UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | ) ) ) ) ) ) ) ) | MDL 2592 |
| | | SECTION L |
| DORA MINGO Case No. 2:15-cv-03469 | | JUDGE ELDON E. FALLON |
| | | MAG. JUDGE NORTH |

**DEFENDANTS' JOINT *DAUBERT* MOTION TO EXCLUDE EXPERT OPINIONS AND TESTIMONY OF PLAINTIFF'S CASE-SPECIFIC EXPERT DR. HENRY RINDER**

Pursuant to Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), Defendants Bayer HealthCare Pharmaceuticals Inc., Bayer Pharma AG, Janssen Pharmaceuticals, Inc., and Janssen Research & Development, LLC (collectively, "Defendants") move to exclude the case-specific expert testimony of Henry Michael Rinder, M.D., Plaintiff's specific causation expert in *Mingo*.

**Preliminary Statement**

Plaintiff offers the case-specific testimony of Henry M. Rinder, M.D., a hematologist, in support of her allegations that Ms. Mingo's use of Xarelto caused her gastrointestinal bleed ("GI bleed") in February 2015. Plaintiff proffers Dr. Rinder's testimony on a variety of issues, several of which are addressed separately in Defendants' omnibus *Daubert* motion. At issue here is the case-specific causation opinion Dr. Rinder offers that is unsupported by a known, published, validated or in any way reliable methodology, and which should be excluded as nothing more than "ipse dixit" of the expert.

First, Plaintiff proffers Dr. Rinder's opinion that Xarelto use, rather than her gastric ulcer, chronic use of Aspirin, or another underlying medical condition or disease, caused her GI bleed on February 13, 2015. Dr. Rinder's opinion that Xarelto caused the GI bleed is pure speculation

and the product of no known or validated methodology; rather, Dr. Rinder relies exclusively on his experience as a hematologist, which amounts to a consulting practice that does not include the clinical management of patients with active GI bleeding and does not require him to extrapolate in any given case whether or not a patient's GI bleed was caused by Xarelto versus any other medication or underlying disease process. In other words, the causation opinion that Dr. Rinder has developed is limited to this case, and he has never offered or explained this opinion to any of his patients.

There is no medically valid way for Dr. Rinder to support his opinion that Xarelto was "the most probable cause" and "the most substantial and significant contributing factor" of Ms. Mingo's GI bleed.[1] Dr. Rinder's opinion fails every reliability factor under *Daubert* because it has not been tested or subjected to peer review, is not generally accepted, is not derived from scientific data, cannot be quantified or calculated, and violates fundamental principles of the scientific method. Dr. Rinder concedes that Ms. Mingo was diagnosed with a gastric ulcer during her admission for the GI bleed and that the gastroenterologist reported blood oozing from that lesion.[2] He admits that Ms. Mingo's gastric ulcer "was the likely anatomic etiology of her GI bleeding"[3] and cannot testify to a reasonable degree of medical certainty that Ms. Mingo would not have bled but for the gastric ulcer.[4] However, Dr. Rinder arbitrarily rules out all known etiologies of GI bleeding, including the gastric ulcer and Ms. Mingo's aspirin use, an independent risk factor for stomach bleeding, to conclude that Xarelto was more likely than not the cause of her GI bleed.

---

[1] Rinder Report at p. 1, ¶ 1 (Exh. 1).

[2] Rinder Report at p. 3, ¶ 4 (Exh. 1).

[3] Rinder Report at p. 1, ¶ 1 (Exh. 1).

[4] Deposition of 2/7/2017 of Dr. Henry M. Rinder ("Rinder Dep.") at 119:3-25 (Exh. 2).

Dr. Rinder's report lacks any reference to a particular method or methodology that he, or anyone else, could implement or repeat in order to verify his ultimate opinion in this case. Any method employed by Dr. Rinder cannot be reliably applied to the facts of this case and amounts to mere *ipse dixit*. His opinion amounts to a hypothesis that has never been tested, has not been subjected to peer review, is unsupported by sufficient facts or data, is not the product of reliable principles or methods, and is, therefore, inadmissible under *Daubert*. *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010); *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007) ("[T]he existence of sufficient facts [to support the opinion] and a reliable methodology is in all instances mandatory.").

**Factual Background**

1. Hospital Course.

Two weeks after receiving a hip replacement, Ms. Mingo experienced a blood clot (deep vein thrombosis or "DVT") in her leg and went to the emergency room at the Southwest Regional Medical Center in McComb, Mississippi.[5] After her hip replacement surgery, Ms. Mingo received seven days of Lovenox injections starting January 9, 2015, then transitioned to aspirin 325mg once a day.[6] On January 22, 2015, Ms. Mingo presented and was admitted to Southwest Regional Medical Center with a DVT diagnosis.[7]

On January 23, 2015, Dr. Renie Jordan prescribed Xarelto for Ms. Mingo to treat her DVT.[8] Ms. Mingo took Xarelto for 21 days before returning to the emergency room with an

---

[5] Pl. Fact Sheet (Sept. 22, 2015) (Exh. 3) §§ I.C, VI; Hip Surgery Op Report (Jan. 6, 2015) (Exh. 4), DMingo-StDomHos-MD-178-79; Radiology Report (Jan. 22, 2015), DMingo-JGholson-00059 (Exh. 5).

[6] Physicians Orders (Jan. 9, 2015), DMingo-StDomHos-MD-00032 (Exh. 6); Deposition of 6/20/2016 of Dora Mingo ("Mingo Dep.") at 30:11-20 (June 20, 2016) (Exh. 7).

[7] Exh. 3 at § VI.A.

[8] Deposition of 8/12/16 of Dr. Renie Jordan ("Jordan Dep.") at 32:2–34:4 (Exh. 8).

oozing ulcer in her upper gastrointestinal tract.[9]  Dr. Keith diagnosed a 6mm oozing gastric ulcer, cauterized it with APC gas, and clipped the ulcer.[10]  Ms. Mingo attributes her gastrointestinal bleeding to Xarelto.[11]  She did not resume Xarelto after this incident. Ms. Mingo was subsequently diagnosed with peptic ulcer disease on February 19, 2015.[12]

  2. Ms. Mingo's Risk Factors for a GI Bleed

Ms. Mingo used various NSAIDs for several years prior to her use of Xarelto before electing to undergo total hip replacement surgery.  Ms. Mingo's aspirin use is well documented throughout her medical history -- it is undisputed that Ms. Mingo used aspirin prior to taking Xarelto, that she took aspirin while using other anticoagulant medications (Lovenox and Coumadin), and that she took aspirin concomitantly with Xarelto for 21 days.[13]  After her orthopedic surgery, Ms. Mingo began taking 325 mg aspirin daily to prophylactically avoid a post-surgical blood clot.  After being diagnosed with the blood clot and starting Xarelto on January 23, she continued to take the 325 mg dose for the time period from January 17 through February 2.[14]  After February 2, she continued taking aspirin at a dose of 81 mg on orders of her PCP Dr. Gholson.  *Id.*  Today, Ms. Mingo remains on aspirin, a point that Dr. Rinder relies upon in forming his ultimate opinion that Xarelto was the proximate cause of her GI bleed.

Nonsteroidal anti-inflammatory drugs (NSAIDs), including aspirin, commonly induce injury to the mucosal lining of the GI tract.  It is widely known that erosions to the gastric mucosa occur as a result of the gastrointestinal toxicity of NSAIDs and aspirin.  Ulcers like Ms.

---

[9] Exh. 3 at § I.C; Deposition of 8/11/16 of Dr. Stephen P. Keith ("Keith Dep.") at 81:2–19 (Exh. 9).

[10] EGD Procedure Op Note, DMingo-SMRMC-MD-000506 (Exh. 10).

[11] Dora Mingo Complaint (Doc. 1) ¶ 10, No. 2:15-cv-03367 (Exh. 11).

[12] Office Visit (Feb. 19, 2015), DMingo-SKeith-08-13 (Exh. 12).

[13] Mingo Dep. 240:10-15 (Exh. 7); Keith Dep. at 62:10-19 (Exh. 9).

[14] Office Visit dated February 3, 2015, DMingo-JGholson-000015 (Exh. 13).

Mingo's are considered "breaks" that extend deeper into the submucosa and have a known tendency to cause severe bleeding. The incidence of ulcers may only be observed and diagnosed endoscopically. Ms. Mingo was diagnosed with a stomach ulcer at the time of her GI bleed. Dr. Rinder states in his report that the ulcer put her at increased risk for gastric bleeding, and that it was in fact the "likely anatomic etiology" of her GI bleeding.[15]

The Xarelto label contains specific warnings about the concomitant use of aspirin. The label expressly states that aspirin is an independent risk factor for increased bleeding.[16]

**Argument**

Pursuant to Federal Rule of Evidence 702, an expert witness may only testify in the form of an opinion if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case. Under *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579 (1993) and its progeny, the trial court acts as a "gatekeeper" to exclude "junk science" that does not meet Rule 702's reliability standards. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997); *Daubert*, 509 U.S. at 592–93; *Hickey v. Gusman*, 2011 WL 6180050, at *3 (E.D. La. Dec. 13, 2011) (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147–48 (1999)).

"*Daubert* requires admissible expert testimony to be both reliable and relevant." *Wells v. SmithKline Beecham Corp.*, 601 F.3d 375, 378 (5th Cir. 2010). "[T]he existence of sufficient facts [to support the opinion] and a reliable methodology is in all instances mandatory." *Hathaway v. Bazany*, 507 F.3d 312, 318 (5th Cir. 2007). Plaintiff bears the burden of proving the

---

[15] Rinder Rep. at p.1 (Exh. 1).

[16] Xarelto Prescribing Information, §§ 5.2, 7.3, 12.3 (January 2015) (Exh. 14).

reliably and relevance of the opinions set forth by her experts. *Moore v. Ashland Chemical, Inc.*, 151 F. 3d 269, 276 (5th Cir. 1998) (en banc); *In re Propulsid Prods. Liab. Litig.,* 261 F. Supp. 2d 603 (E.D. La. 2003).

To clear the reliability bar, the experts must employ "the same level of intellectual rigor that characterizes the practice of [the] expert[s] in the[ir] relevant field[s]." *Kumho Tire Co.,* 526 U.S. at 152. The opinions must be based on "scientifically valid" methodology and "grounded in the methods and procedures of science." *Daubert*, 509 U.S. at 590, 592–93. To determine whether an expert's methodology is sufficiently reliable, the trial court must consider such factors as: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community. *Id.*; *Watkins v. Telsmith, Inc.,* 121 F. 3d 984, 989 (5th Cir. 1997) (quoting *Daubert*, 509 U.S. at 593–594).

Expert testimony "must be reliable at each and every step or else it is inadmissible. The reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia." *Kidd v. Candy Fleet,* LLC, No. CV 16-71, 2016 WL 6901937, at *4 (E.D. La. Nov. 23, 2016) (citing *Knight v. Kirby Inland Marine Inc.*, 482 F.3d 347, 355 (5th Cir. 2007)).

Where an expert's opinions are not based on a sufficiently reliable methodology, they must be excluded. *Edna Tajonera, et al. v. Black Elk Energy Offshore Operations, L.L.C., et al.*, No. CA 13-0366, 2016 WL 1178669, at *10 (E.D. La. Mar. 28, 2016) (excluding expert testimony where expert's opinions relied on no ascertainable methodology, regulations, standards, or other objective criteria).

Likewise, where the expert's conclusions are not based on sufficient facts or data, but instead are based only on the "ipse dixit" of the expert, the proffered testimony must be excluded. Fed. R. Evid. 702; *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519, 139 L. Ed. 2d 508 (1997) (when the trial court finds there is "too great an analytical gap" between the data and the opinion proffered, the testimony should be excluded); *Moore v. Ashland Chem. Inc.,* 151 F.3d 269, 279 (5th Cir. 1998); *Granger v. Marine*, No. CV 15-477, 2016 WL 4621501, at *3 (E.D. La. Sept. 6, 2016).

**I.     Dr. Rinder's Opinion That Xarelto Caused Mrs. Mingo's GI Bleed Is Not Based on a Reliable Methodology Because He Arbitrarily Excludes Known Risk Factors and Potential Causes.**

Dr. Rinder's opinion does not chin the bar of Daubert's requirement, as it is not the product of reliable and valid methods, nor did he reliably apply his principles and methods to the facts in this case. Specifically, Dr. Rinder did not follow a valid methodology in forming his opinion that Xarelto caused Ms. Mingo's GI bleed when he arbitrarily excluded aspirin from the list of possible causes of Ms. Mingo's GI bleed. In the Fifth Circuit, a medical expert must consider and exclude other possible causes of the injury. *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 423 (5th Cir. 1987).

In his report, Dr. Rinder acknowledged that Ms. Mingo had several, known risk factors for developing a GI bleed in addition to her use of Xarelto, including aspirin use and a gastric ulcer.[17] In addition to Ms. Mingo's use of aspirin, Dr. Rinder acknowledged that the "anatomic etiology" or "anatomic source" of her GI bleeding was her gastric ulcer.[18] "After extensive review, and having ruled in and ruled out potential risk factors," Dr. Rinder claims that he

---

[17] Rinder Report, at pp. 2, 4-5 (Exh. 1).
[18] *Id.* at 1, 5.

"concluded to a reasonable degree of medical certainty that Ms. Mingo's use of Xarelto was the most probable cause of her GI hemorrhage in February 2015."[19]

Dr. Rinder's "ruling in and ruling out" of Ms. Mingo's risk factors suggests that he may have performed a "differential diagnosis" to arrive at his opinion that Xarelto, not other risk factors, caused Ms. Mingo's GI bleed.[20] However, Dr. Rinder has never offered a particular method or rationale for actually ruling out other risk factors. Although Dr. Rinder is not required to disprove every possible other cause, he cannot "[s]imply pick the cause that is most advantageous to [plaintiff's] claim;" nor can he do so without any reliable scientific support or medical facts from the patient's records. *See Viterbo*, 826 F.2d at 424 (holding that an expert's opinion lacked foundation and reliability necessary where the expert admitted that the plaintiff's symptoms could have had numerous causes, but instead of reliably ruling out other causes, simply chose the cause most advantageous to the plaintiff's claim). Nor does an expert "establish the reliability of his techniques or the validity of his conclusions simply by claiming that he performed a differential diagnosis on a patient." *Guinn v. AstraZeneca Pharmaceuticals LP*, 602 F.3d 1245 (11th Cir. 2010) (finding that the expert's conclusions were not logically supported by the facts of the case where the expert could not sufficiently rule out other potential causes of the plaintiff's illness through valid methodology).

Without a method to calculate or quantify his opinion, Dr. Rinder's testimony amounts to mere guesswork, which is inadmissible under *Daubert*. *See, e.g., Burleson v. Texas Dep't of Crim Justice*, 393 F.3d 577, 587 (5th Cir. 2004) (affirming exclusion of expert testimony "based

---

[19] *Id.* at 6.

[20] Defendants do not concede that differential diagnosis would have been a proper methodology to follow, had Dr. Rinder done so here. Even if Dr. Rinder claimed he had performed a differential diagnosis, his opinion would be inadmissible in any event because he did not properly rule in/rule out potential causes.

on speculation, guesswork, and conjecture"). Dr. Rinder's guesswork is confirmed by the fact that he made no effort to attribute his conclusion to a published or validated scientific methodology either in his report or in his deposition. Indeed, there is no test, procedure, analysis or medical imaging study that could be done to differentiate a GI bleed exacerbated by anticoagulant use from a GI bleed stemming from some other cause. Undisputed, however, is the fact that the underlying source of Ms. Mingo's GI bleed was an "oozing ulcer of the fundus," which was determined endoscopically by the esophagogastroduodenoscopy ("EGD") performed on February 13, 2015, by her treating gastroenterologist Dr. Stephen Keith.[21] Neither the pre-procedure report nor the operative report includes a reference to Xarelto as a contributing factor or cause of the bleed.[22] And although he was fully aware of Ms. Mingo's Xarelto use and ultimately recommended that she continue taking the medication, Xarelto was not included in Dr. Keith's differential diagnosis.[23] As such, if Dr. Rinder claims to have performed a "differential diagnosis," he failed to reliably implement that methodology.

It may be reasonably inferred from Dr. Rinder's report that he intends to rely on a method of "temporal proximity" for concluding that Ms. Mingo's GI bleed was caused by Xarelto and not aspirin or other known causes of bleeding. If in fact his opinion is based on temporal proximity, the application of such method is improper based on the facts of this case, and unreliable based on Dr. Rinder's rationale that Ms. Mingo took Xarelto and was diagnosed with a GI bleed 21 days later.

Courts have consistently held that the mere temporal relationship between exposure to a substance and the development of a medical diagnosis is insufficient as scientific proof of

---

[21] Procedure Note from Dr. Keith's EGD performed on Feb. 13, 2015 (Exh. 10).
[22] *Id*.
[23] Keith Dep. 100:3-101:3 (underlying cause of her anemia is ulcer) (Exh. 9).

causation. The Fifth Circuit has held that "the temporal connection between exposure to chemicals and an onset of symptoms, standing alone, is entitled to little weight in determining causation." *Moore v. Ashland Chem. Inc.*, 151 F.3d 269, 278 (5th Cir. 1998). Inferring causation from temporality "is not an exercise in scientific logic but in the fallacy of post-hoc propter-hoc reasoning, which is as unacceptable in science as in law." *Black v. Food Lion, Inc.*, 171 F.3d 308, 313 (5th Cir. 1999). In *Guinn*, *supra*, the Eleventh Circuit held that the plaintiff's specific causation expert "did not adequately consider possible alternative causes simply by noting the temporal proximity between [plaintiff's] ingestion of [the drug] and subsequent development of diabetes." *Guinn*, 602 F.3d at 1255. The court explained that "several factors" in that case "make [temporal proximity] especially unreliable" as grounds for a specific causation opinion, emphasizing that just because the patient was diagnosed with diabetes years after starting to take the drug is not strong evidence of causation, but rather, "appears to equally indicate that [the patient] may have already developed [the medical condition] before ever taking [the drug]." *Id*. at 1254. Similarly here, the fact that Ms. Mingo experienced a GI bleed just 21 days after starting Xarelto is not strong evidence of causation. Rather, it indicates the likelihood, as set forth by Defendants' experts, that Ms. Mingo had already developed the stomach ulcer before initiating Xarelto and that she was suffering from occult bleeding January 6, 2015, at the time of her total hip arthroplasty.[24]

Under *Daubert*, Dr. Rinder's failure to identify any scientifically valid methodology is fatal to the admissibility of his opinion that it was Xarelto use, not other known risk factors or potential causes, that caused her hemorrhage. *See, e.g.*, *Berry v. Armstrong Rubber Co.*, 989 F.2d 822, 828 (5th Cir. 1993) (affirming exclusion of expert opinions that were unsupported by an

---

[24] Herrin Report at p. 4, ¶ 1 (Exh. 15).

accepted methodology); *Burst v. Shell Oil Co.,* 104 F. Supp. 3d 773, 788, 790 (E.D. La. 2015) (excluding an expert's opinion for failing to cite any source indicating that his methodology is accepted or any study that utilized his methodology).  Other circuits support exclusion of expert witness opinion when there is a failure to consider alternative causes.  *See, e.g., Cooper v. Smith & Nephew, Inc.*, 259 F.3d 194, 202 (4th Cir. 2001) ("[I]f an expert utterly fails to consider alternative causes or fails to offer an explanation for why the proffered alternative cause was not the sole cause, a district court is justified in excluding the expert's testimony."); *In re: Lipitor (Atorvastatin Calcium) Marketing, Sales Practices and Prods. Liab. Litig.*, 185 F. Supp. 3d 786, 800 (D. S.C. 2016) (while an expert "need not rule out every possible alternative cause . . . he must offer an explanation as to why these other recognized causes, alone, are not responsible for the disease in a particular plaintiff"); *Wilson v. Taser Int'l, Inc.*, 303 F. App'x 708, 714 (11th Cir. 2008) ("[E]xpert opinion testimony is properly excluded as unreliable if the doctor 'engaged in very few standard diagnostic techniques by which doctors normally rule out alternative causes and the doctor offered no good explanation as to why his or her conclusion remained reliable" or if "the defendants pointed to some likely caused of the plaintiff's illness other than the defendants' action and [the doctor] offered no reasonable explanation as to why he or she still believed that the defendants' actions were a substantial factor in bringing about that illness.").

**II.     Dr. Rinder's Opinion Is Unreliable Because He Cannot Calculate or Quantify the Likelihood That Anticoagulant Use Caused Ms. Mingo's GI Bleed.**

On the surface, Dr. Rinder's theory suggests that Xarelto accelerated or prompted Ms. Mingo's ulcer to bleed; however, he offers no testimony as to any impact that Xarelto had on Ms. Mingo's ulcer.  Further, and unlike *all* other clinicians – fact and expert – who reviewed Ms. Mingo's records and offered testimony in this case, Dr. Rinder refuses to concede that but for Ms. Mingo's ulcer (or some other underlying lesion), she would not have experienced a GI bleed

while taking Xarelto and aspirin. In doing so, Dr. Rinder ignores the vast scientific proof that ulcerations of the stomach are known to cause upper GI complications, including severe bleeding.

Dr. Rinder willingly concedes that Xarelto did not cause Ms. Mingo's ulcer, admitting there is no data to demonstrate that Xarelto initiates ulcerations or otherwise causes ulcers to form.[25] He further agrees that it is impossible for anyone to express an opinion, with any degree of scientific certainty, as to what caused Ms. Mingo's stomach ulcer or for how long it had been present (i.e., whether it formed before or after Ms. Mingo's use of Xarelto).[26] Without any explanation, Dr. Rinder states that Ms. Mingo's gastric ulcer, "was the likely anatomic etiology of her GI bleeding," but that "her use of Xarelto was the most probable cause" of her GI bleed.[27] In doing so, Dr. Rinder seems to have arbitrarily excluded Ms. Mingo's diagnosis of peptic ulcer disease from the realm of possible causes of Ms. Mingo's GI bleed and limited the possible causes of Ms. Mingo's GI bleed to aspirin and anticoagulant use. Dr. Rinder then proceeds to arbitrarily choose her Xarelto use, rather than aspirin, Lovenox, or Coumadin, as "the most probable" cause of her bleed.[28] This defies the logic of other clinicians' testimony in this case – fact and expert – who readily admit that concomitant use of aspirin cannot be ruled out as the most likely cause of her GI bleed and that it is impossible to delineate which agent contributed more or less than the other.[29]

---

[25] Rinder Dep. at 118:4-10 (Exh. 2).

[26] Rinder Dep. at 141:9-142:10 (Exh. 2).

[27] Rinder Report at p. 1, ¶ 1 (Exh. 1).

[28] Rinder Report at p. 6 (Exh. 1).

[29] Keith Dep. 111:4-9, 193:19-194:19 (Exh. 9); Jordan Dep., 149:4-21, 151:16-23 (Exh. 8); Deposition of 2/10/17 of Dr. Alan Jones ("Jones Dep.") at 185:10-186:19 (Exh. 16); Deposition of 2/8/17 of Dr. Vincent Herrin ("Herrin Dep.") at 10:5-18 (Exh. 17).

Dr. Rinder offers no reliable methodology or scientific data and cannot quantify or calculate Xarelto's alleged contribution to Ms. Mingo's GI bleed in order to say it was the "most probable" cause of her injury. The lack of a known or potential rate of error further demonstrates the unreliability of Dr. Rinder's opinion. *In re Propulsid Prod. Liab. Litig.,* 261 F. Supp. 2d 603, 617 (E.D. La. 2003) (holding that expert opinions based on theories that are not generally accepted in the scientific community and have no known or potential rate of error are unreliable under the logic of Daubert and Black); *In re Midland Enterprises, Inc.,* No. CIV.A. 00-3750, 2002 WL 31780156, at *2 (E.D. La. Dec. 11, 2002) (excluding an expert's opinions where the expert "failed to articulate or identify an underlying methodology for his opinion which would even provide an opportunity to determine a known or potential 'rate of error' for his conclusion); *Upper St. Rose Fleeting Co. v. Consol. Grain & Barge Co.*, No. CIV. A. 97-2265, 1999 WL 33216962, at *2 (E.D. La. Nov. 10, 1999) (finding an expert's opinion to be unreliable under *Daubert* where the opinion was based on a methodology that lacked a potential rate of error); *Pick v. Am. Med. Sys., Inc.,* No. CIV. A. 94-1729, 1996 WL 243508, at *1 (E.D. La. May 9, 1996) (holding an expert's methodology to be unreliable where it was not supported by any peer review publication; it was experimental, and the potential rate of error was unknown).

## Conclusion

For all of the reasons stated above, pursuant to Federal Rule of Evidence 702 and *Daubert*, the Court should exclude any expert testimony from Henry Rinder, M.D. on the issues of whether Xarelto proximately caused Ms. Mingo's GI bleed.

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
Chanda.Miller@dbr.com


IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ *James B. Irwin*
James B. Irwin
Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com


*Attorneys for Defendants Janssen Pharmaceuticals, Inc. and Janssen Research & Development, LLC*

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *William Hoffman*
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com


BRADLEY ARANT BOULT CUMMINGS LLP

By: */s/ Kevin C. Newsom*
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com


CHAFFE MCCALL L.L.P.

By: /s/ *John F. Olinde*
John F. Olinde
Chaffe McCall L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer HealthCare Pharmaceuticals Inc. and Bayer Pharma AG*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 12th day of June, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system.

*/s/ John F. Olinde*