1               UNITED STATES DISTRICT COURT
               EASTERN DISTRICT OF LOUISIANA
2
    ****************************************************************
3   IN RE:  XARELTO (RIVAROXABAN)
    PRODUCTS LIABILITY LITIGATION
4
                                   Docket No. 14-MD-2592
5   THIS DOCUMENT RELATES TO:       Section L
                                   New Orleans, Louisiana
6   *Joseph Orr, Jr., as Lawful*    Tuesday, May 30, 2017
    *Surviving Spouse of*
7   *Sharyn Orr v. Janssen, et al.*
    *Case No. 2:15-cv-03708*
8
    ****************************************************************
9
                TRANSCRIPT OF TRIAL PROCEEDINGS
10        HEARD BEFORE THE HONORABLE ELDON E. FALLON
              UNITED STATES DISTRICT JUDGE
11               VOLUME I - MORNING SESSION

12
    APPEARANCES:
13
    FOR THE PLAINTIFFS'           MR. ANTHONY BIRCHFIELD, JR.
14  LIAISON COUNSEL:              Beasley Allen Crow Methvin
                                    Portis & Miles
15                                Post Office Box 4160
                                  Montgomery, AL  36103
16

17                                MR. BRIAN H. BARR
                                  Levin Papantonio Thomas
18                                  Mitchell Rafferty & Proctor
                                  316 Baylen Street
19                                Suite 600
                                  Pensacola, FL 32502
20

21                                MR. GERALD EDWARD MEUNIER
                                  Gainsburgh, Benjamin, David,
22                                  Meunier & Warshauer
                                  Energy Centre
23                                1100 Poydras Street
                                  Suite 2800
24                                New Orleans, LA  70163-2800

25

```
 1                                    MS. EMILY JEFFCOTT
                                      Lambert Firm
 2                                    701 Magazine Street
                                      New Orleans, LA  70130
 3

 4                                    MR. BRADLEY D. HONNOLD
                                      Bartimus, Frickleton,
 5                                       Robertson & Goza, P.C.
                                      11150 Overbrook Road
 6                                    Suite 200
                                      Leawood, KS 66211
 7

 8
      FOR THE DEFENDANT JANSSEN       MR. JAMES B. IRWIN, V
 9    PHARMACEUTICALS, INC.,          Irwin Fritchie
      and JANSSEN RESEARCH &             Urquhart & Moore, LLC
10    DEVELOPMENT, LLC:               400 Poydras Street
                                      Suite 2700
11                                    New Orleans, LA  70130

12

13    FOR THE DEFENDANT              MR. DAVID E. DUKES
      BAYER HEALTHCARE               Nelson Mullins Riley &
14    PHARMACEUTICALS, INC.,            Scarborough, LLP
      and BAYER PHARMA AG:           Meridian, 17th Floor
15                                   1320 Main Street
                                     Columbia, SC  29201
16

17                                    MS. BETH A. WILKINSON
                                      Wilkinson Walsh + Eskovitz, LLP
18                                    1900 M. Street NW
                                      Suite 800
19                                    Washington, DC 20036

20

21    Official Court Reporter:        Lanie M. Smith, RPR, CRR
                                      500 Poydras Street, B-275
22                                    New Orleans, Louisiana 70130
                                      (504) 589-7782
23

24
              Proceedings recorded by mechanical stenography,
25    transcript produced via computer.
```

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | (TUESDAY, MAY 30, 2017) |
| 3 | (MORNING SESSION) |
| 4 | (Call to order of the court.) |
| 5 | THE COURT:  Be seated, please. |
| 6 | Good morning, ladies and gentlemen. |
| 7 | Call the case: |
| 8 | COURTROOM MANAGER:  *In Re:  Xarelto Products Liability* |
| 9 | *Litigation*, MDL No. 2952; and this is regarding case number |
| 10 | 15-3708, *Joseph Orr, et al., v. Janssen Research, et al.* |
| 11 | THE COURT:  Counsel, make your appearance for the |
| 12 | record and indicate whether you are ready to proceed. |
| 13 | MR. BIRCHFIELD:  Good morning, Your Honor |
| 14 | Andy Birchfield on behalf of the plaintiffs.  The plaintiffs |
| 15 | are ready. |
| 16 | MS. WILKINSON:  Good morning, Your Honor. |
| 17 | Beth Wilkinson on behalf of the defendants.  We are ready to |
| 18 | proceed. |
| 19 | THE COURT:  Okay.  Ladies and gentlemen, my name is |
| 20 | Eldon Fallon, and I am the judge who will preside over this |
| 21 | case.  I first want to welcome you to the Court.  I appreciate |
| 22 | you being here.  I know that all of you have things to do, |
| 23 | places to go and you'd like to be there rather than here.  I |
| 24 | remind you, however, that our country is indeed the oldest |
| 25 | democratic republic on the face of the earth and one of the |

1 reasons is that our citizens participate in a meaningful way in

2 the running of the country.  I know each of you believe in your

3 country and feel that it is the greatest country in the world.

4 We have a lot of freedom here.  We have a lot of opportunity

5 here.  Other places do not.  We can worship whomever and

6 whenever we wish to.  We can move from state to state without

7 showing papers.  We can do all of those things, but it's not

8 free.  This country is not free from the standpoint of we have

9 to pay for those rights.  We just went through Memorial Day and

10 we recognized and thanked the people who paid with the ultimate

11 price so that we could all be here today.

12          Another service in addition to service in the

13 military is your service in the jury.  You make it possible for

14 us to have justice in this country.  You in a very meaningful

15 way -- and you'll hear me say this many times -- when you serve

16 on a jury, you're a judge, a judge of the facts; and we need

17 you to serve our country in that portion.  So I do appreciate

18 your being here and I recognize the inconvenience that each of

19 you are experiencing by being here, but your presence is

20 meaningful and we all appreciate it.

21          Let me tell you about the case.  This is a civil

22 case.  The plaintiffs who have brought this lawsuit are

23 Joseph Orr, Jr., the surviving husband of Sharyn Orr.

24 Mrs. Orr's three surviving adult children, Joseph Orr, III;

25 Kelli Orr Walker; Kim Orr DeAgano.

1          The defendants, the parties sued by the

2    plaintiffs, are Janssen Research & Development, LLC;

3    Janssen Pharmaceuticals, Inc., Bayer Healthcare

4    Pharmaceuticals, Inc.; and Bayer Pharma AG.

5          The Bayer and Janssen defendants manufacture a

6    medication called Xarelto.  Xarelto is on the market today and

7    has been on the market continuously since 2011.  Xarelto is a

8    prescription anticoagulant, sometimes called a blood thinner,

9    that is used to reduce the risk of stroke in people with atrial

10   fibrillation, a heart problem.  This lawsuit is a survival and

11   wrongful death action based upon injuries and death that the

12   plaintiffs claim Mrs. Orr sustained due to inadequate warnings

13   and instructions in connection with her taking the drug

14   Xarelto.  The plaintiffs claim that the defendants failed to

15   provide Mrs. Orr's prescribing and treating physicians with

16   adequate warnings or instructions about the safe use of Xarelto

17   in view of its dangerous characteristics, including the high

18   degree of variability in how patients absorb the drug, the use

19   of a test to assess the amount of Xarelto in a patient's blood

20   and the lack of an antidote or reversal agent.

21         The plaintiffs claim that such warnings or

22   instructions would have led the physicians or any reasonable

23   physicians in their circumstance to fully understand the drug's

24   dangers and risks and take steps which would have avoided the

25   death of Mrs. Orr or would have increased her chance of

1    surviving.  The defendants deny all of these allegations and

2    claim that Xarelto was not the cause of her hemorrhage and

3    death.  They claim that Xarelto's label adequately warned about

4    the risks and benefits of Xarelto enabling doctors to make

5    informed decisions about the use of Xarelto by their patients.

6    This dispute, ladies and gentlemen, raises a question of fact

7    which must be resolved by the jury.

8            Each of the parties has a right to have their

9    case tried by a qualified, fair and impartial jury.  A

10   qualified and impartial jury is one which will without fear,

11   without favor, bias, prejudice, sympathy or passion, hear and

12   decide the issues in the case objectively and one which will

13   render its verdict based solely on the evidence presented at

14   this trial and the law applicable to the case as the Court

15   gives it to you.

16           It is the law, ladies and gentlemen, that a

17   juror's qualifications and impartiality may not be assumed

18   without some inquiry.  The inquiry, which is about to be made,

19   is known as the voir dire examination.  It is a time-honored

20   process by which the qualifications and impartiality of

21   prospective jurors may be determined.  Its purpose and its sole

22   purpose is to develop the whole truth concerning the competency

23   of each prospective juror, his or her frame of mind and the

24   ability to do his or her sworn duty in accordance with the

25   juror's oath.

1          The answers to the questions to be put to you by

2    the Court will not only enable the Court to determine whether

3    any of you should be excused for cause either upon the Court's

4    own motion or when challenged by a party, but will also allow

5    counsel for the parties to make intelligent use of what we call

6    peremptory challenges; that is to say, challenges which the law

7    gives to each party that he may use without stating any reason

8    for it.  They can dismiss a person -- they have a certain

9    number.  They can dismiss a person for any reason as long as it

10   is a legal reason.

11          You should understand, therefore, it is expected

12   of each of you that your answers to the questions propounded

13   will be complete and, of course, will be truthful.

14          Each juror is under a compulsion to disclose upon

15   a general question any matter which might tend to disqualify

16   him or her for any reason from sitting on the jury.

17          I remind you that false and misleading answers

18   may result in the seating of a juror who might have been

19   discharged by the Court for cause or stricken through the

20   exercise of their peremptory challenge and could result in a

21   miscarriage of justice.

22          Now, in this case, you've previously answered

23   questions -- rather extensive juror questionnaires.  I have

24   reviewed them and the attorneys for the parties have reviewed

25   them.  All of us thank you for the time and effort that you

1    expended answering the questionnaire.

2              This was very helpful and will greatly assist the

3    Court and counsel in making the voir dire process much shorter

4    so that we can get on with the trial.

5              I only have a few questions of all of you, and my

6    questions are not intended to pry upon your personal life.  If

7    anything, if you wish to speak to me privately, just raise your

8    hand and come up and I'll talk with you in private.

9              My questions are general questions, basically,

10   and the reason for them, ladies and gentlemen, is that we all

11   recognize that we come to any activity with certain baggage,

12   that is to say, our past experiences.

13             And sometimes our past experiences make it such

14   that we could better serve on another jury rather than this

15   particular jury.  And so that's all my questions will be

16   focused on and also the questions of the attorneys after I'm

17   finished.

18             If any of you should answer the following

19   questions "yes," please raise your hand, state your number and

20   your name, and I will discuss it further with you.  I'll

21   require that your answers be given under oath.

22             So at this time I'll direct my courtroom deputy

23   to administer the oath to you.

24        THE COURTROOM MANAGER:  Jurors, would you please rise

25   and raise your right hands.

1          (Whereupon, the jury venire was sworn.)

2          THE COURTROOM MANAGER:  Please have a seat.

3          THE COURT:  First, as I have said before, this is a

4     civil case.  The Plaintiffs, that is to say, the parties

5     bringing the lawsuit, have the burden of proving their case by

6     what is called a preponderance of the evidence.

7                That means that the Plaintiffs have to produce

8     evidence which, considered in light of all the facts, leads you

9     to believe that what the claims -- that the claims are more

10    likely true than not true.

11               And if the Plaintiff fails to meet this burden,

12    the verdict must be for the Defendant.  They have to prove that

13    what is -- that it's more likely true than not true.

14               Those of you who have sat on criminal cases will

15    have heard of proof beyond a reasonable doubt.  That

16    requirement does not apply in a civil case, and you should

17    therefore put it out of your mind.

18               Is there anyone who is unwilling or unable to

19    follow that time-honored rule of law?

20               (No response.)

21          THE COURT:  Would you be unable or unwilling to

22    firmly put aside any feelings of sympathy or compassion for the

23    Plaintiffs or the Defendants and decide the case solely on the

24    basis of the merits and according to the law as I explain it to

25    you?

1              (No response.)

2              Let me ask counsel to stand and introduce

3     themselves, please.

4              First, the Plaintiffs.

5         MR. BIRCHFIELD:  Good morning, Your Honor.

6              Andy Birchfield on behalf of the Plaintiffs.

7              Your Honor, at this time would you like for me to

8     introduce the Orr family?

9         THE COURT:  Yes, please.

10        MR. BIRCHFIELD:  We have Mr. Joe Orr, the husband of

11    Sharyn Orr, and their three children, Kim, Kelli, and Joe.

12        THE COURT:  Now, my first question, ladies and

13    gentlemen:  Do any of you know these individuals, seen them

14    before, have anything to do with them?

15             (No response.)

16        THE COURT:  How about the other Plaintiff

17    lawyers?  Would you please --

18        MR. MEUNIER:  Good morning, ladies and gentlemen.

19             I'm Jerry Meunier with the New Orleans law firm

20    of Gainsburgh, Benjamin, David, Meunier & Warshauer.

21        MR. BARR:  Good morning.

22             My name is Brian Barr.  I'm happy to be here

23    today.

24        MR. HONNOLD:  Good morning.

25             My name is Brad Honnold, and I'm from

1    Kansas City.

2         MS. JEFFCOTT:  Good morning.

3              My name is Emily Jeffcott.  I'm with the New

4    Orleans firm of The Lambert Firm.

5         THE COURT:  My question again:  Any of these

6    individuals, do you know them?  Have you seen them before?

7    Have you talked to them?  Know anything about them?  Do they

8    represent you at all or your family?

9              (No response.)

10             THE COURT:  How about the Defendants?

11        MS. WILKINSON:  Good morning.

12             My name is Beth Wilkinson.  I'm with the firm of

13   Wilkinson Walsh + Eskovitz.

14        MR. DUKES:  Good morning.

15             I'm David Dukes with the firm Nelson Mullins.

16        MR. IRWIN:  And I am Jim Irwin.  I'm with the firm of

17   Irwin Fritchie Urquhart & Moore here in New Orleans.

18        THE COURT:  My question to you again:  Anybody know

19   these individuals?  See them -- do they represent you or

20   anybody in your family?  Okay.

21             (No response.)

22        THE COURT:  Do the Defendants have a representative?

23        MS. WILKINSON:  We don't.  Thank you, Your Honor.

24        THE COURT:  Okay.  Does anyone feel any prejudice

25   against someone coming to court seeking monetary damages?

1          As you know, in old biblical times, it was an eye

2  for an eye and a tooth for a tooth, but we found that that

3  simply left a lot of toothless and blind people in the world.

4  So we don't do it that way anymore.

5          We don't take to the streets to seek our rights.

6  We come to court.  And one of the ways we do it is to ask for

7  monetary damages.

8          Does that give anybody any problems?

9          (No response.)

10      THE COURT:  Anyone presently taking any medication

11  which will in any way interfere with your hearing, seeing,

12  sitting, listening or serving as a juror?

13          (No response.)

14      THE COURT:  Anyone know anyone else on the jury venire?

15  If you look around the room, have you seen anybody that you

16  know?

17          Yes, sir.  The second row, please.

18      PROSPECTIVE JUROR:  I know this gentleman here.

19      THE COURT:  Okay.  Do you-all have any business

20  connection with each other?

21      PROSPECTIVE JUROR:  No, sir.

22      THE COURT:  Give us your name and number, sir.

23      PROSPECTIVE JUROR:  Chris Pierce, No. 28.

24      THE COURT:  Okay.  And you know Mr. --

25      PROSPECTIVE JUROR:  Clarence Molaison, No. 18.

1    THE COURT:  Okay.  And my question to you:  Do you have

2  any business relationship with each other?  Any -- in the same

3  business or dependent upon each other for economic support or

4  anything of that sort?

5    PROSPECTIVE JUROR:  No, sir.  I'm his insurance agent

6  on one piece of property.

7    THE COURT:  Thank you very much.

8      Anyone else?

9  PROSPECTIVE JUROR:  I work with --

10   THE COURT:  You've got to give us your name and number

11  please.

12   PROSPECTIVE JUROR:  Lloyd Songy, L5.

13      I work with Ms. Annette Ford.  We work for the

14  same corporation.

15   THE COURT:  Okay.  Do you-all see each other socially

16  or families get together or anything of that sort?

17   PROSPECTIVE JUROR:  No, sir.  We work in the same

18  building.

19   THE COURT:  Okay.  Thank you very much.

20      Anyone else?  Okay.

21      (No response.)

22   THE COURT:  My next question to you:  If you were one

23  of the parties sitting at these tables, would you have any

24  difficulty with someone on the jury in your frame of mind

25  deciding the case, if you swap places with them?

1             (No response.)

2             Anyone have anything else on their mind that

3     might cause concern to be a member of this particular jury?

4             (No response.)

5         THE COURT:  Anyone work for any of the Defendants or

6     any of the Plaintiffs?

7             (No response.)

8         THE COURT:  The case is expected to last about two

9     weeks, ladies and gentlemen.  We hope to get it to you in two

10    weeks.

11            We may run into the third week, but the lawyers

12    tell me that they're going to do everything possible to get it

13    to you in two weeks.

14            We start at 8:30 in the morning.  We go to about

15    5:00 or 5:30.  You will not be sequestered.  You will be able

16    to go home every night or leave every night.

17            We'll take a 15-minute break in the morning;

18    15-minute break in the afternoon; and we'll break, of course,

19    for lunch about an hour and 15 minutes or so.

20            Does that schedule give anybody any serious

21    problems?

22            Yes, sir?

23        PROSPECTIVE JUROR:  I've got a daughter getting ready

24    to attend Mississippi State.  She's got orientation on the 19th

25    and 20th.  If it goes past that, I'm going to have trouble.

1          THE COURT:  Okay.  Give us your name and number, sir.

2          PROSPECTIVE JUROR:  No. 26, William Bouchereau.

3          THE COURT:  All right.

4          PROSPECTIVE JUROR:  I'm L25, Evangelina Rodriguez.

5               My husband is scheduled to have surgery on the

6      21st, if it goes that far.  So....

7          THE COURT:  Okay.  Hopefully, we won't go that far.

8          PROSPECTIVE JUROR:  I'm No. 24, Eleanor Daveron.

9               My wedding anniversary is June 14th.  So we were

10     going to be out of state from the 12th through the 16th.

11         PROSPECTIVE JUROR:  Yes, sir.  I live in Houma and I

12     have two children in child care.  Morning time won't be an

13     issue, but all summer camps close at 6:00.  I can find other

14     child care if I need to, but that's going to be an additional

15     cost.

16         THE COURT:  What's your number, ma'am, and your name?

17         PROSPECTIVE JUROR:  Lana Frazier, No. 31.

18         THE COURT:  Okay.  Now, let me start and I'll ask each

19     of --

20         PROSPECTIVE JUROR:  Your Honor?

21         THE COURT:  Yes.

22         PROSPECTIVE JUROR:  My name is Frank Cucinello, No. 29.

23              I have a daughter at Old Miss.  I think somebody

24     said Mississippi State.  But I'm moving her back to New Orleans

25     on June 15th.  And I've allotted almost a week's vacation for

1    that, and I've used two days' vacation time already to be here

2    a few weeks ago and today.  I'm running out of my vacation

3    time, and my daughter needs to move back.

4           THE COURT:  Okay.  We're running about in the 20s.

5              Let me talk with each of you now at least in the

6    jury box.  I'll ask that each of you stand up, starting with

7    No. 1.  Give us your name, your number and the parish you're

8    living in, how long you've lived there and whether you're

9    working and a little bit about your duties and

10   responsibilities.

11             We'll start with prospective No. 1.

12          PROSPECTIVE JUROR:  My name is Maira Harris.  I'm

13   No. 1.  I live in Jefferson Parish as of October.  So about

14   seven months.  I'm a nurse.  I work at Ochsner as a clinical

15   educator for nursing.  I've been in that position for about two

16   years.  I've been a nurse for five years.

17          THE COURT:  What do you do in your day-to-day job in

18   your present job?

19          PROSPECTIVE JUROR:  Mostly I just teach orientations to

20   the hospital.

21          THE COURT:  Do you teach nurses?

22          PROSPECTIVE JUROR:  Yes.  And it's generally different

23   things as well.  So just really anything in the scope of

24   medical-surgical nursing.

25          THE COURT:  And do you specialize in medical surgery?

1      PROSPECTIVE JUROR:  Surgery and postop is usually what

2 I have been doing for five years.

3      THE COURT:  Are you married?  Widowed?  Single?

4 Divorced?

5      PROSPECTIVE JUROR:  I'm single with a child.

6      THE COURT:  Okay.  Thank you very much.

7      PROSPECTIVE JUROR:  Good morning, everyone.  My name is

8 Azam Mohammed.  I've been living in Jefferson Parish for over

9 38 years now.  I work for a company by the name of Quality

10 Process Services.  We are in the oil field service business.

11          And I am head of the instrumentation and

12 electrical department.  I'm also in charge of international

13 sales.  I also do all the design of the EME systems.  So I do

14 have a lot of folks that work under me.

15          And as far as that goes, I'm still willing to

16 stay here, but -- even though I'm probably needed elsewhere.

17 But I'm already dedicated to be here.

18      THE COURT:  Thank you, sir.

19          Let me ask you before you -- what's your

20 educational background?

21      PROSPECTIVE JUROR:  Well, I'm originally from Trinidad

22 in the West Indies.  High school and training in the oil field.

23      THE COURT:  What do you do in your day-to-day

24 operations?  What's your job?

25      PROSPECTIVE JUROR:  I make sure that all of our

1    employees go along with their daily operations, and I

2    communicate a lot with our international customers, and I

3    design the systems that our employees fabricate and install.

4           THE COURT:  And you're employed by whom, sir?

5           PROSPECTIVE JUROR:  Quality Process Services.

6           THE COURT:  I see.

7           PROSPECTIVE JUROR:  It's an oil field service company

8    based in Houma, but I live in Gretna.

9           THE COURT:  Okay.  And you go on rigs that need you

10   particularly?

11          PROSPECTIVE JUROR:  Well, our employees do.  But they

12   depend on me to give them directions on their daily

13   assignments.

14          THE COURT:  Okay.  Thank you very much.

15          PROSPECTIVE JUROR:  Thank you.

16          THE COURT:  Yes, sir.

17          PROSPECTIVE JUROR:  I'm Herbert Moore, L3.

18              I retired 37 years out of the military.  I'm

19   also -- my church has several pastors.  So I'm one of them.

20   And my thing is I have -- pastor of outreach ministry where I

21   deal with elderly people, sick people and drug addiction.  I

22   deal with young teens, stuff like that.

23              I'm also the executive president over North Baton

24   Rouge CIA.  I'm the executive president over five communities.

25          THE COURT REPORTER:  Could you repeat what you just

1    said, sir.

2          THE COURT:  What did you just say, sir?

3          PROSPECTIVE JUROR:  Also over North Baton Rouge

4    Community Improvement Association.  I'm the president over five

5    communities, which I deal with the infrastructure and deal with

6    the mayor and council members and all that stuff.

7          We work to get things done in the community.

8    That's one of my little pet peeves.  And right now I just work

9    around the house and whatever Mama wants me to do.  That's

10   about it.  I don't have nothing else to do.  You know what I

11   mean?  And I work my little self to death.  Being in the

12   military all these years, I can't stay still, you know.

13         THE COURT:  I understand.

14         What form of the military were you in?

15         PROSPECTIVE JUROR:  I was in the Army.  I worked in

16   logistics on the general staff and waiting for them to call

17   shots and stuff, you know, and I was well depended on.  I did

18   my job well.

19         THE COURT:  Okay.  What was your rank when you got out?

20         PROSPECTIVE JUROR:  My rank when I got out -- I didn't

21   make sergeant major.  I made master sergeant.

22         THE COURT:  Okay.  Thank you very much.  I appreciate

23   it.

24         Yes, sir.

25         PROSPECTIVE JUROR:  I'm Albert LeBlanc, prospective

1    juror No. 4.  I live in Mandeville.  I work for Ingersoll-Rand

2    on air compressors, and I cover from Texas to Florida, 23

3    years.

4            THE COURT:  I see.

5                 What do you do on a day-to-day basis?  What's

6    your job?

7            PROSPECTIVE JUROR:  I work on air compressors in

8    chemical plants.

9            THE COURT:  At various plants?

10           PROSPECTIVE JUROR:  Yes.  From Texas to Florida.

11           THE COURT:  Does your company sell those?

12           PROSPECTIVE JUROR:  Sell, repair, build, everything.

13           THE COURT:  Anybody under you, sir?

14           PROSPECTIVE JUROR:  No.  No.

15           THE COURT:  Are you married?  Widowed?  Single?

16           PROSPECTIVE JUROR:  I'm divorced.

17           THE COURT:  Thank you very much.  I appreciate it.

18           PROSPECTIVE JUROR:  Lloyd Songy, L5.  I live in

19   Jefferson Parish for 52 years.  I work for Rouse Corporation,

20   40 years.  I'm a category manager in the corporate office in

21   Thibodaux.

22           THE COURT:  What do you do on a day-to-day basis?

23           PROSPECTIVE JUROR:  I'm responsible for buying a large

24   percentage of the groceries that's in the store.  I'm a

25   category manager.

1          THE COURT:  Where do you folks buy all the --

2          PROSPECTIVE JUROR:  Majority of the stuff comes out of

3    AWG, which is in Pearl River.  That's our general warehouse.

4    And then most of what my position is is buying and

5    direct-delivery to vendors that are local and throughout the

6    country that deliver to us door to door.

7          THE COURT:  How many stores do you have?

8          PROSPECTIVE JUROR:  We have 54.  And we purchased one

9    about two weeks ago.  So we'll have 55 soon.

10         THE COURT:  And you're over those --

11         PROSPECTIVE JUROR:  For the purchasing and procurement

12   part.  Yes, sir.

13         THE COURT:  Are you married?  Widowed?  Single?

14   Divorced?

15         PROSPECTIVE JUROR:  Divorced.  Two children.

16         THE COURT:  Okay.  Thank you very much.

17         PROSPECTIVE JUROR:  Good morning.  My name is

18   Stephanie Chambliss.  I am prospective juror No. 6.  I reside

19   in Orleans Parish.  Single.  No children.

20              I work as a full-service financial advisor with

21   AXA Advisors.  And I sell life insurance, long-term care and

22   disability insurance to families.

23         THE COURT:  What do you do on a day-to-day basis?  Do

24   you make calls on individuals or they come to you?

25         PROSPECTIVE JUROR:  It varies.  I work a lot off of

1   referrals.  I do offer retirement programs -- I mean,

2   retirement plans.  But I also work a lot with families.  So I

3   go in and I work with the entire family.  Yes.

4           THE COURT:  Okay.  All right.  Thank you very much.

5           PROSPECTIVE JUROR:  My name is Randall Mitchell.  I'm

6   No. 7.  I reside in St. Tammany Parish the last three years.

7   I've also lived in St. Bernard and Orleans Parish in my life.

8   I'm divorced, a retired construction worker.  And I believe my

9   education level is considered some college.

10          THE COURT:  Okay.  What kind of construction did you

11  do?

12          PROSPECTIVE JUROR:  Commercial construction when I was

13  younger, and then I just kind of became a solo carpenter.  I'm

14  mostly on pawpaw duty these days.

15          THE COURT:  Okay.  Do you still do some carpentry work

16  for yourself, friends and other people?

17          PROSPECTIVE JUROR:  Yes.  Exactly.

18          THE COURT:  Thank you very much.

19          PROSPECTIVE JUROR:  And I'm not retired.  I'm just

20  tired.

21          THE COURT:  Okay.  Thank you.

22          PROSPECTIVE JUROR:  Good morning.  Vladimir Thomas.  I

23  reside in Jefferson Parish since about 2015.  I teach college

24  and sell insurance.  And I'm married.

25          THE COURT:  Okay.  Does your wife work outside of the

1    home?  Spouse work outside of the home?

2         PROSPECTIVE JUROR:  Yes, she does.

3         THE COURT:  What does she do?

4         PROSPECTIVE JUROR:  Insurance.  I help her, actually,

5    and I also teach college just online these days.  I used to

6    work on ground as well, but these days I just work online.

7         THE COURT:  What do you do on an everyday basis?

8         PROSPECTIVE JUROR:  I teach and sell insurance,

9    essentially.

10        THE COURT:  What do you teach?

11        PROSPECTIVE JUROR:  University of Holy Cross and a

12   couple of other out-of-state colleges.

13        THE COURT:  What do you teach?

14        PROSPECTIVE JUROR:  Philosophy and marketing.

15        THE COURT:  You teach online?

16        PROSPECTIVE JUROR:  Yes.  Last four or five years

17   online.  And last 15, 18 years I've been teaching on the ground

18   and online.

19        THE COURT:  Do you teach on the ground in Holy Cross?

20        PROSPECTIVE JUROR:  No longer.  I used to, yes.

21        THE COURT:  And online how many students do you have

22   generally.

23        PROSPECTIVE JUROR:  Generally I have about maybe four

24   classes at any given time, you know.  They kind of overlap.

25   They have different schedules, different semesters, that sort

1    of stuff.  Some have traditional, some have eight-week type of

2    compressed kind of courses, accelerated courses.

3              THE COURT:  What educational background do you have?

4              PROSPECTIVE JUROR:  I have two master's and a Ph.D.;

5    and I have a couple of professional certifications, in, you

6    know, insurance business certifications.

7              THE COURT:  What's the Ph.D. in?

8              PROSPECTIVE JUROR:  Philosophy.

9              THE COURT:  Thank you very much.

10             PROSPECTIVE JUROR:  I'm Tina Reed, No. 9.  I've lived

11   in Jefferson Parish for 35 years.  Bartender.

12             THE COURT:  Where do you tend bar?

13             PROSPECTIVE JUROR:  At a daiquiri shop on the West

14   Bank.

15             THE COURT:  Does that involve mixing as well as

16   serving?

17             PROSPECTIVE JUROR:  Very limited.

18             THE COURT:  How long have you been doing that?

19             PROSPECTIVE JUROR:  6 years.

20             THE COURT:  At the same place?

21             PROSPECTIVE JUROR:  Yes.

22             THE COURT:  What are your hours when you are there?

23             PROSPECTIVE JUROR:  Late at night.

24             THE COURT:  Okay.  Are you married, widowed, single,

25   divorced?

1          PROSPECTIVE JUROR:  Married, two kids.

2          THE COURT:  Does your spouse work outside the home?

3          PROSPECTIVE JUROR:  Yes.

4          THE COURT:  What does he do?

5          PROSPECTIVE JUROR:  Manager for a printing company.

6          THE COURT:  Manager for a printing company?

7          PROSPECTIVE JUROR:  Uh-huh.

8          THE COURT:  Which printing company?

9          PROSPECTIVE JUROR:  American Reprographics.

10         THE COURT:  Okay.  Thank you very much.

11         PROSPECTIVE JUROR:  Good morning.

12         THE COURT:  Good morning.

13         PROSPECTIVE JUROR:  My name is Tyson Gerhold.  I

14    work -- I live in St. Charles Parish.  I work in lower

15    Plaquemines Parish on the Mississippi River, marine diesel

16    mechanic.  I keep a grain transfer rig, boom and power systems,

17    generators, whatever is needed to keep it rolling.

18         THE COURT:  Do you go from one place to another?  Do

19    you move around, or do you work in one place?

20         PROSPECTIVE JUROR:  No, sir.  I'm assigned that rig.  I

21    make sure everybody is safe and whatever breaks I fix.

22         THE COURT:  Where is the rig?

23         PROSPECTIVE JUROR:  The rig is in lower Plaquemines

24    Parish below Baton Rouge.

25         THE COURT:  What does it do?

1        PROSPECTIVE JUROR:  It loads ships from barge to ship.

2        THE COURT:  Do you ride the barge from place to place

3    or you just go aboard the --

4        PROSPECTIVE JUROR:  No.  The rig is anchored between

5    four buoys.  We take a half-hour boat ride to the rig per shift

6    change.

7        THE COURT:  What do you load?

8        PROSPECTIVE JUROR:  Grain.  It could be rice, corn.

9    I'm really not familiar with what they load and how.  I just

10   take care of --

11       THE COURT:  It's not bulk cargo?  You --

12       PROSPECTIVE JUROR:  No, it's bulk.  It's dug out of a

13   barge into a ship, weighed and all that.

14       THE COURT:  But you're loading grain?

15       PROSPECTIVE JUROR:  Yeah.

16       THE COURT:  Okay.  All right.  Thank you very much.

17       PROSPECTIVE JUROR:  My name is Linda Rousseau, No. 11.

18   I'm retired from Bell South and I kind of -- I'm a personal

19   assistant, and I go to the gym.  I'm not married, and my child

20   is 30 years old.

21       THE COURT:  Okay.  Does your spouse work outside of the

22   home?

23       PROSPECTIVE JUROR:  No, I'm not married.

24       THE COURT:  You're not married.  I'm sorry.

25       PROSPECTIVE JUROR:  That's okay.

1      THE COURT:  What do you do on a day-to-day basis other
2   than going to the gym?
3      PROSPECTIVE JUROR:  I'm a personal assistant, so
4   whatever -- I have a couple of clients and whenever they
5   need -- like the air-conditioner is broken.  They'll call me up
6   and I have to get a repair person and I'll go sit over there.
7      THE COURT:  I see.
8      PROSPECTIVE JUROR:  Or if they need brake tags on their
9   cars or whatever, these are young professionals that doesn't
10  have any family here.
11     THE COURT:  I see.
12     PROSPECTIVE JUROR:  So I help them out.
13     THE COURT:  So they actually work; but when they need
14  something, there's problems with life in general, they call
15  you?
16     PROSPECTIVE JUROR:  Yes.
17     THE COURT:  All right.  Thanks very much.
18     PROSPECTIVE JUROR:  So I take care of them.  That's it.
19     THE COURT:  All right.  That's fine.  Thank you very
20  much.
21     PROSPECTIVE JUROR:  Hi.  My name is Joe Scorsone.  I'm
22  Juror No. 12.  I lived in Jefferson Parish for the last
23  34 years.  I'm married.  I work for a company named Leidos, who
24  is contracted to Entergy Corporation.  I'm an IT manager.  I
25  manage or oversee software development projects.  I have

1   several software developers and project managers reporting to
2   me.
3          THE COURT:  What do you do?  What's your day-to-day
4   job?
5          PROSPECTIVE JUROR:  I oversee and manage IT development
6   projects for Entergy Corporation.
7          THE COURT:  Anybody under you that you supervise?
8          PROSPECTIVE JUROR:  I either -- I contribute to the
9   projects, and I also manage developers who are doing software
10  development on a day-to-day basis.
11         THE COURT:  Do you develop software yourself or you
12  just make sure --
13         PROSPECTIVE JUROR:  I do some design and architect work
14  and have done some programming in my earlier career.
15         THE COURT:  Which parish do you live in, sir?
16         PROSPECTIVE JUROR:  Jefferson Parish.
17         THE COURT:  Jefferson.  Thank you very much.
18         PROSPECTIVE JUROR:  Good morning.  I'm Hunter Ely.  I'm
19  the information security officer for Tulane University, so I
20  run a team of nine doing strategic and operational information
21  security for the university.  I've lived in Orleans Parish for
22  six years.
23         THE COURT:  What does an information officer do?
24         PROSPECTIVE JUROR:  Take the bullet when things go
25  wrong.  We design the architecture and security around all of

1    our core systems, student systems, the HR system, et cetera.

2         THE COURT:  Do you do any press releases or things of

3    that nature?

4         PROSPECTIVE JUROR:  I have.  I've done some interviews

5    when things go wrong.

6         THE COURT:  How long have you been there?

7         PROSPECTIVE JUROR:  I've been there for six years.

8         THE COURT:  Six years.  What did you do before that?

9         PROSPECTIVE JUROR:  I worked at LSU as a security

10   consultant.

11        THE COURT:  How about your educational background?

12        PROSPECTIVE JUROR:  Just finished my MBA a few weeks

13   ago.

14        THE COURT:  Thank you very much.

15        PROSPECTIVE JUROR:  Good morning.

16        THE COURT:  Morning.

17        PROSPECTIVE JUROR:  My name is James E. Simons, Jr.,

18   No. L14.

19             I was a shipbuilder at Avondale Shipyard for

20   26 years until I got laid off 2013.  Now I draw Social Security

21   and I work at Louisiana Coffee and Tea I've been there three

22   years and I work ten hours a day from 4:30 in the morning to

23   3 o'clock in the evening to make ends meet.

24        THE COURT:  Okay.

25        PROSPECTIVE JUROR:  You have to do what you have to do

1    to survive.

2          THE COURT:  What's your job now?  What do you do?

3          PROSPECTIVE JUROR:  I'm a tea blender.  I blend tea at

4    the plant.

5          THE COURT:  Do you actually have to taste the tea, too,

6    or do you --

7          PROSPECTIVE JUROR:  Sometimes we go to the lab and we

8    taste the tea, but the majority of time we blend the tea.

9          THE COURT:  And you have a formula that you use to

10   blend it or do you use a machine?

11         PROSPECTIVE JUROR:  We use different type teas from all

12   over the countries, you know, from Indonesia, China, Libya.

13   Wherever the tea is made in the country, they deliver it over

14   to our plant and we cut the sacks and we blend three different

15   type teas and then we do 17 more different teas to make one

16   blend.

17         THE COURT:  I see.  How do you tell how much to put in?

18         PROSPECTIVE JUROR:  Well, you go by the sack.  The sack

19   weigh 111 pounds.  All you do, you put on a platform, you cut

20   it and you pour it all in the blender -- in the blender and you

21   blend it for like three to five minutes and then it all go into

22   a hopper and the hopper go into a super-sack and then we put

23   the super-sack over the line and then they pack it into

24   different little tea bags.

25         THE COURT:  I see.

```
 1          PROSPECTIVE JUROR:  That's what I do on an everyday

 2     basis.

 3          THE COURT:  Okay.

 4          PROSPECTIVE JUROR:  When I'm not here.

 5          THE COURT:  Thank you very much.  I appreciate it.

 6          PROSPECTIVE JUROR:  Sir, my name is Rocky Hebert.  I'm

 7     No. 15.  I've lived in Terrebonne Parish all my life.  I'm the

 8     owner of Hebert Services, painting service.  I've been doing

 9     that for 20 years.  I'm married.  And when I'm not busy at work

10     painting, I'm at home taking care of the house and fishing.

11          THE COURT:  Fishing.  I was hoping you would say

12     fishing.

13          PROSPECTIVE JUROR:  I love to fish.

14          THE COURT:  I can tell.  What do you do on a day-to-day

15     basis, Rocky?

16          PROSPECTIVE JUROR:  I go and give bids to people on

17     houses and it's kind of slowing down now.  So when I'm not

18     doing that, me and my wife just built a new home; so I'm around

19     the house taking care of that and when mama ain't got nothing

20     for me to do, I'm in the boat.

21          THE COURT:  Okay.  I understand.  Thank you very much.

22          PROSPECTIVE JUROR:  Yes, sir.

23          PROSPECTIVE JUROR:  Good morning.  My name is

24     Michelle Favalora.  I'm Juror No. 16.  I graduated from UNO,

25     University of New Orleans, December of 2015.  I recently, at
```

1   the end of last year, started a nonprofit organization called

2   Deb's Dream.  We provide hair and makeup services for cancer

3   patients.  We have not had any functions recently.  My fiancee

4   and I will be having to move to Alabama in the beginning of

5   August; so I am currently looking for a place for us to live, a

6   job, which is -- there are about 4,000 people that live there,

7   so it's kind of difficult; but that's pretty much what I do.

8             THE COURT:  Okay.  Well, fine.  We'll be sorry to lose

9   you.  I wish we would keep you in this area.  Let's see.

10            PROSPECTIVE JUROR:  No. 17.  My name is Gregory

11   Dempster.  I've lived in Lafourche Parish, Thibodaux, for

12   45 years.  I'm a plumber.

13            THE COURT:  Do you work for a particular company or do

14   you do --

15            PROSPECTIVE JUROR:  Yeah, it's a little, small company

16   out of Thibodaux.

17            THE COURT:  Where do you-all do plumbing work?

18            PROSPECTIVE JUROR:  Around Thibodaux or Houma.

19            THE COURT:  In the Houma/Thibodaux area?

20            PROSPECTIVE JUROR:  Yes, sir.

21            THE COURT:  And in your spare time you probably fish,

22   too.

23            PROSPECTIVE JUROR:  Fish, hunt.  It's not hunting

24   season yet.

25            THE COURT:  All right.  Thanks very much.  There is

1    great fishing and hunting in that area, I know.

2              PROSPECTIVE JUROR:  Yes, it is.

3              THE COURT:  Yes, sir.

4              PROSPECTIVE JUROR:  Clarence Molaison, No. 18.  I'm a

5    residential supervisor in residential construction.

6              THE COURT:  Are you associated with any company or

7    anything?

8              PROSPECTIVE JUROR:  Yes.

9              THE COURT:  What's your company?

10             PROSPECTIVE JUROR:  Milligan Construction.

11             THE COURT:  What kind of construction do you-all do?

12             PROSPECTIVE JUROR:  Mostly a few custom houses and a

13   lot of spec houses.

14             THE COURT:  Do you work out of a subdivision or on a

15   subdivision --

16             PROSPECTIVE JUROR:  No, all over.  We buy lots and

17   build houses.

18             THE COURT:  In which area or town or --

19             PROSPECTIVE JUROR:  Slidell.

20             THE COURT:  In the Slidell area.  Northshore or in

21   general --

22             PROSPECTIVE JUROR:  Yes, sir.  We also build in

23   New Orleans as well.  I don't, but the owner does.

24             THE COURT:  Okay.  And you are married, widowed,

25   single, divorced?

1          PROSPECTIVE JUROR:  Married for 44 years.

2          THE COURT:  Okay.

3          PROSPECTIVE JUROR:  Three grandchildren.

4          THE COURT:  Does your spouse work outside of the home?

5          PROSPECTIVE JUROR:  No, she works in the home watching

6     the grandchildren.

7          THE COURT:  Okay.  Good.  Thanks very much.

8          PROSPECTIVE JUROR:  Susan Alexander, No. 19.  I've

9     resided in Orleans Parish for 64 years.  I work for Interface

10    Security Systems.  They do commercial and residential security,

11    burglar alarms, CCTV, access control.

12         THE COURT:  What do you for them --

13         PROSPECTIVE JUROR:  I process the sales.  We have

14    salesmen and we have technicians and we do that nationwide.  We

15    have a couple of branches.

16         THE COURT:  I see.  Okay.  How long have you been with

17    them?

18         PROSPECTIVE JUROR:  Since 2010.

19         THE COURT:  What did you do before then?

20         PROSPECTIVE JUROR:  Administrative assistant at

21    Ochsner.

22         THE COURT:  As an administrative assistant were you

23    associated with the hospital or a doctor --

24         PROSPECTIVE JUROR:  No.

25         THE COURT:  -- or a group?

1          PROSPECTIVE JUROR:  No.  Just property management and

2    maintaining properties of Ochsner.

3          THE COURT:  Do you have any training in medicine or --

4          PROSPECTIVE JUROR:  No, I don't.

5          THE COURT:  Okay.  Thank you very much.

6          PROSPECTIVE JUROR:  You're welcome.

7          PROSPECTIVE JUROR:  Louis Lascola, No. 20.  St. Tammany

8    Parish.  I've been caregiving for the last nine years.  We're

9    now closing the estate.

10         THE COURT:  What's your day-to-day job?  What do you

11   do?

12         PROSPECTIVE JUROR:  I'm actually just in the process of

13   closing the estate right now.

14         THE COURT:  How long have you been doing that?

15         PROSPECTIVE JUROR:  Caregiving and estate closing, I

16   guess about the last ten years.

17         THE COURT:  What did you do before then?

18         PROSPECTIVE JUROR:  Auto mechanic.

19         THE COURT:  What's the nature of your education?

20         PROSPECTIVE JUROR:  Some college.

21         THE COURT:  All right.  Fine.  Thank you very much.

22         PROSPECTIVE JUROR:  Good morning.  Eric Lemaitre.  I've

23   lived in St. Tammany Parish for the last 18 years.  I'm a

24   facilities manager for Cypress Point Hospital in Hammond,

25   Louisiana.  I'm responsible for facilities maintenance, life

1    safety and training.

2            THE COURT:  Do you do anything in connection with the

3    patients themselves?

4            PROSPECTIVE JUROR:  No, none, sir.

5            THE COURT:  Do you take care of the facilities?

6            PROSPECTIVE JUROR:  That's correct.

7            THE COURT:  How many people in your unit?

8            PROSPECTIVE JUROR:  I have ten.  I'm responsible for

9    ten people.

10            THE COURT:  How long have you been doing that?

11            PROSPECTIVE JUROR:  Facilities for 35 years.  At this

12    particular location, two years.

13            THE COURT:  What location did you do before?

14            PROSPECTIVE JUROR:  Galleria Office Tower in Place

15    St. Charles and World Trade Center in downtown New Orleans.

16            THE COURT:  Is that the same type of work, that is to

17    say the facilities in general --

18            PROSPECTIVE JUROR:  Yes, sir.

19            THE COURT:  -- and you were in charge of them?

20                What do you do with them?  If they break, you fix

21    them or --

22            PROSPECTIVE JUROR:  Yes.  Maintenance, repair and

23    operations.

24            THE COURT:  Do you purchase them also, or are they

25    already installed when you get there?

1          PROSPECTIVE JUROR:  I do some purchasing.

2          THE COURT:  Thank you very much.

3          PROSPECTIVE JUROR:  Thank you.

4          PROSPECTIVE JUROR:  My name is Mark Sullivan from

5    St. Tammany Parish.  42 years I've been there.  High school

6    education.  I'm an account manager for an offshore crane

7    company.  We service cranes offshore.

8          THE COURT:  What does that mean?  When some crane is

9    going to go offshore, they contact you and you do the

10   paperwork?

11         PROSPECTIVE JUROR:  We'll do anything from setting them

12   up, building them, repairing them, go out there and maintain

13   them, inspect them.

14         THE COURT:  Do you operate them?

15         PROSPECTIVE JUROR:  No, sir.  I just run the crews that

16   go out there and do the work.

17         THE COURT:  How many people in your crew?

18         PROSPECTIVE JUROR:  It varies from two to five.

19         THE COURT:  How long have you been doing that?

20         PROSPECTIVE JUROR:  13 years.

21         THE COURT:  Are you married, widowed, single, divorced?

22         PROSPECTIVE JUROR:  Married, two grown kids.

23         THE COURT:  Does your spouse work outside of the home?

24         PROSPECTIVE JUROR:  Yes, sir.  She's a commercial

25   lending assistant.

```
1              THE COURT:  With which facility?

2              PROSPECTIVE JUROR:  Whitney Bank.

3              THE COURT:  Here in New Orleans?

4              PROSPECTIVE JUROR:  No, sir.

5              THE COURT:  A branch on the Northshore?

6              PROSPECTIVE JUROR:  Yes.

7              THE COURT:  Thank you very much.

8              PROSPECTIVE JUROR:  Annette Ford, Prospective Juror

9     No. 23.  I reside in Lafourche Parish for over 40 years, and I

10    work for Rouse's corporate office in accounts receivable

11    department.

12             THE COURT:  What do you do for them?

13             PROSPECTIVE JUROR:  I process invoices and apply

14    payments for charge accounts.

15             THE COURT:  What's the invoices for?

16             PROSPECTIVE JUROR:  Like schools and churches.  They

17    charge groceries or whatever, and I process those invoices and

18    apply the payments to those.

19             THE COURT:  So you deal with the consumer end of it,

20    not the purchase end?

21             PROSPECTIVE JUROR:  Right.

22             THE COURT:  Thank you very much.  Let's stop here,

23    then, and I'll let -- let me see counsel for a moment.

24                  (Conference at the bench, as follows:)

25             THE COURT:  Is there anything you want me to cover that
```

1    you feel like is a hot potato?

2         MR. BIRCHFIELD:  I'm okay with us going now,

3    Your Honor.

4         MS. WILKINSON:  Yes.  I think there were some people

5    with hardships, so I don't know if you just want to leave that

6    to Andy.

7         MR. BIRCHFIELD:  That's what I was going to say.  If I

8    can just offer, if it's sensitive, they can ask and handle it

9    that way.

10        THE COURT:  Yes.  Sure.  All right.

11        MS. WILKINSON:  Thank you, Your Honor.

12             (Conference at the bench concluded.)

13        THE COURT:  Ladies and gentlemen, that's all the

14   questions I have.  The attorneys have indicated they have a

15   short period of questions for you.  I'll go to the plaintiffs.

16        MR. BIRCHFIELD:  Good morning.  Again, I'm

17   Andy Birchfield.  I'm a lawyer from Alabama.  Don't -- I'm an

18   Auburn fan, not an Alabama fan; so don't hold it against me.

19             Ms. Favalora, there are worse places than

20   Alabama; so we'll welcome you there.

21             I want to talk to you for just a few minutes.

22   Judge Fallon has asked you questions and it's very helpful for

23   us when you share -- when you share information with us; and

24   the information that you filled out on the questionnaires,

25   that's super, super helpful.

1       But let me tell you about this part of the

2   process, if I can, because we are looking for information about

3   you.  It's very important for us on behalf of the Orr family

4   and it's very important for the defense that we identify --

5   that we identify jurors that as best we can, we'll start off

6   with each side even.  And outside, meaning the outside world

7   outside of this courtroom, bias is a bad thing; but here --

8   here we're trying to identify those biases.  We all have

9   biases, whether it is the sporting team that we like or food

10  that we like, we all have biases.

11      And so what we are trying to identify is are

12  there certain biases that would make this not the right case

13  for you and you would be a better juror in another case.

14  That's really what we're looking for.  So I'm going to ask some

15  questions and it's not really to pry.  I don't want to offend

16  anyone, but we're trying to identify those biases.

17      Let me give you an example from my life.  My wife

18  and I, we're adoptive parents.  We've adopted three children.

19  So if I'm called to serve on a jury that involved neglected or

20  abused children, that probably wouldn't be the best jury for me

21  to serve on.  And, you know, if I'm sitting in your spot and

22  I'm asked, you know, "Would you start out even," you know, I

23  would probably have to say, "No, I wouldn't."

24      And so I would appreciate that.  We're looking

25  for you sharing with us.  But even beyond that, we want to know

1   information about your life experiences because sometimes it's

2   even subconscious.  You may think you would start off even, but

3   we're trying to identify those types of issues, okay?  So

4   that's what we're looking for.

5          And I may ask some questions and if it calls for

6   a personal response and it's something you really don't feel

7   comfortable sharing in an open courtroom with a bunch of

8   lawyers and other people that you don't know, if you just let

9   me know, we'll ask the judge and perhaps the judge will allow

10  us to discuss that issue at the bench, okay?  Does everyone

11  follow what I'm talking about here?

12         Okay.  And Judge Fallon told you a little bit

13  about this case.  We represent the Orr family and

14  Ms. Sharyn Orr, the wife of Joe and the mother of Kelli and Kim

15  and Joe.  She died.  She suffered a stroke and she died and she

16  had been prescribed Xarelto for AFib.  I know from the

17  questionnaires that several of you either have AFib or you have

18  family members that have had AFib and you've been on blood

19  thinners.

20         So is there anybody that your personal experience

21  or with your family that's just too close to home that this

22  probably wouldn't be the best jury for you?  You may start out

23  favoring one side or the other?  Is anyone in that category?

24         You would?

25  PROSPECTIVE JUROR:  Yes.

1    MR. BIRCHFIELD:  Okay.  All right.  Ms. Chambliss; is
2    that right?
3    PROSPECTIVE JUROR:  Stephanie Chambliss.  I think the
4    questionnaire asked about close family, but actually my
5    grandmother's older sister, her name is Faye Washington and
6    she's 88.  She did take Xarelto and we do believe it caused her
7    internal bleeding.  Right now she has a lot of heart problems.
8    THE COURT:  Okay.  All right.  Thank you,
9    Ms. Chambliss.  "Chambliss," is it?
10   PROSPECTIVE JUROR:  "Chambliss."
11   MR. BIRCHFIELD:  All right.  So let me press just a
12   little bit further there with that.  So does that mean that you
13   think you may start out favoring one side, or would you put all
14   that aside and try to give both sides a fair start?  Where do
15   you feel you are?
16   PROSPECTIVE JUROR:  So coming in I did kind of feel a
17   little slighted because right now she has heart problems.  She
18   can't walk much, can't grocery shop, can't do anything.  And
19   she's my grandmother's older sister.  My grandmother lives with
20   her, so I see her every Sunday when I go over for Sunday
21   dinner.  But I did hear what the judge said when he said a
22   preponderance of evidence; but just given my family history
23   over the past few years and watching her and knowing that she
24   is taking Xarelto, I do feel partially slighted.
25   MR. BIRCHFIELD:  Okay.  All right.  Thank you very

1   much.  That's very important, you know, for us to hear.  We

2   need to know can you put that aside and try to be fair.  But if

3   there are personal experiences that may play in, we want to

4   know about it.  Thank you.

5              Could you put that aside and give both sides a

6   fair start here?

7        PROSPECTIVE JUROR:  I'll say I'm willing to try and

8   hear both sides, yes.

9        MS. BARRIOS:  Thank you, Ms. Chambliss.

10             Mr. Simons; is that right?

11        PROSPECTIVE JUROR:  I have just recently found out

12   about my niece.  She had cancer from a Johnson & Johnson

13   product and a lot of other medical stuff was involved in that,

14   and they -- and she -- her sisters had a -- they're looking to

15   sue and she went from a healthy young lady, 43 years old, to a

16   wheelchair in about ten years.  When she died she was as big as

17   my little finger, couldn't walk; and so I think it might be a

18   problem for me.

19        MR. BIRCHFIELD:  All right.  Thank you, Mr. Simons.

20   I'm very sorry to hear about your niece.  And so I just want to

21   make sure that I hear you.  You're saying that was really close

22   to you and it would be very difficult for you to put that

23   aside?

24        PROSPECTIVE JUROR:  Right.  It will be, because I was

25   with her, like, almost every weekend; but I didn't know what

1    her status was at the time.  They just recently told me.

2            MR. BIRCHFIELD:  Thank you.

3            PROSPECTIVE JUROR:  You're welcome.

4            MR. BIRCHFIELD:  Is there anyone else that their

5    personal experience with AFib or blood thinners would make this

6    too close to home, make it difficult for both sides to start

7    out and start out even?

8                 All right.  Ms. Rodriguez, if I may, I want to

9    ask you particularly about this issue, because if I understood

10   your questionnaire, that you may have suffered a stroke -- and

11   again if you want to talk about this privately, we can do that.

12   But if I read your questionnaire right, you had suffered a

13   stroke and you also have experience with blood thinner.  Could

14   you tell us more about that?

15           PROSPECTIVE JUROR:  Well, I took different blood

16   thinners -- I had a mild stroke and they gave me blood

17   thinners, but only for a short time.  Once everything was fine

18   -- because I had, like, a hole in my heart and that was causing

19   it since I was born; and the only reason they had to go in and

20   do a procedure was because they say the blood was shooting all

21   kinds of ways.  Usually, they would just leave it alone; but

22   they did go in and put, like, they call it an umbrella.

23           MR. BIRCHFIELD:  Let me just make sure I've got the

24   sequence right.  So you had the heart issue, you had the stroke

25   and then they put you on the blood thinner; is that right?

1          PROSPECTIVE JUROR:  Right.

2          MR. BIRCHFIELD:  Okay.

3          PROSPECTIVE JUROR:  But it was just until it was over

4     with.  Then they just -- I don't use blood thinners at all.

5          MR. BIRCHFIELD:  Okay.

6          PROSPECTIVE JUROR:  I do have baby aspirin every day.

7          MR. BIRCHFIELD:  Okay.  Thank you, Ms. Rodriguez.

8               So as Judge Fallon mentioned, Ms. Sharyn Orr was

9     taking Xarelto.  She was taking it for AFib and then she

10    suffered a stroke, a brain bleed that led to her death.

11              Is there anyone who, based on those facts or

12    based on your family experience of someone who has suffered a

13    death in the family or someone real close to you, it would make

14    it difficult for you to hear the evidence and have both sides

15    start out in an even spot in this case?  Does anyone have that

16    type of personal experience?

17              Ms. Chambliss?

18         PROSPECTIVE JUROR:  So I did disclose in my

19    questionnaire that last year I did lose my best friend from 7th

20    grade, and college roommate, to cancer last year.  So we are

21    rolling up on the first year of her death.  She was 34.  She

22    had breast cancer, and it spread to the lungs and the brain,

23    and I was there with her pretty much the entire time.  So

24    coming in, I did feel a little bit emotional looking at the

25    family, so this may be a little difficult for me, and I did

1    disclose that in my questionnaire.

2        MR. BIRCHFIELD:  All right.  Thank you, Ms. Chambliss.

3    Again, we're sorry for your loss, and I want to -- it's very

4    important that you shared that with us, because we want to know

5    if one side is going to start out ahead of the other.  But you

6    shared with us you think you can put that aside and give people

7    a fair shot, both sides a fair shot, but it would be difficult?

8    Am I hearing you right?

9        PROSPECTIVE JUROR:  I think it will be.

10        MR. BIRCHFIELD:  Okay.  Thank you.

11            Ms. Favalora?

12        PROSPECTIVE JUROR:  My grandmother did pass away from

13    an aneurysm in her brain in 2013, so I kind of feel I would be

14    a little more slighted.

15        MR. BIRCHFIELD:  And that was in 2013 --

16        PROSPECTIVE JUROR:  Yes.

17        MR. BIRCHFIELD:  -- that you lost your grandmother?

18            I understand and appreciate you sharing that.

19    But would you be able to set that aside and follow the judge's

20    instructions --

21        PROSPECTIVE JUROR:  I would try.

22        MR. BIRCHFIELD:  All right.  Thank you.

23            It's very helpful when you share this

24    information.  And I know on behalf of the Orr family that we

25    appreciate your openness and your willingness to share, and I'm

1    sure that the defense counsel is in the same position.  So
2    thank you for sharing.
3              Any others?  And I know this is tough; it's
4    sensitive.  Are there any others who have personal experiences
5    that make it difficult for you to sit as a juror in this case?
6              PROSPECTIVE JUROR:  My name is Nicole Remondet, Juror
7    No. 30.  January 26, 2014, I lost my boyfriend of seven years.
8    He passed away from cancer, and I watched him suffer a lot, so
9    I'm still kind of emotional.
10             MR. BIRCHFIELD:  All right.  Thank you.  So based on
11   that personal experience, would you be able to set that aside
12   and sit as a fair and impartial juror in this case; or would
13   that be too difficult for you?
14             PROSPECTIVE JUROR:  It would probably be difficult, but
15   I would try.
16             MR. BIRCHFIELD:  Thank you.
17             All right.  Any others?
18             As you know from what Judge Fallon has already
19   shared with you about this case, the Orr family has brought
20   this lawsuit against the pharmaceutical company, the makers and
21   the manufacturers of Xarelto.  Does that cause anyone to lean
22   one way or the other?  Do you have strong feelings about
23   lawsuits against pharmaceutical companies that would have you
24   lean toward the pharmaceutical company or toward the family?
25   Anybody start out -- start out -- leaning one way or the other

1    just based on the fact that it's a lawsuit against a

2    pharmaceutical company?  Is anybody in that category?

3            One of the issues in the case that you will be

4    called on to decide pertains to the drug company's or the

5    pharmaceutical company's responsibility to share important

6    safety information with doctors so they can pass that along to

7    their patients.  In looking at the questionnaires and seeing

8    that there's some pretty strong feelings on both sides about

9    the level of warnings or adequacy of the warnings, who has

10   strong feelings about the level, the adequacy of the warnings

11   in general about pharmaceutical drugs?

12           Yes, sir?

13           PROSPECTIVE JUROR:  I don't believe they put enough

14   warnings on the labels on most of the drugs that are released,

15   because they're always being recalled two or three years later.

16   I don't think they do enough research in educating the public

17   on the damage that drugs can do.

18           THE COURT:  What's the number?

19           PROSPECTIVE JUROR:  26, William Bouchereau.

20           MR. BIRCHFIELD:  Okay.  All right.  So Mr. Bouchereau

21   says they don't put enough safety information in the labels.

22   Is there anyone that starts out agreeing with that position,

23   that that's the attitude, the view that you bring into this

24   room today, into this courtroom?  Does anyone share that view?

25           MS. BARRIOS:  Okay.  Mr. Gerhold?  Is that right?

1          PROSPECTIVE JUROR:  Yes, sir.

2          They gave the warnings and then have the recalls,

3     like the gentleman said here.  That's really it; but just as

4     long as accountability is a factor, if you make a mistake, just

5     own it, just own up to it.

6          MR. BIRCHFIELD:  All right.

7          PROSPECTIVE JUROR:  And that's really it.

8          MR. BIRCHFIELD:  All right.

9          PROSPECTIVE JUROR:  And that's really it.

10         MR. BIRCHFIELD:  Thank you, Mr. Gerhold.

11         Anyone else?  Yes.  Ms. Remondet?

12         PROSPECTIVE JUROR:  Yes.  Same here.  I think there's a

13    lot of warnings and sometimes the side effects seem a little

14    more bearable than the outcome, things that can possibly happen

15    from taking it long term, and I've seen the commercials for

16    certain things that list the side effects and they go through

17    it so fast you can't even keep up, and sometimes the doctors

18    don't always tell you, I guess, your chances of having negative

19    side effects.

20         MS. BARRIOS:  All right.  Thank you.

21         Is there anyone else that would hold that view

22    that there is not enough information, important safety

23    information in the labels?

24         I know that there was some expressed views on the

25    other side, that the labels are adequate and the patients just

1    don't read them.  Does anybody have that view that labels are

2    adequate and it's really the patient's responsibility and they

3    fail to read and take them seriously?  Does anybody fall in

4    that category?

5              Yes, ma'am.

6         PROSPECTIVE JUROR:  Shirley Dupre, No. 32.  I believe

7    they put a lot of information -- I believe they put a lot of

8    information on the warnings.  A lot of it is very technical

9    about all these different chemical formulas that are way over

10   my head and the side effects are so numerous that everything

11   sounds like you can eventually die from it, so sometimes I just

12   tune it out and I just trust my doctor, if I have a doctor that

13   I've established a relationship with and know that I can trust

14   him or her.  And then I also take personal responsibility and I

15   go online when they give me a medicine and I go look and see

16   what it says; and if I have questions, I go back to the doctor

17   and say, why I do...

18        MR. BIRCHFIELD:  All right.  Thank you, Ms. Dupre.

19             Does anyone else share that view?

20        PROSPECTIVE JUROR:  I do.

21        MR. BIRCHFIELD:  Ms. Russo?

22        PROSPECTIVE JUROR:  Yes.  I do read it myself and I

23   talk to the doctor, almost exactly like she says.  I don't just

24   take it blindly and I feel like my doctor is a good doctor and

25   I trust him completely.

```
 1          MR. BIRCHFIELD:  Okay.  So you would read the label,
 2    you'd discuss it with your doctor; is that right?
 3          PROSPECTIVE JUROR:  Uh-huh.
 4          MR. BIRCHFIELD:  Did you say you would do research
 5    yourself?
 6          PROSPECTIVE JUROR:  I would do -- if I'm still a little
 7    leery about it, I would do a little research, maybe make
 8    another phone call.
 9          MR. BIRCHFIELD:  When you do that research -- have you
10    done that or is that just something you would do?
11          PROSPECTIVE JUROR:  No, I have.
12          MR. BIRCHFIELD:  Have you done that research and then
13    decided not to take a medicine --
14          PROSPECTIVE JUROR:  No.
15          MR. BIRCHFIELD:  -- that your doctor has prescribed?
16          PROSPECTIVE JUROR:  No, I never did.
17          MR. BIRCHFIELD:  In your research and in your
18    experience in whatever medication that was, did you ever find
19    any information that was not provided by the drug company in
20    the label?
21          PROSPECTIVE JUROR:  No, not from the drug company or my
22    doctor.
23          MR. BIRCHFIELD:  Okay.
24          PROSPECTIVE JUROR:  It kind of panned out exactly like
25    that, what he told me.
```

1          MR. BIRCHFIELD:  All right.  Thank you.

2               Any others?

3          PROSPECTIVE JUROR:  I have MS, and my doctor prescribes

4     Paxil, which is a shot that I use three times a week.  He gave

5     me a packet with a DVD that explained everything about the

6     drug, what side effects would come with it; and I was very

7     confident because the drug that he gave me had a 10-year

8     research span on it.  So I was very confident with the drug

9     that he gave me.

10          MR. BIRCHFIELD:  Okay.  All right.  Ms. Ford?

11          PROSPECTIVE JUROR:  Yes.

12          MR. BIRCHFIELD:  Thank you, Ms. Ford.

13               Mr. Thomas.

14          PROSPECTIVE JUROR:  Vladimir Thomas, No. 8.

15               I had a question of the role of the FDA and

16     other, you know, government agencies, you know, just a general

17     question if it's something that's going to be brought up by

18     either side and, you know, to what extent are they responsible

19     in this whole process of warning labels and such.  Okay.  I

20     mean, it's just a general question if the manufacturer -- if

21     they fulfilled their obligations, they might as well be

22     absolved.

23          MR. BIRCHFIELD:  Thank you, Mr. Thomas.  That's an

24     important area to discuss because the FDA, the role of the FDA,

25     you'll hear a lot about that as you're serving as a juror in

1   this case.

2            So who holds the view that the FDA is responsible

3   for testing the prescription drugs that go on the market?  Who

4   thinks that's the responsibility of the FDA?

5            All right.  Would it surprise you to know that

6   the FDA does not actually do testing on the drugs?  Does that

7   surprise you to learn?  Who would be surprised to learn that

8   the FDA does not actually do testing on the drugs.

9            Let's start right here, because we've got

10  several.

11           PROSPECTIVE JUROR:  Maira, L1.  It would surprise me.

12  Just, I guess, from the nursing side we don't really know too

13  much about how the medications come on the market.  We just

14  hear about it, we read about it, and then we delivery it.  I

15  guess it was assumed that someone was doing testing from a

16  federal standpoint, I believe.

17           MR. BIRCHFIELD:  Okay.  All right.  Thank you.

18           Mr. Mohammed?

19           PROSPECTIVE JUROR:  Yes.  Juror No. 2.  I have the same

20  comment.  I thought that the federal government would have been

21  looking into this also for the testing.

22           MR. BIRCHFIELD:  Okay.  All right.  Thank you, sir.

23           PROSPECTIVE JUROR:  Juror No. 3, Mr. Moore.

24           I did write in the paper that I believe that FDA

25  was supposed to oversee medications.  I know they don't -- I

 1    found out -- I figure they don't do it themselves, but they've

 2    got other people that do it.  But it's their responsibility to

 3    let them know it is the right type of medication to put out.

 4    That's my view on the FDA.

 5         MR. BIRCHFIELD:  Okay.  All right.  Thank you for

 6    sharing.

 7              Mr. LeBlanc?  No?

 8              Who was next?

 9              Ms. Chambliss?

10    PROSPECTIVE JUROR:  I do believe that our federal

11    government should play a role in the drugs that are put on the

12    market; however, I am learning that it's more of a business

13    now, and I am starting to believe that the government does need

14    some ailments to persist in order for pharmaceuticals to make

15    money, if that makes sense.

16         MR. BIRCHFIELD:  Thank you.  Who was next?  Mr. Thomas,

17    did you have views on this?

18         PROSPECTIVE JUROR:  I was just going to add as far as I

19    know, it's the pharmaceutical companies that do the testing and

20    they submit the results to the FDA, and then the FDA examines

21    that and then gives a green light or sends it back for more

22    testing or just simply rescinds it.

23              But I think the issue here is the warning labels

24    and the results of the medicine.  I believe that's the issue

25    here, right?  And that would be a part of the FDA as well, you

1    know.  I'm speculating here.

2         MR. BIRCHFIELD:  So, Mr. Thomas, you seem to know a lot

3    about the role of the FDA.  Do you have strong views one way or

4    the other about the role of the FDA?

5         PROSPECTIVE JUROR:  No, not at all.  I just -- I'm not

6    sure if it's going to be brought up in the trial, whether the

7    specifics of how the process works.  I have a vague idea about

8    it, but I just want to bring that up as a possible issue

9    because I would imagine it would be a thing.

10        MR. BIRCHFIELD:  Thank you, Mr. Thomas.  Anyone else?

11             Mr. Ely?  Did I pronounce it right?

12        PROSPECTIVE JUROR:  "Ely."

13        MR. BIRCHFIELD:  "Ely."  All right.

14        PROSPECTIVE JUROR:  It's hard to pronounce.

15             So I sit on the IRNA (phonetic) at Tulane, and

16   one of the things that I've noticed when this FDA question came

17   up so I wanted to point it out -- one of the things I noticed

18   is that the pharmaceutical companies are really the only ones

19   that can start these tests because they're the only ones that

20   can afford to go through all the processing if it gets to that

21   point, because every case that we review is sponsored by some

22   pharmaceutical company, and they have a researcher that then

23   goes on to identify population and do research.  So I think

24   it's not surprising to me that they don't do the testing

25   themselves, but it is surprising to me that the only way that

1    these drugs can be brought in are by the largest of the

2    pharmaceutical companies.

3              MR. BIRCHFIELD:  Thank you.

4              Does anyone else share views or different views

5    about the role of the FDA and the testing here?

6              Does anyone take the view, as Mr. Thomas shared

7    and Mr. Ely, that the drug companies will do the testing and

8    they submit those results to the FDA and the FDA determines

9    whether the drug is approved or not?  Does anyone take the view

10   that the FDA approval itself, that ends it and that the drug

11   company should not be held responsible?  Does anybody bring

12   that view into the courtroom this morning?

13         THE COURT:  Just a moment.  Let's move on with that.

14   Under the law, ladies and gentlemen, when the FDA approves

15   something there still may be an action brought, the fact that

16   the FDA approves or doesn't approve -- for any drug to come

17   onto the market, the drug companies have to submit to the FDA

18   all their material and explain how they developed the drug.

19   The FDA gets all this material, goes through it and approves or

20   disapproves.  If they disapprove, then the drug cannot get on

21   the market.  If they approve, the drug can get on the market,

22   but that does not mean that there's no claim.  The fact that

23   the FDA approved it doesn't mean that there's no claim, but it

24   is a part of the whole process.

25             MR. BIRCHFIELD:  Thank you, Your Honor.

1          THE COURT:  Let's try to move on.

2          MR. BIRCHFIELD:  Yes, sir, if I can just wrap up with

3     the FDA.

4               Does the fact that the FDA approves Xarelto, does

5     that have anybody leaning one way or the other at the start?

6     At the very beginning would that have you leaning one way or

7     the other toward the Orr family or toward the defense here,

8     just based on the fact that the FDA approved the drug?

9               Okay.  Now I want to turn to some specific

10    questions because several of you mentioned some hardships that

11    it would be difficult for you to serve on this case.  I want to

12    explore that with you one on one.  And if it's personal -- I

13    mean, you can share right here.  But if it's personal, just let

14    us know.  We'll ask Judge Fallon if we can approach the bench

15    and you can tell it in private with Judge Fallon.  Okay?

16              Mr. Mohammed, I -- okay.  You had said that it

17    would be difficult, but you shared --

18         PROSPECTIVE JUROR:  My wife did have a hysterectomy at

19    the end of April and, after two weeks, things went bad.  And

20    about three weeks ago -- maybe a week before I came in -- we

21    had to rush her to the emergency room at the East Jefferson

22    Hospital.

23              Since then, she's been doing a little better.

24    But I still have to help her do things around the house, pick

25    stuff up, move things around, take care of her dogs, stuff like

1    that.

2          MR. BIRCHFIELD:  Have you made arrangements?  Are you

3    able to make accommodations and be here and serve if you're

4    called to, sir?

5          PROSPECTIVE JUROR:  Well, we will have to work things

6    out.  But as of now, like I say, she is doing a little better,

7    but not as she was before.

8          MR. BIRCHFIELD:  All right.  Thank you, Mr. Mohammed.

9    I sure hope your wife gets better.

10         PROSPECTIVE JUROR:  Thank you.

11         MR. BIRCHFIELD:  Mr. Dempster?

12         PROSPECTIVE JUROR:  Yes.

13         MR. BIRCHFIELD:  You shared that it would be difficult,

14   you going without work and paying bills.  Can you share a

15   little more information about that, sir?

16         PROSPECTIVE JUROR:  I just have quite a few bills,

17   house note, truck note.  My daughter just had braces put on.

18         MR. BIRCHFIELD:  And you do painting work?

19         PROSPECTIVE JUROR:  Plumbing.

20         MR. BIRCHFIELD:  Plumbing.  I'm sorry.

21              Is it a situation where, if you don't work,

22   you're not getting paid?

23         PROSPECTIVE JUROR:  Exactly.

24         MR. BIRCHFIELD:  Would that pose a difficulty for you

25   to be out of work for two weeks?

1          PROSPECTIVE JUROR:  Yes, it would.

2          MR. BIRCHFIELD:  Thank you.

3                Mr. Gerhold, you had shared that you would have

4     difficulty as well with work and some financial stress.

5                Can you give us more information.

6          PROSPECTIVE JUROR:  It would be the same as that

7     gentleman over there.  If I don't work, I don't get paid.  It's

8     just that simple.

9          MR. BIRCHFIELD:  Are you in a situation where, if you

10    miss a paycheck like that, it would cause financial hardship

11    for you, sir?

12         PROSPECTIVE JUROR:  Oh, it would hurt.

13         MR. BIRCHFIELD:  All right.  Thank you, sir.

14               Mr. Simons?

15         PROSPECTIVE JUROR:  It would be a problem with me with

16    my financials because I took a big cut in 2013 from my previous

17    job I had.  I was making three times as much money as I'm

18    making right now.  Right now I just live from check to check,

19    making ends meet.  It would be a problem.

20         MR. BIRCHFIELD:  It would be a problem for you, sir?

21         PROSPECTIVE JUROR:  Yes.

22         MR. BIRCHFIELD:  Thank you, Mr. Simons.

23               Mr. Lemaitre.  Did I pronounce your name right?

24         PROSPECTIVE JUROR:  "Lemaitre."

25         MR. BIRCHFIELD:  "Lemaitre."  Okay.

1          PROSPECTIVE JUROR:  Good morning.  Eric Lemaitre,

2    Juror 21.

3          MR. BIRCHFIELD:  You had shared that it would be

4    difficult for you to be out of work covering those facilities.

5          PROSPECTIVE JUROR:  Correct.  Just from an operations

6    standpoint, it'd make it difficult to be away for a long time.

7          MR. BIRCHFIELD:  Is there someone that is filling in

8    for you while you're --

9          PROSPECTIVE JUROR:  Indirectly.  Yes.

10         MR. BIRCHFIELD:  Indirectly?

11         PROSPECTIVE JUROR:  Yes.

12         THE COURT:  So is it a situation where it would be

13   hard, but you can do it?

14         PROSPECTIVE JUROR:  Yes.  It'd be quite hard.

15         MR. BIRCHFIELD:  Thank you, sir.

16              Mr. Molaison, you shared that you're supervising

17   the construction of eight to ten houses.

18         PROSPECTIVE JUROR:  Correct.

19         MR. BIRCHFIELD:  Would it be a financial hardship for

20   you to not have someone to fill in for you?

21         PROSPECTIVE JUROR:  Not for me.  As long as I can get

22   to my phone during breaks, I can keep things going.

23         MR. BIRCHFIELD:  All right.  So Judge Fallon explained

24   to us there would be a 15-minute break every morning and

25   15-minute break in the afternoons.  That would work for you?

1          PROSPECTIVE JUROR:  Yes.  I start texting at 5:00 in
2     the morning anyway.
3          MR. BIRCHFIELD:  Thank you, sir.
4               Mr. Songy?
5          PROSPECTIVE JUROR:  Yes.
6          MR. BIRCHFIELD:  You had shared that it would be
7     difficult for you as well.  Do you have someone covering --
8          PROSPECTIVE JUROR:  Well, my position is buying a large
9     percentage of the groceries that we have.  I do that for the
10    categories I manage.  I live here in Jefferson Parish area and
11    I go to Thibodaux every day, you know, commuting back and
12    forth.  So at this time while I'm here, no one is doing that.
13         MR. BIRCHFIELD:  All right.  Thank you, sir.
14              Is it a situation that can be managed with you
15    being away for two weeks?
16         PROSPECTIVE JUROR:  I can still do things at night when
17    I get out of here from a computer.  I do have meetings weekly
18    with suppliers that come into the corporate office.
19              As far as the work part of it, I can do a lot of
20    it after I would get out of here, from any location, on the
21    computer.
22              But as far as meeting with suppliers, it would
23    be -- for the length of time I would be here, I wouldn't be
24    able to.
25         MR. BIRCHFIELD:  Thank you, Mr. Songy.

1          Does anyone have a situation that would be a

2     hardship that has come up since you filled out the

3     questionnaire?

4          PROSPECTIVE JUROR:  I don't have a hardship that came

5     up since the questionnaire was filled out.  My employer gives

6     me a modest base salary.  That's all I get paid for jury duty.

7     They just dump whatever the government pays for me jury duty to

8     that.

9          MR. BIRCHFIELD:  Mr. Cucinello?

10         PROSPECTIVE JUROR:  Yes.

11          More than two-thirds of my salary comes from

12     tips.  I work at a casino.  Tips are pooled, divided up by

13     man-hours.  If I'm here, I'm not making man-hours.

14          I'm a single father.  My girls came to live with

15     me when they were 8 years old.  They're now in college.  So

16     this is costing me money every day I have to be here because my

17     employer is not going to cover it.  Casino.  Nature of the

18     beast.

19         MR. BIRCHFIELD:  Thank you, sir.

20          Anyone else who -- Ms. Chambliss?

21         PROSPECTIVE JUROR:  Stephanie Chambliss, Juror No. 6.

22          I do work in sales.  I am compensated 100 percent

23     commissions.  I am single and I do have a mortgage and other

24     bills in Orleans Parish.

25         MR. BIRCHFIELD:  Thank you, Ms. Chambliss.

1           Ms. Remondet?  Did I get that right?

2      PROSPECTIVE JUROR:  "Remondet."

3           I also work in sales commission and get paid

4  mileage.  At the time of the questionnaire, I didn't realize

5  that I would only be paid a base salary, which would make it

6  impossible for me to pay my bills, single and living alone.

7      MR. BIRCHFIELD:  Thank you.

8           Anyone else?

9           Yes.

10     PROSPECTIVE JUROR:  Janet Pitts, No. 34.

11          I have medical issues with sitting for long

12  periods of time.  I also suffer with depression.  And I'm in

13  the process of trying to retire for the third time.

14          I have someone at the office waiting for me now

15  to be trained, and right now I'm in no state to really be here.

16     MR. BIRCHFIELD:  Thank you, Ms. Pitts.

17          Anyone else?

18          Ms. Russo, if I could turn to you for just a

19  minute.  You mentioned the difficulty sitting.  I think in your

20  questionnaire you said that you get bored pretty easily and it

21  could be difficult for you.

22     PROSPECTIVE JUROR:  Yes.  I did say that.  It's hard

23  for me to stay still --

24     THE COURT:  We'll do the best not to --

25     MR. BIRCHFIELD:  We'll try to keep it interesting.  But

1    what we find is interesting -- but you would be able to serve

2    okay, Ms. Russo?

3                PROSPECTIVE JUROR:  Yes.

4                MR. BIRCHFIELD:  All right.  Thank you.

5                THE COURT:  Anything further?

6                MR. BIRCHFIELD:  Just one more area, Your Honor, if I

7    may.

8                      Ms. Rodriguez, I think you had shared in response

9    to one of the questions that you had personal beliefs that

10   would make it difficult for you to sit in judgment of others.

11   Did I read that right?

12                     Can you tell us a little bit about that.  You can

13   do it in private or share openly, whichever you want.

14               PROSPECTIVE JUROR:  Well, I just said that because I'm

15   a Catholic.  So I know that sometimes they ask, but I don't

16   think this would be the case.  Like capital punishment and --

17   that's the only reason I answered that like that.

18               MR. BIRCHFIELD:  Okay.  Thank you, Ms. Rodriguez.

19                     And, Mr. Mohammed, I think you had answered

20   similarly.  Is that -- would you have difficulty sitting in

21   judgment in this case based on personal beliefs?

22               PROSPECTIVE JUROR:  Well, at the time when I filled out

23   the first form, I wasn't sure what type of case this was going

24   to be.  So I think I made some comments that would not have

25   applied to this case.

1          MR. BIRCHFIELD:  Okay.  So you would be able to serve

2     on the jury in this case?

3          PROSPECTIVE JUROR:  Yes, sir.

4          MR. BIRCHFIELD:  Okay.  Thank you.

5               All right.  So I would like to wrap up with the

6     question that Judge Fallon asked, and that is -- but now you've

7     had a little more time to think about and hear about the nature

8     of this case.

9               So is there anything that you have heard about

10    this case that, if you were sitting in our spot, that you would

11    want to know about yourself, your frame of mind, what you bring

12    to this case, that would have you leaning one way or the other,

13    somebody would start off ahead, one side would start off ahead?

14    Anyone have anything along those lines that you would like to

15    share?

16               (No response.)

17          THE COURT:  Okay.  Thank you, counsel.

18          MR. BIRCHFIELD:  Thank you.  On behalf of the Orr

19    family, we thank you for answering our questions.

20          THE COURT:  Any questions?

21          MS. WILKINSON:  Yes, Your Honor.  Can we have a short

22    restroom break?

23          THE COURT:  We'll have a ten-minute break.  All rise.

24               (Court is in recess.)

25          THE COURT:  Okay.  Be seated, please.  We'll hear from

1    the defense now in *voir dire*.  Hopefully it won't be as long,

2    because we've had a lot.

3              MS. WILKINSON:  It won't be if you say it that way,

4    Your Honor.  I can tell you that.

5                    Good morning, everybody.  As you heard, my name

6    is Beth Wilkinson; and, along with Mr. Dukes and Mr. Irwin,

7    we're representing Janssen and Bayer.  You have answered a lot

8    of questions starting with -- now you had to take a day off to

9    come in and answer our questions.  You are here today taking

10   other days off, so I want to get right to a few follow-up

11   questions, if I could.

12                   I'm going to try and go in order; but if you-all

13   have something you want to ask, could you please raise your

14   hand so we can make it as efficient as possible.

15                   And I'm going to start with you, if I could.  If

16   I could ask you just a few questions, because you have a lot of

17   expertise in some of the areas we're going to be talking about

18   since you are a nurse.

19                   I want to put one thing in context.  In this case

20   you are going to hear a lot of very detailed medical

21   information.  This is a tragic case with Mrs. Orr.  She had a

22   very complicated medical history; so by bringing this case,

23   both sides are going to have to discuss those details and

24   discuss the evening that Ms. Orr had her hemorrhage and those

25   days following.  Those are some very difficult conversations.

1          I know some of you had talked about how difficult

2    that is and there's going to be a lot of medical terms, which

3    it is our job to explain and understand; but I know that you

4    have had a lot of experience in the nursing area so I wanted to

5    ask you:  Do you think that by being a nurse you will look at

6    the evidence in a different way and/or will you be able to look

7    at the records that you see that are presented here, only the

8    evidence here, and decide the case based on just that evidence

9    that you hear?

10         PROSPECTIVE JUROR:  I think that from my background,

11   because I have worked in post-op so there is a lot of blood

12   thinners given, I have more background knowledge; but I don't

13   know everything, so, I mean, I think I could put that aside and

14   just listen to the evidence presented.

15         MS. WILKINSON:  You know about how blood thinners work,

16   right?  That they thin blood, therefore, there's less clotting

17   and there's a risk of bleeding?

18         PROSPECTIVE JUROR:  Right.

19         MS. WILKINSON:  Are you familiar with the other drugs?

20   You are going to hear about some of those.  A drug called

21   warfarin.  I know some of you talked about it in your

22   questionnaire, which is also called Coumadin.  Are you familiar

23   with that drug as well?

24         PROSPECTIVE JUROR:  Yes.

25         MS. WILKINSON:  Are you familiar with the idea that

1  there are warnings and labels on drugs that lay out the risks

2  and the benefits?

3      PROSPECTIVE JUROR:  Yes.

4      MS. WILKINSON:  As a nurse did you have to become

5  familiar with some of those when you were dealing with patients

6  or was that primarily the responsibility of the doctor who was

7  prescribing?

8      PROSPECTIVE JUROR:  No.  Any time you give medication,

9  you provide education.  Even if the patient takes it from home,

10  you still reinforce and ask what is it they know and still

11  provide additional teaching.

12      MS. WILKINSON:  So did you help explain the risks, even

13  if --

14      PROSPECTIVE JUROR:  Yes.

15      MS. WILKINSON:  -- there was a benefit to the

16  medication.

17          Who ultimately, in your experience, makes the

18  decision to take the medication?  Is it the doctor, the patient

19  or is it in combination when they speak to you and the

20  physician?

21      PROSPECTIVE JUROR:  The patient.  If the patient says,

22  "No," they do not get the medication.

23      MS. WILKINSON:  Thank you very much.

24      Mr. Mohammed?

25      PROSPECTIVE JUROR:  Yes.

1      MS. WILKINSON:  You talked to us about your wife and

2    we're very sorry to hear that and hope that she recovers.

3    Hearing about all this testimony about a very difficult

4    situation, do you think personally that will be difficult for

5    you sitting in the courtroom while you have a wife who is still

6    trying to recover?

7           Because, you know, we don't know.  I can't put

8    myself into your shoes.  I don't know all of those facts.  I'm

9    going to get you to Ms. Favalora about that, but you're not

10   human if it's not emotional.  It's a very difficult situation.

11     PROSPECTIVE JUROR:  I understand.  But I'm -- you know,

12   I spoke to her about it; and we have decided that if I'm needed

13   here, well, then, she will have to get along until I'm finished

14   here.

15     MS. WILKINSON:  Thank you very much.  We appreciate

16   your willingness to serve.

17           Mr. Moore, you thought you were going to get

18   away.

19           You talked about a lot of jobs you have now that

20   you're retired from the military.

21     PROSPECTIVE JUROR:  Uh-huh.

22     MS. WILKINSON:  I was in the military, my dad was in

23   the military, and I know the mind-set of someone who is in the

24   military; always trying to get things done.  Do you think you

25   have the time here to be able to focus on this case and do all

1    your other jobs?

2         PROSPECTIVE JUROR:  Yeah.  Like I said, I have like

3    residents that take over when I'm not there so -- and I have

4    secretaries and they do -- you know, I've got a staff that

5    handles everything and is feeding me the information and my

6    decision is the last one, so...

7         MS. WILKINSON:  You can do that after hours and not

8    worry about it?

9         PROSPECTIVE JUROR:  Yeah.  No problem.

10        MS. WILKINSON:  You don't have any other concerns about

11   serving, do you?

12        PROSPECTIVE JUROR:  No.

13        MS. WILKINSON:  Thank you.  We appreciate it.

14             Okay, Mr. LeBlanc.

15        PROSPECTIVE JUROR:  Yes.

16        MS. WILKINSON:  You have some medical issues that

17   you've shared with us, family members, and in particular a

18   lawsuit that your family brought.

19        PROSPECTIVE JUROR:  Yes.  My ex-wife and myself.

20        MS. WILKINSON:  This is not a malpractice case?

21        PROSPECTIVE JUROR:  No.

22        MS. WILKINSON:  I think everybody knows nobody is

23   claiming the doctors did anything wrong and surely nobody is

24   claiming the Orrs did anything wrong.

25        PROSPECTIVE JUROR:  Right.

1      MS. WILKINSON:  It is really about our drug.  But I

2   just wanted to know if you think bringing that lawsuit would

3   affect your view in this particular case?

4      PROSPECTIVE JUROR:  No.

5      MS. WILKINSON:  Anything that you've heard or you would

6   kind of objectively --

7      PROSPECTIVE JUROR:  I'm objective.  It was a jury

8   trial, so it -- we didn't win, but that has nothing to do with

9   my -- the way I feel about things now.

10      MS. WILKINSON:  Great.  No other problem with serving?

11      PROSPECTIVE JUROR:  No.

12      MS. WILKINSON:  Thank you very much.

13          Mr. Songy, I think you told us about your

14   concerns; but you don't have any problem sitting in this case,

15   do you?

16      PROSPECTIVE JUROR:  No, ma'am.

17      MS. WILKINSON:  You would be fine with following

18   His Honor's instructions, as I'm going to ask of all of you;

19   but the most important thing to us is -- and I think

20   Mr. Birchfield and I agree -- is that both sides get a fair

21   shake and you start from the beginning.  And some people have

22   told us -- and thank you for being honest -- that you can't

23   help it if you have these personal experiences that make you

24   lean one way or the other.  So all we ask is if you tell us you

25   can be fair to both sides.

1    PROSPECTIVE JUROR:  Yes, ma'am.

2    MS. WILKINSON:  That's all we ask.

3         And in this particular case, as in any civil

4    case, when the plaintiffs bring the case, they have the burden

5    of proof.  So the only other question I would ask you with

6    regard to that is:  If the plaintiffs don't prove their case --

7    even though Ms. Orr passed away and it is a huge loss for her

8    family, if they don't prove their case, would you be

9    comfortable returning a verdict for Janssen and Bayer and not

10   awarding the family any money?

11   PROSPECTIVE JUROR:  I would hear both sides and the

12   evidence would have to be there for me to, you know -- for me

13   to make a decision.

14   MS. WILKINSON:  Thank you very much.  I appreciate it.

15        Ms. Chambliss, I'm not going to ask you anymore

16   questions, because I think I heard you say between your

17   financial issues and these personal issues, this is not the

18   right case for you to serve.  Would that be fair?

19   PROSPECTIVE JUROR:  Yes.

20   MS. WILKINSON:  Okay.  Thank you.

21        Mr. Mitchell, in your questionnaire -- I have

22   some notes here, so I wanted to follow up on those.  You said

23   you don't take any medications whatsoever; is that right?

24   PROSPECTIVE JUROR:  Yes.

25   MS. WILKINSON:  Can you tell me what that's based on?

1      PROSPECTIVE JUROR:  Good health.

2      MS. WILKINSON:  You're lucky.

3      PROSPECTIVE JUROR:  Decent DNA.  Luck of the draw.

4      MS. WILKINSON:  I would say "born of peasant stock,"

5  right; so you're healthy?

6      PROSPECTIVE JUROR:  Yes.  My family is pretty healthy.

7      MS. WILKINSON:  Do you have any personal views against

8  prescription medications?

9      PROSPECTIVE JUROR:  No.  They're necessary.  I mean,

10  it's like food.  There's a choice to be made, a life-style.

11      MS. WILKINSON:  How do you think someone who is

12  confronted with a recommendation by a doctor to take a

13  prescription medication -- how would you go about doing that if

14  that was you?  What steps would you take?

15      PROSPECTIVE JUROR:  Well, I would get a doctor based on

16  recommendations from people; and I would probably do some

17  research as well, be halfway analytical.

18      MS. WILKINSON:  I saw you are familiar with the drug

19  Coumadin or warfarin; is that right?

20      PROSPECTIVE JUROR:  I wouldn't say "familiar."  I've

21  run across it, you know, in reading magazines and things along

22  with a lot of others.  I wouldn't have been able to tell you

23  what it was for.

24      MS. WILKINSON:  I'm going to ask you about one

25  particular thing you wrote in there, because it's probably, I

1    would say provocative, depending on how you look at it.  You

2    said you've heard that Hillary Clinton was on warfarin.

3              PROSPECTIVE JUROR:  Yeah, yeah.

4              MS. WILKINSON:  So I had to ask you, therefore --

5              PROSPECTIVE JUROR:  That's where I heard the reference,

6    yes.

7              MS. WILKINSON:  Pardon?

8              PROSPECTIVE JUROR:  That's where I would have heard the

9    reference to it.

10             MS. WILKINSON:  What do you think about the fact that

11   she was on warfarin?

12             PROSPECTIVE JUROR:  Well, I just got the understanding

13   it's for people that are subject to blood clots.  That's the

14   association.

15             MS. WILKINSON:  But that doesn't affect you one way or

16   the other, does it?

17             PROSPECTIVE JUROR:  Not until I have a clot.

18             MS. WILKINSON:  We're going to keep our fingers crossed

19   that nothing like that is going to happen since you're from

20   healthy stock.

21                  Thank you very much.

22                  I should ask you the same question.  Would you

23   have any problem holding the plaintiffs to their burden in this

24   case where this is a particularly sympathetic case?

25             PROSPECTIVE JUROR:  No.

1          MS. WILKINSON:  Thank you very much.

2              Mr. Thomas --

3          PROSPECTIVE JUROR:  Yes.

4          MS. WILKINSON:  -- as counsel said, you know or are at

5    least well informed about the FDA process, that they have to

6    approve the label, but His Honor is going to give very specific

7    instructions about how we can talk about the FDA.  And we will.

8    Both sides will.  Do you think you can follow His Honor's

9    instructions about how you may consider that evidence?

10         PROSPECTIVE JUROR:  I already have so far.  That was

11   clear enough, I believe, so, yeah.

12         MS. WILKINSON:  So otherwise no problem serving in this

13   case?

14         PROSPECTIVE JUROR:  None.

15         MS. WILKINSON:  You are not leaning one way or the

16   other?

17         PROSPECTIVE JUROR:  No.

18         MS. WILKINSON:  Thank you very much.

19             If you wouldn't mind passing the microphone back.

20             Ms. Reed, you've been quiet.  You thought you

21   were going to get away without answering any questions?

22         PROSPECTIVE JUROR:  I don't have much to say.

23         MS. WILKINSON:  Okay.  Well, in our business that's a

24   nice change, because lawyers like to talk.

25             I only wanted to ask you about some of the

1  personal issues, and I don't want to go into the details.  You

2  shared some of the medical issues and losses that you've had in

3  your family, and I just want to look you in the eye and be sure

4  that you think you can hear about this testimony about

5  Mrs. Orr's medical condition and then her death and be able to

6  separate that from what you've been through in your life.

7           PROSPECTIVE JUROR:  Yes.

8           MS. WILKINSON:  Thank you.  I appreciate it.

9                Mr. Gerhold, I think you said that you have a

10  financial issue and this is not the case where you could serve

11  this long?

12           PROSPECTIVE JUROR:  Right.  I was laid off from the oil

13  field almost a year ago, and I'm making ends meet, but I can't

14  afford to stay out of work --

15           MS. WILKINSON:  Two weeks here would not work for you?

16           PROSPECTIVE JUROR:  It wouldn't work.  Later in the

17  future, but not right now.

18           MS. WILKINSON:  Ms. Russo.

19           PROSPECTIVE JUROR:  Yes.

20           MS. WILKINSON:  At some point when we were asking

21  questions, you raised your hand about the FDA and then you put

22  it down.  I thought that was because His Honor explained how it

23  worked.  Is that right?  Or did you have something else?

24           PROSPECTIVE JUROR:  Right.  After he said that.

25           MS. WILKINSON:  Please go ahead.

1        PROSPECTIVE JUROR:  That's it.  After he explained that

2   the drug isn't tested, they look at the paperwork and things

3   like that, that I thought the same thing, that they tested

4   every drug.

5        MS. WILKINSON:  You can be sure we are trying not to

6   waste your time.  Even if we are, His Honor won't let us.  So

7   we don't want to bore you.

8             But one thing we always worry about is we go

9   second because we don't have the burden of proof.  Plaintiffs

10  go first.  They have to present the evidence.  We don't have to

11  present any evidence.  Obviously, we will through

12  cross-examination and we'll put on our other case.

13            I just want to make sure that you're not going to

14  hold it against us because we have to go last and you've been

15  sitting for a while and thinking, "When are they going to get

16  to it?"

17            Do you think you could hear both sides and --

18       PROSPECTIVE JUROR:  I think it is very serious.  I

19  would look at it as being something very serious.

20       MS. WILKINSON:  I really don't think you will be bored.

21  The medicine, the issues here, are important.  They're very

22  important to us.

23            So I'm sure you wrote that when you were

24  thinking, "I really don't want to be a juror."  But now that

25  you know there's a possibility, you wouldn't have any problem

1   doing that?

2          PROSPECTIVE JUROR:  No, I wouldn't.

3          MS. WILKINSON:  Thank you so much.  I appreciate it.

4              I'm going to try and -- "Scorsone"?  Is that --

5          PROSPECTIVE JUROR:  "Scorsone."

6          MS. WILKINSON:  "Scorsone."

7              You talked about actually having an ablation,

8   right?

9          PROSPECTIVE JUROR:  Yeah.  I had a radiofrequency

10  ablation.

11         MS. WILKINSON:  You're going to hear a little bit about

12  that.  At least we're going to call a cardiologist that's a

13  specialist in electrophysiology.  It's just a person that's

14  going to be the electrician of the heart, works on heart

15  rhythm, and they do ablations.

16             So I just wanted to make sure, since you've

17  mentioned that, did it all go well?

18         PROSPECTIVE JUROR:  Went very well.

19         MS. WILKINSON:  You haven't had any problem with your

20  heart?

21         PROSPECTIVE JUROR:  It was in 2009.  I haven't had a

22  problem since.

23         MS. WILKINSON:  Was it a -- I don't want to say

24  pleasant experience, because it can't be pleasant to have to go

25  through that, but did you get good care?

1          PROSPECTIVE JUROR:  The condition wasn't pleasant, but
2     I was actually mostly awake during the operation.  It was very
3     interesting to watch.
4          MS. WILKINSON:  Because you didn't have to go under
5     anesthesia?
6          PROSPECTIVE JUROR:  I was under, but I didn't actually
7     go all the way under.  They were surprised that I didn't.
8          MS. WILKINSON:  Can I ask who your cardiologist was
9     that did the ablation?  Do you remember?
10          PROSPECTIVE JUROR:  It was at Ochsner, but she's no
11     longer at Ochsner.
12          MS. WILKINSON:  You are going to hear about many
13     doctors in this case, local doctors, and one of the great
14     things is, you know, great care.
15               You're going to meet some terrific doctors.  And
16     there's somebody I think we're going to get to who had
17     Dr. St. Martin as his wife's -- Mr. Simmons, right?  Is that --
18          PROSPECTIVE JUROR:  Mr. Moore.
19          MS. WILKINSON:  Mr. Moore.  Is that right, that you --
20          PROSPECTIVE JUROR:  Same one was my wife's primary care
21     before I left to go to Iraq, and that was in 2005.  That's the
22     last time I seen them.
23          MS. WILKINSON:  Did your wife have any problems with
24     him?
25          PROSPECTIVE JUROR:  No.

1      MS. WILKINSON:  Because we're going to call him as a

2   witness and I want to make sure you don't feel one way or the

3   other about the doctor.

4      PROSPECTIVE JUROR:  No.

5      MS. WILKINSON:  Thank you, Mr. Scorsone.

6          Anything else we should know?

7      PROSPECTIVE JUROR:  No.  I'm fine.

8      MS. WILKINSON:  I'm going to pronounce it wrong again.

9   Mr. Ely?

10      PROSPECTIVE JUROR:  "Ely."

11      MS. WILKINSON:  Sorry.

12          You said during the initial questioning that you

13   were concerned that the FDA -- that companies are the only ones

14   who can do these tests because -- the testing necessary to get

15   a drug on the market because it's so expensive.

16      PROSPECTIVE JUROR:  Right.

17      MS. WILKINSON:  Are you aware of testing that's funded

18   sometimes by the company but done by independent researchers?

19      PROSPECTIVE JUROR:  Certainly.

20      MS. WILKINSON:  Would that affect your beliefs about

21   whether the drug was adequately tested if people not only that

22   work for the company, but people that don't work for the

23   company, are doing these tests?

24      PROSPECTIVE JUROR:  Yeah.  I don't think that would

25   affect my thoughts in that area.

1          MS. WILKINSON:  Do you have any concerns because it's

2     only as you described it, big companies that are doing the

3     testing of drugs?  It sounded like you did.

4          PROSPECTIVE JUROR:  Well, I'm trying to put it into

5     words that -- because it's sort of a general philosophy that

6     we're an overmedicated society.  So I think it's sort of driven

7     more from that.  And then you see ads everywhere.

8               A question came up earlier about is there

9     adequate warning labels.  The answer is sure.  But is there

10    adequate education around that?  I would say "no."  So it's

11    just driven from those concerns.

12         MS. WILKINSON:  Do you think that's, in part, because

13    of the financial motive of pharmaceutical companies, that

14    they're there obviously to make medication, but also to make

15    money?

16         PROSPECTIVE JUROR:  Sure.

17         MS. WILKINSON:  One of the things we worry about when

18    representing our clients is some people feel strongly that

19    people who make medications shouldn't be in the profit

20    business.

21         PROSPECTIVE JUROR:  I would agree with that.

22         MS. WILKINSON:  So having that view -- and that's

23    normal -- people have lots of concerns, and we'll get to that,

24    about pharmaceutical companies making money.  Do you think that

25    makes you kind of have us start from behind a little bit in

1   this case because both Janssen and Bayer are for-profit

2   companies who make medications?

3         PROSPECTIVE JUROR:  Healthcare should be free for

4   everyone, and it should never be a for-profit business, from my

5   perspective.  But I don't know anything about this company.  I

6   don't know anything about this drug.

7               So I don't think that would put you in a state of

8   behind, but I certainly have a philosophy that there's not a

9   whole lot of room for profit in healthcare.

10        MS. WILKINSON:  So do you think -- if there was an

11  argument presented by one side that we made decisions about the

12  drug because of money, would you be more likely to believe

13  those just because of your beliefs about this shouldn't be a

14  profit business?

15        PROSPECTIVE JUROR:  Yeah.  I think that would be --

16  that would weigh heavily on me.

17        MS. WILKINSON:  So if you were in my position

18  representing the companies, would you pick yourself as a juror?

19        PROSPECTIVE JUROR:  I think I can be impartial, but I

20  do have beliefs around healthcare.

21        MS. WILKINSON:  So --

22        PROSPECTIVE JUROR:  So I couldn't say.  I couldn't say.

23        MS. WILKINSON:  That's honest.  Thank you very much.

24              But, otherwise, you said you are impartial.  So

25  you believe you could set those views aside and listen to the

1    evidence in here?

2         PROSPECTIVE JUROR:  Sure.

3         MS. WILKINSON:  Thank you very much.

4         THE COURT:  And you could give each side a fair shot,

5    listen to the evidence and make your decision solely on the

6    basis of the evidence?

7         PROSPECTIVE JUROR:  Yes, sir.

8         MS. WILKINSON:  Mr. Simmons, I'm not going to ask you

9    any other questions if I'm clear that the financial hardship

10   would be too severe in this case.  Is that right?

11        PROSPECTIVE JUROR:  Yes.

12        MS. WILKINSON:  Thank you.

13             Mr. Hebert?

14        PROSPECTIVE JUROR:  Yes, ma'am.

15        MS. WILKINSON:  I just want to hear you talk because I

16   like your accent.  I'm not from here, as you probably can tell,

17   so....

18             But you said something in your questionnaire I'm

19   very interested in.  You said anything with side effects should

20   not be sold.  Tell me what you meant by that.  We don't give

21   you a lot of room to explain, which is why we ask these

22   follow-up questions.

23        PROSPECTIVE JUROR:  Yeah.  My dad -- for instance, my

24   dad takes Coumadin.  That's a blood thinner.  And so far it's

25   been doing him great.  The doctor watches him, regulates it,

1    and everything like that.

2            It's just as -- so many drugs out there on the

3    market today and -- it's hard for me to explain.  A lot of them

4    do good.  A lot of them do bad.  But, other than that, I mean,

5    I have no real issue with it.

6            MS. WILKINSON:  Do you watch your dad have to get

7    tested on the Coumadin all the time?  It requires a lot of

8    monitoring?

9            PROSPECTIVE JUROR:  Yeah.  I bring my dad to the doctor

10   pretty regularly.  I go with him in there in the office, and

11   sometimes they'll cut it to two and a half.  He'll take two and

12   a half for a couple days.  Then it goes back to a different

13   dose.  You know, they kind of regulate that up and down.

14           MS. WILKINSON:  You're going to hear about that in this

15   case because -- for the condition AFib, which is an irregular

16   heartbeat, one of Ms. Orr's conditions that she needed this

17   medication for.

18           There are different choices.  One is the one your

19   dad is on, Coumadin, or warfarin.  Then there's Xarelto, our

20   medication, and some others.

21           PROSPECTIVE JUROR:  Yes, ma'am.

22           MS. WILKINSON:  And I think you said -- so we'll be

23   talking about the comparisons, what needs monitoring and

24   Xarelto does not.

25           But I think you said in your questionnaire that

1   you thought you had heard Xarelto wasn't safe.  Do you recall

2   saying that?

3            PROSPECTIVE JUROR:  Yes, ma'am, I do.  You hear so many

4   things from different people.  It's hard to narrow down one

5   particular thing.

6            But you hear some people talk bad about Xarelto.

7   Other people talk, say it does good.  So, I mean, who am I, I

8   guess, to say that it shouldn't be sold?

9            MS. WILKINSON:  Since that's the drug at issue in this

10  case, it's our drug, you might imagine, when I read that, I was

11  a little concerned that you thought it might not be safe.

12           Do you think, when you come into this case, we

13  are already a little bit behind, you know, because you heard

14  this and you believe Xarelto may not be safe?  If you are

15  honest with us, is that already there in the back of your head?

16           PROSPECTIVE JUROR:  No, ma'am.  Like I said, it's just

17  things that you hear from different people.  It's not going to

18  affect anything either way.

19           MS. WILKINSON:  So you could just put that aside and

20  you're willing to listen to what both sides have to say about

21  that and make up your mind based on the facts of this case and

22  the law His Honor gives you?

23           PROSPECTIVE JUROR:  Yes, ma'am.

24           MS. WILKINSON:  That's all we can ask.  Thank you very

25  much.  I appreciate it.

1          PROSPECTIVE JUROR:  Thank you.

2          MS. WILKINSON:  Ms. Favalora, I saw when you were

3    discussing your personal situation that you -- I could tell you

4    were feeling like it might be a little emotional to hear about

5    this situation with the Orrs.  Do you think in this case it

6    would be difficult for you?

7          PROSPECTIVE JUROR:  I think it might.

8          MS. WILKINSON:  Would you rather not serve in this case

9    for that reason?

10         PROSPECTIVE JUROR:  Yeah.  Just for certain

11   circumstances and hearing their situation and just comparing it

12   to mine.  I think it would be kind of difficult to kind of

13   compare and then remember stuff like that.

14         MS. WILKINSON:  So it would be hard to separate your

15   own personal situation from what they've been through?

16         PROSPECTIVE JUROR:  I think it would.

17         MS. WILKINSON:  Thank you very much.

18              Mr. Dempster, I'm not going to make you stand up

19   because I believe that you said this is also not the right case

20   for you because of the financial hardship; is that right?

21         PROSPECTIVE JUROR:  Yes.

22         MS. WILKINSON:  Thank you, sir.

23              And Mr. Molaison?

24         PROSPECTIVE JUROR:  Yes.

25         MS. WILKINSON:  I believe on your questionnaire you

1    said you thought it would be difficult.  But I think -- have
2    you told us now you think you can do it because you have other
3    folks who can fill in?
4            PROSPECTIVE JUROR:  Yes.
5            MS. WILKINSON:  And when you were filling out your
6    questionnaire, you said that you always read the warnings and
7    the warnings have all of the side effects in them; is that
8    right?
9            PROSPECTIVE JUROR:  Well, you would have to take some
10   personal responsibility and talk to your doctor.  I had an
11   asthma issue, went in the hospital, and the -- straightened it
12   out real quick with a follow-up visit with the doctor.  He
13   recommended some drugs.  We discussed it.
14                And I said, "Well, what about diet and exercise?"
15                He said, "We don't prescribe that because most
16   people don't do it."
17                I said, "What if we try it?"
18                And we decided that a drug wasn't necessary.  In
19   some cases, I think they are.  In some cases, I think they
20   aren't.  Personal responsibility.
21           MS. WILKINSON:  So you were your own advocate for this?
22           PROSPECTIVE JUROR:  Yeah.  And as far as that issue, I
23   think it's a government agency.  It's a safety net not to be
24   relied on 100 percent.  I do believe a lot in personal
25   responsibility between the doctor and the patient and advice.

1    MS. WILKINSON:  Thank you so much.  I appreciate it.

2         Ms. Alexander, how are you doing this morning?

3    PROSPECTIVE JUROR:  I'm fine.  Thank you.

4    MS. WILKINSON:  I just want to ask you about one

5    serious side effect you talked about in your questionnaire.

6         I think my notes say the name of the drug --

7    PROSPECTIVE JUROR:  Xiidra.

8    MS. WILKINSON:  Xiidra?

9    PROSPECTIVE JUROR:  Right.  It's an eyedrop for dry

10   eyes.  Because right now I use Restasis.  I've been on that for

11   years and the dry eyes still hasn't cleared.

12        So my doctor told me there was a new drug -- I

13   mean, a new eyedrop, Xiidra.  And even with reading the side

14   effects -- it was one that she had never heard of either.

15        It made the left gland swell and drain and I even

16   tried being off of it for like a week and it went away.  I got

17   back on it and it came back so we decided not to use it.

18   MS. WILKINSON:  So you consulted with your doctor and,

19   even though that hadn't been on there, you realized you were

20   not having a good reaction?

21   PROSPECTIVE JUROR:  Right.

22   MS. WILKINSON:  I take it that that won't have any

23   impact on you in hearing this particular case, will it?

24   PROSPECTIVE JUROR:  No.

25   MS. WILKINSON:  Thank you very much.

1        PROSPECTIVE JUROR:  You're welcome.

2        MS. WILKINSON:  Mr. Lascola?

3        PROSPECTIVE JUROR:  Yes.

4        MS. WILKINSON:  In your questionnaire, you talked about

5   your dad having AFib and a GI bleed, but you said you didn't

6   think he was on an anticoagulant?

7        PROSPECTIVE JUROR:  No.  He wasn't on a blood thinner.

8   My mother was actually on Coumadin.

9        MS. WILKINSON:  Oh, she was?

10           Can you hear me?

11        THE COURT REPORTER:  Yes.

12        MS. WILKINSON:  She's the most important person because

13   she -- we need to make sure she can hear.

14           And did your mom have any problem with being on

15   the blood thinner?

16        PROSPECTIVE JUROR:  No.

17        MS. WILKINSON:  Was she on it for a while, a long time?

18        PROSPECTIVE JUROR:  Yeah, we was on it -- or she was on

19   it for several years, four to five years.

20        MS. WILKINSON:  I believe you said that your mom had a

21   blood clot when she was -- was that --

22        PROSPECTIVE JUROR:  That's when she was on Coumadin.

23        MS. WILKINSON:  She had had it first, and then they put

24   her on it so she wouldn't -- and she didn't have any blood

25   clots after she was on Coumadin?

1          PROSPECTIVE JUROR:  No, not really.

2          MS. WILKINSON:  Anything else we've discussed with the

3     other jurors that would affect you about sitting in this

4     particular case?

5          PROSPECTIVE JUROR:  Not really.

6          MS. WILKINSON:  Thank you very much, sir.

7             Mr. Lemaitre?

8          PROSPECTIVE JUROR:  Good morning.

9          MS. WILKINSON:  Good morning.

10            I just want to be sure, your job is very

11    demanding, but you believe the other folks who work for you

12    could take care of it?  So you could be here with us if you are

13    called on?

14         PROSPECTIVE JUROR:  I believe they can.  And I can take

15    a break to manage what comes up.

16         MS. WILKINSON:  Would that allow you, then, to sit and

17    listen to all the evidence fairly and not be so concerned with

18    your work that you couldn't pay attention to what's going on in

19    the courtroom?

20         PROSPECTIVE JUROR:  Yes.

21         MS. WILKINSON:  Thank you, sir.  I appreciate it.

22            Mr. Sullivan, how are you today?

23         PROSPECTIVE JUROR:  I'm doing fine.

24         MS. WILKINSON:  You were thinking this is almost over,

25    that we are coming to the end.

1              You had a nephew who passed away from leukemia?

2         PROSPECTIVE JUROR:  Yes.

3         MS. WILKINSON:  Sorry about that.

4              And from brain cancer, right?

5         PROSPECTIVE JUROR:  That's where the leukemia was.

6         MS. WILKINSON:  And, again, I'm sorry.

7              This case involves a massive cerebral hemorrhage

8    that Mrs. Orr had in her brain and how it affected her brain.

9    So I just want to make sure that hearing about that won't be

10   difficult because of what you went through.

11        PROSPECTIVE JUROR:  No.  It wouldn't hurt my judgment.

12        MS. WILKINSON:  Thank you very much.  I appreciate it.

13             Ms. Ford, you may have already talked about this

14   a little bit.  I don't want to go over this again, but I just

15   want to make sure.

16             Your sister had a blood clot in her leg; is that

17   right?

18        PROSPECTIVE JUROR:  In her leg and her arm.

19        MS. WILKINSON:  And her arm?

20        PROSPECTIVE JUROR:  It was a result of a damaged aorta.

21   She had an infection and pieces of the aorta were dislodging

22   and going into her leg and her arm.  So she had removal of the

23   blood clots.

24        MS. WILKINSON:  So it was a clot really from the

25   tissue, not from the blood?

1          PROSPECTIVE JUROR:  Right.  Yeah.  It was the pieces of

2     aorta lodging in her veins that was causing the blood clots.

3          MS. WILKINSON:  Did she have to take any blood thinner

4     after that or no because this was --

5          PROSPECTIVE JUROR:  Well, she was scheduled for the

6     surgery for her heart because of the damaged aorta and they

7     went with a biological replacement so -- because they wanted to

8     keep her off of blood thinners.  And I don't know for sure if

9     she was on them after or not.  I couldn't tell you.

10          MS. WILKINSON:  Was there anything about that incident

11     that would cause you difficulty hearing this case?

12          PROSPECTIVE JUROR:  No.

13          MS. WILKINSON:  Thank you very much.

14          Ms. Daveron?  I guess I should call you

15     Dr. Daveron, shouldn't I?

16          PROSPECTIVE JUROR:  Yes.

17          MS. WILKINSON:  We are trying to get the case done in

18     two weeks, but I just want to be clear I understand.

19          What was the day you are planning, you and your

20     husband, to leave the state?

21          PROSPECTIVE JUROR:  June 12th.

22          MS. WILKINSON:  So two weeks from yesterday?

23          PROSPECTIVE JUROR:  Right.

24          MS. WILKINSON:  And are you taking off from your day

25     job as a doctor to do that?

1        PROSPECTIVE JUROR:  Yeah.  We put in leave a year in

2   advance; and we rearrange our patients' schedules, juggle the

3   kids, and that sort of thing.  Everybody's out.

4        MS. WILKINSON:  Do you have prepaid plans, either a

5   hotel or travel or anything like that?

6        PROSPECTIVE JUROR:  Reservations at a hotel, yeah.

7        MS. WILKINSON:  Anything else?  You have a lot of

8   knowledge, being in the medical field as well.  Is there

9   anything about your area of expertise and being in the medical

10  field -- you are going to hear from lots of doctors in this

11  case -- that would make it difficult for you to listen

12  impartially?

13       PROSPECTIVE JUROR:  No, I -- yeah, we have to take each

14  patient's case and listen to what's going on and make

15  decisions; so, no, it wouldn't be an issue.

16       MS. WILKINSON:  Excellent.  Thank you so much.  I

17  appreciate it.

18            Ms. Rodriguez, I'm going to talk with you because

19  we have an idea of how many jurors we need, but we're -- I

20  don't want to get anyone's hopes up, but I want to follow up on

21  one or two things that you said.

22            In this case based on just what you've heard and

23  it really is not evidence -- His Honor will tell you that over

24  and over again, that what we say as lawyers is not evidence,

25  it's what you hear from the witness stand -- do you think

1    there's any reason that you couldn't sit and hear this case and

2    listen objectively to both sides?

3            PROSPECTIVE JUROR:  No, it won't be no reason.  I'll be

4    able to.

5            MS. WILKINSON:  Thank you so much.

6                    I've asked you all the questions that I need to,

7    but I just want to make sure that there's not anything that I

8    haven't asked you that you would want the Court to know or you

9    would want us to know about you before we make the final

10   decisions about who will sit on the jury.

11                   Is there anything anyone wants to share that they

12   haven't been able to share or that we didn't ask you the right

13   question?

14           PROSPECTIVE JUROR:  (Indicating.)

15           MS. WILKINSON:  Yes, ma'am?

16           PROSPECTIVE JUROR:  I suffer with arthritis in my lower

17   back.

18           MS. WILKINSON:  Would you mind passing her the

19   microphone.

20           THE COURTROOM MANAGER:  Give us her name and number,

21   too.

22           PROSPECTIVE JUROR:  Susan Alexander, No. 19.

23                   I suffer with arthritis in my lower back and it's

24   hard to stay and sit for any long period of time, so it's

25   becoming very uncomfortable.

1        MS. WILKINSON:  Do you think it would be difficult for

2  you to sit in a jury box?

3        PROSPECTIVE JUROR:  These benches is very

4  uncomfortable.

5        MS. WILKINSON:  Well, you will get one of the chairs.

6        THE COURT:  I'll make every opportunity.  We'll stop or

7  you can stand up or move around and do whatever you need to if

8  you happen to be picked.

9        PROSPECTIVE JUROR:  Thank you.

10        THE COURT:  I'll make every effort to make sure.

11        PROSPECTIVE JUROR:  Okay.

12        MS. WILKINSON:  Yes, sir, Mr. Moore?

13        PROSPECTIVE JUROR:  Do y'all have court on the

14  weekends?

15        THE COURT:  No.

16        PROSPECTIVE JUROR:  Oh, good.  Because I have two

17  family reunions I have to cook for.

18        THE COURT:  Okay.  No.  We will stop on Friday

19  afternoon.

20        PROSPECTIVE JUROR:  That's good.  I'm cool, then.  I

21  don't have any problem.

22        THE COURT:  Fine.  Great.  Okay.

23        PROSPECTIVE JUROR:  What are the estimated hours that

24  we are here?

25        THE COURT:  What we'll do is we will start about 8:30.

1    We'll go to about 5:00 or 5:30 depending on how far you folks

2    have to drive and we'll take a break in the morning, a break in

3    the afternoon, and a break for lunch.  That's sort of our

4    hours.

5         MS. WILKINSON:  Anybody else?  Thank you-all very much.

6         Thank you, Your Honor.

7         THE COURT:  Let me see counsel.

8         (Conference at the bench, as follows:)

9         THE COURT:  I'm talking first to you-all about cause

10   challenges.

11        This is who the Court is going to excuse for

12   Cause:

13        No. 6, Stephanie Chambliss.  She has a family

14   member on Xarelto.  She also knows a class member who died.

15   She feels she has no bias.  Otherwise I thought she would be a

16   good juror but she indicates she would have bias.  I'm going to

17   excuse her.

18        No. 10 I'm going to excuse.  No work, no pay.  He

19   is a heavy industry machine person.  He has a severe personal

20   problem if he doesn't get paid.  That's No. 10.

21        No. 14, James Simons.  He feels some bias.  He is

22   also no work, no pay.  I'm going to excuse him for cause.

23        No. 16, Michelle Favalora.  She looked to me to

24   be okay at first, but then it seems that she's very emotional

25   when you start talking about people who have died, people who

1  have had a difficult time.  She relates it to her grandmother.

2  She apparently was very close; feels that she would have a very

3  hard time separating personal feelings so I'm going to excuse

4  her for cause.

5           No. 17, Gregory Dempster is again a plumber.  If

6  he doesn't work, he doesn't get paid.  He's from Lafourche.

7  I'm going to excuse him for cause.

8           I'm concerned about No. 24 and she leaves

9  June 12th.  I know you-all are going to do everything you

10  possibly can to finish in two weeks, but if we don't finish in

11  two weeks it's going to be tough on her.

12       MR. BIRCHFIELD:  With those four cause strikes, we

13  don't get to her.

14       THE COURT:  Okay.  Anything else on other cause

15  challenges from the plaintiff?

16       MR. BIRCHFIELD:  No, Your Honor.

17       MS. WILKINSON:  You're not concerned about No. 19

18  sitting?  You can deal with that?

19       THE COURT:  I'm going to deal with that.  I'll make

20  every effort to take care of her.  If she needs to stand up,

21  I'll ask her.

22       MR. BIRCHFIELD:  Judge, the one thing that I would --

23  not for cause, but if we could have a few minutes to talk with

24  our people before?  And if we could do that, is there a way we

25  can do that outside the jury?

1          THE COURT:  Anybody else for cause?

2          MS. WILKINSON:  No, Your Honor.

3          THE COURT:  Okay.  What were you saying?

4          MR. BIRCHFIELD:  Asking if we could have a few minutes

5     with our clients?  And can we do that outside the presence of

6     the jury?

7          THE COURT:  What I would like to do -- you don't have

8     to stand here.  If you want to meet with your clients and ask

9     your people, we can let the jury hear.  We're not going to be

10    concerned about that.

11         MR. MEUNIER:  Particularly with this white noise they

12    can't hear.

13         MS. WILKINSON:  We can't hear you.

14         THE COURT:  Let me know when you are ready and Dean

15    will come.

16              And the same thing, come to you first.  And you

17    each have three strikes.

18         MR. IRWIN:  Back strikes okay?

19         THE COURT:  Yes.

20         (Conference at the bench concluded.)

21         THE COURT:  Okay.  Members of the jury, we are finished

22    with the questions.  I have made my cause challenges.  The

23    parties will now be doing their peremptory challenges.

24              As I mentioned to you, in a case of this sort I'm

25    going to pick nine people.  Under law we need at least six for

1   a verdict, so we pick nine just in case.  The nine will

2   deliberate.  If everybody is able to continue to participate --

3   and I expect you will -- it's good to pick more than we need.

4   In any event, if we end up with nine, nine will participate.

5   The verdict must be unanimous, as you will hear me say.

6           The parties now have an opportunity to do what we

7   call peremptory challenges.  They've heard all of you, all of

8   your comments; and they will now go over themselves and talk

9   with each other, talk with their people, their assistants,

10  associates, whatever; and they will make some what we call

11  peremptory challenges.  Each side gets three, and then we will

12  have a jury.

13          MR. BIRCHFIELD:  Thank you, Your Honor.

14          THE COURT:  They will confer with anybody they need to

15  confer with.

16          While they are doing that, members of the jury,

17  I'm going to just say that for criminal trials we have 12

18  people.  That's a number that western civilization feels

19  comfortable with.  We have 12 months in a year, 12 apostles, 12

20  signs of the Zodiac, 12 trials of Israel.  All of those things,

21  somehow or another, we have come to the conclusion in western

22  civilization that the number 12 is good; so we use that as a

23  number for criminal cases.  We used to do that in civil cases,

24  but I think the jurors get paid and so the government has

25  reduced it to six that we need.  We pick nine just in case, and

1    it's the same thing with criminal matters.  It must be

2    unanimous, and now we have at least six in civil cases.  Six

3    must agree, and that's what we've done.  The system has been

4    going on now for 600 years.  We picked it up from England and

5    it's worked very well for us in our history of 230 or so years.

6    With the fall of the Soviet Union and that sort of thing now

7    we're finding that other countries want to pick up our system,

8    too, particularly in the Orient.  But they like more than 12

9    for some reason.  They like large numbers of people.  We

10   haven't found it helpful, but they are experimenting with it.

11   So it's a tried and true system.  It's amazing how it works.

12   It's very effective and very efficient.  We are still using

13   peremptory challenges here.

14          In England they have done away with peremptory

15   challenges.  They just have challenge for cause.  There's no

16   peremptory challenges.  In our society we bring a lot of people

17   together, a lot of diversity, which is our strength; but

18   because of that there is some feeling that she should have some

19   peremptory challenges that are tailored to the specific facts

20   of the case, background of the individuals; and so we are still

21   having -- we continue to discuss whether or not peremptories

22   are appropriate or not.

23          Okay, folks.  Let's begin wrapping it up.

24               (Brief pause in the proceedings.)

25          THE COURT:  Let's start.

1              (Brief pause in the proceedings.)

2         THE COURT:  Let me see counsel, please.

3              (Conference at the bench, as follows:)

4         THE COURT:  I'm talking first to you-all about cause

5    challenges.

6              This is who the Court is going to excuse for

7    cause:  No. 6, Stephanie Chambliss.  She has a family member on

8    Xarelto.  She also has a class member who died.  She feels she

9    has some bias.  Otherwise, I thought she would be a good juror.

10   But she indicates she would have bias.  I'm going to excuse

11   her.

12             No. 10, I'm going to excuse.  No work, no pay.

13   He is a heavy industry machine person.  He has a severe

14   personal problem if he doesn't get paid.  That's No. 10.

15             No. 14, James Simons.  He feels some bias.  He is

16   also no work, no pay.  I'm going to excuse him for cause.

17             No. 16, Michelle Favalora.  She looked to me to

18   be okay at first, but then it seems that she's very emotional.

19   When you started talking about people who have died, people who

20   have had a difficult time, she relates it to her grandmother.

21   She apparently was very close and feels that she would have a

22   very hard time separating personal feelings.  So I'm going to

23   excuse her for cause.

24             No. 17, Gregory Dempster.  Again, he's a plumber.

25   If he doesn't work, he doesn't get paid.  He's from Lafourche.

1    I'm going to excuse him for cause.

2              I'm concerned about No. 24.  She leaves

3    June 12th.  I know you-all are going to do everything you

4    possibly can to finish in two weeks.  But if we don't finish in

5    two weeks, it's going to be tough on her.

6              MS. WILKINSON:  Your Honor, I don't think we will --

7              MR. BIRCHFIELD:  With those four cause strikes, we

8    don't get to her.

9              THE COURT:  Okay.  Anything else from -- any other

10   cause challenges from the Plaintiff?

11             MR. BIRCHFIELD:  No, Your Honor.

12             MS. WILKINSON:  You're not concerned about No. 19

13   sitting?  You can deal with that, Your Honor?

14             THE COURT:  No.  I'm going to deal with that.  I'll

15   make every effort to take care of her.  If she needs to stand

16   up, I'll ask her.

17             MR. BIRCHFIELD:  Judge, the one thing that I would --

18   not on the for cause, but if we could have a few minutes to

19   talk with our people before we --

20             THE COURT:  Yeah.  Yeah.

21             MR. BIRCHFIELD:  And if we could do that -- is there a

22   way we can do that outside the jury?

23             THE COURT:  Anybody else with cause?

24             MS. WILKINSON:  No, Your Honor.

25             THE COURT:  Okay.  What were you saying?

1    MR. BIRCHFIELD:  Your Honor, if we could just have a

2    few minutes with our consultants, could we do that outside the

3    presence of the jury?

4    THE COURT:  Well, what I would like to do -- you don't

5    have to stand here.  If you want to meet with your consultant

6    and your people even, we can let the jury hear -- we're not

7    going to be concerned about that.

8    MR. MEUNIER:  Particularly with this white noise, they

9    can't hear.

10    THE COURT:  Can't hear anything.

11    MS. WILKINSON:  They can't hear you.

12    THE COURT:  Let me know when you are ready and Dean

13    will come to you.

14    And the same thing.  Comes to you, goes back, and

15    you each have three strikes.

16    MR. IRWIN:  Back strikes okay?

17    THE COURT:  Yes.

18    (Conference at the bench concluded.)

19    (Brief pause in the proceedings.)

20    THE COURT:  Okay.  Members of the jury, with your help,

21    we were able to pick a jury.  I'll list the names for the jury.

22    If your name is called, please remain.  If your name is not

23    called, you will be excused to return to Room 107.

24    The first juror is No. 1, Maira Harris.  The

25    second juror is No. 2, Azam Mohammed.  The third juror is

1   No. 3, Herbert Moore.  The fourth juror is No. 8, Vladimir

2   Thomas.  The fifth juror is No. 9, Tina Reed.  The sixth juror

3   is No. 11, Linda Russo.  The seventh juror is No. 12, Joseph

4   Scorsone.  The eighth juror is No. 15, Rocky Hebert.  The ninth

5   juror is No. 19, Susan Alexander.

6                   As I said, if your name is called, please remain.

7   If your name has not been called, you can return to room 107.

8                   But before you do so, let me take the opportunity

9   to again thank you for your answers to the questions.  It was

10  very helpful to us.  And although you have not been picked to

11  serve on this jury, your presence was very effective, very

12  helpful, to allow us to pick a jury.

13                  I ask everybody to rise out of respect for these

14  individuals as they leave.

15                  Your name has been called, please remain.  If

16  your name has not been called, you are free to go to room 107.

17                  (Prospective jurors dismissed.)

18             THE COURT:  Swear the jurors, please.

19             THE COURTROOM MANAGER:  Okay, jurors.  Would you stand

20  one more time and raise your right hands.

21                  (Whereupon, the jury was sworn.)

22             THE COURT:  Be seated, please.

23                  Members of the jury, let me just say that I will

24  have about ten minutes to speak to you at this point and then

25  we'll take a break and you can have lunch.  I know you've been

1    here early.  We'll take a lunch break that will be about an

2    hour and 15 minutes.

3                We will come back and then we will hear the

4    opening statements from each counsel.  As you will hear me say

5    at that time, opening statements is really a verbal program

6    which each of them try to give to you so that you can better

7    follow the evidence.

8                It's not evidence itself.  It's simply what they

9    expect the evidence to show.  So each of them give that to you

10   so that you can then follow the evidence a little bit more.

11               Let me at the outset tell you that you've been

12   selected to serve as jurors in this case, and I have no doubt

13   that you, as jurors, are mindful of your great

14   responsibilities.

15               And certainly you're aware that your conduct

16   during the trial will be observed by the Court, your fellow

17   jurors, the parties, the attorneys for all of the parties and

18   other persons both inside and outside of this courtroom.

19               I mention that to you because I expect and your

20   responsibility demands that you be extremely careful in the

21   manner in which you conduct yourselves in order that no one has

22   any doubt that this case has been fairly and impartially tried

23   and that, in the end, justice has been done.

24               For the same reason, the attorneys in the case,

25   the parties, the witnesses and all others identified with or

1    connected with this trial in any way should be equally careful

2    of their conduct.

3              During the course of the trial, the jurors should

4    not engage or attempt to engage in any conversation of any kind

5    whatsoever with any of the parties connected with this trial,

6    including the parties their relatives, family, the attorneys,

7    the parties, the witnesses or other persons identified with

8    this trial.

9              The reason for that, in a community such as ours,

10   we tell everybody hello and ask them how they're doing and

11   things of that sort.  But in this particular situation, in this

12   role that you're in, that can be misconstrued.  When you say

13   something and smile at somebody and talk to them, it might

14   appear to be improper.

15             And justice is a funny thing.  It's not only

16   important that justice be done, but it's important that justice

17   appears to be done.  So no one gets a wrong impression, I ask

18   that you not do that.

19             And the attorneys would be very willing to at

20   least talk to you because they're friendly people, but I'm

21   going to ask them not to do it and not to greet you and things

22   of that sort.  So don't hold it against them if they don't

23   greet you as you would expect to be greeted when they see you.

24             All of us are trained to extend to

25   acquaintances -- we talk to them freely.  But, as I told you,

1    at this time, I ask that you not speak to anyone regarding --

2    in any way associated with the trial.

3              Let me give you some specific instructions.  You

4    are not to discuss the case with anyone during the course of

5    the trial.  This includes your spouse, your child, your

6    relatives, friends and strangers.

7              And the reason for that is that oftentimes, when

8    we begin discussing things and putting ideas in words, we put

9    them in cement.  We feel like we said it, we got to stand

10   behind what we said.  And we haven't seen all the evidence yet.

11             So before you speak to anyone, even among

12   yourselves, I want you to get the full scope of the evidence,

13   listen to what the Plaintiffs have to say and then listen to

14   what the Defendants have to say.  You will get both sides of

15   the evidence.

16             And then I'll have an opportunity to discuss the

17   law applicable to the case.  Then you can discuss it.  And I'm

18   sure you will.

19             If any publicity about this case has come to your

20   attention before the moment, you must strike it from your minds

21   and completely disregard anything that has come to your

22   attention outside of this courtroom.

23             From this moment on, you are not to read any

24   newspapers or other accounts of this trial or hear anything on

25   television about this trial.

1           And the reason for that, members of the jury --
2     and also I'll mention to you you are not to go back home at
3     night and look it up on Google or use any device to research
4     the trial or get any information from anything.
5           The reason for that is that, as I've often said,
6     this courtroom is like a laboratory and we are going to study
7     this fact pattern in a proper way.
8           In this laboratory, we have various techniques
9     and, as you know from your experience in laboratories, there
10    are protocols and methods of doing things.
11          And in this laboratory, we have something called
12    cross-examination so that each side gets an opportunity to ask
13    the questions and then cross-examine that witness on the
14    questions.
15          And when you do some research, you are just
16    getting one side of it.  You are not getting the benefit of
17    that cross-examination.
18          And so, by doing that, you will bring into this
19    courtroom, into this laboratory, a germ and the germ will
20    affect us and we won't be able to do justice.
21          So, please, from this moment on, don't research.
22    Don't look at television or talk to anybody about the case
23    until you have gotten all of the evidence and all of the law
24    involved in the case.
25          The case will proceed in the following order.

1    First, counsel for the Plaintiffs and counsel for the

2    Defendants will have the opportunity, as I said, to make an

3    opening statement to you.

4              Plaintiffs' counsel will make an opening

5    statement at the beginning of the case, and the statement is

6    nothing more, as I said, than a verbal program.  It is given to

7    you so that you can follow the case a little bit more -- a

8    little bit better.

9              And then following the Plaintiffs, the Defendants

10   may make an opening statement.  Same thing.  What they say is

11   not evidence.  It's just their attempt to give you their

12   impression of what the evidence will show.

13             And then following the opening statement, the

14   Plaintiff will put on evidence in the case.  Their evidence

15   will be presented to you.  At the conclusion of the Plaintiffs'

16   evidence, counsel for the Defendants may introduce evidence.

17             The Plaintiffs have the burden of going first,

18   and they have the burden of proving by a preponderance of the

19   evidence something that's more likely so than not so.

20             The Defendants don't have the -- they don't have

21   a duty to prove anything, but they may present evidence in the

22   case.

23             And, if they do, then the Plaintiff may have an

24   opportunity to put on what we call rebuttal evidence to rebut

25   what the Defendants have put forth if they feel a need to do

1    so.

2               Fourth, at the conclusion of the evidence, the

3    parties will have the opportunity to present what we call oral

4    argument or summation.

5               They will summarize the evidence for you.  They

6    will tell you what inferences they feel the evidence supports

7    and that you can draw from that.  They will argue to you their

8    side of the case and show what evidence supports their side of

9    the case.

10              Each side will have an opportunity.  The

11   Plaintiff will start, followed by the Defendant.  The Plaintiff

12   then will have an opportunity to close.  The Plaintiff speaks

13   twice because the Plaintiff has the burden of proof.  The

14   Defendant speaks once and that's their responsibility, their

15   opportunity.

16              Finally, I will instruct you on the law

17   applicable to the case.  I will give the charge to you verbally

18   and I'll also give you a written charge.  You can take that

19   charge into the jury room with all of the evidence that has

20   been introduced into evidence.

21              The admission of evidence in the court is

22   governed by what we call Rules of Evidence, rules of law.  From

23   time to time, it may be the duty of the attorneys to make

24   objections to the admissibility of evidence.

25              It is my duty, as a Judge, to rule on these

1    objections.  My rulings may well affect whether you can

2    consider certain evidence.

3              You must not concern yourselves with the

4    objections or the Court's reasons for its ruling on them.  You

5    must not consider testimony or exhibits to which an objection

6    was sustained or which has been ordered stricken.

7              If I instruct you not to consider testimony or

8    evidence to which an objection is sustained or which has been

9    ordered stricken, you must completely ignore such testimony or

10   evidence and not take it into consideration when deciding the

11   case.

12             You must not be influenced by any degree -- or to

13   any degree by any personal feelings of sympathy for or

14   prejudice against any party or counsel.

15             No statements or rulings or remarks which I may

16   make during the presentation of the testimony or evidence is

17   intended in any way to indicate my opinion as to what the facts

18   are.

19             Remember, you are to determine the facts.  You

20   will be the jury which determines the facts.  You and you alone

21   will determine the facts.  In the determination, you alone must

22   decide upon the believability of the evidence and the weight

23   and value to be given to it.

24             Now, if you'd like to take notes during the

25   trial, you may do so.  On the other hand, you are not required

1   to take notes if you prefer not to do so.  Each of you should

2   make up your own decision about this.

3              If you do decide to take notes, please be careful

4   not to get so involved in note-taking that you become

5   distracted from the ongoing proceedings.

6              Remember, your notes should be used only as

7   memory aids and you should not give your notes precedence over

8   your independent recollection of the evidence.

9              Whether or not you take notes, you should rely

10  upon your own independent recollection of the proceedings and

11  you should not be unduly influenced by the notes of other

12  jurors.

13             Again, I remind you that notes are not entitled

14  to any greater weight than the memory or impression of each

15  juror as to what the testimony may have been.  Whether you take

16  notes or not, each of you must form and express your own

17  opinion as to what the facts are.

18             Now, at the end of the trial, you'll have the

19  opportunity to -- you'll have to make a decision based upon

20  what you recall from the evidence.

21             You will not have a written transcript to

22  consult.  It's difficult and time-consuming for the reporter to

23  read back lengthy testimony.

24             So you will have your recollection and your

25  notes, if you take any, to utilize in your deliberations.  So

1    please pay attention to what the evidence is.

2              At this time we'll take a break, as I say, and

3    we'll come back at quarter to 1:00, 12:45.  So relax.  And

4    maybe you should call people and tell them that you are going

5    to be on the jury.

6              We'll go to about 5:00 or 5:30 today, probably

7    more like 5:00, and then we'll break.  But have lunch and then

8    come back and we'll start the opening statements and the

9    witnesses.

10             Thank you very much.

11         THE COURTROOM MANAGER:  All rise.

12         THE COURT:  Court is in recess.

13                   (Court is in recess.)

14                        *  *  *  *

15                   REPORTER'S CERTIFICATE

16             I, Lanie M. Smith, CRR, RPR, Official Court
     Reporter, United States District Court, Eastern District of
17   Louisiana, do hereby certify that the foregoing is a true and
     correct transcript, to the best of my ability and
18   understanding, from the record of the proceedings in the
     above-entitled and numbered matter.

19

20                   ___/s/ Lanie M. Smith_____
                        Official Court Reporter
21

22

23

24

25