UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO (RIVAROXABAN)  *
PRODUCTS LIABILITY LITIGATION  *        Docket No. 14-MD-2592
                               *
                               *        Section L
THIS DOCUMENT RELATES TO:      *
                               *        New Orleans, Louisiana
*Joseph Orr, et al.*           *
*v. Janssen Research &*        *        May 30, 2017
*Development, et. al.,*         *
Case No. 15-CV-3708            *
                               *
* * * * * * * * * * * * * * * *


TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE
VOLUME I – AFTERNOON SESSION


<u>Appearances:</u>


For the Plaintiffs:          Levin Papantonio Thomas Mitchell
                               Rafferty & Proctor, P.A.
                             BY:  BRIAN H. BARR, ESQ.
                             316 South Baylen Street, Suite 600
                             Pensacola, Florida  32502


For the Plaintiffs:          Beasley Allen Crow Methvin
                               Portis & Miles, PC
                             BY:  ANDY BIRCHFIELD, ESQ.
                             Post Office Box 4160
                             Montgomery, Alabama 36103


For the Plaintiffs:          Gainsburgh Benjamin David
                               Meunier & Warshauer, LLC
                             BY:  GERALD E. MEUNIER, ESQ.
                             1100 Poydras Street, Suite 2800
                             New Orleans, Louisiana 70163

<u>Appearances:</u>

For the Plaintiffs:          Goza & Honnold, LLC
                                  BY:  BRADLEY D. HONNOLD, ESQ.
                                  11181 Overbrook Road, Suite 200
                                  Leawood, Kansas 66211

For the Plaintiffs:          The Lambert Firm, PLC
                                  BY:  EMILY C. JEFFCOTT, ESQ.
                                  701 Magazine Street
                                  New Orleans, Louisiana 70130

For Bayer Healthcare        Wilkinson Walsh + Eskovitz, LLP
Pharmaceuticals, Inc.        BY:  BETH A. WILKINSON, ESQ.
and Bayer Pharma AG:        1900 M Street NW, Suite 800
                                  Washington, DC 20036

For Bayer Healthcare        Nelson Mullins Riley &
Pharmaceuticals, Inc.          Scarborough, LLP
and Bayer Pharma AG:        BY:  DAVID E. DUKES, ESQ.
                                  1320 Main Street, 17th Floor
                                  Columbia, South Carolina 29201

For Janssen Pharmaceuticals,  Irwin Fritchie Urquhart
Inc. and Janssen Research &     & Moore, LLC
Development, LLC:           BY:  JAMES B. IRWIN, ESQ.
                                  400 Poydras Street, Suite 2700
                                  New Orleans, Louisiana 70130

Official Court Reporter:    Toni Doyle Tusa, CCR, FCRR
                                  500 Poydras Street, Room B-275
                                  New Orleans, Louisiana 70130
                                  (504) 589-7778

Proceedings recorded by mechanical stenography, transcript
produced by computer.

## <u>INDEX</u>

<u>Page</u>

Opening Statements

    Brian H. Barr, Esq.              117
    Andy Birchfield, Esq.        140
    Beth A. Wilkinson, Esq.     144

Kimberly Orr DeAgano

    Direct Examination By Mr. Birchfield    169

Christopher C. Nessel (Deposition)    200

**<u>AFTERNOON SESSION</u>**

**(May 30, 2017)**

**THE COURT:**  Be seated, please.

Members of the jury, you will notice that I put notebooks on your chair.  In the event you wish to use them, please feel free to do so.

In the morning, when you arrive, and during the day, when you are in the building and the Court is in recess for any reason, the jury is not required to be in the courtroom.  I ask that you go to and remain in the jury room under the supervision of the United States Marshals I will assign to be of assistance to you in the case.  If you need any cokes or water, anything of that sort.  If it gets too hot or too cold, let me know, and we can change it.  We have somebody in Oklahoma that takes care of that, but we will call them up and tell them to make it hotter or colder, whatever it is.

We will now hear opening statements from each of the parties.  As I mentioned to you, opening statements are not evidence; it's simply a verbal program which is intended by the lawyers to assist you in following the evidence.

We will hear from the plaintiffs first.

**MR. BARR:**  May it please the Court.  Counsel.  Ladies and gentlemen of the jury.

My name is Brian Barr.  I'm proud to be here representing the Orr family.  I wish I was standing here

12:49

1    introducing you to Joseph and Sharyn Orr, describing what a
2    wonderful couple they were and how they had so much life to
3    look forward to together.  Married for 45 years, three kids,
4    five grandchildren.
5                But I can only introduce you to Sharyn's
6    husband, Joe.  Sharyn is no Longer here.  Sharyn passed away on
7    May 4, 2015.  Sharyn was taken from us at the age of 67 because
8    Bayer and Janssen, these defendants, failed to provide her
9    doctors with the truth about the drug Xarelto.  Failed to
10   inform her doctors that a simple blood test indicated it was
11   safe to perform an emergency brain surgery to save her life.
12   If the defendants had provided truthful information about their
13   drug, Xarelto, Ms. Orr would still be here with her family.
14               On the night of April 24, 2015, Sharyn went to
15   dinner with her husband, Joe.  Planning a nice dinner at Ruth's
16   Chris, they had no idea the preventible tragedy that would
17   unfold that night.  No idea.  This would be their last dinner
18   together.
19               Towards the end of the dinner, Sharyn began
20   suffering from headaches.  She asked Joe to take her home.
21   And, of course, Joe did what he was asked.  They left dinner.
22   On the way home, you will hear, she threw up twice.  All she
23   wanted to do when she got home was lay down and rest and hope
24   to feel better.
25               What you are going to hear is her condition

12:51

1    didn't improve.  Joe got so worried he called their nearby
2    daughter, Kim, to come over and help.  Kim came over, and Joe
3    and Kim together decided they needed to call an ambulance.  So
4    they called 911, and the paramedics came over.  They saw
5    Ms. Orr and knew they needed to take her to the hospital.  They
6    took her to the emergency room at Ochsner Baptist and arrived
7    there about 11:00 on the night of the 24th.
8            The doctors at Ochsner Baptist ordered a CT scan
9    of her head and saw that she was bleeding in the brain.  They
10   also ordered a routine blood test called "prothrombin time" or
11   "PT."  You are going to hear a lot about the PT test during
12   this trial.  But the test result for Ms. Orr, you are going to
13   hear, was perfectly normal.  You will learn that this perfectly
14   normal result will be very important in the decisions you have
15   to make in this case.
16           Now, Sharyn's condition was such that she
17   couldn't be treated appropriately at Ochsner Baptist.  They had
18   to transfer her to Ochsner main.  She arrived there around 1:15
19   in the morning.  She was seen by the on-call neurosurgery team
20   led by a doctor named Dr. Bui.  The team saw her CT scan.
21   After seeing the scan, they knew that surgery was needed
22   immediately.  Her brain was literally dying, being starved of
23   oxygen.  Literally every minute counted.
24           But you are going to hear Ms. Orr was not taken
25   immediately to surgery.  Instead the doctors waited.  Dr. Bui

12:53

1    had to wait for over 12 hours from the time he first saw her to

2    get her back to surgery.  He couldn't start the operation she

3    needed to save her life until 2:00 that next afternoon.

4    Because Dr. Bui had to wait as long as he did, Ms. Orr's life

5    could not be saved.

6                    Now, you may be asking yourself:  Why isn't the

7    Orr family blaming these doctors?  You have heard this is a

8    case against a drug company.  Why aren't they blaming the

9    doctors?  What you are going to see is the doctors didn't do

10   anything wrong.  They followed the instructions given to them

11   by Bayer and Janssen about how to treat patients on Xarelto.

12   Dr. Bui didn't want to wait to operate on Ms. Orr.  He waited

13   because his hands were tied because she had been prescribed

14   Xarelto.  He had to wait because he couldn't be sure when the

15   last time she took her Xarelto pill was.  He didn't know if she

16   had taken it that night at dinner or she'd thrown it up or if

17   the last time she had taken it was the day before.  And she

18   couldn't tell him, because by the time Dr. Bui and his team got

19   to Ms. Orr, she was in no condition to be able to communicate

20   with him.  He couldn't take the chance and had to assume that

21   she had taken her pill that night.

22                   Ms. Orr took Xarelto once a day, every night.

23   All Dr. Bui wanted to know was whether she had taken her pill

24   that night, whether she still had significant levels of Xarelto

25   in her body.  The defendants, the makers of Xarelto, failed to

12:55

1    tell him that there was a way to find out if Ms. Orr had taken

2    her pill and she had too much drug in her system to operate.

3                    You are going to hear there's a test readily

4    available in the United States that can tell doctors whether it

5    is safe to operate on a patient taking Xarelto, provide them

6    enough information to make an informed decision.  It's a test

7    readily available and used all the time here in the

8    United States.  It's a test that Ms. Orr had done at Ochsner

9    Baptist.  This simple indicator test is the prothrombin time,

10   or PT test, I was just talking to you about.  It is a simple

11   blood test that measures how long it takes for blood to clot.

12   That's what it does.

13                    So why will you hear that Ms. Orr's normal PT

14   test result was so important?  Why was that so important?  It's

15   important because Ms. Orr's normal PT test meant that she had

16   not taken her pill that night.  That's what you are going to

17   hear.  That's what makes this case so tragic.

18                    Dr. Bui thought all he could do was wait because

19   he didn't know that Ms. Orr's normal PT test meant he could

20   immediately go back to surgery.  He didn't know because Bayer

21   and Janssen didn't tell him the truth.  They told him he had to

22   wait 24 hours from her last use of the drug and that Sharyn's

23   normal PT test result was meaningless and he didn't need to

24   consider it when deciding whether or not to go back to surgery.

25                    If Dr. Bui had been told the truth, he could

12:56

1   have immediately gone to surgery and saved her life.

2               Now, Xarelto is an anticoagulant.  That's just a

3   big word for a blood thinner.  We've all heard about blood

4   thinners, and that's what it is.  Xarelto is a relatively new

5   blood-thinning drug.  It's been on the market since 2011, just

6   a few years before Sharyn's death.

7               Sharyn was prescribed a blood thinner because

8   she had a common condition in the heart, a condition hundreds

9   of thousands of folks her age have:  a flutter of the heart

10  known as atrial fibrillation.  We will probably call it AFib

11  throughout most of this trial because, frankly, that's a little

12  easier to say.

13              This fluttering in the heart can lead to the

14  formation of clots in the heart.  Those clots can make their

15  way up into the brain and cause a stroke.  AFib is a well-known

16  and readily treated condition here in the United States.  The

17  risk of stroke due to AFib has been successfully managed by

18  doctors for more than 50 years by prescribing blood thinners.

19              Xarelto, like all blood thinners, is designed to

20  make it harder for the blood to clot.  By making it harder for

21  the blood to clot, Xarelto, by necessity, increases the risk of

22  somebody bleeding.  Xarelto prevents the body from doing what

23  it naturally wants to do:  to clot, to stop everyday bleeding

24  events from getting out of control.  Small, routine, internal

25  bleeding events that most of us aren't even aware of because

12:58

1    the body takes care of them naturally.

2              Blood thinners like Xarelto have the potential

3    to make these small, routine bleeding events into events

4    leading to hospitalization and death.  Defendants know this and

5    understand that people will suffer potentially fatal bleeding

6    events on their drug; know and understand that doctors in

7    emergency rooms and operating rooms will have to treat these

8    patients with life-threatening bleeding events.

9              What you will hear during this case is that the

10   only instruction these companies give to doctors in the

11   United States trying to save patients lives is to wait.  Wait.

12   Wait for the blood-thinning effect of Xarelto to wear off.  Sit

13   with the family and wait before they can perform the needed

14   surgery to save someone's life.  Wait and watch the chance to

15   save these patients' lives fade away.

16             In the defendants' own studies on Xarelto,

17   Defendants learned that for every million people who take

18   Xarelto for one year, 36,000 of those people will have a major

19   bleeding event.  5,000 of those bleeding events will be brain

20   bleeds like Ms. Orr had, and 2,000 of those events will be

21   fatal.

22             Bayer and Janssen knew that people who took the

23   drug would suffer brain bleeds and that doctors treating those

24   bleeds would need to perform emergency surgery to save them.

25   Emergency surgery is critical.  It's what neurosurgeons are

12:59

1   taught to do in medical school:  to treat people with large

2   brain bleeds.  Why?  As blood flows uncontrolled through the

3   brain, you get a build-up of pressure in the skull.  Doctors

4   have to perform a surgery to drill a hole into the skull and

5   place drains to relieve the pressure so that more and more

6   brain tissue doesn't die.

7              Emergency surgery must be done as quickly as

8   possible.  Every second lost is critical.  Ms. Orr was in

9   critical need of surgery.  However, if a patient's blood is too

10  thin and won't clot naturally, they are on a blood thinner,

11  doing the surgery can cause more harm.  Drilling into a

12  patient's skull to relieve the pressure is most likely going to

13  make the situation worse.  So doctors either need to be able to

14  measure the thinness of the blood or to give a reversal agent

15  to return the clotting to normal.  They need to know the second

16  it is safe to do surgery.  This is literally a race to save the

17  patient's life.

18              Some blood thinners have reversal agents, and

19  these reversal agents allow doctors to quickly reverse the

20  effects of the blood thinner so surgery can be performed while

21  there's still time to save the patient.  Xarelto was put on the

22  market, you will hear, without a reversal agent.  There's

23  nothing that can be given to the patient to reverse the

24  blood-thinning effect.  There is nothing readily available to

25  the doctor.

01:01

1         You will hear during this trial that both Bayer

2    and Janssen looked at developing a reversal agent for Xarelto

3    before the drug was ever put on the market.  They initially

4    tried to develop a reversal agent because they thought that

5    would help them sell the drug.  They wanted to have a reversal

6    agent because they thought it would give them a competitive

7    edge in the market.

8         After Xarelto was put on the market, the

9    decision was made not to move forward on the antidote.  Because

10   what you will see is they thought there was limited potential

11   for the antidote to generate incremental revenue.  They didn't

12   move forward, because it wouldn't be profitable enough.  That's

13   what you are going to hear.  This was a conscious decision by

14   the defendants not to provide a life-saving reversal agent,

15   even knowing from their own studies that thousands of Xarelto

16   patients will have life-threatening bleeds and there will be

17   nothing for the doctors to use to save their lives.  The

18   decision was made for pure business reasons.

19        This is the drug label for Xarelto.  You are

20   going to see this throughout the trial.  The drug label is

21   supposed to describe for doctors all of the risks and benefits

22   of the drug, provide all of the information needed to safely

23   prescribe and treat people on Xarelto.  The label is an

24   incredibly important medical document that is supposed to

25   inform doctors what they need to know about a drug so that they

01:02

1   can take the best care of their patients.  The content of the

2   label, you will hear, is the sole responsibility of the drug

3   company.  And the company -- these defendants -- have a

4   responsibility to make sure that the label is accurate,

5   truthful, and contains complete information.  Let me say that

6   again.  The content of the label is the sole responsibility of

7   these companies.

8           The defendants tell doctors in the United States

9   that if you need to go to surgery, Xarelto should be stopped

10   24 hours before the procedure to reduce the risk of bleeding.

11   Wait 24 hours for Xarelto to clear the body and lose precious

12   time to save the patient.

13           Dr. Bui was aware of the information in the

14   label.  He did what the defendants instructed him to do and

15   didn't follow what he was taught to do in medical school, which

16   is operate immediately.  But Bayer and Janssen didn't provide

17   the whole truth in the U.S. label.  They didn't provide the

18   whole truth, because they told doctors like Dr. Bui that the

19   anticoagulant effect -- just a big word for saying how thin

20   somebody's blood is -- the anticoagulant effect cannot be

21   monitored with standard laboratory testing.  PT is standard

22   laboratory testing.

23           This is what U.S. doctors are told:  no

24   measurement and no test available to let doctors know how thin

25   the blood is and whether it's safe to operate.  You are going

01:04   1   to hear this is what Dr. Bui understood about Xarelto.  You are
        2   also going to see that this statement is false.  It's not true.
        3               The defendants know now, knew then, and have
        4   known for years that PT is a simple indicator test that a
        5   doctor can order to indicate whether it's safe to proceed to
        6   emergency surgery, the same test that was perfectly normal for
        7   Ms. Orr the night she went to the ER.
        8               But doctors have to be told the truth.  They
        9   have to be told the test can be used with Xarelto and not be
       10   told there is no test or that the test is meaningless.
       11               Now, PT isn't perfect.  You are not going to
       12   hear us say it's a perfect test.  There's no such thing as a
       13   perfect test in medicine.  But it doesn't need to be perfect.
       14   It only needs to be helpful, to be useful to doctors making
       15   clinical decisions for patients.  PT is a good, helpful test.
       16               The defendants aren't honest about how to use
       17   it.  A helpful test, you will hear, the defendants are legally
       18   required to put it into the label.  That's because, according
       19   to the law, helpful laboratory testing not only should be, it
       20   must be in the warning section of the drug label.  You will see
       21   that at no point have these defendants ever proposed or
       22   suggested that doctors should actually use the PT test to
       23   measure the thinness of the blood to conduct emergency surgery.
       24   Defendants have never proposed such language in the
       25   United States.

01:06

1            In the medical literature -- you are going to

2    see a lot of medical literature in this case.  Most of you will

3    probably have doctorate degrees by the time this is all over.

4    The medical literature agrees that PT is a helpful test that

5    can be used to determine it is safe to go to surgery.  The PT

6    is a useful test, for doctors, on Xarelto.  The defendants may

7    try to argue that it's good enough that some scientists have

8    published what the defendants won't say in the label.

9            But you are going to hear that doctors are

10   responsible for hundreds of drugs.  Each of those drugs have

11   hundreds of articles written about them.  There are hundreds of

12   articles written about Xarelto.  That's why critical safety

13   information is required to be in the label, so that doctors

14   don't have to go searching through the literature to try to

15   figure out what to do when they are dealing with an emergency.

16           The company, you will hear, is obligated to put

17   critical safety information in the label.  You are going to see

18   that the defendants fully understood that PT was a helpful

19   laboratory test that would be useful as an indicator test to

20   let a doctor like Dr. Bui know it's safe to go to surgery.

21           We are going to play the sworn video testimony

22   of several company employees, people who have worked on Xarelto

23   for over a decade.  Now, we wish we could bring these people to

24   you to testify live.  We wish we could do that.  But they are

25   not available to be here, and I can't force them to come.

01:07

1    That's not a choice we as the plaintiffs can make.  So we are

2    going to do the next best thing:  We are going to play their

3    video testimony.

4                    The testimony of these company employees is

5    important, and the judge is going to tell you to give it the

6    same weight as if they were testifying from right there on that

7    stand.  So we ask you, for the sake of the Orr family, please

8    pay particular attention to the testimony of these company

9    employees.  It's on video.  It can be difficult to watch at

10   times, but please pay attention.

11                   You are going to hear from people like

12   Dr. Berkowitz, a Bayer vice president, who will testify that

13   there was the need for an indicator test and that PT could

14   provide the information that was needed for emergency surgery.

15   He is going to tell you the test isn't perfect, but it's

16   helpful and it's what's available here in the United States.

17                   Other executives and employees at Janssen and

18   Bayer, they are going to say the same thing.  We are going to

19   show you the internal company documents that say the same thing

20   as well.  We are going to show you that throughout this trial.

21   You are going to see that the defendants have actually admitted

22   outside of the United States that PT is a useful test to

23   perform to inform doctors in cases of urgent surgery.  They

24   just don't tell doctors here in this country.

25                   Why would the defendants not be willing to tell

01:09

1   doctors in the U.S. about this simple indicator test?  You are

2   going to hear it all goes back to the original business plan

3   for Xarelto and the need to differentiate Xarelto from the gold

4   standard for blood thinners, warfarin.  Warfarin has been used

5   to reduce the risk of stroke in people with atrial fibrillation

6   since 1954.  It is still the most widely used blood thinner for

7   this purpose.

8          In the early 2000s these defendants began

9   developing Xarelto as an alternative and to compete with

10  warfarin.  There were also other companies trying to develop

11  new drugs in the market.  You are going to hear these new drugs

12  are called novel oral anticoagulants.  We are going to call

13  them NOACs throughout the trial, N-O-A-C-S.  They work very

14  different from warfarin.

15         These drugs -- the ones that were available at

16  the time Ms. Orr was prescribed Xarelto -- were Xarelto,

17  Pradaxa, and Eliquis.  Now, this is a huge market, a huge

18  market, a lot of business opportunity for a company if they

19  could develop a drug that doctors would use.

20         The marketing idea for Xarelto was to focus on

21  patient convenience, to allow a patient to take Xarelto without

22  the need for patients to have their blood tested on a monthly

23  basis, like is required for warfarin.  Warfarin requires

24  regular, routine blood tests to measure how thin the blood is.

25  You have to do that once a month to use it safely.  Janssen and

01:11

1   Bayer wanted to avoid regular blood tests with Xarelto.  They

2   wanted to avoid regular blood tests to determine how thin the

3   blood was and what the effect of the drug was with Xarelto.

4              This need to avoid any blood test to measure the

5   thinness of the blood pervaded everything these companies did

6   in the development of the drug.  The desire was so pervasive

7   that the companies even discouraged discussion of conducting a

8   measurement of the effect of Xarelto on the blood, including an

9   indicator test that could tell doctors it's safe to go to

10  surgery.

11             They didn't want to encourage doctors to measure

12  thinness of the blood, even though they understood that this

13  could be done with Xarelto; even recognized that an indicator

14  test would be helpful to the ER physician considering a

15  procedure in a patient in which the last dose was uncertain, a

16  patient just like Sharyn Orr.

17             There was no scientific reason for not telling

18  doctors in the drug label to actually measure blood levels with

19  PT when considering emergency surgery.  The evidence will be

20  that the defendants chose a marketing advantage over good

21  science and patient safety.

22             Bayer and Janssen have been using PT for more

23  than a decade in dozens of their own studies on Xarelto, using

24  the PT test to get the drug approved and then telling doctors

25  there is no test.  The only reason it was kept out of the label

01:12

1    was due to the concerns that telling doctors to actually use it

2    to measure thinness of the blood would run counter to their

3    entire patient convenience marketing message.

4              All the defendants had to do is tell doctors in

5    the label that when considering urgent surgery, assessment of

6    the thinness of the blood of Xarelto is possible.  It's

7    possible to test and see if doctors don't have to wait 24 hours

8    for the drug to clear.  Tell doctors that in patients who are

9    bleeding, measuring PT may assist in determining if a person

10   can go back to surgery and provide the information they had

11   about the ranges of PT that could be expected so doctors could

12   make a decision.  That's all they had to do.  All the

13   defendants had to do was inform Ms. Orr's doctors what they

14   knew internally:  that PT could be used and is helpful.

15   Instead they told them no test could be used, that PT was

16   meaningless.  That's what Dr. Bui understood.

17             Again, the Orr family is not critical of the

18   doctors that cared for Ms. Orr on that night.  Doctors like

19   Dr. Bui did all they could do, did all they knew to do, did

20   what they were told to do by these companies.  And that's the

21   problem:  The defendants did not tell the doctors the truth.

22   As every minute ticked by, waiting, waiting, waiting, her

23   chances of recovery and survival evaporated.

24             You are going to hear from Dr. Peter Liechty.

25   Dr. Liechty is a neurosurgeon, trained at the University of

01:14

1    Alabama Birmingham, that practices out of Thibodaux, Louisiana.

2    Dr. Liechty is going to explain to you that had Dr. Bui been

3    able to immediately operate, Ms. Orr most likely would have

4    survived and had a meaningful recovery.  She would still be

5    here with her family.  Dr. Liechty will explain that based upon

6    Ms. Orr's presentation in the emergency room and his

7    experience, her chance of survival would have been about

8    60 percent had Dr. Bui been able to immediately operate.  You

9    will hear that Ms. Orr could have been saved had these

10   companies told her doctors the truth.

11            Ms. Orr lost her life in a way that was

12   completely avoidable.  She lost even the chance to survive, the

13   chance to live.  Because of the actions of these defendants

14   leading to a delay in her surgery, the chance to survive and

15   make a recovery were taken away from her, taken away from her

16   family.

17            Now, you are also going to hear in this trial

18   that Sharyn should have never been put on the drug Xarelto.

19   Sharyn was prescribed Xarelto by her treating cardiologist,

20   Dr. St. Martin.  He prescribed that to reduce her risk of

21   stroke from her AFib when he prescribed it in February of 2014.

22            At the time Ms. Orr was prescribed Xarelto,

23   there were a number of other blood thinners on the market, a

24   number of other options for her.  The first option was

25   warfarin.  Warfarin works well to reduce the risk of stroke.

01:16

1   It reduces the risk of stroke, you're going to hear, by about

2   60 percent.  It's the gold standard by which all other blood

3   thinners are measured.  Xarelto, you are going to hear, does

4   not do better.  Its ability to reduce the risk of stroke is no

5   better than warfarin.  The other NOACs, Pradaxa and Eliquis,

6   they were also available at the time Ms. Orr was put on

7   Xarelto.  Pradaxa, Xarelto, and Eliquis, all options, each

8   brought to market by different companies competing for the same

9   patients.  All these companies tested and compared their drug

10  to the existing gold standard, warfarin.

11          What did they find out?  Pradaxa and Eliquis

12  proved to be superior to warfarin.  It was better at protecting

13  against stroke than warfarin was.  Xarelto can't say that,

14  because it didn't prove it.

15          You are going to hear from Dr. Frank Smart in

16  this trial.  Dr. Smart is a professor of medicine and the chief

17  of cardiology at the LSU School of Medicine.  He has been

18  treating patients with atrial fibrillation since 1991.  He

19  teaches medical students, residents, and cardiology fellows as

20  part of his responsibilities at LSU.

21          He uses blood thinners in his practice, and he

22  teaches about the use of these drugs.  He is going to explain

23  to you that Xarelto is the worst, most dangerous of all of the

24  NOACs.  It has the highest bleed risk and the lowest stroke

25  protection when compared to Pradaxa and Eliquis.  Dr. Smart

01:17

1    will tell you that he doesn't believe that Xarelto can be used

2    safely in people with atrial fibrillation.  He will explain to

3    you that a reasonable doctor, knowing the whole truth about

4    Xarelto, would not prescribe that drug.

5            Dr. Smart will also explain that he doesn't

6    provide new patients with Xarelto.  He teaches his students at

7    LSU not to use Xarelto.  He does the same thing in his

8    practice, that he is going to talk to you about from the

9    witness stand.  He came to this conclusion before he ever got

10   involved in this case, before he ever started working on this

11   case, decided that Xarelto was too dangerous.  He doesn't use

12   it with new patients.  That's the chief of cardiology at LSU.

13           Dr. Smart is also going to tell you that the

14   risks of the drug are made worse because Xarelto is prescribed

15   once a day.  As a once-a-day pill, Xarelto provides too high of

16   a dose and is not safe for patients with atrial fibrillation.

17           But faced with competition from Pradaxa and

18   Eliquis, both superior to warfarin, Bayer and Janssen had to

19   distinguish themselves to compete.  They did this by pushing

20   for once-a-day dosing, by promoting Xarelto as more convenient

21   than the twice-a-day dosing of Pradaxa and Eliquis.

22           Had the defendants properly warned doctors, a

23   reasonable physician, fully informed and acting in the

24   patient's best interest, would not have given Ms. Orr Xarelto.

25   She would have been on one of the other drugs.  She would not

01:19

1   have suffered this brain bleed and died.

2              Finally, I want to move on to the FDA.  We

3   talked a lot about that this morning.  You are going to hear a

4   lot about the FDA during this trial.  The FDA reviews all

5   prescription drugs before they come onto the market.  During

6   this trial the defendants are going to hide behind the FDA.  We

7   will talk more about the actions of the FDA in a minute, but

8   remember this, and I said this earlier:  The content of the

9   label is not the responsibility of the FDA.  The FDA has a

10  role, but it is the company's obligation to make sure the label

11  is adequate, to make sure the label provides the necessary

12  information for doctors.

13              **THE DEPUTY CLERK:**  30 minutes.

14              **MR. BARR:**  Thank you.

15              It was these defendants, not the FDA, that

16  failed to properly warn Ms. Orr's doctors and caused her death.

17              You will hear during this trial that the FDA's

18  approval of a drug only satisfies a minimum standard of safety.

19  That's because in the real world there are limits on what the

20  FDA can actually accomplish in its role as a governmental

21  agency.  That's why it's up to the drug companies, not the FDA,

22  to protect people.  You are going to hear that the FDA is

23  simply not equipped to test for or guard against all safety

24  issues with the drug.  The FDA is not equipped with the tools

25  it needs to police large pharmaceutical companies like these

1    defendants.

2           The defendants are going to constantly put

3    before you that Xarelto was approved to reduce the risk of

4    stroke in atrial fibrillation by the FDA, based upon a study

5    called ROCKET.  You are going to hear a lot about the ROCKET

6    study during this trial.  In ROCKET, Bayer and Janssen compared

7    populations of people on Xarelto with populations of people on

8    warfarin.  They compared those to see if the risk of bleeding

9    and the protection from stroke was roughly the same.  That's

10   the basic design of ROCKET.  It's the only study that's ever

11   been done comparing Xarelto to warfarin to determine if Xarelto

12   can be sold in the United States.  The FDA has conducted no

13   studies on Xarelto.  You are going to see, during this trial,

14   the FDA doesn't conduct studies on drugs.  That's not its role.

15   The FDA is dependent on the companies, dependent on the

16   companies that are selling the drug, pushing it for approval.

17   They are dependent upon them to conduct the studies.

18           The FDA, you are going to hear, doesn't even

19   have the authority to require the defendants to study different

20   doses of the drug.  They can ask, but the company can tell them

21   no and refuse to do the types of studies the FDA wants.  You

22   are going to see that this happened numerous times with

23   Xarelto.  The FDA repeatedly asked them to study lower doses,

24   study other dosing regimens, like twice a day.  They told them

25   no.  The FDA, the agency they say is there to protect patients

01:22

1    and prevent bad drugs from coming onto the market, was
2    powerless to force them to conduct certain studies.  They said
3    no to studies, you will see, because of a fear that running
4    studies testing other doses than the ones they wanted to push
5    or testing Xarelto as compared to other NOACs would hurt their
6    ability to sell the drug.  It would, in their own words, kill
7    them in the market.
8                  The evidence will show the ROCKET study was
9    conducted so poorly that the company executives were concerned
10   the FDA would think they had stacked the deck in favor of
11   Xarelto, made Xarelto look like a better drug than it actually
12   was.
13                 You are going to see that the doctors at the
14   FDA, doctors that specialize in the review of drugs to treat
15   heart conditions, reviewed the application from the defendants
16   and said the drug should not be approved.  According to the
17   medical reviewers, Xarelto was not shown to be safe or
18   effective when compared to warfarin; said there was a lack of
19   substantial evidence that Xarelto will have its desired effect
20   when used as recommended by these defendants; that there was
21   insufficient information about the drug to determine whether it
22   was safe for use.
23                 What did the companies do?  You are going to see
24   that they sat down with the reviewers' bosses, went above and
25   around them to get assurances that the reviewers' views were

01:24

1    not the views of leadership.  The defendants are going to tell

2    you that an independent group of experts, called an advisory

3    committee to the FDA, voted 9 to 2 to approve Xarelto.  Heard

4    what the reviewers had to say about the drug, heard that the

5    reviewers thought it shouldn't be approved, and still voted to

6    approve it.  But they are not going to tell you that five of

7    the nine on that advisory committee said Xarelto was not as

8    effective as warfarin, said it was only effective when you

9    compare it to having no drug at all; and that Xarelto should

10   only be used as a second-line therapy, a drug to be used when

11   all other options have failed.

12              At the end of this trial, it's going to be up to

13   you as the jury to decide if the instructions and warnings

14   provided by these defendants about Xarelto were adequate.  You

15   are going to be deciding if their conduct complies with the

16   law.  That's for you to decide, not the FDA.  The question you

17   have to answer is whether these companies, regardless of the

18   actions or inactions of the FDA, took the necessary steps to

19   protect patients, patients like Sharon Orr.

20              Throughout this trial you are going to learn

21   what kind of wife, mother, and grandmother Sharyn was while she

22   still lived; learn how she dedicated herself to her family and

23   her grandkids.  She loved being around those grandkids.  Served

24   her students as an academic adviser at Tulane.  How she

25   dedicated her life to others.  And how Ms. Orr was failed --

01:26

1    failed by these companies, failed by the FDA; and their

2    failures cost Sharyn her life, cost this family their wife,

3    their mother, and their grandmother.

4            **THE COURT:**  Thank you, Counsel.

5            **MR. BIRCHFIELD:**  More than anything else, Sharyn Orr

6    loved spending time with her family.  She especially enjoyed

7    spending time with her five grandkids.  She was involved.  She

8    was involved in each of their lives, intimately loved.  In

9    fact, the night before she suffered her stroke, she was at the

10   baseball field.  Her grandson had a double-header, and she

11   spent the night there.  Mrs. Orr was the backbone of the Orr

12   family.  She loved and adored her family, and her family loved

13   and adored her.

14            Outside of her family, the thing Mrs. Orr loved

15   the most was Tulane University.  She was employed there as an

16   academic adviser, actually a senior academic adviser.  She

17   served there for over 40 years -- 43 years.  She loved her job,

18   she loved Tulane, and she was committed to those students.  She

19   would tutor them.  She would mentor them.  She developed

20   relationships with these students.  Often these student

21   athletes, after they had graduated and moved on to their life,

22   they would come back to Tulane and just check in with her

23   because of the investment she made in their lives.  Tulane was

24   a big part of Mrs. Orr's life.  Even when she wasn't working,

25   you would often find her at Tulane's sporting events.

01:28

1        At the time of her death, she was working full

2   time, but she was making plans to retire so that she could

3   spend more time with her grandkids and do some traveling with

4   her husband, Joe.

5        Now, over the course of the trial, you will hear

6   that Mrs. Orr had some health conditions.  Like many people her

7   age, she had diabetes and hypertension and some other

8   conditions; but you will see that she regularly treated with

9   her doctor, she followed her doctor's advice, she took her

10  health seriously.  She exercised.  She tried to watch what she

11  ate.  She followed a good diet.

12       You will see that these conditions may look bad

13  on paper, but hypertension and diabetes, they did not slow

14  Mrs. Orr down.  What slowed her down, what took her life was

15  Xarelto, a pill that she was taking to reduce her risk of

16  stroke.  Now, hypertension and diabetes, they can cause strokes

17  or brain bleeds, but Mrs. Orr's brain bleed was not a

18  hypertensive, not a high blood pressure stroke.  Dr. Liechty

19  will come and explain to us that the location of the bleed

20  shows us that it was a primary intraventricular hemorrhage.  He

21  will explain what that means and how it's different than a

22  hypertensive stroke.  As a highly trained neurosurgeon who has

23  looked very closely at Mrs. Orr's case, he will tell us it was

24  Xarelto that substantially contributed to her bleed.  It made

25  it worse.

01:29

1    On Friday night, April 24, 2015, Joe picked up
2  Sharyn at work, and they went to Ruth's Chris for dinner.  By
3  the end of dinner she wasn't feeling well, had a headache.  She
4  asked to go home.  On the way home she throws up.  She gets to
5  home and she throws up again.
6    I want us to take just a few minutes to look at
7  the timeline of that evening, over the next 18 hours.  At 9:40,
8  911 is called.  The EMTs and ambulance arrive a few minutes
9  later, and they begin to assess her condition.  They take her
10 to Ochsner Baptist, to the ER at Ochsner Baptist.  At 10:43
11 Mrs. Orr arrives at Ochsner Baptist.  They assess her and they
12 suspect a stroke.
13    There's a standard protocol that is followed
14 when a patient is suspected to have a stroke.  There's a list
15 of tests that are done automatically.  One of those tests is a
16 PT test.  Remember, that's the test, the indicator test that
17 Mr. Barr spoke about just a minute ago.  That test, among many
18 others, were performed on Mrs. Orr that night.
19    At 12:02 a.m., two minutes past midnight, the PT
20 test results are known.  The PT results were normal:  11.4 in a
21 normal range of 9.0 to 12.5.
22    At 12:08 the results of the first CT scan are
23 in.  They show she is having a massive brain bleed, or
24 hemorrhage.  They know she needs to be transferred from Ochsner
25 Baptist to Ochsner main.  She arrives at Ochsner main at 1:15.

01:31

1          At 1:54 there's a note in the record [as read]:
2   "It is noted that no surgical intervention can be done at this
3   time."  That's because of Xarelto.  The records note she is
4   taking Xarelto and that the brain bleed is due to Xarelto.
5   That's what the doctors who are treating her in that moment
6   determine.
7          At 3:45 a.m. a note states that [as read] "no
8   good strategy is available for Xarelto reversal."
9          At 12:29 p.m., more than 12 hours after she --
10  the decision to transfer from Baptist to main, Dr. Bui decides
11  that Xarelto has had time to clear enough for surgery.  So
12  after waiting for 12 hours, knowing that immediate surgery,
13  emergency surgery was needed, Dr. Bui is finally able to move
14  forward with the surgery.  Unfortunately we know now that that
15  was too late for Mrs. Orr.
16         The standard of care for someone in Mrs. Orr's
17  condition is to immediately proceed to surgery, to do a surgery
18  to drill a hole in the skull to relieve the pressure from the
19  brain.  When someone is suffering from a brain bleed like this,
20  time is critical.  Time is brain.
21         When the doctors learned that Mrs. Orr was
22  taking Xarelto, everything changed.  The doctors wanted to
23  treat her -- they wanted to move immediately to surgery.  They
24  were trained to move immediately to life-saving surgery, but
25  they could not.  All they could do was wait and watch.

01:33

1    Dr. Bui did the surgery, but it was more than

2  12 hours after they had the PT test results, that if they had

3  known the truth, if the doctors had known the truth about that

4  PT test, they could have moved forward with surgery

5  immediately.  But the defendants had not told the truth about

6  the PT test.  So the defendants had withheld that truth and the

7  doctors had to wait.  They had to wait for more than 12 hours.

8  Those 12 hours were the difference between life and death for

9  Sharyn Orr.

10    Mrs. Orr remained in ICU for several days, but

11  her condition never improved.  She died on May 4, 2015.  On

12  behalf of the Orr family, I thank you for serving on this jury,

13  and we look forward to presenting this evidence to you.  Thank

14  you.

15    **THE COURT:**  Thank you, Counsel.  Let's hear from the

16  defendant.

17    **MS. WILKINSON:**  Yes, Your Honor.  Good afternoon,

18  ladies and gentlemen.  Again, as we discussed during jury

19  selection, this is going to be a very difficult case.  It's a

20  very difficult case because you're going to be asked by the

21  plaintiffs and by us to come along and learn about this

22  important drug Xarelto and learn about Mrs. Orr's medical

23  condition and what contributed and caused her brain hemorrhage.

24    Now, I want you to know right from the outset we

25  are not here to blame Mrs. Orr or her family or her doctors.

01:35

1    She had a very complicated medical history, and you've heard

2    almost nothing about that, but you are going to hear a lot

3    about that from the witnesses who come in here, her own

4    treating physicians and the experts.

5                But sometimes horrible things happen to good

6    people.  So in this case we are not going to challenge the

7    suffering that Mrs. Orr and her family had.  We are not going

8    to challenge the damages they claim.  What we are going to

9    challenge and what we are going to argue over is the medicine

10   and the warning and the necessity of this drug for Mrs. Orr.

11               So when the witnesses get on the stand, we are

12   going to cross-examine them because, as Your Honor told you --

13   as His Honor told you, the most important thing in our jury

14   system other than jurors is cross-examination, is testing the

15   other side of the story, because you just heard one side of the

16   story.  When the witnesses get on and when you see the

17   documents, you are not going to just see snippets like you were

18   shown.  You are going to get to see the whole document for

19   yourself.  And you are going to get to hear from the doctors

20   who actually treated Mrs. Orr.  You are going to get to see the

21   records themselves, and you are going to use that evidence to

22   come to your decision.

23               So I would like to spend my time this afternoon

24   talking to you about what is it that you are going to have to

25   decide and what is the evidence.  So let's start, if we could,

01:36

1    with the three main questions.

2                This case is what we call in the law a failure

3    to warn.  Plaintiffs are claiming that we didn't give the right

4    warning or instructions, and, of course, we believe that we

5    did.  There's three questions you are going to have to decide

6    to come to your answer.  One is:  Did Xarelto cause Mrs. Orr's

7    brain hemorrhage?  You are going to see that that's not what

8    the doctors thought.

9                Despite what you just heard, you are going to

10   see the death certificate yourself, and the death certificate

11   for Mrs. Orr says that it was her hypertension, her

12   uncontrolled high blood pressure which was the cause of a brain

13   hemorrhage.

14               Second, you are going to have to answer:  Did

15   Xarelto have an adequate warning?  That's what the standard is

16   under the law.

17               And third:  Would Mrs. Orr's prescribing doctor,

18   the person who made that decision to put her on Xarelto, would

19   he have still prescribed it if this information plaintiffs

20   claim should be in the label was in there?  You are going to

21   hear all the answers to those questions.

22               Dr. St. Martin was the doctor who treated

23   Mrs. Orr for her AFib and for her risk of stroke.  He has

24   testified in a deposition already and he will come in here --

25   we will call him during our case -- and he will tell you all

01:37

1    about Mrs. Orr's condition and why he prescribed Xarelto and

2    why he still believes, despite what plaintiffs are saying, he

3    still believes it was the right decision to prescribe her

4    Xarelto.

5              So what evidence are you going to be able to

6    look at to answer these questions?  Well, first of all, you

7    have to know about Mrs. Orr.  Again, no one disputes that she

8    was anything but a wonderful mother, wife, grandmother, and

9    co-worker.  But at 67 years old in April of 2015, she had had a

10   long, long history of chronic and very difficult medical

11   conditions.  She ultimately passed away, as you heard, on

12   May 4, but what really is the focus of this case is the massive

13   hemorrhage she had on the evening of April 24.

14             What about her medical history are you going to

15   learn?  Mrs. Orr -- not because she did anything wrong, not

16   because she didn't maintain her diet, live a good life, go see

17   her doctor; she did all of those things.  She did what she was

18   supposed to.  But sometimes, as we know, people have bad

19   genetics; they have unexplained, uncontrolled medical

20   conditions that despite doctors' best attempts, they can't

21   stop.  And that's exactly what happened to Mrs. Orr in this

22   case.  She had uncontrolled hypertension since 1986.

23   Constantly high, high blood pressure.  You are going to hear

24   from the doctors what that does.

25             We all go get our blood pressure taken, right?

01:39

1    Normally you have a normal blood pressure, that's fine.  If you
2    have high blood pressure, often you will go on medications,
3    which Mrs. Orr did.  You will see she had five different high
4    blood pressure medications.  None of them could get her blood
5    pressure under control.
6           She had type 2 diabetes, which was causing damage to
7    her body.  She had sustained high cholesterol.  She had
8    horrible kidney disease, stage 3 kidney disease.  And then she
9    had atrial fibrillation -- or AFib -- in 2011 and heart
10   failure, cardiac heart failure, that same year.  All of these
11   conditions, as you'll see, contributed to difficulties that she
12   was having on a day-to-day basis.
13          The AFib was a separate and different problem for
14   her, because when you have AFib, when your heart doesn't beat
15   regularly, that blood pools in your heart.  And every doctor
16   who comes in will tell you the most important thing when you
17   find out someone has AFib is to stop that clotting in the
18   heart, because if those clots don't stop and they are
19   unleashed, they can go right to the head and cause a massive
20   stroke.  So doctors, before they deal with the AFib, before
21   they deal with the irregular heartbeat, deal with the blood
22   clots, and that's why there will be no dispute in this case
23   that she needed a blood thinner or an anticoagulant.
24          In 2011 what you didn't hear is she was put on a
25   different anticoagulant.  She was put on Pradaxa, and she was

01:41

1    on it for years, and she had stomach problems and she

2    complained about that, and that's why she was switched to

3    Xarelto by her doctor.

4                    This is a chart that we made up for you -- and

5    you will hear from the doctors -- to show you the extent of

6    Mrs. Orr's high blood pressure.  Take a look.  You can see we

7    put down the normal range around 120.  Hypertension or high

8    blood pressure is at 140.  Her blood pressure over the years

9    went up over 180, all the way up over 220, back and forth, up

10   and down.  And sadly, in 2015, when she had this tragic

11   hemorrhage, her blood pressure was around 200.

12                   The doctors will tell you that that kind of

13   sustained high blood pressure does horrible things to people's

14   bodies.  Here are the things that it does, and it did all of

15   these things to Mrs. Orr.

16                   First over here, heart disease.  It caused heart

17   disease; she had that.  It causes renal failure, kidney

18   disease.  She had that.  It causes cardiovascular disease.  She

19   had cardiovascular disease.  It causes retinopathy, the

20   weakening of the blood vessels in the eyes.  So she was having

21   horrible trouble with that.  Her blood vessels were breaking

22   down all throughout her body because of this sustained,

23   uncontrolled high blood pressure.  Sadly, at the end she had a

24   massive, huge -- as you will hear -- hemorrhage deep in her

25   brain.

01:42

1          Now, before April 24, when she suffered this
2     hemorrhage, her doctors were constantly watching over her.  You
3     will see some of their records that show around this time --
4     this is just two months before she had the hemorrhage -- she
5     had uncontrolled blood pressure that her doctor said was
6     difficult to control.  It wasn't that he wasn't trying.  It
7     wasn't that she wasn't trying.  She was trying.  But they could
8     not get her blood pressure under control, and that was despite
9     all of these medications.
10          What we did was we took those from the medical
11     records.  You see that on the left?  And those are the formal
12     names; and in parentheses we added for you, just so you could
13     see, what these different drugs are.  So she had a drug for
14     diabetes.  She had five different drugs for her blood pressure.
15     She had a drug for neuropathy, which is when you lose the
16     feeling, and that often happens, unfortunately, to diabetics.
17     She was on aspirin.  She was on Xarelto for AFib.  She was on
18     cholesterol and gout medication.
19          So even though she was only 67 years old and she
20     lived a full life and she exercised, she got the real short end
21     of the stick.  She did everything she was supposed to, but her
22     body wasn't working.  She took her medications.  She went to
23     see her doctor; and over the years, the doctors chronicled all
24     of her conditions.
25          This shows you the list in December of 2013 of

01:44   1   all of her different difficulties.  And those continued and
2   caused all kinds of other problems.  She had had a 20-year
3   history of diabetes.  She had uncontrolled diabetes.  She had
4   diabetic damage to her blood vessels in her eyes.  She had
5   diabetic ulcers and swelling.
6                She had kidney disease -- chronic kidney
7   disease.  You see as early as 2011, she had stage 3 chronic
8   kidney disease.  She had such bad kidney disease that her dose
9   of Xarelto was actually reduced, because you will see in the
10   label it provides that if you have kidney problems -- in other
11   words, medication gets processed through your kidneys or
12   excreted, and so if that slows down, the label recommends that
13   you reduce the dose.  And that's exactly what happened:  Her
14   dose was reduced.  She had a kidney biopsy, and her doctors
15   told her in 2015 that she was going to have to plan to be on
16   dialysis.
17                We don't know what was happening to her that
18   week before she had a brain hemorrhage.  We know she was at
19   dinner with her husband, but the last record of her blood
20   pressure that we know of showed that her blood pressure was 200
21   over 90 the week before she had the hemorrhage.  Now, most of
22   you know -- you've had your blood pressure taken -- that's
23   extremely high blood pressure.
24                So what does that type of blood pressure do to
25   the brain?  Well, those blood vessels start to break down.

01:46

1    What happens -- this is just a diagram you will see used with

2    some of the physicians who come in here -- is there starts to

3    be bleeding in the brain.  That is that breakdown of those

4    vessels.  And in her case -- you will see the CAT scan -- it

5    was so large and so deep you will hear that there was no way to

6    operate.

7              I'm sure plaintiffs' counsel didn't mean to

8    suggest that there was surgery to remove the hemorrhage.  There

9    wasn't.  Every doctor will come in and tell you that hemorrhage

10   was inoperable.  The only thing they could do for her was put

11   in drains; because as well as having this massive hemorrhage,

12   the spinal fluid in her brain expanded and that caused her

13   brain to swell, and that's what causes additional damage.

14             So that hemorrhage, basically you will hear one

15   of the doctors describe your brain has like a fence around it

16   to allow things in and out, and that hemorrhage broke the fence

17   and the brain tissue started to die.  You can't get that brain

18   tissue back.  So once she had that massive hemorrhage, the

19   doctors will tell you there was nothing they could do for all

20   of that tissue that died.

21             They couldn't remove that hemorrhage because it

22   was so deep and so large, because to even do it, they would

23   have to go in -- and I'm sorry to say this in front of the

24   family because they have already lived through it once -- but

25   if they had gone in and done surgery, the doctors will tell

01:47

1   you, the neurosurgeons will tell you they would have destroyed

2   brain tissue going in, trying to get it out.  So they weren't

3   going to do that.

4           What they were going to do and what they did do

5   was drain the fluid.  And when they drained the fluid, it did

6   all drain out.  It doesn't do anything to the hemorrhage.  It

7   did reduce -- all those areas collapsed where that had been

8   swollen, and she still had all that horrible damage to her

9   brain that she had had from the beginning, when this hemorrhage

10  happened.

11          What did the doctors see when she came in that

12  night?  She had dinner with her husband.  She was 67 years old.

13  And what they had learned from Mr. Orr was that at dinner, she

14  started to have these massive headaches, and that's when they

15  went home and she vomited.  Those are all signs of a

16  hemorrhage.  Of course, they didn't know that at the time.  She

17  thought she was sick.  And then she was losing her mobility,

18  her ability to talk and function, again because of all that's

19  going on, happening to her brain, so Mr. Orr called 911.

20          By the time she got to the hospital -- she

21  started dinner at around 6:45, he started to observe the

22  symptoms.  So four hours later she gets to the hospital.  And

23  you will see these records.  You are going to see lots of them.

24  She had not been verbal since she went to bed three hours ago.

25  So that damage, the killing of those brain cells, was occurring

01:49

1   at that time before she was ever able to get to the hospital.

2   They didn't know at that time when she had taken her last dose

3   of Xarelto.

4           Now, you are going to hear a lot about Xarelto,

5   and I'm going to show you some documents.  But I want to be

6   clear:  Xarelto does not have a reversal agent, and that's in

7   the label.  This is a failure to warn case, and we told doctors

8   that.  Just like Eliquis -- another one of the NOACs or another

9   blood thinner -- does not have a reversal agent.  So that was

10  not a secret from any of these doctors; they knew that.  They

11  still believed that this drug is important enough that it is

12  worth prescribing.

13          Xarelto doesn't stay in your system very long,

14  but what happened here is they didn't know -- because she was

15  not conscious, they didn't know when she took her last dose.  I

16  believe Mr. Orr didn't think that she took it that evening,

17  because she normally took it after dinner and she was sick by

18  then.  But the doctors didn't know, so they proceeded with

19  caution, which they will all tell you is what they had to do

20  and what was the right thing to do.

21          When she was still at Baptist, they started to

22  watch, and her neurological responses were descending very

23  quickly.  Her left arm and her left leg were flaccid.  She

24  wasn't able to follow commands.  She was drowsy.  The doctors

25  will tell you that minute by minute, as she is there where

01:50

1   there is not a neurosurgery unit there, that's why they had to

2   transfer to Main, she was -- those brain cells were dying by

3   the second.

4           The first time she was able to even have

5   neurosurgery was when she went to Main, but the folks at

6   Baptist did what they were supposed to do.  They did a

7   CAT scan.  And take a look at that.  Look at the size.  That's

8   the hemorrhage right there.  It's deep in her brain and it's

9   massive, you will see in the records the doctors say.  That's

10  what they saw at 11:44 that evening.

11          Every neurosurgeon will tell you that there was

12  no way to reverse what had happened at that point, no way to

13  have those brain cells come back, no way to remove the blood.

14  They could drain the fluid, but that blood was actually

15  coagulated.  You'll hear it wasn't like liquid blood.  It was a

16  coagulated hemorrhage.  It wasn't going to move.

17          By midnight, right after that CAT scan, they

18  said she was even less responsive, and that's why they decided

19  to transfer her to Ochsner main.

20          Now, when they transferred her at about 1:15 in

21  the morning, she didn't respond to anything except for really

22  painful stimuli.  I don't know if you have ever seen that, but

23  it's awful when they are in a coma and they engage in more

24  painful attempts to see if they can get any response from the

25  patient.

01:52

1              By 1:15 in the morning, she had had this massive

2   damage to her brain.  It was only then that she was even at a

3   place where any of the drains could have been put in.  The

4   doctors will all tell you that nobody can say if the drains had

5   been put in at that point, it would have made any difference to

6   her.  It wouldn't have changed the hemorrhage; it wouldn't have

7   brought back any of the brain tissue.  The treaters who you are

8   going to hear from all agree on that.

9              Dr. Bui was her neurosurgeon.  Dr. Mahanna was

10  in charge of her case.  Dr. Gropen was also one of the

11  physicians who treated her.  They all agree that her bleed, her

12  hemorrhage was massive and hard to reach.  They all agree that

13  with earlier surgery, you can't say what the outcome could be.

14  So to stand up and say you know that it would have saved her

15  life, no doctor is going to tell you that.

16            Of course the doctors want to give the family

17  every hope that they can, but this was a massive, monumentally

18  damaging hemorrhage.  No one can say that if that intervention

19  had been done at 1:15 p.m. [sic] instead of at 2:00 in the

20  afternoon, that that would have brought back Mrs. Orr and given

21  her any normal neurological function.

22            Now, plaintiffs I think say that some of the

23  records say Xarelto caused the hemorrhage.  Well, there are

24  some records, when people didn't know her full condition; but

25  in the end, the person who was in charge of her case,

01:54

1    Dr. Mahanna, filled out her death certificate.

2                    In trials we talk about what evidence are you

3    going to see that was put in place before the lawyers got

4    involved, right?  This is not by a paid expert.  This is a

5    treating physician who was there at the time, writing down what

6    she honestly thought.  We call it a contemporaneous record.

7    What did people do before we got involved, before they decided

8    to file the lawsuit?  Dr. Mahanna says the cause of death was

9    this hemorrhage from hypertension, from her high blood

10   pressure, not from Xarelto.

11                   Now, Xarelto doesn't even cause hemorrhages.

12   Even Dr. Smart, their cardiologist, and Dr. Khatib, who will be

13   our cardiologist who has the specialty of electrophysiology,

14   they both tell you that Xarelto doesn't cause a bleed.  If

15   someone has an underlying bleed, it makes it difficult to stop.

16   You bleed more.  It slows down the coagulation.  But both sides

17   agree that Xarelto doesn't initiate -- doesn't initiate that

18   brain hemorrhage.

19                   Now, one of the saving graces of this case is

20   you are going to meet some of the most fantastic doctors you

21   have ever seen, doctors who have spent their lives devoted to

22   patients, doctors who practice in this area every day.

23   Dr. Smart I think is going to be the first witness tomorrow.

24   He is not, like Dr. Khatib, an electrophysiologist.  Dr. Khatib

25   spends every day dealing with the wiring of the heart; as we

01:55

1   say, the electrician of the heart.  That's why he is a
2   specialist in electrophysiology.
3          He works at Ochsner himself.  He is the vice
4   chairman of cardiology, and he's the director of the clinical
5   cardiac electrophysiology fellowship.  Why am I telling you
6   that?  Well, he is going to tell you that both of his parents
7   are doctors, and his father started a fellowship to train
8   people in his specialty many, many years ago.  When Dr. Khatib
9   got to become a doctor, he decided he wanted to do the same.
10  And around this country, and especially in this area, there
11  weren't a lot of electrophysiologists.  There weren't a lot of
12  people who had this very important specialty.  So he started in
13  Ochsner that specialty to train others.
14         He is going to come in and tell you that Xarelto
15  is a lifesaving drug, that it stops strokes, that he prescribes
16  it to patients every day, along with other NOACs, and that it
17  was the right decision for Dr. St. Martin to prescribe Xarelto.
18  He is also going to tell you that Xarelto doesn't cause brain
19  hemorrhages and did not cause Mrs. Orr's brain hemorrhage.
20         Most importantly for what you just heard, he is
21  going to tell you this theory that PT tests could actually tell
22  you how much Xarelto was in someone's system when they are
23  having this emergency is wrong.  So you don't have to believe
24  us.  We are going to show you documents on what we really
25  thought, but you don't have to rely on what the companies say.

01:57

1   You are going to hear from real doctors in this community who
2   make that decision every day.
3                  He is going to say he is very familiar with the
4   PT test.  He has read about this.  This is no secret.  There's
5   all kinds of literature.  There's not a piece of literature
6   that says you should use the PT test to test in an emergency
7   situation before you do surgery so that you will know whether
8   the person has Xarelto in their system.  In fact, you are going
9   to see the opposite.
10                  You are going to see articles that say you
11  shouldn't use that test, because the PT test isn't sensitive to
12  measure low amounts, and so you might see a normal number like
13  she had.  It doesn't mean she didn't have lots still in her
14  system.  So the doctors will tell you they would never use that
15  test; it would not be helpful; it would not be clinically
16  helpful.  And they certainly would never have relied on it in
17  Mrs. Orr's case.
18                  So everyone who walks into this courtroom that
19  is a physician is going to tell you they cannot eliminate the
20  possibility that the hemorrhage was caused by her high blood
21  pressure.  No one can say they are sure it was Xarelto and her
22  high blood pressure had nothing to do with her hemorrhage.
23                  Now, what are you going to hear about Xarelto?
24  Xarelto was not just approved in 2011, when it first came out
25  on the market.  It was just reviewed last October, just six

01:58

1   months ago, by the FDA.  You heard they don't do any testing.

2   Well, actually, in this case they did a lot of their own

3   analysis.  They took all the studies we did and they did their

4   own analysis.

5           You are going to see the FDA review.  They

6   actually did some of their own charts and predictions, and they

7   had all the data from the other NOACs, from Pradaxa and

8   Eliquis, and they have looked at this over and over again.  And

9   just six months ago they came out and said the opposite of what

10  you just heard.  They said the FDA concludes that Xarelto is

11  safe and effective alternative to warfarin in patients with

12  AFib.

13          So I don't know what Dr. Smart -- he is entitled

14  to his opinion, but every other doctor who comes into this

15  courtroom is going to tell you that they agree that it's safe

16  and effective as an alternative to warfarin.

17          Now, why, if she had all these other conditions,

18  was it important to treat the AFib separately?  Well, we said

19  that if you have those blood clots, you are not going to have

20  the normal heartbeat like you see on the left, where the blood

21  pumps around and around, and you are going to hear that when

22  you have AFib, those signals go haywire and that blood starts

23  to clot.

24          In her case they actually then needed to deal

25  with the AFib.  We talked about ablation during the jury

02:00

1    selection.  Ultimately you have to deal with the AFib, which is
2    how do you get that heart rhythm back into the normal rhythm,
3    but doctors can't do that until they make sure you don't have
4    any clots.  So that's why she had to be on that medication, and
5    they couldn't get her AFib back under control.

6              When she came into the doctors way back in 2011,
7    they discovered that AFib and they discovered that she had
8    cardiovascular disease.  That's when she was prescribed
9    Pradaxa, one of the other NOACs.  She was prescribed it because
10   she had an incredibly high score that they use to determine how
11   serious your AFib is.

12             And as you can see from this chart, part of the
13   reason that it was so serious, her risk of stroke, was because
14   she had all the other conditions that we're talking about.
15   That's exactly how they calculate what drug she should use.
16   She had congestive heart failure, high blood pressure,
17   diabetes, she was between 65 and 74, and she was female.  So
18   that's why all the doctors are going to come in and tell you
19   she needed this drug.

20             And she did fine on these drugs.  She was on
21   Pradaxa for 34 months until it started to bother her stomach,
22   and you'll hear from doctors that is one of the effects of
23   Pradaxa.  And then she was put on Xarelto in a higher dose, the
24   20 milligrams, and the 15 milligrams for 14 months; and during
25   that entire time, she was fine.

02:01

1            She was fine, and that's why doctors and
2    Dr. St. Martin decided that even though there is no antidote or
3    reversal agent, it was worth the risk and the benefits to her
4    to take this drug.  You are going to hear from Dr. St. Martin
5    himself, and he is going to tell you that.  He's going to tell
6    you he knew all of these things.  He knew all of her
7    conditions.  No one knew better.
8            He knew about her high blood pressure.  He knew
9    about her diabetes.  He still believed Xarelto was the right
10   choice for her and he still believes it today.  So when you get
11   to that question -- Would a different warning have made a
12   difference? -- the answer will be no.
13           Part of the reason that Dr. St. Martin and
14   others feel like this is a good drug is because it has been so
15   thoroughly tested.  Not only tested before it was approved, but
16   it's still tested and reviewed today.  There are many what they
17   call post-marketing studies, where they did all these tests.
18   It took 14 years to develop, and they did clinical studies,
19   which means to get it approved.  But then there's been so many
20   more people who have used it that there have been study after
21   study looking at that.  And all of those studies show that
22   Xarelto, without any monitoring, unlike warfarin, which
23   requires all that monitoring, produces just as good results.
24   So that's why doctors like it.  Doctors like it because it's
25   easier for patients, that they don't have to constantly go in

02:03

1    and get monitored and have all these issues.

2                     All of these drugs that operate the way Xarelto

3    does -- and we will get into that what that is.  It's called a

4    factor Xa.  That's how it works on your body -- they all have

5    these same risks.  This is what Xarelto tells -- the label

6    tells every doctor:  You have a risk of bleeding.  So that's

7    not hidden.  There's no secret.  It has a risk of bleeding.

8    That you can have different doses depending on kidney issues,

9    that there's no reversal agent, and there's no ability to

10   monitor.

11                    So I think it will be interesting during this

12   trial how plaintiffs can claim that there is a lack of a

13   warning and instruction when all these things are right in the

14   label.

15                    The other drugs have the same issues.  Xarelto

16   and Eliquis work on factor Xa.  Warfarin and Pradaxa all are

17   blood thinners, and they all have the same warning about bleed

18   risk, and that's because of what you heard.  If you are trying

19   to thin the blood and not clot, that means you are at a higher

20   risk of bleeding if you have -- think of if you cut yourself,

21   you are going to bleed more because your blood is not clotting

22   as much.  So it wouldn't matter which one of these drugs she

23   was on, she is at the same risk of bleeding.

24                    The reason, though, that doctors don't like

25   warfarin, the gold standard, is because it has all these other

02:04

1    complications.  You all may know -- some of us are a little

2    older.  This drug has been around since 1954, warfarin -- or

3    Coumadin, as it's called.  It was literally, for almost

4    50 years, the only drug doctors had to treat AFib and blood

5    clotting.

6                    You are going to hear from their own expert,

7    Dr. Smart, he said warfarin is a very difficult drug to use.

8    It actually started out as rat poison.  It goes into the body

9    and works through the liver, and it works on vitamin K.  So

10   what happens is when they give you a dose, if you have eaten

11   certain kinds of food with vitamin K or you have individual

12   differences or you take drugs, it interacts and changes those

13   levels, and so you constantly have to be monitored and you

14   constantly have to have blood tests.

15                   Xarelto and Eliquis and Pradaxa don't have those

16   problems.  You don't have to worry about what you eat, very few

17   drug interactions.  You don't have to go in to have your blood

18   tested, and you don't have to change your dose.  Those are

19   important things to doctors.  You are going to hear doctors say

20   that these drugs, the NOACs, were game-changers in their

21   practice, and that if they can, they would much rather

22   prescribe these NOACs than they would warfarin.

23                   Listening to the case and seeing the risks, they

24   are incredibly serious; but in the vast, vast majority of

25   cases, someone taking Xarelto or one of the other NOACs has a

02:06

1  very small risk of a brain hemorrhage.  That doesn't mean that

2  it won't happen, but 99.5 percent of the people who take

3  Xarelto don't have any kind of brain hemorrhage.  That's part

4  of the reason that doctors say there's always some risk.  I

5  think somebody said that every drug has risks and benefits.

6  And, yes, the risks actually of fatal bleeds and brain bleeds

7  are lower on the NOACs than they are on warfarin, but there is

8  a risk there and there's a risk of bleeding and that's in the

9  label.

10          Now, the fact that that risk is in the label

11  doesn't mean that someone taking that drug won't have a

12  hemorrhage.  It also doesn't mean that people like Mrs. Orr who

13  don't take the drug still have brain hemorrhages.  The question

14  is:  What can you do when that happens?

15          Plaintiffs have suggested to you that there is

16  actually a test that we wouldn't put in the label.  Think about

17  what they are saying.  They are saying we know about a test and

18  we lied about it because we didn't want to save people's lives.

19  That's what they are asking you to believe in this case.

20          Well, first of all, they didn't share with you

21  we do talk about PT in the label.  That is the Xarelto label.

22  We do say what we believe we can say.  We tried, as you will

23  see in evidence, to say more and we submitted it to the FDA.

24  And guess what the FDA said?  They crossed it out of the label.

25  And you are going to see that strikeout.  You didn't hear about

02:07

1     that, but you are going to see that document yourself.

2                 What happens in the labeling process is -- and

3     somebody alluded to this -- we are responsible for our label.

4     That's absolutely our responsibility, and we take it seriously.

5     We write up a label.  We have to send it in with all of the

6     study data to the FDA.  They can send it back and mark it up

7     and say yes or no, make suggestions.  We can go back and forth,

8     but ultimately we cannot sell the drug unless it is approved.

9                 This approval goes not just to the drug itself,

10    but actually approving the label.  So it's our responsibility,

11    but we can't send it out if they don't approve it.  They have

12    approved this label in 2011 and it's still approved today.

13                So you're going to hear that while our

14    scientists wanted PT to be able to be a test that could do

15    more, we have never been able to prove that it would be

16    helpful, and doctors have told us that it is not a helpful

17    test.  Independent studies that have nothing to do with us say

18    it's not a helpful test, and we are going to show you those.

19                This is one of the most recent articles.  I want

20    you to, if you could, look at it carefully.  This is the

21    *Journal of Thrombosis and Haemostasis*, nothing to do with the

22    companies.  These are hematologists who deal with blood

23    disease.  This is what they said last year:  "Consequently, the

24    use of PT or APTT" -- that's a different test -- "in clinical

25    practice" -- meaning treating patients -- "to evaluate

02:09

1    anticoagulant activity could cause dangerous

2    misinterpretations."

3              That's what I mean.  You are going to hear

4    doctors say if we looked at that test for Mrs. Orr and it said

5    she was normal, it doesn't mean that she didn't have a lot in

6    her system.  So if we went in there and did surgery, thinking

7    that that test said it was normal, that would be dangerous.

8              That's why doctors don't do it, the reason we

9    don't put it in the label.  But guess what?  The doctors don't

10   always care what we say.  They do read the studies.  And you're

11   going to hear these doctors that come in here, they read the

12   studies.  They talk to each other.  Outside of this courtroom

13   they don't say that that PT test is useful.  None of them say

14   that.  They say that it could cause danger to their patients

15   and they are certainly not going to use it unless it is helpful

16   and proven helpful.  And article after article that you are

17   going to see in this case is going to tell you that there's no

18   proven benefit.

19             Dr. Bui, who was the surgeon, doesn't even read

20   the Xarelto label.  So whether he was aware or not if we had a

21   different label, in this case, under the law it won't matter

22   because he didn't read it, so any different label wouldn't make

23   a difference to him.  Who matters in this case with the label

24   is the doctor who prescribed it.  That's Dr. St. Martin.

25             Dr. St. Martin, at the end of the day, in our

02:10

1   case, is going to tell you he knew about all of her medical

2   conditions.  He weighed the risks and benefits for her; because

3   remember, we are not allowed, and we shouldn't be in that

4   examination room.  We provide the information to the doctors,

5   and the law says that's our duty to warn the doctors and the

6   nurses.  And they talk to the patients and they make the

7   decision by warning the patient and talking about the risks and

8   benefits, and then the patient decides.

9           You are going to hear in this case that Mrs. Orr

10  trusted her physicians implicitly.  She believed they were

11  trying to help her, which they were.  Dr. St. Martin was trying

12  to help her.  He knew there was no reversal agent.  He knew

13  that the PT test was not clinically useful.  He still chose and

14  will tell you from that witness stand that he would still

15  prescribe Xarelto again for her.

16          So at the end of the day, after plaintiffs

17  present their case and we cross-examine their witnesses and we

18  present theirs, the case will be in your hands.  As important

19  as this case is to our clients and to doctors who prescribe

20  this medication around the country, we are honored that you

21  were selected to make this decision for us.

22          We will spend our time focusing on this medicine

23  and Mrs. Orr's condition so that when you go back into that

24  jury room, you have all the evidence you need to make your

25  decision.  Thank you very much.

02:12

1    THE COURT:  Thank you, Counsel.

2         You have heard the opening statements.  As I

3  said in the beginning, opening statements are not evidence.

4  They are simply what the lawyers feel the evidence will show.

5  We will now hear the evidence from the plaintiffs.

6         Call your first witness, please.

7         MR. BIRCHFIELD:  Your Honor, at this time the

8  plaintiffs call Sharyn Orr's daughter, Ms. Kimberly DeAgano.

9         THE COURT:  Would you come forward, please, ma'am.

10                    KIMBERLY ORR DEAGANO,

11  having been duly sworn, testified as follows:

12         THE DEPUTY CLERK:  State your full name and correct

13  spelling for the record, please.

14         THE WITNESS:  It's Kimberly Orr DeAgano,

15  D-E-A-G-A-N-O.  I go by Kim for short.

16                    DIRECT EXAMINATION

17  BY MR. BIRCHFIELD:

18  Q.   Kim, would you take just a moment and introduce yourself

19  to the jury.  They know your name.  Tell them a little bit

20  about yourself.

21  A.   Sure.  I'm married for 18 years.  We have one son

22  together.  His name is Dereck.  He is 14.  I live in Kenner, so

23  I have lived there actually my entire life.  Family person.  I

24  love sports.

25  Q.   So you were born and raised in Kenner; is that right?

**KIMBERLY ORR DEAGANO – DIRECT**

02:13

1   **A.**   That's correct.

2   **Q.**   The jury has heard already, but Sharyn Orr is your mom; is

3   that right?

4   **A.**   Correct.

5   **Q.**   Where did you attend high school?

6   **A.**   I went to St. Mary's Dominican High School Uptown.

7   **Q.**   What type of extracurricular activities were you involved

8   in?

9   **A.**   So basically, most of the sports that they offered I was

10   involved in.  I ran cross-country.  Took stats for volleyball.

11   Played basketball, played cabbage ball.  I was also in the

12   science club.  They have also had a Christian club, which we

13   did outreach kind of things to the community.

14   **Q.**   When did you graduate?  And then tell us what you did

15   after.

16   **A.**   I graduated from high school in 1992, and then thanks to

17   Mom, working at Tulane University for so many years, was able

18   to get a partial track scholarship for the athletics and then

19   tuition waiver for Mom's years of working at Tulane.  So I

20   attended Tulane University and graduated from there in 1996.

21   **Q.**   So you graduated from Tulane in 1996.  What was your

22   degree?

23   **A.**   My degree was in political science.

24   **Q.**   So tell us what you did, Kim, after you graduated from

25   college.

**KIMBERLY ORR DEAGANO – DIRECT**

02:15

1  A.   After I graduated actually there, I wanted to pursue -- I

2  had started in my later years at Tulane pursuing a business

3  minor.  I did a couple internships in the political arena and

4  said, I'm not sure that's for me, so decided I wanted something

5  else to fall back on, so I was pursuing a business minor.

6          A position opened up in my mom's office for another

7  athletic adviser, so I went ahead and took that position for --

8  I believe it was just a year to finish up my business minor,

9  and then I also tutored student athletes.

10 Q.   So a short while you were able to work there with your

11 mom?

12 A.   Correct.

13 Q.   So of your history, have you also had an opportunity to

14 work with your dad?

15 A.   I sure did.  So he worked in the insurance field, and I

16 would do phone calls for him, setting appointments and those

17 types of things, as well as I eventually acquired my own

18 insurance license.

19 Q.   Do you currently work outside the home?

20 A.   Not too much.  Well, I mean, I'm working with my father

21 and my husband.  We do investments, so I don't work outside of

22 the home too much.  Basically I do a lot of the legwork in

23 terms of investing in those properties and looking up materials

24 and things of that nature.

25 Q.   Kim, I think you mentioned you have been married for

**KIMBERLY ORR DEAGANO – DIRECT**

02:16   1   18 years; is that right?

2   **A.**   Correct.

3   **Q.**   What's your husband's name?

4   **A.**   Theodore DeAgano Jr.

5   **Q.**   Y'all have a son Dereck; is that right?

6   **A.**   That's correct?

7   **Q.**   How old is Dereck?

8   **A.**   He is 14.

9   **Q.**   I want you to tell a little bit about when -- your

10   relationship with your mom as you were growing up.  What are

11   some of your favorite childhood memories growing up with your

12   mom?

13   **A.**   Mom -- sorry.  Mom was there for everything.  As I

14   expressed, I was in a lot of sports, and I have a twin sister

15   and a brother.  We were all very involved.  She was at

16   everything.  She was our Brownie leader.  She was our

17   basketball coach, cabbage ball coach.  I don't recall a game in

18   all those years that she ever missed.

19           She worked full time.  Mom was the rock of the

20   family.  She cooked meals for us, even though she worked full

21   time.  We just had such a good family bond together.  We

22   enjoyed being together, and she was just a huge, huge part of

23   my life, obviously.

24   **Q.**   You mentioned you have two siblings, your brother Joe and

25   a twin sister Kelli; is that right?

**KIMBERLY ORR DEAGANO - DIRECT**

02:18

1   **A.**   Yes.

2   **Q.**   We have a picture here.  Is this a family picture of your

3   mom and your dad and you and Kelli and Joe?

4   **A.**   It sure is.  In the '70s.

5   **Q.**   I think we have several here.  If we could just take a

6   look at that.  As your family is growing up, getting a little

7   older, right?

8   **A.**   Yeah.

9   **Q.**   I think we have a wedding photo.  Tell us about this

10  photo.

11  **A.**   That's my wedding.  I'm there in the middle.  And this was

12  at Mom and Dad's house prior to the wedding ceremony.  We just

13  all got together to take pictures before the wedding.  And we

14  were excited -- I was the last one to get married.  Joe and

15  Kelli had already gotten married.  It was just another joyful

16  occasion.

17  **Q.**   I think we have one more here.  Tell us about this photo.

18  **A.**   I believe that was Mother's Day and we were celebrating --

19  that was Kelli's house there in the background.  We did all

20  holidays and birthdays and family -- any function that we could

21  get together, we were.  And we would get together often anyway.

22  **Q.**   So that's your mom with you and Kelli?

23  **A.**   Correct.

24  **Q.**   You were telling us that when you were growing up, you

25  were involved in all types of sports activities.  Was that true

**KIMBERLY ORR DEAGANO – DIRECT**

02:19

1   for Joe and Kelli as well?

2   **A.**   Yes, we were all extremely involved.  Joe played soccer.

3   When he was younger, he played football.  He also played

4   baseball.  Kelli and I did everything the same.  All three of

5   us started sports at a very young age, around five years old,

6   and we continued participating in sports throughout our lives.

7   **Q.**   You told us your mom was there for all of your games.

8   Every single game that you can remember?

9   **A.**   Yes.

10   **Q.**   Is that true for Joe and Kelli as well?

11   **A.**   Yes.  I don't know how she did it, but she was always

12   there.

13   **Q.**   Kim, tell us about your relationship.  Did you have a good

14   relationship with your mom growing up?

15   **A.**   I did.  Mom was -- as soon as you mentioned a need, she

16   was on it.  You didn't have to ask her to fulfill that.  She

17   just expressed her love through taking care of us.  That's what

18   she did.  She met all of our needs.  She made sure everything

19   was taken care of without us even having to ask.

20         Of course, we had responsibilities.  I felt like she

21   raised us so good to be respectful, to be responsible, but yet

22   she just took care of so much for us.

23   **Q.**   What about when you became an adult, when you graduated

24   from college and you moved out?  Tell us about your

25   relationship with your mom as an adult.

**KIMBERLY ORR DEAGANO - DIRECT**

02:20

1   **A.**   So Mom became so integral for all three of us as working

2   adults.  She would help us so much with the kids.  We sought

3   her advice.  She was just somebody you could go to and really

4   listen.  She had good advice for us.

5           We just enjoyed spending time together.  As a family

6   we often liked to laugh, so we just would joke a lot and we

7   enjoyed being together.

8   **Q.**   How far do you live from your mom and dad's house?

9   **A.**   I guess about a minute and a half, maybe two minutes.

10  **Q.**   So y'all would see each other regularly?

11  **A.**   Yes.

12  **Q.**   Did you and your mom become particularly close or even

13  closer after the birth of your son Dereck?

14  **A.**   We sure did.  My son was stillborn.  He had to be

15  resuscitated.  I had some difficulty, too, from that difficult

16  delivery, so I was unable -- he had to stay in the hospital.

17  He was at Children's Hospital for a month.  Mom and Dad and Joe

18  and Kelli and Dori.  Everybody was there, but Mom particularly

19  spent a lot of time at the hospital with Dereck and really

20  picked up where I could not, bringing that motherly role and

21  showing her love and concern for him.

22          Then when he did come home, I still had difficulty.

23  I wish we had the picture, but there's one picture in

24  particular.  She would come over and she would rock him.  He

25  had this huge smile on his face, and she had this huge smile on

**KIMBERLY ORR DEAGANO - DIRECT**

02:22

1   her face.  To me it just showed the expression of the love she

2   had for all of her family members.

3   **Q.**   You have a 14-year-old son, Dereck.

4           What about Kelli and Joe?  Do they have children as

5   well?

6   **A.**   They sure so.  Joe and Dori have two boys:  Jarrett, he is

7   17; and Joshua, and he is 14 also.  He is about three months

8   younger than Dereck.

9           Kelli has two:  She has Jennifer, who is 15; and she

10  has Gregory, who is 11.

11  **Q.**   Your mom and dad, five grandchildren?

12  **A.**   Stay very busy.

13  **Q.**   Tell us about -- I think we may have some photos here of

14  the grandkids.  Will you walk us through those?

15  **A.**   Sure.  Obviously that's Mom in the middle.  My son is

16  there on her right but our left, Dereck.  Jennifer is above

17  her.  Then Gregory is down on the right.

18  **Q.**   We have just a few more here.

19  **A.**   That's Jennifer.  Mom had a very special relationship with

20  Jennifer.  She was the only girl, of course.  They really

21  bonded early.  Then my sister went through a very difficult

22  divorce.  Mom, she really stepped up for Jen because Jen took

23  that hard.  So mom started taking her once a week and spending

24  time with her, just studying with her, teaching her very good

25  study skills.

**KIMBERLY ORR DEAGANO – DIRECT**

02:24

1       Mom's death has been really hard on all the kids, but
2   especially on Jen.
3   **Q.**   Who is this?
4   **A.**   That's Gregory.  That's Grandparents' Day.  Mom and Dad
5   used to make every Grandparents' Day for all the kids.
6   **Q.**   All right.
7   **A.**   That's my son Dereck.  Again, you can see the smile on her
8   face and just what being a grandmother was to her.  It was
9   very, very special to her.
10  **Q.**   I ask you about your favorite memories of your mom when
11  you were growing up.  You talked about how involved she was and
12  always there for all of your sporting events.
13      What about as an adult?  What are your favorite
14  memories of your mom in your adult life?
15  **A.**   One of the things I didn't mention was what a huge aspect
16  Tulane outside of work was.  As children we went to all the
17  Tulane sporting events, all of them, and that continued on in
18  her life.  But she so enjoyed it because not only was she a
19  sports fan, but she developed relationships with all these
20  student athletes.  She continued that.  To see how much those
21  people loved her because she wasn't just advising them on
22  important life decisions; she was advising them and encouraging
23  them.  Because there were quite a few who thought about leaving
24  school because it was really hard on them.  She encouraged them
25  to stay at Tulane, to get their degree.  So many of them

**KIMBERLY ORR DEAGANO – DIRECT**

02:25

1    maintained a relationship with her.  Even at her services they

2    came up to us as a family, and they were telling us, You know,

3    if it weren't for your mom, I wouldn't be where I am today.

4           Her relationships were very deep.  She and Dad have a

5    group of friends, they have been friends since college.  They

6    continue to get together throughout the year for different

7    functions.

8           So family, Tulane, and her friends:  That's Mom.

9    Q.   You were talking about student athletes; they came back at

10   the funeral service and shared --

11   A.   There were so many of them.

12   Q.   Would they come back -- did you see student athletes come

13   back and have dinner with your mom, come back and visit with

14   her along the way?

15   A.   Absolutely.  There was quite a few who, when they would

16   come in town, they would make sure they would see Mom, whether

17   they would go see her at Tulane or they would make specific

18   plans to meet up with her while they were in town.  It was very

19   important to them and to her.  She would keep in touch with

20   them with their children and their careers and those types of

21   things.

22   Q.   Your mom, she worked for a total of 43 years at Tulane?

23   A.   Correct.  Yes, she did.

24   Q.   When she had been there for 40 years, was she recognized

25   and honored there at Tulane?

## KIMBERLY ORR DEAGANO – DIRECT

02:27

1   **A.**   She was, in our opinion, probably not quite as much as she

2   should have gotten, but it was a recognition of her years

3   there.

4   **Q.**   We have just a short video.  I think you actually took a

5   video?

6   **A.**   Yes.

7   **Q.**   Can we take a look at that and you just tell us what was

8   taking place on this night?

9   **A.**   Sure.

10              (Video played.)

11   **BY MR. BIRCHFIELD:**

12   **Q.**   I know the audio is not so good there.  Can you tell us

13   what was happening that night?

14   **A.**   They were just recognizing her for her years.  She started

15   in the physical education department because there wasn't even

16   a separate athletic department when she began there.  When they

17   started the athletic department, she worked there.  She was the

18   only academic adviser for all sports offered at Tulane.

19              It continued to grow and become extremely -- a very

20   involved athletic department where there was a lot of stress.

21   But she loved her job and loved her kids that she worked with.

22              Then she transferred in her later years to the School

23   of Continuing Studies, formally known as University College.

24   She advised all the students there that came through there.

25              Basically it was 40 years of service at Tulane.

**KIMBERLY ORR DEAGANO – DIRECT**

02:29

1   **Q.**   I think your mom and dad were married for like 45 years?
2   Is that right?
3   **A.**   It was going to be their 46th.
4   **Q.**   46 years.  Did they have a good marriage, good
5   relationship?
6   **A.**   Yeah, yeah.  Mom loved Dad so much.  Dad, of course, loved
7   Mom too.  Mom, like I keep saying, she was just the rock of our
8   family.  She took care of Dad in so many ways.  They kept
9   together with their friends.  They would go to movies together.
10   They would go to dinner together.  All the sporting events
11   together.  Doing everything with the kids together.
12         Their lives were very much involved with one another,
13   and it's been a difficult loss.
14   **Q.**   Kim, I want to turn to your mom's medical condition.
15   Before her stroke -- were you familiar with her medical history
16   for the years, the decades leading up to her stroke in April of
17   2015?
18   **A.**   Yes, I was.
19   **Q.**   What are some of the medical conditions that you know that
20   your mom struggled with?
21   **A.**   She did have the hypertension, diabetes, the kidney
22   disease, congestive heart failure, the AFib.
23   **Q.**   She had skin cancer; is that right?
24   **A.**   Yes, yes.  She had a little spot on the top of her head,
25   and basically they just removed that.  There was no further

**KIMBERLY ORR DEAGANO – DIRECT**

02:31

1   treatment necessary for that.

2   **Q.**   Do you recall approximately when your mom was diagnosed

3   with AFib?

4   **A.**   AFib, I believe, was 2011.

5   **Q.**   The jury has heard a little bit about AFib.  That's a

6   fluttering of the heart.  Is that your understanding?

7   **A.**   Correct.  Increased heart rate.

8   **Q.**   How was your mom initially treated for AFib?  Do you know?

9   Do you recall?

10   **A.**   She was placed on Pradaxa, the blood thinner.

11   **Q.**   Are you familiar with your mom seeing, being treated by

12   Dr. St. Martin?

13   **A.**   Yes.

14   **Q.**   Do you remember when she first started seeing

15   Dr. St. Martin?

16   **A.**   I believe initially she had a different cardiologist, and

17   then in 2011, at some point -- I don't remember specifically

18   when -- but that's when she started seeing Dr. St. Martin.

19   **Q.**   Were you aware -- did you and your mom discuss health

20   conditions and decisions she was making about her care and

21   treatment?

22   **A.**   Somewhat.  Yes.

23   **Q.**   Do you recall that she was switched from Pradaxa to

24   Xarelto?  Is that right?

25   **A.**   Correct.

**KIMBERLY ORR DEAGANO – DIRECT**

02:32

1  **Q.**   The health conditions that your mom had -- the high blood

2  pressure, the diabetes, the AFib -- did those noticeably impact

3  or cut back on her activities and the things she was involved

4  in?

5  **A.**   There were times when she had major episodes, but for the

6  most part you really wouldn't know that she had all those

7  issues.  She was still working full time.  Like we said, she

8  was at all of our kids' functions and events.  She lived a very

9  full life.  She still exercised.  She was very active.  It was

10  not like you would look at her or see her and think, Oh, here

11  is somebody who is very ill.

12  **Q.**   In the few years leading up or prior to the stroke, was

13  she still physically active, engaging in playing with

14  grandkids?

15  **A.**   Absolutely.  She would get on the trampoline with them.

16  She would play on the floor with them.  She loved to do that

17  when they were little.  She had special toys for them when they

18  were little.  She'd get on the floor and play with all the

19  kids.

20  **Q.**   I think you have a few-second video of your mom on the

21  trampoline.

22        **MR. BIRCHFIELD:**  Can we take a look at that, please.

23        **THE WITNESS:**  Sure.

24        (Video played.)

25

**KIMBERLY ORR DEAGANO – DIRECT**

02:34

**BY MR. BIRCHFIELD:**

1

2  **Q.**   That was your mom.  Who was on the trampoline with her?

3  **A.**   That's Dereck and, I think, Jennifer.  I couldn't see who

4  else was there.

5  **Q.**   Kim, when it came to your mom's health conditions, did she

6  take her health -- did she take it seriously?

7  **A.**   Yes.  If you noticed, on the diabetes, I believe it showed

8  significantly a long time ago she was diagnosed with that.

9  Well, she changed her diet and she exercised and she was able

10  to control that for a long time without having to go on an

11  insulin shot.  She only took oral medication for the diabetes.

12       Now, she did have episodes a couple times when she

13  had bronchitis, because she wasn't feeling well from the

14  bronchitis and able to eat, that she wasn't able to take her

15  medication for the diabetes.  That's when it was extremely

16  uncontrolled.  But she managed that for years and years without

17  major issues.

18  **Q.**   Was your mom very conscientious about following doctors'

19  orders and taking her medicines as she was supposed to?

20  **A.**   Oh, yes.  She really respects the medical field, and she

21  respected her doctors.  She would follow their recommendations

22  and their suggestions on how to treat herself.

23  **Q.**   I want to transition now, if we can, Kim, to the night

24  your mom suffered the stroke.  Do you recall the date?

25  **A.**   Yes.  It was April 24, 2015.

KIMBERLY ORR DEAGANO – DIRECT

02:36

1  **Q.**   What night of the week was that?

2  **A.**   That was a Friday.

3  **Q.**   How did you first learn that your mom needed medical care?

4  What prompted you being involved in these circumstances?

5  **A.**   So Dad called and he was concerned.  They had gotten home

6  from dinner.  She was in the restroom, and he noticed she was

7  having trouble -- basically she was getting very fatigued, and

8  so he was concerned with how she was looking.  So he called me

9  to come over to help.

10  **Q.**   I think you told us you lived about a minute away?

11  **A.**   Yes.

12  **Q.**   So you went over to your mom and dad's house?

13  **A.**   Correct.

14  **Q.**   Tell us what happened when you got there.  What did you

15  see?  Where was your mom?

16  **A.**   So when I did get there, she was still on the toilet.  Dad

17  was helping to hold her up.  She was kind of slumped over a

18  little bit.  She had a trash can near her because she had

19  thrown up.  So I got down on my knees to talk to her and see

20  how she was doing, what she needed.

21        She asked for some ice to clean her mouth out, so I

22  went and got there for her and gave it to her.  I was talking

23  to her, and she kept saying that she was tired and she wanted

24  to lay down.  So Dad and I were trying to pick her up to bring

25  her to the bathroom [sic], but she just was very lethargic.

**KIMBERLY ORR DEAGANO - DIRECT**

02:37

1          She didn't have any other signs.  I mean, her face
2    wasn't drooping, her speech wasn't slurred.  So we weren't sure
3    what was wrong.  We didn't know if the food had upset her
4    stomach.  We didn't know what was wrong.
5          So we were just very concerned because she wasn't
6    able to help herself off the toilet.  So we called 911 at that
7    point.
8    Q.   You called 911.  You stayed right there with your mom.
9    Was your mom still in the bathroom when the EMTs arrived?
10   A.   Yes, she was.
11   Q.   Kim, I know this is difficult, but help us if you will.
12   Just walk us through the events that night.  What happened when
13   the EMTs arrived?
14   A.   So they came into the house.  The bathroom she was in was
15   really small, so they were having trouble taking her vitals or
16   anything like that, assessing her state at that point.  So they
17   decided to try to get her on the gurney, into the ambulance, to
18   do what they needed to do.  They were having trouble, because
19   of the small space, getting to her to properly lift her.  They
20   finally were able to her, and they got her on the gurney.  She
21   was still speaking.  It wasn't -- but she was very -- she just
22   seemed very tired.  That's the best way -- when you get
23   extremely dehydrated, that kind of thing, where you kind of
24   lose your -- just the ability to really focus.
25   Q.   So the EMTs, they decided to transfer her to the emergency

**KIMBERLY ORR DEAGANO – DIRECT**

02:39

1   room at Baptist; is that right?

2   **A.**   Correct.  They took her into the ambulance, and they were

3   taking her vitals and those things.  They said they were going

4   to transport her.  She asked us for a medication list, which we

5   had put together previously with Mom.  So we went in and got

6   that and gave them that list.  But Kelli and I stayed to update

7   the list and make sure it was all current.  Then they took Mom

8   to Baptist.

9   **Q.**   At that point, when the EMTs were taking your mom to

10  Baptist, did you have any idea?  Did you know what was going on

11  with your mom at that point?

12  **A.**   No, we had no idea.  Like I said, I thought maybe it was a

13  bad stomach virus or food poisoning or something of that nature

14  because she had vomited, as well as she had diarrhea.

15  **Q.**   By this time Kelli had gotten to the house?

16  **A.**   Kelli had gotten there at the same time the EMTs got

17  there, yes.

18  **Q.**   I think you told us that you and Kelli made sure that the

19  list was up to date.  What else -- you and Kelli went to

20  Baptist, the ER, right?

21  **A.**   Yes.  Kelli, myself, and my dad.

22  **Q.**   What else did you do before you went to Baptist?

23  **A.**   We just updated that list to make sure that any

24  supplements, any vitamins, any prescriptions she was currently

25  on were all on that list.  We also packed a bag for her because

## KIMBERLY ORR DEAGANO - DIRECT

02:41

1   we thought she was going to come home.  We knew she would want

2   a change of clothes.  We knew she would want her hairbrush and

3   just the simple pleasures of home.

4   **Q.**   So you got to Baptist, you and Kelli and your dad, right?

5   **A.**   Correct.

6   **Q.**   Tell us what happened there at Baptist.  She was treated

7   in the ER at Baptist, right?

8   **A.**   Correct.  Somebody came out to speak with us relatively

9   early on and just wanted a description of what had taken place

10  that evening.  We just described that they had gone to dinner,

11  she got a headache.  She wanted some Tylenol, but they didn't

12  have any on her at the restaurant.  So they drove home.  She

13  vomited twice, and then she laid down.  Dad went to get her

14  Tylenol.  By the time he came back, basically she was asleep.

15  Then the rest of -- she got up to go to the restroom.  And so

16  we explained that to the first person who came in.

17          Then from there, after further testing, they called

18  us back, and a doctor, physician came and met with us and said

19  that they believed she had had a stroke and that the main

20  campus on Jefferson Highway was more suited for stroke victims,

21  and so they were going to send her there.  They were supposed

22  to, I think, take her by helicopter, but the weather wasn't

23  that good, so they took her by ambulance.

24  **Q.**   When the doctor mentioned that they thought your mom had

25  had a stroke, was that the first idea that she may have had a

**KIMBERLY ORR DEAGANO - DIRECT**

02:42

1  stroke?

2  A.    Absolutely.  We were in total shock.  I remember the three

3  of us just -- we couldn't even hardly speak, because we had no

4  idea.  We weren't expecting to hear that news.

5  Q.    So before your mom was transferred from Baptist to Ochsner

6  main, were you able to see her?  Were you able to see her there

7  at Baptist?

8  A.    Yes.  We were able to go to the room where they had her,

9  and we were able to stay with her until they transported her,

10  yes.

11  Q.    At that point, your mom, was she communicative in any way?

12  What was going on?

13  A.    So I don't recall her speaking so much as maybe an uh-huh

14  or uh-uh kind of thing, but she was still responsive.  I

15  remember holding her hand and just talking to her and asking

16  her to fight because she was a fighter.  She was very strong, a

17  very strong woman.  She just was a fighter.

18  Q.    So your mom was then transferred to Ochsner main?

19  A.    Correct.

20  Q.    Did you and Kelli and your dad follow the ambulance to

21  Ochsner main?

22  A.    Yes, we did.

23  Q.    When she arrived at Ochsner main, did she go to ER first

24  or ICU?  What happened there at Ochsner main?

25  A.    I think they brought her in through the ER.  Then there

**KIMBERLY ORR DEAGANO – DIRECT**

02:44

1    was a specific stroke area in the emergency room.

2    **Q.**   When you got to Ochsner main, did you see any doctors?

3    Did you talk to any doctors at that point about your mom's

4    condition?

5    **A.**   So after a few minutes, at this point Joe had arrived as

6    well, so the five of us -- well, four of us plus Mom -- were

7    there.  The first physician that came in, it was Dr. Khursheed.

8    Dr. Khursheed confirmed that she had had a massive stroke.  He

9    actually put the CT up for us to view.  Of course, I had never

10    seen one, so I had no idea what we were looking at.  He did say

11    it was a bad brain bleed.  He was trying to determine from us

12    whether there was a DNR or not and whether or not we wanted to

13    put her on life support at that point.

14    **Q.**   So Dr. Khursheed came, had this discussion with the

15    family.  Did you talk to any other doctors?

16    **A.**   Yes.  Dr. Khursheed left.  At this point we are in

17    complete shock because they are talking life support now.  The

18    last time I had seen her, she was still responsive and she was

19    still breathing on her own, all of those things.  So this was a

20    complete shock that they were talking about life support and

21    making some very critical decisions.

22    Then Dr. Riffle came in.  Dr. Riffle placed an option

23    on the table to treat mom.  He said, We feel like this is the

24    best option for her to have a chance to survive.

25    **Q.**   So what was the option that Dr. Riffle discussed with you?

**KIMBERLY ORR DEAGANO – DIRECT**

02:46

1  **A.**   They were going to drill a hole in the skull and try to

2  relieve the pressure and try to remove the fluid that had --

3  that was sitting there.

4  **Q.**   Did Dr. Riffle, did he sound hopeful in this discussion in

5  laying this option on the table?

6  **A.**   He really did.  He seemed like this was a viable option

7  and that if they were able to do this, there was a good chance

8  for Mom.  And again we expressed at that point that Mom was a

9  fighter, and we wanted to do something because of how strong

10  she was.  She wasn't one -- when she got sick, she would push

11  through all of the symptoms.  She was so strong.  We wanted to

12  give her a chance to fight because that's who Mom was.

13  **Q.**   So what happened next?

14  **A.**   I believe Dr. Riffle left and came back in, and he asked

15  what medications Mom was on.  As soon as we mentioned

16  Xarelto -- at this point Dr. Khursheed, to my recollection,

17  came back in as well.  We mentioned the Xarelto, and both of

18  their heads, their body language, everything changed.  They

19  dropped their heads, and Dr. Riffle just shook his head.  Then

20  they said, There's nothing we can do.

21       I think they walked back out, consulted, came back

22  in, and they said, Because she is on Xarelto, there's no

23  reversal.

24       They said they would have to wait at least 18 to

25  24 hours before they could treat Mom.  So they felt like -- the

**KIMBERLY ORR DEAGANO – DIRECT**

02:48

1   perception was that was not good.

2   Q.   You were there and -- your dad and Kelli and Joe, y'all

3   were there?

4   A.   We were all there, yes.

5   Q.   So what was it like, getting that news, Kim?

6   A.   Oh, it was terrible.  We are in complete shock that this

7   is even happening, that Mom had had a stroke.  She was at work

8   that day.  They went to dinner, and now we are trying to make a

9   life decision for her.  Now they give us hope and say we can do

10  this procedure, but then as soon as we mention Xarelto, they

11  stay there's nothing we can do, we just have to wait.

12        So we knew -- you can't leave that kind of pressure

13  on the brain.  Even if she did survive, when they were able to

14  do the procedure, we were very concerned as to what the outcome

15  was going to be because mom did have -- she had such a vibrant

16  life, she was so full of life, that we were concerned, was she

17  going to be dependent on somebody else.

18  Q.   So this all took place Friday evening into the early,

19  early morning hours of Saturday, April 25?

20  A.   Correct, correct.

21  Q.   Do you recall the next -- on Saturday do you recall the

22  next discussion you had with the doctors about care for your

23  mom?

24  A.   Yes.  So Dad, Joe, and Kelli were all there at the

25  hospital.  I wasn't there yet.  I wasn't feeling good that

**KIMBERLY ORR DEAGANO - DIRECT**

02:49

1    morning.  They were there.  Dr. Bui had -- was doing a consult
2    with them to discuss the option to put the shunts, or a shunt,
3    in at that point.  That was, I want to say, about maybe 9:30,
4    10:00, that meeting.  So they conference-called myself so I
5    could hear the information.
6    **Q.**   So Dr. Bui had had a discussion with you about doing the
7    shunt?
8    **A.**   Correct.
9    **Q.**   That's the procedure you were talking about, drilling --
10   **A.**   Correct.  They drill the hole, they put the tube in.  The
11   tube goes to the fluid and drains the fluid from the brain.
12   **Q.**   Was that a discussion where he was recommending this or
13   giving this as an option to the family?  What do you recall
14   about that discussion?
15   **A.**   Basically he said that was the best option at that point,
16   that they wanted to try that and see if they would have success
17   in removing the fluid with the shunt and see how that went.  I
18   don't really recall any other options at that point, because
19   that's basically what he was focused on.
20   **Q.**   They moved forward with that surgery; is that right?
21   **A.**   Yes.
22   **Q.**   What do you recall about the discussions you had with the
23   doctors after that surgery?
24   **A.**   So they placed the one shunt in, and then they decided to
25   place another one in.  Both of them were draining at one point.

**KIMBERLY ORR DEAGANO - DIRECT**

02:51

1    Then one of them stopped draining.  So they had to put

2    medication in it to try to dissolve the blood the clots so that

3    it would continue to drain.

4            It was such a roller coaster.  It was good news one

5    moment, then bad news another moment.  One doctor would put

6    something on the table as an option.  Then somebody else,

7    another physician, would take it off the table.  It was a

8    horrible experience to have to go through because you would

9    have a moment of, okay, things are looking good, and then

10   somebody else would talk to you and it was bad.

11           But Mom, we felt she was still at times responsive on

12   Sunday.  So, of course, it happened Friday.  They did the first

13   shunt on Saturday.  On Sunday the whole family was there, and

14   there was a Tulane baseball game.  So we put the game on the

15   radio for her.  Her friends came in to visit, and they are big

16   LSU fans, so it was a thing between them.  They would kind of

17   razz Mom and Dad about Tulane back and forth.  When they were

18   doing that, even when she was there in the bed, she started

19   moving.  Then Tulane won, and we were like, Look at that, Mom.

20   They pulled it out for you.  They won the game.

21           It looked like they were going to lose, but they

22   ended up winning.  And she was more -- there was more movement,

23   so we felt like there was some responsiveness still there.  Of

24   course, the doctors were saying it wasn't, but we felt like it

25   was because it was specific to those situations.

**KIMBERLY ORR DEAGANO – DIRECT**

02:53

1   **Q.**   You and your dad and Kelli and Joe, were you all there at

2   the hospital most of that time, in the days following that

3   surgery --

4   **A.**   Absolutely.

5   **Q.**   -- with your mom?

6   **A.**   Absolutely.  We were there all the time, all the time.

7   **Q.**   Did you have a later discussion with Dr. Bui about your

8   mom's condition and about a possible surgery?

9   **A.**   So on the 29th basically both shunts had, for all intents

10   and purposes, stopped working.  They weren't doing anything

11   anymore.  So Dr. Bui met with us again.  It was just Dad and I

12   at that time.  We had to call Kelli and Joe.  They put on the

13   table for like a partial but whole half of the skull,

14   craniotomy, to remove the whole half of her skull to relieve

15   the pressure.  They basically said there really wasn't much

16   hope for her to have a quality of life at all, that she would

17   be completely dependent on other people.

18        We knew that Mom valued her independence and the

19   quality of life she had.  So we had -- we discussed it all and

20   we said she wouldn't have wanted that.  So we decided against

21   it.

22   **Q.**   At that point, based on the discussion with the doctors,

23   your mom, she was only being kept alive by life support?

24   **A.**   Life support, correct.

25   **Q.**   So that's a decision that you and your dad and Kelli and

**KIMBERLY ORR DEAGANO – DIRECT**

1  Joe all made together?

2  **A.**   Yes.

3  **Q.**   So tell us what happened.  Tell us what happened after

4  that.  That was a discussion on April 29; is that right?

5  **A.**   Correct.  It was later in the day.  So I can't recall if

6  at that -- if it was that same day or the next day.  Someone

7  had come in to speak with us about the process of removing her

8  from life support, what that entailed.  But the weekend was

9  coming up, so we decided we wanted the regular staff to be

10  there.  We didn't want to do it over the weekend if there were

11  any complications, because sometimes when people come off life

12  support, there can be some difficult moments, to say the

13  least:  the responses their body goes through, or if they

14  actually start breathing on their own; any of those things that

15  can happen.  We wanted to make sure regular staff was there to

16  treat Mom.

17  **Q.**   When was the life support removed, Kim?

18  **A.**   On May 4.

19  **Q.**   Who all was there on that day?

20  **A.**   So we were all there.  It was too much for Dad and Joe to

21  stay in the room, so Kelli and I stayed in the room with Mom.

22  And her niece, her godchild, was there; and her niece's

23  daughter, who's a nurse, also came to be with us.

24  **Q.**   You and Kelli were actually in the room with your Mom?

25  **A.**   Yes.

**KIMBERLY ORR DEAGANO – DIRECT**

02:57   1   **Q.**   That was on May 4?

2   **A.**   Correct.

3   **Q.**   Kim, there was a funeral service for your mom, is that

4   right?

5   **A.**   Correct.

6   **Q.**   Tell us about that.  Was there a large crowd there?

7   **A.**   I did want to mention the day she passed, Kelli and I

8   found it ironic that she actually passed right around 5:30.

9   They took her off at noon, and she fought to the end.  She

10   passed at 5:30, which was basically usually the time she got

11   home from work every day.  We felt like she went to be home at

12   5:30 on that day too.

13   But the funeral was amazing.  There were so many

14   people there.  People from years ago from Tulane that had known

15   her for years and years, some that we didn't realize she had

16   kept in touch with all these years.  There was, of course,

17   family, friends, all these former athletes, co-workers.  The

18   place was packed.  It was very touching.

19   **Q.**   I'm sorry to even ask this, but can you tell us the effect

20   that your mom's death has had on you.

21   **A.**   You know, Mom was just the glue to our family.  She kept

22   everybody informed of everything.  She kept us in touch with

23   the extended family, as far as what was going on with the

24   extended family.  She would cook for us the family dinners,

25   family meals she loved to have in her dining room.

**KIMBERLY ORR DEAGANO - DIRECT**

02:59

1          She was so important to the grandkids.  They all, all

2     had a very special relationship with her.

3          Each one of us, her kids, had a different

4     relationship with Mom.  We looked to her for different things.

5     She fulfilled so many people's needs and expectations.  She

6     just -- she was the matriarch.  She was a true example of the

7     matriarch of the family.  She was so strong and so loving and

8     just a wonderful role model and example to us and so important

9     to all of her family, friends.

10          **MR. BIRCHFIELD:**  Thank you, Kim.  Ms. Wilkinson may

11     have some questions for you.

12          **THE COURT:**  Any cross?

13          **MS. WILKINSON:**  I'm Beth Wilkinson.  We're very sorry

14     for your loss.  We're not going to ask you any questions at

15     this time.

16          **THE COURT:**  We will take a 15-minute recess at this

17     time.  Court will stand in recess for 15 minutes.

18          **THE DEPUTY CLERK:**  All rise.

19          (Recess.)

20          **THE COURT:**  Be seated, please.

21          (The following proceedings were held at the bench.)

22          **MR. MEUNIER:**  Judge, two things.  First is just a

23     scheduling matter, which doesn't necessarily need to be on the

24     record.

25          **MR. BARR:**  We are getting ready to play three videos.

03:17

1    The first is Nessel, about an hour.  The second is Peters,

2    which will be about 30 minutes, to take us to 4:45.  We have

3    another one we can play.  It's an hour long.  I wouldn't

4    suggest we play the whole hour, but we might want to play

5    30 minutes, then do 30 in the morning.

6            **THE COURT:**  One problem sometimes with a jury the

7    first day, they get here early.  Maybe we ought to stop at

8    4:45.

9            **MS. WILKINSON:**  That's what we think.

10           **MR. BARR:**  I just wanted to raise the issue.

11           **MR. MEUNIER:**  That may relate, then, to the second

12    issue.  We have noticed that Juror 5, Tina Reed, is dozing a

13    bit.  It's not a slight problem.  It seems to be more of a

14    chronic problem.  Maybe that will change as she comes back

15    refreshed.

16           **THE COURT:**  I'll keep an eye on her.

17           **MR. BIRCHFIELD:**  She is the bartender.

18           **THE COURT:**  Works at night.

19           **MS. WILKINSON:**  She might have had a late night last

20    night.

21           **THE COURT:**  Get ready with some water, Dean.

22           **MR. MEUNIER:**  If it persists, we are going to ask the

23    Court maybe to look at that.

24           (End of bench conference.)

25           **THE COURT:**  Members of the jury, we are not keeping

03:18

1    anything from you.  It's just a question of logistics.  The

2    attorneys tell me we have some video depositions.  We were

3    trying to figure out how we can play them.

4                    We will stop at about 4:45 today, a little bit

5    before 5:00.

6                    The next witness will be called by video

7    deposition.  Let me explain first what a deposition is.

8    Oftentimes in these cases, before the trial the lawyers have an

9    opportunity to conduct what we call discovery.  They take

10   statements from the witnesses, they take depositions from the

11   witness.

12                   A deposition is simply an opportunity that the

13   lawyers have.  They subpoena the witness.  The witness comes to

14   a particular area, an office or a conference room.  Both sides

15   are there.  The lawyer asks questions.  The opposing counsel

16   cross-examines.  The witness is sworn in.  Sometimes this is

17   done, it's recorded and then typed up.  Oftentimes they do it

18   on video.

19                   There are two reasons for doing that.  One

20   reason is to find out what the witness is going to say, but

21   more often it is to project the witness to the jury in the

22   event the witness is unavailable for trial.  When a witness

23   can't be available for any reason, they are out of town or

24   there's some other commitment, the deposition is played in lieu

25   of testimony.

03:20

1            The important thing from your standpoint is that

2     you are to give that video the same scrutiny you would a

3     witness on the stand.  It's the same as if the witness would

4     come in person.  You make the same calls on credibility and

5     veracity, things of that sort.

6            Now we will hear from the witness.

7            **MR. BARR:**  Your Honor, at this time the Orr family

8     calls Dr. Christopher Nessel.  We are going to play his

9     videotaped testimony for you.  It was taken on February 16,

10    2016, and February 17, 2016, in Florham Park, New Jersey.

11           Dr. Nessel is the vice president and franchise

12    medical leader for cardiovascular research at Janssen.

13           It's going to start with questioning from the

14    Orr family, followed by questioning from defense counsel.  It

15    runs about an hour.

16                   **CHRISTOPHER C. NESSEL,**

17    having been duly sworn, testified by deposition [as played]:

18                          **EXAMINATION**

19    **Q.**   Good morning, Dr. Nessel.

20    **A.**   Good morning.

21    **Q.**   Would you please state your full name for the record.

22    **A.**   Yes.  Christopher C. Nessel.

23    **Q.**   Where are you employed, Dr. Nessel?

24    **A.**   I am employed by Janssen Research & Development.

25    **Q.**   How long have you worked there?

CHRISTOPHER C. NESSEL - DEPOSITION

03:21

1  **A.**   In April it will be 10 years.

2  **Q.**   Is it true you are a medical doctor?

3  **A.**   Yes.

4  **Q.**   Where did you go to medical school?

5  **A.**   Temple University.

6  **Q.**   Do you still see patients?

7  **A.**   While I retain an active medical license, I don't have an

8  office practice, no.

9  **Q.**   When was the last time, if ever, you actually treated a

10  patient?

11  **A.**   I will occasionally treat family and friends as a

12  courtesy.  My last formal, if you will, seeing of patients was

13  in maybe 2005 or 2006, in connection with my service in the

14  United States Navy.

15  **Q.**   Yes, sir.  Is it fair to say, sir, that you were

16  intimately involved in the ROCKET trial?

17  **A.**   I was the study-responsible physician for the ROCKET

18  trial.

19  **Q.**   If you could just briefly describe what your roles and

20  responsibilities were for the ROCKET trial.

21  **A.**   Certainly.  Along with the study team at Janssen, I was

22  responsible for the study design and conduct.  I served as a

23  member of the ROCKET AF executive committee.  I think that

24  about describes it.

25  **Q.**   Is it fair to say that you were also involved in

CHRISTOPHER C. NESSEL - DEPOSITION

03:22

1    interaction with regulatory bodies about the ROCKET design

2    conduct and results?

3    **A.**    Yes.

4    **Q.**    You also spoke at the advisory committee in 2011, prior to

5    the approval for the AFib indication; is that correct?

6    **A.**    Yes.

7    **Q.**    You spoke on behalf of the company; is that correct?

8    **A.**    Yes.

9    **Q.**    Could you briefly describe ROCKET, the trial.

10           Let me try to briefly describe it and see if you will

11   generally agree with me.  My understanding is that ROCKET was a

12   trial designed to test Xarelto, to see if it was safe and

13   effective for the prevention of strokes in patients with

14   nonvalvular atrial fibrillation.  Essentially what you did, you

15   followed about 14,000 patients over approximately two years and

16   at the end counted up the number of strokes and bleeds.  Is

17   that a fair summation of ROCKET?

18   **A.**    It is.  The only thing I would add -- there are many --

19   it's a very large trial.  There are many things we could

20   discuss, but one important thing, I think, to include is that

21   warfarin was the comparator.  It was not a placebo-controlled

22   trial; warfarin was the comparator.

23   **Q.**    I'm not sure any of this was discussed yesterday.  I just

24   want to get some background on the mechanism of Xarelto.  If

25   you will indulge me for just a few minutes.

CHRISTOPHER C. NESSEL - DEPOSITION

03:23

1          I understand that Xarelto is what's considered a

2    direct oral anticoagulant.  Is that correct, sir?

3    A.    Yes, sir.

4    Q.    That's unlike, for example, warfarin, which is an

5    anticoagulant but is not considered a direct oral

6    anticoagulant?

7    A.    Yes, sir.

8    Q.    We are talking about blood clots in humans.  They can be

9    harmful.  Agreed?

10   A.    Well, blood clots can serve -- yes, they can be both

11   harmful and helpful.  Yes, sir.

12   Q.    Let's talk about harmful.  For example, if there's a clot

13   in a person's heart, it could travel up through the blood

14   vessel and get into the brain and cause a stroke, right?

15   A.    Yes, sir, that's correct.

16   Q.    Or if there is a clot in the leg, it can travel up a vein

17   and get into the lung and cause a pulmonary embolism?

18   A.    Yes, sir, that is my understanding.

19   Q.    Both of those are very bad outcomes for a person, usually?

20   A.    Yes, I think that is generally correct.

21   Q.    Xarelto was approved for the prevention of -- was approved

22   for the prevention of clots in patients with atrial

23   fibrillation; is that correct?

24   A.    Yes, sir.

25   Q.    Just a little bit about atrial fibrillation.

CHRISTOPHER C. NESSEL - DEPOSITION

03:25  1   **A.**   May I please recharacterize my testimony?

2   **Q.**   Sure.

3   **A.**   It's for the prevention of stroke and non-CNS systemic

4   embolism.  What you said was correct, but the clot is more

5   specific.  It's for stroke or non-CNS systemic embolism.

6   **Q.**   Thank you for that clarification.

7          Atrial fibrillation -- patients with atrial

8   fibrillation have an increased risk of suffering a stroke,

9   correct?

10   **A.**   Yes, sir.

11   **Q.**   Ischemic stroke?

12   **A.**   Yes, sir.

13   **Q.**   By "ischemic," we are talking about a blood clot type of

14   stroke, right?

15   **A.**   Yes, sir.

16   **Q.**   A clot that gets into a blood vessel in the brain and cuts

17   off circulation and therefore results in ischemia and death of

18   brain cells.  That's what a stroke would be?

19   **A.**   Yes.  Unfortunately that is correct.

20   **Q.**   So atrial fibrillation is -- to just boil it down and

21   oversimplify that -- I hope you forgive me for that.  It's an

22   irregular heartbeat?

23   **A.**   It is, in fact, the most common irregular heartbeat.  Yes,

24   sir.

25   **Q.**   It is characterized by inefficiently -- the heart

CHRISTOPHER C. NESSEL - DEPOSITION

03:26

1    inefficiently pumps blood.  Would that be fair to say?

2    A.   It does, in fact, do that.  The two chambers on the top of

3    the heart what is called fibrillate.  Instead of rhythmic

4    contraction, they kind of -- I sometimes liken it to Jell-O a

5    little bit.  There is no rhythmic contraction; they fibrillate.

6    As a result of that, the efficiency of the heart, as you've

7    described it, is diminished, yes, sir.

8    Q.   When blood is pumped inefficiently by the heart, it can

9    potentially pool, and if it pools, it could potentially

10   coagulate?

11   A.   Yes, sir.

12   Q.   And if it coagulates, it could form a clot and the clot

13   can then travel to a blood vessel up to the brain, and lo and

14   behold, a stroke?

15   A.   Yes, sir.  If indeed the clot, which is fixed, a thrombus,

16   then travels, it becomes an embolus.  You have described it as

17   my understanding, sir.

18   Q.   Xarelto was approved to prevent that type of blood clot

19   from forming and causing a stroke, right?

20   A.   Xarelto was approved for the prevention of stroke and

21   non-CNS systemic embolism, as would be brought on by the clot

22   that you've just described.

23   Q.   So it's approved to prevent strokes in patients with

24   atrial fibrillation?

25   A.   Yes, sir.

CHRISTOPHER C. NESSEL - DEPOSITION

03:27

1  Q.   But one of the side effects, however, are that it
2  increases the risk of major bleeding and sometimes fatal
3  bleeding in patients who take Xarelto, correct?
4  A.   Xarelto or any anticoagulant relative to placebo, yes,
5  sir.
6  Q.   Right.  And you just mentioned this, so its side effects
7  are increased risk of bleeding, sometimes fatal bleeding, just
8  like warfarin, which is also an anticoagulant?
9  A.   Yes, sir, that is correct.
10  Q.   They both carry those risks, warfarin and Xarelto?
11  A.   Yes, sir.
12  Q.   So for decades, would it be fair to say that warfarin was
13  used for the prevention of stroke in patients with atrial
14  fibrillation?
15  A.   That is correct, yes.
16  Q.   It was considered for many, many, many years to be the
17  gold standard, correct?
18  A.   It was, in fact, the standard.  There was literally
19  nothing else, unfortunately.
20  Q.   You spent a good deal of yesterday speaking with
21  Mr. McWilliams about warfarin and INR.  Let's just go over some
22  of the basics of that, if you don't mind.
23       What is "INR"?
24  A.   INR stands for international normalized ratio.
25  Q.   What is that?

CHRISTOPHER C. NESSEL - DEPOSITION

03:28

1  A.   The international normalized ratio is an effort to

2  normalize or standardize the laboratory test that had been used

3  for many decades for warfarin therapy called the prothrombin

4  time.

5  Q.   And so patients on warfarin are -- regularly go to the

6  doctor to have their INR measured, right?

7  A.   Yes.

8  Q.   And there are standards out there as to what -- what INR

9  values patients should be -- should be maintained at, right?

10  Guidances, guidelines?

11  A.   Yes, sir.  Depending upon the condition for which they are

12  receiving warfarin, that's right.

13  Q.   And what is it with respect to atrial fibrillation?  What

14  is the -- what is the guideline with respect for the

15  appropriate INR range target?

16  A.   Sure.  The professional society guidelines recommend a

17  range of 2.0 to 3.0 with a target of 2.5.

18  Q.   When they are over 3, 3 1/2, 4, those persons are

19  generally considered to be at a higher risk of potential

20  bleeding, generally speaking?

21  A.   Generally, as the INR climbs over 3.5, there can be an

22  increased risk of bleeding, yes, sir.

23  Q.   And then the same would be true on the opposite side:  If

24  you are too low, it may increase your risk of stroke because

25  the anticoagulant effect isn't efficacious enough?

CHRISTOPHER C. NESSEL - DEPOSITION

03:30

1   **A.**   Yes.  If the INR is less than, say, 1.8; and I would say

2   that not just stroke, but also non-CNS systemic embolism, a

3   thrombotic event in general.

4   **Q.**   And so the -- and with respect to patients on warfarin --

5   and let's just limit this for now in terms of AFib patients.

6   Warfarin is considered to have what's called a wide

7   interpatient variability?

8   **A.**   Can you describe that?  I'm not certain I have seen that.

9   **Q.**   Are you familiar with the concept of patient variability,

10  interpatient variability?

11  **A.**   And is that I-N-T-E-R or I-N-T-R-A?

12  **Q.**   Inter, I-N-T-E-R.

13  **A.**   Yes.

14  **Q.**   And while we are on the subject, are you familiar with

15  intersubject variability?

16  **A.**   Yes, sir.

17  **Q.**   Okay.  What is that?

18  **A.**   That is if you have -- if you have 10 subjects, instead

19  of, say, for a given dose, say, for aspirin, you might give

20  those 10 subjects 81 milligrams of aspirin; but for other

21  medications, say digoxin or warfarin, one patient might require

22  2 milligrams, one patient might require 7 milligrams, one

23  patient might require 7 milligrams every other day.

24  **Q.**   You would agree that it's important to identify those

25  patients whose INR is high and, therefore, at a higher risk of

CHRISTOPHER C. NESSEL - DEPOSITION

03:31  1  bleeding?

2  **A.**   Let me see if I understand the question.  I would state it

3  as it is important to regularly -- regularly monitor the INR to

4  ensure that it is within the therapeutic range.  Did that

5  answer your question?

6  **Q.**   Sure.  And that's because those patients who have an INR

7  of, let's say, 3 1/2 or 4 would be at an increased risk, and

8  you would want to learn that so that you could adjust their

9  dose and bring them back down within the target range?

10  **A.**   They may be.  And, yes, a dose adjustment may be

11  necessary, yes, sir.

12  **Q.**   So I want to talk to you about Xarelto and this concept of

13  interpatient variability.  Interpatient variability is

14  something you know and found to be the case with respect to

15  Xarelto, right?

16  **A.**   Well, I can't answer that without some qualification of

17  interpatient variability.  I mean, it would seem important that

18  there's an adjective in front of "interpatient variability" --

19  low, extreme, high, medium, something like that.  And so I

20  can't answer that question without further quantifying it.  And

21  again, I'm not a clinical pharmacologist; I'm not best suited

22  to answer these questions.

23  **Q.**   Okay.  But you have read the published -- the Patel

24  *New England Journal of Medicine* article with respect to the

25  ROCKET study?

**CHRISTOPHER C. NESSEL - DEPOSITION**

03:33

1   A.   Which paper, sir?

2   Q.   Let's use Mueck first.  Let's see if we can help you out.

3          We talked a few minutes ago about the 161 patients

4   whose plasma concentrations were measured with respect to

5   rivaroxaban levels?

6   A.   In the ROCKET AF study.

7   Q.   In ROCKET.  So assuming it's true that one of the patients

8   had a plasma level of 671 micrograms per liter.

9   A.   Yes, sir.

10  Q.   And another patient had a plasma level at a point in time

11  of .6, the person with the 671 micrograms per liter had a

12  thousand times more drug in their blood plasma than the other

13  person at .6?

14  A.   The difference is a thousandfold.

15  Q.   And assuming that those are accurate actual blood values,

16  blood plasma concentration values taken at the ROCKET trial,

17  then one patient would have had 1,000 times more Xarelto,

18  rivaroxaban, in their blood plasma than somebody else who would

19  have taken the same pill.

20         And generally speaking, the more Xarelto --

21  rivaroxaban -- that's absorbed, the greater the effect of the

22  drug and, therefore, the greater the risk of bleeding, correct?

23  A.   No, sir, I would not agree with that.

24  Q.   You disagree.

25         Would you agree, sir, that the greater the

CHRISTOPHER C. NESSEL - DEPOSITION

03:34

1    rivaroxaban exposure, the greater the potential for increased

2    risk of bleeding?  I'm just asking a general question,

3    independent of the label.  We will get to that in a second.

4    A.    No, I'm not certain I can agree with that, sir.

5    Q.    Would you agree significant increases of rivaroxaban

6    exposure may increase the risk of bleeding?

7    A.    It would depend.

8    Q.    On what?

9    A.    If the drug increased but was within a prespecified range,

10   then it may not -- there may not be a proclivity towards --

11   it's based on many different individual as well as dosage

12   characteristics, drug characteristics, and patient

13   characteristics, I guess is what I mean.

14   Q.    Is there a prespecified range in which drug concentration

15   can increase but will not in turn increase risk of bleeding

16   with respect to Xarelto?

17   A.    Not to my knowledge.

18   Q.    Okay.  So would you agree, therefore -- now that we have

19   established that the idea of a prespecified range wouldn't

20   apply to Xarelto, would you agree, therefore, that significant

21   increases in rivaroxaban exposure may increase bleeding risk?

22   A.    Again, significant is not in any way quantified, and it

23   would depend upon the nature in which the patient was receiving

24   the medication, their individual characteristics, et cetera,

25   their other concomitant medications.

**CHRISTOPHER C. NESSEL - DEPOSITION**

03:36

1  **Q.**   So would you agree that given the variability between

2  patients and the pharmacokinetics of Xarelto that the idea of

3  one dose and no monitoring is not necessarily the best use of

4  Xarelto?

5  **A.**   I disagree with that.

6  **Q.**   Sir, I am just simply asking you whether or not you recall

7  Dr. Califf expressing the view that the dose -- Xarelto dose of

8  15 to 20 was too high?

9  **A.**   That's what I was answering.  My recollection of any dose

10  discussion I had with Dr. Califf was he said the dose of 20 and

11  15 -- it's actually the same dose, but you know what I mean --

12  was both safe and efficacious.

13  **Q.**   So do you agree with the basic, fundamental principle that

14  you -- if you give somebody too much anticoagulant, they are

15  going to bleed?

16         Or if you don't, then that's fair enough.  If

17  Dr. Nessel from Janssen, who has worked on an anticoagulant for

18  about 10 years now, doesn't -- disagrees that too much

19  anticoagulant could cause somebody to bleed, then that's fine

20  too.  I'm asking you about a general principle.

21         The more you anticoagulant somebody, the greater

22  their risk of bleeding.  Isn't that true, generally speaking?

23  If you don't agree, then fine.  Then we will have you on record

24  as disagreeing with that basic principle of science.

25  **A.**   I believe I have answered -- or tried to accurately answer

CHRISTOPHER C. NESSEL - DEPOSITION

03:37

1  the question precisely.  There are many things to consider for

2  an individual patient.

3  **Q.**   So is it true, generally speaking, that the more you

4  anticoagulate a patient, the greater their risk of bleeding?

5  **A.**   There are many things to consider for a given patient

6  relative to how much anticoagulant they need.

7  **Q.**   I appreciate there are many things to consider, but

8  generally speaking, the more anticoagulant, the greater the

9  risk of bleeding, generally speaking, yes or no?  But if you

10  can't answer it, that's fine.

11  **A.**   I believe I have answered it.  I don't have a different

12  answer for you, sir.

13  **Q.**   You will see this is an email chain.  The top part of that

14  chain reflects that you were a recipient and, therefore, we can

15  assume you received the email chain below, right?

16  **A.**   Yes, sir.

17  **Q.**   You're actually on all of them.

18  **A.**   I believe.  Yep.

19  **Q.**   So do you see where it says from Peter DiBattiste -- the

20  middle section from Peter DiBattiste to Gary Peters?

21  **A.**   Dated Monday, December 19, 2011, at 11:24.

22  **Q.**   Exactly.

23  **A.**   Okay.

24  **Q.**   You are a recipient of this email.  Do you see that?

25  **A.**   Yes.

CHRISTOPHER C. NESSEL - DEPOSITION

03:38

1  **Q.**   And Dr. DiBattiste writes:  "Rob" -- I presume that is a
2  reference to Dr. Califf?
3  **A.**   Well, since the email below is from Mr. Califf, yes, sir,
4  I would agree with that.
5  **Q.**   "Rob persists in his interest in exploring other doses."
6         Do you see where I'm reading from?
7  **A.**   Yes, sir.
8  **Q.**   Do you recall that Dr. Califf, presently nominated to be
9  the head of the FDA, had insisted that the company explore
10  other doses?
11         (Video paused.)
12         **THE COURT:**  There's a reference to Dr. Califf as
13  being the commissioner of the FDA at the time; that is to say,
14  February 16, 2016, he was, but he is no longer the commissioner
15  with the FDA.  Also, if and when Dr. Califf appears, he is not
16  speaking for the FDA.
17         (Video resumed.)
18  **Q.**   Do you see where I'm reading from?
19  **A.**   Yes, sir.
20  **Q.**   Do you recall that Dr. Califf, presently nominated to be
21  the head of the FDA, had insisted that the company explore
22  other doses?
23  **A.**   With the emails that I read, I guess I would disagree with
24  your characterization of "insisted."  As I -- I wasn't included
25  on the emails, but as I have read the emails, it appears to be

**CHRISTOPHER C. NESSEL - DEPOSITION**

03:40
1    a scientific discussion between Dr. DiBattiste and Califf.

2    **Q.**   Do you recall that Rob Califf persisted in an interest in

3    exploring other doses with respect to Xarelto?

4    **A.**   And as I -- the email that Dr. DiBattiste wrote states:

5    "Rob persists in his interest."  But my -- again, I wasn't

6    involved in the discussions, with these particular discussions

7    with Rob, so as I read these emails, it appears that two

8    scientists were talking about a potential clinical study.

9    **Q.**   Looking at other doses?

10   **A.**   Yes, sir.

11   **Q.**   Let's move on to . . .

12           This is an email chain that ends with your email of

13   January 3, 2012.  That's at the top of the first page.

14           Do you see that, between you and Gary Peters?

15   **A.**   Yes, sir.  If I could just have one minute?

16   **Q.**   Sure.  Take your time.

17   **A.**   Okay.

18   **Q.**   So is it true that you designed the ROCKET II trial?

19   **A.**   That's what it says in this email, yes.

20   **Q.**   That's what you wrote in that email, right?

21   **A.**   Yes, sir.

22   **Q.**   Okay.  Because before I asked you if you had ever heard of

23   ROCKET II, and I appreciate it was some years ago and you had

24   some hesitancy about that, but now we are clear that you do

25   know what ROCKET II is?

**CHRISTOPHER C. NESSEL - DEPOSITION**

03:42

1   A.   Again, this is going back to -- this is January of 2012,

2   so more than four years ago, and I can get the gist of it from

3   the paragraph at the top of the email, sir.

4   Q.   So you designed the ROCKET II -- this goes on to say:  "I

5   designed the ROCKET II trial for the comparison with apixaban,

6   but fully support the concept of a dose-finding study in

7   advance."

8            Did I read that correctly?

9   A.   Yes, sir.

10  Q.   What you are talking about is looking at other doses of

11  Xarelto and going head-to-head with those Xarelto doses and

12  finding the optimal dose, and then doing a head-to-head with

13  apixaban, right?

14  A.   That is what the sentence means, sir.

15  Q.   So, first of all -- then you go on to say:  "I agree that

16  the bleeding should be lower compared to the 20/15 regimen."

17           Did I read that correctly?

18           "But therein lies the challenge" -- to finish the

19  sentence.

20           Did I read that correctly?

21  A.   You did, sir.

22  Q.   So you would agree that the lower the dose, the lower the

23  bleeding risk, right?

24  A.   Well, sir, I was -- in this email we're -- I'm

25  speculating.

CHRISTOPHER C. NESSEL - DEPOSITION

03:43

1  **Q.**   Okay.

2  **A.**   I agree that the bleeding should be lower, meaning -- what

3  I meant by that, it had never been tested.  We had no data upon

4  which to rely.

5  **Q.**   Okay.  Lowering of the bleeding risk would be a good

6  thing, right?

7  **A.**   Yes.

8  **Q.**   Have you ever had a patient bleed to death?

9  **A.**   Yes, sir, I have seen a patient bleed to death.

10  **Q.**   It's very -- it's very ugly, isn't it?

11  **A.**   It is a very unfortunate event, yes, sir.

12  **Q.**   So lowering the bleeding risk would be a good thing,

13  right?

14  **A.**   Well, sir, lowering -- one could theoretically lower the

15  bleeding risk to zero by administering placebo, but that's only

16  half of the story, right?  So the bleeding risk has been

17  lowered, but now the stroke risk is extraordinary.

18  **Q.**   Let's look -- there's two parts of that equation.  You

19  have bleeding risk and you have stroke risk, right?

20  **A.**   Yes, sir.

21  **Q.**   Let's look at the idea of lowering bleeding risk, though,

22  is a good thing, right?

23  **A.**   Okay.  As I said, that's only half of the story.

24  **Q.**   The other half is if you lowered the bleed risk, what does

25  that do to the stroke risk, right?

CHRISTOPHER C. NESSEL - DEPOSITION

03:44  1  A.   Right.   There is a balance, that's right.

2  Q.   And it would be good to find a better balance, where you

3  could lower the risk of bleeding but maintain the efficacy and

4  maintain the status quo, so to speak, of the stroke risk,

5  right?   That would be a good thing?

6  A.   We have that.

7  Q.   Sir, I'm just saying:   If you could lower the bleeding

8  risk, maintain the stroke risk, that would be a good thing?

9  A.   If that is achievable.

10  Q.   If it's achievable.   One of the ideas behind this study

11  that you folks were contemplating, ROCKET II, was to test that

12  hypothesis, whether you can -- that's what you mean by "therein

13  lies the challenge," right?   The lower dose, you agree, would

14  lower the bleeding risk, right, but you don't know if it would

15  have an effect on the stroke?

16  A.   That is what I meant by that sentence, yes.

17  Q.   Okay.   But you have never tested it.   You never went

18  forward with this -- with this study, right?

19  A.   We didn't.

20  Q.   So this is Nessel 73.

21      Before we do that, by the way, so ROCKET II was never

22  done; is that correct?

23  A.   Yes, sir, that's correct.

24  Q.   Was there a formal decision made at some point to not do

25  ROCKET II, or is it still something that's being contemplated

CHRISTOPHER C. NESSEL - DEPOSITION

03:45   1   today?

2   A.   I no longer have a perspective about what is being

3   contemplated.  I guess that term is generally called lifecycle

4   management.  And so Dr. Anne Vosatka, as the compound

5   development team leader, could -- could offer you an opinion

6   about that.

7   Q.   Okay.  But as far as you are aware, there is no current

8   plans to go forward with ROCKET II, as far as you know?

9   A.   That is correct.

10   Q.   Okay.  You would agree that it would be inappropriate for

11   sales and marketing to dictate whether or not ROCKET II was

12   done or not.  That would be inappropriate?

13   A.   I would say that it is indeed appropriate for sales and

14   marketing to offer an opinion or a perspective; but as I have

15   stated, sales and marketing do not dictate the science that's

16   performed at Janssen.

17   Q.   Because that would be inappropriate, right?

18   A.   It is not done.

19   Q.   Because that's inappropriate?

20   A.   I believe it to be inappropriate, yes.

21   Q.   Good afternoon, Dr. Nessel.

22   A.   Good afternoon, ma'am.

23   Q.   Would you please tell the ladies and gentlemen of the jury

24   where you were born and raised?

25   A.   Sure.  I was born and raised in Philadelphia.  If you are

CHRISTOPHER C. NESSEL - DEPOSITION

03:46

1   familiar with the city, you may know of a section of the city
2   called the Northeast.  That's kind of a colloquial designation.
3   I went to a primary school and high school, in fact, college
4   and medical school, all in Philadelphia.
5   **Q.**   Now, we all know that you are a doctor.  Were your parents
6   doctors as well?
7   **A.**   No.  Neither of my -- my folks didn't go to college,
8   actually.  I'm one of six children, so my mother had, I think,
9   the challenging task of raising six children, and my father
10   worked.  My mother worked every day.
11   **Q.**   All right.  Are you married, sir?
12   **A.**   I am.
13   **Q.**   And you are married to Ms. Schwabe?
14   **A.**   I am.  So my -- I have a beautiful wife, Kimberly Nessel,
15   and we are blessed with four -- four terrific children -- three
16   girls -- oh, my gosh -- three boys and a girl.
17   **Q.**   I understand three of the boys are 16-year-olds?
18   **A.**   Yes.  So we have simultaneous three teenagers now all
19   preparing to drive, teenage boys.
20   **Q.**   Did you serve in the military?
21   **A.**   I did, yes.  I had the singular privilege -- and I mean
22   that with sincerity -- of wearing the uniform of an officer in
23   the United States Navy.
24   **Q.**   Please respond.  How often -- how often did you serve?
25   **A.**   The commitment was one weekend a month and two weeks a

CHRISTOPHER C. NESSEL - DEPOSITION

03:48

1    year.  And that commitment lasted -- my original term was for

2    four years, and I ended up serving for, as I recall, just about

3    a decade.

4    **Q.**   Why was it important to be a part of the ROCKET study?

5    **A.**   Well, ROCKET was -- it's been described in many ways:

6    pivotal, landmark, groundbreaking.  Seldom, I think, in a

7    career -- probably maybe once in a career -- does someone get a

8    chance to work on a trial of almost 15,000 patients.

9             We -- over the course of these days we said those

10   words, 14,000 patients, thousands of patients over and over

11   again, but I think it's important to contemplate that each one

12   of those was an individual patient, someone's mom or someone's

13   dad who made the commitment, who very generously agreed to

14   participate in a clinical study, 14,000 times over.  And so the

15   opportunity to work on such a large trial for such a novel

16   compound, and the sugar on the top of it all was the committees

17   I was able to interact with.

18            So earlier today and yesterday you heard me talk

19   about the ROCKET AF executive committee.  It was my opinion in

20   2006, and it remains my opinion today, these are giants in the

21   medical community.  There are cardiologists, neurologists,

22   hematologists that are expert not only in medicine but also in

23   clinical trial conduct, and it was and remains a privilege to

24   be associated with them.

25   **Q.**   What does it mean to be an expert in "clinical trial

CHRISTOPHER C. NESSEL - DEPOSITION

03:49

1    conduct"?

2    A.    So clinical trials, as you can imagine, broadly come with

3    their own set of challenges.  It would be difficult to say or

4    be -- I think perhaps less than accurate to say we can go to

5    45 countries and enroll patients at over a thousand sites and

6    it's easy.  It's not easy.  There are many things to encounter.

7            The gentlemen that served on the ROCKET AF executive

8    committee had devoted their careers not only to the practice of

9    medicine, whether it was cardiology or neurology, but also to

10   the practice of clinical trials.  Some of them, in particular

11   Dr. Robert Califf, had a long and very successful career in

12   leading other landmark clinical trials.  And again, as with the

13   other gentlemen on the committee, it was a privilege to be

14   associated with.

15   Q.    We have heard you talk about randomized, prospective,

16   multi-centered, double-blinded study.  Explain that for the

17   ladies and gentlemen of the jury, please.  What is a

18   prospective, randomized, multi-centered study?

19   A.    So there are -- when a clinical trial is described,

20   usually those adjectives are used.  So "randomized" means that

21   patients may be assigned to one group or other; so in the case

22   of ROCKET, rivaroxaban or warfarin.  And it is completely done

23   at random.  It's performed by a computer.  And no one at the

24   sponsor, no one at the FDA knows for a particular patient

25   whether they will go to one group or another.

CHRISTOPHER C. NESSEL - DEPOSITION

03:51

1          "Prospective" means that we're going to do this in

2     the future; we're going to enroll patients in the future; we're

3     not going to look at their performance in the past.

4          And probably the most challenging but perhaps the

5     most important aspect is what is called "double-blind."  What

6     is "double-blind"?  Well, "double-blind" means that neither the

7     patient nor the physician knows what the patient is taking,

8     meaning in this instance knows whether the patient is taking

9     rivaroxaban or warfarin therapy.  And that is important because

10    if someone had knowledge, say someone was participating in the

11    clinical trial and both the patient and the physician knew

12    which medication they were taking, they might, whether

13    conscientiously or unconsciously, report things -- you know,

14    certain adverse events or outcome events in a different way to

15    minimize -- and that selective reporting is something we call

16    bias.  It's not always intentional.  I'm not suggesting it's

17    associated with malice, but sometimes it happens.

18         So to minimize the occurrence of bias, we -- we

19    blinded both the physician and the patient, but more than that.

20    The entire study team at Janssen, the ROCKET AF executive

21    committee were all blind to the treatment assignment.

22         Now, you may ask, well, if these patients are blinded

23    to treatment assignment, how is it that -- how is it that their

24    safety is ensured or is optimized?  Well, there was a

25    committee -- I have spoken frequently about the ROCKET AF

CHRISTOPHER C. NESSEL - DEPOSITION

03:53

1   executive committee.  There was another committee called the

2   independent data monitoring committee, sometimes call the DSMB,

3   again, a committee of not only clinical trial experts, but

4   composed of a statistician, internist, cardiologist, and

5   neurologist.

6   **Q.**   Were these people hired -- were these people employees of

7   Janssen or Bayer?

8   **A.**   No, they were not.  These physicians were employees of

9   universities from around the world, and they looked at the data

10  unblinded.  What I mean by that is they can look at any

11  particular patient, any particular event and know if that

12  patient was taking rivaroxaban or warfarin.  They can look

13  across thousands of patients or at one individual patient

14  completely at their discretion.

15       And that mechanism is a safety mechanism.  It ensures

16  that while the executive committee and the sponsor are blinded,

17  as well as the patient and the treating physician, there is a

18  committee that's watching out for patient safety.

19  **Q.**   Did the FDA -- the Food and Drug Administration --

20  actually request a specific type of study from Janssen and

21  Bayer?

22  **A.**   Yes.  It was our understanding going into the discussions

23  with FDA and at the discussions with FDA that a prospective

24  randomized study was necessary, and we didn't find that

25  unusual.  We had expected that.  But it was also stated to us a

CHRISTOPHER C. NESSEL - DEPOSITION

03:54

1  double-blind study was necessary.  This is -- that brings the

2  trial to a level of rigor such that the clinical community and

3  the FDA could be certain of the integrity of the data by virtue

4  of that blind.

5  **Q.**    Thank you.

6          Over the last few days you have used the term

7  "noninferiority."  Would you explain what that means in the

8  term of what is the significance of an FDA finding of

9  noninferiority with respect for a particular medication?

10 **A.**    Sure.

11 **Q.**    And, for example, rivaroxaban.

12 **A.**    Certainly.  In some cases perhaps the members have heard

13 of placebo-controlled trials.  So ROCKET was not a

14 placebo-controlled trial but, say, for example --

15 **Q.**    With a sugar pill?

16 **A.**    With a sugar pill.  You are going to test your medicine

17 against a sugar pill.  Well, if the medicine has almost any

18 effect, it will certainly be better than a placebo, a sugar

19 pill.

20         For patients with atrial fibrillation, there was --

21 and I spoke about this earlier today -- there was a standard

22 and there remains a standard; it's an anticoagulant.  And in

23 2006 the standard treatment for patients with atrial

24 fibrillation was warfarin.  We could not and would not test

25 rivaroxaban against placebo or a sugar pill, because there was

CHRISTOPHER C. NESSEL - DEPOSITION

03:55

1    a standard.  It was warfarin therapy.  And on top of that,

2    warfarin therapy was very effective.  It reduced the risk of

3    stroke in some earlier studies by almost 70 percent.  By almost

4    70 percent.  As such, the FDA understood and the clinical

5    community understood and we the sponsors understood that

6    warfarin was very effective.

7         Because warfarin was so effective, a new medicine

8    coming along like rivaroxaban, for example, could be equivalent

9    to -- approximately equivalent to, the same as, warfarin

10   therapy and still be approved by the U.S. Food and Drug

11   Administration.

12        So the term "noninferiority" is a technical term used

13   in regulatory language; but what it means is there is a

14   standard warfarin that is very, very effective, almost

15   70 percent relative risk reduction, and we are going to test

16   another medicine against it.  And because warfarin is so

17   effective, if this medicine is as good as warfarin therapy, it

18   can be approved.

19   Q.   You explained for us who was involved in the ROCKET study.

20   You talked about the sponsors.  It was Janssen and Bayer,

21   correct?

22   A.   Yes.

23   Q.   And so you had internal experts from each of the two

24   sponsors?

25   A.   Yes.  There was a -- in both companies there were

**CHRISTOPHER C. NESSEL - DEPOSITION**

03:57

1   physicians, statisticians, clinical personnel, regulatory

2   personnel, operations personnel, all who collaborated during

3   the conduct of the study.

4   **Q.**   You had an opportunity to work with a clinical research

5   institute.  What is a "clinical research institute"?

6   **A.**   We did.  Actually, we had the opportunity to work with

7   both a clinical research institute and an academic research

8   organization, or a clinical research organization and a

9   academic research organization.  Let me explain the latter

10   first.

11        The academic research organization for ROCKET AF was

12   the Duke Clinical Research Institute.  Some may have heard of

13   this institute.  It is based out of -- alongside of Duke

14   University in Raleigh-Durham, North Carolina.  It is one of the

15   most highly respected academic research organizations in the

16   world.  We call it the DCRI.  The DCRI has conducted likely

17   hundreds of clinical trials.

18        And because of their track record -- I will use the

19   term -- it was the decision of the sponsor, along with the

20   executive committee, to engage the Duke Clinical Research

21   Institute to assist us in the preparation and conduct of the

22   study.

23        We also worked with a contract research organization.

24   That organization was called PAREXEL.  That organization had

25   offices around the world and assisted us in terms of monitoring

CHRISTOPHER C. NESSEL - DEPOSITION

the sites, meaning that a person would go out to the site and review the data that was collected.  They were able to answer questions for us around the world.  And they, along with the study team, the Duke Clinical Research Institute, and the ROCKET-AF executive committee, all combined and collaborated to conduct this study.

Q.   You described for us kind of the teamwork of entities involved in the study.  How did you, the sponsors, and the Duke Clinical Research Institute go about ensuring that the study was properly conducted?

A.   So probably the first step in all of that was collecting a study team and organizations that had years and years of experience in conducting large clinical trials.

I have spoken about the track record of the Duke Clinical Research Institute, the ROCKET AF executive committee, et cetera, at an individual site or patient level.  So throughout the study, patients return to the clinic to be seen by their treating physician.  There were literally hundreds of thousands of such single-patient visits conducted during the study.  And each time the treating physician would carefully record what the patient told them, whether they would say, "Did you have any particular adverse events?"  And the patient might say, "Well, I had a headache and I started on a new vitamin tablet."  And all of that information was recorded.

The Duke Clinical Research Institute, along with

CHRISTOPHER C. NESSEL - DEPOSITION

04:00

1    PAREXEL International, would send a representative to every
2    site every few months, and those representatives would compare
3    what was reported to the study team with what was found in the
4    medical record.  That process is called source data
5    verification, and it is, as you can imagine, a very time- and
6    labor-intensive process where page-by-page different data
7    variables are compared.  And so I can say for every single
8    patient, there were whole or parts of their medical record that
9    were reviewed as part of their participation in the study.
10   Q.   How many sites were involved in this study?
11   A.   Over 1,100 sites were involved.
12   Q.   So would that have necessitated the involvement of over
13   1,000 institutional review boards, IRBs?
14   A.   Very nearly so.  The reason I qualify that is every --
15   without question, every site needs to have an institutional
16   review board review and approve the protocol.  Every physician
17   who chooses to -- if they choose to participate in the study,
18   must review and approve the protocol.
19        There are some sites that used a regional
20   institutional review board, so that's why the numbers may not
21   add up to over 1100.  However, without a doubt I can tell you
22   at every site in which the ROCKET-AF study was conducted, an
23   independent body called an institutional review board reviewed
24   the protocol and agreed to its performance at that site.
25   Q.   Were there committees that monitored safety events?

CHRISTOPHER C. NESSEL - DEPOSITION

04:02

1  **A.**    There were.  I spoke earlier about the independent data

2  monitoring committee.  At any time that committee could look at

3  any event -- and did -- look at data listings, the occurrences

4  of bleeding events, safety events, et cetera.

5          There was another committee housed at the Duke

6  Clinical Research Institute called the CEC or clinical events

7  committee.  In the study ROCKET-AF, you may recall that we

8  collected both efficacy events in terms of strokes or non-CNS

9  systemic embolus and bleeding events.  I believe I testified

10  earlier that the principal safety endpoint was a composite of

11  major and nonmajor clinically relevant bleeding.

12          The clinical events committee at the Duke Clinical

13  Research Institute was comprised of cardiologists and

14  neurologists specially trained in the protocol but, again,

15  blinded to treatment assignment, and they reviewed thousands of

16  events and categorized them according to the protocol-specified

17  definitions.  Every efficacy and bleeding event reported in the

18  study was reviewed by two independent members of the clinical

19  events committee at the Duke Clinical Research Institute.

20  **Q.**    You mentioned bleeding event.  Did you and the other

21  sponsors in the DCRI anticipate bleeding events in the study?

22  **A.**    Yes, we did.

23  **Q.**    Why is that?

24  **A.**    The reason I say that is in order to participate in the

25  ROCKET-AF study, 100 percent of the patients would be receiving

CHRISTOPHER C. NESSEL - DEPOSITION

04:03

1    an anticoagulant.  And what I mean by that is I spoke earlier

2    about randomization.  The patient might be assigned by a --

3    would be assigned by a computer randomly to receive warfarin or

4    rivaroxaban.  Those were the only two choices.  So 100 percent

5    of the patients were receiving an anticoagulant.

6             Probably the best-studied side effect of

7    anticoagulants broadly are bleeding events.  Knowing that going

8    into the study, the clinical events committee and the

9    independent data monitoring committee were specifically charged

10   to surveil the data or look closely at the data for these

11   particular events.

12   Q.   Did you look to any professional societies for guidelines

13   in establishing what type of bleeding events to look for?

14   A.   We did.  And what I mean by that is before the protocol --

15   before the very first patient was randomized, we wanted to make

16   sure that we were reporting events in a manner that was useful.

17   What I mean by that is we wanted to use a classification system

18   that had been used before so that clinicians, the U.S. FDA, and

19   others could compare the bleeding events that might be reported

20   in ROCKET to other data sources.

21            And so for the principal safety endpoint which I have

22   just described, we used the classification system of the

23   International Society of Thrombosis and Haemostasis.  That

24   society set forth this classification system that bleeding

25   events should meet, for example, a specific severity.  They

CHRISTOPHER C. NESSEL - DEPOSITION

04:05

1   might be associated with elements 1, 2, 3, 4, et cetera.  And

2   the clinical events committee was given these guidelines and

3   this classification system, and as such, any event that came

4   through, they would be able to apply the appropriate criteria.

5   **Q.**   Thank you.

6        You have described for us the types of monitoring

7   that you and the DCRI -- you, the sponsor, and the DCRI

8   employed to ensure that the study was properly conducted.  Were

9   there things -- any joint or cross-study committees that were

10   also used to assist in determining if the study was being

11   conducted properly?

12   **A.**   Yes, ma'am.  So at this time -- so I'm thinking of the

13   time interval of, say, 2006 to roughly 2010 -- there were

14   multiple studies of rivaroxaban that were ongoing.  ROCKET AF

15   was one of them.  Because multiple studies were ongoing, the

16   sponsors approached each of the independent data monitoring

17   committees and asked them to form what ultimately became known

18   as the cross-study DSMB or cross-study data safety monitoring

19   board.

20        The rivaroxaban cross-study DSMB was comprised of an

21   individual from each of the trials that were ongoing.  These

22   physicians had a very unique perspective, and what I mean by

23   that is there were only a few individuals in the world who had

24   access to unblinded data about any of the individual trials.

25   These physicians, in the aggregate, had access to unblinded

CHRISTOPHER C. NESSEL - DEPOSITION

04:07   1   data about all of the ongoing studies.

2         The sponsors felt that was particularly important

3   because in one study there might be a finding and the

4   independent data monitoring committee might think we are not

5   quite sure what to make of that.  Here we gave or we offered to

6   them a venue, another mechanism to share with their colleagues

7   who also had access to unblinded information, the information

8   from across all of the studies.  They had perspective -- a

9   perspective about thousands and thousands of patients who were

10  receiving rivaroxaban during that time.

11  **Q.**   How does that differ from the Global Pharmacovigilance

12  monitoring board, or does that differ?

13  **A.**   It does.  The cross-study data safety monitoring board had

14  the specific charge, as the individual study data safety

15  monitoring boards did, to observe the data and ensure the

16  safety of the patients for the individual studies.  Their

17  tenure, if you will, was for the conduct of those studies.

18  However, during the conduct of those studies and even up until

19  today, there is a team both at Bayer and at Janssen that

20  perform activities called -- broadly called

21  "pharmacovigilance," the term meaning to look carefully at a

22  drug, pharmacovigilance.

23        And that group, separately and together, collect

24  information that is reported to either Bayer or Johnson &

25  Johnson -- Janssen, rather.  They collect information about

**CHRISTOPHER C. NESSEL - DEPOSITION**

04:08

1   rivaroxaban here today and they analyze it and consider it

2   relative to all the information we know about rivaroxaban.

3            So while the data safety monitoring boards were

4   active during the conduct of the trials, the pharmacovigilance

5   activities started in 2005 and continue even through today.

6   **Q.**   What measures were put in place by the sponsors and the

7   DCRI to ensure compliance with the study protocol?  Were there

8   steps put in place to help the investigators who might

9   encounter particular problems throughout the course of the

10  study?

11  **A.**   Yes.  So once the investigator signed the investigator

12  page in the clinical study protocol, in that they -- and once

13  the institutional review board agreed to participate, we began

14  our educational efforts.  And so all of the site personnel who

15  were to participate in ROCKET-AF were trained, almost all of

16  them, at what we call investigator meetings.

17           So in Boston, for example, we brought together

18  several hundred investigators, study coordinators, et cetera,

19  and for two days taught them about rivaroxaban, the nature of

20  atrial fibrillation, the use of warfarin, how the study should

21  be conducted, the kind of information that we were going to

22  collect.  There was an entire section devoted to the HemoSense

23  INR device to ensure that the sites use that -- use that device

24  properly.

25           As a matter of fact, we called them breakout

**CHRISTOPHER C. NESSEL - DEPOSITION**

1    sessions.  There was an afternoon where sites could visit

2    various -- various rooms to learn more.  There were

3    representatives from HemoSense who had INR devices so that the

4    sites could try them out and use them and be educated on their

5    proper use.

6          While that -- the investigator meeting that I just

7    described -- formed the foundation, educational activities

8    continued throughout the study.  There were ROCKET newsletters.

9    There was a study portal called DigiScript.  A study portal is

10   a place -- you can think of it as a document repository.  So if

11   a study site said, "Do you have a copy of the study protocol,"

12   it's on the study portal.  All of the relevant study documents

13   were in the study portal and every site had access to it.

14         So along with that, members of the executive

15   committee, Dr. Manesh Patel in particular, would -- would

16   conduct -- and it sounds a little corny -- but what we would

17   call fireside chats.  And Dr. Patel would -- it was

18   reminiscent -- I believe the term came from what President

19   Roosevelt did, perhaps, during the Depression and the second

20   World War.

21         Dr. Patel, by region, would get on the phone with

22   investigators and study coordinates who wanted to call in, he

23   would give them an update on the study -- today there are

24   800 patients enrolled or something like that -- and then answer

25   their questions.  And it was very free-form.

CHRISTOPHER C. NESSEL - DEPOSITION

04:11

1          And the sites, in a phrase, loved this.  And what I
2    mean by that is they had an opportunity to hear about the
3    ongoing study, had their questions answered and had them
4    answered by either a member of the steering committee or
5    someone who was intimately involved in the study from the Duke
6    Clinical Research Institute.  It was just a terrific endeavor
7    on Dr. Patel's part.
8    Q.   Was there an opportunity for investigators to contact a
9    member of the executive committee and have a one-on-one phone
10   conversation about a particular concern or issue?
11   A.   Well, one mechanism that we did set up was called the DCRI
12   hotline.  So while it would have been possible for an
13   investigator with a -- after email contact to -- we would have
14   set up an appointment with an executive committee member, the
15   DCRI hotline allowed any physician or study coordinator in
16   these 45 countries to pick up the phone 24 hours a day, seven
17   days a week, and speak with a physician, usually a cardiologist
18   at Duke University, about the conduct of the study.
19          They might be asked, "I have a particular patient,
20   I'm not sure if they are appropriate for the study"; or, "My
21   patient came in and they are on this medication; is that okay?"
22   The hotline was set up early on.  It was used throughout the
23   study.  And I believe it gave assurance to the enrolling sites
24   that 24 hours a day, seven days a week, if they went to the
25   DigiScript portal and they had a question, they couldn't find

CHRISTOPHER C. NESSEL - DEPOSITION

04:13

1   an answer, they could pick up the phone and have the question

2   answered.

3        In addition to the DCRI hotline, there were hotlines

4   to medical monitors around the world from PAREXEL who could, in

5   the local language, speak to the study site about their

6   question.  The sponsor also was imminently available to answer

7   questions from the sites.

8   Q.   Did anyone throughout the pendency of the ROCKET-AF study

9   have access to any of the unblinded data?

10  A.   No.

11  Q.   Did you have anyone in place to monitor -- an unblinded

12  monitor that may have had access at any time?

13  A.   I thought you were asking about the unblinded results of

14  the study.  So let me be clear.  During the conduct of the

15  study, no one at the sponsor or the executive committee knew

16  the results of the study.  That's very, very important because

17  they are what I'm referring to as the integrity of the study

18  blind.

19        However, because patients' tests were being

20  performed -- point-of-care INR tests were performed, we had an

21  unblinded monitor in place.  What the unblinded monitor would

22  do, would look at readouts of INR results for patients in both

23  treatment groups.  That unblinded monitor was available to ask

24  questions or advise sites about the patients that they were

25  treating.  Now, importantly, when the unblinded monitor spoke

CHRISTOPHER C. NESSEL - DEPOSITION

04:14

1    to the sites, they would never reveal the treatment assignment
2    of the patient.  But, say, for example, if a study site had an
3    error rating on their INR device, they could call the unblinded
4    monitor and say, This is the problem I'm having.
5             He might say, Well, you need to change the batteries
6    or check the QC code on the device, or something like that.
7             So this unblinded monitor, while he didn't
8    participate in the conduct of the study, meaning he never
9    enrolled patients or something like that, he was available to
10   the study sites to answer their questions about the INR
11   particularly.
12   Q.   You mentioned the HemoSense device.  Can you tell us how
13   that HemoSense device was selected?  You touched a little bit
14   on that yesterday, but if you could tell us about the
15   individuals or describe for us who was involved in the
16   selection of the HemoSense device.
17   A.   Sure.  So the selection of the device, I would
18   characterize it as a collaborative effort between the sponsor
19   and the executive committee, as well as a consultant to the
20   sponsor, a Dr. Jay Horrow.  Dr. Horrow and Dr. Jonathan
21   Halperin, who served on the ROCKET-AF executive committee, had
22   recently completed a study call SPORTIF V that was nearly
23   identical to what we were thinking of for ROCKET-AF.  It used a
24   different drug.  It didn't use rivaroxaban, but otherwise it
25   was identical to ROCKET.

CHRISTOPHER C. NESSEL - DEPOSITION

04:16

1          So in collaboration with Dr. Horrow and the executive

2     committee, we considered actually several devices, three in

3     total:  the HemoSense device, called INRatio; and two other

4     devices, one called ProTime and one called the HemoChron.  They

5     were from a different manufacturer.

6          We believed, I think, that all three devices could

7     get the job done, I will say; but for the two devices, the

8     ProTime and the HemoChron, there was a challenge associated

9     with them.  What I mean by that is the testing strip they

10    used -- the company called it a cuvette -- needed to be

11    refrigerated -- needed to be refrigerated constantly between

12    2 and 8 degrees centigrade.  That meant that from the time that

13    cassette left the factory until the time it was used to treat a

14    patient, it had to be kept refrigerated at a very specific

15    range:  2 to 8 degrees centigrade.

16  Q.   You are talking about all over the world these have to

17    remain refrigerated?

18  A.   All over the world and until the time it is about to be

19    used.  I'm very specific about that because if the cassette --

20    say a patient was going to show up at 3:00 in the afternoon and

21    the cassette was taken out at 6:00 in the morning -- they left

22    it on the desktop -- that cassette would then expire.

23         So the executive committee and the sponsor together

24    and, I think, separately worried that if that refrigeration --

25    we called it cold chain.  If that cold chain was broken and the

CHRISTOPHER C. NESSEL - DEPOSITION

04:17

1  cassettes were left out in the sun, they were left on a loading

2  dock, they were left in the back of a truck, and they expired,

3  two things would happen:  One, we would never know about it;

4  and two, the results that were returned would very likely be

5  invalid.

6           So the HemoSense device was unique in that the test

7  strips could be stored at room temperature, no need for

8  refrigeration.  And in my mind that was one of the key deciding

9  factors in choosing the HemoSense device.

10 Q.   Were there any concerns about the necessity or the

11 potential need to unblind the HemoChron or the ProTime device

12 if it was selected?

13 A.   So the -- when this device -- when any device would have

14 been used in the ROCKET-AF study we were contemplating, the

15 actual INR would not be returned, the actual value.  Because if

16 the actual value was returned, the patient and the physician

17 might know which drug they are taking.

18           Instead, a seven-digit code was returned.  For

19 patients taking rivaroxaban, that code would return a value

20 that was likely to mimic what they would be taking if they were

21 taking warfarin therapy.  So when the physician received that

22 code, they would call in to the IVRS -- interactive voice

23 response system -- and it would be decoded for them.

24           If the patient was randomly assigned to receive

25 warfarin therapy, the value returned would be the true INR.  If

CHRISTOPHER C. NESSEL - DEPOSITION

04:19

1   the patient was assigned to receive rivaroxaban therapy, the

2   value returned would be something like it would be if they were

3   on warfarin.  So, say, an INR of 2.2 or 2.5, something we

4   called clinically reasonable, that would be the term:

5   clinically reasonable.

6   **Q.**   I believe you testified yesterday that you recall having

7   specific discussions with Dr. Becker, Dr. Halperin, and

8   Dr. Horrow about the selection of an appropriate device for the

9   ROCKET-AF study?

10  **A.**   That's correct.

11  **Q.**   During the pendency of the study, how were any potential

12  concerns about the Alere device handled?

13  **A.**   So it would really depend on the nature of the concern.

14  **Q.**   What do you mean by that, "the nature of the concern"?

15  There are different types of concerns you might have with a

16  device?

17  **A.**   Certainly.  Sometimes sites would call us and say, I'm

18  getting an error message.

19          So the screen would read E-R-R, ERR.  The user manual

20  would have plausible reasons why an error message might come

21  up.  Some of those reasons included if the batteries were worn

22  out or if the device was not plugged in conversely.

23          If the code on the test strip was not entered into

24  the machine, if there was inadequate blood -- so a tiny, little

25  drop of blood was needed to be put on the cassette.  If the

CHRISTOPHER C. NESSEL - DEPOSITION

04:21

1    machine didn't detect enough blood, they would get an error

2    message.

3              So the sponsor sometimes received calls, and they

4    said, This is Dr. Smith from Chicago, Illinois.  I have

5    received an error message.  Can you help me get to the bottom

6    of why I'm receiving this.

7              So certainly we would address those particular

8    concerns.

9              If a physician had a concern about the device and the

10   value that was returned, the sponsor put into place a mechanism

11   whereby those values could be checked.  I think I testified --

12   I can't remember if it was today or perhaps yesterday -- about

13   the Covance recheck.  That was a system whereby at the same

14   time the blood test was performed on the point-of-care device,

15   a tube of blood would be sent to Covance, which is a central

16   laboratory we use, and both measures could be determined

17   simultaneously.

18             The unblinded monitor, ma'am, that you and I

19   discussed just a few moments ago, would then get those results

20   and report them to the study site.  The unblinded monitor could

21   also answer questions about error messages or why a particular

22   result might be obtained, et cetera.

23   Q.   Did you ever offer retraining for the investigators if

24   they had any concerns about the device?

25   A.   I would answer that question with two yeses.  What I mean

CHRISTOPHER C. NESSEL - DEPOSITION

04:22

1   by that is retraining happened regularly, with or without

2   cause.  So at the fireside chats, at the investigator meetings,

3   on the DigiScript portal, through the ROCKET AF newsletters,

4   and through direct communication letters from the sponsor,

5   there was ongoing education about the INR monitor and about

6   other aspects of study conduct as well.

7            There were occasions, however, that it was brought to

8   the sponsors' attention that there were some concerns or issues

9   at particular sites.  We would dispatch and monitor, and

10  sometimes even a representative from clinical quality

11  assurance, who would very rigorously go through the data that

12  was collected at the site and question the investigator and

13  question the study coordinator to determine if, in fact, they

14  were conducting the study properly.  That was an added measure,

15  if you will, so that the sponsor could assure themselves, the

16  clinical community, and, in fact, the patients that patient

17  safety was the most important thing for us and that we were

18  ensuring it.

19  Q.    You were asked questions about, in general speaking, the

20  more you anticoagulate a patient, the more risk of bleeding.

21  I'm not sure you had an opportunity to fully explain your

22  answer.  Would you elaborate on the concept of the more of an

23  anticoagulant a patient receives, the potential greater risk of

24  bleeding?

25  A.    Certainly.  As I tried to express, the decision to

CHRISTOPHER C. NESSEL - DEPOSITION

04:24

1    prescribe any medication, but an anticoagulant in particular,

2    is very, very complex.  Patients vary in their baseline medical

3    history, in their physical examination, in their -- the other

4    medications they might be taking, in what they can afford to

5    take, how often they can return to a clinic, et cetera.

6           So when you asked this question, I struggled with the

7    concept of more is worse, simply because the decision is very

8    complex.  In fact, for warfarin-treated patients, in

9    particular, prescribing more warfarin per se may not at all

10   lead to greater bleeding.  In fact, prescribing more warfarin

11   may be appropriate for and necessary for any particular

12   patient.

13          So in summary, ma'am, what I would say is the

14   decision is very complex and cannot as clinical judgment be

15   simply reduced to more means more bleeding.

16          **THE COURT:**  Members of the jury, we are going to stop

17   at this time and come back tomorrow for the depositions.  We

18   will start at 8:30.

19          I hope you get a good night's sleep tonight so

20   you can be ready tomorrow to listen to testimony, both live and

21   in video.

22          I remind you, you have a great responsibility

23   and great powers in your capacity as a juror.  You decide the

24   facts of the case, and basically your decision on the facts is

25   final.  So it's a weighty authority and very, very important

04:26

1    that you keep up with the testimony.  I understand -- if you

2    get tired or something, let me know.  We will stop and get a

3    cup of coffee for you because it's important that you listen to

4    the testimony.  Your authority, this may be the most power you

5    will have in your life.  It's a very, very important thing that

6    everybody keep up to speed and listen to the testimony.

7              We will stop here.  Again, I remind you, don't

8    talk to anybody about the case.  If anything comes on the TV or

9    radio, please don't listen to it.  Let somebody record it for

10   you and you can listen to it after the case is over.

11             You can leave your tablets with me.  I will

12   secure them for tonight and give them back to you tomorrow.

13             All rise as the jury leaves, please.  Bring your

14   tablets with you.  We will lock them up in the room.

15             (Jury exited.)

16             **THE COURT:**  Be seated, please.

17             The jury is out of the room.  Any issues?

18             **MR. MEUNIER:**  Your Honor, we had mentioned in

19   chambers a concern we had about the counter-designations in

20   these cases.  I think this first deposition that's been played

21   to the jury illustrates the problem.  You saw how short and

22   limited in scope the plaintiff questioning was.  Had that

23   witness been here live, the jury would have easily figured out,

24   okay, the direct is over, here comes the cross; and the cross

25   would have gone on and on, whether it was permissible in scope

1    or not.  But just hearing it, the jury is left to wonder why is

2    that much information, particularly information favorable to

3    the defendant, coming out in plaintiffs' case?

4              There's not much we can do to separate the

5    questioning, because it's on a topic and whatnot, but I would

6    ask the Court that in addition to urging the defendants' side

7    to be more limited in their counters for the cases -- the depos

8    we are putting on in our case, to allow us, in the introductory

9    comments we make about these depositions going forward, to tell

10   the jury the total amount of time in this deposition that is

11   questioning by the plaintiffs' counsel and the total amount

12   that is consumed by questioning by defendants.  I think the

13   jury deserves to know it.  Otherwise it's prejudicial.

14             **THE COURT:**  Anything for the other side?

15             **MS. WILKINSON:**  Yes, Your Honor.  This witness was

16   probably an aberration because he is at the center of the

17   testing.  We understand and we will go back and review those.

18             I don't know that it's appropriate to talk about

19   the time.  I think it would be better if we go back and review

20   our designations and see if we can streamline them a bit.  It

21   really does depend on the witness.

22             **THE COURT:**  Take a look at it.  I will deal with it

23   if it's necessary.

24             I would like to see you all about 8:15 tomorrow.

25             Do you know the witnesses they are going to

1  call?

2      MS. WILKINSON:  Yes, Your Honor.

3      THE COURT:  Court will stand in recess.

4      THE DEPUTY CLERK:  All rise.

5                        * * *

6      (The following proceedings were held outside the

7  presence of the jury.)

8      MR. OVERHOLTZ:  Plaintiffs will introduce as

9  Plaintiffs' Exhibit 1 record 32656 [sic], which was Exhibit 69

10 to the Nessel deposition.

11             Plaintiffs will introduce as Plaintiffs'

12 Exhibit 2 record 271862, which is Exhibit 70 to the

13 Dr. Christopher Nessel deposition.

14             Plaintiffs will introduce as Exhibit 3 record

15 277764, which is Exhibit 73 to the Christopher Nessel

16 deposition.

17             That's all we have.

18     MR. DAVIS:  All three were played during the Nessel

19 deposition that was just played in the courtroom.

20     MS. MILLER:  Chanda Miller for the defendants, and

21 just for the record to note that these were submitted for

22 ruling, along with the deposition designations from

23 Dr. Christopher Nessel, so they are being admitted subject to

24 Judge Fallon's prior ruling on them.

25             (Proceedings adjourned.)

04:38

1                              * * *

2                          __CERTIFICATE__

3          I, Toni Doyle Tusa, CCR, FCRR, Official Court

4   Reporter for the United States District Court, Eastern District

5   of Louisiana, certify that the foregoing is a true and correct

6   transcript, to the best of my ability and understanding, from

7   the record of proceedings in the above-entitled matter.

8

9

10                          _s/ Toni Doyle Tusa_
                            Toni Doyle Tusa, CCR, FCRR
11                          Official Court Reporter

12

13

14

15

16

17

18

19

20

21

22

23

24

25