1      UNITED STATES DISTRICT COURT
       EASTERN DISTRICT OF LOUISIANA
2
  ******************************************************
3  IN RE:  XARELTO (RIVAROXABAN)
  PRODUCTS LIABILITY LITIGATION
4
           Docket No. 14-MD-2592
5  THIS DOCUMENT RELATES TO:  Section L
           New Orleans, Louisiana
6  *Joseph Orr, Jr., as Lawful*  Wednesday, May 31, 2017
  *Surviving Spouse of*
7  *Sharyn Orr v. Janssen, et al.*
  *Case No. 2:15-cv-03708*
8
  ******************************************************
9
      TRANSCRIPT OF TRIAL PROCEEDINGS
10  HEARD BEFORE THE HONORABLE ELDON E. FALLON
       UNITED STATES DISTRICT JUDGE
11      VOLUME II - MORNING SESSION

12
  APPEARANCES:
13
  FOR THE PLAINTIFFS'     MR. ANTHONY BIRCHFIELD, JR.
14  LIAISON COUNSEL:      Beasley Allen Crow Methvin
             Portis & Miles
15            Post Office Box 4160
            Montgomery, AL  36103
16

17            MR. BRIAN H. BARR
            MR. NEIL E. McWILLIAMS, JR.
18            Levin Papantonio Thomas
             Mitchell Rafferty & Proctor
19            316 Baylen Street
            Suite 600
20            Pensacola, FL 32502

21
            MR. GERALD EDWARD MEUNIER
22            Gainsburgh, Benjamin, David,
             Meunier & Warshauer
23            Energy Centre
            1100 Poydras Street
24            Suite 2800
            New Orleans, LA  70163-2800
25

```
 1                                    MS. EMILY JEFFCOTT
                                      Lambert Firm
 2                                    701 Magazine Street
                                      New Orleans, LA  70130
 3

 4                                    MR. BRADLEY D. HONNOLD
                                      Bartimus, Frickleton,
 5                                        Robertson & Goza, P.C.
                                      11150 Overbrook Road
 6                                    Suite 200
                                      Leawood, KS 66211
 7

 8
      FOR THE DEFENDANT JANSSEN       MR. JAMES B. IRWIN, V
 9    PHARMACEUTICALS, INC.,          Irwin Fritchie
      and JANSSEN RESEARCH &             Urquhart & Moore, LLC
10    DEVELOPMENT, LLC:               400 Poydras Street
                                      Suite 2700
11                                    New Orleans, LA  70130

12

13    FOR THE DEFENDANT              MR. DAVID E. DUKES
      BAYER HEALTHCARE               Nelson Mullins Riley &
14    PHARMACEUTICALS, INC.,            Scarborough, LLP
      and BAYER PHARMA AG:           Meridian, 17th Floor
15                                    1320 Main Street
                                      Columbia, SC  29201
16

17                                    MS. BETH A. WILKINSON
                                      Wilkinson Walsh + Eskovitz, LLP
18                                    1900 M. Street NW
                                      Suite 800
19                                    Washington, DC 20036

20

21    Official Court Reporter:        Lanie M. Smith, RPR, CRR
                                      500 Poydras Street, B-275
22                                    New Orleans, Louisiana 70130
                                      (504) 589-7782
23

24
              Proceedings recorded by mechanical stenography,
25    transcript produced via computer.
```

1
                   **EXAMINATION INDEX**

**PAGE NO.**

2

3  **FRANK W. SMART, MD**

4       Voir Dire Examination by Mr. Birchfield...   251
          Traverse Examination by Ms. Wilkinson.....   267
5       Direct Examination by Mr. Birchfield......   271

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1             P R O C E E D I N G S

2             (WEDNESDAY, MAY 31, 2017)

3                 (MORNING SESSION)

4             (Call to order of the court.)

5       THE COURT:  Be seated, please.

6             Good morning, ladies and gentlemen.

7             Members of the jury, we're on the Plaintiffs'

8   case at this time.

9             Call your next witness, please.

10      MR. BIRCHFIELD:  Good morning, Your Honor.

11            On behalf of the Orr family, we call

12  Dr. Frank Smart.

13      THE COURT:  Dr. Smart, come forward, please.

14      COURTROOM MANAGER:  Step up.  Both microphones are on.

15  So whatever one you are comfortable with.  And I'll swear you

16  in.

17            (WHEREUPON, **FRANK SMART, M.D.**, was called as a witness,

18  and having been duly sworn, testified as follows:)

19      COURTROOM MANAGER:  Sir, please have a seat, Doctor;

20  and state and spell your name for the record.

21      THE WITNESS:  My name is Frank, F-r-a-n-k, Smart,

22  S-m-a-r-t.

23                 **VOIR DIRE EXAMINATION**

24  **BY MR. BIRCHFIELD:**

25  Q.   Good morning, Dr. Smart.

1    Would you take just a moment and introduce yourself to the

2    jury.  Tell them where you grew up, where you went to school.

3    A.    Sure.  I'm from New Orleans.  I'm a product of Jesuit High

4    School.  I went to Tulane for a couple of semesters and then to

5    Southeastern, where I graduated, in Hammond.

6         I came back, went to LSU School of Medicine, trained

7    there.  I went to Ochsner for my residency in internal medicine

8    and then to Houston, to Baylor College of Medicine, for my

9    cardiology fellowship, which is kind of advanced training.

10   Q.    So you were born and raised right here in New Orleans?

11   A.    Yes, sir.

12   Q.    Then you went to Tulane for a short while?

13   A.    Three semesters.

14   Q.    And then I want us to talk for just a little bit more

15   about your medical training.  Okay?

16        Can you tell us, where did you go to medical school?  LSU?

17   A.    I went to LSU Medical School.  I graduated in 1985 and

18   decided to go into internal medicine.  And I was planning on

19   cardiology at the time.  So I did an internal medicine

20   residency at Ochsner Clinical Foundation here in New Orleans.

21   Q.    When you say "internal medicine," what does that mean?

22   A.    It's a subspecialty of medicine that is typically called

23   internal medicine, which is either -- you can be a primary care

24   doctor, you can be a hospitalist or you can go on to

25   subspecialize in things like GI medicine or pulmonary or a

1    whole number of other things, critical care.  Cardiology is one

2    of them.

3    Q.    And so, after you followed the internal medicine, you

4    decided you wanted to specialize in cardiology, right?

5    A.    I sort of decided that ahead of time.  But, yes, that's

6    correct.  I knew I wanted to go into cardiology, which is why I

7    went and did medicine first.

8    Q.    So after you graduated from college, you got your

9    undergraduate degree, you went to medical school.  Is that four

10   years?  Is that right?

11   A.    Undergraduate school was four years and then medical

12   school was four years, but I interposed three years in the

13   middle, doing research at LSU and working as a mechanic at

14   Sears to try to pay for the lot of both of them.  So...

15   Q.    All right.  So tell us about the three years that you

16   interposed there.

17         What were you studying?  What kind of research?

18   A.    Well, again, I was doing research at LSU, but I was

19   actually applying to medical school.  I didn't get in the first

20   time or the second time.  So I stuck with it and got in on the

21   third time.

22         But it also provided me an opportunity to build up the

23   financial coffers to be able to support myself a little bit

24   better.

25   Q.    Okay.  So after you graduated from medical school, do you

1    continue medical training at that point?

2    A.    Yes.  So after medical school, you get an MD degree and

3    then you go off and do what used to be called an internship,

4    which is really your first year after training.  Now they don't

5    even call it that anymore.  They just call it a residency.

6         And that's a three-year stint where you are focusing on

7    learning different procedures and disease states and things

8    like that, honing your skills, sort of on-the-job training of

9    learning how to take care of patients.

10   Q.    And then after residency do you have what's called

11   fellowships?

12   A.    Yes.  So the residency gives you the ability to consider

13   yourself an internal medicine specialist.  You are able to sit

14   and take the board examination for internal medicine after

15   you've completed your residency.

16        Then you can go on and do further training in what we

17   discussed a minute ago, gastroenterology, cardiology, pulmonary

18   medicine, something like that.  And in the cardiology

19   standpoint, that was an additional three years of training.

20   Q.    And that's called a fellowship?

21   A.    Yes, sir.

22   Q.    Dr. Smart, are you board-certified?

23   A.    I am.  I am board-certified in internal medicine.  I got

24   that right after my residency in 1991.  And I'm fortunate

25   enough that I'm grandfathered in that.  So that never expires.

1        I'm board-certified in cardiology.  It's actually called

2    cardiovascular diseases.  And I got that in -- let's see.  So

3    I'm wrong.

4        So medicine was '98.  Cardiology was '91.  Recertified in

5    '01.  And then recertified again in 2011.  So I have to

6    recertify every ten years in that.

7        And then I'm also board-certified in advanced heart

8    failure, cardiac transplantation and mechanical circulatory

9    support.

10   Q.   So tell us what it means -- what board certification means

11   and the process that you go through to become board-certified

12   in a particular area.

13   A.   What it means is that you've done the requisite coursework

14   and taken a test and passed the test successfully to be given

15   your boards.

16       The -- I don't know that many patients know whether their

17   doctors are board-certified or not.  It usually is a mass -- a

18   bunch of things hanging on the wall that they see.

19       Some hospitals require board certification.  Some don't.

20   And, again, I don't know how many people know whether their

21   doctors are board-certified or not.

22       If you want to be one of the people that helps to sort of

23   write the rules and the test questions and things like that,

24   you have to be board-certified.  It's very important.  And if

25   you want to teach other physicians, you absolutely have to be

1    board-certified.

2         So those are things that are required of anybody who's in

3    an academic practice for sure.  Most private practice doctors

4    are board-certified.

5    Q.    What's the process?  Is it a strenuous process to become

6    board-certified in a particular area?

7    A.    "Strenuous" is a funny term.  It isn't really strenuous.

8    It is just putting in the hours.  There is what they currently

9    call a high-stakes exam.  It's a day-and-a-half-long

10   examination that you have to pass that is required of you.

11        Then you have to maintain that certification with a

12   certain amount of CEUs, you know, continuing education units,

13   that's required over time.

14   Q.    And you mentioned that you specialize in cardiology.

15        Take just a minute and explain to us what cardiology is,

16   Dr. Smart.

17   A.    Sure.  It's diseases of the heart and blood vessels,

18   anything that would encompass both of those.  It has to do with

19   blood pressure, circulation, chest pain, shortness of breath.

20   There's all sorts of things, but anything really dealing with

21   the heart itself and the circulatory system.

22   Q.    And how long have you been practicing in the area of

23   cardiology?

24   A.    1991 until now.  So whatever that is.  26, -7 years.

25   Q.    And will you describe for us -- you mentioned board

1    certification allows you to teach and you do some teaching; is

2    that correct?

3    A.    A lot of teaching.  Yes, sir.

4    Q.    But you also have a clinical practice?

5    A.    I do.

6    Q.    Will you describe for us, describe for the jury, the

7    nature of your clinical practice.  What do you do every day?

8    A.    I have a clinic that I see patients with various

9    complaints of -- from the mundane to the esoteric.  I favor the

10   esoteric.

11        I've sort of gotten to have a reputation for one of the

12   doctors that figures stuff out that's been really challenging.

13   And so I've enjoyed that component of my practice.

14        I have right now a full-day clinic on Monday, a half-day

15   clinic on Wednesday afternoon and a half-day clinic on Friday

16   morning where I see patients at various locations in the LSU

17   system.

18   Q.    So you mentioned you treat mundane situations and

19   esoteric.  Okay.

20        So what are some examples of the mundane, and what are

21   some examples of esoteric?

22   A.    Mundane would be somebody with high blood pressure,

23   routine angina, kind of, chest pain, atrial fibrillation, some

24   more common conditions that occur.

25        The esoteric ones are genetic abnormalities that affect

1  the performance of the heart -- it's one of the things that I

2  have a real interest in -- other associated -- you know,

3  cardiomyopathies and things like that where the heart muscle

4  doesn't work well for a variety of reasons, whether it's

5  inherited or toxin exposure or some other issue that has

6  occurred over time.

7  Q.    Okay.  All right.  Dr. Smart, how many patients have you

8  treated over the course of your career?  Are we talking about

9  dozens?  Hundreds?  What are we talking about?

10  A.    Tens of thousands.

11  Q.    Have you treated patients with atrial fibrillation?

12  A.    Yes.

13  Q.    And ballpark there.  How many patients?

14  A.    Gosh.  Well over a few thousand.

15  Q.    And, Dr. Smart, are you currently affiliated with LSU

16  School of Medicine?

17  A.    I am.  I'm employed by LSU School of Medicine.  I'm a

18  professor at LSU.  I'm the chief of cardiology there.  So I'm

19  the -- in charge of the whole cardiology division for LSU

20  School of Medicine.

21  Q.    All right.  And as a professor, you teach medical

22  students; is that right?

23  A.    Medical students, residents, PA students, nursing

24  students, fellows.  Yes, sir.

25  Q.    What do you teach?

1    A.    Cardiology, different aspects of taking care of patients.

2    I told you before that being a resident was rather like

3    on-the-job training.

4         I'm the person who would be providing that on-the-job

5    training to those medicine residents as they go through their

6    training.

7    Q.    Is it like in a mentor capacity?  You serve as a mentor?

8    A.    No.  It's a little more than a mentor.  It's more hands-on

9    taking care of patients.  You really wouldn't want a resident

10   being primarily responsible for your care.

11        I mean, they're training and they're usually pretty good

12   doctors, but you typically would want to have somebody who was

13   more seasoned and knew what they were doing.

14   Q.    Dr. Smart, you mentioned that you currently are chief of

15   cardiology at LSU Medical School; is that right?

16   A.    Yes, sir.

17   Q.    What does that involve?  What's involved in being the

18   chief of cardiology?

19   A.    I'm trying to resist the urge to be trite, and I was going

20   to say getting yelled at.

21        But what it involves is to be responsible for all of the

22   members of my group that come together and have a -- we have a

23   fellowship program.

24        It's to make sure that they are up to the standards that

25   are required of them to teach fellows.  It's to try to help

1   them develop professionally as well to help them further their

2   careers and their research career and things like that.

3        And so when you are working as a cardiologist, you are

4   constantly trying to advance yourself in your practice so that

5   you're recognized locally, regionally, nationally,

6   internationally, as somebody who knows what they're doing.

7        And then when you become the chief of cardiology, you sort

8   of step back from that and you take on the responsibility of

9   helping your younger colleagues do that for themselves.

10  Q.   Dr. Smart, you also serve as vice chairman for clinical

11  affairs at LSU Medical School; is that right?

12  A.   Yes, sir.  That's a position that Dr. Sanders, the

13  chairman of medicine, asked me to serve in.  LSU has had fits

14  and starts with their clinical practice and they needed some

15  guidance with regard to how to improve what they did

16  clinically, mostly related not to the medical care that people

17  receive, but to patient satisfaction kinds of things, you know,

18  don't keep people waiting in the waiting room for two hours and

19  things like that.  That's kind of what my role has been in that

20  regard.

21  Q.   And I see you also serve as director of the heart and

22  vascular service line; is that right?

23  A.   I do.  I've served in that position for a little over a

24  year now, maybe a year and a half.  The University Medical

25  Center, which is actually the large, teaching hospital in

1    New Orleans, the one down on Canal Street -- University Medical

2    Center decided that they were going to organize some of the

3    larger things that they do into what's called a service line.

4        So instead of a department like we used to have in the

5    past where there was a department of medicine and a department

6    of surgery, they combined everything across a different disease

7    state, and that's called a service line.

8        It's in keeping with what happened at the Cleveland Clinic

9    and the Mayo Clinic a number of years ago that has been shown

10   to be pretty efficient in taking care of people in medicine so

11   that, in that regard, I have responsibility for everything in

12   University Medical Center that has anything to do with the

13   heart or the vascular system.

14       So all of cardiology, both LSU and Tulane, all of cardiac

15   surgery and all of vascular surgery falls under my purview to

16   try to set standards, make things as good as I can make them.

17   Q.   How long did you say you had served as director of this

18   heart and vascular service line?

19   A.   I agreed to begin serving in August of 2015.  So that's

20   when I was actually named to the position.  It sort of didn't

21   exist until about March of 2016, where it finally evolved to

22   what the service line is now, where we have responsibility for

23   those types of endeavors that I just told you about.

24   Q.   Dr. Smart, if we could, I want to turn just a minute to

25   some of the organizations that you're involved with.

1    Are you a member of the American College of Cardiology?

2    A.    Yes, I am.

3    Q.    Okay.  And will you just tell the jury what the American

4    College of Cardiology is.

5    A.    It's a professional society composed of cardiologists,

6    mainly.  It also now has nurses and cardiovascular technicians

7    and PAs.

8         As a group, we discuss things like practice guidelines and

9    try to influence some aspects of the way healthcare is, you

10   know, done in this country, as much influence as any

11   professional group can have.

12        It's very similar to other professional groups, like the

13   radiologists have the American College of Radiology, and the

14   surgeons have the American College of Surgeons.  This is

15   another one of those professional societies.

16   Q.    And have you served as president of the Louisiana chapter

17   of the American College of Cardiology?

18   A.    I'm currently the president of the Louisiana chapter of

19   the American College of Cardiology.  I've been in that position

20   for two years, and I rotate off in March of 2018.

21   Q.    Okay.  I want to turn to peer-reviewed literature for just

22   a minute.

23        Have you published in peer-reviewed literature?

24   A.    Yes, sir.

25   Q.    Let's take just a minute and explain to us, if you will,

1    Dr. Smart, what does it mean to be peer-reviewed?  What are we

2    talking about in the peer-review process?

3    A.   When you write a medical article, it can be an invited one

4    where one of the periodicals, the magazines that we read says,

5    we'd like you to write an article about whatever, heart

6    failure.  And then you write that article and send it in and

7    they publish it.  That is not peer reviewed.  That's an invited

8    article.  A peer-reviewed article is one that you write an

9    article, you have an idea, you write it, and you send it in to

10   the particular journal, and they send it out to various experts

11   in the field, usually physician experts, but other experts as

12   well who look at it, read it, make sure that it makes sense,

13   make sure that your conclusions are found and make sure that

14   the things that you've said throughout the article and

15   particularly in the conclusion are supported by the article and

16   by the data that you presented.  And then if, in fact, they

17   find it acceptable, then the article is published.

18        So it's -- peer-reviewed articles are a little bit more

19   proven, if you would.  They've been vetted by other experts in

20   the field.

21   Q.   And so you've had articles you've written, you've done

22   research, you've written articles that have been published

23   through that peer-review process?

24   A.   Yes, sir.

25   Q.   Have you also served as a peer reviewer, someone that

1    reviews other's work?

2    A.    Yes, sir.  I currently do for a number of journals, mostly

3    cardiology journals, but yes, sir.

4    Q.    Okay.  What are some of those journals?  What are some of

5    the more notable journals?

6    A.    The Journal of the American College of Cardiology,

7    Circulation, Journal of the American Heart Association, Heart

8    Failure Society of America, Congestive Heart Failure, the

9    International Society of Heart and Lung Transplantation, those

10   are --

11   Q.    That's a pretty good list.  Are you also a member of an

12   editorial board for such journals?

13   A.    I'm an editorial board member for a couple of them and one

14   of -- the most active one today is a recurrent periodical

15   called Cardiology Today.  It's sort of a -- while they don't

16   use peer-reviewed literature, they don't do peer-reviewed

17   literature, they are a summation-type paper that looks at

18   peer-reviewed articles and says which ones are important for

19   what's going on in cardiology.

20        So literally just kind of a quick update for cardiologists

21   to look at and to understand, if you would, the CliffsNote

22   version of some of these articles.

23   Q.    All right.  Dr. Smart, if I could, we put together a copy

24   of the exhibits that we will use.

25              MR. BIRCHFIELD:  And, Your Honor, if I may, I've

1  provided a copy to defense counsel.  Could I provide a copy to

2  the Court and to Dr. Smart?

3       THE COURT:  Are you tendering him as an expert?

4       MR. BIRCHFIELD:  I will, Your Honor.  I wanted to

5  review very quickly just some highlights from the CV, if I

6  could.

7       THE COURT:  Okay.

8  BY MR. BIRCHFIELD:

9  Q.   Dr. Smart, you provided us a copy of your CV or curriculum

10 vitae.  Is that like a resume?

11 A.   Yes, sir, it is.

12 Q.   And we have covered much of your experience and your work.

13 There are a couple of things from your CV that I would like to

14 touch on very briefly, if we could.  And you talk in your CV or

15 you describe the experience that you've had with heart

16 transplantation and the development.  Is that right?  You've

17 had experience?

18 A.   Yes, sir.

19 Q.   Okay.  Would you describe for the jury your role in

20 developing heart transplantation units, the work that you've

21 done in that area.

22 A.   My specific training after cardiology, I honed in on

23 cardiac transplantation and heart failure because I found it

24 intellectually stimulating and challenging.  I was not a fan of

25 angioplasty and things like that.  It seemed to me that really

1    and truly you could teach a gorilla to do it in about a week,

2    so the transplantation thing that we put forward was to -- I

3    went to work -- at Baylor I got involved with heart

4    transplantation and mechanical support.  It's just when pumps

5    were in their infancy and I was learning a lot, and so I

6    focused on that area.  My role, I worked in that since really

7    1988 when I started in my training and continued to today.

8    Q.    And, Dr. Smart, one last area I want to touch on, your

9    community service.  I see that you worked in helping high

10   school students in learning about medicine.  Tell us about

11   that, if you would.

12   A.    A friend, who is a Christian brother priest, had asked me

13   to assist Rummel High School, which is a high school in

14   Jefferson Parish, to start a program with biomedical.  He was

15   also starting an engineering and a law program, and so I

16   volunteered time for the planning and also teaching of some of

17   the students.  It was an honors kind of course out there.  I

18   enjoyed it.  It was a lot of fun.

19   Q.    Thank you, Dr. Smart.

20         MR. BIRCHFIELD:  At this time, Your Honor, we would

21   offer Dr. Smart as an expert in cardiology, atrial fibrillation

22   and oral anticoagulants.

23         THE COURT:  Any questions?

24         MS. WILKINSON:  Yes, Your Honor.

25                        **TRAVERSE EXAMINATION**

1    BY MS. WILKINSON:

2    Q.    Good morning, Dr. Smart.  We have not had the chance to

3    meet.  My name is Beth Wilkinson.  It's a pleasure to meet you,

4    sir.

5    A.    Good morning.

6    Q.    I just have a few questions at this time.

7          At LSU, you have many cardiologists who work in your

8    department; is that right?

9    A.    Yes, ma'am.

10   Q.    And some of those have a specialty called cardiology

11   electrophysiology; is that right?

12   A.    That's correct.

13   Q.    And how would you describe that specialty?

14   A.    It's a group of individuals who focus on rhythm

15   disturbances, but primarily the mechanical intervention of

16   those types of rhythm disturbances, ablations and placing

17   pacemakers and defibrillators and things like that.

18   Q.    You don't have that certification, do you?

19   A.    No, ma'am.

20   Q.    You don't do ablations and things like that?

21   A.    No, ma'am, I don't.

22   Q.    Now, in this case you were asked to write a report; is

23   that right?

24   A.    Yes, ma'am.

25   Q.    And you wrote a report, I think it's at the last tab in

1    there, and your report is eight pages long; is that correct?

2    A.    If you say so.

3    Q.    Take a look in the very back there.  I believe it's

4    PX5769439.

5    A.    Okay.  I apologize.

6    Q.    No problem.  I believe --

7         MS. WILKINSON:  Are they in the same order?

8         MR. BIRCHFIELD:  I think so.

9    A.    57694?

10   **BY MS. WILKINSON:**

11   Q.    Yes, sir.  It should be the last tab there.

12   A.    Okay.  It's not the last tab in mine, so let me work from

13   that.

14   Q.    The last four numbers are 439.

15   A.    Yes, ma'am.  I'm trying to -- I go from 433 to 434, and it

16   stops.

17        MR. BIRCHFIELD:  Okay.

18        THE WITNESS:  I will feel terribly embarrassed if you

19   found it.

20        MS. WILKINSON:  That's all right.  We can get you

21   another copy.  Hold on one second.  We have another copy.

22        Your Honor, may I approach?

23        THE COURT:  Yes.

24   **BY MS. WILKINSON:**

25   Q.    Here you are, sir.

1    A.    Thank you.

2    Q.    Now, that's a thick document, but the only part that's

3    your report are the first eight pages, correct?

4    A.    Yes, ma'am.

5    Q.    The rest is your curriculum vitae that you were just

6    discussing with Mr. Birchfield?

7    A.    Yes, ma'am.

8    Q.    Now, you were deposed in this case on November 8th, 2016,

9    just last November, right?

10   A.    Yes, ma'am.

11   Q.    And you told us, did you not, that this report contained

12   all of your opinions?

13   A.    I did, yes, ma'am.

14   Q.    All right.  And in this report nowhere do you mention

15   anything about PT time or PT test, do you?

16   A.    No, ma'am, we do not.

17   Q.    All right.  And you don't --

18        MR. BIRCHFIELD:  Your Honor, I object.  This is beyond

19   qualifications, and at this point, if that's the area for

20   cross-examination, that's fine, but we are in the part for

21   qualifications now.

22        THE COURT:  What's your answer?

23        MS. WILKINSON:  Judge, I want to make sure he's not

24   going to testify about these two issues, and otherwise I don't

25   object to his qualifications.

1     THE COURT:  I'll allow it.  Overrule the objection.

2  BY MS. WILKINSON:

3  Q.   So you don't have anything about PT or PT time in your

4  report, correct?

5  A.   No, ma'am, I do not.

6  Q.   And you don't have anything about the anti-Factor Xa

7  assay, correct?

8  A.   No, ma'am, I do not.

9     MS. WILKINSON:  That's all, Your Honor.  As long as

10  he's not going to testify about those things, I have no

11  objection.

12     THE COURT:  All right.  Members of the jury, this is

13  the first time that an expert has testified live.  Let me

14  discuss it with you.  If a person is qualified by knowledge,

15  experience, training or education, they may testify in the form

16  of an opinion.  Oftentimes, witnesses are called.  They are

17  fact witnesses.  They tell you what happened, how it affected

18  them, things of that sort.

19          An expert is a little different.  An expert is

20  able to testify in the form of an opinion, so the Court will

21  recognize him as an expert and allow him to testify in the form

22  of an opinion.  But just as all other witnesses, it is up to

23  you, the jury, to determine the weight to be given to it and

24  the credibility to be afforded the witness, and so it's the

25  same type of responsibility that you have regarding all

1    witnesses.  The difference is that an expert is able to render

2    an opinion and give an opinion testimony.  That's the

3    difference.

4             MR. BIRCHFIELD:  Thank you, Your Honor.

5                        **DIRECT EXAMINATION**

6    **BY MR. BIRCHFIELD:**

7    Q.    Dr. Smart, when we first contacted you, what did we ask

8    you to do in this case?

9    A.    Offer an opinion about the medication Xarelto.

10   Q.    And what did you do?  I know you mentioned to

11   Ms. Wilkinson that you prepared a report; is that right?

12   A.    That's correct.  I had already formed an opinion about the

13   medication Xarelto before I ever met any of you guys.  I had

14   done some of the literature review on my own prior to that.  I,

15   at the request, tried to educate myself further about Xarelto

16   and then put my opinion in the form of a report and provide it

17   to you.

18   Q.    All right.  So you had formed an opinion already on

19   Xarelto, but you did some -- in preparing your reports, you did

20   some additional research and some work; is that right?

21   A.    Yes, sir, I read a number of articles.  Actually quite a

22   number of articles.

23   Q.    And how did you go about that?  How did you go about doing

24   that research?

25   A.    Well, again, initially before I met you, I did research

1  sort of on my own in the peer-reviewed medical literature, so

2  basically whenever we want to look something up, I use PubMed,

3  which is kind of like the Google of the medical world, and it

4  shows you the articles and things that you can bring them up.

5        Once I signed a nondisclosure agreement or some kind of an

6  agreement that I had to, to see --

7  Q.   A confidentiality order?

8  A.   Confidentiality, thank you.  Once I signed that, I was

9  provided some other things by the attorneys who were involved

10  in the case that were some e-mails that were from one of the

11  companies I --

12  Q.   Internal documents?

13  A.   Yeah, internal e-mails, and then other documents that I

14  had not seen before like transcripts from the FDA where the

15  Xarelto was discussed and the reviewer's opinions about it and

16  things like that.

17  Q.   And, Dr. Smart, you've been retained as an expert in this

18  case, right?

19  A.   Yes, sir.

20  Q.   And you charge for the time that you spend?

21  A.   I do.

22  Q.   What's your rate, sir?

23  A.   I charge $500 an hour to review the literature and things

24  like that, and I charge -- I said $2,000 an hour for testimony

25  and depositions, and I'm embarrassed to say that because I do

1    that because I really don't care to do this very much.

2    Q.    All right.  And so, Dr. Smart, have you submitted invoices

3    so far for your work in this case?

4    A.    Yes, sir, I have.

5    Q.    And what's the amount that you've submitted up through

6    May?

7    A.    I think it's around $27,000 or something along that line.

8    Q.    All right.  Dr. Smart, I want to get to your opinions in

9    just one moment, but I think that it would be helpful if you

10   could give us -- give the jury an understanding about what

11   we're talking about here, and atrial fibrillation, can you help

12   us understand what atrial fibrillation is?  Would you --

13   A.    I can.  Can we show a video or something to help with

14   that?  Because I mean, I know that we had tried to help you

15   understand.  We had a video and that would --

16   Q.    Yes.

17         MR. BIRCHFIELD:  Your Honor, may we play it?

18         THE COURT:  Yes.

19              (Video playing.)

20   **BY MR. BIRCHFIELD:**

21   Q.    Dr. Smart, if you would, if you need to stop us, just tell

22   us to stop, or walk away so you can --

23   A.    Okay.  So the heart is here in the middle of the chest,

24   and it's beating.  It's got four chambers.  There's two on the

25   top, the atria, and two on the bottom, these are the

1   ventricles, and the important thing is the electrical signal

2   starts right up here in what they call the assay node and it

3   spreads across the atrium and then down into the ventricles.

4   That represents a nice ordered contraction.  You can see the

5   chamber is pushing in over here.  This is what happens in

6   atrial fibrillation.

7        So the thing to point out is that now the top chambers

8   really aren't moving that well anymore.  They are just kind of

9   quivering.  They are not contracting.  The bottom chambers are

10  moving faster and more irregularly because the whole pacing of

11  the heart is kind of now off.

12       The quivering of the atria and the lack of movement up

13  there causes blood to get stagnant, and you'll see in a moment

14  that that can pose a problem.  So the atria, again, the

15  ventricles are following along.

16       There's a part of the atrium, particularly on the left

17  side, which is the side that has all the circulation to the

18  body and the brain, that is called the appendage, and when

19  blood gets stagnant in there, it can form a blood clot like

20  that brown clot represented right there.

21       MR. BIRCHFIELD:  Can we stop it there for just one

22  second?

23  BY MR. BIRCHFIELD:

24  Q.   You were talking about that there's an appendage.  What do

25  you mean by that, Dr. Smart?

1    A.   So, the left atrium is -- well, first off, it's a little

2    bit different in everybody, but there is sort of an outpouching

3    or like a sock.  If you've ever seen a windsock, like the

4    windsock at the airport that we judge which way the wind is

5    blowing before the airplane takes off, it kind of looks like

6    that.  It's a sock that hangs off the side of the left atrium.

7    It really doesn't serve much of a purpose.  It doesn't do

8    anything and, in fact, there are people that now advocate

9    blocking it off to prevent blood clots from forming in it.  And

10   that's one of the things that electrophysiologists do is to

11   block off that appendage.

12   Q.   Okay.  So that's an extra like little sock on the atrium

13   there?

14   A.   Exactly, and maybe sock -- it looks like a sock.  It looks

15   like the orifice of a sock just kind of hooked into the side of

16   the left atrium, and it has a little tongue -- the tip of the

17   sock or the toe of the sock comes up and hangs down, again, a

18   little bit different amount in everybody, but nonetheless, it

19   hangs down and it represents a place that blood can become

20   stagnant and form a blood clot.

21   Q.   Okay.  So you don't need it, but blood can get in there

22   and it just sits in there.  Is that part of the problem?

23   A.   Well, blood always gets in there and sits in there, and

24   when the atria and that sock are not actively contracting to

25   push the blood out like in atrial fibrillation, the blood sits

1    there and then becomes stagnant, and stagnant blood is more

2    likely to form a clot.

3    Q.    Okay.  And what's the danger?  What's the risk of a clot

4    forming like that in the heart?

5    A.    Well, a clot anywhere in the heart is a bad idea.  A clot

6    on the left side of the heart is a really bad idea.  So a clot

7    in the right side of the heart, if it were to break off, it

8    usually goes to the lungs and the lungs catch that clot and it

9    can have -- it can actually be fatal.  But most of the time

10   it's not.  Most of the time it's small and the lungs catch it

11   and it's not a big deal.

12        A clot in the left side of the heart so that it comes

13   from the left atrium or the left ventricle -- that kind of a

14   clot is going to circulate through the heart and go out into

15   some of the other arteries.  And if one of the arteries it goes

16   to is the artery to the brain, that's a stroke.  If it goes

17   somewhere else -- arm, leg, kidney, anything else -- we call

18   that a systemic embolus.  So a lot of times you're going to see

19   in the discussion about some of these papers is stroke and

20   systemic embolus.  So that's what we are going to be talking

21   about, is that's what happens.

22        If you play the video a little bit, it will actually

23   show a clot.  So here's a clot that breaks off.

24        Stop right there for a second, if you would.  So now that

25   clot broke off and is traveling up the artery to the brain,

1    called the carotid artery.  And that clot, as it travels up the

2    artery, is going to go as long as it can, depending on how big

3    it is, and it's going to stop at some point in time so you can

4    keep playing a little bit.

5        So here the clot is going out into one of the arteries in

6    the brain.  And you can see that, eventually, it's big enough

7    that it's going to plug up anything.  And so now -- stop right

8    there, please.  So now what happens is that clot is right here

9    and so all of this artery territory that's up in the brain is

10   no longer getting any blood.  And now that brain starts to die.

11   And once the brain starts to die, that's a stroke.  Depending

12   on how far out the clot went and how much brain is involved is

13   dependent on the size of the stroke and whether or not it's a

14   fatal stroke, a massive stroke or whatever.

15        The other part of that is even -- the brain is such a

16   very ultra-complex thing that sometimes even the smallest blood

17   clot in the smallest vessel can have devastating results

18   because it happens to hit right in the wrong place.

19        Other times the stroke can just occur and the patient may

20   not even know that they've had a stroke.  A lot of times we see

21   people that we do a CAT scan on and we'll say, "You had a

22   stroke in the past."

23        "No, I didn't."

24        And they may have just felt bad one day or had a headache

25   or something.  So a lot of it has to do with the -- how

1   fortunate you were or weren't at the time that this blood clot

2   broke off.

3   Q.   All right.  Is there anything else?

4   A.   No.  That's it.  You can turn that off.

5   Q.   So, Dr. Smart, let me make sure that we're tracking what

6   you're saying.  So if a patient has atrial fibrillation,

7   there's a quiver or a fluttering of the heart and it's not

8   pumping, the chambers are not clearing out like they normally

9   would; is that right?

10  A.   The top chamber.  Yes, sir.  That's correct.  The top

11  chamber, the atria, instead of contracting, are just quivering

12  and, in doing so, the blood becomes stagnant and they can form

13  a clot.

14  Q.   And does that increase the likelihood that blood will pool

15  there in that appendage on the left atrium?

16  A.   Yes, it does.  And increases the likelihood that the

17  person is going to have a stroke.

18  Q.   And so, Dr. Smart, if a patient has atrial fibrillation,

19  do you automatically put them on an anticoagulation therapy or

20  how do you -- do you put them on a blood thinner?  What's the

21  process that you go through in making that decision?

22  A.   Automatically is probably not the right word.  We try to

23  assess the risk of the person for getting a blood thinner

24  versus their risk of bleeding, and we do that typically today

25  by applying what's called a CHADS score.

1       And the CHAD score is -- it sounds important, but it's
2   really not.  It just is an acronym that helps us remember what
3   CHADS is.  So C-H-A --
4   Q.   Can I stop you right there for just one second?
5            MR. BIRCHFIELD:  Your Honor, may I use the board?
6            THE COURT:  Yes.
7            MR. BIRCHFIELD:  All right.  Your Honor, may I move it
8   here?
9            THE COURT:  Yes.
10  BY MR. BIRCHFIELD:
11  Q.   So you said CHADS.  That's C-H-A-D-S?
12  A.   C-H-A-D-S.
13  Q.   Okay.  This is a tool that's used in assessing the stroke
14  risk for an AFib patient?
15  A.   That's correct.  And, actually, that's another tool that's
16  called CHADS VASc as well.  It's a more refined version.  And
17  underneath the "S," if you put the little number 2, just kind
18  of like as a sub --
19  Q.   Like that?
20  A.   Yes, sir.
21       So this is a scoring system that was developed to try to
22  judge somebody's risk of having a stroke.  And so the "C" in
23  that is congestive heart failure.  So if the person has had
24  congestive heart failure, then we give that person one point on
25  that score.

1       The "H" in that is hypertension, or high blood pressure.

2   So if the person has high blood pressure, they get one point on

3   the score.

4   Q.   Okay.

5   A.   The "A" is age.  And so that would be an age over 75 for

6   the initial one.

7   Q.   Okay.

8   A.   The "D" is diabetes.  And the "S" is a prior stroke or

9   what's called a TIA.

10      Some people call a TIA a mini stroke.  It's any kind of an

11  evidence for a little clot that's broken off.  Some people, I

12  told you a minute ago, may have a stroke that they don't

13  notice.

14      Every now and then some people will have something that

15  feels like a stroke, but goes away in less than 24 hours and --

16  with no residual effect.  We call that a TIA, or a transient

17  ischemic attack.  That just means that no permanent damage was

18  done.  So if you have had that, you get two points.

19      So each one of those things gets you one point except for

20  the "S," which gets you two points.  Then we total up your

21  point total to decide whether you should be anticoagulated or

22  not.

23  Q.   So the more points you have, the greater the need to be

24  anticoagulated?

25  A.   Yes, sir.  The higher risk you have of a stroke and the

1    greater need to be anticoagulated.

2    Q.    So once a doctor makes that assessment and then they --

3    they have a decision to make, put the patient on a blood

4    thinner or an anticoagulant; is that right?

5    A.    They have a decision to make working with the patient.  So

6    the patient gets a vote in all of this stuff.  So what we try

7    to do is to talk to them about -- talk to the patient about

8    their risk and say, "Look, here's your risk of having a stroke,

9    and we can give you a blood thinner and we can reduce that

10   risk."

11       It doesn't get rid of it completely, but it does reduce

12   the risk of having a stroke.  You discuss that with your

13   patient and you try to come up with a plan for them.

14       But, in general, anytime your CHADS score would be zero,

15   we don't recommend full-blown systemic anticoagulation like

16   Coumadin or one of the NOACs.  We usually just recommend

17   aspirin for $CHAD_0$ patients.

18       Then as you go up in the CHAD score, we become more

19   aggressive about anticoagulation.  For $CHADS_1$, some people

20   recommend anticoagulation and some people don't, again, based

21   on your risk of bleeding.

22       So everything in medicine that we do has got a benefit and

23   has got a risk, and you have to weigh the risk and the benefit.

24   And so, in doing that, you try to individualize it.

25       That's one of the reasons that computers really aren't

1   going to take the role of physicians anytime in the very near

2   future anyway.  Because if you've seen one, you've seen one.

3   And there's a risk involved in all of these things, and you

4   have to weigh that risk for the individual person.

5          So, for example, I just told you you get a point for being

6   75.  Well, suppose you have high blood pressure and you're 74.

7   Well, that's pretty close to 75.  And so should you be on blood

8   thinners or not?

9          The discussion with the patient would be, "Okay.  You've

10  never had any kind of a bleeding risk.  You've never had

11  ulcers.  You don't skydive or anything like that.  And so maybe

12  we should put you on a blood thinner as opposed to not."

13         But those discussions with the patients should always

14  ensue.

15  Q.    All right.  So, Dr. Smart, you mentioned, if a patient has

16  AFib, you go through this process.  You mentioned putting that

17  patient -- one option would be to put that patient on warfarin

18  or Coumadin or a NOAC; is that right?

19  A.    So we decide between systemic anticoagulation, which is

20  what we're going to talk about as real anticoagulation, versus

21  aspirin, which is not really an -- anticoagulation.  It's more

22  of an antiplatelet agent.

23         It cuts down thrombosis a little bit, but it really

24  doesn't reduce the risk of stroke dramatically enough to, say,

25  reduce it for a CHADS patient that's $CHADS_2$ or worse.

1          So anybody who's CHADS$_2$, the recommendations are that you

2     should seriously consider anticoagulation with either Coumadin,

3     warfarin or one of these newer anticoagulants.  Anybody who is

4     less than 2, you want to think twice about it.

5          And if you're zero, you probably want to stay away from it

6     because the risk of having a stroke is going to be less than

7     your risk of having a problem taking the drug.

8          So you are just trying to balance the risk and benefit.

9     Q.    You mentioned Coumadin and warfarin and NOACs.

10         Will you take just a minute and tell us what warfarin or

11    Coumadin -- what that is.  Are they the same thing -- different

12    names for the same thing?

13    A.    Yes and yes.  So Coumadin and warfarin are the same thing.

14    It's a drug that actually started out as rat poison.  Still is

15    rat poison, unfortunately, as well.  But it blocks Vitamin K.

16         And so Vitamin K is a necessary vitamin for the clotting

17    system to form blood clots, and Vitamin K can be blocked by

18    Coumadin or warfarin.

19         And the reason we do it is because it can -- we can give

20    it and have the blockage of Vitamin K controlled, if you will.

21    We can give just enough, but not too much, and that's the role.

22         As a rat poison, they give plenty, plenty, and the rats

23    eat it and bleed and then leave your home and go look for

24    water.  So they don't die in your attic.  So the whole purpose

25    of using it as a poison is to make the rats bleed.  We

1    certainly want to avoid that.

2    Q.    So, Dr. Smart, when you're -- when you have patients on

3    Coumadin or warfarin, is time in therapeutic range -- is that

4    something that's important?

5    A.    Yes.  So maybe I should explain a little bit before we

6    jump straight to that.

7         Because, I mean, what we said a minute ago is you want to

8    give enough, but not too much.  So how do you decide that?

9    Well, you measure how thick or thin the blood is.

10        And that's a -- we use that term and we throw it around a

11   lot.  It really has nothing to do with the actual thickness or

12   thinness of it.  It has to do with how it clots.

13        And we know that warfarin blocks Vitamin K.  And one way

14   to assess how much blockage is there is to do a blood test

15   called a prothrombin time.

16        So prothrombin -- the way your blood clots in your system

17   is in a cascade fashion.  We're all walking around every day

18   with blood circulating inside us.

19        The last thing we want is to have blood clots forming

20   willy-nilly inside of us because that's not a good thing.  You

21   are going to die from that.

22        The problem is, when you get injured or cut or bleed from

23   an ulcer or something like that, you've got to stop bleeding

24   or, otherwise, you are going to bleed to death.

25        And so there has to be some sort of a mechanism that your

1    body has to defend itself against bleeding, but at the same

2    time protect itself against clotting.  And Vitamin K and this

3    clotting cascade are -- they work pretty well, actually.

4         And, you know, over hundreds of millions of years, we've

5    kind of developed all these things inside of us that are pretty

6    robust at doing what needs to be done and keeping our blood

7    circulating, but not letting us bleed to death all the time.

8         When we mess with that system a little bit, we've got to

9    be careful because, just like in the rats, we can give too much

10   Vitamin K blockage and all of a sudden the person is going to

11   be bleeding.

12        The other problem is, if it blocks Vitamin K, well, what

13   happens if you take in more Vitamin K?  So if you take in a lot

14   of Vitamin K, you are going to overload the blockage that we

15   put forward with the medicine.

16   Q.   Dr. Smart, can I interrupt you for just one second?

17        You helped -- directed us in preparing some

18   demonstratives -- or slides to help explain TTR.

19        Would it be helpful at this point to show those to the

20   jury?

21   A.   Sure.  If you would, let me finish this part and then

22   we'll talk about TTR just because --

23   Q.   Okay.

24   A.   So what we are looking for is just enough thinning of the

25   blood, but not too much, or the therapeutic range, which is TR.

1   And so the therapeutic range for prevention of stroke in atrial

2   fibrillation on this prothrombin time is a certain number of

3   seconds.

4        Well, we used to do prothrombin time in seconds.  So when

5   I was an intern, we used to talk about the prothrombin time is

6   22 seconds.

7        Well, the problem with that was I might have been at

8   Ochsner and it was 22 seconds, and I might have gone to LSU and

9   the same patient would have 18 seconds because the reagents,

10   the chemicals that they use in the analysis, are a little bit

11   different.

12        So they started using what's called a normalized ratio,

13   meaning that everybody went against the 1 standard.  And so we

14   now call it an INR.

15        And so you're going to hear me and other people talk about

16   INR.  That just stands for international normalized ratio,

17   meaning that it's how thin your blood is.  And 1 means there's

18   no thinning to it at all.  And then, as you go up from 1, it

19   gets thinner and thinner.

20        So the normalized ratio that we would be looking for is

21   between 2 and 3.  And, again, that's what we are going to call

22   the therapeutic range, an INR of 2 -- between an INR of 2 and

23   an INR of 3.

24        Anything less than 2, your blood is too thick and you have

25   a risk of having a stroke.  Anything greater than 3 and your

1    blood is now getting thin.  You don't get any more stroke

2    benefit, really, but you get more bleeding risk.

3    Q.    So is this one of the slides you helped us prepare to make

4    this clearer to us?

5    A.    It is.  Yes.  So let's see.

6          This is that therapeutic range that we were talking about

7    right here.  And if you were to look at that, that's where we

8    want to keep the blood because, in atrial fibrillation, our

9    risk of stroke goes down and our risk of bleeding, like we just

10   said, goes up.

11         So, if you would, the sweet spot, the middle of the

12   fairway, if you're a golfer, is sort of right here, and that's

13   where we're trying to keep it.

14         Anything lower than that, over this way, there's a higher

15   risk of stroke.  Anything higher than that, over here, there's

16   a higher risk of bleeding.

17   Q.    All right.  So you were talking about in terms of that

18   time in therapeutic range between 2 and 3.

19         That's like a fairway in golf; is that right?

20   A.    Well, we didn't talk about the time in therapeutic range.

21   We just talked about the therapeutic range.

22   Q.    Okay.

23   A.    Now, if you'll go to the next slide that we put together.

24         So the way we measure Coumadin is we periodically test

25   your INR.  Some people are tested once a week.  Some people are

1   tested once every couple of weeks.  Some people are tested once

2   a month.

3       You would almost never go longer than once a month.  And

4   the reason is because the risks are so high.  This is a pretty

5   high-risk thing.  You don't want to get too thin or be too

6   thick.  So you really need to know where you are.

7       Coumadin is hard because, again, I told you, if you take

8   in more Vitamin K, it's a problem.  So if somebody has -- and

9   Vitamin K, by the way, can be not only in multivitamins and

10  things like that, but green, leafy vegetables.

11      Broccoli and even cauliflower, things like that, have a

12  large amount of Vitamin K.  So if somebody decides to have

13  broccoli three days in a row that's taking Coumadin, I'll see

14  it when they come in for their INR.

15      Their blood will be too thick and we will have to make an

16  adjustment or we'll have to tell them, "Look, stop eating the

17  broccoli."  Because diet is an important consideration.

18      What we try to tell people when we're educating them is to

19  say, "Listen, whatever you eat, if you eat broccoli or lettuce

20  or salad for lunch, be consistent with it because, as long as

21  you're consistent, I can adjust the amount of Coumadin that you

22  take up or down to accommodate for that."

23      But, you know, hopefully, nobody is going to like go off

24  on a lettuce diet or a spinach diet and then come in and be too

25  thick or go on another diet where they're only eating potatoes

1    or something that don't have a lot of Vitamin K in it and now

2    they're too thin.

3         So diet is a big thing.  And so we measure monthly whether

4    you're in the therapeutic range or not.  And so you can see

5    that each of those dots right here has a month's name on it, so

6    March, April, May.

7         And if you were to take an example like you see here,

8    every month where we measured the INR, the person is in that

9    therapeutic range.  So the time in therapeutic range, or TTR,

10   is going to be 100 percent.

11        That's a patient that's really doing what they're supposed

12   to be doing.  They are following their diet, they are very

13   religious about getting their blood checked, and their doctor

14   is also doing what they're supposed to be doing and monitoring

15   it closely and making sure that it's appropriately apportioned.

16   Q.   Dr. Smart, I think the next slide would demonstrate

17   someone that's like 80 percent in time in therapeutic range; is

18   that right?

19   A.   Sure.  If you switch that, that would be great.

20   Q.   Okay.

21   A.   So here you can see that we have three, six, eight times

22   out of ten the person was in a therapeutic range, so inside of

23   that two to three that we set up is where we ought to be, and

24   then two times, the person was too thin.  So the INR was higher

25   than that three, so here in June and here in October, the

1    person was too thin.

2          So there was some adjustments made somewhere along the

3    way, either with the person's diet or with the dose of the

4    drug, to try to get them back into the therapeutic range

5    because too thin is a bleeding risk.  So since there was two

6    points out of those ten, the person was not in therapeutic

7    range, that's somebody who has an 80 percent TTR.

8    Q.    And, Dr. Smart, in your practice, in your clinical

9    practice, when you are seeing patients, do you use warfarin or

10   Coumadin as a treatment?

11   A.    I do.  We use it mostly for people with heart valve

12   replacements, but we do use it for people that have atrial

13   fibrillation and heart valve replacement or atrial fibrillation

14   that can't take one of the other more simple drugs.

15   Q.    And have you gone back and checked what your experience is

16   for patients in time therapeutic range?

17   A.    Somewhat embarrassingly, yes, I did, once I started having

18   these conversations -- so I had never looked at it before.

19   Once I started having these conversations with you folks, I

20   went back to look at what my own was, and it was around

21   78 percent.  And again, when I say my own, that's a misnomer.

22   I don't do it.  I have a nurse practitioner who does it and is

23   amazing at it.  If this was left to me, chances are it would be

24   decidedly worse, so...

25   Q.    All right.  So, Dr. Smart, you have one other that shows

1    like 55 percent, one other slide.  Again, that would be a

2    patient that they show up a hundred times, 55 of those times

3    they would be within an INR of 2 and 3.  Is that the concept

4    here?

5    A.    That's correct.  And then 45 percent of those times -- 45

6    times out of a hundred they would not be between 2 and 3.

7    Q.    So, Dr. Smart, if we could, I want to shift from Coumadin

8    or warfarin to Xarelto.  Can you tell us in general terms what

9    is Xarelto?

10   A.    Xarelto is one of the groups of drugs that we call a NOAC,

11   or new oral anticoagulant.  It's a non-Vitamin K drug.  So

12   instead of blocking Vitamin K, Xarelto or the drug rivaroxaban

13   is an inhibitor of something in that clotting cascade that's a

14   much more single point.  It's called Factor Xa, and it too

15   stops the prothrombin-to-thrombin conversion and thins your

16   blood, but it does it without some of the spillover effects

17   that occur with warfarin.  Warfarin blocks a whole bunch of

18   places because Vitamin K is a dependent factor in a lot of

19   things, and also because it's a Factor Xa inhibitor, it's not

20   affected by your diet and things like that to the degree that

21   Coumadin is.

22   Q.    All right.  So, you described NOACs, or new oral

23   anticoagulants; is that right?

24   A.    Yes, sir.

25   Q.    And it's new in the sense that these are new and different

1   from Coumadin or warfarin?

2   A.   Coumadin has been around for a very long time, and that's

3   been sort of the mainstay for using -- for thinning your blood

4   for a very long time.  My mother had a heart valve replacement

5   and was on Coumadin when I was small.  So I mean, it's been

6   around for quite a long time.

7        2011-ish we started seeing some of the newer agents that

8   are now available for use that were effective at

9   anticoagulating people, and those agents, again, were more

10  reliable than Coumadin because of the dietary issues that

11  ensued with Coumadin, and they didn't require as much

12  monitoring.

13  Q.   So, all of these oral anticoagulants, the goal is to

14  prevent clots, is that right, reduce the clots?

15  A.   The goal is to reduce the clots and not worsen the

16  bleeding.  So, I mean, there's yin and a yang here.  I mean,

17  you can't -- if your goal is just to reduce clots, you could

18  give somebody whatever and thin their blood completely, but

19  then they are all going to die from bleeding.  You can cut

20  yourself shaving and bleed to death.  So the goal is to hit

21  that sweet spot, to be in the middle of the fairway, to get

22  just enough blood thinning without too much.

23  Q.   All right.  In simple terms, are their good clots and bad

24  clots?

25  A.   Absolutely.  So like we said before, you want to prevent

1  any kind of clot in the vascular system that can break off and

2  go form a stroke or an embolus, but you want to not prevent

3  good clots, which would be -- God forbid I'm riding home today

4  and get in a wreck on Poydras Street, I want to be able to

5  clot.  I don't want to have a life-threatening or a life-taking

6  hemorrhage right there on the spot.

7  Q.   All right.  So is it true that anticoagulants or blood

8  thinners cause bleeding events?

9  A.   Yes.

10  Q.   And that would be true for all of the NOACs, Coumadin,

11  warfarin; is that right?

12  A.   By definition, an anticoagulant is going to cause bleeding

13  events.  Again, it isn't that they do it.  It is how much you

14  give and how you balance it.

15  Q.   Okay.  All right.  So how are these new drugs, how are

16  they studied to see how they compare to warfarin?  Can you

17  describe that process for us?

18  A.   Sure.  And it's not just these drugs.  I mean, it's all

19  drugs that go through an approval process are studied, and we

20  do what's called a clinical trial, and the first thing that you

21  do is to test the drug in animals.  So you've got a compound

22  that you think is going to thin the blood.  So, you give it to

23  rats to see if it thins the blood.  And if it does, then what

24  you now try to find out is, okay, it thins the blood.  It does

25  what we think it's going to do.  How much of it is necessary

1    before we thin the blood so much that the animal is not going

2    to survive.

3         So we try to establish what is termed in the literature an

4    LD or a lethal dose, so where do you go from being a drug to

5    rat poison sort of thing.

6         So you do this study and then you go from small animals to

7    larger animals that are closer to humans and you try to hone in

8    on the appropriate amount of drug along the way.  And you want

9    to try to get a range, because the range is really important.

10        And then you -- once you have an idea of the range and an

11   idea of how the drug works and how it's eliminated from the

12   body, because so far we have only talked about giving it.  We

13   have not talked about getting it out, so that when we give you

14   anything, we have to worry about how you are going to get it

15   out.

16        Again, different people are different.  Their age matters,

17   their kidney function matters, their liver function matters,

18   whether or not they drink alcohol matters.  All of those things

19   have a role, they play a role in whether the drug comes out or

20   not.

21        So then we try to decide in a clinical trial, okay, this

22   is the right way to give the drug, and then we go into giving

23   it to people, to humans.  We start with what's called a Phase I

24   clinical trial, which is routinely described as a safety trial.

25   We want to make sure we are not going to hurt anybody with

1   this.  So we choose a really low dose and we give it to normal

2   volunteers and we see what happens.  We measure the amount of

3   drug in their bloodstream and establish how the drug acts,

4   how -- in a human being, how the drug -- how quickly it's

5   absorbed, how high it goes in the bloodstream and how quickly

6   it's eliminated.

7       We try to get a -- it's called a pharmacokinetic profile,

8   and basically we're looking at in a real human being how when

9   you give the drug, how high it goes and how quickly it comes

10  out.

11  Q.   All right.  That's a big word you've thrown on us now,

12  pharmacokinetic; is that right?  So tell us what that is.  What

13  is pharmacokinetic?

14  A.   Pharmaco is just drug and kinetic means the motion of the

15  drug or how the drug goes in and comes out.  It goes in and is

16  eliminated.

17  Q.   All right.  So you do clinical trials in phases, right?

18  A.   Correct.  So we were talking about the Phase I trial,

19  which is a safety trial.  Then we typically go to a Phase II

20  trial.  Now, there's different levels of a Phase II trial, but

21  a Phase II trial is where we now are trying to establish a

22  therapeutic dose.

23      We say, okay, if I'm going to give you one pill and it

24  does an okay job, if I give you two pills, is it going to do a

25  better job or am I just giving you more exposure to risk.  And

1   so we try to adjust and give the correct dose.  It's usually a

2   dose-finding study.

3        Phase I, late Phase I and early Phase II are usually

4   dose-finding studies, and then later on in Phase II we're

5   looking for other safety issues that we may not have expected

6   with just the first set of things.  So sometimes --

7   Q.   Dr. Smart, can I stop you just for one second?

8   A.   Sure.

9   Q.   So you talked about dose-finding studies; is that right?

10  A.   Yes, sir.

11  Q.   And what's the goal in a dose-finding study?

12  A.   The goal for any drug is just enough and not too much.

13  So, the best drug for people is no drug, and the second best

14  drug is the least amount needed to give you the effect that

15  you're looking for.

16  Q.   All right.  And do these studies, are they designed to

17  work in sequence?  Like would you do the Phase II studies to

18  find the right dose before you move to the Phase III?  Is that

19  typically how it works?

20  A.   Yes, sir.

21  Q.   All right.  And then when you say "dose finding," you were

22  talking in terms of finding the dose that provides the therapy;

23  is that right?  That's therapeutic?

24  A.   So you want to find the dose that gives you the desired

25  effect, the therapeutic effect.  In this case, thinning the

1    blood, and the dose, you want to do that at the minimal

2    effective dose.

3          In other words, because again, there's a yin and a yang.

4    Everything is good and everything is bad.  You want to get the

5    best therapeutic effect with none of the toxic effects, none of

6    the bleeding effects in the case of an anticoagulant, none of

7    the low blood pressure effects in the case of a blood pressure

8    drug.

9    Q.    All right.  So the goal would be to find the minimal

10   effective dose.  You would do that in Phase II trials?

11   A.    Yes, sir.

12   Q.    And then you would move to Phase III; is that right?

13   A.    So, a Phase III trial is what we consider now as an

14   efficacy trial, meaning that when we give the drug in this

15   dose, does it work in a broad spectrum of people, and in a

16   whole bunch of different people, can we give this drug and get

17   the desired effect that we are looking for.

18   Q.    Okay.  So efficacy, that's the desired result.  That's

19   what you're looking for?

20   A.    Yes.

21   Q.    Does it achieve its purpose?

22   A.    Yes, sir.  And, of course, safety is a component of the

23   Phase III as well.  It's always a component, but more of the

24   Phase III is looking for efficacy, and that is, does it do what

25   we say it's going to do?  Does it thin the blood, does it lower

1   the blood pressure if it's an antihypertensive, does it lower

2   the cholesterol if it's a cholesterol medication?

3   Q.    In the Phase III, are you also looking at safety, so you

4   are looking at efficacy and safety?

5   A.    We are always looking at safety.  We want to record

6   anything that happens adversely so that we know how frequently

7   it occurs, and we compare that to either placebo, a sugar pill,

8   a fake pill or to something -- in the case of some trials,

9   there's already a drug that's out there that you are trying to

10  compare yourself to.

11        So in the case of Xarelto, the trial compared it to

12  Coumadin, because Coumadin was -- again, the drug that was used

13  in standard fashion at the time the ROCKET trial, the Xarelto

14  trial was designed.

15  Q.    Okay.  So if we're moving to Xarelto specifically, the

16  ROCKET trial that you just mentioned, that's the Phase III

17  trial for Xarelto; is that correct?

18  A.    Yes, sir.  It's called ROCKET-AF.  It was rivaroxaban

19  whatever, but ROCKET-AF was the abbreviation name of the trial,

20  yes, sir.

21  Q.    Okay.  Will you describe for us the design, what was the

22  purpose, how did the ROCKET -- how was the ROCKET trial set up?

23  A.    So, the ROCKET trial compared people taking -- so it was

24  in a specific group of patients with what's called nonvalvular

25  AFib, so we talked about what AFib was a few minutes ago.

1    There's a little bit of a difference between just plain

2    old AFib and AFib if you've got a heart valve that's damaged or

3    has been replaced.

4    So we don't want to look at those folks because they are a

5    different risk category, so this is nonvalvular AFib, so you

6    are going to hear that term throughout the course of the rest

7    of the conversation, I think, with the ROCKET trial.

8    Nonvalvular AFib means it's just pure atrial fibrillation like

9    we showed in that video, and we are trying to reduce your clot

10   risk.

11   So the ROCKET trial looked at -- half of the patients got

12   Coumadin, warfarin, and half of the patients got this new drug

13   rivaroxaban, and 20 milligrams once a day was -- the majority

14   of the patients in the trial got that.  If you had bad kidney

15   function, they could give you a little bit lower dose, at

16   15 milligrams once a day.

17   Q.   All right.  So were the results of the ROCKET trial, were

18   those published?

19   A.   They were.  The results were published in the New England

20   Journal of Medicine.  Dr. Patel was the senior author.  I was

21   the first author on the trial.

22   Q.   Okay.  If we could, let's take a look at that article that

23   was published.  This is the publication again of the results of

24   the ROCKET-AF trial; is that right?

25   A.   Yes, sir.  Oh, can I use the thing like everyone else is?

1    Q.    All right.  So we see this is what you were describing

2    that it's rivaroxaban.  That's Xarelto; is that right?

3    A.    That's the generic name for Xarelto, yes, sir.

4    Q.    Okay.  It's comparing Xarelto to warfarin in the

5    nonvalvular AFib like you just described?

6    A.    Yes, sir.

7    Q.    And then you mentioned the first author as Patel, Manesh

8    Patel; is that right?

9    A.    Yes.  So in the scientific literature, the lead author is

10   the guy who typically has kind of done most of the work on

11   organizing the trial, writing the paper, and then the senior

12   author is going to be the guy who kind of oversees the trial

13   and makes sure it was set up right, done right, and is the, if

14   you would, the godfather of what all the other guys have done

15   along the way.

16   Q.    So the senior person would be listed last, that's the

17   protocol for publishing articles?

18   A.    Correct.

19   Q.    And here that would be Dr. Califf; is that right?

20   A.    That's correct.

21   Q.    If we could, let's go to Table 3.  It's on PDF 8 --

22   Page 890 of the article.

23   A.    Okay.

24   Q.    We'll take a look at this table.  And if you would, would

25   you walk us through the results here.  First, do you see where

1   it says, "Principal Safety Endpoint"?  Do you see where I'm

2   referring?

3   A.    Yes, sir.

4   Q.    Will you describe for us, tell us what's a primary safety

5   endpoint?  What's that, in general terms, what are you looking

6   at?

7   A.    So, in the form of any drug, we want to make sure that

8   it's safe.  Well, if you are looking at an anticoagulant, you

9   want to make sure that you don't have a lot of bleeding events

10  with it, so the primary safety endpoint is going to be

11  bleeding.  Safety is always going to include mortality, so even

12  if it's not bleeding, if you give something and half the people

13  die with it, that's not a good drug.

14        So we look at a bunch of different points, but safety

15  endpoints are going to be -- we said we are going to look at

16  that in all trials.  Because it's an anticoagulation trial,

17  bleeding is going to be that.

18        The efficacy endpoint, meaning did you have a stroke or an

19  embolus, so we're looking at a balance between did you have a

20  stroke or a blood clot -- remember, a stroke was it went to the

21  brain.  An embolus was the clot went somewhere else.  So did

22  you have a clot that went somewhere, or did you have bleeding?

23  So that's our efficacy and our safety balance.

24  Q.    Okay.  And then we see -- it's referring to major

25  bleeding, right?

1    A.    Yes, sir.

2    Q.    And major bleeding, that would be something you would

3    expect to see.  You've got to account for that any time you are

4    giving a blood thinner; is that right?

5    A.    Yeah.  I mean, it's a predefined term.  So I mean, if I'm

6    bleeding, it's major, no matter how little it is, but the way

7    the study defined it was that it's a decrease in the amount of

8    hemoglobin, the amount of blood in your system by two grams or

9    needing to get transfused two units of blood.  And that was a

10   predefined number.  In clinical trials, it's important that you

11   assess, going in, how likely something is because the

12   statistics that we use to try to balance this and validate it

13   all are important.  You can't just kind of work backwards from

14   the answer.  You really need to prospectively define it going

15   in and the ROCKET trial did that.  And it was done well, by the

16   way.  They did a good job of defining, you know, those

17   prespecified endpoints of major bleeding, transfusions.

18         Critical bleeding was you bled into an organ and that

19   caused some problems.  And then intracranial hemorrhage is

20   bleeding into your brain, which is, obviously, a pretty

21   important thing.

22   Q.    Dr. Smart, when -- you described with anticoagulants or

23   blood thinners that you are -- that it's kind of a delicate

24   balance between reducing the risk of stroke, but not

25   unnecessarily increasing the bleed risk, right?

1    A.    That's exactly right.

2    Q.    With this class of drugs -- I mean, is that normal for

3    most drugs or is this a more delicate balance when you are

4    talking about blood thinners?

5    A.    It's a much more delicate balance when you are talking

6    about blood thinners because the difference between too much

7    and not enough is pretty small.  And so it makes it that much

8    more challenging.

9          Tylenol -- if you take one Tylenol, your headache doesn't

10   go away.  If you take eight, you might have a problem.  But

11   there's a big difference between the one and the eight as

12   opposed to rivaroxaban or Coumadin or any of the other blood

13   thinners that the difference between too much and not enough is

14   quite small.

15   Q.    And does that draw the safety aspect into sharper focus

16   when you are looking at these drugs?

17   A.    Absolutely.  Because, again, the safety is paramount.

18   It's almost to the point of like a cancer chemotherapy where I

19   can give you a little bit of chemotherapy that doesn't do

20   anything to the cancer or I can give you a lot of chemotherapy

21   that kills the cancer but also kills the patient.  And so it's

22   very important to hit the right amount.

23   Q.    All right.  And is that -- that focus -- is that enhanced

24   by the number of people that are taking these anticoagulants?

25   Is this a widely prescribed class of medicines?

1    A.    It is a very widely prescribed class of medicines.  Yes.

2    It's not -- the actual rates don't change by the number of

3    people taking it.  But what it does signify is that there's so

4    many people taking it that, if you're wrong, you can harm a lot

5    of people.

6         Now, again, when you are talking about harm, if you harm

7    one person, it doesn't matter that 900 went around them to that

8    person.  I mean, it's pretty much an individual thing.

9    Q.    Right.  We'll come back to that in just a minute.

10        But let's walk through the findings of these results here.

11   Help us to understand what we are looking at in this table.

12   We're looking at the major --

13   A.    So the first thing to see is there's two groups.  There's

14   the rivaroxaban group and the warfarin group.

15   Q.    Yes.

16   A.    The second thing to note is the number, the N.  That's how

17   many people were in each group.  7,000 is big.  That's a big

18   clinical trial.  And that's important because the bigger the

19   clinical trial, the more we can glean from it.

20        So if that was 71 patients, we wouldn't have enough

21   statistical power to say anything either way.  The fact that

22   it's 7,000 in each group is a credit to the ROCKET

23   investigators that they did a big, clinical trial and that

24   was -- and, hopefully, they were going to answer the question,

25   the principal safety endpoint of major and nonmajor clinically

1    relevant bleeding.

2         So what you can say is that this was somebody who had a

3    bleeding event that we defined prospectively as clinically

4    relevant that occurred --

5    Q.   When you say you defined that prospectively, that was set

6    up by design before the trial started?

7    A.   The people who designed the trial said, "This is what

8    we're going to consider a clinically relevant bleeding event."

9         And we should probably mention that all of these safety

10   events actually are looked at by a separate committee who is

11   not doing the trial -- it's the Data Safety and Monitoring

12   Board -- and sometimes even what's called a CEC, or Clinical

13   Adjudication Committee.

14        So these are other groups of doctors whose job it is to

15   say, "Yeah.  That really was a bleeding event" or, "No.  We

16   can't define that as a bleeding event" or whatever.

17        And bleeding is a little bit easier because you either

18   bled or you didn't.  But these are all prospectively designed.

19   Q.   So you've got the rivaroxaban group or the Xarelto group

20   and you've got the warfarin group for the major bleeding.

21        So explain the hazard ratio -- --

22   A.   So let's accommodate the chart for just a second, if you

23   don't mind.

24        So in the rivaroxaban group, 1,475 people had an event --

25   a bleeding event.  So 1,475 out of that 7,011 had a bleeding

1    event.

2         In the Coumadin group -- sorry about that -- 1,449 had it

3    out of the 7,125.  And this is the percentage of people --

4    thank you -- and this is the event rate or the number per 100

5    people -- or per 100 patient years of how long they were

6    exposed to the drug.

7         So now back to your question.  I apologize.

8    Q.   Let's move across to the hazard ratio.

9         So explain to us, please, Dr. Smart, what the hazard ratio

10   is.

11   A.   So we tried to use statistics to decide were those numbers

12   any different or are they the same.  That's a -- it's very

13   entailed mathematical analysis, things based on the size, the

14   likelihood that we've detected it appropriately and things like

15   that.

16        But for all intents and purposes, when we see a hazard

17   ratio, it is, if you put a line -- what we would consider like

18   a line of unanimity or everything is equal, the hazard ratio is

19   going to be 1.

20        So if there's -- if I can turn left or I can turn right

21   and I'm going to happen to choose that randomly, that's a

22   hazard ratio of 1.  If I can only turn right, then that's going

23   to be a hazard ratio of 1,000.

24        And so you look at how many events occurred.  And if the

25   hazard ratio is 1, what you can say is there really was no

1    difference between those two treatments.  If the hazard ratio

2    is less than 1, it favors one or the other treatments.

3         And then we look at the P value, and that tells you if

4    that difference that you see on the hazard ratio is likely to

5    have occurred by chance or if this is a real event that we

6    should be seeing.

7    Q.    So what does the P value here tell you?

8    A.    So, again, based on statistics, a P value of .05 is

9    considered to be significant, meaning that the difference

10   didn't occur by chance -- .05 or less.  A P value that's higher

11   than that means that those numbers are really no different.

12        And, therefore, since the P value is .44, those numbers --

13   1,475 and 1,449 -- are really no different.  Even though

14   numerically one is larger than the other, they really are no

15   different in the analysis.

16   Q.    Okay.  All right.  Thank you.  All right.

17        THE COURT:  Let's get to a breaking point.

18        MR. BIRCHFIELD:  Yes, sir.  About three minutes.  Would

19   that be good?

20        THE COURT:  Okay.

21   BY MR. BIRCHFIELD:

22   Q.    So let's walk through -- let's go back to the intercranial

23   hemorrhage numbers there, if you would --

24   A.    Yes, sir.

25   Q.    -- and take a look at that.

1          What's the difference between the absolute risk and the

2    relative risk for the ICH there?

3    A.    An absolute risk is how many people out of 100 are going

4    to have a problem.  The relative risk is going to be the

5    percentage difference between those two.

6          So something could have a relative risk of 20 percent.

7    But if it doesn't happen that frequently, it doesn't affect

8    that many people.  So the absolute risk could be less than 1 in

9    200.

10   Q.    So looking at these numbers, the reported results here,

11   does this difference -- does it have any clinical or, like,

12   real life meaning to you, Dr. Smart?

13   A.    It's different.  And what you can say is it's different

14   and you certainly would have a concern about that difference.

15   But, in fact, because it occurs so infrequently -- only 55 of

16   7,000 had it in the rivaroxaban group and 84 of 7,000 in the

17   warfarin group -- the actual number of people that had a

18   problem is decidedly less.  And so, while -- is it clinically

19   significant?  Yes.  Is it staggeringly significant?  No.

20   Q.    All right.  And if we look at that line, we see a .5

21   versus a .7 difference; is that right?

22   A.    Yes, sir.

23   Q.    So that would be a -- not 1 percent, but that would be

24   one-fifth of 1 percent, a .2 percent difference; is that right?

25   A.    Absolute difference.  Yes, sir.

1    Q.    Okay.  All right.

2         MR. BIRCHFIELD:  Your Honor, this would be a good time

3    for a break.

4         THE COURT:  All right.  Let's take a 15-minute break at

5    this time.

6              Court stands in recess.

7         THE COURTROOM MANAGER:  All rise.

8                   (The jury exited the courtroom.)

9                     (Court in recess.)

10                  (The jury entered the courtroom.)

11        THE COURT:  Be seated, please.  You are still under

12   oath, Doctor.  You may proceed.

13        MR. BIRCHFIELD:  Thank you, Your Honor.

14   **BY MR. BIRCHFIELD:**

15   Q.    Dr. Smart, I want to take just a couple more looks at this

16   Table 3, if we can, and then see if we can put this in real

17   life terms, if you can help us with that.  When we look at the

18   event rate column, do you see where I'm referring?

19   A.    Yes, sir.

20   Q.    And it talks about a major bleeding, that event rate, and

21   what's the event rate for all the major bleeding, sir?

22   A.    For rivaroxaban?

23   Q.    Yes.

24   A.    3.6 percent.

25   Q.    Okay.

1    A.    I'm sorry, 3.6 per hundred patient years.

2    Q.    All right.  So 3.6 per hundred patient years, right?

3    A.    Yes, sir.

4    Q.    And then if we look down and we see the fatal bleeding,

5    what's the event rate for the fatal bleeding?

6    A.    Where you just boxed it at .2 -- .2 per hundred patient

7    years.

8    Q.    Okay.  And then if we look at the intracranial hemorrhage,

9    that would be like a brain bleed; is that right?

10   A.    That's correct.

11   Q.    And the event rate for that, sir?

12   A.    You have .5 per hundred patient year.

13   Q.    And so you were talking to us about the serious nature of

14   the safety endpoint, the safety aspect of this trial, and

15   that's reflected in these event rates; is that right?

16   A.    Yes, sir.

17   Q.    And then you worked with us in preparing a demonstrative

18   to help us put this in real life terms.  Can we take a look at

19   that, sir?

20   A.    Sure.  That would be great.

21   Q.    And describe it in terms of looking at it like the

22   Superdome.

23   A.    Right.  So if you looked at the Superdome that holds

24   76,000 people during a Saints game and you use those numbers,

25   you go to the next slide --

```
 1              MS. WILKINSON:  Excuse me, Your Honor.

 2                   Could you take that down?

 3                   I object to this demonstrative.  I just received

 4    this from Mr. Birchfield and we didn't get a chance to discuss

 5    it.

 6              MR. BIRCHFIELD:  Okay.

 7              MS. WILKINSON:  I object to the numbers that you are

 8    using.

 9              MR. BIRCHFIELD:  What's the basis of your objection?

10              THE COURT:  What is -- just speak to me.  What's the

11    issue?

12              MR. BIRCHFIELD:  Okay.

13              MS. WILKINSON:  Your Honor, I don't know the basis of

14    these numbers.  This isn't in Dr. Smart's report.

15              MR. BIRCHFIELD:  Well, I'll walk through them before I

16    put up the second part.

17    BY MR. BIRCHFIELD:

18    Q.   So, Dr. Smart, if we're looking at the event rate of 3.6

19    per hundred patient years, is that right, for the major

20    bleeding?

21    A.   Yes, sir.

22    Q.   Okay.  And so if we take an example of filling the

23    Superdome --

24    A.   So, again, it's just trying to -- the reason for it was to

25    try to put some size to that.  So if you put the Superdome full
```

1    of people that took Xarelto for one year, what you would

2    predict would be the outcome of those people's taking of that

3    agent for one year was a certain number would have a major

4    bleed, a certain number would have an intracranial bleed, and a

5    certain number would die.

6    Q.    Okay.  I just want to make sure that we've got this clear.

7    So if you have 76,000 people, you fill the Superdome with

8    people that take Xarelto and have taken it for one year; is

9    that right?

10   A.    Yes, sir.

11   Q.    And you apply the event rate that we see in ROCKET of 3.6?

12   A.    Correct.

13   Q.    And then that would -- if you run that calculation, you

14   can calculate how many of those patients would experience a

15   major bleeding event; is that right?

16   A.    Yes, sir.

17   Q.    And did you do that calculation?

18   A.    Yes, sir.

19   Q.    And is that the 2700?

20   A.    Yes, sir.

21        MS. WILKINSON:  Objection to the leading, Your Honor.

22   That's all since we're trying to see the basis of the numbers.

23        THE COURT:  Well, I understand.  Just rephrase the

24   question.  What's the percent?  What's the amount then?

25   BY MR. BIRCHFIELD:

1    Q.    How many of those patients, sir?

2    A.    May I pull out my calculations so I don't tell you the

3    number wrong?

4    Q.    Yes, please.

5    A.    All right.  So 2700 would experience a major bleed based

6    on the ROCKET-AF numbers, 380 would experience an intracranial

7    hemorrhage, and 152 of those individuals would die, and again,

8    that's people that got the drug for one year.

9    Q.    Okay.  All right.

10            MR. BIRCHFIELD:  Your Honor, we would like to show the

11    demonstrative.  We've established the basis there.

12            THE COURT:  Okay.  I'll allow it.

13    **BY MR. BIRCHFIELD:**

14    Q.    All right.  So, Dr. Smart, I just want to make sure that

15    we have this clear so that these numbers are real, when we're

16    looking at a major bleeding event.  So you would have -- if

17    76,000 people took it for one year, you would expect 2700 of

18    those patients to have a major bleeding event?

19    A.    Yes, sir, that's correct.

20    Q.    And then out of that same Superdome filled with 76,000,

21    you would have 152 that would die from a bleeding event?

22    A.    Again, correct, yes, sir, based on the numbers in the

23    ROCKET-AF trial.

24    Q.    And 380 of those would experience an intracranial

25    hemorrhage; is that right?

1    A.    Yes, sir, that is correct.

2    Q.    Okay.  So, as a manufacturer of the drug, the companies

3    that are selling it, these types of events, they were

4    foreseeable.  That's what they would expect for patients taking

5    their drug, correct?

6    A.    Those types of events were -- you don't know until you do

7    the trial, but those are what the events were.  Obviously, you

8    have an anticoagulant, you predict that you are going to have

9    adverse events, and so those were fairly -- in keeping with

10   what their predictions were, yes, sir.

11   Q.    All right.  Dr. Smart, I want to shift gears one more

12   time.  Before you were ever contacted by plaintiffs' lawyers,

13   before we asked you to help us with this case, had you had any

14   experience with Xarelto?

15   A.    Yes, sir.  Once Xarelto came out, I used it as actually my

16   primary new oral anticoagulant.  It was a Factor Xa inhibitor,

17   which is kind of, in my opinion, the better of the group.  It

18   was -- it had what I thought was a favorable profile with

19   regard to patients who would be taking it, their age, other

20   drug interactions and things like that.

21   Q.    Before we ever contacted you and asked for your help, had

22   you stopped prescribing Xarelto?

23   A.    I did.  I had had a few patients with gastrointestinal

24   bleed and they had had complications.  They were always -- I'm

25   going to use the term "fringe patients."  They were older or

1    thinner or didn't have quite the kidney function that I would

2    have liked to -- they certainly fit within the parameters of

3    what was on the package label for using the drug, but when I

4    looked at it, there was really -- I thought that it was patient

5    characteristics that made it worse.

6         I had a patient that was right in the middle of the road,

7    I mean, just the typical patient who was very -- always bad

8    things happen to nice people, it seems.  That's one of the

9    reasons I try to be mean, but the issue was I had given her the

10   drug.  Everything was as good as I could have possibly done it,

11   and she had a life-threatening gastrointestinal bleed.  She

12   required six units of transfusion.  Her blood pressure was low.

13   She had to be in the hospital for a few days.

14        So I said, gosh, you know what, I cannot use this drug any

15   better.  So I went back to read more about it to figure out

16   what I could, to see what I was missing or where along the way

17   I could have chosen more wisely.

18        And at that time, I read an article that was in one of the

19   Canadian journals that was very impressive to me, and I started

20   transitioning people off of Xarelto at that time and have

21   completely abandoned the use of it.

22   Q.   And, Dr. Smart, you said that you -- based on your

23   experience with that patient, it caused some questions in your

24   mind about Xarelto.  That's what prompted you to do further

25   research?

1    A.    It caused questions in my mind about what was going on.

2    It wasn't necessarily about Xarelto at the time.  It was about

3    me as well.  I mean, I didn't know if it was me or my choice or

4    what, but it made me concerned, because again, I didn't think

5    that I had the capacity to do any better than what I had done

6    with this person.

7    Q.    All right.  And just to make sure that we're clear on the

8    timing here, you did that research, you stopped prescribing

9    Xarelto to your patients.  You did that before we contacted you

10   and asked for your opinions about Xarelto?

11   A.    Yes, sir.

12   Q.    All right.  So let's go to your opinions that -- your

13   expert opinions that you're prepared to offer for us today.

14   Can you tell us, just give us a summary.  What are the opinions

15   that you are prepared to offer, sir?

16   A.    My report that I submitted to you was broken down into a

17   variety of sections.  Would you like me to just go through

18   those?  Is that what you are asking?

19   Q.    Maybe for time's sake, do you have an opinion about the --

20   A.    I'll cut it short, and you can ask me direct questions

21   along the way.  When I looked at the article that I mentioned

22   to you and a couple of others, I concluded that Xarelto was

23   given once a day, and based on what I knew of the pharmacology

24   and what was published about the pharmacology, meaning how the

25   drug gets in and gets out of the body like we talked before, it

1    should have been given twice a day.  It was a once-a-day

2    drug -- rather, it was a twice-a-day drug crammed into a

3    once-a-day prescription, and I thought that that was a poor

4    idea.  I still think it's a poor idea.

5            THE COURT:  Just a moment.

6            MS. WILKINSON:  Your Honor, I know we've discussed

7    this.  I just want to put my objection on the record about this

8    opinion and we'll, I think, finish it up later.

9            THE COURT:  Okay.

10           MS. WILKINSON:  Can I have a standing objection to

11   that?

12           THE COURT:  Yes.

13           MS. WILKINSON:  Thank you, Your Honor.

14   BY MR. BIRCHFIELD:

15   Q.   All right.  So you were talking about the -- it's a

16   twice-a-day drug?

17   A.    It should be a twice-a-day drug based on the

18   pharmacokinetics, the way the drug is absorbed and eliminated

19   from the body, and it's not.  It's given once a day, and I

20   think the result of that is that the dose is too high, and I

21   think that results in an excessive amount of people bleeding.

22   Q.   Okay.  All right.  So if I can summarize, so Opinion

23   Number 1 is the dose is too high?

24   A.    Yes, sir.

25   Q.    And that's connected with the once a day versus twice a

1    day?

2    A.    It's not connected.  It's intimately woven, yes, sir.

3    Q.    Okay.  All right.  And then do you have an opinion about

4    how Xarelto relates to the other NOACs, or new oral

5    anticoagulants?

6    A.    Yes.  So Xarelto, of all of the new oral anticoagulants,

7    is the worse.  And that's well established in the medical

8    literature that -- and even by the FDA.  The FDA said that

9    Xarelto was equal to Coumadin.  The other drugs which would be

10   apixaban or Eliquis, dabigatran or Pradaxa and edoxaban or

11   Savaysa are in one shape or form superior either in

12   anticoagulation effect or in bleeding or in both.

13   Q.    Okay.  Dr. Smart, and what I would like for us to do is

14   let's get the summary of the opinions, and then we'll go and

15   have you explain to us the basis for each of these opinions, if

16   that's okay.

17   A.    Okay.

18   Q.    And then do you have an opinion as to whether the safety

19   information, the label -- the safety information provided by

20   the companies relative to Xarelto is adequate?

21         MS. WILKINSON:  Your Honor, I'm going to object to this

22   opinion as well based on the representations of the pretrial

23   pleadings.

24         THE COURT:  Okay.  And I'll make that continuing, too.

25   A.    So when physicians look at drug labels -- and I will

1    confess we don't do it nearly as much as we should -- we look

2    for what's called a black box warning, which is when the FDA

3    says:  Hey, you really need to focus on this because this is

4    important.

5         If you were to look, Coumadin has a black box warning that

6    says:  Bleeding is an issue.  You really need to focus on this.

7    Be careful.  Monitor it, and then things like that.

8         Xarelto, I believe, should have a black box warning as

9    well because all of the literature and the FDA said that

10   there's no difference.

11        So if Coumadin has it, then, in my opinion, Xarelto should

12   have a black box warning label as well.

13   Q.   So, Dr. Smart, let's say that the label, the safety

14   information -- is it adequate or inadequate?

15   A.   By what I just told you, I think it's not adequate.  I

16   don't think that there's enough information available.  And I

17   don't say available -- there's not enough information

18   highlighted, if you would, to really draw your attention to the

19   risks associated with the agent.

20   Q.   Okay.  Thank you, Dr. Smart.

21        All right.  So let's turn to the first opinion that the

22   dose is too high.

23        And, Dr. Smart, in arriving at your opinion on this, did

24   you -- you mentioned that you -- in your research you came

25   across an article out of a Canadian journal that had a

1    particular impact on your decision here.

2    A.    Yes, sir.  The senior author was Kim, but it was from -- I

3    think it was a 2012 or '13 article from -- actually, what turns

4    out -- the Canadian FDA, if you would, is what it is, one of

5    the investigators with them.

6    Q.    I want us to take a look at that article in just a second,

7    but I want to make sure that we're talking in the right terms.

8         When we say the dose is too high, what is the dosing

9    regimen for AFib patients, both for those without renal

10   impairment and those with renal impairment?

11   A.    The dose -- the recommended dose of Xarelto with normal

12   renal function for nonvalvular AFib is 20 milligrams once a

13   day.

14        And for people who have moderate renal impairment -- and

15   we define that -- and, actually, we -- everybody defines it --

16   but it's defined in the label as well as a creatinine

17   clearance, meaning your kidney functions are roughly a third of

18   the maximum.

19        With the numbers 30 to 59, we say that you should be on --

20   30 to 49, 50, you should be on a reduced dose of Xarelto, which

21   would be 15 milligrams once a day.

22        And then below that there's not enough information to

23   warrant saying the drug is safe.  So you're advised not to use

24   it in people with really bad renal failure or on dialysis.

25   Q.    Dr. Smart, if we could, I want to take a look at

1    Plaintiffs' Exhibit 5767516 as a demonstrative.

2         You mentioned that it was the Canadian Journal of

3    Cardiology.  Is this the article that you were referring to,

4    Dr. Smart?

5    A.    Yes, sir, it is.

6    Q.    And you mentioned that it was by Dr. Kim.  And I think you

7    explained to us that --

8    A.    Correct.

9    Q.    -- the senior author is listed last.

10   A.    The senior author is Kim.

11   Q.    Dr. Smart, if we could turn to PDF Page 5.  Notice at the

12   bottom.

13        Is this chart, these figures -- was this helpful for you

14   in arriving at your opinion?

15   A.    More than that.  This was my aha moment for:  Okay.  I

16   understand now why I'm struggling and have a reason to not use

17   this agent anymore.

18   Q.    So, Dr. Smart, can you tell us -- just walk us through

19   this article and how its findings led you to your opinion or

20   support your opinion.

21   A.    So we talked a minute ago about pharmacokinetics and

22   pharmacodynamics, meaning, when you give a drug, it goes into

23   your system, it gets in at a certain rate, it then gets moved

24   out at a certain rate either by the kidneys, the liver or

25   metabolized to something else.  And that is the net effect of

1    what goes on.

2         When we look at drugs, we try to decide the correct dose,

3    like we talked about in the earlier phases of the trials.  We

4    try to decide:  Okay.  Should we give the dose one time a day

5    or six times a day?

6         We base that on how long the drug stays in your system,

7    and we call that the half-life, meaning that -- the amount of

8    time it takes for half of the drug to go away.

9         And so, if the half-life is long, like a drug like

10   amidoarone, which has a half-life of 48 hours, you give the

11   drug once a day.

12        If the half-life is short, like four hours, you give the

13   drug as much as four times a day.  And you do that because it's

14   eliminated fairly quickly.

15        And I can walk through some of these.

16        I also help to craft some of just less complicated

17   figures, because what these figures show is -- with all these

18   different lines on it, it gets kind of soupy.  But let me just

19   kind of form up what I saw in this paper and what was really,

20   like I said, that eye-opening thing for me.

21        If you were to look at these three graphs, the first graph

22   is the drug Pradaxa, or dabigatran.  The second graph is a

23   drug -- Xarelto or rivaroxaban.  And C, the third graph, is a

24   drug called apixaban, or Eliquis.

25        Now, what we talked about before with Coumadin was looking

1   for just enough anticoagulation and not too much, and we said

2   that was the therapeutic range.

3        Well, in this trial -- it was not a trial -- this is using

4   data that's supplied by the various pharmaceutical companies to

5   craft these graphs -- we use what's called a Cmin and a Cmax,

6   which is basically the sweet spot of anticoagulation.

7        So that's where you want to keep the anticoagulation

8   level.  That's -- your blood is thin enough to not have a

9   stroke, but it's thick enough to clot if something goes

10  tragically wrong.

11       So you can see on A -- this shaded area is going to be the

12  sweet spot of what we're talking about.  That's kind of where

13  we want to have the anticoagulation profile and --

14  Q.   Dr. Smart, would this be a good point to shift to the

15  demonstratives, the slides that you helped us to prepare?

16  A.   I think it's much easier because then I don't have to talk

17  about all of the different lines and it's a little bit clearer.

18  Q.   Okay.

19       MR. BIRCHFIELD:  Let's go to the demonstrative.

20  BY MR. BIRCHFIELD:

21  Q.   Dr. Smart, you directed that these slides be prepared to

22  make it clearer?

23  A.   Yeah.  So let me go back so that we can actually focus on

24  where this is on the slides so you can see this isn't something

25  I just cooked up, if you don't mind.  Can you go back to the

1   slide that we just left?

2   Q.    Okay.

3   A.    I hope I didn't throw you too big of a curve on that.

4   Q.    There you go.

5   A.    So, again, we're looking at the shaded area because that's

6   the area that we are really interested in.  We are also looking

7   at the typical patient.  So we are not talking about somebody

8   with bad kidney function or something like that.  This is the

9   typical AFib patient.

10       So you can see that that's -- this black dotted line is

11   the -- and that carries forward on the dabigatran or Pradaxa

12   group that's on the rivaroxaban or Xarelto group and also on

13   the apixaban and Eliquis group.

14       The black dotted line is what we're focusing on.  And what

15   we're focusing on is the shaded area, which is where we want to

16   be.

17       So we want to be in the shaded area, and the black dotted

18   line is the typical patient.  So now, if you go forward, we can

19   take a look at the --

20   Q.    So you used those shaded areas.  You transferred those to

21   the slides.

22       Did you make any adjustments to --

23   A.    The scales on those slides are different.  So we just

24   normalized the scale on this so that we were comparing apples

25   and apples.

1    Q.    All right.

2    A.    So here again the shaded area is the important spot.

3    That's where we want to be.  That's the blood is thin enough to

4    not have a stroke, but it's thick enough to not have a clot and

5    we don't have excessive bleeding.

6    Q.    And just to make sure that we're clear, we're looking at

7    apixaban.  This is a chart for apixaban?

8    A.    Correct.  Eliquis or apixaban.

9    Q.    And Eliquis.

10         And it's prescribed twice a day; is that right?

11   A.    That's correct.

12         So Eliquis is a NOAC similar -- it's a Factor Xa inhibitor

13   just like Xarelto, and it is prescribed twice a day.  You can

14   see that it's got this hump here.  That hump occurs after the

15   dose is given.

16         So we give a dose here and it gets absorbed and you see

17   that hump come up and then it's gradually eliminated from the

18   body until you give the second dose.

19         The hump comes up again and is gradually eliminated.  So

20   here we start the next day and we are ready to give the next

21   dose.

22   Q.    Dr. Smart, if we are looking at this chart down across the

23   bottom line, those numbers there, that's -- those are measured

24   in hours; is that right?

25   A.    Yes, sir.  I'm sorry.  Zero to 24 hours.

1    Q.    Okay.  And so we see the hours.  And that's measuring the

2    blood in the system or the plasma concentration; is that right?

3    A.    Yes, sir.  That's what the Y-axis is.

4    Q.    Explain that to us.  Explain the Y-axis over time, sir.

5    What are you looking for?

6    A.    Well, again, when -- I told you that, when we do these

7    early phases of trials, we measure the amount of chemical, drug

8    in the blood after we give the dose.

9         And so we know, if we give it at time zero, at 30 minutes

10   it's going to be one number and, at an hour, it's going to be

11   something else.  And those numbers relate to the effect of the

12   drug.

13        So the plasma concentration that we know gives us -- the

14   appropriate amount of anticoagulation is what is on there as

15   the shaded area.

16        So then, in this case, it's -- the 50 to 200 milligrams

17   per ML plasma concentration of apixaban gives us that

18   appropriate amount of blood thinner.

19   Q.    And the article -- it also had a similar chart for Pradaxa

20   as well?

21   A.    Yes, sir.

22   Q.    Okay.  Let's take a look at Pradaxa.

23   A.    Okay.

24        Can you clear the green stuff off of there?  Thank you.

25        So here again the plasma concentration is on the Y time

1    and hours is on the X.  And that sweet spot or that particular

2    degree of anticoagulation is in that shaded area.

3         Again Pradaxa is given twice a day.  So here is where the

4    dose is given.  And here's the maximum dose.  Here is where

5    it's dosed a second time.  Here's the maximum absorbed amount.

6         You can see that we -- to get -- to keep it inside of the

7    shaded area here, we actually have to go outside of the shaded

8    area here a little bit along the way.

9         So, actually, anything outside of this shaded area is more

10   drug than you need for thinning the blood.  So it's -- for

11   reducing stroke risk, I should say.

12        This is going to represent an area that the blood is going

13   to be thinned and more bleeding risk, but not any more stroke

14   reduction risk.

15   Q.   Okay.  So the time that is spent that you have shaded

16   there in green, that represents the patient is experiencing an

17   increased risk of stroke because the blood is -- I'm sorry --

18   an increased risk of bleeding event, right?

19   A.   That's a time that you would spend with more blood thinner

20   in your body than you need to accomplish what you are trying to

21   do.  We said all along that this is a balance between too much

22   and not enough.

23        This little diversion outside of that shaded area

24   represents too much, but it's done that way to create enough at

25   the trough level so that you don't swing back out of that

1    shaded zone and get too low down here and experience a stroke

2    risk.

3    Q.    So above the line you're getting an increased risk of

4    bleed, but you are not getting any increased benefit of stroke

5    reduction; is that right?

6    A.    That is correct.

7    Q.    And then they also do a chart like this for Xarelto?

8    A.    That is correct.

9          So Xarelto is -- and this was why it was important to me

10    when I saw this.  Xarelto has a half-life that's less than

11    12 hours and, yet, the drug is given once a day.

12          So in order to keep it inside of the shaded area at the

13    24-hour mark, you have to give a lot of drug and look at the

14    level of over-anticoagulation that occurs for almost 12 hours

15    out of the day.

16          So in an effort to give the drug once a day, you expose

17    this much area for that, again, excessive bleeding risk with no

18    added stroke risk.

19          And I think that's important because my opinion isn't that

20    rivaroxaban is a bad drug.  My opinion is that rivaroxaban is a

21    twice-a-day drug and it's being given once a day.

22          If you were to think that you gave less of this, but you

23    did it twice, similar to what was done in dabigatran and

24    apixaban, it might look different.  It might be like that

25    (drawing).

1    I don't know.  And, again, it's not known is the key.  We

2    didn't do it that way.  Interestingly, it has been done that

3    way now.

4        So the makers of Xarelto giving it for other reasons, like

5    blocked coronary arteries and a heart attack, now do give the

6    drug twice a day.  In the trial they give it in a lower dose.

7    Q.    Dr. Smart, I want to come back to where you did this

8    research on your own, found this article --

9    A.    So, again, I didn't do the research.  I found the article.

10   I read to see what was going on.  This was all done.  This was

11   in published literature.  It just wasn't something that I --

12   this is not a journal that I read all the time.  So it hadn't

13   crossed my path.

14   Q.    Okay.  I need to be careful with my research terms.

15       You were reviewing the medical literature.  You were

16   searching the medical literature.

17   A.    I was trying to find out what went wrong with my folks,

18   particularly this lady, and what I could have done better.  And

19   when I understood the amount of exposure to bleeding without

20   added benefit, I said that I need to not use this agent.

21   Q.    And, Dr. Smart, you were talking to us -- these charts --

22   they represent the pharmacokinetics, the pharmacodynamics, of

23   the drug; is that right?

24   A.    Yes, sir.

25   Q.    Do you teach pharmacology to graduate students?  Is that

1   something you've done in the past?

2   A.   Yes, sir.

3   Q.   And you do practice medicine, but you are also a teacher

4   and a researcher; is that right?

5   A.   Yes, sir.

6   Q.   Would you put yourself in a different category from a

7   cardiologist that is just treating patients every day as far as

8   being able to assess and find this type of material?

9   A.   Sort of.  I don't have a whole stack of patients that I

10   have to see.  So any cardiologist can find this material.  They

11   just don't have the time to do it.

12        I told you that I see patients roughly two days a week,

13   two half-days and one full day.  A practicing cardiologist sees

14   people six, seven days a week and they don't have time.  They

15   don't physically have time to chase down information like this.

16   Q.   And, Dr. Smart, after you had reached this conclusion and

17   you decided not to keep your patients on Xarelto, did you --

18   once you began looking for us, did you find some material from

19   the FDA that is consistent with your opinion here?

20   A.   I did actually.  Again, I had never -- I had never seen

21   transcripts from the FDA and didn't even know that they were

22   available.  You folks have a lot more manpower than I do, and

23   you showed me a transcript from the FDA that were the two

24   doctors, the clinical scientific reviewers of rivaroxaban,

25   Xarelto, that reviewed it for the FDA.

1       MR. BIRCHFIELD:  I want to take a look at the FDA, the

2  summary review.  We offer this, Your Honor, as Plaintiffs'

3  Exhibit 4.  The identification number is 5767781.

4       THE COURT:  Any objection?

5       MS. WILKINSON:  No objection.

6       THE COURT:  Let it be admitted.

7  **BY MR. BIRCHFIELD:**

8  Q.   Dr. Smart, can we take a look.  This is the Center For

9  Drug Evaluation and Research.  That's the FDA, right?

10 A.   Yes, sir.

11 Q.   Okay.  And this is their summary review.  If we take a

12 look at the next page, see, this pertains to the application

13 for Xarelto for AFib; is that right?

14 A.   That's correct.  So, Xarelto had already been approved for

15 the use in deep venous thrombosis, which is a clot in one of

16 the major veins and for clots in the lungs.  This was looking

17 at the drug, what's called an NDA, New Drug Application for

18 Xarelto in nonvalvular atrial fibrillation.

19 Q.   Okay.  You mentioned reviewing the findings of the primary

20 reviewers of the FDA.  Let's take a look at Page 3 and see if

21 that's what you are referring to.  There in the middle of the

22 page where it talks about the primary clinical reviewers, do

23 you see that, Dr. Smart?

24 A.   Yes, I do.  Unfortunately, you kind of put that out there.

25 That's okay.

1    Q.    If I can -- before we go into what it says, will you

2    explain to us what the primary clinical reviewers of the FDA,

3    what --

4    A.    So the FDA assigns -- any information that they are

5    considering a new drug, they assign it to, again, clinician

6    scientists whose job it is to take a look at that information

7    and make sure that the conclusions that they have come to are

8    sound.  The conclusions come to by the applicants, in this

9    case, the drug company are sound, similar to the peer-review

10   thing that we talked about for the medical literature.

11         So these are clinician scientists who are supposed to look

12   at the way the trial is conducted, the outcome of the trial,

13   and all of the things that were involved in reaching that, and

14   then present that information to the FDA committee that will

15   vote yes or no to approve the drug.

16   Q.    Okay.  All right.  So the primary clinical reviewers, they

17   are the ones that are responsible for assessing all this

18   information that's received from the drug companies, right?

19   A.    Yes, sir, that is correct.

20   Q.    All right.  And so if we take a look -- so we can put this

21   in context, it says the primary clinical reviewers identify the

22   following reasons in their review of this NDA -- that's a New

23   Drug Application; is that --

24   A.    Yes, sir.

25   Q.    Okay.  And that is -- I think is that what you were

1    explaining just a second ago, it was already on the market,

2    already approved for other indications.  This is an application

3    for AFib; is that right?

4    A.    Nonvalvular atrial fibrillation, yes, sir.

5    Q.    All right.  So they are reviewing this NDA, and these are

6    the basis for recommending that this NDA not be approved; is

7    that right?

8    A.    So they were asked to review the NDA for Xarelto for

9    nonvalvular atrial fibrillation.  In their review, they

10   concluded that the drug didn't have enough information to

11   warrant the FDA approving the drug for release for nonvalvular

12   atrial fibrillation at the dose of 20 milligrams once a day and

13   15 milligrams for those renally impaired people.

14   Q.    I think what you are referring to is on the next page, if

15   we can take a look at Page 4 in that first bullet point.

16   A.    Yes.  So before you go there, when you ask, this is a

17   summary of the transcript from the FDA, and I think it's

18   important to note that right here, most of this recommendation

19   will explain why the division took a different action to the

20   one recommended by the reviewers.  So we will talk some about

21   what the reviewers thought, and then some of this was going to

22   be why the FDA went against the reviewers and still decided to

23   move forward.

24   Q.    Okay.  All right.  Thank you, Dr. Smart.  So if we go

25   back, go to the first bullet point there on Page 4.

1    A.    Yes, sir.

2    Q.    And so will you walk us through what this says.  It says,

3    "No rational basis for the applicant's choice."  Now, the

4    applicant, again, is that the drug companies in this case?

5    A.    Yes, sir.  So it would be Bayer and Janssen,

6    Johnson & Johnson.  Their choice of the 20-milligram once-a-day

7    dose was not founded on an atrial fibrillation smaller trial

8    that was a really good dose-ranging study.  It was based on a

9    couple of small things that had been done, and primarily the

10   dose that was in the DVT indication.

11   Q.    Okay.  All right.  And when it says that the

12   pharmacokinetic, pharmacodynamic properties of Xarelto suggest

13   the drug should be administered twice a day, when it's talking

14   about the EK and PD, is that the charts that you were looking

15   at in the Kim study?

16   A.    Yes, sir, it is, and what was eye-opening to me was that

17   the clinical reviewers concluded the same thing that I did.

18   Now, they are much better scientists and the like than I am.

19   I'm not a reviewer for the FDA, but they arrived at the same

20   conclusion, that this drug would be better administered twice a

21   day.

22   Q.    Okay.  Dr. Smart, you mentioned that there was a committee

23   that reviewed this information, is that right, and the decision

24   was made by the division to go forward; is that right?

25   A.    Yes, sir.

1    Q.    And advisory committee, an advisory committee, is that

2    what you are referring to?  Was there an advisory committee for

3    the AFib indication of Xarelto?

4    A.    Yes, sir.

5    Q.    Okay.  And will you explain to us what an advisory

6    committee is and what the role was here for AFib?

7    A.    An advisory committee is composed of a group of experts

8    and people that the FDA engages to, again, decide should the

9    drug be given FDA approval for that particular indication.

10         They then further look at the way it's given, in other

11   words, the label and what's on the label and what the drug

12   company can assert, it's better, it's as good, it's fantastic

13   versus what the studies show, and so they are -- they have some

14   role in saying whether the drug company can say that it's

15   useful, better than, or equal to certainly.

16   Q.    And as part of your review, did you review the transcript

17   of the advisory committee meeting for Xarelto and AFib?

18   A.    Yes, sir, I did.

19   Q.    Okay.  And was there any discussion about this once-a-day,

20   twice-a-day, the dose being too high by any of the advisory

21   committee members that stood out to you, sir?

22   A.    There was extensive discussion about it from all of the

23   committee members, and everybody had -- and again, I'm sorry, I

24   wasn't there.  So based on the transcript, it seemed that most

25   people had some degree of trepidation that nobody really knew

1    what the correct dose was.

2         The conclusion seemed to be that if the FDA had had their

3    druthers, the company would have tested a twice-a-day dose, but

4    they went on to say that they didn't have the capacity to force

5    the company into doing that, and the only thing that they could

6    do was to consider the information that had been presented to

7    them at the once-a-day dose.

8    Q.   And, Dr. Smart, Dr. Steven Nissen, was he one of the

9    members of the advisory committee?

10   A.   He was.  Steve Nissen is the head of cardiology at the

11   Cleveland Clinic, and he was on the committee, and his comment

12   was that he thought that this was a -- the dose of once a day

13   was arrived at for marketing reasons and not scientific ones.

14   Q.   Dr. Smart, you reviewed that transcript as part of the

15   process in rendering your report in this case; is that right?

16   A.   It is less in my report than -- but yes, sir, I reviewed

17   it.  I didn't specifically mention that in my report.

18   Q.   Okay.

19        MR. BIRCHFIELD:  Your Honor, we offer as Plaintiffs'

20   Exhibit 5 a copy of that transcript.  It is Plaintiffs'

21   Exhibit 5768873.

22        MS. WILKINSON:  Your Honor, I'm going to object as to

23   hearsay and the other irrelevant material.  Maybe at the

24   conclusion of the day we can work with Mr. Birchfield on what

25   part he is actually trying to get in.

1        THE COURT:  Okay.  I'll refrain from ruling at this

2   time.  I'll listen to you-all after the evidence.

3        MR. BIRCHFIELD:  Your Honor, to avoid -- it is a big

4   transcript, and I understand Ms. Wilkinson's objection.  May I

5   just show the portion of the transcript that Dr. Smart just

6   referred to from Dr. Steven Nissen?  It is on Page 287 of the

7   transcript.

8        MS. WILKINSON:  Your Honor, I object because it's

9   hearsay, and he said he didn't rely on it in coming to his

10  report, so I do object to it.  He gave a summary, and I

11  understand that, but I object to the underlying --

12       THE COURT:  I think he said he did rely on it.  Let him

13  look at it, but not the jury at this time.

14       MR. BIRCHFIELD:  Okay.

15  **BY MR. BIRCHFIELD:**

16  Q.   Dr. Smart, I'm showing you what is Page 287 of the

17  transcript.  The highlighted portion, is that what you were

18  referring to, the comments by Dr. Steven Nissen?

19  A.   Yes, sir, it is.

20       MR. BIRCHFIELD:  Your Honor, at this time may I show

21  this to the jury?

22       THE COURT:  No.  We're not going to show it to the jury

23  at this time.  I'll decide whether or not it's going to be

24  admitted, but I'll let him identify it at that time.

25  **BY MR. BIRCHFIELD:**

1    Q.   Dr. Smart, if you would, would you read for us this

2    portion that you were referring to?

3         THE COURT:  Well, it's identified.  He said that it's

4    the highlighted portion on whatever page it is.

5         MR. BIRCHFIELD:  Okay.  Thank you, Your Honor.

6    BY MR. BIRCHFIELD:

7    Q.   Dr. Smart, did you consider Dr. Nissen's testimony there

8    at the advisory committee to be further support in your opinion

9    that the dose was too high in the once-a-day versus twice-a-day

10   was improper?

11   A.   Yes, sir.  I thought Dr. Nissen did an excellent job of

12   summarizing the information in ROCKET-AF, and again, his

13   opinion has virtually echoed mine, and that gave me some degree

14   of solace that I was on target with things.

15   Q.   Dr. Smart, I want to turn for just a second to -- we've

16   talked about the ROCKET-AF study, and that was the clinical

17   trial for the AFib indication for Xarelto, right?

18   A.   Yes, sir.

19   Q.   And in reviewing your materials, after you had signed the

20   confidentiality order, did you review any materials pertaining

21   to a ROCKET2 or a ROCKET booster, a follow-up clinical trial

22   for the AFib indication?

23   A.   Yes, sir, I was given by your group some e-mail documents

24   from people in -- I think Johnson & Johnson, but I'm not going

25   to swear to that, so I don't know that for sure, but they were

1    internal e-mail documents, and one of them came from Dr. Rob

2    Califf, who was the senior author of the paper that we talked

3    about, the paper in the New England Journal about ROCKET-AF,

4    and he was the lead investigator of ROCKET-AF through what's

5    called DCRI, or Duke Clinical Research Institute.

6    Q.    Okay.  And based on the materials that you reviewed, did

7    you see Dr. Califf proposing additional study be done, and what

8    was the nature of that study?

9    A.    I saw a couple of things where he said that the dose was

10   too high, and that this was going to be problematic when

11   comparisons started between the different NOACs, that it was

12   going to be apparent that the dose was too high.

13       He then proposed another study that he called ROCKET-AF

14   booster, which was a smaller study that would have evaluated

15   four different doses of rivaroxaban in nonvalvular AFib, so

16   220 milligrams once a day, 10 milligrams twice a day, 15

17   milligrams once a day, and 7.5 milligrams twice a day.

18   Q.    Okay.  And based on the materials that you reviewed, what

19   was the basis for Dr. Califf making this recommendation?

20   A.    The pharmacokinetics and pharmacodynamics that we've

21   already discussed, anybody with an eye for those types of

22   scientific studies will quickly conclude that the drug should

23   be administered twice a day.

24   Q.    And did you review a -- did you review an actual proposal

25   from Dr. Califf for a ROCKET follow-up study?

1   A.   That's what I was just talking about.  There was a

2   two-page proposal that he called a ROCKET-AF booster.  And,

3   again, as a disclaimer, it doesn't have his name on it, but it

4   was given to me under the premise that that's where -- it was

5   from him.  So I can't tell you that he signed it or something,

6   but I will presume that it is from him, as you said, in which

7   case, yeah, I reviewed it.

8   Q.   Okay.

9         MR. BIRCHFIELD:  I think we'll have that cleared up

10   through some video deposition testimony, but, Your Honor, I

11   discussed this with Ms. Wilkinson earlier.  If it's okay, we'll

12   proceed with offering this as Plaintiffs' Exhibit 6.

13         MS. WILKINSON:  I have no objection to him showing it

14   to the witness at this time, Your Honor.

15         THE COURT:  Let it be admitted.

16   **BY MR. BIRCHFIELD:**

17   Q.   I'll show you what's marked as Plaintiffs' Exhibit 6 as

18   identified as Plaintiffs' Number 690563.  And, Dr. Smart, is

19   this the document that you were referring to, the proposal for

20   a follow-up study by Dr. Robert Califf?

21   A.   This is what I was referring to, yes, sir, and as you see,

22   and when you see on the next page, I don't think it has

23   Califf's name on it anywhere, but yeah, that's what I reviewed

24   as his proposal for the ROCKET booster.

25   Q.   Okay.  So I know you have told us this, Dr. Smart, but I

1    just want to make sure.  When we are talking about Dr. Robert

2    Califf, we are talking about the doctor at Duke Clinical

3    Research Institute that was the primary investigator for the

4    ROCKET study, the original clinical trial for AFib approval; is

5    that right?

6    A.    Yes, sir, that is correct.

7    Q.    All right.  And so based on the information provided to

8    you that we'll clear up through deposition testimony, this is a

9    proposal that he is making to the drug companies, right, for a

10   follow-up study?

11   A.    Yes, sir.  That's the way I read it based on the e-mails

12   that you provided to me, yes, sir.

13   Q.    All right.  So walk us through what you find significant

14   here, Dr. Smart.

15   A.    Well, again, for the sake of rehashing, he says that

16   rivaroxaban is a good drug, and it has tremendous potential to

17   reduce death and disability in atrial fibrillation, but it's

18   jeopardized by uncertainty regarding the dosing regimen, which

19   you can see right there at the bottom, and again, I think that

20   that is a fairly well-held premise now with regard to Xarelto

21   and its dose.

22         So, formal and informal overviews of completed trials are

23   favorable compared to warfarin, but unfavorable compared to

24   dabigatran, which is Pradaxa and apixaban, which is Eliquis.

25         And so what he's saying is that even though ROCKET-AF

1    showed that Xarelto and warfarin were equivalent when comparing

2    Xarelto with Eliquis or Xarelto with Pradaxa, those comparisons

3    were going to fall on favor of those other agents from a safety

4    and efficacy standpoint.

5    Q.    All right.

6          MR. BIRCHFIELD:  Let's clear that if we can, Carl.

7    **BY MR. BIRCHFIELD:**

8    Q.    I want to go to that second paragraph -- the first part of

9    that second paragraph and ask you to help us understand what

10   he's saying there.  When he talks about the major comparative

11   advantage of rivaroxaban or Xarelto, is its once-daily dosing,

12   right?

13   A.    Correct.

14   Q.    When he's talking about the comparative advantage, what

15   does he mean by that?  What does that mean?

16   A.    Why would you use this drug over something else?  So why

17   would you use Xarelto instead of Eliquis?  The major advantage

18   would be this once-a-day dosing, is what he's saying.  And then

19   that is the basis for someone choosing this over something

20   else.

21   Q.    All right.  Then he goes on to say "but the failure of

22   ROCKET-AF to prove superiority."

23         What does that mean?

24   A.    So, again, we said that Xarelto was the worst in the class

25   of these drugs.  It was never shown to be superior to warfarin

1    for either stroke or bleeding.  But Eliquis, or apixaban, was

2    shown to be superior for both.

3         So now, if you were looking at it from a physician's

4    perspective, you've got one drug that you take twice a day, but

5    it's better than warfarin for stroke, better than warfarin for

6    bleeding risk.

7         You've got another drug that you take once a day that is

8    not any better than warfarin, and when you compare this drug

9    with Eliquis directly, it does not hold up either.

10   Q.   Okay.  So that will lead us to the second opinion that you

11   have offered here, that Xarelto is worst in class?

12   A.   Yes, sir.

13   Q.   So we talked about your opinion that the dose is too high

14   when it's given once daily versus twice daily, correct?

15   A.   Yes, sir.

16   Q.   You found that support, found initially in the Canadian

17   Journal of Cardiology, and you found further support in the FDA

18   documents as well?

19   A.   Yes, sir.  And multiple documents.

20   Q.   All right.  So now let's focus on your second opinion that

21   Xarelto is worst in class.

22        When we say "worst in class," what class are you talking

23   about?

24   A.   The NOACs.

25   Q.   So the NOACs, that would include apixaban, Eliquis, that

1    you've just talked about?

2    A.    Correct.

3    Q.    And dabigatran that you've talked about?

4    A.    Correct.

5    Q.    Okay.

6    A.    And edoxaban.

7    Q.    And edoxaban.  That's Savaysa?

8    A.    Yes.

9    Q.    So when you explained -- when you look at the clinical

10   trial, you described ROCKET -- the ROCKET trial for us.  Were

11   there similar clinical trials for Eliquis and Pradaxa as well?

12   A.    Yes, sir.

13   Q.    And Savaysa?

14   A.    So the RE-LY trial was the Phase III big clinical trial

15   for Pradaxa and the ARISTOTLE trial was the Phase III clinical

16   trial for Eliquis or apixaban.

17   Q.    And I think when we were looking at Dr. Califf's memo --

18   or proposal for the follow-up study, he talked about the

19   superiority of apixaban, right?

20   A.    Yes, sir.  Again, apixaban is labeled and has in ARISTOTLE

21   and all the stuff with the FDA -- apixaban is labeled as

22   superior to warfarin where Xarelto or rivaroxaban is

23   noninferior, meaning they are equal.

24   Q.    So when you looked at the clinical trials for apixaban or

25   Eliquis and Pradaxa and Xarelto -- when you look at those

1    studies, does that provide support for your opinion that

2    Xarelto is worst in class?

3    A.    It is the basis for it.

4    Q.    Okay.  Will you explain what you mean?

5    A.    There's four drugs in a class.  The best one is safe from

6    bleeding and good from stroke, apixaban.  The second best ones

7    are going to be equal on stroke, safer on bleeding, dabigatran,

8    edoxaban.  And the worst is Xarelto or rivaroxaban, which is

9    again equal, equal.

10   Q.    Okay.  So let's make sure that we can track this.

11         So, first of all, we'll talk about your third opinion in

12   just a minute.  When you are looking at a clinical trial, you

13   are looking at both the safety and what we call efficacy; is

14   that right?

15   A.    Yes, sir.

16   Q.    When we are looking at the NOACs, the safety aspect is

17   bleeding events; is that right?

18   A.    Yes, sir.

19   Q.    All right.  So if we look at safety and efficacy, when

20   we're talking about efficacy -- when we're talking about

21   efficacy, we're talking about reducing strokes.

22         That's what we're looking for in the NOACs; is that right?

23   A.    That is correct.

24   Q.    So when we look at these drugs, if we look at Eliquis --

25   all right? -- so Eliquis in the clinical trial, is it shown to

1    be superior in both safety and efficacy?

2    A.    Yes, sir.  To warfarin.

3    Q.    To warfarin.  Okay.

4          All of these --

5    A.    Or compared to warfarin, yes, sir.

6    Q.    All right.  So Eliquis is superior to them both.

7          All right.  And then, when we look at Pradaxa -- okay? --

8    compared to warfarin, was Pradaxa -- was it superior to

9    either -- in either safety or efficacy?

10    A.    Yes, sir.  It was superior in safety.

11    Q.    Okay.  All right.  What about efficacy?

12    A.    Equal.

13    Q.    Equal.  All right.

14          And then, when we look at Xarelto -- all right -- was

15    Xarelto superior in safety?

16    A.    No, sir.

17    Q.    Was it superior in efficacy?

18    A.    No, sir.

19    Q.    And then you mention the other -- Savaysa; is that right?

20    A.    Correct.

21    Q.    What about Savaysa?  Where would you --

22    A.    Safety, superior.  Efficacy, equal.

23    Q.    And, Dr. Smart, what you are talking about here, this is

24    based on the clinical trials that were submitted to get these

25    drugs approved to be sold in the U.S.; is that right?

1    A.    Yes, sir.  And a host of follow-up studies that were done

2    as well.

3    Q.    I want us to talk a little bit more about the clinical

4    trials -- take a little closer look and compare the TTR.  We

5    talked about that this morning, that time in therapeutic range.

6          When you looked at these clinical trials, was there any

7    significance about the time in therapeutic range, the TTR, for

8    warfarin?

9    A.    Yes.  So it's important, again, to talk about this because

10   what we've done is to list a comparison between a drug and

11   warfarin.

12         Well, if you didn't do a good job with warfarin, your

13   comparison is going to be off.  Right?  So you really need to

14   make sure that you've done the very best that you could

15   controlling warfarin.  And then you compare your drug because

16   the entire comparison is based on that.

17         We used the TTR as the time that warfarin was well

18   controlled.  We said that the therapeutic range is where we

19   want to be.  And if the TTR in all of the trials is

20   100 percent, then it's easy to compare.  The TTR wasn't

21   100 percent.

22         So the TTR in the Xarelto trial in ROCKET-AF was

23   55 percent.  So 45 percent of the time the patients were not

24   well controlled and 55 percent of the time they were well

25   controlled.

1      The TTR in the Pradaxa trial was 64 percent, and the TTR

2   in the apixaban trial was 62 percent.  So they had a higher

3   TTR.  And so they were -- the Coumadin arm was better managed

4   in those trials.

5      And that was made note of by all -- actually -- yeah --

6   all of the FDA reviewers.  All of them made mention of it at

7   some point in time.

8   Q.   And, Dr. Smart, I want to show you what's marked as

9   Plaintiffs' Exhibit 7 -- it's identified as Plaintiff

10  No. 5768984 -- and ask you if this is the reference that you

11  are making to the FDA findings on these time in therapeutic

12  range.

13      MR. BIRCHFIELD:  Your Honor, I'm sorry.  We offer

14  Plaintiffs' Exhibit 7.

15          (Conferring privately with Ms. Wilkinson.)

16      MR. BIRCHFIELD:  Just one second, Your Honor.

17          (Brief pause in the proceedings.)

18      MS. WILKINSON:  I will object, Your Honor.  It wasn't

19  on his reliance list, and we didn't receive notice.

20      MR. BIRCHFIELD:  It's part of the AdCom review

21  materials that was included in his report, Your Honor.

22      THE COURT:  Well, it's not included, she said.

23      MR. BIRCHFIELD:  It is included.  I mean, the AdCom

24  report was included in his materials.  It's included in his

25  report.

1        Just for time's sake, Your Honor, I'll move on.

2   I don't have to show that to the jury.  We'll just put it up

3   here on the board.

4   BY MR. BIRCHFIELD:

5   Q.   So when you were talking about the time in therapeutic

6   range, Dr. Smart, what was the time in therapeutic range for

7   warfarin in the Eliquis study?

8   A.   62 percent of the time.

9   Q.   Okay.  All right.  Let me go with a different color.

10       All right.  What about in the Pradaxa study?

11  A.   I think it was 64 percent of the time.

12  Q.   Okay.  And then what about in Xarelto?

13  A.   55.

14  Q.   Okay.  And Savaysa.  Do you recall Savaysa?

15  A.   It was in the 60s, but I'm not going to promise you that I

16  remember exactly what it was.

17  Q.   Okay.  All right.  So in each of these clinical trials,

18  the warfarin arm was used as a comparator, right?

19  A.   Yes, sir.

20  Q.   And the time in therapeutic range is important both to the

21  safety and the efficacy, how it's effective for warfarin,

22  right?

23  A.   It's -- the time in therapeutic range is important to tell

24  how good a job in the trial we did of controlling warfarin.  So

25  it has nothing to do with the drug.  It has to do with the

1    comparison.

2         So that, again, if I'm -- if I'm comparing a 19, you know,

3    82 Chevy to a brand-new Cadillac, yes, they are both cars, but

4    that comparison kind of stops there.  The Cadillac is a much

5    nicer, more-well-built car and things like that.

6         Similar to the trial comparison, you want to use the --

7    the better you did in controlling warfarin, the more robust

8    you'll be able to say that your new drug is as good as or

9    better than well-controlled warfarin.

10   Q.   Okay.  And this -- did the element of the time in

11   therapeutic range for Xarelto being 55 percent -- was that an

12   issue that the medical reviewers at the FDA took note of?

13   A.   Yes, sir.  They noted that it was lower than the other

14   trials and, in their opinion, concerningly low.

15   Q.   All right.  Let's go back to Plaintiffs' Exhibit 4.

16        And, again, this is the FDA summary review that we looked

17   at -- we looked at earlier.

18        If we can go to Page PDF9.

19             THE COURT:  Is that the one we're holding out?

20             MR. BIRCHFIELD:  No, Your Honor.

21             MS. WILKINSON:  No, Your Honor.  No objection.

22             MR. BIRCHFIELD:  This one is in evidence.

23             THE COURT:  Okay.

24   BY MR. BIRCHFIELD:

25   Q.   All right.  So we'll look at the second paragraph that

1    begins, "The Division concurs..."

2    A.   Yes, sir.

3    Q.   Is this what you are referring to when you talk about the

4    FDA medical reviewers here, Dr. Smart?

5    A.   I'm sorry.  Ask your question again.

6    Q.   When you were talking about the FDA's comments about the

7    time in therapeutic range -- I'm sorry.  Let's go back two

8    pages, if we can.  My apologies.  Wrong page.  All right.  So,

9    Dr. Smart, will you walk us through -- sorry.

10        All right.  Sorry.  If we go back to PDF3, it's the second

11   page of the document.  We looked at this earlier where it talks

12   about the primary clinical reviewers identifying the following

13   reasons.

14        Let's look at that first bullet point there.

15   A.   Yes, sir.

16   Q.   Does this reference the time in therapeutic range that you

17   were just talking about here, sir?

18   A.   Yes, sir.  So you can see that, again, the primary

19   reviewers identified the following reasons this NDA -- for it

20   not being approved.  So this is, again, back to the reviewers

21   who said the drug shouldn't be approved for nonvalvular AFib.

22        They said one of the reasons was that, again, the time in

23   therapeutic range of 2.0 to 3.0 was 55 percent, and that's

24   lower than that attained in all other contemporary trials in

25   which warfarin is a comparator, 62 to 73.

1          And so what they said was that this was a trial comparing
2     Xarelto against not-well-managed warfarin; and, therefore, you
3     really couldn't say that, had warfarin been well managed, that
4     Xarelto would have been equal.
5     Q.    All right.  Dr. Smart, when you were looking -- arriving
6     at your opinion that Xarelto is worst in class and we look at
7     the time in therapeutic range, help us put that in real terms.
8          Why does that support your opinion?
9     A.    So I guess maybe I should clarify.
10          The time in therapeutic range has nothing to do with my
11    opinion about worst in class.  Worst in class is, if I take
12    everything at face value on all of the trials and the way the
13    FDA stacks it up, it's worst in class.
14          The time in therapeutic range calls to question even
15    further that the trial may not have been adequately reflective
16    of well-managed Coumadin.
17    Q.    Okay.  All right.  Thank you, Dr. Smart.
18          I want us to -- there's been some references to the
19    patient population in the ROCKET trial being a sicker
20    population.
21          Have you heard that argument, that position, before?
22    A.    Yes, sir.
23    Q.    Okay.  And does that carry any weight, in your opinion?
24    A.    Yes, it does.  I mean, I think that that's important.  I
25    think that, obviously, giving a drug to people is -- you want

1    to know the population that you are giving it to.

2         So, yes, sir, I do believe that that is important.  Again,

3    my issue with the ROCKET trial is the time in therapeutic range

4    was low, and there's some other issues with the ROCKET trial as

5    well.

6         But I think the initial design of the trial, except for

7    the dose, was pretty robust.  Had they done the same trial with

8    a twice-daily dose, I think that they may have hit it out of

9    the park.

10   Q.   All right.  Thank you, Dr. Smart.

11        And the FDA and the reviewers -- I want to go back to

12   Exhibit 4 and the FDA reviewers there.  If we can go to PDF

13   Page 8.

14   A.   If you could clear my green circle again there, that would

15   be great.

16   Q.   So you described for us that Xarelto prescribed as it is

17   20 milligrams, 15 milligrams for renally impaired once a day,

18   that it is worst in class.  Is there any support in the FDA

19   documents to that opinion?

20   A.   Well, again, their labeling of the drugs at the end says

21   that, but I'm looking on here what it is -- where you were

22   talking about or asking the question relative to.

23   Q.   Okay.  We'll go to PDF9, the next page.

24   A.   Okay.

25   Q.   It says:  "The Division concurs with all of the reviewers

1    of this NDA that data adequate to select dose to be tested in

2    ROCKET" -- do you see where I'm reading there?

3    A.    Yes, sir.

4    Q.    Okay.  "Were not available when the trial was designed."

5    Will you explain to us what that means, sir?

6    A.    We sort of went over it already, and that is that they

7    didn't -- the drug companies didn't evaluate lower doses and do

8    so in a way that would have chosen the lowest effective dose to

9    minimize risk, and that's what is being said here, and that's

10   what was said along the way by the reviewers, and that's also

11   what was said by Dr. Califf.

12   Q.    All right.  And so when you were talking about -- you

13   described for us earlier the phases of the clinical trials, and

14   that the Phase II is really the dose-finding studies that are

15   to be conducted; is that right?

16   A.    Yes, sir.  That's correct.

17   Q.    And so is this saying that those were not adequately done

18   to find the right dose?

19   A.    So what they say, and so just to read it, the applicants

20   chose the dose to be tested in ROCKET based on two small

21   dose-ranging studies and a rather narrow range of doses was

22   explored 20 to 40 milligrams, meaning they never looked at 10

23   milligrams or they never looked at something else.  In one --

24   or they never looked at the twice in one, 10 and 30 milligrams

25   twice daily and 40 milligrams daily.

1     The interpretation data from these studies was not

2  obviously stated, and they said it lacked adequate rationale

3  for the choice of the dose, and I do agree with that.

4  Q.   And, Dr. Smart, in looking at the FDA's position here, do

5  they reference that several members of the advisory committee

6  recommended Xarelto as a second line therapy?

7  A.   So, there were a number -- and part of my education in

8  this was I had not read an FDA transcript before, and in

9  reading this one, it said that we don't care what your vote is,

10  but we want you to explain why you voted the way you did.

11     And they then went down and talked to the various members

12  of the committee and said, okay, do you vote yes to approve, no

13  to not approve?

14     There were a number of -- a number -- at least two, I can

15  think of, maybe three people that said, we think the drug ought

16  to be approved, but not sort of readily available and to be

17  given willy-nilly because we think that there are dose concerns

18  and safety concerns, but the drug should be approved for

19  nonvalvular AFib because it's the only thing out there besides

20  Coumadin or Pradaxa.

21     So Pradaxa was a drug, it's not a Factor Xa inhibitor, and

22  at the time when it was being looked at in this trial with the

23  FDA, Pradaxa had had some complaints of nausea and stomach

24  upset and things like that, and so it too wasn't a perfect

25  drug.  And I think what a few of the FDA reviewers said was

1    that Xarelto should be approved.  They voted yes to approve

2    based on the idea that if you couldn't take warfarin and you

3    couldn't take Pradaxa, then Xarelto, because it's a new class

4    of agents, offered an advantage.

5         I think, again, playing Monday morning quarterback, I

6    think had Eliquis been released at the time, there was no way

7    that Xarelto would have been approved.

8    Q.   Dr. Smart, if we look, again, at Plaintiffs' Exhibit 4 and

9    PDF Page 8, we see the consideration of labeling Xarelto as

10   second line therapy, and that's what you just described, okay?

11   A.   Yes, sir.

12   Q.   All right.  And then let's look at the third bullet point

13   and just make sure that we have a clear understanding of what's

14   being stated here.  It says, "Therefore, Xarelto should be used

15   only in patients whose INRs cannot be well controlled on

16   warfarin," right?

17   A.   Yes, sir.

18   Q.   "And who cannot take dabigatran, Pradaxa," right?

19   A.   Yes, sir.

20   Q.   And at this time, at the time of this document, dabigatran

21   or Pradaxa was the only NOAC on the market; is that right?

22   A.   That is correct.

23   Q.   Eliquis had not been approved as you were just referring

24   to?

25   A.   Yes, sir.

1    Q.    All right.  And, Dr. Smart, does this add further support

2    to your position that -- your opinion that Xarelto is worst in

3    class among the NOACs?

4    A.    No.  No, it's worst in class among the NOACs.  That's

5    pretty accepted.  I mean, it's a four-horse race, and they are

6    the fourth horse.  This adds concern that the approval was

7    maybe less grounded in great science.

8    Q.    I want to shift now to your third opinion about the

9    labeling, the safety information that is provided to doctors by

10   the company.  Does the fact that Xarelto is worst in class, the

11   safety concerns, is that adequately conveyed to doctors through

12   the label?  Let's start with the label.

13   A.    So my opinion in my report and my opinion now are, no,

14   it's not adequately conveyed.

15   Q.    All right.  Dr. Smart, in reviewing the materials

16   pertaining to Xarelto and the safety implications of the things

17   that have transpired here, did you review material pertaining

18   to the ratio device?

19   A.    I'm sorry.  Say that again.

20   Q.    Let's back up.  All right.  So when the ROCKET study was

21   conducted, they compared Xarelto to warfarin usage, right?

22   A.    Yes, sir.

23   Q.    And in order to properly manage warfarin, you have to

24   measure the bleeding time in patients, right?

25   A.    Yes, sir.

1    Q.    And was there a point of care device that was used as part

2    of that clinical trial?

3    A.    Yes.  May I diverge for a minute to talk about what this

4    is and why?

5    Q.    Okay.  That would be helpful, yes.

6    A.    It would for me anyway.

7    Q.    Yes.

8    A.    When you do a clinical trial and you are comparing two

9    things, what you don't want to do is to bias it.  You want

10   people to not know which one they're taking, because they may

11   have preconceived notions about which one is better.  The

12   doctors may have preconceived notions.

13        So you do what's called a blinded clinical trial.  We

14   didn't talk about that before, but it's an important

15   consideration in that you want the patient and the doctor,

16   that's double-blinded, not to know what drug they're getting.

17        Well, if managing Coumadin is part of the trial, it gets

18   pretty important that the doctor or somebody knows how to

19   manage the Coumadin.

20        And so to the credit of the people that design the trial,

21   they came up with a pretty novel way to maintain the blinding

22   and yet still manage the Coumadin appropriately, and that is

23   instead of sending the blood to the lab to return an INR level,

24   which is the standard of what we do, because Xarelto wouldn't

25   have an INR that would be significantly elevated most of the

1    time and the Coumadin would and certainly less linear in that

2    regard, if you looked at the way they manage it, the patients

3    came into the study center and had their blood drawn and they

4    used this little point of care device.  We manage Coumadin at

5    home in some people with this device.  They do a little finger

6    stick and can check it at home and then they can adjust their

7    own dose.

8         This device was commercially available, but instead of

9    giving an INR number, it gave a code, and that code, you

10   called -- the study coordinator called the computer for the

11   study and the computer then knew what drug the patient was

12   getting and told you what the INR was.  And you adjusted both

13   of the drugs, the dummy drug or the real Coumadin level based

14   on that INR.

15        So this point of care device was important for keeping

16   patients blinded and measuring their INR, and so that's the

17   reason they used it.

18        So in answer to your question, I am familiar, and yes, and

19   that's why they did what they did.

20   Q.   Okay.  And the INR device that was used, was that shown to

21   be faulty and defective?

22   A.   Unfortunately, yes.  The device actually was removed from

23   the market by the FDA because it was defective, and it was

24   shown to be defective in the trial as well.

25   Q.   All right.  When you say that it was shown to be defective

1  in the trial, are you referring to the ROCKET clinical trial?

2  A.   I'm sorry.  Yes, sir.  In the ROCKET clinical trial, the

3  device did not function properly.  There were times at 12 weeks

4  and at 24 weeks, the patients had their blood drawn and were

5  also measured on the device, and in not a small number of

6  patients, those numbers were different.

7  Q.   All right.  And you said that this device was pulled off

8  the market.  That was after the ROCKET study had concluded; is

9  that right?

10  A.   Yes, sir.

11  Q.   And the defect of this device, how was it defective?  What

12  kind of false readings did it give?

13  A.   Well, unfortunately, instead of being just randomly

14  defective, it was defective in one particular direction, and

15  that is it suggested people had an INR that was either low or

16  therapeutic, when in fact their INR was prolonged, and they

17  were at an increased bleeding risk.

18  Q.   All right.  I want to ask you to take a look at

19  Plaintiffs' Exhibit 5768471.

20       MR. BIRCHFIELD:  This is in the New England Journal of

21  Medicine, Your Honor.  I offer this only as a demonstrative.

22            (Brief pause in the proceedings.)

23       THE COURT:  Let's get to a breaking point too.

24       MR. BIRCHFIELD:  Your Honor, this may be a good

25  breaking point.

1          THE COURT:  All right.  We'll stop here for lunch,

2     ladies and gentlemen, and we'll come back at 1:15.  Court will

3     stay in recess until 1:15.

4                    (The jury exited the courtroom.)

5                       (Court is in recess.)

6                          *  *  *  *

7                      REPORTER'S CERTIFICATE

8          I, Lanie M. Smith, CRR, RPR, Official Court
      Reporter, United States District Court, Eastern District of
9     Louisiana, do hereby certify that the foregoing is a true and
      correct transcript, to the best of my ability and
10    understanding, from the record of the proceedings in the
      above-entitled and numbered matter.

11

12                                 ___/s/ Lanie M. Smith_____
                                     Official Court Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25