UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO (RIVAROXABAN)  *
PRODUCTS LIABILITY LITIGATION  *        Docket No. 14-MD-2592
                               *
                               *        Section L
THIS DOCUMENT RELATES TO:      *
                               *        New Orleans, Louisiana
*Joseph Orr, et al.*           *
*v. Janssen Research &*         *        May 31, 2017
*Development, et. al.,*         *
Case No. 15-CV-3708            *
                               *
* * * * * * * * * * * * * * *  *


TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE
VOLUME II - AFTERNOON SESSION


Appearances:


For the Plaintiffs:         Levin Papantonio Thomas Mitchell
                               Rafferty & Proctor, P.A.
                            BY:  BRIAN H. BARR, ESQ.
                                 NEIL E. MCWILLIAMS, JR., ESQ.
                            316 South Baylen Street, Suite 600
                            Pensacola, Florida  32502


For the Plaintiffs:         Beasley Allen Crow Methvin
                               Portis & Miles, PC
                            BY:  ANDY BIRCHFIELD, ESQ.
                            Post Office Box 4160
                            Montgomery, Alabama 36103


For the Plaintiffs:         Gainsburgh Benjamin David
                               Meunier & Warshauer, LLC
                            BY:  GERALD E. MEUNIER, ESQ.
                            1100 Poydras Street, Suite 2800
                            New Orleans, Louisiana 70163

<u>Appearances</u>:

| | |
|---|---|
| For the Plaintiffs: | Goza & Honnold, LLC<br>BY:  BRADLEY D. HONNOLD, ESQ.<br>11181 Overbrook Road, Suite 200<br>Leawood, Kansas 66211 |
| For the Plaintiffs: | The Lambert Firm, PLC<br>BY:  EMILY C. JEFFCOTT, ESQ.<br>701 Magazine Street<br>New Orleans, Louisiana 70130 |
| For Bayer Healthcare<br>Pharmaceuticals, Inc.<br>and Bayer Pharma AG: | Wilkinson Walsh + Eskovitz, LLP<br>BY:  BETH A. WILKINSON, ESQ.<br>1900 M Street NW, Suite 800<br>Washington, DC 20036 |
| For Bayer Healthcare<br>Pharmaceuticals, Inc.<br>and Bayer Pharma AG: | Nelson Mullins Riley &<br>  Scarborough, LLP<br>BY:  DAVID E. DUKES, ESQ.<br>1320 Main Street, 17th Floor<br>Columbia, South Carolina 29201 |
| For Janssen Pharmaceuticals,<br>Inc. and Janssen Research &<br>Development, LLC: | Irwin Fritchie Urquhart<br>  & Moore, LLC<br>BY:  JAMES B. IRWIN, ESQ.<br>400 Poydras Street, Suite 2700<br>New Orleans, Louisiana 70130 |
| Official Court Reporter: | Toni Doyle Tusa, CCR, FCRR<br>500 Poydras Street, Room B-275<br>New Orleans, Louisiana 70130<br>(504) 589-7778 |

Proceedings recorded by mechanical stenography, transcript
produced by computer.

## INDEX

                                                    Page
Frank Smart

    Direct Examination By Mr. Birchfield          365

    Cross-Examination By Ms. Wilkinson            371

    Redirect Examination By Mr. Birchfield        440

Gary Peters (Deposition)                          452

Patricia Torr (Deposition)                        467

1                 **AFTERNOON SESSION**

2                 **(May 31, 2017)**

3       **THE COURT:** Be seated, please. Members of the jury,

4 we have some logistics. I understand the plaintiffs will

5 finish with this witness soon, and then the defendants will

6 cross-examine him. We should get him off the stand relatively

7 soon, then start with the television deposition and end the day

8 on there.

9                 **FRANK SMART,**

10 having been duly sworn, testified as follows:

11             **DIRECT EXAMINATION**

12 BY MR. BIRCHFIELD:

13 **Q.** Dr. Smart, I want to reset where we were right before the

14 lunch break. We were talking about the ROCKET study and the

15 point-of-care device that was used for the warfarin on the

16 study. Do you recall that?

17 **A.** Yes, sir.

18 **Q.** That point-of-care device was later recalled as a

19 defective device, correct?

20 **A.** That is correct.

21 **Q.** Dr. Smart, I know you have your report there. I don't

22 want to test your memory on these numbers. You can refer to

23 that if you need to. I want to just follow up.

24       After the point-of-care device was recalled, was an

25 analysis done about the readings of the point-of-care device

**FRANK SMART - DIRECT**

01:15

1   and comparing that to the central laboratory or the blood work

2   that was done?

3   A.   Yes, sir, it was.  At two time points, at 12 weeks and

4   24 weeks.

5   Q.   All right.  I want to put back on the screen the

6   demonstrative that we were looking at earlier today.  It shows

7   the therapeutic window.  That analysis -- here is where I would

8   like to focus.  The central laboratory, the blood work that was

9   done, there were 767 patients with an INR of above 4.  Is that

10  correct?

11  A.   I need to turn to my report.  The number sounds correct,

12  but it's not broken down that way, so I will have to add them

13  together.

14         Yes.

15  Q.   So if we are looking at this area right here, there's 767.

16  There are 767 that the laboratory shows -- that's the true

17  reading, right?  The blood work, that's the accurate reading on

18  the INR, right?

19  A.   Yes, sir, that is correct.

20  Q.   So there were 767 that were identified to have an INR of

21  above 4; is that correct, sir?

22  A.   Yes, sir.

23  Q.   Now, INR above 4, would that be -- would that be patients

24  that are at a significant risk of a bleeding event?

25  A.   An increased risk of a bleeding, yes, sir.

**FRANK SMART - DIRECT**

01:17

1   **Q.**   So if you are treating a warfarin patient and you get a

2   reading of above 4, an INR above 4, what do you do?

3   **A.**   Typically you tell the patient to hold the next dose or

4   maybe two doses and then reduce the overall dose and recheck

5   again in a week.

6   **Q.**   But above 4, that's a clear reduction-of-dose,

7   hold-the-dose range, right?

8   **A.**   Yes, sir.

9   **Q.**   So when we look at those 767 that had a true lab reading

10   of an INR above 4, how many of those patients showed as having

11   an INR above 4 --

12          **MR. BIRCHFIELD:**   Carl, can you change this to red for

13   just a second?

14   **BY MR. BIRCHFIELD:**

15   **Q.**   -- based on the defective point-of-care device?  In other

16   words, out of those 767, how many did the point-of-care device

17   that showed above 4?

18   **A.**   257.

19   **Q.**   So there were 257 that were correct.  Then, Dr. Smart, how

20   many of those point-of-care devices -- the 767 lab work shows

21   above 4, should be reduced, how many did the point-of-care

22   device show to be between 2 and 3?

23   **A.**   It showed that 172 were between 2 and 3 where the INR was

24   actually greater than 4.

25   **Q.**   So 172 of those people that really had too much warfarin,

FRANK SMART - DIRECT

01:19

1    the point-of-care device would have suggested that their dose
2    should stay the same; is that correct?
3    A.   That is correct.
4    Q.   All right.  Of those 767 that had an INR that says your
5    dose needs to be reduced, how many did that defective
6    point-of-care device suggest they should be increased?   How
7    many did they show below 2?
8    A.   So there were 47 below 2 that would have suggested that
9    appropriately managed, they should have their warfarin
10   increased.
11   Q.   So the defective device, the defect was actually
12   consistent, always suggesting either stay the same or give more
13   of the Coumadin, correct?  It was always defective in the same
14   direction?
15   A.   That's correct.  It showed a lower reading than the actual
16   INR when it was incorrect.
17   Q.   In looking at this analysis and the defective device here,
18   what's the take-home message for you?  What was the impact on
19   the results of the ROCKET study for you, Dr. Smart?
20   A.   Before we talked about comparing Xarelto to warfarin, and
21   you wanted to have a well-managed trial with warfarin so that
22   you got a real comparison to what the drug would do in somebody
23   who was taking warfarin appropriately.  The TTR was the first
24   hurdle that suggested the management of the warfarin patients
25   could have been better.  And now, because of this faulty

**FRANK SMART - DIRECT**

01:20

1   point-of-care device, it even calls more question to whether or

2   not the patients were appropriately managed in the warfarin

3   arm.

4   **Q.**   Dr. Smart, I want to go back for just a minute to the

5   ROCKET 2 study that we talked about earlier.  Dr. Califf had

6   proposed a ROCKET 2 study.  Do you recall that?  We went

7   through that?

8   **A.**   He called it ROCKET booster, but yes, sir.

9   **Q.**   That study, was that a study that was -- did you consider

10   that to be based on sound science?

11   **A.**   From the two-page overlay I saw of it, yeah.

12   **Q.**   Was that study done?

13   **A.**   No, sir.

14   **Q.**   I want to show you a document that you refer to in your

15   report.  It's already in evidence as Trial Exhibit 3.

16              **MR. BIRCHFIELD:**  If we can pull that up for me, Carl.

17   **BY MR. BIRCHFIELD:**

18   **Q.**   If you could, this is an email from Patty Torr.  Do you

19   see that?

20   **A.**   Yes, sir.  I see the name.

21   **Q.**   Again, this is what the jury saw yesterday, and this is in

22   regards to doing a follow-up study, refers to it as the

23   ROCKET 2 study.  What's the position of Patty Torr here?  Would

24   not support doing a ROCKET 2 study for what reason?

25   **A.**   It says [as read]:  "Would not support doing a ROCKET 2

FRANK SMART - DIRECT

01:22

1   study.  It would say to the market the competition is right, we
2   are a BID drug, would kill us in the market today.  By the time
3   the study was done, the market would have moved on."
4   **Q.**   And "BID" --
5   **A.**   Twice a day.
6   **Q.**   Twice a day.  Dr. Smart, I want to go back -- we had
7   talked earlier, you had discussed the transcript of the
8   advisory committee.  Do you recall that, and Dr. Steven Nissen?
9   **A.**   Yes, sir.
10  **Q.**   At this point I would ask you to take a look at page 287
11  of that transcript.
12  **A.**   Yes, sir.
13  **Q.**   You have it on the screen.  Do you see that this is --
14  let's take note of the portion by Dr. Nissen.  That's Steve
15  Nissen that you referred to earlier; is that correct?
16  **A.**   Yes, sir, it is.
17  **Q.**   Will you tell us, sir, what Dr. Steven Nissen said at this
18  advisory committee meeting?
19  **A.**   Again, in the transcript quoting Dr. Nissen, it says
20  [as read]:  "My concern was that the dose was selected more for
21  a marketing advantage rather than for the scientific data that
22  was available, and that was a mistake."
23            **MR. BIRCHFIELD:**  Your Honor, we offered this
24  previously and the Court had reserved ruling.
25            **THE COURT:**  I'll admit it under 803(6) and 803(8).

FRANK SMART - CROSS

01:24

1    MR. BIRCHFIELD:  Plaintiffs' Exhibit 5, Your Honor.

2    BY MR. BIRCHFIELD:

3    Q.    Dr. Nissen [sic], knowing what you know, would any

4    reasonable doctor prescribe Xarelto for AFib?

5    A.    No, sir, they would not.

6    Q.    I want to wrap up and ask you about the -- you have given

7    us the opinions and you have walked through the support of

8    those opinions that the dose is too high -- the once daily

9    versus twice daily, that's too high a dosing regimen; that

10   Xarelto is worst in class; and the label does not adequately

11   convey -- the safety information provided by the companies is

12   not adequate, correct?

13   A.    That is correct, yes, sir.

14   Q.    Do you hold all of these opinions to a reasonable degree

15   of medical and scientific certainty?

16   A.    Yes, sir.

17            MR. BIRCHFIELD:  Thank you, Dr. Smart.

18            THE COURT:  Cross-examine.

19                    CROSS-EXAMINATION

20   BY MS. WILKINSON:

21   Q.    Good afternoon, Dr. Smart.

22   A.    Hi.

23   Q.    I want to talk -- before we go into your opinions -- a

24   little bit about what you're not talking to the jury about

25   today.  You were not asked to look at any of Mrs. Orr's medical

372

**FRANK SMART - CROSS**

01:26

1   records, correct?

2   **A.**   That is correct.

3   **Q.**   So you are not here to give any opinions about

4   Dr. St. Martin's decision to prescribe in the individual case

5   for Mrs. Orr, right?

6   **A.**   That is correct.

7   **Q.**   You told us that each decision to prescribe for a patient

8   is individualized based on his or her medical history and other

9   circumstances?

10  **A.**   Yes, ma'am.

11  **Q.**   You believe that should be the decision of the physician

12  who is treating that patient, correct?

13  **A.**   In concert with the patient, yes.

14  **Q.**   Of course.   Ultimately the patient makes the decision or

15  the doctor?

16  **A.**   Well, certainly the patient takes the medicine or not.

17  But, yes, it's a combination of both.

18  **Q.**   You told us, I think right before counsel sat down, that

19  you think no reasonable doctor would prescribe Xarelto for

20  AFib; is that right?

21  **A.**   Knowing what I know.

22  **Q.**   Knowing what you know.

23          Now, I think you told us you came to the conclusion

24  that you weren't going to prescribe Xarelto before you ever met

25  the lawyers in this case?

**FRANK SMART - CROSS**

01:27

1   A.   Yes, ma'am.

2   Q.   Did you believe at that time that no reasonable doctor

3   would prescribe Xarelto?  Before you got involved with this

4   case?

5   A.   With the amount of information that I had, I had a real

6   question that it should be used; and certainly that's why I

7   abandoned the use myself, and I started teaching residents and

8   students in my groups that they shouldn't use it and should

9   look at other options.

10        The more I learned about it from some of the -- both

11   internal documents and consistency of other folks that I

12   consider knowledgeable about the agent -- i.e., Dr. Califf --

13   that the dose was a twice-a-day dose, I think that that helped

14   solidify and that is now the basis for my opinion that no

15   reasonable doctor, knowing what I know, would offer it up as a

16   reason to treat atrial fibrillation nonvalvular.

17   Q.   So I want to divide that on what your opinion was before

18   you got documents from the lawyers and afterward, if we could,

19   all right?

20   A.   Sure.

21   Q.   So beforehand, once you came to that decision, it was

22   because you read the Kim article, right, and you had patient

23   experience?

24   A.   Yes, ma'am.

25   Q.   You started to tell your residents?

01:28

1  **A.**   I did.  I started to tell the residents that I thought

2  there was a real issue with the agent.  And then there was

3  another article, the Graham article, that came out in October

4  and I -- that was as I was writing the report.  So before I

5  submitted the report to the lawyers, I saw the Graham article,

6  which again reinforced the fact that the agent was not safe and

7  should not be used in nonvalvular AFib.

8  **Q.**   Doctor, I'm asking about what you told people, not the

9  other -- we'll get to that, sir.

10 **A.**   I told my residents and students and fellows that I had

11 serious questions with the use of rivaroxaban.

12 **Q.**   Did you discuss it with other experienced cardiologists

13 that dealt with AFib at LSU or at Ochsner or at other

14 facilities here in town?

15 **A.**   We certainly talked about it amongst my group, my

16 electrophysiology group.  Most of my group I believe has

17 transitioned away from rivaroxaban to apixaban.  I don't know

18 that for a fact, but my sense is that.  I don't see that many

19 people taking Xarelto anymore in our group.

20 **Q.**   You don't know that, right?  Do you know about the

21 electrophysiologists in your own hospital, whether they

22 prescribe Xarelto or not?

23 **A.**   I'm sorry, I know about the LSU electrophysiologists.  I

24 don't overlap with the Tulane electrophysiologists very much.

25 **Q.**   I'm talking about the LSU.  Is it your representation that

375

**FRANK SMART - CROSS**

01:29  1    the LSU electrophysiologists do not prescribe Xarelto today?

2    **A.**   It's my representation that I don't think they prescribe

3    it often.  I really don't know -- I can't tell you that I know

4    or don't know.  I can tell you it's just my sense.

5    **Q.**   So you don't know?

6    **A.**   I don't know exactly.

7    **Q.**   You do know that the FDA has looked at every issue that

8    you have raised with the jury today, right?

9    **A.**   Yes, ma'am.

10   **Q.**   In fact, some of the issues that you have just raised the

11   FDA just looked at last year, correct?

12   **A.**   Yes, ma'am.

13   **Q.**   So let's start with Alere, that device that was used,

14   right?  That was not a device that was manufactured by Janssen

15   or Bayer, right?

16   **A.**   Correct.

17   **Q.**   They used that, that was manufactured by some other

18   company?

19   **A.**   Yes, ma'am.

20   **Q.**   There was a recall of that device, right?

21   **A.**   Correct.

22   **Q.**   The FDA took it upon themselves to do an independent

23   analysis of ROCKET, a reanalysis, once they learned about that

24   device, correct?

25   **A.**   Yes, ma'am.

**FRANK SMART - CROSS**

01:31

1    **Q.**   That reanalysis isn't secret.  You have seen that, haven't
2    you?
3    **A.**   Yes, ma'am, I have.
4    **Q.**   You didn't mention that to the jury in your direct
5    testimony, did you?
6    **A.**   I don't know that I was asked about it.  But no, ma'am, I
7    don't believe I mentioned it.
8    **Q.**   Well, one of the things we are going to ask you about is
9    how you decided to consider certain materials in your opinion,
10   because after you came to your opinion based on the Kim
11   article, you let the lawyers here give you the information.
12   You didn't go out and do a complete search or review of the
13   documents they had, correct?
14   **A.**   I'm sorry, I didn't understand the question.
15   **Q.**   It probably wasn't a great question.
16           After you were hired by these folks, you did not ask
17   to see all of the documents that were produced, let's say,
18   regarding Dr. Califf, did you?
19   **A.**   No, ma'am, I did not ask to see all of the documents
20   produced by anybody.
21   **Q.**   So the documents that they gave you about Dr. Califf are
22   what they wanted you to look at, and you didn't do any
23   diligence, saying, is there anything else here that would tell
24   the other side of the story?
25   **A.**   I wouldn't say that.  So what I did -- I obviously didn't

**FRANK SMART - CROSS**

01:32

1    have access to any internal documents with Dr. Califf.  The
2    summary statement from the FDA that you saw, I actually read
3    the entire FDA transcript and read Dr. Califf's presentation of
4    the Xarelto to the FDA.
5    **Q.**    Doctor, I want to make my question clearer, because I
6    don't think you're answering it.  You did have access to
7    company documents through these lawyers.  You could have asked
8    them for additional documents, couldn't you?
9    **A.**    Yeah.  I guess I could have.  I didn't even think to.
10   **Q.**    So you got a few emails, right?  How many emails did you
11   get?
12   **A.**    I don't know.  Maybe four.
13   **Q.**    Do you have any idea how many emails or pages have been
14   produced in this case?
15   **A.**    I heard today this morning that it was multiple stacks,
16   but I couldn't even begin to tell you how many.
17   **Q.**    Multiple stacks.  Do you think millions of pages would be
18   more accurate?  You don't really have any idea, do you?
19   **A.**    I don't have any idea.
20   **Q.**    And you didn't ask, when you got these four emails, Is
21   this representative?  Is this all the emails regarding this
22   topic?  You didn't ask any of those questions, did you?
23   **A.**    No, ma'am.  I didn't find -- I thought that the email that
24   said that the dose was too high was consistent, so . . .
25   **Q.**    When you are a physician doing research and publishing,

**FRANK SMART - CROSS**

01:33

 1    don't you want to read all the studies that you can about the

 2    topic?  You don't just rely on one document, so you make sure

 3    you understand the state of the science and get the full story?

 4    A.   I guess the definition of all the documents is a bit

 5    challenging.  So, no, ma'am, when we are writing a paper, we

 6    wouldn't read millions of pages of documents.

 7    Q.   But you would look for the relevant pages, wouldn't you?

 8    A.   Yes, ma'am.

 9    Q.   You wouldn't just look for the pages that support your

10    opinion, correct?

11    A.   That is correct.

12    Q.   You wouldn't want to just rely on documents that supported

13    your opinion.  You would want to look at science and other

14    documents that might show you why there were issues with your

15    opinion or at least the other side, correct?

16    A.   Certainly.  That's part of the peer-review process we

17    discussed earlier.

18    Q.   All right.  So when you went and you did a search for

19    actual scientific articles, you said you used PubMed, right?

20    A.   Yes, ma'am.

21    Q.   PubMed does -- like you said, it's the Google for

22    physicians and scientists, right?  And there are lots of

23    documents out there about Xarelto and the other NOACs, the oral

24    anticoagulants, right?

25    A.   Yes, ma'am.

01:34

1   Q.   You just looked at a few?

2   A.   I looked at what I considered a representative number.

3   Q.   How many?

4   A.   Over a hundred different articles.

5   Q.   Did you see any of those documents that showed scientific

6   information published in peer-review journals that do not

7   support the opinion you just testified to in front of this

8   jury?

9   A.   Which opinion is that?

10  Q.   Let's go through all three.  First of all, that the dose

11  is unsafe, I believe you said.

12  A.   Too high.

13  Q.   Too high.  Did you see -- let me turn it around.  Can you

14  point to a single peer-reviewed publication that says the dose

15  of Xarelto that's approved by the FDA today is too high?

16  A.   I think the Kim article says that, yes, ma'am.

17  Q.   You do?

18  A.   Well, I think it says it's a twice-a-day drug.

19  Q.   Doctor, I'm going to write it down, sir.

20  A.   Does it say that or is it, I inferred from that --

21  Q.   That's a big difference to us.

22  A.   Sure.

23  Q.   So let's talk about what the articles actually say --

24  A.   Okay.

25  Q.   -- versus what you interpret, and we will get to that.  Is

**FRANK SMART - CROSS**

01:35

1  there a single peer-reviewed, published article that says the

2  dose of Xarelto that's approved today and has been approved

3  since it's on the market, the 20-milligram once-a-day dose, is

4  too high and unsafe?

5  **A.**   No, ma'am.

6  **Q.**   Let's go to your -- I want to make sure I get your

7  opinions right here.  "Worst in class."  You said that Xarelto

8  is "worst in class," correct?

9  **A.**   Yes, ma'am.

10  **Q.**   You know there are articles out there -- and we can go

11  through them if you like -- that say you can't say that drugs

12  that are in the same family, right, or class -- as you would

13  call it here -- are better or worse than each other unless they

14  are compared head to head, right?

15  **A.**   You can't say definitively, yes, ma'am, you're correct.

16  **Q.**   You don't know of a single study -- not a compilation of

17  all different studies, but a study that compares these

18  different NOACs head to head and says what you said, which is

19  Xarelto is worst in class, right?

20  **A.**   I'm sorry, say that again.

21  **Q.**   Can you point to a single peer-reviewed journal article

22  published and, therefore, seen by other doctors outside this

23  courtroom that says Xarelto is the worst in class?

24  **A.**   There is an article by Lip that suggested it was the

25  worst.  I don't believe edoxaban was on there, though.  And to

**FRANK SMART - CROSS**

01:37

1   be completely forthright, I think it's not necessarily

2   published with edoxaban.  There's -- again, the Kim article was

3   there that showed the pharmacokinetics and pharmacodynamics.

4   The Graham article compared rivaroxaban and dabigatran.

5           And so those articles I think are a preponderance of

6   information.  Again, my thought and my statement to you or to

7   the Court was that I think part of my conclusion or the biggest

8   part of my conclusion for worst in class is the FDA and how

9   they've ranked the drugs.

10  Q.   Doctor, we have been at this a long time, and I have

11  waited while you have answered questions on direct.  I'm asking

12  you very specific questions.  We can get to how you got there

13  otherwise, but we just want to know this:  Is there a

14  peer-reviewed, published article that says Xarelto is worst in

15  class compared to all the NOACs?

16  A.   Compared to all the NOACs, no, ma'am.

17  Q.   That's what the class is, right?  It's just five of them;

18  it's not a few of the drugs.  It's all of them, right?

19  A.   Yes, ma'am.

20  Q.   You were throwing around a lot of words and terms, so I

21  put this together.  If I could have the ELMO, please, so we can

22  just make sure we are clear on what drugs you are talking

23  about.

24          Okay.  This says [as read]:  "What are the options

25  today?  These are all anticoagulants that are meant to help

FRANK SMART - CROSS

01:39   1   people who might have blood clots."  Right?

2   A.   Yes, ma'am.

3   Q.   There's other uses for it, and these can be used for

4   patients who have AFib, correct?

5   A.   Yes, ma'am.

6   Q.   All of these are approved by the FDA today, correct?

7   A.   Yes, ma'am.

8   Q.   Coumadin is the one you told us was rat poison, right?

9   A.   Yes, ma'am.

10   Q.   That's been out on the market since 1954?

11   A.   Yes, ma'am.

12   Q.   That's only taken once a day, right?

13   A.   That's correct.

14   Q.   But the problem with that drug is it's very volatile in

15   terms of how it interacts with the rest of your life, whether

16   it's drinking or eating or just genetics, so you have to be

17   monitored quite frequently when you are on Coumadin, right?

18   A.   That's correct.

19   Q.   And your dose changes all the time, or it could?

20   A.   Some people changes more than others.  But, yes, ma'am,

21   there's alterations.  That's why we monitor it.

22   Q.   I think you've said that it's a very difficult drug to

23   work with, right?

24   A.   It is.

25   Q.   Now, the next one that came on the market was Pradaxa,

**FRANK SMART - CROSS**

01:40    1  right?

2  **A.**   Yes, ma'am.

3  **Q.**   And I put these names because I know you are used to them,

4  but honestly, the scientific names don't roll off the tongue to

5  the rest of us.  So going back to Coumadin, that's warfarin,

6  right?

7  **A.**   Yes, ma'am.

8  **Q.**   Pradaxa, how do you pronounce the scientific name?

9  **A.**   Dabigatran.

10  **Q.**   Dabigatran.  And that came out before Xarelto, right?

11  **A.**   Yes, ma'am.

12  **Q.**   And it's a twice-a-day drug?

13  **A.**   Yes, ma'am.

14  **Q.**   That works differently than the other three, right, on the

15  body?

16  **A.**   Correct.  That's a direct thrombin inhibitor, and it works

17  differently than the other four, I guess if we're comparing

18  Coumadin, yes, ma'am.

19  **Q.**   So Coumadin, you've explained to us, works through the

20  liver on vitamin K.  That's what makes it a little more

21  difficult to deal with?

22  **A.**   And it affects multiple sites in the clotting cascade,

23  yes, ma'am.

24  **Q.**   Xarelto, Eliquis, and Savaysa all work on only one factor

25  in the blood cascade, which is called factor Xa, right?

**FRANK SMART - CROSS**

01:40

1   **A.**   That's right.

2   **Q.**   The scientific name for Xarelto is what?

3   **A.**   Rivaroxaban.

4   **Q.**   It was approved -- once daily -- back in 2011, right?

5   **A.**   Yes, ma'am.

6   **Q.**   Eliquis is twice a day, right?  And the scientific name

7   for that is?

8   **A.**   Apixaban.

9   **Q.**   Savaysa was just approved in 2015?

10  **A.**   Yes, ma'am.

11  **Q.**   That's a once-a-day drug, correct?

12  **A.**   Yes, ma'am.

13  **Q.**   So doctors have all these choices.  They don't have to

14  prescribe any particular one, correct?  They can choose --

15  **A.**   Yes, ma'am.

16  **Q.**   -- which one they think is right for their individual

17  patient?

18  **A.**   Correct.

19  **Q.**   But when you talk about the class of drugs of NOACs, novel

20  oral anticoagulants, that's everything but Coumadin, right?

21  **A.**   That is correct.

22  **Q.**   So when you came to the opinion to say that Xarelto is the

23  worst in class, you were telling this jury that it was worst,

24  and you believe there is scientific support to say it was worse

25  than Pradaxa, Eliquis, and Savaysa, right?

FRANK SMART - CROSS

01:41

1   A.   Yes, ma'am.

2   Q.   Now, let's go back, if we could, to the device that you

3   said you thought raised even further questions about the ROCKET

4   study, right?

5   A.   Yes, ma'am.

6   Q.   Just so everybody understands, because you all were going

7   through a lot this morning, ROCKET was the clinical study that

8   was approved or reviewed by the FDA, right, even before it was

9   put in place?

10  A.   I'm sorry.  Yes, ma'am, ROCKET was the data review by the

11  FDA, the pivotal trial to decide whether the drug should be

12  released or not.

13  Q.   You know that companies often show the plan for the

14  clinical trial before they go through it because they want to

15  make sure they are going to get approved?

16  A.   Yes, ma'am.

17  Q.   The FDA will give feedback to the company and say, No, you

18  need to do more, you need to make it double-blind, or other

19  things like that, and make it more vigorous, right?

20  A.   Yes, ma'am.

21  Q.   Then they reviewed that study, and that was one of the

22  bases, one of the major reasons why ultimately the FDA approved

23  Xarelto for sale in the United States, right?

24  A.   Yes, ma'am.

25  Q.   You said that when this device -- and I think the market

**FRANK SMART - CROSS**

01:43

1    name is Alere -- was pulled off the market, that raised more

2    questions to you about that initial ROCKET analysis?

3    **A.**    As you pointed out, it raised questions to everybody.  So,

4    yes, ma'am.

5    **Q.**    And the FDA did its own analysis and actually put out a

6    paper, didn't it?

7    **A.**    Yes, ma'am.

8    **Q.**    That was something you didn't put in your reliance

9    materials in your report, right?

10   **A.**    I did not put that they published anything about the Alere

11   device, no, ma'am.

12   **Q.**    They came out with the conclusion that was the opposite of

13   yours, right?

14   **A.**    I'm sorry?

15   **Q.**    They don't agree with your conclusion --

16   **A.**    No, ma'am.

17   **Q.**    -- or your opinion?

18   **A.**    I don't think that they don't agree with it.  I think what

19   they said was they did a mathematical model, and that

20   mathematical model allowed them to conclude that had ROCKET

21   been done appropriately, with appropriate warfarin management,

22   that the results would have been the same.

23   **Q.**    Well, let's take a look.  First of all, this is -- this

24   came out in September of last year, right?  And this is

25   DX 5840.  You have seen that before, right?

**FRANK SMART - CROSS**

01:44

1  A.   Yes, ma'am.

2  Q.   So this wasn't just a one-page analysis, was it?

3  A.   No.

4  Q.   This wasn't done by Bayer or Janssen, correct?

5  A.   No, ma'am.  There were analyzes done by Bayer and Janssen,

6  but this was the FDA.

7  Q.   On their own, with their own scientists and doctors,

8  correct?

9  A.   Correct.

10  Q.   They knew exactly what they were looking at, right?

11  A.   Yep.

12  Q.   They put out the report -- I'm going to ask you to turn to

13  page 1, which just shows what they understood the premise.

14  They call it a reanalysis, right?

15  A.   Yes, ma'am.

16  Q.   They say [as read]:  "The rationale for the recall" --

17  that's of the device, correct?

18  A.   Yes, ma'am.

19  Q.   -- "raised the possibility that patients in the warfarin

20  arm of ROCKET were overanticoagulated" -- that means had too

21  much, right, in their system, so they would clot too slowly,

22  right?

23  A.   Correct.

24  Q.   Raising the risk of bleeding, you said?

25  A.   Yes, ma'am.

FRANK SMART - CROSS

01:45

1   **Q.**   [As read]:  "So as a result of the use of this INRatio

2   device potentially distorting the results of the study by

3   increasing the rate of the bleeding in the warfarin arm."

4   Right?

5   **A.**   Yes, ma'am.

6   **Q.**   That was your concern too, correct?

7   **A.**   That is correct.

8   **Q.**   Do you know Dr. Martin Rose?

9   **A.**   I do not.

10  **Q.**   Let's look at page 3, if we could.  I have highlighted it

11  so we can move this along.  They said [as read]:  "The

12  conclusion we made in 2011 that the benefits of rivaroxaban" --

13  that's Xarelto, correct?

14  **A.**   Yes, ma'am.

15  **Q.**   -- "in patients with nonvalvular atrial fibrillation" --

16  that's what we have been calling AFib, right?

17  **A.**   Yes, ma'am.

18  **Q.**   -- "The benefits outweigh its risks, and it should not be

19  changed."  Right?

20  **A.**   That is correct.

21  **Q.**   Now, you know that the FDA doesn't stop looking at these

22  drugs, especially this class of drugs, once they are put out on

23  the market, right?

24  **A.**   Yes, ma'am.

25  **Q.**   They continue to look at all the studies.  In fact,

**FRANK SMART - CROSS**

01:46

1   there's been many, many more studies about these drugs, haven't
2   there?
3   **A.**   Yes, ma'am.  Dr. Graham, that I mentioned a moment ago,
4   who works for the FDA.
5   **Q.**   That's only one, but there's been many, many more, haven't
6   there?
7   **A.**   Yes.
8   **Q.**   With thousands and thousands of patients?
9   **A.**   Yes, ma'am.
10  **Q.**   Those studies say that Xarelto, like here, is still safe
11  and effective, correct?
12  **A.**   No, ma'am.
13  **Q.**   They don't say -- they say they are unsafe?
14  **A.**   Well, the Graham study we just talked about said that in
15  people over the age of 75, there was a statistically increased
16  risk of dying.
17  **Q.**   Okay.  Those studies all come to the FDA for them to look
18  at, right?  Those studies are turned in by the companies?
19  **A.**   I'm sorry.  I don't know that.
20  **Q.**   You don't know that.  So you don't know how much
21  information the FDA had?
22  **A.**   I know the FDA can get whatever information they want, but
23  I'm thinking that anything in the peer-reviewed literature is
24  available to them.
25  **Q.**   Okay.  What does it say also?  It says [as read]:  "No

**FRANK SMART - CROSS**

01:47   1    changes in Xarelto labeling."  Right?

2    **A.**    Yes, ma'am.

3    **Q.**    But you said you think there should be a black box, and

4    there they are saying no changes in the labeling, right?

5    **A.**    That is correct.

6    **Q.**    You don't need it to reflect the impact of the use of the

7    INRatio device in ROCKET.  It's not warranted.  [As read]:  "No

8    other major regulatory action should be taken with respect to

9    rivaroxaban."  Right?

10   **A.**    Yes, ma'am, that's what it says.

11   **Q.**    If you are a doctor reading that, you believe the FDA has

12   looked at this issue and says, We are not going to -- we are

13   not going to suggest any changes to the label, right?

14   **A.**    I'm sorry.  Is that a question?

15   **Q.**    They are not going to suggest any changes to the label,

16   right?

17   **A.**    If I'm a doctor looking at it, that's what it says, yes,

18   ma'am, We're not going to --

19   **Q.**    No other regulatory action?

20   **A.**    That is correct.

21   **Q.**    And that the benefits still outweigh the risks?

22   **A.**    That's what it says, yes, ma'am.

23   **Q.**    They didn't stop there, did they?  They know how important

24   this is.  They actually put out a press release, didn't they?

25   **A.**    I don't know about that.

**FRANK SMART - CROSS**

01:48

1   **Q.**   You have never seen that?  DX 5842?

2   **A.**   I don't think so.

3   **Q.**   Let me show you.  You will agree, I think, wouldn't you,

4   that dealing with AFib is a very important medical issue in

5   your country?  Right?

6   **A.**   Yes, ma'am.

7   **Q.**   Millions of people in the United States suffer from stroke

8   every day?

9   **A.**   That's correct.

10  **Q.**   Or every year.  Sorry.

11          There you go, DX 5842.  Are you familiar with that?

12  **A.**   No, ma'am.

13  **Q.**   So when you were doing your research for this, did you go

14  on the FDA website yourself instead of relying on what the

15  lawyers gave you before you --

16  **A.**   Yes, ma'am --

17  **Q.**   Excuse me.  I'm not done, sir.

18  **A.**   Okay.  I'm sorry.

19  **Q.**   Before you came into court and told this jury your

20  opinion, did you do that?

21  **A.**   I tried.

22  **Q.**   You didn't see this?

23  **A.**   No, ma'am.  Well, I did not see this, what you just handed

24  me.  I will tell you that navigating the FDA website was

25  incredibly challenging for me.  I had to try to ferret through

01:49

1    hundreds of pages to try to get just about anything that made

2    sense.

3    Q.   I'm certain that you thought this was important to come --

4    before you came before the jury, to be well informed.  Right?

5    A.   Yes, ma'am.

6    Q.   Because you understand that the rest of us are not trained

7    cardiologists, right?

8    A.   It's important to be well informed, yes, ma'am.

9    Q.   We are not trained in how to read these very complex

10   scientific articles, and you are, right?

11   A.   Yes, ma'am.

12   Q.   You understand that in all of these articles, they lay out

13   their goals, right, what their objectives are for the article;

14   in other words, what the purpose of -- why they are writing it

15   or doing this study.  Isn't that laid out in every article?

16   A.   There's a hypothesis, yes, ma'am, although I won't say

17   that the goals of writing the article are laid out.  It's

18   usually the goal of the hypothesis that the study was based

19   upon.

20   Q.   In those studies they also lay out the limitations, don't

21   they?

22   A.   In studies, when you publish them, yes, ma'am, you want to

23   always try to mention the limitations of the studies if you

24   can.

25   Q.   In other words, different kinds of studies can produce

FRANK SMART - CROSS

01:50

1    different levels of evidence for you as a physician or a
2    scientist, right?
3    A.    Maybe you could --
4    Q.    Is there a hierarchy of studies, in your opinion?  In
5    other words, are there studies like the ROCKET study?
6    A.    I understand where you are going.  Yes, ma'am.
7          So a randomized clinical trial certainly carries more
8    validity than a trial that is non-randomized, yes, ma'am.
9    Q.    Going down the line, an observational study that's looking
10   backward isn't as reliable, right?  It gives you information,
11   but not as reliable?
12   A.    It gives you information that's different.  It gives you
13   information about what happens in the real-world application of
14   something.
15         So in a clinical trial -- clinical trials have been
16   faulted for years because of the fact that they don't contain
17   enough African-Americans and minorities, they don't contain
18   enough women, they are done in academic medical centers.  So
19   there's usually Caucasian men, unfortunately.  We are trying to
20   be better about that.
21   Q.    Well, you know, I want to bring that up.  We will get back
22   to this other point.  Cardiovascular disease, heart disease, is
23   the number one killer of women in the United States, isn't it?
24   A.    Yes, ma'am.
25   Q.    When you went through with Mr. Birchfield the factors that

**FRANK SMART - CROSS**

01:52

1   one should look at in determining the CHADS score for one who

2   has AFib, you didn't include all the factors that doctors who

3   are outside this courtroom, who are cardiologists and prescribe

4   it every day --

5   **A.**   We talked about CHADSVASc.  I mentioned that and told you

6   that that was the criteria.  So it's --

7   **Q.**   But you didn't add those factors, right?

8   **A.**   Because we talked about CHADS and not CHADSVASc, yes,

9   ma'am.

10  **Q.**   CHADS went out of fashion in 2010, didn't it?

11  **A.**   CHADS was I think what was used in ROCKET, but CHADS is

12  not -- CHADSVASc has supplanted CHADS.  So we try to use that,

13  yes, ma'am.

14  **Q.**   We don't have to guess about this, do we?  There are

15  guidelines that are put out by the American College of

16  Cardiology, The American Heart Association.  We're talking

17  about only American associations here, American doctors -- and

18  the Heart Rhythm Society that tell you how to manage patients

19  with atrial fibrillation, right?

20  **A.**   Yes, ma'am.

21  **Q.**   In there they recommend not using CHADS anymore, right,

22  but CHADSVASc, did you say?

23  **A.**   Yes, ma'am.

24  **Q.**   What do I add?  What are the letters?

25  **A.**   VAS and then -- so let's see.  Vascular disease, age,

FRANK SMART - CROSS

01:53

1  sex -- I'm trying to remember what the last -- I think it's

2  vascular disease, age, and sex.

3  **Q.**   Let me show you the guidelines.  You are familiar with

4  these guidelines.  You have looked at them, right?

5  **A.**   Yes, ma'am.

6  **Q.**   Let me show you DX 2537.  In there, if you turn to

7  page 17, they lay out the CHADSVASc way to score.  You still

8  need a "c" up there, don't you?  Is that what you are missing?

9  **A.**   Yes, ma'am.

10          **THE COURT:**  Are you going to introduce any of these?

11          **MS. WILKINSON:**  Yes, Your Honor.  In fact, I want to

12  move in those exhibits on the reanalysis, if I could.

13          **MR. BIRCHFIELD:**  No objection to the FDA documents,

14  Your Honor.

15          **THE COURT:**  What's the number?

16          **MS. WILKINSON:**  I knew you were going to ask me that,

17  Judge.  It's DX 5840.

18          **THE COURT:**  That's Exhibit --

19          **MS. WILKINSON:**  Defense 1.

20          **THE COURT:**  Let it be admitted.

21          **MR. BIRCHFIELD:**  Your Honor, as far as the other

22  exhibits, the medical literature, those articles, we have not

23  been admitting those.

24          **THE COURT:**  Right.

25          **MS. WILKINSON:**  We are just using this one for

FRANK SMART - CROSS

01:55    1   demonstrative purposes.

2   BY MS. WILKINSON:

3   Q.   Doctor, did you forget the "c" up here?

4   A.   Yes.  Because it's a small c.  It's sex categories.

5   Q.   Let me put up, if I could, a demonstrative that shows

6   you -- helps the jury see what you're looking at.

7            These are the different things that a doctor is

8   supposed to look at to determine how to treat a patient with

9   AFib, right?

10   A.   Yes, ma'am.

11   Q.   The categories that you didn't include the first time

12   included what?  Vascular disease?

13   A.   Vascular disease, age, and sex, yes, ma'am.

14   Q.   Age and sex because being female, not male, unfortunately,

15   in this area, right, you add --

16   A.   Yes, ma'am.  Female, you get a point.

17   Q.   The problem here is the maximum score you can get is 9,

18   right?

19   A.   Yes.

20   Q.   The higher your score, the worse your condition?

21   A.   Correct.

22   Q.   That's because all of these other things, like

23   hypertension and diabetes, all contribute to your risk of

24   stroke as well, right?

25   A.   Yes, ma'am.

**FRANK SMART - CROSS**

01:56

1   Q.   What you are trying to do here when you have a patient who

2   has AFib is try to reduce that risk of a catastrophic stroke,

3   right, or any stroke?

4   A.   You are trying to correctly assess the right patient to

5   give anticoagulants to, again, adjudicate or weigh in between

6   too much -- to thin and too thick, and the risk of a stroke and

7   the risk of bleeding, yes, ma'am.

8   Q.   So this is the guideline that physicians use today and

9   used back in 2015 when determining how to treat a patient with

10  AFib, right?

11  A.   Yes, ma'am.  In 2015, yes, ma'am.

12  Q.   Now, in these guidelines -- or nowhere in these guidelines

13  does it suggest you should not prescribe Xarelto to patients,

14  right?

15  A.   I'm sorry.  In these guidelines?  No, ma'am, it does not.

16  Q.   In fact, it does the opposite, doesn't it?

17  A.   It says that the NOACs are beneficial.

18  Q.   Well, it doesn't just say the NOACs.  It actually goes

19  through specific NOACs, doesn't it?

20  A.   I have not read the entire guideline recently, and so --

21  but I certainly would think it would mention the NOACs and

22  break them down.

23  Q.   Why don't we take a look at page 15.

24  A.   Okay.

25  Q.   Table 6, if you could.

FRANK SMART - CROSS

01:57

1   A.   Yes, ma'am.

2   Q.   Do you see that, where they go through their

3   recommendations?

4   A.   Yes, ma'am.

5   Q.   When they do that, they have different -- do you know what

6   COR and LOE is that's at the top of that chart?

7   A.   If I can read the chart for just a minute.

8   Q.   Of course.

9   A.   LOE is normally level of evidence, and COR, I don't know

10  what the abbreviation is, but that's the strength of the

11  recommendation.

12  Q.   Okay.  I'm going to put this on the ELMO so the jury can

13  see what you are looking at.

14         That's the table, right?

15  A.   Yes, ma'am.

16  Q.   I'm going to blow it up a little bigger so we can see it.

17  So this is telling doctors, cardiologists the recommendations

18  for risk-based -- how do you pronounce that?  Antithrombotic

19  therapy?  Is that AFib therapy?

20  A.   Yes, ma'am.

21  Q.   It goes through.  When it is a No. 1 in the

22  recommendation, that means it's the most important or the

23  highest recommendation that can be given right, a 1?

24  A.   Correct.

25  Q.   For doctors.  When it comes to evidence, A is the highest

FRANK SMART - CROSS

01:59   1   level of evidence and in descending order of the alphabet?

2   **A.**   A is multiple randomized clinical trials; B might be one

3   trial; C is expert opinion.

4   **Q.**   Okay.  So it has warfarin as a top recommendation, right?

5   **A.**   Yes, ma'am.

6   **Q.**   And it says [as read]:  "The level of evidence is 1, in

7   part it's been on the market 50 years."  Right?  There's lots

8   of studies of warfarin?

9   **A.**   Yes, ma'am.

10   **Q.**   Then it does specifically talk about Xarelto, right?

11   **A.**   It talks about the NOACs as a class:  dabigatran,

12   rivaroxaban, and apixaban.

13   **Q.**   It names the three specific ones, doesn't it?  That is

14   Pradaxa?

15   **A.**   Yes, ma'am.

16   **Q.**   Xarelto?

17   **A.**   Yes, ma'am.

18   **Q.**   And that is Eliquis, right?

19   **A.**   Yes, ma'am.

20   **Q.**   It doesn't include Savaysa because this came out in 2014

21   and Savaysa wasn't on the market yet, right?

22   **A.**   Right.

23   **Q.**   For all of those they are recommended at the highest

24   level, right?

25   **A.**   They are Class 1 indication with level of evidence B.

**FRANK SMART - CROSS**

02:00

1    **Q.**   Again, doctors out in the community, reading the

2    guidelines put together by other physicians, say that Xarelto

3    should be prescribed for patients with AFib, right?

4    **A.**   Xarelto would be one of the options for patients with

5    AFib, yes, ma'am.

6    **Q.**   Let's make another chart, if we could, of what you have

7    told us.

8           So your next opinion, I think, was that no reasonable

9    physician would prescribe Xarelto, right?

10   **A.**   With the knowledge --

11   **Q.**   For AFib?

12   **A.**   For nonvalvular AFib, with the knowledge that I currently

13   have, yes, ma'am.

14   **Q.**   Everything that you have talked about today in court is

15   available publicly except for the four emails that you got from

16   plaintiffs' lawyers, right?

17   **A.**   Yes, ma'am.

18   **Q.**   So I will put a little star up here about the four emails.

19   But you have told us, I think, before that those emails

20   didn't -- they only underscored your opinion you don't need

21   them for your opinion you have told us?

22   **A.**   That is correct.

23   **Q.**   So let's stick with that.  Let's see who agrees with you.

24   So these guidelines sent out by all those associations that you

25   are a member of, right?  You are a member of the American

**FRANK SMART - CROSS**

02:02   1   College of Cardiology?

2   A.    Yes, ma'am.

3   Q.    They don't agree with you, right?

4   A.    I'm sorry.  They don't agree with me?  They say that --

5   Q.    That no reasonable physician would prescribe Xarelto for

6   AFib?

7   A.    The guidelines do not support that currently, yes, ma'am.

8   Q.    The FDA doesn't agree with you, right?

9   A.    That's correct.

10   Q.    Other cardiologists and -- electrophysiologists and

11   cardiologists here in town don't agree with you.  You don't

12   know who, but you know some of them at least?

13   A.    I'm sure some are using Xarelto.  It certainly is used.

14   Q.    Well, you know Dr. Colleen Johnson, don't you?

15   A.    I do.

16   Q.    You know she prescribes Xarelto, don't you?

17   A.    I don't.

18   Q.    So you really don't have a basis to know who else in your

19   community --

20   A.    No, ma'am.

21   Q.    -- does or does not?  You just don't know?

22   A.    Most of the patients I've seen that I shared with

23   Dr. Johnson were on apixaban.

24   Q.    What about Dr. Sammy Khatib?  Do you know him?

25   A.    I don't know him personally.  I know of him.  I know he's

FRANK SMART - CROSS

02:03

1    a respected electrophysiologist at Ochsner.

2    Q.   Do you know whether he prescribes Xarelto to his patients?

3    A.   I'm sorry, I do not.

4    Q.   So we will have to fill that in when we ask him, right?

5    A.   Sure.

6    Q.   I think you told us when we were looking at this chart

7    that a lower level of evidence is just expert opinion.  Right?

8    A.   Yes, ma'am.

9    Q.   So all these things you have told the jury is just your

10   personal expert opinion, right?

11   A.   Yes, ma'am.  All of those things I told the jury are my

12   expert opinion, based on what I have told you so far.  Yes,

13   ma'am.

14   Q.   Let's take a look, if we could, at the article that you

15   said was the kind of aha! moment, the Kim article.  I'm going

16   to add this.  You can see my handwriting is terrible.  This way

17   we don't have any dispute about what you said.

18        This is the Kim article, you call it, right?  That's

19   not the first author, but it's the lead author?

20   A.   The senior author is Kim.  And Gong, G-O-N-G, is the first

21   author.

22   Q.   This article, I think you said 2012, but it was published

23   in 2013, wasn't it?

24   A.   Yes, ma'am.

25   Q.   Do you have a copy up there in front of you?

**FRANK SMART - CROSS**

02:04

1  **A.**   Yes, ma'am, I do.

2  **Q.**   It certainly doesn't say that no reasonable physician

3  would prescribe Xarelto, does it?

4  **A.**   No, ma'am.

5  **Q.**   In fact, if you look at it, it lays out a decision chart

6  where it specifically recommends prescribing Xarelto, doesn't

7  it?

8  **A.**   I don't know that it specifically recommends it except in

9  somebody who had a compliance issue.

10  **Q.**   Really?  Okay.  Well, let's take a look, then.

11  **A.**   So the last one [as read], "Selection of appropriate NOAC

12  continued," the only place that it would specifically recommend

13  Xarelto, where you see the 20-milligram riva, is the very last

14  thing at the bottom where it says "poor compliance."

15  **Q.**   Let's take a look, shall we?

16  **A.**   Sure.

17  **Q.**   This is the article, right?  And this is by Gong and Kim?

18  **A.**   Yes, ma'am.

19  **Q.**   It was published in the *Canadian Journal of Cardiology*

20  back in 2013, right?

21  **A.**   Correct.

22  **Q.**   You told us that reading this, looking at these graphs

23  made you realize that Xarelto -- the dose was too high?

24  **A.**   That's correct.

25  **Q.**   20-milligram dose was too high?

**FRANK SMART - CROSS**

02:05

1   **A.**   20-milligram, once a day, yes, ma'am.

2   **Q.**   You don't have the opinion that the 15-milligram dose is

3   too high?

4   **A.**   I was commenting on the 20-milligram dose, once a day.  I

5   believe the 15-milligram dose, once a day, is also too high.

6   **Q.**   Okay.  Now let's look at what -- I don't think you showed

7   it to the jury.  This is actually a decision chart, right, for

8   selection of warfarin versus NOACs for AFib patients.  Is that

9   what that stands for?

10  **A.**   Yes, ma'am.

11  **Q.**   You go through this decision chart.  They are already on

12  warfarin, right?  If they are not, you can go over and you can

13  choose NOAC, right?

14  **A.**   That is correct.

15  **Q.**   That NOAC includes Xarelto, doesn't it?

16  **A.**   Yes, ma'am.

17  **Q.**   It's not limited; it's all of the NOACs are included?

18  **A.**   Yes, ma'am.

19  **Q.**   So you were mistaken when you just told the jury that in

20  only one instance does it recommend Xarelto?

21  **A.**   I'm sorry.  No, ma'am.  You asked me specifically

22  recommends Xarelto, and that's not specific to recommending

23  Xarelto.  That's recommending all of the NOACs.

24  **Q.**   But that includes Xarelto?

25  **A.**   Correct.  But the only place it specifically recommends

FRANK SMART - CROSS

02:06

1   Xarelto, if you go down to the very bottom, Number C, it says
2   [as read] "20 milligrams q day riva" under the box of poor
3   compliance.
4   Q.   Let's keep going.  We have it there, right?  I could
5   annotate that?  So we don't have a dispute that this includes
6   Xarelto, right?
7   A.   Yes, ma'am.  That's the NOACs.
8   Q.   Then if we go down to the next one, it's talking about if
9   you have renal impairment, which means generally it takes your
10  body longer to get rid of the drug, right?
11  A.   That's correct.
12  Q.   It shows here several places where it recommends -- or you
13  can choose among them the 15-milligram dose, right, the
14  once-a-day dose of rivaroxaban, which is Xarelto, right?
15  A.   Yes, ma'am.
16  Q.   So just so we are clear, this is Xarelto.  So is this,
17  right?
18  A.   Yes, ma'am.
19  Q.   This is the 20-milligram dose, right?
20  A.   Yes, ma'am.
21  Q.   So in each of those instances, this very article that you
22  said supports your opinion that no one should -- no reasonable
23  doctor should prescribe it, this same article is saying it is a
24  reasonable choice for doctors in all of these situations,
25  right?

FRANK SMART - CROSS

02:08

1   **A.**   I'm sorry.  This article supports what I said, was that

2   the dose was too high and it was a twice-a-day drug.  But you

3   asked me my opinion about knowing what I know.  It's based on

4   all the other information as well, not just this article.

5   **Q.**   But this specifically recommends here if you have mild

6   renal impairment to go with the 20-milligram once-a-day dose of

7   Xarelto, doesn't it?

8   **A.**   It recommends all three of the NOACs, yes, ma'am:

9   150 dabigatran, 20 of Xarelto, and 5 of apixaban.

10  **Q.**   So this would tell someone reading this document in a

11  peer-reviewed journal that the choice of a 20-milligram dose of

12  rivaroxaban is reasonable, right?

13  **A.**   That is the what the dose looked at and that's the way

14  they broke it down, yes, ma'am.  You would conclude that

15  20 milligrams once a day of Xarelto, based solely on this

16  article, is reasonable.

17  **Q.**   Then if you go down to the bottom, it says if you have a

18  history of a GI bleed, you go over here to the left, right?

19  **A.**   Yes, ma'am.

20  **Q.**   If you don't, you go down here, right?

21  **A.**   Yes, ma'am.

22  **Q.**   You can pick all these different ones, depending if you

23  have -- what's that, moderate --

24  **A.**   Liver impairment.  Or you are taking a drug, what's called

25  a CYP3A4 drug, which is a drug that will have interactions with

FRANK SMART - CROSS

02:09   1   it.

2   Q.   Now, you just told the jury that the only way they

3   recommend it is for poor compliance.  That's down here, right?

4   A.   The only way -- you asked me specifically recommended

5   Xarelto, and that is where they specifically recommend it.

6   Q.   And I'm sure I misspoke.  I don't mean excluding all

7   others.  I just mean recommended it as one of the choices, and

8   they do that up here as well, don't they?

9   A.   Along with the other three, yes, ma'am.

10   Q.   So this article was reviewed by other knowledgeable

11   physicians and scientists?

12   A.   Yes, ma'am.

13   Q.   That's what peer review means.  And it was put out in the

14   literature, right?

15   A.   Correct.

16   Q.   Now, nowhere in here does it say that Xarelto is unsafe,

17   right?

18   A.   No, ma'am, it does not.

19   Q.   Nowhere does it say that the 20-milligram dose is too

20   high, right?

21   A.   Those words are not written in the article.

22   Q.   Well, the words matter in these articles, right?

23   A.   Certainly.  And so do the graphics and the other things

24   that are laid out in the article, yes, ma'am.

25   Q.   It certainly doesn't say you shouldn't prescribe Xarelto,

FRANK SMART - CROSS

02:10  1   does it?

2   **A.**   It does not.

3   **Q.**   So you came to that conclusion in 2015, was it?

4   **A.**   I think about then.

5   **Q.**   Before you ever met these folks, right?

6   **A.**   Yes, ma'am.

7   **Q.**   Based on this article?

8   **A.**   And the fact that I have had patients who have had

9   bleeding complications, yes, ma'am.

10  **Q.**   And there's nothing wrong with that, right?  Doctors don't

11  have to pick a certain medication if they don't like it or if

12  they don't think the science is good enough for them?

13  **A.**   That is correct.

14  **Q.**   In fact, you are allowed to prescribe what they call "off

15  label," right, even if it's not recommended by the FDA, because

16  you are the doctor and you know best.  You don't have to follow

17  the label, do you?

18  **A.**   You don't have to, but it's a pretty good idea.  Otherwise

19  you end up in court talking to a bunch of lawyers, so . . .

20  **Q.**   Like you said, that's why you charge a lot, so you don't

21  have to do this too often, right?

22  **A.**   Yes, ma'am.

23  **Q.**   So the FDA approval of the label means something to you,

24  right?

25  **A.**   Yes, ma'am, it does.

FRANK SMART - CROSS

02:11

1   Q.   It means -- well, you're here to speak on your behalf, so
2   I won't ask you what it means for other doctors, but it
3   certainly is important to you, right?
4   A.   Yes, ma'am.
5   Q.   Now, the FDA you know -- or maybe you don't -- has the
6   power in certain circumstances to order companies to put a
7   black box on a label.  Did you know that?
8   A.   I do know that, yes, ma'am.
9   Q.   You know there's a regulation, right, that specifically
10  allows the FDA to force a company to put a black box label
11  on -- into a label -- a black box warning into a label if they
12  think it's prudent, right?
13  A.   Again, I'm certain -- I can't tell you that I knew that
14  there was a regulation specifically dealing with that, but it
15  certainly is in keeping with what I thought the FDA did, yes,
16  ma'am.
17  Q.   You know that the FDA has never ordered a black box
18  warning be put on Xarelto, right?
19  A.   Yes, ma'am, I do know that.
20  Q.   One of the reasons that these drugs are so well studied is
21  what you were talking about before about how threatening
22  strokes can be, right, to individuals?
23  A.   And how challenging these agents are to use because of
24  both stroke and bleeding.
25  Q.   So I want to talk -- if we could talk about two different

FRANK SMART - CROSS

02:13

1  kinds of strokes, and I have a demonstrative I can show you.

2  I'm sure you are familiar with something like this because we

3  have heard about different strokes in this case, but I don't

4  think we have made it clear how they are different.  Could you

5  help us with that?

6  A.    Sure.

7  Q.    Let me just point you in the right direction because you

8  start explaining it, sometimes it's harder for us because you

9  know this stuff so well.  So can I start by asking you on the

10  left, this ischemic stroke --

11  A.    That's on the right.

12  Q.    Right.  Sorry.  The one on the right, is this the kind of

13  stroke that you are concerned about in most cases with someone

14  who has AFib?

15  A.    Yes, ma'am.

16  Q.    Explain to the jury why you worry about that type of

17  stroke.

18  A.    Well, because we talked about the blood clot forming in

19  the left atrium and breaking off and going up and causing one

20  of the arteries that we talked about on that graphic, the blood

21  flow to stop in there, and so that's an ischemic stroke,

22  meaning the blood is not delivered there.

23  Q.    On the left, the hemorrhagic stroke -- is that how you

24  pronounce it?

25  A.    Yes, ma'am.

FRANK SMART - CROSS

02:14

1    Q.    That is when the blood vessel collapses, right, or breaks
2    and the bleed starts in the brain?
3    A.    More breaks, and then collapses, yes, ma'am.
4    Q.    That's often caused by hypertension or high blood
5    pressure, right?
6    A.    Or trauma or bad luck, yes, ma'am.  All of those things.
7    Q.    And high blood pressure, hypertension, has a very adverse
8    effect, if it's uncontrolled and occurs over time, on blood
9    vessels, right?
10   A.    Yes, ma'am.
11   Q.    Can destroy organs and --
12   A.    It certainly can destroy organs.  It causes more hardening
13   of the arteries.  It can cause aneurysms of blood vessels where
14   they get bigger and get weaker, yes, ma'am.
15   Q.    Or hemorrhagic brain bleeds?
16   A.    As a consequence of that.
17   Q.    When you all were looking at -- this morning -- the study
18   that was published, the peer-reviewed journal that published
19   the ROCKET data, that was something the companies put out
20   there.  They have never hidden any of this data, right, about
21   ROCKET?  You can go look at it yourself?
22   A.    I'm sorry, what data are we talking about?
23   Q.    From ROCKET.
24   A.    In the *New England Journal*?
25   Q.    Yes.

412

**FRANK SMART - CROSS**

02:15

1  A.    Yes, ma'am, that was published in the *New England Journal*
2  *of Medicine*.
3  Q.    We're not going to go through the whole article, but it
4  talks about that this is a double-blind trial and there were
5  over 14,000 patients, which you acknowledge is quite a large
6  study?
7  A.    It is, yes.
8  Q.    Impressive, right?
9  A.    Yes.
10  Q.    And you were starting, I think, to go through the risks
11  that were laid out -- let me find it.  The comparison of the
12  risks of bleeding, right?
13  A.    Yes, ma'am, that Table 3 on the ROCKET.
14  Q.    I'm going to show you that again.  I don't think it was
15  quite clear to all of us exactly what this is.  So as you said,
16  because warfarin was on the market for a long time, to be a new
17  drug to come in and address the same issue, it has to be at
18  least as good, right?
19  A.    Yes, ma'am.
20  Q.    The FDA is not going to let you -- let some company sell a
21  drug that's worse that deals with the same problem.  They want
22  people to have the best drug that's available?
23  A.    They want the drugs to at least be non-inferior, yes,
24  ma'am.
25  Q.    Non-inferior.  So it doesn't have to be better, but it

**FRANK SMART - CROSS**

02:17    1    can't be worse?

2    **A.**    Right.

3    **Q.**    That's why all of these NOACs we talked about have been

4    compared to warfarin, right?

5    **A.**    Yes, ma'am.

6    **Q.**    And not been compared head to head; they have been

7    compared to the gold standard, we have heard it called, right?

8    **A.**    Correct.

9    **Q.**    And here that's exactly what was done, right?

10    **A.**    Yes, ma'am.

11    **Q.**    And if you go through this, doctors are interested in the

12    risks of all these bleeds, right?

13    **A.**    Yes, ma'am.

14    **Q.**    But it would be common sense that fatal bleeds are

15    something that people are very concerned about, right?

16    **A.**    Of course.

17    **Q.**    Critical bleeds and intracranial hemorrhages, those are

18    the most serious, right?

19    **A.**    Yes, ma'am.

20    **Q.**    When you look down at this chart, what it shows -- you

21    could just compare the numbers, but I think you explained to us

22    that's not good enough, right, the real numbers?  You can't

23    just say one drug did better because it only had 91, let's say

24    here, for --

25    **A.**    I'm sorry, yes, ma'am.  Right, you have to look at whether

02:17

1   or not those numbers were by chance or something such as that.

2   Q.   So without going through all the math, that's why you go

3   over here to the p-value, and that just tells us was it not an

4   accident, therefore you can say it's really a meaningful

5   difference, right?

6   A.   That's correct, yes.

7   Q.   In critical bleeds there was a meaningful difference in

8   that Xarelto had lower, right, percentage of bleeds than

9   warfarin, right?

10  A.   In the ROCKET trial, yes, ma'am.

11  Q.   Yes.  That's what we are looking at, right?

12  A.   Yes, ma'am, but I --

13  Q.   That's all we are talking about right now.  We --

14  A.   Right.  Because of the error in the Coumadin thing, it

15  concerns me a little bit.  So that's why my opinions were what

16  they are.

17  Q.   Right.  But we've talked about that, the FDA doesn't agree

18  with you, right?

19  A.   The FDA's model didn't agree with that, yes, ma'am.

20  Q.   It's not just their model.  They wrote an article and put

21  it out in public and said they don't think it affected the

22  results and they don't think there should be any changes to

23  Xarelto, didn't they?

24  A.   To the labeling, yes, ma'am.

25  Q.   They said it was still a safe alternative to warfarin,

**FRANK SMART - CROSS**

02:18

1    didn't they, safe and effective?

2    **A.**    They did say that, yes, ma'am.

3    **Q.**    So this is statistically significant, right?

4    **A.**    Yes, ma'am.

5    **Q.**    That's the same -- is true for fatal bleeding, right?

6    **A.**    Yes, ma'am.

7    **Q.**    That's the same for intracranial bleeding.  So in all

8    those three categories, Xarelto did better than warfarin,

9    right?

10   **A.**    Yes, ma'am.

11   **Q.**    You agree that doctors look at those statistics, may not

12   be definitive, but they care about that when they are making

13   prescribing decisions for their patients, right?

14   **A.**    I hope so, yes, ma'am.

15   **Q.**    You know that information -- most of that information is

16   in the label, isn't it?

17   **A.**    Yes, ma'am.

18   **Q.**    So -- and I think you said something that those

19   differences, while significant, weren't -- I can't remember the

20   word you used.

21   **A.**    The question was were they statistically significant or

22   clinically significant, and my statement was that they didn't

23   represent a large number of people that had that.  But, again,

24   my statement earlier was if it's your brain bleed, it's

25   clinically significant to you, so . . .

FRANK SMART - CROSS

02:20

1    Q.   You said it wasn't a large number, and then you used the
2    Superdome analogy to try and make it look like it was a large
3    number, right?
4    A.   I'm sorry, I used the Superdome analogy just to kind of
5    give some clarity to how large the number is.  The problem was
6    I thought, looking at it, it's per hundred patient years, and
7    that's not something that's like a normal thing that you can
8    stack up.
9    Q.   Well, what you did here for the jury is all you did was
10   show the numbers for Xarelto, right, for the Superdome?  You
11   didn't show what these numbers would look like if you were
12   doing it for warfarin, did you?
13   A.   No, ma'am, I did not.  And you're right, they would look
14   equal to that.
15   Q.   Equal or they would be higher?
16   A.   Well, I mean, we showed intracranial hemorrhage was -- so
17   intracranial hemorrhage and fatal bleed would both be higher,
18   based on what you just showed.
19   Q.   Let's go through it, because sometimes it's easier for
20   those of us who aren't used to reading it to just look at
21   simple graphs.  So this is -- I think you would agree with
22   that.  Data shows from ROCKET that warfarin had -- right? --
23   events per a hundred patient years of .5, right?
24   A.   Yes, ma'am.
25   Q.   Xarelto only had .2?

FRANK SMART - CROSS

02:21

1    A.   Of fatal bleeding, yes, ma'am.

2    Q.   Yes.  And that's 150 percent increase in the relative risk

3    for warfarin users versus Xarelto, isn't it?

4    A.   Those two numbers are 150 percent apart, yes, ma'am.  That

5    doesn't necessarily mean that 150 percent of people will have

6    that.  But, yes, ma'am, those are numbers that --

7    Q.   If you look at the risk of intracranial bleeding, warfarin

8    users were at a 40 percent increased risk of intracranial

9    bleeding, weren't they?

10   A.   Yes, ma'am.

11   Q.   That matters to doctors when they are trying to decide

12   what risks they want to consider for their patients versus the

13   benefits, right?

14   A.   Again, all of those things matter, yes, ma'am.

15   Q.   So if we wanted to tell the jury the complete picture of

16   the Superdome story that you gave -- I tried to do the math

17   over lunch, or I really got help doing the math is the honest

18   truth -- you said there was 76,000 fans, right?

19   A.   Yes, ma'am.

20   Q.   That means on Xarelto, 2,700 would experience a major

21   bleeding, right?

22   A.   Correct.

23   Q.   I think there was a small but not statistically

24   significant increase for Xarelto patients, right?

25   A.   Correct.

418

**FRANK SMART - CROSS**

02:22

1  **Q.**   We came up with warfarin had 2,584.  Does that sound

2  reasonable to you?

3  **A.**   Yes, ma'am, that's about right.

4  **Q.**   I'm going to try to put it in the other color so it's easy

5  to see.

6  **A.**   And this is what I call the fans took Coumadin for one

7  year.

8  **Q.**   Yes.  So in red we were going to put Coumadin, right?

9  **A.**   Yes, ma'am.  As was managed in the ROCKET trial.

10  **Q.**   Right, exactly.  So this should be 2,584; but if you go

11  over to the intracranial hemorrhage, you said people on

12  Xarelto, like 380 of them would have it.  If you had put in

13  warfarin, it was 532, right?

14  **A.**   Certainly that sounds like a reasonable number, yes,

15  ma'am.

16  **Q.**   Then last, who would die, you said there would be 152

17  people who would die?

18  **A.**   Yes, ma'am.

19  **Q.**   But you didn't tell the jury that if they were on

20  warfarin, 380 would die, right?

21  **A.**   That seems a little bit higher, but if that's what your

22  calculation was, I will certainly go with that.  You said that

23  it was a 40 percent difference, and that's about --

24  **Q.**   No, not fatal.  Fatal was the 150 percent.

25  **A.**   I'm sorry.  Thank you.

02:23

1   Q.   Right?

2   A.   You're correct.

3   Q.   So that helps people see the real difference, the real

4   numbers, right?

5   A.   Yes, ma'am.  Again, let's clarify that my position is that

6   those numbers are correct in the ROCKET AF trial.

7   Q.   Doctor, you have said that over and over again.  We are

8   just trying to understand using your numbers from that ROCKET

9   study --

10  A.   Yes, ma'am.

11  Q.   -- because you were relying on it when you said all the

12  deaths Xarelto would cause?

13  A.   Yes, ma'am.

14  Q.   Right?  So we are just trying to show the other side of

15  the story.

16  A.   Absolutely.  And again, please, if you would, I don't

17  think that warfarin patients were well managed in ROCKET.

18  Q.   No, I know you don't, and let's talk about that.

19       For warfarin users and Xarelto users, those aren't

20  like 76,000 people who go to the Superdome.  They are generally

21  sicker people, right, that need warfarin or Xarelto?

22  A.   I would be willing to bet a lot of New Orleanians that go

23  to the Saints game are sick enough to warrant that.  Yes,

24  ma'am, AFib is very common.  You said that.  And so it isn't

25  like these are people that are bedbound or anything.  There's a

**FRANK SMART - CROSS**

02:25

1    lot of folks --

2    **Q.**   It's more common in folks like us, as you get older,

3    right?

4    **A.**   Older, diabetes, high blood pressure.  Yes, ma'am.

5    **Q.**   More things happen to your body, right?

6    **A.**   Correct.

7    **Q.**   So it's not 76,000 healthy people that you put on this

8    medication and this would happen, right?

9    **A.**   There's not 76,000 young people without atrial

10   fibrillation, that's correct.

11   **Q.**   When you say about them being well managed, let's start

12   with who is in the study.  You don't dispute, do you, that the

13   people that were in the ROCKET study, compared to the studies

14   of the other NOACs, had higher CHADS scores; therefore, they

15   were at higher risk, right?

16   **A.**   Then did have higher CHADS scores, yes, ma'am.

17   **Q.**   And you are familiar with the numbers because you looked

18   at them, comparing Xarelto, Eliquis, and Pradaxa?

19   **A.**   I'm sorry, the CHADS scores?

20   **Q.**   The CHADS scores.

21   **A.**   Comparing RE-LY, ARISTOTLE, and ROCKET?

22   **Q.**   Exactly.

23   **A.**   Yes, ma'am, I am.

24   **Q.**   And you have looked at their age?

25   **A.**   Yes, ma'am.

FRANK SMART - CROSS

02:26

1  Q.   Their previous stroke risks?

2  A.   Yes, ma'am.

3  Q.   Their heart failure?

4  A.   Yes, ma'am.

5  Q.   Their diabetes?

6  A.   Yes, ma'am.

7  Q.   And their hypertension?

8  A.   Correct.

9  Q.   So I put together this demonstrative.  I'm going to give

10  it to you as based on DX 1284, DX 1482, and DX 1970.

11        I only have one more copy, Doctor, so can I give it

12  to you and make sure it represents what you think before I put

13  it up there?

14  A.   Certainly.  Thank you.

15  Q.   I don't want to show it to the jury if it's not accurate.

16  Take a look at that.

17  A.   Yes.  So the only thing I would say that where you see

18  "previous stroke," it's "previous stroke or embolus."

19  Q.   How do you spell "embolus"?

20  A.   E-M-B-O-L-U-S.

21  Q.   So other than that, with that addition, it accurately

22  represents it?

23  A.   Yes, ma'am.

24        MS. WILKINSON:  Your Honor, may I show it as a

25  demonstrative?

**FRANK SMART - CROSS**

02:27

1        **THE COURT:** Yes.

2    **BY MS. WILKINSON:**

3    **Q.** So these are the other two drugs that you looked at that

4    had the same kind of clinical trial to get approved, right?

5    **A.** Correct.

6    **Q.** Eliquis is another factor Xa drug, so it works in the same

7    way as Xarelto, right?

8    **A.** Yes, ma'am.

9    **Q.** Pradaxa works in a different way?

10   **A.** Correct.

11   **Q.** If we look at the CHADS score, the ROCKET AF had sicker

12   people, because they had a higher CHADS score, right?

13   **A.** They had a higher CHADS score and, therefore, it defines a

14   sicker population.

15   **Q.** You just showed us that, right, the more points you get?

16   **A.** Correct.

17   **Q.** And then age, they were older, right?

18   **A.** Yes, ma'am.

19   **Q.** Previous stroke, much higher percentage, right, or

20   embolus?

21   **A.** Yes.

22   **Q.** Heart failure, much higher?

23   **A.** Yes.

24   **Q.** Diabetes, higher?

25   **A.** Yes.

423

**FRANK SMART - CROSS**

02:28

1   Q.   And hypertension, a little higher, but who knows if that's
2   meaningful, right?
3   A.   Right.
4   Q.   But when you look at that, that shows that overall the
5   Xarelto patients that were being studied in the ROCKET clinical
6   study were sicker, right, with more medical complications than
7   the folks that were looked at in the ARISTOTLE or the RE-LY
8   trials, right?
9   A.   RE-LY, yes, ma'am.
10  Q.   That makes a difference.  You need to know that when you
11  are trying to compare the results, right?
12  A.   It certainly is helpful I think, yes.
13  Q.   Just like it's helpful to know about the therapeutic
14  range, right?
15  A.   You mean the TTR we are talking about?
16  Q.   Yes.
17  A.   Yes.  The time in therapeutic range I think is helpful,
18  among the host of other things we have brought out so far, yes.
19  Q.   I think you told us that you believed that the time in
20  therapeutic range for the ROCKET trial was too low?
21  A.   Yes, ma'am, I echoed that sentiment of the FDA advisors.
22  Q.   We'll get to the FDA advisors.  Those were just two of the
23  advisors, right?  Ultimately the whole FDA listened to the
24  advisory committee, right?
25  A.   Yes.

**FRANK SMART - CROSS**

02:29

1   **Q.**   They don't have to follow the advisory committee, right?

2   **A.**   Which was somewhat frightening to me.  I didn't realize

3   that, but yes.

4   **Q.**   That advisory committee voted for it to go on the market,

5   but that doesn't bind the FDA, right?

6   **A.**   Again, I'm not knowledgeable enough on the FDA workings to

7   say that.

8   **Q.**   So the FDA documents you looked at, did you just get those

9   from the lawyers or did you --

10  **A.**   No, I got the FDA documents -- I told you I pulled that

11  out.  That slide show I didn't see on the FDA website, so I

12  don't know where that came from.

13  **Q.**   Let's show some of that document that you didn't show this

14  morning.  This is from PX 4.  There's actually -- in that

15  memorandum it shows the decision by -- after talking to all the

16  divisions at the FDA, that the FDA actually did approve, based

17  on ROCKET, the 20-milligram dose for sale here in the

18  United States, right?

19  **A.**   Yes, ma'am, they did approve that.

20  **Q.**   And the 15-milligram, right?

21  **A.**   Correct.

22  **Q.**   Let's look at page 17.  Wait.  It's page 3.  Sorry.  It's

23  my slide 17.  This is the action of the FDA, right?  This memo

24  conveys the division's decision to approve this application and

25  the basis for it, right?

FRANK SMART - CROSS

02:30

1   A.   Yes, ma'am?

2   Q.   It's good, isn't it, that there's debate at the FDA, and

3   all these concepts and issues about dosage and the therapeutic

4   range were all discussed openly at the FDA, right?  Weren't

5   they?

6   A.   Again, based on the transcript that I read, there was

7   discussion about it.  I don't know about openly, because, I

8   mean, at one point in time the FDA said that had they -- had

9   the company asked about the dose of Xarelto in ROCKET, the FDA

10  would have recommended a twice daily dose, but the company

11  chose not to do that and the FDA didn't have the authority to

12  make them change.

13  Q.   It said that, but it also said that it turns out that that

14  trial was successful, and it said that in -- and we will get

15  there -- in the review, and you didn't show that to the jury

16  either, did you?

17  A.   But the trial was successful.  And you're right, it's been

18  approved.  And so that's why the trial showed non-inferiority

19  to warfarin.

20  Q.   For the 20-milligram dose, it turned out it was safe and

21  effective, wasn't it?

22  A.   It was safe and effective compared to warfarin, yes,

23  ma'am.

24  Q.   That was right in that same document that you were

25  reviewing with the jury this morning, that that turned out to

FRANK SMART - CROSS

02:32

1    be successful, right, that language?  They didn't think it

2    would be but it did, right?

3    A.    What they said was that they were only going to talk about

4    the ROCKET trial and the dose because that was what was being

5    presented.

6    Q.    Here it says at the dose administered, which was

7    20 milligrams, right, and 15 milligrams for folks with renal

8    impairment?

9    A.    Yes.

10   Q.    It demonstrated robust statistical non-inferiority, which

11   means it was significant, right, and it wasn't inferior to

12   warfarin.  It worked just as well, right?

13   A.    Right.  I guess I don't really understand what robust

14   non-inferiority is, but it was good.  So --

15   Q.    You weren't invited to be on this advisory committee for

16   this, were you?

17   A.    Absolutely not.

18   Q.    And so it says compared to warfarin, and they talk about

19   the margin.  It says [as read]:  "This finding was consistent

20   across various analysis populations and various observation

21   periods."  Right?

22   A.    Yes, ma'am, that's what it says.

23   Q.    So based on all that -- the entire FDA, after having all

24   the debate, hearing all the evidence, they decided to approve

25   the drug based on the dose that was tested because it turned

02:33

1    out to be safe and effective in the ROCKET study?

2    **A.**   Yes, ma'am, that is correct.

3    **Q.**   And that dose has been on the market since 2011?

4    **A.**   Yes, ma'am.

5    **Q.**   And it's still the approved dose, right?

6    **A.**   Yes, ma'am.

7    **Q.**   Now, some of the concerns that you have about was it in

8    the therapeutic range -- and I don't really want to go into the

9    details -- you know, that's in the label, so doctors know that,

10   right?

11   **A.**   No, ma'am, I didn't know that.  And therefore, I'm only

12   going to say what I knew.  It is in the label.  It's kind of

13   buried in the back of the label, and I didn't know that there

14   was that degree of controversy by the time in therapeutic range

15   until I started looking further.

16   **Q.**   So you hadn't read the full label before you prescribed it

17   to your patients?

18   **A.**   I had not.

19   **Q.**   Is it your position today, Doctor, that if something is in

20   the back of the label, it's hidden from doctors?

21   **A.**   No, ma'am.  It's my position the label should be

22   highlighted and reflective.  That's why I think the black box

23   warning is important because warfarin has a black box warning,

24   and rivaroxaban, Xarelto, was non-inferior to warfarin.

25   Therefore, I thought that it should have a black box warning.

FRANK SMART - CROSS

02:34

1    **Q.**   You are not a labeling expert, right?  You don't --

2    **A.**   Goodness, no.

3    **Q.**   Do you understand that the FDA actually regulates

4    everything in this label, including the size of the font?

5    **A.**   You told me that, yes, ma'am.  You didn't tell me about

6    the font, but you said that they regulated it.

7    **Q.**   So let me show you the label.  This is DX 6.

8            **MS. WILKINSON:**  We would move it into evidence,

9    Your Honor.

10           **MR. BIRCHFIELD:**  No objection.

11           **THE COURT:**  Let it be admitted.

12   BY MS. WILKINSON:

13   **Q.**   You were talking about the black box.  Right on the front

14   of the label it talks about the bleeding risk, doesn't it?

15   Right in the warnings and precautions section right there,

16   doesn't it?

17   **A.**   Yes, ma'am.

18   **Q.**   That's the first page of the label, isn't it?

19   **A.**   Right, spinal epidural hematoma.

20   **Q.**   It doesn't just say bleeding.  It says can cause serious

21   and fatal bleeding, right?

22   **A.**   I'm sorry, where are you reading?

23   **Q.**   It's on the screen, sir, to help.

24   **A.**   Thank you.  Yes, ma'am.

25   **Q.**   It says that the most common adverse reaction is bleeding,

**FRANK SMART - CROSS**

02:35

1    right?

2    A.    It does say that, yes, ma'am.

3    Q.    Now, that doesn't surprise you, because you knew that

4    because of the way these drugs are designed.  And cardiologists

5    know this, right?  This is not news to them that, as you said,

6    the more you try to stop clotting, the more you raise the risk

7    of bleeding?

8    A.    Correct.

9    Q.    But the company is warning all the doctors of that right

10    up front, right?

11    A.    Yes, ma'am.

12    Q.    Let's take a look at a few of the other sections.  I'm

13    turning a couple pages to page 6.  Do you see there "risk of

14    bleeding"?

15    A.    Yes, ma'am.

16    Q.    They say not only does it cause it, but they tell you, the

17    doctor, when you are prescribing it to patients at increased

18    risk of bleeding, that you should weigh that against the risk

19    of bleeds, right?  So some patients have other things that

20    raise the risk of bleeding?

21    A.    Correct.

22    Q.    It says you need to consider that before you make the

23    decision or recommendation, right?

24    A.    Right.

25    Q.    When drugs are put on the market, are there normal,

FRANK SMART - CROSS

02:36

1 special concerns about whether they can be used with pregnant

2 women?

3 **A.** Yes, ma'am.

4 **Q.** That's something you would be concerned about, if you had

5 a patient who was pregnant or even at the age where she could

6 become --

7 **A.** Anytime I'm considering treating a pregnant patient, I

8 always look up the drug because I don't keep track of that, and

9 that's a very important thing.

10 **Q.** Here, in that section on the risk of pregnancy-related

11 hemorrhage, the companies make clear that the anticoagulant

12 effect -- right?  Meaning a thinning, we call that -- of

13 Xarelto cannot be monitored with standard laboratory testing

14 nor readily reversed, right?

15 **A.** Yes, ma'am.

16 **Q.** That's all well known, right?

17 **A.** Yes, ma'am.

18 **Q.** That's well known in your medical community, isn't it?

19 **A.** Yes, ma'am.

20 **Q.** We have already talked about -- but I just want to show

21 you Table 1.  The first table in the label shows the data from

22 the Xarelto and warfarin ROCKET trial, right?

23 **A.** Yes, ma'am.

24 **Q.** Now, on your issue about the TTR, whether they were in the

25 therapeutic range, this is where they are actually telling you

**FRANK SMART - CROSS**

02:37

1    the details of the study, right?

2    A.    Yes, ma'am.

3    Q.    It's not just like they provide the data.  You can see it

4    up there, a total of 14,264 patients.  They actually summarize

5    the study, right, in the label?

6    A.    One step below where you have highlighted [as read]:

7    "There's insufficient evidence to determine how Xarelto and

8    warfarin compare when warfarin therapy is well controlled."

9    Q.    Exactly.  That's right in the label for doctors to know

10   and decide whether they think they should use the drug or not,

11   right?

12   A.    It is in the label.  Unfortunately, right in the label is

13   a different story.  I again did not appreciate the TTR

14   controversy to the degree it exists.

15   Q.    Well, not everyone agrees with you that it is a

16   controversy, right?

17   A.    The FDA did just now.  I guess I thought that's what it

18   said, but I have no idea who else.

19   Q.    Well, not the FDA.  Those two reviewers said that, right?

20   A.    That was the label you just showed.

21   Q.    Have you -- it says there's not data; it doesn't say

22   there's a controversy.  Have you looked for the peer-reviewed

23   articles that talk about whether that's a problem or not?

24   A.    I have read them, yes, ma'am.

25   Q.    Many of them say that's not a problem, because that's --

432

FRANK SMART - CROSS

02:39

1    excuse me, Doctor -- because that's how patients are really
2    cared for in the real world.  They want to see what that
3    comparison is like and try to replicate as much as they can
4    what happens in the real world instead of just in a clinical
5    setting?
6    A.    Wow.  I'm sorry.  I really did not understand your
7    question there.
8    Q.    I will try again.  Sorry about that.
9              When you do a clinical study, you can bring people
10   in, and there's bias with that because there are people who
11   want to participate, right?  They come in to take their
12   medication.  They are expected to be there.  There's incentives
13   for participating.
14             So their compliance is normally better in a clinical
15   study than it sometimes is in the real world, right?
16   A.    Yes, ma'am.
17   Q.    That's what they are talking about -- one of the issues I
18   think you raised with warfarin is, because people's levels can
19   be all over the map, they can be out of therapeutic range very
20   easily?
21   A.    The ROCKET investigators and the FDA, I think, weighed in
22   that it wasn't patient compliance that was the issue.  The
23   issue with the time in therapeutic range was that there was no
24   mandate in the trial for how warfarin was controlled.
25             So in RE-LY doctors were told if the INR is 3, you do

**FRANK SMART - CROSS**

02:40

1   X; if the INR is 4, you do Y.  In ROCKET that wasn't the case.

2   They let people control it the way they normally did.  In

3   ROCKET, because a lot of people were from outside the U.S.,

4   that controlled differently.

5            **MS. WILKINSON:**  Your Honor, I thought you were giving

6   me the look that this is a good time for the break.

7            **THE COURT:**  Yes.  Let's take a break at this time.

8   Court will stand in recess.

9            **THE DEPUTY CLERK:**  All rise.

10            (Recess**)**

11            **THE COURT:**  Be seated, please.  I understand counsel

12   is about finished, so we should be able to move it faster.

13   BY MS. WILKINSON:

14   **Q.**   Dr. Smart, we are just about finished here.  I want to end

15   where we started, on Dr. Califf, who you said was important in

16   influencing your opinion when you read some of his emails,

17   right, and his testimony in front of the advisory committee?

18   **A.**   Yes, ma'am.

19   **Q.**   I believe you read from that exhibit, which I don't

20   remember the number.  PX 5.  Do you still have that transcript

21   up there?

22   **A.**   I'm sorry -- yes, ma'am.

23   **Q.**   The FDA transcript?

24            You read from one page about Dr. Califf, but you

25   didn't read what he said about why once-a-day dosing was

02:57

1    rational, did you?

2    **A.**    I'm sorry.  I don't know that I read from that.  I read

3    Dr. Nissen's thing from the transcript.

4    **Q.**    Right, but you didn't read Dr. Califf, who you said was

5    also important in considering what he thought, right?

6    **A.**    I did not, no, ma'am.

7    **Q.**    Why don't you take a look at that now.  We will take a

8    look at it together.  If you look up in the right-hand corner,

9    it's page 76 of the document.

10   **A.**    Of the full transcript?

11   **Q.**    Yes, sir.

12   **A.**    Okay.

13   **Q.**    Here is the front of the -- this is what we are talking

14   about, right, the transcript?

15   **A.**    Yes, ma'am.  Mine doesn't have the little number on the

16   top.

17   **Q.**    Yes.  I just wrote that in.  It's PX 5.  This is the

18   advisory committee meeting that happened on September 8, 2011,

19   right before Xarelto was approved, right?

20   **A.**    Yes, ma'am.

21   **Q.**    It was a long transcript, right?  Lots of folks spoke?

22   **A.**    It was a long transcript, yes, ma'am.

23   **Q.**    Dr. Califf spoke, didn't he?

24   **A.**    He did.

25   **Q.**    Take a look, what he said.  He talked about the dose

FRANK SMART - CROSS

02:59

1   there, didn't he?

2   A.    Yes.

3   Q.    He said it was a rational choice, right?

4   A.    He did.

5   Q.    And others could have been made, right?

6   A.    Correct.

7   Q.    Modeling was consistent, right, with the good choice of a

8   dose?

9   A.    That's right.

10  Q.    Phase II data supported it, either the once or twice a

11  day, right?

12  A.    Yes, ma'am, that's what it says.

13  Q.    They had reasons for picking once a day, to put it to the

14  test, right?

15  A.    Yes, ma'am.

16  Q.    As a result, that was the dose that was chosen, right?

17  A.    Yes, ma'am.

18  Q.    It turned out to be successful in ROCKET, right?

19  A.    Yes, ma'am.  It was non-inferior to warfarin.

20  Q.    There were other folks who talked about the dose during

21  this transcript that you didn't read who also said they thought

22  it was a good choice, right?

23  A.    I think -- I won't tell you that I thought -- that they

24  thought it was a good choice.  I thought that they thought it

25  was a choice and did attain non-inferiority.  I don't know if

FRANK SMART - CROSS

03:00   1    they used the word "good choice."

2    **Q.**   Let's focus on Dr. Califf as we finish up here.  You said

3    you had looked at a few emails you were given and that you were

4    troubled by one of the emails, where Dr. Califf himself said he

5    was worried that the dose was too high, right?

6    **A.**   Yes, ma'am.

7    **Q.**   You didn't show that to the jury, did you?  Or counsel

8    didn't give it to you, right?

9         Let's take a look at it.  It's PX 670580.  It should

10   be in your notebook.  Counsel put it in your notebook.

11   **A.**   67 -- I'm sorry.  Say again.

12   **Q.**   It is 670580.

13   **A.**   I guess it might have been too challenging to put them in

14   numeric order.

15   **Q.**   How about if I just put it on the screen?

16   **A.**   That would be great.  Thank you very much.  I apologize.

17   **Q.**   This is the email from Dr. Califf?

18   **A.**   Yes, ma'am.  That's one of the emails I saw.

19   **Q.**   Dr. DiBattiste is at Janssen, right?

20   **A.**   I think so.  I don't know --

21   **Q.**   Look at the date of this email.  This was way back in

22   2008, right?

23   **A.**   Yes, ma'am.

24   **Q.**   That was before they actually completed ROCKET, right?

25   **A.**   Yes, ma'am.

FRANK SMART - CROSS

03:01

1  **Q.**   He is saying there [as read]:  "Overall the RIV" -- that's

2  talking about rivaroxaban, or Xarelto, right? -- "the review

3  was very positive."  Is that what it says?

4  **A.**   Yes, ma'am.

5  **Q.**   [As read]:  "My main concern after seeing the rest of the

6  data is that our dose is too high."  Right?

7  **A.**   Yes, ma'am.

8  **Q.**   That's in 2008.  Then he goes and appears after the data

9  and speaks to the advisory board and recommends that dose,

10  doesn't he?

11  **A.**   He said he thought the dose was reasonable.  He also, as

12  you saw in that other document, recommended a ROCKET booster

13  that had a different dose, a lower dose.

14  **Q.**   You told us during your testimony that your mother had

15  been on Coumadin, right?

16  **A.**   Yes, ma'am.

17  **Q.**   You believe -- when you put your mother on a medication,

18  it's because you believe it's a good medication?

19  **A.**   I didn't put my mother on it.  Dr. St. Martin actually

20  did.

21  **Q.**   Oh.  Who we are going to hear from soon, next week.  You

22  think he is a good physician?

23  **A.**   I do.

24  **Q.**   A good cardiologist?

25  **A.**   Until he retired.

FRANK SMART - CROSS

03:02

1  Q.   You think he does what he thinks is best for his patients?

2  A.   I do.

3  Q.   Including your mom?

4  A.   I certainly voted with my feet.  He took care of her for a

5  long time.

6  Q.   Great.

7       When you were talking to plaintiffs' lawyers, did

8  they tell you or did you ask for the other Dr. Califf email

9  that was long after the 2008 email that you cited for the jury,

10 talking about rivaroxaban?

11 A.   Is that the one where he talked about his mother?

12 Q.   Yes.

13 A.   I did see that, yes, ma'am.

14 Q.   You did, but you didn't list that on your reliance list,

15 did you?  Or did you?  Maybe you did.

16       MR. BIRCHFIELD:  It's in his report, Your Honor.

17 Show him the report.

18 BY MS. WILKINSON:

19 Q.   You can look at your report.

20 A.   Okay.

21 Q.   Let's take a look at the document.  Did Dr. Califf say in

22 this document that his own mother was on rivaroxaban in 2014?

23 A.   No, ma'am, I don't think so.  I read it --

24 Q.   Why don't you take a look.  That's from Dr. Califf, and

25 that's in April of 2014, isn't it?

439

FRANK SMART - CROSS

03:03

1    A.   Yes, ma'am.

2    Q.   That's going to some folks at Duke, where he was a

3    professor, right?

4              MR. BIRCHFIELD:   Your Honor.

5              THE WITNESS:   So I have not seen this email.

6              MR. BIRCHFIELD:   Your Honor, we will be glad to offer

7    those -- these emails that are internal Duke emails.  We have

8    offered those.   They have been objected to.   But if we are

9    going there, we should be able to also offer those internal

10   Duke emails.

11             MS. WILKINSON:   Your Honor, this is for impeachment,

12   not looking at all the emails and what it says about what he

13   thought about the dose.

14             THE COURT:   Well, let's see what he says on redirect.

15   BY MS. WILKINSON:

16   Q.   This document is DX 5009, for the record.

17             Is this or is that not in your report or on your

18   reliance list?

19   A.   This is neither in my report nor on my reliance list.

20   Q.   So nobody gave you that document when they gave you the

21   other Dr. Califf internal emails, right?

22   A.   That is correct.

23   Q.   You had never seen any of those internal emails until you

24   got them in this case?

25   A.   That is correct.

FRANK SMART - REDIRECT

03:04

1   Q.   Take a look at that email.  When you read that email from
2   Saturday, April 26, 2014, is Dr. Califf saying that his mother
3   is on rivaroxaban and eating whatever she likes -- whatever she
4   feels like eating?
5   A.   Yes, ma'am.
6   Q.   He says [as read]:  "What is your next world-changing
7   plan?"  Right?
8   A.   It does.
9   Q.   Reading that email, now that you see it, does that suggest
10  to you that he thought the rivaroxaban dose, the 20-milligram
11  dose that was on the market and approved by the FDA, was
12  appropriate for his mother?
13  A.   Certainly you would conclude that from reading this.
14         MS. WILKINSON:  Thank you very much, Doctor.  I have
15  no further questions.
16         THE COURT:  Any redirect?
17                  REDIRECT EXAMINATION
18  BY MR. BIRCHFIELD:
19  Q.   Dr. Smart, do you recall seeing an email from Dr. Califf
20  that says that he would not put his mother on 20 milligrams?
21  A.   Yes, sir.
22  Q.   Suggesting that the 20 milligrams was too high?
23  A.   Yes, sir.
24  Q.   I want to walk through several of the items that you
25  covered with Ms. Wilkinson.

FRANK SMART - REDIRECT

03:05

1        One of the things -- one of the things I have

2  observed with you, Dr. Smart, is you are very careful about

3  words, and I appreciate that.  I think that makes it very

4  important that we clear up a few of the things that you just

5  covered.

6        If we can go to where Ms. Wilkinson talked about the

7  articles.  She phrased this question -- actually there was a

8  little bit of back-and-forth on that.  But she posed the

9  question to you:  Do any of these articles say the FDA has

10  approved as "safe and effective" -- there was a long question

11  there -- and said that it's too high and unsafe?

12        It was a quote.  She fussed with you about does it

13  say those words; is that right?

14  **A.**   That is correct.

15  **Q.**   So when she says -- when she wrote "no" here, that is --

16  there is not an article that has all of those words in it

17  precisely the way she set it out, right?

18        **MS. WILKINSON:**  Objection.  Leading.

19        **THE COURT:**  Well, let's just phrase your questions

20  better.

21  **BY MR. BIRCHFIELD:**

22  **Q.**   When you say that there are no articles or where the dose

23  is too high, is that what you are saying here?

24  **A.**   No, sir.  My answer was answering her question

25  specifically are those words written in the article, and the

**FRANK SMART - REDIRECT**

03:07  1   answer to that is no.

2   **Q.**   Dr. Smart, are there articles -- are there a significant

3   number of articles that support your position that the dose of

4   Xarelto, 20 milligrams, 15 milligrams, are too high?

5   **A.**   Once a day, yes, sir.

6   **Q.**   In the same way, when Ms. Wilkinson was asking you about

7   your opinion that Xarelto is worst in class, she asked you:

8   Compared to all NOACs?  And you responded no.  Is that right?

9   **A.**   Because there was no article that compared all the NOACs.

10  So what I answered no was because of that.  But my statement in

11  my report was it's worst in class, again, because of the FDA in

12  saying that it was equal equal, not superior equal.

13  **Q.**   I think you discussed that there are articles that compare

14  Xarelto to other NOACs.  Right?

15  **A.**   Yes, sir.

16  **Q.**   And those articles show that Xarelto is worse, correct?

17  **A.**   Yes, sir.

18  **Q.**   But when you are talking about all the NOACs, would that

19  include Savaysa, that was only on the market in 2015?

20  **A.**   The reason for the answer of is there an article that says

21  that, they did not include edoxaban, or Savaysa.  That's the

22  reason I couldn't answer all of the NOACs.

23  **Q.**   Ms. Wilkinson went to guidelines, and she showed you the

24  2014 American Heart Association ACC guidelines.  Do you recall

25  that?

FRANK SMART - REDIRECT

03:09

1    A.    Yes, sir.

2    Q.    Dr. Smart, first of all, let's go back in time to 2014.

3    That's the date of these guidelines.  In 2014 were you

4    prescribing Xarelto at that time?

5    A.    Yes, sir, I was.

6    Q.    So based on the safety information that was provided to

7    you and other doctors at that time, was it your impression that

8    Xarelto was safe and appropriate to prescribe at that time?

9    A.    Yes, sir.

10   Q.    Has there been additional information and studies since

11   2014 that have altered your opinion?

12   A.    Yes.  We brought up one.  The Graham article was 118,000

13   Medicare patients that were treated with dabigatran or

14   rivaroxaban and looked at complications, and again

15   statistically significant increase in mortality in people

16   treated with rivaroxaban over the age of 75.

17   Q.    Dr. Smart, the Dr. Kim study Ms. Wilkinson covered with

18   you, what were you focused on in the Kim study?

19   A.    The size of the curve and how over-anticoagulated people

20   were for the first half of the day after taking the dose of

21   rivaroxaban, Xarelto.

22   Q.    Ms. Wilkinson walked through the decision tree and how

23   NOACs were offered as an option there; is that right?

24   A.    That's correct.

25   Q.    But when you were looking at the pharmacodynamics of the

**FRANK SMART - REDIRECT**

03:11

1  drug, that's what alerted you to the problem --

2  **A.**  Yes, sir.

3  　　　　**MS. WILKINSON:**  Objection.

4  　　　　**THE COURT:**  Sustained.  Please don't lead.

5  **BY MR. BIRCHFIELD:**

6  **Q.**  Dr. Smart, when we were discussing the CHADS score -- do

7  you recall that?

8  **A.**  Yes, sir.

9  **Q.**  And we used CHADS versus the CHADSVASc.  Do you recall

10  that?

11  **A.**  Yes, sir.

12  **Q.**  The CHADS score -- we were discussing CHADS -- were we

13  discussing CHADS in context of the ROCKET study?

14  **A.**  I can't remember if that was the case or not, but that was

15  certainly -- because CHADS was used in ROCKET, that's the

16  reason I went with CHADS instead of CHADSVASc.  But, yes, sir.

17  **Q.**  I want to turn your attention to the discussion of the

18  label.  Ms. Wilkinson covered the label with you.

19  　　　　I show you Defense Exhibit 6 that she discussed with

20  you.  Do you recall that, Dr. Smart?

21  **A.**  Yes, sir.

22  **Q.**  Here we looked at the risk of bleeding, where it states in

23  here that there is a significant risk of bleeding with Xarelto.

24  Do you recall that discussion?

25  **A.**  I do.

FRANK SMART - REDIRECT

03:12

1   **Q.**   If we go to Section 5.2, it says [as read]:  "Xarelto
2   increases the risk of bleeding and can cause serious or fatal
3   bleeding."  Do you recall that discussion?
4   **A.**   Yes, sir, I do.  I'm sorry.  I don't have it in front of
5   me, but, yes, I do.  I think it's on the monitor.
6   **Q.**   So, Dr. Smart, that statement, is that an adequate
7   statement of the safety of Xarelto?
8          **MS. WILKINSON:**  Objection.  Not an expert on
9   labeling; also asked and answered.
10          **THE COURT:**  You established that, but I will allow
11   him to answer the question.
12          **THE WITNESS:**  Again, it didn't convince me not to use
13   it; therefore, I would have to answer, no, I don't think it's
14   adequate.
15   BY MR. BIRCHFIELD:
16   **Q.**   I'm going to go to another section Ms. Wilkinson showed
17   you.  In this section you looked at the statement [as read]:
18   "The anticoagulant effect of Xarelto cannot be monitored with
19   standard laboratory testing, nor readily reversed."  Do you see
20   that?
21   **A.**   Yes, sir.
22   **Q.**   Dr. Smart, would it trouble you if you learned that the
23   statement that the anticoagulant effect of Xarelto cannot be
24   monitored with standard laboratory testing was not true?
25          **MS. WILKINSON:**  Objection, Your Honor.  Beyond the

FRANK SMART - REDIRECT

03:14

1  cross; and also not within the area of expertise --

2      MR. BIRCHFIELD:  He covered that.

3      MS. WILKINSON:  -- as the witness stated.

4      MR. BIRCHFIELD:  She addressed that.  She brought

5  that out.  I'm asking him to clarify that point.

6      THE COURT:  It's close enough.  I will allow it.

7      THE WITNESS:  I'm sorry.  Since I was distracted,

8  would you please ask it again.

9  BY MR. BIRCHFIELD:

10  Q.   Sorry.  Let's do this again.  Looking at this statement

11  [as read]:  "The anticoagulant effect of Xarelto cannot be

12  monitored with standard laboratory testing," if that's not

13  true, would you find that disturbing, Dr. Smart?

14  A.   Yeah.  I guess I don't know "disturbing," but I certainly

15  would find it disingenuous.  That would be wrong.  It would be

16  nice to know if you could monitor it better with standard

17  laboratory testing, yes, sir.

18  Q.   Dr. Smart, you also discussed with Ms. Wilkinson the FDA

19  reanalysis of the ROCKET study.  Do you recall this?

20  A.   Yes, sir.

21  Q.   You were asked about the FDA's findings or their

22  reanalysis, the conclusions of those findings, right?

23  A.   Yes, sir.

24  Q.   I think you mentioned that the findings were based on

25  modeling -- the FDA modeling.  Is that correct?

FRANK SMART - REDIRECT

03:15

1   A.   Yes, sir.

2   Q.   Will you describe for us the modeling process.

3   A.   So I'm going to do my best because it really wasn't that

4   well laid out.  There was another appendix that was on the FDA

5   website for one of the models.  They asked two different people

6   to model.

7        But what modeling was, was -- we didn't -- we don't

8   know if well-controlled warfarin versus Xarelto would have

9   ended up the same way.  So when the question of the Alere

10  device came out, the FDA's own estimate of the TTR at the

11  time -- the therapeutic range at the time the blood was drawn

12  wasn't 55; it was actually 43.  And so the question was:  Is

13  this enough to change the results of the study?

14       The FDA asked some researchers to basically

15  mathematically guess if this would have changed, had it been

16  one way or the other.  They mathematically guessed and

17  concluded it might have altered the reported bleeding rate for

18  warfarin, showing it to be 10 percent -- 7 to 10 percent lower

19  than it actually was.

20       So the problem is not that they tried.  My problem is

21  it's a guess.  A guess is a guess.  If you are going to guess

22  to start with, why spend $30 million doing the study to start

23  with?  Just guess.

24       I don't think we know, is the point.  I can't say it

25  did, I can't say it didn't.  What I'm saying is we don't know.

FRANK SMART - REDIRECT

03:17

1   Because we don't know, I think -- and that's what's in my

2   report.  I think that the label for Xarelto and the label for

3   Coumadin ought to look just about the same because the drugs

4   acted just about the same.  Coumadin has a black box warning

5   for bleeding, so I thought Xarelto should.  So that was the

6   reason for my answer.

7          Again, the whole mathematical modeling thing, it's

8   like, well, Barry Bonds hit X amount of home runs, but he was

9   on steroids.  How many would he have hit if he was not on

10  steroids?  I can guess at that all day long, but I can't prove

11  it one way or the other.  The same thing with the FDA.  I think

12  their modeling is more scientific, but it's still a guess.

13  Q.   Dr. Smart, you have described the protocol, the setup, the

14  design of the ROCKET study -- you thought that was well

15  designed, right?

16  A.   Yes, sir.

17  Q.   That was done under the direction of Dr. Califf; is that

18  right?

19  A.   Among others.  But, yes, sir.  He was the senior design

20  person for it.

21  Q.   At the time the ROCKET reanalysis was done by the FDA, who

22  was the FDA commissioner?

23  A.   Dr. Califf.

24  Q.   Dr. Smart, in reviewing the materials, the FDA materials,

25  what's available on the website, and the internal documents,

FRANK SMART - REDIRECT

03:19

1   has your confidence in the FDA and DCRI been shaken?

2          **MS. WILKINSON:**  Objection, Your Honor.

3          **THE COURT:**  That's a bit far.  I sustain the

4   objection.

5   **BY MR. BIRCHFIELD:**

6   **Q.**   One last area.  In your report you refer to emails from

7   Dr. Califf.  Do you recall that?

8   **A.**   Yes, sir.

9   **Q.**   Ms. Wilkinson showed you a transcript from Dr. Califf's

10  comments at the advisory committee.  Do you recall that?

11  **A.**   Yes, sir.

12  **Q.**   The advisory committee, do you recall when that took

13  place?

14  **A.**   Yes.  That was the advisory committee in November

15  whatever.

16  **Q.**   Of 2011?

17  **A.**   Yes, sir.

18  **Q.**   The emails that you saw about where Dr. Califf writes

19  about the dose being too high and this being corporate BS, were

20  those emails that were written after the advisory committee?

21  **A.**   I'm sorry.  I don't remember the dates on the emails.

22  **Q.**   If you will take a look at the last part of your report.

23  I believe it's the last page of your report.

24  **A.**   Okay.  I'm getting there.  Sorry.

25  **Q.**   The emails.

FRANK SMART - REDIRECT

03:20

1   **A.**   Yes.  Yes, sir, the last page of the report.

2   **Q.**   Is that the 2012 email Dr. Smart?

3   **A.**   Did I specifically note it in my report?

4   **Q.**   The email that you referred to, yes, sir.

5   **A.**   Okay.  So the page in the report packet that I was given,

6   where are we talking about?

7   **Q.**   The last page of your report.

8   **A.**   The last page of my report is nothing more than one line

9   and a signature line.

10  **Q.**   Okay.  I just want to show you the email and the date of

11  the email that you refer to in your report.

12  **A.**   April 3, 2012, yes, sir.

13  **Q.**   That was after the advisory committee transcript that you

14  read from with Ms. Wilkinson; is that right?

15  **A.**   Yes.

16          **MR. BIRCHFIELD:**  Thank you, Your Honor.

17          **THE COURT:**  Okay.  You are excused.  Thank you.

18          **THE WITNESS:**  Thank you.

19          **MS. WILKINSON:**  Your Honor, could I just move in the

20  DX 5009, which is the April 25, 2014, Califf email?

21          **THE COURT:**  It's the one that he talked to him about?

22          **MS. WILKINSON:**  Yes.

23          **THE COURT:**  I'll allow it.  Admitted.  What's the

24  exhibit number?

25          **MS. WILKINSON:**  DX 5009.  I believe that makes it

03:22  1   DX --

2            **THE DEPUTY CLERK:**  DX 6 was your second one, so that

3   will be your third one.

4            **MS. WILKINSON:**  Dean tells me it's DX 3, Your Honor.

5            **MR. BIRCHFIELD:**  We would like to offer the email

6   that he referred to in his report as well.

7            **THE COURT:**  I'll admit that.

8            **MR. BIRCHFIELD:**  3674039.

9            **THE COURT:**  Admitted.

10           **MR. BIRCHFIELD:**  3674039.

11           **THE COURT:**  Call your next witness.

12           **MR. BARR:**  Your Honor, at this time the Orr family is

13   now going to present the video testimony of Patricia Torr taken

14   on October 18, 2016, in Philadelphia.

15           Forget everything I just said.  I'll do that one

16   again in a minute.  The Orr family is now going to present the

17   video testimony of Dr. Gary Peters taken on April 20, 2016,

18   also in Philadelphia.

19           Dr. Peters joined Janssen in May of 2006 and

20   currently holds the position of senior director in the

21   cardiovascular department.  Like the other video, there's going

22   to be questioning by an attorney for the Orr family, followed

23   by questioning by a lawyer for the defendants.  I think this

24   one goes about 30 minutes.

25

1                        **GARY PETERS,**

2      having been duly sworn, testified by deposition [as played]:

3                        **EXAMINATION**

4      **Q.**   Dr. Peters, how are you this morning?

5      **A.**   Fine.

6      **Q.**   Are you currently employed, sir?

7      **A.**   Yes.

8      **Q.**   By whom?

9      **A.**   Janssen Pharmaceuticals Companies of Johnson & Johnson.

10     **Q.**   For how long have you been employed by Janssen?

11     **A.**   Since May of 2006.

12     **Q.**   What is your current position with Janssen?

13     **A.**   I'm a senior director in the cardiovascular department and

14     clinical leader for a new project.

15     **Q.**   During your employment with Janssen, have you had occasion

16     to work on a compound known as rivaroxaban?

17     **A.**   Yes.

18     **Q.**   Commercial name Xarelto?

19     **A.**   Yes.

20     **Q.**   Do you currently have responsibilities with respect to

21     Xarelto?

22     **A.**   I have some limited responsibilities on the Xarelto

23     program currently.  I work on some of the clinical

24     pharmacology-related activities.  I'm the Janssen

25     representative on one of new studies that Bayer is leading, the

GARY PETERS - DEPOSITION

03:25   1   NAVIGATE ESUS study.

2   **Q.**   When did you first work with -- do work with respect to

3   the compound rivaroxaban?

4   **A.**   When I came in May 2006.

5   **Q.**   Was that the -- was that understood that you were going --

6   that when you began working at Janssen, you would be working on

7   rivaroxaban?

8   **A.**   Yes, I was recruited in to work on the rivaroxaban

9   program.

10   **Q.**   You're familiar with ROCKET AF, I assume?

11   **A.**   Yes.

12   **Q.**   That was a clinical trial with respect to rivaroxaban; is

13   that correct?

14   **A.**   Yes, it compared rivaroxaban to the current standard of

15   care, which was warfarin.

16   **Q.**   Dr. Califf was part of the ROCKET team, right?

17   **A.**   Right, he was co-chair of the executive committee, which

18   was the academic leadership of the team.

19   **Q.**   Let's go to 303, the one that ends at 303.  This is Peters

20   Exhibit 24, Record Number 690562.  Now, this is an email from

21   Dr. Califf himself on which you are copied.  Do you see that?

22   And it's February 27, 2012.  Do you see that?

23   **A.**   Yes, it was after the study was done.

24   **Q.**   You will see it's to you and Dr. DiBattiste.  It's marked

25   confidential, and its attachments are the ROCKET booster, and

03:26

1   we talked a little bit about another study that Dr. Califf was

2   interested in called the ROCKET booster or some cute

3   phraseology.

4   A.   A follow-on study to the ROCKET study.

5   Q.   This is Peters 25, Record Number 690563.  This is the

6   attachment to the email, the two-pager he's referring to.  You

7   see that he's referring to a two-pager that is attached to this

8   email.  Do you have that in front of you, sir?

9   A.   Yes, I do.

10  Q.   And you'll see -- it says [as read]:  "Guys, this is a

11  simple two-pager to let you know I'm working on something.  I

12  think this could be done using the ORBIT template at a fraction

13  of the additional cost that we normally attribute to clinical

14  trials.  The motivation is enclosed on page 1."

15          If you look at the first page of the two-pager it

16  says [as read]:  "Rivaroxaban and atrial fibrillation, the need

17  for ROCKET AF booster.  Background."

18          Are you with me so far?

19  A.   Yes.

20  Q.   The second paragraph [as read]:  "The major comparative

21  advantage of rivaroxaban is its once-a-day dosing, but the

22  failure" --

23          If you could just circle that word "failure" in red,

24  please.

25          -- "the failure of ROCKET AF to prove superiority,

**GARY PETERS - DEPOSITION**

03:28  1    even in the face of lower-than-expected TTR in the trial, has

2    raised major concerns about whether the ROCKET AF dosing

3    regimen is indeed the best dose."

4            Did I read that correctly?

5    **A.**   Yes.

6    **Q.**   I thought you told us early on, under oath, when we

7    started this deposition, that you proved -- that ROCKET proved

8    superiority?

9    **A.**   With our -- no.  With the prespecified analysis plan, the

10   prespecified superiority analysis was the safety population on

11   treatment, and we had a p-value less than .05 for that

12   analysis.

13   **Q.**   Let's make it simple.

14   **A.**   This is after the advisory.  This is, you know, a year

15   plus --

16   **Q.**   It is what it is.  And it says [as read]:  "The failure of

17   ROCKET AF to prove superiority."

18           That's Dr. Califf, head of FDA currently.  Those are

19   his words, right?

20   **A.**   Those are his words, yes.

21   **Q.**   And you don't disagree with what he said here, right?

22           You can go ahead and disagree with it.  That's

23   perfectly all right.  I just want to know where you are at with

24   it.

25   **A.**   We looked at a lot of analyses.  And in the more

03:29

1    conservative intent to treat analysis, we were not superior.

2    **Q.**   Okay.

3    **A.**   So, I mean, I think that's where Dr. Califf's lack of

4    superiority statement is coming from.

5    **Q.**   You mean failure of superiority?

6    **A.**   Failure -- well, lack of demonstrating superiority versus

7    warfarin.

8    **Q.**   And he says it raises major questions about whether the

9    ROCKET AF dosing regimen is indeed the best dose.  Now, you

10   received this two-pager, according this email, right?

11   **A.**   I did, yes.

12   **Q.**   So you know that he had stated that there were major

13   questions about whether or not the dose was indeed the best,

14   right?

15   **A.**   That's his opinion, yes.

16   **Q.**   Okay.  And he is the head of the FDA?

17   **A.**   He is the FDA commissioner now, yes.

18   **Q.**   Let's see what else we have got here.

19            And in any event, you know that Dr. Califf for a

20   number of years expressed an interest in exploring other doses?

21   **A.**   I can't recall how long the interest was expressed, but

22   for a number of months at least I was involved in discussions.

23   He was very interested in trying to set up another -- a

24   follow-on study to the ROCKET trial.

25   **Q.**   This is Peters Exhibit 27, Record Number 132656.  You'll

GARY PETERS - DEPOSITION

03:30

1    see this is an email chain of which you are privy to.  It's
2    actually one page, substantively.  And it's -- at the bottom
3    it's an email from Robert Califf to Dr. DiBattiste, who then
4    forwards it to you.  Do you follow me?
5    A.   Yes.
6    Q.   And Dr. DiBattiste writes to you [as read]:  "Rob" --
7    referring to Dr. Califf -- "persists in his interest in
8    exploring other doses."
9         Do you see where I'm referring to?
10   A.   Yes.
11   Q.   And that was in December of 2011, right?
12   A.   Right, which the approval was in November, so this was
13   shortly after the trial was -- certainly after the drug was
14   approved.
15   Q.   And so you know that at least around that time -- it was
16   at least from around that time that Dr. Califf expressed an
17   interest in exploring other doses?
18   A.   Yes.
19   Q.   Let's go to the next document.  It is Peters Exhibit 28,
20   Record Number 132952.  You will see this is an email from you
21   to Troy Sarich and Paul Burton and Dr. Nessel, February of
22   2012, after approval, [as read]:  "Subject, ROCKET booster
23   proposal from Rob Califf."
24        Do you see where I'm reading from?
25   A.   Yes.

GARY PETERS - DEPOSITION

03:32

1   **Q.**   And by the way, this email and the previous one that we

2   looked at, dated December 19, 2011, those were emails that you

3   kept in your ordinary course of business as an employee for

4   Janssen, right?

5   **A.**   Yes, I believe so.

6   **Q.**   All right.  So -- and on this one, February 28, 2012, you

7   write to Chris Nessel and others [as read]:  "Here is the

8   proposal from Rob Califf that we have been talking about for

9   some time.  In general, I like the approach, but the devil will

10  be in the details, as Len likes to say.  Pete."

11              Then you have the proposal attached.  Do we?  I'm

12  sorry, I should have given it to you.  This is Peters 29,

13  Record Number 132953.  We looked at this earlier and marked it

14  as a different exhibit earlier.  But you're familiar with the

15  basics -- the basics of Dr. Califf's proposal?

16  **A.**   Yes.  We took his proposal seriously.  We thought about

17  it.  We had internal discussions and discussions with Bayer

18  about whether to proceed down this path or not, yes.

19  **Q.**   And the potential doses -- if you look at the second page

20  of the proposal, it lists the potential doses, right?

21  **A.**   Right, starting with the approved dose, which was the 20

22  and 15.

23  **Q.**   And the idea was to compare these other doses to the

24  approved dose, right?

25  **A.**   That would be the idea of such a study, yes.

GARY PETERS - DEPOSITION

03:33

1  **Q.**   And then compare, like you did in the comparison to

2  warfarin to look at strokes and bleeds in the 20-milligram or

3  15-milligram in the already-approved doses, and compare it to

4  the proposed doses of 10 and 5 milligram twice a day,

5  7 1/2 milligram twice a day, or 5 milligram twice a day, for

6  renal impairment.  Those are the doses, right?

7  **A.**   15 and 10 once a day.

8  **Q.**   Anyway, so the idea was that -- then there was a

9  discussion, once you identified a different dose from this

10  comparison, the lower doses to the approved doses, you would

11  then potentially do a head-to-head with one of the competitive

12  products like Eliquis, right, or Pradaxa?

13  **A.**   Potentially.  That was part of the discussions.  We could

14  have also discussed just doing a head-to-head comparison would

15  have been an option to consider at the time.

16  **Q.**   The question is independent of the emails.  Does Patricia

17  Torr of commercial frequently give input on when you scientists

18  should conduct a scientific study or not?

19  **A.**   I would say no.

20  **Q.**   I would like to begin by asking you to introduce yourself

21  to the jury by telling us where you live and where you work.

22  **A.**   I live in West Chester, Pennsylvania, and I work at

23  Janssen Research & Development in Spring House, Pennsylvania.

24  **Q.**   Did you attend college?

25  **A.**   I did.

**GARY PETERS - DEPOSITION**

03:35

1    **Q.**   Where did you go to school?  What degree did you get?

2    **A.**   At the State University of New York in Buffalo, and I have

3    a joint degree in biology and psychology.

4    **Q.**   What did you do after you completed college?

5    **A.**   I went to medical school at UCLA.

6    **Q.**   Now, you joined Janssen in May of 2006, if I recall your

7    prior testimony?

8    **A.**   That's correct, yes.

9    **Q.**   What was the status of the ROCKET AF study at the time you

10   joined Janssen?

11   **A.**   It was, I believe, in draft protocol form.  The final

12   protocol was issued in early October, if I recall, but there

13   was a draft already available when I was hired.

14   **Q.**   Okay.  Was there dose-finding data available for you to

15   review?

16   **A.**   Yes, there was.

17   **Q.**   Were you, as a trained clinical pharmacologist, available

18   to review that data and determine your own views about the

19   appropriate dose selection for the ROCKET AF trial?

20   **A.**   Yes, I was able to look at that data.

21   **Q.**   And what conclusions, if any, did you draw, looking at

22   that data about the appropriate dose to study in the ROCKET AF

23   trial?

24   **A.**   So just a little bit of the history.  Bayer had conducted

25   the Phase II dose-finding studies in people with acute blood

**GARY PETERS - DEPOSITION**

03:36

1   clot -- symptomatic blood clots in their legs known as deep

2   vein thrombosis.  They had made the decision before Janssen's

3   involvement that that would be the dose-finding study for the

4   atrial fibrillation studies.  They wouldn't do separate

5   dose-finding in atrial fibrillation population.  And that was

6   selected primarily because you can get a better efficacy

7   assessment in the DVT setting than you can in the AFib setting,

8   where it's very -- the efficacy of the stroke events are --

9   occur but are relatively infrequent.

10          So there were two studies done.  One had primarily

11   twice-daily dosing.  One had once-daily dosing.  I looked at

12   that data.  The dose range was from 20-milligram a day, either

13   10 twice a day or 20 once, up to 40 to 60 milligrams a day.

14          The results for the 10 milligrams twice a day and the

15   20 milligrams once a day were very similar for efficacy; both

16   looked very good versus enoxaparin, warfarin comparator.  And

17   the safety also looked very similar between 20 once a day and

18   10 twice a day.  So that the selection for the ROCKET study was

19   the lowest effective safe dose, which was the 20 once a day.

20   **Q.**   Had a decision yet been made whether the dose or doses

21   studied in ROCKET AF would be studied once a day or twice a

22   day?

23   **A.**   I can't recall exactly when that decision was made.  The

24   protocols, as I remember seeing them, did have the

25   20 milligrams and also the 15-milligram adjustment for renal

GARY PETERS - DEPOSITION

03:37

1   function in when I arrived.  Looking at the data, those were a

2   very reasonable selection of doses and very reasonable, you

3   know, adjusting to the 15 milligrams for people with renal

4   impairment, based on the data -- the blood level data and the

5   efficacy and safety data from the two DVT Phase II dose-ranging

6   studies.

7   Q.   So after you joined Janssen, were you able to participate

8   with your medical and scientific colleagues there and at Bayer

9   to finalize dosing recommendations for the ROCKET study?

10  A.   Yes.  And there were also discussions with -- the

11  executive committee was being formed and there were discussions

12  before the final protocol was signed off with at least the

13  co-chairs.  Dr. Califf and Dr. Fox, you know, endorsed the

14  selection of the regimens that were studied in the ROCKET AF

15  study.

16  Q.   Tell us what the executive committee was.

17  A.   So the executive committee is the independent academic

18  leadership of the study.  So -- so again -- and they're authors

19  at the end, so they had input into the design of the study.

20  They met regularly while it was being conducted to advise on

21  issues that might come up, and then they were part of the

22  analysis and reporting the results in the *New England Journal*

23  *of Medicine*.

24        So we had individuals both mostly -- both

25  cardiologists and stroke neurologists who were expert in

GARY PETERS - DEPOSITION

03:39

1  clinical trials, who were experts in atrial fibrillation, who

2  were expert in stroke prevention or constituted that committee.

3  It was probably about eight to 10 external academic leaders in

4  the field.

5  **Q.**    Was Dr. Califf one of those people?

6  **A.**    Yes, he was co-chair of that committee.

7  **Q.**    With Dr. Fox?

8  **A.**    With Dr. Fox from Edinboro.

9  **Q.**    And did Dr. Califf have an opportunity to contribute to

10 the decision about dosing in the ROCKET AF study?

11 **A.**    Yes.

12 **Q.**    Did you ever hear at that point in time any objection by

13 Dr. Califf to the choice of the 20-milligram dose?

14 **A.**    I don't recall him objecting.  Certainly he was reviewing

15 the protocols, had access to the same data I was looking at.

16 And everyone in the end -- Bayer, Janssen, the academic

17 leadership of the trial -- endorsed moving forward --

18 finalizing the protocol and moving forward with the study with

19 the doses selected.

20 **Q.**    Do you recall hearing any objection by Dr. Califf to the

21 selection of a once-a-day dose to study and market as opposed

22 to twice a day?

23 **A.**    I don't recall -- at that time, when the study was being

24 designed, I don't recall any communication from him objecting

25 to the once daily dosing.

464

**GARY PETERS - DEPOSITION**

03:40

**Q.**   We are now out about 10 years from the time the ROCKET
protocol was finalized, the study was started.  Do you stand by
each of those dosing decisions, 20 milligrams and 20 milligrams
once a day versus twice a day?

**A.**   Yes, I do.  I have not seen any new data that would
suggest that other doses would have necessarily been better.

**Q.**   Now, Mr. Douglas shared with you a number of emails
between Dr. Califf, yourself, and others at Janssen, as well as
some internal Duke emails.  Do you remember that?

**A.**   Yes, I do.  The Duke emails were the first I had seen
those.

**Q.**   There's an email from 2008 that he showed you about the
potential of a higher dose or a lower dose being studied?

**A.**   I think that email referred to concern about the dosing
and maybe making some contingencies.  The study was -- maybe we
should look at it.

**Q.**   Was the study under way in 2008?

**A.**   The study was in the middle in 2008, yes.

**Q.**   So when was the FDA AdCom convened to evaluate the
ROCKET AF data?

**A.**   It was September 2011.

**Q.**   Were you present at that meeting?

**A.**   Yes, I was.

**Q.**   Did you present at that meeting?

**A.**   Yes, I did.

**GARY PETERS - DEPOSITION**

03:42

1   **Q.**   Do you know if Dr. Califf was present at the meeting?

2   **A.**   Dr. Califf was present, yes.

3   **Q.**   Do you know if he presented at the meeting?

4   **A.**   He presented the majority of the slides at the meeting,

5   defending the ROCKET -- the efficacy of the ROCKET AF data,

6   defending the time in therapeutic range was really adequate,

7   defending the dosing regimen that was selected to be studied in

8   the ROCKET AF trial.

9   **Q.**   Did you listen to Dr. Califf's presentation?

10   **A.**   Yes.

11   **Q.**   Did you see the slides that he used to make his

12   presentation to the FDA?

13   **A.**   Yes, I did.

14   **Q.**   Have you seen those slides since that presentation in

15   2011?

16   **A.**   Yes, I did.  As part of the preparation for this, I

17   decided over the weekend to look through the advisory

18   committee's slides again just to see what we had actually

19   presented at the meeting.  I did review those slides Sunday, I

20   believe.

21   **Q.**   Did Dr. Califf tell the FDA advisory committee that he

22   thought the dose was too high?

23   **A.**   No.

24   **Q.**   Did you see any communication from Dr. Califf -- strike

25   that.

GARY PETERS - DEPOSITION

03:43

1          In fairness, after riva is approved -- rivaroxaban is

2     approved for AFib in 2011.  That's when it occurred, right?

3     A.    November of 2011, yes.

4     Q.    Mr. Douglas showed you some emails where Dr. Califf talks

5     about the possibility of a lower dose and some further dosing

6     studies that we have referred to as ROCKET 2 today, right?

7     A.    Correct, or ROCKET booster.  He was very interested, as I

8     was as a clinical trial person, in perhaps doing a follow-up

9     study to ROCKET.

10    Q.    Let me step back a minute.  Did the FDA advisory committee

11    take a vote on whether to approve ROCKET at 20 milligrams a day

12    once a day?

13    A.    Yes, they did.

14    Q.    What was the vote?

15    A.    9 to 2, to my recollection, in favor of approving

16    rivaroxaban.

17    Q.    Subsequent to that, did FDA take formal action with

18    respect to the application to approve ROCKET -- or approve

19    rivaroxaban for the AFib indication?

20    A.    Yes, they did.

21    Q.    What was that action?

22    A.    That action was to approve rivaroxaban with the dosing

23    regimens studied in the ROCKET AF study.

24    Q.    Now, with respect to Dr. Califf's communications with the

25    company concerning follow-up studies, did Ms. Torr in

PATRICIA TORR - DEPOSITION

03:44

1    commercial make the decision whether to do a ROCKET 2 study or

2    not?

3    **A.**    No.

4    **Q.**    Did the commercial people make that decision?

5    **A.**    No.

6              **MR. BARR:**  That concludes that one, Your Honor.

7              **THE COURT:**  Call your next witness, then.

8                    Would you like to stand up, members of the jury?

9              **MR. BARR:**  It's going to be about an hour.

10             **THE COURT:**  Let's do a seventh-inning stretch.

11                    Let's play it.  Tell us who it is.

12             **MR. BARR:**  Your Honor, at this time the Orr family is

13   presenting the videotape deposition of Patricia Torr that was

14   taken on October 18, 2016, in Philadelphia.  At the time of

15   Ms. Torr's deposition, she was the vice president of marketing

16   at Janssen Pharmaceuticals.  The deposition, like all the

17   others you have seen, starts with questioning by the Orr

18   family, then questioning by the defense lawyers.

19                          **PATRICIA TORR,**

20   having been duly sworn, testified by deposition [as played]:

21                          **EXAMINATION**

22   **Q.**    Could you state your name for the record.

23   **A.**    Patricia Torr.

24   **Q.**    Are you currently employed?

25   **A.**    Yes.

PATRICIA TORR - DEPOSITION

03:45

1  Q.   And who are you employed for?

2  A.   Janssen Pharmaceuticals.

3  Q.   How long have you been employed for Janssen

4  Pharmaceuticals?

5  A.   I began working at Janssen May of 2011.

6  Q.   Would it be fair to say that you have over 20 years

7  experience in marketing and sales in the pharmaceutical

8  industry?

9  A.   Yes.

10  Q.   Is your highest degree of education a master's of business

11  administration and marketing from Saint Joseph's University?

12  A.   Yes.

13  Q.   You are not a physician?

14  A.   That's correct.

15  Q.   You are not a scientist?

16  A.   No.

17  Q.   Do you consider yourself a marketing and businessperson,

18  businesswoman?

19  A.   Yes.

20  Q.   Do you have any expertise in any scientific field?

21  A.   No.

22  Q.   Do you have any expertise in cardiology?

23  A.   No.

24  Q.   Do you have any expertise in hematology?

25  A.   No.

PATRICIA TORR - DEPOSITION

03:46   1   **Q.**   Do you have any expertise in pharmacology?

2   **A.**   No.

3   **Q.**   Do you have any formal education in cardiology,

4   hematology, or pharmacology?

5   **A.**   No.

6   **Q.**   As I understand it, since May of 2011, you have been at

7   the vice president's level, reporting directly to the president

8   of the company?

9   **A.**   Of the therapeutic area, yes.

10   **Q.**   And is the therapeutic area CV and metabolic?

11   **A.**   Yes.

12   **Q.**   Did you routinely receive meeting minutes from the joint

13   steering committee?

14   **A.**   If I was an attendant, I would have received the minutes.

15   **Q.**   Let's take a look at the meeting minutes, which are

16   Exhibit 4.  Do you see that these are -- can you confirm that

17   these are the meeting minutes for the joint steering committee

18   meeting on June 26, 2012?

19   **A.**   They appear to be.

20   **Q.**   Peter DiBattiste, he is also a member of the joint

21   steering committee, correct?

22   **A.**   Correct.

23   **Q.**   So you have a drug like Xarelto, and as part of LCM, is it

24   planning and strategies for how you are going to expand the use

25   of Xarelto in the market where there are unmet needs?

**PATRICIA TORR – DEPOSITION**

03:47

1    **A.**   I would position lifecycle management as understanding how

2    your product or medicine could best attempt to improve areas

3    where there's big unmet medical needs and then making a

4    determination on whether to pursue those opportunities or not.

5    **Q.**   So you sort of figure out where in the market there's a

6    need for the medication that's under consideration.  And do you

7    determine what studies you are and are not going to do as part

8    of that process?

9    **A.**   Marketing wouldn't make those determinations.  Our role

10   would be to understand what the gaps were in the areas -- in

11   terms of unmet medical need, what were the treatment gaps, what

12   were the gaps that physicians were struggling with, what were

13   the opportunities with improvements for patients in terms of

14   payers, in terms of is there opportunity to enhance the triple

15   aims in terms of patient outcomes, patient experiences.  We

16   would be looking at that from a market insight standpoint.

17   **Q.**   So I'm just trying to get -- I'm trying to get an

18   understanding of the life-cycle management function so that the

19   jury understands what that is.  Okay?

20           Is part of that determining what additional studies

21   to do for a drug like Xarelto, even once it's on the market?

22   **A.**   I think broadly I would say yes.  My role in that is

23   different than our colleagues' role in that process.

24   **Q.**   So if you look here, it says [as read]:  "Further

25   strengthening the competitive position in SPAF is important, as

471

**PATRICIA TORR - DEPOSITION**

03:49

1   the competitive war most likely will be decided in the SPAF

2   field."  Do you see that?

3   **A.**   I do.

4   **Q.**   Can you -- did I read that correctly, first?

5   **A.**   Yes.

6   **Q.**   "SPAF," can you explain what that is to the jury.

7   **A.**   Stroke prevention in atrial fibrillation.

8   **Q.**   You were at this meeting, correct?

9   **A.**   I was.

10  **Q.**   Do you recall discussion about the competitive war most

11  likely being decided in the stroke prevention in AFib field?

12  **A.**   I generally recall -- this is a few years back -- the

13  discussion, that there was going to be several new oral

14  anticoagulants on the market, and it will be very competitive.

15  **Q.**   Next sentence says [as read]:  "The evaluation should go

16  along the following strategic imperatives:  Achieve a

17  superiority claim in SPAF or closely related settings, do not

18  jeopardize OD, do not jeopardize bleeding profile."

19            Do you see that?

20  **A.**   Uh-huh.

21  **Q.**   One of the things you wanted to do in looking at doing

22  other studies was you wanted to achieve a superiority claim in

23  the AFib indication because you didn't have one, correct?

24  **A.**   It was, I think, a part of the consideration -- we were

25  looking at other opportunities.  That was part of the

PATRICIA TORR - DEPOSITION

03:51   1   consideration.

2   Q.   It was a very important consideration because it was one

3   of the main strategic imperatives, correct?

4   A.   It says that, yes.

5   Q.   The next strategic imperative, in looking at what other

6   studies to do and how to expand Xarelto's use, was not to

7   jeopardize OD.  What does that mean?

8   A.   Not to jeopardize once daily is the way I would read it.

9   Q.   Xarelto was -- Xarelto is dosed in AFib patients once a

10   day, correct?

11   A.   Yes.

12   Q.   That was an important differentiating characteristic of

13   Xarelto versus its competition in the marketplace, correct?

14   A.   That was one of a couple.

15   Q.   Let's read the first sentence.  It says [as read]:  "The

16   JSC discussed how to strengthen the Xarelto position in SPAF,

17   which is the AFib indication, as we cannot provide a

18   superiority claim in many countries, and the only substantial

19   differentiator is OD."  Did I read that correctly?

20   A.   Yes.

21   Q.   So do you recall these discussions being that one of the

22   issues was the only substantial differentiator for Xarelto in

23   the United States and some other countries was its once-a-day

24   dosing?  Do you recall that?

25   A.   I recall that discussion.

**PATRICIA TORR - DEPOSITION**

03:52

1  **Q.**   It says [as read]:  "The JSC emphasized that the

2  competitive war was most likely to be decided in the SPAF

3  field."  Do you recall that?

4  **A.**   I do.

5  **Q.**   Do you recall actually the phrase "competitive war" being

6  used?

7  **A.**   I don't.

8  **Q.**   If we go to the next page, which is page 8 of 9, under

9  No. 6, Critical Issues, what do you understand the critical

10  issues section is supposed to be communicating in this joint

11  steering committee meeting notes?

12  **A.**   I'm sorry.  Could you orient me one more time.

13  **Q.**   Sure.  It's page 8 of 9.  I'm sorry.  I said 6 of 9 --

14  8 of 9, under No. 6.

15  **A.**   8 of 9, No. 6, Critical Issues.

16  **Q.**   Critical Issues.  What is supposed to be -- what is

17  communicated under Critical Issues?

18  **A.**   Opportunity to improve sales in SPAF in the U.S. and

19  primary care.

20  **Q.**   So was one of the critical issues coming out of this

21  meeting to improve sales in the AFib indication in the U.S. and

22  focus on primary care?

23  **A.**   I read that to be broadly globally improve sales and

24  stroke prevention in AF globally and then improve sales in the

25  U.S., with particular focus on primary care.

PATRICIA TORR - DEPOSITION

03:53

1  **Q.**   The point of this is that one of the critical issues
2  coming out of the joint steering committee was there was a need
3  to improve sales, correct?
4  **A.**   That looks like it was a critical issue.
5  **Q.**   So was your job to provide a commercial evaluation of the
6  potential studies or future uses of Xarelto that were being
7  discussed?
8  **A.**   It was.
9  **Q.**   When it says "including a commercial evaluation," what is
10 a commercial evaluation of a life cycle management opportunity
11 for Xarelto?  What does that mean?
12 **A.**   So you would understand from the scientists what the
13 potential areas of study would be.  You would assess the size
14 of the patient population.  You would conduct some market
15 research to understand what the unmet needs, the gaps in
16 therapies were.  You would learn from the researchers, the
17 clinical scientists, what the hypothesis was around how the
18 medicine was going to improve those gaps.
19          And then we would make what we call target product
20 profiles, and then we would test them in the market with
21 prescribing physicians to determine whether or not that
22 hypothetical result would be meaningful for their patients in
23 their practice.
24 **Q.**   For the record, I'm handing you what's been marked as
25 Exhibit 5.  Exhibit 5 is Record Number 1482662, Bates Number

475

**PATRICIA TORR - DEPOSITION**

03:55

1    Xarelto_Janssen_08774749.  Xarelto Exhibit 6 is Record Number

2    1482663, Bates Number Xarelto_Janssen_08774751.

3              Let's start with Exhibit 5.  Do you see that this is

4    an email from a Dr. Califf, attaching a ROCKET booster study,

5    that was forwarded to you and Vanessa Broadhurst, your boss, by

6    Dr. DiBattiste?

7    A.    I see that.  Dr. Califf was also the PR for the ROCKET

8    study.

9    Q.    Right.  He was co-chair of the executive committee that

10   ran the RECORD trial, correct?

11   A.    ROCKET.

12   Q.    ROCKET trial, correct?

13   A.    Correct.

14   Q.    The ROCKET trial is the trial that was run and submitted

15   to the FDA in order to get approval for the AFib indication for

16   Xarelto, correct?

17   A.    Yes.

18   Q.    Have you met with Dr. Califf?

19   A.    I have not as part of Janssen, my Janssen experience.

20   Q.    You have not met with him?

21   A.    I have met with him as part of my work at AstraZeneca

22   previously, but not part of Janssen.

23   Q.    Are you familiar with his reputation?

24   A.    I am.

25   Q.    Do you consider him a good scientist?

PATRICIA TORR - DEPOSITION

03:56  1   **A.**   I do.

2   **Q.**   Do you consider him -- he is a physician, correct?

3   **A.**   He is.  He's a cardiologist.

4   **Q.**   He's out of Duke -- he was out of Duke, correct?

5   **A.**   Correct.

6   **Q.**   Do you consider him the type of scientist and doctor that

7   puts patients' safety first?

8   **A.**   Yes.  I believe he is well respected in the community.

9   **Q.**   Would you say that you have the utmost respect for

10  Dr. Califf?

11  **A.**   I do.

12  **Q.**   If you take a look at the email that was forwarded to you

13  by Dr. DiBattiste, the email says -- this is Dr. Califf

14  speaking [as read]:  "Guys, this is a simple two-pager to let

15  you know I'm working on something.  I think this could be done

16  using the ORBIT template at a fraction of the additional cost

17  that we normally attribute to clinical trials.  The motivation

18  is enclosed on page 1.  I've been skimpy with the operational

19  details because I'm working through some thoughts about

20  endpoints."  Did I read that correctly?

21  **A.**   Yes.

22  **Q.**   He continues [as read]:  "The whole thing is based on two

23  premises."  Do you see that?

24  **A.**   Uh-huh.

25  **Q.**   When he is talking about this, he is talking about a

PATRICIA TORR - DEPOSITION

03:57   1   proposal for a ROCKET booster study, correct?

2   **A.**   It appears so.

3   **Q.**   He says [as read]:  "Number one, it's the right thing to

4   do for a drug that has a long life and can make a huge

5   difference."  Correct?

6   **A.**   Yes.

7   **Q.**   He says [as read]:  "Here is the proposal from Califf we

8   discussed yesterday.  Let's discuss."  Do you see that?

9   **A.**   Yes.

10   **Q.**   Do you have a recollection of having a discussion with

11   Dr. DiBattiste about Dr. Califf's proposal?

12   **A.**   I believe my boss did.

13   **Q.**   So the time period that you got this -- this email from

14   Dr. Califf is dated February 27, 2012.  Do you see that?

15   **A.**   Uh-huh.

16   **Q.**   That's about four months after Xarelto was on the market

17   for the AFib indication, correct?

18   **A.**   Correct.

19   **Q.**   Dr. DiBattiste forwards the email to Vanessa Broadhurst;

20   you in turn forward it to Mr. Shah?

21   **A.**   I did.

22   **Q.**   You say [as read]:  "Need a swift and strong response to

23   me, please . . ."  Do you see that?

24   **A.**   Yes.

25   **Q.**    what did you mean by that?

PATRICIA TORR - DEPOSITION

03:58

1    **A.**    I needed him to evaluate the proposal and have a
2    recommendation that I could take to Vanessa.
3    **Q.**    So you -- is it that you saw the proposal was also sent to
4    Vanessa and you were asking Mr. Shah, who reported to you at
5    the time, to take a look and give you an assessment so that you
6    could speak to Ms. Broadhurst about it?
7    **A.**    That's what I recall.
8    **Q.**    Let's take a look at proposal itself.  If you look at the
9    proposal, the title of the proposal is "Rivaroxaban and Atrial
10   Fibrillation:  The Need for ROCKET AF booster."  Do you see
11   that?
12   **A.**    Uh-huh.
13   **Q.**    Rivaroxaban is Xarelto, correct?
14   **A.**    Correct.
15   **Q.**    If you go -- under the first page is a background that
16   Dr. Califf is giving, correct?
17   **A.**    Yes.
18   **Q.**    If you go to the second paragraph, it says [as read]:
19   "The major comparative advantage of rivaroxaban is its
20   once-a-day dosing, but the failure of ROCKET AF to prove
21   superiority even in the face of lower-than-expected TTR in the
22   trial has raised major questions about whether the ROCKET AF
23   dosing regimen is indeed the best dose."
24        Did I read that correctly?
25   **A.**    Yes.

PATRICIA TORR - DEPOSITION

04:00

1   Q.   So here Dr. Califf is referring to the major advantage for

2   Xarelto as being its once-a-day dosing, correct?

3   A.   That's what I believe Dr. Califf is saying.

4   Q.   That's consistent with what we saw in the joint steering

5   committee meetings as being one of the strategic imperatives,

6   to keep in mind in terms of doing life cycle management,

7   correct?

8   A.   Correct.

9   Q.   Going back to the paragraph we just read, where Dr. Califf

10  is talking about the major advantage for Xarelto is its

11  once-a-day dosing, do you disagree with that?

12  A.   I believe one of -- based on the research that we have

13  about the results of the ROCKET trial, we studied patients at a

14  much higher risk than our competition did.  And that's an

15  important differentiator in the market, as well as we have the

16  most real-word evidence published both on safety and efficacy,

17  which is different than our competition, as well as we have the

18  highest access in terms of formulary reimbursement and the

19  lowest out-of-patient cost.

20       Those are all material differentiators in the market

21  as we -- back then and today.

22  Q.   You see that after the background, Dr. Califf writes --

23  we're at the last paragraph [as read]:  "In summary, the

24  tremendous potential of rivaroxaban to reduce death and

25  disability from atrial fibrillation is jeopardized by

PATRICIA TORR - DEPOSITION

04:01

1   uncertainty regarding the dosing regimen."  Do you see that?

2   A.   Yes, I see that.

3   Q.   Was this the first time that you learned that Dr. Califf,

4   who was the lead on the ROCKET study, thought that there was

5   uncertainty with the dosing regimen for Xarelto?

6   A.   I knew that he and Dr. DiBattiste were having discussions.

7   I wasn't privy to the details about this.

8   Q.   When you saw this document, was this the first time you

9   learned that Dr. Califf thought that there was uncertainty

10  regarding the dosing regimen, or had you heard that before?

11  A.   I hadn't heard that before.  I knew that he and

12  Dr. DiBattiste were in discussions about the topic generally.

13  Q.   If you go back up to the paragraph we were talking about,

14  the last phrase says [as read]:  "Has raised major questions

15  about whether ROCKET AF dosing regimen is indeed the best

16  dose."

17          Was this the first time you ever learned that

18  Dr. Califf thought that the ROCKET AF dosing regimen may not

19  indeed be the best dose?

20  A.   I don't recall any specifics of any correspondence I would

21  have been made aware of or communications from the team.  I

22  know that he -- I know that he had opinions about this, but I

23  had never seen it expressed in this way.

24  Q.   Are you saying that before receiving this proposal, you

25  knew Dr. Califf had opinions about the ROCKET AF dose in

**PATRICIA TORR - DEPOSITION**

04:03

1    Xarelto not necessarily being the best dose, the safest dose?

2    **A.**   No, I'm not sure about those details.  I know that he

3    generally was asking those questions to our scientists.

4    **Q.**   And is proposing that the company do a study testing

5    different doses, correct?

6    **A.**   That is my understanding.

7    **Q.**   If you look at the second page, he actually -- at the very

8    bottom of the page, he proposes potential doses to be tested,

9    correct?

10   **A.**   It appears so.

11   **Q.**   That includes lower doses than 20 milligrams once daily,

12   correct?

13   **A.**   15.  Let's see.  10 milligrams BID, 15 milligrams once per

14   day, 10 milligrams per day for renal, 7.5 BID, 5 for renal.

15   **Q.**   So yes?

16   **A.**   Yes.

17   **Q.**   He is proposing a lower dose in terms of milligrams,

18   correct?

19   **A.**   Yes.

20   **Q.**   He is proposing a different dosing regimen other than once

21   daily, correct?

22   **A.**   It looks like he has four different regimens.

23   **Q.**   Correct, including not just once-daily dosing, but also

24   twice-daily dosing, correct?

25   **A.**   Looks like both.

482

**PATRICIA TORR - DEPOSITION**

04:04

1    **Q.**    The doctor -- the scientist who ran the ROCKET study has

2    come to Janssen and said, I think you might not have the safest

3    dose in AFib patients.  I propose that you do a study.  I

4    propose that you look at a lower dose.  I propose that you look

5    at a different dosing regimen.  Correct?

6    **A.**    Correct.  At this point in time, Dr. Califf was head of

7    the Duke Clinical Research organization, which was in the

8    business to run clinical trials.

9    **Q.**    The Duke Research organization was the organization that

10   your company, Janssen, hired to run the ROCKET clinical trial,

11   correct?

12   **A.**    Correct.

13   **Q.**    On March 1 you became aware that Dr. Califf was making a

14   proposal to do this study in AFib patients at lower doses and

15   at a twice-daily dosing regimen, correct?

16   **A.**    It seemed to be his opinion, yes.

17   **Q.**    You forwarded it on to Mr. Shah, and you write [as read]:

18   "Need a swift and strong response to me, please."

19           Did Mr. Shah ever get back to you?

20   **A.**    I don't recall any email exchanges.  I'm sure we probably

21   had a conversation.

22   **Q.**    Do you have a recollection of the conversation?

23   **A.**    I don't.

24   **Q.**    I'm handing you what's been marked as Torr 7.  I'm going

25   to give you an opportunity to review this.

PATRICIA TORR - DEPOSITION

04:05

1    Q.   Do you see that -- before do you that, do you see
2    this is an email that you appear on, dated January 10, 2012,
3    from Gary Peters?  Correct?
4    A.   Okay.
5    Q.   Do you see that this is an email chain that's started by
6    Mr. Sigmond Johnson on January 5, 2012?
7    A.   Yes.
8    Q.   You're on this email, correct?
9    A.   Correct.
10   Q.   Who is Gary Peters?
11   A.   Dr. Peters would be one of Dr. DiBattiste's medical
12   physicians on his staff.
13   Q.   He is one of the scientists that worked on Xarelto,
14   correct?
15   A.   Correct.
16   Q.   How about Paul Chang?
17   A.   He would be the head of our medical affairs unit.
18   Q.   Another scientist that worked on Xarelto, correct?
19   A.   Yes.
20   Q.   Dr. Paul Burton, who is he?
21   A.   Dr. Burton at the time would have been another physician
22   that reported in to Dr. DiBattiste.
23   Q.   If we go back to the first page, one of the scientists,
24   Dr. Peters, responds, correct?
25   A.   Yes.

PATRICIA TORR - DEPOSITION

04:07

1   **Q.**   He says [as read]:  "Hi, all.  Just reviewed this quick.

2   A few thoughts from my perspective."  Do you see that?

3   **A.**    I do.

4   **Q.**    "Rob Califf" -- that's what it says here, correct?

5   **A.**    Yes.

6   **Q.**    -- "is supposed to be sending us a proposal for such a

7   study . . .  Basis for this is that he says that comparative

8   studies versus apixaban will be done.  And since likely we will

9   not fare operationally with our current dosing regimen, we need

10  to explore others."

11          Then he says [as read]:  "I fully agree with this and

12  would like to see ROCKET 2 discussed again in this context."

13          Did I read that correctly?

14  **A.**    Yes.

15  **Q.**    You were on this email, correct?

16  **A.**    Yes.

17  **Q.**    Dr. Gary Peters, one of the scientists, is anticipating

18  that Dr. Califf is going to send the proposal we looked at,

19  correct?

20  **A.**    Correct.

21  **Q.**    And he says [as read]:  "I fully agree with this and would

22  like to see ROCKET 2 discussed again in this context."

23  Correct?

24  **A.**    Correct.

25  **Q.**    So one of the scientists is anticipating that Dr. Califf

PATRICIA TORR - DEPOSITION

04:08

1    is going to send a dose-finding study in AFib patients, and

2    he's saying he fully agrees, correct?

3    A.   He is.  But I think it's really important to call out that

4    "I fully agree with this and would like to see ROCKET 2

5    discussed again in this context," I think that refers to a

6    prior determination by Dr. DiBattiste and his leadership team

7    that we were not going to be pursuing another ROCKET trial.

8    Q.   But basically Dr. Peters is saying he thinks it may be

9    necessary and he would like to see it discussed, correct?

10   A.   He is saying that.  And my recollection, ROCKET 2 wasn't

11   even part of the agenda, because it was pretty much taken off

12   the table because of our -- Dr. DiBattiste and the senior

13   leadership team had already made the determination that we were

14   not going to pursue; that, in fact, the ROCKET trial was

15   successful.  It met its primary endpoint.  The FDA approved.

16   And we were going to turn our attention to other, higher-need

17   areas as part of this meeting.

18   Q.   I'm handing you what's been marked as Exhibit 8, for the

19   record.  It is Record Number 2501312, Xarelto_Janssen_11775788.

20          Do you see, ma'am, this is the same email from

21   Dr. Peters that you forwarded on to Mr. Moye after taking all

22   the scientists off the email?

23   A.   Yes.

24   Q.   It's dated January 10, 2012?

25   A.   Yes.

**PATRICIA TORR - DEPOSITION**

04:10

1   **Q.**   You say to Mr. Moye [as read]:  "Need to get ahead of
2   Califf proposal."
3   **A.**   Yes.
4   **Q.**   When you say "need to get ahead of the Califf proposal,"
5   you hadn't even seen the Califf proposal, correct?
6   **A.**   That's right.
7   **Q.**   Do you know if Mr. Moye ever replied to you?
8   **A.**   I do not recall.
9   **Q.**   I'm handing you what's been marked as Exhibit 9.  It is
10  Document 1428185, Xarelto_Janssen_08583165.
11          If you take a look, it's another email in the same
12  chain.  It appears as though at 4:31 p.m. on the same day as
13  January 10, 2012, Mr. Moye reapplies.  Do you see that?
14  **A.**   I do.
15  **Q.**   He says [as read]:  "Brought up in CDT a few minutes ago."
16  What is "CDT"?
17  **A.**   Clinical development team.
18  **Q.**   What is the clinical development team?
19  **A.**   It would be the team of folks who are working on the
20  current, ongoing clinical trials to support the program.
21  **Q.**   Does it appear that Mr. Moye and marketing was at that
22  meeting?
23  **A.**   Yes.  Typically marketing attends those meetings.
24  **Q.**   It says [as read]:  "Califf banging this drum for some
25  time."  Do you see that?

PATRICIA TORR - DEPOSITION

04:11

1   **A.**   I do.

2   **Q.**   Michael continues here [as read]:  "Team thinks ROCKET 2

3   needs to be on the agenda for Bayer meeting this week just so

4   everyone knows Califf is making noise about it."

5          Did I read that correctly?

6   **A.**   Yes.

7   **Q.**   What did you understand that to mean?

8   **A.**   That in our discussions about new indications for Xarelto,

9   the life cycle management, the ROCKET 2 discussion had already

10  been determined that we were not moving forward and it wasn't

11  on the agenda.  But Michael thought or the team thought that we

12  should include it, given the fact that there's a pending Califf

13  proposal coming forward.  Just so everybody is aware of it.

14  **Q.**   If I understand in terms of the timing, a ROCKET 2-type

15  dose-finding study had been previously considered by the

16  scientists and had been rejected as a potential, going forward,

17  and that now with Dr. Califf banging the drum again or sending

18  the proposal, that it now is going to go back on the agenda to

19  discuss with Bayer.  Correct?

20  **A.**   No.  I think it was more a heads-up that he is going to be

21  sending a proposal.  I don't believe it was a rediscussion of

22  the R&D decision not to move forward with the ROCKET 2

23  proposal.

24  **Q.**   When it says [as read]:  "Team thinks ROCKET 2 needs to be

25  on the agenda for Bayer meeting this week just so everyone

PATRICIA TORR - DEPOSITION

04:13

1   knows Califf is making noise about it," the decision at this

2   point in time had been made.  You weren't going to do a ROCKET

3   study.  You were just going to inform Bayer that Califf is

4   still banging his drum about a dose-finding study?

5   **A.**   That's my interpretation.

6   **Q.**   There was not really going to be a decision point by

7   putting it on the agenda.  It was just to notify?

8   **A.**   Right.  And keep in mind this LCM meeting is not a

9   decision-making meeting.  Decision-making meeting about funding

10  trials and comparators and doses would be determined by the

11  senior leadership team of Dr. DiBattiste.

12  **Q.**   So the ROCKET 2 trial that would look at twice-daily

13  dosing in AFib patients was not consistent with the strategic

14  imperative that we saw in those joint steering committee

15  meeting notes, correct?

16  **A.**   Correct.  Timing is important.  At this point, when we

17  were having this LCM meeting, we hadn't been in receipt of the

18  Califf proposal.  Importantly, our research and development

19  colleagues already made a determination that we were not going

20  to press forward in that regard.

21  **Q.**   Okay.  I have handed you what I have marked as Exhibit 10.

22  It is Record Number 259501, Bates Numbers

23  Xarelto_Janssen_01203314.

24          I gave you an opportunity off the record to read the

25  email.  Are you ready to answer questions?

**PATRICIA TORR - DEPOSITION**

04:14

1   A.   Yes.

2   Q.   Do you see that this is part of the same email chain that

3   we were talking about with Dr. Peters' email on January 10,

4   2012?  Do you see that?

5   A.   I do.

6   Q.   You write [as read]:  "Would not support doing a ROCKET 2

7   study and unwinding everything we invested and are actively

8   selling today."  Did I read that correctly?

9   A.   Correct.

10  Q.   The ROCKET 2 study you are referencing is the ROCKET 2

11  study we talked about a little bit earlier that Dr. Califf

12  sent, correct?

13  A.   I would just say that we hadn't at this point in time --

14  this is January, and we hadn't received Dr. Califf's proposal

15  at this point in time specifically.

16  Q.   So you didn't receive Dr. Califf's proposal at this point

17  in time, but you did have a sense that it was going -- about a

18  dose-finding study, correct, for Xarelto patients in AFib?

19  A.   I didn't know that.  I thought it was an AFib PCI study

20  that Dr. Califf at the time was going to be putting forward.

21  Q.   So you didn't know what the details were, correct?

22  A.   Correct.

23  Q.   But you were objecting to it, correct, notwithstanding not

24  knowing the details?

25  A.   Well, I was -- for context, I was -- the ROCKET 2 study

PATRICIA TORR - DEPOSITION

04:15

1    was not part of the agenda for this LCM meeting, because our

2    R&D committee, led by Dr. DiBattiste, had already made the

3    decision that we weren't moving forward with another trial in

4    ROCKET, that we had other high-end met need areas that we were

5    going to be focusing on.

6              So my context for my comments here would be that I

7    thought this would be distracting to the team to be discussing

8    in such a forum and that, as Gary mentioned in his -- as

9    Dr. Peters mentioned in his email, he would get his chance at

10   SLT.  That's where those ROCKET 2 discussions, given a decision

11   has already been made, would be taking place.

12   Q.   You're saying to the jury about this email that the reason

13   ROCKET 2 wasn't on the agenda was because it was distracting to

14   the team, right?  That's what you are saying now, but it

15   doesn't say that in this email, correct?  That's not what you

16   wrote?

17   A.   It's not what I wrote.  But it's more important that this

18   decision had already been made by our R&D team, and it wasn't

19   part of the conversation of the LCM meeting that we were going

20   to be having with Bayer.

21   Q.   You didn't want it to be part of it because from your

22   perspective, as you state here, it [as read] "would not support

23   doing a ROCKET 2 study and unwinding everything we invested and

24   are actively selling today."

25              That's what you wrote?

PATRICIA TORR - DEPOSITION

04:17   1   **A.**   It is.

2   **Q.**   You also write [as read]:  "It would say to the market

3   that the competition is right, we are a BID drug."

4           "BID" means what?

5   **A.**   Twice a day.

6   **Q.**   We saw a little bit earlier that one of the strategic

7   imperatives for looking at what studies to do -- what

8   additional studies to do in Xarelto, was to maintain your

9   once-a-day dosing, correct?  We saw that in the JCM meeting

10   minutes, correct?

11   **A.**   Correct.  But as a marketer, I wouldn't have the

12   decision-making power to weigh in on what studies we do or

13   don't do and what doses we study and don't study.

14   **Q.**   But at the time that you are weighing in on this email to

15   not do or consider the ROCKET 2 study, you are vice president

16   of marketing, correct?

17   **A.**   I am.  I am one -- I am adding my opinion, and I think I

18   kind of phrase that at the beginning [as read], "a few comments

19   from my end to consider."

20           Keep in mind decision-making meetings about these

21   matters are managed with a different committee of which I'm not

22   a part of.

23   **Q.**   You are a vice president of marketing giving your opinion

24   in this email as to whether or not you would support the

25   company doing a ROCKET 2 trial?

**PATRICIA TORR - DEPOSITION**

04:18

1  **A.**   As a marketer, I'm weighing in, saying that our R&D

2  colleagues have said that our dose for -- our once-daily dosing

3  that was studied in the ROCKET trial was definitively --

4  addressed safety and efficacy, was approved by the FDA with no

5  post-approval commitments to do any other studies or looking at

6  any other doses.

7  **Q.**   And you continue here, do you not, and you write [as read]

8  "would kill us in the market today."  Correct?

9  **A.**   Correct.

10  **Q.**   So this concern that you are now articulating to the jury

11  about what this email says about patients stopping taking their

12  medicine and creating doubt in patients, that doesn't appear

13  anywhere in this email, does it?

14  **A.**   No.  But I think the context here is I'm a marketer.  I

15  don't get to decide on what studies we do, what doses we

16  select.  That is not an area of decision-making that I would

17  have impact in or a decision-making role in.

18  **Q.**   It's requesting opinions, and you as vice president of

19  marketing were giving your opinion from a commercial

20  standpoint, correct?

21  **A.**   I was giving my opinion from a commercial standpoint based

22  on the information I had, which is our senior research head of

23  CVM, Dr. DiBattiste, had already made the decision that we

24  weren't going forward.  So my role as a marketer was to take

25  the approved indication, bring that value to patients, and pull

PATRICIA TORR - DEPOSITION

04:20   1   through the approved indication.

2   Q.   And you say [as read]:  "By the time the study was done,

3   the market would have moved on."

4              Were you of that opinion at this time that you wrote

5   that?

6   A.   Well, yeah.  I was of that opinion.

7   Q.   Were you of the opinion at this point in time that the --

8   a ROCKET 2 study would unwind everything the company invested

9   in and were actively selling at this point in time?

10   A.   It was my opinion as a marketer we had an approved dose

11   approved by the FDA that had definitive results that could

12   actually potentially save people's lives, and we had the full

13   license to move forward in bringing that value to patients.

14   Q.   Despite Dr. Califf, the scientist that ran the ROCKET

15   study, telling you and other high-level scientists that it was

16   the right thing to do, a ROCKET booster study or ROCKET 2 study

17   or study looking at different doses of Xarelto or different

18   dosing regimens other than once a day and 20 milligrams has

19   never been done to this day, correct?

20   A.   We have not done that study.

21   Q.   Are there any plans to do that study?

22   A.   Not that I'm aware.

23   Q.   Are there any plans for Bayer to do that study?

24   A.   Not that I'm aware.

25   Q.   Is it that type of a study, to your knowledge, completely

PATRICIA TORR - DEPOSITION

04:21    1    off the agenda at this point?

2    **A.**   I think our scientists are always open to exploring new

3    information, but I'm not aware.  It's a topic of conversation

4    that I think Dr. DiBattiste would be the best person to ask.

5    **Q.**   I'm going to hand you what is marked Plaintiffs'

6    Exhibit 11.  Do you see this is an email chain that you're

7    included on, dated December 12, 2013?

8    **A.**   I see.

9    **Q.**   This is Record Number 257-9936, Bates

10   Number Xarelto_Janssen_12325928.  And it looks to me as if this

11   is meeting notes that Rudy Sharan provided you from the subject

12   GDC.  Do you see that?

13   **A.**   I do.

14   **Q.**   And tell us again what "GDC" is?

15   **A.**   Global Development Committee.

16   **Q.**   And do you see -- and this is written to you and copied to

17   Mr. Moye; is that right?

18   **A.**   Yes.

19   **Q.**   And do you see No. 6?  Can you tell the jury what the

20   title of No. 6 is?

21   **A.**   ROCKET 2.

22   **Q.**   And that's the same thing we talked about earlier that was

23   taken off the table, as far as you know, back in 2011, right?

24   **A.**   I do, yes.

25   **Q.**   This is December of 2013, correct?

PATRICIA TORR - DEPOSITION

04:23

1    A.    Correct.

2    Q.    This says [as read]:  "ROCKET 2 - more needs to be

3    discussed."  Correct?

4    A.    Correct.

5    Q.    Do you recall that, that in December of 2013, the GDC had

6    a meeting and it was determined that more needed to be

7    discussed about ROCKET 2?

8    A.    I generally am aware, but it wasn't on my radar screen.

9    Q.    And then Rudy goes on to say [as read]:  "Big concerns

10   raised, especially regulatory."

11         Do you see that?

12   A.    Yes.

13   Q.    Do you recall what big concerns were raised in relation to

14   regulatory?

15   A.    I do not.

16   Q.    Do you see it goes on to say [as read]:  "If we move

17   forward with a low dose trial, puts into question the

18   20-milligram dose."

19         Do you see that?

20   A.    Yes.

21   Q.    Do you understand -- what do you understand that to mean?

22   A.    That we would be taking -- I read that to mean we would be

23   taking -- or that the discussions could have been that we would

24   take the 15-milligram once daily into a trial.

25   Q.    And if you did that, that that may put the 20-milligram

PATRICIA TORR - DEPOSITION

04:24

1    dose into question, correct?

2    **A.**    I believe that's what Rudy is saying here.

3    **Q.**    Do you recall that being the case, that 15-milligram dose

4    had been kicked around by you or other people in the marketing

5    team?

6    **A.**    I do know that -- no, not by the marketing team, by the --

7    during the course of discussion around ROCKET 2, I do believe

8    that the once-daily 15-milligram dose for normal renal patients

9    was one of the topics.

10   **Q.**    In fact, that would be in line with Dr. Califf's opinion

11   that the dose may be too high at 20 milligrams a day, right?

12   **A.**    It was one of the regimens relative that he had on his

13   sheet from the prior documents, one being the standard dose

14   that was approved, and then it looks like two regimens of BID

15   dosing of different doses as well as the 15-milligram once

16   daily.

17   **Q.**    But that project, I understood you to tell us, had been

18   taken off the table prior to January 10, 2012?

19   **A.**    That's right.

20   **Q.**    This email is from a meeting that happened with the

21   company in December of 2013?

22   **A.**    Right.

23   **Q.**    If commercial's opinion is irrelevant, why would he even

24   have the option to advocate at a meeting that the company do

25   that trial?

PATRICIA TORR - DEPOSITION

04:25

1  A.   At Janssen we have a very team-based structure.  All parts
2  of the organization are permitted to share their opinion, but
3  when it comes to decision-making, we each have our swim lanes
4  and swim lanes associated with our clinical trials, dosing that
5  we choose.  Those types of things would not be something that
6  the marketing team would be a decision-maker on.
7  Q.   This is an email -- this is, again, Document 256-4466,
8  Bates Number Xarelto_Janssen_12288446.  This is an email from
9  you to Calvin Schmidt, copied Michael Moye, correct?
10 A.   Yes.
11 Q.   And it's dated February 24, 2014, right?
12 A.   Yes.
13 Q.   That's about a month and a half after the last document we
14 reviewed?
15 A.   Uh-huh.
16 Q.   It's called "MARS background."  Do you see that?
17 A.   Yes.
18 Q.   And it has an attachment called MARS_LCM.PPTX, right?
19 A.   Yep.
20 Q.   So if we look at the actual attachment, the PowerPoint
21 presentation, which is Bates Number Xarelto_Janssen_12288447,
22 we see it's a MARS background dated February 24, 2014, right?
23 A.   Uh-huh.
24 Q.   MARS is an acronym you use at your company, correct?
25 A.   It was an acronym for the next wave of indications that we

PATRICIA TORR - DEPOSITION

04:27

1    were going to put forward to do.

2    Q.    MARS stands for major activities to raise sales, correct?

3    A.    Sounds familiar.  I think it was a Bayer acronym that was

4    utilized.

5    Q.    A decision has now been made yet again not to do the

6    ROCKET 2 study, right?

7    A.    That's right.

8    Q.    And if we look as to why, the bullet points -- the bullet

9    point next to it says [as read]:  "First of all, considerable

10   downside."

11            Let's go down one.  Correct?

12   A.    Yes.

13   Q.    One of the considerable downsides would be that the

14   20-milligram dose could be shown to be too high, correct, if

15   you did that trial?

16   A.    Yes.  I am not sure of what the clinical trial

17   determinations would have been, but it could have been.  That

18   could be in the range of possibility.

19   Q.    One of the considerable downsides could be that the

20   once-a-day dose could be shown to be less safe or less

21   effective than a twice-a-day dose, correct?

22   A.    It could have been.

23   Q.    Ms. Torr, I want to go through a little bit of your

24   personal history.  Where were you born?

25   A.    Pensacola, Florida.

PATRICIA TORR - DEPOSITION

04:28   1   Q.   Where did you go to college?

2   A.   East Carolina University in North Carolina.

3   Q.   What was your major?

4   A.   Public health education.

5   Q.   And as you graduated college, what were your career plans?

6   A.   My first career plan was really to assess whether or not I

7   was going to go on to medical school or I was going to go on to

8   business school, so I took a job with one of my roommates in

9   college in Florida, worked at a cardiac pulmonary rehab center.

10   It's really kind of a step-down unit for patients who were

11   having CT surgery.

12          And from there I came back to the Philadelphia area,

13   worked at the Medical College of Pennsylvania for the

14   department of anesthesiology and CT surgery as a clinical

15   research assistant.  So I kind of got close to determine

16   whether or not I was going to go to medical school or take the

17   business school route.  Ended up during that couple-year

18   experience, decided to go on to business school.

19   Q.   How did you first decide to apply for a job in the

20   pharmaceutical industry?

21   A.   I think it was an extension of my role as a clinical

22   research assistant at the Medical College of Pennsylvania.

23   Part of my job responsibilities there were to identify patients

24   for various clinical trials that the departments had ongoing

25   and make sure that those patients were cared for accordingly to

500

**PATRICIA TORR - DEPOSITION**

04:30

1   the protocol.  We looked at different pharmaceutical products

2   as well as different devices that the hospital was undertaking.

3   **Q.**   Could you tell the jury from a marketing perspective what

4   potential benefit once-a-day dosing has compared to medication

5   that might have been taken two or even three times a day?

6   **A.**   So we know that from decades of cardiovascular medicine,

7   that once-daily medicines patients are more adherent to than

8   BID medicines; and BID medicines, patients are more adherent

9   than three-times-a-day medicines.  And that's really important,

10  because if adherence is tied to outcomes and we want to make

11  sure that people are taking their medicine as directed, so it's

12  really important.

13  **Q.**   So "adherence" means does somebody take their medication

14  as prescribed?

15  **A.**   Yes.

16  **Q.**   And "BID" is?

17  **A.**   Two times a day.

18  **Q.**   And then "TID" would be?

19  **A.**   Three times a day.

20  **Q.**   If I understand you correctly, the data you are talking

21  about demonstrates that patients are more adherent to take

22  their medication as prescribed more often if it's a

23  one-time-a-day medication?

24  **A.**   That's correct.

25  **Q.**   Is there any recent data or studies that you are aware of

501

PATRICIA TORR - DEPOSITION

04:31  1   addressing this topic?

2   A.    Yes.  I'm aware of some recent data where some thought

3   leaders in Canada looked at the use of NOACs in particular and

4   looked at once-daily anticoagulants versus BID anticoagulants

5   and found that the once-daily anticoagulants, that being

6   Xarelto and warfarin, that patients were more statistically

7   significant, more adherent with the once-daily medicines versus

8   the twice-a-day medicines.

9   Q.    So the once-daily medicines, which would be?

10  A.    Once-a-day medicines would be warfarin and Xarelto.  BID

11  would be Pradaxa and Eliquis.

12        Importantly also for the finding of this result was

13  also that, interestingly, one in every three apixaban patients

14  took their dose only once a day even though the drug is

15  prescribed twice a day.

16  Q.    The references -- you were questioned by Mr. Childers this

17  afternoon briefly about whether the original information from

18  Dr. Califf to do a ROCKET 2 study involves a head-to-head with

19  apixaban or was a dose-related study.

20        If you look at No. 4.  In particular, this is a memo

21  from Gary Peters to a bunch of people.  In the center of No. 4

22  it says [as read]:  "Rob Califf is supposed to be sending us a

23  proposal for such a study.  The basis for this is that he says

24  that comparative studies versus apixaban will be done.  Since

25  likely we will not fare optimally with our current dosing

**PATRICIA TORR - DEPOSITION**

04:34

1    regimen, we need to explore others."

2            Was it your understanding at this time that

3    Dr. Califf had not made a specific proposal as to what type of

4    study he was suggesting should be done?

5    **A.**    That's correct.

6    **Q.**    At least from the context of this, it seems like a

7    head-to-head study was a possibility, as was a dosing study.

8    Is that a fair reading of this?

9    **A.**    That's my understanding.

10   **Q.**    The date of this is January 10, 2012.  If we then go to

11   some emails that you wrote which are in Exhibit 10 -- if that

12   could be put up, I would appreciate it.

13           You're responding to information that you were

14   getting from Gary Peters and others about should we do a

15   ROCKET 2.  The data on this, it's up on the top under "sent,"

16   is January 10, 2012.

17           If we also look very briefly at Exhibit 5 and 6,

18   which I believe is the proposal made by Dr. Califf,

19   Dr. Califf's proposal, which is No. 6, relates to this email

20   which was March 1, 2012; is that correct?

21   **A.**    Yes.

22   **Q.**    So you were questioned a lot about your email of

23   January 10, 2012.  That would be almost three months before

24   Dr. Califf made his proposal for ROCKET 2; is that correct?

25   **A.**    That's correct.

PATRICIA TORR - DEPOSITION

04:35

1    **Q.**   Sorry.  Two months.  Sorry.  I will accept that.  I was

2    doing three minus one is three.  I'm not quite sure how I got

3    there.

4            My question is:  Your email came about two months

5    before anybody had seen Dr. Califf's proposal; is that fair?

6    **A.**   That's right.

7    **Q.**   It was your understanding back in January of 2012 that

8    research and development, Dr. DiBattiste, had decided they were

9    not going forward with any further ROCKET studies; is that

10   correct?

11   **A.**   That's correct.

12   **Q.**   Now, who would be the people at Janssen who would evaluate

13   a proposal from somebody like Dr. Califf, who had been an

14   investigator for ROCKET 1, when and if such a proposal was made

15   to do a further ROCKET study?

16   **A.**   Primarily that would be Dr. DiBattiste and probably

17   members of his direct leadership team.

18   **Q.**   Do you recall whether, in fact, you ever even saw

19   Dr. Califf's specific proposal, as in Exhibit 6?

20   **A.**   I believe I -- as I note here today, I received an email

21   copy of it in March.

22   **Q.**   Now, you were then questioned, I believe, again by

23   Mr. Childers, about Rudy Sharan and a timeframe of

24   December 2013.

25           Let me get the precise exhibits there so we can get

504

**PATRICIA TORR - DEPOSITION**

04:37

1    one of them put up there.

2              If you would, Exhibit 11.

3              So people on the jury can see that when Rudy Sharan

4    was raising a question about ROCKET 2 from a commercial point

5    of view, this was at the end of 2013, correct?

6    **A.**    Correct.

7    **Q.**    Now, are you aware -- were you aware of any information,

8    from a safety or efficacy point of view, that raised any

9    questions or concerns about whether the 20-milligram dose for

10   AFib was working inappropriately?

11   **A.**    No, I'm not aware of any safety or efficacy data that

12   would put back questions or would cause the research and

13   development committee to do anything differently or weigh in

14   differently.

15   **Q.**    Based upon your reading of Mr. Sharan's emails that were

16   shown to you today and your recollection of the time, were

17   there safety or efficacy concerns in December of 2013 that

18   Mr. Sharan or anybody was concerned about with respect to the

19   dosage of Xarelto for AFib?

20   **A.**    No.

21   **Q.**    From the time FDA approved marketing of Xarelto for AFib

22   until December of 2013, were you aware of any requests or

23   information or concerns from FDA that the dose for AFib was not

24   a safe and effective dose?

25   **A.**    No.

505

**PATRICIA TORR - DEPOSITION**

04:39

1  **Q.**   From the time after March or April 2012, when Dr. Califf

2  made his formal study proposal, were you aware, in your role,

3  of any further communications from Dr. Califf suggesting that

4  another ROCKET dosing study needed to be done?

5  **A.**   No.

6  **Q.**   From December of 2013 to the present, has Dr. Califf, to

7  your knowledge, suggested that the company needs to do another

8  dosing study for AFib?

9  **A.**   No.

10  **Q.**   Has the FDA suggested to the company up to the present

11  time that it needs to do another dosing study for AFib?

12  **A.**   No.

13  **Q.**   Research and development, based upon your knowledge of

14  them, if someone with the credentials of a Dr. Califf makes a

15  suggestion for a study on a marketed drug or a drug that's in

16  development, is that something you would expect research and

17  development to evaluate and take seriously?

18  **A.**   Yes, I would believe that to be the case.

19         **THE COURT:**   Is that it?

20         **MR. BARR:**   That concludes it, Your Honor.

21         **THE COURT:**   We will stop here, then, and come back

22  tomorrow at 8:30.

23              I know you worked hard today, and I appreciate

24  it.  The lawyers appreciate it.  Keep up the good work.  I hope

25  you find this interesting.  It's fascinating testimony and

04:40

1   witnesses certainly.  You know more about medicine now and

2   about drugs and FDA and everything else.

3                Okay.  Again, please don't talk to anybody about

4   the case.  Bring your tablets into the jury room.  We will have

5   them locked up and give them back to you tomorrow.

6                All rise as the jury leaves, please.

7                We will see you at 8:30.

8            (Jury exited.)

9            **THE COURT:**  Be seated, please.

10               The jury is out of the courtroom.  Do we have

11   any issues we need to talk about?

12           **MR. IRWIN:**  We have an objection to put on the

13   record, Your Honor, please.

14           **THE COURT:**  Sure.

15           **MR. BONEY:**  Good afternoon, Your Honor.  Lindsey

16   Boney on behalf of defendants.  Thank you very much for hearing

17   us in this matter.

18               As Your Honor knows, we talked this morning in

19   chambers before the start of court about defendants' renewed

20   motion to exclude Dr. Smart's dosing-related opinions.  We

21   filed a motion to this effect last night.  It's Document 6674.

22   As the Court heard today, Dr. Smart has offered dosing opinions

23   that Xarelto should be dosed twice daily instead of once daily

24   and that the Xarelto dose is too high and that it's unsafe for

25   those reasons.

04:42

1        Defendants previously moved to exclude all of

2   plaintiffs' experts' opinions that relate to dose as

3   unreliable, under *Daubert*.  They are speculative, unreliable,

4   untested, not peer-reviewed, and not generally accepted.  And

5   Dr. Smart's opinions were included in that challenge, which we

6   expressly incorporate here.

7        In response to our earlier motion, plaintiffs

8   expressly disclaimed the twice-daily dosing theory.  They said,

9   quote, No expert will offer an opinion at trial that

10  twice-daily dosing is safer and/or more effective than

11  once-daily dosing.

12       That's Document 5641 at page 26.  The plaintiffs

13  never defended their too-high-a-dose theory.

14       Plaintiffs should be held to their

15  representation that no expert would offer an opinion that

16  Xarelto should be dosed twice daily instead of once daily.

17       Now, in their response to our motion of last

18  night that they filed this morning, plaintiffs said that these

19  dosing opinions are simply in service of a different opinion

20  regarding variability or regarding narrow therapeutic index,

21  but that is not what they did with Dr. Smart today.  As the

22  Court has seen, plaintiffs' counsel wrote on the Lightboard:

23  "Dose is too high" and elicited opinions from Dr. Smart that

24  that opinion is, quote, intimately connected with once-a-day

25  dosing.

04:44

1    That is not what plaintiffs said that they would
2  do.  To read the full sentence from plaintiffs' brief they
3  filed back in February -- and this is from Document 5527 --
4  plaintiffs wrote [as read]:  "Plaintiffs represent that no
5  expert will offer an opinion at trial that once-daily dosing is
6  safer and/or more effective than twice-daily dosing.
7    This is the full sentence [as read]:  "But
8  plaintiffs do intend to highlight the pharmacological profile
9  and controversy surrounding the choice of the dosing regimen as
10  further evidence of the need to evaluate the bleeding risks in
11  the Xarelto-treated population."
12    The plaintiffs say we are pulling that earlier
13  clause out of context, that they're simply reserving here the
14  right to introduce facts regarding dosing and regulatory
15  history, what they call the controversy.
16    Defendants haven't sought to exclude those
17  facts, as shown in the *Boudreaux* trial.  Facts about the
18  regulatory story on dose and dosing regimen and how they were
19  selected is one thing.  Expert opinion about the safety of
20  those characteristics is something entirely different.
21    Plaintiffs cannot be allowed to now come in
22  after representing, as officers to the Court, they would not
23  introduce expert testimony on this topic and thereby evade
24  *Daubert* scrutiny and present this expert testimony.
25    Your Honor, as a brief but important and related

04:45

1   aside, as the Court saw today with Dr. Smart's opinions about a
2   black box warning, this is becoming a repeated theme.   In
3   response to the defendants' labeling preemption motion for
4   summary judgment, Document 5650, at page 2 and note 2, this is
5   what plaintiffs wrote about a black box warning theory.   They
6   said, quote:  "Defendants also seek to exclude argument that
7   they should have implemented an additional black box warning on
8   Xarelto about its bleeding risk.  Plaintiffs do not intend to
9   advance such an argument at trial and thus request that this
10   aspect of defendants' motion be denied as moot."
11          They go on to say, quote:  Moreover, plaintiffs
12   do intend to argue and offer evidence showing that the lack of
13   a black box warning of Xarelto is not evidence that its
14   bleeding risk is lower than Xarelto's [sic], which has a black
15   box warning about its bleeding risk.  But preemption principles
16   are wholly irrelevant to these arguments, however, because
17   plaintiffs are not contending that state law required
18   defendants to add a black box warning to the label.
19          This continued backtracking is prejudicial to
20   our defense of this case.  We made witness lists and exhibit
21   lists and prepared this trial based on plaintiffs'
22   representations to the Court.  Plaintiffs have waived their
23   *Daubert* objection as to the dosing opinions to Dr. Smart.  And
24   plaintiffs' failure to respond to *Daubert* challenges also means
25   that the Court has never been given the opportunity and,

04:46

1    frankly, the time to make reasoned findings about relevancy and

2    reliability to make these gateway determinations about expert

3    opinions.  That's something that the Fifth Circuit has said is

4    an important -- is an important consideration, and *Daubert*

5    decisions should not be made on an ad hoc basis.  That's the

6    *Carlson* decision by the Fifth Circuit just last year,

7    822 F.3d 194.

8                In the event -- just to be clear and to renew

9    the motion, Your Honor -- defendants' dosing -- plaintiffs'

10   dosing opinions, Dr. Smart's opinions fail under *Daubert* for

11   the reasons explained in our omnibus brief that we renewed last

12   night.

13               The Court's opinion in *Propulsid* about the lack

14   of testing, as well as the speculative nature of Dr. Smart's

15   opinions are based on his personal bias.  That doesn't fit

16   under the *Daubert* standard, and it doesn't fit the facts of

17   this case, where the plaintiffs have once again, just like

18   *Boudreaux,* dismissed a design defect claim.  Even in the

19   statement of their theory of a failure to warn, this dosing

20   theory does not fit within their PT for emergency circumstances

21   theory.

22               For all these reasons and for the reasons we

23   state in our earlier briefing, which we incorporate here, our

24   motion last night, the Court should exclude Dr. Smart's dosing

25   opinions.  For the reasons based on the opinions the Court has

04:48

1   heard today, now hearing the evidence, defendants move to

2   strike Dr. Smart's dosing opinions.  And similarly, we also

3   would move the Court to strike Dr. Smart's black box warning

4   opinion and request a limiting instruction that it's not a

5   basis for finding liability or, in the alternative, to read to

6   the jury as a judicial admission plaintiffs' statement in the

7   briefing at Document 5650 where they agreed not to put on this

8   evidence and were not presenting this theory as a basis for

9   liability.

10          For those reasons, Your Honor, we ask that the

11   Court grant relief.

12          **THE COURT:**  Thank you very much.

13          Let me hear a response.

14        **MR. MEUNIER:**  May it please the Court.  Jerry Meunier

15   for plaintiffs.

16          We have set forth our opposition, Your Honor, to

17   this motion in Record Document 6674, which was filed today in

18   the record.  Nonetheless, I believe it's possible in just a few

19   minutes to summarize the essence of our position.

20          I begin with the statute because it is not the

21   defendants' conceptualization of the theory of our case which

22   governs.  Rather, it is the LPLA which defines what we must

23   prove in order to present a failure to warn case.

24          Under LSA-R.S. 9:2800.57, the plaintiffs in a

25   failure to warn case have a twofold burden.  First, we must

512

04:49

1   show that a product possessed one or more characteristics

2   which, in the words of the statute, quote, "may cause damage,"

3   close quote, to a foreseeable user.

4              Second, we must show that in light of those

5   characteristics, the manufacturer failed to use reasonable care

6   to warn about the risks or dangers posed by such

7   characteristics.

8              Of course, under the learned intermediary

9   doctrine in a prescription drug case, this duty to warn, as the

10  Court has confirmed, extends both to prescribers and to

11  treaters of the patient, in particular those who are in a

12  position to make different medical decisions to avoid harm if

13  an adequate warning had been provided.

14             Dr. Smart's opinion testimony in this trial has

15  addressed both prongs of the statutory road map for proof of

16  failure to warn.  He has testified that the warnings associated

17  with the drug Xarelto are inadequate.  He has expressed further

18  opinions that certain characteristics of Xarelto, specifically

19  its worst-in-class status among NOACs and its once-daily

20  20-milligram dosing regimen, are characteristics which pose the

21  risk of harm to the plaintiffs -- or to patients.

22             The dosing criticism of Dr. Smart, in other

23  words, is not predicated or presented in this case to the jury

24  in support of a stand-alone design defect theory.  Rather, it

25  is relevant to and a predicate for his opinion that the

04:51

1    warnings given about Xarelto are not adequate in light of those

2    characteristics.

3              Your Honor, he was clear in his testimony that

4    there is support for his criticism of the dosing regimen of

5    Xarelto, both in the FDA materials and in published literature,

6    and the jury heard him refer to the charts in the Canadian

7    article which for him was the aha! moment, when he saw the

8    dosing with the drug was problematic.

9              Your Honor, in Louisiana Tort Law there is a

10   bedrock relationship between risk and duty.  We call it

11   duty/risk, but it's the same relationship.  The greater the

12   risk, the more heightened the duty.  If there is a risk with

13   certain characteristics of this drug, including its dosing

14   regimen, those risks inform the duty to warn.  Those risks need

15   to be assessed in order to inform the duty to warn and in order

16   to inform the jury about how heightened a duty to warn there

17   was.  The jury simply has to understand what the dangerous

18   characteristics of the drug are in order to get to an

19   assessment of whether there was a failure to use reasonable

20   care in the duty to warn.

21             And risk, which is what these dangerous

22   characteristics that Dr. Smart testified about, are also

23   relevant to the first cousin of duty, which is foreseeability.

24   Because if it's shown that the manufacturer knew or should have

25   known about a dosing regimen that put plaintiffs more at risk,

04:53

1    that perhaps should have been studied more thoroughly in order

2    not to put patients at risk; the foreseeability of harm from

3    that informs their duty to the learned intermediary to say more

4    than they say about this drug, to give more information about

5    this drug.

6            **THE COURT:**  What about the black box aspect of it?

7            **MR. MEUNIER:**  It was not the testimony of this

8    witness that there has to be a specific dosing reference in the

9    black box warning of the drug.  He said there has to be more

10   put in a prominent place like the black box, just like there is

11   with warfarin, that you have got to tell doctors more about the

12   risks of using the drug.

13           So we don't -- we are not presenting a case

14   where there is a design defect because of the dosing.  We are

15   presenting a failure to warn case, which is informed by, among

16   other things, the characteristics of the dosing regimen.

17           I think, as we say in our brief in opposition,

18   Judge, there was ample testimony and there's evidence in this

19   record to support and give a basis for this expert's opinion

20   about that.

21           **THE COURT:**  He says that you gave up your black box

22   idea, that you brought it out and you said you weren't going to

23   use it, and you used it.

24           **MR. MEUNIER:**  Well, I think the context of that was

25   in the nature of using dosing as a stand-alone theory of fault

04:54

1    that goes in a black box.  I think that was the context in
2    which that discussion took place.
3              There's been no secret about what Dr. Smart was
4    going to say.  It is in his report.  You heard the reference to
5    his report.  There was extensive cross-examination.  He was
6    always going to talk about the dosing issues concerning
7    Xarelto.  So there's no issue about that.
8              The issue is:  Have we surprised the defendants
9    with a warnings case which, among other things, will identify
10   the dosing problems as a dangerous characteristic?  I think we
11   have.
12             Judge, the *Daubert* Court -- it's often
13   forgotten, but it went to great lengths to say, You know, we
14   have to be careful with our gatekeeper responsibilities not to
15   confuse admissibility with weight.
16             One of the great cures of any concerns about an
17   expert's opinion is cross-examination.  There was vigorous
18   cross-examination today which will allow this jury to properly
19   assess the testimony of Dr. Smart when it comes to dosing and
20   other characteristics of the drug.
21             We respectfully submit that the motion to
22   exclude that testimony is not properly founded.  There's been
23   no surprise.  We never abandoned any discussion about dosing.
24   We never abandoned Dr. Smart's expert opinion about dosing.
25             It is in the context of the statutory twofold

04:55

1    test of dangerous characteristics to be followed by a failure

2    to warn.  That's the context in which your jury charge can make

3    it clear to the fact-finders that that's how dosing is

4    relevant.

5              THE COURT:  The dosing doesn't concern me.  I can see

6    your argument with dosing under 2800.54 and 2800.57.

7              The thing that gives me pause is the reference

8    to black box.  That concerned me a little bit because I thought

9    that was out of the case.  Then it's back into the case.  I

10   don't know how that got there.

11             MR. MEUNIER:  Well, Your Honor, it flowed from his

12   discussion that there needed to be, as he put it, more in this

13   label to highlight and bring attention to.  Now, he talked

14   about black box in reference to warfarin as well.

15             He said, If this drug is the same warfarin, why

16   don't we have the same kind of highlighting and drawing

17   attention to the problems with the drug?  That was his

18   testimony.

19             THE COURT:  Tell me about the black box.

20             MR. BONEY:  Your Honor, just briefly, to put a fine

21   point on this, we were back here in front of the Court in

22   March -- I think it was March 23 -- arguing about the various

23   dispositive motions, including the motion relevant here, which

24   was the label preemption motion.

25             One of the plaintiffs' theories that they had

04:57

1  advanced from the beginning of the case was about that the
2  defendants could be held liable for failing to have a black box
3  warning about bleeding risk.  So the defendants,
4  understandably, made motions claiming that those claims are
5  preempted.

6           The law is clear, Your Honor.  In fact, one of
7  the plaintiffs' regulatory experts even concedes in her
8  deposition that the defendants could not unilaterally add a
9  black box warning to the label.  So the plaintiffs, instead of
10  responding to that argument, failed entirely to respond to the
11  preemption argument about black box warning and instead made
12  this representation in their response to the motion, saying
13  that they do not intend to advance such an argument at trial
14  and thus request that this aspect of defendants' motion, the
15  aspect that talked about preemption of a claim regarding a
16  black box warning, the plaintiffs said that should be denied as
17  moot because they weren't going to bring it here.

18           So for now a witness to come on and not only
19  introduce facts but have expert testimony, purported expert
20  testimony about the lack of a black box warning on Xarelto, it
21  doesn't fit with the representation the plaintiffs have made
22  before.

23           Indeed, Your Honor, the defendants on this point
24  would renew our preemption motion and submit to Your Honor that
25  you should grant summary judgment, to the extent the plaintiffs

04:58

1  are saying there should be a claim for liability on the basis

2  of a black box warning.  We would renew the motion that that

3  claim is preempted.

4          THE COURT:  Okay.  I understand it.  I'm not going to

5  tell the jury -- I'm not going to tell them to disregard the

6  material about the dosing, because I do think that has

7  something to do with the characteristics.  But I think the

8  black box is different.  I am going to tell them to disregard

9  testimony regarding the black box warning.

10             Thank you very much.

11         MR. MEUNIER:  Your Honor, just to be clear,

12  Dr. Smart's testimony about inadequate warning was not limited

13  to a black box reference.

14         THE COURT:  I understand.  I'm not going to -- I will

15  talk only about the black box.

16         MR. MEUNIER:  Thank you.

17         THE COURT:  Thank you very much.

18             Court will stand in recess.  I will see you all

19  at 8:15 tomorrow.

20                        *  *  *

21         (The following proceedings were held outside the

22  presence of the jury.)

23         MR. OVERHOLTZ:  I will read them in, then we'll

24  handle them.  The plaintiffs are going to introduce as

25  Plaintiffs' Trial Exhibit 9 Record Number 690562, which was the

05:02   1   Gary Peters deposition Exhibit 24.

2                    Plaintiffs are going to introduce as Plaintiffs'

3   Trial Exhibit 10 Record Number 690563, which was Peters

4   deposition Exhibit 25.

5                    Plaintiffs will introduce Plaintiffs' Trial

6   Exhibit 11, which is Record Number 132656, which was Peters 27.

7                    Plaintiffs will introduce PXT-12, which was

8   Record Number 132952, which was Peters deposition Exhibit 28.

9                    Plaintiffs will introduce as PXT 13,

10   Record Number 132953, which is Peters 29, deposition exhibit.

11                    Okay.  We'll move to the Torr deposition.

12        MS. MILLER:  If I could just quickly.

13                    Chanda Miller on behalf of the defendants.  The

14   Peters deposition exhibits that were PXT 9, 10, 11, 12, and 13

15   are being admitted subject to the Court's earlier rulings on

16   the deposition designations and accompanying exhibits from the

17   deposition of Dr. Peters.

18        MR. OVERHOLTZ:  So for the Torr deposition that was

19   played to the jury, we will introduce Plaintiffs' Trial

20   Exhibit 14, which is Record Number 307612, which was Torr

21   Exhibit 4 from the deposition.

22                    PXT 15 will be introduced by plaintiffs as

23   Record Number 1482662.  That was deposition exhibit Torr 5.

24                    Plaintiffs will introduce PXT 16, which was

25   Record Number 1482663.  That was Torr Exhibit 6 from the

05:04

1      deposition.

2                    Plaintiffs will introduce PXT 17, which was

3      Record Number 311045, which was Torr 7 from the deposition.

4                    Plaintiffs will introduce PXT 18.  That was

5      Record Number 2501312, which was Torr 8 from the deposition.

6                    Plaintiffs will introduce PXT 19, which was

7      Record Number 1428185, which was Torr 9 from the deposition.

8                    Then we will introduce PXT 20, which is Record

9      Number 259501, which was Torr 10 from the deposition.

10                    Next is PXT 21, which was Record Number 2579936,

11     which was Torr 11.

12                    Next is PXT 22, Record Number 2564466, which is

13     Torr 16.

14                    Next is PXT 23, which is Record Number 2564467,

15     which was Torr Exhibit 17 from the deposition.

16             MS. MILLER:  By agreement of the parties, the

17     deposition designations, the objections to them, and the

18     Court's rulings on them from the prior trial for the deposition

19     of -- this is Torr -- are being applied to Mrs. Torr's

20     deposition designations that were played in court here today.

21                    For the record, the Court's prior rulings on the

22     deposition designations and exhibits for Mrs. Torr are Record

23     Document 6329 and Record Document 6329-1.  We will be refiling

24     them here so they are on the record for the *Orr* case.

25                    Also by further agreement of the parties,

05:06

1    PXT 14, which is deposition Exhibit 4 from Mrs. Torr's

2    deposition, will be submitted to the Court with redactions on

3    it.

4              **MR. OVERHOLTZ:**  I'm handing you PXT 9 through 13.

5              We need to make a correction from yesterday's

6    record.  For Plaintiffs' Exhibit PXT 1, the correct record

7    number is 132656.  Yesterday the record number was only 32656.

8              Dean, I'm going to hand you a corrected copy of

9    PXT 1.

10             **THE DEPUTY CLERK:**  I am going to return this one back

11   to you.

12             **MR. OVERHOLTZ:**  Thank you very much.

13             I'm going to hand you these, Dean, and just

14   number them as we go.  I'm going to hand you those exhibits.

15   This is P14 through 23.

16             (Proceedings adjourned.)

17                         * * *

18

19

20

21

22

23

24

25

1            **<u>CERTIFICATE</u>**

2            I, Toni Doyle Tusa, CCR, FCRR, Official Court

3   Reporter for the United States District Court, Eastern District

4   of Louisiana, certify that the foregoing is a true and correct

5   transcript, to the best of my ability and understanding, from

6   the record of proceedings in the above-entitled matter.

7

8

9                              *s/ Toni Doyle Tusa*
                               Toni Doyle Tusa, CCR, FCRR
10                             Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25