1
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA
2
    ****************************************************************
3   IN RE:  XARELTO (RIVAROXABAN)
    PRODUCTS LIABILITY LITIGATION
4
                                        Docket No. 14-MD-2592
5   THIS DOCUMENT RELATES TO:           Section L
                                        New Orleans, Louisiana
6   *Joseph Orr, Jr., as Lawful*        Thursday, June 1, 2017
    *Surviving Spouse of*
7   *Sharyn Orr v. Janssen, et al.*
    *Case No. 2:15-cv-03708*
8
    ****************************************************************
9
                    TRANSCRIPT OF JURY TRIAL PROCEEDINGS
10           HEARD BEFORE THE HONORABLE ELDON E. FALLON
                     UNITED STATES DISTRICT JUDGE
11                   VOLUME III - MORNING SESSION

12
    APPEARANCES:
13
    FOR THE PLAINTIFFS'            MR. ANTHONY BIRCHFIELD, JR.
14  LIAISON COUNSEL:              Beasley Allen Crow Methvin
                                     Portis & Miles
15                                Post Office Box 4160
                                  Montgomery, AL  36103
16

17                                MR. BRIAN H. BARR
                                  MR. NEIL E. McWILLIAMS, JR.
18                                Levin Papantonio Thomas
                                     Mitchell Rafferty & Proctor
19                                316 Baylen Street
                                  Suite 600
20                                Pensacola, FL 32502

21
                                  MR. GERALD EDWARD MEUNIER
22                                Gainsburgh, Benjamin, David,
                                     Meunier & Warshauer
23                                Energy Centre
                                  1100 Poydras Street
24                                Suite 2800
                                  New Orleans, LA  70163-2800
25

```
 1                              MS. EMILY JEFFCOTT
                                Lambert Firm
 2                              701 Magazine Street
                                New Orleans, LA  70130
 3

 4                              MR. BRADLEY D. HONNOLD
                                Bartimus, Frickleton,
 5                                 Robertson & Goza, P.C.
                                11150 Overbrook Road
 6                              Suite 200
                                Leawood, KS 66211
 7

 8
      FOR THE DEFENDANT JANSSEN  MR. JAMES B. IRWIN, V
 9    PHARMACEUTICALS, INC.,     Irwin Fritchie
      and JANSSEN RESEARCH &        Urquhart & Moore, LLC
10    DEVELOPMENT, LLC:          400 Poydras Street
                                Suite 2700
11                              New Orleans, LA  70130

12

13    FOR THE DEFENDANT         MR. DAVID E. DUKES
      BAYER HEALTHCARE          Nelson Mullins Riley &
14    PHARMACEUTICALS, INC.,       Scarborough, LLP
      and BAYER PHARMA AG:      Meridian, 17th Floor
15                              1320 Main Street
                                Columbia, SC  29201
16

17                              MS. BETH A. WILKINSON
                                Wilkinson Walsh + Eskovitz, LLP
18                              1900 M. Street NW
                                Suite 800
19                              Washington, DC 20036

20

21    Official Court Reporter:  Lanie M. Smith, RPR, CRR
                                500 Poydras Street, B-275
22                              New Orleans, Louisiana 70130
                                (504) 589-7782
23

24
            Proceedings recorded by mechanical stenography,
25    transcript produced via computer.
```

1                          EXAMINATION INDEX

2                                                    PAGE NO.

   DR. BERNHARD GLOMBITZA
3
        By Video Deposition........................   527
4

5  DR. FRANCISCO CRUZ

6       Direct Examination by Ms. Jeffcott..........   586

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | (THURSDAY, JUNE 1, 2017) |
| 3 | (MORNING SESSION) |
| 4 | (Call to order of the court.) |
| 5 | |
| 6 | THE COURT:  Be seated, please. |
| 7 | Good morning, ladies and gentlemen. |
| 8 | Just a couple of matters before we begin. |
| 9 | Yesterday a witness made reference to a black box.  That was |
| 10 | Dr. Smart. |
| 11 | You are to disregard any reference to any black |
| 12 | box.  A black box or testimony about a black box has no part |
| 13 | and should play no part in this trial or your deliberations. |
| 14 | So please disregard anything about a black box. |
| 15 | Secondly, I want to talk to you about a |
| 16 | deposition today.  The Plaintiffs are going to start off with a |
| 17 | deposition. |
| 18 | This deposition is -- part of it is a |
| 19 | translation.  The witness speaks only German.  So they had to |
| 20 | translate.  So it will be a little difficult, but I know |
| 21 | you-all can handle it. |
| 22 | So let's start, please.  Call your next witness. |
| 23 | MR. BIRCHFIELD:  Yes, Your Honor.  At this time we |
| 24 | present the videotape deposition of Dr. Bernhard Glombitza. |
| 25 | The deposition was taken on September the 13th and 14th of 2016 |

1   in Amsterdam, Netherlands.

2            And Dr. Glombitza was the global project leader

3   for Xarelto from 2005 until 2007 and was the vice-president and

4   senior global program head for Xarelto from 2007 until 2012.

5            And Dr. Glombitza's testimony will be in German,

6   as Judge Fallon just mentioned, and will be translated into

7   English.

8            The deposition starts with questioning from the

9   attorneys for the Orr family and concludes with questioning

10   from the attorney for the Defendant.

11            Judge, if I may, it was very helpful having a

12   break -- a stretch break in the middle of the deposition.  If

13   we could find an appropriate time at 30 or 40 minutes, would

14   that be --

15            THE COURT:  No.  That's fine.  We will either do that

16   or take a break.  We'll keep that in mind.  Thank you very

17   much.

18            MR. BIRCHFIELD:  Thank you, Your Honor.

19                          (Videotape played.)

20   Q.   Good morning, Dr. Glombitza.  Will you please state your

21   full name for the record here.

22   A.   Bernhard Glombitza.

23   Q.   And, Dr. Glombitza, you currently work for Bayer; is that

24   correct?

25   A.   That is correct.

1  Q.   And, Dr. Glombitza, your native language is German; is

2  that correct?

3  A.   Yes.  That is correct.

4  Q.   Do you speak English?

5  A.   Yes.

6  Q.   Do you speak English well?

7  A.   I speak English well, but not as well as my mother

8  language.

9  Q.   And do you speak English in your job at Bayer?

10 A.   Most of the time, yes.

11 Q.   Now, when did you first go to work for Bayer?

12 A.   In 1994.

13 Q.   Okay.  And at some point, you began working on the Xarelto

14 project, correct?

15 A.   That is correct.

16 Q.   When did you start working on Xarelto?

17 A.   I started working as global project head or leader and/or

18 project manager for Xarelto in September 2005.

19 Q.   According to the draft CV that you sent yourself, as you

20 called it, you were the director, global project leader of

21 Xarelto, 2005-2007, for Bayer HealthCare Germany.  Is that

22 accurate?

23 A.   Independent of this draft document, it is correct that I

24 was the global project leader, global project manager for

25 Xarelto from 2005 to 2007.

1    Q.    But sometime in 2007, were you promoted to vice-president

2    with the title senior global program head, Xarelto?

3    A.    Independent of the accuracy of the document, and here I

4    repeat again, I sent this from my private e-mail to myself.  So

5    it is not my official CV.

6        But independent of that, it is correct that I was promoted

7    to vice-president, program management, for Xarelto in 2007, the

8    title being senior global program leader or program manager,

9    Xarelto.

10   Q.    Do you see that?

11   A.    I see that.

12   Q.    The next bullet point says:  "Managed a large clinical

13   program, greater than 75,000 patients."

14       Do you see that?

15   A.    I see that.

16   Q.    And the next bullet point says:  "Selection of a

17   co-development partner for rivaroxaban."

18       That's Xarelto, right?

19   A.    Rivaroxaban is the INN name for Xarelto.

20   Q.    And it says:  "Cooperation and licensing agreement with

21   J & J, 2005, team lead of due diligence."

22       Do you see that?

23   A.    I can see that it is written here.

24   Q.    And that was talking about you, right?  You were the team

25   lead of the due diligence with J & J?

1    A.    I was responsible for due diligence in organizing the

2    logistics framework for this.  So I was the project manager

3    responsible for implementing due diligence.

4    Q.    Let's look back at Exhibit 1 for a moment.

5         And if we can look on Page 2, there's a -- under your

6    title related to being the senior global project program head,

7    Xarelto, and director, global project leader, from that 2005

8    time period forward, I want to look in the "Major Achievements"

9    section.

10        And if you can look with me at Bullet Point Number 1, it

11   says:  "Developed Xarelto R & D strategy."

12        Do you see that?

13   A.    That's what it says here.  Yes.

14   Q.    And if we look at the next bullet point, that's the one

15   about the -- preserving the situation to be the first oral

16   Factor Xa inhibitor on the market.

17        And it says:  "Met all project milestones over the past

18   six years.  Kept project on track for approval and launch in

19   2008 for the short-term indication.  Kept project on track for

20   approval of launch in 2011 for the long-term indications."

21        Those are all listed as your major achievements, correct?

22   A.    Let me point out that there's an incongruency here in this

23   document between the date and the list, which means that it is

24   a draft version.

25        These are not my personal achievements.  I believe that I

1    can recall that the team that I managed achieved these things.

2    Q.    Delays in the development program and, ultimately, an

3    approval for sale can have negative financial implications on

4    the company, right?

5    A.    Delays can have negative consequences for the patients

6    that might not get valuable medication on time, but they can

7    also have an influence on the finances of the company

8    developing the medication.  But that is always the case.

9    Q.    It was very important that Bayer and J & J outperform

10   their competitors with respect to the timelines of getting

11   approval of their Factor Xa inhibitor, correct?

12   A.    It was important to get the medication out to market

13   speedily in order for patients to be able to benefit from the

14   new standard of care and in order for the health system, as a

15   whole, to benefit from it.

16   Q.    And in order to increase profitability for Bayer, Bayer

17   was in a race with their competitors to get to market, correct?

18   A.    At the time I was the project manager of the R & D team, I

19   was not involved in market observations or observations of our

20   competitors.  That was the responsibility of the marketing

21   department.

22        So it is difficult for me to go into details on this.  All

23   I know is that there were competing products, but they had

24   other profiles.  Their safety and efficacy profiles were

25   different from Xarelto.

1    Q.    If you can look with me at what we'll mark as Exhibit

2    Number 4, which is Record 4627314 and it is Bates BPAG_3374158,

3    it's an e-mail chain from August 2013 between yourself and

4    Kemal Malik.

5         And can you tell us who Kemal Malik was.

6    A.    He was one of Bayer's employees.

7    Q.    Was he a top executive at Bayer?

8    A.    What time frame are you talking about?

9    Q.    In this 2013 time frame.

10   A.    Well, 2013 -- I'm not entirely sure what your definition

11   of a top executive is.  But as far as I can remember,

12   Kemal Malik was part of the management of Bayer.

13   Q.    And so, if you look with me at the bottom of the page,

14   Kemal Malik e-mailed you on August 29th of 2013, and the

15   subject was the "OD decision."

16        And says:  "Dear Bernhard, do you know when we made the OD

17   decision for Xarelto."  Right?

18   A.    That's what it says here.

19   Q.    Okay.  And "OD decision," that's referring to the

20   once-daily dosing decision, correct?

21   A.    "OD" means once daily, but I'm not entirely certain what

22   "decision" means in this context.

23   Q.    And so, in 2013, when Kemal Malik wanted to know when the

24   decision had been made related to once daily for Xarelto, he

25   e-mailed you, correct?

1    A.    That's what I read here.

2    Q.    And you were able to respond to Kemal Malik and you told

3    him that the decision was taken on the pharma management

4    committee on 16 June, 2005, and you attached a presentation and

5    were even able to reference specific slides related to OD/BID

6    for P.VTE, evidence Slide 14, and recommendation Slide 31, and

7    then you corrected your date as a mistyping and said it was

8    16 June, 2004, not 2005, correct?

9    A.    I would like to -- that's what it says here.  And I would

10   like to point out that this was before my time as the project

11   manager for rivaroxaban.

12        As I already mentioned, it was in 2005 that I took on this

13   position.  So 2004, it was before my time.

14   Q.    But you were able to provide this information to

15   Kemal Malik, correct, in 2013?

16   A.    I had presentation from 2004, and I sent it to him.

17   Q.    And Kemal Malik responded to you at the top of the page

18   regarding the OD decision and said, "Perfect.  One of the best

19   decisions we ever made...and one of the bravest."

20        Do you see that?

21   A.    I see that.  I see that's what it says here.

22   Q.    You see this is the e-mail.  It's 4627316,

23   Bates BPAG_33740160.  This was your initial response, in which

24   you told him that the decision was taken by the pharma

25   management committee on 16 June, 2005, and you have the

1    presentation attached to it.  And you later changed that date

2    to 2004, correct?

3    A.    That's what I read.

4    Q.    Do you agree that the AFib indication had the biggest

5    market potential, as you understood it, back in 2005 for the

6    development of Xarelto for Bayer?

7    A.    The AFib indication is a chronic indication that involves

8    benefits for a large number of patients, and was expected to

9    improve the standard of care for these patients.  This was

10   11 years back, and I cannot remember precisely whether it was

11   the biggest indication.  I remember there were other big

12   indications.

13   Q.    So whether AFib was the biggest -- had the biggest market

14   potential, you just don't remember?

15   A.    AFib is one of the indications with a large patient

16   potential.  There is a potential to contribute to benefits to a

17   large number of patients.  It's mostly the case that if a drug

18   is on the market and helps many patients, then it is usually

19   sold more frequently; that is, it has an increased sales

20   potential compared to drugs that are used for -- contribute to

21   the benefit of a smaller number of patients; that is, a smaller

22   patient population.

23   Q.    Let's look at -- I think what we've marked as Exhibit

24   No. 6, which is the attachment to your e-mail to Kemal Malik,

25   and it's the follow-up Factor Xa discussion PowerPoint.  Let me

1    put it on the screen here for you.  That's Exhibit 6.  You have

2    it in front of you.  And if you'll turn with me to the second

3    page, was it a PowerPoint presentation that was made available

4    to you and that's how you were able to provide it to Mr. Malik?

5    A.    I took over the archives of my predecessor, and this

6    presentation was part of the historical archive of my

7    predecessor.

8    Q.    Now, if we can turn to Page 4, there's a page that's

9    titled "Decisions To Be Taken."  And you see "The program

10    decisions, the first decisions, today's decision.  Do we want

11    to investigate the OD opportunity?"  Do you see that?

12    A.    That's what is written here.

13    Q.    And then the second decision is listed as September 2005,

14    "Do we go for DVT prevention and if OD or BID?"  Do you see

15    that?

16    A.    This is what it says, yeah.

17    Q.    And the third decision asks the same question related to

18    the DVT treatment indication, correct?

19    A.    This is what it says, yes.

20    Q.    And then if we look down, the fourth decision, it asks,

21    "Do we go for AFib, and if, OD or BID," right?

22    A.    This is what it says here, yes.

23    Q.    So then let's look at the next slide you recommended to

24    Mr. Malik in your e-mail, which was Slide 31, the

25    Recommendation slide.  Do you see this?

1    A.    Yes, I can see the headline of "Recommendation."

2    Q.    And it says Number 1, "Investigate the OD opportunity,"

3    right?

4    A.    This is what it says here, yes.

5    Q.    The second point says:  "Do not prepare for early BID

6    program."

7          Do you see that?

8    A.    This is what it says here.

9    Q.    And this was the decision that you were telling Mr. Malik

10   about in your 2013 e-mail, right?

11   A.    This is the document I referred him to, but allow me to

12   point out that if you take a look at the chart with the

13   timelines, then you can see that both OD and BID studies and

14   also Phase II studies were planned and were then implemented

15   during my time.

16   Q.    And the first bullet point says:  "Continued planning for

17   Phase III BID.  Dilutes are already limited resources,"

18   correct?

19   A.    Correct.

20   Q.    And the fourth bullet point says:  "Focus on decision on

21   OD dose regimen and do not prepare for early BID program."

22         Do you see that?

23   A.    Yes, I do.

24   Q.    Basically, Bayer determined that further work on a BID

25   dose was a waste of time, correct?

1    A.    This is not correct, and after June 2004, BID studies were

2    implemented.

3    Q.    Let me show you what we'll mark as Exhibit Number 7, which

4    is 3789131.  This is an e-mail from you to Scott Berkowitz on

5    2014, either on November 2nd or February 11th titled "History

6    Docs," and then we'll mark as Exhibit Number 8, the attachment,

7    which is 3789132, and then Exhibit Number 9, which is 3789134.

8    If you can turn with me to the next page, it's labeled "Target

9    Labeling," and BAY 597939, that's Xarelto, right?

10   A.    That is rivaroxaban, and it is sold under the trade name

11   of Xarelto.

12   Q.    And if you can look with me, the fourth one down is "Once

13   daily administration."  And under the Xarelto column, there's a

14   question mark, right?

15   A.    Yes, I see the question mark.

16   Q.    And if you look two down, it says:  "No coagulation

17   monitoring."  Do you see that, and there's a check mark for

18   that, right?

19   A.    Yes, I see the check mark.

20   Q.    For "Fixed dose," just above that, is a check mark, right?

21   A.    I also see that.

22   Q.    Okay.  Then there was check marks for target labeling for

23   "no liver toxicity, no contraindication of severely renally

24   impaired patients.  No warning precaution in moderate renally

25   impaired patients.  No warning precaution in low heavy-weight

1    patients.  No warning precaution in geriatric patients."  Do

2    you see all of those?

3    A.    Yes, I see the check marks.

4    Q.    Okay.  The second bullet point on this Factor Xa inhibitor

5    Partnering:  Main Objectives slide is Number 2, "Reduce money

6    at risk in development.  Share risks and costs with a strong

7    partner."

8         Do you see that?

9    A.    Yes, that's what I read there.

10   Q.    Number 3 says:  "Benefit from partner's development

11   resources and expertise"?

12   A.    Yes, that's what I read.

13   Q.    And Number 4 says:  "Build our specialty business.  Obtain

14   promising quids in exchange for Factor Xa inhibitor US rights."

15        Do you see that?

16   A.    I see that.

17   Q.    Now, if we can turn to the next page, it says:  "The

18   intended deal frame."

19        Do you see that?

20   A.    That's what it says.

21   Q.    And it says:  "Rights and obligations for partner," and

22   it's to "Worldwide codevelop the Factor Xa until all

23   indications according to the development plan have been

24   launched.  Minimum cost participation partner 50 percent."

25        Do you see that?

1    A.    I see that.

2    Q.    And if you look with me on the next page, there is status

3    of negotiations, and there are two companies listed, J & J and

4    Takeda.  Do you see that?

5    A.    That's what it says.

6    Q.    And according to this, both boards of J & J and Takeda had

7    approved terms of an agreement; is that right?

8    A.    I cannot confirm that in this way.

9    Q.    This was your PowerPoint, right?

10   A.    No, this is not my PowerPoint.  This was a PowerPoint that

11   was in my archive, and it dates back to the time before my time

12   as -- my responsibility regarding this project as project

13   manager.  And I would like to repeat again, in my work in due

14   diligence, I was responsible for due diligence logistics.  So

15   there were documents in my files, but I did not have the expert

16   knowledge for creating them.

17   Q.    Let's look at Exhibit Number 9, if we can.  And if we look

18   at the first page, it talks about agenda.  "Results of decision

19   analysis, introduction, results of the decision analysis

20   regarding dosing scheme, and Japan development strategies based

21   on competitive set of indications for market entrance.  Current

22   view on partnering and results of the strategic analysis to

23   fully exploit the value of the asset based on extended set of

24   indications."

25         Do you see that?

1    A.    Yes, I can see that.

2    Q.    Okay.  If you can turn with me over to Slide 4 in this

3    PowerPoint that you sent to Mr. Berkowitz in 2014, it says, "A

4    basic set of indications regarded as competitive was used for

5    evaluating the dosing scheme strategy."

6          Do you see that?

7    A.    I see what it says here.

8    Q.    Okay.  And then the first section here is called the basic

9    program.  And it lists VTE1, 3 and 4 with high PTS, fast, usual

10   entrance indication, fast, highest value VTE and fast

11   development.  Do you see that?

12   A.    That's what it says.

13   Q.    And it says -- "AFib" is the next bullet point.  "AFib:

14   Value driver."  Do you see that?

15   A.    This is what I also read there.

16   Q.    It says:  "High medical need, but longer development time

17   than VTE, lower PTS (18 percent)."

18         Do you see that?

19   A.    That's what it says.

20   Q.    PTS is probability of technical success, correct?

21   A.    This is the generally used term I remember.

22   Q.    Then it says:  "VTE treatment:  Needed for timely AFib

23   development, lower PTS (18 percent), same development time as

24   AFib, low, medium value."

25         Do you see that?

1    A.    I see it.

2    Q.    You recall I asked you whether or not AFib had the biggest

3    market potential and was the most important to Bayer.

4    According to this PowerPoint that you sent to Scott Berkowitz,

5    AFib was the value driver, correct?

6    A.    This document, this PowerPoint was created in 2004, that

7    is more than 12 years ago.  And what we read here is what a

8    marketing colleague believed that he believed that AFib was a

9    value driver.  It doesn't say that there couldn't be or weren't

10   other indications that were value drivers or could become value

11   drivers.

12   Q.    And according to this PowerPoint, it says:  "VTE

13   treatment:  Needed for timely AFib development."

14        Do you see that?"

15   A.    This is what it says here.

16   Q.    And do you recall learning, when you became one of the

17   program directors for Xarelto, that Bayer's belief was that the

18   marketplace for oral anticoagulants was going to be driven by

19   once daily?

20   A.    I do remember that there were discussions regarding the

21   fact that OD offered benefits for patients and that it also

22   increased patient compliance and patient safety as to their

23   concern getting the right -- about getting the right treatment.

24   Q.    If you look with me over at Slide 11, it's Strategy B, and

25   Strategy B says:  "All indications OD -- delivers the highest

1    value and is therefore recommended by the team."

2         Do you see that?

3    A.   Yes, this is what it says here.

4    Q.   And if you look below there, it says:  Strategy A is "all

5    indications BID," and the peak sales are listed.  Do you see

6    that?

7    A.   I see that.  But I do not see any indication of currency.

8    And for me, it's not quite clear what the comment or the point

9    means, because there are differences in that between the

10   United States and Europe, and it says "peak sales" over it.

11   Q.   So the truth was that development of Xarelto for BID use

12   simply wasn't an option for Bayer, right?

13   A.   This is wrong.  Bayer completed several BID studies

14   following 2004, and the selection of OD over BID was

15   data-driven on the basis of clinical data.

16        I would like to add something.  And there are indications

17   out there in the market that are BID for Xarelto.

18   Q.   And so developing Xarelto for BID use for VTE and AFib was

19   not an option for Bayer because BID was not going to be

20   profitable, according to Bayer's market research, correct?

21   A.   This is wrong.  Bayer has got BID indications out there in

22   the market for some indications --

23        THE INTERPRETER:  Sorry.  Correction, translator's

24   correction.  Bayer has got some BID dosages out in the market

25   for some indications, and the decision as to whether or not to

1    go for BID or OD was based on clinical data and the science.

2    Q.    Let's look at Slide Number 12, if we can.  It says, "In a

3    future OD-driven market, BID drugs will not be competitive."

4    A.    This is what I can read here.

5    Q.    It says:  "Strategy A, all indications BID is not an

6    option."

7          Do you see the that?

8    A.    Yes, this is what it says here.

9    Q.    The first bullet point says:  "U.S.:  BID drug will

10   capture only minimal shares in OD-driven market," right?

11   A.    I can read what you also read, but you failed to read out

12   the colon.

13   Q.    Right, I did.  I left out the colon.  The next one says,

14   "Europe:  BID is not profitable despite optimistic market

15   shares," right?

16   A.    This is what it says here in the text.

17   Q.    And it says, "Japan:  BID is not profitable, even with

18   little competition as expected," right?

19   A.    Yes.  Japan, colon, and then I can read what you read out.

20   Q.    And the first bullet point says, "Global:  BID is not

21   profitable," right?

22   A.    This is what it says here.

23   Q.    So let's turn to the last page of the PowerPoint and see

24   how the recommendations in May of 2004 turned out.

25         It says, "New recommendation May 2004.  Focus on once

1    daily development and indications with highest impact of our

2    product profile (oral and unmonitored)."

3        Do you see that?

4    A.    This is what it says here.  Yes.

5    Q.    And the first bullet point is: "Focus on once-daily

6    development."

7        That's what it says, correct?

8    A.    That's what it says.

9    Q.    So in May of 2004, the company has only just begun

10   Phase II studies, still in the middle of Phase II of the study

11   program, and they have decided to focus on a once-daily oral

12   drug that was unmonitored; is that right?

13   A.    That is not correct.  Please let me reiterate that this

14   document is 12 years old.  It's from before I took over the

15   responsibilities for the project.

16       It was written by a colleague from marketing, and it does

17   not represent the company's position.  As I read the document,

18   it's more of a reflection on strategy than a decision document.

19   Q.    Why was marketing -- why were marketing colleagues making

20   recommendations about the drug development strategy for the

21   dose and whether coagulation status should be monitored and

22   whether the dose should be given once daily or twice daily in

23   2004, when the company has just started the Phase II study

24   program?

25   A.    The marketing department is a department that provides

1    market forecasts.  It does not mean that they have the

2    decision-making power when it comes to clinical studies and

3    clinical treatment regimes.

4         The decision as to whether OD or BID should be chosen was

5    driven by available data that came in after 2004 and the

6    scientific evaluation of this data.  So let me repeat.  It was

7    not a marketing decision.  It was an R & D decision.

8    Q.   This PowerPoint that you claim was written by a marketing

9    colleague was making recommendations about dose and coagulation

10   monitoring back in May of 2004 for Xarelto, correct?

11   A.   That is correct.  The marketing people adopt their own

12   wish list at a very early stage.  As with any other drug

13   development, the marketing people start at an early stage to

14   compile their wish list, but it doesn't mean that that wish

15   list will be turned into reality.

16        As we know, there are certain BID indications for Xarelto,

17   just as there are OD indications.  And the decision whether

18   it's going to be BID or OD is always data-driven and based on

19   the scientific analysis of this data.  It is not a decision

20   taken by marketing.  It's taken by R & D.

21        MR. BARR:  Your Honor, this is probably a good point

22   for a stretch break.

23        THE COURT:  All right.  Let's take a break at this

24   time.  The jury will take a ten-minute break.

25        THE COURTROOM MANAGER:  All rise.

1              (The jury exited the courtroom.)

2                   (Court is in recess.)

3              (The jury entered the courtroom.)

4         THE COURT:  Okay.  Be seated, please.

5              Let's continue the deposition.  It feels like you

6    are at the UN, ladies and gentlemen.  This is how it's done.

7    Okay.

8                   (Videotape played.)

9    Q.    And so, if we look at this PowerPoint, the one titled

10   "IPDC May 2004 Wehling" that was attached to Stephan Wirtz's

11   e-mail that then Klaus Wehling forwarded to you -- if we look

12   at the first slide, there's a list of team members.  Do you see

13   that?

14   A.    I see that.

15   Q.    And here it looks like that Stephan Wirtz was a member of

16   a large team of people, including Klaus Wehling, that included

17   marketing, clinical, pharmacology, Japan, regulatory, health,

18   economics, outcome, research, several departments within Bayer,

19   correct?

20   A.    That's what it says.

21   Q.    Then if we turn over to Slide 7, it says:  "New

22   Recommendations" -- "New Recommendation, May 2004."

23         Do you see that at the top of the page?

24   A.    Yes.  This is what it says.

25   Q.    And it says:  "Focus on once-daily development and

1    indications with highest impact on our product profile (oral

2    and unmonitored)."  Right?

3    A.    Yes.  I see that.

4    Q.    So then if we look at these bullet points, it talks about

5    the extended use and prevention of venous thromboembolism, VTE,

6    prevention of stroke in AFib, and then the fourth bullet point

7    is:  "Pursue development for VTE treatment to facilitate AFib."

8          Do you see that?

9    A.    That's what it says.

10   Q.    Okay.  So let's mark as Exhibit 14, Record Number 123 --

11   okay.  I'm sorry.  Exhibit 13, Record Number 1231089, which is

12   the attachment to your e-mail.  And it's Bates BPAG_02660439.

13         So if you'll turn with me over to Slide 37, this is "Brand

14   Vision & Goals, need to guide the Phase III design in VTE,

15   SPAF."

16         Do you agree that commercial brand vision and goals should

17   guide Phase III study design for pharmaceutical drugs?

18   A.    The dosage decision and the design of clinical studies at

19   Bayer is driven by scientific data and scientific state of the

20   art.

21   Q.    The first bullet point says:  "Our vision is to create the

22   new gold standard for the prevention and treatment of

23   thromboembolic diseases," and the second bullet point says:

24   "Our goal is to improve the lives of patients and create a

25   multibillion dollar antithrombotic franchise."

1       Do you see that?

2    A.   Yes.  This is what it says here.

3    Q.   So what I'd like to do now is show you what we'll mark as

4    Exhibit Number 14.  This is an e-mail.  It's Record Number

5    948640, Bates BPAG_01946105.  It's an e-mail from Kemal Malik

6    to several people at Bayer, including yourself, Bernhard

7    Glombitza, on May 31st, 2006, and the subject is the

8    "Rivaroxaban DP3 Decisions 2006."

9       Do you see that?

10   A.   I can read this here, yes.

11   Q.   Okay.  And Kemal Malik sent this e-mail to Andrea Derix,

12   Dagmar Kubitza, Frank Misselwitz, Klaus Wehling, Rene Kluensch,

13   Bernhard Glombitza, Anthonie Lensing, Torsten Westermeier,

14   Martin Homering, Martina Evertz, Andreas Nauck,

15   Reinhard Fescharek, and then copied Iris Howell, correct?

16   A.   I didn't follow whether you actually said all those

17   individual names, but I'm certain that you did.

18   Q.   The presentation that we just looked at was titled

19   "Rivaroxaban DP3 for GDC MC and MC," and was discussing the

20   Phase III decisions for the VTE treatment indication and the

21   AFib indication, correct?

22   A.   This is what it says on the document, yes.

23   Q.   And now if we look at the e-mail from Kemal Malik on

24   May 31st, 2006, that he titles "Rivaroxaban DP3 Decision 2006,"

25   he starts with "Dear all."

1      Do you follow me?

2    A.    This is what it says, yes.

3    Q.    He says, "Last week, the last of the scheduled DP3

4    decisions was made for rivaroxaban VTE treatment.  This means

5    we are now ready to initiate the Phase III activities for SPAF

6    and VTE treatment on schedule and as previously externally

7    communicated in the first half of 2006."

8      Do you see that?

9    A.    Yes, I see that.

10   Q.    The document says that last week, the last of the DP3

11   decision was made for rivaroxaban, right?

12   A.    That's what it says here, yes.

13   Q.    And you remember this happening, right?  This was a big

14   deal?

15   A.    I remember that we took the Phase III decisions for VTE

16   treatment in 2006.

17   Q.    And Mr. Malik says to you and your colleagues at Bayer

18   that:  "This is a truly outstanding outcome, and each of you

19   should be truly proud of this achievement.  The Phase II

20   program (which was exclusively conducted by Bayer) was the

21   largest Phase II program in our history.  As a team, you have

22   steered rivaroxaban forward, adhering to the most challenging

23   timelines, but equally importantly, you have ensured that we

24   have continued to seize all opportunities to maximize the value

25   of this asset.  I personally know that your performance is

1   being discussed as a benchmark in our competitor companies!"

2       That's what Mr. Malik said to you and your colleagues in

3   May of 2006, correct?

4   A.   This is what it says here, yes.

5   Q.   It says:  "Over the last few days, I have been on the IR

6   road show in New York/Boston with Wolfgang Plischke and

7   Alexander Rosar.  This project had the highest possible

8   visibility amongst our investor community."

9       Do you see that?

10  A.   Yes, I can read that here, yes.

11  Q.   He says:  "Rivaroxaban truly has the potential to be

12  transformational for our company, and this is certainly

13  perceived externally."

14      Do you see that?

15  A.   Yes.  This is what it says here.

16  Q.   And Mr. Malik even has a celebratory dinner on the evening

17  of June 13th.  Did you go to that dinner?

18  A.   I cannot remember.

19  Q.   When you became the program leader for Xarelto development

20  in 2005, did you understand that Xarelto could be

21  transformational for Bayer?

22  A.   2005 is a long time ago.  I do not recall what I

23  understood at the time and what I did not understand, so I

24  cannot tell you anything about this.

25  Q.   So yesterday we talked a little bit about the fact that

1    you first became involved in Xarelto with respect to the due

2    diligence program; is that right?

3    A.    Yes, we talked about this.

4    Q.    Let's look at the slide in this PowerPoint presentation

5    regarding the Factor Xa partnering, and it says that "BHC will

6    seek a partner who will license Xarelto for the U.S. territory,

7    will codevelop Xarelto and will assume at least 50 percent of

8    future development costs."  Do you see that?

9    A.    No, this is not what it says here.

10   Q.    What does it say that's different?  It uses the acronym

11   BAY 59-7939 instead of Xarelto?

12   A.    The difference between what you read out and what it says

13   here on paper is BAY 59-7939.

14   Q.    And you understand that BAY 59-7939 is Xarelto?

15   A.    BAY 59-7939 is rivaroxaban, and this is the INN substance.

16   So Xarelto is the formulated rivaroxaban, it's a trade name,

17   and it's not a substance name.

18   Q.    You understand that whenever I call Xarelto -- when I call

19   BAY 59-7939, that I'm talking about Xarelto.  You understand

20   that?

21   A.    If you define it this way now, then I'm going to

22   understand it this way in the future.

23   Q.    And if we can turn over to the fifth slide, it says:

24   "Companies we intend to contact."

25        Do you see that?

1    A.    This is what it says here, yes.

2    Q.    Okay.  And there were three groups of companies, and the

3    first group included Novartis, Pfizer and Abbott, right?

4    A.    This is what it says here, yes.

5    Q.    The second group was J & J, GSK, AstraZeneca, Lilly and

6    says:  "The portfolio conflict given to our knowledge which

7    needs clarification and discussion.  However, these companies

8    are still attractive due to their capabilities in marketing and

9    development."

10          Do you see that?

11   A.    This is what it says here, yes.

12   Q.    And the third group was Schering-Plough and Wyeth.  Do you

13   see that?

14   A.    This is what it says here, yes.

15   Q.    And this due diligence effort was so that Bayer could find

16   a partner for the co-development and marketing of Xarelto,

17   correct?

18   A.    Due diligence was designed to find a partner for Xarelto.

19   Q.    And then it lists the first steps, and it says:  "First

20   steps, identification of a responsible person within each

21   department who will support the partnering and the expert

22   discussions and the due diligence to be named to

23   J. Schöneseiffen, B. Glombitza and A. Brandes shortly after

24   this meeting."

25          Do you see that?

1    A.    This is what it says here, yes.

2    Q.    Okay.  And if we turn to the next page, it says:  "Next

3    steps for preparation of a due diligence," and it says:  "First

4    steps:  Identification of a project manager being responsible

5    for internal organization of due diligence and internal support

6    of partnering process from TA perspective (done --

7    B. Glombitza)."

8          Do you see that?

9    A.    Yes, this is what it says here.

10   Q.    And were you, in fact, the project manager responsible for

11   the organization of the due diligence?

12   A.    I was the person that was responsible for the logistical

13   aspects of due diligence, which means I was the one to organize

14   meetings and to organize the document flow and to organize

15   those things that you do as an organizer, for example.  Also

16   organize events.

17   Q.    That was your responsibility?

18   A.    That was one of my responsibilities.  In parallel, I

19   continued to be the project manager for other development

20   projects.

21   Q.    You, in fact, actually attended and participated in the

22   due diligence meetings, correct?

23   A.    This is correct.  But I cannot confirm that I attended all

24   due diligence meetings.

25   Q.    Let's look at what we'll mark as Exhibit Number 23 and 24,

1    which is 1285633 and 1285634, Bates BPAG_03655684 and then for

2    24, 03655685.  And so the e-mail that attaches the draft

3    minutes from the Novartis meeting is from Dagmar Kubitza to

4    Harold Kallabis, and you're CC'd at the top on March 10th,

5    2005.  Do you see that?

6    A.    Yes, I see that this is what it says.

7    Q.    And now let's look at Exhibit 24, and it's titled

8    "BAY 59-7939, Due Diligence March 1st and 2nd, 2005, Draft."

9          Do you see that?

10   A.    I see that.

11   Q.    And you would have been e-mailed these draft minutes as

12   part of your responsibilities as the project manager on due

13   diligence back in 2005, correct?

14   A.    It looks as if I received this e-mail.

15   Q.    And so then it says:  "Questions raised by Novartis and

16   additional information given verbally by Bayer during group

17   discussions/presentations.  The Novartis questions were

18   answered mainly by Elisabeth Perzborn, Volker Geiss,

19   Corinna Weinz, Dagmar Kubitza and Son-Mi Park, Frank Misselwitz

20   and Klaus Wehling.  These minutes are based on the questions

21   posted electronically by Novartis and on notes made by Harold

22   Kallabis during the two days of due diligence.  Comments in

23   brackets are for clarification purposes and were made upon

24   writing these minutes."

25         Do you see that?

1   A.   That's what it says.

2   Q.   Let's look at Page 2, and there's a section called

3   "Clinical Development."  Do you see that?

4   A.   Yes, I see that.

5   Q.   And the question from Novartis, the first question is:

6   "Why is the OD and BID regimen not combined in all clinical

7   studies?"  Do you see that?

8   A.   That's what it says.

9   Q.   Let's go down a couple of questions, and the next question

10  asked by Novartis is:  "Is there any plan to explore lower

11  doses?"  Do you see that?

12  A.   That's what it says.

13  Q.   Let's look at what we'll mark as Exhibit Number 25, and

14  this is 1231133, and it's Bates BPAG_0261816, and then we'll

15  mark as Exhibit Number 26 the attachment to this e-mail, and

16  this is 1231134, Bates BPAG_0261817, and we'll look at

17  Exhibit 25 first, which is the e-mail from Harold Kallabis on

18  which you were copied.  You received this e-mail from Harold

19  Kallabis on March 5, 2005 -- or it says May 3rd, 2005?  I'm

20  sorry.

21  A.   Yes, this is what it looks like because I was CC'd on this

22  e-mail.

23  Q.   And Mr. Kallabis is e-mailing you and your colleagues the

24  final minutes of the due diligence March 10th and 11th meeting

25  with Scios/J & J, correct?

1    A.    Yes, this is what it looks like.

2    Q.    So then if we can look at Exhibit 26, which is the

3    attachment to this e-mail, it says:  "BAY 59-7939, due

4    diligence March 10th and 11th, 2005.  Questions raised by

5    Scios/J & J and additional information given verbally by Bayer

6    during group discussions/presentations."  Do you see that?

7    A.    Yes, this is what it says here.

8    Q.    Let's look at Page 4, if we can for a minute.  And I'm

9    going to ask you about the second question raised by

10   Scios/J & J.  Do you see it says:  "Do you expect the high

11   peak-to-trough ratio to be a problem in AFib?"  Do you see

12   that?

13   A.    Yes.  This is what I can read here.

14   Q.    Let's look at Page 8, at the top of Page 8, and at the top

15   of Page 8, the Scios/J & J question that's presented in these

16   meeting minutes is:  "Is it possible that you will do a BID

17   development in AFib," right?

18   A.    That's what it says, yes.

19   Q.    And Frank Misselwitz responds to this question and says,

20   "This is possible.  We plan for an OD development, however,"

21   right?

22   A.    That's what it says.

23   Q.    Okay.  If you look at Page 9, look at the top, it says,

24   "Scios/J & J says elderly women have an AUC increase of

25   52 percent compared to younger women."  Do you see that?

1    A.    That's what it says, yes.

2    Q.    It also says, "Women over 75 years have a 20 percent AUC

3    increase compared to elderly men.  What is the implication, if

4    any, on dosing in elderly women?  Do elderly women have a

5    different bleeding profile or a higher frequency of bleeding in

6    completed or ongoing trials?"  Do you see those questions?

7    A.    Yes, I see that.

8    Q.    If you look with me down further on the page near the

9    bottom, it says right here:  "Scios/J & J:  You plan to use one

10   dose in Phase III.  Have you considered using two doses?  What

11   about having both a BID and an OD study arm?"

12         Do you see those questions?

13   A.    That is what it says here, yes.

14   Q.    So J & J was asking about using more than one dose in

15   Phase III, right?

16   A.    I can only confirm what it says here.  I can make no

17   statement on what J & J wanted or wants, what the context of

18   their questions were and what kind of data these questions were

19   based upon.  I simply do not know this, and I can no longer

20   recall.  Plus, I'm not an expert on these issues.

21         My task was to provide logistical support for the due

22   diligence.  I was not called upon to make any comments on the

23   content or any comments -- any scientific comments.

24   Q.    According to these minutes, J & J asked the question

25   regarding, "What about having both a BID and an OD study arm?"

1    Right?

2    A.    What I can read is what it says here.  "You plan to use

3    one dose in Phase III.  Have you considered using two doses?

4    What about having both a BID and an OD study arm?"  That's what

5    I can read.

6          And there seems to be a question that J & J asked on the

7    basis of the context abiding at the time and the data that was

8    available.

9    Q.    Now, in your role as a project manager for Xarelto and

10   managing finances and timelines, did you have an understanding

11   that testing more than one dose in Phase III would be more

12   expensive for Bayer and their partner than testing just one

13   dose in Phase III?

14   A.    Clinical study design is extremely complex, but there's

15   not always a 1-to-1 connection between the number of doses and

16   the expense.  So if you have two dosage arms, it doesn't

17   necessarily mean that the study is going to be more expensive.

18         The cost depends on the general setting, on the condition

19   that is supposed to be studied, and on the general study

20   design.  This determines whether a study will be more expensive

21   or not.

22         Nevertheless, you can say that two dosage arms in a

23   Phase III study will mostly, but not always, require more

24   patients and can, therefore, become more expensive, but they

25   don't have to be.

1    Q.    If you can look with me on Page 14, there's a question

2    from J & J, and it says:  "Are you developing an antidote?"

3          And the response from SP is:  "The FDA asked us for a

4    countermeasure in cases of overdose."

5          Do you see that?

6    A.    This is what it says here.  Yes.

7    Q.    And then if you look a little further down, according to

8    these minutes, J & J asked -- or makes the comment:  "For the

9    chronic indications, an antidote may be useful," right?

10   A.    That's what it says here.  Yes.

11   Q.    Was AFib a chronic indication that was being sought for

12   Xarelto?

13   A.    Yes.  You could define it this way.

14   Q.    So based on these meeting minutes from way back in 2005,

15   J & J, in the due diligence process, raised issues regarding a

16   high peak-to-trough ratio being a problem in AFib, BID

17   development and whether it was going to be developed BID, AUC

18   increases in elderly women and potential dose implications or

19   higher frequency of bleeding, whether more than one dose or a

20   BID and OD study arm would be used in Phase III, the food

21   effect of Xarelto and increases in exposure at certain doses,

22   and whether Bayer was going to develop an antidote, right?

23   A.    That was a rather long list, and I cannot say whether the

24   individual points that you raised are right or not.  We would

25   have to compare what you just said to the minutes that we are

1    looking at.

2         But, generally, you could say that 11 years ago J & J,

3    somehow, touched upon these questions on the basis of a limited

4    amount of data available.  But I am unable to agree with what

5    you just read out, these issues raised by J & J, in their

6    totality.

7    Q.   During the due diligence process, there were second

8    confirmatory due diligence visits later on.  Do you recall

9    that?

10   A.   I don't recall the exact process nor what happened in the

11   individual instances, but I do recall that there were sometimes

12   second rounds.  But I don't remember what companies were

13   concerned and what the content was.

14   Q.   Let me show you -- and it's going to be the first

15   document, while he gets it.  It's going to be Record Number

16   777972, Bates Janssen_05236862.  And then the attachments to

17   that e-mail are Record Number -- so that will be Exhibit

18   Number 27.  And then the attachments to that e-mail will be the

19   next exhibits.

20        Do you see this is an e-mail dated September 8, 2005, and

21   the first e-mail at the bottom is from you, Bernhard Glombitza,

22   to two people at sciosinc.com -- Barrett and Fu at sciosinc.com

23   and the subject was "Presentation of todays."

24        Do you see that?

25   A.   Yes.  I see that.

1   Q.   And you see that the attached file below there -- you

2   attached the J & J Confidential DD clinical

3   presentation_final.pdf as well as the J & J_Factor Xa

4   BAY 59-7939 Bayer presentation September 8 through 9,

5   2005_final.pdf.

6       Do you see that?

7   A.   Yes.  I see that.

8   Q.   So let me then show you what we'll mark as Exhibit

9   Number 28, which is going to be Record Number 2420139.

10       So then the people in J & J forward your e-mail, and a

11   gentleman on the first page named Peter DiBattiste makes

12   comments on the presentations that you forwarded, correct?

13   A.   It looks like it, that parts of my e-mail were forwarded

14   within J & J.  And then at the end it's also text by Peter

15   DiBattiste.

16   Q.   Do you recall Peter DiBattiste, Dr. DiBattiste, being at

17   the due diligence meeting in September of 2005?

18   A.   I cannot recall whether he was present at this meeting in

19   September 2005, but I do remember that he participated in

20   meetings -- due diligence meetings.

21   Q.   And if we can look at Dr. DiBattiste's comments, it says,

22   "Some of the clinical highlights/issues include" and then

23   there's a section called "Dosing."

24       Do you see that?

25   A.   Yes.  I read that.

1    Q.    He says:  "While the once-daily dosing study described in

2    the attached appears to have been successful, it is worth

3    noting that this study was done with the same formulation as

4    the BID studies.  The PK doesn't clearly support once-daily

5    dosing and the potential hazards of higher peaks and lower

6    troughs raises some potential concern."

7        Do you see that?

8    A.    Yes.  I see that.

9    Q.    And then, if we go down, it says:  "Based on all of the

10    dose issues above, I believe it will be most prudent to take at

11    least two active doses into Phase III and, if there's a strong

12    desire to test OD dosing, possibly three.  While they have

13    clearly considered this, they seem to be leaning to a single

14    dose mostly out of concern for feasibility and cost."

15        Do you see that?

16    A.    That's what it says.

17    Q.    Were Dr. DiBattiste's comments ever provided to you?

18    A.    I cannot recall that.  At the time, I was a secretary or a

19    logistics manager of due diligence and there was no reason

20    within my responsibility to ask clinical questions or to

21    evaluate clinical documents.

22    Q.    It was common for you to be the conduit of information

23    back and forth between the companies involved in the due

24    diligence, your contacts at J & J, and then you would forward

25    the information to your colleagues at Bayer and vice versa,

1  correct?

2  A.   I was something like an air traffic controller; that is, a

3  lot of documents went through my desk, back and forth.

4       MR. BIRCHFIELD:  Do we want a stretch break?

5       THE COURT:  Okay.  Why don't we all stand up, members

6  of the jury.

7            How much longer do we have?

8       MR. BIRCHFIELD:  About 20 minutes, Your Honor.

9       THE COURT:  Okay.  All right.

10           (Brief pause in the proceedings.)

11           (Videotape played.)

12  Q.   You agree that Bayer's goal was to get Xarelto to market

13  as soon as possible so that the competitor oral anticoagulants

14  would not have a marketing advantage?

15  A.   I do not agree.

16  Q.   Let me show you what we'll mark as Exhibit Number 30.  And

17  that is Record Number 1283671, Bates BPAG_03628480.  It's an

18  e-mail chain involving yourself and Tao Fu and Arndt Brandes

19  and some others.

20  A.   I'd need some time to read it through.

21  Q.   Okay.  So you can see that the e-mail starts with an

22  e-mail from Arndt Brandes to Tao Fu where he attached a

23  development plan to go along with the collaborative development

24  and license agreement.

25           And then Tao Fu responds, if you look with me on the third

1    page of this document.  And if you look with me, it says:

2    "Dear Arndt."

3         And if you look with me at the second paragraph, it says:

4    "I think it will be important for the two clinical teams to

5    have a discussion about the development plan.  Our impression

6    is that the timeline in your plan for 2006 is aggressive."

7         Do you see that?

8    A.   This is what it says.  Yes.

9    Q.   Okay.  And Arndt Brandes says:  "We need to discuss items

10   1 through 3 with our potential partner Apollo next week."

11        Apollo was the code name for J & J during this due

12   diligence process?

13   A.   I cannot remember for sure.  Might be.  Might not have

14   been.

15   Q.   Think it was, since he's forwarding an e-mail from someone

16   at J & J?

17   A.   If the context is that way, then what you said can be

18   right.

19   Q.   Okay.  Arndt Brandes says to you and your colleagues,

20   "It's going back to clinical trial design (minimization of

21   risk) and expectation by us to partner in terms of resources."

22        Do you see that?

23   A.   Yes.  I can see that.

24   Q.   Okay.  And so then, if we go back to the first page of the

25   e-mail chain and Arndt Brandes' e-mail to you and Frank

1    Misselwitz and Joerg Moeller, when he says:  "It's going back

2    to clinical trial design (minimization of risk)," he's not

3    talking about minimizing the risk to patients, is he?  He's

4    talking about minimizing the risk that the study will not

5    succeed to be able to get Xarelto approved and deciding on a

6    trial design that will make it more likely that Bayer and

7    Janssen will have success, correct?

8    A.    No, this is not right.  I'm not in agreement with what you

9    said.  I do not know what Arndt Brandes meant in 2005 with

10   this, and I do not wish to speculate on this.  So if you'd like

11   to know what he meant back then, you would have to go back to

12   him and ask him.

13   Q.    But you keep Frank Misselwitz and Joerg Moeller in the

14   group, right?

15   A.    Frank Misselwitz is CC'd and Joerg Moeller, together with

16   Josef Schöneseiffen and Kemal Malik are the ones this e-mail is

17   addressed to.

18   Q.    So you e-mail your colleague and say, "Dear colleagues,

19   next week the team is involved in further preparations for the

20   FDA type C meeting and the preparational meetings for the OD

21   BID decision (CDPrc/DP3).  Additionally, next week the CDPrc

22   for the treatment program is scheduled.  We had this week two

23   'accidents' on the project.  This was the timing of the

24   structured request to the DSMB of the 11223 study (group

25   comparison OD 40 milligrams versus BID 20 milligrams) and the

1  date for the 'stat tables available' for the Einstein study.

2  From my point of view, these accidents have could have been

3  avoided, structured request or at least brought up earlier

4  'stat tables available' if the clinical team would have had

5  sufficient time/resources to focus on the operational sides of

6  the project.

7       "It is clear that the request of Apollo is important for

8  the further contract negotiations and potential relationship

9  building, but we have now to be clear that we are cutting

10  resources on the operational side of the project with a high

11  risk that project quality is suffering (...and I see the two

12  'accidents' as clear prealert for this).

13       "I assume that we have to give the Apollo request

14  priority.  Please inform me if this should be wrong.  Hence, I

15  will start organizing to set up the requested meetings for the

16  further Apollo interaction.  Regards, Bernhard."

17       That's what you told your colleagues back on

18  September 25th, 2005, right?

19  A.    This is what it says here, yes.

20  Q.    I show you what we'll mark as Exhibit Number 35.  It's

21  Record 873308, Bates 01476447.  And you send an e-mail to

22  several people at Bayer on April 29th of 2005, the subject

23  being "Due diligence Pfizer Xa."

24  A.    Yes, I see the document, and I need some time to quickly

25  see through it.

1    Q.    Okay.

2    A.    Yes, I briefly read through this.

3    Q.    Okay.  So you tell your colleagues at Bayer on April 29th,

4    2005:  "Dear colleagues, please find enclosed the official

5    feedback of ICL on our due diligence with Pfizer.  I think this

6    DD was special."

7         Moving to the second page:  "The world's biggest pharma

8    company in terms of revenues challenged the team on their

9    expertise on our Factor Xa inhib, BAY 59-7939.  We experienced

10   a situation where several disciplines from the potential

11   partner were represented by a clear numerical majority in

12   respect to us.  We got from Pfizer the feedback that we managed

13   the questions and the process highly professional.  You can be

14   proud of this.  I think the learnings for our project triggered

15   by the questions of Pfizer this time did exceed what the DDs

16   before provided us.  Special thanks to those who are currently

17   under 'full steam' in the preparation of the end of Phase II

18   meeting with the FDA, thus bringing forward both the DDs and

19   the EOP2 meeting preparations.  Thanks, regards,

20   Bernhard Glombitza."

21        That's what you said in your e-mail to your Bayer

22   colleagues, correct?

23   A.    This is what it says.

24   Q.    And your e-mail that you sent was forwarding an e-mail

25   that you received from Arndt Brandes on April 28, 2005,

1    correct?

2    A.    Looks like it, yes.

3    Q.    And Arndt Brandes' e-mail says:  "Dear gentlemen," to you

4    and several others.  "This is to inform you that we have

5    finished today due diligence on our Factor Xa with Pfizer.

6    While it is now the fourth time we did this, it's still

7    noteworthy that everything in terms of organization went very

8    well.  In comparison to the other DDs we have performed so far,

9    it certainly was the most challenging one we experienced.

10   Pfizer sent 21 people being experienced in doing due diligence.

11   To satisfy their needs was challenging, but I think again the

12   team made a very good job in convincing them about the promise

13   of our Xa."

14        Do you see that?

15   A.    This is what it says.

16   Q.    And that was the goal of these DD meetings, right, to

17   convince these potential partners that rivaroxaban had promise

18   for development, right?

19   A.    The objective of the due diligence was to find a partner.

20   Q.    Mr. Brandes goes on and says:  "Pfizer was not prepared to

21   give us a preliminary feedback on the result of the performed

22   DD as the others were willing to do.  However, they promised to

23   officially return to me on that by mid of next week.  Offline,

24   Bernhard Glombitza and I were told that no show-stoppers have

25   been identified.  However, some missing pieces of

1    information/studies and unclarities may add risk to the

2    project."

3        Do you see that?

4    A.   This is what it says.

5    Q.   Can you tell me what Pfizer told you offline were the

6    unclarities that would add risk to the rivaroxaban project?

7    A.   I cannot remember that.  Neither can I remember whether --

8    or that Pfizer's questions were pointing at a risk of the

9    project.  This text was written by Arndt Brandes, and if you

10   have any questions regarding the text, you should pose these

11   questions to him.

12   Q.   At the end of the day, Pfizer did not move forward on due

13   diligence with rivaroxaban and Bayer, and ended up developing

14   and marketing with another company, a competitor Factor Xa

15   inhibiter, apixaban, right?

16   A.   I know that Pfizer entered into a cooperation with BMS

17   regarding apixaban.  I do not know or cannot say whether this

18   due diligence here is connected to that cooperation.  You would

19   have to ask Pfizer.  The due diligence is connected with this

20   cooperation on apixaban.

21   Q.   I'll show you what we'll mark as Exhibit 38 and 39.  38 is

22   an e-mail, Record 1751116, BPAG_04357421, and 39 is Record

23   1751117, Bates BPAG_04357422.

24   A.   Yes, I've got the document in front of me, and allow me to

25   scan it briefly.

1    Q.    So, if we look at these draft meeting minutes from

2    April 27th, Pfizer also raised several issues for Bayer to

3    comment on.  Let's look at a few of those.  If you look with me

4    on Page 2, and then they also ask, if you go down with me, the

5    second question says:  "Please comment on the woman with very

6    high plasma concentration of BAY.  Do you have a ceiling

7    effect?"

8    A.    Yes, this is what it says here.

9    Q.    If you look with me on the bottom of Page 2, Pfizer asked,

10   "Is there an increase of exposure in elderly volunteers when

11   BAY is administered with food"?

12   A.    This is what it says here, yes.

13   Q.    And then if you can turn with me over to the last page, it

14   says:  "Have you tried to correlate PK to safety or efficacy?"

15        Do you see that?  Or maybe it's the next to last page.

16   Next to last page?

17   A.    Yes, I can see that.

18   Q.    And then if you look with me just under there, Pfizer asks

19   the question, "Do you take blood samples when an event occurs?"

20   Do you see that?

21   A.    Yes, that's what it says here.

22   Q.    And then it also asks, "Is bleeding an SAE," right, the

23   next question?

24   A.    Yes, this is what it says here.

25   Q.    So if we look -- as we looked at Exhibit -- I guess it was

1    39 -- is that right -- as we looked at 39 and the draft minutes

2    of the Pfizer due diligence meeting that Harold Kallabis sent

3    to you, "Pfizer raised issues in that meeting related to the

4    food effect, increased exposures in elderly with food, whether

5    Bayer had correlated PK to safety or efficacy and whether Bayer

6    took blood samples for events.  Do you recall that in that

7    document?

8    A.    I do remember what we've just read.

9    Q.    Dr. Glombitza, at some point Bayer and Johnson & Johnson

10   decided to move forward with pursuing the ACS indication.  Do

11   you recall that?

12   A.    Yes, I do remember that there was a decision for

13   continuing with the ACS indication, which means developing the

14   ACS indication further.

15   Q.    And did you, in fact, work on the ACS indication and the

16   ATLAS TIMI study program as part of your duties at Bayer?

17   A.    At that point in time, I was responsible for cost

18   timelines and the facilitation of the team.  Clinicians would

19   want to design this study and the clinicians were also part of

20   my team, the team I facilitated.

21   Q.    Let me show you what we'll mark as Exhibit Number 40,

22   which is record number 4618220, and it's minutes from

23   April 7th, 2008 of something called DevCo.

24   A.    Yes.  I just need a moment to briefly scan the document.

25   I have now taken a quick look at the document.

1    Q.    And if you look with me, according to these DevCo 04/08

2    meeting minutes, you're listed as a guest of the meeting, along

3    with Frank Misselwitz.  Do you see that?

4    A.    That's not entirely correct.  I was a guest along with

5    Frank Misselwitz, Ian Talmage, Stephan Wirtz, Andrea Derix,

6    Harold Kallabis.  That's what I read here.

7    Q.    Okay.  So let's turn over to Page 3.  It says at the top,

8    "All slides presented are stored in the DevCo team room and

9    will be made available in GlobeDoc with the final minutes."

10         Is that your recollection, that documents related to the

11   development committee meetings were kept in a team room?

12   A.    The documents from the development committee were kept,

13   but I do not recall whether they were kept in the team room or

14   in GlobeDoc.  I don't remember the kind of system that was

15   used.  But they were kept for sure.  That is -- I remember

16   that.  But it was not my task to deal with this.  It was the

17   task of those organizing the DevCo.

18   Q.    So according to this Section 1 is "Rivaroxaban, ACS

19   presentation."  It says:  "Frank Misselwitz and

20   Bernhard Glombitza presented the status of the project.  DevCo

21   members were made aware of the fact that the presented data are

22   strictly confidential as they relate to an ongoing, still

23   blinded trial."

24         If you follow down with me, it says:  "Main results in

25   terms of safety show that:  Rivaroxaban dose dependently

1   increases the rate of TIMI major and minor bleeding and

2   clinically significant bleeding.  The risk of bleeding appears

3   to be higher for OD versus BID dosing regimens for any given

4   total daily dose or strata.  Rivaroxaban total daily dose of 5

5   milligrams and 10 milligrams appear to be the most suitable for

6   study in Phase III based on bleeding data.  Main efficacy data

7   show that:  Considering the 5 milligram total daily dose and 10

8   milligram total daily dose panels, the BID dosing regimen

9   continues to outperform OD dosing.  This is true in both strata

10  (aspirin only and aspirin plus thienopyridine); enriching for

11  higher-risk patients increases the placebo event rate, and

12  preserves rivaroxaban's effect.  Both 2.5 milligram BID and 5

13  milligram BID dosing regimens present a positive net clinical

14  benefit, whereas the 10 milligram OD particularly on background

15  treatment with aspirin and thienopyridine does not provide a

16  positive net clinical benefit."

17       Do you see that?

18  A.   Yes, this is what it says here.

19  Q.   And so in April of 2008, was the ROCKET trial still

20  ongoing?

21  A.   I don't recall exactly, but it is possible, but I don't

22  recall.

23  Q.   You understood that the ROCKET study had studied Xarelto

24  for AFib patients with an OD dosing, correct?

25  A.   As far as I remember, that is correct.  The ROCKET study

1   had the OD regime.

2   Q.   Did you tell Frank Misselwitz or anyone at that time that,

3   hey, maybe we ought to go do some more Phase III studies for

4   our other indications comparing BID to OD based on these

5   results from the TIMI 46 dose-finding study in ACS?

6   A.   Dose selection and dose findings were the responsibility

7   of the clinicians and their decision, and it was not my task to

8   tell the clinicians what kinds of doses to use.  So I can

9   answer this question very clearly by saying no.

10  Q.   You called yourself an air traffic controller earlier.

11       Shouldn't an air traffic controller speak up when they see

12  potential danger?

13  A.   I said that I was the project manager, the project leader,

14  and, as such, responsible for costs, timelines and team

15  facilitation.  My task was not to assess -- to scientifically

16  assess clinical data.

17  Q.   Dr. Glombitza, let me show you what we'll mark as

18  Exhibits 41 and 42, which is Record Number 4622236,

19  BPAG_33708397, and then Exhibit 42 is 4622237, which is Bates

20  33708398 -- 399.  I'm sorry.  399.

21       Okay.  So in Exhibit 41, you e-mail on March 31st, 2008,

22  Stephan Wirtz, along with Frank Misselwitz, Harald Kallabis and

23  Ian Talmage, this ACS board of management PowerPoint that's

24  attached as Exhibit 42, and you make a comment regarding

25  modification of Slide Number 6 and taking out the 285 --

1    $280 million case; is that right?

2    A.    What I read here is that a presentation was attached that

3    was supposed to be shown at the marketing board of management

4    on ACS.  And I comment in this e-mail -- and this comment isn't

5    entirely clear to me when I look at it now -- but I comment on

6    somebody having apparently taken out a case, and I don't know

7    whether this was done deliberately or whether it was just a

8    coincidence.

9    Q.    And then the next thing you said in your e-mail was:  "The

10   rest looks good to me."  Right?

11   A.    That's what it says here.  Yes.

12   Q.    So let's look at Exhibit 42, 4622237.  And this is a

13   PowerPoint entitled "Xarelto/rivaroxaban ACS Phase III, BSP

14   Board of Management, April 2, 2008," and it says "Draft" on the

15   bottom, correct?

16   A.    That is what it says.  Yes.

17   Q.    Okay.  And if we turn to the next slide, it says:

18   "Purpose of Presentation.  To gain Board of Management approval

19   to proceed in preparing Phase III in ACS."  Correct?

20   A.    That's what it says.  Yes.

21   Q.    If we turn to the next slide, it says:  "ACS Secondary

22   Prevention Strategically Strengthens Our Competitive Position

23   in SPAF."  Correct?

24   A.    That's what it says here.  Yes.

25   Q.    And the first bullet point says:  "Among all indications

1    that are in development for Xarelto, strong prevention in

2    atrial fibrillation (SPAF) is the most value creating

3    indication."

4         Do you see that?

5    A.    That's what it says.  Yes.

6    Q.    And the next bullet point says:  "ACS secondary prevention

7    will be synergistic to SPAF."  Correct?

8    A.    That's what it says.  Yes.

9    Q.    Okay.  Now, if you'll turn with me -- that's Slide 1, 2,

10   3 -- Slide 5, the top of this page says:  "In ACS Phase III two

11   BID doses will be tested to optimize the benefit-risk profile."

12        Do you see that?

13   A.    Yes.  I can read that here.

14   Q.    Okay.  So then, if we turn to the backup slides, if we go

15   to slide number 10, the PowerPoint asked the question:  "Why

16   twice daily dosing regimen?"

17        And the first bullet point says:  "Data-driven decision:

18   Data from our extensive Phase II study demonstrated improved

19   safety profile and superior efficacy of the BID dosing regimen

20   compared to the OD dosing regimen at the same total daily

21   dose."

22        Do you see that?

23   A.    I see that.  Yes.

24   Q.    It also says:  "On top of aspirin or aspirin plus

25   thienopyridine (e.g., Plavix), there is a relative limited

1    safety margin to add a potent anticoagulant.  Therefore, much

2    smaller doses have to be used compared to Xarelto monotherapy

3    in VTE prevention."

4         Do you see that?

5    A.   Yes.  I see that.

6    Q.   Do you think that people that have AFib may take aspirin

7    or Plavix, too?

8    A.   This is a medical issue.  I'm not a medical expert and,

9    therefore, cannot make a statement on this.

10   Q.   Let's look at the next slide.  It says:  "Why two active

11   arms?"  If you look with me at the bottom bullet point, it

12   says:  "In order to optimize the overall treatment effect while

13   maximizing safety, the ACS ATLAS Phase III study shall study

14   two Xarelto doses.  This also helps mitigating the risk of a

15   failed trial with unacceptably increased bleeding risk."

16        Do you see that?

17   A.   Yes.  You read it out correctly.

18   Q.   Let me show you what we'll mark as Exhibit Number 43,

19   which is an e-mail, Record Number 4629259, Bates BPAG_33752979.

20        So this is an e-mail, at the top, from you to Frank

21   Misselwitz, Scott Berkowitz, Martin van Eickels and Nancy Cook

22   Bruns on December 7th, 2011, I think.

23        And it says -- "Thoughts on how we might handle Xarelto in

24   AF patients to develop an ACS event" is the subject line.  And

25   you say, "I spoke to Troy.  J & J wants to be silent in terms

1   of giving a recommendation in the label.  In the medical Q&A

2   they like to refer to guidelines and physicians'

3   judgment.....seems to be a fairly pragmatic approach -- by sure

4   not ideal, but it looks like best way in-between (until we have

5   data).  Regards, Bernhard."  Correct?

6   A.   This is what it says.

7   Q.   Okay.  And you're responding to Frank Misselwitz's e-mail

8   to Scott Berkowitz, on which you're copied, in which he said

9   that he agreed with the statement that the AF strokes are, of

10  course, cardioembolic, unlike most of the strokes in the ACS

11  setting.

12      He says:  "I actually also agree with a label that remains

13  silent in terms of giving a recommendation.  I feel that

14  educational activities are more important.  In the absence of

15  data, I would not want to make a particular dose

16  recommendation.  Even if we intuitively feel that the

17  2.5-milligram BID dose may be okay in this setting -- we have

18  no data to substantiate a firm recommendation.  Best regards,

19  Frank."

20      That's what you were responding to, correct?

21  A.   Looks like it.  Yes.

22  Q.   And if we look down below, Scott Berkowitz e-mailed Frank

23  Misselwitz and copied you and others.  And he said, if you look

24  kind of halfway through, "The safest course is to either

25  recommend continuing Xarelto for AFib with appropriate

1    conversion to another anticoagulant (I would expect ACS

2    patients would be put on LMWH)" -- low molecular weight

3    heparin -- "or to be silent as the approved U.S. package insert

4    for SPAF currently is."  Right?

5    A.    This is what it says.  Yes.

6    Q.    So based on information that you and Frank Misselwitz had

7    presented to the development team on, I think, the -- just in

8    April of 2008 regarding the TIMI 46 Phase II ACS study that

9    showed that bleeding risks were higher in the people taking a

10   once-daily dose and that any doses above 10 milligrams total

11   daily dose had excessive bleeding, the folks at J & J and Bayer

12   thought it would be better to just stay silent and let AFib

13   patients just continue to take Xarelto at a 20-milligram total

14   daily dose when Bayer and J & J know that people taking those

15   high doses at once daily have an excessive risk of bleeding?

16   A.    I'm not a doctor, and I cannot assess this question; that

17   is, I cannot say "yes" or "no" because I'm not a technical

18   expert here.

19       But what I see here in the sequence of these documents is

20   that, regarding ACS, there must have been additional data

21   between April 2008 and 2011 and they must have been considered

22   in the clinical assessment.

23       So 2008 and 2011 are only difficult -- are not comparable.

24   It's difficult to compare these two years.  But, as I said, I'm

25   not a clinical expert here.

1    Q.    The most important thing for Bayer was to protect the SPAF

2    indication, right?

3    A.    This is a very general statement.  And in this context it

4    has to be defined what you mean by important.

5    Q.    You agree that approval for the SPAF indication created

6    the -- laid the groundwork for Xarelto to be a successful brand

7    for Bayer, right?

8    A.    I'm not a marketing expert for Xarelto, and I left the

9    project in 2012.  But one thing is certain, that the SPAF

10   indication is a very interesting indication because it benefits

11   a large number of patients.

12         But other indications are also important because they also

13   benefit a large number of patients.  So I cannot subscribe to

14   the statement in such a general term or general way.

15   Q.    Okay.  And as we've seen before from the other exhibits,

16   the ACS indication and the ATLAS study was studying BID dosing

17   for Xarelto in that indication, right, twice-daily dosing?

18   A.    That's what I remember.  Yes.

19   Q.    We also saw in documents that it was the once-daily dosing

20   for AFib that would provide a competitive advantage for Xarelto

21   in the marketplace, right?

22   A.    The once-daily dose is a great -- offers a great benefit

23   to patients and it increases patient compliance.  And this

24   leads to a situation that patients are better protected against

25   the disease, and this means more patients take it.  And this

1    then also leads to a situation where more of the drug is

2    bought.

3    Q.    So you were concerned that the BID dosing -- the

4    twice-daily dosing issues coming out of the ATLAS ACS program

5    could potentially damage the SPAF indication, weren't you?

6    A.    I cannot confirm this because I cannot remember that I

7    ever issued this concern.

8    Q.    Let me show you what we'll mark as Exhibit Number 45,

9    which is 4628940, Bates BPAG_33751442.   4628940.   It's an

10    e-mail from you, Bernhard Glombitza, on November 8, 2011, to

11    several people with the subject line being "Update ATLAS

12    Release and Q&A."

13        Do you see that?

14    A.    Yes.   I see that.   And I need a moment to read the e-mail.

15    Q.    So you e-mail Alex Siedler and you say:   "Dear Alex, reads

16    nicely.   One 'last' observation -- I was just reading the SPAF

17    US approval media coverage and then the ATLAS draft release.

18    What did make me stumble is that in the ATLAS release we

19    mention fairly often the 'Twice Daily' (especially in the first

20    paragraph where we don't need it, as it is mentioned in the

21    study section).   The SPAF media coverage is 'hammering' the

22    once-daily.   The question is how far we want to stress now the

23    BID in ATLAS messaging wise."   Right?

24    A.    This is what it says here.   Yes.

25    Q.    According to Exhibit 49, you e-mailed this PowerPoint

1    to -- I think it was Ursula Kroh; is that right?

2    A.    This is what I can read here.

3    Q.    Okay.  If you can just look with me at the fourth slide, I

4    want to ask you -- this slide says "First VTE indications are

5    premarketing indications.  Stroke prevention in AFib is the

6    major indication in the planned future."

7         Down at the bottom it says:  "A delay of the submission of

8    VTE indications will jeopardize this premarketing investment

9    and the second submission of the AFib package."  Right?

10   A.    This is what it says here.

11   Q.    Let me show you what we'll mark as Exhibit Number 51 and

12   52.  51 is 887358 and it's an e-mail from you to Joerg Moeller,

13   Frank Misselwitz and Tiemo-Jeorg Bandel on June 15, 2005.  And

14   you are forwarding some attachments, including the 5/6/17 MC

15   Factor Xa inhibitor BAY 59-7939 final.ppt file, correct?

16   A.    This is what I can read here, yes.

17   Q.    So then if we look at Exhibit 52, the PowerPoint was

18   attached.  It's titled "Factor Xa Strategy Update."  Can you

19   see that?

20   A.    This is what I can read here.

21   Q.    Okay.  Now, if you could just look with me at Slide 10,

22   and this slide says:  "Why Starting with Orthopedic Surgery - A

23   Commercially Less Attractive Indication."

24        And if you look with me, the bullet points below that

25   say, "Regulatory:  Paves the way for the commercially important

1    AFib indication."  Do you see that?

2    A.    This is what I can read here.

3    Q.    Good afternoon, Dr. Glombitza.

4    A.    Good afternoon.

5    Q.    Dr. Glombitza, are you a pharmacologist?

6    A.    No.

7    Q.    Dr. Glombitza, are you a cardiologist?

8    A.    No.

9    Q.    Dr. Glombitza, are you a toxicologist?

10   A.    No.

11   Q.    Dr. Glombitza, are you a nephrologist?

12   A.    No.

13   Q.    Dr. Glombitza, are you someone who runs and analyzes

14   clinical trials?

15   A.    No.

16   Q.    Could you take Exhibit 4 out, please.  Dr. Glombitza,

17   Exhibit 4 is an e-mail exchange between you and Kemal Malik.

18   Do you see that?

19   A.    Yes, I see that.

20   Q.    Dr. Malik, at the bottom of the exhibit, the first e-mail

21   he asked you whether you knew when the once-daily decision for

22   Xarelto was made.  Do you see that?

23   A.    I see that, yes.

24   Q.    Do you recall Mr. Overholtz asking you a series of

25   questions about that decision?

1    A.    I do recall that, yes.

2    Q.    Do you see in Exhibit 4 that you responded to Dr. Malik by

3    telling him that the once-daily dosing decision was made in

4    June of 2004?

5    A.    Yes.  This is what it says here.

6    Q.    Can you explain to the jury what once-daily dosing

7    decision was made in June of 2004?

8    A.    The decision from June 2005 -- and this is something you

9    can see in the presentation that we discussed yesterday and

10   that is part of the exhibit, the decision of June 2005 about OD

11   was not the decision to submit -- to make a submission for

12   approval, nor was it a decision to start a Phase III study with

13   OD.

14         As you will see from the presentation that is part of the

15   exhibits, this presentation shows that the decision was a

16   decision to test the OD indication in additional studies, to

17   test it in a broader way.

18   Q.    Dr. Glombitza, in your answer you referred to the decision

19   from June 2005.  Were you intending to say 2005 or 2004?

20   A.    I actually misspoke.  I meant to say 16th of June 2004,

21   just as it is written in this e-mail.

22   Q.    And what was the state of that decision moving into the

23   end of 2004 and 2005?  We've seen during Mr. Overholtz's

24   examination during the questions he was asking you, we've seen

25   other documents that he referred you to in 2004 and 2005 that

1    discussed a once-daily dosing decision.  What was the status of

2    that decision in 2004 and 2005?

3    A.    In 2004, the Phase II studies had not finished yet.  A

4    decision regarding the start of a new Phase II study was

5    imminent, the databases was very limited, and as I've described

6    before, it was the decision to study OD more broadly in

7    additional studies.  It was not a decision to submit OD for

8    approval or to launch it.  It was the decision to look at BID

9    and OD in a broader manner.

10          MR. BIRCHFIELD:  Your Honor, that concludes the

11   deposition.  I apologize for my estimate of the time.  I was

12   off there.

13          THE COURT:  That's all right.  Sure.  Okay.  Let's take

14   a ten-minute break and then we'll come back with the other

15   witness.  Let's take a ten-minute break.

16          THE COURTROOM MANAGER:  All rise.

17                    (The jury exited the courtroom.)

18                     (Court is in recess.)

19          THE COURTROOM MANAGER:  All rise.

20                    (The jury entered the courtroom.)

21          THE COURT:  Be seated, please.

22              Call your next witness.

23          MS. JEFFCOTT:  Yes, Your Honor.  Plaintiffs call

24   Dr. Francisco Cruz.

25          THE COURT:  Come forward, sir.

```
 1              THE COURTROOM MANAGER:  Step on up, sir.  If you need
 2      to use this at all, there's a stylus.
 3                   Before you sit, let me swear you in.
 4              (WHEREUPON, FRANCISCO CARLOS CRUZ, M.D., was called as
 5      a witness, and having been duly sworn, testified as follows:)
 6              THE COURTROOM MANAGER:  Please have a seat.  And state
 7      and spell your name for the record.
 8              THE WITNESS:  My name is Francisco Carlos Cruz.  Spell
 9      it?
10                   F-r-a-n-c-i-s-c-o.  Carlos is C-a-r-l-o-s.  And
11      Cruz, C-r-u-z.
12                           DIRECT EXAMINATION
13      BY MS. JEFFCOTT:
14      Q.   Good morning, Dr. Cruz.  Or I guess I should say good
15      afternoon or good day.
16      A.   Good morning.
17      Q.   Would you please tell the jury what kind of doctor you are
18      and where you practice.
19      A.   I'm a board-certified nephrologist, which is a kidney
20      specialist, as well as an internist.  And I practice primarily
21      at Touro, but also at Ochsner Baptist Hospital here in
22      New Orleans.
23      Q.   Dr. Cruz, could you pull the mike a little bit closer to
24      you.
25      A.   Yes.  Okay.
```

1    Q.    And my understanding, Dr. Cruz, is that you treated

2    Mrs. Orr about a year and a half before her intraventricular

3    bleed; is that right?

4    A.    That's correct.

5    Q.    And we met a week or so ago to talk about your treatment;

6    is that correct?

7    A.    Yes.

8    Q.    And you also had a deposition taken in this case where

9    both sides got to ask you questions about your treatment of

10   Mrs. Orr?

11   A.    Correct.

12   Q.    Now, before we get into that treatment of Mrs. Orr, I kind

13   of just want to go through your qualifications and your

14   background a little bit and -- starting with your education.

15         I understand that you're a Tulane alum; is that right?

16   A.    I am.  That's correct.

17   Q.    And did you go to Tulane med school?

18   A.    I did, as well.

19   Q.    And what years did you attend Tulane?

20   A.    Undergrad was from 1990 to '94 and then med school was '97

21   through 2000 and then the residency came after that.

22   Q.    Now, Mrs. Orr, Sharyn, she was a student advisor during

23   that time and actually up until her intraventricular

24   hemorrhage.

25         Did you know her then?

1    A.    No.  I don't believe so.

2    Q.    You only knew her in your professional capacity as her

3    doctor?

4    A.    That's correct.

5    Q.    And if I understand correctly, you did your residency at

6    Tulane?

7    A.    I did, from 2000 to 2003, and then a fellowship from 2003

8    to 2005.

9    Q.    Did your fellowship specialize in any particular

10   condition?

11   A.    The fellowship was in kidney disease, which would involve

12   some transplant as well.

13   Q.    And following your fellowship, did you sit for any board

14   examinations, board certifications, what have you?

15   A.    Right.  So after the internal medicine residency, you sit

16   for a board exam, which is a national board.  And then in

17   fellowship -- after you finish and accredit for fellowship, you

18   have to sit for another board exam just to be qualified to

19   practice.

20   Q.    So what board certifications do you hold?

21   A.    Internal medicine and nephrology.  Those usually need to

22   be updated every ten years or so, and I just retook it two

23   months ago.

24   Q.    Was it hard?

25   A.    Yes.

1    Q.    And if you wouldn't mind, what's actually the difference

2    between internal medicine and nephrology?

3    A.    Internal medicine is more what you would consider primary

4    care.  You study a little bit about everything so you know

5    enough about the heart and the kidneys and the lungs to take

6    care of your patients.  But when it gets a little more

7    advanced, you usually see a specialist.

8          So that's what my capacity is as a kidney specialist, is

9    to handle patients who are a little bit beyond what the

10   internists usually can handle.

11   Q.    So you get to see both sides, really, the early phases and

12   then later on when you need the additional support?

13   A.    Correct.

14   Q.    So in your practice now, where do you spend, I guess, the

15   majority of your time, nephrology versus internal medicine?

16   A.    I spend the majority in nephrology.  I inherited a

17   practice that had a lot of internal medicine in it.  So I do

18   that from time to time.  I probably spend 60 percent of my time

19   in nephrology and the rest in internal medicine.

20   Q.    So in your practice as a nephrologist, what are some of

21   the common conditions that you treat?

22   A.    The most common cause of kidney disease is high blood

23   pressure and diabetes.  So I take care of a lot of folks that

24   have those problems.  It tends to run a course to a point where

25   the kidneys fail, and then dialysis is a treatment that we

1     provide.

2         Kidney disease also can be because of certain medications,

3     heart disease, heart failure, and then some immunologic

4     diseases that are rare, but I have a few patients with those.

5     Q.    So the first two conditions that you mentioned were

6     diabetes and high blood pressure, which is also known as

7     hypertension?

8     A.    Correct.

9     Q.    So diabetes and hypertension, those are prevalent

10    conditions in American adults across the United States

11    population.  Is that fair?

12    A.    Yes.  Very common.

13    Q.    And can you estimate, I guess, what percentage of American

14    adults have hypertension?

15    A.    I don't know that I can say.  In this town in my patient

16    population, 70 percent have hypertension and probably at least

17    60 percent have diabetes.

18    Q.    And by "this town" you mean New Orleans?

19    A.    Right.  We tend to -- our diets are a little different

20    than the national diet here, a little more salt, a little more

21    carbohydrates, alcohol, et cetera.  So that can tend to cause

22    obesity and other factors that cause kidney disease.

23    Q.    So we like our good food?

24    A.    We do.

25    Q.    And in terms of your patient population and really

1    speaking more toward the hypertensive population, can you

2    estimate about the percentage that remain uncontrolled?

3    A.    So it's a struggle nationwide to have blood pressure

4    controlled.  We are sort of rated by insurance companies as to

5    whether we can do this -- and graded, I should say.

6         The studies I've seen is about 60 percent of the people

7    are controlled, maybe less in certain places.  Very few

8    physicians have 70 or 80 or even 90 percent adequate control in

9    their patients.

10   Q.    So when we talk about control, can you break that down a

11   little bit.

12   A.    So the goals are to have -- blood pressure has a systolic

13   component, which is the top number, a high number, and a

14   diastolic component, which is the bottom number.

15        We try to get people with low-risk factors under 140 over

16   90, and people with some other risk factors we try to even get

17   it lower than that, 130 over 80.

18        And then age plays a factor as well.  Someone who doesn't

19   have a lot of medical problems, we tend to let their blood

20   pressure be a little higher, maybe 150s over 90s.  Those are

21   the goals, anyway.

22   Q.    Now, in terms of the controlled versus uncontrolled, is

23   there like a bright line in terms of patient population?  So is

24   the goal always to have, for example, 140 under (verbatim) 90?

25   A.    It is the goal, but there are some caveats.  If you check

1   someone's blood pressure in the office and it's, let's say,

2   150 over 90, that may be someone you want to treat.

3         But if their blood pressures at home are better and you

4   give them a medicine, then at home they are going to be too low

5   and they may pass out.

6         So the one reading we get in the office usually isn't

7   enough information to act on.  But I would say that, for most

8   patients, we try to achieve less than 140 over 90 at home.

9   Q.    So your goal is -- in treating patients that have high

10  blood pressure, it requires involvement on the part of the

11  patient to make sure that they're maintaining that at-home

12  blood pressure range?

13  A.    Right.  I ask that my patients monitor their blood

14  pressures at home, which means they should buy a blood pressure

15  cuff.

16        I also discuss diet extensively just about every visit, a

17  low-sodium diet, and I check their blood work to see if they're

18  on a low-sodium diet because the medicines won't work if the

19  patient isn't doing what they're supposed to do.

20  Q.    Now, in your practice, is it common to see patients that

21  have high blood pressure, diabetes and kidney disease?

22  A.    Yes.  Those three commonly occur together.

23  Q.    Is there some sort of interaction that make them come

24  together?

25  A.    Our diet, weight, age.  They sort of mix together to sort

1    of have a perfect storm to cause kidney problems.  High-salt

2    diets, high-fat diets or even high-sugar diets can lead to an

3    increase in blood pressure and diabetes.  And those factors,

4    even if controlled, can lead to kidney disease.

5    Q.    And do other factors like genetics sometimes play a part?

6    A.    Yes.  Absolutely.  Family histories and, also, probably

7    resistance to certain medications.

8    Q.    So in treating a patient that has kidney disease, do you

9    also have to treat the other aspects, the diabetes, the

10    hypertension?

11    A.    Yes.  In my practice, I have a nurse practitioner that

12    helps me control people's diabetes.  It's very difficult in a

13    30-minute session or a 45-minute session with the patient to

14    cover everything at every visit.  So my nurse practitioner sort

15    of takes over on the diabetes side of things a lot of times.

16    Q.    Now, at this point, I kind of want to shift focus and go

17    towards your treatment of Mrs. Orr.

18          Now, how did she come to be a patient of yours?

19    A.    Her cardiologist, Dr. St. Martin, referred her to me for

20    the evaluation of high blood pressure and kidney disease.

21    Q.    And I'm going to hand you a binder of documents and things

22    that we are going to go through as we talk today.

23          MS. JEFFCOTT:  Your Honor, may I approach?

24          THE COURT:  I'm sorry?

25          MS. JEFFCOTT:  May I approach the witness?

1      THE COURT:  Yes, you may.  Get closer to the mike if

2  you're going to be speaking low.

3  BY MS. JEFFCOTT:

4  Q.   Doctor, if you wouldn't mind turning to the first tab --

5  actually, the second page of the first tab.  And, Doctor, if

6  you look at this record, it's dated August 20th, 2013.

7      Is this the first record of your care of Mrs. Orr?

8  A.   Yes.

9  Q.   And, really, before we get into -- delve into this record,

10  I kind of want to set the stage a little bit.

11      When you first do an initial visit with a patient, do you

12  ask them a series of questions about their medical history?

13  A.   Yes.

14  Q.   And did you do that with Mrs. Orr?

15  A.   Yes.

16  Q.   And did she tell you that she had a 20-plus-year history

17  of hypertension and a 15-year-or-so history of diabetes?

18  A.   Yes.

19  Q.   And is it common in your practice to treat patients that

20  have 20-plus years of hypertension and diabetes?

21  A.   Yes.  Most of the time, when they're referred to me by

22  their internist, it's because the diabetes and the high blood

23  pressure has been there for a certain amount of time, usually

24  10 to 15 years, and by then it starts to affect the kidneys.

25  Q.   And for Mrs. Orr, prior to coming to you, had these

1  conditions, her diabetes and hypertension, been treated by

2  other physicians?

3  A.   Yes.  Her primary care, Dr. Cummings.

4  Q.   So you weren't the first doctor to treat her on this?

5  A.   Correct.

6  Q.   So in addition to asking her questions about her medical

7  history, did you also do a physical examination, check her

8  vitals?

9  A.   Correct.  Yes.

10  Q.   And are those vitals -- is that examination put in this

11  record?

12  A.   It is.

13  Q.   And looking at this record --

14       MS. JEFFCOTT:  And, Carl, if you can pull up...

15            And this record is Record Document 5769165.134.

16  And, Your Honor, I'd like to offer this into evidence as

17  Plaintiffs' Exhibit Number 56.

18       MR. DUKES:  No objection, Your Honor.

19       THE COURT:  Let it be admitted.

20  BY MS. JEFFCOTT:

21  Q.   And, Dr. Cruz, looking at this record, the first thing

22  that draws my eye is the blood pressure reading of 190 over 90.

23       On paper, would you consider that to be a high reading?

24  A.   Yes.

25  Q.   Wouldn't a reading this high -- could that be considered a

1    hypertensive emergency?

2    A.    Only if the patient had symptoms.  So if she was

3    complaining of headaches, shortness of breath, chest pain,

4    nausea, those types of things, then, yes.

5    Q.    And in this instance, did she have those?

6    A.    No.

7    Q.    And do you recall if she told you generally how she felt

8    on that visit?

9    A.    I don't recall the visit exactly.  Per my note here, she

10   didn't have any complaints.  I generally ask about those things

11   that I just mentioned.

12        And the review of systems, which is on the right-hand

13   side, the ROS, has some basics, no chest pain, no fevers, no

14   chills, no burning with urination, rashes, things like that.

15   So she was feeling well that day.

16   Q.    And then, if we look further down the page, there is an

17   area -- let's see.  Turn this off.  Her hypertension, right

18   there.

19        And there is -- the "HTN" stands for "hypertension,"

20   right?

21   A.    Correct.

22   Q.    And beside you have a dash that says "white coat

23   syndrome."

24        What do you mean by that?

25   A.    Some people, when they are excited or nervous, especially

1  in the doctor's office, they don't know what the physician is

2  going to say or why they're there sometimes, and their blood

3  pressure can tend to be elevated.  But it's a transient thing.

4  It only happens in the office or in other places that people

5  can get nervous.

6      And so I was making a note to myself that the patient --

7  maybe that 190 over 90 wasn't real, maybe it was just white

8  coat syndrome, something that occurred in the office that day.

9  Q.    So is that a fairly common syndrome?

10  A.    It is.  It is.  And, in general, I don't jump straight to

11  changing medicines or treating unless they are symptomatic with

12  that number.

13  Q.    So 190 over 90, how do you verify that this is actually

14  white coat syndrome?

15  A.    I ask the patient to use their home blood pressure cuffs

16  to check blood pressures in the morning and in the afternoon

17  for a couple of weeks and then bring me back that information

18  so that I can review it.

19      I also ask them to bring their cuff with them so that I

20  can make sure that the cuff is working properly.  And that's

21  how I determine that.

22  Q.    Is that what you meant right -- I think that says:  "Home

23  BP log" and the check?

24  A.    Yes.  Correct.

25  Q.    Now, I think you said you asked Mrs. Orr, Sharyn, to bring

1    in her home monitoring logs.

2         And did she do that?

3    A.   Yes.

4    Q.   I'd like for you, if you could, please, turn to Tab

5    Number 2.

6         Now, what this is, Doctor -- Tab Number 2 is a series of

7    two records, one record dated from October 1st and the other

8    from October 23rd, and sandwiched in between are handwritten

9    notes.

10        Do you see that?

11   A.   Yes.

12   Q.   And, Doctor, do those reflect the records -- accurately

13   reflect the records that you kept for Mrs. Orr on those dates?

14   A.   Yes.

15        MS. JEFFCOTT:  Your Honor, I'd like to admit these

16   records as Exhibit Number 57.

17        MR. DUKES:  No objection, Your Honor.

18        THE COURT:  Let it be admitted.

19        MS. JEFFCOTT:  And this is Record Document

20   Number 5769165.129.

21   BY MS. JEFFCOTT:

22   Q.   Now, Dr. Cruz, on the screen here are those home blood

23   pressure monitoring that Sharyn did; is that correct?

24   A.   Yes, it is.

25   Q.   And from reviewing these, what can you determine about her

1    home monitoring?

2    A.    She did as I asked.  She checked her blood pressures in

3    the mornings and in the afternoons and gave me a range.  Looks

4    like in August and in September they were in the 140s over 80s

5    to 90s, and in October about the same, 140 over maybe 90s.

6    Q.    And it also looks like getting from the August down to the

7    October that she was progressively improving; is that fair?

8    A.    Yes.  In the August numbers she had a 176 reading and a

9    few higher 140s, whereas in October she had some 130s even.

10   Q.    I see you mention the 176 reading there.  And it says

11   right next to that -- is that "salt"?

12   A.    Right.  I asked patients also if they get a high reading,

13   tell me why they think they got a high reading.  Was it their

14   diet, was it something that happened in their life or sleep,

15   something that they can maybe attribute it to that's helpful to

16   educate.

17   Q.    Although it's out of season, it could have been crawfish,

18   but I see it's too late for that.

19   A.    Could have been anything.

20   Q.    Well, and so in looking at these and just doing an

21   average, is it fair to say that at home, her blood pressure

22   readings were on average 140, 145 over 90?

23   A.    Yes.

24   Q.    And in comparing that to the blood pressure reading that

25   she had in your office, which was 190 over 90, these home

1    readings are far better?

2    A.    Right.  It makes me less alarmed and less worried when I

3    see these sorts of numbers because I know I don't have to be

4    more aggressive in treating her blood pressure.

5    Q.    And in a patient like Mrs. Orr with these readings, how

6    would you characterize her blood pressure?

7    A.    Not at goal.  I would say that they were uncontrolled, but

8    I don't think these numbers put her at a danger for stroke.  I

9    think for heart disease over time, these numbers would put you

10   at a higher risk of heart disease.

11   Q.    Now, at this time, Doctor, I would like to show you a

12   demonstrative that we put together.  What we did is we took all

13   of the blood pressure readings at your office, not the home

14   ones, just the ones at your office.

15        Now, in looking at this graph, this point, those are the

16   readings from your office on that first day, which is

17   considerably high.  Now, in reviewing -- it might be easier if

18   I use the pointer.  So those are readings that are initially

19   high.  And then on the next few visits -- each one of those

20   points are visits.

21   A.    Okay.

22   Q.    Okay.  And so on the first few visits her blood pressure

23   was high, right, in your office?

24   A.    Yes.

25   Q.    But now, comparing it to those home blood pressure

1    readings where you said 140 over 90, that puts it down here, or

2    actually right there, if I can get it straight.

3    A.    Yes.

4    Q.    And in terms of just general blood pressure control, does

5    that make you more comfortable as a nephrologist?

6    A.    Yes.

7    Q.    Now, it appears that just looking at this chart, I think

8    what I'll do is mark 140 here and do it.  I'm not great at

9    straight lines.  Now, it appears from just kind of looking at

10   this chart and over the period of time, we have the dates here,

11   so you have starting in September 2013 through almost

12   September 2014 that her blood pressure was fairly controlled.

13   Is that an accurate statement?

14   A.    Yes.

15   Q.    So it would be inaccurate to state, if anyone were to

16   state that Sharyn's hypertension was uncontrolled for the

17   20-plus years that she had it?

18   A.    Correct.

19   Q.    Now, I'd like to go back here -- I hate to skip around.

20   Go back to Tab Number 1 to that initial visit.  Now, as part of

21   your referral from Dr. St. Martin, he asked that you evaluate

22   Sharyn for kidney disease; is that right?

23   A.    Yes.

24   Q.    In the record here, what does that say, first off?

25   A.    It says:  "CKD Stage 3."

1    Q.    So would you explain to the jury what "CKD" means?

2    A.    Chronic kidney disease.

3    Q.    So I take it by saying Stage 3 that there are multiple

4    stages of kidney disease?

5    A.    Yes, 1 through 5.

6    Q.    And would you explain to the jury what those various

7    stages are?

8    A.    So Stage 1 means that the kidneys are working in a range

9    between, let's say, 90 and 100 percent.  I use the word

10   "percent," but "GFR" is probably a better term.  GFR is

11   glomerular filtration rate.  It just means how well the kidneys

12   are cleaning the blood, but we'll just use the percentages.

13        So 90 to 100, Stage 1, nothing too bad there.  Stage 2 is

14   from 60 to 90.  Stage 3 is from 30 to 60, and then Stage 4 is

15   15 to 30, and then Stage 5 is under 15 percent kidney function,

16   and those people are either on dialysis or about to be on

17   dialysis.

18   Q.    And you mentioned GFR.  Could you explain that?

19   A.    So, one of the things the kidneys do are to remove the

20   impurities in the blood, and we can measure how well the

21   kidneys do that by measuring the blood levels called

22   creatinine, and creatinine tells us how well the kidneys are

23   functioning.

24   Q.    And can you break down the actual GFR creatinine per

25   stage?

1    A.    So, as I mentioned earlier, the GFR is the way we measure

2    kidney function, and so Stage 1 would be a GFR of 60 to 100.

3    Q.    Hold on one second.

4          MS. JEFFCOTT:  Your Honor, may I approach and write

5    this down on the board?

6          THE COURT:  Yes.

7    **BY MS. JEFFCOTT:**

8    Q.    I'll get you to repeat yourself.

9    A.    Sure.  So Stage 1 is a GFR of 90 to 100 and --

10   Q.    So in terms of creatinine, how did that measure up?

11   A.    It varies, depending on the size of the person and their

12   gender and even race, but in general, I would say that a

13   creatinine of less than 1 to 1.2 would probably be in that

14   stage.

15   Q.    And then if you could, what exactly is creatinine?

16   A.    Creatinine is a by-product of muscle breakdown.  We all

17   make creatinine every day just by living, and our body -- our

18   kidneys get rid of that creatinine through the urine, so it's

19   easy to measure, it's inexpensive, and it gives us an idea.  If

20   the kidneys are able to get rid of all the creatinine, then the

21   level is low.  If the kidneys can't get rid of all the

22   creatinine, then the creatinine level goes up.

23   Q.    And so for Stage 1, going back, that means that your

24   kidney function is at 90 to 100 percent, right?

25   A.    Yes.

1    Q.    I will do that.  Can y'all see that?

2          All right.  For Stage 2?

3    A.    It's 60 to 90 percent.

4    Q.    All right.  And then what would the GFR be for that?

5    A.    Same.  These are going to be the same.  The percent and

6    the GFR are going to be the same.  We use percent just because

7    people understand that better than they do GFR.

8    Q.    And then for creatinine clearance per stage?

9    A.    So the creatinine will be -- in that stage, again,

10   depending on the size of the person, but maybe up to a

11   creatinine of 1.4.  It depends on the person.

12   Q.    And I think you actually corrected me, so creatinine is

13   different from creatinine clearance?

14   A.    Right.

15   Q.    Will you explain the difference to the jury?

16   A.    So creatinine is actually what we measure in the blood.

17   It's a lab test.  The blood goes into the machine and spits out

18   a number.  That's creatinine.  And creatinine clearance, we

19   need a 24-hour urine for that, and what we determine is how

20   much of that creatinine that's in the blood is actually getting

21   into the urine, and so it's a percent, I guess.

22   Q.    And to calculate creatinine clearance, you need to know

23   the patient's weight?

24   A.    You need to know -- yes.  Well, you need to know how much

25   urine they produced during that day, you need to know what the

1    creatinine in the urine was, and you need to know the

2    creatinine in the blood, and those are the main factors.

3           Now, GFR is a surrogate for creatinine clearance.  It's

4    very similar.  You practically get the same numbers, but you

5    don't need to do a 24-hour urine.  So for GFR, the computer

6    spits out what it thinks the creatinine clearance is.  It uses

7    age.  It uses weight.  It uses gender.  It uses sometimes

8    protein level and the creatinine.  It puts it into a formula

9    and it gives us an answer, and we use that because it's a lot

10   easier than asking people to do 24-hour urine creatinine

11   clearances all the time.

12   Q.    So we've gone through Stage 1, now Stage 2.  Let's move to

13   Stage 3.  My understanding is that there's two Stage 3s; is

14   that right?

15   A.    Yes.  We break it into A and B.

16   Q.    Okay.  So Stage 3a, what percent is that?

17   A.    So, 40 to 60 would be Stage 3a.

18   Q.    And the GFR would be 40 to 60?

19   A.    Right.

20   Q.    And then the creatinine clearance or creatinine?

21   A.    The creatinine there, now we're talking about 1.5 to --

22   and again, if you're a big, strong football player, you have a

23   lot of muscles, you have a lot of creatinine.  It could be 2,

24   2.0, but again, it depends on the person.

25   Q.    I'll put a little squiggly.  It depends.

1    A.    Right.

2    Q.    Stage 3b?

3    A.    That's 30 to 40.

4    Q.    Okay.

5    A.    And the creatinine is about the same.

6    Q.    Okay.  And then Stage 4?

7    A.    15 to 30 percent.

8    Q.    And creatinine?

9    A.    Again, about another half a point above that, so we're

10   talking about 2 and a half sometimes.  Again, it depends.

11   Q.    So for 3b it would be 2, so for Stage 3?

12   A.    Right.

13   Q.    And then for Stage 4, the creatinine would be 2.5, give or

14   take?

15   A.    That's a good rough number, yeah.

16   Q.    Then the final stage, Stage 5, would that be 0 to 15?

17   A.    Correct.

18   Q.    And would the creatinine be 3?

19   A.    Yes, about.

20   Q.    And so obviously Stage 5 is the worst?

21   A.    Correct.

22   Q.    And does it have another name other than Stage 5?

23   A.    End-stage renal disease.

24   Q.    And what about Stage 4?

25   A.    It doesn't have another name, no.

1  Q.   And so Mrs. Orr, in looking at the various stages, it says

2  Stage 3.   In terms of breaking it out, do you recall whether it

3  was Stage 3a or Stage 3b?

4  A.   I believe Stage 3a, and I'll have to look at my notes to

5  know.  If you like, I can look through my records.

6  Q.   Sure.

7  A.   So her kidney function varied quite a bit.  It depends on

8  the medications you are taking, the diuretics that you're

9  taking.  In October, her GFR was actually about 50 percent,

10  which puts her in 3a, and then shortly thereafter, maybe

11  January of 2014, her kidney function was about 46 percent, so

12  getting closer to 3b, yeah.

13  Q.   So somewhere between Stage 3a and 3b when you initially

14  began seeing her; is that fair?

15  A.   Correct.  Yes.

16  Q.   Now, why is it important to know where a patient is in

17  these various stages?

18  A.   When we hit Stage 3a or b, there are more complications

19  that occur, patients become anemic, their blood count lowers,

20  becomes less.  They are more fatigued sometimes.  They stop

21  producing certain hormones, and then certain glands in their

22  body called parathyroid glands become overactive.

23      So when you see someone who has a creatinine in that range

24  and their GFR is in that range, you start looking for anemia,

25  parathyroid problems, vitamin deficiencies, things like that.

1    Q.    Now, is knowing where a patient is in these stages of

2    kidney disease important also for purposes of prescribing

3    medication?

4    A.    Yes.  Certain medications should not be used when the

5    kidney function is decreased.

6    Q.    And why is that, Doctor?

7    A.    So, some medicines build up and they can't be removed.

8    Many medicines are removed by the kidneys or by the liver, and

9    so if the kidneys don't work very well, they don't get rid of

10   the medicine, and so you don't want a buildup of medicine.

11   Q.    And so if you have too much, if your body doesn't

12   metabolize particular medicine, you could have too much of that

13   medicine in your body?

14   A.    Yes.

15   Q.    And that could cause unintended consequences?

16   A.    Yes.

17   Q.    Now, turning back to the record, underneath CKD Stage 3 it

18   says -- your handwriting is sometimes challenging, but I think

19   it says:  "Nephrotic syndrome"?

20   A.    It does, that's correct.

21   Q.    Okay.  And, Doctor, could you explain what that is?

22   A.    Nephrotic syndrome is when a person has an excessive

23   amount of protein in their urine.  Most people have less than

24   150 to 150 milligrams of protein in the urine, and at the time,

25   I believe she had 3,000 milligrams of protein in the urine, so

1    we label that nephrotic syndrome.  It can be caused by a number

2    of different things.  It usually also causes swelling in the

3    legs, a low protein level, and high cholesterol, sort of a

4    grouping of those three or four things that we call nephrotic

5    syndrome.

6    Q.    Now, between hypertension, the diabetic neuropathy and

7    then the kidney disease, those are multiple conditions that you

8    were treating with Mrs. Orr?

9    A.    Yes.

10   Q.    Now, do each of those conditions require their own unique

11   medication?

12   A.    Yes.

13   Q.    And are there instances where a medication for, say, the

14   nephrotic syndrome could be used also to alleviate blood

15   pressure issues?

16   A.    Yes.

17   Q.    So there is overlap in terms of the medications?

18   A.    Correct.

19   Q.    Now, are there multiple medications out there to treat a

20   condition like blood pressure?

21   A.    Yes.

22   Q.    Are there lots of medications?

23   A.    There are many categories of medications, meaning five or

24   six that I can think of offhand, and in each category there are

25   10, if not 20 medicines in each category to treat them.

1    Q.    So you are talking about dozens upon dozens of

2    medications?

3    A.    Absolutely.

4    Q.    And can those medications be used together to treat a

5    patient?

6    A.    Yes.

7    Q.    And do some medications work better than others in a

8    patient?

9    A.    Yes.  Some are stronger than others.  Some will work

10   better for certain populations.  African-Americans tend to

11   respond better to certain medications that Caucasians don't.

12   Q.    And so is part of your job as a nephrologist to come up

13   with a tailored medication plan for a patient?

14   A.    Yes.

15   Q.    Now, given that you have, you said just for blood pressure

16   alone, dozens upon dozens of medications, where do you get your

17   information about the drugs that you prescribe to patients?

18   A.    Most of it for the older drugs came from training and from

19   just book knowledge.  Nowadays, when new medications come out,

20   we use certain computer programs that are available and that

21   you can have on your phone to tell you side effects of

22   medicines.

23   Q.    Is one of those computer programs UpToDate or Epocrates?

24   A.    I use both of those.

25   Q.    And could you describe what those are?

1    A.    Epocrates is -- you can pay to subscribe or it's free,

2    depending on how much information you want.  For me I just use

3    it for medication so I can type in the name of medicine that

4    I'm not sure of or I don't know the side effects.  It will show

5    me the medicine, show me the pill size, the pill colors.  A lot

6    of times patients say, "It's the little while pill."  So I can

7    show them, "Is it this little white pill?"

8         Then it tells me the doses and what it's indicated for.

9    Back when I first started training, this didn't exist and we

10   had just had a big old text, a *PDR*, that you had to flip

11   through.

12        That one I use on a daily basis.  The up to date is -- it

13   is available on the phone as well, but it's more reading.  So I

14   don't use my phone so much for that.  I use my computer.

15        And that is a paid service and use that a few times a

16   week, depending on if I have a challenging patient or not.

17   Q.    You mention *PDR*.

18        What does that stand for?

19   A.    *Physician's Desk Reference*.

20   Q.    It's a thick book, right?

21   A.    Yes.

22   Q.    So for guides like Epocrates or *PDR*, do you know where

23   they get their information?

24   A.    I would imagine from the FDA's evaluation of the product

25   and what the drug company has to prove.  It usually has

1    information about how the medicine is metabolized, what the

2    dosing is, side effects -- most common side effects.  That's

3    mostly what I can recall.

4    Q.   What I'd like to do now is jump forward in time a little

5    bit with your treatment of Mrs. Orr just about a year.  And if

6    you could, please go to Tab 4.

7         Now, during this year, so from August to -- now we are in

8    September of 2014, you saw Mrs. Orr -- you saw Sharyn a number

9    of times; is that right?

10   A.   Yes.

11   Q.   And also during this time Sharyn was switched from Pradaxa

12   to Xarelto; is that right?

13   A.   Yes.

14   Q.   And who switched her?

15   A.   Dr. St. Martin, I believe.

16   Q.   And just putting Xarelto aside, would you and

17   Dr. St. Martin communicate about various treatments that you

18   were doing with patients like Mrs. Orr?

19   A.   Yes.

20   Q.   And so would you tell Dr. St. Martin if you were making an

21   adjustment to a medication or if you had run lab work,

22   something like that?

23   A.   Yes.  I would fax him some information or talk to him on

24   the phone.

25   Q.   Now, during this year -- and I'm skipping over a large

1    part for purposes -- to save time.

2        But I also want to make mention that, during that year,

3    Mrs. Orr did suffer some health issues; is that right?

4    A.    Yes.

5    Q.    And if we could look on this record dated September 10th,

6    is this an accurate record, Dr. Cruz, of your encounter with

7    Mrs. Orr?

8    A.    Yes.

9        MS. JEFFCOTT:  Your Honor, I'd like to admit this

10   document, Plaintiffs' Exhibit Number 58.

11       MR. DUKES:  No objection, Your Honor.

12       THE COURT:  Let it be admitted.

13       MS. JEFFCOTT:  And this is Record Number 5769165.105.

14   **BY MS. JEFFCOTT:**

15   Q.    And, Doctor, at the very top of this record it says "SP

16   AFib."  Is that what that stands for?

17   A.    Yes, SP.

18   Q.    Doctor, can you explain what that says.

19   A.    Sure.  "SP" means "status post," meaning the person just

20   went through something, is just getting over something.

21       "AFib" is "atrial fibrillation," which is a condition

22   where the heart beats rapidly.

23       "CHF" is "congestive heart failure."

24       So this patient just left Baptist Hospital -- or not

25   just -- but maybe a few weeks prior left Baptist Hospital,

1  where she was being treated for atrial fibrillation and heart

2  failure.

3  Q.   And then, underneath that, what does that say?

4  A.   So status post, again, she just also had -- "B" is

5  "bilateral."  Pleural effusion means there is fluid built up

6  around the lung and it was drained.

7       So she was in the hospital at Baptist for atrial

8  fibrillation and heart failure and, during that time, she had

9  fluid drained from around one or both lungs.

10 Q.   And, Doctor, would you consider that to be a significant

11 hospitalization?

12 A.   Yes.

13 Q.   And during that hospitalization, was Mrs. Orr's dosage of

14 Xarelto reduced?

15 A.   It was stopped prior to the removal of fluid from the

16 lung.  You have to put a pretty big needle in the lung.  And we

17 want to try to do everything we can to minimize bleeding.  So I

18 know it was held, and I believe it was restarted at a lower

19 dose when she was discharged.

20 Q.   And what was your understanding of why her dosage was

21 reduced?

22 A.   Her kidney function had declined some.  She went into

23 Stage 4 kidney disease, which means the kidneys are not able to

24 process certain medicines as they used to.  And so the dose was

25 decreased from 20 to 15 milligrams.

1    Q.    In fact, if we look a little bit lower down in your

2    record, there, does that stand for -- right there.   CKD

3    Stage 4, is that what you mean by Stage 4?

4    A.    Yes.

5    Q.    I'm going to mark it on here.

6          So at Stage 4 -- now, based on our chart here --

7    Mrs. Orr's kidney function was only at about 15 to 30 percent;

8    is that right?

9    A.    That's correct.

10   Q.    Now, in response to this, you have a statement right here.

11         Would you mind explaining to the jury what that says.

12   A.    So when kidney function declines into the fourth stage of

13   kidney disease, a discussion needs to be had -- and it's a

14   lengthy discussion -- about the future and the chances of

15   someone's kidneys failing to the point they need dialysis seems

16   to be right around the corner.

17         People can progress fairly quickly from Stage 4 to Stage 5

18   and I need to have a plan in place.   There's two different

19   kinds of dialysis, and they are very different from each other.

20         So I discuss the two different types of dialysis for her

21   to be thinking about and talking to her family about in case

22   the kidneys failed completely.

23   Q.    And what are the two different kinds of dialysis?

24   A.    So it was PD, which is peritoneal dialysis, and hemo,

25   which is hemodialysis.   PD does not involve blood and

1    hemodialysis does involve blood.

2    Q.    Is that the basic difference between the two?

3    A.    Yes.   PD, the patients do it at home at night while they

4    sleep, and they do it every night.   So it's labor-intensive and

5    they have to be trainable and be competent.   It's usually for

6    people who either don't have transportation to dialysis or have

7    more active lifestyles and they want their days free.

8         Hemo, or hemodialysis, patients will have a surgically

9    implanted tube in their arm, and they will then show up to

10   dialysis three days a week, same time every schedule, Monday,

11   Wednesday, Friday, and the nurse will remove blood, clean it,

12   give it back.   And that's how that dialysis is done.

13        So they are pretty different.

14   Q.    So, with PD, the dialysis is more in control of the

15   patient?

16   A.    Absolutely.

17   Q.    How would the patient do the dialysis at home?

18   A.    So a catheter, which is a tube, is placed in the abdomen

19   by the surgeon.   And that tube is not connected to anything in

20   particular.

21        There's a space in the abdomen around the intestines,

22   around the stomach, that nothing occupies that space.   So we

23   train our patients to clean the catheter at night and then

24   connect themselves to some fluid that we provide to them.

25        That fluid then needs to be connected to a machine that

1    would pump the fluid into the abdomen.  It sits there for an

2    hour or two and then it drains.  And this happens while you

3    sleep.  But there are many steps that I left out.

4    Q.    And for your patients that require dialysis -- and I'm

5    going to call it PD --

6    A.    Yes.

7    Q.    -- is PD a treatment that you offer to all of them?

8    A.    Most everyone.  And there are very few reasons a person

9    can't absolutely have PD.  But, in my experience, you have to

10   be -- you have to be someone who understands and cares about

11   their health.

12        They have to take -- you know, you are basically taking

13   your own health into your own hands.  You have to show up to

14   multiple meetings for training.  You have to meet with the

15   peritoneal dialysis nurse.  You have to understand about

16   cleaning and cleanliness.

17        And so not everyone that I manage and help is able to do

18   those things or has the support system at home to do those

19   things.  So I would say I offer it to maybe half of the

20   patients that I see.

21        And of those that I offer it to, I would say maybe half

22   feel like they can do it.  So maybe 30 percent, 25 percent of

23   people that I offer -- or, you know, about 25 or 30 percent of

24   my patients are on peritoneal dialysis right now.

25   Q.    And did you consider Mrs. Orr to be a good candid for PD?

1    A.    Yes.

2    Q.    And why is that?

3    A.    Well, I asked her to do a lot of things during the time

4    that I saw her, and she always did those, as far as bringing

5    blood pressure readings in.

6          She always showed up to all her visits.  She usually came

7    with family.  So I knew she had good family support.  She was

8    active and she didn't have any limitations to being able to

9    perform PD.

10   Q.    And based on your treatment of Mrs. Orr, was she compliant

11   with her medications?

12   A.    Yes.

13   Q.    And were some of those medications taken twice a day?

14   A.    Yes.

15   Q.    Now, for patients that go on dialysis, do you have

16   patients that can continue to live meaningful lives?

17   A.    Yes.  Many times patients do better on dialysis.  Stage 4

18   and early Stage 5 people really start suffering.  Their

19   breathing isn't very good.  The acid levels build up in their

20   body.  They are less interactive with their family.  They

21   develop a lot of swelling.  And dialysis can reverse all that.

22   So yes.

23   Q.    And so, if I understand you correctly, some patients --

24   when they go on dialysis, it actually helps treat some of their

25   other conditions that they have?

1    A.    Correct.

2    Q.    And would that extend beyond say, edema, to blood

3    pressure?

4    A.    Blood pressure, definitely.  Heart failure, definitely.

5    When we remove fluid on dialysis, you are able to better

6    control those two diseases.

7    Q.    Now, have patients with conditions similar to Sharyn who

8    start dialysis, have they gone on to lead meaningful lives?

9          MR. DUKES:  Your Honor, objection.  Improper expert

10   opinion testimony by a treating physician.

11         MS. JEFFCOTT:  Your Honor, he gave a very similar

12   statement in his deposition.

13         THE COURT:  Well, let's get to a time where we can

14   stop, anyway.  It's around noontime.

15              Can we stop here?

16         MS. JEFFCOTT:  We can stop here.

17         THE COURT:  All right.  We'll stop here.  Come back at

18   1:15.  Court is in recess until 1:15.

19         THE COURTROOM MANAGER:  All rise.

20              (The jury exited the courtroom.)

21              (Court is in recess.)

22                        *  *  *  *

23                   REPORTER'S CERTIFICATE

24              I, Lanie M. Smith, CRR, RPR, Official Court
     Reporter, United States District Court, Eastern District of
25   Louisiana, do hereby certify that the foregoing is a true and
     correct transcript, to the best of my ability and

1   understanding, from the record of the proceedings in the
2   above-entitled and numbered matter.

3                                   _____/s/ Lanie M. Smith_____
                                    Official Court Reporter
4