1               UNITED STATES DISTRICT COURT
                EASTERN DISTRICT OF LOUISIANA
2
     ****************************************************************
3    IN RE:  XARELTO (RIVAROXABAN)
     PRODUCTS LIABILITY LITIGATION
4
                                      Docket No. 14-MD-2592
5    THIS DOCUMENT RELATES TO:        Section L
                                      New Orleans, Louisiana
6    *Joseph Orr, Jr., as Lawful*     Friday, June 2, 2017
     *Surviving Spouse of*
7    *Sharyn Orr v. Janssen, et al.*
     *Case No. 2:15-cv-03708*
8
     ****************************************************************
9
                TRANSCRIPT OF JURY TRIAL PROCEEDINGS
10       HEARD BEFORE THE HONORABLE ELDON E. FALLON
                UNITED STATES DISTRICT JUDGE
11               VOLUME IV - MORNING SESSION

12
     APPEARANCES:
13
     FOR THE PLAINTIFFS'          MR. ANTHONY BIRCHFIELD, JR.
14   LIAISON COUNSEL:             Beasley Allen Crow Methvin
                                     Portis & Miles
15                                Post Office Box 4160
                                  Montgomery, AL  36103
16

17                                MR. BRIAN H. BARR
                                  MR. NEIL E. McWILLIAMS, JR.
18                                Levin Papantonio Thomas
                                     Mitchell Rafferty & Proctor
19                                316 Baylen Street
                                  Suite 600
20                                Pensacola, FL 32502

21
                                  MR. GERALD EDWARD MEUNIER
22                                Gainsburgh, Benjamin, David,
                                     Meunier & Warshauer
23                                Energy Centre
                                  1100 Poydras Street
24                                Suite 2800
                                  New Orleans, LA  70163-2800
25

```
 1                              MS. EMILY JEFFCOTT
                                Lambert Firm
 2                              701 Magazine Street
                                New Orleans, LA  70130
 3

 4                              MR. BRADLEY D. HONNOLD
                                Bartimus, Frickleton,
 5                                Robertson & Goza, P.C.
                                11150 Overbrook Road
 6                              Suite 200
                                Leawood, KS 66211
 7

 8
        FOR THE DEFENDANT JANSSEN   MR. JAMES B. IRWIN, V
 9      PHARMACEUTICALS, INC.,      Irwin Fritchie
        and JANSSEN RESEARCH &        Urquhart & Moore, LLC
10      DEVELOPMENT, LLC:           400 Poydras Street
                                    Suite 2700
11                                  New Orleans, LA  70130

12

13      FOR THE DEFENDANT          MR. DAVID E. DUKES
        BAYER HEALTHCARE           Nelson Mullins Riley &
14      PHARMACEUTICALS, INC.,       Scarborough, LLP
        and BAYER PHARMA AG:       Meridian, 17th Floor
15                                 1320 Main Street
                                   Columbia, SC  29201
16

17                              MS. BETH A. WILKINSON
                                Wilkinson Walsh + Eskovitz, LLP
18                              1900 M. Street NW
                                Suite 800
19                              Washington, DC 20036

20

21      Official Court Reporter:   Lanie M. Smith, RPR, CRR
                                   500 Poydras Street, B-275
22                                 New Orleans, Louisiana 70130
                                   (504) 589-7782
23

24
             Proceedings recorded by mechanical stenography,
25      transcript produced via computer.
```

1                          **EXAMINATION INDEX**

2                                                          **PAGE NO.**

   CUONG BUI, M.D.
3
        Direct Examination by Mr. Honnold...........   742
4        Cross-Examination by Mr. Irwin..............   799

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          **P R O C E E D I N G S**

2              (FRIDAY, JUNE 2, 2017)

3               (MORNING SESSION)

4

5          THE COURTROOM MANAGER:  All rise.

6          THE COURT:  Be seated, please.

7              I'm sorry about not responding to your oral

8     argument yesterday.  I'm busy.  When I'm finished here, I've

9     got to get on with the rest of my docket.  So that's what I do

10    at nighttime.

11             But you-all are good lawyers.  So if you have

12    something to say, I always have time to listen to you.  So let

13    me hear from you.

14         MR. MEUNIER:  Thank you, Your Honor.

15             May it please the Court.  Jerry Meunier for the

16    Plaintiffs.

17             The question before you, Judge, is whether and

18    how the Defendant's failure to comply with the mandatory

19    disclosure requirements of Federal Rule 26(a)(2)(C) should

20    apply to limit the cross-examination of Mrs. Orr's treating

21    neurosurgeon, Dr. Bui.

22             And because jurors may be inclined to assign

23    greater weight to expert opinions of non-retained experts such

24    as treating physicians and because this provision was added to

25    Rule 26 seven years ago precisely in order to avoid the

1    prejudicial impact of previously undisclosed opinion testimony

2    by a non-retained expert such as a treating physician, we

3    regard the question before you as profoundly important and need

4    it to be resolved in order to safeguard a fair presentation of

5    the evidence here.

6              At the outset, I think it's important,

7    Your Honor, to distinguish what we're talking about and what we

8    are not talking about in the case of Dr. Bui.

9              As a treating physician whom this Court has now

10   recognized as one of the two learned intermediaries in this

11   LPLA warnings case, we obviously should learn from Dr. Bui

12   whether and how different warnings, different information,

13   about Xarelto would have altered his treatment decisions, his

14   conduct, in treating Mrs. Orr.  In simple terms, would he have

15   operated sooner?  We need to hear from him about that.

16             And the so-called causation prong of the learned

17   intermediary test requires that.  It's speculative, but it's

18   confined to his conduct to what he would have done as a

19   neurosurgeon.

20             It's a far different thing when he moves past

21   that question and solely as the treating physician of Mrs. Orr

22   is invited to opine about the outcome of the earlier

23   intervention, and that is what the focus of this motion is

24   about.

25             Just to make a further point on that, let me

1    refer to what the Court remembers about the Joe Boudreaux case.

2    Dr. Wong, the prescribing physician, was asked how his

3    prescription decision about Mr. Boudreaux might have changed

4    had he been given different warnings.

5           Dr. Wong was not asked whether he believed or, in

6    his opinion, whether Mr. Boudreaux would have bled anyway had

7    there been a different treatment.  We would have objected.  We

8    did object.  We never went there.

9           That's the area we're talking about in the case

10   of this treating neurosurgeon, who also happens to be a learned

11   intermediary.

12          Now, let's bring this down to the specifics about

13   Dr. Bui.  As the Court knows, he gave a deposition in June of

14   last year.  And it is true that, on Plaintiffs' behalf, counsel

15   Russell Abney, did pose a question to Dr. Bui.  This was his

16   question:  "And would doing it earlier" -- meaning the

17   surgery -- "have given her a better chance of having a

18   favorable outcome?"

19          Dr. Bui's response:  "I think that's a difficult

20   assessment.  I think that, in general, bringing down ICP

21   earlier is always better.  Now, as for her long-term outcome

22   after such a massive hemorrhage, that's uncertain."

23          That was the question asked by Plaintiffs'

24   counsel.  And it is attached, in fact, as one of the exhibits

25   to the Defendants' opposition.  They also have attached the ten

1  pages of transcript where defense counsel then sought to go

2  further and ask Dr. Bui more about his opinions, what would

3  have happened, et cetera, et cetera.

4          So you had a simple answer -- it's uncertain --

5  followed by a lot of cross-examination.  And I gather we'll

6  have a lot of cross-examination on the very question when

7  Dr. Bui appears, if the Court allows it.

8          And so, in perfect candor with the Court, we've

9  met with Dr. Bui.  We felt we had to meet with Dr. Bui to get

10 ready for trial.  That's been disclosed to the Defendants.  For

11 whatever reason, whether it's conversations he's had -- we

12 don't know.  And I'm certainly not suggesting any misconduct on

13 defense counsel's part.  But for whatever reason, he seems to

14 have evolved a bit in his attitude about outcome, and that

15 provokes this motion.

16         Now, you have heard the Defendants more than once

17 stand up and say, "Judge, we object.  That's a treating

18 physician opinion.  He's confined to what's in the record."

19 They did it with Dr. Cruz.  So we don't normally let treating

20 doctors go beyond the contemporaneously noted views that are in

21 a medical record.  And if they wish to do so, that's the very

22 purpose of Rule 26.

23         So let me now address -- and, by the way, Judge,

24 you have applied Rule 26.  It was a state trooper case, the

25 *Smith* case.  We cited it in our brief.  But you analogized that

1   to the treating physician situation.

2          Let me now, then, briefly address their three

3   reasons why they say we are wrong in seeking what we seek,

4   which, by the way, to be specific, is to seek a directive from

5   this Court that Dr. Bui is not to offer opinions about any

6   prospective outcome of earlier intervention treatment in this

7   case to the extent that those opinions have not been the

8   subject of Rule 26 disclosures of those opinions as being

9   offered by a non-retained expert witness.  So the Defendants

10  say three things, first, we opened the door and they drove a

11  truck through it.  They don't say they drove a truck through

12  it, but they say we opened the door.

13         Abney asked that question.  They say we're on

14  notice, we should have known better, whatever.  I want you to

15  know that all the questioning that -- followed by them

16  Mr. Abney objected to, made objections as to form.  Couldn't

17  give speaking objections.

18         Let me put the shoe on the other foot.  If the

19  Defendants have now learned that Dr. Bui, since his deposition,

20  is prepared to come into court and say, "You know what.  I

21  think I could have saved her.  Earlier intervention would have

22  made a difference in this case" -- if they learned that, they

23  would be standing up here invoking the Rule 26 disclosure rule.

24         And I don't think it's a question of open the

25  door and, therefore, they get the evidence.  That would be an

1   analogy that would work if we were saying that the testimony is

2   irrelevant.  We're not saying it's irrelevant.  We're saying

3   that Rule 26 safeguards against the jury hearing it without us

4   having been given a statement of not only the opinion, but the

5   facts supporting the opinion.

6              And so I want to now turn to one of their

7   arguments, which is they say we're not prejudiced because we

8   already knew about it.  And, again, I don't think it's a

9   question of whether we knew in advance.  I don't think it's

10  even a question of what we learned in meeting with Dr. Bui.  I

11  think it's a question of whether it's fair for the Defendants

12  on cross to unpack opinion testimony from him elaborating on

13  what would have happened if when it's not been the subject of

14  fair disclosure under Rule 26 ahead of time.

15             So let me now go to the final point they make,

16  which is, "Judge, we've complied with Rule 26.  Look what we

17  did."  Here's what they say was compliance with the rule.

18  "Judge, come on.  We repeatedly said -- it's like boilerplate

19  language.  Treating physicians may offer a mixture of fact and

20  opinion expressed in their depos and consistent with their

21  knowledge."

22             I don't know what this means.  It's so broad.

23  Let's compare this as a supposed disclosure on Dr. Bui in

24  particular with what the rule says.  And it is a mandatory

25  rule.  It's not the disclosure "should"; it says disclosure

1    "must" state the subject matter on which the witness is

2    expected to present evidence under one of the opinion rules of

3    the evidence rules and a summary of the facts and opinions to

4    which the witness is expected to testify.  That is nowhere

5    found in the boilerplate sentence of, "Okay.  Here's a

6    heads-up.  We're going to elicit opinion testimony or facts or

7    mixed questions of fact and law from every treating physician

8    in the case."

9            In fact, as I've stated, they've already stood up

10   and objected in Dr. Cruz's cross-examination and they've

11   objected in counter-designations to us venturing into opinion

12   testimony from treating physicians.

13           And so, Your Honor, this is a mandatory rule.

14   But, obviously, in *Smith*, you cited the factors that go into

15   whether the Court should exclude offered opinion testimony

16   which is in violation of the rule.  And there are several

17   factors, two which really matter to me in this matter -- should

18   matter in this case, I believe.

19           One is:  How important is the testimony?  And on

20   the other hand, how prejudicial is it?  On the importance

21   question, it would be disingenuous for me to say this is not an

22   important matter.  It is a very important matter.  What I will

23   say about importance is that there are other experts this jury

24   is going to hear from.  They are retained experts.  And this

25   jury is going to hear from those other experts on the question

1    of what if there had been earlier intervention.

2              And it won't be surprising to the Court to know

3    that there's a conflicting opinion about that.  That's why it's

4    so dangerous to us to bring in a treating physician as if,

5    "Aha, I was there.  I break the tie."  And that's the

6    prejudice.  There is severe prejudice to the Plaintiffs if

7    Dr. Bui, since his deposition in particular, has now had a

8    further evolution of his thought and will come in here and say

9    things that will make it known to this jury that his earlier

10   intervention would not have mattered, would not have been

11   significant.

12             And so we ask for the Court to prohibit Dr. Bui

13   from going there pursuant to the disclosure requirements of

14   Rule 26.  In the alternative, Your Honor, we ask that you

15   direct the witness and counsel that they are limited to

16   whatever Dr. Bui said about this in his deposition, treat that

17   as his expert report and do not let him on cross-examination

18   venture beyond and elaborate further on those matters.

19             Thank you, Judge.

20        THE COURT:  Thank you.

21             Let's hear from the other side.

22        MR. IRWIN:  Judge, the truth is always prejudicial,

23   depending on which way it goes.  And there's no doubt that this

24   testimony is relevant.  That's not the issue.

25             If the shoe were on the other foot, as Jerry just

1    mentioned, if Dr. Bui went the other way, Jerry suggested that

2    we would be filing this motion, which, in truth, tells us what

3    this motion is really all about.  It's dressed up as a

4    26(a)(2)(C) motion, but it's really a motion to strike this

5    evidence, is what it is.

6              And there's a huge difference between the cases

7    that they have cited to Your Honor and to us, and it arises out

8    of this fact.  They, and only they, have exclusive access to

9    this evidence.  We do not.  We never have.

10             They've had access to Dr. Bui.  They met with him

11   before the deposition on two occasions.  They've been able to

12   meet and talk with him after that deposition and before this

13   trial.

14             Evidently, Dr. Bui's opinion about causation

15   here, which was fully explored in the deposition that we'll

16   talk about in a minute -- I'm now understanding that that

17   opinion may be harder.  I don't know what Jerry just alluded

18   to.

19             But I do know this.  When he was asked that

20   question first by the Plaintiffs' lawyer, Mr. Abney, at the

21   deposition -- they noticed it.  They took it.  They were

22   entitled to take it first -- Dr. Bui said it was uncertain.

23             And they know that the burden of proof here on

24   this causation is their burden, and uncertain doesn't cut it.

25   And so it was nothing but appropriate for us to explore that

1    and make as much of it as we could.  That was our obligation to

2    our client and as defense lawyers.

3              And the further we explored that question that

4    Mr. Abney asked, the more it became clear in that deposition

5    that Dr. Bui felt no one could say that doing this 12 hours

6    earlier would have made any difference.

7              No one -- no one's testimony on this issue is

8    more important than the neurosurgeon who was there in the dark

9    of the night in the midst of this crisis trying to learn from

10   the family when the last pill was taken, trying to figure out

11   how long might this individual still be anticoagulated, trying

12   to make the judgments that Dr. Bui makes all the time.

13             He has brain bleeds, as he'll testify to,

14   Your Honor, with and without anticoagulants.  And this is a

15   complex decision that he must make, and he makes decisions like

16   this all the time about:  When do I do an EVD?  When might I do

17   a craniotomy?  When might I actually try to go in and try to

18   take out the clot?

19             This evidence from Dr. Bui about when he chose to

20   do this and whether or not he thought it might have made any

21   difference or could have made any difference is within the four

22   corners of everything he did and tried to do for Mrs. Orr.

23             It is not a stretch, it's not a reach, to ask

24   him, as they did, "Do you think it would have made any

25   difference?"

1            And he said, "I can't tell you that."

2            And that's the evidence that they seek to strike

3    in this case because it went the wrong way.  And nobody,

4    nobody, has better access to that truth than Dr. Bui, who does

5    not have a horse in this race.  He has not been retained by

6    anybody.

7            And, last of all, we have absolutely no access to

8    this evidence other than with the permission of the Court and

9    with Plaintiff counsel.

10           So, yes, did we do a disclosure?  We did the only

11   disclosure that we could do.  We disclosed to you under

12   26(2)(a)(C) (verbatim) or whatever the number is, in accordance

13   with his deposition, the exact opinions that are sought to be

14   elicited today.  The fact is that that's all we could do.

15           And every one of the cases, Your Honor, that

16   Mr. Meunier has cited in his brief, they all devolve to one

17   proposition, and that is surprise.

18           In the three or four medical cases -- and I'll

19   just touch upon them briefly.  The *Hooks* case.  This was Judge

20   Barbier's case.

21           It was a case where there was a -- there was mold

22   in a mobile home and the plaintiff, who had access to the

23   doctor -- plaintiff's only treating doctor, wanted to call an

24   ENT to testify about causation.  It was excluded because it was

25   a surprise to the defendant.  That's totally the other way

1    around.

2              It's not the Plaintiff here who's calling and we

3    seeking to exclude the testimony of their doctor.  It's the

4    other way around.  And that's exactly what -- why Judge Barbier

5    did what he did.

6              And he distinguished his decision because the

7    firm by -- referring to another case where there had been a

8    deposition that had been taken and had been disclosed to the

9    defendants.  Surprise is the whole question here.

10             Another case was Magistrate Bourgeois' case.  It

11   was a stuttering case involving the Americans with Disabilities

12   Act.

13             The plaintiff sought to call a doctor about

14   harassment and how the harassment was causing this issue with

15   stuttering.

16             And the magistrate said, "We will continue the

17   extended discovery deadline so the defendant can take the

18   deposition and take care of the surprise."

19             And the other cases say the same thing, Judge,

20   and I won't talk about the cases anymore.  But they all hinge

21   on surprise, and there is no surprise here.  And they hinge on

22   control, and they have the control.  We do not.

23             And, finally, as Mr. Meunier alluded to, they

24   asked this question.  The question they asked in the deposition

25   is:  "Would doing it any earlier have given her a better chance

1    of having a favorable outcome?"

2              He said:  "I think that's difficult."

3              How in the world are we, then, not entitled to

4    ask the same question that they sought to ask?  And, you know,

5    Judge, they actually -- when they were going to use this

6    deposition, when they decided that they were not prepared to

7    call Dr. Bui for whatever reason after they met with him and

8    didn't like it, when they decided, "We're not going to call him

9    live.  We're going to designate his testimony," they designated

10   that testimony.

11             They designated that very question that they will

12   now not let us ask.  They designated it in the designations

13   that they sent to us:  "And would doing it any earlier have

14   given her a better chance of a favorable outcome?"  They

15   designated that question.

16             And now that they're not designating and we have

17   forced their hand to make them call Dr. Bui, they don't want

18   that evidence coming in.  So what this really is, Judge, is a

19   motion to strike that evidence.

20        THE COURT:  Okay.  Give me a second first.

21             (Brief pause in the proceedings.)

22        THE COURT:  Okay.  This is an issue -- a significant

23   issue.  I give it great thought and take it seriously.

24             The Plaintiff intends to call the treating

25   physician, the surgeon, Dr. Bui, who decided to wait 10 to

1     12 hours before performing surgery on Mrs. Orr due to his

2     understanding that she was on Xarelto and it was necessary to

3     wait to allow Xarelto to get out of her system.

4            The Plaintiffs move to exclude the Defendant from

5     eliciting testimony from Dr. Bui about what would have happened

6     if Mrs. Orr had received earlier intervention.

7            The Plaintiffs' theory of liability, at least

8     with regard to Dr. Bui's actions or inactions, were really set

9     forth, outlined and discussed by them in the opening statement.

10           In the opening statement, the Plaintiffs

11     indicated the following:  Quote, Dr. Bui thought all he could

12     do was to wait because he didn't know that Mrs. Orr's normal PT

13     test meant that he could immediately go back to surgery.  He

14     didn't know because Bayer and Janssen didn't tell him the

15     truth.  They told him that he had to wait at least 24 hours

16     from the last use of the drug and that Sharyn's normal PT test

17     result was meaningless and he didn't need to consider it when

18     deciding whether or not to go back to surgery.

19           And they further say that, if Dr. Bui had been

20     told the truth, he could have immediately gone to surgery and

21     saved her life.

22           The last clause really sums up the Plaintiffs'

23     theory of liability regarding Dr. Bui:  He could have

24     immediately gone back to surgery and saved her life.

25           In the opening statement, the Plaintiffs say that

1    the essence of early intervention would have saved her life.

2    They now are calling the treating physician, Dr. Bui, and they

3    suggest that the Court should prevent the Defendants from

4    cross-examining the surgeon on what would have happened if

5    Mrs. Orr had actually received the surgery.

6               Plaintiffs say that before the Defendants can do

7    this, they first need to provide the Plaintiffs with an expert

8    report or at least some description, some designation alerting

9    them to this unexpected approach.  The Plaintiffs cite Rule 26

10   and also some of the notes in Rule 26, which flesh out that

11   aspect of the case.

12              It seems to me that the Plaintiffs opened this

13   whole area.  I mean, I got the specific impression in opening

14   statement, articularly delivered, meaningfully delivered, that

15   Dr. Bui delayed, and that it was his delay that caused this

16   untoward event.  In fact, even the family feels that way.  This

17   testimony that when the doctor found that she was on Xarelto,

18   he tightened up -- his whole approach changed.  He said,

19   "There's nothing we can do.  We have to wait."

20              So that seems to me that that's an important part

21   of their case.  They made that the focal point, the issue at

22   least with Dr. Bui.

23              Secondly, a deposition was taken in July of 2016,

24   about a year ago.  This has been on the table from the

25   standpoint of what Dr. Bui felt, how he felt, what he thought.

1    I don't see any surprise here.  I mean, the Plaintiffs knew

2    that that was an issue, that the treater is always an issue in

3    a case of this sort.

4                    And the third, it seems to me that the Plaintiffs

5    complain that the Defendants didn't give them an expert, a

6    report.  Well, Dr. Bui is the Plaintiff's treater.  The

7    Defendants can't give an expert report from the Plaintiff's

8    treater.

9                    If that's not unethical, which I think it is

10   under the medical rules, it's certainly contrary to the Court's

11   order.  I ordered in Order 28 that they couldn't hire -- the

12   Defendant -- their Plaintiff's expert.  They couldn't even talk

13   to him.  And so the fact that they didn't get a report, if they

14   had gotten a report, I would be fining somebody at this point

15   because that would be a violation of my order.  So I can't hold

16   the Defendant to a report when I'm the one that made the report

17   impossible.

18                    The comments that were made in the pleadings in

19   November of 2016, where the Defendant says that they reserve

20   the right to call the Plaintiff's treater and deal with them on

21   the testimony that they revealed in their depositions, if they

22   can't talk to the witnesses, the treaters, if they can't get a

23   report from the witnesses, the only evidence they have that

24   they can possibly use is evidence that they have obtained

25   through depositions.

1          I don't understand how they can do anything more

2     than that, than saying we're going to call the treaters or we

3     may call the treaters, and the areas that we're going to cover

4     with the treaters are what was covered in the depositions.

5          Now, ordinarily that wouldn't satisfy the

6     requirements of notice, but in a case of this sort, that's the

7     best that can be given, so it seems to me for multiple reasons,

8     it's unfair to restrict the Defendants in cross-examination.

9     Cross-examination, it must be limited, of course, to what

10    happened in direct, but it also has to do with credibility, and

11    so this area is both mixed with what the witness knows and what

12    the witness' view is.  I don't see them going outside of that.

13    I wouldn't want this witness to testify to something that has

14    absolutely nothing to do with the facts of this case.

15         I wouldn't expect or allow the Defendants to ask

16    him about something that had nothing at all to do with this

17    case, but had something to do with his experience where he's

18    able to give an opinion on, but is not covered by the facts of

19    this case.  That would be total, not only surprise, but outside

20    the limits of the area.

21         But this has to do with very basic issues that

22    the Plaintiffs themselves put forward, so for all of these

23    reasons I'll deny the motion of the Plaintiffs.

24         Thank you very much.  You-all need to come back

25    to talk about the logistics.

1           Court stands in recess for five minutes.

2           THE COURTROOM MANAGER:  All rise.

3                    (Court is in recess.)

4               (The jury entered the courtroom.)

5                 (Call to order of the court.)

6           THE COURT:  Be seated, please.

7               Good morning, ladies and gentlemen.  Sorry to

8     keep you waiting, members of the jury.  We had some preliminary

9     matters that I had to deal with before.

10              Call your next witness, please.

11          MR. HONNOLD:  Yes.  Thank you, Your Honor.  Good

12    morning.

13              Plaintiffs call Dr. Cuong Bui.

14          THE COURT:  Dr. Bui, come forward, please, sir.

15          THE WITNESS:  Good morning, Your Honor.

16          (WHEREUPON, **CUONG BUI, M.D.**, was called as a witness,

17    and having been duly sworn, testified as follows:)

18          THE COURTROOM MANAGER:  Please have a seat.

19              Please state and spell your name for the record,

20    sir.

21              THE WITNESS:  Last name is Bui, B-u-i.  First

22    came is Cuong, C-u-o-n-g.

23                       **DIRECT EXAMINATION**

24    **BY MR. HONNOLD:**

25    Q.   Dr. Bui, good morning.

1    A.    Good morning.

2    Q.    My name is Brad Honnold.  I'm one of the lawyers for the

3    Orr family in this case.

4          Could you just introduce yourself to the ladies and

5    gentlemen of the jury, please.

6    A.    Yes.  I am one of the staff neurosurgeons at Ochsner

7    Medical Center here in New Orleans.

8    Q.    And can you just explain just generally by way of overview

9    what it is that neurosurgeons do on a daily basis?

10   A.    So neurosurgeons essentially deal with all disease

11   processes involving the brain, the spinal cord, and the

12   peripheral nerve.  That's sort of a big overview.

13         But we essentially deal with brain tumors, brain bleeds,

14   spinal cord compression, trauma.  Those are the common things.

15   Q.    And so I take it that some of the surgeries you do are

16   planned; fair?

17   A.    Yes.

18   Q.    And then you do have to undertake surgeries at times when

19   they are more urgent or an emergency situation; is that right?

20   A.    Yes.

21   Q.    And can you just explain or give us an overview of your

22   educational background, please?

23   A.    So I went to medical school here in New Orleans, LSU.  Did

24   my neurosurgery residency in upstate New York at Syracuse

25   Medical Center.  Went on and did my fellowship at UAB Medical

1    Center.  Graduated from the University of New Orleans here,

2    undergraduate.

3    Q.    Okay.  This case obviously deals with Sharyn Orr.  I think

4    you know that.

5         As you sit here today, do you have some recollection

6    actually of taking care of Mrs. Orr?

7    A.    I do.

8    Q.    And do you recall that your deposition was taken in this

9    case back in -- last summer, July of 2016?

10   A.    I believe so.  Yes.

11   Q.    I don't know whether you brought a copy of that today.

12   But just to let you know, I put a copy of your deposition back

13   to your left, back behind you, so you might need to refer to

14   that.

15   A.    Sure.  I brought my own copy here today, but thank you.

16   Q.    What I'd like to do is go through specifically some of the

17   details that you recall about taking care of Mrs. Orr.  Can we

18   do that?

19   A.    Okay.

20         MR. HONNOLD:  And, Your Honor, may I take the pad out,

21   please?

22         THE COURT:  Sure.

23   BY MR. HONNOLD:

24   Q.    And, Dr. Bui, just to orient you and everyone to the date,

25   we're talking about a time frame which was April 24th of 2015.

1        Are you square with that?

2    A.    Yes.

3    Q.    And can you explain a little bit to the jury how it is

4    that your service works, essentially, at Ochsner in terms of

5    how many neurosurgeons there are and how emergency situations

6    are covered by neurosurgeons.

7    A.    The department currently has eight neurosurgeons on staff.

8    In terms of emergencies, we share the on-call, which is at any

9    one time one of us is on call for emergencies or non-planned

10   admissions through the ER.

11   Q.    The Ochsner system has several hospitals; is that right?

12   A.    That's a complicated question, but yes.  The Ochsner

13   system itself has hospitals and numerous partnerships in

14   collaboration throughout the state.

15   Q.    Do each of the Ochsner hospitals have the capability or do

16   they have neurosurgeons that will respond there to do

17   neurosurgical procedures?

18   A.    So not all of the hospitals in the Ochsner network have

19   neurosurgery coverage, no.

20   Q.    And is Baptist one of the hospitals in the Ochsner system

21   that does not have neurosurgery coverage?

22   A.    It does not have emergency neurosurgery coverage.

23   Q.    If it turns out that a patient that does have a

24   neurosurgical emergency ends up at Ochsner Baptist, what steps

25   need to be taken to make sure that that patient gets

1    appropriate neurosurgical attention?

2    A.    If the patient arrives at Ochsner Baptist and ends up

3    having a disease process that needs the neurosurgical

4    attention, oftentimes a call for transfer is initiated.

5         We have access to films electronically.  We're able to

6    review the films and then triage the patient or get the patient

7    to the Ochsner main campus when appropriate.

8    Q.    And that process of triage or transfer, does that have a

9    name within the system?  Blue phone?  Red phone?  Anything like

10   that?

11   A.    No.

12   Q.    And so, if there is a neurosurgical emergency at Baptist,

13   then somehow is a neurosurgeon that's on call then contacted?

14   A.    Yes.

15   Q.    And is that what happened in Mrs. Orr's case?

16   A.    Yes, it was.

17   Q.    So what I'd like to do is just put -- I'm going to put up

18   here the date of 4/24/15, and I'm going to put approximately

19   11:00 P.M.

20        And is it consistent with the records that you've reviewed

21   or your recollection that Mrs. Orr was taken by ambulance to

22   Baptist -- Ochsner Baptist in the late evening hours of

23   April 24th?

24   A.    Yes.  That's an approximation.  I do not know exactly what

25   time she got to Baptist, no.

1    Q.    So you know she was taken there by ambulance from her

2    home, right?

3    A.    Yes.

4    Q.    And Baptist, even though they don't have neurosurgical

5    coverage, they do have an emergency room; is that right?

6    A.    Yes, that's correct.

7    Q.    You know that she would have received some emergency room

8    attention there at Baptist, right?

9    A.    Yes, she would have.

10   Q.    And in terms of a patient like Mrs. Orr, who had

11   potentially had some change in her mental status that had been

12   picked up by family, an evaluation by an emergency room would

13   include several basic things, including the history and

14   physical, right?

15   A.    Yes.

16   Q.    There would be an actual physical examination performed,

17   correct?

18   A.    I can't speak directly to what was actually done, but the

19   normal workflow would have been an emergency physician taking a

20   detailed history and physical examination and initiating any

21   diagnostic or treatment plan that he or she felt was

22   appropriate.

23        But, again, I can't speak to the specifics of that night

24   and what was actually done by the emergency room there before I

25   was involved in her care.

1   Q.    It would be very common in the emergency room, for a

2   patient that had reported some decline in mental status, for

3   laboratory to be taken, right?

4   A.    Yes.

5   Q.    Included in a basic laboratory screen, there are a number

6   of tests, right?

7   A.    I guess you'd have to be more specific about what was --

8   Q.    Sure.  So when a patient has blood drawn and it's sent to

9   the laboratory, a patient that comes in in an ambulance with a

10  report of a decline in mental status, there would be laboratory

11  tests done, including a coagulation profile, correct?

12  A.    That would be up to the emergency room physician.  That's

13  his or her decision.

14  Q.    In your experience within the Ochsner system, if a

15  coagulation profile is ordered on a patient, what are the basic

16  components of it, generally?

17  A.    It's typically mainly three components, the PT, the PTT,

18  and the INR.

19  Q.    I wasn't reading your mind, but I knew the answer before I

20  asked you so I wrote up here "PT," "PTT" and "INR."  Let's go

21  through each of those.

22        There's been some testimony in court about what a PT test

23  is, but can you explain it from your perspective?

24  A.    Well, let's be clear, I'm not a hematologist so I'm not an

25  expert in the coagulation pathways or, I guess, the various

1    aspects of how it's tested.

2         But, in general terms, the PT, PTT, and INR gives a

3    physician a reasonable estimation of a patient's ability to

4    clot his or her blood.  It doesn't cover all of the spectrum,

5    but it covers a fair amount.

6         And that -- there's two pathways to -- two main pathways

7    to clotting, intrinsic and extrinsic pathways, and PTT and PT

8    kind of covers those.  INR is a more detailed representation

9    of, typically, the PT range.

10   Q.   And the PT test itself, are there any particular

11   medications that you are aware of that it's able to detect

12   whether a patient is taking?

13   A.   Ask that again.

14   Q.   Sure.

15        In terms of the PT test, is that designed, from your

16   perspective, as a test to detect the presence of any

17   medications on board in the patient?

18   A.   So, again, the coagulation test is not specific for

19   picking up any kind of medication, okay?  It's just simply

20   testing whether the patient's coagulation pathway is normal or

21   not.

22        Now, obviously, there are a lot of different medications

23   that can disrupt that either intentionally or unintentionally.

24   And, again, I'm not a hematologist so I'm not going to speak as

25   an expert as to which medications are typically detected from

1    this.

2         But, in general, it's used to track the ability to clot

3    for patients who may be on blood thinners for various reasons.

4    Q.   At about 11:45, the Baptist records show that a CT scan

5    was done.  At some point, you became specifically aware of that

6    and did actually review the CT scan that was performed at

7    Baptist, right?

8    A.   Yes.

9    Q.   For a patient like Sharyn Orr, who's had some decline in

10   mental status, is a CT scan something that is routinely ordered

11   and performed?

12   A.   Yes.

13   Q.   Can you please explain to the jury exactly what a CT scan

14   is.

15   A.   A CAT scan is a fancy X-ray in which, going through a

16   machine, particles are shot across the head, very similar to an

17   X-ray.  And, again, I'm not a radiologist so I can't speak to

18   the specifics or the physics of it, but, at the end of the day,

19   it picks up changes in density within the structure that it

20   examines.

21        So it's very good at picking up calcium or bony structures

22   such as for fractures.  It is very good for picking up acute

23   blood.  That's blood -- or bleeding that is relatively acute

24   within the first hour or two, and that typically shows up as

25   bright white.

1  Q.   And at some point in time, you had the ability to review

2  those -- that initial CT scan done on Mrs. Orr, didn't you?

3  A.   Yes.  I believe I reviewed it right when I got the phone

4  call from the transfer center.

5  Q.   And what's your best recollection as to when you got the

6  call from the transfer center?

7  A.   Somewhere around midnight.

8  Q.   And at that point in time, were you asked by the Ochsner

9  transfer center for your permission or consent to transfer

10 Mrs. Orr from Ochsner Baptist to the main campus?

11 A.   Yes.

12 Q.   So that would have happened, then, sometime after

13 midnight, but we'll put "After midnight transfer to main."

14      At some point after Mrs. Orr arrived at the main campus,

15 did you physically go to the hospital?

16 A.   No.

17 Q.   Did you say "no"?

18 A.   Yes.

19      No.  I did not physically go right when she arrived, no.

20 Q.   Okay.  So at what point in time in this process for

21 Mrs. Orr did you actually physically get to the hospital?

22 A.   So when we're on call, we have residents that take the

23 primary call, which are advance-level trainees.  So from my

24 team, Dr. Riffle, Jonathan Riffle, was the first one to see her

25 upon arrival.  I came in a couple of hours later.

1    Q.    And then we can put 2:00 A.M. or thereabouts?

2    A.    Roughly, yes.

3    Q.    Do you think it might have been before 2:00 A.M.?

4    A.    I don't recall exactly.

5    Q.    So I'm going to put "2:00 A.M., question mark, Dr. Bui

6    arrived."

7         At any point in your conversation or communication with

8    the transfer center, were you told that Mrs. Orr had been a

9    patient who was taking or had a history of taking Xarelto?

10   A.    I believe, yes.

11   Q.    When did you learn that?

12   A.    I believe on the call talking to the emergency room

13   doctor.

14   Q.    And then, at some point during that time from after the

15   call until you went into the hospital, did you look at the

16   CT scans remotely?

17   A.    Yes.

18   Q.    And can you explain to us the system that allows you --

19   the system that Ochsner employs that allows you to look at the

20   CT scans remotely?

21   A.    It's a web-based secure line that allows for medical

22   records and radiology to be encrypted through a secure access.

23   It allows the physician to log in from his or her mobile device

24   or a laptop to be able to look at the medical records and/or

25   any imaging.

1    Q.    And in looking at those films, I take it that you were

2    able to see that Mrs. Orr had suffered an intracranial

3    hemorrhage of some type, right?

4    A.    Yes.

5    Q.    Now, those films were also interpreted by a radiologist at

6    some point at Ochsner main; is that right?

7    A.    I'm not sure it was Ochsner main.  It was more likely

8    interpreted by a radiologist for Baptist.

9    Q.    And at some point then, I take it that you would have,

10   along with members of your team, including Dr. Riffle,

11   participated in examination of Mrs. Orr?

12   A.    Yes.

13   Q.    And why don't you describe from the neurosurgical

14   perspective what sort of examination is generally done on a

15   patient like Mrs. Orr?

16   A.    So are you asking about specifics or --

17   Q.    No.  Let's just talk generally first.

18   A.    So generally with any patient that we evaluate, we start

19   with a general exam, looking at blood pressure and heart rate,

20   things like that, make sure that their airway is okay and that

21   we go on to do a neurologic exam.  A neurologic exam can be

22   very extensive or relatively brief based on what -- the

23   situation we're dealing with and how cooperative or

24   uncooperative a patient is.

25        So we generally assess whether the patient is awake or not

1    and then whether they will follow commands, be able to answer

2    questions appropriately.  Then we test the cranial nerves,

3    which are the various functions of the eyes, the face, the

4    tongue, and then the movements of the lower extremities.

5    Again, that exam can be fairly extensive or abbreviated, based

6    on neurologic condition and the condition of the patient.

7    Q.    And you -- I've written on our timeline here that sometime

8    after approximately 2:00 A.M. -- and again, is it possible that

9    that 2:00 A.M. time might have been before 2:00 A.M.?

10   A.    No, sir.  We evaluate the patient right when the patient

11   got to the ER, I think around 1:00, and then I did another

12   evaluation probably around 2:00, and both evaluations were the

13   same.

14   Q.    So would you have been participating or present when the

15   first examination was done?

16   A.    I was not.

17   Q.    So between approximately 1:00 A.M., when Mrs. Orr arrived

18   at Ochsner main until you got there later, some additional time

19   went by; is that right?

20   A.    Yes, that's correct.

21   Q.    However, the examination that you did you thought

22   coincided with that that had been performed previously by

23   Dr. Riffle and others, fair?

24   A.    Yes, that's correct.

25   Q.    At that point in time, for reasons that we'll get into in

1    a little bit, you and your team did not decide to perform any

2    surgical intervention on Mrs. Orr at that time; is that right?

3    A.    Yes, that's correct.

4    Q.    The decision was made then -- I'm going to put on our

5    timeline "no surgery."  Now, the fact that I wrote "no surgery"

6    there and that surgery was not performed, that does not mean

7    that surgery was not indicated, right?

8    A.    Yes, that's fair to say.

9    Q.    We'll get into the reasons why in a little bit, but the

10   decision was then made to provide Mrs. Orr with medical support

11   that the neurocritical care unit had the ability to give to

12   her, correct?

13   A.    Yes, that's correct.

14   Q.    That would have included ventilatory support.  She was

15   intubated, right?

16   A.    Yes, that's correct.

17   Q.    She would have been receiving various fluids and drugs to

18   assist her body to deal with the situation that she was in,

19   right?

20   A.    In general, yes.

21   Q.    But to the extent that she was having an intracranial

22   process, specifically a hemorrhage, that process was not being

23   relieved or specifically addressed by way of intervention,

24   right?

25   A.    That's probably not accurate.  The medical therapy does

1    address that by the various -- so the hemorrhage caused

2    increased pressure within the brain because your skull is a

3    fixed box, and so once you have -- it normally just contains

4    brain fluid and the normal blood volume, so once you have blood

5    that spills into the fluid space or the brain space, then the

6    pressure goes up.

7        And so the treatment for her is initially to do what we

8    can to bring the pressure down.  That can be by way of surgery,

9    but it also can be by way of medication to shrink the brain or

10   to reduce the amount of fluid in the brain.

11   Q.   So excuse me, Doctor.  I want to interrupt you.

12   A.   Yes, okay.

13   Q.   Increased intracranial pressure is an abnormal condition

14   in the nervous system, isn't it?

15   A.   It can be.

16   Q.   In a patient like Mrs. Orr, her presenting condition is

17   certainly an abnormal condition for her?

18   A.   Yes.

19   Q.   You don't have any reason to believe that she had an

20   underlying medical condition that caused intracranial pressure?

21   A.   No.

22   Q.   Intracranial pressure can be harmful to brain tissue if

23   it's allowed to go on for an extended period of time, right?

24   A.   It can be.

25   Q.   Then the next point I think is shortly after 4:00 A.M.,

1   and was a second CT scan done on Mrs. Orr?

2   A.   Yes.

3   Q.   And was that done at your request or by your order?

4   A.   Yes.

5   Q.   And why is it that you wanted another CT scan on Mrs. Orr

6   shortly after 4:00 A.M. in the early morning hours of now

7   April 25th?

8   A.   We wanted to assess whether the bleeding or the blood clot

9   had gotten larger.  We wanted to assess the amount of swelling

10  on the brain and to look at the general condition of the brain

11  itself.

12  Q.   Did you remain physically at the hospital during this

13  time?

14  A.   Yes.

15  Q.   Do you recall either from looking at notes or materials

16  you might have, would you have participated in rounds that

17  morning, now that Mrs. Orr was admitted to the hospital under

18  your service, would you have gone back to repeat an

19  examination?

20  A.   Yes, I did.

21  Q.   When do you think that happened?

22  A.   Probably sometime before 6:00 A.M.

23  Q.   And would you have been accompanied by your team of

24  residents, Dr. Riffle and others?

25  A.   Yes.

1    Q.    And at that point after 6:00 A.M., was it your decision to

2    continue with medical therapy or support for Mrs. Orr?

3    A.    Yes, it was.

4    Q.    At some point then, at approximately 12:30 P.M. -- and

5    again, this is April 25th -- did you have a discussion or do

6    you recall having a discussion with the Orr family?

7    A.    I did -- I do.

8    Q.    Why don't you go ahead and tell us the details of the

9    conversation as you remember it.

10   A.    At that junction, I had a discussion with the family

11   stating that she was still in a coma; that neurologically,

12   despite fairly aggressive medical therapy, that we did not see

13   an improvement in her neurologic status; that although the

14   CAT scan in the morning was stable, not worse, it wasn't any

15   better.

16        There was still signs of significant increased pressure,

17   particularly the blood on the right side of the brain was

18   pushing the brain over to the left side, and so it was causing

19   quite a bit of what we call a midline shift, which is the

20   shifting of the brain across the middle axis of the skull, and

21   why that's important is just because your brain in general is

22   separated into the right half and the left half, and down the

23   middle there, there is a band that separates it.  So when you

24   push the brain across that band, there is a pressure that

25   pushes it and squeezes underneath that band that can cause

1    further damage.

2         So we discussed that, you know, one of the additional

3    invasive ways to treat her would be to put a catheter or two

4    into the fluid spaces and into the blood clot space itself.

5         One is to try to take off additional fluid directly, and

6    another option was to actually try to inject some medication to

7    break up the blood clot.

8         I explained to them that there is no clear data that

9    that's the definitive procedure, and that the prognosis was

10   still relatively poor, but I was willing to be more aggressive.

11   The family was on board with the idea that, you know, it's

12   still, quote, unquote, a Hail Mary.

13   Q.   Doctor, it's your testimony today that you told them it

14   was a Hail Mary surgery?

15   A.   Yes, I believe so.

16   Q.   Okay.  You proposed to them, you offered to them a

17   surgical procedure at about 12:30, right?

18   A.   Right around that time.

19   Q.   You proposed to them that you, Dr. Bui, the neurosurgeon,

20   could perform the procedure to relieve -- hopefully relieve the

21   intracranial pressure, right?

22   A.   I proposed a procedure to hopefully reduce intracranial

23   pressure, yes.

24   Q.   And by reducing intracranial pressure, what would be the

25   hope that would follow from that?

1    A.   Well, the hope would be for some neurologic improvement.

2    Q.   So the hope of the surgery was to reduce intracranial

3    pressure to then lead to neurologic improvement, right?

4    A.   That's the hope, yes.

5    Q.   When you say "neurologic improvement," what is it that

6    you're talking about?

7    A.   So there are various degrees of, I guess, state of

8    consciousness, so -- and we sort of evaluate how deep of a coma

9    you are based on certain criteria, and so the idea would be to

10   try to get her more awake or more responsive.  The idea would

11   be to have her be able to wake up and follow commands.

12   Q.   And did you go forward and perform that procedure shortly

13   after 2:00 P.M. on the afternoon of April 25th?

14   A.   Yes, we did.

15   Q.   And the specific name of that procedure is an external

16   ventricular drainage; is that right?

17   A.   Yes, an external ventriculostomy, yes.

18   Q.   And in Mrs. Orr's case, it's times two because you put in

19   two drains, right?

20   A.   Yes, that's correct.

21   Q.   You put one in the left side of her head and one in the

22   right, correct?

23   A.   Yes, correct.

24   Q.   And the hope then was that by doing that, you were going

25   to reduce intracranial pressure, lead to neurologic

1    improvement, and hopefully get her to wake up, right?

2    A.    Yes.

3    Q.    Now, at that point in time, that surgery was medically

4    indicated, fair?

5    A.    Yes.

6    Q.    And, in fact, medically necessary, right?

7    A.    Yes, that's fair to say.

8    Q.    You are familiar with the terms "medical necessity" both

9    in medicine and in law, correct?

10   A.    Yes.

11   Q.    You know that medical necessity is something that -- you

12   shouldn't be doing a procedure unless it's medically indicated

13   under the circumstance and medically necessary, right?

14   A.    Yes.

15   Q.    You weren't so cavalier to think that you would do a

16   procedure like this the way that you described it on Mrs. Orr

17   unless you thought there was good reason to do it, correct?

18   A.    So phrase that again.

19   Q.    I think I said something along the lines of you wouldn't

20   be so cavalier as to undertake this procedure the way that you

21   described it, drilling two holes in someone's head, unless you

22   thought there was good reason to do it, right?

23   A.    So let's be clear.  I felt that the procedure was

24   indicated.  As for whether I thought that there was a really

25   good chance of neurologic recovery is different.  I thought

1    there was a chance, but I just want to be clear that we were

2    going in this uphill, and that this was an aggressive

3    intervention.  Some surgeons may not have done this.  So this

4    is not something that, in the neurosurgical community, would

5    have been universally performed.

6         I am on the more aggressive side, particularly if the

7    family has realistic expectations, but there are faculties on

8    my team that may not have done this procedure.

9    Q.   So as a neurosurgeon, though, sometimes as it relates to

10   some of the things that you do, you work and navigate and

11   perform procedures that are in the world of chance, right?

12   A.   Yes.

13   Q.   You get things delivered literally on the doorstep of the

14   hospital at times from trauma, car wrecks, unfortunate

15   accidents on the waterways, things of that nature, and those

16   people that you deal with, you're dealing with many of them in

17   the world of chance, right?

18   A.   Yes, that's correct.

19   Q.   What you are trying to do by certain procedures that you

20   perform is to preserve chance, even though it may be uphill,

21   because sometimes, even though it's an uphill race, there are

22   people that do come through and prevail, correct?

23   A.   Yes.  That's fair to say.

24   Q.   And to be fair, sometimes those procedures, the people

25   that do follow through and hit on the chance and had been

1    running uphill, they might end up though not exactly how they

2    were, right?

3    A.    Yes, that's correct.

4    Q.    And that happens even in the world of stroke, in addition

5    to neurosurgery, right?

6    A.    Yes, that's correct.

7    Q.    So there are people sometimes after a major event like

8    this, they may have a cane, right?

9    A.    So, yes, they -- more often than none, they are left with

10   neurologic deficits.

11   Q.    And those may come in a wide spectrum, just depending upon

12   the underlying nature of the condition, the underlying

13   condition of the patient, things of that nature, right?

14   A.    Yes.

15   Q.    So you dealing in the world of chance as a neurosurgeon,

16   you were providing those treatments to allow that patient the

17   best chance that you can with the tools that are at your use,

18   right?

19   A.    Yes.

20   Q.    Now, after the EVD times two bilateral at 2:10 on the

21   25th, there was another CT scan done sometime after 3:00 P.M.,

22   right?

23   A.    Yes, I believe around 4:00 P.M., but yes.

24   Q.    Closer to 4:00.  I'm sorry, I'll change that to 4:00.

25         And the purpose of doing a CT scan now after the

1   intervention that you performed is what?

2   A.    It's a combination.  Obviously, any time you do anything

3   invasive in the brain, in this case you have to put a catheter

4   deep into the brain, going into the fluid space that sits in

5   the middle of the brain, so when you do that, there's always a

6   chance for hemorrhage or bleeding along the track of the

7   catheter, so we want to make sure that that was not the case,

8   and we want to make sure that the catheters were where we

9   wanted it to be, so...

10  Q.    So this is essentially a post-procedure film that's done

11  just to make sure that the catheters that you have put in are

12  in the right place, that they're functioning and that there's

13  no complications from putting them in, fair?

14  A.    Yes, fair.

15  Q.    And then you mentioned something earlier.  You mentioned

16  TPA.  Do you recall that?

17  A.    Yes.

18  Q.    And let's go back and pick up on that again.  TPA is a

19  medicine, right?

20  A.    Yes, it is.

21  Q.    Some folks may be familiar with TPA in terms of giving

22  it to a loved one or family member if there's concern about a

23  stroke in an emergency room, there's a window to give TPA,

24  right?

25  A.    Yes.  But the most common use is just to unclot IV lines

1    and things like that when you have a...

2    Q.    So how is it that you were wanting to use TPA as part of

3    the tool kit that you were bringing to bear for Mrs. Orr?

4    A.    There is some data to support that -- so when you have a

5    large hemorrhage in the brain, the blood at some point does

6    clot.  Even if they're on anticoagulation, it would clot.  If

7    it doesn't -- if it continues bleeding, they would never have

8    made it to me.

9         So in Ms. Orr's case, the blood had spilled into the

10    cavity of fluid and has formed a thick clot that has

11    essentially then become like a mass.

12        So there is some data that, if we were able to go in and

13    break up that clot or remove that clot, that in certain cases

14    the patient may do better.

15        In the old days, we used to go in more aggressively with

16    open surgery and try to drain it directly, but we found that

17    the procedure itself had a lot of complications and that the

18    outcomes were not as good.

19        So the more recent data suggests that, if we're able to

20    get a catheter in and then inject the medication into the clot,

21    that helps to break the clot up and then it can be drained out

22    through the same catheter and, thus, reducing the mass effect

23    and potentially bringing down the pressure at the same time.

24    Q.    And based upon recollection or records that you've looked

25    at, at what time was the TPA then given to Mrs. Orr?

1    A.    I don't recall.  It would have been sometime after the

2    CAT scan in the afternoon.

3    Q.    Let me ask you this.  At Ochsner, at this time, April

4    of 2015, was there a protocol or guideline in terms of how long

5    after the EVD placement you needed to wait to make sure there

6    wasn't bleeding as a complication?

7    A.    No.  We typically wait until after the CAT scan, just

8    confirms this new specific timeline --

9    Q.    Excuse me.  So it would be fair to at least say, then, it

10   was after this CAT scan that TPA was given?

11   A.    Yes.

12   Q.    So now we're after the 4:00 hour.  How many hours is that

13   after Mrs. Orr got to Ochsner main?

14   A.    16 hours or so -- or 15 hours, I guess.

15   Q.    Let's make sure we're -- I want to make sure we're doing

16   the same math problem.

17         So if we're after 4:00, that's four to get back to noon,

18   right?

19   A.    Yeah.

20   Q.    And then how many to get back to 1:00 A.M.?

21   A.    11.

22   Q.    So 11 plus four is 13?

23   A.    11 plus four is 15.

24   Q.    15.  We definitely weren't doing the same math problem.

25   I'm not a neurosurgeon.  I wouldn't have cut it.

1      All right.  15 hours.

2      So when Mrs. Orr hit the door at 1:00 A.M. in the

3  condition that she was in, in a perfect world, you did not want

4  15 hours to go by for the neurosurgery intervention that you

5  provided in the form of the bilateral EVD and the TPA, right?

6  A.    Phrase that one more time.

7  Q.    In a perfect world, you did not necessarily want 15 hours

8  to go by before the neurosurgery procedures that you did that

9  were indicated in order to give her a chance.  You weren't --

10  in a perfect world, you didn't want 15 hours to go by before

11  you could do that, right?

12  A.    In a perfect world, I would have been asleep that whole

13  night and Mrs. Orr would have never come in.

14  Q.    I'll grant you that.

15  A.    So I think that's probably not a best analogy.  I think --

16  Q.    But Mrs. Orr --

17  A.    I think that, you know, we did initiate intervention as

18  soon as she got there.  Typically, we do try for these type of

19  procedures -- I mean, for these type of things, we typically

20  do -- either we try medical therapy initially or concomitantly.

21      I think that -- I'm not 100 percent sure that I would have

22  offered a ventriculostomy at 1:00 A.M.  I'm just not sure

23  because, you know, the decision for surgery is fairly

24  complicated and you have to weigh a lot of risks, the benefit

25  profiles and, also, whether the family was in a state to sort

1    of be able to make that complicated decision.

2         I think that the fact that she was on a blood thinner that

3    I, at that time, could not readily reverse definitely plays

4    into that.

5         One of the factors -- just one of the factors that played

6    into my decision was that I didn't want to risk increasing --

7    or creating more bleeding by doing an invasive procedure,

8    particularly if you know the prognosis was not great to start

9    with.  So that was one of the factors.

10        Now, if she was not on it, I think it would have been a

11   discussion earlier, but I can't say that I would have done it

12   right at 1:00 A.M.

13   Q.   Let's just focus on her condition for a second.

14        The condition that Mrs. Orr had when you did the procedure

15   at 2:10 P.M. on the afternoon of the 25th was the same

16   condition she had when she hit the door at 1:00 A.M., right?

17   A.   Yes.

18   Q.   From the perspective of her medical condition, she was a

19   candidate for that procedure when she hit the door at Ochsner

20   main, right?

21   A.   Yes.  That's fair.

22   Q.   In your neurosurgery career, it's true, isn't it, that you

23   have been summoned to the emergency room to place external

24   ventricular drains like those you gave to Mrs. Orr emergently

25   and done it in the emergency room at the bedside, right?

1    A.    So in my career I have done ventriculostomies emergently

2    at the bedside.  Yes.

3    Q.    When you were at UAB doing your neurosurgery training, you

4    learned how to do it as a resident, right?

5    A.    No.  Yes.  I was a fellow at UAB, but yes.

6    Q.    I'm sorry.  You were a fellow at UAB.

7          You were doing EVDs yourself as a fellow, right?

8    A.    Yes.

9    Q.    And you even did some EVDs yourself as a resident, didn't

10   you?

11   A.    Yes.

12   Q.    So my point in all of this is that, in terms of

13   Sharyn Orr's condition and having people around, there was a

14   neurosurgery resident there at 1:00 A.M. and her condition was

15   such that it warranted that intervention if the communication

16   could take place and the various things that you mentioned,

17   right?

18   A.    That decision was not made at 1:00 A.M.  So the decision

19   at 1:00 A.M. was for medical therapy.

20   Q.    One of the reasons that we haven't talked about yet --

21   you've alluded to it a little bit.  And I've written "delay"

22   here.

23         We can agree, can't we, in good faith that there was delay

24   in delivering or placing the EVDs in Mrs. Orr because of the

25   fact that she was on the blood thinner Xarelto?

1    A.    I think that it would be fair to say that the fact that

2    she was on the blood thinner Xarelto played into the

3    complicated decision-making process for the timing of the

4    placement of the catheter.

5         One of the factors to proceed with surgery is whether she

6    has responded to medical therapy or not.  So one of the factors

7    that played into my decision was the fact that she had not

8    responded to medical therapy.

9         The other factor was to be conservative and make sure that

10   the Xarelto -- or the potential of Xarelto being on board had

11   cleared.  So they were sort of concomitant factors.

12   Q.    I just want to make sure we're clear.  There was no doubt

13   that the fact -- that you had the history of Mrs. Orr that she

14   had been taking Xarelto, right?

15   A.    Yes.  Correct.

16   Q.    You learned at some point that there was uncertainty as to

17   whether she had taken her evening dose around suppertime on the

18   evening of the 24th, right?

19   A.    Yes.  There was debate on that.

20   Q.    You had to assume, however, that she took it and was

21   therapeutically anticoagulated on Xarelto when she hit the door

22   at Ochsner main, right?

23   A.    Yes.  I had to make that assumption.

24   Q.    And that is at least one of the primary reasons why that

25   procedure to give Mrs. Orr a chance in the world of chance

1   where you, as a neurosurgeon, work -- the Xarelto was at least

2   one of the primary reasons why that chance-giving procedure was

3   delayed until 2:10 P.M., right?

4   A.   That's one of the reasons.

5   Q.   Now, let's go into why it was one of the reasons.  Let's

6   get into your knowledge and how you acquired it about Xarelto

7   at that time.  So let's go back to April 24th, 2015.

8        What was your fund of knowledge as a neuro --

9   board-certified surgeon working at Ochsner main campus?  What

10  did you know about Xarelto that night when you first saw

11  Sharyn Orr?

12  A.   Xarelto was one of several medications in this class of

13  medications that inhibits one of the main -- one of the main

14  steps or factors in the coagulation pathway.

15       So in order for your blood to clot, there is a complicated

16  cascade of things that happen very rapidly.  Again, I'm not a

17  hematologist.  So I'm not going to say that I'm an expert at

18  every step.

19       But the general mechanism for Xarelto was to block one of

20  the factors, Factor X, I believe, or specifically Xa, which is

21  one of the -- the activated form of it, and, hence, it reduces

22  your blood's ability to clot.

23       It's often used in conditions in which patients have

24  increased risk for forming blood clots.  And in Ms. Orr's case,

25  it's for her atrial fibrillation.

1   Q.    Where did you get that information?

2   A.    General medical literature, general medical training,

3   conferences.

4   Q.    So fair to say, then, that your fund of knowledge about

5   Xarelto as of April 25th came from you being a participant in

6   the neurosurgical community; is that right?

7   A.    Yes.

8   Q.    It was based upon your general work that you do as a

9   professional, keeping up-to-date with developments in your

10  field by reading literature, right?

11  A.    Yes.  As a surgeon, you do have to understand some basic

12  level about drugs that may increase or decrease bleeding.

13  Q.    Because everything that you do is in a potentially high

14  bleeding risk situation, correct?

15  A.    Yes.

16  Q.    Operations in the brain, on the spinal cord, things of

17  that nature, if there is a bleed that develops, it can have

18  catastrophic consequences, right?

19  A.    Yes.

20  Q.    Now, let's get this out on the table.

21        As of April 25th, 2015, had you ever looked at the Xarelto

22  label?

23  A.    No, I had not.

24  Q.    So is it fair to say, though, even though you yourself had

25  not looked at the label, you had availed yourself or gotten a

1   lot of information about Xarelto without looking at the label?

2   A.   Yes.   That's fair to say.

3   Q.   Through the ways that we discussed, professional

4   communication, talking with colleagues, reading literature,

5   right?

6   A.   Yes.   I thought I had enough information about it to be

7   able to treat or manage patients that were on it from a

8   neurosurgical perspective.

9   Q.   Did you think that information or fund of knowledge that

10  you had was derived from -- or flowed from the label itself,

11  even though you had not looked at it?

12          MR. IRWIN:   Objection, Your Honor.   Leading,

13  speculation.

14          THE COURT:   It could be speculation.

15              Why don't you rephrase the question.

16          MR. HONNOLD:   Sure.

17  BY MR. HONNOLD:

18  Q.   Did you have some sense that your understanding did come

19  from a good source?

20  A.   Yes.

21  Q.   And so the situation was that part of the reason there was

22  delay was due to the fact that you had to assume that Mrs. Orr

23  was anticoagulated on Xarelto, right?

24  A.   Yes.

25  Q.   Were you the one that delivered that news to the family or

1    was that done by other members of your team?

2    A.    I don't recall exactly.  But we definitely discussed that.

3    Yes.

4    Q.    There's been testimony in the courtroom --

5    A.    I don't know if other team members had discussed that with

6    them or not.

7    Q.    Let me ask you this.  Do you specifically remember being

8    the one that delivered the news to the Orr family between 1:00

9    and 2:00 A.M. on the morning of April 25th that surgery could

10   not go forward in Sharyn because of the Xarelto?

11   A.    I don't recall.

12   Q.    Is it possible that you weren't the one to do it and that

13   members of your team, such as Dr. Riffle and others, might have

14   delivered that news to the family?

15   A.    That's possible.

16   Q.    I think you've used the word before that you were in

17   the -- this puts you in the situation of having to do some

18   guesstimation or doing your best guesstimating.

19        Do you recall that?

20   A.    Yes.

21   Q.    So as the neurosurgeon taking care of Sharyn Orr, having

22   to do some guesstimating about how to take care of her, what

23   was your treatment plan as it related to Xarelto and the

24   ability to do surgery on her eventually?  What thought process

25   did you go through?

1    A.    I think we had to assume that she was therapeutic and had

2    to assume that she had taken it around the early evening.   So

3    to the best of my medical knowledge at that point, there was no

4    established test to actually -- a test for that and there was

5    no established medication to reverse that effect.

6          So then I had to make the assumption that the patient's --

7    that the normal route of the medication clearing the body -- in

8    the scientific community they call it the half-life, which is

9    sort of how long it takes for half the medication to still be

10   on and then will decrease from there.

11         And so, based on my rough understanding of the half-life

12   being somewhere between five and eight hours that -- in normal

13   elective practices, we'd wait at least 24 hours being off of

14   such medication to do an elective procedure.

15         I think, in this case, you know, things were relatively

16   urgent, dire.  And so I think we made a best-guess estimate

17   that, by 12:00 or 2:00 P.M. the next day that the Xarelto had

18   cleared.

19   Q.    So let's go through the math.  I specifically want to know

20   the math that you did in terms of this guesstimation that --

21   whatever the formula was that got you to 2:00 P.M.  What was

22   it?

23   A.    Well, to be honest, there was no math.  I think we

24   guesstimated it.  I had the discussion with the family at

25   around 12:00 and, you know, the 2:00 P.M. was when the OR was

1    able to go.  So I don't think we were doing it based on exact

2    science here.  That's just a reality of the clinical practice

3    sometimes.

4    Q.    So were you necessarily waiting for a guarantee that all

5    of the drug would have cleared Mrs. Orr's system?

6    A.    I was waiting for -- again, in my sort of gross estimation

7    that we were fairly close to 24 hours or, you know, after

8    12 hours for sure, I did curbside my colleagues, which is to

9    ask their opinions.  And they've said that they've done it as

10   soon as 12 hours before and been okay.  That also played into

11   the decision for timing.

12   Q.    So I want to make sure I understand the math.  So when you

13   say 12 hours -- do it as soon as 12 hours, does that mean

14   12 hours --

15   A.    12 hours once you hit the door.

16   Q.    From when she hit the door, okay.  That's what I was

17   looking for.

18   A.    Yes.

19   Q.    So it's essentially a 2:00 A.M. situation plus 12 hours?

20   A.    Roughly.

21   Q.    Roughly, pursuant to the guesstimation?

22   A.    Yes.

23   Q.    In this urgent situation, right?

24   A.    Yes.  Right.

25   Q.    Now, you said before that the two things that I've written

1    here, I wrote:  "Assume she had taken it, or took it in a

2    therapeutic level, no test, no reversal."

3        What do you mean by those two things:  "No test, no

4    reversal"?

5    A.    To the best of my knowledge at that time, there was no

6    established or proven test that -- or blood test that I could

7    do to test how much of the Xarelto was on board, whether she

8    was truly therapeutic or not.

9        Reversal, so there are certain products that you can give

10   patients to enhance their coagulation when they're on certain

11   types of medications.  It was my understanding that for Xarelto

12   that those commonly administered pro-hemostatic agents, which

13   are agents that sort of enhance your clotting ability was not

14   effective while the drug was still active in the bloodstream.

15       MR. HONNOLD:  Your Honor, may I approach the witness,

16   please, to hand him a medical record exhibit?

17       THE COURT:  Yes.

18   BY MR. HONNOLD:

19   Q.    Doctor, I'm going to hand you what is marked as

20   Plaintiff's Exhibit 5769152.459.  What I'd like you to do

21   first, Doctor, is just look at that and familiarize yourself

22   with what it is.

23       MR. IRWIN:  No objection, Your Honor.

24   A.    (Reviewing document.)

25       MR. HONNOLD:  And this will be Plaintiff 74 in addition

1    to the number that I --

2         THE COURT:  Let it be admitted.

3    BY MR. HONNOLD:

4    Q.    Doctor, just let me know when you've had a chance to take

5    a look at this information.

6    A.    Okay.  I have.

7    Q.    Is this the sort of medical record from the Ochsner system

8    that you're familiar with seeing?

9    A.    Yes.

10   Q.    And fair to state that this is several pages of laboratory

11   tests from Ochsner for Mrs. Orr?

12   A.    Yes, that's correct.

13   Q.    Now, what I want to do is I want to put -- I'm going to

14   refer you, Doctor, to the page that has 461 in the lower

15   right-hand corner.

16   A.    Okay.

17   Q.    And I want to refer you to the bottom.  If you look at,

18   Doctor, the information right down here where it says:

19   "Prothrombin time" and "INR."  Do you see that?

20   A.    Yes, I do.

21   Q.    And this suggests that there was anticoagulation testing

22   done on Mrs. Orr on the evening of -- it looks like April 24th,

23   2015, up on the top, right?  Then there's the PT test.  Do you

24   see that 11.4 here?

25   A.    Uh-huh.

1    Q.    And explain how these records work in terms of the value

2    number as opposed to the REF range that's to the right.

3    A.    So, in general, laboratory data are given back with

4    specific value that applies to the patient, and then there are

5    an established range of what's considered normal.  So in her

6    particular case, the prothrombin time value that was obtained

7    by the lab was within what is established by our lab to be

8    within the normal range of between 9 and 12.5 seconds.

9    Q.    So her prothrombin time or her PT was 11.4, right?

10   A.    Yes.

11   Q.    And that puts her not quite exactly in the middle of the

12   reference range, but pretty close, right?

13   A.    Yes.

14   Q.    If you were looking at this, any given patient who had

15   ordered anticoagulation studies, you would say, wow, that's a

16   normal PT.  I wouldn't have any reason to suspect that this

17   patient is anticoagulated, at least on a drug that influences

18   the PT, right?

19   A.    Yes.

20   Q.    Now, there's been a fair amount of discussion before you

21   got here about PT, so let me ask you this question:  As of

22   April 25th, 2015, had you ever heard anything that the PT value

23   is a laboratory test that might or could shed some light on the

24   issue of whether the patient was on Xarelto or not?

25   A.    No, I had not.

1    Q.    Okay.  Just so we're clear then, April 25th, 2015, you,

2    the neurosurgeon, Dr. Bui, in a situation dealing with a

3    patient on Xarelto, no understanding whatsoever as to whether

4    the PT might be a helpful type of lab test for you as a

5    neurosurgeon in evaluating timing of surgery?

6            MR. IRWIN:  I object to the leading nature of the

7    question, Your Honor.

8            THE COURT:  It is leading.

9            MR. HONNOLD:  Okay.

10           THE COURT:  Sustained.

11   BY MR. HONNOLD:

12   Q.    Did you know?

13   A.    Did I know what?

14   Q.    Did you know one way or the other whether the PT might be

15   a helpful test?

16   A.    At that point in time I was aware that you could not

17   test -- well, it was my understanding that the normal PT INR

18   testing could not test for whether this agent was active or

19   not.

20   Q.    And that's why you told me before no test, right?

21   A.    Yes.

22   Q.    Okay.  So the other side of that, the other head of that

23   coin is regardless of what those PTs or INRs might have been,

24   you wouldn't have thought that that had any meaning either?

25   A.    Say that again.

1    Q.    Okay.  Thank you for asking me.  It was a poor question.

2          So you have said that these normal values gave you no

3    meaningful or helpful information in deciding or determining

4    whether Mrs. Orr was, in fact, or did, in fact, have Xarelto in

5    her bloodstream, right?

6    A.    Yes, that's correct.

7    Q.    Now, the flip side of that is if you assume just for

8    purposes of our conversation that if that prothrombin time had

9    been, for example, out of the reference range -- pick a number.

10   Let's pick 15 or 16.  If it had been that, would you have

11   attached any significance to it?

12   A.    Yes.

13   Q.    Why?

14   A.    Well, one is that would be a pretty clear indication that

15   her coagulation pathway was abnormal.  We would then have to

16   look a little bit harder as to why that was, assuming or

17   knowing or with the assumption at that time that Xarelto did

18   not increase that time.  So if it was abnormal, I would have

19   looked a little bit harder for why it was abnormal on top of

20   the Xarelto.

21   Q.    But at least in terms of the normal number, no help?

22   A.    It does rule out that she's on any other type of

23   anti-coagulation or had any other concomitant coagulation

24   deficiencies such as liver disease or something like that, so

25   it does add to the clinical picture.

1   Q.   You generally or frequently deal with patients on

2   anticoagulation, right?

3   A.   I think "generally" is an overstatement.  I do deal with

4   patients on anticoagulations.

5   Q.   Before Sharyn Orr on the evening of April 25th, had you

6   ever had to deal with a decision-making process like this one

7   before, in terms of deciding when you could, in your mind,

8   safely perform surgery on a patient on Xarelto?

9   A.   Yes.

10  Q.   And how many times did you face that decision before?

11  A.   I don't recall specifically.

12  Q.   Was it several?

13  A.   Several, yes.

14  Q.   And did you approach them in the same way?

15  A.   Each neurosurgical patient, particularly when it comes to

16  hemorrhages, is so complex, I really can't say that as a

17  general statement.

18  Q.   So this issue, this occurrence of patients coming in

19  needing neurosurgical procedures on Xarelto, this was something

20  that you had seen happen before.  It was an issue for you on

21  prior occasions?

22  A.   Yes.

23  Q.   Based upon any of those experiences, did you go to any

24  books, resources, medical affairs resources at the companies,

25  anything like that to get additional information about these

1    situations you were having to deal with?

2    A.    I mean, we've looked up papers.  I'm the program director

3    for a residency training program, so we've done some journal

4    clubs just as a review of various anticoagulations as it

5    applies to neurosurgical procedures.  Yes, we've done that.

6    Q.    But in terms of that research or journal club that you had

7    done at that point, the end product of that was still to think

8    that there was no test that provided helpful or useful

9    information; is that right?

10   A.    Yes, that's correct.

11   Q.    Had you ever received any information from either Bayer or

12   Janssen on the issue of the usefulness or helpfulness of the PT

13   test?

14   A.    No, I had not.

15         MR. HONNOLD:  Your Honor, may I approach again?

16         THE COURT:  Yes.

17   **BY MR. HONNOLD:**

18   Q.    Doctor, I'm going to hand you now the next Exhibit

19   Number 5769152.232 (Verbatim).  Same as before, if you would

20   take a look at that.

21         MR. HONNOLD:  Mr. Irwin, this is a consult note.

22         MR. IRWIN:  What are the last three digits, please?

23         MR. HONNOLD:  I'm sorry.  It is 153.232.

24         MR. IRWIN:  No objection, Your Honor.

25         THE COURT:  Okay.

1   A.    (Reviewing document.)

2         THE COURT:  Let it be admitted.

3         MR. HONNOLD:  I offer it at this time.

4              Thank you, Your Honor.

5         THE COURT:  What's the number?

6   A.   Is it 153 or 152?

7         MR. HONNOLD:  75, Your Honor.

8         THE COURT:  It will be admitted as 75.

9   **BY MR. HONNOLD:**

10  Q.   All right.  Can you explain to us what this document is,

11  Exhibit Number 75?

12  A.   This is part of the medical record or the electronic

13  medical record, and this is my reviewing Dr. Riffle, my

14  resident's notes, and attesting to the fact that I have seen

15  the patients; I've reviewed all the relevant information; that

16  I, you know, was in agreement with the plan that was laid out

17  per the documentation by the resident; and often followed by a

18  short, succinct synopsis of what I feel are the major points.

19  Q.   Is "Hail Mary" written in there anywhere?

20  A.   I'm sorry?

21  Q.   Is "Hail Mary" written in there anywhere?

22  A.   No.

23  Q.   If we look down here at the next to last line, it says:

24  "Now that her Xarelto has had a chance to clear," does that

25  essentially sum up kind of the end result of the guesstimation

1    process that you had gone through?

2    A.    Yes, roughly.

3    Q.    And so your view now is that she had been allowed to go

4    through at least a half-life or extended half-life of the drug,

5    right?

6    A.    Yes.  That's correct.

7    Q.    So, I just want to make sure we're clear on this, that

8    just because a patient has gone through a half-life or extended

9    half-life, that doesn't mean all the drug is out of her system

10   necessarily, right?

11   A.    No.  That's correct.

12   Q.    So you were potentially willing to entertain this surgery,

13   even if there was some drug still on board, correct?

14   A.    Yes.

15   Q.    And the reason that you were doing that was that now, some

16   12 hours had passed since she had come in, and you are now

17   thinking if this is going to happen, now we need to go, right?

18   A.    Well, it has to do with the fact that we had maximized the

19   medical therapy, and that -- or had maximized the medical

20   therapy, and that there was neither an improvement or a

21   decline.

22   Q.    So you say:  "I offered the family the option for

23   bilateral EVDs with possible TPA."  Okay.  So when you say that

24   I am offering to family this option, what does that mean?

25   A.    That means that, you know, I -- so often when I use the

1    word "option" for urgent, emergent cases, I often refer to that

2    as a way in which I discuss intervention as one option to

3    proceed, and that there are other options, and I often will

4    explain to them about -- I often give them the option of

5    continued medical therapy or the option of proceeding with

6    surgery or the option of not doing anything further.  So this

7    is one of the options that we discussed.

8    Q.    You were still in the world, though, now from your

9    position as the neurosurgeon, offering the chance that we

10   talked about before, I mean, it's now happening, correct?

11   A.    Yes.

12   Q.    Doctor, when Mrs. Orr arrived at Ochsner main campus

13   shortly after 1:00 A.M., it was an urgent situation where she

14   needed an emergency intervention, correct?

15   A.    Yes.

16   Q.    There was a need for you to know whether she had Xarelto

17   on board, wasn't there?

18   A.    Yes, that would have helped.

19   Q.    Would it have been helpful and useful to have a lab test

20   that would readily and quickly give you an answer about whether

21   there was drug on board?

22   A.    It would have certainly added to the amount of information

23   that I had to make a decision --

24   Q.    And that's especially -- excuse me, I'm sorry, Doctor.

25   A.    That's okay.  Go ahead.

1      Yes.  So, I mean, if I had that test, it would have been

2   helpful.

3   Q.    It's especially true in a patient like Mrs. Orr, who can't

4   specifically tell you whether they had taken their last dose of

5   medicine at suppertime, right?

6   A.    Yes, that's fair to say.

7   Q.    This is the sort of situation where that type of test,

8   that useful, helpful test to determine drug on board would be

9   most useful; fair statement?

10  A.    It would have added value, yes.

11  Q.    Added value for the benefit of your patients, correct?

12  A.    Added value to the whole clinical decision-making process.

13  Q.    Doctor, if she had not been on anticoagulation, do you

14  think you would have recommended more aggressive earlier

15  treatment?

16  A.    I may have.  I don't know.

17  Q.    It would be fair to say that you probably would have --

18  your course, if you were able to do it earlier, probably --

19  strike that.  I'm sorry.

20      You probably would have been -- I'm going to start over.

21      If she had not been on anticoagulation, you probably would

22  have placed the catheters earlier upon admission; isn't that

23  right?

24  A.    I may have.

25  Q.    Okay.  Do you remember when we took your deposition?

1    A.    Uh-huh.

2    Q.    Okay.  So let's go to page -- I want you to look at it.

3    Let's go to Page 34.  While you are looking for the page, you

4    know the deposition is a process where we brought you before a

5    court reporter.  You were sworn to tell the truth just as

6    today, right?

7    A.    Yes.

8    Q.    And we asked you certain questions under that oath,

9    correct?

10   A.    Yep.

11   Q.    Okay.  You had the ability, if you didn't hear or

12   understand a question, to let us know that it wasn't said right

13   or clearly, correct?

14   A.    Yes.

15   Q.    Do you see the question that starts on Page 34 at Line 15?

16   A.    Uh-huh.

17   Q.    Let me read that for you:  "Had she not been on

18   anticoagulation, do you think you would have recommended more

19   aggressive earlier treatment?"

20         Did I read it correctly?

21   A.    Yes, you did.

22   Q.    What was your answer that day?

23   A.    I said -- I think that, if she's not been on an

24   anticoagulation, I think the only thing I would have done

25   differently probably would have been to place the ventricular

1    catheters earlier, upon admission, rather than waiting until

2    the next morning or the next day.

3    Q.    Okay.  So probably earlier upon admission, right?  Fair

4    way to use "probably"?  More likely than not?

5    A.    "Probably" is the same as "may," in my opinion.

6    Q.    When you say "earlier" and you do say "upon admission,"

7    meaning certainly close in time to when she got to the

8    hospital?

9    A.    I'm sorry?

10   Q.    When you say earlier upon admission, meaning closer in

11   time to when she first got to the hospital?

12   A.    Yes.

13   Q.    The reason you wanted to intervene and place these

14   catheters earlier was because that would have given her a

15   greater chance of a positive outcome, right?

16   A.    That may have relieved the pressure faster.  Yes.

17   Q.    When you see increased intracranial pressure like that

18   that Mrs. Orr had, you want to intervene as soon as possible,

19   right?

20   A.    Yes.

21   Q.    The reason that you want to do that is because, when it

22   relates to strokes and increased pressure from hemorrhage, time

23   is brain, right?

24   A.    Yes.

25   Q.    And what "time is brain" really means is that means in the

1    sense that the longer the brain is under pressure and the

2    longer the brain is ischemic, then the more cells will likely

3    die or be impaired.

4         That's true, isn't it?

5    A.   So I think you're overlapping two different concepts.  So

6    the common way -- expression of time is brain is really not to

7    drive -- for stroke awareness.

8         And the stroke that this typically refers to is ischemic

9    stroke, which is the blood clot that clots off the blood

10   vessels which essentially cuts off the blood supply to the

11   brain.

12        So the sooner you are able to get to a place that can

13   break up that blood clot, the sooner your blood flow can

14   restore to the brain and, hence, supply it with the oxygen it

15   needs, which is a little bit different than increase in

16   intracranial pressure.

17        In general, once the pressure in your head or brain goes

18   up, that does produce a greater pressure for which the blood

19   needs to pump to get to the brain.  But it's not quite the same

20   type of comparison as an ischemic stroke.

21   Q.   Doctor, go to Page 35, please, Line 7.

22   A.   Okay.

23        THE COURT:  Let's use the overhead.  Show it so the

24   jury can see.

25        MR. HONNOLD:  Certainly.

1    BY MR. HONNOLD:

2    Q.    Doctor, Page 35, Line 7, did I ask you the following

3    question?

4    A.    That's correct.

5    Q.    "I guess my question is why did you want to intervene

6    earlier?"

7          Did I read that correctly?

8    A.    Yes.

9    Q.    What was your answer?

10   A.    (As read) Well, I think, in general, with strokes and

11   increased pressure from hemorrhage time is brain in the sense

12   that the longer the brain is under pressure and the longer the

13   brain is ischemic, that more cells are likely to die or be

14   impaired from.  Yes.

15   Q.    And that's the answer that you gave in your deposition

16   last summer, correct?

17   A.    That's correct.

18         MR. HONNOLD:  Your Honor, I want to inquire.  Do you

19   want to take a morning break?

20         THE COURT:  Let's break here.

21              Court will stand in recess for ten minutes.

22         THE COURTROOM MANAGER:  All rise.

23              (The jury exited the courtroom.)

24                  (Court is in recess.)

25         THE COURTROOM MANAGER:  All rise.

1                    (The jury entered the courtroom.)

2              THE COURT:  Be seated, please.  Anything further?

3              MR. HONNOLD:  Yes, Your Honor.

4    BY MR. HONNOLD:

5    Q.    Dr. Bui, just picking up on the issue of the brain being

6    under pressure, in those situations, generally speaking,

7    earlier treatment equals better chance of positive outcome; is

8    that right?

9    A.    Yes, that's fair to say.

10   Q.    Now, Doctor, I just want to ask you one thing:  You

11   mentioned -- you used the phrase "Hail Mary."  Do you remember

12   that?

13   A.    Yes, earlier.

14   Q.    And I showed you the note about the EVD procedure, and it

15   didn't say "Hail Mary" in that note.  You know that after the

16   EVD that you performed, while you might -- on the CT scans

17   maybe showed some benefit in terms of removing some fluid and

18   perhaps decreasing the pressure a little bit for some period of

19   time, right?

20   A.    Yes.

21   Q.    But we all know that Mrs. Orr did not survive.  There were

22   several more days that went on and she passed away.  You know

23   that, right?

24   A.    Yes.

25   Q.    There was a point in time where you offered the family

1    another type surgical procedure, a craniotomy where actually

2    half of the skull might be removed?

3    A.   I believe we discussed it, yes.

4    Q.   Now, is it possible -- I'm just trying to be as fair as I

5    can on that -- is it possible that that's the procedure that

6    was later in the hospitalization, that that's the one that you

7    offered described as a Hail Mary situation?

8    A.   I don't recall the exact wording with the family at the

9    time, no.

10    Q.   Well, I just want to try to refresh your recollection a

11    little bit.

12    A.   Okay.

13    Q.   If you go to Page 31 of your deposition, and I'm

14    just going to show it to you just to try to clear this up.  Do

15    you see there at the top of Page 31, this is in the course of

16    your deposition where there were several questions asked about

17    when did you see her next, can you see that by way of context?

18    A.   Uh-huh.

19    Q.   And at Line 2, there's a question that says:  "Okay.  When

20    was your next observation of Mrs. Orr?"

21    Do you see that?

22    A.   Uh-huh.  Yes.

23    Q.   Now, if you read through that answer, I think you'll see

24    that this is a situation later where Mrs. Orr was not doing

25    well or had not responded after the EVDs, and if you read that

1    answer, you see there's a discussion of a surgery.  Why don't

2    you look at that.

3    A.    Yeah.

4    Q.    So does this perhaps refresh your recollection that it

5    was -- it actually was the procedure called the

6    hemicraniectomy, or surgical removal of half of the skull in

7    order to give the brain more room?

8    A.    Uh-huh.

9    Q.    That was really discussed in context of, quote, unquote, a

10   Hail Mary type of approach for her?

11   A.    Yes.  So, again, just to be clear, I think the phrase --

12   the colloquial phrase "Hail Mary" is, as we all know, sort of a

13   fairly desperate attempt with low chance for success.  So I do

14   often use that terminology, just so that the patient and family

15   can sort of have a rough estimation that we're talking about a

16   low probability type of procedure.  It's not really tied to one

17   particular type of procedure.  It's not really saying that a

18   craniectomy is not often done in better type circumstances.  I

19   think that was just to explain that it was a low chance.  And I

20   think earlier when I phrased the term "Hail Mary" for

21   ventriculostomy, it's in the same type of concept, which is I'm

22   willing to be aggressive and do more invasive intervention, but

23   it's not going to come at a high probability of success, and

24   the family has to accept the fact that it is low probability

25   for success and they're willing to take that risk.  So yes.

1    Q.    Would you at least agree with me, though, that in terms of

2    your deposition and the medical records, you didn't describe

3    the EVDs, at least to us, as a Hail Mary procedure?

4    A.    Yes.  Yes.  Yes.  That's correct.

5    Q.    We can have that understanding as it relates to the EVD

6    procedure performed at 2:00 P.M. on April 25th, that was not

7    referred by you to us in deposition and the records as Hail

8    Mary?

9    A.    That's correct.  In the deposition, I did not refer to

10   that as Hail Mary.

11   Q.    Would you take issue with these folks sitting here if they

12   said you didn't describe the EVD as a Hail Mary?

13   A.    No.

14   Q.    Okay.  Does that clear the Hail Mary issue up?

15   A.    Yes.

16   Q.    Doctor, you also have an opinion that the bleed itself,

17   when it's -- let's go back.  Your view is headache that started

18   at 6:30, most likely in your view is when the bleed probably

19   started?

20   A.    Yes.

21   Q.    Dr. Bui, can you state to a reasonable degree of medical

22   probability, meaning more likely than not, whether the Xarelto

23   had anything to do with her hemorrhage?  What's your answer to

24   that?

25   A.    Say that again.

1    Q.    Sure.  Can you state to a reasonable degree of medical

2    probability, meaning more likely than not, whether the Xarelto

3    had anything to do with her hemorrhage?

4    A.    I would have to assume that being on anticoagulation

5    contributes to that for sure, yes.

6    Q.    Okay.  So is it fair to say that you think that her being

7    on Xarelto contributed to the bleed, right?

8    A.    There's no way to know exactly what causes a bleed.  We do

9    know that anticoagulation increases the chances for spontaneous

10   hemorrhage.  Besides hypertension, I didn't see any other

11   obvious lesions or reasons for her to have a spontaneous

12   hemorrhage.

13   Q.    Right.  On the CT scans, I think you told us previously

14   that the CT scan in terms of the hemorrhage, it did not look

15   like the classic hypertension type of brain bleed, right?

16   A.    It's not in the more common locations for hypertension.

17   Q.    It was not the type of bleed that could cause radiologists

18   or neurosurgeons to look at the CT scan and say, that's a bleed

19   from hypertension?

20           MR. IRWIN:  Objection, Your Honor, leading.

21           THE COURT:  Rephrase it.

22           MR. HONNOLD:  Sure.

23   BY MR. HONNOLD:

24   Q.    Doctor, we can agree that in terms of the brain bleed and

25   how Sharyn Orr's bleed looked on the CT scan, did it look like

1    a classic hypertensive bleed in the areas where those normally

2    occur?

3    A.    It did not to me.  It did not look like a classic.

4    Q.    Doctor, can you go to Page 120 of your deposition, Line 6.

5    A.    Okay.

6    Q.    At Line 6, did I ask you this question:  "And you don't

7    know to a reasonable degree of medical probability whether the

8    Xarelto had anything to do with her hemorrhage?"

9          And actually, in fairness, this is being asked by another

10   lawyer, I think.

11   A.    Yes.

12   Q.    You say then:  "Define medical probability."  You see

13   that?

14   A.    Yes, I do.

15   Q.    Then they say:  "More likely than not"?

16   A.    Yes.

17   Q.    And if you review your answer, do you see where you say:

18   "I think that being on Xarelto contributed to the effect"?

19   A.    Yes.

20   Q.    So at least you agree that Xarelto is a substantial

21   contributing cause to her bleed?

22   A.    Yes.

23   Q.    You knew Mrs. Orr had renal failure, right?

24   A.    Yes.

25   Q.    You knew that she was on, while a renally adjusted dose,

1    it was the largest dose that was available or proved for

2    renal-failure patients, the 15 milligrams, right?

3    A.   I don't recall if I knew the exact dosing at the time or

4    not.

5    Q.   Is it fair to say as to the initial EVD that was done on

6    the afternoon of April 25th, that even though you thought her

7    prognosis was poor, you thought that there was some potential

8    reasonable benefit from the intervention?

9    A.   Yes, that's fair to say.

10   Q.   So when you say "some potential" or "some reasonable

11   benefit to be expected from the procedure," it's fair to say, I

12   was thinking that it might work?

13   A.   Yes.

14   Q.   And so under the time is brain theory, if we go back

15   12 hours, so let's look at the clock and think what that means.

16   10:00 until 11:00 A.M. now, we'd add 12 hours, 10:00 to

17   11:00 P.M. tonight.  24 sit-com shows, 72 10-minute segments.

18   If you go back that long for Mrs. Orr under the time is brain

19   theory, her chances would have been better between 1:00 and

20   2:00 A.M., close in time to when she hits the door at main

21   campus, right?

22   A.   I would have definitely had the discussion earlier.

23   Q.   You would have definitely had the discussion earlier,

24   meaning you would have wanted to do it sooner?

25   A.   I would have given the family the option earlier.

1    Q.    The thought being the sooner the better, right?

2    A.    Yes.

3    Q.    You knew time is brain, correct?

4    A.    Yes.

5    Q.    Meaning the more time Sharyn Orr's brain is confined in

6    what you described as the closed box of the skull with blood in

7    there, blood that's going to turn into solid clot over time,

8    even more so, and a blockage of her cerebral spinal fluid so it

9    can't circulate, you knew that that process was going to

10   continue and jeopardize her brain even more and cause her to

11   lose chance of survival, right?

12   A.    Yes, I think --

13        MR. HONNOLD:  I don't have any other questions for you,

14   Doctor -- thank you -- right now.

15        THE COURT:  Cross.

                        **CROSS-EXAMINATION**

17   BY MR. IRWIN:

18   Q.    Good afternoon, Doctor.  My name is Jim Irwin.  You and I

19   have met before; is that correct?

20   A.    Yes.

21   Q.    And I hope you do understand that we have absolutely no

22   criticism of any of your treatment or any treatment of any of

23   your folks on your team or any treatment of any healthcare

24   provider for Mrs. Orr.  Do you understand that?

25   A.    Yes, I do.

1  Q.   I hope you also understand, we might have said this at the

2  deposition as well, that we have no criticism at all and

3  nothing but sympathy for the Orr family.  Do you understand

4  that?

5  A.   Yes.

6  Q.   Do you know Dr. St. Martin, Dr. Bui?

7  A.   I do not know Dr. St. Martin directly.  I think we may

8  have shared a patient in the past, but I do not know --

9  Q.   You know that Dr. St. Martin is a cardiologist --

10  A.   Yes, I do.

11  Q.   -- here in town?

12  A.   Yes.

13  Q.   Now retired; you know that?

14  A.   Yes.

15  Q.   Do you know that also, either from the medical records or

16  from the family, do you know also that Dr. St. Martin was

17  Mrs. Orr's prescriber, the person who prescribed the Xarelto to

18  her?

19  A.   Yes, I do.

20  Q.   For atrial fibrillation?

21  A.   Yes, right.

22  Q.   As we sit here today, do you have any reason to criticize

23  or second-guess any of Dr. St. Martin's prescribing decisions?

24  A.   No, none whatsoever.

25  Q.   What is your understanding as to when this event, this

1   hemorrhage began?  Do you remember?  Do you have any

2   recollection of that?

3   A.    It was per the history of the family that it was shortly

4   after a meal.  I believe that she stated that she wasn't

5   feeling well.  I believe she may have had some nausea and

6   vomiting on the way home or shortly after being home.  Then the

7   history, as I recall it, was that the patient went to bed and

8   then woke up a couple of hours later, was altered and not

9   herself.

10       Clearly there was a history of headaches, nausea,

11  vomiting, and then I believe some weakness on the left side of

12  her body, which prompted the family to take her into Baptist

13  emergency room.

14  Q.    That's a pretty good recollection, Doctor.  Do you

15  remember that it was Ruth's Chris Steak House; does that ring a

16  bell?

17  A.    (Shaking head negatively.)

18  Q.    No?  Those symptoms, the headache, nausea and vomiting,

19  are those known in your profession as something of sentinel

20  symptoms of a hemorrhage of this kind?

21  A.    It can be.

22  Q.    Based on what you know of the medical history that you

23  have just described, would it be your best judgment that this

24  hemorrhage occurred on or about that time when she was having

25  dinner?

1    A.    Most likely, yes.

2    Q.    There was a reference to the radiologist at Ochsner

3    Baptist.  That's Dr. Ogden?

4    A.    Okay.

5    Q.    Do you know Dr. Ogden?

6    A.    Not personally, but professionally.

7    Q.    Do you know that he is a general radiologist and not a

8    neuroradiologist; is that correct?

9    A.    Yes, that's correct.

10   Q.    What's the difference?

11   A.    Neuroradiologists will have some additional training to

12   have typically more in-depth interpretations of brain or spinal

13   cord imaging.  They tend to be more differentiating on more

14   specialized tests of the brain such as special MRI scans,

15   different types, protocols for brain imaging, so -- but it

16   doesn't preclude a general radiologist from interpreting the

17   CAT scan of the brain, no.  So that's the difference.

18   Q.    When you saw that CAT scan, that CT scan for the first

19   time, what was your reaction?  What were you thinking when you

20   saw that scan?

21   A.    I felt she needed to be transferred, and that she had a

22   pretty significant intraventricular hemorrhage.

23   Q.    And what is an intraventricular hemorrhage?

24   A.    So, we place a -- there is no good way to know exactly

25   where -- let me rephrase.

1    I think there are only certain situations where we know

2    exactly where a hemorrhage originates, particularly if a

3    patient had a preexisting lesion somewhere that -- you know, an

4    aneurysm or something.  When a patient has a large hemorrhage

5    in the brain, we tend to label that just based on the gross

6    location of it, based on the space, and the ventricles are

7    large fluid spaces deep within the brain.  There are four of

8    them.  The two larger ones are the lateral ventricle, and one

9    of the common locations for the blood to go and be trapped is

10    inside this fluid space.

11    So in her case, this large blood clot essentially filled

12    up one of the cavities of fluid on the right side of the brain

13    called the ventricle, so that's why we call it an

14    intraventricular hemorrhage.

15    Q.    Now, I believe you have described this bleed as a massive

16    bleed?

17    A.    Yes, it was a large bleed.

18    Q.    And what is your definition of a large bleed?

19    A.    I think there's no agreed upon -- this is like a --

20    there's no agreed-upon scientific definition of what is large

21    compared to moderate.

22    But, in general, any hemorrhages that cause significant

23    shifting of the brain structure, pushing the brain over to one

24    side or the other, causes significant surrounding edema.  I

25    would consider it large.  From a volume perspective, I think

1    anything greater than 3 centimeters I would consider large.

2    Q.    And you did see also the second CT scan that was done at

3    4:00 in the morning?

4    A.    Yes, I did.

5    Q.    And it was significant to you that that second CT scan was

6    determined to be stable?

7    A.    Yes, it was.

8    Q.    Meaning that it was indicative of the fact that there was

9    no further bleeding -- or no further detectable bleeding after

10   the scan at 11:45 -- between 11:45 and 4:00 or 4:30 in the

11   morning?

12   A.    Yes.

13   Q.    And why was that important to you?

14   A.    I think, from a prognosis standpoint, if the blood clot

15   had gotten larger, it would have -- or caused more pressure or

16   more shift.  So that was of some importance to me, that the

17   clot was stable.

18   Q.    So one of the first things that you did, though, was to

19   treat her medically with mannitol; is that right?

20   A.    Yes.  I believe we gave her various forms of diuretics,

21   which are medications to remove some fluid from the system.

22   Certain drugs like mannitol was given, which have a way to draw

23   some fluid from the brain cells itself to reduce the volume of

24   the brain, hence, help bring down the pressure.

25   Q.    And you started that at approximately when, the mannitol?

1    A.    It was ordered pretty much right when she got to the door.

2    Q.    And this would be standard medical treatment for a

3    hemorrhage of this kind?

4    A.    That is one of the routine medical treatments.

5    Q.    And would this be the kind of routine medical treatment

6    you would use with a hemorrhage in an individual who had no

7    history at all of being exposed to any anticoagulant?

8    A.    Yes.

9    Q.    This would be the same kind of medical treatment you would

10   use if a person came in who had a history of having been on

11   warfarin?

12   A.    That would depend on the size of the hemorrhage, but...

13   Q.    If there was a hemorrhage of this size --

14   A.    Yes.

15   Q.    -- similar size as Mrs. Orr's, you would have used the

16   same medical mannitol treatment for someone of that -- in that

17   predicament?

18   A.    Most likely, yes.

19   Q.    Same thing with all the other NOACs?  The approach would

20   have been the same?

21   A.    Again, given the caveat that each patient is different.  I

22   think, if all things were the same, then, yes.

23   Q.    That's my question.

24         Let's talk a little bit about midline shift that you've

25   alluded to earlier.  You could actually see that on the CT

1    scans; is that right?

2    A.    That's correct.

3    Q.    And, actually, I think it was Mr. -- or Dr. Ogden actually

4    measured on one of the CT scans the amount of midline shift?

5    A.    Okay.  Yes.

6    Q.    You remember that?  And do you remember what the

7    measurement was.

8    A.    I don't recall.

9    Q.    If I suggested to you it was about 1 1/2 centimeters, does

10   that sound right?

11   A.    Yes.

12   Q.    That would be a very significant midline shift.  Would you

13   agree with that?

14   A.    That is a significant midline shift.  Yes.

15   Q.    And would you consider -- and I use this word delicately

16   in front of this family.

17       But would you consider that a midline shift of that degree

18   of 1 1/2 centimeters is an ominous sign?

19   A.    So midline shift or the radiology appearance of a scan

20   alone does not typically correlate perfectly well with

21   prognosis.  I think it has to be taken in conjunction with the

22   neurologic status of the patient.

23   Q.    And taking it in conjunction with that neurological

24   status, how would you evaluate the degree of that midline

25   shift?

1   A.   Given the exam that she had by the time she got to us, I

2   felt that it was fairly grave.

3   Q.   Now, when you put in the catheters, the shunts, the EVDs,

4   the likelihood was that the best strategy was that those EVDs

5   were going to remove -- or attempt to remove the cerebrospinal

6   fluid.  Is that right?

7   A.   It was a combination.  It was to remove the cerebrospinal

8   fluid and potential, also, to help drain some of the clot.

9   Q.   And the cerebrospinal fluid filled up the ventricles on

10  the left side of the brain; is that right?

11  A.   The cerebrospinal fluid is throughout the whole brain, but

12  the left lateral ventricle did have fluid in it.  But so did

13  the other ventricles.

14  Q.   But the ventricle on the right side of the brain was the

15  one that was predominantly filled with the blood?

16  A.   That's correct.

17  Q.   And when you actually did install the EVDs, they were

18  generally successful in removing the cerebrospinal fluid; is

19  that right?

20  A.   Yes.

21  Q.   And while the EVDs were put into the right side of the

22  brain where the blood was along with that TPA, there was some

23  removal of some of the blood in the right side of the brain,

24  but not a lot; is that correct?

25  A.   It did remove a moderate amount.  It cleared up a lot of

1    the blood that was on the right frontal horn.  But the

2    ventricle is in a complicated curvilinear shape, like a C.

3         So the part that was in the frontal horn cleared, but the

4    part that was trapped down by the temporal area, or the bottom

5    part, was still there.

6    Q.   Was there any realistic expectation that the EVD alone was

7    going to be able to evacuate and remove that entire clot?

8    A.   Sometimes I have been able to clear out entire ventricles

9    with one catheter.  Yes.

10   Q.   What was your expectation of removing this particular clot

11   with Mrs. Orr?

12   A.   There was no way to know until we saw how well the first

13   TPA clears, because it comes down to whether the TPA can

14   actually get to the whole clot or not.

15        And for unknown reasons, sometimes a TPA can reach and

16   clear the whole clot and sometimes it gets part of the clot.

17   And that's just my personal experience.

18   Q.   And you did not consider any further type of surgical

19   approach, anything else more aggressive than that, did you?

20   A.   We did.  We had a discussion toward the end about a

21   hemicraniectomy.

22   Q.   You never considered trying to actually go in surgically

23   and remove that clot, did you?

24   A.   I had considered it.  But, you know, I guess -- I think

25   the -- in my personal experience, that can sometimes be more

1   harmful.  So we elected to go with a catheter instead of an

2   open evacuation.

3   Q.    And in this case, was it your judgment, on the balance of

4   those considerations, that that was probably not the right

5   choice, to try to attempt to surgically remove that clot?

6   A.    I think that -- you know, like I said, any decision for

7   surgery is fairly complex and fairly multifactorial.  I think

8   that, in her particular case, the things that factored into my

9   decision-making was what is the -- given the fact that she was

10  potentially on an anticoagulation agent that I could not test

11  or reverse, that I wanted to go with the least invasive option

12  to evacuate the clot.

13  Q.    What is the Glasgow Coma Score?

14  A.    The Glasgow Coma Score is a scale developed by a

15  neurologist -- maybe -- or two neurologists that allows for a

16  relatively quick assessment of neurologic function and

17  potentially tie it to outcome.

18  Q.    It basically measures three things; is that right?  It

19  measures sight, movement, and speech?

20  A.    Yes.

21  Q.    All of those things are fairly objective, hopefully?

22  A.    Yes.

23  Q.    And by measuring those three categories of sight,

24  movement, and speech, there's a calculation that you

25  neurosurgeons use to try to figure out the degree of coma that

1    a person might be in?

2    A.    Yes.

3    Q.    So all of us here today are -- we're all 15s, presumably;

4    is that right?

5    A.    Yes, presumably.

6    Q.    So you get five points if your sight is good and normal,

7    you get five points if your movement is normal, and you get

8    five points if your speech is normal.

9          And that makes you a 15?

10   A.    No.  That's actually --

11   Q.    No?

12   A.    Yeah.  So you get six points for your movements, five

13   points for your speech, and four points for your eyes.  But

14   yes.

15   Q.    I was never very good in math.  Thank you.

16         And so when a person's speech declines or when a person's

17   vision or sight declines or when their movement declines in

18   certain defined categories, their total score goes down; is

19   that right?

20   A.    Yes.

21   Q.    Tell us what Mrs. Orr's Glasgow Coma Score was when you

22   saw her, more or less, at the time she was admitted to the

23   Ochsner main campus.

24   A.    So, like I said, the score is three components.  So for

25   the -- the major arm of the score is actually the motor score,

1   which is, if you were able to follow commands, which means that

2   you can comprehend, understand and then execute the function,

3   then you get a motor score of six.

4        Once you're no longer able to follow a command, assume

5   that your level of being awake or being able to comprehend

6   things declines after that, the next things our body is really

7   wired to respond to is pain.

8        And if you are able to localize to the pain, which means

9   that, if I pinch you, you're able to know cognitively where the

10  pain is coming from and you actually go toward my hand to swat

11  it off, that gets you a five.

12       If you are still aware of the pain, but just didn't have

13  enough cognition to really figure out where the pain is coming

14  from, so our body will instinctively draw away from the pain,

15  then that is a four.

16       And anything below that gets into really reflexive things

17  in which you -- the certain types of circuitry in the brain

18  that sort of moves the arm up and down.  So depending on how

19  deep of a coma you are in, you can then have reflexive actions.

20       So for Mrs. Orr, she was able to withdraw from pain, which

21  gave her a score -- a motor score of four.

22       Now, the verbal score, which is typically when you ask

23  someone, "Do you know where you are," and the time and date and

24  things like that, if you're able to respond appropriately, that

25  means that you are not confused and are able to speak.

1        But in her case, because she came on a ventilator, which

2   meant that you have to put a breathing tube into the airway --

3   the most common way is actually going through your mouth.

4        So if you have that in place, we actually don't kind of

5   score that.  We give you a T for a tube, I guess.  So she had a

6   breathing tube in.

7        And then the final part of the score is whether you are

8   awake, whether your eyes are open spontaneously or it takes

9   some stimulus or pain or whether you respond to voice.

10        And in her case, she had her eyes closed.  So her overall

11   score was a 5t, which meant that she had a four for motor, a

12   one for the eyes, and a T or letter score for the verbal.

13   Q.   And in a neurosurgeon's world, what does a 5t mean in a

14   situation like Mrs. Orr's?

15   A.   I think that varies.  People try to tie prognosis to

16   actual number.  But, again, that depend on the pathology.  The

17   original Glasgow Coma Score is really designed for brain

18   injury, like -- and not for hemorrhages and strokes.  Now we

19   have different types of scoring for hemorrhages and strokes.

20   But the Glasgow Coma, because it's easy to use, is used across

21   the board by an ER physician or physicians.

22        So, in general, in a neurosurgical realm, anything less

23   than an eight score tends to do worse than people with a score

24   above eight or tend to require more intensive neurosurgical

25   intervention.

1    Q.    Do you know why eight is considered to be something of a

2    cutoff?

3    A.    Well, I mean, eight is really, again -- because the scale

4    is really driven a lot by the motor scores.  So, in theory, you

5    can have a six in motor scores, which means that you are able

6    to follow commands, but still not speak or not open your eyes.

7          So you had a six, a one and a one, which is an eight.

8    That meant that you'd be able to follow commands and that means

9    that your brain is functioning at a level enough to be able to

10   form an executive function, which is to follow an instruction.

11         So -- but that means your brain is in better shape than if

12   you were not able to follow commands.  That's roughly where the

13   dividing line is.

14   Q.    Did Mrs. Orr, during your treatment of her, ever regain

15   consciousness?

16   A.    No, she did not.

17   Q.    During your treatment of her, did you ever notice any

18   improvement in her condition?

19   A.    No, I did not.

20   Q.    I think you have told us that having -- if you had had the

21   opportunity to implant these EVDs at 2:00 A.M. in the morning

22   instead of 2:00 P.M. in the afternoon, that it was uncertain

23   whether that would have made any difference in her outcome; is

24   that right?

25   A.    Yes.  That's fair to say.  It's uncertain.  There's no way

1    to objectively measure that.

2    Q.    And as we sit here today, Dr. Bui, you cannot state more

3    probably than not medically, scientifically or otherwise that,

4    had you been able to put these drains in at 2:00 A.M. in the

5    morning, that it would have made any difference in her outcome?

6    A.    So I guess you would have to define "difference" in terms

7    of whether she would have passed away or...

8    Q.    Yes, sir.

9          Can you tell us medically, scientifically or any other way

10   that, had you been able to put these drains in at 2:00 A.M. in

11   the morning, that she would be alive today?

12   A.    I simply don't know.

13   Q.    You were asked a bunch of questions about her chances and

14   whether she would have had any better chances had it been

15   earlier or later.  You really don't know, do you?

16   A.    No.  I think in general, if you try to alleviate the

17   pressure as fast as you can, the only way to know would be to

18   do it and then look at the -- the only way to know would be to

19   do it and see the outcome.  In a comparative statement, there's

20   just no way to know.

21   Q.    That doesn't mean, of course, that you don't try, right?

22   A.    Yes, that's correct.

23   Q.    But you just don't know whether in fact it made any

24   difference, do you?

25   A.    That's fair to say.

1    Q.    Doctor, you have over the years -- how long have you been

2    in the stroke unit at Ochsner?

3    A.    I'm not in the stroke unit at Ochsner.

4    Q.    I'm sorry.  In neurosurgery at Ochsner?

5    A.    I've been at Ochsner since the fall of 2007.

6    Q.    And since then, have you been basically in this same

7    service?

8    A.    Yes.

9    Q.    And in that ten years now, have you seen hemorrhages over

10   the years of this kind with and without patients on

11   anticoagulants?

12   A.    Yes.

13   Q.    In fact, I think you told us at your deposition you see

14   how many hemorrhages a week perhaps?

15   A.    It varies in a week whether I'm on call or not, but

16   numerous.

17   Q.    And many of those are with anticoagulants, and many of

18   them occur without anticoagulants; is that right?

19   A.    They are both ways, but it is becoming -- the percentage

20   of them on anticoagulation are going up in the last five years,

21   I would say, in my personal experience.

22   Q.    And the fact that you've seen so many hemorrhages with and

23   without anticoagulants has given you training about whether to

24   use EVDs or whether to use -- to go to surgery, more aggressive

25   approaches, depending on your experience with treating these

1    kinds of problems?

2    A.    Yes, that's fair to say.

3    Q.    And with your experience with people having hemorrhages on

4    anticoagulants, not on anticoagulants, on warfarin, on other

5    anti-DOAC, anticoagulants like Xarelto or Pradaxa or whatever,

6    as we sit here today, you cannot say that this hemorrhage would

7    have been any different had she been on any other

8    anticoagulant, can you?

9    A.    Well, I mean, I think that in general, from the

10   neurosurgical community, we're much more comfortable dealing

11   with anticoagulation such as warfarin because we have the

12   ability to give reversal agents very quickly and would likely

13   give us in general more options upfront.

14   Q.    But insofar as Mrs. Orr's condition is concerned, you

15   can't say that her event or its outcome would have been any

16   different had she been on warfarin; is that correct?

17   A.    I can't say from an outcome perspective, no.

18   Q.    So a reversal agent is a helpful thing to have for you in

19   a setting like this, but when we're talking about Mrs. Orr and

20   when we talk about her and the size of her bleed and its

21   location, you cannot state that a reversal agent for her, had

22   she been on warfarin, would have made any difference; is that

23   correct?

24   A.    I don't know, because if she was on warfarin, I would have

25   given her a reversal agent, and we likely would have had a

1    compensation for intervention invasive earlier.  I don't know

2    if it would be at 2:00 A.M.  I probably would have still given

3    some medical time for trial, but we would have given

4    anticoagulation once she hit the door and likely have had an

5    earlier compensation.

6         But from a prognostic indication, I've seen it go both

7    ways.  I've seen it not make any difference and I've seen it

8    make a difference, and for large hemorrhages, it's more often

9    than not it doesn't make a difference, but it's not zero.

10   Q.   But as for Mrs. Orr and your treatment of Mrs. Orr,

11   there's no way that you can say that this event might not have

12   happened the very same way, the very same day had she been on

13   warfarin; is that right?

14        MR. HONNOLD:  I just object, asked and answered a

15   couple of times.

16        THE COURT:  Yeah.  This is the third time that you've

17   covered this.  I think the doctor's answered, haven't you,

18   Doctor?

19        THE WITNESS:  Yes.

20        THE COURT:  Okay.  Let's move on.

21        MR. IRWIN:  Thank you, Judge.

22   BY MR. IRWIN:

23   Q.   Same question had she been on another anticoagulant like

24   another DOAC, you can't say that this unfortunate event and

25   this outcome would have been any different had she been on

1    Pradaxa, for example?

2    A.    I mean, in the -- again, she wasn't on another agent, but

3    if she was, there's no way for me to know.  It's completely

4    hypothetical at this stage.

5    Q.    Now, anticoagulants do not actually cause a vessel to

6    rupture; is that right?

7    A.    Again, I'm not a stroke neurologist, but I don't know

8    what -- so what I do know is anticoagulations have a known

9    risk, an increased risk for hemorrhages.  As to the actual --

10   what triggers the blood vessel breakage, whatever, I simply

11   just don't know.

12   Q.    Do you have any evidence that anticoagulants actually

13   cause a rupture or a penetration in some way in an artery that

14   might then lead to a bleed?

15   A.    No.

16   Q.    Were you generally aware of Mrs. Orr's history of

17   hypertension from the medical records?

18   A.    In general, yes.

19   Q.    And you know that hypertension is a major risk for brain

20   hemorrhages?

21   A.    Hypertension is a risk for brain hemorrhages, but it's

22   also a risk for lots of other things.

23   Q.    Now, your view was that most hypertensive brain

24   hemorrhages seem to occur in the basal ganglia?

25   A.    Again, I think that -- you know, I'm not a stroke

1    neurologist.  These hypertensive hemorrhages only come to my

2    attention when they are very large.  The majority of

3    hypertensive hemorrhages may be smaller or not seem to cause a

4    mass effect, so they are typically treated by the stroke team,

5    so I don't see all of the hypertensive hemorrhages.

6        In my experience and in my training and reading of the

7    literature, hypertensive hemorrhages tend to be more often than

8    not in certain locations such as the basal ganglia, but then

9    again, the basal ganglia is a term that involves a bunch of

10   different locations in the basal ganglia, but yes.

11   Q.   Where is the basal ganglia and what does it do?

12   A.   So the basal ganglia is located fairly deep within the

13   brain, okay.  It's -- again, it depends on the location.  I

14   mean, we would have to put up a slide show for me to give you

15   an anatomy lesson here; but in general, it's a circuitry that

16   helps to modulate your movements.  It modulates some of your

17   sensation, and around the basal ganglia is what's called your

18   internal capsule.  That's where a lot of the fibers that go

19   from your cortex -- that's kind of where your executive

20   functions are, where you initiate things, that travels through

21   like a cable network through an area that sort of narrows down

22   around the basal ganglia and then going on down to your brain,

23   your brain stem into your spine, out your arms and legs.

24   Q.   And, Doctor, the thalamus is right near the basal ganglia?

25   A.   Yes.

1    Q.    And hypertensive bleeds have also been associated with

2    origin in the thalamus?

3    A.    Yes, correct.

4    Q.    And I think you told us that you could not rule out that

5    this bleed might have started in the thalamus?

6    A.    Yes.  So the two structures that are part of the basal --

7    or close to the basal are the caudate nucleus and the thalamus

8    or the thalami, the one on each side.  They are next to and

9    abut the ventricle.  So there are times when you can have a

10   hemorrhage from those locations that goes into -- they'll start

11   in one of those locations, but then because the ventricle is a

12   free space, it's easier for blood to flow into it so the blood

13   won't erupt into it.

14        In her case, her hemorrhage pretty much covered the whole

15   entire lateral ventricle, so there was no way to tell where it

16   came from.  It could have came from structures inside the

17   ventricle such as the choroid plexus and other blood vessels

18   along the ependymal wall or the lining of the ventricle.  It

19   would have come from one of the thalami, but I didn't see any

20   blood specifically in the thalamus or the caudate or anywhere

21   in the basal ganglia just based on that CAT scan.

22   Q.    Doctor, you can't rule out that this was a hypertensive

23   bleed, can you?

24   A.    I can't rule it out, no.

25   Q.    Do you know who Dr. Mahanna is?

1   A.   Yes.

2   Q.   And what was her role in this treatment of Mrs. Orr?

3   A.   I believe she was the intensivist.

4   Q.   Do you remember what her conclusion was as to the cause of

5   this bleed?

6   A.   I do not.

7   Q.   If we could pull up DX Orr 28.197, which is Dr. Mahanna's

8   note.  And blow it up there in the bottom.  That was her

9   conclusion.  Does that refresh your recollection at all,

10  Doctor, that she concluded that the intraventricular hemorrhage

11  was most likely hypertensive in nature?

12  A.   That's her opinion, yeah.

13       THE COURT:  Let's get to a breaking point, Counsel.

14       MR. IRWIN:  You want to break here, Your Honor?  I know

15  you've got an obligation.

16       THE COURT:  We're going to have to break here at this

17  time.  We're going to have a little longer lunch hour.  I've

18  got a commitment that I can't get out of, so we'll be back at

19  1:30.  Court is in recess until 1:30.

20       THE COURTROOM MANAGER:  All rise.

21           (The jury exited the courtroom.)

22              (Court is in recess.)

23                   * * * *

24              REPORTER'S CERTIFICATE

25           I, Lanie M. Smith, CRR, RPR, Official Court
    Reporter, United States District Court, Eastern District of

1 Louisiana, do hereby certify that the foregoing is a true and
  correct transcript, to the best of my ability and
2 understanding, from the record of the proceedings in the
  above-entitled and numbered matter.

3

4           /s/ Lanie M. Smith
            Official Court Reporter

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25