UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION

THIS DOCUMENT RELATES TO:

Joseph Orr, Jr., as Lawful
Surviving Spouse of
*Sharyn Orr v. Janssen, et al.*
*Case No. 2:15-cv-03708*

Docket No. 14-MD-2592
Section L
New Orleans, Louisiana
Monday, June 5, 2017

*********************************************************************

**TRANSCRIPT OF TRIAL PROCEEDINGS**
**HEARD BEFORE THE HONORABLE ELDON E. FALLON,**
**UNITED STATES DISTRICT JUDGE,**
**AND A JURY.**
**VOLUME V - MORNING SESSION**

*********************************************************************

**APPEARANCES:**


FOR THE PLAINTIFFS'
LIAISON COUNSEL:

MR. ANTHONY BIRCHFIELD, JR.
Beasley Allen Crow Methvin
  Portis & Miles
Post Office Box 4160
Montgomery, AL  36103

MR. BRIAN H. BARR
MR. NEIL E. McWILLIAMS
Levin Papantonio Thomas
  Mitchell Rafferty & Proctor
316 Baylen Street
Suite 600
Pensacola, FL 32502

MR. GERALD EDWARD MEUNIER
Gainsburgh, Benjamin, David,
  Meunier & Warshauer
Energy Centre
1100 Poydras Street
Suite 2800
New Orleans, LA  70163-2800

**OFFICIAL TRANSCRIPT**

```
                                    MS. EMILY JEFFCOTT
                                    The Lambert Firm, PLC
                                    701 Magazine Street
                                    New Orleans, LA  70130

                                    MR. BRADLEY D. HONNOLD
                                    Goza & Honnold, LLC
                                    11181 Overbrook Road
                                    Suite 200
                                    Leawood, KS 66211


FOR THE DEFENDANT JANSSEN           MR. JAMES B. IRWIN, V
PHARMACEUTICALS, INC.,              Irwin Fritchie
and JANSSEN RESEARCH &                 Urquhart & Moore, LLC
DEVELOPMENT, LLC:                   400 Poydras Street
                                    Suite 2700
                                    New Orleans, LA  70130


FOR THE DEFENDANT                   MR. DAVID E. DUKES
BAYER HEALTHCARE                    Nelson Mullins Riley &
PHARMACEUTICALS, INC.,                 Scarborough, LLP and
BAYER PHARMA AG:                    Meridian, 17th Floor
                                    1320 Main Street
                                    Columbia, SC  29201


                                    MS. BETH A. WILKINSON
                                    Wilkinson Walsh + Eskovitz, LLP
                                    1900 M Street NW
                                    Suite 800
                                    Washington, DC 20036


REPORTED BY:  Mary V. Thompson, RMR, FCRR
              United States District Court
              500 Poydras, Room B275
              New Orleans, LA  70130
```

**OFFICIAL TRANSCRIPT**

EXAMINATION INDEX

PAGE NO.

Plaintiffs' Witness:

PETER LIECHTY, M.D.,

Direct Examination...................... 945

**OFFICIAL TRANSCRIPT**

1       **P R O C E E D I N G S**

2                (MONDAY, JUNE 5, 2017)

3                   (MORNING SESSION)

4

5                              (Call to order of the court.)

6                              (Jury in at 8:43 a.m.)

7            THE COURT:  Be seated, please.

8            Good morning, ladies and gentlemen.  I hope everybody

9   had a good weekend.  Appreciate you coming back.  And we're in

10  for the second week.

11           Let's call your next witness, please.

12           MR. HONNOLD:  Good morning, Your Honor.

13           At this time the plaintiffs call Dr. Peter Liechty to

14  the stand.

15                              (The oath was administered.)

16           THE CASE MANAGER:  For the record, sir, please -- you

17  can have a seat -- state and spell your name.

18           THE WITNESS:  Peter Liechty, L-i-e-c-h-t-y.

19                       **PETER LIECHTY,**

20  having been first duly sworn, testified as follows, to wit:

21                       **DIRECT EXAMINATION**

22  BY MR. HONNOLD:

23      **Q.**   Dr. Liechty, good morning.

24           Could you please introduce yourself to the jury,

25  please.

**OFFICIAL TRANSCRIPT**

1      **A.**    Yeah.  My name is Peter Liechty.

2      **Q.**    And what is it that do you for a living?

3      **A.**    I'm a neurosurgeon.

4      **Q.**    And you understand you're here today -- you've been

5   retained as an expert witness on behalf of the plaintiffs, the

6   Orr family?

7      **A.**    Yes.

8      **Q.**    What I would like to do, Dr. Liechty, is spend some

9   time going over the nature of your medical education and training

10  and background as well as your professional experience and

11  qualifications.

12          First of all, can you give us, by way of an overview --

13  let's walk through kind of your medical education and background.

14          First, did you attend undergraduate college?

15     **A.**    Yes.

16     **Q.**    And where did you do that?

17     **A.**    Hope College.

18     **Q.**    And after completing undergraduate school, did you go

19  on to medical school?

20     **A.**    I did.

21     **Q.**    And where did you graduate from medical school?

22     **A.**    From Chicago Medical School.

23     **Q.**    And can you explain, generally, to the ladies and

24  gentlemen on the jury, basic medical school, how much time is

25  involved in terms of span of years?

**OFFICIAL TRANSCRIPT**

1   **A.**    So a few years are spent in basic sciences, learning

2   basically the anatomy, pathology, things like this, pharmacology.

3   And then the latter half of medical school involves clinical

4   care, taking care of patients.  And then you go on to get further

5   training after that.

6   **Q.**    And when you then completed medical school, did you

7   have some desire and interest in continuing your medical

8   education and training in a specialty area?

9   **A.**    Yes.

10  **Q.**    And can you tell us about what you chose to do then in

11  terms of your additional training that you decided to take on.

12  **A.**    So I chose to enter into neurosurgery.

13  **Q.**    And just by way of explanation, and for the record,

14  we've put up on the screen Plaintiffs' Exhibit 5769438.

15          Is this your curriculum vitae?

16  **A.**    Yes.

17  **Q.**    And let's talk a little bit, then, about when you

18  decided to go to the University of Alabama at Birmingham.

19          First of all, can you tell us a little bit about the

20  University of Alabama at Birmingham in terms of the type of

21  institution it is, the services it offers, and its general

22  reputation in the field you chose to pursue.

23  **A.**    During my tenure there, they were the only Level 1

24  trauma center in the state of Alabama.  They were a very, very

25  busy clinical program with trauma and also well known in vascular

**OFFICIAL TRANSCRIPT**

1   issues and stroke.  So the volumes were very high.

2        Q.    So what does it mean when a facility or a hospital like

3   UAB is a Level 1 trauma center?  What's the significance of that?

4        A.    Well, it's a designation that basically -- it means a

5   number of things.  There is a neurosurgeon who is always on call

6   24/7 in house.  And it's basically a tertiary center where

7   everybody else sends their patients.

8        Q.    On your curriculum vitae, it says general surgery

9   internship as the first element of your time spent there.

10            Can you describe and explain what that means, the

11   internship.

12        A.    Yes.  So all of the surgical specialists, whether it's

13   general surgery or other specialities, like ENTs, typically do an

14   internship in general surgery as a first-year.

15            When you match in the program, you actually match to do

16   neurosurgery, and then, just by definition, you do the intern

17   year there typically at the same place.

18        Q.    You've thrown a term out that we might not all be

19   familiar with.  When you say "match," can you explain what that

20   means in terms of the process of how doctors pursue their

21   specialties?

22        A.    Right.  So, basically, there are about 80 or so slots a

23   year in the country to train in neurosurgery.  So when you

24   graduate from medical school, if you want to do that, you go

25   interview around and -- basically, at the different programs.

**OFFICIAL TRANSCRIPT**

1          And, basically, the programs rank the applicants and
2   the applicants rank the programs, and a computer algorithm puts
3   you together to try to make everybody as happy as possible.
4       Q.   And you matched with UAB and that's how you ended up
5   there?
6       A.   Yes.
7       Q.   After that one-year general surgery internship, then,
8   moving forward in time on your CV, it says UAB neurosurgery chief
9   resident or doing a residency in neurosurgery.  What was involved
10   in those years?
11       A.   Well, so, basically, as a second-year resident, you
12   begin to delve into neurosurgery as a specialty without the other
13   general surgery specialty.  So we're just focused on
14   neurosurgery.  And then some sets -- some subsets of it, like
15   pediatrics, come along with it.
16          Basically, the responsibilities increase further and
17   further the farther you get along in training.
18       Q.   Then how many years are spent in total in neurosurgery
19   residency?
20       A.   Six, including the intern year.
21       Q.   And then can you explain, generally -- we've not talked
22   yet about what neurosurgery is from your perspective, but in
23   terms of the practice of neurosurgery, what's the type of things
24   that are involved?  What sorts of diseases?  What kind of
25   patients are you taking care of?

**OFFICIAL TRANSCRIPT**

1      **A.**    So we basically treat diseases of the brain and spine

2   and peripheral nerves --

3      **Q.**    So --

4      **A.**    -- surgically.

5      **Q.**    You would deal with people that have tumors, for

6   example?

7      **A.**    Yes.

8      **Q.**    This case, as you know from the work you've done,

9   involves dealing with Mrs. Orr who had an intracranial

10   hemorrhage.  Would that have been something that you were exposed

11   to significantly in your training?

12      **A.**    Yes.

13      **Q.**    Can you talk about that specifically in the context of

14   UAB and the frequency -- or numbers of patients that you would

15   have dealt with in your residency that had intracranial bleeding

16   or hemorrhage.

17      **A.**    So every day it probably got at least three to five new

18   admissions from intracranial hemorrhaging of some sort, whether

19   it was trauma related or what have you.  So thousands of

20   patients.

21      **Q.**    During your time in residency, then, would you have

22   learned about the different types of intracranial bleeding, the

23   different forms that are presented, and whether it's

24   intracerebral or intraventricular, subarachnoid, things of that

25   nature?

**OFFICIAL TRANSCRIPT**

1      A.    Yes.

2      Q.    Would you have then learned about the different forms

3   of treatment that were indicated and appropriate for those

4   different types of intracranial bleeding?

5      A.    Yes.

6      Q.    There's been testimony so far in the courtroom about a

7   specific surgical procedure called the placement of an external

8   ventricle drain or drains.  Is that something that you're

9   familiar with?

10     A.    Yes.

11     Q.    And is that something that you would have learned how

12  to do during your medical education and training at UAB?

13     A.    Yes.

14     Q.    Can you describe to the ladies and gentlemen of the

15  jury your particular personal experience in performing the EVD

16  and your training and how often that would have been something

17  you would have been involved in?

18     A.    So it was a very common intervention.  I personally did

19  a few hundred, at least, at the -- sometimes in the ER, sometimes

20  at the bedside in the ICU, but rarely in the operating room.

21  But, yeah, it was a very common -- very common thing.

22     Q.    So do you feel, as you've come to the courtroom today,

23  that you have particular experience and expertise in the issue of

24  the necessity, timing, and the technical aspects of placing EVDs

25  in a patient such as Mrs. Orr?

**OFFICIAL TRANSCRIPT**

1      **A.**    Yes.

2      **Q.**    Doctor, what I would like to do is talk a little bit

3   about states where you're licensed.

4           MR. HONNOLD:  And I'm going a little bit out of order.

5   MR. HONNOLD:  (CONTINUING)

6      **Q.**    Currently, what are the states where you maintain

7   medical licensure?

8      **A.**    In Louisiana, Alabama, and Mississippi.

9      **Q.**    And if we move forward a bit in your curriculum vitae,

10  we get to a section with professional memberships.  And there are

11  a number of things listed there, but those organizations -- can

12  you provide us, by way of overview, what those organizations are

13  and describe your involvement in them?

14     **A.**    Yeah.  So I was a member of the bottom two for the

15  longest, the two main outfits in North America, the Congress of

16  Neurological Surgeons and the AANS.  And those basically have --

17  they have ongoing CME requirements and meetings every year

18  pushing the craft.

19           And I'm a member of all the local societies as well,

20  along with the American College of Surgeons.

21     **Q.**    And some organizations are sometimes where you just

22  fill out a form and send in a check and you're a member, but can

23  you explain whether some of these organizations are ones that

24  actually are offering ongoing substantive programs, trainings,

25  things of that nature?

**OFFICIAL TRANSCRIPT**

 1     **A.**   They actually all have CME requirements.  But the
 2   American College of Surgeons actually interviews their members
 3   before you join.
 4         And, yeah, the CNS and the AANS at the bottom, they
 5   have strict CME requirements but also meeting attendance
 6   requirements.
 7     **Q.**   Doctor, during your training at UAB, did you also learn
 8   about issues related to patients who were on anticoagulants who
 9   had neurosurgical issues or problems?
10     **A.**   Yes.
11     **Q.**   And can you describe that a little bit from the
12   neurosurgical perspective, both from your training and in your
13   practice, how you have experience in dealing with patients who
14   present with neurosurgical issues but there is the issue that
15   needs to be addressed that they're on an anticoagulant.  Could
16   you describe that?
17     **A.**   So, actually, when I finished my training in 2008,
18   obviously the newer-age medications weren't out yet.  Back then,
19   we dealt with mostly Coumadin bleeds and Plavix bleeds.
20         But through my career in Thibodaux, the prevalence of
21   the new-age anticoagulants basically became a lot more common.
22   We would see more of those.  And Coumadin as well.
23     **Q.**   Doctor, is it fair to say, then, that, in terms of your
24   background, your education, training, practice, and experience,
25   you do have experience and particular expertise in evaluating

**OFFICIAL TRANSCRIPT**

1    issues relating to patients that are taking anticoagulants as it
2    relates to neurosurgical issues?
3         **A.**    Yes.
4         **Q.**    Another thing, Doctor:  There's been mention of --
5    before you got here, mention of particular radiographic images
6    that are done in patients that might have intracranial bleeding,
7    specifically the CT scan.
8              Can you describe how neurosurgeons develop training and
9    expertise in reviewing radiographic studies like CT scans?
10        **A.**    So we often have to look at patients in extremis or in
11   emergency situations, so radiology is actually one-seventh of our
12   boards, especially in the initial written test leading up to the
13   chief year.
14             So it's actually a huge part of board certification,
15   and it's on the certificate.  The interpretation of relevant
16   imaging is part of your expertise as it relates to neurosurgery.
17        **Q.**    And do you have particular experience that flows from
18   your training and education, as well as your practice, in looking
19   at and evaluating CT scans in patients that have intracranial
20   bleeding?
21        **A.**    Yes.
22        **Q.**    Can you share with the jury as to how many times you've
23   had to deal, in your practice career, in evaluating CT scans that
24   show some type of bleeding within the skull?
25        **A.**    Thousands since starting training.

**OFFICIAL TRANSCRIPT**

1    **Q.**    From the neurosurgical perspective, are you going to be

2   always looking at the scans yourself before you would perform any

3   intervention or are you going to be waiting for a radiologist to

4   review the films?

5    **A.**    Most neurosurgeons don't -- don't even read the

6   radiology reports.  Most of those decisions are made before any

7   report is even available.

8    **Q.**    So there can be an issue of timing in terms of when a

9   radiologist might actually review the films?

10    **A.**    Right.

11    **Q.**    In patients that present with bleeding within the

12   skull, intracranial bleeding, is it often the neurosurgeon on

13   call who may be the first individual to look at the films?

14    **A.**    Well, the radiologist will look at it, but they have a

15   requisite time to dictate and whatnot to get the report out.

16   But, yeah, they're basically looked at simultaneously by the ER

17   docs, the radiologist, and then the neurosurgeon as well when

18   he's called.  They're usually the first to act on it.

19    **Q.**    Doctor, there's also been some use in the courtroom of

20   board certification.  Are you familiar with that term?

21    **A.**    Yes.

22    **Q.**    And are you board certified in your area of practice?

23    **A.**    Yes.

24    **Q.**    And can you explain what is involved, from the

25   neurosurgical perspective, in becoming board certified?

**OFFICIAL TRANSCRIPT**

1      **A.**   So the first component of it is actually during

2   training.  You need to take a written exam to pass on to your

3   last year or your chief year.

4           Once you do that, and successfully finish residency,

5   then you actually go out into the world and do your thing.  And

6   you gather cases over 18 months or so, and keep track of those on

7   a computer program and actually follow outcome data and

8   endpoints, and you submit that to the board.

9           Once they deem that you're safe and competent, then

10   you're invited to sit for the oral exam.

11      **Q.**   How is that?  Is that a tough test?

12      **A.**   Yes.

13      **Q.**   In this board certification process, are there people

14   who try this process and aren't able to pass?

15      **A.**   There's at least a 20 percent failure rate on the oral

16   exam.  I haven't failed it, but it is very common.

17      **Q.**   And so you are now board certified?

18      **A.**   Yes.

19      **Q.**   What does the particular -- what's the name of the

20   particular professional organization that monitors and controls

21   the board certification for neurosurgeons?

22      **A.**   Well we're basically a Fellow of the American

23   Association of Neurological Surgeons.  It's the ABNS, the

24   American Board of Neurological Surgery, who actually administers

25   the test.

**OFFICIAL TRANSCRIPT**

1    Q.   Within your area of practice, once you become board
2 certified, are you board certified forever or are there ongoing
3 requirements?

4    A.   No, it actually used to be like that, the older
5 neurosurgeons got grandfathered in to be board certified forever.

6         Now we have what's called maintenance of certification,
7 which is a -- which is, basically, a ten-year cycle broken into
8 three subsegments where you take examinations along the way.
9 They have -- they talk to your chiefs of staff at the hospitals
10 where you work to evaluate professionalism.  In addition, they
11 have continued education requirements.

12        So the -- it's actually much more rigorous than it used
13 to be.

14   Q.   And have you had to go through the recertification
15 process yet or where are you in that?

16   A.   I'm in the middle of it.

17   Q.   So have you started to actually collect portfolio cases
18 for the recertification?

19   A.   Yeah.  I've completed the first third, and I've almost
20 completed the second third in my first ten-year cycle.

21   Q.   What I would like to do now, Doctor, is talk a little
22 bit about your work that you did after you completed your
23 education and training in private practice.

24        MR. HONNOLD:  Is there a way to go back to the CV, to
25 the first page.  Thank you.

**OFFICIAL TRANSCRIPT**

1  MR. HONNOLD:   (CONTINUING)

2      Q.    So, Doctor, at the top where it says "Practice

3  Experience," can you tell us what was involved with the first

4  private practice group that you were affiliated with after you

5  left UAB.

6      A.    Right.  So I joined the Louisiana Brain & Spine Clinic

7  in Thibodaux, Louisiana, with Tom Donner and Deepak Awasthi,

8  Drs. Awasthi and Donner.

9      Q.    What type of -- was that a private practice group?

10     A.    It was.  The hospital then acquired the practice a year

11  or so later.

12     Q.    And so then you became employed by the health system?

13     A.    Correct.

14     Q.    And can you describe generally the nature of that

15  practice group and the things that you did during the time that

16  you were affiliated with Louisiana Brain & Spine Clinic in

17  Thibodaux.

18     A.    So we covered 24/7 call, basically for nine years,

19  split three ways.  We were on call 125 days a year.

20          And in addition to operating, we had more of a

21  minimally invasive spine emphasis.  My senior partners were both

22  facile in that.  And we took care of cranial processes as well.

23     Q.    And can you describe the nature of -- as an individual,

24  when you're on call for over 100 nights a year, what's involved?

25  What are the sorts of types of things that you see doing that

**OFFICIAL TRANSCRIPT**

1  sort of call coverage?

2       **A.**   I would say the vast majority of the consults have to

3  do with trauma or car wrecks and falls, things like that.  And

4  offshore trauma as well.  Injuries that occur offshore get

5  airlifted in to -- Thibodaux was a close neurosurgical

6  destination for the waterline.

7            But, basically, any process involving the brain or

8  spine or even peripheral nerves on occasion we would get called

9  to evaluate.

10      **Q.**   During this time in Thibodaux, did you continue to see

11  and treat patients that had various forms of intracranial

12  bleeding?

13      **A.**   Yes.

14      **Q.**   Can you describe that?

15      **A.**   Yes.  So we would see patients that had spontaneous

16  hemorrhages, hemorrhages from trauma, spontaneous hemorrhages

17  that were on anticoagulation, traumatic hemorrhages where they

18  were on anticoagulation.

19            Basically, the full gamut.

20            Ruptured aneurysms.  Ruptured AVMs.

21      **Q.**   Did you continue to perform EVD procedures during the

22  time you were in Thibodaux?

23      **A.**   Yes.

24      **Q.**   Can you explain the frequency in which you would

25  encounter patients that needed that?

**OFFICIAL TRANSCRIPT**

1    A.    Yeah.  It really wasn't near as frequent as in

2   training.  The most common patient to routinely get an external

3   ventricular drain was an aneurysm rupture, and we typically sent

4   all those to Dr. Culicchia in New Orleans.

5    Q.    And then, Doctor, did you, while you were in Thibodaux,

6   develop an interest in a more narrow and a more particular area

7   of neurosurgery?

8    A.    I did.

9    Q.    Can you explain that?

10    A.    So I developed an interest in ultra-minimally invasive

11   spine surgery.  By the time I got toward the end of my practice

12   tenure there, our post-operative stays for lumbar fusions were

13   down to 1.1 days after surgery and we hadn't had an infection in

14   seven or eight years.  The idea was to try to push this into the

15   outpatient realm.

16        As far as I know, I'm the first neurosurgeon in

17   Louisiana to do an outpatient lumbar fusion.

18    Q.    Can you generally describe the evolution in the area of

19   neurosurgery, this minimally invasive spine surgery?  What it is

20   and the significance of this evolution towards that area of

21   practice?

22    A.    Right.  So basically minimally invasive surgery is

23   trying to perform the same operations.  You may know people that

24   have a large incision down the middle of their back.  Trying to

25   replace those old operations with smaller, less invasive

**OFFICIAL TRANSCRIPT**

1 procedures.  And basically the advantages are huge in terms of

2 infection, in terms of blood loss, in terms of return to

3 function.

4         So, again, basically the marketplace is demanding

5 higher quality, lower cost, and faster return to function,

6 including all of our insurers, plus Workmans' comp, and that

7 falls into play very nicely there.

8     **Q.**    Okay.  On the top in the practice experience it says

9 ONE Spine Institute in Metairie --

10     **A.**    Yes.

11     **Q.**    -- 2017 until now.  Can you explain what that is and

12 the reasons behind your evolution to that practice?

13     **A.**    Yeah.  So I founded that a few months ago, and

14 basically it's set in Metairie, which is central to my referral

15 area, which is Baton Rouge, Slidell and the North Shore,

16 New Orleans, and down the bayou.

17         And basically our emphasis is minimally invasive --

18 ultra-minimally invasive care of the spine with a full complement

19 of spinal procedures being offered.  But everything that we can

20 do outpatient, I basically attempt that.  So that's the idea of

21 the practice.

22     **Q.**    Doctor, based upon your work in this case as well as

23 your practice and experience, have you developed some particular

24 understanding related to Xarelto and a laboratory test called the

25 PT?

**OFFICIAL TRANSCRIPT**

1    A.    Yes.

2    Q.    And has that been part of the work that you've done in

3  this case in terms of materials that you've reviewed and looked

4  at?

5    A.    Yes.

6    Q.    And is the issue of the PT something that you do

7  have -- it is part of your opinions in this case?

8    A.    Yes.

9    Q.    Thank you.

10        MR. HONNOLD:  Your Honor, at this time I offer and

11  tender Dr. Liechty as an expert witness in the field of

12  neurosurgery.

13        MS. WILKINSON:  No objection, Your Honor.

14        THE COURT:  Okay.  The Court will accept the doctor as

15  an expert witness.  Just as I've mentioned to you, the difference

16  is experts can render opinions.  But it's up to you, again, to

17  determine the weight to be given to that opinion.

18  MR. HONNOLD:  (CONTINUING)

19    Q.    Doctor, what I would like to do briefly is talk about

20  some of the work that you've done on this case.

21        It's your understanding that the plaintiffs, on behalf

22  of the Orr family sitting back here, did retain you to serve as

23  an expert witness -- or evaluate the case from the perspective as

24  an expert witness, right?

25    A.    Yes.

**OFFICIAL TRANSCRIPT**

1    **Q.**   Before your work on this case, had you and I ever met
2    before?
3    **A.**   I don't believe so.
4    **Q.**   Okay.  I mean, I'm a lawyer in Kansas City and I have a
5    law firm up there.  I mean, I've not sent you cases in the past
6    to look at or anything like that?
7    **A.**   No.
8    **Q.**   We didn't have any established reputation by way of
9    friendship, a professional relationship, or anything like that;
10   is that right?
11   **A.**   No.
12   **Q.**   What I'd like to ask you, just by way of overview, what
13   is your understanding of this case?  What were you retained
14   actually to do and to evaluate?
15   **A.**   So I was retained to basically review her -- review
16   Mrs. Orr's medical records, look at her treatments received,
17   review depositions of people involved in the case, and review
18   medical literature and documents from the company itself
19   regarding Xarelto.
20   **Q.**   And what was your understanding as to -- after you
21   looked at those materials, what was your role going to be after
22   that?  What were you going to do?
23   **A.**   So, again, basically to render an opinion about her
24   treatment course and could the outcome have been different,
25   basically.

**OFFICIAL TRANSCRIPT**

 1     **Q.**   And did you do your own independent medical research
 2  and review in this case?
 3     **A.**   Yes.
 4     **Q.**   Meaning you actually went to -- they used to call it
 5  the stacks of the books, but now it's oftentimes digital.  Can
 6  you describe what you did to find literature to reinforce your
 7  understanding in this case?
 8     **A.**   Basically, PubMed searches.
 9     **Q.**   Can describe what a PubMed search is?
10     **A.**   Sure.  It's an internet-based search engine now for
11  reviewing medical literature, so it's not some -- you don't have
12  to dig around for actual journals and whatnot.  You can search
13  for things by keyword, which makes it much more efficient.
14     **Q.**   And in terms of materials reviewed, did you look at the
15  entirety of Mrs. Orr's medical record?
16     **A.**   Yes.
17     **Q.**   Did you also review depositions of various other
18  doctors who took care of her?
19     **A.**   Yes.
20     **Q.**   Did we also provide you for review a limited set of
21  internal company documents as well as some depositions of
22  individuals affiliated with the defendants?
23     **A.**   Yes.
24     **Q.**   And did you review those materials?
25     **A.**   Yes.

**OFFICIAL TRANSCRIPT**

1    Q.    And did you take all of those materials -- depositions,

2    medical records, the research that you did -- did you take all of

3    those things into account as serving as the basis for the

4    opinions that you have formed in this case?

5    A.    Yes.  But also practice experience and education.  I

6    forgot that, too.

7    Q.    Why don't you explain to the jury the importance of --

8    from your view as an expert witness looking at this case, how

9    important your own personal education and your training and your

10   practice experience, yourself, in dealing with these issues --

11   how that's important to you forming your opinions in this case.

12   A.    Well, I was quite familiar with Dr. Bui, who I'll refer

13   to as "C. J." every now and then.  I know him fairly well.

14        But Dr. Bui, his dilemma, when she showed up under his

15   care, that was something I've seen numerous times.  The decision

16   to -- and it goes beyond just anticoagulation.  A lot of times

17   difficult decisions need to be made whether or not to intervene

18   based on potentially very dangerous outcomes.

19        So it's something that I've -- I've seen, dealt with,

20   and lived with.

21   Q.    Is it fair to say you've been there?

22   A.    Been there, yeah.

23   Q.    You're not doing this work for us for free, right?

24   A.    No.

25   Q.    Okay.  Just go ahead and describe to us in terms of how

**OFFICIAL TRANSCRIPT**

1    you're billing us for your time, your hourly rate and things of

2    that nature.

3        A.    So my practice manager bills $1,000 an hour for record

4    review and $1500 an hour for testimony.

5        Q.    What's your understanding of how that relates, in this

6    community, as to how neurosurgeons bill for their hourly time?

7        A.    It's consistent with everybody else, as far as I know.

8        Q.    Doctor, have you actually formed various opinions in

9    this case based upon the materials that you've reviewed?

10       A.    Yes.

11       Q.    Doctor, what I'd ask you to do, when I ask you about

12   opinions, would you only express those opinions that you hold to

13   a reasonable degree of medical certainty, which means, generally,

14   more likely than not to be true?  Will you limit your opinions to

15   that standard?

16       A.    Yes.

17       Q.    Doctor, with that background, what I would like to do

18   now is move forward.  And my approach will be to kind of go

19   chronology -- to follow a chronology and present to you some of

20   the medical records of Mrs. Orr, and ask you for your views on

21   those, and then lead up to your opinions on this case.

22            Let's pretend you were the chief resident back at UAB

23   and you were presenting Mrs. Orr's case, her presentation,

24   initially to your attending supervising doctor.  How would you

25   lay things out in terms of setting the table for what started to

**OFFICIAL TRANSCRIPT**

1  happen the evening of April 24th?

2      A.    So I understand at around 6:30 she was at dinner with

3  her husband at Ruth's Chris, and developed a headache at some

4  point during dinner significant enough to want to leave.

5          Basically en route home, she vomited.

6          When they got home, she wanted to go to bed.  They took

7  her to bed and she rested for a while.

8          The husband came in to check on her and had some

9  concerns with her condition.

10          He called his daughter.

11          She basically came to the house.

12          And then they called EMS.

13      Q.    And ultimately did the ambulance or EMS providers come

14  to the Orr home?

15      A.    Yes.

16          MR. HONNOLD:  Your Honor, with permission, there are

17  various parts of the medical record that we'll be introducing

18  piece by piece.

19          The first exhibit is 5769229.5, which will be

20  Plaintiffs' Exhibit 109, which I would like to display.

21          MS. WILKINSON:  No objection.

22          THE COURT:  Let it be admitted.

23  MR. HONNOLD:  (CONTINUING)

24      Q.    Doctor, even though they're on the screen, I'm going to

25  hand you a paper copy that may assist you in some way.

**OFFICIAL TRANSCRIPT**

 1    **A.**    Okay.

 2    **Q.**    Plaintiffs' Exhibit 109 is on the screen, Doctor.  Can

 3   you tell us what that record is?

 4    **A.**    This is an overview of the EMS services that she

 5   received.  Basically, the ambulance services.  It gives times and

 6   demographic information, plus a history, similar to what I

 7   described, in the top part.

 8    **Q.**    And, Doctor, the top part, the narrative section, does

 9   that essentially align with the information that you provided in

10   terms of case presentation?

11    **A.**    Yes.

12    **Q.**    And on this particular page, can you orient us in terms

13   of the times that we're talking about when EMS might have arrived

14   on the scene and then departed towards the hospital?

15    **A.**    So it looks like they were called around 9:40, and

16   basically got on the scene very soon thereafter, eight minutes

17   later or so.

18    **Q.**    Okay.

19    **A.**    Basically saw and cared for Sharyn Orr, and

20   approximately a half hour later they left to take her to the

21   hospital.

22    **Q.**    Okay.  And so let's be real specific on times.  In

23   terms of departing the scene, then, based upon your review of

24   this, it looks like 10:21 they're leaving the home with Mrs. Orr?

25    **A.**    Yes.

**OFFICIAL TRANSCRIPT**

1    **Q.**    And then what's your understanding in terms of the
2    hospital that they went to?

3    **A.**    They took her to Ochsner Baptist.

4    **Q.**    And this record is suggesting that the ambulance
5    arrived with Mrs. Orr at Ochsner Baptist at 2243 military time,
6    which would be 10:43?

7    **A.**    Correct.

8    **Q.**    Let's move forward in this record, then, and let's talk
9    about some of the additional information regarding Mrs. Orr that
10   is here.

11            If we look at this second sheet, Doctor, can you
12   explain some of the pertinent clinical or objective data that was
13   evaluated by the EMS providers at the home?

14   **A.**    Well, first and foremost, they -- there are vital signs
15   here.

16   **Q.**    And can you explain the significance of those?  And let
17   me put it in context a little bit.

18            There has been testimony from other physicians,
19   specifically Dr. Cruz, about Mrs. Orr's history of hypertension.
20   I know you have seen some medical records in that context.

21            What's your particular view as to the pertinence of the
22   blood pressure numbers there?

23   **A.**    So her -- the blood pressure is elevated.  This is
24   high; it's not normal.  It's fairly consistent with her -- with
25   her readings over the years being elevated, and in her, probably

**OFFICIAL TRANSCRIPT**

1    not much different than baseline.

2          You also see the pulse rate was around 90.

3    Q.   So in terms of for her, a blood pressure that is

4    essentially her baseline and a pulse that's within normal range

5    for her?

6    A.   Correct.

7    Q.   Let's move over to the right, then, to that box which

8    has been highlighted in red where it says "GCS," and then there

9    are some other things past that.

10         Can you explain, in Mrs. Orr's context, what that

11   information means?

12   A.   Yes.  So they did a GCS scale on her when they picked

13   her up, and essentially that's a three-part scale to be able to

14   reliably tell somebody on the other end of the phone what their

15   general level of consciousness is.

16         And they had -- there it's broken up into --

17   Q.   Okay.  Let's stop real quick so I can ask you a

18   question --

19   A.   Okay.

20   Q.   -- just so it's clear on the record.

21         We put an overlay here which is from the outside

22   resource, Table 38.2 Glasgow Coma Scale.  Can you use that

23   overlay table and her specific clinical data and explain how the

24   GCS score of 15 was arrived at?

25   A.   Sure.  So basically it's made up of three components:

**OFFICIAL TRANSCRIPT**

1    an eye component, a verbal, and a motor.

2           So she was able to follow commands so she received a

3    6 under the motor score.

4           She was oriented to self, place, and time, so she

5    received a 5 under verbal.

6           And her eyes were open spontaneously.

7           So basically the three scores get added together and

8    equal 15, which is the top score.

9    **Q.**   Okay.  So in terms of the biggest number that can be

10   given there for GCS, that's what Mrs. Orr had, at least when she

11   was evaluated by the EMS providers, right?

12   **A.**   Yes.

13   **Q.**   All right.  What I would like to do next, then -- we

14   know, then, based upon the timeline we looked at, soon after the

15   evaluation was done at home, then the ambulance left headed for

16   Ochsner Baptist; is that right?

17   **A.**   Yes.

18   **Q.**   Why don't we move forward in time, and what I would

19   like to do is go to Record 5769152.13, and 5769152.63, and

20   5769152.461.

21          MR. HONNOLD:  Those will be offered, Your Honor, and

22   would be marked separately as Plaintiffs' Exhibits 110, 111, and

23   12.  However, on the screen we've taken snippets from those.

24          MS. WILKINSON:  No objection to any of those exhibits,

25   Your Honor.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  Let it be admitted.

2     MR. HONNOLD:  (CONTINUING)

3     Q.   And, Doctor, what I would like to do is -- first I'm

4     going to hand these out.

5          Doctor, I'm going to hand you paper copies as well.

6     There you go.

7          And what I would like to do now, Doctor, is that these

8     are parts out of the record that exist on their own page, but

9     we've kind of condensed them for purposes of your presentation.

10         So what I would like to do is have you walk through

11    these various components of the record, and then explain their

12    significance from your perspective as a neurosurgeon in

13    evaluating and reviewing Mrs. Orr's clinical data.

14    A.   So the first thing that jumped out at me was this

15    markedly elevated blood pressure, which was around in the 170s

16    when the EMS guys picked her up and it is now 252 over 114, which

17    is incredibly high.

18         In addition, the pulse rate drops significantly as well

19    to low normal here, 68.

20    Q.   And so now -- now Mrs. Orr is at Baptist.  For a

21    patient like her, would this be a standard part of a neurologic

22    evaluation in the emergency room?

23    A.   Yeah.  It would be part of anybody's evaluation, they

24    would do vital signs.  But especially in someone that had

25    changes.

**OFFICIAL TRANSCRIPT**

1    **Q.**    Okay.  Now, what I would like to do is really have you

2    focus in on that change of blood pressure that you talked about,

3    that BP of 252 over 114 and a pulse drop-down to 68.

4          Can you explain the significance of that and what that

5    would cause you, as an evaluating physician, to be thinking

6    about?

7    **A.**    So it's consistent with a Cushing response, which in --

8    from a neurosurgeon's standpoint, seeing a markedly elevated

9    blood pressure with a pulse that's gone down significantly lower,

10   that's basically the body's attempt to perfuse the brain with

11   more blood and basically deliver nutrients.

12         So from my standpoint it's concerning for a process

13   going on in the brain.

14   **Q.**    You used a couple of words there, and I want to make

15   sure that we understand.  When you say "perfuse the brain," what

16   are you talking about?

17   **A.**    Basically the blood flow, to deliver nutrients and

18   whatnot.

19   **Q.**    And that's delivered to the brain by blood flow?

20   **A.**    Yes.

21   **Q.**    And so nutrients in terms of the things that are in the

22   blood?  Sugars, glucose, things of that nature?

23   **A.**    Correct.

24   **Q.**    Is oxygen part of that as well?

25   **A.**    Yes.

**OFFICIAL TRANSCRIPT**

1    **Q.**   So when you see this Cushing's response in a patient

2  like Mrs. Orr, does it cause you to be concerned about there may

3  be an intracranial process developing?

4    **A.**   Yes.

5    **Q.**   Let's go to the upper right-hand corner in terms of

6  recent labs, and then the larger laboratory section below.  Can

7  you explain the significance of those numbers or those values?

8    **A.**   So these are routine coagulation labs done in the

9  emergency setting.

10         The PTT here is normal.

11         And then down here, prothrombin time and INR are both

12  normal.

13    **Q.**   Okay.  I know you're not a hematologist, but from your

14  perspective as a neurosurgeon that's having to deal with patients

15  that may have coagulation disorders and are on anticoagulants,

16  what's the significance of those test results in a patient like

17  Mrs. Orr?

18    **A.**   Well, basically, if a patient isn't on any medication

19  that would affect the clotting of the blood, the -- it is fairly

20  safe to assume that these are normal and the patient is not

21  anticoagulated.  But, again, they are taken in context with a

22  complete history and...

23    **Q.**   So at least looking at those numbers in isolation, the

24  INR number of 1.1 -- first of all, the INR of 1.1, is that within

25  the normal reference range for the Baptist laboratory?

**OFFICIAL TRANSCRIPT**

1      **A.**   Yes.

2      **Q.**   And then the prothrombin time of 11.4, is that within

3    the normal reference range for the Ochsner Baptist laboratory?

4      **A.**   Yes.

5      **Q.**   Is it fair to state, then, that these numbers, these

6    normal tests of coagulation function -- there would be no

7    suggestion from that information that she was anticoagulated or

8    had a disease of the coagulation system?

9      **A.**   It would appear as though, yeah.

10     **Q.**   Any reason to believe there -- again, just looking at

11   these without further background that we've not discussed yet,

12   any reason to believe that this patient, Mrs. Orr, looking at

13   this data, is on an anticoagulant or under the influence of one

14   when these labs were drawn?

15     **A.**   Well, you really can't tell from the labs.  But, no,

16   from -- those labs look normal.

17     **Q.**   Let's look at timing to make sure that we put it in

18   context.

19           Can you tell -- I see this time collected by Dawn

20   Taverna, 2316.  Is there any significance or relevance to that

21   time to you?

22     **A.**   Well, it's -- it's basically the time when the

23   specimens were collected.

24     **Q.**   So the blood, then, would be drawn from Mrs. Orr at

25   2316, or 11:16 p.m.; is that right?

**OFFICIAL TRANSCRIPT**

1      A.    Correct.

2      Q.    Now, in terms of relating time to that original history

3 that you gave when you were acting like the resident presenting

4 the case, how long after -- is this blood being drawn after the

5 first complaint of symptoms that you described?

6      A.    Well, her initial -- her initial symptomatology was

7 around 6:30, so five hours later almost.

8      Q.    So slightly less than five hours that she's having

9 blood drawn to assess her anticoagulation status, right?

10      A.    Correct.

11      Q.    Now, these tests like this on a patient like Mrs. Orr

12 who's brought in emergently from home -- are these sorts of tests

13 something that would be ordered normally as part of a standard

14 patient laboratory intake?

15      A.    Yes.

16      Q.    The next thing that I would like to do is look at

17 -152.13 -- oh, no.  Strike that.  I'm sorry.

18            Let's go back to the Glasgow Coma Scale for a second.

19            Was there -- was a Glasgow Coma Scale calculated at

20 Ochsner Baptist?

21      A.    Yes -- well, not formally, but some information could

22 be had from the chart.

23      Q.    What I would like to do is look at information from the

24 Ochsner Baptist record that would allow you to construct -- allow

25 you to construct what her GCS score was.

**OFFICIAL TRANSCRIPT**

1          Specifically, what I would like to do is refer you to
2    5769152.13, which was marked in its entirety as Exhibit 110.  And
3    I'm going to hand you a copy of that document.
4          **A.**   Okay.
5          MR. HONNOLD:  And, Your Honor, we move for admission of
6    this -- excuse me.  This is actually 5769152.13, which is part of
7    the chart.
8          MS. WILKINSON:  I believe it's already in as
9    Plaintiffs' Exhibit 110.
10         MR. HONNOLD:  Thank you.  I might have stated it wrong.
11   This page is .13 so I'm not sure --
12         MS. WILKINSON:  You gave me the right one.
13         MR. HONNOLD:  Thank you.
14   **MR. HONNOLD:  (CONTINUING)**
15         **Q.**   Doctor, in terms of this information here, the
16   emergency department provider notes, is there particular
17   information here that would allow you to construct what
18   Mrs. Orr's GCS score was at Ochsner Baptist?
19         **A.**   Yeah.
20         So two of the components are pretty intuitive.  Her --
21   she was drowsy but would arouse to voice, which means her eyes
22   would open to voice or speech.  That would give her an E score of
23   3.
24         And then following commands would give her an M score
25   of 6 here.

**OFFICIAL TRANSCRIPT**

1      **Q.**    And there's been testimony from a family member that
2   Mrs. Orr was giving verbal responses -- short, simple verbal
3   responses to physician questions.
4           Would that assist in the GCS calculation?
5      **A.**    Yes.   Typically, if someone can follow commands,
6   they'll typically be, at worst, a 4 or so, confused, based on
7   that history.
8      **Q.**    And so what would that -- what would that information
9   do, then, in terms of calculating the GCS score for Mrs. Orr upon
10   her presentation to Ochsner Baptist?
11      **A.**    So, basically, she gets 1 off of the E and the V to
12   become a 13 instead of a 15.
13      **Q.**    And what would that suggest, then, to you in terms of
14   the comparison of the 15 assessed by the EMS personnel at the
15   house and now a 13 at Ochsner Baptist?
16      **A.**    It would suggest that she's worsening.
17      **Q.**    Now, is there information in the Ochsner chart to
18   suggest whether the physicians there at Ochsner Baptist -- did
19   they know or did they not know that Mrs. Orr was taking
20   Xarelto -- or had a history of taking Xarelto as of that time?
21      **A.**    In the notation where they call the accepting facility,
22   they mention that she was on Xarelto.
23           MR. HONNOLD:  Your Honor, at this time we would offer
24   5769152.483, which I believe we're up to Plaintiffs' Exhibit 113.
25           MS. WILKINSON:  No objection.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  Let it be admitted.

2     MR. HONNOLD:  (CONTINUING)

3          Q.   Now, based upon this information in Exhibit 113, what

4     now is the significance of the fact that the health care

5     providers know that Mrs. Orr has a history of taking Xarelto?

6          A.   Well, the significance is that, on the CT scan, they

7     saw a neurosurgical lesion and it became an important part of the

8     history for treatment implications.

9          Q.   Did this issue, the fact that Mrs. Orr by history had

10    been taking Xarelto, become a significant factor to be taken into

11    account as to the timing and nature of treatment that could be

12    given to Mrs. Orr as the events unfolded?

13         A.   Yes.

14         Q.   Then, Doctor, was any form of other important treatment

15    provided -- in terms of evaluatory [verbatim] treatment, provided

16    to Mrs. Orr at Ochsner Baptist?

17         A.   They did a CT scan of her brain.

18         Q.   And so why don't we do this.  Starting -- talking

19    about -- before we look at exhibits related to the CT scan, can

20    you tell us, first, generally what a CT scan is and how it's

21    performed.

22         A.   Yes.  So it's -- "CT" stands for computerized

23    tomography.  It's basically a -- it takes bread-slice images

24    through the brain and shows fairly good detail of the brain

25    itself but also abnormalities like swelling or hydrocephalus or

**OFFICIAL TRANSCRIPT**

1   blood.  It also shows the skull very nicely because it's very

2   sensitive to pick up calcium.

3        Q.   For a patient like Mrs. Orr where we've seen data, such

4   as the Cushing's response, that's perhaps questioning -- or

5   suggesting an intracranial process, is a CT an appropriate and

6   standard radiographic test to order?

7        A.   Yes.

8        Q.   And was that done for Mrs. Orr?

9        A.   Yes.

10       Q.   Now, before we actually get to looking at CT scan

11  images for Mrs. Orr, I would like to show you a demonstrative, if

12  we could.

13            I'm going to hand you a paper copy of this.

14            Can you describe generally what this diagram is?

15       A.   Yes.  This is a -- this is basically a schematic of the

16  brain showing the ventricular system contained within.  And

17  that's essentially a -- there's spaces that are filled with

18  spinal fluid, and there's a circulatory pathway in here where the

19  spinal fluid flows from the lateral ventricles -- this is on one

20  side and this is on the other (indicating) -- into a common third

21  ventricle.

22            And then it flows through this aqueduct here into a

23  fourth ventricle (indicating).

24            And then it flows into a fifth space down by the spinal

25  cord and basically circulates all around.

**OFFICIAL TRANSCRIPT**

1    Q.   And so, Doctor, when you're talking about fluid that
2    flows and circulates, specifically what type of fluid is that?
3    A.   Cerebral spinal fluid.
4    Q.   What is cerebral spinal fluid and what is its
5    importance to the nervous system?
6    A.   So it basically provides cushioning.  It can deliver
7    some nutrients, as well, to the brain.  There is some
8    anti-infective properties as well with it.
9         MR. HONNOLD:  Your Honor, just for the record, we have
10   a tracking number for this demonstrative, 5769297.5, just for
11   tracking purposes.
12   **MR. HONNOLD:  (CONTINUING)**
13   Q.   Using the Netter drawing that's up here, can you then
14   describe how a CT scan is performed and how it's done in relation
15   to the brain anatomy?
16   A.   So a CT -- like I said before, it's essentially slices
17   through the brain.  And it tends to follow an angle about like
18   this to be able to catch this lower part and upper part.
19        And the slices go through -- it's probably at least
20   25 cuts on an average person, sometimes more.  And, basically,
21   that's what it does.
22        So at this angle, it would show these openings here
23   (indicating).
24        And then all of the substance of the brain, including
25   the cerebellum or the lower brain, right here (indicating).

**OFFICIAL TRANSCRIPT**

1     **Q.**   So is it fair to state, then, that someone that is

2  looking at the results of the CT scan then will be presented with

3  sequential images of these various cuts?

4     **A.**   Yes.  At least 25 or so.

5     **Q.**   I'm going to hand you my handy Office Depot ruler.

6       What is the -- generally, an examination on a patient

7  like Mrs. Orr, how thick are those cuts going to be in terms of

8  the slices, the pictures that you described being taken?

9     **A.**   They're typically 5 millimeters.

10    **Q.**   So, then, to the extent that there were 20 to 25, you

11  would estimate -- or multiply that times 5 and that would give

12  you the total width of the examination.  Is that fair?

13    **A.**   Yeah.  The height.

14    **Q.**   The height.  I'm sorry.

15      Now, to orient us, before we start looking at CT scans,

16  generally will it be, then, giving the physician pictures looking

17  from above down, from below up, or front to back?  How is the

18  basic examination oriented?

19    **A.**   Well, it's a little difficult to explain, but,

20  essentially, you're looking from below up.  If you want to put a

21  CT up, it might be easier to explain.

22    **Q.**   Let's go ahead and do that.

23      MR. HONNOLD:  Your Honor, what I would like to do now

24  is offer two exemplary images from the CT scan of April 24th, the

25  first one being 5769298.12 and then 5765298.16.  And those will

**OFFICIAL TRANSCRIPT**

1    be Plaintiffs Exhibits 113 and 114.

2              MS. WILKINSON:  No objection.

3              THE CASE MANAGER:  I think it's 114 and 115.

4              MR. HONNOLD:  114 and 115.  Thank you.  I lost track.

5    **MR. HONNOLD:  (CONTINUING)**

6        **Q.**    Let me distribute those copies.

7              Doctor, I'll hand you copies as well.

8              Let's put Exhibits 114 and 115 up in relation to the

9    Netter drawing that we showed before.

10             So, Doctor, let's take some time, now that we've got

11   two images from the CT scan -- two of the slices out of the

12   several that you said would have been done.

13             And what I would like you to do is relate these images

14   to the structures in the Netter drawing and explain significant

15   abnormalities that you see in these images for Mrs. Orr.

16       **A.**    So, first, the angles are approximately like so

17   (indicating).

18             So on this image up here, this large black fluid-filled

19   space, it's basically a cut right across here (indicating).

20             And then -- so this is a relatively normal caliber

21   (indicating).

22             This is significantly expanded (indicating).

23             So that black fluid-filled space is larger than normal.

24             Obviously, this -- this is an abnormality here

25   (indicating).  This is hemorrhage contained within the ventricle

**OFFICIAL TRANSCRIPT**

1   (indicating).

2          And, again, it's catching it along this axis

3   (indicating).

4      Q.   All right.  So let's talk about the anatomy, then.

5          In terms of the area on -- as we're looking at the

6   picture that has -- that is 0.16, the dark area on the right

7   side, what is that anatomical structure?

8      A.   So that's the left ventricle -- the left lateral

9   ventricle.

10     Q.   So even though, as we're looking at it, it looks right,

11  from the patient's perspective it's actually her left?

12     A.   Yeah.  That's what I was trying to explain before.

13  It's as if we're looking up.  So the feet of the patient are

14  coming out at us.

15         So this side is actually the patient's left and this

16  side is the patient's right (indicating).

17     Q.   All right.  So the dark area that is, as we're looking

18  at it, on the right side, what is that dark substance?

19     A.   So that's just spinal fluid contained in the ventricle.

20     Q.   And in a normal CT scan, what would that ventricle look

21  like?  Would it be anywhere near that size?

22     A.   No, it would be smaller.  The content -- well, the

23  contents would look basically the same.

24     Q.   And then let's talk about the area, then, on the left

25  side, the area that's white with some gray dispersed through it

**OFFICIAL TRANSCRIPT**

1   with some gray around it.  What is that anatomical area?  And

2   what is contained in it?

3       A.   So this is the right lateral ventricle (indicating),

4   and all of the white that you see is hemorrhage.

5       Q.   And then -- so if you were looking at -- or describing

6   just to a lay group like us what abnormality is being shown in

7   the image that ends in 0.16, what is the process or processes

8   that you see going on there?

9       A.   So this is an intraventricular hemorrhage here

10  (indicating).

11           And then this is an enlargement of the ventricles here

12  and here (indicating).

13           So hydrocephalus and intraventricular hemorrhage.

14      Q.   Let's follow up on a couple of those terms.

15           You said hydrocephalus.  Can you explain just medically

16  what that means?

17      A.   Yes.  Basically, it's an increased collection of the

18  spinal fluid in those fluid-filled spaces.  It's essentially a

19  backup of the plumbing.

20           So if you can imagine this exit point right here being

21  pinched off or clogged (indicating), the fluid would have no

22  place to go and the ventricles would expand.

23      Q.   And then, as we're looking at -- on the left side, I

24  think you used another term, "intraventricular hemorrhage."

25           Can you describe specifically what is an

**OFFICIAL TRANSCRIPT**

1    intraventricular hemorrhage?

2        **A.**    So "intraventricular hemorrhage" just means that the

3    blood is contained in the ventricle itself.  That's opposed to

4    subdural hemorrhage or epidural hemorrhage, which is on the

5    exterior of the brain, or intraparenchymal hemorrhage, which is

6    actually in the substance of the brain itself.

7            This hemorrhage is contained in the ventricle.

8        **Q.**    And what is the significance of a patient having --

9    what's the difference between an intraventricular hemorrhage and

10   then we've heard some other words that have been used, such as

11   intraparenchymal hemorrhage or intracerebral hemorrhage.  What is

12   the nature of those distinctions?  And what is the importance of

13   those distinctions?

14       **A.**    Well, the main importance is that the -- this blood

15   doesn't represent exploded brain tissue.  It's basically blood

16   that's in a fluid space.  So the brain tissue around this is

17   not -- essentially not ripped to shreds by a large hemorrhage.

18       **Q.**    And so what I would like to do now, Doctor, is have you

19   go to the image that ends in 0.12 on the right-hand side.

20           Orient us there in terms of the brain anatomy involved

21   and explain the abnormalities there.

22       **A.**    So this is further down.  Again, following along the

23   same angles that travel approximately like this (indicating),

24   this particular CT is catching this across here (indicating).

25           So you see the frontal horn, which is represented here

**OFFICIAL TRANSCRIPT**

1   (indicating), and you see the temporal horn.

2           This pointer is dying.  Do you have a spare one?

3   **Q.**    Oh, I'll get you another one.  Sorry.

4           This one is kind of a super-powered one.

5   **A.**    So this CT here approximates the cut across this, right

6   here (indicating).

7           So this frontal horn in the ventricle is represented

8   here (indicating).

9           And then this temporal horn down here is represented as

10  an expanded area of this (indicating).  And you see that.  So the

11  cut basically approximates right across here (indicating).

12          This small third ventricle, which is basically the

13  confluence or the collecting of these two here, is represented by

14  this small space here (indicating).  And you can see there is

15  blood in that as well.

16  **Q.**    Now, there has been discussion in the courtroom by way

17  of question and answer before you got here about the issue of

18  hypertensive bleed and how a hypertensive bleed might look or not

19  look on a CT Scan.

20          So let me ask you this:  The way that these CT scan

21  images appear, is this classic for what you would call -- or what

22  neurosurgeons would call a classic hypertensive bleed or

23  hemorrhage?

24  **A.**    No, it's not classic.

25  **Q.**    So can you explain the significance as to -- or explain

**OFFICIAL TRANSCRIPT**

1   why it is that you say that this particular pattern of bleeding
2   and hydrocephalus -- why is it not consistent with the classic
3   hypertensive bleed appearance?

4        A.   So basically -- we have only shown two cuts here, but
5   basically throughout this review of the ventricles, the blood is
6   wholly contained inside of this fluid space (indicating).

7        So this is a smooth line around the temporal horn
8   (indicating).

9        That's an expanded right temporal horn (indicating).

10       These are expanded as well (indicating).

11       And, again, you can see the smooth, unbroken line of
12   the blood so the hemorrhage is contained in the fluid space.

13       In a classic hypertensive bleed, the hemorrhage
14   typically originates in the deep nuclei here, so in this strip of
15   gray in between (indicating), and we don't see that here.

16       Q.   All right.  What I would like to do now is talk about
17   those structures.

18       MR. HONNOLD:  Your Honor, is it okay that I use the
19   chart?

20       THE COURT:  Sure.

21   MR. HONNOLD:  (CONTINUING)

22       Q.   I might leave it right here.

23       You talked about the classic structures in this area --
24   or the important brain structures in that area.  What I would
25   like to do is to list those by name so we can talk about them

**OFFICIAL TRANSCRIPT**

1  individually.
2           So what particular brain structures are we talking
3  about that are in that area that you highlighted?
4       A.   Okay.  The head of the caudate.
5       Q.   Okay.
6       A.   The thalamus.
7       Q.   I've got the head of the caudate and thalamus.
8       A.   The internal capsule.
9       Q.   Internal capsule.  What else?
10      A.   The globus pallidus.
11      Q.   Ooh.
12      A.   Sound it out.
13      Q.   Okay.  Help me.
14           Globus p-a-l-l-i-t-u-s.  Close enough?
15      A.   Yeah.  D, d-u-s.  Pallidus.
16      Q.   All right.  Globus pallidus.
17           Are those the primary ones?
18      A.   And the putamen, p-u-t-a-m-e-n.
19      Q.   So let's talk about each of those anatomical structures
20  and how they look in Mrs. Orr.  So let's go through the list,
21  then.  Can you use your pointer and walk us through that list of
22  anatomical parts of the brain and tell us how they look on the CT
23  scan.
24           THE COURT:  Can the jury see it?  You need to move it?
25           MR. HONNOLD:  Should I pull the list out?

**OFFICIAL TRANSCRIPT**

```
 1              THE COURT:  Sure.
 2              THE JUROR:  Yeah.  We have to rubber neck over here.
 3              MR. HONNOLD:  Sorry.
 4              Is that okay?
 5              THE JUROR:  Perfect.
 6     MR. HONNOLD:  (CONTINUING)
 7         Q.   Dr. Liechty, let's go through this list of anatomical
 8     areas within the brain.
 9              First, head of the caudate.
10         A.   So the head of the caudate is on the left side, right
11     here (indicating).
12              You can see it very clearly there (indicating).
13              You don't see it clearly here (indicating).
14         Q.   Thank you.  And so do those areas look -- that anatomy,
15     does it look intact?
16         A.   It is intact, yes.
17         Q.   Is there any reason to believe, from looking at that,
18     that those areas were the source or origin of Mrs. Orr's
19     bleeding?
20         A.   No.
21         Q.   How might those areas look different if, in fact, the
22     hemorrhage had originated in those areas?
23         A.   Well, they would basically be destroyed.  Had the
24     hemorrhage initiated -- had the hemorrhage originated in here
25     (indicating), it would have most certainly blown backwards and
```

**OFFICIAL TRANSCRIPT**

1    involved all this gray tissue and also into the ventricle itself.

2         One thing that -- one thing that's of interest with the

3    brain is that it's basically a -- it's as soft as Jello or

4    panna cotta.  So there really isn't a lot of resistance, meaning

5    that if there is -- if a hemorrhage occurs in this (indicating),

6    it just absolutely obliterates it.  So that's just something to

7    keep in mind.

8         Q.   Let's do something before we go through the rest of

9    these slides.

10        Can you explain why this discussion that we're having

11   is important from Mrs. Orr's perspective, either the prognosis or

12   treatment that she might need?  Why is it important to point out

13   that these areas of the brain are not affected by or certainly

14   not destroyed by hemorrhage?  Why is that important?

15        A.   Well, it's important for a number of reasons.  The

16   first one is to try to lock down a diagnosis and figure out why

17   did this happen.

18        If the bleed originated in these gray tissues here

19   (indicating), there would have been a hundred percent chance that

20   it was related to her high blood pressure.  It's a diagnosis that

21   doesn't require a biopsy or anything like that.  You can look at

22   a CT and know that that's a hypertensive bleed.

23        The only other rare thing would be if a tumor had bled

24   down into this area (indicating), but with her history and

25   everything we know, if the bleed would have occurred in here

**OFFICIAL TRANSCRIPT**

1  (indicating), it would have certainly been hypertensive.

2          So you get some diagnostic information, but more

3  importantly -- I suspect we'll be talking about this later -- the

4  prognostic implications of destroyed brain tissue versus blood

5  contained in a fluid space are significant.

6      Q.   While we're there, let's go ahead and talk about that.

7          Prognosis first.  Explain medically what the term

8  "prognosis" means and why it is that ruling out these anatomical

9  areas as a source or location of Mrs. Orr's bleed -- why that is

10  important to the issue of her prognosis.

11     A.   Well, functionally speaking, these nuclei are involved

12  in controlling advanced movements and whatnot of the body.  It's

13  also the -- through the internal capsule here -- and we didn't

14  discuss all the other structures.  We can maybe go back to those.

15     Q.   Sure.

16     A.   Through the internal capsule here (indicating), it's

17  this sort of V-shaped, dark area, all of the motor and sensory

18  fibers from the cortex of the brain coalesce there in basically

19  one pathway down to the spinal cord.

20          So it's very high-priced real estate, as they would

21  say.  If there's damage in this (indicating), it's basically

22  cutting off a power cord, essentially, so...

23     Q.   Let's go ahead, then, and walk through -- well, let's

24  make sure I understand this, then.

25          These areas in total -- is this an area of the brain

**OFFICIAL TRANSCRIPT**

1  called the basal ganglia?

2       A.   Yes.

3       Q.   There was some discussion with Dr. Bui about the basal

4  ganglia as to whether or not the parts of the brain that make up

5  the basal ganglia were affected by the bleed or were the origin

6  of the bleed.  What's your view in the involvement of the basal

7  ganglia?

8       A.   They were basically unscathed.

9       Q.   When you say "unscathed," do you mean they look

10 relatively normal anatomically on this CT?

11      A.   They do.

12      Q.   And why don't we go back to the list, then, and you can

13 walk us through.  I think we've covered the head of the caudate.

14 Could you go ahead and point out the thalamus, internal capsule,

15 globus pallidus, and putamen similarly and show how those appear

16 normal, not infected -- or not affected by the hemorrhage or not

17 the source of the hemorrhage.

18      A.   So if you can -- this takes a little bit of imagination

19 on a CT, but you can see the head of the caudate pretty clearly

20 here (indicating).  If you can imagine this V-shaped structure is

21 the internal capsule.  That's what we had talked about, this kind

22 of darker gray area (indicating).  We had talked about that as a

23 major conduit or almost like a large collection of network cables

24 coalescing together as it heads down into the spinal cord.

25           Behind that right here is the thalamus (indicating),

**OFFICIAL TRANSCRIPT**

1   which is another very common location for a hypertensive

2   hemorrhage.

3            Outside of the internal capsule, there are two nuclei

4   back to back, so here is the globus pallidus, and here is the

5   putamen (indicating).

6            And, again, there's nothing to suggest that those

7   are -- that those are damaged here.

8        Q.   So if I -- we wanted to capture or put "normal" on each

9   of these -- and "N" equals normal -- can I put an "N" by each of

10  those numbers?

11       A.   Yes.

12       Q.   So as you look at the CT scan for Mrs. Orr, is there

13  any true intracerebral component or intraparenchymal component,

14  meaning the brain issue itself is destroyed by hemorrhage?

15       A.   No.

16       Q.   And then, as we'll get into going forward, again, what

17  is the general importance of that for Mrs. Orr in terms of her

18  prognosis and the issue of whether or not treatment, timely

19  treatment, might matter to her?

20       A.   It basically just offers a much better prognosis if

21  brain tissue itself is not destroyed, especially these deep

22  nuclei that are so important to our function.

23       Q.   And Dr. Liechty, then, was there a radiologist at

24  Ochsner Baptist who also looked at and reviewed these CT scan

25  images?

**OFFICIAL TRANSCRIPT**

1    A.    Yes.

2         MR. HONNOLD:  And, Your Honor, what I would like to do

3    is put up on the screen 5769152.14, which will be Plaintiffs'

4    Exhibit 116, also from Mrs. Orr's record from Ochsner Baptist.

5         THE COURT:  Hearing no objection, I'll admit it.

6         MS. WILKINSON:  No objection, Your Honor.

7    MR. HONNOLD:  (CONTINUING)

8    Q.    And Dr. Liechty, what I would like you to do is just --

9    I think the report is actually maybe the second or third page in

10   there.  We've got it up on the screen.

11        Is this exhibit -- or part of the exhibit as it exists

12   in the record, does this capture Dr. Ogden's, the radiologist,

13   radiological diagnosis for Mrs. Orr's films?

14   A.    Yes.

15   Q.    And Dr. Ogden -- let's orient ourselves as to time now.

16        When we looked at the CT scan, they had time stamps in

17   the lower corner showing they were done in the 11:40-ish to 11:45

18   range.  Dr. Ogden now is doing his report, his formal report, at

19   0008 military time or 12:08 a.m.; is that right?

20   A.    Correct.

21   Q.    Now, you've reviewed this record as part of your work

22   on the case, correct?

23   A.    Yes.

24   Q.    How do you compare your radiographic assessment of the

25   scans as compared to Dr. Ogden?  Were you in agreement?

**OFFICIAL TRANSCRIPT**

1      A.    Basically identical.

2      Q.    Now, you've highlighted in -152.154 this term "primary

3   intraventricular hemorrhage."  Can you explain what that term

4   really means?

5      A.    Yes.  So basically the difference between primary and

6   secondary is that "secondary" originates somewhere else and it

7   involves the ventricle as it bleeds into it.  "Primary" just

8   simply means that it's originating from inside the ventricle

9   somewhere.

10     Q.    Are there such things as secondary intraventricular

11  hemorrhages?

12     A.    Yes.

13     Q.    What is the difference between primary and secondary?

14     A.    Yeah.  We just said --

15     Q.    Oh, excuse me.

16     A.    -- that secondary basically originates right outside of

17  the ventricle and then would bleed into it so there would be an

18  obvious sort of extraneous source.

19     Q.    Now, would an example of a secondary intraventricular

20  hemorrhage be a situation where the hemorrhage started or

21  originated in one of these areas in the basal ganglia that we

22  talked about and then went into the ventricle?

23     A.    Yes.

24     Q.    And we've been through that, so does that analysis

25  walk-through that we did -- does that essentially rule out

**OFFICIAL TRANSCRIPT**

1  Mrs. Orr having a secondary intraventricular hemorrhage?

2      A.   Yes.  I agree with Dr. Ogden in that it's likely

3  primary.

4      Q.   What I would like to do is go back to the CT scan

5  images that we were looking at.

6          MR. HONNOLD:  If we could go to the image that has them

7  both.

8  **MR. HONNOLD:  (CONTINUING)**

9      Q.   And what I would like you to do -- we haven't talked

10 much yet about distortions or abnormalities in the actual

11 structure of the brain itself in terms of what does hydrocephalus

12 do and what does hemorrhage do in terms of causing abnormalities

13 in the structure of the brain due to pressure and other things.

14     A.   So one of the things noted in the report is a shifting

15 of the brain.  And if you draw an imaginary line from this

16 midpoint right here down to this midline back here (indicating),

17 you see that these middle structures are pushed from right to

18 left.  That's the midline shift that's being discussed in the

19 report.

20     Q.   And that's an abnormality?

21     A.   Yes.

22     Q.   And what is it, then -- what is the force at work or at

23 play that's actually causing that shift or abnormality to occur?

24     A.   So basically this ventricle here that's fairly

25 significantly expanded is large enough to cause a shift

**OFFICIAL TRANSCRIPT**

1  (indicating).

2      Q.   And then are there other abnormalities that you can

3  point out on these two slices of the CT scan that would show

4  other abnormalities or effects of swelling or increased

5  intracranial pressure that we have not talked about yet?

6      A.   There is some darkening around the ventricle here

7  (indicating) implying that there is some edema or strain on the

8  surrounding tissues.

9           In the report he also mentions possible early uncal

10 herniation which is a -- that's a -- that's the inside portion of

11 the temporal lobe right here (indicating), and it's being

12 described as being pushed in a little bit as well.

13     Q.   So Dr. Liechty, from your perspective as a

14 neurosurgeon, what is it that you are thinking when you see a CT

15 scan -- or see CT scan images like this?

16     A.   Well, basically she's -- it's a patient with a

17 declining exam who has very large fluid-filled spaces, and our

18 thought would be to decompress those emergently.

19     Q.   So when you say "decompress emergently," what sort of

20 procedure or treatment is that?

21     A.   So to basically gain access to inside of these, we

22 would place catheters inside of these ventricles on both sides,

23 and it would allow for a few things.  It would allow to, number

24 one, measure the pressure, but also offset.

25           If you think of the skull here, this is calcified.

**OFFICIAL TRANSCRIPT**

1  It's basically a fixed box that can't move.  So anything here

2  that increases volume will put pressure on surrounding

3  structures.  So if you can get access to inside of these

4  ventricles and remove a significant amount of spinal fluid and/or

5  hemorrhage -- we'll probably talk about that later -- you can

6  basically decrease the pressure around the brain significantly.

7       Q.   And in your experience, what's that procedure called?

8       A.   Ventriculostomy or external ventricular drain.

9       Q.   So I think we pretty consistently used the term

10  "drains" or "EVD" with Dr. Bui when he testified last week.  Now

11  you've used the word "ventriculostomy."  Are those all kind of

12  synonyms for the same procedure or care?

13       A.   Yes.

14       Q.   Now, let me ask you:  In your experience as a

15  neurosurgeon, have you been able to successfully treat patients

16  like Sharyn Orr who have CT scans that look like this through the

17  treatment that you just described?

18       A.   Yes.

19       Q.   What I would like to do now, Doctor, is to move forward

20  and talk about -- let's talk about specifically the EVD procedure

21  and what's involved.

22            I know we've got some demonstratives of some of the

23  surgical tools and equipment that are used.  Can you explain what

24  this demonstrative is.

25            MR. HONNOLD:  I'm sorry, Your Honor.  I don't have a

**OFFICIAL TRANSCRIPT**

1   specific number for this, and we may have to catch up with that

2   later, but it's simply shown for demonstrative purposes.

3       **A.**   So this is a standard kit.  Basically, it's contained

4   in a small box with a seal on the outside so everything --

5   everything basically remains sterile inside of it.

6           So if you go -- if you go to the bedside or the ICU or

7   wherever and you need to put one of these catheters into the

8   brain, you obviously have to get through the skull.

9           And so that involves shaving a small patch of hair.  It

10  would involve infiltrating the skin with numbing medicine right

11  here, and then making a small incision using one of these knives

12  (indicating).

13          And, basically, there is a -- there is a well-known

14  anatomic location that we've learned over the years as to how to

15  best guesstimate what will get you an accurate pass, and it's

16  called Kocher's point.  And it's about 12 centimeters back from

17  the nasion, which is the part just above the nose.

18          And my hand actually is almost exactly 12 centimeters.

19  So after putting in a lot of these, I realized I could save a

20  step by just putting my hand where it needed to go, and then a

21  few centimeters off the midline, depending on which side you want

22  to get into.

23          So after that small incision is made utilizing this,

24  this hand twist drill -- basically, there's a bit that goes in

25  with a chuck just like a standard drill that anybody else would

1  use at home or whatever.  It's a very, very sharp bit that spins

2  a few times and goes through the outer table of the skull and

3  then the inner table of the skull.

4          At that point, once you have access to a hole, there is

5  a tough covering on the outside of the brain that actually needs

6  to be opened slightly, and you can poke this little trochar tip

7  in to carefully open the dura.

8          Following that, this catheter gets passed through the

9  small hole with this stylette in place (indicating).  And the

10 advantage of the stylette is that it makes a -- makes for a firm

11 pass so you can go in at a perpendicular.

12         Once you get inside of the ventricular space and you

13 encounter fluid, you remove that stylette, and, at that point,

14 you have a functioning drain.

15         And then that end gets tunneled underneath the scalp.

16 And that's what this device is here (indicating).  It's called a

17 trochar.

18         So the end that you are holding up in the air now gets

19 tunneled out of the skin, and it actually is an exit site for the

20 drain.

21         Then you repeat the procedure on the opposite side as

22 well.

23 MR. HONNOLD:  (CONTINUED)

24     Q.  So in terms of the CT scans that Mrs. Orr had, was that

25 likely a situation that was going to require two

**OFFICIAL TRANSCRIPT**

1    ventriculostomies or bilateral drains?

2        **A.**   Yes.

3        **Q.**   Now, in terms of using these instruments to perform the

4    procedure that you described, would a reasonable neurosurgeon

5    ever undertake this procedure using these tools unless there was

6    a really good reason to do it?

7        **A.**   No.

8        MR. HONNOLD:  All right.  Your Honor, we also have a

9    short video demonstrative of the procedure.  It is slightly

10   graphic in that it does show some medical detail.  And I would

11   offer those who want to watch, can, and, if not, have that option

12   as well.

13       THE COURT:  Members of the jury, this is a graphic

14   video.  I've looked at it.  It's one that I struggled with as to

15   whether or not to put you through that.

16       But this is a significant case, in the sense that the

17   operation is not like removing a splinter, and I think that you

18   ought to at least see it and understand the whole thing.  So I

19   don't want to keep anything from you I'll let you see this film.

20       MS. WILKINSON:  Your Honor, before we do that, could we

21   come to sidebar for one minute?

22       THE COURT:  Sure.

23               **SIDEBAR ON THE RECORD**

24       MS. WILKINSON:  Your Honor, I just want to make our

25   objection clear.  We objected to the videotape before under 401

**OFFICIAL TRANSCRIPT**

 1   and 403.  I think that's underscored by Dr. Liechty's detailed
 2   description of the surgery.
 3         I hadn't realized they were going to show the
 4   demonstrative with all the tools.  And he went through what each
 5   tool is for, how he would use it, how it would penetrate the
 6   skull.  So the jury had a full description.
 7         The only thing they're going to see now with the video
 8   is, as you said, something that is rather gruesome, is not in
 9   dispute in the case.  And I think, on top of the description he
10   already gave, it is unnecessary and prejudicial.
11         And for those reasons we'd ask that it not be shown.
12         MR. HONNOLD:  Your Honor, I just think this video, in
13   terms of its nature and scale, in terms of its graphic nature, it
14   is fairly limited.  I do think it is highly instructive as to
15   type of care that is being delivered here.
16         And if there was any question as to whether this is not
17   real surgery or if this was something that would be done
18   cavalierly because the situation was futile, I think this puts it
19   in context that this is a very real medical procedure.
20         And I think it's important for those jurors who want to
21   see it to enhance their understanding.  I think it is very
22   meaningful in terms of our presentation.
23         THE COURT:  Yeah.  It's a tough call, and I do this
24   seriously.  I looked at it.  It is graphic.  The objection
25   focuses on 403 primarily because it is relevant, but it's a 403

**OFFICIAL TRANSCRIPT**

1    issue.

2            The problem that I have is that, although it's graphic,

3    the -- there is some indication -- or at least some part of the

4    defense that says that there was no hope for the person, that the

5    operation would or would not have done good, and there's

6    significance here.  That puts emphasis on the significance of the

7    operation.  Therefore, I have instructed the jury that it is

8    difficult, but I'll allow them to see it and overrule the 403

9    objection.

10            MR. MEUNIER:  Thank you.

11                **AFTER THE SIDEBAR IN OPEN COURT**

12            THE COURT:  After the film, we'll take a brief break.

13            And there is no sound to the film, members of the jury.

14            I want you to get a feel for what was done and evaluate

15    the significance of it.

16            MR. HONNOLD:  And, Dr. Liechty, as we go forward with

17    this demonstrative videotape, could you provide just some basic

18    narration as to what is being done at certain aspects of the

19    procedure being performed?

20            THE WITNESS:  Sure.

21                    (Videotape played in open court.)

22            THE WITNESS:  So, basically, you see a patient there.

23            That entrance point is back about 12 centimeters or so

24    from the nasion and then over about 3 1/2 centimeters or so to

25    the side.

**OFFICIAL TRANSCRIPT**

1          That's an anatomic entrance site right there
2   (indicating).  If a catheter is passed perpendicular to that,
3   which basically just means straight into it without angulation,
4   in theory it will travel nicely into the front horn of the
5   ventricle.
6          So that small entrance site is actually injected with
7   lidocaine.  The lidocaine has epinephrine in it to decrease
8   bleeding from the skin.  It also numbs up the patient's scalp so
9   they don't really feel much here.
10          Right now he's injecting the exit track for it to be
11   tunneled out of the scalp.
12          So the skin looks yellow there.  That's from the
13   Betadine prep.  So it's a sterile procedure and obviously sterile
14   towels are placed around the area to keep out contaminates.
15          The surgeon is wearing sterile gloves, and the marker
16   that he's using there is actually in the kit itself.
17          So this is being done at the bedside.
18          Right there the small incision (indicating).
19          Now he is getting off -- the soft tissue off of the
20   skull.
21          He'll place a small retractor inside of the incision to
22   hold it open, essentially, and it's self-retaining.  It clicks
23   open so it doesn't let go.
24          Then he's loaded the drill bit in the drill itself and
25   tightened the chuck.

**OFFICIAL TRANSCRIPT**

1          And then he'll -- it's a hand-twist drill.  He'll

2     slowly work that through the outer table of the skull.

3          So the skull has, basically, two layers in the bone

4     itself, a hard outside and a hard inside, and then soft in the

5     middle.  So he'll go through the hard outside.

6          And then the drill will pass relatively easy through

7     the intermediate portion.

8          And then he's starting to tighten it into the inside

9     and has actually made the small hole.

10         And now he's using a small needle to open up the

11    covering of the brain.

12         And, basically, on the needle it has a -- it almost has

13    a knife at the tip where it enters the skin.  It can be used as a

14    small knife to actually open the covering of the brain.

15         And here -- I personally don't do it like this, but he

16    is passing the trochar before placing the catheter so it's

17    already set to go.

18         And he's putting a rubber protector on there because

19    that thing could go right through your hand, so it's just

20    basically to be safe.

21         So you'll notice he's perfectly up and down with the

22    skull, perpendicular, and that catheter will get carefully passed

23    into the ventricle.

24         Once it penetrates into the ventricle itself, he'll get

25    a rush of fluid out of the top, and that's the spinal fluid.

**OFFICIAL TRANSCRIPT**

```
 1          And then he takes the catheter out.  He'll actually
 2  hold it down below the ear to allow it to drain.  It basically
 3  verifies that he's in the right place.  If there is clear fluid
 4  flowing out, you know you are in the ventricle.
 5          MR. HONNOLD:  Your Honor, just a couple questions
 6  before time for the break just to close this part down.
 7  MR. HONNOLD:  (CONTINUING)
 8      Q.   Dr. Liechty, based upon the CT scans that Mrs. Orr had
 9  that we've talked about, was this a procedure that was medically
10  necessary and indicated for Mrs. Orr?
11      A.   Yes.
12      Q.   Was this surgery actually capable of being performed on
13  Mrs. Orr at Ochsner Baptist, the first hospital she went to?
14      A.   Actually, no, because they don't have a neurosurgeon
15  there.
16      Q.   So, then, to be able for Mrs. Orr to have this
17  treatment that we've been discussing, what was necessary for her
18  to be able to get that care?
19      A.   Basically transferred to the center that had
20  neurosurgical coverage.
21      Q.   And that transfer, then, is that essentially the next
22  step in the chronology for Mrs. Orr?
23      A.   Correct.
24          THE COURT:  Let's take a 15-minute break at this time.
25  Court will stand in recess.
```

**OFFICIAL TRANSCRIPT**

1        (Jury out at 10:23 a.m.)

2         (A recess was taken.)

3      **AFTER THE RECESS**

4        (Call to order of the court.)

5        (Jury in at 10:40 a.m.)

6    THE COURT:  Be seated, please.

7    You may proceed.

8    MR. HONNOLD:  Thank you, Your Honor.

9 **MR. HONNOLD:  (CONTINUING)**

10  **Q.** Dr. Liechty, I would like to pick up the chronology

11 from where we left it off.

12    We stopped at the point in time where Mrs. Orr was

13 transferred to Ochsner main campus.  Do you recall that?

14  **A.** Yes.

15    MR. HONNOLD:  I would like now to display

16 Exhibit 5769152.22, Plaintiffs' Exhibit No. 117.

17    MS. WILKINSON:  No objection.

18    THE COURT:  Let it be admitted.

19 **MR. HONNOLD:  (CONTINUING)**

20  **Q.** I've given you a copy of 117.

21    And, Doctor, now let's reinforce where we are in terms

22 of the chronology.  If we look here at Exhibit 117, does this

23 show -- tell us about when Mrs. Orr was at Ochsner main and was

24 undergoing evaluation there?

25  **A.** At approximately 1:15 in the morning.

**OFFICIAL TRANSCRIPT**

1     Q.    And does this record provide some overview in terms of

2   what's going on in terms of her evaluation at that time?

3     A.    Yes.  She was intubated and the neurosurgery doctors

4   were there to see her.

5     Q.    Now, let's talk about intubation.  We hadn't mentioned

6   that before the break.

7           What is your understanding as to when Mrs. Orr --

8   first, tell us what intubation is and then when that happened in

9   the progression.

10    A.    So the ER doctors from Baptist basically put a --

11  intubated her or put a breathing tube in.  And the idea is that,

12  when somebody is getting transferred to another facility and they

13  have a process going on in their head, they want to protect the

14  airway to make sure that they're safe and don't -- basically

15  don't drown on their own secretions.  So they put the breathing

16  tube in.  That's basically what happened.

17    Q.    And then, once Mrs. Orr is at Ochsner main, would there

18  have been a recalculation of her Glasgow Coma Scale as part of

19  her examination process?

20    A.    Yes.

21    Q.    And I'm now going to hand you, Doctor, what has been

22  marked as 5769155.2852, which will be Plaintiffs' Exhibit 118,

23  also from the Ochsner main record.

24          MS. WILKINSON:  No objection.

25          THE COURT:  Let it be admitted.

**OFFICIAL TRANSCRIPT**

1  MR. HONNOLD:  (CONTINUING)

2      Q.   And what I would like to do now, Doctor, is put into

3  context -- now that she has arrived at Ochsner main shortly after

4  1:00 a.m. now on the morning of April 25th, how her Glasgow Coma

5  Scale was done and then relate that to the scores that have been

6  done before.

7      A.   Right.  So when somebody has a breathing tube in place,

8  verbal just automatically goes to 1T because they can't make

9  sounds.  There is a tube in their mouth.  So her score went to a

10  1T here.

11          The eyes did not respond to painful stimuli so,

12  basically, the eye score became a 1 as well.

13          And then, per Dr. Reiffel, who is a neurosurgery

14  resident, he basically examined her and said that she was

15  withdrawing from pain, which gives her an M score of 4.

16          So now the GCS score is what's called 6T.

17          So, basically, you add all three components together

18  and put a "T" on there to indicate that they are intubated.

19      Q.   How does that compare to the GCS score that you

20  calculated from the objective data in the Ochsner Baptist chart?

21      A.   It's worse.

22      Q.   And the significance now of this worse score is what to

23  you, as a neurosurgeon?

24      A.   Well, basically, the exam is getting more and more

25  critical in that potential action would need to be undertaken.

**OFFICIAL TRANSCRIPT**

1     **Q.**    Now that Mrs. Orr has moved from a GCS of 15 to 13 and
2  now to a 6T, is it your view for her that she is now moving into
3  a window when additional treatment or intervention needs to be
4  accomplished?
5     **A.**    Absolutely.
6     **Q.**    Okay.  Now, what I would like to do, though, is -- can
7  you point out and explain to us the significance of the various
8  reflex data that is there below "Physical Exam" on the right-hand
9  side of the screen.
10          And I want your explanation, if you can, to focus on is
11  that information that's suggestive or not that Mrs. Orr is still
12  a patient that would benefit from intervention.
13     **A.**    Right.  So nobody had done a brain stem reflex exam
14  until she got to Dr. Reiffel, who's the neurosurgery resident.
15  And he -- it was noted that the pupils are small and reactive,
16  which implies intact cranial nerve pathways of a 1 and 3.
17          The corneal reflexes and a cough gag reflex imply that
18  the cranial nerve reflexes are intact lower down below that.
19          So, basically, her -- the sophisticated way to present
20  the exam is that now she's a 6T with intact brain stem reflexes.
21  And particularly C. J. probably asked, "Does she have a blown
22  pupil," or something along those lines, which would imply that
23  the herniation had gotten so far that the brain stem reflexes
24  were not functional.
25     **Q.**    But does it appear to the contrary as you look at this

**OFFICIAL TRANSCRIPT**

1    reflex data?

2        A.    Yes.

3        Q.    And based upon your view now, that she is newly moved

4    into the 6T Glasgow Coma Scale area but still has intact brain

5    stem reflexes as you've described, is she still a candidate at

6    this point for aggressive intervention?

7        A.    Yes.

8        Q.    What I would like to do now is move forward in 2852 and

9    ask you:  Was there another type of neurologic score that was

10   calculated for Mrs. Orr at Ochsner main?

11       A.    Yes.  They employed the NIH stroke scale, which

12   basically is an 11-point exam where a score is derived off of

13   that.  And then the higher the score, the worse the situation.

14            And she was graded out at 19, which is a moderate to

15   severe stroke.

16       Q.    And at this point in time after the NIH score of 19 was

17   calculated, is Mrs. Orr -- now is it clear that she is a

18   candidate and is in need of the EVD intervention that you've

19   described?

20       A.    Yes.

21       Q.    Now, was this surgery able to be performed on Mrs. Orr

22   when she arrived at Ochsner main?

23       A.    No.

24       Q.    And why is it, in your view, that here is Mrs. Orr who

25   has a condition -- a history and a condition that suggests that

**OFFICIAL TRANSCRIPT**

1    she needs intervention, but it's not able to be done upon her

2    arrival at Ochsner main?  What is your understanding or view as

3    to what prevented Dr. Bui and his team from going forward?

4         A.   So Dr. Bui's concern basically was that he -- they

5    weren't 100 percent sure when she had had her last dose of

6    Xarelto.

7              On top of that, she had known decreased renal function

8    which tends to extend the half-life quite a ways of the drug

9    itself.

10             So, basically, his concern was, if he would have done

11   anything urgent, if she still had some anticoagulation onboard,

12   he would have basically killed her with the ventrics -- with the

13   ventriculostomy, meaning she would have bled from placement of

14   the catheters.

15        Q.   From your review of the records, was it clear at this

16   point in time whether -- well, certainly Mrs. Orr couldn't

17   explain to the medical team whether she took her Xarelto at

18   suppertime on the 24th, right?

19        A.   Correct.

20        Q.   And then, based upon your review of the records, does

21   it appear whether or not family was able to tell Dr. Bui's team

22   with certainty whether or not -- whether or not she had taken her

23   medicine that night?

24        A.   I didn't get the sense that it was with certainty.

25        Q.   So the situation, then, as Dr. Bui explained it, was,

**OFFICIAL TRANSCRIPT**

1   since he did not know whether the Xarelto had been taken at

2   suppertime and whether she would potentially still have

3   significant drug onboard from just taking it earlier in the

4   evening or not taking it at all since the 23rd, the previous

5   supper before that, he basically had to assume that she was fully

6   anticoagulated.  Is that your understanding?

7        A.   That's what he was under the impression, yeah.

8        Q.   Now, in that situation, based upon your review of

9   depositions, medical records, and other materials, how long was

10  it that Dr. Bui wanted to wait?

11       A.   Well, he wanted to wait at least a half-life, eight

12  hours, and then maybe then some for renal issues.

13       Q.   And if Dr. Bui was suggesting that it may be as long as

14  12 or 18 hours, would you quibble with him on how long it is that

15  he wanted to wait potentially from when she took her last dose?

16       A.   No.  That was reasonable thinking.

17       Q.   Okay.  Doctor --

18            MR. HONNOLD:  Can we go back to the CT scans, if we

19  could, the slide that has the CT scans.  Anything that has the

20  two images on them.

21  **MR. HONNOLD:  (CONTINUING)**

22       Q.   Now, for a patient like Mrs. Orr, who has a CT scan

23  examination as of 11:41 p.m. that looks like this (indicating),

24  why is waiting -- why is waiting a problem for Sharyn Orr in this

25  situation, having to wait for this surgery to be performed?

**OFFICIAL TRANSCRIPT**

1     **A.**   Well, basically, the escape route for the flow of

2  spinal fluid is blocked off here.  You have expansion of the

3  ventricles on both sides, and, essentially, ongoing increased

4  pressure in the brain.

5     **Q.**   Dr. Bui used the term several times in his testimony

6  that "time equals brain."  Have you heard that before?

7     **A.**   Yes.

8     **Q.**   Now, if you take that mantra, that saying, time equals

9  brain, how is that evidenced here -- or how is that playing out

10 in terms of what's going on at the cellular level in Mrs. Orr's

11 brain with these processes going on?

12    **A.**   Well, basically, despite the fact that the internal

13 nuclei in the brain itself hasn't suffered any damage from the

14 hemorrhage, it is being compromised because of pressure.

15          And, basically, at the cellular level, it's --

16 nutrients and blood flow are being compromised.  And,

17 essentially, the longer that goes on, the more difficult it is to

18 come back from that.

19    **Q.**   Doctor, in your view, as time goes on -- as that time

20 goes on, is Mrs. Orr progressively losing chance for a favorable

21 outcome due to this delay?

22    **A.**   Yes.

23    **Q.**   Doctor, what I would like to do now is I'm going to

24 hand you what's been marked as 576922.49.  It will be Plaintiffs'

25 Exhibit No. 119.

**OFFICIAL TRANSCRIPT**

1      MS. WILKINSON:  No objection.

2      THE COURT:  Admitted.

3   MR. HONNOLD:  (CONTINUING)

4      Q.   It is the -- this is the next CT scan.

5      And, Doctor, was another CT scan performed on Mrs. Orr

6   at Ochsner main at approximately 4:24 a.m. on the morning of the

7   25th?

8      A.   Yes.

9      Q.   And if you could, as before, could you point out the

10  things that would show that this process of unrelenting

11  intracranial pressure was still ongoing as of this 4:24 CT scan.

12     A.   So, again, imagining an imaginary line from this

13  midpoint right here traveling back to this midpoint dorsally.

14  You see that there is compression of the brain being squeezed

15  this way (indicating).

16     In addition, the quality of this -- this has changed a

17  bit versus the previous study.  You see now that it's more --

18  it's more homogenous and organized.

19     Q.   What's the significance of that?

20     A.   Well, it would have potential treatment implications

21  for being able to remove it.

22     Q.   As time goes on, is that clot potentially becoming more

23  solidified?

24     A.   It is.

25     Q.   And as time goes on and the clot becomes more

**OFFICIAL TRANSCRIPT**

1    solidified, is its potential to respond to later treatment also

2    reduced?

3        **A.**    Yes.

4        **Q.**    And, Doctor, what I would like to do now is hand you

5    what has been marked as Plaintiffs' Exhibit 5769155.2849.  It

6    will be Plaintiffs' Exhibit 120.  It's also from out of the

7    Ochsner main record.

8            MS. WILKINSON:  No objection.

9            THE COURT:  Let it be admitted.

10   **MR. HONNOLD:   (CONTINUING)**

11       **Q.**    And then, Doctor, in looking at this record, does it

12   suggest that a follow-up NIH neurological exam or score was

13   calculated for Mrs. Orr in the early morning hours of April 25th?

14       **A.**    Yes.  They basically repeated the same stroke scale,

15   and now her numbers are clearly worse.

16       **Q.**    So the NIH score is one where -- it's kind of the

17   inverse of the Glasgow Coma Scale where a higher number was good

18   on GCS.  But the NIH, does a higher number suggest a worsening?

19       **A.**    Yes.

20       **Q.**    And now this NIH score of 24, does this suggest that

21   the process of worsening is going on in Mrs. Orr as evidenced by

22   this updated NIH score?

23       **A.**    Yes.

24       **Q.**    Is this further evidence, medical evidence, objective

25   evidence, that Mrs. Orr needs to have the EVD intervention as we

**OFFICIAL TRANSCRIPT**

1    described?

2         **A.**    Yes.

3         **Q.**    Let's add some time post guides to our chronology that

4    we've been building.

5              The first NIH score was done at 1:20 a.m.

6              This NIH score -- I'm trying to see the part of the

7    record, I may not have it up, but I think it would suggest that

8    the 24 was calculated at 4:30 a.m., approximately three hours

9    later.

10             Is a worsening like that something that you would

11   expect in a patient like Sharyn Orr if treatment is not being

12   provided?

13        **A.**    Yes.

14        **Q.**    Doctor, what I would like to do next is move forward

15   and get to the point where -- on Friday, Dr. Bui described a

16   point in time where he did feel that Mrs. Orr was approaching the

17   time now where, if she was, in fact, anticoagulated, enough time

18   had gone by to allow the drug to clear the system.

19             I'm going to hand you what's previously been marked as

20   Plaintiffs' Exhibit 75 in Dr. Bui's testimony, 5769152.232,

21   previously 75.

22                       (Attorneys confering about.)

23        MS. WILKINSON:   Your Honor, we don't object to asking

24   about Dr. Bui's testimony as long as we can both do it, direct

25   and cross.

**OFFICIAL TRANSCRIPT**

1          MR. HONNOLD:  I'm just doing it as kind of a time

2    marker more than anything, Your Honor.

3          THE COURT:  That's fine.

4    **MR. HONNOLD:  (CONTINUING)**

5          Q.   If you look at this note, Dr. Bui -- or -- excuse me --

6    Dr. Liechty, does it appear that now, at 12:29 p.m., the option

7    now of surgical intervention is being offered to Mrs. Orr's

8    family?

9          A.   Yes.

10         Q.   And does this note suggest that Dr. Bui's, in fact, now

11   going to place the EVDs emergently?

12         A.   Yes.

13         Q.   And based upon your review of the records, did that, in

14   fact, happen shortly after 2:00 p.m.?

15         A.   Yes, it did.

16         Q.   Doctor, I'm going to hand you now what we're going to

17   mark as Plaintiffs' Exhibit 121, 5769152.236.

18         And this is -- 121 now is a note from another

19   physician.

20         Did you gain some familiarity as to who Dr. Gropen was

21   in your review of the records?

22         A.   He's a stroke neurologist.

23         Q.   And is it common in a stroke center like Ochsner main

24   where multiple physicians might see a patient during their

25   hospitalization?

**OFFICIAL TRANSCRIPT**

1       **A.**   Yes.

2       **Q.**   To you, does it appear that Dr. Gropen is in agreement

3   with, shortly before 2:00 p.m. -- it looks like the note is

4   actually at the top of 153.  Does it appear to you that

5   Dr. Gropen is in agreement with the EVD placement?

6       **A.**   Yes, he is.

7       **Q.**   And then, based upon your review of the records, did

8   the procedure then go forward shortly after 2:00 p.m. on

9   April 25th?

10      **A.**   Yes.

11      **Q.**   I'm now going to hand you what will be Plaintiffs'

12  Exhibit 122, 5769155.2914.

13          MS. WILKINSON:  No objection.

14          THE COURT:  Let it be admitted.

15          MR. HONNOLD:  Excuse me.  I just have to do one little

16  bit of housekeeping.

17                          (A pause in the proceedings.)

18  **MR. HONNOLD:**  **(CONTINUING)**

19      **Q.**   And based upon your review of the materials, Doctor,

20  what is Plaintiffs' Exhibit 122?

21      **A.**   This looks like its basically tracking the timing of

22  the surgical intervention.

23      **Q.**   And if we orient ourselves now to the timeline that

24  we've been constructing, can you point out where on Exhibit 122

25  it shows that the procedure itself -- after basic preparation,

**OFFICIAL TRANSCRIPT**

1  but where the procedure itself was actually started?

2      A.   It shows the patient got to the room at 1:44 p.m.  She

3  was prepped and draped in a sterile fashion.  And then the

4  procedure started around 2:05 p.m.

5      Q.   And when does it look like the procedure was finished?

6      A.   Basically, they were closing the skin in 16 minutes,

7  2:21.

8      Q.   And so is that -- based upon your experience in

9  performing the EVD procedures, it's a procedure that can be done

10  relatively quickly, right, in skilled hands?

11      A.   Yes.

12      Q.   And during that period of time from -- essentially to

13  2:21, where there's closing, Dr. Bui and his team were able to

14  place both of the external ventricular drains?

15      A.   Correct.

16      Q.   And then by 2:47, Mrs. Orr is returning to the ICU; is

17  that right?

18      A.   Yes.

19      Q.   Doctor, going forward, what I want to do now is, just

20  by way of explanation, hand you what is going to be marked as

21  Plaintiffs' Exhibit 123, 5769152.261, from the Ochsner main

22  record, the operative note of Dr. Bui.

23          MS. WILKINSON:  No objection.

24          THE COURT:  Let it be admitted.

25  MR. HONNOLD:   (CONTINUING)

**OFFICIAL TRANSCRIPT**

1      **Q.**   And is it standard procedure, in most hospitals that
2  you're aware of, that the surgeon or a member of his or her team
3  will prepare an operative note that outlines in detail the
4  surgery or procedure that is done?

5      **A.**   Yes.

6      **Q.**   And based upon your review of Exhibit 123, the
7  operative note, it looks like there is at least one obvious
8  mistake, that being the date, right?

9      **A.**   Uh-huh.  Yes.

10      **Q.**   We can agree that that is -- it should be April 25th,
11  based upon our walk-through of the records?

12      **A.**   Yes.

13      **Q.**   Now, there's one thing here that I want to talk about,
14  pre-operative and post-operative diagnosis.

15          Where it says "large intracerebral hemorrhage," do you
16  disagree with that?

17      **A.**   Yes.

18      **Q.**   And let's go back to when we were talking about the CT
19  scans and the various areas of the brain where we talked about
20  whether this was an intracerebral or an intraparenchymal bleed.

21          Explain to us why you disagree with this part of the
22  operative note that says "large intracerebral hemorrhage."

23      **A.**   Well, this -- the IVH is shorthand for intraventricular
24  hemorrhage, which is where this blood is located.  This
25  descriptor makes it sound secondary.

**OFFICIAL TRANSCRIPT**

1           A more accurate description would have been,

2  "preoperative diagnosis, right-sided intraventricular hemorrhage

3  with hydrocephalus."

4      Q.   In fact, the diagnosis of primary intraventricular

5  hemorrhage, that was assigned by the radiologist, right?

6      A.   Correct.

7      Q.   Other than these issues that we've discussed, does the

8  text or body of the operative note, Plaintiffs 123, coincide with

9  what you would have expected to happen during a standard

10  bilateral EVD placement?

11      A.   As far as the procedure -- as far as the procedure

12  goes, it looks standard.  He did -- it appeared as though he

13  mislabeled right and left on this.  "Brisk CSF flow" was most

14  likely on the left side.

15      Q.   And let's orient that back to the CT scans where we

16  were looking at that larger dark area on the one CT where we said

17  it was on the right-hand side of the view.

18           It would have been the left brain, right?

19      A.   It's actually the patient's left brain.  Correct.

20      Q.   So that would be a minor correction you would make in

21  the note?

22      A.   Yeah.  It's irrelevant, but...

23      Q.   But other than that, you think it fairly describes what

24  you would have anticipated in a patient like this getting the

25  bilateral EVDs?

**OFFICIAL TRANSCRIPT**

1     **A.**   Yes.

2     **Q.**   Does the note suggest that there were any complications

3 encountered during the procedure itself?

4     **A.**   No.

5     **Q.**   Does the note suggest that there was any excessive or

6 unexpected bleeding encountered during the placement of the EVDs?

7     **A.**   No.

8     **Q.**   Doctor, now moving forward, the next step in the

9 chronology, then, is it common for a neurosurgery team like

10 Dr. Bui's at Ochsner main, after drains are placed, to do a

11 follow-up CT scan to verify proper placement?

12     **A.**   Yes.  It's standard care.  Plus, they would be looking

13 for any additional hemorrhage.

14     **Q.**   Doctor, I'm going to hand you now what has been marked

15 as -- it will be Plaintiffs' Exhibit No. 124, 5769301.52.

16          This is a CT scan timed 3:11 p.m. on April 25th.

17          MS. WILKINSON:  No objection.

18          THE COURT:  Admitted.

19 **MR. HONNOLD:  (CONTINUING)**

20     **Q.**   And can you tell us what is displayed or shown by this

21 CT scan, Doctor?

22     **A.**   Unfortunately, this is just one cut of this, but you

23 can see the -- you can see a piece of -- remembering that the

24 slices are 5 millimeters thick, you can see a piece of the

25 catheter here on this cut on the left side, which would have been

**OFFICIAL TRANSCRIPT**

1    going out here (indicating).

2            So if we had the actual CT scan and we were able to

3    scroll through it and go through the top, you could follow the

4    progression of the catheter as it goes out of the skull.

5            And then also I'll note from reviewing the study that

6    there was a well-placed catheter on the right side as well.

7    Right in here (indicating).

8            You can't see it on this cut; but, again, if we were to

9    scroll through it, you could appreciate it.

10       Q.   So now here we are at 3:10, and this would be about 45

11   to 50 minutes after the procedure was done.  But it looks like

12   the drains are in place; is that right?

13       A.   Yes.

14       Q.   In fact, as you look at this, what is your sense as to

15   whether Dr. Bui and his team did a pretty good job getting those

16   drains in?

17       A.   They did an excellent job.

18       Q.   And if you look at -- is there any evidence where there

19   would have been any excessive bleeding or hemorrhage along the

20   track line where the path was taken to get into the ventricles?

21       A.   No.  I reviewed the CT, and tracking the catheters up

22   as they exit the skull, there's no extraneous blood.

23       Q.   Now, in terms of offering the full, I guess, spectrum

24   or panoply of treatment related to the EVDs, was there an

25   additional step that Dr. Bui and his team were going to now want

**OFFICIAL TRANSCRIPT**

1    to take after the drains were placed for Mrs. Orr?

2        A.    Yes.   So to administer TPA, which is basically a clot

3    buster, through the catheter itself was really the second

4    component to the strategy behind putting them in in the first

5    place.   So not only do you want to relieve the pressure

6    immediately and drain some of the fluid, you need to break up the

7    organized clot and make it more liquified so it actually comes

8    out of the drain.   And that's the idea with the TPA.

9        Q.    Okay.   Doctor, I'm now going to hand you what will be

10   Plaintiffs' Exhibit 125, 5769152.35.

11           And I think this is some progress note entries that

12   show times of certain events.

13           MR. HONNOLD:   Your Honor, we offer 125 from the Ochsner

14   main record.

15           MS. WILKINSON:   No objection.

16           THE COURT:   Let it be admitted.

17   MR. HONNOLD:   (CONTINUING)

18       Q.    And what I would like to do, Dr. Liechty, can you just

19   explain a little bit about what your knowledge and understanding

20   is of the history of TPA and how it's become to be -- or adopted

21   as part of this process of treatment for Mrs. Orr of getting with

22   the external ventricular drains.

23       A.    It's commonly administered systemically in patients

24   that have strokes.   It's also used by nurses to open up IV lines

25   as well that are clotted, but there is also some usefulness in

**OFFICIAL TRANSCRIPT**

1     injecting it intraventricularly.

2              So the usual protocol is to place the drains and obtain

3     a CT scan afterwards to make sure that there is no additional

4     bleeding, and then inject TPA every eight hours, 1 milligram.

5              They typically clamp the drain afterwards so that the

6     drug can be in there to break up the clot.

7        Q.   And, Doctor, are you personally familiar with the

8     process of administering TPA after placement of EVDs?

9        A.   Yes.

10       Q.   Have you seen it work in patients before --

11       A.   Yes.

12       Q.   -- in terms of actually having an impact on significant

13    clots and seeing it break up those clots?

14       A.   Yes.

15       Q.   Do you think it was an appropriate treatment for

16    Dr. Bui to go forward with?  Now, even though it's 7:51 on the

17    25th, do you feel that it was still an indicated thing, even at

18    that time, to give the TPA?

19       A.   Yes.

20       Q.   Now, Doctor, have you reviewed the remainder of the

21    medical records for Mrs. Orr at Ochsner main?

22       A.   Yes.

23       Q.   Before we go into that, let me ask you:  The time of

24    the -- now the TPA being administered through the drains at

25    7:51 p.m., how many hours now -- how many hours after arriving at

**OFFICIAL TRANSCRIPT**

1  Ochsner main is now Mrs. Orr finally getting the definitive

2  treatment to break up any clot that is within her ventricles?

3      A.   Almost 19 hours later.

4      Q.   And so is it your view also that the administration or

5  delivery of the TPA was also significantly delayed because of the

6  issue related to whether or not Mrs. Orr had taken her Xarelto on

7  the evening of the 24th?

8      A.   Well, by definition, you have to have a catheter in

9  place to use it, so the delay in the catheters subsequently led

10 to the delay in this.

11     Q.   And I mentioned that you -- or you mentioned that you

12 had reviewed the additional records for Mrs. Orr's treatment

13 there at main.  After this treatment was provided, did you see

14 meaningful improvement or response in Mrs. Orr after the TPA was

15 administered and going forward on following days?

16     A.   Other than visual improvement, the scans, her condition

17 did not improve.

18     Q.   And you know at some point, then, that the Orr family

19 was -- had to address and face the tough decision of withdrawing

20 care from Mrs. Orr?

21     A.   Yes.

22     Q.   And I'm going to hand you what's been marked as -- what

23 will be Plaintiffs' Exhibit 126, which is 5769152.33.

24          And if we go to look at this summary, is this an

25 exhibit, a medical record that provides some overview of

**OFFICIAL TRANSCRIPT**

1  Mrs. Orr's course at Ochsner main and that the family then made

2  the decision to convert Mrs. Orr to comfort care only?

3       A.   Yes.

4       Q.   Have you been in a situation, as a neurosurgeon, having

5  to counsel with and work with families of patients in situations

6  like this?

7       A.   Many times.

8       Q.   And I take it that was a reasonable decision given

9  where Mrs. Orr was by this time, now several days later?

10      A.   Yes.

11      Q.   And you know that, after care was withdrawn, Mrs. Orr

12  unfortunately shortly passed away?

13      A.   Correct.

14      Q.   Doctor, do you think the -- that process that we've

15  gone through of reviewing and discussing various medical

16  records -- do you think that provides an accurate and detailed

17  overview of Mrs. Orr's medical chronology from having her

18  headache on the 24th at 6:30 until the time that she passed away?

19      A.   Yes.

20           MR. HONNOLD:  Your Honor, I forgot to request for

21  admission of Plaintiffs' Exhibit 126.

22           MS. WILKINSON:  No objection.

23           THE COURT:  Let it be admitted.

24  MR. HONNOLD:  (CONTINUING)

25      Q.   Doctor, what I would like to do now is ask you some

**OFFICIAL TRANSCRIPT**

1    questions regarding opinions that you might have in this case.
2    Again, I'd remind you I only want to know, if you have an opinion
3    on something, that you could answer to a reasonable degree of
4    medical certainty.  Will you do that?
5         **A.**   Yes.
6         **Q.**   Doctor, based upon the materials that you reviewed in
7    this case, as well as your training, education, and professional
8    experience, do you have an opinion that you hold to a reasonable
9    degree of medical certainty that Xarelto played a role in
10   Mrs. Orr's primary intraventricular hemorrhage?
11        **A.**   Yes.
12        **Q.**   And what is that opinion, Doctor?
13        **A.**   My opinion is that it essentially contributed to the
14   hemorrhage.
15        **Q.**   And why is it that you -- it is your opinion that the
16   Xarelto did contribute to the hemorrhage?
17        **A.**   Well, in spite of the -- a few things.  But the -- she
18   was a known hypertensive, but the causes of primary
19   intraventricular hemorrhage are not as clear as if she would have
20   bled in that gray area of the brain that we drew out, which
21   basically would have -- that would have been a hundred percent
22   hypertensive bleed.  So these are a lot more -- much more up in
23   the air.
24              And other factors become relevant.
25              The fact that she had very borderline renal clearance.

**OFFICIAL TRANSCRIPT**

1   We know that on the 23rd, the last dose was taken.  Her half-life
2   could have easily extended into the 25th.  And so there is some
3   overlap there.  At the very least, it had a major contributing
4   role in this circumstance.

5        **Q.**   Doctor, I would like to ask you some foundational
6   questions before my next opinion question to you.

7             Based upon your review of the medical records, did
8   Mrs. Orr, in fact, require intervention by way of EVD as soon as
9   reasonably possible?

10       **A.**   Yes.

11       **Q.**   And Doctor, absent Xarelto, could the intervention, by
12  way of EVD and administration of TPA that was required for her,
13  have been performed as soon as Mrs. Orr arrived at a facility
14  that could perform it?

15       **A.**   Yes.

16       **Q.**   But in Mrs. Orr's situation, was she able to get that
17  surgery in a timely basis in your opinion?

18       **A.**   No.

19       **Q.**   Doctor, have you formed an opinion, based upon your
20  review of the materials in this case as well as your professional
21  education, training, and experience, to a reasonable degree of
22  medical certainty whether earlier intervention for Mrs. Orr would
23  have resulted in a different outcome?

24       **A.**   Yes.

25       **Q.**   And Doctor, what is that opinion?

**OFFICIAL TRANSCRIPT**

1      **A.**   My opinion is that she had at least a 60 percent chance

2  of a reasonably functional outcome.

3      **Q.**   And Doctor, what I would like to do now -- in terms of

4  your opinion in that regard, I would like to look at a

5  demonstrative slide that you've helped us prepare.

6         MR. HONNOLD:  Again, Your Honor, I don't have a

7  specific number on that.  I will have to catch up on that.  But

8  this is just for demonstrative purposes.  And I've shown this to

9  counsel before the exam.

10 **MR. HONNOLD:  (CONTINUING)**

11     **Q.**   Doctor, could you use this timeline to help explain

12 your opinions that you have on the fact that earlier intervention

13 would have made a difference for Mrs. Orr, even to the extent

14 that you believe she had a 60 percent likelihood of survival with

15 a meaningful neurologic outcome?

16        Could you explain the opinion in light of this

17 objective data?

18     **A.**   So it's a timeline issue.  It's also the fact that the

19 surrounding brain around the hemorrhage was intact, that the

20 blood was contained in a fluid-filled space, but yet the patient

21 then went from a GCS 15 at 10:10 p.m. with a slight decrease at

22 11:15 to a fairly marked decline at the time she hit Ochsner

23 main.  It was this window where emergent intervention had to take

24 place to achieve that.

25        But even at this GCS of 6T, she had a fully functioning

**OFFICIAL TRANSCRIPT**

1  brain stem.  She had intact pupillary response.  And no evidence

2  that she had herniated.  And that was the window to intervene.

3        So from a neurosurgeon standpoint, that's basically

4  what I look for, is when you can intervene as fast as possible at

5  the time of the decline, that's the time to save something.  And

6  that's what was lost here.

7        Q.   Doctor, is there some -- let me ask this.  The Glasgow

8  Coma Scale of 6T, we've talked about that in terms of when it was

9  first measured; is that right?

10       A.   Yes.

11       Q.   And so I think, in going through the chronology as well

12  as this exhibit, the first time that the Glasgow Coma Scale of 6T

13  was measured was when Mrs. Orr arrived at Ochsner main at

14  1:15 a.m.; is that right?

15       A.   Correct.

16       Q.   Now, ultimately when Mrs. Orr received the procedure,

17  she was still a 6T at 2:30 p.m.; is that right?

18       A.   Yes.

19       Q.   Now, from your view as a neurosurgeon, is there a

20  difference in performing this intervention on a patient who has

21  newly arrived at 6T -- because remember we calculated the

22  score -- you calculated the score at 13 at Baptist.  Now newly

23  arrived at Ochsner main and she is now at 6T.

24       Is there a difference in performing a procedure like

25  the EVDs on a new GCS 6T patient versus one now that has been a

**OFFICIAL TRANSCRIPT**

1  GCS 6T for many hours?

2       A.    Absolutely.

3       Q.    Can you explain that?

4       A.    So first of all, we're talking about a non-dominant

5  hemisphere, so, in theory, speech centers are intact on the left

6  side of the brain.  In addition, you have intact brain stem

7  reflexes and you have the exam that's just freshly declined.

8  That is the time to intervene if there is to be any meaningful

9  hope.

10      Q.    Do you feel, however, it was still reasonable and there

11  was some hope when Dr. Bui performed the procedure at 2:30 p.m.

12  on the 25th?

13      A.    Yes.

14      Q.    Do you have an opinion as to whether her chances at

15  that point were significantly worse than they were closely after

16  her time of arrival at Ochsner main?

17      A.    Yes.  I feel they were much worse.

18      Q.    Do you have an opinion, during that interval time from

19  1:15 a.m. on the early morning hours of the 25th until 2:30, some

20  13 hours later -- 13 and a quarter hours later on the afternoon

21  of April 25th, whether Mrs. Orr, in that interim, lost a

22  significant and meaningful chance of recovery and survival as a

23  result of this delay?

24      A.    Yes.

25      Q.    What's your opinion in that regard?

**OFFICIAL TRANSCRIPT**

1     **A.**   My opinion is that she definitely lost a chance for a

2  meaningful recovery by not being able to intervene in that early

3  window.

4     **Q.**   Doctor, let me ask you now again, based upon the

5  materials you reviewed in this case, your training, your

6  education, and your professional experience -- but especially in

7  light of the materials that you've reviewed in this case related

8  to Xarelto -- do you have an opinion to a reasonable degree of

9  medical certainty whether that -- the surgery could have gone

10  forward when Mrs. Orr arrived at Ochsner main?

11     **A.**   Yes.

12     **Q.**   And what is your opinion in that regard?

13     **A.**   Basically, after review of company documents and

14  knowing what I know now, the normal PT that she had at Ochsner

15  Baptist would have been very useful in this emergent situation in

16  that -- well, it's twofold.

17          Number one, they would have called ahead to the

18  definitive neurosurgical care, but instead of telling them first

19  thing that I've got this patient on Xarelto, that we don't know

20  when she took it last, they don't know when -- they don't think

21  they can intervene right away, so that transfer probably didn't

22  happen as quickly as it could have if they would have known.

23          Secondly, well, the -- I'm sorry, ask your question

24  again, please.

25     **Q.**   Sure.

**OFFICIAL TRANSCRIPT**

1    **A.**   I forgot --

2    **Q.**   Based upon what you know now about the issues

3   specifically of Xarelto coagulation testing and PT, could that

4   procedure have gone forward close in time when Mrs. Orr arrived

5   at Ochsner main?

6    **A.**   Yes.  So, right.  Sorry.  That's -- so the normal PT

7   would have also given the receiving doctors evidence that they

8   could have -- that they could have proceeded in an emergent

9   fashion and they could have been ready for her.

10         You saw from the operative note, it took them -- and

11   they are typically much slower to put in, in the operating room

12   because there is more people involved.

13    **Q.**   Doctor, do you have a -- excuse me, sir.  Go ahead.

14    **A.**   I was just going to say, they got bilateral

15   ventriculostomies in in 16 minutes.

16         So, yes, there was a -- it was a factor.

17    **Q.**   Is that evidence of how quickly EVDs can be placed once

18   a physician is comfortable about the patient not being under the

19   anticoagulant influences of Xarelto?

20    **A.**   Yes.  I can put one in in three minutes bedside.

21    **Q.**   Now, Doctor, based upon your review of the materials in

22   this case, your training, education, and experience, but

23   specifically what you know about Xarelto, does the normal PT that

24   Mrs. Orr had at Ochsner Baptist, based upon blood that was drawn

25   at approximately 11:20 p.m., essentially prove that Mrs. Orr did

**OFFICIAL TRANSCRIPT**

1  not have meaningful levels of Xarelto in her bloodstream that

2  would have prevented surgery?

3      A.   It didn't appear she had meaningful levels.  While it's

4  not perfect, it certainly implied that.  And they could have

5  proceeded with emergent surgery.

6      Q.   Doctor, given Mrs. Orr's clinical presentation upon

7  arrival to Ochsner main in the early morning hours of April 25,

8  2015, would a reasonable neurosurgeon have surgically intervened

9  sooner if he or she -- if Mrs. Orr had not taken Xarelto the

10 evening before?

11     A.   Yes.

12     Q.   Doctor, if the defendants had provided information to

13 doctors, such as Dr. Bui, instructing them that a blood test was

14 able to determine that Mrs. Orr had not taken Xarelto that

15 evening, would a reasonable neurosurgeon order such a test and

16 rely upon it in deciding when to perform surgery?

17     A.   Yes.

18     Q.   And, Doctor, if the test results indicated that

19 Mrs. Orr had not taken her Xarelto pill that evening, would a

20 reasonable neurosurgeon have surgically intervened sooner?

21     A.   Yes.

22     Q.   Now, in terms of what you know about -- well, let me

23 lay some foundation for this.

24          Did you take pharmacology in medical school and even

25 focus more on pharmacological issues in your residency?

**OFFICIAL TRANSCRIPT**

1    **A.**    Yes.

2    **Q.**    And I take it you have some general understanding of

3    the pharmacology of Xarelto now; is that right?

4    **A.**    Yes.

5    **Q.**    And so, if Mrs. Orr, for example, had, in fact,

6    taken -- well, let's pick an earlier time since they were out to

7    dinner.

8         6:00 p.m.  If she had, in fact, taken Xarelto at

9    6:00 p.m., based upon what you know about the pharmacology of

10   Xarelto, would she have had meaningful and measurable amounts of

11   Xarelto in her bloodstream --

12   **A.**    No.

13   **Q.**    -- if she took it at 6:00?

14   **A.**    Oh, based on the PT, I would say no.  But, yeah, right,

15   it should be at least eight hours, and in her potentially longer.

16   **Q.**    So when that PT was performed on blood at approximately

17   11:20 p.m., if there had been meaningful Xarelto in her system,

18   is it your view that that Xarelto should have registered on that

19   PT done at 11:20?

20   **A.**    In theory, yes.

21   **Q.**    And that PT examination or laboratory test was

22   absolutely normal; was it not?

23   **A.**    Yes.

24   **Q.**    Suggesting that there was no Xarelto in Mrs. Orr's

25   bloodstream?

**OFFICIAL TRANSCRIPT**

1      **A.**   Correct.

2      **Q.**   And suggesting that surgery could have gone forward at

3  that -- upon arrival at Ochsner main?

4      **A.**   Correct.

5      **Q.**   Now, Doctor, do you fault Dr. Bui for any of this?

6      **A.**   No.

7      **Q.**   Why not?

8      **A.**   Basically, C. J. had the same working knowledge that

9  all of us had for issues like this.  Most of us in neurosurgery

10 know that there's no antidote and there's really no reliable --

11 it's in the label that there's no reliable lab test to tell if

12 it's functioning or not.  So we know that the only way to really

13 deal with that is time.

14     **Q.**   And, Doctor, to your knowledge, are there still

15 physicians and neurosurgeons who still have this as their general

16 understanding and belief regarding Xarelto?

17     **A.**   Yes.

18          MS. WILKINSON:  Objection, foundation.

19 **MR. HONNOLD:  (CONTINUING)**

20     **Q.**   Let me lay some foundation to this question.

21          Do you have occasion to interact with neurosurgeons on

22 medical staffs, professional meetings, things of that nature?

23     **A.**   Yes.

24     **Q.**   Are you able, based upon your interaction with

25 members -- with your colleagues and members of your profession,

**OFFICIAL TRANSCRIPT**

1  to get some sense as to what the general understanding is in the

2  neurosurgical community?

3       A.   Yes.  But also through updated CMEs that are constantly

4  flooding us now.

5       Q.   Is it fair to state that the general understanding in

6  the neurosurgical community, as of April of 2015, when this

7  happened, was that there was no way to assess the effects of

8  Xarelto, and that the PT test itself was not meaningful in making

9  decisions regarding timing of surgery?

10      A.   That was the working knowledge, yes.

11      Q.   And was the belief essentially that, if someone was

12  unsure or unclear as to when the patient last took Xarelto, that

13  an estimation or guesstimation needed to be done as to how long

14  it would take the drug to clear the system?

15      A.   Yes.

16      Q.   Now, Doctor, was the surgery still necessary and

17  indicated when Dr. Bui performed it shortly after 2:00 p.m.?

18      A.   Yes.

19      Q.   And you believe even then it was medically indicated

20  because she did still have some chance or hope for survival even

21  at that point?

22      A.   She had intact brain stem reflexes and a GCS score that

23  was basically the same.

24      Q.   Now, Doctor, the opinions that you have given today,

25  are they based upon specific materials that you have reviewed

**OFFICIAL TRANSCRIPT**

1   based upon your work in the case?

2       A.   Yes.

3       Q.   Okay.  Including being able to read some depositions of

4   individuals that are employed by the defendants?

5       A.   Correct.

6       Q.   Okay.  Now, Doctor, the opinions that you've arrived at

7   on this case based upon the work you've done in this case, have

8   they caused you to change your practice for your own patients?

9       A.   Yes, I would say definitely.  After reviewing the --

10  after reviewing what happened here, I will definitely rely on PT

11  in an emergent situation.

12      Q.   And, Doctor, as of April of 2015, had you undertaken

13  yet a specific -- as of that time, April 2015, a specific reading

14  of the Xarelto label?

15      A.   In preparation for the paper.

16      Q.   Okay.

17      A.   For my position paper.

18      Q.   So you had not read the label in detail until you

19  prepared your report in this case; is that true?

20      A.   Correct.

21      Q.   The understanding that you had, then, about Xarelto not

22  being able to be measured and reversed, where did that

23  understanding come from in terms of what was the source or basis

24  for your knowledge and understanding as of April 2015?

25      A.   It was basically just blanket information amongst

**OFFICIAL TRANSCRIPT**

1  practitioners at the time.  I'm not exactly sure where that came

2  from, but it was because of the lack of information that that, I

3  guess, was assumed.

4      **Q.**   And what is the reason, Doctor, for you -- well, let me

5  ask it this way:  Based upon the information that you reviewed in

6  this case -- depositions, documents, things of that nature -- do

7  you think that they've provided you with a significant or

8  sufficient enough basis to actually use and rely upon the PT test

9  in your own patients in deciding when to perform surgery?

10     **A.**   Yes.

11         MR. HONNOLD:  Doctor, thank you for your time and

12  courtesy.  I don't have any other questions for you right now.

13         THE COURT:  Let's do this, why don't we take a break at

14  this time for lunch.  It's 11:30.  We'll come back at 1:15.

15  Let's do that.

16         Court will stand in recess.

17                    (End of morning session.)

18              * * * *

19              **CERTIFICATE**

20     **I hereby certify this 5th day of June, 2017, that the**
    **foregoing is, to the best of my ability and understanding, a true**
21  **and correct transcript of the proceedings in the above-entitled**
    **matter.**

22

23              */s/ Mary V. Thompson*
    _____

24              **Official Court Reporter**

25

**OFFICIAL TRANSCRIPT**