```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2
    ****************************************************************
 3
    IN RE:  XARELTO (RIVAROXABAN)
 4  PRODUCTS LIABILITY LITIGATION        Docket No. 14-MD-2592
                                         Section "L"
 5                                       New Orleans, Louisiana
    THIS DOCUMENT RELATES TO:            Monday, June 5, 2017
 6  Joseph Orr, et al
    v. Janssen Research &
 7  Development, et. al.,
    Case No. 15-CV-3708
 8
    ****************************************************************
 9
                    TRANSCRIPT OF TRIAL PROCEEDINGS
10        HEARD BEFORE THE HONORABLE ELDON E. FALLON
                    UNITED STATES DISTRICT JUDGE
11                  VOLUME V - AFTERNOON SESSION

12
    APPEARANCES:
13
    FOR THE PLAINTIFFS'
14  LIAISON COUNSEL:                LEVIN PAPANTONIO
                                    BRIAN H. BARR, ESQ.
15                                  316 Baylen Street, Suite 600
                                    Pensacola, FL 32502
16
                                    BEASLEY ALLEN
17                                  BY:  ANDY BIRCHFIELD, ESQ.
                                    P.O. Box 4160
18                                  Montgomery, AL 36103

19                                  GAINSBURGH BENJAMIN DAVID
                                    MEUNIER & WARSHAUER
20                                  BY:  GERALD E. MEUNIER, ESQ.
                                    2800 Energy Centre
21                                  1100 Poydras Street
                                    New Orleans, LA 70163
22
                                    GOZA & HONNOLD, LLC
23                                  BY:  BRADLEY D. HONNOLD, ESQ.
                                    11181 Overbrook Road, Suite 200
24                                  Leawood, Kansas 66211

25
```

```
 1                                  THE LAMBERT FIRM, PLC
                                    BY:  EMILY JEFFCOTT, ESQ.
 2                                  701 Magazine Street
                                    New Orleans, Louisiana 70130
 3

 4   FOR THE DEFENDANT BAYER
     HEALTHCARE PHARMACEUTICALS
 5   INC. and BAYER PHARMA AG:      WILKINSON WALSH & ESKOVITZ, LLP
                                    BY:  BETH A. WILKINSON, ESQ.
 6                                  1900 M Street NW, Suite 800
                                    Washington, DC 20036
 7
                                    Nelson Mullins Riley
 8                                  & Scarborough, LLP
                                    BY:  DAVID E. DUKES, ESQ.
 9                                  Meridian, 17th Floor
                                    1320 Main Street
10                                  Columbia, SC 29201

11
     FOR JANSSEN PHARMACEUTICALS,
12   INC. AND JANSSEN RESEARCH &
     DEVELOPMENT, LLC:              IRWIN FRITCHIE URQUHART & MOORE
13                                  BY:  JAMES B. IRWIN, ESQ.
                                    400 Poydras St., Suite 2700
14                                  New Orleans, LA 70130

15

16   Official Court Reporter:      Karen A. Ibos, CCR, RPR, CRR, RMR
                                    500 Poydras Street, B-275
17                                  New Orleans, Louisiana 70130
                                    (504) 589-7776
18

19     Proceedings recorded by mechanical stenography, transcript
     produced by computer.
20

21

22

23

24

25
```

1                              I N D E X

2

3    WITNESSES FOR THE PLAINTIFF:                    PAGE/LINE:

4

5    PETER LIECHTY

6      Cross-Examination by Ms. Wilkinson           1046/11

7      Redirect Examination by Mr. Honnold          1144/11

8

9    VIDEO DEPOSITION OF SCOTT D. BERKOWITZ         1164/10

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<pre>
 1                    P R O C E E D I N G S

 2                  (MONDAY, JUNE 5, 2017)

 3                  (AFTERNOON SESSION)

 4

 5          (OPEN COURT.)

 6              THE COURT:  Be seated, please.

 7              You may cross-examine, Counsel.

 8              MS. WILKINSON:  Thank you, your Honor.

 9              Good afternoon, everyone.

10                  CROSS-EXAMINATION

11  BY MS. WILKINSON:

12  Q.  Good afternoon, Doctor.

13  A.  Hi.

14  Q.  We have not met.  My name is Beth Wilkinson.  We haven't met

15  before, right?

16  A.  I don't believe so.

17  Q.  You did have a deposition in this case; you recall that?

18  A.  Yes.

19  Q.  And I did not depose you or ask questions?

20  A.  I don't believe so.

21  Q.  You recall that deposition, don't you?

22  A.  Yes.

23  Q.  And I am going to give you a copy, if I have it, of the

24  deposition because we may need to refer it.  So let me get a copy

25  before we get started.  You can just put it aside until we need it.
</pre>

12:51:20 1   A.  Thank you.

12:51:24 2   Q.  All right.  I just want to start with asking you a little bit

12:51:27 3   more about what you did in this case and your background.

12:51:31 4   A.  Okay.

12:51:31 5   Q.  Before you got hired in this case, you had never done any

12:51:35 6   research on Xarelto, right?

12:51:35 7   A.  Correct.

12:51:36 8   Q.  You had never done any research on the rest of the DOACs, the

12:51:41 9   oral anticoagulants, right?

12:51:43 10  A.  Correct.

12:51:44 11  Q.  You're familiar with Eliquis now?

12:51:46 12  A.  Yep.  Superficially.

12:51:49 13  Q.  Savaysa?

12:51:51 14  A.  No.

12:51:52 15  Q.  Not familiar with that one at all?

12:51:53 16  A.  No.

12:51:53 17  Q.  Are you familiar with Pradaxa?

12:51:55 18  A.  Yes, superficially.

12:51:58 19  Q.  And you're familiar with warfarin?

12:51:59 20  A.  Yes.

12:52:00 21  Q.  But you hadn't done research on any of those drugs before you

12:52:05 22  got hired by plaintiffs, right?

12:52:07 23  A.  Correct.

12:52:07 24  Q.  And you told us you hadn't read the Xarelto label until you got

12:52:11 25  hired in this case?

12:52:13  1   A.   That's true.

12:52:14  2   Q.   Nor have you done or had you done before this case any research

12:52:17  3   on ICH, intracranial hemorrhages?

12:52:22  4   A.   Correct.

12:52:23  5   Q.   You've had experience, but you've never done additional

12:52:27  6   research yourself, right?

12:52:28  7   A.   Correct.

12:52:28  8   Q.   You've never published any articles on those topics?

12:52:31  9   A.   No.   They were mostly spine-related, other things.

12:52:34  10  Q.   And, of course, no -- you've never published anything on the

12:52:39  11  anticoagulants or atrial fibrillation or anything like that, right?

12:52:42  12  A.   No, nor would any neurosurgeon do that.

12:52:45  13  Q.   Your specialty is not in AFib, right?

12:52:47  14  A.   Correct.

12:52:48  15  Q.   And you don't prescribe Xarelto?

12:52:49  16  A.   I just take care of the problems.

12:52:52  17  Q.   You don't prescribe any anticoagulants, do you?

12:52:56  18  A.   No.   The closest I ever came was prescribing Coumadin for a new

12:53:03  19  vascular graft as an intern in general surgery.

12:53:06  20  Q.   I believe you said in your deposition that nothing in your CV

12:53:10  21  stands out as being particularly pertinent to this case.   Do you

12:53:13  22  agree with that still?

12:53:14  23  A.   In what regard?

12:53:19  24  Q.   We were ask -- someone was asking you about your CV, right?

12:53:22  25  That's your list of your experience and your publications --

12:53:24  1    A.   Yeah, uh-huh.

12:53:25  2    Q.   -- correct?

12:53:26  3         And you said nothing on your CV stands out as being

12:53:30  4    particularly pertinent to this case.   Do you recall that?

12:53:34  5    A.   I don't recall that.

12:53:35  6    Q.   Take a look at page 89 --

12:53:38  7         MR. HONNOLD:   Can I just object.   I don't think this is

12:53:42  8    appropriate impeachment.   He has not been shown to make an

12:53:44  9    inconsistent statement.

12:53:45  10        THE COURT:   That's what he just said, so let's see.

12:53:46  11   BY MS. WILKINSON:

12:53:47  12   Q.   Go ahead and take a look at page 89, if you will.   Take a look

12:54:08  13   at line 15 through line 20.

12:54:10  14   A.   Yeah.   I just read it.

12:54:11  15   Q.   You agreed with that, right?

12:54:12  16   A.   Yeah.   Nothing in my publications.   We were talking about

12:54:15  17   publications.

12:54:16  18   Q.   Okay.   You have testified in other cases as a treating

12:54:24  19   physician, right?

12:54:25  20   A.   Yes.

12:54:25  21   Q.   And you said you were paid for your testimony in this case

12:54:29  22   $1500 an hour when you testify?

12:54:31  23   A.   Yes.

12:54:32  24   Q.   And you have an assistant that works with you that bills that

12:54:35  25   fee?

12:54:36  1    A.   Yes.

12:54:36  2    Q.   And has that been the same assistant that you've had for some

12:54:41  3    time?

12:54:41  4    A.   Since I started the new practice, yeah.

12:54:43  5    Q.   And you started the new practice when, sir?

12:54:46  6    A.   A couple of months ago.

12:54:47  7    Q.   January of 2017?

12:54:50  8    A.   Closer to March.

12:54:52  9    Q.   March.  But you left your prior employment after December of

12:54:57  10   2016, correct?

12:54:58  11   A.   No.

12:54:59  12   Q.   When did you leave?

12:55:00  13   A.   March 5th was my last day.

12:55:03  14   Q.   And when you were engaged for this case, you did review

12:55:09  15   Mrs. Orr's medical records, right?

12:55:11  16   A.   Yes.

12:55:11  17   Q.   And you started to review some papers regarding Xarelto?

12:55:15  18   A.   Correct.

12:55:16  19   Q.   Papers that plaintiff's counsel provided to you?

12:55:19  20   A.   And some I found.

12:55:21  21   Q.   You said you did a PubMed search?

12:55:26  22   A.   Uh-huh.

12:55:26  23   Q.   And that you said is easy nowadays because you can put in

12:55:29  24   search words; it's kind of like the Google of medicine, correct?

12:55:32  25   A.   Correct.

12:55:33  1   Q.  So doctors use that quite frequently when they want to go do

12:55:35  2   research about a drug or a condition?

12:55:37  3   A.  Correct.

12:55:39  4   Q.  That's not hard for doctors to do?

12:55:39  5   A.  Not particularly.

12:55:40  6   Q.  And doctors do it if they're interested in finding out about a

12:55:44  7   particular drug or condition?

12:55:45  8   A.  Yes.

12:55:46  9   Q.  And it's a good way to access peer-reviewed medical literature,

12:55:50  10  right?

12:55:50  11  A.  Yes.

12:55:51  12  Q.  And that peer-reviewed medical literature is important in

12:55:54  13  medicine, right?  So you can practice evidence-based medicine,

12:55:58  14  right?

12:55:58  15  A.  We do our best.

12:55:59  16  Q.  You try to practice evidence-based medicine, right?

12:56:02  17  A.  We try to, yeah.

12:56:03  18  Q.  Well, I'm not asking about everyone else.  I'm just talking

12:56:07  19  about you.

12:56:07  20       You try to practice evidence-based medicine, right?

12:56:09  21  A.  Yes.

12:56:09  22  Q.  You don't practice antidotal medicine?

12:56:12  23  A.  No, but there's a lot of feel to what we do.

12:56:14  24  Q.  But antidotal medicine can be dangerous because if you've seen

12:56:17  25  one or two things you may think that that would happen more

12:56:20 1 commonly than it would, right?

12:56:22 2 A. "Dangerous" is a strong word.

12:56:24 3 Q. Could be dangerous, couldn't it?

12:56:25 4 A. I don't think so.

12:56:28 5 Q. So you think it's fine to just rely on your personal experience

12:56:32 6 and not look at kind of studies and evidence that shows, you know,

12:56:36 7 over a population or over time whether a procedure or drug is

12:56:40 8 appropriate?

12:56:40 9 A. No. I think it's fine to rely on experience and the best

12:56:44 10 information you can get from the literature.

12:56:46 11 Q. Did you do a thorough search in PubMed for articles regarding

12:56:58 12 PT?

12:56:59 13 A. Yes.

12:57:00 14 Q. And you included all of those on your reliance list that you

12:57:05 15 provided for us with your report, right?

12:57:07 16 A. For this, not for the video deposition.

12:57:10 17 Q. Okay. But you have all of the articles that you relied on in

12:57:15 18 your report that you provided to us and --

12:57:20 19 A. They weren't used in my report.

12:57:21 20 Q. Pardon?

12:57:22 21 A. They weren't used in my report.

12:57:24 22 Q. So where would -- I'm sorry. I am confused then.

12:57:27 23 Are there articles that you relied on regarding PT that

12:57:30 24 aren't in your report?

12:57:31 25 A. You're talking about the report that I wrote before?

12:57:37  1   Q.  Before the deposition.

12:57:38  2   A.  Before the video -- yes.  Yeah.  I didn't discuss PT in that

12:57:42  3   report.

12:57:42  4   Q.  So before your deposition, you didn't tell us any of your

12:57:46  5   opinions about PT, right?

12:57:47  6   A.  That's correct.

12:57:48  7   Q.  It was only about a week before your deposition that counsel

12:57:52  8   gave you some documents, and then you issued an opinion during your

12:57:56  9   deposition, right?

12:57:57  10  A.  Something like that.

12:57:59  11  Q.  So you didn't go find those documents; they gave them to you?

12:58:03  12  A.  Then I found additional ones.

12:58:05  13  Q.  So you've now done an additional search since your deposition

12:58:09  14  for PT?

12:58:10  15  A.  Yes.

12:58:10  16  Q.  And have you provided us with a list of those additional

12:58:13  17  documents?

12:58:13  18  A.  I don't know.  Have they?

12:58:17  19  Q.  Have you provided them to counsel?  They normally provide us if

12:58:23  20  you provided it to them.

12:58:24  21  A.  It's on the list that we have.  Are you talking about the

12:58:32  22  American Heart Association and some of the other --

12:58:34  23  Q.  I don't know, sir.  All we can rely on is what's in your

12:58:37  24  report, and you said you've added documents since the deposition.

12:58:40  25  And normally you give us -- you tell us what those are so we can

12:58:43  1   look at them before we come to court, and I am saying you said you

12:58:47  2   have a list of those additional document, right?

12:58:48  3   A.  We discussed that in the video deposition.

12:58:50  4   Q.  Okay.  So if you didn't mention it in the video deposition and

12:58:54  5   it's not on here, you don't have any additional documents after?

12:58:57  6   A.  No.  We did mention that there were some company documents that

12:59:00  7   I looked at in the video deposition.

12:59:02  8   Q.  Sure.  I am focusing right now, if I could, on published

12:59:05  9   peer-reviewed literature.  You said you did a thorough search on PT

12:59:10  10  of that literature, right?

12:59:11  11  A.  Yes.  Since the video deposition.

12:59:13  12  Q.  Since the video deposition.  Where is the list of those

12:59:16  13  peer-reviewed articles that you reviewed?

12:59:17  14  A.  Down in our war room.  That was only about six or seven

12:59:24  15  articles.

12:59:25  16         MS. WILKINSON:  Your Honor, at a break I would ask that

12:59:27  17  we get provided with that list.

12:59:29  18         THE COURT:  Certainly.  If there are any, get them.

12:59:46  19  BY MS. WILKINSON:

12:59:47  20  Q.  You haven't written any additional reports since you did your

12:59:49  21  video deposition, have you?

12:59:50  22  A.  No.

12:59:51  23  Q.  You haven't come to any additional conclusions?

12:59:54  24  A.  Well, I've learned -- I've learned some more things.

13:00:00  25  Q.  Did you ask -- after you received some of those company e-mails

13:00:04  1   from counsel, did you ask for any additional company documents?

13:00:07  2   A.  I did not.

13:00:08  3   Q.  Did you read -- you didn't read all of the depositions that

13:00:13  4   were in this case, did you?

13:00:14  5   A.  Of the company people?

13:00:16  6   Q.  Yes.

13:00:17  7   A.  No, I didn't.

13:00:17  8   Q.  You listed on your curriculum vitae and your report that you

13:00:22  9   had all of the -- you had all of the depositions, right?

13:00:24 10   A.  Right.  They were probably provided.  I couldn't get through

13:00:28 11   them all.

13:00:28 12   Q.  Didn't you say, for example, Dr. Berkowitz, who is the head of

13:00:32 13   cardiovascular at Janssen, that you spent maybe ten or 15 minutes

13:00:36 14   reviewing his deposition?

13:00:37 15   A.  Something along those lines, yes.

13:00:43 16   Q.  Did you ask anyone to provide you any information that might

13:00:46 17   contradict or inform you further about your opinions in this case,

13:00:49 18   for example, about PT?

13:00:50 19   A.  No.

13:00:53 20   Q.  So do you know if there were other documents or other

13:00:56 21   statements that you're unaware of about PT in this case that could

13:01:00 22   change your opinion?

13:01:01 23   A.  There was a host of literature on PT, yes, I am aware of that.

13:01:05 24   Q.  And did you read those articles, the most recent articles that

13:01:09 25   came out about PT?

| | | |
|---|---|---|
| 13:01:10 | 1 | A.  I've looked at some from -- that are recent. |
| 13:01:13 | 2 | Q.  Which ones have you looked at, sir? |
| 13:01:15 | 3 | A.  The American Heart Association article from a few years ago. |
| 13:01:19 | 4 | Q.  Do you recall who the author of that article was? |
| 13:01:23 | 5 | A.  I don't recall. |
| 13:01:23 | 6 | Q.  Who? |
| 13:01:24 | 7 | A.  I don't recall. |
| 13:01:25 | 8 | Q.  You don't recall.  Do you recall what year it was? |
| 13:01:27 | 9 | A.  It was within the last year or two. |
| 13:01:30 | 10 | Q.  And how did you come across that article? |
| 13:01:33 | 11 | A.  I believe that was provided for me by counsel. |
| 13:01:38 | 12 | Q.  Did they provide any other articles to you about PT? |
| 13:01:41 | 13 | A.  There were a couple of other ones as well, but they were small |
| 13:01:48 | 14 | foreign papers. |
| 13:01:49 | 15 | Q.  Will they be on the list that you provided? |
| 13:01:51 | 16 | A.  Probably so.  I didn't really read those very much. |
| 13:01:54 | 17 | Q.  Let's go and talk about your employment history, if we could, |
| 13:01:57 | 18 | and your experience.  You told us that most of your experience with |
| 13:02:03 | 19 | these PIVHs, right -- |
| 13:02:07 | 20 | A.  Yes. |
| 13:02:08 | 21 | Q.  -- which is primary intraventricular hemorrhage? |
| 13:02:12 | 22 | A.  Correct. |
| 13:02:12 | 23 | Q.  Can we abbreviate that as PIVH? |
| 13:02:16 | 24 | A.  Sure. |
| 13:02:17 | 25 | Q.  I think you said before PIVHs are very rare, right? |

13:02:22  1   A.  They're quite rare, yes.

13:02:24  2   Q.  Quite rare.  And you've said in your entire practice over your

13:02:29  3   residency, your fellowship, and your current practice, you've only

13:02:34  4   seen a handful, right?

13:02:36  5   A.  Of primary.

13:02:38  6   Q.  So less than five, right?

13:02:39  7   A.  Probably more than that.  I would say ten to 20.

13:02:43  8   Q.  You said a handful in your deposition --

13:02:47  9   A.  You need to understand UAB sees thousands of cranial bleeds a

13:02:52 10   year, so, I mean, that's not uncommon if they represent a

13:02:58 11   percentage or so of that.

13:02:59 12   Q.  So I am just going by what your said in your deposition.  You

13:03:02 13   said you saw a handful, right?

13:03:03 14   A.  Uh-huh.

13:03:04 15   Q.  And since you've been in practice yourself, not at UAB, you've

13:03:14 16   only seen very, very few, right?

13:03:16 17   A.  Correct.

13:03:16 18   Q.  And it's very rare for someone to have just a primary

13:03:20 19   intraventricular hemorrhage that's contained in the ventricles,

13:03:24 20   right?

13:03:25 21   A.  Certainly compared to secondary, yeah.

13:03:27 22   Q.  And it would be important in understanding those to look at the

13:03:30 23   studies that are available about those to see what the causes are,

13:03:34 24   right?

13:03:35 25   A.  Correct.

13:03:35  1    Q.  And to see whether your personal experience matches up with

13:03:39  2    what's in the literature, right?

13:03:41  3    A.  Correct.

13:03:41  4    Q.  And you've done that, correct?

13:03:43  5    A.  Correct.

13:03:44  6    Q.  Now, you were employed by the Thibodaux Regional Medical

13:03:50  7    Center --

13:03:50  8    A.  Yes.

13:03:50  9    Q.  -- right?

13:03:51 10    A.  Yes.

13:03:51 11    Q.  And you left there, you said, this year?

13:03:54 12    A.  Uh-huh.

13:03:54 13    Q.  And you also had privileges at Champion?

13:03:57 14    A.  I did.

13:03:58 15    Q.  And do you still have privileges there?

13:04:01 16    A.  Yes.

13:04:01 17    Q.  Have you performed any surgeries there this year?

13:04:04 18    A.  A couple.

13:04:05 19    Q.  What type of surgeries?

13:04:07 20    A.  Spine surgery.

13:04:08 21    Q.  You said you opened your new practice, and I want to ask you

13:04:14 22    about that.

13:04:14 23    A.  Yes.

13:04:14 24    Q.  You have to apply for a license with the State of Louisiana,

13:04:19 25    don't you, to do -- to practice medicine when you open up a new

13:04:24   1   business?

13:04:25   2   A.  I already have my license.

13:04:26   3   Q.  Well, didn't you apply for and get --

13:04:31   4   A.  You might --

13:04:32   5   Q.  -- a provider information number?

13:04:34   6   A.  One Spine, LLC.  My MPI travels with me throughout.  I

13:04:38   7   wasn't -- I was assigned that as a resident, I think.

13:04:42   8   Q.  Did you apply this year, sir, for a new provider information

13:04:45   9   number?

13:04:45  10   A.  No.

13:04:45  11   Q.  Okay.

13:04:47  12          MS. WILKINSON:  Let me mark this as Exhibit 8, your

13:04:49  13   Honor.  Defense Exhibit 11023.

13:04:49  14   BY MS. WILKINSON:

13:04:58  15   Q.  Could it be, sir -- let me hand a copy of this to you and your

13:05:02  16   counsel.  Could it be that you updated that license with a new

13:05:04  17   address?

13:05:05  18   A.  No, because it hasn't come up for renewal yet.

13:05:12  19   Q.  I'll give you the one marked Exhibit 8.  Are you familiar with

13:05:22  20   that?

13:05:23  21   A.  Yes.

13:05:23  22   Q.  And doesn't this list your provider number as associated with

13:05:28  23   One Spine Institute?

13:05:29  24   A.  My license number, yes.

13:05:31  25   Q.  Yes.  And it tells you where you have your mailing address,

13:05:35  1    right, here in New Orleans?

13:05:37  2    A.  Yeah.  The office is being built as we speak.

13:05:40  3    Q.  And it says your primary practice address, right?

13:05:43  4    A.  Yes.

13:05:45  5            MS. WILKINSON:  Your Honor, I would move in Defense

13:05:47  6    Exhibit 8.

13:05:49  7            THE COURT:  Let it be admitted.

13:05:51  8    BY MS. WILKINSON:

13:05:51  9    Q.  And let's see if we can show that here to the ladies and

13:05:55 10    gentlemen of the jury.  That's a provider number, right, which

13:05:59 11    allows you to bill the government and other folks for services

13:06:02 12    provided?

13:06:03 13    A.  We don't see Medicare patients.

13:06:05 14    Q.  Okay.  So why do you need a provider number, sir?

13:06:08 15    A.  I am not sure, honestly.  I never did understand that.

13:06:13 16    Q.  And it shows your mailing address, right?

13:06:16 17    A.  Yes.

13:06:16 18    Q.  And your primary practice address is 3530 Houma Boulevard,

13:06:20 19    Suite 202, right?

13:06:22 20    A.  Houma Boulevard, yes, in Metairie.

13:06:24 21    Q.  And it's true, isn't it, that there is no office there at

13:06:28 22    Suite 202 right now, is there?

13:06:30 23    A.  It's being built.

13:06:31 24    Q.  It's not a suite at all, is it?

13:06:33 25    A.  Yeah, it's a 3,000-square-foot suite that's already been leased

13:06:37  1    with a signed lease and everything else, with construction.

13:06:40  2    Q.  Excuse me.  Go ahead.

13:06:43  3    A.  Go ahead.

13:06:43  4    Q.  So you can't see patients there right now, can you?

13:06:46  5    A.  No, not yet.  It's not built yet.

13:06:48  6    Q.  And you haven't seen any patients through your own business,

13:06:54  7    One Spine Institute, since you opened it, right?

13:06:57  8    A.  No, we've been leasing office space.

13:06:59  9    Q.  And you haven't done any brain surgery since you opened your

13:07:03 10    new practice, right?

13:07:04 11    A.  That's true.

13:07:05 12    Q.  I believe you told us in your direct examination that at your

13:07:20 13    new practice, One Spine Institute, you provide a full complement of

13:07:25 14    spinal procedures?

13:07:25 15    A.  Yes.

13:07:26 16    Q.  And where do you provide those, sir?

13:07:28 17    A.  At Omega Hospital.

13:07:30 18    Q.  Omega Hospital is only an outpatient facility, isn't it?

13:07:34 19    A.  No, it's not.

13:07:35 20    Q.  It's not?

13:07:35 21    A.  Uh-uh, it's a standalone facility.

13:07:37 22    Q.  And can you do surgery and have someone there overnight?

13:07:40 23    A.  Yes.

13:07:41 24    Q.  And have you done that since you left your other practice?

13:07:44 25    A.  Yes.

13:07:44  1   Q.  Not -- you have.  And have you done spinal surgery there?

13:07:47  2   A.  Yes.

13:07:47  3   Q.  And have you done brain surgery there?

13:07:50  4   A.  No.

13:07:50  5   Q.  Do you intend to do brain surgery in your new practice?

13:07:53  6   A.  I am not sure if I'll be covering call or not.  For now, I am

13:07:59  7   not covering ER call in Metairie.

13:08:02  8   Q.  And that's normally how you would get those patients is through

13:08:06  9   ER, right?

13:08:07 10   A.  For cranial bleeds, yes.

13:08:09 11   Q.  And that's how you've gotten most of your experience in the

13:08:12 12   last ten years or so, right?

13:08:14 13   A.  Yeah.

13:08:14 14   Q.  That's pretty rigorous to cover call every three days?

13:08:18 15   A.  Pretty much so.

13:08:19 16   Q.  Let's start, if we could, by talking about Mrs. Orr's medical

13:08:35 17   condition.  When you looked at her records, your overall impression

13:08:42 18   of the severity of her hypertension was that it was very difficult

13:08:48 19   to control, right?

13:08:49 20   A.  Correct.

13:08:49 21   Q.  And you said even with a number of medications, it was still

13:08:53 22   very difficult to control her high blood pressure, correct?

13:08:57 23   A.  Correct.

13:08:58 24   Q.  And she needed an anti-anticoagulant, in your view, right?

13:09:02 25   A.  Yes.

13:09:03  1   Q.  Because if she didn't get an anticoagulant, she was facing the

13:09:07  2   risk of a very serious ischemic stroke, right?

13:09:12  3   A.  Yes.

13:09:12  4   Q.  That can be devastating?

13:09:13  5   A.  Yes.

13:09:14  6   Q.  And deadly?

13:09:14  7   A.  Yes.

13:09:15  8   Q.  And she had many of the factors that make an anticoagulant a

13:09:20  9   necessary medication, right?

13:09:21 10   A.  Yes.

13:09:22 11   Q.  And she didn't just have AFib, right?

13:09:25 12   A.  No, she didn't.

13:09:26 13   Q.  What else did she have that made prescribing an anticoagulant

13:09:31 14   beneficial for Mrs. Orr?

13:09:33 15   A.  I am not sure.

13:09:40 16   Q.  Do you remember that she had diabetes?

13:09:42 17   A.  Uh-huh, correct.

13:09:42 18   Q.  And that's counted, right?

13:09:44 19   A.  Correct.

13:09:45 20   Q.  She had congestive heart failure, right?

13:09:51 21   A.  I don't recall that.

13:09:52 22   Q.  You know that she was female, right?  That's another factor?

13:09:57 23   A.  Okay.

13:09:57 24   Q.  Do you know that?

13:09:58 25   A.  I assume she was, yes.

13:10:00  1    Q.  I mean, there's no dispute that she was.  That that's a factor

13:10:03  2    that you consider when you decide whether a patient should go on an

13:10:07  3    anticoagulant?

13:10:08  4    A.  I don't prescribe anticoagulants.

13:10:09  5    Q.  And you know that she had -- she was over 65 at the time?

13:10:17  6    A.  Yes.

13:10:18  7    Q.  Are you familiar with her use of Pradaxa?

13:10:28  8    A.  No.

13:10:29  9    Q.  Did you look in the records and see that she was first

13:10:32 10    prescribed Xarelto -- I mean prescribed Pradaxa when she had AFib?

13:10:38 11    A.  I don't recall seeing that.

13:10:39 12    Q.  So you have no idea how long she was on it?

13:10:42 13    A.  No.

13:10:43 14    Q.  Would it surprise you to learn that she was on it for almost

13:10:47 15    two years?

13:10:47 16    A.  No.

13:10:51 17    Q.  And you understand that Pradaxa also has a risk of increased

13:10:58 18    bleeding, right?

13:10:58 19    A.  Yes.

13:10:58 20    Q.  And I think you said before that you can't say that Mrs. Orr,

13:11:02 21    if she had been on any different anticoagulant, would have had a

13:11:05 22    different outcome other than warfarin, right?

13:11:08 23    A.  It's impossible to say.

13:11:09 24    Q.  Because Pradaxa has a risk of bleeding, right?

13:11:13 25    A.  Correct.

13:11:13  1    Q.  Eliquis has a risk of bleeding, right?

13:11:16  2    A.  Correct.

13:11:16  3    Q.  And Savaysa, you don't know?

13:11:19  4    A.  Don't know.

13:11:19  5    Q.  So if she had been on any of those DOACs, she could have had

13:11:26  6    the same condition and perhaps the same outcome, right?

13:11:30  7    A.  Yes.

13:11:30  8    Q.  And on all three of those medications, they would have been

13:11:34  9    given to her to try to reduce her risk of stroke, correct?

13:11:37 10    A.  Correct.

13:11:37 11    Q.  Now, when a doctor decides to prescribe a medication or

13:11:45 12    treatment for a patient, isn't it important to know what the risks

13:11:51 13    of that particular medication are to that particular patient?

13:11:54 14    A.  Yes.

13:11:54 15    Q.  And would it be important to know about a, you know,

13:11:58 16    substantially large double-blind clinical trial that might give a

13:12:03 17    doctor some information about those risks?

13:12:06 18    A.  Yes.

13:12:07 19    Q.  And would you agree or disagree that if a study showed that

13:12:14 20    Xarelto had a lower risk of critical bleeding, fatal bleeding and

13:12:19 21    intracranial hemorrhages that that would be important for a doctor

13:12:22 22    to know?

13:12:23 23    A.  That could be useful, yes.

13:12:25 24    Q.  And let me -- have you reviewed Patel 2011 that published the

13:12:34 25    ROCKET results?

13:12:35  1    A.  Yes.

13:12:35  2    Q.  You're familiar with that, okay.  Let me then give you 19 --

13:12:41  3    DX 1970.  And this is published in a peer-reviewed journal, right?

13:13:06  4    A.  Yes.

13:13:06  5    Q.  In the New England Journal of Medicine, a very highly regarded

13:13:11  6    publication, right?

13:13:12  7    A.  Yes.

13:13:14  8    Q.  And you hadn't read this article before you got involved in the

13:13:18  9    case, right?

13:13:19 10    A.  Not before.

13:13:20 11    Q.  But if someone like Dr. St. Martin were prescribing it and he

13:13:29 12    looked at the label and looked at the study here, he would see the

13:13:33 13    rate of bleeding events, right?

13:13:35 14    A.  Yes.

13:13:35 15    Q.  Do you see that?

13:13:36 16    A.  Yes.

13:13:36 17    Q.  And if you look in the middle where it says "warfarin," these

13:13:40 18    warfarin patients were actually being monitored at the time, right?

13:13:43 19    A.  That's more questionable.

13:13:50 20    Q.  Do you know or not know?

13:13:52 21    A.  I know some things about their monitoring.

13:13:55 22    Q.  Okay.  And the patients who were taking Xarelto, right, that

13:14:01 23    had similar number of patients that they were comparing?

13:14:04 24    A.  Yes.

13:14:05 25    Q.  And it shows down here, doesn't it, that the critical bleeds,

13:14:09 1   the risk for rivaroxaban or Xarelto was only .8 and the warfarin

13:14:15 2   was 1.2, right?

13:14:17 3   A.  Yes.

13:14:18 4   Q.  And that's statistically significant, right?

13:14:21 5   A.  Yes, it is.

13:14:22 6   Q.  So that means if a doctor is trying to figure out whether they

13:14:26 7   should prescribe warfarin or Xarelto, they see a substantial

13:14:31 8   increase in the critical bleeding rates for the patients on

13:14:34 9   warfarin, right?

13:14:35 10  A.  Yeah, I understand what the study says.  My concerns were

13:14:40 11  with -- my concerns were with where a lot of those warfarin

13:14:43 12  patients resided.

13:14:44 13  Q.  And fatal bleeding showed the same thing, right, that the risk

13:14:48 14  was much higher for warfarin than Xarelto?

13:14:51 15  A.  Yes, right there it does.

13:14:53 16  Q.  And intracranial hemorrhage, the same thing, right?

13:14:57 17  A.  Yes.

13:14:59 18  Q.  Did you look at what they call postmarketing studies that show

13:15:03 19  what the risks are now that we have lots of folks taking this

13:15:08 20  medication?

13:15:08 21  A.  I am not sure.

13:15:08 22  Q.  So you didn't check -- you said you had trouble with where

13:15:12 23  these patients are from.  Did you not look at --

13:15:15 24  A.  No, I had trouble where the Coumadin patients were.

13:15:17 25  Q.  Did you not look at any of the other studies that have come out

13:15:20  1   since Xarelto is on the market where they compared them to warfarin

13:15:23  2   patients in the U.S., and still Xarelto did better on those

13:15:27  3   critical and fatal bleeds?

13:15:28  4   A.  I did not see that.

13:15:29  5   Q.  You didn't even look for that?

13:15:30  6   A.  I didn't see that, no.

13:15:31  7   Q.  Did you do a search for that?

13:15:33  8   A.  I am not -- I don't recall.

13:15:47  9   Q.  Would you agree or disagree, Doctor, that if someone decided

13:15:50 10   that one of the benefits of Xarelto over warfarin was that the

13:15:55 11   critical organ bleeds and the fatal bleeds were lower for Xarelto

13:15:58 12   than warfarin that that was one thing that influenced their

13:16:01 13   decision to prescribe it, you agree that's a fair concern or

13:16:04 14   consideration?

13:16:04 15   A.  That's a fair consideration.

13:16:06 16   Q.  And, in fact, I think you said you do not disagree with

13:16:12 17   Dr. St. Martin's decision to prescribe Xarelto to Mrs. Orr?

13:16:18 18   A.  No, not at all.

13:16:19 19        MR. HONNOLD:  May I just object to this line of

13:16:21 20   questioning.  It's focused on him as a prescribing physician.  He

13:16:24 21   is here as an expert neurologist, speaking --

13:16:27 22        THE COURT:  It has something to do with credibility.

13:16:29 23   I'll overrule the objection.

13:16:31 24   BY MS. WILKINSON:

13:16:31 25   Q.  You've said, haven't you, that Xarelto is very good at reducing

13:16:38  1  the risk of ischemic stroke associated with atrial fibrillation,

13:16:41  2  right?

13:16:42  3  A.  Yeah.

13:16:42  4  Q.  And you've called the drug and drugs like that that reduce that

13:16:48  5  risk life-saving drugs, right?

13:16:50  6  A.  Yes, they can.

13:16:51  7  Q.  And one of the issues with all drugs is that there's risks and

13:16:57  8  benefits, right?

13:16:58  9  A.  Yes.

13:16:58 10  Q.  So if you're Dr. St. Martin or you're a prescriber and you see

13:17:04 11  someone with AFib constantly and all these other risks, your job is

13:17:07 12  to try and reduce that risk of stroke, right?

13:17:09 13  A.  Yes.

13:17:11 14  Q.  And when you pick one of those drugs, one of those

13:17:14 15  anticoagulants for those patients, you know from reading the label

13:17:20 16  that there are risks associated with Xarelto and the other DOACs,

13:17:23 17  right?

13:17:23 18  A.  Correct.

13:17:23 19  Q.  So Xarelto says in its label what the bleeding risks are,

13:17:28 20  right?

13:17:28 21  A.  Yes.

13:17:29 22  Q.  And it says throughout about different types of risks of

13:17:33 23  bleeding, right?

13:17:34 24  A.  Yes.

13:17:34 25  Q.  So no doctor who read the label would be unaware of the

13:17:38  1   bleeding risk, right?

13:17:40  2   A.  Correct.

13:17:40  3   Q.  And it also provides specific dosing information for people who

13:17:45  4   have renal impairment, right?

13:17:46  5   A.  Yes, it does.

13:17:47  6   Q.  So it provides a test that you use or that other physicians

13:17:52  7   use, a creatinine clearance test, that's easy to use so that you

13:17:58  8   can see what dosage is appropriate, right?

13:17:59  9   A.  Correct.

13:18:00 10   Q.  All right.  Let's take a look at the label if we could, DX 2 at

13:18:03 11   page 8 and 9.  You're familiar with this, right?

13:18:06 12   A.  Yes.

13:18:07 13   Q.  So this specifically tells doctors that if someone had a

13:18:09 14   creatinine clearance less than 50 -- I'm sorry, greater than 50,

13:18:14 15   then a 20-milligram dose is appropriate, right?

13:18:16 16   A.  Correct.

13:18:17 17   Q.  You know that Mrs. Orr when she switched over to Xarelto was on

13:18:20 18   a 20-milligram dose for awhile?

13:18:23 19   A.  I do.

13:18:23 20   Q.  Do you know how many months she was on that dose?

13:18:25 21   A.  I am not sure.

13:18:26 22   Q.  Do you have any idea?

13:18:28 23   A.  No.

13:18:29 24   Q.  And then it says that if the creatinine clearance goes below

13:18:33 25   and is between 15 and 50, the prescription should be reduced to

13:18:37 1    15 milligrams, right?

13:18:39 2    A.  Which it was in her case.

13:18:40 3    Q.  And you know that was?

13:18:41 4    A.  Yes.

13:18:42 5    Q.  And you don't disagree with that?  In fact, you think that's a

13:18:45 6    good idea, right?

13:18:45 7    A.  Yes.

13:18:45 8    Q.  Do you know how long she was on the 15-milligram dose?

13:18:49 9    A.  Basically up until the incident.

13:18:52 10   Q.  And the 15-milligram dose is supposed to account for that

13:18:56 11   slowing of the excretion of the drug, right, because the liver

13:18:59 12   function is slowing down?

13:19:01 13   A.  Yeah, in theory.

13:19:03 14   Q.  And then it says you shouldn't use Xarelto at all if someone

13:19:07 15   has a creatinine clearance of less than 15, right?

13:19:10 16   A.  Correct.

13:19:11 17   Q.  And because of the patients who have these issues, there are

13:19:20 18   often other serious complications when someone has a creatinine

13:19:25 19   clearance that low, right?

13:19:26 20   A.  Yes.

13:19:27 21   Q.  So I am going to show you this and see if this will refresh

13:19:31 22   your recollection on her anticoagulant history.

13:19:44 23         MS. WILKINSON:  Showing this for demonstrative purposes,

13:19:46 24   your Honor.

13:19:46 25   BY MS. WILKINSON:

13:19:48  1    Q.  Doctor, does this refresh your recollection about how long

13:19:50  2    Mrs. Orr was on Pradaxa and then the two doses of Xarelto?  Or did

13:19:56  3    you not really look at that in the record?

13:19:58  4    A.  Yeah, that looks about right.

13:20:02  5    Q.  And you saw during that entire time, she did not have an

13:20:07  6    ischemic stroke, right?

13:20:08  7    A.  That's correct.

13:20:08  8    Q.  She didn't have any when she was on Pradaxa?

13:20:12  9    A.  Correct.

13:20:12 10    Q.  Did you see that she had stomach problems when she was on

13:20:16 11    Pradaxa?

13:20:16 12    A.  I did see that.

13:20:18 13    Q.  Do you know whether that's a common side effect for patients

13:20:22 14    who use Pradaxa?

13:20:23 15    A.  I don't prescribe Pradaxa.

13:20:25 16    Q.  Okay.  And you know that until April 24th, 2015, she hadn't had

13:20:32 17    an ischemic stroke, right?

13:20:34 18    A.  Correct.

13:20:34 19    Q.  Now, in this case, we heard a lot about different kinds of

13:20:38 20    strokes, and it's a little confusing, so if we could go over the

13:20:41 21    two, we would appreciate it.

13:20:43 22           There are two types of strokes we've been discussing in

13:20:46 23    this case, right?

13:20:46 24    A.  Yes.

13:20:47 25    Q.  One is ischemic --

13:20:48  1   A.  Yes.

13:20:49  2   Q.  -- right?  And that is when a blood clot goes somewhere -- to

13:20:55  3   the head, right, to cut off --

13:20:57  4   A.  Correct.

13:20:57  5   Q.  -- to cut off blood to the brain?

13:21:00  6        And that's the kind of stroke you worry about for

13:21:02  7   patients who have AFib, right?

13:21:04  8   A.  Correct.

13:21:04  9   Q.  So if I put AFib.  And they have a clot, right?  And that's one

13:21:09 10   way, unfortunately, that blood can get cut off from the brain,

13:21:12 11   right?

13:21:13 12   A.  Yes.

13:21:13 13   Q.  The kind of hemorrhage that actually occurred in Mrs. Orr's

13:21:19 14   case was a brain hemorrhage, right, which is a hemorrhage -- I

13:21:24 15   can't say it, hemorrhagic stroke, right?

13:21:26 16   A.  It was intraventricular hemorrhage.

13:21:29 17   Q.  But that is -- in the big category, it's a hemorrhagic stroke?

13:21:33 18   A.  It's a very small subset of hemorrhagic strokes, yes.

13:21:39 19   Q.  So intraventricular.  And then this is a hemorrhagic.  So if we

13:21:45 20   call it a hemorrhagic bleed or stroke, it's the same thing, right?

13:21:51 21   A.  Essentially.  Stroke really implies, though, that it occurred

13:21:55 22   in the substance of the brain itself.  And that's where that

13:21:59 23   comparison breaks down a bit.

13:22:01 24   Q.  And you know that Mrs. Orr was also at risk of having a

13:22:09 25   hemorrhagic stroke, right?

13:22:11  1    A.  Yes, she had hypertension.

13:22:13  2    Q.  She had multiple independent risk factors that put her at great

13:22:18  3    risk of having a hemorrhagic stroke, right?

13:22:22  4    A.  Diabetes as well, yes.

13:22:23  5    Q.  Well, let's list them, if we could.  For the hemorrhagic

13:22:30  6    stroke, she had high blood pressure, right?  These are risk

13:22:33  7    factors?

13:22:33  8    A.  Yes.

13:22:34  9    Q.  And these are separate, right, from the anticoagulant?

13:22:39 10    A.  Yes.

13:22:40 11    Q.  So we have high blood pressure?

13:22:45 12    A.  The anticoagulant being in that list as well.

13:22:48 13    Q.  Of course.  You have the anticoagulant.  And, again, that would

13:22:58 14    have been true when she was on the Pradaxa as well, right?

13:23:01 15    A.  Correct.

13:23:02 16    Q.  And then diabetes?

13:23:03 17    A.  Yes.

13:23:03 18    Q.  Any other risk factors that you know she had of having a

13:23:13 19    hemorrhagic stroke?

13:23:14 20    A.  Not that I am aware of.

13:23:15 21    Q.  Would congestive heart failure have put her at a higher risk?

13:23:21 22    A.  Of hemorrhagic stroke, I don't think so.

13:23:24 23    Q.  Okay.  Nothing else from her records?

13:23:25 24    A.  Not that I recall.

13:23:26 25    Q.  Despite being at all of those risks and being at risk of the

13:23:41 1   ischemic stroke, you don't have any question or gripe with

13:23:47 2   Dr. St. Martin that he put Mrs. Orr on anticoagulants, right?

13:23:50 3   A.  No, not at all.

13:23:51 4   Q.  He didn't make an error in medical judgment?

13:23:54 5   A.  No.

13:23:55 6   Q.  So it's hard sometimes after a horrible event like this to talk

13:23:58 7   about those risks, but a doctor like Dr. St. Martin who is taking

13:24:03 8   care of her every day has to weigh those different risks and

13:24:06 9   benefits, right?

13:24:07 10   A.  Yes.

13:24:08 11   Q.  Whereas you said when you get to take care of a patient, you

13:24:11 12   are just there thinking about the surgery and how you can try to

13:24:13 13   save that person's life at that moment, right?

13:24:16 14   A.  Correct.

13:24:16 15   Q.  So you're not saying that because a patient comes to you on an

13:24:21 16   anticoagulant, that's a bad thing for the patient over their

13:24:25 17   lifetime?

13:24:25 18   A.  No.  The only time I deal with them otherwise is for elective

13:24:29 19   surgery.

13:24:30 20   Q.  So it's not unusual to have a patient who is on an

13:24:35 21   anticoagulant, right?

13:24:36 22   A.  No.

13:24:36 23   Q.  And if a patient is on an anticoagulant and they're having an

13:24:41 24   elective surgery like spinal surgery, you can plan in advance and

13:24:43 25   tell them to get off that drug for as long as you recommend so that

13:24:47  1  you reduce that risk of bleeding, right?

13:24:49  2  A.  Correct.

13:24:49  3  Q.  And you don't tell that person they shouldn't be on the drug.

13:24:52  4  You just say you need to get off of it so I can do the surgery?

13:24:57  5  A.  Temporarily.

13:24:58  6  Q.  And they can go back on it?

13:24:59  7  A.  Yeah.

13:25:00  8  Q.  In this tragic case, Mrs. Orr didn't have that chance, did she?

13:25:04  9  A.  No.

13:25:04 10  Q.  So she needed to be on that drug on April 24th, 2015, right?

13:25:08 11  A.  Yes.

13:25:10 12  Q.  And because she had this, some sort of -- the PIVH that you

13:25:16 13  say, spontaneous hemorrhage, she didn't have any opportunity to get

13:25:19 14  off the drug for the surgery that Dr. Bui thought would help her,

13:25:26 15  right?

13:25:26 16  A.  Other than missing a dose.

13:25:28 17  Q.  So missing her dose, you said, means that you can't say exactly

13:25:39 18  how much, if any, Xarelto she had in her blood at 6:30 on

13:25:44 19  April 24th when she started to have the symptoms of headache and

13:25:47 20  vomiting, right?

13:25:48 21  A.  It's impossible to say.  We have a better idea at night at

13:25:52 22  11:00 P.M.

13:25:54 23  Q.  So even though you think it was one of the contributing factors

13:25:57 24  to her stroke, you don't know whether she even had any Xarelto in

13:26:02 25  her system at 6:30 on April 24th, right?

13:26:05 1   A.  With her creatinine clearance, I wouldn't be surprised if there

13:26:09 2   was still drug on board.

13:26:10 3   Q.  Well, Doctor, instead of that you wouldn't be surprised, did

13:26:15 4   you do any analysis looking at literature to be able to determine

13:26:18 5   how you would calculate her --

13:26:21 6   A.  Yes.

13:26:22 7   Q.  -- creatinine clearance?

13:26:23 8   A.  Yes.  There are plenty of pharmacokinetic studies that show a

13:26:29 9   creatinine clearance study of 31, which is right at the margin,

13:26:33 10  with half-lives extending out well past 16, 18 hours, 24 hours,

13:26:39 11  some even as long as 33.

13:26:41 12  Q.  But those are -- the 33 is outlier, isn't it?

13:26:44 13  A.  Sure.

13:26:44 14  Q.  So on average, you say in some of those studies, not all,

13:26:55 15  right, it's 12 to 24 hours?

13:26:58 16  A.  Yeah.

13:26:58 17  Q.  Is that right?

13:26:59 18  A.  Yeah.

13:27:00 19  Q.  It's your testimony.

13:27:01 20  A.  Twelve to, yeah, as high as 33.

13:27:04 21  Q.  But you said 33 is an outlier.  What's the average?

13:27:07 22  A.  I am not sure.  But basically 24 hours.

13:27:10 23  Q.  Okay.  24?

13:27:12 24  A.  Yeah.

13:27:12 25  Q.  So on April 23rd, we presume Mrs. Orr took her medication,

13:27:19  1  right?

13:27:19  2  A.  Yes, yes.

13:27:20  3  Q.  Around dinnertime, like she said?

13:27:23  4  A.  Yes.

13:27:23  5  Q.  So that would have been around 6:30 or so?

13:27:27  6  A.  Whenever she ate dinner, yep.

13:27:29  7  Q.  Well, you don't know, do you?

13:27:30  8  A.  And neither do you.

13:27:32  9  Q.  That's true, sir.  I am not the witness, though.

13:27:34  10  A.  Right.

13:27:35  11  Q.  So the question is, we're here to collect the evidence --

13:27:38  12  A.  Sometime around dinner, whenever that was.

13:27:41  13  Q.  But you don't know if it was 5:30 or 7:30, right?

13:27:44  14  A.  I don't.

13:27:44  15  Q.  So we put dinnertime.  And on April 24th, the testimony shows

13:27:55  16  that she didn't take her Xarelto that night, right?

13:27:57  17  A.  Correct.

13:27:58  18  Q.  And at 6:30 she started to have her symptoms, right?

13:28:01  19  A.  Yes.

13:28:02  20  Q.  So no Xarelto.  So you really can't say that you're sure that

13:28:09  21  she had Xarelto in her system when she started having her symptoms

13:28:14  22  on April 24th, can you?

13:28:15  23  A.  It's really not an unreasonable thing to say with somebody with

13:28:21  24  a creatinine clearance of what she had.

13:28:24  25  Q.  The question is, can you say it, sir?

13:28:26  1   A.  Yes, I can say it.

13:28:27  2   Q.  You can say it, you're sure?  You're sure she had it in her

13:28:32  3   system at 6:30?

13:28:33  4   A.  It's more likely than not.

13:28:37  5   Q.  Okay.  And tell me what it is, what study it is, or what data

13:28:46  6   you have that allows you to make that conclusion.

13:28:49  7   A.  The Mueck pharmacokinetic study.

13:28:55  8   Q.  Mueck, M-E-U-C-K, right?

13:28:58  9   A.  I think it's E-U, U-E, I am not sure.

13:29:02  10  Q.  It's someone from Bayer who published, right?

13:29:05  11  A.  I think so, yeah.

13:29:06  12  Q.  Do you remember which study it was, which year, because he

13:29:10  13  published several studies?

13:29:11  14  A.  No, I don't.

13:29:12  15  Q.  Are there any other studies that allow you to come to that

13:29:16  16  conclusion to say it's more likely than not that she definitely had

13:29:19  17  Xarelto in her system at 6:30 P.M. on April 24th?

13:29:22  18  A.  That's the one that comes to mind.

13:29:24  19  Q.  Are there any other others?

13:29:27  20  A.  Not that I can recall.

13:29:37  21  Q.  Now, you know many of the neurosurgeons in this area, right?

13:29:40  22  A.  Yes.

13:29:41  23  Q.  And do you -- Dr. Bui does not state that he is sure that there

13:29:49  24  is -- or more likely than not that there was Xarelto in her system

13:29:54  25  on April 24th, right?

13:29:56 1   A.  I don't recall what his answer was.

13:29:58 2   Q.  Let's put the name, we'll put Xarelto 6:30 P.M. April 24th.

13:30:11 3   And you say yes.  These people, we'll put -- I don't want to say

13:30:18 4   no, but they can't agree to a medical certainty, right?  So can't

13:30:24 5   agree, let's say.  So this is you, I am going to put Dr. L.  And

13:30:31 6   Dr. Bui, he doesn't agree that, yes, you can tell that, does he?

13:30:34 7   A.  I am just saying that I think it's more likely than not with

13:30:39 8   her creatinine clearance that she would have a half-life easily

13:30:44 9   into 24 hours.

13:30:44 10  Q.  Doctor, that wasn't my question whether what you think.  Does

13:30:48 11  Dr. Bui agree with you that --

13:30:49 12  A.  That's my answer.  But I am not sure if he agrees with me or

13:30:53 13  not.

13:30:53 14  Q.  So you don't know about Dr. Bui?

13:30:55 15  A.  No.

13:30:55 16  Q.  Now, you know Dr. Najeeb Thomas, right?

13:31:00 17  A.  Yes.

13:31:01 18  Q.  He is a very well-regarded neurosurgeon in this community?

13:31:04 19  A.  Yes.

13:31:05 20  Q.  You think highly of him, right?

13:31:07 21  A.  Yes.

13:31:08 22  Q.  And you know that he doesn't agree that you can say this to a

13:31:11 23  reasonable degree of medical certainty, right?

13:31:13 24  A.  We don't always agree.

13:31:15 25  Q.  Doctor, I just need you to help me with answers to the

13:31:18  1   questions.  He doesn't agree with you, does he?

13:31:20  2   A.  I didn't read his -- I didn't read his report completely, so I

13:31:25  3   assume no.

13:31:31  4   Q.  And I should put a question mark because you don't know either?

13:31:35  5   A.  Did you mean to write Dr. Thomas?

13:31:39  6   Q.  Sorry.  Thank you.

13:31:42  7        Should I put a question mark because you're not sure

13:31:45  8   either what he says?

13:31:45  9   A.  Yes.

13:31:46 10   Q.  And is there any other doctor, any treater in this case who

13:31:49 11   actually took care of Mrs. Orr or any other expert in this case

13:31:53 12   that agrees with you that you can tell to a reasonable degree of

13:31:56 13   medical certainty that she definitely had Xarelto in her system at

13:32:00 14   6:30 on April 24th?

13:32:01 15   A.  I am not sure.

13:32:02 16   Q.  But you can't name anybody else, right?

13:32:05 17   A.  No.

13:32:06 18   Q.  At 6:30 on April 24th, she, of course, had diabetes, right?

13:32:18 19   A.  Yes.

13:32:18 20   Q.  She had serious hypertension?

13:32:21 21   A.  She had hypertension, yes.

13:32:23 22   Q.  Well, did you look at her records to see what her last

13:32:26 23   measurement of her blood pressure was before the night of

13:32:30 24   April 24th?

13:32:31 25   A.  I don't recall.  It was elevated.

13:32:34  1    Q.  Do you remember seeing that it was 200/90?

13:32:38  2    A.  I remember seeing some sporadic readings that I would -- I

13:32:44  3    don't recall that was the last one.

13:32:45  4    Q.  Do you have any idea when the last reading was before she got

13:32:48  5    so sick?

13:32:49  6    A.  No.

13:32:49  7    Q.  So you don't know whether it was April 16th or whether it was

13:32:53  8    200/90 or anything else?

13:32:54  9    A.  No.  I just know what it was when the EMS arrived.

13:32:58 10    Q.  Right.  But that's after she's started having these horrible

13:33:02 11    symptoms, right, the hemorrhage has already occurred?

13:33:05 12    A.  With pain and you would expect it to be high.  It was 179, yep.

13:33:09 13    Q.  So before that, though, you don't know what the last

13:33:12 14    measurement of her blood pressure was in her medical records?

13:33:16 15    A.  No, not off the top of my head.

13:33:18 16    Q.  You will agree that at the time that Mrs. Orr went into the

13:34:05 17    hospital, first at Ochsner Baptist, there was no known test to be

13:34:12 18    able to tell whether she had Xarelto in her system?

13:34:16 19    A.  That's the working knowledge.

13:34:23 20    Q.  You didn't believe there was any clinically useful test that

13:34:27 21    would help you as a surgeon know whether she had it in her system,

13:34:30 22    right?

13:34:31 23    A.  Not at the time, no.

13:34:32 24    Q.  And you know that Xarelto is a Factor Xa inhibitor?

13:34:37 25    A.  Yes.

13:34:38  1    Q.   And so is Eliquis?

13:34:38  2    A.   Yes.

13:34:39  3    Q.   And you know Eliquis does not have any clinically useful test

13:34:42  4    to be able to tell you as surgeon whether somebody has Eliquis on

13:34:45  5    board, right?

13:34:45  6    A.   Correct.

13:34:46  7    Q.   And the same for Savaysa?

13:34:49  8    A.   Correct.

13:34:49  9    Q.   So all three of those anti-factor Xa's -- none of them have

13:34:54 10    clinically useful test that will allow you, the surgeon in an

13:34:59 11    emergency situation like this, to know whether that person has a

13:35:01 12    DOAC or an anticoagulant in their system, right?

13:35:04 13    A.   There's becoming more evidence lately.

13:35:08 14    Q.   But right now you are not --

13:35:09 15    A.   At the time, no.

13:35:10 16    Q.   Right.

13:35:10 17    A.   At the time, no.

13:35:12 18    Q.   Right.   And you're not aware of a test today for Eliquis, are

13:35:15 19    you?

13:35:15 20    A.   Well, some suggest that PTT might be a reasonable thing to

13:35:22 21    follow.

13:35:22 22    Q.   Do you know if that's used here in the community in

13:35:26 23    New Orleans?

13:35:26 24    A.   I am not sure if that's working knowledge either.   That's in

13:35:30 25    the literature.

13:35:31  1   Q.   Okay.   It's in the literature.   You don't think it's working

13:35:36  2   knowledge?

13:35:37  3   A.   Potentially not.

13:35:38  4   Q.   Do you know whether people like Dr. St. Martin and Dr. Sammy

13:35:47  5   Khatib, who were cardiologist, whether they read the literature or

13:35:50  6   not?

13:35:50  7   A.   I'm sure they do.

13:35:51  8   Q.   And whether emergency physician, like Dr. Piazza, read the

13:35:55  9   literature to determine whether they could use a test that might

13:35:58  10   help them determine whether someone is on an anticoagulant or not?

13:36:01  11   A.   I mean, from pretty reputable paper; so there's a good chance

13:36:07  12   they would have seen it.

13:36:08  13   Q.   It's certainly not secret, right, because it's published

13:36:11  14   literature?

13:36:11  15   A.   Yes.

13:36:12  16   Q.   You can go do a PubMed search, right?

13:36:14  17   A.   Yes.

13:36:15  18   Q.   You hadn't done it before this case?

13:36:17  19   A.   Correct.

13:36:17  20   Q.   But you're certainly not saying that other doctors don't read

13:36:20  21   the literature in their area to see if there are tests or other,

13:36:23  22   you know, developments in their specialty area, right?

13:36:26  23   A.   Correct.

13:36:27  24   Q.   You read neurosurgery articles?

13:36:29  25   A.   Yes.

13:36:30  1    Q.  And spinal surgery articles?

13:36:32  2    A.  Yes.

13:36:33  3    Q.  And you're not aware of any tests for Savaysa, are you, with

13:36:40  4    clinically useful information at the time of an emergency surgery?

13:36:47  5    A.  No.

13:36:49  6    Q.  So you told this jury that based on reading a few documents

13:36:54  7    from the company, you determined that the PT test could be

13:36:59  8    clinically useful to a surgeon who is facing a decision about

13:37:03  9    emergency surgery, right?

13:37:04  10   A.  Yes.

13:37:05  11   Q.  All right.  Now, do you know that PT is in the label of

13:37:08  12   Xarelto?

13:37:09  13   A.  It's in the pharmacokinetic section.

13:37:13  14   Q.  It is an issue of pharmacology, isn't it?

13:37:16  15   A.  Yeah.

13:37:17  16   Q.  So you don't question that it should be there, right?

13:37:20  17   A.  No.

13:37:20  18   Q.  Let's take a look at that provision 12.2, it's in DX 2, which

13:37:27  19   is already admitted into evidence.  And this is what is said in the

13:37:31  20   label, right, about PT?

13:37:33  21   A.  Yes.

13:37:33  22   Q.  And do you understand that that tells doctors that there is

13:37:37  23   some relationship between the concentration and the PT test?

13:37:40  24   A.  There is some relationship, yes.

13:37:42  25   Q.  It doesn't say there anywhere, does it, that it's a clinically

13:37:47  1    useful test that you can use it to make life-and-death decisions,

13:37:51  2    right?

13:37:51  3    A.  No, it doesn't.

13:37:52  4    Q.  And you don't think somebody should put that in the label if it

13:37:56  5    can't provide that information, right?  That would be reckless if

13:37:59  6    we put something in the label, and it doesn't provide that type of

13:38:03  7    surety for you?

13:38:04  8    A.  There's some mounting evidence that -- that that is the case,

13:38:09  9    though, at least for presence of the drug.

13:38:11 10    Q.  But do you agree or disagree with some of the other experts in

13:38:15 11    this case that you would not want to make that decision about

13:38:18 12    surgery unless there were proven positive outcomes using that PT

13:38:23 13    measurement?

13:38:23 14    A.  I think in an emergent situation that it would be reasonable if

13:38:31 15    you had a stone cold normal PT like Mrs. Orr had, knowing that if

13:38:38 16    she -- even if she had taken her night dose on the 24th, it would

13:38:42 17    have been easily within the half-life, and having it be stone cold

13:38:49 18    normal is -- in an emergent situation is useful.

13:38:53 19    Q.  You said a bunch of things.  So let's go to PT.

13:38:56 20          You called her score at 10:40 at night stone cold --

13:39:02 21    A.  Normal.

13:39:02 22    Q.  -- normal?

13:39:03 23    A.  Yes.

13:39:03 24    Q.  And that was about an 11.2, right, somewhere around there?

13:39:14 25    A.  Somewhere along those lines.

13:39:16  1   Q.  We'll put about.

13:39:18  2        Okay.  And this was around what time?

13:39:21  3   A.  11:15.

13:39:24  4   Q.  11:00 what?

13:39:26  5   A.  Right around 11:00.

13:39:27  6   Q.  11:00?

13:39:28  7   A.  Uh-huh.

13:39:29  8   Q.  P.M.?

13:39:30  9   A.  Correct.

13:39:30 10   Q.  On the 24th.  Okay.

13:39:32 11        So you're saying that you're sure that she had Xarelto in

13:39:36 12   her blood at 6:30 P.M. that night, right?

13:39:40 13   A.  More likely than not.

13:39:44 14   Q.  More likely than not.

13:39:47 15        But that she didn't have any in her blood at 11 o'clock

13:39:51 16   that night, right?

13:39:51 17   A.  Based on the PT.

13:39:52 18   Q.  Well, you believe the PT test is reliable, right?

13:39:54 19   A.  Yes.

13:39:55 20   Q.  So you believe that anyone else knowing what you know would

13:39:58 21   look at that and say you could go in and do surgery, not at this

13:40:02 22   time, but at the time when she was at a facility where surgery

13:40:05 23   could be done?

13:40:06 24   A.  We're also talking 30 hours after the -- 30 hours after her

13:40:10 25   last known dose.

13:40:11  1    Q.  So that's 30 hours, but you told us, I thought --

13:40:14  2    A.  There are --

13:40:15  3    Q.  Excuse me, Doctor.  You can answer as soon as I finish my

13:40:17  4    question.

13:40:18  5           You told us that it could go up to 33 hours?

13:40:22  6    A.  And you told us that was an outlier.

13:40:25  7    Q.  Doctor, you're --

13:40:28  8           MS. WILKINSON:  Your Honor, can I have an instruction?

13:40:28  9    BY MS. WILKINSON:

13:40:30 10    Q.  I don't tell anyone.  You're the one providing the evidence.  I

13:40:33 11    was just wanting to make clear, and you said it could go out to

13:40:37 12    33 hours, right, the study showed that?

13:40:39 13    A.  Yes.  There was an outlier out that far.

13:40:41 14    Q.  But despite that, you're saying that you believe that this test

13:40:44 15    that showed it was stone cold normal only at 30 hours that you

13:40:49 16    could rely on that and that's accurate, right?

13:40:51 17    A.  Yes.

13:40:52 18    Q.  And that's not based on any literature, right?

13:40:59 19    A.  Well, in fact, it is based on some literature.

13:41:03 20    Q.  Showing that 30 hours out you can be sure with a PT test that

13:41:07 21    there's nothing in her system, no Xarelto?

13:41:10 22    A.  From the things I've read, no matter what the reagent is, if

13:41:16 23    you're that far outside of the half-life, it is valuable to know

13:41:23 24    whether or not there's presence or not of drug.

13:41:27 25    Q.  You brought up the next thing we want to talk about, about PT.

13:41:30  1   A.  Right.

13:41:31  2   Q.  And getting a bit into details, but it's important.

13:41:34  3        PT is the prothrombin time test, right?

13:41:37  4   A.  Correct.

13:41:38  5   Q.  It was really used for years with warfarin, right?

13:41:40  6   A.  Correct.

13:41:41  7   Q.  And that test -- that's why it comes up on every blood work

13:41:46  8   analysis that's done for a patient that comes into the emergency

13:41:48  9   room, right?

13:41:49  10  A.  Uh-huh.

13:41:49  11  Q.  And that test can vary from hospital to hospital here in

13:41:55  12  New Orleans, let alone around the country, right?

13:41:58  13  A.  There is some variation, yes.

13:42:00  14  Q.  And one of the variances is something called the reagent,

13:42:03  15  right?

13:42:03  16  A.  Yes.

13:42:03  17  Q.  And what does a reagent do, Doctor?

13:42:06  18  A.  It basically reacts with the blood; it's the medium that sets

13:42:12  19  up the test, essentially.

13:42:13  20  Q.  And do you know what type of reagent was used that evening for

13:42:19  21  Mrs. Orr's PT test?

13:42:21  22  A.  I do not.

13:42:22  23  Q.  You have no idea, right; nowhere in the records, is it?

13:42:26  24  A.  Nope.

13:42:26  25  Q.  And when you look at the literature, even the literature that

13:42:30  1   suggests you might be able to use a PT test says it's very

13:42:34  2   dependent on which reagent, doesn't it?

13:42:36  3   A.  I wouldn't say "very dependent."

13:42:40  4   Q.  Is it dependent at all on the reagent?

13:42:43  5   A.  It does -- it does tend to hint that Neoplastin is a little

13:42:48  6   more accurate.

13:42:50  7   Q.  Neoplastin is little more accurate?

13:42:53  8   A.  Yes.  But, I mean, the reality is we're trying to figure out

13:42:57  9   whether or not there was -- there was any hint of drug on her at

13:43:03 10   all.

13:43:03 11   Q.  So let's assume for a minute, if we could, that the PT test

13:43:08 12   that Mrs. Orr had wasn't used with a Neoplastin reagent?  Okay?

13:43:13 13   A.  It's very possible it wasn't.

13:43:15 14   Q.  Possible right?  Very possible, you said?

13:43:17 15   A.  Yep.

13:43:17 16   Q.  How in the world would you know that it's reliable if you don't

13:43:21 17   know what the reagent is, sir?

13:43:23 18   A.  That 30 hours out in an emergent situation it's a no-brainer.

13:43:33 19   Q.  Thirty hours out it's a no-brainer, then that means you don't

13:43:37 20   need the test, right?  Because it's 30 hours out and you know the

13:43:41 21   half-life, that's what you're telling us?

13:43:43 22   A.  Again, there was some question whether she had taken a night

13:43:46 23   dose that night.

13:43:47 24   Q.  Right.  But we know she -- the evidence has been that she

13:43:52 25   didn't take it that night, right?

13:43:54 1   A.  Dr. Bui wasn't under that impression or he wasn't sold.

13:43:59 2   Q.  Well, did you read his testimony in this case?  He just

13:44:01 3   testified in front of the jury a few days ago.

13:44:03 4   A.  There was a reason why he waited on put the ventriculostomies

13:44:08 5   in.

13:44:08 6   Q.  Sure.  But you know that if she took it that night around her

13:44:10 7   dinner time, it's likely that it didn't have any impact anyway

13:44:14 8   because she was vomiting, right, right after that?

13:44:16 9   A.  She was vomiting, yes.

13:44:18 10  Q.  And she normally took it after dinner.  So it would have been

13:44:21 11  unusual for her to take it while she was vomiting and feeling very

13:44:26 12  badly, right?

13:44:26 13  A.  Yes.

13:44:27 14  Q.  But your point is that it doesn't matter because if it's

13:44:31 15  30 hours out --

13:44:32 16  A.  With --

13:44:33 17  Q.  -- you know because of the half-life, right?

13:44:35 18  A.  With normal PT.

13:44:37 19          You asked me how do I know in the face of a normal PT,

13:44:40 20  and I am saying that combined with a normal PT is very useful

13:44:44 21  information.

13:44:45 22  Q.  Okay.  So you're saying a PT no matter what the reagent?

13:44:49 23  A.  Yes.

13:44:50 24  Q.  So it doesn't matter.  No matter what the reagent.

13:44:54 25  A.  At 30 hours.

13:44:56  1    Q.  What hour does the reagent matter, Doctor?

13:45:00  2    A.  Probably around four to five hours.

13:45:06  3    Q.  Four to five hours?

13:45:07  4    A.  In the early -- in the early -- sort of at the peak of the

13:45:10  5    half-life, maybe a little lit less -- a little bit earlier than the

13:45:16  6    half-life.

13:45:16  7    Q.  So if it's past that, you can't really rely on the test?

13:45:20  8    A.  I didn't say that.  I said if it's past that the reagent

13:45:24  9    matters less.

13:45:28 10    Q.  It matters less?

13:45:29 11    A.  Yes.

13:45:30 12    Q.  So the farther you are away from taking the drug, then it

13:45:39 13    doesn't matter what PT test it is, it is more and more reliable?

13:45:45 14    A.  Essentially, yes.

13:45:45 15    Q.  And have you done a thorough and complete search of the

13:45:51 16    literature and of the evidence in this case to see if anyone agrees

13:45:55 17    with what you just told the jury?

13:45:56 18    A.  Yeah.  There is -- there is literature involving Neoplastins

13:46:05 19    that say -- that basically says that the difference is less the

13:46:10 20    further away from peak concentrations you go.  That's basically

13:46:15 21    their statement.

13:46:16 22    Q.  You just said Neoplastin is a very specifically agent?

13:46:19 23    A.  They're all specific.

13:46:21 24    Q.  Well, the literature you're talking about says that's only

13:46:25 25    applicable when Neoplastin is used, right?

13:46:28  1    A.  No.  What I said is, is outside of the peak half-life the

13:46:34  2    reagent matters less on the PT test.

13:46:38  3    Q.  So Neoplastin only matters only four to five hours out?

13:46:43  4    A.  I would say right at four to eight hours, right when you expect

13:46:47  5    the drug to be at its maximum efficacy.

13:46:50  6    Q.  So you're saying that a doctor who is thinking about surgery,

13:46:54  7    if they know that the reagent used at their hospital is Neoplastin,

13:46:59  8    they have a PT test, and they know it's four to eight hours from

13:47:04  9    when the patient took it, then they can use that to determine

13:47:06 10    whether to do surgery, right?

13:47:08 11    A.  There's evidence in the literature that Neoplastin is more

13:47:13 12    sensitive than Innovin at peak half-life.

13:47:16 13    Q.  The problem is you don't often know, especially in your

13:47:20 14    business when you're seeing an emergency patient, when the person

13:47:22 15    took their Xarelto or their anticoagulant, right?

13:47:23 16    A.  That's true.

13:47:24 17    Q.  Because they're normally unconscious or in dire straits, right?

13:47:28 18    A.  Not always; but, yeah.

13:47:30 19    Q.  So you can't often ever determine this, right?

13:47:34 20    A.  Usually family is helpful in that regard.

13:47:37 21    Q.  And Mrs. Orr's family was very helpful in this regard, right?

13:47:40 22    A.  Yes.

13:47:41 23    Q.  They told the doctors that she normally took it after dinner;

13:47:46 24    Mr. Orr didn't see her take it after dinner --

13:47:48 25    A.  They didn't think she took it.

13:47:50  1    Q.  And she was very sick after dinner, right?

13:47:52  2    A.  Yes.

13:47:52  3    Q.  So would that be enough for you as a doctor to say you are sure

13:47:56  4    she didn't have it in her system?

13:47:58  5    A.  With a normal PT thinking that there was --

13:48:01  6    Q.  Not -- forget the PT, Doctor.  We'll get to the PT.  But if

13:48:06  7    you just heard --

13:48:06  8    A.  No.  I would have done exactly what CJ did.

13:48:11  9    Q.  So you wouldn't rely on the family being able to tell you that

13:48:13 10    because they weren't sure, right?

13:48:14 11    A.  With my working knowledge at the time, I would have done

13:48:18 12    exactly what CJ did.

13:48:19 13    Q.  Right.  And no one is here criticizing Dr. Bui, you know that,

13:48:25 14    right?

13:48:25 15    A.  Including me.

13:48:26 16    Q.  Okay.  You think this test could be helpful in determining

13:48:30 17    having surgery.  I think you said some of the language that you

13:48:31 18    thought would be helpful in the label was, "If an assessment of the

13:48:35 19    pharmacodynamic effects of rivaroxaban" -- which is Xarelto, right?

13:48:38 20    A.  Yeah.

13:48:39 21    Q.  -- "is considered necessary in individual cases, PT measured in

13:48:42 22    seconds is recommended," right?

13:48:44 23    A.  Yes.

13:48:45 24    Q.  You said that.  And you know, don't you, that these companies

13:48:50 25    actually proposed that language to the FDA back in January of 2011,

13:48:55  1   right?

13:48:56  2   A.  I wasn't aware.

13:48:57  3   Q.  You weren't -- you weren't shown that?

13:49:00  4   A.  I am not sure.

13:49:01  5   Q.  You were asked about it in your deposition, weren't you?

13:49:04  6   A.  I don't recall.

13:49:06  7   Q.  You don't recall being asked about the language and whether it

13:49:13  8   should be in the label?

13:49:16  9   A.  No.

13:49:17  10  Q.  Let me see if I can find the cite for you.  Hold on one second.

13:49:40  11  We're going to look for a second.  She is helping me out and she is

13:49:45  12  going to look.

13:49:48  13          Did you ask counsel in this case whether the FDA was ever

13:49:54  14  proposed that or reviewed that language, Doctor?

13:49:57  15  A.  I did not, no.

13:49:59  16  Q.  And would it surprise you to learn that the FDA actually

13:50:01  17  crossed that language out of the proposed label?

13:50:07  18          MR. HONNOLD:  I am just going to object, your Honor.

13:50:09  19          MS. WILKINSON:  Here is the page.

13:50:11  20          MR. HONNOLD:  I am just going to object.  There's no

13:50:13  21  foundation as to what the FDA did or didn't do.

13:50:16  22          THE COURT:  Can you go back to the deposition --

13:50:20  23          MS. WILKINSON:  Yes.

13:50:20  24  BY MS. WILKINSON:

13:50:20  25  Q.  Go to page 398, Doctor.  Do you see that?

13:50:28  1    A.   (WITNESS REVIEWS DOCUMENT.)

13:50:34  2              THE COURT:   398 of his deposition?

13:50:36  3              MS. WILKINSON:   Yes, sir.

13:50:38  4              THE WITNESS:   I see what Mr. Irwin told me, which was --

13:50:42  5    I believe the line from the pharmacokinetic section.

13:50:49  6    BY MS. WILKINSON:

13:50:50  7    Q.   Well, wait a minute.   You think what you were asked about in

13:50:54  8    the deposition was what's in the label today?

13:50:58  9    A.   No.   On page 398 -- you directed me to 398.

13:51:02 10    Q.   Yeah.   Let's take a look at it, if we could, together so that

13:51:06 11    everybody can see it.

13:51:23 12              It starts down here, right?   This is your deposition; you

13:51:25 13    were asked this question, right?

13:51:26 14    A.   Yes.

13:51:27 15    Q.   "Was the language something like this -- and the words are

13:51:30 16    important -- 'the relationship between PT, prothrombin time, and

13:51:34 17    rivaroxaban plasma concentration is linear and closely

13:51:37 18    correlated'"?   Was that -- was the language like that, right?

13:51:41 19    A.   Yes.

13:51:41 20    Q.   And then what does it say -- you get asked another question,

13:51:44 21    right?

13:51:45 22              "And did it also sound something like this:   If

13:51:48 23    assessment of the pharmacodynamic effect is -- rivaroxaban is

13:52:02 24    considered necessary in individual cases, PT in seconds is

13:52:08 25    recommended."   Right?

13:52:09  1    A.  Yes.

13:52:10  2    Q.  "The Neoplastin PT assay was measured in the RECORD program,

13:52:16  3    does that sound like something you read?"

13:52:18  4            And you said, "Yes," right?

13:52:19  5    A.  I said it sounded familiar, yes.

13:52:22  6    Q.  Right.  And then you were asked whether it would be helpful,

13:52:24  7    right, and you said, "Potentially."  Do you see that?

13:52:26  8    A.  Yes.

13:52:27  9    Q.  And did you see -- did you see that you were actually asked

13:52:32 10    exactly this:  "Did you know in June of 2001 that Janssen submitted

13:52:38 11    the exact language to the FDA for inclusion in the label"?

13:52:40 12    A.  Yeah.  That was on page 399, not 398.

13:52:44 13    Q.  399, right.

13:52:45 14    A.  I asked you where it was.  You said 398, and that's why I

13:52:49 15    didn't see it; but, yes, I see it now.

13:52:51 16    Q.  And you were asked specifically about whether you saw that,

13:52:53 17    that it was submitted in the FDA label, right?

13:52:56 18            MR. HONNOLD:  Your Honor, I just object.  That's not what

13:52:59 19    he said, and I don't think he can be asked to assume what the FDA

13:53:02 20    did or didn't do.

13:53:03 21            THE COURT:  He said -- she showed it to him to refresh

13:53:07 22    his recollection.  He said, "I don't remember."

13:53:10 23    BY MS. WILKINSON:

13:53:11 24    Q.  Does that refresh your recollection that you were asked that,

13:53:13 25    Doctor?

13:53:13  1  A.  I said that I didn't know that.

13:53:17  2  Q.  But you were asked about it?

13:53:19  3  A.  Yes.

13:53:19  4  Q.  And after the deposition when you were asked about it, did you

13:53:23  5  go to counsel or do any research to see whether, in fact, it was

13:53:27  6  true that that language was proposed to the FDA and that it was

13:53:30  7  struck?

13:53:33  8  A.  I did ask them about it at one point.

13:53:34  9  Q.  You did or did not?

13:53:36  10  A.  I did ask them.

13:53:37  11  Q.  And did they show you the language -- the documents that we

13:53:40  12  provided showing you that it was struck?

13:53:42  13  A.  They never showed me the documents, no.

13:53:45  14  Q.  So if I showed you that document, you wouldn't recognize it,

13:53:48  15  right?

13:53:49  16  A.  I don't think so.

13:53:50  17  Q.  Well, let me just make sure.  I'll have DX 5548, please.

13:53:56  18       Doctor, I tabbed this copy I am showing you page 30 of

13:54:14  19  44.  You can look at the whole thing, but just so you know

13:54:19  20  ultimately what we're looking at.

13:54:27  21       If we could start -- Doctor, let me start with the -- and

13:54:30  22  then you can look at it.  Look at the front page just so we can

13:54:33  23  see.

13:54:34  24       Do you see down there at bottom it says "Xarelto Janssen"

13:54:36  25  and it gives a number?

13:54:38  1          THE COURT:  The question is whether he recognizes that

13:54:40  2  document as having been shown to him.  So let's not go into the

13:54:44  3  jury at this point.

13:54:45  4          Do you recognize it?

13:54:46  5          THE WITNESS:  I've never seen this, no.

13:54:48  6          MS. WILKINSON:  You've never seen it.

13:54:48  7          THE COURT:  He's never seen it.  So let's go on to

13:54:50  8  something else.

13:54:51  9          MS. WILKINSON:  Okay.  You can put it down then, Doctor.

13:54:54 10  BY MS. WILKINSON:

13:55:08 11  Q.  Doctor, under your theory here, Mrs. Orr, at best, when her PT

13:55:15 12  test was taken -- Doctor?

13:55:17 13  A.  Yes.

13:55:18 14  Q.  Tell me when you're ready.  Are you ready?

13:55:21 15  A.  I'm ready.

13:55:21 16  Q.  When her PT test was taken at 11 o'clock on April 24th that

13:55:26 17  evening, she was at what you would call a trough level, right?

13:55:30 18  A.  Yes.

13:55:31 19  Q.  Meaning -- and just help us understand that -- the high level's

13:55:34 20  when you first take the drug, right?

13:55:36 21  A.  Yes.

13:55:37 22  Q.  And then it starts to go down, and you call, like, at the end

13:55:40 23  of when it's having any effect on the body the trough level, right?

13:55:43 24  A.  Yes.

13:55:44 25  Q.  So you told the jury that you believe that that reading at

13:55:49  1   trough level would have been helpful to Dr. Bui, right?

13:55:53  2   A.  Yes.

13:55:54  3   Q.  And you would have relied on it, right?

13:55:56  4   A.  Yes.

13:55:56  5   Q.  So a trough level measurement.

13:56:04  6           And did you look at the literature and see if anybody

13:56:07  7   agrees with you about that?

13:56:08  8   A.  From what I read -- from what I read the -- basically the

13:56:18  9   further away from the peak half-life you get the more reliable PT

13:56:23 10   is.

13:56:27 11   Q.  So let's -- you had some documents on your list, and you had an

13:56:32 12   article by Samama from 2010, right?

13:56:35 13   A.  Yes.  It may be on the list.

13:56:40 14   Q.  DX 2137.  And ask you if you recognize it.  Let's start with

13:57:08 15   this.  This is DX 2137 see if you recognize that article.

13:57:12 16   A.  (WITNESS REVIEWS DOCUMENT.)  I did see this.  I very quickly --

13:57:22 17   Q.  Doctor, did you cite this in your report?

13:57:24 18   A.  It was cited, but it wasn't in my report.  There were no PT

13:57:28 19   articles in my report.

13:57:29 20   Q.  So you said you did some more PT research after your report,

13:57:34 21   right?

13:57:34 22   A.  Yes.

13:57:35 23   Q.  And did you look at Samama?

13:57:37 24   A.  This was -- this was one of the papers that I did see, yes.

13:57:40 25   Q.  And did you read it with regard to PT?

13:57:43  1   A.  I saw it was from -- I really spent most of my time looking at

13:57:49  2   American Heart Association and the American Society of Hematologist

13:57:53  3   paper.

13:57:53  4   Q.  Okay.  We'll get there.  And take a look at, if we could,

13:57:58  5   page 9, and it starts with, "Under these conditions."  Do you see

13:58:07  6   that?

13:58:07  7   A.  I am on page 9.

13:58:16  8   Q.  Okay.  It's down there -- thank you for telling me.  It's right

13:58:28  9   above, "What is known about this topic."  Do you see that?  Do you

13:58:36 10   see that?  I've highlighted it just to help you.

13:58:38 11   A.  Yes.

13:58:39 12   Q.  So this says, "Under these conditions, PT could be used for

13:58:42 13   monitoring the effect of rivaroxaban in the clinical setting, if

13:58:47 14   considered, at peak plasma levels, but not at trough levels."

13:58:52 15   Right?

13:58:53 16   A.  This is actually the opposite of what I was looking for,

13:58:56 17   though.  What I am looking for is presence of the drug.  Yeah.  I

13:59:00 18   understand what they're trying to say.  That's if somebody --

13:59:03 19   that's if somebody has an active anticoagulation.

13:59:08 20   Q.  Doctor, you told us that it's reliable to measure the trough

13:59:11 21   level, and this says it's not, right?

13:59:13 22   A.  To exclude its presence, yes.

13:59:14 23   Q.  That's what you want to do; you want to exclude its presence

13:59:17 24   before you have surgery, right?

13:59:19 25   A.  This is a different -- this is a different statement.  This is

13:59:22  1  saying that it's -- this is saying that it's functioning.  That the

13:59:26  2  rivaroxaban is functioning, and, obviously, it needs to be at peak

13:59:31  3  plasma levels to pick that up on a PT.

13:59:34  4  Q.  Doctor, this is deep or complicated stuff for most of us that

13:59:41  5  don't practice medicine.  The first thing you want to know if

13:59:44  6  you're going to go in to do surgery on someone who is on an

13:59:49  7  anticoagulant is you want them to not have any in their system,

13:59:53  8  right?

13:59:53  9  A.  Correct.

13:59:54  10  Q.  You don't want them -- you want them to be able to clot when

13:59:56  11  you're doing surgery, right?

13:59:57  12  A.  Although for emergency surgeries there's really more of a

14:00:01  13  spectrum but fair enough.

14:00:03  14  Q.  But generally --

14:00:04  15  A.  Fair enough.

14:00:06  16  Q.  Right.  You want a normal PT, you said, right?

14:00:09  17  A.  No.  That's not what I said.  What I said is that PT is useful

14:00:16  18  for excluding the presence of the drug.  I am not talking about

14:00:20  19  anticoagulant effect.

14:00:22  20       I am referring to the American Heart Association paper.

14:00:26  21  This is absolutely true as well.  I didn't spend a lot of time

14:00:28  22  looking at this because it's from France, and looked like a small,

14:00:33  23  a small study.

14:00:37  24       What this is saying is that if -- if there is active

14:00:43  25  anticoagulation and the drug is at peak levels, then PT can be used

14:00:48  1   for monitoring the effects of rivaroxaban.  All I am interested

14:00:54  2   in -- CJ at that point really as well -- would have been interested

14:00:57  3   in knowing is the drug still around.

14:01:01  4   Q.  You don't want it to be around --

14:01:05  5   A.  We're saying the same thing.

14:01:06  6   Q.  So you don't want it to be in the system.  And that would

14:01:09  7   normally be at trough level, right, when it's at the end of its

14:01:12  8   functioning, right?

14:01:13  9   A.  In theory, yes.

14:01:14  10  Q.  And here this article says -- at least this article that it's

14:01:20  11  not reliable to measure rivaroxaban and whether it's present or not

14:01:24  12  at a trough level, right?

14:01:25  13  A.  Yes.

14:01:27  14  Q.  So let's talk about some of the other studies.  I am going to

14:01:33  15  put a list up here for you, if I could.  Did you read the Adcock

14:01:42  16  2017 article about PT?

14:01:45  17  A.  I am not sure.

14:01:47  18  Q.  Well, Doctor, is there any way for you to recall so we can

14:01:51  19  figure out what you relied on?

14:01:53  20  A.  Maybe if I look at it.

14:01:55  21  Q.  Okay.  Let me get it for you.  Okay.  Take a look at DX 2451.

14:02:33  22  Do you recognize that, Doctor?

14:02:34  23  A.  Thank you.

14:02:35  24  Q.  Pardon?

14:02:36  25  A.  Thank you.

14:02:38  1   Q.  You're welcome.

14:02:40  2   A.  I did not see this.

14:02:42  3   Q.  Okay.  Now, this is a very recent article just published this

14:02:45  4   year, right?

14:02:45  5   A.  Yes.

14:02:47  6   Q.  And do you see what journal it's published in?

14:02:49  7   A.  International Journal of Laboratory Hematology.

14:02:54  8   Q.  And those folks would know a thing or two about PT tests and

14:02:58  9   laboratory tests, right?

14:03:00 10   A.  Yes.

14:03:00 11   Q.  So you didn't look at Adcock, right?

14:03:03 12   A.  No.

14:03:03 13   Q.  So if I showed you what it said about PT and that it could be

14:03:12 14   dangerous for using it for surgery, you wouldn't be aware of that,

14:03:15 15   right?

14:03:15 16   A.  I didn't see this paper.

14:03:18 17   Q.  Okay.  I am going to put your name right here.  How about Testa

14:03:25 18   2016, did you look at that?

14:03:30 19   A.  I would have to look at it.  The name doesn't ring a bell.

14:03:38 20   Q.  Let's take a look.  Here you go, sir.  That is DX 2272.  Is

14:03:53 21   that familiar?

14:03:57 22   A.  No.  The Italian study I saw was from PhRMA.

14:04:05 23   Q.  You didn't read this one either?

14:04:07 24   A.  I don't believe so, no.

14:04:08 25   Q.  How about Samuelson from 2017?

14:04:11  1    A.  I am not sure.

14:04:18  2    Q.  All right.  I am going to try, if I can, to get most of these

14:04:22  3    up here so we can see.  I am going to hand you two at a time, just

14:04:29  4    to be efficient, if I could.  Samuelson is 2143 and Gosselin is

14:04:38  5    1473.  This is another Gosselin, right, that I am going to show

14:04:48  6    you.  So this is Samuelson, DX 2143, and then there's the next one

14:04:54  7    I am going to ask you about.

14:04:58  8    A.  I did not see this one.

14:04:59  9    Q.  You did not see Samuelson?

14:05:01  10   A.  No, I didn't.

14:05:02  11   Q.  And now go to Gosselin.  Gosselin and Adcock write together

14:05:08  12   quite a bit on this topic.  Did you read Gosselin from 2016, so

14:05:12  13   that's just last year?  And that's Defendant's Exhibit 1473.

14:05:17  14   A.  I would have to take a look.  Same deal.  It doesn't ring a

14:05:22  15   bell.

14:05:22  16   Q.  Pardon?

14:05:23  17   A.  It doesn't ring a bell.

14:05:51  18   Q.  Doctor, have you read that?  I know you're looking at it now,

14:05:55  19   but have you read that before?

14:05:57  20   A.  This Gosselin, no.

14:05:58  21   Q.  How about Adcock 2015?  Again, you saw he wrote in 2017.  Have

14:06:04  22   you seen that one?

14:06:05  23   A.  I don't think so.

14:06:06  24   Q.  Okay.  Let's just make sure.  This is DX 1349.  The 2015 Adcock

14:06:26  25   peer-reviewed article.  Did you read that in preparing for your

14:06:29  1  testimony and giving your opinions to this jury?

14:06:31  2  A.  I did not.

14:06:33  3  Q.  Doctor, I'm sure you would agree it would be important if

14:06:39  4  there's a lot of peer-reviewed literature talking about this

14:06:42  5  important subject, it would be helpful to read all of these

14:06:44  6  articles, right?

14:06:45  7  A.  Yes, certainly to take everything into consideration.

14:06:50  8  Q.  Right.  You doctors and scientists don't make up your mind

14:06:54  9  based on one article or one document normally, right?

14:06:57 10  A.  I felt like what I read was from a pretty favorable source.

14:07:02 11  Q.  But you weren't given or you didn't find all of these other

14:07:05 12  articles, right?

14:07:06 13  A.  I didn't see these, no.  And, yes, it's a study from Belgium

14:07:11 14  saying how dangerous PT is.

14:07:13 15  Q.  Says PT is dangerous, doesn't it?

14:07:16 16  A.  I am just saying.

14:07:19 17  Q.  Let me show you the next article.  This is Gosselin from 2015,

14:07:23 18  DX 1473.  Did you read that before coming to your opinions?

14:07:28 19  A.  (Witness Reviews Document.)  No, I didn't read this either.

14:07:56 20  Q.  How about -- I'll skip Douxfils --

14:08:04 21  A.  I can probably save some time.  If these are outside of the

14:08:07 22  American Heart Association and American Society of Hematology paper

14:08:11 23  that talks about the presence of the drug on board, then I probably

14:08:14 24  haven't seen it.

14:08:15 25  Q.  Okay.  So you read two articles.  You didn't talk about on

14:08:19  1    direct what they were?

14:08:19  2    A.  I briefly went over a number of foreign articles as well, but I

14:08:25  3    spent most of my time on the U.S. based.

14:08:27  4    Q.  So you didn't read Douxfils 2015, right?

14:08:30  5    A.  I don't think so, no.

14:08:31  6    Q.  Or Frankart 2014?

14:08:39  7    A.  I don't think so.

14:08:40  8    Q.  Or Eikelboom 2017?

14:08:41  9    A.  Same answer for all.

14:08:45  10   Q.  And you sold us already you didn't read Samama, right, for PT?

14:08:48  11   A.  Correct.

14:08:51  12   Q.  So, Doctor, wouldn't it be important to know whether there was

14:08:54  13   a lot of research and study and data on this important question

14:08:57  14   before you decided to change your practice and operate on somebody

14:09:01  15   who might actually have an anticoagulant in their blood?

14:09:04  16   A.  In her circumstance, I would approach it differently.

14:09:14  17   Q.  I wasn't asking you about her.

14:09:16  18   A.  No, I know.

14:09:17  19   Q.  You told this jury that you changed your practice from reading

14:09:21  20   two articles and you didn't look at any of this other peer-reviewed

14:09:25  21   literature that was out there, and you said you would go in and do

14:09:28  22   surgery on a patient based on a PT test without reading any of the

14:09:33  23   rest of the literature.  That's what you told the jury, isn't it?

14:09:35  24   A.  In an emergent situation, yes.

14:09:39  25   Q.  You don't care what the rest of the literature says, if it says

14:09:42  1    it's dangerous, it's not proven, you don't care?

14:09:44  2    A.  In an emergent situation, and I have some evidence that it

14:09:49  3    doesn't look like the drug is on board and the patient is going to

14:09:52  4    die or have a bad outcome otherwise, then, yes, I would proceed.

14:09:57  5    Q.  So you could have done that before you read those two articles

14:10:00  6    on PT, right?

14:10:01  7    A.  Potentially.

14:10:05  8    Q.  In fact, you have, right?  You have sometimes decided it's such

14:10:09  9    an emergency, even if someone may have an anticoagulant in their

14:10:12  10   system, to have any chance of saving their life, you'll still do

14:10:14  11   the surgery, right?

14:10:15  12   A.  Like in situations with Coumadin, we don't always wait for the

14:10:19  13   INR to become normal.  We'll bring it down to a level that's still

14:10:24  14   somewhat anticoagulated, but if emergency is the call of the day,

14:10:30  15   then we'll proceed.

14:10:31  16   Q.  Now, you said that one of the reasons you thought PT was useful

14:10:36  17   is because you got a few company documents from the plaintiff's

14:10:40  18   counsel, right?

14:10:40  19   A.  I did see some things, yes.

14:10:43  20   Q.  Now, you received Dr. Berkowitz's deposition, right?

14:10:46  21   A.  I did, I saw it.

14:10:47  22   Q.  And did you see what he said about PT?

14:10:49  23   A.  Yes.

14:10:52  24   Q.  And did you see that he said that if it was at trough, it's not

14:10:55  25   reliable?

1109

14:10:56   1    A.  That's not what I recall.

14:11:02   2    Q.  Let me -- does this refresh your recollection?  "If you did a

14:11:05   3    PT at trough, you might not be able to detect it because it's

14:11:09   4    insensitive down there."

14:11:11   5    A.  Correct.  And if it's suspected at trough and you don't detect

14:11:16   6    it and someone needs emergent neurosurgical intervention, then it's

14:11:21   7    a very reasonable thing to proceed.

14:11:24   8    Q.  Well, Doctor, Dr. Berkowitz said this, and you didn't take it

14:11:33   9    into consideration in deciding to come and tell the jury that a PT

14:11:36  10    test was reliable and useful at trough?

14:11:42  11    A.  So what I don't understand is if a drug is at trough, how could

14:11:51  12    we possibly be missing something with PT?  That doesn't make sense

14:11:55  13    to me.

14:11:55  14    Q.  It doesn't make sense to you that certain instruments aren't

14:11:59  15    sensitive enough to measure at lower levels?

14:12:01  16    A.  At trough, which is basically the bottom?  It doesn't make

14:12:07  17    sense to me that if the drug is at trough -- I think we're saying

14:12:13  18    the same thing.  It's looking at it the other way.  If you're

14:12:16  19    trying to see if it's functioning, it picks it up much better at

14:12:23  20    peak level, the half-life peak.

14:12:25  21    Q.  But nobody, even you, said that Mrs. Orr was at peak level --

14:12:29  22    A.  No.

14:12:30  23    Q.  -- at 11:00 P.M., so that's not really relevant to this case

14:12:34  24    and Mrs. Orr's case, is it?

14:12:36  25    A.  This is twisting of the language.  It's not -- it's not --

14:12:40  1    you're -- we're saying the same thing.

14:12:44  2    Q.  Doctor, did you look at any FDA documents to see what they said

14:12:49  3    about whether the PT test was reliable?

14:12:51  4    A.  This is just -- this is a common sense thing and it doesn't --

14:12:57  5    it doesn't take a pharmacology expert to understand this, that if a

14:13:02  6    test to see if a drug is not as sensitive, if that test is trying

14:13:10  7    to see if the drug is on board and it's not as sensitive in picking

14:13:16  8    it up, then it would make sense that you would need to be at peak

14:13:20  9    levels to even be able to see it.

14:13:23  10        All they're saying is that it's at a lower level when it

14:13:27  11    wears off and it gets to the trough.  It's not as sensitive in

14:13:33  12    picking it up.  In fact, it may even say it's normal because it's

14:13:38  13    at such a low level.

14:13:39  14        My argument is for an emergent neurosurgical situation

14:13:42  15    where emergent surgery is necessary, that's good enough.

14:13:49  16    Q.  Do you understand that it could have false positives?  In other

14:13:52  17    words, it would show that there is none on board when there is and,

14:13:55  18    therefore, the person could bleed extensively during --

14:13:58  19    A.  It's actually a false negative, right.

14:14:00  20    Q.  You think that, right?  That's what you think?

14:14:03  21    A.  False negative.

14:14:04  22    Q.  Do you think there aren't false negatives in this PT test?

14:14:08  23    A.  That's what all of these guys are saying, and that's

14:14:10  24    probably -- it's probably true in regards to the efficacy of the

14:14:14  25    drug.  But my point is in a situation where emergent neurosurgical

14:14:20  1    intervention is needed, if there is a false negative, meaning if

14:14:25  2    we're at trough -- if we're at a trough concentration, it makes

14:14:30  3    sense that the efficacy of the drug is going to be potentially at

14:14:33  4    its lowest --

14:14:34  5    Q.  You --

14:14:35  6    A.  -- even if there was some board.

14:14:37  7    Q.  You said there was common sense, right?

14:14:39  8    A.  Yes.

14:14:40  9    Q.  So anyone would know this, right?  You've read the reports in

14:14:44 10    this case, haven't you?

14:14:45 11    A.  Yes.

14:14:47 12    Q.  And you know that Dr. Sammy Khatib, a specialty cardiologist in

14:14:54 13    electrophysiology, disagrees with you, right, and thinks that PT --

14:14:59 14    using PT to determine whether you can go in for surgery because the

14:15:04 15    person may still have it on board even though there's a low level,

14:15:08 16    that's reckless?  You saw that, right?

14:15:09 17    A.  Two hours after peak concentration --

14:15:12 18             THE COURT:  Wait.

14:15:14 19             THE WITNESS:  Two hours --

14:15:15 20             THE COURT:  Wait just a minute.

14:15:16 21             MR. HONNOLD:  I just object now calling him to comment

14:15:19 22    upon unproved and untested aspects of things that might or might

14:15:23 23    not be in someone else's report at this point.

14:15:25 24             THE COURT:  You can't ask one witness to comment on

14:15:28 25    another witness's testimony except for experts.  Experts can do

14:15:33  1   that.

14:15:33  2           MS. WILKINSON:  Excuse me, your Honor.  I am asking him

14:15:36  3   about his deposition.

14:15:36  4   BY MS. WILKINSON:

14:15:37  5   Q.  You read Dr. Khatib's deposition?

14:15:40  6   A.  I don't think so.

14:15:41  7   Q.  So you didn't check your opinion against some of the other

14:15:43  8   experts in this case?

14:15:44  9   A.  I didn't see Dr. Khatib's deposition.

14:15:47  10  Q.  Did you see Dr. Colleen Johnson's?

14:15:50  11  A.  No.

14:15:51  12  Q.  Do you know who she is?

14:15:52  13  A.  No.

14:15:53  14  Q.  Do you know -- so you don't know that she is another

14:15:56  15  cardiologist electrophysiologist?

14:16:00  16  A.  I have a feeling if we sat down with these two and we had a

14:16:03  17  discussion about it, they would think, if my suspected patient was

14:16:12  18  30 hours after dose and we think we were somewhere in trough and

14:16:16  19  the PT was negative, they would be fairly confident in saying that

14:16:21  20  that's pretty certain the drug is not board.

14:16:23  21          You're looking at it from the flip side.  If you're

14:16:26  22  looking for efficacy and you're outside of the peak levels, meaning

14:16:29  23  it's not sensitive, so it has to be at peak levels to be able to

14:16:34  24  pick up efficacy.  We're all saying the same thing.  I am just

14:16:38  25  saying I am going the other way, saying that if it's -- that if

14:16:42  1    you're at trough, is the drug really going to be efficacious.

14:16:50  2    Q.  This isn't about efficacy, which means does it work.

14:16:52  3    A.  Yeah, does it work.

14:16:54  4    Q.  It's about can you use it to go in and determine whether to do

14:16:58  5    emergency surgery, right?

14:16:59  6    A.  Yeah.  And I would say if you're at a trough, you can

14:17:02  7    definitely use it.

14:17:02  8    Q.  You don't know often whether you're at trough, but you told us

14:17:07  9    you would use it, period, if -- you were going to change your

14:17:09  10   practice from now on, right?

14:17:11  11   A.  From the history of the patient, yes.

14:17:13  12   Q.  And you would rely on the PT test?

14:17:15  13   A.  Yes.

14:17:15  14   Q.  And you may not know whether they're at trough or peak, that's

14:17:19  15   the point, right?

14:17:20  16   A.  Well, I would get the history from the family.

14:17:22  17   Q.  Let's say the person comes in and they don't have any family.

14:17:25  18   A.  Then nobody would know that they're on Eliquis or Pradaxa or

14:17:29  19   whatever.

14:17:29  20   Q.  So if you saw a normal PT test, would you say that's enough to

14:17:32  21   go do surgery?

14:17:34  22   A.  Well, unfortunately, we might get caught in something like that

14:17:37  23   if we don't have a medical history and somebody comes in with a

14:17:42  24   catastrophic hemorrhage.

14:17:44  25   Q.  Doctor, I was asking about the PT test.

14:17:47  1    A.   Right.

14:17:47  2    Q.   Would you use that as a reliable indicator that there was no

14:17:51  3    anticoagulant on board?

14:17:52  4    A.   If I didn't have any other history and the patient came in and

14:17:56  5    needed an operation and they were going to die otherwise and the PT

14:18:00  6    was normal, yes, I would proceed, thinking that, you know, I'm

14:18:07  7    probably going to be at worst, with a normal PT, at worst at a

14:18:13  8    half-strength efficacy.  But even then, we would never know -- if

14:18:19  9    that patient comes in without family, we don't have a history, so

14:18:23 10    you wouldn't know, regardless, what medicines they were on.

14:18:28 11    Q.   And you did read Dr. Najeeb Thomas' deposition?

14:18:34 12    A.   I saw parts of it.

14:18:36 13    Q.   And you know he doesn't agree with you that you can rely on a

14:18:39 14    PT test for making surgical decisions in an emergency situation,

14:18:43 15    right?

14:18:43 16    A.   That was the working knowledge at the time, and still is.

14:18:46 17    Q.   No, we're talking about he is an expert in this case, right?

14:18:48 18    He's had access to all of the materials you have?

14:18:52 19    A.   And he is going off of these studies or going off his regular

14:18:56 20    knowledge.

14:18:57 21    Q.   So you're saying you know something, you've seen something that

14:19:01 22    Dr. Najeeb hasn't -- Dr. Thomas that would change his mind?

14:19:05 23    A.   No, I am saying four years ago, every neurosurgeon would have

14:19:09 24    said that PT wouldn't matter.

14:19:11 25         MR. HONNOLD:  Can I object?  I don't think there is any

14:19:13  1    showing here about whether Dr. Najeeb Thomas has been shown

14:19:18  2    internal company documents or not.  She can't suggest that he had

14:19:22  3    access to those.

14:19:23  4            THE COURT:  The witness is being cross-examined at this

14:19:25  5    point, so...

14:19:29  6            MS. WILKINSON:  Your Honor, I have two more questions.

14:19:31  7    Do you want me to go ahead or take a break?

14:19:34  8            THE COURT:  Go ahead.

14:19:38  9    BY MS. WILKINSON:

14:19:38 10    Q.  Doctor, are you saying despite all of the literature, based on

14:19:41 11    some internal documents from the company, that you believe PT is a

14:19:44 12    reliable measurement for a Xa -- anti-factor Xa anticoagulants in

14:19:54 13    an emergency situation where you're trying to determine whether you

14:19:56 14    should go and do surgery?

14:19:58 15    A.  No, I didn't say that.  For presence of the drug.

14:20:00 16    Q.  For presence of the drug?

14:20:01 17    A.  Yes.

14:20:02 18    Q.  And you think -- and why do you want to know the presence of

14:20:07 19    the drug?

14:20:08 20    A.  That's a common sense question.

14:20:12 21    Q.  Then what's the answer?

14:20:13 22    A.  The answer is if there's -- if it does not appear that a drug

14:20:18 23    is present, even if there is some functioning anticoagulant

14:20:23 24    activity, again, in the face of an emergent crash to the OR

14:20:29 25    procedure, I feel that it's safe to proceed.  And I would do that

14:20:33 1   in my practice, like I said.

14:20:35 2   Q.  So if the PT is normal, which means it shows it's not present,

14:20:38 3   in your mind, it's safe to proceed?

14:20:41 4   A.  Yes.

14:20:47 5            MS. WILKINSON:  This is probably a good place --

14:20:50 6            THE WITNESS:  In an emergent --

14:20:50 7   BY MS. WILKINSON:

14:20:52 8   Q.  Fair enough.  We are all asking about emergency situations.

14:20:56 9   A.  Not for anything elective, but in an emergent situation, yes.

14:21:00 10  Q.  Okay.  Most of my questions are all about emergencies, not

14:21:04 11  about those that you can plan for.

14:21:07 12           The last question is, Doctor -- I think I tried to ask

14:21:10 13  you this before.  Did you look at FDA documents commenting on these

14:21:13 14  issues?

14:21:16 15  A.  I don't believe I saw anything from the FDA.

14:21:18 16  Q.  You weren't given any of the FDA reviews, even the pharmacology

14:21:22 17  reviews?

14:21:23 18  A.  Possibly at one point, it would have been a long time ago.  I

14:21:27 19  don't remember.

14:21:27 20  Q.  You didn't put it on your reliance list?

14:21:29 21  A.  I don't think so, no.

14:21:30 22  Q.  So then would you have seen it?

14:21:32 23  A.  Most likely not.

14:21:33 24  Q.  Would you want to see that to see if it's consistent with your

14:21:37 25  opinion, or does it not matter what the FDA said?

14:21:40  1    A.  Looking at it would be good.

14:21:45  2               MS. WILKINSON:  This is a good place to stop, your Honor.

14:21:48  3               THE COURT:  All right.  Let's take a break at this time.

14:21:50  4    We'll take a 15-minute break.

14:21:51  5               THE MARSHAL:  All rise.

14:21:53  6          (WHEREUPON, A RECESS WAS TAKEN.)

14:47:22  7               THE DEPUTY CLERK:  All rise.

14:47:24  8               THE COURT:  Let's bring them in, Marshal.

14:47:53  9          (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

14:47:53 10               THE COURT:  Be seated, please.

14:47:55 11               Proceed, Counsel.

14:47:57 12               MS. WILKINSON:  Thank you, your Honor.

14:47:59 13    BY MS. WILKINSON:

14:47:59 14    Q.  Doctor, we're going to try and finish up these articles, if we

14:48:03 15    could.  And talk about the PT test.

14:48:07 16               Do you understand that the PT test measures all of the

14:48:11 17    different factors that Coumadin or warfarin affects when it goes

14:48:17 18    through the liver?

14:48:18 19    A.  Yes.

14:48:18 20    Q.  Do you know what factors those are?

14:48:21 21    A.  Yeah.

14:48:21 22    Q.  II, right?

14:48:22 23    A.  VII, IX.

14:48:23 24    Q.  V?

14:48:26 25    A.  Okay.  II, V, VII, and IX.

14:48:28  1   Q.  And X, right?

14:48:29  2   A.  Yes.

14:48:34  3   Q.  You know that Xarelto, Eliquis, and Savaysa only affect

14:48:40  4   Factor X, right?

14:48:41  5   A.  Yes.

14:48:41  6   Q.  So the PT test wasn't designed to measure just one factor; it

14:48:45  7   was designed to measure multiple factors, right?  Is that right?

14:48:48  8   A.  I am not sure what it was designed for, but it does measure

14:48:53  9   multiple factors.

14:48:54  10  Q.  And you mentioned when we were talking earlier that one of the

14:48:58  11  articles you used to rely on were some guidelines for the

14:49:01  12  management of spontaneous intracerebral hemorrhage, right?  Is that

14:49:07  13  what it was?

14:49:08  14          Let me show you to make sure it's the one.  I know you

14:49:12  15  said it was some kind of guidelines, and I thought this was it.

14:49:19  16  I've marked it DX 1535.

14:49:22  17  A.  Thank you.

14:49:29  18  Q.  Is that one of the documents you've been referring to?

14:49:31  19  A.  No.  Mine was from 2017.

14:49:41  20  Q.  Okay.  So these deal with spontaneous intracerebral hemorrhage.

14:49:46  21  Did Mrs. Orr have a spontaneous intracerebral hemorrhage?

14:49:50  22  A.  She had a spontaneous intraventricular hemorrhage.

14:49:53  23  Q.  So would these guidelines apply?

14:49:58  24  A.  Maybe; maybe not.

14:50:03  25  Q.  Let's look back at the literature, if we could.  Do you still

14:50:07  1   have Adcock and Gosselin, the most recent article, from 2017 in

14:50:13  2   front of you?  It was marked as DX 2451.  It looks like this

14:50:19  3   (INDICATING).  Just to help you, it has some dark purple.

14:50:21  4   A.  Yes.

14:50:21  5   Q.  Do you see that?

14:50:22  6   A.  Yes.

14:50:22  7   Q.  And I want to show you, if I could -- turn to page 2 and start

14:50:44  8   at the bottom there, you see 2.1.1?

14:50:48  9   A.  Yes.

14:50:48 10   Q.  And it's talking about the relationship of DOACs.  Those are

14:50:55 11   the anticoagulants we've been talking about other than Coumadin,

14:50:58 12   right?

14:50:58 13   A.  Uh-huh.

14:50:59 14   Q.  And it's talking about a test called APTT and PT, right?

14:51:03 15   A.  Yes.

14:51:03 16   Q.  And I've blown it up a little bit.  I want to ask you whether

14:51:08 17   you agree or disagree with this.

14:51:09 18        The first quote says, "The term misprediction is used

14:51:12 19   when patients on therapy DOAC concentrations with normal APTT and

14:51:17 20   PT values."

14:51:21 21        Do you understand that that's saying you get a normal

14:51:23 22   value and that could be a misprediction, right?

14:51:26 23   A.  Yeah.  I see what they're saying.

14:51:28 24   Q.  Do you see that?

14:51:29 25   A.  Yes.

14:51:30  1    Q.  And then below that it says, "For rivaroxaban, Xarelto,

14:51:34  2    published misprediction of the PT ranged from 10 percent to

14:51:39  3    52 percent... depending on the reagent used."  Right?

14:51:43  4    A.  That's what they said, yes.

14:51:45  5    Q.  Do you agree or disagree with that?

14:51:47  6    A.  I haven't really reviewed this paper, so it's hard to say.

14:51:51  7    Q.  Do you agree generally with that -- those statements?  Or you

14:51:58  8    have no basis?

14:51:59  9    A.  I have no basis.  I haven't reviewed this paper.

14:52:01  10   Q.  Okay.  Now, turn, if you could, back to the very first page.

14:52:06  11   A.  Okay.

14:52:06  12   Q.  And here is what they say, "It has been repeatedly demonstrated

14:52:10  13   that patients can have normal PT..."  That's what you say Mrs. Orr

14:52:16  14   did, right?

14:52:16  15   A.  Yes.

14:52:17  16   Q.  ..."with a therapeutic plasma concentration of a NOAC..."

14:52:20  17   right?

14:52:21  18   A.  Okay.

14:52:22  19   Q.  ..."clinicians can no longer rely on a normal PT to determine

14:52:26  20   that an anticoagulation -- anticoagulated patient is safe to

14:52:33  21   undergo an invasive procedure."  That's what the article says,

14:52:37  22   right?

14:52:37  23   A.  Yeah.  It's --

14:52:40  24   Q.  First of all, does it say that, Doctor?

14:52:42  25   A.  It does say that, yes.

14:52:43  1   Q.  And an "anticoagulated patient"; meaning, you can't rely on

14:52:47  2   PT -- a normal PT score to say that the patient isn't

14:52:52  3   anticoagulated, right?

14:52:53  4   A.  It just flying in the face of the things that I've seen and --

14:53:01  5   and the literature from the company.

14:53:03  6   Q.  And that says it's not safe to undergo an invasive procedure,

14:53:08  7   which is surgery, right?

14:53:09  8   A.  Yes.

14:53:10  9   Q.  So this contradicts what you told the jury, right?

14:53:14 10   A.  This paper contradicts what I told the jury, yes.

14:53:17 11   Q.  Just came out in 2017, right?

14:53:19 12   A.  Yes.

14:53:20 13   Q.  It's in a peer-reviewed published journal, right?

14:53:24 14   A.  Yeah.  I am not familiar with that journal.

14:53:26 15   Q.  Well, I think we talked about it before.  This is where you

14:53:29 16   might expect something like this.  It's in the International

14:53:32 17   Journal of Laboratory Hematology, right?

14:53:34 18   A.  Yes.

14:53:35 19   Q.  You're not a hematologist, right?

14:53:37 20   A.  No.

14:53:38 21   Q.  And so you never looked at this study to see whether that could

14:53:44 22   change your opinion even though it was in a peer-reviewed journal

14:53:49 23   on a topic that you've been talking to the jury about most of the

14:53:52 24   day, right?

14:53:53 25   A.  I have not.

14:53:57  1          MS. WILKINSON:  Your Honor, I would like to move in as a

14:53:59  2    demonstrative so I have it clear this exhibit that I marked on as

14:54:04  3    Exhibit 9 showing which studies Dr. Liechty did not read.

14:54:09  4          THE COURT:  I'll allow that as demonstrative.

14:54:15  5    BY MS. WILKINSON:

14:54:15  6    Q.  Doctor, let's go back to Mrs. Orr, if we could.  Remember you

14:54:19  7    said you didn't know when -- what her last blood pressure was

14:54:23  8    before April 24th?

14:54:24  9    A.  Yes.

14:54:25  10   Q.  And I am going to show you DX 4.  Those are medical records at

14:54:32  11   101, and see if you recognize this.  Do you recognize this from

14:54:35  12   April 16th?

14:54:35  13   A.  (WITNESS REVIEWS DOCUMENT.)  I think I saw it in a different

14:54:45  14   format; but, yes.

14:54:46  15   Q.  Do you see it over in the left.  We put the whole record over

14:54:49  16   there.  We just blew it up so we could read the doctor handwriting?

14:54:53  17   A.  Yes.

14:54:53  18   Q.  That shows that her last known blood pressure reading was

14:54:59  19   200/90, right?

14:54:59  20   A.  Yes.

14:55:00  21   Q.  That's an extremely high blood pressure, isn't it?

14:55:01  22   A.  It's quite elevated, yes.

14:55:03  23   Q.  Would you call that a hypertensive emergency?

14:55:06  24   A.  It's borderline.

14:55:08  25   Q.  And I believe you were asked before that you agreed with

14:55:17  1   Dr. Cruz, who took this measurement, that Mrs. Orr's health status

14:55:21  2   during that last year was declining, right?

14:55:24  3   A.  Yes.

14:55:25  4   Q.  And that was because she had high blood pressure, right?  She

14:55:31  5   had AFib, right?

14:55:32  6   A.  Yes.

14:55:33  7   Q.  She had diabetes --

14:55:34  8   A.  Yes.

14:55:35  9   Q.  -- right?

14:55:36  10          And we talked about the risk factors for the -- different

14:55:40  11  stroke for the hemorrhagic stroke, right?

14:55:43  12  A.  Yes.

14:55:43  13  Q.  And I asked you whether there are any other risk factors,

14:55:47  14  right?

14:55:47  15  A.  You did.

14:55:48  16  Q.  Independent.  And wouldn't you agree that one you should have

14:55:52  17  included was kidney disease?

14:55:54  18  A.  Potentially, yes.

14:55:56  19  Q.  She had serious kidney disease, didn't she?

14:56:01  20  A.  Yes.

14:56:01  21  Q.  You heard that Dr. Cruz say she was at Stage VI kidney disease

14:56:07  22  during 2015?

14:56:07  23  A.  Yes.

14:56:08  24  Q.  So that's another risk factor for that hemorrhagic stroke that

14:56:11  25  she had, right?

1124

14:56:12  1   A.  Yes.

14:56:13  2   Q.  All of those.

14:56:14  3        And that's in part why you said and based on all of her

14:56:17  4   medical records, she was in declining health at that time, right?

14:56:20  5   A.  Correct.

14:56:22  6   Q.  I want to, if we could briefly, we really don't want to dwell

14:56:36  7   on the timeline other than to talk about some of the testimony that

14:56:39  8   you had.  You showed a timeline about when you thought it could be

14:56:42  9   appropriate, right, to intervene?

14:56:44  10  A.  Right.

14:56:44  11  Q.  And you know that when Mrs. Orr first came in to Ochsner

14:56:49  12  Baptist around 10:46 she was in bad shape, right?

14:56:54  13  A.  Yes.

14:56:55  14  Q.  And she had not been verbal since her husband had talked to her

14:57:02  15  before she got in the ambulance, right?

14:57:04  16  A.  When she got to Ochsner Baptist, she was verbal.

14:57:09  17  Q.  She was?  Well, let's take a look at DX Orr 77 at page 1 and 6

14:57:15  18  and see if I can give that to you.

14:57:26  19        And you told us it's important to talk to the family

14:57:28  20  members to get information on a person's health, especially when

14:57:31  21  they can't speak for themselves, right?

14:57:33  22  A.  Correct.

14:57:33  23  Q.  Take a look at page 7.  Doesn't that show her arrival time as

14:57:42  24  10:46?

14:57:43  25  A.  Yes.

14:57:44  1  Q.  And now let me see if I can find the right -- now, here is the

14:58:03  2  comments on the doctor when they talked to Mr. Orr.  Do you see

14:58:06  3  that?

14:58:07  4  A.  Yes.

14:58:08  5  Q.  And Mr. Orr said that "Three hours ago she woke up and vomited;

14:58:16  6  however, she was unable to support herself, and she had not been

14:58:20  7  verbal since then," right?

14:58:22  8  A.  That's what's written.

14:58:26  9  Q.  And do you recall when she was intubated, when she -- they had

14:58:30 10  to put the tube in her to help her?

14:58:33 11  A.  Basically just prior to transfer I understand.

14:58:35 12  Q.  So it would have been after 10:46 because she is still at

14:58:39 13  Baptist but before she got to Main at around 1:15 A.M.?

14:58:44 14  A.  Correct.

14:58:45 15  Q.  And you know that she was unconscious when she was intubated,

14:58:49 16  right?

14:58:49 17  A.  I was not under the impression she was unconscious; I was under

14:59:01 18  the impression they were worried about protecting her airway.

14:59:04 19  Q.  Do you know whether she had to be sedated before she received

14:59:07 20  the intubation?

14:59:08 21  A.  I am not sure.

14:59:10 22  Q.  Never checked that.  If she hadn't been sedated, that would

14:59:15 23  suggest that she was unconscious, right?  Because, otherwise, you

14:59:17 24  wouldn't have a very good reaction to getting intubated, would you?

14:59:21 25  A.  Right.

1126

14:59:24  1    Q.  You talked about the damage and the CT scans for Mrs. Orr that
14:59:43  2    were taken at Ochsner Baptist, right?
14:59:45  3    A.  Yes.
14:59:46  4    Q.  Once they saw that, would you call it a massive hemorrhage?
14:59:50  5    A.  Not necessarily.
14:59:52  6    Q.  Would you call it a large hemorrhage?
14:59:55  7    A.  I would say a large intraventricular hemorrhage.
15:00:00  8    Q.  They couldn't do any of the surgery there, right, that's why
15:00:03  9    she had to be transferred to Main?
15:00:05 10    A.  Correct.
15:00:05 11    Q.  Couldn't put in the EVDs.  And I believe you said that you
15:00:13 12    could tell by the CT scans that it was a primary intraventricular
15:00:18 13    hemorrhage, right?
15:00:19 14    A.  Yes.
15:00:19 15    Q.  And that there hadn't been much other damage to the brain, is
15:00:23 16    that what you said?
15:00:24 17    A.  Well, there was no evidence of actual hemorrhage in the brain
15:00:27 18    itself.
15:00:28 19    Q.  But that's different than the brain was damaged by the
15:00:31 20    pressure, right?
15:00:32 21    A.  Yes.  As evidenced by her decreased exam.
15:00:35 22    Q.  And if you look at Dr. Ogden's report -- and this is already
15:00:43 23    been put into evidence as PX 116 -- he talks about some of the
15:00:50 24    problem he sees, right?  He sees the PIVH, right, primary
15:00:53 25    intraventricular hemorrhage?

OFFICIAL TRANSCRIPT

15:00:57 1   A.  Yes.

15:00:58 2   Q.  And then he says, like you said, this midline shift, which is a

15:01:01 3   very bad sign, right?

15:01:03 4   A.  Yes.

15:01:03 5   Q.  And you didn't talk about this, but he said there's probably

15:01:07 6   early right-side uncal herniation, right?

15:01:11 7   A.  Yes.

15:01:11 8   Q.  That's damage to the brain, isn't it?

15:01:13 9   A.  That's pressure.

15:01:14 10  Q.  That's not good for the brain, right?

15:01:17 11  A.  It's not good, no.

15:01:18 12  Q.  And differential considerations could include underlying right

15:01:24 13  ventricular vascular lesions, right?

15:01:26 14  A.  Yes.

15:01:28 15  Q.  And/or intraventricular solid mass, right?

15:01:31 16  A.  That would be much less likely.

15:01:32 17  Q.  But we can't say for sure whether any of those things happened

15:01:36 18  because some of those things might not show up on a CAT scan,

15:01:40 19  right?

15:01:40 20  A.  The mass I feel would.

15:01:45 21  Q.  But not the other things.  Some of the lesions you might not be

15:01:49 22  able to see, right?

15:01:50 23  A.  It would be -- it would be a very small vascular lesion, it

15:01:55 24  would be unusual.

15:01:55 25  Q.  And she could not have an MRI, which would have provided more

15:01:59  1   detail, because of her physical condition, right?

15:02:02  2   A.  Correct.

15:02:04  3   Q.  So she couldn't have an MRI because her kidneys were

15:02:08  4   functioning so poorly that she couldn't clear out, right, to show

15:02:12  5   the contrast when one has an MRI -- clear out the fluid?

15:02:16  6   A.  If it's ordered with contrast.

15:02:19  7   Q.  But she couldn't have one, right?

15:02:21  8   A.  Probably not, no.

15:02:22  9   Q.  And there certainly wasn't one that you're aware of, right?

15:02:26  10  A.  Nor would it have mattered.  The etiology here, I mean, the

15:02:30  11  treatment is -- the treatment would be the same.

15:02:34  12  Q.  Exactly.  So what actually caused her hemorrhage, whether

15:02:40  13  Xarelto was a contributing cause along with high blood pressure or

15:02:43  14  other things, doesn't matter when you're sitting there trying to

15:02:46  15  save her life, right?

15:02:47  16  A.  Correct.

15:02:47  17  Q.  And all you want to do is, you see it on the CAT scan and you

15:02:51  18  want to do whatever you can to help her, right?

15:02:53  19  A.  Correct.

15:02:53  20  Q.  So the doctors, when you see something in their records and

15:02:57  21  they say could be related to Xarelto or could be hypertension, you

15:03:02  22  don't think that's definitive when they put that in there,

15:03:05  23  contemporaneous records at the time of her emergency, right?

15:03:07  24  A.  Especially with both of those as being -- as being culprits.

15:03:13  25  Q.  Right.

15:03:13  1    A.  The treatment's the same.

15:03:14  2    Q.  And, in fact, you can't eliminate high blood pressure as a

15:03:18  3    cause of her PIVH, right?

15:03:21  4    A.  You can't eliminate it, no.

15:03:23  5    Q.  And, in fact, the articles that you rely on to say that a

15:03:28  6    contributing factor is the anticoagulant actually shows that the

15:03:31  7    biggest risk factor for the type of unusual hemorrhage she had, the

15:03:35  8    rare hemorrhage that you say is the type of PIVH, 50 percent or

15:03:40  9    more of all of those in the literature say that high blood pressure

15:03:44 10    is the cause, right?

15:03:45 11    A.  About 50 percent.

15:03:45 12    Q.  That's for very rare PIVH, right?

15:03:51 13    A.  Yes.

15:03:52 14    Q.  And, in fact, those studies show very few people who have a

15:03:59 15    PIVH are even on an anticoagulant, right?

15:04:01 16    A.  Right, there are only a handful.

15:04:03 17    Q.  And these studies that you rely on only have 24 patients or 12

15:04:07 18    patients, right?

15:04:08 19    A.  Yes.

15:04:08 20    Q.  Over a 19-year period, for example?

15:04:11 21    A.  Right.

15:04:12 22    Q.  Because it's so rare?

15:04:14 23    A.  Correct.

15:04:16 24    Q.  And in the literature, one of the articles you rely on is an

15:04:20 25    article by Giray, G-I-R-A-Y?

1130

15:04:22  1    A.   Yes.

15:04:23  2    Q.   And I think you told the ladies and gentlemen of the jury that

15:04:26  3    when Mrs. Orr came to Main, she had a GCS, right, a Glasgow Coma

15:04:39  4    score of 6, right?

15:04:39  5    A.   6T.

15:04:41  6    Q.   6T, and you said she still had -- with that PIVH, she still had

15:04:46  7    a good chance of surviving, right?

15:04:49  8    A.   Yes.

15:04:49  9    Q.   If intervened.  You don't disagree with Dr. Bui trying to do

15:04:54 10    medical therapy first, do you?

15:04:56 11    A.   No, I don't disagree.  What she really needed was control of

15:05:00 12    ventricular space.

15:05:01 13    Q.   But he chose not to do that first, right?  He chose --

15:05:05 14    A.   He did what he could do.

15:05:06 15    Q.   Did you read his testimony from the other day where he couldn't

15:05:11 16    say that even if she weren't on an anticoagulant that he

15:05:14 17    probably -- he might have tried the medical therapy first?

15:05:16 18    A.   I saw that he wanted to put the EVDs in earlier.

15:05:20 19    Q.   Well, did you -- we'll get to that.  In the article that you

15:05:25 20    cite, Giray, are you familiar with the table that actually goes

15:05:28 21    through all of the people who have a coma scale and have a PIVH?

15:05:36 22    A.   I did look through it at one point.

15:05:40 23    Q.   Let me show you.  It's DX 2468.  And I'm sorry that this topic

15:06:04 24    is so difficult, Doctor, but one of the things you told us was that

15:06:09 25    she had a 60 percent chance of surviving even though she came in

15:06:14  1    with a GCS score of 6 at 1:15 in the morning at Main, right?

15:06:21  2    A.  Yes.

15:06:22  3    Q.  If you look at the data and the peer-reviewed study on page 3,

15:06:26  4    it shows that every single person in this study, they all have

15:06:30  5    PIVHs, right?

15:06:31  6    A.  Yes.

15:06:32  7    Q.  And every single one that had a GCS score, the coma score, less

15:06:37  8    than 8 passed away, right?

15:06:38  9    A.  Yes.  Can I talk about the limitations here?

15:06:45 10    Q.  Sure.  In a moment, sure.

15:06:47 11    A.  Yep.

15:06:47 12    Q.  But just so we're clear, Mrs. Orr at the time you said was

15:06:52 13    relevant for intervention had a GCS score of 6, right?

15:06:57 14    A.  Yes.

15:06:57 15    Q.  Now, that doesn't mean as a doctor you don't try to save

15:07:00 16    someone's life, right?

15:07:02 17    A.  Correct.

15:07:02 18    Q.  Of course you try to do everything you can, right?

15:07:05 19    A.  Yes.

15:07:06 20    Q.  But when you look at evidence-based medicine, in a rare case

15:07:12 21    like PIVH, this shows that every person that had her same condition

15:07:17 22    with a score of 8 or below died, right?

15:07:20 23    A.  Yes.

15:07:22 24    Q.  Now, every study that you read has limitations, right?

15:07:29 25    A.  Yeah.  As pointed out earlier by others, this one has

15:07:34   1   significant limitations.

15:07:35   2   Q.  And that's, in part, because these are small numbers, right?

15:07:39   3   A.  Correct.

15:07:40   4   Q.  And on page 6, don't folks say, "Our findings reveal that the

15:07:46   5   rate of poor outcome for patients with EVD" -- that's what you said

15:07:51   6   should have been done here, right, which was done for Mrs. Orr --

15:07:54   7   "the rate was alarmingly high"?

15:07:58   8   A.  Right.  For Turkish neurosurgery in 2009, that may be the case.

15:08:03   9   Q.  Right.  But there are very few -- there are very few articles

15:08:08  10   in the world published on PIVH, right?

15:08:11  11   A.  That is true.

15:08:11  12   Q.  So if we don't look at articles, all we have is your experience

15:08:15  13   of five, ten to 20 PIVHs over your career, right?

15:08:20  14   A.  Yes.

15:08:21  15   Q.  And that's not evidence-based medicine because you haven't kept

15:08:24  16   all of those records and compared those to each other, you haven't

15:08:27  17   done your own observational study, right?

15:08:29  18   A.  One thing that's not mentioned in this table is how long -- how

15:08:33  19   long these patients were sitting at GCS before they got to the

15:08:37  20   facility.

15:08:37  21   Q.  I'm so glad you mentioned that, because it actually does.  And

15:08:42  22   I should have shown you that because it actually says that this is

15:08:50  23   the score upon admission.

15:08:51  24   A.  Right.

15:08:52  25   Q.  Right there.  Doesn't it?

15:08:55  1   A.  So --

15:08:56  2   Q.  Doesn't it say that?

15:08:57  3   A.  Right.  So in Turkey, how long were they out in the community

15:09:01  4   before they were brought to the hospital, I guess, that's what I'm

15:09:04  5   getting at.

15:09:04  6   Q.  And that's true of every study, you've seen that, right?

15:09:07  7   Observational studies are difficult.  They are not as reliable as a

15:09:10  8   double-blind clinical study, are they?

15:09:12  9   A.  That's what I am saying, that every patient is unique.

15:09:15 10   Q.  But you have to go on what the study showed to make conclusions

15:09:20 11   more likely than not, don't you?

15:09:22 12   A.  You can use it as part of your judgment, yes.

15:09:26 13   Q.  And this study doesn't support your judgment, does it?

15:09:30 14   A.  This study basically predicts a very poor outcome in Turkey of

15:09:42 15   patients with low GCS on admission, yes.

15:09:45 16   Q.  This doesn't support your opinion, does it?

15:09:48 17   A.  This is not consistent with my opinion.

15:09:51 18   Q.  But you did put this article on your reliance list.  You said

15:09:56 19   you relied on it, right?

15:09:58 20   A.  I tried to read everything I could find on primary

15:10:01 21   intraventricular hemorrhage.

15:10:04 22   Q.  And the other studies, the few that you're aware of, have even

15:10:09 23   fewer patients than 24, right?

15:10:11 24   A.  Correct.

15:10:12 25   Q.  And they're also from foreign jurisdictions?

15:10:14  1    A.  Most of them, yeah.

15:10:16  2    Q.  So they would be similarly difficult to rely on?

15:10:19  3    A.  True.

15:10:20  4    Q.  So then there's no peer-reviewed literature that you're

15:10:25  5    comfortable with that supports your conclusion that somebody with a

15:10:27  6    PIVH and a Glasgow Coma score of 6 has a more than 60 percent

15:10:36  7    chance of neurological recovery, right?

15:10:42  8    A.  That's not in this paper, yes.

15:10:45  9    Q.  You can't point to any article that isn't greater than 24

15:10:51 10    patients and isn't from a foreign jurisdiction, right?

15:10:54 11    A.  No.  But what I am looking at is a patient in a sophisticated

15:10:59 12    health system with a recent decline of GCS with intact brain stem

15:11:06 13    reflexes.

15:11:07 14    Q.  Doctor, the medical care here in this town is great.  The

15:11:14 15    question is, is there any peer-reviewed article meeting the

15:11:17 16    criteria you just gave us, they're not foreign patients, that are

15:11:22 17    more than 24 people?  Have you pointed to one peer-reviewed article

15:11:26 18    or study that supports that?

15:11:27 19    A.  Most of the articles are portending mortality of around

15:11:34 20    40 percent.

15:11:35 21    Q.  Doctor, I asked you to name an article that has more than 24

15:11:39 22    patients that isn't from a foreign jurisdiction that supports your

15:11:44 23    opinion.

15:11:45 24    A.  There is none.

15:11:47 25    Q.  When someone has an intracranial bleeding like a PIVH, you

15:12:09  1  agree that there has to be some breakdown in the vascular structure

15:12:13  2  that allows the blood to get outside of the blood vessel, right?

15:12:15  3  A.  Yes.

15:12:16  4  Q.  So Xarelto does not break open the blood vessel, right?

15:12:22  5  A.  No.

15:12:22  6  Q.  It's not what they call the underlying pathology, right?

15:12:26  7  A.  Right.

15:12:27  8  Q.  It doesn't initiate the bleeding, correct?

15:12:29  9  A.  Correct.

15:12:30  10  Q.  High blood pressure can do that, right?

15:12:33  11  A.  It can.

15:12:34  12  Q.  And there's nothing about Xarelto that causes damage to a

15:12:39  13  vascular structure, right?

15:12:40  14  A.  That's correct.

15:12:41  15  Q.  Now, in Mrs. Orr's medical records, she had an intensivist, a

15:12:54  16  doctor who was in charge of her overall care, right?

15:12:56  17  A.  Yes.

15:12:57  18  Q.  And that person would have spent more time overall reviewing

15:13:00  19  her records with her normally than the neurosurgeon, right?

15:13:03  20  A.  Possibly.

15:13:04  21  Q.  And did you look at Dr. Mahanna's records in this case?

15:13:08  22  A.  Briefly, yes.

15:13:09  23  Q.  And take a look at DX Orr 266 at 6.  I am told I already gave

15:13:33  24  it to you.  So this is a record from April 24th, 2015.

15:13:42  25  A.  May I see that?

15:13:43  1    Q.  You have it up there, and it looks like it's page 6 of 7.  Do

15:13:53  2    you see the medical records?

15:14:19  3    A.  I don't think so.

15:14:20  4    Q.  All right.  Doctor, do you see it there?

15:14:22  5    A.  I don't have it.

15:14:25  6    Q.  You didn't show -- you weren't shown any of Dr. Mahanna's

15:14:30  7    records during your direct testimony?

15:14:32  8    A.  I just don't have them in front of me.

15:14:34  9    Q.  Sorry.  We did have it, I apologize for that.  Here you go,

15:14:59  10   sorry about that.

15:14:59  11   A.  Oh, that's all right.  Thank you.

15:15:01  12   Q.  This is from your deposition -- oh, no, it's not.  It's from

15:15:07  13   Dr. Mahanna's deposition.  But you looked at this record, right?

15:15:10  14   A.  Yes, I would have seen these.

15:15:12  15           MS. WILKINSON:  I am going to move this in as Exhibit --

15:15:14  16   Defense Exhibit No. 10, your Honor.

15:15:16  17           MR. HONNOLD:  No objection, your Honor.

15:15:18  18           THE COURT:  Let it be admitted.

15:15:20  19   BY MS. WILKINSON:

15:15:20  20   Q.  And this is a record, you see there in the middle this is by

15:15:25  21   Dr. Mahanna right?

15:15:26  22   A.  Yes.

15:15:27  23   Q.  And she was in charge of her care -- of Mrs. Orr's care, right?

15:15:31  24   A.  Yes.

15:15:31  25   Q.  And when you look down here, look at the next page 6, she talks

15:15:42  1   about all of the health problems up here that Mrs. Orr had, right?

15:15:48  2   A.  Yes.

15:15:49  3   Q.  And then it says under the neurology a large IPH, right?

15:15:54  4   A.  She says that, but that's not correct.

15:15:56  5   Q.  And an IVH, right?

15:15:58  6   A.  The IVH is correct.

15:16:00  7   Q.  And she says it's most likely hypertensive in nature, right?

15:16:03  8   A.  That's her opinion, yes.

15:16:05  9   Q.  And you know that Dr. Thomas, Dr. Najeeb Thomas agrees that

15:16:09  10  that's the likely cause, right?

15:16:11  11  A.  Yes.

15:16:11  12  Q.  And you disagree with him as well, right?

15:16:14  13  A.  I do.

15:16:15  14  Q.  And did you look at the death certificate for Mrs. Orr?

15:16:20  15  A.  I did see that at one point, yes.

15:16:22  16  Q.  And did you see that that shows that hypertension was the cause

15:16:25  17  of her hemorrhage?

15:16:26  18  A.  Yes.

15:16:27  19  Q.  And you disagree with that as well, right?

15:16:29  20  A.  Yes.

15:16:29  21  Q.  Now, you said you have a lot of respect for Dr. Bui, correct?

15:16:37  22  A.  I do.

15:16:38  23  Q.  And Dr. Bui said that by the time he saw Mrs. Orr, because of

15:16:44  24  the midline shift and her other neurological status, that he felt

15:16:49  25  like her situation was fairly grave.  Do you agree with that?

15:16:52  1    A.  Not entirely.

15:16:55  2    Q.  Okay.  Would you agree that because he was there with her at

15:17:02  3    the time, you know, looking at all of the facts and circumstances,

15:17:05  4    talking to the family, examining Mrs. Orr, that he is probably in a

15:17:09  5    better position to make that comment than you are?

15:17:11  6    A.  Potentially, yeah.

15:17:12  7    Q.  Well, if it was your patient, would you want some expert coming

15:17:15  8    in after the fact --

15:17:19  9    A.  Depends.

15:17:20  10   Q.  -- second-guessing what you did?

15:17:22  11   A.  I wasn't second-guessing him.

15:17:24  12   Q.  Or second-guessing your conclusion about the state or the

15:17:27  13   status of your patient?

15:17:28  14   A.  Well, at the time, you had to wait at least 12 hours to

15:17:31  15   intervene, so --

15:17:33  16   Q.  Do you understand that he said that he's not even 100 percent

15:17:38  17   sure that even if she weren't on Xarelto or any anticoagulant that

15:17:42  18   he would have put the EVDs in at that moment after he examined her?

15:17:47  19   A.  I would respectfully disagree with that.

15:17:54  20   Q.  So if he said that the decision for surgery is fairly

15:17:58  21   complicated and you have to weigh a lot of risks and the benefit

15:18:01  22   profiles and also whether the family was in a state to make that

15:18:05  23   complicated decision, and the medical therapy, that you might --

15:18:09  24   that, you know, he might not have made that decision to go forward

15:18:13  25   immediately with EVDs, even if she weren't on any anticoagulants?

1139

15:18:19   1    A.  I always understood he wanted to put it in earlier.

15:18:22   2    Q.  And would you agree or disagree if he said -- if she had not

15:18:26   3    been on the anticoagulation, do you think you would have

15:18:28   4    recommended more aggressive earlier treatment -- that's what you're

15:18:32   5    recommending, right?

15:18:33   6    A.  Yes.

15:18:33   7    Q.  And he says:  I may have, I don't know.  So you disagree with

15:18:37   8    him, too?

15:18:38   9    A.  Respectfully, yes.

15:18:39   10   Q.  Now, when he did perform the procedure, he believed it was

15:18:48   11   medically indicated and appropriate.  You do too, right?

15:18:52   12   A.  Yes.

15:18:52   13   Q.  But he said it's a different thing whether she had a good

15:18:58   14   chance of a neurologic recovery.  Do you agree or disagree with

15:19:01   15   that?

15:19:01   16   A.  Well, a long time had passed by, so, yes, it was --

15:19:11   17   certainly the chances were much worse than they would have been

15:19:13   18   earlier.

15:19:14   19   Q.  Do you believe to a reasonable degree of medical certainty that

15:19:18   20   if the drains had been put in at 2:00 A.M. for Mrs. Orr that she

15:19:24   21   would be alive today?

15:19:25   22   A.  Yes.

15:19:26   23   Q.  So if Dr. Bui says he doesn't know and can't say that, you

15:19:34   24   disagree respectfully?

15:19:35   25   A.  Respectfully, yes.

15:19:35  1   Q.  And if Dr. Thomas says the same thing, you disagree with him as

15:19:40  2   well?

15:19:40  3   A.  Respectfully, yes.

15:19:41  4   Q.  And do you agree or disagree that making that kind of

15:19:45  5   prognosis, that you've seen it where it doesn't make any difference

15:19:49  6   and where it can make a lot of difference?

15:19:51  7   A.  I've seen all comers.

15:19:54  8   Q.  And have you seen that when it's a large hemorrhage, more often

15:19:57  9   than not, it doesn't make a difference?

15:20:00 10   A.  Well, it depends on what you're calling a large hemorrhage,

15:20:05 11   where it's located, and all of the details of the case.  Again,

15:20:09 12   this is not a situation where you're non-dominant with intact brain

15:20:15 13   stem reflexes with brain that hasn't been destroyed, it's just

15:20:18 14   under pressure, extreme pressure.

15:20:23 15        So I mean, every patient is unique.  She represents, in

15:20:28 16   my opinion, somebody that would have done well from early

15:20:34 17   intervention.

15:20:34 18   Q.  So do you agree or disagree with Dr. Bui when he says that for

15:20:39 19   large hemorrhages, he's seen that EVDs, more often than not, don't

15:20:43 20   make a difference?

15:20:44 21   A.  For large hemorrhages that involve parenchyma, yes.

15:20:47 22   Q.  That's not what he said.  He just said large hemorrhages.

15:20:50 23   A.  That's what I would agree with.

15:20:52 24   Q.  But not for large hemorrhages generally?

15:20:55 25   A.  I wouldn't even -- I would characterize that hemorrhage is very

15:21:00 1    severe, but I certainly wouldn't call it massive.  It's contained

15:21:04 2    in just one ventricle.

15:21:06 3    Q.  When you say Mrs. -- this is, again, difficult to talk about --

15:21:17 4    when you say her brain wasn't destroyed --

15:21:19 5    A.  Yes.

15:21:20 6    Q.  -- clearly she had brain damage from the pressure and that

15:21:22 7    hemorrhage, right, and the spinal fluid?

15:21:26 8    A.  Yes.  There was pressure on her brain that had been in play for

15:21:35 9    at least an hour or so.

15:21:36 10   Q.  You know that she only had pressure in her brain for an hour or

15:21:41 11   so?

15:21:41 12   A.  After her exam declined.

15:21:44 13   Q.  So are you saying you don't believe she had any pressure in her

15:21:47 14   brain at 6:30 when she started to have headaches and vomit?

15:21:51 15   A.  She had pressure, but she was accommodating it up to that

15:21:54 16   point.

15:21:55 17   Q.  You don't know that because you don't have a CAT scan from that

15:21:58 18   time, right?

15:21:58 19   A.  No.

15:21:59 20   Q.  But you do have a CAT scan from 11:00, right?

15:22:03 21   A.  And I would say that the blood pressure would imply that the

15:22:06 22   pressure was not that great when she was initially picked up.

15:22:13 23   Q.  You agree that even if she had been on warfarin where you could

15:22:20 24   have a reversal agent, the reversal agent doesn't reverse brain

15:22:23 25   damage that's already happened, right?

15:22:24 1    A.  No, that would be basically trying to offload the pressure

15:22:28 2    within that small window.

15:22:33 3    Q.  And are you saying, just so I am clear, that there wasn't any

15:22:37 4    brain damage Mrs. Orr had suffered from by the time she got to

15:22:42 5    Ochsner Main at 1:15 and theoretically could have had some

15:22:47 6    significant --

15:22:47 7    A.  I am saying she exhibited brain dysfunction.

15:22:50 8    Q.  Is that considered brain damage?

15:22:52 9    A.  It's dysfunction.  Sometimes it's reversible.  I mean, the gray

15:22:58 10   tissue around the ventricle was not destroyed.

15:23:04 11   Q.  Doctor, you know that in the Xarelto label and the Eliquis

15:23:10 12   label that it specifically says there's no reversal agent?

15:23:14 13   A.  Yes.

15:23:15 14   Q.  No antidote, right?

15:23:17 15   A.  Right, yeah.

15:23:19 16   Q.  So doctors know that when they put people on these drugs,

15:23:23 17   right?

15:23:23 18   A.  Yes.

15:23:24 19   Q.  And you said Xarelto can have a shorter half-life, right?

15:23:27 20   A.  It can, uh-huh.

15:23:28 21   Q.  And warfarin has a longer one, right?

15:23:31 22   A.  Correct.

15:23:31 23   Q.  Much longer?

15:23:32 24   A.  Uh-huh.

15:23:33 25   Q.  I just want to end, if I could, on a couple of questions about

15:23:55 1   your opinions.  Is it your opinion that a vast majority of

15:24:02 2   intracranial hemorrhages that occur in patients who don't take

15:24:06 3   anticoagulants?

15:24:08 4   A.  Correct.

15:24:09 5   Q.  Would you agree that hypertension is the most common risk

15:24:14 6   factor for intracranial bleeding?

15:24:16 7   A.  Yes.

15:24:17 8   Q.  You showed Dr. Gropen's records.  Did you read his deposition?

15:24:30 9   A.  I am not sure.  I don't think so.

15:24:33 10   Q.  So you don't know whether he said that he didn't have any

15:24:37 11   information --

15:24:38 12        MR. HONNOLD:  Just object, your Honor, assumes facts not

15:24:40 13   in evidence.  There's nothing in evidence, he's not reviewed it.

15:24:43 14        THE COURT:  He said he didn't read it.  Do you remember

15:24:45 15   reading it?

15:24:46 16        THE WITNESS:  I never saw it.

15:24:47 17   BY MS. WILKINSON:

15:24:48 18   Q.  So you have no idea what Dr. Gropen said about why he wrote

15:24:52 19   Xarelto in the record, right?

15:24:53 20   A.  I only saw it in the medical record, in the Ochsner records.

15:24:57 21   Q.  But you didn't look at his testimony under oath?

15:25:02 22   A.  No, I didn't see his deposition.

15:25:03 23   Q.  Did you receive it?

15:25:04 24   A.  I am not sure.

15:25:05 25   Q.  Knowing what you know about Mrs. Orr's history, can you state

15:25:14  1   more probably than not or to a reasonable degree of medical

15:25:17  2   certainty that this hemorrhage would not have happened without

15:25:20  3   Xarelto?

15:25:21  4   A.  No.

15:25:30  5           MS. WILKINSON:  That's all I have, your Honor.

15:25:31  6           THE COURT:  Thank you.  Any redirect?

15:25:33  7           MR. HONNOLD:  Yes, your Honor.

15:26:26  8           I am just getting organized a little bit, your Honor,

15:26:30  9   thank you.

15:25:35 10                      REDIRECT EXAMINATION

15:25:37 11   BY MR. HONNOLD:

15:26:31 12   Q.  So, Doctor, there's a couple of things I want to try to

15:26:34 13   straighten out here, and we'll rely on the pad to do that.

15:26:44 14           MR. HONNOLD:  Are you okay there?

15:26:45 15           MS. WILKINSON:  I'll just move around.

15:26:48 16   BY MR. HONNOLD:

15:26:49 17   Q.  Now, I want to focus in on, I think, something that you were

15:26:54 18   trying to say during some of counsel's questions, but I am not sure

15:26:59 19   that it came out clearly.

15:27:06 20           When Dr. Bui and his team first had to deal with

15:27:13 21   Mrs. Orr, they had a situation where they knew by way of history

15:27:17 22   that the patient had been taking Xarelto, right?

15:27:20 23   A.  Yes.

15:27:21 24   Q.  And was it reasonable for them to assume that she was generally

15:27:29 25   compliant in terms of taking the medication as it had been

15:27:32 1  prescribed and indicated, which meant once per day, generally at

15:27:38 2  dinner; fair to have that belief and assumption?

15:27:41 3  A.  Correct.

15:27:41 4  Q.  So we know from Dr. Bui's situation and perspective with his

15:27:48 5  team, what we know is that it is the early morning hours of 4/25,

15:27:56 6  or April 25th, right?

15:27:59 7  A.  Yes.

15:27:59 8  Q.  And what we know is that she was positive for a Xarelto

15:28:09 9  history, she was a patient that had been prescribed Xarelto and, by

15:28:13 10 all indications, had been taking it as directed, right?

15:28:16 11 A.  Yes.

15:28:17 12 Q.  And so if she had been taking it as directed, generally at

15:28:22 13 dinnertime, then we could put here a range of time, say, 6:00 to

15:28:34 14 8:00 P.M.  Would that be a fair way to block out the dinnertime for

15:28:39 15 Mrs. Orr?

15:28:40 16 A.  Yes.

15:28:40 17 Q.  Fair enough?

15:28:41 18 A.  Yes.

15:28:41 19 Q.  Now, so this would be 4/24, right?

15:28:52 20 A.  Yes.

15:28:53 21 Q.  We know if she was taking it as directed, then on April 23rd,

15:29:01 22 she would have taken her medication between 6:00 and 8:00 P.M.,

15:29:06 23 right?

15:29:06 24 A.  Correct.

15:29:07 25 Q.  Now, in terms of -- why don't you tell me generally about what

15:29:13 1   you know in terms of on a daily basis after the drug is taken, how

15:29:19 2   does it build up in the system during -- over time from when you

15:29:22 3   take it over the 24-hour period until you take it again?

15:29:27 4   A.  So the half-life, the peak concentration tends to be at the

15:29:38 5   48-hour mark, yeah.

15:29:40 6   Q.  So the real question that was being faced by Dr. Bui and his

15:29:44 7   team was at 1:15 A.M., had she taken it during the 6 to 8 o'clock

15:29:53 8   hour, right?

15:29:54 9   A.  Correct.

15:29:54 10  Q.  And what happened in the interim here was on April 24th at

15:30:00 11  11:20, she has the PT, which is normal, right?

15:30:07 12  A.  Yes.

15:30:08 13  Q.  So if she has a normal PT.  What does that suggest to you,

15:30:18 14  based upon -- based upon everything you know about whether or not

15:30:23 15  she had taken the drug at 6:00 to 8:00 P.M. on the evening of

15:30:28 16  April 24th?

15:30:30 17  A.  Well, basically even -- even if the PT reagent used at that

15:30:37 18  time wasn't the most sensitive, and PT in general is -- there's

15:30:44 19  some -- there's some debate as to its sensitivity, that would

15:30:49 20  concede that it can pick up in this peak half-life.

15:30:54 21  Q.  Based upon everything that you've reviewed, is it true that if,

15:31:01 22  in fact, she had taken the drug between 6:00 and 8:00 P.M.,

15:31:04 23  regardless of the reagent used, that her PT would have been

15:31:08 24  elevated at 11:20 P.M.?

15:31:12 25  A.  Yes, in theory, uh-huh.

1147

15:31:13 1   Q.  That would then mean, would it not, that the last time she had

15:31:17 2   taken the dose was April 23rd between 6:00 and 8:00 P.M., fair

15:31:21 3   enough?

15:31:22 4   A.  Correct.

15:31:22 5   Q.  And so what that would mean, then, if the PT at 11:20 had ruled

15:31:29 6   out that she had taken it that night, then that means that she was

15:31:33 7   nearly -- that would be 24, plus -- 29 or 30 hours since she had

15:31:39 8   taken it last time, correct?

15:31:40 9   A.  Correct.

15:31:41 10  Q.  And the Xarelto label essentially says that if you can wait

15:31:46 11  24 hours for surgery to do that, right?

15:31:48 12  A.  Correct.

15:31:51 13  Q.  So what they would know then, based upon the normal PT at 11:20

15:31:55 14  as being, as you said, at cold normal, it suggests that she had not

15:32:02 15  taken the drug for over 24 hours; and, therefore, even pursuant to

15:32:06 16  the drug's label of asking or directing physicians to wait

15:32:10 17  24 hours, she would be absolutely able to undergo surgery; is that

15:32:14 18  true?

15:32:15 19  A.  Correct.  Yep.

15:32:16 20  Q.  That outline and the way that you're talking about PT

15:32:20 21  specifically in Sharyn Orr's case, are you talking about using PT

15:32:26 22  as a test to screen whether the patient at issue, who can't speak

15:32:31 23  for herself -- whether she had or had not taken drug in the

15:32:36 24  recent -- close in time to when she presents?

15:32:39 25  A.  It would have ruled it out, essentially.

15:32:41  1   Q.  And do you based upon the materials, literature that you've

15:32:45  2   reviewed and what you've read that that would be true regardless of

15:32:48  3   whether the reagent is Neoplastin or Innovin or something else?

15:33:02  4   A.  I understand that the -- there are some limitations with any of

15:33:06  5   them, but they're minimized at peak concentrations.

15:33:11  6   Q.  Is it fair to say then that using -- pursuant to your opinions

15:33:14  7   in this case is that using the PT to rule out whether the patient

15:33:17  8   is at peak to determine whether they can undergo surgery makes

15:33:21  9   perfect sense and is consistent with everything that you've read on

15:33:25 10   PT and Xarelto?

15:33:26 11   A.  Yes.

15:33:26 12   Q.  And so any conversation that was had during your

15:33:32 13   cross-examination about whether or not PT is accurate to pick up

15:33:38 14   smaller, lower drug levels at trough, does that really have

15:33:42 15   anything to do with this analysis that you've been talking about

15:33:45 16   for Mrs. Orr?

15:33:47 17          MS. WILKINSON:  Objection.  Leading.

15:33:48 18          THE COURT:  Restate it.

15:33:49 19          MR. HONNOLD:  Sure.

15:33:49 20          THE WITNESS:  Not really --

15:33:51 21          THE COURT:  Just a moment.

15:33:52 22   BY MR. HONNOLD:

15:33:53 23   Q.  Doctor, do you have a view as to whether the questioning that

15:33:55 24   you went under on the issue of PT and trough levels -- does that --

15:34:00 25   did that questioning, to you, have pertinence on that issue?

15:34:04  1   A.  No.  For the answer that a neurosurgeon is looking for in an

15:34:08  2   emergent situation, I don't feel that it did.

15:34:10  3   Q.  Doctor, amongst -- and we're going to play this deposition in

15:34:22  4   greater sections, but you mentioned that you did look at the -- in

15:34:26  5   your materials reviewed a witness by the name of Scott Berkowitz?

15:34:31  6   A.  Yes.

15:34:32  7   Q.  Is that right?

15:34:32  8   A.  Yes.

15:34:33  9   Q.  Now, what I want to you to do is I want you to listen to my

15:34:36  10  question very, very careful.  Okay.  I am going to hand you what

15:34:39  11  has been marked as Plaintiff's Exhibit 100 and -- or what will be

15:34:45  12  marked as Plaintiff's Exhibit 127.

15:34:59  13          And you did review Dr. Berkowitz's deposition as part of

15:35:03  14  your work on this case?

15:35:04  15  A.  Yes.

15:35:05  16  Q.  Now, what I want you to do is simply read the sections on the

15:35:11  17  pages -- it's a very short snippet.  I want you to read this, and

15:35:15  18  just tell us when you've had a chance to read it.

15:35:19  19  A.  Okay.

15:35:21  20          MR. HONNOLD:  And I have copies for counsel and your

15:35:24  21  Honor as well, 127.

15:35:34  22          I guess this is just for instruction, and he is reviewing

15:35:37  23  the materials and looking at materials that he's reviewed as part

15:35:40  24  of his work on the case.

15:35:51  25          THE WITNESS:  (WITNESS REVIEWS DOCUMENT.)  Yes.  This is

15:36:29  1   what I remembered seeing.

15:36:29  2   BY MR. HONNOLD:

15:36:30  3   Q.  So you've had a chance to confirm that this is something that

15:36:34  4   you looked at in terms of your work on the case, right?

15:36:36  5   A.  Yes, yes.

15:36:37  6   Q.  It's your understanding that Dr. Berkowitz is a hematologist?

15:36:41  7   A.  That's what I understand.

15:36:42  8   Q.  And that he is employed by one of the defendants in this case,

15:36:45  9   Bayer, you know that?

15:36:46 10   A.  Yes.

15:36:47 11   Q.  Now, based upon what you've read here -- I want you to listen

15:36:52 12   to my questions very, very carefully.  Is the information that

15:36:58 13   Dr. Berkowitz give in his answers to questions of counsel -- do you

15:37:01 14   have a view as to whether they are completely supportive of your

15:37:06 15   opinion in this case?

15:37:08 16        MS. WILKINSON:  Your Honor, I am just going to object

15:37:10 17   because it's only a portion of the deposition and not the other

15:37:14 18   portion he showed.

15:37:16 19        THE COURT:  Restate it.

15:37:16 20   BY MR. HONNOLD:

15:37:16 21   Q.  At least this portion that you've read, do you believe that it

15:37:19 22   does tend to lend some support to the opinions you've given in this

15:37:24 23   case?  And we are going to view this videotaped deposition of

15:37:28 24   Dr. Berkowitz.

15:37:29 25        But my question for you is what I've handed you here,

| | |
|---|---|
| 15:37:31 1 | this portion, is it supportive of your opinion? |
| 15:37:34 2 | A.  It is supportive of my opinion. |
| 15:37:36 3 | Q.  Thank you. |
| 15:38:00 4 | Doctor, I am going to hand you what we are going to have |
| 15:38:03 5 | marked as -- I am going to refer to as Plaintiff Exhibit 128.  It |
| 15:38:10 6 | will be demonstrative. |
| 15:38:24 7 | And, Doctor, if you would look at the front of this |
| 15:38:27 8 | document, could you just explain what it is? |
| 15:38:29 9 | A.  Yes.  This looks like the Pradaxa package insert. |
| 15:38:34 10 | Q.  And, Doctor, there's been a lot of questions about different |
| 15:38:39 11 | NOACs -- |
| 15:38:39 12 | MS. WILKINSON:  Your Honor -- I'm sorry.  Go ahead. |
| 15:38:42 13 | BY MR. HONNOLD: |
| 15:38:42 14 | Q.  There's been questions about Eliquis and Pradaxa and warfarin |
| 15:38:45 15 | and a number of things.  Do you recall that? |
| 15:38:47 16 | A.  Yes. |
| 15:38:47 17 | Q.  And so -- |
| 15:38:49 18 | MS. WILKINSON:  Your Honor, I am going to object to the |
| 15:38:52 19 | questions about the Pradaxa label.  He said he isn't familiar with |
| 15:38:56 20 | it and hadn't read it. |
| 15:38:58 21 | MR. HONNOLD:  I just want to point out certain |
| 15:39:00 22 | information that's within this label -- |
| 15:39:02 23 | THE COURT:  He hadn't read it. |
| 15:39:02 24 | MR. HONNOLD:  Okay. |
| 15:39:06 25 | THE COURT:  That's the wrong witness to talk with about |

15:39:09  1    it.

15:39:09  2                    Have you read this before, the Pradaxa label?

15:39:11  3                    THE WITNESS:  No.  This is the first time I've seen it.

15:39:13  4                    THE COURT:  Okay.

15:39:14  5    BY MR. HONNOLD:

15:39:15  6    Q.  Very well.  You did take a look at, did you not -- you

15:39:21  7    mentioned American Heart Association scientific statement on

15:39:24  8    patients on oral anticoagulants?

15:39:29  9    A.  Yes.

15:39:29  10   Q.  And this is something that you have reviewed; is that right?

15:39:46  11   A.  Yes.

15:39:47  12   Q.  And I want to refer you to what is page 608.

15:40:00  13   A.  Okay.

15:40:00  14   Q.  And I want to point out the table -- well, first, let's talk

15:40:07  15   about this document.  American Heart Association, are they, to your

15:40:14  16   knowledge, a legitimate recognized medical society that does a

15:40:19  17   great deal of research into heart disease in the United States?

15:40:22  18   A.  Yes.

15:40:22  19   Q.  And do they sponsor their own journal called Circulation?

15:40:28  20   A.  Yes.

15:40:28  21   Q.  And American Heart Association, so this is American

15:40:33  22   information, right?

15:40:33  23   A.  Correct.

15:40:34  24   Q.  And is this something that you did, in fact, look at at some

15:40:37  25   point in your work on this case?

15:40:39  1    A.  Yes.

15:40:40  2    Q.  And the American Heart Association, then, in its scientific

15:40:44  3    statement that's dated -- published in Circulation in March of this

15:40:50  4    year says -- in this upper table that if you want to do

15:40:56  5    rivaroxaban -- if you wanted to detect the presence of the drug,

15:41:00  6    what tests can or should be done?

15:41:03  7    A.  It mentioned PT.  It also mentioned PTT and the anti-factor Xa.

15:41:14  8    Q.  Here the American Heart Association is saying in a table in a

15:41:17  9    journal, in its official journal that, if a physician is concerned

15:41:20 10    about assessing or trying to detect the presence of rivaroxaban,

15:41:25 11    the American Heart Association says what you can do is use the PT;

15:41:30 12    and if you look here, PT stands for prothrombin time, right?

15:41:34 13    A.  Yes.

15:41:34 14    Q.  To be fair, I want to point out the information that's in the

15:41:46 15    lower right-hand corner.  And do you see the highlighted

15:41:51 16    information immediately under the section, it says, "rivaroxaban,

15:41:54 17    apixaban, and edoxaban."  Do you see that?

15:41:57 18    A.  Yes.

15:41:57 19    Q.  Now, it says, "Prothrombin time is less sensitive especially

15:42:05 20    for apixaban, and a normal prothrombin time may not exclude

15:42:09 21    clinically relevant levels."

15:42:14 22           But down below it says, "In summary, although routine

15:42:18 23    NOAC monitoring is unnecessary, measurement of NOAC effects may

15:42:22 24    assist clinical management in certain acute care and periprocedural

15:42:27 25    settings."  Do you see that?

15:42:28  1    A.  Yes.

15:42:29  2    Q.  And so does measurement of NOAC effect mean doing a test?

15:42:34  3    A.  Yes.

15:42:35  4    Q.  And where it says, "may assist clinical management in certain

15:42:39  5    acute care," let's say -- let's focus on acute care situations,

15:42:44  6    that's certainly Mrs. Orr, is it not?

15:42:46  7    A.  Yes.

15:42:46  8    Q.  And "to assist with management of the periprocedural settings,"

15:42:50  9    she was in that setting as well; meaning, the consideration of

15:42:53 10    whether or not she could have an operation?

15:42:55 11    A.  Correct.

15:42:55 12    Q.  And so if you read that and then go up to "How to Measure

15:43:01 13    Effect," is it true that the American Heart Association in March of

15:43:05 14    this year is saying to detect presentation of the drug for

15:43:09 15    rivaroxaban do the PT?

15:43:11 16    A.  Yes.

15:43:12 17    Q.  Do you believe the American Heart Association to be

15:43:19 18    trustworthy, reliable, and generally authoritative?

15:43:22 19    A.  Yes.

15:43:22 20    Q.  Doctor, I want to hand you another document, which I'll

15:43:39 21    introduce or identify in a moment.  It's from the American Society

15:43:56 22    of Hematology.  If you look at -- and I'll just put this here -- we

15:44:03 23    can see the title, "Clinical Practice Guide on Antithrombotic Drug

15:44:08 24    Dosing and Management of Antithrombotic Drug-associated Bleeding

15:44:12 25    Complications in Adults," February 2014.  And this is specifically

15:44:23  1    a publication of the American Society of Hematology.

15:44:27  2            You're not a hematologist, but do you have some belief

15:44:30  3    that they would be a reputable, trustworthy, and reliable

15:44:33  4    organization?

15:44:34  5    A.  Yeah, it would seem.

15:44:36  6    Q.  Now, one thing I want to point out to you.  If you look here

15:44:41  7    where it says, "Presented by the American Society of Hematology,"

15:44:45  8    it says "Adapted in part from the American College of Chest

15:44:50  9    Physicians Evidence-Based Clinical Practice Guideline on

15:44:55 10    Antithrombotic and Thrombolytic Therapy."  Do you see that?

15:44:59 11    A.  Yes.

15:44:59 12    Q.  Are you generally familiar with the group of physicians in this

15:45:02 13    country Chest Physicians that have written significantly on

15:45:07 14    anticoagulation?

15:45:08 15    A.  Just superficially.

15:45:09 16    Q.  You certainly seen references to the chest guidelines, right?

15:45:12 17    A.  Yes, yes.

15:45:13 18    Q.  Based upon the title does, it appear that the Chest Physicians

15:45:17 19    Guidelines are evidence-based --

15:45:19 20    A.  Yes.

15:45:19 21    Q.  -- for clinical practice?

15:45:20 22    A.  Yes, based on that.

15:45:22 23    Q.  Now, this was a document that you said you reviewed and relied

15:45:27 24    on, correct?

15:45:27 25    A.  Yes.

15:45:28  1   Q.  Now, it says, "Commonly available tests to assess for presence

15:45:46  2   of dabigatran are the APTT and for the rivaroxaban PT."  Do you see

15:45:52  3   that?

15:45:52  4   A.  Yes, sir.

15:45:53  5   Q.  And it says, "These tests may be prolonged when dabigatran and

15:45:59  6   rivaroxaban are used at recommended doses but they do not reliably

15:46:03  7   measure the anticoagulant activity."

15:46:07  8            So that statement there, as your view that, does it -- is

15:46:11  9   your view that it does suggest that PT would at least be reliable

15:46:15  10  enough to determine a normal PT whether that determines that the

15:46:19  11  patient has not recently just within the past few hours taken the

15:46:24  12  drug?

15:46:25  13  A.  At their the peak dose, yes.

15:46:28  14  Q.  Doctor, as -- in terms of your work on this case, did

15:46:44  15  counsel -- myself and others on behalf of the plaintiffs, provide

15:46:48  16  you with this document?

15:46:51  17            Let me hand it out.

15:47:06  18            MR. HONNOLD:  Did I give somebody my highlighted version?

15:47:10  19  You better fess up.  Here it is.

15:47:17  20  BY MR. HONNOLD:

15:47:17  21  Q.  Doctor, this is a document that is a paper called "Xarelto

15:47:24  22  Coagulation Monitoring."  Do you see that?

15:47:27  23  A.  Yes.

15:47:34  24  Q.  Did we give it to you as part of your work on this case?

15:47:37  25  A.  I believe so, yes.

15:47:38  1    Q.  Did we represent to you that this was, in fact, an internal

15:47:43  2    document medical literature summary that had been prepared by one

15:47:48  3    of the defendants in this case?

15:47:50  4    A.  That's how it was presented, yes.

15:47:52  5    Q.  And is it something that you took into account and relied upon

15:47:56  6    in forming your opinions in this case?

15:47:58  7    A.  Yes.

15:47:59  8    Q.  If you look at this --

15:48:03  9           MS. WILKINSON:  Your Honor, I don't mind him asking about

15:48:06 10    it but I am going to object to showing it because it's not in

15:48:09 11    evidence.  This is not sponsored by this witness.

15:48:13 12           THE COURT:  That's right, this is not a medical article

15:48:16 13    or anything.  It's a document.

15:48:18 14           MR. HONNOLD:  It's been something that he's relied upon

15:48:22 15    to inform his opinions.

15:48:23 16           MS. WILKINSON:  Your Honor, can I ask him to take it down

15:48:26 17    while he is having the discussion?

15:48:28 18           THE COURT:  It has to be put it in evidence if that's

15:48:32 19    what it is, to show the jury.  It's not an article.  An article

15:48:36 20    doesn't have to be in evidence.  It cannot be in evidence.  But

15:48:40 21    this is a document that -- what you represented for.

15:48:49 22           MR. HONNOLD:  Your Honor, I'd just go ahead and offer

15:48:50 23    this for admission into evidence.  It is a document prepared by

15:48:53 24    Janssen that outlines coagulation monitoring information that was

15:48:58 25    undertaken by the company and made available to individuals who

15:49:01  1    asked for it.

15:49:02  2         MS. WILKINSON:  Your Honor, I am going to object to the

15:49:04  3    testimony.  There's not a witness sponsoring either of those goals,

15:49:08  4    and your Honor needed a witness to sponsor the document.

15:49:22  5         And, your Honor, I am not going to have the opportunity

15:49:24  6    because it's coming in on redirect to ask any questions about it.

15:49:27  7         THE COURT:  Well, I may allow you to do that.

15:49:32  8         MS. WILKINSON:  I would still object to its admission.

15:49:36  9    BY MR. HONNOLD:

15:49:37  10   Q.  Dr. Liechty, is it your belief that if rivaroxaban plasma

15:49:41  11   concentration is necessary to be measured that the PT has been

15:49:46  12   reported to be the appropriate coagulation test to use?

15:49:50  13   A.  Yes, especially with -- especially with Neoplastin reagent.

15:50:03  14   Q.  And is it your understanding that more than 12 hours after

15:50:08  15   administration of Xarelto that the PT measurement for Xarelto will

15:50:12  16   return to normal?

15:50:14  17   A.  Yes.

15:50:15  18   Q.  And is it your understanding then as a result of that that if a

15:50:20  19   patient has a normal PT then they have not taken Xarelto for at

15:50:24  20   least 12 hours?

15:50:25  21   A.  Yes.

15:50:26  22   Q.  And what that would do in Mrs. Orr's case, it would exclude,

15:50:31  23   would it not, her taking the Xarelto medicine on the evening of

15:50:36  24   April 24th?

15:50:37  25   A.  Yes.

15:50:37  1    Q.  Doctor, have you -- as part of the work that you've done as a

15:51:03  2    consultant for us in this case, have you gone to onto the web site

15:51:10  3    for Xarelto and tried to find out whether there was any information

15:51:14  4    there that related to this issue of the usefulness or helpfulness

15:51:17  5    of the PT?

15:51:19  6    A.  Yes.

15:51:20  7    Q.  And can you describe to the jury the process that you had to go

15:51:26  8    through in an attempt to find whether the defendants that sponsor

15:51:32  9    the web site knew anything and had posted any information about PT

15:51:36  10   being useful?  Describe to them what you went through to find

15:51:41  11   anything.

15:51:41  12          MS. WILKINSON:  Your Honor, just object to beyond the

15:51:44  13   scope of cross.

15:51:45  14          THE COURT:  Well, you know, it's not necessarily beyond

15:51:47  15   the scope.  You've made a lot on your cross as to whether or not

15:51:55  16   he's did enough research.  This is applicable to that, I feel.  You

15:52:03  17   made a large part of your cross on that.  So I overrule that

15:52:07  18   objection.

15:52:07  19          Let's go, Counselor.  I overrule the objection.

15:52:14  20          MR. HONNOLD:  Okay.  Thank you, your Honor.

15:52:14  21   BY MR. HONNOLD:

15:52:16  22   Q.  Can you -- seriously, explain to the jury what you had to go

15:52:20  23   through as a trained, board certified neurosurgeon to try to find

15:52:26  24   out whether the defendants had any information about whether PT was

15:52:31  25   useful or helpful on its web site.

OFFICIAL TRANSCRIPT

15:52:34  1  A.  Yeah.  So basically the -- there was a link on the far right

15:52:39  2  side that got to -- it was, like, a resources section, but it was

15:52:45  3  really kind of buried and difficult to find.

15:52:48  4         But when I finally got in there, I was able to -- I had

15:52:54  5  to put my -- I had to register for the web site to search, put

15:52:59  6  physician information in, that type of thing.  And then I had to

15:53:04  7  search for PT basically in the web site.  And then I did, I was

15:53:10  8  able to find the article.  But it certainly wasn't intuitive from

15:53:17  9  the initial site and it's --

15:53:20 10  Q.  Would you have been able to find it in 24 hours --

15:53:24 11         THE COURT:  I sustain the objection.  That's speculative.

15:53:29 12  BY MR. HONNOLD:

15:53:29 13  Q.  Doctor, let me ask you:  To your knowledge -- or what is your

15:53:36 14  belief as to where would it be helpful in a product label to have

15:53:41 15  information about whether certain tests could be done to determine

15:53:44 16  whether a patient was a good or appropriate candidate for

15:53:47 17  surgery -- what part --

15:53:49 18         THE COURT:  Wait just a moment.  Go ahead.

15:53:50 19         MS. WILKINSON:  Your Honor, I am going to object.  He is

15:53:52 20  not a labeling expert.  He said he didn't read the label

15:53:56 21  beforehand.

15:53:56 22         THE COURT:  I sustain that objection.

15:53:59 23         MR. HONNOLD:  I thought she had shown him the label, your

15:54:03 24  Honor, and kind of opened the door to that.

15:54:06 25         THE WITNESS:  She did.  She showed it.

15:54:11  1          MR. HONNOLD:  And this will be the last -- this will be

15:54:14  2   it.  I guarantee it.

15:54:17  3          THE COURT:  Let me hear the question.

15:54:19  4          MR. HONNOLD:  Puts a little pressure on me.

15:54:20  5          THE COURT:  Okay.  Go ahead.

15:54:22  6   BY MR. HONNOLD:

15:54:22  7   Q.  What is your view as to what is the best place in a label if

15:54:25  8   there's going to be information on a test to be used to determine

15:54:28  9   whether a patient's a good candidate for surgery?

15:54:31  10         THE COURT:  Let's reframe that question.  What does he

15:54:34  11  look at?

15:54:35  12  BY MR. HONNOLD:

15:54:35  13  Q.  What would you look at in the label to find information on the

15:54:39  14  utility of the laboratory tests?  Where in the label?

15:54:42  15         MS. WILKINSON:  Objection.  Foundation.  He doesn't

15:54:44  16  prescribe this medication.  He doesn't look at the label, and he

15:54:47  17  doesn't make those decisions with any anticoagulants.

15:54:53  18         THE COURT:  It's a legitimate objection.

15:54:55  19         MR. HONNOLD:  Correct.  But we talked about how

15:54:58  20  neurosurgeons come across these patients all the time and might

15:55:00  21  need to find out this information.

15:55:02  22         THE COURT:  Do you prescribe any medications to patients?

15:55:06  23         THE WITNESS:  I prescribe other medications, but I have

15:55:07  24  to make decisions -- surgical decisions based on anticoagulation

15:55:13  25  status all the time.

15:55:13  1        THE COURT:  All right.

15:55:16  2        THE WITNESS:  Basically I would go to an emergency

15:55:21  3  section or a surgical urgency section or some heading that said --

15:55:28  4  that said what if type thing.

15:55:31  5        MS. WILKINSON:  Your Honor --

15:55:31  6  BY MR. HONNOLD:

15:55:32  7  Q.  Is that where you would expect that information to be --

15:55:33  8        THE COURT:  Wait.  Just a moment.

15:55:33  9        MS. WILKINSON:  Your Honor, I am going to move to strike.

15:55:35 10  There are rules on what sections, how they're titled.  He doesn't

15:55:38 11  even know those.  It's not appropriate testimony from him since he

15:55:42 12  doesn't know this class of drugs and their labels.

15:55:45 13        THE COURT:  He testified that he looks -- that before he

15:55:50 14  does an operation, he does look -- he does have to determine

15:55:53 15  whether or not the person is under a blood thinner.  And while he

15:55:59 16  doesn't prescribe the medication, it plays a part in whether or not

15:56:05 17  he decides to operate or not.  That's what I am hearing anyway.

15:56:08 18        MS. WILKINSON:  Yes, your Honor.  The only thing I would

15:56:11 19  ask is that he never said he looked at Xarelto label before he

15:56:15 20  became an expert.  So he's done all of those surgeries beforehand,

15:56:17 21  and he's never looked at the label.  So how would he know where to

15:56:21 22  look?

15:56:24 23        THE COURT:  What's your answer to that?

15:56:28 24        MR. HONNOLD:  I am just trying to establish where would

15:56:31 25  he, as a neurosurgeon, expect the information regarding surgery and

15:56:34  1   interventions and laboratory tests to be in the label so that

15:56:39  2   individuals in the neurosurgical community like him could become

15:56:42  3   aware of it.

15:56:43  4           THE COURT:  That's the question.  I'll overrule the

15:56:46  5   objection on that question.

15:56:48  6           THE WITNESS:  In a heading entitled "Emergency

15:56:51  7   Situations" or something along those lines.  Or "Urgent

15:56:56  8   Interventions" or something like that.

15:56:58  9           MR. HONNOLD:  Thank you very much, Doctor.  I don't have

15:57:00  10  any other questions for you.  Thank you.

15:57:02  11          THE COURT:  Okay.  You're excused, Doctor.

15:57:04  12          THE WITNESS:  All right.  Thank you.

15:57:13  13          THE COURT:  Let's call your next witness.

15:57:16  14          MR. BIRCHFIELD:  Your Honor, at this time we present the

15:57:19  15  video-taped deposition of Dr. Scott Berkowitz, taken on October the

15:57:23  16  19th and 20th of 2016 in New York City.

15:57:26  17          Since 2007, Dr. Berkowitz has been vice president of

15:57:30  18  Bayer HealthCare Pharmaceuticals and head of the thrombosis group

15:57:35  19  for clinical research and development within the cardiovascular

15:57:37  20  therapeutic area.

15:57:38  21          The deposition starts with questioning by an attorney for

15:57:41  22  the Orr family and followed by questioning by an attorney for the

15:57:44  23  defendants and then a follow-up series from each side.

15:57:49  24          THE COURT:  Would y'all like to -- to stand up?  Before

15:57:52  25  we do this one, let's stand up, then.  Do you need to take a break?

15:58:15 1   We'll take a five-minute break.

15:58:17 2        (WHEREUPON, A RECESS WAS TAKEN.)

16:10:00 3             THE DEPUTY CLERK:  All rise.

16:10:01 4             THE COURT:  Bring them in, Marshal.

16:10:25 5        (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

16:10:25 6             THE COURT:  Be seated, please.  Okay.  Members of the

16:10:28 7   jury, this is the last witness for today.  It's probably the

16:10:31 8   hardest one at this time of day watching television, but we'll play

16:10:36 9   it.  Let's do it.

10        (WHEREUPON, THE VIDEO DEPOSITION OF SCOTT D. BERKOWITZ WAS

11        PLAYED AS FOLLOWS:)

12   EXAMINATION:

13   Q.  Sir, could I get you to state your name and full title for the

14   record.

16:10:47 15   A.  Scott Darrell Berkowitz.  I'm a vice president at Bayer

16:10:51 16   Pharmaceutical.  I oversee the group called thrombosis group in

16:10:54 17   development.

16:10:56 18   Q.  Okay.  And you've held that title for how long?

16:10:58 19   A.  Since 2007.

16:11:00 20   Q.  Just from a 30,000-foot view, can you give me a thumbnail

16:11:06 21   sketch of your work in Xarelto?

16:11:08 22   A.  Well, I joined the company in 2006 as a -- in a position that

16:11:14 23   we call global clinical leader.  This is, in essence, a physician

16:11:18 24   who oversees either an indication of a drug and provides strategy

16:11:25 25   as well as operation expertise for the team.

16:11:29  1   Q.  So you came in in 2006?

16:11:32  2   A.  Six.

16:11:33  3   Q.  So that was roughly between the time of Phase II and Phase III?

16:11:37  4   A.  Correct.

16:11:38  5   Q.  So you had more involvement in Phase III obviously than you did

16:11:42  6   in Phase II?

16:11:43  7   A.  Correct.

16:11:43  8   Q.  I've handed you Exhibit 12.  Is this your PowerPoint

16:11:50  9   presentation that you gave at the CSRC symposium?

16:11:56  10  A.  It appears to be.

16:11:57  11  Q.  And this is a PowerPoint you put together for a symposium that

16:12:02  12  was entitled "Is There a Role for Pharmacokinetic/Pharmacodynamics

16:12:09  13  Dosing for Novel Anticoagulants," right?

16:12:11  14  A.  Yes, that's part of the second session on precision dosing.

16:12:15  15  Q.  And yours is:  "Counterpoint PK Dosing Strategy is Impractical

16:12:19  16  and May Not Add Value," right?

16:12:21  17  A.  Correct.

16:12:21  18  Q.  And Mr. Temple gave the point to the counterpoint?

16:12:27  19  A.  Dr. Temple.

16:12:29  20  Q.  And then you list "When is it Valuable to Measure," correct?

16:12:34  21  A.  Yes.

16:12:34  22  Q.  You say, "When we need to know drug levels, PK, or coagulation

16:12:39  23  effect, PD," correct?

16:12:41  24  A.  Yes.

16:12:42  25  Q.  And with Xarelto, the main coagulation effect you were looking

16:12:46  1   at is PT, correct?

16:12:47  2   A.  Well, PT is not a very good measure.  It's the best of the

16:12:50  3   routine tests that are available in hospitals, but even then, it's

16:12:53  4   not good because not all hospitals use the same thromboplastin

16:13:02  5   reagent.

16:13:02  6   Q.  Well, in your clinical trials, the decision was made that PT is

16:13:07  7   good enough to serve as a PK surrogate, correct?

16:13:07  8   A.  It matches depending on the timing with the concentration, but

16:13:11  9   it's not what you would use in practice to take care of patients.

16:13:16  10  Q.  It's linear --

16:13:16  11  A.  When tested, as you said.

16:13:18  12  Q.  It's linear correlated to -- PT has a linear correlation to the

16:13:23  13  blood plasma concentration of Xarelto, correct?

16:13:26  14  A.  Depending on the time that it's taken.

16:13:27  15  Q.  And also the reagent used?

16:13:30  16  A.  Definitely the reagent.  Plus there are some that are --

16:13:34  17  there's one in particular that's very sensitive.  There are others

16:13:38  18  that are sensitive; some that are insensitive.

16:13:40  19  Q.  So let's talk about that for a second.

16:13:42  20  A.  Sure.

16:13:43  21  Q.  As I understand it, the one that's really sensitive is

16:13:46  22  Neoplastin?

16:13:47  23  A.  Well, we've tested a few, I don't know exactly how many, six or

16:13:50  24  so.  But there are a number more.  But of the ones that were tested

16:13:54  25  and used in the clinical trials that were easier to obtain, there

16:13:58  1    is the Neoplastin Plus that was used, and that seemed to match the

16:14:04  2    best.

16:14:04  3    Q.  So Neoplastin Plus, in your view, is the best match for the

16:14:08  4    reagent, correct?

16:14:08  5    A.  Of the few reagents that were tested.  You have to member these

16:14:13  6    agents are designed to test warfarin, they were refined over years

16:14:16  7    to test warfarin.  So not for rivaroxaban or any of the NOACs,

16:14:20  8    they're not for that purpose.

16:14:21  9    Q.  Okay.  In your clinical trials, you used PT Neoplastin as a

16:14:29  10   surrogate rather than taking actual PK samples and getting more

16:14:34  11   plasma concentration, correct?

16:14:35  12   A.  That's not correct --

16:14:36  13   Q.  I'm sorry, in your Phase III -- in ROCKET.

16:14:38  14   A.  In Phase III.  We usually do our PK work in our Phase II

16:14:43  15   because that's where you can -- you really have better control of

16:14:46  16   the sampling and stuff, so it's more accurate.  Very difficult to

16:14:49  17   do in Phase III.  So we did do PT testing to have something to

16:14:54  18   match up with, but that wasn't to try to show whether it would be

16:14:58  19   of value or not.

16:14:59  20   Q.  So you go on and you list several bullet points on when you may

16:15:06  21   need to know drug levels and coagulation levels under the "When is

16:15:11  22   it Valuable to Measure?"

16:15:13  23   A.  When it is valuable.

16:15:14  24   Q.  And you list "Assess adherence," right?

16:15:17  25   A.  Could be used there.  If there's no drug on board, then you're

16:15:20  1    going to be suspicious.

16:15:22  2    Q.  Right.

16:15:22  3    A.  Not taking the medication.

16:15:25  4    Q.  Or they could just be at trough, right?

16:15:26  5    A.  Well, it depends on the sensitivity.  If you did a PT at

16:15:29  6    trough, you might not be able to detect it because it's insensitive

16:15:32  7    down there.

16:15:33  8    Q.  "Detect overdose"?

16:15:34  9    A.  If you thought someone took an overdose and you thought it

16:15:38  10   might be a high level, you could use it for that.

16:15:41  11   Q.  Do you know as you sit here today what a high-level PT would be

16:15:46  12   to tell somebody whether or not they were overdosed on rivaroxaban?

16:15:50  13   A.  We don't have a level, and we have the issue with the PT that

16:15:55  14   in different labs, they have different ranges.  I mean, they're not

16:15:59  15   markedly different, but they are different.  So there's no cutoff

16:16:02  16   that we're aware.

16:16:03  17   Q.  Are you aware of a blood plasma concentration that would

16:16:08  18   indicate overdose?

16:16:09  19   A.  No, I'm not.

16:16:10  20   Q.  So even though you're saying when is it valuable to measure and

16:16:16  21   one of those things is to detect overdose, you have no information

16:16:20  22   you can provide the doctor as to what -- what an overdose is,

16:16:25  23   correct?

16:16:25  24   A.  Well, I guess it depends on how you term overdose.  Overdose

16:16:30  25   meaning people take too much medicine, maybe a suicide attempt or

16:16:34 1  something like that.  That's what I meant by "overdose."

16:16:36 2  Q.  But you still have to have -- if you're going to test, if

16:16:39 3  you're going to measure, that measurement has to mean something,

16:16:42 4  right?

16:16:43 5  A.  Absolutely.

16:16:43 6  Q.  And if you've given doctors no data as to what that measurement

16:16:48 7  means, how is the doctor going to do anything with this test?  What

16:16:55 8  is he going to look to that tells him this patient's overdosed?

16:17:01 9  A.  Well, I think we have to understand that the PT is just a

16:17:04 10 semi-quantitative data measure.  It's a high or low, on board or

16:17:07 11 not, maybe higher than you might expect.  We have ranges in some of

16:17:12 12 the pharmacology pages -- papers of what we've seen in trials.  So

16:17:16 13 something could be used, but I don't know of a, you know,

16:17:19 14 across-the-board level that if it's above that, then that's a

16:17:22 15 problem.  I mean, any of us could guess by looking at those numbers

16:17:27 16 that something much higher than that, of course, would be.  I think

16:17:30 17 doctors can understand that.

16:17:31 18 Q.  Well, we'll come back to that.  You also have "Evaluate

16:17:36 19 potential drug interactions," right?

16:17:39 20 A.  These are just -- these are general for all drugs.

16:17:41 21 Q.  Right.

16:17:42 22 A.  Yes.

16:17:43 23 Q.  "Disease of the metabolizing organs," right?

16:17:46 24 A.  Sure.

16:17:47 25 Q.  "Planned timing of urgent surgery," correct?

16:17:49  1    A.  That's a convenient thing of wanting to know if there's drug on

16:17:54  2    board before you do a procedure.

16:17:55  3    Q.  It would certainly be beneficial to a doctor in that situation

16:17:59  4    to be told, run a PT, find out what their drug level is, and then

16:18:05  5    you know whether or not there's drug on board and whether or not

16:18:07  6    you can proceed to surgery or if you have to wait 24 hours,

16:18:10  7    correct?

16:18:10  8    A.  No.  I'm sorry.  I have to disagree.  I mean, if the

16:18:14  9    prothrombin time is prolonged, it's possible that there's drug on

16:18:18  10   board.  There could be other reasons there's drug on board.  If

16:18:22  11   you're looking for a magic number for when to go into surgery, that

16:18:25  12   doesn't insist.  But you have drug on board, and that's what

16:18:27  13   doctors need to know.

16:18:29  14        I mean, it's not okay to have a level of, say, 50 or a

16:18:32  15   hundred, but not okay to do surgery at some other number.  It's on

16:18:37  16   board or not, and then you have to understand the possibility of

16:18:40  17   when they took the drug what the metabolism might be.  If it's

16:18:44  18   urgent surgery, you just have to go.

16:18:46  19   Q.  So you think they just need to ignore the warning?

16:18:50  20   A.  No one is saying to ignore the warning.  And I'm not saying

16:18:52  21   that.  I'm just simply saying when you're faced with that

16:18:55  22   situation, then having just some number come back and tell you

16:18:58  23   that's not the whole story.  You have to know the whole patient,

16:19:01  24   you have to know the drugs they're taking and the ones they're

16:19:04  25   concerned about.

16:19:04  1   Q.  So the indications in which you're giving 20 milligrams once a
16:19:08  2   day, okay --
16:19:09  3   A.  Okay.
16:19:09  4   Q.  -- it's your position that it is not valuable to monitor or
16:19:14  5   measure those patients, correct?
16:19:17  6   A.  In general, there's not a need to routinely monitor in those
16:19:22  7   patients.
16:19:22  8   Q.  When you say "in general," that means there could be situations
16:19:26  9   where it may be valuable to monitor those patients?  Are you
16:19:31 10   talking about purely the instances you listed on the page before
16:19:34 11   when you said "When is it valuable to measure?"
16:19:39 12   A.  This is a general statement that talks about monitor and
16:19:41 13   measure.  Remember that's what you mentioned.  And that's an
16:19:44 14   opportunity -- so's it's a conglomerate.  And we talked about just
16:19:49 15   very recently conditions where you might want to measure.  So
16:19:51 16   that's why I say it would depend.
16:19:54 17   Q.  Okay.  Let's go two pages over.  And you have -- it's page 12.
16:20:04 18   A.  Thank you.
16:20:05 19   Q.  "What we should do rather than monitor/measure a level."  Do
16:20:11 20   you see that?
16:20:12 21   A.  I do.
16:20:12 22   Q.  And you have "monitor the patient," right?
16:20:13 23   A.  Yes.
16:20:14 24   Q.  That's what we talked about this morning, correct?
16:20:16 25   A.  Yes.  We went over defining the terms.

16:20:19  1    Q.  Right.  The PowerPoint we just talked about was your position

16:20:24  2    on whether or not there is value in monitoring or measuring,

16:20:30  3    correct?

16:20:30  4    A.  It says in the document that it's the opinion of mine, not

16:20:36  5    necessarily the opinion of others in the company or outside.

16:20:38  6    Q.  The only position the company has put out that you know of is

16:20:43  7    the position on the label that says no routine monitoring is

16:20:47  8    necessary, right?

16:20:48  9    A.  Right.  That's the message to the physicians that they don't

16:20:52 10    need to be looking for some test to check every so often on

16:20:57 11    patients routinely.

16:20:58 12    Q.  Now, let's go to Exhibit 16, which is one of those attachments.

16:21:04 13    This is Plaintiff's 372322.  And do you see this is "Bayer

16:21:12 14    Healthcare AG Xarelto 15-milligram film-coated tablets and

16:21:17 15    20-milligram film-coated tablets response to list of questions,

16:21:21 16    clinical aspects"?  Do you see that?

16:21:22 17    A.  I do.

16:21:23 18    Q.  And it is specifically for the AFib indication, right?

16:21:26 19    A.  Correct.

16:21:26 20    Q.  And the author is listed as John Paolini and Dagmar Kubitza,

16:21:32 21    right?

16:21:32 22    A.  Yes.

16:21:33 23    Q.  Are they both Bayer employees?

16:21:35 24    A.  Yes.

16:21:36 25    Q.  It says, Question 17, "Monitoring of anticoagulate parameters

16:21:42  1    may be considered in situations of bleedings or perceived increased

16:21:45  2    bleeding risk.  More firm recommendations on how this can be

16:21:49  3    performed in clinical routine are requested to be implemented in

16:21:53  4    the SPC."

16:21:54  5          And your response is, "The applicant has investigated

16:21:59  6    several laboratory assays throughout the clinical development

16:22:02  7    program.  In order to assess the appropriateness of laboratory

16:22:06  8    assays.  Inhibition of Factor Xa, PT, aPTT, and HepTest were

16:22:13  9    measured in nearly all studies and correlations with plasma

16:22:17 10    concentrations were established.  Except for PT, the tests were not

16:22:20 11    considered to be suitable for the following pharmacodynamic effects

16:22:26 12    of rivaroxaban because of a curvilinear relationship or a low

16:22:34 13    sensitivity of the PK/PD relationship."

16:22:39 14          Did I read that right?

16:22:39 15    A.  Yes.

16:22:40 16    Q.  According to your response, PT was considered suitable for

16:22:44 17    following the pharmacodynamic effects of rivaroxaban, correct?

16:22:48 18    A.  Well, that's just a very small portion of the whole through

16:22:51 19    response.  So of the tests that are available, PT would be one more

16:22:55 20    consideration.

16:22:57 21    Q.  Well, your sentence is, except for PT, all of the others were

16:23:01 22    not considered to be suitable, right?

16:23:03 23    A.  Yeah.  The PT was considered suitable.  The others were not

16:23:08 24    considered to be suitable.  Bit doesn't mean that it would be

16:23:11 25    reliable, validated, et cetera.  Certainly going forward, we would

16:23:14  1   look at it.

16:23:15  2   Q.  Okay.  So according to your response, PT is suitable?

16:23:18  3   A.  Certainly should be looked at going forward.

16:23:21  4   Q.  I'm talking about a patient coming into the emergency room with

16:23:27  5   an intracranial hemorrhage in the United States and a doctor

16:23:30  6   wanting to know whether or not there is drug on board.  How is he

16:23:36  7   supposed to figure that out?

16:23:38  8   A.  Well, talk to the patient if they could speak to them.  Talk to

16:23:40  9   the family if they could speak to them.  Check the medical record.

16:23:45 10   They can --

16:23:45 11   Q.  They can check -- I'm sorry.  They can check their medical

16:23:46 12   record to figure out if a drug they take once a day -- they can use

16:23:51 13   a medical record to figure out whether or not they took their pill

16:23:54 14   that day?

16:23:54 15   A.  Not whether they take it or not, but whether they take

16:23:58 16   rivaroxaban or not.  That would be helpful.  What if they take

16:24:03 17   another drug?

16:24:04 18   Q.  Let's assume with my hypothetical, then, that the spouse has

16:24:09 19   told them they take rivaroxaban, so they know that, and they're

16:24:14 20   wanting to know whether or not the person has drug on board.  How

16:24:20 21   are they supposed to figure that out?

16:24:21 22   A.  Again, I can only say that -- what's available now in the U.S.,

16:24:25 23   because in Europe we have a specific assay for rivaroxaban.  But

16:24:29 24   the assay is not yet approved in the U.S.  All we have is the

16:24:34 25   prothrombin time.

16:24:35   1   Q.   Okay.  And where are they supposed to figure that out?  Where

16:24:38   2   in the label does it tell them if their prothrombin time is

16:24:45   3   whatever the number is, that means they have drug on board?  Where

16:24:47   4   is that on the label?

16:24:48   5   A.   There is no -- I don't know if there's a specific area because

16:24:51   6   I don't have time to re-review the label.  There is a section on

16:24:55   7   pharmacodynamics that talks about the dose-depending inhibition of

16:25:01   8   Factor Xa with the drug.  I mean, that gives some, but if you're

16:25:02   9   looking for a specific number, I don't know if there's something in

16:25:05  10   the label about that.

16:25:05  11   Q.   You know --

16:25:09  12   A.   There's other knowledge, of course.  There's other -- and sort

16:25:10  13   of -- as the things we mentioned, training and education, this is a

16:25:13  14   topic of discussion in scientific meetings every year.

16:25:18  15   Q.   You're aware there's nothing in the label that would tell

16:25:22  16   somebody if you run a PT, it will -- it will tell you whether or

16:25:26  17   not a person has drug on board?  That's nowhere in the label, you

16:25:30  18   know that, right?

16:25:31  19   A.   I don't know that for sure.  I would and have to re-read the

16:25:36  20   label, which I do from time to time.  But I'd have to take a look.

16:25:39  21   But I can just ask you if you -- if you --

16:25:39  22   Q.   I am giving you a chance to look at the label.

16:25:42  23   A.   You want me to sit here and read the whole label?

16:25:45  24   Q.   Well, what the label actually tells the doctor in an emergency

16:25:46  25   setting to do is to wait 18 to 24 hours since the last dose, right?

16:25:49  1   A.  I didn't see the actual wording on it.  Could you refer me

16:25:53  2   to --

16:25:55  3   Q.  Now I'll have to find it.  If you look at Section 2.7.

16:25:55  4   A.  Okay.

16:26:04  5   Q.  And that's discontinuation for surgery and other interventions.

16:26:07  6   Do you see that?

16:26:08  7   A.  I do now.  Thank you.

16:26:09  8   Q.  It says, "If anticoagulation must be discontinued to reduce the

16:26:13  9   risk of bleeding with surgical or other procedures, Xarelto should

16:26:17 10   be stopped at least 24 hours before the procedure to reduce the

16:26:20 11   risk of bleeding.  In deciding whether a procedure should be

16:26:22 12   delayed until 24 hours after the last dose of Xarelto, the

16:26:26 13   increased risk of bleeding should be weighed against the urgency of

16:26:30 14   the intervention."  Did I read all that correctly?

16:26:32 15   A.  Yes.

16:26:32 16   Q.  And as far as you know, you're not aware of any other language

16:26:38 17   that informs a doctor on how to handle that situation in this

16:26:40 18   label?

16:26:41 19   A.  In this label, I am not.

16:26:42 20   Q.  Are you aware -- aware of any information provided to people

16:26:47 21   treating patients on Xarelto in the United States that informs them

16:26:55 22   that 30 micrograms per liter could be the safe to proceed to

16:27:01 23   surgery level?

16:27:02 24   A.  The only thing I am aware of in that regard would be to look at

16:27:05 25   the pharmacology papers that give the levels, ranges and CMIN and

16:27:10   1   CMAX, and you could tell from that kind of the work that we're

16:27:13   2   doing here.

16:27:14   3   Q.  So they would have to try to figure it out themselves?

16:27:17   4          Okay.  So what about the neurosurgeon that's trying to

16:27:20   5   treat a person with an ICH?  They -- they are supposed to go take

16:27:23   6   the time to figure out what the safe to proceed to surgery level

16:27:27   7   is?  They're supposed to go research all of that before they can

16:27:28   8   decide whether or not they're going to go to surgery?

16:27:30   9   A.  Well, surgeons who have to face these issues day after day have

16:27:35  10   a procedure on what to do.  And they're certainly knowledgeable on

16:27:38  11   what drugs are out there that they have to face.  Right.  They get

16:27:41  12   these patients in front of them, so they have their meetings, they

16:27:44  13   have their discussions, they talk with colleagues at the hospital

16:27:47  14   and they get that information in different ways.

16:27:50  15          But this is not solid information, so we have to be

16:27:54  16   careful about putting out data that's not proven to provide what

16:27:58  17   you're asking for.

16:27:59  18   Q.  When we left, we were talking about no-effect levels and the

16:28:07  19   ability of primarily emergency room physicians to identify whether

16:28:11  20   or not rivaroxaban was on board.  Do you remember that?

16:28:13  21   A.  Yes.

16:28:14  22   Q.  Okay.  You agree it would help surgeons save lives if they were

16:28:23  23   able to determine whether or not rivaroxaban was on board, correct?

16:28:27  24   A.  I don't know that we could say it would help surgeons save

16:28:32  25   lives because once a person has an intracranial hemorrhage, it's

16:28:36  1    very difficult to do anything about it.  Something on the order of

16:28:40  2    50 to 66 percent actually will die.

16:28:43  3            It's important to know if the drugs are on board.  I

16:28:47  4    think the qualitative part is probably more important than exactly

16:28:53  5    what the value would be.

16:28:54  6    Q.  Right.  If it is not necessarily to wait 24 hours, being able

16:28:58  7    to go in and conduct surgery is always better than waiting?

16:29:01  8    A.  Well, in that situation, having a level isn't going to help you

16:29:06  9    much.  You have to go ahead with your plans to address the current

16:29:11  10   critical situation, which in this case you mentioned is

16:29:14  11   intracranial hemorrhage.

16:29:16  12   Q.  The ability to figure out whether or not rivaroxaban is on

16:29:20  13   board in an emergency situation is particularly important, as

16:29:25  14   there's no reversal agent for Xarelto, right?

16:29:27  15   A.  There's no specific reversal agent for Xarelto or any of the

16:29:32  16   NOACs, other than the thrombin inhibiter.

16:29:36  17   Q.  Okay.  You would agree that that's an unmet medical need,

16:29:40  18   right?

16:29:40  19   A.  It's something that we're addressing.

16:29:41  20   Q.  Would you agree there's an unmet medical need for effective

16:29:45  21   reversal agents for anticoagulants in general?

16:29:48  22   A.  I think there are occasions when you would need them.  How

16:29:51  23   great the need is, is in question, but it would make everyone feel

16:29:56  24   better to have something, wouldn't it?

16:29:57  25   Q.  Would you agree that there's an unmet medical need for

16:30:02  1   effective reversal agents for Xarelto?

16:30:03  2   A.  I think there could be some need for it, yes.

16:30:06  3   Q.  You actually believe that a reversal agent should be a high

16:30:10  4   priority for the company, correct?

16:30:11  5   A.  I do believe that's an important thing for the company to

16:30:15  6   accomplish.  And as you can see from the work stream that we've had

16:30:20  7   for years, we've been trying to develop one.

16:30:23  8   Q.  Let me show you Exhibit 23.  This is Plaintiff's 358604.  This

16:30:36  9   is an e-.mail I am focusing on the top e-mail from you where you

16:30:38 10   wrote to -- is it Dr. Spiro?

16:30:42 11   A.  Yes, that's correct.

16:30:43 12   Q.  Dr. Spiro, Robert Kramer and Frank Misselwitz, right?

16:30:51 13   A.  Yes.

16:30:51 14   Q.  And you wrote this on November 30th, 2011, right?

16:30:56 15   A.  Yes, in response to the e-mail I received that day.

16:30:58 16   Q.  Right.  And the subject of this is "Xarelto antidote clinical

16:31:03 17   experience study design concepts," correct?

16:31:05 18   A.  Yes.

16:31:06 19   Q.  So you said, "Due to this meeting in Paris, I am not able to

16:31:10 20   attend your meeting.  However, please keep me closely in the loop

16:31:13 21   on this project, including studies.  I am very interested in our

16:31:17 22   progress, especially since we're returning from AHA, where I had a

16:31:22 23   lot of interaction with some KOLs and other colleagues."  Now,

16:31:28 24   KOLs, that's key opinion leaders?

16:31:29 25   A.  Yes.

16:31:32 1   Q.  "Besides our current antidote compound current" -- strike that.

16:31:33 2             "Besides our current antidote compound under study, we

16:31:38 3   need to develop other studies to assess other potential reversal

16:31:42 4   agents already available, PCCs, and" -- is that Factor VII?

16:31:48 5   A.  Yes.

16:31:49 6   Q.  "This should be a high priority for the coming year."  Did I

16:31:52 7   read that right?

16:31:53 8   A.  Yes.

16:31:53 9   Q.  So you thought it was a high priority to study the other

16:31:57 10  reversal agents, correct?

16:31:58 11  A.  We find it important to study any reversal therapies that might

16:32:02 12  be of benefit.  The difficulty has been finding one that's easy --

16:32:06 13  easy to do.

16:32:09 14  Q.  Do you recall whether or not Janssen was as willing to study

16:32:14 15  these reversal agents and antidotes?

16:32:17 16  A.  The way you present the question it sounds like we don't work

16:32:21 17  together.  But we do.  I mean, we interdigitate between the

16:32:24 18  clinical development, regulatory, statistics, clinical

16:32:28 19  pharmacology.  So there -- there could be views on -- in either

16:32:31 20  company that may be different.  But my sense working with them that

16:32:37 21  we've work together on this issue.  Finding a path has been the

16:32:40 22  challenge for us.

16:32:41 23  Q.  Now, in Exhibit 23 you had talked about looking at PCC and

16:32:53 24  recombinant Factor VII in developing other study to assess

16:32:57 25  essential reversal agents being a high priority.  Do you remember

16:33:00  1   that?

16:33:00  2   A.  Trying.  We had in the label this information as well from

16:33:05  3   preclinical work.  And we wanted to figure out a way if we could do

16:33:08  4   things in a clinical sense as well.

16:33:10  5   Q.  I am just asking since 2011 what work has been done, what other

16:33:16  6   studies have been done to assess these other potential reversal

16:33:19  7   agents?

16:33:20  8   A.  So there are some studies working with outside external

16:33:22  9   advisors, like in the Netherlands and the U.S. on PCCs and how they

16:33:28 10   might work, the four-factor PCC was one of the studies that was

16:33:33 11   done.

16:33:33 12          There's been some work in trying to see if tranexamic

16:33:37 13   acid would be of some value.  But there hasn't been a reliable or

16:33:42 14   good way for us to do the studies and be convinced that they make a

16:33:46 15   difference.  So it's been a difficulty, and actually even today we

16:33:50 16   still talk about what we can do for this.

16:33:52 17   Q.  So, as we sit here today in 2016, you are not aware of a

16:33:59 18   potential reversal agent that could be used in a clinical setting

16:34:03 19   in the United States, correct?

16:34:04 20   A.  Do you mean approved or working on?

16:34:07 21   Q.  Approved.

16:34:08 22   A.  Not approved.  But still working on it.  And that's the case

16:34:11 23   for all of the Xa inhibitors.  The thrombin inhibitors was easier

16:34:17 24   to make an antibody to.  It's not our molecule.  But the Xa's

16:34:21 25   appear have difficulty because of their structure.

16:34:23  1   Q.  Look at one more of your e-mails in this chain.  It's your

16:34:29  2   e-mail on May 8th, 2012.  It's on Bates 2811.

16:34:34  3           You've written an e-mail to Shaun Goodman, Graeme Hankey,

16:34:40  4   Robert Califf, and you've cc'd a group of people?

16:34:43  5   A.  Yes.  They're the co-authors and members of the ROCKET-AF

16:34:46  6   steering committee.

16:34:46  7   Q.  And what you write is, "For the clinical development of the two

16:34:49  8   Factor Xa inhibitors furthest along, the exposure target accepted

16:34:54  9   has been different.  The doses of rivaroxaban appear slightly on

16:34:59 10   the high end of what is needed for efficacy in the various

16:35:01 11   indications, and apixaban doses appear more on the lower end

16:35:06 12   (excluding ACS), my opinion."

16:35:09 13           Did I read that right?

16:35:10 14   A.  Yes.  In 2012.

16:35:11 15   Q.  So it's your opinion in 2012, that the dose of rivaroxaban is

16:35:14 16   on the high end of what's needed for efficacy, right?

16:35:20 17   A.  Well, at the time my -- looking at data that we have and the

16:35:22 18   information that we have that's not here, we know that the apixaban

16:35:26 19   dose is set lower.

16:35:27 20           We know it's set lower because the scientist have told us

16:35:31 21   it's to set lower.  It was set lower because they were second to

16:35:36 22   market and they wanted to get there faster.  So looking at data and

16:35:40 23   seeing they failed orthopedic study and failed in an ACS study, we

16:35:44 24   find them to be on the lower end.

16:35:46 25   Q.  Okay.  But you were actually write that Xarelto is slightly on

16:35:49 1   the high end of what's needed for efficacy, right?

16:35:51 2   A.  I don't know that I am right.  All I know is that our goal, we

16:35:55 3   always try to balance the efficacy with safety.  And we would like

16:36:01 4   to, especially four years ago, and maybe it's not possible with any

16:36:04 5   of the Xa inhibitors because now we have edoxaban out and we have

16:36:09 6   apixaban out there in a lot more patients so we can see the

16:36:12 7   bleeding profile.

16:36:12 8             We were unable to uncouple the bleeding from the

16:36:16 9   efficacy.  If we could adjust that, that would be a great thing.

16:36:16 10  Q.  Okay.  But --

16:36:19 11  A.  So one could make the assumption, looking at that, that

16:36:23 12  we're -- compared to apixaban, we dose a little higher than they

16:36:27 13  do.  Whether they would be successful or not, that's a different

16:36:30 14  story.

16:36:30 15  Q.  So your opinion in 2012 was that the dose of rivaroxaban given

16:36:35 16  was higher than necessary for efficacy, right?  That's what it

16:36:39 17  says?

16:36:39 18  A.  Incorrect.

16:36:39 19  Q.  How else can you interpret that?

16:36:41 20  A.  It says the dose of rivaroxaban are appear -- and I don't know

16:36:46 21  what that means -- slightly on the high end --

16:36:48 22  Q.  Well, you wrote --

16:36:49 23  A.  -- of efficacy.

16:36:49 24  Q.  These are your words.

16:36:50 25  A.  This is an e-mail.  E-mails can have flaws in them.  They're

16:36:55  1    not 100 percent accurate, and they're not like us talking back and

16:36:58  2    forth, are they?  They don't have the depth; they don't have the

16:37:00  3    context; they don't have any of that.  They're just a communication

16:37:03  4    in a quick form.

16:37:04  5            So I don't think it's appropriate to take any of these

16:37:08  6    e-mails and just say that's the gospel, especially as research is

16:37:11  7    going on in time.

16:37:13  8            So if you're just seeing us at work.  And what we think

16:37:16  9    on one day could be a little bit different the next day.

16:37:19  10   Q.  Your opinion in 2012 was that the dose of rivaroxaban was

16:37:25  11   slightly on the high end of what is needed for efficacy --

16:37:32  12   A.  I don't have -- I'm sorry.

16:37:33  13   Q.  -- right?

16:37:33  14   A.  No, not right.  That's why I am interjecting.  Sorry.  Go

16:37:38  15   ahead.

16:37:38  16   Q.  So what you wrote isn't what you meant?

16:37:40  17   A.  It may not be.  But it may not be; it may be because I don't

16:37:45  18   know exactly what I was thinking at that moment.  We only know the

16:37:49  19   words on the page.  But there's a lot going on at this time.

16:37:52  20   During that time we developed rivaroxaban, which was ahead of

16:37:54  21   apixaban, you have to understand that the guidelines for atrial

16:38:02  22   fibrillation allowed aspirin for CHADS2 patients.  That's a weak

16:38:06  23   anticoagulant being used -- or antiplatelet being used.

16:38:09  24           And we all were concerned about using these novel

16:38:12  25   anticoagulants in patients who were at high risk.  We only wanted

1185

16:38:15  1  patients to receive them that could tolerate the possibility of the

16:38:19  2  side effects.  We didn't know what the profile would be.  So we

16:38:22  3  target to be efficacious.

16:38:25  4       Apixaban targeted to be safe, already knowing that the

16:38:28  5  Xa's were effective.  So in wording it in a general term, I don't

16:38:34  6  have values there.  I don't know exactly what I am trying to

16:38:36  7  express.  I believe it's just that our interest is efficacy.

16:38:40  8  That's the FDA's interest in efficacy.

16:38:43  9       Bleeding has become more important over these years, not

16:38:47 10  that it wasn't important to us, but you have to understand we were

16:38:49 11  facing the issue of trying to improve on warfarin.

16:38:54 12       So as I look at it, when I look at the agents, then I see

16:38:57 13  for rivaroxaban is it possible that a lower dose could be better,

16:39:01 14  as you were saying?  Is it possible?  Could be.  But we think that

16:39:04 15  the work that's been done shows that rivaroxaban at 20 milligrams

16:39:09 16  was appropriate, and 15 for patient with renal failure is

16:39:13 17  appropriate.

16:39:14 18  Q.  Okay.  Then the other question I wanted to ask was, you know,

16:39:16 19  you were saying that could a 10-milligram dose be better?

16:39:19 20  A.  No.  I didn't say that.

16:39:21 21  Q.  You were asking -- okay.  Well, you were asking if a lower dose

16:39:25 22  could be better, right?

16:39:26 23  A.  I was simply saying that you don't get the opportunity to

16:39:31 24  perfect exactly what it is.  You use your Phase II sides, whatever

16:39:35 25  you can do, your modeling.  And then you do the clinical trial.

16:39:38  1   Once the clinical trial is done, then you have your dose.  It

16:39:41  2   either works or it doesn't.  And it worked.

16:39:45  3   Q.  Okay.  So let me just try to get this right what you said.  You

16:39:49  4   said is it possible that a lower dose could be better, as you were

16:39:54  5   saying, is it -- it is possible?  Could be.  Right?  That's what

16:39:59  6   you said?

16:40:00  7   A.  Could, would, should, yeah.

16:40:02  8   Q.  You would agree with me you never tested that dose, a lower

16:40:07  9   dose in Phase III patients, right?

16:40:09 10   A.  For atrial fibrillation --

16:40:11 11   Q.  Yes.

16:40:12 12   A.  -- we tested 20 milligrams with 15 milligrams for patients in

16:40:15 13   moderate renal failure.

16:40:16 14   Q.  The reason you don't know that answer is because you never did

16:40:19 15   the study to find out?

16:40:21 16   A.  There's lots of doses we didn't test, but you can't do those

16:40:25 17   kind of trials by adding two, three, four, five different dosing

16:40:29 18   arms.  That's a Phase II study.

16:40:30 19   Q.  Earlier in the day, in the -- in the last session, we talked

16:40:36 20   about Professor Jeff Weitz.  Do you remember that?

16:40:39 21   A.  Yeah.

16:40:39 22   Q.  Are you aware that he disagrees with you as far as whether or

16:40:44 23   not there is a need to measure with Xarelto?

16:40:46 24   A.  I don't know that we have much disagreement.  I know Dr. Weitz

16:40:51 25   personally.

1187

16:40:51  1   Q.  Okay.  Well, let's -- let's look at his e-mails and

16:40:59  2   attachments.  This will be Exhibit 30.  And it's Plaintiffs'

16:41:08  3   107527.

16:41:08  4            All right.  I want to flip towards the back.  It's the

16:41:11  5   third -- third page from the back, and there's a slide titled,

16:41:16  6   "Monitoring Versus Measuring Anti -- Anticoagulant Effect of

16:41:20  7   NOACs."  Do you see that?

16:41:23  8   A.  Yeah.  Monitoring versus measuring?

16:41:26  9   Q.  Yes, sir.  And it says, "We do need to measure.  We don't need

16:41:32 10   to monitor."

16:41:32 11   A.  Okay.

16:41:33 12   Q.  Did I read that right?

16:41:34 13   A.  Yes.

16:41:35 14   Q.  It says, "When do we need to know drug levels or anticoagulate

16:41:40 15   effect"?

16:41:40 16   A.  Next slide.

16:41:42 17   Q.  Next slide.

16:41:43 18   A.  Yes.

16:41:44 19   Q.  It's, "Assess adherence.  Detect overdose.  Evaluate potential

16:41:47 20   drug interactions.  Plan timing of urgent surgery.  Diagnose

16:41:52 21   potential cause of stroke or bleeding.  Decide on use of

16:41:55 22   thrombolytics," right?

16:41:58 23   A.  Yes, that's what it says.

16:41:58 24   Q.  Those are many of the same special circumstances we talked

16:42:01 25   about, correct?

16:42:01 1    A.  Correct.

16:42:02 2    Q.  And then you go to the next page.  It says, "Routine assays can

16:42:07 3    be used to determine anticoagulant effects."  Do you see that?

16:42:11 4    A.  I do.

16:42:11 5    Q.  And for rivaroxaban it has anti-Xa assays and sensitive PT,

16:42:19 6    right?

16:42:19 7    A.  Right.  Meaning the Neoplastine.

16:42:22 8    Q.  Right.  Saying that can be used to determine anticoagulant

16:42:24 9    effect, right?

16:42:24 10   A.  Well, it's talking about what routine assays might be available

16:42:29 11   now in the laboratory around the world.

16:42:31 12   Q.  Let me restate my question to make sure we're clear what I am

16:42:34 13   talking about.

16:42:35 14          He says that in the case of rivaroxaban, Xarelto,

16:42:40 15   sensitive PT can be used to determine anticoagulant effects.

16:42:46 16          That's what that checkmark next to rivaroxaban and

16:42:49 17   sensitive PT means?

16:42:51 18   A.  No.  I'm sorry.  I can't agree with that.  This is a slide

16:42:54 19   showing a table of potential tests that could be used.  For

16:42:57 20   example, look at dabigatran, APTT is listed, the thrombin time and

16:43:01 21   the dilute thrombin time and the ETT.  The best would be the ETT.

16:43:07 22   So it's not saying anything different than what we've been saying.

16:43:09 23   Q.  Well, I thought your testimony was that PT could not be used?

16:43:12 24   A.  No, that was not my testimony.  My testimony is that it's not

16:43:15 25   the best test to use.  It's not very reliable.  It gives you a

16:43:21  1    qualitative or semi-quantitative.  It is not what we would

16:43:24  2    recommend that physicians use because we don't think it's the best

16:43:28  3    test.

16:43:28  4           If you use a test that's not precise or accurate, then

16:43:31  5    you can get results that are not valuable.

16:43:34  6    Q.  The idea of clinicians wanting to be able to measure the

16:43:40  7    anticoagulant effect of any anticoagulant was known to Bayer in the

16:43:46  8    early 2000s, right?

16:43:47  9    A.  I can't say what was known to Bayer before I got there.  I can

16:43:51 10    say that some of us have been in the field a long time trying to

16:43:55 11    develop antithrombotics, and many of us, like Dr. Weitz and myself,

16:44:00 12    who is not at of the company, but those of us who are

16:44:00 13    hematologists, we measure.  We like to measure.  This is how we

16:44:04 14    check things.

16:44:05 15           Doctors like to do that because they're used to heparin

16:44:08 16    and warfarin.  They grew up thinking they had to do that.  It was a

16:44:13 17    big change for low-molecular-weight heparin to come along and not

16:44:17 18    need to be monitored.  It was very hard.  And you see the same

16:44:19 19    thing now.  Doctors would like to measure because it makes them

16:44:22 20    feel like it's doing something.  But you have to have a test that

16:44:25 21    allows you, that tells you that it's really doing something, not

16:44:29 22    just treating the doctor, but actually treating the patient.

16:44:31 23    Q.  Okay.  But for purposes of a patient in the United States where

16:44:37 24    an anti-Factor Xa assay is not available, the only thing available

16:44:41 25    is PT with Neoplastin, correct?

16:44:43  1   A.   Sorry.   I have to correct you just a little bit.   There's

16:44:45  2   anti-Factor Xa assays, and there's the rivaroxaban assay that's

16:44:48  3   based on the platform.   So if you mean a platform, yes.

16:44:51  4   Unfortunately, not at this time do we have the test, but we're

16:44:54  5   hopeful that it will be available.

16:44:55  6   Q.   So the only thing the doctor could use in present practice

16:45:01  7   today is PT Neoplastin, right?

16:45:02  8   A.   In practice today that would be the closest we could get.   This

16:45:07  9   could change.

16:45:08  10  Q.   I want to hand you what I am going to mark as Exhibit 35.   It's

16:45:17  11  Plaintiffs' 1094747.   It's my understanding, based upon the way

16:45:24  12  these were produced -- and you can confirm this or not -- that

16:45:28  13  these are your notes from your custodial file.   Do you recognize

16:45:32  14  these?

16:45:33  15  A.   I haven't looked at it in a long time.   It looks like notes

16:45:36  16  that I took in speaking with Dr. Mueck to get some history on what

16:45:41  17  they faced early on with the design of the program.   So it looks

16:45:46  18  like something I might produced.

16:45:50  19  Q.   "But we tested in prevention and treatment setting a once

16:45:57  20  versus twice-a-day and conclude on clinical data that once-a-day

16:45:58  21  fine and then go to Phase III and confirm."   Did I read that right?

16:46:02  22  A.   I think so.

16:46:04  23  Q.   "If you just -- if you just a PK guy, say half-life of 9 to

16:46:10  24  11 hours, then you should use twice-a-day, but we have done

16:46:15  25  clinical work and then clinical confirmation."   Did I read that one

16:46:20  1    right?

16:46:20  2    A.   Yeah.   I think I understand what I was writing here.

16:46:22  3    Q.   Okay.   Help me out.

16:46:23  4    A.   Well, it was basically the concept we were just speaking about.

16:46:25  5    So the half-life of rivaroxaban for a young healthy volunteer is 5

16:46:30  6    to 9 hours.   The half-life in young elderly patient is 9 to

16:46:35  7    13 hours.   It usually gets said that the half-life is something

16:46:38  8    like 5 to 9 hours or something.   But it varies a bit.

16:46:42  9         The problem is that the half-life in the circulation has

16:46:47 10    no -- no important meaning in coagulation, because it's the

16:46:51 11    pharmacodynamic effect that makes the difference.   What happened

16:46:54 12    was, we initially started testing the drug as twice-a-day, because

16:46:58 13    the half-life might make you think that.   But it turned out that

16:47:02 14    when we did more sophisticated coagulation tests, or more

16:47:08 15    sophisticated than a PT or a PTT, but did like thrombin generation,

16:47:09 16    it turns out that thrombin is inhibited beyond 24 hours.   Now, that

16:47:14 17    it wasn't realized at first in the program.   So you'll see the

16:47:16 18    first dosing studies were BID.

16:47:18 19         When it was realized that OD might be possible, we did

16:47:22 20    another study.   We've added on a study.   It actually lengthen the

16:47:26 21    program.   It cost us about a year.   But we added on it a once-a-day

16:47:31 22    arm in the orthopedic and tested it, and it looked clinically good

16:47:34 23    in Phase II.   That's -- that's how it went.   So the important

16:47:37 24    lesson from it to me, although it's mis- -- mistaken a lot even

16:47:42 25    today, half-life for an anticoagulant isn't the major important

16:47:48  1    thing.  It's the pharmacodynamic effect.

16:47:51  2    Q.  You remember a time when Janssen and Bayer were considering

16:47:55  3    conducting the ROCKET2 study?

16:48:00  4    A.  Yes.

16:48:01  5    Q.  Yet it was not conducted primarily because it turned out there

16:48:07  6    was no risk to the product in the market, right?

16:48:11  7    A.  No, that's not correct.  I think that's not the case.  But what

16:48:16  8    I think ultimately turned the tide on that was the edoxaban data,

16:48:24  9    the -- the fourth, or third Xa inhibitors, when they did look at

16:48:29 10    their BID and lower doses, and there -- there was loss of efficacy.

16:48:32 11    And this is our greatest concern and the FDA's greatest concern.

16:48:37 12    And so at that point then it became clear to us that that's

16:48:40 13    probably not the best step.

16:48:42 14    Q.  We can move on.

16:48:44 15           Now, let's look at some papers that were published by

16:48:53 16    Dr. Mueck.  I want to start with what I'll mark as Exhibit 48, and

16:49:05 17    this is Plaintiffs' 177639.  Now, this manuscript is titled,

16:49:08 18    "Rivaroxaban and Other Novel Oral Anticoagulants:  Pharmacokinetics

16:49:12 19    in healthy subjects, specific patient populations, and relevance of

16:49:16 20    coagulation monitoring."  Correct?

16:49:17 21    A.  Yes.

16:49:18 22    Q.  And this is written by Dr. Mueck, among others, right?

16:49:26 23    A.  Yes.

16:49:26 24    Q.  It's going to be published in the journal Thrombosis, right?

16:49:31 25    A.  It's the target journal.  This is Draft 6.  So I don't know the

16:49:33  1    final paper.

16:49:33  2    Q.  And just so the jury understands, can you explain what CMAX

16:49:37  3    and area under the curve are?

16:49:37  4    A.  Well, CMAX is the concentration maximum.  So it would be the

16:49:40  5    peak value that has a time range somewhere in the order of two to

16:49:44  6    four hours after a dose is given in general.

16:49:47  7            The area under the curve is the calculation of the

16:49:51  8    concentration all during the 24-hour period or whatever period you

16:49:55  9    choose.

16:49:56  10   Q.  Okay.  It says, "Top and bottom of the shaded boxes correspond

16:50:00  11   to the upper 75 percent or lower 25 percent percentiles,

16:50:05  12   respectively.  The central white bands represent the median.

16:50:10  13   Whiskers corresponded to the lowest and highest data points within

16:50:16  14   in 1-1/2 times interquartile range calculated from the center of

16:50:22  15   the data.  Points beyond this range are possible outliers indicated

16:50:22  16   by horizontal lines."  Right?

16:50:22  17   A.  Yes.

16:50:23  18   Q.  And the CMAX ranges from just below 200 --

16:50:23  19   A.  Yes.

16:50:26  20   Q.  -- to just below 500?

16:50:28  21   A.  Yes.

16:50:29  22   Q.  Right?

16:50:32  23   A.  Yes.

16:50:33  24   Q.  So that's roughly two-and-a-half-fold difference, right?

16:50:33  25   A.  Using simple math calculations, yes.

16:50:37  1   Q.  So two -- people taking the same pill, their blood plasma

16:50:42  2   concentration ranges from just below 200 to somebody else taking

16:50:46  3   the same pill to just below 500, right?

16:50:50  4   A.  In this study in these however many patients you said it was,

16:50:55  5   that's the finding they have here.

16:50:58  6   Q.  And do you believe that this is a significant variation in

16:51:03  7   concentration?

16:51:04  8   A.  No.

16:51:05  9   Q.  How would you describe that variation?

16:51:11 10   A.  I would call it moderate, but I am not a clinical

16:51:16 11   pharmacologist.

16:51:16 12   Q.  I am just asking you what your characterization of the

16:51:19 13   variability with Xarelto is.  I thought I heard you say moderate;

16:51:23 14   is that right?

16:51:23 15   A.  What you heard me say is I am not a clinic pharmacologist, and

16:51:27 16   we should talk to those specialists.  But my understanding is that

16:51:29 17   it's moderate.  From what I've seen from drugs and what I've seen

16:51:30 18   from rivaroxaban is that fits into a more moderate category.

16:51:34 19   Q.  So let's go to Exhibit 49, Plaintiffs' 3261528.  I've handed

16:51:45 20   you a paper from Dr. Mueck, Stampfuss, Kubitza, and Becka.  And

16:51:56 21   this is titled, "Clinical Pharmacokinetic and Pharmacodynamic

16:51:58 22   Profile of Rivaroxaban."  Do you see that?

16:52:00 23   A.  Yes.

16:52:00 24   Q.  And this is published in September -- on September 3rd, 2013,

16:52:04 25   right?

16:52:04  1    A.  Yes.  Online.  Mm-hmm.

16:52:09  2    Q.  Okay.  If you go down about a third of the way down, you see

16:52:14  3    the sentence that starts "Variability"?

16:52:19  4    A.  I'm sorry.  Yes.

16:52:23  5    Q.  It says, "Variability in the pharmacokinetic parameters is

16:52:27  6    moderate, coefficient of variation 30-40 percent."  Correct?

16:52:32  7    A.  Yes.

16:52:33  8    Q.  So according to this paper the variation is moderate, correct?

16:52:36  9    A.  That's what it's saying here.  For -- now it's taking all the

16:52:41 10    pharmacokinetic parameters here.

16:52:42 11    Q.  Which is consistent with what you understood?

16:52:45 12    A.  What I understood.

16:52:45 13    Q.  So now let's go to Table 3.  You understand that Table 3 in

16:52:55 14    this paper is data from the ROCKET trial, correct?

16:53:00 15    A.  By looking at the table, I understand it's data from the

16:53:04 16    various trials that we've done, including the ROCKET trial.

16:53:07 17    Q.  Okay.  And I am looking at stroke presentation in patients with

16:53:10 18    AF 20 milligrams once a day.  Okay?

16:53:14 19    A.  So you're looking at the patients with the creatinine clearance

16:53:19 20    greater than or equal to 50 --

16:53:21 21    Q.  Yes, sir.

16:53:22 22    A.  -- right?  Okay.

16:53:23 23         Well, the concentration at trough is basically as low as

16:53:23 24    the concentration might be before the next dose.  So the -- the

16:53:26 25    time period could vary unlike the CMAX which has a more narrow

16:53:32   1   range that you would be sampling from.

16:53:35   2   Q.  So the concentration trough, the mean is 44, right, 44

16:53:39   3   micrograms per liter, correct?

16:53:41   4   A.  That's what it says for -- for the stroke prevention row.

16:53:44   5   Q.  And the 5th to 95th percentile is 12 to 137 micrograms per

16:53:52   6   liter, correct?

16:53:53   7   A.  Yeah.

16:53:53   8   Q.  That's a tenfold difference, correct?

16:53:56   9   A.  Well, again, doing simple math -- well, not quite.

16:54:04  10   Q.  It's actually more than 10?

16:54:07  11   A.  I'm sorry.  From 18 to 136?

16:54:09  12   Q.  No, from 12 -- you're looking at --

16:54:11  13   A.  Oh, I'm sorry.  I'm on the wrong line.  Yep.  I lost my place.

16:54:11  14   Yes.  Mm-hmm.

16:54:14  15   Q.  Okay.  So it's actually a slightly greater than tenfold

16:54:19  16   increase, right?

16:54:19  17   A.  But you can call it tenfold.

16:54:22  18   Q.  Okay.  And so that -- that gets back to the original idea that

16:54:25  19   different patients taking the same 20-milligram pill at trough,

16:54:30  20   there is a tenfold variation in the blood their plasma

16:54:36  21   concentration at trough, right, across the 5th and 95th percentile?

16:54:42  22   A.  Again, I think the -- one has to understand how the samples are

16:54:44  23   drawn, and there's a wide window for trough.  So you are going to

16:54:45  24   get a wider spread.

16:54:46  25   Q.  Okay.  But then if you go to CMAX, there is a median of 249,

16:54:54 1   correct?

16:54:54 2   A.  Yes.

16:54:54 3   Q.  I'm sorry.  It's the geometric mean.  Geometric mean 249,

16:55:00 4   correct?

16:55:00 5   A.  Sorry.  Let me check the footnote.  Yes, geometric mean.

16:55:06 6   Correct.

16:55:06 7   Q.  And the variation in the 5th to 95th percentile is 184 to 343

16:55:13 8   micrograms per liter, right?

16:55:15 9   A.  Yes.

16:55:15 10  Q.  Approximately a twofold difference, right?

16:55:18 11  A.  So as we had noted a more narrow -- a more narrow range and a

16:55:25 12  more narrow fold.

16:55:25 13  Q.  So according to this data, it's a narrower range at CMAX and a

16:55:29 14  wider range at trough, right?

16:55:31 15  A.  Well, according to this data, what I was saying was that the

16:55:35 16  sampling time is wider.  Now, as I said, I'm not a clinical

16:55:38 17  pharmacologist, but as a clinician, that's how I understand it.

16:55:41 18  That's how I look at the data.

16:55:43 19  Q.  I'll show you Exhibit 52 and this is Plaintiffs' 80333.  So you

16:55:54 20  see that this is a series of e-mails that got forwarded to you by

16:56:01 21  Ms. Kubitza?  Do you see that?

16:56:03 22  A.  Dr. Kubitza, yes.

16:56:05 23  Q.  And she sent this to you on August 18th, 2014?

16:56:09 24  A.  Yes.

16:56:09 25  Q.  And she writes to you, "Dear both" -- well, you and Dr. Derix.

16:56:15   1   It says, "Dear both.  Some background information for the

16:56:18   2   discussion to come later this week.  Best regards, Dagmar."

16:56:21   3   A.  Yeah.

16:56:21   4   Q.  Correct?

16:56:22   5          So what I want to do is I want to start looking at this.

16:56:26   6   And I'm going to start with the e-mail from Paul Burton that starts

16:56:31   7   on the bottom of the page at 20944.

16:56:41   8   A.  Okay.

16:56:42   9   Q.  Do you see the e-mail from Paul Burton?

16:56:44  10   A.  Yes.

16:56:45  11   Q.  And this is August 14, 2014, correct?

16:56:48  12   A.  Yes.

16:56:49  13   Q.  And he sends an e-mail to -- it looks like a group of people at

16:56:54  14   Janssen primarily, correct?

16:56:57  15   A.  Correct.

16:57:03  16   Q.  Okay.  And he says, "I think the edits for clarity are

16:57:07  17   valuable.  I would keep the information in the middle column that

16:57:11  18   we performed testing for monitoring in early and late stage trials

16:57:16  19   and were able to confidently conclude that monitoring is neither

16:57:21  20   necessary nor required with Xarelto use in routine clinical

16:57:25  21   practice."  Did I read that correctly?

16:57:26  22   A.  Yes.

16:57:27  23   Q.  Okay.  You agree with me that the label indicates that routine

16:57:29  24   monitoring is not required with Xarelto, correct?

16:57:31  25   A.  That's correct.

16:57:32  1   Q.  According to Dr. Burton here, he believes that the company's

16:57:39  2   tested for monitoring in early and late stage trials and were able

16:57:44  3   to confidently conclude that monitoring is neither a necessary nor

16:57:46  4   required with Xarelto use, correct?

16:57:48  5   A.  That's what he is writing in his e-mail here.  I am just

16:57:51  6   reading that.  I don't know what he actually believes.

16:57:54  7   Q.  That's what he wrote?

16:57:56  8   A.  That's what me wrote, yes.

16:57:57  9   Q.  Do you agree or disagree with that statement?

16:57:59  10  A.  Well, my memory of it -- I mean, we did a little bit of PK in

16:58:05  11  small samples in the ROCKET trial, 160 or so.  But we did our work,

16:58:10  12  as -- as I mentioned, in Phase II where we looked at these

16:58:13  13  connections with bleeding and events as the best we could from that

16:58:16  14  work.

16:58:16  15  Q.  So is that an agreement or a disagreement.  I just want to --

16:58:19  16  A.  Well, I guess it depends on what we talked about, early or late

16:58:21  17  stage trials.  But if it is -- I mean, I am thinking of -- you

16:58:24  18  know, in the Phase II I think of the middle.  So early I think of

16:58:27  19  as Phase I.  So I'm not sure what he means by early or late stage

16:58:28  20  trials.  But to me, the bulk of the work doing the comparisons that

16:58:28  21  you asked about us doing a study, maybe we were missing each other

16:58:36  22  in terms of -- of the discussion before the break, but we did that

16:58:40  23  work in Phase II.  And we looked at those connections.

16:58:43  24  Q.  Okay.  Now, I want to look at one of the responses from Todd

16:58:49  25  Moore.  This is on page 204943.

16:58:52  1        You see the e-mail from Todd Moore dated August 14th,

16:58:59  2  2015, in the middle of the page?

16:59:00  3  A.  I see one August 15.

16:59:03  4  Q.  I'm sorry.  August 15th, 2014, in the middle of the page?

16:59:06  5  A.  Yes.

16:59:06  6  Q.  And -- and remind the jury who Todd Moore is again?

16:59:09  7  A.  Todd Moore is a -- a clinic pharmacologist at Johnson &

16:59:15  8  Johnson.

16:59:15  9  Q.  Okay.  He says, "Dear Judy.  I'm concerned with the statement

16:59:19  10  in the middle column, 'testing for monitoring was performed in the

16:59:22  11  early and late stage trials.'

16:59:25  12        "I don't believe this statement is accurate.  After

16:59:28  13  discussing this with Dagmar this morning, perhaps a better strategy

16:59:28  14  would be to highlight the results from the multiple large

16:59:28  15  postmarketing-type studies that appear to show a consistent

16:59:38  16  bleeding profile as was determined in the pivotal Phase III trials,

16:59:42  17  correct?  I state this because I don't believe we truly tested for

16:59:47  18  monitoring."  Did I read that correctly?

16:59:49  19  A.  That's what is written here.

16:59:50  20  Q.  So So Todd Moore, the clinical pharmacologist at Janssen, is

16:59:52  21  saying, we never truly tested for monitoring, correct?

16:59:56  22  A.  I am not sure I take that completely from what he said.  I

16:59:59  23  think he corrects the version about the early and late stage when

17:00:02  24  he says, "I don't believe this statement is correct."  And then as

17:00:06  25  you go on further, then he says, "I state this" -- that portion

1201

17:00:10 1    about "I don't believe we truly tested for monitoring."  But I

17:00:13 2    don't know what -- if he means in one of those programs or at all.

17:00:17 3    It doesn't say that.

17:00:18 4    Q.  You agree with him on that statement, don't you?

17:00:19 5    A.  I agree with him on the statement about the early and late

17:00:22 6    stage.  But as -- as we had spoken about earlier, in the Phase II

17:00:25 7    program we looked at the connection of -- of bleeding and PT and

17:00:29 8    you can find this information in our files.

17:00:32 9              But I am not sure what exactly he meant by that.

17:00:36 10   Q.  Okay.  Well, let's look -- he -- I think he clarifies a little

17:00:38 11   later.  If you go to the -- the first page.  This is just to give

17:00:42 12   you the beginning of the e-mail.  You see the e-mail starts right

17:00:48 13   there on the bottom from Todd Moore to Dr. Burton, August 15th,

17:00:53 14   2014?  It's right on --

17:00:53 15   A.  Oh, yeah.  I do see it.  Mm-hmm.

17:00:56 16   Q.  So then, you flip to the next page, and he says, "Thanks for

17:00:59 17   your response.  Perhaps I misunderstood what is meant by testing

17:01:03 18   for monitoring in this regards.  During the Phase I and II clinical

17:01:08 19   development, we collected intensive PK and PD to help characterize

17:01:12 20   the drug's profile.  We have a lot of data on this.  However, I

17:01:16 21   don't know if we can consider any of this testing for monitoring --

17:01:19 22   monitoring.  I don't believe Bayer performed or could perform any

17:01:24 23   specific analysis for this."  Did I read that correctly?

17:01:26 24   A.  Yes.

17:01:26 25   Q.  So he is saying we didn't do any testing for monitoring at all,

17:01:31   1   correct?

17:01:31   2   A.  He is saying that from his memory that there is no testing --

17:01:36   3   quote-unquote, "testing for monitoring" or -- or that we could

17:01:40   4   perform that.

17:01:41   5   Q.  Okay.  Then if you go down to the bottom, he says, "Without

17:01:45   6   taking significantly more PK and PD samples in the Phase III

17:01:48   7   studies."  And there was a specific decision not to take PK samples

17:01:56   8   from all patients in Phase III studies, right?

17:01:59   9   A.  We did not take PK samples in all patients in the Phase III, as

17:02:04  10   we did all of that work in the Phase II.

17:02:05  11   Q.  But you had a small subgroup of patients in the ROCKET trial

17:02:08  12   that you did some PK at Week 12 and 24, correct?

17:02:13  13   A.  Well, a small subgroup at Week 12 and 24 was a small cry from

17:02:18  14   doing the 360,000 samples we got during the whole trial.  So that

17:02:20  15   you can have a little better control.  And then that's a lot of the

17:02:23  16   issue for us is in Phase II where you can control the setting and

17:02:26  17   control the sampling, have the tubes, get the timing right.  That's

17:02:31  18   a -- that's more reliable way to do it.  And that's how we chose to

17:02:35  19   do it for this program.

17:02:36  20   Q.  Okay.  He says, "Without taking more significantly more PK and

17:02:40  21   PD samples in the Phase III studies and performing a more rigorous

17:02:44  22   type of analysis, more than observational, perhaps a regression

17:02:50  23   type, et cetera, I don't know if we can truly say we tested the

17:02:53  24   need for monitoring," correct?

17:02:54  25   A.  That's what he writes.

17:02:55  1   Q.  So he reiterates, "Without substantially more data, there is no

17:02:59  2   way that we can truly say we tested for monitoring," correct?

17:03:02  3   A.  Just confirming what he says in the document.

17:03:05  4   Q.  Well, so you agree with that?

17:03:06  5   A.  I am not an expert on the clinical pharmacology, so I can't

17:03:10  6   say.  But all I can say is that we did that work in Phase II and we

17:03:15  7   didn't see a need in doing the various indications that we study

17:03:19  8   because we didn't just study one indication.  We didn't see how

17:03:23  9   that would be of benefit.

17:03:28 10   Q.  Okay.  Can you identify which Phase II studies where the

17:03:34 11   companies looked at PK/PD versus outcomes?

17:03:38 12   A.  Well, I think you can look at the FDA AdCom briefing document

17:03:43 13   where we list those.  I don't know their numbers offhand.  If you

17:03:47 14   check that, I think you'll find the comparisons with PK and PD.

17:03:50 15   Q.  Okay.  And you are specifically correlating this to outcomes?

17:03:54 16   A.  I know for a fact that they discuss bleeding outcomes.

17:03:57 17   Q.  I am going to hand you what I am marking as Exhibit 53, which

17:04:05 18   is Plaintiff's 3388635.  You see that this is a series of e-mails

17:04:13 19   between you and your colleagues at Bayer on November 9, 2015,

17:04:18 20   correct?

17:04:19 21   A.  Yes.

17:04:19 22   Q.  And in the therapeutic drug monitoring, there's discussion

17:04:25 23   about whether or not you could monitor blood plasma concentration

17:04:34 24   or PD marker and then have dose adjustments based on whatever the

17:04:37 25   blood testing showed, right?

17:04:40  1    A.  It was mostly about whether you could add benefit to the care.

17:04:43  2    Q.  And if I remember correctly, Bayer's position was -- is that

17:04:48  3    would not add benefit to the care, correct?

17:04:51  4    A.  My understanding of our position then was the very same, that

17:04:53  5    it would not add benefit over and above patient characteristics, as

17:04:57  6    we said, or what's in our label.

17:04:59  7    Q.  So I want to go down to your last paragraph on the first page.

17:05:02  8    A.  Sure.

17:05:02  9    Q.  And you say, "I need your help in deciding and obtaining slides

17:05:06  10   that will directly address the description provided for our

17:05:09  11   section, which is, 'This section aims to discuss ways to fill the

17:05:13  12   gaps in our knowledge about PK/PD measurements as well as how to

17:05:19  13   better use the available data, future scenarios on how knowledge

17:05:23  14   can be obtained should be depicted.'"  Correct?

17:05:26  15   A.  Correct.

17:05:27  16   Q.  So that is the description for the section that you've been

17:05:30  17   asked -- or the company has been asked to present on, correct?

17:05:32  18   A.  I think that's a word-for-word lift from the agenda.

17:05:36  19   Q.  And you say, "It is our position that we do not have gaps.  And

17:05:41  20   other than the modeling and simulation project which is ongoing, we

17:05:46  21   do not have more to suggest."  Did I read that correctly?

17:05:49  22   A.  Yes.

17:05:49  23   Q.  So you certainly said on November 19, 2015, that when it comes

17:05:53  24   to your knowledge and data about PK/PD measurements that it was

17:05:57  25   your position that the company does not have gaps, correct?

17:05:59  1   A.  It is my position -- and this is talking about position of the

17:06:03  2   group, not just myself -- that we don't have gaps.

17:06:06  3   Q.  So you believe as you sit here today that the company does not

17:06:11  4   have gaps in its PK/PD data, correct?

17:06:15  5   A.  Well, as I stated to you, I am not a PK/PD expert.  I am

17:06:19  6   talking about some major gap involved that we need to help

17:06:23  7   patients.  Now, there might be things that a clinical

17:06:26  8   pharmacologist could come up with or other people would come up

17:06:31  9   with, but although here I am representing the group here, that is

17:06:34  10  my view, there were no major gaps.

17:06:36  11  Q.  So if there are no caps in your PK/PD data, no major gaps in

17:06:41  12  your PK/PD data, what is the maximum safe blood plasma

17:06:46  13  concentration of Xarelto?

17:06:48  14  A.  We discussed this yesterday, and we don't have definitive level

17:06:51  15  for that.

17:06:52  16  Q.  If there are no major gaps in your PK/PD data, what is the

17:06:57  17  absolute minimum blood plasma concentration necessary to

17:07:01  18  successfully reduce stroke risk?

17:07:03  19  A.  I am not aware of having that.  Are these major gaps?

17:07:08  20  Q.  Okay.  Are you able to provide the range of concentration

17:07:11  21  needed so that people maintain sufficient stroke benefit without

17:07:17  22  excessive bleed risk?  Can you give that risk of concentration?

17:07:21  23  A.  I am not aware of a range because it hasn't been necessary to

17:07:26  24  have that, once we have the dose tested and the clinical trials.

17:07:29  25  Q.  Okay.  So let's make this about Factor Xa inhibition then.  If

17:07:33   1   there are no gaps in your PK/PD data, what is the maximum safe

17:07:41   2   Factor Xa inhibition level?

17:07:43   3   A.  Again, as I said before, it's not no gaps.  It's no major gaps.

17:07:48   4   I don't see this as a major gap when we have the dose for patients.

17:07:51   5   If you need more information on this, then I suggest you talk with

17:07:56   6   a clinical pharmacologists.

17:07:57   7   Q.  If there are no gaps in your PK/PD data, what is the absolute

17:08:02   8   minimum necessary Factor Xa inhibition level to successfully reduce

17:08:08   9   stroke risk?

17:08:08  10   A.  As we have the -- I don't have a level for that as we have the

17:08:12  11   clinical trial data which shows the effectiveness of preventing

17:08:15  12   stroke in patients.

17:08:17  13   Q.  If there's no major gaps in your PK/PD data, what is the range

17:08:22  14   of Factor Xa inhibition needed to maintain stroke protection

17:08:27  15   without excessive bleed risk?

17:08:28  16   A.  I don't have any levels that I can give you because we have the

17:08:32  17   clinical trial data, which I find more important.

17:08:34  18   Q.  Okay.  Let's try PT.  If there are no major gaps in your PK/PD

17:08:42  19   data, what is the maximum safe PT prolongation due to Xarelto?

17:08:48  20   A.  I don't think that exists for -- I don't think that exists.

17:08:51  21   Q.  Okay.  If there are no major gaps in your PK/PD data, what is

17:08:57  22   the minimum PT prolongation needed to successfully reduce stroke

17:09:02  23   risk?

17:09:02  24   A.  As we've discussed, the PT is not the best test for measuring

17:09:08  25   rivaroxaban.  For that question and the question before, they are

17:09:11  1    not major gaps.

17:09:12  2    Q.  If there are no major gaps in your PK/PD data, are you able to

17:09:17  3    provide a range of PT prolongation that shows somebody has

17:09:24  4    effectively -- reducing the risk of stroke without putting them at

17:09:29  5    excessive bleed risk?

17:09:32  6    A.  As noted before, I think the PT is an inappropriate test to be

17:09:34  7    testing for rivaroxaban.  So your questions are not pertinent to

17:09:37  8    the clinician.

17:09:38  9    Q.  Do you believe a correlation analysis has been conducted

17:09:45  10   between PT and bleeding events with Xarelto?

17:09:49  11   A.  As I mentioned, in the FDA AdCom document, you'll find that

17:09:53  12   correlation.

17:09:54  13   Q.  Okay.  Then would you agree that it's known within the company

17:10:01  14   as PT goes up, bleed risk goes up?

17:10:04  15   A.  I -- I think we understand that as the PT go up, as flawed as

17:10:08  16   the test is for rivaroxaban, that bleeding risk may go up.

17:10:12  17   Q.  Okay.  And you -- would you agree that PT has been shown in

17:10:18  18   Phase I and Phase II clinical studies to be a reliable exposure

17:10:23  19   marker for Xarelto plasma concentrations when a sensitive assay is

17:10:28  20   used?

17:10:28  21   A.  I would agree that if you use a PT with a Neoplastin plus

17:10:32  22   reagent which is sensitive that then you can get some fix, some

17:10:37  23   semi-quantitative fix on the rivaroxaban concentration, but would

17:10:42  24   recommend using the assay that's the specific for rivaroxaban.

17:10:44  25   Q.  Okay.  Now, PT was certainly sufficient in the company's view

17:10:50  1   to be used as biomarker to be carried forward as a PK surrogate in

17:10:56  2   all Phase III trials for an exposure response analysis, correct?

17:11:00  3   A.  I believe that's correct.

17:11:02  4   Q.  And -- and that's because of the established linear

17:11:06  5   relationship between rivaroxaban blood plasma concentration and PT,

17:11:12  6   right?

17:11:12  7   A.  Well, when you use the sensitive reagent for PT, not for all

17:11:17  8   PT.

17:11:17  9   Q.  Fair enough.  So when you use the sensitive reagent Neoplastin,

17:11:21 10   PT has an established linear relationship with rivaroxaban blood

17:11:29 11   plasma concentration, correct?

17:11:30 12   A.  That's correct.  You can see a linear relationship.

17:11:32 13   Q.  Let me give you Exhibit 54.  And this is Plaintiffs' 1097767.

17:11:43 14            So referring back to Exhibit 45.  We looked at this

17:11:46 15   earlier today.  And this is the e-mail from Dr. Mueck to yourself

17:11:51 16   copying multiple other of your colleagues on May 28th, 2014,

17:11:55 17   correct?

17:11:56 18   A.  Yes.

17:11:57 19   Q.  "Based on the established linear relationship between

17:12:01 20   rivaroxaban plasma concentration and prothrombin time, PT, carry PT

17:12:08 21   measured at peak and trough in all pivotal Phase III programs to

17:12:12 22   use them as PT -- PK surrogate for subsequent exposure/response,

17:12:17 23   mainly bleeding event analyses," right?

17:12:20 24   A.  Yes.

17:12:20 25   Q.  Do you know if that was over done, this exposure response

17:12:23  1  dealing mainly with bleeding events?

17:12:25  2  A.  Yes, it's been done.  I mean, it's going on.

17:12:28  3  Q.  Okay.  And what that analysis shows is that bleed risk

17:12:33  4  increases with -- as PT goes up, right?

17:12:36  5  A.  P -- well, we've established that already, right?  As the PT

17:12:40  6  goes up, there's an increased risk of bleeding.

17:12:43  7  Q.  Okay.  And you certainly agree with that, right, you

17:12:46  8  personally?

17:12:46  9  A.  I agree that that's what was found.

17:12:49  10  Q.  Do you think it would be misleading to inform anyone that there

17:12:54  11  is no correlation between bleeding events and blood plasma

17:12:59  12  concentration of Xarelto?

17:13:01  13  A.  I wouldn't think that would be a right -- a correct statement.

17:13:05  14  Q.  What is it that would not be a correct statement?

17:13:10  15  A.  I don't have the benefit of reading it like you do off the

17:13:13  16  screen, but...

17:13:14  17        It sounded like you said the correlation between bleeding

17:13:16  18  risk and increased concentration.  It's well known and, again,

17:13:20  19  something -- a topic we talked about yesterday that anticoagulants,

17:13:24  20  if you increase their blood concentration, there's an increased

17:13:27  21  risk of bleeding.  Unfortunately, we are not unable to uncouple

17:13:33  22  bleeding from efficacy, meaning decrease in strokes and blood clots

17:13:35  23  to the lung, et cetera.  That's not yet possible.

17:13:41  24  Q.  Let me show you Exhibit 55 -- 54, as Roger has corrected me,

17:13:48  25  which will be Plaintiffs' 1075492.  Now, you see that this is a

17:13:58 1  series of e-mails internal at Bayer, right?

17:14:01 2  A.  Yes.

17:14:02 3  Q.  Okay.  And in the -- the top e-mail is -- is an e-mail from

17:14:07 4  you, but it includes multiple of your colleagues, right?

17:14:10 5  A.  Yes.

17:14:11 6  Q.  And we've talked about a number of these before.  I don't

17:14:16 7  believe we've talked about Claudia Henn.  Who is she?

17:14:18 8  A.  Claudia Henn is a physician in the medical affairs division.

17:14:22 9  Q.  Okay.  And you're talking about corrections to Document 1A,

17:14:30 10  version 04181, right?

17:14:33 11  A.  That's what the subject line says.

17:14:34 12  Q.  And this is April 18, 2015, right?

17:14:36 13  A.  Yes.

17:14:39 14  Q.  And do you remember specifically what that document was?

17:14:41 15  A.  Not exactly.

17:14:42 16  Q.  There's an e-mail from Dr. Henn --

17:14:46 17  A.  Yes.

17:14:46 18  Q.  -- on April 18, 2015, forwarding Document 1A.  Do you see that?

17:14:52 19  A.  Yes.

17:14:53 20  Q.  Okay.  And she has -- you know, she says, "I've read the

17:14:56 21  document, and I am fine with it.  I've only added a subheader,

17:14:59 22  'Clinical Trial Program,' in the chapter 2.1.1, Analysis of the

17:15:04 23  Relationship," and she goes on, right?

17:15:06 24  A.  Okay.

17:15:07 25  Q.  And then she has -- one, two, three -- four kind of bullet

17:15:12  1   points within her e-mail, right?

17:15:15  2   A.  Yeah.

17:15:16  3   Q.  Okay.  If you look right above that, you see your e-mail back

17:15:21  4   to her.  So you see you've responded to Dr. Henn on the page before

17:15:31  5   April 18, 2015?

17:15:33  6   A.  Yes.

17:15:34  7   Q.  Okay.  And what you say is, "Thank you for addressing these

17:15:37  8   remaining questions, which I also noted.  My thoughts are in red

17:15:40  9   below," right?

17:15:41 10   A.  Right.

17:15:42 11   Q.  So you took the text from her e-mail and you added some

17:15:47 12   comments to it, right?

17:15:48 13   A.  That's what it says.

17:15:49 14   Q.  Okay.  So what I want to look at is your comments to point

17:15:57 15   number 4 in Dr. Henn's e-mail.  Are you with me?

17:16:03 16   A.  Yes.

17:16:04 17   Q.  Bullet point 4 is, "In summary, no obvious relationship between

17:16:10 18   PT and bleeding events was observed in any of these analyses.

17:16:16 19   There were wide overlaps of the distribution of PT values between

17:16:20 20   patients with bleeding events of different severities and patients

17:16:24 21   without bleeding events within the box plots which did not allow

17:16:28 22   the determination of a threshold of PT to identify patient at

17:16:32 23   higher risk of bleeding for any of the studies."  Did I read that

17:16:38 24   correctly?

17:16:39 25   A.  Yes.

1212

17:16:39  1    Q.  And then your comment is below.  Do you see that?

17:16:41  2    A.  Well, I see the writing below it.  It's not in color, so I

17:16:45  3    can't tell if it's mine.

17:16:46  4    Q.  Okay.  It says, "No, I don't think we can simply state no

17:16:48  5    correlation to plasma concentration"?

17:16:51  6    A.  Excuse me, actually, it's probably not mine because later it

17:16:54  7    has my initials and the colon and then my statement.

17:16:57  8    Q.  Okay.

17:16:58  9    A.  But if it were in color and as it said in red, we could see

17:17:01 10    better.

17:17:01 11    Q.  We'll get to that.  Maybe we can clear this up.  There's a

17:17:07 12    comment below number 4 that says, "No, I don't think we can simply

17:17:10 13    state no correlation to plasma concentration.  This would be too

17:17:15 14    simplified and could be misleading as there are correlations to

17:17:19 15    CMAX, area under the curve, et cetera, in dose-finding trials,

17:17:27 16    e.g., this is my understanding.  Am I right?"  Do you see that?

17:17:27 17    A.  Yes.

17:17:28 18    Q.  And then there's SDB.  That's you, right?

17:17:32 19    A.  That's me.

17:17:32 20    Q.  You say, "I believe you are correct and this is an appropriate

17:17:36 21    way to state it," right?

17:17:37 22    A.  That's what it says.

17:17:37 23    Q.  So you agree that you can't simply state there is no

17:17:40 24    correlation to plasma correlation and that that would be too

17:17:45 25    simplified and could be misleading, right?

17:17:47  1    A.  Exactly as I had said previously.

17:17:50  2    Q.  Right.  So if anyone is out there telling people that there is

17:17:52  3    no correlation between plasma concentration and bleeding, they're

17:17:57  4    misleading them, right?

17:17:57  5    A.  If anyone is out there saying that, they may simply be the lack

17:18:02  6    of understanding, as it's been quite complicated.  You've seen the

17:18:06  7    years in which we've been discussing this back and forth.  I don't

17:18:13  8    believe that anybody is intentionally misleading patients.

17:18:14  9    Q.  Well, whether they are doing it intentionally or not, it's

17:18:16 10    still misleading, correct?

17:18:16 11    A.  It depends on what they're saying.  We would have to see what

17:18:20 12    you're actually talking about.

17:18:21 13    Q.  So do you agree that PT is predictive of bleeding with Xarelto?

17:18:26 14    Whether you like the test or not, do you agree that it's predictive

17:18:30 15    of bleeding?

17:18:31 16    A.  So in the work that we've discussed in the Phase II, we can see

17:18:33 17    that there's a correlation with it.  What we've also seen with that

17:18:37 18    is that whether patients have a high PT or not, if you look at

17:18:41 19    patients with bleeding outcomes, with bleeding events, you can find

17:18:44 20    patients with and without high PT.  So in that sense, it's not

17:18:48 21    helpful to me as a physician.  It's simply referring to what we

17:18:52 22    already talked about before, that it's not about just having an

17:18:55 23    elevated PT level or an elevated concentration.  Patients bleed

17:19:01 24    because of other clinical factors, and then you have an

17:19:03 25    anti-thrombotic, whatever it is, on board.

17:19:05  1   Q.  Okay.  I want to get back to this idea of PT being predictive

17:19:09  2   of bleed risk, okay.  And I want to show you what I am marking as

17:19:14  3   Exhibit 55, and this is Plaintiffs' 1094903.  Do you recognize

17:19:24  4   Exhibit 55 as your notes that are taken in the ordinary course of

17:19:28  5   business?

17:19:29  6   A.  They look like notes that I would take.

17:19:31  7   Q.  You don't have anything that would suggest these are not your

17:19:35  8   notes, correct?

17:19:35  9   A.  Correct.

17:19:37 10   Q.  And so those are your notes from a consolidation call on the

17:19:43 11   Xarelto PK/PD statement July 31, 2014, right?

17:19:48 12   A.  Correct.

17:19:49 13   Q.  Do you recall this consolidation call and what that would have

17:19:53 14   been about?

17:19:53 15   A.  Not exactly.

17:19:55 16   Q.  So you don't have any memory of a call on this, mail who was on

17:19:58 17   the call, anything like that?

17:19:59 18   A.  No.

17:20:00 19   Q.  Well, you -- you take a few notes here.  And I want to point

17:20:07 20   to, you note that bleeding tend to higher values, correct?

17:20:12 21   A.  What's that -- I -- yeah, it says, "Bleeding tend to higher

17:20:15 22   values."  As I look through these, though, it seems like I am

17:20:18 23   taking notes of what different people might be saying.

17:20:21 24   Q.  Okay.  When you take notes like this, do you write if you

17:20:24 25   disagree with something?

17:20:25  1    A.   No.   As a matter of fact, usually it would have corrections of

17:20:29  2    spelling if they were like my final notes or ones that I was using.

17:20:33  3    If they're just something -- if I am at a meeting and I want to

17:20:36  4    take down some concepts so I can use them while I am at the

17:20:41  5    telecon, it would look like this, rather rough.

17:20:45  6    Q.   Okay.   Okay.   And -- and another one of your notes is, "PT is

17:20:46  7    predictive of bleeding, so cannot say that."   Did I read that

17:20:49  8    right?

17:20:49  9    A.   Yes, you read that right.   I'm not exactly sure what that

17:20:52  10   means.   Say what?   I'm not sure.   It says P -- says, "PT is

17:20:57  11   predictive of bleeding, so cannot say that."   So I don't know what

17:21:00  12   that --

17:21:00  13   Q.   Yeah, I mean, the notes aren't written in a way where we can

17:21:02  14   understand what it is you're noting that cannot be said.

17:21:02  15   A.   Right.

17:21:07  16   Q.   But they do establish your note that PT is predictive of

17:21:10  17   bleeding, right?

17:21:11  18   A.   Yeah, I mean, this -- this is saying that PT is predictive of

17:21:15  19   bleeding, which is something that we've said over and over the last

17:21:17  20   couple of hours.

17:21:18  21   Q.   Would you agree with me that Bayer itself has concluded that

17:21:21  22   bleed risk increases with PT?

17:21:23  23   A.   I believe I stated all morning that there's seen a relationship

17:21:29  24   into the risk of bleeding when you isolate it as you have in

17:21:32  25   looking at PK samples, PT samples and the like.

17:21:35 1    Q.   Okay.  You understand the FDA also believes that -- that an

17:21:41 2    increased PT leads to increased bleed risk, correct?

17:21:44 3    A.   I would assume that that's the -- I mean, we had agreement on

17:21:48 4    that, that in preparation of the AdCom and for going forward.  So I

17:21:54 5    would assume that's -- that's still their position.

17:21:56 6    Q.   I understand you are a medical doctor?

17:21:58 7    A.   I am.

17:21:58 8    Q.   Are you board-certified in a particular area?

17:22:01 9    A.   In internal medicine.

17:22:02 10   Q.   And are you actually licensed to practice medicine?

17:22:05 11   A.   Yes, I am.

17:22:05 12   Q.   Currently what states are you licensed?

17:22:07 13   A.   Pennsylvania, North Carolina, although I've had licenses in

17:22:10 14   other states, but as I am not in those areas, I released them.

17:22:14 15   Q.   Okay.  You said you currently work at Bayer?

17:22:17 16   A.   I currently work at Bayer.

17:22:19 17   Q.   How long have you worked at Bayer?

17:22:20 18   A.   Just over ten years.  Almost ten and a half.

17:22:23 19        MS. WILKINSON:  Your Honor --

17:22:24 20   A.   Since April 2006.

17:22:26 21     (WHEREUPON, THE VIDEO DEPOSITION OF SCOTT D. BERKOWITZ WAS

17:22:27 22      PAUSED FOR THE DAY.)

17:22:27 23        MS. WILKINSON:  Your Honor, this is our portion.  We have

17:22:28 24   quite a bit to play.  Could we break and start again in the

17:22:31 25   morning?

17:22:32　1　　　　　　　THE COURT:  I didn't hear you.  What did you say?  Let's

17:22:43　2　see.

17:22:43　3　　　　　(WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

17:22:45　4　　　　　　　MS. WILKINSON:  Yes, sir.  There's quite a bit more, and

17:22:47　5　we want to play it in the morning and not later.

17:22:50　6　　　　　　　MR. BIRCHFIELD:  I think we have about 20 to 25 minutes

17:22:53　7　left.  The issue is we changed the schedule to accommodate the

17:22:58　8　defense witness tomorrow morning.  I think we need to finish this

17:23:01　9　so we can get started.

17:23:03　10　　　　　　　MR. MEUNIER:  It's 20 minutes.

17:23:04　11　　　　　　　MS. WILKINSON:  Well, it wasn't a problem.  It's because

17:23:06　12　we went all day today, both sides.

17:23:11　13　　　　　　　MR. MEUNIER:  It's 20 minutes, though.

17:23:13　14　　　　　　　MS. WILKINSON:  Go ahead.

17:23:17　15　　　　　　　MR. BARR:  The agreement Jim and I had we would put

17:23:20　16　Mr. Jalota on first thing in the morning -- I'll get it right one

17:23:23　17　of these times, hopefully by tomorrow -- and we would have him off

17:23:28　18　before lunch.  So long as this doesn't impact that.  And we

17:23:32　19　recognize, you know, that we're adding 20 minutes in the morning we

17:23:37　20　weren't expecting.  I am agreeable to that.  But it's really --

17:23:41　21　your Honor, if you want to sit here --

17:23:45　22　　　　　　　THE COURT:  You know, I realize that the jury is -- this

17:23:48　23　is very hard for them to proces it; but at the same time, I don't

17:23:52　24　want your guy to have to leave.

17:23:54　25　　　　　　　MR. IRWIN:  We're okay with that.

1218

| | |
|---|---|
| 17:23:56 1 | MS. WILKINSON:  We're okay.  We can start in the morning. |
| 17:23:58 2 | MR. BIRCHFIELD:  They just told me it's 22 minutes left. |
| 17:24:02 3 | THE COURT:  So you have 22 minutes. |
| 17:24:02 4 | MS. WILKINSON:  So we can finish it in the morning and |
| 17:24:03 5 | then go right to that. |
| 17:24:05 6 | THE COURT:  We'll start at 8:30 and start your guy at |
| 17:24:08 7 | 9:00.  Will that work? |
| 17:24:11 8 | MR. IRWIN:  Yes, sir. |
| 17:24:12 9 | THE COURT:  All right.  We'll stop here. |
| 17:24:12 10 | (OPEN COURT.) |
| 17:24:22 11 | THE COURT:  Members of the jury, we'll stop here.  Come |
| 17:24:24 12 | tomorrow at 8:30.  Tomorrow we'll hear about 20 more minutes for |
| 17:24:27 13 | this and then we'll start a doctor tomorrow, someone else tomorrow. |
| 17:24:35 14 | It will be a little different, it will be video, but it |
| 17:24:37 15 | will be live video.  We've got, in the federal court, in New |
| 17:24:46 16 | Jersey, subpoenaed the person to go to the federal courthouse in |
| 17:24:49 17 | New Jersey, and we're going to stream the testimony to you.  The |
| 17:24:52 18 | lawyers will be here, the witness will be there, and they will be |
| 17:24:56 19 | asking the witness questions and the witness will be answering |
| 17:24:59 20 | them. |
| 17:25:00 21 | You all have seen that on television and during the news, |
| 17:25:04 22 | so we're going to do it that way this time. |
| 17:25:07 23 | Okay.  All right.  The Court will stand in recess. |
| 17:25:10 24 | Please do the same thing, put your tablets in the jury room and |
| 17:25:18 25 | don't speak to anybody about the case.  See you all tomorrow |

17:25:21  1    morning at 8:30.  Okay.

17:25:47  2         (WHEREUPON, THE JURY EXITED THE COURTROOM.)

17:25:47  3         THE COURT:  Okay.  I will see you all tomorrow at 8:15,

17:25:51  4    and I'll either rule at that time or whatever on that other matter

17:25:55  5    that we have before me.

17:25:59  6         MR. BARR:  We will probably have to take up the Canadian

17:26:02  7    issue in the morning, the Canadian label issue, that will come up

17:26:05  8    with Mr. Jalota.

17:26:06  9         THE COURT:  Okay.  I can do that now, if you want.  Are

17:26:11 10    you tired?

17:26:12 11         MR. BARR:  I am happy to do it now -- or I should say I

17:26:16 12    am happy to let Jerry do it now.

17:26:18 13         THE COURT:  I really understand the issue, I read it, I

17:26:21 14    heard you all before, so I am ready to do a ruling.

17:26:24 15         I have before me a motion, the defendant seeks to exclude

17:26:28 16    certain documents and statements reflecting what the doctor told or

17:26:34 17    communicated in some way to a foreign regulatory agency; namely,

17:26:41 18    the Canadian Regulatory Agency.  I assume it's something like the

17:26:46 19    FDA here.

17:26:48 20         In the opening statement, the defendant said the

17:26:51 21    following:  "The plaintiffs have suggested to you that there is

17:26:55 22    actually tests that that we wouldn't put on the label.  Think about

17:27:02 23    what they're saying.  They're saying that we know about a test and

17:27:07 24    we lied about it because we didn't want to save people's lives.

17:27:12 25    That's what they're asking you to believe in this case."

17:27:17  1        In short, it seems to me the defendant suggests that

17:27:20  2   there is no such test and that the defendants know of no such test

17:27:27  3   or any test.  This is consistent, frankly, with what the

17:27:32  4   defendant's position is, that there is no test and they don't know

17:27:37  5   of any.

17:27:37  6        Yet they told the Canadian authorities the following:

17:27:42  7   "Although there is no need to monitor clinical practice in certain

17:27:49  8   in-treatment situations such as an overdose, acute bleeding, or

17:27:54  9   urgent surgery, in cases of suspected or noncompliance, I assume

17:27:59 10   not taking the drug, or in other unusual circumstances, assessment

17:28:06 11   of the anticoagulant effect of rivaroxaban may be appropriate."

17:28:12 12   "Accordingly," they say, "measuring PT may be useful to inform

17:28:19 13   clinical decisions in these circumstances."

17:28:23 14        The significant issue in the case, it seems to me, is

17:28:26 15   what the defendant knew, when they knew it, and whether or not any

17:28:34 16   prior statements that conflict with their position is admissible.

17:28:40 17        I am concerned about the fact that this is a statement

17:28:44 18   made in connection, I assume, with the approval of the label by

17:28:52 19   Canada.  Canada, like Europe, has a different process and they do

17:28:57 20   have a different process and, therefore, I had felt that it was

17:29:04 21   confusing, at best, to perhaps not even relevant under 401, but if

17:29:12 22   relevant, certainly not admissible under 403 to allow labels from

17:29:18 23   Canada to come into the litigation or labels from Europe to come

17:29:22 24   into the litigation.

17:29:25 25        But this is a statement made, and it's at least arguably

17:29:33   1   inconsistent with what the position of the defendant is.  It's

17:29:42   2   certainly an 801(d)(2) situation where it would be admissible, even

17:29:48   3   though it's a prior statement; it would also be admissible under

17:29:54   4   613 as a prior statement.

17:29:57   5          So I am going to allow it, but I will instruct the jury

17:30:03   6   that it's only relevant to what the defendant knew or when they

17:30:08   7   knew it.  Knowledge of the defendant.

17:30:13   8          Any reference to any Canadian label, I am going to tell

17:30:19   9   them to disregard.  I would hope I wouldn't have to do that because

17:30:22  10   I hope that doesn't come up from the plaintiff's standpoint.  I am

17:30:25  11   not interested in what the label is or any reference to the label.

17:30:31  12   If a reference does come into -- mentioning the label, I am going

17:30:36  13   to instruct the jury to disregard that and to only consider it

17:30:41  14   insofar as a statement is made regarding when the defendant knew

17:30:47  15   the information and what they knew.

17:30:51  16          So that's going to be my ruling.  I will allow it, but I

17:30:55  17   will -- I may have to have an instruction to the jury to that

17:30:59  18   effect.

17:31:00  19          MR. MEUNIER:  Your Honor, I understand the Court's

17:31:03  20   ruling, and there will be reference to the label, so I think that

17:31:05  21   limiting instruction you mentioned --

17:31:07  22          THE COURT:  Well, I will instruct the jury then to

17:31:09  23   disregard.  And I'll explain why.  The label reference can be

17:31:14  24   confusing, and I am going to have to surgically remove that.

17:31:20  25          I wish I didn't have to, but it's a situation where the

17:31:25  1   whole theory of the defendant's case is based on that, that there

17:31:33  2   was no test available.

17:31:36  3        Now, you can weasel word it or at least use words like

17:31:41  4   "no credible test," "no satisfactory test," but, really, that

17:31:49  5   created the situation where there is no test that does this.  The

17:31:52  6   plaintiffs say there is a test that would be helpful.  The

17:31:56  7   defendants say it's not helpful.

17:31:59  8        So the concepts -- I mean, words that put this issue, at

17:32:06  9   least, in play, I think the jury ought to hear it.  But I am going

17:32:13 10   to try to surgically remove that from the label and explain to them

17:32:17 11   why.

17:32:18 12        Thank you very much.  The court will stand in recess.

17:32:20 13        THE DEPUTY CLERK:  All rise.

17:32:22 14    (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

         15

         16                    * * * * * *

         17

         18            REPORTER'S CERTIFICATE

         19        I, Karen A. Ibos, CCR, Official Court Reporter, United
              States District Court, Eastern District of Louisiana, do hereby
         20   certify that the foregoing is a true and correct transcript, to the
              best of my ability and understanding, from the record of the
         21   proceedings in the above-entitled and numbered matter.

         22

         23        /s/ Karen A. Ibos
              Karen A. Ibos, CCR, RPR, CRR, RMR
              Official Court Reporter

         24

         25

─────────────── OFFICIAL TRANSCRIPT ───────────────