UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION

THIS DOCUMENT RELATES TO:

Joseph Orr, Jr., as Lawful
Surviving Spouse of
*Sharyn Orr v. Janssen, et al.*
*Case No. 2:15-cv-03708*

Docket No. 14-MD-2592
Section L
New Orleans, Louisiana
Tuesday, June 6, 2017

*********************************************************************

TRANSCRIPT OF TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE ELDON E. FALLON,
UNITED STATES DISTRICT JUDGE,
AND A JURY.
VOLUME VI - MORNING SESSION

*********************************************************************

APPEARANCES:


FOR THE PLAINTIFFS'
LIAISON COUNSEL:

MR. ANTHONY BIRCHFIELD, JR.
Beasley Allen Crow Methvin
  Portis & Miles
Post Office Box 4160
Montgomery, AL  36103

MR. BRIAN H. BARR
MR. NEIL E. McWILLIAMS
Levin Papantonio Thomas
  Mitchell Rafferty & Proctor
316 Baylen Street
Suite 600
Pensacola, FL 32502

MR. GERALD EDWARD MEUNIER
Gainsburgh, Benjamin, David,
  Meunier & Warshauer
Energy Centre
1100 Poydras Street
Suite 2800
New Orleans, LA  70163-2800

**OFFICIAL TRANSCRIPT**

MS. EMILY JEFFCOTT
The Lambert Firm, PLC
701 Magazine Street
New Orleans, LA  70130

MR. BRADLEY D. HONNOLD
Goza & Honnold, LLC
11181 Overbrook Road
Suite 200
Leawood, KS 66211

FOR THE DEFENDANT JANSSEN            MR. JAMES B. IRWIN, V
PHARMACEUTICALS, INC.,               Irwin Fritchie
and JANSSEN RESEARCH &                  Urquhart & Moore, LLC
DEVELOPMENT, LLC:                    400 Poydras Street
                                     Suite 2700
                                     New Orleans, LA  70130

FOR THE DEFENDANT                    MR. DAVID E. DUKES
BAYER HEALTHCARE                     Nelson Mullins Riley &
PHARMACEUTICALS, INC.,                  Scarborough, LLP and
BAYER PHARMA AG:                     Meridian, 17th Floor
                                     1320 Main Street
                                     Columbia, SC  29201

                                     MS. BETH A. WILKINSON
                                     Wilkinson Walsh + Eskovitz, LLP
                                     1900 M Street NW
                                     Suite 800
                                     Washington, DC 20036

REPORTED BY:  Mary V. Thompson, RMR, FCRR
              United States District Court
              500 Poydras, Room B275
              New Orleans, LA  70130

**OFFICIAL TRANSCRIPT**

## EXAMINATION INDEX

PAGE NO.

Plaintiffs' Witness:

SCOTT BERKOWITZ, M.D.,

    (By video deposition).................   1226


SANJAY JALOTA

    Direct Examination....................   1244

**OFFICIAL TRANSCRIPT**

<b>P R O C E E D I N G S</b>

(MONDAY, JUNE 5, 2017)

(MORNING SESSION)

08:28:13

                           (Jury in at 8:28 a.m.)

                        (Call to order of the court.)

THE COURT:  Be seated, please.

Good morning, ladies and gentlemen.

We were looking at the TV deposition.  Let's play the
08:29:11 rest of it.

We have 22 minutes left, members of the jury.

<b>SCOTT BERKOWITZ, MD.,</b>

having been first duly sworn, testified as follows, to wit:
08:29:12

<b>EXAMINATION</b>

Q.   I understand you're a medical doctor?

A.   I am.

Q.   Are you board certified in a particular area?

A.   In internal medicine.

08:29:18 Q.   And are you actually licensed to practice medicine?

A.   Yes, I am.

Q.   Currently what states are you licensed in?

A.   Pennsylvania, North Carolina.  Although I've had
licenses in other states, but as I'm not in those areas I have
08:29:30 released them.

1    Q.    You said you currently work at Bayer?

2    A.    I currently work at Bayer.

3    Q.    How long have you worked at Bayer?

4    A.    Just over 10 years now.  Almost 10 and a half.

08:29:39    5    Q.    Since April of 2006?

6    A.    April 2006.

7    Q.    What's your current role at Bayer?

8    A.    I'm vice-president and head of the thrombosis group in

9    clinical development.

08:29:50    10    Q.    And explain for the jury, if you would, please, what

11   your personal work primarily focuses on as the head of the

12   thrombosis group, the global head, and with an eye towards

13   clinical development at Bayer.

14    A.    So my job is to oversee our antithrombotics portfolio.

08:30:11    15   Those are drugs that are trying to address the conditions of

16   blood clotting.  So stroke; deep-vein thrombosis, leg clots;

17   pulmonary emboli, which are clots that can cause shortness of

18   breath and patients to die, these kinds of conditions.  So we

19   work to develop drugs to prevent these.

08:30:33    20    Q.    There was a fair amount of talk with counsel for the

21   plaintiffs about the risk side of the equation with respect to

22   Xarelto and anticoagulants and antithrombotics.  The benefit

23   side -- what is the benefit side and how does it relate to what

24   you were just describing to us?

08:30:55    25    A.    Well, the benefit side is that we can identify in many

**OFFICIAL TRANSCRIPT**

 1  patients risk factors that lead them to clot.  And then on the --

 2  so that would be a preventative type of preventing these blood

 3  vessels -- I'm sorry -- these blood clots.

 4          It's important to remember that the hemostatic system

08:31:11
 5  is a balance, and certain clots can be good if you have a break

 6  in a blood vessel or a peptic ulcer.  You develop a clot to close

 7  that down.  That's physiologic.  The body is doing that on

 8  purpose.

 9          But it becomes pathologic when it goes beyond the usual

08:31:28
10  need, when some disease state occurs or you have certain risk

11  factors.  And so we inhibit those clots.  And then there is

12  another group where you have a clot and we treat that clot.  So

13  there's the preventive or prophylaxis like we talked in SPAF, and

14  then there is the treatment kind; once you get it, what do you

08:31:44
15  do.

16      Q.   Just to make that a bit more understandable for folks

17  like myself, do blood clots cause strokes?

18      A.   Yes.  That's the -- that's the cause of most of the

19  strokes is a blood clot.

08:31:55
20      Q.   And do people die who have blood clots?

21      A.   People do die.  First of all, about 60 percent of the

22  clots that you get in SPAF, these blood clots are debilitating

23  strokes.  They are not little ones.

24      Q.   So when we're talking about the efficacy side of the

08:32:11
25  equation in these medications that you work on, are we talking

**OFFICIAL TRANSCRIPT**

1  about medications that are designed to basically prevent these

2  types of things from occurring?

3      A.   The goal of developing these drugs is to take care of

4  these major unmet needs where people have a high risk of

08:32:28  5  clotting, and these are among the top two or three causes of

6  death in the world.

7      Q.   To save people's lives?

8      A.   That's the whole point, yeah.

9      Q.   How many doctors or clinical trial folks report to you

08:32:40  10  now?

11      A.   I have seven physicians reporting to me at this time.

12      Q.   And they all work on various clinical trials?

13      A.   Different aspects of our clinical trials.  We have a

14  very large program with Xarelto.  The company has invested in

08:32:52  15  this over a long period of time in many different areas of unmet

16  need, which is a very exciting part to me as I've spent my life

17  developing antithrombotic drugs.  So we're having the opportunity

18  to look at other areas of unmet need that often go ignored and

19  then doctors are left with not having the information.

08:33:12  20      Q.   When you use the phrase "unmet need," what do you mean?

21      A.   Well, these are areas where we don't think the current

22  standard of care is sufficient or there may not be any good

23  therapy at the time.  So our goal is to -- we focus first --

24  that's how we make our decision as to where to go, is where there

08:33:31  25  isn't the most important need, but where we think a particular

**OFFICIAL TRANSCRIPT**

1   molecule and a particular class will be effective.

2       Q.   Let me ask you about OD versus BID and that decision

3   you're talking about.  What do you mean that was a

4   follow-the-science type of decision?

08:33:47

5       A.   Well, you know, the initial part -- and I think

6   Mr. Barr and I discussed this.  When one first looks at drugs in

7   general, we often look at the half-life and it gives us some

8   sense about what a drug might be if it is oral.  Is it once a

9   day, twice a day, three times a day.  That's a first step.

08:34:04

10      But coagulation is a little bit different.  And,

11  initially, Xarelto was the same way.  It was looked at first from

12  the half-life, and it was started off in twice-a-day dosing.  And

13  several trials were done.  There were three orthopedic trials

14  done that way.

08:34:19

15      But while that was going on, then some more

16  sophisticated coagulation testing was done.  First, they do the

17  usual, PT, PTT, the things that we have available in hospital

18  labs.  But there was another test being developed back in that

19  time which is used now, although not so easy to do as a PT or

08:34:35

20  PTT, and that's called the thrombin generation time.

21      And the bottom line is it's just a measure of how a

22  molecule might affect thrombin.  And thrombin, as we said, is an

23  important molecule in coagulation.

24      So what we learned in those studies -- and, actually, I

08:34:50

25  should say what they learned because I wasn't there at the

**OFFICIAL TRANSCRIPT**

1  company -- was that the molecule inhibited thrombin for over

2  24 hours.  The PT, you know, there's a shorter period of time.

3  The half-life, a shorter period.

4         But our goal with coagulation is affecting the clotting

5  in the patient.  Not in the test tube, not in the PT test or PTT

6  test or any of those tests, but in the patient.  And so they

7  started adding OD, once a day, in the testing.  Well, that's

8  following the science.

9         It cost us, I think, nine months or a year.  We added

10  another program.  We could have gone to market, if things were

11  successful, a year earlier, but that wasn't the way they

12  developed that molecule.

13         There's four orthopedic dosing studies, two DVT/PE

14  studies, a full range in ACS.  That's the kind of thing that a

15  scientist really appreciates inside a company.

16    Q.   And do you consider Xarelto to be an improvement over

17  warfarin and heparin and low molecular-weight heparin?

18    A.   I certainly do not discount the value of warfarin and

19  its effectiveness, but it is so hard to use that many patients

20  don't want to be on it, can't be on it.  The doctors can't manage

21  it.

22         And I certainly consider Xarelto to be a major

23  achievement.  If we think about what happens to a patient today,

24  versus when we're talking 15 years ago, who has deep-vein

25  thrombosis with risk of pulmonary embolism, what happens today?

08:35:06
08:35:23
08:35:40
08:35:58
08:36:13

**OFFICIAL TRANSCRIPT**

1   They go to the doctor's office or the emergency department, and
2   what would happen 15 years ago is they would be admitted to the
3   hospital and they would be started on unfractionated heparin.
4          And today they go to the doctor's office or an
5   emergency room.  They get oral Xarelto.  In two hours the doctor
6   knows that it's effective and they can go home.  I would say
7   that's a major advance for patients and doctors in the health
8   care system.
9      Q.   I've heard the phrase "fixed dosing without the need
10  for routine anticoagulation monitoring" with respect to Xarelto.
11  Are you familiar with that phrase?
12     A.   I've heard that term before, yes.
13     Q.   Okay.  What does "fixed dosing" mean?
14     A.   Fixed dosing just means that we've studied a range of
15  doses to get us into Phase III.  We choose a dose, we test it,
16  and if it's effective and safe, the patients can get that dose
17  and then it's fixed at that dose.
18         Now, some adjustments might be needed.  For example, in
19  SPAF, we know that patients with moderate renal failure need some
20  dosing adjustment.  We tested for that.  So you can think of us
21  giving two doses in the SPAF ROCKET-AF program.  But we fixed it
22  at that dose after doing some study.
23     Q.   Does every indication for Xarelto have the same dose?
24     A.   Well, that's something unique to the program.  We've
25  studied Xarelto indication by indication.  That's time consuming,

08:36:30
08:36:45
08:36:59
08:37:19
08:37:35

**OFFICIAL TRANSCRIPT**

1    resource consuming, but each patient population is different and
2    needs to be tested according to the patient population.  So this
3    is why we have in many cases different doses for the different
4    indications.

5        Q.    For example, what are the two doses for SPAF that -- or
6    atrial fibrillation that you just mentioned?

7        A.    So we use 20 milligrams once a day for patients unless
8    their creatinine clearance, which is a measure of kidney
9    function, is in the range of 49 milliliters per minute down to
10   30 milliliters per minute.  If it's lower than that, then we
11   recommend not to be using Xarelto.

12       Q.    Do patients taking Xarelto for any of these indications
13   need to have their blood monitored to make sure they're getting
14   the proper dose?

15       A.    No.  We do not believe that they need to be done.  And
16   that's not just because we want to say that, but because we have
17   the trial proof to show that and the pharmacokinetic and
18   pharmacodynamic information.

19       Q.    And what is it about the pharmaco and -- the
20   pharmacodynamic or the PK/PD profile of Xarelto that makes it so
21   you don't need to do this type of monitoring?

22       A.    Well, we see that the -- when the Cmax comes in for
23   patients and when the drug is eliminated, we know that we can
24   give it once a day.  It does not accumulate.  So you can give,
25   the next day, the next dose, and there won't be this buildup of

08:37:51
08:38:10
08:38:26
08:38:46
08:39:02

**OFFICIAL TRANSCRIPT**

1    drug because it's metabolized.  We understand its metabolism very

2    well.  We know that it has several routes of elimination.  So

3    it's not primarily renal.  It's partly renal and partly liver.

4    Actually, a third goes out the kidney unchanged.  One-third is

08:39:22   5    metabolized by the kidneys and one-third is metabolized by the

6    liver, so it has a nice spread.

7           We know that food doesn't affect it.  We know that food

8    improves absorption, but it's important to understand that

9    Xarelto is not, at high doses, well absorbed.  It works very well

08:39:40   10   under doses of, say, 60 milligrams, which is higher than we often

11   use -- or that we ever use, actually.  But as you increase it,

12   there's less and less absorption of the drug.  It's not that

13   soluble.

14          So these are characteristics that are important to

08:39:55   15   managing that part about not needing routine coagulation

16   monitoring.

17      Q.   Okay.  And when we talk about routine anticoagulation

18   monitoring with respect to anticoagulants, just to be clear

19   again, define that for us.  What is it you're talking about?

08:40:12   20      A.   I'm sorry.  Routine --

21      Q.   Yeah.  Routine anticoagulation monitoring --

22      A.   Oh.

23      Q.   -- or anticoagulation monitoring.

24      A.   Just meaning a requirement that we have to check

08:40:19   25   periodically to make sure that the drug is in a certain level,

**OFFICIAL TRANSCRIPT**

1    that's not necessary.

2        Q.   And is that one of the problems that Xarelto was

3    developed to solve, the need for that with a drug like warfarin?

4        A.   It is my opinion that that's the major importance.  I'm

08:40:35   5    not really understanding why one would want to develop a drug

6    that needs monitoring if we could put our efforts -- we're only

7    going to get to do in this world a few kinds of projects, and I

8    would think that's where the development should be, in drugs that

9    don't need to be monitored.

08:40:51   10        Q.   Okay.  And to be clear, does the absence of the need

11    for a routine anticoagulation monitoring recommendation mean that

12    doctors don't need to bring the patients in for visits to check

13    on them or keep an eye on them?

14        A.   No.  I think this is a misunderstanding.  What's

08:41:11   15    happened over the years is people have become -- with warfarin,

16    we're focusing on the INR visit, the visit where they come at

17    least once a month to see the doctor to check the blood test.

18             But anticoagulants, whatever they are, are potent

19    medicines.  It's not candy.  These patients have to be watched

08:41:28   20    carefully.  You have to know your patient.  You have to watch

21    them and ask them the questions every month or few weeks or

22    whatever you choose.  But you have to find a time to talk with

23    the patient about how they're doing on their medicine and their

24    thrombotic disease.  This requires physicians to watch their

08:41:46   25    patients.

**OFFICIAL TRANSCRIPT**

1      Q.    Let me ask you -- plaintiffs' counsel in his questions

2  to you asked you about the correlation between blood plasma

3  concentration of rivaroxaban and bleeding risk.  Do you recall

4  that?

08:42:07    5      A.    Right.

6      Q.    And he asked you questions about whether it would be

7  misleading to say that there's no correlation between Xarelto,

8  blood plasma concentration, and bleeding risk.  Do you recall

9  that conversation?

08:42:21   10      A.    Yes.  It was a little bit confusing because there was

11  some mix-up with concentrations and PTs, and I was not clear on

12  some of the questions.

13      Q.    Okay.  In what phase of the clinical trials did the

14  company primarily look at the PK/PD parameters and blood plasma

08:42:42   15  concentration and bleeding risk?

16      A.    So all that work was done in the Phase III -- sorry --

17  the Phase II studies, the dosing studies, so the Orthopedic 4

18  Phase II studies, the VTE treatment Phase II studies.  We also

19  had ACS studies.

08:42:58   20      Q.    And how would you characterize the range of doses that

21  were looked at in Phase II?

22      A.    Well, there we went to a range from 1.25 milligrams, I

23  believe, all the way up to 80 milligrams.  These are

24  80 milligrams, of course, and above 20 milligrams, as you know,

08:43:15   25  we don't use, but we did a wide range in those studies.  That's

**OFFICIAL TRANSCRIPT**

1   the purpose of them.

2       Q.   And what did you see in the Phase II when you looked at

3   this broad or wide range of doses?  What did you see with respect

4   to concentration increases at those higher doses and the

08:43:33   5   correlation to bleeding risk?

6       A.   Well, I think this is where the confusion came in.  So

7   I was thinking about our work in Phase II, and when you get up

8   into that range, into 60 and 80 milligrams, then you certainly

9   can see some increase in relationship to bleeding risk.

08:43:49   10       But it's not in the phase -- in the indication doses

11   that we use, like 20 milligrams or 10 milligrams in the -- the

12   different indications we have approval for.

13       Q.   Do you see a correlation between bleeding risk and

14   blood plasma concentration within the therapeutic doses?

08:44:12   15       A.   I don't believe that's been shown.  I don't think we

16   saw that.  We just saw it in our in Phase II studies where we

17   really looked at this carefully at the high ranges.

18       Q.   The high range of doses?

19       A.   High range of doses.

08:44:23   20       That's part of that whole program, looking for -- we

21   didn't know where it was going to come in, but that's where it

22   came in, at doses that are not used or approved.

23       Q.   Is there a difference between monitor and measure, in

24   your mind?

08:44:33   25       A.   Yes.  I think when we -- it's -- we have to be careful

**OFFICIAL TRANSCRIPT**

1    about the words that we use, and we want to be clear with each

2    other when we use them.

3             So in this context, we've been using "monitor" to mean

4    checking periodically and being required to do that, a laboratory

08:44:50  5    test.  That's as opposed to being able to measure something that

6    the company has worked on for years and has achieved with other

7    commercial companies.  We do have the laboratory test that can be

8    used to measure.  It's not yet approved in the U.S., but it's

9    something we've worked hard with the companies to allow.

08:45:09  10        Q.   What test is that?

11        A.   Well, this is a test that's not based on the PT test,

12   because that -- although research was done on that, it's just not

13   reliable as a base for the test.

14        Q.   Let me pause you there.

08:45:21  15             When you say research was done on that, who did that

16   research?

17        A.   Well, the way we worked for this is we weren't trying

18   to have a commercial test of our own from Bayer.  So the company

19   worked with actually five companies that are diagnostics

08:45:36  20   companies, and we gave intellectual support along with academic

21   leaders and provided substance to use to do the testing.  So it

22   was done independently, but we talked with the thought leaders on

23   that.

24        Q.   Did you also provide Dr. Ted Spiro to work on that?

08:45:52  25        A.   Yes.  Dr. Ted Spiro's a -- was actually a pathologist

**OFFICIAL TRANSCRIPT**

1    initially, but worked in antithrombotics for many years.  And he

2    reports to me.  He had expertise in that area.  So he's been

3    working on that.

4        Q.   What was -- why was the company looking at PT in terms

5    of developing a test that could measure prothrombin time in the

6    context of the Xarelto development program?

7        A.   Well, they were looking at it, not that the PT itself

8    would be, but that you could use it as the base to develop a

9    test.  And it's simpler.  So -- and doctors would have some --

10   more familiarity.  The lab -- it would be a little bit easier.

11   So that's the start.  I mean, if you could, you would.

12        But doing that work, it turned out that anti-Factor Xa

13   assay, which is a little bit more complicated, was a better base,

14   a more reliable base, to develop the entire test on.

15        Q.   So as between the PT test, even when using the

16   Neoplastine assay and the anti-Factor Xa for measuring

17   rivaroxaban, it turned out that anti-Factor Xa was the better way

18   to go?

19        A.   Yeah.  Because the PT test was -- was just not

20   sensitive, especially at the lower levels.

21        Q.   That said, does the U.S. label for Xarelto provide

22   information that doctors need, in your view, to make appropriate

23   decisions about how to best treat their patients?

24        A.   I think it does.

25        Q.   Why don't we take a look at a few.  Why don't we look

**OFFICIAL TRANSCRIPT**

1    at Example Section 5.

2         **A.**   Okay.

3         **Q.**   The warnings and precautions section.

4         **A.**   Right.

08:47:26  5   **Q.**   What is Section 5.2 headed?  What, if anything, does it

6    say with regard to evaluation of patients?

7         **A.**   Well, as we had discussed about how we care for

8    patients, promptly evaluate any signs or symptoms of blood loss,

9    and consider the need for blood replacement.

08:47:43  10        So clearly that's evidence that you have to watch

11   patients on anticoagulants.

12        **Q.**   What about, for example, Section 5.4, use in patients

13   with renal impairment?  What does it say with respect to patients

14   and what does it -- what type of information is provided to

08:47:58  15   doctors about patients with nonvalvular atrial fibrillation?

16        **A.**   In that particular situation, it says periodically

17   assess renal function as clinically indicated, that is, more

18   frequently in situations in which renal function may decline, and

19   adjust therapy accordingly to the dosage in administration

08:48:20  20   section of 2.4, where we provide that information.

21        **Q.**   One of the things you spent some time talking about was

22   language about PT in the United States product insert.  Do you

23   remember that?

24        **A.**   Yes.

08:48:31  25   **Q.**   And you said there was language about PT that was

**OFFICIAL TRANSCRIPT**

1    proposed by Janssen, I believe, that the regulatory authority

2    would not allow in to the label; is that correct?

3        A.    What I said was that we have standard language in our

4    CCDS, our core data sheet, and we include it in the SPC.  I know

08:48:51  5    that we use it for all the labels, and that it was initially

6    there.  And then, during the interchange back and forth, it's

7    not.  They struck it.  They have their reasons for why they do

8    different things, but that's what I know.

9        Q.    You were not involved in label negotiations between

08:49:08  10   Janssen and the FDA for the United States product insert, were

11   you?

12       A.    No, that's not correct.  I am.  I'm not deeply involved

13   in it.  They keep us in communication.  We may comment on the

14   label that they go back and forth.  So there's some interaction,

08:49:23  15   but they're responsible.

16       Q.    You were not, yourself, directly involved in the

17   negotiations negotiating the label with the FDA?

18       A.    No.  That's a part of the regulatory positions at

19   J & J.

08:49:37  20       Q.    And as I believe you testified to, you don't know why

21   the FDA struck that language, do you?

22       A.    I don't remember why that was.

23       Q.    Let me show you what I'm going to mark as Exhibit 58,

24   and this will be Plaintiffs' 2905274.

08:50:01  25             Exhibit 58 is a document entitled Xarelto USPI Label

**OFFICIAL TRANSCRIPT**

1    Contingency Document from LRC, April 23rd, 2009, correct?

2         A.    Yes.

3         Q.    And if you look, you'll see this -- there's a statement

4    in the middle of the box that says, "Will we need to add a new

08:50:16   5    5.4 laboratory section like Lovenox?"  Do you see that?

6         A.    I do.

7         Q.    You understand that Section 5 is the warning section of

8    the United States product insert, right?

9         A.    Yes.

08:50:27   10        Q.    Okay.  It says, "Only if section is requested, consider

11   modifying significantly without stool occult blood test and PT is

12   not insensitive."  Do you see that?

13        A.    Yeah.

14        Q.    And so the instruction is only give this if the section

08:50:46   15   is requested, right?

16        A.    Well, it says, "Only if section is requested, consider

17   modifying significantly without stool occult blood test and PT is

18   not insensitive."

19        Q.    Right.

08:50:59   20        A.    Yeah.

21        Q.    So if you go over to the third box there on the bottom,

22   it just has in bold at No. 1, "Defend not having any laboratory

23   monitoring statement in the warning section," doesn't it?

24        A.    Sorry.  Where are you?

08:51:14   25        Q.    This box right here (indicating).

**OFFICIAL TRANSCRIPT**

1       A.   Okay.  Thank you.

2       Q.   It says, "Defend not having any laboratory monitoring

3   statement," doesn't it?

4       A.   Yes.

08:51:25    5       Q.   Okay.  And this is in the warning section, correct?

6       A.   Yes.

7       Q.   Okay.  And it strikes out "if needed" -- all of this

8   language about PT, correct?

9       A.   Yeah.  I'm not sure exactly if this is all the language

08:51:38   10   about PT or not.  I just see a Section 2 that says "if needed,"

11   and then everything is struck from there.

12       Q.   Are you aware of, at any point, Janssen requesting the

13   FDA to include language about PT in the warning section of the

14   label?

08:51:55   15       A.   I'm not aware of the detailed discussions and

16   negotiations.

17                           (End of video deposition.)

18           THE COURT:  Is that it?

19           MR. BARR:  Yes, Your Honor.

08:52:07   20           THE COURT:  Okay.  Where are we with the --

21           THE CASE MANAGER:  He's coming up to make the call

22   right now, Judge.

23           THE COURT:  Let's take a ten-minute break and we'll

24   come back with a witness that's waiting in New Jersey.

08:52:25   25                           (Jury out at 8:52 a.m. )

**OFFICIAL TRANSCRIPT**

```
 1                            (A recess was taken.)
 2                    AFTER THE RECESS
 3                            (Call to order of the court.)
 4                            (Jury in at 9:06 a.m.)
 5            THE COURT:  Be seated, please.
 6            Call your next witness.
 7            MR. BARR:  Your Honor, the Plaintiffs call Mr. Sanjay
 8   Jalota.
 9            THE COURT:  Okay.  Mr. Jalota -- swear in the witness,
10   please.
11            THE CASE MANAGER:  Mr. Jalota, would you stand and
12   raise your right hand.
13                            (The oath was administered.)
14            THE CASE MANAGER:  Please have a seat.
15            State and spell your name for the record, sir.
16            THE WITNESS:  My name is Sanjay Jalota, S-a-n-j-a-y
17   J-a-l-o-t-a.
18                    SANJAY JALOTA,
19   having been first duly sworn, testified as follows, to wit:
20                    DIRECT EXAMINATION
21   BY MR. BARR:
22       Q.   Good morning, Mr. Jalota.
23            You're presently employed by Janssen, correct?
24       A.   I am, yes, sir.
25       Q.   And at the time of your deposition, you were the senior
```

09:07:05 — line 5
09:07:25 — line 10
09:07:41 — line 15
09:07:51 — line 20
09:08:01 — line 25

**OFFICIAL TRANSCRIPT**

1    director of global regulatory affairs at Janssen, correct?

2         **A.**   I just -- there seems to be an echo.

3         **Q.**   Let me try that again.

4              At the time of your deposition, you were the senior

5    director of global regulatory affairs at Janssen, correct?

6         **A.**   I was -- I'm sorry, I am.  I apologize.  There's a very

7    bad echo on the line.

8                                  (Technical discussion.)

9              MR. BARR:  We're hearing you fine in here.

10             THE COURT:  We're hearing you fine, but apparently you

11   have a problem there.

12   **MR. BARR:  (CONTINUING)**

13        **Q.**   Let me try it one more time and we'll see if we have to

14   fix something.

15             Are you presently the senior director of global

16   regulatory affairs at Janssen?

17        **A.**   I am.

18        **Q.**   Okay.  And you've held that title since October 2007,

19   correct?

20        **A.**   That is correct.

21        **Q.**   And you agree with me that part of your job as the

22   senior director of global regulatory affairs is to advise the

23   company as to the FDA regulatory process, right?

24        **A.**   That is correct.

25        **Q.**   And as part of that responsibility, you have had

*09:08:18*

*09:08:43*

*09:08:50*

*09:09:03*

*09:09:19*

**OFFICIAL TRANSCRIPT**

1   significant direct contacts with people at the FDA regarding

2   Xarelto, correct?

3        A.   I've had contact with the FDA, but various divisions,

4   on Xarelto, correct.

*09:09:36*

5        Q.   There was a period of time where you had a significant

6   amount of contact with the FDA?  You were talking to them on

7   almost a daily basis, correct?

8        A.   That is correct, during the review of the file.

9        Q.   Did you say "file"?

*09:09:52*

10       A.   I did.  During the review of the NDA files.

11       Q.   And you agree that when you came to the company, when

12   you came to Janssen, you had no actual formal training in

13   regulatory matters, correct?

14       A.   No, that's not correct.

*09:10:09*

15       Q.   So what formal training had you had before you came to

16   Janssen?

17       A.   I apologize.  I apologize.  There's a lot of -- it's a

18   loud echo.  I'm sorry.

19            MR. BARR:  Can we see --

*09:10:25*

20            THE COURT:  We're going to have to take a break at this

21   time and let's see if we can fix this audio.

22                              (Jury out at 9:10 a.m.)

23                              (A recess was taken.)

24                    **AFTER THE RECESS**

*09:15:53*

25                              (Call to order of the court.)

**OFFICIAL TRANSCRIPT**

1                          (Jury in at 9:15 a.m.)

2              THE COURT:  Be seated, please.

3              We'll try it again.

4              MR. BARR:  Mr. Jalota, I think we've got things worked

09:16:15    5    out.  I apologize for the inconvenience.  I think we have it

6    worked out.

7              May I continue, Your Honor?

8              THE COURT:  Yes, please.

9    MR. BARR:  (CONTINUING)

09:16:23   10       Q.   You were involved in the day-to-day activities with

11   Xarelto from approximately September 2005 to May of 2012; is that

12   true?

13       A.   That is correct.

14       Q.   And during this time period, is it true that the only

09:16:38   15   drug you were really focusing on was Xarelto?

16       A.   That is right.  I provided the regulatory day-to-day

17   activities for Xarelto.

18       Q.   Right.  So your sole focus during this approximate

19   seven-year period of time was the drug Xarelto, correct?

09:16:54   20       A.   I focused primarily on Xarelto.  There were other

21   activities, but my main role was with Xarelto.

22       Q.   And during this time, you were part of a team of people

23   from two different companies only working on the approval of the

24   drug Xarelto, correct?

09:17:12   25       A.   We were -- I was part of the team from Bayer and

**OFFICIAL TRANSCRIPT**

1 Janssen working on the clinical development and the approval of
2 Xarelto, that's correct.
3      Q.   It was a team that included hundreds of people,
4 correct?
09:17:26   5      A.   That is correct.
6      Q.   And you've maintained, since you -- well, in May of
7 2012, you quit having day-to-day responsibility for Xarelto,
8 correct?
9      A.   That is correct.  I have administrative
09:17:44  10 responsibilities, but not day-to-day activities.
11      Q.   Right.  But you've maintained some involvement on
12 Xarelto since you moved on from the day-to-day responsibilities
13 in May of 2012, right?
14      A.   Very little.  It's been more responsibility -- more on
09:17:59  15 a -- I cover for people on their time off or am available for
16 historical support as needed.
17      Q.   Now, I want to start with your work on the compound
18 development team.  Can you just tell the jury what the compound
19 development team for Xarelto was?
09:18:18  20      A.   The compound development team for Xarelto was a team
21 comprised -- it was a multifunctional team comprising of
22 colleagues from various functions; chemistry, preclinical,
23 clinical, medical affairs, commercial, and we also had a compound
24 development team leader and myself in regulatory.
09:18:41  25      Q.   And you were a member of the compound development team,

**OFFICIAL TRANSCRIPT**

1    correct?

2        A.    I was a member.

3        Q.    And as a member of the compound development team, you

4    recall that there was a period of time prior to Xarelto ever

09:18:51    5    coming onto the market that Janssen wanted to develop a reversal

6    agent for Xarelto, correct?

7        A.    That is correct.

8        Q.    And you know what a reversal agent is.  It's a drug

9    that can be taken to quickly reverse the effects of an

09:19:08    10   anticoagulant, right?

11       A.    I would say it's a reversal agent that sometimes needs

12   to be quick.  Sometimes it's not as quick.  But it's a reversal

13   agent that reverses the pharmacodynamic activity of Xarelto.

14       Q.    The entire point of it is to quickly return clotting to

09:19:26    15   normal, right?

16       A.    That is my understanding.

17       Q.    And you started -- Janssen started working on -- or

18   considering, I should say, the development of a reversal agent in

19   2011; is that right?

09:19:41    20       A.    I would say so.  It was probably earlier, but I know in

21   2011 there was activity.  There may have been some earlier, I

22   just don't recollect on that, sir.

23            MR. BARR:  Okay.  Can I get y'all to hand Mr. Jalota

24   Plaintiffs' Exhibit 303724.

09:20:03    25            Don't publish that just yet.

**OFFICIAL TRANSCRIPT**

```
 1              MR. IRWIN:  No objection.

 2              MR. BARR:  Your Honor, at this time plaintiffs move

 3    into evidence Plaintiffs' Exhibit 303724 as Plaintiffs'

 4    Exhibit 145.

 5              THE COURT:  Any objection?

 6              MR. IRWIN:  No, Your Honor.

 7              THE COURT:  Let it be admitted.

 8    MR. BARR:  (CONTINUING)

 9        Q.   Now, what I want to do is I want to turn to this memo.

10             And you see that ---

11             MR. BARR:  Can we blow up the top section here so that

12    the jury and Mr. Jalota can see it.

13    MR. BARR:  (CONTINUING)

14        Q.   You see that this is a document from the compound

15    development team related to Xarelto, correct?

16        A.   That is correct.

17        Q.   And it's a recommendation on pursuing Bayer-developed

18    rivaroxaban antidote, right?

19        A.   That is right.

20        Q.   And so at this period of time, Bayer has come to

21    Janssen and asked Janssen to participate in the development of a

22    Xarelto antidote, right?

23        A.   That is right.  I just -- I just want to caution that

24    I'm hearing -- I'm hearing a bit of an echo.

25        Q.   Okay.  Well, we'll be careful.
```

09:20:30

09:20:40

09:20:51

09:21:04

09:21:29

**OFFICIAL TRANSCRIPT**

1           And the date of this is February 15, 2011, right?

2      A.   That is correct.

3      Q.   And you're on this?  You're listed as the regulatory

4 leader, right?

09:21:46    5      A.   That is right.

6      Q.   And if you go down, there's a --

7           MR. BARR:  Take this one off.  Let's blow up CDT

8 recommendation on pursuing the Bayer riva antidote.

9 MR. BARR:  (CONTINUING)

09:22:02   10      Q.   And you see there's a consideration against

11 development/concerns/open issues, right?

12      A.   That's right.

13      Q.   And the very first consideration is high estimated

14 sales price and cost of goods -- is that cost of goods sold?

09:22:17   15      A.   I don't see it.  I don't know what is sold.  I don't

16 know.

17      Q.   And it says that may make for a challenging business

18 case, right?

19      A.   That's what it states, correct.

09:22:25   20      Q.   So the very first consideration point against

21 development was, we might not be able to profit off of this,

22 right?

23      A.   I would say -- I don't -- this isn't a list of

24 priorities, it's just a list of points.  I couldn't tell you

09:22:42   25 whether this was the first or the last one, but it's just a list

**OFFICIAL TRANSCRIPT**

1    of considerations against development.

2        Q.   But the very first one listed -- the very first one --

3    is it would make for a challenging business case, right?

4        A.   That is the first bullet point, again, but it may not

09:23:01   5    be -- it is not the priority of the company.

6        Q.   Let's look at the second one.

7            Portola -- that was a competitor, right, that was

8    working on a different antidote?  Correct?

9        A.   It was an alternative that we were also looking at,

09:23:14   10   correct.

11       Q.   So it says it would undermine the value proposition of

12   a Xarelto-specific antidote, right?

13       A.   That's what it states, correct.

14       Q.   Okay.  Now, there also, if you go down --

09:23:29   15           MR. BARR:  Take this one down.

16   MR. BARR:  (CONTINUING)

17       Q.   In fairness to you, there is some considerations in

18   favor of supporting a development, right?

19       A.   That is correct.

09:23:38   20       Q.   And then, if you go to the last -- the next page, there

21   is the Overall CDT Assessment on the bottom of the page.

22           And the overall assessment was proceed with an

23   assessment, right?

24       A.   That is correct.

09:23:50   25       Q.   So we're going to continue looking at it, right?

**OFFICIAL TRANSCRIPT**

1    A.   That is right.

2    Q.   And in Janssen --

3         MR. BARR:  We can take this down.

4  MR. BARR:  (CONTINUING)

09:24:01
5    Q.   Janssen was interested in developing an antidote

6  because there was a thought that having an antidote would give

7  Xarelto a competitive advantage in the market, right?

8    A.   I would disagree with that.  I would say it was -- they

9  were -- my understanding from the clinical team was they had

09:24:23
10  received requests from physicians saying it would be good to have

11  a reversal agent on the market because that would help us with

12  prescribing the drug.

13    Q.   So it's your testimony in front of this jury that it

14  was not the position of the company that developing an antidote

09:24:40
15  for Xarelto -- the thought was that would give Xarelto a

16  competitive advantage in a very competitive anticoagulant market?

17    A.   That would be my position, that, based on what I

18  understand our position as I knew it, as far as I was aware, was

19  that the need for a Xarelto antidote was based upon patient --

09:25:04
20  was based upon physician concerns or requests for an antidote

21  that would make them comfortable sometimes on specific cases.

22         MR. BARR:  Can we hand the witness Plaintiffs' 119114

23  and 119115.

24         At this time, Your Honor, plaintiffs move into evidence

09:25:31
25  Exhibits 119114 and 119115 as Plaintiffs' 147 and 148

**OFFICIAL TRANSCRIPT**

1  respectively -- I'm sorry -- 146 and 147.  I'll get it right one
2  of these times.
3           MR. IRWIN:  No objection, Your Honor.
4           THE COURT:  Let it be admitted.
09:25:51  5  **MR. BARR:  (CONTINUING)**
6       Q.   All right.  Mr. Jalota, do you have that document in
7  front of you?
8       A.   I have both documents in front of me.
9       Q.   Okay.  Do you see --
09:26:03  10          MR. BARR:  If we can get it up on the screen.  Just
11  blow up the header right here (indicating).
12  **MR. BARR:  (CONTINUING)**
13      Q.   And I just want to confirm that you received this.
14           You received this e-mail on February 1, 2011, correct?
09:26:18  15  Do you see your name right here (indicating)?
16      A.   Yes, I did.  Yes, I do.
17      Q.   And so this is approximately two weeks prior to the
18  compound development team meeting, right?
19      A.   That is correct.
09:26:34  20      Q.   That was on February 15th.  This is on February 1st.
21  Correct?
22      A.   That is correct.
23      Q.   And this attaches to it what is called a slide deck on
24  the Bayer riva -- and that's Xarelto, right? --
09:26:51  25      A.   Right.

**OFFICIAL TRANSCRIPT**

1        Q.    -- the Bayer riva antidote under development, right?

2        A.    That's correct.

3        Q.    So let's look at the slide, then.

4              This is 119115 that's been admitted as Plaintiffs'

09:27:05  5   147 -- I mean Trial Exhibit 147.

6              You see that this is a PowerPoint and it's from Bayer,

7   correct?

8        A.    That is correct.

9        Q.    And it says, Xarelto Rivaroxaban Specific Antidote,

09:27:20  10  right?  And it's a working draft, correct?

11       A.    That is right.

12       Q.    And it's dated January 19, 2011, right?

13       A.    That is right.

14       Q.    What I would like to do -- let me tell you which page

09:27:36  15  to flip into.

16             I would like to go to pdf Page 2.  It should be the

17  next page.

18             Do you have that in front of you, sir -- Mr. Jalota?

19  Page 2 of the PowerPoint.  It's pdf Page 3 on the bottom is what

09:27:55  20  it says.

21       A.    Yes, I do.

22       Q.    And it says Project Rationale.  Do you see that?

23       A.    Yes, I do.

24       Q.    And it says, Anticoagulants are associated with a

09:28:04  25  bleeding risk, right?

**OFFICIAL TRANSCRIPT**

1        A.    That's what it states, correct.

2        Q.    Okay.  And if you go down to the bottom, it says, There

3    is a competitive advantage for a company who will provide an

4    antidote for their anticoagulant drug, right?

09:28:20    5        A.    That's what it states, correct.

6        Q.    So at least according to this PowerPoint, that was one

7    of the considerations, that it would provide a competitive

8    advantage in the market, right?

9        A.    Whoever prepared the slides, yes, put that information

09:28:39   10    down.  I don't know who prepared that slide.

11        Q.    And you received this, right, prior to your meeting?

12        A.    That is right.

13        Q.    And at your meeting, as the jury has now seen, the

14    first two bullet points you considered were that you wouldn't

09:28:55   15    make enough money on this, right?

16        A.    Again, I wouldn't say -- there is an echo.  I'm sorry.

17        Q.    Go ahead.

18        A.    All right.  So as I was stating, the -- I'm sorry,

19    there's a loud background coming through.

09:29:27   20            As I was stating, those are points on -- in the CDT

21    minutes.  They were highlighted as against -- as against

22    proceeding, but that is what it was.

23        Q.    And you're aware that Janssen ultimately decided not to

24    pursue development of this antidote because it wouldn't be

09:29:52   25    profitable, right?

**OFFICIAL TRANSCRIPT**

1    **A.**   I would say Janssen took the approach that this was not

2    possible, given the timeline, and we were also exploring other

3    reversal agents.

4        We had started looking at a non-specific reversal agent

5    prothrombin complex, PCC.  We had also started discussing with

6    Portola.

7    **Q.**   So it's your testimony before this jury that the reason

8    wasn't based upon the profitability of the reversal agent?

9    That's what you're saying under oath to this jury?

10   **A.**   My perspective was -- it may have been a reason.  But

11   the primary reason for us, at least as I know it, was the time to

12   get it on the market would have been too late, and we wanted to

13   provide some information early -- or provide some guidance early

14   to the investigators and the patients who were taking Xarelto

15   who --

16   **Q.**   Can we -- I'm sorry.  I did not mean to cut you off

17   there and I'll try to do better at that.

18       MR. BARR:  Can we hand Mr. Jalota Plaintiffs' 119111.

19       Your Honor, at this time plaintiffs move into evidence

20   Plaintiffs' 119111 to be marked as Trial Exhibit 148.

21       MR. IRWIN:  No objection, Your Honor.

22       THE COURT:  Let it be admitted.

23   MR. BARR:  (CONTINUING)

24   **Q.**   Now, do you have that e-mail in front of you, sir?

25   **A.**   I do.

09:30:12
09:30:27
09:30:49
09:31:15
09:31:33

**OFFICIAL TRANSCRIPT**

```
 1            MR. BARR:  I would like to blow up the top.
 2   MR. BARR:  (CONTINUING)
 3       Q.   And you see that this is an e-mail.  It's Riva Antidote
 4   Communication, right?  That's the subject line, correct?
 5       A.   That's correct.
 6       Q.   And it's dated December 19, 2011?
 7       A.   That is correct.
 8       Q.   This is a little over a month after Xarelto has been
 9   approved, right?
10       A.   That is right.
11       Q.   So prior to Xarelto being approved, we're talking about
12   developing a reversal agent, right?
13       A.   We've been talking about doing reversal agents since --
14   most of 2011, yes.
15       Q.   And then after Xarelto is approved, this e-mail comes
16   out, correct?
17       A.   This e-mail was -- we had done an assessment and we had
18   looked at other -- we had looked at other compounds; PCC, the
19   Portola antidote.
20       Q.   And you received this?  This isn't a surprise to you,
21   right?
22       A.   I'm sorry?  I missed that.
23       Q.   This isn't a surprise to you, you got it?
24       A.   I received the note.  I don't know about the surprise
25   part, but I did receive the note, yes.
```

09:31:46
09:32:04
09:32:16
09:32:35
09:32:50

**OFFICIAL TRANSCRIPT**

1    **Q.**   So let's take this off.  And I want to look at what was

2  actually said.

3          MR. BARR:  Let's blow up these first two paragraphs of

4  the e-mail.

09:33:00   5  **MR. BARR:  (CONTINUING)**

6    **Q.**   Can you see that fine, sir?

7    **A.**   I do.

8    **Q.**   And it says:  Hello, everyone.  Just wanted to let you

9  know that Bob and I communicated our decision not to move to

09:33:19  10  diligence or pursue the riva antidote opportunity any further

11  with Bayer late last week.

12          Right?

13    **A.**   That is right.

14    **Q.**   So the decision was made a week prior to December 19,

09:33:32  15  2011, that we're not going forward with Bayer on a Xarelto

16  antidote, right?

17    **A.**   That's correct.  That's what it states.

18    **Q.**   It says:  Bayer was disappointed by this decision.

19          Right?

09:33:43  20    **A.**   That is right.

21    **Q.**   They were surprised that we decided to stop prior to

22  completing diligence.

23          Right?

24    **A.**   That's what it states, correct.

09:33:55  25    **Q.**   So you hadn't even completed your assessment -- your

**OFFICIAL TRANSCRIPT**

1   due diligence assessment of the antidote before you stopped going
2   forward, right?
3       A.   We said in February that we were to proceed with some
4   preliminary.  So I don't know what we did between February and
5   December to accept this note, but all I can say is at that time
6   we were also exploring PCCs and the Portola collaboration.
7       Q.   And let's look at what was told to Bayer.
8            The main messages communicated to Bayer were that,
9   after careful consideration and additional analytic work, there
10  was limited clinical need for a riva-specific antidote, right?
11      A.   That is right.
12      Q.   And you agreed there was a need for a Xarelto-specific
13  antidote, right?
14      A.   My -- based on what I understand from the clinical team
15  and the medical affairs team, is there was some -- it was felt
16  that, in some cases -- or some individual cases, a Bayer antidote
17  might help.
18      Q.   Like a case of a woman coming into the hospital with a
19  brain bleed and doctors needing to perform surgery on her?  That
20  type of clinical need, right?
21      A.   Again, that's completely over my --
22           MR. IRWIN:  Objection, Your Honor.  Argument.
23           THE COURT:  Well, he's under cross.  I'll allow it.
24  Overruled.
25  MR. BARR:   (CONTINUING)

09:34:12
09:34:33
09:34:52
09:35:09
09:35:18

**OFFICIAL TRANSCRIPT**

1     **Q.**   Can you restate your answer, please, sir.

2     **A.**   Yes.  Based -- I'm not a clinician so that's something

3 I think you would have to refer more to a clinical person on that

4 in some respects.

*09:35:30*  5     **Q.**   Okay.  And then it goes on to say -- the second main

6 message communicated is there was limited potential for the

7 antidote to generate incremental revenues to the Xarelto program

8 either through the sales of the antidote or increased sales of

9 Xarelto, right?

*09:35:47*  10    **A.**   That is what Nancy Ondovik writes, correct.

11     **Q.**   And that's what she told Bayer about, that this is why

12 we're not going forward?

13     **A.**   That's that paragraph, but I think it's important just

14 to be aware of the effect of the rest of the paragraph which also

*09:36:10*  15 states other aspects worth noting.

16     **Q.**   But those are the main messages?  That's one sentence

17 on our main messages, right there, those words.  Correct?

18     **A.**   Again, I think you've got to read the entire paragraph

19 because they do say we also communicated that we were aligned on

*09:36:28*  20 many of the key assumptions, including the need for the antidote

21 to get to the market quickly.

22     And then, if you look at the next one, it is that we

23 acknowledge that the development timeline, while feasible, was

24 very aggressive and would push -- and any unforeseen delays would

*09:36:45*  25 further push out launch beyond the window, which we both agreed

**OFFICIAL TRANSCRIPT**

1    would affect the overall clinical usefulness of the antidote.

2        Q.    Right.   Now, do me a favor.   Read what the main

3    messages were.

4        A.    Again, the main messages communicated to Bayer were

09:37:06    5    that, after careful consideration and additional analytic work,

6    there was limited clinical need for a riva-specific antidote as

7    well as limited potential for the antidote to generate

8    incremental revenues to the riva program either through sales of

9    the antidote or increased sales of riva based on our current

09:37:28   10    understanding of the riva TPP and the U.S. regulatory landscape.

11        Q.    Right.   Is the layman's way of saying generate

12    incremental revenues is it's not going to make us enough money?

13        A.    I am struggling trying to give you that answer.

14            I would say probably yes, but that's something more of

09:37:55   15    a commercial person to comment on that, sir.

16        Q.    And you know today that, as we sit here today in this

17    courtroom, there is no antidote for Xarelto, right?

18        A.    As of today there is a collaboration with Portola, but

19    there is no specific antidote.   However, we have data in the

09:38:16   20    label regarding some non-specific reversal agents that are

21    applicable or available.

22        Q.    And you agree -- I mean you know that Janssen knows

23    that major bleeding events will occur on Xarelto, right?   I mean,

24    that's not a surprise to you, is it?

09:38:32   25        A.    No.   Major bleeding -- because of the pharmacodynamic

**OFFICIAL TRANSCRIPT**

1    effects -- because of the pharmacodynamic effect of rivaroxaban,

2    major bleeding is a potential.

3        Q.    And there is no antidote presently available to reverse

4    any of those major bleeds, is there?

09:38:47   5        A.    As of today, correct.  The agency did not -- upon

6    approval, the agency did not request an antidote to be available

7    on the market.

8        Q.    Wait.  Could you say that again for me.  The agency

9    didn't request?

09:39:03  10        A.    The FDA did not require us at the point of approval to

11   have an antidote on the market also.

12       Q.    So does this company only do what the FDA makes them

13   do?

14       A.    No, absolutely not.  I will say we were actively

09:39:19  15   working on a reversal agent, and we had started work with

16   Portola, and we also had started looking at other activities.

17       Q.    You were working on it so actively that we don't have

18   one today, and you stopped working on development on it in 2011

19   because it wouldn't make you enough money?  That's how active

09:39:37  20   you've been developing it?

21       A.    No.  I think -- no, that's not correct.

22             We -- we have been actively working with Portola in

23   collaboration.  It's Portola's development plan that's been --

24   that's -- that's the approval process for Portola's antidote.

09:39:53  25   We've been working with them.

**OFFICIAL TRANSCRIPT**

1              We also looked at other entities, other reversal

2    agents.  And we've also -- again, I said we've got the partial

3    reversal agents like PCC in the label that help in specific

4    cases.

09:40:06    5         Q.    So if I heard what you just said correctly, what I

6    heard was we don't have one because it's not our fault, because

7    Portola is too slow to develop it.  Is that what you just said?

8         A.    No, that's not correct.  I'm simply stating at this

9    moment, the label clearly says there's no known antidote.

09:40:24   10    However, Janssen has always supported activity in this.

11        Q.    Now, you understand because there's not an antidote, it

12    would be a helpful clinical tool for a doctor to have to be able

13    to determine if someone has Xarelto on board when they come in to

14    the hospital needing an emergency surgery, right?  That would be

09:40:53   15    a good tool?

16        A.    I would say -- I would have to defer to clinical on

17    that.  That's their perspective they would have to offer to you.

18        Q.    So you, as the person that was regularly communicating

19    with the FDA about this -- you don't know whether or not that

09:41:11   20    would be a helpful tool for doctors to be able to assess whether

21    or not somebody had Xarelto on board when they needed an

22    emergency surgery?

23        A.    We proposed PT language very early on.  The agency

24    struck that out during the review and the approval process.

09:41:32   25    That's what I'd offer you.

**OFFICIAL TRANSCRIPT**

1    **Q.**   And we're going to get into more about that
2    strike-through in a little bit, but that was done in June of
3    2011, right?
4        **A.**   That is correct.
09:41:42
5        **Q.**   Okay.  And that was not based on the ROCKET study,
6    right?
7        **A.**   That was based on the -- well, it was not based -- it
8    was a decision -- a recommendation between both divisions, but
9    the initial strike-out came from the hematology division.
09:42:01
10       **Q.**   You can't point to a single document where anyone ever
11   has struck language in the AFib label about PT.  You can't do
12   that, can you?
13       **A.**   Well, it's very clear that we were told by the
14   cardiorenal division that they did not want to re-review sections
09:42:21
15   that they had already reviewed in the past.
16       **Q.**   Right.  And so they didn't even look at what you
17   proposed, right?
18       **A.**   No, they did.  They did.  They did.  We submitted the
19   initial label three times.  We submitted it in January and
09:42:36
20   subsequently two others.  The way we continued to propose the
21   ROCKET-specific information in Section 12, in the pharmacodynamic
22   section.
23       **Q.**   And it was never struck out?
24       **A.**   It was never struck out.  However, it's important to
09:42:50
25   note that when we have the first strike-through from hematology,

**OFFICIAL TRANSCRIPT**

1  they've struck out the overall and the ROCKET information, and we

2  were then specifically requested to use the updated label for the

3  ROCKET study, for the atrial fibrillation indication.

4      Q.   And like I said, we'll get more into the strike-through

09:43:09   5  in a little bit here.

6           You're aware that helpful laboratory testing is

7  required to be in the warning section of the label?  You know

8  that, right?

9      A.   It's -- it's one of the requirements, but it is not --

09:43:27   10  it's -- it's dependent on the data and -- it's dependent on the

11  data and the need for putting something in there.

12     Q.   Okay.  Let me just make sure we understand each other.

13          MR. BARR:  Can we hand Mr. Jalota 254968 and 254969.

14          And, Your Honor, at this time plaintiffs move into

09:43:53   15  evidence Plaintiffs' 254968 as Plaintiffs' 149 and 254969 as

16  Plaintiffs' 150.

17          MR. IRWIN:  No objection, Your Honor.

18          THE COURT:  Let it be admitted.

19  MR. BARR:  (CONTINUING)

09:44:09   20     Q.   Do you see, sir, this is an e-mail from you.

21          MR. BARR:  Let's blow up the top here so the jury can

22  see it.

23  MR. BARR:  (CONTINUING)

24     Q.   This is an e-mail from you on October 14, 2011, right?

09:44:23   25     A.   That is correct.

**OFFICIAL TRANSCRIPT**

1    **Q.**   And that's, what, a month prior to the AFib indication
2    being approved, right?
3    **A.**   That is correct.  That's when we were discussing the
4    label with the agency.

09:44:36
5    **Q.**   And you attach -- this is for the Xarelto AFib -- what
6    is LWG, for the jury?
7    **A.**   It's a labeling working group.  It's a group of
8    individuals who make recommendations on proposed labeling to the
9    agency.

09:44:52
10   **Q.**   And so you were part of that group, right, working on
11   negotiating the label, right?
12   **A.**   I was part of the -- I was part of the label working
13   group that would develop the label to discuss it further with the
14   FDA.

09:45:04
15   **Q.**   Right.  And what you sent to the group is an FDA
16   guidance that was just released, right?
17   **A.**   That is correct.
18   **Q.**   And so as part of your regulatory responsibilities, you
19   were keeping track of these guidances, right?

09:45:18
20   **A.**   I was.
21   **Q.**   And you got this one and said, Hey, the label working
22   group needs to see this, and you sent it around, right?
23   **A.**   That was correct.  And that was for a very specific
24   reason, but, yes.

09:45:31
25   **Q.**   So let's go to the guidance that you sent around.  So

**OFFICIAL TRANSCRIPT**

1    this is Trial Exhibit 150.

2          And you see, sir, this is the Guidance For Industry,

3    Warnings and Precautions, Contraindication, and Box Warning

4    Sections of Labeling for Human Prescription Drugs, right?

09:45:50

5          A.    That is correct.

6          Q.    And this came out from the FDA in October 2011, right?

7          A.    That is right.

8          Q.    Okay.  And just so it's clear for the record, that's

9    four months after June 2011, right?

09:46:06

10         A.    That is right.

11         Q.    So what I want to go to is Page -- pdf Page 9 of this.

12               All right.  Do you see that there is a --

13               MR. BARR:  Let's blow this up starting with the

14    warnings and precautions, right there.

09:46:32

15    **MR. BARR:  (CONTINUING)**

16         Q.    It says the warnings and precautions section must

17    identify --

18               THE WITNESS:  I'm sorry.  Sorry.  Which -- pdf Page 9

19    or Page 9 of the --

09:46:43

20               MR. BARR:  Yeah, pdf Page 9.  I'm sorry, sir.

21    **MR. BARR:  (CONTINUING)**

22         Q.    You see it has a pdf dot 9 on the bottom?  Look at the

23    bottom.

24         A.    Yeah.

09:46:58

25         Q.    Otherwise it's Page 6.  Try Page 6.

**OFFICIAL TRANSCRIPT**

```
 1        A.    Page 6.  Okay.

 2        Q.    Are you there?

 3        A.    Right.  Pdf Page 8.  Thank you.

 4        Q.    It says the warnings and precautions section "must

 5   identify."  It's not optional, right?  It has to do it, correct?

 6        A.    It says: ... must identify any laboratory test that

 7   would be helpful or necessary to identify possible adverse

 8   reactions.

 9        Q.    So that's the guidance from the FDA based upon a

10   regulation promulgated by the FDA, right?

11        A.    That is correct.

12        Q.    And it's not optional, correct?

13        A.    It is optional.  It says if.  If there are any

14   laboratory tests that would be helpful or necessary.  So if you

15   don't have a test that is helpful or necessary, you're not

16   required to put it in that section.

17        Q.    And if you do have a test that's helpful or necessary,

18   you are required to put it in the label?

19        A.    That is correct, if there is a test that is helpful or

20   necessary.

21        Q.    So you would agree with me -- we can argue about

22   whether or not PT is helpful or not, and I'm sure we'll have that

23   argument; but if PT is helpful, it must be in the label, right?

24        A.    Our clinical team made the assessment that it would not

25   be helpful, and hence we didn't need to put -- we made the
```

09:47:27
09:47:45
09:48:05
09:48:22
09:48:42

**OFFICIAL TRANSCRIPT**

1    decision not to put this in 5.4, which the agency agreed with.

2       Q.   So your testimony before this jury is the FDA would not

3    allow you to put in the warning section that PT was a helpful

4    laboratory test?  That's what you're saying under oath here

09:49:04    5    today?

6       A.   No, I did not say that, sir.  I said we -- the clinical

7    team made the decision or recommendation that this information

8    was not going to be helpful, and if the FDA really wanted to put

9    something, they could have, based on their review.

09:49:23    10       Q.   So we're going to say the FDA could have done this and

11    it's not our fault, right?

12       A.   No, I didn't say that.  I would say we made a conscious

13    decision.  If the FDA really felt there was, sure.  But our

14    decision -- our recommendation and decision was we wouldn't

09:49:37    15    because PT --

16       Q.   So it was the company's conscious decision not to put

17    helpful laboratory testing in the warning section, right?

18       A.   Again, we assessed the data, we made the

19    recommendation.  Our perspective was that it did not meet

09:49:58    20    Section 5.4 criteria, so we put the information in Section 12 and

21    not Section 5.

22       Q.   And they just saw some of this with Dr. Berkowitz, but

23    you know that Janssen actually decided -- they didn't make a

24    conscious decision not to do it, they decided they wouldn't do it

09:50:14    25    unless it was specifically requested by the agency, right?

**OFFICIAL TRANSCRIPT**

1       **A.**   I would say we -- my perspective is we had made the

2  recommendation at the time of the initial NDA, and one of our

3  ideas, one of our options was if the agency had requested it,

4  then we would consider it, but we put the same language in

09:50:39   5  Section 12.

6       **Q.**   Right.  We're only going to do it if the FDA

7  specifically asks for it, right?

8            MR. IRWIN:  Objection, Your Honor.  Asked and answered.

9       **A.**   No, I wouldn't say --

09:50:48   10            THE COURT:  Well, I'll let him ask it again.

11  **MR. BARR:   (CONTINUING)**

12       **Q.**   Go ahead.

13       **A.**   Could you repeat your question again, please?  Sorry.

14       **Q.**   You made the decision we're only going to provide this

09:51:00   15  information, propose this language, in the warning section of the

16  label if the FDA specifically asks for it; otherwise, we're

17  staying quiet, right?

18       **A.**   No.  I think it's important to note our clinical -- our

19  clinical team had made the assessment based on the data that we

09:51:27   20  would put this information in Section 12 because it did not meet

21  the criteria for Section 5.

22       **Q.**   Okay.  And I'm about to explore that a little further

23  with you, but my original question was:  If PT is helpful, you

24  agree with me it must be in the warning section?

09:51:48   25            I'm not asking about your assessment.  I'm asking if

**OFFICIAL TRANSCRIPT**

1    that is shown, it must be in the warning section?  You agree with
2    that?
3         A.    If PT were to be helpful, then I would agree with you.
4         Q.    And you would also agree that at no point has Janssen
5    or Bayer ever proposed that PT, as a helpful laboratory test, be
6    put in the warning section of the label?  That has never
7    happened, has it?
8         A.    The clinical team made the decision that this
9    information should be in the pharmacodynamic section because it
10   did not meet the criteria for Section 5, the warnings and
11   precautions.  So, yes, we have not proposed this.
12        Q.    That has never happened, ever, right?
13        A.    We have never proposed this, that's correct.
14        Q.    And you have nothing you can tell this jury --
15             MR. IRWIN:  Objection, Your Honor.  Asked and answered.
16             THE COURT:  Yeah, we're moving -- let's move on to
17   something else.
18             MR. BARR:  Okay.
19             Can I get 2905273 and 2905274, and show those -- hand
20   those to Mr. Jalota.
21             Your Honor, at this time, plaintiffs move into evidence
22   Plaintiffs' 2905273 and 2905274 as Exhibits 151 and 152.
23             MR. IRWIN:  One second, please, Your Honor.
24                              (A pause in the proceedings.)
25             MR. IRWIN:  No objection.

**OFFICIAL TRANSCRIPT**

```
 1              THE COURT:  Let them be admitted.
 2              MR. BARR:  Can we blow up the first -- the top of this.
 3    MR. BARR:  (CONTINUING)
 4         Q.   And you see that this is an e-mail from you dated
 5    June 1, 2011, right?
 6         A.   That is correct.
 7         Q.   And then this is dealing specifically with the AFib
 8    indication, right?
 9         A.   That is what -- I was doing, I was forwarding the
10    AFib -- the contingency document prepared for the orthopedic
11    surgery to Alla Rhoge for consideration with the AFib.
12         Q.   Right.  And so you forwarded to her --
13              MR. BARR:  If we can go to 29574.
14    MR. BARR:  (CONTINUING)
15         Q.   You forwarded to her on June 1, 2011, this document
16    titled Xarelto USPI Labeling Contingency Document, right?
17         A.   That is correct.
18         Q.   And you're aware that this is the document that shows
19    that Janssen made the conscious decision not to recommend
20    laboratory testing in the warning section of the label, right?
21         A.   So let me just put this into context and --
22         Q.   Sir, I asked whether or not this is the document that
23    does that.  I didn't ask you to put it in context.
24              MR. IRWIN:  Your Honor, he's trying to answer the
25    question.
```

09:54:09
09:54:26
09:54:43
09:55:05
09:55:19

**OFFICIAL TRANSCRIPT**

1         THE COURT:  Yeah.  Let's let him answer the question.

2         MR. BARR:  Go ahead.

3         THE COURT:  Go ahead, sir.

4         THE WITNESS:  I'm sorry, could you repeat the question?

09:55:28  5         MR. BARR:  I don't remember it now.

6    MR. BARR:  (CONTINUING)

7         Q.   You agree that this is the document that sets out that

8    Janssen made the conscious decision not to disclose -- not to

9    propose PT language as a helpful laboratory test in the warning

09:55:49  10   section of the label, right?

11        A.   No.

12        Q.   Okay.  Well, let's go to page -- pdf Page 15 of this.

13        MR. BARR:  And let's just blow up this whole thing.

14        MR. IRWIN:  Your Honor, can we pull that down for a

09:56:12  15   second, please.

16        THE COURT:  Okay.

17        MR. IRWIN:  May we approach?

18        THE COURT:  Yes.

19                      SIDEBAR ON THE RECORD

09:56:47  20        MR. IRWIN:  This is going to be part of our ongoing

21   problem with this document, Your Honor.  Here we have the

22   Canadian label.

23        THE COURT:  Okay.

24        MR. BARR:  And, Your Honor, the relevance of this is

09:57:00  25   they are specifically considering what to say to the U.S.

**OFFICIAL TRANSCRIPT**

1  regulator by referencing the Canadian label.  I mean, that is a

2  relevant fact that they thought about.  I mean, this isn't about

3  Canadian regulatory requirements, this is about what they're

4  going to say to the U.S. regulator.  And they say that if it is

09:57:19
5  requested, we'll modify this.  I mean the document is clearly

6  relevant.

7       MR. IRWIN:  Your Honor, this is always what we've been

8  concerned about.  Your ruling was that if there are impeachable

9  statements, quote/unquote -- that's my word -- that that could be

09:57:35
10  considered relevant, but not to introduce the whole regulatory

11  scheme from another country, and this is the back-door way of

12  doing exactly that.

13       Now, they could redact that out.  They could cover it

14  up with a piece of paper and still ask the question about the

09:57:49
15  other statement that is our statement in that contingency

16  document without disclosing the label to the jury.

17       MR. BARR:  But, Your Honor, they were considering doing

18  it in light of what they say in Canada.  The document makes no

19  sense without that.

09:58:03
20       THE COURT:  Let's make that clear.  And I'll instruct

21  the jury as to the situation.

22       MR. IRWIN:  Your Honor, can we cover up the Canadian

23  label?

24       MR. BARR:  To me the document makes no sense without

09:58:16
25  referring to it.  I won't spend time reading through it.  I

**OFFICIAL TRANSCRIPT**

1   mean -- but the point is they had this in that label, they

2   thought about it, and they thought -- they were thinking about

3   that when they were making communications with the U.S. FDA.

4           MR. IRWIN:  Your Honor, what I would like to know is

09:58:33   5   what is it off this document they want to read to the jury?

6           What is it you want to show to the jury?

7           MR. BARR:  "Only if section is requested, consider

8   modifying without," and they referred to the Canadian label.

9   They're saying if the FDA asks us for this, this is what we're

09:58:47   10  going to modify.

11          MR. IRWIN:  That's exactly the problem, Judge.  Going

12  right to --

13          THE COURT:  I'm going to tell them to disregard what

14  you say, if you say.  Let's do it.  I'll just tell the jury to

09:58:57   15  disregard that.

16          MR. BARR:  Okay.

17          THE COURT:  That's the best we can do.

18          MR. MEUNIER:  Your Honor, just for the record, Jim made

19  a statement about what your ruling was, and I just want to

09:59:07   20  clarify something.

21          When you sustained our Motion *in limine* No. 11, which

22  was our motion to allow there to be evidence in the case

23  regarding the foreign label issues -- you sustained that motion.

24  You said we would be able to admit into evidence whatever the

09:59:24   25  defendants said to anyone regarding foreign label issues as long

**OFFICIAL TRANSCRIPT**

1   as that's what the defendant said to others.

2        And you said the only way that's not going to be

3   admissible is actions taken in order to comply with federal

4   regulatory requirements.  Well, none of what we are proposing to

09:59:46   5   show the jury is anything about actions taken in order to comply

6   with a foreign regulation.

7        THE COURT:  Let me just add that the defendants have a

8   legitimate point.  The defendants say that you're mixing up

9   Canadian labels and United States labels, and the words that they

10:00:01   10   say have more reference to Canadian labels than to the

11   United States labels, and we're going to have to deal with that.

12   It's a legitimate point.

13        The plaintiffs make a legitimate point that the

14   defendants knew at a certain time and they told people certain

10:00:17   15   things.  Now, if they told people something that's inconsistent

16   with what they told the FDA, that, to me, seems to be admissible

17   because it seems to contradict what they said to the FDA.

18        But at the same time, the defendants have a point that

19   it mixes apples and oranges.  They're concerned about things that

10:00:38   20   are required in the Canadian label that are not required in the

21   United States label.

22        So I'm going to have to do my best to tell the jury

23   what's the significance of the thing.

24        MR. BARR:  Your Honor, I think we've established the

10:00:51   25   point with this witness that helpful laboratory testing is

**OFFICIAL TRANSCRIPT**

1    required in the U.S. label, and that's what we're talking about.

2          THE COURT:  Well, you know, that's for the jury to

3    determine, whether or not you've established something.  I make

4    no decision on that.

5          We have to go forward, folks.  This -- the sound is bad

6    for this witness.  I mean, it's -- you know, do we want to take

7    it out of the courtroom and put it in an office at the request of

8    you guys?

9          You went along with it.  It's the request of

10   the defendant and agreed to by the plaintiff, but we ought to

11   have a -- he ought to have a pin-on mic or something.  It's not

12   coming across well.

13         MR. MEUNIER:  Thank you, Judge.

14         THE COURT:  Let's just do the best we can.

15                **AFTER THE SIDEBAR IN OPEN COURT**

16         THE COURT:  Members of the jury, we do the best we can

17   with the audio.

18         Continue.

19         MR. BARR:  I'll try to slow down some, Your Honor.

20   That may help.

21         We can go back to pdf Page 15.

22         Just blow this whole thing up.

23   **MR. BARR:  (CONTINUING)**

24   **Q.**  Can you see that they ask -- Janssen asks the question:

25   Will we need to add a new 5.4 laboratory section like Lovenox,

**OFFICIAL TRANSCRIPT**

1    right?

2         A.    That's correct, Mr. Barr.

3              I think it's important to realize why the contingency

4    document was produced.  The labeling contingency document is a

10:02:44   5    document that's generated -- we prepare it within Janssen every

6    time we do a labeling supplement.

7              What we do is we submit the label and we prepare

8    anticipated reactions, feedback.  We provide our perspectives.

9    And this is in when we're dealing further with the divisions.

10:03:03  10             So this is our internal thinking of what we need to --

11   the steps we would need to go through and what we need to get

12   agreement internally for.

13        Q.    Right.  It's Janssen's internal thinking.  We agree

14   with each other.

10:03:16  15             And you see here it points out that the Pradaxa label

16   doesn't have a 5.4 section, right?

17        A.    That is correct.

18             But that's just -- yeah.  That's -- Pradaxa is

19   approved, we have this information, and it's just something we

10:03:34  20   need to highlight.  It's nothing more than that on that.

21        Q.    Pradaxa was the very first NOAC approved, right?

22        A.    That is correct, to be fair.  But our perspective was

23   we wanted to know what was available when we were discussing

24   that.

10:03:48  25        Q.    Pradaxa was a direct competitor of Xarelto, right?

**OFFICIAL TRANSCRIPT**

1      **A.**    It is a competitor of Xarelto, that's correct.

2      **Q.**    You're competing for the same patient population?

3      **A.**    I would say we are competing for the atrial

4  fibrillation indication, that's correct.

5                   MR. BARR:  I only want to blow up this section right

6  here, right there (indicating).

7                   MR. IRWIN:  Please note our objection.

8                   THE COURT:  Okay.  Yeah.

9                   Members of the jury, there's something there called a

10  Canadian label.  Disregard the Canadian label.  And the reason

11  for that is that it is a different country.  It has different

12  rules, different regulations, different procedures, and different

13  requirements.

14                   The only relevance of this testimony is what the

15  defendant knew and when they knew it.  That's the only thing.

16  Not anything that the Canadian -- that needs to be on a Canadian

17  label or doesn't need to be on the Canadian label.

18                   We're talking about the United States naval -- label,

19  and there's different rules, different laws, different

20  regulations.

21                   So from the standpoint of what's on the Canadian label,

22  that has no relevance.  The only relevance is if there is -- if

23  you find it relevant, the only relevance is what they knew and

24  when they knew it.

25                   Let's proceed.

*10:04:06*

*10:04:21*

*10:04:40*

*10:05:01*

*10:05:17*

**OFFICIAL TRANSCRIPT**

1          MR. IRWIN:  Your Honor, I have one more request.

2          This continues over -- if you see the last sentence

3     there, it continues over to the next page.  I would appreciate

4     it, for completeness, if the entire thing was put up.

10:05:28    5          THE COURT:  Okay.

6          MR. BARR:  I can't put up the entire thing.  It's all

7     on this page.

8          MR. IRWIN:  Then I would appreciate, for completeness,

9     that counsel go and show the witness the next page.

10:05:39   10          THE COURT:  Okay.  You have a right to do that.  106.

11     I'll allow it.

12          MR. BARR:  He has a right to do that when he takes the

13     witness.

14          THE COURT:  Well, that's okay.  He can do it either

10:05:44   15     then or now.  That's what 106 says.

16     **MR. BARR:  (CONTINUING)**

17          **Q.**  And so what Janssen says -- and this is in answer to

18     the question of should we add a Section 5.4, right?

19          **A.**  That is correct.

10:06:02   20          **Q.**  And what they say is only if section is requested,

21     right?

22          **A.**  That is what it states, correct.  That's one of the

23     contingency discussions we were having.

24          **Q.**  Right.  So helpful or not helpful, we're only providing

10:06:23   25     this language if it's specifically requested by FDA, right?

**OFFICIAL TRANSCRIPT**

1      A.    Again, our perspective was we had put this information

2  in Section 12 of the pharmacodynamic information, and if the

3  agency felt that this was going to be helpful, we were going to

4  discuss it with them and put it in there.

5           But the information we were going to put in Section 5

6  would have been the same information in Section 12 of the label.

7      Q.    Only if they asked you to do that?

8      A.    Again, our perspective is it did not meet the criteria.

9  And if the agency felt there was a clear request or a need for

10  putting in this information, we would put it in there.  But our

11  perspective was it wasn't, and the agency agreed with that.

12      Q.    So I just want to make sure that the position is clear.

13           Is it your position this language didn't belong in the

14  label to start with or it belongs in the label and the FDA

15  wouldn't let you do it?  Which is it?

16      A.    My position is -- my perspective is -- based on the

17  clinical team's perspective was that this information did not fit

18  the criteria for Section 5.  Instead, it would provide -- the

19  information would be available for Section 12 if the physician

20  required this, if an assessment was required.

21      Q.    Okay.  And then what you go on to say -- or the

22  document goes on to say is that if the section is requested, we

23  will consider modifying significantly without stool occult blood

24  test and PT is not insensitive, which is what is said in the

25  Canadian label, right?

**OFFICIAL TRANSCRIPT**

1      **A.**   Well, I think we will see that this information was

2   already proposed in our initial label.

3      **Q.**   So you think --

4      **A.**   It's almost the same, if not the same, as what we had

5   proposed in the initial NDA for both products -- for both NDAs.

6      **Q.**   So you think that this language right down here -- "In

7   cases of excessive doses, the PT is expected to be outside of

8   this range," you think that language was proposed?

9      **A.**   Nope.  I think the -- I would say the first part --

10   with the exception of the last sentence, the first sentence is

11   all there.

12           Now, the last one, again, I'm not sure whether this

13   is -- this was requested by Health Canada or proposed; but my

14   understanding is what's in the first part of this, which is not

15   highlighted, is in our -- would have been in what we submitted in

16   June -- in January -- in July 2008 and January 2011.

17           MR. BARR:  So let's take this down.

18           THE COURT:  Put up the next part.

19           MR. BARR:  That's where I'm going, Your Honor.

20           THE COURT:  Okay.

21           MR. BARR:  Let's go to the next page.

22           Is this the part you want right here, Jim?

23           MR. IRWIN:  Yes.

24           MR. BARR:  Let's blow that up.

25           Is there a particular question you want me to ask about

10:08:10

10:08:32

10:08:50

10:09:07

10:09:16

**OFFICIAL TRANSCRIPT**

1    it?

2         MR. IRWIN:  I want you to show it to Mr. Jalota and ask

3    him if he has any comments on it.

4    **MR. BARR:  (CONTINUING)**

10:09:24   5        **Q.**   Do you have any comments on this?

6              THE COURT:  Did you hear that, Mr. Jalota?

7              THE WITNESS:  I did.

8    **MR. BARR:  (CONTINUING)**

9        **Q.**   Do you have any comments on what I put up on the next

10:09:41  10   page?

11       **A.**   I did.  I'd have to compare what we submitted in 2008

12   and 2011, but that's what it states for present.

13             MR. BARR:  Is that good enough?

14             MR. IRWIN:  Yes.

10:09:50  15             Thank you, Your Honor.

16             THE COURT:  Yes.  Let's move on.

17   **MR. BARR:  (CONTINUING)**

18       **Q.**   Let's go back to Page 15.

19             MR. BARR:  And I want to blow up this part right here

10:10:01  20   (indicating).

21   **MR. BARR:  (CONTINUING)**

22       **Q.**   Do you see what is said in bold is the ultimate

23   conclusion is defend not having any laboratory monitoring

24   statement, right?

10:10:12  25       **A.**   That is correct.  And what we would have done was --

**OFFICIAL TRANSCRIPT**

1  what we meant by "defend" is we would want to understand where
2  the agency's position is, and then work through the next steps.
3        That's our current way, is we have to understand what
4  the agency's position is.  That's why we'd say defend it
5  initially.
6     Q.   So if the agency says we need this, we're going defend
7  our position not to have it, right?
8     A.   No.  I think we -- well, what I would say is, if the
9  agency said we needed to include it, our first perspective is to
10  try and understand why they did.  And we would then antidote not
11  included as we discussed with the agency [verbatim].  Ultimately,
12  the agency would have the final say on the approvability.
13        MR. BARR:  I want to put up Defendants' Trial
14  Exhibit No. 2, which is Defendants' 6.
15        MR. IRWIN:  No objection, Your Honor.  It's in
16  evidence.
17        THE COURT:  It's in evidence already.
18  MR. BARR:  (CONTINUING)
19     Q.   Sir, you see --
20        MR. BARR:  If we can blow up right here so the jury can
21  see what it is we're talking about (indicating).
22  MR. BARR:  (CONTINUING)
23     Q.   This is the label that was approved in 2011, right?
24     A.   No.
25     Q.   Just follow me here.  I'm going to get there.  Follow

**OFFICIAL TRANSCRIPT**

1   me.

2        A.    Sorry.  The label is -- sorry.

3              The label you're showing me is not the label that was

4   approved in 2011.  This label -- if you look right at the bottom,

5   the right side, it says, Revised 02-2014.

6        Q.    That's where I'm going.  That's where I'm going, I

7   promise.

8              This says U.S. approval 2011, right?

9        A.    That is correct.

10             MR. IRWIN:  Slow down, please.

11  **MR. BARR:  (CONTINUING)**

12       Q.    Right?  That's what it says?

13       A.    That is correct.

14             MR. BARR:  So let's take that down.

15             And then if we blow up this part right here so the jury

16  can see the date of this (indicating).

17  **MR. BARR:  (CONTINUING)**

18       Q.    This is the label that was revised in February of 2014,

19  right?

20       A.    That is correct.

21       Q.    Okay.  And then this was the label that was in effect

22  in February of 2014, right?

23       A.    This was available in 2014, that's right.

24       Q.    Okay.  And what this label tells doctors in the face of

25  emergency surgery, if we go to Page 6, is if you are faced with

**OFFICIAL TRANSCRIPT**

1    surgery, stop using Xarelto for 24 hours prior to proceeding with

2    surgery?  That's what it says, right?

3        A.    Section 2.6?  Are you looking at Section 2.6?

4        Q.    Section 2.6, yes, sir.

10:13:11
5        A.    Right.

6        Q.    Okay.  So that's what doctors like Dr. Bui are told to

7    do, right?

8        A.    That is what the label states, correct, sir.

9        Q.    And then the label goes on to say, if we go to Page 9,

10:13:34
10   The anticoagulant effect of Xarelto cannot be monitored with

11   standard laboratory testing, right?

12       A.    That's correct.

13       Q.    You agree with me that PT is a standard laboratory

14   test, right?

10:13:49
15       A.    PT is a laboratory test, that's correct.  Yes.

16       Q.    It's standard, right?

17       A.    I can't -- I really don't know that, I'm sorry to say.

18             I would say it's a test -- it's a laboratory test

19   that's available.

10:14:04
20       Q.    Okay.  You know that this statement isn't true, right?

21       A.    I would say it is true.

22       Q.    You didn't say it is true?

23       A.    No.  I would say it is not -- I would say this

24   statement is not true.  The anticoagulant effect cannot -- we're

10:14:25
25   talking specifically about the anticoagulant effect, not the

**OFFICIAL TRANSCRIPT**

1  pharmacodynamic effect here.

2       **Q.**   Right.

3       **A.**   The anticoagulant effect cannot be monitored.

4       **Q.**   So that's your belief?

*10:14:32*

5       **A.**   That is my -- that is what my clinical team have

6  communicated, and that's what I believe to say, sir.

7       **Q.**   So it is your personal belief -- I'm just trying to

8  make it clear what you know.

9            It's your personal belief that Xarelto cannot be

*10:14:52*

10  monitored with standard laboratory testing, right?

11      **A.**   It's my personal belief, as a regulator perspective,

12  this is what it says [verbatim].  I would rely on the clinical

13  team to have given me that judgment.  If that's what the clinical

14  team says, then I have complete confidence in that.

*10:15:09*

15      **Q.**   Sir, you know, and you've known since at least 2009,

16  that PT can be used in the face of emergency surgery to determine

17  whether it's safe to go to surgery?  You've known that since

18  2009, haven't you?

19      **A.**   I would say -- I don't -- I think you would have to

*10:15:30*

20  show me how I know this.  But -- you'd have to show me further

21  information.  Show me that, please.

22      **Q.**   Okay.

23      **A.**   I've seen labels -- I've seen what we submitted in

24  July 2008, but I don't see any more than that in the label.  But

*10:15:44*

25  you'd have to show me more, please.

**OFFICIAL TRANSCRIPT**

| | |
|---|---|
| 1 | **Q.**   I'll show you some more. |
| 2 | MR. BARR:  Can we hand Mr. Jalota 862186. |
| 3 | Your Honor, plaintiffs move into evidence |
| 4 | Plaintiffs' 826186 as Trial Exhibit 153. |
| 10:16:11  5 | MR. IRWIN:  No objection, Your Honor. |
| 6 | THE COURT:  Let it be admitted. |
| 7 | MR. BARR:  If we can blow up this top part here |
| 8 | (indicating). |
| 9 | **MR. BARR:   (CONTINUING)** |
| 10:16:23  10 | **Q.**   I just want to confirm that you got this. |
| 11 | This is your label working group again, correct? |
| 12 | **A.**   I am, but I'm a copy of this.  But, yes, I am. |
| 13 | **Q.**   And this is April -- |
| 14 | **A.**   This appears -- |
| 10:16:35  15 | **Q.**   Go ahead. |
| 16 | **A.**   I was going to say, this appears to be a discussion |
| 17 | between clinical pharmacology and clinical. |
| 18 | **Q.**   Right.  And this is April 3rd, 2009, right? |
| 19 | **A.**   That is correct. |
| 10:16:50  20 | **Q.**   And you received this on April 9, 2009, right? |
| 21 | **A.**   That is correct. |
| 22 | **Q.**   Okay.  So what I want to go to is I want to go -- it's |
| 23 | an e-mail -- just so you can follow me, it's an e-mail that |
| 24 | starts on the bottom of the page, the e-mail from Paul Burton. |
| 10:17:10  25 | Do you see that? |

**OFFICIAL TRANSCRIPT**

1      **A.**    I do.

2      **Q.**    And it continues to the next page.

3             And so this e-mail from Mr. Burton is April 8, 2009,

4   right?

10:17:19   5      **A.**    That is right.

6      **Q.**    And you were copied on this as well, correct?

7      **A.**    I was again as a carbon -- as a cc to me.

8             And, again, this appears to be a discussion between

9   Paul and the clinical team and clinical pharmacology.

10:17:36   10      **Q.**    And so what I want to do is I want to go to this next

11   page --

12             MR. BARR:   And I want to blow this up (indicating).

13   **MR. BARR:   (CONTINUING)**

14      **Q.**    And what they say here is they say, See some text

10:17:50   15   below.  Really little difference to what we have already.

16             Do you see that?

17      **A.**    I see that.

18      **Q.**    And it says, We basically state that if you need to,

19   you can measure PT.

10:17:58   20             Right?

21      **A.**    That's what it appears Paul is stating, yes.

22      **Q.**    And it says, We don't have any data relating PT

23   prolongation to bleeding risk.

24             Right?

10:18:13   25      **A.**    That's what it says, correct.

**OFFICIAL TRANSCRIPT**

1      **Q.**   And then An Thyssen adds a comment that says, We did

2   look at the relationship between PT and bleeding, but could not

3   identify a threshold predictive for bleeding.

4          Right?

10:18:24    5      **A.**   That's what she states, correct.

6      **Q.**   But she says, For the reason we do not think there is a

7   need -- for the reason that we do not think there is a need.  So

8   if a physician measures PT, I think it would be more likely to

9   get a sense of when the last dose was taken in the emergency

10:18:44   10   setting and not to guide dosing.

11          Right?

12      **A.**   That's her perspective as a team member, right.

13      **Q.**   And is Ms. Thyssen clinical?

14      **A.**   She's clinical pharmacology.

10:18:57   15      **Q.**   So the clinical pharmacologist is telling you in 2009

16   that in an emergency setting, we can use PT, right?

17      **A.**   She is stating a fact -- she is stating her

18   perspective -- she's stating her perspectives to --

19          THE COURT:  Get a little closer to the microphone.

10:19:22   20          Can you get a little closer to the microphone or move

21   that microphone closer to him.

22          THE WITNESS:  It is the feedback loop I think we're

23   getting.  I'm sorry.

24          THE COURT:  Okay.

10:19:37   25          THE WITNESS:  I apologize.

**OFFICIAL TRANSCRIPT**

1    **MR. BARR:   (CONTINUING)**

2        **Q.**    So that was Ms. Thyssen's perspective that she wrote in

3    an e-mail, that you were copied on in 2009, saying PT could be

4    used for that purpose, right?

10:19:50    5        **A.**    Sorry, Mr. Barr.  I really couldn't hear.  The fallback

6    echo is coming as everybody here can tell you that also.

7            MR. BARR:  Let's take this down and lets look at a

8    different part of this.

9            I want to blow up this e-mail on the first page, the

10:20:11   10   one from Mehul Desai.

11   **MR. BARR:   (CONTINUING)**

12       **Q.**    And this is -- tell the jury who Mehul Desai is.

13       **A.**    Dr. Desai is in clinical.

14       **Q.**    So it's another clinical person.

10:20:34   15           And Dr. Desai says, Is this language necessary, right?

16       **A.**    That is correct.  That's Dr. Desai's discussion here.

17   He is raising questions for discussion.

18       **Q.**    And then he says, If language is necessary, how about

19   routine monitoring of coagulation parameters is not required with

10:20:56   20   Xarelto use.

21           Right?

22       **A.**    That is what Dr. Desai says.  That's what he's saying,

23   yes, that's correct.

24       **Q.**    In cases of suspected overdose, measurement of PT could

10:21:11   25   be considered.

**OFFICIAL TRANSCRIPT**

1          Right?

2      **A.**    That is -- that's right.

3      **Q.**    That would be looking at the anticoagulant effect of

4  Xarelto, would it not?

10:21:19    5      **A.**    I would say so.  And we did put this information in

6  July 2008 or December 2010 and January 2011 -- somewhat similar

7  text about it if an assessment was required.

8      **Q.**    And then Dr. Desai goes on to say, My first preference

9  would be to go with what we currently have in labeling which is

10:21:45   10  no statement at all.

11          Right?

12      **A.**    Well, he was referring to what we currently had in our

13  Section 12 and no additional statement, that's correct.

14      **Q.**    Right.  He says your Section 12 is not a statement at

10:22:01   15  all about this, right?

16      **A.**    No.  I'd say he is -- I would say we have to look at

17  the label and see what he is talking about.  There might be

18  something specifically that he was trying to highlight, not

19  adding.  But we have some information already in there.

10:22:15   20      **Q.**    Now, you know who Dr. Samama is, right?

21      **A.**    I know Dr. Samama as an external expert or author.

22      **Q.**    You've received publications from Dr. Samama from time

23  to time, correct?

24      **A.**    I was involved in the review of his publications,

10:22:42   25  that's right.

1  Q.   Janssen actually had a program to work on publications
2  and get information out into the medical literature, right?
3  A.   We -- Janssen and Bayer had a publication strategy on
4  the various publications and the information that we were
5  generating with the clinical studies.
6  Q.   You hired a company called Chameleon to help Janssen
7  put out articles of Janssen's message under other doctors' names,
8  right?
9  A.   I was not involved in that.  I'd say our medical
10 affairs slash commercial and slash the clinical development team
11 would have probably worked to have a consulting company to
12 develop publications.  I wouldn't say their messages, it's what
13 the publication strategy was.  Whatever we needed to -- whatever
14 information we had that we wanted to publish.
15 Q.   So your commercial side was involved in the publication
16 of scientific literature about Xarelto, right?
17 A.   No, not scientific.  If it was scientific safety,
18 commercial would not have been involved.  They were part of the
19 team but they did not review or approve scientific publications.
20 Q.   Okay.  Maybe we'll get into that in a little bit.
21      I would like to show you 255699 and 255700.
22      MR. BARR:  These have already been admitted,
23 Your Honor, as Plaintiffs' 82 and 83.
24      THE COURT:  Okay.
25      MR. BARR:  Can I get those on the screen.

10:23:01
10:23:20
10:23:42
10:24:04
10:24:25

**OFFICIAL TRANSCRIPT**

1  **MR. BARR:   (CONTINUING)**

2       **Q.**   Do you have that in front of you, Mr. Jalota?

3       **A.**   I do.

4       **Q.**   Okay.  And this is an e-mail, if you'd just look at the

10:24:36  5  top, from Nini -- is that Bode (bowed) or Bode (bodie)?

6       **A.**   Dr. Bode.

7       **Q.**   And this is June 15, 2010, right?

8       **A.**   That is correct.

9       **Q.**   Okay.  And what side of the company is Bode on?

10:24:53  10      **A.**   Dr. Bode is in our preclinical group.

11       **Q.**   And they're attaching an article from Dr. Samama,

12  right?

13       **A.**   That is correct.

14           **MR. BARR:**  So take this down.

10:25:05  15  **MR. BARR:   (CONTINUING)**

16       **Q.**   Do you see that it says, Dear all.  In the upcoming VTE

17  treatment (Bayer only) and AFib submissions, preclinical is ahead

18  of clinical with regards to writing modules.

19           Do you see that?

10:25:26  20      **A.**   I do.

21       **Q.**   And it says, We uncovered the attached paper by Samama

22  on attempts to find an assay to measure rivaroxaban in clinical

23  practice.

24           Do you see that?

10:25:36  25      **A.**   I do.

**OFFICIAL TRANSCRIPT**

1    **Q.**    All right.  So this a paper that was received by the

2    company in June of 2010, that you received, uncovered about how

3    to measure Xarelto in clinical practice, right?

4    **A.**    That's Dr. Nini saying -- is Dr. Bode saying she found

10:25:55    5    this paper, that's correct.  I may have been aware earlier, but

6    this is Dr. Bode's note to all of us.

7         And just to put it in context, she had again -- this

8    is -- she's writing the preclinical documents that will go into

9    the NDA.

10:26:10    10    **Q.**    So I want to go to the paper, which is 255700.  And

11    this is the paper that you received.  It's a paper from

12    Dr. Samama titled Assessment of Laboratory Assays to Measure

13    Rivaroxaban - an Oral Direct Factor Xa Inhibitor, right?

14    **A.**    That is correct.

10:26:35    15    **Q.**    And what Dr. Samama writes, if you go to Page 823 of

16    the article -- do you see in the top corner?  Look in the top

17    corner of the article and go to Page 823.

18         It's the last sentence on this page.

19         Do you see it says, Under these conditions PT could be

10:27:07    20    used for monitoring the effect of rivaroxaban in the clinical

21    setting, right?

22    **A.**    That is right.

23    **Q.**    Okay.  And a clinical setting is an emergency room

24    where you're trying to determine whether or not it's safe to go

10:27:25    25    to surgery?  That would be a clinical setting, would it not?

**OFFICIAL TRANSCRIPT**

1      **A.**   I would say it is potentially one.  It could be any --

2    whatever Dr. Samama wrote, but that's potentially one.

3      **Q.**   And he says, If considered necessary -- let's read the

4    whole thing so it's clear, it's not a broken up sentence.

5           Under these conditions PT could be used for monitoring

6    the effect of rivaroxaban in the clinical setting, if considered

7    necessary, at peak plasma levels but not at trough levels.

8           Right?

9      **A.**   That's what Dr. Samama writes.

10     **Q.**   Okay.  If you're trying to determine whether or not

11   somebody had taken their drug 4 to 6 hours earlier, would that be

12   at peak or at trough?

13     **A.**   I would defer to our clinical and clinical pharmacology

14   teams for what's that perspective -- what that constitutes, peak

15   or trough.

16     **Q.**   Sir, you know that, under the dose response curves,

17   that 4 to 6 hours is still in the peak window for Xarelto?  You

18   know that?

19     **A.**   I would again defer to the clinical team.  It may be,

20   but I would defer to the clinical team on that.  There is -- our

21   drug has an effect for 24 hours.  So there would be a peak and a

22   trough, but the timings I couldn't tell you.

23     **Q.**   So the person that, during this time frame, is having

24   significant communications with the FDA about Xarelto doesn't

25   even understand the dose response curves for Xarelto?  That's

10:27:45

10:27:59

10:28:21

10:28:38

10:28:55

**OFFICIAL TRANSCRIPT**

1    what you're saying?

2        A.   What I'm saying is the clinical team would have given

3    me the information.  I would be aware of this, but, again, this

4    is something that the clinical team would have given me to look

10:29:12   5    at and provide back to the agency.  My perspectives are -- my

6    goal is to interface with the FDA and also provide any guidance

7    or precedence from the FDA as needed.

8        Q.   And you're aware that the marketing department learned

9    about the Samama paper and made the decision that no

10:29:37   10   recommendation to measure would be made?  You know that, right?

11       A.   No, I don't recall it.  But, again, I would -- if you

12   could refresh my recollection to see that, please.

13       Q.   And I'll do that in a second.

14            But you know it would be completely inappropriate for

10:29:58   15   the marketing department to weigh in about whether or not

16   clinical information was going to be disclosed, right?

17       A.   I would say clinical -- commercial medical affairs are

18   entitled to give an opinion, but -- and they are free, as in any

19   function, to give their opinion, but ultimately the decision

10:30:23   20   would be based by -- would be done by our clinical division, by

21   our clinical team.

22       Q.   Okay.  Let me show you Plaintiffs' 204244.

23            MR. BARR:  The plaintiffs move 204244 into evidence as

24   Trial Exhibit 154, Your Honor.

10:30:49   25            MR. IRWIN:  One minute, please, Your Honor.

**OFFICIAL TRANSCRIPT**

1                           (A pause in the proceedings.)

2              MR. IRWIN:  No objection, Your Honor.

3              THE COURT:  Let it be admitted.

4    **MR. BARR:  (CONTINUING)**

5         Q.   All right.  So let's go to the second page of this.

6              And I just want -- so the jury understands we're

7    talking about the same thing.

8              MR. BARR:  Blow up this right here (indicating).

9    **MR. BARR:  (CONTINUING)**

10        Q.   Sir, you would agree with me that this is the same

11   e-mail from Nini Bode talking about the Samama paper, right?

12   She's attaching this?  This is a continuing string in that,

13   right?

14        A.   The next e-mail, correct.  It appears to be that.

15             MR. BARR:  So let's take that down.

16             And let's blow up this entire section here

17   (indicating).

18   **MR. BARR:  (CONTINUING)**

19        Q.   I want to talk to you about the e-mail from

20   Nauman Shah.

21             Now, Nauman Shah, who wrote this e-mail, he is in the

22   marketing department, right?

23        A.   He's in our commercial group, that's correct.

24        Q.   Right.  All he does is "how do we best sell this drug,"

25   right?

**OFFICIAL TRANSCRIPT**

1      A.   Well, at that time, the drug had not been approved so

2  he was providing his perspectives as a team member.

3      Q.   As a commercial team member, right?

4      A.   Correct.   As a team member, yes.

10:32:24
5      Q.   And this is June 15, 2010, right?

6      A.   That is correct.

7      Q.   And he says, talking to Nini, Thanks for forwarding

8  this on.   From a commercial strategy standpoint, we do not want

9  to recommend or encourage use of any measurements for rivaroxaban

10:32:48
10  given that they will not accomplish the primary purpose that most

11  clinicians have for measuring levels in chronic treatment

12  situations - compliance.

13          Right?

14      A.   That's what he states.   That's his perspective, right.

10:33:02
15      Q.   While the tests may provide an indication of whether

16  rivaroxaban is on board, none will convey whether the patient has

17  been taking rivaroxaban regularly.

18          Right?

19      A.   That is what he states.

10:33:18
20      Q.   So even Mr. Shah is recognizing that PT can be used to

21  determine if Xarelto is on board, right?

22      A.   That's what he's stating.   I mean, I think he is

23  stating that, but, again, I think you should just look at the

24  entire e-mail and just look at what it says at the ending also.

10:33:39
25      Q.   Well, we're not done reading.

**OFFICIAL TRANSCRIPT**

1        Then it says, Therefore, assuming this is indeed the
2   case, we are planning to stick with a simple strategy to not
3   recommend measurement.
4        Right?
5   **A.**   That's what he states.
6   **Q.**   If there is a need to assess whether rivaroxaban is on
7   board, one of the these tests could be implied.
8        Right?
9   **A.**   Yes, that's correct.
10  **Q.**   We can imply there's a test even though we tell doctors
11  there's not a test, right?
12  **A.**   But he states also the conclusions regarding will be
13  difficult to make.
14       So he's providing his perspective to the team on this.
15  And as I said, it was given to everybody in the team and we just
16  took it into account and that's it.
17  **Q.**   So let me ask you --
18  **A.**   He's allowed to give his perspectives.
19  **Q.**   As we sit here in 2017, anywhere in the U.S. label does
20  Janssen encourage the use of measurement with Xarelto?
21  **A.**   No, there isn't.  I mean, Section 5 is the only one
22  where it clearly says the contrary, but, no.
23  **Q.**   I want to go to the first page.
24       MR. BARR:  And I want to blow up this e-mail from
25  Christopher Nessel.

10:33:56
10:34:11
10:34:27
10:34:44
10:35:11

**OFFICIAL TRANSCRIPT**

MR. BARR:   (CONTINUING)

     Q.    Now, you know Christopher Nessel is also with Janssen, right?

     A.    Christopher Nessel is with Janssen, but I'm not copied on this note.

     Q.    Okay.  But you're in this string.  And what Dr. Nessel writes is, No test will indicate long-term compliance as even a single dose of rivaroxaban will generate therapeutic levels however that is defined.

          Right?

          MR. IRWIN:  Your Honor, I think he's copied on this before this.

          THE WITNESS:  I'm not --

          MR. IRWIN:  Hold on, please.

          MR. BARR:  Wait one second.

          MR. IRWIN:  Yeah.  I think that -- if I can try to catch up here.

          I think that Mr. Jalota is copied on this e-mail string before Dr. Nessel's entry here, so I don't believe there's any indication that Mr. Jalota would have seen this.

          MR. BARR:  But, Your Honor, the document's been established as a business record.  It's an e-mail -- he's on, not all of them, but he's on some of them.

          THE COURT:  Well, he has to either write the e-mail or receive the e-mail in order for him to testify about the e-mail

**OFFICIAL TRANSCRIPT**

1   so let's establish that first.

2           MR. BARR:  Well, he's on the original strings of this,

3   Your Honor -- well, let me just do it this way.

4           MR. IRWIN:  Your Honor, he's on the string at 9:44 but

*10:36:26*
5   this e-mail comes up at 10:07.  He is not on it at that point.

6           MR. BARR:  Your Honor, I agree he is not on it, but

7   it's a business record of this company.  It's been established as

8   a business record.

9           THE COURT:  I'm not going to allow that.  Let's move on

*10:36:41*
10  to something else, then.

11  **MR. BARR:  (CONTINUING)**

12      **Q.**   Mr. Jalota, just --

13          MR. BARR:  Don't blow that up.

14  **MR. BARR:  (CONTINUING)**

*10:36:54*
15      **Q.**   Look at this e-mail from Christopher Nessel.  Have you

16  ever seen this before?

17      **A.**   No, I have not.  I have not seen this note before.

18      **Q.**   So you have never seen this e-mail in your life?

19      **A.**   I don't recall.  Again, I've not been copied.  Unless

*10:37:13*
20  you have a follow-on copy that was sent to me, I don't recall

21  seeing this discussion.

22      **Q.**   Okay.

23          MR. BARR:  Your Honor, I don't know if you want to take

24  a break at some point --

*10:37:25*
25          THE COURT:  Why don't we take a break at this time.

**OFFICIAL TRANSCRIPT**

 1 We'll take a ten-minute break.

 2                                  (Jury out at 10:37 a.m.)

 3                                  (A recess was taken.)

 4                        **AFTER THE RECESS**

10:50:30  5                         (Call to order of the court.)

 6                                  (Jury in at 10:50 a.m.)

 7            THE COURT:  Be seated, please.

 8            Let's continue, Counsel.

 9            MR. BARR:  Thank you, Your Honor.

10:50:59 10 **MR. BARR:  (CONTINUING)**

11      **Q.**  Now, Mr. Jalota, we've been spending some time here

12 this morning talking about PT and whether or not it can be used

13 to measure even in the case of an emergency, right?

14      **A.**  That is correct, sir.

10:51:16 15      **Q.**  Okay.  And you would agree with me that even having

16 that discussion causes you to have a physical reaction, right?

17      **A.**  No.  I would say...

18      **Q.**  Well, let me show you 804456.

19            MR. BARR:  Your Honor, at this time plaintiffs move

10:52:03 20 into evidence Plaintiffs' Exhibit 804456 as Trial Exhibit 155.

21            MR. IRWIN:  No objection, Your Honor.

22            THE COURT:  Let it be admitted.

23 **MR. BARR:  (CONTINUING)**

24      **Q.**  Mr. Jalota, you see that this is an e-mail -- a string

10:52:19 25 of e-mails between Gareth Tucker, yourself, and Ted Spiro, right?

**OFFICIAL TRANSCRIPT**

1    **A.**    That's correct.

2    **Q.**    And this is January 27, 2011, right?

3    **A.**    That's correct.

4    **Q.**    So this is before approval of the drug, right?

10:52:31    5    **A.**    That's correct.

6    **Q.**    And what is in the subject line is it's a proposed ISTH

7    submission on anti-Xa and PT field studies, right?

8    **A.**    That's correct.

9    **Q.**    And Gareth Tucker is with the company Chameleon, right?

10:52:52    10    **A.**    That is correct.

11    **Q.**    So the company that's been hired to help place medical

12    articles, right?

13    **A.**    I'm sorry?

14    **Q.**    The company that's been hired to help place medical

10:53:08    15    articles, that's Chameleon, right?

16    **A.**    They are the company that helps Johnson and Bayer with

17    our publication strategy, that's correct.

18    **Q.**    And what I want to focus on is the e-mail from you down

19    at the bottom of the page.  And this is from yourself to Gareth

10:53:26    20    Tucker on January 26, 2011, right?

21    **A.**    That is right.

22    **Q.**    And you say, Just want to check what is the message -

23    is it around a test or method for monitoring.  I always have

24    palpitations when monitoring test (even for emergencies) is

10:53:45    25    proposed because we should be using standard management for

**OFFICIAL TRANSCRIPT**

1   bleeding.

2           Right?

3       A.   I state that.   That's a -- I understand what you're

4   saying.   That's a figure of speech that I used.

5           I was trying to convey my perspective that we should --

6   I need understand what the author was trying to convey in this

7   paper and was this consistent with what our data showed.

8       Q.   And so, in 2011 -- let's recall you saw a document in

9   2009 from An Thyssen that said PT could be used for emergency

10  surgery, right?

11      A.   She stated a perspective that was, but that was -- we

12  have a specific text that we proposed in 2008, July, and we

13  proposed it again as part of the section -- in the

14  pharmacodynamic section.   And that was our perspective again.

15      Q.   And just having this discussion caused you to have an

16  intense reaction, right?   You called it "palpitations."   I don't

17  think anybody believes your heart was actually palpitating.

18          But you didn't like having these discussions.   Fair?

19      A.   It's not I didn't like, it's just a figure of speech.

20  I was just conveying that I think we need to really take a step

21  back and understand what is the author trying to say; is it

22  consistent with our -- with our data.   And if it's not

23  consistent, well, at least understand what.

24          It is a figure of speech I was using, nothing more than

25  that.

10:53:58
10:54:22
10:54:46
10:55:06
10:55:25

**OFFICIAL TRANSCRIPT**

1    **Q.**   It's a figure of speech that people use when they've

2 seen something or they talk about something they don't want to

3 see, when something scares them, right?  They have palpitations,

4 right?

10:55:35  5    **A.**   No.  I would say no.  I'd say that's just a term I used

6 to say, Look, I need to understand a bit more.  That's the way I

7 put it down.

8    **Q.**   So when you wanted to understand things, would you call

9 clinical up and say, Hey, I'm just having some palpitations here;

10:55:52  10 would you talk to me about PT?

11       Is that kind of a normal flat response?

12    **A.**   No.  Again, this is, again, a figure of speech I used

13 at that time.  The circumstances of when and why I used it is

14 there.  I don't recall how -- why I made that.

10:56:06  15    **Q.**   It's a strong figure of speech, correct?

16    **A.**   It's a figure of speech, that's correct.

17    **Q.**   A strong figure of speech?

18    **A.**   It's a figure of speech I used.

19       MR. IRWIN:  Objection, Your Honor.

10:56:15  20       THE COURT:  Let's move on now, Counsel.

21 **MR. BARR:**  **(CONTINUING)**

22    **Q.**   So let's keep talking about PT and what you've been

23 told about it over the years.

24       As Xarelto was approved, you kept track of what was

10:56:30  25 published in the literature; true?

**OFFICIAL TRANSCRIPT**

1     **A.**   I would not have kept track.  I would have -- if
2  somebody [audio breaking up] --
3          THE COURT REPORTER:  I really am having trouble hearing
4  him.
10:56:50
5          MR. BARR:  The court reporter is having some trouble
6  hearing you so try and speak a little slower and a little louder,
7  if you can.
8          THE WITNESS:  Is this any better?
9          MR. BARR:  Is that better?
10:57:01
10         THE COURT REPORTER:  A little bit.
11  **MR. BARR:  (CONTINUING)**
12      **Q.**   So I want to show you Plaintiffs' 497386 and 497387.
13         MR. BARR:  Your Honor, at this time the Plaintiffs
14  offer 493876 as Trial Exhibit 156 and 497387 as Trial
10:57:40
15  Exhibit 157.
16         MR. IRWIN:  Your Honor, no objection to 497386 and no
17  objection to the 497387.
18         THE COURT:  Let them be admitted.
19         MR. BARR:  I would like to put up on the screen
10:58:01
20  Exhibit 497386.
21         And let's just blow up the top part here.
22  **MR. BARR:  (CONTINUING)**
23      **Q.**   So you see that this is April 2011, right -- I'm
24  sorry -- April 2013, correct?
10:58:14
25      **A.**   That is correct.

**OFFICIAL TRANSCRIPT**

1      Q.   So a little less than two years since the drug has come
2    onto the market, right?
3      A.   That is correct.
4      Q.   And you received this, correct?
5      A.   I received it.  I don't know why because in May 2012 I
6    was no longer on the project actively.  I may have been on
7    circulation of this, but I certainly was not actively involved in
8    Xarelto.
9      Q.   Okay.  And you got this document that is titled Review
10   of Riva -- that's Xarelto, right? --
11     A.   That's correct.
12     Q.   -- in Emergency Care Manuscript, right?
13     A.   That is correct, sir.
14     Q.   So we're particular -- this article is particularly
15   talking about how to manage Xarelto in emergency care, right?
16     A.   I would have to look at the paper and tell you, but
17   it's -- right now all it states is review of riva in emergency.
18   I don't know what the context of the manuscript is yet, sir.
19     Q.   Let's look at the page.  And that's 497387.
20          You see that this is a manuscript, right?
21          See on Page 2, sir?
22     A.   I see it.
23     Q.   And it's Rivaroxaban and Hemostasis in Emergency Care,
24   right?
25     A.   That's correct.

**OFFICIAL TRANSCRIPT**

1    **Q.**    And this is Draft No. 9, right?

2    **A.**    That is correct, sir.

3    **Q.**    So this document has been circulated amongst Janssen

4    and they're providing edits to it, right?

*11:00:01*

5    **A.**    It appears so.  I think you need to -- if you want me

6    to look at the paper, I can do that.  Is there something

7    specific --

8    **Q.**    We're going to get there.  I'm just trying to establish

9    for the jury what this is.

*11:00:21*

10           And so let's go to the next page.

11           And this is an article by Jurgen Koscielny.  Do you see

12   that?

13   **A.**    Yes, I do.

14   **Q.**    And the target journal for this is the *Academic*

*11:00:35*

15   *Emergency Medicine*, right?

16   **A.**    That's correct, sir.

17           MR. BARR:  Can we clear that, the annotation.

18   **MR. BARR:  (CONTINUING)**

19   **Q.**    So what I want to go to now is pdf Page 5.  It's Page 4

*11:00:57*

20   of the article if, you look at it.

21   **A.**    Correct, sir.

22   **Q.**    What this article says that you've received is, Routine

23   coagulation monitoring is not required with Xarelto in clinical

24   practice.

*11:01:11*

25           Right?

**OFFICIAL TRANSCRIPT**

1       **A.**   That is correct.

2       **Q.**   Although Xarelto has a short half-life, it may be

3   necessary to confirm anticoagulation levels in certain clinical

4   circumstances such as life-threatening bleeding or prior to

5   emergency surgery.

*11:01:27*

6            Right?

7       **A.**   That is correct.

8       **Q.**   A qualitative assessment of Xarelto activity can be

9   obtained through use of the PT assay as a reagent-sensitive

10   Xarelto.

*11:01:42*

11            Right?

12      **A.**   That is correct.

13      **Q.**   So this paper that you received told you that PT can be

14   used in an emergency setting to assess anticoagulant effects,

15   right?

*11:01:55*

16      **A.**   That's what the paper states.  And that's very

17   consistent with what we had put in the label if an assessment of

18   the PD requirements -- if assessment of PD was required, PT could

19   be used.

20      **Q.**   Sir, this says in the emergency setting it can be used.

*11:02:09*

21   That has never been said in the label, right?

22      **A.**   That is correct.  I would contend to you that we did

23   say in the original cases which could include emergency settings,

24   for example.

25      **Q.**   It goes on to say -- well, let me ask you:  Is this

*11:02:27*

**OFFICIAL TRANSCRIPT**

1    document a single piece of literature?

2        **A.**    No, I would contend it's not.

3            I would further say the way this document is looking

4    at -- and I looked -- and I'm looking at Page 2 -- it appears --

5    it appears this is based on the European SPC, if I look at the

6    appendices of it.  Because it looks -- some of the text, the way

7    it reads, is very much in the European SPC setting.

8        **Q.**    So the European SPC, who publishes that?

9            MR. IRWIN:  Objection, Your Honor.  May we approach?

10           THE COURT:  Yes.

11           MR. BARR:  He brought it up.

12                    **SIDEBAR ON THE RECORD**

13           MR. IRWIN:  I think this is the risk created by this

14   situation, Your Honor.  The witness is just trying to answer a

15   question.  He's not sensitive to the delicate issue here as much

16   as we are, and we would respectfully request that we don't go

17   down this road anymore and make it any worse.

18           MR. BARR:  All I was asking -- and I'm not going to go

19   any further than this.  All I was asking him is who publishes it.

20   I'm not going to put up European SPC and I'm not going to talk

21   about it.

22           THE COURT:  Who publishes it?

23           MR. BARR:  Bayer does.

24           THE COURT:  Okay, let's go with that, and then let's

25   get on to something else.

**OFFICIAL TRANSCRIPT**

 1             How much further do we have?

 2             MR. BARR:  I probably have 30 to 40 minutes with him,

 3   Your Honor.

 4             MR. IRWIN:  Your Honor, just for the record, we do want

 5   to reiterate our objections to the reversal agent testimony that

 6   came up.  We're on record about that.  It's a design issue.

 7             And just for the sake of the record here, we would like

 8   to reiterate that objection and move to strike that testimony.

 9             MR. BARR:  Your Honor, we obviously oppose that.

10             THE COURT:  Yeah.  And you're correct from the

11   standpoint of design, but it's a characteristic of the drug that

12   has to be taken into consideration.  It's just -- that's where

13   they are going here.

14             They take the position it's a characteristic of the

15   drug.  It's dealing with a 16-wheeler as opposed to a Volkswagen

16   in an automobile and dealing with the characteristic of the facts

17   in this case.  It's the same way with various other -- that's

18   what it is.

19             Now it has some relevance, I suppose.

20             MR. IRWIN:  Your Honor, I feel the twain will not meet

21   here because this is a warning case and we say twice in our label

22   that there is no antidote.

23             But we wanted to just restate this.  It's an important

24   objection for us.

25             THE COURT:  Okay.  I understand.  I got it.

**OFFICIAL TRANSCRIPT**

**AFTER THE SIDEBAR IN OPEN COURT**

2        MR. BARR:  May I proceed?

3        THE COURT:  Yes.

**MR. BARR:  (CONTINUING)**

11:05:57   5    Q.   Now, Mr. Jalota, all I'm asking you is:  Who publishes

6  the European SPC?  Who is that a document from?

7    A.   That's a document from the European authorities, and

8  it's a Bayer document.

9    Q.   Okay.  So let's keep going on with this.

11:06:21  10       MR. BARR:  I want to go to pdf Page 7.  What I want to

11  blow up for the jury to see is what the aim of this article is.

12  It's in the top paragraph.

**MR. BARR:  (CONTINUING)**

14    Q.   And you see it says, The aim of this article is to

11:06:36  15  provide guidance on the management of patients who are receiving

16  anticoagulation with Xarelto and who may require an emergency

17  intervention.

18        Right?

19    A.   That is correct, sir.

11:06:49  20    Q.   And what Dr. Koscielny says --

21        MR. BARR:  Take this down.

22        Let's blow this up (indicating).

23        I'm going to the paragraph that starts with "The PT is

24  more sensitive."

11:07:08  25  **MR. BARR:  (CONTINUING)**

**OFFICIAL TRANSCRIPT**

1    **Q.**   Do you see that?

2    **A.**   I do.

3    **Q.**   It says, The PT is more sensitive than APTT and is

4    prolonged in a concentration-dependent manner when reagents such

11:07:19   5    as Neoplastine CI Plus or Innovin are used.  The slope of the

6    rivaroxaban response curve is dependent on the sensitivity to PT

7    reagent thromboplastin to Xarelto.

8          Right?

9    **A.**   That is right.

11:07:31   10   **Q.**   And then it goes down a little further.  Do you see the

11   sentence that starts "nevertheless"?

12   **A.**   Yes.

13   **Q.**   It says, Nevertheless, in an acute situation, the

14   determination of PT could deliver valuable preliminary

11:07:52   15   information on the effect of rivaroxaban.

16         Did I read that right?

17   **A.**   You did.

18   **Q.**   Let's read this next sentence -- why don't you read

19   this next sentence for us.

11:08:03   20   **A.**   A normal PT value using a sensitive thromboplastin

21   reagent indicates that a clinically significant residual effect

22   of rivaroxaban is unlikely.

23   **Q.**   So what that is saying is that, if you have a normal PT

24   in an acute setting, it is unlikely that Xarelto is present in

11:08:27   25   clinically significant levels, right?

**OFFICIAL TRANSCRIPT**

1    **A.**    I'm not a clinical expert, but that sounds possible.

2    **Q.**    That's what it says, correct?

3    **A.**    That's what it states, correct.   That's all it states,

4  yes.

11:08:46   5    **Q.**    You have a doctor of pharmacy, right?

6    **A.**    I have a bachelor of pharmacy, yes.

7    **Q.**    So you understand what these scientific terms are

8  saying, right?

9    **A.**    Could you clarify that more, sir.

11:09:02  10    **Q.**    You understand scientific terminology?  I mean, you've

11  got a bachelor's degree in pharmacy, right?

12    **A.**    I understand.  I'm not an expert, but I do understand

13  some aspects, yes.

14    **Q.**    You understand what that sentence is saying, right?

11:09:16  15    **A.**    Which sentence are you asking me to look at, sir?

16    **Q.**    The one I asked you to read that says, Nevertheless, in

17  an acute situation, the determination of PT could deliver

18  valuable preliminary information on the effect of Xarelto.

19         Right?

11:09:31  20    **A.**    That is what the author states, correct.

21    **Q.**    That sounds helpful, doesn't it?

22    **A.**    It says it offers the --

23    **Q.**    You broke up there.

24         THE COURT:  What did you say?

11:09:47  25  MR. BARR:   (CONTINUING)

**OFFICIAL TRANSCRIPT**

| | |
|---|---|
| 1 | Q. That sounds helpful, doesn't it? |
| 2 | A. I'm sorry. There was a background echo. |
| 3 | Q. Let me try it one more time. |
| 4 | That sounds helpful, doesn't it? |
| 5 | A. It sounds -- it's not -- it's valuable preliminary |
| 6 | information that might help a prescriber, that's correct. I |
| 7 | don't know if it's more than that, sir. |
| 8 | Q. Now, would you agree with me that, once this was |
| 9 | received by Bayer and Janssen, no effort was made to change the |
| 10 | label to reflect this information, was it? |
| 11 | A. This information was received in May 200- -- this -- |
| 12 | well, I received it in April of 2013. So I would say -- I don't |
| 13 | know what the clinical team -- I would assume the clinical team |
| 14 | looked at this information, but the decision -- they made a |
| 15 | recommendation not to include any of this, correct. |
| 16 | Q. So -- |
| 17 | A. Again, it's also worthy of knowing that this -- when a |
| 18 | physician is out there, they would use the label and articles |
| 19 | like this to make a determination, that's correct. |
| 20 | Q. So you think doctors shouldn't be able to look at the |
| 21 | label, they should have to go digging through the literature when |
| 22 | they're trying to decide whether or not it's safe to operate on |
| 23 | somebody that desperately needs a surgery? |
| 24 | A. I would defer to the clinical team on this. But my -- |
| 25 | a physician would have the label and other publications to be |

Time stamps (left margin): 11:09:58 (line 5), 11:10:21 (line 10), 11:10:45 (line 15), 11:10:57 (line 20), 11:11:17 (line 25)

**OFFICIAL TRANSCRIPT**

1    aware of this information, that's correct, sir.

2        Q.   And you know no effort was made to change the label in
3    response to this information, right?

4        A.   It's not no effort.  We had already discussed this.  We
11:11:34
5    had gone through the approval process.  We had discussed this
6    with the agencies also.

7             And based on this -- I don't know how this data came --
8    I don't know the basis of this data, but in my perspective it
9    appears to be what we've already previously done with it.

11:11:53
10       Q.   You agree with me that, since June of 2011, these two
11   companies have never, at any point since then, tried to include
12   information about PT in the label?  That's never happened?

13       A.   Well, I would be -- I would be -- I clarify by saying
14   there are two occasions in June when we did, and in both
11:12:18
15   occasions we were not allowed to put that information.

16            So by the end, the 30th of June, that is correct, but
17   we tried twice.

18       Q.   This is after June of 2011, right?

19       A.   That is correct.

11:12:34
20       Q.   You agree with me that, as a drug goes on to the
21   market, the science changes, right?

22       A.   As we get new information, our teams would assess the
23   information, that is correct.

24       Q.   And you're getting this new information and you're
11:12:49
25   assessing it, and you're not doing anything to change the label,

**OFFICIAL TRANSCRIPT**

1  are you?

2      A.    I would say -- first of all, I'd defer to the clinical

3  team whether this is new information or this is information that

4  we currently have.

5          And based on that -- this is the author's presentation

6  or his perspective on what he feels he wants to mention.

7      Q.    Let me show another one you received.  Let me show you

8  3062810 and 3062811.

9          MR. BARR:  Your Honor, at this time the plaintiffs

10  offer Plaintiffs' Exhibit 3062810 as Exhibit 158 and 3062811 as

11  Exhibit 159.

12          MR. IRWIN:  Your Honor, may we approach?

13          THE COURT:  Sure.

14                      **SIDEBAR ON THE RECORD**

15          MR. IRWIN:  It's really two things, Judge.

16          We would request, respectfully, that Your Honor

17  instruct the jury to disregard the testimony of Mr. Jalota about

18  the SPC label being by the product of the foreign regulators.

19          Brian said that the answer was going to be Bayer and we

20  have no objection to that, but this is part of this problem.  We

21  don't know what the witness might say inadvertently, and we

22  respectfully request that the jury be so instructed.

23          MR. BARR:  The answer was Bayer.

24          MR. IRWIN:  But he also said the European regulators.

25          MR. BARR:  I didn't talk about it.

**OFFICIAL TRANSCRIPT**

11:13:02

11:13:55

11:14:33

11:14:54

11:15:11

1    MR. IRWIN:  I know, but that's the problem here.

2    MS. WILKINSON:  Your Honor, I'm going to raise another

3  point about this document he was just shown, PX 157.  You said

4  what's admissible are previous inconsistent statements by the

5  company.  This is not a statement by the company.  It's an

6  article that a scientist wrote that was sent to them and sent to

7  Janssen.

8    But it is not a Bayer statement, and he said that.  He

9  said, when he answered the question, this was a regulatory

10  document.

11    MR. BARR:  He didn't say that.

12    MS. WILKINSON:  He said it was written by the

13  regulators.

14    MR. BARR:  He didn't say that about that article.  Oh,

15  no, he didn't.  That's an article that he testified that they had

16  commentary on and they provided edits it on.  It's not to a

17  regulator.

18    MS. WILKINSON:  This is not their document.  It's not

19  statements they made.  And you implied to the jury that these

20  were statements that Bayer and Janssen made, and they are not.

21    MR. BARR:  They provided commentary to these

22  articles --

23    MS. WILKINSON:  You weren't pointing to the commentary.

24    MR. BARR:  -- and it is notice of the issue.

25    MS. WILKINSON:  There is no commentary, Your Honor.

**OFFICIAL TRANSCRIPT**

11:15:30

11:15:44

11:15:51

11:16:05

11:16:13

1        MR. BARR:  The whole line of questioning I'm having

2   with him, Beth, is that you have to keep up with the science, and

3   you're not changing the label based upon the science you're

4   getting.  That's the whole line of questioning I just went

5   through with him.

6        MS. WILKINSON:  Your Honor, there is no commentary

7   here.  It's just the article.

8        THE COURT:  The way I understand it is that it's

9   Bayer's article.  Is that right or not?

10       MR. BARR:  It's an article written by somebody that

11  discloses a conflict of interest with Bayer that was sent to

12  Bayer.

13       MS. WILKINSON:  It's written by Jurgen Koscielny, and

14  it's from the Institute for Transfusion Medicine in Berlin,

15  Germany.  It is not written by Bayer.

16       MR. BARR:  Well, if you want me to go there, Beth, I

17  will pull up the article that was published that says the authors

18  would like to acknowledge Kelly Farrell, who provided editorial

19  support with funding from Bayer HealthCare Pharmaceuticals and

20  Janssen Scientific Affairs.

21       Is that where you want me to go?

22       THE COURT:  No.  Look, we are not introducing it.

23       When you said it was an article, I understood it was an

24  article that -- an internal article between Bayer.

25       Reviews of other articles, medical journal articles,

**OFFICIAL TRANSCRIPT**

1  they are not introduced.  You can use them, you can discuss them
2  with the witness, but they are not introduced.
3  MR. BARR:  But, Your Honor, this is a draft of an
4  article that the company received.  He testified they provide
*11:17:42*  5  edits to these things.  That's what he said.
6  I'm not saying Bayer made this up, but they got it.
7  That's the point.
8  THE COURT:  Yeah, but that's the point.  You can use it
9  to develop the information, but it's not introduced into
*11:17:55*  10  evidence.  It's just -- you know, you don't put up articles.
11  It's 803(18).  You can use it.  You can question the
12  witness, but it's not introduced into evidence.
13  MR. BARR:  But I'm not offering it for a hearsay
14  purpose.  I'm offering it for notice, that they knew this was
*11:18:13*  15  going on.
16  THE COURT:  But the point is you can question a
17  witness, but you can't introduce it into evidence.  I mean,
18  that's just clear --
19  MR. IRWIN:  803(18).
*11:18:25*  20  THE COURT:  -- 803(18).
21  MS. WILKINSON:  Your Honor, then we move to strike just
22  the piece of evidence --
23  THE COURT:  I'll remove that article.
24  That doesn't mean you can't use it.  It means that it
*11:18:34*  25  is not introduced.

**OFFICIAL TRANSCRIPT**

1         The statements -- the statement is called to the
2    attention of an expert witness on cross-examination or relied on
3    on direct examination.  Publications established as reliable
4    authority, but is not introduced into evidence.
5         It's admitted -- if admitted, the statement may be read
6    but not received as an exhibit.
7         MR. BIRCHFIELD:  I think that we're talking about two
8    separate things.  We're talking about the article, which would be
9    used as a demonstrative but not admitted.  We agree with that.
10        What was admitted prior was the article that was
11   attached to an e-mail.  That is a document, that is a draft, it's
12   not the learned treatise.  It was submitted to the company for
13   review and comment.
14        That's the part that was admitted into evidence, not
15   the article itself.
16        THE COURT:  I understand.  We'll take it out of the
17   evidence.  That's all.  You can use it.  You can use it in
18   argument just like they used it in argument, but it's not part of
19   the evidence.
20        MR. IRWIN:  Your Honor --
21        MS. WILKINSON:  157.
22        MR. BARR:  We're striking that one back.
23        MR. IRWIN:  Here is the other objection, Your Honor.
24        Brian is going to use two exhibits involving a drug in
25   development, sort of a miracle drug.  It is an injectable

**OFFICIAL TRANSCRIPT**

1    anticoagulant that is -- the promise is that it will stop clots

2    but not cause bleeds.  It is not in this class of drugs.  It has

3    not been approved.  Obviously it's in the earliest, earliest

4    stages.  We should not be compared to that standard that may

5    never come true.

6              And then there is an article --

7              THE COURT:  What is your response to that?

8              MR. BARR:  I'm not -- I think what Jim is talking about

9    is this e-mail references this drug that I don't even know what

10   it is.  I'm not talking about that.  The article that's attached

11   to this e-mail talks specifically about Xarelto and the use of PT

12   in an emergency setting.  That's all I'm highlighting.

13             MR. IRWIN:  Well, with that understanding --

14             MR. BARR:  I'm not talking about some other drug.

15             MR. IRWIN:  With that understanding, we don't object.

16             MR. BARR:  I wouldn't even have the ability to ask a

17   question about that other drug.

18                  AFTER THE SIDEBAR IN OPEN COURT

19             MR. BARR:  May I continue?

20             THE COURT:  Proceed.

21   MR. BARR:  (CONTINUING)

22        Q.   Mr. Jalota, did somebody hand you 3062810?

23        A.   Yes.

24        Q.   And so you have --

25             MR. BARR:  Did I offer those in already?  I don't know

**OFFICIAL TRANSCRIPT**

1    if I did.

2              MR. IRWIN:  Well, Your Honor --

3              MR. BARR:  So, Your Honor, we're removing 157.  And

4    that will just be a blank space.

5              I'm going to continue with 160.

6              At this time, Your Honor, plaintiffs offer 3062810 as

7    Exhibit 160.

8              MR. IRWIN:  Your Honor, we object to this exhibit for

9    the reasons described up at the bench.  This is the e-mail

10   involving that different product.

11             THE COURT:  Let's do it in a different way.  Let's not

12   introduce it, just give them focus on it.

13             MR. BARR:  All right.

14   **MR. BARR:  (CONTINUING)**

15        **Q.**   Mr. Jalota, do you have Exhibit 3062810 in front of

16   you?

17        **A.**   I do.

18        **Q.**   Okay.  This is an e-mail you received from Thomas

19   Connolly, correct?

20        **A.**   That's correct, Dr. Connolly.

21        **Q.**   And this is August 10, 2015, right?

22        **A.**   That is correct.

23        **Q.**   And it attaches a series of articles, one of which is

24   called NOAC Antidotes.  Do you see that?

25        **A.**   I do.

11:21:35
11:21:53
11:22:03
11:22:14
11:22:33

**OFFICIAL TRANSCRIPT**

1    Q.   So you received this, correct?

2    A.   I did in relation to the compound I'm currently working

3  on.

4    Q.   Okay.  I don't want to talk to you about the compound

11:22:43  5  you are currently working on.  I want to keep this focused on

6  Xarelto.

7    A.   Okay.

8    Q.   What it says is there's a couple of interesting papers

9  related to reversal antidotes and NOACs that came out within the

11:22:55  10  last few days and are attached, right?

11    A.   That is correct.

12    Q.   And Xarelto is a NOAC, right?

13    A.   That is correct.

14    Q.   So what I would like to do is for a demonstrative show

11:23:07  15  you 3062811.

16        MR. BARR:  Can we get that -- do you have any objection

17  to putting that up, Jim?

18        MR. IRWIN:  No objection, Your Honor.

19        THE COURT:  Let it be admitted.

11:23:17  20        MR. BARR:  I think we are just doing it as a

21  demonstrative.

22        THE COURT:  It's not admitted, it's a demonstrative.

23  All right.

24  MR. BARR:   (CONTINUING)

11:23:26  25    Q.   And you see that this is an article that you received

**OFFICIAL TRANSCRIPT**

1    called Antidotes For Novel Oral Anticoagulants, right?

2        A.    That's correct.  Dr. Connolly is our biomarker and he

3    had sent us this paper in relation to our current compound.

4        Q.    Okay.  And this is an article by -- it looks like by

5    two gentlemen named Mark Crowther, correct?

6        A.    Yes.

7        Q.    And this is a series that was edited by Jeffrey Weitz,

8    right?

9        A.    It appears that's correct, sir.

10       Q.    Okay.  So what I want to do is I want to go to the

11   third page of the article.

12       A.    Okay.  Pdf Page 3, sir?

13       Q.    It's pdf Page 4, sir.

14             Can you see the section titled Measurement of the

15   Effects of the NOACs?

16       A.    Correct.

17       Q.    And it says, Because the NOACs have, in most patients,

18   dependable pharmacokinetics, routine measurement of effect is not

19   required.  Measurement of effect is useful when there is...

20             Do you see that?

21       A.    I do, sir.

22       Q.    And it lists three times in this article when it would

23   be useful to measure the effect of a NOAC, right?

24       A.    There are three instances mentioned, that's correct.

25       Q.    And No. 3 is before surgery to determine when it is

**OFFICIAL TRANSCRIPT**

```
 1   safe to operate or to provide neuraxial anesthesia, right?
 2       A.    That is what it states.
 3       Q.    And "useful," that's another word for "helpful," right?
 4       A.    You can say that.
 5       Q.    So let's go --
 6             MR. BARR:  Let's take this down.
 7             And now I want to go to where it says "For Many
 8   Laboratories" and blow that up.
 9             THE WITNESS:  Mr. Barr, just --
10             MR. BARR:  Yes, sir?
11             THE WITNESS:  There is an echo on the line.  Sorry.
12             MR. BARR:  Let's give it a second.
13             Better?
14             THE WITNESS:  No.  Still persistent.
15             MR. BARR:  All right.  Well, let's give this a shot and
16   then -- because we're getting close to hopefully being able to
17   wrap up.
18             THE WITNESS:  Okay.
19   MR. BARR:   (CONTINUING)
20       Q.    It says, For many laboratories and clinicians, this is
21   a major problem as the only reliable coagulation test available
22   24 hours a day is the prothrombin time and activated partial
23   prothrombin time, but the effect of the NOACs on the PTT and APPT
24   varies significantly between the various reagents used.
25             Right?
```

11:25:21  (line 5)
11:25:36  (line 10)
11:25:56  (line 15)
11:26:01  (line 20)
11:26:25  (line 25)

**OFFICIAL TRANSCRIPT**

1       A.    That is right.

2       Q.    Okay.  That is something you're fully aware of, right?

3       A.    I'm aware of the label that we proposed, yes.  That's

4  what I've taken it as, correct, sir.

11:26:37   5       Q.    This is August of 2015, right, sir?

6       A.    Right.  That's right.

7       Q.    This is four years after whatever proposal was made,

8  right?

9       A.    Again, this article was sent to me by our biomarker

11:26:54  10  colleagues, and that's a discussion that was taking place between

11  the teams for this particular product.

12       Q.    It goes on to say, For the management of bleeding or in

13  preparation for emergency surgery, every hospital laboratory

14  should have an immediate method of determining whether the drug

11:27:12  15  is present in clinically significant quantities.

16             Right?

17       A.    That is correct.

18       Q.    Timing of dose is useful, for the first 12 hours after

19  ingestion (24 hours for Xarelto).

11:27:29  20             Right?

21       A.    That is correct.

22       Q.    As long as the drug is absorbed, it is likely to be

23  present in therapeutic levels and measurement of the level is

24  unnecessary.

11:27:41  25             Right?

**OFFICIAL TRANSCRIPT**

1    A.    That is what the article states, correct.

2    Q.    After this time, if the PTT and APPT are normal,

3    Pradaxa, Xarelto, or edoxoban are unlikely to be present in

4    significant quantities.

11:27:56    5    Right?

6    A.    That is what the author states.

7    Q.    That's what it says, that it can identify that a normal

8    PTT test means that it is unlikely that Xarelto is present in

9    significant quantities, right?

11:28:14    10    A.    I'm reading it.  Yes, correct, sir.

11    Q.    And there has been no effort to change the label to let

12    doctors know this since that time, right?

13    A.    The label has not been changed, that's correct, sir.

14    Q.    It hasn't only not been changed, there has not even

11:28:36    15    been an effort to change it, right?

16    A.    Again, I argue that the data we have still confirms

17    this.  This is the author's perspective.

18    And, again, I would defer to our clinical team if there

19    was something, but right now we have not changed the label

11:28:56    20    because our data as such doesn't require the change of the label.

21    Q.    You know -- you're fully aware that outside of the

22    United States, Bayer admits that PT can be used by doctors to

23    determine if it's safe to proceed to surgery, right?

24    A.    I'm not -- my jurisdiction was with the -- was with the

11:29:26    25    U.S.  Bayer was handling the European and the rest of the world,

**OFFICIAL TRANSCRIPT**

1    and so I would have probably got informed of it, but I was not
2    involved in any of that discussion.
3        Q.   Okay.  But you were certainly informed that Bayer said
4    that, right?
5        A.   You would have to show me some documents to show that.
6             But, in general, we were made aware of aspects.  But,
7    again, my perspective -- I was handling the U.S. specifically.
8        Q.   I'm happy to show you a document.
9             MR. BARR:  Can we hand Mr. Jalota 3061443 and 3061444.
10            MR. IRWIN:  And before we do that, Your Honor, for the
11   sake of completeness, can we put that back up on the screen and
12   ask the witness to read the last sentence that was not
13   highlighted?
14            THE COURT:  Okay.  Let's do that.  He has a right to do
15   that.  It's 106.
16            MR. BARR:  I don't remember what number it was.  Do
17   y'all have that?
18            THE WITNESS:  Mr. Barr, we don't know which one --
19            MR. BARR:  Hold on one second.  We are just pulling
20   something up.
21            THE COURT:  Is that it?
22            MR. BARR:  Yes, sir.  That's it.
23            That's the one you want, isn't it?
24            MR. IRWIN:  It is 3062811.  Pdf 4.
25            Let's highlight right down to here where you stopped

**OFFICIAL TRANSCRIPT**

```
 1   (indicating).
 2              MR. BARR:  Can we highlight that.
 3              MR. IRWIN:  Let's focus on that last sentence, if the
 4   witness would kindly read that.
 5   MR. BARR:  (CONTINUING)
 6        Q.    Do you want to go ahead, sir, and read that?
 7              MR. IRWIN:  Mr. Jalota, would you please read the final
 8   sentence?  Can you see that on the screen?  That was not
 9   highlighted by plaintiff counsel.
10              THE WITNESS:  Right.
11              However, this approach may misidentify some patients as
12   being free of anticoagulant effect when, in actuality, they are
13   anticoagulated.
14              MR. IRWIN:  Thank you, Your Honor.
15   MR. BARR:  (CONTINUING)
16        Q.    Since we went there, let's keep it up.
17              Does the word "unlikely" -- what does that word mean?
18        A.    "Not possible."
19        Q.    Right.  And it says it's unlikely to be present in
20   significant quantities.
21              There is a chance, maybe some small chance, it could
22   be, but it's unlikely, right?
23        A.    I'm not sure what you're saying.  What is -- what is
24   the context of what you are trying to say, sir?  Sorry.
25        Q.    If the question is, is the person more likely than not
```

11:31:11 (line 5)
11:31:23 (line 10)
11:31:41 (line 15)
11:32:00 (line 20)
11:32:21 (line 25)

**OFFICIAL TRANSCRIPT**

1   anticoagulated, that answer says they're more likely than not not

2   anticoagulated, right?

3       A.   I'm reading it as if the PT is normal, it appears that

4   dabigatran is unlikely to be present.

*11:32:57*   5       Q.   And?

6            There are a couple other drugs listed there.  Xarelto

7   is listed there, isn't it?

8       A.   That's correct, sir.

9       Q.   And it says, more likely than not, Xarelto is not

*11:33:09*   10  present in significant quantities, right?

11      A.   Yes.

12      Q.   We can move on.

13      A.   However, this approach may misidentify, and this is the

14  author's perspective about that.  I don't know where -- I don't

*11:33:26*   15  know how he or she -- I don't know how Drs. Crowther and Crowther

16  came to this perspective or this phrase.

17      Q.   It appears they have done more work than your company

18  has?

19           THE COURT:  No, that's argumentative.  I sustain the

*11:33:39*   20  objection.

21  MR. BARR:  (CONTINUING)

22      Q.   So we were talking about whether or not you knew that

23  Bayer admits, outside of the United States, that PT can be used

24  by doctors to determine if it's safe to proceed to surgery.  Do

*11:33:55*   25  you remember that?

**OFFICIAL TRANSCRIPT**

1       **A.**    I do.

2       **Q.**    And you said that you may get updates about it, but you

3   weren't directly involved, right?

4       **A.**    Correct.  We get updates.  We may be asked to provide

11:34:05
5   our perspectives, but the final decision is with Bayer, sir.

6       **Q.**    So you are aware of the position that Bayer takes

7   outside of the United States, right?

8       **A.**    I would have to see what you're trying to refer to,

9   sir.

11:34:23
10      **Q.**    Okay.  Did somebody hand you 3061443 and 3061444?

11          MR. BARR:  Your Honor, at this time plaintiffs move

12  into evidence 3061443 as Exhibit 161 and 3061444 as Exhibit 162.

13          MR. IRWIN:  Your Honor, may we approach?

14          THE COURT:  Yeah.

11:34:52
15                     **SIDEBAR ON THE RECORD**

16          MR. IRWIN:  Your Honor, it's the same slippery slope.

17  It is a quilt and a dialogue back and forth between the regulator

18  and the company, and it is impossible, really, to separate one

19  from the other.  They're joined at the hip.  And all this will do

11:35:37
20  is lead the jury to be misled about the situation that we're

21  concerned about.  It invites confusion under 403, and we would

22  ask that it not be used at all.

23          MR. BARR:  Your Honor, the exact question that they

24  were responding to was to provide a summary of all information

11:36:00
25  known to you relevant to this issue.

**OFFICIAL TRANSCRIPT**

1        That's what we're talking about.  We're talking about
2   what they knew and when they knew it.
3        THE COURT:  I understand that.  But you -- we've got a
4   problem that I'm trying to solve, and we can't get into what you
5   are doing with regulatory and what's regulatory's response to it.
6   It's what they knew and when they knew it.
7        Now, we've got to figure a way of dealing with that so
8   I don't have to keep telling the jury to disregard it.
9        MR. MEUNIER:  Your Honor, again just for the record, I
10  want to revert to your ruling which is what we are relying on.
11       THE COURT:  I got it.  I understand the issue.
12       MR. BARR:  And I'm not going to go into this.  This is
13  going to be the last time I cover it.
14       THE COURT:  I'm not going to admit it into evidence,
15  then.  You can use it and show him and say, Didn't Bayer say such
16  and such.
17       But if you put stuff in that there's discussion by and
18  between the regulatory agencies, there's a problem there that I'm
19  trying to avoid.  If we contaminate the evidence, any verdict is
20  going to be contaminated.  So I'm trying to deal with it so that
21  they understand -- the jury understands whether or not they knew.
22  And not -- you know, the context of it is not the significant
23  part.  What they knew and when they knew it is the significant
24  part.
25       MR. BARR:  Okay.

11:36:17
11:36:35
11:36:50
11:37:07
11:37:24

**OFFICIAL TRANSCRIPT**

```
 1              THE COURT:  When you start putting it in context, it
 2   becomes problematic.
 3              MR. BARR:  Can we --
 4              MR. IRWIN:  There's no way to avoid that respectfully,
 5   Your Honor, and putting it up in front of the jury is what --
 6              THE COURT:  That's what I'm saying.  Maybe the way of
 7   doing it is to say look at it just like you do with the journals.
 8              MR. IRWIN:  And don't flash it up on the screen.
 9              MR. BARR:  But it needs to be on the screen for the
10   jury to follow.  If we don't want to admit it into evidence, I
11   can live with that.  And I'll try to ask the question in a way
12   where it is, You know Bayer said this, instead of This is what
13   they said to the Canadian regulator.
14              THE COURT:  I'm going to have to tell them to disregard
15   things, and the more the judge says "disregard," it's a problem.
16              MR. BARR:  I understand, Your Honor.  This is the last
17   time we're going into this, but it's --
18              MR. IRWIN:  Your Honor, he has -- the only way he can
19   respond to it is a response from a regulatory question coming
20   from a foreign regulator.  That's the only response he can make.
21              MR. BARR:  I don't agree with that.  He can say this is
22   what Bayer said.  This is what they said.  This is what they
23   knew.
24              I mean, they represented in opening statement that they
25   don't know any of this and that we think that they are lying
```

**OFFICIAL TRANSCRIPT**

1    about it.  You can't open that door like that and accuse us of

2    that and then not say what they know.

3            MR. IRWIN:  Ask him the question, "If Bayer said this."

4    And he can read it, you direct him to it.  Don't show it to the

11:38:49   5    jury, and he'll answer the question, Bayer said this.

6            THE COURT:  Let's try this.

7            MR. BARR:  So this is complete, we had to listen to a

8    cross-examination yesterday where Ms. Wilkinson sat there and

9    cross-examined Dr. Liechty accusing him of doing something

11:39:05  10    dangerous by using PT.  This directly contradicts that it is

11    dangerous.

12            THE COURT:  I understand it.  I'm trying to keep it out

13    of context.  That's the deal.  So let's see if you can ask him

14    the question --

11:39:16  15            MR. BARR:  Okay.

16            THE COURT:  -- without going there.  Let's go with

17    that.

18            MR. BARR:  I'll do my best.

19            THE COURT:  Yeah.

11:39:21  20                   **AFTER THE SIDEBAR IN OPEN COURT**

21            THE COURT:  Members of the jury, the problem that's

22    presented is I'm trying to focus the attorneys on what the

23    company knew and when they knew it.

24            And some of the discussion -- the context is within

11:39:48  25    other regulatory agencies, which has nothing to do with this

**OFFICIAL TRANSCRIPT**

1    particular case.

2           Why they did it or whatever is context.  What they knew

3    and when they knew it is the whole relevance of this line of

4    questioning.

5           So let's ask the question.

6           MR. BARR:  Your Honor, may I publish this?

7           THE COURT:  Well --

8           MR. BARR:  Not admit it.

9           THE COURT:  -- let's ask the question first.

10   MR. BARR:  (CONTINUING)

11        Q.   Mr. Jalota, you have in front of you a document,

12   3061443.  Do you see that?

13        A.   -1443, I do.

14        Q.   This is an e-mail you received on November 19, 2014,

15   right?

16        A.   That is correct.  Lori is my direct report and she

17   forwarded it to me because -- as information.  But, again, I was

18   not involved in it, nor would have probably spent more time

19   looking at it also.

20           MR. IRWIN:  Your Honor, then I move to strike any

21   questions that -- this witness has said he was not involved in

22   these arrangements.

23           MR. BARR:  Your Honor, he got the e-mail.  We've

24   established it's a business record he received.

25           THE COURT:  Okay.  I understand.  He received the

**OFFICIAL TRANSCRIPT**

1  e-mail.

2          I assume you received the e-mail and I assume you read

3  the e-mail; is that correct?

4          THE WITNESS:  I would have -- Your Honor, it appears I

5  received the e-mail.  I don't recall it.  But as to any more

6  information, looking at the attachments, I don't recall even -- I

7  don't recall looking at it or -- I don't recall.  That's all I

8  can say to you, sir.

9  **MR. BARR:  (CONTINUING)**

10      Q.  You clearly received it, right?

11      A.  I received it as -- but not as a direct person.  This

12  is because Lori is my direct report.  So she forwarded it to me

13  as this is it.  Other than that, she didn't ask for comments.

14  She didn't ask for anything else, just this is what is happening.

15      Q.  So you received this e-mail?

16      A.  But --

17      Q.  Go ahead.

18          THE COURT:  Go ahead.  Ask the question.

19  **MR. BARR:  (CONTINUING)**

20      Q.  You received this e-mail in the ordinary course of

21  business, correct?

22      A.  I would have -- I would have received it as part of her

23  sending something to me.  Again, she doesn't send me everything.

24  There may have been a reason for this.  I don't know, sir.

25      Q.  And she sent to you a document that Bayer wrote, right?

**OFFICIAL TRANSCRIPT**

11:41:11
11:41:25
11:41:45
11:41:49
11:42:04

```
 1        A.    That is correct, sir.
 2        Q.    Okay.  And so let's look at that document.
 3              MR. IRWIN:  I object, Your Honor.
 4              THE COURT:  Just let him look at the document.  That's
 5   the question.
 6              MR. BARR:  That's all I'm doing.
 7              THE COURT:  Look at the document, sir.
 8              THE WITNESS:  I have, sir.
 9              THE COURT:  Tell him the page.
10   MR. BARR:  (CONTINUING)
11        Q.    What I'm looking at is Page -- let's start with Page 2
12   of the document.  Are you there?
13        A.    Yes.
14        Q.    Bayer was asked a series of questions, and they say
15   that we're providing our full response, right?
16        A.    I would add a clarification --
17              MR. IRWIN:  Your Honor, I would like to ask this
18   witness if he read -- excuse me.
19              THE COURT:  Wait just a minute.
20              MR. IRWIN:  I'd ask him to -- I would like him to ask
21   this witness if he has read this page -- if he ever read this
22   page or ever did anything with it.
23   MR. BARR:  (CONTINUING)
24        Q.    Have you read this page?
25        A.    I have not -- I've not read it.  If you would like me
```

**OFFICIAL TRANSCRIPT**

11:42:21 (line 5)
11:42:31 (line 10)
11:42:49 (line 15)
11:43:02 (line 20)
11:43:14 (line 25)

1    to read it now, I'm happy to do that, sir.

2    **Q.**  So in the course of your duties, you routinely get

3    e-mails and just ignore them and don't read them?

4           MR. IRWIN:  Object, Your Honor.  No foundation,

*11:43:33*   5    argumentative.

6           THE COURT:  I sustain the objection.  Let's move on.

7    We're going to have to move on.

8           MR. BARR:  It would be a lot easier if I could just ask

9    him the question.

*11:43:37*   10           THE COURT:  Well, no.  If he --

11           MR. BARR:  I'm sorry.

12           THE COURT:  -- hasn't even read the page, I'm not going

13    to -- let's get on to something else.

14           MR. BARR:  Your Honor, he received this e-mail.

*11:43:46*   15           THE COURT:  Yeah, he received it, but he said he didn't

16    even read it.

17           MR. BARR:  Your Honor, can we approach?

18           THE COURT:  Yeah.  Sure.

19                        **SIDEBAR ON THE RECORD**

*11:44:13*   20           THE COURT:  The problem you're having is that e-mails

21    don't get into evidence simply because they're used in the usual

22    course of business.  Otherwise, you could put e-mails in without

23    any witness.

24           If a witness got the e-mail but they didn't read it,

*11:44:29*   25    what's he going to testify to?  I don't know.  He is going to

**OFFICIAL TRANSCRIPT**

1    say, I haven't read it.

2         MR. BARR:  Your Honor, there's no question he received

3    the e-mail.  We have been -- throughout this trial -- throughout

4    this trial, if somebody receives an e-mail, there has been no

5    objection, none.  And now we're doing this solely to keep this

6    out.

7         THE COURT:  No.  The problem is that this e-mail is

8    just more than just an e-mail, it's an attachment.  And the

9    fellow gets the attachment, as I understand it.  He's not a part

10   of it.  He gets an attachment.  He says now that he hasn't even

11   read the attachment.

12        So how does it get in if he didn't read it, doesn't

13   know anything about it, and it's not a question -- and it's not

14   business records?  It's not a business record.

15        MR. BARR:  Your Honor, he said he got it in the

16   ordinary course of business.  That's what he said.

17        THE COURT:  But that doesn't make an e-mail a business

18   record.  It just -- you can't do that.  Otherwise, every e-mail

19   you wouldn't even need a witness for.

20        MR. BIRCHFIELD:  Your Honor, as opposed to admitting

21   the e-mail or the attachment, where Mr. Barr was headed was

22   reading him the statement in there and asking him if he

23   understands that that is what Bayer tells people outside the U.S.

24        Ask him -- ask him that question.  We're not asking --

25   at this point we're not asking to move the document into

**OFFICIAL TRANSCRIPT**

1    evidence.

2         THE COURT:  All right.

3         MR. IRWIN:  Your Honor, they could ask any question

4    like that, but they shouldn't imply that it's in this document,

5    that has been such a subject of controversy, in front of the

6    jury.

7         And another thing about the fact that this is just an

8    attachment to an e-mail, he does not deal with Canadian labeling.

9    That's not what he does.  He deals with U.S. labeling.

10        THE COURT:  No, I understand.

11        MR. IRWIN:  All the more reason --

12        THE COURT:  That's part of it.

13        MR. BARR:  Your Honor, part of the problem here is Jim

14   can say that all he wants.  Somebody decided it was important

15   enough to send him the e-mail to tell him here's what's going on

16   in Canada.  And maybe they wanted this historical perspective,

17   who knows.  But they sent it to him.  And he says he gets his

18   e-mails and he looks at them.

19        And, Your Honor, your motion *in limine* order said that

20   what they say to regulators is admissible.  Anything they say to

21   regulators is admissible, and this is Bayer talking to a

22   regulator.  And we relied upon that.  I got up in opening and I

23   said they say these things outside of the United States based

24   upon that.

25        THE COURT:  But --

**OFFICIAL TRANSCRIPT**

1       MR. IRWIN:  There is no foundation.

2       THE COURT:  It's a play-within-a-play situation and

3  that's what I'm trying to deal with.  And it's a complicated

4  problem, because, as I said, there is -- both sides of it is a

5  problem.

6       You're right about they said things, but when you put

7  them in context, it gets confusing to the jury.  And they say

8  certain things in response back and forth.  It is just the

9  problem when you are dealing with FDA and Canadian or FDA and

10  Europe.

11       Look, I think that they may have a point, but let's do

12  it that way.  But just ask him.  The point is whether they knew

13  it -- whether he knew it, whether Bayer knew it, and when they

14  knew it.

15       MR. BARR:  Okay.

16       THE COURT:  Let's ask him, you know -- that's the

17  issue.

18       MR. BARR:  Then I'll read the statement and I'll ask

19  him if he understood that.

20       MR. BIRCHFIELD:  That's where we were headed, Your

21  Honor, when Jim objected.

22       THE COURT:  Okay.

23       MR. BARR:  I'm trying to do it without mentioning

24  Canada or the label, and we're not putting it up.

25       THE COURT:  But then you are showing the document.

**OFFICIAL TRANSCRIPT**

11:47:21
11:47:45
11:47:59
11:48:07
11:48:15

1   Just ask him the question.

2           MR. BARR:  I'm not going to put it up on the screen.

3           MR. IRWIN:  Don't hold it up.  Just read it on your --

4           MR. BARR:  They can't see it.

5           MS. WILKINSON:  And don't ask him to refer to it

6   because then you're implying it's in the document.

7           MR. MEUNIER:  Oh, come on.

8           THE COURT:  "Don't you know Bayer knows this?"

9           MR. BARR:  But, Your Honor --

10          MR. MEUNIER:  He has to be referring to the document.

11          MR. BARR:  It's an unimpeachable --

12          MR. MEUNIER:  You're saying he can't refer to a

13  business record to answer that question?  We are not going to

14  admit the business record.

15          THE COURT:  The problem is that -- it's a 403 problem

16  when you put it in, in context, and I'm trying to keep it out of

17  the context.

18          MR. BARR:  Your Honor, what I'm hearing from Jim is he

19  is not making a 403 objection.

20          MR. IRWIN:  Yes, he is.

21          MR. BARR:  No, you're making an "he hasn't seen the

22  document" objection.

23          MR. IRWIN:  I mentioned 403 from the beginning.

24          THE COURT:  I understand the issue.

25          You say it's a business record; therefore, it gets in.

**OFFICIAL TRANSCRIPT**

1  I disagree with that.  I don't think it is a business record.

2        MR. MEUNIER:  No, I wasn't going to say that, Judge.  I

3  realize there's a problem and I realize we're trying to thread a

4  needle.

11:49:22

5        The only thing, we came into the trial based on an

6  express ruling that anything Bayer said to regulators was

7  admissible.  That's what your ruling was.

8        We could not get into what they did to comply with

9  regulations in the foreign scheme, but anything they said to

11:49:38

10  regulators.  It was an express ruling on our motion *in limine*.

11  We relied on it.  So what Bayer tells regulators goes to the

12  heart of what they knew.

13        THE COURT:  The problem is what they said to regulators

14  is contextual.

11:49:53

15        MR. MEUNIER:  I understand.

16        THE COURT:  That's the problem.

17        MR. MEUNIER:  I understand, Judge.

18        THE COURT:  Because what they said to one regulator is

19  not necessarily accurate with the other regulator.  So you've got

11:50:03

20  a situation where, when they say, What did you say to this

21  regulator, you're taking it out of the context of the case.

22        MR. MEUNIER:  I understand, Your Honor.

23        And all I was trying to get across is that we did rely

24  on a ruling that made it relevant and admissible to talk about

11:50:20

25  what Bayer said to regulators.

**OFFICIAL TRANSCRIPT**

1          THE COURT:  I understand.  It's in the record.  Let's

2     see if we can get through it.

3                  **AFTER THE SIDEBAR IN OPEN COURT**

4          THE COURT:  We have to take a break for lunch.

5          MR. BARR:  Okay.

6     **MR. BARR:  (CONTINUING)**

7          **Q.**   Mr. Jalota, are you aware that Bayer has said outside

8     of the United States that, Although there is no need to monitor

9     clinical practice, in certain infrequent situations such as

10    overdosage, acute bleeding, urgent surgery, in cases of suspected

11    non-compliance, or in other unusual circumstances, assessment of

12    the anticoagulant effect of rivaroxaban may be appropriate.

13    Accordingly, measuring PT using the Neoplastine reagent or a

14    Factor Xa assay using riva-specific calibrators and controls may

15    be useful to inform clinical decisions in these circumstances.

16              Are you aware of that?

17         **A.**   I would say to you that I'm not aware of the current

18    label.  In 2008 and 2011, that text, if it was similar to what

19    was presented to the FDA, would be there.

20              I don't know whether that text you're saying is how it

21    came about if it isn't in the label.  I confess you'd have to

22    show me the label.

23              I'm not -- I can tell you this, I'm not aware -- I'm

24    aware that there are -- there may be some language, but I don't

25    know what the language is and what was agreed with the agencies

**OFFICIAL TRANSCRIPT**

*11:50:43* (line 5)
*11:51:06* (line 10)
*11:51:33* (line 15)
*11:52:01* (line 20)
*11:52:18* (line 25)

1   outside of the U.S.

2        THE COURT:  That's not the question, sir.  The question

3   is whether or not you're aware that Bayer knew or did not know

4   what he just read.

*11:52:36*

5        THE WITNESS:  I would say -- that's difficult for me to

6   say, sir.  The information we proposed in 2008 is what was agreed

7   with both companies, so if there is some text, then Bayer would

8   be aware.  But I simply don't know what is in the labels to tell

9   you, sir.

*11:52:55*

10        MR. BARR:  Do you want to break at this point?

11        THE COURT:  Let's take a break here.  We're going to

12   have a break for -- until 1:15.  We stand in recess until then.

13                              (Jury out at 11:53 a.m.)

14        THE COURT:  Be seated, please.

*11:53:39*

15        Folks, I know that some of you disagree with my ruling,

16   but that's my ruling so let's move on with it.

17        MR. BARR:  Your Honor, I'm not going to bring up the

18   Canadian thing again.  We're done with that.

19        THE COURT:  Court will stand in recess until 1:15.

*11:53:55*

20                              (A recess was taken.)

21                              (End of morning session.)

22

23                    *  *  *  *

24

25

**OFFICIAL TRANSCRIPT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

CERTIFICATE


    I hereby certify this 6th day of June, 2017, that the foregoing is, to the best of my ability and understanding, a true and correct transcript of the proceedings in the above-entitled matter.


                              /s/ Mary V. Thompson
                          _____
                              Official Court Reporter

**OFFICIAL TRANSCRIPT**