```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2

 3      ***************************************************************

        IN RE:  XARELTO (RIVAROXABAN)
 4      PRODUCTS LIABILITY LITIGATION        Docket No. 14-MD-2592
                                             Section "L"
 5                                           New Orleans, Louisiana
        THIS DOCUMENT RELATES TO:           Tuesday, June 6, 2017
 6      Joseph Orr, et al
        v. Janssen Research &
 7      Development, et. al.,
        Case No. 15-CV-3708
 8

 9      ***************************************************************

                      TRANSCRIPT OF TRIAL PROCEEDINGS
10          HEARD BEFORE THE HONORABLE ELDON E. FALLON
                    UNITED STATES DISTRICT JUDGE
11                  VOLUME VI - AFTERNOON SESSION

12

        APPEARANCES:
13

        FOR THE PLAINTIFFS'
14      LIAISON COUNSEL:                LEVIN PAPANTONIO
                                        BRIAN H. BARR, ESQ.
15                                      316 Baylen Street, Suite 600
                                        Pensacola, FL 32502
16
                                        BEASLEY ALLEN
17                                      BY:  ANDY BIRCHFIELD, ESQ.
                                        P.O. Box 4160
18                                      Montgomery, AL 36103

19                                      GAINSBURGH BENJAMIN DAVID
                                        MEUNIER & WARSHAUER
20                                      BY:  GERALD E. MEUNIER, ESQ.
                                        2800 Energy Centre
21                                      1100 Poydras Street
                                        New Orleans, LA 70163
22
                                        GOZA & HONNOLD, LLC
23                                      BY:  BRADLEY D. HONNOLD, ESQ.
                                        11181 Overbrook Road, Suite 200
24                                      Leawood, Kansas 66211

25
```

```
 1                                    THE LAMBERT FIRM, PLC
                                      BY:  EMILY JEFFCOTT, ESQ.
 2                                    701 Magazine Street
                                      New Orleans, Louisiana 70130
 3

 4    FOR THE DEFENDANT BAYER
      HEALTHCARE PHARMACEUTICALS
 5    INC. and BAYER PHARMA AG:       WILKINSON WALSH & ESKOVITZ, LLP
                                      BY:  BETH A. WILKINSON, ESQ.
 6                                    1900 M Street NW, Suite 800
                                      Washington, DC 20036
 7
                                      Nelson Mullins Riley
 8                                    & Scarborough, LLP
                                      BY:  DAVID E. DUKES, ESQ.
 9                                    Meridian, 17th Floor
                                      1320 Main Street
10                                    Columbia, SC 29201

11
      FOR JANSSEN PHARMACEUTICALS,
12    INC. AND JANSSEN RESEARCH &
      DEVELOPMENT, LLC:               IRWIN FRITCHIE URQUHART & MOORE
13                                    BY:  JAMES B. IRWIN, ESQ.
                                      400 Poydras St., Suite 2700
14                                    New Orleans, LA 70130

15

16    Official Court Reporter:       Karen A. Ibos, CCR, RPR, CRR, RMR
                                      500 Poydras Street, B-275
17                                    New Orleans, Louisiana 70130
                                      (504) 589-7776
18

19      Proceedings recorded by mechanical stenography, transcript
      produced by computer.
20

21

22

23

24

25
```

OFFICIAL TRANSCRIPT

```
 1                    I N D E X

 2

 3   WITNESSES FOR THE PLAINTIFF:                    PAGE/LINE:

 4

 5   SANJAY JALOTA

 6      Continued Cross-Examination by Mr. Barr

 7      Redirect Examination by Mr. Irwin

 8      Further Cross-Examination by Mr. Barr

 9

10   VIDEO DEPOSITION OF SUSAN GEIGER

11

12   VIDEO DEPOSITION OF NAUMAN SHAH

13

14   SUZANNE PARISIAN

15      Voir Dire Examination by Mr. Barr

16

17

18

19

20

21

22

23

24

25
```

OFFICIAL TRANSCRIPT

```
 1                    P R O C E E D I N G S.

 2                    (MONDAY, JUNE 6, 2017)

 3                    (AFTERNOON SESSION)

 4

 5        (OPEN COURT.)

 6        (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

 7            THE COURT:  Be seated, please.  Members of the jury, I've

 8   asked the lawyers to pick up the pace little bit.  I know they'll

 9   do so.  I'm sorry it slowed down a bit, we're going to see what we

10   can do to get back on speed.

11            MR. BARR:  Your Honor, may I proceed?

12            THE COURT:  Yes, please.

13                    CONTINUED CROSS-EXAMINATION

14   BY MR. BARR:

15   Q.  Mr. Jalota, I want to change topics with you, and I want to

16   move and talk about the actual approval of Xarelto, okay?

17   A.  Okay.  Mr. Barr, do you mind slightly speaking up, please,

18   also?

19   Q.  Sure.  Is that better?

20   A.  Yes, that's better.  Thank you very much.

21   Q.  You're welcome.

22            You're aware that the primary medical reviewers that

23   reviewed the new drug application for the AFib indication

24   recommended that Xarelto should not be approved for that

25   indication, correct?
```

13:20:22 1   A.  Correct.

13:20:23 2   Q.  They believed that Xarelto was not shown to be safe and

13:20:29 3   effective, right?

13:20:31 4   A.  I would like to see the exact text, but in general they felt

13:20:40 5   the safety and efficacy had not been proven.

13:20:43 6   Q.  Right.  In the ROCKET study all Xarelto showed was that it was

13:20:49 7   non-inferior to poorly controlled warfarin, right?

13:20:54 8   A.  No, I would say Xarelto showed non-inferiority and the time in

13:21:04 9   therapeutic range was 55, less than 60 percent, but I would say

13:21:06 10  it's poorly controlled, so.

13:21:08 11  Q.  The label for Xarelto says that it is not known how Xarelto

13:21:15 12  compares to well controlled warfarin, right?

13:21:19 13  A.  That is correct, sir.

13:21:21 14  Q.  So you said you wanted to see what they said, so let's look at

13:21:28 15  that.

13:21:30 16  A.  Sure.

13:21:31 17  Q.  If we could hand Mr. Jalota 5768754.

13:21:43 18          MR. BARR:  And, your Honor, we would move this in as

13:21:47 19  Trial Exhibit 163.

13:21:49 20          MR. IRWIN:  No objection, your Honor.

13:21:52 21          THE COURT:  Let it be admitted.

13:21:54 22  BY MR. BARR:

13:21:55 23  Q.  Mr. Jalota, you see that this is a brief from the FDA on

13:22:02 24  September 8th, 2011, right?

13:22:05 25  A.  That is correct.  It's the original document for the Advisory

13:22:10  1    Committee.

13:22:10  2    Q.  Right.  This was the brief written by the FDA prior to the

13:22:14  3    Advisory Committee on the atrial fibrillation indication for

13:22:19  4    Xarelto, right?

13:22:19  5    A.  It's -- I would say correct.  Just to clarify, this doesn't

13:22:26  6    have all of the reviews, it only has specific reviews, information

13:22:30  7    in here, not every single review is in here.

13:22:35  8    Q.  Okay.  But this is written by the FDA, this is written by the

13:22:39  9    clinical reviewers, right?

13:22:41 10    A.  That's correct.  This is written specifically by the clinical

13:22:46 11    reviewers, yes.

13:22:47 12    Q.  So let's look at what they said.  If we go to PDF page 11.  Are

13:22:57 13    you with me?

13:22:58 14    A.  Correct.

13:22:59 15    Q.  You see there's a part of the document that says recommendation

13:23:03 16    on regulatory action, right?

13:23:06 17    A.  I do.

13:23:07 18    Q.  And the primary clinical reviewers recommended that a complete

13:23:12 19    response be given, right?

13:23:16 20    A.  That is correct.

13:23:17 21    Q.  And in regulatory terms that means do not approve this drug,

13:23:23 22    right?

13:23:24 23    A.  It means at present it's not approvable but it requires

13:23:30 24    additional information to be approved.

13:23:31 25    Q.  Let's look at what they based that on.  They say based on your

13:23:38  1  review of the clinical data, right?

13:23:40  2  A.  That is correct.

13:23:40  3  Q.  And then they offered their reasons for this recommendation,

13:23:43  4  correct?

13:23:45  5  A.  That is correct.

13:23:45  6  Q.  So let's go down and let's look at their first recommendation.

13:23:51  7  They say there is a lack of substantial evidence that Xarelto will

13:23:56  8  have its desired effect when used as recommended in the labelling,

13:24:00  9  right?

13:24:00  10  A.  That is correct.

13:24:03  11  Q.  And you're aware that the clinical reviewers are the people at

13:24:07  12  the FDA who have been studying the data from ROCKET, right?

13:24:12  13  A.  I would say they are primary reviewers but there are other

13:24:20  14  members like the CDTL Dr. Lisa Thompson, the FDA director

13:24:27  15  Dr. Stockbridge and Dr. Grant will also been looking at the data --

13:24:30  16  at the submission also.

13:24:32  17  Q.  And they say the data from the ROCKET trial comparing Xarelto

13:24:37  18  to warfarin are not adequate to determine whether Xarelto is as

13:24:43  19  effective for its proposed indication in comparison to warfarin

13:24:47  20  when the latter is used skillfully, right?

13:24:51  21  A.  That is correct, sir.

13:24:52  22  Q.  Now, you would agree, you have never in your career seen a

13:24:56  23  situation where the clinical reviewers say don't approve this drug

13:25:00  24  and it's approved anyway, you've never seen that, have you?

13:25:05  25  A.  I personally, no, but it's not uncommon that that has happened.

13:25:10  1   Q.  Let's go to their second reason.  Pull this up.  It says,

13:25:17  2   "There is insufficient information about the drug to determine

13:25:20  3   whether it is safe for use with its proposed labelling."  Did I

13:25:24  4   read that right?

13:25:25  5   A.  Yes, you did.

13:25:26  6   Q.  So according to the medical reviewers, they didn't think that

13:25:33  7   ROCKET proved that Xarelto was safe and effective, right?

13:25:39  8   A.  In their prospective that is correct.

13:25:48  9   Q.  And you understand that the reason they did that was primarily

13:25:54 10   because of the time and therapeutic range of the warfarin arm in

13:25:59 11   the ROCKET study, right?

13:26:00 12   A.  That's one of them, yes, I understand that.

13:26:05 13   Q.  They believe that the warfarin arm who was the gold standard,

13:26:10 14   the comparator for Xarelto was not adequately managed, right?

13:26:15 15   A.  They felt at the time in therapeutic range was lower than what

13:26:26 16   they were expecting it to be.

13:26:26 17   Q.  It was lower than any of the other studies done by -- with any

13:26:29 18   of the other NOACs, right?

13:26:32 19   A.  I would say in 2011 that was the only other study that was

13:26:40 20   available at that time was the Pradaxa study was more than that,

13:26:45 21   correct.

13:26:45 22   Q.  Right.  And you understood prior to the medical reviewers ever

13:26:51 23   saying this that within the company adequate warfarin control was

13:26:59 24   defined as 60 percent or more, right?

13:27:01 25   A.  I -- again, I don't know that.  It may have been mentioned

13:27:07  1  somewhere but I would like to -- you would have to show me that.  I

13:27:11  2  don't think -- at least the clinical team made a determination what

13:27:15  3  they felt adequate.

13:27:16  4  Q.  You were aware that there were some executives within the

13:27:19  5  company that thought the FDA was going to think that the deck had

13:27:24  6  been stacked in favor of Xarelto in the ROCKET trial, you're aware

13:27:29  7  of that, right?

13:27:30  8  A.  I don't recall that but I would like you to show me some

13:27:37  9  information if you would like me to respond to it better, sir.

13:27:42  10  Q.  Okay.  Let me show you Plaintiffs' 6342528.

13:27:51  11        MR. BARR:  And, your Honor, plaintiffs move into evidence

13:27:55  12  Exhibit 634528 to be marked as Trial Exhibit 164.

13:28:00  13        MR. IRWIN:  No objection.

13:28:02  14        THE COURT:  Let it be admitted.

13:28:08  15  BY MR. BARR:

13:28:08  16  Q.  So what I want to do is start with the e-mail on, if you look

13:28:15  17  at the bottom you see the 161?

13:28:22  18  A.  Right, sir.

13:28:26  19  Q.  So the e-mail I am talking about actually starts on 160 so the

13:28:30  20  people can see what that is, PDF page 5.  You see that there's an

13:28:35  21  e-mail from Gary Peters on July 20th, 2009, right?

13:28:41  22  A.  Yes.

13:28:42  23  Q.  And you received this, correct?

13:28:45  24  A.  That's from John Zhang, that's correct.

13:28:50  25  Q.  And what Dr. Peters says to people, including you, was that if

13:28:56 1   you go to the next page, TTR of 75 percent would be good, 50 to

13:29:02 2   75 percent would be moderate and poor would be less than

13:29:06 3   50 percent, right?

13:29:06 4   A.  I am just not sure what you're looking at, sir.

13:29:16 5   Q.  Right here, it says, "my vote for categories would be."  Do you

13:29:21 6   see that?  That's what Dr. Peters said, correct?

13:29:29 7   A.  Dr. Peters is giving his perspective, that's what he states,

13:29:33 8   correct.

13:29:33 9   Q.  So I want to move forward in this e-mail and I want to move to

13:29:38 10  the e-mail on 159 and I'm starting with this e-mail here from

13:29:52 11  Dr. Byra, do you see that?

13:29:55 12  A.  Yes.

13:29:57 13  Q.  So this is July 23rd, 2009, Dr. Byra writes, "I think that

13:30:02 14  expecting 75% being within target is being unrealistic especially

13:30:07 15  since we have many countries in Eastern Europe and Asia where

13:30:12 16  anticoagulation is not as common."  Did I read that right?

13:30:16 17  A.  Yes, you did.

13:30:17 18  Q.  So this study was designed and included large numbers of

13:30:25 19  patients in Eastern Europe and Asia where it was known by the

13:30:31 20  company that they did not know how to adequately use warfarin,

13:30:35 21  right?

13:30:36 22  A.  I think the clinical team made a recommendation which countries

13:30:42 23  to go to.  I mean, that's what Dr. Byra is suggesting, but it's --

13:30:50 24  that's his perspective, sir.

13:30:52 25  Q.  He is saying, well, there is no way we're going to have

13:30:55  1   75 percent TTR because we got too many people in Eastern Europe and

13:31:00  2   Asia where they don't even know how to use warfarin.  How can we

13:31:03  3   expect those people to be able to manage warfarin.  That's what he

13:31:07  4   is saying, isn't it?

13:31:08  5   A.  I would say you'd have ask him what his perspective is, that's

13:31:11  6   what he's stating, he's stating something there, sir.

13:31:15  7   Q.  Let's look at what Dr. Peters said in response.  Right here.

13:31:22  8   The very next e-mail up.  He says, "Bill, this wasn't expecting 75%

13:31:28  9   or above to be in range, just setting a threshold where we would

13:31:31 10   have a reasonable size subgroup to look at - so if I am at FDA how

13:31:38 11   will you convince me that we have not stacked the deck in our favor

13:31:42 12   by including investigators not able to use warfarin properly?"  Did

13:31:48 13   I read that right?

13:31:49 14   A.  Yes, you did.

13:31:50 15   Q.  So Dr. Peters is saying in 2009 before the FDA ever saw the

13:31:54 16   data that the FDA is going to think that we stacked the deck in

13:32:00 17   favor of Xarelto because we included all of these people, all of

13:32:02 18   these study sites that don't know how to use warfarin, right?

13:32:06 19   A.  I would say this discussion took place in 2009 when the ROCKET

13:32:41 20   study was ongoing.  So at that time this is his perspective and he

13:32:41 21   is just asking a question, that's it.  And I think it was more

13:32:41 22   there -- it appears that this is a discussion to see what we could

13:32:41 23   do with the TTR if we could improve it or change it or any measures

13:32:45 24   that could be done.

13:32:45 25   Q.  It turned out he was exactly correct, right, because the TTR

13:32:45  1   just showed was far below 75 percent, it was 55 percent, right?

13:32:45  2   A.  It was 55 percent, that's correct.  I would say -- I mean, I

13:32:48  3   don't know about him being correct, he is stating a number and

13:32:52  4   that's his perspectives again.

13:32:58  5   Q.  All right.  So the company got this recommendation, they got

13:33:01  6   the briefing book and they knew that the primary reviewers were

13:33:07  7   saying this drug should not be approved, right?

13:33:12  8   A.  When we got the briefing document that's what we were made

13:33:16  9   aware of.

13:33:17 10   Q.  And at that point in time you're aware that executives with the

13:33:22 11   company went and met with the FDA, right?

13:33:25 12   A.  That is correct as part of our routine activities we had

13:33:31 13   discussions -- we had ongoing dialogue with the agency about

13:33:40 14   information to be provided and we wanted to discuss how best to

13:33:41 15   provide the information to the Advisory Committee.  This is a topic

13:33:44 16   for discussion.

13:33:44 17   Q.  And what the people with Janssen and Bayer wanted to discuss

13:33:48 18   was to make sure that division leadership views were not -- I'm

13:33:54 19   sorry, that the primary medical reviewers' views were not the views

13:33:59 20   of division leadership, right?

13:34:02 21   A.  Well, I don't know about that, but that's also very clear in

13:34:10 22   the cover page of the advisory committee briefing document where it

13:34:16 23   clearly states that it is -- it does not represent the final

13:34:22 24   position.  I think if you wanted to look at that, that would

13:34:24 25   probably clarify it better.

13:34:26  1   Q.  Okay.

13:34:27  2   A.  And we just needed to get clarity that that was the case and

13:34:30  3   the division confirmed that there was still discussions on going.

13:34:34  4   Q.  And after this meeting it was confirmed that the division

13:34:37  5   leadership didn't necessarily have the same views as the primary

13:34:41  6   reviewers, right?

13:34:43  7   A.  No, I don't say they didn't.  They wanted an open robust

13:34:49  8   discussion at the Advisory Committee where we would provide our

13:34:53  9   perspectives and the FDA would provide their perspectives to the

13:35:00  10  independent group at the Advisory Committee, who could then make an

13:35:04  11  informed decision based on what the TTR is and what other aspects

13:35:08  12  were.

13:35:09  13  Q.  So let's look at Plaintiff 731161 and 731162.

13:35:34  14          MR. BARR:  At this time, your Honor, Plaintiffs offer

13:35:37  15  731161 as Exhibit 165 and 731162 as Exhibit 166.

13:35:46  16          MR. IRWIN:  No objection, your Honor.

13:35:47  17          THE COURT:  Okay.  Let it be admitted.

13:35:51  18  BY MR. BARR:

13:35:51  19  Q.  You see this cover e-mail is an e-mail from you on August 26,

13:35:56  20  2011, right?

13:35:57  21  A.  That is correct.

13:35:59  22  Q.  And you knew at this point in time what the views of the

13:36:03  23  medical reviewers were, right?

13:36:05  24  A.  That is correct, we received the briefing document from them.

13:36:10  25  Q.  And what you say is you actually draft minutes of the meeting

OFFICIAL TRANSCRIPT

13:36:16  1    that took place with the FDA, right?

13:36:19  2    A.  Yes, I did.

13:36:20  3    Q.  So you worked on a draft and you circulated it to everyone,

13:36:25  4    right?

13:36:26  5    A.  Typically what I would do is I would work with the team to

13:36:31  6    draft the TOP-LINE minutes and I would send them out for review,

13:36:34  7    that's correct.

13:36:34  8    Q.  Okay.  So let's look at your minutes, which is the attachment

13:36:38  9    which is 731162.  And you see that this is Rivaroxaban AFib FDA

13:36:47 10    AdCom Alignment Meeting TOP-LINE - August 25th, 2011.  Right?

13:36:54 11    A.  That is correct.

13:36:54 12    Q.  You go down to bullet point No. 3, Dr. Stockbridge and

13:37:00 13    Dr. Grant, those were the heads of the division, right?

13:37:02 14    A.  That's correct.

13:37:03 15    Q.  And after this meeting they reiterated that the package

13:37:08 16    reflected the views of the primary reviewers and not that of

13:37:13 17    division leadership, right?

13:37:14 18    A.  That is correct.  I think that's important -- yeah, fine.

13:37:25 19    Q.  So now I want to talk about the Advisory Committee --

13:37:29 20    A.  Sorry, Dr. Barr -- Mr. Barr, sorry, can I just --

13:37:31 21    Q.  You don't have to call me doctor, I wish that was true, but

13:37:35 22    it's not.

13:37:36 23    A.  I'm sorry, I apologize, Mr. Barr.  I just want to finish.  I

13:37:42 24    think it's worth reading the end of this, which is Dr. Stockbridge

13:37:44 25    agreed to restate this in the introductory remarks at the Advisory

13:37:48  1    Committee.  And I think the key thing is the division wanted a

13:37:51  2    thorough discussion of the Advisory Committee to help guide the

13:37:55  3    final decision.

13:37:56  4          And to be honest, this aspect No. 3 is also reflected in

13:38:02  5    the FDA Advisory Committee FDA briefing document in the cover page.

13:38:07  6    Q.  Right.  The company wanted to make sure that the bosses would

13:38:11  7    say at the beginning of the meeting that we don't necessarily agree

13:38:16  8    with the views of the primary reviewers, right?

13:38:20  9    A.  Again, I wouldn't characterize them as bosses.  They are

13:38:24 10    division directors or medical doctors.  They also reviewed the

13:38:28 11    document, they've also reviewed the assessment.  So they're not

13:38:32 12    overruling, they're just stating that they wanted to have an open

13:38:37 13    discussion.

13:38:37 14    Q.  Okay.  And you're aware -- there's a lot of work that went into

13:38:41 15    preparing for the Advisory Committee, correct?

13:38:43 16    A.  That is correct, there is a lot of work on both sides required.

13:38:48 17    Q.  Bayer and Janssen convened mock panels to do mock Advisory

13:38:56 18    Committee meetings and get input from consultants to tell them what

13:38:59 19    arguments they could make better, how they could present better

13:39:02 20    views, right?

13:39:03 21    A.  That is correct.  That's typical for the preparation is to

13:39:10 22    anticipate work through and understand where the discussions with

13:39:16 23    the independent experts on the Advisory Committee would be.

13:39:18 24    Q.  And some of those consultants, their advice to Janssen was the

13:39:24 25    FDA briefing book is so good and yours is so bad, you need to

13:39:29  1    withdraw the application, right?

13:39:34  2    A.  I don't recall that, but I would like you to -- if you could

13:39:39  3    show me something to help me to find more context behind that

13:39:45  4    discussion.

13:39:45  5    Q.  Okay.  I'll show you Plaintiffs' 256336 and 256337.

13:40:01  6           MR. BARR:  At this time, your Honor, Plaintiffs offer

13:40:04  7    256336 as Trial Exhibit 167 and 256337 as Exhibit No. 168.

13:40:15  8           MR. IRWIN:  Your Honor, I don't object to 256336, but I

13:40:20  9    would ask that counsel connect 256337 to it.  It's connected by

13:40:27  10   this witness then I have no objection.

13:40:29  11          MR. BARR:  Okay.  Well, let's see.

13:40:31  12   BY MR. BARR:

13:40:32  13   Q.  So you received this e-mail, if we look at 256336 and we can

13:40:36  14   pull that one up.

13:40:39  15   A.  Yes, I did.

13:40:40  16   Q.  And it was sent to you, right?

13:40:42  17   A.  Yes, it would have been sent to me.

13:40:46  18   Q.  On August 22nd, 2011, right?

13:40:49  19   A.  That is correct.

13:40:50  20   Q.  And this was notes from Mock #4, right?

13:40:55  21   A.  That is -- yes, Dr. -- Ms. Wittreich had provided her notes

13:41:02  22   from this meeting.

13:41:04  23          MR. IRWIN:  No objection, your Honor.

13:41:05  24          THE COURT:  Let it be admitted.

13:41:11  25   BY MR. BARR:

13:41:11   1    Q.  So you got this, so let's look at the attachment, which is

13:41:15   2    25636 -- 337, I'm sorry.

13:41:20   3    A.  Yes, yes.

13:41:23   4    Q.  And there's several different consultants talking here.  The

13:41:27   5    first one is a consultant Lipicky, right?

13:41:32   6    A.  That's correct.

13:41:33   7    Q.  And he says TTR is the big issue.  Well you knew that, right?

13:41:36   8    A.  He's expressed an opinion that TTR was a discussion point, yes.

13:41:45   9    Q.  And then is this Dr. Fenichel?

13:41:47  10    A.  It's Dr. Lipicky and Dr. Fenichel, correct.

13:41:50  11    Q.  What Dr. Fenichel tells you is, "The FDA briefing book is the

13:41:56  12    best briefing book that I've ever seen.  A game changer.  J&J

13:42:01  13    briefing book is bad.  There is data in FDA briefing book that is

13:42:06  14    not present in J&J briefing book.  After people look at FDA

13:42:10  15    briefing book, they wouldn't look at the J&J briefing look in light

13:42:15  16    of FDA.  Are there holes in the FDA presentation?"  Right?

13:42:19  17    A.  That's Dr. Fenichel's perspective.  Again, he was offering a

13:42:23  18    perspective and that's it.

13:42:24  19    Q.  And he actually, his perspective was Janssen should temporarily

13:42:29  20    withdraw the application so that there is no AdCom, right?

13:42:37  21    A.  That's what he suggested.  We didn't do that but that was his

13:42:39  22    perspective, sir.

13:42:45  23    Q.  Now, ultimately, despite the reviews of the medical reviewers,

13:42:49  24    despite Dr. Fenichel saying temporarily withdraw the application,

13:42:55  25    somehow this drug was still approved, right?

13:42:59  1   A.  Well, I wouldn't say -- I think you oversimplify it.  It had a

13:43:03  2   thorough discussion at the Advisory Committee, it was nine to two,

13:43:07  3   where all of the aspects were discussed.  Subsequent to that, the

13:43:10  4   agency reviewed -- took everything into account and did approve it

13:43:14  5   in November 2011.

13:43:16  6   Q.  But you agree with me that the Advisory Committee members most

13:43:22  7   of them did not feel that rivaroxaban was proven to be non-inferior

13:43:30  8   to warfarin, right?

13:43:30  9   A.  I would say no, I would say there were reviewers -- some of the

13:43:35 10   advisory consultant members who were -- who felt that and others

13:43:45 11   who didn't.  I wouldn't say mostly.

13:43:52 12   Q.  Okay.  Well, let me show you Plaintiffs 229986.

13:43:56 13        MR. BARR:  And, your Honor, Plaintiffs move into evidence

13:44:00 14   Exhibit 229986 as Exhibit 169.

13:44:03 15        MR. IRWIN:  No objection, your Honor.

13:44:04 16        THE COURT:  Let it be admitted.

13:44:09 17   BY MR. BARR:

13:44:10 18   Q.  Do you see here this is -- let's go to the one with Troy Sarich

13:44:18 19   right here on the bottom.

13:44:25 20   A.  Right -- are you looking at page 1, sir?

13:44:27 21   Q.  Yes, sir, page 1.

13:44:28 22   A.  Okay.  Thank you.

13:44:29 23   Q.  And this is talking about a meeting with the board and SATAC,

13:44:33 24   right?

13:44:43 25   A.  Just give me -- can you give me a second, please?

13:45:28  1   Q.  Sure.

13:45:28  2   A.  (WITNESS REVIEWS DOCUMENT.)  Sir, I think you've got to look at

13:45:28  3   the last page where one of our mem -- Paul Stoffels, the head of

13:45:28  4   clinical had said -- told us --

13:45:28  5   Q.  Let us catch up with you real quick -- I am going to put up the

13:45:28  6   last page so the jury can see it.

13:45:28  7   A.  Right.  So if you look at this, the agency Dr. Stoffels called

13:46:00  8   Dr. DiBattiste and says he has a meeting with the board and he just

13:46:00  9   wanted to provide some information on the ROCKET AFib AdCom.  So

13:46:00 10   that's the whole context of this discussion.

13:46:00 11   Q.  Right.  He is asking -- Dr. Stoffels is saying I've got a

13:46:00 12   meeting with the board, so Dr. DiBattiste, would you put together

13:46:46 13   some slide for me so I can report to the board what happened,

13:46:46 14   right?

13:46:46 15   A.  That is correct.

13:46:46 16   Q.  And you've seen in this series of e-mails that Dr. DiBattiste

13:46:46 17   undertook that and did it, right?

13:46:46 18   A.  That's correct.  He worked with a team to prepare something

13:46:46 19   here.

13:46:46 20   Q.  And then Dr. DiBattiste -- take this down and let's go to the

13:47:19 21   first page.  Dr. DiBattiste, let's blow this one up right here.  So

13:47:19 22   if you look at the e-mail from Dr. DiBattiste at September 11,

13:47:19 23   2011, at 5:30 in the evening, okay?

13:47:19 24   A.  Yes.

13:47:19 25   Q.  What Dr. DiBattiste writes is, "The deck looks great."  And he

13:47:19  1   is talking about the slide deck that is going to be used to report

13:47:19  2   to the board of J&J, right?

13:47:19  3   A.  Correct.

13:47:19  4   Q.  He says, "Just one question - was it really "most" who felt

13:47:44  5   that riva was non-inferior to warfarin?  That seems like a bit of

13:47:44  6   an optimistic interpretation to me.  I'll change that to "some" in

13:54:37  7   the deck if that's OK with everyone."  Right?

13:54:37  8   A.  That's what he states.  What had happened was it appears that

13:54:37  9   Dr. Sarich and Dr. Peters had provided their perspectives, and Pete

13:54:37 10   was challenging that question.

13:54:37 11         MR. BARR:  Your Honor, at this time I think I can pass

13:54:37 12   the witness to Mr. Irwin.

13:54:37 13         MR. IRWIN:  Good afternoon.  Your Honor, we have a

13:54:37 14   demonstrative, and I believe I've already given a copy of it to

13:54:38 15   Mr. Barr.

13:54:38 16                    REDIRECT EXAMINATION

13:54:38 17   BY MR. IRWIN:

13:54:38 18   Q.  Mr. Jalota, can you see the back of my head?

13:54:38 19   A.  I can.

13:54:38 20   Q.  I know it's not much to look at.  Would you tell the jury,

13:54:38 21   please, how long you have worked for Janssen?

13:54:38 22   A.  I've worked for Janssen for 14 years.

13:54:38 23   Q.  And where are you originally from?

13:54:38 24   A.  I was born in Kenya in Africa.  I lived my first -- my parents

13:54:38 25   moved -- my parents were actually born there.  And we moved there

13:54:38  1    when my grandfather was helping build the railways in Kenya and

13:54:38  2    Uganda.  And I moved to the UK to do my pharmacy degree.  I did

13:54:38  3    some time at retail pharmacy and then moved to industry, in the

13:54:38  4    pharmacy industry in '95.

13:54:38  5    Q.  And when did you get your pharmacy degree in the UK?

13:54:38  6    A.  I got my pharmacy degree in 1985 at the Wales School of

13:54:38  7    Pharmacy in Wales.

13:54:38  8    Q.  Are you trained as a medical doctor?

13:54:38  9    A.  No, I am not.

13:54:38 10    Q.  What did you do in your work in retail pharmacy?

13:54:38 11    A.  I was responsible -- I was the pharmacist responsible for

13:54:38 12    dispensing prescriptions to patients and providing guidance and

13:54:38 13    information and any pharmaceutical labelling information to the

13:54:38 14    patients.

13:54:38 15    Q.  And how did it come to pass that you got involved with the

13:54:38 16    pharmaceutical industry?

13:54:38 17    A.  In 1995, '94 I wanted to change in career.  I wanted to

13:54:38 18    understand how drugs and medicinal products were developed, and I

13:54:38 19    wanted -- that's the change in career.  And that's when I joined

13:54:38 20    the pharmaceutical industry.

13:54:38 21    Q.  And who did you go to work with?  What company?

13:54:38 22    A.  I joined a company called Hoechst Marion Roussel, which

13:54:39 23    subsequently became Aventis.

13:54:39 24    Q.  And briefly, tell us how long you worked for Aventis and what

13:54:39 25    you did for them.

13:54:39  1   A.  I joined Aventis in 19- -- in 1995 and worked in the UK offices

13:54:39  2   till April 2000, where I was responsible for the European

13:54:39  3   regulatory affairs and the international regulatory affairs.

13:54:39  4            In April 2000, I moved to the U.S. and joined -- I was

13:54:39  5   still with Aventis in 2003.  And when I moved over to the U.S., I

13:54:39  6   actually took over the U.S. regulatory affairs activities.

13:54:39  7   Q.  So for Aventis from, what, the year 2000 to 2003 you worked in

13:54:39  8   regulatory affairs for that company; is that correct?

13:54:39  9   A.  That is correct.

13:54:39 10   Q.  And what medicine or medicines did you work on at that time?

13:54:39 11   A.  I worked on cardiovascular drugs, some investigational

13:54:39 12   products, and a product called Lovenox, which is an injectable

13:54:39 13   anticoagulant.

13:54:39 14   Q.  And how did it come to pass and when did you get to work or go

13:54:39 15   to work for Janssen?

13:54:39 16   A.  In 2003 I was looking to change my -- to get into new

13:54:39 17   opportunities, change my career, and to get -- to get information

13:54:39 18   and to get more experience around early development of the

13:54:39 19   products, which is products doing preclinical early phase

13:54:39 20   development, to learn more about the early aspects then moving into

13:54:40 21   the later development.

13:54:40 22   Q.  And were your responsibilities involved in regulatory matters

13:54:40 23   and working with the FDA at that time?

13:54:40 24   A.  That is correct.

13:54:40 25   Q.  And when did you start to work with Xarelto?

13:54:40  1  A.  I started working with Xarelto in September 2005 when I was
13:54:40  2  contacted by the team to conduct due diligence on Xarelto compound.
13:54:40  3  Q.  And what were your responsibilities with that due diligence
13:54:40  4  effort?
13:54:40  5  A.  My responsibilities included -- my responsibilities were to
13:54:40  6  review the regulatory correspondence and determine what information
13:54:40  7  had been received from the FDA.
13:54:40  8  Q.  And you eventually began work with the compound development
13:54:40  9  team?
13:54:40 10  A.  That is correct.  When the collaboration was signed, I joined
13:54:40 11  the compound development team for Xarelto.
13:54:40 12  Q.  And how long did you continue to work with Xarelto?
13:54:40 13  A.  I continued to work till May 2012.  When in 2012 I transitioned
13:54:40 14  off to work on compounds in the heart failure space.  I had some
13:54:40 15  administrative oversight for Xarelto.  So in that respect, the team
13:54:40 16  working on Xarelto administratively reported to me; and that
13:54:40 17  essentially means I would do the performance pays, sign off on
13:54:40 18  their expense sheets, and other administrative activities.
13:54:40 19  Q.  And through this term that you worked with Xarelto from 2005 to
13:54:40 20  2012, were you familiar with the development of a product -- the
13:54:41 21  phases of the clinical trials and the labelling discussions that
13:54:41 22  went on with the FDA?
13:54:41 23  A.  Yes, I was.
13:54:41 24  Q.  And it's been said that the program that is perhaps in place
13:54:41 25  for this kind of long-term product development is a

13:54:41 1    multi-disciplinary program.  Can you tell us is little bit about

13:54:41 2    what that is?

13:54:41 3    A.  Yes.  So the compound development team comprises of various

13:54:41 4    functions - preclinical, clinical, chemistry, medical affairs,

13:54:41 5    regulatory.  So we -- including clinical pharmacology.  We all

13:54:41 6    provide our expertise to develop the protocols and to prepare the

13:54:41 7    labelling and the other aspects.

13:54:41 8    Q.  So would it be fair to say that these are -- this is a team of

13:54:43 9    different type of science groups that work together to help bring a

13:54:43 10   new medicine like this to the market?

13:54:43 11   A.  Yes, it is.

13:54:43 12   Q.  And could you please very slowly -- and you don't need to offer

13:54:43 13   much explanation -- but if you could, please, very slowly just go

13:54:43 14   through those -- what those teams are that are part of this

13:54:43 15   interdisciplinary network to help bring a new medicine to the

13:54:43 16   market.

13:54:43 17   A.  We have the clinical representative who provides information on

13:54:43 18   the clinical and the medical doctors in general.  We have a

13:54:43 19   clinical pharmacologist, who provides information on the

13:54:47 20   pharmacodynamics/pharmacokinetics, which is how the drug behaves in

13:54:51 21   the body; how the drug is excreted, metabolized, absorbed.  We have

13:54:59 22   chemistry who provides on how the compound is actually made, how

13:55:02 23   it's dissolved, how'd you make a tablet.  How you'd package it

13:55:07 24   also.

13:55:08 25            We have representatives from the medical affairs group

13:55:12   1    who look at the product and, again, provide information on how

13:55:17   2    development should look at it.  And then we have the commercial

13:55:20   3    group who help work with it, help with the team.

13:55:25   4    Q.  And where does regulatory fit in to this interdisciplinary

13:55:31   5    approach?

13:55:31   6    A.  Regulatory is an integral part of the team.  My role or our --

13:55:37   7    the regulatory role is to interface with -- on Xarelto

13:55:42   8    specifically, with the FDA.  And for my role, it was to look at

13:55:48   9    guidances, provide interpretations, any new guidances, or if there

13:55:54  10    is any precedences that we all needed to be aware of.

13:55:57  11    Q.  And you are familiar with the approval process that's -- that

13:56:04  12    culminates in the eventual approval or lack of approval of a

13:56:08  13    medicine in the United States?

13:56:10  14    A.  I am.

13:56:11  15    Q.  We've heard some testimony a little while ago about the process

13:56:20  16    near the end, which involves preparing for the Advisory Committee,

13:56:25  17    presenting information to the Advisory Committee.  Tell us how that

13:56:29  18    happens.

13:56:32  19    A.  I'm sorry.  I apologize.  Is it for the ending or do you want

13:56:40  20    me to give the early perspective?

13:56:40  21    Q.  Just -- I think the jury has heard about the investigational

13:56:43  22    new drug application and the new drug application, the NDA.  I

13:56:49  23    would like you to tell the jury a little bit more about the end of

13:56:53  24    this process that we heard about a few minutes ago when the company

13:56:56  25    and the FDA is preparing to come before the independent Advisory

13:57:01  1   Committee.  Please tell us how that works.

13:57:05  2   A.  All right.  So during the review process if the agency

13:57:10  3   determines there is a need to get external advice, they will

13:57:18  4   suggest -- they will recommend that an Advisory Committee be held.

13:57:22  5            An Advisory Committee is -- comprises of external experts

13:57:28  6   in various disciplines and fields who are convened and who have --

13:57:34  7   and the FDA chooses them.

13:57:36  8            What happens within the company is we will have -- we

13:57:41  9   will work with external experts to determine where the positions

13:57:45 10   were, how we need to provide further information for the Advisory

13:57:51 11   Committee.

13:57:51 12            And then what happens at the Advisory Committee is the

13:57:56 13   sponsor provided -- the company provides their perspective, the

13:58:00 14   agency provides their perspective.  There's a robust discussion at

13:58:03 15   the Advisory Committee, and ultimately the Advisory Committee takes

13:58:08 16   a vote.

13:58:09 17   Q.  And I think you mentioned earlier that the Advisory Committee

13:58:12 18   voted nine to two in favor of approving Xarelto was safe and

13:58:18 19   effective?

13:58:18 20   A.  That is correct.

13:58:21 21   Q.  And then on November -- was it November 4, 2011, Mr. Jalota,

13:58:28 22   the FDA itself actually approved Xarelto for the atrial

13:58:34 23   fibrillation indication as safe and effective?

13:58:35 24   A.  Yes, they did.

13:58:37 25   Q.  And has that approval remained in place ever since then and up

13:58:43  1    until today?

13:58:44  2    A.  Yes, it has.

13:58:47  3    Q.  Doctor, are you familiar -- pardon me, Mr. Jalota, are you

13:58:52  4    familiar with the labelling discussions that occurred with the FDA

13:58:56  5    and the eventual approval by the FDA of the atrial fibrillation

13:59:01  6    label?

13:59:02  7    A.  Yes, I am.

13:59:03  8    Q.  And tell us briefly how that process works between the company,

13:59:12  9    which is often known as a sponsor, and the FDA.

13:59:15  10   A.  As part of the initial NDA, which was submitted for atrial

13:59:23  11   fibrillation in January 2011, we provided a draft label or markup

13:59:28  12   label with -- providing our positions and perspectives based on

13:59:35  13   clinical and the various -- and clinical pharmacology in the label.

13:59:43  14   That label is looked at during the review, and once all of the

13:59:47  15   reviews are completed, then the agency will start sending us some

13:59:54  16   proposals as to how the label may be changed or not, appropriately.

14:00:00  17   Q.  The jury has heard discussion, questions and answers in this

14:00:04  18   trial about Janssen's efforts to submit some PT testing language to

14:00:12  19   the FDA.  Are you familiar with the beginning and the end of that

14:00:17  20   story?

14:00:18  21   A.  I am.

14:00:19  22   Q.  Did you work on it throughout the labelling process?

14:00:23  23   A.  Yes, I did.

14:00:25  24   Q.  And let's start here then, if we might.

14:00:32  25          MR. IRWIN:  I would like to pull up and call up on the

1377

14:00:35  1   screen -- but first I'll offer into evidence DX 05926, which is a

14:00:44  2   cover letter, along with DX 05379, which is a draft label.  This is

14:00:52  3   in July of 2008.

14:00:52  4   BY MR. IRWIN:

14:01:27  5   Q.  Mr. Jalota, would you please look at DX 05926, and we want to

14:01:34  6   make sure that your signature is on this cover letter of July 22,

14:01:40  7   2008.

14:01:43  8   A.  (WITNESS REVIEWS DOCUMENT.)  That is correct.  That's my

14:01:46  9   signature.

14:01:49  10           MR. BARR:  No objection, your Honor.

14:01:51  11           THE COURT:  Let it be admitted.

14:01:53  12           MR. IRWIN:  We offer DX 05926 as Defendants' Exhibit 11,

14:01:57  13  and DX 05379 as Defendants' Exhibit 12.

14:02:04  14           THE COURT:  Let it be admitted.

14:02:07  15           MR. IRWIN:  If we can put on the screen Defendants'

14:02:09  16  Exhibit 11, which is DX 05926.  And if you could just blow up the

14:02:19  17  top of it and look at the date.

14:02:19  18  BY MR. IRWIN:

14:02:23  19  Q.  Is this the transmittal letter of the first label that contains

14:02:28  20  the PT language that we're going to talk about?

14:02:31  21  A.  That is correct.

14:02:32  22  Q.  And if we can go to the fourth page and look at your signature.

14:02:43  23  That is your signature above Andrea Kollath?

14:02:50  24  A.  That is.

14:02:50  25  Q.  Let's turn and look at the label itself, which is Defendant's

14:02:54 1    Exhibit 11, DX 05379.

14:03:04 2    A.  Correct.

14:03:04 3    Q.  That's Defendant's Exhibit 11.  And if we can go to part 12.2,

14:03:18 4    which is .17.22.

14:03:28 5         Mr. Jalota, is the language that was proposed to the FDA

14:03:31 6    in the first label submission -- and this is for -- if you would

14:03:35 7    clarify for what particular indication?

14:03:37 8    A.  I'm afraid -- could you speak up, please.  Sorry.

14:03:44 9    Q.  Yes.  Can you tell us what this is, please, sir?

14:03:47 10   A.  This is the label from Section 12 of the label.

14:03:52 11   Q.  This is --

14:03:53 12   A.  I am not sure -- please, continue.

14:03:56 13   Q.  This is the first submission of this particular label and this

14:04:00 14   language?

14:04:01 15   A.  Yes, it was.

14:04:03 16   Q.  And this is for the DVT indication, deep vein thrombosis?

14:04:10 17   A.  That is correct.

14:04:12 18   Q.  And would you please read the highlighted language?

14:04:15 19   A.  "The relationship between PT and rivaroxaban plasma

14:04:21 20   concentration is linear and closely correlated.  If assessment of

14:04:29 21   the pharmacodynamic effect of rivaroxaban is considered necessary

14:04:34 22   in individual cases, PT (measured in seconds) is recommended."

14:04:45 23   Q.  Thank you.  Let's next then turn to this.

14:04:48 24        MR. IRWIN:  We have a PowerPoint, a demonstrative, your

14:04:51 25   Honor.  Any objection to put up the demonstrative?

14:04:54  1          MR. BARR:  Just the timeline?

14:04:56  2          MR. IRWIN:  Yes, the timeline.

14:04:57  3          MR. BARR:  No objection.

14:05:01  4   BY MR. IRWIN:

14:05:02  5   Q.  The purpose of this demonstrative, Mr. Jalota, is to try to

14:05:05  6   speed this up a little bit, make it perhaps a little more

14:05:10  7   efficient.

14:05:11  8          You can see here that we have a tab here for CL, which

14:05:17  9   means cover letter, and a tab here that references the same section

14:05:21 10   in the label, 12.2.

14:05:23 11          Are you familiar with the second submission of the VTE

14:05:27 12   label in December of 2010?

14:05:32 13   A.  I am.  Yes.  This is the submission back to hematology after we

14:05:37 14   received the complete response.

14:05:38 15          MR. IRWIN:  If we can, then, give to Mr. Barr Defense

14:05:43 16   Exhibit 05389 and DX 05390.  The first is the cover letter and the

14:05:54 17   next is the actual label.

14:06:13 18          MR. BARR:  Your Honor, I don't see Dr. Jalota's name on

14:06:16 19   here.

14:06:16 20   BY MR. IRWIN:

14:06:23 21   Q.  Dr. Jalota, would you please look at Defense Exhibit 5389, and

14:06:29 22   tell me if you can identify this transmittal letter dated --

14:06:35 23   A.  Yes.  It's -- yes, I can, this is a cover letter for the

14:06:39 24   readmission of the VTE prevention submission.

14:06:44 25   Q.  And how do you know this is the true and correct transmittal

14:06:47   1   letter?

14:06:47   2   A.  I'm sorry.  I couldn't hear you.  I apologize.

14:06:51   3   Q.  I'm sorry.  How do you know that this is the true and correct

14:06:54   4   transmittal letter signed by -- evidently by an Andrea Kollath?

14:07:00   5   A.  It's dated December 27th.  And the electronic -- there's an

14:07:07   6   electronic signature from Andrea Kollath that confirms that.

14:07:11   7   Q.  So do you have first-hand knowledge about this letter?

14:07:13   8   A.  Yes, I do.  I do.

14:07:16   9        MR. BARR:  I am not sure he can testify to a letter.

14:07:18  10   It's not his letter.

14:07:22  11        THE COURT:  He's recognized it.  I'll overrule the

14:07:25  12   objection and allow it.

14:07:28  13        MR. IRWIN:  Your Honor, we offer DX 5389 as Defense

14:07:32  14   Exhibit 13 and the attached referenced label DX 05390 as Defense

14:07:40  15   Exhibit 14.

14:07:41  16        THE COURT:  I'll admit it.

14:07:53  17   BY MR. IRWIN:

14:07:54  18   Q.  So if we can then click on CL, cover letter.  That's the cover

14:07:58  19   letter; is that right?  The excerpt of the cover letter,

14:08:02  20   Mr. Jalota?

14:08:03  21   A.  That is correct, sir.

14:08:04  22        MR. IRWIN:  And if we can go back on the timeline, Joshu,

14:08:09  23   and click on the 12.2 section of the label.

14:08:09  24   BY MR. IRWIN:

14:08:11  25   Q.  That's the same section of the label; is that right, sir?

OFFICIAL TRANSCRIPT

14:08:15  1    A.  That is correct, sir.

14:08:16  2    Q.  With the same PT language proposed?

14:08:20  3    A.  That is correct, sir.

14:08:24  4    Q.  Then next, did there come a time going back to the timeline

14:08:33  5    that the company submitted this same language in Section 12.2 in

14:08:39  6    the AFib indication?

14:08:43  7    A.  That is correct.  We submitted NDA 22-409 -- 202439 for the

14:08:52  8    AFib indication.

14:08:54  9              MR. IRWIN:  So what we would like to do is offer DX 05913

14:08:59 10    as Defense Exhibit 15 and DX 05251 as Defense Exhibit 16.

14:09:08 11              The first being the cover letter in January of 2011, and

14:09:12 12    the second being the AFib label that contains Section 12.2.

14:09:20 13              MR. BARR:  Your Honor, so I don't have to keep

14:09:23 14    interrupting, can I just have a standing objection to examining

14:09:25 15    about the document.

14:09:26 16              THE COURT:  It's a 901, he recognized it, he is familiar

14:09:29 17    with.  So I'll overrule the objection if there is one.  I'll allow

14:09:31 18    it.  Admitted.

14:09:34 19    BY MR. IRWIN:

14:09:35 20    Q.  Can we click on the cover letter very quickly.  That is the

14:09:40 21    cover letter of January 2011?

14:09:43 22    A.  That is correct.

14:09:44 23    Q.  And then if we click back on Section 12.2, this is the same

14:09:49 24    language that was submitted in January of 2011 for the AFib label;

14:09:56 25    is that correct, sir?

14:09:57  1   A.  That is correct, sir.

14:09:58  2   Q.  Containing the same language for a PT test?

14:10:02  3   A.  Yes.

14:10:03  4   Q.  Then next let's go to DX 05280, the cover letter, and DX 05281,

14:10:20  5   which is another submission of the AFib labelling in April of 2011.

14:10:30  6          MR. IRWIN:  And, your Honor, we offer the cover letter as

14:10:34  7   Defense Exhibit 17, and the label as 18.

14:10:39  8          THE COURT:  Let's see if he recognizes it.

14:10:42  9   BY MR. IRWIN:

14:10:42 10   Q.  Mr. Jalota, would you please look at the cover letter and

14:10:46 11   affirm that you're familiar with and recognize that that cover

14:10:49 12   letter in April of 2011 is what indeed did submit -- the transmit

14:10:57 13   the label to the FDA?

14:10:59 14   A.  That is correct.  That is right.

14:11:03 15          MR. IRWIN:  We offer them both, your Honor.

14:11:05 16          THE COURT:  Admitted.

14:11:07 17   BY MR. IRWIN:

14:11:08 18   Q.  Then if we can go back to the timeline.  We'll skip the cover

14:11:11 19   letter and go right to 12.2.  That's the same language submitted to

14:11:18 20   the FDA in April of 2011 for a PT test, this the fourth time; is

14:11:23 21   that correct, sir?

14:11:24 22   A.  That is correct.

14:11:28 23   Q.  And then, finally, let's go to May of 2011 for the AFib

14:11:36 24   labelling submission again.

14:11:39 25          MR. IRWIN:  And we would offer Defense Exhibit 05285 and

14:11:44   1   05286 as Defense Exhibits 19 and 20.

14:11:53   2            MR. BARR:  He signed this one, your Honor.  No objection.

14:11:57   3            MR. IRWIN:  Are they admitted, your Honor?

14:12:01   4            THE COURT:  Admitted.

14:12:02   5            MR. IRWIN:  Thank you, sir.

14:12:03   6   BY MR. IRWIN:

14:12:03   7   Q.  Let's take a look.  We'll go straight to the label.  And would

14:12:08   8   you read that again before we move to the next section.  What is

14:12:12   9   the highlighted labelling language say, please?

14:12:15  10   A.  "The relationship between PT and rivaroxaban plasma

14:12:20  11   concentration is linear and closely correlated.  If assessment of

14:12:27  12   the pharmacodynamic effect of rivaroxaban is considered necessary

14:12:30  13   in individual cases, PT (measured in seconds) is recommended."

14:12:36  14   Q.  This is the fifth time that language -- that identical language

14:12:40  15   was submitted to FDA?

14:12:42  16   A.  That is correct.

14:12:43  17   Q.  Did there come a time when the FDA struck that language out?

14:12:46  18   A.  Yes, they did.  In June --

14:12:50  19   Q.  Then if we -- I'm sorry.  Please go ahead.

14:12:54  20   A.  I was just going to say -- there's an echo on the line.  I'm

14:12:59  21   sorry.

14:13:01  22            MR. IRWIN:  We will offer defense exhibits, it's actually

14:13:06  23   a DX number, 5221 and 5222.  First is an e-mail and the next is an

14:13:16  24   transmission back from FDA with the strike-through.

14:13:33  25            We offer them, your Honor, as Defense Exhibits 20 and 21.

OFFICIAL TRANSCRIPT

14:13:37  1          MR. BARR:  Can we just approach really quick?

14:13:48  2          THE COURT:  Sure.

14:13:48  3          THE DEPUTY CLERK:  Twenty-one and 22.

14:13:51  4          MR. IRWIN:  Twenty-one and 22.

14:13:54  5       (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

14:13:55  6          MR. BARR:  Your Honor, as we did in the Boudreaux

14:14:10  7  trial --

14:14:10  8          MR. IRWIN:  Wait, wait.

14:14:10  9          MR. BARR:  I'm sorry.  As we did in the Boudreaux trial,

14:14:20 10  we think if we're going to go into this, it's appropriate for a

14:14:20 11  limiting instruction like we did so that the jury understands that

14:14:52 12  this isn't definitive of anything.

14:14:52 13          THE COURT:  I'll do that.  And the reason I am admitting

14:14:52 14  it is there is -- obviously, the plaintiffs say they didn't do it,

14:14:52 15  and this has some information that contradicts that.  So it seems

14:14:52 16  to me that that's a part of the plaintiffs' case, it's responsive.

14:14:52 17  So I will give the instruction.

14:14:52 18          MR. BARR:  Thank you.

14:14:52 19          MR. MEUNIER:  Your Honor, just for the record, I ask the

14:15:40 20  jury be told that this evidence is not to be taken in any way

14:15:40 21  relevant to whether the FDA would have approved the language in the

14:15:40 22  label that the plaintiffs feel should have been in there.

14:15:40 23          MR. IRWIN:  I think that's argument, your Honor.

14:15:40 24          THE COURT:  Yes.  I'll give my regular instruction to

14:15:40 25  them.  Thank you.

14:15:43  1           MR. BARR:  Thank you, Judge.

14:15:43  2           MR. MEUNIER:  Thank you.

14:15:43  3        (OPEN COURT.)

14:15:43  4           THE COURT:  Members of the jury, let me just talk with

14:15:43  5   you about the FDA and their relationship with the label.

14:15:43  6           FDA approval of a label is not conclusive.  A drug

14:15:43  7   manufacturer's compliance with the FDA criteria for approval of a

14:15:43  8   drug may establish that the manufacturer has met the minimum

14:15:43  9   standards for the safety of the drug.  But such compliance does not

14:15:43 10   in and of itself absolve the manufacturer of all legal

14:15:43 11   responsibility.  Neither does it necessarily establish by itself

14:15:43 12   that the drug label's warnings or instructions are adequate under

14:15:43 13   the law with regard to the drug's labels, warnings, and

14:15:46 14   instructions.  The law holds that the final responsibility for the

14:15:50 15   label rests with the manufacturer.

14:15:53 16           You'll probably be hearing from me again on that, but

14:15:57 17   that's an instruction to you.  So you may take it into

14:16:03 18   consideration, but it's not conclusive.

14:16:08 19           MR. IRWIN:  Thank you, your Honor.

14:16:11 20   BY MR. IRWIN:

14:16:11 21   Q.  Let's pull up the e-mail Defense Exhibit 21, which is an e-mail

14:16:18 22   first on June 13, 2011, from Tyree Newman at the FDA to Andrea

14:16:27 23   Kollath, your assistant, with a copy to you.

14:16:32 24           Can you identify that e-mail, Mr. Jalota?

14:16:34 25   A.  Yes.  That is an e-mail received from Tyree Newman, a project

14:16:38 1    manager at the FDA.

14:16:44 2    Q.  And can you read this paragraph that begins, "Good morning,

14:16:47 3    Andrea"?

14:16:47 4    A.  "Good morning, Andrea.  Please see attached redlined version of

14:16:52 5    the label regarding NDA 22-406 for your review and comments.

14:16:57 6    Please accept changes you agreed to and for changes you do not,

14:17:02 7    keep in track changes."

14:17:06 8    Q.  Now, Mr. Jalota, is this a representative example of the kind

14:17:13 9    of exchanges that go back and forth between the sponsor and the FDA

14:17:16 10   as the label is developed?

14:17:19 11   A.  Yes, that is.

14:17:20 12   Q.  And are you going to next show us -- when I pull up the

14:17:25 13   document -- where the FDA struck out the language that we've been

14:17:29 14   talking about in Section 12.2?

14:17:34 15   A.  I will.

14:17:36 16   Q.  And let's please pull that up.  Defense Exhibit 22,

14:17:41 17   Section 12.2.

14:17:47 18           Mr. Jalota, is this the same section in the label that

14:17:50 19   we've looked at earlier that was submitted five times by the

14:17:53 20   company?

14:17:55 21   A.  That is correct.

14:17:56 22   Q.  And so would you please read what has been stricken out?

14:18:03 23   A.  The agency struck out the sentence that was highlighted

14:18:08 24   earlier.  "The relationship between PT and rivaroxaban plasma

14:18:12 25   concentration is linear and closely correlated.  If assessment of

14:18:18  1   the pharmacodynamic effect of rivaroxaban is considered necessary

14:18:22  2   in individual cases, PT (measured in seconds) is recommended."

14:18:29  3   Q.  And can you keep reading?

14:18:31  4   A.  "The Neoplastin PT assay was measured in the RECORD program and

14:18:38  5   the median (with 5-95 percentiles) for PT (Neoplastin) two to four

14:18:49  6   hours after tablet intake (that is at the time of maximum effect)

14:18:53  7   was 18 (13 to 26) seconds.  The International Normalized Ratio

14:19:03  8   (INR) should not be used for measuring rivaroxaban pharmacodynamic

14:19:07  9   effect."

14:19:10 10   Q.  And what is the next sentence?  Can you tell us what happened

14:19:16 11   there as part of these labelling discussions?

14:19:19 12   A.  The agency introduced this -- deleted all of the text I just

14:19:26 13   described and added the additional text -- additional sentence

14:19:30 14   below.

14:19:31 15   Q.  And can you read that sentence for us, please?

14:19:34 16   A.  "The predictive value of these coagulation parameters for

14:19:42 17   bleeding risk or efficacy has not been adequately studied."

14:19:47 18   Q.  Now, Mr. Jalota, did the FDA also at this time in June of 2011

14:19:55 19   offer some additional language about tests in Sections 5.3 and 8.1

14:20:03 20   of this label?

14:20:05 21   A.  Yes, they did.

14:20:06 22   Q.  So if we can then take a look at Section 5.3.

14:20:24 23        Do you see it up there on your screen, Mr. Jalota?

14:20:27 24   A.  I do see it on the screen.  The highlighted text is, "The

14:20:35 25   anticoagulant effect of Xarelto cannot be monitored with standard

14:20:40  1    laboratory testing nor readily reversed."

14:20:45  2    Q.  And was this language in 5.3 that you just read added into the

14:20:52  3    label by the FDA?

14:20:53  4    A.  That is correct.

14:20:54  5    Q.  Let's also take a look at Section 8.1.  And if we can call that

14:21:00  6    up, please, Joshu.

14:21:09  7    A.  Section 8.1 is the pregnancy category, and it states again,

14:21:13  8    "The anticoagulant effect of Xarelto cannot be reliably monitored

14:21:18  9    with standard laboratory testing."

14:21:19 10    Q.  And, likewise, was this sentence also added by FDA?

14:21:23 11    A.  That is correct.

14:21:35 12    Q.  What was Janssen's response to the FDA about the deletion of

14:21:40 13    the PT language that we saw them strike through?

14:21:43 14    A.  We accepted the additional piece, but we added an additional

14:21:54 15    sentence towards the end of June to provide more information again.

14:22:00 16          MR. IRWIN:  We would offer Defense Exhibit 5353 and 5355

14:22:05 17    as Exhibits 23 and 24.

14:22:16 18          MR. BARR:  Your Honor, we object.  These are e-mails.

14:22:18 19    Mr. Jalota is not on any of these e-mails.

14:22:21 20          THE COURT:  Ask him about whether he knows them and

14:22:24 21    recognizes them.

14:22:26 22    BY MR. IRWIN:

14:22:26 23    Q.  Mr. Jalota, can you take a look at the e-mail, which is

14:22:32 24    DX 05353.  It is an e-mail from Andrea Kollath forwarding an e-mail

14:22:39 25    from Tyree Newman, the same Tyree Newman who transmitted the strike

14:22:47  1   out from FDA.  Are you familiar with this e-mail?

14:22:49  2   A.  I am.

14:22:50  3   Q.  And how are you familiar with it?

14:22:52  4   A.  Well, Andrea would have notified the team that she actually

14:23:00  5   sent information to the team, to the FDA.

14:23:02  6   Q.  And so can you identify this e-mail as being true and accurate?

14:23:07  7   A.  I can.

14:23:09  8              MR. IRWIN:  Your Honor, we offer the e-mail.

14:23:10  9              THE COURT:  Admitted under 901.  901 says that one way of

14:23:17 10   satisfying the authenticity is the testimony that an item is what

14:23:20 11   it is claimed to be by a witness with knowledge.  I'll admit it.

14:23:27 12              MR. IRWIN:  So may we publish that, your Honor?

14:23:29 13              THE COURT:  Yes.

14:23:30 14   BY MR. IRWIN:

14:23:30 15   Q.  If we could put up Exhibit 23.  And what do we have here,

14:23:39 16   Mr. Jalota?

14:23:41 17   A.  That is an e-mail -- the bottom e-mail is an e-mail from Andrea

14:23:47 18   Kollath, who was working with Xarelto with me, to Tyree Newman, who

14:23:53 19   is the project manager at the FDA, and we are providing our sponsor

14:24:00 20   responses to the FDA's comments and strikeouts.  And that was in

14:24:06 21   June 28th, 2011.

14:24:09 22              MR. IRWIN:  And, your Honor, if I failed to do so, I

14:24:11 23   would offer the attachment, which is the U.S. package insert, as

14:24:15 24   Exhibit 24.

14:24:15 25              THE COURT:  Admitted.

14:24:17  1    BY MR. IRWIN:

14:24:18  2    Q.  We then can pull up Section 12.2 in Exhibit 24.  Do you see

14:24:29  3    that, Mr. Jalota?

14:24:31  4    A.  I'm sorry, I missed that, I apologize.

14:24:39  5    Q.  Do you see the language that was added by the company back into

14:24:42  6    Section 12.2 on your screen?

14:24:46  7    A.  "While the prothrombin time (PT) could be used for estimating

14:24:54  8    rivaroxaban pharmacodynamic effect, the International Normalized

14:25:00  9    Ratio (INR) should not be used."

14:25:04 10    Q.  Why did the company propose this PT language as something of an

14:25:08 11    alternative after the strikethrough?

14:25:11 12    A.  My understanding, based on the clinical team, was they did

14:25:18 13    not -- they wanted PT -- they wanted to provide some information on

14:25:25 14    the PT, but also make it clear that the INR should not be used

14:25:27 15    because that was my understanding, again, that that was specific to

14:25:31 16    warfarin.

14:25:32 17    Q.  And did the FDA accept this alternative proposal for this PT

14:25:35 18    testing language?

14:25:37 19    A.  No, they did not.  They struck it out again.

14:25:41 20    Q.  Then if we can go to DX 05357.  And before we put that up on

14:26:06 21    the screen, Mr. Jalota, can you tell us what that is?

14:26:08 22    A.  Yes.  That is the approval letter for the orthopedic indication

14:26:15 23    for rivaroxaban.

14:26:19 24    Q.  And are you familiar with that approval letter and can you

14:26:22 25    identify it as true and accurate?

14:26:24   1    A.  I can identify it as true and accurate.

14:26:26   2              MR. IRWIN:  Your Honor, we would offer Defense

14:26:28   3    Exhibit 05357.

14:26:32   4              MR. BARR:  No objection, your Honor.

14:26:33   5              THE COURT:  I'll admit it.

14:26:39   6    BY MR. IRWIN:

14:26:39   7    Q.  And if we can go and take a look at Section 5.2, again, in the

14:26:45   8    label from this exhibit.  Let's see, it is 5357, yes.  And go to

14:27:12   9    12.2.  12.2, please.  And if you can --

14:27:43   10             So what did the FDA, Mr. Jalota, do with the alternative

14:27:48   11   PT test language that was proposed?

14:27:50   12   A.  They deleted that text.

14:27:57   13   Q.  And what did they do, if anything, with Sections 5.3 and 8.1,

14:28:04   14   those sections which previously said, "The anticoagulant effect of

14:28:08   15   Xarelto cannot be monitored with standard laboratory testing or

14:28:11   16   readily reversed."  Did they make any changes in that language in

14:28:15   17   those two sections?

14:28:16   18   A.  No, they did not.  They retained the text that they gave us.

14:28:21   19   Q.  Now, Mr. Jalota, did it come to pass that labelling

14:28:31   20   negotiations and discussions occurred between the company and the

14:28:40   21   FDA regarding the AFib indication?  Because what we just saw was

14:28:45   22   the DVT labelling; is that correct?

14:28:47   23   A.  That is correct, sir.

14:28:49   24   Q.  And so did the company and the FDA then transition to

14:28:53   25   discussing the labelling for the AFib indication?

14:28:58  1  A.  That is correct.

14:28:59  2  Q.  And approximately when did that happen?

14:29:01  3  A.  In July/August after we received approval for the DVT

14:29:11  4  prevention label.

14:29:15  5  Q.  And what were the -- what were the FDA's instructions about

14:29:19  6  what labelling format should be used going forward in doing the

14:29:26  7  AFib label?

14:29:27  8  A.  Typically upon approval, the FDA requires that you submit an

14:29:37  9  overlay of the label on top of the -- overlay of the new label on

14:29:42 10  top of the approved label within 30 days.

14:29:45 11        In this case, we did that, but we were also instructed by

14:29:51 12  the cardiorenal division that -- not to propose additional changes

14:29:57 13  because -- and they were not going to re-review sections that they

14:30:01 14  were already involved in earlier.

14:30:03 15        Because we're -- we have been involved and we were

14:30:06 16  involved in various conversations with both divisions together, and

14:30:10 17  they also confirmed to us that they have been reviewing -- that

14:30:15 18  cardiorenal was involved in the review of the hematology label.

14:30:19 19  Q.  So was it the hematology division that was actually doing the

14:30:22 20  labelling review for the DVT label?

14:30:26 21  A.  That is correct, that was being done.  Again, it's important to

14:30:32 22  realize since we had a panel NDA that although hematology were

14:30:38 23  leading it, cardiorenal were actively involved in the review, as

14:30:44 24  well as the other functions of the FDA.

14:30:47 25  Q.  And so the cardiorenal division of the FDA was then going to

14:30:51  1    take over the handling of the AFib label?

14:30:57  2    A.  Correct.  It was specific sections relating to the atrial

14:31:02  3    fibrillation indication.

14:31:03  4    Q.  Let's take a look at DX 05352, which is an e-mail from Tyree

14:31:11  5    Newman, again at the FDA, to Ms. Kollath, your assistant, dated

14:31:16  6    June 24, 2011.  Do you recognize that e-mail, Mr. Jalota?

14:31:26  7    A.  I do, I do.

14:31:30  8    Q.  And what is it?  Before we offer it into evidence, what is this

14:31:35  9    e-mail?

14:31:36 10    A.  This is an e-mail from Tyree Newman summarizing a meeting that

14:31:42 11    the sponsors -- Bayer and Janssen had a meeting with the division,

14:31:49 12    the hematology division.

14:31:51 13    Q.  And were you at that meeting?

14:31:53 14    A.  I was.

14:31:54 15              MR. IRWIN:  Your Honor, we would offer DX 05352 as

14:31:58 16    Exhibit 25.

14:32:00 17              THE CLERK:  Twenty-six.

14:32:02 18              MR. IRWIN:  Twenty-six.

14:32:03 19              MR. BARR:  No objection.

14:32:04 20              THE COURT:  All right, I'll admit it.

14:32:06 21              MR. IRWIN:  May we publish that, then, please.

14:32:08 22    BY MR. IRWIN:

14:32:11 23    Q.  This shows the people who attended the meeting you just

14:32:13 24    referred to?

14:32:15 25    A.  Yes, that is correct.

14:32:16  1   Q.  And your name appears down there on the bottom, right above
14:32:21  2   Ms. Kollath?
14:32:22  3   A.  That is correct.
14:32:23  4   Q.  And does this meeting document that the -- this meeting memo,
14:32:32  5   e-mail, does it document that the cardiorenal division and the
14:32:35  6   hematology division were working together on these labels, namely
14:32:41  7   the DVT label and the AFib label?
14:32:44  8   A.  Yes, it does.
14:32:45  9   Q.  And if we can look at that.  And from this e-mail of this
14:32:58 10   meeting minutes, can you read the highlighted language for the
14:33:02 11   jury, please?
14:33:04 12   A.  "The sponsor, as in Janssen, was concerned that there may be
14:33:09 13   changes as they are working with the cardiorenal division on the
14:33:13 14   label.  The division confirmed that cardiorenal has been involved
14:33:18 15   in the current labelling review."
14:33:26 16   Q.  After the VTE label was approved in July of 2011, did Janssen
14:33:33 17   submit revised labelling to the cardiorenal division?
14:33:39 18   A.  Yes, we did.
14:33:40 19   Q.  Let's take a look at Exhibit DX 05224, which is a record of
14:33:53 20   contact with telephone -- of a telephone call between Janssen and
14:33:56 21   the FDA.  And, Mr. Jalota, if you will look at that.  Can you
14:34:03 22   identify this record of contact?
14:34:05 23   A.  Yes, it is a record of contact.  I attended that meeting also.
14:34:11 24   Q.  And you're indicated as an attendee of this meeting?
14:34:14 25   A.  Yes, I did.

14:34:17  1          MR. IRWIN:  Your Honor, we would offer DX 05224 as

14:34:21  2   Defense Exhibit 27.

14:34:23  3          MR. BARR:  No objection.

14:34:24  4          THE COURT:  Let it be admitted.

14:34:27  5   BY MR. IRWIN:

14:34:27  6   Q.  And if we can call that up, please, Joshu.

14:34:32  7          It shows you there as an attendee of this meeting,

14:34:36  8   Mr. Jalota?

14:34:36  9   A.  That is correct, I am there with Alla Rhoge.

14:34:44 10   Q.  And if we can go to the section USPI that references going

14:34:48 11   forward with the DVT label.  Can you explain the highlighted

14:34:52 12   sections and particularly that number, what that number means?

14:34:58 13   A.  I'll just read the section.  "Allison mentioned that NDA 22-406

14:35:07 14   approved label should be used as a basis for the updated label and

14:35:11 15   the AFib-specific added to it."

14:35:14 16          NDA 22-406 is the NDA for DVT prevention.  So what the

14:35:20 17   agency was clear there was we should be using the approved label

14:35:22 18   for the DVT prevention and overlay the atrial fibrillation-specific

14:35:28 19   information on it.

14:35:34 20   Q.  And when was the final atrial fibrillation label approved by

14:35:39 21   the FDA?

14:35:40 22   A.  In November -- on November 4th, 2011.

14:35:46 23   Q.  And if we can look at DX 05233.  Do you recognize this as the

14:36:08 24   approved label?

14:36:09 25   A.  I do.

14:36:11  1          MR. IRWIN:  We offer it, your Honor, as Exhibit 28.

14:36:14  2          MR. BARR:  No objection.

14:36:15  3          THE COURT:  Let it be admitted.

14:36:20  4   BY MR. IRWIN:

14:36:21  5   Q.  So, Mr. Jalota, if we can look at Section 5.4 regarding the

14:36:25  6   risk of pregnancy-related hemorrhage, and there is the language

14:36:30  7   about how the anticoagulant effect of Xarelto cannot be monitored

14:36:34  8   with standard laboratory testing nor readily reversed.  Is that

14:36:38  9   correct?

14:36:39 10   A.  That is correct.

14:36:40 11   Q.  And that is the language that was proposed some time ago, we

14:36:43 12   saw, by the FDA?

14:36:45 13   A.  That is correct.

14:36:48 14   Q.  And, similarly, if we go to Section 8.1, we see that same

14:36:54 15   proposed language?

14:36:57 16   A.  Yes, I do.

14:36:58 17   Q.  And then finally, Joshu, if we can call up what we've already

14:37:05 18   seen, the strikethrough from 12.2 and the current -- the approved

14:37:10 19   label for 12.2.

14:37:13 20          THE COURT:  Let's get to a breaking point, Counsel, the

14:37:13 21   jurors want a break.

14:37:13 22          MR. IRWIN:  Okay, Judge?

14:37:13 23          THE COURT:  Yes.

14:37:13 24   BY MR. IRWIN:

15:23:50 25   Q.  Mr. Jalota, you recognize Section 12.2 that was stricken by the

15:23:50  1    FDA in June of 2011?

15:23:50  2    A.  Yes, I do.

15:23:50  3    Q.  And you see the --

15:23:50  4    A.  The information --

15:23:50  5    Q.  I'm sorry.  And you see the eventual language in 12.2 --

15:23:50  6    A.  Please proceed.

15:23:50  7    Q.  -- you see the eventual language in 12.2 that was approved by

15:23:50  8    the FDA on November 4th, 2011, without the PT test language?

15:23:50  9    A.  Yes, I do.

15:23:50 10    Q.  And has that language that you're looking there -- at there on

15:23:51 11    the bottom, that was approved on November 4, 2011.  Has that

15:23:51 12    language in the label remained the same ever since and to this day?

15:23:51 13    A.  Yes, it has.

15:23:51 14            THE COURT:  Let's take a break at this point.

15:23:51 15            MR. IRWIN:  No further questions, your Honor.

15:23:51 16            THE COURT:  The court will stand in recess.

15:23:51 17            THE DEPUTY CLERK:  All rise.

15:23:51 18        (WHEREUPON, A RECESS WAS TAKEN.)

15:23:51 19        (OPEN COURT.)

15:23:51 20            THE COURT:  Okay.  Be seated, please.

15:23:51 21            Any redirect?

15:23:51 22            MR. BARR:  Yes, your Honor.  May I proceed?  Your Honor,

15:23:51 23    may I proceed?

15:23:51 24            THE COURT:  Yes.  Sorry.

15:23:51 25                    FURTHER CROSS-EXAMINATION

15:23:51 1    BY MR. BARR:

15:23:51 2    Q.  Now, Mr. Jalota, you were listening, you heard Judge Fallon's

15:23:51 3    charge to the jury.  So you know, don't you, that the ultimate

15:23:51 4    content of a label is the responsibility of the drug company, not

15:23:51 5    the manufacturer, right -- I mean, not the FDA?

15:23:51 6              MR. IRWIN:  Object to the form of the question, your

15:23:51 7    Honor.

15:23:51 8              THE WITNESS:  I --

15:23:51 9              THE COURT:  Just restate it from the standpoint --

15:23:51 10   correct what you just said.

15:23:52 11   BY MR. BARR:

15:23:52 12   Q.  You know, don't you, that the ultimate content of a drug label

15:23:52 13   is the responsibility of the drug manufacturer, not the FDA?

15:23:52 14   A.  That is correct.  Ultimately it's the sponsor's responsibility,

15:23:52 15   the responsibility for the label.  But it needs to be approved by

15:23:52 16   the FDA before it can be marketed or released.

15:23:52 17   Q.  So you don't know that the company at any time can strengthen a

15:23:52 18   warning without FDA approval; you know that's true, right?

15:23:52 19   A.  Can you just rephrase that again for a second, please.

15:23:52 20   Q.  You know that it's true that a drug company can strengthen the

15:23:52 21   warning of its label at any time without FDA approval, right?

15:23:52 22   A.  That is not correct.

15:23:52 23   Q.  So that's what you believe the regulatory structure of the

15:23:52 24   United States is; just so the jury understands that's what you

15:23:52 25   believe?

15:23:52  1   A.  That is correct, sir.

15:23:52  2   Q.  Okay.  So if you agree with me that the content of the label is

15:23:52  3   always the responsibility of the manufacturer, for this jury,

15:23:52  4   please detail all of the steps taken by Janssen to advise of the

15:23:52  5   usefulness of PT in emergency medical care?

15:23:52  6   A.  So what we did -- what we did for -- specifically the PT

15:23:52  7   language is, as you saw this in Section 12.2, we provided the

15:23:52  8   initial text to both divisions.  They saw it five times.  The

15:23:53  9   agency struck it off.  We tried one more time.  The agency struck

15:23:53 10   that off.  And ultimately we ended up with information in Section 5

15:23:53 11   and Section 12.  And that's where it has been since then.

15:23:53 12   Q.  Let's look at this actual redline.

15:23:53 13          MR. BARR:  Can I get Defendant's 5222 on the board,

15:23:53 14   please?  And let's go to page 30, which is 12.2.  And let's blow

15:23:53 15   this out.

15:23:53 16   BY MR. BARR:

15:23:53 17   Q.  Now, let's establish a few things about this.  Let's say you're

15:23:53 18   looking at this, and you're trying to decide whether or not

15:23:53 19   somebody has Xarelto on board.  Where does it tell you in there

15:23:53 20   that the PT test can be used to tell a doctor that information?

15:23:53 21   A.  I am unsure as to what you're asking.  I'm sorry.  On the --

15:23:53 22   I'm sorry.  Please continue.

15:23:53 23   Q.  You have Defendant's 5222 in front of you, correct?

15:23:53 24   A.  I do.  I do.

15:23:53 25   Q.  That's Section 12.2, right?

1400

15:23:54  1    A.  Yes.

15:23:54  2    Q.  What information in here tells a doctor that you can use PT to

15:23:54  3    determine if somebody has Xarelto on board?  Where is it?

15:23:54  4    A.  The only information is what the agency struck out.

15:23:54  5    Q.  And where does it say in there -- anywhere in there, than in an

15:23:54  6    emergency care situation you can run a PT and some result will tell

15:23:54  7    you there is no Xarelto on board?  Where is that?

15:23:54  8    A.  Okay.  So the emergency situation setting that you're

15:23:54  9    requesting -- you're suggesting is not there; however, we do

15:23:54 10    state -- and this is how the clinical team had determined this --

15:23:54 11    the relationship -- "If assessment of the pharmacodynamic effect of

15:23:54 12    rivaroxaban is considered necessary in individual cases."  And at

15:23:54 13    least my understanding was individual cases, emergencies and other

15:23:54 14    aspects could be -- would be encompassed in individual cases.

15:23:54 15    Q.  Okay.  So a patient has a normal PT on Xarelto.  Let's look at

15:23:54 16    that and tell me what that means.

15:23:54 17    A.  I couldn't tell you.  I'm not a clinical expert, I am just

15:23:54 18    saying this is what the dat is.  I don't know what would I be

15:23:54 19    looking for with a normal or other information.

15:23:54 20    Q.  And that language doesn't tell you anything about that, does

15:23:54 21    it?

15:23:54 22    A.  That information just gives you -- the information that was

15:23:54 23    there says -- again, if it's required in individual cases, and this

15:23:54 24    is what was tested in the RECORD program.

15:23:54 25    Q.  So this information that's struck out, all of this information,

15:23:55  1    you're telling me the FDA will not allow you to say this stuff that

15:23:55  2    is struck out; that's your testimony?

15:23:55  3    A.  The FDA deleted that text.  We don't know specifically why they

15:23:55  4    deleted it, but they did delete that.  That's correct.  We tried --

15:23:55  5    sorry.  I apologize -- we tried that again.

15:23:55  6    Q.  So let me ask you:  Are you allowed to tell doctors that the

15:23:55  7    routine monitoring of coagulation parameters is not required with

15:23:55  8    Xarelto use?  Are you allowed to say that?

15:23:55  9    A.  We are not allowed to do that in -- as per label.  It's deleted

15:23:55 10    there.

15:23:55 11    Q.  So you're not allowed to walk around and tell people that you

15:23:55 12    don't have to routinely monitor with Xarelto; that's what you're

15:23:55 13    telling this jury?  You're not allowed to say that?

15:23:55 14    A.  I'm saying -- I'm saying it's in the label -- it's deleted from

15:23:55 15    the label.  A determination by others would have to be made whether

15:23:55 16    they could or could not talk about this externally.

15:23:55 17    Q.  Are you really telling this jury that Janssen believes that PT

15:23:55 18    is a useful and helpful test for doctors, and the FDA will not

15:23:55 19    allow the company to tell that to doctors; is that what you're

15:23:55 20    really telling this jury?

15:23:55 21    A.  I can't comment on the first part.  The perspective I'll offer

15:23:56 22    you is this is what the FDA did, and we've tried that and this is

15:23:56 23    the information based on the data we put into a label and the

15:23:56 24    agency struck that out.  Janssen's position would be somebody I

15:23:56 25    think you would have to talk to our clinical team for that.

15:23:56  1    Q.  So you're not aware that the position that's been taken in this

15:23:56  2    courtroom is that it would be dangerous to use PT to make clinical

15:23:56  3    decisions?  You're not aware of that?

15:23:56  4             MR. IRWIN:  Your Honor, asked and answered, and it's now

15:23:56  5    argument.

15:23:56  6             THE COURT:  I'll let him answer it.  Go ahead.  He's

15:23:56  7    under cross.

15:23:56  8             THE WITNESS:  My understanding -- I'm sorry.  Can you

15:23:56  9    please repeat the question.

15:23:56 10    BY MR. BARR:

15:23:56 11    Q.  Are you aware that Bayer and Janssen have taken the position in

15:23:56 12    this courtroom that it would be dangerous to use PT in clinical

15:23:56 13    situations?

15:23:56 14    A.  I confess I don't know.  My perspective is I am offering you

15:23:56 15    the regulation perspective and what the regulator history was.  I

15:23:56 16    don't know the specifics of this case of the discussions that are

15:23:56 17    taking place in this case.

15:23:56 18    Q.  Let me ask you:  You would agree with me that in the regulatory

15:23:56 19    process in the life of a drug things like dates are important,

15:23:56 20    right?

15:23:56 21    A.  Dates as in?

15:23:56 22    Q.  Dates, when things happen; it's important, right?

15:23:56 23    A.  Correct, it is.

15:23:56 24    Q.  So let's look at what the FDA said on -- this is June 13, 2011,

15:23:56 25    when the FDA, according to you, struck this language.  They said

15:23:56  1   that, "The predictive value of these coagulation parameters for

15:23:56  2   bleeding risk or efficacy has not been adequately studied."  Right?

15:23:56  3   A.  That is correct.

15:23:56  4   Q.  That was the reason for removing it, right?

15:23:56  5   A.  That's what it seems.  That may have been their perspective.

15:23:57  6   We -- as you'll note, we changed -- we asked for a change to

15:23:57  7   "adequately studied" to "has not been established," which the

15:23:57  8   agency accepted.

15:23:57  9   Q.  Whose job is it to run the study, the FDA or Janssen?

15:23:57 10   A.  It's Janssen's and Bayer's responsibilities.

15:23:57 11   Q.  Right.  So the FDA is saying here that Janssen hasn't proven

15:23:57 12   this, right?  In June of 2011, right?

15:23:57 13   A.  That is what this stated.  We changed it to "established," but

15:23:57 14   that's what it states, correct.

15:23:57 15   Q.  And so it is clear this is based upon the RECORD study, right?

15:23:57 16   A.  This is based on the RECORD study, that's correct.

15:23:57 17   Q.  This is not based on the ROCKET study, right?

15:23:57 18   A.  At this particular instance it is not based on the ROCKET

15:23:57 19   study.

15:23:57 20   Q.  You can't show this jury a single label where language about PT

15:23:57 21   related to the ROCKET study has ever been removed from a label, can

15:23:57 22   you?

15:23:57 23   A.  We -- in June, when we resubmitted the label after the FDA --

15:23:57 24   after NDA approval, we provided this information when we -- when we

15:23:57 25   overlaid the AFib information on top of the DVT information, the

15:23:57  1    agency was very clear that they did not -- they did not re-review

15:23:57  2    some of the sections they had looked at earlier.  Now, they had

15:23:57  3    already seen the ROCKET label three times already.

15:23:58  4    Q.  You agree with me that the science of Xarelto fundamentally

15:23:58  5    changed in August of 2011, right?

15:23:58  6    A.  I am not sure what you mean by the science fundamentally

15:23:58  7    changed.

15:23:58  8    Q.  In August of 2011, the FDA told Janssen that based upon the

15:23:58  9    ROCKET study there is a relationship between PT and bleed risk,

15:23:58 10    right?

15:23:58 11    A.  The agency gave that perspective.  That's what we did.  But our

15:23:58 12    perspectives were -- I'm sorry.  Please continue.

15:23:58 13    Q.  That is two months after this, after this strikethrough, right?

15:23:58 14    A.  That is correct.

15:23:58 15    Q.  Based on that, when did Janssen ever go to the FDA and say,

15:23:58 16    "Hey, the science has changed.  Please put this safe -- this

15:23:58 17    information that provides safety information to doctors.  Please

15:23:58 18    put that in the label."  When did that happen?

15:23:58 19    A.  Again, that did not happen because that was the agency's

15:23:58 20    perspective.  Our perspective was different than that, and that's

15:23:58 21    why we did not propose any additional text.

15:23:58 22    Q.  In your examination with me originally we looked at several

15:23:58 23    articles that established that PT can be used in an emergency

15:23:58 24    setting.  After any of those, when did you go to the FDA and say,

15:23:58 25    "Look at this.  It needs to be considered."  When did you do that?

15:23:58  1  A.  Again, PT -- what we did was we provided this information in

15:23:59  2  June, and we know that cardiorenal was involved in the review.  And

15:23:59  3  so if they specifically felt that was very necessary, they could

15:23:59  4  have also introduced this, if they felt it was a safety or some way

15:23:59  5  of assessing patient responses.

15:23:59  6  Q.  Sir, you keep going back to June of 2011.  We are sitting here

15:23:59  7  in 2017.  There have been six years of study on this drug.  This

15:23:59  8  drug has been on the market since 2011 with hundreds of thousands,

15:23:59  9  millions of people taking it.  What change has Janssen ever asked

15:23:59  10  for based upon the science changing?  Where is it?

15:23:59  11  A.  From a regulation perspective, there is no change.  Again, I'll

15:23:59  12  defer to our clinical teams and the overall teams to provide more

15:23:59  13  information on how the science has changed or not changed.

15:23:59  14  Q.  There hasn't even been a proposal, has there?

15:23:59  15  A.  As of May 2012, I am not aware of any proposals.  Subsequent to

15:23:59  16  that, I have not seen any changes to any label from there.  But,

15:23:59  17  again, that's not to say that our clinical teams have been looking

15:23:59  18  at all of the data available to make a determination if change is

15:23:59  19  needed.

15:23:59  20  Q.  You know, as you sit here today, that since June of 2011

15:23:59  21  Janssen has not proposed the first change of information about PT

15:24:00  22  in the label; that has not happened, right?

15:24:00  23  A.  Janssen has not proposed any change, any additional changes to

15:24:00  24  include PT.  Again, this is based on an assessment of all of the

15:24:00  25  data available.

15:24:00 1   Q.  I want to look at 5767369.

15:24:00 2         MR. BARR:  And, your Honor, we will move this into

15:24:00 3   evidence, if it's not already in.  It might already be.  This is

15:24:00 4   the approval label from 2011 to the AFib indication.

15:24:00 5         MR. IRWIN:  No objection, your Honor.

15:24:00 6         THE COURT:  Okay.  Let it be admitted.

15:24:00 7         MR. BARR:  We will move this in as Exhibit 170.  So I

15:24:00 8   want to go to Section 12.2.

15:24:00 9         THE WITNESS:  Mr. Barr, I haven't received the document

15:24:00 10  yet.

15:24:00 11        MR. BARR:  Okay.  Are y'all working on giving it to

15:24:00 12  Mr. Jalota?  I want to go to PDF page 18.

15:24:00 13  BY MR. BARR:

15:24:00 14  Q.  And, sir, just will you identify this for the jury as the

15:24:00 15  original approval label for the AFib indication?

15:24:00 16  A.  That is correct.

15:24:00 17  Q.  So let's go to Section 12.2, and let's blow that up.  There is

15:24:00 18  a sentence missing now, right?

15:24:00 19  A.  That is correct.

15:24:00 20  Q.  The company took out the coagulation parameters and their

15:24:00 21  ability to do this; that's no longer there, right?

15:24:00 22  A.  The company did not take this out; the FDA had deleted that

15:24:00 23  statement.

15:24:00 24  Q.  So the FDA took out the ability of PT to be a coagulation

15:24:00 25  parameter; that's now been established according to the FDA, right?

```
15:24:00   1    A.  That is correct.
15:24:00   2    Q.  And so when that's now established, did the company do
15:24:00   3    anything, did it submit any language about PT for emergency
15:24:00   4    doctors?  Did that happen?
15:24:00   5    A.  The agency did not put in any text, neither did we.
15:24:00   6    Q.  I didn't ask what the agency did.  You, sir, already agreed
15:24:01   7    with me that the company is responsible for the label.
15:24:01   8             So did the company submit any language now that it has
15:24:01   9    been established that the coagulation parameters have been -- let
15:24:01  10    me get the exact language here because I am butchering this.
15:24:01  11    A.  Please, sorry.  I am getting -- I got confused there, I'm
15:24:01  12    sorry.
15:24:01  13             MR. BARR:  And if we could put these up.  Can you hand --
15:24:01  14    BY MR. BARR:
15:24:01  15    Q.  Mr. Jalota, do you have Defendant 5357 with you?  You were
15:24:01  16    shown that during your examination with Mr. Irwin.
15:24:01  17       (SOUND.)
15:24:01  18             MR. BARR:  Yeah.  That's bad.  I hear it.
15:24:01  19             THE WITNESS:  I have 5357.
15:24:01  20             MR. BARR:  And what I would like to do here, is if we can
15:24:01  21    go to page 22 of 5357 and blow up that 12.2 and put the November
15:24:02  22    12.2 for AFib on the bottom and the July 12.2 for the DVT
15:24:02  23    indication on the top.
15:24:02  24             THE WITNESS:  Mr. Barr, while you're doing that, do you
15:24:02  25    mind going closer to the mic.  There's a very bad echo here.
```

`15:24:02`  1   BY MR. BARR:

`15:24:02`  2   Q.  Right.

`15:24:02`  3   A.  Thank you.

`15:24:02`  4   Q.  In the July label for DVT, the label says, "The predictive

`15:24:02`  5   value of these coagulation parameters for bleeding risks or

`15:24:02`  6   efficacy has not been established," right?

`15:24:02`  7   A.  That is correct.

`15:24:02`  8   Q.  That is the understanding of the FDA at the time of the

`15:24:02`  9   strikethrough, right?

`15:24:02` 10   A.  That is correct.

`15:24:02` 11   Q.  And then in November 2011 that sentence is gone, right?

`15:24:02` 12   A.  That is correct.

`15:24:02` 13   Q.  And so it is now the position that it has been established,

`15:24:02` 14   right?

`15:24:02` 15   A.  I wouldn't -- I wouldn't -- I'm sorry.  There's a very bad

`15:24:02` 16   echo.

`15:24:02` 17   Q.  I think the jury gets it.  We can move on.

`15:24:02` 18           MR. IRWIN:  I would like him to answer the question, your

`15:24:02` 19   Honor, please.

`15:24:02` 20           THE COURT:  Let him answer then.

`15:24:02` 21           Did you hear it, sir?  Did you hear the question?

`15:24:02` 22           THE WITNESS:  I did not.  There is an echo on the line.

`15:24:02` 23   I apologize.

`15:24:02` 24           MR. BARR:  That's fine.  I'll restate it.

`15:24:02` 25   BY MR. BARR:

15:24:02  1    Q.  In November of 2011 it has been established through the ROCKET

15:24:02  2    study that the predictive value of a coagulation parameter like PT

15:24:02  3    for bleeding risk or efficacy has been established, right?

15:24:02  4    A.  I would disagree on that.  It may be from the agency's

15:24:02  5    perspective, but I don't know if that's the case why it was

15:24:02  6    deleted.  And, to be honest, if the agency felt that it has been

15:24:02  7    established, they would have put some information for patient

15:24:02  8    safety if they felt that in Section 12.2 or Section 5.

15:24:03  9    Q.  So it's the FDA's job -- that's your ultimate position.  It's

15:24:03  10   the FDA's job to make sure --

15:24:03  11   A.  No.

15:24:03  12   Q.  -- the warning label of this drug company is accurate?

15:24:03  13   A.  No.  I am saying it's the company's responsibility, and

15:24:03  14   ultimately the FDA has to approve it.

15:24:03  15         From our perspective, when we saw that text, we didn't --

15:24:03  16   our perspective was the agency's taking it out.  We don't know why

15:24:03  17   they had taken it out, other than that it was taken out.  We did

15:24:03  18   not -- our perspective was -- again, our perspective was we did not

15:24:03  19   feel -- our clinical team did not feel that there was a predictive

15:24:03  20   value of coagulation for bleeding risk or efficacy.

15:24:03  21   Q.  You didn't feel that in June of 2011, you didn't feel that in

15:24:03  22   July of 2011, you didn't feel that in November of 2011, and you

15:24:03  23   don't feel that today, right?

15:24:03  24   A.  I would defer to the clinical team, but that's what my

15:24:03  25   understanding is as is currently.

15:24:03  1          MR. BARR:  Give me one second, your Honor.

15:24:03  2          Your Honor, we don't have anything else for this witness.

15:24:03  3          THE COURT:  All right.  Do you have a tender?

15:24:03  4          MR. BARR:  We do have a proffer, your Honor.

15:24:03  5          MR. MEUNIER:  May we approach.

15:24:03  6          THE COURT:  Yes.

15:24:03  7       (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

15:24:03  8          THE COURT:  You want to put the tender and just the

15:24:03  9  statement rather than question him?  I mean, the easier thing, "If

15:24:03 10  the witness were called, this is what we would have asked him."

15:24:03 11          MR. MEUNIER:  That's what we wanted to talk about, Judge,

15:24:03 12  is how to make a proffer of the document that we wanted to walk him

15:24:03 13  through so we could do a later Q and A on the telephone and move

15:24:03 14  on, or we could take a break and do it quickly now.  It's up to --

15:24:04 15          MR. IRWIN:  I'm sure we would be happy to do it on the

15:24:04 16  telephone and save time for everybody.

15:24:04 17          MR. MEUNIER:  As long as he would have the document in

15:24:04 18  front of him and we can just walk him through under oath and make

15:24:04 19  the proffer that way.

15:24:04 20          MR. IRWIN:  Yes, certainly.

15:24:04 21          THE COURT:  We will to it that way.

15:24:04 22          So the record is clear, it's agreeable to the parties on

15:24:04 23  both sides that a proffer be made sometime, when?  After the trial

15:24:04 24  or before we close?

15:24:04 25          MR. MEUNIER:  Before we close, we would like it to be

15:24:04  1    proffered as part of our case.

15:24:04  2              MR. IRWIN:  We can do that.

15:24:04  3              THE COURT:  All right.  Okay.  I mean, before both sides

15:24:04  4    close.

15:24:04  5              MR. IRWIN:  Right.  Right.

15:24:04  6              MR. MEUNIER:  We'll work out a schedule and we'll find a

15:24:04  7    time for a phone call.

15:24:04  8              THE COURT:  Are you going to take a witness now?

15:24:04  9              MR. BARR:  Are we going to play the video now?

15:24:04 10              THE COURT:  Why don't you establish the qualifications of

15:24:04 11    the witness.

15:24:04 12              MR. BARR:  We can do that.  That's only going to take me

15:24:04 13    about 30 minutes.

15:24:04 14              MR. MEUNIER:  We were going to do a video.

15:24:04 15              THE COURT:  But that can be interrupted.  You can do that

15:24:04 16    and get that finished and then you can -- because you've got

15:24:04 17    control over the video.

15:24:04 18              MR. DUKES:  I'm fine, you want to do the video and do the

15:24:04 19    qualifications?

15:24:04 20              MR. BARR:  That's what I would do.

15:24:04 21              THE COURT:  How long is the video?

15:24:04 22              MR. DUKES:  One is thirty minutes, maybe one's

15:24:04 23    40 minutes.

15:24:04 24              THE COURT:  Okay.  All right.

15:24:04 25          (OPEN COURT.)

15:24:04  1          THE COURT:  Okay.  Thank you, sir, that's all, you're

15:24:04  2   excused.

15:24:04  3          THE WITNESS:  Thank you.

15:24:04  4          THE COURT:  We're back to New Orleans now, folks.

15:24:04  5          MR. BIRCHFIELD:  And we're back to traditional TV, your

15:24:04  6   Honor.  It is a short one, a relatively short one.

15:24:04  7          We will now present the videotaped deposition of Susan

15:24:04  8   Geiger.  It was taken on April the 25th, 2016, in Florham Park, New

15:24:05  9   Jersey.  And Ms. Geiger was a Janssen group product director until

15:24:05 10   October of 2015 and is now a director of marketing.

15:24:05 11          The deposition starts by questioning from the lawyer for

15:24:05 12   the Orr family, followed by questions from the defense, and ends

15:24:05 13   with a brief questioning from the lawyer for the Orr family.

15:24:05 14      (WHEREUPON, THE VIDEO DEPOSITION OF SUSAN GEIGER WAS PLAYED AS

15:24:05 15       FOLLOWS:)

15:24:05 16   EXAMINATION:

15:24:05 17   Q.  Would you please state your name.

15:24:05 18   A.  Susan Geiger.

15:24:05 19   Q.  Ms. Geiger, who do you work for?

15:24:05 20   A.  I work for Janssen.

15:24:05 21   Q.  And how long have you been employed by Janssen?

15:24:05 22   A.  I have been working for Janssen for a little over 18 years.

15:24:05 23   Q.  Okay.  Did you start with Janssen in 1998?

15:24:05 24   A.  I did.

15:24:05 25   Q.  And throughout your career at Janssen, have you held all sales

15:24:05  1   and marketing positions?

15:24:05  2   A.  Yes, with the exception of about a year I was in a business

15:24:05  3   development type of role which really could be under the marketing

15:24:05  4   umbrella.  But it was a little more business development.

15:24:05  5   And a little bit different, but...

15:24:05  6   Q.  Okay.  And as I understand it, you first became part of the

15:24:05  7   Xarelto team in August 2008?

15:24:05  8   A.  That's correct.

15:24:05  9   Q.  And since that time, have you continuously worked in some

15:24:05  10  respect on the Xarelto brand?

15:24:05  11  A.  From August of 2008 until October of 2015, I had some relation

15:24:05  12  to Xarelto, although my direct work on Xarelto ceased in May of

15:24:05  13  2013 where I was no longer responsible for the marketing of the

15:24:05  14  product.  After that point, I was in a sales leadership role.  And

15:24:05  15  there was a nine-month period from 2009, pretty much for the

15:24:05  16  whole -- from January to September, I was on medical leave and

15:24:05  17  didn't have any, you know, role or really contact with the

15:24:05  18  organization.

15:24:05  19  Q.  All right.  Going back to Exhibit 2, which are your slides.

15:24:05  20          An additional internal marketing message that you

15:24:05  21  identified in 2008 was that Xarelto eliminates the need for blood

15:24:06  22  clotting monitoring and dose adjustments, correct?

15:24:06  23  A.  Is this page 6 here that you are noting?  I am not sure

15:24:06  24  which...

15:24:06  25  Q.  Yes.

15:24:06  1          That's okay.  So you had already identified, before you

15:24:06  2  interviewed for the product director position, that a marketing

15:24:06  3  message that had been defined internally at the company was that

15:24:06  4  Xarelto did not have the need for blood clotting monitoring and

15:24:06  5  dose adjustments, correct?

15:24:06  6  A.  Yes.

15:24:06  7  Q.  Okay.  Blood -- the -- the "no blood clotting" monitoring

15:24:06  8  characteristic of Xarelto is another factor that distinguishes

15:24:06  9  Xarelto from other anticoagulant options, correct?

15:24:06 10  A.  Yes.  This terminology was prior to approval.  We wouldn't have

15:24:06 11  used that language after approval; but, yes.

15:24:06 12  Q.  Okay.  The idea of no monitoring or eliminating the need for

15:24:06 13  blood clotting monitoring -- monitoring, though, is a trait that

15:24:06 14  distinguishes Xarelto from the standard of care at the time, which

15:24:06 15  was warfarin, right?

15:24:06 16  A.  Yes.  Eliminated the need for required INR monitoring which

15:24:06 17  applies only to warfarin, yes.

15:24:06 18  Q.  And can you explain what that involves with respect to

15:24:06 19  warfarin?

15:24:06 20  A.  So -- and this is more of a layman's understanding of it,

15:24:06 21  right.  Warfarin is a product that fluctuates quite a bit, so they

15:24:06 22  designed a test to check how much was in the patient's system, and

15:24:06 23  that's known as INR monitoring.  There are a variety of things, I'm

15:24:06 24  sure, that goes into international normalized ratio, I don't fully

15:24:06 25  understand that.  But Xarelto was a different compound and didn't

15:24:06 1    require that testing.  So that's the required monitoring.

15:24:06 2    Q.  After you interviewed for this position at some point to the

15:24:06 3    present day, have you learned that the decision of no monitoring

15:24:09 4    occurred as part of the collaboration agreement from Bayer and

15:24:13 5    Janssen?

15:24:14 6    A.  No, I didn't know that.

15:24:14 7    Q.  Let me hand you Exhibit 5, which is the collaboration agreement

15:24:24 8    between Bayer and Ortho-McNeil.  And Exhibit 5 is the collaboration

15:24:35 9    agreement between Bayer and Janssen that's dated October 1st, 2005.

15:24:40 10   A.  Okay.  Wow.

15:24:41 11   Q.  And I am not going to ask you all about that agreement, but

15:24:45 12   simply direct your attention to pages tabbed there, which is

15:24:49 13   Exhibit E to the agreement.  That is the marketing plan that's

15:25:00 14   attached to the agreement that I just handed you, correct?

15:25:05 15            And this marketing plan is dated September 2005?

15:25:08 16   A.  Yes.

15:25:09 17   Q.  It has Johnson & Johnson's name on the front page, correct?

15:25:14 18   A.  It does.

15:25:16 19   Q.  This agreement pertains to the U.S. commercial strategy and

15:25:21 20   initial marketing plan for Xarelto.  Are you in agreement with

15:25:24 21   that?

15:25:24 22   A.  That's what it says, yes.

15:25:25 23   Q.  That numerical designation BAY 59-7939 references what

15:25:33 24   ultimately turned into the brand product Xarelto, correct?

15:25:37 25   A.  Yes, right, compound.

15:25:40  1    Q.  And to put this in context, the second paragraph of the first

15:25:47  2    page here is talking about the commercial overview of the product

15:25:51  3    and references the positioning of Xarelto to compete in the U.S.

15:26:01  4    anticoagulation anti-thrombotic market, correct?

15:26:04  5    A.  That's what it states.

15:26:05  6    Q.  And it goes on to state that, "We expect BAY," which is

15:26:13  7    Xarelto, "to be well positioned to compete in that market,"

15:26:17  8    correct?

15:26:17  9    A.  That's what it states, yes.

15:26:18 10    Q.  That was the plan, or that was part of the initial marketing

15:26:22 11    plan by Johnson & Johnson, according to this document in 2005,

15:26:26 12    correct?

15:26:27 13    A.  That appears to be so.

15:26:31 14    Q.  And, in fact, Xarelto has, over time, made a substantial impact

15:26:37 15    in that market and has just resulted in prescriptions -- a

15:26:47 16    significant amount of prescriptions of Xarelto, correct?

15:26:48 17    A.  Yes, there's a large unmet need, and that has been successful,

15:26:52 18    yes.

15:26:53 19    Q.  And you've been an instrumental part in the marketing and

15:27:00 20    positioning of Xarelto in that anticoagulation market throughout

15:27:04 21    your career, correct?

15:27:05 22    A.  Yes.  But I need to provide some context because what this

15:27:09 23    agreement and what I did, there's probably not a match between

15:27:13 24    marketing plans between the two.  This says marketing plan.  I

15:27:16 25    never saw this before.  But, yes, I was instrumental.  I am giving

15:27:21  1    it in context to this exhibit that you're showing me when you're

15:27:23  2    asking the questions.

15:27:23  3    Q.  This portion of Johnson & Johnson's initial marketing plan for

15:27:30  4    Xarelto in 2005 starts off by referencing their commercial

15:27:37  5    strategy.  Do you see that?

15:27:38  6    A.  Yes.

15:27:39  7    Q.  Commercial strategy refers to the strategy for selling

15:27:48  8    prescriptions of the drug, correct?

15:27:52  9    A.  Yes, yes, for selling, sure.

15:28:01  10   Q.  The marketing plan goes on to reference another aspect of

15:28:05  11   product positioning is without the need for coagulation monitoring.

15:28:10  12   Do you see that?

15:28:11  13   A.  Yes, I do.

15:28:11  14   Q.  And that's another way of stating that Xarelto was being

15:28:18  15   developed without the need for blood clotting monitoring that we

15:28:23  16   just discussed, correct?

15:28:24  17   A.  Yes.

15:28:25  18   Q.  So at the time Johnson & Johnson identified no coagulation

15:28:32  19   monitoring as a way to position Xarelto in the market, it was

15:28:37  20   unknown as to how Xarelto was going to do in any of the clinical

15:28:43  21   trials, correct?

15:28:44  22   A.  I can't necessarily agree with that answer.  It needs a little

15:28:48  23   context.  I am not a scientist, but before they get to Phase III,

15:28:53  24   they had a Phase II.

15:28:53  25   Q.  Okay.

15:28:54  1   A.  So there were some clinical trials, just not Phase III clinical

15:28:58  2   trials.

15:28:58  3   Q.  The Phase III clinical trials are the trials that test the

15:29:01  4   safety and efficacy of the product in a large population, correct?

15:29:06  5   A.  Yes, that's true.

15:29:07  6   Q.  So at this point in time when Johnson & Johnson dated this

15:29:13  7   initial marketing plan --

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

15:29:13  1    A.   Mm-hmm.

15:29:16  2    Q.   -- it is correct, is it not, that it's unknown as to how

15:29:20  3    Xarelto is going to do in any of the Phase III clinical trials

15:29:23  4    involving a certain population group?

15:29:25  5    A.   That's correct.

15:29:26  6    Q.   No monitoring has continued to be a key feature of Xarelto's

15:29:33  7    marketing campaign through the present day, correct?

15:29:37  8    A.   Yes, no required monitoring.

15:29:39  9    Q.   Okay.   We were talking about the first bullet point in the

15:29:43 10    executive summary.   Would you agree with me that largest business

15:29:49 11    opportunity would -- is equivalent to an opportunity for sales?

15:29:50 12    A.   Yes, it is.

15:29:51 13    Q.   Okay.   And would you agree with me that growth driver equals an

15:29:59 14    opportunity for increased sales?

15:29:59 15    A.   It is an opportunity, yes.

15:30:01 16    Q.   If we could talk about what's previously been marked as

15:30:12 17    Geiger 2, which I think I'll refer to those as your interview

15:30:17 18    slides, is that an acceptable phrase for that?

15:30:22 19    A.   Yes, before I got the job.

15:30:24 20    Q.   Before you got the job, correct.   And it was based on

15:30:27 21    information that you had gleaned internally from a number of

15:30:33 22    sources that you testified to yesterday, correct?

15:30:35 23    A.   Yes, the clinical studies, whatever newsletters came out.

15:30:39 24    Q.   Okay.   And if you would look at, I think it's slide 14, it says

15:30:50 25    "Xarelto launch."

15:30:59  1    A.  Okay.

15:31:00  2    Q.  And if you look at the second bullet point, in fact, there you

15:31:07  3    say, "Product has potential to be next blockbuster for J&J,

15:31:11  4    producing fiscal stability for pharma sector."  Do you see that?

15:31:15  5    A.  Yes.

15:31:16  6    Q.  In fact, you were correct, block -- Xarelto has lived up to

15:31:19  7    that status, it is -- it became a blockbuster drug, correct?

15:31:22  8    A.  Yes, it did.

15:31:27  9    Q.  Now, if you look at the same bullet point, you have, "Product

15:31:30 10    has potential to be next blockbuster for J&J," right?  You didn't

15:31:37 11    write Janssen.  You wrote J&J there, correct?

15:31:39 12    A.  Yes.

15:31:39 13    Q.  "And producing fiscal stability for pharma sector," do you see

15:31:43 14    that?

15:31:43 15    A.  I do.

15:31:44 16    Q.  If you look at the first bullet point, it says, "J&J has

15:31:48 17    several key products going off patent in 2008-2010."  Do you see

15:31:54 18    that?

15:31:54 19    A.  Yes, I do.

15:31:55 20    Q.  Now, a patent holder on a drug has an exclusive right to sell

15:31:59 21    that drug, right?

15:32:00 22    A.  Yes.

15:32:00 23    Q.  And since Xarelto doesn't come off patent until about 2023, no

15:32:06 24    other company other than Johnson & Johnson and Bayer can sell or

15:32:11 25    market Xarelto, right?

15:32:12  1    A.  That's right.

15:32:12  2    Q.  So you have the exclusive right to make money and to sell

15:32:16  3    Xarelto in the marketplace, correct?

15:32:18  4    A.  That's correct.

15:32:20  5    Q.  Before Xarelto was launched, you were personally aware of how

15:32:24  6    important it was within the context of the Johnson & Johnson

15:32:28  7    pipeline, right?

15:32:29  8    A.  Yes, it was a big opportunity.

15:32:30  9    Q.  It had potential to be the next biggest blockbuster for Johnson

15:32:35 10    & Johnson, correct?

15:32:35 11    A.  Absolutely did, yeah.

15:32:36 12    Q.  And Johnson & Johnson had several key products that were coming

15:32:41 13    off of patent, so they were going to be less profitable for the

15:32:43 14    company, right?

15:32:44 15    A.  Yes.

15:32:45 16    Q.  As a matter of fact, you wrote that Xarelto was so important

15:32:48 17    that it was to provide fiscal stability for the J&J pharmaceutical

15:32:53 18    sector, correct?

15:32:54 19    A.  Yes.  As I mentioned, I likely picked that up from something.

15:32:58 20    Clearly, you know, not my area of expertise.

15:33:00 21    Q.  But you felt confident enough to put it in a slide to go into

15:33:06 22    an interview on a job and speak to other Johnson & Johnson and

15:33:10 23    Janssen colleagues, correct?

15:33:10 24    A.  Yeah.  I picked it up from a good source, I suppose, and I

15:33:14 25    guess you've proven that.

1422

15:33:15  1    Q.  Let's mark as Geiger 39 a document that has a record number

15:33:25  2    3043971, and I'll represent to you this is a document that was

15:33:32  3    located in the custodial file.  And I've also handed you, I don't

15:33:37  4    have it in front of me, Geiger 40, which is Document 3043970, and

15:33:42  5    this is an e-mail that the plan that I presented you that was

15:33:49  6    Geiger 30 was attached to in your file.

15:33:52  7              Do you see that this is an e-mail dated 7/29/2008 from

15:33:57  8    Mr. Shah to you?

15:33:58  9    A.  Yes.

15:34:00  10   Q.  Now, if we go to page 4, at the very top paragraph, the

15:34:09  11   sentence that starts with "due to," do you see that?  Second

15:34:13  12   sentence.

15:34:13  13   A.  Yes.  Okay.

15:34:14  14   Q.  "Due to a strong collaboration and timely strategic decisions,

15:34:18  15   Xarelto appreciates a first market mover advantage as well as once

15:34:23  16   daily administration differentiation in key indications."  Do you

15:34:27  17   see that?

15:34:27  18   A.  I do.

15:34:28  19   Q.  And it says, "appreciates a first market mover advantage."  Do

15:34:33  20   you understand that that means that there is an advantage to

15:34:36  21   Xarelto getting to market first before any of its competitors,

15:34:42  22   including Pradaxa and Eliquis, there will be an advantage to that?

15:34:46  23   A.  Yes, brand-new class of product and kind of drug, sure.

15:34:50  24   Q.  The first one out is likely to be -- to have more success in

15:34:53  25   terms of prescriptions?

15:34:56  1    A.  Initially, yes.  We didn't see that with Pradaxa, but...

15:35:04  2    Q.  We're going to get to that.

15:35:04  3         "Beyond the initial orthopedic indication, the subsequent

15:35:07  4    indications have a very narrow order of entry as compared to the

15:35:10  5    competitive agents, and each day of development is critical."  Do

15:35:15  6    you see that?

15:35:15  7    A.  Yes.

15:35:15  8    Q.  So that really is saying that it is very important for Xarelto

15:35:19  9    to get to the market first, correct?

15:35:22 10    A.  It looks like there's going to be a lot of people in the field.

15:35:29 11    That's what I read from it.  There's a lot of people coming, a lot

15:35:31 12    of indications.

15:35:32 13    Q.  So there's a lot -- just so I understood what you said.  You

15:35:35 14    said there's a lot of people in the field and there's a lot of

15:35:38 15    indications, meaning that there will be a lot of competitors in the

15:35:42 16    anticoagulant market, correct?

15:35:43 17    A.  Yes, sure.

15:35:44 18    Q.  That includes Pradaxa and Eliquis, right?

15:35:46 19    A.  Yes.

15:35:47 20    Q.  And it's important in terms -- from a commercial standpoint,

15:35:51 21    because this was a commercial plan, for Xarelto to get into the

15:35:54 22    market first, right?

15:35:55 23    A.  Yes.  I mean, that's reasonable.

15:35:58 24    Q.  Okay.  Do you see the last sentence of the first nonfull

15:36:02 25    paragraph?

15:36:03  1    A.   "It is critical" or the second one --

15:36:05  2    Q.   Starts with the word "finally."

15:36:07  3    A.   Okay.  Second to last.

15:36:09  4    Q.   "Finally, and perhaps most importantly, to maintain" -- and

15:36:13  5    underline this in red -- "current financial projections, Xarelto

15:36:18  6    must be best in class and, where possible" -- and underline this in

15:36:24  7    red, please -- "first to market in future indications.  It is" --

15:36:32  8    and underline the next word -- "critical that we stay ahead of the

15:36:38  9    competition across all indications for market leadership to be

15:36:42 10    achieved initially and maintained throughout the life of the

15:36:47 11    brand."  Did I read that all correctly?

15:36:50 12    A.   It appears you did.

15:36:51 13    Q.   Okay.  And so did you understand when you reviewed this that it

15:36:57 14    was absolutely critical for Xarelto not only to get to market first

15:37:01 15    but to stay ahead of its competitors in order to meet the financial

15:37:06 16    projections?

15:37:07 17    A.   As you read it to me here, that appears to be the key point.

15:37:13 18    This appears to have been one of the many things I received, so I

15:37:15 19    don't know how greatly I internalized this particular paragraph,

15:37:19 20    but I knew it was an important product, you have the potential to

15:37:22 21    be first up to the market, so that all seems logical and very

15:37:25 22    simple.

15:37:26 23    Q.   And you've got Pradaxa at the starting gate, Xarelto at the

15:37:32 24    starting gate, and you all know that Eliquis is a horse in the

15:37:36 25    background that's coming to the starting gate, right?

OFFICIAL TRANSCRIPT

15:37:38  1    A.  Yeah, just about, sure.

15:37:39  2    Q.  And in 2010, the gates fly open and Pradaxa is on its way, it's

15:37:49  3    to the races, and Xarelto is still stuck at the gate, right?

15:37:53  4    A.  Okay.  Yeah.

15:37:55  5    Q.  Because you all were racing to market and you wanted to be

15:37:59  6    first to market as the first and new oral anticoagulant, correct?

15:38:05  7    A.  Yeah, makes sense.

15:38:07  8    Q.  Okay.  So -- and the reason you wanted to be first to market

15:38:12  9    was you had made some financial projections, and being first to

15:38:17 10    market was important to live up to those financial projections for

15:38:21 11    the drug, right?

15:38:22 12    A.  Someone them made the projections.  Not me.

15:38:26 13    Q.  Okay.  All right.  This is a set of slides titled on the first

15:38:30 14    page "Xarelto 2010 Strategic Plan Brand Summary," it's dated

15:38:35 15    April 26, 2010, do you see that?

15:38:37 16    A.  Yep.

15:38:37 17    Q.  And it's an internal document, correct?

15:38:40 18    A.  Yes, it was.

15:38:40 19    Q.  So if we go back to the racing thing, really the anticoagulant

15:38:45 20    market that we're talking about is the racetrack that Xarelto,

15:38:50 21    Pradaxa and Eliquis want to run on, right?

15:38:53 22    A.  Yeah.

15:38:54 23    Q.  It's a big track?

15:38:56 24    A.  Yeah.

15:38:56 25    Q.  With big opportunity at the end of it, right?

15:38:58   1    A.   Yeah.

15:38:58   2    Q.   For a big prize?

15:39:02   3    A.   Yes.

15:39:03   4    Q.   Next bullet point.   "Competition and battle for market share

15:39:07   5    will be fierce and intense."   Correct?

15:39:09   6           The next big bullet point, "Xarelto has lost first market

15:39:13   7    among novel orals to Pradaxa (dabigatran)."   Do you see that?

15:39:20   8    A.   Yes.

15:39:21   9    Q.   Now, it says, "Xarelto and apixaban in close race to be first

15:39:27  10    oral Factor Xa inhibitor with Xarelto projected to be six months

15:39:32  11    ahead."   Do you see that?

15:39:33  12    A.   Yes.

15:39:34  13    Q.   All right.   So what that is saying is that you're looking ahead

15:39:39  14    and you think -- Xarelto thinks its gate is going to open before

15:39:44  15    Eliquis and it's going to get out first, right, on the race?

15:39:47  16    A.   Yes.

15:39:48  17    Q.   And it says, "Delay in ORS has negatively impacted access

15:39:54  18    levels at launch for future indications."

15:39:57  19           So that is -- I think you talked a little bit about this

15:40:00  20    yesterday.   That was the delay in the launch of the orthopedic --

15:40:06  21    strike that.

15:40:08  22           That is a reference to the delay in Xarelto -- Xarelto's

15:40:13  23    indication in the orthopedic surgery arena, correct?

15:40:18  24    A.   Yes.

15:40:18  25    Q.   And that delay was due in part to the problems with the RECORD

15:40:24  1    trial, correct?

15:40:24  2    A.  Yeah, that's what you guys shared with me yesterday and what I

15:40:28  3    recall.

15:40:28  4    Q.  Okay.  And we know -- and you talked to Ms. Kraft yesterday

15:40:34  5    about the delays in the RECORD4 data because of the problems of the

15:40:40  6    FDA finding that RECORD4 was unreliable, correct?

15:40:43  7    A.  Yeah, that's what you shared yesterday.

15:40:45  8    Q.  And that that delayed Xarelto getting on the market before it

15:40:49  9    had anticipated, correct?

15:40:50  10   A.  Yes.

15:40:52  11   Q.  Pradaxa, when it was approved, had a -- had the ability to

15:40:59  12   market itself as having superior efficacy to warfarin, correct?

15:41:03  13   A.  That's true.

15:41:04  14   Q.  Eliquis, your other competition, when it was approved, had the

15:41:07  15   ability to market itself as having superior efficacy to warfarin,

15:41:12  16   correct?

15:41:12  17   A.  That's correct.

15:41:13  18   Q.  All right.  So on the one side, you have Pradaxa and Eliquis,

15:41:18  19   who can market themselves as being better than warfarin in terms of

15:41:21  20   reducing stroke?

15:41:21  21   A.  Yes.

15:41:23  22   Q.  And on the other side, you have Xarelto who cannot, right?

15:41:26  23   A.  That's true.

15:41:26  24   Q.  All right.  So you've got two drug -- two of the new drugs, two

15:41:31  25   of the horses that are racing around the track.  They can say to

15:41:35  1   the public that they're superior to warfarin, but Xarelto cannot,

15:41:39  2   correct?

15:41:39  3   A.  That's true, yes.

15:41:41  4   Q.  And so that -- I'm sorry.

15:41:42  5   A.  As of today, right?  Not if we're going back in time.  Today

15:41:46  6   this is all true, yes.

15:41:47  7   Q.  As of today and also as of the time that Eliquis first

15:41:52  8   launched, correct?

15:41:52  9   A.  Yes, that's true.

15:41:53 10   Q.  The entire time from the moment that Pradaxa launched until

15:41:56 11   Eliquis launched until today, both of those drugs claim superiority

15:42:00 12   to warfarin, and Xarelto could not --

15:42:02 13   A.  Yes.

15:42:03 14   Q.  -- right?

15:42:04 15        So in terms of racing on that racetrack, they had that

15:42:07 16   advantage, correct?

15:42:08 17   A.  Yes, that's what they could claim.

15:42:11 18   Q.  And you did not have that advantage, correct?

15:42:13 19   A.  We did not claim that, no.

15:42:15 20   Q.  All right.  And Xarelto's primary -- one of the differences,

15:42:18 21   one of the primary differences versus Eliquis and Pradaxa was it

15:42:22 22   was once a day, and they were twice a day, correct?

15:42:25 23   A.  That's correct.

15:42:25 24   Q.  And that was one of your key marketing messages that would

15:42:29 25   enable you to compete on that racetrack against both Pradaxa and

1429

15:42:32  1    Eliquis, correct?

15:42:33  2    A.  Yes.  But on that racetrack is also warfarin.

15:42:36  3    Q.  Right.  Right.

15:42:37  4    A.  Yes.

15:42:39  5    Q.  But versus Pradaxa and Eliquis, once-daily dosing, once-a-day

15:42:44  6    dosing, it was very important message, it was a very important

15:42:49  7    quality of the drug that enabled you to compete on that racetrack

15:42:53  8    with Eliquis and with Pradaxa, correct?

15:42:57  9    A.  Yes, it's an important fact, important indication for

15:43:00  10   physicians.

15:43:01  11   Q.  And that was an important fact -- and the fact that -- strike

15:43:07  12   that.

15:43:07  13        Both Pradaxa and Eliquis, they have similar -- they have

15:43:14  14   no blood monitoring, correct?  When you take Pradaxa and you take

15:43:17  15   Eliquis, you don't have to go and get routine blood testing,

15:43:21  16   correct?

15:43:21  17   A.  It's not required, yes.

15:43:23  18   Q.  So similarly with Xarelto, there is no blood monitoring,

15:43:29  19   correct?

15:43:29  20   A.  That's correct.

15:43:29  21   Q.  All right.  So you've got two drugs, Pradaxa and Eliquis, that

15:43:34  22   have superiority to warfarin, and Xarelto that does not.  All three

15:43:39  23   drugs have no blood monitoring.  So it sounds like once-a-day

15:43:43  24   dosing was really a key message that allowed -- a key quality that

15:43:48  25   allowed Xarelto to compete on that track with Pradaxa and Eliquis,

15:43:52  1    correct?

15:43:52  2    A.  There's multiple.  That's only two of multiple ways to compare

15:43:56  3    the drugs, but, yes, those two that you chose are -- what you said

15:44:01  4    was factual.

15:44:01  5    Q.  Well, the once-daily dosing, that's really important, correct?

15:44:05  6    A.  It's very important, yes.

15:44:06  7    Q.  And all three, you don't need to eat -- there's no dietary

15:44:09  8    restrictions, right?  There's no dietary restrictions with Xarelto,

15:44:11  9    there's no dietary restrictions with Pradaxa and there's no dietary

15:44:15 10    restrictions with Eliquis, right?

15:44:16 11    A.  Not in the label.

15:44:17 12    Q.  Not in the label.  So really what it comes down to is one of

15:44:22 13    Xarelto's key advantages when it's racing around that track against

15:44:26 14    Pradaxa and Eliquis, is the once-daily dosing, correct?

15:44:29 15    A.  That's an important feature, yes.

15:44:30 16    Q.  We're marking Geiger 66, Document 1356534.  This is an e-mail

15:44:39 17    that is dated 2/22/2012 from field communications.  It says

15:44:48 18    "NAPharma," do you see that?

15:44:50 19    A.  I do.

15:44:51 20    Q.  Would this have been a document that you would have received?

15:44:55 21    Would you have been part of that group?

15:44:57 22    A.  Yeah, I don't know if as a marketer we were included in the

15:45:00 23    field communications or not.  It's possible.  I just don't know the

15:45:03 24    distribution list.  Not all communications, I don't think that the

15:45:06 25    market team was copied on.

15:45:08  1    Q.  Okay.  So if this was in your custodial file, would you have

15:45:12  2    received -- if it was, I am not sure that it was, would you

15:45:16  3    received this in the normal course -- or reviewed it in the normal

15:45:17  4    and of the business?

15:45:19  5    A.  If it was on my PC, I would have been a recipient of it in some

15:45:25  6    way, shape or form.

15:45:26  7    Q.  All right.  She lists, number 1, "Xarelto core messages."  It

15:45:29  8    says, "The core message for Xarelto is comprised of five key

15:45:31  9    messages that we need to communicate to our customers so they

15:45:35 10    understand the full clinical story."  Do you see that?

15:45:37 11    A.  Yes.

15:45:38 12    Q.  And you were responsible for crafting and coming up with those

15:45:42 13    key messages, correct?

15:45:43 14    A.  I was responsible for coming up with the external use core

15:45:50 15    messages.  Without reading this and looking at what's there, I

15:45:54 16    don't know if she captured them correctly here.  But the core

15:45:57 17    message as it went out externally was my responsibility, yes.

15:46:00 18    Q.  Let's see if she captured them correctly.  It says, "When

15:46:05 19    conveying the story, the five key points are, number one" -- I will

15:46:09 20    underline this -- "once daily Xarelto provides protection

15:46:12 21    demonstrated in patients at an increased risk of stroke, including

15:46:15 22    those with common comorbidities."  Is that -- did she correctly

15:46:20 23    capture the core message as you crafted it there?

15:46:23 24    A.  I think she's referring to the core message above, which was

15:46:26 25    "Start with a core message and convey the story," which was in the

15:46:29  1   paragraph above here.  That is one message that she does in five

15:46:34  2   key points afterwards.  These are the support of that message.  The

15:46:42  3   core message is actually above that.

15:46:42  4   Q.  The core message is above.  "Once-daily Xarelto delivers proven

15:46:43  5   protection with an effective reduction in stroke, combined with

15:46:47  6   demonstrated safety profile and a better proven tolerability and no

15:46:53  7   routine coagulation monitoring.  This is the winning combination

15:46:59  8   that will help the market differentiate Xarelto from current and

15:47:02  9   future competitors."  Correct?

15:47:03 10   A.  That is what's stated.  Again, I don't know if she captured it

15:47:05 11   correctly.  The first part appears to be the appropriate sort of

15:47:09 12   capturing of verbiage that was approved, once daily, Xarelto you

15:47:12 13   know delivers -- but this aspect at the bottom, "this is the

15:47:14 14   winning combination," I am not sure that that was what the

15:47:17 15   marketing team approved as the core message to go externally.

15:47:22 16   Q.  But appears -- it appears that this is what she's communicating

15:47:24 17   to the internal medicine sales force correct as being the correct

15:47:28 18   core message, correct?

15:47:29 19   A.  As a national sales director, she wasn't mandated to check with

15:47:32 20   me on this.  She could have gotten this approved in a different

15:47:35 21   way.  I am not sure.

15:47:36 22   Q.  Okay.  So you said you're not sure if it's the core message?

15:47:39 23   A.  The first half of it, to my recollection, and I would have to

15:47:42 24   look at what was communicated and approved at the time, everything

15:47:46 25   but that last sentence appears to be what I recall being, in

15:47:52  1   general, the core message.  This last sentence about "this is a

15:47:56  2   winning combination," I don't believe that was part of our core

15:48:00  3   message.

15:48:00  4   Q.  But that was what she was communicating --

15:48:04  5   A.  That's what she says here, yes.  I don't know if it's accurate.

15:48:07  6   Q.  And the core message that you're referring to that generally

15:48:10  7   contains a core message, it contains "once-daily Xarelto," correct?

15:48:13  8   A.  Yes.

15:48:13  9   Q.  And that's a dosing message, correct?

15:48:16 10   A.  Yes.

15:48:16 11   Q.  That's the message that differentiates Xarelto from Pradaxa and

15:48:22 12   Eliquis, correct?

15:48:23 13   A.  Yes.

15:48:24 14   Q.  And you also have no routine coagulation -- strike that.

15:48:29 15        She also writes, "no routine anticoagulation monitoring,"

15:48:32 16   correct?

15:48:33 17   A.  That's correct.

15:48:33 18   Q.  And that was one of your key messages?

15:48:35 19   A.  Yes, it was.

15:48:36 20   Q.  Ms. Geiger, how are you?

15:48:38 21   A.  Very well.  How are you?

15:48:39 22   Q.  Good.  Just a little background information about yourself.

15:48:42 23   A.  Okay.

15:48:43 24   Q.  Okay.  Can you tell the jury a little bit about yourself and

15:48:48 25   your family and your interests growing up.

1434

15:48:50  1    A.   Sure.   I grew up the youngest of six kids.   My father was a

15:48:55  2    physician.   My grandfather was a physician.   And, you know, we

15:48:59  3    always were interested and steeped in health care.   You know,

15:49:03  4    family first, family was important and critical to us.   And when I

15:49:07  5    went off to college, I went to the same college as all of the rest

15:49:09  6    of my siblings and ended up in the health care field.

15:49:13  7    Q.   Where did you go to college?

15:49:14  8    A.   Boston College.

15:49:15  9    Q.   There were a bunch of questions about a leave you had to take.

15:49:23 10    That was a pregnancy leave, is that correct?

15:49:24 11    A.   Yes.   I was pregnant with twins, my first and only children,

15:49:29 12    and left a meeting in preparation for at the time the orthopedic

15:49:35 13    surgery launch.   I left for a standard appointment and didn't come

15:49:38 14    back for nine months.

15:49:40 15    Q.   Okay.   Those twins were born and are fine and healthy?

15:49:43 16    A.   Yes, after four months of restricted bed rest.

15:49:47 17    Q.   And you worked for Johnson & Johnson-related companies your

15:49:53 18    entire professional career?

15:49:54 19    A.   I have.   I've been here 18 years.

15:49:56 20    Q.   Can you tell me and the jury in your own words what is meant by

15:50:00 21    the term "unmet need" with respect to Xarelto at or about the time

15:50:07 22    when the company was seeking approval of Xarelto for atrial

15:50:07 23    fibrillation?

15:50:13 24    A.   Sure.   Atrial fibrillation is a disease that impacts several

15:50:17 25    million patients -- new patients each year.   And the unmet need is

15:50:23  1  that not all of those patients, while they may be at risk for

15:50:26  2  having a stroke, not all of those patients are actively treated

15:50:28  3  with anticoagulation therapy.  Some go untreated for a variety of

15:50:33  4  reasons, some of which being intolerance to what was available at

15:50:39  5  the time, warfarin.  Some of them are not treated because they had

15:50:40  6  been on warfarin and couldn't tolerate it or couldn't handle some

15:50:44  7  of the requirements of it.

15:50:46  8         And then there was an unmet need in the patients who were

15:50:51  9  currently managed on warfarin, but found that it was a struggle or

15:50:55 10  difficult and would have been looking for options that helped them

15:50:59 11  relieve some of the requirements related to diet or exercise or INR

15:51:06 12  testing, what have you.

15:51:08 13  Q.  The company employed sales representatives to communicate with

15:51:13 14  physicians about products, is that correct?

15:51:15 15  A.  Yes.

15:51:17 16  Q.  And how easy is it for sales reps to get in to see physicians?

15:51:23 17  A.  It gets more and more difficult over time.  I think in the last

15:51:27 18  five years, it's exceptionally difficult compared to maybe in the

15:51:32 19  '90s or so.  Physicians have more patients they need to see, less

15:51:37 20  time with each patient, and they're not able, willing, nor would we

15:51:42 21  ask them to take time away from their patients for a

15:51:45 22  representative.

15:51:46 23         So the time that a representative has, sometimes they

15:51:47 24  have to make multiple visits to get maybe five minutes with a

15:51:51 25  physician.  And when they have that time, they have to be able to

15:51:54  1    relay this critical and complex information in a way that the

15:51:58  2    physicians can really take in mind as they care for their patients

15:52:03  3    on a daily basis.  So it's difficult.  It's limited time.

15:52:07  4    Q.  Do physicians have to meet with sales reps?

15:52:10  5    A.  No.  Many of them actually have chosen not to, and there are

15:52:14  6    restrictions in offices that they won't see sales reps.  Many

15:52:17  7    hospitals have done so, so --

15:52:19  8    Q.  Do other companies, pharmaceutical companies, typically employ

15:52:24  9    sales reps to bring information about their medications to

15:52:27 10    physicians?

15:52:27 11    A.  Yes.  The sales rep to physician model is still very much alive

15:52:32 12    and well.  So offices are, you know, frequently flooded with people

15:52:38 13    waiting for that five-minute period of time to share information

15:52:41 14    with a physician.

15:52:43 15    Q.  Given the lack of physician time and the difficulties you've

15:52:47 16    just described, how did you try to craft messages for your sales

15:52:51 17    force with respect to Xarelto?

15:52:52 18    A.  So I think as we've seen through the last few days, the Xarelto

15:52:59 19    label as it relates to atrial fibrillation is very complex.  And so

15:53:06 20    that was a significant challenge for us.  It wasn't a simple one-

15:53:11 21    or two-point message that we asked representatives to share with

15:53:13 22    physicians and to educate them.

15:53:17 23         There were specific nuances, there's black box warnings,

15:53:20 24    there's caveats to the indications.  So my job was to include

15:53:24 25    everything that the FDA required to ensure that representatives

15:53:28  1   only spoke on label, but to find a way to do so in a less compact,

15:53:35  2   complex and convoluted way because they didn't really have a lot of

15:53:39  3   time.

15:53:40  4         So the goal would be to have a succinct and crisp piece

15:53:43  5   of information that would invite the physician to maybe offer more

15:53:46  6   time to talk through some of these other aspects.

15:53:48  7   Q.  Were there differences in the patient population studied in the

15:53:52  8   Xarelto ROCKET studies as compared to those studies that were done

15:53:57  9   for Pradaxa and Eliquis?

15:53:58 10   A.  Yes.  So the study population for Xarelto skewed more to the

15:54:04 11   sicker and older population than the other trials.  So if you look

15:54:08 12   at the entire patient population for the Eliquis AFib trials and

15:54:15 13   the Pradaxa AFib trials, they had a broader spectrum of patients

15:54:18 14   from those who had a low stroke risk to those with a high stroke

15:54:23 15   risk.

15:54:23 16         Our study focused and enrolled patients that were a CHADS

15:54:28 17   score or stroke risk score of 3 or above.  So you can categorize

15:54:31 18   that as moderate- to high-risk patients versus really all-comers,

15:54:37 19   low-, medium- and high-risk stroke patients.  So patients who have

15:54:41 20   a higher CHADS score have diabetes, hypertension, maybe have had a

15:54:47 21   prior stroke, are of an advanced stage.  Those are stipulations

15:54:51 22   that increase your risk.  So a low-risk patient might have just one

15:54:54 23   thing like diabetes.  A moderate-risk patient might have diabetes

15:54:59 24   and hypertension.  And a high-risk patient may have a prior stroke,

15:55:03 25   diabetes and hypertension.  So they're on a lot of other meds.

15:55:07  1   They're dealing with a lot of other comorbid conditions.  And

15:55:13  2   they're, frankly, just a more difficult patient population to

15:55:16  3   manage.

15:55:16  4   Q.  Given the differences in the patient population for the

15:55:20  5   patients studied with Eliquis, for example, and the patients

15:55:23  6   studied with Xarelto, can you compare efficacy between the two

15:55:30  7   medications, Xarelto and Eliquis?

15:55:33  8   A.  No.  Everyone's label is based on their performance versus

15:55:37  9   warfarin, and they get whatever claims they have related to that

15:55:40 10   study versus warfarin.

15:55:43 11        It's standard practice in the medical community as well

15:55:45 12   as it's just inappropriate to do what they call cross-trial

15:55:48 13   comparisons where you take the results of one study and try and

15:55:52 14   project them on results of another study.  And that was done here,

15:55:56 15   or that's sort of why it would be inappropriate to compare

15:56:01 16   different claims for products against each other because they

15:56:05 17   haven't studied that yet.

15:56:07 18   Q.  Looking back at your time working with Xarelto as a marketer,

15:56:11 19   how do you assess your job performance?

15:56:15 20   A.  I worked extremely hard.  I learned a lot.  I made a tremendous

15:56:23 21   amount of personal sacrifices.  There were many times when I had

15:56:26 22   young kids at home, not sleeping through the night, that my husband

15:56:29 23   was on duty until 8:00 or 9:00 at night when I came home.  But I

15:56:33 24   really think that all of that work and all of that effort and all

15:56:35 25   of that energy was for a positive result.  And for me, the ability

15:56:41  1   to have an option for patients with AFib or really with any of

15:56:46  2   these other diseases that gives them piece of mind that they can

15:56:50  3   avoid a thromboembolic event and do so without all of these other

15:56:56  4   burdens is really gratifying.

15:56:57  5          So I am really proud of what we did.  I think this is a

15:57:00  6   really exciting product.  Like any pharmaceutical medication, it

15:57:03  7   has its risks and benefits, and that's why, you know, having

15:57:06  8   physicians make the decision on who should get them, they're truly

15:57:10  9   the experts, they've been trained in these diseases.  So I look

15:57:15 10   back, and I am very proud of what we did and I am very proud of the

15:57:19 11   work.

15:57:21 12   Q.  Ms. Geiger, ultimately it's up to a physician to determine for

15:57:26 13   each individual AFib patient whether to treat with a medication

15:57:31 14   and, if so, whether to prescribe Xarelto, Eliquis, warfarin,

15:57:36 15   Pradaxa or another medication, is that correct?

15:57:38 16   A.  That's true.

15:57:39 17   Q.  And all of those medications remain approved by the FDA for

15:57:43 18   treatment for patients with non-valvular atrial fibrillation today,

15:57:48 19   is that correct?

15:57:48 20   A.  That's true.

15:57:49 21   Q.  What was your job?

15:57:50 22   A.  My job was to create materials for our sales representatives to

15:57:56 23   educate the physician on the risks and benefits of Xarelto and AFib

15:58:02 24   per our indication.

15:58:03 25          THE COURT:  Okay.

OFFICIAL TRANSCRIPT

15:58:04  1          (WHEREUPON, THE VIDEO DEPOSITION OF SUSAN GEIGER WAS

15:58:06  2   CONCLUDED.)

15:58:07  3          MR. BIRCHFIELD:  That's it.  Do you want to take a break

15:58:09  4   or --

15:58:10  5          THE COURT:  Let's take a break.  Ten-minute break.

15:58:13  6          THE DEPUTY CLERK:  All rise.

15:58:14  7      (WHEREUPON, A RECESS WAS TAKEN.)

15:58:14  8      (OPEN COURT.)

16:10:41  9      (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

16:10:41 10          THE COURT:  Be seated, please.

16:10:44 11          MR. BIRCHFIELD:  Your Honor, at this time we will play

16:10:45 12   what we fully intend to be our very last deposition in this case.

16:10:48 13   We have the deposition of Nauman Shah.  It was taken on August the

16:10:52 14   3rd and 4th of 2016 in Princeton, New Jersey.  Mr. Shah is employed

16:10:57 15   by Janssen Pharmaceuticals, and his current title is vice-president

16:11:01 16   of sales and marketing, metabolics.

16:11:04 17          His deposition starts with questioning by an attorney for

16:11:07 18   the Orr family, followed by an attorney representing the

16:11:11 19   defendants.  It's about 30 minutes, your Honor.

16:11:11 20      (WHEREUPON, THE VIDEO DEPOSITION OF NAUMAN SHAH WAS PLAYED AS

16:11:11 21       FOLLOWS:)

16:11:11 22   EXAMINATION:

16:11:17 23   Q.  Could you state your name for the record?

16:11:19 24   A.  Nauman Shah.

16:11:20 25   Q.  And where do you currently reside?

16:11:21  1    A.  I live in Flemington, New Jersey.

16:11:24  2    Q.  And are you currently employed?

16:11:24  3    A.  I am.

16:11:24  4    Q.  And what -- who are you employed with?

16:11:26  5    A.  I am employed by Janssen Pharmaceutical, which is the -- the

16:11:29  6    pharmaceutical division of Johnson & Johnson.

16:11:32  7    Q.  Do you no longer have responsibilities for Xarelto?

16:11:36  8    A.  That is correct.

16:11:36  9    Q.  Okay.  And how long have you worked for Janssen or a Johnson &

16:11:40 10    Johnson company?

16:11:40 11    A.  I have worked for Janssen or Johnson & Johnson since 2000- --

16:11:46 12    January of 2003.  So 13 years.

16:11:49 13    Q.  Okay.  So you've worked for the drug industries for about

16:11:51 14    20 years?

16:11:51 15    A.  Yes, over 20 years.  23 years.

16:11:53 16    Q.  In your 20-plus years of working for a pharmaceutical company,

16:11:58 17    I understand that you've led or played a major role in marketing

16:12:02 18    blockbuster drugs?

16:12:03 19    A.  I have played a role in multiple drugs that have been

16:12:05 20    successful, yes.

16:12:07 21    Q.  So I think you and I have talked about on a couple of occasions

16:12:10 22    that from a marketing standpoint in the AFib indication, one

16:12:14 23    important differentiator for Xarelto versus Eliquis and Pradaxa was

16:12:18 24    the fact that it was taken once daily, correct?

16:12:21 25    A.  Yes.  That was one of the advantages.

16:12:23 1    Q.  And because Pradaxa and Eliquis, your competitors, were

16:12:27 2    twice-a-day drugs, correct?

16:12:28 3    A.  Correct.

16:12:29 4    Q.  And Pradaxa and Eliquis had a label that allowed them to be

16:12:33 5    advertised and promoted as having superior efficacy and safety for

16:12:36 6    warfarin, correct?

16:12:37 7    A.  That -- superior efficacy on stroke risk reduction was common

16:12:43 8    for both of them.  Not superior bleeding.

16:12:46 9    Q.  Eliquis couldn't market itself or advertise itself as having

16:12:51 10   superior efficacy to warfarin?

16:12:52 11   A.  Eliquis could market itself as having superior efficacy to

16:12:55 12   warfarin.

16:12:55 13   Q.  Xarelto could not, right?

16:12:56 14   A.  Xarelto could not.

16:12:57 15   Q.  From a marketing standpoint, do you agree that it was important

16:13:00 16   for you all to end up with a label that had no dosing regimen

16:13:06 17   whatsoever that was more than once a day?

16:13:08 18   A.  Was it important?  It was the only way that we studied --

16:13:13 19   studied the dose in ROCKET, so we didn't expect the FDA to alter

16:13:17 20   the dosing.

16:13:17 21   Q.  Well, there are certain drugs that should be avoided when

16:13:21 22   taking Xarelto, correct?

16:13:21 23   A.  I believe there are some drugs, if my memory is correct, listed

16:13:23 24   in the package insert that the FDA cautioned about taking

16:13:27 25   concomitantly with Xarelto.

1443

16:13:30  1    Q.  There was another set of drugs that were not -- you can't take

16:13:35  2    with Xarelto because it decreases the amount of Xarelto in your

16:13:39  3    blood, correct?

16:13:39  4    A.  I think that's what the package insert says.

16:13:41  5    Q.  And they were PGP and cytochrome P450 3A4 inducers, right?

16:13:47  6    A.  That's right.

16:13:48  7    Q.  Are you remembering this now?

16:13:49  8    A.  It is starting to come back to me.

16:13:51  9    Q.  And one of those inducers is St. John's Wort; is that correct?

16:13:54  10   A.  Yes, that's correct, I believe.

16:13:55  11   Q.  And one of those antibiotics is called rifampin.  Sound

16:14:02  12   familiar?

16:14:02  13   A.  It does sound familiar, yes.

16:14:03  14   Q.  And epilepsy drugs like Tegretol and Dilantin, right?

16:14:07  15   A.  Yes.

16:14:07  16   Q.  So folks with epilepsy that are on those drugs can't take

16:14:11  17   Xarelto because it decreases the amount of Xarelto in their blood,

16:14:15  18   correct?

16:14:15  19   A.  Yes.  So those drug interactions would indicate watch-outs for

16:14:20  20   people in terms of concomitant medications that could either

16:14:23  21   increase the blood levels of Xarelto or decrease the blood levels

16:14:26  22   of Xarelto.

16:14:27  23   Q.  Do you recall in 2011 you were involved in discussions about a

16:14:30  24   proposed draft label for submission to the FDA?

16:14:32  25   A.  I could have been.  I don't recall specifically.

1444

16:14:36  1  Q.  You were -- okay.  You were part of what's called the label

16:14:42  2  working group, correct?

16:14:43  3  A.  Yes, I was.

16:14:44  4  Q.  And the label working group is a subgroup of the LRC, the label

16:14:51  5  review committee, correct?

16:14:53  6  A.  I wouldn't call it a subgroup.  It was the level blow the LCR

16:14:57  7  that worked.  And then our regulatory people would take ownership

16:15:00  8  because they had ownership ultimately for the label, and then take

16:15:03  9  it to the LRC for review.

16:15:06  10  Q.  Okay.  And who was the person in regulatory that would take

16:15:10  11  input from your subcommittee -- the subcommittee to the LRC?  Was

16:15:15  12  it Judy Kinaszczuk?

16:15:17  13  A.  Gosh, I can't remember the exact time that was there.  There

16:15:21  14  were multiple people.  I think Judy was the project manager.  She

16:15:24  15  would be the one, if my memory is correct.  And Sanjay Jalota

16:15:28  16  obviously ultimately ended up regulatory in R&D.

16:15:31  17  Q.  Do you remember back in 2011 discussion about a draft label

16:15:37  18  that included a dosing regimen of 10 milligrams twice a day with

16:15:44  19  concomitant administration of PGP and strong cytochrome CY3A4

16:15:52  20  inducers?  Do you remember a discussion about that?

16:15:53  21  A.  I don't recall the specific discussion.  But I have no reason

16:15:55  22  to argue that it may have happened.  I don't recall the specifics

16:15:58  23  though.

16:15:59  24  Q.  Okay.  Do you know whether in the final label that -- in 2011,

16:16:14  25  whether there was any circumstances where Xarelto for AFib was

16:16:25  1    taken twice daily?

16:16:26  2    A.  I don't recall.

16:16:27  3    Q.  I'm handing you Shah 49.  49?  Yes.

16:16:27  4    A.  Okay.

16:16:36  5    Q.  This appears to be an e-mail between you and Judy.  Can you

16:16:36  6    pronounce her name for me?

16:16:42  7    A.  I think it's Kinaszczuk.

16:16:42  8    Q.  Kinaszczuk.  That's what we will call her at least for this

16:16:46  9    deposition.  An e-mail between you and Judy Kinaszczuk on

16:16:49 10    August 15th, 2011.  Do you see that?

16:16:51 11    A.  I do.

16:16:51 12    Q.  And this was an e-mail that was sent and received in the

16:16:55 13    regular course of Janssen's business?

16:16:56 14    A.  Yes.

16:16:57 15    Q.  Were all these folks up here members of the label working

16:17:01 16    group?

16:17:02 17    A.  It seems like too long of a list.  But many of them I would say

16:17:08 18    were.  I can't -- I can't be sure if all of them were.  Some people

16:17:11 19    may have just been copied here for information purposes.

16:17:15 20    Q.  Okay.  The Xarelto -- I'll go back to where we were reading.

16:17:18 21          "The Xarelto atrial fibrillation LWG requests your LRC

16:17:23 22    ex-committee review and approval of several revisions to the USPI

16:17:28 23    by August 16 (via the voting buttons) and will be submitted to the

16:17:34 24    FDA no later than August 19, 2011."  Did I read that correctly?

16:17:38 25    A.  You did.

16:17:39  1   Q.  Do you know -- and you probably don't, but I should ask.  Do

16:17:44  2   you know if there was -- it appears that there was a vote on this

16:17:48  3   particular label that is being circulated, because it talks about

16:17:53  4   the via voting button.  Do you see that?

16:17:55  5   A.  I do.  So the date on this indicates to me, because it's

16:17:59  6   August 15, 2011, that this was prior to the actual FDA AdCom.  We

16:18:05  7   were preparing the label for review -- final review by the FDA.

16:18:11  8   The final label obviously would ultimately come from the FDA, but

16:18:15  9   given this timing, it was certainly early in that process.

16:18:18  10  Q.  What I am trying to figure out is, it says "via the label --

16:18:22  11  the voting buttons."  Do you see that?

16:18:23  12  A.  Yes.

16:18:24  13  Q.  How -- where would I go?  Where would you go, Mr. Shah --

16:18:24  14  A.  Mm-hmm.

16:18:26  15  Q.  -- to find out what the vote was on this particular label?  How

16:18:31  16  would you find that out?

16:18:32  17  A.  I wouldn't know that.  That would only go to the regulatory

16:18:34  18  folks.

16:18:36  19  Q.  So -- so the -- so the person to really talk to about that

16:18:42  20  might be Judy Kinaszczuk?

16:18:43  21  A.  Yes.  I think that that would be the accurate person.  There

16:18:46  22  was no way for me to know who had voted what or struck down what

16:18:50  23  after this label working group.

16:18:51  24  Q.  Now, if we go back up to the e-mail, you -- apparently, you

16:18:56  25  replied just to Judy, correct?

16:18:58  1   A.  Yes.

16:18:58  2   Q.  And that was on August 15, 2011, right?

16:19:02  3   A.  That is correct.

16:19:02  4   Q.  And you say, "Judy, I am looking through this.  I am obviously

16:19:07  5   supportive of the items below.  However, one area that concerns me

16:19:10  6   is the proposed twice-daily dosing versus QD dosing for the section

16:19:17  7   page 5, 2.5, use with P-GP and strong CYP3A4 inducers."  Did I read

16:19:26  8   that correctly?

16:19:27  9   A.  Yes, you did.

16:19:28  10  Q.  You were concerned that there was a section of the label --

16:19:28  11  A.  Mm-hmm.

16:19:31  12  Q.  -- that was being discussed and that was going to be sent to

16:19:34  13  the FDA that included proposed twice-daily dosing versus once-daily

16:19:40  14  dosing, correct?

16:19:41  15  A.  For a specific situation.  So I was obviously expressing

16:19:47  16  concern, but my recommendation was for the team to discuss further.

16:19:51  17  Q.  Okay.  But you -- you're not a doctor, right?

16:19:53  18  A.  No.

16:19:54  19  Q.  And you're not an expert in pharma -- pharmacodynamics,

16:19:59  20  correct?

16:19:59  21  A.  No.  I don't have a pharmacology degree.

16:20:00  22  Q.  Right.  And you -- and you really have no scientific background

16:20:03  23  whatsoever in terms of determining what the appropriate dose is,

16:20:07  24  whether it's twice a day or once a day for concomitant use of

16:20:14  25  Xarelto/rivaroxaban with these other drug, right?

16:20:15  1   A.  That's absolutely right.

16:20:17  2   Q.  All right.  So you were really looking at this from a marketing

16:20:18  3   standpoint?

16:20:19  4   A.  No.  I was actually asking for an opinion.

16:20:21  5   Q.  So -- but what you -- you were concerned about the fact that

16:20:25  6   the label that was being discussed and was proposed had twice-daily

16:20:30  7   dosing, correct?

16:20:31  8   A.  I -- look, I mean, I don't actually state what the concern was.

16:20:38  9   So what I am asking for is, you know, one of my big gest concerns

16:20:40 10   ever for any drug that I worked on is to ensure that there is

16:20:45 11   proper context on dosing, that dosing is clear.  It's not something

16:20:49 12   people are going to mess up or take inappropriately.

16:20:52 13         So what I'm asking here, I obviously clearly write, "I'm

16:20:55 14   obviously supportive of the items below."  That includes all of the

16:20:58 15   items listed.  And then I state that I have a concern about this in

16:21:02 16   the specific section which obviously related to drug-drug

16:21:05 17   interactions.  "Can we please have this be discussed further."

16:21:10 18   Q.  If you would turn to the second page.

16:21:12 19   A.  Yes.

16:21:13 20   Q.  It is --

16:21:15 21   A.  Page 2?

16:21:16 22   Q.  Yeah, page 2.  And if you would look, if you can see where I am

16:21:19 23   pointing on mine.  Right down there.  It starts with, "concomitant

16:21:25 24   use of Xarelto."  Do you see that that is the section that you were

16:21:32 25   raising questions about the dosing?  Do you see that?

16:21:35  1    A.  Yes.  Exactly.

16:21:36  2    Q.  It's page 5.  And then you see above it, it's 2.5 use with P-GP

16:21:41  3    and strong CYP3A4 inducers.  Do you see that?

16:21:46  4    A.  Yeah, I do.

16:21:46  5    Q.  And do you see it -- after it -- see where it's St. John's Wort

16:21:50  6    should be avoided.  You see that?

16:21:52  7    A.  Okay.  I see --

16:21:54  8    Q.  Paragraph down, "Concomitant use of Xarelto"?

16:21:58  9    A.  Yes, I see it.

16:22:00 10    Q.  All right.  Let's go to the sentence that starts, "Taking the

16:22:01 11    recommended dose twice a day should be considered if these drugs

16:22:05 12    must be co-administered."  That's pretty clear, right?

16:22:09 13    A.  Yeah.  That's the opinion of whoever wrote that, yes.

16:22:12 14    Q.  Right.  And the folks that are writing this -- who wrote this

16:22:16 15    are scientists, correct?

16:22:17 16    A.  Yes.

16:22:18 17    Q.  Okay.  Now, if you go back to your -- if you go back to your

16:22:22 18    e-mail --

16:22:22 19    A.  Mm-hmm.

16:22:22 20    Q.  -- where you are questioning whether the label has -- should

16:22:26 21    say proposed twice-daily dosing in that section --

16:22:26 22    A.  Yes.

16:22:29 23    Q.  -- you say in the last paragraph, "Given what the division is

16:22:33 24    focusing on, I think recommending twice-daily dosing may not be

16:22:37 25    optimal right now."

16:22:37  1   A.  Okay.

16:22:39  2   Q.  Okay.  So you're not a scientist, but you are saying that you

16:22:47  3   don't think that twice-daily dosing should be in the label in this

16:22:49  4   section, correct?

16:22:49  5   A.  I'm -- I'm requesting based on what I am writing here -- and

16:22:51  6   obviously it's to Judy -- is to allow for further dialogue on that

16:22:56  7   and to make sure the team gets it right.

16:22:57  8   Q.  Then you say, "I think recommending twice-daily dosing may not

16:23:01  9   be optimal right now."

16:23:01  10  A.  So --

16:23:04  11  Q.  That's more than -- that's more than -- strike that.

16:23:06  12          This does not say, I'd like to have further discussion,

16:23:09  13  right?

16:23:09  14  A.  I don't get to be the decision-maker on this label, anyway.

16:23:13  15  Q.  Okay.  You know that the label that -- the final label does not

16:23:16  16  include twice-daily dosing in this section, correct?

16:23:18  17  A.  I believe that's -- that's correct, if that's what the label is

16:23:22  18  as of today.

16:23:23  19  Q.  Okay.  And you do write, "Given that what division is focusing

16:23:27  20  on, I think recommending twice-daily dosing may not be optimal

16:23:31  21  right now"?

16:23:32  22  A.  I do write that.

16:23:33  23  Q.  And you write that without any scientific background to be able

16:23:36  24  to make that determination, correct?

16:23:38  25  A.  I wouldn't say without any scientific background.  I think I

16:23:42  1   had a pretty good knowledge of the medicine at that point.  But,

16:23:45  2   no, no, I'm not a scientist.

16:23:46  3   Q.  Okay.  Now, let's jump back in time to 2009?

16:23:50  4   A.  Okay.

16:23:51  5   Q.  I know we're doing a lot of time travel.  In February 2009, you

16:23:56  6   were director of marketing leading the team responsible for the

16:23:59  7   Xarelto launch, correct?

16:24:00  8   A.  Yes.

16:24:00  9   Q.  And do you recall in early 2009 discussions about Janssen

16:24:06  10  collaborating with Portola to develop a Factor Xa specific

16:24:13  11  antidote -- Factor Xa specific antidote?

16:24:16  12  A.  At a very high level, I remember hearing that there was a

16:24:21  13  potential collaboration.  I wasn't involved in the evaluation or

16:24:24  14  due diligence on it.

16:24:26  15  Q.  I've handed you what's been marked as Shah-54.  For the record,

16:24:30  16  it's Record Number 105-5516, Bates number Xarelto-Janssen 07189114.

16:24:39  17  Mr. Shah, this appears to be another set of meeting minutes of the

16:24:42  18  compound development team for February 19th, 2009.  Do you see

16:24:47  19  that?

16:24:47  20  A.  I do.

16:24:48  21  Q.  I want you to go to page 3.  This appears to be the meeting

16:24:52  22  minutes from the meeting a month after the meeting that we just

16:24:57  23  talked about in Shah-53, correct?

16:25:01  24  A.  Okay.  Yep.

16:25:02  25  Q.  "Commercial update."  Do you see where I am?

```
16:25:03   1   A.  Yes, I do.

16:25:04   2   Q.  It says, "Final recommendation antidote:  Commercial" -- and

16:25:08   3   that's marketing, right?

16:25:09   4   A.  Yes.

16:25:10   5   Q.  -- "has completed the evaluation and recommends not to pursue

16:25:13   6   this opportunity.  Position statement placed in CDT MTG eRoom

16:25:19   7   folder for today's meeting."  Do you see that?

16:25:21   8   A.  I do.

16:25:22   9   Q.  Okay.  We know that at the time Xarelto was launched in 2011,

16:25:26   10  it was launched without an available antidote for reverse bleeding,

16:25:30   11  correct?

16:25:30   12  A.  That is correct.

16:25:31   13  Q.  And that was a decision Janssen made to launch it without an

16:25:34   14  antidote, correct?

16:25:35   15  A.  We did not have an option available at that time for an

16:25:38   16  antidote.

16:25:39   17  Q.  Do you know that Bayer was considering developing an antidote

16:25:44   18  that worked specifically on Xarelto?

16:25:45   19  A.  I heard about that.

16:25:46   20  Q.  Okay.  And do you recall that you attended compound development

16:25:49   21  team meetings in or around early 2011 where that was discussed?

16:25:54   22  A.  That topic was brought to the CDT for us to be aware of it,

16:25:59   23  yes.

16:26:00   24  Q.  I am handing you Shah-58 and Shah-59, which are another e-mail

16:26:06   25  and attachment.  If you look at the first slide, it says, "Xarelto
```

16:26:11  1   rivaroxaban specific antidote (BAY 1110262)," correct?

16:26:19  2   A.  Yes.

16:26:20  3   Q.  Now, would this have been a set of slides that somebody would

16:26:24  4   have presented at the global development committee meeting?

16:26:27  5   A.  Based on the note, I assume it looks like, yes.

16:26:31  6   Q.  Do you know who presented them?

16:26:32  7   A.  I would have no idea.

16:26:33  8   Q.  And you recall -- I think you testified, that generally you

16:26:36  9   have a recollection of Bayer -- Bayer developing an antidote back

16:26:41  10  around this period of time?

16:26:42  11  A.  Yes.  And it looks like this document was from Bayer because

16:26:45  12  they're the only ones that would have put Xarelto in quotes.

16:26:49  13  Q.  Okay.  And you're pointing to the first page of the slide?

16:26:52  14  A.  Yes, I am.

16:26:53  15  Q.  And actually, if you look at first page on the side, on the

16:26:56  16  right-hand side, it's got the Bayer --

16:26:58  17  A.  It's actually got the Bayer logo.  There you go.  Okay.

16:27:00  18  Q.  All right.  So if we go to page 2.

16:27:03  19  A.  Yes.

16:27:03  20  Q.  It says, "Project rationale."

16:27:06  21  A.  Yes.

16:27:06  22  Q.  And it says, "Anticoagulants are associated with bleeding

16:27:09  23  risk."  You can agree with that?

16:27:10  24  A.  Yes, all anticoagulants are.

16:27:13  25  Q.  And, "There is an unmet medical need for effective antidotes

1454

16:27:16  1   for anticoagulants in general."  Did I read that correctly?

16:27:20  2   A.  You did.

16:27:21  3   Q.  And do you agree with that?

16:27:22  4   A.  There is, yes.

16:27:24  5   Q.  And the next bullet point, it says, "No specific antidotes are

16:27:29  6   available for the new anticoagulants."  Did I read that correctly?

16:27:32  7   A.  You did.

16:27:32  8   Q.  And is that accurate as of this time?

16:27:36  9   A.  Thank you.  That's what I was going to say.  Yes, at that time

16:27:39 10   it was.

16:27:39 11   Q.  And if you look at the second bullet point down, it says,

16:27:42 12   "Life-threatening bleeds can be expected in 1 to 3 percent of

16:27:45 13   Xarelto patients."  Do you see that?

16:27:47 14   A.  Yes, I do.

16:27:47 15   Q.  Next bullet point, it says, "Physicians report significant

16:27:52 16   interest in an antidote 'security blanket,'" correct?

16:27:55 17   A.  Yes.  That's how I would describe it as well.

16:27:57 18   Q.  Right.  And we saw it in that prior PowerPoint slide that one

16:28:01 19   of the barriers to prescribing Xarelto after launch of the AFib

16:28:04 20   indication, you knew that doctors were talking about not having an

16:28:09 21   antidote, correct?

16:28:10 22   A.  Yes.  And that's what we found in our market research was

16:28:12 23   basically they wanted a security blanket in case -- in case

16:28:15 24   something ever happened.

16:28:16 25   Q.  I've given you what's marked as Shah-60, Mr. Shah.  Let me just

16:28:21  1  read it for the record.  It's Record Number 303724,

16:28:27  2  Xarelto-Janssen 0142951.  This appears to be a set of meeting

16:28:33  3  minutes from the compound development team meeting of

16:28:37  4  February 15th, 2009.  Does it look like that?

16:28:39  5  A.  Yes, it does.

16:28:40  6  Q.  All right.  And your name appears a core CDT member?

16:28:47  7  A.  It does.

16:28:47  8  Q.  It's highlighted.  Does that mean you were at the meeting?

16:28:51  9  A.  Attendees in bold, then, yes, I -- I think that's what it

16:28:54 10  means.

16:28:54 11  Q.  Okay.  And you're listed as the commercial leader, correct?

16:28:57 12  A.  I am.

16:28:58 13  Q.  If you could turn to the second page.

16:28:58 14  A.  Mm-hmm.

16:29:05 15  Q.  And if you -- I'm sorry.  If you go back to the first page.  It

16:29:08 16  is, "Compound Development Team Meeting, Recommendation on Pursuing

16:29:12 17  Bayer Developed Rivaroxaban Antidote."  Do you see that?

16:29:14 18  A.  I do.

16:29:14 19  Q.  And is this the ad hoc meeting that was talked about in the

16:29:18 20  prior e-mail for considering the Bayer antidote around this time?

16:29:22 21  A.  I don't know if it was the ad -- ad hoc meeting.  But it's

16:29:27 22  certainly a meeting that looks like it was focused on that topic.

16:29:29 23  Q.  Okay.  Going to the second page.

16:29:32 24  A.  Okay.

16:29:32 25  Q.  First, the bullet point there says as a -- strike that.

16:29:36  1          "As a life-saving product, it may command the necessary

16:29:39  2   price to justify high COGs and development."  What is "COGs"?

16:29:46  3   A.  COG stands for cost of goods.

16:29:49  4   Q.  Okay.  And so if I understand what this is saying is that -- is

16:29:58  5   that an antidote if it's developed, because it's a life-saving

16:30:01  6   product, you might be able to charge a lot more for it?

16:30:04  7   A.  No, actually -- well, it's saying, I guess, command the

16:30:09  8   necessary -- can it command the necessary price, because the -- the

16:30:11  9   production cost here is very high, apparently, for this Bayer

16:30:14 10   specific -- Bayer antidote.

16:30:16 11   Q.  Okay.  And so one of the things that's being considered and

16:30:21 12   factored as to whether or not to pursue the Bayer antidote is what

16:30:26 13   price can be commanded for the antidote itself, correct?

16:30:30 14   A.  It appears that the team is stating or the information is

16:30:35 15   stating that the developing and -- or the production cost is high,

16:30:40 16   and, obviously, there would need to be a price that could be high

16:30:44 17   enough to justify supporting that.

16:30:44 18   Q.  Okay.

16:30:46 19   A.  And the belief, to your point, is that because it would be

16:30:49 20   life-saving, that hopefully that would be possible.

16:30:53 21   Q.  Third bullet point down, it says "Dabigatran developing

16:30:58 22   specific antibody.  Lack of antidote could become a competitive

16:31:03 23   disadvantage for riva."  And Dabigatran is Pradaxa, correct?

16:31:07 24   A.  Correct.

16:31:07 25   Q.  And did I read that sentence correctly?

OFFICIAL TRANSCRIPT

16:31:09  1    A.  You did.

16:31:10  2    Q.  And so one of the things that's being considered as to whether

16:31:12  3    or not to pursue the Bayer antidote is the fact that Pradaxa is

16:31:15  4    developing a specific antidote, correct?

16:31:18  5    A.  It is one of the factors, yes.

16:31:19  6    Q.  And we saw that actually Pradaxa had successfully completed

16:31:24  7    that, and they do have an antidote and are advertising that,

16:31:26  8    correct?

16:31:27  9    A.  Yes, they recently launched one.

16:31:28  10   Q.  And it says, "Lack of an antidote could become a competitive

16:31:32  11   disadvantage for riva," do you see that?

16:31:35  12   A.  I do.

16:31:35  13   Q.  And does that mean that not having an antidote could decrease

16:31:41  14   sales versus Pradaxa if it did develop an antidote?

16:31:45  15   A.  Yes, potentially.

16:31:46  16   Q.  And that was one of the things that was being considered at the

16:31:50  17   time?

16:31:50  18   A.  It was one of the considerations.

16:31:51  19   Q.  Next bullet point down.  "Health authorities and physicians

16:31:55  20   have expressed a keen interest in having effective antidotes to

16:31:59  21   anticoagulant drugs; clear desire for such a product."  Did I read

16:32:04  22   that correctly?

16:32:04  23   A.  Yes, you did.

16:32:05  24   Q.  All right.  And that was verified and consistent with your

16:32:09  25   market research shortly after Xarelto launched, correct?

16:32:12  1    A.  It was.

16:32:13  2    Q.  And this meeting in February of 2011 was months before the

16:32:22  3    launch in AFib, correct?

16:32:23  4    A.  It was approximately -- sorry, it's getting late in the day, it

16:32:30  5    was prior to the launch, yes.

16:32:32  6    Q.  Would it be fair to say that based on the reading of this

16:32:36  7    fourth bullet point that your company knew that health authorities

16:32:39  8    and physicians had expressed a keen interest in having effective

16:32:43  9    antidotes to anticoagulant drugs and that there was a clear desire

16:32:48  10   for such a product before you launched Xarelto?

16:32:50  11   A.  We were aware of all of that, but did not have a viable

16:32:54  12   opportunity at that time to bring one to the market, especially

16:32:57  13   prior to launch or at the same time as launch.

16:33:00  14   Q.  All right.  We saw in 2009 a decision was made not to pursue

16:33:04  15   the Portola antidote at that point in time, correct?

16:33:07  16   A.  I believe that that is correct, for whatever reason.  The team

16:33:11  17   decided.

16:33:12  18   Q.  Right.  So there was an opportunity to develop the Portola

16:33:16  19   antidote in 2009, which would have been two years before launch,

16:33:19  20   the team decided not to do that, correct?

16:33:21  21   A.  Portola would have actually been the one developing.  I think

16:33:24  22   the opportunity was should we invest in it at that time or should

16:33:28  23   we invest in it later as it gains more data to give us confidence

16:33:31  24   that it was real.

16:33:32  25   Q.  And you made the decision that you would defer investing in the

1459

16:33:35  1    Portola antidote in 2009, correct?

16:33:38  2    A.  It was a very fair assessment, yes.

16:33:40  3    Q.  From a regulatory standpoint, was there anything that stopped

16:33:43  4    the company from saying, you know what, let's develop an antidote

16:33:47  5    before we launch this drug so that if somebody bleeds while on the

16:33:52  6    drug, we can reverse it?

16:33:53  7    A.  The regulatory pathway, again, I would defer to one of our

16:33:57  8    regulatory colleagues because an antidote pathway, I don't know if

16:34:01  9    it was clear at that time because nothing had been approved as an

16:34:04 10    antidote on the market.

16:34:05 11    Q.  Was there anything that prohibited Janssen in 2009 from

16:34:09 12    deciding, you know what, we'll collaborate with Portola and we'll

16:34:14 13    get an -- on -- on what they're looking at, we'll give them money

16:34:16 14    and we'll work with them to get an antidote going.  There's nothing

16:34:21 15    that prohibited the company from doing that in 2009?

16:34:24 16    A.  I would say that the thing that would have inhibited us was the

16:34:27 17    lack of confidence into whether or not that was real or not.  But

16:34:30 18    other than that, nothing.

16:34:31 19    Q.  The company was aware of the Portola option in 2009, correct?

16:34:33 20    A.  We knew it was an option.  We just didn't know how confident we

16:34:37 21    could be in that option as to whether it was viable or not.

16:34:39 22    Q.  And the commercial -- we saw documents where the commercial

16:34:42 23    folks recommended that they not -- that the company not pursue that

16:34:46 24    from a commercial standpoint, correct?

16:34:47 25    A.  We saw documents where somebody in the CDT, some commercial

16:34:51  1    folks recommended that.  I just don't know which antidote they were

16:34:55  2    talking about.

16:34:58  3    Q.  I'm handing you Shah 62.  For the record, Shah 62 is 119-111,

16:35:05  4    Bates number Xarelto-Janssen 00114696.  Take a minute and let me

16:35:15  5    know when you're ready.

16:35:16  6    A.  (WITNESS REVIEWS DOCUMENT.)  Okay.

16:35:19  7    Q.  Okay.  This -- strike that.

16:35:27  8          This is an e-mail from Nancy -- am I pronouncing this

16:35:31  9    right -- Ondovik?

16:35:32 10    A.  Good guess.

16:35:35 11    Q.  We'll keep it at that.

16:35:36 12    A.  Okay.

16:35:37 13    Q.  E-mail from Nancy Ondovik to several people on the Xarelto

16:35:41 14    team, including yourself?

16:35:42 15    A.  Yes.

16:35:42 16    Q.  This is -- the e-mail was sent December 19th, 2011?

16:35:46 17    A.  Yes, that's correct.

16:35:47 18    Q.  So it's one and a half months after Xarelto was approved and on

16:35:51 19    the market for AFib, correct?

16:35:54 20    A.  About six months after the approval for the orthopedic

16:36:01 21    indication, and about a month and a half after the approval of the

16:36:01 22    AF indication.

16:36:01 23    Q.  Right.  And Xarelto was launched without an antidote, correct?

16:36:05 24    And that is a discussion that's happening about an antidote after

16:36:08 25    that time, correct?

16:36:09  1    A.  That is correct.

16:36:10  2    Q.  And she says in the first paragraph, "Hello, everyone.  Just

16:36:14  3    wanted to let you know that Bob and I communicated our decision not

16:36:17  4    to move to diligence or pursue the riva antidote opportunity any

16:36:22  5    further with Bayer late last week."  Did I read that correctly?

16:36:26  6    A.  You did.

16:36:27  7    Q.  And, "Bayer was understandably disappointed by this decision

16:36:30  8    and hoped to share more details on the program and their rationale

16:36:34  9    and reasons for moving forward with this antidote as part of the

16:36:37 10    diligence process."  Correct?

16:36:38 11    A.  Yes.

16:36:40 12    Q.  "They were quite surprised that we decided to stop prior to

16:36:43 13    completing diligence."  Did I read that correctly?

16:36:45 14    A.  You did.

16:36:46 15    Q.  The main -- next paragraph.  "The main messages communicated to

16:36:49 16    Bayer were that after careful consideration and additional analytic

16:36:53 17    work, there was limited clinical need for a riva-specific antidote

16:36:58 18    as well as limited potential for the antidote to generate

16:37:01 19    incremental revenue to the riva program, either through sales of

16:37:07 20    the antidote or increased sales of riva, based on our current

16:37:12 21    understanding of the riva TPP and the U.S. regulatory landscape."

16:37:18 22    Did I read that correctly?

16:37:19 23    A.  You did.

16:37:20 24    Q.  Would you agree with me that as long as there is a chance of

16:37:25 25    somebody bleeding on Xarelto, from a clinical standpoint, from a

16:37:29  1    patient's perspective, that there would always be a need for an

16:37:32  2    antidote?

16:37:33  3    A.  There would be a need for modalities to manage that bleeding.

16:37:36  4    But if I may just finish my thought for a minute, since we didn't

16:37:40  5    move to the next question.  By "modality," just to be clear for the

16:37:43  6    jury and everyone else, what I mean is there needs to be options,

16:37:48  7    whether it's a precise antidote or whether it's, like, the things

16:37:52  8    people do with warfarin where they apply Vitamin K and it seems to

16:37:56  9    help.  That, in essence, is what I mean by "modalities."  There

16:37:59 10    needs to be identified some modalities to control a very serious

16:38:03 11    bleeding, should one ever occur.

16:38:06 12    Q.  And are you married?

16:38:07 13    A.  I am married.

16:38:08 14    Q.  Do you have children?

16:38:09 15    A.  I do.

16:38:10 16    Q.  How many children do you have?

16:38:12 17    A.  I am the proud father of three daughters and two stepdaughters.

16:38:20 18    My twins are Morgan and Lea.  They are 13 years old.  And my

16:38:26 19    younger one is Amira.  She's only 20 months.

16:38:30 20    Q.  Where did you go to college?

16:38:32 21    A.  I went to Penn.

16:38:33 22    Q.  University of Pennsylvania?

16:38:34 23    A.  I did.

16:38:35 24    Q.  What did you major in?

16:38:36 25    A.  Biological basis of behavior.

16:38:40  1    Q.  Do you have any degrees after you graduated college and your

16:38:45  2    degree from the University of Pennsylvania?

16:38:47  3    A.  Yes.  When I -- I decided a few years ago, once I decided to

16:38:51  4    stay in the industry, to return to graduate school.  And I received

16:38:54  5    an M.B.A. in finance.

16:38:57  6    Q.  Okay.  From what university?

16:38:59  7    A.  That was from temple University.

16:39:00  8    Q.  In Philadelphia?

16:39:02  9    A.  In Philadelphia.

16:39:03  10   Q.  Could you define marketing in the context of working for a

16:39:08  11   pharmaceutical company like Janssen?

16:39:10  12   A.  Yes.  I mean, first of all, you know, it's interesting.  It is

16:39:15  13   very different than marketing in some other aspects.  I've been

16:39:19  14   asked this question multiple times, even in internal meetings, as

16:39:24  15   to, you know, what do you -- what is it that marketing does.  And I

16:39:26  16   think it's very different than working in an industry like consumer

16:39:30  17   products or the car industry where you are focused on creating

16:39:35  18   brochures and simply advertising.  I think in our case, we have --

16:39:38  19   and you can do all of that without any regulation.  We're obviously

16:39:41  20   a regulated industry --

16:39:43  21   Q.  By that, you mean -- let me interrupt you.

16:39:44  22   A.  Yep.

16:39:45  23   Q.  Regulated by the Food & Drug Administration?

16:39:46  24   A.  That is correct.  By the Food & Drug Administration based on

16:39:50  25   laws that the federal government has created and in some cases

16:39:54  1   state governments have created.  Obviously it's a different aspect

16:39:56  2   in that we are working to communicate information about products,

16:40:02  3   but also educate both the healthcare provider community as well as

16:40:06  4   patients.  And I think that that makes it a lot different.

16:40:10  5   Q.  In terms of checks and balances on marketers for pharmaceutical

16:40:17  6   companies, there's the FDA on one hand, is that correct?

16:40:20  7   A.  That is correct.

16:40:20  8   Q.  FDA plays a role in reviewing -- has the ability to review

16:40:26  9   marketing materials from pharmaceutical companies?

16:40:29  10  A.  Yes, that's absolutely true.  So every material that we create

16:40:32  11  that is used in promotion or advertising is submitted to the FDA by

16:40:38  12  our regulatory department.  FDA keeps those things on file.  They

16:40:42  13  proactively review either some or all.  Obviously it varies by

16:40:47  14  individual -- product individual situation.  There are a number of

16:40:51  15  materials or -- or campaigns that we may submit for a proactive

16:40:55  16  review at times.  DTC ads, for example, our television ads have to

16:41:01  17  be, by Janssen policy and by the Pharma guidelines, submitted for

16:41:06  18  review by the FDA and have to be approved by the FDA prior to us

16:41:09  19  launching those on television.

16:41:12  20       (WHEREUPON, THE VIDEO DEPOSITION OF NAUMAN SHAH WAS

16:41:13  21       CONCLUDED.)

16:41:13  22            THE COURT:  Let's see if we can start the next witness.

16:41:17  23  We'll just go 15 minutes or so.  Call your witness, please.

16:41:22  24            MR. BARR:  Your Honor, at this time, plaintiffs call

16:41:24  25  Dr. Suzanne Parisian.  Come forward, please.

16:41:40  1          THE DEPUTY CLERK:  Please raise your right hand.

16:41:42  2        (WHEREUPON, SUZANNE PARISIAN, WAS SWORN IN AND TESTIFIED AS

16:41:49  3      FOLLOWS:)

16:41:49  4          THE CLERK:  Please have a seat, and state and spell your

16:41:52  5  name for the record.

16:41:52  6          THE WITNESS:  My name is Dr. Suzanne Parisian.  And you

16:41:55  7  want me to spell it?  S-U-Z-A-N-N-E P-A-R-I-S-I-A-N.

16:42:02  8          MR. BARR:  May I proceed, your Honor?  May I proceed?

16:42:07  9          THE COURT:  Proceed, please.

16:42:08  10                   VOIR DIRE EXAMINATION

16:42:08  11  BY MR. BARR:

16:42:09  12  Q.  Good afternoon, Dr. Parisian, how are you?

16:42:11  13  A.  Fine.  How are you?

16:42:12  14  Q.  I'm doing great.  Why don't you just introduce yourself to the

16:42:15  15  jury.  Tell them a little bit about who you are and what your

16:42:18  16  background is.

16:42:19  17  A.  I am a physician.  I have been a physician at the Food & Drug

16:42:25  18  Administration as a chief medical officer.  I graduated from

16:42:29  19  University of Central Florida, got a master's degree in biology.  I

16:42:35  20  graduated from University of South Florida in Tampa, that was my

16:42:40  21  medical school.  Should I continue on?

16:42:42  22  Q.  Sure.

16:42:43  23  A.  And then I did a flexible internship after I left medical

16:42:48  24  school -- after I finished medical school, and I did that in

16:42:51  25  Greenville, South Carolina, and the kind of residency where you

16:42:55  1    take care of patients, all kinds of different rotations like

16:43:00  2    orthopedics and anesthesia, internal medicine, so it's -- you went

16:43:05  3    through a lot.  And I did that for a year.  And then after that --

16:43:08  4    should I continue?

16:43:09  5    Q.  Dr. Parisian, would it be helpful if we put up a copy of your

16:43:13  6    CV so the jury can follow along with you?

16:43:14  7    A.  It might be helpful for the jury.

16:43:16  8    Q.  Can we get Exhibit 297.  There you go.  And is this a copy of

16:43:21  9    your CV, Dr. Parisian?

16:43:24 10    A.  Yes, sir.

16:43:24 11    Q.  And this includes all of your background, your education, those

16:43:29 12    types of things?

16:43:30 13    A.  Yes.

16:43:30 14    Q.  And if we could go to the section on her educational history.

16:43:38 15            And so explain to the jury, you got your bachelor's of

16:43:43 16    science, I understand, in biology is where you got your master's

16:43:46 17    degree from the University of Central Florida, correct?

16:43:49 18    A.  Yes, sir.

16:43:49 19    Q.  And then you went on to medical school.  You went to the

16:43:52 20    University of South Florida, graduated in 1978, right?

16:43:55 21    A.  Right.

16:43:57 22    Q.  So you were talking about to the jury about then you went to

16:44:00 23    your flexible residency, and we'll talk about that in a minute.

16:44:03 24    But did you go on to complete a residency in any specialty?

16:44:08 25    A.  Yes, I did.

16:44:09 1    Q.  And tell the jury about that.

16:44:11 2    A.  It's a residency in anatomic and clinical pathology.  I am a

16:44:15 3    pathologist.  And I did that at various places in terms of

16:44:21 4    California, UC San Diego, LA County and Grand Rapids, Michigan.

16:44:27 5    And the reason -- times are crazy because I have a husband also who

16:44:33 6    is a doctor, so we are trying to pair up two medical careers.

16:44:36 7    Q.  So you actually went out to California and then you finished

16:44:39 8    your residency, as I understand it, in Michigan?

16:44:41 9    A.  That's right.

16:44:43 10   Q.  Are you board-certified in any specialties?

16:44:46 11   A.  Yes, in anatomic and clinic pathology.

16:44:49 12   Q.  And just so the jury understands what that is, can you explain

16:44:53 13   what anatomic and clinical pathology is?

16:44:56 14   A.  The clinical pathology part would be the person who is trained

16:44:59 15   to run a clinical laboratory or blood bank, so you work with

16:45:03 16   laboratory results.  The anatomic pathology is your surgical path,

16:45:08 17   the person who would read surgical slides when you have surgery,

16:45:13 18   look at the slides and come up with what the diagnosis was.  And

16:45:16 19   then the surgical path also -- or anatomic path includes the

16:45:22 20   medical examiner, the person who does autopsies and figures out the

16:45:26 21   cause of death.  So it's kind of an across-the-board, all the types

16:45:31 22   of things pathologists do.

16:45:33 23   Q.  So does your training as a pathologist, does that involve work

16:45:36 24   in the laboratory?

16:45:37 25   A.  Pardon?

16:45:38  1   Q.  Does your work as a pathologist, your training, does that

16:45:41  2   involve work in the laboratory?

16:45:42  3   A.  Yes.  Yes, that would be one part of it.

16:45:45  4   Q.  So you're familiar with medical laboratory testing?

16:45:49  5   A.  Yes.

16:45:51  6   Q.  Are you licensed to practice medicine?

16:45:52  7   A.  Yes.

16:45:53  8   Q.  Where are you licensed to practice medicine?

16:45:55  9   A.  I am licensed to practice medicine in Virginia and Arizona.

16:45:58 10   Q.  And you've had those licenses for how long?

16:46:02 11   A.  Oh, since the -- since the '90s.  In Virginia, before 1991 and

16:46:10 12   then Arizona when I moved to Arizona, that was about 13 years.

16:46:15 13   Q.  And do you have to do anything to maintain your medical

16:46:17 14   licenses?

16:46:18 15   A.  Yes, I have to take what you call continuing medical education,

16:46:21 16   CME.  So I have to fulfill a certain number of hours in order to

16:46:26 17   keep my license current.

16:46:27 18   Q.  Now, I want to kind of go through your professional career and

16:46:31 19   the positions you've held.  What did you do after leaving medical

16:46:35 20   school?

16:46:36 21   A.  I did the flexible internship, so that was my year after

16:46:40 22   medical school actually taking care of patients.  And you do

16:46:44 23   that -- you do a year, so you have to be licensed in certain

16:46:49 24   states.  So I was licensed after that in the state of South

16:46:52 25   Carolina.

16:46:52   1   Q.  And that was in Greenville, South Carolina, as I understand it,

16:46:56   2   from roughly 1978 to 1980?

16:46:59   3   A.  Yes.

16:47:02   4   Q.  And then after you left the flexible internship, you went to --

16:47:06   5   is that when you went to North Carolina?

16:47:08   6   A.  Yes, moved up to the mountains of North Carolina.

16:47:10   7   Q.  So explain to the jury what it was you were doing when you

16:47:12   8   moved to North Carolina.

16:47:14   9   A.  When I first went there -- and, again, there's two careers

16:47:17  10   here.  But when I first went there, I was a health department

16:47:20  11   doctor.  I was the physician that -- it was the federal government,

16:47:23  12   health department, so I was basically like a general practice.  I

16:47:28  13   didn't have hospitalized patients, but I took care of pediatrics

16:47:32  14   through OB through elderly people.  But it was based in the health

16:47:37  15   department.

16:47:37  16   Q.  So you actually cared for patients during this period of time?

16:47:40  17   A.  Yes, yes.

16:47:41  18   Q.  And then at some point, did you move from the health department

16:47:46  19   to actually working in an emergency room?

16:47:47  20   A.  Yes.

16:47:48  21   Q.  So tell the jury about that.

16:47:50  22   A.  Then I moved in Caldwell County, North Carolina to an emergency

16:47:56  23   company, we did the ER.  And I had -- we had a company my husband

16:48:01  24   and I started called Mountain Emergency Medical, and I was the

16:48:05  25   president of that.  So we had ER patients, and it was up in the

16:48:10  1    mountains of North Carolina.

16:48:11  2    Q.  So you would actually treat patients as they came into the

16:48:15  3    emergency room?

16:48:15  4    A.  Yes, sir.

16:48:15  5    Q.  And you have experience doing that?

16:48:17  6    A.  Yes, sir.

16:48:18  7    Q.  And then you left North Carolina.  When was that?

16:48:22  8    A.  I left North Carolina in the '80s to begin a pathology

16:48:28  9    residency.

16:48:28  10   Q.  And that's when you went out to California to do your pathology

16:48:32  11   residency?

16:48:33  12   A.  Yes, I first went to UC San Diego.

16:48:36  13   Q.  At some point in time -- well, just tell -- explain to the jury

16:48:41  14   what happened after you completed your pathology residency.

16:48:44  15   A.  After I completed my pathology training and got board-certified

16:48:48  16   in '89, I went to the Food -- I joined the United States Public

16:48:54  17   Health Service, so I looked like a Navy officer.  And I got

16:48:57  18   assigned -- my husband was very surprised.  And I got assigned to

16:49:02  19   the Food & Drug Administration.

16:49:03  20   Q.  Can you explain to the jury why it was you wanted to join the

16:49:08  21   United States Public Health Service?

16:49:09  22   A.  Well, I really was interested in public health and I also liked

16:49:14  23   the military.  My father had been in the military, I was -- kind of

16:49:17  24   thought it would be great.  Here I was later in my life, mid-life

16:49:21  25   crisis, my husband likes to say.  And so I got to be in the

16:49:24  1    military, I got to work at the Food & Drug Administration.  I also

16:49:27  2    got to have a clinical bill at the Armed Forces Institute of

16:49:32  3    Pathology in the office of the medical examiner.  So it was really

16:49:35  4    kind of exciting for a pathologist to get to do all of that.

16:49:40  5    Q.  And we'll go into more detail about your work with the United

16:49:45  6    States Public Health Service and the FDA, but you actually achieved

16:49:47  7    a rank, is that correct?

16:49:48  8    A.  Yes, I got to be a lieutenant commander.

16:49:51  9    Q.  With all of the bells and whistles and buttons?

16:49:53 10    A.  And all of medals and things.  It was real cool.

16:49:56 11    Q.  And during this time -- was there a particular division at the

16:50:03 12    FDA that you were assigned to?

16:50:04 13    A.  They assigned me to the Center For Devices and Radiological

16:50:08 14    Health.  I had a broad background in exposure to medical devices,

16:50:13 15    medical issues, so it was a good center to put me in in terms of

16:50:17 16    also being able to work with knowing about medical devices.

16:50:20 17    Q.  Was there a particular reason they wanted you in that division?

16:50:24 18    A.  Basically because of my training in medicine and my background

16:50:30 19    actually having taken care of patients and actually having used

16:50:33 20    some of the devices that we would have in that center.

16:50:35 21    Q.  So it's fair to say there was a need for doctors who had

16:50:38 22    actually treated patients at the FDA?

16:50:40 23    A.  Yes.  And there was a need for doctors who had actually used

16:50:44 24    devices and had been in an ER and had worked with instruments.

16:50:48 25    Because there are some physician groups that don't work as much

16:50:52  1    with some of the medical devices.  So it was a good fit for me and

16:50:57  2    it was a good fit for the FDA.

16:51:00  3    Q.  So while you were at the Center For Devices and Radiological

16:51:04  4    Health, you were also assigned, you mentioned, with the Air Force

16:51:08  5    institute of pathology, correct?

16:51:09  6    A.  The Armed Forces Institute of Pathology, AIFP, that's in Walter

16:51:16  7    Reed.

16:51:16  8    Q.  Can you explain to the jury what the Armed Forces Institute of

16:51:19  9    Pathology was?

16:51:19 10    A.  It was a group that was consulting for the rest of the country

16:51:24 11    on pathology issues.  You had a group, not all military, but you

16:51:30 12    had a body pathologist who could look at slides, look at X-rays.

16:51:35 13    So it was a medical group -- I was specifically in the office of

16:51:42 14    the medical examiner.  My goal and role was to sign out autopsies

16:51:47 15    that had been done for anyone that would come under the AIFP, that

16:51:54 16    would be military cases, it would be FBI cases, CIA cases, anyone

16:51:59 17    who died in any one of those services, and to collect information.

16:52:04 18         I also would work at Dover when they would bring bodies

16:52:08 19    back, as a pathologist, which they used pathologists for to take

16:52:13 20    organs out of the bodies, believe it or not.  I was really thrilled

16:52:17 21    about that.  And unexploded armaments and different things.  So

16:52:23 22    that's what they used pathologists for.

16:52:24 23    Q.  Similar to the work maybe the jury has seen on CSI?

16:52:28 24    A.  Yeah, yeah.  Only I was at the time when Quincy was the

16:52:32 25    pathologist, an ugly guy.  Now they have these beautiful women on

16:52:36  1    CSI.  But I've gotten old like Quincy, and they're beautiful on TV.

16:52:42  2    Q.  So let's get more involved -- well, let me ask it this way.

16:52:47  3    You stated you had a position with the FDA.  So can you just

16:52:51  4    explain to the jury who the FDA is, they've heard a lot about that,

16:52:55  5    and what the FDA does.

16:52:56  6    A.  The FDA means the Food & Drug Administration, and Congress sets

16:53:02  7    up what the FDA does and what products the FDA looks at.  The FDA

16:53:07  8    looks at some products before they're marketed, some products after

16:53:11  9    they're marketed, and if there's a safety issue.

16:53:14  10            Do you want to know what the types of products are?

16:53:18  11   Q.  Yes, ma'am.

16:53:19  12   A.  There would be prescription drugs, there would be medical

16:53:22  13   devices, there would be biologics.  That would include blood

16:53:26  14   banking, vaccines.  They also look at cosmetics, foods, and they

16:53:31  15   look at veterinary products in terms of veterinary animal products.

16:53:36  16   And now they look at tobacco.  When I was there, they didn't look

16:53:40  17   at tobacco.

16:53:41  18   Q.  So we have on the screen your CV, and it talks about -- you've

16:53:45  19   got on here from August of '91 to March of '93, you were a medical

16:53:49  20   officer with the FDA?

16:53:50  21   A.  Correct.

16:53:50  22   Q.  So can you explain to the jury what you did in your role as a

16:53:55  23   medical officer at the FDA.

16:53:56  24   A.  When I joined the FDA in that period of time, I was involved in

16:54:00  25   products that were marketed.  So they're called post marketed

16:54:04  1   products.  I was involved with safety issues, doing health risk

16:54:09  2   assessments.  I would look at labelling, I would look at marketing,

16:54:13  3   I would look at recalls.  So anything about a product that was a

16:54:18  4   medical device, I would be involved with when it was being sold.

16:54:23  5        And safety issues, my role was to be a physician and to

16:54:26  6   help protect the public in terms of those products and to help

16:54:32  7   guide the FDA and Center For Devices as to what they could do to

16:54:37  8   protect the public.

16:54:38  9   Q.  And so you talked about that was a role working post market.

16:54:41 10   Did there come a time where you got involved premarket with the

16:54:45 11   FDA?

16:54:45 12   A.  Yes, yes.

16:54:46 13   Q.  Can you explain that to the jury, what that time frame was?

16:54:50 14   A.  They tried to -- they wanted to reorganize the center.  There

16:54:52 15   were only ten physicians in the center.  So they took the

16:54:56 16   physicians that were in post market and decided that they would do

16:55:00 17   away with that office and put us in the Office of Device

16:55:04 18   Evaluation.  So we looked at products that weren't on the market

16:55:07 19   yet.  So you would look at clinical trials, you would look at

16:55:10 20   feasibility studies.

16:55:13 21        As a pathologist, I looked at animal studies.  So you

16:55:17 22   would try to help bring new products to the market so that there

16:55:20 23   would be benefits for the public in terms of new technology, new

16:55:25 24   devices.

16:55:25 25   Q.  And you did this from March of '93 to December of '93

16:55:30 1   approximately?

16:55:31 2   A.  Well, the Office of Health -- '95.  '93 to '95.  That's when my

16:55:38 3   bill -- my time with the FDA was up, in '95.

16:55:41 4   Q.  So let's talk a little bit more about your work premarket.  As

16:55:45 5   part of your premarket work, would you work with companies to

16:55:49 6   design clinical trials?

16:55:51 7   A.  In the pre -- in the premarket, yes, I would be the one who

16:55:55 8   would review the clinical trials and give recommendations as to

16:55:58 9   what needed to be done, what didn't need to be done.  I would help

16:56:02 10  look at who the investigators were, what the plan was in terms of

16:56:07 11  the study, the informed consent, and try to use my clinical

16:56:14 12  knowledge to try to protect the patients that are getting enrolled

16:56:18 13  in clinical trials.  Clinical trials are human trials.  So my job

16:56:22 14  was to make sure that the patients were taken care of.

16:56:25 15  Q.  And would you review applications for a product to see if the

16:56:29 16  product could be approved as safe and effective?

16:56:33 17  A.  Yes.  And make recommendations, write up documents to say what

16:56:36 18  my recommendations were so the next person would be able to see

16:56:40 19  what my recommendations were.

16:56:41 20  Q.  And in your experience during this time, was it your view that

16:56:46 21  recommendations were taken seriously at the FDA?

16:56:49 22  A.  Right.  If you write a recommendation, a summary, that is the

16:56:54 23  official record of the FDA so that the next person who comes --

16:56:58 24  because people change at the FDA all the time.  But the written

16:57:01 25  record is what stays so the next person can review it.

16:57:05  1    Q.   Okay.   Were FDA rules and regulations in any way part of your

16:57:10  2    job --

16:57:10  3    A.   Yes.

16:57:10  4    Q.   -- during this period?

16:57:11  5    A.   Yes.   I was required -- I had -- my supervisor was an M.D.

16:57:17  6    J.D., and he said, well, you know the medicine, so let's start

16:57:20  7    having you learn the law.   So he required me to read the Food, Drug

16:57:24  8    and Cosmetic Act and to learn the Code of Federal Regulations in

16:57:28  9    terms of all of the products that the FDA was regulating so that I

16:57:33 10    would help in terms of any actions that the FDA was involved with.

16:57:39 11            And then I would also help support any actions the FDA

16:57:41 12    had in terms of their general counsel people.   When they needed

16:57:46 13    expert witnesses, I would help get that.   So I was required for

16:57:50 14    those first two years to be involved with the law and all of the

16:57:52 15    requirements and then to look at things in terms of safety issues

16:57:58 16    and then apply, to tell the FDA how do I see this fits into what's

16:58:03 17    required for the manufacturing.

16:58:04 18    Q.   And while you were at the FDA, did you receive any awards or

16:58:08 19    honors?

16:58:09 20    A.   Yes, I did.

16:58:10 21    Q.   Can you -- and I know nobody really likes to brag about

16:58:13 22    themselves, but can you kind of explain to the jury some of the

16:58:17 23    awards you got?   I've heard you say this before, the employee of

16:58:21 24    the month one is kind of an interesting one.   Can you start with

16:58:24 25    that one?

16:58:24  1   A.  It is.  I was the Center For Devices radiological health

16:58:28  2   employee for the month, and then I got nominated for the Food &

16:58:32  3   Drug Administration employee of the month, and then the Department

16:58:36  4   of Health and Human Services employee for the month.  And it's the

16:58:38  5   same month, but it's the only time they ever gave it out -- I think

16:58:42  6   somebody was unhappy that I got it.  So, yeah, I am the only one

16:58:46  7   who got it, as far as I know.  But yes.

16:58:48  8   Q.  So you've also got some Public Health Service achievement

16:58:51  9   medal.  You got that in 1992.  Can you explain what that is?

16:58:54  10  A.  Right.  That was -- that's basically a medal for me in terms of

16:58:58  11  public health issues.  The next group, the Public Health Service

16:59:03  12  unit commendation medals, those were groups.  I was leading groups

16:59:08  13  of people on public health issues.  Some of those were some of the

16:59:11  14  issues that I was involved in, and then I got -- if anyone knows

16:59:15  15  the military, I got two commendation medals that were individual

16:59:20  16  commendation medals for my work.  So I was busy in that time, but

16:59:24  17  it's very rare you get medals.

16:59:27  18  Q.  Are you proud of the work you did at the FDA?

16:59:30  19  A.  I'm very proud.

16:59:31  20  Q.  Now, there came a point in time where your tenure at the FDA

16:59:35  21  ran out.  Can you explain that to the jury?

16:59:37  22  A.  Yes.  I had signed up for four years.  I stayed there for four

16:59:40  23  years.  But I hadn't seen my children, and they were ten and eight,

16:59:45  24  so that's the only reason I left the FDA was because I wanted to

16:59:48  25  spend some time with my family.  And so I thought, well, I must

OFFICIAL TRANSCRIPT

16:59:54  1   know something from the FDA, so I came out and opened a consulting

16:59:57  2   firm.

16:59:58  3   Q.  Did people at the FDA want you to stay?

17:00:01  4   A.  Yes, yes.  In fact, the Public Health Service tried to keep me

17:00:06  5   on their roster for another year or two because they didn't want me

17:00:09  6   to leave.

17:00:10  7   Q.  And so you mentioned after you left the FDA, you started your

17:00:14  8   own company.  What was that?

17:00:15  9   A.  My company originally was called Medical Device Assistants,

17:00:20 10   Inc. because I thought I would be working mainly with medical

17:00:23 11   devices.  And then later on, it became apparent that I was working

17:00:26 12   with more than medical devices, so my company in Phoenix was called

17:00:30 13   M.D. Assist, MDA, to show that I am an M.D. and I will assist.  And

17:00:36 14   so it was more representative of just medical devices assistance.

17:00:41 15   Q.  What particularly did your company do?  What was it

17:00:44 16   established -- what service did it provide?

17:00:46 17   A.  I came out of the FDA, and I wanted to consult for people who

17:00:50 18   needed information about the FDA.  Before I went to the FDA, I knew

17:00:54 19   nothing about the FDA, and so I felt that there needed to be

17:00:58 20   someone who could talk either to public groups, to manufacturers to

17:01:03 21   help them with clinical trials, so I thought I knew information

17:01:07 22   about the FDA.

17:01:07 23   Q.  And in your role as the president of M.D. Assist, did that

17:01:13 24   require you to maintain working knowledge of FDA rules and

17:01:16 25   regulations?

17:01:17  1    A.  Every day.  So every day since I left in '95, I had to be

17:01:21  2    involved with what's going on at the FDA.

17:01:23  3    Q.  And is MDA -- M.D. Assist, do you continue to provide

17:01:29  4    regulatory information to individual manufacturers and

17:01:33  5    organizations regarding the FDA's requirements, rules and

17:01:37  6    regulations?

17:01:38  7    A.  I have more in the past.  I am trying to retire.  I am getting

17:01:43  8    old.  So I am trying to cut back and just -- I'm just doing

17:01:47  9    litigation support at this point in time.  I stopped with the

17:01:49 10    manufacturers and the speaking.

17:01:51 11    Q.  But there was a time where you would do lectures for companies?

17:01:54 12    A.  Right.  And I would talk to medical students, I would go to

17:01:58 13    their classes and teach them about the FDA.  I would talk to

17:02:02 14    colleges and people who are particularly graduate students who are

17:02:06 15    engineer types that want to learn about the FDA.  I would talk to

17:02:10 16    industry groups to tell them about the FDA and what you needed to

17:02:13 17    know.  I wrote a book about the FDA to try to help my clients,

17:02:18 18    people who needed to know about the FDA.  So I was quite busier up

17:02:25 19    until a couple of years ago.

17:02:26 20    Q.  And we'll get into the litigation support a little later.

17:02:30 21           But you've also published a book about the FDA, is that

17:02:35 22    right?

17:02:35 23    A.  Yes.  Yes.

17:02:35 24    Q.  So can you explain to the jury the book you've published?

17:02:38 25    A.  It's called "FDA Inside and Out."  It's about -- when I was

17:02:42  1   with the FDA, there were six centers.  They didn't have tobacco.

17:02:46  2   So I actually wrote about each center, what was required, the

17:02:51  3   history of the center, what someone would need to know if you were

17:02:54  4   dealing with that center, you were looking at issues about that

17:02:59  5   center.

17:02:59  6        I tried to make it -- because books get so outdated these

17:03:03  7   days, that I put information about where you could go, the reader,

17:03:08  8   and look up on the internet what was the latest thing that was

17:03:10  9   going on in the FDA.  But I was trying to give you resources so

17:03:13  10  that people would be able to find out more about the FDA.

17:03:16  11  Q.  Do you know if that book is listed as a reference book at any

17:03:20  12  libraries?

17:03:21  13  A.  It has been.  It's been listed as a reference book at the FDA,

17:03:25  14  it's been -- different industries, manufacturers have used it in

17:03:29  15  their libraries.  It's been used as a course book at several

17:03:34  16  different colleges to teach about the FDA.  It's -- I think it's

17:03:37  17  been at Harvard, it's been at various different libraries, but it's

17:03:42  18  been a reference book.  It's not something you would want to sit

17:03:45  19  and read, it's boring, but it would tell you what you needed to

17:03:51  20  know, if you needed, about any one particular center, the history

17:04:04  21  and what kind of things to consider.  And so it was made mainly for

17:04:31  22  teaching.

17:04:31  23       MR. BARR:  Your Honor, at this time, we would tender

17:04:31  24  Dr. Parisian as an expert in the FDA, FDA regulations, standards,

17:04:31  25  labelling of drugs, medical pathology, clinic trials.

OFFICIAL TRANSCRIPT

17:04:31  1              MR. DUKES:  Your Honor, no objection.

17:04:31  2              THE COURT:  Okay.  The Court will accept her.  And we'll

17:04:32  3     stop here today.

17:04:32  4              MR. BARR:  Thank you, your Honor.

17:04:32  5              THE COURT:  We'll stop here.  You worked very hard.  The

17:04:32  6     lawyers, we all appreciate that, and you need to know the Court

17:04:32  7     appreciates that.  I am very proud of each of you.  You've been on

17:04:32  8     time and taking the matters seriously, you're listening to it, and

17:04:33  9     we're all proud of you.

17:04:35 10              Unfortunately, we will have to start tomorrow a little

17:04:37 11     earlier.  I would like to start at 8 o'clock.  I hope that's not

17:04:41 12     too inconvenient for you, but it's important that we catch up where

17:04:46 13     we're at.  Okay.  All rise out of respect for the jury as they

17:04:50 14     leave.

17:04:50 15          (WHEREUPON, THE JURY EXITED THE COURTROOM.)

17:05:26 16              THE COURT:  Okay.  I will see you all tomorrow at 7:45.

17:05:29 17              MR. BARR:  Thank you, your Honor.

17:05:30 18              THE COURT:  We'll stand in recess.

17:05:32 19          (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

        20

        21                         *  *  *  *  *  *

        22

        23

        24

        25

1

2

3                        REPORTER'S CERTIFICATE

4

5        I, Karen A. Ibos, CCR, Official Court Reporter, United

6   States District Court, Eastern District of Louisiana, do hereby

7   certify that the foregoing is a true and correct transcript, to the

8   best of my ability and understanding, from the record of the

9   proceedings in the above-entitled and numbered matter.

10

11

12                    _____/s/ Karen A. Ibos_____

13                    Karen A. Ibos, CCR, RPR, CRR, RMR

14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25