UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION

THIS DOCUMENT RELATES TO:

Joseph Orr, Jr., as Lawful
Surviving Spouse of
*Sharyn Orr v. Janssen, et al.*
*Case No. 2:15-cv-03708*

Docket No. 14-MD-2592
Section L
New Orleans, Louisiana
Wednesday, June 7, 2017

*********************************************************************

**TRANSCRIPT OF TRIAL PROCEEDINGS**
**HEARD BEFORE THE HONORABLE ELDON E. FALLON,**
**UNITED STATES DISTRICT JUDGE,**
**AND A JURY.**
**VOLUME VII - MORNING SESSION**

*********************************************************************

**APPEARANCES:**


FOR THE PLAINTIFFS'
LIAISON COUNSEL:

MR. ANTHONY BIRCHFIELD, JR.
Beasley Allen Crow Methvin
  Portis & Miles
Post Office Box 4160
Montgomery, AL  36103

MR. BRIAN H. BARR
MR. NEIL E. McWILLIAMS
Levin Papantonio Thomas
  Mitchell Rafferty & Proctor
316 Baylen Street
Suite 600
Pensacola, FL 32502

MR. GERALD EDWARD MEUNIER
Gainsburgh, Benjamin, David,
  Meunier & Warshauer
Energy Centre
1100 Poydras Street
Suite 2800
New Orleans, LA  70163-2800

**OFFICIAL TRANSCRIPT**

```
                                    MS. EMILY JEFFCOTT
                                    The Lambert Firm, PLC
                                    701 Magazine Street
                                    New Orleans, LA  70130

                                    MR. BRADLEY D. HONNOLD
                                    Goza & Honnold, LLC
                                    11181 Overbrook Road
                                    Suite 200
                                    Leawood, KS 66211

FOR THE DEFENDANT JANSSEN            MR. JAMES B. IRWIN, V
PHARMACEUTICALS, INC.,              Irwin Fritchie
and JANSSEN RESEARCH &                 Urquhart & Moore, LLC
DEVELOPMENT, LLC:                   400 Poydras Street
                                    Suite 2700
                                    New Orleans, LA  70130

FOR THE DEFENDANT                   MR. DAVID E. DUKES
BAYER HEALTHCARE                    Nelson Mullins Riley &
PHARMACEUTICALS, INC.,                 Scarborough, LLP and
BAYER PHARMA AG:                    Meridian, 17th Floor
                                    1320 Main Street
                                    Columbia, SC  29201

                                    MS. BETH A. WILKINSON
                                    Wilkinson Walsh + Eskovitz, LLP
                                    1900 M Street NW
                                    Suite 800
                                    Washington, DC 20036

REPORTED BY:  Mary V. Thompson, RMR, FCRR
              United States District Court
              500 Poydras, Room B275
              New Orleans, LA  70130
```

**OFFICIAL TRANSCRIPT**

## EXAMINATION INDEX

PAGE NO.

Plaintiffs' Witness:

Suzanne Parisian, M.D.,

Further Direct Examination............    1486
Cross-Examination....................    1586

**OFFICIAL TRANSCRIPT**

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | (WEDNESDAY, JUNE 7, 2017) |
| 3 | (MORNING SESSION) |
| 4 | |
| 5 | (Jury in at 8:24 a.m.) |
| 6 | (Call to order of the court.) |
| 7 | THE COURT:  Be seated, please.  Good morning, ladies |
| 8 | and gentlemen. |
| 9 | JURORS IN UNISON:  Good morning, Your Honor. |
| 10 | THE COURT:  We'll call the doctor on the stand.  I |
| 11 | accepted her as an expert witness in the designated case. |
| 12 | You may continue, Counsel. |
| 13 | MR. BARR:  Thank you, Your Honor. |
| 14 | **SUZANNE PARISIAN, MD,** |
| 15 | having been previously sworn, testified as follows, to wit: |
| 16 | **FURTHER DIRECT EXAMINATION** |
| 17 | **BY MR. BARR:** |
| 18 | **Q.**  Dr. Parisian, yesterday we went through your |
| 19 | qualifications.  Now I want to go now and talk about the work |
| 20 | you've actually done to get ready to prepare to offer opinions to |
| 21 | this jury.  Okay? |
| 22 | **A.**  Yes, sir. |
| 23 | **Q.**  So when you were contacted in this case, what was it we |
| 24 | asked you to do? |
| 25 | **A.**  To look at the information and first to decide whether |

**OFFICIAL TRANSCRIPT**

1  I wanted to take the case or not, to be involved in looking at

2  more documents.  And then I was asked to look at the types of

3  documents I was trained to look at when I was at the FDA, to look

4  at the regulatory history, how the product Xarelto got on the

5  market, and the issues about the product available to the

6  company, to the FDA, to the public, and to come up with an

7  opinion as -- regulatory opinions as to the actions of the

8  company in terms of marketing Xarelto.

9      Q.   Were you specifically looking at the actions of the

10 company when it comes to appropriately instructing doctors and

11 patients about a drug's -- Xarelto's safety, use, and how to

12 adequately warn about its risks?

13     A.   Yes.

14     Q.   Now, have you done this kind of work, what we kind of

15 talked about yesterday as litigation support?  Have you done this

16 work in the past?

17     A.   Yes.

18     Q.   I don't want to get into the details of the litigation,

19 but can you generally talk about, you know, your litigation

20 support work in the past?

21     A.   It is primarily the role that I first learned at the

22 FDA, and it's basically what I was required to do at the FDA

23 also, is to determine the FDA history, the documents that were

24 available, to put it in context of what the regulations require,

25 and to come up with regulatory opinions.  And, also, use my

**OFFICIAL TRANSCRIPT**

1    medical training to come up with issues about public health and
2    how it related to patient care.
3        Q.   Is it fair to say -- I'm sure we'll hear a lot about
4    it.  Is it fair to say you have been involved in a number of
5    different cases?
6        A.   Yes.  I've been in involved in litigation like I'm
7    doing today since 1997, so it's been a long time.
8        Q.   Do you accept every case that comes in your door?
9        A.   No.
10       Q.   How do you decide which cases you're going to offer an
11   opinion on and which ones you aren't?
12       A.   Well, the first thing would be that I would look up --
13   I talk to the attorneys, and I talk to -- and I look at the FDA
14   regulatory history, I look at the labeling, I look at certain key
15   factors as to decide whether I want to be involved in the issue
16   at all.  There are cases that I turn down because I say that I
17   don't see that I have a role, or that oftentimes I say that the
18   company didn't do anything wrong, and so I kind of pick and
19   choose which cases.
20            I do have a leaning to public health issues where I
21   think there is something for the public, to help patient care.
22   That's why I worked at the FDA, and that is my thing still, is
23   patient care, taking care of patients and protecting the public.
24       Q.   And are you compensated to do that work?
25       A.   Yes, I'm paid to do this.  I'm paid an hourly rate, and

**OFFICIAL TRANSCRIPT**

1    then I'm paid to be here today.  So it's a business that I've

2    been involved in since 1995.  Whether I work for a

3    manufacturer -- I get paid if I'm working for a manufacturer,

4    too.  I'm not paid for my opinions, I'm paid for my time.

5        **Q.**    Is this difficult work?

6        **A.**    I think it's difficult.  It's no fun to be up here.

7        **Q.**    In this case, how did you go about doing your review to

8    be able to offer the opinions you are about to offer?

9        **A.**    I looked at the standard documents that a regulatory

10   expert would look at.  I looked at company documents.  I looked

11   at depositions.  I've looked at the public record, which would be

12   what the FDA has said publicly.  I look at communications between

13   the company and the FDA, the meeting minutes.  I look at the

14   scientific information.  I look at the animal data.  I look at

15   how the products were developed.

16        So I go back to the very first idea that the company

17   may have had about a product, and then I walk it forward.  I have

18   to put everything into a time frame as to what would have been

19   known at particular periods of time, particularly when I come

20   into a case that is involving a single patient, a client.  So

21   everything has to be kind of rebuilt in terms of the regulations,

22   and so it's a process of going through and putting it back

23   together again, the whole history.

24        **Q.**    Okay.  And when you do this review of documents,

25   literature, public records, do you try to review all of the

**OFFICIAL TRANSCRIPT**

1    information you can about the company's product?

2        A.    Yes.  Yes, I try to look at the whole history and what

3    was said to the company, what the company has said.  I think it's

4    only fair to go and look at all the documents.  I listen -- I

5    also read depositions.

6            You've been watching depositions.  I get to read all

7    those depositions.  I had 40 employee depositions in this

8    particular case that I went through.  And I had to look at all

9    the exhibits, and I had to look at all the summaries that the FDA

10   has written.

11           So I try to take everything I possibly can.  Plus, then

12   I also do my own search of the medical literature, not to become

13   an expert in the product -- I'm not prescribing it -- but to get

14   the feel for the information that's being provided to the doctors

15   and the patients in terms of Xarelto.  So I try to make it a

16   complete thing.

17           But I do documents -- some documents are only coming

18   from the attorneys, because those are documents that are

19   confidential.  So I have to look at the documents that I'm given,

20   and then I try to get my own documents, too, whatever is

21   available out there in the public.

22       Q.    I want to delve into that a little bit more.

23           So when you are doing this document review, that

24   includes internal company documents that aren't available to the

25   public, right?

**OFFICIAL TRANSCRIPT**

1    **A.**   That's right.

2    **Q.**   And then why is that important to what you're doing?

3    **A.**   Well, to make a complete history as to what is going

4    on.  I need to see what the company knew at particular periods of

5    time.  As a regulatory expert, you need to know that.  What was

6    the company saying internally, what was the company seeing, and

7    then you kind of compare it to what is being said to the FDA in

8    terms of getting approval for their different clinical trials.

9    So you have to look at the company's documents.

10           And then I also look at the company's depositions

11   because I want to know what the company says about certain

12   exhibits, because they may have a different -- I may never have

13   appreciated the way they were looking at it at the time the

14   document was written.  So to be fair, you have to look at all of

15   that information.

16   **Q.**   And in your experience as an FDA medical officer, did

17   the FDA have access to these internal company documents and

18   corporate depositions?

19   **A.**   Not typically.  I was involved in one case with devices

20   when I had sheriff's go out and get documents and then had

21   depositions.  But the FDA doesn't get company documents, and so,

22   no, the FDA wouldn't have it.  They are relying on the company to

23   tell them things at meetings and in their NDA.  So I have a more

24   complete history than the FDA would have.

25   **Q.**   And in doing your review, did you receive documents

**OFFICIAL TRANSCRIPT**

1   from me, as counsel, for you to review?

2       A.   Yes.

3       Q.   And can you just give the jury a sense of the scope and

4   how broad a picture you got with those documents.

5       A.   Well, it would go all the way back to the very first --

6   beginning with Bayer in the development of Xarelto.  So we have

7   two clients.  So I would be looking at the original idea to sell

8   a product like Xarelto, beginning with Bayer, tracking through

9   when Janssen got involved.  It would be the different corporate

10  depositions from Bayer and Janssen employees.  Different

11  exhibits.  I would look also at any labels that are available,

12  any communications, meeting minutes with doctors.  So it's all

13  that information.

14          And then once the product sold, I look at

15  information -- like you were hearing I think Ms. Geiger the other

16  day talking about the marketing, so I would look at the marketing

17  information.  So everything related to the selling of this

18  product and how it ended up with Ms. Orr, I would have looked at.

19      Q.   Did you receive a hard drive that contained a large

20  volume of documents?

21      A.   Yes.  We're talking hundreds of thousands of pages

22  here.  And, yes, I received that.  And then if I needed more

23  documents, I would ask for them.  I was never not given documents

24  that I asked for.  Fortunately, I'm looking at kind of the

25  regulatory history so that does limit it down to more of the

**OFFICIAL TRANSCRIPT**

1    regulatory-related documents.

2        Q.    And were you given access to a database that contained

3    all of the information that was produced to plaintiffs' counsel?

4        A.    Yes, I was.  There is a lot of documents.  And so I was

5    given access to anything I wanted.

6        Q.    Are we talking literally millions of pages of

7    documents?

8        A.    Yes.

9        Q.    Now, you said that you also reviewed articles and

10   literature, right?

11       A.    Yes.

12       Q.    How do you go about searching the literature?  What did

13   you do?

14       A.    Well, I go on to the NIH's library, PubMed, and I can

15   do my own search, so that would give you your peer-reviewed

16   articles.  I'm looking at the types -- I'm not prescribing

17   Xarelto, but I'm looking at the types of information that is

18   being given out there in terms of a physician, what was there.

19            I would also be doing a search of all this type of

20   group of drugs, the anticoagulants, because I would be looking at

21   the other comparable anticoagulants being sold at the same time,

22   the DOACs, as they call them, and NOACs.  So I would be looking

23   at that.

24            Then I would do -- that's the peer review.

25            Then I'd also look at the Internet, just to see what

**OFFICIAL TRANSCRIPT**

1    kinds of things are out there for, if I was a patient trying to

2    find out things, what's out there.

3            So you try to get kind of a feel for what's being given

4    out there to doctors, to nurses, to patients about a product

5    because that feeds into the regulatory picture.

6        Q.    Were there any sources of documents or anything like

7    that where you were specifically told, You aren't allowed to go

8    look at those?

9        A.    Oh, no.  No.  And I would use -- I'm using the same

10   process that I've always used.  And I'm obsessive-compulsive

11   about trying to find as much as I can to make it so that I'm

12   being correct in creating an opinion that can be supported.  And

13   then I try to support -- give people the information that I use

14   to support an opinion.

15           So I have to be pretty thorough, and I wasn't denied

16   anything.

17       Q.    Okay.  And you also said, I believe, that you received

18   about 40 depositions that you read.  Did you also review the

19   exhibits to those depositions?

20       A.    Yes.  And I focused on the regulatory depositions, but

21   I did have access to all of them.

22       Q.    And from the hundreds of thousands of pages you've

23   reviewed, did you try and cull down to what you thought were the

24   most critical documents?

25       A.    Right.

**OFFICIAL TRANSCRIPT**

1    **Q.**    And so how do you go about doing that?

2    **A.**    Well, you go through all of this information and then

3    you start formulating your opinions based on what the regulations

4    require in terms of a manufacturer.  I would even do this if a

5    manufacturer came to me for consulting to ask about an issue.

6          So you try to take the information and put it in

7    context of what's required for a manufacturer doing business in

8    the United States.

9          And then you have to create opinions.  And then you

10    have to create a report.  And in my report I try to provide the

11    basis to support those opinions, what the regulations are, what

12    I'm thinking about, and then the documents that I think support

13    it.  Obviously, I can't put every document in, but I try to give

14    the documents that I think are supportive of that opinion.

15    **Q.**    And just like all other experts in this case, I assume

16    you have an hourly charge?

17    **A.**    Yes, sir.

18    **Q.**    And what is that?

19    **A.**    $500 an hour.

20    **Q.**    And that is for your review of documents.  What is your

21    hourly rate for testimony?

22    **A.**    To be here today is $1,000 an hour.  And that's the

23    going rate because there are only a few of us who really do this.

24    **Q.**    And you have been working on this litigation for

25    approximately how long?

**OFFICIAL TRANSCRIPT**

1     **A.**   Since last spring.

2     **Q.**   All right.  And approximately how many hours have you

3  billed so far to come in and offer opinions to this jury?

4     **A.**   About 400 hours.

5     **Q.**   And then what is the total amount that you have been

6  paid so far?

7     **A.**   $215,000.

8     **Q.**   So after doing all of this work that you've done, did

9  you formulate certain opinions with respect to the actions or

10 inactions of Bayer and Janssen related to Xarelto?

11    **A.**   Yes, sir.

12    **Q.**   What methodology did you employ in coming to those

13 opinions?

14    **A.**   It would have been taking documents and putting them in

15 the context of the regulations, what's required of a

16 manufacturer, and then supporting them.  And giving them -- and

17 then I have to be able to explain them.

18    **Q.**   Did you also rely upon your scientific and medical

19 education?

20    **A.**   Yes.  And you couldn't -- I'm looking at this as a

21 physician who was trained to do this for the FDA.  So you bring

22 both.  I'm also a scientist, because I worked in research before

23 I went to medical school, so I'm looking at animal data all the

24 way up through, and so that's my clinical training.

25    **Q.**   And have you reached opinions regarding the actions of

**OFFICIAL TRANSCRIPT**

1  Bayer and Janssen and whether adequate information was conveyed

2  to doctors in the Xarelto case?

3      **A.**   Yes.

4      **Q.**   And after doing this review and coming to your

5  opinions, did you issue a report that was given to Bayer and

6  Janssen so both sides could know what your opinion was?

7      **A.**   Yes, sir.

8      **Q.**   Do you have a copy of your report with you on the

9  stand?

10     **A.**   Yes, I do.

11     **Q.**   It looks pretty big.

12     **A.**   It is pretty big.

13     **Q.**   Approximately how long is that?

14     **A.**   That's about 400 pages.

15     **Q.**   Why in the world would you write a 400-page report,

16  something that thick?

17     **A.**   I wrote the report so that -- because -- any of the

18  opinions I have I could be questioned about, and, you know, I

19  want to explain what the basis of the opinions were.  And so the

20  report is so that anyone, defense or plaintiffs, can ask me

21  questions about it.

22          And so it's -- I try to find the documents that

23  actually, you know, support my opinions.  So -- and I have to be

24  able to answer questions about that.  That's part of the process,

25  is that I just have to have a basis for my opinions.

**OFFICIAL TRANSCRIPT**

1     Q.    And the jury has seen some of these.  Bayer and Janssen

2  had the opportunity to sit down with you over a couple days and

3  ask you questions, right?

4     A.    Yes, sir.

5     Q.    And those questions were all based upon the contents of

6  your report, correct?

7     A.    Yes, sir.  And anything else they wanted to ask me

8  about.

9     Q.    So we're going to get into your opinions in a little

10  bit, but I want to talk now and make sure the jury understands

11  the responsibilities of the drug manufacturer and the role of the

12  FDA in the regulatory scheme in the United States.

13         So can you explain to the jury what kind of products

14  that the FDA regulates?

15     A.    Well, the FDA regulates, I think as we said yesterday,

16  foods, drugs, cosmetics, biologics -- that would be blood

17  products, vaccines, medical devices, and veterinary products in

18  terms of veterinary prescription drugs for animals.  The USDA

19  does animal foods, but -- so it's a wide group of products.

20         In terms of drugs, it would be your prescription drugs,

21  which is what we're talking about; over-the-counter drugs;

22  generic drugs.  There is some regulation of dietary supplements,

23  but not much.  But -- so it's a wide group.

24         Now, some of those the FDA looks at before they go on

25  the market, and those would be a smaller group.  Those would be

**OFFICIAL TRANSCRIPT**

1  pre-market review.  That would be drugs, prescription drugs,

2  medical devices, and biologics.  Other products go on the market

3  without an FDA review, and they become involved when there is a

4  safety issue.

5      Q.    Okay.  And we're still talking big-picture FDA here.

6  Are we literally talking hundreds of thousands of different

7  products regulated by the FDA?

8      A.    In some way, shape or form, yes.  They say -- I've

9  read, 25 percent of every dollar that consumers spend are usually

10  some product that the FDA has some role with.

11     Q.    And how is it determined which products are regulated

12  by the FDA?

13     A.    Congress determines the role of the FDA.  And so now

14  they're regulating tobacco.  So Congress is the one who sets up

15  what the FDA is going to regulate.

16     Q.    And how many total employees does the FDA have to

17  regulate or oversee these hundreds of thousands of different

18  products?

19     A.    I believe the last number I saw was about 14,000.  And

20  they are scattered all over the United States.

21     Q.    Now I want to reign this in, and let's quit talking

22  about big picture, all products, and let's focus on prescription

23  drugs.  Okay?

24         How many drugs do you know -- well, let me restate

25  that.

**OFFICIAL TRANSCRIPT**

1          Do you know how many drugs over which the FDA has an

2    oversight responsibility?

3          A.    I've seen the number 11,000.

4          Q.    And then what would that be comprised of?

5          A.    That would be in all the prescription drugs, generic

6    drugs, over-the-counter drugs.  So the FDA has some role with

7    each one of those products.

8          Q.    Is the entire FDA responsible for regulating

9    prescription drugs?

10         A.    No.  No.  It's just one center.

11         Q.    Okay.  And so there is a smaller group within the FDA

12   that has responsibility for the oversight of prescription drugs?

13         A.    Right.  And that's the Center For Drug Evaluation and

14   Research.  You might have heard people call it CDER.  That's the

15   center for drugs.

16         Q.    Okay.  And how many people at the FDA work in CDER?  Is

17   that how --

18         A.    "CDER."

19         Q.    How many people in the FDA work in CDER that are

20   responsible for regulating prescription drugs?

21         A.    There are about 1,300 people in CDER.

22         Q.    And so that's less than 10 percent of the FDA are

23   actually looking at drugs?

24         A.    Right.  And that would include everybody who is working

25   there.  Not all people are looking at new drugs specifically.

**OFFICIAL TRANSCRIPT**

1        **Q.**    So even within the group at FDA responsible for
2    regulating prescription drugs, is that group further divided into
3    smaller groups?
4        **A.**    Yes.
5        **Q.**    And so let's -- as I understand it, there is two broad
6    groups.  Let's talk about those.  What are those two groups?
7        **A.**    It would be your pre-market.  Those would be new
8    products, new drugs, getting approved.  And post-market, that
9    would be products that are being marketed.  That would be the
10   drug safety group.
11       **Q.**    And how many doctors work at CDER who are -- how many
12   of them are there who are responsible for reviewing the clinical
13   safety and efficacy of drugs?
14       **A.**    Well, I don't know how many specifically for that, but
15   there is only 300 doctors over all of CDER.  Some of that would
16   be management.  Some of that would be in generics and
17   over-the-counter.
18            So there is not -- of that 300, you'd break it down,
19   and they would be broken down into divisions.  And most divisions
20   for drug review would maybe have maybe five doctors at the most,
21   and maybe two or three are involved in reviewing a new drug
22   application.
23       **Q.**    So is it fair to say that each employee at CDER has a
24   responsibility for multiple drugs?
25       **A.**    Oh, yes.  Yes.  You're given paper -- you are given

**OFFICIAL TRANSCRIPT**

1  applications like this (indicating).  This is a standard-size
2  thing at FDA.  And you basically -- you're given that and you're
3  supposed to get it out, looked at, reviewed and out by a certain
4  time frame.  So that's -- basically, at CDER, all you're looking
5  at is paper that comes from the manufacturer.
6      Q.   And when you say something like that, that would just
7  be like one report?  That wouldn't be the entire application that
8  the medical reviewer was responsible for, would it?
9      A.   That's correct.  Because the clinical data could be
10 lots and lots of pages.  Now we're getting computerized so they
11 would have computer files.
12          But this would be a typical size of one document that a
13 reviewer might get, and then there might be other bound volumes
14 of clinical data to go with it.
15     Q.   So the reviewers aren't able to just focus on one drug,
16 are they?
17     A.   No.  You have -- your division, you're assigned
18 multiple drugs.  You're an expert.  You rely on the manufacturer
19 to be the expert and then you're the reviewer for CDER.
20          And so you have lots of drugs.  Whatever needs to get
21 approved in your division you get assigned to review.  So you
22 have to be fairly flexible as a medical reviewer.
23     Q.   So the jury heard yesterday from Mr. Jalota that he was
24 part of a team of hundreds of people that were focused on
25 Xarelto.  Is that consistent with what the FDA has, in your

**OFFICIAL TRANSCRIPT**

1   experience?

2       **A.**    No, no, no, no, because the FDA relies on the company

3   to be the expert.  And so you may have maybe one or two reviewers

4   who have reviewed your product.

5           But that's why the written -- remember I said yesterday

6   the written document is so important because reviewers change.

7   And so the written document of your review is what the next

8   reviewer might look at.  He may never have looked at this drug

9   before and he may have looked -- so it's -- you know, it's

10  just -- whatever you're assigned is what you have to do as a

11  medical reviewer.  So you're not the expert in that particular

12  drug.

13      **Q.**    And so based on your review of the documents in this

14  case, who had more resources working on Xarelto, Bayer and

15  Janssen or the FDA?

16      **A.**    The company, Janssen or Bayer.  I mean, they're the

17  ones wanting to sell the drug, and they have staffs of hundreds

18  of people that may be focused on that one particular drug.

19  That's why the FDA, in the way it's set up, is that it relies on

20  the manufacturer to be the expert.

21          The FDA reviewers are good and they're smart and they

22  are scientifically trained, but they're not the expert in the

23  drug they're reviewing.

24      **Q.**    Would it be a true statement to say that the FDA has

25  primary responsibility for the safety of drugs in the

**OFFICIAL TRANSCRIPT**

1    United States?

2        A.    No.  Each manufacturer is responsible for the drug they

3    sell to the public.  You get approved for marketing and for

4    various different things with the drug, but the manufacturer is

5    selling it so he has the day-to-day responsibility to be

6    monitoring it, to be making sure it is safe and effective, and

7    adequately labeled.

8        Q.    In your experience as a medical officer, who knows more

9    about the specifics of the drug, the FDA or the drug company, the

10   companies like Bayer and Janssen?

11       A.    The drug company.  They're required to.

12       Q.    Can you explain why it is that the companies would know

13   more than the FDA about the specifics of the drug Xarelto?

14       A.    Well, I mean, they have the staff -- they have the

15   research staff, they have the scientists, they have the people

16   who to do the clinical trials, oversee the clinical trials.  They

17   have a lot larger funding than the FDA has.  The FDA has a

18   regulatory role to approve things, but they rely on the company.

19   The company knows.  They sell the drug.

20            So even when you get approved, the company has the duty

21   to continue to monitor it, not the FDA.  The company has the duty

22   to update the labeling and tell doctors about how to use it

23   safely.

24            The FDA has a role as a gatekeeper.  They basically

25   allow new products on the market.  But they have limited

**OFFICIAL TRANSCRIPT**

1  resources, limited manpower.  They're not using the drug on
2  patients.
3      Q.   From your review of the internal company documents and
4  what you saw, you know, with the FDA documents, do Bayer and
5  Janssen have teams of people set up in different specialities on
6  Xarelto?
7      A.   Yes.  We're talking large teams, and they are very good
8  researchers and people.  So they're experts in their field that
9  work for the companies.
10     Q.   Why is a drug company responsible for the safety of
11 their drug?
12     A.   Because they're the ones selling it in the country.
13 It's -- you can't sell something in the United States that's not
14 safe and effective that's regulated by the FDA.  That would even
15 be Campbell's soup.  They couldn't sell soup that was not safe
16 for people to consume.
17          And so a manufacturer who is selling a drug has to be
18 sure that it's safe and effective and adequately labeled.  The
19 responsibility is not the FDA, it is the manufacturer.
20     Q.   Is one of those reasons because it's the company that
21 conducts the studies of the drug?
22     A.   Yes, they do all the studies.  The FDA doesn't do any
23 of the studies.  There is no FDA hospital doing clinical studies.
24 There's no doctors who are using the drug at the FDA.
25          It's all the company.  The company writes the

**OFFICIAL TRANSCRIPT**

1   protocols.  They pick who is going to use the drug.  They pick
2   how they are going to use the drug.  So they're the ones who are
3   involved, not the FDA.

4       Q.   So to give the jury a complete picture, the FDA has a
5   role in how the drug is studied, correct?

6       A.   They do have a role, yes, and it's defined in terms of
7   the process that goes on at the FDA, but it's a limited role.

8       Q.   Does the FDA have the power or the authority to tell
9   the drug company how to do a clinical trial?

10      A.   Well, they can tell them, but the final say as to how
11  to do a clinical trial belongs to the manufacturer, because
12  ultimately it's their drug and they're responsible for it.  And
13  they're the ones who design the clinical trials and conduct the
14  clinical trials, and the FDA can comment and say whether they
15  think something is going to get approved or not.  But,
16  ultimately, it comes to the manufacturer to do the clinical
17  trial.

18      Q.   And is there evidence you've seen in this case that
19  that occurred, that the FDA asked for certain studies and the
20  company refused to do it?

21      A.   Yes.

22          MR. BARR:  Can we have Plaintiffs' Trial Exhibit No. 4.
23  This has already been in the record.

24          Any objection to putting this up?

25          MR. DUKES:  I don't know what it is.

**OFFICIAL TRANSCRIPT**

1          MR. BARR:  It's the summary review.

2          MR. DUKES:  No objection, Your Honor.

3  **MR. BARR:  (CONTINUING)**

4      **Q.**  And is this a document that supports your view that the

5  FDA asked Bayer and Janssen to perform certain studies and Bayer

6  and Janssen told the FDA "no"?

7      **A.**  Yes.

8          MR. BARR:  If we could go to Page 9.

9  **MR. BARR:  (CONTINUING)**

10     **Q.**  Is there a part of this document --

11         MR. BARR:  Let's just blow up -- there we go.

12 **MR. BARR:  (CONTINUING)**

13     **Q.**  Can you explain to us, Dr. Parisian, what we're seeing

14 here.

15     **A.**  Well, remember I told you that they write a summary?

16 And this is part of the official record of the drug.  And so any

17 reviewer that comes on, this is what is there.  And it is

18 published on the FDA's website.  So this is the official record

19 of Xarelto and what the reviewers said who were reviewing it.

20         So when they talk about the division, this is the

21 division that is actually reviewing the drug Xarelto in terms of

22 the atrial fibrillation indication, which you've been hearing

23 about.  There are other divisions that review for other

24 indications.

25         So the division concurs with -- do you want me to read

**OFFICIAL TRANSCRIPT**

1  it?

2      Q.   I just -- explain to the jury what's happening here.

3  And let me set this up a little more.

4           This is a document released by the FDA at approval,

5  right?

6      A.   Yes.   FDA is required to provide the public with

7  the issues that were considered and why it approved a drug.   And

8  so it is a requirement of the FDA that this type of a document be

9  put out for the public.

10     Q.   And it is safe to say there was some dispute within the

11  FDA about whether or not Xarelto should even be approved?

12     A.   Yes.

13     Q.   And --

14     A.   Based on the documents.

15     Q.   And this is a memo written by Dr. Grant, the division

16  leader, right?

17     A.   He's the deputy leader.   So he would be the second in

18  command in terms of this division.   He is an administrative type,

19  but I believe he is a physician, too.

20     Q.   What he is pointing out in this section of the document

21  is that the division -- and what division are we talking about

22  here?

23     A.   We're talking about the cardiorenal, the people who are

24  looking at the atrial fibrillation indication.

25     Q.   And were there other division s looking at other

**OFFICIAL TRANSCRIPT**

 1   indications?

 2        A.   Yes, there was.  Like the hematology division was

 3   looking at the VTE, the blood clot indication.  So whatever your

 4   indication is, what you say, as the manufacturer, your drug is

 5   good for, that determines what division you go to.

 6            So it's not like one drug stays in one division and

 7   they work on it all the time.  It's the indication, what you're

 8   asking for, that determines where it gets sent to and who the

 9   reviewers are who are looking at it.

10        Q.   So Dr. Grant is laying out in this memo that, at the

11   time ROCKET was put together, the FDA did not feel like there was

12   adequate information to select the dose for ROCKET, right?

13            MR. DUKES:   (Non-audible movement.)

14            THE COURT:   Sustain the objection, leading.

15            Restate it, please.

16   MR. BARR:   (CONTINUING)

17        Q.   Can you explain what Dr. Grant -- just explain this

18   first section that is highlighted.

19            MR. DUKES:   I'll renew our objection with regard to

20   Rules 401 and 403 with regard to dosing issues and would ask for

21   a continuing objection.

22            THE COURT:   All right.  Just for thoroughness I'll

23   overrule those.

24   MR. BARR:   (CONTINUING)

25        Q.   So can you explain what Dr. Grant is saying in this

**OFFICIAL TRANSCRIPT**

1  first section.

2      A.   He is saying that the company -- that would be the

3  manufacturer -- what do they call them?  The applicant, that

4  would be Janssen -- chose to use only one dose.

5           And so the first paragraph that is highlighted there is

6  talking about that -- typically, you would do a study like this

7  and you would look for a dose.  You would look for the one --

8  which dose works best in terms of the clinical study.  The

9  applicant -- that would be Janssen -- chose to study -- do the

10  ROCKET study with only one dose to try to get one dose approved.

11     Q.   And does Dr. Grant indicate whether or not the FDA

12  agreed with that decision?

13     A.   No.  The FDA actually wanted them to do multiple doses.

14     Q.   And did Dr. Grant indicate that the FDA had the

15  authority to force Bayer and Janssen to study other doses?

16     A.   Well, he says in that last highlighted area there that

17  they did not have the authority to require a manufacturer to

18  study multiple doses, which means, if Janssen wants to sell it at

19  one dose, then Janssen can do a study for one dose.

20          So the FDA can't say, no, we want you to do two doses,

21  because the manufacturer's responsible for setting up their

22  clinical trial, not the FDA.

23          So he is saying that they didn't have the authority to

24  require them to do multiple doses the way ROCKET was designed.

25  So it is -- it was -- the company is trying to get approval for a

**OFFICIAL TRANSCRIPT**

1   specific indication.  They chose, Janssen, to only study one dose

2   in ROCKET.

3       Q.   So what are the responsibilities of a drug company

4   before it places a drug on the market?

5       A.   To ensure that it's safe and effective for a specific

6   indication and that it's adequately labeled.  Because you're

7   prohibited, as a manufacturer, from selling a product that's not

8   safe, effective, and adequately labeled.

9            So that's the role of the manufacturer.  And,

10  typically, when a manufacturer gets approved to put a new drug on

11  the market, the only data they have, really, is efficacy data.

12  There is not that much safety data, but efficacy showing you are

13  effective for a specific indication.

14      Q.   Is there an obligation to ensure the drug has an

15  adequate label to ensure that users of that drug are adequately

16  warned?

17      A.   Yes.  That's the manufacturer's role.  Part of the NDA

18  process is that the manufacturer is required to write a label.

19  FDA can comment on the label, but the source of the label comes

20  from the manufacturer.

21      Q.   Once a drug is actually put on the market, are there

22  additional responsibilities on the drug company?

23      A.   Yes.

24      Q.   And what are those?

25      A.   Well, one is to continue to monitor.  You get approved

**OFFICIAL TRANSCRIPT**

1    to go onto the market because you did a clinical study, which is

2    a small group of patients.

3            Now, this drug is intended to be given to a larger

4    group of patients for a longer period of time than would have

5    been in the clinical trial, so new safety issues can occur.  And

6    so part of the condition for your approval and being able to

7    market a product is you continue to follow the drug and update

8    the label as needed in order to make sure that the drug label

9    stays safe and effective.

10           So the FDA approves the initial label, but that's only

11   based on, in this case, ROCKET and, also, the VTEs, the

12   indication from before.

13           But -- so Janssen has a duty to continue to monitor and

14   to make sure that all the information about it is -- makes it so

15   that it will be safe for the public.

16   **Q.**   And so as new information is learned, if it is

17   important safety information, there is an obligation on behalf of

18   the company to update the label?

19   **A.**   Right.  And they're permitted to do that because

20   they're responsible for how the drug performs.

21   **Q.**   And we'll get into how they do that here shortly.

22           Is the FDA -- when they're conducting their review of a

23   new drug application, is the FDA under any time constraints in

24   their review of that application?

25   **A.**   Yes.

**OFFICIAL TRANSCRIPT**

1    **Q.**   And so explain what the time constraints are on the FDA

2    in conducting their review of a drug application.

3           MR. DUKES:  Your Honor, I would just object to the

4    extent it's general, out in space, and I would not have an

5    objection if it was directed to the Xarelto group.

6           THE COURT:  Let's see if you can focus it.

7           MR. BARR:  I can narrow it.

8    **MR. BARR:   (CONTINUING)**

9    **Q.**   Was the cardiorenal division with Xarelto under any

10   time constraints in their review of the Xarelto NDA for the AFib

11   application?

12   **A.**   Yes.  There is what they call a PDUFA date,

13   Prescription Drug User Fee Act, PDUFA.  And so every application

14   that comes in to get reviewed by the FDA is given a date that the

15   review has to be completed by the FDA's division.  So everybody

16   in the FDA who is reviewing new drug applications has to meet

17   those PDUFA dates; otherwise, they get into trouble.

18   **Q.**   So explain how the PDUFA date -- explain how that was

19   developed.

20   **A.**   The PDUFA date -- you know, government loves names like

21   that, PDUFA -- came from a --

22   **Q.**   What does it stand for?

23   **A.**   It stands for Prescription Drug User Fee Act, which was

24   an act in 1992 where the -- FDA had been -- up to that period of

25   time, it had thought that the FDA had been delaying approval of

**OFFICIAL TRANSCRIPT**

1   new drugs, so in 1992, Congress and -- with the agreement of the

2   prescription -- the pharmaceutical industry, agreed that there

3   would be annual payment to the FDA in return for the FDA

4   improving their efficiency for getting the products out quicker

5   in terms of new drug applications.

6          The regulations say that there is a benefit to the

7   public to have new drugs and to have them approved more quickly.

8   And so in return for getting drugs approved within certain time

9   frames, the industry, pharmaceutical industry, agreed to pay the

10  fees to the FDA.

11         It doesn't -- if you pay a fee, it doesn't mean you get

12  approved, but you have to pay a fee to submit an application.

13  And it's supposed to speed up the FDA's turnover time in terms of

14  new drug approval.

15         And so that is now -- since 1992, everything that comes

16  in that needs to have something reviewed has a PDUFA date, which

17  is the date that the FDA reviewer and division has to have that

18  document completed.

19     Q.   And Xarelto had a PDUFA date, right?

20     A.   Yes, it did.

21     Q.   And was that PDUFA date November 4, 2011?

22     A.   Yes.  So the FDA is working to try to get the approval

23  of the drug completed by that PDUFA date.

24     Q.   And so the NDA for Xarelto was submitted in January of

25  2011 for the AFib indication?

**OFFICIAL TRANSCRIPT**

1      **A.**   I think so.

2      **Q.**   And it had a PDUFA date of approximately 11 months

3    later?

4      **A.**   That's right.

5      **Q.**   And so the FDA had 11 months to conduct their complete

6    review of this application?

7      **A.**   Right.

8      **Q.**   Are there repercussions for the medical reviewers if

9    they don't meet the PDUFA deadline?

10     **A.**   Yes.  It's held against you in terms of your annual

11   review.  If you consistently don't make your PDUFA dates, that is

12   held against you in terms of your future employment or what

13   happens to you in terms of the FDA.  If you want to move up the

14   chain, you need to make your PDUFA dates.

15          It's also held against the division if they don't make

16   their PDUFA dates.

17          And then it's held against the FDA because periodically

18   it goes before Congress and it has to show that it has been

19   making its PDUFA dates, and so that is then a part of the

20   negotiation for more fees from the pharmaceutical industry.

21          So it's like this chain.  Everybody has to make your

22   PDUFA dates or you're -- it's held against you.

23     **Q.**   And for the group within the FDA responsible for drug

24   safety, what percentage of their budget comes from PDUFA

25   application fees?

**OFFICIAL TRANSCRIPT**

1        **A.**    Well, now it's up to about 47 percent.  So 47 percent

2   of the FDA's budget for new drug approvals comes from PDUFA fees.

3   In 2007, some of that money, I think 7 percent, was given to drug

4   safety.  So the main bulk of PDUFA goes to new drug approval.

5        **Q.**    Okay.  So let's move on from talking about the FDA, and

6   let's talk specifically about Xarelto.

7             When was Xarelto approved for the atrial fibrillation

8   indication by the FDA?

9        **A.**    November 2011.

10       **Q.**    And what clinical trial provided the basis for that

11   approval?

12       **A.**    Well, the basis for that approval is ROCKET, which

13   you've heard about ROCKET.

14       **Q.**    Okay.  So can you give just a broad view of what ROCKET

15   was, how it was designed, what it was intended to do?

16       **A.**    Okay.  Broad view.

17             It was multinational so it was not just conducted in

18   the United States.  It was comparing the dose that was chosen by

19   Janssen, which was a 20-milligram dose, a once-a-day dose, to

20   warfarin control.  Warfarin was used as your basic control in

21   terms of patients who have an atrial fib, nonvalvular atrial fib.

22             And there was 7,000 warfarin patients versus 7,000

23   Xarelto patients.  And it is called a noninferiority trial.  It

24   means that you are showing that your drug is not -- is not

25   significantly worse than the other drug.  So it's a study that

**OFFICIAL TRANSCRIPT**

1   is -- a particular type of study that FDA uses and industry uses,

2   noninferiority, and it was -- but that design of that study has

3   been used for other anticoagulants but it is always based on

4   well-controlled populations with warfarin.  So this one was

5   actually -- so the population control of warfarin was kind of

6   different than is seen in other studies.

7         So it is basically one drug versus the other looking to

8   see if you could prevent emboli, systemic emboli, in ischemic

9   stroke, and that you weren't significantly worse than the other

10  product.  "Worse" would be more bleeding, more risk.

11  Q.   Okay.  I want to talk for a minute about a

12  noninferiority study and what that means.  Is there a -- I think

13  you said it has to show that it's not worse than?  How did you

14  phrase that?

15  A.   Right.  It's -- it can be worse than.  You can have

16  more risks.  But you set a -- that it can be no worse than

17  something, and the company sets what that something is.  So you

18  don't have to be better.  A lot of drugs are approved this way,

19  that you just show that you have to not be significantly worse

20  than the other drug.

21  Q.   So the company sets what that noninferiority margin is?

22  A.   That's right.

23  Q.   And you mentioned this.  What was the comparator drug

24  for Xarelto in the ROCKET trial?

25  A.   It would be well-controlled warfarin, which is --

**OFFICIAL TRANSCRIPT**

1  Coumadin is another name for it.  And it's a -- it's the

2  traditional drug that has been used for patients with atrial fib

3  to try to reduce blood clots.

4       Q.   And what were the results of the ROCKET trial?

5       A.   Well, one of the -- one of -- it got approved.  So it

6  met its noninferiority, but the problem was that the warfarin

7  population was not well-controlled.  So that makes it difficult

8  when you have a noninferiority study and the control arm is not

9  well-controlled.

10            So it did get approved as a noninferiority.  I think

11  the main group that showed a benefit was -- the hemorrhagic

12  stroke population did better in Xarelto than warfarin, the

13  bleeding stroke patients.

14       Q.   And based on the results of the ROCKET trial, were

15  Bayer and Janssen allowed by the FDA to tell doctors and patients

16  that Xarelto is safer or more effective than warfarin?

17       A.   No.  No, because it didn't show that.  It showed that

18  it was noninferior to a certain degree.  It didn't show

19  superiority, so it -- and it also had to have the caveat that it

20  was poorly controlled warfarin.  So it is noninferior to a

21  population of poorly controlled warfarin.

22       Q.   And, Dr. Parisian, the jury has heard about some other

23  drugs in the NOAC class.  Has the FDA allowed the makers of those

24  drugs, primarily Pradaxa and Eliquis, to tell doctors and

25  patients that their drugs are safer or more effective than

**OFFICIAL TRANSCRIPT**

1  warfarin?

2     A.    Yes, they have, because they did almost the same design

3  and they actually showed noninferiority and then they reviewed

4  their data and their data showed superiority.  So they are

5  allowed to have that claim in terms of they are superior to the

6  warfarin group.

7     Q.    So if you were to describe the nature of Xarelto's

8  approval for the AFib application, how would you describe it?

9     A.    That it's not -- that it's a drug that FDA has

10  approved, but it's not been compared to a good population of

11  warfarin.  So it's noninferior to a poorly controlled warfarin,

12  which confuses the issue because this type of a study is supposed

13  to have well-controlled warfarin.

14     Q.    All right.  So we have talked about how many employees

15  at FDA and CDER are responsible for reviewing the safety and

16  efficacy of the drugs.  Now let's talk about how many reviewers

17  were responsible for reviewing the safety and efficacy of

18  Xarelto.

19            And from your review of the documents, how many primary

20  reviewers were responsible for reviewing the AFib indication

21  application for Xarelto?

22     A.    Well, there is a team of different types of

23  specialities, but for the clinical review there were only two

24  doctors that were -- one was involved with safety and one was

25  involved with looking at efficacy.

**OFFICIAL TRANSCRIPT**

 1          MR. BARR:  Can I put back up Plaintiff Trial

 2   Exhibit No. 4, which is 5767781.

 3   **MR. BARR:  (CONTINUING)**

 4      **Q.**   And this is the summary review, again, right, Doctor?

 5      **A.**   Yes.

 6      **Q.**   Okay.  If we look on Page 2 of this, does this indicate

 7   to you who the primary clinical reviewers were?

 8      **A.**   Yes.

 9          MR. BARR:  And can we blow out that box.

10   **MR. BARR:  (CONTINUING)**

11      **Q.**   And so who were the primary clinical reviewers for

12   Xarelto?

13      **A.**   Martin Rose and Preston Dunnmon.  They are both

14   physicians.  And they both presented at the advisory committee

15   about it.

16      **Q.**   Okay.  And so let's -- can you give me a little bit

17   more detail about what a primary clinical reviewer is and their

18   importance in the review of a drug application?

19      **A.**   Well, a primary clinic -- usually there is only one.

20   For this one, they actually gave them two.  And they're

21   responsible for looking at all the clinical data and to make a

22   recommendation for approval or not approval based on their review

23   of the data.

24          In this particular case they were focused on ROCKET,

25   the ROCKET study.  And so they are the ones responsible for

**OFFICIAL TRANSCRIPT**

1  putting the data together and making a clinical review based on
2  what they know the requirement is for approval in terms of the
3  FDA.

4          And so those would be the most knowledgeable.  Like I
5  said, this is double.  Usually it is only one.

6     Q.   And in your experience as an FDA medical officer, would
7  it be fair to say that Dr. Rose and Dr. Dunnmon know more about
8  the safety and efficacy of Xarelto than anyone in the FDA?

9          MR. DUKES:  Objection.  Her experience was over two
10 decades ago primarily with medical devices and not drugs.

11         THE COURT:  I saw that.  You can make it generic with
12 regard to --

13         MR. BARR:  I'll do that.

14 MR. BARR:  (CONTINUING)

15    Q.   In your experience with the FDA, do the clinical
16 reviewers know more about the safety and efficacy of the
17 application they are reviewing than anyone else in the FDA?

18    A.   That is what -- they are required to, yes, sir.  So
19 they would be the ones who would have to respond to any questions
20 about it, and that's why they presented at the advisory panel.

21    Q.   And based on Dr. Dunnmon and Dr. Rose's review of the
22 AFib application for Xarelto, what did these two reviewers
23 conclude regarding Xarelto?

24    A.   They recommended against approval mainly because of
25 their concern about the control of the warfarin arm.

**OFFICIAL TRANSCRIPT**

1      **Q.**    And is that view of theirs reflected in this summary

2  review?

3      **A.**    Yes.

4            MR. BARR:  Can we go to Page 3 of this.  And can we

5  blow out.

6  **MR. BARR:  (CONTINUING)**

7      **Q.**    So does this document state that the primary clinical

8  reviewers did not believe that this indication should be

9  approved?

10     **A.**    Right.  And the first bullet underneath that is about

11 the control of the warfarin arm.

12     **Q.**    So if -- we want to blow that out so you can point that

13 out.

14            So is this supporting your view on what the thoughts of

15 these reviewers are?

16     **A.**    Right.  They were concerned about the ROCKET study and

17 the lack of a good control of the warfarin arm, because -- see,

18 the main safety issue is going to be bleeding.  So if you have a

19 warfarin arm with poor control, that population is at increased

20 risk for bleeding.

21     **Q.**    And so -- but despite the recommendation of Dr. Rose

22 and Dr. Dunnmon, ultimately the application was approved by the

23 FDA, correct?

24     **A.**    Yes.

25     **Q.**    Now, in your opinion based on your time at the FDA, do

**OFFICIAL TRANSCRIPT**

1   you think it's exceptionally rare that when the two -- when the

2   clinical reviewers who know more about the safety and efficacy of

3   a drug would recommend against approval, that it would still be

4   approved?

5              MR. DUKES:  Your Honor, objection.  Again --

6              MR. BARR:  I tried to make that broad.  I'll restate

7   it.

8              MR. DUKES:  Thank you.

9   **MR. BARR:  (CONTINUING)**

10      **Q.**   In your opinion based on your time at the FDA, if the

11  clinical reviewer, who knows more about the safety and efficacy

12  of the drug, recommends against approval, has the agency gone on

13  to approve the drug anyway?

14             MR. DUKES:  Your Honor, objection.  Her experience with

15  the FDA was over two decades ago.  It was with medical devices.

16  I believe she testified before she did not work on new drug

17  applications for prescription drugs.

18             THE COURT:  Well, you can cover that on

19  cross-examination.  I'll allow her to give the opinion.  I think

20  that that goes to her credibility or goes to the weight of her

21  evidence which you can cover.

22      **A.**   It is unusual.  I mean, I've been looking at

23  applications for 20 years and this is unusual.  Typically they

24  would ask for additional information, they would have taken a

25  different route.  Not approve it.

**OFFICIAL TRANSCRIPT**

1  **MR. BARR:  (CONTINUING)**

2       **Q.**   I want to move -- change topics on you again.

3            I realize -- you've got a number of opinions in your

4  report up there --

5       **A.**   Yes.

6       **Q.**   -- that we're going to talk about.  But I want to get

7  just the basic opinions now, okay?

8                 MR. DUKES:  Your Honor, excuse me.  May we approach?

9                 THE COURT:  Yes.

10                        **SIDEBAR ON THE RECORD**

11            MR. DUKES:  Your Honor, in order to be efficient, I

12  would like to renew our 702 objections, and I'll specify those

13  and ask for a continuing objection for the ones that are

14  overruled.

15                 THE COURT:  Okay.

16            MR. DUKES:  Number one is a new objection.  I

17  anticipate, based on the plaintiffs' theme in the case, that they

18  may ask her for an opinion about utility of PT testing in the

19  emergency room.  There is no opinion in her 400-page report about

20  that, and there are no answers or opinions in her deposition

21  about that.  So I would object to that.

22            I've looked at it.  I've had younger, smarter people

23  than me look at it, and we can't find it.  So that's number one.

24            THE COURT:  If it's not included in the opinion, I'm

25  not going to let her do it.

**OFFICIAL TRANSCRIPT**

1          MR. BARR:  Your Honor, she has extensive opinions about

2    PT in her report and about how it can be used to assess the

3    anticoagulant effect.  That is written throughout her report.

4    And the emergency room use of that is part and parcel of the

5    entire thing.  That's the whole point of what this case is about.

6          MR. DUKES:  Your Honor, what she says -- and this is a

7    quote from her deposition.  She does talk about PT.  She talks

8    about it in the context of the themes in Boudreaux.  And her

9    answer is (as read):  Just get a PT occasionally.  Not every day.

10   Not every month.  But just get a PT and find out what -- how long

11   has the PT been prolonged in this particular patient, and do I as

12   a doctor need to consider that I might need to change from

13   Xarelto to something else?  Do I need to maybe cut the dose down

14   because perhaps they are not handling it right.

15         That is Parisian deposition, Page 612, Line 3

16   through 613, Line 1.

17         That was what she was asked -- when you take the

18   totality of 400 pages of the document about what the company knew

19   about PT and they were monitoring PT, this is her summary of her

20   PT opinion.

21         Now, she has three opinions in which she mentions PT,

22   No. 6, No. 7, and No. 11.

23         No. 6 talks about prescribing the drug.

24         No. 7 talks about prescribing the drug.

25         No. 11 says:  Xarelto label is inadequate because it

1    fails to include adequate instructions on helpful laboratory

2    testing on PT time.

3          When she was asked to explain that, she gives the

4    answer that I just read.  Nothing in here about using this in an

5    emergency or for emergent health.

6          MR. BARR:  But, Your Honor, again, the whole point of

7    this is that PT is a helpful laboratory test.  She talks a lot

8    about the pharmacodynamics in her report.  I don't think it's

9    fair to point to one question and answer in her deposition.  She

10   has a 400-page report on this.  It is clearly -- they were on

11   notice that this is in her report.

12         THE COURT:  Yeah, you know, the situation with the

13   report always is, at least if she covers an area in her report,

14   and specific questions are in the area, she doesn't have to

15   answer each question.  If she brings up the area of -- an area

16   and makes some comments about the area, generally that area is

17   able to be -- the parties are able to get into it.

18         It's if nothing is mentioned about a particular area

19   and it's a new area that she brings up, then that's out of

20   bounds.

21         But if she discusses an area in her report, it's hard

22   for anybody to expect her to answer every question that either

23   the questioner is going to ask or the cross-examiner is going to

24   ask.

25         So I understand, and I'll make your objection

**OFFICIAL TRANSCRIPT**

1   continuing.

2          If she discussed PT in her report, I'll allow PT to be

3   gone into.  If she doesn't discuss it, then it is out of bounds.

4          MR. DUKES:  I understand.

5          Number two, our objection is offering opinions about

6   evidence of what companies did or what they put on Xarelto's

7   label in other countries in order to comply with foreign

8   regulatory bodies or agencies.

9          MR. BARR:  Unless somehow that door is open, I'm not

10  walking down it.  I don't want to relive yesterday.

11         THE COURT:  Yeah.

12         MR. DUKES:  Number three is offering opinions about

13  what a treating doctor would find useful in the Xarelto label

14  because she has never prescribed Xarelto, she doesn't even treat

15  patients since the late 1980s, and she is not trained to treat

16  the conditions Mrs. Orr had.

17         MR. BARR:  Your Honor, she is a regulatory labeling

18  expert, she knows what the regulations are and what they require.

19         THE COURT:  I think it is a legitimate area and you

20  ought to be able to cover it on cross, but I don't think it's

21  something I can stop her from testifying about.

22         I think it's a question of whether or not she is

23  credible in that type of situation, and that can be done on

24  cross.

25         MR. DUKES:  Your Honor, objection number four is

**OFFICIAL TRANSCRIPT**

1 offering an opinion on claims that plaintiffs have expressly
2 abandoned, particularly the failure to test the absence of the
3 black box warning and the dosing issues.
4          THE COURT:  This is an area that I struggled with over
5 the period of cases.  The plaintiffs' claim is a failure to warn.
6 Those areas oftentimes are treated, and -- other aspects of it
7 are an improper design or something of that sort.
8          But this case is such that it has some relevance in the
9 characteristics of the drug, and if a drug -- it's one type of
10 drug.  If it has an antidote, then certain things -- that's a
11 part of a characteristic of it.  If it doesn't have an antidote,
12 it's another characteristic.
13          If it has a black box warning, that's a characteristic.
14 If it doesn't, it's --
15          So it's part of the characteristic of the drug, a
16 dangerous characteristic, which the warning has to take into
17 consideration in warning.  So it's --
18          I understand the objection, and it's a legitimate
19 objection, but it has -- you can't deny the fact that it has to
20 do with a characteristic, and for that reason I have been
21 allowing it and will continue to do so.
22          MR. DUKES:  Your Honor, number five, our objection is
23 offering opinions about a reversal agent or an antidote because
24 this is a warnings case.
25          THE COURT:  Yeah, I agree.  It's the same type

**OFFICIAL TRANSCRIPT**

1  situation.  This is a nonantidote drug, which may or may not be
2  significant, but it's part of the whole characteristic of the
3  drug.  And we know that there is no antidote, and the plaintiffs
4  say you have to be told something to understand whether or not
5  the drug is present.
6          And part of -- that theory has to be accepted by the
7  jury, but that's the point of -- that is their theory.  And it is
8  based on the fact that there is no antidote.  So based on their
9  theory, if the drug has an antidote, you just give the antidote
10 and you knock it out.  This one doesn't.
11         So their theory is, since it doesn't have an antidote,
12 you have to say something about how do you tell them when
13 somebody comes in comatose and you don't know whether they took
14 the drug or not?  That's their theory on it.
15         MR. BARR:  Stated very well.
16         MR. MEUNIER:  Can we use that for closing?
17         MR. DUKES:  Your Honor, I would ask for continuing
18 objections on all those various --
19         THE COURT:  Yeah, I'll make those continuing.  And I
20 appreciate counsel making that so that we don't have to
21 interrupt.
22         But I will make them continuing and I will assume that
23 they are made at the appropriate time and explained in an
24 articulate way.
25         MR. BARR:  We agree with that.

**OFFICIAL TRANSCRIPT**

1     MR. MEUNIER:  Thank you.

2     MR. DUKES:  Based on cross-examining Dr. Parisian four

3 or five times in court, I anticipate some speculative answers and

4 some legal conclusions, and I'll raise those objections --

5     THE COURT:  Yeah.  And not only that, but call my

6 attention to it and maybe I can help you out and make sure --

7 direct her.

8     MR. DUKES:  Yes.  Thank you, Your Honor.

9     MR. BARR:  You think you have covered that enough?

10 That's three times you've said that now.

11     MR. DUKES:  Well, I'm not sure I've covered it enough.

12             **AFTER THE SIDEBAR IN OPEN COURT**

13     THE COURT:  You may proceed.

14     MR. BARR:  Thank you.

15 **MR. BARR:  (CONTINUING)**

16     **Q.**  Dr. Parisian, when we start talking about your

17 opinions, I'm going to ask that you only provide me your opinions

18 to the extent that you hold them to a reasonable degree of

19 scientific and medical certainty.

20     Can you agree with that?

21     **A.**  Yes, sir.

22     **Q.**  Do you have an opinion as to whether or not Bayer and

23 Janssen used reasonable care in warning of the foreseeable risks

24 with Xarelto?

25     **A.**  Yes, I do.

**OFFICIAL TRANSCRIPT**

1     Q.   What is that opinion?

2     A.   No, they did not.

3     Q.   Do you think the defendants were reasonable in telling

4  doctors about the safety profile of the drug Xarelto?

5     A.   I do have an opinion, yes, sir.

6     Q.   And what is that opinion?

7     A.   No, they did not.

8     Q.   Is your opinion informed or based in part by how the

9  defendants conducted the ROCKET study?

10    A.   Yes.

11    Q.   Do you have an opinion as to whether the defendants

12  appropriately conducted and reported the ROCKET clinical trial?

13    A.   Yes, I have an opinion.

14    Q.   What is that opinion?

15    A.   No, they did not.

16    Q.   Do you have an opinion as to whether the defendants

17  failed to use reasonable care in providing adequate warnings and

18  instructions to doctors for the safe use of Xarelto?

19    A.   Yes, I have an opinion.

20    Q.   What is that opinion?

21    A.   No, they did not.

22    Q.   And specifically with regard to information regarding

23  helpful laboratory tests, what is that opinion?

24    A.   I have an opinion that they did not provide that

25  information to physicians.

**OFFICIAL TRANSCRIPT**

1    **Q.**   Okay.  So those are your broad opinions that you plan

2  on offering to the jury, correct?

3    **A.**   Yes.

4    **Q.**   So let's kind of get into the meat of this, and I want

5  to start by talking about what a drug label is and how it's used.

6  Okay?

7    **A.**   Okay.

8    **Q.**   What is a product insert or drug label?  Can you just

9  explain that to a jury?

10   **A.**   That is described -- the format comes from the FDA, but

11 it is to provide the physician or the prescriber -- it can be

12 anyone that the state licenses to prescribe -- with information

13 on how to use that drug safely and effectively and how to protect

14 the public, basically.

15   **Q.**   Who is it written by?

16   **A.**   It's written by the manufacturer.  The FDA has a

17 process, 21 CFR 201.57, where they describe what a drug label

18 should look like, the components for it.

19          Each part of that is written by the manufacturer

20 because they have the drug, because they know the most about

21 their drug, and they have the responsibility to have an adequate

22 label.

23   **Q.**   Is the drug label actually copyrighted?

24   **A.**   Yes.  By the manufacturer.

25   **Q.**   And do you have an example that we can show the jury?

**OFFICIAL TRANSCRIPT**

1      A.    Sure.

2            MR. BARR:  Can I get Defendant's Exhibit 6, which is

3  Trial Exhibit No. 2.

4            Can we go to the end of this.

5  **MR. BARR:  (CONTINUING)**

6      Q.    Does this document reflect a copyright by one of these

7  drug companies?

8      A.    Yes, because it is Janssen's label.  It's not the FDA's

9  copyright, it's the company's copyright.

10     Q.    Now, from a regulatory perspective --

11           MR. BARR:  We can take that down.

12 **MR. BARR:  (CONTINUING)**

13     Q.    -- is there a difference between the term "the label"

14 and "labeling"?

15     A.    Yes.

16     Q.    What is that difference?

17     A.    The label, when you're talking about a drug, would be

18 like that product insert.  It is what comes in drugs in the

19 bottle or what is in the *PDR*.

20           Labeling is much broader.  It's anything written.  It's

21 orally said.  It comes from the manufacturer.  And so it's

22 anything about that product that the manufacturer generates.

23           So that's -- labeling would be your marketing

24 information, Dear Doctor letters.  Anything that the company puts

25 out in terms of advertising, it would be described under

**OFFICIAL TRANSCRIPT**

1   21 CFR 202.1.

2         So there is -- it's much broader than just the label.

3   But the label is required to be adequate and to provide the

4   information that the drug can be used safely.  So they're two

5   different things.

6         The labeling -- but the label sets what can be said in

7   marketing in terms of what something has been approved for and

8   what the company can claim about their product in their

9   marketing.

10      Q.   Would labeling include medical seminars put on by the

11  drug companies?

12      A.   Yes.  Anything that is involved with the manufacturer

13  has to be consistent with the way the product is approved, and

14  the label sets what it is approved for.

15      Q.   So if I understand what you've just said, the labeling

16  must be consistent with the information in the label?

17      A.   Right.

18      Q.   So would you agree with me that the label, the label

19  itself, is the most important mechanism for a drug company to

20  communicate important information to doctors?

21      A.   Well, it's not the most, but it is the one that is

22  required for all manufacturers.  Manufacturers can always issue

23  out Dear Doctor letters and update their information.  But it is

24  the starting point of what that product can be sold for in the

25  United States.

**OFFICIAL TRANSCRIPT**

1  **Q.**   It's the foundation of all of the information that the
2  drug company puts out?

3  **A.**   That's right.

4  **Q.**   Who has responsibility for the content of the drug
5  labeling?

6  **A.**   The manufacturer.

7  **Q.**   Is the FDA involved?

8  **A.**   Yes, the FDA has a role.  They approve the final label
9  that goes out to show that -- it represents the information that
10 was actually reviewed by the FDA.

11      And so the FDA tries to negotiate a label that is good
12 for the public.  But the ultimate -- even when you negotiate, the
13 manufacturer can say, "Yes" or "No, I don't want that."

14      So the manufacturer has the ability.  The FDA does
15 approve the final label.  But it is a negotiation process.
16 Usually, it's about the time the PDUFA date is coming up that
17 it's negotiated as to what is going to go into the label.

18  **Q.**   So the PDUFA date continues to apply even while
19 labeling negotiations are going on?

20  **A.**   Yes.  So the only one under the time gun is the FDA.
21 They have to hit their PDUFA date.  So, unfortunately, what is an
22 important document is usually negotiated right at the very end
23 when the FDA is trying to get their work completed.

24  **Q.**   And is this labeling negotiation like most
25 negotiations, a give-and-take?

**OFFICIAL TRANSCRIPT**

1    **A.**   Yeah.  Yes, it's a negotiation.  The manufacturer is

2    responsible with the ultimate say to ensure they have a safe

3    label.

4         The FDA tries to get what they can into the label, and

5    they have some ability to make sure that the clinical trial is

6    described.  The FDA got in that the clinical trial showed that it

7    was poorly controlled warfarin.

8         So -- but it is a negotiation process with the FDA on a

9    time frame, and the manufacturer has the ability, particularly if

10   they're marketing the drug, to say yes or no.

11   **Q.**   If a company really believes that important safety

12   information needs to be in the label, do they have an obligation

13   to push for that information to be in the label?

14   **A.**   Yes.  And Janssen did that, and particularly in the VTE

15   label.  They wanted a certain line back in and they got it back

16   in.  So the manufacturer has the ability.

17        And if they think it is essential for them to be

18   selling a drug that is not misbranded, then they have a duty to

19   put it in writing and ask to put something in or not.  So they

20   can fight to get something in the label.

21   **Q.**   Does the drug company have an obligation to stay

22   up-to-date and current with respect to the safety of a drug?

23   **A.**   Yes.  That's part of your condition of approval, is

24   that you continue to monitor your drug.  They call it

25   pharmacovigilance, continue to watch your drug.  And part of that

**OFFICIAL TRANSCRIPT**

1   requires looking at the literature for similar products, for your

2   product, reporting to the FDA.

3           So, yes, they have a duty after they're approved to

4   continue to watch their drug to make sure that the public is

5   safe.

6           Because, once you get approved, more people are going

7   to take the drug, hopefully, if you have a good drug.  And so

8   that is their duty, is to find out what happens when you give it

9   to more people than in the clinical trial.

10      Q.   And that obligation continues as long as the drug is on

11  the market?

12      A.   As long as you sell that drug, you have a

13  responsibility to protect the public, yes.

14      Q.   Does that obligation stop at the point of approval?

15      A.   No, no.  It actually begins because you're in a

16  controlled situation with clinical trials, but now you're

17  marketing it across the United States.

18          And this is a drug, Xarelto, that is going to be given

19  to people forever, chronically.  And so you have -- you're going

20  to have much more data coming in than you would in ROCKET, which

21  was only 19 months of data.

22      Q.   And as a drug company learns new safety information

23  about a drug, are they required to change the labeling?

24      A.   Right.  Because, I mean, the bottom line is you want

25  patients safe.  And so, yes, you're required to change the label.

**OFFICIAL TRANSCRIPT**

1  You can also send out Dear Doctor letters.  You can also tell
2  your key opinion leaders in conferences.
3        So there are lots of ways for manufacturers to get the
4  information out, but they are required to update their label.
5      **Q.**   Does a drug company have the ability to change the
6  warnings in their drug label?
7      **A.**   Yes.
8      **Q.**   Without FDA approval?
9      **A.**   Yes.  If you had to wait for FDA approval, people could
10 get killed waiting for the FDA so there is the mechanism that
11 Congress, in their wisdom, put in there that manufacturers can
12 immediately change the label that they are circulating and the
13 information.  It is called Changes Being Effected.
14       And you can strengthen and improve warnings.  You can
15 also delete false and misleading information that was put in an
16 FDA-approved label.
17       So the manufacturer still has the control to protect
18 the public with their label.
19     **Q.**   There was discussion about this yesterday.  Can a drug
20 company always strengthen the warnings in its label?
21     **A.**   Yes.
22     **Q.**   Explain to the jury how a drug company can do that.
23     **A.**   It's called -- it's an NDA supplement called a special
24 supplement.  It's called Changes Being Effected, 21 CFR 314.70.
25 And it's a process that allows you to circulate an updated label

**OFFICIAL TRANSCRIPT**

1  with strengthened warnings.

2       You're going to have to submit it to the FDA.  FDA is

3  going to approve it, but you have to -- but you can change the

4  label before that in order to protect the public.  If you had to

5  wait for the FDA, people could get hurt.  And they could also

6  communicate directly with doctors outside the label.

7       So the label -- yes, they can change their label, but

8  you have a duty to communicate information even faster with your

9  sales reps, your key opinion leaders, your Dear Doctor letters,

10 important drug information.  They have other mechanisms.

11      But to change the label, they can change it by

12 themselves to put new safety information in a label.

13  **Q.**   So if a drug company felt that there was a helpful

14 laboratory test for use with their drug, could they add that to

15 the label without FDA approval?

16  **A.**   Yes.  And it would be under CVE process.

17      And other manufacturers -- I know that Pradaxa has done

18 that.  They added APTT to their label under a CVE process.

19      So you can do that immediately.  That would be safety

20 information.  It's not a new claim, which you need to have FDA

21 approval for for marketing, but it is safety so you can add that

22 information.

23  **Q.**   So let's wrap all this up.  Just in real basic terms,

24 just explain to the jury what the real purpose of a drug label

25 is.

**OFFICIAL TRANSCRIPT**

1     A.   It's so you know how to use the drug and so that a

2  physician or prescriber -- it could be a nurse practitioner --

3  they know how to use this drug.

4         It tells you what it is good for.  There is

5  indications.  It is supposed to tell you the risks.  It is

6  supposed to tell you anything you need to know about that drug,

7  like don't give it to someone who is allergic to this.

8         So it's supposed to be for patient safety.  And it's

9  written for a prescriber, somebody with training who can

10 interpret what they are reading in the label.

11    Q.   Okay.  So now let's move into the Xarelto label itself.

12        Are there regulations that discuss whether information

13 about helpful laboratory tests are required to be in the warning

14 section of a drug label?

15    A.   Yes.  That would be in that -- remember I told you that

16 labeling format is specified by the FDA, so it would be 21 CFR

17 201.57.  And it specifically addresses putting helpful laboratory

18 information in a label.

19    Q.   Did you create a demonstrative that has the language of

20 21 CFR 201.57(c)(6)(iii)?

21    A.   I didn't want to get that fancy.

22    Q.   I can't believe I said it.

23        Did you create a demonstrative that has the language

24 that would help the jury?

25    A.   Yes.

**OFFICIAL TRANSCRIPT**

1           MR. BARR:  Any objection to that demonstrative going

2    up?  It is just the helpful laboratory testing.

3           MR. DUKES:  No objection.

4    **MR. BARR:   (CONTINUING)**

5       **Q.**   And is this a demonstrative?

6       **A.**   Right.  And the book on the side is CFR, Code of

7    Federal Regulations.  This is what the FDA has interpreted

8    Congress wanted them to do.

9           Congress makes the act.  The FDA makes the Code of

10   Federal Regulations.  The 201.57(c)(6)(iii), that's what -- if

11   you went into that book, that's where you would find it.  And it

12   has a component in here about they can put helpful laboratory

13   tests in the label.

14          So there is even a place in the Code of Federal

15   Regulations that helpful laboratory tests are required to be put

16   in there.

17      **Q.**   Can you give the jury just a little history of this

18   regulation.

19      **A.**   The history?  It's -- basically, it was -- in 2006, the

20   FDA went and tuned up its format for labeling, and it kept

21   including -- this had actually been in the law before, but it

22   included it in 2006 again.

23          And they say "must."  When the FDA uses "must," it

24   means you must do it.  It is not "you shall" or "you should."  It

25   is "must."  You must include that information.

**OFFICIAL TRANSCRIPT**

1       So it's requiring the manufacturer must identify any
2  helpful tests.  So it is a part of a requirement for a
3  manufacturer selling a drug.
4       Q.   And whose obligation is it to put this helpful
5  laboratory test into the warning section of the label?
6       A.   The manufacturer's.
7       Q.   Was this 2006 regulation in place at the time of
8  Xarelto's approval for the AFib indication?
9       A.   Yes.
10      Q.   Now, is it also true that, beyond this helpful
11  laboratory testing regulation, the FDA has a regulatory
12  requirement that manufacturers must provide adequate instructions
13  for safe use?
14      A.   Yes.  And that comes right out of the act, that you --
15  the FDA's act, 21 USC 352(a)(f)(1) and (f)(2) [verbatim] requires
16  that you provide adequate instructions for use.
17          In the CFR, the FDA then said you had to do that.
18          And so you're required to provide that adequate
19  instruction.  That is part of all drug labels, part of all the
20  information that you give a physician or a person using that
21  drug.
22      Q.   Now, in your review of all the documents you looked at,
23  your review of the medical literature, your review of the
24  peer-reviewed science, what is the most serious adverse event
25  associated with the use of Xarelto?

**OFFICIAL TRANSCRIPT**

1      **A.**    Bleeding.

2      **Q.**    Is that usually referred to in a specific way?

3      **A.**    It would be significant bleeding, massive bleeding.

4   We're not talking just a finger bleeding, we're talking

5   hemorrhage bleeding.

6      **Q.**    What they call major bleeding?

7      **A.**    Major bleeding.

8      **Q.**    Now, is major bleeding a frequent adverse event

9   associated with the use of Xarelto?

10     **A.**    It's frequent in that it's a foreseeable risk if you

11  are using a drug that changes your blood in terms of clotting.

12  So that is a concern.

13          If you are making an anticoagulant, you have to be

14  concerned because that -- it's a foreseeable frequent risk.  If a

15  patient has a problem with a drug, it's going to be bleeding.

16     **Q.**    How frequent -- based upon your review of the

17  literature and the documents, how frequent is major bleeding

18  observed in Xarelto patients?

19     **A.**    Well, using the ROCKET data, there was 3.6 patients out

20  of 100 would have serious bleeding in the clinical trial per

21  year.  And that study was done only 19 months, so it was a year

22  and a half about.  So that is where that rate comes from.

23     **Q.**    So if 100 people -- just to make sure we understand the

24  math, if 100 people take Xarelto for one year, 3.6 of them -- I

25  don't know how you have 0.6 of a person, but 3.6 of them will

**OFFICIAL TRANSCRIPT**

```
 1   have a major bleed?
 2        A.   That's right.
 3             THE COURT:  Let's get to a breaking point.  The jury
 4   asked to take a break.
 5             MR. BARR:  Let me just wrap up this section and we can
 6   do that, Your Honor.
 7             THE COURT:  Okay.
 8   MR. BARR:   (CONTINUING)
 9        Q.   Do you have an opinion about Xarelto and the risk of
10   bleeding?
11        A.   Yes.
12        Q.   What is that opinion?
13        A.   That it's a serious complication in terms of patients.
14   It can kill you.  And so, as a public health person, I'm
15   concerned about the risk of bleeding and I would like to stop it
16   so that anyone who is bleeding wouldn't be hurt, and that they
17   would be given -- given any -- that the physician caring for that
18   patient would be given any information available to help take
19   care of that patient.
20        Q.   And it's a foreseeable risk?
21        A.   It is a foreseeable risk.
22        Q.   And does the manufacturer of a drug that has a drug
23   with a common serious adverse event -- does it have a heightened
24   duty to provide all relevant information to allow for the safest
25   use of their drug?
```

**OFFICIAL TRANSCRIPT**

1    **A.**    Yes.

2         MR. DUKES:  I'm going to object to the "heightened

3    duty," Your Honor.  I don't think there is any basis for that

4    regulatory framework.

5         THE COURT:  Okay.  Let's reframe that.

6    **MR. BARR: (CONTINUING)**

7    **Q.**    Is the duty to warn even more important if a drug

8    company knows that frequent serious adverse events will happen

9    with their drug?

10    **A.**    Yes.

11         MR. BARR:  This is probably a good breaking point.

12         THE COURT:  Okay.  Let's take a break.  Court will

13    stand in recess.

14                              (Jury out at 9:46 a.m.)

15                              (A recess was taken.)

16                    **AFTER THE RECESS**

17                              (Call to order of the court.)

18                              (Jury in at 10:05 a.m.)

19         THE COURT:  Be seated, please.  You're still under

20    oath, Doctor.

21         THE WITNESS:  Yes, Your Honor.

22         THE COURT:  You may proceed, Counsel.

23         MR. BARR:  Thank, Your Honor.

24    **MR. BARR:  (CONTINUING)**

25    **Q.**    Dr. Parisian, are you ready to proceed?

1    **A.**    Yes.

2    **Q.**    In your opinion, what responsibility does a drug

3    company have to patients that end up in the ER with a bleeding

4    event as a result of taking the drug Xarelto?

5    **A.**    They have the responsibility to make sure, if there is

6    any information -- that the physicians or the people caring for

7    that patient have as much information as they possibly can about

8    their drug so that they can treat that patient.

9    **Q.**    And if it were true that there was a standard

10   laboratory test that could help a doctor treat a patient bleeding

11   on Xarelto, should that information be included in the warning

12   label?

13   **A.**    Yes.

14   **Q.**    Now, Doctor, are there generally accepted laboratory

15   tests that follow a patient's response to Xarelto, including

16   bleeding?

17   **A.**    In the label?

18   **Q.**    No.  Are they available?  Are there generally accepted

19   laboratory tests available, you know, for doctors that follow a

20   patient's response to Xarelto?

21   **A.**    In the company's documents there are.  And in their

22   clinical studies and in their animal studies.  Yes, sir.

23   **Q.**    Is there a generally available laboratory test that

24   doctors in the United States have access to that is capable of

25   following a patient's response to Xarelto?

**OFFICIAL TRANSCRIPT**

1     **A.**   Of monitoring or just following?

2     **Q.**   Just following the response.

3     **A.**   And knowing how much the anticoagulant effect is, yes.

4     **Q.**   What is that test?

5     **A.**   That would be the prothrombin test.

6     **Q.**   And what does the prothrombin time test do?

7     **A.**   Well, it's a simple test that tells how long it takes

8  for your blood to clot.

9     **Q.**   Now, did Bayer and Janssen study whether using the PT

10 test correlated with the amount of Xarelto in the blood?

11    **A.**   Internally, yes, sir.

12    **Q.**   Did the company publish this correlation?

13    **A.**   It has been published.

14    **Q.**   Do you know when it was published?

15    **A.**   It was published in 2005.  I think Kubitza was the

16 first publication.

17    **Q.**   So that's the publication by Dagmar Kubitza in 2005?

18    **A.**   Right.

19    **Q.**   Dr. Kubitza, is that a doctor for Bayer?

20    **A.**   Yes.

21    **Q.**   Now, did Dr. Kubitza's article have certain graphs that

22 would be helpful to your testimony today?

23    **A.**   Yes.

24        MR. BARR:  Your Honor, at this time I would like to

25 show Plaintiffs' 5767878 as a demonstrative.  It is the

**OFFICIAL TRANSCRIPT**

1    Dr. Kubitza, 2005.

2              THE COURT:  Okay.  Allowed.

3    MR. BARR:  (CONTINUING)

4         Q.   Now, Doctor, I believe this graph is on Page 6.  Is it

5    Figure 4b?

6         A.   Yes, sir.  There it is.

7         Q.   So can you explain what we're looking at here.

8         A.   Okay.  This is a graph.  They have patient -- these are

9    patient blood values.  And they've taken the blood value from a

10   patient and they've gotten a prothrombin time, clotting time, and

11   they've looked also at plasma concentration.

12             So what you have on that -- the up-and-down one is the

13   y-axis.

14        Q.   Would it help if I gave you a pointer to be able to

15   point at the axis?

16        A.   Okay.  Okay.

17             MR. BARR:  May I approach, Your Honor?

18             THE COURT:  Yes.

19   MR. BARR:  (CONTINUING)

20        Q.   Just so they can see what you are pointing at.

21        A.   Right.

22        Q.   It is hard to follow your finger.

23        A.   Okay.  Now, if I don't blind anybody.  Do I push the

24   little button?  There we go.  I figured it out.

25             So here is the prothrombin time (indicating).  This

**OFFICIAL TRANSCRIPT**

1    would be your clotting time (indicating).  And down on the bottom
2    is the concentration.
3            This is what they've measured as the drug Xarelto.
4    That's the name at the company, 59-7939.  That was what
5    eventually became Xarelto.
6            And so they plotted them on a graph.  And so you see
7    the dots?  Each one of those dots represents a patient and
8    patient values.
9            And you see most of the patients cluster down here in
10   terms of their clotting time, in terms of the length of time, and
11   their concentration (indicating).
12           There are a few patients out here that have a high
13   concentration and a really high clotting time (indicating).
14           What we have here is that you take all these dots and
15   they put a straight line so you know that there is a direct
16   relationship between the blood concentration and the delay or the
17   clotting time.
18           So the higher the drug, the longer your clotting time.
19   So your blood doesn't clot as fast if you have higher Xarelto on
20   board.  And that's what this table is showing.
21       Q.   And what is the significance of the relationship there?
22       A.   Well, it's information about the concentration of
23   Xarelto so a doctor would have that.  If you have more Xarelto on
24   board, you're likely to have a longer clotting time.  So your
25   blood is not going to clot as quickly.

**OFFICIAL TRANSCRIPT**

1          And if you have less Xarelto on board, then you
2     probably would be in the normal range down here where all these
3     little dots are, where most people are, in terms of clotting time
4     (indicating).
5          So you can use the clotting time to have some feel for
6     the amount of drug that the patient has.
7     Q.   So do you have an opinion as to whether or not the PT
8     test that is represented here is informative as to whether
9     someone has Xarelto in their blood?
10    A.   It would be, yes, particularly if you have a patient in
11    the ER and you're trying to figure out what is going on, how much
12    clotting effect do they have in terms of a drug.
13    Q.   And does this chart show that PT can give you a sense
14    of how much drug is on board?
15    A.   Yes.
16    Q.   And what is the significance of somebody having a low
17    PT?  What does that mean?
18    A.   Well, it means that their blood -- they're not at much
19    risk for bleeding because your blood is clotting and so you also
20    have a lower concentration of Xarelto on board.
21         And so this is the type of study that was being done
22    all the way from the animal studies on, that the company knew
23    that you could correlate, basically, PT with the amount of drug
24    you had in that animal or that patient.
25    Q.   Now, in your opinion, is the PT test clinically useful

**OFFICIAL TRANSCRIPT**

1    to a physician in an emergency setting?

2        A.    In an emergency setting, yes, that a physician would

3    know -- I mean, it's a common test.  Anyone who has been in

4    medicine knows that a PT has been around forever, and that right

5    now there is all kinds of confusion that the PT, about clotting,

6    and Xarelto having any relationship together.

7            So it would be helpful to a patient -- to a physician

8    caring for a patient to know that, if they didn't have Xarelto on

9    board, their PT would normally be in the normal range.

10           And so if they had a lot of -- say in an overdose

11   patient, if you had a lot of Xarelto on board, you would see that

12   the PT has been expanded in terms of not clotting.

13           So it helps you -- gives you an idea, as a physician,

14   how to care for that risk of bleeding for that patient.

15       Q.    Now, Dr. Parisian, there has been a representation made

16   in this trial that there is not a single piece of literature that

17   says that you can use PT to determine whether it is safe to do an

18   emergency surgery.  Is that correct?

19       A.    No.  Not if you're talking about published literature.

20   Because Dr. Mueck actually in 2013 came out with talking about

21   using it for emergency use, the PT.

22       Q.    Okay.  And so you're talking about the -- is that the

23   Mueck paper from 2013?

24       A.    Yea.  The Mueck paper.  Mueck (muk) paper, Mueck (moke)

25   paper.

**OFFICIAL TRANSCRIPT**

1     Q.   And is that a study you referred to and relied upon in
2  offering this opinion?
3     A.   Yes.  And it is consistent with the documents that I
4  saw internally, too.
5     Q.   Okay.
6          MR. BARR:  Your Honor, I would like to put up
7  Exhibit 5768548 as a demonstrative, which is the Mueck 2013
8  paper.
9          MR. DUKES:  No objection.
10         THE COURT:  Okay.
11 MR. BARR:  (CONTINUING)
12    Q.   So, Dr. Parisian, is this the article you're talking
13 about by Dr. -- I don't know if it's Mueck (mook) or Mueck (muk),
14 I've heard it said both ways during this trial -- but published
15 in 2013?
16    A.   Yes, sir.
17    Q.   Is the part you're looking for -- is that on
18 approximately Page 11?
19    A.   Yes.  It talks about emergency use.
20         MR. BARR:  Can we --
21         THE WITNESS:  There it is.
22 MR. BARR:  (CONTINUING)
23    Q.   Is this the section right here (indicating)?
24    A.   Right.
25    Q.   So what is this saying?  What is Dr. Mueck saying?

**OFFICIAL TRANSCRIPT**

1      A.   Well, Dr. Mueck is saying that, in an emergency
2  situation, which is what we're talking about, not the day-to-day
3  monitoring of patients -- but in an emergency situation, that you
4  could use the PT test, which is Neoplastine Plus, which is the PT
5  test expressed in seconds.  That's the time it takes for your
6  blood to clot.
7           And it would be helpful for assessing the anticoagulant
8  effect of the rivaroxaban, telling that, in an emergency, if you
9  need something, use the PT, and it will give the doctor at least
10  an idea of the anticoagulant effect, how much Xarelto is in there
11  changing the patient's clotting.
12     Q.   At least Dr. Mueck, in this paper, recommends this?
13     A.   Right.  And going through the Bayer development of this
14  product, he was like number one involved in all of it.  So, you
15  know, he is an authority, and I would trust what he says.  And he
16  is saying that you would use it as an emergency treatment or a
17  test for when you are caring for a patient.
18     Q.   Now, this says Neoplastine Plus.  Do you know from your
19  review of the literature and the documents reviewed whether that
20  is referring to a PT test?
21     A.   Yes, it is a PT test.  It is a type of cleared PT test.
22  They use Neoplastine as the agent for triggering the blood clot.
23           So it is a common test.  It is not something exotic.
24  It is cleared for the United States.  It has been cleared since
25  the '90s.

**OFFICIAL TRANSCRIPT**

1      Q.    You mentioned earlier that you've reviewed depositions

2  of internal company witnesses, right?

3      A.    Yes, sir.

4      Q.    And in your review of the internal company depositions,

5  did any of those witnesses share similar views regarding the use

6  of PT?

7      A.    Yes.

8      Q.    And did you create a demonstrative to highlight that?

9      A.    Yes.  Some of the people who've testified said you

10 could use the PT.

11          MR. BARR:  So let's put up that demonstrative.

12 MR. BARR:  (CONTINUING)

13     Q.    And so are you referring to these doctors here at Bayer

14 (indicating)?

15     A.    Yes.  And I particularly focused on Dr. Berkowitz

16 because he is a hematologist.  And so he also said that you could

17 use the PT in an emergency situation.

18     Q.    And just to be clear, Dr. Kubitza and Dr. Mueck are

19 Bayer employees?

20     A.    Yes.

21     Q.    So the studies -- those are studies written by people

22 at Bayer?

23     A.    Right.  And they were the ones who developed the

24 product to start with.

25     Q.    Now, you've reviewed the Xarelto label from --

**OFFICIAL TRANSCRIPT**

1          MR. BARR:  You can take that down.

2     **MR. BARR:  (CONTINUING)**

3          Q.   -- from the time of approval to the time of Mrs. Orr's

4     prescription of the drug, correct?

5          A.   And before.  Before approval, through that, to the time

6     of Mrs. Orr.

7          Q.   So you have a good working knowledge of what is

8     included in that label?

9          A.   Yes, sir.

10         Q.   Does the United States' label for Xarelto recommend PT

11    for assessing the anticoagulant effect of Xarelto?

12         A.   No.

13         Q.   Should it?

14         A.   Yes.

15         Q.   Why should it?

16         A.   Because I -- the physicians who are treating patients

17    or nurses, they need to know that it affects -- it is a simple

18    test and it will at least give you a ballpark figure as to the

19    amount of Xarelto on board and the likelihood of this patient to

20    clot or not clot, particularly if you are going to take them to

21    the OR.

22         So it is not being used and it needs to be in there so

23    that people can at least give it to the doctors and let them put

24    it in their differential as to how to use this for the patient.

25         Q.   So, in your opinion, it is helpful information?

**OFFICIAL TRANSCRIPT**

1     **A.**   If I was in the ER and I had a bleeding patient, I
2   would want to know this.  Or if I had an overdose patient, I
3   would want to know this.  What can I do to determine what the
4   effect of the Xarelto is on this patient if I have clotting time?
5   Does it mean anything?
6            At this point in time, it's a lot of confusion because
7   it doesn't say that it means something.  So you have taken away a
8   laboratory test that's -- an old laboratory test that has been
9   around and added lot of confusion about it.
10    **Q.**   And you used to be an emergency room doctor?
11    **A.**   Right.  So I would look at this as if I had a bleeding
12   patient.
13    **Q.**   Did you assist in the creation of a demonstrative to
14   explain to the jury what information, in your opinion, should be
15   included in the warning section of the label?
16    **A.**   Yes.
17            MR. BARR:  Can I have that demonstrative put up.
18            MR. DUKES:  May I see -- can we take that down before I
19   see it?
20            MR. BARR:  Sure.
21            MR. DUKES:  Your Honor, can we have a quick sidebar and
22   I can look at this.
23            THE COURT:  Okay.
24                                (A pause in the proceedings.)
25            MR. DUKES:  Your Honor, can we approach?

**OFFICIAL TRANSCRIPT**

1        THE COURT:  Yes.

2                    **SIDEBAR ON THE RECORD**

3        MR. DUKES:  Your Honor, my objection is this is an

4   opinion, and this is not an opinion that was disclosed in her

5   report or deposition.  And it says:  Information Missing from

6   U.S. Label -- that's the heading -- Laboratory Test.   In

7   situations of urgent surgery, assessment of the anticoagulation

8   effect of rivaroxaban is appropriate.  Accordingly, measuring PT

9   may be useful in informed clinical decisions in this

10  circumstance.  A normal PT value indicates that clinically

11  significant levels of rivaroxaban are unlikely.

12       This is yet again an undisclosed opinion that I haven't

13  had an opportunity to cross-examine the witness on.

14       THE COURT:  Isn't that what she has been saying,

15  though?

16       MR. BARR:  It's what she has been saying.  And at some

17  point the jury is going to want to know what needs to be in the

18  label.

19       And she is saying, based upon my review of documents,

20  based upon my knowledge of PT, what I've disclosed in the report,

21  this is the information that needs to be in the label.  It is a

22  demonstrative.

23       THE COURT:  I thought she already said this.

24       MR. BARR:  She did.  But the point is here -- I mean,

25  they've made --

**OFFICIAL TRANSCRIPT**

1        THE COURT:  No, I understand.

2        I think she has already said that.  She said -- I mean,

3  I think that's exactly what she said.

4        Now, you know, I know what you're, I guess, objecting

5  to this.  This is a form of a label.  I mean, she has been

6  testifying to everything so far.

7        MR. DUKES:  Yes, Your Honor, she is testifying to it

8  over my early objection that she did not disclose anything about

9  using PT tests for surgery, she only talked about prescribing.

10  So that is my continuing objection.

11        And here is a proposed label which she is going to put

12  up which is further prejudicial.

13        THE COURT:  I understand.  I'll overrule the objection,

14  but I'll make it continuing and a part of the record.

15        MR. DUKES:  Thank you, Your Honor.

16            **AFTER THE SIDEBAR IN OPEN COURT**

17        MR. BARR:  Can we get the demonstrative put back up.

18  **MR. BARR:  (CONTINUING)**

19    **Q.**  All right, Dr. Parisian, is this a draft of the

20  information you believe needs to be in the warning label for

21  Xarelto?

22    **A.**  Yes.  Particularly since we're talking about Ms. Ross

23  [verbatim] and surgery.  So it's urgent surgery and it would be

24  that you could have assessed the effect of rivaroxaban.

25        So, yes, this is exactly what I just said a second ago.

**OFFICIAL TRANSCRIPT**

1    Q.   Can you explain the significance of this language in

2 the label, how a doctor would use this?

3    A.   It would tell them that they could draw a PT and they

4 could use the information clinically to make a decision about

5 what is going on.

6         And in a normal PT -- if you draw and you get a normal

7 PT, that probably means -- and you know usually when the patient

8 took it or have a feeling for when the patient took it, that

9 would tell you that it is unlikely the rivaroxaban is creating an

10 effect, that your blood clotting should be fine.

11        So it's basically a ballpark figure like in an

12 emergency situation as to how -- if you take someone to the OR,

13 are they going to bleed to death?  So it gives the physician

14 caring for the patient just more information about what to do

15 with that patient.

16   Q.   So if I understand what you are saying, this

17 information provides what to do and what the result means?

18   A.   Right.  And this is consistent with what I saw

19 internally.  And the issue is that the medical literature has

20 made this very confusing, and this would be just -- it seems

21 simple, as we sit here, but it needs to be given to physicians

22 that they could get a PT.

23   Q.   Doctor, if the label were just to say you can measure

24 the anticoagulant effect with PT, if that's all it said, is that

25 useful information?  Does that provide anything for the doctor to

**OFFICIAL TRANSCRIPT**

1  actually do with that test?

2      A.   Well, it's not -- it's something.  It's not really

3  enough, but it -- I think it is better this in terms of

4  likelihood, particularly in overdose patients.

5          What is the likelihood -- how much drug is on board

6  with this patient and what is the effect?

7      Q.   Can you just -- so we have this in the record, can you

8  just read what the label should say.

9      A.   (As read:)  In situations of urgent surgery, assessment

10  of the anticoagulation effect of rivaroxaban is appropriate.

11          It is telling them they can assess that.

12          Accordingly --

13          And they're telling them now how.

14          -- measuring PT may be useful to inform clinical

15  decisions in this circumstance.  A normal PT value indicates that

16  clinically significant levels of rivaroxaban are unlikely.

17          So a physician could then proceed knowing that if --

18  what the likelihood of this person bleeding was because of

19  rivaroxaban.

20          So it's just -- it's giving information.  The best way

21  to give information is to give them what happens if you do

22  something, and so it is giving them, at the very end, if it's

23  normal, it's unlikely the effect and so the patient is not going

24  to bleed to death.

25      Q.   It's been suggested to the jury by the lawyers for the

**OFFICIAL TRANSCRIPT**

1    drug company that this information has been disclosed in the

2    label.

3              Have you looked at the label and do you have a view on

4    that?

5         A.    I don't believe it has been in there.

6         Q.    Would looking at the present label assist you in

7    testifying to this?

8         A.    Well, yes.  And I think they're specifically referring

9    to the pharmacodynamic -- it's not in the label.  I know that

10   it's been referred to in the pharmacodynamic section, and it is

11   not there.  This information is not in that section.

12        Q.    Let's look at Trial Exhibit 2, No. 6.

13              MR. BARR:  And let's go to Section 12.2, which is on

14   Page 21.

15              And let's blow out Section 12.2.

16   MR. BARR:  (CONTINUING)

17        Q.    And Dr. Parisian, can you just read what that says?

18        A.    (As read:)  Dose-dependent inhibition of Factor Xa

19   activity was observed in humans in the Neoplastine prothrombin

20   time, PT, activated partial thromboplastin time, APTT, and hep

21   test are prolonged dosed dependently.  Anti-factor Xa activity is

22   also influenced by rivaroxaban.

23        Q.    Now, Dr. Parisian, does this language in the current

24   Xarelto label adequately communicate to doctors that PT can be

25   used in an emergency situation to assess the anticoagulant effect

**OFFICIAL TRANSCRIPT**

1  in a Xarelto-treated patient?

2    A.   No, not in terms of that warning.  That warning

3  basically describes what is occurring if you give a patient

4  Xarelto.  It's not saying anything about using those tests or

5  what any kind of a value would mean.  So the words are there, but

6  they're not telling the physician how to use it for a patient.

7    Q.   And under the regulatory scheme, the warning about a

8  helpful laboratory test is required to be in what section of the

9  label?

10    A.   It would be up in the Warnings/Precautions.

11    Q.   Is that where this language is?

12    A.   No.  This is describing the pharmacodynamics, the way

13  the drug works.  And so it's not telling -- it actually is more

14  saying this is the good thing about this drug, this is what it

15  will do, but it's not saying how to use it if you had a patient.

16    Q.   Would this language, in your opinion, tell a doctor

17  that they can use PT to determine whether it's safe to proceed

18  with emergency surgery in a Xarelto-treated patient?

19    A.   No.

20    Q.   Is there anything in the label about the use of

21  standard laboratory testing to measure the anticoagulant effect

22  of Xarelto?

23    A.   There is -- in terms of standard testing, there is

24  something under the Hemorrhaging and Pregnancy.  I think it is

25  5.6 or something.

**OFFICIAL TRANSCRIPT**

1          MR. BARR:  If we can go to Section 8.1 of Page 18.

2  MR. BARR:  (CONTINUING)

3      Q.   Is this what you were referring to?

4      A.   Yes.  And it says don't measure -- it originally was

5  going to be under Pregnancy and Hemorrhaging and now it is under

6  there.  So, no, that doesn't tell you anything.  This is buried

7  under the Pregnancy Category C.

8          So it is saying -- if a doctor were to read this far

9  down, they would see that you can't reliably monitor with

10  standard laboratory testing.  So this doesn't tell you about an

11  emergency situation, and it implies that you can't use standard

12  laboratory testing.

13      Q.   And would that inference be correct?

14      A.   No, not in terms of what we're talking about as an

15  emergency situation with a PT.

16      Q.   Is PT a standard laboratory test?

17      A.   Yes, very standard, very old.  It has been around for a

18  long time.

19      Q.   Now, do you have an opinion as to whether the

20  defendants used reasonable care in warning of the foreseeable

21  risks associated with Xarelto?

22      A.   Yes, I have an opinion.

23      Q.   What is that opinion?

24      A.   They didn't.

25      Q.   Do you have an opinion as to whether the defendants

**OFFICIAL TRANSCRIPT**

1  failed to use reasonable care in providing adequate warnings and

2  instructions to doctors for the safe use of Xarelto?

3      **A.**   Yes, I have an opinion.

4      **Q.**   What is that opinion?

5      **A.**   They did not.

6      **Q.**   And that opinion relates specifically to the failure to

7  disclose a helpful laboratory test?

8      **A.**   Yes.

9      **Q.**   I now want to move on to the other opinions you've

10  offered with respect to your opinion regarding whether defendants

11  used reasonable care in warning of the foreseeable risks with

12  Xarelto based on the way they conducted and ran the ROCKET study.

13  Okay?

14      **A.**   Okay.

15      **Q.**   As part of the ROCKET study, were the patients in the

16  warfarin arm monitored with what is called a point of care

17  device?

18      **A.**   Yes.

19      **Q.**   Can you just explain quickly to the jury what a point

20  of care device is?

21      **A.**   It's a simple testing device that is in clinics, now

22  they are starting to sell them for home, that gives you a

23  ballpark figure as to the warfarin dose in terms of -- because

24  the patients have to monitor their warfarin dose all the time,

25  people on warfarin.  So "point of care" just means it is not a

**OFFICIAL TRANSCRIPT**

1  laboratory, it's not a complex laboratory test.  It is a simple

2  test where you can look at the INR value to determine how your

3  warfarin dose is and if it needs to be changed.

4      **Q.**   Okay.  And I think you just said this, but just so it

5  is clear, what did the point of care device in the ROCKET

6  trial -- what was it measuring?

7      **A.**   The INR, supposedly.  But it was under a code.

8      **Q.**   What was this device used in the ROCKET trial?  What

9  was that device called?

10     **A.**   It was called the INRatio.

11     **Q.**   And was that made by a company called HemoSense?

12     **A.**   HemoSense.  And I believe they are called Alere now,

13  A-l-e-r-e.

14     **Q.**   And during the ROCKET trial, was the point of care

15  device used routinely in the warfarin arm?

16     **A.**   Yes.  It was supplied to each one of the

17  investigational sites throughout the world by the company.

18     **Q.**   And was -- would it have been important, in your

19  opinion, that the device accurately report INR?

20     **A.**   Everything about ROCKET was based on it providing

21  accurate information and also the protection of the patients on

22  warfarin.  They need to have an accurate machine.

23     **Q.**   Why does it matter that INR was accurately reported

24  with the HemoSense device?

25     **A.**   Because patients are being treated with this.  In terms

**OFFICIAL TRANSCRIPT**

1  of their warfarin and their Coumadin, if the value is not
2  correct, then the person who is just prescribing whether you
3  should go up or down with your dose won't know what to do with
4  that patient.
5      So if it is under-reading, it's not giving the right
6  INR, you're going to have patients walking around who are high in
7  terms of potential risk for bleeding, so you have set in an
8  increased risk for those patients.  It's a bias that these
9  patients would be more likely to bleed if they're not given an
10  accurate reading for the physicians or the people caring for
11  them.
12      **Q.**   And how would the device -- reporting low values and
13  putting warfarin people at higher bleed risk, how would that
14  impact the comparison of warfarin to Xarelto?
15      **A.**   So you have taken an arm of the study, which is
16  supposed to be well-controlled warfarin, and you have now given
17  doctors an inaccurate number, or reading, so those patients who
18  have the inaccurate number from the machine are at increased risk
19  of bleeding.
20      Now, you can be high in terms of your warfarin dose and
21  you may not bleed immediately, but you are at risk of bleeding.
22  Something may have to trigger you to bleed.  So you're letting a
23  group of people who are participating in this study be at high
24  risk of bleeding without the people caring for them knowing it.
25      **Q.**   And in or around 2014, was there important information

**OFFICIAL TRANSCRIPT**

1    learned about the HemoSense device that was used in the ROCKET

2    trial?

3        A.   Yes.

4        Q.   What was it?

5        A.   There was a recall in December of 2014.

6        Q.   And why was the device recalled?

7        A.   The device -- the commercial device was recalled

8    because it was giving a low value and it was not giving the

9    correct value.  So patients were being put at risk for bleeding

10   from this false value.  So the device outside of ROCKET was found

11   to be not reliable in terms of taking care of patients on

12   warfarin.

13       Q.   And at some point after the recall of the device in

14   December of 2014, was it confirmed that that same device was used

15   in the ROCKET trial?

16       A.   Yes.  It was accidently that it was identified that it

17   had been used in ROCKET.

18       Q.   And as a result of the recall -- and you recall there

19   was some publicity around that?

20       A.   Right.

21       Q.   And as a result of that, was an investigation conducted

22   as to whether the device malfunctioned in the ROCKET trial?

23       A.   Yes.

24       Q.   What did that investigation uncover?

25       A.   It documented that the device in ROCKET had

**OFFICIAL TRANSCRIPT**

1   malfunctioned.  There were blood values drawn at 12 weeks and
2   24 weeks that are split samples.  The comparison of the value
3   that was given in ROCKET versus the laboratory determination
4   clearly showed that they were not -- it was not reliable.  The
5   device was not giving the same value as the laboratory.
6           So that was confirmed because of those split samples,
7   and it was confirmed that it occurred in ROCKET.
8       Q.   Did the investigations that were conducted -- there
9   were multiple investigations, correct?
10      A.   Yes.
11      Q.   There was -- do you know who all conducted an
12  investigation?
13      A.   The FDA.  When it came to light that the ROCKET study
14  had a faulty device, the FDA got involved re-looking at ROCKET
15  data.
16      Q.   Did Bayer and Janssen investigate?
17      A.   Yes.  And that is where they used the split samples and
18  they found out that there was this discrepancy between the values
19  in the laboratory.
20      Q.   Did the investigations reveal that the device
21  malfunctioned in a large number of warfarin patients?
22      A.   Yes.  And we're talking about the warfarin arm so this
23  would be the 7,000 patients that were the group that was a
24  comparator for Xarelto.
25      Q.   And was this malfunction in a large number of

1  patients -- did it have clinical significance?

2      A.   Right.  In terms of the FDA's mathematical review, they

3  said that 7 to 10 percent more patients than had been -- they had

4  been aware of had bleeding because of this device.

5      Q.   Okay.  And did you actually look at the data yourself?

6      A.   Yes.

7      Q.   What data did you look at to determine that the device

8  malfunctioned in ROCKET?

9      A.   Well, I looked at the split sample information that the

10  company had developed and I also looked at the FDA's

11  documentation.

12     Q.   So let's back that up a little bit.

13          As part of the ROCKET trial, split samples were taken?

14  Is that what I'm understanding?

15     A.   Right.  At 12 weeks -- it was part of the protocol.  At

16  12 weeks and 24 weeks, but the samples hadn't been run until

17  after this issue with the device came up.

18     Q.   Okay.  So let's explain what a split sample is.  What

19  do you mean by that?  What was that?

20     A.   Well, you'd have two tubes drawn when you get your

21  blood drawn.  You'd get one tube that would be the one for the

22  point of care.  You'd also get a tube that would be sent to a

23  laboratory.  So split samples, it's the same patient, two sets of

24  blood, and they would go to two different places for processing.

25     Q.   And these blood draws were taken at the same time?

**OFFICIAL TRANSCRIPT**

1    **A.**    Same time.

2    **Q.**    So how do you know, based upon your review of the

3    Week 12 and 24 samples, that the device malfunctioned in a large

4    number of warfarin patients?

5    **A.**    Well, that's based on the data, because you compare.

6    This is how you would validate a program to begin with.  So you

7    compare the consistency of the point of care machine versus the

8    laboratory.  And there was a discrepancy.  And the device tended

9    to give a low value compared to the laboratory value, what the

10   patient was really running at in terms of the warfarin.

11   **Q.**    So this wasn't limited to a small subset of patients?

12   **A.**    No.

13   **Q.**    How many patients are we talking about?

14   **A.**    We are talking about 7,000, the warfarin arm.

15   **Q.**    So how do you know that the device malfunctioned to a

16   clinical -- to a degree of clinical significance?

17   **A.**    Well, I know that, from having warfarin patients, you

18   would not want them to be high.  But you also -- when the FDA

19   recalled the device -- and they actually have withdrawn it off

20   the market.  They said based on the ROCKET and the significance

21   of the bleeding and the way that the device was performing, the

22   INRatio, that was part of the FDA's justification for pulling it

23   off -- for having the manufacturer pull it off the market.

24   **Q.**    Based upon the degree of the malfunction, would you

25   have expected it to result in more patients having bleeding

**OFFICIAL TRANSCRIPT**

1  events in the warfarin arm?

2      A.   Yes.  It would tend to be a bias to make it so that the

3  patients who are running high -- because the point of care

4  machine was to ensure that the patients stayed within the normal

5  range, that they were in therapeutic range, TTR.  You have heard

6  that?

7          So it was supposed to -- that was the way it was

8  supposed to be.  But even in the way it was supposed to be, the

9  FDA was concerned that they weren't well-controlled.  So having

10  this new bias, they were really not well-controlled because the

11  machine was wrong that they were using for the study.

12      Q.   So in addition to your clinical judgment, are you aware

13  of any data or analysis that has been -- that has concluded that

14  the malfunction resulted in additional bleeds in the ROCKET

15  trial?

16      A.   We know that the FDA's mathematical conclusion was that

17  there is 7 to 10 percent more bleeding than they were aware of in

18  the original ROCKET study.

19      Q.   And in your opinion, Doctor, did the device

20  malfunction -- let me restate that.  I'm sorry.

21          Did the device malfunction bias the results of the

22  ROCKET trial?

23      A.   Yes.  That's what the big word is, "bias," that you

24  would have a group of people on warfarin who were even at higher

25  risk of bleeding in the study.  You want them to be the same.

**OFFICIAL TRANSCRIPT**

1    You want the risks to be the same, particularly for a

2    noninferiority study, but now you have made it so that all the

3    warfarin patients are at an increased risk for bleeding.  So they

4    are more likely to bleed than you would have had in the original

5    plan.

6        Q.    So the FDA became aware of this malfunction in what

7    time frame?

8        A.    Around 2000 -- well, the recall was in 2014, but the

9    FDA didn't become aware until about 2015.

10       Q.    So let's be clear on that.

11       A.    The company told them.

12       Q.    But the FDA is a large organization, right?

13       A.    Oh, yeah.  Yes.

14       Q.    And there are multiple different divisions within the

15   FDA?

16       A.    That's right.

17       Q.    Do they all sit in one room at some point and talk to

18   each other every day?

19       A.    No.  And we're talking about an issue that involved The

20   Center For Drugs and then The Center For Devices and Radiological

21   Health.  They don't talk that much together anyway.  So you are

22   talking about big organizations, and it would have been unlikely

23   that they would have put the two together.

24             And if you looked at the label for Xarelto, it doesn't

25   say that it used the INRatio device in ROCKET, and so that was

**OFFICIAL TRANSCRIPT**

1  why the person who put it together -- it was a reporter for the

2  *British Medical Journal* -- did a wonderful job, because she

3  actually went and found what device had been used in ROCKET based

4  on European data and put the two together.

5      Q.   So the cardiorenal division of the FDA discovered this

6  information, did I get you right, from a reporter?

7      A.   From the -- well, the reporter brought it to everyone's

8  attention, yes.

9      Q.   And that was in 2015, right?

10     A.   Yes.

11     Q.   And did the FDA ultimately write a report about the

12  conclusions of their investigation?

13     A.   Yes.  CDER did write a report about the ROCKET study

14  specifically, and they -- it's hard to go back after a study has

15  been done, so they used mathematical modeling, based on the

16  information they had, to try to get your best guess using

17  mathematics.  And so -- of a completed study for a drug that is

18  already marketed.

19     Q.   So I would like to put up Plaintiffs' 5767737.  This is

20  the ROCKET reanalysis.

21          MR. DUKES:  No objection, Your Honor.

22          THE COURT:  Okay.

23  MR. BARR:  (CONTINUING)

24     Q.   Is this that report?

25     A.   Yes, sir.

**OFFICIAL TRANSCRIPT**

```
 1        Q.   Okay.
 2             MR. BARR:  And can we go to pdf 43 of this report,
 3    please.
 4   MR. BARR:  (CONTINUING)
 5        Q.   Did the FDA come to any conclusions in this report that
 6    are relevant to your opinions today?
 7        A.   Yes.  And as part of the -- it's part of the history of
 8    the evidence that is going on in terms of ROCKET.
 9             MR. BARR:  And blow up -- there you go.
10   MR. BARR:  (CONTINUING)
11        Q.   What does the FDA say about whether or not doctors
12    should be told about the information on the use of the INRatio
13    device from the ROCKET trial?
14        A.   They thought that they might.  They were trying to come
15    out with what the FDA's role is, and so the FDA might issue a
16    simple statement to talk about what they did with ROCKET.
17             So they are not saying the physicians didn't know.
18    They are also leaving it open as to some people may want to
19    change the label.  So it's basically:  Well, now, what do we do?
20    Here it is.  And so they are putting forth some of the things
21    that are options for the FDA to do.
22             The bottom line is that the drug stays on the market.
23        Q.   But the FDA didn't say that this isn't important
24    information?
25        A.   Oh, no.  No.  It is important.  This is a big issue.
```

**OFFICIAL TRANSCRIPT**

1    This doesn't happen, fortunately, to the FDA very often.

2        Q.    Now, Doctor, in your review of materials in this case,

3    did you find evidence that the company knew or should have known

4    that the device was malfunctioning while the ROCKET trial was

5    ongoing?

6        A.    Yes.

7        Q.    And so while the trial itself was ongoing, you have

8    come across documents that show the company was aware that the

9    device was malfunctioning?

10       A.    Right.

11       Q.    Did the company -- at any point during the time the

12   ROCKET trial was ongoing through the approval and through 2015

13   when the FDA became aware of this, did the company at any point

14   report what they were seeing during the ROCKET trial?

15       A.    No.   And that is -- that's important also for all the

16   people on warfarin who are using this machine.   So during the

17   ROCKET trial, they knew that the machine wasn't functioning and

18   it took years for it to get pulled off the market.

19            And so there are a lot of warfarin patients who were

20   not in ROCKET who were also being exposed to this device, and the

21   company didn't tell the FDA.   And so to me that's, from a public

22   health point of view, important, too.

23       Q.    Did ROCKET have a group of independent doctors with the

24   sole responsibility of patient safety called an independent data

25   monitoring committee?

**OFFICIAL TRANSCRIPT**

1     **A.**   Yes.  They call them the IDMC, Independent Data

2   Monitoring Committee.

3          And their purpose is to make sure that everybody in the

4   clinical trial -- the warfarin arm, the drug arm -- are being

5   taken care of and it is safe for those patients to be in that

6   clinical trial.

7     **Q.**   And in your work in this case, did you review the

8   meeting minutes of the IDMC?

9     **A.**   Yes.

10    **Q.**   Have you seen any evidence that the company told the

11  IDMC about the device malfunctioning while the trial was ongoing?

12    **A.**   I didn't see any evidence that they did, no, sir.

13    **Q.**   In response to these incidents of the device

14  malfunctioning during the trial, did the company create a special

15  safety program to address this issue?

16    **A.**   Right.

17    **Q.**   And what was the name of this program?

18    **A.**   Covance Recheck.

19    **Q.**   And can you briefly describe for the jury what the

20  Covance Recheck program was?

21    **A.**   Well, it was triggered by physicians being concerned

22  that patients were bleeding in terms of they're seeing the

23  reading from the machine and yet the patients are coming in

24  bleeding on warfarin.

25          And so to answer some of the concerns of the physicians

**OFFICIAL TRANSCRIPT**

1    who are participating in this study, the company started a

2    process where they actually got some blood drawn and sent to a

3    laboratory to compare it to the machine.  Because the machine --

4    and then they often told them to use a second machine in their

5    facility.

6            So there are patients that did bleed and they went to

7    the emergency room, and you also had values for that.  So the

8    company was getting information about patients on warfarin that

9    were bleeding, and so they set up this other program in order to

10   look at the patients that they were getting reports about

11   bleeding and getting laboratory for them.

12       **Q.**    Have you reviewed the results of the Covance Recheck

13   program?

14       **A.**    Yes.

15       **Q.**    And can you briefly describe for the jury what those

16   results were.

17       **A.**    They were showing that the point-of-care machine was

18   inaccurate.  It was giving values that were too low in terms of

19   the potential bleeding of the patients.  So they had that

20   information internally.

21       **Q.**    And just so it's clear, being too low means they are

22   getting too much warfarin, right?

23       **A.**    They are at too high of a risk of bleeding.  And so

24   you've put one group of patients, 7,000 patients, at clinical

25   risk of bleeding, increased risk of bleeding.

**OFFICIAL TRANSCRIPT**

1        And, remember, this drug is being compared to that
2   group in terms of inferiority, the adverse events.  So bleeding
3   is an important risk that helps bias the data in favor of
4   Xarelto.
5        THE COURT:  I hope we're getting close to the
6   conclusion.
7        MR. BARR:  We are, Your Honor.  We are getting close.
8   **MR. BARR:  (CONTINUING)**
9        **Q.**   Did the company tell the FDA or the IDMC about the
10  existence of the Covance Recheck program while the trial was
11  ongoing?
12       **A.**   No.
13       **Q.**   Did the company tell the FDA or the IDMC about the
14  results of this program?
15       **A.**   No.  Or that they were even doing it, that they had
16  started it.
17       **Q.**   So I want to move forward a little bit.  The ROCKET
18  trial is over.  Xarelto is still not approved.  And the jury has
19  heard that one of the reasons the medical reviewers recommended
20  against approval was concern of a warfarin management mistake.
21  Do you remember that?
22       **A.**   Right.  And that is under the assumption that the
23  INRatio was working.
24       **Q.**   At that point in time when the medical officers were
25  reviewing the safety and efficacy of ROCKET [verbatim], did they

**OFFICIAL TRANSCRIPT**

1    send a specific request for specific information to the company

2    relating to the performance of the device in ROCKET?

3         A.   Yes, they did.

4         Q.   Let's take a look at that.

5              MR. BARR:  Can I get Plaintiffs' 748350.

6              MR. DUKES:  No objection.

7    MR. BARR:  (CONTINUING)

8         Q.   Is this the information request you are talking about,

9    Doctor?

10        A.   Yes.  It's a fax from the government.  And it says --

11   when it says "clinical IR," "IR" is information request.

12             And so this is getting the -- Alison Blaus is at the

13   FDA.  She is the consumer safety officer who interacts with the

14   company, and she is asking specifically for NDA 202439.  That

15   would be the Xarelto NDA for atrial fib.

16             And she's asking specifically for information about the

17   INR used in ROCKET:  Please provide the following information on

18   the INR point-of-care device used in ROCKET.

19        Q.   So did they specifically ask for performance

20   characteristics of the device beyond the information found in the

21   labeling?

22        A.   Yes.

23        Q.   And is this term "information request" -- is that

24   important?

25        A.   Yes.

**OFFICIAL TRANSCRIPT**

1    Q.    Could you explain that?

2    A.    It is like having someone from the IRS ask you for

3    information.  You are supposed to, as a manufacturer, provide

4    complete and accurate information back to the FDA.  It is the

5    federal government so you are required to respond and provide all

6    the information you have to address that issue.

7    Q.    So in March of 2011, the Covance Recheck program had

8    been started, right?

9    A.    Right.

10   Q.    And the results -- they knew the results, right?

11   A.    Right.

12   Q.    Was the Covance Recheck program disclosed as a result

13   of this information request?

14   A.    No.  And here the FDA is asking for the labeling for

15   the medical device.  The device is a cleared device.  It's not an

16   investigational device.  The FDA wants to have more information

17   about how it is performing than would be in the label for the

18   device.

19   Q.    So we've talked about what the company did.  Let's

20   briefly discuss what you feel they should have done.

21        Should the company have disclosed to the FDA and the

22   IDMC their initial concerns with respect to the device

23   malfunction in ROCKET?

24   A.    Yes.

25   Q.    Would that information, had it been disclosed, been

**OFFICIAL TRANSCRIPT**

1  significant to you as a medical officer at the FDA?

2      **A.**    It would have been significant information to the

3  clinical reviewers, because they were concerned about the

4  clinical trial, as well for to them to be able to talk to CDRH

5  and tell them there were issues occurring with a cleared device

6  that was being sold and used in the United States for warfarin

7  patients.

8      **Q.**    Should the company have disclosed to the FDA and the

9  IDMC the existence of the Covance Recheck program and its

10 results?

11             MR. DUKES:  Your Honor, objection.

12             May we approach?

13             THE COURT:  Yeah.

14                      **SIDEBAR ON THE RECORD**

15             MR. DUKES:  Your Honor, my objection is that this is

16 clearly an attempt to demonstrate fault on the FDA, which would

17 be a preemptive claim, so I move to strike the testimony that

18 relates to this particular level of testimony.

19             THE COURT:  What is the relevancy?

20             MR. BARR:  Your Honor, it informs their duty to warn.

21 This is what Dr. Smart was talking about.  It has to do with the

22 risk of this drug.

23             And you have this study that was done and a device that

24 was used that wasn't appropriately reported during the trial.

25 None of that information is disclosed.  Doctors don't know about

**OFFICIAL TRANSCRIPT**

1    this.  The FDA says itself, in reanalysis, that it is relevant to
2    doctors.
3         I mean, it all goes to that continuing -- it builds on
4    the characteristics of the drug and its bleed risks.
5         THE COURT:  The defense says it deals with fraud and
6    independent personal claim when that happens.  So I understand,
7    but let's go into it surgically and get in and get out quickly.
8         MR. BARR:  I probably have four or five more questions
9    on this.  I'm done.  I'm just wrapping up what her opinions are.
10        THE COURT:  All right.  I think what he is saying,
11   though, is a legitimate point, that you blow this up and it has
12   no relevance in this particular case because there is no such
13   thing as fraud on the FDA personally, a claim.  And so it gets to
14   be irrelevant.
15        MR. BARR:  Okay.  I understand, Your Honor.
16        THE COURT:  All right.
17        MS. WILKINSON:  I have one more objection.  And I don't
18   have the paragraph.  Counsel put up the article from Mueck and
19   said that was a statement saying that we said it was useful in
20   emergency situations.
21        In that article, that exact section is footnoted, and
22   the footnote goes to a foreign label.  So that statement is in
23   there only because it's part of the foreign label, exactly what
24   you said shouldn't come in.
25        And so they're making the misleading impression to the

**OFFICIAL TRANSCRIPT**

1    jury that we made that statement in an article out of context

2    when it is cited specifically to our foreign label.

3            So the only way we can explain it, which we are going

4    to have to do, is put up the article with our own witness and

5    say:  Did you see this statement?  Yes.  Why?  You know, Do you

6    agree with it?  He is going to say "no."  Why?  Well, they are

7    citing a foreign label, and I don't agree with it for a variety

8    of reasons.

9            There is no way to avoid that because of what they did,

10   because it is a misleading impression about that contents.

11           MR. BARR:  Your Honor, it is a peer-reviewed article

12   that Bayer published.  Nobody talked about a label.  And counsel

13   got up in opening and said there is not a single piece of

14   literature that says this.  It is a piece of literature in the

15   peer-reviewed literature.

16           Nobody is going to the footnote.  Nobody thinks that

17   has to do with the label.  If she has to bring it up, that's on

18   her.  But that's what they say.

19           THE COURT:  I understand the objection, but I do think

20   that goes to their whole case, so I'll --

21           MS. WILKINSON:  May we raise it in the foreign label

22   and you'll give some kind of instruction?

23           THE COURT:  Yes.  And I'll give an instruction.

24           MS. WILKINSON:  Thank you, Your Honor.

25           MR. DUKES:  Your Honor, with regard to my motion to

**OFFICIAL TRANSCRIPT**

1    strike the testimony relates to what I believe is fraud on the
2    FDA, is that denied?
3            THE COURT:  Yes, that's going to be denied.
4            MR. BARR:  I'm wrapping up, Your Honor.
5            THE COURT:  Let's finish up with this witness, please.
6            MR. BARR:  We are getting there.
7                    **AFTER THE SIDEBAR IN OPEN COURT**
8            THE COURT:  Counsel, I hope you can finish with this
9    witness in about ten minutes.
10           MR. BARR:  One question.
11   **MR. BARR:  (CONTINUING)**
12       Q.    The jury has heard your testimony at this point.
13           Do you have an opinion to a reasonable degree of
14   medical and scientific certainty whether Janssen and Bayer
15   complied with the standard of care expected of a reasonable
16   pharmaceutical company?
17       A.    I do have an opinion.
18       Q.    What is that opinion?
19       A.    That they didn't.
20           MR. BARR:  Your Honor, we'll pass the witness.
21           THE COURT:  Okay:  Let's take a break.
22           Court will stand in recess for ten minutes.
23                            (Jury out at 10:56 a.m. )
24                            (A recess was taken.)
25                    **AFTER THE RECESS**

**OFFICIAL TRANSCRIPT**

1           (Call to order of the court.)

2           (Jury in at 11:08 a.m.)

3       THE COURT:  Be seated, please.

4       MR. BARR:  Your Honor, briefly can we approach?

5       THE COURT:  Yes.

6               **SIDEBAR ON THE RECORD**

7       MR. BARR:  Your Honor, I neglected to move in

8  Plaintiffs' Exhibit 748350.  It was information requested from

9  the FDA.  We talked about it.  It was relied upon in her report,

10 and it is a government object.

11      MR. DUKES:  I object on 401 and 403 and the prior

12 argument that it simply relates to a preempted argument regarding

13 fraud with the FDA.

14      THE COURT:  Okay, I'll overrule the objection and I'll

15 let it in.

16      MR. BARR:  So this will be Trial Expert 184.

17      THE COURT:  My thinking on it is that this is a label

18 case.  That's been clear.  And so a lot of this is referenced and

19 has relevance to that aspect of it.  And also to the actions,

20 intent, and motive of the parties.  So -- okay.

21      MR. BARR:  Thank you.

22          **AFTER THE SIDEBAR IN OPEN COURT**

23      MR. DUKES:  Good morning, ladies and gentlemen.

24      Good morning, Dr. Parisian.

25      THE WITNESS:  Good morning, Mr. Dukes.

**OFFICIAL TRANSCRIPT**

                        CROSS-EXAMINATION

BY MR. DUKES:

    Q.   On direct examination you talked about the use of PT
testing in people taking Xarelto, right?

    A.   Yes, sir.

    Q.   And you testified that you think the Xarelto label is
inadequate because it did not instruct doctors to use PT testing,
right?

    A.   In an emergency situation.  Not for regular monitoring
but we're talking about just emergency in the particular case of
Mrs. Orr.

    Q.   Okay.  Let me hand you Defendants' Exhibit 2451.

    A.   Okay.

    Q.   Now, this is an article by Drs. Adcock and Gosselin
entitled *The Danger of Relying on the APTT and PT in Patients on
DOAC Therapy, a Potential Patient Safety Issue;* is that right?

    A.   Yes, sir, that's the title.

    Q.   And it was published in the *International Journal of
Laboratory Hematology* in 2017, this year, right?

    A.   Yes, sir.

    MR. DUKES:  Your Honor, I offer DX 2451 as a learned
treatise.

    MR. BARR:  No objection.

    THE COURT:  You can use it and I won't -- you can use
it.  I just won't admit it into evidence.

**OFFICIAL TRANSCRIPT**

1           MR. DUKES:  Yes, Your Honor.

2   MR. DUKES:  (CONTINUING)

3       Q.   Now, DOAC means direct oral anticoagulant, right?

4       A.   Correct.  It's the whole class of these types of

5   products.

6       Q.   So it includes Xarelto?

7       A.   Yes.

8           MR. DUKES:  Could I pull up DX 2451.1.1.

9   MR. DUKES:  (CONTINUING)

10      Q.   Here we are looking at the abstract of the article,

11  right?

12      A.   Yes, sir.

13      Q.   And the authors say:  It has been repeatedly

14  demonstrated that patients can have normal APT and PT/INR --

15          And PT/INR is what you are talking about, right?

16      A.   Yes, sir.

17      Q.   -- with a therapeutic plasma concentration of the DOAC,

18  right?

19      A.   Yes, sir.

20      Q.   And a therapeutic plasma concentration means that they

21  are anticoagulated, right?

22      A.   Yes, sir.

23      Q.   It goes on to say:  Clinicians can no longer rely on a

24  normal APTT and PT to determine that an anticoagulated patient is

25  safe to undergo an invasive procedure.  That's what these authors

**OFFICIAL TRANSCRIPT**

 1  say, correct?

 2      A.   That's right.  That's part of the confusion in terms of

 3  clinicians.

 4      Q.   My question was:  That is what these authors said,

 5  right?

 6      A.   Yes, sir.

 7      Q.   And these authors were actually publishing in a journal

 8  of laboratory hematology?  In other words, these are folks who

 9  work in the area of laboratories and blood testing, right?

10      A.   Right.  But they are talking about DOACs across the

11  board.

12      Q.   And that would include Xarelto?

13      A.   It is part of that, yes, sir.

14      Q.   Okay.  Now, they are telling doctors here that they

15  cannot rely on a PT to determine whether a patient is

16  anticoagulated and safe to undergo something like surgery, right?

17      A.   Right.

18      Q.   And that's this year?

19      A.   Right.  That's why it is dangerous.

20      Q.   So a normal PT would mean that a patient is not safe to

21  undergo surgery, right?

22      A.   Based on that statement and taken in the context of

23  what this article is about, yes, sir.

24      Q.   Now let me hand you DX 2272.

25      A.   Okay.

**OFFICIAL TRANSCRIPT**

1      Q.    Now, DX 2272 is an article by Dr. Tessler [verbatim]

2  that is titled *Poor comparability of coagulation screening tests*

3  *with specific measurement in patients receiving direct or*

4  *anticoagulants: results from a multicenter/multiplatform study,*

5  correct?

6      A.    Did you say Tessler or Testa?

7      Q.    I said Testa -- I'm not sure what I said, actually, but

8  I meant Testa.

9      A.    Okay.  Yes, it's Dr. Testa.  And I've seen this study.

10     Q.    You have?

11     A.    Yes.

12     Q.    All right.

13           MR. DUKES:  And I would offer DX 2272.

14           THE COURT:  You certainly can use it.

15           MR. DUKES:  Thank you.

16  **MR. DUKES:  (CONTINUING)**

17     Q.    Now, if we go over to the left-hand column, you see

18  Essentials.  Are you with me?

19     A.    Yes, sir.

20           MR. DUKES:  And if we can call up DX 2272.1.3.

21  **MR. DUKES:  (CONTINUING)**

22     Q.    And if we go down to the third bullet point, you see

23  where it says, Normal PT/ --

24           This is what you are talking about.

25           -- PTT, don't exclude DOAC activity and their

**OFFICIAL TRANSCRIPT**

1    prolongation doesn't confirm DOAC action?

2          And they go on to say:  The use of PT or PTT to

3    evaluate DOAC activity could cause dangerous misinterpretations,

4    don't they?

5          A.   Right.  And that's all of these anticoagulants.  They

6    are saying that specifically for that.

7          Q.   Right.  And this includes Xarelto, right?

8          A.   Well, Xarelto is one of them, but there are a lot more.

9    And so they are saying don't use that.

10         Q.   That includes Xarelto, right?

11         A.   Yes, sir.

12         Q.   Now, it would be a dangerous misinterpretation here to

13   think that a normal PT test meant that a patient was not

14   coagulated and could safely go to surgery?  That's what it is

15   saying, right?

16         A.   I think -- well, it says what it says, use of the PT

17   could be dangerous -- cause dangerous misinterpretations.  And in

18   the way it's being used, I understand why they are saying that.

19   So it speaks for itself.

20         Q.   Okay.  Let's switch gears.

21              You left the FDA in 1995, right?

22         A.   Yes, sir.

23         Q.   So a couple decades ago?

24         A.   Yeah.  I'm getting old.

25         Q.   Then you started your own consulting company?

**OFFICIAL TRANSCRIPT**

1      **A.**    Yes, sir.

2      **Q.**    And that was originally called Medical Device, Inc.

3  because you had been working with medical devices at the FDA,

4  right?

5      **A.**    Medical Device Assistance, Inc., because there were a

6  lot of experts for drugs, so I thought there weren't experts for

7  devices.

8      **Q.**    But when you were at FDA, you almost exclusively worked

9  with medical devices, not prescription drugs?  You agree with

10  that?

11      **A.**    Yes, sir.

12      **Q.**    And then in 1997 you went into the expert witness

13  consulting and testifying business like what you are doing today,

14  right?

15      **A.**    That was when I got pulled into the first litigation

16  support, yes, sir, in '97.

17      **Q.**    I think you said when you are testifying in court, like

18  today, you charge $1,000 an hour?

19      **A.**    Yes, sir.

20      **Q.**    And that's what you're charging today?

21      **A.**    Yes, sir.

22      **Q.**    And how many hours -- you said you worked about

23  400 hours?

24      **A.**    Yes, sir.

25      **Q.**    So would that be $400,000?

**OFFICIAL TRANSCRIPT**

1    **A.**   No, no, no.  That was $500 an hour so it would be
2    $215,000.
3    **Q.**   Okay.  And just to be clear, as I understand it, your
4    consulting company has one other employee and that's your
5    husband; is that right?
6    **A.**   That's right.  And he handles all the money.
7    **Q.**   You bring in the money and he counts the money?
8    **A.**   That's right.
9    **Q.**   Now --
10   **A.**   He likes it that way.
11   **Q.**   Now, you are the only person in your company that
12   actually testifies or consults with lawyers, aren't you?
13   **A.**   Or does this work or writes reports or empties the
14   garbage, yes, sir.
15   **Q.**   And the income that your company brings in comes almost
16   exclusively from you, doesn't it?
17   **A.**   Yes, sir.
18   **Q.**   And your office is in your house?
19   **A.**   Yes, sir, now it is.
20   **Q.**   In Phoenix?
21   **A.**   Yes, sir.
22   **Q.**   Now, in 2009, you stopped doing any consulting other
23   than consulting with plaintiff's lawyers, right?
24   **A.**   To finish up the cases I've been involved with, yes,
25   sir.  It is not all plaintiff's lawyers.  It just works out that

**OFFICIAL TRANSCRIPT**

1   I'm working with plaintiff's lawyers.

2       Q.   So from 2009 forward, you've worked exclusively with

3   lawyers?

4       A.   Yes, sir.  Lucky me.

5       Q.   And in 2009, I guess based on your rate schedule of

6   $1,000 an hour to testify and $500 an hour to review things, you

7   earned approximately $800,000 from working with plaintiffs in

8   litigation, correct?

9       A.   Right.  And back in most -- in 2009 I was charging $400

10  an hour and $600 an hour.  So it's only recently that I went up

11  to the other because I'm trying to cut back.

12      Q.   But you earned approximately $800,000 in 2009 working

13  with plaintiff's lawyers?

14      A.   Right.  I have given you all the numbers all the way

15  from whenever I started working.

16      Q.   I understand.  I just want to confirm, make sure we're

17  on the same page.

18      A.   Yes.

19      Q.   In 2010 you made approximately $900,000 from working

20  with plaintiff's lawyers, correct?

21      A.   Well, that's -- that would be bringing in -- yes, that

22  would have been it.  But it's not mine, it's the company's.  The

23  government takes a lot of it.  But that's how much --

24      Q.   Yeah, you got that.

25      A.   Yeah.  So, yes, I billed that, and that's at an hourly

**OFFICIAL TRANSCRIPT**

1    rate.

2        Q.    And in 2000 -- let's see, 2011 you made approximately
3    $800,000 from working in litigation with plaintiff's lawyers?

4        A.    Primarily, yes, sir.

5        Q.    And from 2012 through the present, you have made
6    approximately $800,000 each year working with plaintiff's lawyers
7    in litigation like we're here today on?

8        A.    Well, it's lawyers.  It just happens that they are
9    plaintiffs, the ones that I'm involved with.  And it would be --
10   last year would have been like $700,000.

11       Q.    Okay.  So if we add up 2009, $800,000 and 2010,
12   $900,000 and five times $800,000 -- how much is that?

13       A.    I don't know.  It's a lot of money.

14       Q.    It is.

15       A.    Yeah.

16       Q.    So this is -- really, this is what you do for a living
17   nowadays, right?

18       A.    Well, I'm a specialist.  You know there is only about
19   five of us.

20       Q.    So if somebody is looking for an expert to testify
21   against a pharmaceutical company about labels, you're in that
22   group of five reliable plaintiff's experts, right?

23       A.    I would be one of the five.  But I wouldn't put it that
24   way, that I would be -- I am one of the five.  There are five
25   that will work on one side, and I think there's more on the other

**OFFICIAL TRANSCRIPT**

1    side.

2        Q.    Now, let's talk a little bit about your experience in

3    court.  You've testified in court approximately 81 times?

4        A.    Up to now it's about 90, 90 times.

5        Q.    And approximately 210 depositions you've given?

6        A.    It's actually up to 232.

7        Q.    Okay.  And when was the last time you testified in

8    court?

9        A.    Probably about a year and a half ago.  In December, I

10   believe.

11       Q.    And since 1997, you have traveled all over the country

12   testifying in cases, right?

13       A.    Since 19- -- yes, sir, unfortunately.

14       Q.    And you have been involved in cases in 41 states,

15   Puerto Rico, and the District of Columbia; does that sound right?

16       A.    Right.  They used to put up a display.  You don't have

17   that?

18       Q.    I've got it.

19             MR. DUKES:  Slide 1.  Could we see Slide 1.

20             THE WITNESS:  There it is.

21   MR. DUKES:  (CONTINUING)

22       Q.    All right.

23       A.    See how pretty I was when I was younger?

24       Q.    You're not going to bait me into that.

25             Now, here in the blue -- now, what we have done is

**OFFICIAL TRANSCRIPT**

1    we've gone through your deposition and everything, and just to --

2        A.    Sure.  No, I know.

3        Q.    All these states in blue are states where you have been

4    involved in litigation on the plaintiff's side, correct?

5        A.    Right.  Fortunately I haven't been in all those states,

6    but my reports and information has been in those states.

7        Q.    So, for instance -- that's a good point.  You live in

8    Phoenix but you might be an expert witness in a case in Texas and

9    file a report there and you may or may not give a deposition or

10   go to trial?

11       A.    Yes.  I probably will give a deposition, but I won't

12   necessarily go to trial.

13             What are the light blue states?  Are those the ones

14   I've missed?

15       Q.    Yes, those are the ones you missed.

16       A.    Gosh.

17       Q.    Those are the ones.

18             All right.  Let's talk about the types of cases you've

19   testified in.

20       A.    Yes, sir.

21       Q.    And you don't always testify in cases involving

22   prescription medicines, do you?

23       A.    No.  But it's always about FDA.

24       Q.    Well, now, one case you testified in was a wrongful

25   death case against Caesar's Entertainment, a casino company?

**OFFICIAL TRANSCRIPT**

1    **A.**    That right.  That was a medical examiner.  I never did

2    that again.  But I just stuck with the FDA.

3    **Q.**    Okay.  In that case, in 2007, you testified for the

4    plaintiffs, right?

5    **A.**    Yes, sir.

6    **Q.**    And in that case the facts were that a man was in a

7    casino and a ceiling tile allegedly fell, didn't hit him in the

8    head, but he was doused with water, right?

9    **A.**    Well, the kitchen contents fell on a man who'd just had

10   heart surgery and he was standing at the casino, and so that is

11   what that was about.  And then he subsequently died from an

12   infection.

13        But unfortunately the casino got destroyed in Katrina,

14   I believe, so there was no evidence other than his history.

15   **Q.**    So you testified that when the ceiling tile fell and

16   the water came down on the man, he was exposed to bacteria and

17   that killed him, right?

18   **A.**    Well, he was -- no, I didn't testify to that.  I said

19   that there was contents of the whole kitchen that had fallen on

20   his head.  There was a problem with the kitchen pipes.

21        So it was more than just the ceiling tile and water.

22        But, yes, I did.

23   **Q.**    So it was the water from the pipe in the kitchen that

24   came through and doused him and that allegedly killed him, right?

25   **A.**    Well, no.  And then he got an infection, and the

**OFFICIAL TRANSCRIPT**

1    infection killed him, not the water.

2         Q.   Now, in that case the judge dismissed the case, right?

3         A.   Right.

4         Q.   And he dismissed it in part because of your conduct and

5    testimony, right?

6         A.   No.  I don't know -- I think it was because there was

7    really no evidence.

8         Q.   Well, right.  And you recall the Court saying:

9    However, the plaintiffs' only support for this allegation are the

10   reports of their two experts, Dr. Suzanne Parisian and EHA

11   Consulting Group, neither of whom treated or examined the

12   decedent or inspected the casino premises or tested the water

13   which fell on the decedent?  And therefore the judge dismissed

14   the case?

15        A.   Right.  And the casino, the barge -- it was a barge --

16   got destroyed, so the judge, which was Judge Fallon, was correct.

17        Q.   Now, you also had testified in a case involving liquid

18   silver that allegedly turned a woman blue, right?

19        A.   Oh, it didn't allegedly.  They all turned blue.

20        Q.   So your opinion was that liquid silver was responsible

21   for turning a lady blue, and, therefore, you were testifying

22   against the company that made the liquid silver?

23        A.   No.  It was a dietary supplement that had silver in it,

24   and the people were permanently stained blue.  So you can go look

25   "blue people" up online, and there are blue people walking

**OFFICIAL TRANSCRIPT**

1    around.  And it was because they continued taking the dietary

2    supplement with all the silver.  And so that was the issue,

3    was -- in fact, it was some of their own employees that turned

4    blue.

5        Q.    Okay.  Now --

6        A.    So my role was not about their blueness, it was about

7    how the FDA -- what was the role of the FDA in terms of oversight

8    of dietary supplements, which is very small in terms of the FDA's

9    involvement.

10        Q.    Okay.  Now, to kind of move us along, I'm going to go

11    through a list of products or drugs or things that you have

12    testified for plaintiffs in, and at the end I'm just going to ask

13    you, yes or no, if you testified in this.

14        A.    This will be 20 years.  Go ahead.

15        Q.    Right.  Right.

16              So you have testified for plaintiffs in cases involving

17    pacemakers, pain pumps, hip implants, flu vaccines, orthopedic

18    products, facelift lasers used in plastic surgery, lasers used

19    for prostate cancer -- or surgery, a hernia patch, surgically

20    implanted slings for urinary incontinence, robotic surgery

21    devices, penile implants, contact lenses, and electric

22    wheelchairs.

23              That's just a listing of some you've testified in,

24    right?

25        A.    Right.  And they're related to how they get on the

**OFFICIAL TRANSCRIPT**

1    market with the FDA's involvement.  So it's all the same type of

2    information I'm talking about here.

3           And I chose all those cases.  And usually there is

4    somebody that was hurt in those cases.

5      Q.    Now, in the prescription drug cases like we have here

6    where you come into court, you've only testified for plaintiffs,

7    right?

8      A.    That have gone to court, yes.  And there's about 26 of

9    them, I believe, that I have been involved in, in terms of drugs.

10   I think it was like 46 devices.

11          So that's 20 years, 26 drugs.

12     Q.    So with respect to prescription drug cases, you have

13   never testified for a drug manufacturer, correct?

14     A.    No.  And I have taken cases and they usually don't go

15   further, if I take the case for the manufacturer.

16     Q.    Now, in all of the pharmaceutical drug cases like this

17   where you have testified and given an opinion about the drug's

18   label, you have always found that the label was not adequate, or

19   inadequate, haven't you?

20     A.    If I discussed -- not all cases are about a label.  But

21   if I take the case in the first place, there is probably

22   something in there in terms of the label.

23          So I believe that is correct.

24     Q.    So the answer to my question you think is "yes," right?

25     A.    I believe it is correct in terms of the ones that

**OFFICIAL TRANSCRIPT**

1    require something about a label.

2        Q.    All right.  Now, let's talk a little bit about your

3    background.

4             You're a pathologist?

5        A.    Yes, sir.

6        Q.    In just kind of general terms -- and you mentioned it

7    yesterday -- that is somebody who works with tissues and fluids

8    and things like that, right?

9        A.    And laboratory tests, yes, sir.  Blood banks.

10       Q.    And you have not worked as a practicing pathologist

11   since 1995; is that right?

12       A.    That's right.

13       Q.    And you are not a pharmacologist?

14       A.    No, I'm not.

15       Q.    In general, a pharmacologist is a scientist who

16   conducts experiments and tests drugs on animals and in the

17   laboratory, right?

18       A.    Yes.  But as a physician, as a medical person, you have

19   to know pharmacology.

20       Q.    Right.

21       A.    But I'm not a pharmacologist.

22       Q.    So you would have been exposed to that back in the

23   1980s in medical school and residency and things like that,

24   right?

25       A.    Well, pharmacology would continue.  Every time I take a

1    drug case, you're involved in pharmacology.

2              But I'm not a pharmacologist.

3        Q.    You're not a cardiologist or a heart doctor?

4        A.    No, I'm not.

5        Q.    And you're not a hematologist or a blood doctor?

6        A.    That's correct.

7        Q.    And you do not hold yourself out as an expert in

8    pharmacokinetics or pharmacodynamics, do you?

9        A.    That's correct.

10       Q.    Now, you started with the FDA back in 1991; is that

11   right?

12       A.    Yes, sir.

13       Q.    And you were there for just four years, from 1991 to

14   1995?

15       A.    Yes, sir.

16       Q.    And you are not here speaking on behalf of the FDA?

17       A.    That is correct.

18       Q.    And there are several divisions within the FDA that are

19   called centers?

20       A.    Correct.

21       Q.    Centers, c-e-n-t-e-r-s?

22       A.    Are you going to have a slide of that, too?

23       Q.    I've got that.

24             Now, during the four years you were at FDA, you did not

25   work in the drug center of the FDA that reviews new drug

**OFFICIAL TRANSCRIPT**

1   applications, did you?

2        A.   That's correct.

3        Q.   Let's take a look at --

4             MR. DUKES:  If we could hand Mr. Barr the slide.

5             And if I could pull up Slide 2, please.

6   MR. DUKES:  (CONTINUING)

7        Q.   Now, this slide shows how the FDA was organized when

8   you were working at the FDA, correct?

9        A.   Yes, sir.  It still, other than tobacco, would be about

10  the same.

11       Q.   And you were in the Center For Devices and Radiological

12  Help, the CDRH, right?

13       A.   Yes, sir.

14       Q.   And there you were mainly involved with medical

15  devices?

16       A.   Yes, sir.

17       Q.   And over here, CDER (indicating), is the Center for

18  Drug Evaluation and Research, and that's the center that actually

19  approves new drug applications, and that's the center that was

20  involved in the Xarelto approval process, correct?

21       A.   Yes, sir.

22       Q.   And you never worked in this center (indicating), did

23  you?

24       A.   No, sir.

25       Q.   And you never reviewed a new drug application for a

**OFFICIAL TRANSCRIPT**

1    prescription drug while you were at FDA, did you?

2        A.   That is correct.  Biologic drugs, which is very

3    similar, I did, but I was not over at CDER.

4        Q.   Do you recall testifying that, while you were at FDA,

5    you only worked on one warning label that involved both a device

6    and a drug?

7        A.   Well, that was a specific response to a question, and

8    that was what I said.  Because the FDA doesn't write warning

9    labels.  I got involved in a safety issue.

10            And that is a correct answer.  I did work on one label

11   that was a combination device/drug.  And it was a safety issue

12   where I was the medical officer involved in that.  And the

13   industry took my warning and the FDA.

14       Q.   Now, the last time you prescribed a drug to a patient

15   in a clinical setting was in the late 1980s; is that right?

16       A.   Right.  I still can prescribe, but I'm not in a clinic.

17       Q.   And you have never prescribed Xarelto, have you?

18       A.   That's correct.

19       Q.   And you've never prescribed any of the novel oral

20   anticoagulants, or NOACs, have you?

21       A.   That's correct.

22       Q.   And Xarelto and those NOACs actually did not exist when

23   you were practicing medicine, did they?

24       A.   Well, no, I'm still practicing medicine, but I wasn't

25   prescribing things, that's correct.

**OFFICIAL TRANSCRIPT**

1     Q.   And you don't have any personal experience, any

2   real-world physician experience, with Xarelto, do you?

3     A.   That's correct.

4     Q.   And your only experience with Xarelto or any of the

5   novel oral anticoagulants is after getting retained in this

6   litigation, isn't it?

7     A.   Yes, because I'm not prescribing people anticoagulants.

8   That wouldn't be something I would do.

9     Q.   Let me hand you PX 5767878.

10    A.   Thank you.

11    Q.   Now, this is an article by Dr. Kubitza at Bayer and

12   others entitled *Safety, pharmacodynamics and pharmacokinetics of*

13   *BAY 59-7939, an oral direct Factor Xa inhibitor* published in

14   2005, correct?

15    A.   Yes.  And this is before Xarelto was approved.  That's

16   why they are using the numbers like that for the name.

17         MR. DUKES:  Your Honor, I think it has been used

18   before, but I would --

19         THE COURT:  You can use it.

20         MR. DUKES:  Thank you.

21 **MR. DUKES:  (CONTINUING)**

22    Q.   And you know that this Kubitza 2005 article was

23   provided to the FDA in 2008?  Do you know that?

24    A.   It probably was.  It would have been one of the

25   documents, yes, sir.  Because it was basically their safety study

**OFFICIAL TRANSCRIPT**

1    that was being done in male subjects.  So it was like a Phase I

2    study.

3        Q.    And 2008 would have been three years before Xarelto was

4    even approved, right?

5        A.    Right.

6              I don't know if the study was.  I know the data would

7    have been.

8        Q.    Okay.  And that would be typical, that sponsors provide

9    data, they provide studies.  They even provide global literature

10   to the FDA, don't they?

11       A.    Yes, it's their job to do that.  But I would assume it

12   would have been the data more than the study, per se.

13       Q.    And FDA also has the capability to do its own PubMed

14   searches and other global searches of literature, and they

15   actually do that, don't they?

16       A.    Sometimes they do.  It depends.

17       Q.    Now, you showed a graph from this Kubitza 2005 article

18   on direct showing a linear relationship between PT with

19   Neoplastine reagent and correlation, correct?

20       A.    Yes.  And it also appears in the FDA documents so I

21   know they saw the graph.

22       Q.    So you know they had that graph years before they

23   approved Xarelto?

24       A.    Yes, sir.

25       Q.    Now, let's take a look at PX 5767878.1.1.

**OFFICIAL TRANSCRIPT**

```
 1          So in this article, under conclusions, the author has
 2   determined that BAY 59-7939 was safe and well tolerated -- that's
 3   Xarelto --
 4      A.   Uh-huh.
 5      Q.   -- before it was named Xarelto?
 6      A.   Yes, sir.
 7      Q.   -- across the wide-dose range study with predictable
 8   dose-proportional pharmacokinetics and pharmacodynamics.  And
 9   they go on to say:  These results support further investigation
10   of what is now Xarelto in Phase II clinical trials, right?
11      A.   Right.  That's why I call this a Phase I trial.
12          And accumulation is important in terms of a drug.  So,
13   yeah, this would be the information that FDA had, I think, before
14   they went with the VTE studies, the record studies.
15      Q.   So they had this.
16          And at this stage back in 2005, that range, whenever
17   the data was provided, but we know before 2008 -- after this,
18   there are going to be more studies performed on what becomes
19   Xarelto, right?
20      A.   Right.
21      Q.   Now let's take a look at DX 1902.
22      A.   Okay.
23      Q.   Now, this is the Mueck 2014 article titled *Clinical*
24   *Pharmacokinetic and Pharmacodynamic Profile of Rivaroxaban*,
25   right?
```

**OFFICIAL TRANSCRIPT**

1        A.    Yes, sir.

2        Q.    And the lead author is Dr. Mueck from Bayer?

3        A.    Yes, sir.

4        Q.    And Dr. Kubitza with Bayer, who we just saw was one of

5    the authors of the prior article, is an author of this article,

6    right?

7        A.    Yes, sir.

8        Q.    And this article was published in 2014 in the journal

9    *Clinical Pharmacokinetics*, wasn't it?

10       A.    Yes, sir.

11            MR. DUKES:  Your Honor, I would offer DX 1902 for

12    demonstrative purposes.

13            THE COURT:  You can use it.

14            MR. DUKES:  If you call up DX 1902.9.1.

15   **MR. DUKES:  (CONTINUING)**

16       Q.    So we're on Page 9, bottom right, and I have it up on

17    the screen.

18            These authors stated:  In the early stage of clinical

19    development, it was believed that PT might be a useful laboratory

20    test platform for measuring rivaroxaban if required in certain

21    clinical situations.

22            It goes on at the end of what I'm showing to say:

23    However, the assay --

24            Meaning PT, right?

25       A.    Uh-huh.

1    Q.    -- the assay is not optimal under field conditions when

2    different laboratories and assays are used, correct?

3    A.    That's what it states.

4         MR. DUKES:  And if we could pull up DX 1902.9.1.

5    **MR. DUKES:  (CONTINUING)**

6    Q.    They go on -- and this is the part I don't have in

7    red -- to say:  Existing data suggests that PT can provide a

8    quantitative measurement of rivaroxaban when using one central

9    laboratory with reagent sensitive to rivaroxaban.  However, the

10   assay is not optimal under field conditions if different

11   laboratories and assays are used.

12        Correct?

13   A.    That's what it states, yes, sir.

14   Q.    And "under field conditions" would mean circumstances

15   like hospitals and emergency rooms, wouldn't it?

16   A.    Well, out in the field would be as opposed to the

17   manufacturer's sites.

18   Q.    And you don't disagree that that would include

19   hospitals and emergency rooms?

20   A.    No, sir.

21   Q.    And when they're talking about reagents sensitive to

22   rivaroxaban, you know that there are different reagents that are

23   used to do PT tests, right?

24   A.    Right.

25   Q.    And some are more or less sensitive with regard to

**OFFICIAL TRANSCRIPT**

1  different drugs, correct?

2      A.    Right.  And they tended to use Neoplastine.

3      Q.    In the clinical trials, the sponsors tended to use

4  Neoplastine as the reagent, right?

5      A.    Well, even going back as far as the animal data, yes,

6  they used Neoplastine.  And that is a common PT test in the

7  United States.

8      Q.    So we now know, after nine years of continued testing

9  of Xarelto, Bayer published that, although they had been hopeful

10 that PT would be useful in clinical situations, that PT is not

11 optimal under field conditions with different laboratories and

12 different PT assays, correct?

13     A.    Well, that was the conclusion of Bayer at the time,

14 yes, sir.

15     Q.    And this was -- the Kubitza article, the Mueck

16 article -- this is all published in the -- in literature that can

17 be accessed by any scientist or doctor, right?

18     A.    Well, yes, but it's not consistent with the information

19 internally.  So, yes, this is published.  This is adding to the

20 confusion about what to do.

21     Q.    I understand that's your opinion.

22           But my question was just nothing is hidden?  This is

23 being published in the literature by Bayer scientists from 2005

24 to 2014, the opinions about PT, correct?

25     A.    Well, I mean, you have asked me two things there.  You

**OFFICIAL TRANSCRIPT**

1    said nothing is hidden and they --

2        Q.    Let me ask it again.

3        A.    -- are publishing this.

4              They did publish this.

5        Q.    That's a better question.

6              There is no debate that these opinions by Bayer

7    scientists and colleagues were published in the medical and

8    scientific literature, correct?

9        A.    No, those were published.

10       Q.    And FDA had access to this information?

11       A.    They should have.  And they had the company telling

12   them the same information, yes, sir.

13       Q.    Let me hand you PX 5768548.

14       A.    Thank you.

15       Q.    Now, this is an article entitled *Rivaroxaban or Xarelto*

16   *and other novel oral anticoagulants; pharmacokinetics in healthy*

17   *subjects, specific patient populations and relevance of*

18   *coagulation monitoring.*

19             Right?

20       A.    Yes, sir.

21       Q.    Okay.  Now --

22             MR. DUKES:  Your Honor, this has already been used by

23   plaintiffs, but I'd ask that I can use it.

24             THE COURT:  Yes.

25   MR. DUKES:  (CONTINUING)

**OFFICIAL TRANSCRIPT**

1    **Q.**   And this article was published in 2013 in the

2    *Thrombosis Journal*, wasn't it?

3    **A.**   Yes, sir.

4    **Q.**   And the lead author again is Dr. Mueck at Bayer?

5    **A.**   Yes, sir.

6    MR. DUKES:  If we could call up PX 5768548.11.1.

7    **MR. DUKES:  (CONTINUING)**

8    **Q.**   So in this article, Dr. Mueck and the other authors

9    say:  Nevertheless, if used in an emergency and in the absence of

10   any other available test, Neoplastine Plus (with results

11   expressed in seconds) is the recommended agent for assessing the

12   anticoagulant effect of rivaroxaban.

13   Correct?

14   **A.**   Right.

15   **Q.**   And this information was published in respected medical

16   and scientific journals, wasn't it?

17   **A.**   Right.

18   Are you going to show them Table 4?

19   **Q.**   I'm going to go through parts of it, but you're

20   welcome, on redirect, to show, you know, anything.

21   **A.**   Okay.

22   MR. DUKES:  Let's call up PX 5768548.11.2.

23   And I'm just showing the whole page so we can put in

24   context.

25   **MR. DUKES:  (CONTINUING)**

**OFFICIAL TRANSCRIPT**

1      **Q.**   But this is where the authors are mentioning
2  limitations on PT testing in general, right?
3      **A.**   Right.
4      **Q.**   And you did not discuss these limitations on PT testing
5  in your direct examination, did you?
6      **A.**   No, sir.
7           Do you want to discuss them?
8      **Q.**   Yes.
9           MR. DUKES:  Let's take a look at PX 5768548.11.3.
10  **MR. DUKES:  (CONTINUING)**
11      **Q.**   So Bayer scientists in 2013 informed doctors that, even
12  with standardization --
13           Meaning even if you standardize the reagents, right?
14      **A.**   Uh-huh.
15      **Q.**   -- there are a number of other limitations of PT when
16  applied to novel OACs?
17      **A.**   Right.  So they've gone to the DOACs.  And they have a
18  table in there with the -- showing the information on each of the
19  DOACs and the tests that you would use.
20      **Q.**   Okay.
21           MR. DUKES:  Now, let's call up PX 5768548.11.4.
22  **MR. DUKES:  (CONTINUING)**
23      **Q.**   And the authors go on to say:  Finally, PT reagents are
24  insensitive at low concentrations of rivaroxaban and are not able
25  to accurately measure the Ctrough levels predicted for

**OFFICIAL TRANSCRIPT**

1    rivaroxaban in PK models.

2           Right?

3      A.   Right.  So they are talking about you wouldn't use PT

4    for monitoring their drug level, but they're not saying if you

5    had an emergency situation.  So they're talking specifically

6    about using it for monitoring the drug level at trough and peak.

7      Q.   They go on to say:  Ctrough levels were in the range of

8    9 to 32 MG over ML, but Neoplastine Plus can only measure plasma

9    levels down to approximately 50 MG over ML, meaning that a PT

10   reading taken around the time of a Ctrough will likely provide a

11   false negative result.

12          That's what they said, right?

13     A.   Right.  That's why I said it also is important to know

14   when the patient had taken the Xarelto.

15          So you can still use PT.  They're talking about

16   Ctrough.

17     Q.   And Ctrough is, if you take a drug that works for

18   24 hours, it's basically at the end where the lowest amount of

19   concentration is in somebody's bloodstream, right?

20     A.   Right.

21     Q.   And a false negative would mean that a PT test was

22   normal, but there was still Xarelto anticoagulation in the

23   plaintiff's body, correct?

24     A.   Yes.  And this would be for a low dose.

25          MR. DUKES:  Now, let's call up PX 5768548.11.5.

**OFFICIAL TRANSCRIPT**

1        This is the paragraph just above this one.

2  MR. DUKES:   (CONTINUING)

3    Q.    The authors state:  Rivaroxaban prolongs PT in a

4  dose-dependent manner, but the extent of prolongation depends on

5  the thromboplastin reagent used.

6        Correct?

7    A.    Right.

8    Q.    And other than Neoplastine, what are some names of some

9  other reagents commonly used --

10    A.    Thromboplastin is one that they used.

11    Q.    What are some others?

12    A.    Those are the two that I remember at this point in

13  time.

14        What it is, is a tissue activation factor.  You can

15  have very -- and I don't remember all the ones that have been

16  cleared.  There aren't that many that are used for triggering a

17  clot.  So that's what they are talking about, the product you

18  make to try to trigger a blood clot.

19    Q.    Do you know -- I'm talking about the PT reagents now.

20    A.    Right.

21    Q.    The reagent you put the blood in to count the PT time.

22        Do you know the one most frequently used in the

23  United States?

24    A.    I don't know.  I thought it was the thromboplastin, but

25  I don't know.  Every laboratory has -- that's why they have to

**OFFICIAL TRANSCRIPT**

1  calculate their own.

2  No.  I don't know.

3  Q.  You've looked at --

4  A.  What is it?

5  Q.  I'm sorry.

6  You've looked at medical records -- I know.

7  You've looked at medical records that show PT tests,

8  right?

9  A.  Yes, sir.

10  Q.  And they almost never show what the reagent is, do

11  they?

12  A.  That would be true.  They just give a value for that

13  facility.

14  Q.  Right.  What they give is they give the PT time for the

15  patient and then they give a normal range for that facility,

16  right?

17  A.  Right.

18  Q.  But they don't say what the reagent is, correct?

19  A.  As a rule, not.  Unless you were running the

20  laboratory, then you would know what your reagent is.

21  Q.  So if you're a doctor and you're looking at the PT test

22  and you don't know what the reagent is, you have no idea what

23  that PT test means, do you?

24  A.  No.  It means that your blood is not clotting.  In an

25  emergency situation, it would still work.  And in terms of the --

**OFFICIAL TRANSCRIPT**

1  the Neoplastine is the most accurate, but we were talking about

2  looking at clotting in general.  And so you can call the lab and

3  ask them.  You can also ask for Neoplastine if it's in the label,

4  which it is in the label.

5      Q.    Let me understand that.

6           You are in an emergency situation.  A patient comes

7  into the ER.  You can call up the lab that doesn't use

8  Neoplastine and say, How about would you go get me some

9  Neoplastine?

10     A.    That's not what I said.  I said that the PT is a

11 screening test in terms of knowing that you have got

12 anticoagulation on board, and that it's reliable in terms of

13 knowing you have an excess amount.

14          Now, you can get into -- if you really want to know if

15 it is Neoplastine, you can ask the laboratory to run it with

16 Neoplastine because it's a common agent.  It's not that uncommon.

17 And so if you really want to be specific.

18          But in terms of the way we're talking about using PT,

19 we're not that specific in terms of looking at the clotting

20 factor of a patient's blood.

21          Say, in an overdose patient, if you have an increased

22 clotting, it doesn't matter if it is Neoplastine at that point in

23 time if you have an elevated PT.

24     Q.    Let's talk about overdose for just a second, since you

25 have raised it a couple of times.  Are you aware of the studies

**OFFICIAL TRANSCRIPT**

1   that have shown that patients have taken as much as 60 times the

2   120-milligram dose trying to take their life and have had no ill

3   effects on rivaroxaban or Xarelto?

4      A.   Well, that's a different thing.

5      Q.   No.  I'm just asking have you seen those, are you aware

6   of that?

7      A.   Yes, I'm aware of that, because we also were looking at

8   that curve in terms of some people are low absorbers and high

9   absorbers.

10         But in terms of knowing if a patient took an

11  anticoagulant -- because sometimes patients come in on an

12  overdose and you don't know what they took -- that that would be

13  helpful to know that they may have taken that on board, if they

14  don't know.

15     Q.   Now, you agree, based on everything you've read, that

16  Neoplastine PT is what was used in clinical studies for

17  rivaroxaban, right?

18     A.   Yes.  And from the animal data, yes, sir.

19     Q.   And you have read that it's of -- of the reagents, all

20  of which have flaws, it's the one that most closely would

21  correlate, correct?

22     A.   The ones that the company says.

23         I think another one is Innovar.  Isn't it Innovar?

24  There's one with an "I."  Yeah.

25     Q.   Now, all of this information that we've been looking at

**OFFICIAL TRANSCRIPT**

1  from 2005 to 2014 about PT as -- was published in the medical

2  literature by Bayer scientists, wasn't it?

3     A.   They were.  But the problem is that the data internally

4  shows that the PT can have a function in screening patients like

5  Mrs. Orr.

6          But the literature is very complex and is saying you

7  can't use a common test, which, to me as a clinician, is sad that

8  doctors are being told not to use a test in a situation which

9  could actually protect patients.

10    Q.   And, yet, Doctor -- I understand that's your opinion.

11         We just looked at 2017 articles -- that's what we

12  started with -- from people who are laboratory clinicians who

13  disagree with your opinion, correct?

14    A.   No, they don't disagree with my opinion.  They're

15  talking about DOACs.  You've expanded it to every drug that's out

16  there, and they're saying that you can't use those.

17         But if you look at this table that you didn't want to

18  look at, at Table 4, it goes through each one of those drugs and

19  the types of laboratory tests that you could use -- that Bayer is

20  saying for those, and it uses PT for rivaroxaban.

21         And so it's become a mess in terms of all these drugs

22  and physicians caring for patients, and rivaroxaban has added to

23  that mess.

24    Q.   And you keep saying that we're talking about the NOACs,

25  but, again, you agree that Xarelto is one of the NOACs, right?

**OFFICIAL TRANSCRIPT**

1    A.   I'm saying the DOACs, yes.

2         So it is one, but there are others, and they all behave

3    differently.  Like you take Pradaxa, it is not a factor X, it's a

4    thrombin, so it's going to behave different on laboratory tests.

5         So you pile these together and it does make it a mess.

6    You can't find one test.  And that's what these articles are

7    saying.

8    Q.   And you'd mentioned Pradaxa on direct very briefly.

9    And what you understand is Pradaxa is completely different from

10   Xarelto, Eliquis, and Savaysa in that Pradaxa operates on

11   Factor IIa, not Factor Xa, correct?

12   A.   Correct.  And it basically affects thrombin, too.  And

13   so they recommend -- and updated their own label to put "use

14   APTT," which is your activated PTT.  And so they have been

15   putting laboratory into their label.

16   Q.   Now, let's change subjects and mention reversal agents

17   for a bit.

18        Now, you understand that Xarelto does not have a

19   reversal agent, correct?

20   A.   Yes, sir.

21   Q.   And the Xarelto label has always warned that it does

22   not have a reversal agent, right?

23   A.   Yes, sir.

24   Q.   Let me hand you DX 6.

25        Now, Defendants' Exhibit 6, already admitted -- this is

**OFFICIAL TRANSCRIPT**

1  a copy of a Xarelto label as of 2014.

2          Do you recognize that?

3      A.   Yes, sir.

4          MR. DUKES:  And if we could pull up DX 6.8.3.  And I'm

5  basically turning to Page 8 of the February 2014 label.  And I'll

6  show it on the board -- or the monitor beside you.

7  MR. DUKES:  (CONTINUING)

8      Q.   Do you see where it says:  A specific antidote for

9  rivaroxaban is not available?

10     A.   Yes, sir.

11     Q.   And this was included in the Risk of Bleeding section

12 under the Warnings and Precautions, wasn't it?

13     A.   Yes, sir.

14     Q.   Now, are you aware that there has been a suggestion by

15 plaintiffs' counsel that Janssen and Bayer stopped testing for a

16 reversal agent in 2011 due to commercial reasons?

17     A.   I know there was a company decision not to proceed and

18 to fund it.  I don't think -- I mean, so, that's what I know of.

19     Q.   Okay.  All right.  Let me hand you DX 5177.

20     A.   Thank you.

21     Q.   Now, this is a presentation entitled:

22          Xarelto

23          Antidote/Reversal Agents

24          a) Status Update

25          b) Termination of Rivaroxaban Specific Antidote

**OFFICIAL TRANSCRIPT**

1          It's dated March 14, 2013, correct?

2     A.   Yes, sir.

3     Q.   So this is a presentation in 2013, which would be two

4    years after 2011, and it gives a status update for the

5    development of a Xarelto-specific reversal agent, doesn't it?

6     A.   Right.

7          MR. DUKES:  Your Honor, I would offer DX 5177.

8          MR. BARR:  Your Honor, I don't mind him questioning

9    about it or looking at it, but I don't believe he can offer it

10   into evidence.

11         THE COURT:  Let's look at it first.  Let her testify

12   about it.

13         MR. DUKES:  Certainly.

14   **MR. DUKES:   (CONTINUING)**

15    Q.   Dr. Parisian, is this something you have seen before?

16    A.   Yes, sir.

17    Q.   As part of your review in forming your opinions?

18    A.   I believe I have seen this before.

19         MR. DUKES:  Your Honor, I would offer it into evidence

20   under those circumstances.

21         MR. BARR:  Your Honor, she is not a company employee.

22   I don't believe she can lay a foundation for what this is.  They

23   can talk about it.

24         THE COURT:  In any event, why don't you use it and see

25   how the evidence and testimony goes.

**OFFICIAL TRANSCRIPT**

1          MR. DUKES:  Certainly.  May I show it to the jury?

2          THE COURT:  Yes.

3          MR. DUKES:  Let's call up DX 5177.4.

4  MR. DUKES:  (CONTINUING)

5      Q.   Now, if we go to Slide 3 of this presentation, the

6  title shows that there was a toxicology assessment of a

7  Xarelto-specific anecdote referred to as Fab BAY 1110262,

8  correct?

9      A.   Yes, sir.

10      Q.   Now, were you aware that Bayer did not abandon the

11  development of this potential reversal agent back in 2011?  Did

12  you know that?

13      A.   I know they want a reversal agent because Pradaxa came

14  out with one.  So from a marketing point of view, you need a

15  reversal agent.

16      Q.   So you can tell that Bayer conducted toxicology tests

17  on a potential reversal agent, didn't they?

18      A.   Bayer did, yes, sir.

19      Q.   Right.  And the toxicology studies, if we look right

20  here (indicating), actually found:  Tissue cross reactivity study

21  indicate specific cross reactivity of --

22          And it mentions the experimental reversal agent.

23          -- to epithelial structures of rats, monkeys and humans

24  (mainly on tubular structures in the kidneys).

25          Right?

**OFFICIAL TRANSCRIPT**

1      **A.**   Right.   They are looking at an antibody.   That is what
2  the "Fab" stands for.   It's an antibody cross-react.
3      **Q.**   And it says:   A two-week study in a cynomolgus monkey
4  actually resulted in acute renal failure.
5           Right?
6      **A.**   Right.
7      **Q.**   So if we go to the last sentence, it says:   The team
8  recommends to terminate the rivaroxaban-specific antidote
9  development program.
10          And they give the program number, right?
11     **A.**   Yes, sir.
12     **Q.**   And the reason that Bayer stopped this development was
13  because it was not safe to pursue it in humans, right?
14          MR. BARR:   Objection, Your Honor.   I don't believe she
15  has the foundation to answer that question.
16          THE COURT:   I'll sustain that objection, unless she
17  knows.
18  **MR. DUKES:   (CONTINUING)**
19     **Q.**   Do you know from reviewing this document the reason
20  that Bayer stopped pursuing this particular reversal agent?
21          MR. BARR:   Same objection.
22          THE COURT:   Sustained.
23          MR. DUKES:   We can take that down.
24  **MR. DUKES:   (CONTINUING)**
25     **Q.**   Now, all drugs have --

**OFFICIAL TRANSCRIPT**

1     MR. DUKES:  Your Honor, I can break or I can keep

2  going.  Your preference.

3     THE COURT:  Why don't we break here for lunch, ladies

4  and gentlemen.  We'll take a break for lunch and come back at

5  1:10.

6                    (Jury out at 11:56 a.m.)

7                    (Morning session concluded.)

8

9                    *  *  *  *

10                    **CERTIFICATE**

11

12     **I hereby certify this 7th day of June, 2017, that the**

13  **foregoing is, to the best of my ability and understanding, a true**

14  **and correct transcript of the proceedings in the above-entitled**

15  **matter.**

16

17                         */s/ Mary V. Thompson*

18                    **Official Court Reporter**

19

20

21

22

23

24

25

**OFFICIAL TRANSCRIPT**