1    UNITED STATES DISTRICT COURT
     EASTERN DISTRICT OF LOUISIANA
2

3    **************************************************************

     IN RE:  XARELTO (RIVAROXABAN)
4    PRODUCTS LIABILITY LITIGATION        Docket No. 14-MD-2592
                                          Section "L"
5                                         New Orleans, Louisiana
     THIS DOCUMENT RELATES TO:            Wednesday, June 7, 2017
6    Joseph Orr, et al
     v. Janssen Research &
7    Development, et. al.,
     Case No. 15-CV-3708
8

9    **************************************************************

10              TRANSCRIPT OF TRIAL PROCEEDINGS
          HEARD BEFORE THE HONORABLE ELDON E. FALLON
11              UNITED STATES DISTRICT JUDGE
                VOLUME VII - AFTERNOON SESSION
11

12

     APPEARANCES:
13

     FOR THE PLAINTIFFS'
14   LIAISON COUNSEL:                LEVIN PAPANTONIO
                                     BRIAN H. BARR, ESQ.
15                                   316 Baylen Street, Suite 600
                                     Pensacola, FL 32502
16
                                     BEASLEY ALLEN
17                                   BY:  ANDY BIRCHFIELD, ESQ.
                                     P.O. Box 4160
18                                   Montgomery, AL 36103

19                                   GAINSBURGH BENJAMIN DAVID
                                     MEUNIER & WARSHAUER
20                                   BY:  GERALD E. MEUNIER, ESQ.
                                     2800 Energy Centre
21                                   1100 Poydras Street
                                     New Orleans, LA 70163
22
                                     GOZA & HONNOLD, LLC
23                                   BY:  BRADLEY D. HONNOLD, ESQ.
                                     11181 Overbrook Road, Suite 200
24                                   Leawood, Kansas 66211

25

─────────────────── OFFICIAL TRANSCRIPT ───────────────────

```
 1                                    THE LAMBERT FIRM, PLC
                                      BY:  EMILY JEFFCOTT, ESQ.
 2                                    701 Magazine Street
                                      New Orleans, Louisiana 70130
 3

 4    FOR THE DEFENDANT BAYER
      HEALTHCARE PHARMACEUTICALS
 5    INC. and BAYER PHARMA AG:       WILKINSON WALSH & ESKOVITZ, LLP
                                      BY:  BETH A. WILKINSON, ESQ.
 6                                    1900 M Street NW, Suite 800
                                      Washington, DC 20036
 7
                                      Nelson Mullins Riley
 8                                    & Scarborough, LLP
                                      BY:  DAVID E. DUKES, ESQ.
 9                                    Meridian, 17th Floor
                                      1320 Main Street
10                                    Columbia, SC 29201

11
      FOR JANSSEN PHARMACEUTICALS,
12    INC. AND JANSSEN RESEARCH &
      DEVELOPMENT, LLC:               IRWIN FRITCHIE URQUHART & MOORE
13                                    BY:  JAMES B. IRWIN, ESQ.
                                      400 Poydras St., Suite 2700
14                                    New Orleans, LA 70130

15

16    Official Court Reporter:       Karen A. Ibos, CCR, RPR, CRR, RMR
                                      500 Poydras Street, B-275
17                                    New Orleans, Louisiana 70130
                                      (504) 589-7776
18

19      Proceedings recorded by mechanical stenography, transcript
      produced by computer.
20

21

22

23

24

25
```

OFFICIAL TRANSCRIPT

I N D E X

                                                        PAGE/LINE:


WITNESSES FOR THE PLAINTIFFS:


SUZETTE PARISIAN, M.D.


  Continued Cross-Examination by Mr. Dukes        1629/11
  Redirect Examination by Mr. Barr                1681/10




WITNESSES FOR THE DEFENDANTS:


EDWARD ST. MARTIN, M.D.


  Direct Examination by Mr. Irwin                 1691/15
  Cross-Examination by Mr. Birchfield             1731/13
  Redirect Examination by Mr. Irwin               1764/15



EXHIBITS                                          1771/22

<u>P R O C E E D I N G S</u>

(WEDNESDAY, JUNE 7, 2017)

(AFTERNOON SESSION)


     (OPEN COURT.)

13:17:46  6      (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

13:17:46  7           THE COURT:  Be seated, please.

13:17:49  8           You're still under oath.

13:17:51  9           MR. DUKES:  Good afternoon, ladies and gentlemen.

13:17:51  10               CONTINUED CROSS-EXAMINATION

13:17:51  11  BY MR. DUKES:

13:17:53  12  Q.  Good afternoon, Dr. Parisian.

13:17:55  13  A.  Good afternoon.

13:17:59  14           MR. DUKES:  If we could put DX 5177.4.1 back up on the

13:17:59  15  screen.

13:17:59  16  BY MR. DUKES:

13:18:07  17  Q.  Now, I failed to mention the last time, Dr. Parisian, that the

13:18:11  18  conclusion here -- this is the document where Bayer was talking

13:18:14  19  about doing research to try to discover reversal agent.

13:18:18  20           The conclusion was, "The non-clinical data indicate that

13:18:21  21  the Fab," which is the reversal agent they're working on, right? --

13:18:25  22  "was not safe and, thus, should not be administered to humans."

13:18:29  23           That's what they said, correct?

13:18:31  24           MR. BARR:  Objection, your Honor.  At this point he is

13:18:33  25  just asking her to read documents.  She has already said she

13:18:37  1    doesn't know anything about this.

13:18:38  2                MR. DUKES:  I think it's fair game on the reversal agent.

13:18:41  3                THE COURT:  Yeah.  But you prepared the document, and,

13:18:45  4    you know, I mean, we can all read.  If that's your document, she

13:18:48  5    can read it.  But I don't know what that means.

13:18:50  6    BY MR. DUKES:

13:18:52  7    Q.  Let me ask you -- we can take that down, and I'll ask some

13:18:54  8    questions.

13:18:55  9            Were you aware that after this Bayer did not stop seeking

13:18:59 10    a reversal agent but actually continued with other activities?

13:19:03 11    A.  I knew that the reversal agent was discussed, yes, sir; and it

13:19:07 12    continued to be discussed particularly for commercial use.

13:19:11 13    Q.  Well, did you know that they also talked to Portola, another

13:19:16 14    company, about assisting them in trying to develop a reversal

13:19:19 15    agent?

13:19:19 16    A.  I know Portola is in some of the documents.  I really haven't

13:19:23 17    focused on the reversal agent.

13:19:28 18    Q.  Were you aware that they also looked at things like PCC to see

13:19:32 19    if that would be a useful reversal agent?

13:19:34 20    A.  No.  I don't recall that.

13:19:35 21    Q.  Are you aware of the multiple strategies that Bayer looked at

13:19:40 22    to continue to see, after this -- after they determined that this

13:19:43 23    particular reversal agent was not safe in humans, are you aware of

13:19:48 24    other strategies that Bayer pursued?

13:19:50 25    A.  No.

13:19:51  1    Q.   Now, there are three Factor Xa NOACs, correct?

13:20:00  2    A.   Yes, sir.

13:20:00  3    Q.   And you mentioned Pradaxa.   Pradaxa is not a Factor Xa?

13:20:05  4    A.   No.

13:20:06  5    Q.   It operates on Factor IIa, and it operates very differently,

13:20:09  6    right?

13:20:09  7    A.   Right.   And in a role as thrombin.

13:20:12  8    Q.   And the three Xa factor NOACs are Savaysa, which has just

13:20:17  9    recently been approved --

13:20:19 10    A.   Correct.

13:20:20 11    Q.   -- Eliquis, and Xarelto, right?

13:20:21 12    A.   Yes, sir.

13:20:22 13    Q.   Now, if we could call up Slide 18.

13:20:32 14           And I just want to ask you some questions so we

13:20:35 15    understand, you know, your opinion.   With regard to the Savaysa,

13:20:40 16    does it -- does this label say that a PTT test would be helpful?

13:20:46 17    A.   I don't believe so.

13:20:46 18    Q.   Okay.   So if we could check that.   Let's put an "X" in there

13:20:53 19    for no.

13:21:00 20    A.   Am I supposed to put the "X"?

13:21:03 21    Q.   No.   No, you're not.

13:21:06 22           MR. BARR:   You can do it on the screen.

13:21:08 23           MR. DUKES:   Can I do it on the screen?   Well, I may even

13:21:12 24    write it out then.   All right.   So are going to put --

13:21:13 25           THE WITNESS:   There you go.

13:21:15 1          MR. DUKES:  -- "X" there for no.

13:21:16 2          MR. BARR:  Let me know if you need any more help.

13:21:19 3          MR. DUKES:  This is challenging my technology.

13:21:21 4   BY MR. DUKES:

13:21:22 5   Q.  How about Eliquis, does Eliquis label say that a PTT test is

13:21:25 6   helpful?

13:21:26 7   A.  I don't believe so.

13:21:28 8   Q.  And how about Xarelto?  Does Xarelto label say that a PTT test

13:21:32 9   is helpful?

13:21:32 10  A.  No.  I wish it did; but, no.

13:21:34 11  Q.  Now, let's talk about reversal agent.  The same thing.  Does

13:21:37 12  the Savaysa label say that it has a reversal agent?

13:21:41 13  A.  No.

13:21:42 14  Q.  And Eliquis, does that label say it has a reversal agent?

13:21:49 15  A.  No.

13:21:49 16  Q.  And we've already discussed that Xarelto label specifically

13:21:53 17  says it does not have a reversal agent, right?

13:21:55 18  A.  Yes.  That is correct.

13:21:56 19  Q.  Now, we can take that down.  Let me try the ELMO, if I could.

13:22:34 20  All right.

13:22:34 21          Now, all of the Xa NOACs say in the label that they

13:22:40 22  prolong PT time, don't they?  And what I've done is put that

13:22:46 23  portion of the labels up for you.

13:22:49 24  A.  Um, no.  I mean, if you look at Xarelto where is it saying

13:23:26 25  "prolongs PT time"?

13:23:26  1   Q.  See where it says, "PT activated partial thromboplastin and

13:23:26  2   Heptest are prolonged dose dependently"?

13:23:26  3   A.  Dose dependently.  All right.  I'll buy that.

13:23:26  4   Q.  So you would agree that all Factor Xa NOACs say in the label

13:23:26  5   that they prolong PT time, right?

13:23:26  6   A.  Let me look at them.  I haven't looked at them this way.

13:23:26  7   (WITNESS REVIEWS DOCUMENT.)  Okay.  I mean, they say what they say.

13:23:38  8   Let me look at the last one.

13:23:42  9   Q.  Okay.

13:23:42 10   A.  (WITNESS REVIEWS DOCUMENT.)  Yes, but they're talking about

13:23:55 11   using them for monitoring them.

13:23:57 12   Q.  But they all say that they prolong PT time.  That's my

13:24:01 13   question.

13:24:02 14   A.  Indirectly, yes, sir.

13:24:03 15   Q.  Now, none of the Factor Xa NOAC labels say that PT is helpful,

13:24:08 16   do they?

13:24:08 17   A.  Not there.

13:24:11 18   Q.  Okay.  Now, this is the Xarelto label, and you agree that

13:24:26 19   Xarelto label warns and always has warned of the risk of bleeding?

13:24:30 20   A.  Yes, sir.

13:24:31 21   Q.  And that includes fatal bleeds, right?

13:24:34 22   A.  Yes, sir.

13:24:34 23   Q.  And brain bleeds?

13:24:35 24   A.  Yes, sir.

13:24:35 25   Q.  And that warning about bleeding is actually in the warnings and

13:24:56  1   precautions section, correct?

13:24:57  2   A.  Yes, sir.

13:24:58  3   Q.  And if we look at other anticoagulants, Savaysa, Eliquis,

13:25:03  4   Xarelto, all of the Factor Xa; Pradaxa, a Factor IIa; and then

13:25:08  5   Coumadin or warfarin, which we've been discussing, which is --

13:25:12  6   A.  Vitamin K dependent.

13:25:13  7   Q.  -- Vitamin K.  It's been on the market for about 50 years.  All

13:25:17  8   of those anticoagulants warn of bleeding risk, don't they?

13:25:21  9   A.  Correct.

13:25:22 10   Q.  Now, do you know when the ROCKET study -- the percentage of

13:25:31 11   patients in that study who actually had a brain hemorrhage?

13:25:34 12   A.  Are you talking --

13:25:35 13   Q.  On Xarelto.

13:25:36 14   A.  On Xarelto.  Because there's the ischemic and the hemorrhagic,

13:25:41 15   but I don't remember the percentages.  They were low.

13:25:42 16   Q.  Let's combine it.  Would it --

13:25:44 17   A.  Are you going to combine the two?

13:25:46 18   Q.  Yeah.  Just brain hemorrhage.  Would it be consistent with your

13:25:52 19   understanding that in ROCKET that there was a very small percentage

13:25:55 20   of patients who actually had a brain bleed, right?

13:25:57 21   A.  Right.

13:25:58 22   Q.  Would it be consistent with your understanding that it was

13:26:01 23   .5 percent or approximately .5 percent?

13:26:03 24   A.  Right.  In terms of -- that's bleeding into the brain.  So that

13:26:07 25   would be an adverse event.

13:26:10  1    Q.  Now, all drugs have risks, don't they?

13:26:13  2    A.  Yes, sir.  That's why the manufacturer's supposed to provide

13:26:17  3    the information to the physicians to determine if they want to use

13:26:19  4    that drug.

13:26:20  5    Q.  So all drugs have risks; that was my question?

13:26:23  6    A.  Yes, sir.

13:26:23  7    Q.  And when a drug is approved by FDA, it does not mean that that

13:26:27  8    drug does not have risks, does it?

13:26:29  9    A.  No.

13:26:29  10   Q.  For example, we've just seen that all of the anticoagulants

13:26:33  11   have a risk of bleeding, right?

13:26:35  12   A.  That's right.

13:26:35  13   Q.  So safety in the regulatory context with FDA does not mean the

13:26:41  14   absence of risk, does it?

13:26:42  15   A.  Safety would be -- it's commensurate risk in terms of the risk

13:26:49  16   versus the benefit.  So in terms of the clinical trial, there was

13:26:52  17   some benefit showed that would justify the potential risk in their

13:26:56  18   clinical trial.

13:26:57  19   Q.  So safety in the FDA regulatory context means that the benefits

13:27:01  20   of a medicine outweigh the risk, right?

13:27:03  21   A.  They should, yes, sir.  Or they're explained.  There are some

13:27:06  22   drugs that you're going to have a risk, and you're dead if you

13:27:12  23   didn't take it.  So you have to make that choice between risk

13:27:15  24   versus benefit.

13:27:15  25   Q.  So when the FDA approves a drug, that means that FDA has

13:27:19  1    concluded that the medicine is safe and effective when used in

13:27:22  2    accordance with the approved label, right?

13:27:25  3    A.  Yes, basically primarily effective.  Safety has to come from

13:27:29  4    longer use.  So they've approved it.  This is an approved drug.

13:27:32  5    Q.  Right.  They've approved it as safe and effective?

13:27:35  6    A.  Well, they've approved it as effective for what they claimed in

13:27:39  7    terms of the indication.  Safety is the data from ROCKET.

13:27:42  8    Q.  So do you dispute that the FDA approved Xarelto as safe and

13:27:47  9    effective?

13:27:47  10   A.  No.  They've approved it; it's an approved drug.

13:27:50  11   Q.  So the answer to my question would be:  FDA did approve Xarelto

13:27:53  12   as safe and effective, right?

13:27:55  13   A.  Yes.  But I wanted the jury to understand it was the safety of

13:27:58  14   the ROCKET study.

13:27:58  15   Q.  Now, the FDA is a federal public health agency that Congress

13:28:03  16   charged with ensuring the safety of drugs in the United States,

13:28:06  17   right?

13:28:06  18   A.  Yes.  Well, the gatekeeper for the new drugs coming onto the

13:28:10  19   market.

13:28:10  20   Q.  And FDA hires many scientists and doctors?

13:28:14  21   A.  Yes.

13:28:14  22   Q.  They got statisticians and epidemiologists?

13:28:17  23   A.  Pharmacologists, toxicologists, chemists, all kinds of people.

13:28:22  24   Q.  Hematologists who deal with blood?

13:28:26  25   A.  They have -- I don't know how many they have, but I know they

13:28:27 1    have at least one or two.

13:28:29 2    Q.  You know that from reviewing the approval documents from

13:28:32 3    Xarelto, don't you?

13:28:33 4    A.  The hematology department, I know, had at least two

13:28:35 5    hematologists, but you don't have to be a hematologist to be the

13:28:39 6    hematology branch.

13:28:40 7    Q.  And Xarelto also hired -- I'm sorry -- FDA also has

13:28:44 8    cardiologist, correct?

13:28:45 9    A.  They have some.  They have a wide -- medical officers are

13:28:48 10   looked at very fairly generically.  They had some cardiorenal

13:28:54 11   people, but you're not always stuck with having that specialty to

13:28:57 12   review your application.

13:28:58 13   Q.  I understand.

13:28:59 14   A.  But in this particular case, they did have.

13:29:01 15   Q.  I may have made that question a little too complicated.

13:29:05 16           My question was simply, FDA hires cardiologists, don't

13:29:08 17   they?

13:29:09 18   A.  If they could get them.  They hire a lot of internists to work

13:29:13 19   as cardiologists in terms of cardiac drugs.

13:29:15 20   Q.  Now, FDA has the final approval authority for prescription

13:29:19 21   drugs in the United States, don't they?

13:29:21 22   A.  Yes.  You have to be approved by the FDA to be on the market.

13:29:24 23   Q.  And you're familiar with the laws governing FDA, aren't you?

13:29:28 24   A.  Yes, sir.

13:29:28 25   Q.  And you're familiar with the FDA regulations that are based on

13:29:32  1   what congress mandated that FDA do, aren't you?

13:29:35  2   A.  Yes, sir.

13:29:36  3   Q.  And you're familiar with what FDA must do if it finds that a

13:29:41  4   drug is not safe and effective, aren't you?

13:29:43  5   A.  Well, they're not supposed to approve it.  If the clinicians

13:29:48  6   determine that it's not safe and effective, they typically don't

13:29:51  7   approve it.  But it is a political organization also.

13:29:55  8   Q.  Let me hand you DX 526.  Now, this is a copy of a statute from

13:30:17  9   21 USC, US Code 355 about new drug applications, isn't it?

13:30:23 10   A.  Yes, sir.

13:30:23 11   Q.  And you're familiar with this?

13:30:24 12   A.  Yes, sir.

13:30:25 13         MR. DUKES:  Your Honor, I will offer it for

13:30:27 14   demonstrative.

13:30:28 15         MR. BARR:  No objection as a demonstrative.

13:30:28 16   BY MR. DUKES:

13:30:30 17   Q.  You can call it DX 526.6.1.  And if you're following along,

13:30:35 18   I'll have it on the screen, but I am looking at page 6 of 34, and

13:30:39 19   the page number is on the bottom of the page.

13:30:41 20   A.  Thank you.

13:30:41 21   Q.  And this is Section 355(d).  Do you see that?

13:30:46 22   A.  Yes, sir.

13:30:46 23   Q.  The language from the United States Code tells the FDA that

13:30:51 24   they must refuse a new drug application if it does not include

13:30:56 25   adequate tests by all methods reasonably applicable to show whether

13:31:01  1   the drug is safe for use under the conditions prescribed, doesn't

13:31:05  2   it?

13:31:05  3   A.  Correct.

13:31:06  4   Q.  And FDA has the power and the obligation to deny approval of a

13:31:14  5   new drug if they determine not enough tests have been conducted,

13:31:17  6   don't they?

13:31:18  7   A.  Right.  They can -- particularly when the product is not

13:31:21  8   marketed, because if it's not marketed, then there's no

13:31:24  9   availability to the public.  But if it's marketed, it's already on

13:31:28 10   the market, the FDA can deny approval.  But sometimes the drug's

13:31:33 11   already out there.

13:31:34 12   Q.  But to answer my question, the FDA does have the power and

13:31:38 13   authority to deny approval of drugs?

13:31:39 14   A.  Yes, sir, they do.

13:31:41 15   Q.  If you could call up DX 526.6.2.  We're still looking at the

13:31:46 16   statute.

13:31:47 17            And it further states that:  The FDA must reject the

13:31:50 18   application if it deems that there is insufficient information to

13:31:55 19   determine whether such drug is safe for use, correct?

13:31:58 20   A.  Yes, sir.

13:31:59 21   Q.  And if we could take a look at DX 526.6.5.  The statute goes on

13:32:07 22   to state:  The FDA must reject an application if based on a fair

13:32:12 23   evaluation of all material facts the labelling is false or

13:32:16 24   misleading in any particular, correct?

13:32:18 25   A.  Yes, sir.

1640

13:32:20  1    Q.   Now, let me hand you DX 551.

13:32:32  2    A.   Thank you.

13:32:33  3    Q.   And this is a federal regulation that you're familiar with

13:32:46  4    called 21 CFR 314.2, isn't it?

13:32:49  5    A.   Yes, sir.

13:32:50  6    Q.   And this governs applications for FDA approval to market a new

13:32:53  7    drug, doesn't it?

13:32:54  8    A.   Yes, sir.

13:32:55  9    Q.   And it describes the purpose of the application process, right?

13:32:59 10    A.   Yes, sir.

13:33:00 11              MR. DUKES:  Your Honor, I would like to offer DX 551 as a

13:33:03 12    demonstrative.

13:33:04 13              MR. BARR:  No objection.

13:33:05 14              MR. DUKES:  If we can call up DX 551.1.1.

13:33:05 15    BY MR. DUKES:

13:33:10 16    Q.   The regulation states, "The purpose of this part is to

13:33:13 17    establish an efficient and thorough drug review process in order to

13:33:17 18    facilitate the approval of drugs shown to be safe and effective."

13:33:22 19    Doesn't it?

13:33:22 20    A.   Yes, sir.

13:33:23 21    Q.   And the regulation is also to "ensure the disapproval of drugs

13:33:27 22    not shown to be safe and effective," correct?

13:33:29 23    A.   Yes.

13:33:30 24    Q.   That's what -- that's what we have in paragraph (b), right?

13:33:35 25    A.   Right.

13:33:36  1   Q.  So under the regulations the FDA operates under, when it

13:33:44  2   approves a new drug application, it has to make a determination

13:33:47  3   that the drug has met the standards for safety and effectiveness,

13:33:51  4   doesn't it?

13:33:51  5   A.  That's right.

13:33:52  6   Q.  And in addition to that, the FDA must establish that the label

13:33:58  7   that goes with the drug is adequate, correct?

13:34:00  8   A.  Right; meaning, that you can use the label.

13:34:02  9   Q.  Now, you know that FDA approved two new drug applications for

13:34:08 10   Xarelto in 2011?

13:34:10 11   A.  Yes, sir.

13:34:10 12   Q.  And Xarelto met the FDA's standards for approval for those

13:34:16 13   approved indications, didn't it?

13:34:17 14   A.  Yes, sir.  They're both marketed drugs.

13:34:19 15   Q.  And Xarelto continues to meet the standards for approval,

13:34:23 16   doesn't it?

13:34:24 17   A.  Yes, it's still marketed.

13:34:25 18   Q.  Now, the FDA first approved a new drug application for Xarelto

13:34:29 19   on July 1, 2011, to prevent deep vein thrombosis and pulmonary

13:34:35 20   embolism; is that right?

13:34:36 21   A.  Yes, sir.

13:34:37 22   Q.  That was in patients having hip and knee replacement surgery?

13:34:40 23   A.  Yes, sir.

13:34:40 24   Q.  And let me hand you DX 5357.  Now, this is the FDA's letter to

13:35:05 25   Johnson & Johnson on July 1, 2011, approving the Xarelto

13:35:09  1  10-milligram tablets for deep vein thrombosis and pulmonary

13:35:14  2  embolism in patients having hip and knee replacement surgery,

13:35:17  3  correct?

13:35:17  4  A.  Yes, sir.

13:35:18  5  Q.  And you're familiar with this letter?

13:35:19  6  A.  Yes, sir.

13:35:20  7          MR. DUKES:  Your Honor, I would offer DX 5357 into

13:35:23  8  evidence.

13:35:23  9          MR. BARR:  I believe it's already in.

13:35:23 10          MR. DUKES:  I think it is but...

13:35:23 11  BY MR. DUKES:

13:35:26 12  Q.  If we could call up DX 5357.2.3.  The first paragraph refers to

13:35:34 13  the new drug application that was submitted under Section 505(b)

13:35:37 14  that we looked at, right?

13:35:39 15  A.  Yes, sir.

13:35:39 16  Q.  And if we could call up DX 5357.2.1, what I am doing here is

13:35:47 17  going down to the fifth paragraph.  The FDA says, "We have

13:35:50 18  completed our review of this application, as amended.  It is

13:35:53 19  approved, effective on the date of this letter, for use as

13:35:57 20  recommended in the enclosed agreed-upon labelling text," correct?

13:36:01 21  A.  Yes, and there were also certain conditions in the letter.

13:36:04 22  Q.  Correct, there were some postmarketing conditions, right?

13:36:07 23  A.  Right, that the company was going to meet certain requirements.

13:36:10 24  Q.  Right.  And under the statutory standard for approving a new

13:36:15 25  drug application, this approval indicates that FDA has found

13:36:19  1    Xarelto to be safe and effective for this approved indication,

13:36:22  2    doesn't it?

13:36:22  3    A.  For that specific indication, yes, sir, they could market it

13:36:25  4    legally for that indication.

13:36:26  5    Q.  And if we call up DX 5357.32.1.  The letter was signed by

13:36:36  6    Dr. Richard Pazdur, who was the director of the Office on Oncology

13:36:40  7    Drug Products within the Center for Drug Evaluation and Research,

13:36:43  8    which is that center on the far left that we looked at?

13:36:45  9    A.  Right.  In his division, he is the head -- the hematology

13:36:49  10   division was in his group, and so that's why Pazdur -- so this is

13:36:54  11   the hematology review -- was approving it for VTE.

13:37:00  12   Q.  Now, in November of 2011, the FDA approved a second new drug

13:37:02  13   application for Xarelto, didn't it?

13:37:03  14   A.  Yes, sir.

13:37:03  15   Q.  And this was for Xarelto to be used in patients with atrial

13:37:07  16   fibrillation to reduce the risk of stroke; is that right?

13:37:10  17   A.  Yes.

13:37:11  18   Q.  Let me hand you DX 5233.  Now, this is FDA's letter to Janssen

13:37:34  19   Pharmaceuticals dated November 4, 2011, approving the use of

13:37:38  20   Xarelto to reduce the risk of stroke in patients who had atrial

13:37:42  21   fibrillation, right?

13:37:43  22   A.  Yes, sir.

13:37:43  23           MR. DUKES:  Your Honor, I think this is this evidence,

13:37:46  24   but if not, I'll --

13:37:47  25           MR. BARR:  No objection either way.

BY MR. DUKES:

Q.  If we could call up DX 5233.2.1.  So the FDA says here, "We
have completed our review of this application, as amended.  It is
approved, effective on the date of this letter, for use as
recommended in the enclosed agreed-upon labelling text," correct?

A.  Yes, it and also reminds them of the commitments that the
company had made when they got the VTE approval for enhanced
postmarket surveillance and for developing a smaller dose.  There's
a lot of different things that the FDA is reminding the company of.

Q.  But they're approving it to be marketed, correct?

A.  It's approved to be marketed with those conditions, that the
company is going to fulfill those requirements.

Q.  If we could call DX 5233.6.1.  And this was signed by
Dr. Norman Stockbridge.  Do you know what his position was at the
time?

A.  He was the director, I believe, of the cardiorenal -- the
division that had the cardiorenal group in it.

Q.  So this was a different division within the FDA that approved
this indication?

A.  That's right.

Q.  Now, the FDA could have refused to approve Xarelto, couldn't
they?

A.  In any of these situations, it could have, yes, sir.

Q.  And you do not disagree with the FDA's approval of Xarelto as
safe and effective, do you?

13:39:05  1   A.  Based on the information that the FDA had, the VTE, I don't

13:39:13  2   have any problems with that.

13:39:15  3        Internally, when the medical officers are raising

13:39:17  4   concerns about the risks of the warfarin patients and ROCKET,

13:39:25  5   that I would have some problems with, but the FDA ultimately --

13:39:29  6   management decided to go ahead and approve it.  So I would say with

13:39:33  7   a caveat, based on the clinical reviewers, I would have problems.

13:39:37  8   But it is approved, so the bottom line is that FDA did approve it

13:39:41  9   for whatever FDA chose to approve it for.  Therefore, whoever signs

13:39:46 10   off on it is certifying that it met the standard to be marketed.

13:39:49 11   Q.  So do you disagree or do you agree with the FDA's approval of

13:39:54 12   Xarelto, yes or no?

13:39:54 13   A.  I think I said my answer.  I think that -- I have difficulty

13:40:00 14   with the medical officers, and I know a lot more about ROCKET than

13:40:04 15   they do in terms of the FDA.  That the FDA decided to approve it,

13:40:09 16   the management, I have no -- I am not going to fault the FDA.  But

13:40:13 17   knowing more information that I do, particularly about the bleeding

13:40:18 18   with the INRatio, I have difficulties as a clinician and a medical

13:40:21 19   officer with the FDA 's approval.  But the FDA did approve it for

13:40:25 20   marketing.

13:40:25 21   Q.  You know that FDA weighed the benefits and the potential risks

13:40:32 22   before the initial approval in 2011 and has done that since 2011,

13:40:37 23   don't you?

13:40:37 24   A.  Well, I know that they weighed it in terms of their

13:40:41 25   mathematical modeling of ROCKET.  Is that what you're talking

1646

13:40:44  1   about?

13:40:45  2   Q.  Yes.  Yes.

13:40:46  3   A.  They haven't approved it for anything else.  So the main bulk

13:40:50  4   of all of the approval is in that letter we're seeing in 2011.

13:40:53  5   Q.  And it's also been evaluated again and deemed to be safe and

13:40:59  6   effective in 2016, hasn't it?

13:41:01  7   A.  No.  You're talking about the ROCKET reevaluation study?  The

13:41:04  8   FDA has chosen not to take any regulatory action based on

13:41:08  9   mathematical modeling.

13:41:10 10   Q.  Okay.

13:41:11 11   A.  I know that they funded some postmarket safety studies.  I

13:41:16 12   think Dr. Graham in postmarket safety went and did a comparison

13:41:20 13   study head to head, Pradaxa versus Xarelto.  So I know the FDA is

13:41:25 14   still continuing to look at safety.

13:41:26 15   Q.  So the answer would be, yes, the FDA is continuing to look at

13:41:30 16   safety of Xarelto, right?

13:41:31 17   A.  Yes, sir, I think they are continuing to look at the safety.

13:41:34 18        MR. BARR:  Can we approach real quick?

13:41:46 19     (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

13:41:51 20        MR. BARR:  Your Honor, in your motion in limine order,

13:41:55 21   you said that this issue about FDA approval was a close issue, and

13:42:02 22   I think at this point it's come up, we've been talking about for a

13:42:11 23   little while, and I think the limiting instruction that you

13:42:21 24   contemplated is appropriate at this point, given what we've been

13:42:21 25   talking about, approval and that, you know, that this is a finding

OFFICIAL TRANSCRIPT

13:42:23  1    that the drug is safe and effective is how the questioning is

13:42:23  2    going.  So I think an instruction on that is appropriate.

13:42:23  3             MR. DUKES:  Your Honor, I think you've given that

13:42:23  4    instruction to the jury.  This is a regulatory expert.  I think it

13:45:17  5    would be highly prejudicial in the context of my cross-examination

13:45:17  6    to give that instruction.

13:45:17  7             THE COURT:  I don't want to interrupt it.  Maybe when you

13:45:17  8    finish that area, I'll simply tell the jury you've heard my

13:45:17  9    previous instruction.  I give it to you the same way, something

13:45:17 10    like that.  And I'll reiterate that in my charges.  But I'll touch

13:45:17 11    on the instruction.

13:45:17 12             MR. BARR:  Thank you, your Honor.

13:45:17 13             THE COURT:  But I won't interrupt.  Let me know when

13:45:17 14    you're getting to another point, another area.

13:45:17 15             MR. DUKES:  Yes, sir.

13:45:17 16       (OPEN COURT.)

13:45:17 17    BY MR. DUKES:

13:45:17 18    Q.  Now, you agree that FDA properly approved the label for

13:45:17 19    Xarelto, don't you?

13:45:17 20    A.  Which label?  Yes.  I have not raised anything about the FDA.

13:45:17 21    They're going on the information they have.

13:45:17 22    Q.  And when a pharmaceutical company proposes a label, the FDA

13:45:17 23    does not at the time of approval just have to accept what the

13:45:17 24    pharmaceutical company proposed, do they?

13:45:17 25    A.  It depends.  It depends.  Because I know that if the company

13:45:17 1  says something is important -- like, if we look at the VTE label,

13:45:17 2  FDA had struck one line about INR.  The company said it was

13:45:17 3  important; FDA let them put that back in.  So it depends.  It's a

13:45:17 4  negotiation process.  The FDA is running a timeline.  They're

13:45:17 5  trying to get the best label.  So the FDA will try to approve a

13:45:17 6  label that represents the information that's been reviewed.

13:45:17 7  Q.  Maybe my question wasn't clear.  My question was intended to be

13:45:17 8  at the time the drug company submits a label to the FDA, the FDA

13:45:17 9  does not have to accept that and approve it?

13:45:17 10  A.  That's correct.

13:45:17 11  Q.  And the FDA can refuse to approve a drug if the labelling is

13:45:17 12  misleading in any way, correct?

13:45:17 13  A.  Yes, sir.

13:45:17 14  Q.  And if the FDA doesn't like what the pharmaceutical company

13:45:17 15  submitted, the FDA can propose its own edits to the label, can't

13:45:18 16  it?

13:45:18 17  A.  They can propose them.  The company may not have to take them.

13:45:18 18  Q.  And FDA can rewrite parts of the label if it doesn't like what

13:45:18 19  the label says, can't they?

13:45:18 20  A.  They can try to, yes, sir.  But it's ultimately the company's

13:45:18 21  say what's in the label.  Some companies have chosen not to get

13:45:18 22  approved if they don't like what FDA is asking in the label.

13:45:18 23  Q.  Now, ultimately FDA, with regard to the Xarelto labels, had to

13:45:18 24  approve every word of the final label, didn't it?

13:45:18 25  A.  Every word.  All right.  You're talking about the -- which one

1649

13:45:18  1  are you talking about label -- yes, the FDA signs off on the final

13:45:18  2  label.

13:45:18  3  Q.  And it has to approve every word on the label, right?

13:45:18  4  A.  I guess if you're saying -- yes.  But if you're changing the

13:45:18  5  label, the first label --

13:45:18  6  Q.  Nope.  My question was, when it was first approved --

13:45:21  7  A.  Yes, FDA approved the label.

13:45:22  8  Q.  And, in fact, you can't just decide that you're going to write

13:45:25  9  a section in there that's not within the topics that FDA requires

13:45:29  10  you to have in there.  They dictate the format of the label also,

13:45:34  11  don't they?

13:45:34  12  A.  They don't dictate the contents.

13:45:36  13  Q.  I didn't say that, I'm sorry -- the headings.  They dictate the

13:45:41  14  headings and the categories?

13:45:42  15  A.  Right.  If a manufacturer said that a certain new heading

13:45:47  16  needed to be for their drug, then I don't think the FDA would say

13:45:50  17  no.  They would listen to what it is.  It's not written in stone

13:45:52  18  what's in the label.  It's suggestions as to what components you

13:45:56  19  need to add.  And if a manufacturer said he needed to have

13:45:59  20  something, then they could add that.  I mean, it's not --

13:46:02  21  Q.  You know that the FDA specifies the order of what's in the

13:46:08  22  label, all the way down to the font size or the typeface of what

13:46:14  23  goes in the label, don't you?

13:46:15  24  A.  Right, but not everything is used.  The manufacturers pick and

13:46:17  25  choose --

13:46:18   1   Q.  Dr. Parisian, that wasn't my question.  My question was simply

13:46:21   2   that you understand that FDA approves every aspect of the label,

13:46:24   3   including down to the size of the words?

13:46:26   4   A.  Well, yes, and that would be your 21 CFR 201.57, we saw before,

13:46:34   5   the FDA creates the format for what a drug prescription label would

13:46:37   6   look like.  It's done that since 1979.

13:46:40   7   Q.  So when we look at the approved Xarelto label, we're looking at

13:46:43   8   a label that FDA has approved every section, every paragraph, every

13:46:48   9   word, even the size and the placement of those words, haven't they?

13:46:52  10   A.  Based on what the manufacturers told them, yes, sir.

13:46:59  11   Q.  And you're not here to criticize the FDA in approving the

13:47:02  12   Xarelto label, are you?

13:47:03  13   A.  No.  I'm talking -- that's why it's the manufacturer, not the

13:47:08  14   FDA.

13:47:08  15   Q.  My question was, you're not here to criticize the FDA for

13:47:13  16   approving the Xarelto label, are you?

13:47:14  17   A.  No, not based on the information they were provided.  And we've

13:47:19  18   discussed information they weren't provided.

13:47:21  19   Q.  So would a fair answer be that you're not here to criticize the

13:47:27  20   FDA for approving the Xarelto label?

13:47:28  21   A.  Not on the information they were given, no, sir.

13:47:31  22   Q.  Before FDA approved the new drug application for Xarelto, they

13:47:34  23   conducted a thorough review of those applications, didn't they?

13:47:37  24   A.  Can you say that again?

13:47:41  25   Q.  Before FDA approved the new drug applications for Xarelto, they

13:47:45  1    conducted a thorough review of those applications?

13:47:48  2    A.  Of all of the components in the new drug application, yes, sir.

13:47:54  3    Q.  And before FDA approved the new drug application for Xarelto,

13:47:58  4    they had different doctors and scientists in different disciplines

13:48:02  5    look at the information in the new drug application, correct?

13:48:05  6    A.  Correct.  But there's all kinds of components that have to be

13:48:08  7    reviewed, and it's a team of people that review them.

13:48:10  8    Q.  And the first NDA, that was NDA 22-406 for the prevention of

13:48:18  9    deep vein thrombosis, you're aware that that was approved by FDA

13:48:25 10    and it was approved by different scientists and doctors in

13:48:28 11    different divisions of FDA?

13:48:29 12    A.  It was the hematology division, yes, sir.

13:48:32 13    Q.  And are you aware in July of 2008 that the company submitted

13:48:38 14    the first label for Xarelto to FDA?

13:48:41 15    A.  I think so, a draft label, yes, sir.

13:48:43 16    Q.  So the draft label -- let's get the timeline straight.  So FDA

13:48:47 17    approved one indication in July of 2011, another in November of

13:48:52 18    2011, but the first draft label was provided for Xarelto in 2008,

13:48:59 19    right?

13:48:59 20    A.  Right.  And I believe that was when they had the RECORD

13:49:03 21    studies, 1, 2, 3 and 4.  And so that label was actually focused on

13:49:08 22    the studies that were used for VTE, and then they ran into some

13:49:12 23    issues with the RECORD study.

13:49:14 24              MR. DUKES:  Your Honor, move to strike.

13:49:16 25              THE COURT:  Just answer the question.

13:49:18  1          THE WITNESS:  Yes, your Honor.

13:49:19  2   BY MR. DUKES:

13:49:20  3   Q.  The second NDA being reviewed was being reviewed by the

13:49:23  4   cardiology and renal division, wasn't it?

13:49:25  5   A.  Yes, sir.

13:49:25  6   Q.  And in reviewing the first NDA, now we're going back to NDA

13:49:31  7   22-406, the hematology group which was reviewing it coordinated

13:49:36  8   with the cardiology division that was handling the review of the

13:49:39  9   second NDA for atrial fibrillation.  You know that from reviewing

13:49:43 10   the records, don't you?

13:49:44 11   A.  Yes.  According to the June documents, there was -- because the

13:49:47 12   company asked specifically about the label.

13:49:48 13   Q.  So focusing on the second NDA, the one for atrial fibrillation,

13:49:55 14   a number of doctors and scientists reviewed that new drug

13:49:58 15   application, didn't they?

13:49:59 16   A.  Yes, sir.

13:49:59 17   Q.  And there was a medical officers review of the second NDA,

13:50:03 18   right?

13:50:04 19   A.  Yes, sir.

13:50:04 20   Q.  And the review was by Dr. Preston Dunnmon and Dr. Martin Rose,

13:50:09 21   right?

13:50:09 22   A.  Right, as we saw that summary today.

13:50:11 23   Q.  And there was also a cross-discipline team leader review,

13:50:14 24   right?

13:50:14 25   A.  Yes, sir.

13:50:15  1   Q.  And a cross-discipline team leader is generally the medical

13:50:19  2   team leader for the drug applications, right?

13:50:22  3   A.  The cross-team leader can be all kinds of people.  It's

13:50:27  4   somebody who has been put to look at the application, particularly

13:50:31  5   if it's across teams.  It's usually somebody that management -- it

13:50:36  6   can be variable who is the cross-team leader.  In this particular

13:50:39  7   case, it was an M.D., but I am not sure about her involvement with

13:50:43  8   the drug before she was assigned to cross-team leader.  She wasn't

13:50:47  9   a primary reviewer in either of the reviewing divisions.

13:50:50  10  Q.  And the cross-discipline team leader review was by Dr. Eliza

13:50:56  11  Thompson?

13:50:56  12  A.  That's right, and she was the one who recommended the approval.

13:50:58  13  Q.  And there was also a review by Stephen Grant, the deputy

13:51:04  14  director of FDA's division of cardiovascular and renal drugs?

13:51:06  15  A.  Right.  That was the summary that we had up there today.

13:51:08  16  Q.  And a statistician reviewed Xarelto's new drug application,

13:51:11  17  right?

13:51:11  18  A.  Right, that would be your numbers cruncher.

13:51:13  19  Q.  And that was Dr. John Lawrence, do you recall that?

13:51:15  20  A.  Yes, but I think he is a Ph.D. doctor.

13:51:18  21  Q.  And there was a clinical pharmacology review also?

13:51:20  22  A.  Yes, sir.

13:51:20  23  Q.  And that was performed by Drs. Sreedharan Nair Sabarinath and

13:51:26  24  Tzu-Yun McDowell, right?

13:51:28  25  A.  Right.  There are a bunch of people doing the pharmacology and

13:51:31  1   toxicology review.

13:51:32  2   Q.  And there was a biopharmaceutics review, wasn't there?

13:51:37  3   A.  Right.  That's another pharmacology type that they're looking

13:51:40  4   at how it interacts with humans.

13:51:43  5   Q.  And there was a pharmacology and toxicology review?

13:51:45  6   A.  Right.  And that would look the at preclinical data, the animal

13:51:48  7   studies.

13:51:49  8   Q.  And there was a chemistry review?

13:51:50  9   A.  Chemistry goes into manufacture, so they're looking at the

13:51:53  10  proposed manufacturing of this drug.

13:51:56  11  Q.  Let me hand you DX 5689.  Now, this is a list of the FDA

13:52:21  12  officers and employees who participated in the decision to approve

13:52:25  13  the new drug application for Xarelto for patients with atrial

13:52:29  14  fibrillation, isn't it?

13:52:30  15  A.  Yes, sir.

13:52:31  16          MR. DUKES:  Your Honor, I would offer DX 5689.

13:52:34  17          MR. BARR:  No objection, your Honor.

13:52:36  18  BY MR. DUKES:

13:52:36  19  Q.  If we could pull up DX 5689.2.1.  So this list includes the

13:52:45  20  officers and employees of FDA who participated in the decision to

13:52:49  21  approve Xarelto for atrial fibrillation, correct?

13:52:51  22  A.  Right.  And they begin with Dr. Temple, who is one of the

13:52:54  23  primary management people at the Office of New Drugs.

13:52:58  24  Q.  So I think earlier you testified that generally a drug was

13:53:03  25  being approved by maybe only one or possibly two medical officers?

13:53:08  1    A.  No.  The only two people on there who are the primary clinical

13:53:12  2    reviewers, which is what we said before, are Martin Rose and

13:53:15  3    Preston Dunnmon.  The other people are management, Robert Temple,

13:53:22  4    Stockbridge, Grant.  Nhi Beasley is a pharmacologist.  And so Eliza

13:53:26  5    Thompson, we talked about, is management, an M.D. The rest of the

13:53:30  6    people on that list are primarily pharmacologists, toxicologists,

13:53:35  7    chemistry people.  So what we said before was there were two

13:53:38  8    clinical reviewers that signed this application, and those are Rose

13:53:43  9    and Dunnmon.

13:53:45  10   Q.  And all of these people are scientists within the FDA?

13:53:48  11   A.  They all work for the FDA, but they all -- like Alison Blaus is

13:53:54  12   a management type.  She is the one that made the fax that we saw

13:53:57  13   before.  She is not a reviewer.  She is basically a facilitator who

13:54:00  14   makes sure that the documents get sent to the right place.  So it's

13:54:04  15   everybody who was involved in this application, they put their name

13:54:07  16   down here on this list.  So it's not all reviewers.

13:54:11  17   Q.  I didn't mean to suggest it was all reviewers, but these are

13:54:14  18   all of the people who participated at FDA in the review process for

13:54:17  19   Xarelto?

13:54:17  20   A.  Right.  And they get credit in terms of their work that they've

13:54:21  21   been involved with approval of this NDA.

13:54:24  22   Q.  Dr. Parisian, I think my question was just these are the people

13:54:28  23   who worked and --

13:54:29  24   A.  Yes, they are.

13:54:30  25   Q.  And I just ask you --

13:54:32  1   A.  Yes, sir.

13:54:32  2   Q.  Let's try to communicate a little bit better so we can try to

13:54:35  3   finish.

13:54:36  4          Let me -- so what's that, roughly 25 officers and

13:54:42  5   employees of FDA that participated in the Xarelto approval for

13:54:46  6   atrial fibrillation?

13:54:46  7   A.  Yes, all different roles.

13:54:48  8   Q.  Now, the FDA Advisory Committee is a committee of outside

13:54:53  9   experts who FDA brings in help with their reviews, right?

13:54:56  10  A.  Yes, sir.

13:54:56  11  Q.  So the Cardiovascular and Renal Drugs Advisory Committee met on

13:55:01  12  September 8, 2011, to discuss the new drug application for atrial

13:55:06  13  fibrillation, correct?

13:55:06  14  A.  Right.

13:55:07  15  Q.  And they received a briefing document, included a number of

13:55:11  16  reviews we just discussed, didn't they?

13:55:13  17  A.  Yes, that's what they get.  They don't look at the application.

13:55:17  18  One person will be assigned to look at it.

13:55:18  19  Q.  Let me hand you DX 5613-A.

13:55:29  20  A.  Thank you.

13:55:37  21  Q.  Now, these are the summary minutes of the September 8, 2011,

13:55:41  22  meeting of the Cardiovascular and Renal Drugs Advisory Committee,

13:55:46  23  aren't they?

13:55:46  24  A.  Yes, sir.

13:55:46  25          MR. DUKES:  Your Honor, I would offer DX 5613-A into

13:55:52  1    evidence.

13:55:52  2              MR. BARR:  No objection.

13:55:52  3    BY MR. DUKES:

13:55:53  4    Q.  If we could call up 5613-A.2.1.  So there were four members of

13:56:01  5    the Cardiovascular and Renal Drugs Advisory Committee that were

13:56:04  6    present at the meeting, right?

13:56:05  7    A.  Yes, sir.

13:56:08  8    Q.  Allan Coukell, who was the consumer representative for

13:56:12  9    consumers and patients; is that right?

13:56:13  10   A.  That's right.  He is not an M.D.

13:56:15  11   Q.  He is a pharmacist?

13:56:16  12   A.  Yes, sir.

13:56:17  13   Q.  And Dr. Sanjay Kaul was present?

13:56:20  14   A.  Yes, sir.

13:56:21  15   Q.  He is a cardiologist, right?

13:56:24  16   A.  I am not sure.  Does it have what he is in here?

13:56:27  17   Q.  You're not aware he is with Cedars Sinai Medical Center out in

13:56:32  18   California?

13:56:32  19   A.  Not off the top of my head, no, sir.

13:56:33  20   Q.  Dr. Mori Krantz was present, right?

13:56:37  21   A.  Yes.

13:56:38  22   Q.  And you're aware he is a cardiologist?

13:56:41  23   A.  I am not -- usually they give -- no, I am not aware that he is

13:56:46  24   a cardiologist.  I know he is on the cardiorenal committee, but you

13:56:50  25   don't have to be a cardiologist.  And they just say --

13:56:54  1    Q.  So you just don't know?

13:56:55  2    A.  I don't know what hospital he is at, if that's what you're

13:56:58  3    going to ask me.

13:56:59  4    Q.  And Dr. Darren McGuire was present, correct?

13:57:03  5    A.  Yes, sir.

13:57:03  6    Q.  He is a fellow with the American Heart Association?

13:57:06  7    A.  I believe -- I don't have any reason to doubt it.

13:57:09  8    Q.  Let's take a look at DX 5613-A.2.2.  So there were six special

13:57:17  9    government employee consultants who were temporary voting members,

13:57:22 10    right?

13:57:22 11    A.  Yes, sir.

13:57:22 12    Q.  And it included Dr. Scott Emerson, a biostatistician at the

13:57:26 13    University of Washington?

13:57:27 14    A.  Yes, sir.

13:57:27 15    Q.  Dr. Thomas Fleming, who was also a biostatistician?

13:57:30 16    A.  Yes, sir.

13:57:31 17    Q.  Dr. Michael Lincoff, a cardiologist with Cleveland Clinic?

13:57:34 18    A.  That sounds right.

13:57:35 19    Q.  Dr. --

13:57:36 20    A.  And he is the acting chair, so he wouldn't vote.

13:57:39 21    Q.  Debra McCall was a patient representative?

13:57:41 22    A.  Yes.

13:57:42 23    Q.  Dr. Stephen Nissen, another cardiologist at Cleveland Clinic?

13:57:45 24    A.  Yes, sir.

13:57:46 25    Q.  And Dr. Phillip Sager, a cardiologist, right?

13:57:48   1   A.  Yes, sir.

13:57:49   2   Q.  If we look at DX 5613-A.2.3, there were also two regular

13:57:57   3   government employee consultants, right?

13:58:00   4   A.  Yes, sir.

13:58:00   5   Q.  Dr. Papademetriou was present?

13:58:05   6   A.  Yes, sir.

13:58:05   7   Q.  He's a cardiologist with the VA in Washington, D.C.?

13:58:08   8   A.  No.

13:58:08   9   Q.  And Dr. Andrei Kindzelski was present, right?

13:58:13  10   A.  Yes, sir.

13:58:14  11   Q.  Are you aware he is with the National Institutes of Health?

13:58:17  12   A.  I knew one of them was.

13:58:19  13   Q.  Now, let's take a look at DX 5613-A.2.4.  There were two

13:58:25  14   non-voting members, Dr. Temple and Dr. Stockbridge, which I think

13:58:29  15   you mentioned before, right?

13:58:30  16   A.  Yes, sir.

13:58:30  17   Q.  And let's take a look at DX 5613-A.2.5.  So the Advisory

13:58:45  18   Committee was asked to consider whether Xarelto should be approved

13:58:49  19   for the prevention of stroke in patients with AFib, right?

13:58:52  20   A.  Yes, sir.

13:58:53  21   Q.  And the clinical study that was being used to support Xarelto

13:58:56  22   for that indication was ROCKET AF?

13:58:59  23   A.  Right.

13:59:00  24   Q.  And ROCKET AF studied over 14,000 patients?

13:59:03  25   A.  Yes, sir.

13:59:03 1   Q.  And during the Advisory Committee, there were also

13:59:06 2   presentations from Janssen and two doctors from the Duke University

13:59:11 3   Medical Center, right?

13:59:12 4   A.  Yes.

13:59:12 5   Q.  And the Duke Clinical Research Institute is who had coordinated

13:59:16 6   the ROCKET study, hadn't they?

13:59:18 7   A.  Yes, sir.

13:59:19 8   Q.  And I think you mentioned there were presentations at the

13:59:21 9   Advisory Committee from Dr. Preston Dunnmon and Dr. Martin Rose

13:59:26 10  with the FDA?

13:59:27 11  A.  Yes, sir.

13:59:27 12  Q.  And Dr. Dunnmon gave a presentation on dose selection?

13:59:30 13  A.  Right, because there hadn't been one discussing the dose

13:59:34 14  selection.

13:59:34 15  Q.  And Dr. Rose gave a presentation on efficacy data, right?

13:59:37 16  A.  That's right.  And he talked about the ROCKET study.

13:59:40 17  Q.  And Dr. Dunnmon and Dr. Rose's presentations did not favor

13:59:44 18  approving Xarelto, did they?

13:59:45 19  A.  No.  It was consistent with the summary that we saw.

13:59:49 20  Q.  They presented on what they thought were issues or concerns

13:59:51 21  with Xarelto, didn't they?

13:59:52 22  A.  Yes, sir.

13:59:53 23  Q.  So this process was a debate among scientists from all over the

13:59:56 24  country in different disciplines, wasn't it?

13:59:59 25  A.  Yes.  With the caveat that they're only provided summaries.

14:00:05  1    They're not given the NDA to look at and all of the documentation.

14:00:09  2    So they only have one day to do the study, to review, and so they

14:00:13  3    were given a summary.  Both the company and the FDA summarized

14:00:17  4    their information for the advisory panel.

14:00:20  5    Q.  And they also had an opportunity to ask questions of the

14:00:23  6    presenters, right?

14:00:24  7    A.  Yes, sir.

14:00:24  8    Q.  So this certainly wasn't some rubber-stamping procedure by the

14:00:29  9    FDA?  This was a scientific dialogue among people who had different

14:00:34 10    opinions, wasn't it?

14:00:34 11    A.  Well, FDA was concerned, particularly about the ROCKET study

14:00:38 12    and the poor control.  So they wanted to get opinions from the

14:00:42 13    outside advisory members, and they wanted them to be able to listen

14:00:48 14    to Janssen's people, which would include Dr. Califf, who eventually

14:00:54 15    became the head of the FDA.  So, yes, it was a public presentation,

14:00:58 16    it's non-binding, and it was for FDA to gather information and

14:01:02 17    comments from outside sources.

14:01:04 18    Q.  Okay.  Let's take a look at DX 5613-A.9.1.  So the question for

14:01:14 19    the group to vote on was:  Should rivaroxaban be approved for the

14:01:17 20    reduction of stroke and non-CNS systemic embolism in patients with

14:01:23 21    non-valvular atrial fibrillation, right?

14:01:25 22    A.  Yes.

14:01:25 23    Q.  And there were nine votes yes to approve, two votes no not to

14:01:29 24    approve, which were Drs. Dunnmon and Rose, correct?

14:01:33 25    A.  No.  No, they didn't vote.

14:01:34  1   Q.  Okay.

14:01:35  2   A.  FDA doesn't vote.  They're just the advisory panel vote.  And

14:01:39  3   that really doesn't capture the discussion as to the role of this

14:01:43  4   drug and treatment.  But, yes, there were nine votes to approve and

14:01:47  5   two against, but it's from the members of the panel.

14:01:49  6   Q.  And one abstention?

14:01:50  7   A.  And one abstention.

14:01:51  8   Q.  Now, FDA was aware of everything that was said and everything

14:01:59  9   that was presented at this Advisory Committee meeting, and there

14:02:03 10   were actually minutes taken of the meeting, weren't there?

14:02:06 11   A.  Yes.  And --

14:02:14 12   Q.  Now, before FDA approved Xarelto as safe and effective, doctors

14:02:20 13   at FDA looked closely at the relationship between PT and plasma

14:02:25 14   concentration with Xarelto, didn't they?

14:02:27 15   A.  The FDA was concerned about it, yes, sir.

14:02:29 16   Q.  And they looked closely at it, right?

14:02:31 17   A.  They looked closely, but as the summary said, the company chose

14:02:35 18   not to use that information.

14:02:36 19   Q.  My question is, did FDA look closely at it?

14:02:39 20   A.  Yes.  And they commented on it.

14:02:41 21   Q.  Let me hand you DX 5130.  Now, this is the medical review for

14:03:06 22   Xarelto and the proposed indication for patients with AFib, right?

14:03:10 23   A.  Yes.  From the FDA.  We do write in big documents routinely.

14:03:15 24   Q.  And you're familiar with this document, aren't you?

14:03:17 25   A.  Yes, sir.  This is double-sided.

14:03:20  1              MR. DUKES:  Your Honor, I believe it's been admitted in

14:03:22  2    evidence, DX 5130, but to be safe, I'll offer it.

14:03:27  3              MR. BARR:  No objection.

14:03:27  4    BY MR. DUKES:

14:03:28  5    Q.  Now, this medical review was complete as of August 10, 2011;

14:03:32  6    isn't that right?

14:03:32  7    A.  August -- yes, sir, that's what it says.

14:03:38  8    Q.  And FDA did not approve the use of Xarelto in patients with

14:03:43  9    AFib until November of 2011, correct?

14:03:45 10    A.  Right.  But you can see there it says the PDUFA goal date,

14:03:50 11    November 5th.

14:03:50 12    Q.  My question was just, FDA did not approve the Xarelto

14:03:53 13    indication for AFib until November 5th, 2011, right?

14:03:56 14    A.  That is correct.

14:03:59 15    Q.  Now, this medical review, which I think you said a lengthy,

14:04:02 16    two-sided document, was prepared several months before FDA approved

14:04:06 17    Xarelto in November, right?

14:04:07 18    A.  Yes, sir.

14:04:08 19    Q.  Now, let's look at DX 5130.39.1.

14:04:19 20    A.  Yes.

14:04:19 21    Q.  And returning to page 38 of the medical review, and the medical

14:04:27 22    reviewer stated, "The PK data from 161 ROCKET patients confirms the

14:04:33 23    linear relationship between plasma concentration of rivaroxaban and

14:04:38 24    the PT, as demonstrated in Figure 6 below," correct?

14:04:42 25    A.  Right.

14:04:43  1  Q.  So as of August 2011, the FDA medical reviewers saw this linear
14:04:50  2  relationship between PT, prothrombin time, and plasma concentration
14:04:54  3  of Xarelto, didn't they?
14:04:55  4  A.  Yes.  But you also notice when you read it was from 161
14:05:00  5  patients out of 7,000.  And so the medical officer also commented
14:05:04  6  that there was a shortage of information and blood drawn by
14:05:08  7  Janssen.  But they did see the linear relationship, but it was
14:05:12  8  considered a weakness that there were only 161 patients.
14:05:15  9  Q.  But my question was that this was part of the review and
14:05:18  10  considered by FDA, wasn't it?
14:05:19  11  A.  Yes.
14:05:20  12  Q.  And considered months before FDA actually approved Xarelto?
14:05:23  13  A.  Yes.
14:05:24  14  Q.  Now, on direct you were discussing an article by Dr. Mueck, the
14:05:54  15  2013 article in the Thrombosis Journal, do you remember that?
14:05:57  16  A.  Yes, sir.
14:05:57  17  Q.  And do you remember pointing to a sentence on page 11 where you
14:06:02  18  took a position that the PT test should be used in emergency
14:06:06  19  situations?
14:06:07  20  A.  No, no, that's what he says.  And that's --
14:06:12  21  Q.  I understand that you were pointing to that sentence.
14:06:13  22  A.  I was pointing that out and saying it was consistent with what
14:06:16  23  I had seen internally at the company.
14:06:18  24  Q.  And you recall that there was a footnote at the end of that
14:06:21  25  sentence, don't you?

1665

| | | |
|---|---|---|
| 14:06:22 | 1 | A.  I don't recall a footnote.  Should we look at it? |
| 14:06:25 | 2 | Q.  Okay.  Yep. |
| 14:06:28 | 3 | THE COURT:  While they're doing that, members of the |
| 14:06:30 | 4 | jury, we've been talking about the approval, FDA approval.  As I |
| 14:06:33 | 5 | instructed you before, under the law, FDA approval is relevant, but |
| 14:06:38 | 6 | it is not dispositive. |
| 14:06:56 | 7 | THE WITNESS:  Thank you. |
| 14:07:06 | 8 | BY MR. DUKES: |
| 14:07:19 | 9 | Q.  Now, do you see that footnote, footnote 3? |
| 14:07:22 | 10 | A.  Let's see, where is it?  What page? |
| 14:07:25 | 11 | Q.  It is page 14 of 17, based on the document production numbers. |
| 14:07:32 | 12 | A.  All right.  Footnote -- okay.  Footnote 3.  So you're saying |
| 14:07:44 | 13 | it's reference 3? |
| 14:07:45 | 14 | Q.  Right. |
| 14:07:46 | 15 | A.  Okay. |
| 14:07:47 | 16 | Q.  And you see that that's referencing the foreign label, don't |
| 14:07:51 | 17 | you? |
| 14:07:52 | 18 | A.  It's -- yes, it's the European information. |
| 14:07:57 | 19 | MR. DUKES:  Your Honor, I would just ask for, based on |
| 14:08:00 | 20 | her direct testimony and this clarification, the instruction with |
| 14:08:03 | 21 | regard to the foreign labelling. |
| 14:08:05 | 22 | THE COURT:  What's the question?  Let's just answer the |
| 14:08:08 | 23 | question. |
| 14:08:10 | 24 | MR. BARR:  I mean -- |
| 14:08:11 | 25 | MR. DUKES:  Why don't we approach. |

14:08:31  1        (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

14:08:34  2             THE COURT:  What's the issue?

14:08:34  3             MR. DUKES:  Your Honor, this was a statement on direct

14:08:34  4   that she said was outside of the U.S. that we made.  At first she

14:08:34  5   said she wasn't aware it was outside of the U.S., so I was

14:08:34  6   demonstrating that it was.  And then I just wanted clarification

14:08:49  7   with instruction with regard to foreign labels.

14:08:49  8             THE COURT:  Right.

14:08:49  9             MR. BARR:  Your Honor, he is asking for a limiting

14:08:49 10   instruction with regards to a foreign label, that's not

14:08:49 11   appropriate.

14:08:50 12             MS. WILKINSON:  This is what I asked for before when I

14:08:54 13   was up here before and the judge said he would do it.

14:09:11 14             MR. BARR:  It's not appropriate.  And I still -- just

14:09:11 15   because you said you would do it, I don't think it's appropriate,

14:09:11 16   your Honor.  It's a peer-reviewed article.  I mean, if we're going

14:09:11 17   to highlighting foreign labels -- I mean, that's been their whole

14:09:22 18   objection to this thing.

14:09:22 19             THE COURT:  I understand.  I'll do what I need to do.

14:09:22 20        (OPEN COURT.)

14:09:42 21             THE COURT:  Do you want to restate the question again?

14:09:43 22             MR. DUKES:  Yes.

14:09:44 23   BY MR. DUKES:

14:09:45 24   Q.  So in looking at reference 3, you understand that this was a

14:09:51 25   reference to a European labeling document, correct?

14:09:55  1  A.  I am not sure, because you asked me about what I had talked

14:09:58  2  about with emergency, and I was trying to find where that was

14:10:01  3  because I don't know if that footnote 3 belongs with that.  So can

14:10:05  4  you find me where we were talking about the emergency use in here?

14:10:08  5  Because that's what -- that was what I discussed.

14:10:12  6  Q.  Well, that's my recollection on the direct testimony.

14:10:16  7          THE COURT:  In any event, members of the jury, as I

14:10:18  8  mentioned before, the relevance of that is what the defendant knew

14:10:23  9  and when they knew it.  The reference to foreign labels are not --

14:10:28  10  you can disregard anything regarding a foreign label insofar as a

14:10:32  11  foreign label approving it, disapproving it, changing it, doing

14:10:37  12  different things, because there's different law involved with

14:10:40  13  different procedures.  But it has some relevance to what the

14:10:43  14  defendant knew and when they knew it.  That's it.

14:10:46  15  BY MR. DUKES:

14:10:47  16  Q.  Now, Dr. Parisian, in June of 2011, FDA provided comments on

14:10:51  17  Janssen's proposed labelling for the first new drug indication, the

14:10:55  18  deep vein thrombosis application, didn't it?

14:10:57  19  A.  Yes, sir.

14:10:57  20  Q.  Let me hand you DX 5221 and 5222.  Doctor, I need to reclaim

14:11:56  21  5251 and give you 5221.

14:11:56  22  A.  Wait, wait, wait.  Did you want 5221 or 5251?

14:11:56  23  Q.  5251.

14:12:04  24  A.  There's 5251.

14:12:09  25  Q.  I apologize for that.

14:12:10  1    A.  No problem.

14:12:17  2    Q.  Now, this is an e-mail from FDA to Janssen on June 13, 2011,

14:12:23  3    along with a redlined version of the label, isn't it?

14:12:25  4    A.  Yes, sir.

14:12:25  5    Q.  And these are already in evidence.  So if we can call up

14:12:31  6    DX 5221.2.1.  Now, the e-mail at the bottom is a cover e-mail from

14:12:38  7    FDA to Janssen and it says, "Please see the attached redlined

14:12:42  8    version of the label regarding NDA 22-406 for your review and

14:12:47  9    comments," correct?

14:12:48  10   A.  Yes.  Are we going to include the next line?  Because that's

14:12:50  11   the essential line.

14:12:51  12   Q.  Well, I'll get there.

14:12:53  13   A.  Okay.

14:12:53  14   Q.  You agree that in June 2011, FDA made changes to Janssen's

14:12:58  15   proposed language in Section 12.2, right?

14:13:00  16   A.  Yes.  And then they said they could accept --

14:13:04  17   Q.  And FDA crossed out certain language regarding PT under

14:13:08  18   Section 12.2, didn't they?

14:13:10  19   A.  Yes, sir.

14:13:10  20   Q.  Let's call up DX 52 --

14:13:14  21        MR. BARR:  Your Honor, for rule of completeness, just

14:13:16  22   like yesterday.

14:13:18  23        THE COURT:  106, you have a right to do it, but show them

14:13:21  24   the rest of the sentence.

14:13:27  25   BY MR. DUKES:

1669

14:13:28  1    Q.  So the next sentence says, "Please accept changes you agree to,

14:13:31  2    and for changes you do not, keep in track changes," correct?

14:13:33  3    A.  Right.  Which shows that the company still could make comments

14:13:36  4    and put in what they wanted.

14:13:36  5    Q.  Right.

14:13:38  6    A.  So it's still a negotiation.  It's not FDA saying you have to

14:13:42  7    do this.

14:13:43  8    Q.  Right.  Let's call up DX 5222.30.1.  So the FDA struck the

14:13:54  9    relationship between PT and rivaroxaban plasma concentration as

14:13:59 10    linear and closely correlated, didn't they?

14:14:02 11    A.  Yes, sir.

14:14:02 12    Q.  And if we call up DX 5222.30.2, FDA also struck "If assessment

14:14:12 13    of the pharmacodynamic effect of rivaroxaban is considered

14:14:17 14    necessary in individual cases, PT (measured in seconds) is

14:14:22 15    recommended."  Correct?

14:14:24 16    A.  Right.  That would be like monitoring a patient, adjusting

14:14:28 17    their dose.

14:14:28 18    Q.  And let's call up DX 5222.6.1.

14:14:33 19    A.  Well, we're not going to get the final sentence that they left?

14:14:35 20    Q.  No.  You will have an opportunity, but I am trying to complete

14:14:38 21    this.

14:14:38 22         MR. BARR:  Your Honor, I mean, she's asking for a rule of

14:14:41 23    completeness again.

14:14:42 24         THE COURT:  Well, you know, just answer the questions and

14:14:46 25    then --

14:14:46  1          THE WITNESS:  Yes, your Honor.

14:14:47  2          THE COURT:  -- and then you can take her under redirect

14:14:50  3  and establish whatever you need to establish.

14:14:51  4          MR. BARR:  Thank you, your Honor.

14:14:52  5  BY MR. DUKES:

14:14:52  6  Q.  So we look at 5222.6.1.  So here we are look at Section 5.3 of

14:15:00  7  the warnings and precaution section, right?

14:15:01  8  A.  Right.  Risks of pregnancy and hemorrhage.  We're talking about

14:15:04  9  bleeding in pregnancies.

14:15:05 10  Q.  And FDA added, "The anticoagulant effect of Xarelto cannot be

14:15:08 11  monitored with standard laboratory testing nor readily reversed,"

14:15:11 12  right?

14:15:11 13  A.  Yes, sir.

14:15:12 14  Q.  Let's look at DX 5222.23.1.  Now, we're look at Section 8.1,

14:15:19 15  "Pregnancy."

14:15:20 16  A.  Right.  We saw that this morning.

14:15:22 17  Q.  And FDA added two paragraphs, including, "The anticoagulant

14:15:25 18  effect of Xarelto cannot be reliably monitored with standard

14:15:30 19  laboratory testing," didn't they?

14:15:32 20  A.  Right.  Because that was not done in the clinical study.  There

14:15:34 21  were no pregnant women in the study.

14:15:36 22  Q.  Now -- but the answer to my question is, "Yes," right?

14:15:40 23  A.  Yes.  That's why.  There were -- they don't have any

14:15:43 24  information about pregnant women.

14:15:44 25  Q.  So the cardiovascular and renal drug products division, which

14:15:49 1    was reviewing the application for AFib, was involved in reviewing

14:15:52 2    this label, wasn't it?

14:15:54 3    A.  Yes.

14:15:54 4    Q.  So in July of 2011 FDA approved without any recommendation to

14:16:00 5    use PT for patients undergoing hip and knee replacements, didn't

14:16:05 6    it?

14:16:05 7    A.  Can you say that again?

14:16:06 8    Q.  In July of 2011 FDA approved Xarelto without any recommendation

14:16:11 9    to use PT for patients undergoing hip and knee replacement surgery?

14:16:16 10   A.  Right.  And the company hadn't used that in their clinical

14:16:19 11   studies.

14:16:20 12   Q.  And the cardiovascular and renal drug products division told

14:16:24 13   Janssen to use the approved label for the DVT, deep vein

14:16:28 14   thrombosis, indication for the AFib labelling, correct?

14:16:31 15   A.  As a starting point, yes.  For the next round of labels.

14:16:34 16   Q.  And in November 2011, FDA approved Xarelto without any

14:16:38 17   recommendation to use PT for patients with AFib, correct?

14:16:42 18   A.  Yes.  Because none had been done in the clinical trials, and

14:16:46 19   the company -- as the summary says from the medical officers, the

14:16:50 20   company chose not to use it.

14:16:52 21   Q.  And FDA has never said that there's a clinically meaningful way

14:16:57 22   to measure bleeding risks by PT in patients taking Xarelto, has it?

14:17:01 23   A.  It's not the FDA's role; it's the manufacturer's.  And based on

14:17:05 24   the information they have internally, that would be what you would

14:17:07 25   put in there for an emergency use.  And the company hasn't put it

14:17:11  1   in.  It's not the FDA's job; it's the company's job.

14:17:13  2   Q.  My question was --

14:17:15  3   A.  You're right, they haven't asked for it.

14:17:17  4   Q.  Sorry.  Because maybe you didn't hear it the first time.

14:17:20  5           The FDA has never said that there's clinically meaningful

14:17:24  6   way to measure bleeding risk by PT in patients taking Xarelto, have

14:17:29  7   they?

14:17:29  8   A.  The FDA hasn't asked for it.

14:17:32  9   Q.  Now, in October 2016, the FDA issued a statement telling

14:17:44 10   patients that Xarelto is safe and effective alternative to warfarin

14:17:48 11   in patients with atrial fibrillation, right?

14:17:50 12   A.  Are you meaning the re-review?  They concluded their re-review

14:17:55 13   that they weren't going to take any regulatory action, and it was

14:17:58 14   still continued to be safe and effective in terms of

14:18:02 15   non-inferiority.  That's what their statement was.  Is that what

14:18:04 16   you're talking about?

14:18:05 17   Q.  No.  My question was in October of 2016, FDA issued a

14:18:10 18   statement --

14:18:10 19   A.  Okay.

14:18:11 20   Q.  -- telling patients that Xarelto is a safe and effective

14:18:15 21   alternative to warfarin in patients with AFib.  Didn't FDA do that?

14:18:19 22   A.  Yes, it's considered still on the market.

14:18:21 23   Q.  And that was just eight months ago, right?

14:18:24 24   A.  Yes, sir.

14:18:24 25   Q.  And let me hand you DX 5842.  And this is a statement from the

14:18:49  1   FDA dated October 11, 2016.  It's available on the FDA's web site,

14:18:54  2   isn't it?

14:18:54  3   A.  Yes, sir.  And this --

14:18:56  4           MR. DUKES:  I offer DX 5842 into evidence.

14:18:59  5           MR. BARR:  No objection.

14:19:00  6           THE DEFENDANT:  Let it be admitted.

14:19:00  7   BY MR. DUKES:

14:19:02  8   Q.  And if we can call up DX 5842.1.  So the heading is, "FDA

14:19:13  9   analysis conclude that Xarelto clinical trial results were not

14:19:17 10   affected by faulty monitoring device," right?

14:19:20 11   A.  That's what it states, yes, sir.

14:19:21 12   Q.  And in July of 2016 the Alere INRatio device was recalled.

14:19:32 13   That's what you testified about on direct, correct?

14:19:34 14   A.  It was taken off the market, yes, sir.

14:19:37 15   Q.  And that happened years after the ROCKET study was completed,

14:19:40 16   didn't it?

14:19:40 17   A.  Yes.  Unfortunately, for warfarin patients, yes.

14:19:43 18   Q.  But the answer to my question was, yes, it happened years after

14:19:49 19   ROCKET was completed, right?

14:19:50 20   A.  Yes, sir.  But it was based on the faulty data in ROCKET.

14:19:53 21   Q.  And this device, the INRatio device, was used to monitor

14:20:00 22   warfarin therapy, not Xarelto therapy?

14:20:03 23   A.  That's right.

14:20:03 24   Q.  And the INRatio device was not manufactured by Bayer or

14:20:09 25   Janssen, was it?

14:20:09 1   A.  That's correct.

14:20:09 2   Q.  In fact, it was manufactured by a company now I think you said

14:20:12 3   was Alere, Incorporated, right?

14:20:14 4   A.  Right.  But it was chosen by them for their clinical trial.

14:20:18 5   Q.  But the answer to my question would be it was not manufactured

14:20:20 6   by Bayer or Janssen?

14:20:22 7   A.  That's correct.  I said that.

14:20:23 8   Q.  Let's call it DX 5842.1.6.  So after the recall of the device,

14:20:31 9   the FDA completed a variety of analyses to assess the impact of the

14:20:36 10  device on the ROCKET AF trial, right?

14:20:38 11  A.  Right.  That was that modeling, the mathematical modeling.

14:20:41 12  Q.  And the FDA said that it "determined that effects on strokes or

14:20:46 13  bleeding, including bleeding in the head, were minimal.  The FDA

14:20:52 14  concludes that Xarelto is a safe and effective alternative to

14:20:56 15  warfarin in patients with AFib."  That's what they said, correct?

14:20:59 16  A.  Right.  But they didn't say it was superior still and they --

14:21:04 17  Q.  That would be responsive to a question that asks you if they

14:21:06 18  said it was superior.  My question was simply:  FDA determined that

14:21:11 19  Xarelto is safe and effective alternative to warfarin in patients

14:21:15 20  with atrial fibrillation, right?

14:21:17 21  A.  Right.  Based on the way it was approved.

14:21:19 22  Q.  Now, you're familiar with that FDA web site, aren't you?

14:21:26 23  A.  Yes, sir.

14:21:26 24  Q.  And it states that "Additional information on these analysis

14:21:30 25  are available through a link on the web site," doesn't it?

14:21:32 1   A.  Yes, sir.

14:21:33 2   Q.  And that web site -- that web page is still on the FDA's web

14:21:37 3   site today?

14:21:37 4   A.  Yes, sir.

14:21:38 5   Q.  And that information is available for anybody who wants to look

14:21:43 6   at it, isn't it?

14:21:44 7   A.  Yes, sir.

14:21:44 8   Q.  Let me hand you DX 5840.

14:21:58 9   A.  Thank you.

14:22:08 10  Q.  Now, this is a collection of reviews from the FDA Center of

14:22:12 11  Drug Evaluation and Research called the ROCKET AF Reanalysis

14:22:16 12  Reviews, isn't it?

14:22:17 13  A.  Right.

14:22:18 14  Q.  And there's an FDA clinical review, a statistical review, and a

14:22:23 15  clinical pharmacology review, right?

14:22:25 16  A.  Yes, sir.

14:22:28 17       MR. DUKES:  Your Honor, this was already admitted as

14:22:30 18  Defendants' Exhibit 1 in Dr. Smart's testimony.  If we could call

14:22:35 19  up DX 5840.2.1.

14:22:37 20  BY MR. DUKES:

14:22:40 21  Q.  So the first review here is the division of cardiovascular and

14:22:44 22  renal products, CDTL, review by Dr. Martin Rose dated September 26,

14:22:51 23  2016, correct?

14:22:51 24  A.  Yes, sir.

14:22:52 25  Q.  And Dr. Martin Rose, as you've indicated, was one of the

14:22:55  1   medical officers during the original NDA review of the AFib

14:22:59  2   indication, wasn't he?

14:23:00  3   A.  Yes, sir.

14:23:01  4   Q.  And CDTL is the cross discipline team leader, right?

14:23:05  5   A.  Yes.

14:23:06  6   Q.  So that's the medical team leader for drug applications,

14:23:10  7   correct?

14:23:10  8   A.  Right.  I believe now that he's been put in terms of the cross

14:23:13  9   team.

14:23:14 10   Q.  If we can call up DX 5840.2.2.  So at the bottom of the page,

14:23:23 11   Dr. Rose at FDA states:  "After learning of the recall, Janssen and

14:23:28 12   FDA independently performed a variety of analyses intended to

14:23:34 13   characterize the impact of the use of the INRatio device on the

14:23:39 14   safety and efficacy results of ROCKET."  That's what Dr. Rose said,

14:23:42 15   right?

14:23:42 16   A.  Right.  And that was that mathematical model in trying to go

14:23:46 17   back.

14:23:46 18   Q.  If we could look at DX 5840.4.1.  FDA concluded that,

14:23:58 19   "Accordingly, the conclusion we made in 2011 that the benefit of

14:24:03 20   rivaroxaban in patients with non-valvular atrial fibrillation

14:24:08 21   outweigh its risks should not be changed."  That's what the FDA

14:24:11 22   stated, isn't it?

14:24:12 23   A.  And I think I said that four times today, yes, sir.

14:24:14 24   Q.  So FDA, again, reconfirmed its position that Xarelto was safe

14:24:20 25   and effective in September of 2016, didn't it?

14:24:23  1    A.  No.  They did a mathematical analysis based on the

14:24:27  2    retrospective look at ROCKET and said they would not make any

14:24:31  3    changes at that point in time, and it's continued to be marketed,

14:24:34  4    which I said.

14:24:35  5         So it's not a retrospective review that they went back

14:24:38  6    and looked at everything and did some kind of study.  They're using

14:24:42  7    data from a flawed study, not aware that the company knew ROCKET

14:24:47  8    wasn't functioning early on in the study.  But the FDA did the best

14:24:52  9    they could with data to try to create some kind of information

14:24:55 10    about a non-inferiority study with poorly controlled warfarin.

14:25:00 11    Q.  The FDA in September of 2016 stated that the conclusion they

14:25:07 12    made in 2011 when they originally approved Xarelto -- that the

14:25:12 13    benefits of rivaroxaban, Xarelto, in patients with non-valvular

14:25:16 14    atrial fibrillation outweigh its risks, and that conclusion should

14:25:21 15    not be changed, didn't they?

14:25:22 16    A.  It's a marketed drug.  The FDA -- it's still a marketed drug.

14:25:26 17    That's what they're going to say.  They're going to leave it on the

14:25:29 18    market.

14:25:29 19    Q.  And FDA concluded that no changes should be made to the Xarelto

14:25:33 20    label in September of 2016, didn't it?

14:25:35 21    A.  Well, we had what they concluded.  They concluded it's very

14:25:39 22    complicated; they said somebody may want to change the label.  At

14:25:44 23    the time they may put out an announcement, which is that.  So they

14:25:46 24    basically left it open.  But they're going back trying to look at

14:25:50 25    something that occurred years ago and come up with information, but

OFFICIAL TRANSCRIPT

1678

14:25:54  1    they still allowed it on the market.

14:25:56  2    Q.  Let's take a DX 5840.49.1, and we're moving through that

14:26:02  3    document.  And --

14:26:04  4    A.  Oh, the same one.  Okay.

14:26:06  5    Q.  This is the statistical review and evaluation, correct?

14:26:08  6    A.  Yes, sir.

14:26:08  7    Q.  And it's dated September 10, 2016, about eight months ago,

14:26:14  8    right?

14:26:14  9    A.  Yes, sir.

14:26:14  10   Q.  And the reviewer is Dr. John Lawrence, correct?

14:26:18  11   A.  Yes, sir.

14:26:18  12   Q.  Let's call up DX 5840.52, and this is the executive summary and

14:26:26  13   the statistical review and evaluation section, right?

14:26:29  14   A.  Right.

14:26:29  15   Q.  If we could look DX 5840.52.1.  And we get near the end.  The

14:26:37  16   reviewer explains, "The FDA has also looked at other sources of

14:26:41  17   data available such as post-marketing data about the rate of

14:26:45  18   reported bleeding for Xarelto and bleeding rates in the warfarin

14:26:49  19   arm from other atrial fibrillation studies.  Given all of these

14:26:54  20   analyses, it appears that the faulty device had a minor impact on

14:27:00  21   the bleeding rate in the warfarin arm in ROCKET -- in the ROCKET AF

14:27:05  22   trial.  Rivaroxaban is still judged to be safe and effective based

14:27:09  23   on the result of that trial."  That's what the conclusion was,

14:27:12  24   correct?

14:27:12  25   A.  Right.  Based on the same non-inferiority study that it wasn't

14:27:20  1   poorly controlled warfarin; it still kept that.  So the FDA is not

14:27:23  2   going to do anything about it.

14:27:25  3   Q.  And my question was intended just to be that the conclusion was

14:27:29  4   rivaroxaban is still judged to be safe and effective based on the

14:27:33  5   results of that trial, correct?

14:27:35  6   A.  Right.  And I was saying what the results of the trial was.  So

14:27:38  7   based on the results of the trial, yes, it's going to stay on the

14:27:42  8   market.

14:27:42  9   Q.  Let's take a look at DX 5840.52.1 -- I'm sorry.  This mentioned

14:27:54 10   post-marketing data, correct?

14:27:57 11          Let's put that back up.  Put back 5840.52.1.  Let's leave

14:28:18 12   that on the screen.

14:28:18 13          Here it mentions post-marketing data.  That's data

14:28:18 14   gathered after a medicine goes on the market, right?

14:28:18 15   A.  Yes, sir.

14:28:18 16   Q.  So, in other words, in addition to re-analyzing the data in

14:29:00 17   ROCKET AF, the FDA also looked at information about the rate of

14:29:00 18   reported bleeding in Xarelto after it was approved in 2011, right?

14:29:00 19   A.  Yes, sir.

14:29:00 20   Q.  So that would be by September 2016 approximately five years of

14:29:00 21   additional real-world, real-patient data, correct?

14:29:00 22   A.  Well, the real-world data is coming from Janssen's reporting.

14:29:00 23   So in terms of what the FDA has available, with that caveat, yes,

14:29:00 24   they did use that.  But you have to remember the source of bleeding

14:29:00 25   is coming from Janssen's post-market surveillance in terms of their

14:29:00   1   global study.  So, yes, they looked at that data that they have.

14:29:00   2   Q.  Companies have an obligation to provide certain data to the FDA

14:29:01   3   after a drug goes on the market, right?

14:29:03   4   A.  Right.

14:29:03   5   Q.  And that's called post-marketing data, correct?

14:29:06   6   A.  Right.  But it can be --

14:29:07   7   Q.  And there was five years of post-marketing data the FDA said

14:29:11   8   they looked at here by September of 2016, didn't they?

14:29:14   9   A.  Right.  But we know that -- you and I know that there's

14:29:18   10   underreporting in terms of the FDA, and it depends on a company

14:29:21   11   reporting it.  So, yes, they did look at what came into the FDA's

14:29:25   12   main database, but they don't look at periodic reports.  So, yes,

14:29:29   13   they did look at post-market, the data the FDA has.

14:29:32   14   Q.  Now, do you remember Dr. Martin Rose?

14:29:39   15   A.  Yes, sir.

14:29:39   16   Q.  Dr. Martin Rose, who was the initial -- one of the two medical

14:29:46   17   reviewers in 2011 that voted not to approve Xarelto, wasn't he?

14:29:51   18   A.  Yes, sir.  And he signed off on this document saying that they

14:29:55   19   weren't going to do anything.

14:29:56   20   Q.  He was the head of the group that participated in the

14:30:01   21   re-analysis of the data that looked at five years of post-marketing

14:30:07   22   data; he's now moved in a position where he is actually in charge

14:30:12   23   of this, and his group's conclusion was:  Rivaroxaban in 2016 is

14:30:18   24   still judged to be safe and effective based on the results of the

14:30:23   25   ROCKET AF trial, yes or no?

14:30:25  1    A.  Yes.  And I know he said that, and I have no reason to doubt

14:30:28  2    why he said that.  And I would probably agree with him in terms of

14:30:33  3    the information that he's looking at, which is a retrospective

14:30:37  4    review of the clinical study and using mathematical modeling.

14:30:41  5              THE COURT:  Any further questions?

14:30:42  6              MR. DUKES:  No further questions, your Honor.

14:30:43  7              THE COURT:  Any redirect?

14:30:44  8              MR. BARR:  Yes, your Honor.

14:30:50  9              I'll try and be as brief as possible, your Honor.

14:30:50  10                       REDIRECT EXAMINATION

14:30:50  11   BY MR. BARR:

14:30:54  12   Q.  I want to go back and I want to talk about the strikethrough

14:30:58  13   document we talked about.  From your review of the documents, did

14:31:03  14   the FDA ever issue a "final word" on whether or not Janssen chose

14:31:10  15   to use PT in the labelling?

14:31:14  16   A.  The summary -- the summary written by Dr. Grant talks that the

14:31:18  17   company chose not to use it.

14:31:20  18   Q.  And is that the summary -- that's the summary reviewed by

14:31:24  19   Dr. Grant?

14:31:24  20   A.  Yes.

14:31:25  21              MR. BARR:  Can I get Plaintiffs' 5767781, which has been

14:31:29  22   previously admitted as Plaintiffs' Exhibit No. 4.  And this is on

14:31:45  23   PDF page 10.  And please blow up the paragraph that starts, "This

14:31:51  24   entire additional issues."

          25

1682

14:31:51  1   BY MR. BARR:

14:31:58  2   Q.  Doctor -- Dr. Parisian, does this paragraph set out that FDA

14:32:04  3   believed that there was a linear correlation between rivaroxaban

14:32:07  4   levels and PT time?

14:32:09  5   A.  Yes.  The FDA -- the clinical pharmacology and clinical

14:32:13  6   reviewers thought there was a linear relationship, and the company

14:32:17  7   chose not to use it.

14:32:18  8   Q.  Does this paragraph -- and can we highlight this, the second

14:32:22  9   sentence.  What does the FDA in summary review say about the risk

14:32:27  10  of bleeding and the correlation with PT?

14:32:30  11  A.  The next sentence, "They also demonstrated there is a

14:32:33  12  correlation between risk of bleeding and PT."  That's like that

14:32:37  13  first table we looked at this morning with all of the dots on it.

14:32:40  14  Q.  And let's go to the next sentence and tell the jury what this

14:32:43  15  next sentence is about whether or not the defendants chose to use

14:32:48  16  this information.

14:32:49  17  A.  "This applicant has not chosen to utilize this information."

14:32:53  18  Q.  And this is in November of 2011, right?

14:32:56  19  A.  Yes.

14:32:56  20  Q.  This is five months after the strikethrough, right?

14:33:00  21  A.  Yes.

14:33:01  22       MR. DUKES:  Your Honor, I would just ask for the rule of

14:33:03  23  completeness that the next sentence be read.  I didn't mean to

14:33:07  24  interrupt.

14:33:07  25       THE COURT:  Please do.

14:33:08  1            THE WITNESS:  Should I read it?

14:33:10  2            THE COURT:  Yes.

14:33:11  3            THE WITNESS:  "In fact, so far as we are aware none of

14:33:13  4   the other manufacturers/sponsors of other oral anticoagulants that

14:33:18  5   inhibit single anticoagulation factors have chosen to utilize

14:33:23  6   pharmacokinetic/pharmacodynamic information to explore adjusting

14:33:26  7   dose to optimize safety and efficacy."

14:33:31  8   BY MR. BARR:

14:33:32  9   Q.  How would Janssen utilize PT information?

14:33:34 10   A.  They would put in information about the bleeding risk.  And

14:33:37 11   so -- also the FDA's putting in there, if none of the other

14:33:41 12   manufacturers have done it, it makes it difficult for the FDA to

14:33:46 13   force Janssen to do it if Janssen has said they won't do it.

14:33:49 14   Q.  And where should this information go, in your opinion?

14:33:52 15   A.  It should go in the warning section so that a physician faced

14:33:54 16   with a bleeding patient will know about it.

14:33:56 17   Q.  Okay.  We spent some time on your cross-examination talking

14:34:00 18   about other drugs.  And this sentence is talking about other drugs.

14:34:05 19   You recall that?

14:34:06 20   A.  Right.

14:34:07 21   Q.  And you were shown this slide.  Do you recall this?

14:34:14 22   A.  Yes.

14:34:14 23   Q.  Let me just ask you:  Is this case about Eliquis?

14:34:18 24   A.  No.  And each one -- Eliquis and Savaysa, the other one,

14:34:23 25   they -- PT is different for those drugs.  It's more sensitive for

14:34:27  1   Xarelto.  Even though they're all Factor X, there's a difference in

14:34:30  2   how it works.  So it's misleading to put them all together because

14:34:34  3   Xarelto is different in terms of PT sensitivity.

14:34:38  4   Q.  Is this case about Savaysa?

14:34:40  5   A.  No.

14:34:41  6   Q.  Have you spent time reviewing depositions and internal company

14:34:46  7   documents and scientific literature about Eliquis and Savaysa?

14:34:50  8   A.  No.

14:34:51  9   Q.  Do you know anything about whether PT time can predict bleed

14:34:55 10   risks with Eliquis or Savaysa?

14:34:57 11   A.  No.

14:34:57 12   Q.  Do you know anything about whether Eliquis can be used to tell

14:35:01 13   a doctor that there's drug on board with Eliquis or Savaysa and so

14:35:05 14   that it's safe to go to surgery?

14:35:07 15   A.  No.  And the only literature I've seen shows that it's less

14:35:11 16   sensitive -- at least for Eliquis.

14:35:12 17   Q.  What do you know about in relation to those topics on Xarelto?

14:35:17 18   A.  I know that it does -- it is a laboratory result that does

14:35:22 19   influence whether a person's bleeding or been exposed.  In terms of

14:35:25 20   Mrs. Orr, if she's been exposed to the drug.

14:35:29 21         MR. DUKES:  Your Honor, objection to any case-specific

14:35:32 22   testimony about Xarelto.

14:35:33 23         THE WITNESS:  Okay.

14:35:35 24         MR. DUKES:  Move to strike.

14:35:36 25         MR. BARR:  That's fine.  That's fine.

BY MR. BARR:

Q.  Now, you were also shown this document, and I wrote it out, but I think you ultimately said it, it's 25 people, right --

A.  Right.

Q.  -- at the FDA that touched the application?

A.  Right.  You get credit at the FDA if you have been involved in so many NDAs and supplements.  So they want to get their names listed as credit for their workload.

Q.  How many people at Bayer and Janssen worked on the application over a period of ten years before the drug -- before the application was even submitted to the FDA?

A.  Hundreds.  Hundreds.  It would be their R&D development.  It would be their animal studies people.  It would be their clinical trial -- there's hundreds of people.

Q.  Now, can we get back up on the screen the labelling information that Dr. Parisian believes should be in the United States label.

Dr. Parisian, you recall that this is the information you believe should be in the United States' label about the ability to use PT to determine whether it's safe to proceed to surgery.  Do you recall that?

A.  Yes.

Q.  Have you -- are you aware of statements made by Bayer that they continue to make today that support the language you have provided in your label?

A.  Yes.

14:37:14  1       MR. DUKES:  Your Honor, objection.  May we approach?

14:37:25  2     (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

14:37:31  3       MR. DUKES:  Your Honor, this particular document is a

14:37:35  4   document that's redacted, but basically relates to foreign

14:37:39  5   labelling.  And I would object to it, Rules 401, 403, as it relates

14:37:45  6   to foreign labelling.  I would also object to this as being

14:37:48  7   improper scope of redirect because we're basically looking at a

14:37:52  8   proposed warning which we objected on direct, but that was covered

14:37:57  9   on direct.

14:37:57 10       MR. BARR:  Your Honor, they talked about PT, called it

14:38:01 11   dangerous, and we've already had this discussion, and we would

14:38:04 12   stand by what we previously argued in chambers.

14:38:07 13       THE COURT:  I understand the issue, and I feel that has

14:38:15 14   been covered on cross and it's appropriate redirect.  And I'm going

14:38:20 15   to deal with the foreign labelling if it comes up.  I'll tell the

14:38:24 16   jury the same way.  It's a question of what they knew and when they

14:38:28 17   knew it.

14:38:28 18       And if they sent it to anybody, that's significant; not

14:38:33 19   why they sent it or what the other person did about it.  It's only

14:38:39 20   relevant as to what they knew and when they knew it.  And one way

14:38:43 21   of doing that is to find out what they said and that's it.

14:38:50 22       I understand it's a problem that foreign labelling, but

14:38:54 23   I've done my best to instruct the jury every time it's come up to

14:38:57 24   disregard the foreign labelling.  I'm more interested in what they

14:39:02 25   knew and when they knew it, and I am confident in looking at them

14:39:05  1   and listening that they understand what I am saying.  I've said it

14:39:09  2   enough times to them.  So if it comes up, I'll say the same thing.

14:39:13  3        MR. BARR:  Your Honor, for purposes of the record, we've

14:39:15  4   redacted any mention of the reference to foreign label to Canada,

14:39:19  5   and we've instructed the witness not to raise those issues in her

14:39:23  6   answer.

14:39:24  7        THE COURT:  Okay.  We'll see what happens.  Thank you.

14:39:38  8     (OPEN COURT.)

14:39:38  9        THE COURT:  I hope we're getting to an end of redirect

14:39:40 10   soon?

14:39:53 11        MR. BARR:  Your Honor, give me one second.  I'm sorry,

14:40:26 12   your Honor, just give me one brief second here.  I am trying to...

14:40:44 13        THE COURT:  I said I hope you're getting to the end.

14:40:47 14        MR. BARR:  Yes.  This is it, your Honor.

14:40:49 15   BY MR. BARR:

14:40:49 16   Q.  Let me restate that.  Are you aware of statements made by

14:40:52 17   Bayer -- a statement Bayer continues to make today -- that supports

14:40:56 18   the language in the label you're offering and what you say needs to

14:41:01 19   be in the label?

14:41:02 20   A.  Yes.

14:41:02 21   Q.  Have you reviewed or relied upon such statements in coming to

14:41:06 22   your opinions?

14:41:07 23   A.  Yes.

14:41:07 24   Q.  Dr. Parisian, is this the statement by Bayer, this document on

14:41:21 25   the screen, the document you have reviewed or relied upon in coming

14:41:25  1   to your conclusions that Bayer supports the statements you've

14:41:30  2   offered in your label?

14:41:31  3   A.  Yes.

14:41:32  4   Q.  Could you please read for the jury the statement made by Bayer?

14:41:37  5   A.  "Although there is no need to monitor clinical practice, in

14:41:43  6   concern" --

14:41:44  7   Q.  Wait.  Start with the first paragraph.

14:41:47  8   A.  "The sponsor"?

14:41:48  9   Q.  Yes, ma'am.

14:41:49  10  A.  "The sponsor recognizes that in certain infrequent situations

14:41:54  11  (such as overdosage, acute bleeding, urgent surgery, suspected

14:41:59  12  noncompliance, or in other unusual circumstances) assessment of the

14:42:07  13  anticoagulant effect of Xarelto may be desirable.  In these

14:42:12  14  circumstances, chromogenic assays can be utilized.

14:42:16  15          Although there is no need to monitor clinical practice,

14:42:22  16  in certain infrequent situations such as overdosage, acute

14:42:28  17  bleeding, urgent surgery, in cases of suspected noncompliance, or

14:42:33  18  in other unusual circumstances, assessment of the anticoagulant

14:42:38  19  effect of rivaroxaban may be appropriate.  Accordingly, measuring

14:42:44  20  PT using the Neoplastin reagent, or Factor Xa assay using

14:42:50  21  rivaroxaban-specific calibrators and controls may be useful to

14:42:55  22  inform clinical decisions in these circumstances."

14:42:59  23  Q.  When did Bayer make this statement?

14:43:01  24  A.  Well, years before, but this one is in 2014.

14:43:06  25  Q.  Is this -- does this statement contradict the position Bayer

14:43:11  1    has taken in this courtroom?

14:43:13  2    A.  Yes.

14:43:14  3    Q.  Is this statement anywhere in the U.S. label or available to

14:43:19  4    doctors in the United States?

14:43:20  5    A.  No.

14:43:22  6              MR. BARR:  No more questions, your Honor.

14:43:24  7              THE COURT:  Thank you.  You're excused, ma'am.

14:43:24  8              THE WITNESS:  Thank you, your Honor.

14:43:26  9              THE COURT:  Let's take a ten-minute break here and

14:43:29  10   we'll go with the other witness.

14:43:32  11             THE DEPUTY CLERK:  All rise.

14:43:32  12      (WHEREUPON, THE JURY EXITED THE COURTROOM AND A RECESS WAS

15:10:32  13      TAKEN.)

15:10:32  14      (OPEN COURT.)

15:10:34  15      (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

15:10:34  16             THE COURT:  Be seated, please.  We have a matter.

15:10:39  17             MR. DUKES:  Thank you, your Honor.  With regard to the

15:10:41  18   last document that Dr. Parisian was testifying about, under the

15:10:44  19   rule for completeness, I would like to show the jury another

15:10:47  20   statement that's in that same document that was not shown.

15:10:51  21             MR. BARR:  And, your Honor, for the record, plaintiffs

15:10:54  22   object.  We actually believe the entirety of the document should

15:10:57  23   come in and not bits and pieces.  So for the purposes of the

15:11:01  24   record, for that reason, we think the entire document should come

15:11:04  25   in.

15:11:05 1        THE COURT:  Thank you.  Under 611(c), I'll allow the

15:11:09 2 defendants to do that, which would be under cross, direct, or

15:11:18 3 re-redirect on that particular point, and under 106, I think the

15:11:23 4 rest of the document would have a right to go in.

15:11:26 5        MR. DUKES:  Thank you, your Honor.  So this comes from

15:11:28 6 the same document Dr. Parisian was talking about.  If I could have

15:11:33 7 the ELMO.

15:11:45 8        So the other statement that is in the same document that

15:11:47 9 Dr. Parisian was talking about says, "However, the response of the

15:11:51 10 PT varies both dependent on PT reagent (which is not standardized)

15:11:57 11 and coagulometer.  Thus, the PT cannot be used to reliably measure

15:12:04 12 the anticoagulant effect of Xarelto since a normal PT may be found

15:12:08 13 in patients with therapeutic Xarelto levels if measured using

15:12:12 14 selected machine/reagent combinations."

15:12:16 15        And, your Honor, that's the additional part, and I

15:12:18 16 appreciate the opportunity.

15:12:19 17        THE COURT:  All right.  Okay.  Thank you.  Okay.  Let's

15:12:23 18 call a witness.

15:12:25 19        Let me mention this to you, members of the jury.  As I

15:12:28 20 told you at the outset, the way the case proceeds is that after

15:12:32 21 opening statements, the plaintiff has a right to put on their case.

15:12:35 22 When they rest, the defendant has the right to put on their case.

15:12:41 23        Sometimes because of scheduling issues, we have to

15:12:46 24 interrupt that, and that's what we're doing at this point.  The

15:12:49 25 plaintiff has not rested yet, but the defendant is calling a

15:12:54  1   witness in their portion of the case, but it's just interrupting

15:13:00  2   the plaintiff's case and allowing them to call them at this time.

15:13:07  3           MR. IRWIN:  Thank you, your Honor.  The defendants call

15:13:09  4   Dr. Edward St. Martin.

15:13:11  5           THE COURT:  Would you come forward, please, sir.

15:13:25  6           THE DEPUTY CLERK:  You can step up in the box, Doctor.

15:13:30  7           THE WITNESS:  Sure.

15:13:34  8           THE DEPUTY CLERK:  Before you have a seat, would you

15:13:35  9   raise your right hand.

15:13:36  10      (WHEREUPON, EDWARD M. ST. MARTIN, M.D., WAS SWORN IN AND

15:13:42  11       TESTIFIED AS FOLLOWS:)

15:13:42  12           THE DEPUTY CLERK:  Please have a seat, Doctor, and state

15:13:44  13   and spell your name for the record.

15:13:46  14           THE WITNESS:  Dr. Edward St. Martin, E-D-W-A-R-D S-T,

15:13:55  15   period, M-A-R-T-I-N.

15:14:00  16                   DIRECT EXAMINATION

15:14:01  17   BY MR. IRWIN:

15:14:02  18   Q.  Good afternoon, Dr. St. Martin.

15:14:06  19           Good afternoon, ladies and gentlemen.

15:14:07  20           Dr. St. Martin, would you tell the jury, please, what

15:14:11  21   your career has been?  I understand you're now recently retired.

15:14:15  22   Congratulations.

15:14:16  23   A.  Thank you.  I was a cardiologist practicing from the day I got

15:14:23  24   out of the medical school 50 years, and I've been retired for about

15:14:27  25   a year and a half now.

15:14:27  1   Q.  And could you give the jury an overview of your cardiology

15:14:31  2   practice, where you practiced and, generally speaking, what was the

15:14:35  3   nature and focus of your cardiology practice?

15:14:37  4   A.  I practiced at Baptist Hospital, which was then renamed

15:14:44  5   Memorial and now Ochsner Baptist.  And I had a large outpatient

15:14:50  6   practice in an office across the street seeing about 20 or 25

15:14:55  7   patients four days a week.  And I and my two partners took care of

15:15:00  8   virtually all of the cardiac patients at the hospital.

15:15:03  9   Q.  Was there any particular focus in your cardiac practice?

15:15:07 10   A.  We did interventional cardiology, stents, arrhythmias, all

15:15:14 11   sorts of things, but we didn't really limit ourselves to one small

15:15:18 12   niche.

15:15:18 13   Q.  And what is "interventional cardiology"?  In a sense of your

15:15:21 14   practice, what was it?

15:15:22 15   A.  That is angioplasties and placing stents in coronary arteries.

15:15:29 16   Q.  And what is "electrophysiology" with respect to your practice?

15:15:34 17   A.  Study of arrhythmias.

15:15:37 18   Q.  And did you do any procedures with respect to arrhythmias?

15:15:42 19   A.  I did for a while, but then I realized I wasn't doing enough of

15:15:48 20   them to be as good at it as I wanted to; so then I started

15:15:52 21   referring the interventional studies away.

15:15:58 22   Q.  Doctor, in the name of full and fair disclosure, about -- I

15:16:02 23   guess about 15 years ago, you and I worked on a case together; is

15:16:06 24   that right?

15:16:07 25   A.  Yes.

15:16:08   1   Q.  Actually my law partner hired you as an expert cardiologist,

15:16:13   2   and I presented you in a trial.  Do you remember that?

15:16:16   3   A.  Yes.

15:16:18   4   Q.  And that was in, as I recall, about February of 2003?

15:16:24   5   A.  That sounds right, yes.

15:16:26   6   Q.  And do you remember about two years later, three years later

15:16:30   7   when we were all refugees because of Katrina that I came and

15:16:35   8   visited you in Atlanta?  I was up in Baton Rouge at the time and I

15:16:39   9   came and visited you in Atlanta and asked you about a specific

15:16:42  10   case.  Do you recall that?

15:16:43  11   A.  Now, that you mention it, it rings a small bell, yes.  Yeah.

15:16:51  12   Q.  That's Katrina, right?

15:16:52  13   A.  Yeah, yeah.

15:16:53  14   Q.  And then after that time that I came and visited you and asked

15:16:58  15   you about some medical records, the next time that you and I saw

15:17:02  16   each other was in Ms. Jeffcott's office in June of 2016; is that

15:17:06  17   right?

15:17:07  18   A.  That sounds right, yes.

15:17:09  19   Q.  Did you and I have any contact at all between that visit in

15:17:14  20   Atlanta in 2005 and when I saw you in 2016 -- in June of 2016 at

15:17:21  21   your deposition?

15:17:22  22   A.  Not that I recall.

15:17:26  23   Q.  And since your deposition in June of 2016, have you and I had

15:17:30  24   any contact then, since then?

15:17:33  25   A.  Not -- again, not that I recall.

15:17:35 1   Q.  Doctor, would the fact that you and I worked together on a case

15:17:42 2   in court affect your testimony in this case one way or the other?

15:17:48 3   A.  I don't think so.

15:17:53 4   Q.  You do know that the plaintiff lawyers, because of privacy

15:17:58 5   reasons, for Mrs. Orr -- they have had the ability to talk to you

15:18:04 6   about this case; in fact, they have visited with you about this

15:18:07 7   case; is that right?

15:18:08 8   A.  At my age, I don't remember every single thing.  If they have,

15:18:16 9   I could be -- my memory could be refreshed.

15:18:19 10  Q.  Do you remember a doctor, lawyer by the name of Whitehead --

15:18:23 11  A.  Oh, yes.

15:18:23 12  Q.  -- from Lafayette --

15:18:24 13  A.  Right, okay.

15:18:25 14  Q.  -- he came and visited with you?

15:18:27 15  A.  Right.

15:18:27 16  Q.  And did you -- what was your understanding as to whether or not

15:18:31 17  he had any relationship with the Orrs?

15:18:33 18  A.  I remember that day now that -- I never really understood

15:18:39 19  exactly why he was there.

15:18:41 20  Q.  He came and showed you a bunch of papers and documents that he

15:18:47 21  wanted you to talk about?

15:18:48 22  A.  Well, he asked me about, yes.

15:18:50 23  Q.  Yes.  Do you remember generally the kinds of things that he

15:18:55 24  presented to you?

15:18:55 25  A.  No.

15:18:57  1    Q.  Do you remember if it had things about PT, prothrombin time

15:19:02  2    testing; anything about that?

15:19:03  3    A.  I think that was one of the topics, yes.

15:19:06  4    Q.  Do you know Dr. Frank Smart?

15:19:14  5    A.  Yes.

15:19:17  6    Q.  He testified in this case earlier for the plaintiffs for the

15:19:21  7    Orr family, and he testified that he referred patients to you from

15:19:27  8    time to time?

15:19:27  9    A.  It would be from a long time, a long time, yes.

15:19:31 10    Q.  And you're here today at our request to testify about your

15:19:38 11    treatment of Mrs. Orr?

15:19:40 12    A.  That's correct.

15:19:41 13    Q.  You actually are the person who prescribed Xarelto to Mrs. Orr?

15:19:47 14    A.  Yes.

15:19:47 15    Q.  And you did so because she had atrial fibrillation, as I

15:19:54 16    understand it?

15:19:54 17    A.  Yes.  Because she had atrial fibrillation, and she had already

15:19:58 18    been started on Pradaxa, which would be the other major oral drug.

15:20:05 19    That was from Tulane.  And she got the common side effect from

15:20:08 20    Pradaxa, which was bad indigestion and couldn't tolerate it.  So I

15:20:13 21    switched her to Xarelto.

15:20:14 22    Q.  Let's then turn to your first visit -- rather her first visit

15:20:19 23    with you, which was on August 1, 2011, and we'll put up on the

15:20:24 24    screen.

15:20:25 25            MR. IRWIN:  And we'll offer into evidence DX, Defense

───────── OFFICIAL TRANSCRIPT ─────────

15:20:28 1    Exhibit 38, and we'll go through -- I think we'll go to page 136.

15:20:34 2    And Dean tells me that this will actually be identified as our next

15:20:39 3    exhibit, which is No. 33.  We offer it into evidence.

15:20:44 4                MR. BIRCHFIELD:  No objection.

15:20:45 5                THE COURT:  Let it be admitted.

15:20:47 6                MR. IRWIN:  May we put it up on the screen, please.

15:20:49 7                THE COURT:  Yes.

15:20:49 8    BY MR. IRWIN:

15:20:50 9    Q.  Doctor, does this refresh your recollection that you can see

15:20:52 10   this is the new patient sheet for Mrs. Orr?

15:20:55 11   A.  Yes.

15:20:55 12   Q.  And the handwriting -- and we'll get to it -- the handwriting

15:21:01 13   down here, is this -- I won't call it chicken scratching.  I'll

15:21:06 14   call it doctor writing.  Is that yours?

15:21:09 15   A.  That's my doctor writing, yes.

15:21:12 16   Q.  And up here, whose handwriting is this up here (INDICATING)?

15:21:18 17   A.  That would be one of the people that checked the patient into

15:21:21 18   the office.

15:21:22 19   Q.  And so what we have here, of course, is Mrs. Orr's name; is

15:21:27 20   that right, sir?

15:21:28 21   A.  Yes.

15:21:28 22   Q.  And then what was history?

15:21:31 23   A.  History of atrial fib, fibrillation, changing doctors.

15:21:38 24   Q.  And whose handwriting is that?

15:21:41 25   A.  It's another member in the office personnel; I am not

1697

15:21:45  1   remembering it right now.

15:21:46  2          THE COURT:  You have a screen right there, Doctor, if you

15:21:50  3   know.

15:21:51  4          THE WITNESS:  Oh, okay.

15:21:52  5          THE COURT:  If you need it.

15:21:52  6   BY MR. IRWIN:

15:21:53  7   Q.  And the date is what?

15:21:54  8   A.  Looks like 8/1/11.

15:21:59  9   Q.  And what was Mrs. Orr's blood pressure at this first visit?

15:22:05 10   A.  220/105.

15:22:08 11   Q.  And how would characterize that blood pressure?

15:22:10 12   A.  Quite high.

15:22:11 13          MR. IRWIN:  And let's take a look, if you'll call out the

15:22:15 14   next call out, please, Joshu.  And I think we've seen that and the

15:22:22 15   next one.

15:22:22 16   BY MR. IRWIN:

15:22:24 17   Q.  Okay.  Here are doctor scratches.  Can you tell us what you

15:22:27 18   wrote there?

15:22:28 19   A.  "In April of 2011 her primary doctor, PCP, sent to Tulane

15:22:37 20   Medical Center emergency room in atrial fibrillation."

15:22:41 21          Right below that little arrow that points up to it

15:22:45 22   indicates the potassium was low at that point.

15:22:47 23   Q.  Potassium?

15:22:48 24   A.  Potassium level, the K plus ion right there, and it was low.

15:22:53 25   So that could have had something to do with precipitating it.

15:22:57 1    Q.  Right here (INDICATING).

15:22:58 2    A.  And then it says, "Stopped three days later.  Had a stress

15:23:04 3    test," which is MTST, maximum treadmill stress test, "which

15:23:11 4    produced atrial fibrillation also."

15:23:14 5    Q.  What was the --

15:23:16 6    A.  Uh --

15:23:16 7    Q.  I'm sorry.  Did you finish, Doctor?

15:23:19 8    A.  Well, she has -- said she had a torn left knee meniscus, and it

15:23:23 9    needed to be scoped and repaired by Southern Orthopedics.

15:23:28 10   Q.  And what was the significance of the depressed K?

15:23:34 11   A.  Well, when the potassium gets out of bounds, arrhythmias start.

15:23:42 12   And the potassium goes too high, it slows the heart dramatically,

15:23:46 13   and if it goes too low, you get these rapid arrhythmias.

15:23:51 14   Q.  And let's go to the next call out on this document.  And this

15:23:58 15   is also your handwriting, Doctor, of her past medical history?

15:24:01 16   A.  Yes.

15:24:01 17   Q.  And why was her past medical history of importance to you at

15:24:06 18   this first visit?

15:24:07 19   A.  Well, we always like to know everything we can find out about

15:24:10 20   the patient.

15:24:13 21   Q.  Can you take us through it and tell us what that past medical

15:24:16 22   history was?

15:24:17 23   A.  "DM" is diabetes mellitus on oral treatment.

15:24:21 24   Q.  That's DM, diabetes?

15:24:22 25   A.  DM.  Yeah.  "On oral Rx treatment, 15 to 20 years.  High blood

15:24:30  1   pressure, five or six years.  Home blood pressure's 140/90 plus or

15:24:38  2   minus.  Now within normal limits."  I believe.  That's what it

15:24:43  3   looks like to me.

15:24:44  4   Q.  "Now normal"?

15:24:46  5   A.  "Now normal.  High cholesterol."

15:24:49  6        And in the year 2000 was hospitalized with a sugar of

15:24:56  7   1185, which is extraordinary.  And I think the symptoms of that is

15:25:04  8   that would be nausea, vomiting, and diarrhea.

15:25:10  9   Q.  So her blood glucose -- she had a history of having a blood

15:25:15 10   glucose event of 1185?

15:25:19 11   A.  Right.  This is a certain type of diabetic thing called

15:25:26 12   hyperosmolar coma.  They commonly go into coma with that, too.

15:25:31 13   It's pretty rare; means, the diabetes is really bad.

15:25:35 14        MR. IRWIN:  Let's take a look at the next call out if we

15:25:38 15   can, then, please.  If we have it, Joshu, if you would call out the

15:25:51 16   list of medicines on that same page.  You may have to call it out

15:25:55 17   separately.  There you go.  Can you blow that up, please.

15:25:55 18   BY MR. IRWIN:

15:26:04 19   Q.  This is in Mrs. Orr's handwriting.  You ask your patients to

15:26:07 20   list their meds, medicines?

15:26:10 21   A.  Yes.

15:26:11 22   Q.  Would you please take us through the medicines that she was on

15:26:13 23   at that first visit?

15:26:15 24   A.  Okay.  Aspirin, 81 milligrams.  That's the baby aspirin dose

15:26:23 25   that's used to protect the patient against blood clots in the

OFFICIAL TRANSCRIPT

15:26:27  1   coronary and carotid arteries.

15:26:31  2         Lipitor for high cholesterol, one at bedtime.

15:26:35  3         Benazepril, which is an ace inhibitor, a very common

15:26:41  4   variety of hypertensive, anti-hypertensive drugs.

15:26:45  5         Pradaxa, which is an oral anticoagulant, 150 milligrams

15:26:49  6   twice a day.

15:26:51  7         Cardizem, which is a calcium channel blocker, and that is

15:26:56  8   used for hypertension.

15:27:00  9         Metoprolol tart ER that's extended release 100 milligrams

15:27:05 10   daily.  That's a beta blocker.  Again, for hypertension.

15:27:10 11         And metformin, 1000 milligrams, twice a day for diabetes.

15:27:15 12         And glipizide, 10 milligrams daily for diabetes.

15:27:22 13   Q.  Doctor, the jury has heard about CHAD scores and CHADSVASc

15:27:28 14   score.  We'll do this quickly, but do you remember roughly what her

15:27:33 15   CHADSVASc score was?

15:27:34 16   A.  I would say it was in the two to three range.

15:27:37 17   Q.  Let's take a look at the --

15:27:37 18   A.  That's -- I'm trying to remember that.  I don't know for sure.

15:27:40 19   Q.  Okay.  I'll see if I can help you with that a little bit.  If

15:27:43 20   we can pull up DX Orr 84, the CHADSVASc calculator.

15:27:50 21         Did she have congestive heart failure at this time; do

15:27:56 22   you know?

15:27:56 23   A.  I think she may have had diastolic heart failure, which is very

15:28:03 24   different from systolic heart failure and common in hypertension.

15:28:07 25   Q.  Did she have hypertension?

15:28:08  1   A.  She did have hypertension.

15:28:10  2   Q.  Did she have diabetes?

15:28:12  3   A.  Yes, she had diabetes.

15:28:14  4   Q.  And was she between age 65 and 74?

15:28:20  5   A.  I am not remembering her age at that time right now.

15:28:22  6   Q.  And she was a female?

15:28:25  7   A.  Yes, definitely.

15:28:26  8   Q.  So no matter how you add this up, she was clearly an

15:28:30  9   appropriate candidate for an anticoagulant?

15:28:33  10  A.  Absolutely.

15:28:37  11          MR. IRWIN:  Let's go to the next visit, which is DX Orr

15:28:41  12  38, which, your Honor, we will offer as Defense Exhibit 34.

15:29:00  13          THE COURT:  I'll admit it.

15:29:10  14  BY MR. IRWIN:

15:29:11  15  Q.  Doctor, we'll put it up on the screen, and I'll ask you if you

15:29:14  16  recognize this as an office visit of August 23, 2011.

15:29:23  17  A.  That's what it says, yes.

15:29:25  18  Q.  And what was the blood pressure on this visit?

15:29:27  19  A.  It looks to me like 230 -- well, left, I think it's a 230/120.

15:29:36  20  I am not too sure about the 230.  And on the right it was 226/110.

15:29:43  21  Really high.

15:29:44  22  Q.  Very high?

15:29:44  23  A.  Yes.

15:29:45  24  Q.  And let's then go to the next call out and would you give us

15:29:54  25  your notes, please, Doctor.

15:29:56 1   A.  Do you want me to read that to you?

15:30:01 2   Q.  Please.  Explain it if it needs explaining.

15:30:03 3   A.  "Feels Pradaxa is worsening her acid reflux."  And that is the

15:30:08 4   most common side effect, indigestion, however you want to call it.

15:30:13 5        She awakened at 2:00 in the morning, had pain in her

15:30:19 6   upper chest.  She had no sign of what's called water rash which is

15:30:25 7   when some acid actually comes up into your mouth.  That's when it's

15:30:29 8   really bad.  But most people with flux don't have that.  I just put

15:30:33 9   down that she didn't have it.

15:30:35 10  Q.  Reflux is like when the acid comes up?

15:30:37 11  A.  Comes up.  It's not supposed to be -- things from your stomach

15:30:40 12  are not supposed to be coming this way (INDICATING).  It's supposed

15:30:43 13  to be going the other way.

15:30:45 14        So I stopped Pradaxa realizing that was probably a side

15:30:48 15  effect of Pradaxa.  And I started her on Xarelto 10-milligram

15:30:54 16  tablets two daily to try that for the next month.

15:30:57 17  Q.  And so was this a transitional dose of Xarelto, 10 milligrams

15:31:03 18  two daily?

15:31:04 19  A.  Yes.  It was common dose, yeah.

15:31:06 20  Q.  And did you convert her eventually to 20 milligrams?

15:31:11 21  A.  Probably.

15:31:11 22  Q.  What was your experience in your cardiology practice, Doctor,

15:31:18 23  in treating people with atrial fibrillation and with

15:31:25 24  anticoagulants?  Can you tell the jury about your experience

15:31:27 25  generally in that area?

15:31:28  1   A.  Well, atrial fibrillation is extremely common.  It's actually

15:31:32  2   becoming more common.  Probably because the population is aging

15:31:36  3   more, and it's linearly related to age after mid life.  And things

15:31:43  4   that people do like alcohol and caffeine, et cetera, will aggravate

15:31:48  5   and cause atrial fibrillation.

15:31:52  6   Q.  And over the years, how have you treated your patients with

15:31:55  7   atrial fibrillation?

15:31:56  8   A.  Well, it all depends upon the heart rate and other things, but

15:32:02  9   the most lethal thing about atrial fibrillation -- if it hasn't

15:32:08  10  been mentioned before, the atrium is the chamber -- chambers on the

15:32:11  11  top of the heart, which are low pressure.  And the blood comes in

15:32:16  12  from the body into the right atrium, and from the lungs into to the

15:32:20  13  left atrium.

15:32:22  14         It sits there for a moment between heartbeats.  And then

15:32:27  15  the atrium contracts.  It's a weak contraction.  But it propels it

15:32:32  16  down into the ventricle, which is the big muscle in the muscle

15:32:36  17  chamber.  And that propels it to the rest of the body.

15:32:39  18         And if the atrium is fibrillating, it completely loses

15:32:44  19  the power to propel it.  So the blood is rather stagnant in there,

15:32:50  20  and the biggest problem with atrial fibrillation is not that people

15:32:54  21  feel the palpitations and their heart isn't quite as strong, so

15:32:59  22  they might be short of breath, but with the blood stagnating in the

15:33:02  23  atrium, the blood clots readily.

15:33:05  24         It's also been a speculation, which is pretty good, that

15:33:09  25  the wiggling of the atrium itself might have something to do with

15:33:14  1   building the blood clot, too.  But it's a well-known fact that the

15:33:18  2   blood will tend to clot in the atrium when it's fibrillating.  It's

15:33:22  3   been identified as a major cause of strokes.

15:33:24  4          And so in modern medicine virtually everybody who has

15:33:30  5   atrial fibrillation, unless it's a 16-year-old who went out and

15:33:37  6   drank ten bottles of beer and then got it just that one time, but

15:33:40  7   people as they grow up older, middle and later age groups, a

15:33:45  8   recommendation is to put them all on anticoagulant drug.

15:33:51  9   Q.  And what was your experience over the years with warfarin and

15:33:55 10   your patients?

15:33:56 11   A.  It's a good drug; it was the original anticoagulant, and a lot

15:34:05 12   of it is still used.  It requires regulation with blood tests

15:34:13 13   periodically to see that you've got the blood, quote, thin enough;

15:34:19 14   in other words, the anticoagulant potency is just about right.  If

15:34:22 15   it's too low, you're not helping the patient; and if it's too high,

15:34:26 16   you're putting the patient at a risk of bleeding.  But it's still

15:34:31 17   used.

15:34:32 18   Q.  You've used it for many, many years with your patients, and you

15:34:36 19   found it to be a very good drug?

15:34:37 20   A.  Yes.

15:34:38 21   Q.  When the novel anticoagulants came along, what was your

15:34:47 22   application of those novel anticoagulant when they came along?

15:34:51 23   A.  I discussed their -- the fact that they came along with

15:34:56 24   patients, and they would ask if they wanted to try it, but I didn't

15:35:00 25   really push them into it.  But then as more and more people that

15:35:04  1  had to take Coumadin -- or rather had atrial fibrillation heard

15:35:10  2  from their friends and people in the waiting room or anywhere or

15:35:13  3  another doctor, that maybe they didn't need all of the blood tests

15:35:16  4  necessary to regulate it, then people started asking for it.  And I

15:35:21  5  generally explained the difference and explained the ups and downs,

15:35:25  6  and if they wanted to try it, I let them try it, if I thought it

15:35:29  7  was reasonable.

15:35:29  8  Q.  And did you -- after the novel anticoagulants came on the

15:35:34  9  market, did you make it your business to learn about each one of

15:35:37  10  them --

15:35:37  11  A.  Yes.

15:35:38  12  Q.  -- to read the labelling, to confer with your colleagues?

15:35:41  13  A.  Sure.  Yes.

15:35:42  14  Q.  So that you could know -- you could feel you knew all of the

15:35:45  15  risks and benefits so you could adequately explain that to your

15:35:49  16  patients?

15:35:49  17  A.  Yes.

15:35:50  18  Q.  And did you in the course of, I guess, the end of your career

15:35:57  19  as a cardiologist begin to become familiar with all of the novel

15:36:03  20  anticoagulant and prescribe them as you thought appropriate to your

15:36:06  21  patients?

15:36:06  22  A.  Yes.  Although, I don't always jump to the newest one.  Yeah.

15:36:11  23  Xarelto is the one that I've used the most.

15:36:13  24  Q.  Doctor, let's take a look at the next visit of July 8, 2013,

15:36:30  25  which is DX 38.

15:36:36  1          MR. IRWIN:  And, your Honor --

15:36:41  2          THE WITNESS:  Blood pressure is still high.

15:36:43  3  BY MR. IRWIN:

15:36:44  4  Q.  What was her blood pressure on this visit, Dr. St. Martin?

15:36:46  5  A.  204/93.

15:36:49  6  Q.  And let's take a look at your notes.

15:36:52  7          THE COURT:  Has that been admitted?

15:36:55  8          MR. IRWIN:  Yes, your Honor, it has.

15:36:57  9  BY MR. IRWIN:

15:36:57 10  Q.  Let's take a look at your notes on the next call out.

15:37:10 11          I think it's notes that deals with a history of blood

15:37:15 12  pressure for a number of years.  This is page 126 -- I'm sorry.

15:37:21 13  This should be -- I believe this is on visit of July -- there we

15:37:30 14  go.  Okay.

15:37:32 15          Can you take us through that, Doctor?

15:37:34 16  A.  Okay.  This is an emergency room doctor writing this.

15:37:40 17  Q.  Okay.  I got ahead of myself there.  She appeared in the

15:37:44 18  emergency room, and you were familiar with this event?

15:37:47 19  A.  Yes.

15:37:48 20  Q.  Can you tell us about it?

15:37:49 21  A.  Well, basically it says here -- they describe her as

15:37:54 22  66-year-old lady, atrial fibrillation, hypertension, diabetes,

15:37:58 23  congestive heart failure, presents with heart palpitations.

15:38:03 24          Definition of a palpitation is an uncomfortable awareness

15:38:08 25  of the heartbeat.  It doesn't always mean an arrhythmia.  May be

15:38:13 1   beating harder, but that's the scientific definition of a

15:38:17 2   palpitation.

15:38:19 3           The ER doctors will commonly use that for arrhythmia.

15:38:24 4           "She had experienced intermittent palpitations for the

15:38:27 5   last several days, which increased in severity this morning.  She

15:38:32 6   had associated increasing weakness, shortness of breath, cough,

15:38:36 7   productive of "creamy" sputum for three days.  Mid sternal chest

15:38:42 8   pain right in the middle of the chest.  Constant nonradiating.  Has

15:38:47 9   some edema of her lower extremities.  I presume that's the legs and

15:38:51 10  the ankles.  Been constant for the past month.  No nausea and

15:38:56 11  vomiting.  Patient states this is similar to previous episodes of

15:39:00 12  atrial fibrillation.  And her last visit with me was greater than

15:39:06 13  three months ago before that."

15:39:11 14  Q.  Was she observed at this point to have congestive heart

15:39:14 15  failure?

15:39:15 16  A.  I would have to read more of the chart to know that.  I mean,

15:39:20 17  that would certainly be the suspicion with weakness and shortness

15:39:23 18  of breath.

15:39:24 19  Q.  Let's see if we can go to the next call out then on this

15:39:27 20  emergency room visit.  This is on February 19, 2014.

15:39:50 21  A.  Yes.

15:39:51 22  Q.  Was she admitted at this point into the hospital under your

15:39:55 23  care?

15:39:55 24  A.  Since it says, "The services cardiology," I presume that's

15:40:04 25  under my care.  And down below, the past medical history is

15:40:11  1    hypertension, high blood pressure, diabetes, atrial fibrillation,

15:40:16  2    congestive heart failure, and long-term anticoagulant use.

15:40:25  3    Q.  And, Doctor, let's next take a look at Orr 181, which I believe

15:40:32  4    is 35, Exhibit 35.

15:40:52  5            MR. BIRCHFIELD:  I don't have an objection.  I would just

15:40:54  6    like to get a copy.

15:41:04  7            MR. IRWIN:  Your Honor, we offer Exhibit 35.

15:41:07  8            THE COURT:  Admitted.

15:41:14  9            MR. IRWIN:  We can call that up, please.  DX Orr 181,

15:41:20  10   pages 4068.  There we go.

15:41:20  11   BY MR. IRWIN:

15:41:26  12   Q.  Doctor, this is the discharge summary?

15:41:28  13   A.  That's what it says, yes.

15:41:30  14   Q.  What is a discharge summary?

15:41:32  15   A.  Whenever a patient is discharged from the hospital, you're

15:41:36  16   responsible for dictating or writing a summary of what went on

15:41:40  17   there.  So if later another doctor or somebody else needs to look

15:41:45  18   at what went on there, rather than read the entire chart, which

15:41:48  19   might be 50 pages, you look at the discharge summary to get the

15:41:52  20   overview.

15:41:52  21   Q.  And is this when she was put on Xarelto 20 milligrams daily?

15:41:57  22   A.  I see that in large print.  So I guess it was.  I can't read

15:42:02  23   the summary underneath the -- on the thing.  I'm thinking that's

15:42:08  24   it.

15:42:11  25            Actually, now that I look at the very bottom.  Yeah.

15:42:14  1  "Follow-up patient instructions given in writing to the patient."
15:42:17  2  And Xarelto is the last thing on the list there, yeah.
15:42:20  3  Q.  Doctor, when you put a person on a new anticoagulant, what do
15:42:27  4  you tell them about the risks and the benefits of the
15:42:30  5  anticoagulant?
15:42:31  6  A.  Just about everything that a reasonable person would like to
15:42:36  7  know.  Number one, the benefit if you're in atrial fibrillation,
15:42:41  8  especially with heart failure, is very great because it's going to
15:42:45  9  go a long way to prevent a stroke.  And all anticoagulants carry
15:42:49  10  the risk of bleeding.
15:42:50  11  Q.  So how do you explain that to the patient so that they know
15:42:55  12  whether they want to run the risk of a stroke or run the risk of a
15:42:59  13  bleed?  How do you take them through that?
15:43:01  14  A.  I would say the great majority of patients respond fine to the
15:43:08  15  sentence I gave -- or the short paragraph I just recited.  If they
15:43:13  16  have some particular special interest in bleeding, like all their
15:43:19  17  neighbors died from bleeding or something like that, then you would
15:43:22  18  have to go into it more deeply.
15:43:24  19  Q.  But what do you tell them about the risk of a stroke if they
15:43:28  20  don't take the medicine versus the risk of a bleed if they do take
15:43:33  21  the medicine?
15:43:34  22  A.  I think the risk of the stroke is -- a clotting stroke is much
15:43:40  23  greater than the risk of any type of bleed of an anticoagulant.  If
15:43:45  24  it wasn't, we wouldn't be using the drugs.
15:43:53  25  Q.  Doctor, when you prescribed Xarelto to Mrs. Orr, did you think

15:44:00  1   that you were fully informed of the risks and benefits of Xarelto?

15:44:05  2   A.  I have read what's in the literature and the product

15:44:18  3   circulation.  If there was some obscure thing in the journal of

15:44:23  4   Western Australia or something like that, I wouldn't have known it.

15:44:26  5   But I thought I knew about it as well as any other drug, yes.

15:44:30  6   Q.  Did you read the label thoroughly before you started

15:44:33  7   prescribing Xarelto to your patients?

15:44:35  8   A.  I generally do that with new drugs.

15:44:38  9   Q.  And you did that with Xarelto, I assume?

15:44:41 10   A.  Yes.

15:44:42 11   Q.  And by virtue of you having read the label thoroughly and

15:44:47 12   having discussed it with your colleagues and done whatever research

15:44:51 13   you thought was appropriate, did you feel that when you prescribed

15:44:55 14   the medicine to Mrs. Orr that you were fully and satisfactorily

15:45:00 15   informed of the risks and benefits so you could make the proper

15:45:05 16   recommendation to her about Xarelto?

15:45:07 17   A.  Absolutely.

15:45:14 18   Q.  Let's take a look at the label, then, if we can.  It's already

15:45:17 19   in evidence, and it's DX 4 -- pardon me, DX 6.  And if we could go

15:45:30 20   to page 4, paragraph 2 on dosing.  And if we could blow up the

15:45:37 21   dosing.

15:45:40 22          So, Doctor, we know that there are indications and

15:45:43 23   dosages for each of the indications; is that right?

15:45:45 24   A.  Right.

15:45:46 25   Q.  And you had put her on for -- right here, atrial fibrillation,

15:45:55  1   you put her on 20 milligrams once daily with the evening meal.  Did

15:46:01  2   you explain the evening meal to her?

15:46:05  3   A.  I don't know if I had to explain what an evening meal was, but

15:46:09  4   I can't say I specifically recall that.

15:46:12  5   Q.  Was it your practice to tell your patients that taking the

15:46:17  6   Xarelto with the evening meal was the appropriate time to take the

15:46:21  7   Xarelto?

15:46:21  8   A.  Yes.

15:46:21  9   Q.  Did you know that?

15:46:23  10  A.  I can't remember that one particular detail, no.

15:46:27  11  Q.  Did there come a time because of her kidney problems that you

15:46:33  12  reduced her dosage to 15 milligrams?

15:46:35  13  A.  Yes.

15:46:36  14  Q.  And did you also have her seen by a kidney doctor, a

15:46:43  15  nephrologist?

15:46:43  16  A.  Yes.

15:46:44  17  Q.  And who was that?

15:46:45  18  A.  Dr. Frank Cruz.

15:46:48  19  Q.  Why did you send her to a kidney doctor?

15:46:51  20  A.  Because the kidney function had gone down somewhat.

15:46:59  21  Q.  And next, let's take a look at page 7 of the label and the risk

15:47:13  22  of bleeding.  All anticoagulants carry this risk; is that correct,

15:47:20  23  sir?

15:47:20  24  A.  That's correct.

15:47:21  25  Q.  The fact is, nobody really needed to tell you about the risk of

15:47:24  1   bleeding with an anticoagulant because that's -- anticoagulants are

15:47:27  2   supposed to do that, right?

15:47:29  3        MR. BIRCHFIELD:  Your Honor, I object to the leading.

15:47:31  4        MR. IRWIN:  I'll rephrase the question.

15:47:32  5   BY MR. IRWIN:

15:47:33  6   Q.  You were aware of the risk of bleeding with any -- would you

15:47:35  7   tell me whether or not you were aware of the risk of bleeding with

15:47:38  8   any anticoagulant?

15:47:38  9   A.  Yes, all anticoagulants can produce bleeding that you don't

15:47:43  10  want to happen.

15:47:44  11  Q.  And it says here, "In deciding whether to prescribe Xarelto to

15:47:56  12  patients at increased risk of bleeding, the risk of thrombotic

15:48:01  13  events should be weighed against the risk of bleeding."  Can you

15:48:04  14  explain that?

15:48:05  15  A.  Well, a thrombotic event is a blood clot.  And the risk of

15:48:12  16  having a stroke from atrial fibrillation is -- first of all, it's a

15:48:18  17  much more devastating complication than bleeding, if it's something

15:48:23  18  simple like gastrointestinal bleeding.  But the risk does -- the

15:48:29  19  benefit does outweigh the risk.

15:48:32  20  Q.  And, Doctor, were you aware that with these modern novel

15:48:40  21  anticoagulants that you could not measure the level of the

15:48:42  22  anticoagulant, the novel anticoagulant level in the patient's

15:48:50  23  system?

15:48:50  24  A.  Yes.

15:48:50  25  Q.  That, of course, is in contrast to warfarin that you could and

15:48:57  1   did measure --

15:48:57  2   A.  Yes.

15:48:58  3   Q.  -- the level?

15:48:58  4          And was it your understanding or can you tell me whether

15:49:02  5   or not it was your understanding that that was true of all modern

15:49:07  6   novel anticoagulants, that there was no reliable way to measure the

15:49:11  7   level?

15:49:11  8   A.  As far as I know, yes.

15:49:12  9   Q.  And as far as you know, can you tell me whether or not there

15:49:22 10   was any reliable way to monitor the level by testing, standard

15:49:26 11   laboratory testing, PT or otherwise?

15:49:28 12   A.  Not that I am aware of.

15:49:31 13   Q.  And let's then turn to the label, the same label, page 8.

15:49:36 14   DX 6, page 8.  And the language here -- well, I got ahead of

15:49:48 15   myself.  Got behind myself.

15:49:50 16          Doctor, you were aware that none of the oral

15:49:54 17   anticoagulants, the modern oral anticoagulants, the Factor Xa

15:50:01 18   anticoagulants had a reversal agent?

15:50:03 19   A.  I didn't hear the last sentence.

15:50:04 20   Q.  Were you aware that none of the modern Factor Xa anticoagulants

15:50:10 21   had a reversal agent?

15:50:12 22   A.  Yes.

15:50:12 23   Q.  And that would include not just Xarelto, but also Eliquis?

15:50:17 24   A.  Yes.

15:50:18 25   Q.  Before you retired, did you ever have any experience with

15:50:24  1   Savaysa?

15:50:24  2   A.  No.

15:50:25  3   Q.  Are you aware that it is also a Factor Xa anticoagulant?

15:50:32  4   A.  No.

15:50:36  5   Q.  Are you aware that -- or do you remember that the labelling for

15:50:40  6   Xarelto clearly set forth that there was no reversal agent or there

15:50:44  7   was no antidote?

15:50:45  8   A.  Yes.

15:50:45  9   Q.  Let's take a look at page -- well, there we are.  Okay.  You

15:50:51 10   see where it's described here in the label, "A specific antidote

15:50:58 11   for rivaroxaban is not available"?

15:51:00 12   A.  Yes.

15:51:00 13   Q.  And you were aware of that?

15:51:02 14   A.  Yes.

15:51:02 15   Q.  And if we can go to page 20, it's mentioned a second time.

15:51:36 16   Under "Overdosage," "a specific antidote is not available"?

15:51:45 17   A.  Right.

15:51:46 18   Q.  You were aware of that?

15:51:47 19   A.  I was aware of that, yes.

15:51:48 20   Q.  Doctor, do you remember that Mrs. Orr was hospitalized in July

15:52:02 21   of 2014 with a serious bout of pleural effusions and heart failure?

15:52:11 22   A.  Yes.

15:52:12 23   Q.  And if we can take a look at that, that is Dx ORR 24, pages 185

15:52:18 24   to 189.  And that's already in evidence.  And if we can call that

15:52:23 25   up, please.

15:52:26  1              Doctor, do you recognize this history and physical dated

15:52:37  2    July 15, 2014?

15:52:39  3    A.  I did for the five seconds it was up there.  It's covered by

15:52:42  4    the other blocks right now, but, yes, I recognize it.

15:52:45  5    Q.  If we go back, I think he's called it out here.

15:52:49  6    A.  Okay.

15:52:49  7    Q.  Does that look right to you there, Doctor?

15:52:56  8    A.  I am not seeing the history and physical now because of the

15:53:01  9    other --

15:53:02 10    Q.  I'm sorry?

15:53:03 11    A.  I am not seeing the history and physical now because of the

15:53:05 12    other things are in front of it.  Okay.  There's the history and

15:53:09 13    physical.

15:53:09 14    Q.  Do you see that's the past medical history under the "History

15:53:15 15    and Physical"?

15:53:15 16    A.  Yes, yes.

15:53:16 17    Q.  I'm sorry about that, Doctor.

15:53:20 18    A.  Okay.

15:53:21 19    Q.  Let's then take a look -- you can see that the chief complaint

15:53:25 20    is heart failure and pleural effusions?

15:53:28 21    A.  Yes, I do.

15:53:29 22    Q.  There we go.  And she's admitted for heart failure?

15:53:34 23    A.  Okay.  I am not looking at history and physical again, it's

15:53:40 24    covered up.  But I think the active problems I am seeing there are

15:53:46 25    heart failure and pleural effusion.

15:53:48  1    Q.  Let's go back to, Joshu, to the page -- I think Dr. St. Martin

15:53:53  2    would prefer to see the whole page.  Is that what you're interested

15:53:57  3    in seeing, Doctor?

15:53:58  4    A.  Yes.

15:53:59  5    Q.  Okay.  Good.  And so what was her past medical history?

15:54:08  6    A.  It says hypertension, diabetes, atrial fibrillation, congestive

15:54:16  7    heart failure, and anticoagulant long-term use.

15:54:19  8    Q.  Do you -- as we sit here today, Dr. St. Martin, do you have any

15:54:26  9    independent recollection of this hospitalization for Mrs. Orr?

15:54:29 10    A.  Not really, no.

15:54:30 11    Q.  If we then can go to the discharge summary, which is pages 189

15:54:39 12    and 190.  And, Joshu, if you'll just, as we did before, just blow

15:54:51 13    up that whole page.  There you go.  Thank you.

15:54:54 14            Do you recognize that as the discharge summary?

15:54:56 15    A.  Yes, I do.

15:54:57 16    Q.  And, Doctor, she was admitted on what date?

15:55:03 17    A.  July 14th, 2014.

15:55:07 18    Q.  And she was discharged on what date?

15:55:10 19    A.  It looks like July 29th, 2014.

15:55:16 20    Q.  So this would have been a two-week hospitalization?

15:55:19 21    A.  That date is the date that I did the discharge summary.  So I

15:55:31 22    can't guarantee that's the date that she was discharged.

15:55:38 23    Q.  And can you describe the reasons for the hospitalization, and

15:55:45 24    in particular, Doctor, the procedures that were performed on

15:55:49 25    Mrs. Orr at that hospitalization?

15:55:51  1    A.  You want me to jump to the procedures?

15:55:55  2    Q.  I would like you to describe the reason for the hospitalization

15:55:58  3    first.

15:55:58  4    A.  Atrial fibrillation with a rapid ventricular response.  That's

15:56:03  5    the RVR.  And congestive heart failure.  And because we are stuck

15:56:10  6    with computerized medical records now, you want to know what type

15:56:15  7    event before you've done an echo to see whether it's systolic

15:56:20  8    failure, so you have to throw in unknown type.  I would have known

15:56:24  9    that the next day after we do an echocardiogram on her.  And I

15:56:29 10    guess that just got copied from the admission.

15:56:31 11         Then the procedures, thoracentesis, that is inserting a

15:56:37 12    needle or a tube through a needle between the ribs into the chest

15:56:44 13    cavity to drain out excess fluid that is in the space around the

15:56:50 14    lungs.  You can't get the fluid out of the lungs themselves because

15:56:54 15    it's like a soggy sponge, the lung.  But the lung is sitting in

15:56:58 16    that cavity, and there will be free fluid in there, and it can be

15:57:02 17    taken out, which will leave people with shortness of breath pretty

15:57:07 18    quickly.

15:57:08 19    Q.  And what is the cause -- what was the cause of her accumulation

15:57:11 20    of fluid in her lungs?

15:57:13 21    A.  From what I see written here is congestive heart failure.

15:57:18 22    Q.  And how does congestive heart failure cause that fluid

15:57:22 23    accumulation?

15:57:24 24    A.  Well, the whole definition of congestive heart failure is very

15:57:32 25    complicated.  You can fill a whole book with it.

15:57:35  1    Q.  Well, make it easy for me.

15:57:36  2    A.  I am going to try to make it easy for everybody.  Congestive

15:57:41  3    heart failure means that the heart is calling upon some abnormal

15:57:48  4    compensation to put more output as opposed to a normal compensation

15:57:53  5    to put more output would, say, be an elevation in the heart rate if

15:57:59  6    you're running a race.  That's normal.  You get a higher cardiac

15:58:04  7    output, but that's normal.

15:58:05  8         An abnormal compensation generally requires the body to

15:58:09  9    retain more fluid to prime the pump more, stretch the heart a

15:58:16 10    little bit more so it has a little bit more umph to its output.

15:58:23 11         Congestive heart failure is hard to define, but that's

15:58:27 12    basically what it is.  The heart is using abnormal compensations to

15:58:31 13    try to maintain an output.

15:58:33 14    Q.  And, Doctor, what was the thoracentesis procedure?

15:58:40 15    A.  That's -- first we put a lot of local anesthetic, give a little

15:58:47 16    sedation, and go in right over the rib into the cavity.  I don't do

15:58:52 17    that myself anymore.  I used to many years ago.  Radiologists and

15:58:57 18    other interventionists do it now.  And put a tube in through the

15:59:01 19    needle and just drain out all of the excess fluid that's free in

15:59:05 20    the chest cavity.

15:59:06 21    Q.  So, Doctor, she was back in your office about two weeks later

15:59:12 22    on August 12, 2014, for an office visit.  And that is again

15:59:18 23    DX ORR 38.

15:59:25 24         MR. IRWIN:  And we offer that into evidence, pages 118.

15:59:34 25         MR. BIRCHFIELD:  It's already admitted.

OFFICIAL TRANSCRIPT

15:59:44  1    BY MR. IRWIN:

15:59:44  2    Q.  Doctor, do you recognize this as a note from your office, an

15:59:49  3    office visit?

15:59:50  4    A.  Yes, I do.

15:59:50  5    Q.  And let's look at the date up at the top.

15:59:53  6    A.  It says August 12th of '14.

15:59:58  7    Q.  And let's look at her list of medicines, Doctor.

16:00:01  8            And, Joshu, if you'll blow that up in Mrs. Orr's

16:00:05  9    handwriting.  Over on the right.

16:00:09  10   A.  Okay.

16:00:13  11   Q.  And what are her medicines like, her list of medicines now?

16:00:17  12   A.  Well, the top one, Levemir, is a type of insulin.  She is

16:00:22  13   taking 30 units of insulin.  Folic acid is a vitamin.  The

16:00:28  14   allopurinol is a drug to reduce uric acid in the blood, which is

16:00:34  15   the acid that causes gout.  And uric acid in the blood is increased

16:00:40  16   by almost all diuretics.  So the uric acid can go up if you're

16:00:47  17   having to use more diuretic.

16:00:48  18            The Metoprolol is a betablocker which slows the heart

16:00:55  19   rate down some.  Verapamil is a calcium channel blocker that lowers

16:01:00  20   the blood pressure and slows the heart rate down.  The Klor-Con is

16:01:05  21   just a brand name of potassium chloride to reduce -- or to improve

16:01:10  22   potassium, if any was lost on the diuretic.  And furosemide, Lasix,

16:01:19  23   diuretic.

16:01:20  24   Q.  Let's stop there for a second, please, Doctor.

16:01:22  25   A.  Okay.

1720

16:01:23  1    Q.  Let's talk about this group that we just went over here a

16:01:27  2    minute ago.  When you saw her originally, she was on metformin for

16:01:32  3    her diabetes?

16:01:34  4    A.  That's correct.

16:01:34  5    Q.  And now she has gone to insulin?

16:01:37  6    A.  Yes.

16:01:38  7    Q.  Now, how would that reflect on the progression on her diabetes

16:01:45  8    disease?

16:01:46  9    A.  It would generally mean that the diabetes has gotten worse and

16:01:50 10    more difficult to control.

16:01:51 11    Q.  And the allopurinol for gout, she was not on that before, when

16:01:57 12    you saw her the first time?

16:01:58 13    A.  Right.

16:01:59 14    Q.  And why would she now be on allopurinol?

16:02:02 15    A.  Either she had gout, which I don't recall, or the uric acid

16:02:07 16    went up as measured in her blood as a result of diuretics.

16:02:15 17    Q.  And given her disease states, can you explain or would you know

16:02:20 18    or have an opinion as to why her uric acid had gone up?

16:02:27 19    A.  My best estimate right now, it would be from the diuretics.

16:02:30 20    Q.  And furosemide, that was new also?

16:02:41 21    A.  Yes.

16:02:42 22    Q.  And what was furosemide doing for her now, since she didn't

16:02:46 23    have it back in February of 2011?

16:02:49 24    A.  That is a diuretic, and now that she had come down with

16:02:52 25    congestive heart failure with fluid in both chest cavities, that's

16:02:58  1    pretty significant.  That's why she is on the diuretic, to try to

16:03:01  2    keep it from recurring.

16:03:03  3    Q.  Thank you, Doctor.  Let's look at the next group right here,

16:03:07  4    starting -- is that benazepril?

16:03:09  5    A.  Yes.

16:03:10  6    Q.  Would you take us through those.

16:03:12  7    A.  Benazepril is an angiotensin converting enzyme inhibitor which

16:03:18  8    is called an ACE inhibitor.  It's too complicated to explain

16:03:23  9    briefly.  But it is an excellent drug to lower the blood pressure.

16:03:28 10    And that's why it's used there.

16:03:30 11    Q.  I don't remember, was she on that before, when you saw her the

16:03:33 12    first time?

16:03:34 13    A.  I don't think so.  And it looks like it was prescribed her

16:03:37 14    primary doctor, Dr. -- I think Dr. Cummings' name on the left side.

16:03:42 15    Q.  That's right.

16:03:44 16    A.  Yeah.  And then Metoprolol is a betablocker.  Atorvastatin is

16:03:52 17    for cholesterol, more commonly known as Lipitor, it's the brand

16:03:56 18    name.  A lot of people have heard of it.  Xarelto, what we are

16:04:00 19    talking about.  And the aspirin is a small -- it's a baby aspirin

16:04:05 20    size to inhibit platelet clotting.

16:04:07 21    Q.  Doctor, I probably skipped over this before, but I am going to

16:04:12 22    suggest to you, tell me whether or not this even refreshes your

16:04:16 23    recollection or adds up or doesn't add up, but that July 2014

16:04:20 24    hospitalization that we went through --

16:04:23 25    A.  Uh-huh.

16:04:24 1  Q.  -- at that hospitalization, the records reflect that her dosage

16:04:27 2  of Xarelto was reduced from 20 to 15.

16:04:31 3  A.  Uh-huh.

16:04:31 4  Q.  Do you have any recollection of that?

16:04:33 5  A.  Not right now sitting here, no.

16:04:37 6  Q.  Why would it have been reduced from 20 to 15?

16:04:40 7  A.  Well, one thing that I can think of, of course, her renal

16:04:47 8  function changed a little bit.

16:04:48 9  Q.  Declining renal function would have been appropriate to reduce

16:04:51 10  it to the 15-milligram dose?

16:04:53 11  A.  Absolutely.

16:04:54 12  Q.  Let's go down through the bottom group there.  Magnesium,

16:05:02 13  et cetera.

16:05:03 14  A.  Magnesium is another common electrolyte in the blood that can

16:05:10 15  be depleted by diuretics, and if it gets too low, that can cause

16:05:15 16  muscle cramps and arrhythmias also.

16:05:20 17       The next one to me looks like vitamin D3, 1,000 units.  I

16:05:28 18  don't think I prescribed that.  A lot of doctors see the patient at

16:05:35 19  the hospital.  Somebody thought she needed it.  That's the sunshine

16:05:39 20  vitamin, D.

16:05:41 21       Calcium would be there as a supplement.  Next, "C" I am

16:05:46 22  going to presume is vitamin C.  And the last one says CVS Vision

16:05:56 23  Formula, I have no idea what that is.

16:05:59 24  Q.  Okay.  Then let's get back to the page.  And then, Doctor, if

16:06:13 25  we can go to -- or, Joshu, if we can go to, I believe, the next

16:06:19  1    page, page 119.

16:06:37  2         Doctor, I'll read this to you from the medical record and

16:06:40  3    ask you if this sounds like something you might have said to the

16:06:45  4    patient with this condition.  Is it reasonable that you would have

16:06:48  5    spoken to a patient in this condition about other ways to try to

16:06:55  6    lower blood pressure and control blood pressure?

16:06:56  7    A.  Sure.

16:06:58  8    Q.  What kind of conversations would you have had with the patient

16:07:01  9    in this condition along those lines?

16:07:03  10   A.  Well, the other ways to lower blood pressure, No. 1, is to

16:07:07  11   reduce your salt intake, which is for most people extremely hard to

16:07:14  12   do, especially in this city where we all like to eat a lot.  So a

16:07:22  13   low-salt diet.  Lean body weight, which is another thing that's

16:07:25  14   very hard to get people to change, especially if they weigh a lot.

16:07:31  15   And then regular exercise.  And it doesn't need to be jogging in

16:07:36  16   the park.  You can just get out and walk at your own pace, as long

16:07:40  17   as you do it for 15 minutes or so three to four days a week, that

16:07:45  18   helps, too.

16:07:45  19   Q.  Doctor, do you remember -- and I have the medical records here

16:07:51  20   to show you if you don't.  Do you remember that in January and

16:07:53  21   February of 2015 that you and Mrs. Orr were working hard together

16:07:59  22   to try to get her blood pressure under control?

16:08:02  23   A.  I can't say I remember that right off, but I know we saw her a

16:08:06  24   lot and worked on a lot of things, yeah.

16:08:08  25   Q.  Let's take a look at an office visit on January 19, 2015, which

16:08:13 1    is DX ORR 38, which is in evidence.  This is page 114.

16:08:19 2              MR. IRWIN:  I guess we'll offer the separate page.  And

16:08:22 3    what would be the number, Dean?

16:08:23 4              THE DEPUTY CLERK:  Thirty-six.

16:08:24 5              MR. IRWIN:  No. 36.

16:08:26 6              MR. BIRCHFIELD:  No objection.

16:08:26 7              THE COURT:  Let it be admitted.

16:08:32 8    BY MR. IRWIN:

16:08:33 9    Q.  Doctor, if we look at the upper right-hand corner, what was her

16:08:38 10   blood pressure on this visit to your office on January 19, 2015?

16:08:42 11   A.  It's 190/80.

16:08:47 12   Q.  And that is serious?

16:08:48 13   A.  Yes.

16:08:51 14   Q.  Let's look at the medicines.  Did you add any medicine for her?

16:08:55 15             And if we look down here, Joshu, down here, we'll blow

16:09:01 16   that up for Dr. St. Martin and the jury.

16:09:04 17   A.  Come down about a third of the page.  Yes.  Clonidine.

16:09:08 18   Q.  And what is clonidine and why did you add clonidine?

16:09:13 19   A.  Well, clonidine is a good blood pressure medication.  It's an

16:09:17 20   alpha blocker, and mostly people have heard of beta blockers, but

16:09:24 21   alpha blockers have never gotten so famous.  They work very well

16:09:29 22   for lowering blood pressure, and they have a particular use in PRN,

16:09:34 23   or as needed.  If your blood pressure was high at the end of the

16:09:39 24   day, you could take an extra clonidine, which is not as easy with a

16:09:44 25   beta blocker.

1725

16:09:44  1    Q.  And, Joshu, if we can go back to the history of medicine.  We

16:09:48  2    will not go all through them.  But if you blow that up.

16:09:53  3            Now, adding in clonidine, which you just did, how many

16:09:57  4    blood pressure medicines would she have been on at this time in

16:10:02  5    January 19, 2015?

16:10:04  6    A.  Well, Metoprolol is one, benazepril is two, the furosemide is

16:10:10  7    three, so that's four.  And I am not remembering exactly what the

16:10:18  8    hydroxyzine is.

16:10:19  9    Q.  But the clonidine would make it five?

16:10:25  10   A.  No, the clonidine would make it four.

16:10:27  11   Q.  Make it four, okay.

16:10:29  12   A.  But with the caveat I don't remember what the hydroxyzine is.

16:10:35  13   I don't think that's a blood pressure medication, but it could be.

16:10:37  14   Q.  She was back in your office, Doctor, on February 3, which would

16:10:43  15   be about two weeks later?

16:10:45  16   A.  Uh-huh.

16:10:45  17   Q.  And why would she be coming back, I'll use this phrase, so

16:10:50  18   soon?

16:10:51  19   A.  Well, it's really not that soon for somebody who has this

16:10:55  20   serious a problem that was just hospitalized.

16:10:58  21   Q.  Okay.

16:10:59  22   A.  I would rather see her more frequently than not frequently

16:11:02  23   enough.

16:11:04  24   Q.  Let's take a look then at DX 38.  This is the same chart,

16:11:09  25   February 3, 2015, page 113.  And, Doctor, what is her blood

16:11:20 1   pressure at this visit?

16:11:21 2   A.  213/96.

16:11:27 3   Q.  And let's take a look, if we can, at the -- go back to the

16:11:32 4   page, please, Joshu -- what your -- what your notes say in this

16:11:42 5   quadrant (INDICATING).

16:11:43 6   A.  That says that she has Cardizem, which is a calcium channel

16:11:51 7   blocker useful for blood pressure, that she has it 30 milligrams

16:11:56 8   four times a day.  I am not too sure whether I gave her that in the

16:12:02 9   interim or some other doctor gave it to her.  It's unusual

16:12:06 10  terminology for me to just write down that she has it, so I am

16:12:11 11  thinking maybe somebody else gave it to her, I don't know.  Then it

16:12:14 12  says to come back in a week.

16:12:17 13  Q.  So would this now put her on five --

16:12:19 14  A.  Yes.

16:12:20 15  Q.  -- hypertensives?

16:12:22 16  A.  Yes.

16:12:22 17  Q.  And how does Cardizem work in contrast to the other four?

16:12:26 18  A.  It's a calcium channel blocker.  And there are calcium channels

16:12:33 19  in the heart which reflect or regulate the entry of calcium into

16:12:37 20  the cell and out.  But there are also calcium channel in the

16:12:43 21  musculature of all of the peripheral arteries.  All of the arteries

16:12:47 22  have three layers, an inner layer, a muscular layer, and then a

16:12:52 23  fibrous layer on the outside.

16:12:53 24        And the calcium channel blocker is used for hypertension.

16:12:56 25  They relax the muscular wall of the artery, essentially loosens

16:13:00 1    them up some and lowers the blood pressure.

16:13:02 2    Q.  Let's go take a look at the next visit, which is a week later,

16:13:09 3    February 10, 2015, ORR 38, page 112.

16:13:20 4         Joshu, if we can look at the blood pressure.

16:13:22 5    A.  It's 178/82.

16:13:25 6    Q.  Going in the right direction?

16:13:27 7    A.  Yes, it has.

16:13:28 8    Q.  And let's take a look at the lower right-hand quadrant, Joshu.

16:13:35 9    "High blood pressure, difficult to control"?

16:13:37 10   A.  Yes.

16:13:37 11   Q.  That's your handwriting?

16:13:38 12   A.  That's my handwriting.

16:13:39 13   Q.  And I guess that's obvious at this point --

16:13:43 14   A.  Yes.

16:13:44 15   Q.  -- that it was difficult.

16:13:45 16        And let's go to the next -- if you'll blow up the lower

16:13:50 17   right-hand quadrant, Joshu.

16:13:53 18        I thought there was something there.  There we go.  Yes,

16:14:02 19   this.  Okay.  Tell us about this, please.

16:14:05 20   A.  Well, I increased the clonidine to twice a day from one a day,

16:14:12 21   and the fact that I wrote "new Rx form" meant that when my

16:14:18 22   assistant checked the patient out she knew that she had to write a

16:14:22 23   new prescription for it, or maybe I wrote it myself.  "Come back in

16:14:25 24   a week."  And then below that it says, "Discussion regarding the

16:14:30 25   blood pressure medications-will try the above."

16:14:33  1   Q.  I'm sorry.  Say that again.  "Will try" what?

16:14:36  2   A.  "Will try the above."  Clonidine.

16:14:40  3   Q.  So she had been on clonidine before, but you were increasing

16:14:43  4   the dose?

16:14:44  5   A.  Yes, doubling the dose.

16:14:47  6   Q.  All right.  Let's go, then, to the next visit, which is

16:14:54  7   February 18, 2015, eight days later.  This is, again, Orr 38,

16:15:01  8   page 111.  And what number is that?

16:15:04  9          THE DEPUTY CLERK:  We didn't number the last couple.

16:15:07  10          MR. IRWIN:  We better number them then.

16:15:12  11          THE DEPUTY CLERK:  Orr 38, page 113, will be 37.

16:15:12  12          MR. IRWIN:  Thank you.

16:15:16  13          THE DEPUTY CLERK:  Orr 38, page 346, will be 38; and

16:15:26  14   Orr 38, page 111, will be 39.

16:15:30  15          MR. IRWIN:  Thank you, Dean.

16:15:32  16          We offer those, your Honor.

16:15:33  17          THE COURT:  Let it be admitted.

16:15:42  18   BY MR. IRWIN:

16:15:42  19   Q.  So let's take a look at page 111, Orr 38.  And how are we doing

16:15:50  20   blood pressure-wise now, Doctor?

16:15:52  21   A.  167/85, which is still high, but not anywhere as bad as it was.

16:15:59  22   Q.  Better.  And let's see if there's anything in that lower

16:16:07  23   right-hand quadrant.  I cannot remember right now.  I guess there's

16:16:12  24   not.

16:16:14  25          So, Doctor, according to the medical records, this is the

16:16:18  1   last time you saw Mrs. Orr on February 18, 2015?

16:16:24  2   A.  Okay.

16:16:25  3   Q.  I want to show you a medical record that we showed you at your

16:16:29  4   deposition, which has already been introduced into evidence, I

16:16:33  5   believe.  It's a note from Dr. Cruz, and it is, I believe, Orr Cruz

16:16:44  6   page 101, and if we can put that up, please, Joshu.  And up here if

16:16:57  7   we can blow this up up here.

16:16:59  8           Do you recognize this as a note by Dr. Cruz?

16:17:02  9   A.  Yeah.  That's Dr. Cruz, Jr.  The father and the son worked

16:17:08  10  together.

16:17:08  11  Q.  And where is her blood pressure now?

16:17:11  12  A.  200/90.

16:17:14  13  Q.  And how would you describe that blood pressure?

16:17:17  14  A.  Still way too high.

16:17:18  15  Q.  Doctor, a few minutes ago I asked you about whether you knew

16:17:28  16  that you could not monitor anticoagulation levels in modern oral

16:17:37  17  anticoagulants.  Are you aware of that?

16:17:40  18  A.  Yes.

16:17:40  19  Q.  Were you aware that there was no reliable PT test or other test

16:17:47  20  that would tell you whether or not a patient on a modern

16:17:52  21  anticoagulant such as Xarelto was there in the system?

16:17:58  22  A.  I might have heard a double negative in the question.  There is

16:18:05  23  no reliable test.

16:18:06  24  Q.  Okay.

16:18:07  25  A.  Yeah.

16:18:08  1   Q.  Either for monitoring purposes or for emergency purposes?

16:18:13  2   A.  As far as I know.

16:18:14  3   Q.  And were you aware that the labelling of Xarelto had

16:18:22  4   information about how it could not be monitored with standard

16:18:28  5   laboratory testing?

16:18:31  6   A.  Probably.

16:18:31  7   Q.  Let's take a look at paragraph 5.7 of the label, which is DX 6.

16:18:50  8   I believe it's DX 6, and I don't have a page number here,

16:19:03  9   paragraph 5.7.  There we go.

16:19:12  10          Do you see the phrase, Doctor, here -- this is in the

16:19:15  11  pregnancy section -- "the anticoagulant effect of Xarelto cannot be

16:19:20  12  monitored with standard laboratory testing nor readily reversed"?

16:19:24  13  A.  Yes.

16:19:24  14  Q.  Did you understand that back when you prescribed this medicine

16:19:27  15  to Mrs. Orr?

16:19:28  16  A.  Yes, yes.

16:19:29  17  Q.  Doctor, remembering that at your deposition you were asked many

16:19:43  18  questions by Mrs. Orr's lawyers and remembering when Mrs. Orr's

16:19:50  19  lawyer-doctor came to meet with you and asked you many questions

16:19:53  20  about things like PT testing and what have you, looking back on

16:19:57  21  your prescription that you gave to Mrs. Orr to use Xarelto for her

16:20:02  22  atrial fibrillation, and knowing what you know today, would you

16:20:08  23  change that prescription decision?

16:20:09  24  A.  No, I wouldn't, because atrial fibrillation carries such a

16:20:13  25  higher risk of stroke than the risk of bleeding from the

16:20:18 1    medication, for any anticoagulant.

16:20:22 2    Q.  So are you comfortable -- of course, we know that Ms. Orr had

16:20:28 3    this unfortunate event.  But are you comfortable that the

16:20:32 4    prescribing decision you made for Mrs. Orr for Xarelto was the

16:20:36 5    right decision, and with the benefit of all of the hindsight, would

16:20:41 6    you still believe that that was the proper decision to make?

16:20:44 7    A.  Yes, I do.

16:20:45 8    Q.  And, as we sit here today, would you change that decision for

16:20:48 9    any reason?

16:20:49 10   A.  No.

16:20:51 11            MR. IRWIN:  That's all the questions I have, Doctor.

16:20:54 12   Thank you very much.

16:20:55 13            THE COURT:  You may cross.

16:20:56 14                     CROSS-EXAMINATION

16:20:57 15   BY MR. BIRCHFIELD:

16:21:14 16   Q.  Good afternoon.  Good afternoon, Dr. St. Martin.  I am Andy

16:21:18 17   Birchfield.  You and I have never met; is that right?

16:21:20 18   A.  That's correct.  Nice to meet you.

16:21:22 19   Q.  Nice to meet you.

16:21:24 20            You understand that I represent -- I am one of the

16:21:26 21   lawyers that represents the Orr family --

16:21:28 22   A.  Yes.

16:21:28 23   Q.  -- is that correct?

16:21:29 24            And, Dr. St. Martin, you understand that the Orr family

16:21:34 25   is not critical of you and your care of Mrs. Orr in this case; you

16:21:39  1  understand that, right?

16:21:40  2  A.  That's what I've understood ever since this happened, yes.

16:21:44  3  Q.  And you understand that the Orr family's position is that the

16:21:50  4  drug companies, Bayer and Janssen, didn't adequately inform you and

16:21:55  5  other doctors; that's the reason they're not blaming you.  You

16:21:58  6  understand that, right?

16:21:59  7  A.  Yes.

16:21:59  8  Q.  And, Dr. St. Martin, you're not being paid for your testimony

16:22:04  9  today, are you?

16:22:05  10  A.  No.

16:22:07  11  Q.  And -- but you have been paid by Janssen in the past; is that

16:22:13  12  right?

16:22:13  13  A.  Well, when I give depositions and things like that, I usually

16:22:19  14  charge by the hour.

16:22:21  15  Q.  Okay.  But beyond that, I mean, you've been paid a significant

16:22:26  16  amount of money by Janssen for work that you have done for them; is

16:22:32  17  that right?

16:22:32  18  A.  I am not remembering it right now, but I've been out of the

16:22:36  19  practice of medicine for a year and a half, and it could be a long

16:22:39  20  time ago.

16:22:40  21  Q.  All right.  Mr. Irwin just talked to you about a time when you

16:22:46  22  served as an expert witness.  Do you recall that?

16:22:50  23  A.  I've been an expert witness a lot of times.  I am not too sure

16:22:57  24  which one are you referring to.

16:22:58  25  Q.  Okay.  Do you recall serving as an expert witness for Janssen

16:23:04  1  Pharmaceutical?

16:23:05  2  A.  I can remember it if you told me what the name of the drug was.

16:23:10  3  Q.  Propulsid.

16:23:11  4  A.  Yes, I remember that.

16:23:12  5  Q.  And in that -- and you were hired as an expert on behalf of

16:23:17  6  Janssen, right?

16:23:17  7  A.  That's correct.

16:23:18  8  Q.  And you worked with Mr. Irwin in that case, in the

16:23:21  9  litigation --

16:23:22 10  A.  Yes.  Yes, I did.

16:23:23 11  Q.  -- is that right?

16:23:26 12       And you and Mr. Irwin, y'all worked together

16:23:29 13  professionally, but you're also kind of friends and neighbors,

16:23:33 14  right?  Lived in the same uptown neighborhood for about ten years;

16:23:36 15  is that right?

16:23:37 16  A.  We lived in the same neighborhood a number of years ago.  Jim

16:23:41 17  probably remembers when he moved out, but it's been a pretty long

16:23:44 18  time now.

16:23:45 19  Q.  And you mentioned that you served as an expert a number of

16:23:52 20  times.  But specifically for that case involving Mr. Irwin and

16:23:58 21  Janssen, you were paid a significant amount of money for your work

16:24:04 22  in that case, right?

16:24:05 23  A.  It took a really significant amount of time to get all of

16:24:09 24  preparation for it, yes.

16:24:10 25  Q.  All right.  So how much were you paid by Janssen in the case --

16:24:14  1   A.  I don't remember.

16:24:15  2   Q.  Was it well over $100,000, Dr. St. Martin?

16:24:18  3   A.  Over 100?

16:24:19  4   Q.  Yes.

16:24:20  5   A.  I don't think so, no.

16:24:21  6   Q.  Would it help you if I showed you a transcript from your

16:24:26  7   testimony?  Would that help you?

16:24:27  8   A.  It would only help me if it states the number in there.

16:24:33  9   Q.  All right.  So, Dr. St. Martin, this is the Propulsid

16:24:54  10  litigation.  Do you see this?

16:24:55  11  A.  Yes, I do.

16:24:56  12  Q.  And this is your testimony, Dr. St. Martin.  You see where

16:25:02  13  you're testifying?

16:25:03  14  A.  Yes.

16:25:05  15  Q.  And then it asks, "Okay.  How many hours have you put into this

16:25:09  16  endeavor?"  And you say, "I can't tell you exactly, but it's well

16:25:13  17  over 100" --

16:25:15  18  A.  Yeah.

16:25:16  19  Q.  -- is that correct?

16:25:17  20  A.  Over 100 hours of work, yes.

16:25:19  21  Q.  Right, right.

16:25:19  22  A.  And that's while I'm practicing medicine, too.

16:25:22  23  Q.  "And how much have you been paid thus far in this litigation?"

16:25:26  24  Do you follow there?

16:25:27  25  A.  Yes.

16:25:27  1    Q.  "And we're talking about a case that's here today or the

16:25:31  2    educational process that started before I got involved in this

16:25:35  3    particular case," both, right?

16:25:37  4    A.  Okay.

16:25:38  5    Q.  "And it's something over $100,000.  I can't tell you exactly

16:25:43  6    how much."  Does that refresh your recollection?

16:25:45  7    A.  Yes.

16:25:48  8    Q.  So in that litigation you were paid -- you worked with

16:25:54  9    Mr. Irwin and you were paid over $100,000 by Janssen; is that

16:25:58 10    right?

16:25:58 11    A.  That's what you just showed me, yes.  I didn't remember the

16:26:03 12    exact number.

16:26:03 13    Q.  Right, right.  But that's what you testified to under oath,

16:26:07 14    right?

16:26:07 15    A.  Yes.

16:26:08 16    Q.  And that litigation -- that case that you were testifying in,

16:26:14 17    that was a pharmaceutical-type case, right?

16:26:18 18    A.  That's correct.

16:26:18 19    Q.  Similar to what we're here about today, right?

16:26:21 20    A.  Yes.

16:26:21 21    Q.  And so you have -- you have some experience in the legal

16:26:27 22    aspects of these cases, right?

16:26:29 23    A.  I have some experience, but I haven't done an awful lot of it,

16:26:35 24    no.

16:26:35 25    Q.  But you understand -- you understand that a plaintiff in this

16:26:42  1   type case must -- one of the things that they must show is that the

16:26:46  2   prescribing doctor was not adequately informed or instructed about

16:26:51  3   the drug.  You understand that, right?

16:26:53  4   A.  Yes, yes.

16:26:54  5   Q.  And so you understand that if you are offering testimony as the

16:27:00  6   prescribing doctor that you were fully informed, you understand

16:27:05  7   that that favors Mr. Irwin and Janssen, right?

16:27:09  8   A.  I guess you could say it favors Janssen, yes.

16:27:14  9   Q.  And Mr. Irwin asked you about a visit that he made to you when

16:27:22 10   you were living in Atlanta.  Do you recall that?

16:27:25 11   A.  I recall now recently hearing about it, but I don't remember

16:27:30 12   exactly where and when we met.  That would be after Katrina, I

16:27:35 13   think.

16:27:35 14   Q.  Yes.

16:27:36 15   A.  Yes.

16:27:36 16   Q.  So you don't recall that visit, whether it was all

16:27:40 17   work-related, social, both; you don't remember one way or the

16:27:43 18   other?

16:27:44 19   A.  I'm sure it wasn't social.

16:27:47 20   Q.  You also mentioned that Mr. Irwin asked you about contact, and

16:27:55 21   that you had not had any contact or you hadn't seen him up until

16:27:59 22   June of last year.  Do you recall that?

16:28:01 23   A.  Yes.

16:28:02 24   Q.  And then you said that you had not had any contact with him

16:28:06 25   since then, right?

16:28:08  1   A.  As far as I remember.

16:28:11  2   Q.  And when you're saying "contact," you're talking about you

16:28:15  3   haven't actually, you know, sat down with him, but you've talked to

16:28:19  4   him on the phone, and you've had e-mail communications with him,

16:28:22  5   right?

16:28:23  6   A.  I talked to him on the phone just a couple of days ago just

16:28:28  7   about the -- I think the scheduling or the timing of this trial or

16:28:32  8   something.  And he immediately got Ms. Jeffcott on the phone and

16:28:37  9   said I should be talking to her.  Yeah.  So that was the whole

16:28:41  10  discussion I was asking him a question and he referred me to her.

16:28:44  11  Q.  And Mr. Irwin asked you about some meeting that you had with a

16:28:50  12  doctor who is also a lawyer, Dr. Mark Whitehead.  Do you recall

16:28:54  13  that?

16:28:55  14  A.  You mean in the more remote past?  Did he ask me that?

16:29:02  15  Q.  There wasn't anything inappropriate that took place with your

16:29:05  16  meetings with Mr. Whitehead or any of the lawyers representing the

16:29:09  17  Orr family.  You're not saying that, are you?

16:29:11  18  A.  No, I am not.

16:29:16  19  Q.  Dr. St. Martin, in your testimony you prescribed Xarelto to

16:29:27  20  Mrs. Orr.

16:29:28  21  A.  Yes.

16:29:29  22  Q.  And you made that decision based on the -- based on the

16:29:34  23  information -- all of the information that you had about Xarelto at

16:29:38  24  that time?

16:29:38  25  A.  That's correct.

16:29:39  1   Q.  And that information -- the information that you had, that came

16:29:45  2   from a very thorough review of the product label, right?

16:29:49  3   A.  Yes.

16:29:49  4   Q.  And it also -- I think you said that it also included CMEs or

16:29:55  5   continuing medical education events that you would have attended,

16:30:00  6   right?

16:30:00  7   A.  Yes.  I couldn't name a specific one right this second.

16:30:04  8   Q.  Okay.  And it would also include -- it would include your

16:30:09  9   discussions with other doctors, with colleagues; is that right?

16:30:12 10   A.  Yes.

16:30:13 11   Q.  And I think you said that it also included some review of the

16:30:18 12   medical literature --

16:30:19 13   A.  Yes.

16:30:20 14   Q.  -- is that right?

16:30:20 15   A.  Right.

16:30:21 16   Q.  And so when you were making your prescribing decision, the

16:30:26 17   information that you had was from all of those sources, right?

16:30:29 18   A.  That's correct.

16:30:29 19   Q.  And so when you say -- when you tell the jury that there is no

16:30:39 20   test to measure or monitor Xarelto, then that is based on your

16:30:46 21   understanding -- all of that information from the label, from the

16:30:49 22   continuing medical education, from the medical -- the literature

16:30:53 23   that you reviewed, from all of those sources, it's your position

16:30:58 24   that there is no test --

16:31:00 25   A.  That is correct, yes.

16:31:01  1    Q.  -- to measure or to monitor?

16:31:03  2    A.  Yes.

16:31:03  3    Q.  So I want to take a look at a label, a Xarelto label.  I'll

16:31:21  4    give you a copy.  We probably won't make it through all of these,

16:31:24  5    Doctor, but just for convenience sake, we'll start here.

16:31:33  6    A.  Okay.

16:31:44  7          MR. BIRCHFIELD:  Your Honor, I want to offer Plaintiffs'

16:31:47  8    Exhibit -- it's Exhibit Identification No. 5767300.  It's the

16:31:56  9    September of 2015 product label, as Plaintiffs' Exhibit 185.

16:32:06 10          MR. IRWIN:  Your Honor, September of 2015, I think it's

16:32:10 11    remote in time.

16:32:12 12          MR. BIRCHFIELD:  That's the whole point.

16:32:16 13          MR. IRWIN:  Your Honor, I'll reserve my objection until

16:32:19 14    we see where it's going.

16:32:20 15          THE COURT:  I'll allow him to use it.  I'll admit it.

16:32:25 16    BY MR. BIRCHFIELD:

16:32:26 17    Q.  Dr. St. Martin, so we're looking at the Xarelto label, correct?

16:32:35 18    A.  Yes.

16:32:36 19    Q.  And then we see here in the middle that this is the September

16:32:43 20    of 2015 version of the label; is that right?

16:32:48 21    A.  Yeah.  In the bottom right, I see it.

16:32:52 22    Q.  And I want you to -- if you would, Dr. St. Martin, you can

16:32:55 23    either look on the screen or you can turn to page 13 of the product

16:33:02 24    label.  And I want us to look at this chart.

16:33:12 25    A.  There's about 20 different separators in here.  Is page 13 just

16:33:18  1   counting from the front?

16:33:21  2   Q.  It's in the product labels, sir.

16:33:23  3   A.  None of these are labeled as product labels.

16:33:29  4   Q.  I'll just hand you another copy.

16:33:32  5          THE COURT:  And he has it up here, too, Doctor, so you

16:33:35  6   can see it.

16:33:36  7          THE WITNESS:  Oh, okay.

16:33:45  8   BY MR. BIRCHFIELD:

16:33:45  9   Q.  So, Dr. St. Martin, before we go here, you had described for us

16:33:51 10   earlier, I think, in -- at least your deposition, that, in addition

16:33:57 11   to product label, you were familiar with one clinical trial for

16:34:00 12   Xarelto and AFib.  It's the ROCKET trial; is that right?

16:34:04 13   A.  Yes, yes.

16:34:05 14   Q.  So I want you to take a look for just a minute at this chart,

16:34:10 15   and let's make sure that we understand what we're looking at, okay.

16:34:13 16   So this is the -- this is a risk of major bleeding events by

16:34:17 17   baseline characteristics in the ROCKET AF study.  Do you see that?

16:34:23 18   A.  Yes.

16:34:24 19   Q.  And then if we look at this -- look at this first column here

16:34:37 20   that is -- that's the baseline characteristics that they are going

16:34:40 21   to be looking at; is that right?

16:34:43 22   A.  Looks like it, yes.

16:34:45 23   Q.  And then we see in that next column we have the rivaroxaban or

16:34:53 24   the Xarelto column?

16:34:54 25   A.  Yes.

16:34:54  1    Q.  Is that correct?  That's --

16:34:57  2    A.  Yes, it's correct.

16:34:58  3    Q.  And then we have the warfarin.  So we've got the Xarelto;

16:35:06  4    that's the treatment.  The warfarin is the control group, right?

16:35:12  5    A.  I don't see where it was a control group.  I mean, it looks

16:35:16  6    like two different treatments.

16:35:19  7           MR. IRWIN:  Excuse me, Dr. St. Martin.  I am going to

16:35:21  8    reiterate my objection.

16:35:23  9           I don't know what the relevance of this study is, this

16:35:28 10    figure is to a prescribing decision made several years earlier.

16:35:35 11    And, unfortunately, after Mrs. Orr was gone.  I don't know where

16:35:39 12    we're going with this.  I don't understand why it would at all be

16:35:42 13    relevant to his decision-making.

16:35:43 14           MR. BIRCHFIELD:  It will be very clear, your Honor.

16:35:45 15           THE COURT:  Okay.

16:35:46 16    BY MR. BIRCHFIELD:

16:35:47 17    Q.  Dr. St. Martin, you understand that this is data from the

16:35:50 18    ROCKET trial, correct?

16:35:52 19    A.  Yes.

16:35:53 20    Q.  And this is included in the September 2015 product label for

16:36:00 21    Xarelto, correct?

16:36:00 22    A.  Well, that's what you're telling me.

16:36:05 23    Q.  So let's look at the next column here where it says "Hazard

16:36:13 24    Ratio"?

16:36:13 25    A.  Yes.

16:36:14  1    Q.  And the "Confidence Intervals."  Do you see that?

16:36:17  2    A.  Yes.

16:36:17  3    Q.  When you're look at Hazard Ratio, you're measuring the number

16:36:28  4    of events or outcomes on a treatment group, right?  Is that what

16:36:35  5    you're looking at?

16:36:36  6    A.  Well, I am not a statistician, and that's not a term that I

16:36:41  7    use.  But I'll take your word for it.

16:36:43  8    Q.  Okay.  Well, Dr. St. Martin, do you understand -- you

16:36:49  9    understand the concept of Hazard Ratio?

16:36:51 10    A.  I understand the concept, yes.

16:36:52 11    Q.  And Confidence Intervals, right?

16:36:55 12    A.  Roughly, yes.

16:36:56 13    Q.  And then if we look at the -- if we look at the last bullet --

16:37:03 14    if we look here in that column, then that's a chart.  Is that

16:37:08 15    called like a "forest plot"?

16:37:10 16    A.  I'm looking at the column there (INDICATING)?

16:37:13 17    Q.  Yes.

16:37:14 18    A.  Okay.  I don't know the name of that type of plot, no.

16:37:17 19    Q.  And then if we look over in the last column we have the Hazard

16:37:23 20    Ratio and the 95 percent Confidence Intervals in numeric form; is

16:37:32 21    that right?

16:37:32 22    A.  That's what it looks like.

16:37:34 23    Q.  This is really small.  Let's see if we can make that a little

16:37:37 24    bit better.

16:37:38 25    A.  Okay.

16:37:41  1   Q.  And just to make sure that we understand what we're looking at

16:37:45  2   here, if we take a look at that first column and that is -- that's

16:37:51  3   all patients, right?  That's all patients?

16:37:53  4   A.  That's what it says, yes.

16:37:55  5   Q.  So if we look at that first column for all patients and we're

16:37:59  6   looking at major bleeding events, then that first number, the

16:38:05  7   395 -- do you see that, Doctor?  Dr. St. Martin?

16:38:10  8   A.  Under the Xarelto?

16:38:12  9   Q.  Yes.

16:38:13  10  A.  Yes.

16:38:13  11  Q.  So the 395, that is the number of major bleeding events in the

16:38:19  12  Xarelto arm; is that correct?

16:38:21  13  A.  That's what it looks like, yes.

16:38:23  14  Q.  And then that next number, the 7,111, that is the total number

16:38:31  15  of Xarelto patients in the ROCKET study, right?

16:38:35  16  A.  Right.

16:38:36  17  Q.  And then we see the -- in parenthesis the 3.6.  Can you tell us

16:38:43  18  what the 3.6 is, Dr. St. Martin?

16:38:45  19  A.  Percent per year?  Yeah.  The percent sign is very hard to

16:39:03  20  read.

16:39:03  21  Q.  So what this tells us is for Xarelto there were 395 events of

16:39:09  22  the 7,111 that were on Xarelto, right?  And the rate was 3.6 per

16:39:17  23  100 patient years.  Does that make sense?

16:39:20  24  A.  Okay.

16:39:20  25  Q.  Does that line up with what your understanding is?

16:39:24  1    A.   Yes.

16:39:24  2    Q.   Sir?

16:39:25  3    A.   Yes.

16:39:25  4    Q.   So then if we move across and we see that the next numbers,

16:39:34  5    it's 386; is that right?

16:39:37  6    A.   I see that, yes.

16:39:39  7    Q.   386.   And that's the number of warfarin patients that had a

16:39:44  8    major bleeding event, right?

16:39:46  9    A.   Yes.

16:39:47 10    Q.   And that was out of the total of 7,125 warfarin patients in the

16:39:54 11    ROCKET study, right?

16:39:55 12    A.   Yes.

16:39:58 13    Q.   And the percentage per year is 3.5.

16:40:02 14    A.   Okay.

16:40:03 15    Q.   Okay.   Is that right?

16:40:04 16    A.   That's what I see, yes.

16:40:05 17    Q.   And if we go across and we look at the Hazard Ratio and we're

16:40:11 18    looking at the 95 percent Confidence Intervals, Dr. St. Martin, if

16:40:16 19    you're looking at Confidence Intervals, you're looking to determine

16:40:21 20    whether or not the finding is statistically significant; that's one

16:40:25 21    of the main points of the Confidence Intervals, right?   Do you

16:40:32 22    understand that?

16:40:33 23    A.   I am understanding what you're telling me.   I've never used the

16:40:37 24    term "confidence interval."   So...

16:40:40 25             But I understand "statistically significant."

16:40:42  1    Q.  You do?

16:40:43  2    A.  Yes.

16:40:43  3    Q.  So if you're looking at this chart and you -- do you understand

16:40:47  4    that if the Confidence Intervals, if they span 1 -- if they cross 1

16:40:55  5    that that means they are not statistically significant?  Do you

16:40:58  6    understand that?

16:40:59  7    A.  No.

16:40:59  8    Q.  You don't?  You don't understand that --

16:41:06  9    A.  If they -- I don't understand what "span 1" means.

16:41:09  10   Q.  If you look at this -- if you look at this chart, let's look at

16:41:12  11   the graph here.  Do you see the graph?

16:41:18  12   A.  Up at the top, yeah.

16:41:20  13   Q.  Yes.  Right there (INDICATING).  So we've got this, and this

16:41:24  14   line that runs -- this perpendicular line that runs all the way

16:41:29  15   down that represents 1 --

16:41:29  16   A.  The vertical line.

16:41:31  17   Q.  I'll show you at the bottom.  Look down at the bottom.  Right

16:41:35  18   here.  We see 1 (INDICATING).  Is that right?

16:41:39  19   A.  Okay.  I can see it better now.  I'm sorry.

16:41:41  20   Q.  One.  Do you see that?

16:41:47  21   A.  Yes.

16:41:48  22   Q.  So if we look at -- if we look at this chart and if we are

16:41:54  23   looking for findings that are statistically significant, and I

16:42:03  24   understand -- let me make sure.  You don't know one way or the

16:42:07  25   other whether a confidence interval that spans or includes 1 -- you

1746

16:42:14  1   don't know whether that is statistically significant or not?

16:42:17  2   A.  It's not a term of art I use, no.  Independently I don't know

16:42:24  3   it.  I hear you telling me that.

16:42:25  4   Q.  All right.  Well, I am going to ask you to take my word for

16:42:28  5   that for just a minute, okay?

16:42:30  6   A.  Okay.

16:42:30  7   Q.  If we look at this first finding, we would see that that

16:42:34  8   chart -- that chart crosses the 1 line.  Do you see that?  Here is

16:42:40  9   our 1 line right here (INDICATING).  And that crosses 1, right?

16:42:48 10   A.  Yes.

16:42:48 11   Q.  And if we look over here at the -- look in the numeric column

16:42:55 12   we see that it is -- this is really small.  I am doing my best.

16:43:00 13   This is 1.04; is that right?

16:43:03 14   A.  Is that the last column on the right?

16:43:05 15   Q.  Yes.  And the confidence interval is .90 to 1.2, right?

16:43:12 16   A.  That's what it says.

16:43:13 17   Q.  So that would cross 1, right?

16:43:15 18   A.  Okay.

16:43:16 19   Q.  So that tells us that it is not statistically significant.

16:43:21 20            Let's take a look at what we -- these study results show

16:43:25 21   us about the baseline characteristics.  So if we see the very first

16:43:32 22   one all patients, it's 1.04.  It crosses 1.  It's slightly favors

16:43:40 23   warfarin.  Do you see that?

16:43:41 24   A.  Yes.

16:43:41 25   Q.  If you look down at the bottom or at the top here, it says,

16:43:46  1  "Favors warfarin to the right; favors Xarelto to the left"?  Do you

16:43:50  2  see that?

16:43:50  3  A.  Got it.

16:43:52  4  Q.  So if we work our way down, the next one crosses 1, not

16:43:57  5  statistically significant.  The next one crosses 1, not

16:44:02  6  statistically significant.  Work our way all the way down, not

16:44:07  7  statistically significant.  Not statistically significant.

16:44:15  8          THE COURT:  You need to move it up.

16:44:17  9          MR. BIRCHFIELD:  Thank you, your Honor.

16:44:20  10  BY MR. BIRCHFIELD:

16:44:20  11  Q.  Here's one.  This one is statistically significant.  It does

16:44:25  12  not cross the 1 line; is that right?

16:44:27  13  A.  That looks correct to me, yes.

16:44:29  14  Q.  So let's see what that is.  That is U.S. patients, is that

16:44:41  15  right?  Well, let me get there.  So this is looking at U.S.

16:44:47  16  patients and it shows that it is statistically significant.  And if

16:44:55  17  we look over in the hazard ratio, it is 1.5, and it's -- and the

16:45:01  18  range is 1.14 to 1.98.  Do you see that, Dr. St. Martin?

16:45:06  19  A.  I see it.

16:45:08  20  Q.  Now, when we're looking at the hazard ratio, the hazard ratio,

16:45:28  21  that would tell us that that is a 50 percent increased risk for

16:45:32  22  major bleeding for Xarelto versus warfarin when you look at U.S.

16:45:37  23  patients only.  Is that right?

16:45:39  24  A.  That's what you're telling me.  I am not familiar with this

16:45:44  25  type of statistic, but that's what I hear you saying.

16:45:51  1    Q.  If this information -- if the information -- if the data from

16:45:55  2    ROCKET showed that there was a 50 percent increased risk in major

16:45:59  3    bleeding events for Xarelto versus warfarin and it's statistically

16:46:07  4    significant, that would be information you didn't know about,

16:46:12  5    right?

16:46:14  6    A.  Right.  I am going to assume that if this was before the drug

16:46:19  7    was approved, the FDA knew about it, though.

16:46:23  8    Q.  Right.  Okay.  So -- but if you were to know that there was a

16:46:33  9    50 percent increased risk for Xarelto patients versus warfarin when

16:46:42 10    you look at the U.S. data only, is that important safety

16:46:46 11    information that you would want to know about and discuss with your

16:46:49 12    patients, Dr. St. Martin?

16:46:50 13    A.  Yes.  And it's confusing because it's hard to know why it would

16:46:53 14    be different in the United States as opposed to somewhere else.

16:46:57 15    It's the same human beings and the same drug.

16:47:00 16    Q.  Okay.  So that would -- it would really matter why, is that

16:47:04 17    what you're telling us?

16:47:07 18    A.  Yes.

16:47:08 19    Q.  So, Dr. St. Martin, you are -- when -- do you have any idea why

16:47:13 20    there would be a difference in the risk of major bleeding when you

16:47:18 21    look at U.S. patients only --

16:47:20 22    A.  No.

16:47:20 23    Q.  -- in the ROCKET data?

16:47:21 24    A.  No.

16:47:21 25    Q.  So in the ROCKET study, Dr. St. Martin, what was the average

16:47:29  1    time in therapeutic range for the warfarin patients?

16:47:33  2    A.  I don't know.

16:47:39  3    Q.  Dr. St. Martin, you understand that -- when we talk about time

16:47:45  4    in therapeutic range, you understand what we're talking about,

16:47:48  5    right?

16:47:48  6    A.  It could have various interpretations, so if you want to

16:47:53  7    explain it to me, I'll be happy to listen.

16:47:55  8    Q.  Okay.  All right.  You prescribed -- let me use this

16:48:03  9    demonstrative.

16:48:05  10           You've prescribed warfarin or Coumadin for a large number

16:48:09  11   of years, right?

16:48:10  12   A.  Yes, yes.

16:48:11  13   Q.  And the time in therapeutic range is pretty well established

16:48:18  14   for warfarin and it's measured in INR; is that right?

16:48:21  15   A.  Yes.

16:48:23  16   Q.  And so if you are -- if you're below 2.0, then you're not --

16:48:31  17   your blood is not thin enough; is that right?

16:48:33  18   A.  Right.

16:48:33  19   Q.  And you are at an increased risk for a stroke, correct?

16:48:38  20   A.  (WITNESS NODS HEAD IN THE AFFIRMATIVE.)

16:48:39  21   Q.  And if you are -- if you are above 3.0, then you are -- your

16:48:46  22   blood's too thin and you're at risk for a bleed; is that right?

16:48:50  23   A.  Yes, in general.

16:48:52  24   Q.  And so if you are -- if you're managing a warfarin patient,

16:48:58  25   then you want to keep them in that therapeutic range for as much

16:49:03  1    time as possible, right?

16:49:04  2    A.  Right.

16:49:04  3    Q.  And I think that you have -- you've told us in your deposition

16:49:08  4    that you manage your patients?

16:49:11  5    A.  Yes.

16:49:11  6    Q.  And you manage your patients and you keep them in the

16:49:14  7    therapeutic range between 75 and 80 percent of the time; is that

16:49:18  8    right?

16:49:19  9    A.  Okay.  We're using time in two different ways here.  When I say

16:49:26  10   75 percent of the time, I mean the time each time they come.  Like

16:49:31  11   each time I go to the movie, I buy popcorn.  It's each visit.  But

16:49:37  12   I don't know -- this looks to me like time in therapeutic range --

16:49:44  13   would you want to an INR or prothrombin time every single day to

16:49:47  14   know how much time they really were in it?  I mean, that's --

16:49:54  15   that's confusing me.  I can't tell you that I understand it right

16:49:58  16   now.  If you're only looking at it at certain different punctuation

16:50:03  17   marks in the time, how do we know how much time you really are in

16:50:08  18   the therapeutic range?

16:50:09  19   Q.  So, Dr. St. Martin, if the time in therapeutic range for

16:50:18  20   warfarin arm in the ROCKET study, if that was 55 percent, would

16:50:22  21   that cause you some concern about how well controlled those

16:50:25  22   patients were?

16:50:26  23   A.  I really don't think I know that much about that statistic to

16:50:31  24   give you an honest answer.

16:50:33  25   Q.  All right.  So when you were talking about your understanding,

16:50:39  1   your fully understanding the risk and the benefits of Xarelto and

16:50:45  2   the other NOACs, you didn't take into account the time and

16:50:50  3   therapeutic range for any of these agents, sir?

16:50:53  4   A.  No, I don't think so.

16:50:56  5          THE COURT:  Get to a point where we can take a break.

16:50:59  6   The jury needs to take a break.

16:51:03  7          MR. BIRCHFIELD:  We can take a break now.

16:51:05  8          THE COURT:  All right.  Let's take a ten-minute break.

16:51:08  9          THE DEPUTY CLERK:  All rise.

16:51:09  10     (WHEREUPON, THE JURY EXITED THE COURTROOM AND A RECESS WAS

17:05:05  11       TAKEN.)

17:05:05  12     (OPEN COURT.)

17:05:07  13     (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

17:05:07  14          THE COURT:  You can take the stand.  You're still under

17:05:10  15   oath.  Be seated, please.

17:05:21  16   BY MR. BIRCHFIELD:

17:05:21  17   Q.  So, Dr. St. Martin --

17:05:26  18          MR. BIRCHFIELD:  May I proceed, your Honor?

17:05:27  19          THE COURT:  Yes.

17:05:28  20   BY MR. BIRCHFIELD:

17:05:29  21   Q.  So, Dr. St. Martin, when we left off, we were looking at this

17:05:35  22   chart and we'll go back into that again.  But in looking at this,

17:05:42  23   Dr. St. Martin, does it tell you that there is a 50 percent

17:05:48  24   increased risk in major bleeds on Xarelto versus warfarin that is

17:05:55  25   statistically significant?

17:05:58   1    A.  My honest answer is I don't know enough about statistics to

17:06:03   2    tell you that absolutely I understand this chart.

17:06:07   3    Q.  Okay.

17:06:08   4    A.  I mean, I see how it looks.

17:06:10   5    Q.  Right.  And so the label -- this information in the label does

17:06:15   6    not adequately communicate to you that there is a 50 percent

17:06:19   7    statistically significant increased risk in major bleeds on Xarelto

17:06:24   8    versus warfarin, correct?

17:06:25   9    A.  I would have to go get a statistic book and look up -- I

17:06:29  10    haven't seen a chart like this.

17:06:31  11    Q.  Dr. St. Martin, in the CMEs -- when we're talking about CMEs,

17:06:36  12    those are continuing medical education, right?

17:06:39  13    A.  Right.

17:06:39  14    Q.  And oftentimes are those sponsored by pharmaceutical companies

17:06:45  15    and they hire doctors to come and speak; is that right?

17:06:48  16    A.  I don't know exactly how they do it.

17:06:52  17    Q.  But at any rate, that's an event where you get information

17:06:57  18    about drugs, pharmaceuticals, right?

17:06:59  19    A.  I think -- that's not one that I get a lot of information.  I'm

17:07:05  20    not too sure which CMEs are you talking about.

17:07:08  21    Q.  I was really going back to what you told us, Dr. St. Martin.

17:07:12  22    You told us that -- you felt like you fully understood --

17:07:17  23    A.  Yes.

17:07:17  24    Q.  -- the risk and benefits of Xarelto based on the product label.

17:07:20  25    A.  Yes.

17:07:21  1    Q.  And CMEs?

17:07:23  2    A.  Yes.

17:07:24  3    Q.  And talking to other doctors?

17:07:26  4    A.  Yeah.

17:07:26  5    Q.  Right.  And your search of the literature.  Is that right?

17:07:31  6    A.  I understood it to the best of my ability to understand it.

17:07:35  7    Q.  And so from all of those sources, was it ever adequately

17:07:42  8    communicated to you that there was a 50 percent increased risk of

17:07:47  9    major bleeds on Xarelto versus warfarin when you looked at U.S.

17:07:50 10    population only?

17:07:51 11    A.  Not that I remember, no.

17:07:52 12    Q.  And one of the questions that you raised with me is why, why

17:07:58 13    would you have people -- or people all over, right?

17:08:00 14    A.  Yes.

17:08:02 15    Q.  And when you're looking at -- when we look at the ROCKET study,

17:08:09 16    do you understand that that included people enrolled from all over

17:08:14 17    the world?

17:08:16 18    A.  From lots of countries, 45 countries, I see that, yes.

17:08:20 19    Q.  And so that includes the United States, but it also includes

17:08:26 20    Venezuela, Colombia, Peru, it includes India and the Ukraine and

17:08:33 21    Romania and Hungary; do you see that, Dr. St. Martin?

17:08:36 22    A.  Yes.

17:08:37 23    Q.  And do you think it's possible, Dr. St. Martin, that the

17:08:44 24    warfarin management, how well they manage patients on warfarin, may

17:08:49 25    not be as good in some of those countries as it is in the U.S.?

17:08:53  1    A.  Certainly that's a possibility, yes.

17:08:58  2    Q.  And, Dr. St. Martin, Mr. Irwin gave you a copy of Defense

17:09:08  3    Exhibit 6, and that's the product label for February of 2014.  Do

17:09:14  4    you have that with you?  I can give you another copy if you want

17:09:17  5    it.

17:09:18  6    A.  That's it (INDICATING)?  It's about 40 pages?

17:09:26  7    Q.  Let's see.  No, that's the one we just looked at.

17:09:30  8    A.  Okay.

17:09:30  9    Q.  This is February of 2014.

17:09:33 10    A.  Okay.

17:09:36 11    Q.  So I want to -- I just want to put that in context.  So the

17:09:39 12    chart that we just looked at, that forest plot that showed the

17:09:44 13    50 percent increase for U.S. patients --

17:09:46 14    A.  Yes.

17:09:47 15    Q.  -- that was in the September of 2015 label, right?

17:09:51 16    A.  If you tell me.

17:09:52 17    Q.  That's what we just looked at.

17:09:55 18    A.  If you tell me.

17:09:56 19    Q.  And, Dr. St. Martin, you understand that Sharyn Orr died on

17:10:01 20    May 4th of 2015, right?

17:10:03 21    A.  Yes.

17:10:04 22    Q.  So that label with the U.S. data that we just looked at, that

17:10:11 23    was after her death, correct?

17:10:13 24    A.  That's what you're telling me, yes.

17:10:15 25    Q.  Now, looking at Defense Exhibit 6, the February of 2014 label

17:10:23  1   and, Dr. St. Martin, what I would ask is if you would just look and

17:10:28  2   see if you can find that table with the U.S. data, if you can find

17:10:32  3   it in there.  I'll represent to you that it's not, but I'll give

17:10:39  4   you the opportunity to take a look.

17:10:41  5   A.  This is -- the entire 46 pages is the label?

17:10:44  6   Q.  The chart.  The chart that we looked at that showed the

17:10:47  7   50 percent risk, increased risk for major bleeds in the U.S. data.

17:10:53  8   A.  No, but you're asking me to look at all 46 pages?

17:10:58  9          THE COURT:  He is representing that it's not in there.

17:11:01 10          THE WITNESS:  Okay.  Well, I don't know that yet unless I

17:11:04 11   look at all 46 pages.  That's the question?

17:11:08 12   BY MR. BIRCHFIELD

17:11:08 13   Q.  Yes.

17:11:09 14   A.  Do I agree with you?  (WITNESS REVIEWS DOCUMENT.)  Okay.  I

17:11:42 15   don't see such a chart.

17:11:43 16   Q.  So that information was not in the label when you prescribed it

17:11:46 17   to Sharyn Orr.  It was only included in the label after Sharyn

17:11:50 18   Orr's death, correct?

17:11:52 19   A.  That's what you're telling me, yes, I believe.

17:11:55 20   Q.  So, Dr. St. Martin, if you knew, if you knew that there was a

17:12:04 21   50 percent increased risk of major bleeding on Xarelto versus

17:12:10 22   warfarin for U.S. patients, would that have affected the way you

17:12:16 23   prescribe the drug?  Would you have at least discussed that risk

17:12:19 24   with your patients?

17:12:20 25   A.  I would first have tried to find out why that is and how that

17:12:27  1  happened so I would have something to really discuss with the

17:12:33  2  patient.

17:12:33  3  Q.  And did you do that, Dr. St. Martin?

17:12:36  4  A.  Because I didn't know it, I didn't do it.

17:12:40  5  Q.  If that risk was explained because the time in therapeutic

17:12:45  6  range in the ROCKET study was much higher for the U.S. than it was

17:12:50  7  on average, would you then have discussed that risk with your

17:12:54  8  patients?

17:12:55  9          MR. IRWIN:  Your Honor, speculation.

17:12:57  10          THE COURT:  Well, but you've asked him about whether it

17:13:00  11  changes his thinking.

17:13:03  12          MR. IRWIN:  Yes, your Honor.

17:13:04  13          THE COURT:  I understand.

17:13:06  14          THE WITNESS:  So what's the question again?

17:13:08  15  BY MR. BIRCHFIELD:

17:13:09  16  Q.  All right.  I asked you if you knew that there was a

17:13:11  17  statistically significant 50 percent increased risk for Xarelto

17:13:16  18  patients, a risk of major bleeds, would you have discussed that

17:13:21  19  risk with your patients?

17:13:23  20  A.  If I was absolutely certain that it was a fact, I would, yes.

17:13:26  21  Q.  And if your patients didn't want to take that risk, would you

17:13:33  22  consider other options?

17:13:34  23  A.  Sure.

17:13:38  24  Q.  And if you knew that there was a 50 percent increased risk of

17:13:44  25  major bleeds on Xarelto versus warfarin, would you recommend that

17:13:48 1  your patients at least try warfarin first?

17:13:52 2  A.  Probably, yes.

17:13:54 3  Q.  And, Dr. St. Martin, you were asked some questions about

17:14:03 4  Xarelto and Savaysa and Eliquis and Pradaxa.  Pradaxa is also one

17:14:09 5  of the NOACs or the new oral anticoagulants --

17:14:13 6  A.  Right.

17:14:13 7  Q.  -- right?

17:14:15 8      And is it your understanding, Dr. St. Martin, that all of

17:14:20 9  those NOACs are -- they're equal; they're the same?

17:14:25 10  A.  No, they're not the same.

17:14:27 11  Q.  If you knew -- if you knew that Xarelto was worst in class

17:14:37 12  among those NOACs, considering safety and efficacy, would you --

17:14:45 13  would you discuss that with your patients?

17:14:47 14  A.  Assuming that I really knew it and I was convinced, yes, I

17:14:51 15  would.

17:14:51 16  Q.  If there were significant observational studies, real-world

17:15:01 17  data that suggested that Xarelto was worst in class, you would have

17:15:06 18  that discussion with your patients?

17:15:08 19  A.  I think that's the same thing you just asked me, yes.

17:15:13 20  Q.  And if your patient wanted to go with the best in class as

17:15:19 21  opposed to the worst in class, would you put them on a different

17:15:25 22  drug than Xarelto?

17:15:27 23  A.  Again, as a hypothetical question, and I am still not fully

17:15:33 24  understanding the statistic.  But the answer is probably, yes, with

17:15:37 25  all of those assumptions.

1758

17:15:38 1   Q.  And, Dr. St. Martin, have you seen any literature that suggests

17:15:45 2   that Xarelto is worst in class?

17:15:48 3   A.  No.

17:15:51 4   Q.  And when you were making your prescribing decision for Sharyn

17:16:00 5   Orr, did you know whether Xarelto was worst in class or not?

17:16:05 6   A.  No.

17:16:06 7   Q.  Did you know that for -- that Eliquis -- Eliquis was available

17:16:14 8   at the time that you prescribed Xarelto for Sharyn Orr, correct?

17:16:18 9   A.  I am not positive, but it probably was, yes.

17:16:22 10  Q.  If you had been adequately informed that Eliquis was superior

17:16:35 11  for safety and efficacy, would you have recommended Eliquis as

17:16:42 12  opposed to Xarelto?

17:16:45 13  A.  Again, it's hypothetical.  And if I really knew -- convinced

17:16:51 14  that I understood everything that Eliquis was better, then I would

17:16:56 15  certainly consider it.

17:16:57 16  Q.  And so, Dr. St. Martin, you described that Mrs. Orr had high

17:17:09 17  blood pressure, right?

17:17:10 18  A.  Yes.

17:17:10 19  Q.  And you walked through some readings of Sharyn Orr's blood

17:17:15 20  pressure when she came into the office to see you; is that right?

17:17:18 21  A.  Yes.

17:17:19 22  Q.  Did you ever recommend that Ms. Sharyn Orr keep track of her

17:17:26 23  blood pressures at home?

17:17:27 24  A.  I don't recall.  I do that commonly.  I don't recall

17:17:33 25  specifically with her.

17:17:34  1    Q.  Have you ever heard of "white coat syndrome"?

17:17:39  2    A.  Sure.

17:17:40  3    Q.  And is that real?

17:17:41  4    A.  I think it's pretty much exaggerated.

17:18:01  5    Q.  Dr. St. Martin, I want to show you this medical record.

17:18:10  6    A.  Okay.

17:18:10  7    Q.  Or this record.  It's part of your file --

17:18:13  8    A.  Okay.

17:18:14  9    Q.  -- for Sharyn Orr.

17:18:15 10    A.  Okay.

17:18:16 11    Q.  Down at the bottom you see that indicates it came from your

17:18:21 12    file; is that right?

17:18:23 13    A.  That's what it looks like, yeah.

17:18:27 14    Q.  And this is May -- May 1st of 2012.

17:18:33 15    A.  Okay.

17:18:34 16    Q.  Is that blood pressure readings that Sharyn Orr submitted to

17:18:39 17    you for your file where she took those readings at home?

17:18:44 18    A.  If she is the one who said it and it's my file, then I assume

17:18:49 19    it's her blood pressures, yes.

17:18:52 20         MR. BIRCHFIELD:  Your Honor, we would offer this as

17:18:53 21    Plaintiffs' Exhibit 186.

17:18:56 22         THE COURT:  Admitted.

17:19:05 23    BY MR. BIRCHFIELD:

17:19:06 24    Q.  Dr. St. Martin, I am going to ask you.  Same question about

17:19:10 25    this record that was part of your file.

17:19:13  1    A.  Okay.

17:19:14  2    Q.  And this is on Tulane University letterhead.  Do you see that,

17:19:19  3    Dr. St. Martin?

17:19:19  4    A.  Yes, I see it.

17:19:21  5    Q.  And is this blood pressure readings that Mrs. Orr submitted to

17:19:26  6    you.  She recorded these at home; is that what this is, sir?

17:19:31  7    A.  That's what it looks like.

17:19:33  8    Q.  And then we have blood pressure readings in March and April of

17:19:43  9    2014?

17:19:43  10   A.  Right.

17:19:44  11   Q.  And do those blood pressure readings -- do they suggest to you

17:19:49  12   that maybe Ms. Orr did have some white coat syndrome?

17:19:55  13   A.  Well, if she brought these from home, I don't know who has the

17:19:59  14   white coat at home.  They look pretty good to me.  One or two were

17:20:04  15   elevated.

17:20:05  16            MR. BIRCHFIELD:  Plaintiffs' Exhibit 187.

17:20:08  17            THE COURT:  Admitted.

17:20:11  18   BY MR. BIRCHFIELD:

17:20:12  19   Q.  So, Dr. St. Martin, if Mrs. Orr has high blood pressure and

17:20:19  20   other medical conditions that would make her vulnerable for a

17:20:26  21   stroke or other type of bleeding event, wouldn't it be more

17:20:30  22   important to make sure that she is on the most effective and the

17:20:35  23   safest anticoagulant?

17:20:38  24   A.  We always try to use the most effective and safe drug, yes.

17:20:42  25   Q.  And so if Xarelto was worst in class on both safety and

1761

17:20:52  1   efficacy and you knew that, you would not have prescribed Xarelto

17:20:55  2   to Sharyn Orr, would you?

17:20:57  3   A.  If I was really convinced that I knew it, yeah.

17:21:00  4   Q.  What would it take to really convince you?  Medical literature?

17:21:06  5   Information in the product label?  What would it take?

17:21:09  6   A.  It would probably take a search of medical literature done by

17:21:15  7   myself and look around and see what I could find.

17:21:21  8   Q.  Okay.  Have you done -- I know you retired a year ago.  But did

17:21:32  9   you do some literature searchs before you retired?

17:21:37  10  A.  You mean on this particular topic, or did I do literature

17:21:42  11  researches?  I did a lot of them.

17:21:44  12  Q.  Have you seen any real-world literature that compares Xarelto

17:21:48  13  and Eliquis and Pradaxa for stroke risk and bleed risk?

17:21:52  14  A.  Not that I remember right off.

17:21:54  15  Q.  And the manufacturers of Xarelto didn't provide you that

17:22:02  16  information, did they?  Either through the label or through CMEs or

17:22:09  17  through literature that they got to you?

17:22:12  18  A.  I don't recall getting any such literature.

17:22:19  19  Q.  I want to -- let me ask you, Dr. St. Martin.  Mr. Irwin walked

17:22:28  20  you through some medical records leading up to Sharyn Orr's death.

17:22:36  21  You've reviewed medical records surrounding Mrs. Orr's

17:22:43  22  intraventricular hemorrhage and her death, right?

17:22:47  23  A.  Yes, I have.

17:22:49  24  Q.  And you saw in those notes a -- you saw in those notes from a

17:22:58  25  treating neurologist that he assessed that Xarelto -- that her IVH,

1762

```
17:23:04   1   her intraventricular hemorrhage, was secondary to Xarelto, and you
17:23:10   2   agreed with that assessment, right?
17:23:11   3   A.  It's a likely thing, yes.
17:23:13   4   Q.  Pardon me?
17:23:13   5   A.  It's a likely thing.  Either that or it was spontaneous and
17:23:18   6   Xarelto could have made it worse.
17:23:22   7   Q.  I want to -- I want to make sure that we're clear on one point.
17:23:28   8   And that is your statement that there is no way to measure or
17:23:36   9   monitor Xarelto in a person's system.
17:23:43  10   A.  From a practical viewpoint, as far as I know, yes.
17:23:46  11   Q.  And that is -- that was your working knowledge?
17:23:50  12   A.  Yes.
17:23:50  13   Q.  And that was your working knowledge in 2014 when you prescribed
17:23:55  14   to Sharyn Orr up until the time of her passing; is that right?
17:24:00  15   A.  Yes.
17:24:02  16   Q.  And that working knowledge -- that was consistent with the
17:24:07  17   doctors in the community that you were talking with, correct?
17:24:10  18   A.  Yes.  And it was -- I put a lot of faith in the FDA, too.  That
17:24:15  19   if they approve the drug and they have many more statisticians up
17:24:19  20   there than I have in my own brain, that the FDA approved it.  So I
17:24:26  21   never think that an FDA approved drug has some hidden but easily
17:24:31  22   discoverable bad thing about it that I had to go look up.
17:24:38  23   Q.  All right.  So in -- you place a lot of trust and faith in the
17:24:43  24   FDA?
17:24:43  25   A.  I do, yeah.
```

17:24:45  1   Q.  From any of the -- any of the sources -- any information that

17:24:52  2   you've been provided by these companies that conveyed to you any

17:24:58  3   reservations or concerns that the FDA had about the dosing, the

17:25:05  4   dosing regiment, the 20 milligrams or 15 for renal impairment, once

17:25:11  5   daily versus, twice daily, did you ever hear anything from the drug

17:25:15  6   companies about concerns from the FDA on that point?

17:25:18  7   A.  No.

17:25:18  8   Q.  If you knew that the clinical reviewers for the FDA -- the ones

17:25:27  9   who were responsible for the clinical review of the drug -- if they

17:25:32 10   had recommended that it not be approved because of concerns about

17:25:40 11   the low time in therapeutic range in the ROCKET study, would that

17:25:46 12   have affected your prescribing decisions, sir?

17:25:49 13   A.  I certainly would have considered it, yes.

17:25:57 14          MR. BIRCHFIELD:  Your Honor, just one second.

17:26:06 15   BY MR. BIRCHFIELD:

17:26:07 16   Q.  Dr. St. Martin, do you remember Sharyn Orr?

17:26:09 17   A.  Yes.

17:26:10 18   Q.  And Mr. Joe Orr her husband seated right here?

17:26:15 19   A.  Uh-huh.

17:26:16 20   Q.  He would come to her appointments sometimes?

17:26:19 21   A.  Yes, yes.

17:26:20 22   Q.  Does Pradaxa have a reversal agent?

17:26:30 23   A.  Not that I recall right now.

17:26:32 24   Q.  Do you know one way or the other whether there's a reversal

17:26:38 25   agent for Pradaxa?

17:26:39  1    A.  I forgot a lot of things just in the last year and a half since

17:26:43  2    I quit.  I deliberately forgot a lot of things.

17:26:46  3    Q.  Fair enough.

17:26:47  4    A.  I don't know the answer to that question.

17:26:48  5    Q.  So, Dr. St. Martin, there are ways to reverse warfarin,

17:26:54  6    correct?

17:26:54  7    A.  Yes.  That I know.

17:26:56  8    Q.  So if in instead of Xarelto, you place a patient on warfarin

17:27:04  9    and they were in an emergent situation, then there is a way --

17:27:09  10   A.  Sure.

17:27:10  11   Q.  -- to reverse the coagulation?

17:27:11  12   A.  Yes.

17:27:13  13   Q.  So that they can proceed to surgery, correct?

17:27:16  14   A.  Yes.

17:27:17  15              MR. BIRCHFIELD:  Thank you.

17:27:20  16                    REDIRECT EXAMINATION

17:27:21  17   BY MR. IRWIN:

17:27:33  18   Q.  Just about done, Dr. St. Martin.

17:27:35  19   A.  Okay.

17:27:37  20   Q.  You were shown -- these are my words.  Don't agree with these

17:27:46  21   words unless you agree with them.

17:27:47  22           You were shown bits and pieces of labels and literature

17:27:52  23   and asked what I think he called were hypothetical questions; is

17:27:58  24   that right?

17:27:58  25   A.  Yes.

17:27:58  1    Q.  Would you tell the jury whether or not you make clinical

17:28:02  2    decisions on prescribing based on that kind of information that was

17:28:05  3    just presented to you?

17:28:07  4             MR. BIRCHFIELD:  Your Honor, I object.  I mean, that's an

17:28:10  5    improper hypothetical.

17:28:14  6             MR. IRWIN:  Redirect examination, your Honor.

17:28:16  7             THE COURT:  I'll overrule the objection.  Go ahead.

17:28:20  8             THE WITNESS:  Just to be sure I understand the question.

17:28:23  9    When you say "that kind of information that was just presented to

17:28:26 10    you," you're talking about this outlier graph in the United States

17:28:30 11    in particular?

17:28:31 12    BY MR. IRWIN:

17:28:32 13    Q.  Yes.  That and some other things.

17:28:34 14    A.  Then I would -- if I had seen that, before I would make a

17:28:39 15    clinical decision just on looking at that one graph, I would try to

17:28:42 16    find out as much as I possible could about it.

17:28:47 17    Q.  Let's show you something else on that that is sort of a little

17:28:51 18    bit of the other information that you might come across.  And this

17:28:54 19    is from Plaintiffs' Exhibit 163, which has been admitted into

17:28:57 20    evidence.  It's also Defendants' Exhibit 5115.  And this is a table

17:29:02 21    of this U.S. subgroup.  It's in evidence.  I'll put this on the

17:29:18 22    ELMO.

17:29:34 23             Doctor, you can see I am going to flash my little light

17:29:38 24    on here if it works, not so well.  You can see that this is "ROCKET

17:29:43 25    adjudicated bleeds U.S. alone."  Are you with me?

1766

17:29:46  1    A.   Yes.

17:29:47  2    Q.   And you see the category of "Major Bleeding" --

17:29:49  3    A.   Yes.

17:29:50  4    Q.   -- that was referred to?

17:29:54  5    A.   Yep.

17:29:55  6    Q.   Now, do you know or do you remember from the ROCKET study that

17:30:00  7    there was a greater incidence of gastrointestinal bleeding in the

17:30:06  8    Xarelto arm as compared to the warfarin arm?  Do you remember that?

17:30:10  9    A.   I don't really remember all of the details of the ROCKET study.

17:30:13 10    Q.   But do you remember from the ROCKET study that there was a

17:30:16 11    significantly lower incidence of intracranial brain bleeding for

17:30:25 12    Xarelto as compared to warfarin?  Do you remember that?

17:30:27 13    A.   No.  I don't remember all of the details of the ROCKET study.

17:30:31 14    Q.   Let's look at how this is broken down here.  The Major Bleeding

17:30:35 15    category --

17:30:35 16    A.   Okay.

17:30:36 17    Q.   -- that Mr. Birchfield was showing you.  Do you see those

17:30:40 18    numbers?

17:30:40 19    A.   Yes.

17:30:41 20    Q.   I want to go down and look -- you can see how the Major

17:30:44 21    Bleeding category is broken down into "Transfusion," "Critical

17:30:48 22    Site" -- I am not sure what this.  Do you know what is "Hb drop"

17:30:51 23    is?

17:30:51 24    A.   That would be hemoglobin drop or anemia.  That you lost enough

17:30:57 25    red blood cells that your blood count would drop.

17:30:59  1   Q.  Let's look at "Death."  In the rivaroxaban arm there were six

17:31:03  2   deaths, which accounted for .62 percent.  Do you see that?

17:31:09  3   A.  I see that.

17:31:09  4   Q.  And the warfarin arm there were ten deaths which accounted for

17:31:16  5   1.04 percent.

17:31:16  6   A.  Yes.

17:31:16  7   Q.  So you can see in the U.S. subgroup there was a larger number

17:31:21  8   of deaths in warfarin than there was in rivaroxaban; is that right?

17:31:28  9   A.  Yes.  Yes, I see that.

17:31:30 10   Q.  That might be another fact that you would consider as against

17:31:33 11   what you were shown earlier; is that right?

17:31:35 12   A.  Yes.

17:31:37 13           MR. BIRCHFIELD:  Under Rule 106, option of completeness,

17:31:40 14   I would like him to point out the statistical significance in that

17:31:44 15   finding portion.

17:31:44 16   BY MR. IRWIN:

17:31:45 17   Q.  And what is the statistical significance there?

17:31:48 18           MR. BIRCHFIELD:  The statistical significance of the

17:31:51 19   P value.

17:31:52 20   BY MR. IRWIN:

17:31:52 21   Q.  Do you see what the P value is?

17:31:54 22   A.  Yes.

17:31:54 23   Q.  And what is the P value?

17:31:56 24   A.  It says 0.365.

17:32:00 25   Q.  So, Doctor, is this more information that you might come along

17:32:03  1   if you research this question?

17:32:04  2   A.  Yes, I would think so.

17:32:08  3   Q.  So are you satisfied now that the U.S. subgroup information

17:32:14  4   you've seen so far is not sufficient to change your decision about

17:32:18  5   having prescribed Xarelto to Mrs. Orr?

17:32:23  6   A.  No.  I don't see anything that would cause me to

17:32:26  7   retrospectively change my decision.

17:32:29  8   Q.  Remember you were asked questions about time in therapeutic

17:32:32  9   range?

17:32:33  10  A.  Yes.

17:32:33  11  Q.  I am going to show you an article which was published in the

17:32:57  12  Journal of Electrocardiology.

17:32:59  13        MR. IRWIN:  It is Defendants' Exhibit 1503, your Honor,

17:33:02  14  which we offer for demonstrative purposes only.  It's a learned

17:33:06  15  treatise.  And I am going to put it on the ELMO.

17:33:06  16  BY MR. IRWIN:

17:33:14  17  Q.  Are you familiar with the Journal of Electrocardiology?

17:33:17  18  A.  Yes, I am.

17:33:20  19  Q.  That is you're an electrocardiologist?

17:33:27  20  A.  Yes.

17:33:28  21  Q.  And the title of this is "Quality of anticoagulation with

17:33:32  22  warfarin in patients with non-valvular atrial fibrillation in the

17:33:36  23  community setting."  Is that right?

17:33:38  24  A.  That's what I see, yes.

17:33:39  25  Q.  And you can look at the background.  But this is the control of

17:33:44  1   the warfarin in the United States?

17:33:50  2   A.  Yeah.  That print is hard to see, but I see in the United

17:33:54  3   States there in the second line or so.

17:33:57  4   Q.  And do you remember it was suggested to you on examination by

17:34:01  5   Mr. Birchfield that the 55 percent average of time in therapeutic

17:34:09  6   range of warfarin in the United States was below standard?  Do you

17:34:15  7   remember those suggested questions?

17:34:16  8   A.  Yes.

17:34:16  9   Q.  Why don't you look at the results here of this study of

17:34:21 10   American community hospitals, that I have highlighted.  During the

17:34:25 11   one-year period, the overall mean TTR was 56.7 percent.

17:34:35 12   A.  Okay.

17:34:36 13   Q.  Doctor, does that make it -- does that suggest to you that out

17:34:41 14   in the real world, in the real hospital and not at a clinical

17:34:45 15   trial -- does that suggest to you that a real-world United States

17:34:49 16   range for time in therapeutic range for warfarin is in that

17:34:57 17   neighborhood of 56.7 percent?

17:35:00 18   A.  Yes.  If I can volunteer the next sentence.  "In cardiology

17:35:05 19   practices it was better than in primary care practices."

17:35:10 20   Q.  That's because you guys presumably would watch those patients

17:35:13 21   more closely than primary care doctors would?

17:35:16 22   A.  Yes.

17:35:17 23   Q.  Still these numbers are more consistent with what you would

17:35:20 24   expect to see in the United States?

17:35:21 25   A.  Yes.

17:35:22  1    Q.  And less consistent than what was suggested to you in good

17:35:27  2    questions by Mr. Birchfield?

17:35:29  3    A.  I think so.

17:35:41  4    Q.  You were asked questions about Xarelto being worst in class.

17:35:46  5    Do you have any information, any scientific literature, any proof

17:35:50  6    that Xarelto is worst in class?

17:35:52  7    A.  Not that I know of, no.

17:35:54  8    Q.  You've heard Mr. Birchfield's questions; you've heard my

17:36:02  9    questions.  My question is this:  Has anything you've heard today,

17:36:07 10    either from Jim Irwin or Andy Birchfield changed your impression

17:36:12 11    and your judgment that the prescribing decision that you made for

17:36:19 12    Mrs. Orr of Xarelto was the correct decision?

17:36:23 13    A.  No.  I believe sitting here right now having seen all of this

17:36:27 14    it was the correct decision, yes.

17:36:29 15    Q.  Just a couple of last questions.

17:36:31 16            I moved out of the neighborhood in 1988.  Does that sound

17:36:38 17    about right?

17:36:38 18    A.  Sounds about right, yes.

17:36:40 19    Q.  There was some questions about our visit in Atlanta, and you

17:36:47 20    made it clear it was not a social visit; is that right?

17:36:49 21    A.  Right.

17:36:50 22    Q.  You and I have never had any social relationship, have we?

17:36:53 23    A.  No.

17:36:53 24    Q.  It has always been professional?

17:36:55 25    A.  Right.  I don't think I was ever in your house, and I don't

17:36:58  1    think you were ever in my house.

17:37:00  2    Q.  I think that's right.

17:37:01  3    A.  Maybe when I took the kids trick or treating, I don't know.

17:37:06  4    Q.  And, finally, there was a suggestion about a phone call that I

17:37:10  5    had with you recently.  The fact is that Ms. Jeffcott was on that

17:37:14  6    phone call with me; is that right?

17:37:16  7    A.  Yes, right.

17:37:17  8    Q.  Because you understand that under the rules of this court in

17:37:20  9    the case I am not allowed to speak to you; is that right?

17:37:22 10    A.  I didn't understand that, but you immediately got ahold of her,

17:37:25 11    and it was within 30 seconds, cleared up, and we hadn't said much

17:37:30 12    more than hello.

17:37:31 13            MR. IRWIN:  No further questions.  Thank you.

17:37:32 14            THE COURT:  You're excused, sir.  We'll stop here,

17:37:35 15    members of the jury, and come back here at 8:30 tomorrow.  Y'all

17:37:39 16    have been very good.  I appreciate all the work that you've done

17:37:41 17    already.  You've worked very hard.  Thank you so much.

17:37:45 18            THE MARSHAL:  All rise.

17:38:09 19       (WHEREUPON, THE JURY EXITED THE COURTROOM.)

17:38:09 20            THE COURT:  See you all at 8:15 tomorrow, and we will

17:38:12 21    stand in recess.

17:38:15 22       (WHEREUPON, THE JUDGE EXITED THE COURTROOM AND THE FOLLOWING

17:38:15 23          PROCEEDINGS WERE CONDUCTED:)

17:49:06 24            MR. OVERHOLTZ:  Plaintiffs introduce as PXT 24,

17:49:11 25    Deposition Exhibit Glombitza 1.  That's Record 4627032.

Case 2:14-md-02592-EEF-MBN   Document 6847   Filed 06/14/17   Page 147 of 154

17:49:17 1        Plaintiffs introduce PXT 25 as Glombitza Depo Exhibit 2,

17:49:24 2  which is 4618416.

17:49:27 3        Plaintiffs introduce PXT 26, which is Glombitza 4, which

17:49:34 4  is 4627314.

17:49:37 5        Plaintiffs introduce PXT 27, which is 4627316, which was

17:49:45 6  Glombitza 5.

17:49:46 7        PXT 28 will be 4627317, which is Glombitza 6.

17:49:54 8        PXT 29 will be 3789131, which is Glombitza 7.

17:50:02 9        PXT 30, 3789132, which is Glombitza 8.

17:50:13 10       PXT 31, 3789134, which is Glombitza 9.

17:50:18 11       PXT 33 is 1284617, which is Glombitza 11.

17:50:26 12       PXT 34 is 1231088, which is Glombitza 12.

17:50:33 13       PXT 35 is 1231089, which is Glombitza 13.

17:50:40 14       PXT 36, 948640, which is Glombitza 14.

17:50:48 15       PXT 37, 2682668, which is Glombitza 21.

17:50:57 16       PXT 38 is 1285633, which is Glombitza 23.

17:51:04 17       PXT 39 is 1285634, which is Glombitza 24.

17:51:11 18       PXT 40 is 1231133, which is Glombitza 25.

17:51:17 19       PXT 41 is 1231134, which is Glombitza 26.

17:51:25 20       PXT 42 is 777972, which is Glombitza 27.

17:51:33 21       PXT 43 is 2420139, which is Glombitza 28.

17:51:41 22       PXT 44 is 1283671, which is Glombitza 30.

17:51:49 23       PXT 45 is 873308, which is Glombitza 35.

17:51:55 24       PXT 46 is 1751116, which is Glombitza 38.

17:52:04 25       PXT 47 is 1751117, which is Glombitza 39.

OFFICIAL TRANSCRIPT

17:52:13  1          PXT 48 is 4618220, which is Glombitza 40.

17:52:20  2          PXT 49 is 4622236, which is Glombitza 41.

17:52:26  3          PXT 50 is 4622237, which is Glombitza 42.

17:52:35  4          PXT 51 is 4629259, which is Glombitza 43.

17:52:43  5          PXT 52 is 4628940, which is Glombitza 45.

17:52:51  6          PXT 53 is 887396, which is Glombitza 49.

17:52:59  7          PXT 54 is 887358, which is Glombitza 51.

17:53:06  8          And PXT 55 is 887359, which is Glombitza 52.

17:53:14  9          And that's the end of the Glombitza deposition exhibits

17:53:16 10  that were entered into evidence.

17:53:19 11          And let me know if you need to say anything on the

17:53:23 12  judge's ruling.

17:53:24 13          MR. BARBER:  Those are already been admitted.

17:53:28 14          MR. OVERHOLTZ:  So we will now move forward to the Spiro

17:53:31 15  depositions exhibits, which is -- starts with PXT 60.

17:53:33 16          So PXT 60 is 932284, which is Spiro 06.

17:53:39 17          PXT 61 will be 449266, which is Spiro 07.

17:53:45 18          PXT 62 will be 1160715, which is Spiro 09.

17:53:54 19          PXT 63 is 417291, which is Spiro 12.

17:53:59 20          PXT 64 is 1690921, which is Spiro 18.

17:54:06 21          PXT 65 is 1699945, which is Spiro 19.

17:54:13 22          PXT 66 is 1701567, Spiro 21.

17:54:20 23          PXT 67 is 1145884, which is Spiro 22.

17:54:26 24          And PXT 68 is 1145885, which is Spiro 23.

17:54:33 25          PXT 69 is 1145886, which is Spiro 24.

17:54:39  1          PXT 70 is 1160578, which is Spiro 30.

17:54:47  2          PXT 71 is 411373, Spiro 35.

17:54:54  3          PXT 72 is 1158771, which is Spiro 36.

17:55:01  4          PXT 73 is 1097767, which is Spiro 53.

17:55:09  5          That ends the Spiro exhibits.  And I believe the parties

17:55:13  6   are going to enter a stipulation that the Court's rulings with

17:55:16  7   respect to the deposition designation and the exhibits from the

17:55:20  8   Boudreaux trial will apply to the Orr trial.

17:55:23  9          MR. BARBER:  That's correct.  And as part of that

17:55:25  10  stipulation we will be submitting into the Orr record those actual

17:55:28  11  rulings that were made previously.

17:55:32  12         MR. OVERHOLTZ:  So now we'll move to the Horvat-Broecker

17:55:33  13  deposition, which is B-R-O-C-K-E-R (VERBATIM).

17:55:37  14         PXT 76 will be 2695595, Horvat-Broecker 10.

17:55:45  15         PXT 77 will be 2195444, which is Horvat-Broecker 13.

17:55:53  16         That ends the Horvat-Broecker deposition exhibits.

17:55:57  17         So now we will be moving to the Moore deposition

17:56:01  18  exhibits.

17:56:02  19         PXT 78 will be 1389694, which is Moore 01.

17:56:10  20         PXT 79, which is 1389695, which is Moore 2.

17:56:16  21         PXT 80, which is 1363457, which is Moore 19.

17:56:23  22         PXT 81 is 880160, which is Moore 20.

17:56:28  23         PXT 82 is 255699, which is Moore 21.

17:56:34  24         PXT 83 is 255700, which is Moore 22.

17:56:42  25         PXT 84 is 1023223, which is Moore 23.

17:56:52 1          MS. MILLER:  I'm sorry.  I think that's 1023223.

17:56:54 2          MR. OVERHOLTZ:  That's it.  1023223, which is Moore 23.

17:56:59 3          PXT 85, which is 255705, is Moore 24.

17:57:05 4          The next exhibit is PXT 89, which is 231309, which is

17:57:14 5  Moore 29.

17:57:15 6          PXT 90 is 834573, which is Moore 31.

17:57:21 7          PXT 92 is 144360, which is Moore 33.

17:57:28 8          PXT 93 is 144361, which is Moore 34.

17:57:33 9          PXT 94 is 161823, which is Moore 35.

17:57:39 10          PXT 95 is 1357997, which is Moore 36.

17:57:45 11          PXT 96 is 1357998, which is Moore 37.

17:57:52 12          PXT 97 is 1357450, which is Moore 38.

17:57:59 13          PXT 98 is 1395718, which was Moore 40.

17:58:13 14          MR. BARBER:  I think that's incorrect.

17:58:14 15          MR. OVERHOLTZ:  That's the one from the deposition.  And

17:58:15 16  we had to go back -- we gave you a wrong number.  And I had to go

17:58:18 17  back and check the record because when it pulled up it was the

17:58:22 18  wrong exhibit.

17:58:24 19          MS. MILLER:  So it's not the image you gave us.  Then

17:58:27 20  we'll need to look at the before --

17:58:29 21          MR. OVERHOLTZ:  It was the wrong record number.  There

17:58:31 22  was actually two Exhibit 40s in the deposition, and Exhibit 40, the

17:58:34 23  one that was introduced, is the record number, which is 1395718.

17:58:40 24  And it was -- that's the one that was in the depo clip that the

17:58:44 25  judge ruled upon.

1776

17:58:48  1          PXT 99 is 1395454, which is Moore 41.

17:58:54  2          PXT 100 is 4440518, which is Moore 51.

17:59:00  3          PXT 101 is 2070035, which is Moore 54.

17:59:08  4          PXT 102, which is 2122147, which is Moore 55.

17:59:15  5          PXT 103, which is 139010, which is Moore 56.

17:59:21  6          PXT 104 is 1085822, which is Moore 57.

17:59:28  7          PXT 105 is 141656, which is Moore 58.

17:59:33  8          PXT 106 is 166255, which is Moore 59.

17:59:39  9          PXT 107 is 141657, which is Moore 60.

17:59:46 10          And that finishes the Moore deposition exhibits.

17:59:49 11          MS. MILLER:  And for the record, the parties are still

17:59:51 12   discussing agreements on which exhibits from the Moore deposition

17:59:56 13   need redactions and which pieces will be redacted before being

17:59:59 14   shown to the jury.

18:00:00 15          MR. OVERHOLTZ:  That's correct.

18:00:02 16          MR. BARBER:  And the parties are -- and that's true for

18:00:03 17   all of the exhibits.  The parties are continuing to discuss whether

18:00:05 18   any redactions will be appropriate before being submitted to the

18:00:08 19   jury.

18:00:09 20          MR. OVERHOLTZ:  So let's move to Berkowitz now, which

18:00:14 21   is -- starts with PXT 129, which is 5767482, which is Berkowitz 2.

18:00:22 22          MS. MILLER:  Twelve -- sorry.

18:00:25 23          MR. OVERHOLTZ:  Two, right?

18:00:26 24          MS. MILLER:  It is.

18:00:27 25          MR. OVERHOLTZ:  PXT 130 is 3083260, which is

18:00:33  1    Berkowitz 12.

18:00:34  2              PXT 131 is 372322, which is Berkowitz 16.

18:00:40  3              PXT 132 is 358604, which is Berkowitz 23.

18:00:47  4              PXT 133 is 3673723, which is Berkowitz 29.

18:00:53  5              PXT 134 is 1070527, which is Berkowitz 30.

18:01:00  6              PXT 135 is 1070529, which is Berkowitz 31.

18:01:07  7              PXT 136 is 1094747, which is Berkowitz 35.

18:01:14  8              And PXT 137 is 1097767, which is Berkowitz 45.

18:01:21  9              PXT 138 is 177639, which is Berkowitz 48.

18:01:27 10              PXT 139 is 3261528, which is Berkowitz 49.

18:01:34 11              And PXT 140 is 80333, which is Berkowitz 52.

18:01:42 12              PXT 141 is 388635, which is Berkowitz 53.

18:01:48 13              PXT 142 is 1075492, which is Berkowitz 54.

18:01:55 14              PXT 143 is 1094903, which is Berkowitz 55.

18:02:02 15              PXT 144 is 2905274, which is Berkowitz 58.

18:02:09 16              And that concludes the Berkowitz depositions.  And they

18:02:12 17    will also be subject to the stipulation related to the Boudreaux

18:02:16 18    rulings on the deposition designations, as well as the deposition

18:02:19 19    exhibits that we will work on the stipulation so that they can be

18:02:23 20    entered into the Orr matter.

18:02:25 21              So that leaves us with Geiger and Shah deposition

18:02:31 22    exhibits.

18:02:36 23              PXT 171 is 3041252, which is Geiger 2.

18:02:42 24              PXT 172 is 7741, which is Geiger 5.

18:02:47 25              PXT 173 is 1426816, Geiger 34.

1778

18:02:54 1     PXT 174 is 3043971, which is Geiger 39.

18:02:59 2     PXT 175 is 3043970, which is Geiger 40.

18:03:06 3     PXT 176 is 3054065, which is Geiger 42.

18:03:13 4     PXT 177 is 1356534, which is Geiger 66.

18:03:19 5     PXT 178 is 855530, which is Shah 49.

18:03:27 6     PXT 179 is 0155561, which is Shah 54.

18:03:35 7     MR. BARBER:  Can you restate that number?

18:03:35 8     MR. OVERHOLTZ:  Yeah.  Sure.

18:03:36 9     PXT 179 is 1055561, and that's Shah 54.

18:03:42 10     PXT 180 is 119114, which is Shah 58.

18:03:48 11     PXT 181 is 119115, which is Shah 59.

18:03:53 12     PXT 182 is 303724, which is Shah 60.

18:03:59 13     And PXT 183 is 119111, which is Shah 62.

18:04:06 14     MS. MILLER:  And for the deposition exhibits for Geiger

18:04:09 15 and Shah, the parties have already reached an agreement as to the

18:04:12 16 redactions on those exhibits, and redacted copies of the following

18:04:17 17 will be entered into the record as shown to the jury.  That is:

18:04:20 18     PXT 172, which is Geiger 5.

18:04:24 19     PXT 173, which is Geiger 34.

18:04:28 20     PXT 174, which is Geiger 39.

18:04:32 21     PXT 181, which is Shah 59.

18:04:36 22     And PXT 182, which is Shah 60.

18:04:41 23     MR. OVERHOLTZ:  And we are going to work tonight to make

18:04:44 24 sure we have the right redacted copies, and we will provide a set

18:04:47 25 for you in the morning, Dean.

18:04:48  1          THE DEPUTY CLERK:   Thank you.

2          (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.)

3

4                            *  *  *  *  *  *

5

6                        REPORTER'S CERTIFICATE

7

8          I, Karen A. Ibos, CCR, Official Court Reporter, United

9  States District Court, Eastern District of Louisiana, do hereby

10  certify that the foregoing is a true and correct transcript, to the

11  best of my ability and understanding, from the record of the

12  proceedings in the above-entitled and numbered matter.

13

14

15                     /s/ Karen A. Ibos
                       _____

16                     Karen A. Ibos, CCR, RPR, CRR, RMR

17                     Official Court Reporter

18

19

20

21

22

23

24

25

─────────────── OFFICIAL TRANSCRIPT ───────────────