UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION

                                        Docket No. 14-MD-2592
THIS DOCUMENT RELATES TO:               Section L
                                        New Orleans, Louisiana
Joseph Orr, Jr., as Lawful              Thursday, June 8, 2017
Surviving Spouse of
*Sharyn Orr v. Janssen, et al.*
*Case No. 2:15-cv-03708*

*******************************************************************

                  **TRANSCRIPT OF TRIAL PROCEEDINGS**
         **HEARD BEFORE THE HONORABLE ELDON E. FALLON,**
                  **UNITED STATES DISTRICT JUDGE,**
                          **AND A JURY.**
                  **VOLUME VIII - MORNING SESSION**

*******************************************************************

**APPEARANCES:**


FOR THE PLAINTIFFS'            MR. ANTHONY BIRCHFIELD, JR.
LIAISON COUNSEL:               Beasley Allen Crow Methvin
                                 Portis & Miles
                               Post Office Box 4160
                               Montgomery, AL  36103

                               MR. BRIAN H. BARR
                               MR. NEIL E. McWILLIAMS
                               Levin Papantonio Thomas
                                 Mitchell Rafferty & Proctor
                               316 Baylen Street
                               Suite 600
                               Pensacola, FL 32502

                               MR. GERALD EDWARD MEUNIER
                               Gainsburgh, Benjamin, David,
                                 Meunier & Warshauer
                               Energy Centre
                               1100 Poydras Street
                               Suite 2800
                               New Orleans, LA  70163-2800

**OFFICIAL TRANSCRIPT**

```
                              MS. EMILY JEFFCOTT
                              The Lambert Firm, PLC
                              701 Magazine Street
                              New Orleans, LA  70130

                              MR. BRADLEY D. HONNOLD
                              Goza & Honnold, LLC
                              11181 Overbrook Road
                              Suite 200
                              Leawood, KS 66211


FOR THE DEFENDANT JANSSEN     MR. JAMES B. IRWIN, V
PHARMACEUTICALS, INC.,        Irwin Fritchie
and JANSSEN RESEARCH &           Urquhart & Moore, LLC
DEVELOPMENT, LLC:             400 Poydras Street
                              Suite 2700
                              New Orleans, LA  70130


FOR THE DEFENDANT            MR. DAVID E. DUKES
BAYER HEALTHCARE             Nelson Mullins Riley &
PHARMACEUTICALS, INC.,          Scarborough, LLP and
BAYER PHARMA AG:             Meridian, 17th Floor
                             1320 Main Street
                             Columbia, SC  29201

                             MS. BETH A. WILKINSON
                             Wilkinson Walsh + Eskovitz, LLP
                             1900 M Street NW
                             Suite 800
                             Washington, DC 20036


REPORTED BY:  Mary V. Thompson, RMR, FCRR
              United States District Court
              500 Poydras, Room B275
              New Orleans, LA  70130
```

**OFFICIAL TRANSCRIPT**

EXAMINATION INDEX

PAGE NO.

Plaintiffs' Witnesses:

RANDOLPH RICE, Ph.D.
    Direct Examination.................... 1784
    Cross-Examination..................... 1801
    Redirect Examination.................. 1804

JOSEPH ORR, JR.,

    Direct Examination.................... 1804

Defendants' Witness:

SAMMY KHATIB, M.D.

    Voir Dire Examination, ............... 1826
    Voir Dire Cross-Examination........... 1846
    Direct Examination.................... 1848

**OFFICIAL TRANSCRIPT**

<u>**P R O C E E D I N G S**</u>

(THURSDAY, JUNE 8, 2017)

(MORNING SESSION)


(Call to order of the court.)

(Jury in at 8:35 a.m.)

THE COURT:  Be seated, please.

Good morning, ladies and gentlemen.

MS. JEFFCOTT:  Morning.

THE COURT:  I'll just give you a heads-up on what the plan is the rest of the trial.

The plaintiffs have two more witnesses so they will rest probably before lunch or at lunch, and then the defendants will put on some witnesses.

Of course, they have the opportunity to cross-examine witnesses.  So their witnesses -- they feel it's not necessary to put on as many witnesses as the plaintiffs because they've had that opportunity, but they'll put on about three witnesses.  So we should get the evidence in by Friday sometime and finish it.

At that point, I'll be meeting the defendants and the plaintiffs to talk about what we call jury charges, the law.  I've been working on them and I've gotten some suggestions from each side, and I'm doing my research and writing and getting together a final charge.

But then we'll go on Monday.  Monday will be summation

**OFFICIAL TRANSCRIPT**

1  by the parties and then the jury charge.  And then Monday you

2  should get the case sometime before noon and you can begin your

3  deliberations.

4  I know the lawyers want me to thank you for all of your

5  work.  You folks have been a terrific jury.  You have been

6  attentive and interested and timely, and all of us appreciate

7  that.  You know the Court appreciates all of that.  I'm proud of

8  each of you.

9  Call your next witness.

10  MS. JEFFCOTT:  Thank you, Your Honor.  Good morning.

11  Plaintiffs call Dr. Randolph Rice.

12  THE COURT:  Okay.

13  (The oath was administered.)

14  THE DEPUTY CLERK:  Please have a seat.

15  State and spell your name for the record, Dr. Rice.

16  THE WITNESS:  Yes.  Randy Rice, R-i-c-e.

17                           **RANDOLPH RICE,**

18  having been first duly sworn, testified as follows, to wit:

19                        **DIRECT EXAMINATION**

20  BY MS. JEFFCOTT:

21  **Q.**  Good morning, Dr. Rice.

22  **A.**  Good morning.

23  **Q.**  Would you please introduce yourself to the jury.

24  **A.**  Well, I'm Randy Rice.

25  **Q.**  And you're an economist, correct?

**OFFICIAL TRANSCRIPT**

1     **A.**   Yes, ma'am.

2     **Q.**   Are you prepared to testify and explain to the jury

3     today the earnings Mrs. Orr would have produced had she had a

4     lifetime of gainful employment?

5     **A.**   I made some estimates, yes, ma'am.

6            THE COURT:   Members of the jury, you have heard other

7     experts involved.   Most of the experts you've heard are medical

8     experts and matters of that sort.   This expert witness is an

9     economist, and he will be talking about the damage aspect of the

10    case that the plaintiffs are claiming.   He'll tell you from an

11    economic standpoint how that translates.

12           MS. JEFFCOTT:   Thank you, Your Honor.   That saves me

13    some time.

14    **MS. JEFFCOTT:   (CONTINUING)**

15    **Q.**   Before we get into your opinions, Dr. Rice, I would

16    like to walk through your qualifications briefly.

17           Would you please go through your formal education.

18    **A.**   Yes, ma'am.   I have a bachelor's degree in mathematics

19    and economics from Centre College of Kentucky.   I have a master's

20    and a Ph.D. in economics from the University of Kentucky.

21    **Q.**   You gave us a CV.   Would that be helpful in reviewing

22    some of your qualifications?

23    **A.**   Well, I pretty much remember, but, sure, it always

24    helps to have a prompt.

25           MS. JEFFCOTT:   Karl, would you mind pulling it up on...

**OFFICIAL TRANSCRIPT**

```
 1   MS. JEFFCOTT:   (CONTINUING)
 2       Q.   Now, looking at the University of Kentucky, that's
 3   where you earned your doctorate, correct?
 4       A.   Yes, ma'am.
 5       Q.   And the doctorate that you earned, that's not the same
 6   kind of degree that a medical physician would have; is that fair?
 7       A.   Absolutely.
 8       Q.   After you completed your doctorate education, where did
 9   you go to next?
10       A.   I came to LSU in Baton Rouge.
11       Q.   And what did you do at LSU?
12       A.   Well, I was an assistant professor and -- starting in
13   the fall of 1969.
14       Q.   And at LSU did you teach undergraduate- and
15   graduate-level courses?
16       A.   Yes, ma'am.
17       Q.   And did you also serve as chairman of the department of
18   economics for LSU?
19       A.   I did, for ten years total, yes, ma'am.
20       Q.   And as professor and chairman, did you share your
21   knowledge by publishing and speaking on the field of economics?
22       A.   Yes, ma'am.
23       Q.   And I see that you currently hold the title of
24   professor emeritus.
25       A.   That's true.
```

**OFFICIAL TRANSCRIPT**

1    **Q.**   Can you explain that title?

2    **A.**   Well, it's an honorary matter after you complete your

3    active service on the faculty.  It has a few privileges and not

4    many responsibilities.

5            I have access to the campus.  I can get in the gates

6    and buy a parking pass and go to the library and things of that

7    sort, but I don't teach anymore.

8            MS. JEFFCOTT:  Karl, if you could go to the next page,

9    please.

10   **MS. JEFFCOTT:   (CONTINUING)**

11   **Q.**   I see that you were also president of Omicron Delta

12   Epsilon?

13   **A.**   Yes, ma'am.

14   **Q.**   And what organization is that?

15   **A.**   Well, that's an honor society that spans both national

16   and international academic institutions.  I served as the

17   international and national chairman of that honorary fraternity,

18   society.

19   **Q.**   And in addition to this professional experience that we

20   have listed here, you also do consultancy work on behalf of

21   companies and individuals like attorneys; is that right?

22   **A.**   Yes, ma'am.

23   **Q.**   And when you do work for attorneys, do you do work for

24   the plaintiffs and defendants?

25   **A.**   Yes, ma'am.

**OFFICIAL TRANSCRIPT**

1    **Q.**   And, in this case, we, the plaintiffs, hired you; is

2    that right?

3    **A.**   You did.

4    **Q.**   Does the way that you calculate losses or values or

5    your opinions differ depending on who you have been hired by?

6    **A.**   No, ma'am.  The methodology is very standard.

7        MS. JEFFCOTT:  With that, Your Honor, I would tender

8    Dr. Rice as an expert in the field of economics.

9        THE COURT:  Any questions?

10       MR. IRWIN:  No objection, Your Honor.

11       THE COURT:  The Court will accept the doctor as an

12   expert in economics.

13       You may proceed, counsel.

14       MS. JEFFCOTT:  Thank you, Your Honor.

15   **MS. JEFFCOTT:   (CONTINUING)**

16   **Q.**   With that, Doctor, I'd like to kind of delve into your

17   opinions.

18       What were you asked to do in this case?

19   **A.**   To take some information about Mrs. Orr and her family

20   and estimate, one, the kinds of earnings that she might have, in

21   fact, produced in her employment that she had had for some time,

22   had she, in fact, continued that following her death through a

23   period of time that we'll talk about both leading up to today and

24   potentially into today, had she lived.

25       And then the final number that we're working toward is

**OFFICIAL TRANSCRIPT**

1    that, since she has passed away and would have used some of those

2    monies on herself, we're trying to drill down to the idea of,

3    from those monies she might have earned, how much would have gone

4    to the support of her surviving husband.

5            So that's the bottom line that we're working toward.

6    You start with the income and then you adapt it accordingly.

7        Q.   So is a fair way to describe your opinion is that you

8    are determining the Orr family's loss of financial support as a

9    result of Mrs. Orr's death?

10       A.   That's the intent, yes, ma'am.

11       Q.   What is the value that you determined that to be?

12       A.   $204,683.

13       Q.   So I have written on the board here $204,683.  Is that

14   right?

15       A.   Yes, ma'am.

16       Q.   And I just noticed that it says "loss of support."

17   That's the ultimate amount that you've come to?

18       A.   That's true.

19       Q.   Now, in reaching this amount -- are you offering any

20   opinions as to what caused Mrs. Orr's death?

21       A.   No, ma'am.

22       Q.   And does this value include any sort of non-economic

23   damages, things for pain or the loss of affection and love, those

24   sorts of things?

25       A.   No, ma'am.

**OFFICIAL TRANSCRIPT**

1      **Q.**   And does this number account for any sort of medical

2  expenses, funeral expenses, those sorts of things?

3      **A.**   It does not.

4      **Q.**   And I'd like to drill down on this number.

5          This is the total.  You talked a moment ago about

6  having to break it up into essentially what Mrs. Orr would have

7  earned from the date of her death until the time of trial?

8      **A.**   Yes, ma'am.

9      **Q.**   And how do you classify those kinds of damages?

10     **A.**   You start with what she was earning, what she

11  demonstrated as her wages.  The year before her death, she earned

12  $51,636.55.

13     **Q.**   Dr. Rice, is it fair to call those damages past

14  damages?

15     **A.**   Yes, ma'am.

16     **Q.**   I'm going to write "past" here (indicating).

17          Now, you noted the amount that she made before her

18  death.  How did you learn and gain that information?

19     **A.**   Well, I had W-2s.

20     **Q.**   Dr. Rice, I'm going to hand you a copy of the W-2s.

21          MS. JEFFCOTT:  Your Honor, may I approach?

22          THE COURT:  Yes.

23  **MS. JEFFCOTT:  (CONTINUING)**

24     **Q.**   Dr. Rice, if you would, kindly review those and let me

25  know if those were the W-2s that you were provided.

**OFFICIAL TRANSCRIPT**

1      A.   It is.

2      Q.   And does that W-2 reflect for Mrs. Orr's total amount

3   that she earned for the year before her death?

4      A.   It does.

5           MS. JEFFCOTT:   Your Honor, I would like to admit this

6   into evidence as Exhibit No. 188.

7           MR. IRWIN:   No objection, Your Honor.

8           THE COURT:   Let it be admitted.

9   MS. JEFFCOTT:   (CONTINUING)

10     Q.   Dr. Rice, who provided the W-2s, the tax records?

11     A.   I think these materials came through the office of

12  Mr. Meunier.

13     Q.   And Mr. Meunier is counsel for plaintiffs; is that

14  fair?

15     A.   Yes, ma'am.

16     Q.   And did plaintiffs' counsel provide you other records

17  in addition to tax information?

18     A.   That's true.

19     Q.   Now, with the amount that she earned in the year prior

20  to her death, how did you arrive from there to the amount of past

21  damages?

22     A.   Is it okay if I just set this here (indicating)?

23     Q.   Yes, sir.

24     A.   We'll save it.

25          There was information given to me that she got cost of

**OFFICIAL TRANSCRIPT**

1    living increases from her Tulane employment.  And so if we have

2    the 2014 income for history, we know what has happened in terms

3    of cost of living.  The Consumer Price Index is readily available

4    to us.

5         So I simply go and look at the data, and, in fact,

6    adjust upward the 2014 number consistent with the rise in the

7    prices or cost of living into 2017.

8    **Q.**   And what was the total number that you got to for

9    Mrs. Orr's past lost earnings?

10   **A.**   $109,462.

11   **Q.**   Now, for future, from this point in time, the present

12   to the future, what value did you calculate?

13   **A.**   In current-day dollars, $173,054.

14   **Q.**   So I've written on the board here the amount that you

15   determined for her past damages, which would be $109,462, and

16   then, for her future, that would be $173,054.

17        Did I do that right?

18   **A.**   You did, yes, ma'am.

19   **Q.**   I'm going to separate this at the top.

20        Now, Doctor, in coming to this future amount, how did

21   you determine the span of years in which to calculate?

22   **A.**   I guess we ought to say with regard to all of this that

23   the assumption is that she would have lived.  So this is really

24   counterfactual in a way.  We are trying to re-create a situation

25   as if she had lived.

**OFFICIAL TRANSCRIPT**

1          And so the proposition that I've addressed is, had this

2     not occurred, she would be living today, she would be alive and

3     still employed.  That's a premise that is necessary for us to go

4     and do what we did.

5          If she were alive today and we stopped by her place of

6     employment and pulled out some statistical data on what is called

7     worklife expectancy -- if you were sitting at your desk and you

8     came in and asked me to do this, we could do the same.

9          So, we're putting ourself in the place of Mrs. Orr.  We

10    pull those tables out, asked about her education.  She has a

11    bachelor's degree.  What's your date of birth, so what's your

12    age.  And you're a female, that's what we're seeing.

13          What does that statistic tell us about how far she

14    would continue to work into the future as a statistical premise.

15          That table would tell us 3.28 additional years from

16    today forward, a statistical version of what we're talking about.

17    And so that becomes our working number.

18          And I guess that's a long way to go, I'm sorry, to

19    answer a pretty simple question.

20    **Q.**   And that worklife expectancy, is that different than

21    just overall life expectancy?

22    **A.**   Yes, ma'am.

23    **Q.**   Can you explain the difference for the jury, please.

24    **A.**   Well, we all live a certain number of years, and that

25    exceeds how long we work, the difference being the retirement

**OFFICIAL TRANSCRIPT**

1 years.  So this is, in fact, addressing, from a statistical point

2 of view, people of like circumstances -- the bachelor's degree,

3 the age, et cetera -- and what statistically would be the number

4 of years from today forward anticipated to work.

5     **Q.**   And you mentioned that you based your information off

6 of whether or not Mrs. Orr had a bachelor's degree, her age.  How

7 did you come about that information?

8     **A.**   Well, they are tables.  And they generate from the

9 Department of Labor, and then people take them and put them into

10 a form that addresses this particular static.  And so it derives

11 from national statistics.  It's U.S.  It's an overview, a large

12 population, individuals like Mrs. Orr.

13     **Q.**   So we're talking about millions of people that are

14 evaluated in this table and summarized, essentially?

15     **A.**   Yes, ma'am.

16     **Q.**   What were the -- what was the table that you used in

17 determining Mrs. Orr's future worklife expectancy?

18     **A.**   Well, it's -- Department of Labor is the generating

19 data source.  I forget the author of the particular study, but

20 it's from a published resource that gives this data.

21     And it's the only one I know that really talks about

22 education detailed to the college degree.  So this is unique in

23 that specific case and gives us as much information as we need or

24 can possibly have about education being a critical factor of

25 worklife.

**OFFICIAL TRANSCRIPT**

1     **Q.**    Doctor, I'm going to put on the ELMO --

2            MS. JEFFCOTT:  I need this.

3  **MS. JEFFCOTT:  (CONTINUING)**

4     **Q.**    Dr. Rice, is this the table of the information and the

5  calculator that you used to determine Mrs. Orr's worklife

6  expectancy?

7     **A.**    Yes, ma'am.

8     **Q.**    And this right there is where you were discussing, on

9  the screen, considering whether or not she had a bachelor's

10  degree, her age, and whatnot?

11     **A.**    Yes, ma'am.  You can see it's over on the upper

12  right-hand corner where it says Worklife Expectancy and you have,

13  I guess, six different categories.  And we're talking about a

14  female with bachelor's degree, so that's the one that ultimately

15  was used in this case.

16     **Q.**    And so, depending upon the criteria that you put into

17  this calculator, it will essentially spit back out a different

18  worklife expectancy?

19     **A.**    That's right.  I didn't invent the number, it's taken

20  from that source.

21     **Q.**    Do you find the source to be reliable?

22     **A.**    Well, it's used very widely.  I haven't gone back and

23  checked any of the data.  That's a project unto itself that

24  people like me don't do.  But, yes, ma'am.

25     **Q.**    How do you go from Mrs. Orr's worklife expectancy to

**OFFICIAL TRANSCRIPT**

1  the 173,000 and change that you told us earlier?

2      A.    Yes, ma'am.  Well, we've got a time period we're

3  talking about.  We're up to 2017 in terms of an income.

4          Remember we adjusted the 2014 for cost of living.

5          And that implies that by 2017, had she lived, her

6  annual income would have risen very slightly because inflation

7  hasn't been very robust.  But her 2017 annual income would have

8  become $52,989.37.

9          So going forward after 2007, continue the idea of cost

10  of living.  In 2018, I put in another 1 percent.  That's what

11  inflation has been in the years we looked at here.  So 1 percent

12  more in 2018.

13         Another 1 percent in 2019.

14         Another 1 percent in 2020.

15         And that gets us into the 3.28 years down the road.

16         And then finally the question is what would I need to

17  set aside today, realizing I can earn interest on those monies,

18  so that I can duplicate the anticipated earnings that would have

19  occurred in those respective years into the future.  So a lump

20  sum of money today that allows me, with interest, to replace the

21  anticipated income for 3.28 years.

22         The bad news is that interest rates are relatively low

23  now from an historical perspective, so we don't have much help in

24  that regard but at least we took note of it.

25     Q.    And just by looking at the past and future numbers that

**OFFICIAL TRANSCRIPT**

1   we have on here -- and, I mean, I'm not a math major, but those

2   don't add up to $204,000?

3       A.   Well, they don't.  They add up to $282,516.

4       Q.   Okay.

5       A.   And then we get to this point of loss of support.

6   Remember we started this conversation with --

7       Q.   Dr. Rice, what was that number again?

8       A.   Oh, yes, ma'am.  $282,516.

9       Q.   Would it be safe to say this is her total lost

10  earnings?

11       A.   Those are the estimated earnings for this period we are

12  talking about, yes, ma'am.

13       Q.   All right.  Now, how do you go from this number, the

14  $282,516, to the $204,683?

15       A.   The difference is what she would have spent on herself.

16  Remember, we're talking about loss of support.

17       The toughest question that we, who do this, ever have

18  to deal with is how much would an individual have spent on

19  themselves.

20       We keep records on what people earn but we don't keep

21  very good records on what people spend in a household budget, and

22  very rarely can people go back and recreate their budgetary --

23  that was just for her and this was for the family and this was

24  for some other reason down the road.

25       So the second best is to rely on some statistics, as we

**OFFICIAL TRANSCRIPT**

1    have done in our other calculations, that address the typical

2    expenditures of individuals within a family unit uniquely on

3    themselves and then collectively as a family unit, and that's

4    what I did.

5        Q.   What was that number that you determined?

6        A.   27.55 percent is the deduction.

7             And so what it says is we need to restore 72.45 percent

8    to the family unit.  That's the loss of support result.  And that

9    gets us the $204,683.

10       Q.   And the 21 percent [verbatim] that you mentioned, what

11   does that total to that we would deduct?

12       A.   I flipped it and took 72.45 percent, which is, in

13   effect, saying the number we're working toward.  Rather than

14   taking numbers out and ending up with something, we just cut to

15   the chase and went to the 72 percent.

16            Now, people -- it's a two-member family.  Why isn't it

17   50/50?  And the reason for that is that there are, as I said, the

18   three categories:  Mr., Mrs., and the family unit.  You can't pay

19   a half of the mortgage any longer.  There's what I call sort of,

20   the infrastructure of the family, and so that's a large portion

21   of keeping the family unit consuming at a level typically

22   observed in a family setting.

23       Q.   And so it's very possible that what Mrs. Orr spent on

24   herself, the personal consumption component, was less than

25   21 percent?

**OFFICIAL TRANSCRIPT**

1     **A.**   Well, 27 percent.

2     **Q.**   27 percent.  Pardon me.

3     **A.**   Well, sure.  I mean, we come at it from a very --

4  trying to deal with a typical family.  Mr. Orr can tell you more

5  about what that number should be.  The math is pretty simple.  If

6  he says it's another number and that's believable and it is

7  unique to the family, I defer.

8     **Q.**   And just to walk and summarize through, what you did in

9  this case is you took the past earnings potential, that would be

10  from the time of her death to present, and that would amount to

11  $109,462?

12    **A.**   Yes, ma'am.

13    **Q.**   And then you calculated her future earnings potential.

14  That would be from now into the future for 3.28 years; is that

15  right?

16    **A.**   Yes, ma'am.

17    **Q.**   And that would total $173,054?

18    **A.**   In present-day dollars, yes, ma'am.

19    **Q.**   And then you added those together?

20    **A.**   I did.

21    **Q.**   To come to $282,516.

22          And then you deducted the personal consumption of

23  27 percent to come to $204,683?

24    **A.**   That's correct.

25    **Q.**   And I just have a few more questions.

**OFFICIAL TRANSCRIPT**

1          Do you recall giving a deposition in this matter?

2     A.   Yes, ma'am.

3     Q.   You were questioned for a number of hours?

4     A.   I was.

5     Q.   And do you remember a number of questions regarding

6  Mrs. Orr's life expectancy?

7     A.   I remember a substantial discussion about worklife

8  expectancy, but probably life expectancy was addressed as well.

9     Q.   And counsel for defendants brought up whether you had

10 considered Mrs. Orr's health conditions?

11    A.   Yes, ma'am.

12    Q.   And I think we established this earlier, but you are

13 not a medical doctor, correct?

14    A.   I am not.

15    Q.   You don't normally, as an economist, review medical

16 records?

17    A.   Well, unless they address something that is very

18 important to the case.  I would then, yes, ma'am.

19         But I don't examine or make medical opinions part of my

20 presentation.

21    Q.   And as you described to the jury earlier, you base your

22 information -- you conduct your analysis based on actuarial data

23 and statistical analysis?

24    A.   That's true.  And if -- you know, I would certainly

25 accept if a medical professional offered an opinion different

**OFFICIAL TRANSCRIPT**

1  from what the statistical version is.  That's their

2  responsibility, and I would follow that, certainly.

3          MS. JEFFCOTT:  That's all the questions I have.

4          THE WITNESS:  Yes, ma'am.

5          MR. IRWIN:  Good morning, again, Dr. Rice.

6          THE WITNESS:  Good morning.

7          MR. IRWIN:  Good morning, ladies and gentlemen.

8                  **CROSS-EXAMINATION**

9  BY MR. IRWIN:

10     **Q.**  Just a couple of questions.

11         You mentioned, in response to some of Ms. Jeffcott's

12  questions, that you had gotten some information about -- or from

13  the family and about Mrs. Orr.  Did I understand your comment

14  correctly?

15     **A.**  Well, I guess it came from the family, what her date of

16  birth was, what her education was.  That was part of a list that

17  I was provided, I trust either from her employer or from the

18  family, the idea of this cost of living being a typical part.  So

19  indirectly, yes, sir.

20     **Q.**  Yes, sir.  Did you get any medical information about

21  Mrs. Orr?

22     **A.**  Not particularly that I recall.

23     **Q.**  Were you given any medical information about her health

24  problems such as kidney disease and diabetes and atrial

25  fibrillation?  Were you given any of that information?

**OFFICIAL TRANSCRIPT**

1        A.    I don't remember the specific designations of that
2    sort.  But since, and maybe during my deposition, the questions
3    pointed in that fashion, so not directly.
4        Q.    You were asked in your deposition if you had an
5    understanding of Mrs. Orr's health and her health problems, and
6    you said you did not.  Does that sound right?
7        A.    Yes.
8        Q.    This future damages calculator --
9              MR. IRWIN:  May I approach the witness, Your Honor?
10             THE COURT:  Yes.
11   MR. IRWIN:  (CONTINUING)
12       Q.    After you -- is that the one you used?
13       A.    Either the '16 -- probably didn't have the '17 just
14   yet, but I think it's essentially the same.
15       Q.    We went out and got our own like the one you have.
16       A.    Yes.  I have gotten the '17 since then so I try to keep
17   up.
18       Q.    This calculator -- and we'll just put it on the screen
19   for a second and I'm about done.
20       A.    Yes.
21       Q.    This calculator does not specifically take into account
22   a person who has disease states like, say, for example, diabetes
23   and congestive failure and kidney disease and atrial fibrillation
24   as that might impact an individual's life expectancy and worklife
25   expectancy; is that right?

**OFFICIAL TRANSCRIPT**

1      **A.**    Well, it's not -- it doesn't break out those

2    circumstances.   Now, some of those people are in the sample,

3    obviously; but, no, sir, it doesn't have a separate category for

4    all those details, that's true.

5      **Q.**    If you really wanted to know the worklife expectancy

6    and the life expectancy of an individual like that, you would

7    really have to get a medical opinion, wouldn't you?

8      **A.**    Yes.

9           MR. IRWIN:   That's all the questions I have.   Thank you

10   very much, Doctor.

11          And thank you, Your Honor.

12          THE COURT:   Any Redirect?

13          MS. JEFFCOTT:   Very brief.

14                      **REDIRECT EXAMINATION**

15   BY MS. JEFFCOTT:

16     **Q.**    Doctor, you haven't been presented with any evidence

17   that Mrs. Orr's worklife expectancy would have been less than

18   what you have -- what you calculated?

19     **A.**    Not directly, no, ma'am.   The conversation has taken

20   place, but nothing specific.

21          MS. JEFFCOTT:   Thank you.

22          THE COURT:   Thank you.   Good to see you.

23          Call your next witness, please.

24          MS. JEFFCOTT:   Yes, Your Honor.   Plaintiffs call

25   Joe Orr, Jr.

**OFFICIAL TRANSCRIPT**

1       THE COURT:  Mr. Orr, come forward.

2                           (The oath was administered.)

3       THE DEPUTY CLERK:  Please have a seat.

4                     **JOSEPH ORR, JR.,**

5  having been first duly sworn, testified as follows, to wit:

6                     **DIRECT EXAMINATION**

7  BY MS. JEFFCOTT:

8       Q.   Good morning, Mr. Orr.

9       A.   Good morning, Emily.

10      Q.   I would like to --

11           THE WITNESS:  Good morning, jury.

12  MS. JEFFCOTT:  (CONTINUING)

13      Q.   I would like to get us started by kind of talking a

14  little bit about you.

15      A.   Okay.

16      Q.   Would you tell the jury where you went to high school?

17      A.   Yeah.  I went to De La Salle High School.

18      Q.   Where is that?

19      A.   On St. Charles Avenue.

20      Q.   And were you born here?

21      A.   Yes, I was.

22      Q.   And when were you born?

23      A.   I was born in 1948, April 16th.

24      Q.   And where do you currently live?

25      A.   I live in Kenner.

**OFFICIAL TRANSCRIPT**

1  **Q.**   So you don't live too far from where you were born?

2  **A.**   No.

3  **Q.**   And so after high school, did you go to college?

4  **A.**   Yes, I did.

5  **Q.**   And where did you go to college?

6  **A.**   I went to LSU-NO.  Now it's the University of

7  New Orleans.

8  **Q.**   After college, what did you do?

9  **A.**   After college I -- well, actually, during college I

10  left and went into the military -- I didn't finish right then and

11  there.  I went into the military, into the Army Reserve, and did

12  my basic training, AIT, at Fort Polk.

13       I came back.  I had about 12 hours left to graduate,

14  and so I worked during the day, worked at DePaul Hospital, and

15  then went to school at night.

16  **Q.**   And I understand that you met Sharyn the night before

17  Mardi Gras?

18  **A.**   I did, right.  I was a senior in high school.  She was

19  a freshman at Dominican College.  She came here for school, for

20  Dominican College.  She was born in Monroe.  And -- anyway, came

21  here, lived with her grandmother.

22       She -- that particular night, she was with her cousin,

23  and a friend of mine was dating her cousin.  So we basically went

24  over there, all piled into a van, and went to the French Quarter.

25       So that's how we met.  We seemed to like each other and

**OFFICIAL TRANSCRIPT**

1    it went on from there.

2            But I didn't know her.  In fact, it was just a bunch of

3    guys and girls who went out together and had a good time.

4        Q.   The night before Mardi Gras?

5        A.   The night before Mardi Gras, right.

6        Q.   How long did y'all date before you got married?

7        A.   Let's see.  We dated all through college.  And so we

8    got married in '69.  Around Christmastime, December of '69.  You

9    know, that was the only break we could get, so that's when we

10   planned it.

11       Q.   Did you provide us a picture from your wedding?

12       A.   Yes.

13            MS. JEFFCOTT:  Karl, would you mind pulling it up.

14   **MS. JEFFCOTT:  (CONTINUING)**

15       Q.   Can you tell us a little about this picture.  What was

16   happening here?

17       A.   Well, first of all, you can see she was very pretty.

18   I'm pretty pleased and proud of that.

19            So, yeah, we just basically were riding in the

20   limousine.

21       Q.   When was Sharyn born?

22       A.   Sharyn was born December 20, 1947.  She's six months

23   older than me.  I never let her forget that.

24       Q.   Mr. Orr, when did she pass?  How old was she when she

25   passed?

**OFFICIAL TRANSCRIPT**

1       A.   She was 67 when she passed.

2       Q.   So you knew Sharyn for almost 50 years.   You were

3   married for 45.

4       A.   For 45, yeah.   And right at 50 years knowing each

5   other, yeah.

6       Q.   Can you tell us a little bit about what she was like?

7       A.   Yeah, I would be glad to.   I hope I can capture her

8   because she was a terrific, wonderful lady.

9            She was the matriarch of our family.   She was a

10   private, caring person.   She was very intelligent.

11           A little side note, we watched Jeopardy and Wheel of

12   Fortune basically every night together.   I never beat her, not

13   once.   Extremely intelligent.

14           And she had a lot of character and integrity, and she

15   never wanted to do the wrong thing.   She cared about people.   She

16   tried to help them in any way she could.

17           And so she was a good wife, a good mother, and probably

18   the best grandmother I've ever seen in my life.

19           And, you know, it's kind of interesting, at first I was

20   a little jealous of that, because all the grandkids truly, truly

21   loved her.   Gravitated towards her, and I was, like, oh, wow, you

22   know, that's -- but then you think about that and you just enjoy

23   how beautiful that relationship was.   And it was.   It was -- I

24   just sat back and smiled and enjoyed it.   It was beautiful.

25       Q.   You have five grandchildren, right?

**OFFICIAL TRANSCRIPT**

1       **A.**   Five.

2       **Q.**   So Kim's son, Derrick?

3       **A.**   Yes.

4       **Q.**   And then Joe has two sons, right?

5       **A.**   Joe has two sons, Jared and Joshua.

6       **Q.**   Then what about Kelli?

7       **A.**   Kelli has two.  She has Jennifer and Gregory.

8       **Q.**   How old are they?

9       **A.**   I don't know.  No -- Jennifer is 15.  Gregory is 11.

10      **Q.**   Okay.  And so --

11      **A.**   Jared is 17.  Both Derrick and Joshua are 14.  And

12   Bubby, Gregory, is 11.

13      **Q.**   You got it.

14      **A.**   Not bad.

15      **Q.**   And what did your grandkids call Sharyn?

16      **A.**   They called her GaGa.

17      **Q.**   And what do they call you?

18      **A.**   PopPop.

19           That all came from Jared.  Jared was the first, and he

20   named Sharyn GaGa.  And I wanted to be called Pop, and he just

21   put another "pop" on it so now it's PopPop.

22      **Q.**   And has Sharyn's death been hard on the grandchildren?

23      **A.**   It's just not the same, you know.  We have functions

24   and -- and the family has been beautiful.  I'm not criticizing

25   anybody.  But it's not the same.  It's not the same for the

**OFFICIAL TRANSCRIPT**

1   grandchildren.

2          I could -- you know, let's take Good Friday.  We all

3   get together for crawfish and we used to do a -- like an Easter

4   egg hunt and go out there, and she would, you know, put the eggs

5   out there and they would go find the eggs.

6          But anyway, she is -- she is sorely missed.  And they

7   know she's not there so it's just not the same.

8       **Q.**   Now, between you and Sharyn, how would you describe

9   y'all's relationship?

10      **A.**   That's a tough one.  It was a typical long-term-

11  marriage relationship.  Married 45 years.  We had some great

12  moments, wonderful times together.

13         We had some times that weren't as good as the other

14  times, but through it all, we partnered, we got together, we

15  struggled through it, and our relationship became stronger

16  through the years, actually.

17         And -- you know -- and so we had our children together

18  and educated them.

19         And, by the way, I'm extremely proud of them.  But,

20  anyway...

21         So we educated our children through elementary, high

22  school, and then college.  And that's a tribute to her.  Because

23  of her position at Tulane, we were afforded the opportunity to

24  send our children to Tulane on a tuition waiver, they call it.

25  We still had to pay a little bit, but not nearly as much.  We

**OFFICIAL TRANSCRIPT**

1    could have never afforded that kind of education for our

2    children.

3          So we -- you know, we -- we pooled our -- I mean, it

4    really was a partnership for all those years, and we worked hard

5    together.  She worked extremely hard for a long time, and she

6    deserved a better life.

7    **Q.**   And I believe that Kim testified earlier that Sharyn

8    was planning to retire at some point.

9    **A.**   She was.  We didn't know when that would be.  And the

10   reason we didn't know when that would be, that would depend on

11   the grandchildren.  We were trying to help them in any way we

12   could, and -- you know.  So we had talked about it, but we

13   weren't sure when it was going to happen.

14   **Q.**   And, Mr. Orr, you have been here throughout this entire

15   trial and you have heard testimony regarding some of Sharyn's

16   health conditions?

17   **A.**   Yes.

18   **Q.**   And are you aware that she had diabetes and

19   hypertension?

20   **A.**   Yes.

21   **Q.**   And did the diabetes slow her down or prevent her from

22   doing anything she wanted to do?

23   **A.**   Nothing slowed her down, nothing at all.

24   **Q.**   And --

25   **A.**   She was -- you know, some of the things I left out, she

**OFFICIAL TRANSCRIPT**

1    had a strong will, determination.  If she had a goal, if she set

2    her mind to it, it happened.

3        Q.   And there has been a lot of discussion about Mrs. Orr's

4    hypertension.

5        A.   Right.

6        Q.   Do you remember that?  And did that slow her down?

7        A.   Let me touch on that.  That didn't slow her down.  And

8    part of her makeup was that she never wanted to disappoint

9    anybody, and that included her doctors, so she would get

10   extremely nervous before she went to see any doctor.

11       Q.   And I believe Dr. Cruz talked about home blood pressure

12   readings --

13       A.   Yes.

14       Q.   Notes and papers.  Do you remember that?

15       A.   I do.

16       Q.   Did you see Sharyn take her blood pressure at home?

17       A.   I did.

18       Q.   And how often would she do that?

19       A.   She did it all the time.  And, you know, her readings

20   at home were much better than they ever were in a doctor's

21   office.

22       Q.   Now, Mr. Orr, I want to move forward to when Sharyn

23   suffered her brain bleed.

24       A.   Okay.

25       Q.   And on that day, April 24th, 2015, did she work a full

**OFFICIAL TRANSCRIPT**

1  day?

2      A.   Yes.

3      Q.   Now, you picked her up from work; is that right?

4      A.   I did.  About 4:30.

5      Q.   And did y'all normally carpool?

6      A.   No.  Normally, she drove herself to work.  And Tulane

7  has a real parking problem, parking situation.  So she would have

8  to get there about 7:30 in the morning in order to find a parking

9  place.

10         This particular Friday I wasn't doing anything so I

11  said, you know, I'll bring you to work and then I'll pick you up.

12  So I brought her to work.

13         And when I brought her to work, I could get her there

14  at 8:15, 8:30, and then pick her up.

15     Q.   And would she typically work a full day at work?

16     A.   Yes.  Forty hours a week, five days a week, yeah.  And

17  then she'd go in sometimes on a Saturday and -- you know, if they

18  asked her to come in and talk to students or something, she would

19  do that, like an orientation, that kind of thing.

20     Q.   And on that Friday, April 24th, what time did you pick

21  her up?

22     A.   About 4:30.

23     Q.   And did y'all have plans that evening?

24     A.   We did.  We did.  We were supposed to meet some friends

25  of ours, Ray and Connie, at the restaurant, and something

**OFFICIAL TRANSCRIPT**

1  happened and they couldn't go so we went to the restaurant by

2  ourselves.

3      Q.   And I think a couple of different times it's been

4  mentioned that you guys went to Ruth's Chris.

5      A.   Yeah.  Let me set the record straight.  That was not

6  our normal restaurant to go to.  That was out of our league, so

7  to speak.  But a friend of hers had given us a gift certificate,

8  and so we were able to go there that particular night.

9           It was a special occasion for us.  So -- and we had

10  that gift certificate for probably a year, maybe more.  I don't

11  know.  So, yeah, we went there that night.

12      Q.   It was a date night?

13      A.   It was a date night, yeah.

14      Q.   And do you know if Sharyn took Xarelto before dinner?

15      A.   I don't know, no.  I wish -- I would have known, but I

16  don't know.

17      Q.   And what happened during dinner?

18      A.   You know, it started out as a pretty good evening, a

19  pretty good dinner.  And so we had, you know, iced tea and -- I

20  don't remember what she ordered.  I don't remember what I

21  ordered.

22           But, anyway, we sat there and we had a delicious

23  dinner.  And right around the end of the dinner -- I mean, just

24  about finished with everything -- she said, "I have a headache."

25           I said, "Okay."

**OFFICIAL TRANSCRIPT**

1          I said, "Do you have any Tylenol?

2          "No, I don't.

3          "Do you have aspirin?  Do you have anything?

4          "No, I don't.

5          "Well, I don't have it either, so why don't we just

6     finish here, I'll pay the check, and we'll go?"

7          Finally she said, "I'm going to go to the restroom

8     first."

9          So she went to the restroom.  She came back.  I paid

10    the check and we left.  It was valet parking.  So they came up

11    and opened the car door for her.  She got in.

12          And on -- so we started to go home.

13          And I -- maybe we got five or six blocks away and she

14    said, "You know, I'm nauseous.  Can you pull over?"

15          So we were on Veterans and I -- you know, so I said,

16    "Yeah, let me pull off on a side street."

17          So I pulled off on a side street and then she

18    vomited -- opened the car door, vomited.  And then she got back

19    in, closed the door.

20          We drove off.  We drove home.  We drove up to the back

21    garage.  I opened the garage door.  And she opened the door again

22    and vomited again so I was starting to get concerned.

23          I walked around the car -- around the back of the car,

24    got her out of the car, and then, basically, just walked her to

25    her bed -- or to our bed, and said, you know, "Let me go get a

**OFFICIAL TRANSCRIPT**

1    Tylenol and you can get rid of this headache."

2            Well -- so I did.  I went to get the Tylenol.  And

3    then, when I came back, she was asleep.  So I said, well, I'm not

4    going to bother her.  Let this headache go away.

5            So I went in our den.  And I don't know why, but I was

6    sitting there and I just -- I don't know, I said let me -- I

7    better go check on her.

8            So I walked back in there and, sure enough, in maybe

9    five minutes, ten minutes, give or take, and she said, "Can you

10   take me to the bathroom?"

11           I said, "Sure, I'll take you to the bathroom."

12           So I helped her to the bathroom.  Got her out of bed.

13   We walked together to the bathroom.  And then, you know, she sat

14   on the commode and was pretty weak.  So --

15       Q.   Now, at some point, you decided to call Kim; is that

16   right?

17       A.   Yeah.  Well, I asked her -- I said, "Sharyn, do you

18   want me to call 911?

19           "Oh, no.  No, Joe, don't do that.  Huh-uh.

20           "Do you want me to call Kim?

21           "Oh, no, Joe.  Huh-uh, don't do that.  No.  I'm okay.

22   I'll be okay.  Just let me sit here a minute and then I'll go

23   back to bed and I'll be fine.  No."

24       Q.   So what made you decide to ultimately call Kim?

25       A.   Well, I mean, she was getting pretty weak.

**OFFICIAL TRANSCRIPT**

```
 1          So I called Kim, Kim came over, and, you know, it

 2  wasn't long after that, that we called 911.  And they came, and

 3  pretty much the rest is history.  They put her on a gurney and...

 4      Q.   And they took her to Ochsner Baptist, right?

 5      A.   Took her to Ochsner Baptist, yes.

 6      Q.   And then from Ochsner Baptist to Ochsner main?

 7      A.   Yes.

 8      Q.   And you, Kim, Kelli, and Joe, your son, all went to

 9  Ochsner main?

10      A.   Yes -- well, me, Kelli, and Kim -- everybody lives

11  close.  Kelli and Kim live real close.  Joe lives about

12  20 minutes away.  So Joe met us at Ochsner main because it was

13  easier for him to do that.  But me, Kelli, and Kim followed the

14  ambulance from Baptist to main.

15      Q.   And we've heard Joe and Kim testify about the treatment

16  options that were presented to you at Ochsner main.

17      A.   Yes.

18      Q.   And, you know, I don't want to walk you through every

19  detail of that --

20      A.   Please don't.

21      Q.   -- but I'd just like to ask you a few questions.

22      A.   Sure.

23      Q.   Do you agree with the way Kim and Joe explained how the

24  treatment options were provided to you by Dr. Bui and

25  Dr. Reiffel?
```

**OFFICIAL TRANSCRIPT**

1    **A.**   Absolutely.

2    **Q.**   And did the doctors initially lay out the option to

3    place the drains in Mrs. Orr?

4    **A.**   They did.

5    **Q.**   And why was that option to immediately place those EVD

6    drains taken off the table?

7    **A.**   When they heard the word Xarelto, everything changed.

8    Their heads shook and then all of a sudden everything was off the

9    table.  So, I mean, we -- we knew something was wrong.

10   **Q.**   And did any of the doctors discuss what options could

11   have been available if she had been on another drug?

12   **A.**   Yeah.  I mean, they were going to do something

13   immediately, but they couldn't.  They could not.  They were

14   afraid.

15   **Q.**   And so --

16   **A.**   They were afraid of the bleed.  That's what they were

17   afraid of.

18   **Q.**   And so what did the doctors recommend at that point?

19   **A.**   They recommended to wait 24 hours until the Xarelto was

20   out of her blood, out of her system, whatever you want to say.

21   **Q.**   Do you remember speaking to Dr. Bui later that day?

22   **A.**   I do.  It was about noon that day, which was now

23   Saturday afternoon.  And, basically, he said, you know, now we

24   can do it.

25   **Q.**   And then do you know about when that surgery was

**OFFICIAL TRANSCRIPT**

1  performed?

2      A.    I want to say probably about 2:00 that afternoon.

3      Q.    And that was about 12 hours after the initial options

4  had been provided to the family?

5      A.    Right.

6      Q.    Now, over the next few days, did Sharyn improve?

7      A.    No.  No.  I mean, the team would come in and she had

8  some reflex reactions, but nothing to speak of.

9      Q.    Was she on life support?

10      A.    Yes.  She was on life support, which, initially, they

11  said, We're going to put a breathing tube in her.

12      What?

13      I don't know that much.  I didn't realize that was life

14  support, honestly.  I didn't realize that -- I thought it was

15  just something that cleared her passageway to breathe.

16      But, yes, she was on life support.

17      Q.    And do you know about when the discussions to withdraw

18  care began?

19      A.    I want to say it was probably that Friday, May 1st,

20  is -- yeah.  Because we had had discussions.

21      But, anyway, this was a social worker who basically

22  came in.  And then -- and I want to say all of the family -- the

23  children, myself -- you know, we had some horrendous decisions to

24  make, and -- but we all were in agreement as to how to handle the

25  situation.

**OFFICIAL TRANSCRIPT**

 1    **Q.**   You did it together?

 2    **A.**   I'm sorry?

 3    **Q.**   You did it together?

 4    **A.**   We did it together.  And we're still doing it together.

 5    **Q.**   And do you remember when care was withdrawn?

 6    **A.**   Yeah.  It was that Monday, and it was around noon.  We

 7    didn't want to do it that Friday because we didn't want her to

 8    suffer in any kind of way with a makeshift staff over there over

 9    the weekend.  We wanted it to be, you know, their top-quality

10    people, for lack of a better term.

11         So, anyway, it was that Monday.  They took her off at

12    about noon.  And, of course, the idea was, if she could breathe

13    on her own, everything would be fine.  But that didn't happen.

14         She fought it.  She fought it.  She fought it till

15    about 5:00 that afternoon, and that was it.

16    **Q.**   Can you tell us about the funeral services that y'all

17    held for Sharyn.

18    **A.**   Yeah.  Yeah.  The funeral services were terrific.  Of

19    course, all of the family was there.  All the friends were there.

20    All her coworkers were there, including the dean.  You know, her

21    boss.  You name it.

22         And then a lot of her former students.  I want to say

23    anywhere between -- and the kids could probably help me better

24    with this, but anywhere between 50 and 75 of her former students

25    came and had just wonderful things to say about her, wonderful

**OFFICIAL TRANSCRIPT**

1  praise for her.

2      **Q.**   And the pictures of you and Sharyn that we've been

3  showing throughout the trial, those were shown at the funeral; is

4  that right?

5      **A.**   That's right.

6      **Q.**   Now, after Sharyn passed, do you recall receiving

7  medical bills related to her hospitalization and the funeral?

8      **A.**   Yes.

9      **Q.**   Mr. Orr, I would like to hand you a copy of these

10  medical bills.

11      **A.**   Sure.

12      MS. JEFFCOTT:  Your Honor, may I approach?

13      THE COURT:  Yes.

14  **MS. JEFFCOTT:  (CONTINUING)**

15      **Q.**   Now, Mr. Orr, I know this might be difficult, but if

16  you wouldn't mind reading through these medical bills, just

17  looking at them and telling me if those are the ones that you are

18  familiar with and received.

19      **A.**   Okay.

20      **Q.**   And let me know when you have done that.

21      **A.**   (Reviews documents.)

22      They look right.

23      **Q.**   What I would like to do, Mr. Orr, is just go through a

24  demonstrative, a chart that we prepared summarizing these

25  medicals.

**OFFICIAL TRANSCRIPT**

1       **A.**    Okay.

2               MR. BARR:   No objection.

3               THE COURT:   Go ahead.

4   **MS. JEFFCOTT:   (CONTINUING)**

5       **Q.**    Mr. Orr, starting with -- at the top, those are -- that

6   amount is for the amount spent for Xarelto, is that fair, the

7   $1,106.98?

8       **A.**    Yes.

9       **Q.**    And the next three line items on this chart that I just

10  want to walk through are related to Ochsner.  Do you see that?

11      **A.**    Yes.

12      **Q.**    And those are expenses from her initial hospitalization

13  at Baptist and -- through May 4th; is that right?

14      **A.**    Correct.

15      **Q.**    And those values attributed to those bills -- we'll

16  start with the first one for Ochsner, which is $1,679.12 for

17  professional services at Ochsner on April 24th.

18              Did I read that correctly?

19      **A.**    Right.

20      **Q.**    And is that a correct amount?

21      **A.**    Yes.

22      **Q.**    The next one is for hospital charges at Ochsner for a

23  total of $119,832.23; is that right?

24      **A.**    Yes.

25      **Q.**    And the last one for Ochsner is $14,059; is that right?

**OFFICIAL TRANSCRIPT**

```
1        A.    Yes.

2        Q.    Just a few more.

3              The next few are for EMS; is that right?

4        A.    Yes.

5        Q.    The first one would be for EMS from your home to

6   Ochsner Baptist.  And that was East Jefferson General Hospital,

7   right?

8        A.    Right.

9        Q.    For a total of $1,312.80?

10       A.    Right.

11       Q.    And the next ambulance would have been from -- between

12  Ochsner main and -- Ochsner Baptist and Ochsner main; is that

13  right?

14       A.    Right.

15       Q.    And that would have totaled $3,498.12; is that right?

16       A.    Right.

17       Q.    And the last one is her funeral expenses at Garden of

18  Memories?

19       A.    Correct.

20       Q.    That's for $7,420; is that right?

21       A.    Right.

22       Q.    And so the total expenses related to Sharyn's

23  hospitalization and death are -- totals $148,908.25?

24       A.    Correct.

25             MS. JEFFCOTT:  Your Honor, I would like to admit these
```

**OFFICIAL TRANSCRIPT**

1    expenses as Plaintiffs' 189.

2            MR. BARR:  No objection, Your Honor.

3            THE COURT:  Let it be admitted.

4            MS. JEFFCOTT:  Thank you for doing this.

5            THE COURT:  All right.  Is that it?

6            MS. JEFFCOTT:  Just a few more questions.

7            THE COURT:  Okay.

8    **MS. JEFFCOTT:  (CONTINUING)**

9        **Q.**    You and Sharyn, I think you said, were married about

10   45 years prior to her death; is that right?

11       **A.**    Right.

12       **Q.**    And you asked us to share a picture from the Christmas

13   that y'all spent together before she died?

14       **A.**    Right.

15           MS. JEFFCOTT:  Karl, would you mind pulling up that

16   picture.

17           Thank you.

18   **MS. JEFFCOTT:  (CONTINUING)**

19       **Q.**    Is that the picture?

20       **A.**    Yeah.

21       **Q.**    Mr. Orr, would you mind trying to put into words how

22   her death has affected you?

23       **A.**    Wow.  You know, I'll start by saying you really don't

24   realize how much you are going to miss somebody until they are

25   gone.  Over that long period of time you kind of take each other

**OFFICIAL TRANSCRIPT**

1    for granted, but once they are gone, you realize how much you

2    depended on them.  She did everything for me.  She cooked,

3    cleaned, washed clothes, washed dishes, and so it is quite an

4    adjustment to live without her.

5           But more than that -- more than that, she was the

6    matriarch of our family, and it's hard on me.  Yeah, I miss her.

7    I loved her and I still love her and I miss her, but seeing my

8    children -- I lost my mom at 83 years old -- 83.  My dad was 86.

9    I lost them both within a year.  That was traumatic.  But I can't

10    imagine what these children are going through at their young age

11    not to have their mother.  It's difficult.  It's extremely

12    difficult.

13    **Q.**    Do you still live in the same home that you and Sharyn

14    had?

15    **A.**    I do.  I do.

16    **Q.**    And --

17    **A.**    And nothing has changed.  Her closet is the same with

18    her clothes.  Her pictures are there.  All our pictures are

19    there.  All her decorations are still there.  It's going to be a

20    while before I can move anything.

21    **Q.**    Is life harder without Sharyn?

22    **A.**    Life is really a lot harder.  You know, like I said,

23    you don't -- you don't realize how much you are going to miss

24    somebody until they are not there anymore.  It's not an easy

25    thing.

**OFFICIAL TRANSCRIPT**

```
 1          MS. JEFFCOTT:  Thank you, Mr. Orr.  That's all the
 2   questions I have, Your Honor.
 3          THE COURT:  Any Cross?
 4          MR. DUKES:  Sir, good morning.
 5          THE WITNESS:  Good morning.
 6          MR. DUKES:  My name is David Dukes, and I don't have
 7   any questions.
 8          THE COURT:  Any further witnesses?
 9          MR. BIRCHFIELD:  Your Honor, at this time, subject to
10   making the proffer that we discussed and housekeeping, making
11   sure that our exhibits are marked and entered properly, the Orr
12   family rests.
13          THE COURT:  Okay.  Let's take a break at this time,
14   members of the jury, for 15 minutes and come back.
15                          (Jury out at 9:37 a.m.)
16          THE COURT:  Be seated, please.
17          Are there motions at this time for the record?
18          MR. IRWIN:  Yes.  Thank you, Your Honor.
19          As we discussed earlier this morning in chambers, we
20   will be making a formal motion, with your permission, later on at
21   the right time.
22          We would like to state now for the record that,
23   pursuant to Rule 50, we would ask the Court to enter a judgment
24   as a matter of law for the reasons that have been previously set
25   forth and that will be set forth in more detail later.
```

**OFFICIAL TRANSCRIPT**

1        Thank you, Your Honor.

2        THE COURT:  Okay.  I assume the motion is made at the

3   appropriate time and I'll hear briefs and argument later on.  But

4   we'll assume that it's been made appropriately and at the

5   appropriate time.

6        We'll be back in a minute.  Court will stand in recess.

7                              (A recess was taken.)

8                        **AFTER THE RECESS**

9                              (Call to order of the court.)

10                             (Jury in at 9:56 a.m.)

11        THE COURT:  Be seated, please.

12        Ladies and gentlemen, as I told you at the outset, the

13   matter goes -- after *voir dire* and opening statements, the

14   plaintiffs put on evidence and then the defendants may put on

15   evidence.

16        Call your first witness -- or second witness.

17        MS. WILKINSON:  Thank you, Your Honor.

18        We call Dr. Sammy Khatib to the stand.

19        THE COURT:  Come forward, please, sir.

20                              (The oath was administered.)

21        THE DEPUTY CLERK:  Please have a seat.

22        State and spell your name for the record.

23        THE WITNESS:  Sammy Khatib, K-h-a-t-i-b.

24

25                        *  *  *  *

**OFFICIAL TRANSCRIPT**

1            SAMMY KHATIB, M.D.,

2    having been first duly sworn, testified as follows, to wit:

3              VOIR DIRE EXAMINATION

4    BY MS. WILKINSON:

5         Q.   Morning, Dr. Khatib.

6         A.   Good morning.

7         Q.   Is this your first time testifying in court?

8         A.   Yes, it is.

9         Q.   All righty.  The ladies and gentlemen of the jury have

10   seen quite a few witnesses, and one thing we like to start with

11   is if you just introduce yourself to the jury.

12        A.   My name is Sammy Khatib.  I'm an electrophysiologist.

13   I practice at Ochsner Clinic.

14        Q.   And when we get to it, will you be able to explain to

15   us what an electrocardiophysiologist does?

16        A.   An electrophysiologist.

17        Q.   There we go.  Thank you.

18        A.   It's a subspecialty of cardiology.  So my particular

19   area of expertise is in the rhythm disorders of the heart, of

20   which the most common is atrial fibrillation.

21        Q.   Let's start, if we could, by going back to the basics.

22   Where do you live?

23        A.   I live in Metairie.

24        Q.   How long have you lived in the New Orleans area?

25        A.   I moved here in 2003 as part of my training, and I

**OFFICIAL TRANSCRIPT**

```
 1    started my cardiology training at the Ochsner Clinic at that
 2    time.
 3         Q.   Go ahead.
 4         A.   So I have been here since 2003.
 5              I left for two years to develop a subspecialty training
 6    in the field of electrophysiology and then I was brought back by
 7    my wife.  I was told where we were going to live; didn't have
 8    much choice in the matter.
 9         Q.   Where do you currently work?
10         A.   Ochsner.
11         Q.   Where did you grow up?
12         A.   I was born right outside of Detroit, in a suburb of
13    Detroit.  I went to high school there.  And then since then have
14    moved and lived all over the place.  I tell people I've been a
15    gypsy of my education and just gone where the training has taken
16    me.
17         Q.   Let's start first with your undergraduate.
18              Where did you go for undergrad?
19         A.   Duke University from '91 to '95.  I got my bachelor's
20    in science and biology.
21         Q.   Where did you go next?
22         A.   Came back home to med school in Detroit, Wayne State
23    School of Medicine.  Was there from '95 to '99.
24         Q.   What made you want to be a doctor?
25         A.   I didn't know any other way to do it.  Both my parents
```

**OFFICIAL TRANSCRIPT**

1    are physicians.  I'm of Middle Eastern descent, and there is a
2    strong community of Middle Eastern physicians in the suburbs of
3    Detroit.
4         I was the oldest child of that generation and everyone
5    was physicians, and so, to me, when you grow up, you become a
6    doctor.  I didn't know any better, is what I tell people.
7         Q.   Do your parents still practice?
8         A.   Dad does.  Mom retired the day that I finished my
9    training.
10        Dad still works.  I think Dad is going to -- he's going
11   to struggle with retirement.  So I think he's going to go, go,
12   go.
13        Q.   Just tell the jury briefly what type of physicians your
14   parents are.
15        A.   So mom was a pathologist.  She was chief of her
16   department at a teaching university in Detroit.
17        Dad is an infectious disease specialist.  Was for a
18   long time the chief of infectious disease at a local hospital in
19   Michigan.
20        Q.   We're going to get to it, but at some point did you end
21   up having to work in a hospital where your parents were?
22        A.   Yes.  So that was great.  So, first, I realized that my
23   parents --
24        Q.   Do you mean "great" like really great or sarcastic
25   great?

**OFFICIAL TRANSCRIPT**

1     **A.**   No, it was great.  I give my dad some grief about it,

2  but I appreciate, now that -- so I -- my parents claim that they

3  did not influence me to go into medicine.

4          I look at this -- as a high school senior, my senior

5  project was done at my dad's hospital.  In college, I spent one

6  of my summers doing research in my dad's laboratory.

7          And through high school all -- you know, physicians are

8  unidimensional.  We are one-trick ponies.  We know medicine and

9  not much else.  We had dinner -- we had to wait for Mom and Dad

10 to come home, and all of the conversations from high school on

11 were about medicine.

12         So what I realized is my dad and mom were presenting

13 patients to me when they were talking among themselves.  And, of

14 course, I'm nosy and would get into it.  So it started early.

15         My mom was always -- is still the nice, sweet one.  Dad

16 is the old-school hard one, so I expected grief from my dad when

17 I got there.

18         So being able to go to med school and have the

19 opportunity to have your mom train you -- she did a second-year

20 rotation at the medical college.  And I'll never forget her

21 showing up in the room and she asked me a question and I totally

22 blew it and she said, Well, you're wrong because of X, Y and Z,

23 and everyone started laughing.

24         So with Dad --

25     **Q.**   He was a professor, also, at your medical school?

**OFFICIAL TRANSCRIPT**

1      **A.**    He was a professor at Wayne State University and then

2  he started an infectious disease fellowship at St. John Hospital.

3  A fellowship is a training program for ID, people interested in

4  infectious disease.

5           When I got to the hospital, it was clear that the

6  expectation was that I was going to work harder than the

7  residents and the students because I was his kid.  I didn't get a

8  free quarter, I got more work because of it.

9      **Q.**    Did you go somewhere else for residency after medical

10 school?

11     **A.**    Yes.  So then I went to Georgetown University.

12          So to get into cardiology, you start with internal

13 medicine training.  So I went to do internal medicine training.

14 I did that in Washington, DC, at Georgetown University.  I was

15 there from '99 to 2002.

16     **Q.**    A total of three years?

17     **A.**    Three years.

18          I stayed an extra year to do a chief medical residency

19 year.  That's a year where you focus on teaching of the house

20 staff and administration stuff.  It's an extra year of work.

21          People kind of look at you like, Why are you spending

22 longer time in training when you could just get through?  And I

23 found it incredibly valuable to be able to spend time focusing on

24 teaching people and really leading the house staff.

25     **Q.**    Let me put up a few charts we made.  We've gone through

**OFFICIAL TRANSCRIPT**

1    most of these.

2            Let's talk about -- when you were at Georgetown, did

3    you specialize in anything during your residency?

4        A.   No.  And so when you get your medical degree, you

5    become an MD, you go into internal medicine.  That's general

6    training, and then you want to make a decision to go further.

7            So a GI doctor or an infectious disease doctor, that is

8    subspecialty training.  So my three years was focused on internal

9    medicine.

10           There were about -- we had a unique situation at

11   Georgetown.  I had a mentor, and you always gravitate towards

12   your mentor.  But there were about 12 of us who ended up, from

13   that internal medicine residency program, going into

14   electrophysiology.

15       Q.   Is that normal?

16       A.   No, it's very uncommon.  When we go to our yearly

17   meetings and we meet up, we talk about that.  And it really is

18   due to one man and his passion for teaching and for showing us

19   the field.

20       Q.   Is that when you first got interested in

21   electrophysiology?

22       A.   Yes, I would say so.  I had an interest in cardiology

23   when I applied to internal medicine.  And I always thought I was

24   going to end up being an interventional cardiologist where you

25   put the stents in, but the field of electrophysiology -- to me,

**OFFICIAL TRANSCRIPT**

1    it's physiology.  It's in the name.  And it's just understanding
2    how mechanics work in the body, how X leads to Y, and you can see
3    finite results and things happen.
4            So it is, to me, a more academic and thoughtful part of
5    cardiology where you still get to be involved.
6        Q.   And what did you do after you were the chief resident
7    at Georgetown?
8        A.   So then I went to Ochsner.  I did my general cardiology
9    training from 2003 to 2006.  My last year was as a chief
10   cardiology fellow.  So I was a -- continued my rotations, but was
11   again involved in teaching and in the administration of the
12   fellowship.
13       Q.   And when you were learning and specializing in
14   cardiology, you followed on with your fellowship in
15   electrophysiology?
16       A.   Yes.  So one of my mentors at Ochsner at the time, an
17   electrophysiologist, he had trained at the University of Florida
18   and he had recommended -- said, You need to go to this place.  He
19   called the people there and said, You should take a look at this
20   gentleman.  So I went to the University of Florida, Gainesville.
21           It was supposed to be a one-year training.  It was
22   accredited as a one-year program.
23       Q.   Did you stay longer than one year?
24       A.   Yeah.  I told them I wouldn't come for one year, I'd
25   come for two, because my education -- I started college in '91.

**OFFICIAL TRANSCRIPT**

1  Med school started in '95.  But I think my education -- I spent a

2  lot of time and effort on this, and I didn't want to spend one

3  year doing what I ultimately was going to do for the rest of my

4  life.  I said I wanted a second year, and in particular to focus

5  on management of atrial fibrillation and ablation.

6          So I stayed on as a second-year -- technically, one

7  year was as a fellow.  The second year was as a clinical

8  lecturer, they called it, where I was an attending.  I had my own

9  clinic, I had my own patients, but I was able to work as a junior

10 staff under the more senior faculty that were there.

11     Q.   Dr. Khatib, throughout your career in school and

12 residency and fellowships and here, have you continued to teach?

13     A.   Yes.  I would say that has been a big part of the

14 reason that I -- one of the biggest reasons that I came back to

15 work at Ochsner.

16          My goal when I came back -- you always think about your

17 career goals, and my goal was always to set up a fellowship in

18 electrophysiology.

19     Q.   Let's talk about that for a second.

20     A.   Sure.

21     Q.   You told us your dad set up a fellowship program,

22 right?

23     A.   Yes.

24     Q.   Did you set one up here in New Orleans?

25     A.   I did.  So we set up the first -- so a fellowship is a

**OFFICIAL TRANSCRIPT**

1    training program for further training.  So we set up the first

2    training program in the state of Louisiana specifically for

3    people wanting training in electrophysiology or the heart rhythm

4    disorders.

5        Q.    Currently are you the section head of electrophysiology

6    here at Ochsner?

7        A.    I am, yes.

8        Q.    As vice-chairman of cardiology, what do you do?

9        A.    So that role -- my role has evolved.  Again, my initial

10   plan was I wanted to start a fellowship and then they keep adding

11   things for you to do.  So then I became a section head for EP,

12   the administrator of the section.

13            So then my chair asked me to take on the role of

14   vice-chair, and my role there is -- now I have a lot of

15   involvement in managing the department as opposed to my section

16   alone within the hospital itself as well as within the system.

17            Ochsner is a health system now, it is not one hospital.

18   You have heard about Baptist and the main campus.  There are

19   multiple systems.

20       Q.    How much of your work, approximately, is focused on

21   electrophysiology?

22       A.    Well, the clinical work that I do, 95 or 98 percent of

23   the time is EP.  "EP" is "electrophysiology" so I don't have to

24   say that.

25            So I tell physicians I'm a one-trick pony.  I'm a heart

**OFFICIAL TRANSCRIPT**

1  rhythm specialist, and that's my area of expertise.

2       Q.   Does that mean that you see plenty of patients with

3  AFib?

4       A.   I see a significant number.  That's the majority of my

5  practice, I would say, is patients with atrial fibrillation.

6       Q.   Are you specifically board certified in

7  electrophysiology?

8       A.   I am board certified in electrophysiology.

9            I was previously board certified in internal medicine

10  and in general cardiology.  I did not recertify in internal

11  medicine.  My recertification for cardiology lapsed last year.  I

12  have yet to recertify.

13           I plan on doing that, but, again, the majority -- not

14  the majority, almost exclusively my practice is in the field of

15  electrophysiology, and that's where my focus is.

16      Q.   Do you know approximately how many board-certified

17  electrophysiologists there are in this area?

18      A.   In New Orleans proper -- I was trying to think about

19  this the other day -- I think there are about 12 of us.

20      Q.   Do you all go to meetings on occasion and go to

21  conferences?

22      A.   We have our national meetings.  We have a local or

23  regional meeting that we also do with EPs where we meet with the

24  various institutions we've talked about further.

25           And what we used to do is a great program where we'd

**OFFICIAL TRANSCRIPT**

1  bring fellows from all the different programs and we'd do
2  teaching, because you get exposed to one set of faculty and it's
3  nice to be exposed to other sets of faculty.  So we talked about
4  bringing that back into the fold as well.
5      Q.    Without getting into the details, at these conferences
6  and meetings do you all talk about current practices in your
7  area?
8      A.    Yes.
9      Q.    Do you talk about current literature and medications?
10     A.    We do.
11     Q.    Procedures that you use?
12     A.    Yes, we do.
13     Q.    So as you testify here today, are you going to use all
14  of that experience and knowledge to explain to the jury your
15  opinions about Mrs. Orr's care, her use of -- and her doctor's
16  prescription of Xarelto and the other related issues?
17     A.    I do.  Just to add, we do this amongst the different
18  hospitals, but as the section head for EP, and as the training
19  program director, I'm mandated to stay up to date -- not only
20  stay up to date, but to lead the physicians in the group staying
21  up to date on the science in this area.  We have -- I don't have
22  a choice.
23          So as the leader for the group, you set the tone.
24  We're responsible for training the next generation of
25  electrophysiologists.  This is something that we do, meet with

1  other hospitals, but we do this as a group weekly.  We have

2  weekly -- two weekly conferences where our group, our six

3  electrophysiologists, and our fellows meet and discuss cases,

4  discuss journal articles, discuss concepts.

5      Q.    So based on all of those discussions and your

6  leadership responsibility, are you aware of whether other doctors

7  in your specialty prescribe Xarelto and other DOACs as well as

8  Coumadin?

9      A.    Yes.  This is something that -- in the field of

10 electrophysiology, this is a medication that we have become very

11 comfortable with.

12          And we're going to talk about this later, but I look at

13 these medications, the oral -- the novel or direct oral

14 anticoagulants as game-changers for my practice and the practice

15 of electrophysiology.

16     Q.    All right.  In addition to your kind of administrative

17 responsibilities, tell us approximately how much of your week is

18 spent actually with patients.

19     A.    Well, technically, I'm supposed to be 80 percent

20 clinical.  This last year I went from 90 percent clinical to

21 80 percent clinical.  That's technically.

22          It doesn't work out that way because they -- when they

23 give you administrative responsibilities, they don't take away

24 clinical responsibilities.

25          And so my responsibilities are the same as everyone

**OFFICIAL TRANSCRIPT**

1   else's responsibilities in the group.  I just have the

2   additional.

3           So I would say 90 percent of my time is spent clinical

4   doing this, and 10 percent is leading meetings, seeing what is

5   going on.

6       Q.   Let's talk about that for a moment.

7           Do you see patients who have atrial fibrillation and

8   other heart rhythm issues one on one anymore?

9       A.   All the time.  This is the -- this is the sea that I

10  live in.  These are my patients.

11      Q.   Do you also do procedures for some of those patients?

12      A.   Yes, ma'am.

13      Q.   What type of procedures do you do?

14      A.   The procedures that I perform -- so there is ones that

15  are very -- more -- more straightforward.

16          Cardioversion, which is where you shock the heart back

17  into normal rhythm to reset it.  And that's often done by general

18  cardiologists, not just specialists.

19          There is pacemakers and defibrillators where you plant

20  devices underneath the skin to help modulate rhythm disorders.

21  There are some general cardiologists, not in my practice, who do

22  that.  That's more of a specialist.

23          And then there is the ablations, where we go in and we

24  try to map the abnormal heart rhythms, figure out where they are

25  coming from, and cauterize the hot spots to prevent them from

**OFFICIAL TRANSCRIPT**

1    occurring.

2            That's exclusively an electrophysiologist.

3        Q.   Because of your interest in these areas, have you

4    written papers specifically about the treatment of AFib and other

5    heart rhythm issues?

6        A.   I have.

7        Q.   All right.  Did we pull out just a few of your

8    publications?

9        A.   I believe so.

10        Q.   And are these selections from peer-reviewed journals

11    that you've published?

12        A.   Yes, ma'am.

13        Q.   We don't need to go into the details, but just so the

14    jury understands, *Atrial Fibrillation, Current Perspective*, 2009,

15    was that published in a peer-reviewed journal?

16        A.   Yes.

17        Q.   What about the next one, *Anticoagulation Strategies in*

18    *Atrial Fibrillation*, 2012?

19        A.   Yes.

20        Q.   All right.  And the last one, *Atrial Fibrillation of*

21    *the 21st Century, a Current Understanding of the Risk Factors and*

22    *Primary Prevention Strategies*, 2013?

23        A.   Yes.

24        Q.   And all of the work that you did in putting these

25    papers together, in addition to your regular work with patients

**OFFICIAL TRANSCRIPT**

1  and your teaching and your study and review of the literature --

2  do all these things contribute to the opinions that you are going

3  to share with this jury today?

4      A.   Yes.

5      Q.   Doctor, as we go through these questions, will you

6  testify to a reasonable degree of medical certainty for all your

7  opinions?

8      A.   Absolutely.

9      Q.   And more importantly, is everything you're going to say

10 here in the courtroom about how -- your beliefs about Xarelto and

11 the other DOACs and how to treat a patient with AFib, is it going

12 to be consistent with how you practice medicine out in the

13 community every day?

14     A.   Absolutely unequivocally.

15     Q.   Doctor, in your practice, do you prescribe Xarelto?

16     A.   I do.

17     Q.   Do you prescribe warfarin or what's also known as

18 Coumadin?

19     A.   I do.

20     Q.   Do you prescribe Pradaxa?

21     A.   I do.

22     Q.   And Eliquis?

23     A.   I do.

24     Q.   Do you prescribe Savaysa?

25     A.   I specifically have not.  I have one patient that I

**OFFICIAL TRANSCRIPT**

1    share that someone else put on Savaysa.

2        Q.    In prescribing these medications, have you become

3    familiar with their labels --

4        A.    Yes.

5        Q.    -- and the information for doctors.

6              Have you also become familiar with studies and

7    published literature regarding Xarelto and the other DOACs?

8        A.    I think it's critical to have a complete understanding

9    and awareness.

10             As an electrophysiologist, the challenging patients end

11   up coming to me -- to us for decisions about anticoagulation,

12   whether to put them on a blood thinner or not, and, I think that

13   you owe it not only to the people we are training but to our

14   patients to have a complete understanding and awareness of this.

15       Q.    Do you also keep up with what is referred to as

16   post-marketing studies or real-world studies?

17       A.    I do.

18       Q.    Can you briefly tell the jury what those mean, kind of

19   in contrast to clinical studies?

20       A.    Yes.  So usually you start with a big trial, lots of

21   patients, and they are enrolled -- and these are -- and it is

22   important because these are landmark trials, but they are done in

23   a more rigorous setting.  So a patient shows up, they are put on

24   medications, they are followed more rigorously than they are in

25   the real world, and they show up for follow-up appointments more

**OFFICIAL TRANSCRIPT**

1  often.

2          So it is doesn't -- what I always counsel our trainees,

3  or our fellows, is these are important studies but you have to

4  see how the medication, or whatever the intervention is, plays

5  out when it comes into the real world.  Because the real world is

6  messier.  You don't have clean indications.  There are challenges

7  with patients who don't always follow up like they are supposed

8  to.

9          So you have to see how it plays out in the real world.

10  So I think the role of real-world registries is to see is it

11  playing out like it played out in the big trials.

12          And I think you have to be careful, because there are a

13  lot of registries out there, and you have to be able to look --

14  you have to be disciplined about what message you are taking away

15  from the registries, I think.

16     **Q.**   Have you become familiar and reviewed post-marketing

17  studies which look at Xarelto?

18     **A.**   I have.

19     **Q.**   And did you become familiar with the studies and -- the

20  clinical studies, these post-marketing studies and the

21  literature, after we asked you to be an expert or before?

22     **A.**   No, this -- again, this is my -- this is my area where

23  I need to know exactly what is going on.  We are training other

24  people.  I give talks on this at meetings.  And so my

25  appreciation of the literature started before I was approached

**OFFICIAL TRANSCRIPT**

1    about this.  And if I wasn't -- honestly, if I didn't feel that

2    my opinion was going to be something that was consistent with

3    them, I would just -- I wouldn't have been involved.

4            So my opinion was -- has been fleshed out more since

5    getting involved in this, because I've done more reading and I've

6    done reading in areas that I don't necessarily -- you know, this

7    is a new venue for me.  I have never done anything like this.

8    But my appreciation and awareness of the science and how it

9    affects my patients -- this is something that I have been doing

10   and I do all the time.

11       Q.    Is that why you agreed to be an expert witness in this

12   case?

13       A.    I did.

14       Q.    You told us you've never testified in court before, but

15   have you ever worked on a case for a court?

16       A.    I have.  I was appointed as an expert by Judge Fallon

17   for the Propulsid case that was looking at a medication that can

18   prolong an interval called the QT interval.

19       Q.    In this instance, did we ask you to review all of the

20   medical records and any literature or the studies that you wanted

21   to, to come to some conclusions about Mrs. Orr's medical

22   treatment?

23       A.    Well, I was asked to -- I was asked to review the

24   records.  And I was given -- there was a give-and-take.

25   Sometimes somebody would give me something to review, and

**OFFICIAL TRANSCRIPT**

1   sometimes I would ask, Hey, this is something -- you know, you

2   guys have access to a compendium that I would love to have.  I

3   mean, it's great.  I could -- you know, if I'm reviewing a study

4   and decide I would really like to see the citation, I can just

5   send an e-mail out and a half-hour later I'm getting that.  I

6   would love for that to continue when this is done.

7          But in terms of asking to form a conclusion, I formed

8   my own conclusions on this.

9      Q.   Did you also review deposition testimony in this case?

10     A.   I did.

11     Q.   And are you prepared today to give your opinions on the

12  risks and benefits on Xarelto?

13     A.   I am.

14     Q.   Are you prepared to testify to this jury about

15  Mrs. Orr's AFib condition and whether Xarelto was a safe and

16  effective and appropriate medication for her?

17     A.   I am.

18     Q.   And are you prepared to testify about the Xarelto label

19  and whether there's sufficient information in there to give

20  clinicians like yourself the information they need to safely and

21  effectively prescribe Xarelto for their patients?

22     A.   I am.

23     Q.   Most specifically, are you prepared to opine and

24  explain to the jury whether an instruction on the use of a PT

25  test in emergency situations would be helpful to clinicians and

**OFFICIAL TRANSCRIPT**

1    patients?

2         A.   I am.

3              MS. WILKINSON:  Your Honor, at this time I offer

4    Dr. Khatib as an expert in cardiology, electrophysiology, and the

5    labeling of anticoagulants.

6              MR. BARR:  Your Honor, just a brief *voir dire*.

7              THE COURT:  Okay.

8                   **VOIR DIRE CROSS-EXAMINATION**

9    BY MR. BARR:

10        Q.   Am I correct that you are intending on offering

11   opinions on the adequacy of the Xarelto label?

12        A.   If asked, yes.

13        Q.   You would agree with me, you don't have any actual

14   experience in the application of the federal regulatory scheme as

15   to drug labels, correct?

16        A.   Correct.

17        Q.   You aren't an expert in how those regulations apply to

18   drug labeling, correct?

19        A.   Correct.

20        Q.   You have no actual experience with the FDA --

21        A.   Correct.

22        Q.   -- correct.

23             You don't have an understanding of what the

24   regulatory -- regulations of the United States government mandate

25   be in the label, do you?

**OFFICIAL TRANSCRIPT**

1    **A.**   I don't claim to be an expert in that.  I'm learning
2  about it as we go through this, but by no means am I an expert in
3  that.

4    **Q.**   Okay.  You're not intending on offering any opinions on
5  how those regulations apply to labeling, correct?

6    **A.**   In terms of -- I'm sorry.  I'm not understanding.

7    **Q.**   There are regulations that control a drug label.  You
8  understand that, right?

9    **A.**   Yes.

10    **Q.**   You understand there are regulations that mandate what
11  needs to be in a label, correct?

12    **A.**   Yes.

13    **Q.**   And you're not intending on offering any opinions on
14  how those regulations apply to labels, correct?

15    **A.**   No.

16        MR. BARR:  Your Honor, I have no objection to him as
17  long as he doesn't get into regulations and how those regulations
18  apply to labeling.  If he is talking just as a clinician, what he
19  understands, no objection.

20        THE WITNESS:  I have no interest in doing that.

21        MS. WILKINSON:  He is not going to do it, then,
22  Your Honor.

23        THE COURT:  Okay.  We'll accept him in the designated
24  fields.

25        MS. WILKINSON:  Thank you.

**OFFICIAL TRANSCRIPT**

```
 1                    DIRECT EXAMINATION
 2   BY MS. WILKINSON:
 3        Q.   Doctor, when we were discussing your testimony, did you
 4   say that it would be easier for you to explain to us how the
 5   regular heart works and the rhythm if you could draw it on a
 6   board?
 7        A.   Yeah.  That's normally how I do it with my patients.
 8   It would be easier for me, as opposed to doing it on a dry slide
 9   deck.
10             MS. WILKINSON:  Your Honor, may I have permission to
11   move this towards the jury and let the doctor step down?
12             THE COURT:  Sure.  Yes.
13             MS. WILKINSON:  Doctor, speak slowly but loudly because
14   the court reporter has to get down every word that's said.
15             THE WITNESS:  I get that a lot.
16             THE COURT:  You can use one of those microphones, if
17   you'd like.
18             THE WITNESS:  Thank you.
19   MS. WILKINSON:   (CONTINUING)
20        Q.   I'm going to put these here, Doctor.
21             And I know you are used to teaching without any
22   questions, but so that the jury can understand, I'm going to slow
23   you down a little bit by asking you to start, and we're going to
24   ask you some follow-up questions to make sure we understand.
25        A.   Okay.  I actually prefer questions.  I would rather
```

**OFFICIAL TRANSCRIPT**

1   they were able to --

2       Q.   Well, they are not allowed to --

3       A.   I know.  I'm -- I encourage interaction, but I've been

4   told that that's not an option.

5       Q.   It's not in the rule book.

6            So if you could start first just by telling us how the

7   normal heart rhythm works.

8       A.   Sure.  Okay.

9            And some of this you guys have probably already heard.

10  When I talk to patients, I tell them to bear with me because

11  sometimes there's gaps in understanding and I don't want there to

12  be any gaps.

13           And so I'm going to start by drawing the four chambers

14  of the heart.  Okay?

15           This is the right side of heart (indicating).

16           This is the left side of the heart (indicating).

17           So we're looking like this (indicating).  I'm looking

18  at you like this (indicating).

19           And you have to think about -- before we talk about the

20  way the wiring is done, we have to think about what the heart is

21  trying to do.  Okay?

22           And so the blood goes from the right side of the heart

23  and it goes into the lungs.  It gets oxygenated in the lungs,

24  comes back in the left upper chamber, goes out to the left lower

25  chamber, and then out to the rest of the heart.

**OFFICIAL TRANSCRIPT**

 1          Okay.  Now, the upper chambers, or the atria, are
 2   really conduits; they're pumps.  Their goal -- they're not pumps,
 3   they're conduits, and their goal is to dump the blood into the
 4   lower chambers.
 5          The lower chambers are the main pumps.  Okay?
 6          So the lower chamber on right pushes the blood to the
 7   lungs.
 8          The lower chamber on left pushes the blood out to the
 9   rest of the heart.
10          So the atria, the upper chambers, again, their function
11   is to dump the blood down here (indicating).
12          Then the blood is down here and then it goes out
13   (indicating).
14          Okay?  It's a beautiful symphony.  It works
15   beautifully.
16          And the way your internal rhythm does this is the
17   following:
18          So we have an internal pacemaker called the sinus node.
19   This is the drummer for the band.  Okay?  It's connected to the
20   brain by two sets of reflexes, the sympathetic and the vagal.
21   And it will pick up while you're exercising and sleeping, and it
22   will slow it down while you're -- it will pick up while you're
23   exercising or anxious, and it will slow it down while you are
24   sleeping.  All right?
25          And if everything goes very smoothly, you get a nice,

1    organized signal through the upper chambers.  The upper chambers

2    squeeze in a concerted way to get the blood down to the lower

3    chambers.  And then the signal gets to the lower chambers through

4    what we call the AV node.

5            And so everything goes bum-bump, bum-bump, bum-bump,

6    and you get this nice organized contraction that allows for the

7    blood to move efficiently and smoothly.

8            Is that -- I know you're not supposed to answer but

9    does it sort of make sense?

10        Q.    No.  No, don't do that.

11        A.    Okay.  Sorry.

12        Q.    Now -- okay.

13        A.    So when you have atrial fibrillation, instead of the

14   upper chambers beating in a nice, organized manner, they are just

15   quivering all over the place.

16           So instead of seeing this in the upper chambers

17   (indicating), what you're seeing is they are going all over the

18   place (indicating).  They are quivering all over the place.

19        Q.    Just to be clear, that's atrial fibrillation?

20        A.    Yes, ma'am.

21        Q.    Okay.  Tell us what is going wrong with that.

22        A.    So when that happens, there are a couple of problems.

23           One, the blood now does not move as efficiently.

24   Because you are not getting that concerted squeeze, not as much

25   blood in every beat gets to the main pumps to send the blood out.

**OFFICIAL TRANSCRIPT**

```
 1   Okay?  So this can result in people feeling very poorly -- and
 2   we'll get into that a little bit more.
 3           The most challenging thing with atrial fibrillation,
 4   the biggest concern we have, is with stroke.
 5           Now, what happens, instead of these upper chambers
 6   beating in a nice, organized manner with the blood just -- with
 7   the upper chambers just quivering, the blood pools up there, it
 8   sits there.
 9           And there is a specific area called the left atrial
10   appendage, which is little sock-like area where the blood clots
11   tend to form.  So if the blood pools and it sits there, blood
12   clots can form.
13           THE COURT REPORTER:  Excuse me, Doctor.  I can't keep
14   up.
15           THE WITNESS:  I'm sorry.
16           MS. WILKINSON:  Slow down a little bit.
17           THE WITNESS:  I'm sorry.  I get that all the time.
18       A.   So the blood tends to pool and then blood clots can
19   form.
20           If blood clots form, if they stay here, there's no
21   challenge.
22           So yesterday I did a procedure on a patient and he had
23   a blood clot in there.  I just stood down and we're going to have
24   to talk about what we need to do next for him.
25           The problem happens when the blood -- when the clot
```

**OFFICIAL TRANSCRIPT**

```
 1   propagates.  So then if it moves from the left upper chamber to
 2   the left lower chamber and then it goes out, that's when bad
 3   things happen.
 4          And if it goes out and goes from the heart up into the
 5   brain, that's a stroke.
 6          If it goes elsewhere, into the arteries in the heart,
 7   that causes a heart attack.
 8          So when they talk about stroke, they're talking about a
 9   blood clot going up here (indicating).
10          When they're talking about a thromboembolic event -- I
11   don't know if you guys have heard that term -- what they are
12   talking about is, instead of it going up to the brain, it goes to
13   the heart or it can go to the kidneys, to your extremities.  It
14   can go multiple different places.
15   MS. WILKINSON:  (CONTINUING)
16       Q.   Doctor, we've heard about the risk of stroke associated
17   with atrial fibrillation.  One thing we would like to clear up is
18   when you're treating the patient with atrial fibrillation, and
19   you have the risk of stroke, what is the decision process that
20   you're making since you have two different diseases or risks to
21   your concern?
22       A.   Well, I'm going to go to here.
23          So it is important -- I really want to get across our
24   perspective, as an EP, what we are trying to get across to
25   patients.  And this is something that I try to do with my
```

**OFFICIAL TRANSCRIPT**

1  patients, because half the time when they see me and they're

2  coming to me for a question about atrial fibrillation, I'm not

3  changing management; I'm trying to educate and manage what we're

4  trying to do.  So I really want to try to get across what we're

5  trying to do when we see a patient with atrial fibrillation.

6       And there are two concerns primarily when you have

7  atrial fibrillation.  As we've talked about, there is stroke, and

8  then there is, what I say is quality of life.

9    Q.   What do you mean by "quality of life"?

10   A.   So we talked about how the blood does not always move

11  as -- it's not moving as efficiently, causing problems with the

12  blood getting out to the rest of the heart, and that can cause

13  significant symptoms.  So there is a wide spectrum of symptoms

14  that can occur with atrial fibrillation.

15       Half the people who have this have no idea.  They are

16  completely asymptomatic.  Half the people who have this can feel

17  poorly with it.  And that can be anything from palpations, where

18  they feel their heart racing, to shortness of breath, dizziness,

19  fatigue, or Frank congestive heart failure where the fluid builds

20  up in the rest of body.

21       And there is a wide course of spectrum to this.  And

22  I'm going to come back and talk about what we do here, but the

23  first order always to address is stroke.

24   Q.   Why?

25   A.   Because this is the most -- to me, the most clinically

**OFFICIAL TRANSCRIPT**

1    devastating thing that can occur in a setting of atrial

2    fibrillation.  When I see patients and we talk about this, a lot

3    of them tell me that they would rather die than have a stroke and

4    be disabled or whatnot.

5              And so the primary fear people have with atrial

6    fibrillation, and the thing that they want to talk about often,

7    the most, is stroke.  And so I usually have 20 minutes get a lot

8    of information in, and this, to me, is the most important part,

9    the stroke part.  So I start with talking about the stroke part,

10   and then I say we're going to come back and talk about what we do

11   about the quality of life.  Because if we don't address the

12   stroke, we can't address the quality of life, and I'll get into

13   that in a little bit, if I have time.

14        Q.   Doctor, let's do this.  Why don't you go back up so we

15   can talk about these issues.

16        A.   Okay.

17        Q.   And we both will have a microphone.

18        A.   Sure.

19        Q.   So keeping this lovely drawing in mind, tell us what

20   options you have for treating your patients with AFib when you

21   are first dealing with the stroke risk.

22        A.   Okay.  So the options are what we call anticoagulants,

23   and that includes warfarin or the direct oral anticoagulants,

24   which include Pradaxa, Xarelto, Eliquis, and Savaysa, and the

25   lesser or less strong one would be asprin.  So we can make a

**OFFICIAL TRANSCRIPT**

1  decision to put someone on asprin or we can make the decision to

2  put someone on something stronger.  And when I talk to people, I

3  say we have to weigh the risks and benefits.

4         Anticoagulants, by nature, they're designed to prevent

5  the clots from forming.  They're thinning the blood.  They're

6  going to put you at higher risk for bleeding.  That's the nature

7  of what they are trying to accomplish to prevent stroke from

8  occurring.

9     **Q.**   True for all of those anticoagulants?

10    **A.**   For all anticoagulants and aspirin as well.  There is a

11  risk of bleeding from aspirin.

12         So the question is when do -- so when we're talking to

13  patients, it's risks and benefits.  We're always weighing the

14  risks and the benefits of any approach that we're going to take.

15  Okay?

16         So when do the risks of stroke outweigh the -- or when

17  are the risks of bleeding outweighed by the risk of stroke or

18  vice versa.  All right?

19         And so the question -- when I talk to a patient, I say,

20  It really depends on your underlying risk of stroke.  If your

21  underlying risk of stroke is low, then you don't need the

22  stronger blood thinners.  And if your underlying risk of stroke

23  is high enough, then the benefits of being on the blood thinners

24  outweigh the risks that we see with the stronger blood thinners.

25         And this is what the majority of evidence -- and we

**OFFICIAL TRANSCRIPT**

1    have guidelines that help inform us in this decision.  And so

2    I'll say, This is your -- we have to talk about your underlying

3    risk of stroke.

4         And when we talk about that, we use something called

5    the CHADS-VASc.

6    **Q.**   And we're going to get to that in the context of

7    Mrs. Orr, so maybe we could leave that there and we'll get into

8    it with regard to her specific symptoms.

9    **A.**   Okay.

10   **Q.**   Once you've dealt with the stroke risk, how do you

11   address the quality of life?

12        And would it help if I put up that EKG chart you had?

13   **A.**   Sure.

14   **Q.**   So let's start with this.

15        Tell us --

16   **A.**   If we go back to that one, what I want to show you --

17   so the normal one first.

18        You see there is a -- I don't have a pointer, huh?

19   **Q.**   I'll get you one.  Hold on a second.

20   **A.**   When you have that -- when the upper chambers are

21   beating in a nice, organized manner, they're all summating at the

22   same time, you're going to actually see an electrical blip, an

23   earthquake big enough to actually make a difference on the

24   baseline.

25   **Q.**   Excuse me, Doctor.  Let me give you this.

**OFFICIAL TRANSCRIPT**

1    **A.**   So that's what we call the P-wave.  And that's this
2    little blip right here and this little blip right here
3    (indicating).

4           Then when it gets down to the main chambers, the main
5    chambers are bigger pumps.  You get this (indicating).  And that
6    is why this is bigger than these little ones (indicating).

7           When you have atrial fibrillation and those upper
8    chambers are quivering all over the place, you don't get that
9    summation because they're not working together.  So there is not
10   one loud roar, it's all a dull kind of thing.

11          So you have a baseline.  Instead of seeing this nice,
12   silent baseline and then a beep, you get this wavy baseline
13   because they are just going crazy.

14          Now the lower chambers now are no longer beating in a
15   nice, organized manner.  Here there's a nice organization where
16   there -- I can tell people you can play music to it.

17          Now here what you see is there is an irregularity to
18   the lower chambers.  So this is one interval (indicating).  This
19   is another interval (indicating).  So they are kind of all over
20   the place.

21   **Q.**   I'm going to share Mrs. Orr's EKG that you want to use
22   as an example.  Let me get the exhibit so I can mark it and give
23   a copy to them.

24   **A.**   Sure.

25          MS. WILKINSON:  So it's going to be DX-Orr 43 at 279.

**OFFICIAL TRANSCRIPT**

1           And I'm going to mark that, Your Honor, as DTX 40 and
2   offer it into evidence.
3           MR. BARR:  No objection.
4           THE COURT:  Let it be admitted.
5   MS. WILKINSON:  (CONTINUING)
6       Q.  I'm going to give you a copy, Doctor, but I'm going to
7   flash it up on the screen so it's easier to discuss.
8           First, tell us what this is.  And I don't have it
9   highlighted so maybe you can put your pointer up there and tell
10  us when this EKG was done.
11      A.  Sure.  This was an EKG -- and, again, this is what I
12  mean by in the real world versus clinical setting.  It is not
13  uncommon for me to get a copy like this and asked to make a
14  comment on it.  It's a reproduction and it is a little more
15  grainy than we will often see.
16          But I think what you can appreciate is -- again, you
17  remember on that prior one where you had the nice summation?  You
18  can see the P-wave as opposed to the atrial fibrillation where
19  you have the baseline that is really wavy.  And if you look here,
20  that baseline again is really wavy (indicating).
21          And I wish I had a picture of normal rhythm where you
22  could play music with what the lower chambers are doing, beating
23  in a nice, regular manner.  But what you can appreciate here -- I
24  hope you can appreciate is that they are not regular
25  (indicating).  There is an irregularity to what the lower pumps

**OFFICIAL TRANSCRIPT**

1    are getting from above, and, therefore, contracting.

2         So there is this interval, this interval, and all of a

3    sudden it's shorter for a little bit, it's longer here, longer

4    here, shorter, longer, longer, shorter (indicating).  It's all

5    over the place.

6    Q.   So in 2011, when Mrs. Orr had this EKG, do you agree

7    with Dr. St. Martin's decision to prescribe her an anticoagulant?

8    A.   I absolutely do.

9    Q.   Why is that?

10   A.   Because, if we look at her risk factors for stroke, her

11   risk factors for stroke warranted anticoagulation based on the

12   data that we have, including the guidelines that we have.

13   Q.   Let's look -- did you make a list of the quality of

14   life and the risk factors that someone like Mrs. Orr faces when

15   she is diagnosed with atrial fibrillation?  The consequences I

16   think you call it.

17   A.   I made a list in general of what can be the impact.  So

18   if someone gets diagnosed with atrial fibrillation, what are we

19   concerned about?

20        Again, there is the impact on the quality of life.

21   Half the people are asymptomatic, have no idea, and then half the

22   people feel it.

23        And when people ask me, What am I supposed to feel, I

24   tell them, I'm not going to tell you because the spectrum is so

25   wide in terms of what you can feel.

**OFFICIAL TRANSCRIPT**

1          There is an increased risk of death.  This association
2  remains an area of investigation and research, and this is seen
3  when your heart function is actually low.
4      **Q.**   And so we have it, it's a 50- to 90-percent increased
5  risk of death?
6      **A.**   Yes.  And particularly when your heart function is
7  lower.
8          And then there is a fivefold or 500 percent increased
9  risk of stroke.  So right off the bat, if one of us goes into
10 atrial fibrillation, our risk of stroke goes up fivefold.
11         And how much that is depends on our risk factor profile
12 for a stroke to begin with.
13     **Q.**   Let's start by focusing more on Mrs. Orr's records that
14 you pulled up.
15         MS. WILKINSON:  Let's look at DX-Orr 181 at 5131.
16         And we'll mark that as DTX 41 and offer it into
17 evidence.
18         MR. BARR:  No objection.
19         THE COURT:  Let it be admitted.
20 **MS. WILKINSON:  (CONTINUING)**
21     **Q.**   All right, Doctor.  This is one of the medical records
22 that was in Mrs. Orr's file describing her symptoms on
23 April 29th, 2011.
24         Tell us why these are important to you as someone who
25 deals with patients like Mrs. Orr who have atrial fibrillation.

**OFFICIAL TRANSCRIPT**

1    A.    Well -- so this is a common way that someone will

2 present with atrial fibrillation.  They will show up with --

3 again, half of them will show up with symptoms.  And so this --

4 Mrs. Orr in this case is presenting with shortness of breath and

5 evidence of having congestive heart failure.

6        Congestive heart failure is the heart is not able to

7 meet the demands of what the body is asking for.  When that

8 happens, the fluid tends to build up.  It can build up in your

9 lungs and legs.  It can manifest as having shortness of breath

10 because you can't deliver the needs to the rest of the body.

11    Q.    Did Mrs. Orr -- in her file, does it show that she had

12 symptoms and consequences of -- adverse consequences associated

13 with congestive heart failure?

14    A.    She had symptoms in terms of -- I don't know how to --

15 adverse consequences.  She had congestive heart failure.

16    Q.    Okay.  I'm going to skip this next one because you

17 talked about it.

18        At the time in -- before 2011, we've heard that

19 warfarin was the only anticoagulant available; is that right?

20    A.    I'm painfully aware of the fact that it was.

21    Q.    And tell us what the benefits and drawbacks are of

22 warfarin, in your opinion.

23    A.    So I want to say first warfarin is an important

24 medication.  It's probably the medication that I've prescribed

25 the most in my life because that was the only option for the

**OFFICIAL TRANSCRIPT**

1    longest time.

2          So when somebody had atrial fibrillation, we -- and

3    they had risk factors for stroke, we told them, Look, you need to

4    be on warfarin.  So there wasn't many options.  And there still

5    are times now where we end up using warfarin.

6          The problem is the challenges with warfarin.

7          And I don't know if you have -- if any of you are

8    familiar with people who have been on Coumadin, but when someone

9    comes to see me and if I say the word "Coumadin," I can tell

10   whether they've had family members or themselves been on it

11   because they'll just start shaking their head no, no, no.  They

12   don't want to be on it.

13         There are significant challenges with this medication.

14   Again, it is safe and it's effective, but there are challenges

15   that you have with it.  And in particular, the variation on the

16   levels that you see with Coumadin can occur on multiple levels.

17         So food, dietary, can push the levels up or down into

18   levels that are no longer therapeutic or they're too high.

19   Q.    What do you mean by individual differences?

20   A.    Individual differences -- so if I put you on

21   5 milligrams of Coumadin (indicating) and you on 5 milligrams of

22   Coumadin (indicating), I have no idea what the impact is going to

23   be.  It could be very different in terms of how that ends up

24   impacting you.

25   Q.    Meaning two identical -- or similar patients --

**OFFICIAL TRANSCRIPT**

1    **A.**   Two similar people --

2    **Q.**   -- you wouldn't know if that dose would work --

3    **A.**   So if I put you on 5 milligrams, I have no idea what

4    your level of INR is going to be.  It's too hard to predict.

5    **Q.**   What about drug interactions?

6    **A.**   Not only on a person to person can there be variations,

7    but so many things -- not just the food, but drugs can push your

8    levels up and down.

9         And it's levels with drugs that are very commonly used.

10   So if you get a pneumonia and you end up on an antibiotic, that

11   could push your level way up or way down.

12        And you have to be very diligent about the monitoring

13   with this medication.  So the key with this medication, as

14   opposed to other blood thinners like aspirin or Plavix, is you

15   have to do the monitoring.  You have to keep a close, tight eye

16   on it because there are such significant variations and not

17   everyone is fully aware of the variations.

18        So you have a challenge where there's a drug with a lot

19   of variations and people don't always appreciate those

20   variations.  You can get into a lot of trouble with it being too

21   high or too low.  And that's why you have to do the constant

22   monitoring with these medications.

23   **Q.**   In 2010, did an alternative medication to address the

24   risk of stroke with a patient who had atrial fibrillation come

25   onto the market?

**OFFICIAL TRANSCRIPT**

1      **A.**   Yes.

2      **Q.**   Are you familiar with Pradaxa?

3      **A.**   I am.

4      **Q.**   And, subsequently, have other DOACs or new oral

5   anticoagulants come on the market?

6      **A.**   Yes.  So if you review the literature before these

7   medications came to market, there has been a history since the

8   '50s of trying to find alternatives to warfarin that would be

9   effective without the challenges that we're seeing.

10           And so when these medications first came out -- you

11   know, every article that you read has an introduction to try to

12   give you context.  And the articles all state there has been a

13   need for newer medications, and this has been decades of

14   research.

15           And there have been other attempts at medications where

16   they had some promise, but they just did not stand up to the

17   level of scrutiny and were not approved.

18           And so these were the first classes of medications that

19   actually stood to the level of scrutiny and have continued to

20   stand to the level of scrutiny in terms of their safety and

21   efficacy.

22      **Q.**   Let's focus first on Pradaxa, if we could, because the

23   first medical record on -- that you've pulled out of Mrs. Orr's

24   file is about her first prescription on April 30th, 2011.

25           What anticoagulants were available to Dr. St. Martin

**OFFICIAL TRANSCRIPT**

1  back in early 2011 for Mrs. Orr?

2       A.   Pradaxa was --

3            MR. BARR:  Your Honor, Ms. Wilkinson's misstating the

4  record just a little.

5                           (Attorneys conferring.)

6            MS. WILKINSON:  Oh, I'm sorry.  He is right.  Thank

7  you.  It's not Dr. St. Martin who did the first prescription.

8  Sorry about that.

9            Thank you.

10 MS. WILKINSON:  (CONTINUING)

11      Q.   The doctor who was seeing her in 2011, what medications

12 did he have to choose from?  You said Pradaxa --

13      A.   Pradaxa and warfarin.

14      Q.   -- or warfarin, right?

15      A.   Uh-huh.

16      Q.   Let's take a look at her record, which is DX-Orr 43 at

17 344.

18           MS. WILKINSON:  And we're going to mark that as DTX 42,

19 Your Honor, and offer it into evidence.

20           MR. BARR:  Okay.

21           THE COURT:  Let it be admitted.

22 MS. WILKINSON:  (CONTINUING)

23      Q.   Doctor, tell us what this medical record indicates.

24      A.   This indicates that the decision was made to place her

25 on anticoagulation, and they specifically chose Pradaxa at

**OFFICIAL TRANSCRIPT**

1  150 milligrams twice a day.

2      Q.   Now, you've prescribed patients Pradaxa, right, you

3  told us?

4      A.   I do.  I use it less than Xarelto and Eliquis.  And I

5  don't, again, use Savaysa at all.

6      Q.   Tell us why you use Pradaxa less than the others.

7      A.   I think there are more challenges with the utilization

8  of Pradaxa.  In particular, it's coded on a tartaric acid core to

9  help its absorption.

10      Q.   What is that?  With not too much explanation, just tell

11  us what that means or why it's troubling.

12      A.   So the way Pradaxa gets absorbed from the stomach, it

13  requires it to be more acidic.  And so there is an acidic core to

14  it, and that acidic core helps it with absorption but it also

15  causes more problems in terms of reflux and bloating.

16          So the studies have shown that 1 in 5 had significant

17  problems with this.  In my practice, probably it is higher.  I've

18  seen higher than that.

19      Q.   Did you find a record in Mrs. Orr's medical records

20  that showed she indeed had similar problem with Pradaxa?

21      A.   Yes.  And I believe her problems preceded the

22  initiation of the Pradaxa.  So she had reflux at baseline from my

23  review of the --

24      Q.   Does that mean Pradaxa could have exacerbated those

25  problems or do you even know?

**OFFICIAL TRANSCRIPT**

```
 1        A.    It could have.  There is no way to know.

 2             What I tell people when they tell me they have that

 3    problem -- I say it may exacerbate it, it may not.  The presence

 4    of reflux does not mean they are not going to tolerate the

 5    medication.

 6             MS. WILKINSON:  We are going to take a look at

 7    DX-Orr 38 at 130 and mark that as DTX 43 and offer that into

 8    evidence.

 9             I'm sorry, Your Honor.  It is already in as DTX 34.

10             MR. BARR:  Okay.

11             THE COURT:  Okay.

12    MS. WILKINSON:   (CONTINUING)

13        Q.    Let's take a look at that, if we can.

14             Tell us what that record indicates, Doctor.

15        A.    I believe this is Dr. St. Martin now.  I can't read it.

16             THE COURT:  Look right there (indicating).

17             THE WITNESS:  Oh, right here.

18        A.    Yep, Dr. St. Martin.

19             I didn't realize I had this.

20             And so he's indicating that Mrs. Orr has complaints of

21    worsening acid reflux, and so at this time he was recommending

22    switching over to Xarelto, 20 milligrams a day.

23             It says 10 milligrams.  That moniker right there is two

24    tablets (indicating).

25             So 20 milligrams a day.  And to try this for a month.
```

**OFFICIAL TRANSCRIPT**

1    MS. WILKINSON:   (CONTINUING)

2        Q.   Now, did you see -- or were you able to calculate

3    Mrs. Orr's risk of stroke using the CHADS-VASc score that you

4    told us about?

5        A.   Yes.

6            MS. WILKINSON:  Let's take a look at the next

7    demonstrative, if we could.

8    MS. WILKINSON:   (CONTINUING)

9        Q.   And tell us, in April of 2011, what was Mrs. Orr's risk

10   of stroke and how did you and her doctors calculate that?

11       A.   So the CHADS-VASc has -- it's a classification system.

12   You get a point if you have congestive heart failure.  You get a

13   point if you have high blood pressure.  You get one point if

14   you're 65.  Two if you're over 75.  You get a point if you're

15   diabetic.  You get two points if you've had a prior stroke.  You

16   get a point for having a prior heart attack or evidence of

17   peripheral vascular disease.  And you get a point for being a

18   woman.

19           Those are risk factors for stroke in this setting.

20           And so she had at this time, at her initial diagnosis

21   of atrial fibrillation, a CHADS-VASc of 4.

22       Q.   Is there any doubt in your mind, Doctor, that, in April

23   of 2011, Mrs. Orr should have been on an anticoagulant?

24       A.   No.  I feel very strongly that her risk profile

25   warranted -- her risk for stroke per year was 4 percent per year

**OFFICIAL TRANSCRIPT**

1  if she was not on a blood thinner.  And, again, we have our
2  guidelines -- our society guidelines.
3         This is the American College of Cardiology, the
4  American Heart Association, and the Heart Rhythm Society
5  guidelines to -- these are experts in the field that are guiding
6  our management.  And there is consensus that, if you have a
7  CHADS-VASc score of 2 or more, the benefits of anticoagulation
8  outweigh the risks and you should be on anticoagulation.
9     Q.   So if a doctor -- a cardiologist came into this
10 courtroom and suggested that no reasonable physician would
11 prescribe -- or cardiologist would prescribe Xarelto to a patient
12 with a CHADS score of either 4 or 5, would you agree or disagree
13 with that?
14    A.   Well, I prescribe Xarelto and I consider myself a
15 reasonable physician, so I would respectfully disagree with that.
16         And I can tell you in the field of electrophysiology,
17 this is a medication that we are very grateful for having.
18         So I would strongly disagree with that statement.
19    Q.   Let's move forward in Mrs. Orr's medical condition --
20 because the jurors have heard a lot about it -- to the year
21 before she had her hemorrhage.
22         MS. WILKINSON:  And turn to DX-Orr 181 at 4063.
23         And I will mark that one as 43 and offer it into
24 evidence, Your Honor.
25         MR. BARR:  No objection, Your Honor.

**OFFICIAL TRANSCRIPT**

1           THE COURT:  Let it be admitted.

2    MS. WILKINSON:  (CONTINUING)

3       Q.   Now, tell us what was going on here with Mrs. Orr's

4    medical condition on February 19th, 2014.

5       A.   So this is one time when she came in to the emergency

6    room.  She was reporting significant palpitations --

7    "palpitations" means heart racing -- along with increasing

8    weakness, shortness of breath, and cough, and chest pain.

9           And so this is -- I see this as someone who is really

10   having problems with their atrial fibrillation.

11      Q.   At this time, in your medical opinion, would it have

12   been appropriate to maintain Mrs. Orr's prescription to Xarelto

13   or any anticoagulant?

14      A.   Absolutely.  I see no evidence that would indicate at

15   this time that it should be discontinued, and I feel strongly

16   that it was appropriate to remain on it at that time.

17      Q.   So you agree that Dr. St. Martin appropriately

18   prescribed Xarelto to Mrs. Orr?

19      A.   Absolutely.

20          MS. WILKINSON:  Let's take a look at that record.  It's

21   DX-Orr 424 at 151.

22          And I'll mark that and offer it as DTX 44.

23          MR. BARR:  No objection, Your Honor.

24          THE COURT:  Let it be admitted.

25   MS. WILKINSON:  (CONTINUING)

**OFFICIAL TRANSCRIPT**

1        **Q.**    Tell us about this record from February 19th, 2014,

2   Doctor.

3        **A.**    This is the same one we were...

4        **Q.**    Oh, there you go.  February 23rd, 2014.

5        **A.**    Okay.  So this was the decision to switch her from

6   Pradaxa to Xarelto at 20 milligrams a day.

7        **Q.**    And based on her difficulty with Pradaxa, do you have

8   any concern about her being switched to a 20-milligram tablet of

9   Xarelto on February 23, 2014?

10       **A.**    Well, I think ultimately she was switched to the

11  15-milligram dosing, and I think the 15-milligram dosing based on

12  her kidney function was the appropriate dosing.

13       **Q.**    Explain that to the jury, if you could, please.

14       **A.**    So Xarelto, if you look at ROCKET -- and I know you

15  guys have heard about it and we're going to go over it again, but

16  there is -- a significant amount of its clearance is through the

17  kidneys.  And if your kidneys don't work as well, more is going

18  to stay in your system and you can have higher levels in your

19  system.

20            And so with Xarelto, with ROCKET, the way they studied

21  this is they had patients on 20 milligrams unless they had kidney

22  problems.  And with certain particular kidney problems, they

23  would lower the dose to 15 milligrams a day.

24            Specifically the way that was looked at was something

25  called a creatinine clearance, which is a marker of how your

**OFFICIAL TRANSCRIPT**

1  kidneys are clearing the body's stuff, we'll say for lack of

2  another reason -- a way of using it.  And the lower that

3  creatinine clearance is, that means your kidney function is

4  getting impaired.

5     Q.   So let's turn to the label, if we could, on that exact

6  subject.  Does the Xarelto label clearly lay out the dosing

7  regimen for patients who have normal renal function and renal

8  impairment?

9     A.   Very well, yes.

10    Q.   Let's look at DTX 2, which is in evidence.

11         What is this?

12    A.   This is where they go over the dosing.  And they talk

13  about, with renal impairment, to avoid or adjust the dose based

14  on, again, the creatinine clearance.  That's the lab value we

15  were talking about.

16         And if your creatinine clearance is greater than 50,

17  then the 20-milligram daily dosing is appropriate.  If you have a

18  creatinine clearance of 15 to 50, you dose-adjust to

19  15 milligrams a day.

20    Q.   And you said there came a time when Dr. St. Martin

21  switched her to the lower dose?

22    A.   Yes.

23    Q.   Do you understand why he did that from reading and

24  reviewing the medical records and the testimony?

25    A.   It doesn't come -- I can't imagine any other reason why

**OFFICIAL TRANSCRIPT**

1    he would switch it to 15 milligrams.  There's no other indication

2    to switch it.  And so I don't remember specifically seeing him

3    say the rationale, but I think it's a fair assumption that he did

4    it because of the kidney function.

5         Q.   Okay.  Let's take a look at the record we have, which

6    is DX-Orr 24 at 242.

7              MS. WILKINSON:  And I'm going to mark that as DTX 45.

8              And offer that into evidence.

9              MR. BARR:  No objection, Your Honor.

10             THE COURT:  Let it be admitted.

11   MS. WILKINSON:  (CONTINUING)

12        Q.   What does this record from July 25, 2014, indicate,

13   Doctor?

14        A.   So Xarelto restarted a renal dose.

15             "Renal dose" to me implies 15 milligrams a day.

16        Q.   Is that consistent with the instruction in the label

17   that if you have some kind of renal impairment between 15 and 50,

18   you should be on the 15-milligram dose?

19        A.   Yes.

20        Q.   Now, when Mrs. Orr was on Xarelto, she was at an

21   increased risk of bleeding, right?

22        A.   Yes.

23        Q.   Is every patient who is on Xarelto at an increased risk

24   of bleeding?

25        A.   I think every patient who is on any anticoagulant is at

**OFFICIAL TRANSCRIPT**

1    increased risk for bleeding.  And that informs the conversation
2    we have with every patient when we talk about the risks and
3    benefits of whether to put somebody on this medication.  You have
4    to talk about the benefits and the risks.
5         Q.   One of the difficult things in this case, Doctor, is
6    that, of course, Mrs. Orr suffered a horrible brain hemorrhage,
7    right?
8         A.   Right.
9         Q.   And in the label, which we'll get to in a minute, there
10   are warnings -- or there's data, I should say, about the risk of
11   brain hemorrhages when you are on this drug, right?
12        A.   Yes.
13        Q.   And did you review a chart talking about what the real
14   risk is when someone is on that medication?  It's a pie chart.
15        A.   Yes.
16        Q.   Okay.  Let's take a look at this demonstrative.
17             And so when you are making a prescription decision for
18   a patient like Mrs. Orr, and you know she has all these other
19   risk factors, you know she needs an anticoagulant, and you know
20   that there is this -- very small but very serious risk of a
21   devastating brain hemorrhage, why is it that you think it is
22   appropriate to put a patient like Mrs. Orr on this medication?
23        A.   The -- you have to, again, weigh the risks and
24   benefits.  And it's -- Mrs. Orr had a terrible outcome.  And I am
25   appreciative that I was able to listen to Mr. Orr's testimony

**OFFICIAL TRANSCRIPT**

1    this morning.  And I am sincerely sorry for everything that

2    occurred.  I can't imagine -- I have a wife of 14 years.

3    Forty-five years, that would be tough.

4            And so it is a devastating thing that occurred, but you

5    have to put it in the context of managing a lot of people.  And

6    one bad outcome for one person, if I withhold therapy for the

7    next 99.2 percent, I'm doing them a disservice by doing that.

8        Q.    Let's talk, if we could, about Mrs. Orr's

9    hospitalizations.  You reviewed those records that show her going

10   in and out of the hospital?

11       A.    Yes.

12       Q.    We heard testimony that Mrs. Orr lived a full life.

13   You know, she didn't let any of these diseases keep her down.

14   Have you seen that with these patients that have all these

15   complications, that they are able to still function like she did?

16       A.    Yes.

17            Our goal with atrial fibrillation is to help people

18   manage their quality of life.  Again, we're talking about -- part

19   of the management of this is stroke and part of it is quality of

20   life, and so we're trying to help people with that all the time.

21       Q.    In reviewing her records, did you see that she had

22   other serious medical conditions?

23       A.    Yes.  So she had kidney problems.  She had recurrent

24   hospitalizations for heart failure.  I would tell you, in

25   particular, this hospitalization --

**OFFICIAL TRANSCRIPT**

1    Q.   Can you say that date just so we have it?

2    A.   In July of 2014 when she was admitted -- we heard

3    earlier about her being put on a breathing machine, which is life

4    support, when she came in with her bleed.  When she came in then,

5    she was admitted to the intensive care unit and she was put on

6    something called BIPAP, which is a step below the ventilator.

7            So if someone doesn't tol- -- and BIPAP is where you

8    are actually forcing the oxygen in to help them get their oxygen

9    needs.  And if that doesn't work, the next step is life support.

10   It is the ventilator.

11           And so when she came in at this time, she -- she was

12   very sick.  She was in the intensive care unit and needed

13   significant support.

14           And so I'm glad that she was able to have a good

15   quality of life and appear that she was doing well, but these

16   hospitalizations and her numbers are very telling numbers, I

17   think.

18   Q.   Let's talk, if we could, about her blood pressure.  Is

19   that something that you consider a very significant factor in her

20   medical history?

21   A.   I do.

22   Q.   All right.  Let's take look at this demonstrative.

23           And this shows, from 2006 to 2015, the records of her

24   blood pressure.  And you've laid out there what's normal and

25   what's hypertension.  Could you just briefly explain that, but

1   try to focus on what this, you know, chart of her blood pressure
2   tells you as a physician.
3       A.   So this is a -- this is where you take a step back and
4   look at the forest and not the trees.  And this is where I have
5   an opportunity, when you are reviewing records, that perhaps
6   clinicians, when you see them individually on a day, don't get
7   that data.
8           But if you look here throughout her clinical
9   evaluations, it's rare that her blood pressure is under control.
10  She not only had high blood pressure, but she had markedly
11  elevated blood pressures.
12          Now, I understand the concept of what we call
13  white-coat hypertension that Mr. Orr had brought up, and I see
14  that a lot where people are anxious when they come into the
15  hospital.  And there is sometimes a component to that, and I will
16  not overtreat that when that happens.
17          So if someone comes in with a blood pressure of 150 and
18  they have a monitor at home, and they say, I have been running
19  110s, 120s, I will ask them to bring in their monitor and
20  correlate it and see, make sure that it is working.
21          If someone has a blood pressure in the 180s, 200s,
22  that, to me, cannot only be white-coat hypertension and anxiety.
23  That is underlying problems and challenges with high blood
24  pressure.  It's not -- anxiety will push it up a little bit.
25  It's not going to get you to these numbers, I would say.

**OFFICIAL TRANSCRIPT**

1        And I think Terry Cummings, who is one of her internal
2   medicine physicians -- and she is a great physician -- had
3   brought up the concept of white-coat hypertension in her but had
4   mentioned that she had poorly controlled blood pressure.
5        So I understand the concept, but it's hard for me to
6   believe that she was adequately controlled.  I see not only
7   someone here -- and again, I can take a step back, look at the
8   forest and not the trees because we have these numbers, but she
9   not only had difficult-to-control blood pressure, but she is
10  evidencing the conditions that you see when your blood pressure
11  is not under control.  She had kidney issues.  She had heart
12  failure.  She had atrial fibrillation.
13        So it's not hard to see that.
14   Q.   Let's focus on that for a minute.  You know, there has
15  been testimony that Mrs. Orr went to work most days.  You know,
16  she was active with her grandchildren.  She was strong, as
17  Mr. Orr said.
18   A.   Yes.  I -- so --
19   Q.   So what -- how can someone like her have this very
20  difficult condition, you know, and be able to thrive like that?
21   A.   That's why we call hypertension the silent killer.
22  It's hard, when you are talking to patients in the clinic, and
23  they say, But I feel fine.  And you have to manage the blood
24  pressure.
25        So people don't feel the high blood pressure, they feel

**OFFICIAL TRANSCRIPT**

1  the complications that ultimately develop from the high blood

2  pressure.

3          But that moniker, silent killer, is used for a reason.

4  People don't feel it until it's too late.

5      Q.   What does the sustained high blood pressure do to the

6  body?

7      A.   Well, it depends on the organ system you're talking

8  about.  So --

9      Q.   What did you see it did --

10      A.   Well, for her -- so high blood pressure causes

11  challenges to multiple organs, including the kidneys.

12          And so she had evidence of kidney issues.  Now, that

13  could have been related to her diabetes also or exclusively --

14  I'm not a nephrologist.

15          The heart failure that she developed.  That is a --

16  when you have heart failure, one of the cornerstones is to get

17  the blood pressure under control, because when your blood

18  pressure is high, the resistance that the heart is trying to

19  squeeze out on is harder.  So if your blood pressure is high,

20  it's harder to get the blood out.  So you lower the blood

21  pressure to get that under control.

22          And then there is the risk of stroke or bleeds that you

23  can see when you have hypertension.

24      Q.   Did you see that Mrs. Orr's doctors tried to put her on

25  multiple medications to control her blood pressure?

**OFFICIAL TRANSCRIPT**

1     **A.**   I think she had a very challenging course in terms of

2 the management of her blood pressure.  I think if you read the

3 clinical studies, and, again, look at the forest and not the

4 trees of individual visits, this was a recurring challenge of the

5 physicians.

6     **Q.**   Okay.  Let's take a look at her record DX 412 at 13

7 that we have annotated for demonstrative purposes to talk about

8 the medications.

9           Are you familiar with this record from April 1, 2015,

10 just a few weeks before Mrs. Orr's --

11    **A.**   Yes.

12    **Q.**   -- hemorrhage.

13    **A.**   So she was on -- furosemide is Lasix.  That's a

14 medication that's designed to reduce the amount of fluid in your

15 body when you're having congestive heart failure.

16          Metoprolol and Cardizem are medications that are to

17 help reduce the blood pressure and also prevent the heart rate

18 from going too fast.

19          So when you have atrial fibrillation, we don't have to

20 get you back in normal rhythm.  If we get the heart rate under

21 control, often that is helpful.  And so they are trying to do

22 that.  But those are also blood pressure medications.

23          Clonidine, that's a medication that we don't use as

24 often.  That medication is generally reserved for when you are

25 having people that have challenging high blood pressure.  That's

**OFFICIAL TRANSCRIPT**

1   when we go to that medication.

2        So she is on one, two, three -- four blood pressure

3   medications.  Lasix will drop your blood pressure a little bit,

4   but not significantly, so maybe we'll say four and a quarter.

5        Q.   Let's focus on this April time period because it's so

6   crucial.  This is the beginning of month.  She has her bleed on

7   April -- or it begins on April 24th, right?

8        A.   Yes.

9        Q.   And did you see in her records that she was prescribed

10  another medication that has nothing to do with the conditions

11  we've talked about, on April 15th, just a few days before her

12  hemorrhage?

13       A.   Yes.  From my recollection, she had presented with

14  right shoulder pain.

15       Q.   Let's take a look at that record that is already in

16  evidence, DX-Orr 43.

17            THE WITNESS:  I can barely read that.

18            MS. WILKINSON:  Excuse me.  I guess it is not in

19  evidence.  I need to move it.

20            That's the identifier, Your Honor.  I'd move it in as

21  DTX 46.

22            MR. BARR:  No objection.

23            THE COURT:  Let it be admitted.

24  MS. WILKINSON:  (CONTINUING)

25       Q.   All right, Doctor.  Tell us what this condition is and

**OFFICIAL TRANSCRIPT**

1    what the drug is and the consequences.

2        A.    So the condition, it's described as right shoulder

3    pain.  What caused the condition is not for me to say here.  I

4    believe they thought they were dealing with some form of

5    arthritis, but I'm not sure exactly what.  I do know that they

6    ended up placing her on an anti-inflammatory steroid, prednisone.

7        Q.    Okay.  And this was not done by Dr. St. Martin, right?

8        A.    Correct.

9        Q.    What impact can prednisone have on the body?

10       A.    Prednisone can lead to salt retention which can

11   increase your blood pressure, so this is a medication that can

12   increase your blood pressure acutely if you take it.  And it can

13   also increase your sugars if you have diabetes.  And so you have

14   to be wary when you are doing this.

15       Q.    Is there a record that shows what Mrs. Orr's blood

16   pressure was the day after she started the prednisone?

17       A.    Yes.

18       Q.    So she went back to see Dr. St. Martin; is that right?

19       A.    This is Dr. Cruz.

20       Q.    Dr. Cruz.  I'm sorry.  Dr. Cruz.

21       A.    So she had a blood pressure of 200 over 90.  This is

22   characterized as a hypertensive urgency.  This is not a mildly

23   elevated blood pressure.  And whatever the reason, be it anxiety

24   or pain or whatever, or the prednisone -- whatever the reason,

25   this is a serious problem.

**OFFICIAL TRANSCRIPT**

1          Often, when I -- if I see a patient in the clinic and
2    I'm -- it's easy to sit here and look at this, but it's not
3    uncommon for us to say, You should go to the emergency room to
4    get this acutely managed.
5          I'm not judging.  And there are patients who I have not
6    taken to the emergency room because there are other factors, but
7    this is a critically elevated blood pressure, I would say.
8      Q.    All right.  Let's move forward, if we could, to
9    April 24th and 25th.  There are others who have talked about the
10    details and others to come, but I want to focus on the
11    prothrombin time, because we've heard a lot about this PT test.
12          Are you familiar with the regular laboratory PT test?
13      A.    Yes.
14      Q.    Tell the ladies and gentlemen of the jury what the
15    PT test is designed to do.
16      A.    A PT test is -- so if you cut yourself, you are going
17    to clot to try to prevent the bleeding from occurring.  So a
18    PT test is a way to measure how long it takes to clot your blood.
19      Q.    Is a PT test ordered on patients as a regular course of
20    practice when they are brought in to the emergency room?
21      A.    I don't think it is uncommon.  It depends on what they
22    are coming in to the emergency room for.  And if -- so if someone
23    comes in and they are bleeding, whether or not they are on an
24    anticoagulant or not -- because if the PT is elevated, that could
25    be a sign of increased risk of bleeding whether or not you are on

**OFFICIAL TRANSCRIPT**

1    a medication.

2            And if there is anticipation of perhaps someone needing

3    emergent surgery, the surgeons are going to want to see those

4    results before they go in.  So before I do a pacemaker, I'm going

5    to want to know that the PT level is okay or at least be aware of

6    it before I go in.

7        Q.   Let's take a look at PTX 112, which is in evidence, a

8    medical record of Mrs. Orr's PT time from 12:02 a.m.

9            Are you familiar with this record?

10       A.   Yes.

11       Q.   Now, we just highlighted the prothrombin time and the

12   reference range.  Is there an INR reading underneath that?

13       A.   I...

14       Q.   Or do you need to see the record?

15       A.   I can't see it here.

16       Q.   It's not much better in the print, but you can give it

17   a try.

18       A.   Yes.  Okay.  1.1.

19       Q.   Now, explain to us why in this record you see PT, or

20   prothrombin time, and INR right together.

21           MS. WILKINSON:  Maybe -- could I switch to the ELMO?

22           MR. BARR:  Your Honor, may we approach just one second?

23           THE COURT:  Sure.

24                     **SIDEBAR ON THE RECORD**

25           MR. BARR:  Your Honor, I'm a little concerned about

**OFFICIAL TRANSCRIPT**

1  maybe where this is heading.  And if it's not heading here, I

2  don't have a problem.

3          But there is a motion *in limine* that talks about how we

4  can't talk about that the PT test is not approved for use with

5  Xarelto.  And if you are going to go into that the PT test was

6  designed to be used with warfarin and that's what the INR is, I

7  think you are just back-dooring the violation of that order.

8          So if that is where you are going, we do have an

9  objection to that because there is a motion -- there is an order

10  in place.

11          MS. WILKINSON:  Well, I thought it was specifically

12  about it's not FDA-approved for use with the Neoplastine for, you

13  know -- and we -- that means it's not -- you can't use it with

14  Xarelto.

15          I'm just having him explain historically what PT and

16  INR -- or that used for warfarin.  I'm not going to go near --

17          MR. BARR:  Well, if he's not saying it's specifically

18  designed and intended for use with warfarin, back-dooring that, I

19  guess I don't have a major objection to it.  We have to see where

20  it's going, but before we go there, I just wanted to make sure to

21  state that.

22          MS. WILKINSON:  That is a fact, Your Honor, that it was

23  designed and it is used with warfarin.  I don't think that is in

24  violation of your order.

25          MR. BARR:  But he can't say it can't be used with

**OFFICIAL TRANSCRIPT**

1  Xarelto.  You can't take that --

2          MS. WILKINSON:  Well, he's going to say it can't be

3  used with Xarelto because that's the entire case.

4          MR. BARR:  But from an FDA perspective.

5          MS. WILKINSON:  No, he is not going to say that.  As

6  far as I know, he is not going to say it.

7          THE COURT:  Okay.

8                  **AFTER THE SIDEBAR IN OPEN COURT**

9  **MS. WILKINSON:  (CONTINUING)**

10     Q.    We're going to put this record up, PTX 112.

11          And I just want you to explain -- it says PT/INR

12  Coumadin therapy.  When you read a record like this, what does

13  that indicate to you?

14     A.    I guess I'm not understanding the context.

15     Q.    Maybe I should say:  Do you understand why the INR and

16  the Coumadin therapy nomenclature is there?

17     A.    Yes.  There is significant variability with the

18  prothrombin time based on which lab you are dealing with and

19  which reagent you are utilizing.

20          And warfarin -- they have been able to standardize that

21  with this internationalized normalized ratio.  So they have been

22  able to take that and set it to a standard and compare it.

23          So when I'm looking at someone who is on warfarin, I'm

24  specifically looking at their INR levels, not their PT levels.

25     Q.    So even if you have this PT, if you know the person is

**OFFICIAL TRANSCRIPT**

1    on warfarin and you believe they -- this second number is what is
2    important to you --
3        A.    Yes.
4        Q.    The INR number.
5        A.    More so than the prothrombin time.
6            MS. WILKINSON:  Let's go back to the slides, if we
7    could.
8    **MS. WILKINSON:   (CONTINUING)**
9        Q.    Now, we had heard from an expert yesterday that this
10   test, the PT test, could have been used at this time with
11   Mrs. Orr to be able to tell whether she had Xarelto in her blood
12   and whether she was still in the -- it was still having an effect
13   of anticoagulation.
14            Do you agree or disagree?
15       A.    I disagree with that.
16       Q.    Tell us why.
17       A.    I don't feel that the prothrombin time is a sufficient
18   test to be used in a clinical situation where I can look a
19   surgeon in the eye and tell them you're okay to go in or not.
20       Q.    And have you ever used the PT test in your practice to
21   determine whether someone is sufficiently coagulating, meaning,
22   you know, there's nothing in their system that's working on their
23   blood, or an anticoagulant to make a clinical decision?
24       A.    For Xarelto?
25       Q.    For Xarelto.

**OFFICIAL TRANSCRIPT**

1     **A.**   No.   Not only do I -- I have never used that.

2            And, again, there are six of us who -- we discuss case

3     management all the time, and there are none of the six

4     physicians, that I'm aware of, that utilize PT in that manner.

5            And that's not because I'm their section head or their

6     leader.  Believe me, these guys are all -- believe that they know

7     best and have individual opinions.  And we're not using that.

8     **Q.**   Have you reviewed the literature, which discusses this

9     publicly, about whether PT could be used with Xarelto to make

10    clinical decisions for patients?

11    **A.**   I have.

12    **Q.**   And are you familiar with Eikelboom from 2017?

13    **A.**   I am.

14           MS. WILKINSON:  And, Your Honor, we're going to show

15    that as Demonstrative DX 2440 from *JAMA Cardiology*.

16           MR. BARR:  No objection.

17    **MS. WILKINSON:  (CONTINUING)**

18    **Q.**   Let's go to the next one.  This article, what journal

19    is it from?

20    **A.**   The *JAMA -- Journal of American Medical Association --*

21    *Cardiology*.

22    **Q.**   Was it just published this year?

23    **A.**   Yes.

24    **Q.**   In this article, do the authors discuss using PT to

25    test and make clinical decisions for patients on Xarelto and

**OFFICIAL TRANSCRIPT**

1    other DOACs?

2         A.    They do.

3         Q.    What is important in this article that you have pulled

4    out for us?

5         A.    Well, I thought this was a nice article -- and, again,

6    you have to take every article with a grain of salt and look at

7    this.

8              But I feel -- this probably gets closer to how I feel

9    about PT than what I have seen stated in prior articles.  In

10   prior articles, you see them saying there may be some benefit,

11   there may not be.

12             There seems to be now a trend towards being more

13   strongly saying that there is not only not a -- there is unproven

14   clinical benefit, but it can be a net harm.

15             And why would it result in net harm?  Well --

16        Q.    I don't even have to ask you the questions.  You ask

17   them yourself.

18             Why would there be a net harm, Doctor?

19        A.    If you take -- so if the PT -- and it has the

20   challenges -- and PT has its challenges, and I know it's been

21   discussed and we can go over that again.

22             So let's assume that someone gets a PT drawn and it's

23   normal, I can't look a surgeon in the eye and tell him that it's

24   okay, that if they take that patient to surgery, they're not

25   going to bleed.

**OFFICIAL TRANSCRIPT**

1      **Q.**   Why?

2      **A.**   Because there is the challenges with the PT.  You know,

3  the PT is -- it's sensitive to the timing of when it's drawn

4  compared to Xarelto.  That's less an issue for Coumadin.

5          Coumadin has a three-day half-life.  It's in your

6  system for a while.  So I can get an INR in the morning and I can

7  get an INR in the evening.  It's going to give me a good estimate

8  of that.

9          Xarelto, with its shorter half-life, it's -- the PT is

10  going to be sensitive to when you actually check it.  And so if

11  someone comes in and you just take a willy-nilly PT and don't

12  take that into account, it's going to be hard to use that.

13          Not only that, there remains patients with normal PT.

14  If you look at those -- and I know we have this.  Patients with

15  normal PT, they are still anti -- potentially having

16  anticoagulant effect.

17          And if you look at the ROCKET AF, the seminal study for

18  this -- and they looked at PT.  There were 10 percent of patients

19  that were on -- and they drew them at Week 12 and they drew them

20  at Week 24.  20 percent of the patients went from one extreme

21  quartile of PT to another for no apparent reason.

22          In other words, if you're on Xarelto, 20 milligrams,

23  and I check your PT and it's normal, and I check it at 24 weeks

24  and all of a sudden it's the highest level, there is no apparent

25  understanding of why that is.  That occurs in 10 percent of

**OFFICIAL TRANSCRIPT**

 1  patients.  That was seen in ROCKET.

 2          And so I think -- I'm not comfortable with utilizing

 3  PT.  Believe me, if it was effective, I would -- and reliable and

 4  something that I could use, I would use it.  I would want it.  I

 5  want to help -- we're here for our patients.

 6          And this is -- so if this were something that I thought

 7  was comfortable, I'm not going to withhold that.  I would want

 8  that.  But the PT test is not a reliable test.  It doesn't -- it

 9  can't be applied in a clinical context in a meaningful manner.

10      Q.   Let's take a look at the proposed label change that

11  Dr. Parisian presented yesterday and get your opinion on that.

12  This is what Dr. Parisian said should be in a label -- the

13  Xarelto label to help clinicians to treat patients that are

14  prescribed Xarelto.

15          MR. BARR:  Objection, Your Honor.  Dr. Parisian talked

16  about what should be in the label from a regulatory perspective,

17  what is required according to the regulations.

18          THE COURT:  Well, I thought it was a little broader

19  than that.  The question is different than what -- I'll allow the

20  question.

21          THE WITNESS:  I'll give my opinion, not a regulatory...

22  MS. WILKINSON:   (CONTINUING)

23      Q.   Yeah.  We're not talking about regulatory.

24          We want to know from your point of view, as a clinician

25  and an expert who prescribes this drug, would this language be

**OFFICIAL TRANSCRIPT**

1   useful or helpful to you with your patients?

2       A.   So I'm specifically --

3       Q.   Just first answer that question.

4            Would it be helpful?

5       A.   No.  Sorry.

6       Q.   Now let's go through it and you tell us why this would

7   not be helpful.

8       A.   The one that troubles me the most is that middle thing:

9   Accordingly, measuring PT may be useful to inform clinical

10  decisions in this circumstance.

11           I have no data to tell me how that will inform my

12  clinical decisions.  There is no studies that have looked at PT

13  and said, Okay, if someone comes in and they're bleeding and they

14  have a normal PT, you can take them to surgery and they do well.

15           That has not been studied.

16           You have to look at a situation and test it out in

17  people, and there's no data that actually looks at changing dose

18  based on PT, or withholding surgery based on PT, and that having

19  a net clinical benefit.

20           And that's why I think it's inappropriate to imply that

21  there is -- it's useful in informing clinical decisions, because

22  I don't think it can help me.  If it would help me, I would use

23  it.

24           My study of this is not scant.  I have looked at this

25  extensively, and I do not feel it is of value.  Not only that,

**OFFICIAL TRANSCRIPT**

1  but in the field of EP, in the Heart Rhythm society itself,

2  people are not using PT.

3      Q.   Do you believe that is because people don't know about

4  it because somebody has hidden this information or because they

5  don't believe it's useful?

6      A.   So when we do our journal clubs and we go over articles

7  and studies, these are the things that kind of come up when we

8  discuss this.

9           So I don't -- I think that it was appreciated.  And,

10  again, we looked at it and our impression was that that was not

11  the case.

12      Q.   And do you agree or disagree that a normal PT value

13  indicates that clinically significant levels of rivaroxaban are

14  unlikely?

15      A.   I think that there is -- so I can't explain why

16  10 percent of patients go from a normal PT to a high PT with

17  absolutely no change in their dosing.  So I can't --

18      Q.   Does that mean you don't agree?

19      A.   I don't agree.  Sorry.  Yes.

20      Q.   And tell us -- we've heard about a false negative in

21  testing.  Are you familiar with that?

22      A.   Yes.

23      Q.   Have you seen that in PT where someone could have

24  either -- a normal level and still have an anticoagulation effect

25  in their blood?

**OFFICIAL TRANSCRIPT**

1      **A.**    Yeah.  I've never seen it in the context of someone

2    actually saying false negatives, false positives.  But the

3    concept being -- so a false negative would be the test came back

4    negative but it's wrong.

5            And so I would characterize it there as -- I can't put

6    a number on the false negative rate, but I would say that there

7    are some false negatives.

8      **Q.**    You showed us one piece of peer-reviewed literature.

9            Is there other literature out there in the public for

10   doctors like you to read about whether a PT test would be

11   clinically useful?

12     **A.**    There is a lot of literature out there.

13     **Q.**    And you've reviewed that literature; have you not?

14     **A.**    I've tried to be thorough.  By no means would I claim

15   that I've reviewed every article or every study on that.

16     **Q.**    But have you brought an example from a recent journal,

17   an article written by Testa in 2016 in the *Journal of Thrombosis*

18   *and Hemostasis*?

19     **A.**    Yes.

20     **Q.**    Yes, you have?

21     **A.**    I have.

22            MS. WILKINSON:  Let's show, for demonstrative purposes,

23   DX 2272.

24   **MS. WILKINSON:   (CONTINUING)**

25     **Q.**    And is this that article and a quote from it?

**OFFICIAL TRANSCRIPT**

1     A.   Yes.

2     Q.   And read that quote and tell us what that tells you, as

3  a clinician prescribing Xarelto and the other DOACs.

4     A.   "Consequently, the use of PT or APTT in clinical

5  practice to evaluate NOAC anticoagulant activity could cause

6  dangerous misinterpretations."

7     Q.   So "dangerous misinterpretations" sounds bad.  What

8  does that mean?

9     A.   So an example of a dangerous misinterpretation is

10  someone that could have surgery that could be delayed for 24 or

11  48 hours, and they come in with a normal PT but they actually

12  still have an anticoagulant effect.  They're still going to be at

13  risk for bleeding if you take them.  So that would be a dangerous

14  misinterpretation.

15     Q.   So one thing that's difficult for some of us to

16  understand, I would say, is you talk about half-life and it could

17  be out of your system.

18          Why is it that it's -- you know, you're at that time of

19  the half-life.  Why can't you just say there is no effect of the

20  anticoagulant on the blood?

21     A.   Well, half-life does not -- half-life is -- does not

22  imply level of activity and effect.  So you could still have

23  effect with -- so if someone comes in and they have a pacemaker

24  and they have half the battery left on their pacemaker, it is

25  still functioning, it's still working.

**OFFICIAL TRANSCRIPT**

1         So half-life doesn't mean you are not having an

2    anticoagulant effect.  That, to me, is dosing.  I know it has

3    been brought up, dosing.  I believe in the once-daily dosing, and

4    I think that the proof is in the pudding with ROCKET.

5         But if it -- if -- you still have to be having

6    anticoagulant effect out -- further out than the half-life, at

7    the 24-hour period.  Otherwise, Xarelto would not have been shown

8    to be safe and effective.

9    Q.    You mentioned ROCKET.  We're going to turn to that to

10   start talking about PT and then the rest of the study.

11        We heard yesterday that Dr. Parisian did not believe

12   that ROCKET was adequately conducted as a clinical trial.

13        Do you agree or disagree with?

14   A.    I would say I disagree with that.

15   Q.    Let's start, if we could, with one of the

16   charts from --

17   A.    I will also say that, in the field of cardiology,

18   heart rhythm, that is -- ROCKET has always been viewed as a

19   well-executed, well-designed study.

20        THE COURT:  Counsel, before we get into that, can I

21   just see you all for a second for logistical purposes.

22             **(SIDE-BAR CONFERENCE OFF THE RECORD.)**

23        THE COURT:  Members of the jury, we'll break for lunch

24   early today.  We'll take a break at 11:30 and we'll come back at

25   12:45.

**OFFICIAL TRANSCRIPT**

1    We'll stand in recess.  Thank you.

2                        (Jury out at 11:27 a.m.)

3                        (End of morning session.)

4

5              *  *  *  *

6              **CERTIFICATE**

7

8        **I hereby certify this 8th day of June, 2017, that the**

9    **foregoing is, to the best of my ability and understanding, a true**

10   **and correct transcript of the proceedings in the above-entitled**

11   **matter.**

12

13                        */s/ Mary V. Thompson*

14   _____
                         **Official Court Reporter**

15

16

17

18

19

20

21

22

23

24

25

**OFFICIAL TRANSCRIPT**