1                  UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF LOUISIANA
2

3      *****************************************************************

       IN RE:  XARELTO (RIVAROXABAN)
4      PRODUCTS LIABILITY LITIGATION        Docket No. 14-MD-2592
                                            Section "L"
5                                           New Orleans, Louisiana
       THIS DOCUMENT RELATES TO:            Thursday, June 8, 2017
6      Joseph Orr, et al
       v. Janssen Research &
7      Development, et. al.,
       Case No. 15-CV-3708
8

9      *****************************************************************

                     TRANSCRIPT OF TRIAL PROCEEDINGS
10           HEARD BEFORE THE HONORABLE ELDON E. FALLON
                    UNITED STATES DISTRICT JUDGE
11                 VOLUME VIII - AFTERNOON SESSION

12

       APPEARANCES:
13

       FOR THE PLAINTIFFS'
14     LIAISON COUNSEL:               LEVIN PAPANTONIO
                                      BRIAN H. BARR, ESQ.
15                                    316 Baylen Street, Suite 600
                                      Pensacola, FL 32502
16
                                      BEASLEY ALLEN
17                                    BY:  ANDY BIRCHFIELD, ESQ.
                                      P.O. Box 4160
18                                    Montgomery, AL 36103

19                                    GAINSBURGH BENJAMIN DAVID
                                      MEUNIER & WARSHAUER
20                                    BY:  GERALD E. MEUNIER, ESQ.
                                      2800 Energy Centre
21                                    1100 Poydras Street
                                      New Orleans, LA 70163
22
                                      GOZA & HONNOLD, LLC
23                                    BY:  BRADLEY D. HONNOLD, ESQ.
                                      11181 Overbrook Road, Suite 200
24                                    Leawood, Kansas 66211

25

```
 1                              THE LAMBERT FIRM, PLC
                                BY:  EMILY JEFFCOTT, ESQ.
 2                              701 Magazine Street
                                New Orleans, Louisiana 70130
 3

 4   FOR THE DEFENDANT BAYER
     HEALTHCARE PHARMACEUTICALS
 5   INC. and BAYER PHARMA AG:     WILKINSON WALSH & ESKOVITZ, LLP
                                   BY:  BETH A. WILKINSON, ESQ.
 6                                 1900 M Street NW, Suite 800
                                   Washington, DC 20036
 7
                                   Nelson Mullins Riley
 8                                 & Scarborough, LLP
                                   BY:  DAVID E. DUKES, ESQ.
 9                                 Meridian, 17th Floor
                                   1320 Main Street
10                                 Columbia, SC 29201

11
     FOR JANSSEN PHARMACEUTICALS,
12   INC. AND JANSSEN RESEARCH &
     DEVELOPMENT, LLC:             IRWIN FRITCHIE URQUHART & MOORE
13                                 BY:  JAMES B. IRWIN, ESQ.
                                   400 Poydras St., Suite 2700
14                                 New Orleans, LA 70130

15

16   Official Court Reporter:     Karen A. Ibos, CCR, RPR, CRR, RMR
                                   500 Poydras Street, B-275
17                                 New Orleans, Louisiana 70130
                                   (504) 589-7776
18

19     Proceedings recorded by mechanical stenography, transcript
     produced by computer.
20

21

22

23

24

25
```

<u>I N D E X</u>

<u>WITNESSES FOR THE DEFENDANTS</u>:                    <u>PAGE/LINE</u>:


<u>SAMMY KHATIB, M.D.</u>


  Continued Direct Examination by Ms. Wilkinson    1902/11

  Cross-Examination by Mr. Barr                    1920/25

  Redirect Examination by Ms. Wilkinson            1976/23



<u>VANESSA PIAZZA, M.D.</u>


  Voir Dire Examination by Mr. Dukes               1992/21

  Direct Examination by Mr. Dukes                  2000/16

<u>P R O C E E D I N G S</u>

(THURSDAY, JUNE 8, 2017)

(AFTERNOON SESSION)


     (OPEN COURT.)

     (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

          THE COURT:  Be seated, please.  You're still under oath,

Doctor.  You may proceed.

          MS. WILKINSON:  Thank you, your Honor.

                    CONTINUED DIRECT EXAMINATION

BY MS. WILKINSON:

Q.  Are you ready to go, Dr. Khatib?

A.  Round two.

Q.  Let's focus, if we can, on the questions.  We'll start with

ROCKET and try and link up what you were just saying about the PT

test and why it concerns you and what you learned from ROCKET.  Are

you ready?

A.  Yes.

Q.  Let's take a look at DX 5115.  And is this one of the charts

that's in the article that's published about ROCKET?

A.  I don't think it's in the article that was published.  This is

from the FDA.

Q.  So this chart comes from FDA documents that obviously FDA had,

right?

A.  Yeah, uh-huh.

1   Q.  And what does -- first tell us what this is supposed to show

2   and tell us -- well, I'll ask you about interpreting.  But first

3   tell us what it is showing.

4   A.  So this is looking -- it's trying to compare prothrombin time,

5   that PT assay that we've talked about, that's on the Y axis.  On

6   the X axis is the concentration of rivaroxaban that correlates with

7   that.  So, for instance, this patient had a PT of 40 and a

8   concentration of 290.  This patient had a PT of 50 and

9   concentration of somewhere around 350.

10  Q.  Let me ask you the first question.  From this data and other

11  data you've seen, can you say that if someone is -- has

12  200 milligrams in their system and they have a PT of 20 that they

13  won't bleed?

14  A.  No.

15  Q.  You say they will bleed?

16  A.  There is no indication.  No, can't say they will.

17  Q.  How about if we go way down here, they have a low -- we've

18  heard in this case about a low PT, let's say 11, and they have a

19  low level of concentration.  Can you say that if you did surgery,

20  that person wouldn't bleed?

21  A.  No.

22  Q.  Why not?

23  A.  There's no data to look at patients who are undergoing surgery

24  on concentrations and PT and looking at outcomes.

25  Q.  Why can people say there is a relationship between PT time and

12:47:48  1   plasma concentration, but not take this next step to say there is a

12:47:52  2   relationship between PT time and whether your blood is actually

12:47:57  3   anticoagulated or not?

12:47:58  4   A.  Well, the missed step -- not the missed step.  The leap you're

12:48:05  5   making is that plasma concentration means effect and outcome.  And

12:48:11  6   there's no data that I am aware that correlates outcomes to this --

12:48:16  7   to these concentrations.  And so they have that, I believe, for

12:48:21  8   apixaban and dabigatran, but they don't have concentration -- a

12:48:26  9   therapeutic window, if you will, for rivaroxaban.

12:48:28  10          So what this means, this concentration, it doesn't inform

12:48:33  11  me in terms of am I protected from stroke, am I too high risk for

12:48:40  12  bleeding.

12:48:40  13  Q.  Now, let's turn to ROCKET.  And you said you thought it was a

12:48:44  14  well-designed and carried-out study?

12:48:49  15  A.  I think well-designed, well-executed study, yes.

12:48:52  16  Q.  And you helped me with these slides.  Tell us why you think

12:48:55  17  ROCKET --

12:48:56  18  A.  It was a large trial, over 14,000 patients.  That's a mega

12:48:59  19  trial.  That's a very big trial.  So you're looking at a large

12:49:03  20  number of patients that were studied.  This was double blind and

12:49:06  21  randomized; in other words, you had two arms.  They took patients.

12:49:09  22  They put them on warfarin.  Patients and put them on Xarelto.  The

12:49:12  23  prescribers were not aware of which medication they were on.  That

12:49:15  24  prevents certain types of bias.

12:49:18  25          This also looked at more or higher risk patients than was

12:49:23  1    seen in some of the other trials, and I think that's important to

12:49:25  2    keep in mind, and we'll touch on later.

12:49:27  3    Q.  Were the results published in the New England Journal of

12:49:30  4    Medicine?

12:49:30  5    A.  They were.  And that is a very prestigious journal.

12:49:36  6    Q.  You talked about how the study was designed.  What was it

12:49:40  7    intended to measure?

12:49:40  8    A.  It was intended to -- so there's two outcomes:  There's the

12:49:44  9    efficacy outcome and the safety outcome --

12:49:46  10   Q.  Let me interrupt you.  We've heard this word "efficacy" all the

12:49:49  11   time.

12:49:49  12   A.  Sure.

12:49:50  13   Q.  I know you use it, but what's the simple way of saying

12:49:53  14   efficacy?  What does it mean?

12:49:54  15   A.  What they meant in this trial was stroke or systemic

12:50:01  16   thromboembolic event.  So a blood clot going to the brain --

12:50:01  17   Q.  That didn't make it any simpler.  First, let's start with

12:50:04  18   efficacy.  Does it mean does it work?

12:50:06  19   A.  Does it work; is it effective.

12:50:07  20   Q.  And what was it trying to do?

12:50:09  21   A.  And is it safe.

12:50:10  22   Q.  Go ahead.

12:50:11  23   A.  I'm sorry.  I'm lost.

12:50:14  24   Q.  Okay.  ROCKET AF efficacy is a fancy way of saying does Xarelto

12:50:20  25   work, right?

12:50:20  1    A.  Correct.

12:50:21  2    Q.  Does the study show whether it works?

12:50:23  3    A.  Yes.

12:50:24  4    Q.  It was supposed to work to reduce the risk of stroke for AFib

12:50:28  5    patients?

12:50:28  6    A.  Yes.

12:50:28  7    Q.  And what does this -- simply what does this diagram show?

12:50:32  8    A.  This shows that patients who were on Xarelto, the reduction in

12:50:38  9    stroke was not inferior to what was seen with warfarin.

12:50:42 10    Q.  We've heard that it's compared to warfarin because warfarin was

12:50:45 11    already on the market and worked, right?

12:50:48 12    A.  It was the standard of care at that time.

12:50:48 13    Q.  Is that -- and is that called a non-inferiority comparison?

12:50:53 14    A.  Yes.

12:50:55 15    Q.  Now, did it also put out safety data from the ROCKET study?

12:50:58 16    A.  It did.

12:50:59 17    Q.  And these are circled down here.  Tell us why you think -- as a

12:51:04 18    practicing clinician who prescribes this medication, why these

12:51:08 19    safety and rates of bleeding events are important to you.

12:51:11 20    A.  Well, as we've talked about, everything is risk and benefit.

12:51:15 21    And with any anticoagulant there's a risk of bleeding.  So you want

12:51:18 22    to demonstrate that risk.

12:51:20 23            And what they showed was with the principle safety

12:51:24 24    endpoint, the overall risk of major and non-major bleeding was

12:51:27 25    similar between the two arms.

12:51:29  1    Q.  That's these (INDICATING).

12:51:31  2    A.  Here and here (INDICATING).

12:51:32  3          When I talk to a patient about this, you know -- and,

12:51:34  4    again we go over the risks and benefits of Coumadin versus the

12:51:40  5    direct oral anticoagulants.  What I will talk to them about is that

12:51:44  6    they're safe and effective.  They reduce the risk of stroke

12:51:46  7    similarly to Coumadin.  The overall reduction of bleeding is

12:51:50  8    similar to Coumadin.  There is a higher risk of bleeding from the

12:51:53  9    stomach with the direct oral anticoagulants.  There's a lower risk

12:51:56  10   of bleeding from having a fatal or intracranial bleed with the

12:52:01  11   direct oral anticoagulants compared to warfarin.

12:52:03  12         So I say, although the overall risk is similar, there's a

12:52:07  13   slightly higher risk of bleeding from the gut than from bleeding

12:52:10  14   from the brain or fatally.  I have yet to have a patient who

12:52:14  15   chooses higher risk of bleeding from the brain versus the gut.

12:52:20  16   Q.  Now, you talked about the patients in ROCKET being sicker.  Is

12:52:25  17   that compared to something?

12:52:26  18   A.  Compared to the other trials looking at oral anticoagulants.

12:52:32  19   Q.  Let's take a look at this demonstrative.  We see ROCKET AF on

12:52:39  20   the left, right?  That's the trial for Xarelto.

12:52:41  21         What is ARISTOTLE?

12:52:43  22   A.  ARISTOTLE was the pivotal trial examining apixaban or Eliquis

12:52:49  23   comparing it to warfarin.

12:52:50  24   Q.  RE-LY or --

12:52:51  25   A.  RE-LY, Pradaxa or dabigatran versus warfarin.

12:52:54  1    Q.  If we go down this category, CHAD scores we've heard about.

12:52:59  2    ROCKET looks like it's higher.  What does that tell you?

12:53:02  3    A.  So that to me tell me it's a sicker patient population.  The

12:53:05  4    CHADS and CHADSVASc -- the CHAD score was what we utilized prior to

12:53:13  5    the CHADSVASc -- are risk factors for stroke that we've talked

12:53:13  6    about.  And all these are also what in general will make you --

12:53:17  7    make a sicker patient population.  So it's intuitive that the older

12:53:22  8    you are the more prone to conditions that you have these other

12:53:25  9    conditions, you're sicker.

12:53:26 10         So it's important because there's been attempts to

12:53:29 11    compare Xarelto to Eliquis to Pradaxa, and what you're seeing here

12:53:34 12    is this is apples and oranges.  These are different patient

12:53:38 13    populations.

12:53:38 14    Q.  So, Doctor, would you agree or disagree with cardiologists who

12:53:42 15    came here and said that there's evidence from studies that Xarelto

12:53:47 16    is "worst in class"?

12:53:49 17    A.  You know, so worst in class is not a medical term.  That to me

12:53:54 18    sounds like a marketing term.  So I will tell you I'll take the

12:53:57 19    premise of what was trying to be said, and I would say I would

12:53:59 20    disagree with that.

12:54:01 21         The only way to figure out if you're going to try to

12:54:04 22    compare them is to do a head-to-head trial of Xarelto versus

12:54:08 23    Eliquis versus Pradaxa in similar patient populations.  My problem

12:54:13 24    with the registries that have tried to argue -- so registries we

12:54:19 25    talked about earlier versus big studies.  Registries are to me the

12:54:25  1    goals to see does this work in the real world.  When they get into

12:54:28  2    problems is when they're trying to make other leaps and

12:54:32  3    conclusions.

12:54:32  4          And so when you take a registry and you compare Xarelto

12:54:37  5    to Coumadin versus Eliquis to Coumadin or Pradaxa to Coumadin,

12:54:41  6    you're still comparing apples and oranges.  The only way that you

12:54:45  7    can do this is to do a trial similar to these trials, but you have

12:54:48  8    a Xarelto arm, Eliquis arm, and a Pradaxa arm.  That's the only way

12:54:52  9    to know.

12:54:53 10    Q.  Another criticism we've heard of ROCKET through some of the

12:54:57 11    plaintiff witnesses was that the TTR, the time in therapeutic range

12:55:01 12    for the warfarin patients were worse in ROCKET.  Do you agree or

12:55:06 13    disagree with that?

12:55:07 14    A.  I think the TTR was lower in ROCKET compared to ARISTOTLE and

12:55:11 15    RE-LY.  Yes, I'll agree with that.

12:55:13 16    Q.  Why does that not bother you that ROCKET is at 55 percent for

12:55:17 17    the warfarin patients in therapeutic range?

12:55:20 18    A.  You know -- and, again, this is -- I looked at this before I

12:55:23 19    was asked to comment.  I've given talks about this, and so this is

12:55:28 20    something that is brought up.

12:55:30 21          And I think if you look at real-world utilization of

12:55:35 22    warfarin, the TTR hits right around that level.  So when I --

12:55:41 23    before I was asked to come here and I put up studies and looked at

12:55:44 24    this and I tried to figure this out on my own, the conclusion I

12:55:46 25    came to was that the TTR seen in ROCKET more closely mimics what we

12:55:51  1  were seeing in the real world.

12:55:52  2  Q.  Doctor, you told us before lunch that you've also looked at

12:55:57  3  post-approval studies of Xarelto; is that right?

12:56:01  4  A.  Yes.

12:56:01  5  Q.  Let's take a look at this one.  What journal is this?

12:56:09  6  A.  I don't remember here.  This is the Eikelboom article, I can't

12:56:16  7  read the -- oh, JAMA.  Oh, there it is.  JAMA Cardiology, Journal

12:56:18  8  of American Medical Association Cardiology.

12:56:20  9  Q.  Is that a journal you read?

12:56:21 10  A.  I do.  I read across all sorts of journals, mostly cardiology

12:56:26 11  journals.

12:56:26 12  Q.  And do you agree with the author's conclusion that "Randomized

12:56:32 13  trials show that unmonitored NOAC therapy is at least as effective

12:56:36 14  and safer than those dose-adjusted warfarin for stroke prevention"?

12:56:40 15  A.  Absolutely.  Unequivocally.  That was the whole point of ROCKET

12:56:43 16  was to look at it in a fixed-dose manner, don't test patients --

12:57:21 17  not have the testing of patients and see how they do.  And what

12:57:21 18  they found was that was safe, and it was effective.

12:57:21 19          The challenge is this is a paradigm shift to go from

12:57:21 20  warfarin, where you had to do this intense monitoring, and

12:57:21 21  switching the course of anticoagulants back to what we do with

12:57:21 22  aspirin and Plavix, which is no intense monitoring.  We give

12:57:22 23  aspirin, and we give Plavix, and we assume it's working.  The

12:57:22 24  challenge is we're shifting the paradigm with the anticoagulants.

12:57:22 25  And what this trial showed, ROCKET -- not just ROCKET, RE-LY, and

12:57:22  1    ARISTOTLE, and ENGAGE was this is safe and effective to do without

12:57:24  2    monitoring.

12:57:25  3    Q.  Doctor, I want to change topics a bit and talk about some other

12:57:32  4    documents that have been shown during this trial.  One of the

12:57:34  5    witnesses, Dr. Liechty, came in front of the jury and said that

12:57:38  6    this scientific statement from the American Heart Association -- I

12:57:42  7    am going to hand it to you -- supports his opinion that PT tests

12:57:46  8    could be used for Xarelto in emergency situations.  Have you

12:57:48  9    reviewed this?

12:57:49  10   A.  I did.

12:57:49  11   Q.  Let me hand up a copy.  Before I hand this, I assume you're

12:58:12  12   familiar with the American Heart Association?

12:58:14  13   A.  Vaguely.  Thank you.

12:58:21  14   Q.  Take a look at that, and I think you asked me to focus on --

12:58:26  15   looks at PDF page 6.  Is that right?  Which is I think --

12:58:32  16   A.  Yes.

12:58:33  17        MS. WILKINSON:  Okay.  Could I have the ELMO, please.

12:58:41  18   And I am going to start so we all know what we're talking about.

12:58:41  19   BY MS. WILKINSON:

12:58:45  20   Q.  Is this the paper that we just mentioned?

12:58:47  21   A.  Yes, ma'am.

12:58:48  22   Q.  Can you read the title, please?

12:58:49  23   A.  "Management of patients on non-vitamin K antagonist oral

12:58:54  24   anticoagulants in the acute care and periprocedural setting."

12:58:57  25   Q.  And are you familiar with these types of scientific statements

12:59:00  1   from medical organizations like the AHA?

12:59:03  2   A.  Yes, ma'am.

12:59:03  3   Q.  And do you review those on occasions in your practice?

12:59:06  4   A.  More than on occasion, yes.

12:59:07  5   Q.  So the jury was shown this page.  Talking about Table 1 up

12:59:16  6   there where it talks about "therapeutic measurement" -- do you see

12:59:18  7   that? -- "to detect the presence of PT under rivaroxaban"?

12:59:21  8   A.  Yes.

12:59:22  9   Q.  And then down here there's a specific paragraph about

12:59:27 10   rivaroxaban and apixaban and --

12:59:30 11               MR. BARR:  Your Honor --

12:59:30 12               THE COURT:  Yes.

12:59:30 13               MS. WILKINSON:  This was read in Shah.

12:59:32 14               MR. BARR:  -- I object to the highlight you have got on

12:59:34 15   the portion of that.  It's in direct violation of the motion in

12:59:37 16   limine order, your Honor.

12:59:40 17               THE COURT:  You object to what?  The highlighted?

12:59:41 18               MR. BARR:  What she has highlighted.

12:59:44 19               MS. WILKINSON:  This was already read into the record by

12:59:46 20   Mr. Barr, these exact words.  You read this when you pointed that

12:59:49 21   out.

12:59:53 22               MR. BARR:  Your Honor, I mean, that's a violation of the

12:59:55 23   motion in limine.

12:59:58 24               THE COURT:  Everybody has been highlighting things.  I

13:00:01 25   don't see any issue with that.  I'll overrule the objection.

13:00:04  1          MR. BARR:  But, your Honor, we not just highlighting

13:00:05  2   things we're not talking about.  That's -- can we approach, your

13:00:16  3   Honor, so we can talk this out?

13:00:16  4          THE COURT:  Yes.

13:00:22  5       (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

13:00:22  6          MR. BARR:  It's about the FDA approval section, it's

13:00:24  7   highlighted.  This section right here.  I mean, that's -- we are

13:00:28  8   not supposed to be talking about that, it shouldn't be highlighted

13:00:30  9   up on the screen for the jury to read.

13:00:32 10          THE COURT:  What's your --

13:00:33 11          MS. WILKINSON:  He read that exact section.  He showed

13:00:36 12   this to Dr. Liechty and said -- to be fair, he read -- I checked

13:00:39 13   the transcript.  He read this exact section about it not being

13:00:44 14   approved by the FDA into the record.  So all I want this doctor to

13:00:46 15   say is why this doesn't show --

13:00:48 16          MR. BARR:  I don't know that that happened.

13:00:48 17          MS. WILKINSON:  You did.  You were trying to say --

13:00:48 18          MR. BARR:  I didn't.

13:00:52 19          MS. WILKINSON:  Whoever put it in front of Dr. Liechty.

13:00:54 20   Who put Dr. Liechty on?

13:00:56 21          MR. BARR:  Brad did.

13:00:57 22          MS. WILKINSON:  Brad did.  Sorry.

13:00:59 23          THE COURT:  Well, you know, I mean, if one witness

13:01:02 24   focused on it, I have to let the other witness explain it.  That's

13:01:06 25   the way it is.

13:01:06 1          MR. BARR:  Your Honor, there's no way we would -- he may

13:01:09 2   have read it.  I am trying to figure out the purpose why we would

13:01:13 3   even read that.

13:01:14 4          MS. WILKINSON:  Because someone said, I am trying to be

13:01:16 5   fair.  You are trying to say this showed --

13:01:17 6          MR. BARR:  So now you're going to point out that it's not

13:01:19 7   approved?

13:01:20 8          MS. WILKINSON:  No.  I am going to point out -- he wants

13:01:22 9   to tell you why he thinks this does not show that PT should be

13:01:24 10  used.  Your position was that this article supported Dr. Liechty's

13:01:28 11  opinion that PT should be used, and we read it and said, right here

13:01:31 12  it's clear why they are not recommending.

13:01:34 13         MR. BARR:  And one of those reasons is because it's not

13:01:37 14  specifically approved by the FDA.

13:01:38 15         MS. WILKINSON:  Well, he said, "And the normal

13:01:41 16  prothrombin time may not exclude clinically relevant times."

13:01:44 17         MR. BARR:  I don't have a problem with him reading that,

13:01:46 18  but this highlighting right here.  I don't understand why we're

13:01:49 19  showing --

13:01:49 20         MS. WILKINSON:  I don't know why it matters to him when

13:01:51 21  it's been read into the record already, and he says that's one of

13:01:55 22  the factors -- he won't say that's the most important thing, he'll

13:01:58 23  say this (INDICATING).

13:01:58 24         MR. BARR:  Your Honor, there's an order on this.

13:02:01 25         THE COURT:  I know, but it's been read into the record,

1915

13:02:34 1   and she represents that it has, she has to have somebody testify as

13:02:34 2   to what the -- what's his position on it.  I mean, if it's in the

13:02:34 3   record, it's in the record.

13:02:34 4           MR. BARR:  I don't believe Dr. Liechty took a position on

13:02:34 5   it.

13:02:34 6           MS. WILKINSON:  He can't take a position on half of it

13:02:34 7   and not the other.  I mean -- I'll put it up and focus on -- let

13:02:34 8   him tell you what's most important.  But this was used as a reason

13:02:34 9   to support his opinion, and he is here to contradict your expert

13:02:34 10  and say, no, it does not.

13:02:34 11          MR. BARR:  Your Honor, I think a limiting instruction

13:02:34 12  consistent with the order is appropriate.

13:02:36 13          THE COURT:  That's fine.  I'll do that.

13:02:46 14     (OPEN COURT.)

13:02:51 15  BY MS. WILKINSON:

13:02:54 16  Q.  Dr. Thomas --

13:02:55 17  A.  Dr. Khatib.

13:02:56 18  Q.  Dr. Khatib, sorry.  Did you read this article?

13:02:59 19  A.  I did.

13:03:00 20  Q.  And do see this portion here that's "Rivaroxaban," it says, "in

13:03:06 21  a normal prothrombin time may not exclude clinically relevant

13:03:10 22  levels"?

13:03:10 23  A.  Yes.

13:03:11 24  Q.  Do you agree with that?

13:03:11 25  A.  I do.

13:03:12  1    Q.  And does that in any way suggest that PT time can be used in an

13:03:18  2    emergency situation?

13:03:18  3    A.  Does it suggest --

13:03:21  4    Q.  Is it recommended -- I should say it better.  Is that

13:03:24  5    recommending that you should use it even though it can exclude

13:03:29  6    clinically relevant levels?

13:03:30  7    A.  No.  I think if you look at the summary conclusion, when I

13:03:33  8    read -- I went to that -- "In summary, although routine NOAC

13:03:37  9    monitoring is unnecessary, measurement of NOAC effect may assist

13:03:42 10    clinical management."

13:03:44 11         I actually think the more -- "in certain acute care and

13:03:49 12    periprocedural settings, in most situations the time of the last

13:03:51 13    ingestion -- of the last drug ingestion combined with the recent

13:03:54 14    assessment of creatinine clearance should enable appropriate

13:03:59 15    clinical decision-making."

13:04:00 16         I agree with that.  That you incorporate the time of the

13:04:02 17    last ingestion of the medication and the kidney function because

13:04:05 18    that was what was studied, the kidney function for the changing

13:04:09 19    dosing, 15 milligrams versus 20 milligrams.

13:04:12 20    Q.  So --

13:04:13 21    A.  They're not recommending -- when I see that, their

13:04:15 22    recommendation is for using the BMP and time of last medication

13:04:20 23    ingestion.

13:04:20 24    Q.  So are you aware of out in your clinic practice any belief that

13:04:25 25    the American Heart Association recommends in clinical practice to

13:04:29 1 use PT for Xarelto patients in an emergency situation?

13:04:32 2 A.  No.

13:04:32 3 Q.  Let's turn to the label, if we could.  This shouldn't take

13:04:44 4 long.  First of all, you told us that all anticoagulants have the

13:04:48 5 risk of bleeding, right?

13:04:49 6 A.  Yes.

13:04:50 7 Q.  And we just want to walk through these so you can show us where

13:04:56 8 some of the warnings are.  Is there a warning on bleeding or

13:05:00 9 warnings on the bleeding -- about bleeding in the Xarelto label?

13:05:03 10 A.  There is.

13:05:03 11 Q.  And is this just a sample of those?

13:05:06 12 A.  Yes.

13:05:07 13 Q.  Is there a warning about the lack of reversal agent for

13:05:15 14 Xarelto?

13:05:15 15 A.  Yes.

13:05:16 16 Q.  And is that true for the other anti-Factor Xa drugs?

13:05:23 17 A.  For the anti-Factor Xa at this time, yes.

13:05:25 18 Q.  Yesterday we saw this.  Do you agree that Savaysa doesn't have

13:05:29 19 a PT test to measure the effect of anticoagulation in an emergency

13:05:35 20 situation?

13:05:35 21 A.  I agree.

13:05:35 22 Q.  And you agree Eliquis and Xarelto don't have those either?

13:05:39 23 A.  I agree.

13:05:39 24 Q.  What about reversal agent?  Is it true that none of these

13:05:45 25 anticoagulants have a reversal agent?

| | |
|---|---|
| 13:05:47 | 1 |
| 13:05:49 | 2 |
| 13:05:52 | 3 |
| 13:05:55 | 4 |
| 13:05:57 | 5 |
| 13:06:00 | 6 |
| 13:06:00 | 7 |
| 13:06:03 | 8 |
| 13:06:06 | 9 |
| 13:06:12 | 10 |
| 13:06:16 | 11 |
| 13:06:18 | 12 |
| 13:06:19 | 13 |
| 13:06:20 | 14 |
| 13:06:22 | 15 |
| 13:06:27 | 16 |
| 13:06:30 | 17 |
| 13:06:32 | 18 |
| 13:06:35 | 19 |
| 13:06:36 | 20 |
| 13:06:36 | 21 |
| 13:06:41 | 22 |
| 13:06:47 | 23 |
| 13:06:51 | 24 |
| 13:06:54 | 25 |

A.  Yes.

Q.  Is it your opinion that doctors know that when they are prescribing these drugs to their patients?

A.  I do.  That is my opinion.

Q.  Let's take a look at the label provision here.  What does that say?

A.  "A specific antidote for rivaroxaban is not available."

Q.  Is "antidote" the same as a "reversal agent"?

A.  Yes.

Q.  There has been some criticism in the courtroom about the TTR range that you talked about.  Is there any information about that in the label itself?

A.  Yes.

Q.  Tell us what it says.

A.  "Patients randomized warfarin had a mean percentage time between -- of -- in the INR target range of 55 percent lower during the first few months of the study."

Q.  And is that consistent with what you know about the ROCKET data?

A.  Yes.

Q.  And what about -- is it your medical opinion that physicians who prescribe this medication know that there is no reliable monitoring using a standard laboratory test for Xarelto?

A.  I didn't catch the question.

Q.  That there's no way to measure the anticoagulant effect of

13:06:58  1    Xarelto with some kind of standard laboratory testing?

13:07:02  2    A.  I don't think that there is a clinically meaningful way to do

13:07:06  3    so.

13:07:06  4    Q.  Is that consistent with this warning in the Xarelto label?

13:07:10  5    A.  Yes.

13:07:11  6    Q.  Let's end, if we could, by talking about PT.  Is there a

13:07:21  7    section in the label that does talk about prothrombin time?

13:07:25  8    A.  I believe so.

13:07:26  9    Q.  And what section is that?

13:07:30 10    A.  12.2, pharmacodynamic.

13:07:36 11    Q.  We had it read to us before, but tell us what that means in

13:07:40 12    English; or it means to you as a doctor is a better question?

13:07:43 13    A.  What does it mean to me as a physician.  Let me read it again.

13:07:47 14    (WITNESS REVIEWS DOCUMENT.)

13:07:52 15            So the impact on Factor X activity was related in a

13:08:00 16    dose-dependent manner to PT.

13:08:04 17            I am not doing that in English, am I?  I am just

13:08:08 18    repeating what it's saying.

13:08:09 19    Q.  Yes, a bit.

13:08:10 20    A.  So it's saying that the impact on the Factor Xa correlates with

13:08:15 21    the prothrombin time, if you use the Neoplastin agent.

13:08:17 22    Q.  So would that be consistent with that FDA diagram that you

13:08:21 23    showed us earlier?

13:08:22 24    A.  Yes.

13:08:22 25    Q.  That there's some relationship?

13:08:24 1   A.  On a macro, on a population level, yes, it does correlate.

13:08:29 2   Q.  Dr. Khatib, in your expert opinion, is Xarelto a safe and

13:08:35 3   effective drug to prescribe to patients who have atrial

13:08:40 4   fibrillation?

13:08:40 5   A.  Absolutely.  I still use it and will continue to use it.  I am

13:08:45 6   comfortable with the medication, and I am happy it's on the market.

13:08:47 7   Q.  In your expert opinion, is there a PT test that can measure the

13:08:53 8   anticoagulant effect of a patient who is on Xarelto in an emergency

13:08:57 9   situation?

13:08:57 10  A.  Not in a clinically meaningful way.

13:09:00 11  Q.  Is there a helpful test?

13:09:01 12  A.  No, not at this time.  Well, BMP, I'm sorry, the creatinine

13:09:08 13  clearance as was said in the HA, I think that could be helpful.

13:09:11 14  Q.  There's no PT test that would be helpful?

13:09:13 15  A.  No.

13:09:14 16  Q.  And in your expert opinion, was it appropriate for

13:09:19 17  Dr. St. Martin to prescribe Xarelto to Mrs. Orr in light of her

13:09:23 18  medical condition?

13:09:24 19  A.  Absolutely.  That was the right decision.

13:09:29 20           MS. WILKINSON:  That's all I have.  Thank you very much.

13:09:31 21           THE COURT:  Okay.  Cross-examination.

13:09:47 22           MR. BARR:  Just give me a brief moment, your Honor, to

13:09:49 23  get set up.

13:09:58 24                       CROSS-EXAMINATION

13:09:58 25  BY MR. BARR:

13:10:08  1   Q.  Good afternoon, Dr. Khatib.  My name is Brian Barr.  We've

13:10:11  2   never met, have we?

13:10:12  3   A.  No.  Nice to meet you.

13:10:13  4   Q.  I believe you've met my partner Ned McWilliams?

13:10:16  5   A.  Yes, sir.

13:10:16  6   Q.  You've never treated Sharyn Orr, have you?

13:10:21  7   A.  No, sir.

13:10:22  8   Q.  You've never looked at her CT films, anything like that?

13:10:26  9   A.  I looked at the actual images, no, sir.

13:10:29 10   Q.  All you've done is reviewed her medical records, right?

13:10:32 11   A.  Yes, sir.

13:10:32 12   Q.  You've never met her or her family, correct?

13:10:35 13   A.  No, sir.

13:10:35 14   Q.  You understand that in this case we're not talking about a

13:10:49 15   cardiologist's use of PT, correct?

13:10:55 16   A.  I'm not sure I understand.

13:10:58 17   Q.  Well, you testified to this jury that you wouldn't use PT; you

13:11:03 18   don't find it helpful, correct?

13:11:05 19   A.  Correct.

13:11:06 20   Q.  And you testified that you wouldn't find it helpful because you

13:11:11 21   can't use it to monitor like you do with warfarin and adjust dose,

13:11:15 22   correct?

13:11:15 23   A.  No.  I don't -- it's not about adjusting dose.  I am very

13:11:22 24   comfortable with the dosage estimate without the utilization of PT.

13:11:25 25   Q.  So you're comfortable adjusting dose of Xarelto based upon

OFFICIAL TRANSCRIPT

13:11:30  1   anything other than creatine clearance?

13:11:33  2   A.  No.  It's creatine clearance.  That's it.

13:11:35  3   Q.  So you don't believe that you can have PT to have an

13:11:38  4   individually tailorized dose for Xarelto, right?  You don't believe

13:11:41  5   there is data to do that, correct?

13:11:43  6   A.  I am not familiar with any study of outcome data that's looked

13:11:47  7   at dose adjusting people and looking at outcomes.

13:11:51  8   Q.  You understand that the issues in this case are about a

13:11:55  9   neurosurgeon's use of PT, right?

13:12:00 10   A.  I guess.  I am looking at this in general, but you're asking if

13:12:06 11   this is specific -- if the question was posed specifically to the

13:12:09 12   neurosurgeon; is that what you're asking?

13:12:12 13   Q.  Yes, sir.

13:12:13 14   A.  So in this case specific case the question was posed to the

13:12:16 15   neurosurgeon.

13:12:17 16   Q.  Right.  You understand that all Dr. Bui wanted to know was

13:12:21 17   whether or not Sharyn Orr had taken her Xarelto pill six hours

13:12:24 18   earlier, right?

13:12:25 19   A.  I am not -- I am not going to opine on what Dr. Bui's thought

13:12:35 20   specifically and what he was using and not using to make his

13:12:38 21   decision.  That's his clinical decision.  And clinical decisions

13:12:40 22   there's a lot of factors that go into that.  I am not a

13:12:43 23   neurosurgeon.  So I am not going opine one way or another that

13:12:47 24   that's the case.

13:12:49 25   Q.  You've never been faced with the situation as a neurosurgeon

13:12:53  1  where somebody has come to you, they're having a brain bleed, you

13:12:56  2  know you need to get in there and operate, and you have to wait

13:13:00  3  because they're on Xarelto?  You've never dealt with that?

13:13:02  4  A.  I am not a neurosurgeon.

13:13:04  5  Q.  And you understand that the normal PT result of Ms. Sharyn Orr

13:13:11  6  was consistent with the truth in this case, right?  That she didn't

13:13:14  7  have Xarelto on board, correct?

13:13:16  8  A.  I am -- one more time.

13:13:20  9  Q.  Do you believe that Sharyn Orr had significant levels of

13:13:24 10  Xarelto in her blood at the time that PT was taken?

13:13:29 11  A.  No.  My judgment on that is based on the timing of her likely

13:13:33 12  timing of her last ingestion and her creatinine clearance.

13:13:39 13  Q.  Right.  You believe the timing of her last ingestion was the

13:13:42 14  day before, April 23rd?

13:13:43 15  A.  That's my suspicion.

13:13:47 16  Q.  Now, you spent a lot of time talking about PT, and I want to

13:13:52 17  kind of walk through this with you.

13:13:54 18  A.  Okay.

13:13:55 19  Q.  In forming your opinions in this case, one of the things you

13:13:57 20  did was perform a literature search to see what the scientific

13:14:04 21  literature said about the use of PT in a clinical setting, correct?

13:14:10 22  A.  Correct.

13:14:10 23  Q.  And you understand -- at least as I understand what you said,

13:14:20 24  you weren't able to find any literature that supports the use of PT

13:14:24 25  in a clinical setting, correct?

1924

13:14:25  1    A.  No.  There's literature that makes the statement that it is

13:14:31  2    something that you can use.  What I am specifically saying is that

13:14:33  3    there's no trial looking at outcomes, there's no data specifically

13:14:38  4    looking at outcomes saying, "We're going to take this PT and we're

13:14:41  5    going to make this decision," and showing the impact it has on a

13:14:45  6    patient.  There's no trial of someone coming in with a brain

13:14:50  7    hemorrhage and those on PT, you wait or not wait, based on the

13:14:53  8    decision, and showing that that made a clinical difference.

13:14:56  9    Q.  So you want to run a clinical trial of people with a brain

13:15:01  10   bleed and to run a PT on them to see if that impacts outcome;

13:15:08  11   that's what you want to do?

13:15:08  12   A.  No.  I am comfortable not using the PT and using the timing and

13:15:14  13   the creatinine clearance.  I am not the one who is saying that this

13:15:20  14   is going to be helpful.  I am comfortable with that clinical

13:15:27  15   managing in that clinical situation.  But, as you said, I am not a

13:15:28  16   neurosurgeon; they may feel differently.

13:15:30  17   Q.  Now, you're aware that it's been represented to this jury that

13:15:35  18   there's not a single piece of literature that says you can use the

13:15:39  19   PT test in an emergency situation before doing surgery?  Do you

13:15:44  20   know that?

13:15:44  21   A.  No, I don't know what's been discussed.

13:15:49  22   Q.  In your thorough search of the literature, did you find

13:15:52  23   articles that support the use of PT in an emergency situation?

13:15:56  24   A.  There are articles that are of the opinion -- that state the

13:16:00  25   opinion that it can be useful.  There's no articles that

13:16:04  1   specific -- that I am aware of, that specifically state for a PT of

13:16:08  2   this on X time that -- that have data showing the outcomes.

13:16:13  3   Q.  So I think that was an agreement that there are articles that

13:16:19  4   exist that support the use of PT in an emergency setting, right?

13:16:23  5   A.  There are -- there are articles that exist that do make that

13:16:29  6   suggestion, yes.

13:16:30  7   Q.  I want to start with one of those articles.  Are you familiar

13:16:40  8   with the Lippi study?

13:16:42  9   A.  Lippi?

13:16:43 10   Q.  Yeah.  Did you come across the Lippi study in your thorough

13:16:48 11   literature review?

13:16:48 12   A.  It sounds familiar.  I've read a lot of articles.  I can't --

13:16:52 13   it's not at my fingertips, but I am happy to look at it and then

13:16:56 14   tell you.

13:16:56 15   Q.  It's not one that you relied upon in coming to your opinion, is

13:17:01 16   it?

13:17:01 17   A.  Don't know without having seen the article.

13:17:04 18   Q.  It's not one that was listed in your reference or reliance

13:17:07 19   materials in your expert report, is it?

13:17:08 20   A.  Okay.  Again, I don't have my reliance list memorized.  So if

13:17:14 21   it's not on the reliance list, then hopefully I didn't see it.

13:17:23 22   Q.  Well, let me hand one of these to you.

13:17:26 23           MR. BARR:  May I approach, your Honor?

13:17:27 24           THE COURT:  Yes.

13:17:33 25           THE WITNESS:  Thanks.

13:17:38  1   BY MR. BARR:

13:17:39  2   Q.  Do you see that this is an article -- can I get 5767884 on the

13:17:45  3   screen.

13:17:49  4            You see that this is an article by Giuseppe Lippi,

13:17:52  5   correct?

13:17:52  6   A.  Sure.

13:17:53  7   Q.  And the title of this is, "Recent guidelines and

13:17:58  8   recommendations for laboratory assessment of the direct oral

13:18:00  9   anticoagulants:  Is there a consensus?"  Did I read that right?

13:18:04 10   A.  You did.

13:18:04 11   Q.  And this article states -- if you look on this first page here

13:18:12 12   that there is a dogma --

13:18:15 13            MR. BARR:  Can we blow this up?

13:18:19 14            THE WITNESS:  Where are you?

13:18:30 15   BY MR. BARR:

13:18:30 16   Q.  Do you see it, the dogma?  Do you see that?  Let's blow this up

13:18:35 17   (INDICATING).

13:18:35 18   A.  That is a great technology.  I need to figure out how to do

13:18:39 19   that.

13:18:40 20            THE COURT:  You can read it closer right there.

13:18:42 21            THE WITNESS:  Oh, yeah.  Now it's here.

13:18:44 22   BY MR. BARR:

13:18:44 23   Q.  It says that, "There's a dogma that DOACs do not require

13:18:47 24   laboratory monitoring.  The dogma that DOACs do not require

13:18:51 25   laboratory monitoring is countered by ongoing recognition that

OFFICIAL TRANSCRIPT

13:18:53  1   laboratory testing for drug effects is needed in many situations."

13:18:59  2         Did I read that correctly?

13:19:01  3   A.  You did.

13:19:03  4   Q.  And you agree with that, don't you?

13:19:04  5   A.  No, I do not agree with that.

13:19:05  6   Q.  So you don't agree that a laboratory test is even needed in any

13:19:09  7   situation?

13:19:09  8   A.  I didn't say any.  I said many.  I think that there would

13:19:13  9   always -- if there's an opportunity where you have a reliable,

13:19:18 10   clinically meaningful laboratory test, I would absolutely -- there

13:19:22 11   are times where it would be helpful.  I am not agreeing with

13:19:25 12   "many."

13:19:25 13   Q.  Then let's restate it.  Do you agree there are any clinical

13:19:29 14   situations in which a laboratory test would be helpful -- would be

13:19:34 15   useful?

13:19:35 16   A.  Yes, I think that it would be of value to have -- again, I said

13:19:39 17   this.  If the PT test were helpful, I would be all for -- bring it

13:19:43 18   on.  I'll use it.  That's not the question.  So there are times

13:19:46 19   where it would be a value to have some testing.

13:19:48 20   Q.  And just so it's clear, because I want to understand this.  How

13:19:52 21   would you use the PT test, if it were helpful?

13:19:56 22   A.  I wouldn't.  I don't look at it.  I don't -- for Xarelto, I

13:20:00 23   don't use it.

13:20:01 24   Q.  Then this test -- you're saying if something was helpful and

13:20:04 25   you would use it, how would you use it?

13:20:06  1    A.   How would I use --

13:20:12  2    Q.   What would it be helpful for you to use?

13:20:14  3    A.   In a situation such as Mrs. Orr?

13:20:16  4    Q.   Yes, sir.

13:20:18  5    A.   I think if there was a test that could definitively tell you

13:20:20  6    that -- and not just bleeding, but impact of bleeding when you're

13:20:27  7    actually going to operate, that you're going to have no

13:20:30  8    anticoagulant effect, I would find that helpful.

13:20:32  9    Q.   Would you require that test to have medical certainty?

13:20:37  10   A.   I think if you're going to ask -- the physician's going to ask

13:20:42  11   me whether it's safe to operate or not operate, you're going to

13:20:45  12   want it to be a reliable, effective test.

13:20:48  13   Q.   That's not what I asked.

13:20:49  14   A.   I understand, but I am trying to answer to the best of my

13:20:52  15   abilities.  I want a reliable test.  And if it's not reliable, I am

13:20:56  16   not going to feel comfortable with it.

13:20:58  17   Q.   That's not what I am asking.  Would you require the test to

13:21:02  18   have absolute certainty?

13:21:06  19   A.   Absolute certainty?  I would want meaningful certainty.

13:21:14  20   Q.   You agree there's no such thing --

13:21:16  21   A.   No such thing --

13:21:19  22   Q.   -- as absolute certainty in the practice of medicine, right?

13:21:19  23   A.   Yes, there's nothing that's absolute, I agree.

13:21:21  24   Q.   Nothing, you agree with that?

13:21:23  25   A.   Yes.  There's nothing absolute.

13:21:26  1    Q.  There are false negatives all the time in medicine, right?

13:21:32  2    A.  Yes, sir.

13:21:32  3    Q.  You can't guarantee -- I mean, there's no such thing as a

13:21:41  4    guarantee in medicine, right?

13:21:41  5    A.  Correct.  That's the art and why you have to judge and make

13:21:42  6    decisions.

13:21:44  7    Q.  Right.  You can't guarantee if you give somebody a Xarelto pill

13:21:47  8    that they won't have a stroke, will you?

13:21:49  9    A.  Correct.

13:21:49 10    Q.  You can't guarantee that if you give somebody a Xarelto pill,

13:21:55 11    they will or won't bleed, can you?

13:21:59 12    A.  Correct.

13:22:00 13    Q.  It's about risks and benefits, right?

13:22:00 14    A.  Absolutely.

13:22:00 15    Q.  And you weigh the options based upon the available data,

13:22:04 16    correct?

13:22:04 17    A.  Correct.

13:22:04 18    Q.  And you've seen literature that says PT can be helpful, right?

13:22:08 19    A.  I've seen literature where that opinion has been made, yes.

13:22:11 20    Q.  It can provide a piece of information for the doctor to weigh,

13:22:15 21    right?

13:22:15 22    A.  I've seen that statement, yes.

13:22:18 23    Q.  To be able to sit down with a patient's family and have a

13:22:23 24    discussion with them about the risks and benefits of proceeding to

13:22:27 25    surgery, right?

13:22:28  1    A.  I do not feel that PT helps me in that decision, in that

13:22:32  2    conversation.

13:22:33  3    Q.  So you just don't think it can be used as all, that's your

13:22:36  4    view?

13:22:37  5    A.  I don't use it in my practice at this time.  If I thought it

13:22:40  6    was helpful, believe me, I would be the first to use it, but I am

13:22:43  7    not using it.

13:22:43  8    Q.  You keep going back to your practice, and I tried to make clear

13:22:47  9    here that we're not talking about your practice.  We're talking

13:22:50  10   about the use of PT by a neurosurgeon trying to figure out if

13:22:55  11   somebody -- it's safe for them to go in and perform emergency

13:22:59  12   surgery.

13:22:59  13   A.  We're still talking about my practice, because if my patient is

13:23:02  14   on an anticoagulant and they show up in a hospital with a bleed,

13:23:05  15   we're -- it's my patient.  So I am not going to make the final

13:23:08  16   decision as a neurosurgeon whether to make that intervention or if

13:23:11  17   it's a surgical because of GI bleed.  If it's from something I've

13:23:15  18   done from a procedure, then I am going to make that decision, but I

13:23:18  19   am still involved.  That's my patient.  So that's still my

13:23:21  20   practice.

13:23:23  21   Q.  You agree --

13:23:25  22   A.  And I'm sorry to interrupt.

13:23:26  23   Q.  Please.

13:23:27  24   A.  But we get asked those questions.  We get phone calls and say,

13:23:32  25   can I do this.  I can't tell you how many times a day I get sent a

13:23:35  1    note by a neurosurgeon, a general surgeon, a dentist, hey --

13:23:39  2    Q.  Watch out for that microphone.

13:23:41  3    A.  Thanks, it's dangerous.

13:23:42  4        How long can I hold this medication, do I -- you know, is

13:23:46  5    it safe to hold it, how long can we hold it, when can we resume it.

13:23:49  6    They call, they ask us.  So, yes, this is in my practice.

13:23:52  7    Q.  Okay.  You're aware that prostate screens, they don't always

13:23:58  8    get the screen right, correct?

13:23:59  9    A.  Correct.

13:24:00 10    Q.  Mammograms, they don't always get it right, right?

13:24:03 11    A.  Correct.

13:24:03 12    Q.  A host of other tests, right?

13:24:05 13    A.  Absolutely.

13:24:06 14    Q.  And we use them in medicine, right?

13:24:08 15    A.  We do.

13:24:10 16    Q.  We don't require absolute certainty, correct?

13:24:12 17    A.  There's very little that requires absolute certainty,

13:24:16 18    absolutely.

13:24:17 19    Q.  And you talked about in your direct and you were specifically

13:24:22 20    talking about the Orr family and her use of Xarelto, you talk about

13:24:27 21    how one bad outcome can't determine how you practice, right?

13:24:32 22    A.  Correct.

13:24:33 23    Q.  That should apply to all medicine, right?

13:24:37 24    A.  Absolutely.

13:24:39 25    Q.  So because you can't take a PT test and guarantee somebody

13:24:46  1    doesn't have drug on board, that doesn't mean you can't use it,

13:24:49  2    right?

13:24:50  3    A.  One more time.

13:24:51  4    Q.  If you take a PT and it's normal and you can't go to that

13:24:56  5    patient or that family and guarantee that they don't have drug on

13:25:00  6    board, that doesn't mean you can't use it to get information,

13:25:04  7    right?

13:25:05  8    A.  Again, I agree, you don't need absolute certainty.  I don't

13:25:09  9    ever guarantee anything when I am talking to a patient.  I tell

13:25:15 10    them we're the opposite of politicians, we don't promise.  So, no,

13:25:18 11    I don't look for guarantee.  What I look for is something that's

13:25:21 12    going to be reasonably helpful and that the degree of certainty is

13:25:26 13    relatively low.

13:25:27 14    Q.  I want to keep looking at the Lippi article, if we can get that

13:25:32 15    back up.

13:25:34 16    A.  Sure.

13:25:35 17    Q.  And I want to go to page 5, if you don't mind, sir.

13:25:41 18    A.  Is that PDF 5?

13:25:43 19    Q.  PDF 5, yes, sir.  If you look here, I'll show you where I am

13:25:47 20    going to be going, right there, and we'll blow that up for you.

13:25:51 21    And I want to highlight this right here, starting there, and just

13:25:55 22    highlight this little section so that Dr. Khatib can see it

13:26:00 23    (INDICATING).

13:26:00 24          And this is an article, if you look at it, it's published

13:26:04 25    in the peer-reviewed literature, right?

13:26:06  1   A.  This is international, right.  This is an Italian hematologist

13:26:11  2   I was just looking at?

13:26:12  3   Q.  Yes, sir.  Do they not perform good science internationally?

13:26:16  4   A.  No, I am not saying that.  But I tend to utilize our data.  But

13:26:20  5   I look at international data as well.

13:26:21  6   Q.  International data was used in ROCKET, wasn't it?

13:26:24  7   A.  There were -- it was -- they used international centers, but it

13:26:29  8   was centered out of the United States.

13:26:30  9   Q.  The data came from all over the world, right?

13:26:33 10   A.  Yes.  But the analysis and the collection was done in the

13:26:37 11   United States.

13:26:37 12   Q.  Well, the collection couldn't have been done in the United

13:26:39 13   States if the blood draws were taken in Eastern Europe, would they?

13:26:43 14   A.  I mean the data collection and collation.  Yes, so it starts

13:26:47 15   there and then it comes back to the center.

13:26:48 16   Q.  The vast majority of the ROCKET data was collected outside of

13:26:51 17   the United States, right?

13:26:52 18   A.  Sure, yes.

13:26:54 19   Q.  So we're looking at "Routine or urgent assessment of

13:27:00 20   rivaroxaban."  Do you see that, that's Xarelto, correct?

13:27:02 21   A.  Yes, sir.

13:27:02 22   Q.  And it says, "It was therefore concluded that the PT may be

13:27:06 23   used for urgent measurements of rivaroxaban and as a screening test

13:27:10 24   to assess the risk of bleeding in the individual patient because

13:27:15 25   it's available to all hospital laboratories, is prone to worldwide

13:27:18   1   standardization" -- and then if we go to the next page -- "is

13:27:22   2   relatively cheap compared with other tests, and is sufficiently

13:27:26   3   sensitive to Xarelto, views in agreement with other expert

13:27:31   4   opinions," right?

13:27:31   5   A.  I am going to look the citation.  No, I don't agree with that.

13:27:39   6   Q.  I didn't ask if you agreed with it.  I asked if that's what it

13:27:43   7   said.

13:27:43   8   A.  Yes, sir, it does.

13:27:44   9   Q.  So this is an article published in the peer-reviewed literature

13:27:50  10   that was not part of your report, that disagrees with your

13:27:54  11   assessment, right?

13:27:55  12   A.  This is an example of an article that has an opinion that is

13:27:58  13   different from mine, yes.  It's not data looking at outcomes saying

13:28:04  14   if you do it this way, this is your outcome.

13:28:06  15   Q.  You didn't consider this report in coming to your opinions, did

13:28:10  16   you?

13:28:10  17   A.  I viewed a lot of reports that I -- again, there is no way to

13:28:14  18   review every report.  I was familiar with some of the international

13:28:19  19   studies that have made the comments that they felt it should be in

13:28:23  20   there, I am with that.  But, no, this is not one that I

13:28:26  21   specifically saw.

13:28:27  22   Q.  Well, in this article, they do their own thorough search of the

13:28:32  23   literature, are you aware of that?

13:28:33  24   A.  The three citations from the Journal of Hematology, I believe,

13:28:38  25   yes, the 29 through 32 is their review.

1935

13:28:41  1    Q.  Let's take this down.  Let's go to page 7.  Do you see this

13:28:47  2    "Recent guidelines and recommendations for laboratory assessment of

13:28:51  3    DOACs," do you see that?

13:28:52  4    A.  Yes.

13:28:53  5    Q.  It says, "To provide a comprehensive picture and national and

13:28:57  6    international guidelines on urgent and routine measurement of

13:29:01  7    DOACs, we performed a systematic search using the three mostly

13:29:06  8    accessed scientific databases, Medline, Scopus and Web of Science

13:29:12  9    with the following criteria," right?

13:29:13  10   A.  Correct.

13:29:13  11   Q.  Is that similar to what you did when you did your thorough

13:29:18  12   literature search?

13:29:18  13   A.  Yes.

13:29:19  14   Q.  Let's go to the next page.  It says, "Key orders, guidelines or

13:29:23  15   recommendation or indication or position paper or novel oral

13:29:27  16   anticoagulants or new oral anticoagulants or direct oral

13:29:30  17   anticoagulants or dabigatran" -- that's Pradaxa, right?

13:29:35  18   A.  Yes.

13:29:35  19   Q.  -- "or rivaroxaban" -- which is Xarelto, right?

13:29:37  20   A.  Correct.

13:29:38  21   Q.  -- "or apixaban" -- which is Eliquis, right?

13:29:40  22   A.  Correct.

13:29:41  23   Q.  -- "or edoxaban" -- which is Savaysa, right?

13:29:44  24   A.  Correct.

13:29:44  25   Q.  And then they did "date limits, none; language English."  So

13:29:49  1   that's how they performed their search, correct?

13:29:51  2   A.  Correct.

13:29:51  3   Q.  And you did something similar, right?

13:29:54  4   A.  Yes.  But I don't remember what key words I would say I used,

13:29:58  5   but that's the nature of what I did, yes.

13:30:01  6   Q.  Okay.  Let's look at what these doctors find.  You agree, and I

13:30:06  7   think you said this in direct, that the guidelines are really

13:30:09  8   important, the practice guidelines, right?

13:30:11  9   A.  Correct.

13:30:12 10   Q.  Would you give those greater weight than the peer-reviewed

13:30:17 11   literature, practice guides?

13:30:18 12   A.  Well, the guidelines are based on peer-reviewed literature, so

13:30:23 13   I am not sure I would give greater weight.  Guidelines you have

13:30:28 14   to -- they're not law, they're not pillars, they're guidelines that

13:30:34 15   are helpful in directing us.  But I think you always have to look

13:30:37 16   at the peer-reviewed literature, that's where it comes from.

13:30:40 17   Q.  Okay.  Let's take this down and I want to go this section here

13:30:46 18   (INDICATING).

13:30:48 19   A.  What page are you on?

13:30:50 20   Q.  It's one paragraph below, starts "regarding anti-Xa

13:30:57 21   inhibitors," right?  Do you see that?  If you look on the screen --

13:31:00 22   A.  Yes.

13:31:01 23   Q.  -- do you see "regarding anti-Xa inhibitors"?

13:31:05 24   A.  Yes, I do.

13:31:06 25   Q.  It's literally one paragraph down from where we were just

13:31:09  1    reading.

13:31:10  2    A.  I do, I see that.

13:31:11  3    Q.  What this says -- so it's clear, Xarelto is an anti-Factor Xa

13:31:15  4    inhibitor, correct?

13:31:16  5    A.  Yes.

13:31:17  6    Q.  And it says, "Regarding Factor Xa inhibitors, the PT was

13:31:22  7    proposed as a reliable screening test in patients taking these

13:31:26  8    drugs in six of seven guidelines."  Did I read that right?

13:31:30  9    A.  Correct.

13:31:30 10    Q.  According to this article, which you didn't reference in your

13:31:34 11    report, these authors doing their thorough search found that in six

13:31:40 12    of seven guidelines, PT was proposed as a reliable screening test,

13:31:45 13    right?

13:31:45 14    A.  I would like to see which guidelines they're referencing.  Do

13:31:48 15    you have that?

13:31:49 16    Q.  Yes, we can do that.  That's the next table down.  Let's blow

13:31:55 17    this up.  These are the guidelines.  Do you see this?

13:31:59 18    A.  Yes.

13:32:00 19    Q.  So those are the guidelines that are being referenced.

13:32:03 20    A.  Do they have the dates for those?

13:32:06 21    Q.  It doesn't have that.  But that's what the article says,

13:32:11 22    correct?

13:32:11 23    A.  It does say that.  I think you have to keep in context also

13:32:15 24    dates and whether there have been any updated guidelines since then

13:32:19 25    that have been modified.  There's no -- these are all international

13:32:23  1   guidelines, huh?  These aren't American.  I think the ACCP -- what

13:32:29  2   does ACCP stand for?

13:32:32  3   Q.  Let's see if we can find it down here.  I want to help you.

13:32:38  4   American College of Chest Physicians.

13:32:39  5   A.  There you go.

13:32:41  6   Q.  In conducting -- we can put this one down.

13:32:44  7   A.  Can you put that back up for a moment?

13:32:47  8            MS. WILKINSON:  Your Honor, can he just read the article

13:32:49  9   so he doesn't have to have Mr. --

13:32:51 10            MR. BARR:  Your Honor, it's cross.

13:32:55 11            THE WITNESS:  I just -- the American College -- the one

13:32:57 12   American guideline you have on there said there was no -- said

13:33:01 13   don't use PT, said none for anti-Factor Xa drugs.  That's the one

13:33:06 14   American guideline that's included in that.

13:33:07 15            MR. BARR:  Okay.

13:33:09 16            THE WITNESS:  Okay.  So it's important -- you're showing

13:33:13 17   a piece.  And when our fellows and students, they're going to look

13:33:18 18   at an article, I tell them you have to look at the whole context

13:33:21 19   and really look at it.  If they show me one piece, they're going to

13:33:25 20   get skewered.  You have to look at the context.

13:33:29 21   BY MR. BARR:

13:33:29 22   Q.  I agree with you.  You want to talk about only showing a piece,

13:33:32 23   right?  That's what you want to talk about?

13:33:33 24   A.  I am saying you have to look --

13:33:35 25   Q.  Let's talk about showing pieces.  Can I get the ELMO.

13:33:43  1              You were shown this slide in your direct, do you remember

13:33:46  2  this?

13:33:47  3  A.  Yes.

13:33:48  4  Q.  This is the article by Testa?

13:33:51  5  A.  Yes.

13:33:53  6  Q.  And what you were shown was the use of PT or APTT in clinical

13:33:59  7  practice to evaluate NOAC anticoagulation activity could cause

13:34:05  8  dangerous misinterpretations.  Did I read that right?

13:34:07  9              THE COURT:  We have an objection.

13:34:08 10              MS. WILKINSON:  My only objection is, I know he may be a

13:34:11 11  little upset, but putting up there what "Ms. Wilkinson not show

13:34:14 12  you" might be a little argumentative, so I would --

13:34:16 13              MR. BARR:  I am about to ask the question.

13:34:17 14              MS. WILKINSON:  It's not appropriate.

13:34:20 15              THE COURT:  Let's ask the question.

13:34:24 16              MR. BARR:  Is that better, Beth?

13:34:28 17  BY MR. BARR:

13:34:29 18  Q.  There's a piece of information here that Ms. Wilkinson didn't

13:34:32 19  show you, isn't there?

13:34:34 20  A.  Sure.  Yeah, I am familiar with the article.

13:34:38 21              MR. BARR:  May I approach, your Honor?

13:34:39 22              THE COURT:  Yes.

13:34:40 23              MR. BARR:  Do you want a copy of this?

13:34:41 24              MS. WILKINSON:  No, I'm okay.

13:35:04 25              THE WITNESS:  (WITNESS REVIEWS DOCUMENT.)

13:35:04  1   BY MR. BARR:

13:35:07  2   Q.  So this is on page 4 of the article, correct, sir?

13:35:10  3   A.  Correct.

13:35:10  4   Q.  And there's this whole thing about a discussion, right?

13:35:14  5   A.  Yes, sir.

13:35:15  6   Q.  And it says, "Previous studies showed poor responsiveness of a

13:35:21  7   anticoagulation screening tests for DOAC measurements in relation

13:35:25  8   to the type of reagent used."  Did I read that right?

13:35:27  9   A.  You did.

13:35:28  10  Q.  "Even though some reagents showed acceptable responsiveness to

13:35:32  11  a specific drug, e.g., Neoplastin and Recombiplastin for

13:35:38  12  rivaroxaban."  Did I read that right?

13:35:40  13  A.  You did.

13:35:41  14  Q.  So this is saying that except for Xarelto with Neoplastin, that

13:35:51  15  one, it does show a relationship, right?  It is a good response?

13:35:55  16  A.  I think that -- I am not disagreeing that Neoplastin -- if the

13:36:00  17  Neoplastin reagent with PT has some correlation on a population

13:36:05  18  level with concentration, I am not disagreeing with that.  I stand

13:36:10  19  by the comment that was made on the other page that we showed that

13:36:15  20  the utilization of that can be dangerous, because I don't feel it

13:36:20  21  has clinical applicability.

13:36:23  22  Q.  This states clearly that Neoplastin PT showed acceptable

13:36:30  23  responsiveness with Xarelto, right?

13:36:31  24  A.  I don't know how to use acceptable responsiveness.  How do I

13:36:36  25  use that in a clinically meaningful way?  Please guide me.  I don't

13:36:39  1   know how to use it.

13:36:40  2   Q.  Sir, this is my chance to ask you questions, okay?

13:36:43  3   A.  Sorry.

13:36:44  4   Q.  And you weren't shown that in your direct.  You didn't show the

13:36:50  5   jury?

13:36:50  6   A.  I didn't show that, but I am familiar with the data, yes.

13:36:53  7   Q.  Let's keep going.

13:36:56  8        So in your thorough search -- can we get the scientific

13:37:00  9   literature demonstrative on the screen.  So if I represent to you

13:37:21  10  that the Lippi paper was not in your report, you're not going to

13:37:24  11  argue with me about that?

13:37:26  12  A.  No, it's not in my report.  Are we talking about specifically

13:37:30  13  in the report or was --

13:37:31  14  Q.  Wasn't in your reliance materials or cited in your report, do

13:37:35  15  you disagree with that?

13:37:35  16  A.  No.

13:37:36  17       MR. BARR:  Can I get, though, where I can write on this

13:37:39  18  thing?

13:37:39  19       THE DEPUTY CLERK:  There you go.

13:37:41  20  BY MR. BARR:

13:37:41  21  Q.  So you didn't get that one?

13:37:43  22  A.  Nope.

13:37:43  23  Q.  Let's show you another one.  Can I get Kubitza 2005, which is

13:38:04  24  5767878.

13:38:04  25  A.  Thank you.

13:38:05  1   Q.  So this is an article, and the jury has seen this one, I

13:38:14  2   believe, by Dagmar Kubitza.  Do you know that that's an employee of

13:38:20  3   Bayer?

13:38:21  4   A.  No.

13:38:21  5   Q.  And this is another article that you didn't cite, it's not on

13:38:25  6   your reliance list, right?

13:38:26  7   A.  No.  But I have read other articles by Kubitza.  The name

13:38:31  8   sounds familiar.  And I'm pretty sure that this citation was used

13:38:33  9   in those articles, but I haven't specifically seen this article.

13:38:36 10   Q.  So you didn't find this one, correct?

13:38:37 11   A.  I did find it.  I chose not to pull up the citation.  It was

13:38:41 12   referenced --

13:38:42 13   Q.  So if you found articles that you did not put on your reliance

13:38:45 14   list -- on your reference list --

13:38:47 15   A.  When I say "find," it was referenced in another article I read.

13:38:51 16   Q.  Okay.  So if we're going by that standard, if you go to the

13:38:54 17   back of this, there's 14 articles that you found?

13:38:57 18   A.  I'm sorry?

13:38:58 19   Q.  There's 14 references to this article, do you see that in the

13:39:02 20   back?

13:39:02 21   A.  There's 14 references by this article, not of this article,

13:39:06 22   yes.

13:39:06 23   Q.  So explain to me what it is you're saying, how you found this

13:39:10 24   article, when it's not an article you read in preparation of your

13:39:13 25   report.

13:39:13 1    A.  So that would be -- so when I read a study, what I will always

13:39:18 2    do is I will read this and if there are citations that I am

13:39:21 3    interested in pulling, I will circle them and pull them.  And so

13:39:25 4    what I am saying is, I've read other articles where this was cited

13:39:30 5    where I didn't specifically pull up it and review it, but it was

13:39:34 6    discussed.

13:39:35 7    Q.  I got you now.  PDF 87.  And what I want to do is I want to

13:39:42 8    blow up starting here.

13:39:58 9         Dr. Kubitza writes that "Pharmacodynamic and

13:40:02 10   pharmacokinetic parameters correlated closely.  There was a direct

13:40:05 11   linear relationship between plasma and Xarelto concentration and

13:40:10 12   PT.  This suggests that PT, a routinely used anticoagulation test,

13:40:15 13   could be used to clinically monitor the anticoagulant effect of

13:40:20 14   Xarelto, if necessary."  Did I read that right?

13:40:22 15   A.  You did.

13:40:23 16   Q.  So this is another article you hadn't seen that you didn't

13:40:27 17   refer to?

13:40:27 18   A.  Yep.  If I am not mistaken, this is Kubitza, and his more

13:40:32 19   recent literature doesn't say that anymore.

13:40:35 20   Q.  I asked you a very easy question.  Please try and answer my

13:40:39 21   question.  You'll have your chance to say whatever you want to

13:40:42 22   say --

13:40:42 23   A.  I am trying to give context.

13:40:44 24   Q.  You'll have your chance to say whatever you want to say on

13:40:47 25   redirect.  Please just try to answer my questions.

13:40:49  1          MS. WILKINSON:  Your Honor, he can explain.

13:40:52  2          THE COURT:  He can explain himself, but he is bringing in

13:40:55  3  new theory.  So I think counsel is right.  Just listen to the

13:40:58  4  question and answer the question.  If they have any questions,

13:41:01  5  they'll be resolved, I hope.

13:41:02  6          THE WITNESS:  Okay.

13:41:03  7  BY MR. BARR:

13:41:03  8  Q.  Okay.  This was the article you hadn't seen, right?

13:41:06  9  A.  Yes.

13:41:06 10  Q.  And this is Bayer saying that this PT test could be used,

13:41:13 11  correct?

13:41:13 12  A.  Correct.

13:41:14 13  Q.  Do you know of any studies Bayer did to try to prove this?

13:41:19 14  A.  No, not familiar.

13:41:22 15  Q.  So let's take this down.  Can I get my demonstrative back.

13:41:33 16          So we've now got you didn't read Lippi and you didn't

13:41:37 17  read Kubitza, right?

13:41:40 18  A.  Correct.

13:41:41 19  Q.  Let's talk about another one.  Can I get 5767837.

13:42:30 20          Let me skip that one until we find it.  Let me show you

13:42:40 21  5767502.

13:42:56 22  A.  Thank you.

13:42:57 23  Q.  You're welcome.  You see that this is an article by a

13:43:42 24  Dr. Tripodi.  Do you see that?

13:43:42 25  A.  I do.

13:43:42 1  Q.  And you see that this is an article titled "Which test to use

13:43:42 2  to measure the anticoagulant effect of rivaroxaban:  The

13:43:42 3  prothrombin time test."  Right?

13:43:42 4  A.  Correct.

13:43:42 5  Q.  And this is published in the Journal of Thrombosis and

13:43:52 6  Hemostasis, right?

13:43:52 7  A.  International Society of Thrombosis and Hemostasis, yes, up

13:43:52 8  there, yes.

13:43:52 9  Q.  You see that?

13:43:52 10  A.  I do.

13:43:52 11  Q.  It's a reputable journal, right?

13:43:52 12  A.  I'm sure it is.  I am not as familiar with the literature out

13:44:43 13  of the hematologic in terms of which journals are more reputable

13:44:43 14  than others.

13:44:43 15  Q.  And this is another article you didn't refer to or rely on in

13:44:43 16  coming to your opinions?

13:44:43 17  A.  I did not.

13:44:43 18  Q.  So let's take down the title.  One of these days I am going to

13:45:59 19  remember where I laid my laser pointer down.

13:46:02 20          And you see it says -- I want to blow up this paragraph.

13:46:05 21  And it's talking about Xarelto, right?  Do you see that?

13:46:10 22  A.  Correct, yes.

13:46:11 23  Q.  And it says, "However, accumulating evidence suggests that some

13:46:15 24  sort of laboratory measurement may be useful to guide clinicians in

13:46:19 25  special situations, including:  Patients on treatment presenting to

13:46:22  1   emergency departments with hemorrhagic or thrombotic events;

13:46:27  2   screening to ensure that the drug has been removed from circulation

13:46:30  3   prior to surgery or invasive procedures."  Do you see that?

13:46:33  4   A.  I do.

13:46:34  5   Q.  So this is talking about a situation where we need a screening

13:46:40  6   test to help people like Sharyn Orr determine whether or not we can

13:46:46  7   go back to surgery, right, that's what he is talking about in this

13:46:49  8   article?

13:46:49  9   A.  I believe so.

13:46:50 10   Q.  So let's take this down.  And I want to go here, starting with

13:46:55 11   "hence".  It says, "Hence, measurement of the anticoagulant

13:47:02 12   activity by means of clotting test is warranted, and for

13:47:06 13   rivaroxaban this may be achieved (among other methods) by means of

13:47:10 14   the prothrombin time test."  Did I read that right?

13:47:14 15   A.  Yes, you have.

13:47:15 16   Q.  So this is another article in the peer-reviewed literature that

13:47:20 17   you did not review or rely upon in coming to your opinions,

13:47:23 18   correct?

13:47:24 19   A.  I did not review this article, correct.

13:47:27 20   Q.  Let's go to the next page -- I'm sorry, page 3.  And I want to

13:47:36 21   blow up this "in conclusion".

13:47:41 22         "In conclusion, I believe that, although the anti-Factor

13:47:47 23   Xa assay is a suitable test, the old and time honored PT should be

13:47:51 24   preferred as the test with which to assess the anticoagulant effect

13:47:54 25   of Xarelto, because it is readily available even in small

13:47:59  1   hospitals; it is relatively cheap; it is adequately responsive to

13:48:03  2   Xarelto; and it can be easily standardized."  Did I read that

13:48:06  3   right?

13:48:07  4   A.  You did.

13:48:46  5   Q.  I want to show you another one.  You didn't come across an

13:48:46  6   article by Dr. Mueck in 2013 either, did you?

13:48:46  7   A.  I've read some of his publications.  The name sounds familiar.

13:48:46  8   Q.  Can I get 5768548.  You see this is another article in the

13:48:46  9   peer-reviewed literature, and this is in the Thrombosis Journal.

13:49:13 10   Do you see that?

13:49:14 11   A.  Yes.

13:49:16 12   Q.  And this is an article by Wolfgang Mueck, who this jury knows

13:49:21 13   is an employee of Bayer.  Did you know that?

13:49:23 14   A.  I did.

13:49:23 15   Q.  So you're aware of that?

13:49:24 16   A.  Uh-huh.

13:49:25 17   Q.  And the title of this is, "Rivaroxaban and other novel oral

13:49:25 18   anticoagulants:  Pharmacokinetics in healthy subjects, specific

13:49:39 19   patient populations and relevance of coagulation monitoring."  Did

13:49:39 20   I read that right?

13:49:39 21   A.  I'm sorry, what?

13:49:41 22   Q.  Did I read the title correctly?

13:49:42 23   A.  Yes, you did.

13:49:44 24   Q.  Hopefully you trust me.

13:49:46 25   A.  I do.

13:49:51  1    Q.  Beth might not.

13:49:53  2              If we can go to page 11, and you see we're talking about

13:50:01  3    clot-based assays, do you see that?

13:50:02  4    A.  I do.

13:50:03  5    Q.  And what Dr. Mueck is talking about is, "The most commonly

13:50:06  6    available clot-based assays include the PT, dilute PT, APTT, and

13:50:14  7    ECT, HepTest and prothrombinase-induced clotting time," right, or

13:50:19  8    the PiCT.

13:50:21  9    A.  Okay.

13:50:21 10    Q.  Okay.  And so if we go down -- take this down.  And I want to

13:50:24 11    blow up right here (INDICATING).

13:50:30 12              What Dr. Mueck writes is, "Nevertheless, if used in an

13:50:34 13    emergency and in the absence of any other available test,

13:50:37 14    Neoplastine Plus (with results expressed in seconds) is the

13:50:41 15    recommended agent for assessing the anticoagulant effect of

13:50:46 16    Xarelto," right?

13:50:48 17    A.  That's what it says, yes.

13:50:49 18    Q.  This is another article you didn't refer to or rely upon in

13:51:02 19    coming to the conclusions and opinions you've offered to this jury,

13:51:05 20    right?

13:51:05 21    A.  I've seen -- maybe not this specific article, but I've read

13:51:11 22    Mueck.  That name is familiar, so I know I've read.  I thought I

13:51:15 23    read something again more recent, but I don't know off the top of

13:51:19 24    my head.

13:51:19 25    Q.  Okay.  Would you accept my representation that it's not

13:51:25  1  referenced or relied upon in your report?

13:51:27  2  A.  Sure.  I would accept that.

13:51:32  3  Q.  Can we go back to the demonstrative just so we can catch up.

13:51:35  4       So we have Lippi, no; Kubitza, no; Tripodi, no; and Mueck

13:51:44  5  2013, no.  Right.  You haven't looked at any of those?

13:51:48  6  A.  Sure.

13:51:56  7  Q.  Let me show you 5768436.

13:52:23  8  A.  Thanks.

13:52:30  9  Q.  This is an article by Dr. Jurgen Koscielny.  Do you see that?

13:52:39 10  A.  Yes.

13:52:39 11  Q.  And you've not seen this article before, correct?

13:52:41 12  A.  Definitely not.

13:52:43 13  Q.  Definitely not?

13:52:44 14  A.  I know I haven't seen this one for sure.

13:52:47 15  Q.  And what this says -- if you come up here, because this is

13:52:51 16  small.  So we might -- I don't know if there's a way to blow it up

13:52:54 17  even bigger.

13:52:57 18       It says, "confirmation of rivaroxaban levels may be

13:53:05 19  required in circumstances such as life-threatening bleeding or

13:53:09 20  perioperative management," right?

13:53:11 21  A.  I see that, yes.

13:53:12 22  Q.  So let's go to the next page.  And let's blow up this,

13:53:21 23  "Nevertheless" language again.

13:53:27 24       It says, "Nevertheless, in an acute situation, the

13:53:31 25  determination of PT could deliver valuable preliminary information

13:53:35  1   on the effect of Xarelto.  A normal PT value, obtained using a

13:53:41  2   sensitive thromboplastin reagent, indicates that a clinically

13:53:45  3   significant residual effect of Xarelto is unlikely," right?

13:53:49  4   A.  That's what it says.

13:53:51  5   Q.  You would agree that if that's true, that would be helpful,

13:53:57  6   correct?

13:53:57  7   A.  If it were true that a normal PT would show that there is very

13:54:03  8   little residual effect on an individual level, that will be

13:54:07  9   helpful.

13:54:07 10   Q.  That would be particularly helpful to a doctor like Dr. Bui,

13:54:11 11   who is trying to ask the very basic question, "Did my patient take

13:54:16 12   this drug six hours earlier," right?

13:54:22 13   A.  I don't know if I would extend it to saying six hours earlier,

13:54:26 14   whatever time period.  It's not saying a time period here.

13:54:31 15   Q.  Well, six hours earlier you know this because you know the dose

13:54:35 16   response curve for Xarelto.  Six hours earlier a person is going to

13:54:38 17   be at peak plasma levels, peak concentration, right?

13:54:41 18   A.  Six hours in the normal individual is two to four.

13:54:44 19   Q.  Person with poor kidney function.

13:54:48 20   A.  Yeah.  Okay.  So perhaps.  I don't know the exact timing, but I

13:54:52 21   know normal individuals is two to four hours.

13:54:54 22   Q.  So a person with poor kidney functions, six hours earlier.

13:54:58 23   Peak concentration, peak effect is the opposite of what this is

13:55:02 24   saying, right?

13:55:03 25   A.  I'm sorry?

OFFICIAL TRANSCRIPT

1951

13:55:04  1    Q.  If somebody's at peak effect --

13:55:08  2    A.  Peak effect.

13:55:09  3    Q.  -- peak effect, peak concentration, because as concentration

13:55:12  4    goes up, effect goes up.  You know that, right?

13:55:14  5    A.  Concentration goes up, peak effect.

13:55:17  6    Q.  Right.  You know that?

13:55:18  7    A.  I'm sorry.  I'm still -- now you're losing me.

13:55:21  8    Q.  If PT goes up, the blood gets thinner and thinner and thinner.

13:55:26  9    As concentration goes up, the blood gets thinner and thinner and

13:55:29  10   thinner.  You know that?

13:55:30  11   A.  For other agents, yes.

13:55:32  12   Q.  For Xarelto.

13:55:33  13   A.  So I think that with PT going up there's no impact that's been

13:55:36  14   shown on anticoagulant factor or blood clots.

13:55:38  15   Q.  Let's talk about concentration.

13:55:40  16   A.  So concentration, there is a correlation on a population level,

13:55:43  17   yes.

13:55:43  18   Q.  As concentration goes up, the blood gets thinner and thinner

13:55:47  19   and thinner, right?

13:55:48  20   A.  As concentration goes up -- no.  Now you're talking about

13:55:52  21   effect.  You're talking about outcomes.  That's my point is that

13:55:56  22   there is no --

13:55:57  23   Q.  There is no concentration --

13:55:59  24        MS. WILKINSON:  Your Honor, I object to not lot allowing

13:56:01  25   him to --

13:56:02  1          THE COURT:  Yeah, lets him finish explaining.

13:56:03  2          THE WITNESS:  So there is data looking at concentrations

13:56:05  3   and effect on dabigatran and apixaban.  There is no data to show

13:56:09  4   concentration and its correlation to effect with rivaroxaban.

13:56:09  5   BY MR. BARR:

13:56:14  6   Q.  So are you disputing that it was shown in the ROCKET trial that

13:56:19  7   as concentration went up, that was showing a higher effect on the

13:56:25  8   blood with Xarelto?  Are you disputing that?

13:56:26  9   A.  Define "effect."

13:56:31 10   Q.  The PT went up.

13:56:33 11   A.  Yes.  So -- in a macro level, the PT went -- the effect on the

13:56:37 12   PT, yes.  If you're talking about the effect on outcomes, blood

13:56:40 13   clots and -- no.  We're -- if you're talking about effect on PT,

13:56:45 14   there is a correlation with concentrations.  On a macro level it's

13:56:49 15   much more challenging to use in an individual person.

13:56:52 16   Q.  And what this is saying is a normal PT tells you that

13:56:59 17   significant residual effect of Xarelto is unlikely, right?

13:57:05 18   A.  That's what it's saying, yes.

13:57:08 19   Q.  And you understand -- well, you don't know this, so let's look

13:57:11 20   at this.  Let's take this down, and let's go to page 7 of this.  Do

13:57:25 21   acknowledgments.  This was an article that Bayer and Janssen had

13:57:31 22   editorial license over.  Do you see that?

13:57:33 23   A.  I do.

13:57:35 24   Q.  So they're aware of this, aren't they?

13:57:38 25          MS. WILKINSON:  Objection.  Foundation.

13:57:39  1            THE COURT:  Sustained.

13:57:40  2            THE WITNESS:  I am not -- okay.

13:57:42  3            THE COURT:  He doesn't know that.

13:57:43  4            MR. BARR:  That's fine.

13:57:43  5   BY MR. BARR:

13:57:58  6   Q.  Let me show you another article.  This is Plaintiffs' 3062811.

13:58:23  7   A.  Thank you.

13:58:24  8   Q.  You're welcome.

13:58:31  9            You see, Dr. Khatib, which is an article published --

13:58:35 10   it's copyrighted at the bottom, if you see -- take this down so he

13:58:40 11   can see -- by the American Heart Association.  Do you see that?

13:58:46 12   A.  Copyrighted by the American Heart Association.  Yep.  I see

13:58:49 13   that.

13:58:49 14   Q.  You see that.  And you've already shown this jury some stuff

13:58:54 15   from the American Heart Association.  Do you remember that?

13:58:56 16   A.  I think, as you have, yes.

13:58:57 17   Q.  This is an American piece of literature, correct?

13:59:00 18   A.  No.  This comes out of England.

13:59:03 19   Q.  It's copyrighted by the American Heart Association, correct?

13:59:06 20   A.  I am not sure what copyrighting means.  I can just tell you

13:59:09 21   that the author of this is from the United Kingdom.  And the

13:59:13 22   correspondence is directed to someone in the United Kingdom.  So...

13:59:18 23   Q.  So let's -- I want to look at this right here (INDICATING).

13:59:23 24   Let's blow this up.

13:59:25 25            Now, I want to read, "A similar strategy for the

13:59:28  1   management of emergency surgery should be considered; that is,

13:59:31  2   waiting for as long as possible after the last dose of

13:59:35  3   anticoagulant before operating, because few emergency operations or

13:59:38  4   procedures cannot be delayed by several hours." Right?  Do you see

13:59:43  5   that?

13:59:43  6   A.  I do see that, yes.

13:59:45  7   Q.  So we're talking about a situation of emergency surgery, right?

13:59:52  8   A.  Yes, sir.

13:59:53  9   Q.  Take this down.

13:59:57  10            You agree timing of dose is important, right?  That's

13:59:59  11  what you told this jury is you should look at timing of dose,

14:00:03  12  right?

14:00:04  13  A.  I am just trying to review this for a little bit.

14:00:24  14            THE COURT:  Let's take a break at this time, a ten-minute

14:00:27  15  break at this time.  Court will stand in recess.

14:00:27  16            THE DEPUTY CLERK:  All rise.

14:00:27  17     (WHEREUPON, THE JURY EXITED THE COURTROOM AND A RECESS WAS

14:00:27  18     TAKEN.)

14:09:58  19     (OPEN COURT.)

14:09:58  20            THE DEPUTY CLERK:  All rise.

14:10:25  21     (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

14:10:25  22            THE COURT:  Be seated, please.  You may proceed, Counsel.

14:10:31  23  BY MR. BARR:

14:10:33  24  Q.  Dr. Khatib, we were talking about the Crowder article.  Do you

14:10:36  25  still have that one in front of you?

14:10:38  1   A.  Which one, Crowder?

14:10:39  2   Q.  Crowder, yes, sir.

14:10:41  3   A.  Let me find it.

14:10:42  4   Q.  It has a big stamp on it, looks like this (INDICATING).

14:10:46  5   A.  Yep, I got it.

14:10:47  6   Q.  Can we get Crowder back on the board, 3062811.  And we were on

14:10:58  7   page 4, sir.  And you see this article, it's talking about

14:11:06  8   measurement of the effect of the NOAC, do you see that?

14:11:09  9   A.  Yes, I do.

14:11:15 10   Q.  And it says, "Measurement of effect is useful when there," is

14:11:20 11   and it lists three times, right?

14:11:24 12   A.  Yes.

14:11:25 13   Q.  One of those times is before surgery to determine when it is

14:11:29 14   safe to operate, right?

14:11:31 15   A.  Yes.

14:11:31 16   Q.  Exactly the situation where we're dealing with with Ms. Orr,

14:11:36 17   correct?

14:11:36 18   A.  Correct.

14:11:37 19   Q.  So let's take that down.  And if we go top of "for many

14:11:44 20   laboratories and clinicians."

14:11:46 21   A.  We're still on page --

14:11:47 22   Q.  We're still on page 4, sir.

14:11:49 23   A.  Okay.

14:11:50 24   Q.  And what I want to go here, "timing of dose is useful," do you

14:11:55 25   see that, "for the first 12 hours after ingestion," right?

1956

14:11:59  1    A.  Where is -- okay.  I'm with you.

14:12:03  2    Q.  And we will have to get you one of these for your classes so

14:12:07  3    you can do it.

14:12:08  4    A.  This is amazing.  I need this.  This is awesome.

14:12:10  5    Q.  He can tell you all about where to get it.

14:12:13  6    A.  I need to get your card.

14:12:14  7    Q.  24 hours for Xarelto, right, as long as the drug is absorbed,

14:12:19  8    correct?

14:12:20  9    A.  Okay.

14:12:21 10    Q.  And as long as it's absorbed, it's likely to be present in

14:12:25 11    therapeutic levels, right?

14:12:26 12    A.  Okay.

14:12:26 13    Q.  "After this time, if the PT and APTT are normal, dabigatran,

14:12:33 14    rivaroxaban or edoxaban are unlikely to be present in significant

14:12:37 15    quantities," right?

14:12:38 16    A.  Can we keep highlighting the next sentence?

14:12:41 17    Q.  Sure.

14:12:42 18    A.  "However, this approach may misidentify some patients as being

14:12:44 19    free of anticoagulant effect when, in actuality, they are

14:12:50 20    anticoagulated."

14:12:50 21    Q.  Right.

14:12:51 22    A.  That's my problem with the test.

14:12:52 23    Q.  That's just saying the test isn't perfect, right?

14:12:55 24    A.  So if you look -- the discussion on this, if you want -- it

14:13:03 25    says -- it makes the same conclusion based on that.

14:13:06  1    Q.  It says that after this, if PT is normal, it's unlikely to be

14:13:12  2    present in significant quantities.  I am just asking if that's what

14:13:15  3    it says.

14:13:16  4    A.  Yes, it says that.  There's a big qualifier after that.

14:13:19  5    Q.  And then it goes -- it goes on, and I am pointing out, I am

14:13:23  6    allowing you to do that, it goes on to say this approach may

14:13:27  7    misidentify some people, right?  Just like the mammogram might get

14:13:30  8    it wrong sometimes, right?

14:13:32  9    A.  Yes.

14:13:32  10   Q.  Just like a prostate screening may get it wrong sometimes,

14:13:36  11   right?

14:13:36  12   A.  These are very different clinical scenarios, and you accept

14:13:40  13   different levels of false negatives and false positives based on

14:13:43  14   the clinical scenario.  So an abnormal mammogram results in someone

14:13:47  15   needing an MRI, that's very different than making a decision

14:13:51  16   whether to perform surgery urgently or not.  There's much more --

14:13:55  17   you accept different levels.  So these are not the same clinical

14:13:58  18   context that you're talking about.

14:14:00  19   Q.  So you're requiring a perfect test, is that what I am hearing?

14:14:03  20   A.  I didn't say I am requiring the perfect test.  I am saying I

14:14:06  21   would like better than that qualifier.  Again, if you look at the

14:14:09  22   discussion -- can you put up the discussion?

14:14:11  23   Q.  No.  We're talking about this sentence right here.

14:14:13  24   A.  You gave me this article to review, and so --

14:14:15  25   Q.  Sir, I am not going to get into a debate with you here.  I am

14:14:19  1    asking you if that's what --

14:14:21  2            THE COURT:  He is explaining it now.  He is saying that

14:14:24  3    that's his approach.  He is focusing on the "however."

14:14:27  4            MR. BARR:  That's fine, Your Honor, and I'm okay with him

14:14:29  5    answering that way, but we are not going to dig all through this.

14:14:32  6            THE WITNESS:  The conclusion, in the discussion they

14:14:35  7    overall state in this that it has that limitation.  If you look at

14:14:39  8    that -- if normal, they do not indicate the patient is free of

14:14:43  9    clinically important levels of drug.  That's what they state in the

14:14:46 10    discussion part.

14:14:48 11    BY MR. BARR:

14:14:48 12    Q.  Nobody is disagreeing with that.  You understand that, right?

14:14:51 13    A.  Okay.

14:14:52 14    Q.  Have I represented to you or have you heard anybody represent

14:14:55 15    to you that PT is a perfect test?

14:14:58 16    A.  It's not, no --

14:15:00 17            THE COURT:  Now we're debating or arguing.  Let's just

14:15:03 18    continue on, please.

14:15:05 19    BY MR. BARR:

14:15:06 20    Q.  We can go to the next article.  The next one is one you showed

14:15:15 21    the jury, so we can go -- we will be able to give you a yes on this

14:15:20 22    one.

14:15:20 23    A.  Great.

14:15:21 24    Q.  This is 5769104, which is the Eikelboom study.

14:15:40 25    A.  Thank you.

14:15:49  1    Q.  I want to follow-up on something you just said before we talked

14:15:53  2    about it.  Are you aware that Dr. Bui said he would proceed even if

14:15:58  3    there was some drug on board?

14:15:59  4    A.  Doesn't come to my immediate recollection, no.

14:16:04  5    Q.  So you're not aware that he didn't need to know whether or not

14:16:08  6    she was completely free of anticoagulants?

14:16:11  7    A.  I'm sorry.  There was a cough that I missed part of what you

14:16:13  8    were saying.

14:16:13  9    Q.  You're not aware that he testified that he didn't need to know

14:16:18  10   that she was completely free of anticoagulants?

14:16:21  11   A.  I don't recall that.

14:16:22  12   Q.  So let's talk about Eikelboom.  This is one you have seen,

14:16:29  13   right?

14:16:29  14   A.  Yes.

14:16:30  15   Q.  Now, in fairness to me, it wasn't referenced or relied upon in

14:16:33  16   your report, but in fairness to you, it came out after your report?

14:16:37  17   A.  Absolutely.

14:16:37  18   Q.  Okay.  And so this is an article published in JAMA right,

14:16:44  19   Cardiology?

14:16:45  20   A.  (WITNESS NODS HEAD IN THE AFFIRMATIVE.)

14:16:46  21   Q.  And you talked about a section of this, right, in your direct?

14:16:52  22   Have you seen this before?

14:16:53  23   A.  Have I seen this article?  Yeah, I read it.  Yes, I read it.

14:16:57  24   Q.  And what I want to point out in this article is on page E4,

14:17:03  25   which is page 4 of the PDF.

14:17:06 1    A.   Which page, I'm sorry?

14:17:09 2    Q.   Page 4.

14:17:10 3    A.   Page 4, gotcha.

14:17:12 4    Q.   And this first paragraph here that is, "What is the therapeutic

14:17:16 5    range (target drug level) for each of the NOACs?"  Are you with me?

14:17:20 6    A.   I am.

14:17:20 7    Q.   And we're talking about in the ROCKET trial, the PT was

14:17:26 8    linearly correlated with rivaroxaban and weakly associated with the

14:17:32 9    risk of stroke, right?  Do you see that?

14:17:34 10   A.   I do see that, yes.

14:17:36 11   Q.   And it also gives a summary of the trial for Pradaxa, Savaysa

14:17:42 12   and Eliquis, right?

14:17:44 13   A.   Eliquis below it, yep.

14:17:46 14   Q.   What it says is with all four agents, the plasma levels or the

14:17:53 15   PT predicted the risk of bleeding, right?

14:17:55 16   A.   Correct.

14:17:56 17   Q.   So this is JAMA assaying PT can predict the risk of bleeding,

14:18:02 18   right?

14:18:02 19   A.   It's saying that, yes.

14:18:05 20   Q.   That's what it says in the Eikelboom study, right?

14:18:07 21   A.   It does.

14:18:08 22   Q.   Well, let me -- because I am sure this will get pointed out on

14:18:17 23   redirect, so I am happy to go ahead and do it for you.

14:18:20 24   A.   Okay.

14:18:20 25   Q.   Let's go to the "Conclusions and Future Directions."  It's on

14:18:29   1    the last page, page 7.  Let's blow this up.  The jury has seen this

14:18:36   2    before.  It says, "Although it's possible to accurately measure

14:18:40   3    NOAC drug levels, information is lacking on the optimal level in

14:18:44   4    particular patient groups the appropriate dose adjustment to

14:18:50   5    achieve expected levels and whether routine laboratory monitoring

14:18:54   6    and dose adjustment will improve clinical outcomes."  And I know I

14:18:59   7    butchered the reading of that, but I was close, wasn't I?

14:19:02   8    A.  You did well.

14:19:04   9    Q.  And it says, "We suggest that clinicians continue to prescribe

14:19:07  10    NOACs in fixed doses without monitoring," right?

14:19:09  11    A.  Correct.

14:19:10  12    Q.  This is talking about how you would like to use a test if you

14:19:13  13    were to use it, right?

14:19:15  14    A.  If I were to have -- I'm sorry, I don't understand.  If I had a

14:19:21  15    test?  I am not using a test.  I guess I don't get the question.

14:19:27  16    Q.  This is talking about monitoring the dose adjustment, right?

14:19:30  17    A.  In a routine clinical setting.

14:19:32  18    Q.  Right.  That's not what this case is about?

14:19:36  19    A.  I agree.

14:19:37  20    Q.  This case is about emergency rooms and whether or not drug is

14:19:40  21    on board, right?

14:19:41  22    A.  Correct.

14:19:41  23    Q.  This whole paragraph has nothing to do with this case, right?

14:19:47  24    A.  Oh, I see what you're saying.  So their reference -- this is

14:19:53  25    the same data when you go back to that -- go back to that other

1962

14:19:57  1    one --

14:19:58  2    Q.  Which other one?

14:19:59  3    A.  The one before showing the --

14:20:00  4    Q.  Page 4?

14:20:02  5    A.  -- the link between PT and bleeding.

14:20:04  6    Q.  Yes, sir.

14:20:05  7    A.  This is my whole point, is that you're talking about a

14:20:09  8    bleeding, and when they're talking about correlation with bleeding,

14:20:11  9    they're not talking about bleeding during a surgical procedure,

14:20:15  10   they're talking about bleeding events that occur.

14:20:17  11   Q.  Uh-huh.

14:20:18  12   A.  So the correlation with PT is not with surgical outcomes from

14:20:21  13   bleeding, it's with PT.

14:20:23  14   Q.  Right.  It says PT can predict the risk of bleeding, right?

14:20:26  15   A.  Risk of bleeding in the general clinical setting, not in a

14:20:29  16   situation of an urgent scenario where you need to make a decision

14:20:34  17   about surgery.  There is a difference there.

14:20:36  18   Q.  All right.  Let's look what else it says.  Let's go back, back

14:20:46  19   to page 6.  "Circumstances where measurement may be useful."  Do

14:20:54  20   you see that?

14:20:54  21   A.  I do.

14:20:55  22   Q.  And it says, "Although routine laboratory monitoring and dose

14:20:58  23   adjustment of NOAC therapy cannot be recommended based upon

14:21:01  24   available information," right?

14:21:03  25   A.  Correct.

14:21:03  1    Q.  So that's regular monitoring, testing all the time, running a

14:21:08  2    PT and adjusting dose, they're saying we can't recommend that,

14:21:11  3    right?

14:21:11  4    A.  Yes.

14:21:12  5    Q.  "Measurement of drug levels or anticoagulant effects might be

14:21:17  6    useful in certain clinical situations," right?

14:21:20  7    A.  Might.

14:21:22  8    Q.  "These scenarios include the following indications:  To manage

14:21:25  9    patients with serious bleeding or thromboembolic events to

14:21:30 10    establish the optimal timing of surgery or other invasive

14:21:35 11    procedures, and to detect drug accumulations in the case of acute

14:21:39 12    renal or hepatic insufficiency or suspected overdose," right?

14:21:43 13    A.  Yes.  And I don't disagree with that statement.  I just can't

14:21:46 14    use "might" in a clinical scenario.  You need more than "might."

14:21:52 15    Q.  You've seen a host of articles --

14:21:55 16    A.  I am not saying absolute.  I am just saying "might" is fraught

14:21:59 17    with risk.

14:21:59 18    Q.  You've seen a host of articles that we've walked through that

14:22:02 19    are stronger than "might," aren't they?  They say PT can be used,

14:22:06 20    and if it's normal, that means you don't have drug on board and

14:22:10 21    it's safe to go to surgery.  You've seen those articles now, right?

14:22:13 22    A.  I would like to review those articles in totality without

14:22:16 23    looking at snippets before I am going to say what the ultimate

14:22:20 24    conclusion based on those were.  Because just based on the last

14:22:21 25    one, having a chance to read the discussion, from what you're

14:22:25 1  showing versus what they're saying, is a very different thing.

14:22:26 2  Q.  When were you hired as an expert in this case?

14:22:28 3  A.  I think about -- it's been awhile.  I think two years.

14:22:32 4  Q.  Two years.  So you've had two years to find all of this

14:22:36 5  material, study it, come up with your opinions.  You had two years

14:22:40 6  to do that, haven't you?

14:22:41 7  A.  Yes.  I've had more than two years.  I've had years of

14:22:45 8  experience with studying this medication before I got involved in

14:22:49 9  this.  I didn't get involved -- I didn't read this just to be

14:22:51 10 involved in this study.  This is for my patients.

14:22:54 11 Q.  I believe you said on direct you are mandated to follow all of

14:22:58 12 this, to keep abreast of the subject?

14:22:59 13 A.  Yes, and I think I do a good job.

14:23:03 14 Q.  You had the opportunity to find all of this material and study

14:23:05 15 it.  Nobody has denied that opportunity, have they?

14:23:08 16 A.  I am comfortable with the data that I have reviewed, yes.  But

14:23:11 17 if you're asking me if I am going to review every morsel and

14:23:16 18 article out there in regard to everything in the field of

14:23:18 19 electrophysiology, anyone who tells you that they're doing that is

14:23:22 20 selling you a bill of goods.

14:23:24 21 Q.  You would agree there's material you haven't seen before you've

14:23:27 22 come in to testify to this jury, right?

14:23:29 23 A.  By no means would I claim that I've read every single

14:23:33 24 publication when it comes to atrial fibrillation or oral

14:23:36 25 anticoagulants.  By no means would I claim to have read every

14:23:42  1    article.

14:23:42  2    Q.  And you just missed all of the ones that say PT can be helpful

14:23:46  3    in the case of urgent surgery?

14:23:47  4    A.  I didn't miss.  I've judged and I have reviewed, and my opinion

14:23:53  5    is that "might" doesn't help me in a clinical scenario.  I am

14:23:55  6    familiar with this.

14:23:56  7    Q.  Sir, we've walked through a series of articles directly on this

14:23:59  8    point that you had not seen before.

14:24:02  9    A.  Yes.

14:24:02 10         MS. WILKINSON:  Your Honor, I am going to object.  That

14:24:04 11    wasn't a question.  That was a statement.

14:24:05 12         THE COURT:  We've been through this.  Let's go on to

14:24:07 13    something else, Counsel.

14:24:09 14         MR. BARR:  Let's go to the next article.  And this is

14:24:12 15    5769392.  And this is an article that's just come out in 2017.

14:24:19 16    Okay.

14:24:19 17    BY MR. BARR:

14:24:19 18    Q.  So in fairness to you, you wouldn't have the opportunity --

14:24:22 19    A.  Thank you.

14:24:23 20    Q.  -- to see this before you wrote your report.

14:24:37 21    A.  Thanks.

14:24:38 22    Q.  You're welcome.  You see that this is an article by

14:24:48 23    Dr. Pereira.  Do you see that?

14:24:50 24    A.  I do.

14:24:50 25    Q.  And this is an article in Clinics in Surgery.  Do you see that?

14:24:55  1   A.  I do.

14:25:00  2   Q.  What I want to do is I want to go into page 4 of the article --

14:25:04  3   A.  Can I read the article?  I would like to understand the

14:25:08  4   context.  If you're going to point stuff out, I would just like to

14:25:11  5   have the opportunity --

14:25:12  6   Q.  Sir, I am going to ask you questions about the article.

14:25:14  7   A.  I would like to review the article without having --

14:25:17  8   Q.  I am going to ask you questions about the article, okay.  So

14:25:23  9   let's blow up the section that says "Laboratory Control."  Do you

14:25:27 10   see that?  Do you see that section?

14:25:34 11   A.  I do.

14:25:35 12   Q.  It says, "As previously mentioned, routine laboratory control

14:25:38 13   is not necessary for patients undergoing treatment for NOAC."  You

14:25:43 14   certainly agree with that, don't you?

14:25:44 15   A.  I do.

14:25:45 16   Q.  "However, some particular situations require a determination of

14:25:49 17   the plasma levels or anticoagulant activity of the NOACs.  These

14:25:52 18   situations include trauma, spontaneous bleeding, suspected

14:25:57 19   overdose, persistent thrombotic disease despite continued drug

14:26:01 20   administration, and the need for emergency surgery."  Right?

14:26:05 21   A.  I see that.

14:26:06 22   Q.  It says, "Although the general belief is that conventional

14:26:10 23   tests are useless," right?  That's your belief, correct?

14:26:14 24   A.  I don't know what they mean by "conventional tests."  I believe

14:26:17 25   that the creatinine clearance is helpful.

| | | |
|---|---|---|
| 14:26:20 | 1 | Q.  PT, is that a conventional test? |
| 14:26:22 | 2 | A.  Measurement -- so the next sentence, I see PT and APPT.  Okay. |
| 14:26:28 | 3 | Q.  Is PT a conventional test? |
| 14:26:30 | 4 | A.  Yes.  I didn't see the next sentence, I'm sorry. |
| 14:26:32 | 5 | Q.  I am not being -- I'm just asking if it is a conventional test. |
| 14:26:37 | 6 | A.  It is. |
| 14:26:37 | 7 | Q.  Okay.  And it's your general belief that PT is useless, right? |
| 14:26:41 | 8 | A.  I don't find it clinically meaningful.  I am not willing to |
| 14:26:45 | 9 | call it useless completely. |
| 14:26:46 | 10 | Q.  I'm sorry, I didn't mean to cut you off.  So you don't want to |
| 14:26:49 | 11 | call it useless, you don't want to call it clinically meaningful? |
| 14:26:54 | 12 | A.  I'm saying it's not clinically meaningful at this time. |
| 14:26:56 | 13 | Q.  Okay.  Fair enough.  And it says, "This belief is unfounded," |
| 14:26:59 | 14 | right? |
| 14:26:59 | 15 | A.  I see that. |
| 14:27:00 | 16 | Q.  "The results of these tests, mainly measurement of the PT and |
| 14:27:05 | 17 | APTT, are changed in a somewhat predictable manner by NOACs.  This |
| 14:27:12 | 18 | makes them useful in guiding further management."  Do you see that? |
| 14:27:15 | 19 | A.  I do. |
| 14:27:15 | 20 | Q.  And then it goes on to say there are some tests that are more |
| 14:27:20 | 21 | appropriate that are available, right? |
| 14:27:22 | 22 | A.  Sure, it says that. |
| 14:27:23 | 23 | Q.  But it doesn't say those can't be used, right? |
| 14:27:26 | 24 | A.  I don't know what it says in other parts of the article. |
| 14:27:30 | 25 | You're showing me a snippet, so... |

14:27:32  1   Q.  Okay.  It says, "These tests are sensitive enough to serve as a

14:27:39  2   good surrogate to the plasma concentration of the drug," and

14:27:43  3   they're talking about dabigatran here, right?

14:27:46  4   A.  I don't know.  I have no idea.

14:27:47  5   Q.  You're not able to read that?

14:27:49  6   A.  Where does it say dabigatran?

14:27:53  7   Q.  It says for drugs -- we'll just read this next section.

14:27:57  8        "For drugs that inhabit Factor Xa, the most appropriate

14:28:00  9   test would be measurement of the plasma anti-Factor Xa activity."

14:28:00  10  Right?

14:28:05  11  A.  Okay.

14:28:06  12  Q.  "For dabigatran, a direct thrombin inhibitor, the most

14:28:10  13  frequently used tests are the ecarin clotting time and the diluted

14:28:14  14  thrombin time."  Right?

14:28:15  15  A.  Sure.

14:28:15  16  Q.  It says, "These tests are sensitive enough to serve as a good

14:28:18  17  surrogate to the plasma concentration of the drug."

14:28:20  18  A.  So they're talking about the Factor Xa activity as opposed to

14:28:23  19  PT --

14:28:24  20  Q.  Right.

14:28:25  21  A.  -- when they're talking about that.

14:28:26  22  Q.  It then says goes on to say, though, "Most hospitals do not

14:28:30  23  have these recently developed tests."

14:28:32  24  A.  Correct, I agree with that.

14:28:33  25  Q.  You know that to be true, right?

14:28:34   1    A.  Yes, I'll agree with that.

14:28:36   2    Q.  It says, "These hospitals must instead rely on the results of

14:28:40   3    the classic tests," right?

14:28:41   4    A.  It says that.

14:28:42   5    Q.  "The combination of the APTT and PT can be vital in

14:28:46   6    decision-making," right?

14:28:47   7    A.  Boy, that's a strong statement.

14:28:50   8    Q.  I am just asking if that's what they said.

14:28:52   9    A.  That's what they say in the sentence.

14:28:53  10    Q.  "The APTT is most useful for estimating the activity of

14:28:58  11    dabigatran, and the PT is most useful estimating the activity of

14:29:02  12    Factor Xa inhibitors."  Did I read that right?

14:29:06  13    A.  Yes.

14:29:07  14    Q.  And Xarelto is a Factor Xa inhibitor, right?

14:29:10  15    A.  It is.

14:29:11  16    Q.  So would it be -- let's talk about Pradaxa for a second.  Would

14:29:20  17    it be irresponsible to recommend APTT to assess the anticoagulant

14:29:28  18    effect of Pradaxa?

14:29:29  19    A.  I am not as comfortable with the data with PTT and dabigatran

14:29:33  20    off the top of my head, where I would say to use it or not use it.

14:29:39  21    Q.  I thought you testified in direct that you used Pradaxa.

14:29:44  22    A.  I do.  I use it very limited fashion.  It's not a medication

14:29:48  23    that I use -- I will continue it if a patient comes to see me and

14:29:54  24    they're already on it.

14:30:02  25    Q.  Let me finish this.  "Despite their low sensitivity, normal

14:30:06 1  results of these tests assure that" -- "assure," that's the word

14:30:10 2  they use, right?

14:30:11 3  A.  Strong word, especially for low sensitivity.

14:30:14 4  Q.  -- "that the patient's coagulation function is adequate to

14:30:18 5  proceed to surgery."

14:30:20 6  A.  Low sensitivity.

14:30:21 7  Q.  That's what was published in 2017, right?

14:30:25 8  A.  I agree that that's what was published.  But saying you have a

14:30:29 9  test with low sensitivity, then a normal test will not assure that

14:30:35 10  that's true.  Low sensitivity implies you're not capturing all of

14:30:39 11  the right information, that you may have misses.  So I am not

14:30:43 12  really sure how they can -- how they're saying that here.  But,

14:30:47 13  again, it's the context of one paragraph.

14:30:49 14  Q.  Okay.

14:30:51 15         THE COURT:  Counsel, let's get into something else.

14:30:53 16         MR. BARR:  I am going to move on to something different.

14:31:00 17  BY MR. BARR:

14:31:00 18  Q.  You talked a little bit about guidelines in your direct.  Do

14:31:04 19  you remember that?

14:31:04 20  A.  Not off the top of my head, but I know how I feel about them.

14:31:10 21  Q.  You're aware that there are guidelines out there now that say

14:31:15 22  you can use PT to determine whether or not it's safe to go to

14:31:19 23  urgent surgery with Xarelto, right?

14:31:22 24  A.  I am not familiar with American guidelines, I would say that.

14:31:27 25  Q.  Well, you showed the American Heart Association, do you

14:31:30 1  remember that?  Do you remember talking about their guidelines in

14:31:33 2  your direct?

14:31:34 3  A.  Yeah.  Yes.  Sorry.

14:31:35 4  Q.  And that guideline has a table that says with urgent surgery,

14:31:42 5  you can use PT, right?

14:31:43 6  A.  Are you talking about the one where if you actually read the

14:31:47 7  text --

14:31:48 8  Q.  Let me show you --

14:31:49 9  A.  -- where they show the summary and they say you can't -- or you

14:31:52 10  can use the time from last ingestion and the creatinine clearance?

14:31:57 11  Is that the one we're talking about?

14:31:59 12  Q.  Let me show it to you, and let's get on the same page.  It's

14:32:03 13  5769341.

14:32:09 14  A.  Thank you.

14:32:10 15  Q.  You're welcome.

14:32:11 16  A.  Which PDF page?

14:32:13 17  Q.  Give me one second to get back here and look at my notes, and

14:32:16 18  I'll tell you.  It's PDF page 5.

14:32:19 19  A.  Got it, yep, I'm there.

14:32:22 20  Q.  You would agree that you try to put the most important

14:32:27 21  information in tables when you look at this kind of information,

14:32:29 22  right?

14:32:29 23  A.  I am agreeing that -- with their summary.  If you're -- if

14:32:34 24  you're going to ask me to parcel this, they put the summary slide

14:32:39 25  and then they put in the actual context.  I would never just read a

14:32:42  1    table.  I would read the context of the table.

14:32:44  2    Q.  But what did they put in the summary slide?

14:32:47  3    A.  They say to detect presence PT, APTT, anti-Factor Xa activity.

14:32:53  4    Q.  Right.  So for therapeutic measurement to detect presence, and

14:32:58  5    that's what Dr. Bui was trying to do, right?

14:33:00  6    A.  Mr. Barr, you can't take that in that context.  If you look at

14:33:06  7    the actual text from this that we went over, "In summary, although

14:33:11  8    routine NOAC monitoring is unnecessary, in most situations, the

14:33:13  9    time of last drug ingestion combined with the recent assessment of

14:33:16 10    creatinine clearance should enable appropriate clinical

14:33:19 11    decision-making."  They are not making the argument that you should

14:33:21 12    be using this.

14:33:22 13    Q.  How is Ms. Sharyn Orr supposed to tell you the last time she

14:33:28 14    took her drug?

14:33:29 15    A.  No way to know.

14:33:32 16    Q.  No way to know, right?  She couldn't say, could she?  So to

14:33:38 17    detect presence, look at her PT, that's what this is telling you,

14:33:41 18    isn't it?

14:33:42 19    A.  That's not what the text is saying.  You're going off the

14:33:46 20    table, not what they wrote in the text.

14:33:48 21    Q.  In coming to your opinions, you agree with me that you were not

14:33:58 22    shown any internal company documents.  You didn't have any of that,

14:34:03 23    did you?

14:34:03 24    A.  My only exposure, I think, was from reading Dr. Smart's report.

14:34:08 25    Q.  You were not offered to receive any of the documents that this

14:34:14  1  company -- these two companies have --

14:34:17  2  A.  Correct.

14:34:17  3  Q.  -- to review and to see what they know about the use of PT for

14:34:23  4  Xarelto, right?

14:34:24  5  A.  I've never used internal documents to form my opinion when it

14:34:28  6  comes to -- that I would go by the peer-reviewed data and what was

14:34:32  7  brought out by the final product.

14:34:34  8  Q.  So unless it is --

14:34:36  9  A.  I can't tell you that I've never used internal documents --

14:34:37  10  I've never been recommended to during the course of my training to

14:34:41  11  make sure you look at internal documents.  You need appropriate

14:34:44  12  clinical context, and you have to make the judgments, but it's

14:34:47  13  never been internal documents.

14:34:50  14  Q.  Okay.  And in the course of your training, it's probably pretty

14:34:54  15  common that no drug company has ever said, hey, come dig through

14:34:58  16  our files and see what we know, right?

14:35:01  17  A.  I wouldn't take up the offer, if given it.  I have no interest

14:35:05  18  in doing that.

14:35:05  19  Q.  And they certainly -- nobody at Bayer or Janssen ever offered,

14:35:10  20  please come look and see what we know, did they?

14:35:12  21  A.  What we know?  They offer the peer-reviewed literature.

14:35:18  22  Q.  Did they give you a single internal company document to look at

14:35:21  23  to see what this company knows?

14:35:22  24  A.  No, sir.

14:35:23  25  Q.  Did they give you any of the depositions of the company

14:35:27  1   employees to see what this company knows?

14:35:30  2   A.  If that was not put in peer-reviewed literature, I would not be

14:35:35  3   interested in that.

14:35:36  4   Q.  So you're just not interested in what this company actually

14:35:39  5   knows?

14:35:40  6   A.  I wouldn't -- it's not -- no, it's not am I interested -- I am

14:35:46  7   not willing to take that framing.  Once again, one more time.

14:35:50  8   Q.  Well, you said --

14:35:51  9   A.  I am trying to follow, sorry.

14:35:53  10  Q.  -- you wanted to look at the peer-reviewed literature.  And I

14:35:55  11  am trying not to have an argument with you.  I really am, I

14:35:57  12  promise, your Honor.

14:35:58  13          You said you only look at the peer-reviewed literature,

14:36:00  14  right?

14:36:01  15  A.  I look at peer-reviewed literature and guideline statements and

14:36:06  16  consensus statements, yes.

14:36:07  17  Q.  And you didn't ask the company to give you any information they

14:36:10  18  have internally?

14:36:11  19  A.  No.  And the point being that never in my training when I was

14:36:14  20  taught how to investigate and evaluate and make my own informed

14:36:18  21  decisions did any of mentors ever say, "You should look at internal

14:36:22  22  company documents before you make an informed decision."  And I've

14:36:25  23  never done so for --

14:36:27  24  Q.  And they didn't offer to give you any, did they?

14:36:30  25  A.  Not to my --

14:36:31   1          MS. WILKINSON:  Objection.  Asked and answered.

14:36:33   2          THE COURT:  Yeah, it has been.

14:36:40   3   BY MR. BARR:

14:36:40   4   Q.  So you haven't seen it, right?

14:36:41   5          THE COURT:  He said he hasn't, let's establish that.

14:36:45   6   I've heard him say that several times.  He hasn't.

14:36:51   7   BY MR. BARR:

14:36:52   8   Q.  I want to put up --

14:36:55   9          MR. BARR:  Can we put this back up so it doesn't have my

14:36:59  10   writing all over it?

14:37:00  11          MS. WILKINSON:  Sure.  You can put up what you said about

14:37:11  12   me, Brian.  I don't know where my copy is.

14:37:26  13          MR. BARR:  This will be my last series, your Honor.

14:37:38  14   BY MR. BARR:

14:37:39  15   Q.  Would you agree that the company likely knows more about how

14:37:41  16   this drug works than you do?

14:37:44  17   A.  Than I do?

14:37:46  18   Q.  Yes, sir.

14:37:46  19   A.  Yes, I hope so.

14:37:49  20   Q.  So you wanted to talk about this language, right?  You talked

14:37:54  21   about this language in your direct, correct?

14:37:56  22   A.  Yep.

14:37:56  23   Q.  And you particularly pointed out this sentence here as a

14:38:02  24   sentence that bothered you, right (INDICATING)?

14:38:04  25   A.  Yes.  It does bother me.

14:38:07  1   Q.  Are you aware, as you sit here and testify today, that Bayer

14:38:11  2   tells doctors outside of the United States this exact language?

14:38:17  3   A.  No.

14:38:19  4   Q.  So you have no knowledge of that.

14:38:44  5        Let me show you what the company says.  You see right

14:38:51  6   here that this is Bayer telling doctors that "Although there is no

14:38:57  7   need to monitor in clinical practice, in certain infrequent

14:39:01  8   situations such as overdosage, acute bleeding, urgent surgery, in

14:39:07  9   cases of suspected noncompliance, or in other unusual

14:39:11 10   circumstances, assessment of the anticoagulant effect of

14:39:13 11   rivaroxaban may be appropriate.  Accordingly, measuring PT using

14:39:17 12   the Neoplastin reagent or Factor Xa, may be useful to inform

14:39:25 13   clinical decisions in these circumstances."  Did you know that?

14:39:29 14   A.  I see that.

14:39:30 15   Q.  According to that sentence, Bayer disagrees with you, don't

14:39:34 16   they?

14:39:34 17   A.  I'm -- you're giving me one -- I don't have a whole document

14:39:39 18   here.  I am not going to comment on what Bayer thinks or doesn't

14:39:42 19   think.  I am not going to look at snippets.

14:39:44 20        MR. BARR:  That's all.

14:39:45 21        THE COURT:  All right.  Any redirect?

14:39:47 22        MS. WILKINSON:  Yes, your Honor.

14:39:59 23                    REDIRECT EXAMINATION

14:39:59 24   BY MS. WILKINSON:

14:39:59 25   Q.  Doctor, if you can speak up and lean into the microphone so we

14:40:03   1   can all hear you.

14:40:04   2   A.  Sorry.

14:40:04   3   Q.  You were just shown a statement, and yesterday the rest of the

14:40:07   4   statement was shown to the jury.  Do you see the bottom, the green

14:40:10   5   part that was left out?  Do you see that?

14:40:12   6   A.  Yes.

14:40:12   7   Q.  So what does that say?  Can you read it out loud, please?

14:40:15   8   A.  "However, the response of the PT varies both dependent on PT

14:40:19   9   reagent (which is not standardized) and coagulometer.  Thus, the PT

14:40:25  10   cannot be used to reliably measure the anticoagulant effect of

14:40:29  11   Xarelto since a normal PT may be found in patients with therapeutic

14:40:32  12   Xarelto levels if measured using selected machine/reagent

14:40:36  13   combinations."

14:40:37  14   Q.  And do you agree with that?

14:40:38  15   A.  That's the limitation that I find with the medication.

14:40:40  16   Q.  And when you read that together, does that suggest that PT is

14:40:44  17   useful in a clinical situation where a patient on Xarelto is in an

14:40:51  18   emergency such as surgery?

14:40:52  19   A.  Not in any way that I feel comfortable using.

14:40:55  20          MR. BARR:  Your Honor, I don't want to interrupt, but can

14:40:57  21   we approach real quick?

14:41:07  22          THE COURT:  Yes.

14:41:13  23     (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

14:41:13  24          MR. BARR:  You obviously know what this is about.  It's

14:41:16  25   the Canadian label again.  I think it continues to prejudice the

14:41:20  1   plaintiffs that we can't show the label.  It has -- I mean, they

14:41:26  2   keep criticizing the language from their own label, and they put up

14:41:31  3   language -- I don't think that's anywhere in the actual label about

14:41:35  4   not being able to use the PT.

14:41:39  5            MR. BIRCHFIELD:  And, your Honor, their own witness just

14:41:42  6   asked to see the whole document.  That's --

14:41:46  7            THE COURT:  I understand.  The way I see it, and I've

14:41:49  8   said it several times, the issue is really what the defendant knew

14:41:56  9   and when they knew it.  It's not what's in one label or what's in

14:42:02 10   another label, because the rules are different, the laws are

14:42:06 11   different, the specifics are different.

14:42:08 12            We're going to get in a situation where we then have to

14:42:11 13   try the Canadian label, and then we're going to be with witnesses

14:42:16 14   about what the Canadian label says and why it says that.  And then

14:42:19 15   we're going to go into the France label.  It's really involving the

14:42:24 16   United States label.  It's the FDA's label.

14:42:27 17            And I'll let you get in what they said, what they told

14:42:31 18   other people, obviously what they knew.  But that's where it's got

14:42:37 19   to stop.  We can't put in different labels.  It just doesn't -- it

14:42:43 20   would be impossible to deal with.  It's a different jurisdiction.

14:42:47 21            MS. WILKINSON:  Your Honor, just for the record, the

14:42:49 22   statement they put up was from a submission to a regulator, and all

14:42:53 23   you allowed us to do yesterday was show the complete statement.  It

14:42:56 24   wasn't -- this particular statement where they took the document

14:42:59 25   out was not the label.  It was in answer to a regulatory request in

14:43:03  1   Canada.

14:43:04  2           MR. BARR:  Your Honor, for completeness, this language

14:43:06  3   right here that's quoted is directly out of the label, and they

14:43:09  4   just put a witness up to criticize their own label.  I mean -- and

14:43:14  5   then they put up language that's not -- I mean, it just puts us in

14:43:18  6   an impossible situation.

14:43:20  7           THE COURT:  I understand.  I understand your position.

14:43:25  8           MR. BIRCHFIELD:  Yes, sir.

14:43:26  9           THE COURT:  Thank you.

14:43:46  10        (OPEN COURT.)

14:43:46  11  BY MS. WILKINSON:

14:43:47  12  Q.  All right, Doctor.  One of the questions we have is these

14:43:51  13  different terms that you know and you were being asked about

14:43:54  14  whether we're clear.  So up here we show it says, "PT cannot be

14:43:59  15  used to reliably measure the anticoagulant effect."  All right?

14:44:03  16  A.  Where are you?

14:44:03  17  Q.  I want you to --

14:44:07  18  A.  You're on the second --

14:44:09  19  Q.  "Anticoagulant Effect."  Do you see that?

14:44:12  20  A.  Yes, I do.

14:44:12  21  Q.  These are very different terms from the concentrate, right?

14:44:16  22  The concentrations?

14:44:16  23  A.  Yes.  So --

14:44:18  24  Q.  Let's slow down and see if we can explain this to the jury,

14:44:21  25  okay?

14:44:21   1    A.  Okay.

14:44:22   2    Q.  The first thing you were getting asked about was concentration,

14:44:25   3    right?

14:44:26   4    A.  Correct.

14:44:26   5    Q.  Is that the same thing as the anticoagulant effect?

14:44:31   6    A.  No.

14:44:32   7    Q.  Tell us what concentration is.

14:44:35   8    A.  Concentration refers to the amount of blood -- the amount of

14:44:39   9    medication in the blood.

14:44:40  10    Q.  So if you had a liter of blood, you would measure how much of

14:44:45  11    that medication was in there?

14:44:47  12    A.  Yes.

14:44:47  13    Q.  Is that it?  Okay.  Amount of the meds.  All right.

14:44:52  14            Does that tell you, if you know, the amount of medication

14:44:55  15    in someone's blood, whether their blood is anticoagulated or not?

14:44:59  16    A.  Not without correlating that with anticoagulant effect; you

14:45:03  17    have to correlate it.

14:45:04  18    Q.  You say "anticoagulant effect."  So we don't know what that

14:45:07  19    means.  So start with anticoagulation.  That means the blood is not

14:45:11  20    clotting, right?

14:45:12  21    A.  Yes.  So the effect would be the impact of the medication.  So

14:45:16  22    the amount of medication is one thing, that's the concentration.

14:45:19  23    The effect would be the impact of that medication.

14:45:22  24    Q.  So whether you have it in your blood is a different question of

14:45:25  25    whether it's working, right?

14:45:26  1    A.  Correct.

14:45:27  2    Q.  Whether -- all right.

14:45:28  3         And when you measure this, the concentration, does that

14:45:31  4    mean you can predict this, whether a person's blood is coagulated

14:45:34  5    or not?

14:45:34  6    A.  No.

14:45:37  7    Q.  Does that matter when you're trying to decide whether to do

14:45:40  8    emergency surgery?

14:45:41  9    A.  That is the critical variable.

14:45:42  10   Q.  Which one is critical?

14:45:43  11   A.  The anticoagulant effect.

14:45:44  12   Q.  And explain, as clearly as you can, why is it that the

14:45:48  13   anticoagulant effect is so critical and the concentration is not?

14:45:51  14   A.  Because if you have a low concentration and you still have

14:45:55  15   effect, if I cut, you're going to bleed.  If you have a very large

14:46:01  16   concentration but very little effect, if I cut, you're not going to

14:46:06  17   bleed.  The key to the variable is the anticoagulant effect.

14:46:09  18   Q.  So if you have a low amount and you say -- we're talking about

14:46:16  19   a low concentration, can you say that equals -- that you are

14:46:22  20   coagulating or you don't have any anticoagulant effect?

14:46:25  21   A.  You don't have correlation, there's never been, with

14:46:28  22   concentration and effect with Xarelto.

14:46:31  23   Q.  So a low amount on a PT reading of Xarelto does not mean that

14:46:38  24   your blood is coagulating?

14:46:41  25   A.  Correct.

1982

14:46:41  1    Q.  In fact, it could mean that it's still anticoagulant?

14:46:46  2    A.  Correct.

14:46:46  3    Q.  Why is it that it was important to you when you were talking to

14:46:48  4    Mr. Barr talking about the reading at low levels, right, the

14:46:52  5    sensitivity?

14:46:53  6    A.  Yes.

14:46:53  7    Q.  What do you mean by the "sensitivity"?

14:46:55  8    A.  So sensitivity is -- so going back to what Mr. Barr was saying

14:47:02  9    about screening tests for cancer.  You want a screening test that

14:47:06  10   is very sensitive.  What that means is that -- if you have it, it's

14:47:11  11   not going to miss it.  It may overcall it; it may not be specific.

14:47:16  12         "Specific" means you have -- the test is positive, and

14:47:19  13   that means you have it.  There is a difference.

14:47:21  14         And so when you're doing a screening test for cancer, you

14:47:26  15   want a test that's going to capture a lot of patients and then

14:47:30  16   later you're going to want to hone in and figure out, okay.  Do

14:47:33  17   they truly have cancer or not?  That's what a screening test is

14:47:37  18   designed to have high sensitivity.  Okay.

14:47:40  19         When you're doing something about making a clinical

14:47:44  20   decision whether or not to have surgery emergently, you want

14:47:52  21   high -- you want specificity for that.  It's not a screening test.

14:47:56  22   We're not talking about a screening test now.  We're talking about

14:47:59  23   a test that I am going to actually take an action on and not a

14:48:03  24   small action.  It's a big decision.

14:48:06  25   Q.  Okay.  Are there -- in some of those articles that you were

1983

14:48:10  1   shown and articles you read, were there statements about whether

14:48:13  2   the PT test is sensitive enough to read whether your blood at the

14:48:18  3   lower levels still has the drug in the blood?

14:48:21  4   A.  No.  The sensitivity of the PT test is even lower at lower

14:48:25  5   concentrations.

14:48:26  6   Q.  Meaning it's not as sensitive when you have less?

14:48:29  7   A.  You'll have more misses.

14:48:31  8   Q.  So what would that mean?  If I had a low level -- let's use

14:48:35  9   Mrs. Orr's.  Comes out to 11.5.  Looks like it's normal, right?

14:48:39 10   A.  What that would mean is that she could have -- so if she has a

14:48:43 11   lower concentration, the ability of the PT to predict that

14:48:46 12   accurately is less sensitive.  It would be more misses.  So you

14:48:50 13   could have still low concentrations that may have -- and, again,

14:48:54 14   concentration doesn't correlate to effect, but you may have

14:48:57 15   concentrations that have anticoagulant effect, you're going to miss

14:49:00 16   it.

14:49:01 17   Q.  So if you have an 11.5 concentration, you can still have the

14:49:08 18   anticoagulation; meaning, if you were cut, you would bleed,

14:49:12 19   profusely not --

14:49:13 20   A.  You should be a teacher, this is how I should have said it.

14:49:13 21   Q.  Pardon?

14:49:14 22   A.  You should have been the teacher.  I should have said that from

14:49:17 23   the front end, that's much simpler.

14:49:17 24   Q.  No.  Well, you've kind of taught me.  I am just trying to make

14:49:20 25   it simple so we can understand because this doesn't come naturally

1984

14:49:24  1   to most of us.

14:49:25  2   A.  I get it.  You're right.

14:49:26  3   Q.  Okay.  So when we go back, and we're not going to go through

14:49:29  4   all of those studies again, I just want to point out a few

14:49:31  5   things --

14:49:31  6   A.  Please don't.

14:49:32  7   Q.  -- with your standard of reading the whole article.  Is this

14:49:36  8   what you're concerned about when using the PT test in an emergency

14:49:39  9   situation?

14:49:40 10   A.  That's my concern is that it doesn't correlate to actual

14:49:44 11   effect.  We don't know how it works in that setting.

14:49:46 12   Q.  So when you look at this -- Dr. Parisian's proposed label

14:49:54 13   change, it says you can actually assess the anticoagulation effect

14:50:00 14   in rivaroxaban.  Is that true in a PT test?  She is saying you can

14:50:04 15   assess the coagulation effect.

14:50:07 16   A.  I disagree with that statement.  I think putting that in a

14:50:10 17   label would be reckless.

14:50:11 18   Q.  And have you been shown any data that shows how you would

14:50:13 19   actually measure that?  What numbers you would use as a clinician?

14:50:17 20   A.  No.

14:50:17 21   Q.  Did Dr. Parisian give any numbers, any way that a clinician

14:50:21 22   would know, once that PT test was taken, what you were supposed to

14:50:27 23   do when a patient was at certain level?

14:50:29 24   A.  I don't know what Dr. Parisian gave.  I just know from

14:50:30 25   basing --

14:50:30 1   Q.   Is there anything in that label that tells you that?

14:50:32 2   A.   No.

14:50:32 3   Q.   So if this was in the label and you were treating Mrs. Orr and

14:50:38 4   she had an 11.5 PT test, right, and you were advising her

14:50:43 5   neurosurgeon whether to go into surgery, would this give you any

14:50:47 6   information about what to tell him?

14:50:48 7   A.   I would go based on the time from last ingestion and creatinine

14:50:53 8   clearance.

14:50:53 9   Q.   That's not what I asked you.  Would this give you any basis to

14:50:56 10  tell him anything?

14:50:57 11  A.   I would not feel comfortable rendering a clinically important

14:51:01 12  decision based on that; so, no.

14:51:02 13  Q.   Would you know how to interpret the PT number?

14:51:04 14  A.   No.  I don't even know if this was Neoplastin.

14:51:09 15  Q.   And the Neoplastin makes a difference?

14:51:12 16  A.   Yes.  That's the only reagent that's been correlated with this.

14:51:15 17  I'm at Ochsner and I don't know which reagent we use.

14:51:18 18  Q.   Let's go back, if we could, just briefly to the articles.  You

14:51:23 19  were not given your reliance list when you were asked those

14:51:26 20  questions, right?  Would you like to take a look at it so you can

14:51:27 21  see whether some of those articles are actually on there?

14:51:30 22  A.   Sure.

14:51:31 23  Q.   Take a look.  Now, you have quite a few articles listed on your

14:51:41 24  reliance list, do you not?

14:51:43 25  A.   I have a few, yes.  Yes.

14:51:45  1    Q.  And if we just turn -- you were asked about an article by

14:51:53  2    Dr. Mueck, right?

14:51:53  3    A.  Yes.

14:51:53  4    Q.  From Bayer, from 2013.

14:51:56  5    A.  I have it on my reliance list.

14:51:58  6    Q.  And it is on your reliance list, isn't it?

14:52:00  7    A.  Yes, it is.

14:52:01  8    Q.  Is that it right there (INDICATING)?

14:52:02  9    A.  Yep.  Yes.

14:52:03 10    Q.  And do you -- if I -- not that we would understand all of these

14:52:07 11    articles.  If I went through this, are there all different articles

14:52:11 12    on different subjects related to Xarelto on your reliance list?

14:52:15 13            MR. BARR:  Beth, can I see that?

14:52:17 14            MS. WILKINSON:  You have a copy.

14:52:18 15            MR. BARR:  Can I see the one you are --

14:52:20 16            MS. WILKINSON:  Your Honor, can I finish my examination?

14:52:22 17            THE COURT:  I would --

14:52:22 18            MR. BARR:  I want to see.

14:52:24 19            MS. WILKINSON:  Would you like a copy of it?

14:52:27 20            MR. BARR:  Yes, I would like a copy of it.

14:52:28 21            MS. WILKINSON:  Sure.  Do you have a copy?  I'm being

14:52:28 22    told we do have another copy.

14:52:41 23            I don't have it.  You can have this copy as soon as I'm

14:52:43 24    done.

14:52:44 25            THE WITNESS:  You want to give him this copy?

14:52:47  1          THE COURT:  Why don't you give him this copy, the copy

14:52:50  2    the doctor has.  He doesn't need it.

14:52:51  3          MS. WILKINSON:  He doesn't need it.  You can have it.

14:53:00  4    BY MS. WILKINSON:

14:53:00  5    Q.  Doctor, do you believe you've read other articles by Dr. Mueck?

14:53:04  6    A.  I think so.  Again --

14:53:07  7    Q.  Do you remember every article you've read in this case?

14:53:10  8    A.  No.  No way to do it.

14:53:11  9    Q.  All right.  You were shown this article by Mr. Lippi or

14:53:16 10    Dr. Lippi, and what does it say right up there at the top that I

14:53:20 11    have highlighted?

14:53:21 12    A.  "Opinion paper."

14:53:22 13    Q.  Is that different?  Does that -- does that mean that these

14:53:27 14    gentlemen are giving their opinion?  Do you have that?

14:53:28 15    A.  Just means to me someone is giving their opinion.  You know,

14:53:31 16    when you're looking at guidelines, the strength of guidelines can

14:53:34 17    be based on consensus or an opinion or it can be based on studies,

14:53:41 18    trials, be it randomized trials or registries.  So this to me means

14:53:46 19    he is rendering an opinion on this.

14:53:48 20    Q.  You weren't given a time to look through this, but do you have

14:53:52 21    any reason to believe that there's any study or any data that these

14:53:57 22    gentlemen are referring to that supports whether PT can be used in

14:54:02 23    an emergency situation?

14:54:04 24    A.  I haven't reviewed the study -- the paper.  So I don't have --

14:54:08 25    I haven't reviewed it.

14:54:09  1    Q.  Go to page 8 because I think you were trying to point out the

14:54:12  2    only American institution here that's cited.

14:54:16  3    A.  I think I am on the wrong one now.

14:54:18  4    Q.  You see -- look up on the screen.

14:54:21  5    A.  Yes.

14:54:21  6    Q.  And look at the part I underlined that you weren't shown.  Is

14:54:25  7    that the American institution or a society you were talking about?

14:54:27  8    A.  The ACCP, yes.

14:54:29  9    Q.  And what does it say?

14:54:31 10    A.  It says, "The rule or -- interestingly the American College of

14:54:35 11    Chest Physicians in an Australian consensus document ruled out the

14:54:38 12    use of PT for assessing direct oral Factor Xa inhibitors."

14:54:44 13    Q.  Would that include Xarelto?

14:54:45 14    A.  Yes.

14:54:46 15    Q.  What does that tell you about the American guidelines and what

14:54:48 16    they say in this article about using PT to test for Xarelto?

14:54:51 17    A.  I don't see any American guidelines recommending that.

14:54:54 18    Q.  Let's go to the next article by Dr. Trippie (PHONETIC).  That's

14:55:06 19    titled, "A debate," right?

14:55:08 20    A.  That's titled "Debate," yes.

14:55:09 21    Q.  If you can look down here is he writing this in the personal,

14:55:12 22    where he says, "All in all I believe that PT is it more suitable"?

14:55:15 23    A.  Yes.

14:55:15 24    Q.  Do you see that?

14:55:16 25    A.  I do.

14:55:16  1   Q.  And this article, the review article by -- I am not going to be

14:55:29  2   able to pronounce his name properly -- but Dr. Koscielny,

14:55:36  3   K-O-S-I-E-L-N-Y (VERBATIM).  And you have not seen this either,

14:55:40  4   right?

14:55:41  5   A.  No.

14:55:41  6   Q.  And if I just turn to the rest of the laboratory test of

14:55:53  7   rivaroxaban, do you see that section?

14:55:56  8   A.  I do.

14:55:57  9   Q.  It's up on the screen.  And what does it say about whether PT

14:56:01  10  is useful in predicting a bleeding risk?

14:56:03  11  A.  "However, PT is not a useful -- is not useful as a predictor of

14:56:08  12  potential bleeding events.  For example" --

14:56:10  13  Q.  So does this support your opinion or the opinion that

14:56:13  14  Dr. Parisian expressed yesterday about that label being useful for

14:56:18  15  clinicians?

14:56:18  16  A.  The sentence would appear to support my opinion.

14:56:24  17  Q.  And the Eikelboom article, you read the entire thing, right?

14:56:28  18  A.  I did.

14:56:28  19  Q.  After reading the entire article, do you believe this supports

14:56:31  20  your opinion that PT is not useful in the clinical setting with a

14:56:36  21  patient who is facing emergency surgery who has been on Xarelto or

14:56:39  22  not?

14:56:40  23  A.  I absolutely -- my review of that article I thought it hit it

14:56:46  24  just appropriately.

14:56:47  25  Q.  And, Doctor, did you read the most recent article that has come

14:56:50  1   out on this very subject by Adcock and Gosselin that just came out

14:56:55  2   about a month ago?

14:56:56  3   A.  I believe so.

14:56:57  4   Q.  All right.  Let me show it to you.

14:57:22  5   A.  Thanks.

14:57:24  6   Q.  This wouldn't be on your reliance list because it just came out

14:57:27  7   last month, right?

14:57:28  8   A.  Correct.

14:57:28  9   Q.  Did you read it, though, before coming to court?

14:57:31 10   A.  I did.

14:57:32 11   Q.  And does it suggest that PT can be used in clinical situations

14:57:39 12   when a Xarelto patient is in an emergent situation facing possible

14:57:45 13   surgery?

14:57:46 14   A.  No, it does not.

14:57:46 15   Q.  In fact, can you turn to page 1.  First of all, let me put it

14:57:51 16   up on the screen so everyone can see it.  Is this the article?

14:57:53 17   A.  Yes.

14:57:54 18   Q.  And do you know whether Adcock and Gosselin have written

14:57:59 19   multiple articles on this subject?

14:58:00 20   A.  I know they have.  That name -- both of those names are

14:58:04 21   familiar to me.

14:58:04 22   Q.  Could you read the title, please?

14:58:06 23   A.  "The danger of relying on the APTT and PT in patients on DOAC

14:58:11 24   therapy, a potential patient safety issue."

14:58:13 25   Q.  And I've highlighted just one portion of the abstract.  Can you

14:58:17  1    read that?

14:58:17  2    A.  "It has been repeatedly demonstrated that patients can have

14:58:21  3    normal APTT and PT INR with a therapeutic plasma concentration of a

14:58:27  4    DOAC.  Clinicians can no longer rely on a normal APTT and PT to

14:58:32  5    determine that an anticoagulated patient is safe to undergo an

14:58:35  6    invasive procedure."

14:58:37  7    Q.  What is that saying?

14:58:38  8    A.  That is saying that you can't use the PT to make a clinical

14:58:41  9    decision whether or not to intervene surgically or not.

14:58:45  10   Q.  So based on all of the literature you reviewed, your practice,

14:58:48  11   and even the literature you got to read for a few minutes here,

14:58:51  12   what is your final opinion about whether PT can be used in an

14:58:55  13   emergency situation with a patient who has been on Xarelto?

14:58:58  14   A.  I think it is clinically not a meaningful test, and I don't --

14:59:03  15   it does not have any part of my practice.  My review of the

14:59:07  16   literature, if it was, I would be using it.  And I strongly believe

14:59:10  17   that I cannot use it in a clinically meaningful way.  I think you

14:59:16  18   have other variables to look at.  This is not a variable that I am

14:59:19  19   going to use.

14:59:20  20            MS. WILKINSON:  Thank you very much, Doctor.  That's all,

14:59:25  21   your Honor.

14:59:25  22            THE COURT:  Okay.  Thank you, you're excused.  Thank you,

14:59:25  23   sir.

14:59:25  24            THE WITNESS:  Thank you.

14:59:27  25            THE COURT:  We'll take a break here and come back and

14:59:29  1  start another witness.  The court will stand in recess for ten

14:59:32  2  minutes.

14:59:32  3           THE MARSHAL:  All rise.

14:59:32  4      (WHEREUPON, THE JURY EXITED THE COURTROOM AND A RECESS WAS

15:13:28  5      TAKEN.)

15:13:28  6      (OPEN COURT.)

15:13:29  7      (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

15:13:29  8           THE COURT:  Okay, be seated.  Call your next witness.

15:13:32  9           MR. DUKES:  Good afternoon, your Honor, ladies and

15:13:34 10  gentlemen, the defendant's next witness is Dr. Vanessa Piazza, who

15:13:38 11  is on the witness stand, ready to be sworn.

15:13:41 12           THE DEPUTY CLERK:  Would you stand and raise your right

15:13:44 13  hand, please.

15:13:44 14      (WHEREUPON, VANESSA PIAZZA, M.D., WAS SWORN IN AND TESTIFIED

15:13:47 15      AS FOLLOWS:)

15:13:47 16           THE DEPUTY CLERK:  Please have a seat.  State and spell

15:13:49 17  your name for the record, ma'am.

15:13:50 18           THE WITNESS:  Good afternoon.  My name is Vanessa Piazza,

15:13:55 19  P-I-A-Z, as in zebra, Z-A.  I am an emergency medicine doctor.

15:14:02 20                       VOIR DIRE EXAMINATION

15:14:03 21  BY MR. DUKES:

15:14:05 22  Q.  Dr. Piazza, tell us what an emergency room doctor does.

15:14:07 23  A.  An emergency room doctor is a specialist in the care of people

15:14:13 24  who present with unscheduled visits of all hours, all times of the

15:14:17 25  day and night, with acute illness or injury that need immediate

15:14:20  1  medical attention.

15:14:20  2  Q.  Do you practice at a hospital here in New Orleans?

15:14:23  3  A.  Yes, at UMC, previously known as Charity, just downtown.  As

15:14:28  4  well as at Ochsner Kenner.

15:14:29  5  Q.  And did you help prepare a slide that talks about your

15:14:32  6  education and training?

15:14:34  7  A.  I did.

15:14:34  8  Q.  If I could pull up slide 1, please.

15:14:37  9         Would you tell us about your educational background.

15:14:40 10  A.  Yes.  I attended LSU in Baton Rouge, had a full scholarship

15:14:44 11  there.  And then I went to LSU Medical School here in New Orleans.

15:14:48 12  Board-certified in emergency medicine, trained in residency here at

15:14:52 13  Charity Hospital.  Went on to do a fellowship in emergency medicine

15:14:59 14  ultrasound.

15:15:00 15  Q.  Now, where did you grow up?

15:15:01 16  A.  In New Orleans.

15:15:02 17  Q.  Do you have a family?

15:15:03 18  A.  Yes, I do.

15:15:04 19  Q.  Tell us a little bit about your family.

15:15:06 20  A.  I have a husband and I have a three-year-old daughter that I

15:15:10 21  had at age 44.

15:15:11 22  Q.  Did that impact your emergency room schedule a little bit?

15:15:14 23  A.  It did.  I finished residency in 2000, loved my job, worked a

15:15:19 24  lot, 20 to 22 shifts a month.  Continued doing that, which is

15:15:23 25  basically twice full-time.  Most of the time that was at more than

15:15:26 1    one facility.  I've worked in the east at Methodist before the

15:15:31 2    hurricane, in the west at Kenner Regional, which is now Ochsner

15:15:34 3    Kenner, and downtown at UMC.  I've been there since I trained at

15:15:38 4    Charity, either part-time or full-time.  Work all the time.

15:15:41 5            Then after 14, almost 15 years of doing that and then at

15:15:44 6    age 44 having a baby, now decided to cut back a little bit.  I am

15:15:49 7    still full-time, but in order to give myself time to review the

15:15:52 8    literature, to got to CMEs, to go to conventions as I did

15:15:56 9    previously and still take care of my now three-year-old, I work

15:16:00 10   about ten shifts a month.

15:16:01 11   Q.  So you went to undergraduate at LSU?

15:16:03 12   A.  Yes, I did.

15:16:05 13   Q.  Still an LSU tiger?

15:16:07 14   A.  Oh, yes.  Parents are big fans.

15:16:08 15   Q.  And med school at LSU?

15:16:10 16   A.  Absolutely.  All home-grown.

15:16:11 17   Q.  After getting your medical degree at LSU, did you undergo any

15:16:15 18   other training after that in the medical field?

15:16:17 19   A.  I did.  So I finished residency in 2000.  I was faculty at LSU.

15:16:23 20   As the training of the residents began to more actively include

15:16:28 21   ultrasound as a modality, so what that means is historically we've

15:16:33 22   used ultrasounds in pregnancy to see if somebody is pregnant or

15:16:37 23   not.  But now we use it for gallbladders, we use it for abscesses,

15:16:41 24   we use it for procedures like putting in a chest tube, putting in a

15:16:47 25   suprapubic catheter, bladder, basically procedures.

15:16:51 1      And as that training became more evident, I wanted to do

15:16:53 2 a fellowship so that I could supervise properly the residents and

15:16:56 3 know basically more than they did so that I could teach them.

15:16:59 4      So I entered a fellowship while concurrently being an

15:17:02 5 emergency room staff.  All that meant is while I am still working

15:17:06 6 as an emergency room doctor, I was also a fellow student in

15:17:09 7 ultrasound.  And after a year and a half, finished that fellowship.

15:17:13 8 Q.  What attracted you to emergency medicine?

15:17:16 9 A.  I like the action, the variety.  I like to be able to do

15:17:19 10 something that makes a difference, put a shoulder back in place,

15:17:23 11 sew up a laceration, listen to somebody and make them feel better.

15:17:26 12 Q.  Are you board-certified in any areas?

15:17:29 13 A.  I am certified and then I had to recert ten years later, so,

15:17:32 14 yes.

15:17:32 15 Q.  Can you tell us sort of a -- briefly, a typical day in the

15:17:36 16 emergency department?

15:17:37 17 A.  So I may see about 30, 32 patients a day.  And they'll come

15:17:42 18 from all different varieties.  I'll see a dog bite, possible

15:17:46 19 meningitis, kid with a fever, stroke, chest pain.  Recently I saw

15:17:53 20 someone who was on a car when his girlfriend drove off, came in

15:17:58 21 with an open ankle fracture and a head bleed.  I've seen patients

15:18:01 22 who have come in with vomiting, GI bleeds, those kind of things.

15:18:05 23      I delivered a baby on the ramp at Charity Hospital.  Came

15:18:07 24 in by a cab, whole waiting room behind me watching out the glass

15:18:12 25 waiting room as I am delivering this baby that momma couldn't get

15:18:15  1   out the car fast enough but the baby was coming.

15:18:18  2   Q.  How often do you deal with bleeding events in the ER?

15:18:21  3   A.  Pretty much every day, bleeding of some sort, whether it's from

15:18:24  4   a laceration, recently I saw a tongue bleed, bleeding from the

15:18:29  5   head, externally, internally.

15:18:31  6   Q.  And how often do you deal with intracranial bleeds?

15:18:35  7   A.  An intracranial bleed, when you're speaking -- what -- I

15:18:39  8   believe what you're referring to is non-traumatic.  So when you're

15:18:42  9   talking about a non-traumatic intracranial bleed, those will

15:18:45 10   come -- now that I am working about ten shifts a month, I'll see

15:18:48 11   those maybe twice a month or so.

15:18:50 12   Q.  How do patients with intracranial bleeds typically present at

15:18:55 13   the ER?

15:18:55 14   A.  So an intracranial bleeds typically will present with a

15:18:59 15   headache, with vomiting, nausea, and a change in mental status.  So

15:19:03 16   what that means is they're just not acting right.  It could be

15:19:07 17   confusion or it could be just failure to be alert at all, just

15:19:12 18   somnolent.

15:19:12 19   Q.  Do you treat patients at the ER who come in with signs of

15:19:15 20   ischemic or clotting-type strokes?

15:19:17 21   A.  Yes, that's the other kind of stroke more commonly.  That

15:19:19 22   presents about 85 percent of the time when someone has a stroke.

15:19:22 23   And those strokes can present with headaches and mental status

15:19:26 24   changes, but more typically they will present with an onset of

15:19:29 25   weakness, like a facial weakness or arm and leg weakness, and a

15:19:34  1    slurring of their speech.

15:19:35  2    Q.  Are you familiar with the risks and benefits of anticoagulants?

15:19:39  3    A.  Yes, I am.

15:19:40  4    Q.  And why are you familiar with them?  What's your experience

15:19:43  5    with them?

15:19:44  6    A.  I see patients who are on these anticoagulants, sometimes for

15:19:47  7    an unrelated problem, and that's just in their history, and I need

15:19:50  8    to be able to appreciate that.  And sometimes they're actually

15:19:53  9    coming in bleeding.  They're vomiting blood, they're bleeding from

15:19:56 10    their rectum, they're bleeding from a laceration.  I need to know

15:19:59 11    if they're on an anticoagulant in order to manage them

15:20:02 12    appropriately.

15:20:02 13    Q.  You see a lot of patients in the ER who come in on

15:20:06 14    anticoagulants?

15:20:06 15    A.  I see all-comers.  There's no screening for who comes into the

15:20:11 16    ER.  So if the public is on a medication or affected by a

15:20:13 17    medication, I will see them in the ER, yes.

15:20:15 18    Q.  Do you have experience both with warfarin or Coumadin as well

15:20:19 19    as the new novel anticoagulants?

15:20:22 20    A.  Yes, Coumadin, warfarin has been around for years.  So -- since

15:20:25 21    I started medical school in 1992.  So, yes, since then, I've seen

15:20:31 22    patients on warfarin up to the present.  We still see patients on

15:20:34 23    warfarin.  And then recently, if you want to say recently in the

15:20:37 24    past ten years or so, the NOACs, or the novel oral anticoagulation

15:20:44 25    agents, the NOACs is how we call them.

15:20:45  1    Q.  And that would include Xarelto, right?

15:20:47  2    A.  Yes.

15:20:47  3    Q.  Have you treated patients who experience brain bleeds on

15:20:52  4    anticoagulants?

15:20:52  5    A.  Yes, I have.

15:20:53  6    Q.  And have you seen patients who had brain bleeds while taking

15:20:58  7    the NOACs?

15:21:00  8    A.  Yes, I have.  They're less frequent on the NOACs.  There's a

15:21:04  9    less -- there's a lower incidence, but, yes, I have seen those.

15:21:08  10   Q.  As part of your medical practice, do you have to be familiar

15:21:10  11   with what's called the clotting cascade?

15:21:13  12   A.  Yes.  More so as far as its application to clinical practice.

15:21:17  13   But, yes.

15:21:18  14   Q.  Why in your position do you need to understand the clotting

15:21:21  15   cascade?

15:21:22  16   A.  In order to understand how the clotting cascade affects the PT,

15:21:29  17   PTT and INR test as well as how patients may present clinically, if

15:21:34  18   they have hemophilia, if they have something called Factor V Leiden

15:21:39  19   disease, that's a clotting problem.  If they have Von Willebrand

15:21:45  20   disease.  How these diseases affect the way they clot, the clotting

15:21:48  21   cascade is how your body is making clots, and involves a bunch of

15:21:52  22   clotting and protein factors.  And I need to know how that will

15:21:56  23   present in my patients and how to use the lab work to understand

15:21:59  24   that as well.

15:21:59  25   Q.  As part of emergency medicine practice, do you have to be

15:22:03  1  familiar with the various tests of clotting function?

15:22:05  2  A.  Yes.

15:22:06  3  Q.  And do you need to be familiar with the various drugs and the

15:22:10  4  impacts that they have on clotting function?

15:22:12  5  A.  Yes, I do.

15:22:13  6  Q.  Could you give us some examples of drugs that affect clotting

15:22:17  7  function?

15:22:17  8  A.  Aspirin, everybody is familiar with that.  That will affect

15:22:21  9  clotting function in that it affects platelet function for seven

15:22:26  10  days.  That's not reflected in any of our emergency room

15:22:31  11  coagulation studies, but, yes, aspirin.  Plavix, another one,

15:22:35  12  anti-thrombotic test that people are commonly on.  Non-steroidal

15:22:40  13  anti-inflammatory medications, like Aleve or Ibuprofen, those

15:22:45  14  affect bleeding profiles, as well as warfarin, NOACs.

15:22:48  15  Q.  Do all anticoagulants and other drugs that affect the clotting

15:22:53  16  function, do they do it through the same mechanism, or are there

15:22:56  17  different mechanisms?

15:22:57  18  A.  The ones I mentioned -- in general, all different mechanisms.

15:23:02  19  So the aspirin, the Plavix, those affect platelet function.  Some

15:23:07  20  of the other ones are different aspects of the clotting cascade.

15:23:11  21  Q.  You keep up with the medical and scientific literature as it

15:23:14  22  relates to anticoagulants, including the NOACs?

15:23:17  23  A.  Yes.  In general, I'm pretty much reading all the time.

15:23:21  24  Q.  Do you keep up with the medical and scientific literature as it

15:23:25  25  relates to management of bleeding and bleeding in patients?

15:23:28  1    A.  Yes.

15:23:28  2    Q.  Are you being paid for your time working on this case?

15:23:31  3    A.  I am.

15:23:32  4    Q.  How much are you being paid?

15:23:33  5    A.  300 an hour up to deposition, then deposition and trial 500 an

15:23:39  6    hour.

15:23:42  7              MR. DUKES:  Your Honor, at this time we would offer

15:23:44  8    Dr. Piazza as an expert in emergency medicine, the evaluation and

15:23:47  9    treatment of bleeding events, and the assessment of clotting

15:23:50  10   function.

15:23:52  11             THE COURT:  Any questions?

15:23:53  12             MR. HONNOLD:  No objection, your Honor.

15:23:54  13             THE COURT:  Okay.  The Court will accept her in the

15:23:56  14   designated fields.

15:23:57  15                      DIRECT EXAMINATION

15:23:58  16   BY MR. DUKES:

15:23:58  17   Q.  Let's talk about the preparation of your opinions in this case.

15:24:02  18   Did you review Mrs. Orr's medical records to prepare for your

15:24:05  19   opinions in this case?

15:24:05  20   A.  I did.

15:24:06  21   Q.  Did you review depositions of Mrs. Orr's family members or

15:24:11  22   doctors and other witnesses in the case?

15:24:12  23   A.  I did.

15:24:13  24   Q.  Did you review the Plaintiffs' -- what's called the fact sheet?

15:24:16  25   A.  I did.

15:24:16 1    Q.  Did you review medical and scientific literature regarding

15:24:20 2    Mrs. Orr's medical conditions, anticoagulant use, and Xarelto?

15:24:26 3    A.  Yes, I did.

15:24:27 4    Q.  Now, you have not reviewed every article that's been written on

15:24:30 5    all of these topics, have you?

15:24:31 6    A.  That would be impossible.

15:24:33 7    Q.  And did you review Xarelto FDA-approved prescribing information

15:24:37 8    called the label?

15:24:38 9    A.  Yes, I did.

15:24:39 10   Q.  And are you familiar with the Xarelto medication guide that was

15:24:42 11   provided to patients like Mrs. Orr?

15:24:44 12   A.  Yes, I am.

15:24:45 13   Q.  Did you review and consider the opinions of Plaintiffs' expert

15:24:49 14   Dr. Liechty?

15:24:49 15   A.  Yes.

15:24:50 16   Q.  And have you reviewed Dr. Bui's testimony?

15:24:53 17   A.  Yes.

15:24:54 18   Q.  And have you also relied on your own training, education,

15:24:58 19   background, and experience in coming to the opinions you're going

15:25:01 20   to talk to the jury about this afternoon?

15:25:03 21   A.  Yes.

15:25:03 22   Q.  Now, let's talk about Mrs. Orr and the time period around the

15:25:09 23   event that she suffered.  When did Mrs. Orr's brain bleed start?

15:25:15 24   A.  Her brain bleed started when she had the symptoms around 6:30

15:25:18 25   or 6:45 of a headache and nausea.

15:25:21  1    Q.  And how do you know that?

15:25:22  2    A.  Well, we know that brain bleeds cause headaches because any

15:25:27  3    amount of blood in the brain is an irritant, and that's going to

15:25:31  4    make people have a headache.  Even small bleeds called sentinel

15:25:36  5    headaches because of the small subarachnoid hemorrhage is going to

15:25:40  6    make you have a headache.

15:25:42  7    Q.  Based on your review of Mrs. Orr's medical records as well as

15:25:44  8    your reading the testimony of family members, how did Mrs. Orr's

15:25:48  9    condition change after that initial headache?

15:25:51 10    A.  After the initial headache, she had some nausea, she vomited

15:25:58 11    after dinner and right outside the car, and then on arrival home.

15:26:03 12    She also had some confusion and felt very, very tired, which was

15:26:07 13    also described as lethargic.

15:26:09 14    Q.  Were all of these signs of a worsening neurologic condition?

15:26:13 15    A.  Yes.

15:26:14 16    Q.  Now, there's a notebook in front of you, because I am going to

15:26:18 17    try to move things along pretty quickly this afternoon, and counsel

15:26:22 18    has a notebook that has exhibits in it.  So if you would turn to

15:26:27 19    Tab 1 in your notebook, please.  This is Defendant's Exhibit Orr

15:26:34 20    13A.  Just let me know when you're get there.

15:26:37 21    A.  I'm there.

15:26:38 22    Q.  You're at Tab A.  It should be the ambulance report for the

15:26:41 23    call to the Orrs' home on April 24.  Is that what you're looking

15:26:44 24    at?

15:26:44 25    A.  Yes.

15:26:45  1          MR. DUKES:  Your Honor, I'd move to admit Defendant

15:26:47  2   Exhibit Orr 13A into evidence.

15:26:49  3          MR. HONNOLD:  No objection, your Honor.

15:26:50  4          THE COURT:  Let it be admitted.

15:26:52  5   BY MR. DUKES:

15:26:52  6   Q.  If we could call up DX Orr 13A.1.1.

15:27:01  7          Now, the first page is a discussion of a Glasgow Coma

15:27:03  8   score of 15, do you see that?

15:27:04  9   A.  Yes.

15:27:05  10  Q.  Let's call up DX Orr 13A.2.1.

15:27:10  11         Now, the jury has previously heard that a Glasgow Coma

15:27:14  12  score of 15 means a patient is completely normal neurologically,

15:27:17  13  right?

15:27:17  14  A.  Yes.

15:27:18  15  Q.  Are there other statements in this report that indicate that

15:27:21  16  Mrs. Orr was beginning to have some neurologic symptoms?

15:27:25  17  A.  Yes.  When you look at what the EMS people actually wrote when

15:27:31  18  they had to subjectively make an entry, writing what they thought

15:27:34  19  and what they saw other than just pushing a button, they wrote that

15:27:38  20  she was lethargic.  So lethargic means that you're sleepy, that

15:27:44  21  you're not awake, that's the definition of lethargic.  Being

15:27:47  22  lethargic is not compatible with being awake and alert.

15:27:50  23         So perhaps at one time when they first got there, she may

15:27:54  24  have been 15, not sure, but it looks like -- it looks like when

15:27:59  25  they put their description of what was going on, she was not alert,

15:28:03  1   she was lethargic.

15:28:05  2   Q.  What's more important, the Glasgow score when the patient is

15:28:10  3   having the event originally or when the patient is transported to

15:28:13  4   the emergency care center?

15:28:15  5   A.  As far as prediction of mortality, those studies were done with

15:28:19  6   the admission Glasgow Coma, admission to the ICU or admission to

15:28:25  7   the operating room.  So admission, meaning to the final unit where

15:28:29  8   they were going to stay.

15:28:32  9   Q.  What time did Mrs. Orr arrive at the first hospital, Ochsner

15:28:35 10   Baptist?

15:28:36 11   A.  She got to Ochsner Baptist at approximately 11 or so, 10:45,

15:28:41 12   11.

15:28:42 13   Q.  And what happens when a patient in Mrs. Orr's condition arrives

15:28:46 14   in an emergency room?

15:28:48 15   A.  So if I am the emergency room doctor seeing this patient, what

15:28:52 16   will happen is the EMS people transport her on the gurney, and

15:28:57 17   usually the nurse will kind of get an assessment, get her onto the

15:29:01 18   bed if there's one available, get her blood pressure, and then

15:29:04 19   they'll call me over, in a patient like this, right away to assess

15:29:08 20   the patient and make a determination of what's going to happen

15:29:11 21   next.

15:29:12 22   Q.  Now, if you turn to Tab 2 in your notebook, that's DX Orr 158,

15:29:19 23   should be behind Tab 2.

15:29:22 24   A.  Okay.

15:29:22 25   Q.  Got it?

15:29:23  1    A.  Yes.

15:29:24  2    Q.  Are these some of Mrs. Orr's medical records prepared by the

15:29:27  3    emergency room doctors at Ochsner Baptist?

15:29:29  4    A.  Yes.

15:29:31  5            MR. DUKES:  Your Honor, I'd move DX Orr 158 into

15:29:33  6    evidence.

15:29:34  7            MR. HONNOLD:  No objection, your Honor.

15:29:35  8            THE COURT:  Let it be admitted.

15:29:36  9    BY MR. DUKES:

15:29:36  10   Q.  If we could call up DX 158.2.1.  If you turn, Dr. Piazza, to

15:29:44  11   the second page, that's what I pulled up.  Does this part of the

15:29:48  12   note describe what the emergency room medicine doctor told about

15:29:51  13   what happened to Mrs. Orr before she arrived at the emergency room?

15:29:54  14   A.  Yes, it does.

15:29:55  15   Q.  And what was the time that this history was taken?

15:29:58  16   A.  This history is documented at 11:31 P.M.

15:30:04  17   Q.  And as an ER doctor, what's significant to you about Mrs. Orr's

15:30:09  18   status at this time, at 11:31?

15:30:11  19   A.  She is declining.

15:30:12  20   Q.  And is it significant to you that Mrs. Orr became nonverbal and

15:30:17  21   was having trouble responding to questions?

15:30:19  22   A.  Yes.  So, actually, when it came to the review of systems,

15:30:23  23   patient was unable to perform review of systems.  And that just

15:30:27  24   means you have to say yes or no.  Do you have nausea?  Do you have

15:30:32  25   chest pain?  The patient can in some way respond.  I have done a

2006

15:30:36  1  review of systems on people who don't even speak English, and just

15:30:40  2  pantomiming (DEMONSTRATING), vomiting, and they can do a review of

15:30:44  3  systems.  So the review of systems was unable to be performed on

15:30:48  4  this patient.

15:30:49  5  Q.  If we could call up DX Orr 158.4.1, so I am now moving to the

15:30:55  6  fourth page in your notebook.  Does this page show Mrs. Orr's blood

15:30:59  7  pressure when she got to the emergency room?

15:31:01  8  A.  Yes.

15:31:01  9  Q.  And what was it?

15:31:02  10  A.  252/114.

15:31:06  11  Q.  And how would you describe that blood pressure reading?

15:31:08  12  A.  Dangerously high.

15:31:11  13  Q.  Can a patient's blood pressure increase as a result of having a

15:31:14  14  brain bleed?

15:31:15  15  A.  Yes.  A high blood pressure can cause a brain bleed, and then

15:31:21  16  as their brain is bleeding, the body's response can be to elevate

15:31:25  17  the blood pressure.  Both go hand in hand.

15:31:27  18  Q.  In your experience as an ER doctor, would you expect a patient

15:31:30  19  to have a blood pressure elevated to 252/114 simply as a result of

15:31:36  20  an intracranial bleed?

15:31:38  21  A.  Yes.

15:31:39  22  Q.  Now, from this review of Mrs. Orr's medical records, do you

15:31:45  23  recall if she had systolic, the top number, pressures above 200 in

15:31:49  24  her past?

15:31:50  25  A.  She had.  She had a few that I saw of 210.  I believe I saw one

15:31:56  1    of 230 or so.  She had a couple at 200 and above, yes.

15:32:01  2    Q.  Do emergency room doctors like you, when a patient presents

15:32:05  3    like Mrs. Orr, try to get that blood pressure reduced?

15:32:08  4    A.  Yes.

15:32:09  5    Q.  And how do you do that?

15:32:10  6    A.  In a patient who presents with high blood pressure and/or organ

15:32:15  7    damage or malignant hypertension, meaning very, very high, such as

15:32:20  8    this, we need to get that blood pressure down with intravenous

15:32:23  9    medication.  Oral medication isn't good enough for a pressure that

15:32:26 10    high, you need to get it down faster than that.

15:32:29 11    Q.  And what blood pressure medication was given to Mrs. Orr

15:32:31 12    originally in the emergency room?

15:32:32 13    A.  She had a blood pressure medicine nicardipine, which is a

15:32:35 14    calcium channel blocker, and that's to relax the arteries so that

15:32:39 15    the blood can flow through in a more relaxed way, not so high.  The

15:32:43 16    hypertension tightens them up.

15:32:45 17    Q.  Why do you want to reduce the blood pressure of a patient in a

15:32:48 18    situation like this?

15:32:48 19    A.  In a situation of a stroke, the studies have shown that blood

15:32:53 20    pressure has got to get down as soon as possible after the

15:32:56 21    symptoms, because the hemorrhage is going to continue.  And there

15:32:58 22    are worse outcomes with high blood pressure from the moment you get

15:33:01 23    the symptoms.

15:33:02 24    Q.  So with a patient presenting with a systolic blood pressure of

15:33:06 25    252, how much would the emergency room doctors want to get that

15:33:09  1    blood pressure down?  What would be sort of the target?

15:33:11  2    A.  The goal, it would be to 140.

15:33:14  3    Q.  Would that be lower than most of Mrs. Orr's blood pressure

15:33:20  4    readings before the event?

15:33:21  5    A.  Oh, yes, yes.  She had -- was -- consistently had over 160, 180

15:33:28  6    and several readings that were above that.

15:33:31  7    Q.  If we go a little further down, it says "neurological."

15:33:37  8    A.  Yes, sir.

15:33:38  9    Q.  Let's call up DX Orr 158.4.2.

15:33:44  10           Can you explain the significance of Mrs. Orr being

15:33:46  11   "drowsy but arouses to voice"?

15:33:50  12   A.  What's going on here is they are doing a neurologic exam.  For

15:33:53  13   a patient like this, if I was the ER doctor, to get an assessment

15:33:57  14   of her status, what I would do is -- she was sleepy.  I would lean

15:34:02  15   over and yell in her ear, "Ms. Orr, Ms. Orr, squeeze my hand."  If

15:34:06  16   she would squeeze my hand with the side that looks to be working,

15:34:10  17   then she would get a point for following commands, okay.  So that's

15:34:13  18   a Glasgow of 6 up to that point for following commands, even if

15:34:18  19   that's the best she can do.  Because later on, she couldn't follow

15:34:23  20   commands due to cranial exam.

15:34:25  21           What that means is you ask the patient to look side to

15:34:27  22   side, to smile, stick their tongue out, lift their eyebrows.  Even

15:34:32  23   though they can't follow that part of the exam, which she could

15:34:36  24   not, they could not do a cranial nerve exam that's documented

15:34:39  25   because she couldn't follow those exams, she still gets points for

15:34:42  1  being able to squeeze my hand on that good side.  So that's that

15:34:46  2  part of the exam.

15:34:48  3       "Minimally drowsy but arouses to voice," that means she

15:34:51  4  gets a 3 for the eye part because she is not awake and alert, but

15:34:54  5  when I yell in her ear, she will open her eyes.  So she gets a 3,

15:34:58  6  so.  So 6 and 3, we're at 9.

15:35:00  7       So then we go to Glasgow Coma scale to see what she can

15:35:04  8  do with her body.  They mention her face is flat on one side, it's

15:35:08  9  asymmetric.  "Asymmetric" is the word they use.  What that means is

15:35:12 10  one side doesn't look like the other.  The nerves are out on that

15:35:16 11  side to where her nasolabial fold is flat and it looks different

15:35:20 12  than the other side.  That most likely means there's a stroke going

15:35:24 13  on.

15:35:24 14       As far as following commands, I believe that 6 was the

15:35:28 15  best she could do.  So we talked about verbal 3.  Then we're trying

15:35:31 16  to get -- eyes are 3.  Then we're trying to get verbal.  "Minimally

15:35:35 17  verbal" is what they said.

15:35:36 18       So for verbal, she was making some noises, maybe a

15:35:39 19  groaning perhaps, making some sounds, but not able to answer a

15:35:44 20  question coherently.

15:35:46 21  Q.  At this point, did Mrs. Orr's doctors know exactly what her

15:35:49 22  situation or what her problem was?

15:35:51 23  A.  Well, not exactly until we get the CAT scan back.  I would be

15:35:56 24  suspecting a stroke.  The big deal here is to see whether it's a

15:35:59 25  bleeding stroke, the hemorrhagic stroke, or an ischemic stroke.

2010

15:36:05  1    The clotted type, thrombotic-type stroke.  So the first thing you

15:36:09  2    need to do is to get a CAT scan once you've got a good assessment

15:36:14  3    and start lowering the blood pressure.

15:36:15  4    Q.  What's the next thing the ER doctors did?

15:36:18  5    A.  Sent her to the CAT scan.

15:36:19  6    Q.  And why did they order a CAT scan?

15:36:21  7    A.  To differentiate between a bleeding stroke, a thrombotic

15:36:25  8    stroke, or on -- the strange occurrence that this could be some

15:36:28  9    other kind of mass, like a huge tumor that just started to become

15:36:32  10   symptomatic or bleeding into a tumor or one that's abscessed, one

15:36:35  11   of these more unusual things.

15:36:36  12          So basically to see what is causing these changes that

15:36:39  13   appear to be going on in the brain.

15:36:40  14   Q.  And have you reviewed Mrs. Orr's CT films yourself?

15:36:44  15   A.  Yes, I have.

15:36:45  16   Q.  Do you normally as an emergency room doctor review your

15:36:47  17   patients' CT scans?

15:36:49  18   A.  Yes.  I always look at my scans, particularly in a patient like

15:36:52  19   this where I am wanting to know what to do next and I am worried

15:36:55  20   about this patient.  It may be as I'm multitasking and I am doing

15:36:59  21   other things, but I am waiting for the CAT scan to come up on the

15:37:02  22   scanner.

15:37:03  23   Q.  And if you take a look behind Tab 3 in your notebook, and

15:37:06  24   that's DX Orr 170.  At the bottom of page 5 going over to page 6,

15:37:14  25   is that the radiologist's report on the first CT scan that was done

15:37:17  1   on Mrs. Orr on April 24 at approximately 11:30 P.M.?

15:37:21  2   A.  Where are you?

15:37:22  3   Q.  I am on the bottom of page 5 and going over to page 6 behind

15:37:28  4   Tab 3.

15:37:36  5   A.  I am not finding that.

15:37:38  6   Q.  Let me walk up here.

15:37:41  7          MR. DUKES:  May I approach, your Honor?

15:37:42  8          THE COURT:  Yes.

15:38:12  9   BY MR. DUKES:

15:38:13 10   Q.  Dangerous situation when I am guiding through the medical

15:38:15 11   records, but you found that?

15:38:16 12   A.  Yes, I did.

15:38:17 13   Q.  Now, is this the --

15:38:19 14          MR. DUKES:  Well, your Honor, I would move to admit

15:38:21 15   Defendants' Exhibit Orr 170.

15:38:23 16          MR. HONNOLD:  No objection, your Honor.

15:38:24 17          THE COURT:  Let it be admitted.

15:38:25 18   BY MR. DUKES:

15:38:26 19   Q.  If we could call out DX 170.6.1.

15:38:29 20          Now, is this the radiologist's impression from reading

15:38:33 21   that first CT scan?

15:38:34 22   A.  Yes.

15:38:34 23   Q.  And from your own review of the films, do you agree that

15:38:38 24   Mrs. Orr had an extensive hemorrhage?

15:38:40 25   A.  She did.

2012

15:38:40  1   Q.  And Dr. Liechty told the jury that Mrs. Orr had blood in only

15:38:45  2   one ventricle.  Is that your opinion?

15:38:47  3   A.  No.  It went from the lateral ventricle into the third

15:38:51  4   ventricle.

15:38:51  5   Q.  And what does "significant right to left subfalcine shift" mean

15:38:57  6   in the radiologist's notes?

15:38:58  7   A.  That's a herniation.  That means there is so much volume and

15:39:01  8   mass on one side that it's shifting the brain over to the other

15:39:05  9   side.  So hernia -- hernia means -- and we've all heard that

15:39:09 10   term -- that something that should be right here is being shifted

15:39:12 11   to another part where it shouldn't be, like a groin hernia.

15:39:16 12           Well, a hernia in the brain is much worse.  It means one

15:39:18 13   side of the brain that's supposed to be on this side is being

15:39:21 14   pushed over to the other side.  It's a mass effect.

15:39:25 15   Q.  Dr. Liechty also told the jury that Mrs. Orr had a good

15:39:28 16   prognosis because there was no herniation on the first CT.  Is it

15:39:32 17   true that there was no herniation on the first CT at Baptist?

15:39:34 18   A.  A midline shift is the most common herniation.  There's also

15:39:39 19   early uncal herniation or suggestion of that.  That's the second

15:39:42 20   most common type of brain herniation.

15:39:44 21   Q.  And what does uncal, U-N-C-A-L, herniation mean?

15:39:48 22   A.  Uncal in Greek comes from the -- the word hook.  And it's

15:39:53 23   basically something that looks like a hook on the inside of the

15:39:58 24   brain, the temporal lobe, kind of by the middle.  And when things

15:40:02 25   are swelling a whole lot, it can get pushed down.  So the

15:40:07  1  significance of an uncal herniation means the brain was so swollen

15:40:10  2  that it was actually trying to push out of the skull.

15:40:12  3  Q.  What is the significance of the mention of hydrocephalus in the

15:40:16  4  radiology report?

15:40:16  5  A.  The significance of the hydrocephalus?

15:40:18  6  Q.  Yes.

15:40:18  7  A.  Well, that's tied to a worse outcome.  But what that means is

15:40:24  8  some of the blood had clotted and started to block the absorption

15:40:31  9  of the CSF.  That's not something we about in regular life.

15:40:36  10  Cerebrospinal fluid is the water, if you will, that's

15:40:37  11  normally cushioning the brain.  It's made nonstop.  So the body

15:40:42  12  makes it all the time.  And then it re-absorbs it.

15:40:45  13  If the clots were blocking that re-absorption, you're

15:40:49  14  still making it, so you're getting swelling of the ventricles, and

15:40:52  15  that's what causes the hydrocephalus.  The ventricles are swollen.

15:40:57  16  So he had swelling there as well as in the brain itself from the

15:40:59  17  hemorrhage.

15:41:00  18  Q.  Now, the radiologist said that an identifiable cause could not

15:41:04  19  be seen.  Is that surprising to you?

15:41:05  20  A.  No.  Because there was so much smushing, if you will, to use a

15:41:10  21  normal word, there was so much mass effect effacement that you

15:41:15  22  couldn't really make out the anatomy that was right next to the

15:41:18  23  ventricle.  So something right by the ventricle could have been

15:41:21  24  bleeding into the ventricle.

15:41:23  25  So what he is saying -- he is being very, very meticulous

2014

15:41:26  1    in his read -- is that he cannot actually see where the bleeding

15:41:30  2    was coming from.  So there is no definite cause associated with it.

15:41:36  3    Q.  Now, based on your experience, what was your impression of the

15:41:39  4    hemorrhage seen on Mrs. Orr's CT?

15:41:42  5    A.  Huge.  When I first saw it, I said, "That is a shame.  She has

15:41:48  6    a really big bleed."

15:41:49  7    Q.  What happens to a patient clinically when they have a

15:41:52  8    significant midline shift and herniation?

15:41:54  9    A.  Clinically what's happening to them?

15:41:56 10    Q.  Yes.

15:41:56 11    A.  My descriptive term would be they're starting to go into a

15:42:01 12    coma.  They're getting more and more lethargic.  They're having

15:42:04 13    less and less awareness, and they're just going downhill.

15:42:07 14    Q.  And what happened to Mrs. Orr after she came out of the CT?

15:42:10 15    A.  That's exactly what happened.

15:42:11 16    Q.  What did her doctors do when she had that rapid decline?

15:42:15 17    A.  So in reading the notes, it looked like they got her to the CAT

15:42:19 18    scan.  On the way back from the CAT scan, at 11:49, her nurse, who

15:42:25 19    most likely accompanied her to CAT scan -- because the patients are

15:42:28 20    so sick, and typically 20 to 30 percent of the time they decline

15:42:31 21    just like this.  So they need a nurse with them during CAT scan and

15:42:35 22    on the way back, somebody accompanying them all the time to watch

15:42:38 23    to make sure they're still awake, they're still breathing.  Which

15:42:41 24    she began to get somnolent with the way it was described.

15:42:45 25         Somnolent is meaning not arousable at all, not to

15:42:50  1   stimuli, not breathing.

15:42:52  2          So when she came back from CAT scan at 11:49, the nurse

15:42:56  3   notified the ER doctor that she was somnolent, and then she was

15:43:01  4   intubated.

15:43:01  5   Q.  Okay.  Well, let's turn back behind Tab 2, which is DX Orr 158.

15:43:08  6   So turn behind Tab 2, and if you go to page 12.  Let me know when

15:43:13  7   you get to page 12, if you would.  We're going to look at the ED

15:43:18  8   note at the top of page 12.

15:43:22  9   A.  Yes.

15:43:23 10   Q.  And if we can call up DX Orr 158.12.1, please.

15:43:28 11          Can you explain to us what was happening at 11:49 P.M.?

15:43:32 12   A.  It says, "Patient extremely lethargic to somnolent.  And the

15:43:38 13   respiratory therapist was paged, emergent intubation prep done."

15:43:43 14   Q.  If you go to page 4 behind that -- just turn eight pages back

15:43:48 15   to page 4, that same tab.  Now call up DX Orr 158.4.3 that you've

15:43:52 16   got on the screen.

15:43:53 17          Now, why did Mrs. Orr need to be intubated?

15:43:56 18   A.  I don't think I'm as fast of a turner as you are.

15:44:04 19   Q.  I have the advantage of flashing on the screen.

15:44:08 20   A.  So she needed to be intubated because she -- this says, "Airway

15:44:14 21   protection."

15:44:14 22          So airway protection from an emergency medicine

15:44:17 23   standpoint means the airway, this breathing tube that you got is

15:44:20 24   not working right.  Protection means that you could either choke on

15:44:24 25   your own tongue, you can drown in your own saliva secretions.

15:44:29  1    You're not swallowing.  You are not awake enough to not choke on

15:44:33  2    your own tongue.  Also it could mean that you're not alert enough

15:44:36  3    to take in a deep breath.

15:44:38  4            So she was intubated without any paralytic.  That means

15:44:43  5    no sedation.

15:44:44  6            And that's huge.  When you intubate somebody, you take a

15:44:47  7    tube that's about this big (DEMONSTRATING).  So six and a half,

15:44:52  8    seven size tube, and you take it from the back of the mouth, down

15:44:56  9    their pallet, into their breathing tube, down to their lungs to

15:45:01 10    breathe for them.

15:45:01 11            Basically the public refers to that as life support.  We

15:45:05 12    talk about that as intubating, putting a tube in, and putting them

15:45:08 13    on a vent to breathe for them.

15:45:10 14            She did that without any -- she took that tube without

15:45:13 15    any paralytic and without any need for sedation.  She was pretty

15:45:17 16    out of it at that point.

15:45:18 17    Q.  Dr. Liechty told the jury that Mrs. Orr was conscious at the

15:45:22 18    time she was being intubated; is that true?

15:45:25 19    A.  Conscious?

15:45:27 20    Q.  If you -- does it help to look at that "Patient Status" under

15:45:31 21    "Intubation"?

15:45:31 22    A.  Yeah.  I don't understand how somebody could consciously take

15:45:34 23    that tube.  I don't know who read that.

15:45:37 24    Q.  Is it significant that Mrs. Orr needed to be intubated?

15:45:40 25    A.  Yes.

2017

15:45:40  1    Q.  And does that, essentially, mean that at point Mrs. Orr is on

15:45:46  2    life support?

15:45:47  3    A.  Yes.

15:45:47  4    Q.  What was the plan at that time for further treatment?

15:45:51  5    A.  At that time after she was intubated -- once you've intubated,

15:45:56  6    you supported the airway, you've got the blood pressure medications

15:45:59  7    going, you know that there is a head bleed.  The first thing to do

15:46:02  8    is to communicate with the neurosurgeon.

15:46:04  9    Q.  And when was Mrs. Orr taken from Ochsner Baptist to Ochsner

15:46:09 10    Main?

15:46:09 11    A.  When did she arrive at Ochsner Main?

15:46:13 12    Q.  Yes.  That's a better question.

15:46:14 13    A.  She got there about -- around 1:00, 1:15 A.M.

15:46:17 14    Q.  And did Mrs. Orr's doctors give her any kind of medical

15:46:21 15    treatment for hemorrhage once she arrived at Ochsner Main Campus?

15:46:24 16    A.  Yes.  When she got to Ochsner Main Campus, she began to get

15:46:29 17    things that would help to shrink the brain, to decrease some of the

15:46:32 18    swelling that was caused by all of this damage.

15:46:33 19          So she got mannitol and Lasix and 3 percent normal

15:46:38 20    saline.  These are the things we do to decrease swelling in the

15:46:40 21    brain.  All those things do is they kind of draw the water out of

15:46:43 22    the tissues of the brain to effectively make it a little bit

15:46:46 23    smaller to get some of the pressure down.

15:46:49 24    Q.  And did the fact that Mrs. Orr was taking Xarelto, did that

15:46:53 25    delay any of those medical treatments?

15:46:55  1    A.  No.

15:46:56  2    Q.  Have you seen other patients in the emergency room with bleeds

15:46:59  3    this large?

15:47:00  4    A.  Yes.

15:47:00  5    Q.  What is your experience with the prognosis of a patient in a

15:47:03  6    situation like Ms. Orr's?

15:47:05  7    A.  When you have that much blood, you have shift, you have

15:47:07  8    herniation, a low Glasgow Coma Scale, you just have a very poor

15:47:13  9    picture, a grim picture.

15:47:14  10   Q.  Now, based on your education, training, experience as an ER

15:47:20  11   doc, did you help prepare a slide that lists the signs and symptoms

15:47:23  12   that were present when Mrs. Orr left the ER at Baptist?

15:47:26  13   A.  Yes.

15:47:26  14   Q.  Let's look at Slide 17, please.

15:47:32  15   A.  So when taken the patient as a whole, which is what we do in

15:47:37  16   the emergency room, she had every poor predictor, factor on any

15:47:42  17   measure that you look at.  She had a large volume.

15:47:45  18         Some studies when they do mortalities and predictive

15:47:47  19   outcomes, they consider greater than 60 cc's just terrible.

15:47:53  20   Terrible.  And she had above that.  She had closer to 80 or 90

15:47:57  21   cc's.

15:47:58  22         She had midline shift.  She had herniation from the side

15:48:01  23   as well as from the bottom.

15:48:02  24         She had intraventricular component to the hemorrhage.

15:48:05  25         She had hydrocephalus.

15:48:07   1          In addition she had high blood pressure.

15:48:10   2          Other measures to look at, she had a high glucose coming

15:48:13   3   in.  That's a predictor of mortality in and of itself even if you

15:48:16   4   are not a diabetic.

15:48:17   5          She also had a high troponin when she came in.  A high

15:48:22   6   troponin within the first 24 hours is a predictor of mortality.

15:48:25   7          She had multiple comorbidity.  She was older.  She was a

15:48:29   8   diabetic.  She was on aspirin.  She had other things in her system,

15:48:31   9   other additives and supplements that affect bleeding profiles.  She

15:48:36  10   had multiple things going against her.

15:48:39  11   Q.  Is it difficult to have a conversation with a family about a

15:48:43  12   prognosis in situations like this?

15:48:45  13   A.  Very, very difficult.  I do not envy the people who had to

15:48:51  14   explain this to the family.  I've been there many times, and it's a

15:48:56  15   very sad and difficult thing to do.

15:48:58  16   Q.  Based on your training and experience as well as Mrs. Orr's

15:49:03  17   condition, do you have an opinion about whether she was likely to

15:49:06  18   survive her brain hemorrhage if she had received surgery soon after

15:49:11  19   arrival at Ochsner Main Campus?

15:49:13  20   A.  It would not have impacted her outcome.

15:49:15  21   Q.  Have you read Dr. Bui's testimony in this case?

15:49:18  22   A.  I have.

15:49:19  23   Q.  Are you aware that Dr. Bui told the jury that some of the

15:49:23  24   neurosurgeons he works with would not have attempted surgery in

15:49:26  25   Mrs. Orr's case?

15:49:27 1   A.   Yes.   And I have experienced that, yes.

15:49:31 2   Q.   Does that support your opinion that more likely than not

15:49:36 3   Mrs. Orr would not have survived her brain bleed?

15:49:38 4   A.   Yes.

15:49:39 5   Q.   Now, have you attempted to calculate any more exact percentage

15:49:42 6   of Mrs. Orr's chances of survival if surgery had been done earlier?

15:49:47 7   A.   It would not have changed my opinion that her mortality was

15:49:52 8   greater than 50 percent, way greater than 50 percent.

15:49:55 9   Q.   Now, remind us how often you see patients in the ER with

15:50:00 10   intracranial bleeds.

15:50:01 11   A.   Say that again.

15:50:02 12   Q.   Remind us how often you see patients in the ER with

15:50:06 13   intracranial bleeds.

15:50:07 14   A.   So intracranial bleeds now that I'm working about ten shifts a

15:50:11 15   month, I would say maybe two or so a month.   All-comers.

15:50:17 16   Q.   And how would you describe the size of Mrs. Orr's hemorrhage?

15:50:20 17   A.   Very large.

15:50:22 18   Q.   Have you taken care of patients who had intracranial bleeds as

15:50:26 19   large as Mrs. Orr's but who were not taking any kind of

15:50:29 20   anticoagulant?

15:50:29 21   A.   Yes, I have, recently.

15:50:31 22   Q.   And what's the leading cause of the kind of brain bleed that

15:50:35 23   Mrs. Orr had?

15:50:36 24   A.   Hypertension is the most common cause of the intracranial

15:50:39 25   hemorrhage.

15:50:39  1   Q.  And based your review of Mrs. Orr's records, what can you tell

15:50:43  2   us about her history of hypertension?

15:50:44  3   A.  She had uncontrolled hypertension for years.  She was first

15:50:47  4   diagnosed in the '80s, 1980s, and she had high blood pressure for

15:50:50  5   years that was very, very high.

15:50:52  6   Q.  Was Mrs. Orr's blood -- hypertension under control?

15:50:56  7   A.  No.  Despite multiple medications.

15:50:58  8   Q.  And why do you say that her hypertension was not well

15:51:01  9   controlled?  What's your basis for that?

15:51:03 10   A.  Well, her numbers were high despite multiple medications, but

15:51:08 11   also she had signs of end organ damage.  Her eyes, her kidneys --

15:51:12 12   her kidneys had fibrinoid necrosis.  That's related to high blood

15:51:17 13   pressure.  That's basically present -- from a general understanding

15:51:21 14   outside of the medical community, it's almost like dry rot of your

15:51:24 15   arteries.  They're just so hardened by the atherosclerosis and the

15:51:30 16   high blood pressure that they can leak, or when you put too much

15:51:33 17   pressure on them, like you put too much pressure in a bike tire

15:51:37 18   that's dry rot, they'll bust.

15:51:38 19   Q.  Was atrial fibrillation one of Mrs. Orr's significant medical

15:51:42 20   issues?

15:51:42 21   A.  Atrial fibrillation was another problem that she had, yes, sir.

15:51:44 22   Q.  Did that put her at risk of an ischemic stroke or a

15:51:48 23   clotting-type stroke?

15:51:49 24   A.  The AFib put her at risk of an embolic stroke, which is the

15:51:52 25   other kind of stroke, the ischemic stroke.

2022

15:51:55  1    Q.  Now, the jury heard from Dr. Khatib, who testified that

15:51:59  2    Mrs. Orr's CHADSVASc was a 5.  That put her at a high risk of

15:52:04  3    stroke.  Do you agree?

15:52:05  4    A.  Very, yes.

15:52:06  5    Q.  You agree Mrs. Orr was at a high risk of stroke?

15:52:08  6    A.  I agree.

15:52:09  7    Q.  Is a standard of care to put an AFib patient with a CHAD score

15:52:13  8    of 2 or higher on an anticoagulant?

15:52:15  9    A.  Yes, it is.

15:52:15  10   Q.  And was Xarelto a reasonable choice of an anticoagulant for

15:52:19  11   Mrs. Orr?

15:52:19  12   A.  Yes.

15:52:20  13   Q.  Now, Plaintiffs' expert Dr. Smart told the jury that no

15:52:24  14   reasonable doctor would prescribe Xarelto.  Do you agree with him?

15:52:27  15   A.  I disagree with that.

15:52:29  16   Q.  Do all anticoagulants increase the risk of bleeding?

15:52:32  17   A.  All anticoagulants increase the risk of bleeding.

15:52:35  18   Q.  And do you have an opinion, based on your experience and your

15:52:39  19   review of Mrs. Orr's records, whether she could have avoided her

15:52:43  20   brain bleed if she had been prescribed a different anticoagulant

15:52:46  21   than Xarelto?

15:52:47  22   A.  She could have had that bleed on any --

15:52:49  23           MR. HONNOLD:  Your Honor, I just object on that.

15:52:53  24           THE COURT:  That's speculation, isn't it?

15:52:56  25           MR. DUKES:  Your Honor, no.  It's in her report.  It was

15:52:58  1    actually one of her opinions in her report.

15:53:01  2                THE COURT:  What's the objection?

15:53:03  3                MR. HONNOLD:  Speculation.

15:53:05  4                THE COURT:  I think it is.  Sustain the objection.

15:53:13  5    BY MR. DUKES:

15:53:13  6    Q.  Have you had -- have you seen patients who were on

15:53:17  7    anticoagulants other than Xarelto who had brain bleeds?

15:53:20  8    A.  Yes.

15:53:21  9    Q.  Now, have you treated bleeds like Mrs. Orr's in patients who

15:53:28 10    are taking other NOACs other than Xarelto?

15:53:30 11    A.  Yes.

15:53:31 12    Q.  Now, let's talk about PT a little it bit.  Do you have an

15:53:37 13    opinion as whether PT is a reliable or helpful test for evaluating

15:53:41 14    the anticoagulant effect of Xarelto in an individual patient?

15:53:44 15    A.  It's not reliable in an individual patient.  It's not

15:53:47 16    sensitive; it's not specific.

15:53:50 17    Q.  Did you help prepare a slide that helps explain your opinion?

15:53:53 18    A.  Yes.

15:53:54 19                MR. DUKES:  Can we look at Slide 3, please.

15:53:54 20    BY MR. DUKES:

15:54:04 21    Q.  Can you explain why PT is an unreliable and unhelpful test for

15:54:08 22    assessing Xarelto's anticoagulant effect in an individual patient

15:54:12 23    that comes into the ER?

15:54:13 24    A.  Yes.  So the PT -- maybe -- I know you guys have heard a little

15:54:18 25    bit about this, but it tests too much.  It tests II, V, VII, and X.

15:54:23  1    Those numbers are names for clotting proteins.  These are the

15:54:28  2    things that make your body make a clot.  It tests for all of those

15:54:32  3    together.  It doesn't sort out for one versus the other.  So it's

15:54:35  4    like this big old exam on French, math, science, and history.  You

15:54:40  5    only get one grade, so you don't know how you're doing on each

15:54:43  6    subject.

15:54:43  7          The PT, when you get that value back, it's one value for

15:54:46  8    all of those.  You don't know which one is right and which one is

15:54:49  9    not or which combination might be off.

15:54:51  10          It's not sensitive at low levels.  So the lower your

15:54:55  11   levels go, the further out you are from your last dose, the

15:55:00  12   insensitivity gets worse.  So it's even worse at low levels.  It

15:55:05  13   has a high rate of false negatives, which means that it looks like

15:55:10  14   it's normal by the number but it's not because you're still

15:55:15  15   anticoagulated.

15:55:16  16          It does not indicate an individual's ability to clot.  So

15:55:19  17   maybe in broad numbers there is some correlation, but we're not

15:55:24  18   talking about a herd of cattle here.  This is a patient, an

15:55:27  19   individual patient.  So on the individual level, it doesn't tell

15:55:31  20   you about that patient's physiologic ability to make a clot in

15:55:35  21   their system.

15:55:35  22          Also, the results are going to vary.  So the reagent is

15:55:40  23   very, very important here.  If you have an insensitive reagent or

15:55:44  24   if you have reagent versus another at different hospitals, those

15:55:47  25   numbers are going to vary.

15:55:48  1           After years and years and years, the PT for warfarin

15:55:54  2    actually they did something to make it more sensitive across the

15:55:57  3    labs.  They call it the INR.  That was made for warfarin.  That's

15:56:01  4    because the PT has different reagents, and that's not been done for

15:56:06  5    the NOACs.  The PTs are different with different reagents.

15:56:10  6    Q.  Are there other medical conditions or problems that can affect

15:56:13  7    the accuracy of the PT score other than the things that you

15:56:16  8    mentioned here?

15:56:17  9    A.  Oh, yes.  So you can have PT affected by liver failure; you can

15:56:22 10    have it affected by sepsis, which is a really bad infection.  You

15:56:26 11    can have it affected by -- lupus will increase your PTT and

15:56:30 12    sometimes your PT.  You can have it -- it could be because of the

15:56:34 13    way it was -- the sample was collected.  So there are other things

15:56:37 14    that could influence these tests.

15:56:39 15    Q.  Regardless of the reagent used is PT sensitive to all

15:56:45 16    concentrations of Xarelto?

15:56:45 17    A.  It's not as sensitive at the lower levels.

15:56:48 18    Q.  And sometimes is that referred to as perhaps C trough or the

15:56:52 19    trough in the dose curve?

15:56:53 20    A.  Yes.  So the Cmax is right after you take the drug, the first

15:56:58 21    two or three hours after you take the drug.  And the C trough is

15:57:01 22    towards the last 23rd hours before you take your next dose.

15:57:05 23    Q.  What is Neoplastin?

15:57:06 24    A.  Neoplastin is a type of reagent, which means a substance used

15:57:11 25    in the chemical reaction for the PT test.

2026

15:57:14 1   Q.  And do you know whether, based on what you've reviewed,

15:57:18 2   Neoplastin or Innovin is more sensitive to Xarelto?

15:57:23 3   A.  Innovin is the least sensitive, and Neoplastin and Neoplastin

15:57:27 4   Plus are the most sensitive.

15:57:28 5   Q.  And do you know what reagent Bayer and Janssen use for PT in

15:57:32 6   the clinical trials for Xarelto?

15:57:33 7   A.  They used Neoplastin, and I believe they continue to use

15:57:38 8   Neoplastin because once they started with it they wanted to be able

15:57:41 9   to compare apples to apples.  And there is so much variability

15:57:45 10  between the reagents they wanted to avoid that confounding factor.

15:57:49 11  So they kept using the same one, Neoplastin.

15:57:52 12  Q.  Does that mean that the fact they used Neoplastin in the

15:57:53 13  clinical trials that values -- PT values using Neoplastin would

15:57:58 14  provide helpful information in an ER clinical setting?

15:58:01 15  A.  Could you repeat that?

15:58:02 16  Q.  Yes.  The fact that Bayer and Janssen used Neoplastin PT in the

15:58:09 17  clinical trials, does that translate into Neoplastin PT providing

15:58:14 18  helpful information in an emergency room with a real patient

15:58:17 19  situation?

15:58:18 20  A.  No.  Because they didn't use it to make any clinical decisions.

15:58:21 21  Not for dose adjustments or for clearing anybody for anything.

15:58:25 22  They were using it because traditionally that's what we used in

15:58:28 23  warfarin, and it's what we had available.

15:58:30 24  Q.  Does the PT test -- when it tests Factors II, V, VII, and X,

15:58:38 25  was it actually designed to test those factors because those are

15:58:41  1   the factors that warfarin operates on?

15:58:43  2   A.  The INR was developed in terms of warfarin.  I don't know if

15:58:49  3   the PT was made just for warfarin.  I think that was out for a

15:58:53  4   while before warfarin came.

15:58:55  5   Q.  Now, are there articles in the peer-reviewed medical journals

15:58:59  6   supporting your opinion that PT is not helpful for determining the

15:59:04  7   anticoagulant effects of Xarelto in a specific patient?

15:59:07  8   A.  Yes.

15:59:07  9   Q.  We are not going to talk about all of them, I promise.  We've

15:59:11 10   cut this way down, but I do want to hit just a handful.

15:59:15 11           Do you have some examples of those articles to share with

15:59:18 12   the jury?

15:59:18 13   A.  Yes.

15:59:19 14   Q.  Now, in addition to what I'm going to talk about -- I think I

15:59:25 15   cut it down to four articles we'll hit quickly.  Are there other

15:59:27 16   articles in the medical literature that also support your opinions

15:59:30 17   in addition to the four we're going to talk about?

15:59:32 18   A.  Yes.

15:59:32 19   Q.  And are there articles that might be viewed as not supporting

15:59:38 20   your opinion in the medical literature?

15:59:40 21   A.  Some articles that speak to a contrary opinion, but more often

15:59:46 22   than not, as I further read those articles, I will find something

15:59:49 23   that reconciles with what I believe.

15:59:52 24   Q.  I am not going to cover a lot of those, but there will be an

15:59:55 25   opportunity for cross-examination and counsel will have an

15:59:57  1   opportunity to talk to you about all of those articles also.

16:00:00  2          So let's turn to Notebook Tab 8, behind Tab 8.  And

16:00:07  3   that's Defendants' Exhibit 2451, and just let me know if you're

16:00:12  4   looking at an article by Adcock?

16:00:14  5   A.  Yes.

16:00:14  6   Q.  And the jury has seen this before.  Titled, "The danger relying

16:00:17  7   on the APTT and PT in patients on DOAC therapy, a potential patient

16:00:23  8   safety issue," published in the International Journal of Laboratory

16:00:26  9   Hematology in 2017.

16:00:28 10          MR. DUKES:  Your Honor, this has been used before.

16:00:32 11   BY MR. DUKES:

16:00:32 12   Q.  Is that one example of one of the studies that support your

16:00:35 13   opinion?

16:00:35 14   A.  Yes.

16:00:36 15          MR. DUKES:  If we could call up DX 2451.1.1.

16:00:36 16   BY MR. DUKES:

16:00:43 17   Q.  What does this article by Dr. Adcock tell you about whether

16:00:48 18   doctors can rely on a normal PT to clear a patient for surgery?

16:00:51 19   A.  It this says, "We can no longer rely on a normal PT to

16:00:55 20   determine that an anticoagulant patient is safe to undergo an

16:00:58 21   invasive procedure."

16:00:59 22   Q.  Is that consistent with your opinion?

16:01:01 23   A.  Yes.

16:01:02 24   Q.  Let's turn to -- behind Tab 9 is the next tab.  That's DX 2272.

16:01:10 25   And that's an article by Tesla (VERBATIM), which, again, the jury

16:01:15 1   has seen before; so we are going to move pretty quickly.  Titled,

16:01:17 2   "Poor comparability of coagulation screening test with specific

16:01:21 3   measurement in patients receiving direct oral anticoagulants,"

16:01:24 4   published in the Journal of Thrombosis and Hemostasis in 2016.

16:01:30 5           MR. DUKES:  Your Honor, this one has also been used.  If

16:01:33 6   we could call up DX 2272.5.1.

16:01:33 7   BY MR. DUKES:

16:01:38 8   Q.  And what does this article by Dr. Tesla (VERBATIM) tell you

16:01:42 9   about whether doctors can rely on a normal PT test to rule out

16:01:47 10  anticoagulation from a NOAC like Xarelto?

16:01:49 11  A.  It says there, "Normal test is not always associated with the

16:01:55 12  absence or minimal residual concentration of drugs."

16:01:58 13          So what that means is you can have a little bit of drug

16:02:00 14  there and the PT is saying that it's normal when it's not because

16:02:03 15  there's a little bit of drug there.  A little bit of drug there is

16:02:07 16  enough to do the job.  That's enough to anticoagulant you.

16:02:10 17  Q.  And are there other aspects that you would like to point out?

16:02:14 18  A.  "Patients who present with normal PT could be erroneously

16:02:19 19  considered to be safe for surgery."  So that would be bad.

16:02:22 20  Q.  Is that consistent with your opinion?

16:02:24 21  A.  Yes.

16:02:25 22  Q.  Let's turn to Tab 17 in your notebook.  We're skipping a lot of

16:02:32 23  articles.  And that's DX 1473, which is article Dr. Robert

16:02:40 24  Gosselin, titled, "The laboratory's 2015 perspective on direct oral

16:02:44 25  anticoagulant testing," published in the Journal Thrombosis and

16:02:48  1   Hemostasis in 2016.  Did you find that?

16:02:51  2   A.  Yes.

16:02:52  3          MR. DUKES:  Your Honor, this one has also been used.

16:02:55  4   Call up DX 1473.2.7, please.

16:03:00  5   BY MR. DUKES:

16:03:00  6   Q.  What does this article by Dr. Gosselin tell you about whether a

16:03:02  7   normal PT test tells you that an anti-Factor Xa drug like Xarelto

16:03:06  8   is completely out of a patient's system or not?

16:03:08  9   A.  So, again, this is another of many examples, and what this

16:03:12  10  says, "A normal PT may not exclude the presence of significant

16:03:15  11  amounts of anti-Factor Xa drugs."

16:03:20  12  Q.  And does that support your opinion?

16:03:22  13  A.  Yes, it does.

16:03:23  14  Q.  Let's turn behind Tab 19, this is DX 1470, an article by

16:03:32  15  Dr. Gosselin and five coauthors titled, "Heparin Calibrated

16:03:36  16  Chromogenic Anti-Xa Activity Measurements in Patients Receiving

16:03:39  17  Rivaroxaban:  Can This Test Be Used to Quantify Drug Level?"

16:03:43  18  Published in the Research Report in 2015.  Did you find that?

16:03:46  19  A.  Yes.

16:03:48  20          MR. DUKES:  Your Honor, again, this has been previously

16:03:50  21  used.  Can we call up DX 1470.2.6.

16:03:50  22  BY MR. DUKES:

16:03:54  23  Q.  And what does this statement from this article by Dr. Gosselin

16:03:58  24  tell you about whether screening assays like PT can rule out

16:04:02  25  anticoagulant effect of Xarelto in an individual patient?

16:04:06  1   A.  That they are not suitable, and they should not be used to
16:04:08  2   ensure the absence of the drug.
16:04:11  3   Q.  Now, does that support your opinion?
16:04:13  4   A.  Yes, it does.
16:04:14  5   Q.  Now, we've put up just this language.  Have you read these
16:04:18  6   entire articles?
16:04:18  7   A.  Yes.  I've read these articles and several others like them
16:04:24  8   that say basically the same thing.  It's not safe to use the PT to
16:04:27  9   tell you that there's no anticoagulation on board when you talking
16:04:30 10   about the NOAC.
16:04:31 11   Q.  We are not going to discuss this one in detail, but Tab 20 was
16:04:35 12   the Mueck 2013 article.  You were here when Dr. Khatib was
16:04:43 13   testifying about that, weren't you?
16:04:45 14   A.  Yes.  And I have read this outside of here, yes.
16:04:47 15   Q.  And does that also support your opinion?
16:04:49 16   A.  Yes, it does.
16:04:58 17   Q.  Now, is there a standard group of coagulation tests that
16:05:03 18   emergency doctors order when a patient presents in the emergency
16:05:06 19   room?
16:05:06 20   A.  Yes.  We order the PT, INR, and PTT together for most patients
16:05:10 21   that are sick.  So if they come in and we call them basically a
16:05:14 22   Level 3 or sicker.  So if you come in pneumonia or chest pain or
16:05:18 23   burning urination, a fever, or trauma of any kind, even if you're
16:05:24 24   not actively bleeding, we order those tests.
16:05:26 25   Q.  So if PT is not reliable or helpful test for determining how

16:05:32  1    much of anti-coagulant effect Xarelto has on an individual patient,

16:05:37  2    why do you order a PT in the emergency room?

16:05:39  3    A.  It could be helpful for other reasons, because a patient could

16:05:43  4    have multiple things going on.  That patient could have liver

16:05:47  5    failure that developed a few days ago when they overdosed on

16:05:50  6    Tylenol.  They're coming in today with liver failure.  They could

16:05:55  7    have sepsis.  You're just finding out now that they have some

16:05:58  8    problem, and you don't get it all in the history.  Sometimes you

16:06:00  9    don't get the benefit of a history with a patient, they can't tell

16:06:04  10   you.

16:06:04  11   Q.  So is a PT test helpful for determining the anticoagulant

16:06:08  12   effect of Xarelto?

16:06:09  13   A.  It's not helpful for that.  It could be helpful in other

16:06:12  14   situations as I had mentioned before, liver failure, sepsis, those

16:06:16  15   things.

16:06:16  16   Q.  Now, did you read Dr. Liechty's testimony about Mrs. Orr's PT

16:06:21  17   of 11.4 seconds on the night of her hemorrhage?

16:06:24  18   A.  Yes.

16:06:24  19   Q.  Do you recall Dr. Liechty giving the opinion that Mrs. Orr's

16:06:27  20   normal PT meant that she was not anticoagulated, so Dr. Bui could

16:06:35  21   have operated immediately?

16:06:35  22   A.  Yes, I recall that.

16:06:37  23   Q.  Do you agree or disagree with his opinion?

16:06:38  24   A.  I disagree with that.

16:06:39  25   Q.  Why do you disagree?

2033

16:06:41  1   A.  I disagree because the PT is not a good test, for those reasons

16:06:45  2   we mentioned.  It's not specific, it's not sensitive, it's not

16:06:49  3   reliable.  That doesn't sound like a good test.  That is not a good

16:06:53  4   test.

16:06:53  5   Q.  Now, did you also review Dr. Bui's testimony?

16:06:56  6   A.  Yes, I did.

16:06:57  7   Q.  And did Dr. Bui say that PT could be used to tell him there was

16:07:01  8   no Xarelto in her blood when Mrs. Orr got to the hospital and had

16:07:05  9   her blood test?

16:07:06 10   A.  Say that again, please.

16:07:07 11   Q.  Did Dr. Bui say that PT could be used to tell him that there

16:07:11 12   was no Xarelto in her blood when she got to the hospital?

16:07:13 13   A.  He said that he could not use the PT to determine that.

16:07:16 14   Q.  And you agree with Dr. Bui?

16:07:18 15   A.  I agree with Dr. Bui.

16:07:20 16   Q.  Let's show you what Plaintiffs' regulatory expert,

16:07:27 17   Dr. Parisian, told the jury yesterday about what she thinks the

16:07:29 18   Xarelto label should have said about PT.  So if we could call up

16:07:33 19   Slide 25.

16:07:37 20        And based on your review of the medical literature as

16:07:40 21   well as your training and experience, do you agree or disagree with

16:07:44 22   Dr. Parisian that this is what should be told to doctors about PT

16:07:50 23   in an emergent situation?

16:07:51 24   A.  I disagree.

16:07:52 25   Q.  And can you give us, the jury, maybe a commonsense example of

2034

16:07:56  1    why you disagree with that?

16:07:57  2    A.  Well, what this says is that you can use the PT to make

16:08:02  3    clinical decisions.  A normal PT indicates that clinically

16:08:06  4    significant values are unlikely.

16:08:08  5         So we talked about how the PT is going to be insensitive

16:08:12  6    at low levels.  So you could still have a low level of an

16:08:16  7    anticoagulant, the PT is not picking it up.  A commonsense example

16:08:21  8    is you could have a quarter tank of gas and still go 60 miles an

16:08:26  9    hour.  The same as on a full tank of gas.  So a quarter tank of gas

16:08:31 10    works just fine.  And that's how the PT works in people.

16:08:34 11         So the PT is not going to pick up those low levels.

16:08:37 12    That's been shown on multiple, multiple articles.  But you can

16:08:41 13    still have some anticoagulant effect there that's working just the

16:08:45 14    same as when you just took the medication.

16:08:48 15    Q.  Do you recall whether Dr. Bui testified that he even read the

16:08:52 16    Xarelto label?

16:08:53 17    A.  I read his testimony.  I believe he said that he had not read

16:08:57 18    the label.

16:08:57 19    Q.  Do you recall what Dr. Bui said that he had reviewed in order

16:09:04 20    to come to his opinions about PT and Xarelto?

16:09:07 21    A.  I know he reviewed the literature, and I remember from his

16:09:11 22    deposition that he reviewed the Class I indications.  Class I

16:09:15 23    indications from the medical society means that this is what we

16:09:18 24    must do.  There is no Class I indications to look at the PT to make

16:09:22 25    a clinical decision.  That's the standard of care.  There is no

16:09:26   1   indications for that.

16:09:27   2   Q.  Now, the jury's heard some discussions about so-called reversal

16:09:31   3   agents for anticoagulant medications.  Let's make sure we're all on

16:09:36   4   the same page terminologywise.  So tell us what a reversal agent is

16:09:40   5   in this context.

16:09:42   6   A.  A reversal agent is a medication that's supposed to decrease or

16:09:48   7   reverse the effects of the medication.

16:09:51   8   Q.  And what are some examples of reversal agents?

16:09:56   9   A.  In -- in general, a reversal agent that we've seen on movies

16:10:01  10   and we're all familiar with is Narcan.  When somebody overdoses on

16:10:06  11   an opiate, you give them Narcan; and because it affects the

16:10:08  12   neuroreceptors, they wake back up.  That's an immediate antidote.

16:10:12  13        In terms of these reversal agents, like with warfarin,

16:10:16  14   the reversal agents are Vitamin K and FFP.  These take 24 hours to

16:10:21  15   effectively work.  So while the patient's continuing to bleed, the

16:10:26  16   reversal agents are trying to work and ultimately take about

16:10:29  17   24 hours to have full effect.

16:10:31  18   Q.  Some of Plaintiffs' experts suggested to the jury that warfarin

16:10:37  19   or Coumadin is a safer drug than Xarelto because it can be

16:10:41  20   reversed.  Based on your experience, do you agree with that

16:10:43  21   opinion?

16:10:43  22   A.  That's not supported in real life or in the literature.  The

16:10:46  23   safety profiles of the NOACs are better because the half-life of

16:10:51  24   these drugs is basically coming out of your system and reversing

16:10:55  25   itself by -- at about the same rate as the antidotes take with the

16:11:00 1   agents that do have reversal agents.

16:11:02 2   Q.  Is Vitamin K one of the reversal agents for warfarin or

16:11:05 3   Coumadin?

16:11:06 4   A.  Yes, it is.

16:11:06 5   Q.  And how does Vitamin K work in that context?

16:11:10 6   A.  So with Vitamin K, what's happening is warfarin poisons your

16:11:15 7   Vitamin K system.  What it does is your body -- your liver wants to

16:11:19 8   make these clotting factors and it needs II, VII, IX and X, but

16:11:26 9   warfarin poisons them.  The same way it poisons the rat, it poisons

16:11:30 10  the human body.  And you can't make II, VII, IX and X for a while.

16:11:34 11        And Vitamin K makes the liver make them correctly, but

16:11:37 12  it's got to start all over from the beginning making the proteins,

16:11:40 13  and that takes that long.  So you've got these dysfunctional

16:11:44 14  proteins in your body and they can't start working again until you

16:11:48 15  have got that Vitamin K.  Your liver grabs up that Vitamin K,

16:11:51 16  starts making good proteins so that you can clot, but it takes a

16:11:55 17  while.  And it can take up to 24 hours.

16:11:57 18  Q.  So would that have helped Mrs. Orr if she had been taking

16:12:02 19  warfarin and given a Vitamin K reversal agent?

16:12:03 20  A.  It would have helped about 24 hours later.

16:12:06 21  Q.  Are there other reversal agents for warfarin or Coumadin?

16:12:10 22  A.  Yes.  Also FFP and then, of recent, the FDA has approved PCC.

16:12:17 23  Q.  Let's tell the jury what FFP stands for.

16:12:22 24  A.  FFP is fresh frozen plasma.  And what that is -- we kind of

16:12:27 25  talked about II, VII, IX and X, and thrown all of those numbers

16:12:31  1   around.  But fresh frozen plasma is all of them, so II, VII, IX and

16:12:37  2   X, as well as all the other ones.  It's clotting factor, so it's

16:12:39  3   giving your body all of the clotting factors.

16:12:41  4   Q.  And how long does it take fresh frozen plasma to reverse the

16:12:45  5   affects of warfarin?

16:12:46  6   A.  We talk about it -- changes within 24 hours, but sometimes it

16:12:50  7   takes as much as 48.  So they talk about 13 to 48 hours.  It takes

16:12:57  8   a long time to thaw, to get it up there, it takes a long time to

16:13:00  9   work.  And you have to give a large volume.  So you can actually

16:13:03  10  fluid overload some patients with the amount of FFP you need to

16:13:06  11  give.

16:13:06  12  Q.  Okay.  What are PCCs?  What does that stand for?

16:13:09  13  A.  That stands for prothrombin complex concentrate.  So you're

16:13:15  14  giving some of the factors.  You're giving II, IX and X with the

16:13:21  15  three PCCs, and II, IX and X and VII with the four PCCs.  The

16:13:26  16  outcomes are the same.

16:13:27  17  Q.  Is PCC effective in reversing the effects of warfarin?

16:13:31  18  A.  Yes.  The funny thing, or interesting, however you want to look

16:13:35  19  at it, with the PCCs is that it changes the numbers very quickly.

16:13:39  20  Within 30 minutes sometimes, those high INRs for those high

16:13:44  21  Coumadin levels that we talk about, it can change those numbers

16:13:47  22  really fast.  But, unfortunately, the outcomes are the same.  So

16:13:51  23  there are times when the numbers look really good, but the patient

16:13:54  24  will still bleed.

16:13:56  25  Q.  And let's take a look behind Tab 12 in your notebook just to

16:14:00  1   follow up on that.  That's DX 1351.  Have you got it?

16:14:08  2   A.  Yes.

16:14:09  3   Q.  Is that an article that describes the points you were just

16:14:12  4   making?

16:14:13  5   A.  Yes.  Yes, it is.

16:14:14  6   Q.  DX 1351 is an article by -- let me spell it.

16:14:23  7   D-O-W-L-A-T-S-H --

16:14:23  8   A.  Dowlatshahi.

16:14:24  9   Q.  Dowlatshahi.  I'll still spell it for the court reporter

16:14:26 10   quickly.  D-O-W-L-A-T-S-H-A-H-I and others, and it's entitled "Poor

16:14:32 11   prognosis in warfarin-associated intracranial hemorrhage despite

16:14:36 12   anticoagulation reversal."  It's published in Stroke and 2012; is

16:14:40 13   that right?

16:14:41 14   A.  Yes.

16:14:41 15   Q.  And is Stroke a reliable source of information for doctors like

16:14:45 16   you?

16:14:45 17   A.  Yes.

16:14:46 18          MR. DUKES:  Your Honor, I would request permission to

16:14:48 19   publish DX 1351.

16:14:50 20          THE COURT:  Yes.

16:14:51 21   BY MR. DUKES:

16:14:51 22   Q.  Now, you have a slide to help explain this article?

16:14:53 23   A.  Yes.

16:14:54 24   Q.  If we could call up Slide 18, and this is actually page 4 on

16:15:01 25   the top page.  What does this show?

16:15:03  1   A.  It's a brain.  It's an axial cut, which means, like I tell my

16:15:07  2   students, like you're cutting somebody's head with an ax, like

16:15:11  3   that, an axial cut (DEMONSTRATING).  So it's a slice right through,

16:15:15  4   like you slice a watermelon, right there.  And the right side is

16:15:17  5   the patient's right brain, and the left side that we're seeing is

16:15:19  6   the patient's left brain.

16:15:21  7          That big ole white thing, that's blood.  So on one side

16:15:25  8   it's when the patient presented with bleeding.  And if you look

16:15:28  9   down there, the INR, where the -- the patient is called the

16:15:31 10   Coumadin level, that's high.  It's 3.6.  I am not wearing my

16:15:34 11   glasses, but I think it's 3.6.  Yes.

16:15:37 12          So they fixed those numbers real quickly and his INR got

16:15:40 13   better.  But look.  This poor person, 19 hours later, that

16:15:44 14   hemorrhage got bigger, it expanded.  That happens over 50 percent

16:15:48 15   of the time with warfarin patients.

16:15:51 16   Q.  Okay.  Now, did Mrs. -- we can take that down.

16:15:54 17          Did Mrs. Orr's doctors consider giving her anything to

16:15:58 18   reverse the anticoagulant effects of Xarelto?

16:16:00 19   A.  Yes.  I saw a note to consider PCC, as well as she was crossed

16:16:04 20   for FFP.

16:16:06 21   Q.  Did she actually receive any of those treatments?

16:16:08 22   A.  No.

16:16:09 23   Q.  Now, was there any evidence of further bleeding when Mrs. Orr

16:16:13 24   had a repeat CT scan at approximately 4:30 A.M. on April the 25th?

16:16:17 25   A.  No.

16:16:18   1   Q.  And do you have an opinion as to whether a reversal agent for

16:16:22   2   Xarelto would have made a difference in Mrs. Orr's case?

16:16:24   3   A.  No.  Unfortunately, it wouldn't have made a difference because

16:16:27   4   she didn't have any further hemorrhage.  She had already began to

16:16:31   5   clot.

16:16:31   6   Q.  You were going kind of fast there.  Did you say it would not

16:16:33   7   have a made a difference?

16:16:34   8   A.  It would not have made a difference because she did not have

16:16:37   9   expansion of her hemorrhage.  The goal of a PCC or a reversal agent

16:16:43   10  would be to stop the bleeding.  She had already stopped.

16:16:46   11  Q.  And do reversal agents undo the effects of bleeding that has

16:16:50   12  already taken place?

16:16:51   13  A.  They don't erase what's been done.

16:16:54   14  Q.  Do reversal agents repair brain damage that's already occurred?

16:16:58   15  A.  They cannot repair what's been done.

16:17:01   16  Q.  Dr. Piazza, did you prepare a slide that summarizes your

16:17:04   17  opinions that you presented to the jury this afternoon?

16:17:06   18  A.  Yes.

16:17:06   19  Q.  Can we look at Slide 10, please.  And would you just summarize

16:17:12   20  for the jury your opinions?  And then those are all of the

16:17:14   21  questions I will have for you this time.

16:17:16   22  A.  Yes.  So Mrs. Orr was at high risk for a stroke, the thrombotic

16:17:21   23  stroke, so she needed to be anticoagulated.  That puts her at risk

16:17:26   24  for a bleed.  All anticoagulants will put you at risk for a bleed.

16:17:30   25  She could have had that same bleed on any anticoagulant or on no

16:17:35  1   anticoagulant, just with her history of hypertension.  She had, in

16:17:39  2   fact, your typical hypertensive bleed, in its presentation and in

16:17:42  3   its outcome, your typical hypertensive bleed.

16:17:46  4        MR. HONNOLD:  Your Honor, we had objected to that

16:17:48  5   prior -- that subset opinion, we had objected to it.  I didn't

16:17:52  6   realize she was reading from that.

16:17:53  7        THE COURT:  And I upheld the objection, so I ask that

16:17:59  8   that be stricken.

16:17:59  9        MR. DUKES:  Understood, your Honor.  If you would just go

16:17:59 10   to your fourth.

16:18:01 11        THE COURT:  And disregard the second one, members of the

16:18:04 12   jury.

16:18:06 13        MR. HONNOLD:  Can we just take it down and maybe correct

16:18:07 14   it?

16:18:08 15        MR. DUKES:  Yes.  Let me just read the fourth one and

16:18:10 16   we'll take it down.

16:18:10 17        MR. HONNOLD:  Can we cover it up?

16:18:12 18        MR. DUKES:  Can we cover up the second one?  We'll do

16:18:16 19   that.  Perfect.  And if you would read your fourth opinion.

16:18:20 20        THE WITNESS:  Okay.  So she had a typical presentation

16:18:24 21   for a massive brain bleed, a typical outcome for a massive brain

16:18:29 22   bleed.

16:18:30 23        Then as far as the business about the PT, it's not a good

16:18:33 24   test.  It's not sensitive, especially at low levels.  It's not

16:18:38 25   specific.  It tests too much.  It's not reliable.  There's variance

16:18:42  1   with different reagents.  It's not a good test, particularly to

16:18:45  2   clear somebody for brain surgery.

16:18:47  3           MR. DUKES:  Thank you.  Those are all of the questions I

16:18:49  4   have at this time.

16:18:51  5           MR. HONNOLD:  Your Honor, may we approach briefly?

16:18:53  6           THE COURT:  Yes.

16:19:05  7       (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

16:19:07  8           THE COURT:  Logistics.  Do you want to start tomorrow?

16:19:10  9           MR. HONNOLD:  Yes, because we would like to set up an

16:19:12  10  internet connection for part of her examination.

16:19:15  11          THE COURT:  We'll start tomorrow.

16:19:17  12          MR. DUKES:  I'm sorry, I didn't hear.

16:19:18  13          THE COURT:  He wants to start tomorrow instead of today.

16:19:20  14  It's only about 15 minutes or 20 minutes anyway.

16:19:24  15          MR. DUKES:  We would like to -- it's 4:30, we'd like to

16:19:28  16  get it finished if we can.

16:19:29  17          MR. HONNOLD:  I am going to have more than that.  We're

16:19:32  18  going to set up an internet connection and get on some things with

16:19:35  19  her, some very specific things that I want to have her search on

16:19:38  20  the internet.  We're going to need some time to set that up and

16:19:41  21  make sure that it works.

16:19:42  22          THE COURT:  Since it's going anyway to tomorrow, we might

16:19:45  23  as well take a break.  The jury's been at it for a long time.  I'll

16:19:49  24  do that, we'll come back at 8:30.

16:19:52  25          MR. HONNOLD:  And could we -- is the witness assumed just

16:19:57  1    to be continued to be under oath without the ability to be spoken

16:20:02  2    or conferred with by counsel?

16:20:04  3          THE COURT:  We usually do that with a client.  I don't do

16:20:08  4    it with a witness in general and tell them not to speak to anybody.

16:20:12  5          MR. DUKES:  So with an expert witness, I just want to be

16:20:15  6    clear so I do the right thing.  Are we able to talk to her?

16:20:19  7          THE COURT:  That's what he is saying.  He's objecting to

16:20:21  8    that, and I think it's a legitimate objection because if you would

16:20:26  9    go on -- I don't do that with a client.  If this were your client,

16:20:29 10    I couldn't tell you not to talk to your client because you have a

16:20:33 11    duty to talk to your client; but with a witness, it's a little

16:20:36 12    different.  Okay.  I'll instruct the witness to that.

16:20:53 13        (OPEN COURT.)

16:20:54 14          THE COURT:  We're going to stop here, members of the

16:20:56 15    jury, and start tomorrow at 8:30.  That will be better for you all,

16:20:59 16    we'll get the whole thing finished.  Okay.

16:21:03 17          Ma'am, don't talk to anybody about this particular case,

16:21:07 18    about your testimony.

16:21:09 19          THE WITNESS:  Yes, sir.

16:21:10 20          THE COURT:  You can find out where to go for dinner and

16:21:12 21    things of that sort, but not about the testimony.

16:21:14 22          THE WITNESS:  Yes, sir.

16:21:17 23          THE COURT:  Okay.  We'll stand in recess until tomorrow

16:21:20 24    at 8:30.

16:21:21 25          THE MARSHAL:  All rise.

OFFICIAL TRANSCRIPT

1    (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.)

2

3                        *  *  *  *  *  *

4

5                    REPORTER'S CERTIFICATE

6

7        I, Karen A. Ibos, CCR, Official Court Reporter, United

8   States District Court, Eastern District of Louisiana, do hereby

9   certify that the foregoing is a true and correct transcript, to the

10  best of my ability and understanding, from the record of the

11  proceedings in the above-entitled and numbered matter.

12

13

14                    /s/ Karen A. Ibos

15              Karen A. Ibos, CCR, RPR, CRR, RMR

16              Official Court Reporter

17

18

19

20

21

22

23

24

25