UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION

THIS DOCUMENT RELATES TO:

Joseph Orr, Jr., as Lawful
Surviving Spouse of
*Sharyn Orr v. Janssen, et al.*
*Case No. 2:15-cv-03708*

Docket No. 14-MD-2592
Section L
New Orleans, Louisiana
Friday, June 9, 2017

*********************************************************************

TRANSCRIPT OF TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE ELDON E. FALLON,
UNITED STATES DISTRICT JUDGE,
AND A JURY.
VOLUME IX - MORNING SESSION

*********************************************************************

**APPEARANCES:**


FOR THE PLAINTIFFS'
LIAISON COUNSEL:

MR. ANTHONY BIRCHFIELD, JR.
Beasley Allen Crow Methvin
   Portis & Miles
Post Office Box 4160
Montgomery, AL  36103

MR. BRIAN H. BARR
MR. NEIL E. McWILLIAMS
Levin Papantonio Thomas
  Mitchell Rafferty & Proctor
316 Baylen Street
Suite 600
Pensacola, FL 32502

MR. GERALD EDWARD MEUNIER
Gainsburgh, Benjamin, David,
   Meunier & Warshauer
Energy Centre
1100 Poydras Street
Suite 2800
New Orleans, LA  70163-2800

**OFFICIAL TRANSCRIPT**

```
                              MS. EMILY JEFFCOTT
                              The Lambert Firm, PLC
                              701 Magazine Street
                              New Orleans, LA  70130


                              MR. BRADLEY D. HONNOLD
                              Goza & Honnold, LLC
                              11181 Overbrook Road
                              Suite 200
                              Leawood, KS 66211



FOR THE DEFENDANT JANSSEN      MR. JAMES B. IRWIN, V
PHARMACEUTICALS, INC.,         Irwin Fritchie
and JANSSEN RESEARCH &            Urquhart & Moore, LLC
DEVELOPMENT, LLC:              400 Poydras Street
                              Suite 2700
                              New Orleans, LA  70130



FOR THE DEFENDANT              MR. DAVID E. DUKES
BAYER HEALTHCARE               Nelson Mullins Riley &
PHARMACEUTICALS, INC.,            Scarborough, LLP and
BAYER PHARMA AG:               Meridian, 17th Floor
                              1320 Main Street
                              Columbia, SC  29201


                              MS. BETH A. WILKINSON
                              Wilkinson Walsh + Eskovitz, LLP
                              1900 M Street NW
                              Suite 800
                              Washington, DC 20036



REPORTED BY:  Mary V. Thompson, RMR, FCRR
              United States District Court
              500 Poydras, Room B275
              New Orleans, LA  70130
```

**OFFICIAL TRANSCRIPT**

EXAMINATION INDEX

PAGE NO.

Defendants' Witnesses:

Vanessa Piazza, M.D.,

    Cross-Examination..................... 2048
    Redirect Examination.................. 2102

Najeeb Thomas, M.D.,

    Direct Examination.................... 2106

**OFFICIAL TRANSCRIPT**

<u>**P R O C E E D I N G S**</u>

(FRIDAY, JUNE 9, 2017)

(MORNING SESSION)

08:33:04

                                              (Call to order of the court.)

                                              (Jury in at 8:38 a.m.)

THE COURT:  Be seated, please.

Good morning, ladies and gentlemen.

Okay.  You may proceed in cross-examination.

08:39:28

You are still under oath, ma'am.

You may proceed, Counsel.

MR. HONNOLD:  Good morning, ladies and gentlemen.

May it please the Court:

**CROSS-EXAMINATION**

08:39:32

BY MR. HONNOLD:

     Q.   Dr. Piazza, there's one thing I want to make sure that
we're clear on at the outset.  Is it your view that, when
Mrs. Orr was at the emergency room at Ochsner Baptist on the
evening of April 24th, that the family should have just been told

08:39:58

there was nothing that could have been done and no care should
have been provided at that point?  Is that your view?

     A.   No, sir.

     Q.   Your view is, based upon the objective information that
was collected on Mrs. Orr that evening, that she was in a serious

08:40:12

condition?  That's your view, correct?

**OFFICIAL TRANSCRIPT**

1     A.    Yes, sir.

2     Q.    And your view is that, based upon that objective

3 information, you thought she presented a situation that did

4 present a greater than 50 percent risk of mortality, correct?

08:40:26
5     A.    Yes, sir.

6     Q.    And when a patient of yours, as an emergency room

7 physician, is in a situation like that where they are presenting

8 with a situation that may have a 50 percent or greater risk of

9 mortality, the treatment that they then receive thereafter needs

08:40:45
10 to be provided appropriately and timely, correct?

11     A.    Yes, sir.

12     Q.    You know that because, as an emergency room physician,

13 you are presented with conditions that, if the patient in that

14 situation is going to have a chance or opportunity for survival,

08:41:02
15 that meaningful care that may give them a chance to survive and

16 live needs to be provided seamlessly and consistent with the

17 standard of care; isn't that right?

18     A.    Yes.

19     Q.    And so that window -- you grant that there is a window

08:41:20
20 for Mrs. Orr because you said it was a 50 percent -- greater than

21 50 percent risk of mortality; but there is a window there for

22 survival and that's why you, as an emergency room physician,

23 would provide that necessary treatment, correct?

24     A.    What do you mean by "window"?

08:41:37
25     Q.    That when you are providing that care to her, that is a

**OFFICIAL TRANSCRIPT**

1  window in time when you are providing the care so that you are

2  creating a situation so that she has the best opportunity for

3  survival.  Correct?

4      A.   I agree with care, absolutely.  I agree with greater

08:41:55  5  than 50 percent chance of mortality, absolutely.  I'm not sure

6  about your application of the word "window."  It's continual care

7  from when we receive her until she is discharged or, ultimately,

8  to death.

9      Q.   A fair point.  Then let's not restrict it to a window.

08:42:13  10     That you are in a situation where everything that you

11  need to be doing as an emergency room physician in that

12  situation, within that continuum or spectrum, needs to be

13  provided timely, seamlessly, and consistent with the standard of

14  care, right?

08:42:27  15     A.   Timelessly, seamlessly, standard of care, yes.

16     Q.   And the reason that it is important for those things to

17  be achieved is to allow the patient -- in this instance Sharyn

18  Orr, mother, wife -- to be given the best opportunity and chance

19  that she can have for survival, right?

08:42:48  20     A.   Yes.

21     Q.   Okay.  That's consistent with your oath that you have

22  sworn to in the state of Louisiana, correct?

23     A.   To provide the standard of care, yes.

24     Q.   To give patients the best chance to survive and live,

08:43:02  25  correct?

**OFFICIAL TRANSCRIPT**

 1      A.   Yes.

 2      Q.   Even when the odds may be stacked against them, right?

 3      A.   Yes.

 4      Q.   You have dealt with situations in the emergency room at

 5 University Hospital, at Ochsner Kenner, and other places --

 6 you've dealt with plenty of situations that have come into your

 7 emergency room, and because of the things that you do, the things

 8 that you provide with your hands, with your mind, with the help

 9 of others -- those things in those situations have allowed

10 patients to live even when the odds have been against them,

11 correct?

12      A.   Yes.  Gunshot wound to the head, gunshot wound to the

13 chest, yes.  We take care of patients who are on the edge of

14 survival.  Sometimes they do and sometimes they do not.  In

15 general, yes.

16      Q.   You mentioned those unfortunate situations of gunshots.

17 Explain to us how timing -- how the issue of time and providing

18 care timely, meaning, here is this situation and now, as a

19 doctor, I need to do something.  But sometimes time -- time is

20 the critical part, isn't it, when you do things?

21      A.   That's a broad question.  I'm not going to disagree

22 with a broad question like that.  Timing, yes, it's relative.

23 Timing sometimes means within 24 hours.  Sometimes it means right

24 now.

25           So that's a broad question I can't answer exactly.

08:43:14
08:43:35
08:43:51
08:44:11
08:44:25

**OFFICIAL TRANSCRIPT**

1          **Q.**    When timing means right now, you do it right now,

2     correct?

3          **A.**    Yes, sir.

4          **Q.**    Based upon the presenting signs, symptoms, and

08:44:36    5     situation of the patient, that issue of time, whether you have

6     two minutes or two days -- that's part of your education,

7     training, and your skill, isn't it?

8          **A.**    That is all relative, and sometimes somewhat

9     subjective, but pertinent to the clinical situation.

08:44:52   10          **Q.**    Now, in a situation where there is a brain bleed -- you

11     have been in the situation that Dr. Azcuy was in in the situation

12     of Mrs. Orr at Ochsner Baptist, correct?

13          **A.**    Oh, yes.

14          **Q.**    The goal of treatment -- or at least some of the goals

08:45:12   15     of treatment that we can agree on is that there needs to be a

16     timely assessment and evaluation of the patient, right?

17          **A.**    Yes.

18          **Q.**    There need to be steps taken to stabilize the patient

19     as well as can be done in the emergency room, correct?

08:45:24   20          **A.**    Yes.

21          **Q.**    There need to be steps taken to inquire about certain

22     facts or information that might be developed on the patient, like

23     laboratory tests and radiographic studies, right?

24          **A.**    The history is probably one of the most important

08:45:39   25     radiographic tests.  As far as a CAT scan for a possible brain

**OFFICIAL TRANSCRIPT**

1    bleed, yes, very important.  Labs tests, cannot deny that.  Yes.

2         Q.    So those are all things that you and your team in the

3    emergency room, as Dr. Azcuy's team was in the emergency room,

4    are trying to gather and assemble efficiently and timely, right?

08:46:00    5         A.    Yes.

6         Q.    You have been an emergency room physician at Ochsner

7    Kenner, worked in that facility for several years, correct?

8         A.    Correct.

9         Q.    And continue to do so, right?

08:46:10    10        A.    Correct.

11        Q.    Ochsner Kenner, like Baptist, is one of those hospitals

12   that does not have a neurosurgeon on call that will come to

13   Ochsner Kenner to perform surgeries, correct?

14        A.    Correct.  We have a neurosurgeon that we can call to

08:46:24    15   discuss and transfer to Ochsner main.

16        Q.    You're familiar -- I think I've heard from other

17   physicians in the system -- the blue phone or the triage phone,

18   something like that, where you connect to a triage center who

19   might then connect you to a physician on call?

08:46:39    20        A.    You are not incorrect.  There is such a thing as a blue

21   phone and a red phone.  We haven't used that for years.

22             But there is a hotline, if you will, with a phone that

23   you can call to get directly to the main, and they will transfer

24   you to the neurosurgeon, yes, sir.

08:46:52    25        Q.    So you believe it was fully appropriate, consistent

**OFFICIAL TRANSCRIPT**

1    with the standard of care, to do all those things for Mrs. Orr

2    and to arrange for her transfer, really, as timely as possible,

3    correct?

4        A.    Correct.

08:47:06
5        Q.    And based -- and, again, those things were all being

6    done to provide Mrs. Orr with her best opportunity and chance for

7    survival, correct?

8        A.    All those things were done, yes, sir.

9        Q.    And you know, in a situation of a brain bleed, that

08:47:20
10   that time -- that relevant spectrum of time that we were just

11   talking about, the goal is to get that patient to where a

12   neurosurgical evaluation can be made as quickly as reasonably

13   possible, correct?

14       A.    Yes.  Lower the blood pressure, protect the airway, and

08:47:39
15   get the patient to a neurosurgeon, that is correct.

16       Q.    And then the issue -- what a board-certified

17   neurosurgeon might do, you would certainly defer to a physician

18   like that as to what steps would then be taken, right?

19       A.    So you're asking me, after I talked to the

08:47:56
20   neurosurgeon, I would do what he asked?

21       Q.    Yes.  And then defer to their own professional judgment

22   as a board-certified neurosurgeon as to what care would be

23   indicated and provided.

24       A.    That's understood in the consult.  So I'm telling them

08:48:08
25   what I have.  If they have any instructions for me, I'll execute

**OFFICIAL TRANSCRIPT**

1  that, and then get the patient to the neurosurgeon.  That's my

2  job.

3      Q.    And in terms of your practice as an emergency room

4  physician, that is kind of -- that's what you do, right?  You

08:48:21  5  bring them in, do what needs to be -- is necessary, and either

6  discharge or on to the next level of care, right?

7      A.    Repeat that, please.

8      Q.    As an emergency room physician, that's what you do.

9  You receive patients that come to you.  You provide the necessary

08:48:35  10  care or stabilization.  The patient will either be discharged

11  from the emergency room, admitted to the hospital, or, in these

12  situations, transferred to another facility for further care.

13  Right?  That's what you do?

14      A.    The interim of what I do in the emergency room

08:48:51  15  sometimes requires a little more intervention than what it sounds

16  like you're referring to.

17          But, ultimately, there is an admit and there is a

18  transfer, discharge, or admit somewhere else, admit at the

19  hospital.

08:49:03  20          And then the in-between is the management, the

21  diagnosis, the evaluation.  So I'm not just a conduit, but there

22  is a resting spot where there is a lot done.

23      Q.    And, Doctor, I apologize to you, because I was not

24  trying to diminish anything that you -- the meaningful care and

08:49:20  25  treatment that you provide to your patients.

**OFFICIAL TRANSCRIPT**

2056

1      A.   No, no, no.  I'm just giving a full answer.

2      Q.   Because there are things that you might do.  There are

3 invasive procedures, whether it might be a tracheostomy or having

4 to drain blood from a collapsed lung or something like that.  I

08:49:35   5 mean, you are doing real significant things on occasion a lot of

6 times, right?

7      A.   Yes.

8      Q.   And those things may need to be done before that

9 patient can be sent to the ICU or transferred to another

08:49:47  10 hospital, right?

11      A.   Yes.

12      Q.   But at some point, your role as an emergency room

13 physician then stops, right, for a given patient?  You won't

14 usually be the doctor that will then see that patient on the

08:49:58  15 floor in the unit or you won't be the doctor that follows that

16 patient to another hospital, right?

17      A.   Right.

18      Q.   Now, there has been testimony and discussion in this

19 court about the issue of "time is brain."

08:50:14  20           Have you heard that before?

21      A.   Yes.

22      Q.   And you know that that is a concept that applies in

23 situations of strokes, both ischemic strokes and hemorrhagic

24 strokes, correct?

08:50:26  25      A.   That general concept about organ failure as a result of

**OFFICIAL TRANSCRIPT**

1   nonperfusion applies to every organ, whether it's the brain or
2   the heart or the gut, yes.  Function is going to decrease and
3   then die as time goes by, that's a physiologic basic question.
4   And, yes, I agree with that.

08:50:48

5        Q.   And that's true for the brain, time is brain?  As an
6   unrelieved situation, such as hydrocephalus or hemorrhage into
7   the brain goes unresolved and the brain is continued to be put at
8   risk, then that can be a situation that is detrimental for the
9   patient, correct?

08:51:05

10       A.   Regarding hydrocephalus, that's not specifically an
11  ischemic syndrome, but the whole mantra of time is brain I agree
12  with.

13            I don't know if that can be applied to hydrocephalus.
14  It can be applied to ischemia, to cell death.  But I agree with

08:51:23

15  your general statement, yes, sir.

16       Q.   You certainly wouldn't disagree with board-certified
17  neurosurgeons who say time is of the essence when it comes to
18  oftentimes placement of external ventricular drains, right?

19       A.   As a broad statement, I understand, yes, that that is a

08:51:42

20  good broad statement to apply.

21       Q.   It's hard to argue with that broad general statement,
22  correct?

23       A.   I'm not trying to argue with that.  I'm trying to
24  define it.  It's a general statement.

08:51:51

25       Q.   And in situations where a patient does, based upon

**OFFICIAL TRANSCRIPT**

1    their condition, face a significant risk of mortality, is it true

2    that timely provision of treatment can be absolutely critical to

3    that patient's outcome?

4         A.   Repeat that so I can make sure I'm answering correctly.

08:52:14    5         Q.   Sure.

6              When it relates to situations where a patient presents

7    with a situation that carries with it a significant chance of

8    mortality, can it be true in certain situations that the

9    provision of timely care can be absolutely critical to the

08:52:33    10   patient's outcome?

11        A.   Care sometimes means actually not doing anything, so to

12   watch and to wait to see what is going to happen next.  That is

13   what experience tells you.  So just because you can do something

14   doesn't mean you should.

08:52:52    15             So timely care sometimes means observation to see what

16   is going to happen next because all procedures, all medications,

17   also have adverse effects and risks.

18             So, yes, timely care, in general, yes.

19        Q.   And sometimes that can be true as to the timing of

08:53:10    20   intervention?  I mean, there are situations where intervention is

21   necessary.  In a situation where the patient faces a high risk of

22   mortality, there can be situations where the treaters say there

23   needs to be an intervention and doing it timely can be critical

24   to the outcome.  That's true, isn't it?

08:53:27    25        A.   As a general statement, if the treater thinks that, I

**OFFICIAL TRANSCRIPT**

1    agree, yes.

2        Q.    And in some situations, if the treater thinks that,

3    that might be a physician, other than an emergency room

4    physician, such as the type of doctor that you might then send or

08:53:43   5    transfer a patient to, like a neurosurgeon?

6        A.    A treating physician may be a physician that is not

7    myself, yes.

8        Q.    Doctor, I'm going to put something here on the screen.

9    I want to switch gears a little bit.

08:54:02  10        Doctor, do you agree with this statement:  The effect

11    of Xarelto on PT is transient and changes over time after

12    administration, according to its half-life of 5 to 9 hours in

13    healthy adults and 11 to 13 hours in the elderly, meaning that,

14    if you take your dose of Xarelto at 7:00 a.m. and measure a PT at

08:54:27  15    10:00 a.m., it will be different for that same person on that

16    same day when the PT is measured at 10:00 p.m.?

17        Do you agree with that statement?

18        A.    I believe I recognize that as my own.  And, yes, I

19    agree with that.

08:54:38  20        Q.    You're right on the first part, that is your statement.

21        So you agree with it?

22        A.    Yes.

23        MR. HONNOLD:  Your Honor, may I push the chart out?

24        THE COURT:  Sure.

08:54:52  25    MR. HONNOLD:  (CONTINUING)

**OFFICIAL TRANSCRIPT**

1    **Q.**   Now, Doctor, what I would like to do is talk about that
2    statement a little bit in the context of some of the pharmacology
3    that we've talked about in this case and a little bit during your
4    direct examination yesterday.

08:55:13
5            So I'm just writing "Xarelto" on the pad and the word
6    "PT."

7            So in your statement there, you say that the effect of
8    Xarelto on PT is transient.

9            So you agree in the statement, then, that, when a
08:55:40
10   patient does take Xarelto, that it will have some effect their
11   PT, right?

12   **A.**   It can, yes.

13   **Q.**   And when it does have some effect on their PT, what is
14   going on in the body?

08:55:55
15   **A.**   Could you ask that in a more specific way?  What do you
16   mean by "what's going on in the body"?

17   **Q.**   Well, we all know, as it relates to prescription drugs,
18   the patient takes it and ingests the drug, right?

19   **A.**   Yes.

08:56:13
20   **Q.**   That starts the clock running in terms of what that
21   medicine does in their body, right?

22   **A.**   It begins to take effect, yes.

23   **Q.**   The medicine begins to take effect through the various
24   processes of absorption in the body, right?

08:56:26
25   **A.**   Yes.

**OFFICIAL TRANSCRIPT**

1      **Q.**   One thing that happens after a patient takes a dose of
2  the drug, it will result in some impact on the plasma
3  concentration level of that drug in the patient's bloodstream,
4  right?

08:56:52   5      **A.**   Yes.

6      **Q.**   And we know certain things about pharmacology and how
7  drugs work that allow us to come up with some terms about plasma
8  concentration.

9          But for specific drugs, after the drug is taken, there
08:57:07  10  will be a period of time when the plasma concentration gets to
11  its peak for that dose, right?

12      **A.**   Yes.

13      **Q.**   And explain to us what the peak is for -- let's do it
14  within the context of Xarelto and plasma concentration as to how
08:57:25  15  and when peak happens.

16      **A.**   Two to four hours after ingestion, if the ingestion was
17  with a meal, if you are talking about 15- and 20-milligram
18  tablets.

19      **Q.**   So if we say -- so we would say peak then happens two
08:57:42  20  to four hours post-ingestion, right?

21      **A.**   With a meal, yes.

22      **Q.**   With meal.

23          Now, the way that you have set up your statement here,
24  you talked about a situation of morning ingestion, right?

08:58:01  25      **A.**   Oh, no.  I know that it must be ingested in the

**OFFICIAL TRANSCRIPT**

1  evening -- oh, in that part -- this was during my deposition with
2  you.
3      Q.   Yes.
4      A.   So I gave an example that was easy to discuss as far as
08:58:12
5  time, because I think of the beginning of time in the morning and
6  the end of time in the day.
7          So in conversation with you, that was how I set it up.
8  So in this specific hypothetical situation, that's how I set it
9  up, yes.
08:58:25
10     Q.   You wrote this down in your report.  It wasn't from in
11  conversation with me.
12     A.   Well, in explaining how PT works, that was the easiest
13  way to set it up, thinking of time of day instead of going from
14  the evening until the next morning.
08:58:39
15          But, yes, it should be taken with the evening meal.
16  Yes, for this situation, let's consider that it was taken with
17  the morning meal.
18     Q.   So what we could do, then, based upon what you have
19  just said, to get to a more realistic situation as to when the
08:58:54
20  drug is taken, we could just flip the a.m.'s and p.m.'s on each
21  of those times there, right, and the statement would still be
22  true?
23          7:00 a.m. taking it would become 7:00 p.m.  You measure
24  the PT at -- instead of 10:00 a.m., it will be 10:00 p.m?
08:59:09
25     A.   Okay.

**OFFICIAL TRANSCRIPT**

1    Q.   Right?

2    A.   Yeah.  I'm not going to disagree with that.

3    Q.   All right.  That would be the way it would be,

4  generally, for -- as you've talked about Xarelto would be taken?

08:59:16
5    A.   In the evening meal, yes.

6    Q.   And so, then, if someone then would take a dose of

7  Xarelto at 7:00 p.m. with a meal, they would then be reaching

8  their peak between 9:00 and 11:00 p.m., right?

9    A.   If they took it with food and they took it at

08:59:46
10  7:00 p.m., the peak would be two to fours hours later.  So the

11  7:00 p.m. plus two to four would be 9:00 to 11:00 p.m., yes.

12    Q.   And so in this situation, then, when you are describing

13  that the effect of Xarelto on PT is transient, then let's talk

14  about the effect, then, that a dose taken with a meal at

09:00:03
15  7:00 p.m. -- then let's talk about the effect of the Xarelto on

16  the PT at that time.

17        How will taking that dose at 7:00 p.m. affect the PT

18  when the patient is at peak 9:00 to 11:00 p.m.?

19    A.   How will that affect the concentration?

09:00:25
20    Q.   Let's talk about concentration first.

21    A.   Okay.

22    Q.   And so how will it affect the concentration?

23    A.   For that person, their concentration will be higher at

24  that time.

09:00:36
25    Q.   So you've seen graphs like that where the plasma

**OFFICIAL TRANSCRIPT**

1    concentration is shown going up to where the patient is at peak,

2    right?

3        **A.**    That graph isn't labeled very well, but if you are

4    trying to show a peak, yes.

09:00:57    5        The important -- I'm not trying to criticize your

6    drawing --

7        **Q.**    Yes, you are.

8        **A.**    No.  I'm a stick figure person too.

9        However, the way that you are making it go up, yes.

09:01:06   10    But you need some numbers in there to make it really relevant.

11       **Q.**    Well, let's -- so if we just say "peak," and that would

12    relate to some --

13       **A.**    Number.

14       **Q.**    Some number.  And this would relate to time

09:01:23   15    (indicating)?

16       **A.**    Yes.

17       **Q.**    So we know that under that scenario the peak would be

18    between 9:00 and 11:00 p.m., right?

19       **A.**    Yes.

09:01:32   20       **Q.**    And then that plasma concentration, then, would then

21    tend to go down over time, right?

22       **A.**    I don't know about that C curve, because it depends on

23    some individual variance as well as creatinine clearance, and

24    there is a variance of the peaks that people will get.

09:02:03   25        But in general, yes, there is a peak, and then later

**OFFICIAL TRANSCRIPT**

1    on, hours later, there is a trough.

2        Q.    All right.  So let's talk about those new things, then.

3             So then you said trough will be further out, right?

4    And what does "trough" mean?

09:02:21
5        A.    That's the low dose right before the next dose.

6        Q.    And this graph that --

7        A.    Or the lower level right before the next dose.

8        Q.    Right.

9             And so that would be -- this graph that I've inartfully

09:02:34
10   tried to create, it would be fair to call that the plasma

11   concentration curve for a dose of Xarelto, right?

12       A.    Yes.

13       Q.    Now, when you talk about the effect of Xarelto on PT as

14   transient, then what are you explaining there in terms of how

09:02:51
15   Xarelto over time is going to be affecting the PT?

16       A.    It's going to change, unlike -- and we use this as a

17   reference point because it's been around for 50 or 60 years.  The

18   PT with warfarin, when you test it at one time during the day,

19   because warfarin's half-life is so long, it's going to be the

09:03:14
20   same for that person all day long.  And with Xarelto, that is

21   different.  It's transient.  It changes.  That's one of the

22   reasons it's not a good test.

23       Q.    Let's talk about how it changes, then.  Let's talk

24   about it specifically within the context of the times that we've

09:03:28
25   been talking about.  Before we do that, you mentioned one new

**OFFICIAL TRANSCRIPT**

1    term, and it was "half-life."

2         A.    I mentioned that?

3         Q.    You did.  You said the half-life of Xarelto, because of

4    warfarin -- because it is so long, the PT for warfarin stays

09:03:47   5    steady during the day.

6         A.    For half- -- for warfarin, uh-huh.

7         Q.    Right.  But since you used the term "half-life," I want

8    to peel that out a bit.

9         A.    Sure.

09:03:57  10         Q.    What does half-life mean as it relates to Xarelto?

11         A.    So half-life means when half of the drug is gone out of

12    your system.  It's still potent, but half of it is gone.  So we

13    are metabolizing it.

14         Q.    And on the plasma concentration curve, would it mean

09:04:24  15    that it's the level when it's at half of where the peak was?

16         A.    Say that again, please.

17         Q.    Sure.  Is the half-life at that point in time where the

18    plasma concentration, the amount in the blood, is half of what

19    peak was?

09:04:37  20         A.    That is dependent on the individual's metabolism so you

21    can't make that extrapolation.

22         Q.    So for Xarelto, the half-life is what?

23         A.    It depends on who you're talking about.

24         Q.    I'm talking about Sharyn Orr.

09:04:53  25         A.    Okay.  So she would fit in -- by definition of her age,

**OFFICIAL TRANSCRIPT**

1    that would put her between 11 and 13 hours.  However, because of

2    her renal function, she could be quite beyond that.  And that is

3    an unknown entity because we don't know exactly what her

4    half-life is because of her renal clearance.

09:05:10    5    Q.    What is your best estimate -- well, first let me ask

6    you this:  Describe the literature search that you undertook in

7    this case to gather your information.  Can you just tell us what

8    you did?

9    A.    Just in general how I found my research?

09:05:28    10    Q.    No, in this case specifically what you did.

11    A.    In this case what I did is I looked at uptodate.com,

12    which is an updated, peer-reviewed systematic journal and read

13    that.

14         Then I went to their references for everything that I

09:05:45    15    had a question about on the back of their references, and read

16    those articles.

17         Then I used a search engine to look up more things that

18    were related.

19         Every time I used a search engine, if it threw me out

09:05:57    20    another related article, if I had any interest in that article, I

21    read that.

22         So it was kind of a frenzy, I guess.  Lots of searching

23    for a lot of things.

24    Q.    What was the search engine?  Google?

09:06:07    25    A.    I used PubMed for some of it.  For -- at times I used

**OFFICIAL TRANSCRIPT**

1    Google when I had that available to me.  It depends on where I

2    was location-wise, what resource I had.

3        Q.    Based on that work that you did or previous

4    understanding, what's, then, the half-life -- or the range of

09:06:24    5    anticipated or expected half-life for Mrs. Orr?

6        A.    It's prolonged is what all the literature says.  And

7    there is not a specific number I can give you for a specific

8    creatinine clearance.

9        Q.    So you mentioned that for her age, what would the

09:06:40    10    half-life be, not taking the renal insufficiency --

11        A.    If she had normal renal function at her age, it would

12    be between 11 and 13 hours.  But that's not her.

13        Q.    So for a person like Sharyn Orr, in terms of age and

14    normal health without the renal situation, if that person took a

09:07:06    15    pill at 7:00 p.m., then the half-life would be at that 11 to

16    13 hours later, right?

17        A.    For a person who had normal kidney function at her age,

18    yes.

19        Q.    So that would be, then, the next morning at 6:00 a.m.

09:07:21    20    to 9:00 a.m.?

21        A.    I've a little bit lost track because I know that is not

22    Mrs. Orr, but --

23        Q.    I'm just going on a person who would be of Mrs. Orr's

24    age but without the renal problem.

09:07:35    25            So at 7:00 p.m., if we add 11 hours, that would be

**OFFICIAL TRANSCRIPT**

 1  6:00 a.m., right?

 2       A.   Okay.  Yes.

 3       Q.   And then if we were to add 13 hours to 7:00 p.m., that

 4  would be 8:00 a.m., right?

*09:07:52*  5       A.   Yes.

 6       Q.   And so that would be the anticipated time when half of

 7  the drug would be out of the system for a person that did not

 8  have renal insufficiency like Mrs. Orr, right?

 9       A.   It would take two half-lifes to get a pretty low

*09:08:15* 10  threshold, so if that is where you are -- I can't see down on the

11  board.

12            But, in general, one half-life in this patient without

13  renal failure will be 11 to 13 hours.  And it takes two

14  half-lives to get to where you're very low.  That's why you take

*09:08:31* 15  the drug again.

16       Q.   Now, since we've followed up on the half-life, then

17  let's talk about your statement here about how Xarelto affects

18  the PT over time.

19            Can you explain exactly what you're saying here in the

*09:08:45* 20  context of this statement?

21       A.   I still don't understand what you're saying.

22            It's obvious that there are changes in concentration

23  during the day.  And it's obvious that there are changes in PT

24  during the day.  While all this is fluctuating, you are still

*09:09:04* 25  therapeutic the whole time.  It takes -- actually for the drug to

**OFFICIAL TRANSCRIPT**

1    get completely out of your system, it takes five half-lifes until

2    there is no drug in your system.  So five half-lifes times

3    13 hours, I would need my pen to look down and make that, but

4    that is how long that is.

09:09:18
5        Q.    I appreciate all that, but I want to focus on the PT

6    specifically.

7            Tell me about a patient, then, who takes the medicine

8    at 7:00 p.m. and then would have a measure of PT at 10:00 p.m. --

9    because we've reversed the times up here so the anticipation,

09:09:42
10   then, that they would be in that peak time in terms of plasma

11   concentration -- how would that affect the PT, then, in that

12   window of time specifically at 10:00 p.m.?

13       A.    Well, the PT changes.  And so when you are talking

14   about specifics, you really can't apply that.  You can't say what

09:10:03
15   it is going to be at a certain time.  It's going to be different.

16   It changes.  It's transient.  And that's the most -- because it's

17   not sensitive or specific, that's the best that I can give you,

18   just the idea that it is going to change.  I can't tell you

19   exactly how much.  That's one of the problems.

09:10:18
20       Q.    Would it be fair to state, though, that the PT -- that

21   the effect of the PT would be greatest when the plasma

22   concentration is at its highest point?

23       A.    That's a fair statement, yes.

24       Q.    So we can agree, then, that the impact of PT -- the

09:10:39
25   impact that Xarelto has on the PT will be at its greatest when

**OFFICIAL TRANSCRIPT**

1  the drug is at its peak plasma concentration level, right?

2     A.   Yes.  But if we take that back to Mrs. Orr, patients

3  who have renal insufficiency have lower peaks, lower troughs, and

4  longer half-lifes.  That is going to make your little hill there

09:11:01   5  a little bit lower of levy.  You are going to have to draw it a

6  little bit lower when you are talking about Mrs. Orr.

7     Q.   Taking that into account, still, that the highest

8  impact on PT will happen when the plasma concentration is at its

9  peak, correct?

09:11:18   10    A.   In general, the highest point is going to be when the

11  concentration is highest, but that's very non-specific.

12    Q.   Now, Doctor, I know that we've about worn ourselves out

13  looking at papers and articles and things, but there is one that

14  I want to show you.

09:11:41   15         MR. HONNOLD:  Your Honor, may I approach?

16         THE COURT:  Yes.

17  MR. HONNOLD:  (CONTINUING)

18    Q.   This was marked as Defendants' Exhibit 2213.  It was in

19  a notebook that was handed to me yesterday.

09:11:51   20    A.   Okay.

21    Q.   And, Doctor, what I would like to do is refer you to --

22  first, feel free to take your time to orient yourself to it.

23    A.   I believe I may have looked at this at one time, but --

24  would you give me one second to look through it --

09:12:28   25    Q.   Sure.

**OFFICIAL TRANSCRIPT**

1    **A.**    -- because I think I'm recognizing it, but I don't

2    remember every word.

3    **Q.**    Absolutely.

4    **A.**    (Reviews document.)

09:12:50    5    **Q.**    And, Doctor, it was Tab 10 in your exhibit book

6    yesterday.

7    **A.**    Okay.  Okay.  So -- I have this.  I think I -- I'm kind

8    of looking at it, so I can handle the questions.

9    **Q.**    Now, I want to get to a spot here on the lower

09:13:11    10   right-hand corner of Page 1224.

11   **A.**    Page 2 of 23.  Okay.

12   **Q.**    Yes.

13   **A.**    Yes, I'm there, okay.

14   **Q.**    And that statement that -- we have seen similar ones.

09:13:33    15   It basically says:  Although routine laboratory monitoring of

16   rivaroxaban is not necessary, in many situations drug monitoring

17   is desirable, such as in the setting of urgent invasive

18   procedures or surgery, suspected underdosing or overdosing,

19   extremes of body weight, suspected drug interactions, medication

09:13:52    20   adherence concerns, progressive renal insufficiency, hepatic

21   impairment, the need for thrombolytic therapy or a combination

22   therapy with antithrombotic therapy.

23        Do you see that part?

24   **A.**    I see that, yes.

09:14:04    25   **Q.**    As it relates to Mrs. Orr, you know, based upon the

**OFFICIAL TRANSCRIPT**

1    facts that we've talked through with her, she was potentially in

2    a situation of a setting of urgent invasive procedure, right?

3         A.    Yes.

4         Q.    That would mean, as you've looked at the records that

5    transpired, that being the EVD, right?

6         A.    In general, it would have been a good idea to

7    understand where she was on her coagulation status.  I do not

8    disagree with that.

9         Q.    But there are a couple of other -- there is another

10   issue that may relate to her, and that is the fact that nobody

11   could tell the doctors exactly when she took her last dose,

12   right?

13        A.    From my review of the records, they were unsure if her

14   last dose was that night or the night before, and that was

15   crucial.

16        Q.    And that was a crucial piece of information, right?

17        A.    Yes.

18        Q.    Now, if you look at this section, this specifically

19   talks about that situation, doesn't it?

20        A.    Yeah.  Yes, sir.

21        Q.    Because when you go through the list, you see that

22   there is this discussion about medication adherence concerns,

23   right?  Do you see that?

24        A.    Yes.

25        Q.    So while in this case nobody is suggesting or accusing

**OFFICIAL TRANSCRIPT**

1    Mrs. Orr of not regularly following the instructions of her
2    doctor to take the medicine, there is an issue of adherence,
3    meaning did she take the medicine on the evening of April 24,
4    right?

09:15:50  5        A.    There was a question that we were not sure when she
6    last took the medication, yes.

7        Q.    And as it relates to April 24th, that evening, whether
8    she took it or not, that is a medication adherence concern or
9    question, right?

09:16:06  10       A.    That applies, yes.

11       Q.    This article talks about that situation that Mrs. Orr
12   was in, both the situation of needing urgent surgery potentially
13   and there being a significant question of did she take the
14   medicine that night, right?

09:16:24  15       A.    Yes.

16       Q.    The reason that that matters is that when we go look at
17   our curve, people assessing whether surgery can go forward won't
18   know whether she's up here closer to peak (indicating), having
19   recently taken the medicine around dinnertime, or whether she is
09:16:44  20   more at trough, having not taken it since two days before, the
21   23rd, right?

22       A.    But the PT is not going to help you there.

23       Q.    Okay.  I hear what you're saying.  Let's keep going
24   forward with this article.

09:16:59  25            What I would like to do first is go back -- I'd like

**OFFICIAL TRANSCRIPT**

2075

1    you to go to the back of this article.  And if you would go to

2    Page 18 of 23.

3         A.   Yes.

4         Q.   You see that there is some information there that talks

09:17:33  5    about Janssen Pharmaceuticals, right?

6         A.   Yes.

7         Q.   And so as you look at that Page 18, does this suggest

8    to you that this article is being perhaps written with

9    potentially the knowledge or approval of Janssen?

09:18:05  10        A.   Does this paragraph tell me that Janssen knew about

11   this article?  Is that what you're asking me?

12        Q.   Well, as you look at it, as you look at that Patient

13   Education section from 18 over to 19.  And even if you go to

14   Page 19, there is more things that talk about Janssen

09:18:27  15   Pharmaceuticals has done this Internet website entitled Care

16   Coordination, Janssen Pharmaceuticals has done educational

17   materials.  If you go to the next page after that, there is

18   discussion about Janssen Pharmaceuticals is offering patients

19   rivaroxaban savings coupons.

09:18:49  20        Do you see that?

21        A.   Yes.  It looks like they are trying to explain to the

22   patients what a stroke is, what an embolism is, and maybe that's

23   what those videos are about.

24        Q.   Okay.  But if you -- so it looks at least like there is

09:19:03  25   some Janssen-specific information at the end of this article,

**OFFICIAL TRANSCRIPT**

1  right?

2       **A.**    That they make reference to, yes.

3       **Q.**    So if we go back to where we were in the article

4  earlier, let's go now to Page 5 of 23 in the lower right-hand

5  corner.  And if you look at that paragraph, it says:  The desire

6  to measure rivaroxaban's anticoagulant effect reliably in special

7  circumstances is gaining considerable attention.   Current

8  limitations include the lack of routinely available standardized

9  validated assays with established target ranges and the lack of

10 an established relationship of laboratory parameters to

11 clinically important outcomes.  As a guide to clinicians -- as a

12 guide to clinicians, Table 4 provides potential scenarios for

13 measuring a PT in rivaroxaban patients.

14           Do you see that?

15      **A.**    I see where it says that, yes.

16      **Q.**    It looks like one purpose of this article or goal is to

17 guide clinicians.  You're a clinician, right?

18      **A.**    Yes.

19      **Q.**    So to guide clinicians like you about potential

20 scenarios for how to measure a PT in patients on Xarelto?

21      **A.**    Okay.  I'm following you.

22      **Q.**    If we go forward, then, to Table 4, let's look at this

23 part first.

24           So if we look at the top part of Table 4, Potential

25 Scenarios For Measuring a Prothrombin Time in Rivaroxaban

09:19:25 (line 5)
09:19:54 (line 10)
09:20:15 (line 15)
09:20:30 (line 20)
09:21:10 (line 25)

**OFFICIAL TRANSCRIPT**

1  Patients, do you see that?

2      A.   Yes.

3      Q.   And prothrombin time, no doubt that's the PT test we've

4  been talking about, right?

09:21:20  5      A.   Yes.

6      Q.   If you assume that all that Janssen information at the

7  end of the article meant that Janssen had some knowledge or role

8  in that information or preparing an article like this, do you

9  know why it is that that might -- why they would want to do that

09:21:43  10  and provide this information about Xarelto?

11          MR. DUKES:  Your Honor, objection.  Lack of foundation.

12  The witness doesn't know that...

13          THE COURT:  Sustain the objection.  She would be

14  guessing.

09:21:52  15  MR. HONNOLD:  (CONTINUING)

16      Q.   Doctor, this table lays out clinical situations about

17  the use of prothrombin time in rivaroxaban patients, right?

18      A.   Yes.

19      Q.   The first situation we talked about for Mrs. Orr is

09:22:05  20  prior to an invasive or emergent procedure, right?

21      A.   Yes.

22      Q.   Why is it that a clinician might want to have some

23  understanding as to the level of Xarelto in a patient's blood

24  before they undertake surgery?

09:22:24  25      A.   Because they're going to have a higher risk if they are

**OFFICIAL TRANSCRIPT**

1   anticoagulated as far as when their ingestion of Xarelto was.

2          But I'm a little bit distracted, because, as I'm

3   looking at the article right here on Page 4, it says:  Global

4   coagulation tests like the PT and PTT do not provide a reliable

09:22:46   5   indicator of the level of Xarelto anticoagulation.  That's in

6   this article.

7          And in what you are pointing out right here, they

8   mention that it must be with a sensitive reagent, Neoplastine

9   Plus.

09:22:58   10          Then right next to it, under "Action," they say that

11   you must combine the interpretation of PTT with clinical

12   assessment of risk versus benefit.

13          So they're not saying that you can use it or you

14   should.  They're putting limitations on using clinical

09:23:13   15   assessment.  They're saying that, in this instance, if you are

16   even going to use it, it has to be Neoplastine.  And then earlier

17   they specifically say you can't.

18          MR. HONNOLD:  Your Honor, I hate to interrupt.  I'm

19   just trying to be polite.

09:23:25   20          THE COURT:  Yeah.  There's no question, ma'am.  Just

21   listen to the question and answer the question.

22          THE WITNESS:  Okay.  But --

23          THE COURT:  I don't know -- you're not on one side or

24   the other side, you're an expert.

09:23:33   25          THE WITNESS:  Yeah.  Okay.  I'm sorry.  I'm just

**OFFICIAL TRANSCRIPT**

1  reading that it's not reliable.

2  MR. HONNOLD:  (CONTINUING)

3      Q.   Doctor, I need to ask you a question, as Your Honor

4  just told you.

09:23:49   5      Why is it -- let's go back.

6      Why is it that a doctor might want to know how much

7  Xarelto is in a patient's blood before surgery?

8      A.   Because if they have a high level of anticoagulant,

9  they may bleed.  If they have any level of anticoagulant, they

09:24:03  10  may bleed.

11      Q.   And patients will have their highest level when they

12  are at -- as you told us, at the peak plasma concentration,

13  right?

14      A.   Yes.

09:24:13  15      Q.   And as it relates to Xarelto, if somebody takes it in

16  the evening around 7:00 p.m., their peak will be 9:00 to

17  11:00 p.m., right?

18      A.   Yes.

19      Q.   Now, this says the Neoplastine Plus reagent is

09:24:31  20  considered sensitive to rivaroxaban whereas Innovin is less

21  sensitive, right?

22      A.   Yes.

23      Q.   That's giving the clinician -- remember, this was a

24  table for clinicians like yourself, right?

09:24:44  25      A.   Yes.

**OFFICIAL TRANSCRIPT**

1      Q.    This is telling the clinician that, if PT is to be
2   done, Neoplastine Plus reagent is considered sensitive to
3   rivaroxaban, right?
4      A.    In comparison with Innovin, yes.
09:24:55   5      Q.    This statement says the Neoplastine Plus reagent is
6   considered sensitive to rivaroxaban, comma.
7            It is an affirmative statement, right?
8      A.    That's what that says.  Yes, sir.
9      Q.    You, yesterday, used different terms, sensitivity,
09:25:12  10   specificity, all of that.
11            So in this context, when this Table 4 says Neoplastine
12   Plus reagent is sensitive to rivaroxaban, what does that mean?
13      A.    That says it is sensitive to rivaroxaban.
14      Q.    What does that mean?  What does "sensitive" mean?
09:25:29  15      A.    I believe that that's a relative statement based on the
16   choices that they have.  So it's sensitive in the range of what
17   they have to choose from.
18      Q.    Specifically, what does it mean when a reagent is
19   sensitive to rivaroxaban?
09:25:41  20      A.    That means that it has -- it was going to be able to
21   pick up some of the positives.
22      Q.    So the Neoplastine Plus reagent, if that test is done,
23   it will be able to pick up whether the patient is on rivaroxaban?
24      A.    If they are using Neoplastine.
09:26:00  25      Q.    If they are using Neoplastine.  I grant you that.

**OFFICIAL TRANSCRIPT**

1          Then if we go on to the right-hand side:  Action.
2    Excessive prolongation may indicate the need to delay the
3    procedure.
4          Did I read it correctly?
5    **A.**    Yes.
6    **Q.**    What does that mean?
7    **A.**    That means, if the PT is prolonged, that may indicate
8    that the procedure may need to be put off.
9    **Q.**    And you talked about that, that you might not want to
10   proceed with surgery due to an increased risk of bleeding, right?
11   **A.**    Yes.
12   **Q.**    Now, then it says below this:  Health systems may wish
13   to evaluate the sensitivity of their PT reagent to rivaroxaban.
14         Right?
15   **A.**    Yes.
16   **Q.**    Do you see that?
17   **A.**    Yes.
18   **Q.**    Now, what that importantly is saying is that hospital
19   systems -- hospitals, hospital pharmacies, things like that --
20   might want to be aware of exactly what reagent they have,
21   correct?
22   **A.**    Yes.
23   **Q.**    Now, when you were working at the emergency room at
24   Ochsner Kenner, did folks from either Janssen or Bayer ever come
25   over to you and say, We've been calling on doctors over in this

09:26:08
09:26:25
09:26:36
09:26:46
09:27:01

**OFFICIAL TRANSCRIPT**

1    area, in these ZIP codes, asking them to write the medicine, so
2    there may be sick folks showing up in the emergency room and you
3    want to be attentive to the fact that our medicine that we are
4    selling to folks is sensitive to Neoplastine Plus?

09:27:19
5              Did you ever get called on like that?
6         A.   That never happens in the emergency room.  We're too
7    busy to talk to sales representatives.
8         Q.   Okay.  So if you're too busy to talk to folks, did they
9    send you an e-mail?

09:27:31
10        A.   No.
11        Q.   Send you a letter?
12        A.   No.
13        Q.   Announce that there was a meeting at the hospital where
14   folks from Janssen or Bayer came and put on an educational

09:27:41
15   seminar to talk about this thing just like this (indicating),
16   that Neoplastine Plus is the sensitive reagent for rivaroxaban?
17        A.   Not that I'm aware of.  It may have happened and I
18   don't know.  But not that I'm aware of, no.
19        Q.   In this case, have you reviewed any of the internal

09:27:56
20   company documents that talk about the marketing strategy for the
21   sale of rivaroxaban?
22        A.   I have seen a few, but nothing that I can specifically
23   recall.
24        Q.   What does the word "foreseeable" mean to you?

09:28:11
25        A.   Foreseeable?

**OFFICIAL TRANSCRIPT**

1    **Q.**    Yes.

2    **A.**    Something that could be possible.

3    **Q.**    Okay.  And you talked about, yesterday, that you had

4    dealt with patients that had had various forms of bleeding,

09:28:22   5    including brain bleeds, on Xarelto, right?

6    **A.**    Yes.

7    **Q.**    And because Xarelto is an anticoagulant, it's certainly

8    foreseeable that folks taking that medicine are going to end up

9    in emergency rooms like yours, correct?

09:28:32   10    **A.**    Yes.

11    **Q.**    It's certainly foreseeable that those folks may need to

12    be evaluated from the laboratory perspective to determine whether

13    surgery can go forward, right?

14    **A.**    Yes.

09:28:41   15    **Q.**    Okay.  What we know, then, is if that laboratory

16    testing is going to be performed on a patient on rivaroxaban, it

17    looks like the Neoplastine Plus reagent is the best way to do it,

18    right?

19    **A.**    If you are going to use a reagent, they say that

09:28:59   20    Neoplastine would be the one that you need to use.

21    **Q.**    And if we go down here (indicating), now we're talking

22    about the second scenario that we addressed with Mrs. Orr, select

23    cases of non-adherence.  We talked about that, right?

24          There was an issue of adherence for her on that evening

09:29:28   25    of April 24th, whether she took the drug about suppertime, right?

**OFFICIAL TRANSCRIPT**

1    **A.**   Right.

2    **Q.**   So in select cases of non-adherence, I think that

3    middle column -- I forget what it was called -- it's called

4    "Comment."  So the comment is:  Measure PT at time of peak

09:30:04  5    rivaroxaban effect approximately two to four hours after dosing.

6         So that comment in this article is saying, if there is

7    a question about whether a patient has taken a medicine at a

8    certain time, you should think about when they usually took it

9    and then figure out when that peak time would have been for that

09:30:24  10    drug, right?

11        And so, for Mrs. Orr, if she is usually taking it

12    around suppertime, then her peak time would be in that range

13    (indicating), right?

14    **A.**   Yes.

09:30:35  15    **Q.**   So they're saying here:  Measure PT at time of peak

16    rivaroxaban effect, approximately two to four hours after dosing.

17        Then they comment:  Normal PT measured at time of peak

18    effect with sensitive reagent suggests no recent drug

19    administration.

09:30:54  20        Right?

21    **A.**   If you are using a sensitive reagent.

22    **Q.**   Okay.  So if a patient like that has a normal PT, that

23    suggests no recent drug administration, right?

24    **A.**   If you are using a sensitive reagent, that's what that

09:31:15  25    would suggest, yes.

**OFFICIAL TRANSCRIPT**

1          Q.     And that would mean -- suggestion of no recent drug

2    administration would mean that this patient wasn't up in their

3    peak plasma concentration level, right?

4          A.     That's what that says, yes.

09:31:27

5          Q.     What it would mean would be that that patient was more

6    likely -- if they are taking it once a day, was down in the

7    trough area, right?

8          A.     Yes.

9          Q.     It's hard to argue with that, right?

09:31:39

10         A.     If it's taken -- if it was taken within that period,

11   which would mean by 11:00 p.m., if she had it with a meal, and

12   with a sensitive reagent, that's what that's suggesting.  That it

13   would be -- if it's normal, that's what that would suggest.  If

14   it's in that period with a sensitive reagent.

09:31:58

15         Q.     So we know that the information for Mrs. Orr is that,

16   at 11:20-ish -- that's my sign for "ish" (indicating) -- at

17   11:20-ish, she had labs drawn, right?

18         A.     Yes.

19         Q.     And she also then had a PT that was in the normal

09:32:33

20   range, right?  A normal PT, right?

21         A.     That's outside of her two- to four-hour window, but

22   yes.

23         Q.     Well, it's pretty close.  It is 20 minutes after her

24   four-hour window, right?

09:32:47

25         A.     But it's not within the four-hour window.

**OFFICIAL TRANSCRIPT**

1    Q.   And her PTT was normal, right?

2    A.   Yes.

3    Q.   So all of her laboratory information related to

4    anticoagulation was normal at that time, right?

09:33:04    5    A.   Her coags were normal, yes.

6    Q.   So what I would like to do now is to follow up on

7    something that this article said at the back.  We saw that

8    information about websites; do you recall that?

9    A.   Yes.  At the bottom -- was it 18 or 20?

09:33:28    10    Q.   Right.  Pages 18 and 19.

11    A.   Uh-huh.

12    Q.   So we've got an Internet connection here and what I

13    would like to do is go to the Xarelto website.

14    A.   Okay.

09:33:39    15    Q.   And specifically I'd like to see what we can find, if

16    anything, on this issue of PT related to Xarelto.  All right?

17         You're familiar with the Google setup, right?

18    A.   Yes.

19    Q.   And so we've typed "Xarelto" into the box and we've

09:34:01    20    gotten to the Xarelto website.

21         Have you seen that before?

22    A.   I have not listened to the video.  I may have seen this

23    page setup.

24    Q.   Okay.  So if you wanted to know whether there was

09:34:20    25    information -- well, let me ask it in a way that makes some

**OFFICIAL TRANSCRIPT**

1    sense.

2              What we're trying to figure out here -- and we've got a

3    computer operator here that has some familiarity with the

4    website.

09:34:33    5              Do you have some sense, from looking at that screen,

6    what -- if you assume that all of those words are kind of live

7    buttons that you could go to, which of those you might pick to

8    see if there is information on the website related to PT and

9    Xarelto?

09:34:46   10         A.    On the top in purple?

11         Q.    On the top in purple or --

12         A.    Is that what you are asking me?

13         Q.    Either the dark purple, the light purple, or the bar

14    above the dark purple.

09:34:59   15         A.    "Important safety information."

16         Q.    Oh, I'm sorry.  Do you want to go to -- that would make

17    sense.  Let's try "important safety information."  Let's do that.

18              And so why don't you -- you can be the guide of at

19    least where we land to see if that information is in there.

09:35:21   20              As we look at this screen, and what is before you, can

21    you tell us whether there's any PT information on that screen?

22              And if you want us to scroll down, go ahead and we

23    will.

24         A.    I see "cause bleeding."  "For atrial fibrillation."

09:35:39   25              No, nothing about PT.

**OFFICIAL TRANSCRIPT**

1    **Q.**    Okay.  So that one is a miss.

2         What would be the next thing that you might want to hit

3    to try to regroup and find PT information?

4    **A.**    "For health care professionals."

09:35:53    5    **Q.**    Okay.  Let's try that one.

6         All right.  So you can again be the guide in terms of

7    looking at the information that is on the screen.

8         You see there is various additional prompts, including

9    "resources," "clinical trials."  And I'm happy to direct to the

09:36:16    10   site where we are trying to go.

11   **A.**    Maybe that would be the best way.

12        MR. DUKES:  Your Honor, I object to the extent this is

13   an experiment.  I also object to the extent I have not been

14   provided with a hard copy so that I can properly raise these

09:36:30    15   objections.

16        MR. HONNOLD:  (Tenders document.)

17        MR. DUKES:  This may solve that (indicating).

18        MR. HONNOLD:  Here's where we're going.  That's the

19   landing spot we're trying to get to.  It exists.

09:36:36    20        MR. DUKES:  Your Honor, under those circumstances, this

21   is an experiment to get there.  It think it would be appropriate

22   to ask her questions and --

23        THE COURT REPORTER:  I can't hear you, sir.

24        THE COURT:  Let's try to move it along.

09:36:45    25        MR. HONNOLD:  Move it along, okay.  I get that.

**OFFICIAL TRANSCRIPT**

```
 1   MR. HONNOLD:  (CONTINUING)
 2       Q.   So why don't we do this.  Why don't we try -- let's hit
 3   "resources."  Would that make sense?
 4       A.   Sure.
 5       Q.   Okay.  Let's try that.  Okay.
 6            Then we get a resource bar, right?
 7            On this "resources" side, if "HCP" stands for health
 8   care provider resources, should we try that?
 9       A.   I'm letting you be the driver here.
10       Q.   So let's go to "health care provider resources."
11            Okay.  And it looks like we are getting warmer right
12   now.  We're getting some things that look like -- things like
13   "prescribing information," "medication guide," "dosing summary,"
14   "formulary coverage."
15            Can we scroll down to complete that.
16            Then there is some additional information.
17            Here is one that says "JanssenMD professional
18   information resource."  Should we try that one?
19            Let's try that and see where we go.
20            Okay.  Now we get to a search box, "search medical
21   information."  Do you see that?
22       A.   Yes.
23       Q.   So if we want to try to get information for PT, let's
24   type "PT" in and hit "search."
25            Now it says you are accessing the JanssenMD --
```

09:36:55 (line 5)
09:37:15 (line 10)
09:37:33 (line 15)
09:37:51 (line 20)
09:38:06 (line 25)

**OFFICIAL TRANSCRIPT**

1          MR. HONNOLD:  Let's go back up, please, to show the top
2   of that box.
3   **MR. HONNOLD:   (CONTINUING)**
4       **Q.**   "You are now accessing the JanssenMD medical
5   information database."
6          Can we put your name and ZIP code in to get through
7   this?
8       **A.**   Sure.
9       **Q.**   So Vanessa is the first name?
10      **A.**   V-a-n-e-s-s-a.
11      **Q.**   Last name?
12      **A.**   P-i-a-z-z-a.
13      **Q.**   ZIP code?
14      **A.**   Is that safe to put out here like this?
15   70124.  I don't want anybody to write it down.
16      **Q.**   Your secret is good with me.
17          Now, let's stop right here, "confirm you're a health
18   care professional in the U.S."
19      **A.**   "Yes."
20      **Q.**   We can check that box.
21          And so now we're going to leave it at "Do not contact
22   me unless requested."  Okay?
23      **A.**   Please.
24      **Q.**   We'll do that.  Mr. Dukes might want to change that.
25          We'll get you to "confirm."

09:38:15
09:38:21
09:38:32
09:38:45
09:38:57

**OFFICIAL TRANSCRIPT**

1      **A.**   Yes.  This is a little scary for me.  I don't know what
2  is going to come up next.

3      **Q.**   Let's see what happens.

4      **A.**   It might show pictures from the '80s or something.

09:39:06
5      **Q.**   Now it says "Search results for PT."  So let's scroll
6  down and see what they came up with.  Okay.

7          So here's some things now that have information.  So
8  the "coagulation monitoring," PT is a form of coagulation
9  monitoring, right?

09:39:20
10     **A.**   Yes.

11     **Q.**   Let's hit on that.

12         All right.  Now, if we scroll down, it looks like it
13  gives us kind of some written information with a pdf option there
14  on the right.  Do you see that?

09:39:33
15     **A.**   Yes.

16     **Q.**   So "pdf," let's hit on that and see if it will put it
17  in a more presentable image for us.

18         Okay.  Now we get to this paper that talks about
19  JanssenMD, Xarelto, coagulation monitoring.

09:39:50
20         MR. HONNOLD:  Your Honor, may I approach?  I have paper
21  copies.

22         THE COURT:  (Nods head.)

23  **MR. HONNOLD:  (CONTINUING)**

24     **Q.**   And if we look at this information --

09:40:10
25         MR. HONNOLD:  Let's scroll up just a bit, if we can --

**OFFICIAL TRANSCRIPT**

1    I mean, scroll down.  Sorry.

2    MR. HONNOLD:  (CONTINUING)

3        Q.   So it has a summary.  It says the statement we have

4    seen before:  Routine monitoring not required.

09:40:26

5            And then, if we go down, it says:  If assessment of

6    rivaroxaban plasma concentrations is necessary, the PT was

7    reported to be an appropriate coagulation test.  The relationship

8    between PT and rivaroxaban plasma concentration when Neoplastine

9    Plus, STA Neoplastine, or Innovin is used as the reagent, is

09:40:51

10   linear and closely correlated.  The pharmacodynamic effects of

11   rivaroxaban as measured by the PT are strongly affected by the

12   type of type of PT reagent that is used.

13           Do you see that?

14       A.   Yes, I do.

09:41:05

15       Q.   Okay.  And you agree with all of that, right?

16       A.   I agree that "linearly correlated" -- that means as one

17   goes up, the other one goes up rather than down -- and "strongly

18   affected by the type of PT reagent used," I agree with that, yes,

19   I do.

09:41:20

20       Q.   Okay.  So this says Neoplastine Plus, STA Neoplastine,

21   or Innovin -- that if those are used, then there is a linear and

22   closely correlated relationship, right?

23       A.   Yes.

24       Q.   Okay.  So what does it mean if a physician wants to

09:41:36

25   assess rivaroxaban plasma concentrations?  What does that mean?

**OFFICIAL TRANSCRIPT**

1    A.   This means that as one goes up, the other must go up.

2    It doesn't tell you how much or give you a specific number.

3         And it says that it's affected by the PT reagent used,

4    so that exact number may be affected by which reagent you use,

09:41:57    5    whether you use Neoplastine or Innovin.

6    Q.   And that it speaks to rivaroxaban plasma concentration

7    when Neoplastine Plus, STA Neoplastine, or Innovin is used as a

8    reagent is linear and closely correlated.

9         So if the test result of PT is closely correlated to

09:42:16    10   our plasma concentration curve, then, here (indicating), then

11   using one of those reagents that they talk about, the test will

12   be at its highest when the plasma concentration is at its

13   highest, right?

14   A.   Within two to four hours.

09:42:32    15   Q.   And then how would you expect, then, if the plasma

16   concentration, then, gradually goes down with time after four

17   hours approaching 12, then would you expect that the PT, then, as

18   you say, transiently would respond by going down in a

19   corresponding fashion?  Right?

09:42:53    20   A.   Yes, as a principle, but we don't know what it was to

21   begin it with.  But, yes, they're saying that it would go down,

22   and I can appreciate that, yes.

23   Q.   And so what you told us yesterday -- I think you were

24   read some -- there was some back-and-forth that talked about

09:43:10    25   there was concern about PT not being really good necessarily down

**OFFICIAL TRANSCRIPT**

1  in the absolute trough section, because there could be lower

2  amounts at trough that might not be able to be picked up at -- by

3  the test, right?

4      A.   That is true.

09:43:25  5      Q.   So for somebody, though, who was near their peak time

6  when they were in an emergency and needed to be assessed possibly

7  for surgery, we aren't necessarily worried about the trough down

8  here (indicating), right?

9      A.   I agree.

09:43:42  10      Q.   Because we're looking for a test of adherence, meaning

11  did they take it at a time with they should be high, right?

12      A.   I hear what you're saying, but technically she is still

13  outside of that two- to four-hour peak.

14      Q.   But you would expect, though, that if you go 20 minutes

09:44:05  15  outside the four-hour peak, that's not trough?

16      A.   I agree that 20 minutes outside of the peak is not

17  trough.  I agree.

18      Q.   And so if we go back -- I hope I don't -- well,

19  let's -- we'll go back to that.  Let's keep looking at what is on

09:44:24  20  the website, then.

21          Then let's -- on this paper, if we could look at the

22  date of this.

23          Sometimes it matters in terms of figuring out whether a

24  medical paper or something like that is pertinent is to look at

09:44:45  25  the date of publication, right?

**OFFICIAL TRANSCRIPT**

1       A.    Yes.

2       Q.    And so the date of publication up here is May 9, 2017,

3   right?

4       A.    Yes.

09:44:54    5       Q.    Last updated May 9, 2017.

6             And if we scroll down and get back to the top of the

7   document, this is something that is done by Janssen (indicating),

8   right?

9       A.    Yes.

09:45:08   10       Q.    Okay.  So it looks like, then, Janssen is saying we've

11   updated this information as of May 9th, 2017, right?

12       A.    Yes.

13       Q.    Now, as you look at that summary information in the

14   pages that follow, is there anything anywhere that says "PT,"

09:45:26   15   "warning," "danger," "no good," "bad," anything like that?  Scan

16   through it.

17       A.    It doesn't say anything about a clinical scenario, but

18   in general, the statements that it says do not say "bad" or

19   "warning" or anything like that, you are correct.

09:45:49   20       Q.    In fact, in the summary section we have some more

21   information that says the test gets back to normal at 12 hours,

22   right?

23       A.    What page is the summary section on?

24       Q.    The first page.

09:46:03   25       A.    Oh, oh, oh, I thought it would be at the end.

**OFFICIAL TRANSCRIPT**

1          Yes, I see that.

2     Q.   And so that's consistent with what we've been saying,

3 is that the PT test itself -- once we get down to trough or

4 half-life at 12 hours (indicating), the test starts reporting out

09:46:18  5 at normal, right?

6     A.   They're probably talking about patients right here with

7 normal renal function and they're saying that 12 hours after

8 administration, so that's after two half-lifes and a normal renal

9 function.  Five times two times is going to be a little bit close

09:46:34  10 to 12.  It returns to levels prior to dosing, yeah.

11     Q.   Now, you have read -- it became clear yesterday that

12 you had read Dr. Bui's testimony, the actual transcript of what

13 he said under oath in court, didn't you?

14     A.   I read his deposition and I read his testimony, yes, I

09:46:50  15 did.

16     Q.   He made clear in both his deposition and in his sworn

17 testimony here in court that he was willing and he knew that he

18 was going to have to operate on Mrs. Orr when there was going to

19 be likely some drug present, right?  You saw him say that?

09:47:04  20     A.   He said that he wanted it to be the lowest level

21 possible.

22     Q.   Okay.  But taking into account her clinical

23 circumstances, not letting her get so bad that he was going to

24 lose a chance or opportunity to help Mrs. Orr, right?

09:47:18  25     A.   He needed to look at the whole clinical situation, yes.

**OFFICIAL TRANSCRIPT**

1    **Q.**   All right.  So at 2:00 -- at 2:10 in the afternoon when

2  he placed those bilateral drains, he had decided then, I've

3  waited as long as I can for a drug to clear.  If there is still

4  some drug on board, I'm willing to operate now because we cannot

*09:47:36*  5  wait any longer, right?

6    **A.**   At the time he believed that she had been 12 to

7  18 hours after her dose -- or maybe longer because there was some

8  thought that it was possible she could have taken it on the 23rd.

9        He saw that she was declining, that she was having more

*09:47:53*  10  swelling, and also she had reached maximal medical therapy, so he

11  decided to proceed in places where some doctors would not have.

12    **Q.**   But you clearly know he wanted to make sure, though,

13  that she was not at the peak time, right?

14    **A.**   I didn't hear him say that, but I have no reason to

*09:48:14*  15  disagree.

16    **Q.**   It would make sense that he was trying to assure

17  himself that she was not at the peak time, right?

18    **A.**   That sounds like it would make sense.

19    **Q.**   Now, if you are a physician taking care of a patient

*09:48:24*  20  like Mrs. Orr in a situation who might need surgery, what is --

21  based upon what we've seen on the article and now on the website,

22  based upon what it says, what is a way to rule out whether a

23  patient is at peak or not?

24    **A.**   I can't follow you that far into this.  The article

*09:48:43*  25  that you showed me earlier, I found something that was giving a

**OFFICIAL TRANSCRIPT**

1   discrepancy with what you had said.  And I also find that she is

2   outside of the peak when the lab is drawn.  So I can't take it

3   out that far with you.

4       **Q.**  Okay.

*09:48:59*

5       THE COURT:  Anything much further?

6       MR. HONNOLD:  Your Honor --

7       THE COURT:  I mean, I think we understand where you are

8   going.  You don't need to keep going over the same road.

9       MR. HONNOLD:  Yes, Your Honor.

*09:49:10*

10   **MR. HONNOLD:  (CONTINUING)**

11       **Q.**  Doctor, have you looked at any of the --

12       MR. HONNOLD:  Your Honor, I would like to move for

13   admission of the website document.  I actually move that it be

14   admitted into evidence as Plaintiffs' Exhibit -- we'll supplement

*09:49:34*

15   a number, but I'd actually like to move that this exhibit be in

16   evidence.

17       THE COURT:  I'm not going to put it in evidence because

18   it is a learned treatise or a document.  And I don't think that

19   that goes into evidence.

*09:49:43*

20       MR. HONNOLD:  Your Honor, I'd suggest that it be

21   admissions of the company the way that they've incorporated it

22   into --

23       THE COURT:  Well, but you've -- but the whole document

24   is the problem, as I see it.  I mean, I don't --

*09:49:54*

25       MR. HONNOLD:  The document has citations --

**OFFICIAL TRANSCRIPT**

```
 1              THE COURT:  It's an article.
 2              MR. HONNOLD:  The document has citations to the
 3    literature and various things so I think it reflects their state
 4    of mind as to the state of the literature and the science.
 5              THE COURT:  I don't want to attach the document so I
 6    won't make it -- you can use it in oral argument, you can use
 7    things that are demonstrative, you can show things, but the
 8    document itself doesn't go into evidence.
 9              MR. DUKES:  Note my objection for --
10              THE COURT REPORTER:  I can't hear you, Mr. Dukes.
11              MR. DUKES:  Sorry.  My objections were --
12              THE COURT REPORTER:  I can't still can't hear you.
13              THE COURT:  He objects to lack of authenticity and
14    foundation.
15              MR. DUKES:  As well as it was an experiment.
16              Thank you.
17              MR. HONNOLD:  A couple of things, Your Honor, and then
18    I'll be finished.
19    MR. HONNOLD:  (CONTINUING)
20         Q.   Doctor, based upon your work on this case, have you
21    reviewed any of the internal e-mail files or sworn deposition
22    testimony from any of these individuals shown on the screen who
23    are Bayer employees?
24         A.   Let's see.  I think I saw a couple of pages of
25    Berkowitz, but I know it wasn't the whole thing.  I may be
```

09:50:06
09:50:18
09:50:33
09:50:45
09:51:08

**OFFICIAL TRANSCRIPT**

1    looking at a page or two.

2         The other people I do not remember at all.  I didn't

3    see them.

4         Q.   Did you see Dr. Berkowitz's -- part of his testimony

09:51:20   5    where he said in an emergency situation, the PT test could be

6    useful in terms of guiding the decision-making process?

7         A.   I actually didn't see that part.

8         Q.   You didn't see that part?

9         A.   I don't know if he said it or if I -- I didn't see

09:51:31  10    that.

11         Q.   The part you looked at, it was provided to you by

12    counsel?

13         A.   I just got that piece of paper, and I don't remember

14    it.  Maybe that was why -- it was just one or two pieces of

09:51:40  15    paper.  I wasn't interested in the rest.  I didn't ask.  I

16    don't -- I only saw a few pieces.

17         Q.   Okay.  So for your testimony yesterday, you read the

18    part about Dr. Bui and what he said and Dr. Liechty and what he

19    said, but nothing about this side of the story (indicating),

09:51:53  20    right, before you came in to testify yesterday?

21         A.   I had read Liechty.  I had read Bui, both deposition

22    and testimony.  Berkowitz, I didn't see any deposition, and

23    testimony I saw like that one or two pieces of paper.  It really

24    didn't make sense because I didn't have the rest.

09:52:10  25         Q.   Then based upon what you read for Dr. Bui, you saw

**OFFICIAL TRANSCRIPT**

```
 1  where he said under the "time is brain" concept that Mrs. Orr
 2  would have had a better chance to survive if he would have been
 3  able to intervene earlier and not had to wait for Xarelto to
 4  clear?  You saw his testimony in that regard, didn't you?
 5       A.   I don't remember that is how he stated it.
 6            MR. DUKES:  Objection; misstates the testimony.
 7            THE WITNESS:  He said that it wasn't clear to him if it
 8  would have made a difference.
 9  MR. HONNOLD:  (CONTINUING)
10       Q.   But when he said "chance," he said -- yet when I asked
11  him at the end if she would have a better chance -- you saw that?
12            THE COURT:  I sustain the objection.
13            Anything further?
14            MR. HONNOLD:  I don't have any other questions, Your
15  Honor.
16            THE COURT:  Let's take a break at this time.
17                           (Jury out at 9:52 a.m.)
18                           (A recess was taken.)
19                      AFTER THE RECESS
20                           (Call to order of the court.)
21                           (Jury in at 10:06 a.m.)
22            THE COURT:  Be seated, please.
23            Any redirect?
24            MR. HONNOLD:  Before I stand down, I would like to make
25  a specific plaintiffs' proffer.
```

09:52:27 (line 5)
09:52:36 (line 10)
09:52:47 (line 15)
10:06:33 (line 20)
10:07:00 (line 25)

**OFFICIAL TRANSCRIPT**

```
 1              THE COURT:  Sure.
 2              MR. HONNOLD:  I'll call this Plaintiffs' Proffer No. 1
 3   for the Janssen website material.
 4              Specifically, Your Honor, limited to the first page
 5   that was on the screen that provided the documentary basis for
 6   the questions with Dr. Piazza.  We'd just put that forward as
 7   Plaintiffs' Proffer No. 1.
 8              THE COURT:  Okay.
 9              Redirect?  Hopefully, it won't be long.
10              MR. DUKES:  Your Honor, it will not be long.  I
11   promise.
12              THE COURT:  Okay.
13                        REDIRECT EXAMINATION
14   BY MR. DUKES:
15      Q.   Dr. Piazza, you were asked about Defendants'
16   Exhibit 2213, which was the Smythe article.  Do you remember
17   that?
18      A.   Yes.  Is that the one I still have?
19      Q.   Yes, it's the one you still have.  It is the one you
20   were trying to explain.
21      A.   Yes, sir.
22              MR. DUKES:  Dean, if I could have the ELMO, please.
23   MR. DUKES:  (CONTINUING)
24      Q.   So this is the Smythe article that plaintiffs' counsel
25   was asking you about, right?  You remember that?
```

10:07:08
10:07:24
10:07:30
10:07:42
10:07:55

**OFFICIAL TRANSCRIPT**

1    A.    Yes.

2    Q.    And if we go to Page 4 of 23, this is the information

3 that you were trying to explain that was inconsistent with what

4 counsel was talking to you about, isn't it?

10:08:07

5    A.    Yes.  A lot of the articles at first glance sometimes

6 look like they are going to say something about PT that is a

7 recommendation.  Usually, when I look further in the article, I

8 see something like this, and so my eyes went to that.

9    Q.    Explain to the jury what this article is saying here

10:08:27

10 that is consistent with your opinions in this case.

11    A.    So what this says is the PT -- if you look up on top,

12 "Unreliable indicator of the level of anticoagulation," meaning

13 what's actually going on in blood, its ability to clot.  "Lacks

14 sensitivity to detect low levels."

10:08:45

15          And then later on in this paragraph it says, "Does not

16 provide a reliable indicator of the level of anticoagulation,"

17 "reliable" meaning you can't rely on it to make a decision.

18    Q.    And if we go down further, is this also part of what

19 you were talking about that supports your opinion?

10:09:10

20    A.    Yes.  "Global coagulation tests like the PT and PTT do

21 not provide reliable indicators."

22    Q.    So this was what you were attempting to explain during

23 your --

24    A.    Yes.  Thank you.  Yes.

10:09:24

25    Q.    Now, you were also shown a Xarelto coagulation

**OFFICIAL TRANSCRIPT**

1    monitoring document.  Do you remember that?

2        **A.**    Yes.

3        **Q.**    And you were asked some questions about it.  I would

4    like you to go to Page 3, please.  They are not numbered so you

5    are just going to have to count.

6        **A.**    Yes.

7        **Q.**    It's Page 3, top of the page.

8            And would you read to the jury what this document says

9    and explain how this fits in with your opinions, please.

10       **A.**    "PT is not specific for Factor Xa inhibitors" -- that

11   is what Xarelto is -- "and is not correlated to bleeding or other

12   clinical outcomes."

13           So earlier they said it is not sensitive, and now they

14   are saying it's not specific.  Now they are saying it is not

15   correlated to clinical outcomes, and that is my opinion.

16       **Q.**    This is the last document called the Janssen document

17   that you were discussing at length near the end of your

18   cross-examination, correct?

19       **A.**    Yes.  This is one that I was handed, yes, sir.

20           MR. HONNOLD:  Your Honor, I would suggest now for rule

21   of completeness under Rule 106, now that the entire sections

22   relating to PT, both the summary on Page 1 and then the specific

23   PT section that has been gone into, be displayed and read for

24   completeness.

25           THE COURT:  Let's show it to them.

**OFFICIAL TRANSCRIPT**

1            MR. DUKES:  Your Honor, I'm not sure which ones he's

2    referring to.

3            THE COURT:  Why don't you help him.

4            MR. HONNOLD:  It is the section above it.  You have now

10:10:47   5    gone into the specific PT section after the summary.  There is a

6    whole section on prothrombin time there where there is numerous

7    things that are said, and I think that entire matter, for

8    completeness, needs to be shown, including the information at the

9    top there.

10:11:02  10            MR. DUKES:  Your Honor, I will do that.  But I'm simply

11   responding to what he referenced in this document.  If that was

12   important on cross, he certainly could have gone into that.  I'm

13   trying to be brief and just show the contrast.

14            THE COURT:  You're correct.  Let's continue.

10:11:18  15   MR. DUKES:  (CONTINUING)

16       Q.   Now, why is having some limited information about the

17   plasma concentration of Xarelto not helpful in an emergency

18   setting?

19       A.   Because we can't -- we need to make an inclusive, not a

10:11:33  20   maybe-it's-a-good-guess medical decision.

21       Q.   Now, did anything that plaintiffs' counsel showed you

22   or put on the screen or talked to you about -- did any of that

23   change any of your opinions that you told the jury about

24   yesterday?

10:11:47  25       A.   No.

**OFFICIAL TRANSCRIPT**

```
 1              MR. DUKES:  Dr. Piazza, thank you.  Those are all the
 2    questions I have.
 3              THE WITNESS:  Thank you.
 4              THE COURT:  You are excused.  Thank you, ma'am.
 5              Call your next witness.
 6              MR. IRWIN:  Your Honor, we do have to move some boxes
 7    around.  It will take us a minute or so.
 8              THE COURT:  Do you want to take a ten-minute break?
 9              MR. IRWIN:  I don't think it will take ten minutes.
10    We'd would like to have a brief break to get set up.
11              THE COURT:  We'll take a five minute break then.  They
12    have to bring in some boxes.  It's the last witness, members of
13    the jury.
14                               (Jury out at 10:12 a.m.)
15                               (A recess was taken.)
16                          AFTER THE RECESS
17                               (Call to order of the court.)
18                               (Jury in at 10:22 a.m.)
19              THE COURT:  Okay.  Be seated, please.
20              Call your next witness, please.
21              MS. WILKINSON:  Your Honor, we call Dr. Najeeb Thomas.
22    Mr. Irwin went out to get him.
23              THE COURT:  Okay.
24                               (The oath was administered.)
25              THE CASE MANAGER:  For the record, please have a seat.
```

10:11:53
10:12:14
10:12:21
10:22:55
10:23:39

**OFFICIAL TRANSCRIPT**

```
 1            State and spell your name.
 2            THE WITNESS:  Sure.  Najeeb, N-a-j-e-e-b; middle
 3   initial, M.; last name, Thomas.
 4            MR. IRWIN:  May I proceed, Judge.
 5            THE COURT:  Yes.
 6            MR. IRWIN:  Thank you.  Good morning.
 7                    NAJEEB M. THOMAS, MD,
 8   having been first duly sworn, testified as follows, to wit:
 9                         EXAMINATION
10   BY MR. IRWIN:
11       Q.   Dr. Thomas, just one more time will you state your name
12   and address for the record, please.
13       A.   Sure.  Najeeb M. Thomas at Southern Brain & Spine,
14   3798 Veterans Memorial Boulevard, Metairie, 70002.
15       Q.   We want to tell a little bit about -- tell the jury a
16   little bit about you, Dr. Thomas, the person, and you,
17   Dr. Thomas, the neurosurgeon.  Okay?
18            Where were you born?
19       A.   Houma, Louisiana.
20       Q.   And tell us a little bit about your parents, please.
21       A.   My dad is a physician.  He was a general surgeon down
22   in Houma for ten years, and then went back and did an anesthesia
23   residency down here at LSU, Big Charity, and trained there.  And
24   subsequently worked and taught at the medical school in the
25   Veterans' Medical Center for about 20 years.  And subsequently
```

10:23:56
10:24:18
10:24:32
10:24:52

**OFFICIAL TRANSCRIPT**

1  went to Ochsner Clinic, I think, in 1999, the Department of

2  anesthesia.  And retired there from part-time practice a few

3  years ago.

4       And my mother is a nurse who met my dad back in the

5  '60s at Hotel Dieu or Charity Hospital.

6       Q.   So they met each other in the hospital.  She was a

7  nurse and he was a doctor?

8       A.   Yes, sir.

9       Q.   I guess that's another story.

10      A.   It is.  It was long before I was around so I don't know

11  much about the story, and I don't know if I want to know any of

12  those details.

13      Q.   Tell us about your mom.

14      A.   Sure.  So my mom is actually from here, grew up in

15  Mandeville on the North Shore before they had the Causeway and

16  you had to go to Slidell.  Grew up in a large family in

17  Mandeville.

18      And we used to take fun rides going on the Causeway and

19  taking a spin when there was one Causeway.  I always used to

20  hear, when we'd go over to my aunt's for Thanksgiving, about how

21  she would spin around the Causeway.  That was fun in Mandeville.

22      And she was a nurse and raised four of us and did a

23  pretty good job, I think.

24      Q.   And tell us about your siblings.  You have -- there are

25  four of you-all?

**OFFICIAL TRANSCRIPT**

1      A.    Yes.   I have two brothers and a sister.   One brother is

2  a general surgeon practicing over at West Jefferson Medical

3  Center.   And I have a brother that is an attorney.   There's one

4  bad apple in every bunch.

10:26:22    5           THE WITNESS:   I'm sorry, Your Honor.

6      A.    And -- I'm kidding.   He is an attorney in Baton Rouge.

7           And I have another sister who's a -- a sister, one

8  sister.   She is an anesthesiologist at Ochsner.

9  MR. IRWIN:   (CONTINUING)

10:26:32   10      Q.    Let me see.   You have got four kids, three of them are

11  in the health care profession and one is the black sheep and went

12  to be a lawyer?

13      A.    That's right.

14      Q.    Jesuit High School, I understand?

10:26:45   15      A.    Yes.   Graduated from Jesuit right here in New Orleans.

16      Q.    And how did you develop an interest in the practice of

17  medicine?   I guess it was sort of natural with your parents, but

18  tell us how that developed.

19      A.    Sure.   There was a lot of table talk over dinner,

10:27:00   20  talking about patients and the surgical specialty.   Since my dad

21  was a surgeon, and then subsequently an anesthesiologist, he was

22  in the operating room every day.   So I kind of grew up hearing

23  about surgery and about taking care of patients so it was sort of

24  natural that I got interested in it, I guess.

10:27:19   25      Q.    And when did you start thinking about neurosurgery?

**OFFICIAL TRANSCRIPT**

1    **A.**    I had a real interest in neuroscience, in the brain and
2  function of the spinal cord.  My uncle actually had spine
3  surgery.  He had a pinched nerve in his back and he did really
4  well from the surgery, and I thought it was very interesting and
10:27:38
5  kind of cool that, you know, he was having a lot of pain and then
6  a week later I saw him and he was doing fine.  And so I thought
7  maybe that was something that I wanted to do, was to treat
8  disorders of the brain and spine.
9    **Q.**    And where did you go to college?
10:27:51
10    **A.**    Boston College.
11    **Q.**    And I know all of our mothers told us it's not good to
12  brag about ourselves, but -- so I'll brag about you.
13         How long did it take you to get through Boston College?
14    **A.**    So I went to college for three years.  I left college
10:28:14
15  early, didn't have a degree, and went to medical school early;
16  and they accepted me after three years of college.
17    **Q.**    And how were you able to get out of college in three
18  years and be accepted into medical school?
19    **A.**    You have certain prerequisites you have to get for
10:28:30
20  medicine, chemistries and physics and that sort of thing.  You
21  have to take what is called the MCAT, and so I had to take the
22  MCAT, finish my prerequisites, and -- I took the MCAT at the
23  beginning of my third year of college.  I did kind of teach
24  myself the physics necessary for the MCAT.  And so I took it all
10:28:52
25  and applied and got in.

**OFFICIAL TRANSCRIPT**

1    **Q.**   What is the MCAT?

2    **A.**   It's the medical school aptitude test, kind of like the

3    SAT or ACT in high school.

4    **Q.**   Where did you go to medical school?

10:29:02   5    **A.**   LSU here in New Orleans.

6    **Q.**   How many people does LSU accept from college on just a

7    three-year program?

8    **A.**   When I talked to them about it, they told me they

9    accept one or two a year.

10:29:15   10   **Q.**   And after you graduated from LSU, what year was that,

11   ballpark?

12   **A.**   In '97.

13   **Q.**   Okay.  It's right up there on the screen.

14   **A.**   I just had my 20th year reunion last weekend, so...

10:29:31   15   **Q.**   I see from looking at this that you were -- had

16   internship of one year.  You could tell us that?

17   **A.**   Sure.  So after you finish medical school, you do a

18   year of -- you know, generally speaking, depending on your

19   specialty, either a surgical specialty or medicine specialty.  So

10:29:50   20   I spent a year in the Department of Neurosurgery -- or, sorry --

21   Department of General Surgery in 1997 and '98.  We did some

22   training in anesthesia and general surgery.  I actually did a

23   month of neurosurgery as well.

24   **Q.**   And then you went on to six years on residency?

10:30:07   25   **A.**   Yes.  So in total, the residency, which is after

**OFFICIAL TRANSCRIPT**

2112

1  medical school, is six years.  One year of internship and then
2  five years of neurological surgery.
3      Q.    And it seems rather long to me, five years of a
4  neurosurgery residency.  Why is that the case?
5      A.    Oh, I was ready to finish.
6          So of a primary specialty, neurosurgery is the longest.
7  For instance, internal medicine is three years.  Emergency
8  medicine can be three or four years.  Generally pediatrics is
9  three years of training after medical school.  Ours is now six or
10 seven years after medical school.
11     Q.    So if you want to become a neurosurgeon, is it fair to
12 say you're going to have to go through the longest period of
13 medical training?
14     A.    Right.  For a primary specialty, yes, sir.
15     Q.    And how many neurosurgery residents does LSU accept
16 each year?
17     A.    So when I was there, they accepted one a year.  And I
18 believe a couple years ago they went to two residents a year.
19     Q.    So only one person out of your class would be able to
20 go into neurosurgery?
21     A.    Yes.  So LSU Health Sciences Center, the medical
22 school, accepted one neurosurgery resident, and I was the only
23 person in my medical school class that went into neurosurgery.
24     Q.    And I think your resume says that you were determined
25 to be the outstanding neurosurgery resident in 2003 for the

10:30:24
10:30:46
10:30:56
10:31:13
10:31:31

**OFFICIAL TRANSCRIPT**

1   entire LSU and Big Charity system?

2       A.   Yes.  So it was sort of a surprise to me.  I just kind

3   of kept my head down and did my work, and then my last year --

4   they give an award for the LSU service for the outstanding

10:31:51   5   resident, and someone in the Dean's office called me -- graduate

6   medical education, I can't remember -- and said be at the Windsor

7   Court at noon next Wednesday, or something like that, because

8   you're going to be the resident of the year for the LSU system.

9       Q.   And have you done any teaching of any residents or

10:32:09   10  interns over -- during that time period?

11      A.   Sure.  So during my training, we obviously taught the

12  residents.  And then my first three years of practice at Ochsner

13  Clinic, we were involved and had full resident coverage.

14      Q.   Were you honored with any awards for those teaching

10:32:27   15  experiences?

16      A.   Yes.  So the Aesculapian Society, which is the medical

17  school peer society, I won the teaching award twice.

18      Q.   And then you went to Big Charity.  Tell us about your

19  time at Big Charity in residency.  Why do they call it "Big

10:32:43   20  Charity," by the way?

21      A.   Well, it is a really big place.  It's what they call,

22  you know, that one and some of the other large ones in Chicago,

23  Atlanta that we referred to as the dinosaur hospitals because

24  they were really, really big.  And maybe some people have been to

10:32:57   25  Charity.  It's a big place, a big institution.  They had a

**OFFICIAL TRANSCRIPT**

1  Level 1 trauma center.  And they still do, down at the University

2  Medical Center.

3       I trained in there before the 80-hour work week, which

4  means when I was down at Charity, I was on-call for the trauma

10:33:14  5  center.  We split the trauma with Tulane.  So every other night I

6  was on-call for the trauma center.  And then we were on-call for

7  our patients every night.  It was pretty rigorous.

8       Q.   And during that time period, did you have any

9  experience with helping patients with the use of external

10:33:32  10  ventricular drains, ventriculostomies?

11      A.   Yeah.  So especially with the trauma center.  I mean,

12  we put in many of those at night.  I put in hundreds of them.

13      Q.   What is the Louisiana Neurosurgical Society?

14      A.   So that's our state organization which represents

10:33:52  15  neurosurgeons.

16       Most neurosurgeons in the state are a member of that

17  organization, and we represent the neurosurgeons whose matters

18  come, for instance, before the legislature.  Or when you're an

19  officer in the neurosurgery group, someone will call you and say,

10:34:09  20  Hey, I need an opinion with this issue, can you help me?  Or what

21  are your thoughts?  That sort of thing.

22      Q.   And have you ever been an officer for that

23  organization?

24      A.   I've been the secretary/treasurer, and I just finished

10:34:20  25  my term, three or four months ago, in January, as president of

**OFFICIAL TRANSCRIPT**

1    that organization.

2        **Q.**    And you are board certified?

3        **A.**    I am.

4        **Q.**    And I know the jury has heard about that, but could you

5    tell them a little bit about how you get recertified?

6        **A.**    Sure.  So after you get your certification, it formerly

7    was you'd get a lifetime certificate, but now the certificate is

8    only for ten years.  So you have to participate in what's called

9    three separate mini cycles, meaning, every three years is a

10   cycle.

11            The first thing you have to do is give them a check to

12   the American Board of Neurosurgical Surgery.  Everybody wants a

13   check.  And then you have to do a certain number of continuing

14   medical education hours.  And then you have to provide certain

15   cases and present them -- fill them out online, the demographic

16   information and some basic clinical information.

17            And I think there is some other things.  You get

18   letters from the chief of staff at the hospitals to make sure you

19   are in good standing.

20            And you do that three times over a ten-year period,

21   what's called a three-year mini cycle.

22            There are some certain CMEs are actually required in

23   neurosurgery that you have to take.

24            And then in the last two years you have to take what's

25   called a cognitive exam, which is a recertification exam.  So

**OFFICIAL TRANSCRIPT**

1  like in neurosurgery, as I'm sure they have in law, there are a
2  lot of tests.  So you have to take another test in ten years.
3      Q.   And the test that you took recently -- and I'll go on
4  and brag for you again -- what was the highest score in the
5  nation on that test?
6      A.   96 percent.
7      Q.   What was your score?
8      A.   95 percent.
9      Q.   Are you going to do better next time?
10     A.   I hope so.  I was just looking to pass.
11     Q.   Tell the jury, please, now about your current practice.
12     A.   Sure.  So after Katrina hit, myself and a few
13 neurosurgeons, we founded our group called Southern Brain and
14 Spine out in Metairie, which we work at East Jefferson General
15 Hospital.  And I began practicing neurosurgery out there after
16 having worked at Ochsner for three years.
17          And then in 2014, we moved our main hospital practice
18 down to Touro Infirmary.  And now we work at Ochsner Kenner,
19 Crescent City Surgical Center, and Touro Infirmary.  And we have
20 clinical offices, offices where we see patients -- where you go
21 see the doctor -- both in Metairie and in New Orleans in Touro.
22     Q.   And would you please tell the jury how you started a
23 stroke center or a stroke program at both East Jeff and at Touro?
24     A.   Sure.  So I'm a managing partner of Southern Brain and
25 Spine, and I'm the liaison between administration and ourself, my

10:35:47
10:35:54
10:36:30
10:36:53
10:37:10

**OFFICIAL TRANSCRIPT**

1    group.  So at East Jefferson General Medical Center, the

2    neurologists wanted to start a stroke program so they consulted

3    me as to what services we could or couldn't provide, and what we

4    could do, and to help them with some order sets.

5              And then when we went to Touro in 2014, they didn't

6    have a neurologist that really had an interest in that.  They

7    recently brought someone over from Tulane, so I worked and

8    assisted with them to tell them what we could do in neurosurgery

9    and assist in any way to get the stroke program -- help them get

10   it certified.

11       Q.   Now, are these stroke programs that you helped

12   establish at East Jeff and at Touro -- are these the kinds of

13   programs that would receive and treat in an acute setting persons

14   with brain bleeds?

15       A.   Sure.

16       Q.   In your current practice, how much of your time is

17   spent doing spine work as opposed to brain work?

18       A.   About 80 percent spine work and 20 percent brain work.

19       Q.   Do you take Medicare patients?

20       A.   I do.

21            MR. IRWIN:  Your Honor, at this point we would tender

22   Dr. Thomas as an expert in neurosurgery.

23            MR. HONNOLD:  No objection, Your Honor.

24            THE COURT:  Okay.  The Court will accept him in the

25   designated field as an expert.

**OFFICIAL TRANSCRIPT**

10:37:29

10:37:47

10:37:58

10:38:14

10:38:27

1  MR. IRWIN:   (CONTINUING)

2     Q.   Doctor, you've had experience before in testifying in

3  court?

4     A.   I have.

10:38:39  5     Q.   And also in producing reports related to litigation?

6     A.   I do.

7     Q.   And what are those largely related to?

8     A.   Most of those are related to injuries, people injured

9  at work.   Sometimes car accidents or other types of trauma.

10:38:56  10     Q.   And to what extent are some or most of those involving

11  the patients that you actually treat or are referred to you in

12  some form or fashion?

13     A.   The majority of them are patients that I treat that are

14  in a car wreck or have litigation.

10:39:11  15     Q.   And have you testified as an expert, or at least worked

16  on cases that perhaps were done with courts, as an expert for

17  both the plaintiff's side and the defense side?

18     A.   Yes.

19     Q.   And what is your hourly rate?

10:39:29  20     A.   $1500 an hour.

21     Q.   And I'm going to ask you some opinions, as you know, to

22  express to the jury in a few minutes, and will you reassure me

23  and the jury that all of the opinions that you express are made

24  to a reasonable degree of medical certainty?

10:39:46  25     A.   Yes.

**OFFICIAL TRANSCRIPT**

1    **Q.**   What did we ask you to do, Doctor?

2    **A.**   I was asked to pretty much "decide safe," so look at

3    the facts of the case involving Mrs. Orr, and treatment around

4    her bleed, and any pertinent medical records or treatment that

5    was performed, any pertinent literature, and render an opinion on

6    her hemorrhage, the treatment of her hemorrhage, and the role, if

7    any, that rivaroxaban or Xarelto played.

8          MR. IRWIN:  Your Honor, we would like to next offer

9    DX-Orr 27 as Defense Exhibit No. 50.  These are the CTs.  We

10   offer them all into evidence.

11         MR. HONNOLD:  No objection, Your Honor.

12         THE COURT:  All right.  I'll admit them.

13         MR. IRWIN:  Thank you, Judge.

14   **MR. IRWIN:   (CONTINUING)**

15   **Q.**   Doctor, you and I worked here for a little bit

16   yesterday, and you know how to work your screen on your TV, if

17   you need to, and you also have a laser; is that right?

18   **A.**   Yes.

19   **Q.**   What I would like you to do is to take the jury through

20   this CT scan.  And I would like you to maybe go around the circle

21   here (indicating) and tell them what all this information means,

22   and sort of orient them to it, because we're going to be seeing

23   quite a few of these.

24         THE COURT:  Why don't you tell us what it is, a CT scan

25   of --

**OFFICIAL TRANSCRIPT**

10:40:10

10:41:11

10:41:33

10:41:47

10:42:03

1        MR. IRWIN:  This is the CT scan of Mrs. Orr,

2   Your Honor.

3        THE COURT:  Okay.

4   A.   I guess -- can everyone see this green light?

*10:42:13*   5        Is it easier if I just shine it on here for the jury?

6        This is a CT scan of Sharyn Orr.  Location is Ochsner

7   Baptist Medical Center.  This is her age (indicating).  And this

8   is performed at 11:44 at night.  And this is the series and the

9   image that was performed (indicating).

*10:42:32*   10       This is what is called a sagittal image.  So imagine

11  if -- where the green light is, that is the patient's nose, the

12  back, the top of head (indicating).  Imagine if someone is

13  talking to someone straight ahead and you are coming up from the

14  side so you are looking at their ear.

*10:42:48*   15       And I think to kind of easily orient everyone, you see

16  the eyeball right there (indicating).  That eyeball is -- so it's

17  a picture from the side like as if the patient is sort of sliced

18  like this (indicating).

19       Does that make sense to everybody?

*10:42:58*   20       And so this is the front and this is the back

21  (indicating).  That's the orientation.

22  MR. IRWIN:  (CONTINUING)

23  Q.   Doctor, tell us about the first time you saw this CT

24  scan.

*10:43:10*   25  A.   So Ms. Moore, Kim Moore, who is I guess an attorney in

**OFFICIAL TRANSCRIPT**

1    your office, brought the films to my office.  I didn't really

2    know -- actually didn't know any facts of the case other than, I

3    guess, this was Xarelto litigation.

4          I put the scans in my computer, and when I looked at

10:43:31    5    the scans, my first reaction was, this is a fatal hemorrhage.

6      Q.    Doctor, let's go quickly through some of Mrs. Orr's

7    medical background only to set the stage for you as to your

8    neurosurgery opinions.  The jury has seen a lot of this so we'll

9    move quickly.  Okay?

10:43:52    10          What is this and why is this important to any of your

11    opinions (indicating)?

12      A.    Sure.  So this establishes that Mrs. Orr, regrettably,

13    had uncontrolled hypertension.  She was on multiple medications.

14    She had hypertension, if you look on here, going back ten years

10:44:08    15    before, which is 1986.

16          So by the time of her hemorrhage, she almost had

17    hypertension for 30 years, almost half her life.  She was 67.  So

18    really poorly controlled hypertension.

19          She had diabetes, which is elevation of sugar in the

10:44:25    20    blood, which can lead to a variety of issues, including

21    atherosclerotic disease, which is damage to vessels.

22          And her hypertension -- you can see here back in '96,

23    and by 2005, both of those, the diabetes and the hypertension,

24    were not really well regulated.

10:44:46    25      Q.    And, likewise, the jury has seen this before.  And what

**OFFICIAL TRANSCRIPT**

1    is -- from your perspective as a neurosurgeon, what is your
2    reaction to that record?
3         A.    Yeah.  So, as a neurosurgeon, when I look at this, I
4    see that she had consistently elevated blood pressures going
5    back -- from 2006 all the way to her event in 2015, she had
6    elevated blood pressures.
7         Q.    Let's talk about 2015, then.  All right?
8              This, we know, is about four months before she had her
9    hemorrhage (indicating).  And tell us what the significance is of
10   these numbers.
11             And I know that you have -- I know you have seen
12   Dr. St. Martin's records, and you may have read his deposition.
13   I'm not sure.
14             But tell us what the significance is of these numbers
15   as we're looking ahead towards this unfortunate hemorrhage on
16   April 24th.
17        A.    So if you look, a couple things strike me as a
18   neurosurgeon.  Obviously, you can look at the numbers and see the
19   blood pressure is elevated and that she has hypertension, but
20   Dr. St. Martin obviously notes it is difficult to control.
21             For me, when I look at that as -- clinical records as a
22   doctor, I look and see, okay, January 19th, February 3rd,
23   February 10th.
24             So if you look over essentially what is a three-week
25   period, he is seeing her in his office three times because of the

10:45:00
10:45:18
10:45:31
10:45:52
10:46:06

**OFFICIAL TRANSCRIPT**

1    hypertension, which means he's keeping a close tab on it.

2         When we see patients in our office very frequently,

3    that means we want to see them back to be able to monitor

4    something very closely.

10:46:22    5         So what it is showing in January and February of

6    2015 -- and it's not difficult to just read -- but he is having

7    trouble -- he's having difficulty controlling it and he is

8    keeping close tabs on it.

9         Q.   And the jury has seen this as well.  I'm sure you will

10:46:40    10   recognize this is Dr. Cruz, his office note of April 16, 2015, he

11   being her nephrologist, her kidney doctor.

12        What significance, if any, do you attribute to this

13   office visit on April 16, 2015?

14        A.   Well, this is eight or so days right before her

10:47:01    15   hemorrhage.  And what you begin to see is, again, the blood

16   pressure is elevated with a 200 over 90 level.  So there is

17   continued blood pressure issues and control of it on this date of

18   April 16th of 2015.

19        Q.   Next --

10:47:22    20        MR. IRWIN:  And I'd like to offer this exhibit,

21   DX-Orr 181.

22        MR. HONNOLD:  No objection.

23        THE COURT:  Let it be admitted.

24   MR. IRWIN:  (CONTINUING)

10:47:53    25        Q.   Doctor, what is the significance of this?

**OFFICIAL TRANSCRIPT**

1    **A.**   Sure.  So this is a document noting that Mrs. Orr had

2  damage to her kidneys from her diabetes.  So this is an example

3  of what we call some end organ damage from one of her pathologic

4  processes.

10:48:14   5          Hypertension, high blood pressure, we'll talk about in

6  a little bit, can damage blood vessels.  Diabetes can damage the

7  kidneys, among other things, and damage other structures, the

8  retina, the eyes.

9          So what it is showing now is that, because of her

10:48:27  10  diabetes, she is beginning to get some what we call dysfunction

11  or problems with some organs, and, in this case, her kidney.

12    **Q.**   Let's take a look at the next document.

13          MR. IRWIN:  And we will offer this into evidence,

14  DX-Orr 14.

10:48:44  15          MR. HONNOLD:  No objection, Your Honor.

16          THE COURT:  Let it be admitted.

17          MR. IRWIN:  I think that is No. 52.

18  **MR. IRWIN:  (CONTINUING)**

19    **Q.**   Doctor, what is the significance of this record dated

10:49:13  20  April 6th, 2015?

21    **A.**   Yeah.  This is a pretty important document.

22          What it shows is that, again, she was having, in her

23  retinas, which is the back part of the eyes -- she is having

24  damage from the diabetes, but, also, she is having what is called

10:49:32  25  microaneurysms and mild hypertensive retinopathies.

**OFFICIAL TRANSCRIPT**

1    Let me explain why that is important.  Hypertension,

2  high blood pressure -- just think of increased pressure in the

3  pipes -- is causing damage to those vessels.

4    So when you have a pipe that has low pressure in it,

10:49:49    5  it's not -- the pipe is not shaking.  If you have a metal pipe

6  that has high pressure and/or a hose, it's stretching and has

7  pressure.

8    So her high blood pressure has caused problems into the

9  retina.  But really important for me is that microaneurysms were

10:50:03   10  observed.  "Microaneurysms" means outpouching of the blood

11  vessel.

12    So imagine if you have a long pipe.  An aneurysm is

13  sort of a ballooning out of the blood vessel.  That is from the

14  hypertension.

10:50:16   15    The eyes are formed embryologically, meaning in the

16  womb of a mother in the formative period, the embryological

17  period, from an area called the diencephalon.  You don't need to

18  know fancy medical terms, but what you need to know is that's

19  part of the brain.

10:50:32   20    So when we look in the eyes, it often can be a window

21  to give us information of what's going on in the brain.  When

22  someone has an aneurysm rupture in the back of the brain, we

23  often can see hemorrhages in the eyes.  Certain tumors that we

24  have in the brain, we also can see markers in the eyes.

10:50:47   25    So what this is showing in the eyes, which come from

**OFFICIAL TRANSCRIPT**

1    that part of the brain, the diencephalon, those microaneurysms

2    are noted.  So there is damage to the blood vessels in the eyes,

3    and that gives us an indication that there is damage to the blood

4    vessels in the brain as well.

10:51:07

5           And what is interesting is the diencephalon not only

6    has the eyes, but it also, embryologically, forms something

7    called the thalamus, which we'll discuss later, and it can give

8    you an idea how those are related embryologically.

9      Q.   Doctor, let's talk about the event itself when she had

10:51:31

10   her bleed at Ruth's Chris Steak House.

11          What is the significance of her history of a sudden

12   headache, nausea, and lethargy?

13     A.   So I think that's when her hemorrhage started.

14     Q.   And, Doctor, we've seen some of this before, a little

10:51:55

15   bit of a timeline here that we'll talk about, and, also, some

16   questions about these blood pressure readings and the GCS score.

17          You recognize this as a timeline about when the event

18   occurred and some of her symptoms at or near the time the event

19   occurred and when the EMS was called (indicating).  Do you

10:52:18

20   recognize that?

21     A.   Yes.  That's my understanding of the timeline, yes,

22   sir.

23     Q.   And when EMS was called, they filled out a report and

24   they described a GCS of 15.  I would like you to comment on that

10:52:33

25   for the jury from your standpoint as a neurosurgeon.

**OFFICIAL TRANSCRIPT**

1      **A.**   Sure.  So the GCS, or the Glasgow coma scale, is a

2   scale that is utilized to -- we use it today to sort of determine

3   a level of consciousness.  And we use it in neurosurgery for a

4   variety of things.  We won't get into all the things.

10:52:54   5          But it is important because it gives us an idea -- you

6   know, if I get a transfer in and they call me from Houma, for

7   instance, and say, Dr. Thomas, we have a patient with a Glasgow

8   coma scale of 15, and when they come to the emergency room at

9   Touro and say the Glasgow coma scale is 11 or 9, that means there

10:53:08   10   has been a deterioration.  So it allows us to get some

11   information there.

12          This Glasgow coma scale is -- from the EMS record,

13   appears to be normal from what the EMS doctors wrote.  From the

14   other descriptions, it seems to be at odds a bit, but it speaks

10:53:26   15   for itself.

16      **Q.**   What about the blood pressure?  What can you make of

17   the blood pressure readings?

18      **A.**   Yeah.  They take a gross blood pressure reading in the

19   field.  I mean, it's mildly elevated at 178 and 180.

10:53:38   20      **Q.**   Do you attribute any significance to those blood

21   pressure readings?

22      **A.**   Well, you know, she has high blood pressure already.

23   Certainly that could be her.  But I think this is probably

24   elevated in someone who has a head bleed.

10:53:52   25      **Q.**   Then let's next take a look at how she presented to

**OFFICIAL TRANSCRIPT**

1   Baptist Hospital on Napoleon Avenue.  What were her symptoms at

2   presentation there?  And what significance would you describe to

3   the jury with respect to those symptoms?

4       **A.**    Sure.  So the ER physician, whose name I have

10:54:15

5   difficulty pronouncing, Azcuy -- I was hoping to do that name

6   justice -- what it showed was she had a couple things that were

7   going on.

8           First, she was minimally verbal, which means she had

9   difficulty speaking; wasn't able to really communicate well if

10:54:35

10  you are using short words or short sentences.

11          The other thing is she's beginning to show signs of a

12  stroke, and real clinical signs, not just global signs of a level

13  of consciousness.

14          But at this point, what you're looking at is the left

10:54:47

15  arm and left leg are flaccid.  "Flaccid" means there is no muscle

16  tone.  They are completely unable to be moved, and -- they can't

17  move them.  So if you touch them or poke them or squeeze them

18  with pain, there's no response.  So "flaccid" means really no

19  movement.

10:55:03

20          And her smile is asymmetric.  You may have seen some

21  people who have Bell's palsy, when they smile one side comes up

22  or one of their eyes doesn't close.

23          Those are indicative of stroke and indicative of

24  something going on in the right side of the brain, most likely.

10:55:18

25          Additionally, the patient is not able to follow

**OFFICIAL TRANSCRIPT**

1   commands.

2          So what is going on at Baptist, there has been

3   deterioration since nausea and vomiting at Ruth's Chris.   Then

4   when EMS was called and the assessment by EMS, there's a

5   continual decline.

6      Q.   And then next, of course, we have the CT scan, which

7   we'll be looking at in quite some detail.

8          But looking at the overview of those findings by the

9   radiologist, would you describe the significance of those at this

10   stage in the emergency room at Baptist Hospital.

11      A.   So the radiologist talks about the CAT scan -- and

12   we'll go over it, but he talks about a hemorrhage, which is

13   acute, meaning it just occurred, with extension into the

14   ventricles.   The ventricles are the cavities in the middle of the

15   brain.   Okay?

16          There is also significant midline shift, meaning the

17   structures in the right side of the brain are now going into the

18   left side of the brain.   The brain, like everything else in the

19   face, is symmetric.

20          If you look at me this way (indicating), chopping your

21   nose, you have an eye over here, an eye over here, a cheekbone, a

22   cheekbone, and ear and ear (indicating).   The brain is largely in

23   two hemispheres, and those are symmetric.

24          And so what's happened is, because of the hemorrhage,

25   because of the bleed and the swelling associated with it, the

**OFFICIAL TRANSCRIPT**

1  right side of the brain has now gone into the left intracranial

2  cavity so it has now shifted over.  That's what they mean by

3  midline shift.

4          And the other -- uncal herniation means there is a

10:56:53  5  specific part of the brain in the lower portion of the brain,

6  right in here (indicating), that is pushing on the brain stem.

7          What is the brain stem?

8          The brain stem is a structure that connects the brain

9  to the spinal cord, and it's a few things.  It is a relay center,

10:57:10  10  but it also houses some vital processes.

11          For instance, you're not telling yourself to breathe

12  right now, you're not telling yourself to blink your eyes, you're

13  not telling yourself necessarily to cough -- maybe sometimes you

14  hold it in -- but those are reflexive things, some basic

10:57:27  15  functions that allow us to live and do our day-to-day breathing,

16  regulating blood pressure, and so on.  And that is now, because

17  of this herniation, beginning to experience pressure.

18      Q.    Doctor, the jury has seen the Glasgow coma score, and

19  we don't need to spend a lot of time on this, but we know that,

10:57:51  20  at this point when she was -- when she arrived at the main

21  campus, she was a 6T; is that right?

22      A.    Yeah.  So we know from Dr. Reiffel's assessment and

23  Dr. Bui's assessment -- Dr. Reiffel is the neurosurgery

24  resident -- and Dr. Bui's assessment -- and this is something we

10:58:14  25  do every day.  So you can really trust their Glasgow coma scale,

**OFFICIAL TRANSCRIPT**

 1  in my opinion, because they are neurosurgeons and we do this

 2  every day.

 3          She has a Glasgow coma scale of 6T, which means she is

 4  comatose.  She is withdrawing to pain only.  There is no real

 5  verbal response, but she has the breathing tube down.  And there

 6  is no response to eye opening.

 7          So taken with the CAT scan that we have, her

 8  deterioration on arrival at Ochsner -- and this is a very extreme

 9  situation in that we're encountered now with someone who is

10  comatose, has a large blood clot, and is nonresponsive.  There is

11  a high likelihood of mortality here.  I mean someone dying,

12  regrettably.

13          MR. IRWIN:  Your Honor, for demonstrative purposes

14  only, in the context that it is a learned treatise, I would like

15  to offer Defense Exhibit DX 2472, which is Defense Exhibit 53.

16          THE COURT:  You can use it.

17          MR. HONNOLD:  It's just demonstrative?

18          MR. IRWIN:  Yeah.

19          And would you please call out what we wanted on this,

20  please.

21  MR. IRWIN:  (CONTINUING)

22      Q.   If you could look at the title of this article, Doctor,

23  and tell us what it is, please.

24      A.   This is a study by Hemphill called *The ICH Score*, which

25  is one way we try to stratify risk.  It is not a predictor of

**OFFICIAL TRANSCRIPT**

1    mortality, but it stratifies that this person may be at a higher
2    risk for having a fatal hemorrhage.
3            And the ICH score showed that the GCS score at the time
4    of transfer from the emergency department to the ICU was used in
5    their scale.
6            So what they utilized -- and in having used the ICH
7    score here, we need to use the GCS, or Glasgow coma scale, of 6.
8            And what the ICH score does depends on age, size,
9    whether there's blood in the ventricles.  And you add up those
10    points and you begin to stratify that person's risk of mortality.
11    Q.    One of the questions that has been the subject of
12    previous testimony, because there are reports in the literature
13    about the mortality associated with -- or measured in some extent
14    by the GCS score, is when those measurements should take place.
15    Whether the measurement should take place at the time of
16    somebody's house when the EMS is called or whether the
17    measurement should take place at the time the person is at the
18    emergency room or whether the measurement should take place when
19    the person is admitted into the hospital, or, I should say, at a
20    place where that individual can actually be treated for the
21    event.
22            And what does this article say about the point in time
23    when the GCS score is applied in the literature and by the
24    science and by you-all, neurosurgeons?
25    A.    Yeah.  So we use the GCS when they are admitted to the

11:00:08
11:00:26
11:00:44
11:01:05
11:01:23

**OFFICIAL TRANSCRIPT**

1    hospital.  Everybody who has a brain hemorrhage initially has a

2    GCS of 15.  You know, you can have someone that has a massive

3    brain hemorrhage that says, Oh, I don't feel right, and then five

4    minutes later or two minutes later they could have a GCS of 3.

11:01:47    5    But you have to rely on when it is by a physician at the time of

6    admission.

7        Q.   Let's talk about the ICH score, which this article sort

8    of previewed a little bit.

9             This is a little bit different scoring system, is that

11:02:17   10    right, Dr. Thomas?

11       A.   Yeah.

12       Q.   ICH?

13       A.   Yeah, it is.

14            This is a scoring system we use for intracranial

11:02:27   15    hemorrhage.  No scoring system is perfect, but it gives you an

16    idea of which hemorrhages are more serious than not.

17            And generally speaking in neurosurgery, the bigger the

18    hemorrhage, it makes sense, the bigger the problem, because you

19    have the brain in an enclosed area.  So if there is a bigger

11:02:45   20    hemorrhage, it is a bigger problem.  So size matters.

21            The Glasgow coma scale -- and where the hemorrhage

22    occurs matters, because where it occurs may mean whether we can

23    actually access it as neurosurgeons safely, meaning, we can go in

24    and remove the clot and not damage other vital structures and

11:03:06   25    make the patient worse.  Or how much pressure or how much damage

**OFFICIAL TRANSCRIPT**

1    the blood clot has caused already with your Glasgow coma scale.

2         So in this case what you can see is the Glasgow coma

3    scale, in her case, is 6.  She does not have an age of 80, she is

4    less than that.  Her intracranial blood clot volume is certainly

5    more than 30 cc's.  She has hemorrhaging in her ventricle, and

6    it's not infratentorial, which just means it's in a different

7    part of the brain that's not applicable in this case.  So she has

8    an ICH score of 3.

9         Q.   And I see that equates to 70 percent mortality.

10        A.   Yes.

11        Q.   Tell us how that equation works.

12        A.   It stratifies those people.  In the ICH score, what

13   they found was that those people that stratified in that group

14   had a 72 percent mortality.  It doesn't necessarily predict that,

15   but it stratifies them as a higher mortality.

16        And, you know, one of the things is, we always have to

17   interpret articles, because no article is going to be exact on a

18   patient.  That's why we have part of the art and the science of

19   medicine.

20        One of the issues with an ICH score is that you have

21   a -- right here you see 5 to 12 on the Glasgow coma scale.  Well,

22   a person with a Glasgow coma scale of 12 is very different than

23   someone, say, like a 6 with Mrs. Orr.  But in this they are

24   usually grouped together for that.  So it may mean -- we don't

25   know -- that someone with a 6 is obviously worse off, but we

**OFFICIAL TRANSCRIPT**

1  can't stratify that.

2      Q.   And, Doctor, I'm going to draw --

3           MR. IRWIN:  Your Honor, I would like to offer, as a

4  demonstrative exhibit, some guidelines from the American Heart

*11:04:44*

5  Association.  It is DX 1535 for demonstrative purposes only.

6           THE COURT:  Okay.

7           MR. HONNOLD:  No objection.

8           THE COURT:  You can use it.

9           MR. IRWIN:  That is Exhibit 54.

*11:05:01*

10  MR. IRWIN:  (CONTINUING)

11      Q.   We'll just spend a second on this, Dr. Thomas.  I'm

12  really just going to focus on what is on the screen up there.

13           It says it's the most widely used and externally

14  validated, according to the American Heart Association.  What

*11:05:20*

15  does it mean, externally validated?

16      A.   Someone else did the study again and came up with a

17  similar result.

18      Q.   And there is this advisory here right after that

19  statement.  It says:  The severity scales -- these severity

*11:05:36*

20  scales should not be used as a singular indicator of prognosis.

21           What does that mean to you as neurosurgeon?

22      A.   Well, it means that we have to take it in the context

23  of everything else we do; a particular patient, our particular

24  experience, locations of hemorrhage, and so on and so forth.  We

*11:05:54*

25  need to use it in the context of a particular patient.

**OFFICIAL TRANSCRIPT**

**Q.**   Now, we're about to get into these CT scans, and before we do, this is sort of a preview.  Can you tell us why these dates are a preview into the importance of the CT scans?

**A.**   Sure.  So the CT scans are very important.  They show the nature and extent of Mrs. Orr's stroke and brain damage objectively.  They are pictures looking into her brain as we would with anyone else's brain.

And what they've shown is -- the initial scans show that large hemorrhage, which we have talked about already, on that sagittal or side-view CAT scan that was occupying a significant part of the scan.  But what it showed was the original scan done at Baptist and the second scan done at Ochsner main campus, roughly four and a half hours later, showed no additional bleeding and no changes.  It was considered what we call stable.  No change, no significant change.

**Q.**   What is the significance of that to you as a neurosurgeon, that roughly five hours later it was determined to be, quote/unquote, stable?

**A.**   Yeah.  So a very big risk in people who have these type of hemorrhages or bleeds, we call them, is something called a rebleed.  Okay?  If you bled once, you are going to bleed -- your risk of bleeding early on in the first four to six hours is higher because the vessels are friable, you are having responses with hypertension, and the clot may or may not have properly coagulated or formed.  Okay?

**OFFICIAL TRANSCRIPT**

2137

1          So it is very important in the management of patients
2      to get a second or serial CAT scan, because if it has gotten
3      larger or changed or not changed, that may or may not alter what
4      you do.
11:07:51  5      Q.   And in going after that, for the few days after that,
6      tell us what the significance is of the evolution that is
7      observed there with those CTs.
8      A.   Yeah.  So we're going to see over these CAT scans some
9      of the things we talked about:  The pressure in the right side of
11:08:10 10      brain going into the left side of the brain.  We're going to see
11      the actual drains that Dr. Bui put in in an attempt to remove
12      some of the blood and to remove some of the fluid.  And we're
13      going to see the progression of the worsening swelling of the
14      brain which led to Mrs. Orr's ultimate death.
11:08:30 15          MR. IRWIN:  Your Honor, with the Court's permission, we
16      would like to ask Dr. Thomas -- this is obviously a
17      demonstrative.  The brain can be separated in here and some of
18      the structures can be shown to the jury, including the
19      ventricles.
11:08:44 20          THE COURT:  Okay.
21          MR. IRWIN:  With the Court's permission, I would like
22      to do that.
23          THE COURT:  Let's establish that as an accurate
24      replica.
11:08:53 25          THE WITNESS:  Yes, it is an accurate replica of the

**OFFICIAL TRANSCRIPT**

1    brain.

2              MR. IRWIN:  Do you want to come down?

3              THE WITNESS:  Sure.

4    **MR. IRWIN:  (CONTINUING)**

11:09:35    5         Q.    Doctor, for the record, you have in your hand a model.

6    Would you tell us about that model and generally what it

7    represents?

8         A.    Sure.  So this is a synthetic model of the skull.  It's

9    a representation of the -- what's called the sutures or the lines

11:09:51    10    outside of the skull.  Then the brain inside of the skull.  And

11    this is the bottom of the skull (indicating).

12              What you can see is here where I'm placing my index

13    finger (indicating), there is the brain stem going through this

14    opening or this hole.  It's called the foramen magnum.  So the

11:10:10    15    brain structures are within this cranial vault.  And then it goes

16    down through here -- the brain stem starts up higher within the

17    cranial vault and goes and connects to the spinal cord for

18    orientation.

19              And as we talked about before, this is that view on the

11:10:25    20    side.  This is the front (indicating).  This is the back

21    (indicating).

22              Does that make sense to everybody?

23         Q.    They can't really answer your question, but that's

24    okay.  They are not allowed to.

11:10:34    25         A.    Sorry.

**OFFICIAL TRANSCRIPT**

1    **Q.**   And then can you show to the jury -- and feel free to

2   walk down so everybody can see it, if you think it is helpful --

3   some of the structures inside the brain that they have been

4   hearing about for the last couple of weeks?

11:10:49   5    **A.**   So what we talked about was the symmetry of the brain.

6   Remember, the left eye, the right eye (indicating).  This is the

7   symmetry of the brain.  These are the two cerebral hemispheres

8   here.  (Indicating.)

9         This is nice, it's magnetic and it opens up.

11:11:03   10        And what you can see is here, this is that ventricle

11   (indicating).  It is like a cavity, a fluid-filled cavity within

12   the brain.  There is the brain stem within there (indicating).

13        These are some of the structures.  The thalamus is in

14   here (indicating).

11:11:18   15        It won't show as well as some of the other structures,

16   but this is where the hemorrhage is (indicating).  It is

17   important to note it is essentially right in the middle of the

18   brain in that fluid-filled cavity.

19    **Q.**   And can you please just walk down in front of the jury

11:11:28   20   and let them get a good close look at that.

21    **A.**   (Complies.)

22    **Q.**   Don't go too fast.

23    **A.**   (Complies.)

24    **Q.**   That is the right side of the brain?

11:11:45   25    **A.**   This is the left side of the brain, but it shows the

**OFFICIAL TRANSCRIPT**

1    cavity the best.

2         Q.    Okay.  Can you show them the right side?

3         A.    Yeah.

4               So one other thing to point out, I did not show you the

*11:12:03*
5    right side because they have this membrane right here

6    (indicating).  That will become important when we look at the CAT

7    scans.  Between those ventricles -- there are ventricles on each

8    side, but there is a fibrous tissue band, and this is that

9    fibrous tissue band called the --

*11:12:17*
10              THE COURT REPORTER:  I'm sorry -- I can't hear you.

11        A.    There's a fibrous tissue band in between the ventricles

12   called the septum pellucidum.  And that septum pellucidum is seen

13   as this white material right here on the model (indicating).

14              And that marks generally the midline of the ventricles.

*11:12:43*
15   And we'll be able to see on the CAT scan where that septum

16   pellucidum is pushed over to the other side, because it's -- the

17   blood is contained mainly in one ventricle.  And you're going to

18   see that it is pushed over into the other ventricle.

19              So an idea of that -- it's like a barrier.  Kind of

*11:12:57*
20   like a film, if that makes sense.

21        Q.    One last thing you mentioned, can you show the jury the

22   thalamus?

23        A.    Sure.

24              So we talked about it here (indicating).  This is the

*11:13:07*
25   area of the thalamus, right abutting that ventricle (indicating).

**OFFICIAL TRANSCRIPT**

1    It is kind of hard to see, but it is right over there.  This

2    isn't the demonstrative for that, but it is adjacent to that

3    ventricle right in there (indicating), the structure of the

4    brain.

5            Q.    Thank you very much.

6                  Okay, Doctor.  This is a graphic.  It'll sort of help

7    you explain how these CT scans are shot.

8            A.    Sure.

9                  So the CT scans are taken in several planes.  We

10   already saw the one side-to-side, which is the sagittal, as if

11   you are walking up to someone and you're talking to someone.

12                 We have the coronal up there, too?

13           Q.    Yep.  There you go.

14           A.    This is a -- another one that's called the coronal.

15   That's just like if you are talking to somebody, if you are

16   ordering a sandwich at Subway; they are talking to you and you

17   are talking to them.  You're looking at them as they are either

18   taking your order or checking you out at Subway.

19                 That's the orientation there.

20                 And then the final one is called the axial.  The axial

21   is if -- imagine someone laying on a couch or laying on a bed and

22   you are looking at them from the feet up.  That's the traditional

23   CAT scan as you lay down.  The original CAT scans that were done

24   are all axial.

25                 And so there are three different ways to look at the

*11:13:20*
*11:13:58*
*11:14:12*
*11:14:26*
*11:14:41*

**OFFICIAL TRANSCRIPT**

1   structures in the brain and then any pathology or problems in the
2   brain.  One is by looking at us (indicating).  One is by looking
3   at the side (indicating).  And then one is what we called cuts or
4   slices going from the feet up.

11:14:56
5        Q.    And what do we have here, Doctor?
6        A.    So this is, you know, a normal representation of a
7   CAT scan.  This is -- again, this is the Subway.  It's as if you
8   are looking at the person in the Subway.  This is the right side
9   (indicating).  This is the left side (indicating).

11:15:12
10             And, again, to orient the jury, remember we talked
11  about the symmetry?  This is the middle of the brain right in
12  here (indicating).  You can see there is a ventricle over here,
13  called the lateral ventricle (indicating).  There is a ventricle
14  over here called the lateral ventricle (indicating).  This is the

11:15:27
15  third ventricle in here (indicating).  And this area is the
16  thalamus in here (indicating).

17             So this is the third ventricle and the lateral
18  ventricles.  And you don't see any white -- spinal fluid on a
19  CAT scan is dark, what we call hypodense.  Bone, which is thick

11:15:45
20  structures, called hyperdense, are white.  And blood is going to
21  be white as well.

22       Q.    To be sure, this is a normal one.  This is not
23  Mrs. Orr; is that correct?

24       A.    This is not Mrs. Orr.

11:15:58
25       Q.    Let's take a look at Mrs. Orr.

**OFFICIAL TRANSCRIPT**

```
 1          And just one more time, if you would, quickly -- and we
 2   won't do this again -- if you would just go around the circle
 3   here and tell us about this data.
 4       A.   Sure.  So the key things we look for, this is a
 5   CAT scan performed on Ms. Sharyn Orr, 67 years old, at Ochsner
 6   Baptist Medical Center at 2343, almost 2344, so 11:44, 11:45 at
 7   night.  And this is the particular image (indicating).  And this
 8   is a coronal image, again, so it's as if you are looking at
 9   someone at Subway.
10       Q.   And what are the findings in this coronal image?
11       A.   Yeah.  So it's pretty dramatic.  She has a --
12   regrettably she has this large hemorrhage over here on the right
13   side (indicating).
14          This is the right side (indicating).  This is the left
15   side (indicating).  These are the ventricles (indicating), which
16   are the cavities where the spinal fluid was.  That is what we
17   showed you just a minute ago on the model, was those cavities.
18          And what you begin to see is this ventricle is expanded
19   over here, which is the hydrocephalus that has been talked about,
20   I believe (indicating).
21          This ventricle over here is where the hemorrhage is
22   (indicating).
23          And this hemorrhage, you can see, is obviously within
24   the ventricle, but it's much larger than this.  It's three, maybe
25   four times, something like that, eyeballing it, larger.  And
```

11:16:13

11:16:35

11:16:53

11:17:10

11:17:23

**OFFICIAL TRANSCRIPT**

1   there is a lot of swelling around all of this hemorrhage already,
2   even at 11:45 at night.
3          This dark area, you are beginning to notice some
4   swelling already around this hemorrhage early in the game, early
5   in her pathology.
6      Q.   Doctor, this is my laser.  I noticed over here it seems
7   rather smooth, and over here I see some undulations (indicating).
8   What is the significance of that?
9      A.   Yeah.  So a very important point, in a normal brain you
10  have what you see what is called a sulci and gyri, fancy medical
11  terms.  A sulcus is like a mountain -- I mean a gyrus is like a
12  mountain; a sulcus is like a valley.  So you have a gyrus that
13  comes out; a sulcus that goes down.
14         And there is spinal fluid all in those, over that area.
15  It's bathing the brain.
16         You can see this dark spot right here and right here
17  (indicating).  Those are areas of spinal fluid.  And you can see
18  what is called sulci and gyri differentiation.
19         On this right side of the brain, that is really
20  obliterated.  You don't really see that.  So there is some
21  evidence of early pressure on the right side of the brain.
22     Q.   And what swelling, if any, do you see right now?
23     A.   You're beginning to see swelling surrounding this clot
24  on this right side (indicating).  A little bit on the left, but
25  all around this right clot is where you are seeing the

OFFICIAL TRANSCRIPT

 1  significant swelling.

 2      Q.   And you, as a neurosurgeon looking at this first CT

 3  scan, what does that swelling portend?

 4      A.   Well, when I looked at this scan, I know, having done

 5  this a lot -- I know what is going to happen, regrettably, in

 6  some ways down the road.  I know the swelling is only going to

 7  get worse.

 8          It is kind of like your ankle.  You know, you sprain

 9  your ankle and then three, four days later, it begins to get

10  bigger and swell even more.

11          This is the beginning of the process.  This is the

12  beginning of where we're getting what's called the swelling

13  cascade.  There's pressure from the clot itself, and I also

14  believe that there are some chemicals released by the blood which

15  helps to the damage of the brain -- not really helps but damages

16  the brain as well.

17          So with a clot of this magnitude, I know that things

18  are going to get really bad.

19      Q.   Let's look at another scan on April 24th, the same

20  evening.  Can you tell us what the findings are here?

21      A.   Yeah.  This is, again, as if you are looking at someone

22  in Subway, for point of reference.

23          This is the right side (indicating).  This is the left

24  side (indicating).  This is that ventricle over here

25  (indicating).  And back over here you are beginning to see --

**OFFICIAL TRANSCRIPT**

1    this is the area where there is some blood in that ventricle on

2    this side (indicating).  The scan is a little off.

3            But what you notice is on this right side where the

4    hemorrhage is located, you are seeing all this swelling around

11:20:27    5    the brain -- in the brain (indicating).  You don't see it on this

6    left side (indicating).

7            So in areas not just adjacent or next to the blood clot

8    you are beginning to see brain damage.  You are beginning to see

9    swelling and some damage beyond where the blood clot is located.

11:20:40    10            And that's the nature, regrettably, of this large

11    hemorrhage in Mrs. Orr's case that is now causing pressure beyond

12    the actual perimeter of the hemorrhage and in other areas beyond

13    that.  And that's indicative of the nature of the injury and the

14    significance of the injury.

11:20:59    15        Q.   Why in this particular slice -- knowing that these CTs

16    are sliced every 5 millimeters, why in this particular slice does

17    the hemorrhage appear so small?

18        A.   You're getting toward the tail end or the back end of

19    that hemorrhage on that side.

11:21:15    20        Q.   And what do we have here, Doctor?

21        A.   This is again a CAT scan from Ochsner Baptist, so this

22    is part of that original CAT scan.  As we look down the model --

23    we discussed that area called the septum lucidum.  Again, we

24    talked about being symmetrical here (indicating).  Right side of

11:21:36    25    the brain (indicating).  Left side of the brain (indicating).

**OFFICIAL TRANSCRIPT**

11:21:52
11:22:04
11:22:22
11:22:36
11:22:55

1    And what you're beginning to notice on this particular

2 image is this hemorrhage here in the lower part of the ventricle

3 (indicating), this hemorrhage here in what we call the lateral

4 ventricle (indicating) -- remember, there's two lateral

5 ventricles on each side -- and now there is a hemorrhage in the

6 middle (indicating), called the third ventricle.

7    So you have two of the four ventricles now in which

8 there is blood located, and you're beginning to see this

9 right-to-left shift.  This hemorrhage is contained because that

10 fibrous band that we saw on the model, that septum lucidum, is

11 holding that hemorrhage to some degree.

12    But the problem is the pressure has built up from this

13 hemorrhage on the right side.  It's pushing from that right side

14 into the left side of the brain and into the left side of the

15 intracranial cavity.  And you can see this sulci here on this

16 side of the left (indicating).  You don't see those on the right

17 side.

18    So what you are beginning to see here at 11:45 at night

19 is a picture of the brain that has had a hemorrhage and now the

20 right side of the brain is under serious duress and now pushing

21 into the left side of the intracranial cavity, which is ominous.

22  Q.   And then please explain to the jury what the uncal

23 herniation is.

24    This is in quotes because this was referenced by the

25 original radiologist in his report?

**OFFICIAL TRANSCRIPT**

1    **A.**    I believe it was Dr. Ogden who referenced that uncal

2    herniation.

3    **Q.**    Would you tell us what this uncal herniation is -- and

4    I'll flash that up there again in a minute -- and the

11:23:10   5    significance of it.

6    **A.**    So, again, we're looking at this patient.  And one of

7    the things that we talked about when we looked at the model was

8    that the temporal lobe in the lower part of the brain -- or I

9    mentioned up here the lower part of the brain, that can push on

11:23:26   10    that brain stem that we talked about.  Remember the brain stem is

11    important for critical structures.

12            What you are seeing is the pressure from this clot has

13    now caused all of this medial part of the temporal lobe and the

14    uncus to now push and be what is called herniated outside of its

11:23:40   15    normal anatomical location.

16            You can see on this left side how there's a clear

17    barrier right in here of this black, which is spinal fluid.  But

18    over here you begin to see this gray, which the temporal lobe is

19    now herniating or being outside of its normal anatomical area.

11:23:56   20    And that's a vital area it's pushing on.  That's a sign of

21    potential impending neurological doom.

22    **Q.**    Now we're going to take a look at some axial scans.

23    And this would be, obviously, a normal scan and not Mrs. Orr's,

24    simply for teaching purposes.

11:24:15   25    **A.**    Yes.  So this is a normal scan.  This is the axial

**OFFICIAL TRANSCRIPT**

1   image or the image that we talked about like laying down and

2   looking up on the CAT scan table.

3          This is the front, the back, the right, the left

4   (indicating).

11:24:29   5          These are the ventricles (indicating).

6          And this is what we call that septum lucidum, that

7   fibrous tissue (indicating).

8          This is -- again, think symmetry.  There is normal

9   symmetry here on a normal scan.

11:24:38   10   **Q.**   And let's take a look at the first axial scan that

11   we're going to display anyway.

12          And tell us about what we see here and what this

13   measurement is and who did it.

14   **A.**   So, again, Ochsner Baptist, 11:40.  What you can see is

11:24:56   15   there is this large hemorrhage here on the right side in this

16   right ventricle (indicating).

17          The right ventricle is in the left side of the brain,

18   regrettably.

19          That means, unfortunately, she has a lot of pressure in

11:25:08   20   this right side of the brain, that the contents of the right side

21   of the brain are now being pushed over to the left side of the

22   brain.  And this is what the radiologist is noting, these lines

23   (indicating).  The radiologist is roughly marking the midline.

24          And that septum lucidum, which is right here

11:25:26   25   (indicating), they are saying it's 15 millimeters, 1 1/2

**OFFICIAL TRANSCRIPT**

1    centimeters of shift.  And just for a point of reference,
2    2.54 centimeters is an inch.
3         So this is obviously more than a half an inch of
4    shifting from the brain of the right to the left.
11:25:43
5         And then also what you are clearly getting to see is
6    some swelling all around this blood clot (indicating).
7    **Q.**   And let's take a look at a normal sagittal CT from the
8    side.  And tell us what is important about looking at a normal
9    sagittal CT here.
11:25:59
10   **A.**   This is the front, the back, the top, the bottom, like
11   you're -- someone is talking and you are sneaking up on them
12   (indicating).
13        And, again, this is that area of the ventricle right in
14   here that we talked about, the lateral ventricle (indicating).
11:26:11
15        This is the brain stem down in here (indicating).  You
16   can see here -- this is a nice representation of these -- we'll
17   call these gyruses, which is the outpouching, the mountains, and
18   then valleys, which are the sulci.
19        You can see how there is all this black (indicating),
11:26:24
20   which is fluid going in and out and bathing that area in the
21   normal brain.  That's what a normal brain looks like that's not
22   under pressure.
23   **Q.**   And this is Mrs. Orr's sagittal CT scan.  I think we
24   saw this earlier.
11:26:38
25   **A.**   We did.

**OFFICIAL TRANSCRIPT**

           1          This shows really dramatically, regrettably, how big
           2    this is on this one particular image.  I mean, this is 20 to
           3    25 percent of the brain on this slice is filled with hemorrhage.
           4          Q.   And what we've done here, Doctor, is compare the first
  11:26:58 5    CT at 11:41 to the second CT at 4:25 a.m.  We have the word
           6    "stable" down there.  This was taken from the radiology report.
           7          Can you explain to us the significance of this?
           8          A.   Well, the initial scan was done at Ochsner Baptist, the
           9    subsequent scan was done at Ochsner main campus, and what it
  11:27:17 10   shows is, essentially, there is no growth in the actual size of
           11   the hemorrhage.
           12         The swelling, it's roughly the same.  Maybe a little
           13   bit more.  You can see here this black almost goes to the
           14   surface, where it didn't here (indicating).
  11:27:28 15         But they are essentially the same.
           16         Q.   And that suggested that she had not bled anymore
           17   between 11:40 and 4:20 or whatever it was in the morning?
           18         A.   Yes.  I think that's pretty clear.
           19         Q.   And would you please comment on these -- this --
  11:27:48 20   particularly this second CT scan at 4:25 with respect to edema.
           21         A.   Yeah.  So, if you look -- I mean, these aren't exact
           22   pairings, but what you can see now is the swelling is really
           23   going out to the surface, whereas here you see what's called some
           24   lighter gray (indicating).
  11:28:05 25         But this darker, more black swelling is now going out

**OFFICIAL TRANSCRIPT**

1    to the surface.

2           So just in that four-hour period there may be a little

3    bit more swelling.

4      **Q.**    And then here is the third CT.

5           And this is taken at what time, Doctor?

6      **A.**    So this is the first scan after there has been some

7    placement of the ventriculostomies.  To this point, she has been

8    treated with airway protection.  She was given medication to

9    diminish brain swelling.  So she has been treated, but this is

10   the first time they treated with these ventriculostomies.

11          Remember the ventriculostomies are these little white

12   tubes (indicating).  I believe they were shown here earlier in

13   the court at one point.  And Dr. Bui put in two, one on the left

14   side.  Remember this is the patient laying down.  Here on the

15   left (indicating).  This is one on the right (indicating).

16          And what you have to see is he is passing this to the

17   left side.  The ventricular catheter on the right is actually

18   having to go beyond midline in order to get into this space of

19   that right ventricle because that blood has shifted the brain.

20          So, normally, when you put in a ventriculostomy, you

21   put it in on the right side.  And you are putting it on the right

22   side in this case, but you would have to put it in a little bit

23   longer than normal, meaning advance it more deeply, because he is

24   trying to get to the right ventricle, which is partially in the

25   left side of the brain.

**OFFICIAL TRANSCRIPT**

1    Q.   And here is a comparison of the first CT on April 24

2  and the fourth CT on April 27.

3         And what is the significance of the difference between

4  these two CTs?

*11:29:44*    5    A.   Yeah.  This is important because this is on the initial

6  one at Baptist.  This is the next one here at Ochsner main campus

7  after these had the ventriculostomies, after TPA administration.

8         And what you see is the swelling is now worse all

9  around this hemorrhage (indicating), but more importantly the

*11:30:09*   10  midline shift is worse.

11         So despite attempting to drain fluid, despite

12  attempting to drain some of the blood clot, despite giving her

13  medicines to help with the swelling, because of the size of the

14  clot and the location of the clot, you're beginning to see

*11:30:24*   15  continued -- what we call neurological deterioration on the CAT

16  scan, meaning the swelling is worsening, the brain damage is

17  worsening, despite these really heroic efforts.

18    Q.   And on what side of the brain now are both of the

19  catheters?

*11:30:39*   20    A.   Both of the catheters -- the midline is marked here.

21  You can see the catheter on the right side is now on the left

22  side of the brain and the catheter on the left side is on the

23  left side of the brain, all because of the swelling.

24    Q.   And here is CT No. 5 on April 29.

*11:30:54*   25         Tell us the significance of the findings of this CT.

**OFFICIAL TRANSCRIPT**

1      **A.**   Yeah.  So, in this case, what you can see is the

2  ventricular catheter on this left side is placed in very good

3  position by Dr. Bui and his team.

4          The left side of the brain looks -- seems to be okay.

11:31:14   5  There was no swelling around that ventricle.  The initial

6  swelling that we saw on that scan related to some hydrocephalus.

7  That is now gone after it has been treated.

8          But what you are seeing is there is worsening swelling

9  here, worsening edema, and some really dark areas that are

11:31:31   10  probably consistent with stroke or brain death in this area,

11  meaning not brain death overall, death of brain tissue dying or

12  stroke.

13          So what you see now on this scan on the 29th is,

14  despite adequate decompression of the ventricles, you're seeing

11:31:45   15  what -- the effects of the clot continue to progress and take

16  over and cause damage, regrettably, in Mrs. Orr.

17      **Q.**   Doctor, this will be the final CT we'll look at,

18  April 29, CT No. 6, taken at 3:28 in the afternoon.

19          And what are the observations that are pertinent in

11:32:05   20  this final CT scan?

21      **A.**   Yeah.  So this is, again, as if you are looking at

22  somebody.  And what you see is this midline shift is beginning to

23  continue, really, to progress.

24          The clot perhaps has gotten a little bit smaller.  But

11:32:19   25  all of this swelling and edema is now clearly in multiple areas

**OFFICIAL TRANSCRIPT**

1  extending out to the white, which is the surface of the brain.

2       And this whole right side of the brain looks like what

3  we call very angry or swollen.  While the left side does not

4  appear to be that way, all this swelling from the right side is

11:32:35  5  moving over and pushing that side of the brain.

6  Q.    I think we'll skip this one and go right to this.

7       Now, Doctor, did we --

8       MR. HONNOLD:  Can we approach?

9       THE COURT:  Sure.

11:32:47  10                SIDEBAR ON THE RECORD

11       MR. HONNOLD:  Yes, Your Honor.  Brad Honnold.

12       We're going to object at this time.  They are getting

13  into a process of measuring the volume of the hemorrhage.  It was

14  not disclosed, not even mentioned or referenced, anywhere in his

11:33:29  15  report.

16       The issue of calculating volume of intracranial

17  hemorrhage is a fairly controversial topic.  There are several

18  ways to do it.  The literature is uncertain.

19       What is most important about it is that the literature

11:33:42  20  proposes different ways to do it that can get drastically

21  different outcomes.

22       The literature that is cited in the PowerPoint was not

23  referenced in the reliance list.  It was not mentioned in the

24  slightest in the report.

11:33:54  25       And so this is -- we're being severely prejudiced on

**OFFICIAL TRANSCRIPT**

1    this.  We have not been able to explore this in deposition.

2            MR. IRWIN:  Your Honor, it was explored in the

3    deposition.  On Page 230, he described (as read):  Why wouldn't

4    the EVD help was because the problem was the 75- or 80-cc clot

5    that she had in the right ventricle.

6            On Page 233, he was asked:  I think you described it to

7    be 60.

8            And he answered:  I think it was about 75 to 80.  I

9    measured it one time.  It's hard to do.

10           And then later, 244, he said:  I don't know that any of

11   them had 75- or 80-cc clots, comparing the size of these clots to

12   the mortality studies.

13           Now, they had the opportunity to ask him how he

14   measured it because he said he did measure it, and they did not

15   ask.

16           MR. HONNOLD:  That's just the point, Your Honor.  In a

17   matter of complexity like this, to go into deposition like this

18   without having that information in the report so that there can

19   be full preparation on the source and the basis of the

20   calculations, the source and basis of other things in the

21   literature, and knowing what is the actual underlying basis of

22   it -- you cannot be prepared properly for a deposition to put

23   yourself in a position to try on that issue.

24           MR. IRWIN:  He said clearly in his report that it was

25   large.  It's been described as massive.

**OFFICIAL TRANSCRIPT**

1        Even Dr. Liechty said, in his testimony on Page 982:

2   So, then, to the extent that there was a 20 to 25, would you

3   estimate or multiply that times five, and that would give you the

4   total width of the examination?  Is that fair?

11:35:45
5        Yes.  The height.

6        So their expert looked at it.  Our expert looked at it.

7   They had a chance to ask him how did you measure it at the

8   deposition?  They did not.

9        Now he has measured it very carefully.

11:35:59
10       MR. HONNOLD:  Here, what we're getting into, Judge.

11  We're going into very detailed evaluations of the slices on the

12  CT, calculations of specific areas.  The mathematical program.

13  Bootstrapping in literature that tells you how to do.

14       This is a controversial area.  There are different

11:36:16
15  models to do that.  And without knowing, walking into a

16  deposition of somebody like this -- that is the exact purpose of

17  a report for a witness like this, so you can go in prepared to be

18  ready to challenge so that you can try.  So that you can be

19  prepared, not only for the deposition, but to put yourself in a

11:36:34
20  position to try on those issues following the deposition.

21       MR. IRWIN:  He has very carefully measured it, and I

22  have a burden to show the foundation of that, Judge, and this is

23  the foundation.

24       MR. HONNOLD:  Here is other literature, Judge, that

11:36:47
25  wasn't on his -- on his reliance list and not disclosed.  It

**OFFICIAL TRANSCRIPT**

```
 1   really is prejudicial.
 2            MR. IRWIN:  I can go talk about a bunch of articles,
 3   Your Honor, and I have them in my folder over there, where they
 4   have introduced literature that was not disclosed.  Like to
 5   Liechty they introduced the American Heart Association document
 6   and the American Hematology Association document to Liechty that
 7   was not disclosed in his remarks.
 8            MR. HONNOLD:  That came up on redirect after he was
 9   challenged for not looking at certain things.  That was a
10   completely different issue.
11            THE COURT:  Can't we do this without going into all of
12   the documents?
13            I think Counsel has a -- if it is not in his record, if
14   it's not in his report, he has no way to prepare for it,
15   particularly if he doesn't have the material.
16            MR. IRWIN:  Can I simply ask him if he measured it and
17   what the result was?
18            THE COURT:  Yeah.  Let's do it that way.
19            MR. IRWIN:  Thank you.
20                    AFTER THE SIDEBAR IN OPEN COURT
21            THE COURT:  Let's get to a break.
22            MR. IRWIN:  Thank you, Judge.
23   MR. IRWIN:  (CONTINUING)
24       Q.   At my request, did you measure the hemorrhage in
25   Mrs. Orr?
```

**OFFICIAL TRANSCRIPT**

1      **A.**   I did.

2      **Q.**   We're not going to put up any graphics, but would you

3  briefly tell us how you measured it.

4      **A.**   Sure.  So what I did was I measured the hemorrhage that

11:38:17   5  was on the axial CAT scan, the one you were laying down.  I

6  measured the area, the area of the length and the width.

7           And we know they are 5-millimeter cuts.

8           So the length and the width on each one of those and

9  how many it is present in.

11:38:30  10          And in the different areas I measured them individually

11  to get as best an idea that I could of what the volume of the

12  hemorrhage was.

13      **Q.**   And what was the result of your calculation as to the

14  size of the hemorrhage?

11:38:41  15      **A.**   It was 92 cc's.

16      **Q.**   Was it actually 92.07 cc's?

17      **A.**   That's about right, yes.

18      **Q.**   Then, if we then can go to the literature, which you

19  have used, that describes the mortality of individuals with

11:39:00  20  bleeds of this size.  And I will...

21           MR. IRWIN:  Could I have the article, please.

22           MR. HONNOLD:  Your Honor, same issue.  May we approach

23  again?

24           THE COURT:  Come on up.

11:39:30  25           Let's take a break at this time.  The jurors need a

**OFFICIAL TRANSCRIPT**

1    break.  Court will stand in recess.

2                          (Jury out at 11:39 a.m.)

3         THE COURT:  Jurors are outside of the courtroom.

4         What is the problem?  Do y'all want to come up?

11:40:11    5         MR. HONNOLD:  Yeah.

6                     **SIDEBAR ON THE RECORD**

7         MR. HONNOLD:  The same issue as before, Your Honor.

8    We're now bringing in literature that again was not on the

9    witness's reliance list.

11:40:43   10         This would be an attempt to show through a single paper

11   a mortality rate that again creates the same issue of surprise

12   and prejudice.

13         There are a lot of different competing papers and

14   models on mortality rates in bleeds like this.  They picked a

11:41:00   15   specific one.

16         This paper again is not on the reliance list.  It

17   creates the same issue when you go try to depose an expert like

18   this on these issues.  You can't come to take a good deposition

19   that puts you in a position to try the case if you aren't walking

11:41:14   20   into the deposition knowing what is truly on the table before.

21         MR. IRWIN:  Your Honor, Mr. Honnold cannot, with a

22   straight face, say "surprise" because he took the deposition of

23   another one of our neurosurgeons, Dr. Robert Dawson.

24         Mr. Honnold asked Dr. Dawson on Page 1033 of that

11:41:34   25   deposition about the Roderick article.  He has that article.  He

**OFFICIAL TRANSCRIPT**

1    knows what is in it.  He knows how to debate with Dr. Dawson

2    about it.

3         It is an article which is very relevant because it

4    establishes a relationship between the size of a hemorrhage and

11:41:53   5    the -- how it equates to mortality.

6         It's a very relevant article and he is not surprised.

7         MR. HONNOLD:  But that issue -- how I take it on

8    dealing with the animal being Dr. Dawson is a completely

9    different situation that we have.

11:42:07   10         When someone else on our team is going to go take a

11    another deposition of a completely different witness who doesn't

12    have that on their reliance list, it is a surprise.

13         It borders on ambush when we are seeing this issue come

14    up like this, to put this literature up on the screen, when it

11:42:22   15    has not been on any other piece of paper before in this case.

16         MR. IRWIN:  It was disclosed on our exhibit list, Your

17    Honor.  There have been summary articles that have been used on

18    witnesses in this trial that have not been disclosed to the

19    witness, whether on direct examination or cross-examination.  And

11:42:38   20    Mr. Honnold knows this article and cross-examined a neurosurgeon

21    on it in this case.  It was in the Orr case.

22         THE COURT:  Look, both in this case and in other cases,

23    I expect the expert -- because it's a very, very technical

24    aspect.  I really expect the expert to write an appropriate

11:42:57   25    report.  Both sides are paying him enough to write an appropriate

**OFFICIAL TRANSCRIPT**

1   report.  You have the time to write an appropriate report and to

2   give all of the material that they are going to use in their

3   testifying.

4          Now, the problem sometimes is in cross-examination.

5   When a witness is crossed on an area that is not in his report or

6   contradicts material in his report, that's valid in

7   cross-examination.

8          But on direct examination, the witness has to be held

9   to the report and the materials cited in the report to be fair to

10  both of you-all.

11         When you go in these depositions, you don't go into

12  them blind.  You spend as much time in a deposition as you spend

13  at this point, because it's very critical and you have to be

14  prepared for it.

15         So if it is not listed in the report, let's not use it.

16         I'll give you an opportunity to say what it is, is it

17  supported in the literature, or something of that sort.

18         But to go to the specific literature that he hasn't

19  seen seems to me to be unfair to him whether he knows about the

20  literature or not.  If your witness hasn't used it, he is not

21  ready for it.

22         MR. HONNOLD:  And may I just burden the Court again

23  with one other.  I'm now trying to anticipate the next step so

24  here is where I think the next step will be.

25         The article that was attempted to be used has certain

**OFFICIAL TRANSCRIPT**

1   numbers in it regarding mortality.  This witness has put a

2   different mortality number in his report.

3          I want to make sure that the next step isn't now to try

4   to use the higher mortality number from the paper and to say

5   that's his opinion so I don't have to go through this again.

6          THE COURT:  If he said what it is in his report, that

7   is what he is going to have to testify to.  He can't testify to

8   something that is not in his report.  If he has measured it, he's

9   measured it.

10          MR. IRWIN:  Your Honor, there are different articles

11   that come up with different estimates of mortality.  There are

12   ranges.  Some of them could be 60 percent, some of them could be

13   70 percent.  It depends on the condition of the patients and what

14   have you.

15          But the bottom line is that there is a uniformity among

16   this literature that, if you have a bleed of this size, your

17   chances of survival are far less than 50 percent, which is really

18   the standard that matters here.

19          So I think a witness like Dr. Thomas --

20          THE COURT:  He said that in his report, didn't he?

21          MR. IRWIN:  Yes.

22          THE COURT:  He can say that.

23          MR. HONNOLD:  Kind of.

24          MR. IRWIN:  Well, if he is cross-examined with other

25   mortality literature by Mr. Honnold that may show a lesser

**OFFICIAL TRANSCRIPT**

1  number, and without giving me a chance, let's say, on redirect to
2  come back and show that they are -- here in the Roderick article,
3  for example, there is a larger number of --
4      THE COURT:  No.  And you have to know that, too.  If
5  you are going to cross-examine him on material that he hasn't
6  gone into on direct, then he is going to have a right to redirect
7  him on material that you used in cross.
8      MR. HONNOLD:  That I use.  But right now it doesn't go
9  to Roderick if I don't use Roderick.
10      THE COURT:  Yeah, that's right.
11      MR. HONNOLD:  But he is talking about something else.
12      THE COURT:  If you use something, he has a right to
13  counter it with stuff that counters your use.  He doesn't have to
14  put in the report rebuttal because he doesn't know what is going
15  to be rebutted.
16      So I don't have any problem with him saying what his
17  measurement is and whether that is consistent, or whatever it is
18  with the literature, but going into this specific literature
19  seems to me to be unfair to one side.
20      MR. IRWIN:  I'll just -- obviously, I respect
21  Your Honor's rulings all day long.
22      THE COURT:  Sure.
23      MR. IRWIN:  But if Mr. Honnold goes into literature
24  contrary to that, I may come back up here and ask you to
25  reconsider that I can use Roderick and --

**OFFICIAL TRANSCRIPT**

11:45:49
11:46:03
11:46:15
11:46:41
11:46:53

1          THE COURT:  No, you can do it.  If he uses literature
2   that counteracts it, you can use literature that counteracts what
3   he says.
4          MR. IRWIN:  That's what I want to know.
5          MR. HONNOLD:  If an expert states an opinion Y based
6   upon certain materials disclosed, and we challenge that in
7   deposition with other materials, I'm not sure the response is
8   they get to bootstrap new things that take them into a new area
9   of an opinion as long as we're --
10          THE COURT:  No, I'm not talking about that.
11          What I'm saying is that he has rebuttal.  He can't go
12   into what he did on direct, in rebuttal, because that's not
13   rebuttal.  So when he has him back after you get him, if you have
14   gone into something that he hasn't gone into, he is going to have
15   to be able to go into stuff that you haven't gone into.
16          MR. HONNOLD:  Okay.
17          MR. IRWIN:  Your Honor, can I make one more
18   observation?  And then I'll shut up.  I know the clock is
19   running.
20          Mr. Honnold said, in the earlier part of this
21   conversation when I raised those two articles, AHA and
22   Kirshman [phonetic] -- he said he didn't use those on direct,
23   only on redirect.
24          So my point is, as they used to say in Civil District
25   Court in the courtroom, what's good for the goose is good for the

**OFFICIAL TRANSCRIPT**

1  gander.  You used new and unlisted articles on redirect on
2  Liechty's redirect examination.  I just told that to the Court.
3          THE COURT:  That's what I'm saying, is you can do it.
4          If he brings in something that counteracts him, then
5  you can bring in something on redirect that counteracts again.
6          MR. IRWIN:  That's what I --
7          THE COURT:  As I see it, redirect is rebuttal.  It's
8  not an opportunity to go over direct again.  It's an opportunity
9  to rebut what he did.
10          MR. IRWIN:  That's what I was hoping would be the
11  understanding.
12          THE COURT:  I see.  We'll take a break here for lunch.
13  We'll come back at 1:00.
14                          (Morning session ended.)
15
16                      *  *  *  *
17                      CERTIFICATE
18
19      I hereby certify this 9th day of June, 2017, that the
20  foregoing is, to the best of my ability and understanding, a true
21  and correct transcript of the proceedings in the above-entitled
22  matter.
23
24                          /s/ Mary V. Thompson
25                      Official Court Reporter

**OFFICIAL TRANSCRIPT**

11:48:25 (line 5)
11:48:38 (line 10)