```
 1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA
 2

 3   ********************************************************************

     IN RE:  XARELTO (RIVAROXABAN)
 4   PRODUCTS LIABILITY LITIGATION         Docket No. 14-MD-2592
                                           Section "L"
 5                                         New Orleans, Louisiana
     THIS DOCUMENT RELATES TO:             Friday, June 9, 2017
 6   Joseph Orr, et al
     v. Janssen Research &
 7   Development, et. al.,
     Case No. 15-CV-3708
 8

 9   ********************************************************************

10                   TRANSCRIPT OF TRIAL PROCEEDINGS
           HEARD BEFORE THE HONORABLE ELDON E. FALLON
11                    UNITED STATES DISTRICT JUDGE
                     VOLUME IX - AFTERNOON SESSION
12

13   APPEARANCES:

14   FOR THE PLAINTIFFS'
     LIAISON COUNSEL:                 LEVIN PAPANTONIO
15                                    BRIAN H. BARR, ESQ.
                                      316 Baylen Street, Suite 600
16                                    Pensacola, FL 32502

17                                    BEASLEY ALLEN
                                      BY:  ANDY BIRCHFIELD, ESQ.
18                                    P.O. Box 4160
                                      Montgomery, AL 36103
19
                                      GAINSBURGH BENJAMIN DAVID
20                                    MEUNIER & WARSHAUER
                                      BY:  GERALD E. MEUNIER, ESQ.
21                                    2800 Energy Centre
                                      1100 Poydras Street
22                                    New Orleans, LA 70163

23                                    GOZA & HONNOLD, LLC
                                      BY:  BRADLEY D. HONNOLD, ESQ.
24                                    11181 Overbrook Road, Suite 200
                                      Leawood, Kansas 66211
25
```

```
 1                              THE LAMBERT FIRM, PLC
                               BY:  EMILY JEFFCOTT, ESQ.
 2                              701 Magazine Street
                               New Orleans, Louisiana 70130
 3

 4    FOR THE DEFENDANT BAYER
      HEALTHCARE PHARMACEUTICALS
 5    INC. and BAYER PHARMA AG:    WILKINSON WALSH & ESKOVITZ, LLP
                                   BY:  BETH A. WILKINSON, ESQ.
 6                                 1900 M Street NW, Suite 800
                                   Washington, DC 20036
 7
                                   Nelson Mullins Riley
 8                                 & Scarborough, LLP
                                   BY:  DAVID E. DUKES, ESQ.
 9                                 Meridian, 17th Floor
                                   1320 Main Street
10                                 Columbia, SC 29201

11
      FOR JANSSEN PHARMACEUTICALS,
12    INC. AND JANSSEN RESEARCH &
      DEVELOPMENT, LLC:            IRWIN FRITCHIE URQUHART & MOORE
13                                 BY:  JAMES B. IRWIN, ESQ.
                                   400 Poydras St., Suite 2700
14                                 New Orleans, LA 70130

15

16    Official Court Reporter:    Karen A. Ibos, CCR, RPR, CRR, RMR
                                   500 Poydras Street, B-275
17                                 New Orleans, Louisiana 70130
                                   (504) 589-7776
18

19       Proceedings recorded by mechanical stenography, transcript
      produced by computer.
20

21

22

23

24

25
```

1                              I N D E X

2

3

4    WITNESSES FOR THE DEFENDANT:                    PAGE/LINE:

5

6    NAJEEB THOMAS, M.D.

7

8      Continued Direct Examination by Mr. Irwin      2170/20

9

10     Cross-Examination by Mr. Honnold               2185/13

11

12     Redirect Examination by Mr. Irwin             2196/12

13

14

15   DEFENDANTS REST                                  2197/11

16

17

18   RULE 50A MOTION                                  2199/13

19

20

21

22

23

24

25

P R O C E E D I N G S

(FRIDAY, JUNE 9, 2017)

(AFTERNOON SESSION)

    (OPEN COURT.)

    (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

         THE COURT:  Be seated, please.

         Doctor, you're still under oath.

         MR. IRWIN:  Thank you, your Honor.

         THE COURT:  Continue.

         MR. IRWIN:  Next, your Honor, we would like to identify
Defendants' Exhibit 2481, which is an article in the literature by
Passero.

         And don't put it up yet, please.  And this is Exhibit 55.

         Your Honor, I would like to offer this as a demonstrative
exhibit.

         THE COURT:  You may use it.

         MR. IRWIN:  Thank you.

CONTINUED DIRECT EXAMINATION

BY MR. IRWIN:

Q.  Doctor, are you familiar with this study, the Passero study?

A.  I am.

Q.  And, generally speaking, what does it address?

A.  It looked at 26 patients with primary intraventricular
hemorrhage, and they looked at determined outcomes and predictors

13:04:55 1   of in-hospital mortality.

13:04:57 2   Q.  And what were the main predictors of outcome; namely,

13:05:03 3   in-hospital mortality?

13:05:03 4   A.  Sure.  So the things that predicted mortality or death in their

13:05:07 5   series were a low Glasgow Coma Scale, less than 8, which is

13:05:11 6   comatose, and early hydrocephalus, as well.  Both of those were

13:05:17 7   independent predictors in their series.

13:05:18 8   Q.  Let's take a look at the data, then, on the next slide that

13:05:23 9   I'll click us over to.

13:05:25 10           Actually, this is the narrative, and what are the

13:05:28 11  findings of these two drivers -- I'll call them drivers -- namely,

13:05:34 12  GCS score and hydrocephalus?  How do they increase and by what

13:05:39 13  magnitude the risk of fatalities?

13:05:42 14  A.  Yeah.  They were independent predictors of poor outcome;

13:05:46 15  meaning, patients not doing well.  In fact, what they found that

13:05:49 16  patients were with a GCS of 8 or less -- Mrs. Orr's was 6 -- they

13:05:56 17  were over four times, almost five times greater and had the odds of

13:06:01 18  dying and predicting mortality of someone who didn't.

13:06:04 19  Q.  And what about those with hydrocephalus?

13:06:09 20  A.  The same thing.  It showed that those with hydrocephalus were

13:06:13 21  almost five times greater the odds of having the odds of dying.

13:06:17 22  What it shows is -- and what we sort of commonly know in

13:06:21 23  neurosurgery larger hemorrhages, larger problem.

13:06:23 24  Q.  And would Mrs. Orr and her presentation at Ochsner Main with

13:06:30 25  her GCS score and her hydrocephalus -- would she fit into this

13:06:34  1    group?

13:06:35  2    A.  She would; she would be both of these.

13:06:38  3    Q.  Let's take a look at the actual patients.  Can you tell us what

13:06:43  4    this table is?  And we're going to blow it up a little bit too.

13:06:47  5    Table 1.

13:06:47  6    A.  This is Table 1 in which they reviewed the clinical

13:06:53  7    characteristics of all of their patients with this type of

13:06:56  8    hemorrhage.  And if you take the area -- the highlighted area --

13:07:00  9    Q.  There it is blown up.

13:07:02  10   A.  -- and blow it up, one of the things that you can see is -- on

13:07:05  11   here is that all of these patients with the Glasgow Coma Scale on

13:07:13  12   admission here, which is circled there -- all of those patients

13:07:17  13   with the Glasgow Coma Scale of 8 or less, their outcome was that

13:07:21  14   they died, regrettably.

13:07:25  15   Q.  And what about -- what about the column under hydrocephalus?

13:07:31  16   A.  Yeah.  So if you look one of the ones that had questionable

13:07:36  17   hydrocephalus.  If you look at other ones, they had hydrocephalus

13:07:38  18   in some of them; some of them they didn't have hydrocephalus.  And

13:07:42  19   two of them looks like they were treated with external ventricular

13:07:46  20   drainage but yet they ultimately died.

13:07:48  21   Q.  Can you indicate on there -- I guess it's pretty obvious -- but

13:07:52  22   can you indicate on there the two patients who were treated with

13:07:55  23   EVDs?

13:07:55  24   A.  Sure.  I'll circle that for you.  (WITNESS COMPLIES.)

13:08:00  25   Q.  And with respect to that treatment, that did not save their

13:08:03   1   life or lives?

13:08:04   2   A.  No, sir.  No, sir.

13:08:06   3   Q.  Next, let's look at the Giray study.  It's been previously

13:08:15   4   mentioned.

13:08:15   5          MR. IRWIN:  And I will again, your Honor, offer this as a

13:08:18   6   demonstrative.  It is DX 2468.

13:08:31   7          THE COURT:  You may use it.

13:08:36   8          MR. HONNOLD:  What did you call this?

13:08:40   9          MR. IRWIN:  Called it Giray.

13:08:50  10   BY MR. IRWIN:

13:08:54  11   Q.  And, Doctor -- and we'll click to this.  Tell us generally what

13:08:59  12   we have here.  What is this study about?

13:09:02  13   A.  Sure.  This is a study that looked at 24 patients with

13:09:08  14   intraventricular hemorrhage, and what the results were they found

13:09:12  15   that early hydrocephalus and Glasgow Coma Scale of 8, again, are

13:09:18  16   early predictors of mortality.

13:09:20  17   Q.  And of this group of 24 patients, 41 percent of them died?

13:09:28  18   A.  That's correct.  It was a little over 40 percent mortality.

13:09:32  19   Q.  However, the people who fit into the category -- or rather

13:09:38  20   looking at the category of people who would be similar to Mrs. Orr,

13:09:43  21   what was the fatality rate of that group?

13:09:45  22   A.  Yeah.  So if you look at the GCS's of people --

13:09:50  23   Q.  I'll click over to that, Doctor.

13:09:52  24   A.  Okay.  So if you look on this chart, they're highlighted here,

13:09:57  25   but everyone one of these has a Glasgow Coma Scale here of these

13:10:00  1  two are 3 and 5; that one is 6; 6; 7; 6; 4; 6; and 6.  All of those

13:10:08  2  regrettably died.

13:10:09  3  Q.  Let me blow it up larger so you can look at it more closely.

13:10:15  4  All that group died?

13:10:17  5  A.  Yes, sir.

13:10:17  6  Q.  And what about hydrocephalus and EVDs?  What were the results

13:10:24  7  with respect to that?

13:10:26  8  A.  Again, in the four patients that they treated with external

13:10:30  9  ventricular drains, it really didn't make any difference

13:10:33 10  regrettably in their outcome.

13:10:36 11  Q.  And, Doctor, are you familiar with literature, published

13:10:42 12  literature that equates the size of the bleed to mortality?

13:10:45 13  A.  Sure.

13:10:46 14  Q.  And bleeds as big as Mrs. Orr's, roughly, what range of

13:10:53 15  mortality do you find in the literature for persons with bleeds of

13:10:57 16  that size?

13:10:58 17  A.  Well, the large bleeds like that they can go anywhere from

13:11:02 18  maybe 40 to 90 percent, really.

13:11:04 19  Q.  And, Doctor, let's then turn to -- let me ask you your opinion

13:11:13 20  at this point.

13:11:13 21      Based on the CT scans that you've seen and the medical

13:11:22 22  records that you've reviewed and the literature that you have

13:11:27 23  reviewed, what is your opinion as to the nature of the bleed and

13:11:41 24  the likelihood that any medical or surgical treatment would have

13:11:47 25  saved Mrs. Orr's life?

13:11:48  1    A.   Yeah.   So that night at Ruth's Chris and substantiated by the

13:11:58  2    CAT scan at Ochsner Baptist, Ms. Orr sustained a large bleed into

13:12:02  3    her head.   That's clearly visible on the CAT scan.

13:12:06  4            Given the size of that bleed, given the location deep,

13:12:10  5    really, inside the brain as we saw on the skull -- I mean, if you

13:12:14  6    kind of take your eye and go back an inch or two that's where the

13:12:18  7    bleed was, almost in the middle of your brain.

13:12:22  8            Given the size, the location, and her Glasgow Coma Scale,

13:12:27  9    how she presented, those are three things that we can look at in

13:12:31  10   this case and regrettably put her in a category to have a very high

13:12:34  11   mortality and die.   And it was the size, it was the location, it

13:12:41  12   was Glasgow Coma Scale.

13:12:43  13           When I first looked at it, just the size alone and the

13:12:45  14   location of it, I knew that she would likely have a very low coma

13:12:50  15   scale and be comatose.   So those three things are really important

13:12:54  16   in helping to determine if this was a bleed, regrettably, that was

13:12:57  17   in a category that was fatal.

13:12:59  18   Q.   And also, Doctor, based on your review of the medical

13:13:02  19   literature, your review of her medical records, her history of

13:13:06  20   hypertension, the micro aneurisms you saw in her eyes shortly

13:13:11  21   before she passed away, what is your opinion with respect to the

13:13:15  22   role of hypertension in her fatal bleed?

13:13:19  23   A.   So we know that she had long-standing hypertension, and that

13:13:23  24   hypertension, again, like we talked about is the pressure in the

13:13:27  25   pipes.   And that constant pressure of hitting those vessels causes

13:13:31  1   damage to those vessels.  And what happens is over time those

13:13:35  2   vessels begin to get damaged to the extent that they hemorrhage or

13:13:39  3   bleed.  So I think in her case, given her long-standing history of

13:13:42  4   hypertension, I believe that hypertension was most likely the

13:13:45  5   etiology or cause of her hemorrhage.

13:13:47  6   Q.  Let's take a look at some of the literature very quickly about

13:13:53  7   hypertension and the risk of hypertension.  Generally speaking,

13:13:57  8   what does the literature establish with respect to the primary risk

13:14:02  9   factor for a cerebral hemorrhage?

13:14:06  10  A.  Yes, so for intracerebral hemorrhage in someone Mrs. Orr's age

13:14:17  11  with her history, hypertension would be the most common.

13:14:24  12          MR. IRWIN:  Your Honor, next I would like to offer as a

13:14:27  13  demonstrative Defendants' Exhibit 2469, which I think is Exhibit --

13:14:36  14  Defense Exhibit 57.

13:14:36  15  BY MR. IRWIN:

13:14:37  16  Q.  Doctor, are you familiar with this article that we published up

13:15:00  17  on the screen up there?

13:15:02  18  A.  Yes.

13:15:04  19  Q.  And what is the conclusion of the article?

13:15:07  20  A.  This looked at indicators for primarily intraventricular

13:15:13  21  hemorrhage, and the most common risk factor was hypertension.

13:15:17  22  Q.  Next, let's look back at Passero that we looked at just a few

13:15:23  23  minutes ago.  According to Passero, what was the most common risk

13:15:31  24  factor for the patients in Passero?

13:15:34  25  A.  Arterial hypertension, which is hypertension such as Mrs. Orr

OFFICIAL TRANSCRIPT

13:15:39 1   had.

13:15:40 2   Q.  And then let's look at Giray, which the jury saw just a minute

13:15:45 3   ago.  What was the most common associated risk factor for the

13:15:50 4   cerebral hemorrhages in that -- in that study?

13:15:54 5   A.  So the most common associated risk factor again was

13:15:58 6   hypertension or high blood pressure.

13:15:59 7   Q.  And the jury has seen this before.  You've looked at the

13:16:05 8   medical records, and you saw that the attending physician,

13:16:08 9   Dr. Mahanna described -- attributed the cerebral hemorrhage to

13:16:18 10  hypertension?

13:16:18 11  A.  Yeah.  She thought it was most likely hypertensive in nature.

13:16:21 12  Q.  I assume you agree with that?

13:16:23 13  A.  Yes.

13:16:30 14  Q.  So, Doctor, is it your opinion, to a medical certainty, that

13:16:35 15  the cause of her hemorrhage was hypertension?

13:16:37 16  A.  Yes.

13:16:38 17  Q.  Doctor, what is your opinion as to whether or not -- had the

13:16:46 18  EVDs been implanted at 2:00 A.M. in the morning, rather than

13:16:51 19  2:00 P.M. in the afternoon -- what is your opinion as to whether or

13:16:54 20  not that would have saved Mrs. Orr's life?

13:16:56 21  A.  Right.  So given, again, the size of the hemorrhage, I don't

13:17:02 22  think that the EVDs would have really helped Mrs. Orr.  And,

13:17:05 23  additionally, what we can see on the serial follow-up scans after

13:17:09 24  the ventricles were decompressed, all of the swelling is in the

13:17:13 25  right side of the brain.  The left side of the brain, which is

13:17:16  1   where the hydrocephalus was, that actually looks very good on the

13:17:19  2   CAT scans that we saw earlier this morning.

13:17:21  3        But the swelling and shift was all on that right side for

13:17:26  4   which the EVDs weren't going to get out; and, in fact, in her case

13:17:30  5   they didn't get out a substantial amount of blood because of the

13:17:34  6   size of her hemorrhage.  Remember these are small tubes with really

13:17:38  7   small almost like pinholes in them.  So for them to really clear a

13:17:42  8   lot of blood is very difficult.

13:17:45  9   Q.  Doctor, let's take a look at a couple of articles in literature

13:17:51  10  that we looked at the data before on this same point.  And if we

13:17:56  11  look at -- again, this is the Giray article.  That's where they

13:18:02  12  recite their findings -- and we looked at the data -- that the rate

13:18:05  13  of poor outcome for patients with EVD was alarmingly high.  Do you

13:18:09  14  agree with that?

13:18:09  15  A.  Yes.

13:18:09  16  Q.  And why do you agree with that?

13:18:11  17  A.  Because when you have, again, these hemorrhages that are

13:18:14  18  exclusively in the ventricles, you're inside the ventricle itself.

13:18:19  19  So the clotted blood is expanding the ventricle.  And that's what a

13:18:23  20  big factor in the issue.

13:18:24  21       So while you're able to drain spinal fluid and you think,

13:18:27  22  "Wow, it may help a little bit," it does create extra space, but

13:18:31  23  the problem -- the main issue is that hemorrhage.

13:18:33  24       And we saw in Mrs. Orr's case that that hemorrhage was

13:18:37  25  casted all the way around the ventricle.  There wasn't spinal fluid

13:18:41  1   that could circulate around that hemorrhage and sort of wash it off

13:18:43  2   the edges.  So you weren't able -- we weren't going to be able to

13:18:47  3   get out a lot of that blood, despite even using the tPA that

13:18:53  4   Dr. Bui and his group used, which is to help break up the blood

13:18:56  5   clot, despite that, you still really didn't get any substantial

13:18:59  6   resolution of the clot.

13:19:00  7   Q.  And, Doctor, have you reviewed the testimony of Dr. Bui, who

13:19:05  8   testified here in court last week?

13:19:07  9   A.  I have.

13:19:08  10  Q.  And have you reviewed the deposition of Dr. Mahanna, who was

13:19:16  11  the attending physician who was deposed some months ago?

13:19:21  12  A.  I have.

13:19:21  13  Q.  Let me suggest to you that Dr. Bui testified last week that

13:19:27  14  some surgeons might not have done this --

13:19:29  15            MR. HONNOLD:  Your Honor, I just object.  We've been kind

13:19:32  16  of avoiding putting things up and suggesting they were from the

13:19:36  17  transcript.

13:19:38  18            MR. IRWIN:  Your Honor, the jury would have the best

13:19:40  19  recollection of that, if they disagree with my question then --

13:19:41  20            THE COURT:  What are you putting up?

13:19:41  21            MR. IRWIN:  (SHOWS DOCUMENT.)

13:19:48  22            THE COURT:  Let's go.  I'll overrule the objection.

13:19:53  23  BY MR. IRWIN:

13:19:54  24  Q.  Assuming that this is what Dr. Bui testified to last week, that

13:19:58  25  some surgeons may not have been -- may not have chosen to be as

13:20:03 1 aggressive as he was, do you agree or disagree with that that some

13:20:09 2 surgeons might not have chosen to do the EVDs?

13:20:12 3 A.  Yeah.  So as I said in my deposition, I think it's both within

13:20:16 4 the standard of care to put those in, even though it's a heroic

13:20:20 5 effort, and also to treat it medically as well and not put in the

13:20:23 6 EVDs.

13:20:24 7        And my recollection of Dr. Bui's testimony stated some of

13:20:28 8 his colleagues or partners would likely have not put in the EVD.  I

13:20:33 9 think both of those fall within the standard of care.  Knowing full

13:20:39 10 well that she had a very grave or poor prognosis because of her

13:20:43 11 hemorrhage, irrespective of what was going to be done.

13:20:46 12 Q.  I want you to assume that Dr. Bui said that he -- even he

13:20:54 13 thought it was uncertain that placing a drain earlier at 2:00 A.M.

13:20:58 14 would have made any difference.  Do you agree or disagree with

13:21:02 15 that?

13:21:02 16 A.  Yeah.  I mean, I think that's a reasonable conclusion that

13:21:09 17 Dr. Bui drew that he was uncertain whether it would make a

13:21:11 18 difference in the outcome.  I didn't think when I originally saw

13:21:14 19 the scan whether it would make a difference in the outcome.  And I

13:21:17 20 think in this case when you look at the CAT scans and show the

13:21:21 21 swelling in the right side of the brain and the swelling from the

13:21:23 22 hemorrhage, we kind of know that it wouldn't have made a difference

13:21:25 23 really in the outcome.

13:21:26 24 Q.  And you did review Dr. Mahanna's deposition.  I take it you

13:21:29 25 would agree with her, as she did with Dr. Bui, that it was

13:21:32  1   uncertain whether these drains would have made any difference?

13:21:35  2   A.  I believe that's what she said, as I recall.

13:21:37  3   Q.  Dr. Thomas, I want you to assume that Dr. Bui said that with

13:21:53  4   large hemorrhages, it's more often than not it doesn't make a

13:21:57  5   difference if they're large.  Do you agree or disagree with that?

13:22:01  6   A.  You mean placing the external ventricular drain?

13:22:04  7   Q.  I mean, with respect to the outcome and placing the drains.

13:22:08  8   A.  Yeah.  I mean, larger hemorrhages have poorer outcomes.  I

13:22:13  9   think that's a general axiom of neurosurgery.  Makes sense.

13:22:16  10  Q.  And I also want you to assume that Dr. Bui said that he

13:22:21  11  couldn't say that the outcome would have been any different had she

13:22:24  12  been on warfarin.

13:22:27  13  A.  Okay.  I think that's correct.

13:22:28  14  Q.  Do you agree or disagree with that?

13:22:30  15  A.  I agree.

13:22:31  16  Q.  Why do you agree with that?

13:22:33  17          MR. HONNOLD:  Your Honor, I just object, that's a

13:22:34  18  misstatement of what Dr. Bui said about warfarin.

13:22:37  19          THE COURT:  He is asking him to assume.

13:22:45  20          Members of the jury, these assumptions are for you to

13:22:50  21  determine whether or not that's in the evidence.  You can't assume

13:22:52  22  something that's not in the evidence.

13:22:56  23          MR. IRWIN:  I'll rephrase the question.

13:22:56  24  BY MR. IRWIN:

13:22:58  25  Q.  I would like you to assume that Dr. Bui was asked this

13:23:02  1   question, that:  Insofar as Mrs. Orr's condition is concerned, you

13:23:05  2   can't say that her event or its outcome would have been any

13:23:08  3   different had she been on warfarin; is that correct?

13:23:11  4           And his answer was:  "I can't say from an outcome

13:23:14  5   perspective, no."

13:23:15  6           I want you to assume that.  And if that was the question,

13:23:19  7   if that was the answer, would you agree or disagree with that?

13:23:22  8   A.  I agree.

13:23:23  9   Q.  Doctor, a suggested warning label has been proposed by

13:23:41 10   plaintiffs.  I would like to ask you to look at this warning --

13:23:44 11   suggested warning label and ask you, from a neurosurgeon

13:23:48 12   standpoint, would this warning label be of any help to you.

13:23:51 13           MR. IRWIN:  If we could have the ELMO, please.  And --

13:24:00 14           MR. HONNOLD:  Could we just note an objection that we

13:24:03 15   made previously for the record?

13:24:04 16           THE COURT:  Right.

13:24:19 17           THE WITNESS:  (WITNESS REVIEWS DOCUMENT.)  Okay.

13:24:28 18   BY MR. IRWIN:

13:24:29 19   Q.  My question is, would this proposed label, proposed by the

13:24:34 20   plaintiff -- plaintiff lawyers be of help to you as a neurosurgeon?

13:24:41 21   A.  So for me as a neurosurgeon, when I treat patients, hemostasis,

13:24:46 22   which is stopping of blood, whether it be -- bleeding, rather --

13:24:50 23   stop it in an elective surgery, emergency surgery, brain surgery,

13:24:54 24   spine surgery is of the utmost importance because we operate in

13:24:59 25   small compartments that are confined.  And so because we operate in

13:25:03  1    small compartments that are confined, bleeding can cause

13:25:06  2    significant issues.

13:25:07  3            My understanding, if I read this, if I was a

13:25:12  4    practitioner, I would think, okay, a normal PT value indicates that

13:25:15  5    maybe levels of rivaroxaban are clinically significant unlikely and

13:25:21  6    it's okay to operate.  But you can have a normal PT and you can

13:25:24  7    have levels of rivaroxaban in your system that are still causing

13:25:27  8    the blood to be thinner and anticoagulated and which would be

13:25:31  9    dangerous.

13:25:31  10           MR. HONNOLD:  Your Honor, this is exactly what we had

13:25:33  11   discussed when we brought the objection up.

13:25:36  12           MR. IRWIN:  Your Honor, he deals with this all the time.

13:25:39  13           THE COURT:  I'll let him go into it.  Overrule the

13:25:43  14   objection.

13:25:45  15   BY MR. IRWIN:

13:25:45  16   Q.  Please continue, Doctor.

13:25:46  17   A.  My understanding, that a patient with a normal PT, you can

13:25:50  18   still have anticoagulation of the blood and that would be dangerous

13:25:53  19   in neurosurgery.

13:26:17  20           THE COURT:  Anything further?

13:26:18  21           MR. IRWIN:  Just about, your Honor.  I am just trying to

13:26:20  22   move through it.

13:26:31  23   BY MR. IRWIN:

13:26:31  24   Q.  Back to the screen, please.  Doctor, these are my last

13:26:46  25   questions.

13:26:48  1        Going back to your main opinion that this was a fatal

13:27:00  2   bleed and it was unlikely that any medical or surgical treatment

13:27:04  3   would have made any difference, tell me what, if anything, could

13:27:08  4   have been done to undo that one-and-a-half-centimeter midline

13:27:13  5   shift.

13:27:13  6   A.  Well, when you see these patients in the ER when they come in,

13:27:22  7   once you have a hemorrhage, the best way to not have a hemorrhage

13:27:26  8   is hopefully prevent and control hypertension, not fall down and

13:27:29  9   hit your head, those sorts of things.

13:27:31 10        Regrettably, this location deep inside the brain and the

13:27:34 11   size of the hemorrhage, although we can try, we try to give people

13:27:37 12   medicines to decrease swelling, sometimes we try to put in

13:27:43 13   ventricular drains, like Dr. Bui did.  We haven't been really able

13:27:47 14   to do something that's really shown success in treating these types

13:27:50 15   of patients.  It's hard, it's hard to talk to the family, it's hard

13:27:54 16   because it's a sudden thing.

13:27:55 17        Somebody -- in this case even, for instance, they're

13:27:57 18   eating at Ruth's Chris at 6:45 and five hours later, regrettably,

13:28:03 19   have a hemorrhage, in my opinion, that's fatal.  Those are not easy

13:28:07 20   things.  But given this location and where it was, this is not

13:28:10 21   something that an operation would help.

13:28:13 22        Remember we are putting in drains.  We're not going out

13:28:15 23   and really opening up the brain and physically removing the clot,

13:28:19 24   because to do that, we have to go through a bunch of normal or good

13:28:22 25   brain, which would be dangerous.

13:28:23 1  Q.  And, Doctor, you mentioned the CT scan, the very first CT scan

13:28:31 2  and early signs of swelling.  What was going to stop that swelling?

13:28:35 3  A.  In my opinion, I don't think anything was going to stop it.

13:28:39 4  Q.  What do you think ultimately was the cause of Mrs. Orr's

13:28:43 5  passing?

13:28:43 6  A.  I think she had a fatal intracerebral hemorrhage that caused

13:28:50 7  her to continue to swell in the brain.

13:28:53 8         MR. IRWIN:  Thank you very much, Doctor.  We have no

13:28:55 9  further questions.  Thank you, Judge.

13:28:57 10        THE COURT:  Cross.

13:29:00 11        MR. HONNOLD:  Yes, your Honor.

13:29:20 12                    CROSS-EXAMINATION

13:29:21 13 BY MR. HONNOLD:

13:29:21 14 Q.  Hey, Doctor, good afternoon.  My name is Brad Honnold.  We've

13:29:24 15 not met before.  I wasn't the lawyer that took your deposition.

13:29:26 16 I've looked at your deposition.  I've heard your testimony.

13:29:29 17        The one thing that you know today was that Sharyn Orr did

13:29:34 18 not take her Xarelto pill on the evening of April 24th, 2015,

13:29:39 19 right?

13:29:39 20 A.  I don't know.  Is that known?

13:29:45 21 Q.  You were asked in your deposition, you said taking into account

13:29:48 22 everything that you know and that you've looked at, based upon the

13:29:51 23 fact that Dr. Bui didn't encounter any bleeding effect when he did

13:29:55 24 the procedure, things of that nature, that it's your view that she

13:29:59 25 was not anticoagulated and would not have taken the Xarelto pill,

13:30:02  1   do you recall that?

13:30:03  2   A.  Right.  So in my deposition, right, we talked about, I believe,

13:30:07  3   there was no traumatic intubation, the IV site there was no

13:30:11  4   bleeding.  So it was most likely that she didn't.  I didn't know if

13:30:17  5   there was new information that it was known.  That was my

13:30:20  6   interpretation.  But I think that's most likely, sure.

13:30:25  7   Q.  So most likely, Mrs. Orr did not take Xarelto the evening of

13:30:44  8   April 24th, right?

13:30:45  9   A.  Yes.

13:30:56  10  Q.  So knowing what you know about pharmacology, if someone doesn't

13:31:00  11  take a Xarelto pill on the evening of April 24th at around

13:31:04  12  dinnertime, then there would not have been drug on board in her

13:31:06  13  system when she presented initially to Baptist, Ochsner Baptist at

13:31:12  14  around 10:45 or 11:00 P.M., correct?

13:31:15  15  A.  Right.  So to make sure I am clear.  The assumption would be

13:31:18  16  that she took it on the 23rd, and that would be the last dose; is

13:31:21  17  that correct?

13:31:22  18  Q.  Well, it's not -- there's no assumption about it.  You said

13:31:25  19  it's most likely that she didn't take it on the evening of the

13:31:27  20  24th.  And there's no claim or allegation in this case that she

13:31:30  21  didn't take it daily as instructed, except for the 24th, right?  So

13:31:35  22  she wouldn't have had drug on board on the evening of the 24th when

13:31:39  23  she arrived at Ochsner Baptist between 10:45 and 11?

13:31:44  24  A.  Right.  If she didn't take it on the 24th.  Again, I think it's

13:31:48  25  most likely.  I didn't know that it was known.  I thought there was

13:31:50  1  a question whether she was -- had taken it or not.  Her husband

13:31:54  2  didn't know.  But I think it's most likely she did not have Xarelto

13:31:58  3  on board, yes.

13:31:58  4  Q.  It's your view, in looking back, that she probably didn't take

13:32:02  5  the Xarelto and was not anticoagulated, right?

13:32:04  6  A.  I think that's what I've been saying.

13:32:06  7  Q.  So if she didn't take the Xarelto, then no drug on board,

13:32:12  8  right?

13:32:13  9  A.  Correct.

13:32:13  10  Q.  And to your knowledge, Mrs. Orr did not have any underlying

13:32:25  11  medical disease such as liver failure or something like that that

13:32:29  12  would cause her to have a chronically abnormal PT for any reason,

13:32:33  13  either abnormally low or high?

13:32:34  14  A.  Not that I am aware.

13:32:35  15  Q.  So it would make sense, then, that at 11:20 P.M., her PT of

13:32:49  16  11.4, which is absolutely normal, that would make sense, right?

13:32:57  17  That would make sense?

13:32:59  18  A.  In the sense of?  Make sense to what?  I'm sorry, I don't know

13:33:04  19  that I understand the question.

13:33:04  20  Q.  Well, it would make sense that her PT wasn't elevated, that

13:33:08  21  would make -- a normal PT, that would make sense if she had not

13:33:11  22  taken any Xarelto four hours sooner, right?

13:33:15  23  A.  Well, you can have a normal PT taking Xarelto.

13:33:19  24  Q.  Okay.  But here -- we've been through this with prior

13:33:22  25  witnesses, and I don't necessarily want to have to go through it

13:33:27  1  with you again.  But in terms of the pharmacology of the drug, you

13:33:32  2  know -- well, maybe you don't know.  Let me ask you.  When does --

13:33:36  3  after a dose of Xarelto, when does the patient arrive at peak

13:33:41  4  value, at peak plasma concentration?

13:33:43  5  A.  My understanding is somewhere between two and four hours.

13:33:46  6  Q.  So Mrs. Orr would then be at peak plasma concentration -- if

13:33:51  7  she had took it around dinnertime at 7:00 P.M., she would be at

13:33:55  8  peak between 9:00 and 11:00 P.M., right?

13:33:57  9  A.  That's a great question.  Well, maybe.  Because Mrs. Orr, we

13:34:03  10  know, threw up, so if she took her medicine -- as a clinician, when

13:34:08  11  I see these patients, if she took the medicine, did she ingest all

13:34:11  12  of it, did she ingest some of it?  Was she actually absorbing

13:34:15  13  correctly?  Because she was vomiting, maybe she took the pill, but

13:34:19  14  threw some of it, and it wasn't enough to give a peak dose.  I am

13:34:22  15  not certain.

13:34:22  16  Q.  You now Dr. Bui was willing to operate without all of the drug

13:34:27  17  being from her system, correct?

13:34:28  18  A.  Yeah.  I believe he asked his partners what they had done and

13:34:31  19  tried to get a consensus, and his best guess was that afternoon it

13:34:36  20  might be fairly safe.

13:34:37  21  Q.  And you know that Mrs. Orr had renal insufficiency, correct?

13:34:40  22  A.  Yes, sir.

13:34:41  23  Q.  You know that patients with renal insufficiency, when they take

13:34:45  24  Xarelto, they actually have higher peaks when they reach maximum

13:34:49  25  plasma concentration, right?

13:34:51  1   A.  That's my understanding.

13:34:51  2   Q.  Right.  So the peak is actually steeper.  So with a normal

13:34:56  3   dose, somebody with renal failure is actually going to go up

13:34:59  4   steeper and higher initially to peak than someone without that

13:35:04  5   renal failure problem, right?

13:35:05  6   A.  Generally, yes.

13:35:07  7   Q.  And so you understand that plasma concentration for Xarelto is

13:35:14  8   linearly correlated with the PT outcome, right?

13:35:19  9   A.  Yes.  So generally the higher the plasma, which is in the serum

13:35:24 10   of the blood concentration of rivaroxaban, you can have an elevated

13:35:27 11   PT.

13:35:28 12   Q.  And so you know from looking at Dr. Bui's testimony that that's

13:35:33 13   what he really wanted to know, did Sharyn Orr take her Xarelto pill

13:35:38 14   that evening, correct?

13:35:39 15   A.  Yeah, I guess he wanted to know if she was anticoagulated.  So

13:35:43 16   that would be helpful.

13:35:44 17   Q.  Yeah.  And why is it helpful as a neurosurgeon contemplating

13:35:48 18   placing bilateral external ventricular drains, why is the patient's

13:35:57 19   anticoagulation status important?

13:35:59 20   A.  Because anytime you do surgery on the brain, even in a person

13:36:02 21   with normal anticoagulation status, you can have a risk of

13:36:04 22   hemorrhage.

13:36:05 23   Q.  And you know that Dr. Bui was concerned about that, right?

13:36:08 24   A.  Yes.

13:36:08 25   Q.  Rightly so, correct?

2190

13:36:10  1    A.  Sure.

13:36:10  2    Q.  And, in fact, given the uncertainty that he had about these

13:36:14  3    things, he had to -- Dr. Bui had to assume she was fully

13:36:34  4    anticoagulated on Xarelto, right?

13:36:37  5    A.  Yes.

13:36:39  6    Q.  And as a result of that assumption, had to wait and delay the

13:36:43  7    procedure that he wanted to do, correct?

13:36:45  8    A.  I think that was one of his reasons which he testified to.

13:36:50  9    That was a reason, yes.

13:36:51 10    Q.  And it's your understanding you know that the Orr family,

13:36:56 11    Sharyn Orr in this situation, she was deprived of treatment

13:37:01 12    opportunity because of this issue or question about whether Xarelto

13:37:04 13    was on board or not, correct?

13:37:06 14    A.  What do you mean by "deprived of a treatment opportunity"?

13:37:11 15    Because she was treated, and she was intubated and given medication

13:37:15 16    to decrease the swelling in the brain, which Dr. Bui said he did.

13:37:19 17    Q.  Do you recall being asked that the Orr family was essentially

13:37:22 18    deprived of a treatment opportunity, and you said, "Yeah, because

13:37:25 19    of Xarelto, Dr. Bui did not place the EVD, yeah"?  Do you remember

13:37:28 20    that?

13:37:28 21    A.  Yes, I think he -- right, he could have probably placed it

13:37:33 22    earlier, sure.

13:37:34 23    Q.  So the Orr family, Mrs. Orr did not have the treatment

13:37:37 24    opportunity for Mrs. Orr to have those EVDs placed earlier, right?

13:37:42 25    Do you recall what you said in response to that?

13:37:43  1   A.  Yes.

13:37:43  2   Q.  Do you want to know what you said?

13:37:45  3   A.  I'm sure I said "yes."

13:37:47  4            MR. IRWIN:  I think if he is going to use the deposition,

13:37:49  5   that's fine, but he should show him the deposition.

13:37:52  6            THE COURT:  Yes, show him the deposition.

13:37:53  7            MR. HONNOLD:  I'm sorry, your Honor, I just have this

13:37:55  8   copy.

13:37:57  9   BY MR. HONNOLD:

13:37:57  10  Q.  If you go down to the bottom of this page right here, I just

13:38:00  11  read you that question.  And what was your answer?

13:38:02  12           MR. IRWIN:  What's the page number, please, Counsel?

13:38:05  13           MR. HONNOLD:  The page number is 267, lines 15 through

13:38:14  14  25.

13:38:15  15           MR. IRWIN:  Thank you.

13:38:16  16           THE WITNESS:  Okay.  "So and by extension that the Orr

13:38:20  17  family did not have the treatment opportunity to Ms. Orr to have

13:38:23  18  the EVDs placed?"  Which I think I just said yes.  And then my

13:38:27  19  answer was, "Yeah, so I think Mrs. Orr, because of the question of

13:38:30  20  her taking Xarelto and the effects of Xarelto, and because the

13:38:34  21  blood was potentially anticoagulated, as I said, an EVD would not

13:38:38  22  have been placed at that time, sure."

13:38:41  23  BY MR. HONNOLD:

13:38:42  24  Q.  And you don't fault Dr. Bui for having to assume that Mrs. Orr

13:38:46  25  was anticoagulated, right?

13:38:48  1   A.  No, sir.

13:38:49  2   Q.  And, in fact, your view of Dr. Bui and his team's care at

13:38:53  3   Ochsner Main was that it was absolutely appropriate and complied

13:38:57  4   with the standard of care in every respect, correct?

13:38:59  5   A.  My understanding, yes.

13:39:01  6   Q.  And including -- included in that opinion that Dr. Bui complied

13:39:05  7   with the standard of care was the performance of the EVDs times

13:39:15  8   two, meaning left and right, and several hours later, then

13:39:21  9   administration of tPA, right?

13:39:24  10  A.  Yes.  I think I said that before, too, sure.

13:39:26  11  Q.  And the tPA, that's clot buster, isn't it?

13:39:29  12  A.  Yeah.  We use the term "clot buster."  It helps to break down

13:39:34  13  some of the blood clot.

13:39:37  14  Q.  And so you think that those things when performed by Dr. Bui at

13:39:43  15  2:10, those things were medically indicated and medically

13:39:50  16  appropriate, correct?

13:39:51  17  A.  Yes.

13:39:51  18  Q.  And you know what Dr. Bui testified to about his views of doing

13:39:57  19  it that time, that he was doing that to provide Mrs. Orr with a

13:40:00  20  chance for survival, correct?

13:40:02  21  A.  I think what he was trying to do is do some treatment, he had

13:40:06  22  talked to the family, and I guess giving her an opportunity, yes.

13:40:10  23  Q.  Mr. Irwin asked you a question just about four minutes ago

13:40:21  24  where he said, well, somebody answered the question that the

13:40:24  25  outcome would have been uncertain with earlier treatment.

13:40:31  1   Uncertain doesn't mean that earlier treatment wouldn't have

13:40:36  2   provided a better chance, right?

13:40:38  3   A.  You mean uncertain -- that was on the deposition that someone

13:40:49  4   said?  I'm sorry?

13:40:50  5   Q.  Right, Mr. Irwin asked you a question.  He said, did you read

13:40:54  6   those depositions where they if it said it had been earlier, if it

13:40:57  7   had been earlier, they were uncertain as to whether it would change

13:41:00  8   the outcome.  He read you that exact question.  And you agreed with

13:41:03  9   it, didn't you?

13:41:04 10   A.  Yeah.  And I think you asked me what I meant by "uncertain," am

13:41:07 11   I answering that correctly?

13:41:08 12   Q.  I wanted to make sure that you saw that the question said

13:41:13 13   "uncertain," and that you agreed with it.

13:41:15 14   A.  Right.  I think I was asked what it meant, in my opinion, and

13:41:19 15   what it means to me, uncertain is they didn't know one way or the

13:41:22 16   other.

13:41:23 17   Q.  Right.  Didn't know one way or the other whether earlier

13:41:27 18   intervention would have changed the outcome.

13:41:29 19           But I know you've read Dr. Bui's testimony.  You weren't

13:41:33 20   here for Dr. Bui's testimony when he sat right there, did you?

13:41:36 21   A.  I was not here.

13:41:37 22   Q.  And I asked him a question:  Under the time versus brain

13:41:41 23   theory, isn't it true -- I kind of went like

13:41:43 24   this (DEMONSTRATING) -- that if you would have been able to do it

13:41:46 25   sooner instead of at 2:10 P.M., several hours before, between 1:00

13:41:50  1   and 2:00 A.M., close in time to when she arrived at Ochsner Main,

13:41:53  2   isn't it true that she would have had a better chance for survival?

13:41:56  3          You saw in the testimony where Dr. Bui said "yes."  You

13:42:00  4   saw that, didn't you?

13:42:01  5   A.  I don't know.  Do you have a copy of that?

13:42:04  6   Q.  You don't recall that?

13:42:05  7   A.  I remember talking about time is brain, and I believe Dr. Bui

13:42:11  8   talking about ischemic stroke with time is brain.  I don't remember

13:42:17  9   the other part, but if you have it, I'll be happy to look at it.

13:42:43 10   Q.  Well, the record will show what it says.  Are you saying that

13:42:46 11   Dr. Bui did not say in his testimony that he thought earlier

13:42:49 12   treatment under the time versus brain concept would have provided

13:42:52 13   her a better chance of survival?

13:42:54 14   A.  My recollection of his testimony is that he said it was

13:42:58 15   uncertain.  If there's other things he said, I honestly don't

13:43:02 16   recall.  I'm happy to look at it.  I just don't know.

13:43:13 17          MR. IRWIN:  Your Honor, should we approach?

13:43:15 18          MR. HONNOLD:  No, I am going to hand him the transcript.

13:43:18 19          THE COURT:  Either that or show it.

13:43:21 20          MR. HONNOLD:  Okay.  Very well.  I am going to highlight

13:43:23 21   it so it shows up.

13:43:28 22          THE COURT:  And the question is, assuming Dr. Bui said

13:43:30 23   this.

13:43:37 24          With expert witnesses, members of the jury, you can ask

13:43:41 25   them to assume things.

13:43:43  1          MR. HONNOLD:  I picked the wrong color to highlight it

13:43:46  2  in.

13:44:00  3          THE COURT:  The question is assume this was the

13:44:03  4  question --

13:44:03  5          MR. HONNOLD:  Yes, yes.

13:44:04  6  BY MR. HONNOLD:

13:44:05  7  Q.  Doctor, if you assume this is the question.  If you go to the

13:44:07  8  top of page 799 where I say:  "The thought being the sooner the

13:44:10  9  better, right?"

13:44:10  10         He says:  "Yes."

13:44:11  11         Then I say:  "You knew time is brain, correct?

13:44:14  12         Answer:  Yes."

13:44:16  13         Have I read it correctly so far?

13:44:17  14  A.  Yes.

13:44:18  15  Q.  Question: " Meaning the more time Sharyn Orr's brain is

13:44:20  16  confined in what you described as the closed box of the skull with

13:44:24  17  blood in there, blood that's going to turn into solid clot over

13:44:28  18  time, even more so, and a blockage of her cerebrospinal fluid so it

13:44:33  19  can't circulate., you knew that that process was going to continue

13:44:36  20  and jeopardize her brain even more and cause her to lose chance of

13:44:39  21  survival, right?"

13:44:41  22         And his answer included:  Yes.

13:44:48  23         The issue of delay that Dr. Bui talked about, the issue

13:44:55  24  of delay is the one word that you know of that you could pick

13:45:03  25  uncertainty over what caused Dr. Bui to have to delay surgery until

`13:45:07`  1  2:10 P.M.?

`13:45:10`  2  A.  Just -- was there a question with that last --

`13:45:13`  3  Q.  Yes.

`13:45:13`  4  A.  Okay.

`13:45:13`  5  Q.  What is the prescription medication that was at issue?

`13:45:16`  6  A.  So Xarelto was the blood thinner she was taking.

`13:45:24`  7        MR. HONNOLD:  Thank you.  I don't have any other

`13:45:25`  8  questions for you, Doctor.

`13:45:27`  9        THE COURT:  Any redirect?

`13:45:28`  10        MR. IRWIN:  Yes, your Honor, one question.

`13:45:31`  11                    REDIRECT EXAMINATION

`13:45:31`  12  BY MR. IRWIN:

`13:45:41`  13  Q.  I want you to assume that Dr. Bui was asked this question and

`13:45:46`  14  this answer when he testified.  If we can make that smaller.

`13:46:02`  15        Dr. Thomas, I want you to assume that Dr. Bui was asked

`13:46:05`  16  the following question:

`13:46:06`  17        "Can you tell us medically, scientifically, or any other

`13:46:08`  18  way, that had you been able to put these drains in at 2:00 A.M. in

`13:46:13`  19  the morning, that she would be alive today?"

`13:46:17`  20        And I want you to assume that his answer was:  "I simply

`13:46:20`  21  don't know."

`13:46:21`  22        Now, is that consistent with your recollection of his

`13:46:25`  23  testimony?

`13:46:26`  24  A.  Yeah, he said it was uncertain.  And simply don't know -- as a

`13:46:31`  25  doctor, when I say -- tell a patient "I don't know, I am

13:46:33 1  uncertain," we can't predict everything, regrettably.  So I think

13:46:38 2  he was uncertain.

13:46:40 3          And like he talked about, medically, scientifically,

13:46:43 4  given the size, given the location, all of those things matter, and

13:46:47 5  they matter significantly.

13:46:49 6          MR. IRWIN:  Thank you very much, your Honor.  Thank you,

13:46:51 7  Dr. Thomas.

13:46:52 8          THE COURT:  Okay.  All right.  Thank you very much.

13:46:54 9          THE WITNESS:  Thank you.  Any further witnesses from the

13:46:57 10 defendant?

13:46:58 11         MS. WILKINSON:  No, your Honor.  Subject to some of the

13:47:00 12 evidentiary issues, the defense rests.

13:47:03 13         THE COURT:  Okay.  Anything in rebuttal from the

13:47:04 14 plaintiffs?

13:47:05 15         MR. BIRCHFIELD:  Your Honor, we do not have any rebuttal.

13:47:10 16 We do need to introduce the exhibit that we talked about with the

13:47:15 17 Court and with the defense.

13:47:16 18         THE COURT:  I would like both sides to meet with Dean and

13:47:18 19 make sure the exhibits are in in the form and fashion that you need

13:47:22 20 them to be in.  And we'll do that.

13:47:24 21         Okay.  Members of the jury, we're going to stop here,

13:47:27 22 give you the rest of the day off; and I ask that you come back

13:47:33 23 9 o'clock on Monday, and we'll go for oral argument.

13:47:38 24         What I'll do, just to give you a schedule of the feeling,

13:47:41 25 I am going to give each side an hour to present their case.  So if

13:47:46 1  we start at -- now, you know that's my restriction, not theirs.

13:47:50 2  You know they can talk for days.  I've asked them to hold it down

13:47:55 3  to an hour each.  So we'll -- then I'll have an opportunity to talk

13:48:00 4  to you about the law applicable to the case, and then we'll provide

13:48:04 5  you with lunch Monday and you can then relax, have lunch, and then

13:48:10 6  begin your deliberations.

13:48:12 7      Again, on behalf of the lawyers and on behalf of me, we

13:48:16 8  really appreciate all of the work that you all have done in the

13:48:18 9  case.  I hope we haven't bored anybody, and kept everybody focused

13:48:24 10 on the evidence.  You've seen very good lawyers present their case,

13:48:32 11 both sides have done a very fine job of getting the message to you,

13:48:37 12 and I know that you'll continue to take it seriously.

13:48:41 13     Don't read anything about the case.  Please don't go on

13:48:45 14 the internet or anything of that sort, for the reasons that I told

13:48:48 15 you.  You have cross-examination in this laboratory that we're

13:48:52 16 examining this topic, and if you bring something into this

13:48:58 17 laboratory without that aspect, then you'll bring a germ in and

13:49:03 18 you'll contaminate it and we won't have justice, and that's your

13:49:07 19 job, to decide the facts of the case.

13:49:11 20     So I'll see you then on Monday.  You can bring your

13:49:16 21 tablets into the jury room, and we'll lock them up and give them

13:49:20 22 back to you on Monday.

13:49:22 23     All rise out of respect for the jury as they leave,

13:49:25 24 please.

13:49:48 25     (WHEREUPON, THE JURY EXITED THE COURTROOM.)

OFFICIAL TRANSCRIPT

13:49:48  1      THE COURT:  Okay.  Be seated, please.  Do you want to

13:49:51  2  make the motions now or do you want to do them in writing?  How do

13:49:55  3  you want to do that?

13:49:55  4      MS. WILKINSON:  I think we are going to both, your Honor.

13:49:57  5  We have motions in writing, and I think Mr. Irwin is just going to

13:50:00  6  give a short argument.

13:50:01  7      THE COURT:  Fine.

13:50:03  8      MR. IRWIN:  Only if I can find my notes, Judge.  Here we

13:50:06  9  go.

13:50:11 10      THE COURT:  These are the motions that were made timely

13:50:14 11  by the parties -- by the Defendant at end of Plaintiffs' case, they

13:50:16 12  move for directed verdict.

13:50:23 13      MR. IRWIN:  Thank you, your Honor.  This will be brief,

13:50:25 14  just incorporating our papers.  We ask pursuant to Rule 50(a) for

13:50:30 15  judgment as a matter of law.  The primary basis for this motion is

13:50:35 16  the testimony of the two prescribers, this being a failure to warn

13:50:39 17  case.

13:50:41 18      Dr. St. Martin said, your Honor, we believe, in no

13:50:45 19  uncertain terms that he was fully aware of the risks, and that even

13:50:49 20  after cross-examination, extensive cross-examination, on redirect

13:50:55 21  he reiterated that nothing that has occurred since he prescribed

13:51:00 22  the medicine to Mrs. Orr, nothing that has occurred during his

13:51:05 23  deposition, nothing that has occurred since his deposition, and

13:51:08 24  nothing that occurred on cross-examination made him change his mind

13:51:14 25  and say that today he would not have prescribed the medicine.  That

13:51:19  1   interrupts the causal link that the plaintiffs have the burden to

13:51:25  2   prove.

13:51:26  3          Secondarily, although we respectfully disagree with your

13:51:28  4   Honor's extension of the learned intermediary doctrine downstream

13:51:32  5   to a non-prescriber, we believe that our debate with your Honor

13:51:37  6   about that is moot because the prescriber himself said that he

13:51:42  7   never read the label.

13:51:44  8          So there is the interruption, again, of the all important

13:51:50  9   proximate cause.

13:51:50 10          Just a couple of other things that I'll flag, your Honor.

13:51:54 11   We believe that the plaintiffs have not shown to a reasonable

13:51:57 12   degree of medical certainty more probably than not that Mrs. Orr's

13:52:06 13   outcome, her fatal outcome was the result of Xarelto.

13:52:14 14          All we have, your Honor, is the naked testimony and

13:52:18 15   opinion of Dr. Liechty, who threw out a number of 60 percent.

13:52:24 16   There was no basis for this number, there was no support for that

13:52:28 17   number, there was no analysis of that number, there was no

13:52:31 18   literature supporting that number.  It was ipse dixit, take my word

13:52:37 19   for it, utterly no basis for that opinion.

13:52:39 20          Without that opinion, hollow as it is, there is no proof,

13:52:44 21   substantial preponderance of evidence otherwise, that Xarelto was a

13:52:49 22   substantial factor in the cause of Mrs. Orr's unfortunate passing.

13:52:54 23          We reiterate the arguments, your Honor, about preemption

13:52:59 24   and abandoned claims.

13:53:01 25          And we thank you very much for hearing us on this motion.

13:53:04 1        THE COURT:  Good.  I'll also allow you all to write, if

13:53:07 2   you need to.

13:53:08 3        The issue in the case, as I see it, is if either or both

13:53:13 4   of the doctors were adequately, properly, fully informed of the

13:53:18 5   availability of a PT test, as being useful to a plaintiff in

13:53:27 6   emergency situations, available to inform the doctors as to the

13:53:32 7   proper treatment of a party in emergency situations, if they had

13:53:39 8   been advised or informed, would they have acted differently.

13:53:44 9        I listened closely to the doctors, and I must say that in

13:53:49 10  the examination by the plaintiff there was -- either or both of the

13:53:54 11  doctors answered questions that were favorable to the plaintiff.

13:53:57 12       I also listened to the defendants, and I believe that the

13:54:00 13  doctors, either or both of them, also answered questions that were

13:54:04 14  favorable to the defendant.

13:54:07 15       It's a question of the credibility at that point.  If

13:54:11 16  they answer one way for the plaintiffs, one way for the defendants,

13:54:14 17  it raises some question of credibility, and credibility really is

13:54:17 18  the question for the jury.

13:54:19 19       So for that reason, I'll deny it.

13:54:23 20       With regard to the question of the learned intermediary.

13:54:27 21  The statute itself talks about not -- of course, it's couched in

13:54:34 22  such a way that it's not just for drugs, it's for products in

13:54:39 23  general.  The question is posed that's -- that -- it seems to me,

13:54:51 24  that it's important for both the prescriber and the user.

13:54:57 25       Back in the day when old Doc Smith was around, he was the

13:55:04 1  prescriber and the user.  He did all of the work or she did all of

13:55:07 2  the work.  And times have changed now.

13:55:11 3       You have one doctor examines you in the emergency room;

13:55:15 4  he sends you to another doctor or a surgeon or whatever.  And it

13:55:20 5  seems to me that if one doctor knows something and the other doctor

13:55:25 6  doesn't know it, it's got -- they've got to be informed.  It makes

13:55:31 7  no sense to me if you only have to advise the prescribing doctor,

13:55:36 8  and you have no responsibility to advise the treating doctor,

13:55:44 9  particularly when they're different.  It seems inconsistent with

13:55:49 10  the statute, inconsistent with the cases that I read.

13:55:53 11       And so for that reason also I'll deny it.

13:55:56 12       MR. IRWIN:  Your Honor, can I make one more comment

13:55:59 13  procedurally?

13:56:00 14       THE COURT:  Sure.  Of course.

13:56:00 15       MR. IRWIN:  Your Honor, very kindly mentioned this, I

13:56:02 16  think, on the record yesterday.  But we want to make sure that it

13:56:05 17  is clear that we have properly moved at the end of the case at the

13:56:10 18  time that was proper to make this motion.

13:56:11 19       THE COURT:  Right.

13:56:14 20       MR. IRWIN:  And that we renew it now --

13:56:14 21       THE COURT:  Right.

13:56:16 22       MR. IRWIN:  -- as a matter of record, and we do want

13:56:18 23  permission to file the proper papers today at the close of

13:56:21 24  evidence.

13:56:21 25       THE COURT:  That's my understanding.  And I understood

13:56:24  1   that the plaintiffs agreed to that.  So you made them properly; you

13:56:29  2   made them timely; and you have an opportunity to supplement with

13:56:32  3   writing.

13:56:32  4         MR. IRWIN:  Thank you very much, Judge.

13:56:34  5         MR. MEUNIER:  Your Honor, may I just say a brief word

13:56:37  6   about one issue?

13:56:39  7         THE COURT:  Sure.

13:56:39  8         MR. MEUNIER:  Of course we believe -- may it please the

13:56:42  9   Court, Jerry Meunier for the plaintiffs.

13:56:45  10        We believe that the Rule 50(a) question before you

13:56:47  11   virtually answers itself based upon the more than legally

13:56:50  12   sufficient evidence on Plaintiffs' case.

13:56:52  13        I would like to say, your Honor, that when we talk here

13:56:55  14   about the subjective testimony of the prescribing physician

13:57:01  15   Dr. St. Martin, which to be kind -- the kindest thing you can say

13:57:06  16   about is it is equivocal.

13:57:08  17        He tells Mr. Irwin, "I'd never prescribed it again."

13:57:12  18        He tells Mr. Birchfield, "Yes, I'd take those things into

13:57:15  19   account and consider something else."

13:57:17  20        It's in that very case, your Honor, where I urge the

13:57:19  21   Court to reconsider its position on the objective evidence

13:57:23  22   standard.  When you decided the *Allgood* case, *Allgood versus*

13:57:27  23   *GlaxoKline* (VERBATIM), 2008 WL 483574, 2008 --

13:57:33  24        THE COURT:  I remember it.

13:57:34  25        MR. MEUNIER:  -- the prescriber had basically said, "I'd

13:57:39  1    prescribe it again."

13:57:41  2             And what you acknowledged in the footnote was the

13:57:44  3    plaintiffs didn't put on anything to rebut that, which is why they

13:57:49  4    lost that case.  But you acknowledged that in the Fifth Circuit --

13:57:52  5    and we now have it in both Mississippi law Fifth Circuit and

13:57:56  6    Louisiana law Fifth Circuit -- objective evidence is relevant.

13:57:59  7             The only point I want to make, your Honor, is not

13:58:02  8    necessarily to urge that the jury be told that they can decide the

13:58:09  9    causation prong of learned intermediary based on objective

13:58:13 10    evidence, only that objective evidence of what a reasonable doctor

13:58:18 11    would have done is relevant to their deciding whether

13:58:21 12    Dr. St. Martin or Dr. Bui would have acted differently.

13:58:24 13             And I believe, particularly in a case like this, that

13:58:27 14    objective standard should be considered.

13:58:30 15             THE COURT:  I understand that.  The plaintiffs take the

13:58:34 16    position that the defendants have a duty and responsibility under

13:58:37 17    the law to advise a treater, a prescriber, or a reasonable --

13:58:47 18    either the prescriber or a reasonable prescriber the information.

13:58:51 19             Now, they're correct in the sense that there are some

13:58:54 20    cases that talk about the objective evidence, but my reading of the

13:58:58 21    law -- and I am familiar with this area -- my reading of the law is

13:59:03 22    that that's accurate.

13:59:05 23             But it's accurate when a treater is not available, when

13:59:09 24    the treater doesn't know; and, therefore, the question is, assuming

13:59:15 25    a treater doesn't know, assuming a treater is not available, what

2205

13:59:19  1   does the plaintiff do at that point?  And the Court said, well, in

13:59:22  2   that situation, we can use other evidence to show what a reasonable

13:59:28  3   person would do.

13:59:29  4        But in this case we have a treater; the treater's

13:59:32  5   testified.  The treater's credibility is at issue at this point,

13:59:37  6   and that's before the jury.  So I understand the issue, but I'll

13:59:41  7   deny it.

13:59:42  8        Thank you very much, and I'll see you in ten minutes on

13:59:46  9   the jury --

13:59:48  10        MR. BARR:  Your Honor, before we go off the record with

13:59:50  11   what we talked about in chambers -- Brian Barr for the

13:59:52  12   plaintiffs -- we want to now move in the exhibit that we referred

13:59:55  13   to.

13:59:56  14        THE COURT:  Yes.

13:59:57  15        MR. IRWIN:  Can I complain about this?  They have

13:59:59  16   redacted everything.  You complained about us redacting everything,

14:00:03  17   but look what you've done.

14:00:04  18        MR. BARR:  I did exactly what I said I would do.

14:00:08  19        So at this time, your Honor, plaintiffs move in 30614444

14:00:14  20   as redacted to have only the language that was used with the

14:00:20  21   witnesses in court.

14:00:22  22        MR. DUKES:  Your Honor, I understand that's over our

14:00:24  23   objections which included 401 --

14:00:27  24        THE COURT:  Yes.  Right.  The way I see it, as I

14:00:29  25   mentioned, I don't feel that it's appropriate for a party, be it

14:00:35   1   plaintiff or defendant, to introduce into evidence labels from a

14:00:39   2   foreign country.  It has nothing to do with the case before us.

14:00:44   3        On the other hand, the issue is what did the defendants

14:00:50   4   say in this case?

14:00:52   5        So you have a situation where it's hearsay, but it's an

14:00:58   6   exception to the hearsay rule, which 801(d)(2) comes in.  The

14:01:05   7   question is how does it come in?

14:01:08   8        Well, we look to 613 in that situation.  When a witness

14:01:13   9   has made a statement, a prior statement and is questioned on the

14:01:17  10   statement, that portion of the statement can come in.

14:01:20  11        Then the issue is, well, the plaintiff put in a

14:01:24  12   particular portion that the defendants said to a foreign entity.

14:01:33  13   To me that comes in because it's a statement.  The plaintiff

14:01:37  14   (VERBATIM) can't say, well, we said it to a foreign entity, but it

14:01:40  15   was a lie.  It doesn't make sense to me.

14:01:43  16        So they said it to a foreign entity because they believed

14:01:46  17   it to be true or in response to a question, but they said it.  And

14:01:50  18   so that comes in.

14:01:51  19        On the other hand, the defendant (VERBATIM) then says,

14:01:53  20   well, look, if you let in a portion of the statement, I want the

14:01:56  21   rest of the statement.  106, they have a right to do that.

14:01:59  22        So I put it in both.  Seems to me to be the way to do it.

14:02:04  23        MR. BARR:  We agree, your Honor.

14:02:05  24        THE COURT:  Yeah.  Well, all right.

14:02:05  25        MR. DUKES:  Your Honor, with regard to this document,

14:02:07  1    Mr. Barr and I have an agreement.  There's a statement at the

14:02:10  2    bottom left corner of each page that's says highly protected

14:02:12  3    information subject to protective order.  I think he's agreed to

14:02:15  4    submit that as redacted on the official version.

14:02:19  5         THE COURT:  Okay.  I've given to you all a copy of the

14:02:22  6    jury charges.  You know what I do.  I meet with you and I get

14:02:25  7    suggestions from you.  I'll give you another draft that has taken

14:02:28  8    into consideration those objections.  And then I'll meet with you

14:02:32  9    again.

14:02:33 10         It's probably best if we try to do this today however

14:02:38 11    long it takes, and then my thinking is, is that probably on Monday,

14:02:43 12    since we're going to the jury at 9 o'clock, it will be helpful if

14:02:47 13    you all came at 8 o'clock, put on the record all of your objections

14:02:51 14    to it.

14:02:51 15         At that point -- before that point, I'll send it to you

14:02:55 16    the Saturday or Sunday, my final charge.  You'll know what it is.

14:03:00 17    You'll be able to then make your objections, put it in the record.

14:03:04 18         And, again, in the Fifth Circuit, they like you to be

14:03:07 19    specific rather than general.  So take that into consideration.

14:03:11 20    Tell me whatever you need, and we'll do it that way.

14:03:15 21         MR. BARR:  Okay.  Thank you.  Your Honor, this will be

14:03:19 22    Exhibit 190, for the record.

14:03:21 23         THE COURT:  Okay.

14:03:21 24         MR. MEUNIER:  We will continue going through the charge

14:03:22 25    now with you in chambers?

14:03:25  1          THE COURT:  Yes.  Give me about ten minutes.

14:03:27  2          And just on a personal note, I appreciate all of the work

14:03:29  3   that you all have done in the case.  These cases are very difficult

14:03:33  4   because of the numbers of people, I have 17,000 of them, so forth.

14:03:37  5   They sell me I have 860 lawyers in the case.  So it makes it

14:03:42  6   complicated.

14:03:42  7          But the reason that these cases can be handled is because

14:03:46  8   of the quality of the lawyers who handle these cases.  And it's no

14:03:51  9   surprise to me that we have the best of the best on both sides, and

14:03:55 10   not only are they proficient, but they're very professional in the

14:04:00 11   case.  And that means a lot to me, and I need to tell you how much

14:04:03 12   I appreciate it.

14:04:05 13          MR. BARR:  Thank you, your Honor.

14:04:06 14          THE COURT:  The Court will stand in recess.

14:04:08 15          THE DEPUTY CLERK:  All rise.

14:04:09 16       (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.)

         17

         18                        *  *  *  *  *  *

         19

         20                    REPORTER'S CERTIFICATE

         21

         22          I, Karen A. Ibos, CCR, Official Court Reporter, United
              States District Court, Eastern District of Louisiana, do hereby
         23   certify that the foregoing is a true and correct transcript, to the
              best of my ability and understanding, from the record of the
              proceedings in the above-entitled and numbered matter.
         24
                             /s/ Karen A. Ibos
         25                 _____
                            Karen A. Ibos, CCR, RPR, CRR, RMR
                            Official Court Reporter

————————————————— OFFICIAL TRANSCRIPT —————————————————