UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


| | | |
|---|---|---|
| IN RE:  XARELTO (RIVAROXABAN) | * | |
| PRODUCTS LIABILITY LITIGATION | * | Docket No. 14-MD-2592 |
| | * | |
| | * | Section L |
| THIS DOCUMENT RELATES TO: | * | |
| | * | New Orleans, Louisiana |
| *Joseph Orr, et al.* | * | |
| *v. Janssen Research &* | * | June 12, 2017 |
| *Development, et. al.,* | * | |
| Case No. 15-CV-3708 | * | |
| | * | |
| * * * * * * * * * * * * * * * * | | |

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE
VOLUME X
JUNE 12, 2017

<u>Appearances:</u>


For the Plaintiffs:          Levin Papantonio Thomas Mitchell
                               Rafferty & Proctor, P.A.
                             BY:  BRIAN H. BARR, ESQ.
                             316 South Baylen Street, Suite 600
                             Pensacola, Florida  32502


For the Plaintiffs:          Beasley Allen Crow Methvin
                               Portis & Miles, PC
                             BY:  ANDY BIRCHFIELD, ESQ.
                             Post Office Box 4160
                             Montgomery, Alabama 36103


For the Plaintiffs:          Gainsburgh Benjamin David
                               Meunier & Warshauer, LLC
                             BY:  GERALD E. MEUNIER, ESQ.
                             1100 Poydras Street, Suite 2800
                             New Orleans, Louisiana 70163

1    Appearances:

2

3    For the Plaintiffs:                 Goza & Honnold, LLC
                                         BY:  BRADLEY D. HONNOLD, ESQ.
                                         11181 Overbrook Road, Suite 200
4                                        Leawood, Kansas 66211

5

6    For the Plaintiffs:                 The Lambert Firm, PLC
                                         BY:  EMILY C. JEFFCOTT, ESQ.
                                         701 Magazine Street
7                                        New Orleans, Louisiana 70130

8

9    For Bayer Healthcare                Wilkinson Walsh + Eskovitz, LLP
     Pharmaceuticals, Inc.               BY:  BETH A. WILKINSON, ESQ.
     and Bayer Pharma AG:                1900 M Street NW, Suite 800
10                                       Washington, DC 20036

11

12   For Bayer Healthcare                Nelson Mullins Riley &
     Pharmaceuticals, Inc.               Scarborough, LLP
     and Bayer Pharma AG:                BY:  DAVID E. DUKES, ESQ.
13                                       1320 Main Street, 17th Floor
                                         Columbia, South Carolina 29201

14

15   For Janssen Pharmaceuticals,        Irwin Fritchie Urquhart
     Inc. and Janssen Research &         & Moore, LLC
16   Development, LLC:                    BY:  JAMES B. IRWIN, ESQ.
                                         400 Poydras Street, Suite 2700
17                                       New Orleans, Louisiana 70130

18                                       Bradley
                                         BY:  LINDSEY C. BONEY, IV
19                                       One Federal Place
                                         1819 5th Ave. N
20                                       Birmingham, AL  35203

21

22   Official Court Reporter:            Tana J. Hess, CCR, FCRR, RMR
                                         500 Poydras Street, Room B-275
23                                       New Orleans, Louisiana 70130
                                         504.589.7781

24

25   Proceedings recorded by mechanical stenography using
     computer-aided transcription software.

OFFICIAL TRANSCRIPT

1                          <u>I N D E X</u>

2                                              <u>PAGE</u>

3      Closing Argument by Mr. Barr              2338

4      Closing Argument by Ms. Wilkinson         2366

5      Closing Argument by Mr. Birchfield        2404

6

7

8                      <u>INDEX OF WITNESSES</u>

9      <u>NAME</u>                                <u>PAGE</u>

10     Sanjay Jalota(Proffer)

11         Direct Examination by Mr. Overholtz    2447

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1          (Open court.)

7:59AM    2          THE COURT:  Be seated, please.  Okay.  I met on

7:59AM    3   several occasions with the attorneys, gave them a draft of my

7:59AM    4   jury charges, got their input on it.  I gave them another

7:59AM    5   draft, and through several drafts, I came with the final and

7:59AM    6   gave them the final.  Are there any objections at this time

7:59AM    7   from the Plaintiff?

8:00AM    8          MR. MEUNIER:  Good morning, Your Honor.  May it

8:00AM    9   please the Court, Jerry Meunier on behalf of the Plaintiffs.

8:00AM   10          First, Judge, we respectfully object to the

8:00AM   11   Court's not having included in its final version of the jury

8:00AM   12   charges the instruction that the Defendant takes the Plaintiff

8:00AM   13   or the victim as it finds her.  We had included in one of the

8:00AM   14   earlier versions of your charges, and, in fact, you had

8:00AM   15   included in an earlier draft language along those lines, but in

8:00AM   16   the final draft we don't find that, and here is what we have

8:00AM   17   proposed in our last red line edit to the Court's charges.  It

8:00AM   18   was at Page 31 of the second draft.  "However, under our laws,

8:00AM   19   the Defendants take the victim as they find her.  In other

8:00AM   20   words, the age and pre-existing health conditions of Sharyn Orr

8:00AM   21   prior to her injury should not in and of themselves discount

8:00AM   22   the amount of the compensation received for her injury."

8:01AM   23          And Your Honor, we believe that both with

8:01AM   24   respect to Mrs. Orr's condition at the time she was prescribed

8:01AM   25   Xarelto and certainly her condition at the time she was in the

8:01AM 1    ER, that jury charge is appropriate.

8:01AM 2         **THE COURT:**  Let me speak on that.  I think that's a

8:01AM 3    correct statement of the law.  However, it depends upon how

8:01AM 4    it's packaged and where it's put, and that's really a factual

8:01AM 5    predicate in cases.  With regard to the usual case where

8:01AM 6    there's a typical bad back and then the injury occurs and the

8:01AM 7    back is worsened or the eggshell skull of somebody involved in

8:01AM 8    an accident and there is a -- head damage, that is appropriate

8:01AM 9    at the time to worsening of conditions.  It's appropriate to

8:01AM 10   focus the jury on the fact that they take their victims as they

8:02AM 11   find them.

8:02AM 12        In this particular case, that's not the facts of

8:02AM 13   the case.  The facts of the case are that the -- Mrs. Orr came

8:02AM 14   into the operating room or came into the hospital either

8:02AM 15   comatose or nearly comatose.  It's not a question of worsening

8:02AM 16   of condition.  It's a question of causation, as I see it.  So I

8:02AM 17   packaged that concept in terms of causation and focused the --

8:02AM 18   the jury on the fact that this may be multiple causes, but that

8:02AM 19   does not relieve the Defendant if a predominant cause is the --

8:02AM 20   the liability that the Plaintiffs are focusing on.  So I had

8:02AM 21   that concept in the jury charges, but it's packaged in a

8:02AM 22   different way that's more consistent with the facts of this

8:03AM 23   case.  So I will deny the motion.

8:03AM 24        **MR. MEUNIER:**  Thank you, Judge.

8:03AM 25        The next reference is to the Plaintiffs' revised

2314

8:03AM  1  and supplemental proposed jury instructions numbered 1 through

8:03AM  2  34, which were in the record as documents 6732.  We

8:03AM  3  respectfully object to the Court's not having included

8:03AM  4  Plaintiffs' proposed jury charge Number 2, which tells the jury

8:03AM  5  that there is no legal requirement that a medical or scientific

8:03AM  6  expert express an opinion to a degree of scientific or medical

8:03AM  7  certainty since the standard is preponderance of the evidence

8:03AM  8  and it is sufficient that the opinion be expressed to a

8:03AM  9  reasonable probability.

8:03AM  10         Your Honor, in this case, both sides, both --

8:03AM  11  counsel for both sides have invited different experts to

8:03AM  12  express their opinions in terms of certainty, reasonable

8:03AM  13  medical certainty.  It's customary to do that.  However, we

8:03AM  14  think the jury should be told that even if they should find

8:03AM  15  that a given expert's opinion didn't rise to the level of some

8:03AM  16  reasonable certainty, that it would still be sufficient if it

8:04AM  17  rose to the level of probability.  And so we object to the

8:04AM  18  Court's not having included Plaintiffs' proposed Charge

8:04AM  19  Number 2.

8:04AM  20         THE COURT:  With respect to that, all of the

8:04AM  21  witnesses have testified that they're testifying to a great --

8:04AM  22  to a degree of -- what they've testified to, and I don't think

8:04AM  23  that probability has come into it, but it's really overall, the

8:04AM  24  concept is preponderance of the evidence, more likely so than

8:04AM  25  not.  That is true in all of the -- of the testimony of all of

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 8:04AM | 1 | the witnesses.  So I think it's covered substantially, and I |
| 8:04AM | 2 | don't think it's necessary and could be confusing to the jury. |
| 8:04AM | 3 | So I'll deny the motion. |
| 8:04AM | 4 | MR. MEUNIER:  Your Honor, our next objection can be |
| 8:04AM | 5 | discussed in reference to two of the Plaintiffs' proposed jury |
| 8:04AM | 6 | charges in document 6732.  That is proposed charge Number 9 and |
| 8:04AM | 7 | proposed charge Number 25.  Both deal, Your Honor, with the |
| 8:05AM | 8 | so-called objective evidence standard in terms of the causation |
| 8:05AM | 9 | prong of the learned intermediary test.  We've also submitted a |
| 8:05AM | 10 | bench memo to the Court, which is record doc. 6731.  I would |
| 8:05AM | 11 | incorporate our arguments from that memo for purposes of this |
| 8:05AM | 12 | objection.  And we've cited the Court to the *Allgood* case, to |
| 8:05AM | 13 | the *Thomas* case, and to the *Grenier* case.  And Your Honor, the |
| 8:05AM | 14 | *Allgood* case, the subjective testimony of a learned |
| 8:05AM | 15 | intermediary was that the label would not have made a |
| 8:05AM | 16 | difference in his prescribing decision.  And yet Your Honor |
| 8:05AM | 17 | noted that the Plaintiff may have had an opportunity to put in |
| 8:05AM | 18 | objective evidence and chose not to. |
| 8:05AM | 19 | We acknowledge that in *Thomas* and in *Grenier*, |
| 8:05AM | 20 | there was basically an absent -- I'm sorry, there was basically |
| 8:05AM | 21 | a question about the subjective evidence from the learned |
| 8:05AM | 22 | intermediary.  And Your Honor, I think in this case |
| 8:05AM | 23 | since the -- for example, the testimony of Dr. St. Martin is at |
| 8:05AM | 24 | best equivocal in that he said on the one hand, he would still |
| 8:06AM | 25 | prescribe Xarelto, and he said on the other hand, well, if I |

8:06AM   1   knew that, I would sit down with the clients and -- the patient
8:06AM   2   and maybe come to a different decision.  We think it's
8:06AM   3   precisely when the subjective testimony on the causation prong
8:06AM   4   is equivocal, it's precisely in those cases that the jury
8:06AM   5   should also hear what a reasonable physician would have done
8:06AM   6   and be able to decide causation on that basis.
8:06AM   7              And so for the reasons we've previously argued,
8:06AM   8   Your Honor, we object to the Court's not having given
8:06AM   9   Plaintiffs' proposed charges 9 and 25 on the objective evidence
8:06AM  10   standard.
8:06AM  11              THE COURT:  You know, I think that the cases, when
8:06AM  12   you look at them closely, they indicate to me in any event that
8:06AM  13   the -- that that standard of objective evidence is -- is alive
8:06AM  14   and well, but it's alive and well in a fact pattern where there
8:06AM  15   is no treater or there is a treater who is -- has forgotten or
8:07AM  16   is absent or has not even expressed an opinion.
8:07AM  17              Here the treaters have expressed an opinion,
8:07AM  18   although frankly, their opinion seems to coincide with both
8:07AM  19   parties.  So I -- I understand Plaintiffs' position, but I
8:07AM  20   think that that introduces a credibility quotient, and it's
8:07AM  21   just up to the jury to decide on credibility.  So that's the
8:07AM  22   reason I deny the motion.
8:07AM  23              MR. MEUNIER:  Your Honor, our next objection again
8:07AM  24   can be discussed in reference to two of our proposed charges,
8:07AM  25   proposed charge Number 12 and proposed charge Number 3.  These

| | |
|---|---|
| 8:07AM | 1 |
| 8:07AM | 2 |
| 8:07AM | 3 |
| 8:07AM | 4 |
| 8:07AM | 5 |
| 8:08AM | 6 |
| 8:08AM | 7 |
| 8:08AM | 8 |
| 8:08AM | 9 |
| 8:08AM | 10 |

1    deal with federal regulations.

2            Proposed charge Number 12 instructs the jury

3    that the regulations set forth in 21 CFR Section

4    201.57(c)(6)(iii) sets forth a mandatory requirement that

5    helpful liability -- helpful laboratory tests be disclosed in a

6    warnings label for a prescription drug.  This regulation was in

7    fact shown to the jury, and it's clearly relevant to the case.

8    And we believe the Court should instruct the jury that the

9    referenced regulation specifically is relevant to the failure

10   to warn case made -- offered by Plaintiffs.

11           And then in jury charge Number 13, Judge, we

12   asked the Court to instruct the jury that the violation of such

13   regulatory standards may be considered as evidence of the

14   appropriate standard for determining whether instructions were

15   adequate, and we cite case law for that.

16           So we respectfully object to the failure to give

17   charges 12 and 13 proposed by Plaintiffs.

18       THE COURT:  I think taken as a whole, the jury

19   charges are accurate and they express what the Plaintiff has

20   indicated.  I don't think that zeroing in on something is even

21   helpful to the jury or helpful to the parties.  So that's the

22   reason I deny it.

23       MR. MEUNIER:  Our final objection, Judge, again, can

24   be referenced with two of the proposed charges, Numbers 27 and

25   28.  This deals with the strike-through label that the

8:09 AM
8:09 AM
8:09 AM
8:09 AM
8:09 AM
8:09 AM
8:09 AM
8:09 AM
8:09 AM
8:09 AM
8:09 AM
8:09 AM
8:09 AM
8:10 AM
8:10 AM
8:10 AM
8:10 AM
8:10 AM
8:10 AM
8:10 AM
8:10 AM
8:10 AM
8:10 AM
8:10 AM
8:10 AM

1   Defendants have offered into evidence.  And with regard to that
2   exhibit and the evidence and the testimony, regarding the fact
3   that the FDA struck through certain language which was proposed
4   by Janssen for the Xarelto label, we have asked the Court to
5   instruct the jury that they are not to consider that evidence
6   as proof that the FDA either refused to approve or would not
7   have approved the nature and extent of warnings and
8   instructions which the Plaintiffs claim were needed to properly
9   instruct Mrs. Orr's prescribing and treating physicians about
10  the dangers and safeties of Xarelto.

11          We believe that this instruction, Your Honor, is
12  critically important because the jury otherwise might be led to
13  believe that the PT language which the Plaintiffs proposed was
14  proposed by Janssen and rejected by the FDA.  And even if the
15  FDA approval is not conclusive, as you will instruct the jury,
16  that rejection of label language should not be seen as having
17  any preemptive effect.  And in fact, Judge, you have ruled
18  prior to this case that the Defendants are not in a position to
19  assert a preemptory defense.  The Defendants have not even
20  sought to do so, to meet the clear evidence standard for a
21  preemption defense, and yet through this, I think we have, in
22  effect, back-door preemption in the case.

23          And so we respectfully object to the Court not
24  giving that limiting instruction about what is not to be taken
25  from that strike-through label or any argument of counsel that

8:10AM 1  may -- we may now hear about it.

8:10AM 2              And in connection with that, we've also

8:10AM 3  submitted a proposed charge 28, which again says that if the

8:10AM 4  Defendants are going to suggest that some rejection or action

8:11AM 5  by the FDA has a preemptive effect, then they have a clear

8:11AM 6  evidence standard that the FDA would not have approved the

8:11AM 7  label proposal that the Plaintiffs are putting forward.  So we

8:11AM 8  object to the Court not having given Plaintiff charges 27 and

8:11AM 9  28.

8:11AM 10             **THE COURT:**  I understand.  The jury has been advised

8:11AM 11 that the actions of the FDA are not dispositive.  I

8:11AM 12 specifically have a charge on that.  Also from the Plaintiffs'

8:11AM 13 standpoint, they take the position that -- and they focus the

8:11AM 14 jury on what the Defendant knew and when they knew it and what

8:11AM 15 they did or failed to do about it.  And that's the whole

8:11AM 16 concept, that the Defendants knew that this test should have

8:11AM 17 been included and they used it themselves.  They were satisfied

8:11AM 18 when they used it themselves.  They didn't tell the FDA that it

8:11AM 19 was a test, a good test, a test albeit had some false positives

8:12AM 20 or false negatives, not accurate all the time, but it was close

8:12AM 21 enough for them to use it.  They didn't tell the FDA that.

8:12AM 22 That's the whole position of the Plaintiffs.

8:12AM 23             Well, the Defendants have an opportunity to say

8:12AM 24 what they did tell the FDA and what they suggested to the FDA

8:12AM 25 and why it is -- why they -- they said it, they did what the

8:12AM   1    Plaintiffs said.  That's their answer to it.

8:12AM   2                So I think that that portion does come in, but I

8:12AM   3    also balance that by telling the -- the jury that what the FDA

8:12AM   4    does or say -- says is not dispositive; that Louisiana law can

8:12AM   5    still make someone liable notwithstanding what the FDA says.

8:12AM   6    So I think on balance, the charges are balanced and fair, and

8:12AM   7    I'll deny the motion.

8:13AM   8                MR. MEUNIER:  And, Your Honor, we have no -- the

8:13AM   9    Plaintiffs make no objection to the Court's final version of

8:13AM  10    the verdict form.  As you know, there has been some additional

8:13AM  11    briefing now presented by the Defendants.  I am more than

8:13AM  12    willing, in fact, anxious to address the question of whether

8:13AM  13    the medical causation question is needed in the verdict form

8:13AM  14    based on the loss of a chance doctrine being included.  But if

8:13AM  15    Your Honor would like to hear that, I'm prepared to go forward.

8:13AM  16    Otherwise, we can submit this on briefs.

8:13AM  17                THE COURT:  You can do it on briefs.  I understand

8:13AM  18    the issue.

8:13AM  19                MR. MEUNIER:  And likewise, Judge --

8:13AM  20                THE COURT:  What about the charge -- the verdict

8:13AM  21    form?

8:13AM  22                MR. MEUNIER:  I said we're fine on the verdict form,

8:13AM  23    Judge.  It's just that they have now briefed the question of

8:13AM  24    the medical causation question, which --

8:13AM  25                THE COURT:  Right.

| | | |
|---|---|---|
| 8:13 AM | 1 | **MR. MEUNIER:** -- as you know, we believe that's |
| 8:13 AM | 2 | embedded in the proximate cause of damages question and in no |
| 8:13 AM | 3 | way is it mandated by loss of a chance doctrine, which I'll be |
| 8:13 AM | 4 | happy to expound upon in briefing if the Court does not wish to |
| 8:13 AM | 5 | hear opposition of that on the record this morning. |
| 8:14 AM | 6 | The final point I would just make, Judge, is |
| 8:14 AM | 7 | that the Defendants also have raised a question about the -- |
| 8:14 AM | 8 | the charge provision you have that's the Defendant is able to |
| 8:14 AM | 9 | strengthen a warning label without need for FDA approval.  We |
| 8:14 AM | 10 | have looked this morning at the exact language used by the |
| 8:14 AM | 11 | Wyatt case in this regard, and if the Court is willing to |
| 8:14 AM | 12 | accept an amendment that might satisfy the concerns of the |
| 8:14 AM | 13 | Defendant, this would be at Page 26 of your charge where you |
| 8:14 AM | 14 | say, "Specific federal regulations authorize the manufacturer |
| 8:14 AM | 15 | of a drug which has been approved by the FDA to 'add or |
| 8:14 AM | 16 | strengthen warning, precaution or adverse reaction' information |
| 8:14 AM | 17 | about the drug and the drug's label and to do so without need |
| 8:14 AM | 18 | for prior FDA approval.  The exact language of *wyeth* is, "and |
| 8:14 AM | 19 | it need not wait for FDA approval."  And if the Court wished to |
| 8:15 AM | 20 | clarify that in light of what the Defendants have raised, we |
| 8:15 AM | 21 | would have no objection. |
| 8:15 AM | 22 | **THE COURT:**  Okay. |
| 8:15 AM | 23 | **MR. MEUNIER:**  Thank you, Judge. |
| 8:15 AM | 24 | **THE COURT:**  Let me hear from the Defendant. |
| 8:15 AM | 25 | **MR. IRWIN:**  Good morning, Your Honor.  I'll go |

8:15AM  1   backwards, okay?

8:15AM  2          THE COURT:  Okay.

8:15AM  3          MR. IRWIN:  Talking about the CBE and the label and

8:15AM  4   changes.  The language that has been proposed on paragraph --

8:15AM  5   in a paragraph on Page 26 of your jury charge we do object to.

8:15AM  6   And for the record, I'll recite the language.  It's very brief.

8:15AM  7   It says, "Specific federal regulations authorize the

8:15AM  8   manufacturer of a drug which has been approved by the FDA to

8:15AM  9   add or strengthen warning, precaution or adverse reaction

8:15AM  10  information about the drug and the drug's label and to do so

8:15AM  11  without the need for further FDA approval."  I do not think --

8:16AM  12         THE COURT:  I changed it to prior, for prior FDA

8:16AM  13  approval.

8:16AM  14         MR. IRWIN:  It's been changed to prior FDA approval?

8:16AM  15         THE COURT:  Yeah.

8:16AM  16         MR. IRWIN:  Thank you, Judge.

8:16AM  17             We do not believe that the language suggested by

8:16AM  18  Mr. Meunier just a minute ago really solves the problem.  The

8:16AM  19  problem -- if I can borrow from Rule 106 and apply it to the

8:16AM  20  law, the problem is that this jury charge is incomplete.  In

8:16AM  21  fact, what would make it complete is the very next paragraph in

8:16AM  22  Section 340.70.  340.70, Subpart (c), Subpart (7) says that

8:16AM  23  this C.B.E. submission requires the FDA approval.  And if the

8:16AM  24  FDA does not agree with the submission, the FDA has the right

8:16AM  25  to pull the NDA.  So ultimately, the jury needs to know that,

8:17AM  1  yes, we may able to submit this language under the CBE

8:17AM  2  provisions, but at the end of the day, if the FDA says no, then

8:17AM  3  the FDA says no.  And we all know the jury's seen evidence that

8:17AM  4  we knocked on that FDA door six times and never got in.  So the

8:17AM  5  jury knows that -- those facts, but they should also know, we

8:17AM  6  respectfully submit, Your Honor, the law requires at the end of

8:17AM  7  the day that the FDA say yes or no.  And that is why we believe

8:17AM  8  that this jury charge, as it stands right now, is prejudicially

8:17AM  9  incomplete.

8:17AM  10        THE COURT:  Okay.  All right.  I'll look at it more

8:17AM  11  closely, and I'll let you know in about 10 minutes.

8:17AM  12        MR. IRWIN:  Thank you, Judge.  I will then next take

8:17AM  13  up medical causation, and Lindsey then will address the balance

8:18AM  14  of the issues.

8:18AM  15        I remember back in the day of *Propulsive*, Your

8:18AM  16  Honor, and I went back and found the verdict form.  It is -- if

8:18AM  17  I can pull it up here.  It's dated March 26th, 2003.  It's

8:18AM  18  signed by the foreperson, Keith, and I will not say his last

8:18AM  19  name, begins with an F.  And the very first question was:  "Do

8:18AM  20  you find by a preponderance of the evidence that Propulsive was

8:18AM  21  the cause of the Plaintiff's death?"

8:18AM  22        We submitted to Your Honor a jury charge in

8:18AM  23  support of that proposition, and it was jury charge Number 5 on

8:18AM  24  causation.  And jury charge Number 5 said to Your Honor,

8:18AM  25  suggested to Your Honor that the first element of proof in a

| | |
|---|---|
| 8:18 AM | 1 |
| 8:19 AM | 2 |
| 8:19 AM | 3 |

product liability case is causation or cause in fact.  Conduct

of the Defendant is a cause in fact of harm to the Plaintiff if

it was a substantial factor in bringing about that harm.  Such

conduct is a substantial factor if the harm would not have

occurred without the conduct; i.e. but for Defendants' conduct,

Plaintiff would not have sustained injury.  Cause in fact is a

factual question to be determined by the jury, and the finding

of no fact -- finding of no cause in fact ends the inquiry into

liability, citing *Theriot v. Lasseigne* and *Quick v. Murphy Oil*.

Your Honor virtually word for word provided that instruction to

the jury on Page 14 of your jury charges back in March of 2003.

We believe that -- as we have suggested in our

verdict form, that that should be the very first question, and

we believe that the -- that the question on the verdict forms

that the Plaintiffs have used, to use a term that's popular in

our modern parlance, conflates those two issues.  It really

merges the duty to warn and the duty to prove medical

causation.

The Plaintiffs have -- Plaintiffs have two

critical burdens here.  They have to prove that there was a

failure to warn either Dr. St. Martin or Dr. Bui, and I will

not argue about Dr. Bui, Judge, but that's two very profound

and distinct burdens that they have.  Those burdens have been

subsumed into a single question, and it raises higher concerns,

not just, I respectfully submit, Your Honor, making it

| | |
|---|---|
| 8:20AM | 1 | difficult for the jury to fathom what that really means when |
| 8:20AM | 2 | your jury instructions clearly state that they have the burden |
| 8:21AM | 3 | of proving causation, but the question confuses that.  And the |
| 8:21AM | 4 | jury's going to be wondering, well, where is the proof of |
| 8:21AM | 5 | causation?  And the jury's going to be wondering, because |
| 8:21AM | 6 | they've heard it from day one after nine days of testimony, a |
| 8:21AM | 7 | bold and hearty debate about what caused this hemorrhage. |
| 8:21AM | 8 | And -- and this verdict form is not going to answer that |
| 8:21AM | 9 | question. |
| 8:21AM | 10 | And I think even though I was not in the jury |
| 8:21AM | 11 | charge conferences, Your Honor, as Your Honor knows, it's my |
| 8:21AM | 12 | understanding that Your Honor did indicate perhaps that he |
| 8:21AM | 13 | would revisit the lost chance question at the end of the trial |
| 8:21AM | 14 | after the verdict, if it was appropriate to do so.  And we |
| 8:21AM | 15 | appreciate that, but we would note that this verdict form would |
| 8:21AM | 16 | not give the Court any guidance really about whether or not |
| 8:21AM | 17 | there was a medical injury and medical causation.  So it |
| 8:22AM | 18 | renders really almost moot, if not totally moot, the ability to |
| 8:22AM | 19 | revisit that issue because we don't have the answer to medical |
| 8:22AM | 20 | causation.  So -- |
| 8:22AM | 21 | **THE COURT:**  Yeah, I got it. |
| 8:22AM | 22 | **MR. IRWIN:**  Your Honor, I -- |
| 8:22AM | 23 | **THE COURT:**  The way I addressed -- |
| 8:22AM | 24 | **MR. IRWIN:**  Thank you very much, Judge. |
| 8:22AM | 25 | **THE COURT:**  Yeah, the way I addressed it was I spoke |

8:22AM 1    in causation in fact, and I said "Causation in fact is proved

8:22AM 2    by establishing that a Plaintiff's injury would not have

8:22AM 3    occurred but for the Defendants' actions.  In order to prove

8:22AM 4    causation in fact in this case, the Plaintiff must show to a

8:22AM 5    reasonable degree of medical probability both that Xarelto

8:22AM 6    caused Mrs. Orr's bleed and that the failure to instruct

8:22AM 7    Dr. St. Martin and/or Bui was the cause of Mrs. Orr's injury."

8:22AM 8            And the very next page I focused the jury again

8:22AM 9    on it, and I said, "To recover for failure to warn or instruct

8:22AM 10   claim, Plaintiff must prove by a preponderance of the evidence

8:22AM 11   that an inadequate instruction itself in addition to the

8:23AM 12   medication was the proximate cause."  So I packaged it in the

8:23AM 13   causation part, not spinning out the degree of causation.  I

8:23AM 14   put them both to -- as causation.  One fails, the other one

8:23AM 15   fails.  So it's -- that's the reason I did it that way, and I

8:23AM 16   think it's amply covered.  I deny the motion.

8:23AM 17           MR. IRWIN:  Thank you very much, Judge.

8:23AM 18           THE COURT:  Okay.

8:23AM 19           MR. BONEY:  Good morning, Your Honor.  May it please

8:23AM 20   the Court, Lindsey Boney for the Defendants to wrap up the rest

8:23AM 21   of our objections, and I'll be brief, Your Honor.  Thanks for

8:23AM 22   hearing us this morning.

8:23AM 23           THE COURT:  Sure.

8:23AM 24           MR. BONEY:  Just so the record is clear, Your Honor,

8:23AM 25   we filed yesterday on the written record our written objections

| | |
|---|---|
| 8:23AM | 1 |
| 8:23AM | 2 |
| 8:23AM | 3 |
| 8:23AM | 4 |
| 8:23AM | 5 |
| 8:23AM | 6 |
| 8:23AM | 7 |

1   to the Court's --

2          **THE COURT:**  Right.  I received it last night, looked

3   at it.

4          **MR. BONEY:**  Right.  Thank you, Your Honor.  Document

5   6799, and Mr. Irwin's already handled our objections to the

6   medical causation to the verdict form and to strike or

7   supplement the CBE instruction.

8          Just a couple of additional points, Your Honor.

9   The first is the learned intermediary doctrine for the record.

10  We've discussed this numerous times with the Court, but the

11  discussion about the duty running to treating physicians like

12  Dr. Bui -- this is Page 20 of the Court's final instructions,

13  Lines 5 to 12, and otherwise the references throughout to

14  Dr. Bui, to treating physicians and treater throughout the

15  instructions.  Again we've briefed this several times and

16  discussed it with Your Honor, but just for the record, we've

17  put our objections in before at Document 6482, 6765, and 6776,

18  and we reassert those now and in our written objections last

19  night that it would be inappropriate for the Court to instruct

20  the jury that it's to consider Dr. Bui to be a learned

21  intermediary, because under Louisiana law, the Defendants' duty

22  to warn extends only to prescribing physicians, and that's the

23  Fifth Circuit's decision in *Stahl*, in the *Stahl* case, and

24  because no Louisiana Court has so held, it would be an

25  inappropriate extension of Louisiana law under the Erie

OFFICIAL TRANSCRIPT

8:25AM  1    doctrine.

8:25AM  2            **THE COURT:**  The reason I put it in is that it just --

8:25AM  3    back in the day, the treater was the -- was the prescriber.

8:25AM  4    The doctor was called up in the middle of the night.  He came,

8:25AM  5    and he did everything.  That's the way it worked.  You went to

8:25AM  6    see your doctor.  Your doctor handled your case.

8:25AM  7            Nowadays, the doctor refers you to other people,

8:25AM  8    and you're receiving perhaps the same treatment, but you're

8:25AM  9    receiving treatment, the same treatment, from two and three

8:25AM  10   other people.  And so for -- if you have a responsibility to

8:25AM  11   tell the prescriber, it doesn't seem appropriate to me to say

8:25AM  12   that you don't have any responsibility to tell the treaters,

8:25AM  13   the person who is going to treat the individual.  So for that

8:25AM  14   reason I felt that the law is moving in that direction and I

8:25AM  15   think it should be encompassed in it.  So I'll deny the motion.

8:26AM  16           **MR. BONEY:**  Thank you, Your Honor.

8:26AM  17           The second is the heeding presumption.  This is

8:26AM  18   Line -- excuse me, Your Honor, this is Page 20, Line 13, to

8:26AM  19   Page 21, Line 5.  Defendants object to the heeding presumption

8:26AM  20   instruction and request that it be -- that it be stricken.

8:26AM  21   Your Honor, it's unfairly prejudicial and likely to confuse the

8:26AM  22   jury to instruct them on the heeding presumption where

8:26AM  23   Miss Orr's physicians have rebutted that presumption with

8:26AM  24   testimony about their understanding of the Xarelto label.  The

8:26AM  25   heeding presumption, Your Honor, as Your Honor knows, is a

8:26AM   1   burden-shifting rule, not one of evidence particularly the way

8:26AM   2   it's been rebutted as in this case.  And so we ask that the

8:26AM   3   Court reject that instruction.

8:26AM   4        **THE COURT:**  Okay.  The reason I gave it is because I

8:26AM   5   put the other side of that nickel also and say for the treating

8:26AM   6   presumption, and then I say, "However, may be overcome by

8:26AM   7   evidence that a different warning or instruction would not have

8:27AM   8   made any difference."  In other words, it would have been

8:27AM   9   futile under the circumstances.  So I think I've covered that

8:27AM  10   as well as -- as well as rebutting that presumption.  So I'll

8:27AM  11   deny it for that reason.

8:27AM  12        **MR. BONEY:**  Thank you, Your Honor.

8:27AM  13             The next is the labeling and the federal

8:27AM  14   regulations.  This is in the Court's final charge at Page 25,

8:27AM  15   Line 1, to Page 26, Line 10.  And Your Honor, Defendants object

8:27AM  16   on the ground that the instruction gives insufficient attention

8:27AM  17   to and obscures the relevance of FDA's approval of Xarelto and

8:27AM  18   Defendants' compliance with regulatory standards which,

8:27AM  19   although not conclusive, do bear on the non-defectiveness of

8:27AM  20   the product, the adequacy of the label, and the reasonableness

8:27AM  21   of the Defendants' conduct.

8:27AM  22             Moreover, the charge is unfairly balanced in

8:27AM  23   Plaintiffs' favor.  The instruction provides one sentence that

8:27AM  24   the jury can consider FDA approval, but at the same time on the

8:27AM  25   flip side, there are four sentences, all stating the same

8:28AM 1   proposition, that the jury need not give FDA approval much, if

8:28AM 2   any, weight.  And the imbalance is made worse, Your Honor, by

8:28AM 3   the different levels of specificity in the charge, charges more

8:28AM 4   specific in terms of how the jury can disregard FDA approval

8:28AM 5   and, much vaguer, in terms of how it can consider FDA approval

8:28AM 6   in determining liability.  And the charge is further incorrect

8:28AM 7   in several respects as explained in our written objections and

8:28AM 8   as Mr. Irwin just discussed with the CBE provision.

8:28AM 9           THE COURT:  I spoke on that.  Okay.  Anything else?

8:28AM 10          MR. BONEY:  Thank you, Your Honor.  Just a couple

8:28AM 11  more.  There's the foreseeability component of the

8:28AM 12  instructions.  This is Page 27, Line 10, to Page 28, Line 2.

8:28AM 13  Defendants object simply that this could be stricken because

8:28AM 14  foreseeability has not been an issue in the case, and that the

8:28AM 15  instruction could therefore confuse jurors.

8:28AM 16          THE COURT:  I think in whole it covers all of those

8:28AM 17  things.  I'll deny it for that reason.

8:28AM 18          MR. BONEY:  Thank you, Your Honor.  Just a couple

8:29AM 19  more.

8:29AM 20          The next is warnings, causation, and learned

8:29AM 21  intermediary.  This is Page 29, Lines 1 to 10.  And we object

8:29AM 22  on the ground that the instruction does not fully state the

8:29AM 23  warnings causation standard.  And this is in addition to the

8:29AM 24  treating physician objection that we've already identified.

8:29AM 25  But it -- it states the standard incorrectly inasmuch as it

2331

8:29AM 1    states that Plaintiffs must prove only that the different

8:29AM 2    warning would have altered the physician's behavior.  But the

8:29AM 3    *Willett* decision from the Fifth Circuit, Your Honor, frames the

8:29AM 4    correct standard, which is that the Plaintiff must show that a

8:29AM 5    proper warning would have changed the decision -- or changed

8:29AM 6    the prescribing decision of the treating physician; that is,

8:29AM 7    that but for the inadequate warning, the treating physician

8:29AM 8    would not have used or prescribed the product.

8:29AM 9            THE COURT:  I added in there then Dr. St. Martin or

8:29AM 10   Bui would have altered their prescribing or treating decision

8:29AM 11   or behavior and Mrs. Orr's death would not have occurred.  So I

8:30AM 12   think that it's covered appropriately in that statement.  I'll

8:30AM 13   deny it.

8:30AM 14           MR. BONEY:  Okay.  Thank you, Your Honor.

8:30AM 15           And the last one of the charge that the Court

8:30AM 16   has given is -- you had to know this was coming -- the lost

8:30AM 17   chance of survival component.  And again, we have briefed this

8:30AM 18   issue several times throughout the course of the trial, Your

8:30AM 19   Honor.  That's document Number 6389, 6762, and document 6776.

8:30AM 20   This is in the Court's final charge at Page 34, Line 3, to Page

8:30AM 21   35, Line 10, and also on Page 18, Line 16.  And Your Honor, the

8:30AM 22   Defendants object to the Court's inclusion of any lost chance

8:30AM 23   for seven separate reasons which I'll just walk through very

8:30AM 24   quickly.

8:30AM 25           The first is that Plaintiffs previously

OFFICIAL TRANSCRIPT

8:30AM  1  stipulated -- this is document 5341, Paragraph 4 -- that,
8:30AM  2  quote, "All claims and causes of action falling outside of the
8:30AM  3  exclusive theories of recovery and damages allowed by the LPLA
8:31AM  4  are hereby dismissed with prejudice."
8:31AM  5            Second, the lost chance theory is irreconcilably
8:31AM  6  inconsistent with the LPLA because it requires proof that the
8:31AM  7  Plaintiffs' injury be unrelated to the Defendants' conduct
8:31AM  8  while the LPLA requires proof that the product caused the
8:31AM  9  injury.
8:31AM  10            And indeed, Your Honor, the LPLA provides in no
8:31AM  11  way for these sorts of damages in a products liability case.
8:31AM  12  No Louisiana Court has ever applied the lost chance doctrine
8:31AM  13  outside the context of cases involving the rendition of
8:31AM  14  services like medical malpractice and certainly never to a
8:31AM  15  products liability case.  And as we discussed with the treating
8:31AM  16  physician in the learned intermediary, in the same way the lost
8:31AM  17  chance, the Fifth Circuit is clear that District Courts sitting
8:31AM  18  in diversity may not extend state law on an Erie guess.  And
8:31AM  19  there's no suggestion -- there's certainly no explicit
8:31AM  20  application of or suggestion that any Louisiana Court would
8:31AM  21  apply a lost chance of survival to a product liability case
8:32AM  22  like this one.  But in any event, the doctrine cannot apply in
8:32AM  23  cases where, like here, the Defendant is alleged to have caused
8:32AM  24  the initial injury, and Plaintiffs have put on insufficient
8:32AM  25  evidence for a jury to award the damages in any event.

2333

8:32AM  1          And finally, Your Honor, just one final point on

8:32AM  2  this is that the Defendants were prejudiced by Plaintiffs' late

8:32AM  3  assertion of the theory mere weeks before trial and after all

8:32AM  4  of the depositions and discovery had concluded.  Despite those

8:32AM  5  objections we've proposed this, Your Honor, a final set of

8:32AM  6  charges that -- that notwithstanding our objections would clean

8:32AM  7  up some of the lost chance instructions that the Court has

8:32AM  8  given, and so we would ask the Court strike those, or in the

8:32AM  9  alternative use the alternative instruction.

8:32AM  10          **THE COURT:**  I think that this is not a new cause of

8:32AM  11  action.  It's simply a fleshing out of the damage aspect of the

8:32AM  12  cause of action allowed in Louisiana.  And I see no reason to

8:32AM  13  restrict it, and I see no reason why it should be restricted.

8:33AM  14  There's several cases that also apply in various other areas,

8:33AM  15  and I think that this is appropriate in this particular matter.

8:33AM  16  I'll deny the motion.

8:33AM  17          **MR. BONEY:**  Okay.  And so, Your Honor, that is it

8:33AM  18  with regard to the charges that the Court has given, but just

8:33AM  19  briefly, the charges that the Defendant proposed that the Court

8:33AM  20  did not give, there are three of them that I'll just note for

8:33AM  21  the record.  The proximate cause on warnings -- that's

8:33AM  22  Defendants' Number 21 -- that the Plaintiffs must prove that a

8:33AM  23  different warning would have changed the prescribing or

8:33AM  24  treating decisions.  The FDA approval instruction, which was

8:33AM  25  Defendants' Number 12, that provides a more balanced statement

8:33AM   1    of the FDA standard.  And finally, Defendants' Number 22
8:33AM   2    regarding evidence, particularly with regard to dose and
8:33AM   3    reversal agent, which are theories of liability that the
8:33AM   4    Plaintiffs are no longer pursuing.  And specifically on that
8:33AM   5    charge, Your Honor, that the Court should instruct the jury
8:34AM   6    that Plaintiff's dose and reversal agent is irrelevant to this
8:34AM   7    case.  It's not evidence of a defect in the product.
8:34AM   8            A Pradaxa court in Boston Federal Court just
8:34AM   9    recently in fact, Your Honor, in a case very similar to this
8:34AM   10   involving another NOAC, granted a motion in limine to exclude
8:34AM   11   any evidence about dose or dosing regimen or reversal agent.
8:34AM   12   So too in this case the LPLA requires proof that the product
8:34AM   13   possessed a characteristic that may cause damage, but also,
8:34AM   14   that the manufacturer failed to provide an adequate warning of
8:34AM   15   such characteristic.  And this case is not about a failure to
8:34AM   16   warn regarding dose or reversal agent, and so therefore, we ask
8:34AM   17   that the Court give this and the other two instructions as
8:34AM   18   well.
8:34AM   19           THE COURT:  The reason I put it in is because it has
8:34AM   20   something to do with the characteristics of the drug, and
8:34AM   21   therefore, it does bear on the warning.  It's a difference of a
8:34AM   22   warning.  If you want to use a Volkswagen as opposed to an
8:34AM   23   18-wheeler truck, it's a different type of vehicle.  It's a
8:35AM   24   different type of case, and so I felt that it was appropriate
8:35AM   25   to at least have that in it, and it deals with one aspect of

8:35 AM  1  litigation which is a significant aspect of it.  That's the

8:35 AM  2  reason I deny the motion.

8:35 AM  3          MR. BONEY:  Okay, thank you, Your Honor.  That's all

8:35 AM  4  we have.

8:35 AM  5          THE COURT:  Anything on the verdict?

8:35 AM  6          MR. BONEY:  The verdict form, Your Honor, we've

8:35 AM  7  already discussed about the medical causation.  Mr. Irwin

8:35 AM  8  discussed that.  Our objection to the lost chance damages

8:35 AM  9  instructions also would apply to the verdict form, Your Honor.

8:35 AM  10         THE COURT:  Okay.

8:35 AM  11         MR. BONEY:  We've proposed a revised proposed verdict

8:35 AM  12  form for Your Honor's consideration.

8:35 AM  13         THE COURT:  All right.  Thank you very much.

8:35 AM  14         MR. BONEY:  Thank you, Your Honor.

8:35 AM  15         MR. MEUNIER:  Your Honor, just for the record, we

8:35 AM  16  have a proffer, as you know, dealing with Mr. Jalota's

8:35 AM  17  testimony.  Just for the record, that will occur, I understand,

8:35 AM  18  later this afternoon.

8:35 AM  19         THE COURT:  Okay.

8:35 AM  20         MR. MEUNIER:  But we have a stipulation and agreement

8:35 AM  21  with the Court's permission that it would -- the proffer will

8:35 AM  22  be considered to have been made on a timely basis and as part

8:36 AM  23  of the Plaintiffs' case.

8:36 AM  24         THE COURT:  Okay.  That's my understanding.  With the

8:36 AM  25  Defendants?

OFFICIAL TRANSCRIPT

8:36AM    1          **MR. IRWIN:**  That is correct, Your Honor.

8:36AM    2          **THE COURT:**  Okay.  Okay.  I'll be back in a couple

8:36AM    3   minutes.  Court will stand in recess.

8:36AM    4          **THE CASE MANAGER:**  All rise.

8:36AM    5                            **(Recess.)**

8:55AM    6          **THE COURT:**  All right.  Be seated, please.

8:55AM    7              With regard to the jury charge, I altered a part

8:55AM    8   of my charge.  The new charge is:  "Specific federal

8:55AM    9   regulations authorize the manufacturer of a drug which has been

8:55AM   10   approved by the FDA to add or strengthen warning, precaution,

8:55AM   11   or adverse reaction information about the drug in the drug's

8:55AM   12   label and to do so without the need for prior approval.  The

8:55AM   13   FDA, however, retains the power to remove such language."

8:55AM   14              And so that's the part that I have changed.

8:55AM   15   I've given the lawyers a copy of it, and that, together with

8:55AM   16   all of my other portions of the charge, will be the final

8:56AM   17   charge.  Okay.

8:56AM   18              In a moment we'll bring the jury out.  Court is

8:56AM   19   in recess.

8:56AM   20          **THE CASE MANAGER:**  All rise.

8:59AM   21                            **(Recess.)**

9:01AM   22          **THE CASE MANAGER:**  All rise for the jurors, please.

9:02AM   23          (Whereupon the jury entered the courtroom.)

9:02AM   24          **THE COURT:**  Be seated, please.  Good morning, ladies

9:02AM   25   and gentlemen.  Members of the jury, as you know, this is the

2337

09:02AM 1   final stage of the case, and this is the closing arguments or

09:02AM 2   sometimes we refer to it as summation.

09:02AM 3               The Plaintiffs will open the summation and

09:03AM 4   followed by the Defendants, and the Plaintiffs have an

09:03AM 5   opportunity to close the summation.  The reason for that is

09:03AM 6   they have the burden of proof, and so the law gives them an

09:03AM 7   opportunity to rebut.

09:03AM 8               The -- also I've given time limits to each side.

09:03AM 9   Each side has an hour to present the case.  The point is that

09:03AM 10  the time is mine, not theirs, and they have -- you know and I

09:03AM 11  know that, as I told you, they could probably talk for days,

09:03AM 12  but I've asked them to sum up in an hour.

09:03AM 13              So then after the summation, I'll have an

09:03AM 14  opportunity to discuss the rules of law with you in the case,

09:03AM 15  and at the end I'll give you a copy of the rules of law so that

09:03AM 16  you can refer to them if you feel appropriate.

09:03AM 17              Before I allow the Plaintiff to start, I want to

09:03AM 18  take the opportunity again to thank each of you for your hard

09:03AM 19  work.  All of the lawyers here have indicated that you've been

09:03AM 20  a very hardworking group.  You've been timely, and you've taken

09:04AM 21  the matter seriously, and that's the best that we can hope for.

09:04AM 22  As I mentioned, you play a vital role in the administration of

09:04AM 23  justice, and each of you should be proud of your service.  You

09:04AM 24  need to know that the Court is proud of you.

09:04AM 25              So with that, let's hear from the Plaintiffs.

9:04AM 1          **MR. BARR:**  May it please the Court, counsel, ladies

9:04AM 2     and gentlemen of the jury.  This is what Bayer says outside of

9:04AM 3     the United States.  They say that PT is a useful test in the

9:04AM 4     face of urgent surgery; that it can inform clinical decisions.

9:04AM 5     This language right here that you see on the screen is what

9:04AM 6     this whole case is about.  Are doctors in the United States

9:04AM 7     entitled to this same information?  That's what you have to

9:05AM 8     decide.

9:05AM 9          Sharyn Orr lost her life because Bayer and

9:05AM 10    Janssen didn't tell her doctors the truth; didn't tell her

9:05AM 11    doctors what they know about the drug Xarelto.  Failed to tell

9:05AM 12    the doctors everything they know.

9:05AM 13          Is that a standard of conduct that we find

9:05AM 14    acceptable in this community?  Is that what we expect from

9:05AM 15    companies that make the prescription drugs that we all take?

9:05AM 16    You have to decide that.

9:05AM 17          But we have to expect better than what we saw

9:05AM 18    from these two companies in this trial.  We have to expect that

9:05AM 19    drug companies will provide doctors everything they know about

9:05AM 20    a drug, talk about all the risks.  They owe that to the doctors

9:05AM 21    and patients that have entrusted their lives to the

9:05AM 22    prescription drugs that they make.

9:05AM 23          We don't have to accept that companies can be so

9:05AM 24    misguided that they don't provide doctors, doctors like Dr. St.

9:06AM 25    Martin and Dr. Bui, everything they need to know about a drug.

1  We don't have to accept that when there is a better way to

2  protect patients, to provide better and more complete

3  information, that it's acceptable to withhold that information

4  and not provide it to the people who need it and not provide it

5  because it doesn't meet the company's marketing needs.

6          Bayer and Janssen made the decision not to tell

7  doctors in the United States everything they know about the

8  drug Xarelto, and they did that to protect their sales here in

9  the US.  Now, they didn't do this because they don't care about

10  people.  That's not what we're saying.  They did it because

11  they got lost in the effort to make sure they could sell

12  Xarelto and sell Xarelto in a very competitive and quite

13  lucrative market.

14          You saw during this trial that Xarelto was

15  coming into a very competitive market, competing with Warfarin,

16  which you heard is the gold standard for anticoagulant therapy,

17  a drug that Xarelto couldn't show it was better than; competing

18  with Pradaxa and Eliquis that, unlike Xarelto, showed they were

19  better than warfarin in their clinical trials.  That was the

20  competition that Xarelto was up against.  And they got so

21  wrapped up in the competition for the market, they forgot that

22  there are people at the end of every one of their commercial

23  decisions.

24          Their lack of perspective about the human cost

25  of their decisions is shown by that piechart they have put up

OFFICIAL TRANSCRIPT

9:07AM  1   all throughout this trial.  I've got it up on the screen.  I'm

9:07AM  2   sure you guys remember it.  This is the one that tries to

9:07AM  3   minimize the risk of intracranial hemorrhage.  It's the one

9:07AM  4   that says only 0.8 percent of people on Xarelto will have a

9:07AM  5   brain bleed, and they forget that those 0.8 percent of people

9:07AM  6   are people like Sharyn Orr.  That's who those 0.8 percent of

9:08AM  7   people are, people that have a family to love them; have a

9:08AM  8   husband like Joe that they've been married to for 45 years.

9:08AM  9   True life partners in every sense.  Kids like Kelli, Kim, and

9:08AM 10   Joe that would give anything to have their mom back.  Grandkids

9:08AM 11   like Jared, Jennifer, Joshua, Derek, and Gregory that just want

9:08AM 12   Gaga back.

9:08AM 13            Bayer and Janssen admit with that chart that for

9:08AM 14   every million people that take Xarelto for one year, 8,000

9:08AM 15   Sharyn Orrs will happen.  That's as many as 8,000 Sharyn Orrs

9:08AM 16   every year.  8,000 people coming into the hospital needing

9:08AM 17   emergency surgery.  8,000 people unable to tell their doctor

9:08AM 18   when they last took their Xarelto pill.  Not able to speak for

9:08AM 19   themselves.

9:08AM 20            And they know there's a test that can speak for

9:09AM 21   those people, and instead of doing what a responsible company

9:09AM 22   would do and telling doctors what they know, they tell doctors

9:09AM 23   in the US that PT is of no value; that it doesn't mean

9:09AM 24   anything.  They tell you in this courtroom that it's reckless

9:09AM 25   and dangerous.  But they admit internally and outside of the

```
9:09AM    1    United States that PT can provide useful information to the
9:09AM    2    doctor.
9:09AM    3                And that's where you come in.  You have to
9:09AM    4    decide if companies selling drugs in this country have to tell
9:09AM    5    doctors in the United States everything they know.  You have to
9:09AM    6    decide if it's acceptable for Bayer and Janssen not to tell
9:09AM    7    doctors the whole truth.  You, as jurors in our system of
9:09AM    8    justice, are a check on corporate misconduct to hold companies
9:09AM    9    accountable for their decisions.
9:09AM   10                And that's the difficult part about all of this,
9:10AM   11    because that's the only thing you can do.  The only thing you
9:10AM   12    can do is compensate this family with money damages.  But
9:10AM   13    money, that's not what the Orr family wants.  They just want
9:10AM   14    Sharyn back.  They want Dr. St. Martin to have all the
9:10AM   15    information he needed to have; to know the truth about Xarelto
9:10AM   16    so he never gives it to her.  They want to go back to the night
9:10AM   17    of April 24 with Dr. Bui and his team knowing what the
9:10AM   18    Defendants knew internally.  That's what they want; to know
9:10AM   19    that Sharyn's normal PT meant she hadn't taken her pill that
9:10AM   20    night and it was safe to go to surgery, to give Sharyn, in that
9:10AM   21    fighting spirit you heard so much about, the chance she
9:10AM   22    deserved to go home with her family.
9:10AM   23                We can't go back in time.  That's not how it
9:10AM   24    works.  But in your verdict, you can tell these companies it's
9:10AM   25    time to do the right thing.  You have the power to tell these
```

companies they're wrong, and they need to provide what they
know about this drug to the medical community, provide what
they know to protect patients.

Now, this family asked me -- the Orrs asked me
to thank you because they've been watching, and they wanted me
to thank you for the attention and dedication you've shown
throughout this trial.  They've seen the enormous effort each
of you have made, the sacrifice to take time out of all your
lives to come in here and listen to their case and make the
decisions you have to make.  And it's heart-wrenching to listen
to this family get up on that stand over there and expose their
loss and what Sharyn meant to them.  It's sad for all of us.
It was difficult to listen to.

But the Orrs don't want you to decide this case
on sympathy.  They want you to provide justice, because a
verdict for the Orr family will tell the Defendant that their
conduct is not acceptable; that they must adequately inform the
medical community of what they know internally.  That's the
justice the Orrs are seeking.

And when you go back to that jury room, your
vote has to be unanimous.  The Court's going to tell you that.
And that requires a careful and thoughtful review of the
evidence.  And you're going to have all the exhibits back
there, all of them that have been introduced.  Pull them out,
read them, look at them, see what they say.  And I'm going to

9:12AM 1    tell you some as you walk through what we believe the evidence
9:12AM 2    shows, and I'm going to ask you to write down the numbers and
9:12AM 3    go look at those documents that I'm pointing out and go read
9:12AM 4    them.  Don't accept my word for what -- for what I say the
9:12AM 5    exhibits mean.  Don't accept the Defendants' word for what they
9:12AM 6    say they mean.  Pull them out.  Read them.  Read them for
9:12AM 7    yourselves and come to your own decisions.  But what you're
9:12AM 8    going to find is the evidence shows that the Defendants didn't
9:12AM 9    provide all the information they know about Xarelto to
9:13AM 10   Dr. St. Martin and Dr. Bui, and those failures led to Sharyn's
9:13AM 11   death.
9:13AM 12            Now, you're going to have a verdict form back in
9:13AM 13   the jury room.  The Court's going to provide that for you and
9:13AM 14   we're going to put it up on the screen.  This is the first
9:13AM 15   question, what it looks like.  And this first question is
9:13AM 16   whether the Defendants failed to provide adequate instructions
9:13AM 17   to either or both St. Martin and Dr. St. Bui (verbatim).
9:13AM 18            The first question is pretty easy to understand,
9:13AM 19   and clearly the evidence is yes, they didn't get everything
9:13AM 20   they needed to know.
9:13AM 21            The second question is whether the failure to
9:13AM 22   provide adequate warnings or instructions was a proximate cause
9:13AM 23   of Sharyn's death.  Now, the second question is more
9:13AM 24   complicated, but the answer's the same.  The Court's going to
9:13AM 25   explain to you what proximate cause is, but here's how I think

9:13AM  1  you can think about it.  Was there information not provided to

9:13AM  2  Dr. Bui that would have changed the decisions he made on the

9:13AM  3  night of April 24th?  Would he have waited 12 hours to go to

9:14AM  4  surgery had he been instructed about the meaning of Sharyn's

9:14AM  5  normal PT test?  And if Dr. Bui had made a different decision

9:14AM  6  and had decided to operate earlier, is it more likely than not

9:14AM  7  that Sharyn would have lived?  You don't have to find that

9:14AM  8  Miss Orr's brain bleed was due to her use of Xarelto when it

9:14AM  9  comes to Dr. Bui.

9:14AM  10         As to Dr. St. Martin, if you find he wasn't

9:14AM  11  adequately informed about the dangerous characteristics of

9:14AM  12  Xarelto, then you have to determine if providing him adequate

9:14AM  13  instructions, what Dr. Smart said Dr. St. Martin needed to

9:14AM  14  know, would have changed his decision to give that drug to

9:14AM  15  Sharyn?  And in addition to that, you have to determine that

9:14AM  16  Xarelto was a substantial contributing factor in her death.

9:14AM  17         The preponderance of the evidence, simply a

9:14AM  18  fancy way of saying greater weight, more likely than not, and

9:15AM  19  the answer is yes for all of those questions.

9:15AM  20         Now, I want to start with Dr. Bui.  All Dr. Bui

9:15AM  21  wanted to know that night was whether Sharyn took Xarelto

9:15AM  22  around dinner, and we proved that he had the answer in the PT

9:15AM  23  that was drawn at around 11:15 at Baptist.  He had the answer

9:15AM  24  sitting right there in the Ochsner Medical Building.  Her

9:15AM  25  normal PT told him the truth, that she hadn't taken her pill.

9:15AM
9:15AM
9:15AM
9:15AM
9:15AM
9:15AM
9:15AM
9:15AM
9:16AM
9:16AM
9:16AM
9:16AM
9:16AM
9:16AM
9:16AM
9:16AM
9:16AM
9:16AM
9:16AM
9:16AM
9:16AM
9:16AM
9:16AM
9:16AM
9:16AM

1  But because Bayer and Janssen put in the label that PT was

2  meaningless, Dr. Bui thought all he could do was wait.  He

3  didn't know the answer to that critical question.  So he didn't

4  consider this standard laboratory test and waited.  He wasn't

5  adequately instructed and told the truth.

6            Now, I think you all remember this, we did a

7  march -- and that's probably the best way to call it, a

8  march -- through the scientific literature.  Nobody should ever

9  have to be subjected to that.  We did that though for a number

10 of reasons.  The first was to show you that the Defendants'

11 experts hadn't looked at everything.  They hadn't looked --

12 they looked at some of it.  They hadn't looked at most of the

13 literature saying PT was a useful, helpful test.  We also did

14 it to show there's a substantial amount of literature that says

15 PT can be used in the face of emergency surgery to make

16 clinical decisions.

17           But I'll admit, the literature, it's an absolute

18 mess.  It's all over the place.  You all saw that.  It has

19 language on both sides.  Can't deny that.  Whenever both sides

20 can pull up one article and one thing supports us and one thing

21 supports them, the only thing you can take away from that is

22 the literature's a confusing mess.  You remember the table?

23 The table says you can use PT.  Down in the language it says

24 it's not reliable.  That's confusing.

25           So how are you supposed to see through this fog

9:16AM   1    of confusion?  What are you supposed to do?  Well, you can go
9:17AM   2    knock on the door of Bayer and Janssen, look in their files,
9:17AM   3    the files of the people who know the most about this drug.  You
9:17AM   4    put their employees under oath, and you ask them questions.
9:17AM   5    You do that, things get pretty clear because, like Dr. Khatib
9:17AM   6    agreed, no one knows more about the drug Xarelto than these
9:17AM   7    companies, the companies that have been studying it for more
9:17AM   8    than 10 years.  Not the defense experts, not the FDA, not the
9:17AM   9    literature.  Certainly not doctors like Dr. St. Martin and
9:17AM   10   Dr. Bui.

9:17AM   11          You're on a search for the truth.  And the only
9:17AM   12   way to get to the truth is to look at everything, including
9:17AM   13   what the Defendants say behind the protected walls of Bayer and
9:17AM   14   Janssen and what they testify to under oath.  Look at
9:17AM   15   everything, like our experts did, like you have now seen.  And
9:17AM   16   what do you learn when you peek into the files of the company?
9:17AM   17   You see clearly that these companies knew that tragic events
9:18AM   18   like Sharyn Orr would happen.  They knew they were putting
9:18AM   19   Xarelto on the market without a reversal agent to help protect
9:18AM   20   patients, but didn't follow through because it wouldn't be
9:18AM   21   profitable enough.  That's in Plaintiffs' Exhibit 148.  Pull it
9:18AM   22   out and look at it.  Read it.  They knew they needed an
9:18AM   23   indicator test to tell doctors it was safe to go to surgery.
9:18AM   24   But that puts them in a bind.  Encouraging someone to measure
9:18AM   25   even in the face of an emergency would be inconsistent with

9:18AM 1  their marketing message.  So they wouldn't recommend it.

9:18AM 2  That's Plaintiffs' Exhibit 154, and 155.  Read them.  They kept

9:18AM 3  to themselves what they said in 2009 when discussing labeling

9:18AM 4  for Xarelto, that PT would let a doctor know when the last dose

9:18AM 5  of Xarelto was taken.  That's Plaintiffs' Exhibit 153.

9:18AM 6          Now, beyond the internal documents, you also

9:18AM 7  heard from the company employees that answered questions under

9:19AM 8  oath.  Now, let me be the first to apologize for having to play

9:19AM 9  so much video.  It's tedious to come into this courtroom and to

9:19AM 10 have to watch TV.  I get it.  I understand, but videos are

9:19AM 11 important evidence.  It's important evidence because the

9:19AM 12 testimony of the company's employees provides clarity in this

9:19AM 13 unclear world.

9:19AM 14         Dr. Ted Spiro said it most clearly.  He was

9:19AM 15 asked directly if PT can be used to make an assessment of the

9:19AM 16 presence of Xarelto in the blood.  He answered without

9:19AM 17 limitation "yes."  No ambiguity, no confusion, nothing like the

9:19AM 18 medical articles the Defendants' experts relied upon.

9:19AM 19 Perfectly clear, and nowhere in the US literature.

9:19AM 20         And let's remember what was proven about what

9:19AM 21 Janssen knows and what Janssen says in a document buried 17

9:20AM 22 clicks deep into their website.  Do you remember that in the

9:20AM 23 cross-examine of Dr. Piazza?  The experiment, as the Defendants

9:20AM 24 call it, an experiment of whether she could find the hidden

9:20AM 25 information?  How in the world they expect a doctor in an

9:20AM  1    emergency to go find that, I have no idea.  A doctor's not

9:20AM  2    going to find that document on PubMed or doing a Google search.

9:20AM  3    Only going to find it buried 17 clicks into Janssen's website.

9:20AM  4              It would be so much easier just to put it into

9:20AM  5    the label where doctors can find it.  They haven't done that.

9:20AM  6    They buried it in their website.

9:20AM  7              What do they say?  They said it's been reported

9:20AM  8    that PT, either neoplastin or interray as the reagent, can be

9:20AM  9    used to assess anticoagulant effect.  A direct contradiction to

9:20AM 10    their label and to the position that they've taken in this

9:21AM 11    courtroom.  The very information in the label Dr. Parisian

9:21AM 12    offered that Dr. Khatib characterized as reckless.  Remember

9:21AM 13    the label proposed by Dr. Parisian, the only regulatory witness

9:21AM 14    you heard from, the only witness to explain the limits of the

9:21AM 15    FDA, what the FDA can do, what they can't do, the strict

9:21AM 16    timelines the FDA has to comply with, the army of people these

9:21AM 17    handful of FDA reviewers are matched up against from these

9:21AM 18    companies?  The Defendants didn't bring a regulatory expert to

9:21AM 19    directly rebut her opinion.

9:21AM 20              MS. WILKINSON:  Objection, Your Honor, to the

9:21AM 21    suggestion that we have to bring a witness to rebut any

9:21AM 22    information.  We don't have the burden of proof.

9:21AM 23              MR. BARR:  Your Honor, it's just a fact.

9:21AM 24              THE COURT:  They didn't, but they don't need to.  The

9:21AM 25    Plaintiff has the burden.  The Defendant does not have the

9:21AM   1  burden.

9:21AM   2         **MR. BARR:**  May I continue, Your Honor?

9:21AM   3         **THE COURT:**  Yes.

9:21AM   4         **MR. BARR:**  They brought doctors who haven't seen

9:21AM   5  everything, everything that you have seen.  And the label

9:21AM   6  Dr. Parisian proposed was information that met the regulatory

9:22AM   7  mandate to provide helpful laboratory testing in the warning

9:22AM   8  section of the label.  Now, I can't stress enough that helpful

9:22AM   9  laboratory testing is required to be in Section 5, the warning

9:22AM  10  section of the label.  The language she proposed provides

9:22AM  11  useful information, and Dr. Khatib called it reckless.  Focus

9:22AM  12  in on that second step, the same information that's buried on

9:22AM  13  their website, the same information Bayer says outside of the

9:22AM  14  United States.  Is Janssen really burying reckless and

9:22AM  15  dangerous information on its website?  Or is it that the

9:22AM  16  statement is true, that Janssen doesn't really want US doctors

9:22AM  17  to find out about it?  Use your good judgment to figure that

9:22AM  18  one out.

9:22AM  19         This is what they tell doctors outside of the

9:22AM  20  United States.  It's Plaintiffs' Exhibit 190.  Read it yourself

9:22AM  21  back in the jury room.  You're going to have it back there with

9:22AM  22  you.  It's what Bayer says, it's what Bayer knows, and they

9:23AM  23  never disputed that this is what they say.  It's a strange

9:23AM  24  position, isn't it, saying to someone you can use PT to assess

9:23AM  25  anticoagulant effect when considering emergency surgery, yet

9:23 AM  1    coming into this courtroom, you're told by the same defendant

9:23 AM  2    the language is reckless and dangerous?  Well, it can't be

9:23 AM  3    both.  It can't be.  It can't be helpful information outside of

9:23 AM  4    the United States and dangerous inside this courtroom.  That

9:23 AM  5    makes no sense.  And that's what you have to decide as a

9:23 AM  6    helpful laboratory test, have these Defendants failed doctors,

9:23 AM  7    doctors like Dr. Bui, by not telling them the truth about PT?

9:23 AM  8         The Defendants bring you good doctors, doctors

9:23 AM  9    like Dr. Khatib, Dr. Piazza and Dr. Thomas, but they don't know

9:23 AM  10   what the Defendants know, and they don't know what you know.

9:23 AM  11   They haven't been given access to what these Defendants know.

9:23 AM  12   They haven't been allowed or encouraged to talk to company

9:24 AM  13   employees.  They only know what's available to the public.

9:24 AM  14   Talk about things that make you wonder.  If they wanted their

9:24 AM  15   expert to know the full truth, why wouldn't they let them talk

9:24 AM  16   to the company employees?  Show them the company documents.

9:24 AM  17   Show their experts the documents created by these companies

9:24 AM  18   that directly contradict the opinions they offered here.  Maybe

9:24 AM  19   defense will answer that question when they talk to you.

9:24 AM  20        Again, the PT test isn't perfect.  Like anything

9:24 AM  21   in medicine, it doesn't come with a guarantee, but it provides

9:24 AM  22   the doctor with helpful information.  It allows the doctor to

9:24 AM  23   have an earlier conversation with the family and to make a

9:24 AM  24   medical decision based on all of the evidence.

9:24 AM  25        Sure, it would have been great if Sharyn had

9:24 AM    1   been able to tell Dr. Bui that she hadn't taken her pill.
9:24 AM    2   Yeah, that would absolutely be the most accurate way to do it,
9:24 AM    3   if the patient can talk.  But what is a doctor supposed to do
9:25 AM    4   when the patient can't tell them?  What's the doctor supposed
9:25 AM    5   to do when the next Sharyn Orr is brought to the hospital and
9:25 AM    6   there's no way to find out from the patient?  That's why the PT
9:25 AM    7   test is a helpful test.  It will help the doctor make a
9:25 AM    8   clinical decision.  It's one piece of the puzzle, but a piece
9:25 AM    9   that fills in the gap to help protect patients like Sharyn Orr.
9:25 AM   10          And don't fall into this trap Defendants try to
9:25 AM   11   set about PT not being accurate at low levels.  That isn't what
9:25 AM   12   this case is about.  The question was whether Sharyn had taken
9:25 AM   13   that pill that night 4 to 6 hours before her blood was drawn at
9:25 AM   14   Baptist.  She would have been at peak levels.  The Xarelto in
9:25 AM   15   her blood would have been at the highest.  Dr. Piazza had to
9:25 AM   16   agree with that.  And the evidence is clear had Sharyn been at
9:25 AM   17   peak levels, her PT would have been elevated.  It would not
9:25 AM   18   have been normal.  We know that because that's what the data
9:25 AM   19   is.  Look at Page 38 of Plaintiffs' Exhibit 163.  She would not
9:26 AM   20   have had an 11.4, perfectly normal PT, if she had taken her
9:26 AM   21   pill 4 to 6 hours earlier.  But Bayer and Janssen decided to
9:26 AM   22   filter what they told doctors in the United States.  They took
9:26 AM   23   a valuable tool away from Dr. Bui.
9:26 AM   24          Now, I want to spend a few minutes, and I want
9:26 AM   25   to talk about this strike-through document the Defendants have

9:26AM
9:26AM
9:26AM
9:26AM
9:26AM
9:26AM
9:26AM
9:26AM
9:27AM
9:27AM
9:27AM
9:27AM
9:27AM
9:27AM
9:27AM
9:27AM
9:27AM
9:27AM
9:27AM
9:27AM
9:27AM
9:27AM
9:27AM
9:27AM
9:28AM

 1   made such a big deal on.  When you come into a courtroom and
 2   you review evidence, you don't check your common sense at the
 3   door.  Your common sense goes back into that jury room.  The
 4   Court's going to tell you that.  So why would Janssen say it
 5   truly tried to get helpful information in the Xarelto label
 6   but, on the other hand, turn around and claim in this courtroom
 7   that PT is not only unhelpful, it's dangerous?

 8           If Janssen really and truly thought that PT was
 9   reckless or dangerous, would they have ever proposed it to be
10   in the label?  Of course not.  Maybe they decided they could
11   sell this drug better without the language and didn't want to
12   push to put it back in.  Who knows?  They never explained that.

13           All we know is that on June 13, 2011, a redline
14   was provided.  And then you saw two months later the FDA found,
15   based on ROCKET in August of 2011, that PT was in fact capable
16   of assessing anticoagulant effect.  Look at Page 40 of
17   Plaintiffs' Exhibit 163.

18           And what did Janssen do?  They did nothing.
19   Never proposed language into the label, made the conscious and
20   intentional decision that they would only provide language if
21   it was specifically requested by the FDA.  Look at Page 15 of
22   Plaintiffs' Exhibit 152.  They tried to shift their
23   responsibility to warn to the FDA.

24           And what did the FDA say, the same FDA you now
25   know can't force these companies to act responsibly?  The FDA

said Janssen chose not to utilize the PT information.  Read
Plaintiffs' Exhibit 4.  Read it careful.  Focus on Page 10.
"This was the Defendants' choice."  This was the final word of
the FDA on the issue.

          These two companies had a continuing obligation
to change the label as information changes.  Judge Fallon is
going to tell you that in his instructions.  The Defendants are
solely responsible for the content of the label and keeping it
up to date, not the FDA.

          They want you to believe that the FDA came to
this conclusion in August of 2011, yet won't allow these
companies to provide this information to doctors because of a
redline document sent in June, two months earlier.  They want
you to believe that on faith.  I say faith because they
provided no actual evidence that they tried to update the label
consistent with their knowledge.  They provided you no actual
evidence of what the FDA would do.

          Like Judge Fallon will instruct you, the
manufacturer of a drug is responsible for the label and can
always strengthen its warnings.  They haven't even tried to
update the label.  You heard Mr. Jalota say that.

          Now, let's move to whether information
Defendants withheld about PT would have changed Dr. Bui's
decision that day.  Dr. Bui testified clearly that had he known
that Miss Orr had not taken her pill, that she didn't have

|  |  |  |
|---|---|---|
| 9:29AM | 1 | significant levels of anticoagulants in her body, he would have |
| 9:29AM | 2 | operated earlier.  That was his clear testimony.  No question |
| 9:29AM | 3 | his clinical decision would have changed. |
| 9:29AM | 4 | How are the defendants going to try to deal with |
| 9:29AM | 5 | that?  They're going to argue that what was in the label for |
| 9:30AM | 6 | Xarelto doesn't matter because Dr. Bui hasn't read the label. |
| 9:30AM | 7 | They're going to ignore all the evidence presented about how |
| 9:30AM | 8 | the label is the foundation for all information that flows into |
| 9:30AM | 9 | the medical community; how the information in the label is |
| 9:30AM | 10 | disseminated throughout the medical community so that the |
| 9:30AM | 11 | doctors that have to treat patients injured by their drug know |
| 9:30AM | 12 | how to treat them, what Dr. Parisian called labeling.  If they |
| 9:30AM | 13 | put that information on the label, put the PT information |
| 9:30AM | 14 | there, Dr. Bui would have found out about it. |
| 9:30AM | 15 | Their phone apps you heard about in this trial, |
| 9:30AM | 16 | like Epocrates and UpToDate, that give doctors information |
| 9:30AM | 17 | based on the label.  He knew what was in the Xarelto label even |
| 9:30AM | 18 | though he said he hadn't read it.  He goes to conferences.  He |
| 9:30AM | 19 | talks to his colleagues.  He knew what that label said.  No |
| 9:30AM | 20 | test and wait 24 hours.  And he would have known about the |
| 9:30AM | 21 | meaning of a normal PT had Defendants put that information |
| 9:31AM | 22 | where it belongs, in the label. |
| 9:31AM | 23 | Now, finally we get to the question of whether |
| 9:31AM | 24 | the failure to inform Dr. Bui about PT caused Miss Orr's death. |
| 9:31AM | 25 | You heard throughout this trial that time was money.  Nothing |

2355

9:31AM 1    good resulted from that 12-hour delay.  All neurosurgeons that

9:31AM 2    testified said that regardless of their view of the chance that

9:31AM 3    Sharyn had, to have a meaningful chance, care had to be

9:31AM 4    provided timely and seamlessly.

9:31AM 5           Dr. Liechty, a trained neurosurgeon who's seen

9:31AM 6    bleeds just like Miss Orr's, explained to you that from his

9:31AM 7    experience, Dr. --  had Dr. Bui been told the truth, Sharyn

9:31AM 8    most likely would have lived.  Despite the size of Sharyn's

9:31AM 9    hemorrhage, had Dr. Bui been able to operate as quickly as

9:31AM 10   possible, Miss Orr more likely than not would still be alive.

9:31AM 11          As Dr. Liechty pointed out, the major

9:31AM 12   structures -- you could see it in the CT.  The major structures

9:32AM 13   were all in place.  Nothing was destroyed.  There was hope for

9:32AM 14   her doctors if they could intervene sooner.

9:32AM 15          And you heard about what kind of a fighter, what

9:32AM 16   kind of a fighter Miss Orr was, how she wanted to live.  But

9:32AM 17   because this drug caused such a large bleed, the Defendants

9:32AM 18   want to tell you there was nothing Dr. Bui could really do.

9:32AM 19          You heard from three neurosurgeons in this

9:32AM 20   trial, two experts and Dr. Bui.  Dr. Liechty said that Sharyn

9:32AM 21   most likely would have lived if Dr. Bui had been able to

9:32AM 22   operate sooner.  Dr. Thomas, the Defendants' expert, initially

9:32AM 23   said she had no chance.  Testified he knew from the second he

9:32AM 24   saw that CT scan that that was a fatal bleed.  According to

9:32AM 25   him, her story was concluded at 6:30 that evening at Ruth's

9:32AM
9:32AM
9:33AM
9:33AM
9:33AM
9:33AM
9:33AM
9:33AM
9:33AM
9:33AM
9:33AM
9:33AM
9:33AM
9:33AM
9:33AM
9:33AM
9:33AM
9:33AM
9:34AM
9:34AM
9:34AM
9:34AM
9:34AM
9:34AM
9:34AM

1   Chris while having her last dinner with Joe.  He ultimately
2   said that she faced a 72 percent mortality; in other words, a
3   chance to live.  Two really different opinions.  One's hopeful.
4   The other's virtually hopeless.
5            But what happened?  What's the truth?  What did
6   her treating neurosurgeon, Dr. Bui, do?  He operated at 2:00 in
7   the afternoon on April 25th, 12 hours later.  Dr. Bui testified
8   he performed a necessary surgery, and he had hoped for success.
9   Otherwise, he wouldn't have done it.  And Dr. Bui told you he
10  would have operated sooner and that early -- and that earlier
11  surgery would have improved her chance for a favorable outcome.
12  Could he guarantee it?  Of course not.  Could he provide
13  certainty?  No.  That's why he said the outcome was uncertain.
14  But it's simply not believable that he thought there was no
15  chance for her to survive, as the Defendants would have you
16  believe.
17           You saw firsthand the nature of the surgery
18  which Dr. Bui performed on Miss Orr.  It was difficult to watch
19  at times, but you needed to see it with your own eyes to see
20  how serious that surgery was, to set aside any doubt you may
21  have on whether a neurosurgeon would ever put a patient and her
22  family through that unless he thought it was medically
23  necessary and could successfully allow a patient to recover.
24           The reason Miss Orr's bleed was so large was
25  because she took Xarelto.  Xarelto took what would have been a

2357

9:34AM   1   much easier bleed to deal with and caused it to be the massive

9:34AM   2   bleed you saw on these CT -- CT scans.

9:34AM   3            But let me get this straight.  These Defendants

9:34AM   4   cause Miss Orr's bleed to be as large as it was; don't tell her

9:34AM   5   doctors the truth about the PT test so that they have the best

9:34AM   6   opportunity to save her life; and then use the size of the

9:34AM   7   bleed they caused as an excuse to say she wasn't going to make

9:34AM   8   it anyway, so we don't need to tell them about a test.  It

9:35AM   9   doesn't matter.

9:35AM   10           Let me be clear on this, though.  We don't have

9:35AM   11   to prove that Sharyn's bleed was caused by Xarelto for the

9:35AM   12   failure to warn Dr. Bui.  The important point is that she had a

9:35AM   13   bleed, and Dr. Bui thought she was on Xarelto.  And because he

9:35AM   14   wasn't told the truth about PT, he thought there was no way to

9:35AM   15   answer the question he needed answered, and he had to wait.

9:35AM   16   Doesn't matter what actually caused that bleed to happen.

9:35AM   17           The family all told you how the entire tenor of

9:35AM   18   that room changed once the doctors learned she was on Xarelto.

9:35AM   19   Do you remember that?  Just a sink of the entire room.  If

9:35AM   20   Dr. Bui had been told the truth -- told the truth that her

9:35AM   21   normal PT meant she hadn't taken Xarelto that night, they could

9:35AM   22   have immediately moved forward.  Who's to say surgery couldn't

9:35AM   23   have been done sooner than 2 a.m. if they knew that?  Maybe

9:36AM   24   they would have hurried things along because now they thought

9:36AM   25   there was a chance to actually save her.  We'll never know for

OFFICIAL TRANSCRIPT

9:36AM    1    certain whether Sharyn would have lived had Dr. Bui been able

9:36AM    2    to operate earlier.

9:36AM    3              But the greater weight of the evidence shows

9:36AM    4    that more likely than not, Sharyn would still be here with her

9:36AM    5    family, and the answer to question Number 2 is yes.

9:36AM    6              But even if you don't decide that Miss Orr more

9:36AM    7    likely than not would have survived, there can be no dispute

9:36AM    8    that the chance to survive was taken from her.  That's question

9:36AM    9    Number 3.  If you decide there was a failure to provide

9:36AM   10    adequate information, but despite that failure, Sharyn most

9:36AM   11    likely wouldn't have lived had an earlier operation been done,

9:36AM   12    then you have to decide whether that same failure deprived her

9:36AM   13    of the chance to survive, no matter how slight.

9:36AM   14              I was listening to what the Defendants and their

9:36AM   15    experts were saying about Miss Orr's health, and I couldn't

9:37AM   16    align it with what the family was saying.  I couldn't align it

9:37AM   17    with what Dr. Cruz said.  All the Defendants know about Sharyn,

9:37AM   18    what they see on paper.  They've never met her.  They know

9:37AM   19    nothing of the essence of her, her spirit, her strength.  They

9:37AM   20    don't know anything about that.  They know nothing of her

9:37AM   21    "nothing is going to slow me down" attitude about life.  You

9:37AM   22    heard Dr. Cruz who saw her regularly testify she was vibrant,

9:37AM   23    and he was surprised to learn that she had passed.  You heard

9:37AM   24    the family.  Sharyn lived life to the fullest.  She wasn't some

9:37AM   25    sick, frail lady that could barely get by in life.  She was

9:37 AM
9:37 AM
9:37 AM
9:37 AM
9:37 AM
9:38 AM
9:38 AM
9:38 AM
9:38 AM
9:38 AM
9:38 AM
9:38 AM
9:38 AM
9:38 AM
9:38 AM
9:38 AM
9:38 AM
9:38 AM
9:38 AM
9:38 AM
9:38 AM
9:39 AM
9:39 AM
9:39 AM
9:39 AM

1    active; active, energized, committed to living life to the
2    fullest.
3          Sharyn Orr was a fighter.  She fought to live
4    for five and a half hours after being taken off life support.
5    She wanted to live, to have more time with her family.  She
6    fought hard.  She fought hard, but the chance, no matter how
7    small, was taken away by the actions of these Defendants.
8    Bayer and Janssen took away her opportunity to win her fight,
9    and it's up to you to provide this family with some measure of
10   justice.
11          Now I want to move quickly and I want to talk
12   about the question of whether Dr. St. Martin was provided
13   adequate instructions about Xarelto.  You were told in the
14   beginning of this case that you were going to hear from some of
15   the best doctors in the world, doctors like Dr. Liechty,
16   Dr. Bui, doctors like Dr. Smart, the chief of cardiology at
17   LSU, a researcher, a teacher and a clinician.
18          Dr. Smart came in here, and he told you why
19   Xarelto's so dangerous; how the label doesn't explain that the
20   drug will put people at significant risk without any added
21   stroke protection; how Xarelto is the worst in its class of
22   these drugs.  And the Defendants, they brought great doctors to
23   you as well.  They did.  And then there was Dr. St. Martin.
24   Dr.  St. Martin, very different from all these other doctors.
25   More like a typical doctor, not a researcher, isn't as informed

2360

9:39AM 1 about Xarelto as the experts that testified.  He's a doctor

9:39AM 2 that depends on the information he gets from the drug companies

9:39AM 3 being accurate.  What did you see?  There was so much about

9:39AM 4 this drug he didn't know, so many things he didn't understand.

9:39AM 5 I'm not being critical; just how it was.

9:39AM 6        With her conditions, Sharyn should have never

9:39AM 7 been put on Xarelto, the least effective and most dangerous

9:39AM 8 drug of its class, the drug with no reversal agent to protect

9:39AM 9 the patient if a bleed occurs.  And Dr. St. Martin clearly

9:39AM 10 testified that if it were true, if it were true that Xarelto

9:39AM 11 was the worst in its class, he wouldn't have given it to her.

9:40AM 12 That's the only reasonable thing to say.

9:40AM 13        THE CASE MANAGER:  Brian, ten minutes left.

9:40AM 14        MR. BARR:  Okay.

9:40AM 15        If it were true there were a 50 percent

9:40AM 16 increased risk of bleeding for Xarelto patients in the United

9:40AM 17 States, he would have recommended she try warfarin first.  You

9:40AM 18 heard that.  Yeah, he also said, under questions from Mr.

9:40AM 19 Irwin, that considering everything he knew, he would not have

9:40AM 20 changed his decision, but he made it clear there was a lot of

9:40AM 21 stuff he didn't know.  He didn't know what was true.  He didn't

9:40AM 22 know what you know is true.  You know the truth.  There was

9:40AM 23 information he was not told that would have changed his

9:40AM 24 decision on whether or not to give Sharyn Xarelto.  The

9:40AM 25 evidence proves that Dr. St. Martin wasn't adequately informed.

|  |  |  |
|---|---|---|
| 9:40AM | 1 | That's a yes.  And this failure would have changed his |
| 9:40AM | 2 | prescription decision. |
| 9:40AM | 3 | The only other thing you have to decide then is |
| 9:40AM | 4 | whether Xarelto was the cause of Sharyn's bleed.  Was it a |
| 9:41AM | 5 | substantial contributing factor of her bleed?  Without |
| 9:41AM | 6 | question, yes.  Every treating doctor that testified said it |
| 9:41AM | 7 | was a substantial contributing factor.  The treating doctors |
| 9:41AM | 8 | stated clearly it was the cause of her bleed.  That's what |
| 9:41AM | 9 | Dr. Bui said.  That's what Dr. St. Martin said.  That's what |
| 9:41AM | 10 | her medical records say.  Look at Plaintiffs' Exhibit 121 on |
| 9:41AM | 11 | Page 2. |
| 9:41AM | 12 | And I have to address one thing the Defendants |
| 9:41AM | 13 | keep doing.  They're probably going to do it again when they |
| 9:41AM | 14 | stand up here.  That blood pressure chart, the chart that only |
| 9:41AM | 15 | shows her blood pressures in the doctor's office that they keep |
| 9:41AM | 16 | popping up on the screen.  It doesn't show her blood pressures |
| 9:41AM | 17 | at home that she was regularly monitoring.  They don't put any |
| 9:41AM | 18 | of that in their chart.  They ignore the white coat effect her |
| 9:41AM | 19 | doctors said she had, what Dr. Cruz testified about.  Dr. Cruz, |
| 9:42AM | 20 | one of her treaters, a doctor that knew and examined her -- she |
| 9:42AM | 21 | wasn't just a piece of paper to Dr. Cruz -- testified her home |
| 9:42AM | 22 | blood pressures were much better, relatively controlled. |
| 9:42AM | 23 | That's what he said.  That's not something that was made up. |
| 9:42AM | 24 | And you have to ask yourself, why did they do this?  Why do |
| 9:42AM | 25 | they do this? |

```
9:42AM    1              We haven't disputed Sharyn had hypertension.  We
9:42AM    2    haven't disputed hypertension likely contributed to her bleed.
9:42AM    3    We're saying that it's because she was on Xarelto, that's why
9:42AM    4    the bleed was as bad as it was.  It was a substantial
9:42AM    5    contributing factor, the size of the bleed, that directly led
9:42AM    6    to her death.  Defendants are just trying to make her medical
9:42AM    7    picture look worse by ignoring half of it.
9:42AM    8              And now we have to talk about the damages to
9:42AM    9    award.  This is always the hardest part.  This family will
9:42AM   10    never be the same.  They all told you about how Sharyn was the
9:43AM   11    rock of the family, the matriarch, a lady in every sense of the
9:43AM   12    word.  One of her favorite things was giving her grandkids
9:43AM   13    nicknames, and you all know how this works.  You don't get to
9:43AM   14    pick your own nickname.  Any of you have a nickname, you don't
9:43AM   15    get to pick it.  That's not how the nickname game works.  She
9:43AM   16    wanted to be called Gram.  That's what she wanted them to call
9:43AM   17    her.  She told everyone, "They're going to call me Gram."
9:43AM   18    Well, she got Gaga, and she loved every minute of it.  She paid
9:43AM   19    those grandkids back with their own names, got every one of
9:43AM   20    them.  J-Rock, Butz, Shoe, Buggy and Bub; every one of those
9:43AM   21    grandkids with their own nickname from their Gaga.
9:43AM   22              How do you go about deciding what the damages
9:43AM   23    are in this case?  How are you supposed to place a value on the
9:44AM   24    loss of Sharyn Orr to Joe and each one of her children?  You
9:44AM   25    have to look at the loss of each family member and the reality
```

9:44AM   1   that they face every day.  She's not coming back.  She'll no

9:44AM   2   longer be sitting at the ballpark watching Joshua play.  That's

9:44AM   3   their reality.  She'll no longer be there to be that support

9:44AM   4   they need, that rock, their mom and grandma.  Never missed

9:44AM   5   anything and will now miss everything.  Ballgames, birthdays,

9:44AM   6   holidays, graduations, weddings.  Giant hole in that family.

9:44AM   7   There'll be no more date nights for Joe.  Joe's soulmate for

9:44AM   8   the past 45 years, and he has to figure out how to go on.  I

9:44AM   9   can't imagine that.  It's every spouse's greatest fear to be

9:44AM  10   the one that's left behind, the one faced with the stark

9:45AM  11   reality that we don't have forever with each other.  For 45

9:45AM  12   years, just being able to reach over and with a gentlest of

9:45AM  13   touches know that Sharyn is still there, just gone. Her life

9:45AM  14   was cut short at a time when she was enjoying it most, spoiling

9:45AM  15   those grandchildren with the Hershey's Kisses and the red M&Ms.

9:45AM  16   Sharyn and Joe able to look back with great pride at the family

9:45AM  17   they raised together, able to see the success each one of their

9:45AM  18   kids became due to their hard work, and just like that she's

9:45AM  19   gone.

9:45AM  20            THE CASE MANAGER:  Brian, five minutes.

9:45AM  21            MR. BARR:  Okay.  And all because these defendants

9:45AM  22   decided her doctors didn't need to know the truth about

9:45AM  23   Xarelto, didn't need to know what the Defendants know.  What's

9:45AM  24   that worth?  That's a tough question to grapple with.  Judge

9:45AM  25   Fallon's going to give you some instructions on that.

9:45AM 1          Now, I can tell you certain on the economic
9:46AM 2  damages.  Those are easy.  They're largely undisputed.  $7,000
9:46AM 3  in funeral and burial expenses.  $140,000 in medical bills.
9:46AM 4  $200,000 for the loss of Sharyn's financial support.
9:46AM 5          But the remainder of the damages on question 4
9:46AM 6  and 5, the compensation to this family for losing its anchor,
9:46AM 7  the family leaves that to you to decide what that loss is
9:46AM 8  worth.  And whatever you decide, they will accept it and live
9:46AM 9  with it forever.
9:46AM 10         This is their one chance to come before a jury
9:46AM 11 and tell their story, explain how this all impacted them.  And
9:46AM 12 they leave that decision in your hands, the jury, the true
9:46AM 13 leveler of the playing field, their peers who have been so
9:46AM 14 attentive in this trial.
9:46AM 15         Now, in closing, let me remind you what Bayer
9:46AM 16 says outside of the United States.  Here it is right here.
9:47AM 17 This is what Bayer says outside of the United States, and I put
9:47AM 18 this up, and I ask this question.  Isn't it true that Bayer
9:47AM 19 tells doctors outside of the United States that you can use PT
9:47AM 20 to make clinical decisions in an emergency situation?  And I'm
9:47AM 21 going to come up here and, on behalf of Sharyn Orr, I'm going
9:47AM 22 to check true because I know that's true.  That's what they
9:47AM 23 tell doctors outside of the United States, but I'm about to sit
9:47AM 24 down, and I'm going to leave this up.  I'm going to leave this
9:47AM 25 up, and I'm going to ask the Defendants the same question.

9:47AM  1   Isn't it true that this is what you tell doctors outside of the

9:48AM  2   United States?

9:48AM  3              Let me tell you what I think they're going to

9:48AM  4   do.  They may tell me to take this down.  They may come up here

9:48AM  5   and try to explain this away, to confuse the issue.  They may

9:48AM  6   try to add some language, but let me tell you what they won't

9:48AM  7   do.  As an Officer of the Court, they aren't going to walk up

9:48AM  8   there and check that false box.

9:48AM  9        **MS. WILKINSON:**  Your Honor, I'm going to object to

9:48AM  10  that.  That's inappropriate.

9:48AM  11             **THE COURT:**  Yeah --

9:48AM  12        **MR. BARR:**  I'll wrap it up.

9:48AM  13             **THE COURT:**  Disregard that last comment, folks.

9:48AM  14        **MR. BARR:**  And that says all you need to know.

9:48AM  15  Through your verdict, you have the opportunity to tell these

9:48AM  16  companies that we expect better than this.  We as a society are

9:48AM  17  better than this.  Every single person they put at risk is a

9:48AM  18  person like Sharyn, a person with a family, goals and dreams.

9:48AM  19             And while your verdict can't bring Sharyn

9:48AM  20  back -- we wish it could -- what it can do is it can help the

9:49AM  21  next Sharyn Orr, help the next Sharyn Orr on Xarelto that shows

9:49AM  22  up at the hospital suffering from a brain bleed, hoping the

9:49AM  23  doctors there have been told more than Dr. Bui and that those

9:49AM  24  doctors will be able to save that person's life.

9:49AM  25             Sharyn lived her life in service of others, and

9:49AM 1   you, the jury, can now carry on her memory and live and work in

9:49AM 2   service of others to protect those coming behind her.  Thank

9:49AM 3   you.

9:49AM 4           **THE COURT:**  Let's take a break here and come back and

9:49AM 5   we'll hear from the Defendants.  Court's in recess.

9:49AM 6           **THE CASE MANAGER:**  How long, Judge?

9:50AM 7           **THE COURT:**  Ten minutes.

9:50AM 8           **THE CASE MANAGER:**  Ten minutes.

9:50AM 9           (Whereupon the jury was excused from the courtroom.)

9:50AM 10                          **(Recess.)**

10:01AM 11          **THE CASE MANAGER:**  All rise.

10:01AM 12          (Whereupon the jury entered the courtroom.)

10:01AM 13          **THE COURT:**  Okay.  Be seated, please.  Let's hear

10:01AM 14  from the Defendant.

10:01AM 15              You may proceed.

10:01AM 16          **MS. WILKINSON:**  Thank you, Your Honor.  Good morning,

10:01AM 17  ladies and gentlemen.

10:01AM 18          **JURORS:**  Good morning.

10:01AM 19          **MS. WILKINSON:**  Every time I walk through those doors

10:01AM 20  and I get the privilege of standing in front of you, I know I

10:02AM 21  am here because we have the greatest justice system in the

10:02AM 22  world.  We take nine people from all different backgrounds who

10:02AM 23  have busy lives, who have different experiences, different

10:02AM 24  viewpoints, and His Honor instructs you, and you follow, to

10:02AM 25  decide this case on only the evidence that's presented from

1  that witness stand and based on one of the most important
2  things we have in our system, cross-examination.  You've heard
3  His Honor say that to you over and over again.  Why is that?
4  Because you can hear a very good story, a story that calls
5  people names and says companies are awful people or that they
6  don't care about the family, but in the end you got to hear
7  about the evidence through cross-examination, through both
8  sides, and you're going to decide this case based on all of
9  that evidence.

10         So instead of getting into the mud over some of
11  these allegations that made no sense, I want to spend my time
12  with you focusing on what matters, and that is what are the
13  questions that you're going to have to answer when you go back
14  into that jury room?  Because we all have been talking for two
15  weeks now, right?  But the hard part is just about to begin,
16  because you all go back there.  We don't go back there with
17  you.  You get the evidence, and the nine of you will decide a
18  case that is very, very important.  Very important to our
19  companies, because this is a medicine that saves lives.  Very
20  important to the Orrs, because of course they are distraught
21  and sad about losing their mother.

22         The one thing that I heard that I know was meant
23  to be said, because I watched Mr. Barr look at his notes, and
24  he chooses his words very carefully.  He said that these
25  companies don't even remember that there's a family here.  That

1    is the most outrageous thing I've heard.  We've sat here every
2    day with great respect to the Orrs.  As a mother of three, I
3    would love to have my children give the tribute that they gave
4    to their mother.  Anyone would love that.
5              But that's not what this case is about.  This
6    case isn't about sympathy or whether we care about the family.
7    How could you not?  We didn't cross-examine any of them.  We
8    don't challenge any of them on the loss or the damages, because
9    that's not what's in dispute in this case.
10             And in a courtroom, when we're brought into a
11   courtroom because Plaintiffs want to say we did something wrong
12   and they want money, we have to defend ourselves if we believe
13   in this medicine, and we do.  And unfortunately, because of
14   comments like that, His Honor has to give this instruction, and
15   you'll hear it.  Your duty, and this is to you, is to base your
16   verdict solely upon the testimony and other evidence in this
17   case without prejudice or sympathy.  And that everyone under
18   the law, corporations and individuals, are to be treated fairly
19   and equally.
20             And why is that instruction necessary?  Because
21   of statements like that, that try and demonize corporations,
22   try and make you think that they don't care about what's going
23   on in here, and they don't care about what happens to people on
24   these medications.
25             It isn't just the companies, in any event.  You

heard from doctors, some of the best doctors in the world that happen to work in this community, right?  And they came in here and they told you over and over again that they would love to have a test that would help them in emergency situations.

So what is he saying?  Is he saying that they actually don't care?  That they've seen this PT test and all the literature and everything that happened, and they don't care?  They don't care about their patient?  They'd rather get up here on the stand under oath and say, "We don't think the PT test is useful, we think it's dangerous, it's reckless," but it really is a good test?  Because that's what they're asking you to believe; that doctors who practice in this community, who take care of patients every day, two of which were -- it was the first time ever testifying in a jury trial in this case because they believe this medication is so important, and they're suggesting that they don't understand or don't believe that this test would be helpful.

They are here and we are here because it is our responsibility to put that label together and to warn and advise doctors.  And we take it seriously.  But we have -- our responsibility also is to have a science-based label.  That label is a 47-page document, reviewed, as you know, by the FDI (verbatim), submitted by us, studied by doctors and used by physicians across the country.  We take our responsibility for that label very seriously, but we are not going to put in a

10:06AM   1   test that could be harmful or isn't usable by physicians with

10:07AM   2   this medication.

10:07AM   3              And Plaintiffs have tried to suggest to you that

10:07AM   4   for some marketing reason, we didn't put this test in the

10:07AM   5   label.  What in the world could that be?  The drug came out on

10:07AM   6   the market in 2011.  They suggested if we had the test, more

10:07AM   7   people would use the medicine, right?  More doctors would

10:07AM   8   prescribe it.  So why in the world wouldn't we want to put a

10:07AM   9   simple test in the label if it worked?  It would only help us.

10:07AM  10   Even if you want to believe the worst about the companies, that

10:07AM  11   all they care about is making money, putting the test in the

10:07AM  12   label if it worked would just make doctors prescribe it even

10:07AM  13   more.  So what they're asking you to believe makes absolutely

10:07AM  14   no sense.

10:07AM  15              And when you get the questions that you're going

10:07AM  16   to answer -- have to answer, you will see that most of what you

10:07AM  17   just heard has nothing to do with what you have to answer.  So

10:07AM  18   let's take a look at those questions.  I tried to put --

10:08AM  19   whoops, sorry -- to put them into simple terms that I think we

10:08AM  20   have used throughout the trial.  And the first is did we give

10:08AM  21   adequate warning and instructions, ones that doctors could

10:08AM  22   actually use in their clinical practice?  Two, did Xarelto

10:08AM  23   cause Mrs. Orr's brain hemorrhage?  And three, would a

10:08AM  24   different warning or instruction have changed her outcome?  And

10:08AM  25   those -- those three basic questions are going to be what helps

| | |
|---|---|
| 10:08AM | 1 |
| 10:08AM | 2 |
| 10:08AM | 3 |
| 10:08AM | 4 |
| 10:08AM | 5 |
| 10:08AM | 6 |
| 10:08AM | 7 |
| 10:08AM | 8 |
| 10:08AM | 9 |
| 10:09AM | 10 |
| 10:09AM | 11 |
| 10:09AM | 12 |
| 10:09AM | 13 |
| 10:09AM | 14 |
| 10:09AM | 15 |
| 10:09AM | 16 |
| 10:09AM | 17 |
| 10:09AM | 18 |
| 10:09AM | 19 |
| 10:09AM | 20 |
| 10:09AM | 21 |
| 10:09AM | 22 |
| 10:09AM | 23 |
| 10:09AM | 24 |
| 10:10AM | 25 |

you answer these questions.

This is the first question on your verdict form. Did Plaintiffs prove -- it's their responsibility; as you know, they always have to prove by a preponderance of the evidence -- that we failed to provide adequate warnings and instructions for the safe use of Xarelto to either of the physicians, Dr. St. Martin or Dr. Bui.  So the answer is no, we didn't fail.  And let's talk about why we gave an adequate instruction to these doctors.

You had simple direct testimony from both of these doctors.  Dr. St. Martin said he did read the Xarelto label.  He studied it.  He read literature, and he understood the risks and benefits.  He knew there was a bleeding risk, in fact, a fatal bleeding risk on this drug.  I mean, they don't dispute that.  There's warnings all over the label that say there's a fatal bleed risk.  And despite that, he said this drug was worth it, because when he had to take care of Mrs. Orr every day, she did have difficult medical challenges.

She was a fighter.  She was a great lady.  She did get up every day and do her job, take care of her family and her grandchildren.  Nobody disputes that.  She got a really bad deal.  Her body didn't work well, despite her doing everything she could.  Her kidney disease, her blood pressure, her diabetes, those things are not her fault, but those things were very, very difficult for doctors to deal with, because she

10:10AM
10:10AM
10:10AM
10:10AM
10:10AM
10:10AM
10:10AM
10:10AM
10:10AM
10:10AM
10:10AM
10:10AM
10:10AM
10:10AM
10:10AM
10:11AM
10:11AM
10:11AM
10:11AM
10:11AM
10:11AM
10:11AM
10:11AM
10:11AM
10:11AM

1    was declining internally every year while she faced those

2    conditions.  And then she had AFib.  And as you know, AFib not

3    only causes that unusual and irregular pattern of the

4    heartbeat, but it causes that clotting that could give her an

5    ischemic stroke.  And that's why Dr. St. Martin, who was

6    responsible for her day in and day out, said this is the right

7    medication.  She had been prescribed another, the Pradaxa by

8    her original doctor, so he too agreed that she needed an

9    anticoagulant, and then when she had stomach problems on

10   Pradaxa, he switched her to Xarelto.

11          Dr. Bui didn't read the label, and there's

12   nothing wrong with that.  He's a neurosurgeon.  He didn't

13   prescribe the medication, so he doesn't make the decision.  So

14   a different warning on that label wouldn't have made a

15   difference to him.  But he too said he understood the risks and

16   benefits.  He understood that people need that medication when

17   they face AFib, and he did not question Dr. St. Martin's

18   decision to prescribe it.  None of the treating physicians --

19   which is what we call Dr. Bui, right, because he was treating

20   her before there was ever a lawsuit.  None of these treating

21   physicians questioned the prescription of Xarelto.

22          Plaintiffs pointed out on that chart that they

23   put up, remember right at the end, saying what will she say?

24   They pointed out the language up top that there's no -- that we

25   said there's no need to monitor.  But as happened in this trial

10:11AM
10:11AM
10:11AM
10:11AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:12AM
10:13AM
10:13AM
10:13AM
10:13AM
10:13AM
10:13AM

1    over and over again, they only showed you part of the language.

2            Now why does that matter?  Well, here it matters

3    because later in the document -- and you'll see it.  Here it

4    is.  It's Exhibit 190.  And the rest is blacked out because

5    it's not relevant to this case, according to His Honor.  And on

6    one page they show you one statement, and if you just turn the

7    next page is the other statement.  And what does it say?  "PT

8    cannot be used reliable to measure the anticoagulant effect

9    since a normal PT may be found in patients" -- that would be

10   Mrs. Orr, right?  She had a normal PT -- "with therapeutic

11   Xarelto levels if measured using selected machine/reagent

12   combinations."  That's exactly her situation, but Plaintiffs

13   don't want you to see the entire story.

14            This is not a game.  This is not a game where we

15   show you one part and they show you the other.  This is

16   science.  You can't read one part of the article that you see

17   and not the other.  You heard that from our doctors.  What did

18   they say?  They said you needed to read the whole thing, right?

19   And not even just one article, because you do get competing

20   scientific views.  We want that.  But until there's enough

21   scientific proof to say you can do it, these doctors aren't

22   going to do it.

23            And the same with the company.  The company --

24   if we had left that out, what do you think they'd be saying?

25   And what if the doctors used the PT test and they cut into

1    Mrs. Orr and she bled to death at that moment?  You know what
2    they would be in here saying?  They would be in here saying,
3    "You didn't tell us that it wasn't reliable."
4              That's the risk that these doctors on the stand
5    make every day; not these folks, but the doctors you heard
6    from, they make those real world decisions.  They think, "Can I
7    put that stint in her head?  Can I do that surgery because she
8    could bleed to death?"  And you know what?  Nobody has perfect
9    information when they make those decisions.  That's why those
10   doctors go through incredible training and experience, and they
11   live with those decisions, and they don't always go right.
12             So we're not putting this label together and
13   this information for one patient.  We're giving the doctors the
14   information they need to treat people every day.  And they need
15   to know that when someone has a normal PT, that doesn't mean
16   that their -- their blood isn't anticoagulated.  And we went
17   over this day -- I think several days.  Remember, this was --
18   let me pull this up.  This was something Dr. Khatib told you,
19   that Plaintiffs -- we're going to see it in some of the
20   literature, that they kept pointing to concentration, remember?
21   That's just how much you have in the blood.  But what you heard
22   is that's not the same as does it have an anticoagulating
23   effect?
24             You heard Dr. Piazza with a good analogy I
25   thought, which is a gas tank.  You can fill your gas tank and

2375

10:14AM
10:14AM
10:14AM
10:15AM
10:15AM
10:15AM
10:15AM
10:15AM
10:15AM
10:15AM
10:15AM
10:15AM
10:15AM
10:15AM
10:15AM
10:15AM
10:15AM
10:15AM
10:15AM
10:16AM
10:16AM
10:16AM
10:16AM
10:16AM
10:16AM

1   drive let's say 60 miles an hour, because I know none of you

2   would speed.  And then you're down, and you have 5 gallons

3   left.  Can you still go 60 miles an hour?  Yes, you can.  So

4   you can have a lower concentration and still have the same

5   effect.  And that is what the complexity is of this medication.

6   You can have a full concentration, right, and your blood is

7   anticoagulated, thinned.  You can have a very little amount in

8   your blood, and your blood is still thinned.  And that's why

9   you can't take this PT test and say when someone has a normal

10  score, that means their blood is no longer thin.  And that's

11  what the doctors came in to tell you.  And that's what the

12  companies say outside the US and inside the US.

13              I just want to say, you know, to suggest -- to

14  suggest that these companies actually treat people differently

15  outside the US and the US -- inside the US, why would somebody

16  do that to you?  Why would they suggest that?  These statements

17  aren't -- aren't private.  There's published literature from us

18  since back in 2005, Dr. Khatib said, who talked about PT.  We

19  don't treat people differently.  His Honor told you that there

20  are different regulatory requirements, right?  And that's why

21  we're not talking about those because there's different

22  countries that have different requirements.  But we don't treat

23  the people in the US worse than we do somewhere else.  And what

24  kind of fear mongering is that to suggest that somehow these

25  companies don't care about people in the US and they care about

people elsewhere?  It's shameful.

And lots of good doctors who understand these medications and understand what it takes to take care of these patients all agreed under oath in this courtroom that Dr. St. Martin was right.  Mrs. Orr needed an anticoagulant.  She had a very high risk score, as you know, what was called the Chad VASc score, and she needed it.  And everyone, everyone who came into this courtroom, other than Dr. Smart -- and we'll talk about him in a minute -- every single person said it was reasonable to prescribe Xarelto.  Dr. Thomas, Dr. Bui, Doctor Khatib, who does it every day, the American Heart Association, the FDA.  This is not just the companies.  Major medical organizations believe this is a good therapy for people, knowing those risks.  Doctors who practice here all said -- and Dr. Smart, what did he say?  Well, first of all, he didn't come in and talk about Mrs. Orr.  He didn't say a thing about her, and he didn't say a thing about PT.  He wasn't here to say PT could have made a difference.  That wasn't one of his opinions, and he's certainly not an expert in the area like Dr. Khatib.

What he said was, "Oh, Xarelto is worst in class." They were trying to make you think it's a horrible drug despite all those people.  And you know what he said when he asked him is there a single peer-reviewed article supporting his company that it was best in -- that it was the worst in class?  Said, "Is there a single peer-reviewed published article that says

10:18AM 1   the dose of Xarelto that's approved today has been approved

10:18AM 2   since it's on the market, the 20-milligram dose, is too high

10:18AM 3   and unsafe?"  "No, ma'am."  Nobody said that.

10:18AM 4           The doctors understand this drug because of its

10:18AM 5   nature, right?  It thins the blood; therefore, you're going to

10:18AM 6   have more bleeding.  And these clear warnings are throughout

10:18AM 7   the label.  Bleeding risks, no reversal agent.  You can't

10:18AM 8   monitor or test.  And it's not inferior to warfarin.

10:18AM 9           Now, I just want to address the no reversal agent for

10:18AM 10  a moment.  Plaintiffs kind of suggested all around the margins,

10:19AM 11  well, we should have a reversal agent.  It would be great to

10:19AM 12  have one.  There isn't one, as you know, for any of the

10:19AM 13  anti-Factor Xa drugs.  But what's important in a warnings

10:19AM 14  case -- this case is about warnings -- is, we clearly warned

10:19AM 15  about that.  If doctors don't want to prescribe it because

10:19AM 16  there's not a reversal agent, they don't have to.  But nobody

10:19AM 17  came in this courtroom and disputed that there wasn't a

10:19AM 18  reversal agent.

10:19AM 19          So why are Plaintiffs trying to make you feel like

10:19AM 20  we're bad companies because we don't have a reversal agent?  It

10:19AM 21  has nothing to do with this case.  It's just another way of

10:19AM 22  demonizing the companies to make you think that we're bad

10:19AM 23  people who don't care about the patients and the doctors.  Our

10:19AM 24  obligation is to warn, and we did.

10:19AM 25          But Dr. Khatib told you there's a reason, despite

10:19AM
10:19AM
10:19AM
10:20AM
10:20AM
10:20AM
10:20AM
10:20AM
10:20AM
10:20AM
10:20AM
10:20AM
10:20AM
10:20AM
10:20AM
10:20AM
10:20AM
10:20AM
10:20AM
10:20AM
10:21AM
10:21AM
10:21AM
10:21AM
10:21AM
10:21AM
10:21AM
10:21AM
10:21AM
10:21AM

1    these things and the risks, to prescribe this medication,

2    right?  All medications have risks and benefits, and this one

3    has a huge benefit, and it has risks.  But when you put it in

4    the context of all the patients that have to take it, the risks

5    are still small, and he doesn't want to take this medication

6    away from all those patients because there are these risks.

7    And they are very serious risks, no doubt about it.  No one

8    disputes that.

9            But when you look at those numbers for the patients,

10   it shows that compared to warfarin, the risk of fatal bleeds

11   are far lower.  So the numbers you heard -- I don't remember.

12   I think it was 8,000, if those same -- that same group had been

13   on warfarin, that would be about 20,000 people who would have

14   those bleeds.

15           Does that mean you shouldn't prescribe warfarin?

16   Absolutely not.  No doctor suggested that.  These are horrible

17   statistics, they're in the label, and the doctors again know

18   that.  They are warned about that.  No one disputed that they

19   understand those risks.  But most doctors, when looking at all

20   the different kinds of bleeds, would rather prescribe a drug

21   that has a lower rate of fatal bleeding than another drug.

22           So all these warnings, ladies and gentlemen, show you

23   that Dr. Bui and Dr. St. Martin were adequately and fully

24   warned about the risks and benefits of Xarelto.

25           So the next question is, did the lack of the warning,

10:21AM 1   did the drug and therefore, the lack of the PT test, did that

10:21AM 2   cause her death?  And there's two aspects to this, kind of what

10:21AM 3   they call medical causation.  Did the drug actually cause the

10:21AM 4   hemorrhage, and would a different warning have made a

10:21AM 5   difference?  So let's talk about both.

10:21AM 6         Every doctor who walked into this courtroom said

10:21AM 7   hypertension can be deadly.  Hypertension, as you heard, is the

10:22AM 8   silent killer.  So someone looks fine on the outside, but when

10:22AM 9   you have the sustained high blood pressure like Mrs. Orr did,

10:22AM 10  it starts to break down your blood vessels.  And she had all of

10:22AM 11  those symptoms, unfortunately.  Remember when she had the

10:22AM 12  kidney biopsy showing that she had that damage?  We're going to

10:22AM 13  look at others.

10:22AM 14        This hypertension on this chart is important, because

10:22AM 15  this is what caused over a long period of time her tragedy,

10:22AM 16  caused that massive hemorrhage.

10:22AM 17        And why aren't the home measurements here?  Well,

10:22AM 18  first of all, she was on five medications, remember that, for

10:22AM 19  hypertension?  If the doctors thought it was just white coat

10:22AM 20  and Mr. Barr's chart was right that she was just normal, why

10:22AM 21  did they have her on five different high blood pressure

10:22AM 22  medications?

10:22AM 23        They all believed that she was having a very

10:22AM 24  difficult time despite trying to do everything she could

10:22AM 25  controlling her high blood pressure.  It was nothing that she

10:23AM
10:23AM
10:23AM
10:23AM
10:23AM
10:23AM
10:23AM
10:23AM
10:23AM
10:23AM
10:23AM
10:23AM
10:23AM
10:23AM
10:23AM
10:24AM
10:24AM
10:24AM
10:24AM
10:24AM
10:24AM
10:24AM
10:24AM
10:24AM
10:24AM

1    did.  It was her body.  And she had all the signs of the

2    damage, right?  We know she had congestive heart failure.  What

3    else does high blood pressure cause?  Renal failure.  We know

4    she was at stage 4 kidney disease before she had her

5    hemorrhage.  Cardiovascular disease.  We know she had AFib.

6    Retinopathy, and you heard Dr. Thomas talk about that,

7    remember, that she had retinopathy, the breakdown of blood

8    vessels in both of her eyes.  And sadly on April 24th, 2015,

9    she had a massive hemorrhage.  Those are all the result of

10   having sustained high blood pressure.

11           And what does high blood pressure do that Xarelto

12   doesn't?  High blood pressure actually breaks down the blood

13   vessels, and that's how blood escapes.  No one came into the

14   courtroom and said that Xarelto damages the blood vessels.  No

15   one said that it initiates the bleed, because it doesn't.  What

16   happens is the hypertension breaks open that vessel and someone

17   starts to bleed.  And that's exactly, tragically, what happened

18   here.  And Dr. Thomas told you that he saw that because of what

19   he saw just a week or two before in the records, she had

20   microaneurysms that were observed in both of her eyes.  And

21   what did he say?  He said the eye is a window into the brain

22   because it's all developed when you're in embryo the same way.

23   Those are from the same cells.  And when she started to have

24   those microaneurysms, right, the little bleeds, that was an

25   indicator that the blood vessels in her brain were also

10:24AM
10:24AM
10:24AM
10:24AM
10:24AM
10:25AM
10:25AM
10:25AM
10:25AM
10:25AM
10:25AM
10:25AM
10:25AM
10:25AM
10:25AM
10:25AM
10:25AM
10:25AM
10:25AM
10:26AM
10:26AM
10:26AM
10:26AM
10:26AM
10:26AM

1    breaking down.  Dr. Thomas said when he saw that hemorrhage

2    that day, he knew -- or from that CAT scan, he knew that it was

3    fatal.

4            But what else contributed to it?  Well, Plaintiffs

5    never addressed this.  There's no evidence from them in it.

6    But just a week before she took prednisone because she had a

7    bad shoulder.  Remember that?  It wasn't prescribed by Dr. St.

8    Martin, so it was prescribed by a guy named Dr. Stewart.  We

9    didn't hear from him.  Maybe he didn't know she was on all

10   those other blood pressure medications.  But this medication is

11   known, as you heard Dr. Khatib say, to raise blood pressure.

12           So she's already got incredibly high blood pressure.

13   She's on five or six medications by this week, and someone else

14   gives her yet another medication that does what she doesn't

15   need.  It raises her blood pressure on April 15th, 2015.  And

16   what do we see the next day?  The next day after she's given

17   that prednisone, her blood pressure is up to 200/90.

18           Now, again, that's no one's fault, but those are the

19   medical facts in this case.  And the medical facts sadly,

20   tragically, ended up the next week producing this massive

21   hemorrhage in her brain, deep into her brain as you heard,

22   where they couldn't go in and surgically remove it because it

23   was way down covered by good brain tissue where there was

24   swelling all around it.  And you can see, look up around the

25   skull where he -- I think Dr. Thomas described them as kind of

2382

10:26AM  1    mountains and valleys where the fluid can go around.  It's

10:26AM  2    starting to press out so that that fluid out there can't

10:26AM  3    protect the brain, and the swelling is pushing all of the brain

10:26AM  4    tissue.  This is at 11:44 p.m.  This is before they could have

10:26AM  5    ever done any surgery, any surgery to put in the EVDs.  That

10:26AM  6    was the brain and the brain damage that the doctors saw when

10:26AM  7    she was still at Baptist.

10:26AM  8           And the sad truth -- and I think I've said this

10:26AM  9    before -- it's horrible to have to discuss this in front of the

10:27AM 10    family, but we have to do it because that's why we're here,

10:27AM 11    because they brought the case.

10:27AM 12           So what do you see?  You see all these factors that

10:27AM 13    experts like Dr. Thomas, the neurosurgeon, said left only one

10:27AM 14    outcome, and it didn't have anything to do with Xarelto.  And

10:27AM 15    when he testified, Plaintiffs didn't even challenge him.

10:27AM 16    Remember cross-examination, why it's so important to hear the

10:27AM 17    other side?  All of these topics that Dr. Thomas talked about

10:27AM 18    they didn't cross-examine him on.  They didn't even challenge

10:27AM 19    him when he said hypertension was the cause and that she had

10:27AM 20    this horrible hypertension, right?  That she had microaneurysms

10:27AM 21    in her eyes, and that's what started to show him that that --

10:27AM 22    those blood vessels were breaking down in the brain.  CAT

10:28AM 23    scans, remember how many CAT scans he showed you, all the

10:28AM 24    different views to try and explain the pressure?  They didn't

10:28AM 25    put one of those back up and challenge him.

1    And the outcome, again a terrible thing to talk about
2  in front of the family, that her coma score was less than
3  eight, which means she was comatose and had an ischemic stroke
4  score -- or I'm sorry, not -- an ICH, an intracranial
5  hemorrhage score of three, which he told you meant in all
6  likelihood she would pass away.
7    They did not confront him on any of that evidence,
8  not once.  Why?  Because they knew he had answers.  If they
9  really believed that this didn't cause it and that she could
10  have survived, why didn't they challenge him?  I know, because
11  he's an incredibly qualified doctor that grew up in this
12  community, went off to school and came back, and has been
13  serving as one of the leading neurosurgeons in this community
14  ever since.  He deals with these tragedies every day, and he
15  has gone in and had to tell families like the Orrs the facts
16  about what is really going on.
17    And I don't think the Orrs even knew.  They probably
18  didn't know that their mother had all of these problems.  She
19  sounded like she was the kind of woman who wasn't going to
20  burden her kids or even her husband.  She was going to fight
21  and live her life the best that she could.  So I don't know
22  that they knew all of her medical records and how insane her
23  blood pressure had been, how high it was, or how many times
24  she'd been in the hospital, as you heard Dr. Khatib say, just a
25  few months before on the edge of life support.

10:29AM
10:29AM
10:29AM
10:29AM
10:30AM
10:30AM
10:30AM
10:30AM
10:30AM
10:30AM
10:30AM
10:30AM
10:30AM
10:30AM
10:30AM
10:30AM
10:30AM
10:30AM
10:31AM
10:31AM
10:31AM
10:31AM
10:31AM
10:31AM
10:31AM

1          So we don't blame them, but these are the medical

2    facts.  And the medical facts were decided at the time before

3    there was a lawsuit, before they could go hire experts.  And

4    you know what it shows?  The doctor for Mrs. Orr said her

5    hemorrhage was caused by hypertension.  And I highlighted this

6    part of the death certificate, which is DTX 7, because I don't

7    think we showed you that not only did she put down that the

8    cause -- that Mrs. Orr died of intracerebral hemorrhage, but

9    that the cause was hypertension, but we didn't tell you that

10   the death certificate specifically asks to list any other

11   conditions, and she didn't list Xarelto.  She didn't list

12   anything except for hypertension.  And that is the medical

13   truth that was established before this lawsuit was ever

14   brought.

15         Now, this drug works not just because we say it does

16   or because the doctors say it does, but because it was tested

17   and reviewed by lots of people.  And that's what you want,

18   right?  It's our responsibility, and we put forth ROCKET, a big

19   great clinical trial which even their experts agree was --

20   except for Dr. Parisian, was a very well done study.  All of

21   their other experts agree with that.  But you don't have to

22   rely just on us, because we published that data.  We gave it to

23   the FDA, and then we've had post-marketing studies where

24   doctors can see and independent researchers can look at all of

25   this and make their own decision.

2385

| | |
|---|---|
| 10:31AM | 1 |
| 10:31AM | 2 |
| 10:31AM | 3 |
| 10:31AM | 4 |
| 10:31AM | 5 |
| 10:31AM | 6 |
| 10:31AM | 7 |
| 10:31AM | 8 |
| 10:31AM | 9 |
| 10:31AM | 10 |
| 10:32AM | 11 |
| 10:32AM | 12 |
| 10:32AM | 13 |
| 10:32AM | 14 |
| 10:32AM | 15 |
| 10:32AM | 16 |
| 10:32AM | 17 |
| 10:32AM | 18 |
| 10:32AM | 19 |
| 10:32AM | 20 |
| 10:32AM | 21 |
| 10:32AM | 22 |
| 10:32AM | 23 |
| 10:32AM | 24 |
| 10:32AM | 25 |

1    And that's what we want in our country.  We don't

2  want the companies to be the only one to have a say, right?

3  We've got the responsibility.  We should pay for that testing.

4  But other people who have no interest.  Independent

5  researchers, people like the FDA should also look at that and

6  make those determinations, and they have.  They looked at the

7  ROCKET data, which, as you know, was a huge study based on

8  14,000 patients, with sick patients, and it was reviewed by the

9  FDA and published.  The people at the company developed this

10  drug for specific reasons, most importantly to prevent strokes,

11  to have it only work on one of the factors so you didn't have

12  all the complications that you have with warfarin where you

13  have to watch your diet, your medications or even your alcohol

14  intake.  You could take it once a day so it's easier for

15  people.  And you didn't have to go and have your blood tested

16  regularly.  Dr. Khatib said that was a game changer.  It made

17  it easier for his patients, and that's one of the reasons he

18  likes Xarelto.

19    But the companies shared their opinions publicly.

20  Plaintiffss' counsel wanted you to believe that we say one

21  thing to each other and something different to you here in the

22  courtroom.  That's absolutely not true.

23    Here's another document you saw.  Dr. Berkowitz,

24  remember, was on videotape.  In December of 2015, he was at a

25  symposium.  This document was shown to you on a slide, which

10:32AM
10:32AM
10:33AM
10:33AM
10:33AM
10:33AM
10:33AM
10:33AM
10:33AM
10:33AM
10:33AM
10:33AM
10:33AM
10:33AM
10:33AM
10:33AM
10:34AM
10:34AM
10:34AM
10:34AM
10:34AM
10:34AM
10:34AM
10:34AM
10:34AM

1   always make it a little difficult -- see if I can pull it for
2   you -- but it's a PowerPoint that he did at a public symposium
3   right before -- or right after the time Mrs. Orr passed away,
4   before this lawsuit, and talking about what he and the company
5   believe about PT testing and monitoring.  And what does he say?
6   He said exactly what Dr. Piazza told you.  It's not reliable,
7   reproducible, accurate, or precise.  The concentration levels
8   change easily, and there's no validation on how the measurement
9   would prove -- improve clinical outcomes.  That's exactly what
10  the doctors are saying in this courtroom and what we've been
11  saying all along.  And the value the doctors have is what they
12  told you in this courtroom, they told you is exactly how they
13  practice medicine every day outside of this courtroom.

14          So the company is saying the same thing.  What about
15  independent researchers?  Well, this email came to you -- this
16  is DTX 3 -- because Plaintiffs' expert claimed -- I was very
17  troubled by this Dr. Califf who raised issues about the dosing,
18  which as you can tell really has nothing to do with what you're
19  going to decide.  And we showed them this email which showed
20  Dr. Califf, who was at Duke and at one point was the FDA
21  commissioner, but he was an independent researcher.  So the
22  companies paid for the research, but these other folks outside
23  did the research.  And what does he say?  He's writing to
24  another doctor at Duke, so not even to the company.  This is
25  what they're saying in 2014, three years after the drug is

2387

approved:  "Congrats.  We had some shaky times, but looking
back, we changed the world for the better with ROCKET AF.  Many
people saved from the misery of warfarin and spared from
ischemic or intracranial hemorrhage.  Seeing my mom today happy
on riva" -- right, which is Xarelto -- "and eating whatever she
feels like eating.  What's your next world-changing plan?"

That's what an independent researcher thought.
Someone who was picked to become the head of the FDA later, he
had worked on this research.  He had raised issues, which of
course you would want him to.  He had his own mother on the
drug, and he said the study had helped change the world because
it got the drug on the market.

And the FDA saw all of this information.  They not
only saw it in 2011, but they thought to re-review the safety,
remember, of Xarelto in 2016 when the Alere, that device was
used by ROCKET, was questioned.  It wasn't our device,
manufactured by another company.  And what did the FDA say?
They did a big analysis -- again, I think this is about 70
pages because it's on both sides.  This is DTX 1.  They did a
thorough analysis, and they shared it with the public.

Now, Dr. Parisian, the paid witness for hire, didn't
agree with it.  And you know what?  That's okay.  But guess
what?  She's one person hired and paid for by Plaintiffs.  This
is a full analysis, a written analysis that the FDA put out and
said, "Based on our analysis, based on our modeling, we don't

10:36AM
10:36AM
10:36AM
10:36AM
10:36AM
10:36AM
10:36AM
10:36AM
10:36AM
10:36AM
10:36AM
10:36AM
10:37AM
10:37AM
10:37AM
10:37AM
10:37AM
10:37AM
10:37AM
10:37AM
10:37AM
10:37AM
10:37AM
10:37AM
10:37AM

1   believe there needs to be any changes in the labeling of

2   Xarelto or any other major regulatory action."  They didn't

3   think it changed the safety profile, and in fact, they say,

4   "The conclusion we made in 2011," when they approved it,

5   "should not be changed."

6           So if PT was so necessary -- there are articles out

7   there.  There had been discussions.  They had done their own

8   analysis.  They were saying in 2011 it was right and not be

9   changed.  And who said it?  Plaintiffs made a very big deal

10  that two of their initial reviewers didn't agree with the

11  approval of Xarelto.  Remember they didn't recommend it?  One

12  of those people was Martin Rose.  He got promoted at the FDA,

13  so he became one of the bosses, as they said, to demonize those

14  folks.

15          And what did Martin Rose say?  He signed off.  This

16  is his signature saying he agrees that the conclusion was right

17  and it should not be changed.  He had access to all that PT

18  data.  He did the analysis with his colleagues and reviewed it

19  and reported on it to an advisory board.  If he thought PT

20  should be in the label, he could have easily said so.

21          So Plaintiffs are left with saying that this one

22  measurement, this PT measurement would have made a difference

23  to doctors if they had known that it meant that they could go

24  operate immediately.  Well, first and foremost, it doesn't mean

25  that.  It doesn't mean that.  It doesn't mean that because the

10:37AM 1  concentration is quote "normal", that there isn't an
10:37AM 2  anticoagulating effect.  And you know that because all the
10:37AM 3  doctors who did look at the records, who did look at the
10:37AM 4  literature, say it would not have helped Mrs. Orr.  Remember,
10:37AM 5  who came in here and testified about Mrs. Orr, who looked at
10:38AM 6  her records?  It wasn't Dr. Parisian, and it wasn't Dr. Smart.
10:38AM 7  They both said they had not looked at any of her records.  So
10:38AM 8  Dr. Khatib, Dr. Piazza, Thomas, Dr. Bui, Doctor Smart.  They
10:38AM 9  all said PT wouldn't help.
10:38AM 10         The only person Plaintiffs brought you, a single
10:38AM 11 witness, Dr. Liechty, who was the neurosurgeon who hadn't read
10:38AM 12 any of the literature before he got hired, wasn't familiar with
10:38AM 13 it, he's the only one who testified that it could have helped.
10:38AM 14         Well, I will tell you that the overwhelming
10:38AM 15 evidence -- you want to talk about the preponderance of the
10:38AM 16 evidence?  The overwhelming evidence that you heard from in
10:38AM 17 this courtroom that was cross-examined is that PT would have
10:38AM 18 not helped Mrs. Orr.  And just because someone makes a
10:38AM 19 speculation doesn't make it so.
10:38AM 20         In fact, His Honor will tell you when talking about
10:38AM 21 proving their case that Plaintiffs need not produce every
10:39AM 22 possible witness or prove every claim beyond a reasonable
10:39AM 23 doubt, right?  It's not a criminal trial.  But speculation,
10:39AM 24 mere possibility, or even unsupported probability is not
10:39AM 25 sufficient to support a judgment in Plaintiffs' favor.

2390

10:39AM   1          So just because they got up and say, "Well, it could

10:39AM   2    have been, we don't know, it could have been," doesn't make it

10:39AM   3    so.  That's why we brought you all of these doctors who did do

10:39AM   4    their work and did look at the literature and tell you it

10:39AM   5    wouldn't have helped Mrs. Orr.

10:39AM   6          And they're not the only ones who have studied the PT

10:39AM   7    test.  Bayer and Janssen studied it, the FDA evaluated it, and

10:39AM   8    literature around the world has looked at it.  This is just the

10:39AM   9    timeline showing you how many times the FDA looked at this

10:39AM  10    issue, how many times other people looked at the issue, and no

10:39AM  11    one, no one who's well informed said PT is a helpful test in an

10:40AM  12    emergency situation.

10:40AM  13          Bayer published their data in 2005, and Plaintiffs

10:40AM  14    made some crazy claim that, "Oh, my gosh.  Who would want to

10:40AM  15    look through the literature?"  Are you serious?  The doctors

10:40AM  16    and the scientists want to look through the literature.  That's

10:40AM  17    why they publish it.  There's a reason that we publish it.

10:40AM  18    It's so that they can decide.  And every doctor who came in

10:40AM  19    here tells you that they keep up on the literature, but the

10:40AM  20    other medical organizations look at it.  Of course it's

10:40AM  21    important to publish it.  We didn't hide anything.  There were

10:40AM  22    no secrets.  We published the data Dr. Kubitza did from Bayer

10:40AM  23    in 2005.  There's been seven -- what is that, 12 years?  While

10:40AM  24    people around the world are looking at this, including the FDA,

10:40AM  25    and down here we showed you articles from the last seven years,

10:40AM
10:40AM
10:40AM
10:41AM
10:41AM
10:41AM
10:41AM
10:41AM
10:41AM
10:41AM
10:41AM
10:41AM
10:41AM
10:41AM
10:41AM
10:41AM
10:41AM
10:42AM
10:42AM
10:42AM
10:42AM
10:42AM
10:42AM
10:42AM
10:42AM

1    numerous peer-reviewed articles that looked at it.

2            And here's just a chart that shows you how many

3    articles were looked at.  And is this the whole group of

4    literature?  I'm sure it's not.  But when doctors and the

5    companies have to make up their mind and they have to decide,

6    they have to look at all of this.  They can't pull one sentence

7    out and not another.  They can't say, "I'm going to go to this

8    one article, and I'm not going to read what other scientists

9    say," because they have to analyze the totality of the science.

10   And that started way back in 2008 really when the FDA first

11   received information and 2011.  Remember this chart?  This is

12   the FDA's chart.  So doctor -- the doctors who reviewed this

13   made it clear they were talking about concentration.  See that?

14   Not about anticoagulating effect.  All they say is there's a

15   general correlation between plasma concentration and the PT

16   time, not that it can tell you whether someone's going to bleed

17   or not, not whether they're anticoagulated.  And Plaintiffs

18   have tried to confuse you over and over again with those two

19   concepts; that you have a certain concentration does not mean

20   that you have the same anticoagulating effect.

21           For me that wasn't obvious.  Probably wasn't for you.

22   Maybe someone of you knew it more than I did.  That's why this

23   is science.  That's why we call in real experts.  But you can't

24   just measure how much you have in your tank and say, therefore,

25   you can't drive the car or you can't go that fast, because you

could have a very low tank and still have your blood

coagulating -- or not coagulating, and all the articles make

this point.

Remember we showed you some of the most recent

literature which matters.  What are scientists saying today?

Why is it this test won't work?  This is just from a month ago.

They're saying you can't use it to determine the

anticoagulation effect.  It's not safe -- you can't use it to

say it's safe to undergo an invasive procedure.  That's

Mrs. Orr.  That's what it says.  You can't use a normal PT to

determine that an anticoagulated patient is safe to undergo an

invasive procedure.

And Plaintiffs say, "Oh, you should ignore that.  You

should ignore peer-reviewed literature because we found little

snippets of where Bayer and Janssen say it could be used, even

though they then later say it's not reliable."

That's ridiculous.  This is the latest science, and

they're saying you can't use it.  It shouldn't go in the label.

It wouldn't help.  In fact, it would give dangerous

misinterpretations.  And that's why our doctor says it's

reckless and dangerous.  Why?  Because think of someone who's

not in Mrs. Orr's situation.  Think if you were -- you had a

car accident, and you had some small amount of Xarelto in your

system, and they were trying to go in and do some kind of

surgery internally, and they measured it and the PT came out

10:44AM
10:44AM
10:44AM
10:44AM
10:44AM
10:44AM
10:44AM
10:44AM
10:44AM
10:44AM
10:44AM
10:44AM
10:44AM
10:44AM
10:44AM
10:44AM
10:44AM
10:45AM
10:45AM
10:45AM
10:45AM
10:45AM
10:45AM
10:45AM
10:45AM

1   normal, and they decided to go do surgery and they cut you open
2   and you bled to death.  If they had waited -- it does -- it's
3   not always a fatal situation like Mrs. Orr.  Sometimes you can
4   just put off the surgery and it's better.

5          And what they want us to do is put it in the label
6   even though they say it can be subject to dangerous
7   misinterpretation.  Because once we put that in the label, we
8   are responsible and we're telling doctors in every situation,
9   you can use it in emergency situation.  And we won't do that.
10  It's not based on the science.  It's not right.

11         And that's why we pointed out that Dr. Liechty didn't
12  do any of this work.  He didn't read those articles.  It's easy
13  to come in and say it sounds like it might be a good idea if
14  you don't study the science.  We don't have that luxury.  The
15  companies don't get to just ignore the literature.  They don't
16  get to say, "This is what we think," even if they think it,
17  which is why the FDA didn't agree when they even tried to put
18  some of the language in.

19         What does the literature say?  It says there's a 10
20  to 52 percent rate of misprediction.  That's a serious rate.
21  That could be half the surgeries.  We can't do that.

22         And the only person who came in to say that a label
23  would make it better, a specific label, was Dr. Parisian.  What
24  do you know about her?  She didn't know anything about
25  Mrs. Orr.  She's not a clinician.  She tried to say she was a

10:45AM
10:45AM
10:45AM
10:45AM
10:45AM
10:45AM
10:45AM
10:45AM
10:46AM
10:46AM
10:46AM
10:46AM
10:46AM
10:46AM
10:46AM
10:46AM
10:46AM
10:46AM
10:46AM
10:46AM
10:46AM
10:46AM
10:46AM
10:46AM
10:47AM

1    doctor.  She hasn't treated patients in 30 years, and she was a
2    pathologist.  She's never prescribed one of these
3    anticoagulants.  And in every case she's testified in, she's
4    made over 8 million dollars in the last 10 years.  8 million,
5    because she always comes into every courtroom and says its he
6    inadequate.  Did you see the way she greeted Mr. Dukes and
7    said, "Oh, You going to put up the chart?"  Because she's been
8    through this before, ladies and gentlemen.  She says the same
9    thing.  She always says the label's inadequate, no matter what
10   the drugs is, no matter who the defendant is, no matter who the
11   plaintiffs are.  That's certainly not someone you want to use
12   to make medical decisions.
13        Here's the people you want to rely on.  Dr. Khatib,
14   who says he would love to have the test but he thinks using it
15   to be reckless.  He wouldn't tell other doctors when they call
16   him, "Go ahead and operate because the PT is normal."
17   Dr. Piazza said it won't be based on science.  Well, that's our
18   requirement.  Our label has to be based on science.  And Dr.
19   Najeeb Thomas, who makes these decisions every day, said it
20   would be dangerous.  So you can listen to Dr. Parisian or you
21   can listen to three doctors who make these decisions every day.
22        I respectfully suggest to you that there's not an
23   even a close call.  These doctors told you this is what they do
24   every day.  They make these decisions.  And unlike the doctors
25   they had in their case, who never got to look at the label that

2395

10:47AM  1   Dr. Parisian put up -- remember, she was the last witness they

10:47AM  2   had other than Mr. Orr and Dr. Rice, but the last medical

10:47AM  3   expert.  That was the first time they showed the list.  And

10:47AM  4   none of the other doctors, Dr. Bui, nobody got to say whether

10:47AM  5   that was helpful.

10:47AM  6          We showed it to our doctors, and this was the label,

10:47AM  7   and it says "In situations of urgent surgery, you can assess

10:47AM  8   the anticoagulation effect."  Well, in a vacuum, that could be

10:47AM  9   true.  But they say, "Accordingly, measuring PT may be useful

10:47AM  10  to inform clinical decisions in this circumstance."  What are

10:47AM  11  you supposed to do with that?  If you're Dr. Piazza and you see

10:47AM  12  a PT test, she said, "What do I do with that?"  There's no

10:47AM  13  number.  So what number is it exactly when you looked at that

10:47AM  14  chart?  Is it when you have an 11?  Is it when you have a 10

10:47AM  15  PT?  Is it when you have a 20?  Or a doctor is just supposed to

10:47AM  16  make it up?  Because Dr. Parisian didn't give any parameters

10:47AM  17  for that, and that's why they say it's dangerous.  And worse is

10:48AM  18  a normal PT value indicates that clinically significant levels

10:48AM  19  of rivaroxaban are unlikely.  Well, do you want to be the one

10:48AM  20  where it's likely?  And normal PT, what is that?  Indicates

10:48AM  21  that clinically significant levels are unlikely.  Do they mean

10:48AM  22  concentration?  Is that what she is trying to say?  Or that you

10:48AM  23  won't be anticoagulated?  She doesn't say in that label.

10:48AM  24          What would a doctor -- what would Dr. Bui do with

10:48AM  25  that?  Just imagine.  It's 1:30 in the morning.  He sees this

10:48AM  1   massive hemorrhage.  He's going to do medical therapy as he

10:48AM  2   told you anyway; right?  That was what he was going to do

10:48AM  3   first.  And then he's thinking, "Could I do the EVDs?"  What

10:48AM  4   would he do with that?  Should he just go in and put the EVDs

10:48AM  5   in because she says that a normal PT indicates it's unlikely?

10:49AM  6   She doesn't say that the anticoagulation effect is unlikely.

10:49AM  7   She just said clinically significant levels.  What does that

10:49AM  8   mean?  That's why the doctors say that's unsafe.

10:49AM  9            And this has been debated in the literature.  That's

10:49AM  10  what -- some of these articles Plaintiff showed, it's a debate,

10:49AM  11  an opinion, it may misidentify some patients.  More scientific

10:49AM  12  evidence is needed, even in the articles they showed.  This is

10:49AM  13  what was said in 2017.  "More scientific evidence is needed."

10:49AM  14           Plaintiffs want to come into this courtroom and

10:49AM  15  convince you, convince us who aren't doctors, that this should

10:49AM  16  go in the label when all the physicians who work in this field

10:49AM  17  tell you no.

10:49AM  18           Janssen also makes this clear.  You saw this

10:49AM  19  demonstration or experiment -- remember, when they had the

10:49AM  20  website up and they were clicking through it for Dr. Piazza,

10:49AM  21  and they made a big deal that it's 17 clicks?  Honestly, I'm

10:49AM  22  sure some of our kids would say that's nothing, but that's not

10:50AM  23  the point.  The point is what did they say?  And once again,

10:50AM  24  Plaintiffs only showed you one sentence.  They showed you the

10:50AM  25  part that said it could be useful.

OFFICIAL TRANSCRIPT

10:50AM
10:50AM
10:50AM
10:50AM
10:50AM
10:50AM
10:50AM
10:50AM
10:50AM
10:50AM
10:50AM
10:50AM
10:51AM
10:51AM
10:51AM
10:51AM
10:51AM
10:51AM
10:51AM
10:51AM
10:51AM
10:51AM
10:51AM
10:51AM
10:51AM

1          But what else does it say?  In this same document
2     that's on the internet that you can find, "PT assay is not
3     specific for a Factor Xa inhibitors;" right?  "Xarelto, Eliquis
4     or Savaysa" -- in this case we're talking about Xarelto -- "and
5     it is not correlated to bleeding or other clinical outcomes."
6     So once again, you only saw half of the statement.
7          Now, the companies thought that maybe the general
8     statement would be helpful back in 2011, and look what
9     happened.  What did they do?  Excuse me.  Right?  They proposed
10     language to the FDA, and it was about concentration.  And I put
11     that in red because we're having this discussion.  They didn't
12     say that it'll tell you the anticoagulation effect.  They said
13     the concentration is closely correlated.  And what did the FDA
14     say to them?  "No, we don't agree."
15          Now, it's still our label and our responsibility, but
16     what is the company supposed to think when the scientists who
17     wrote the report showing the PT analysis say, "Don't put that
18     in the label"?  Wouldn't you think if the FDA told you that
19     they think it's not a good test?  I mean, they're supposed to
20     be listening to everyone, and the FDA said, "No, you cannot put
21     it in there."
22          So why would they come back in 2015, '16, and '17 and
23     do it when all the literature is showing that there's not
24     enough evidence, that there's not scientific basis that it's
25     not precise?  So the FDA told them what they thought, and they

10:51AM
10:51AM
10:51AM
10:51AM
10:52AM
10:52AM
10:52AM
10:52AM
10:52AM
10:52AM
10:52AM
10:52AM
10:52AM
10:52AM
10:52AM
10:52AM
10:52AM
10:52AM
10:52AM
10:53AM
10:53AM
10:53AM
10:53AM
10:53AM
10:53AM

1   told them even more importantly they should add the yellow
2   sentence; the anticoagulant effect, right?  Again, go back --
3   I'll go back.  Sorry.  Concentration.  That's what we were
4   talking about, right?  They took even that out.  And then they
5   made us go further and say the anticoagulant effect cannot be
6   monitored with standard laboratory testing.  So those two words
7   are key in this case, concentration versus anticoagulant and
8   its effect.  So what is in the label is what we believe the
9   science shows, and that's what's in there.
10          But forget the language.  If we were really hiding
11  some PT test, which is crazy, why would we put this in the
12  label?  Why would we even mention PT?  It doesn't make any
13  sense.  This is what we think the science shows, and the FDA
14  saw this.  If they thought more should have been in there, they
15  could have told us.  Somebody else could have told us.  You
16  didn't see any evidence of people coming and saying, "Hey,
17  Janssen or Bayer, you should put PT in your label."  Yes, it's
18  our responsibility, but if someone else thinks that we need to
19  do it, we will listen.  The people we heard from said no.  The
20  doctors you heard from said no.
21          So there isn't evidence, ladies and gentlemen, in
22  this case showing anything other than the overwhelming fact
23  that PT is not a scientific precise test that could be used in
24  emergency situations.
25          Now, the only question left that you have to answer,

10:53AM  1    and I hope you won't get to it, because if you find that there

10:53AM  2    was an adequate warning, you don't have to go any further.  If

10:53AM  3    you find that it didn't cause it, you don't have to go any

10:53AM  4    further.  But because there are all these questions and I don't

10:53AM  5    know what you're thinking and I'm sure you don't until you all

10:53AM  6    get back there, I need to address the last question which

10:53AM  7    again, I find very difficult.  And this is:  Did our failure to

10:53AM  8    provide the PT warning, did it deprive her of a chance of

10:53AM  9    survival?

10:53AM  10            Well, everyone wants to believe that she could have

10:53AM  11   survived, and that's why Dr. Bui did what he did; right?  He

10:54AM  12   gave her medical therapy, and then he put the EVDs in later.

10:54AM  13   But it wasn't the lack of the PT test that caused her death.

10:54AM  14   It was her medical condition.  It was the horrendous fact that

10:54AM  15   bad things happen to good people.  These doctors deal with that

10:54AM  16   every day.

10:54AM  17            And Dr. Thomas gave you the predictors of her

10:54AM  18   outcome.  He said she had a large hemorrhage, it was deep in

10:54AM  19   the brain; that it was continued swelling.  Remember, even if

10:54AM  20   you drain the fluid, you couldn't stop the swelling.  Her brain

10:54AM  21   was pushed over, squished over that midline shift, which he

10:54AM  22   said was a very grave problem.  There was pressure on the

10:54AM  23   brainstem.  She had a terrible coma score when she came in and

10:54AM  24   a score of three, that meant that she was not likely to

10:54AM  25   survive.

1    Now, no one can say there wasn't going to be a
2  miracle.  Nobody's saying that.  Of course we all wish that
3  there would be.  But Dr. Bui and Dr. Thomas, the folks who know
4  best, here's what they agree on.  They agree that the EVDs were
5  a last ditch effort, and they both say, you'll remember, they
6  do not know if you put them in earlier if they would have made
7  a difference.  So that's the speculation we were reading about
8  or mere possibility.  Here's a possibility.  Of course, but
9  it's not supported by any evidence because Dr. Bui himself said
10 he doesn't know.  He may not have even placed those EVDs
11 earlier even if she hadn't been on the Xarelto because he
12 thought that medical therapy was the first and most important
13 step.  And he said himself that other doctors might not have
14 done this.  So there's not a basis for saying that.

15     But Dr. Bui was asked a very straightforward
16 question:  "Can you tell us medically, scientifically or any
17 other way that had you been able to put in these drains at 2:00
18 a.m.," that was when she was at Ochsner Main, "if you had been
19 able to put those in at 2:00 a.m. in the morning, would she be
20 alive today?"  And he said, "I simply don't know."

21     So how is it that Plaintiffs want you to say you
22 know?  The fellow who was there, who only cared about her, who
23 isn't a paid witness, who isn't hired after the fact, he told
24 you he did not know.  He was in the best position to know.
25 Even compared to our doctors, he was there at the time.  And so

10:56AM   1    you don't always have to have lots of evidence to say it's
10:56AM   2    definitive evidence, and you'll see that.  It's not how many
10:56AM   3    witnesses on each side.  It's sometimes, what position were
10:56AM   4    they in?  What's their motivation?  Dr. Bui had no motivation
10:56AM   5    other than to take care of her, and he says he cannot tell you.
10:56AM   6    It's not more likely than not.  He cannot tell you that she
10:57AM   7    would be alive today.  And the only person who came in and
10:57AM   8    said --
10:57AM   9             THE CASE MANAGER:  Five minutes.
10:57AM  10             MS. WILKINSON:  Thank you.
10:57AM  11             -- that she could have a 60 percent chance was
10:57AM  12    Dr. Liechty.  He didn't give you any support, no literature, no
10:57AM  13    statistics.  He had almost no personal experience with the
10:57AM  14    PIVHs.  He's had only a handful, and he wasn't there.  And he's
10:57AM  15    a paid witness by the Plaintiffs to say what he said.  If he
10:57AM  16    didn't have an opinion, he wouldn't have been called.
10:57AM  17             So it's Dr. Bui's testimony who tells you that
10:57AM  18    there wasn't a chance.
10:57AM  19             And the CAT scans, as Dr. Thomas said, show you
10:57AM  20    that on April 24th, she was already losing the dispersion of
10:57AM  21    the spinal fluid around her head, there was swelling, and April
10:57AM  22    24th, even after the EVDs were put in and the fluid was
10:57AM  23    drained, the swelling had increased.  That was what caused her
10:57AM  24    damage, and that was something they couldn't have stopped.
10:58AM  25    Even when they did drain out all the fluid, the swelling

10:58AM
10:58AM
10:58AM
10:58AM
10:58AM
10:58AM
10:58AM
10:58AM
10:58AM
10:58AM
10:58AM
10:58AM
10:58AM
10:59AM
10:59AM
10:59AM
10:59AM
10:59AM
10:59AM
10:59AM
10:59AM
10:59AM
10:59AM
10:59AM
10:59AM

1    continued.

2              So at the end of the day, ladies and gentlemen,

3    this is a tragic case, but it's actually a very simple case.

4    The overwhelming evidence shows that a PT test is not reliable,

5    it's not scientific, and it could not have helped Mrs. Orr

6    because you could not rely on it to say if she had a normal

7    score, she wasn't anticoagulated.

8              Plaintiffs want you to look past that simple

9    testimony and the testimony of these doctors who told you that,

10   who said that if there was a test, they would want to use it.

11   What is their motivation, ladies and gentlemen, for coming in

12   here and saying that?  All three of them who practice in your

13   community, all three of them who treat patients every day, they

14   would love a test if it would work, and it doesn't.  And not a

15   single one of them -- Dr. Khatib, Dr. Piazza or Dr. Thomas --

16   said that it would.

17             And the reason they didn't is the same reason

18   that Dr. St. Martin said he would still prescribe.  He'd been

19   deposed by these folks and shown PT and talked about all these

20   things.  He didn't change his mind because he understood.  And

21   he understood because everyone understands what the literature

22   and the science is today.  And in this article from this year,

23   scientists say that the approach of using PT is an unproven

24   benefit and may result in net harm.  We couldn't say it better

25   ourselves.

| | |
|---|---|
| 10:59AM | 1 |
| 10:59AM | 2 |
| 10:59AM | 3 |

       1        When you go back and you have to make this

       2  decision, please look at the scientific evidence, consider the

       3  scientific testimony from the doctors who know best, and I

       4  believe you will see that Plaintiffs did not prove that there

       5  was a failure to adequately warn.

       6        Now, I don't get to talk last, and luckily for

       7  you I only get to talk an hour, like His Honor said, but it's

       8  hard when your companies have been waiting for years for this

       9  trial.  This is a very important medication.  So when

      10  Plaintiffs get up, Mr. Birchfield gets up and makes his

      11  argument, I can't respond, and I'm asking you to think

      12  critically about what he says.  Because he has the burden, he

      13  gets to go last.  But I know when you go back into that jury

      14  room together, you will see that Plaintiffs have not proven

      15  their case.

      16        Thank you very much for your attention.

      17        THE COURT:  Okay.  Thank you, Counsel.  We'll take a

      18  break now.  Okay.  We'll take a break then.  Let's take a

      19  break, 10-minute break.  Court will be in recess.

      20        THE CASE MANAGER:  All rise.

      21                    (Recess.)

      22        THE CASE MANAGER:  All rise.

      23        (Whereupon the jury entered the courtroom.)

      24        THE COURT:  Be seated, please.  Ladies and gentlemen,

      25  lastly we'll hear from the Plaintiff.

11:12AM
11:12AM
11:12AM
11:12AM
11:12AM
11:12AM
11:13AM
11:13AM
11:13AM
11:13AM
11:13AM
11:13AM
11:13AM
11:13AM
11:13AM
11:13AM
11:13AM
11:13AM
11:13AM
11:13AM
11:13AM
11:13AM
11:14AM
11:14AM
11:14AM

1     MR. BIRCHFIELD:  Thank you, Your Honor.

2          I have -- I have 15 minutes, and my goal in

3     these 15 minutes is to -- is to clear up a lot of what you --

4     what you just heard.  And I want to start with where

5     Miss Wilkinson started, and that was with Plaintiffs' Exhibit

6     190.  And one of the things that she addressed here and she

7     talked about -- remember, she showed the -- she showed the

8     draft and talked about Dr. Piazza, the emergency room doctor

9     who testified about PT, and she described gas in the tank, and

10    she said that there's a big difference between the

11    anticoagulant effect and -- and having some drug on board.

12    Remember that?

13         Well, let's look at what -- at what they tell

14    the doctors outside the United States.  Look what they are

15    doing.  They are talking about the assessment of the

16    anticoagulant effect.  And you're going to have this document

17    back there with you.

18         The other thing that they are doing is that they

19    are giving the doctors this information to make clinical

20    decisions, clinical decisions.

21         So it is -- it is misleading to suggest that

22    what we are -- that what we are talking about is something

23    other than the anticoagulant effect.  It's misleading to say

24    that we are not talking about information that is relevant to

25    doctors in making clinical decisions.

11:14AM
11:14AM
11:14AM
11:14AM
11:14AM
11:14AM
11:14AM
11:14AM
11:14AM
11:14AM
11:14AM
11:15AM
11:15AM
11:15AM
11:15AM
11:15AM
11:15AM
11:15AM
11:15AM
11:15AM
11:15AM
11:15AM
11:15AM
11:15AM
11:15AM

1          But the most disturbing part is when -- when

2    Ms. Wilkinson showed this, and she talked about what we didn't

3    want to show you -- and I want to address that in just one

4    minute, but she also -- she talked about what we -- what -- the

5    part that was told to doctors -- that was the suggestion; that

6    what was told to doctors, the rest of the story that they

7    wanted to show.  Well, I want you to look at -- I want you to

8    look very closely at this document, because this is an

9    important -- important point.  Look at what is actually told to

10   the doctors, and it's in -- it's in quotations.  We have

11   quotations here.  This is what is told to the doctors.

12         The part that Ms. Wilkinson showed, it is not.

13   Did I hit that dang -- what did I do?  The part that Ms.

14   Wilkinson showed, it's not in quotes.  That's not part of the

15   information that is told to doctors.  So when you go back to

16   the -- to the deliberation room and you're looking at this --

17   at this document, remember that.

18         But here's the most troubling part of this to

19   me, is Ms. Wilkinson said that we didn't want to show you the

20   whole document.  Remember that?  She said it was shameful for

21   us.  Do you remember how this came about?  Do you remember that

22   we showed you that first part, the part that is actually told

23   to the doctors, and they -- and they stood up and said, "Show

24   the other part," and they showed the sentence.  And we asked,

25   "Put the whole document in."  This is not something that the

11:15AM
11:15AM
11:16AM
11:16AM
11:16AM
11:16AM
11:16AM
11:16AM
11:16AM
11:16AM
11:16AM
11:16AM
11:16AM
11:16AM
11:16AM
11:16AM
11:16AM
11:17AM
11:17AM
11:17AM
11:17AM
11:17AM
11:17AM
11:17AM
11:17AM

1   Plaintiffs were trying to hide.  It's not something that we

2   didn't want to show you, and to make that suggestion, to make

3   that suggestion is false.

4            Why would they do that?  This is information

5   that is told to doctors about the anticoagulant effect of their

6   drug that can be measured with the PT test.

7            I want to -- another example of -- of how

8   careful -- and Ms. Wilkinson, the defense lawyers are very,

9   very good lawyers.  No question about that.  They serve their

10  clients well.  But they also choose their words very carefully,

11  and she highlighted this with Dr. Smart, and she brought it out

12  again today.  And she said no single piece of literature, no

13  single piece of literature says that Xarelto is worst in class.

14  Do you remember that?  And his answer was, "No, ma'am."  Do you

15  remember the discussion about why that is?  Because it's not

16  saying do you look at -- do you look at the literature, do you

17  look at five, six, seven pieces of real world data, articles

18  that are printed in six or seven that would show that it is

19  worst in class?  She chose her words carefully.  No single

20  piece of literature.  Why is that?  Because those articles,

21  those articles look at -- at Xarelto versus Pradaxa or they

22  look at Xarelto versus Eliquis and Pradaxa.  Savaysa?  Savaysa

23  is the newest in the class.  It just came on the market in

24  2015, so there's not a single piece of literature that shows

25  that it's worst in class.  But there's multiple pieces of

1    literature that show that it's worst in class.

2              So why?  Why would -- why would you create

3    confusion?  Why would you want to kind of mix the facts?  Why

4    would you want to choose your words so carefully and say no

5    single piece of literature?  That sounds impressive, but it's

6    not the truth.  It doesn't support the fact that Xarelto is

7    anything other than the worst in class.

8              That brings us to -- to another point.  One of

9    the things that you've heard here, and you saw it in Ms.

10   Wilkinson's closing, is the -- is the conflating, bringing

11   together of all the NOACs like they're all the same.  And she

12   would talk about Dr. St. Martin, and nobody disputes that

13   she -- that she should be anticoagulated.  We don't dispute

14   that.  But there's a difference in picking Xarelto, worst in

15   class, versus Eliquis, best in class.  There is a difference

16   between picking Xarelto, which has no better benefit and is no

17   safer than warfarin, but doesn't have a reversal agent.  There

18   is a difference between picking between those words.

19             Nobody would fuss or argue that -- that cars are

20   better than horses and buggies, but that doesn't mean that all

21   cars are the same.  Dr. St. Martin had options when he came to

22   pick -- when he made that prescription decision, he had

23   options, but he did not have all of the important information,

24   and that's -- that's critical.

25             I want to -- I want to discuss ROCKET.  When she

| | |
|---|---|
| 11:19 AM | 1 |
| 11:19 AM | 2 |
| 11:19 AM | 3 |
| 11:19 AM | 4 |
| 11:19 AM | 5 |
| 11:19 AM | 6 |
| 11:19 AM | 7 |
| 11:19 AM | 8 |
| 11:19 AM | 9 |
| 11:20 AM | 10 |
| 11:20 AM | 11 |
| 11:20 AM | 12 |
| 11:20 AM | 13 |
| 11:20 AM | 14 |
| 11:20 AM | 15 |
| 11:20 AM | 16 |
| 11:20 AM | 17 |
| 11:20 AM | 18 |
| 11:20 AM | 19 |
| 11:20 AM | 20 |
| 11:20 AM | 21 |
| 11:20 AM | 22 |
| 11:20 AM | 23 |
| 11:20 AM | 24 |
| 11:21 AM | 25 |

talked about ROCKET, this is another area of confusion, and you have to be very careful in what was said here, because there is a difference between a well-designed study -- which the doctors came and the experts said, "Yes, it's well designed."  Dr. Smart said that.  But there is a difference in a well-designed study and a well done study.

The study -- the study was well designed.  It was not well done.  They used -- they used patients in 45 countries, countries all over the world, third world countries that do not manage warfarin well.  They used a defective device to measure the anticoagulant effect of the warfarin arm that was defective.  It was faulty.  They knew that it was faulty before they started the study.  They used it anyway.  And you've heard the -- you've heard the testimony about -- from Doctor Smart.  He walked through all those numbers and the defect was always, always in the direction of giving more warfarin than was need.  So there were patients that were anticoagulated that were given -- when they should have had their dose reduced, they were given more warfarin.

What does that do?  That skews, that tilts that playing field in favor of Xarelto.  It causes more bleeds, and it causes -- and it allows more strokes if they're not in that therapeutic range in time.  So there is a difference.  You heard her talk about doctors saying that it was a well -- well designed study, but that's different than a well done study.

11:21AM 1    Another area that is -- that is an area of
11:21AM 2  confusion, and this is -- this is so very important.  You heard
11:21AM 3  Ms. Wilkinson talk, and they asked doctors, and they made a
11:21AM 4  big -- a big point like about Dr. Bui and the other doctors,
11:21AM 5  can you say for certain?  Can you say for certain that she
11:21AM 6  would have survived?  Can you say for certain that the outcome
11:21AM 7  would have been different?  That's not the standard.  That's
11:21AM 8  not the standard.

11:21AM 9    We do not have to prove to a certainty.  We have
11:21AM 10 to prove by a preponderance of the evidence that it was a
11:21AM 11 substantial contributing factor.  Judge Fallon is going to give
11:21AM 12 you that charge.  So keep that in mind as you're evaluating
11:21AM 13 the -- the testimony, as you're evaluating the testimony of
11:21AM 14 Dr. Bui, and you've seen him -- you've seen him say and you've
11:22AM 15 seen it on the screen that there is uncertainty.  He can't say
11:22AM 16 with certainty.  But what did he say?  Dr. Bui said, "If she
11:22AM 17 had not been on Xarelto, if I had known that she was not
11:22AM 18 anticoagulated, I would have intervened earlier.  I would have
11:22AM 19 done those EVDs earlier."  He would have had that discussion.
11:22AM 20 The family would have been given that opportunity to make the
11:22AM 21 decision, "Do we go forward now?  "

11:22AM 22    The only thing that deprived them of that
11:22AM 23 opportunity early that Saturday morning was the fact that she
11:22AM 24 was on Xarelto and the Defendants had not told the doctors what
11:22AM 25 they know, and that is that in emergency situations, urgent

11:22AM 1    surgery situations, PT is a helpful test to determine if there

11:22AM 2    is drug on board.

11:23AM 3              THE CASE MANAGER:  Five minutes.

11:23AM 4              MR. BIRCHFIELD:  Mr. Barr -- Mr. Barr also discussed

11:23AM 5    the literature, and he said that -- and he's right, and you

11:23AM 6    heard Ms. Wilkinson talk about the literature as well, and he

11:23AM 7    said that it's a big mess.  The literature's a big mess.  And

11:23AM 8    here's what I want you to remember.  We can say that it's a big

11:23AM 9    mess because -- because of an error of omission.  The

11:23AM 10   Defendants knowing the situation.  They sat on their hands and

11:23AM 11   they didn't intervene, but it's more than that.  The evidence

11:23AM 12   is that it's more than that.  It's an error of omission.

11:23AM 13             You heard Dr. -- or not Dr., Mr. Jalota testify

11:23AM 14   about Chameleon, remember?  He testified about Chameleon, a

11:23AM 15   company that they hired to guide their publication strategy,

11:23AM 16   publications in the medical literature.  I ask you to take a

11:23AM 17   look at these exhibits.  These exhibits deal with Chameleon,

11:23AM 18   and it shows how not only did they sit on their hands and allow

11:24AM 19   this debate to go on when they know most about this drug and

11:24AM 20   they didn't intervene, but they took affirmative action to

11:24AM 21   influence what's going on in the medical community, to promote

11:24AM 22   their marketing strategy here.  Plaintiffs' Exhibit 67,

11:24AM 23   Plaintiffs' Exhibit 84, Plaintiffs' Exhibit 85, Plaintiffs'

11:24AM 24   Exhibit 155.  You will see that -- you'll see those emails.

11:24AM 25   You'll see Chameleon, and they are guiding this.  They are

2411

11:24AM
11:24AM
11:24AM
11:24AM
11:24AM
11:24AM
11:24AM
11:24AM
11:24AM
11:24AM
11:24AM
11:25AM
11:25AM
11:25AM
11:25AM
11:25AM
11:25AM
11:25AM
11:25AM
11:25AM
11:25AM
11:25AM
11:25AM
11:25AM
11:25AM

1    seek -- they're finding literature that's out there.  They're

2    coming to conclusions they don't like, and they're intervening

3    to change it.

4              One last area I want to -- want to address, and

5    that is, you know, Ms. Wilkinson, you know, raised the

6    question, why would we do this?  Here's what the evidence --

7    here's what the evidence shows; that within this company, if

8    you go back and you think about the video depositions that you

9    heard, you look at those exhibits that came in through that,

10   what you will see within this company on these -- on these

11   issues of a reversal agent, do we go forward with one or not?

12   With the -- with the issue of the ROCKET study, Dr. Califf --

13   remember he ended up and went on to become commissioner of the

14   FDA.  He said, "We don't have the right dose.  The dose is too

15   high.  We need to do another study."  So the company had

16   that -- that opportunity.  And then they had the issue of they

17   knew -- their scientists, clinically they knew that there are

18   emergent situations where companies -- where people will

19   present, and they had the question, "Do we mention -- do we

20   tell doctors that you can test, that there is a way to

21   measure?"  On all three of those, all three of those issues,

22   there was internal debate.  The clinicians, the scientists,

23   they knew, "We can do this.  We should do this.  This is an

24   unmet need."  The commercial side said, "This cuts against our

25   marketing strategies."  And every time on all three of those

OFFICIAL TRANSCRIPT

decisions, commercial won out.

There is one thing that Ms. Wilkinson and I do agree on, and that is that bad things happen to good people. Sometimes those bad things are preventable. Sometimes they're not. History is filled with champions that have stood up to make a difference when bad things happen for preventable reasons. Psychologists tell us that -- that people want to believe that we live in a safe world, and they tell us it is very hard, it's very hard to get people to accept facts that run counter to that, that are contrary to that. We want to believe that -- that we live in a safe world. We want to believe the cars we drive are safe. We want to believe the foods that we eat are safe. We want to believe that the medicines that we take are safe. And most of the time, that's the case. But there are times when the true facts don't align with a safe world view. There are times when companies step over the line and they violate rules, rules that are designed and put in place to keep people safe. That's hard to accept, but it happens sometimes, and that's where you come in.

You are sitting in a very special place. The jury box is the one place in America where an individual, a family can stand on equal footing with the most powerful corporations in the world. The jury box is one place in America, the one place in America that is free from outside influence, from financial influence. It is -- it's free from

11:27AM 1   political pressure.  This is a very special place.  This box is

11:28AM 2   unlike any other place in America.  It's unlike the business

11:28AM 3   world.  It's unlike the halls of Congress.  It's unlike city

11:28AM 4   hall or any federal agency.  This is a sacred, hallowed box.

11:28AM 5         Soon you'll go back to your regular jobs, but

11:28AM 6   today for this moment, you are a jury, and you have the full

11:28AM 7   force and authority of the United States government standing

11:28AM 8   behind your decision.  Perhaps you were born for such a time as

11:28AM 9   this.

11:28AM 10        Judge Fallon has said on several occasions that

11:28AM 11  the jury is vital, it is critical to our democracy and the

11:28AM 12  freedoms that we enjoy.  An ancient Greek historian said that

11:29AM 13  the secret to freedom is courage.  And on behalf of the Orr

11:29AM 14  family, we're praying for you to find the courage to do the

11:29AM 15  hard work to find and declare the truth through your verdict.

11:29AM 16        That same Greek historian also noted that

11:29AM 17  justice will not come until those who are not injured are as

11:29AM 18  indignant as those who are injured.  We ask that you carefully

11:29AM 19  review this evidence, review it, see what happened when this

11:29AM 20  company lost their way.

11:29AM 21        And we -- we are grateful for your service, and

11:29AM 22  we thank you in advance for the verdict that you will render.

11:29AM 23        Thank you, Your Honor.

11:29AM 24        **THE COURT:**  Thank you, counsel.

11:29AM 25        Why don't we stand up a moment, then I'll have

| | |
|---|---|
| 11:29AM | 1 |
| 11:30AM | 2 |
| 11:30AM | 3 |
| 11:30AM | 4 |
| 11:30AM | 5 |
| 11:30AM | 6 |
| 11:30AM | 7 |
| 11:30AM | 8 |
| 11:30AM | 9 |
| 11:30AM | 10 |
| 11:30AM | 11 |
| 11:30AM | 12 |
| 11:30AM | 13 |
| 11:30AM | 14 |
| 11:30AM | 15 |
| 11:31AM | 16 |
| 11:31AM | 17 |
| 11:31AM | 18 |
| 11:31AM | 19 |
| 11:31AM | 20 |
| 11:31AM | 21 |
| 11:31AM | 22 |
| 11:31AM | 23 |
| 11:31AM | 24 |
| 11:31AM | 25 |

1  the opportunity to discuss the law with you.  We are going to

2  close the courtroom, so anybody who wishes to leave should

3  leave now.

4                              **(Pause.)**

5              **THE COURT:**  All right.  Be seated, please.

6              Members of the jury, you have now heard all the

7  evidence in this case as well as the final argument.  It

8  becomes my duty to instruct you on the rules of law which you

9  must apply in arriving at your decision.

10             I will first give you some general instructions

11  which apply in all cases, and then I will give you some special

12  instructions specific to this case.

13             First the general instructions.  As I mentioned

14  on several occasions, in any jury trial there are in effect two

15  judges.  I'm one of the judges.  The other is you, the jury.

16             It is my duty to preside over the trial and to

17  determine what testimony and other evidence is admissible under

18  the law for your consideration.  It is also my duty at the end

19  of the trial to instruct you on the law applicable to the case.

20             You as jurors, however, are judges of the facts,

21  but in determining what actually happened in this case, it

22  is -- in reaching your decision as to the facts, it is your

23  sworn duty to follow the law as I am now in the process of

24  defining for you, and you must follow my instructions as a

25  whole.  You have no right to disregard or give special

2415

11:31AM 1    attention to any one instruction or to question the wisdom or

11:31AM 2    correctness of any rule that I may state to you.  That is, you

11:31AM 3    must not substitute or follow your own notion or opinion as to

11:31AM 4    what the law is or ought to be.  It is your duty to apply the

11:31AM 5    law as I give it to you, regardless of the consequences.

11:32AM 6             By the same token, it is also your duty to base

11:32AM 7    your verdict solely on the testimony and other evidence in the

11:32AM 8    case without prejudice or sympathy.  That was a promise you

11:32AM 9    made and the oath you took before being accepted by the parties

11:32AM 10   and the Court as jurors, and they have a right to expect

11:32AM 11   nothing less from you.

11:32AM 12            The case should be considered and decided by you

11:32AM 13   as an action between persons of equal standing in the

11:32AM 14   community, of equal worth and holding the same or similar

11:32AM 15   stations in life.  All persons, all corporations, all entities

11:32AM 16   stand equal before the law and are to be dealt with as equals

11:32AM 17   in a court of justice.

11:32AM 18            As I stated earlier, it is your duty to

11:32AM 19   determine the facts, and in so doing, you must concern yourself

11:32AM 20   only with the evidence I have admitted in the case.  The term

11:32AM 21   "evidence" includes the sworn testimony of the witnesses and

11:33AM 22   the exhibits admitted into evidence into the record.

11:33AM 23            Remember that any statements or objections or

11:33AM 24   arguments made by the lawyers are not evidence in the case.

11:33AM 25   The function of the lawyer is to point out those things that

1   are most significant and most helpful to their side of the

2   case, and in so doing, to call your attention to the facts or

3   inferences that they particularly are concerned about that you

4   recall.  In the final analysis, however, it is your own

5   recollection of the evidence that controls in the case.  What

6   the lawyers say is not binding upon you.

7             Also during the course of the trial, I have

8   occasionally made a comment to the lawyer or asked a question

9   of a witness or admonished a witness concerning the manner in

10   which he or she should respond to the question of counsel.  Do

11   not assume from anything that I may have said that I have any

12   opinion concerning any of the facts of the case.  In arriving

13   at your own findings of the facts, you should disregard

14   anything I may have said during the trial except for my

15   instructions to you on the law.

16             The law of the United States permits a judge to

17   comment on the evidence presented during the case.  I do not

18   believe that I have made any comments on the evidence in this

19   case.  However, if you could possibly construe any remark which

20   I have made during the course of this trial as a comment on the

21   evidence, then I specifically instruct you that any such

22   comment on my part is only an expression of my opinion as to

23   the facts and you, the jury, may disregard such comment or

24   comments entirely because you, as jurors, are indeed the sole

25   judges of the facts.

11:34AM   1           While you should consider only the evidence in

11:34AM   2   the case, you are permitted to draw such reasonable inferences

11:34AM   3   from the testimony and the exhibits as you feel are justified

11:34AM   4   in the light of common experience.  In other words, you may

11:35AM   5   make deductions and reach conclusions that reason and common

11:35AM   6   sense lead you to draw from the facts that have been

11:35AM   7   established by the testimony and evidence in the case.

11:35AM   8           You may consider either direct or circumstantial

11:35AM   9   evidence.  Direct evidence is the testimony of one who

11:35AM   10  actually -- who has actual knowledge of a fact, such as an

11:35AM   11  eyewitness.  Circumstantial evidence is proof of a chain of

11:35AM   12  fact and circumstances indicating a fact to be proved.  The law

11:35AM   13  makes no distinction between the weight to be given to either

11:35AM   14  direct or circumstantial evidence.

11:35AM   15          In deciding the case, you're expected to use

11:35AM   16  your good sense.  Give the evidence and the testimony of a

11:35AM   17  witness a reasonable and fair interpretation in light of your

11:35AM   18  knowledge of the actual tendencies of human beings.  In

11:35AM   19  weighing the testimony and in determining the credibility of

11:36AM   20  any witness, you may consider the conduct of the witness; his

11:36AM   21  or her bearings on the witness stand; his or her personal

11:36AM   22  feelings as demonstrated by his or her testimony and actions;

11:36AM   23  any interest he or she may have in the outcome of the case; any

11:36AM   24  prejudice or bias he our she may have shown; any partiality he

11:36AM   25  or she may have demonstrated.

OFFICIAL TRANSCRIPT

2418

11:36AM 1    If a witness is shown to have testified falsely

11:36AM 2 concerning any material matter, you have a right to distrust

11:36AM 3 such witness's testimony on other matters.  You also have the

11:36AM 4 right to distrust all of that witness's testimony.  You should

11:36AM 5 keep in mind, however, that a simple mistake does not

11:36AM 6 necessarily mean that a witness was not telling the truth as he

11:36AM 7 or she remembers it, because people may forget some things or

11:36AM 8 remember other things inaccurately.  So if a witness has made a

11:37AM 9 misstatement, you need to consider whether that misstatement

11:37AM 10 was an intentional falsehood or simply an innocent lapse of

11:37AM 11 memory.  And the significance of that may well depend upon

11:37AM 12 whether it has to do with an important fact or only with an

11:37AM 13 unimportant detail.

11:37AM 14    The testimony of a single witness may be

11:37AM 15 sufficient to prove any fact, even if a greater number of

11:37AM 16 witnesses may have testified to the contrary, if after

11:37AM 17 considering all of the other evidence you, the jury, believe

11:37AM 18 that single witness.

11:37AM 19    Now, when knowledge of technical subject matter

11:37AM 20 may be helpful to the jury, a person who has special training

11:37AM 21 or experience in that technical field may be called as an

11:37AM 22 expert witness and is permitted to state his or her opinions on

11:37AM 23 those technical matters.  Such witnesses have testified in this

11:38AM 24 case.  You are not, however, required to accept that opinion.

11:38AM 25 As with all other witnesses, it is up to you to decide whether

11:38AM 1    to rely upon it.

11:38AM 2           If you should decide that the opinion of the

11:38AM 3    expert witness is not based on sufficient education or

11:38AM 4    experience or if you should conclude that the facts that the

11:38AM 5    expert relied upon are incorrect, that the reason given in

11:38AM 6    support of the opinion are not so sound or that the opinion is

11:38AM 7    outweighed by other evidence, then you as a jury may disregard

11:38AM 8    the opinion entirely.

11:38AM 9           In deciding whether to accept or rely upon an

11:38AM 10   opinion of an expert witness, you may consider any bias of the

11:38AM 11   witness, including any bias you may infer from evidence that

11:38AM 12   the expert witness has an economic or philosophical or any

11:38AM 13   other interest in the outcome of the case.

11:39AM 14          Now, you'll recall that certain testimony has

11:39AM 15   been presented to you through video depositions.  A deposition

11:39AM 16   is a sworn, recorded answers to questions asked to a witness in

11:39AM 17   advance of the trial.  Under some circumstances, if the witness

11:39AM 18   cannot be present to testify from the witness stand, that

11:39AM 19   witness's testimony may be presented under oath in the form of

11:39AM 20   a deposition.  Sometime before the trial attorneys representing

11:39AM 21   the parties in the case question the witness under oath.  A

11:39AM 22   court reporter was present and recorded the testimony.  The

11:39AM 23   questions and answers were presented by video to you.  This

11:39AM 24   deposition testimony is entitled to the same consideration, is

11:39AM 25   to be judged by you as to credibility, and is to be weighed and

11:39AM
11:39AM
11:40AM
11:40AM
11:40AM
11:40AM
11:40AM
11:40AM
11:40AM
11:40AM
11:40AM
11:40AM
11:40AM
11:40AM
11:40AM
11:40AM
11:41AM
11:41AM
11:41AM
11:41AM
11:41AM
11:41AM
11:41AM
11:41AM
11:41AM

1   otherwise considered by you insofar as it is possible in the

2   same way as if the witness had been present and had testified

3   from the witness stand.

4          During the course of the trial, you have heard

5   objections to evidence.  Sometimes these have been argued out

6   of the hearing of the jury.  It is the duty of the attorneys on

7   each side of the case to object when the other side offers

8   testimony or other evidence which the attorney believes is not

9   properly admissible.  You should not draw any inference against

10  or show any prejudice against a lawyer or his or her client

11  because of the making of an objection.  Upon allowing the

12  testimony or other witness to be introduced over the objections

13  of an attorney, the Court does not, unless expressly stated,

14  indicate any opinion as to the weight or effect of such

15  evidence.  As stated before, you, the jury, are indeed the sole

16  judges of the credibility of all witnesses and the weight and

17  effect of all evidence.

18         When the Court has sustained an objection to a

19  question addressed to a witness, the jury must disregard the

20  question entirely and may draw no inferences from the wording

21  of it or speculate as to what the witness would have said if

22  permitted to answer the question.

23         During the course of the trial, I have occasionally

24  asked a question of a witness in order to bring out facts not

25  then fully covered by the testimony.  Again, do not assume that

11:41AM
11:41AM
11:41AM
11:41AM
11:41AM
11:41AM
11:41AM
11:41AM
11:41AM
11:42AM
11:42AM
11:42AM
11:42AM
11:42AM
11:42AM
11:42AM
11:42AM
11:42AM
11:42AM
11:42AM
11:42AM
11:42AM
11:43AM
11:43AM
11:43AM

 1    I hold any opinion on the facts to which my question or
 2    questions may have been related.  Again, you are the judges of
 3    the facts.
 4         Statements and arguments of lawyers are not evidence
 5    in the case unless made as an admission or a stipulation of a
 6    fact.
 7         A stipulation is an agreement between both sides
 8    that certain facts are true or that a person would have given
 9    certain testimony.  When the lawyers on both sides stipulate or
10    agree to the existence of a fact, you must unless otherwise
11    instructed accept the stipulation as evidence and regard that
12    fact as proved.
13         Finally, certain materials have been shown to you
14    solely as an aid to help explain the facts disclosed by the
15    evidence, testimony, records and other documents in the case.
16    That is what we refer to as demonstrative evidence, because it
17    is offered merely to demonstrate or to illustrate a point
18    rather than actual proof of that point.  Demonstrative evidence
19    is not admitted evidence or proof of any facts.  You should
20    determine the facts from the evidence that is admitted.
21    Remember, demonstrative evidence is only as good as the
22    underlying testimony, data, assumptions and opinions that serve
23    as the basis for it, and the maxim garbage in, garbage out
24    applies.  Like all other evidence in the case, you may accept
25    it or reject it in whole or in part.

|  |  |
|--|--|
| 11:43AM | 1 |

And I remind you that any notes that you may have taken during the trial are only aids to your memory. If your memory differs from your notes, you should rely on your memory and not your notes. The notes are not evidence. If you have not taken notes, you should rely upon your independent recollection of the evidence and should not be unduly influenced by the notes of other jurors. I remind you again that notes are not entitled to any greater weight than the recollection or impression of each juror's about the testimony.

Let me talk with you about some special instructions that apply in this particular case.

As you know, this action arises out of Sharyn Orr's use of Xarelto. The Janssen and Bayer Defendants manufactured Xarelto. The Plaintiffs contend that Mrs. Orr suffered a brain hemorrhage or brain bleed as a result of her use of Xarelto. Plaintiffs allege that Xarelto was defective or unreasonably dangerous because of Defendants' failure to provide adequate warnings or instructions to Mrs. Sharyn Orr's physicians, Dr. St. Martin and Dr. Bui. They claim that adequate warnings or instructions would have caused Dr. St. Martin not to prescribe Xarelto in the case of Mrs. Orr. And they claim that adequate warnings or instructions would have caused Dr. Bui to perform emergency surgery sooner in the case of Mrs. Orr.

Mrs. Orr's husband and three children seek monetary damages proximately caused by her injuries and death.

11:45AM
11:45AM
11:45AM
11:45AM
11:45AM
11:45AM
11:45AM
11:45AM
11:45AM
11:45AM
11:45AM
11:46AM
11:46AM
11:46AM
11:46AM
11:46AM
11:46AM
11:46AM
11:46AM
11:46AM
11:46AM
11:46AM
11:46AM
11:46AM
11:47AM

1      The Defendants deny all of the allegations.  They

2  contend that Xarelto's warnings and instructions were adequate

3  and that any alleged inadequacy in the instructions did not

4  proximately cause Mrs. Orr's injury and death.  They contend

5  Xarelto was appropriately prescribed to Mrs. Orr by her doctor,

6  Dr. St. Martin, for stroke prevention, and that the brain

7  hemorrhage she suffered on April the 24th, 2015, did not result

8  from her use of Xarelto.

9      Further, the Defendants contend that the label

10  was approved by the FDA and contains accurate scientific-based

11  information enabling doctors to make an informed decision about

12  the benefits and risks of prescribing the medication to their

13  patients.

14      Now, the mere fact that the Plaintiff may have

15  been injured standing alone does not permit you, the jury, to

16  draw any inference that such injuries were caused by the

17  Defendants.  The burden of proof is on the Plaintiff in a civil

18  action such as this one to prove every essential element of

19  their claim by a preponderance of the evidence.

20      Now, a preponderance of the evidence means such

21  evidence, when considered and compared with that opposed to it,

22  has more convincing force and produces in your minds a belief

23  that what is sought to be proved is more likely true than not

24  true.  In other words, to establish a claim by a preponderance

25  of the evidence means to prove that the claim is more likely so

1    than not so.

2              In determining whether any fact has been proved

3    by a preponderance of the evidence in this case, you may unless

4    otherwise instructed consider the testimony of all witnesses,

5    regardless of who may have called them and all exhibits

6    received into evidence, regardless of who may have produced

7    them.

8              If the Plaintiff fails to establish any

9    essential element of their claim by a preponderance of the

10   evidence, you, the jury, should find for the Defendant.

11             The Plaintiff need not produce every possible

12   witness, and they need not prove their case beyond a reasonable

13   doubt as is necessary in a criminal prosecution, but

14   speculation, mere possibility or even unsupported probability

15   is not sufficient to support a judgment in their favor.

16             Let me discuss the law applicable to the

17   Plaintiffs' theory of recovery.  The law applicable to this

18   case is the law of Louisiana.  In Louisiana, a product

19   liability action such as this one is governed by the Louisiana

20   Products Liability Act, the LPLA.  The LPLA provides that

21   manufacturers of a product shall be liable to a claimant for

22   damages proximately caused by one or more characteristic of the

23   product that renders it unreasonably dangerous.  One of the

24   ways in which the drug can -- a drug can be unreasonably

25   dangerous is by failing to include proper warnings or

instructions not otherwise known to physicians.

In order to recover the Plaintiffs in this case must show that, one, their damage was proximately caused by the Defendants' failure to provide adequate warnings and/or instructions about one or more of the characteristics of the product that renders it unreasonably dangerous; and that two, their damages arose from a reasonably anticipated use of the product.

Now, it has been stipulated and agreed upon in this case, and therefore you must consider it to be established, that both Janssen and Bayer Defendants in this case are manufacturers of Xarelto within the meaning of the LPLA.  Where there is a relationship between manufacturers and a plaintiff is injured by a product that may be deemed manufactured by more than one manufacturer, these manufacturers are collectively responsible to the plaintiff.

Xarelto is a brand name for rivaroxaban. Xarelto is a prescription drug; that is to say, a medical provider or a doctor must prescribe the drug.

A reasonably anticipated use of a product means a use or handling of a product that the manufacturer should reasonably expect, in this case by a prescribing or treating physician.

A failure to warn.  I will discuss with you the law governing the Plaintiffs' claim for failure to warn and/or

2426

instruct.  In order to decide the Plaintiffs' failure to warn
claim, you must determine whether the Plaintiffs have proven by
a preponderance of the evidence that the Defendants failed to
adequately warn and/or properly instruct Mrs. Orr's prescribing
and treating physicians, Dr. St. Martin and Dr. Bui, about the
proper use of Xarelto, and if so, whether the Defendants'
failure to warn or instruct was a proximate cause of the
Plaintiffs' injuries.

          Prescription drugs often cause unwanted side effects,
despite the fact that they have been carefully designed and
properly manufactured.  The law deems such products as
unavoidably unsafe, but they are not defective nor unreasonably
dangerous if they include adequate instructions for the safe
use of the drug.  In providing such adequate instructions,
manufacturers must give due consideration to the likelihood of
harm in the use of the drug and the seriousness of consequences
in failing to give clear instructions to doctors.

          The Plaintiffs claim that Xarelto is unreasonably
dangerous because of inadequate warnings or instructions about
its potential risks and the availability and significance of a
PT test in emergency circumstances to minimize these risks.

          In order to be successful, the Plaintiffs must prove
by a preponderance of the evidence that, one, the product had a
potentially damage-causing characteristic or characteristics;
two, that the Defendants failed to use reasonable care to

2427

1   provide adequate warnings or instructions that was not

2   otherwise known to the prescribing or treating physician about

3   such characteristic or characteristics, their associated

4   danger, and how to minimize or avoid the associated risks; and

5   three, injury which Mrs. Orr suffered was proximately caused by

6   the inadequate warning or instruction.

7   Now, inadequate warning under the LPLA is defined as

8   a warning or instruction that would lead an ordinary reasonable

9   user or handler of a product, such as a prescribing or treating

10   physician, to contemplate the danger in using or handling the

11   product and either to decline to use or handle the product or,

12   if possible, to use or handle the product in such a manner as

13   to avoid the damage for which the claim is made.  The lack of

14   adequate instructions for safe use of a product may include

15   inadequacies in recommending assessment, testing or screening

16   techniques.

17   Under the applicable law, a prescription drug

18   manufacturer only has a duty to warn and instruct a learned

19   intermediary, such as a prescribing or treating physician, of

20   potential risks or dangers inherent in the product.  It does

21   not have any duty to warn or instruct the consumer directly.

22   This is because physicians are generally in a superior position

23   to evaluate the warning and instruction and to impart such

24   warning and instruction to the patient and can provide an

25   independent medical decision as to whether to use the drug is

1  appropriate for a particular patient.

2          Although the prescription drug manufacturer's duty to

3  warn and instruct about the potential risks of its product is

4  directed only to physicians, the manufacturer is directly

5  liable to the patient for a breach of this duty.

6          In your consideration of learned intermediaries,

7  you're to consider not only the Plaintiffs' prescribing

8  physician, Dr. Martin (verbatim), but also her treating

9  physician, Dr. Bui.

10          Manufacturer's duty to provide information about a

11  drug extends to non-prescribing health care providers such as

12  Dr. Bui, because they are in a position to act on such

13  information so as to reduce or prevent injuries to patients.

14          When a prescribing drug manufacturer provides a

15  warning or instruction, it may reasonably assume that it would

16  be read or known and heeded by the prescriber or treater.  If a

17  manufacturer were to provide inadequate warning or instruction

18  for the safe use of a prescription drug, the law allows for

19  what is called a healing -- heeding presumption.  That means

20  that you may assume the prescribing or treating physician would

21  have read and followed or heeded such a warning or instruction,

22  had it been provided.  That presumption, however, may be

23  overcome by evidence that a different warning or instruction

24  would not have made any difference; in other words, it would

25  have been futile under the circumstances.

1   It is a physician's duty to remain abreast of a
2   drug's characteristics and to take into account the information
3   contained in the prescription drug's label.  The drug
4   manufacturer may reasonably assume the prescriber or treater
5   will apply the same knowledge, professional expertise and good
6   judgment that a reasonable physician would apply in using the
7   product.  Providing an adequate warning or adequate
8   instructions to the prescribing or treating doctor relieves the
9   manufacturer of its duty to warn the patient, regardless of how
10  or if the prescriber or treater actually warns a patient.  A
11  warning or instruction is inadequate if the manufacturer fails
12  to give the prescriber or treater warnings or instructions
13  about a particular risk that was known or knowable to the
14  manufacturer in light of the generally recognized and
15  prevailing best scientific and medical knowledge available at
16  the time of the manufacture and distribution.
17          The drug manufacturer has a duty to take reasonable
18  precautions to provide an adequate warning or instruction in
19  its label that would place a prescriber or treater on guard
20  against the harmful consequences that might result from use of
21  a product.  The label must contain language that is adequate to
22  reasonably inform the prescribing or treating physician about
23  how to use the product in such a manner as to avoid the damage
24  for which the claim is made.
25          The manufacturer may communicate a warning or

|   |   |
|---|---|
| 11:58AM | 1 |
| 11:58AM | 2 |
| 11:58AM | 3 |
| 11:58AM | 4 |
| 11:58AM | 5 |
| 11:58AM | 6 |
| 11:58AM | 7 |
| 11:58AM | 8 |

1  instruction through a label or package insert or other

2  communication or literature.  In determining the scope of the

3  manufacturer's duty to warn of dangers and provide instructions

4  associated with the use of the product, the manufacturer is

5  held to the knowledge and skill of an expert in its field.  The

6  manufacturer must keep up with scientific knowledge,

7  discoveries, and advances, and is presumed to know what could

8  be -- could be learned by doing so.  This duty is continuing.

9       If a manufacturer learns of a characteristic or

10  danger which may cause injury after its product is on the

11  market, the manufacturer has a continuing duty to use

12  reasonable care to provide adequate warning or instructions to

13  prescribers and treaters concerning such later discovered

14  matters; this is to say, under the law, including federal

15  regulations applicable to this case, drug manufacturers are

16  responsible to draft the initial label for their product and to

17  assure that the label continues to reflect the current

18  knowledge concerning the risks posed by the drug.

19       Where the Defendants are shown to have failed to

20  adequately warn or instruct a prescribing or treating physician

21  about a drug, the learned intermediary doctrine does not

22  relieve the manufacturer of legal responsibility.  In other

23  words, the circumstances -- in those circumstances, the

24  prescribing or treating doctor cannot be said to be a learned

25  intermediary, because he or she was not fully informed by the

2431

| | | |
|---|---|---|
| 12:00PM | 1 | Defendants. |
| 12:00PM | 2 | In order to prove their failure to warn or instruct |
| 12:00PM | 3 | claim, the Plaintiffs must not only prove that the Defendants' |
| 12:00PM | 4 | warnings or instructions regarding Xarelto were inadequate, but |
| 12:00PM | 5 | also that such inadequacy affected the decision or decisions of |
| 12:00PM | 6 | the prescribing or treating physician with regard to Xarelto. |
| 12:00PM | 7 | In other words, you must determine if Dr. St. Martin and Bui |
| 12:00PM | 8 | would have altered their prescribing or treating decision or |
| 12:00PM | 9 | behavior and Mrs. Orr would not have suffered her bleed or |
| 12:01PM | 10 | death had the doctors been provided with fully and adequate |
| 12:01PM | 11 | instructions about the characteristics of the drug and the |
| 12:01PM | 12 | utility of the PT test. |
| 12:01PM | 13 | If the greater weight of the evidence does not |
| 12:01PM | 14 | support the Plaintiffs' claim, your verdict should be for the |
| 12:01PM | 15 | Defendants.  If the greater weight of the evidence, however, |
| 12:01PM | 16 | does support the Plaintiffs' claim, then your verdict should be |
| 12:01PM | 17 | for the Plaintiffs. |
| 12:01PM | 18 | Let me say something about labeling and federal |
| 12:01PM | 19 | regulations.  As I previously mentioned, Xarelto is a brand |
| 12:01PM | 20 | name drug.  The FDA approved both Xarelto and its label.  You |
| 12:01PM | 21 | may consider that fact in weighing the evidence in this case |
| 12:01PM | 22 | and determining the liability of the Defendants.  However, FDA |
| 12:02PM | 23 | approval, although relevant, does not in and of itself absolve |
| 12:02PM | 24 | the Defendant of all liability, nor does it establish that the |
| 12:02PM | 25 | warnings or instructions provided with the drug were adequate |

OFFICIAL TRANSCRIPT

12:02PM  1   under the standards of Louisiana law.  If fact, an action or

12:02PM  2   inaction on the part of the FDA, though relevant, does not

12:02PM  3   foreclose a claim under Louisiana law.  Therefore, even if the

12:02PM  4   Defendants have met all the appropriate minimum standards for

12:02PM  5   FDA approval and governmental regulations and requirements to

12:02PM  6   obtain FDA approval, this compliance and approval, though

12:02PM  7   relevant, is not sufficient to conclusively establish that the

12:02PM  8   Defendants have taken the steps necessary under the law

12:02PM  9   applicable to this case.  More specifically, if you find that

12:03PM  10  the Defendants failed to apprise prescribing or treating

12:03PM  11  physicians of appropriate testing to address the risks that

12:03PM  12  they knew or should have known prior to the FDA approval or

12:03PM  13  became known or should have become known after the FDA approved

12:03PM  14  Xarelto's label, that FDA approval of the drug, though

12:03PM  15  relevant, is not conclusive.

12:03PM  16         Specific federal regulations authorize the

12:03PM  17  manufacturer of a drug which has been approved by the FDA to

12:03PM  18  add or strengthen warnings, precautions, adverse reactions,

12:03PM  19  information about the drug in the drug's label, and to do so

12:03PM  20  without the need for prior FDA approval.  The FDA, however,

12:03PM  21  retains the power to remove such language.

12:04PM  22         Causation.  In order for the Plaintiffs to prevail on

12:04PM  23  their claim, they must establish that the inadequate

12:04PM  24  instructions or warnings was the proximate cause of Sharyn

12:04PM  25  Orr's alleged injuries.  Proximate cause means the efficient or

12:04 PM
12:04 PM
12:04 PM
12:04 PM
12:04 PM
12:04 PM
12:04 PM
12:04 PM
12:04 PM
12:05 PM
12:05 PM
12:05 PM
12:05 PM
12:05 PM
12:05 PM
12:05 PM
12:05 PM
12:05 PM
12:05 PM
12:05 PM
12:05 PM
12:05 PM
12:06 PM
12:06 PM
12:06 PM

1   direct cause.  The law defines proximate cause as something
2   that produces a natural chain of events which in the end brings
3   about the injury.  In other words, proximate cause is a cause
4   without which the injury would not have occurred.  Proximate
5   cause requires proof of both causation-in-fact, as well as
6   legal cause.
7          Causation-in-fact is proved by establishing that a
8   plaintiff's injury would not have occurred but for the
9   defendant's action.  In order to prove cause-in-fact in this
10  case, the Plaintiff must show to a reasonable degree of medical
11  probability both that Xarelto caused Mrs. Orr's bleed and that
12  the failure to instruct Drs. St. Martin and Bui was the cause
13  of Mrs. Orr's injury.
14         Legal cause is proved by establishing foreseeability.
15  The test of foreseeability is whether some injury to another is
16  the natural and probable consequence of the complained of
17  conduct.  The law requires only reasonable foresight.  It is
18  not necessary for the Plaintiffs to demonstrate that the
19  Defendant should have foreseen the regular -- the particular
20  event which occurred, but merely that the Defendant should have
21  foreseen that its actions would probably cause injury to
22  someone.  The Plaintiffs prove legal cause by establishing that
23  the injury in question occurred as a natural and probable
24  consequence of the Defendants' actions or inactions.
25         Proximate cause does not mean the sole cause.  The

2434

12:06PM 1  Defendants' conduct can be a proximate cause if it was at least

12:06PM 2  one of the direct concurring causes of the alleged injury.

12:06PM 3  However, Plaintiffs must show that the Defendants' conduct was

12:06PM 4  a substantial contributing factor in bringing about the result.

12:06PM 5  In other words, it is not necessary for the Plaintiffs to

12:06PM 6  negate all other contributing factors or causes of Mrs. Orr's

12:06PM 7  injuries, provided they show that the Defendants' failure to

12:06PM 8  provide adequate instructions in the Xarelto label

12:06PM 9  substantially contributed to her injuries.

12:06PM 10     Where two or more possible causes for an injury are

12:07PM 11  identified, Plaintiffs must establish with reasonable

12:07PM 12  probability that Mrs. Orr's injuries resulted from a cause for

12:07PM 13  which the Defendants would be liable.  Moreover, Plaintiffs

12:07PM 14  must proffer a competent medical expert to testify to a

12:07PM 15  reasonable degree of medical probability that Xarelto was a

12:07PM 16  proximate cause of Mrs. Orr's injuries.

12:07PM 17     To recover for the failure to warn or instruct claim,

12:07PM 18  the Plaintiff must prove by a preponderance of the evidence

12:07PM 19  that an inadequate instruction itself in addition to the

12:07PM 20  medication was the proximate cause of Mrs. Orr's injury.  In

12:07PM 21  other words, Plaintiffs must prove by a preponderance of the

12:07PM 22  evidence -- of the evidence that if an adequate warning or

12:08PM 23  instructions had accompanied Xarelto, then Dr. St. Martin or

12:08PM 24  Dr. Bui would have altered their prescribing or treating

12:08PM 25  decisions or behavior, and Mrs. Orr would not have suffered her

12:08PM
12:08PM
12:08PM
12:08PM
12:08PM
12:08PM
12:08PM
12:08PM
12:08PM
12:08PM
12:08PM
12:09PM
12:09PM
12:09PM
12:09PM
12:09PM
12:09PM
12:09PM
12:09PM
12:09PM
12:09PM
12:09PM
12:09PM
12:09PM
12:09PM

1    injury and death.

2             Now, let me say a word finally about damages.

3    Damages is the term used to indicate in dollars and cents what,

4    if any, monetary damages the Plaintiffs have sustained.  If you

5    find that the Plaintiffs have proven their case against the

6    Defendants by a preponderance of the evidence, you must then

7    determine the amount of damages, if any, to which they're

8    entitled.

9             You should not interpret the fact that I'm giving you

10   instructions about the Plaintiffs' damages as an indication in

11   any way that I believe that Plaintiff should or should not win

12   this case.  It is your task first to determine whether the

13   Plaintiff suffered damages as a result of the Defendants'

14   fault.  I'm instructing you on damages only so that you will

15   have some guidance in the event that you would decide that the

16   Plaintiff proved that they sustained damages as a result of the

17   fault of the Defendants and that they're entitled to recover

18   money from the Defendants.

19            Plaintiffs must prove their damages with reasonable

20   certainty and cannot be awarded on the basis of speculation or

21   conjecture.

22            If you find that the Defendants are liable to the

23   Plaintiffs, then you must determine an amount that is fair

24   compensation for Plaintiffs' damages.  These damages are called

25   compensatory damages.  The purpose of compensatory damages is

12:10PM 1    to make the Plaintiffs whole; that is to say, to compensate the

12:10PM 2    Plaintiffs for the damages they suffered.  Under the applicable

12:10PM 3    law, you may not award vindictive or punitive or exemplary

12:10PM 4    damages in this case.  Only compensatory damages may be

12:10PM 5    awarded.  You may award compensatory damages only for injuries

12:10PM 6    that the Plaintiff proved were caused by the Defendants'

12:10PM 7    wrongful conduct.

12:10PM 8         The damages you award must be fair compensation for

12:10PM 9    Plaintiffs' damages, no more and no less.  Compensatory damages

12:10PM 10   are not allowed as punishment and cannot be imposed or

12:10PM 11   increased to penalize the Defendants.  You should not award

12:10PM 12   compensatory damages for speculative injuries, but only for

12:10PM 13   those injuries actually sustained.

12:10PM 14        If you decide to award compensatory damages, you

12:11PM 15   should be guided by dispassionate common sense.  That is to

12:11PM 16   say, you should not be affected by sympathy, by compassion,

12:11PM 17   prejudice or bias.  Computing damages may well be difficult,

12:11PM 18   but you must not let the difficulty lead you to engage in

12:11PM 19   arbitrary guesswork.

12:11PM 20        On the other hand, the law does not require the

12:11PM 21   Plaintiff to prove the amount of their losses with any

12:11PM 22   mathematical precision, but only with as much definiteness and

12:11PM 23   accuracy as the circumstances permit.

12:11PM 24        You must use sound discretion in fixing an award of

12:11PM 25   damages, drawing reasonable inferences where you find them

1  appropriate from the facts and circumstances in the evidence.

2          You should consider the following elements of

3  damage to the extent that you, the jury, find that the

4  Plaintiffs have established them:  One, Mrs. Orr's pain,

5  suffering, and anguish prior to death; second, the medical

6  bills for treating Mrs. Orr prior to her death, her funeral

7  expenses, and her burial expenses; three, Joseph Orr's loss of

8  his wife's financial support, material services, love,

9  affection, and society; four, Kelli Orr Walker's loss of her

10  mother's love, affection, and society; five, Kim Orr DeAgano's

11  loss of her mother's love, affection, and society; six, Joseph

12  Orr, III's loss of his mother's love, affection, and society;

13  seven, the loss of Mrs. Orr's chance of survival.

14          Some of the damages, such as mental or physical pain

15  and suffering, are intangible things about which no evidence of

16  value is required.  In awarding these damages, you are not

17  determining value, but you should award an amount that will

18  fairly compensate the Plaintiff for their injuries.  There is

19  no exact standard for fixing the compensation to be awarded for

20  these elements of damage.  Any award that you make must be fair

21  in light of the evidence.

22          Survival action.  In an action such as this one,

23  Louisiana law permits these Plaintiffs as a surviving

24  beneficiary of the decedent to present evidence of certain

25  losses that may have been suffered by the decedent prior to

12:13PM

12:13PM

12:13PM

12:14PM

12:14PM

12:14PM

12:14PM

12:14PM

12:14PM

12:14PM

12:14PM

12:14PM

12:14PM

12:14PM

12:14PM

12:14PM

12:14PM

12:15PM

12:15PM

12:15PM

12:15PM

12:15PM

12:15PM

12:15PM

12:15PM

1    death for which you may award damages.  These damages may

2    include conscious pain and suffering by the deceased prior to

3    death, as well as any medical and funeral expenses which may

4    have been incurred.  Plaintiffs have the burden of

5    demonstrating that the decedent was alive and conscience after

6    her death -- or injury at least for a brief survival interval

7    following the incident.

8         Wrongful death.  In an action such as this one,

9    Louisiana law permits these Plaintiffs as the surviving

10   beneficiaries of the deceased to present evidence of the loss

11   which they have suffered as a result of the death for which you

12   may award damages to them.  In addition to the loss of future

13   economic support, these damages may include loss of love,

14   affection and companionship of the decedent and the grief and

15   anguish of the beneficiary in question.  If you decide to award

16   such damage, you should specify as to each beneficiary

17   individually a single sum for the loss of love, affection,

18   companionship of the decedent and the grief and anguish of that

19   survivor.  The award need not be the same for each beneficiary.

20        Mental anguish.  The law recognizes that Plaintiffs

21   may suffer mental distress and anguish as a result of the

22   incident in addition to physical pain and suffering.  You are

23   permitted to consider such consequences as part of the general

24   damages which may be awarded.  By mental distress and anguish I

25   mean substantial worry or concern, grief and the like.

12:15PM  1        Loss of consortium.  Loss of consortium in this
12:15PM  2   term -- is the term which the law uses to describe loss of
12:15PM  3   love, companionship, comfort, and services which a family
12:15PM  4   member might provide if she had not been injured, and you may
12:15PM  5   consider the following factors in making this determination:
12:16PM  6   Loss of love, affection, loss of companionship, moral support,
12:16PM  7   decreased sexual relations, Plaintiff's decreased ability to
12:16PM  8   perform household services and decreased aid and assistance in
12:16PM  9   the family unit.
12:16PM  10       In the event you find that the Plaintiff is entitled
12:16PM  11  to receive an award for mental or physical pain and suffering,
12:16PM  12  I instruct you that such an award is not subject to income tax.
12:16PM  13  Neither the state nor federal government will tax it.
12:16PM  14  Therefore, you should determine the amount that the Plaintiffs
12:16PM  15  are entitled to receive without considering the effect of taxes
12:16PM  16  on it.
12:16PM  17       Future wage loss or loss of earnings capacity.  The
12:16PM  18  amount of damage for loss of future wages or diminished earning
12:16PM  19  capacity cannot be calculated with mathematical certainty.  By
12:16PM  20  its nature, these damages deal with future, and no one can be
12:16PM  21  certain of what the future will bring.  However, they must be
12:17PM  22  based on evidence and not mere speculation.  Diminished earning
12:17PM  23  capacity reflects the injured party's ability to earn money in
12:17PM  24  the future, rather than what she actually earned in the past.
12:17PM  25  In determining such an award, you must consider -- you may

consider Mrs. Orr's physical condition before and after the
incident, her work record, her earnings in prior years, the
likelihood that she may have earned similar amounts in the
remainder of her work life, amounts that she would have spent
on herself and similar factors.  Since if you make such an
award, Plaintiffs would be receiving today the sums of money
they otherwise would have received only after a number of years
in the future, you must reduce it to present value by
considering the interest that the Plaintiffs could earn on the
amount of the award if he made a relative risk-free investment.
The reason why you must make this reduction is because an award
of an amount representing future losses of earnings or earning
capacity is more valuable to the Plaintiffs if they receive it
today than if they receive it in the future.  It's more
valuable simply because the Plaintiffs can earn interest on it
for the period of time between the date of the award and the
date on which she would incur the future expense.  If you
should make such an award, you should list the reduced figure
for your award for the future wage loss.

      Her medical expenses.  Plaintiffs may recover past
medical expenses if they establish that they are incurred past
medical expenses in good faith as a result of Mrs. Orr's
injury.

      Loss of chance of survival.  Let me say something
about that.  If you find by a preponderance of the evidence

2441

| | |
|---|---|
| 12:19PM | 1 |
| 12:19PM | 2 |

that Sharyn Orr's death was not proximately caused by the

Defendants' failure to warn or instruct, then you may consider

Plaintiffs' claims for damages based upon what the law calls

the loss of a chance of survival.  Under Louisiana law, this

means less than even chance of survival.  In their claim for

damages due to the loss of a chance of Mrs. Orr's survival,

Plaintiffs must prove by a preponderance of the evidence that

an inadequate warning and instruction for the use of Xarelto

caused or substantially contributed to the loss of a chance

that Mrs. Orr might survive.  Therefore, in seeking recovery

for the loss of a chance of survival, Plaintiffs are not

required to prove that different or earlier treatment by

Dr. Bui actually would have saved her life.  It is only

necessary for Plaintiffs to show by a preponderance of the

evidence that at the time Mrs. Orr arrived in the ER at Ochsner

Main, there was a less than even chance her life could have

been saved, and that the chance of her surviving was lost due

to the Defendants' failure to warn or instruct.  If the

Plaintiffs prevail in proving this, you must determine the

monetary value of the loss of a chance for the Orr family based

on the evidence you've heard.  In doing so, you are allowed to

consider not only evidence concerning Mrs. Orr's chances of

survival, but also the evidence as to the loss of love,

support, affection experienced by her surviving members.

          Again, I remind you that the mere fact that I have

OFFICIAL TRANSCRIPT

2442

12:21PM
12:21PM
12:21PM
12:21PM
12:21PM
12:21PM
12:21PM
12:21PM
12:21PM
12:21PM
12:21PM
12:21PM
12:22PM
12:22PM
12:22PM
12:22PM
12:22PM
12:22PM
12:22PM
12:22PM
12:22PM
12:22PM
12:22PM
12:22PM
12:23PM

1   given you instructions on the law of damages does not in any

2   way suggest that I believe that any damages are due in this

3   case.  Plaintiffs must prove their damages with reasonable

4   certainty and cannot be awarded damages on the basis of

5   speculation.  Whether or not Plaintiffs are entitled to recover

6   and whether or not they have proven that any damages are due is

7   for you to decide.

8          Now, in conclusion, let me remind you, ladies and

9   gentlemen, that it is your sworn duty as jurors to discuss the

10  case with one another in an effort to reach a unanimous

11  agreement, if you can do so.  Each of you must decide the case

12  for yourself, but only after full consideration of the evidence

13  with the other members of the jury.  And while you're

14  discussing the case, do not hesitate to re-examine your own

15  opinion and change your mind if you're convinced that you are

16  wrong.  Do not, however, give up your honest belief solely

17  because the others think differently or merely to finish the

18  case.  Remember in a very real way, you are judges, judges of

19  the facts.  Your only interest is to seek the truth from the

20  evidence.

21         Now, I've prepared a special verdict form for your

22  convenience to aid you in reaching a unanimous decision.  You

23  will take the form with you to the jury room.  The verdict must

24  represent the considered judgment of each juror.

25         You will note that the form contains several

|   |   |
|---|---|
| 12:23PM | 1 |
| 12:23PM | 2 |
| 12:23PM | 3 |
| 12:23PM | 4 |
| 12:23PM | 5 |
| 12:23PM | 6 |
| 12:23PM | 7 |

1   interrogatories or questions.  The answers to each question

2   must be the unanimous answer of the jury.  In the space

3   provided below each question, you will find directions which

4   instruct you either to answer the next question or to answer

5   some other question, or to stop and return to the courtroom

6   with your verdict.  You must carefully follow these

7   instructions as you complete the form.

8        The jury form which I -- jury verdict form which I'll

9   give you is, first, question Number 1.  Do you find by a

10   preponderance of the evidence that the Defendant failed to

11   provide adequate warnings or instructions for the safe use of

12   Xarelto to either or both Mrs. Sharyn Orr's physicians, A,

13   Dr. Maurice St. Martin?  Yes or no, you fill in the appropriate

14   form; B, Dr. Cuong Bui.  Yes or no, you fill out the form.

15        The instructions.  If you answered yes to either or

16   both A and B, please proceed to question 2.  If you answered no

17   to both A and B, please skip all the remaining questions, date

18   and sign this verdict form where indicated on the last page and

19   inform the marshal that you have reached a verdict.

20        Question 2.  Do you find by a preponderance of the

21   evidence that the Defendants' failure to provide adequate

22   warnings and instructions were a proximate cause of Mrs. Orr's

23   death?  Yes or no.  You decide.  If you answer yes to this

24   question, please proceed to question 4.  If you answer no to

25   this question, please proceed to question 3.

12:25PM
12:25PM
12:25PM
12:25PM
12:25PM
12:25PM
12:25PM
12:25PM
12:25PM
12:25PM
12:25PM
12:26PM
12:26PM
12:26PM
12:26PM
12:26PM
12:26PM
12:26PM
12:26PM
12:26PM
12:26PM
12:26PM
12:26PM
12:27PM
12:27PM

1     Question 3.  Do you find by a preponderance of the
2  evidence that the Defendants' failure to provide adequate
3  warnings and instructions deprived Mrs. Sharyn Orr of a chance
4  of survival?  Yes or no.  You decide.  If you answer yes to
5  this question, please proceed to question 5.  If you answer no
6  to this question, please skip all remaining questions, date and
7  sign this verdict form where indicated on the last page, and
8  inform the marshal you have reached a verdict.
9     Question 4.  Please state the amounts which you find
10 by a preponderance of the evidence will fairly and adequately
11 compensate Plaintiffs for the following elements of damage:
12 Mrs. Orr's conscience pain and suffering prior to death; the
13 medical bills for the treatment of Mrs. Orr prior to her death;
14 funeral and burial expenses; Joseph Orr, Jr.'s loss of love and
15 affection and society; loss of financial support; loss of
16 wife's material services.  Each of those has a form for you to
17 fill out.  Joseph Orr, III's loss of mother's love and
18 affection; Kelli Orr Walker's loss of her affection; Kim Orr
19 DeAgano's loss of her love and affection and society.  If you
20 answered question 4, please do not answer question 5, but
21 simply date and sign this verdict form where indicated on the
22 last page and inform the marshal you have reached a verdict.
23     Finally, question 5.  Please state the amount which
24 you find by a preponderance of the evidence will fairly and
25 adequately compensate the Plaintiff for the following elements

of damage:  Loss of the chance of Mrs. Orr's survival.  Please
date and sign this verdict form where indicated on the last
page and inform the marshal you have reached a verdict in New
Orleans dated today's date or whenever you reach the verdict.

        When you retire to the jury room to deliberate on
your verdict, you may take this charge with you.  I've made a
copy for each of you to look at, as well as all the exhibits
which I have admitted into evidence.  First I suggest that you
relax and have lunch we've provided for you to have in the jury
room.  Then select your foreperson and conduct your
deliberations.  If you recess during the deliberations, follow
all the instructions that the Court has given about your
conduct during the trial.

        After you have reached your unanimous verdict, your
foreperson is to fill in the form, your answers to the
questions.  Do not reveal your answers until such time as you
are discharged, unless otherwise directed by me.

        You may never disclose, you must not disclose to
anyone, not even to me, any numerical division of any question,
if there be any.

        If you want to communicate with me at any time,
please give a signed, written message or question to the United
States Marshal that I've assigned to work with you who will
bring it to me.  I will then respond as promptly as possible,
either in writing or by having you brought into the courtroom

12:28PM  1    so that I can address you personally.  I will always first

12:28PM  2    disclose to the attorneys your question and my response before

12:29PM  3    I answer the question.

12:29PM  4         After you have reached your verdict, you're not

12:29PM  5    required to talk with anyone about the case unless I order

12:29PM  6    otherwise.

12:29PM  7         You may now retire to the jury room to conduct your

12:29PM  8    deliberations.  All rise as the jury leaves, please.

12:29PM  9         (Whereupon the jury was excused from the courtroom.)

12:29PM  10        **THE COURT:**  Okay.  Be seated, please.  If you leave

12:29PM  11   the courtroom to have lunch or any other time, just leave

12:29PM  12   your -- your cell phone number in the event I have a question,

12:30PM  13   that I can contact you and get you back into court.

12:30PM  14        Let me again thank you for all of the work that

12:30PM  15   you've done on it.  And I know, from having done this many

12:30PM  16   years, that the work that you have done is only a part of what

12:30PM  17   is preparation in the case and many behind you or in another

12:30PM  18   room that have also worked on the case, and I appreciate all

12:30PM  19   their help.

12:30PM  20        We'll stand in recess.  Thanks.

12:30PM  21        **THE CASE MANAGER:**  All rise.

12:30PM  22                       **(Recess.)**

12:30PM  23        (Whereupon the following proceedings were held out of

12:30PM  24        the hearing of the Court and jury:)

1:33PM   25   **MR. OVERHOLTZ:**  Ready?  Are you guys ready?  Okay.

1:33PM  1    Well, let's get started.

1:33PM  2                        **SANJAY JALOTA,**

1:33PM  3    a witness called on behalf of the Plaintiffs, being first duly

1:33PM  4    sworn, was examined and testified as follows:

1:33PM  5                        **DIRECT EXAMINATION**

1:33PM  6                        **BY MR. OVERHOLTZ:**

1:33PM  7    **Q.**   Mr. Jalota, my name is Neil Overholtz.  I'm going to be

1:33PM  8    asking you some questions now that are primarily going to focus

1:33PM  9    on questions related to Plaintiffs' Exhibits Record Number

1:33PM 10    3061443 and 3061444 that you were briefly questioned about last

1:33PM 11    Tuesday and matters related to those documents.  This will be

1:33PM 12    like you were testifying here at the trial, and we have

1:33PM 13    stipulated that you're still under oath.  Do you understand

1:33PM 14    that?

1:33PM 15    **A.**   I do.

1:33PM 16    **Q.**   Okay.  And we're going to -- we're doing this proffer over

1:33PM 17    the telephone for the convenience of all the parties, so if you

1:34PM 18    need me to repeat a question or you have difficulty hearing,

1:34PM 19    please let me know, okay?

1:34PM 20    **A.**   I understand.  Thank you.

1:34PM 21    **Q.**   All right.  Now, since your testimony last week, have you

1:34PM 22    had any discussions with any attorneys for Janssen and Bayer

1:34PM 23    about that testimony?

1:34PM 24    **A.**   No.

1:34PM 25    **Q.**   Okay.  And have you had any conversations with any

                        OFFICIAL TRANSCRIPT

1:34PM    1    attorneys for Janssen or Bayer about the testimony that you're

1:34PM    2    going to give today related to the Health Canada clarification

1:34PM    3    request response, an email that you received in November 2014?

1:34PM    4    A.    No.  And just to -- I don't recall those two exhibits, but

1:34PM    5    thank you for telling me what they are.

1:34PM    6    Q.    Okay.  And we'll talk about those in just a moment.

1:34PM    7          Have you had any conversations about that email that

1:34PM    8    you received from Lori Birkenberger and the attachment, the

1:34PM    9    Health Canada clarification request response from November

1:35PM   10    2014, have you had any conversations with any of your

1:35PM   11    colleagues at Janssen?

1:35PM   12    A.    No.

1:35PM   13    Q.    What about Bayer, any of your colleagues at Bayer?

1:35PM   14    A.    No.

1:35PM   15    Q.    Okay.  And have you done any of your own independent

1:35PM   16    research into the issue, looking at your old emails or looking

1:35PM   17    into the files, to see if you can recollect those emails and

1:35PM   18    that attachment?

1:35PM   19    A.    Again no, because I'm -- and I'm not actively involved in

1:35PM   20    Xarelto at all, so there was no need for me to go back to look

1:35PM   21    at anything.

1:35PM   22    Q.    Okay.  So let's -- with that in mind, let's go ahead and

1:35PM   23    take a look at what Plaintiffs will offer as Plaintiffs' Trial

1:35PM   24    Exhibit Number 191, which is the email that you received in

1:35PM   25    November of 2014.  That's November 9th, 2014.  It's record

1:35PM 1 Number 3061443, and if you can just let me know when you have

1:36PM 2 that in front of you.

1:36PM 3 A.    I do.

1:36PM 4 Q.    Okay.  And this was the email that was sent to you that

1:36PM 5 you testified about last week, and you testified that you have

1:36PM 6 no reason to doubt that you did, in fact, receive this email;

1:36PM 7 correct?

1:36PM 8 A.    Correct.  If it was sent from -- if I'm on the "to" list,

1:36PM 9 I would have received it, sure.

1:36PM 10 Q.    Can you repeat your answer?  We had difficulty hearing you

1:36PM 11 here.

1:36PM 12 A.    Oh, yes.  I was saying I have no reason to doubt it,

1:36PM 13 because I'm on there on the "to" distribution list.

1:36PM 14 Q.    Okay.  So you're on the "to" distribution list of the

1:36PM 15 email from Lori Birkenberger; correct?

1:36PM 16 A.    That is correct.

1:36PM 17 Q.    Okay.  And it's your testimony from last week that you

1:36PM 18 don't recall the email.  Is that still true today, that you do

1:36PM 19 not recall receiving this email?

1:36PM 20 A.    That is correct, yes.

1:36PM 21 Q.    Okay.  Now, let me ask you a little bit about that.  You

1:37PM 22 know, I may not recall an email that I received, you know,

1:37PM 23 yesterday, but do you have any reason to believe that when you

1:37PM 24 received this email, you would not have received it -- you

1:37PM 25 would not have read it at the time?

1:37PM  1   A.   Yes, that's actually a good possibility, because in 2014 I

1:37PM  2   was involved in other projects, and Lori had sent me saying

1:37PM  3   something for appreciation what's going in Canada.  If she had

1:37PM  4   specifically said, "Look at it and you review it and let me

1:37PM  5   know if you have anything", I would have probably looked at it

1:37PM  6   in more detail, but what she said was for appreciation.  I may

1:37PM  7   have looked at the email without spending too much time on it.

1:37PM  8   Q.   Okay.  Let me ask you this.  Independent of the email, did

1:37PM  9   anyone from Janssen or Bayer ask you to review the Health

1:38PM  10  Canada clarification request response of November of 2014?

1:38PM  11  A.   I don't recollect anybody doing that because, again, I got

1:38PM  12  off the project for two and a half years, so I wasn't the

1:38PM  13  principal contact or the principal regulatory calling on the

1:38PM  14  team.

1:38PM  15  Q.   Mr. Jalota, we may -- Mr. Jalota, if I can interrupt you.

1:38PM  16  You may want to slow down just a little bit.  Because the court

1:38PM  17  reporter can't see you speaking, it makes it difficult.  If you

1:38PM  18  could just slow down and try to speak clearly into the

1:38PM  19  microphone, that should help the court reporter in giving your

1:38PM  20  answers.  So if you want to repeat your answer --

1:38PM  21  A.   Actually, you know what?  Do you mind doing me a favor?

1:38PM  22  Could you maybe mute your phone while I talk, because I'm

1:38PM  23  getting some background sounds.

1:38PM  24  Q.   I'm not sure if we can do that.

1:38PM  25  A.   Okay.  Let me just -- I'll try again.  So do you mind

2451

1   repeating the question again, please?

2   **Q.**   Sure.  I asked you whether or not independent of the

3   email, had anyone from Bayer or Janssen requested that you

4   review the Health Canada clarification response from November

5   of 2014?

6   **A.**   And so my response is I don't recall, but what I'm saying

7   is because I've not been involved -- because I was not actively

8   involved for two and a half years, they wouldn't have contacted

9   me unless it was something specifically for like a management

10  review or for historical purposes.

11  **Q.**   Okay.  So at this time in November of 2014, you were a

12  senior director in the regulatory affairs department, correct,

13  at Janssen?

14  **A.**   Yes, I was.

15  **Q.**   Okay.  And you did not have day-to-day responsibility for

16  Xarelto, but your direct report, Lori Birkenberger, who sent

17  this email to you on November 9th, 2014, she did in fact have

18  Xarelto responsibility here in the United States; is that

19  correct?

20  **A.**   That is correct.

21  **Q.**   Okay.  Mrs. Birkenberger forwarded you this email, and if

22  we can look back at the email, she says to you, "F.Y.I., for

23  appreciation what's going on in Canada."  Do you see that?

24  **A.**   I do.  I did see the note from Dr. Birkenberger, yes.

25  **Q.**   Okay.  Now, what she has done here is forwarded an email

1:40PM   1   that starts at the bottom of this page on Plaintiffs' Exhibit

1:40PM   2   191, which is an email from Natasha Sidhu at Bayer to several

1:40PM   3   employees at Bayer and Janssen in which the subject is

1:40PM   4   "Canadian Xarelto class label -- review needed by noon November

1:40PM   5   20th"; correct?

1:40PM   6   A.   That is correct.

1:40PM   7   Q.   Okay.  And she copies on this email several people from

1:41PM   8   Janssen, including Lori Birkenberger, Purve Patel and Chris

1:41PM   9   Nessel, Dr. Nessel; correct?

1:41PM  10   A.   That is correct.

1:41PM  11   Q.   Okay.  Did you have an understanding that along with

1:41PM  12   Miss Birkenberger, that Purve Patel as well as Dr. Nessel were

1:41PM  13   involved in the activities related to Health Canada's

1:41PM  14   clarification request in November of 2014?

1:41PM  15   A.   I don't.  Other than seeing this note, I wouldn't have

1:41PM  16   known.  The only thing I can say to you is Miss Purve Patel and

1:41PM  17   Dr. Nessel are involved in day-to-day activities of Xarelto, so

1:41PM  18   if it -- it's perfectly logical for them to be copied on this

1:41PM  19   letter.

1:41PM  20   Q.   Okay.  And so Purve Patel also worked in the regulatory

1:41PM  21   affairs department; is that right?

1:42PM  22   A.   That is correct.

1:42PM  23   Q.   And she would have had Xarelto responsibilities here in

1:42PM  24   the United States as well; is that correct?

1:42PM  25   A.   That is correct.

1:42PM 1    Q.   Okay.  And both Purve Patel and Lori Birkenberger reported

1:42PM 2    to you as their supervisor; correct?

1:42PM 3    A.   That is correct.

1:42PM 4    Q.   Okay.  Attached to the email that you received was a draft

1:42PM 5    response to the Health Canada clarification request, and we

1:42PM 6    will give you a copy of that, which is 3061444.  Do you have

1:42PM 7    that?

1:42PM 8    A.   I just received it, yes.

1:42PM 9    Q.   Okay.  And the Plaintiffs are offering this 306144

1:42PM 10   (verbatim) as Plaintiffs' Exhibit 192 for the trial.

1:42PM 11            And you were shown this document last week in your

1:42PM 12   testimony.  This is the attachment to the email.  Do you have

1:43PM 13   recollection of reviewing this draft response to Health Canada

1:43PM 14   back in November of 2014?

1:43PM 15   A.   No, I do not.

1:43PM 16   Q.   Okay.  Do you have any reason to believe that you would

1:43PM 17   not have reviewed this attachment when you received the email

1:43PM 18   from Miss Birkenberger in November of 2014?

1:43PM 19   A.   Again, unless -- unless Miss Birkenberger asked me to look

1:43PM 20   at something specifically, I would have not -- I would have not

1:43PM 21   reviewed it.  I receive so many things.  Unless somebody

1:43PM 22   specifically tells me to look at something, I'd find it and may

1:43PM 23   look at it at a future date, but I don't recollect seeing it.

1:43PM 24   Q.   Okay.  Well, we'll get back to that.  Let me ask you a

1:43PM 25   couple of questions about the actual response to Health Canada,

1:43PM 1    the document itself.  If we can look at Plaintiffs' Exhibit
1:43PM 2    192, and if we can turn to the first page, you'll see --
1:44PM 3    A.   Did you want me to look at this?  Because if you want me
1:44PM 4    to -- if you're going to ask specific sections, I may have to
1:44PM 5    look at it in more detail.  So how do you want to do this?
1:44PM 6    Q.   Okay.  So why don't we start by looking at the first page,
1:44PM 7    and I want to identify what we're looking at, if we can.
1:44PM 8    A.   Okay.  Okay.
1:44PM 9    Q.   So if you'd flip over to the first page, what's marked at
1:44PM 10   the top of the page as Page 1 of 11, do you have that?
1:44PM 11   A.   I do.
1:44PM 12   Q.   Okay.  And you can see it's titled at the top "Xarelto
1:44PM 13   Response to Clarification Request" dated 03 October 2014.  Do
1:44PM 14   you see that?
1:44PM 15   A.   I do.
1:44PM 16   Q.   Okay.  And a clarification request is a document or series
1:44PM 17   of questions that are sent to the sponsor, the drug sponsor by
1:44PM 18   Health Canada; is that correct?
1:44PM 19   A.   That is correct.  Upon review of a submission, they'd have
1:44PM 20   some additional verification questions, and this is -- this
1:45PM 21   appears to be one of those.
1:45PM 22   Q.   Okay.  And if we look at the very first paragraph, it says
1:45PM 23   that Bayer in this draft response are preparing -- are
1:45PM 24   providing answers to those questions from the clarification
1:45PM 25   request, and that the questions are highlighted in bold font

2455

1:45PM   1    that came from Health Canada, and then Bayer's responses are in
1:45PM   2    a regular font.  Do you see that?
1:45PM   3    A.    Could be.
1:45PM   4    Q.    Okay.  And that's what it says in that first paragraph;
1:45PM   5    correct?
1:45PM   6    A.    That is correct.
1:45PM   7    Q.    Okay.  So I want to ask you about the first section of
1:45PM   8    this document, which is the Executive Summary.  And
1:45PM   9    specifically, I'm going to be asking you about the third bullet
1:45PM  10    point at the bottom of this first page that continues --
1:45PM  11    A.    Right.
1:45PM  12    Q.    -- over to Page 2.
1:45PM  13    A.    Okay.
1:45PM  14    Q.    Okay.  And if you could look with me, Health Canada --
1:45PM  15    Bayer starts out by quoting from the clarification request in
1:46PM  16    which they ask whether updates to the product monograph may be
1:46PM  17    appropriate to advise prescribers of the need to determine
1:46PM  18    steady-state anticoagulant effect of the drug at trough,
1:46PM  19    possibly followed by a dose adjustment.  Do you see that in
1:46PM  20    that bold paragraph at the top of Page 1?
1:46PM  21    A.    Yes, I do.
1:46PM  22    Q.    Okay.  And when it refers to the product monograph, is
1:46PM  23    that the labeling for the drug in Canada?
1:46PM  24    A.    That is correct.
1:46PM  25    Q.    Okay.  And so if we can look down at the third paragraph,

OFFICIAL TRANSCRIPT

1:46PM 1    it looks like Bayer is providing an Executive Summary, and they

1:46PM 2    state at the bottom that "The Xarelto product monograph

1:46PM 3    includes the available information on coagulation monitoring

1:46PM 4    and laboratory testing from the Xarelto clinical development

1:46PM 5    program, including the correlation between rivaroxaban plasma

1:46PM 6    concentration and commonly used coagulation tests."  Do you see

1:47PM 7    that?

1:47PM 8    A.    I do.

1:47PM 9    Q.    Okay.  And were you aware that the product monograph, the

1:47PM 10   label, in Canada for Xarelto included information related to

1:47PM 11   the correlation between Xarelto concentration levels and

1:47PM 12   commonly used coagulation tests?

1:47PM 13   A.    No, I didn't.  I mean, all I can say to you is that could

1:47PM 14   be what Canada -- what they would have submitted very early on

1:47PM 15   may have been very similar to what we submitted in Section 12.

1:47PM 16   But other than that, I don't know what negotiations took place

1:47PM 17   at Health Canada.

1:47PM 18   Q.    Okay.  So it's your testimony you were not involved in any

1:47PM 19   of the further labeling work on Xarelto in Canada after the

1:47PM 20   early approval from Xarelto in Canada; is that right?

1:48PM 21   A.    So what happened was Janssen and Bayer collaborated very

1:48PM 22   closely, so we would have got -- we would have received

1:48PM 23   documents here -- we would have received some of the key label

1:48PM 24   changes that Bayer would have sent us just for information,

1:48PM 25   nothing else, because we -- we weren't responsible for the

1:48PM 1  labeling or -- yeah, we weren't responsible for the application

1:48PM 2  in Canada.

1:48PM 3  Q.   Can you start over?  Just try to speak slowly and clearly,

1:48PM 4  if you can, please.

1:48PM 5  A.   Okay.  So what I'm saying was that Bayer would have shared

1:48PM 6  that with us, but more as an F.Y.I. rather than any commenting

1:48PM 7  per se.

1:48PM 8  Q.   So if you can flip with me to the next page, which is Page

1:48PM 9  2 of 11 at the top, you see that that section from that third

1:48PM 10 bullet point continues with "the sponsor recognizes".  Do you

1:49PM 11 see that?

1:49PM 12 A.   I do.  I do.  I do.

1:49PM 13 Q.   Okay.  And this statement is made by Bayer in this

1:49PM 14 response says, "The sponsor recognizes that in certain

1:49PM 15 infrequent situations such as overdosage, acute bleeding,

1:49PM 16 urgent surgery, suspected non-compliance, or in other unusual

1:49PM 17 circumstances, assessment of the anticoagulant effect of

1:49PM 18 Xarelto may be desirable."  Correct?

1:49PM 19 A.   That's correct.

1:49PM 20 Q.   Okay.  And was it -- and was it --

1:49PM 21 A.   I --

1:49PM 22 Q.   Was it Bayer and Janssen's position that the ability to

1:49PM 23 assess the anticoagulant effect of Xarelto in circumstances

1:49PM 24 like urgent surgery or acute bleeding was desirable?

1:49PM 25 A.   So let me just -- let me just -- before I answer that, I

OFFICIAL TRANSCRIPT

1:50PM  1   actually wanted to finish the -- I think what the sponsor --

1:50PM  2   the sponsor's saying that the product more or less provides the

1:50PM  3   guidance there.  Now, so I don't know --

1:50PM  4   Q.   Can you -- I'm sorry, the court reporter had a -- couldn't

1:50PM  5   hear you that time.  It's just not a great connection, and

1:50PM  6   it's --

1:50PM  7   A.   I'm sorry.

1:50PM  8   Q.   I know the phone you're using may be not -- may not be

1:50PM  9   giving us the right sound, but if you could just restate that

1:50PM  10  last part you said, and then I'll reask my question.

1:50PM  11  A.   Right.  So I just wanted to highlight that this is the --

1:50PM  12  it may well be that Bayer is stating what's in the product

1:50PM  13  monograph already.  That's one aspect.

1:50PM  14          But to your -- to your question is when we -- when we

1:50PM  15  had submitted the initial NDA in July 2008 and the NDA for

1:51PM  16  January 2011, we left it as individuals AFib, which could

1:51PM  17  encompass overdose, acute bleeding, urgent surgery.  So we

1:51PM  18  recognized individual AFib and directed them to prescribe --

1:51PM  19  all the physicians who -- that (connection cutting out).

1:51PM  20  Q.   We're really having a difficulty time hearing what you're

1:51PM  21  saying, Mr. Jalota.

1:51PM  22          MS. TERSIGNI:  Neil, this is Julie.  Do you want us

1:51PM  23  to try to dial back in?

1:51PM  24          MR. OVERHOLTZ:  Should we try that, Dean?

1:51PM  25          THE CASE MANAGER:  Is he on a cell phone?

1:51 PM  1          MR. OVERHOLTZ:  Is it a regular speakerphone you guys

1:51 PM  2   are using?

1:51 PM  3          MS. TERSIGNI:  It's like in one of our conference

1:51 PM  4   rooms.  It's a huge speaker.

1:51 PM  5          THE WITNESS:  I'm actually on top -- I just on top of

1:52 PM  6   the speaker, and I know that will help -- helping a lot.

1:52 PM  7          THE CASE MANAGER:  She's much clearer than he is.

1:52 PM  8          MR. OVERHOLTZ:  Yeah, Julie's much clearer than you

1:52 PM  9   are, so maybe -- maybe you should step back a little bit where

1:52 PM 10   Julie is.

1:52 PM 11          THE WITNESS:  Okay.  Does this help?

1:52 PM 12          MR. OVERHOLTZ:  Sounded a little better.  Let's try

1:52 PM 13   that.

1:52 PM 14          THE WITNESS:  Okay.  So could you ask the question

1:52 PM 15   again, please?

1:52 PM 16   BY MR. OVERHOLTZ:

1:52 PM 17   Q.   Sure.  Well, you mentioned that also stated in this

1:52 PM 18   response is a statement from the Xarelto product monograph.  Do

1:52 PM 19   you recall that?

1:52 PM 20   A.   Yes.  It states below.  It states -- just below that

1:52 PM 21   statement you stated, it states, "The Xarelto product monograph

1:52 PM 22   provides guidance to the physicians."

1:52 PM 23   Q.   So it says that, "The Xarelto product monograph provides

1:52 PM 24   guidance to physicians regarding the possibility to monitor

1:52 PM 25   patients as clinical indicated," and then there is a quote.  Do

1:52PM  1   you see that?

1:52PM  2   A.   Yes, I do.

1:52PM  3   Q.   Okay.  And that language that is in quotes there, is that

1:53PM  4   language from the Xarelto product monograph, the Canadian

1:53PM  5   labeling for the product; is that right?

1:53PM  6   A.   I -- without looking at the monograph, I don't have it,

1:53PM  7   but I'd say that's what it states, provides guidance, and I

1:53PM  8   would assume that is from the label, that's correct, from the

1:53PM  9   monograph, correct.

1:53PM  10  Q.   Okay.  And this language from the Xarelto product

1:53PM  11  monograph states that "Although there is no need to monitor

1:53PM  12  clinical practice, in certain infrequent situations such as

1:53PM  13  overdosage, acute bleeding, urgent surgery, in cases of

1:53PM  14  suspected non-compliance, or in other unusual circumstances,

1:53PM  15  assessment of the anticoagulant effect of rivaroxaban may be

1:53PM  16  appropriate.  Accordingly, measuring PT using the neoplastin

1:53PM  17  reagent or Factor 10A assay using rivaroxaban-specific

1:53PM  18  calibrators and controls may be useful to inform clinical

1:53PM  19  decisions in these circumstances."  Did I read that correctly?

1:54PM  20  A.   Yes, you did.

1:54PM  21  Q.   Okay.  And this is information that is being provided to

1:54PM  22  physicians in Canada as guidance in these situations; correct?

1:54PM  23  A.   That's what it appears, so -- I mean, I don't know.  Yes,

1:54PM  24  that's probably that, yes, yes.

1:54PM  25  Q.   And it specifically states that the use of the PT test

1:54 PM
1:54 PM
1:54 PM
1:54 PM
1:54 PM
1:54 PM
1:55 PM
1:55 PM
1:55 PM
1:55 PM
1:55 PM
1:55 PM
1:55 PM
1:55 PM
1:55 PM
1:55 PM
1:55 PM
1:55 PM
1:56 PM
1:56 PM
1:56 PM
1:56 PM
1:56 PM
1:56 PM
1:56 PM

1  using the neoplastin reagent in circumstances like urgent

2  surgery could be useful in making clinical decisions; correct?

3  A.   That's correct.

4  Q.   And do you agree that this statement from the Xarelto

5  product monograph about the usefulness of PT using the

6  neoplastic reagent in urgent surgery situations represents

7  Bayer and Janssen's position on the ability to use such tests?

8  A.   I -- I would defer to the clinical people that -- I mean,

9  for us -- actually, first of all, I'd go to the clinical people

10  that -- I -- my perspective is we put something in the label --

11  we proposed something in July 2008 and January 2011.

12  Q.   Let me ask you to look down with me to -- let's see what

13  page.  Let's -- if we can turn over to Page 4 of 11, there's a

14  Section 3.

15  A.   Page 4 of 11?  Yes.  Thank you.

16  Q.   Okay.  And there's a question posed by Health Canada that

17  bears responding to.  And it says, "Discuss currently available

18  laboratory tests that might be useful to prescribers of your

19  drug in terms of routine assessment of safety and efficacy of

20  its anticoagulant effect."  Do you see that?

21  A.   I do.

22  Q.   And if you can look with me at this response, it indicates

23  that the sponsor had investigated several tests during the

24  clinical development program, including prothrombin time, PT,

25  as well as some other tests, including APTT and HepTest, and do

1:56PM  1   you see with me where it says that, "Except for PT, the tests

1:56PM  2   were not considered to be suitable for following the

1:56PM  3   pharmacodynamics effect of Xarelto"?  Do you see that?

1:56PM  4   A.   I do.

1:56PM  5   Q.   Okay.  And then the next paragraph states, "In contrast, a

1:56PM  6   linear correlation between PT using a sensitive reagent system

1:56PM  7   neoplastin and plasma concentrations were established in Phase

1:57PM  8   I and Phase II trials in patients treated for the prevention

1:57PM  9   and treatment of thromboembolic disorders."  Do you see that?

1:57PM  10  A.   I do.

1:57PM  11  Q.   Okay.  Now, you see that -- with me that in this response,

1:57PM  12  someone has added the language regarding PT regarding using a

1:57PM  13  sensitive reagent system neoplastin; is that correct?

1:57PM  14  A.   It appears so, yes.  That's correct.  I don't know who did

1:57PM  15  it, but it appears so.

1:57PM  16  Q.   Okay.  And, in fact, if we look down at the bottom of the

1:57PM  17  page, there's a section called "Monitoring and Laboratory Test

1:57PM  18  Information in the Xarelto Monograph".  That's talking about

1:57PM  19  the Canadian Xarelto label; correct?

1:57PM  20  A.   That is correct.

1:57PM  21  Q.   Okay.  And it describes that, "The Xarelto product

1:57PM  22  monograph contains the following information about PT in the

1:57PM  23  section 'Warnings and Precautions, Monitoring in Laboratory

1:57PM  24  Tests.'"  Do you see that?

1:57PM  25  A.   I do.

1:58PM 1    **Q.**   Okay.  And that first paragraph describes this close

1:58PM 2    correlation between plasma concentration and PT if the

1:58PM 3    neoplastin reagent is used; is that correct?

1:58PM 4    **A.**   That's correct.

1:58PM 5    **Q.**   Okay.  And it states specifically there that, "In patients

1:58PM 6    who are bleeding, measuring the PT using the neoplastin reagent

1:58PM 7    may be useful to assist in determining an excess of

1:58PM 8    anticoagulant activity."  Correct?

1:58PM 9    **A.**   That is what it states on the product monograph.

1:58PM 10   **Q.**   Okay.  And so if something is a useful test in determining

1:58PM 11   the excess of anticoagulant activity in a patient taking

1:58PM 12   Xarelto, that would be helpful information to a physician; is

1:58PM 13   that correct?

1:58PM 14   **A.**   I would -- so my first reaction would be, again I think

1:58PM 15   you talk to clinical -- a clinical person for this, the

1:58PM 16   usefulness.  I would say to you is this is -- yes, this is in

1:59PM 17   the label.  I mean, if you look at what we proposed initially

1:59PM 18   it's somewhat similar, something like what we proposed

1:59PM 19   initially.

1:59PM 20   **Q.**   When -- and, in fact, when we looked at Page 1 of 11,

1:59PM 21   specifically in the Executive Summary, it was described by

1:59PM 22   Bayer in this document that that Xarelto product monograph,

1:59PM 23   that section was providing guidance to physicians; correct?

1:59PM 24        **MR. IRWIN:**  I object.  Asked and answered at least

1:59PM 25   twice before.

2464

| | | |
|---|---|---|
| 1:59PM | 1 | **BY MR. OVERHOLTZ:** |
| 1:59PM | 2 | Q.   You can go ahead and answer, Mr. Jalota. |
| 1:59PM | 3 | A.   I'm sorry.  Can you repeat that question again, please? |
| 1:59PM | 4 | Q.   Sure.  This section that we're reading from when we looked |
| 1:59PM | 5 | at Page 2 of 11 in the Bayer response to the Health Canada |
| 1:59PM | 6 | request specifically said that this section provides guidance |
| 1:59PM | 7 | to physicians in this situation; correct? |
| 2:00PM | 8 | A.   That's what the texts say, and that's correct.  That's |
| 2:00PM | 9 | what this section is saying here, the section on Page 4 of 11. |
| 2:00PM | 10 | That's what the information states.  That's correct. |
| 2:00PM | 11 | Q.   And you provide guidance to physicians in situations in |
| 2:00PM | 12 | which you are trying to provide the physician with helpful |
| 2:00PM | 13 | information; correct? |
| 2:00PM | 14 | A.   That's what the Canada labels say.  I think -- I mean, I |
| 2:00PM | 15 | think you've got to be careful about -- Canada labeling system |
| 2:00PM | 16 | is different to ours.  You've got to understand who put what |
| 2:00PM | 17 | where, whether -- I don't know the full development of the |
| 2:00PM | 18 | label, so I don't know whether Health Canada proposed -- |
| 2:00PM | 19 | (connection breaking up). |
| 2:00PM | 20 | Q.   You broke up on the last part, Mr. Jalota. |
| 2:00PM | 21 | A.   What I can say is we don't know -- this information is in |
| 2:00PM | 22 | there.  How it got there, I don't want to speak. |
| 2:01PM | 23 | Q.   This information, this -- well, let's look, make sure |
| 2:01PM | 24 | we're talking about the right paragraph.  If we look at Page 4, |
| 2:01PM | 25 | that quoted section again appears at the very bottom of the |

2:01PM   1   page regarding the circumstances involving situations such as
2:01PM   2   acute bleeding and urgent surgery and measuring PT; correct?
2:01PM   3   A.    That's correct, it does.
2:01PM   4   Q.    Okay.  And regarding this information in the Health Canada
2:01PM   5   product monograph for Xarelto, the Canadian labeling, have you
2:01PM   6   ever suggested that that information that's being provided to
2:01PM   7   physicians in Canada was inaccurate -- was inaccurate?
2:01PM   8   A.    I missed that.  I'm sorry, about the inaccurate part.  Can
2:01PM   9   you repeat again?
2:02PM  10   Q.    Sure.  Have you ever suggested that this section in the
2:02PM  11   Health Canada label regarding using PT neoplastin in an urgent
2:02PM  12   surgery situation was somehow inaccurate in the guidance it
2:02PM  13   provides physicians?
2:02PM  14   A.    I don't -- I don't recall saying that, but again, if
2:02PM  15   you've got something to show, I'd be happy to look at it, but I
2:02PM  16   don't recall saying that.  I would probably have deferred it to
2:02PM  17   others.
2:02PM  18   Q.    All right.  I want to ask you about a statement just above
2:02PM  19   the "Monitoring and Laboratory Test Information" section.  It
2:02PM  20   starts with "however".  Do you see that?
2:02PM  21   A.    I do.
2:02PM  22   Q.    Okay.  And this sentence follows the paragraph that talked
2:02PM  23   about the linear correlation between PT and -- PT neoplastin
2:02PM  24   and plasma concentrations of Xarelto and says, "However, the
2:02PM  25   response of the PT varies both dependent on PT reagent, which

2466

| | |
|---|---|
| 2:03PM | 1 |
| 2:03PM | 2 |
| 2:03PM | 3 |
| 2:03PM | 4 |
| 2:03PM | 5 |
| 2:03PM | 6 |
| 2:03PM | 7 |

2:03PM  1   is not standardized, and coagulometer.  Thus, the PT cannot be

2:03PM  2   used to reliably measure the anticoagulant effect of Xarelto

2:03PM  3   since a normal PT may be found in patients with therapeutic

2:03PM  4   Xarelto levels if measured using selected machine/reagent

2:03PM  5   combinations."  Do you see that statement?

2:03PM  6   A.    I do.

2:03PM  7   Q.    Okay.  So this statement -- I want to make sure we're

2:03PM  8   clear about this statement.  This is not a statement that

2:03PM  9   appears in the Canadian labeling for Xarelto; correct?

2:03PM  10  A.    Without looking at the Canadian -- without looking at the

2:03PM  11  Canadian monograph, it's not there, but I -- without looking at

2:03PM  12  the Canadian monograph, I can't really tell you if it does or

2:03PM  13  doesn't.

2:03PM  14  Q.    I mean, unlike the language we see at the bottom of Page 4

2:03PM  15  in which it's indented and in quotes, this language does not

2:03PM  16  have quotes around it; correct?

2:03PM  17  A.    That is correct.

2:04PM  18  Q.    This is Bayer responding to Health Canada's request

2:04PM  19  regarding the use of measurement in a situation in which dose

2:04PM  20  adjustment might be used, sometimes called therapeutic drug

2:04PM  21  monitoring; correct?

2:04PM  22  A.    I'm sorry.  Could you repeat that again?

2:04PM  23  Q.    Sure.  This section, this statement, this is part of

2:04PM  24  Bayer's response to a request, a clarification request from

2:04PM  25  Health Canada that would -- that dealt with the use of

|        |    |
|--------|----|
| 2:04 PM | 1  | measurement of Xarelto levels in a situation in which a doctor |
| 2:04 PM | 2  | may want to adjust the dose of Xarelto; is that right? |
| 2:04 PM | 3  | A.   I don't know, but I'm looking at -- I don't know.  I'm |
| 2:04 PM | 4  | looking at the first -- at Page 1.  It -- there appears to be |
| 2:04 PM | 5  | some discussions on this, but I don't -- I really don't know |
| 2:04 PM | 6  | much about that.  I'm sorry. |
| 2:04 PM | 7  | Q.   All right.  That was the -- on Page 1 of 11 where Health |
| 2:04 PM | 8  | Canada said, "To optimize the benefit risk of novel oral |
| 2:05 PM | 9  | anticoagulant drugs, including that of Xarelto, we've |
| 2:05 PM | 10 | determined that updates to your product monograph may be |
| 2:05 PM | 11 | appropriate to advise prescribers of the need to determine the |
| 2:05 PM | 12 | steady-state anticoagulant effect of the drug at trough, |
| 2:05 PM | 13 | possibly followed by a dose adjustment."  Right? |
| 2:05 PM | 14 | A.   That's correct.  And that's -- yeah, that's correct. |
| 2:05 PM | 15 | Q.   Okay.  Now, this statement on the middle of Page 4 that |
| 2:05 PM | 16 | begins with "however," it doesn't say anywhere in that |
| 2:05 PM | 17 | statement that using PT neoplastin is not a reliable test; does |
| 2:05 PM | 18 | it? |
| 2:05 PM | 19 | A.   No, it doesn't. |
| 2:05 PM | 20 | Q.   In fact, it says that it cannot be used reliably if you |
| 2:05 PM | 21 | use select machine/reagent combinations; right? |
| 2:05 PM | 22 | A.   That's what it -- yeah, that's what it states in the -- in |
| 2:06 PM | 23 | the response. |
| 2:06 PM | 24 | Q.   And the Xarelto labeling in Canada specifically directs |
| 2:06 PM | 25 | doctors to the PT neoplastin test as being the sensitive |

2:06PM 1   reagent test; correct?

2:06PM 2   A.   That is correct.

2:06PM 3   Q.   Okay.  And then if we look at the top of Page 5, this

2:06PM 4   section goes on, and there's further information quoted from

2:06PM 5   the product monograph.  If you see that sentence that begins

2:06PM 6   with the word "additionally"?

2:06PM 7   A.   Correct.

2:06PM 8   Q.   And if we look at this section, Bayer's telling Health

2:06PM 9   Canada that there are other parts of the label that tell

2:06PM 10  doctors which tests not to use; correct?

2:06PM 11  A.   It's saying -- well, the first -- the first three appear

2:06PM 12  to be -- the first -- the first two appear to be correct.

2:06PM 13  Q.   Right.  It tells doctors that -- not to use INR; correct?

2:06PM 14  A.   That is correct.

2:07PM 15  Q.   It tells doctors not to use APTT or HepTests; correct?

2:07PM 16  A.   That is correct.  For the assessment of pharmacodynamic

2:07PM 17  effects, that's correct.

2:07PM 18  Q.   Okay.  And that information is in the Canadian label for

2:07PM 19  the drug, because knowing which tests to use and which tests

2:07PM 20  not to use is helpful information for the doctor; correct?

2:07PM 21  A.   I -- I don't know.  I'd say -- I'd have to go back to the

2:07PM 22  clinical team.  I'd say -- if you look at me -- I think if you

2:07PM 23  look at what we submitted in July 2008 and January 2011, that's

2:07PM 24  what -- we had some similar text in that.  We tried -- even

2:07PM 25  during the labeling negotiations, we tried to tell the agency

2:07PM 1    that INR should not be used.

2:07PM 2    Q.    I want to ask you about a statement on the next page,

2:07PM 3    Page 6.

2:07PM 4    A.    Okay.

2:07PM 5    Q.    Okay.  And it's the paragraph that says that -- it's

2:08PM 6    talking about the use of an anti-Factor Xa assay, and it says,

2:08PM 7    "It's important to note that a very limited number of

2:08PM 8    laboratories are able to run anti-Xa assays, and only some of

2:08PM 9    these laboratories are currently providing rivaroxaban levels.

2:08PM 10   Most laboratories do not have coagulometers, reagents or

2:08PM 11   technical skills required to run this assay."  Do you see that?

2:08PM 12   A.    I do.

2:08PM 13   Q.    Okay.  Now, there's a comment out to the side that says

2:08PM 14   TS13.  Do you see that?

2:08PM 15   A.    I do.

2:08PM 16   Q.    Now, do you know who Ted Spiro is?

2:08PM 17   A.    I do know Ted Spiro, Dr. Spiro.

2:08PM 18   Q.    Right.  And Dr. Spiro has testified in this trial by video

2:08PM 19   deposition, and he was a clinician at Bayer; correct?

2:08PM 20   A.    Dr. Spiro was a clinician at Bayer.

2:08PM 21   Q.    All right.  And he worked here in the United States;

2:09PM 22   correct?

2:09PM 23   A.    He -- yes, he -- yes, he did.  He was working here in the

2:09PM 24   United States, yes.

2:09PM 25   Q.    All right.  And Ted Spiro makes the comment in this draft

2:09PM   1   response and says, "I would delete this.  The Canadian labs

2:09PM   2   absolutely have the technical skills to run these assays.  The

2:09PM   3   laboraticians in Canada are excellent, well trained and highly

2:09PM   4   competent," exclamation point.  Do you see that?

2:09PM   5   **A.**   I do.

2:09PM   6   **Q.**   Okay.  Do you have any reason to believe that the

2:09PM   7   laboraticians here in New Orleans at health facilities like

2:09PM   8   Ochsner are not also excellent, well trained, and highly

2:09PM   9   competent?

2:09PM  10   **A.**   I am not qualified to think that.  I mean, that's Dr.

2:09PM  11   Spiro's opinion there.  I don't -- I'm not qualified to tell

2:09PM  12   you that, sir.  Sorry.

2:09PM  13   **Q.**   Okay.  Do you have any reason to believe that the

2:09PM  14   laboraticians that work at the Ochsner Health System here in

2:09PM  15   New Orleans are not skilled and well trained and can follow

2:10PM  16   instructions if provided by the company?

2:10PM  17   **A.**   Again, I would say to you -- I would assume everybody

2:10PM  18   should be if they're -- if they're in their current role, but

2:10PM  19   specifically, I -- I can't tell you more than that.  But in

2:10PM  20   general, I would say yes.

2:10PM  21   **Q.**   Okay.  If we can turn back to Page 2 of 11 in which the

2:10PM  22   quote from the Canadian label is provided by -- in this

2:10PM  23   response.  Do you have that?

2:10PM  24   **A.**   Page 2 of 11; right?

2:10PM  25   **Q.**   2 of 11, correct.

OFFICIAL TRANSCRIPT

2:10PM 1    **A.**   Okay.  Right.

2:10PM 2    **Q.**   Okay.  Now, I want you to look at that language that talks

2:10PM 3    about situations such as acute bleeding and urgent surgery and

2:10PM 4    the use of PT being useful to inform clinical decisions in

2:10PM 5    those circumstances.  Has Janssen ever attempted to add that

2:11PM 6    language regarding urgent surgery and the use of PT neoplastin

2:11PM 7    to the United States label for Xarelto?

2:11PM 8              **MR. IRWIN:**  I object.  This is going way beyond the

2:11PM 9    proffer, and I don't -- Counsel, how much longer are you going

2:11PM 10    to be on this proffer?

2:11PM 11              **MR. OVERHOLTZ:**  I don't think we're going to have too

2:11PM 12    much longer, but I --

2:11PM 13              **MR. IRWIN:**  Okay, because I'm going to start asking

2:11PM 14    the judge for a little help if it goes much longer.

2:11PM 15    **BY MR. OVERHOLTZ:**

2:11PM 16    **Q.**   Can you answer the question, Mr. Jalota?

2:11PM 17    **A.**   All right.  So since -- since November 2011, I don't --

2:11PM 18    any of the times that I've been involved in, I don't recall

2:11PM 19    that we ever submitted anything like that.

2:11PM 20    **Q.**   Okay.  Can we look back at your email, the PXT 191?  This

2:11PM 21    was the email from Miss Birkenberger to you on November 19th,

2:12PM 22    2014.  Do you have that?

2:12PM 23    **A.**   I do.

2:12PM 24    **Q.**   Okay.  I just want to ask you a couple of questions about

2:12PM 25    what she says to you.

|          |    |                                                                      |
|----------|----|----------------------------------------------------------------------|
| 2:12PM   | 1  | **A.**   Right.                                                       |
| 2:12PM   | 2  | **Q.**   She says "F.Y.I."  That's for your information; correct?     |
| 2:12PM   | 3  | **A.**   That is correct.                                            |
| 2:12PM   | 4  | **Q.**   Okay.  And she sent this email directly to you; correct?    |
| 2:12PM   | 5  | **A.**   That is correct.                                            |
| 2:12PM   | 6  | **Q.**   It wasn't sent to a group of people at Janssen or at        |
| 2:12PM   | 7  | Bayer.  She sent it directly to her boss, Sanjay Jalota;             |
| 2:12PM   | 8  | correct?                                                             |
| 2:12PM   | 9  | **A.**   Correct.  I mean, Purve and Christopher were copied in the  |
| 2:12PM   | 10 | original note, but she sent it to directly over to me.              |
| 2:12PM   | 11 | **Q.**   Right.  And she specifically says in this email "for        |
| 2:12PM   | 12 | appreciation of what's going on in Canada"; correct?                |
| 2:12PM   | 13 | **A.**   That's correct.                                            |
| 2:12PM   | 14 | **Q.**   And saying "for appreciation" means more than just saying   |
| 2:12PM   | 15 | "so you know"; right?                                                |
| 2:13PM   | 16 | **MR. IRWIN:**  Objection.  Speculation.  Argument.                  |
| 2:13PM   | 17 | **THE WITNESS:**  I don't know, sir.  I couldn't tell you            |
| 2:13PM   | 18 | what Dr. Birkenberger was telling me when she was sending me         |
| 2:13PM   | 19 | this note.  I read it as F.Y.I.  That's all.                        |
| 2:13PM   | 20 | **BY MR. OVERHOLTZ:**                                                |
| 2:13PM   | 21 | **Q.**   I mean, at this point in time, the company has regulatory   |
| 2:13PM   | 22 | responsibilities for Xarelto in the United States; correct?         |
| 2:13PM   | 23 | **A.**   That is correct, sir.                                      |
| 2:13PM   | 24 | **Q.**   And you're aware that the regulations that govern           |
| 2:13PM   | 25 | pharmaceutical companies in the United States have requirements      |

| | | |
|---|---|---|
| 2:13 PM | 1 | of the company if they have information related to helpful |
| 2:13 PM | 2 | laboratory tests that can be used to make the drug safer; |
| 2:13 PM | 3 | correct? |
| 2:13 PM | 4 | **A.**   Are you referring to Section 5 of the label? |
| 2:13 PM | 5 | **Q.**   Yeah, I'm specifically referring to the regulations |
| 2:13 PM | 6 | 201.57.  Are you familiar with those regulations? |
| 2:14 PM | 7 | **A.**   I do. |
| 2:14 PM | 8 | **Q.**   Okay.  And so you know that 201.57(c)(6) states that when |
| 2:14 PM | 9 | it comes to laboratory tests, that -- |
| 2:14 PM | 10 | **MR. IRWIN:**  Can we stop so I can go in to see the |
| 2:14 PM | 11 | judge, because we have a meeting right now regarding a message |
| 2:14 PM | 12 | from the jury, so I'd like to go in there.  Can we hold off? |
| 2:14 PM | 13 | **MR. OVERHOLTZ:**  Yeah, let's pause, please.  Thank |
| 2:14 PM | 14 | you.  We're going to take a pause.  We have a message. |
| 2:14 PM | 15 | **THE WITNESS:**  Okay. |
| 2:14 PM | 16 | **(Pause.)** |
| 2:23 PM | 17 | **MR. IRWIN:**  Yes, Julie. |
| 2:23 PM | 18 | **MR. OVERHOLTZ:**  You guys still set? |
| 2:23 PM | 19 | **MS. TERSIGNI:**  Okay.  Yes.  Sanjay just ran out real |
| 2:23 PM | 20 | quick.  He's coming back in now, though. |
| 2:23 PM | 21 | **MR. OVERHOLTZ:**  Okay. |
| 2:23 PM | 22 | **Ms. TERSIGNI:**  We're set here. |
| 2:23 PM | 23 | **MR. IRWIN:**  Thank you. |
| 2:23 PM | 24 | **MS. TERSIGNI:**  We're set and ready whenever you guys |
| 2:23 PM | 25 | are. |

2:23PM    1          **MR. OVERHOLTZ:** Okay. Great.

2:23PM    2    **BY MR. OVERHOLTZ:**

2:23PM    3    **Q.** Mr. Jalota, I was asking you about the regulation from the

2:24PM    4    201.57(c)(6), the "Monitoring and Laboratory Tests" section

2:24PM    5    dealing with what would go under the "Warnings and Precautions"

2:24PM    6    section of the label. You're familiar with that regulation;

2:24PM    7    correct?

2:24PM    8    **A.** I am.

2:24PM    9          **MR. IRWIN:** Are we talking about a US regulation?

2:24PM   10          **MR. OVERHOLTZ:** US Reg -- 21 CFR US.

2:24PM   11          **MR. IRWIN:** Good. Then I'm going to ask the judge to

2:24PM   12    come in and rule on that, because that has absolutely nothing

2:24PM   13    to do with this proffer. This is a deposition now.

2:24PM   14          **MR. OVERHOLTZ:** This would have been the proffer that

2:24PM   15    we would have presented had we been able to continue to

2:24PM   16    question Mr. Jalota about the questions about the documents in

2:24PM   17    Canada and whether or not those triggered regulatory

2:24PM   18    responsibilities here in the US.

2:24PM   19          **MR. IRWIN:** Which has nothing to do with this

2:24PM   20    document which is a response to Health Canada. So if you want

2:24PM   21    to ask that question, I would respectfully ask for a pause so

2:24PM   22    we can ask the judge to come in here, because I think it's now

2:24PM   23    turned into a deposition.

2:24PM   24          **MR. OVERHOLTZ:** We can take a pause and ask the judge

2:24PM   25    if you want to.

| | | |
|---|---|---|
| 2:24PM | 1 | **MR. IRWIN:** Okay. |
| 2:26PM | 2 | **(Pause.)** |
| 2:30PM | 3 | **MR. OVERHOLTZ:** Mr. Jalota, we're just seeing if we |
| 2:30PM | 4 | have any additional questions. |
| 2:30PM | 5 | **THE WITNESS:** Okay. Thank you. |
| 2:31PM | 6 | **MR. OVERHOLTZ:** That's all we have, Jim. |
| 2:31PM | 7 | **MR. IRWIN:** Thank you, Neil. This is Mr. Irwin, Jim |
| 2:31PM | 8 | Irwin, Mr. Jalota. I'm just going to make a couple of comments |
| 2:31PM | 9 | for the record and for the court reporter. |
| 2:31PM | 10 | On Page 1 of 11, I would respectfully direct the |
| 2:31PM | 11 | Court's attention under the "Executive Summary" to bullet point |
| 2:31PM | 12 | Number 2 that starts off, "There are no definitive data," et |
| 2:31PM | 13 | cetera. |
| 2:31PM | 14 | And then next, on Page 2 of 11, I would respectfully |
| 2:31PM | 15 | direct the Court's attention to the paragraph at the bottom |
| 2:31PM | 16 | beginning, "The sponsor would also like to emphasize." |
| 2:31PM | 17 | There are -- there is one bullet point under there |
| 2:31PM | 18 | that goes on to the next page, and it ends with the following |
| 2:31PM | 19 | sentence: "However, as clearly stated in the Xarelto product |
| 2:32PM | 20 | monograph, the INR is only calibrated and validated for VKA," |
| 2:32PM | 21 | et cetera. |
| 2:32PM | 22 | And those are my comments. Thank you very much. |
| 2:32PM | 23 | **MR. OVERHOLTZ:** Thank you, Mr. Jalota. |
| 2:32PM | 24 | **THE WITNESS:** Thank you. |
| 2:32PM | 25 | **MR. IRWIN:** That's it, Julie. Thank you. |

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 2:32PM | 1 | **MS. TERSIGNI:**  Thank you. |
| 2:32PM | 2 | **(Witness excused.)** |
| 2:32PM | 3 | **(Recess.)** |
| 3:40PM | 4 | **THE CASE MANAGER:**  All rise. |
| 3:40PM | 5 | (Whereupon the jury entered the courtroom.) |
| 3:40PM | 6 | **THE COURT:**  Okay.  Be seated, please.  The jury has |
| 3:41PM | 7 | returned. |
| 3:41PM | 8 | **THE CASE MANAGER:**  Let me get you back on here, |
| 3:41PM | 9 | Judge.  All right. |
| 3:41PM | 10 | **THE COURT:**  The jury has returned to the courtroom, |
| 3:41PM | 11 | the lawyers and the litigants are present.  Ladies and |
| 3:41PM | 12 | gentlemen have you reached a verdict? |
| 3:41PM | 13 | **THE FOREPERSON:**  Yes, Your Honor. |
| 3:41PM | 14 | **THE COURT:**  Would you please give the verdict to my |
| 3:41PM | 15 | courtroom deputy?  Would you please read the verdict? |
| 3:41PM | 16 | **THE CASE MANAGER:**  For MDL 2592, In Re Xarelto |
| 3:41PM | 17 | Products Liability Litigation regarding case number 15-3708, |
| 3:41PM | 18 | Joseph Orr, Jr. et al. versus Janssen Research, et al. |
| 3:41PM | 19 | As to question Number 1 of the jury verdict |
| 3:42PM | 20 | form, do you find by a preponderance of the evidence that |
| 3:42PM | 21 | Defendants failed to provide adequate warnings and instructions |
| 3:42PM | 22 | for the safe use of Xarelto to either or both of Mrs. Sharyn |
| 3:42PM | 23 | Orr's physicians?  As to A, Doctor Maurice St. Martin, the |
| 3:42PM | 24 | answer was no.  As to letter B, Doctor Cuong Bui, the answer |
| 3:42PM | 25 | was no. |

3:42PM 1          And this was signed by the jury foreperson on

3:42PM 2     June 12th, 2017.  Members of the jury, is that your verdict?

3:42PM 3              (All jurors indicating in the affirmative.)

3:42PM 4              **THE COURT:**  Does anybody wish the jury to be polled?

3:42PM 5              **MR. BIRCHFIELD:**  No, Your Honor.

3:42PM 6              **MS. WILKINSON:**  No, Your Honor.

3:42PM 7              **THE COURT:**  Okay.  Then jury, we'll make this a part

3:42PM 8     of the record, and the jury is discharged with the thanks of

3:42PM 9     the Court.

3:42PM 10              **THE CASE MANAGER:**  All rise.

3:42PM 11              (Whereupon the jury was excused from the courtroom.)

3:43PM 12              **THE COURT:**  Okay.  Court will stand in recess.

13

14                           **CERTIFICATE**

15

16          I, Tana J. Hess, CCR, FCRR, Official Court

17     Reporter for the United States District Court, Eastern District

18     of Louisiana, certify that the foregoing is a true and correct

19     transcript, to the best of my ability and understanding, from

20     the record of proceedings in the above-entitled matter.

21

22

23              Tana J. Hess, CCR, FCRR, RMR
                Official Court Reporter

24

25


                        OFFICIAL TRANSCRIPT