UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * | |
| ***Mingo v. Bayer Corp., et al.*** | * | JUDGE ELDON E. FALLON |
| **Case No. 2:15-cv-03469** | * | |
| | * | MAGISTRATE JUDGE NORTH |
| ***Henry v. Bayer Corp., et al.*** | * | |
| **Case No. 2:15-cv-0224** | * | |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

---

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' RENEWED JOINT *DAUBERT* MOTION
TO EXCLUDE EXPERT OPINIONS AND TESTIMONY
REGARDING UNAPPROVED DOSING AND MONITORING REGIMENS**

---

I.   **INTRODUCTION**

Plaintiffs respectfully submit the following response in opposition to Defendants' Renewed Joint *Daubert* Motion to Exclude Expert Opinions and Testimony Regarding Unapproved Dosing and Monitoring Regimens [Record No. 6740] ("Def. Motion"). Part of Defendants' motion renews arguments that have been raised, and rejected, many times throughout the course of this litigation, while the rest argues against the presentation of opinions that have not been, and will not be, offered at trial. As such, Defendants' motion should be denied in its entirety.

II.   **ARGUMENT**

A.   **There is Sufficient Evidence to Support Plaintiffs' Experts' Opinions that a Physician is Able to Evaluate a Xarelto-Treated Patient's Risk of Bleeding with Neoplastin PT.**

Defendants again have challenged Plaintiffs' experts' opinions that Neoplastin PT testing can be used after Xarelto treatment is initiated to assess a patient's risk of bleeding.

1

Defendants have addressed their arguments in only two paragraphs, essentially summarizing their general (and incorrect) position that this Neoplastin PT theory has never been tested and is not supported by scientific evidence or studies, and incorporating their past briefs by reference.[1] Plaintiffs will respond in similar fashion.

As addressed in detail in Plaintiffs' prior briefs and arguments, the opinions by Plaintiffs' experts about this type of Neoplastin PT testing are supported by Defendants' own clinical trial (ROCKET), Defendants' own scientists, the scientific and regulatory communities, government agencies, medical associations, and peer-reviewed publications. These briefs and arguments, and the materials cited therein, establish that exposure to Xarelto increases a patient's risk of bleeding, and that a physician can reliably evaluate a Xarelto patient's risk of bleeding with Neoplastin PT and thereby decide, along with the patient, whether to accept that risk. Plaintiffs incorporate the entirety of each of these briefs and arguments, as well as the exhibits to each of these briefs, into this memorandum as if they were set forth fully herein.[2]

---

[1] *See* Def. Motion, at 4-5. In so doing, Defendants again take quotes out of context. For example, Defendants suggest that Plaintiffs' Generic Expert, Dr. Phillip Cuculich, admitted to being unable to use PT results in practice, *see id.* at 5, when he instead said that while he could not "draw a line in the sand," he talks to patients in his practice about rethinking their anticoagulation strategies once their Neoplastin PT goes above 30, 35, 40. *See* Deposition of Phillip Cuculich, M.D., at 224:5-225:24 (attached to Def. Motion at Exhibit 9) [Record Doc. 6740-7]. Defendants also try again to place import on statements about what might or might not have happened if another anticoagulant had been taken, *see* Def. Motion at 5, but, again, this has no bearing on what actually did happen while Xarelto was being taken. *See, e.g.,* Plaintiffs' Memorandum in Support of Motion to Preclude Speculative Testimony from Seven Defense Experts About Potential Outcomes from Other Anticoagulants [Record Doc. 5517-1].

[2] These briefs and arguments include: (a) Plaintiffs' Response in Opposition to Defendants' Joint *Daubert* Motions to Exclude Expert Opinions and Testimony Regarding: (1) Unapproved Dosing and Monitoring Regimens; and (2) the Experts' 20-Second PT Cut-Off Guideline in the *Orr* and *Boudreaux* Cases ("Plaintiffs' Neoplastin PT *Daubert* Opposition Brief") [Record Doc. 5641]; (b) Plaintiffs' Response in Opposition to Defendants' Renewed Motion to Exclude Certain Dosing-Related Opinions of Dr. Smart MD, FACC, FACP in *Orr* [Record Doc. 6674]; (c) Oral Argument Transcript, 03/23/17, at 108:19-122:1 (attached as Exhibit 1); and (d) *Orr* Trial Transcript, 05/31/17, at 511:14-518:17 (attached as Exhibit 2).

**B.** **There is Sufficient Evidence to Support Plaintiffs' Experts' Opinions that a Physician is Able to Evaluate a Xarelto-Treated Patient's Risk of Bleeding with an Anti-Factor Xa Assay.**

As an initial matter, Defendants' *Daubert* motion with regard to the anti-Factor Xa assay, similar to its prior (and now renewed) *Daubert* motion with regard to Neoplastin PT testing, is an improper "umbrella" motion that purports to apply *Daubert* to particular topics, rather than to the testimony of individual experts. For the same reasons that were outlined in Plaintiffs' Neoplastin PT *Daubert* Opposition Brief,[3] such an approach is procedurally improper, and the motion should be denied on this basis alone.

As to the substance, Plaintiffs are pursuing only one claim (a design defect claim) with regard to the anti-Factor Xa assay. This claim alleges that Xarelto was unreasonably dangerous because it was developed and designed in the United States without an anti-Factor Xa assay to evaluate each patient's anticoagulation status, notwithstanding the fact that prior to placing Xarelto on the market in the United States: (1) Defendants used an anti-Factor Xa assay to evaluate each patient's anticoagulation status in their own Xarelto clinical studies; (2) the Bayer Defendants provided instructions on how to safely use anti-Factor Xa assays to assess a patient's exposure to Xarelto in their Canadian label for Xarelto; and (3) anti-Factor Xa assays were commercially available in Europe. Despite this, Defendants developed and designed Xarelto in the United States without the anti-Factor Xa assay for pure marketing reasons, due to their race to obtain market approval in the United States, and their desire to distinguish Xarelto from other anticoagulants as requiring "no blood monitoring."

Support for this claim was provided in prior briefs, as well as in exhibits attached to the prior briefs. These briefs, and the materials cited therein, establish that prior to placing Xarelto on

---

[3] *See* Plaintiffs' Neoplastin PT *Daubert* Opposition Brief [Record Doc. 5641], at 7-10.

the market in the United States, Defendants also could have developed and designed an anti-Factor Xa assay to be placed on the market in the United States at the same time, similar to what had been done abroad, so the anti-Factor Xa assay would have been available for physicians to evaluate each patient's anticoagulation status. Defendants, however, chose not to do so, solely for marketing reasons. Plaintiffs incorporate the entirety of each of these briefs, as well as the exhibits to each of these briefs, into this memorandum as if they were set forth fully herein.[4]

Defendants appear to make only one argument against allowing expert testimony related to this claim: the fact that no anti-Factor Xa assay has been approved in the United States to measure Xarelto concentrations.[5] The two cases cited for alleged support of this argument, however, say only that an expert cannot propose an alternative design that had never been tested or subjected to any peer review whatsoever, and is not otherwise supported by a scientifically valid methodology.[6] The cited cases say nothing to support Defendants' argument that an expert cannot propose an alternative design that had been approved, and was, in fact, being used, in foreign

---

[4] These briefs include: (a) Plaintiffs' Response in Opposition to Defendants' Joint Motion for Summary Judgment as to Plaintiffs' Design-Defect Claims Under the Louisiana Product Liability Act [Record Doc. 5606]; and (b) Plaintiffs' Response in Opposition to Defendants' Joint Motion for Partial Summary Judgment on the Ground that Federal Law Preempts Plaintiffs' Dosing, Monitoring, and Other Design Defect Claims [Record Doc. 5652], at 3-12, 29-30.

[5] *See* Def. Motion, at 6.

[6] *See In re Propulsid Prods. Liab. Litig.,* 261 F. Supp. 2d 603, 615-16 (E.D. La. 2003); *In re Bextra & Celebrex Mktg. Sales Practices & Prod. Liab. Litig.,* 524 F. Supp. 2d 1166, 1181 (N.D. Cal. 2007). To the extent Defendants may have intended the cases cited on the following page of its brief to likewise support this point, Plaintiffs state that those cases are equally inapplicable for similar reasons. *See Hathaway v. Bazany,* 507 F.3d 312, 318-19 (5th Cir. 2007) (no training or scientific methods supported the expert's reconstruction-type opinion); *Watkins v. Telsmith, Inc.,* 121 F.3d 984, 992-93 (5th Cir. 1997) (no alternative product design had been tested or assessed through a scientific approach); *Winters v. Fru-Con Inc.,* 498 F.3d 734, 743 (7th Cir. 2007) (same); *Guy v. Crown Equip. Corp.,* 394 F.3d 320, 326-27 (5th Cir. 2004) (same, plus no specifics about the alternative design had been presented); *Pipitone v. Biomatrix, Inc.,* 288 F.3d 239, 245 (5th Cir. 2002) (expert admitted his conclusion was not supported by scientific evidence, and was not more likely than other conclusions to be correct); *United States v. Hoang,* 891 F. Supp. 2d 1355, 1358-1362 (M.D. Ga. 2012) (most opinions were within the ken of ordinary laymen, plus they were vague and presented only in terms of "possibilities").

countries, simply because the approval had not yet been extended to the United States. The latter, and not the former, situation is what exists in the present case.

Regardless, Defendants' argument is much ado about nothing since the Mississippi Products Liability Act requires only the existence of a "feasible design alternative that would have to a reasonable probability prevented the harm."[7] It does not require the existence of a feasible design alternative that had been submitted, and approved, for use in the United States before the subject product was approved for use in the United States. Indeed, if that were the requirement, no design defect claim could ever be pursued, because the plaintiff would have avoided harm by using the alternatively-designed product. In any event, this sole argument goes to the viability of the claim itself, and not to the reliability of the opinions of Plaintiffs' experts.

### C.    All Remaining Opinions that Defendants Seek to Exclude Have Not, and Will Not, be Presented at Trial.

 Defendants' remaining arguments are made in support of the exclusion of expert opinions that will not be offered. These include opinions that: (1) Xarelto patients should be monitored on a routine warfarin-like basis with Neoplastin PT tests and/or anti-Factor Xa assays; (2) Xarelto patients should have their doses titrated based on such routine warfarin-like monitoring; (3) Xarelto patients should be dosed twice-daily rather than once-daily as approved by the FDA; (4) Xarelto patients should be provided unspecified doses that are lower than the FDA-approved doses.[8]

Because Defendants continue to misstate Plaintiffs' experts' dosing opinions, Plaintiffs will clarify the position one additional time. Defendants' clinical studies have shown that patients taking Xarelto, whether on a once-daily or twice-daily regimen, have clinically

---

[7] *See* Miss. Code Ann. § 11-1-63(f)(ii).

[8] *See* Def. Motion, at 1-3, 6-11.

significant inter-patient variability in the way Xarelto is absorbed, distributed, metabolized, and/or eliminated. As a result, it is not possible to reliably predict a patient's exposure to Xarelto based solely on the dose administered, so certain patients may be exposed to higher Xarelto blood levels, leaving them at a higher risk of bleeding. Additionally, because Defendants initially designed Xarelto to be taken once-daily for all non-DVT patients, rather than twice-daily as is standard with most other NOACs (Pradaxa and Eliquis), it requires a higher dose to maintain sufficient anticoagulation over a 24-hour cycle.[9]

These characteristics, individually and combined, make Xarelto unreasonably dangerous without a screening test. If Xarelto were accompanied with an anti-Factor Xa assay, physicians could test at initiation to identify patients at a high risk of bleeding, and allow physicians and patients to avoid the risk of bleeding by discontinuing the use of Xarelto. This failure (along with the failure to design a reversal agent) is the crux of the design defect claim.

While some experts have criticized the dose levels and/or the once-daily dosing regimen,[10] it is not to argue that Defendants should have ignored the bounds of FDA approval for Xarelto and marketed the drug at different dosing levels and different dosing schedule. Plaintiffs' experts' observations instead are intended to highlight the pharmacological profile and controversy surrounding the choice of the dose and dosing regimen to support their opinions

---

[9] This dosing opinion applies only to Mr. Henry, who was on a once-daily regimen in connection with his atrial fibrillation. It does not apply to Ms. Mingo, because she was on a twice-daily regimen to treat a DVT.

[10] These criticisms of the dose levels and/or the once-daily dosing regimen were supported by the FDA. *See, e.g.,* FDA Summary Review, at 3 (attached as Exhibit 21 to Plaintiffs' Neoplastin PT *Daubert* Opposition Brief) [Record Doc. 5641-21] ("There was no rational basis for the applicant's choice of the dose tested in ROCKET, 20mg once a day. The pharmacokinetic/pharmacodynamic properties of rivaroxaban suggest the drug should be administered twice a day."); FDA CDER Transcript, at 287:15-18, quoting Dr. Steve Nissen (attached as Exhibit 48 to Plaintiffs' Neoplastin PT *Daubert* Opposition Brief) [Record Doc. 5641-48] ("[M]y concern was that the dose was selected more for a marketing advantage rather than for the scientific data that was available, and that was a mistake."). These dosing opinions, however, apply only to Mr. Henry's case, and not to Ms. Mingo's case, as noted in footnote 9.

with regard to the need to evaluate the risk of bleeding in the Xarelto-treated population. It is **because** Xarelto exhibits a clinically significant variability of concentration between patients taking the same dose, and/or **because** Xarelto is not taken twice-daily by non-DVT patients (as most other NOACs), and/or **because** the Xarelto once-daily dose potentially is too high,[11] and/or **because** of the total daily dose experienced by DVT patients is even higher, that Xarelto needs a screening-type blood test to identify high-risk patients. Plaintiffs have not waived these arguments. They instead have raised them, time and again, while Defendants have attempted to contort and misstate them, time and again.[12]

## III.   CONCLUSION

For the reasons set forth above, this Court should deny Defendants' motion.

Dated: July 7, 2017                                  Respectfully submitted,

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Email: ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
**GAINSBURGH BENJAMIN DAVID MEUNIER
& WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
Email: gmeunier@gainsben.com

***Plaintiffs' Liaison Counsel***

---

[11] The once-daily dosing part of this opinion applies only to Mr. Henry's case, and the twice-daily dosing part of this opinion applies only to Ms. Mingo's case, as noted in footnotes 9 and 10. The overall concept, however, still applies to both cases, because the variability alone creates a need for a screening-type blood test to identify high-risk patients.

[12] *See infra* footnotes 2 and 4.

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on July 7, 2017, the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre- Trial Order No. 17.

*/s/ Leonard A. Davis*
**LEONARD A. DAVIS**