# EXHIBIT 1

```
                    UNITED STATES DISTRICT COURT

                    EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO (RIVAROXABAN)  *        14-MD-2592
PRODUCTS LIABILITY LITIGATION  *
                               *        Section L
                               *
Relates to:  All Cases         *        March 23, 2017
                               *
* * * * * * * * * * * * * * * *


                       ORAL ARGUMENT BEFORE
                 THE HONORABLE ELDON E. FALLON
                 UNITED STATES DISTRICT JUDGE


Appearances:


For the Plaintiffs:         Levin Papantonio Thomas Mitchell
                              Rafferty & Proctor, P.A.
                            BY:  BRIAN H. BARR, ESQ.
                            316 South Baylen Street, Suite 600
                            Pensacola, Florida 32502


For the Plaintiffs:         Levin Sedran & Berman
                            BY:  FREDERICK S. LONGER, ESQ.
                            510 Walnut Street, Suite 500
                            Philadelphia, Pennsylvania 19106


For the Plaintiffs:         Schlichter Bogard & Denton, LLP
                            BY:  ROGER DENTON, ESQ.
                            100 S. Fourth Street, Suite 1200
                            St. Louis, Missouri 63102


For the Plaintiffs:         The Lambert Firm
                            BY:  EMILY C. JEFFCOTT, ESQ.
                            701 Magazine Street
                            New Orleans, Louisiana 70130
```

Appearances:

| | |
|---|---|
| For the Defendants: | Irwin Fritchie Urquhart<br>   & Moore, LLC<br>BY:   JAMES B. IRWIN, ESQ.<br>400 Poydras Street, Suite 2700<br>New Orleans, Louisiana 70130 |
| For the Defendants: | Bradley Arant Boult Cummings, LLP<br>BY:   KEVIN C. NEWSOM, ESQ.<br>1819 5th Avenue N<br>Birmingham, Alabama 35203 |
| For the Defendants: | Drinker Biddle & Reath, LLP<br>BY:   RODNEY M. HUDSON, ESQ.<br>50 Fremont Street, 20th Floor<br>San Francisco, California 94105 |
| For the Defendants: | Drinker Biddle & Reath, LLP<br>BY:   SUSAN M. SHARKO, ESQ.<br>600 Campus Drive<br>Florham Park, New Jersey 07932 |
| For the Defendants: | Barrasso Usdin Kupperman<br>   Freeman & Sarver, LLC<br>BY:   RICHARD E. SARVER, ESQ.<br>909 Poydras Street, Suite 2400<br>New Orleans, Louisiana 70112 |
| Official Court Reporter: | Toni Doyle Tusa, CCR, FCRR<br>500 Poydras Street, Room B-275<br>New Orleans, Louisiana 70130<br>(504) 589-7778 |

Proceedings recorded by mechanical stenography using computer-aided transcription software.

12:08

1       Instructions on testing and what to do with a
2  test result need to be grounded in science.  As the
3  Eleventh Circuit said, hypotheses are verified by testing, not
4  submitting them to a lay jury for a vote.
5       As Your Honor said and as the Seventh Circuit
6  has said, the courtroom is not the place for scientific
7  guesswork, even of the inspired sort.  Law lags science; it
8  does not meet it.
9       **THE COURT:**  Before you leave, they take the position
10 this is not appropriate under *Daubert*, that it's not a *Daubert*
11 issue, it's something else.  How do you see that?
12      **MS. SHARKO:**  I don't understand that position at all.
13 This is scientific evidence.  They want the jury to decide what
14 should happen to a patient when they are taking a medicine,
15 what tests should be employed, and how those results should be
16 interpreted.  That's science, and science means *Daubert*.
17      **THE COURT:**  Okay.  Let me hear from your opponent.
18      **MS. SHARKO:**  Thank you.
19      **MR. DENTON:**  Good afternoon, Your Honor.  I'll try to
20 be brief.  Roger Denton on behalf of plaintiffs.
21      As you said earlier this morning, it's like two
22 ships passing in the night.  We are still there, Your Honor.
23 They have in this argument actually reframed even what they put
24 in their papers.
25      I want to restate as clearly as I can what our

12:10

1  case is. Every anticoagulant on the market at the time Xarelto
2  was approved had some laboratory test available for the
3  physicians to assess the effect. Why? Because not enough of
4  an anticoagulant leaves you exposed to stroke in this
5  indication; too much causes you to bleed or be exposed to
6  risks. They do it for warfarin. They do it for heparins.
7  They do it for Lovenox.
8              This idea that we are talking about regular
9  monitoring -- all those quotes from those experts that
10 Ms. Sharko just referred to are related to monitoring,
11 warfarin-like monitoring, which is every three or four weeks,
12 and you adjust dose forever.
13             We are not saying that, Judge. We are saying
14 basically one test at initiation or maybe once every year
15 thereafter, or if there's a clinical change in the condition,
16 you test to see where the patient is at, and you make a
17 decision -- in the United States not to adjust dose, but to
18 make a decision on the risk/benefit. Is the risk of bleeding
19 too high for the stroke benefit?
20             Mr. Boudreaux, for example -- and Mr. Barr will
21 get into it in his specific case -- once he had his GI bleed on
22 Xarelto, he still had AFib, and the doctors made the decision
23 that the risk was too high to continue him on an anticoagulant,
24 and he went 15 months without any. So this idea that anybody
25 has to be on an anticoagulant if they have AFib is just wrong.

12:11

**THE COURT:** But they take the position that the PT test doesn't tell anything about Xarelto; that Xarelto targets the factor X, and the test evaluates II, III, IV, and X or whatever.

**MR. DENTON:** Well, if that's true, Your Honor, then Bayer is telling every regulatory agency in the world just the opposite. They also told -- Janssen also told the FDA the opposite.

Let's move on to some of these slides. Let's go to Slide 11, if you could, please. This gets into -- one more, please. So this -- first of all, you have to understand, Judge, why we say this really isn't *Daubert*. They didn't challenge any particular expert opinion. They didn't go through a methodology issue. They don't challenge methodology. They don't challenge expertise. All the experts rely on the same data. What do our experts rely on? The clinical trial data, the ROCKET data, the same data that the FDA looked at.

To answer your specific question about PT, let's not forget, in every clinical trial Bayer used PT to assess the effect, ROCKET and in their Phase II trials.

Next slide, please. So what we have, the FDA looked at this data on PD relationship, which they are referring to the PT test, and they asked four questions. Let's look at the answers to the FDA's evaluation of whether or not PT can measure Xarelto effects.

12:13      1                  Next slide, please.  They ask this very
           2   question, the FDA, reviewing the ROCKET data:  Can PT be used
           3   as a surrogate marker for PK?  The answer is yes.  There is a
           4   correlation between plasma concentrations and PT.  When they
           5   say PT here, it's Neoplastin PT because that is what was done
           6   and what was used in all of their studies.
           7                  The important slide is the next slide.  The next
           8   question:  "Is there a PT-bleeding relationship?"
           9                  The FDA's answer is:  "PT data from 7,008
          10   patients in ROCKET" -- that's all the Xarelto patients --
          11   "demonstrates that the risk of major bleeds increases with PT."
          12                  The FDA is analyzing this data.  But it's not
          13   just FDA -- and let's look at what the chart shows.
          14                  Next page.  Ms. Sharko points out, well, we
          15   don't know what a PT time means on the rate of bleeding.  Well,
          16   look at this chart, Your Honor.  PT is on the X axis.  As PT
          17   goes up from 6 all the way out to about 26, it's increasing, as
          18   you see.  The bleeding risk on the Y axis goes up all the way
          19   up to 8.  What you see is the line goes up like this,
          20   Your Honor.  So what that means is we know if you have a PT of
          21   20 seconds, you're going to have a bleeding risk of about 5.
          22                  That's what clinical physicians do when they
          23   deal with making these decisions.  So the idea to say there's
          24   no data to tell us what 20 seconds or any PT time means in
          25   bleed risk is just flat not accurate.  Their own data, the

12:15  1  ROCKET data, shows that, Your Honor.
       2              Let's go to the final -- next slide, please.
       3  This is -- the next slide, please.  This is an important
       4  document, Your Honor.  This is the summary review.  This is the
       5  FDA looking at the ROCKET data in November of 2011, at the time
       6  of approval.  Let's see what they say, looking at their data.
       7  They talk about the prothrombin time.  This demonstrates there
       8  is a correlation between PT and risk of bleeding.
       9              "This applicant has chosen not to utilize this
      10  information."  In other words, they are not putting it in the
      11  label.  They have chosen not to tell the doctors to do it.
      12              The FDA also goes down here at the bottom,
      13  highlighted:  "However, infrequent monitoring (perhaps at
      14  initiation and yearly thereafter) to assure appropriate dosing
      15  of drugs that prevent stroke and causes bleeding may improve
      16  outcomes and be acceptable to the patients."
      17              That's our theory of the case.  The FDA said it
      18  in November of 2011.  All of our experts have said it.  The
      19  defendants have known that from the beginning.  They somehow
      20  wanted to act like they don't know what we are talking about.
      21              Let's move forward to the Janssen analysis.
      22  Janssen also did an analysis, their own analysis separate from
      23  the FDA, on the PT bleed risk, of documents out of ROCKET.  So
      24  Janssen does their own and submits it to the FDA.  Let's see
      25  what that shows.

12:17

                    Next slide, please.  This is Janssen's crunching
of their own numbers from ROCKET with PT and major bleeds.  So
these are the quartile analysis.  These are PT levels,
Your Honor, Neoplastin PTs.  As those go up in the quartile
analysis, you can see the percent of major bleeding goes up.
Not only does it go up, which is consistent with our theory of
the case and what the FDA says, we know exactly what the rate
is.  This is Janssen's own assessment, their experts looking at
the same data as our experts, drawing the same conclusions.
                    Now, next slide, please.  FDA told -- or Janssen
told FDA that they didn't think that this data they looked at
supported the PT evaluation, but -- next slide -- as we will
see, Troy Sarich, one of the top Xarelto physicians [sic] at
Janssen, was asked this question about these documents.  This
is important (as read):
          "**QUESTION:**  So at the end of the day, the FDA and
     Janssen didn't reach an agreement on the relationship
     between PT and bleed risk?
          "**ANSWER:**  That's correct."
                    So at the end of the day, the FDA was of the
opinion that there was a correlation between PT and bleed risk,
and he obviously has to admit that.
                    So the point here, why this really isn't
*Daubert* -- they cite to your *Vioxx* order where you referred to
these *Daubert*-like motions.  One of them was -- there was a

12:18

1 dispute in that case whether long-term use was necessary to
2 increase cardiovascular risk, the short-term risk. What you
3 said was, very clearly, everybody is looking at the same data.
4 Everybody is qualified. They are coming to different
5 conclusions. That's not the gatekeeper role. That's what's
6 going on here.
7 More importantly -- next slide, please --
8 Bayer -- this is Dr. Berkowitz. This is the head guy from
9 Bayer on Xarelto. He was asked in his deposition (as read):
10 **"QUESTION:** But they do establish, you note, that PT
11 is predictive of bleeding risk?"
12 What did he say?
13 **"ANSWER:** Yeah."
14 Mr. Barr was talking to him about it all
15 morning, that PT is predictive of bleeding, which is something
16 we have said over and over the last couple hours. So Bayer
17 agrees with plaintiffs' theory of the case.
18 Some of these other things Ms. Sharko brought up
19 I think I have answered, Your Honor.
20 Let's go to Slide 24, I think it is. She said
21 in addition to the data I have showed you -- one back, please.
22 One more forward. I'm sorry. Dr. Rinder. One more forward.
23 There he is.
24 She said there's no opinion as to what the
25 clinical significance is. Dr. Rinder, a hematologist from

Yale, he spoke at Science Day. He says very clearly in his opinion, looking at the same data the Bayer and Janssen experts are looking at, that Xarelto therapy should be discontinued with a PT of greater than 20 seconds as measured with the appropriate reagent, Neoplastin, at an appropriate time, to avoid excessive risk of major bleeding. So there is evidence to support this. It's not just our experts.

Next slide, please. International labels say this -- Bayer's labels, by the way: Prothrombin time is influenced by a dose-dependent manner with Neoplastin. In cases of excessive doses, the PT is expected to be outside of the range.

They say the same thing in Health Canada: Prothrombin time. Neoplastin reagent. Measuring the PT using the Neoplastin reagent may be useful. Remember that. That's what the U.S. regulatory requirement is, that this test is useful to determine the excess of anticoagulant activity.

So you have got a situation where they are arguing in here completely different than what they say in their label. But it's not just them. They say there's no professional societies that support our theory of the case.

Next slide, please. Actually, they are wrong about that, Your Honor. We put this in our response, and they didn't deal with it in the reply. They didn't deal with it here today in the argument. There are societies. PT is a

12:21

useful and available method to determine the degree of
anticoagulant effect.

International Society on Thrombosis:  PT is
useful and readily available.

**THE COURT:**  Was this a question of fact?  You're
telling me they say one thing and you say another?

**MR. DENTON:**  What I'm basically saying, Your Honor,
is what you said in *Vioxx*, you've got it, that we are all
looking at the same data.  We are crunching the same data.
Everybody is qualified.  Everybody is using the same
methodology.  They are coming to different conclusions.  That
is not a proper -- if they submit that as a *Daubert* kind of
issue-type argument, you have been very clear -- of the six
such arguments made in *Vioxx*, you denied every one on both
sides.  You essentially said that if you have qualified experts
looking at the same data, making evaluations in the same way,
and simply drawing different conclusions, then you can't keep
it away from the jury.

Here we have the FDA supporting us.  Plaintiffs'
experts support us.  Peer-reviewed literature supports us.
Practice societies support us.  Bayer's labeling in other parts
of the world support us.  Really, the only persons that tend to
disagree are Janssen.  Janssen and Bayer are kind of on two
different alternative universes on PT Neoplastin as well.

Then the other thing -- I do have to show you

12:22    1  this.  This is a Janssen document, although it's marked
         2  confidential.
         3              Can you go to Slide 30, please.  There you go.
         4              They produced this to us, a document that
         5  apparently is available -- if a doctor asks for it, they will
         6  mail it to them -- on whether or not PT can be used as an
         7  appropriate coagulation test.  Janssen tells them -- not in the
         8  labeling, by the way -- there that, yes, you can use
         9  Neoplastin PT.
        10              There's also this discussion, well, how do we
        11  know that Mr. -- well, there's one other point I want to make,
        12  and then I will move on to Mrs. Orr and Mr. Boudreaux.  This is
        13  important, Your Honor.
        14              Let's go to the peer-review slide.
        15  Defendants -- think about this -- have not cited a single
        16  peer-reviewed article that states that Neoplastin PT cannot be
        17  used to evaluate bleed risk in a Xarelto-treated patient.  If
        18  anybody is coming up with testimony solely for litigation, it's
        19  the defendants, because their own data supports our theory of
        20  the case.  There's not a single article they have cited and can
        21  cite to that supports their position.  Even if they did, it
        22  would still be a question of a battling of experts on the same
        23  data for the jury to decide.
        24              There's also this discussion -- which I don't
        25  understand, since they have used it in all their clinical

12:24

1  trials and have said in their clinical trials, Dr. Kubitza and
2  Mr. Mueck, their head pharmacology people at Bayer, that you
3  can use Neoplastin PT to assess the fact.  They published that
4  as early as 2005.  So this idea that PT isn't approved to test
5  is just again not accurate.
6           Let's go to the slide with Dr. Kessler's
7  testimony on that very issue, because they ask him about that.
8           Now, we have Dr. Kessler, former commissioner of
9  the FDA, as our expert.  He was appointed by two different
10 presidents, the first Bush and President Clinton.  He was with
11 the FDA a long time.
12          They were asking about this guidance document in
13 some of the testimony you've heard here today.  What did he
14 say?  "Neoplastin is available to measure PT.  It is approved
15 to assess bleeding risks and can monitor bleeding risks."  So I
16 don't understand their argument at all.  They are just wrong.
17          There's one other thing.  They said our experts
18 haven't changed their prescribing practices.  We didn't hear
19 that from Ms. Sharko, I guess, because they realized they were
20 wrong.
21          Dr. Smart, chief of cardiology right here at
22 LSU, plaintiffs' expert, has very clearly said in reviewing
23 these materials, in treating patients, "I have completely
24 abandoned the use of Xarelto . . . I continue to advise my
25 students and residents and other physicians" -- it goes on to

12:26   1   say -- "not to use Xarelto in the AFib indication."
        2           So moving on now, they briefly mentioned
        3   Mr. Boudreaux and Mrs. Orr, well, you can't prove anything
        4   because they didn't have a Neoplastin PT before their event.
        5   Well, first of all, the label doesn't tell the doctors to do
        6   the test.  So of course these patients didn't have that test.
        7   In fact, you will hear from Dr. Wong and Dr. St. Martin they
        8   didn't know a test was available.  So the plaintiffs are not
        9   going to have a test before the bleed.
       10           Next slide, please.  What we do know -- keep
       11   going, please -- is that these patients had a major bleeding
       12   event on Xarelto.  We know from their own data that as PT goes
       13   up, bleeding risk goes up.  It is more likely than not both of
       14   these patients, if they would have been evaluated, would have
       15   had an elevated PT.  As the Court mentioned earlier, we also
       16   know that reduced kidney function increases Xarelto exposure.
       17   Mrs. Orr had severe kidney dysfunction and likely to have a
       18   higher, elevated PT.
       19           **THE COURT:**  She says that the PT tests were normal or
       20   not problematic, at least, in one of them.
       21           **MR. DENTON:**  Let me explain that, Your Honor.  This
       22   is where this combination of patchwork of quotes and confusion
       23   and, frankly, scientifically inaccurate arguments are that I
       24   have to clear up.  Every reagent for PT will give you a
       25   different result.

12:27

```
 1                  Go to the last slide.  This will be the last
 2   slide.  Keep going all the way to my last slide.  There you go.
 3                  This is the Douxfils article.  What this expert
 4   did and published -- peer-reviewed, and it's in all of our
 5   reports.  What he did, Your Honor, he took samples of blood and
 6   put known quantities of rivaroxaban in it and used different
 7   level -- used these different reagents.  Okay.  What you found
 8   is -- this is the PT time over here.  This is the
 9   concentration.  It's what you find -- I'm sorry this isn't
10   blown up, but it's in our brief.  As you see these different
11   reagents up here, Your Honor, with PT you are going to get a
12   different slope and a different absolute number.  Okay.
13                  So an Innovin PT of 13.6 is not the same as a
14   Neoplastin of greater than 20.  Mr. Boudreaux, in the emergency
15   room at least 12 hours after his last dose and maybe 36 hours
16   after his last dose -- there's some factual dispute there -- he
17   still has an Innovin PT of 13.6.  When you look at this -- you
18   can't see it here, but what Dr. Rinder did in his deposition --
19   when you just read this chart and you go to an Innovin of 13.6,
20   you can see he is way over 20 on the Neoplastin PT.
21                  So it's not some calculation or some magical
22   mystery here.  You look at a peer-reviewed article that shows
23   the variations.  So for them to come in and say that
24   Mr. Boudreaux only had a 13.6 PT, you have got to say it wasn't
25   Neoplastin; it was Innovin.  Innovin 13.6 is still highly
```

12:29

elevated, as the evidence shows, outside of the reference range way after his last dose, which clearly shows he had an elevated anticoagulant effect by Xarelto and would have clearly had an over-20 PT.  We have direct evidence in his case.

As to Mrs. Orr, let's not forget, in the emergency room a normal PT was what she should have had.  She hadn't taken the dose probably for 36 hours.  It's a tragic case.  She'd been taking Xarelto.  She goes to dinner right over here at Ruth's Chris, has a horrible headache, goes home thinking she is going to be sick.  She doesn't even finish her meal.  She goes home, has a headache.  Her family is called after several hours.  She's vomiting, becomes comatose, goes to the hospital, and she has a massive brain hemorrhage.  Very tragic.

They do a PT Innovin at the time and find out it's normal.  Well, if that would have been in the label and told these doctors that that means Xarelto is no longer on board -- a normal Innovin would tell them at least it's not on board, and they could have done immediate surgery.  But they couldn't.  Why?  Because the label says wait 24 hours because there's no way to test.  That's what happened in the 12-hour delay, a tragic consequence.  She suffered for 10 days with her family before she ultimately passed away.  The point there is that PT should have been low.  It shouldn't have been over 20.

So with that, Your Honor, I will finish, unless

12:31 1 there's any particular questions.
2 **THE COURT:** No. Thank you.
3 **MR. DENTON:** Thank you.
4 **MS. SHARKO:** The documents that Mr. Denton refers to,
5 the things that he showed the Court, those relate to the
6 conclusion that there's a rough linear correlation between the
7 PT test result and the concentration of the medicine. There is
8 and remains no evidence, no sound scientific evidence from
9 which you can make scientific conclusions about how to assess
10 risk and treat patients based on a PT lab value.
11 **THE COURT:** Do you feel that there's some evidence
12 that he puts up that supports the view that certain PT tests
13 can show levels of Xarelto in the body?
14 **MS. SHARKO:** No. The best that can be said is that
15 there is a rough correlation, but the PT tests could be
16 elevated for any number of reasons.
17 This is in the medical literature. There's a
18 recent study from Italy of 635 patients. I know the plaintiffs
19 are aware of it. I'm happy to supply Your Honor with a copy of
20 it. They look at these issues, and they conclude the use of PT
21 or aPT in clinical practice to evaluate NOAC anticoagulant
22 activity could cause dangerous misinterpretations. Why?
23 Because we don't have the science. We don't have the science.
24 It should be inadmissible.
25 **THE COURT:** Let's stop here and come back in an hour

```
03:14    1  PowerPoints?
         2         THE COURT:  Yes, that would be helpful, actually, if
         3  you all can give me that.
         4         MR. BARR:  I think I owe some labels and things that
         5  I talked about.  We will get those to you as well.
         6         (Proceedings adjourned.)
         7                            * * *
```

## CERTIFICATE

I, Toni Doyle Tusa, CCR, FCRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of proceedings in the above-entitled matter.

*s/ Toni Doyle Tusa*
Toni Doyle Tusa, CCR, FCRR
Official Court Reporter