## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO: | JUDGE ELDON E. FALLON |
| Dora Mingo et al. v. Janssen et al. Case No. 2:15-cv-03469 | MAGISTRATE NORTH |
| William Henry v. Janssen et al. Case No. 2:15-cv-00224 | |

### DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION TO PRECLUDE SPECULATIVE TESTIMONY FROM SEVEN DEFENSE EXPERTS ABOUT POTENTIAL OUTCOMES FROM OTHER ANTICOAGULANTS

Defendants hereby respond to Plaintiffs' Motion to Preclude Speculative Testimony From Seven Different Defense Experts About Potential Outcomes From Other Anticoagulants [Dkt. 5517], which applies to both the third (*Mingo*) and fourth (*Henry*) bellwether trials.

This Court previously denied two nearly identical motions filed by Plaintiffs to challenge similar opinions from Defendants' experts in the *Boudreaux* and *Orr* cases.  *See* Order & Reasons (Apr. 13, 2017) (Dkt. 6198).  In denying those motions, the Court held that Defendants' experts' testimony about Plaintiffs' potential outcomes if they had used another anticoagulant medicine is both relevant and "admissible on <u>rebuttal</u> of Plaintiffs' defective design theory," and that it "goes toward Defendants' theory that Xarelto was an appropriate drug for Plaintiffs to take." *Id.* at 11-13.  The Court further held that Defendants' experts' opinions were properly "based on [the experts'] experience and training . . . [and] based on proper methodology," and noted that "[a]t trial, Plaintiffs may cross-examine these witnesses as to the validity of their conclusions, but excluding their testimony at this stage would be improper."  *Id.*

The same is true here.  Just like under the Louisiana law that applied in *Boudreaux* and *Orr*, the Mississippi Products Liability Act ("MPLA") and the Texas Products Liability Act ("TPLA")—which apply in the *Mingo* and *Henry* cases, respectively—require Plaintiffs to prove the existence of "a feasible design alternative that would have to a reasonable probability prevented the harm."  Miss. Code. Ann. § 11-1-63(f); *see also* Tex. Civ. Prac. & Rem. Code. Ann. § 82.005(a)(1) ("In a products liability action in which a claimant alleges a design defect, the burden is on the claimant to prove by a preponderance of the evidence that there was a safer alternative design . . . .").  And as in *Boudreaux* and *Orr*, the *Mingo* and *Henry* Plaintiffs have pursued two different theories of liability presumably towards proving that requirement: (1) that other anticoagulant medicines are safer alternatives to Xarelto, and (2) that Xarelto should have been redesigned with a different dose, an assay, and a reversal agent.

Plaintiffs cannot both seek to offer these opinions and at the same time preclude Defendants from rebutting this testimony with evidence that other medicines would not have resulted in a different outcome for either Ms. Mingo or Mr. Henry.  In support of their argument that other medicines are alleged safer alternatives, Plaintiffs' experts seek to render the following opinions:

- Ms. Mingo could have "been switched to an anticoagulant with a lesser risk of bleeding, such as Eliquis or Pradaxa" (Rinder Mingo Rep. at 2, 6 (Exh. A)),

- "Mr. Henry would have been at a lower risk of hemorrhage had he been placed on Pradaxa" (Polukoff Rep. at 7 (Exh. B)), and "Mr. Henry would have had a lower risk of suffering this bleeding event had he been anticoagulated with any of the other NOACs (particularly Dabigatran)" (Emory Rep. at 6 (Exh. C)).

On cross-examination, Plaintiffs' own experts agreed with the defense experts that all anticoagulant medicines carry an increased risk of bleeding, that both Plaintiffs had certain underlying health conditions that predisposed them to bleeding risks, and that there is no evidence that a different medicine would have been safer for either Plaintiff:

- Rinder Mingo Dep. 120:3-121:15 (Feb. 7, 2017) (Exh. D) ("So I'm afraid that your question can't be answered in a medically viable way without context. She requires anticoagulation. . . So there's just no way of being able to answer that question. . . . ."); *see also* Rinder Boudreaux Dep. 48:6-13 (Dec. 15, 2016) (Exh. E) ("I think that to try and state that someone would not, as in never, have a bleed [had they been prescribed another anticoagulant] I think is just impossible to know . . . [because] [e]very anticoagulant carries a risk of bleeding.");

- Polukoff Dep. 115:25-116:3 (Apr. 24, 2017) (Exh. F) ("Q. Do you agree that Mr. Henry could have had the same bleed that he had in December of 2012 if he had been on another anticoagulant besides Xarelto?  A. Yes.");

- Emory Dep. 113:10-16 (Apr. 17, 2017) (Exh. G) ("Q. Do you agree that it is possible that Mr. Henry would have had the same bleed in December 2012, if he had been on some different anticoagulant? . . . [A.] It is possible.  Anything is possible.  He could have had a bleed.  Yes.").

This testimony confirms the opinions of Defendants' experts that a bleeding event could not be ruled out had Ms. Mingo or Mr. Henry used a different medicine—opinion testimony that is relevant and necessary to rebut Plaintiffs' general contention (in an effort to establish their burden under the MPLA and TPLA, respectively) that other anticoagulants would have been safer alternatives to Xarelto.

Plaintiffs seek to preclude Defendants' experts[1] from testifying based on their education, training, and experience—as well as their extensive review of relevant studies, literature, and medical records—that Ms. Mingo and Mr. Henry had underlying health conditions that predisposed them to a bleeding event on any anticoagulant and that it cannot be shown that other medicines, all of which carry an increased risk of bleeding based on the relevant studies and literature, would have resulted in a different outcome.  As set forth below—and as the Court has previously concluded in *Boudreaux* and *Orr* regarding similar opinions from Defendants' experts

---

[1] Plaintiffs' Motion seeks to exclude opinions offered by Drs. Kevin Wheelan, M.D.; Steven Deitelzweig, M.D.; Vonda Reeves-Darby, M.D.; Alan E. Jones, M.D., F.A.C.E.P.; Randy C. Roth, M.D., F.H.M; Demondes Haynes, M.D., F.C.C.P.; and Brian E. Persing, M.D.

in those cases—Defendants' experts' opinions are relevant, reliable, and admissible.  Plaintiff's

Motion should be denied.

## <u>ARGUMENT</u>

**I.      Defendants are entitled to rebut Plaintiffs' contentions that other anticoagulant medicines would have avoided Plaintiffs' alleged injuries.**

Under both the MPLA and the TPLA, Plaintiffs have the burden to prove, with reliable

evidence, that there is a safer alternative design of Xarelto that would have prevented their

alleged injuries.  *See* Miss. Code. Ann. §11-1-63(f); Tex. Civ. Prac. & Rem. Code. Ann.

§ 82.005(a)(1).  To that end, in pursuing their claims, Plaintiffs' experts have testified that Ms.

Mingo could have "been switched to an anticoagulant with a lesser risk of bleeding, such as

Eliquis or Pradaxa" (Rinder Mingo Rep. at 2), "Mr. Henry would have been at a lower risk of

hemorrhage had he been placed on Pradaxa" (Polukoff Rep. at 7), and "Mr. Henry would have

had a lower risk of suffering this bleeding event had he been anticoagulated with any of the other

NOACs (particularly Dabigatran)" (Emory Rep. at 6).

As explained in Defendants' Joint Motion for Partial Summary Judgment On State-Law

Grounds As To Plaintiffs' Design-Defect Claim in the *Mingo* case (Dkt. 6753), Mississippi law

precludes Plaintiffs from asserting that alternative products are considered alternative designs

(and Texas law is the same).  A recent federal-court decision applying Mississippi law confirms

that although Mississippi state courts have not addressed "the alternative design/different product

distinction in the context of pharmaceuticals," based on other Mississippi case law and the

almost universal holdings of courts throughout the country, it is likely Mississippi would follow

suit holding "that a party may not show a reasonable alternative design by pointing to the

availability of a different drug available for the same purpose . . . ." *Young v. Bristol-Myers*

*Squibb Co.*, No. 4:16-cv-00108-DMB-JMV, 2017 WL 706320, at *10-11 (N.D. Miss. Feb. 22,

2017) (dismissing design defect claim under Mississippi law for failure to plead a feasible alternative design where the plaintiff "point[s] to drugs which by their very nature perform a different function").  And Texas law is clear that a plaintiff cannot demonstrate the existence of a "safer alternative design" "by pointing to a substantially different product, even when the other product has the same general purpose as the allegedly defective product." *Brockert v. Wyeth Pharms.*, 287 S.W.3d 760, 770 (citing *Theriot v. Danek Med., Inc.*, 168 F.3d 253 (5th Cir. 1999)).  Instead, as in most other states, "a safer alternative design must be one for the product at issue," not a different product. *Id.*

Nevertheless, in an effort to meet their burden of proof, Plaintiffs—as they did in *Boudreaux* and *Orr*—have pursued the general theory that other anticoagulant medicines are safer than Xarelto and would have resulted in a better outcome for Ms. Mingo and Mr. Henry. *Cf., e.g.*, *Orr* Trial Tr. 344:24-345:9 (Exh. H) (Plaintiffs' counsel eliciting testimony on direct from Dr. Smart regarding why Xarelto is "worst in class" based on safety and efficacy).  But Plaintiffs have no proof to support that claim and, indeed, concede, as they must, that other anticoagulants also could have resulted in bleeding events. *See* Rinder Mingo Dep. 120:3-121:15; Rinder Boudreaux Dep. 48:6-13; Polukoff Dep. 115:25-116:3; Emory Dep. 113:10-16.[2]

Plaintiffs cannot both argue that other medicines are safer alternatives and at the same time preclude Defendants from rebutting those allegations.  Plaintiffs now seek to exclude Defendants' experts' rebuttal opinions—namely, that all anticoagulants carry an increased risk of bleeding, and that it cannot be shown that Plaintiffs' injuries would have been avoided on a different medicine.  But that effort must fail.  The challenged opinions are both relevant and reliable, and Defendants are entitled to rebut Plaintiffs' theory.  *See* Dkt. 6198 at 11-13.

---

[2] It is undisputed that it was medically necessary for both Ms. Mingo and Mr. Henry to use an anticoagulant medicine. Rinder Mingo Dep. 120:21 (as to Ms. Mingo); Polukoff Dep. 52:6-10 (as to Mr. Henry).

## A.     Dr. Wheelan's opinions are admissible.

Dr. Wheelan is one of Defendants' experts in the *Henry* case.  He is a clinical electrophysiologist, chief of staff at the Baylor Heart and Vascular Hospital, and chief of cardiology at Baylor University Medical Center.  *See* Wheelan Rep. at 2 (Exh. I).  He is "uniquely qualified to render an opinion in this case due to [his] extensive 36 year career in prescribing anticoagulants for patients with stroke risks similar to Mr. Henry and [his] involvement in teaching residents and fellows and lecturing on the use of NOAC medications." *Id.*  He "was co-principal investigator at Baylor in the multi-national Rely Trial using Dabigatran vs. Warfarin for stroke prevention." *Id.*  To form his opinions in the *Henry* case, Dr. Wheelan reviewed Mr. Henry's medical records and relied on his personal experience and working knowledge of the medical literature. *Id.*  His report contains in-depth analysis of cardiac function, atrial fibrillation, stroke risk, warfarin, and NOACs, including rivaroxaban, as well as an extensive summary of Mr. Henry's medical history. *Id.* at 3-10.

Based on this review and analysis, Dr. Wheelan has opined that "[t]here is no data or evidence in this case to suggest that had Mr. Henry been on a different anticoagulant that this GI event would not have occurred."  *Id.* at 11.  Plaintiffs' own experts agree that this opinion is in fact true (*see* Polukoff Dep. 115:25-116:3; Emory Dep. 113:10-16), and Dr. Wheelan is imminently qualified to render the opinion.

## B.     Dr. Deitelzweig's opinions are admissible.

Dr. Deitelzweig is one of Defendants' experts in the *Mingo* case.  He is board certified in internal medicine and has extensive experience with anticoagulant medications. Deitelzweig Generic Rep. at 2-3 (Exh. J).  Specifically, he has been an investigator "for clinical trials for medical conditions and drugs indicated for use in atrial fibrillation, hypertension, stroke, venous

thromboembolic disease and anticoagulants." *Id.* at 2.  He has "authored or coauthored over 50 articles on multiple scientific topics including stroke, atrial fibrillation, venous thromboembolic disease and anticoagulants, including rivaroxaban," including "the Society of Hospital Medicine's compendium on Anticoagulants for use by hospitals in the United States," as well as a book on anticoagulants for hospitalists.  *Id.*  Dr. Deitelzeig is an incoming board member of the Anticoagulation Forum at the Ochsner Clinic Foundation.  *Id.*  In his practice, he frequently diagnoses, manages, and treats orthopedic patients needing prophylactic treatment for venous thromboembolism, as well as patients with anticoagulant-related bleeding events. *Id.* at 3.  He is "routinely consulted by other physicians for [his] opinions regarding anticoagulants, including Rivaroxaban, for hospitalized patients with complex medical issues." *Id.*

In forming his opinions in the *Mingo* case, Dr. Deitelzweig "relied on [his] training and expertise, and scientific literature in the field," as well as a review of Ms. Mingo's medical records.  Deitelzweig Mingo Rep. at 6 (Exh. K).  He used the "same method of review an analysis as [he uses in his] clinical and academic practice."  *Id.*  Dr. Deitelzweig's report contains an extensive discussion of coagulation, venous thromboembolism, and various anticoagulants, such as warfarin, heparins, NOACs (including the use of NOACs for treating venous thromboembolism), and rivaroxaban in particular. *See generally* Deitelzweig Generic Rep.  Likewise, Dr. Deitelzweig's report includes a detailed overview of Ms. Mingo's medical history.  Deitelzweig *Mingo* Rep. at 2-4.  Based on this review and analysis, Dr. Deitelzweig determined to a reasonable degree of medical certainty that "[s]election of a different anticoagulant for Ms. Mingo's DVT would not have led to a different outcome." *Id.* at 5.  He supported this conclusion by noting that the selection of Xarelto in this case is "evidenced based," that "[t]he NOACs are the preferred agents for acute venous thrombosis," and that

"[t]here is no preferred NOAC by the evidence based guidelines that exist in clinical practice today." *Id.* The assertion that Dr. Deitelzsweig's opinions have no reliable basis is not supported by the record, and his opinions are admissible.

### C. Dr. Reeves-Darby's opinions are admissible.

Dr. Reeves-Darby is another of Defendants' experts in the *Mingo* case. She is a board-certified gastroenterologist with more than 30 years of experience. Reeves-Darby Rep. (Exh. L) at 2. "A significant portion of [her] patients are on prescription oral anticoagulants, such as Coumadin/warfarin, or on a novel oral anti-coagulant (NOAC), which includes Xarelto." *Id.* She has treated many patients with gastrointestinal bleeds, a number of which have taken some sort of anticoagulant. *Id.* In forming her opinions, she reviewed Ms. Mingo's medical records and the peer-reviewed medical literature, and her report contains an extensive review of Ms. Mingo's medical history. *Id.* at 3-7. She also relied on her "background, education, training and clinical experience." *Id.* at 3.

Dr. Reeves-Darby has opined that "Ms. Mingo's clinical course would not have been any different had she taken a different anticoagulant." *Id.* at 12. This opinion is supported by evidence on multiple levels. First, Dr. Reeves-Darby stated that she agreed with Ms. Mingo's treating doctor, Dr. Stephen P. Keith, that the clinical course would not have been different had Ms. Mingo taken a different medication. *See id.* Dr. Keith testified that he treated Ms. Mingo as if she had been on any other anticoagulant, and that he could not say there would have been a difference in Ms. Mingo's bleeding event had she taken another anticoagulant. *See* Keith Dep. 97:12-17, 110:18-111:2 (Aug. 11, 2016) (Exh. M). Dr. Reeves-Darby also noted that no medical provider ever suggested that Ms. Mingo discontinue Xarelto or to take a different NOAC when Ms. Mingo was experiencing signs of anemia, and that after her bleeding event, Ms. Mingo was

offered continuation of Xarelto. *See* Reeves-Darby Rep. at 12. There is no basis for Plaintiffs' assertions that Dr. Reeves-Darby's opinions are unsupported by the record, and Dr. Reeves-Darby's opinions are admissible to rebut Plaintiffs' experts' opinions.

**D.      Dr. Jones's opinions are admissible.**

Dr. Jones is another of Defendants' experts in the *Mingo* case. He is an emergency room doctor, and Chairman and Professor of Emergency Medicine at the University of Mississippi Medical Center. Jones Rep. at 1 (Exh. N). He has "particular expertise in venous thromboembolism and anticoagulation by virtue of the fact that [he has] studied and written on the diagnosis and treatment of venous thromboembolism extensively throughout [his] career." *Id.* He also regularly diagnoses and manages patients with thrombosis and patients on oral anticoagulants, and he routinely prescribes oral anticoagulation. *Id.* at 2. He trains residents to identify and treat thrombosis, and manage anticoagulation. *Id.* He also regularly diagnoses and manages patients with gastrointestinal bleeding, including patients on anticoagulants. *Id.* His report includes an extensive discussion of gastrointestinal bleeding and anticoagulants, as well as a survey of Ms. Mingo's medical history. *Id.* at 5-12.

Dr. Jones has opined that "regardless of the type of anticoagulant [Ms. Mingo] had been placed on for her DVT (for example Coumadin or Lovenox) she would have had the same bleeding event that occurred while she was on Xarelto." *Id.* at 14. Dr. Jones specified that this opinion is based on the fact that there is evidence in Ms. Mingo's medical records that she had a subclinical bleeding event while on Lovenox post-operatively. *Id.* Specifically, Ms. Mingo's medical records note that her hemoglobin dropped 4 g/dl in four days, that Ms. Mingo reported having black stools since January 9th, and that when her Lovenox was discontinued, her

hemoglobin rebounded by 2.5 g/dl. *Id.* Thus, Dr. Jones's opinion is supported, reliable, and should not be excluded.

**E.      Dr. Roth's opinions are admissible.**

Dr. Roth is one of Defendants' experts in the *Mingo* case. He is the Chief Medical Officer for the Singing River Health System, and was the Clinical Director of Hospital Services for Singing River Health System. Roth Rep. at 2 (Exh. O). He has more than 20 years of experience and currently practices medicine in Mississippi. *Id.* One of the mainstays of his practice is studying and reviewing materials related to anticoagulants. Roth Dep. 18:11-14 (Feb. 16, 2017) (Exh. P). He prescribes anticoagulants on a weekly basis. *Id.* 75:15-76:5. Dr. Roth's report includes a discussion on the use of anticoagulation to treat venous thromboembolism, as well as a section discussing Ms. Mingo's medical history. Roth Rep. at 2-6.

In reaching his opinions in this case, Dr. Roth reviewed Ms. Mingo's medical records, as well as relied upon his background, education, training, and clinical experience. *See* Roth Rep. at 2. Based upon this review, Dr. Roth concluded that "Ms. Mingo's use of Xarelto for treatment of a deep vein thrombosis most likely unmasked the slowly bleeding gastric ulcer; the use of any anticoagulant to treat the deep vein thrombosis would most likely have resulted in the same oozing of the underlying gastric ulcer." *Id.* at 7. Dr. Roth further explained that "[a]ny other anticoagulant used to treat a DVT . . . would have put [Ms. Mingo] at the same risk to expose a previously existing gastric ulcer." Roth Dep. 166:21-25. Those opinions are based on the pathophysiology of Ms. Mingo's bleeding event:

> I mean, a blood thinner is a blood thinner. I know that sounds simple, but the mechanism of action of a Xa inhibitor is a mechanism of action of a Xa inhibitor, and if they are taking it and their blood is thinning and they have a gastric ulcer that's already oozing, it's going to probably bleed no matter what agent they take. I mean, I think that any reasonable clinician would agree with that.

*Id.* 176:1-12. Dr. Roth explained that based on his 20 years of clinical experience, it is his opinion that Ms. Mingo "would have had a very similar outcome on any properly taken anticoagulant." *Id.* 177:19-22.  He continued, "I've seen it happen with every agent and the unmasking is the clinically relevant part."  *Id*. 179:9-11.  Thus, Plaintiffs' assertion that Dr. Jones's opinion is baseless has no merit, and his opinions are admissible.

> **F.**     **Dr. Haynes's opinions are admissible.**

Dr. Haynes is another of Defendants' experts in the *Mingo* case.  He is a physician who specializes in pulmonology and critical care medicine and is a Professor of Medicine at the University of Mississippi Medical Center. Haynes Rep. at 1 (Exh. Q).  He is the program director for pulmonary and critical care fellowship training program, director of respiratory therapy, and chair of the procedural sedation committee for the University of Mississippi Medical Center.  *See id.*  His clinical practice includes the care and treatment of patients with DVT and PE, and he regularly prescribes NOACs. *See id.* at 1-3.  His report provides an in-depth discussion about venous thromboembolism, the treatment of that condition, and various studies regarding Xarelto. *See id.* at 3-22.

In forming his opinions in this case, Dr. Haynes reviewed the published medical literature regarding Xarelto and DVT/PE, and Ms. Mingo's medical records, and he relied on his knowledge and expertise based on his education and work.  *Id.* at 1-2.  Dr. Haynes has opined that "[t]here is no scientific evidence to support an assertion that Ms. Mingo's ulcer would not have bled had she not taken Xarelto or that a bleed would not have occurred had she been taking a different anticoagulant." *Id.* at 3.  He further opined, based on his experience, that Ms. Mingo "would have bled on any anticoagulant because all NOACs carry a risk of bleeding.  We know that Xarelto increases the risk that an existing ulcer will bleed, and based on her records, her

PUD likely pre-dated the use of Xarelto." *Id.* at 26.  Thus, Dr. Haynes shares the same opinion as Plaintiffs' experts—that all anticoagulants have a bleeding risk, and it is possible that any patient will suffer the same bleed on a different anticoagulant.

Plaintiffs make much of the fact that Dr. Haynes also holds the opinion that it would be "pure conjecture" to "draw any conclusion as to whether a different NOAC would have been a safer alternative for Ms. Mingo," (*id.* at 3), but this statement does not make Dr. Haynes's opinions speculative.  To the contrary, because he holds the view that all anticoagulants have bleeding risks, he believes it is speculative to offer the opinion that a different anticoagulant could have been a safer alternative for Ms. Mingo.  Plaintiffs' challenge to Dr. Haynes's opinions fails because he is qualified to offer these opinions, and they are based on a reliable methodology of experience and review of Ms. Mingo's records.

**G.     Dr. Persing's opinions are admissible.**

Finally, Dr. Persing is another of Defendants' experts in the *Mingo* case.  He is board certified in Hematology and Oncology, and has more than 15 years of experience.  *See* Persing Rep. at 2 (Exh. R).  His report includes a detailed description of Ms. Mingo's medical history and his findings based on that history. *Id.* at 3-13.

In forming his opinions in this case, Dr. Persing reviewed Ms. Mingo's medical records and relied on his background, education, training, and clinical experience.  *See id.* at 2.  Dr. Persing has opined that "[i]ncreasing degrees of anticoagulation bring with them increasing risks of bleeding." *Id.* at 7.  Dr. Persing also opines that "[u]ltimately, [Ms. Mingo's] gastric ulcer bled and this was likely potentiated with anticoagulation in the form of Xarelto and aspirin.  However, anticoagulation, including Lovenox and Coumadin, that would have been administered for deep vein thrombosis at treatment doses would have led to an equivalent if not more profound rate of

bleed." *Id.* at 13.  Plaintiffs have tried to tie this opinion solely to Dr. Persing's understanding of bleed rates in the EINSTEIN study (*see* Pls.' Mem. at 6), but Dr. Persing himself never qualifies or limits his opinion in that way.  Plaintiffs' challenge to Dr. Persing fails because he is qualified to offer these opinions, which are reliable and admissible.

* * *

Drs. Wheelan, Deitelzweig, Reeves-Darby, Jones, Roth, Haynes, and Persing are highly qualified physicians who have extensive experience with anticoagulant medicines and have rendered reliable opinions—which Plaintiffs' own experts do not dispute—that there is no evidence to rule out that Ms. Mingo and Mr. Henry would have experienced a bleeding event even if they had used another medicine.  In light of Plaintiffs' theory that another anticoagulant medicine would have been a safer alternative, these experts' opinions are both relevant and necessary to rebut Plaintiffs' theory of the case and to support Defendants' position that "Xarelto was an appropriate drug for Plaintiffs to take."  Dkt. 6198 at 11-14.

## II.     Plaintiffs' case law is inapposite.

Plaintiffs cite in their motion the very same case law that they cited in their nearly identical motion in *Boudreaux* and *Orr*.  Those cases are as inapposite here as they were there.

First, Plaintiffs' reliance on *Washington v. Armstrong World Industries, Inc.*, 839 F.2d 1121, 1122 (5th Cir. 1988), is misplaced.  In *Washington*, the plaintiff alleged that her husband's colon cancer resulted from his exposure to asbestos.  The defendants filed a motion for summary judgment based on testimony of three of the defendants' treating doctors who affirmatively testified that there was no evidence of asbestos fibers in any of the tissue that was examined and there was no evidence of asbestos exposure during any treatment of the plaintiff's husband.  *Id.* The plaintiff submitted testimony from another doctor, who never examined her husband, and who based his findings on the possibility that had another test been done, then such a test would

have found proof of exposure to asbestos.  *Id.*  The district court concluded this testimony was "pure speculation and unreliable" because it relied on possible tests that could have been done "rather than specific findings or evaluations of test results that were available," and excluded the testimony. *Id.*  In contrast, the defense experts' opinions here are based on their extensive review of Ms. Mingo's and Mr. Henry's medical history, as well as relevant medical literature and their experience.

Second, and similarly, Plaintiffs' reliance on *Sweeney v. Chertoff*, 178 F. App'x 354, 355 (5th Cir. 2006), does not result in a different conclusion.  *Sweeney* is not a product-liability case, but instead is a case brought under the Privacy Act.  *Id.* at 355.  The opinions in *Sweeny* were not based on underlying records or evidence but on "a hypothetical counterfactual situation" not supported by the record.  *Id.* at 357-58.  Therefore, *Sweeney*'s holding is inapplicable here.[3]

### III.    The opinions of Defendants' experts are relevant, and exclusion would result in substantial prejudice.

In light of the fact that Mississippi and Texas law requires that they prove that  a safer alternative would have prevented their alleged injuries—and because Plaintiffs have advanced a safer-alternative-design theory based on different medicines—the opinions of Drs. Wheelan, Deitelzweig, Reeves-Darby, Jones, Roth, Haynes, and Persing are highly probative, and any perceived prejudice to Plaintiffs from these opinions is minimal.  Accordingly, Plaintiffs' request to exclude these opinions under Rule 403 should be denied.  As this Court has already recognized, if Plaintiffs are permitted to pursue a theory under Mississippi and Texas law based on the assertion that other anticoagulant medicines are safer alternatives, Defendants are entitled to rebut those assertions by showing that Plaintiffs would have likely bled on another medicine.

---

[3] Similarly, Plaintiffs' reliance on *United States v. Settle*, 267 F. App'x 395 (5th Cir. 2008), is a without merit. *Settle* was a criminal action, and the defendant sought to present evidence of third-party guilt. It was in that context that the Fifth Circuit stated that the criminal defendant had to "demonstrate[] a nexus between the third party and the crime charged." *Id.* at 398.

*See* Dkt. 6198 at 11-14.  The exclusion of evidence under Rule 403 is limited to circumstances where the probative value of the evidence is outweighed by the undue prejudice.  The fact that Plaintiffs cannot rule out a bleeding event on another medicine and that there are alternative explanations in the medical records for Ms. Mingo's and Mr. Henry's bleeding events are highly relevant to the issues in these cases.  Any potential prejudice perceived by Plaintiffs does not outweigh the probative value of this unquestionably relevant evidence.

## CONCLUSION

For the foregoing reasons, Plaintiffs' Motion should be denied.

Respectfully submitted,

BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C.

By: /s/ *Richard E. Sarver*
Richard E. Sarver
Celeste R. Coco-Ewing
BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C.
909 Poydras Street, 24th Floor
New Orleans, Louisiana  70112
Telephone:  (504) 589-9700
rsarver@barrassousdin.com
ccoco-ewing@barrassousdin.com

DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

WILKINSON WALSH + ESKOVITZ LLP

By: /s/ *Beth A. Wilkinson*
Beth A. Wilkinson
Jennifer L. Saulino
Jeremy Barber
WILKINSON WALSH + ESKOVITZ LLP
1900 M. Street NW, Suite 800
Washington, DC 20036
Telephone: (202) 847-4000
bwilkinson@wilkinsonwalsh.com
jsaulino@wilkinsonwalsh.com
jbarber@wilkinsonwalsh.com

NELSON MULLINS RILEY & SCARBOROUGH LLP

By: /s/ *David E. Dukes*
David E. Dukes
J. Mark Jones
NELSON MULLINS RILEY & SCARBOROUGH LLP
1320 Main Street, 17th Floor
Columbia, SC 29201
Telephone: (803) 799-2000
David.Dukes@nelsonmullins.com
Mark.Jones@nelsonmullins.com

Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2700
Chanda.Miller@dbr.com


IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ James B. Irwin
James B. Irwin
Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com


*Attorneys for Defendants Janssen
Pharmaceuticals, Inc., Janssen Research &
Development, LLC, and Janssen Ortho LLC*

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ Andrew K. Solow
Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com


William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com


BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ Kevin C. Newsom
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com
lboney@bradley.com


CHAFFE MCCALL L.L.P.
By: /s/ John F. Olinde
John F. Olinde
CHAFFE MCCALL L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com


*Attorneys for Bayer HealthCare
Pharmaceuticals Inc. and Bayer Pharma AG*

## CERTIFICATE OF SERVICE

      The undersigned hereby certifies that on July 7, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

                */s/ James B. Irwin*
                **James B. Irwin**