```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2

 3   ******************************************************************

     IN RE:  XARELTO (RIVAROXABAN)
 4   PRODUCTS LIABILITY LITIGATION        Docket No. 14-MD-2592
                                          Section "L"
 5                                        New Orleans, Louisiana
     THIS DOCUMENT RELATES TO:            Monday, June 6, 2017
 6   Joseph Orr, et al
     v. Janssen Research &
 7   Development, et. al.,
     Case No. 15-CV-3708
 8

 9   ******************************************************************

10                  TRANSCRIPT OF TRIAL PROCEEDINGS
          HEARD BEFORE THE HONORABLE ELDON E. FALLON
11                 UNITED STATES DISTRICT JUDGE
                 VOLUME VI - AFTERNOON SESSION
12

13   APPEARANCES:

14   FOR THE PLAINTIFFS'
     LIAISON COUNSEL:              LEVIN PAPANTONIO
15                                 BRIAN H. BARR, ESQ.
                                   316 Baylen Street, Suite 600
16                                 Pensacola, FL 32502

17                                 BEASLEY ALLEN
                                   BY:  ANDY BIRCHFIELD, ESQ.
18                                 P.O. Box 4160
                                   Montgomery, AL 36103

19                                 GAINSBURGH BENJAMIN DAVID
                                   MEUNIER & WARSHAUER
20                                 BY:  GERALD E. MEUNIER, ESQ.
                                   2800 Energy Centre
21                                 1100 Poydras Street
                                   New Orleans, LA 70163
22
                                   GOZA & HONNOLD, LLC
23                                 BY:  BRADLEY D. HONNOLD, ESQ.
                                   11181 Overbrook Road, Suite 200
24                                 Leawood, Kansas 66211

25
```

```
 1                                        THE LAMBERT FIRM, PLC
                                          BY:  EMILY JEFFCOTT, ESQ.
 2                                        701 Magazine Street
                                          New Orleans, Louisiana 70130
 3

 4    FOR THE DEFENDANT BAYER
      HEALTHCARE PHARMACEUTICALS
 5    INC. and BAYER PHARMA AG:           WILKINSON WALSH & ESKOVITZ, LLP
                                          BY:  BETH A. WILKINSON, ESQ.
 6                                        1900 M Street NW, Suite 800
                                          Washington, DC 20036
 7
                                          Nelson Mullins Riley
 8                                        & Scarborough, LLP
                                          BY:  DAVID E. DUKES, ESQ.
 9                                        Meridian, 17th Floor
                                          1320 Main Street
10                                        Columbia, SC 29201

11
      FOR JANSSEN PHARMACEUTICALS,
12    INC. AND JANSSEN RESEARCH &
      DEVELOPMENT, LLC:                   IRWIN FRITCHIE URQUHART & MOORE
13                                        BY:  JAMES B. IRWIN, ESQ.
                                          400 Poydras St., Suite 2700
14                                        New Orleans, LA 70130

15

16    Official Court Reporter:           Karen A. Ibos, CCR, RPR, CRR, RMR
                                          500 Poydras Street, B-275
17                                        New Orleans, Louisiana 70130
                                          (504) 589-7776
18

19      Proceedings recorded by mechanical stenography, transcript
      produced by computer.
20

21

22

23

24

25
```

OFFICIAL TRANSCRIPT

17:27:17  1          In short, it seems to me the defendant suggests that

17:27:20  2     there is no such test and that the defendants know of no such test

17:27:27  3     or any test.  This is consistent, frankly, with what the

17:27:32  4     defendant's position is, that there is no test and they don't know

17:27:37  5     of any.

17:27:37  6          Yet they told the Canadian authorities the following:

17:27:42  7     "Although there is no need to monitor clinical practice in certain

17:27:49  8     in-treatment situations such as an overdose, acute bleeding, or

17:27:54  9     urgent surgery, in cases of suspected or noncompliance, I assume

17:27:59 10     not taking the drug, or in other unusual circumstances, assessment

17:28:06 11     of the anticoagulant effect of rivaroxaban may be appropriate."

17:28:12 12     "Accordingly," they say, "measuring PT may be useful to inform

17:28:19 13     clinical decisions in these circumstances."

17:28:23 14          The significant issue in the case, it seems to me, is

17:28:26 15     what the defendant knew, when they knew it, and whether or not any

17:28:34 16     prior statements that conflict with their position is admissible.

17:28:40 17          I am concerned about the fact that this is a statement

17:28:44 18     made in connection, I assume, with the approval of the label by

17:28:52 19     Canada.  Canada, like Europe, has a different process and they do

17:28:57 20     have a different process and, therefore, I had felt that it was

17:29:04 21     confusing, at best, to perhaps not even relevant under 401, but if

17:29:12 22     relevant, certainly not admissible under 403 to allow labels from

17:29:18 23     Canada to come into the litigation or labels from Europe to come

17:29:22 24     into the litigation.

17:29:25 25          But this is a statement made, and it's at least arguably

17:29:33   1   inconsistent with what the position of the defendant is.  It's

17:29:42   2   certainly an 801(d)(2) situation where it would be admissible, even

17:29:48   3   though it's a prior statement; it would also be admissible under

17:29:54   4   613 as a prior statement.

17:29:57   5          So I am going to allow it, but I will instruct the jury

17:30:03   6   that it's only relevant to what the defendant knew or when they

17:30:08   7   knew it.  Knowledge of the defendant.

17:30:13   8          Any reference to any Canadian label, I am going to tell

17:30:19   9   them to disregard.  I would hope I wouldn't have to do that because

17:30:22  10   I hope that doesn't come up from the plaintiff's standpoint.  I am

17:30:25  11   not interested in what the label is or any reference to the label.

17:30:31  12   If a reference does come into -- mentioning the label, I am going

17:30:36  13   to instruct the jury to disregard that and to only consider it

17:30:41  14   insofar as a statement is made regarding when the defendant knew

17:30:47  15   the information and what they knew.

17:30:51  16          So that's going to be my ruling.  I will allow it, but I

17:30:55  17   will -- I may have to have an instruction to the jury to that

17:30:59  18   effect.

17:31:00  19          MR. MEUNIER:  Your Honor, I understand the Court's

17:31:03  20   ruling, and there will be reference to the label, so I think that

17:31:05  21   limiting instruction you mentioned --

17:31:07  22          THE COURT:  Well, I will instruct the jury then to

17:31:09  23   disregard.  And I'll explain why.  The label reference can be

17:31:14  24   confusing, and I am going to have to surgically remove that.

17:31:20  25          I wish I didn't have to, but it's a situation where the

17:31:25  1   whole theory of the defendant's case is based on that, that there

17:31:33  2   was no test available.

17:31:36  3        Now, you can weasel word it or at least use words like

17:31:41  4   "no credible test," "no satisfactory test," but, really, that

17:31:49  5   created the situation where there is no test that does this.  The

17:31:52  6   plaintiffs say there is a test that would be helpful.  The

17:31:56  7   defendants say it's not helpful.

17:31:59  8        So the concepts -- I mean, words that put this issue, at

17:32:06  9   least, in play, I think the jury ought to hear it.  But I am going

17:32:13 10   to try to surgically remove that from the label and explain to them

17:32:17 11   why.

17:32:18 12        Thank you very much.  The court will stand in recess.

17:32:20 13        THE DEPUTY CLERK:  All rise.

17:32:22 14      (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

15

16                        *  *  *  *  *  *

17

18                     REPORTER'S CERTIFICATE

19        I, Karen A. Ibos, CCR, Official Court Reporter, United
   States District Court, Eastern District of Louisiana, do hereby
20   certify that the foregoing is a true and correct transcript, to the
   best of my ability and understanding, from the record of the
21   proceedings in the above-entitled and numbered matter.

22

23           /s/ Karen A. Ibos
             _____
             Karen A. Ibos, CCR, RPR, CRR, RMR
             Official Court Reporter

24

25

OFFICIAL TRANSCRIPT

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION

                                    Docket No. 14-MD-2592
THIS DOCUMENT RELATES TO:           Section L
                                    New Orleans, Louisiana
Joseph Orr, Jr., as Lawful          Tuesday, June 6, 2017
Surviving Spouse of
*Sharyn Orr v. Janssen, et al.*
*Case No. 2:15-cv-03708*

*********************************************************************

**TRANSCRIPT OF TRIAL PROCEEDINGS**
**HEARD BEFORE THE HONORABLE ELDON E. FALLON,**
**UNITED STATES DISTRICT JUDGE,**
**AND A JURY.**
**VOLUME V - MORNING SESSION**

*********************************************************************

**APPEARANCES:**


FOR THE PLAINTIFFS'            MR. ANTHONY BIRCHFIELD, JR.
LIAISON COUNSEL:               Beasley Allen Crow Methvin
                                  Portis & Miles
                               Post Office Box 4160
                               Montgomery, AL  36103

                               MR. BRIAN H. BARR
                               MR. NEIL E. McWILLIAMS
                               Levin Papantonio Thomas
                                 Mitchell Rafferty & Proctor
                               316 Baylen Street
                               Suite 600
                               Pensacola, FL 32502

                               MR. GERALD EDWARD MEUNIER
                               Gainsburgh, Benjamin, David,
                                  Meunier & Warshauer
                               Energy Centre
                               1100 Poydras Street
                               Suite 2800
                               New Orleans, LA  70163-2800

**OFFICIAL TRANSCRIPT**

```
                                    MS. EMILY JEFFCOTT
                                    The Lambert Firm, PLC
                                    701 Magazine Street
                                    New Orleans, LA  70130

                                    MR. BRADLEY D. HONNOLD
                                    Goza & Honnold, LLC
                                    11181 Overbrook Road
                                    Suite 200
                                    Leawood, KS 66211


FOR THE DEFENDANT JANSSEN            MR. JAMES B. IRWIN, V
PHARMACEUTICALS, INC.,               Irwin Fritchie
and JANSSEN RESEARCH &                  Urquhart & Moore, LLC
DEVELOPMENT, LLC:                    400 Poydras Street
                                     Suite 2700
                                     New Orleans, LA  70130


FOR THE DEFENDANT                    MR. DAVID E. DUKES
BAYER HEALTHCARE                     Nelson Mullins Riley &
PHARMACEUTICALS, INC.,                  Scarborough, LLP and
BAYER PHARMA AG:                     Meridian, 17th Floor
                                     1320 Main Street
                                     Columbia, SC  29201

                                     MS. BETH A. WILKINSON
                                     Wilkinson Walsh + Eskovitz, LLP
                                     1900 M Street NW
                                     Suite 800
                                     Washington, DC 20036


REPORTED BY:  Mary V. Thompson, RMR, FCRR
              United States District Court
              500 Poydras, Room B275
              New Orleans, LA  70130
```

**OFFICIAL TRANSCRIPT**

```
1            THE COURT:  Yeah.  Let's let him answer the question.
2            MR. BARR:  Go ahead.
3            THE COURT:  Go ahead, sir.
4            THE WITNESS:  I'm sorry, could you repeat the question?
5            MR. BARR:  I don't remember it now.
6  MR. BARR:  (CONTINUING)
7       Q.   You agree that this is the document that sets out that
8  Janssen made the conscious decision not to disclose -- not to
9  propose PT language as a helpful laboratory test in the warning
10 section of the label, right?
11      A.   No.
12      Q.   Okay.  Well, let's go to page -- pdf Page 15 of this.
13           MR. BARR:  And let's just blow up this whole thing.
14           MR. IRWIN:  Your Honor, can we pull that down for a
15 second, please.
16           THE COURT:  Okay.
17           MR. IRWIN:  May we approach?
18           THE COURT:  Yes.
19                        SIDEBAR ON THE RECORD
20           MR. IRWIN:  This is going to be part of our ongoing
21 problem with this document, Your Honor.  Here we have the
22 Canadian label.
23           THE COURT:  Okay.
24           MR. BARR:  And, Your Honor, the relevance of this is
25 they are specifically considering what to say to the U.S.
```

**OFFICIAL TRANSCRIPT**

1  regulator by referencing the Canadian label.  I mean, that is a

2  relevant fact that they thought about.  I mean, this isn't about

3  Canadian regulatory requirements, this is about what they're

4  going to say to the U.S. regulator.  And they say that if it is

5  requested, we'll modify this.  I mean the document is clearly

6  relevant.

7          MR. IRWIN:  Your Honor, this is always what we've been

8  concerned about.  Your ruling was that if there are impeachable

9  statements, quote/unquote -- that's my word -- that that could be

10  considered relevant, but not to introduce the whole regulatory

11  scheme from another country, and this is the back-door way of

12  doing exactly that.

13          Now, they could redact that out.  They could cover it

14  up with a piece of paper and still ask the question about the

15  other statement that is our statement in that contingency

16  document without disclosing the label to the jury.

17          MR. BARR:  But, Your Honor, they were considering doing

18  it in light of what they say in Canada.  The document makes no

19  sense without that.

20          THE COURT:  Let's make that clear.  And I'll instruct

21  the jury as to the situation.

22          MR. IRWIN:  Your Honor, can we cover up the Canadian

23  label?

24          MR. BARR:  To me the document makes no sense without

25  referring to it.  I won't spend time reading through it.  I

**OFFICIAL TRANSCRIPT**

1    mean -- but the point is they had this in that label, they

2    thought about it, and they thought -- they were thinking about

3    that when they were making communications with the U.S. FDA.

4              MR. IRWIN:  Your Honor, what I would like to know is

5    what is it off this document they want to read to the jury?

6              What is it you want to show to the jury?

7              MR. BARR:  "Only if section is requested, consider

8    modifying without," and they referred to the Canadian label.

9    They're saying if the FDA asks us for this, this is what we're

10   going to modify.

11             MR. IRWIN:  That's exactly the problem, Judge.  Going

12   right to --

13             THE COURT:  I'm going to tell them to disregard what

14   you say, if you say.  Let's do it.  I'll just tell the jury to

15   disregard that.

16             MR. BARR:  Okay.

17             THE COURT:  That's the best we can do.

18             MR. MEUNIER:  Your Honor, just for the record, Jim made

19   a statement about what your ruling was, and I just want to

20   clarify something.

21             When you sustained our Motion *in limine* No. 11, which

22   was our motion to allow there to be evidence in the case

23   regarding the foreign label issues -- you sustained that motion.

24   You said we would be able to admit into evidence whatever the

25   defendants said to anyone regarding foreign label issues as long

**OFFICIAL TRANSCRIPT**

1   as that's what the defendant said to others.

2         And you said the only way that's not going to be

3   admissible is actions taken in order to comply with federal

4   regulatory requirements.  Well, none of what we are proposing to

5   show the jury is anything about actions taken in order to comply

6   with a foreign regulation.

7         THE COURT:  Let me just add that the defendants have a

8   legitimate point.  The defendants say that you're mixing up

9   Canadian labels and United States labels, and the words that they

10  say have more reference to Canadian labels than to the

11  United States labels, and we're going to have to deal with that.

12  It's a legitimate point.

13        The plaintiffs make a legitimate point that the

14  defendants knew at a certain time and they told people certain

15  things.  Now, if they told people something that's inconsistent

16  with what they told the FDA, that, to me, seems to be admissible

17  because it seems to contradict what they said to the FDA.

18        But at the same time, the defendants have a point that

19  it mixes apples and oranges.  They're concerned about things that

20  are required in the Canadian label that are not required in the

21  United States label.

22        So I'm going to have to do my best to tell the jury

23  what's the significance of the thing.

24        MR. BARR:  Your Honor, I think we've established the

25  point with this witness that helpful laboratory testing is

**OFFICIAL TRANSCRIPT**

1    required in the U.S. label, and that's what we're talking about.

2            THE COURT:  Well, you know, that's for the jury to

3    determine, whether or not you've established something.  I make

4    no decision on that.

5            We have to go forward, folks.  This -- the sound is bad

6    for this witness.  I mean, it's -- you know, do we want to take

7    it out of the courtroom and put it in an office at the request of

8    you guys?

9            You went along with it.  It's the request of

10   the defendant and agreed to by the plaintiff, but we ought to

11   have a -- he ought to have a pin-on mic or something.  It's not

12   coming across well.

13           MR. MEUNIER:  Thank you, Judge.

14           THE COURT:  Let's just do the best we can.

15                   **AFTER THE SIDEBAR IN OPEN COURT**

16           THE COURT:  Members of the jury, we do the best we can

17   with the audio.

18           Continue.

19           MR. BARR:  I'll try to slow down some, Your Honor.

20   That may help.

21           We can go back to pdf Page 15.

22           Just blow this whole thing up.

23   **MR. BARR:  (CONTINUING)**

24       Q.  Can you see that they ask -- Janssen asks the question:

25   Will we need to add a new 5.4 laboratory section like Lovenox,

**OFFICIAL TRANSCRIPT**

1    right?

2         A.    That's correct, Mr. Barr.

3              I think it's important to realize why the contingency

4    document was produced.  The labeling contingency document is a

5    document that's generated -- we prepare it within Janssen every

6    time we do a labeling supplement.

7              What we do is we submit the label and we prepare

8    anticipated reactions, feedback.  We provide our perspectives.

9    And this is in when we're dealing further with the divisions.

10             So this is our internal thinking of what we need to --

11   the steps we would need to go through and what we need to get

12   agreement internally for.

13        Q.    Right.  It's Janssen's internal thinking.  We agree

14   with each other.

15             And you see here it points out that the Pradaxa label

16   doesn't have a 5.4 section, right?

17        A.    That is correct.

18             But that's just -- yeah.  That's -- Pradaxa is

19   approved, we have this information, and it's just something we

20   need to highlight.  It's nothing more than that on that.

21        Q.    Pradaxa was the very first NOAC approved, right?

22        A.    That is correct, to be fair.  But our perspective was

23   we wanted to know what was available when we were discussing

24   that.

25        Q.    Pradaxa was a direct competitor of Xarelto, right?

**OFFICIAL TRANSCRIPT**

1    **A.**   It is a competitor of Xarelto, that's correct.

2    **Q.**   You're competing for the same patient population?

3    **A.**   I would say we are competing for the atrial

4    fibrillation indication, that's correct.

5         MR. BARR:  I only want to blow up this section right

6    here, right there (indicating).

7         MR. IRWIN:  Please note our objection.

8         THE COURT:  Okay.  Yeah.

9         Members of the jury, there's something there called a

10   Canadian label.  Disregard the Canadian label.  And the reason

11   for that is that it is a different country.  It has different

12   rules, different regulations, different procedures, and different

13   requirements.

14        The only relevance of this testimony is what the

15   defendant knew and when they knew it.  That's the only thing.

16   Not anything that the Canadian -- that needs to be on a Canadian

17   label or doesn't need to be on the Canadian label.

18        We're talking about the United States naval -- label,

19   and there's different rules, different laws, different

20   regulations.

21        So from the standpoint of what's on the Canadian label,

22   that has no relevance.  The only relevance is if there is -- if

23   you find it relevant, the only relevance is what they knew and

24   when they knew it.

25        Let's proceed.

**OFFICIAL TRANSCRIPT**

```
 1   particular case.

 2           Why they did it or whatever is context.  What they knew

 3   and when they knew it is the whole relevance of this line of

 4   questioning.

 5           So let's ask the question.

 6           MR. BARR:  Your Honor, may I publish this?

 7           THE COURT:  Well --

 8           MR. BARR:  Not admit it.

 9           THE COURT:  -- let's ask the question first.

10   MR. BARR:  (CONTINUING)

11      Q.   Mr. Jalota, you have in front of you a document,

12   3061443.  Do you see that?

13      A.   -1443, I do.

14      Q.   This is an e-mail you received on November 19, 2014,

15   right?

16      A.   That is correct.  Lori is my direct report and she

17   forwarded it to me because -- as information.  But, again, I was

18   not involved in it, nor would have probably spent more time

19   looking at it also.

20           MR. IRWIN:  Your Honor, then I move to strike any

21   questions that -- this witness has said he was not involved in

22   these arrangements.

23           MR. BARR:  Your Honor, he got the e-mail.  We've

24   established it's a business record he received.

25           THE COURT:  Okay.  I understand.  He received the
```

**OFFICIAL TRANSCRIPT**

1    e-mail.
2            I assume you received the e-mail and I assume you read
3    the e-mail; is that correct?
4            THE WITNESS:  I would have -- Your Honor, it appears I
5    received the e-mail.  I don't recall it.  But as to any more
6    information, looking at the attachments, I don't recall even -- I
7    don't recall looking at it or -- I don't recall.  That's all I
8    can say to you, sir.
9    MR. BARR:  (CONTINUING)
10       Q.   You clearly received it, right?
11       A.   I received it as -- but not as a direct person.  This
12   is because Lori is my direct report.  So she forwarded it to me
13   as this is it.  Other than that, she didn't ask for comments.
14   She didn't ask for anything else, just this is what is happening.
15       Q.   So you received this e-mail?
16       A.   But --
17       Q.   Go ahead.
18            THE COURT:  Go ahead.  Ask the question.
19   MR. BARR:  (CONTINUING)
20       Q.   You received this e-mail in the ordinary course of
21   business, correct?
22       A.   I would have -- I would have received it as part of her
23   sending something to me.  Again, she doesn't send me everything.
24   There may have been a reason for this.  I don't know, sir.
25       Q.   And she sent to you a document that Bayer wrote, right?

**OFFICIAL TRANSCRIPT**

1       A.    That is correct, sir.

2       Q.    Okay.  And so let's look at that document.

3             MR. IRWIN:  I object, Your Honor.

4             THE COURT:  Just let him look at the document.  That's

5    the question.

6             MR. BARR:  That's all I'm doing.

7             THE COURT:  Look at the document, sir.

8             THE WITNESS:  I have, sir.

9             THE COURT:  Tell him the page.

10   MR. BARR:  (CONTINUING)

11      Q.    What I'm looking at is Page -- let's start with Page 2

12   of the document.  Are you there?

13      A.    Yes.

14      Q.    Bayer was asked a series of questions, and they say

15   that we're providing our full response, right?

16      A.    I would add a clarification --

17            MR. IRWIN:  Your Honor, I would like to ask this

18   witness if he read -- excuse me.

19            THE COURT:  Wait just a minute.

20            MR. IRWIN:  I'd ask him to -- I would like him to ask

21   this witness if he has read this page -- if he ever read this

22   page or ever did anything with it.

23   MR. BARR:  (CONTINUING)

24      Q.    Have you read this page?

25      A.    I have not -- I've not read it.  If you would like me

**OFFICIAL TRANSCRIPT**

```
 1    to read it now, I'm happy to do that, sir.
 2        Q.   So in the course of your duties, you routinely get
 3    e-mails and just ignore them and don't read them?
 4            MR. IRWIN:  Object, Your Honor.  No foundation,
 5    argumentative.
 6            THE COURT:  I sustain the objection.  Let's move on.
 7    We're going to have to move on.
 8            MR. BARR:  It would be a lot easier if I could just ask
 9    him the question.
10            THE COURT:  Well, no.  If he --
11            MR. BARR:  I'm sorry.
12            THE COURT:  -- hasn't even read the page, I'm not going
13    to -- let's get on to something else.
14            MR. BARR:  Your Honor, he received this e-mail.
15            THE COURT:  Yeah, he received it, but he said he didn't
16    even read it.
17            MR. BARR:  Your Honor, can we approach?
18            THE COURT:  Yeah.  Sure.
19                        SIDEBAR ON THE RECORD
20            THE COURT:  The problem you're having is that e-mails
21    don't get into evidence simply because they're used in the usual
22    course of business.  Otherwise, you could put e-mails in without
23    any witness.
24            If a witness got the e-mail but they didn't read it,
25    what's he going to testify to?  I don't know.  He is going to
```

**OFFICIAL TRANSCRIPT**

1  say, I haven't read it.

2  　　　　MR. BARR:  Your Honor, there's no question he received

3  the e-mail.  We have been -- throughout this trial -- throughout

4  this trial, if somebody receives an e-mail, there has been no

5  objection, none.  And now we're doing this solely to keep this

6  out.

7  　　　　THE COURT:  No.  The problem is that this e-mail is

8  just more than just an e-mail, it's an attachment.  And the

9  fellow gets the attachment, as I understand it.  He's not a part

10  of it.  He gets an attachment.  He says now that he hasn't even

11  read the attachment.

12  　　　　So how does it get in if he didn't read it, doesn't

13  know anything about it, and it's not a question -- and it's not

14  business records?  It's not a business record.

15  　　　　MR. BARR:  Your Honor, he said he got it in the

16  ordinary course of business.  That's what he said.

17  　　　　THE COURT:  But that doesn't make an e-mail a business

18  record.  It just -- you can't do that.  Otherwise, every e-mail

19  you wouldn't even need a witness for.

20  　　　　MR. BIRCHFIELD:  Your Honor, as opposed to admitting

21  the e-mail or the attachment, where Mr. Barr was headed was

22  reading him the statement in there and asking him if he

23  understands that that is what Bayer tells people outside the U.S.

24  　　　　Ask him -- ask him that question.  We're not asking --

25  at this point we're not asking to move the document into

**OFFICIAL TRANSCRIPT**

1    evidence.

2              THE COURT:  All right.

3              MR. IRWIN:  Your Honor, they could ask any question

4    like that, but they shouldn't imply that it's in this document,

5    that has been such a subject of controversy, in front of the

6    jury.

7              And another thing about the fact that this is just an

8    attachment to an e-mail, he does not deal with Canadian labeling.

9    That's not what he does.  He deals with U.S. labeling.

10             THE COURT:  No, I understand.

11             MR. IRWIN:  All the more reason --

12             THE COURT:  That's part of it.

13             MR. BARR:  Your Honor, part of the problem here is Jim

14   can say that all he wants.  Somebody decided it was important

15   enough to send him the e-mail to tell him here's what's going on

16   in Canada.  And maybe they wanted this historical perspective,

17   who knows.  But they sent it to him.  And he says he gets his

18   e-mails and he looks at them.

19             And, Your Honor, your motion *in limine* order said that

20   what they say to regulators is admissible.  Anything they say to

21   regulators is admissible, and this is Bayer talking to a

22   regulator.  And we relied upon that.  I got up in opening and I

23   said they say these things outside of the United States based

24   upon that.

25             THE COURT:  But --

**OFFICIAL TRANSCRIPT**

1      MR. IRWIN:  There is no foundation.

2      THE COURT:  It's a play-within-a-play situation and

3   that's what I'm trying to deal with.  And it's a complicated

4   problem, because, as I said, there is -- both sides of it is a

5   problem.

6      You're right about they said things, but when you put

7   them in context, it gets confusing to the jury.  And they say

8   certain things in response back and forth.  It is just the

9   problem when you are dealing with FDA and Canadian or FDA and

10  Europe.

11     Look, I think that they may have a point, but let's do

12  it that way.  But just ask him.  The point is whether they knew

13  it -- whether he knew it, whether Bayer knew it, and when they

14  knew it.

15     MR. BARR:  Okay.

16     THE COURT:  Let's ask him, you know -- that's the

17  issue.

18     MR. BARR:  Then I'll read the statement and I'll ask

19  him if he understood that.

20     MR. BIRCHFIELD:  That's where we were headed, Your

21  Honor, when Jim objected.

22     THE COURT:  Okay.

23     MR. BARR:  I'm trying to do it without mentioning

24  Canada or the label, and we're not putting it up.

25     THE COURT:  But then you are showing the document.

1    Just ask him the question.

2         MR. BARR:  I'm not going to put it up on the screen.

3         MR. IRWIN:  Don't hold it up.  Just read it on your --

4         MR. BARR:  They can't see it.

5         MS. WILKINSON:  And don't ask him to refer to it

6    because then you're implying it's in the document.

7         MR. MEUNIER:  Oh, come on.

8         THE COURT:  "Don't you know Bayer knows this?"

9         MR. BARR:  But, Your Honor --

10        MR. MEUNIER:  He has to be referring to the document.

11        MR. BARR:  It's an unimpeachable --

12        MR. MEUNIER:  You're saying he can't refer to a

13   business record to answer that question?  We are not going to

14   admit the business record.

15        THE COURT:  The problem is that -- it's a 403 problem

16   when you put it in, in context, and I'm trying to keep it out of

17   the context.

18        MR. BARR:  Your Honor, what I'm hearing from Jim is he

19   is not making a 403 objection.

20        MR. IRWIN:  Yes, he is.

21        MR. BARR:  No, you're making an "he hasn't seen the

22   document" objection.

23        MR. IRWIN:  I mentioned 403 from the beginning.

24        THE COURT:  I understand the issue.

25        You say it's a business record; therefore, it gets in.

**OFFICIAL TRANSCRIPT**

1    I disagree with that.  I don't think it is a business record.

2            MR. MEUNIER:  No, I wasn't going to say that, Judge.  I

3    realize there's a problem and I realize we're trying to thread a

4    needle.

5            The only thing, we came into the trial based on an

6    express ruling that anything Bayer said to regulators was

7    admissible.  That's what your ruling was.

8            We could not get into what they did to comply with

9    regulations in the foreign scheme, but anything they said to

10   regulators.  It was an express ruling on our motion *in limine*.

11   We relied on it.  So what Bayer tells regulators goes to the

12   heart of what they knew.

13           THE COURT:  The problem is what they said to regulators

14   is contextual.

15           MR. MEUNIER:  I understand.

16           THE COURT:  That's the problem.

17           MR. MEUNIER:  I understand, Judge.

18           THE COURT:  Because what they said to one regulator is

19   not necessarily accurate with the other regulator.  So you've got

20   a situation where, when they say, What did you say to this

21   regulator, you're taking it out of the context of the case.

22           MR. MEUNIER:  I understand, Your Honor.

23           And all I was trying to get across is that we did rely

24   on a ruling that made it relevant and admissible to talk about

25   what Bayer said to regulators.

**OFFICIAL TRANSCRIPT**

1    THE COURT:  I understand.  It's in the record.  Let's
2  see if we can get through it.
3                  **AFTER THE SIDEBAR IN OPEN COURT**
4    THE COURT:  We have to take a break for lunch.
5    MR. BARR:  Okay.
6  **MR. BARR:  (CONTINUING)**
7    **Q.**  Mr. Jalota, are you aware that Bayer has said outside
8  of the United States that, Although there is no need to monitor
9  clinical practice, in certain infrequent situations such as
10  overdosage, acute bleeding, urgent surgery, in cases of suspected
11  non-compliance, or in other unusual circumstances, assessment of
12  the anticoagulant effect of rivaroxaban may be appropriate.
13  Accordingly, measuring PT using the Neoplastine reagent or a
14  Factor Xa assay using riva-specific calibrators and controls may
15  be useful to inform clinical decisions in these circumstances.
16         Are you aware of that?
17    **A.**  I would say to you that I'm not aware of the current
18  label.  In 2008 and 2011, that text, if it was similar to what
19  was presented to the FDA, would be there.
20         I don't know whether that text you're saying is how it
21  came about if it isn't in the label.  I confess you'd have to
22  show me the label.
23         I'm not -- I can tell you this, I'm not aware -- I'm
24  aware that there are -- there may be some language, but I don't
25  know what the language is and what was agreed with the agencies

**OFFICIAL TRANSCRIPT**

1   outside of the U.S.

2           THE COURT:  That's not the question, sir.  The question

3   is whether or not you're aware that Bayer knew or did not know

4   what he just read.

5           THE WITNESS:  I would say -- that's difficult for me to

6   say, sir.  The information we proposed in 2008 is what was agreed

7   with both companies, so if there is some text, then Bayer would

8   be aware.  But I simply don't know what is in the labels to tell

9   you, sir.

10          MR. BARR:  Do you want to break at this point?

11          THE COURT:  Let's take a break here.  We're going to

12   have a break for -- until 1:15.  We stand in recess until then.

13                              (Jury out at 11:53 a.m.)

14          THE COURT:  Be seated, please.

15          Folks, I know that some of you disagree with my ruling,

16   but that's my ruling so let's move on with it.

17          MR. BARR:  Your Honor, I'm not going to bring up the

18   Canadian thing again.  We're done with that.

19          THE COURT:  Court will stand in recess until 1:15.

20                              (A recess was taken.)

21                              (End of morning session.)

22

23                      *  *  *  *

24

25

**OFFICIAL TRANSCRIPT**

1
2
3          CERTIFICATE

        I hereby certify this 6th day of June, 2017, that the
foregoing is, to the best of my ability and understanding, a true
and correct transcript of the proceedings in the above-entitled
matter.


                                    /s/ Mary V. Thompson
                                  _____
                                     Official Court Reporter

**OFFICIAL TRANSCRIPT**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION

                                        Docket No. 14-MD-2592
THIS DOCUMENT RELATES TO:               Section L
                                        New Orleans, Louisiana
Joseph Orr, Jr., as Lawful              Thursday, June 8, 2017
Surviving Spouse of
*Sharyn Orr v. Janssen, et al.*
*Case No. 2:15-cv-03708*

*********************************************************************

                    TRANSCRIPT OF TRIAL PROCEEDINGS
           HEARD BEFORE THE HONORABLE ELDON E. FALLON,
                    UNITED STATES DISTRICT JUDGE,
                             AND A JURY.
                    VOLUME VIII - MORNING SESSION

*********************************************************************

**APPEARANCES:**


FOR THE PLAINTIFFS'          MR. ANTHONY BIRCHFIELD, JR.
LIAISON COUNSEL:             Beasley Allen Crow Methvin
                               Portis & Miles
                             Post Office Box 4160
                             Montgomery, AL  36103

                             MR. BRIAN H. BARR
                             MR. NEIL E. McWILLIAMS
                             Levin Papantonio Thomas
                               Mitchell Rafferty & Proctor
                             316 Baylen Street
                             Suite 600
                             Pensacola, FL 32502

                             MR. GERALD EDWARD MEUNIER
                             Gainsburgh, Benjamin, David,
                               Meunier & Warshauer
                             Energy Centre
                             1100 Poydras Street
                             Suite 2800
                             New Orleans, LA  70163-2800

**OFFICIAL TRANSCRIPT**

```
                                    MS. EMILY JEFFCOTT
                                    The Lambert Firm, PLC
                                    701 Magazine Street
                                    New Orleans, LA  70130

                                    MR. BRADLEY D. HONNOLD
                                    Goza & Honnold, LLC
                                    11181 Overbrook Road
                                    Suite 200
                                    Leawood, KS 66211


FOR THE DEFENDANT JANSSEN           MR. JAMES B. IRWIN, V
PHARMACEUTICALS, INC.,              Irwin Fritchie
and JANSSEN RESEARCH &                 Urquhart & Moore, LLC
DEVELOPMENT, LLC:                   400 Poydras Street
                                    Suite 2700
                                    New Orleans, LA  70130


FOR THE DEFENDANT                   MR. DAVID E. DUKES
BAYER HEALTHCARE                    Nelson Mullins Riley &
PHARMACEUTICALS, INC.,                 Scarborough, LLP and
BAYER PHARMA AG:                    Meridian, 17th Floor
                                    1320 Main Street
                                    Columbia, SC  29201


                                    MS. BETH A. WILKINSON
                                    Wilkinson Walsh + Eskovitz, LLP
                                    1900 M Street NW
                                    Suite 800
                                    Washington, DC 20036



REPORTED BY:  Mary V. Thompson, RMR, FCRR
              United States District Court
              500 Poydras, Room B275
              New Orleans, LA  70130
```

**OFFICIAL TRANSCRIPT**

1    patients.  That was seen in ROCKET.

2         And so I think -- I'm not comfortable with utilizing

3    PT.  Believe me, if it was effective, I would -- and reliable and

4    something that I could use, I would use it.  I would want it.  I

5    want to help -- we're here for our patients.

6         And this is -- so if this were something that I thought

7    was comfortable, I'm not going to withhold that.  I would want

8    that.  But the PT test is not a reliable test.  It doesn't -- it

9    can't be applied in a clinical context in a meaningful manner.

10        Q.   Let's take a look at the proposed label change that

11   Dr. Parisian presented yesterday and get your opinion on that.

12   This is what Dr. Parisian said should be in a label -- the

13   Xarelto label to help clinicians to treat patients that are

14   prescribed Xarelto.

15        MR. BARR:  Objection, Your Honor.  Dr. Parisian talked

16   about what should be in the label from a regulatory perspective,

17   what is required according to the regulations.

18        THE COURT:  Well, I thought it was a little broader

19   than that.  The question is different than what -- I'll allow the

20   question.

21        THE WITNESS:  I'll give my opinion, not a regulatory...

22   MS. WILKINSON:  (CONTINUING)

23        Q.   Yeah.  We're not talking about regulatory.

24        We want to know from your point of view, as a clinician

25   and an expert who prescribes this drug, would this language be

**OFFICIAL TRANSCRIPT**

1  useful or helpful to you with your patients?

2      A.   So I'm specifically --

3      Q.   Just first answer that question.

4           Would it be helpful?

5      A.   No.  Sorry.

6      Q.   Now let's go through it and you tell us why this would

7  not be helpful.

8      A.   The one that troubles me the most is that middle thing:

9  Accordingly, measuring PT may be useful to inform clinical

10  decisions in this circumstance.

11          I have no data to tell me how that will inform my

12  clinical decisions.  There is no studies that have looked at PT

13  and said, Okay, if someone comes in and they're bleeding and they

14  have a normal PT, you can take them to surgery and they do well.

15          That has not been studied.

16          You have to look at a situation and test it out in

17  people, and there's no data that actually looks at changing dose

18  based on PT, or withholding surgery based on PT, and that having

19  a net clinical benefit.

20          And that's why I think it's inappropriate to imply that

21  there is -- it's useful in informing clinical decisions, because

22  I don't think it can help me.  If it would help me, I would use

23  it.

24          My study of this is not scant.  I have looked at this

25  extensively, and I do not feel it is of value.  Not only that,

**OFFICIAL TRANSCRIPT**

1  but in the field of EP, in the Heart Rhythm society itself,

2  people are not using PT.

3      Q.    Do you believe that is because people don't know about

4  it because somebody has hidden this information or because they

5  don't believe it's useful?

6      A.    So when we do our journal clubs and we go over articles

7  and studies, these are the things that kind of come up when we

8  discuss this.

9          So I don't -- I think that it was appreciated.  And,

10  again, we looked at it and our impression was that that was not

11  the case.

12      Q.    And do you agree or disagree that a normal PT value

13  indicates that clinically significant levels of rivaroxaban are

14  unlikely?

15      A.    I think that there is -- so I can't explain why

16  10 percent of patients go from a normal PT to a high PT with

17  absolutely no change in their dosing.  So I can't --

18      Q.    Does that mean you don't agree?

19      A.    I don't agree.  Sorry.  Yes.

20      Q.    And tell us -- we've heard about a false negative in

21  testing.  Are you familiar with that?

22      A.    Yes.

23      Q.    Have you seen that in PT where someone could have

24  either -- a normal level and still have an anticoagulation effect

25  in their blood?

**OFFICIAL TRANSCRIPT**

1    We'll stand in recess.  Thank you.

2                                (Jury out at 11:27 a.m.)

3                                (End of morning session.)

4

5                        *  *  *  *

6                        CERTIFICATE

7

8         I hereby certify this 8th day of June, 2017, that the

9    foregoing is, to the best of my ability and understanding, a true

10   and correct transcript of the proceedings in the above-entitled

11   matter.

12

13                                  /s/ Mary V. Thompson

14                        _____
                                   Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25

**OFFICIAL TRANSCRIPT**

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2

     ***********************************************************
 3

     IN RE:  XARELTO (RIVAROXABAN)
 4   PRODUCTS LIABILITY LITIGATION        Docket No. 14-MD-2592
                                          Section "L"
 5                                        New Orleans, Louisiana
     THIS DOCUMENT RELATES TO:            Thursday, June 8, 2017
 6   Joseph Orr, et al
     v. Janssen Research &
 7   Development, et. al.,
     Case No. 15-CV-3708
 8

     ***********************************************************
 9

                    TRANSCRIPT OF TRIAL PROCEEDINGS
10       HEARD BEFORE THE HONORABLE ELDON E. FALLON
                     UNITED STATES DISTRICT JUDGE
11                   VOLUME IX - AFTERNOON SESSION

12

     APPEARANCES:
13

     FOR THE PLAINTIFFS'
14   LIAISON COUNSEL:                LEVIN PAPANTONIO
                                     BRIAN H. BARR, ESQ.
15                                   316 Baylen Street, Suite 600
                                     Pensacola, FL 32502
16
                                     BEASLEY ALLEN
17                                   BY:  ANDY BIRCHFIELD, ESQ.
                                     P.O. Box 4160
18                                   Montgomery, AL 36103

19                                   GAINSBURGH BENJAMIN DAVID
                                     MEUNIER & WARSHAUER
20                                   BY:  GERALD E. MEUNIER, ESQ.
                                     2800 Energy Centre
21                                   1100 Poydras Street
                                     New Orleans, LA 70163
22
                                     GOZA & HONNOLD, LLC
23                                   BY:  BRADLEY D. HONNOLD, ESQ.
                                     11181 Overbrook Road, Suite 200
24                                   Leawood, Kansas 66211

25
```

```
 1                                      THE LAMBERT FIRM, PLC
                                        BY:  EMILY JEFFCOTT, ESQ.
 2                                      701 Magazine Street
                                        New Orleans, Louisiana 70130
 3

 4      FOR THE DEFENDANT BAYER
        HEALTHCARE PHARMACEUTICALS
 5      INC. and BAYER PHARMA AG:       WILKINSON WALSH & ESKOVITZ, LLP
                                        BY:  BETH A. WILKINSON, ESQ.
 6                                      1900 M Street NW, Suite 800
                                        Washington, DC 20036
 7
                                        Nelson Mullins Riley
 8                                      & Scarborough, LLP
                                        BY:  DAVID E. DUKES, ESQ.
 9                                      Meridian, 17th Floor
                                        1320 Main Street
10                                      Columbia, SC 29201

11
        FOR JANSSEN PHARMACEUTICALS,
12      INC. AND JANSSEN RESEARCH &
        DEVELOPMENT, LLC:               IRWIN FRITCHIE URQUHART & MOORE
13                                      BY:  JAMES B. IRWIN, ESQ.
                                        400 Poydras St., Suite 2700
14                                      New Orleans, LA 70130

15

16      Official Court Reporter:       Karen A. Ibos, CCR, RPR, CRR, RMR
                                        500 Poydras Street, B-275
17                                      New Orleans, Louisiana 70130
                                        (504) 589-7776
18

19        Proceedings recorded by mechanical stenography, transcript
        produced by computer.
20

21

22

23

24

25
```

OFFICIAL TRANSCRIPT

14:36:31  1                    MS. WILKINSON:  Objection.  Asked and answered.

14:36:33  2                    THE COURT:  Yeah, it has been.

14:36:40  3    BY MR. BARR:

14:36:40  4    Q.  So you haven't seen it, right?

14:36:41  5                    THE COURT:  He said he hasn't, let's establish that.

14:36:45  6    I've heard him say that several times.  He hasn't.

14:36:51  7    BY MR. BARR:

14:36:52  8    Q.  I want to put up --

14:36:55  9                    MR. BARR:  Can we put this back up so it doesn't have my

14:36:59 10    writing all over it?

14:37:00 11                    MS. WILKINSON:  Sure.  You can put up what you said about

14:37:11 12    me, Brian.  I don't know where my copy is.

14:37:26 13                    MR. BARR:  This will be my last series, your Honor.

14:37:38 14    BY MR. BARR:

14:37:39 15    Q.  Would you agree that the company likely knows more about how

14:37:41 16    this drug works than you do?

14:37:44 17    A.  Than I do?

14:37:46 18    Q.  Yes, sir.

14:37:46 19    A.  Yes, I hope so.

14:37:49 20    Q.  So you wanted to talk about this language, right?  You talked

14:37:54 21    about this language in your direct, correct?

14:37:56 22    A.  Yep.

14:37:56 23    Q.  And you particularly pointed out this sentence here as a

14:38:02 24    sentence that bothered you, right (INDICATING)?

14:38:04 25    A.  Yes.  It does bother me.

14:38:07  1   Q.  Are you aware, as you sit here and testify today, that Bayer

14:38:11  2   tells doctors outside of the United States this exact language?

14:38:17  3   A.  No.

14:38:19  4   Q.  So you have no knowledge of that.

14:38:44  5        Let me show you what the company says.  You see right

14:38:51  6   here that this is Bayer telling doctors that "Although there is no

14:38:57  7   need to monitor in clinical practice, in certain infrequent

14:39:01  8   situations such as overdosage, acute bleeding, urgent surgery, in

14:39:07  9   cases of suspected noncompliance, or in other unusual

14:39:11 10   circumstances, assessment of the anticoagulant effect of

14:39:13 11   rivaroxaban may be appropriate.  Accordingly, measuring PT using

14:39:17 12   the Neoplastin reagent or Factor Xa, may be useful to inform

14:39:25 13   clinical decisions in these circumstances."  Did you know that?

14:39:29 14   A.  I see that.

14:39:30 15   Q.  According to that sentence, Bayer disagrees with you, don't

14:39:34 16   they?

14:39:34 17   A.  I'm -- you're giving me one -- I don't have a whole document

14:39:39 18   here.  I am not going to comment on what Bayer thinks or doesn't

14:39:42 19   think.  I am not going to look at snippets.

14:39:44 20        MR. BARR:  That's all.

14:39:45 21        THE COURT:  All right.  Any redirect?

14:39:47 22        MS. WILKINSON:  Yes, your Honor.

14:39:59 23                REDIRECT EXAMINATION

14:39:59 24   BY MS. WILKINSON:

14:39:59 25   Q.  Doctor, if you can speak up and lean into the microphone so we

14:40:03  1   can all hear you.

14:40:04  2   A.  Sorry.

14:40:04  3   Q.  You were just shown a statement, and yesterday the rest of the

14:40:07  4   statement was shown to the jury.  Do you see the bottom, the green

14:40:10  5   part that was left out?  Do you see that?

14:40:12  6   A.  Yes.

14:40:12  7   Q.  So what does that say?  Can you read it out loud, please?

14:40:15  8   A.  "However, the response of the PT varies both dependent on PT

14:40:19  9   reagent (which is not standardized) and coagulometer.  Thus, the PT

14:40:25 10   cannot be used to reliably measure the anticoagulant effect of

14:40:29 11   Xarelto since a normal PT may be found in patients with therapeutic

14:40:32 12   Xarelto levels if measured using selected machine/reagent

14:40:36 13   combinations."

14:40:37 14   Q.  And do you agree with that?

14:40:38 15   A.  That's the limitation that I find with the medication.

14:40:40 16   Q.  And when you read that together, does that suggest that PT is

14:40:44 17   useful in a clinical situation where a patient on Xarelto is in an

14:40:51 18   emergency such as surgery?

14:40:52 19   A.  Not in any way that I feel comfortable using.

14:40:55 20        MR. BARR:  Your Honor, I don't want to interrupt, but can

14:40:57 21   we approach real quick?

14:41:07 22        THE COURT:  Yes.

14:41:13 23     (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

14:41:13 24        MR. BARR:  You obviously know what this is about.  It's

14:41:16 25   the Canadian label again.  I think it continues to prejudice the

14:41:20  1    plaintiffs that we can't show the label.  It has -- I mean, they

14:41:26  2    keep criticizing the language from their own label, and they put up

14:41:31  3    language -- I don't think that's anywhere in the actual label about

14:41:35  4    not being able to use the PT.

14:41:39  5           MR. BIRCHFIELD:  And, your Honor, their own witness just

14:41:42  6    asked to see the whole document.  That's --

14:41:46  7           THE COURT:  I understand.  The way I see it, and I've

14:41:49  8    said it several times, the issue is really what the defendant knew

14:41:56  9    and when they knew it.  It's not what's in one label or what's in

14:42:02 10    another label, because the rules are different, the laws are

14:42:06 11    different, the specifics are different.

14:42:08 12           We're going to get in a situation where we then have to

14:42:11 13    try the Canadian label, and then we're going to be with witnesses

14:42:16 14    about what the Canadian label says and why it says that.  And then

14:42:19 15    we're going to go into the France label.  It's really involving the

14:42:24 16    United States label.  It's the FDA's label.

14:42:27 17           And I'll let you get in what they said, what they told

14:42:31 18    other people, obviously what they knew.  But that's where it's got

14:42:37 19    to stop.  We can't put in different labels.  It just doesn't -- it

14:42:43 20    would be impossible to deal with.  It's a different jurisdiction.

14:42:47 21           MS. WILKINSON:  Your Honor, just for the record, the

14:42:49 22    statement they put up was from a submission to a regulator, and all

14:42:53 23    you allowed us to do yesterday was show the complete statement.  It

14:42:56 24    wasn't -- this particular statement where they took the document

14:42:59 25    out was not the label.  It was in answer to a regulatory request in

14:43:03  1   Canada.

14:43:04  2              MR. BARR:  Your Honor, for completeness, this language

14:43:06  3   right here that's quoted is directly out of the label, and they

14:43:09  4   just put a witness up to criticize their own label.  I mean -- and

14:43:14  5   then they put up language that's not -- I mean, it just puts us in

14:43:18  6   an impossible situation.

14:43:20  7              THE COURT:  I understand.  I understand your position.

14:43:25  8              MR. BIRCHFIELD:  Yes, sir.

14:43:26  9              THE COURT:  Thank you.

14:43:46 10      (OPEN COURT.)

14:43:46 11   BY MS. WILKINSON:

14:43:47 12   Q.  All right, Doctor.  One of the questions we have is these

14:43:51 13   different terms that you know and you were being asked about

14:43:54 14   whether we're clear.  So up here we show it says, "PT cannot be

14:43:59 15   used to reliably measure the anticoagulant effect."  All right?

14:44:03 16   A.  Where are you?

14:44:03 17   Q.  I want you to --

14:44:07 18   A.  You're on the second --

14:44:09 19   Q.  "Anticoagulant Effect."  Do you see that?

14:44:12 20   A.  Yes, I do.

14:44:12 21   Q.  These are very different terms from the concentrate, right?

14:44:16 22   The concentrations?

14:44:16 23   A.  Yes.  So --

14:44:18 24   Q.  Let's slow down and see if we can explain this to the jury,

14:44:21 25   okay?

```
 1        (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.)

 2

 3                          *  *  *  *  *  *

 4

 5                       REPORTER'S CERTIFICATE

 6

 7        I, Karen A. Ibos, CCR, Official Court Reporter, United

 8   States District Court, Eastern District of Louisiana, do hereby

 9   certify that the foregoing is a true and correct transcript, to the

10   best of my ability and understanding, from the record of the

11   proceedings in the above-entitled and numbered matter.

12

13

14                     /s/ Karen A. Ibos

15                  Karen A. Ibos, CCR, RPR, CRR, RMR

16                  Official Court Reporter

17

18

19

20

21

22

23

24

25
```

OFFICIAL TRANSCRIPT

1      UNITED STATES DISTRICT COURT
      EASTERN DISTRICT OF LOUISIANA
2

  **************************************************************
3

IN RE:  XARELTO (RIVAROXABAN)
4 PRODUCTS LIABILITY LITIGATION   Docket No. 14-MD-2592
               Section "L"
5              New Orleans, Louisiana
 THIS DOCUMENT RELATES TO:   Friday, June 9, 2017
6 Joseph Orr, et al
 v. Janssen Research &
7 Development, et. al.,
 Case No. 15-CV-3708
8

  **************************************************************
9

      TRANSCRIPT OF TRIAL PROCEEDINGS
10   HEARD BEFORE THE HONORABLE ELDON E. FALLON
      UNITED STATES DISTRICT JUDGE
11     VOLUME IX - AFTERNOON SESSION

12

<u>APPEARANCES:</u>
13

FOR THE PLAINTIFFS'
14 LIAISON COUNSEL:     LEVIN PAPANTONIO
          BRIAN H. BARR, ESQ.
15         316 Baylen Street, Suite 600
          Pensacola, FL 32502
16

         BEASLEY ALLEN
17         BY:  ANDY BIRCHFIELD, ESQ.
          P.O. Box 4160
18         Montgomery, AL 36103

19         GAINSBURGH BENJAMIN DAVID
          MEUNIER & WARSHAUER
20         BY:  GERALD E. MEUNIER, ESQ.
          2800 Energy Centre
21         1100 Poydras Street
          New Orleans, LA 70163
22

         GOZA & HONNOLD, LLC
23         BY:  BRADLEY D. HONNOLD, ESQ.
          11181 Overbrook Road, Suite 200
24         Leawood, Kansas 66211

25

```
 1                              THE LAMBERT FIRM, PLC
                               BY:  EMILY JEFFCOTT, ESQ.
 2                              701 Magazine Street
                               New Orleans, Louisiana 70130
 3

 4    FOR THE DEFENDANT BAYER
      HEALTHCARE PHARMACEUTICALS
 5    INC. and BAYER PHARMA AG:     WILKINSON WALSH & ESKOVITZ, LLP
                                    BY:  BETH A. WILKINSON, ESQ.
 6                                  1900 M Street NW, Suite 800
                                    Washington, DC 20036
 7
                                    Nelson Mullins Riley
 8                                  & Scarborough, LLP
                                    BY:  DAVID E. DUKES, ESQ.
 9                                  Meridian, 17th Floor
                                    1320 Main Street
10                                  Columbia, SC 29201

11
      FOR JANSSEN PHARMACEUTICALS,
12    INC. AND JANSSEN RESEARCH &
      DEVELOPMENT, LLC:             IRWIN FRITCHIE URQUHART & MOORE
13                                  BY:  JAMES B. IRWIN, ESQ.
                                    400 Poydras St., Suite 2700
14                                  New Orleans, LA 70130

15

16    Official Court Reporter:     Karen A. Ibos, CCR, RPR, CRR, RMR
                                    500 Poydras Street, B-275
17                                  New Orleans, Louisiana 70130
                                    (504) 589-7776
18

19      Proceedings recorded by mechanical stenography, transcript
      produced by computer.
20

21

22

23

24

25
```

————— OFFICIAL TRANSCRIPT —————

13:23:02  1   question, that:  Insofar as Mrs. Orr's condition is concerned, you

13:23:05  2   can't say that her event or its outcome would have been any

13:23:08  3   different had she been on warfarin; is that correct?

13:23:11  4          And his answer was:  "I can't say from an outcome

13:23:14  5   perspective, no."

13:23:15  6          I want you to assume that.  And if that was the question,

13:23:19  7   if that was the answer, would you agree or disagree with that?

13:23:22  8   A.  I agree.

13:23:23  9   Q.  Doctor, a suggested warning label has been proposed by

13:23:41  10  plaintiffs.  I would like to ask you to look at this warning --

13:23:44  11  suggested warning label and ask you, from a neurosurgeon

13:23:48  12  standpoint, would this warning label be of any help to you.

13:23:51  13         MR. IRWIN:  If we could have the ELMO, please.  And --

13:24:00  14         MR. HONNOLD:  Could we just note an objection that we

13:24:03  15  made previously for the record?

13:24:04  16         THE COURT:  Right.

13:24:19  17         THE WITNESS:  (WITNESS REVIEWS DOCUMENT.)  Okay.

13:24:28  18  BY MR. IRWIN:

13:24:29  19  Q.  My question is, would this proposed label, proposed by the

13:24:34  20  plaintiff -- plaintiff lawyers be of help to you as a neurosurgeon?

13:24:41  21  A.  So for me as a neurosurgeon, when I treat patients, hemostasis,

13:24:46  22  which is stopping of blood, whether it be -- bleeding, rather --

13:24:50  23  stop it in an elective surgery, emergency surgery, brain surgery,

13:24:54  24  spine surgery is of the utmost importance because we operate in

13:24:59  25  small compartments that are confined.  And so because we operate in

13:25:03  1  small compartments that are confined, bleeding can cause

13:25:06  2  significant issues.

13:25:07  3       My understanding, if I read this, if I was a

13:25:12  4  practitioner, I would think, okay, a normal PT value indicates that

13:25:15  5  maybe levels of rivaroxaban are clinically significant unlikely and

13:25:21  6  it's okay to operate.  But you can have a normal PT and you can

13:25:24  7  have levels of rivaroxaban in your system that are still causing

13:25:27  8  the blood to be thinner and anticoagulated and which would be

13:25:31  9  dangerous.

13:25:31  10       MR. HONNOLD:  Your Honor, this is exactly what we had

13:25:33  11  discussed when we brought the objection up.

13:25:36  12       MR. IRWIN:  Your Honor, he deals with this all the time.

13:25:39  13       THE COURT:  I'll let him go into it.  Overrule the

13:25:43  14  objection.

13:25:45  15  BY MR. IRWIN:

13:25:45  16  Q.  Please continue, Doctor.

13:25:46  17  A.  My understanding, that a patient with a normal PT, you can

13:25:50  18  still have anticoagulation of the blood and that would be dangerous

13:25:53  19  in neurosurgery.

13:26:17  20       THE COURT:  Anything further?

13:26:18  21       MR. IRWIN:  Just about, your Honor.  I am just trying to

13:26:20  22  move through it.

13:26:31  23  BY MR. IRWIN:

13:26:31  24  Q.  Back to the screen, please.  Doctor, these are my last

13:26:46  25  questions.

13:56:24  1   that the plaintiffs agreed to that.  So you made them properly; you

13:56:29  2   made them timely; and you have an opportunity to supplement with

13:56:32  3   writing.

13:56:32  4               MR. IRWIN:  Thank you very much, Judge.

13:56:34  5               MR. MEUNIER:  Your Honor, may I just say a brief word

13:56:37  6   about one issue?

13:56:39  7               THE COURT:  Sure.

13:56:39  8               MR. MEUNIER:  Of course we believe -- may it please the

13:56:42  9   Court, Jerry Meunier for the plaintiffs.

13:56:45  10              We believe that the Rule 50(a) question before you

13:56:47  11  virtually answers itself based upon the more than legally

13:56:50  12  sufficient evidence on Plaintiffs' case.

13:56:52  13              I would like to say, your Honor, that when we talk here

13:56:55  14  about the subjective testimony of the prescribing physician

13:57:01  15  Dr. St. Martin, which to be kind -- the kindest thing you can say

13:57:06  16  about is it is equivocal.

13:57:08  17              He tells Mr. Irwin, "I'd never prescribed it again."

13:57:12  18              He tells Mr. Birchfield, "Yes, I'd take those things into

13:57:15  19  account and consider something else."

13:57:17  20              It's in that very case, your Honor, where I urge the

13:57:19  21  Court to reconsider its position on the objective evidence

13:57:23  22  standard.  When you decided the *Allgood* case, *Allgood versus*

13:57:27  23  *GlaxoKline* (VERBATIM), 2008 WL 483574, 2008 --

13:57:33  24              THE COURT:  I remember it.

13:57:34  25              MR. MEUNIER:  -- the prescriber had basically said, "I'd

13:57:39  1    prescribe it again."

13:57:41  2         And what you acknowledged in the footnote was the

13:57:44  3    plaintiffs didn't put on anything to rebut that, which is why they

13:57:49  4    lost that case.  But you acknowledged that in the Fifth Circuit --

13:57:52  5    and we now have it in both Mississippi law Fifth Circuit and

13:57:56  6    Louisiana law Fifth Circuit -- objective evidence is relevant.

13:57:59  7         The only point I want to make, your Honor, is not

13:58:02  8    necessarily to urge that the jury be told that they can decide the

13:58:09  9    causation prong of learned intermediary based on objective

13:58:13 10    evidence, only that objective evidence of what a reasonable doctor

13:58:18 11    would have done is relevant to their deciding whether

13:58:21 12    Dr. St. Martin or Dr. Bui would have acted differently.

13:58:24 13         And I believe, particularly in a case like this, that

13:58:27 14    objective standard should be considered.

13:58:30 15         THE COURT:  I understand that.  The plaintiffs take the

13:58:34 16    position that the defendants have a duty and responsibility under

13:58:37 17    the law to advise a treater, a prescriber, or a reasonable --

13:58:47 18    either the prescriber or a reasonable prescriber the information.

13:58:51 19         Now, they're correct in the sense that there are some

13:58:54 20    cases that talk about the objective evidence, but my reading of the

13:58:58 21    law -- and I am familiar with this area -- my reading of the law is

13:59:03 22    that that's accurate.

13:59:05 23         But it's accurate when a treater is not available, when

13:59:09 24    the treater doesn't know; and, therefore, the question is, assuming

13:59:15 25    a treater doesn't know, assuming a treater is not available, what

14:03:25 1          THE COURT:  Yes.  Give me about ten minutes.

14:03:27 2          And just on a personal note, I appreciate all of the work

14:03:29 3  that you all have done in the case.  These cases are very difficult

14:03:33 4  because of the numbers of people, I have 17,000 of them, so forth.

14:03:37 5  They sell me I have 860 lawyers in the case.  So it makes it

14:03:42 6  complicated.

14:03:42 7          But the reason that these cases can be handled is because

14:03:46 8  of the quality of the lawyers who handle these cases.  And it's no

14:03:51 9  surprise to me that we have the best of the best on both sides, and

14:03:55 10 not only are they proficient, but they're very professional in the

14:04:00 11 case.  And that means a lot to me, and I need to tell you how much

14:04:03 12 I appreciate it.

14:04:05 13         MR. BARR:  Thank you, your Honor.

14:04:06 14         THE COURT:  The Court will stand in recess.

14:04:08 15         THE DEPUTY CLERK:  All rise.

14:04:09 16      (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED FOR THE DAY.)

17

18                          * * * * * *

19

20                    REPORTER'S CERTIFICATE

21

22          I, Karen A. Ibos, CCR, Official Court Reporter, United
     States District Court, Eastern District of Louisiana, do hereby
23   certify that the foregoing is a true and correct transcript, to the
     best of my ability and understanding, from the record of the
24   proceedings in the above-entitled and numbered matter.

25              /s/ Karen A. Ibos
        _____
        Karen A. Ibos, CCR, RPR, CRR, RMR
        Official Court Reporter

—OFFICIAL TRANSCRIPT—

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO (RIVAROXABAN)  *
PRODUCTS LIABILITY LITIGATION  *          Docket No. 14-MD-2592
                               *
                               *          Section L
THIS DOCUMENT RELATES TO:      *
                               *          New Orleans, Louisiana
                               *
*Joseph Orr, et al.*           *
*v. Janssen Research &*         *          June 12, 2017
*Development, et. al.,*         *
Case No. 15-CV-3708            *
                               *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE
VOLUME X
JUNE 12, 2017

Appearances:


For the Plaintiffs:          Levin Papantonio Thomas Mitchell
                               Rafferty & Proctor, P.A.
                             BY:  BRIAN H. BARR, ESQ.
                             316 South Baylen Street, Suite 600
                             Pensacola, Florida  32502


For the Plaintiffs:          Beasley Allen Crow Methvin
                               Portis & Miles, PC
                             BY:  ANDY BIRCHFIELD, ESQ.
                             Post Office Box 4160
                             Montgomery, Alabama 36103


For the Plaintiffs:          Gainsburgh Benjamin David
                               Meunier & Warshauer, LLC
                             BY:  GERALD E. MEUNIER, ESQ.
                             1100 Poydras Street, Suite 2800
                             New Orleans, Louisiana 70163

```
 1   Appearances:

 2
     For the Plaintiffs:              Goza & Honnold, LLC
 3                                    BY:  BRADLEY D. HONNOLD, ESQ.
                                      11181 Overbrook Road, Suite 200
 4                                    Leawood, Kansas 66211

 5
     For the Plaintiffs:              The Lambert Firm, PLC
 6                                    BY:  EMILY C. JEFFCOTT, ESQ.
                                      701 Magazine Street
 7                                    New Orleans, Louisiana 70130

 8
     For Bayer Healthcare             Wilkinson Walsh + Eskovitz, LLP
 9   Pharmaceuticals, Inc.            BY:  BETH A. WILKINSON, ESQ.
     and Bayer Pharma AG:             1900 M Street NW, Suite 800
10                                    Washington, DC 20036

11
     For Bayer Healthcare             Nelson Mullins Riley &
12   Pharmaceuticals, Inc.           Scarborough, LLP
     and Bayer Pharma AG:             BY:  DAVID E. DUKES, ESQ.
13                                    1320 Main Street, 17th Floor
                                      Columbia, South Carolina 29201
14

15   For Janssen Pharmaceuticals,    Irwin Fritchie Urquhart
     Inc. and Janssen Research &      & Moore, LLC
16   Development, LLC:                BY:  JAMES B. IRWIN, ESQ.
                                      400 Poydras Street, Suite 2700
17                                    New Orleans, Louisiana 70130

18                                    Bradley
                                      BY:  LINDSEY C. BONEY, IV
19                                    One Federal Place
                                      1819 5th Ave. N
20                                    Birmingham, AL  35203

21

22   Official Court Reporter:        Tana J. Hess, CCR, FCRR, RMR
                                      500 Poydras Street, Room B-275
23                                    New Orleans, Louisiana 70130
                                      504.589.7781
24

25   Proceedings recorded by mechanical stenography using
     computer-aided transcription software.
```

OFFICIAL TRANSCRIPT

8:04AM 1   the witnesses.  So I think it's covered substantially, and I

8:04AM 2   don't think it's necessary and could be confusing to the jury.

8:04AM 3   So I'll deny the motion.

8:04AM 4        MR. MEUNIER:  Your Honor, our next objection can be

8:04AM 5   discussed in reference to two of the Plaintiffs' proposed jury

8:04AM 6   charges in document 6732.  That is proposed charge Number 9 and

8:04AM 7   proposed charge Number 25.  Both deal, Your Honor, with the

8:05AM 8   so-called objective evidence standard in terms of the causation

8:05AM 9   prong of the learned intermediary test.  We've also submitted a

8:05AM 10  bench memo to the Court, which is record doc. 6731.  I would

8:05AM 11  incorporate our arguments from that memo for purposes of this

8:05AM 12  objection.  And we've cited the Court to the *Allgood* case, to

8:05AM 13  the *Thomas* case, and to the *Grenier* case.  And Your Honor, the

8:05AM 14  *Allgood* case, the subjective testimony of a learned

8:05AM 15  intermediary was that the label would not have made a

8:05AM 16  difference in his prescribing decision.  And yet Your Honor

8:05AM 17  noted that the Plaintiff may have had an opportunity to put in

8:05AM 18  objective evidence and chose not to.

8:05AM 19        We acknowledge that in *Thomas* and in *Grenier*,

8:05AM 20  there was basically an absent -- I'm sorry, there was basically

8:05AM 21  a question about the subjective evidence from the learned

8:05AM 22  intermediary.  And Your Honor, I think in this case

8:05AM 23  since the -- for example, the testimony of Dr. St. Martin is at

8:05AM 24  best equivocal in that he said on the one hand, he would still

8:06AM 25  prescribe Xarelto, and he said on the other hand, well, if I

8:06AM  1  knew that, I would sit down with the clients and -- the patient

8:06AM  2  and maybe come to a different decision.  We think it's

8:06AM  3  precisely when the subjective testimony on the causation prong

8:06AM  4  is equivocal, it's precisely in those cases that the jury

8:06AM  5  should also hear what a reasonable physician would have done

8:06AM  6  and be able to decide causation on that basis.

8:06AM  7          And so for the reasons we've previously argued,

8:06AM  8  Your Honor, we object to the Court's not having given

8:06AM  9  Plaintiffs' proposed charges 9 and 25 on the objective evidence

8:06AM  10  standard.

8:06AM  11          THE COURT:  You know, I think that the cases, when

8:06AM  12  you look at them closely, they indicate to me in any event that

8:06AM  13  the -- that that standard of objective evidence is -- is alive

8:06AM  14  and well, but it's alive and well in a fact pattern where there

8:06AM  15  is no treater or there is a treater who is -- has forgotten or

8:07AM  16  is absent or has not even expressed an opinion.

8:07AM  17          Here the treaters have expressed an opinion,

8:07AM  18  although frankly, their opinion seems to coincide with both

8:07AM  19  parties.  So I -- I understand Plaintiffs' position, but I

8:07AM  20  think that that introduces a credibility quotient, and it's

8:07AM  21  just up to the jury to decide on credibility.  So that's the

8:07AM  22  reason I deny the motion.

8:07AM  23          MR. MEUNIER:  Your Honor, our next objection again

8:07AM  24  can be discussed in reference to two of our proposed charges,

8:07AM  25  proposed charge Number 12 and proposed charge Number 3.  These

8:07AM 1    deal with federal regulations.

8:07AM 2              Proposed charge Number 12 instructs the jury

8:07AM 3    that the regulations set forth in 21 CFR Section

8:07AM 4    201.57(c)(6)(iii) sets forth a mandatory requirement that

8:07AM 5    helpful liability -- helpful laboratory tests be disclosed in a

8:08AM 6    warnings label for a prescription drug.  This regulation was in

8:08AM 7    fact shown to the jury, and it's clearly relevant to the case.

8:08AM 8    And we believe the Court should instruct the jury that the

8:08AM 9    referenced regulation specifically is relevant to the failure

8:08AM 10   to warn case made -- offered by Plaintiffs.

8:08AM 11             And then in jury charge Number 13, Judge, we

8:08AM 12   asked the Court to instruct the jury that the violation of such

8:08AM 13   regulatory standards may be considered as evidence of the

8:08AM 14   appropriate standard for determining whether instructions were

8:08AM 15   adequate, and we cite case law for that.

8:08AM 16             So we respectfully object to the failure to give

8:08AM 17   charges 12 and 13 proposed by Plaintiffs.

8:08AM 18        THE COURT:  I think taken as a whole, the jury

8:08AM 19   charges are accurate and they express what the Plaintiff has

8:08AM 20   indicated.  I don't think that zeroing in on something is even

8:08AM 21   helpful to the jury or helpful to the parties.  So that's the

8:08AM 22   reason I deny it.

8:09AM 23        MR. MEUNIER:  Our final objection, Judge, again, can

8:09AM 24   be referenced with two of the proposed charges, Numbers 27 and

8:09AM 25   28.  This deals with the strike-through label that the

| | | |
|---|---|---|
| 12:00PM | 1 | Defendants. |
| 12:00PM | 2 | In order to prove their failure to warn or instruct |
| 12:00PM | 3 | claim, the Plaintiffs must not only prove that the Defendants' |
| 12:00PM | 4 | warnings or instructions regarding Xarelto were inadequate, but |
| 12:00PM | 5 | also that such inadequacy affected the decision or decisions of |
| 12:00PM | 6 | the prescribing or treating physician with regard to Xarelto. |
| 12:00PM | 7 | In other words, you must determine if Dr. St. Martin and Bui |
| 12:00PM | 8 | would have altered their prescribing or treating decision or |
| 12:00PM | 9 | behavior and Mrs. Orr would not have suffered her bleed or |
| 12:01PM | 10 | death had the doctors been provided with fully and adequate |
| 12:01PM | 11 | instructions about the characteristics of the drug and the |
| 12:01PM | 12 | utility of the PT test. |
| 12:01PM | 13 | If the greater weight of the evidence does not |
| 12:01PM | 14 | support the Plaintiffs' claim, your verdict should be for the |
| 12:01PM | 15 | Defendants.  If the greater weight of the evidence, however, |
| 12:01PM | 16 | does support the Plaintiffs' claim, then your verdict should be |
| 12:01PM | 17 | for the Plaintiffs. |
| 12:01PM | 18 | Let me say something about labeling and federal |
| 12:01PM | 19 | regulations.  As I previously mentioned, Xarelto is a brand |
| 12:01PM | 20 | name drug.  The FDA approved both Xarelto and its label.  You |
| 12:01PM | 21 | may consider that fact in weighing the evidence in this case |
| 12:01PM | 22 | and determining the liability of the Defendants.  However, FDA |
| 12:02PM | 23 | approval, although relevant, does not in and of itself absolve |
| 12:02PM | 24 | the Defendant of all liability, nor does it establish that the |
| 12:02PM | 25 | warnings or instructions provided with the drug were adequate |

12:02PM   1   under the standards of Louisiana law.  If fact, an action or

12:02PM   2   inaction on the part of the FDA, though relevant, does not

12:02PM   3   foreclose a claim under Louisiana law.  Therefore, even if the

12:02PM   4   Defendants have met all the appropriate minimum standards for

12:02PM   5   FDA approval and governmental regulations and requirements to

12:02PM   6   obtain FDA approval, this compliance and approval, though

12:02PM   7   relevant, is not sufficient to conclusively establish that the

12:02PM   8   Defendants have taken the steps necessary under the law

12:02PM   9   applicable to this case.  More specifically, if you find that

12:03PM  10   the Defendants failed to apprise prescribing or treating

12:03PM  11   physicians of appropriate testing to address the risks that

12:03PM  12   they knew or should have known prior to the FDA approval or

12:03PM  13   became known or should have become known after the FDA approved

12:03PM  14   Xarelto's label, that FDA approval of the drug, though

12:03PM  15   relevant, is not conclusive.

12:03PM  16            Specific federal regulations authorize the

12:03PM  17   manufacturer of a drug which has been approved by the FDA to

12:03PM  18   add or strengthen warnings, precautions, adverse reactions,

12:03PM  19   information about the drug in the drug's label, and to do so

12:03PM  20   without the need for prior FDA approval.  The FDA, however,

12:03PM  21   retains the power to remove such language.

12:04PM  22            Causation.  In order for the Plaintiffs to prevail on

12:04PM  23   their claim, they must establish that the inadequate

12:04PM  24   instructions or warnings was the proximate cause of Sharyn

12:04PM  25   Orr's alleged injuries.  Proximate cause means the efficient or

1:35PM   1    Number 3061443, and if you can just let me know when you have

1:36PM   2    that in front of you.

1:36PM   3    **A.**    I do.

1:36PM   4    **Q.**    Okay.  And this was the email that was sent to you that

1:36PM   5    you testified about last week, and you testified that you have

1:36PM   6    no reason to doubt that you did, in fact, receive this email;

1:36PM   7    correct?

1:36PM   8    **A.**    Correct.  If it was sent from -- if I'm on the "to" list,

1:36PM   9    I would have received it, sure.

1:36PM  10    **Q.**    Can you repeat your answer?  We had difficulty hearing you

1:36PM  11    here.

1:36PM  12    **A.**    Oh, yes.  I was saying I have no reason to doubt it,

1:36PM  13    because I'm on there on the "to" distribution list.

1:36PM  14    **Q.**    Okay.  So you're on the "to" distribution list of the

1:36PM  15    email from Lori Birkenberger; correct?

1:36PM  16    **A.**    That is correct.

1:36PM  17    **Q.**    Okay.  And it's your testimony from last week that you

1:36PM  18    don't recall the email.  Is that still true today, that you do

1:36PM  19    not recall receiving this email?

1:36PM  20    **A.**    That is correct, yes.

1:36PM  21    **Q.**    Okay.  Now, let me ask you a little bit about that.  You

1:37PM  22    know, I may not recall an email that I received, you know,

1:37PM  23    yesterday, but do you have any reason to believe that when you

1:37PM  24    received this email, you would not have received it -- you

1:37PM  25    would not have read it at the time?

OFFICIAL TRANSCRIPT

1:37PM  1    A.   Yes, that's actually a good possibility, because in 2014 I
1:37PM  2    was involved in other projects, and Lori had sent me saying
1:37PM  3    something for appreciation what's going in Canada.  If she had
1:37PM  4    specifically said, "Look at it and you review it and let me
1:37PM  5    know if you have anything", I would have probably looked at it
1:37PM  6    in more detail, but what she said was for appreciation.  I may
1:37PM  7    have looked at the email without spending too much time on it.
1:37PM  8    Q.   Okay.  Let me ask you this.  Independent of the email, did
1:37PM  9    anyone from Janssen or Bayer ask you to review the Health
1:38PM  10   Canada clarification request response of November of 2014?
1:38PM  11   A.   I don't recollect anybody doing that because, again, I got
1:38PM  12   off the project for two and a half years, so I wasn't the
1:38PM  13   principal contact or the principal regulatory calling on the
1:38PM  14   team.
1:38PM  15   Q.   Mr. Jalota, we may -- Mr. Jalota, if I can interrupt you.
1:38PM  16   You may want to slow down just a little bit.  Because the court
1:38PM  17   reporter can't see you speaking, it makes it difficult.  If you
1:38PM  18   could just slow down and try to speak clearly into the
1:38PM  19   microphone, that should help the court reporter in giving your
1:38PM  20   answers.  So if you want to repeat your answer --
1:38PM  21   A.   Actually, you know what?  Do you mind doing me a favor?
1:38PM  22   Could you maybe mute your phone while I talk, because I'm
1:38PM  23   getting some background sounds.
1:38PM  24   Q.   I'm not sure if we can do that.
1:38PM  25   A.   Okay.  Let me just -- I'll try again.  So do you mind

1:45PM   1   that came from Health Canada, and then Bayer's responses are in
1:45PM   2   a regular font.  Do you see that?
1:45PM   3   A.   Could be.
1:45PM   4   Q.   Okay.  And that's what it says in that first paragraph;
1:45PM   5   correct?
1:45PM   6   A.   That is correct.
1:45PM   7   Q.   Okay.  So I want to ask you about the first section of
1:45PM   8   this document, which is the Executive Summary.  And
1:45PM   9   specifically, I'm going to be asking you about the third bullet
1:45PM  10   point at the bottom of this first page that continues --
1:45PM  11   A.   Right.
1:45PM  12   Q.   -- over to Page 2.
1:45PM  13   A.   Okay.
1:45PM  14   Q.   Okay.  And if you could look with me, Health Canada --
1:45PM  15   Bayer starts out by quoting from the clarification request in
1:46PM  16   which they ask whether updates to the product monograph may be
1:46PM  17   appropriate to advise prescribers of the need to determine
1:46PM  18   steady-state anticoagulant effect of the drug at trough,
1:46PM  19   possibly followed by a dose adjustment.  Do you see that in
1:46PM  20   that bold paragraph at the top of Page 1?
1:46PM  21   A.   Yes, I do.
1:46PM  22   Q.   Okay.  And when it refers to the product monograph, is
1:46PM  23   that the labeling for the drug in Canada?
1:46PM  24   A.   That is correct.
1:46PM  25   Q.   Okay.  And so if we can look down at the third paragraph,

OFFICIAL TRANSCRIPT

1:46PM   1    it looks like Bayer is providing an Executive Summary, and they

1:46PM   2    state at the bottom that "The Xarelto product monograph

1:46PM   3    includes the available information on coagulation monitoring

1:46PM   4    and laboratory testing from the Xarelto clinical development

1:46PM   5    program, including the correlation between rivaroxaban plasma

1:46PM   6    concentration and commonly used coagulation tests."  Do you see

1:47PM   7    that?

1:47PM   8    A.    I do.

1:47PM   9    Q.    Okay.  And were you aware that the product monograph, the

1:47PM  10    label, in Canada for Xarelto included information related to

1:47PM  11    the correlation between Xarelto concentration levels and

1:47PM  12    commonly used coagulation tests?

1:47PM  13    A.    No, I didn't.  I mean, all I can say to you is that could

1:47PM  14    be what Canada -- what they would have submitted very early on

1:47PM  15    may have been very similar to what we submitted in Section 12.

1:47PM  16    But other than that, I don't know what negotiations took place

1:47PM  17    at Health Canada.

1:47PM  18    Q.    Okay.  So it's your testimony you were not involved in any

1:47PM  19    of the further labeling work on Xarelto in Canada after the

1:47PM  20    early approval from Xarelto in Canada; is that right?

1:48PM  21    A.    So what happened was Janssen and Bayer collaborated very

1:48PM  22    closely, so we would have got -- we would have received

1:48PM  23    documents here -- we would have received some of the key label

1:48PM  24    changes that Bayer would have sent us just for information,

1:48PM  25    nothing else, because we -- we weren't responsible for the

1:48PM   1   labeling or -- yeah, we weren't responsible for the application

1:48PM   2   in Canada.

1:48PM   3   Q.   Can you start over?  Just try to speak slowly and clearly,

1:48PM   4   if you can, please.

1:48PM   5   A.   Okay.  So what I'm saying was that Bayer would have shared

1:48PM   6   that with us, but more as an F.Y.I. rather than any commenting

1:48PM   7   per se.

1:48PM   8   Q.   So if you can flip with me to the next page, which is Page

1:48PM   9   2 of 11 at the top, you see that that section from that third

1:48PM  10   bullet point continues with "the sponsor recognizes".  Do you

1:49PM  11   see that?

1:49PM  12   A.   I do.  I do.  I do.

1:49PM  13   Q.   Okay.  And this statement is made by Bayer in this

1:49PM  14   response says, "The sponsor recognizes that in certain

1:49PM  15   infrequent situations such as overdosage, acute bleeding,

1:49PM  16   urgent surgery, suspected non-compliance, or in other unusual

1:49PM  17   circumstances, assessment of the anticoagulant effect of

1:49PM  18   Xarelto may be desirable."  Correct?

1:49PM  19   A.   That's correct.

1:49PM  20   Q.   Okay.  And was it -- and was it --

1:49PM  21   A.   I --

1:49PM  22   Q.   Was it Bayer and Janssen's position that the ability to

1:49PM  23   assess the anticoagulant effect of Xarelto in circumstances

1:49PM  24   like urgent surgery or acute bleeding was desirable?

1:49PM  25   A.   So let me just -- let me just -- before I answer that, I

1:50PM  1   actually wanted to finish the -- I think what the sponsor --
1:50PM  2   the sponsor's saying that the product more or less provides the
1:50PM  3   guidance there.  Now, so I don't know --
1:50PM  4   Q.   Can you -- I'm sorry, the court reporter had a -- couldn't
1:50PM  5   hear you that time.  It's just not a great connection, and
1:50PM  6   it's --
1:50PM  7   A.   I'm sorry.
1:50PM  8   Q.   I know the phone you're using may be not -- may not be
1:50PM  9   giving us the right sound, but if you could just restate that
1:50PM 10   last part you said, and then I'll reask my question.
1:50PM 11   A.   Right.  So I just wanted to highlight that this is the --
1:50PM 12   it may well be that Bayer is stating what's in the product
1:50PM 13   monograph already.  That's one aspect.
1:50PM 14        But to your -- to your question is when we -- when we
1:50PM 15   had submitted the initial NDA in July 2008 and the NDA for
1:51PM 16   January 2011, we left it as individuals AFib, which could
1:51PM 17   encompass overdose, acute bleeding, urgent surgery.  So we
1:51PM 18   recognized individual AFib and directed them to prescribe --
1:51PM 19   all the physicians who -- that (connection cutting out).
1:51PM 20   Q.   We're really having a difficulty time hearing what you're
1:51PM 21   saying, Mr. Jalota.
1:51PM 22        MS. TERSIGNI:  Neil, this is Julie.  Do you want us
1:51PM 23   to try to dial back in?
1:51PM 24        MR. OVERHOLTZ:  Should we try that, Dean?
1:51PM 25        THE CASE MANAGER:  Is he on a cell phone?

1:51PM   1          **MR. OVERHOLTZ:**  Is it a regular speakerphone you guys

1:51PM   2   are using?

1:51PM   3          **MS. TERSIGNI:**  It's like in one of our conference

1:51PM   4   rooms.  It's a huge speaker.

1:51PM   5          **THE WITNESS:**  I'm actually on top -- I just on top of

1:52PM   6   the speaker, and I know that will help -- helping a lot.

1:52PM   7          **THE CASE MANAGER:**  She's much clearer than he is.

1:52PM   8          **MR. OVERHOLTZ:**  Yeah, Julie's much clearer than you

1:52PM   9   are, so maybe -- maybe you should step back a little bit where

1:52PM   10  Julie is.

1:52PM   11         **THE WITNESS:**  Okay.  Does this help?

1:52PM   12         **MR. OVERHOLTZ:**  Sounded a little better.  Let's try

1:52PM   13  that.

1:52PM   14         **THE WITNESS:**  Okay.  So could you ask the question

1:52PM   15  again, please?

1:52PM   16  **BY MR. OVERHOLTZ:**

1:52PM   17  Q.   Sure.  Well, you mentioned that also stated in this

1:52PM   18  response is a statement from the Xarelto product monograph.  Do

1:52PM   19  you recall that?

1:52PM   20  A.   Yes.  It states below.  It states -- just below that

1:52PM   21  statement you stated, it states, "The Xarelto product monograph

1:52PM   22  provides guidance to the physicians."

1:52PM   23  Q.   So it says that, "The Xarelto product monograph provides

1:52PM   24  guidance to physicians regarding the possibility to monitor

1:52PM   25  patients as clinical indicated," and then there is a quote.  Do

| | | |
|---|---|---|
| 1:52PM | 1 | you see that? |
| 1:52PM | 2 | A.   Yes, I do. |
| 1:52PM | 3 | Q.   Okay.  And that language that is in quotes there, is that |
| 1:53PM | 4 | language from the Xarelto product monograph, the Canadian |
| 1:53PM | 5 | labeling for the product; is that right? |
| 1:53PM | 6 | A.   I -- without looking at the monograph, I don't have it, |
| 1:53PM | 7 | but I'd say that's what it states, provides guidance, and I |
| 1:53PM | 8 | would assume that is from the label, that's correct, from the |
| 1:53PM | 9 | monograph, correct. |
| 1:53PM | 10 | Q.   Okay.  And this language from the Xarelto product |
| 1:53PM | 11 | monograph states that "Although there is no need to monitor |
| 1:53PM | 12 | clinical practice, in certain infrequent situations such as |
| 1:53PM | 13 | overdosage, acute bleeding, urgent surgery, in cases of |
| 1:53PM | 14 | suspected non-compliance, or in other unusual circumstances, |
| 1:53PM | 15 | assessment of the anticoagulant effect of rivaroxaban may be |
| 1:53PM | 16 | appropriate.  Accordingly, measuring PT using the neoplastin |
| 1:53PM | 17 | reagent or Factor 10A assay using rivaroxaban-specific |
| 1:53PM | 18 | calibrators and controls may be useful to inform clinical |
| 1:53PM | 19 | decisions in these circumstances."  Did I read that correctly? |
| 1:54PM | 20 | A.   Yes, you did. |
| 1:54PM | 21 | Q.   Okay.  And this is information that is being provided to |
| 1:54PM | 22 | physicians in Canada as guidance in these situations; correct? |
| 1:54PM | 23 | A.   That's what it appears, so -- I mean, I don't know.  Yes, |
| 1:54PM | 24 | that's probably that, yes, yes. |
| 1:54PM | 25 | Q.   And it specifically states that the use of the PT test |

1:54 PM
1:54 PM
1:54 PM
1:54 PM
1:54 PM
1:54 PM
1:55 PM
1:55 PM
1:55 PM
1:55 PM
1:55 PM
1:55 PM
1:55 PM
1:55 PM
1:55 PM
1:55 PM
1:55 PM
1:55 PM
1:56 PM
1:56 PM
1:56 PM
1:56 PM
1:56 PM
1:56 PM
1:56 PM

1   using the neoplastin reagent in circumstances like urgent

2   surgery could be useful in making clinical decisions; correct?

3   A.    That's correct.

4   Q.    And do you agree that this statement from the Xarelto

5   product monograph about the usefulness of PT using the

6   neoplastic reagent in urgent surgery situations represents

7   Bayer and Janssen's position on the ability to use such tests?

8   A.    I -- I would defer to the clinical people that -- I mean,

9   for us -- actually, first of all, I'd go to the clinical people

10   that -- I -- my perspective is we put something in the label --

11   we proposed something in July 2008 and January 2011.

12   Q.    Let me ask you to look down with me to -- let's see what

13   page.  Let's -- if we can turn over to Page 4 of 11, there's a

14   Section 3.

15   A.    Page 4 of 11?  Yes.  Thank you.

16   Q.    Okay.  And there's a question posed by Health Canada that

17   bears responding to.  And it says, "Discuss currently available

18   laboratory tests that might be useful to prescribers of your

19   drug in terms of routine assessment of safety and efficacy of

20   its anticoagulant effect."  Do you see that?

21   A.    I do.

22   Q.    And if you can look with me at this response, it indicates

23   that the sponsor had investigated several tests during the

24   clinical development program, including prothrombin time, PT,

25   as well as some other tests, including APTT and HepTest, and do

1:56PM   1    you see with me where it says that, "Except for PT, the tests
1:56PM   2    were not considered to be suitable for following the
1:56PM   3    pharmacodynamics effect of Xarelto"?  Do you see that?
1:56PM   4    A.   I do.
1:56PM   5    Q.   Okay.  And then the next paragraph states, "In contrast, a
1:56PM   6    linear correlation between PT using a sensitive reagent system
1:56PM   7    neoplastin and plasma concentrations were established in Phase
1:57PM   8    I and Phase II trials in patients treated for the prevention
1:57PM   9    and treatment of thromboembolic disorders."  Do you see that?
1:57PM  10    A.   I do.
1:57PM  11    Q.   Okay.  Now, you see that -- with me that in this response,
1:57PM  12    someone has added the language regarding PT regarding using a
1:57PM  13    sensitive reagent system neoplastin; is that correct?
1:57PM  14    A.   It appears so, yes.  That's correct.  I don't know who did
1:57PM  15    it, but it appears so.
1:57PM  16    Q.   Okay.  And, in fact, if we look down at the bottom of the
1:57PM  17    page, there's a section called "Monitoring and Laboratory Test
1:57PM  18    Information in the Xarelto Monograph".  That's talking about
1:57PM  19    the Canadian Xarelto label; correct?
1:57PM  20    A.   That is correct.
1:57PM  21    Q.   Okay.  And it describes that, "The Xarelto product
1:57PM  22    monograph contains the following information about PT in the
1:57PM  23    section 'Warnings and Precautions, Monitoring in Laboratory
1:57PM  24    Tests.'"  Do you see that?
1:57PM  25    A.   I do.

1:58PM    1    **Q.**   Okay.  And that first paragraph describes this close

1:58PM    2    correlation between plasma concentration and PT if the

1:58PM    3    neoplastin reagent is used; is that correct?

1:58PM    4    **A.**   That's correct.

1:58PM    5    **Q.**   Okay.  And it states specifically there that, "In patients

1:58PM    6    who are bleeding, measuring the PT using the neoplastin reagent

1:58PM    7    may be useful to assist in determining an excess of

1:58PM    8    anticoagulant activity."  Correct?

1:58PM    9    **A.**   That is what it states on the product monograph.

1:58PM   10    **Q.**   Okay.  And so if something is a useful test in determining

1:58PM   11    the excess of anticoagulant activity in a patient taking

1:58PM   12    Xarelto, that would be helpful information to a physician; is

1:58PM   13    that correct?

1:58PM   14    **A.**   I would -- so my first reaction would be, again I think

1:58PM   15    you talk to clinical -- a clinical person for this, the

1:58PM   16    usefulness.  I would say to you is this is -- yes, this is in

1:59PM   17    the label.  I mean, if you look at what we proposed initially

1:59PM   18    it's somewhat similar, something like what we proposed

1:59PM   19    initially.

1:59PM   20    **Q.**   When -- and, in fact, when we looked at Page 1 of 11,

1:59PM   21    specifically in the Executive Summary, it was described by

1:59PM   22    Bayer in this document that that Xarelto product monograph,

1:59PM   23    that section was providing guidance to physicians; correct?

1:59PM   24         **MR. IRWIN:**  I object.  Asked and answered at least

1:59PM   25    twice before.

OFFICIAL TRANSCRIPT

2464

BY MR. OVERHOLTZ:

Q.    You can go ahead and answer, Mr. Jalota.

A.    I'm sorry.  Can you repeat that question again, please?

Q.    Sure.  This section that we're reading from when we looked at Page 2 of 11 in the Bayer response to the Health Canada request specifically said that this section provides guidance to physicians in this situation; correct?

A.    That's what the texts say, and that's correct.  That's what this section is saying here, the section on Page 4 of 11.  That's what the information states.  That's correct.

Q.    And you provide guidance to physicians in situations in which you are trying to provide the physician with helpful information; correct?

A.    That's what the Canada labels say.  I think -- I mean, I think you've got to be careful about -- Canada labeling system is different to ours.  You've got to understand who put what where, whether -- I don't know the full development of the label, so I don't know whether Health Canada proposed -- (connection breaking up).

Q.    You broke up on the last part, Mr. Jalota.

A.    What I can say is we don't know -- this information is in there.  How it got there, I don't want to speak.

Q.    This information, this -- well, let's look, make sure we're talking about the right paragraph.  If we look at Page 4, that quoted section again appears at the very bottom of the

| | | |
|---|---|---|
| 2:01PM | 1 | page regarding the circumstances involving situations such as |
| 2:01PM | 2 | acute bleeding and urgent surgery and measuring PT; correct? |
| 2:01PM | 3 | A.   That's correct, it does. |
| 2:01PM | 4 | Q.   Okay.  And regarding this information in the Health Canada |
| 2:01PM | 5 | product monograph for Xarelto, the Canadian labeling, have you |
| 2:01PM | 6 | ever suggested that that information that's being provided to |
| 2:01PM | 7 | physicians in Canada was inaccurate -- was inaccurate? |
| 2:01PM | 8 | A.   I missed that.  I'm sorry, about the inaccurate part.  Can |
| 2:01PM | 9 | you repeat again? |
| 2:02PM | 10 | Q.   Sure.  Have you ever suggested that this section in the |
| 2:02PM | 11 | Health Canada label regarding using PT neoplastin in an urgent |
| 2:02PM | 12 | surgery situation was somehow inaccurate in the guidance it |
| 2:02PM | 13 | provides physicians? |
| 2:02PM | 14 | A.   I don't -- I don't recall saying that, but again, if |
| 2:02PM | 15 | you've got something to show, I'd be happy to look at it, but I |
| 2:02PM | 16 | don't recall saying that.  I would probably have deferred it to |
| 2:02PM | 17 | others. |
| 2:02PM | 18 | Q.   All right.  I want to ask you about a statement just above |
| 2:02PM | 19 | the "Monitoring and Laboratory Test Information" section.  It |
| 2:02PM | 20 | starts with "however".  Do you see that? |
| 2:02PM | 21 | A.   I do. |
| 2:02PM | 22 | Q.   Okay.  And this sentence follows the paragraph that talked |
| 2:02PM | 23 | about the linear correlation between PT and -- PT neoplastin |
| 2:02PM | 24 | and plasma concentrations of Xarelto and says, "However, the |
| 2:02PM | 25 | response of the PT varies both dependent on PT reagent, which |

| | | |
|---|---|---|
| 2:03PM | 1 | is not standardized, and coagulometer.  Thus, the PT cannot be |
| 2:03PM | 2 | used to reliably measure the anticoagulant effect of Xarelto |
| 2:03PM | 3 | since a normal PT may be found in patients with therapeutic |
| 2:03PM | 4 | Xarelto levels if measured using selected machine/reagent |
| 2:03PM | 5 | combinations."  Do you see that statement? |
| 2:03PM | 6 | A.    I do. |
| 2:03PM | 7 | Q.    Okay.  So this statement -- I want to make sure we're |
| 2:03PM | 8 | clear about this statement.  This is not a statement that |
| 2:03PM | 9 | appears in the Canadian labeling for Xarelto; correct? |
| 2:03PM | 10 | A.    Without looking at the Canadian -- without looking at the |
| 2:03PM | 11 | Canadian monograph, it's not there, but I -- without looking at |
| 2:03PM | 12 | the Canadian monograph, I can't really tell you if it does or |
| 2:03PM | 13 | doesn't. |
| 2:03PM | 14 | Q.    I mean, unlike the language we see at the bottom of Page 4 |
| 2:03PM | 15 | in which it's indented and in quotes, this language does not |
| 2:03PM | 16 | have quotes around it; correct? |
| 2:03PM | 17 | A.    That is correct. |
| 2:04PM | 18 | Q.    This is Bayer responding to Health Canada's request |
| 2:04PM | 19 | regarding the use of measurement in a situation in which dose |
| 2:04PM | 20 | adjustment might be used, sometimes called therapeutic drug |
| 2:04PM | 21 | monitoring; correct? |
| 2:04PM | 22 | A.    I'm sorry.  Could you repeat that again? |
| 2:04PM | 23 | Q.    Sure.  This section, this statement, this is part of |
| 2:04PM | 24 | Bayer's response to a request, a clarification request from |
| 2:04PM | 25 | Health Canada that would -- that dealt with the use of |

2:04PM   1   measurement of Xarelto levels in a situation in which a doctor
2:04PM   2   may want to adjust the dose of Xarelto; is that right?
2:04PM   3   A.   I don't know, but I'm looking at -- I don't know.  I'm
2:04PM   4   looking at the first -- at Page 1.  It -- there appears to be
2:04PM   5   some discussions on this, but I don't -- I really don't know
2:04PM   6   much about that.  I'm sorry.
2:04PM   7   Q.   All right.  That was the -- on Page 1 of 11 where Health
2:04PM   8   Canada said, "To optimize the benefit risk of novel oral
2:05PM   9   anticoagulant drugs, including that of Xarelto, we've
2:05PM  10   determined that updates to your product monograph may be
2:05PM  11   appropriate to advise prescribers of the need to determine the
2:05PM  12   steady-state anticoagulant effect of the drug at trough,
2:05PM  13   possibly followed by a dose adjustment."  Right?
2:05PM  14   A.   That's correct.  And that's -- yeah, that's correct.
2:05PM  15   Q.   Okay.  Now, this statement on the middle of Page 4 that
2:05PM  16   begins with "however," it doesn't say anywhere in that
2:05PM  17   statement that using PT neoplastin is not a reliable test; does
2:05PM  18   it?
2:05PM  19   A.   No, it doesn't.
2:05PM  20   Q.   In fact, it says that it cannot be used reliably if you
2:05PM  21   use select machine/reagent combinations; right?
2:05PM  22   A.   That's what it -- yeah, that's what it states in the -- in
2:06PM  23   the response.
2:06PM  24   Q.   And the Xarelto labeling in Canada specifically directs
2:06PM  25   doctors to the PT neoplastin test as being the sensitive

| | |
|---|---|
| 2:06PM | 1 |

reagent test; correct?

2:06PM 2  **A.**    That is correct.

2:06PM 3  **Q.**    Okay.  And then if we look at the top of Page 5, this

2:06PM 4  section goes on, and there's further information quoted from

2:06PM 5  the product monograph.  If you see that sentence that begins

2:06PM 6  with the word "additionally"?

2:06PM 7  **A.**    Correct.

2:06PM 8  **Q.**    And if we look at this section, Bayer's telling Health

2:06PM 9  Canada that there are other parts of the label that tell

2:06PM 10  doctors which tests not to use; correct?

2:06PM 11  **A.**    It's saying -- well, the first -- the first three appear

2:06PM 12  to be -- the first -- the first two appear to be correct.

2:06PM 13  **Q.**    Right.  It tells doctors that -- not to use INR; correct?

2:06PM 14  **A.**    That is correct.

2:07PM 15  **Q.**    It tells doctors not to use APTT or HepTests; correct?

2:07PM 16  **A.**    That is correct.  For the assessment of pharmacodynamic

2:07PM 17  effects, that's correct.

2:07PM 18  **Q.**    Okay.  And that information is in the Canadian label for

2:07PM 19  the drug, because knowing which tests to use and which tests

2:07PM 20  not to use is helpful information for the doctor; correct?

2:07PM 21  **A.**    I -- I don't know.  I'd say -- I'd have to go back to the

2:07PM 22  clinical team.  I'd say -- if you look at me -- I think if you

2:07PM 23  look at what we submitted in July 2008 and January 2011, that's

2:07PM 24  what -- we had some similar text in that.  We tried -- even

2:07PM 25  during the labeling negotiations, we tried to tell the agency

2:07PM   1   that INR should not be used.

2:07PM   2   Q.   I want to ask you about a statement on the next page,

2:07PM   3   Page 6.

2:07PM   4   A.   Okay.

2:07PM   5   Q.   Okay.  And it's the paragraph that says that -- it's

2:08PM   6   talking about the use of an anti-Factor Xa assay, and it says,

2:08PM   7   "It's important to note that a very limited number of

2:08PM   8   laboratories are able to run anti-Xa assays, and only some of

2:08PM   9   these laboratories are currently providing rivaroxaban levels.

2:08PM  10   Most laboratories do not have coagulometers, reagents or

2:08PM  11   technical skills required to run this assay."  Do you see that?

2:08PM  12   A.   I do.

2:08PM  13   Q.   Okay.  Now, there's a comment out to the side that says

2:08PM  14   TS13.  Do you see that?

2:08PM  15   A.   I do.

2:08PM  16   Q.   Now, do you know who Ted Spiro is?

2:08PM  17   A.   I do know Ted Spiro, Dr. Spiro.

2:08PM  18   Q.   Right.  And Dr. Spiro has testified in this trial by video

2:08PM  19   deposition, and he was a clinician at Bayer; correct?

2:08PM  20   A.   Dr. Spiro was a clinician at Bayer.

2:08PM  21   Q.   All right.  And he worked here in the United States;

2:09PM  22   correct?

2:09PM  23   A.   He -- yes, he -- yes, he did.  He was working here in the

2:09PM  24   United States, yes.

2:09PM  25   Q.   All right.  And Ted Spiro makes the comment in this draft

OFFICIAL TRANSCRIPT

2:09PM   1   response and says, "I would delete this.  The Canadian labs

2:09PM   2   absolutely have the technical skills to run these assays.  The

2:09PM   3   laboraticians in Canada are excellent, well trained and highly

2:09PM   4   competent," exclamation point.  Do you see that?

2:09PM   5   **A.**   I do.

2:09PM   6   **Q.**   Okay.  Do you have any reason to believe that the

2:09PM   7   laboraticians here in New Orleans at health facilities like

2:09PM   8   Ochsner are not also excellent, well trained, and highly

2:09PM   9   competent?

2:09PM  10   **A.**   I am not qualified to think that.  I mean, that's Dr.

2:09PM  11   Spiro's opinion there.  I don't -- I'm not qualified to tell

2:09PM  12   you that, sir.  Sorry.

2:09PM  13   **Q.**   Okay.  Do you have any reason to believe that the

2:09PM  14   laboraticians that work at the Ochsner Health System here in

2:09PM  15   New Orleans are not skilled and well trained and can follow

2:10PM  16   instructions if provided by the company?

2:10PM  17   **A.**   Again, I would say to you -- I would assume everybody

2:10PM  18   should be if they're -- if they're in their current role, but

2:10PM  19   specifically, I -- I can't tell you more than that.  But in

2:10PM  20   general, I would say yes.

2:10PM  21   **Q.**   Okay.  If we can turn back to Page 2 of 11 in which the

2:10PM  22   quote from the Canadian label is provided by -- in this

2:10PM  23   response.  Do you have that?

2:10PM  24   **A.**   Page 2 of 11; right?

2:10PM  25   **Q.**   2 of 11, correct.

OFFICIAL TRANSCRIPT

| | |
|---|---|
| 3:42 PM | 1 |

3:42 PM 1          And this was signed by the jury foreperson on

3:42 PM 2  June 12th, 2017.  Members of the jury, is that your verdict?

3:42 PM 3          (All jurors indicating in the affirmative.)

3:42 PM 4          **THE COURT:**  Does anybody wish the jury to be polled?

3:42 PM 5          **MR. BIRCHFIELD:**  No, Your Honor.

3:42 PM 6          **MS. WILKINSON:**  No, Your Honor.

3:42 PM 7          **THE COURT:**  Okay.  Then jury, we'll make this a part

3:42 PM 8  of the record, and the jury is discharged with the thanks of

3:42 PM 9  the Court.

3:42 PM 10          **THE CASE MANAGER:**  All rise.

3:42 PM 11          (Whereupon the jury was excused from the courtroom.)

3:43 PM 12          **THE COURT:**  Okay.  Court will stand in recess.

13

14

15

16                              **CERTIFICATE**

17          I, Tana J. Hess, CCR, FCRR, Official Court Reporter for the

18  United States District Court, Eastern District of Louisiana, certify

19  that the foregoing is a true and correct transcript, to the best of

20  my ability and understanding, from the record of proceedings in the

21  above-entitled matter.

22

23

24                              _____
                                Tana J. Hess, CCR, FCRR, RMR
25                              Official Court Reporter


                              OFFICIAL TRANSCRIPT