UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO: | JUDGE ELDON E. FALLON |
| Dora Mingo v. Janssen Research & Development, LLC, et al.<br>Case No. 2:15-cv-03469 | MAGISTRATE NORTH |

**DEFENDANTS' MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF FOREIGN LABELING AND REGULATORY ACTIONS UNDER FEDERAL RULES OF EVIDENCE 402 AND 403**

Defendants Bayer HealthCare Pharmaceuticals Inc., Bayer Pharma AG, Janssen Pharmaceuticals, Inc., Janssen Research & Development, LLC, and Janssen Ortho LLC (collectively, "Defendants") submit this joint motion *in limine* to exclude evidence of foreign labeling and regulatory actions under Federal Rules of Evidence 402 and 403.  By this motion, Defendants seek only to exclude evidence of foreign labeling and regulatory actions.  Defendants do not seek to exclude otherwise relevant scientific information generated outside the United States, evidence of otherwise relevant conduct of Defendants' non-United States employees, or otherwise relevant non-United States documents.

In *Boudreaux*, this Court held that evidence of foreign labeling and regulatory actions "is likely excludable under Federal Rules of Evidence 401 and 403," but reserved ruling on the issue "because context or rebuttal use may have to be considered."  Order and Reasons (Apr. 18, 2017), at 13–14 (Doc. 6254).  The Court ultimately excluded the evidence.  In *Orr*, with respect to Plaintiffs' motion *in limine* to admit certain evidence, the Court held that what "the Defendants have said to anyone, even foreign regulatory bodies, should be admissible," but "[w]hat is not admissible . . . is what the Defendants did or what they put on Xarelto's label in other countries in

order to comply with foreign regulatory bodies or agencies.  This information is irrelevant." Order and Reasons (May 26, 2017), at 13 (Doc. 6645).

As the Court explained in striking that balance during the *Orr* trial:

> The way I see it, and I've said it several times, the issue is really what the defendant knew and when they knew it.  It's not what's in one label or what's in another label, because the rules are different, the laws are different, the specifics are different.
>
> We're going to get into a situation where we then have to try the Canadian label, and then we're going to be with witnesses about what the Canadian label says and why it says that.  And then we're going to go into the France label.  It's really involving the United States label.  It's the FDA's label.
>
> And I'll let you get in what they said, what they told other people, obviously what they knew.  But that's where it's got to stop.  We can't put in different labels.  It just doesn't—it would be impossible to deal with.  It's a different jurisdiction.

*Orr* Tr. at 1978:7–20.

The Court should adhere to its rulings in *Boudreaux* and *Orr* and exclude evidence of foreign labeling and regulatory actions in this case.  In addition, as it did in *Orr*, the Court should exclude evidence to the extent it quotes or relies on portions of foreign labeling, and evidence of Defendants' statements made "to comply with foreign regulatory bodies or agencies." [1]

### ARGUMENT

**I.    Evidence of foreign labeling and regulatory actions regarding Xarelto should be excluded because it is irrelevant.**

   **A.    Foreign-labeling and foreign-regulatory evidence is irrelevant.**

---

[1] In *Orr*, the Court admitted into evidence PX 190 (a November 24, 2014 submission from Bayer to Health Canada, which responded to an October 3, 2014 "Clarification Request" from Health Canada to Bayer) over Defendants' objection.  Defendants continue to maintain that the introduction of the document risks confusing the jury by introduction of the irrelevant Canadian label.  Although the Court overruled Defendants' objections, the Court agreed that the Canadian label was irrelevant, that the jury should not be exposed to the Canadian label, and that a strict limiting instruction was necessary.

As explained in Defendants' earlier Motion *In Limine* to Exclude Evidence of Foreign Labeling and Regulatory Actions (Doc. 5954), such evidence is irrelevant because it does not bear on the adequacy of Xarelto's labeling or design as a matter of U.S. law and FDA's own unique regulatory standards.  *See*, *e.g.*, *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 488 (S.D.N.Y. 2016) ("Because this litigation is based on U.S. law, and because evidence regarding the FDA will be admitted, the actions taken by foreign regulatory agencies are not particularly probative and likely will be confusing."); *McDowell v. Eli Lilly & Co.*, 13 Civ. 3786, 2015 WL 845720, at *5 (S.D.N.Y. Feb. 26, 2015) ("The mere existence of a differently structured and written European label does not establish that the U.S. label is insufficient, misleading, or legally inadequate, nor is foreign regulatory action even appropriate as a subject of expert testimony in pharmaceutical cases."); *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 965–66 (D. Minn. 2009) ("[A]ny discussion of foreign regulatory actions is irrelevant . . . and should therefore be excluded."); *see also Jones v. Lederle Labs.*, 785 F. Supp. 1123, 1126–27 (E.D.N.Y. 1992) (because of less stringent testing standards in Japan, testimony regarding a vaccine's use in Japan provided "no acceptable evidence" to support plaintiffs' claim that a safer vaccine existed).

That point is amply demonstrated by the fact that FDA expressly rejected proposed Neoplastin PT language that is similar to the language contained in the Canadian, European Union, and New Zealand labels.  And it is further demonstrated by the fact that FDA has yet to approve or clear an anti-Factor Xa assay for use with patients in the U.S., even though such an assay is approved in other countries.

In any event, the foreign labels that Plaintiffs seek to introduce do not support their theory—namely, that if a Neoplastin PT test, taken at some undefined time after initiation of therapy, shows that a patient's PT is above a certain value (which Plaintiffs also do not define),

3

then the patient is at an elevated risk for bleeding and should be taken off Xarelto. *See* Pls.' Opp. to Defs.' Dosing & Monitoring Preemption MSJ (Doc. 5531), at 2. *None* of the foreign Xarelto labeling that Plaintiffs seek to introduce—from Canada, the European Union, or New Zealand—states that a Neoplastin PT test should be used for that purpose. Although those labels do provide information regarding the correlation between PT and Xarelto plasma concentrations, *none* describes what Plaintiffs argue here: a correlation between PT and *bleeding risk*, much less instructs doctors to make clinical decisions based on such a test. For example, the Canadian label states that "[t]he prothrombin time (PT), measured in seconds, is influenced by XARELTO in a dose-dependent way with a close correlation to plasma concentration if the Neoplastin® reagent is used," and for "patients who are bleeding . . . may be useful to assist in determining an excess of anticoagulant activity." Canadian Product Monograph (PX 5767716), at 9. The European Union label provides similar information: "Prothrombin time (PT) is influenced by rivaroxaban in a dose dependent way with a close correlation to plasma concentrations (r value = 0.98) if Neoplastin is used for the assay." EU SmPC (PX 5768997), § 5.1. And the New Zealand label tracks the European Union label language. *See* New Zealand Data Sheet (PX 5767717), at 19.

      **B.**      **Defendants' position at trial has been consistent.**

The evidence offered by Defendants at the *Boudreaux* and *Orr* trials has been consistent with the distinction between the utility of PT testing to assess plasma concentration in certain instances as recommended by the Canadian, European Union, and New Zealand labels, and the lack of utility of PT testing at initiation of therapy to assess bleeding risk as Plaintiffs propose. In *Boudreaux*, Defendants' expert Dr. Colleen Johnson testified that the data from the FDA's pharmacology review for Xarelto showed a "correlation" between PT and bleeding, but that the PT test has limited utility because it does not account for "a lot of other factors that play into

4

whether or not you bleed." *Boudreaux* Tr. at 1232:10–1239:16. And when Plaintiffs' counsel asked Dr. Johnson whether she believed Neoplastin PT was "worthless," she responded:

> I didn't say that either. What I said was that I do not use it as a way of either giving me an idea whether someone is at risk of bleeding, or giving any information about dosing; that if you want to draw a PT on a patient who is bleeding – as was done for Mr. Boudreaux – I would recommend that. You don't know what other factors come into play.

*Id.* at 1274:19–1275:1.

During closing argument, Defendants' counsel acknowledged that Neoplastin PT testing "was part of the ROCKET trial," and that "[t]hey found a correlation, but they found it wouldn't predict in an individual patient." *Id.* at 1590:4–8. Addressing Plaintiffs' contention that Neoplastin PT "predicts bleeding risk" by referencing Dr. Johnson's testimony, counsel told the jury "[s]he said it doesn't predict bleeding risk in individual patients" and "it wouldn't be helpful for her to treat patients using that and it could lead to harmful circumstances." *Id.* at 1602:5–16. In that context—whether Neoplastin PT is a useful test to predict bleeding risk in individual patients—counsel argued that "outside of this courtroom, nobody thinks this test works. They don't think it helps." *Id.* at 1600:9–11.

And in *Orr*, Janssen employee Sanjay Jalota, called in Plaintiffs' case-in-chief, testified that the "anticoagulant effect," *i.e.*, bleeding risk, associated with Xarelto for any individual patient cannot be monitored, as opposed to the "pharmacodynamic effect," *i.e.*, the concentration of Xarelto in a patient's blood. *Orr* Tr. at 1287:9–1288:6. Defendants' expert, Dr. Sammy Khatib likewise testified on cross-examination: "[T]he Neoplastin reagent with PT has some correlation on a population level with concentration, I am not disagreeing with that. I stand by the comment that was made on the other page that we showed that the utilization of that can be dangerous, because I don't feel it has clinical applicability." *Orr* Tr. at 1940:14–21; *see also id.* at 651:21–23

5

(testimony of Dr. Theodore Spiro that "[t]here was a correlation between the prothrombin time prolongation in seconds and the concentration of rivaroxaban present in the patient's plasma").

The Court correctly excluded evidence of foreign labels and regulatory actions during the *Boudreaux* and *Orr* trials as irrelevant. The Court should do so again here.

## II. Evidence of foreign labeling and regulatory actions regarding Xarelto should be excluded because it is unduly prejudicial.

Even if evidence concerning foreign labeling and regulatory actions was relevant, it should nonetheless be excluded under Rule 403. Admission of the evidence would be unfairly prejudicial, would confuse the issues and mislead the jury, and would waste trial time on collateral issues by leading to a series of mini-trials necessary to determine the basis of each foreign regulatory action and label history, as well as the applicable foreign regulatory standards. *See In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d at 965–66 (holding that "to the extent that foreign regulatory information is relevant, its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury"); *In re Seroquel Prods. Liab. Litig.*, 601 F. Supp. 2d 1313, 1318 (M.D. Fla. 2009) (holding that even "[a]ccepting for argument's sake that such evidence [concerning foreign regulatory actions] is relevant regarding notice and scienter, the fact remains that its probative value is greatly overmatched by the jury confusion, waste of time, and unfair prejudice that would result if the Court were to allow Plaintiffs to introduce this evidence during their main case"); *In re Baycol Prods. Litig.*, 532 F. Supp. 2d 1029, 1054 (D. Minn. 2007) ("allowing the admission of evidence of foreign regulatory actions, in a case that is governed by domestic law, would likely cause jury confusion").

For example, it does not follow—as a jury might improperly infer from Plaintiffs' evidence—that each worldwide regulatory agency would disclose laboratory testing on a product's label, even assuming the testing was equally available in each jurisdiction. And it does not

6

follow—as a jury might improperly infer from Plaintiffs' evidence—that the disclosures on foreign labeling regarding a Neoplastin PT test should be mirrored on FDA-approved labeling for use with patients in the United States.  Inviting the jury to draw those inferences would be unduly prejudicial to Defendants, risk jury confusion, and waste trial time.

Similarly, there are health-authority approved anti-Factor Xa assays on the market in Canada and the European Union, so the Xarelto labeling in those countries provides information to doctors about use of those assays.  In the United States, Diagnostica Stago has tried to gain FDA approval for an anti-Factor Xa assay and has thus far been unsuccessful, so there is no commercially available Xarelto-specific anti-Factor Xa assay for use with patients in the United States.  Thus, there is no basis for Defendants or FDA to recommend its use for any purpose to American doctors.  Allowing Plaintiffs to introduce evidence concerning foreign labeling and regulatory actions regarding the use of an anti-Factor Xa assay when the assay has not been approved by FDA, and is not commercially available in the United States, would be unduly prejudicial to Defendants, confuse the jury, and waste trial time

Indeed, the possibility of juror confusion is not just theoretical—it is likely.  In an effort to support their anti-Factor Xa assay theory with language from the Canadian label, Plaintiffs have conflated the experimental *Factor Xa inhibition* biomarker assay that Defendants used as a research tool in their clinical trials to assess the *amount of Factor Xa* in subjects' blood, with the *anti-Factor Xa* assay that has since been developed by third parties outside the U.S. to assess *rivaroxaban levels* in patients' blood.  *See* Defs.' *Boudreaux* Dosing & Monitoring Preemption Reply (Doc. 5677), at 4 n.12.  These are two different assays with different results and purposes, and Plaintiffs do not advocate use of the biomarker assay for U.S. patients taking Xarelto.  There is no reason to allow that confusion to affect the jury.

7

### III.   Evidence that quotes from or relies on foreign labeling—and Defendants' statements made to comply with foreign regulatory bodies or agencies—should be excluded.

During the *Orr* trial, the Court acknowledged that it is not only foreign labeling and regulatory actions themselves that should be excluded for the reasons described above. Evidence that quotes from or is based on foreign labeling or that reflects Defendants' efforts "to comply with foreign regulatory bodies or agencies" should be excluded for the same reasons. Order and Reasons (May 26, 2017), at 13 (Doc. 6645). As the Court stated during the *Orr* trial with respect to evidence of Defendants' statements to foreign regulatory agencies that might otherwise bear on Defendants' knowledge, "[w]hen you start putting it in context, it becomes problematic." *Orr* Tr. at 1336:1–2. The Court's evidentiary rulings carefully reflected the distinction between evidence concerning "what the company knew and when they knew it" and "the context [to the extent it] is within other regulatory agencies, which has nothing to do with this particular case." *Id.* at 1337:21–1338:1.

To maintain that distinction, the Court prevented Plaintiffs from publishing portions of documents to the jury that quoted or relied on foreign labeling or that reflected statements made to comply with foreign regulatory agencies, and/or instructed the jury to disregard any references to foreign labeling or regulatory actions. *See Orr* Tr. at 1277:7–23, 1280:8–25 (with respect to document that included reference to Canadian label "defendants have a legitimate point . . . that you're mixing up Canadian labels and United States labels, and the words that they say have more reference to Canadian labels than to the United States labels, and we're going to have to deal with that"; instructing the jury to "[d]isregard the Canadian label" because "it is a different country [with] different rules, different regulations, different procedures, and different requirements" and "what's on the Canadian label that has no relevance"); *id.* at 1334:16-1347:2 (precluding Plaintiffs from showing jury document involving communication with Canadian regulators regarding

8

Canadian label because "what [defendants] said to one regulator is not necessarily accurate with the other regulator"); *id.* at 1582:17–1583:23, 1667:6–13 (instructing jury with respect to statement in scientific article based on foreign labeling that "the relevance of that is what the defendants knew and when they knew it. . . . [Y]ou can disregard anything regarding a foreign label insofar as a foreign label approving it, disapproving it, changing it, doing different things, because there's different law involved with different procedures."). The Court should do the same in this case.

### A. Evidence that quotes from or relies on foreign labeling should be excluded.

Plaintiffs have designated as a trial exhibit Bayer's response to a 2014 "Clarification Request" from Health Canada (HC). *See* PX 447561. That document should be excluded to the extent it contains a number of direct quotes from the Canadian Product Monograph. In addition, and separately, the document was prepared to provide "answers to the questions from the Clarification Request dated 03 Oct 2014," which advised Bayer that HC had "determined that updates to your Product Monograph (PM) may be appropriate to advise prescribers" of certain information. *Id.* at 1. Moreover, a version of the language on which Plaintiffs focused from that document first appeared in regulatory correspondence when Health Canada specifically requested that it be added to Xarelto's Canadian label. *See* PX 143768. This language should be treated as falling squarely within the Court's ruling that statements added to foreign labels to comply with foreign regulatory requirements are irrelevant to this litigation.

### B. Evidence reflecting Defendants' efforts to comply with foreign regulatory agencies should be excluded.

Generally, to obtain approval to market a prescription medicine, pharmaceutical companies submit an initial proposal, and then engage in a series of communications or negotiations with the appropriate regulatory body. Evidence reflecting Defendants' efforts to comply with foreign regulators' requests regarding PT testing in the course of those discussions should be excluded.

9

For example, in Canada, Xarelto is accompanied by a product monograph that must be approved by Health Canada. Bayer proposed an initial draft of the Xarelto Product Monograph in 2007 that did not contain any information about whether PT can be used as a means to determine anticoagulant activity. Doc. 6705, Exh. C. In response to the draft, Health Canada issued a Therapeutic Products Directorate, which directed Bayer to delete certain paragraphs of the draft, and indicated that those paragraphs:

> should be replaced by a paragraph summarizing the blood coagulations tests used to determine the pharmacodynamics of rivaroxaban (Inhibition of Factor XA Activity, Prothrombin Time, Activated Partial Thromboplastin Time, and HepTest). The replacing paragraph should also include a discussion of the validity and reliability of each blood coagulation monitoring test.

Doc. 5677, Exh. 49. Bayer complied with that directive by submitting a revised draft of the Product Monograph in 2008, which explained that PT "is influenced by XARELTO in a dose dependent way if Neoplastin® is used for the assay. . . . In the case of excessive doses, the PT is expected to be outside that range." *Id.*

Then in December 2011, Bayer and Health Canada exchanged Product Monograph proposals. *See* Doc. 6705, Exh. E. The regulators provided comments on the Monitoring and Laboratory Tests section, asking "which test has clinically relevant use? Provide guidance to clinicians." *Id.* Again, Bayer responded to this request for more information, *see* Doc. 6705, Exh. G, and proposed the following addition to the label: "In patients who are bleeding, measuring the PT (Neoplastin®) may be useful to assist in determining an excess of anticoagulant activity." Doc. 6705, Exh. E. The comments for that section indicate that this was "[p]roposed text sent to [HC] on Dec. 16, with [HC's] revisions from [a] Dec 16 [teleconference]." *Id.*

More recently, in 2013, Health Canada informed Bayer that "[a]s part of a class labelling action to ensure consistency of the Product Monographs (PM) or all Novel Oral Anticoagulants

(NOAC) we are requesting the Xarelto PM be updated" with certain information.  Doc. 6705, Exh. H.  Specifically, the Canadian regulators requested that the label state, among other things, that

> Although there is no need to monitor anticoagulant effect of XARELTO during routine clinical practice, in certain infrequent situations such as overdosage, acute bleeding, urgent surgery, in cases of suspected non-compliance, or in other unusual circumstances, assessment of the anticoagulant effect of rivaroxaban may be appropriate.  Accordingly, measuring PT using the Neoplastin reagent, or Factor-Xa assay using rivaroxaban-specific calibrators and controls, may be useful to inform clinical decisions in these circumstances.

*Id.*

Bayer's statements to foreign regulators described above are precisely the sort of efforts Defendants took "to comply with foreign regulatory bodies or agencies."  The information Bayer provided to Health Canada was in response to specific questions from that agency in the course of determining whether the proposed Xarelto Product Monograph complied with Canadian regulations.  As with foreign labeling itself, this evidence is irrelevant because it does not bear on the adequacy of Xarelto's label as a matter of U.S. law, and would be unfairly prejudicial, would confuse the issues, and would waste trial time.

## CONCLUSION

For the foregoing reasons, the Court should exclude evidence of foreign labeling and regulatory actions.

11

Respectfully submitted,

BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C.

BY: /s/ *Richard E. Sarver*
Richard E. Sarver
Celeste R. Coco-Ewing
BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C.
909 Poydras Street, 24th Floor
New Orleans, Louisiana 70112
Telephone: (504) 589-9700
rsarver@barrassousdin.com
ccoco-ewing@barrassousdin.com


DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
Chanda.Miller@dbr.com


IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ *James B. Irwin*
James B. Irwin
Kim E. Moore

MITCHELL, WILLIAMS, SELIG, GATES & WOODYARD, P.L.L.C.

By: */s/ Lyn P. Pruitt*
Lyn P. Pruitt
Adria W. Conklin
Benjamin D. Brenner
Mary Catherine Way
MITCHELL, WILLIAMS, SELIG, GATES & WOODYARD, P.L.L.C.
425 West Capitol Ave., Suite 1800
Little Rock, AR 72201
Telephone: (501) 688-8800
lpruitt@mwlaw.com
aconklin@mwlaw.com
bbrenner@mwlaw.com
mway@mwlaw.com


WATKINS & EAGER PLLC

By: */s/ Walter T. Johnson*
Walter T. Johnson
WATKINS & EAGER PLLC
The Emporium Building
400 East Capitol Street
Jackson, Mississippi 39201
Telephone: (601) 965-1846
wjohnson@watkinseager.com


ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *William Hoffman*
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street

IRWIN FRITCHIE URQUHART & MOORE LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

*Attorneys for Defendants Janssen Pharmaceuticals, Inc. and Janssen Research & Development, LLC*

New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: */s/ Lindsey C Boney IV*
Kevin C. Newsom
Lindsey C. Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com


CHAFFE MCCALL L.L.P.

By: /s/ *John F. Olinde*
John F. Olinde
CHAFFE MCCALL L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer HealthCare Pharmaceuticals Inc. and Bayer Pharma AG*

## CERTIFICATE OF SERVICE

     The undersigned hereby certifies that on the 17th day of July, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system.

                                                */s/     John F. Olinde*