# EXHIBIT 3

Protected - Subject to Further Protective Review

Page 372

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF LOUISIANA

IN RE: XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION     MDL No. 2592
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~   SECTION L

THIS DOCUMENT RELATES TO ALL     Judge Eldon E. Fallon
CASES                            Mag. Judge North

- PROTECTED -

- SUBJECT TO FURTHER PROTECTIVE REVIEW -

FRIDAY, DECEMBER 9, 2016

SUZANNE PARISIAN, M.D.
VOLUME II

    Videotaped deposition of SUZANNE PARISIAN, M.D., held at the law offices of Burg Simpson, 2398 East Camelback Road, Suite 1010, Phoenix, Arizona, commencing at 8:48 a.m., on the above date, before Sommer E. Greene, a Certified Court Reporter and Certified Realtime Reporter.

Golkow Technologies, Inc. - 1.877.370.DEPS

Protected - Subject to Further Protective Review

Page 373

```
 1    APPEARANCES OF COUNSEL
 2
 3         For Plaintiffs:
 4
             LEVIN, FISHBEIN, SEDRAN & BERMAN
 5           MICHAEL M. WEINKOWITZ, ESQ.
             510 Walnut Street, Suite 500
 6           Philadelphia, Pennsylvania 19106
             215.592.1500
 7           Mweinkowitz@lfsblaw.com
 8
             SCHLICHTER, BOGARD & DENTON
 9           ASHLEY BRITTAIN-LANDERS, ESQ.
             100 South Fourth Street, Suite 1200
10           St. Louis, Missouri 63102
             314.621.6115
11           Abrittain@uselaws.com
12
13         For Janssen Defendants:
14           BARNES & THORNBURG, LLP
             JAMES F. MURDICA, ESQ.
15           One North Wacker Drive, Suite 4400
             Chicago, Illinois 60606
16           312.357.1313
             Jmurdica@btlaw.com
17
18           BARNES & THORNBURG LLP
             SARAH E. JOHNSTON, ESQ.
19           2029 Century Park East, Suite 300
             Los Angeles, California 90067
20           310.284.3880
             Sjohnston@btlaw.com
21
22
23
24
25
```

Protected - Subject to Further Protective Review

Page 374

1   APPEARANCES CONTINUED
2
3        For Janssen Defendants:
4
             DRINKER BIDDLE & REATH, LLP
5            JULIE L. TERSIGNI, ESQ.
             600 Campus Drive
6            Florham Park, New Jersey 07932
             973.549.7106
7            Julie.tersigni@dbr.com
8
         For Bayer Defendants:
9
             BARTLIT, BECK, HERMAN, PALENCHAR
10           & SCOTT, LLP
             STEVEN E. DERRINGER, ESQ.
11           54 West Hubbard Street, Suite 300
             Chicago, Illinois 60654
12           312.494.4415
             Steven.derringer@bartlit-beck.com
13
14
         Also Present:
15
             Videographer, Samantha Elliot
16
17
18
19
20
21
22
23
24
25

Protected - Subject to Further Protective Review

Page 521

1  practice?
2     A.   That's not what I stated.
3          MR. WEINKOWITZ:  Object to the form.
4          THE WITNESS:  I didn't say a Dear Doctor
5  letter.
6     Q.   BY MR. MURDICA:  You just said that.
7     A.   No, no.  You said the Dear Doctor letter.  I'm
8  saying that the company did nothing to correct a
9  publication about RECORD4.  They didn't tell the
10 company -- the physicians that RECORD4 wasn't accepted,
11 the FDA -- there's nothing to tell them that the FDA
12 discredited RECORD4.
13    Q.   Is it the company's publication in The Lancet?
14    A.   Well, they did pay for the Turpie -- he's their
15 investigator.  So he's using his -- the article that was
16 generated on Janssen's data for -- or, no, it was
17 actually Bayer's data for RECORD4.
18         So in terms of the information, it was
19 discredited by the FDA, in terms of the follow-up that
20 was done enough so that it was removed from the label and
21 was not allowed to be used.
22         So in terms of there is a public -- it's a
23 fact, there's a publication.  There's never been any
24 attempts by anyone, Janssen or Turpie, to update the
25 information that the FDA discredited it and did not find

Protected - Subject to Further Protective Review

Page 522

```
 1   it acceptable.
 2              Now, this was the same study that Janssen
 3   made Bayer pay for because it was so poorly done, and
 4   they changed the consulting contract.
 5       Q.   Dr. Parisian, we're talking about The Lancet.
 6       A.   Right.
 7       Q.   As far as you know.  Right?
 8       A.   As far as I know, I have not --
 9       Q.   You have no --
10              MR. WEINKOWITZ:  Wait.
11       Q.   BY MR. MURDICA:  You have no personal knowledge
12   about this.  Correct, Dr. Parisian?
13       A.   As --
14              MR. WEINKOWITZ:  Objection to the form.
15       Q.   BY MR. MURDICA:  Other than seeing The Lancet
16   article?
17       A.   As far as doing a search, I have no personal
18   knowledge as -- what happened.
19       Q.   Okay.
20       A.   But if you continue on that we have now Exhibit
21   7 where we have an example of the medical information
22   services telling the physician or pharmacist that it was
23   a perfectly good study.  There's no information --
24       Q.   Show me where it says it was a perfectly good
25   study.
```

Protected - Subject to Further Protective Review

Page 523

1    A.    Okay.  Okay.

2    Q.    Please read the part you're going to tell the
3  jury that it's a perfectly good study.

4    A.    Okay.  Let me show it to you.  All right.

5        Under the heading pharmacokinetic and
6  pharmacodynamic data, it would be page 18 of 34 --
7  actually, it's before that.  If you look at page 18, on
8  that same page, there's a table 4 that provides the
9  incident rates for the primary efficacy end point and
10  treatment emergent major bleeding stratified by baseline
11  level of creatinine clearance for RECORD4.  Okay.

12        So they provide the data that's not included
13  in the approved label.  Let's see what the heading of
14  this all is, though.  That should be -- under prescribing
15  information, it talks about the total hip arthroplasty
16  studies.  Then it goes on and talks about the total knee
17  arthroplasty studies.  It provides table 3, which would
18  be RECORD3.  It provides table 4.

19        Then it has, "Author's conclusion:  Results
20  from various subgroups should be interpreted with caution
21  because of the smaller sample size."  Nothing about FDA
22  throwing it out.

23        Then you go on -- you talk about
24  pharmacokinetic and pharmacodynamic data, and you go
25  under results talking about pharmacokinetic data.

Protected - Subject to Further Protective Review

Page 524

1 　　　　　　And it says, "The record clinical
2 development program, a comprehensive program of four
3 phase 3 studies with over 12,000 patients, studied
4 Xarelto for the prophylaxis of venomous thromboembolism,
5 VTE, in patients undergoing knee, RECORD3 and 4, or hip,
6 RECORD1 and 2, replacement surgery. The data from the
7 record program was submitted to the FDA. Xarelto was
8 approved on July 1st, 2011 by the FDA for the indications
9 studied in the record program." It was approved.
10 　　　　　　Okay. And -- but then it goes on, "In the
11 RECORD4 study, patients received either oral rivaroxaban,
12 ten milligrams once daily beginning at least six to eight
13 hours after surgery, or subcutaneous Enoxaparin, 30
14 milligrams every 12 hours starting 12 to 24 hours after
15 surgery. Data record" -- "from RECORD4 are not included
16 in the approved product labeling for Xarelto." That's
17 true. But it doesn't tell the physician why.
18 　　　　　　And it says, "Since publication of RECORD4
19 findings, the sponsor company conducted a verification of
20 the data for all patients in this clinical trial with
21 respect to study findings, additional adverse events.
22 Serious adverse events were identified. However, the
23 distribution of those was balanced between study groups.
24 　　　　　　"In the company's view, verification and
25 findings did not appreciably change the conclusions of

Protected - Subject to Further Protective Review

Page 525

1  the study.  Thus the RECORD4 findings reported in the
2  publication remain consistent with the overall results
3  from the total record program."
4           So there -- that's not consistent with what
5  the FDA said about RECORD4.  So they're telling the
6  doctor that it's consistent, it's good data, they don't
7  say that it was thrown out, that you should not rely on
8  it.  The reason it's not in the -- in the label is
9  because the company -- FDA would not permit it in the
10 label.  The company made references and asked the FDA to
11 include this in the label.
12          They said they did their verification; FDA
13 rejected it.  That information's missing.  So if a
14 physician or a prescriber were to review it, suddenly the
15 RECORD4 study is not what it was approved as.  It was
16 thrown out by the FDA, and here it's saying in the
17 company's opinion.  Well, hey, the FDA said it wasn't
18 valid scientific evidence.
19          So the company's over -- second-guessing the
20 FDA on RECORD4.  And that's the same thing when you look
21 at the EMA, the European information.  There's nothing
22 that I've ever seen that the European Union was told that
23 FDA had major questions about RECORD1 through 3 and that
24 all of RECORD4 was thrown out.
25          And I haven't seen that.  And I know that it

1  was an issue because I know Janssen then went and
2  penalized Bayer for having done such a sloppy job with
3  record and preventing its approval.
4           So the company knew that RECORD4 had not
5  been approved by the FDA, and it's implying that in the
6  company's opinion, it's fine.  And that's not providing
7  full disclosure to a doctor so he can make his own
8  decision.  Okay?
9     Q.   Are you done?
10    A.   Yes, I am done.
11    Q.   Do you know how many minutes that answer was?
12    A.   No, sir.
13         MR. WEINKOWITZ:  Objection.
14    Q.   BY MR. MURDICA:  It was seven.
15    A.   Well, part of it --
16         MR. WEINKOWITZ:  That's not a question.
17  That's not a question, Doctor.
18         THE WITNESS:  I mean, you asked me -- I read
19  it to you.  So that's --
20    Q.   BY MR. MURDICA:  I didn't ask you to read it,
21  Doctor.  I asked you a simple question.  I asked where
22  are the words "perfectly good" regarding RECORD4.
23         MR. WEINKOWITZ:  Objection.
24    Q.   BY MR. MURDICA:  You never read that to me.
25         MR. WEINKOWITZ:  Objection.

Protected - Subject to Further Protective Review

Page 527

1           THE WITNESS:  No, it's in --
2           MR. WEINKOWITZ:  That's not what your
3    question was.
4           THE WITNESS:  It's implying that they let --
5    that --
6           MR. WEINKOWITZ:  Hold on a second.  Hold on
7    a second.  "Dr. Parisian, please read the part you're
8    going to tell the jury is perfectly good study."  That's
9    what your question was.
10       Q.    BY MR. MURDICA:  Dr. Parisian --
11       A.    And I read it.
12       Q.    Is it your opinion that the RECORD4 data is not
13   consistent with the other three record studies?
14       A.    Yes.
15       Q.    Okay.
16       A.    It's really -- it's a really crappy study.  And
17   that's why Bayer had --
18       Q.    That was not the question.
19       A.    -- to pay for it for Janssen.
20       Q.    Is the data inconsistent with the other three?
21       A.    Yes.
22       Q.    Okay.
23       A.    The other three were problematic too.  And so
24   RECORD4 was the only one that was totally eliminated by
25   the FDA.

Protected - Subject to Further Protective Review

Page 528

```
 1      Q.    You hear my question.  Right?  I'm talking
 2   about the data.
 3      A.    Yeah.
 4      Q.    Was the data consistent with the other three?
 5            MR. WEINKOWITZ:  Object to the form.
 6            THE WITNESS:  Who knows?
 7            MR. WEINKOWITZ:  Asked and answered.
 8            THE WITNESS:  It's a poorly run study.
 9      Q.    BY MR. MURDICA:  You can't answer it?
10      A.    No one can.  The FDA --
11      Q.    Okay.
12      A.    -- can't either.  That's why they threw it out.
13      Q.    Was there more or less bleeding in RECORD4 than
14   the other three record studies?
15      A.    I don't recall offhand.  I know that FDA had
16   problems with studies 1 through 3.  It took away the
17   confidence interval, some of the statistical analysis.
18   But RECORD4 was earmarked by the FDA as a totally
19   unreliable study.  So who knows if there was bleeding.
20      Q.    Doctor --
21      A.    It's unreliable.
22      Q.    Did you hear the question?
23      A.    Yes.  I can't answer it.
24      Q.    Okay.
25      A.    Neither can the FDA.
```

Protected - Subject to Further Protective Review

Page 756

1                    CERTIFICATE OF REPORTER
2    STATE OF ARIZONA        )
                             )
3    COUNTY OF MARICOPA      )
4
5           I, Sommer E. Greene, a Certified Reporter in the
     State of Arizona, do hereby certify that the foregoing
6    deposition was taken before me in the County of Maricopa,
     State of Arizona; that an oath or affirmation was duly
7    administered to the witness, SUZANNE PARISIAN, M.D.,
     pursuant to A.R.S. 41-324(B); that the questions
8    propounded to the witness and the answers of the witness
     thereto were taken down by me in shorthand and thereafter
9    reduced to typewriting; that the transcript is a full,
     true and accurate record of the proceeding, all done to
10   the best of my skill and ability; and that the
     preparation, production and distribution of the
11   transcript and copies of the transcript comply with the
     Arizona Revised Statutes and ACJA 7-206(j)(1)(g)(1) and
12   (2).
            The witness herein, SUZANNE PARISIAN, M.D.,
13   has requested signature.
            I FURTHER CERTIFY that I am in no way related
14   to any of the parties nor am I in any way interested in
     the outcome hereof.
15
16          IN WITNESS WHEREOF, I have set my hand in my
     office in the County of Maricopa, State of Arizona, this
17   10th of December, 2016.
18
19
                              --------------------------------
20                            Sommer E. Greene, RPR, CRR
                              Certified Reporter 50622
21
22
23
24
25

Golkow Technologies, Inc. - 1.877.370.DEPS