# EXHIBIT 1

```
 1                    UNITED STATES DISTRICT COURT
                      EASTERN DISTRICT OF LOUISIANA
 2
     *******************************************************
 3   IN RE:  XARELTO (RIVAROXABAN)
     PRODUCTS LIABILITY LITIGATION
 4
                                        Docket No. 14-MD-2592
 5   THIS DOCUMENT RELATES TO:          Section L
                                        New Orleans, Louisiana
 6   Joseph Orr, Jr., as Lawful         Tuesday, May 30, 2017
     Surviving Spouse of
 7   Sharyn Orr v. Janssen, et al.
     Case No. 2:15-cv-03708
 8
     *******************************************************
 9
                    TRANSCRIPT OF TRIAL PROCEEDINGS
10          HEARD BEFORE THE HONORABLE ELDON E. FALLON
                   UNITED STATES DISTRICT JUDGE
11                  VOLUME I - MORNING SESSION

12
     APPEARANCES:
13
     FOR THE PLAINTIFFS'          MR. ANTHONY BIRCHFIELD, JR.
14   LIAISON COUNSEL:             Beasley Allen Crow Methvin
                                     Portis & Miles
15                                Post Office Box 4160
                                  Montgomery, AL   36103
16

17                                MR. BRIAN H. BARR
                                  Levin Papantonio Thomas
18                                   Mitchell Rafferty & Proctor
                                  316 Baylen Street
19                                Suite 600
                                  Pensacola, FL 32502
20

21                                MR. GERALD EDWARD MEUNIER
                                  Gainsburgh, Benjamin, David,
22                                   Meunier & Warshauer
                                  Energy Centre
23                                1100 Poydras Street
                                  Suite 2800
24                                New Orleans, LA   70163-2800

25
```

17:27:17  1       In short, it seems to me the defendant suggests that
17:27:20  2  there is no such test and that the defendants know of no such test
17:27:27  3  or any test.  This is consistent, frankly, with what the
17:27:32  4  defendant's position is, that there is no test and they don't know
17:27:37  5  of any.
17:27:37  6       Yet they told the Canadian authorities the following:
17:27:42  7  "Although there is no need to monitor clinical practice in certain
17:27:49  8  in-treatment situations such as an overdose, acute bleeding, or
17:27:54  9  urgent surgery, in cases of suspected or noncompliance, I assume
17:27:59 10  not taking the drug, or in other unusual circumstances, assessment
17:28:06 11  of the anticoagulant effect of rivaroxaban may be appropriate."
17:28:12 12  "Accordingly," they say, "measuring PT may be useful to inform
17:28:19 13  clinical decisions in these circumstances."
17:28:23 14       The significant issue in the case, it seems to me, is
17:28:26 15  what the defendant knew, when they knew it, and whether or not any
17:28:34 16  prior statements that conflict with their position is admissible.
17:28:40 17       I am concerned about the fact that this is a statement
17:28:44 18  made in connection, I assume, with the approval of the label by
17:28:52 19  Canada.  Canada, like Europe, has a different process and they do
17:28:57 20  have a different process and, therefore, I had felt that it was
17:29:04 21  confusing, at best, to perhaps not even relevant under 401, but if
17:29:12 22  relevant, certainly not admissible under 403 to allow labels from
17:29:18 23  Canada to come into the litigation or labels from Europe to come
17:29:22 24  into the litigation.
17:29:25 25       But this is a statement made, and it's at least arguably

|  |  |
|---|---|
| 17:29:33 1 | inconsistent with what the position of the defendant is.  It's |
| 17:29:42 2 | certainly an 801(d)(2) situation where it would be admissible, even |
| 17:29:48 3 | though it's a prior statement; it would also be admissible under |
| 17:29:54 4 | 613 as a prior statement. |
| 17:29:57 5 | So I am going to allow it, but I will instruct the jury |
| 17:30:03 6 | that it's only relevant to what the defendant knew or when they |
| 17:30:08 7 | knew it.  Knowledge of the defendant. |
| 17:30:13 8 | Any reference to any Canadian label, I am going to tell |
| 17:30:19 9 | them to disregard.  I would hope I wouldn't have to do that because |
| 17:30:22 10 | I hope that doesn't come up from the plaintiff's standpoint.  I am |
| 17:30:25 11 | not interested in what the label is or any reference to the label. |
| 17:30:31 12 | If a reference does come into -- mentioning the label, I am going |
| 17:30:36 13 | to instruct the jury to disregard that and to only consider it |
| 17:30:41 14 | insofar as a statement is made regarding when the defendant knew |
| 17:30:47 15 | the information and what they knew. |
| 17:30:51 16 | So that's going to be my ruling.  I will allow it, but I |
| 17:30:55 17 | will -- I may have to have an instruction to the jury to that |
| 17:30:59 18 | effect. |
| 17:31:00 19 | MR. MEUNIER:  Your Honor, I understand the Court's |
| 17:31:03 20 | ruling, and there will be reference to the label, so I think that |
| 17:31:05 21 | limiting instruction you mentioned -- |
| 17:31:07 22 | THE COURT:  Well, I will instruct the jury then to |
| 17:31:09 23 | disregard.  And I'll explain why.  The label reference can be |
| 17:31:14 24 | confusing, and I am going to have to surgically remove that. |
| 17:31:20 25 | I wish I didn't have to, but it's a situation where the |

```
17:31:25   1   whole theory of the defendant's case is based on that, that there
17:31:33   2   was no test available.
17:31:36   3           Now, you can weasel word it or at least use words like
17:31:41   4   "no credible test," "no satisfactory test," but, really, that
17:31:49   5   created the situation where there is no test that does this.  The
17:31:52   6   plaintiffs say there is a test that would be helpful.  The
17:31:56   7   defendants say it's not helpful.
17:31:59   8           So the concepts -- I mean, words that put this issue, at
17:32:06   9   least, in play, I think the jury ought to hear it.  But I am going
17:32:13  10   to try to surgically remove that from the label and explain to them
17:32:17  11   why.
17:32:18  12           Thank you very much.  The court will stand in recess.
17:32:20  13           THE DEPUTY CLERK:  All rise.
17:32:22  14       (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)
          15
          16                          *  *  *  *  *
          17
          18                       REPORTER'S CERTIFICATE
          19           I, Karen A. Ibos, CCR, Official Court Reporter, United
               States District Court, Eastern District of Louisiana, do hereby
          20   certify that the foregoing is a true and correct transcript, to the
               best of my ability and understanding, from the record of the
          21   proceedings in the above-entitled and numbered matter.
          22
                                          /s/ Karen A. Ibos
          23                           _____
                                       Karen A. Ibos, CCR, RPR, CRR, RMR
                                       Official Court Reporter
          24
          25
```

```
 1              THE COURT:  Yeah.  Let's let him answer the question.
 2              MR. BARR:  Go ahead.
 3              THE COURT:  Go ahead, sir.
 4              THE WITNESS:  I'm sorry, could you repeat the question?
 5              MR. BARR:  I don't remember it now.
 6  MR. BARR:  (CONTINUING)
 7        Q.    You agree that this is the document that sets out that
 8  Janssen made the conscious decision not to disclose -- not to
 9  propose PT language as a helpful laboratory test in the warning
10  section of the label, right?
11        A.    No.
12        Q.    Okay.  Well, let's go to page -- pdf Page 15 of this.
13              MR. BARR:  And let's just blow up this whole thing.
14              MR. IRWIN:  Your Honor, can we pull that down for a
15  second, please.
16              THE COURT:  Okay.
17              MR. IRWIN:  May we approach?
18              THE COURT:  Yes.
19                        SIDEBAR ON THE RECORD
20              MR. IRWIN:  This is going to be part of our ongoing
21  problem with this document, Your Honor.  Here we have the
22  Canadian label.
23              THE COURT:  Okay.
24              MR. BARR:  And, Your Honor, the relevance of this is
25  they are specifically considering what to say to the U.S.
```

OFFICIAL TRANSCRIPT

1  regulator by referencing the Canadian label.  I mean, that is a
2  relevant fact that they thought about.  I mean, this isn't about
3  Canadian regulatory requirements, this is about what they're
4  going to say to the U.S. regulator.  And they say that if it is
5  requested, we'll modify this.  I mean the document is clearly
6  relevant.
7            MR. IRWIN:  Your Honor, this is always what we've been
8  concerned about.  Your ruling was that if there are impeachable
9  statements, quote/unquote -- that's my word -- that that could be
10 considered relevant, but not to introduce the whole regulatory
11 scheme from another country, and this is the back-door way of
12 doing exactly that.
13           Now, they could redact that out.  They could cover it
14 up with a piece of paper and still ask the question about the
15 other statement that is our statement in that contingency
16 document without disclosing the label to the jury.
17           MR. BARR:  But, Your Honor, they were considering doing
18 it in light of what they say in Canada.  The document makes no
19 sense without that.
20           THE COURT:  Let's make that clear.  And I'll instruct
21 the jury as to the situation.
22           MR. IRWIN:  Your Honor, can we cover up the Canadian
23 label?
24           MR. BARR:  To me the document makes no sense without
25 referring to it.  I won't spend time reading through it.  I

OFFICIAL TRANSCRIPT

1  mean -- but the point is they had this in that label, they
2  thought about it, and they thought -- they were thinking about
3  that when they were making communications with the U.S. FDA.
4              MR. IRWIN:  Your Honor, what I would like to know is
5  what is it off this document they want to read to the jury?
6              What is it you want to show to the jury?
7              MR. BARR:  "Only if section is requested, consider
8  modifying without," and they referred to the Canadian label.
9  They're saying if the FDA asks us for this, this is what we're
10 going to modify.
11             MR. IRWIN:  That's exactly the problem, Judge.  Going
12 right to --
13             THE COURT:  I'm going to tell them to disregard what
14 you say, if you say.  Let's do it.  I'll just tell the jury to
15 disregard that.
16             MR. BARR:  Okay.
17             THE COURT:  That's the best we can do.
18             MR. MEUNIER:  Your Honor, just for the record, Jim made
19 a statement about what your ruling was, and I just want to
20 clarify something.
21             When you sustained our Motion *in limine* No. 11, which
22 was our motion to allow there to be evidence in the case
23 regarding the foreign label issues -- you sustained that motion.
24 You said we would be able to admit into evidence whatever the
25 defendants said to anyone regarding foreign label issues as long

OFFICIAL TRANSCRIPT

1  as that's what the defendant said to others.
2          And you said the only way that's not going to be
3  admissible is actions taken in order to comply with federal
4  regulatory requirements.  Well, none of what we are proposing to
5  show the jury is anything about actions taken in order to comply
6  with a foreign regulation.
7          THE COURT:  Let me just add that the defendants have a
8  legitimate point.  The defendants say that you're mixing up
9  Canadian labels and United States labels, and the words that they
10 say have more reference to Canadian labels than to the
11 United States labels, and we're going to have to deal with that.
12 It's a legitimate point.
13         The plaintiffs make a legitimate point that the
14 defendants knew at a certain time and they told people certain
15 things.  Now, if they told people something that's inconsistent
16 with what they told the FDA, that, to me, seems to be admissible
17 because it seems to contradict what they said to the FDA.
18         But at the same time, the defendants have a point that
19 it mixes apples and oranges.  They're concerned about things that
20 are required in the Canadian label that are not required in the
21 United States label.
22         So I'm going to have to do my best to tell the jury
23 what's the significance of the thing.
24         MR. BARR:  Your Honor, I think we've established the
25 point with this witness that helpful laboratory testing is

1    **A.**   It is a competitor of Xarelto, that's correct.
2    **Q.**   You're competing for the same patient population?
3    **A.**   I would say we are competing for the atrial
4  fibrillation indication, that's correct.
5            MR. BARR:  I only want to blow up this section right
6  here, right there (indicating).
7            MR. IRWIN:  Please note our objection.
8            THE COURT:  Okay.  Yeah.
9            Members of the jury, there's something there called a
10 Canadian label.  Disregard the Canadian label.  And the reason
11 for that is that it is a different country.  It has different
12 rules, different regulations, different procedures, and different
13 requirements.
14           The only relevance of this testimony is what the
15 defendant knew and when they knew it.  That's the only thing.
16 Not anything that the Canadian -- that needs to be on a Canadian
17 label or doesn't need to be on the Canadian label.
18           We're talking about the United States naval -- label,
19 and there's different rules, different laws, different
20 regulations.
21           So from the standpoint of what's on the Canadian label,
22 that has no relevance.  The only relevance is if there is -- if
23 you find it relevant, the only relevance is what they knew and
24 when they knew it.
25           Let's proceed.

OFFICIAL TRANSCRIPT

1   patients.  That was seen in ROCKET.
2           And so I think -- I'm not comfortable with utilizing
3   PT.  Believe me, if it was effective, I would -- and reliable and
4   something that I could use, I would use it.  I would want it.  I
5   want to help -- we're here for our patients.
6           And this is -- so if this were something that I thought
7   was comfortable, I'm not going to withhold that.  I would want
8   that.  But the PT test is not a reliable test.  It doesn't -- it
9   can't be applied in a clinical context in a meaningful manner.
10     Q.   Let's take a look at the proposed label change that
11  Dr. Parisian presented yesterday and get your opinion on that.
12  This is what Dr. Parisian said should be in a label -- the
13  Xarelto label to help clinicians to treat patients that are
14  prescribed Xarelto.
15          MR. BARR:  Objection, Your Honor.  Dr. Parisian talked
16  about what should be in the label from a regulatory perspective,
17  what is required according to the regulations.
18          THE COURT:  Well, I thought it was a little broader
19  than that.  The question is different than what -- I'll allow the
20  question.
21          THE WITNESS:  I'll give my opinion, not a regulatory...
22  **MS. WILKINSON:   (CONTINUING)**
23     Q.   Yeah.  We're not talking about regulatory.
24          We want to know from your point of view, as a clinician
25  and an expert who prescribes this drug, would this language be

1  useful or helpful to you with your patients?
2     **A.**   So I'm specifically --
3     **Q.**   Just first answer that question.
4          Would it be helpful?
5     **A.**   No.  Sorry.
6     **Q.**   Now let's go through it and you tell us why this would
7  not be helpful.
8     **A.**   The one that troubles me the most is that middle thing:
9  Accordingly, measuring PT may be useful to inform clinical
10 decisions in this circumstance.
11         I have no data to tell me how that will inform my
12 clinical decisions.  There is no studies that have looked at PT
13 and said, Okay, if someone comes in and they're bleeding and they
14 have a normal PT, you can take them to surgery and they do well.
15         That has not been studied.
16         You have to look at a situation and test it out in
17 people, and there's no data that actually looks at changing dose
18 based on PT, or withholding surgery based on PT, and that having
19 a net clinical benefit.
20         And that's why I think it's inappropriate to imply that
21 there is -- it's useful in informing clinical decisions, because
22 I don't think it can help me.  If it would help me, I would use
23 it.
24         My study of this is not scant.  I have looked at this
25 extensively, and I do not feel it is of value.  Not only that,

**OFFICIAL TRANSCRIPT**

```
14:36:31   1              MS. WILKINSON:  Objection.  Asked and answered.
14:36:33   2              THE COURT:  Yeah, it has been.
14:36:40   3   BY MR. BARR:
14:36:40   4   Q.  So you haven't seen it, right?
14:36:41   5              THE COURT:  He said he hasn't, let's establish that.
14:36:45   6   I've heard him say that several times.  He hasn't.
14:36:51   7   BY MR. BARR:
14:36:52   8   Q.  I want to put up --
14:36:55   9              MR. BARR:  Can we put this back up so it doesn't have my
14:36:59  10   writing all over it?
14:37:00  11              MS. WILKINSON:  Sure.  You can put up what you said about
14:37:11  12   me, Brian.  I don't know where my copy is.
14:37:26  13              MR. BARR:  This will be my last series, your Honor.
14:37:38  14   BY MR. BARR:
14:37:39  15   Q.  Would you agree that the company likely knows more about how
14:37:41  16   this drug works than you do?
14:37:44  17   A.  Than I do?
14:37:46  18   Q.  Yes, sir.
14:37:46  19   A.  Yes, I hope so.
14:37:49  20   Q.  So you wanted to talk about this language, right?  You talked
14:37:54  21   about this language in your direct, correct?
14:37:56  22   A.  Yep.
14:37:56  23   Q.  And you particularly pointed out this sentence here as a
14:38:02  24   sentence that bothered you, right (INDICATING)?
14:38:04  25   A.  Yes.  It does bother me.
```

| | | |
|---|---|---|
| 14:38:07 | 1 | Q. Are you aware, as you sit here and testify today, that Bayer |
| 14:38:11 | 2 | tells doctors outside of the United States this exact language? |
| 14:38:17 | 3 | A. No. |
| 14:38:19 | 4 | Q. So you have no knowledge of that. |
| 14:38:44 | 5 | Let me show you what the company says. You see right |
| 14:38:51 | 6 | here that this is Bayer telling doctors that "Although there is no |
| 14:38:57 | 7 | need to monitor in clinical practice, in certain infrequent |
| 14:39:01 | 8 | situations such as overdosage, acute bleeding, urgent surgery, in |
| 14:39:07 | 9 | cases of suspected noncompliance, or in other unusual |
| 14:39:11 | 10 | circumstances, assessment of the anticoagulant effect of |
| 14:39:13 | 11 | rivaroxaban may be appropriate. Accordingly, measuring PT using |
| 14:39:17 | 12 | the Neoplastin reagent or Factor Xa, may be useful to inform |
| 14:39:25 | 13 | clinical decisions in these circumstances." Did you know that? |
| 14:39:29 | 14 | A. I see that. |
| 14:39:30 | 15 | Q. According to that sentence, Bayer disagrees with you, don't |
| 14:39:34 | 16 | they? |
| 14:39:34 | 17 | A. I'm -- you're giving me one -- I don't have a whole document |
| 14:39:39 | 18 | here. I am not going to comment on what Bayer thinks or doesn't |
| 14:39:42 | 19 | think. I am not going to look at snippets. |
| 14:39:44 | 20 | MR. BARR: That's all. |
| 14:39:45 | 21 | THE COURT: All right. Any redirect? |
| 14:39:47 | 22 | MS. WILKINSON: Yes, your Honor. |
| 14:39:59 | 23 | REDIRECT EXAMINATION |
| 14:39:59 | 24 | BY MS. WILKINSON: |
| 14:39:59 | 25 | Q. Doctor, if you can speak up and lean into the microphone so we |

| | | |
|---|---|---|
| 14:40:03 | 1 | can all hear you. |
| 14:40:04 | 2 | A.  Sorry. |
| 14:40:04 | 3 | Q.  You were just shown a statement, and yesterday the rest of the |
| 14:40:07 | 4 | statement was shown to the jury.  Do you see the bottom, the green |
| 14:40:10 | 5 | part that was left out?  Do you see that? |
| 14:40:12 | 6 | A.  Yes. |
| 14:40:12 | 7 | Q.  So what does that say?  Can you read it out loud, please? |
| 14:40:15 | 8 | A.  "However, the response of the PT varies both dependent on PT |
| 14:40:19 | 9 | reagent (which is not standardized) and coagulometer.  Thus, the PT |
| 14:40:25 | 10 | cannot be used to reliably measure the anticoagulant effect of |
| 14:40:29 | 11 | Xarelto since a normal PT may be found in patients with therapeutic |
| 14:40:32 | 12 | Xarelto levels if measured using selected machine/reagent |
| 14:40:36 | 13 | combinations." |
| 14:40:37 | 14 | Q.  And do you agree with that? |
| 14:40:38 | 15 | A.  That's the limitation that I find with the medication. |
| 14:40:40 | 16 | Q.  And when you read that together, does that suggest that PT is |
| 14:40:44 | 17 | useful in a clinical situation where a patient on Xarelto is in an |
| 14:40:51 | 18 | emergency such as surgery? |
| 14:40:52 | 19 | A.  Not in any way that I feel comfortable using. |
| 14:40:55 | 20 | MR. BARR:  Your Honor, I don't want to interrupt, but can |
| 14:40:57 | 21 | we approach real quick? |
| 14:41:07 | 22 | THE COURT:  Yes. |
| 14:41:13 | 23 | (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:) |
| 14:41:13 | 24 | MR. BARR:  You obviously know what this is about.  It's |
| 14:41:16 | 25 | the Canadian label again.  I think it continues to prejudice the |

OFFICIAL TRANSCRIPT

```
14:41:20  1   plaintiffs that we can't show the label.  It has -- I mean, they
14:41:26  2   keep criticizing the language from their own label, and they put up
14:41:31  3   language -- I don't think that's anywhere in the actual label about
14:41:35  4   not being able to use the PT.
14:41:39  5           MR. BIRCHFIELD:  And, your Honor, their own witness just
14:41:42  6   asked to see the whole document.  That's --
14:41:46  7           THE COURT:  I understand.  The way I see it, and I've
14:41:49  8   said it several times, the issue is really what the defendant knew
14:41:56  9   and when they knew it.  It's not what's in one label or what's in
14:42:02 10   another label, because the rules are different, the laws are
14:42:06 11   different, the specifics are different.
14:42:08 12           We're going to get in a situation where we then have to
14:42:11 13   try the Canadian label, and then we're going to be with witnesses
14:42:16 14   about what the Canadian label says and why it says that.  And then
14:42:19 15   we're going to go into the France label.  It's really involving the
14:42:24 16   United States label.  It's the FDA's label.
14:42:27 17           And I'll let you get in what they said, what they told
14:42:31 18   other people, obviously what they knew.  But that's where it's got
14:42:37 19   to stop.  We can't put in different labels.  It just doesn't -- it
14:42:43 20   would be impossible to deal with.  It's a different jurisdiction.
14:42:47 21           MS. WILKINSON:  Your Honor, just for the record, the
14:42:49 22   statement they put up was from a submission to a regulator, and all
14:42:53 23   you allowed us to do yesterday was show the complete statement.  It
14:42:56 24   wasn't -- this particular statement where they took the document
14:42:59 25   out was not the label.  It was in answer to a regulatory request in
```

|   |   |
|---|---|
| 14:43:03 1 | Canada. |
| 14:43:04 2 |    MR. BARR: Your Honor, for completeness, this language |
| 14:43:06 3 | right here that's quoted is directly out of the label, and they |
| 14:43:09 4 | just put a witness up to criticize their own label. I mean -- and |
| 14:43:14 5 | then they put up language that's not -- I mean, it just puts us in |
| 14:43:18 6 | an impossible situation. |
| 14:43:20 7 |    THE COURT: I understand. I understand your position. |
| 14:43:25 8 |    MR. BIRCHFIELD: Yes, sir. |
| 14:43:26 9 |    THE COURT: Thank you. |
| 14:43:46 10 |  (OPEN COURT.) |
| 14:43:46 11 | BY MS. WILKINSON: |
| 14:43:47 12 | Q. All right, Doctor. One of the questions we have is these |
| 14:43:51 13 | different terms that you know and you were being asked about |
| 14:43:54 14 | whether we're clear. So up here we show it says, "PT cannot be |
| 14:43:59 15 | used to reliably measure the anticoagulant effect." All right? |
| 14:44:03 16 | A. Where are you? |
| 14:44:03 17 | Q. I want you to -- |
| 14:44:07 18 | A. You're on the second -- |
| 14:44:09 19 | Q. "Anticoagulant Effect." Do you see that? |
| 14:44:12 20 | A. Yes, I do. |
| 14:44:12 21 | Q. These are very different terms from the concentrate, right? |
| 14:44:16 22 | The concentrations? |
| 14:44:16 23 | A. Yes. So -- |
| 14:44:18 24 | Q. Let's slow down and see if we can explain this to the jury, |
| 14:44:21 25 | okay? |

|  |  |
|---|---|
| 14:49:24 1 | to most of us. |
| 14:49:25 2 | A. I get it. You're right. |
| 14:49:26 3 | Q. Okay. So when we go back, and we're not going to go through |
| 14:49:29 4 | all of those studies again, I just want to point out a few |
| 14:49:31 5 | things -- |
| 14:49:31 6 | A. Please don't. |
| 14:49:32 7 | Q. -- with your standard of reading the whole article. Is this |
| 14:49:36 8 | what you're concerned about when using the PT test in an emergency |
| 14:49:39 9 | situation? |
| 14:49:40 10 | A. That's my concern is that it doesn't correlate to actual |
| 14:49:44 11 | effect. We don't know how it works in that setting. |
| 14:49:46 12 | Q. So when you look at this -- Dr. Parisian's proposed label |
| 14:49:54 13 | change, it says you can actually assess the anticoagulation effect |
| 14:50:00 14 | in rivaroxaban. Is that true in a PT test? She is saying you can |
| 14:50:04 15 | assess the coagulation effect. |
| 14:50:07 16 | A. I disagree with that statement. I think putting that in a |
| 14:50:10 17 | label would be reckless. |
| 14:50:11 18 | Q. And have you been shown any data that shows how you would |
| 14:50:13 19 | actually measure that? What numbers you would use as a clinician? |
| 14:50:17 20 | A. No. |
| 14:50:17 21 | Q. Did Dr. Parisian give any numbers, any way that a clinician |
| 14:50:21 22 | would know, once that PT test was taken, what you were supposed to |
| 14:50:27 23 | do when a patient was at certain level? |
| 14:50:29 24 | A. I don't know what Dr. Parisian gave. I just know from |
| 14:50:30 25 | basing -- |

| | | |
|---|---|---|
| 13:23:02 | 1 | question, that: Insofar as Mrs. Orr's condition is concerned, you |
| 13:23:05 | 2 | can't say that her event or its outcome would have been any |
| 13:23:08 | 3 | different had she been on warfarin; is that correct? |
| 13:23:11 | 4 | And his answer was: "I can't say from an outcome |
| 13:23:14 | 5 | perspective, no." |
| 13:23:15 | 6 | I want you to assume that. And if that was the question, |
| 13:23:19 | 7 | if that was the answer, would you agree or disagree with that? |
| 13:23:22 | 8 | A. I agree. |
| 13:23:23 | 9 | Q. Doctor, a suggested warning label has been proposed by |
| 13:23:41 | 10 | plaintiffs. I would like to ask you to look at this warning -- |
| 13:23:44 | 11 | suggested warning label and ask you, from a neurosurgeon |
| 13:23:48 | 12 | standpoint, would this warning label be of any help to you. |
| 13:23:51 | 13 | MR. IRWIN: If we could have the ELMO, please. And -- |
| 13:24:00 | 14 | MR. HONNOLD: Could we just note an objection that we |
| 13:24:03 | 15 | made previously for the record? |
| 13:24:04 | 16 | THE COURT: Right. |
| 13:24:19 | 17 | THE WITNESS: (WITNESS REVIEWS DOCUMENT.) Okay. |
| 13:24:28 | 18 | BY MR. IRWIN: |
| 13:24:29 | 19 | Q. My question is, would this proposed label, proposed by the |
| 13:24:34 | 20 | plaintiff -- plaintiff lawyers be of help to you as a neurosurgeon? |
| 13:24:41 | 21 | A. So for me as a neurosurgeon, when I treat patients, hemostasis, |
| 13:24:46 | 22 | which is stopping of blood, whether it be -- bleeding, rather -- |
| 13:24:50 | 23 | stop it in an elective surgery, emergency surgery, brain surgery, |
| 13:24:54 | 24 | spine surgery is of the utmost importance because we operate in |
| 13:24:59 | 25 | small compartments that are confined. And so because we operate in |

...

```
13:25:03  1   small compartments that are confined, bleeding can cause
13:25:06  2   significant issues.
13:25:07  3              My understanding, if I read this, if I was a
13:25:12  4   practitioner, I would think, okay, a normal PT value indicates that
13:25:15  5   maybe levels of rivaroxaban are clinically significant unlikely and
13:25:21  6   it's okay to operate.  But you can have a normal PT and you can
13:25:24  7   have levels of rivaroxaban in your system that are still causing
13:25:27  8   the blood to be thinner and anticoagulated and which would be
13:25:31  9   dangerous.
13:25:31 10              MR. HONNOLD:  Your Honor, this is exactly what we had
13:25:33 11   discussed when we brought the objection up.
13:25:36 12              MR. IRWIN:  Your Honor, he deals with this all the time.
13:25:39 13              THE COURT:  I'll let him go into it.  Overrule the
13:25:43 14   objection.
13:25:45 15   BY MR. IRWIN:
13:25:45 16   Q.  Please continue, Doctor.
13:25:46 17   A.  My understanding, that a patient with a normal PT, you can
13:25:50 18   still have anticoagulation of the blood and that would be dangerous
13:25:53 19   in neurosurgery.
13:26:17 20              THE COURT:  Anything further?
13:26:18 21              MR. IRWIN:  Just about, your Honor.  I am just trying to
13:26:20 22   move through it.
13:26:31 23   BY MR. IRWIN:
13:26:31 24   Q.  Back to the screen, please.  Doctor, these are my last
13:26:46 25   questions.
```