UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO: | JUDGE ELDON E. FALLON |
| Dora Mingo v. Janssen Research & Development, LLC et al. | MAGISTRATE NORTH |
| Case No. 2:15-cv-03469 | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL
SUMMARY JUDGMENT ON THE GROUND THAT FEDERAL LAW PREEMPTS
PLAINTIFFS' DESIGN-DEFECT CLAIMS**

Plaintiffs have now made clear that they are pursuing a "pre-approval" design-defect claim, premised on a single theory—that Xarelto is unreasonably dangerous because Defendants brought it to market (and FDA approved it) without an accompanying anti-Factor Xa assay.[1]  *See* Pls.' Opp. (Doc. 7007), at 10–11.  No court applying Mississippi law has recognized such a claim, and this Court should not create a new claim under Mississippi law based on a "pre-approval" design defect, which is, in any event, preempted as a matter of law.  Numerous courts—including the only U.S. court of appeals to have addressed this type of "pre-approval" claim, and the federal district

---

[1] Plaintiffs have expressly disclaimed any dosing-related theories (*see* Pls.' Opp. at 11–12), as well as any theory that Xarelto should be designed to incorporate PT testing for purposes of dose adjustment (*see id.*).  In the previous bellwether cases, Plaintiffs similarly disclaimed dosing-related or other theories of liability—and thereby avoided subjecting these theories to dispositive or *Daubert* scrutiny—but nonetheless later introduced related evidence at trial.  They propose to do so again here.  *See* Pls.' Opp. at 11–12.  Accordingly, the Court should enter an order dismissing with prejudice any claims that are based on those theories.  *See* Defs.' Br. at 2–3 n.2; *see also Carlson v. Bioremedi Therapeutic Sys., Inc.*, 822 F.3d 194, 200–01 (5th Cir. 2016) (requiring courts to "conduct[] a *Daubert* inquiry or mak[e] a *Daubert* determination on the record" before allowing expert testimony); *cf. Jones v. Wells Fargo Bank, N.A.*, 858 F.3d 927, 933 (5th Cir. 2017) (recognizing that "basic fairness entitles a defendant to notice, before trial, of . . . the nature of the claims being asserted against it").  Moreover, although Plaintiffs reference reversal agent in their response, they have elsewhere expressly disclaimed that theory by acknowledging that "Ms. Mingo is not pursuing th[e reversal agent] theory in her case."  Pls.' Opp. to MPLA MSJ (Doc. 7042), at 3 n.3.  The Court should hold Plaintiffs to those representations, but to the extent that Plaintiffs attempt to revive their reversal-agent theory, that design-defect claim would be preempted for the reasons explained here and in Defendants' opening brief.

court overseeing MDL litigation involving Eliquis, another NOAC—have held that design-defect claims (like Plaintiffs' here) premised on the speculative and attenuated argument that a pharmaceutical company could have designed a different medicine before FDA approved it fail under the Supreme Court's *Levine-Mensing-Bartlett* preemption trilogy. *See, e.g.*, *Yates v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F.3d 281 (6th Cir. 2015); *Utts v. Bristol-Myers Squibb Co.*, No. 16cv5668(DLC), 2016 WL 7429449, at *11–12 (S.D.N.Y. Dec. 23, 2016). Plaintiffs' claim here is the same type of "stop-selling" theory that the U.S. Supreme Court has expressly declined to recognize. *Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2477 (2013).

As Defendants explained in their opening brief—in arguments that Plaintiffs have not meaningfully engaged—federal law preempts Plaintiffs' design-defect claim because Defendants could not "independently" or "unilaterally" alter Xarelto's design, whether before or after FDA approval, to incorporate an unapproved adjunct product. *See* Defs.' Br. (Doc. 6745), at 14–20, 23–24. Plaintiffs point to two cases, in addition to this Court's *Boudreaux*/*Orr* decision, that have rejected preemption of "pre-approval" claims, but neither *Guidry v. Janssen Pharmaceuticals, Inc.*, 206 F. Supp. 3d 1187 (E.D. La. 2016), nor *Young v. Bristol-Myers Squibb Co.*, No. 4:16-CV-00108-DMB-JMV, 2017 WL 706320 (N.D. Miss. Feb. 22, 2017), involved the novel theory that Plaintiffs press here—*i.e.*, that Defendants were required to redesign their medicine to be used in conjunction with an *entirely separate* product. Plaintiffs' response also ignores that Mississippi law and Louisiana law are meaningfully (and dispositively) different in one key respect. Unlike the Louisiana law that the Court applied in *Boudreaux* and *Orr*, no court applying Mississippi law has ever imposed on a prescription-drug manufacturer a "pre-approval" duty of care before the product is FDA approved and released to the market. *See* Defs.' Br. at 16–17. Plaintiffs have not cited any case that has held to the contrary.

Federal law preempts Plaintiffs' design-defect claim in this case because, consistent with FDA regulations and controlling Supreme Court precedent, Defendants could not have "independently" or "unilaterally" altered Xarelto's design—before or after FDA approval—to incorporate the use of an unapproved anti-Factor Xa assay. The Court should grant Defendants summary judgment.

## ARGUMENT

I.  **Plaintiffs have misstated the relevant standard because Defendants are not required to prove that federal law preempts design-defect claims by "clear evidence."**

As an initial matter, Plaintiffs have misstated the relevant legal standard as requiring Defendants to "prove [their] affirmative defense" of preemption "by 'clear evidence.'" Pls.' Opp. at 7–8. There are two problems with Plaintiffs' position. *First*, to the extent that Plaintiffs suggest that preemption is a question of fact that must be proved to the jury, they are wrong—as this Court has repeatedly made clear, preemption is a question of law to be decided by the Court. *See* Order and Reasons (Apr. 18, 2017), at 5 (Doc. 6254) (holding that preemption is "a question of law that is not appropriate for consideration by the finder of fact"); *Boudreaux* Trial Tr. at 1147:3–15 (stating that preemption is "a question of law, not for the jury"); *id.* at 1531:5–20.[2] *Second*, the "clear evidence" standard from *Wyeth v. Levine*, 555 U.S. 555 (2009), does not apply to this motion, which addresses Plaintiffs' challenges to Xarelto's FDA-approved *design* rather than its FDA-approved *labeling*.

The standard for "impossibility" preemption that has emerged from the Supreme Court's

---

[2] At oral argument on the dispositive motions filed in the *Boudreaux* and *Orr* cases, Plaintiffs presented the Court with the Third Circuit's decision in *In re Fosamax Prods. Liab. Litig.*, 852 F.3d 268, 293 (3d Cir. 2017), in support of their argument that preemption is a question of fact for the jury. *Fosamax* is distinguishable because it involved a failure-to-warn claim, not a design-defect claim, but its analysis is wrong in any event. As explained above, this Court has already concluded that preemption is a question of law, and the Court should follow its earlier holding here.

*Levine-Mensing-Bartlett* trilogy is "whether the [defendant drug manufacturer] could *independently* do under federal law what state law requires of it." *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620 (2011) (emphasis added); *see also Bartlett*, 133 S. Ct. at 2470 (citing *Mensing*).  And by "independently," the Supreme Court has made clear that it means "unilaterally." *Mensing*, 564 U.S. at 620 (citing *Levine*, 555 U.S. 555 (2009)).  Whatever the plaintiff's claim, if the defendant manufacturer cannot "independently" and "unilaterally" do what a plaintiff's state-law claim would require—*i.e.*, take remedial action without obtaining FDA's prior approval or seeking FDA's help—the claim is preempted.

In *Levine*, the Supreme Court held that compliance with FDA's *labeling* regulations does not necessarily preempt *failure-to-warn claims* absent "clear evidence that the FDA would not have approved a change to [the drug's] label" because FDA's Changes Being Effected (CBE) regulation—which applies uniquely to labeling changes—expressly "permitted Wyeth to unilaterally strengthen its warning." 555 U.S. at 571–73.  That one fact—the CBE regulation's authorization of independent manufacturer action to change labeling in certain circumstances—dictated the outcome.  *See, e.g.*, *id.* at 562, 563, 568, 571, 572 (emphasizing that no-preemption decision turned on CBE's unique unilateral-change authorization).  But the regulations governing product *design* are more stringent.  *See, e.g.*, *Bruesewitz v. Wyeth, Inc*., 561 F.3d 233, 246 n.8 (3d Cir. 2009) (noting "FDA's far-more extensive control and oversight of the approval of a drug's design and alteration"), *aff'd*, 131 S. Ct. 1068 (2011).  Most notably for present purposes, a manufacturer can *never* unilaterally change a drug's design—put simply, because there is no CBE option for design changes.  *See, e.g.*, *Barcal v. EMD Serono, Inc.*, No. 5:14-cv-01709, 2016 WL 1086028, at *4 (N.D. Ala. Mar. 21, 2016) (observing that, as distinguished from FDA's labeling regulations, "no . . . process exists for [unilateral] changes" to a drug's design).

Plaintiffs' misapplication of *Levine*'s *labeling preemption* standard misses the key point: Where a manufacturer *can* "independently" effectuate the change that a plaintiff's claim would require, the claim against it *is not* preempted and may proceed absent "clear evidence" (*e.g.*, *Levine*); where the manufacturer *cannot* "independently" make that change, the claim *is* preempted and must be dismissed (*e.g.*, *Mensing*, *Bartlett*). Because Defendants here could not have independently done what Plaintiffs say they should have—*i.e.*, marketed an anti-Factor Xa assay or incorporated this separate product into Xarelto's design—Plaintiffs' claim that Xarelto is unreasonably dangerous in the absence of this product is preempted. *Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 620.

## II. Federal law preempts Plaintiffs' so-called "pre-approval" claim that Defendants had a duty to design Xarelto alongside an anti-Factor Xa assay before seeking FDA approval.

Plaintiffs contend, as they did in *Boudreaux* and *Orr*, that Defendants should have designed Xarelto to incorporate an anti-Factor Xa assay *prior to* FDA approval. *See* Pls.' Opp. at 9–10. As Defendants have previously explained, Plaintiffs' so-called "pre-approval" design-defect claim is inconsistent with the Supreme Court's decisions in *Bartlett* and *Mensing*, and is preempted by federal law. *See* Defs.' Br. at 13–20. But even more fundamentally, no court has *ever* held that the Mississippi Product Liability Act (MPLA) imposes pre-approval duties on a manufacturer, so Plaintiffs' claim fails for that additional reason.

### A. Plaintiffs have failed to engage the analogous cases—including the only decision from the U.S. courts of appeals—holding that federal law preempts "pre-approval" design-defect claims asserted against brand-name manufacturers.

Plaintiffs, tellingly, do not meaningfully engage the analogous cases holding that federal law preempts similar "pre-approval" design-defect claims asserted against brand-name drug manufacturers; instead, they simply argue that the Court should not "adopt the law" from other jurisdictions. Pls.' Opp. at 9–10. But on this federal-law question, the host of recent decisions that

Defendants cited in their opening brief—including the Sixth Circuit's decision in *Yates*, the only U.S. court of appeals to address this sort of "pre-approval" claim, and the *Utts* decision from the Eliquis MDL—are precisely on point and should drive the Court's analysis. *See, e.g.*, *Wheeler v. Pilgrim's Pride Corp.*, 591 F.3d 355, 363 (5th Cir. 2009) (en banc) (holding that, on issues of federal law, federal courts should "look to the opinions of other circuits for persuasive guidance, always chary to create a circuit split").

These cases appropriately recognize that a "pre-approval" design-defect claim is premised on the very sort of "stop-selling" rationale that the Supreme Court's preemption precedents reject. *See Yates*, 808 F.3d at 298–300 (plaintiff's pre-approval design-defect claim failed because it "essentially argue[d] that defendants should never have sold the FDA-approved formulation of the [drug] in the first place"); *Utts*, 2016 WL 7429449, at *12 (plaintiffs' design-defect claim "suggest[ing] that the defendants should never have sold the FDA-approved formulation of Eliquis" was preempted because this theory was "explicitly repudiated" in *Bartlett*); *Brazil v. Janssen Res. & Dev. LLC*, 196 F. Supp. 3d 1351, 1364 (N.D. Ga. 2016) (holding that a "pre-approval" theory "makes little sense in the face of the Supreme Court's precedents"); *Fleming v. Janssen Pharms., Inc.*, 186 F. Supp. 3d 826, 833 (W.D. Tenn. 2016) (rejecting claim that Defendants should have "design[ed] the drug differently before FDA approval"); *see also Bartlett*, 133 S. Ct. at 2477–78.

So too here. Defendants "could not have complied with whatever pre-approval duty might exist without ultimately seeking the FDA's approval prior to marketing [Xarelto], and certainly prior to [Ms. Mingo's] use of the drug." *Yates*, 808 F.3d at 300. And although Plaintiffs try to narrow their claim as focusing on Defendants' failure to *redesign* Xarelto from the very beginning—before FDA approval—to incorporate an anti-Factor Xa assay, Plaintiffs' theory, at its core,

rests on the contention that Defendants never should have sold Xarelto in its FDA-approved for-mulation. *See* Pls.' Opp. at 10. That is precisely the "stop-selling" (or "should never have sold") claim that Supreme Court precedent squarely bars. *Bartlett*, 133 S. Ct. at 2477–78.

**B.    The Court's decision in *Boudreaux*/*Orr*, the *Guidry* decision, and the recent *Young* decision are all distinguishable and contrary to Supreme Court prece-dent.**

Plaintiffs claim that this Court's decision in *Boudreaux*/*Orr*, which applied *Guidry* to hold that a pre-approval design-defect claim under the Louisiana Product Liability Act is not preempted, compels the same conclusion here. *See* Pls.' Opp. at 8–10. They are incorrect. In addition to the state-law differences explained below, *Guidry*—like *Young*, which likewise followed *Guidry*—is distinguishable because it was resolved on a motion to dismiss and did not involve the novel "ad-junct product" theory that Plaintiffs press here. Moreover, *Guidry* and *Young* are wrongly decided.

**1.**    By the *Guidry* court's own admission, its decision was result-oriented. But preemp-tion is a question of law, governed by statutory and regulatory language, and any public-policy considerations are for the political branches, not the courts, to consider. Defs.' Br. at 17–18. *See Bartlett*, 133 S. Ct. at 2478–79; *Mensing*, 564 U.S. at 624–25.

**2.**    The *Guidry* court based its decision on the premise that a pharmaceutical manufac-turer could independently "design" a different drug, ignoring that the manufacturer cannot *market* its medicine for consumer use without FDA approval. Defs.' Br. at 18–19. *See Bartlett*, 133 S. Ct. at 2741 (recognizing that FDA's drug approval is "onerous and lengthy"); 21 C.F.R. § 314.105; *see also* 21 U.S.C. § 355(b).

**3.**    *Guidry* improperly relies on *Levine*'s "floor-ceiling" metaphor, which makes sense in certain labeling contexts—in which the CBE regulation permits unilateral manufacturer ac-tion—but is inapplicable in the design context, where there is no CBE-like mechanism that permits

a manufacturer to unilaterally market its preferred design without seeking FDA's advance approval. Defs' Br. at 19–20. *See Barcal*, 2016 WL 1086028, at *4; *cf. Bartlett*, 133 S. Ct. at 2471.

4.      *Guidry* proves too much and would defeat preemption in every case, because a plaintiff and his or her lawyers could always "speculate" that (1) a manufacturer could have sought FDA approval of a medicine that is supposedly "safer" than what was actually brought to market; (2) FDA would have approved the alternate design; (3) the plaintiff would have selected the drug; and (4) the alternate design would have avoided the injury. Defs.' Br. at 20. But such "conjectures" do not suffice to defeat preemption. *Mensing*, 564 U.S. at 621; *id.* at 624 & n.8 (rejecting the "possibility of *possibility*" as sufficient to avoid preemption). And accordingly, *Guidry* allows what the Supreme Court disavowed: "read[ing] the Supremacy Clause to permit an approach to pre-emption that renders conflict pre-emption all but meaningless." *Mensing*, 564 U.S. at 621.

\* \* \*

At bottom, Plaintiffs contend that their design-defect claim is not preempted based on a series of "ifs": perhaps Defendants *could* have proposed an alternative design for Xarelto before seeking FDA approval; then FDA *may* have approved it; and finally, Ms. Mingo's alleged injuries *might* have been avoided. But the "possibility of *possibility*" does not defeat preemption. *Mensing*, 564 U.S. at 624 & n.8. Defendants here could not have "unilaterally" or "independently" altered Xarelto's FDA-approved design as Plaintiffs request, and that fact is determinative.

C.      **Unlike Louisiana, no court applying Mississippi law has ever imposed a "pre-approval" duty on prescription-drug manufacturers.**

This Court previously held in the *Boudreaux* and *Orr* cases that Louisiana law imposes a "pre-approval" duty of care on prescription-drug manufacturers.[3] As Defendants explained in the

---

[3] Plaintiffs assert that "the MPLA and the LPLA are virtually identical" and that this Court should thus follow its decision in *Boudreaux/Orr*. Pls.' Opp. at 8–9. But in *Boudreaux/Orr*, this Court relied on *Guidry*, which expressly found that "*Louisiana law*" imposes a "pre-approval duty" on pharmaceutical manufacturers. Order & Reasons (Apr.

opening brief, no court has ever found a similar duty under Mississippi law, and nothing in the MPLA supports imposing such a duty. *See* Defs.' Br. at 16–17. In response, Plaintiffs have not shown otherwise. Plaintiffs point to just one case, *Young*, arguing that Mississippi courts have recognized "the ability to pursue pre-market design defect claims." Pls.' Opp. at 9–10. But the citation to *Young* is misleading. Although the *Young* court rejected a preemption argument—and thus allowed such claims to proceed—the court observed that Mississippi law may not even "recognize[] a pre-approval claim" and expressly "d[id] not reach th[at] issue" simply because "the parties ha[d] not argued" it. 2017 WL 706320, at *8. Plaintiffs have not pointed to any authority that would support the viability of their "pre-approval" design-defect theory as a matter of existing Mississippi law, and this absence of authority alone defeats Plaintiffs' claim as a matter of law. *See, e.g.*, *Hemphill v. State Farm Mut. Auto. Ins. Co.*, 805 F.3d 535, 540 (5th Cir. 2015) (expressly rejecting the existence of a duty where "no case from either the Mississippi Supreme Court or a Mississippi intermediate appellate court has suggested or even hinted that the Mississippi Supreme Court" would impose a duty under the particular circumstances); *Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*, 844 F.2d 1174, 1178 n.8 (5th Cir. 1988) (federal courts sitting in diversity are not state-law "pioneers" and therefore must "simply apply state law as it exists" without "adopt[ing] innovative theories of recovery"); *see also* Defs.' MPLA MSJ (Doc. 6753).

**III.   Federal law preempts Plaintiffs' claim that Xarelto was defectively designed because it was marketed without an anti-Factor Xa assay.**

Plaintiffs' response largely focuses on their contention that "Xarelto-specific anti-Factor Xa assays existed at the time of Xarelto's U.S. approval, are commercially available in Europe, had been tested, and were extensively relied upon by Defendants in many of the clinical studies

---

13, 2017), at 6–7 (Doc. 6196) (emphasis added) (quoting *Guidry*, 206 F. Supp. 3d at 1209). No court has recognized a similar pre-approval duty under Mississippi law.

9

before the FDA's approval of Xarelto."[4]  Pls.' Opp. at 10.  That assertion is not only incorrect, but more importantly, is irrelevant to preemption, which turns simply on "whether the manufacturer could "independently"—*i.e.*, "unilaterally"—"do under federal law what state law requires of it." *Mensing*, 564 U.S. at 620; *Bartlett*, 133 S. Ct. at 2470.

In other words, whether a "Xarelto-specific anti-Factor Xa assay" exists, is commercially available elsewhere in the world (where there are different regulatory standards and requirements), has previously been tested, or was ever relied upon are all beside the point—the relevant question is whether Defendants could independently market or incorporate such an agent into Xarelto's design.  They cannot.  Plaintiffs' proposed anti-Factor Xa assay would be an altogether separate product—in particular, a "medical device"—requiring separate FDA pre-approval.  *See* 21 U.S.C. §§ 360e(a), 360(k); 21 C.F.R. Part 809.  Although a rivaroxaban-specific anti-Factor Xa assay has been approved for use in Europe, that approval extends only to its use in "exceptional situations"—because, as the regulators there have explained, "rivaroxaban does not require routine monitoring of exposure."  Doc. 5677, Exh. 50.  A company called Diagnostica Stago has formally engaged FDA to discuss approval of its assay for use in the United States, but Plaintiffs have conceded—as they must—that FDA has not approved *any* rivaroxaban-specific anti-Factor Xa assay (Stago's

---

[4] Although immaterial for purposes of this motion, Plaintiffs' claim seems to rest on inaccurate facts.  In particular, in their earlier briefing incorporated by reference, Plaintiffs conflated the experimental *Factor Xa inhibition* biomarker assay that Defendants used as a research tool in their clinical trials to assess the *amount of Factor Xa* in subjects' blood, with the *anti-Factor Xa* assay that has since been developed by third parties to assess *rivaroxaban levels* in patients' blood.  *See* Mueck 38, at 236–37 (Doc. 5677 Exh. 48) (describing the different assays).  For example, Plaintiffs incorrectly cite Kubitza 2005, a study that used a Factor Xa inhibition assay, not an anti-Factor Xa assay.  *See* Pls.' Opp. at 10 & n.54 (citing (Doc. 5606)).  Plaintiffs also incorrectly assert that Defendants "extensively relied" on "Xarelto-specific anti-Factor Xa assays" in the Xarelto clinical studies.  Pls.' Opp. at 10.  In fact, while there was some minimal experimental use in a few Phase I trials, none of the critical Phase II or Phase III clinical trials used an anti-Factor Xa assay.  *See* Bayer Resp. to Health Canada (July 1, 2008) (XARELTO_BPAG_34470609, at -653) (Doc. 5677 Exh. 49) ("Anti-Factor Xa tests used in the phase I trials employed either the enoxaparin or the LMWH standard for calibration, mainly to assess effects on these assays in isolated studies but not for monitoring purposes. Therefore no information can be derived from these assays that would provide guidance for monitoring.").

10

or otherwise) for *any* purpose.  *See* Doc. 5531 at 11 n.34.[5]  And absent that FDA approval, Defendants could not have acted "independently" to incorporate an anti-Factor Xa assay into Xarelto's design or otherwise to market such an assay.  *See* Defs.' Br. at 23–24; *see also* Guidance for Industry and Food and Drug Administration Staff: In Vitro Companion Diagnostic Devices ("IVD Guidance") (Doc. 5677, Exh. 36), at 6, 8–9, 11–12.  That simple fact preempts Plaintiffs' anti-Factor-Xa-based claim.  *See Mensing*, 564 U.S. at 624 (preemption attaches where "[t]he only action the [defendants] could independently take" is to "ask[]for the FDA's help"); *Bartlett*, 133 S. Ct. at 2470.

## CONCLUSION

Plaintiffs' design-defect claims are preempted by federal law, and this Court should grant Defendants summary judgment.

Respectfully submitted,

| | |
|---|---|
| BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C. | MITCHELL, WILLIAMS, SELIG, GATES & WOODYARD, P.L.L.C. |
| BY: */s/ Richard E. Sarver* | By: */s/ Lyn P. Pruitt* |
| Richard E. Sarver | Lyn P. Pruitt |
| Celeste R. Coco-Ewing | Adria W. Conklin |
| BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C. | Benjamin D. Brenner |
| 909 Poydras Street, 24th Floor | Mary Catherine Way |
| New Orleans, Louisiana  70112 | MITCHELL, WILLIAMS, SELIG, GATES & WOODYARD, P.L.L.C. |
| Telephone:  (504) 589-9700 | 425 West Capitol Ave., Suite 1800 |
| rsarver@barrassousdin.com | Little Rock, AR  72201 |
| ccoco-ewing@barrassousdin.com | Telephone: (501) 688-8800 |
| | lpruitt@mwlaw.com |
| | aconklin@mwlaw.com |

---

[5] *See also* Gosselin Dep. at 207:5–13 (Doc. 5677, Exh. 53) (agreeing that no "rivaroxaban-specific test [has] been cleared by the FDA"); Leissinger Dep. at 184:6–16 (Doc. 5109, Exh. 29) ("I know that there is no recommended FDA-approved test" to measure Xarelto concentration or effect); Plunkett Dep. at 408:21–409:7 (Doc. 5677, Exh. 51) (agreeing that there are no FDA-cleared devices "that measure the effect or concentration of direct oral anticoagulants"), *id.* at 409:9–414:7 (Exh. 1) (acknowledging "that there has been an application" to FDA and answering questions about "FDA feedback" to Stago); Plunkett Dep. Exh. 13 (Extract of FDA Feedback: STA—Rivaroxaban Calibrator & Control) (Exh. 2).

DRINKER BIDDLE & REATH LLP

By: /s/ Susan M. Sharko
Susan M. Sharko
DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
Chanda.Miller@dbr.com

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ James B. Irwin
James B. Irwin
Kim E. Moore
IRWIN FRITCHIE URQUHART & MOORE LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

*Attorneys for Defendants Janssen Pharma-
ceuticals, Inc. and Janssen Research
& Development, LLC*

bbrenner@mwlaw.com
mway@mwlaw.com

WATKINS & EAGER PLLC

By: /s/ Walter T. Johnson
Walter T. Johnson
WATKINS & EAGER PLLC
The Emporium Building
400 East Capitol Street
Jackson, Mississippi 39201
Telephone: (601) 965-1846
wjohnson@watkinseager.com

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ William Hoffman
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ Lindsey C Boney IV
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com

CHAFFE MCCALL L.L.P.

By: /s/ *John F. Olinde*
John F. Olinde
CHAFFE MCCALL L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer HealthCare Pharmaceuticals Inc. and Bayer Pharma AG*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 17th day of July, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system.


/s/     *John F. Olinde*