UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO: | JUDGE ELDON E. FALLON |
| Dora Mingo, et al. v. Janssen Research & Development, LLC et al. | MAGISTRATE NORTH |
| Case No. 2:15-cv-03469 | |

**DEFENDANTS' REPLY IN SUPPORT OF THEIR JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE GROUND THAT FEDERAL LAW PREEMPTS PLAINTIFFS' FAILURE-TO-WARN CLAIM**

Plaintiffs have narrowed their failure-to-warn (or instruct) theory in this case to the claim that Xarelto®'s FDA-approved label should have included "an instruction for physicians to test Neoplastin PT at initiation to identify patients at a high risk of bleeding." Pls.' Opp. (Doc. 7040), at 9. They contend that federal law does not preempt that claim because, under *Wyeth v. Levine*, 555 U.S. 555 (2009), Janssen could have invoked FDA's "Changes Being Effected" (CBE) regulation and "independently" or "unilaterally" changed Xarelto's label to add their proposed instruction.

But Plaintiffs' experts concede that no PT test—including Plaintiffs' preferred Neoplastin test—is FDA-approved for use with Xarelto. It is undisputed that FDA *previously rejected* a proposal by Janssen to include PT-related information in Xarelto's label. Moreover, it is undisputed that Plaintiffs' proposed instruction is a "monitoring recommendation" under FDA regulations, which means that Defendants could not have "independently" or "unilaterally" altered Xarelto's label to include it.

Federal law preempts Plaintiffs' claims for these reasons. *First*, it is undisputed that FDA

regulations prohibited Defendants from independently adding this sort of "monitoring recommendation" to Xarelto's label, and there is no "newly acquired information" that would have allowed Defendants to change Xarelto's label under the CBE regulation.  **Second**, federal regulations and guidance prohibit Defendants from changing Xarelto's label to recommend "off-label" use of a PT test that all agree is not approved for use with Xarelto.  **Third**, there is "clear evidence," *Levine*, 555 U.S. at 571, that FDA would have rejected—and *in fact did expressly reject*—PT-related language similar to what Plaintiffs press here.  **Fourth**, and finally, to the extent that Plaintiffs have renounced any claim based on a particular theory of liability (including the failure to include a "black box" warning), the Court should enter an order dismissing any claims based on such theories.  *See Whetstone v. Jefferson Par. Pub. Sch. Bd.*, No. Civ. A 07-9704, 2012 WL 1032894, at *8 (E.D. La. Mar. 27, 2012) (Fallon, J.) (granting summary judgment where "Plaintiff did not respond to [the defendant's] arguments or defend her . . . claims").  An order limiting the claims at issue is particularly important here, in light of Plaintiffs' attempts to resurrect previously abandoned claims during the *Boudreaux* and *Orr* bellwether trials.

The Court should grant Defendants summary judgment on Plaintiffs' failure-to-warn (or instruct) claim.

## ARGUMENT

**I.   Federal law preempts Plaintiffs' failure-to-warn (or instruct) claim because all agree that Plaintiffs' proposed labeling is a "monitoring recommendation" that Defendants could not independently add to Xarelto's label, and there is no "newly acquired information" to justify such a change in any event.**

There is no dispute (1) that Plaintiffs' proposal that Xarelto's label should have included an instruction regarding PT testing would be a "monitoring recommendation" that Defendants could not "independently" add to Xarelto's label, and (2) that there is no "newly acquired information"—much less new information that meets the requisite materiality standard—that would

have allowed Janssen to unilaterally add Plaintiffs' requested instruction to Xarelto's label through the CBE process. Because a party who "fails to assert a legal reason why summary judgment should not be granted" waives that ground, *Vaughner v. Pulito*, 804 F.2d 873, 877 n.2 (5th Cir. 1986), Defendants are entitled to summary judgment on this basis alone.[1]  *See Whetstone*, 2012 WL 1032894, at *8.

> **A.  All agree that Plaintiffs' proposed change would be a "monitoring recommendation," and Defendants could not "independently" add any such "monitoring recommendations" to Xarelto's label.**

As Defendants explained in their opening brief, there is no dispute (*see* Doc. 5966, at 3–4) that Plaintiffs' failure-to-warn (or instruct) claim would require Defendants to add a "monitoring recommendation" to Xarelto's label. *See* Defs.' Br. (Doc. 6749), at 11–13. There is no dispute that such a change *must* be included in the "Highlights" section of the Xarelto label, which *all agree* "'cannot be changed without prior [FDA] approval.'" *Id.* (quoting Plaintiffs' regulatory expert, Dr. Parisian). Because any "monitoring recommendation" would have to be included in the Highlights section of the label, and because Defendants cannot "independently" make that change, Plaintiffs' claim is preempted. *Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2470 (2013); *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620 (2011).

> **B.  There is no "newly acquired information" that would have allowed Janssen to "independently" add PT-monitoring information to Xarelto's label following FDA approval.**

Moreover, there is no evidence of "newly acquired information" following FDA approval that would have allowed Janssen to "independently" add PT-monitoring information to Xarelto's

---

[1] *Accord Aldrup v. Caldera*, 274 F.3d 282, 288 & n.30 (5th Cir. 2001) (plaintiff waived argument that "was not raised in his response to defendant's motion for summary judgment"); *Wagster v. Gautreaux*, No. 12-00011-SDD-SCR, 2013 WL 6194516, at *8 (M.D. La. Nov. 26, 2013) (granting summary judgment where plaintiff "failed to address or counter [defendant's] . . . argument"); *Washburn v. Texas*, No. A-07-CA-116 LY, 2008 WL 3243880, at *7 (W.D. Tex. Aug. 6, 2008) (granting summary judgment; plaintiff who "failed to address" defendant's argument "waived the grounds upon which she could have responded" (citing *Vaughner*, 804 F.2d at 877)).

label.  *See* Defs.' Br. at 20–23; *see also, e.g.*, Doc. 5109, at 5–6; Doc. 5110, at 14.  In the second bellwether trial, Plaintiffs' counsel argued to the jury that the scientific literature regarding the use of PT testing in conjunction with Xarelto is "an absolute mess.  It's all over the place. . . . [It's] a confusing mess."  *Orr* Trial Tr. at 2345:17–24.  That belies a failure of proof as to any "newly acquired information" that could have given rise to use of the CBE regulation, which is fatal to Plaintiffs' claim.  *See Vaughner*, 804 F.2d at 877 n.2; *Whetstone*, 2012 WL 1032894, at *8.

As Defendants have explained, a manufacturer may use the CBE regulation to make a labeling change *only if* the change is based on "newly acquired information."  21 C.F.R. § 314.70(c)(6)(iii).  "[N]ewly acquired information" is defined as "data, analyses, or other information not previously submitted to the agency, which may include (but are not limited to) data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (*e.g.*, meta-analyses) if the studies, events or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA."  *Id.* § 314.3(b).  In applying FDA regulations to plaintiffs' proposed labeling changes, numerous courts have found that the information to which those plaintiffs have pointed does not qualify as "newly acquired information," and accordingly have held the plaintiffs' claims preempted.  *See, e.g.*, *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 43 (1st Cir. 2015) (holding failure-to-warn claims preempted because plaintiffs "ma[de] no claim . . . that this information was unknown to the FDA prior to label approval"); *In re Lipitor (Atorvastatin Calcium) Mktg., Sales Pracs. & Prods. Liab. Litig.*, 185 F. Supp. 3d 761, 770 (D.S.C. 2016) (granting summary judgment where there was no new information "that should have caused [the defendant] to change its label").  And recently, in *Utts v. Bristol-Myers Squibb Co.*—a case decided after this Court's rulings in *Bou-*

4

*dreaux*/*Orr* (and that Plaintiffs tellingly do not address)—the MDL court found that similar monitoring-based warning claims concerning Eliquis, a brand-name medication in the same NOAC class as Xarelto, were preempted by federal law for this very reason. *See* __ F. Supp. 3d __, 2017 WL 1906875, at *11–19 (S.D.N.Y. May 8, 2017) (concluding that none of the information relied on by the plaintiffs, including statements based on adverse drug event data, constituted "newly acquired information").

Here, there is no "newly acquired information" not previously submitted to FDA about use of a PT test with Xarelto that "reveal[ed] risks of a different type or greater severity or frequency than previously included in submissions to FDA." 21 C.F.R. § 314.3(b). The risk of bleeding has always been present and well known with use of anticoagulant medicines and is specifically referenced in Xarelto's labeling *more than 100 times*. Plaintiffs' claim is not based on "newly acquired information" about bleeding risk, nor could it be. Moreover, there certainly is no evidence that meets the materiality standard applicable to "newly acquired information," particularly in light of Plaintiffs' view that the science supporting their position is "an absolute mess." *See* Defs.' Br. at 22–23; *see also* 73 Fed. Reg. at 49604 (explaining "that a CBE supplement may be used to add or strengthen a contraindication, warning, precaution, or adverse reaction *only if* there is sufficient evidence of a causal association with the drug" (emphasis added)); *Utts*, 2017 WL 1906875, at *12 ("[T]he mere existence of reports of adverse events . . . says nothing in and of itself about whether the drug is causing the adverse events." (quoting *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011)). Accordingly, because Plaintiffs' claims are not based on "newly acquired information" as that term is defined in the CBE regulation, their failure-to-warn (or instruct) claim fails as a matter of law.

II.     **Federal law preempts Plaintiffs' failure-to-warn (or instruct) claim because Defendants could not have unilaterally changed Xarelto's label to recommend the use of a diagnostic medical device "off label" without prior FDA approval.**

As Defendants have explained—and as Plaintiffs' experts have conceded—no PT test is approved (or recommended) by FDA for use with Xarelto generally or, in particular as Plaintiffs propose here, to assess bleeding risk. *See* Defs.' Br. at 8–11.  Indeed, FDA has recently made clear that "[t]here are no cleared or approved devices that measure" the "effect or concentration of direct oral anticoagulants." Doc. 5109, Exh. 33.  Plaintiffs have emphasized using the Neoplastin PT test, but FDA cleared Neoplastin as a Class II medical device for use as a "general screening procedure . . . in the extrinsic coagulation pathway, which involves the reaction between coagulation factors III and VII, and to monitor patients receiving coumarin [*i.e.*, warfarin] therapy." 21 C.F.R. § 864.7750(a).  Accordingly, under FDA regulations and guidance, Defendants were prohibited from "unilaterally" instructing physicians to use Neoplastin in conjunction with Xarelto, and Plaintiffs' assertions to the contrary should be rejected.

1.      Consistent with FDA's classification regulation and the agency's public statements, the Neoplastin label makes clear that the device was designed and cleared for use in "monitoring vitamin K antagonist therapy" with "Coumadin." Neoplastin USPI § 2 (Doc. 5109, Exh. 35). Moreover, and importantly, the Neoplastin label's "Limitations" section says that the "test is insensitive" to certain "anti-Xa" levels.  *Id.* § 11. Although Plaintiffs say that the Neoplastin label "contains no *prohibition against* using Neoplastin for measurements with any other type of therapy" (Pls.' Br. at 11), that begs the question and ignores FDA's position on what it believes is the commonly accepted and scientifically valid use of Neoplastin. All agree that using Neoplastin with Xarelto would be an "off-label" use in light of Neoplastin's approval, its label, and FDA's public statements. The relevant question is instead whether Defendants may "unilaterally" recommend that off-label use in the Xarelto labeling, and the answer to that question—based on FDA

6

regulations and guidance—is unequivocally "no." *See* Defs.' Br. at 9–11.

   **2.**   FDA has stated publicly that there is no approved test for use with Xarelto, but Plaintiffs argue that those statements do "not equate to admissions that recommendations for the use of Neoplastin testing with Xarelto would have been strictly forbidden without specific approval." Pls.' Br. at 11. In fact, FDA's IVD Guidance makes clear that "specific approval" for use with Xarelto is *exactly* what FDA requires: "When an IVD companion diagnostic device has been approved or cleared for use with one therapeutic product"—as, for instance, Neoplastin has been for warfarin—"and evidence becomes available that use of the same device is essential for the safe and effective use of a different therapeutic product"—as Plaintiffs claim here for Xarelto—"the IVD companion diagnostic device labeling should be expanded through approval or clearance of a new premarket submission (PMA or 510(k) as appropriate) or PMA supplement . . . to include the new therapeutic product." Guidance for Industry and Food and Drug Administration Staff: In Vitro Companion Diagnostic Devices ("IVD Guidance") (Doc. 5677, Exh. 36), at 12. And as FDA further clarified, the "[l]abeling of the therapeutic product should also be amended through submission of a supplement." *Id.* Plaintiffs have tried to turn the IVD Guidance to their support, but their selective quotation of the guidance does not fit. The portion that Plaintiffs have quoted communicates FDA's position that "when the labeling for an already approved therapeutic product must be revised to address a serious safety issue . . . FDA does not intend to delay approval of changes to the labeling of the therapeutic product until the IVD companion diagnostic device is approved or cleared." *Id.* at 9. That statement does not help Plaintiffs—it says nothing about *unilateral* manufacturer labeling changes. Indeed, the statement communicates that even though "approval" is required, the agency "*does not intend to delay approval*" of the necessary changes. *Id.* (emphasis added).

7

3.     Plaintiffs point to the Pradaxa and Arixtra labels, which they claim "include instructions as to which general coagulation tests should and should not be used to measure the anticoagulant effect of the drug" and, they say, show that FDA will allow "laboratory test guidance" to be included in NOAC labeling. Pls.' Opp. at 12; *see also* Doc. 5966. Defendants have explained the fallacy of this argument before. *See* Doc. 5988, at 3–4. Plaintiffs here are *not* arguing that Xarelto's label should include general "laboratory test guidance." Nor could they, as Xarelto's label also includes general information about the utility of certain coagulation tests. *See* Xarelto USPI § 12.2 (Doc. 5109-3) ("Dose-dependent inhibition of factor Xa activity was observed in humans and the Neoplastin® prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest® are prolonged dose-dependently. Anti-factor Xa activity is also influenced by rivaroxaban."). Rather, Plaintiffs claim that the Xarelto label should include a *specific instruction*—in the Warnings section of the label (*see* Pls.' Opp. at 14)—directing doctors to conduct a Neoplastin PT test and use the results to make specific clinical decisions. Neither Pradaxa's nor Arixtra's label instructs doctors to use (1) a particular test, (2) at a particular time, (3) to determine the course of treatment based on a particular lab value. Plaintiffs' reliance on those labels is misplaced.

4.     Finally, Plaintiffs assert briefly—and for the first time in this litigation—that Defendants could have done something to "disclose safety and risk information . . . without invoking the CBE regulation." Pls.' Opp. at 8. That passing argument is incorrect and cannot stave off preemption. As Plaintiffs seem to recognize from their citation to 21 C.F.R. § 202.1, FDA broadly defines "labeling to include virtually any type of audio, visual, or printed matter descriptive of a drug and supplied by a manufacturer." *Id.* § 202.1(l)(2). And the CBE regulation, of course, governs "[c]hanges in the labeling." *Id.* § 314.70(c)(6)(iii). Moreover, the *Lipitor* MDL court (on

which Plaintiffs rely) recognized that even non-labeling advertisement "is still highly regulated by the federal government and state law cannot require a manufacturer to take action with regard to its advertisements not allowed by federal law." 185 F. Supp. 3d at 772. In particular, federal law prohibits "a manufacturer's advertisement" from "recommend[ing] or suggest[ing] any use that is not in the labeling accepted by the FDA." *Id.* (citing 21 C.F.R. § 202.1(e)(4)). It is undisputed here that Plaintiffs' proposed instruction to use Neoplastin PT at the initiation of therapy is not in Xarelto's FDA-approved labeling. Plaintiffs cannot avoid preemption on this basis.

### III. Federal law preempts Plaintiffs' failure-to-warn (or instruct) claim because there is "clear evidence" that FDA would have rejected a PT-related instruction in the Xarelto label.

In any event, federal law preempts Plaintiffs' claim because there is "clear evidence" that FDA would have rejected it. *Levine*, 555 U.S. at 571.[2] On this point, Defendants agree with Plaintiffs on one thing: "[a]n accurate review of the label's history is essential." Pls.' Opp. at 14.

**1.** Defendants proposed—repeatedly—to add information regarding PT testing to the Xarelto label. For example, as Defendants have explained, in 2008, Janssen proposed: "If assessment of the pharmacodynamic effect of rivaroxaban is considered necessary in individual cases, PT (measured in seconds) is recommended." In January 2011, Janssen included the same PT-related language and proposed language in April and May 2011 recommending the use of PT "if assessment of the pharmacodynamic effect is considered necessary in individual cases." FDA expressly rejected it in June 2011. *See* Defs.' Br. at 13–19.

The regulatory history does not show a "turnaround" by FDA in its views on PT or that the

---

[2] Notably, a plaintiff must "point to the existence of 'newly acquired information' to support a labeling change under the CBE regulation" *before* the burden "shifts to the manufacturer to show by 'clear evidence' that the FDA would not have approved the labeling change made on the basis of this newly acquired information." *Utts*, 2017 WL 1906875, at *9. As explained above, Plaintiffs have not pointed to any "newly acquired information" obtained after FDA's approval of Xarelto's VTE treatment indication, and, accordingly, Defendants are entitled to summary judgment—clear evidence or not.

agency "diametrically changed" its position "just months later," as Plaintiffs assert (Pls.' Opp. at 15–16):

- In November 2011, FDA approved NDA 202439 for the AFib indication *without* (1) the previously-stricken PT-related language, (2) any recommendation to use Neoplastin, or (3) any further evaluation of PT's utility to predict bleeding risk, but *with* the statement that "[t]he anticoagulation effect of XARELTO cannot be reliably monitored with standard laboratory testing." (Doc. 6479 Exh. 8); and

- In November 2012, FDA approved sNDA 022406 for the VTE treatment (DVT/PE) indication, again *without* any language referring to the "relationship between PT and rivaroxaban plasma concentration" and without any further inquiry regarding PT. (Doc. 6749 Exh. 10).

And Janssen responded to FDA's strikethrough of the PT language with another proposal that included reference to PT: Janssen "propose[d] to add the statement 'the Prothrombin Time could be used for estimating rivaroxaban pharmacodynamics effect' (although [Janssen] does not recommend it due to the short half-life and fact that the effect varies with the various available thromboplastin/tissue factor reagents)." (Doc. 5677 Exh. 56). FDA did not accept that proposal. *See* Defs. Br. at 15–16.

    **2.**    If (as Plaintiffs now say) FDA wanted to include Janssen's proposed PT language, the agency would not have categorically rejected it simply because it "disliked" it or it was proposed in the "wrong" section (Pls.' Opp. at 7, 17–18), but would instead have instructed Janssen to move it elsewhere. Plaintiffs' contention requires the Court to assume the worst about FDA— that it was either asleep at the switch or engaged in some sort of cat-and-mouse game. What's more, there is no dispute that the post-*Levine* cases demonstrate that "clear evidence" applies whenever FDA rejects a proposal to add a warning that is substantially similar to the warning that a plaintiff advocates, even if the proposal is not identical in every respect. *See* Defs.' Br. at 19;

10

Doc. 5109-1, at 26–27; Doc. 5677, at 12–15.[3]

    **3.**    Finally, there is no evidence that FDA would have approved a label that included Plaintiffs' proposed instruction had Defendants presented it. *See* Pls.' Br. at 19. Indeed, the evidence is to the contrary: (1) FDA (in particular, the Hematology Division that reviewed the NDA for the orthopedic surgery indication and the sNDA for the VTE treatment indication) rejected proposed language regarding using PT to "assess[]" the "pharmacodynamic effect of rivaroxaban"; and (2) FDA approved the Xarelto AFib indication—again, months after receiving the ROCKET AF data—*without* either requiring the previously stricken PT-related labeling, providing any recommendation to use the Neoplastin PT assay, or requesting any further evaluation of PT's utility to predict bleeding risk, but tellingly, *with* the statement (which remains in the label today) that "[t]he anticoagulant effect of XARELTO cannot be reliably monitored with standard laboratory testing." Xarelto USPI §§ 5.7, 8.1.

**IV. The Court should grant Defendants' motion to the extent that Plaintiffs have expressly renounced or failed to defend their previously asserted theories.**

There is one final point. As in *Boudreaux* and *Orr*, Plaintiffs have used their response to dramatically narrow the scope of this case. Plaintiffs now say that their only remaining failure-to-warn claim is that Xarelto's label should have included "an instruction for physicians to test Neoplastin PT at initiation to identify patients at a high risk of bleeding." Pls.' Opp. at 9. In so doing, Plaintiffs now have either expressly renounced various theories that they had initially advanced or simply failed to defend them from Defendants' preemption challenge:

- Plaintiffs disclaim any theory that Xarelto's label should have provided "instructions for physicians to perform warfarin-like routine measurements with PT tests

---

[3] Plaintiffs claim that preemption is a "question of fact for the jury." Pls.' Opp. at 6. The Court has already rejected this argument, *see* Order and Reasons (Apr. 18, 2017), at 5 (Doc. 6254) (holding that preemption is "a question of law that is not appropriate for consideration by the finder of fact"); *Boudreaux* Trial Tr. at 1147:3–15 (stating that preemption is "a question of law, not for the jury")—and rightly so. Accordingly, the Court can—and should—decide preemption as a matter of law on summary judgment.

and dose adjustments." Pls.' Opp. at 9.

- Plaintiffs are expressly no longer pursuing a claim that Xarelto should have included a "'black box' warning[] about the risk of bleeding." *Id.*

- Nor are Plaintiffs any longer pursuing a claim that Xarelto's label failed to warn about an anti-Factor Xa assay. *See id.* at 9–10.

- Moreover, Plaintiffs have failed to respond to Defendants' argument that any failure-to-warn claim regarding the INRatio device or the ROCKET AF U.S. subgroup data is preempted.[4]

In light of those concessions, the Court should enter an order dismissing these claims. *See, e.g.*, *Whetstone*, 2012 WL 1032894, at *8. An order of dismissal is critical here. Plaintiffs made similar concessions in their *Boudreaux/Orr* briefs, only to later backtrack by eliciting testimony at trial regarding previously abandoned theories of liability. *See* Defs.' *Boudreaux/Orr* Design Preemption Reply Br. (Doc. 5677), at 1–3; Defs.' Mot. Regarding Pls.' Abandoned Claims (Doc. 5957); *see also Orr* Trial Tr. 526:8–14 (instructing jurors to "disregard anything about a black box" from testimony of Plaintiffs' expert); *id.* 506:16–511:11.

Defendants are entitled to go into trial with a certain knowledge of the claims that will be asserted against them, and they are prejudiced by Plaintiffs' attempts to dodge dispositive decisions on liability theories that Plaintiffs later resurrect. *Cf. Jones v. Wells Fargo Bank, N.A.*, 858 F.3d 927, 933 (5th Cir. 2017) (recognizing that "basic fairness entitles a defendant to notice, before trial, of . . . the nature of the claims being asserted against it").

---

[4] It is no answer for Plaintiffs to later say that they preserved these two liability theories by incorporating their earlier briefing. In the opening brief, Defendants raised these liability theories and questioned whether Plaintiffs were pursuing them here, recognizing that they do not fit the facts of this case. *See* Defs.' Br. at 4 n.2. Plaintiffs have not responded or otherwise said anything that would suggest that they are pursuing those theories in this case, much less that they are defending them from preemption challenge. In fact, their briefing indicates the opposite. *See* Pls.' Opp. at 9 ("The failure to include this [Neoplastin PT] instruction is the crux of Ms. Mingo's failure to warn claim."). They have thus waived any failure-to-warn claim based on those theories. *See Vaughner*, 804 F.2d at 877 n.2; *Whetstone*, 2012 WL 1032894, at *8.

12

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants summary judgment on Plaintiffs' failure-to-warn (or instruct) claim.

Respectfully submitted,

BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C.

BY: /s/ *Richard E. Sarver*
Richard E. Sarver
Celeste R. Coco-Ewing
BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C.
909 Poydras Street, 24th Floor
New Orleans, Louisiana 70112
Telephone: (504) 589-9700
rsarver@barrassousdin.com
ccoco-ewing@barrassousdin.com


DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500

MITCHELL, WILLIAMS, SELIG, GATES & WOODYARD, P.L.L.C.

By: */s/ Lyn P. Pruitt*
Lyn P. Pruitt
Adria W. Conklin
Benjamin D. Brenner
Mary Catherine Way
MITCHELL, WILLIAMS, SELIG, GATES & WOODYARD, P.L.L.C.
425 West Capitol Ave., Suite 1800
Little Rock, AR 72201
Telephone: (501) 688-8800
lpruitt@mwlaw.com
aconklin@mwlaw.com
bbrenner@mwlaw.com
mway@mwlaw.com


WATKINS & EAGER PLLC

By: */s/ Walter T. Johnson*
Walter T. Johnson
WATKINS & EAGER PLLC
The Emporium Building
400 East Capitol Street
Jackson, Mississippi 39201
Telephone: (601) 965-1846
wjohnson@watkinseager.com

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *William Hoffman*
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001

Chanda.Miller@dbr.com

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ *James B. Irwin*
James B. Irwin
Kim E. Moore
IRWIN FRITCHIE URQUHART & MOORE LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

*Attorneys for Defendants Janssen Pharmaceuticals, Inc. and Janssen Research & Development, LLC*

Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com


BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ *Lindsey C Boney IV*
Kevin C. Newsom
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
knewsom@bradley.com


CHAFFE MCCALL L.L.P.

By: /s/ *John F. Olinde*
John F. Olinde
CHAFFE MCCALL L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer HealthCare Pharmaceuticals Inc. and Bayer Pharma AG*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 17th day of July, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system.

*/s/     John F. Olinde*

15