UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | * * * * * * * * | MDL NO. 2592<br><br>SECTION L<br><br>JUDGE ELDON E. FALLON<br><br>MAG. JUDGE NORTH |

**THIS DOCUMENT RELATES TO:**
*Dora Mingo v. Janssen, et al.* **(Case No. 2:15-cv-03469)**

### ORDER AND REASONS

Before the Court are several motions to exclude certain areas of anticipated testimony of various expert witnesses for the *Mingo* and *Henry* bellwether trials.[1] Plaintiff asks this Court to preclude testimony from seven defense experts about the potential outcomes from other anticoagulants. Rec. Doc. 5517. Defendants seek to exclude expert opinions and testimony regarding unapproved dosing and monitoring regimens, Rec. Doc. 6740, as well as opinions and testimony from Plaintiff's case specific expert, Dr. Henry Rinder. Rec. Doc. 6820. Mississippi law applies in *Mingo*. Having considered the parties arguments, submissions, and the applicable law, the Court now issues this Order and Reasons.

**I.     LEGAL STANDARDS**

    **A.**     ***Daubert* Standard**

Rule 702 of the Federal Rules of Evidence governs the admissibility of expert testimony. Rule 702 is in effect a codification of the United States Supreme Court's opinion in *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). In *Daubert*, the Supreme Court held that

---

[1] The Court will bifurcate Defendants' motions and only consider matters related to the upcoming *Mingo* trial in Mississippi. Parties may refile their motions and oppositions for *Henry* at a later time.

1

trial courts should serve as gatekeepers for expert testimony and should not admit such testimony without first determining that the testimony is both "reliable" and "relevant." *Id*. at 589.

The trial court is the gatekeeper of scientific evidence. *Daubert*, 509 U.S. at 596. It has a special obligation to ensure that any and all expert testimony meets these standards. *Id*. Accordingly, it must make a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and whether the reasoning or methodology can be properly applied to the facts in issue. *Id*. at 592-93. In making this assessment, the trial court need not take the expert's word for it. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 147 (1997). Instead, when expert testimony is speculative or lacks scientific validity, trial courts are encouraged to exclude it. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 279 (5th Cir. 1998).

In satisfying its "gatekeeper" duty, the Court will look at the qualifications of the experts and the methodology used in reaching their opinions and will not attempt to determine the accuracy of the conclusion reached by the expert. The validity or correctness of the conclusions is a determination to be made by the fact finder after the *Daubert* analysis.

Scientific testimony is reliable only if "the reasoning or methodology underlying the testimony is scientifically valid," meaning that such testimony is based on recognized methodology and supported by appropriate validation based on what is known. *Daubert*, 509 U.S. at 592-93. In *Daubert*, the Supreme Court set forth a non-exclusive list of factors to consider in determining the scientific reliability of expert testimony. *Id*. at 593-95. In the context of the present case, these factors are: (1) whether the theory has been tested; (2) whether the theory has been subject to peer review and publication; (3) the known or potential rate of error; (4) whether standards and controls exist and have been maintained with respect to the technique; and (5) the general acceptance of the methodology in the scientific community. *Id*. Whether some or all of

2

these factors apply in a particular case depends on the facts, the expert's particular expertise, and the subject of his testimony. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 138 (1999).

In addition to the five factors laid out in *Daubert*, a trial court may consider additional factors to assess the scientific reliability of expert testimony. *Black v. Food Lion, Inc.*, 171 F.3d 308, 312 (5th Cir. 1999). These factors may include: (1) whether the expert's opinion is based on incomplete or inaccurate data; (2) whether the expert has identified the specific mechanism by which the drug supposedly causes the alleged disease; (3) whether the expert has unjustifiably extrapolated from an accepted premise to an unfounded conclusion; (4) whether the expert has adequately accounted for alternative explanations; and (5) whether the expert proposes to testify about matters growing directly out of research he or she has conducted independent of the litigation. *See, e.g.*, *id.* at 313; *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 278-79 (5th Cir. 1998); *Christophersen v. Allied-Signal Corp.*, 939 F.2d 1106, 1114 (5th Cir. 1991); *Newton v. Roche Labs., Inc.*, 243 F. Supp. 2d 672, 678 (W.D. Tex. 2002). Scientific testimony is relevant only if the expert's reasoning or methodology can be properly applied to the facts at issue, meaning there is an appropriate fit between the scientific testimony and the specific facts of the case. *Daubert*, 509 U.S. at 593. Scientific evidence is irrelevant, however, when there is too great an analytical gap between the data and the opinion proffered. *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997).

The party seeking to introduce the expert testimony bears the burden of demonstrating that the testimony is both relevant and reliable. *Moore*, 151 F.3d at 275-76. The requirement of reliability does not strictly bind an expert within the proffered field of expertise; an expert may also testify concerning related applications of his or her background. *Slatten, LLC v. Royal Caribbean Cruises Ltd.*, No. 13-673, 2014 WL 5393341, at *2 (E.D. La. Oct. 23, 2014) (citing

*Wheeler v. John Deere Co.*, 935 F. 2d 1090, 1100 (10th Cir. 1991).  The focus is not on the result or conclusion, but on the methodology.  *Moore*, 151 F.3d at 275-76.  The proponent need not prove that the expert's testimony is correct, but must prove by a preponderance of the evidence that the expert's methodology was proper.  *Id*.

Both the Plaintiffs and Defendants have various experts in this case.  The Court will address each of the motions in turn.

### B. Mississippi Products Liability Act ("MPLA")

Because the admissibility of testimony depends in part on the relevant products liability statutes in Mississippi, the Court will generally describe them herein.  In order to prove a design-defect claim under the MPLA,

> the plaintiff must prove, by the preponderance of the evidence, that "the product was designed in a defective manner," that "[t]he defective condition rendered the product unreasonably dangerous to the user or consumer," and that "[t]he defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought."

\* \* \*

Additionally, a plaintiff making a design-defect claim must prove by the preponderance of the evidence the existence of a feasible design alternative:

> The product failed to function as expected and there existed a feasible design alternative that would have to a reasonable probability prevented the harm. A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers.

*Elliott v. El Paso Corp.*, 181 So. 3d 263, 271 (Miss. 2015) (quoting Miss. Code Ann. §§ 11-1-63(a)(i)(3), (a)(ii), (a)(iii), and (f)(ii)) (emphasis removed); *see also Williams v. Manitowoc Cranes, LLC*, No. 1:14CV383-HSO-JCG, 2016 WL 7665907, at \*3 (S.D. Miss. Sept. 30, 2016).

"[D]emonstrating a feasible alternative design as proof of a design defect is elemental to a claimant's prima facie case." *Id*. (quotation omitted).

The MPLA defines a "feasible design alternative" as "a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers." Miss. Code. Ann. § 11-1-63(f)(ii). "[A] plaintiff establishes a design defect by proving a product could have been made safer by the adoption of a reasonable alternative design." *Williams v. Bennett*, 921 So. 2d 1269, 1275 (Miss. 2006) (citing Restatement (Third) of Torts: Prod. Liab. § 2 (1998)). The Mississippi Supreme Court has explained that "[i]f an alternative design could have been practically adopted at the time of sale, and if the omission of such an alternative design rendered the product not reasonably safe, then a design is defective." *Id*.

A feasible design alternative is "required by Miss. Code Ann. Section 11-1-63(f)(ii)." *Williams*, 921 So. 2d at 1277. As the Mississippi Supreme Court has stated, "in Mississippi, the legislature has codified the requirements unique to a design defect claim and laid out an explicit blueprint for claimants to prove when advancing such a claim." *Williams v. Manitowoc Cranes, LLC*, No. 1:14CV383-HSO-JCG, 2016 WL 7665907, at *3 (S.D. Miss. Sept. 30, 2016).

## II. PRESENT MOTIONS

### A. Plaintiff's Motion to Preclude Speculative Testimony About Potential Outcomes from Other Anticoagulants (Rec. Doc. 5517)

Plaintiff in *Mingo* requests this Court to preclude speculative testimony about potential outcomes from other anticoagulants, which asks the Court to prevent certain testimonies from Drs. Steven Deitelzweig; Vond Reeves-Darby; Aland Jones; Randy Roth; and Demondes Haynes about what might have happened to the bellwether plaintiff if they had taken a different anticoagulant. Rec. Doc. 5517-1.

5

### 1. Plaintiffs' Argument

Citing depositions from six defense experts, Plaintiff generally argues these opinions of outcomes from other anticoagulants were not subject to peer review or tested, are without standards controlling their opinion, contain no support, and that the data used were inapplicable to Ms. Mingo. *Id.* at 8-11. They also argue such opinions are irrelevant and run a high risk of undue prejudice. *Id.* at 11-13.

Further, Plaintiff challenges the qualification of these defense experts under Federal Rule of Evidence 702. Plaintiff notes:

> Out of the seven defense experts who are the subjects of this motion, only one – Dr. Persing – is a hematogist. Two are hospitalists (Dr. Deitezweig and Dr. Roth), one is a gastroenterologist (Dr. Reeves-Darby), one is a pulmonologist (Dr. Haynes), one is an electrophysiologist (Dr. Wheelan), one is an emergency medicine physician (Dr. Jones). With the arguably exception of Dr. Deitelzweig, there is nothing in the backgrounds of the non-hematologists to suggest that they would be qualified to state opinions about the relative effects of anticoagulants.

Rec. Doc. 5517-1 at 9 (citations omitted). Thus, Plaintiff argues that "the opinions of Defendants' experts are based solely on subjective 'feelings' and unsupported speculation." *Id.* at 10.

### 2. Defendants' Opposition

Defendants, however, contend that Plaintiff has misconstrued their experts' testimony, arguing that their opinions are relevant to rebut Plaintiff's claim that Xarelto is not as reliable as other drugs and that there is a safer alternative. To not allow this testimony, Defendants contend, would be prejudicial to their case and their ability to defend themselves against Plaintiff's theories. Defendants further argue that Plaintiff's own expert witnesses agree that they cannot rule out the possibility of a bleeding event on another anticoagulant. Further, Defendants contend that all of

the doctors base their opinions on their education, training and expertise and on extensive review of relevant studies, literature, and medical records. *See generally* Rec. Doc. 7012 at 6-13.

### 3. Plaintiff's Motion Is Denied.

The Court finds the defense experts qualified and their testimonies relevant. One of Plaintiff's arguments is that there is a safer alternative to Xarelto. Mississippi product liability laws have components regarding whether a safer alternative design exists. *See* Miss. Code Ann. § 11-1-63(f). The testimony of these expert witnesses seeks to rebut Plaintiff's theory in that regard. Further, the testimony goes toward Defendants' theory that Xarelto was an appropriate drug for Plaintiff to take. This Court finds these testimony proper as the experts are well-qualified and their testimony is relevant and the experts have used appropriate and recognized methodology in arriving at their opinions. Accordingly, Plaintiff's motion (Rec. Doc. 5517) is **DENIED**.

### B. Defendants' Renewed Motion to Exclude Opinions and Testimony Regarding Unapproved Dosing and Monitoring Regimens (Rec. Doc. 6740)

The Court's opinion on testimony about dosing and monitoring regimens has not shifted since *Boudreaux* and *Orr*. *See In re Xarelto (Rivaroxaban) Prod. Liab. Litig.*, No. MDL 2592, 2017 WL 1352860, at *3-4 (E.D. La. Apr. 13, 2017). Defendants, once again, challenge Plaintiff expert witnesses' opinion that patients' risk of bleeding could be reduced and made safer if doctors monitored the concentration or anticoagulant effect of Xarelto, and if the FDA-approved dosages were changed. The experts who have been retained to provide case-specific opinions in *Mingo*— Drs. Emory, Polukoff, and Rinder—offer monitoring-related opinions.

### 1. Defendants' Argument

Defendants challenge the methodologies underlying the monitoring opinions, alleging that they are (1) untested and unsupported by any actual data, (2) are not accepted in the scientific community, and (3) have not been implemented in their own clinical practices, but rather were

7

developed solely for litigation. Rec. Doc. 5113 at 3. Defendants further contend that Plaintiff's alleged failure to address these issues waives those issues. Rec. Doc. 6740 at 3 (citing *McZeal v. J.P. Morgan Chase Bank, NA*, No. 13-6754, 2014 WL 3166715, at *8, n.23 (E.D. La. July 7, 2014).

Defendants also oppose Plaintiff's opinion regarding one-time Neoplastin PT test because the theory allegedly "has never been tested and no scientific evidence supports using a Neoplastin PT result to making prescribing decisions . . . ." Rec. Doc. 6740 at 4. Further, Defendants argue that "[w]ithout even an FDA-approved assay to point to that supposedly would make Xarelto safer, Plaintiffs cannot meet their burden of demonstrating the reliability of this opinion." *Id*. at 6. Defendants further challenge the expert opinions that "Xarelto should be dosed twice-daily rather than once-daily as approved by FDA," as well as the notion of some alternative, unspecified—yet safer—dose. *Id.* at 8-9. Defendants argue that these opinions have never been tested and are therefore unreliable.

        2.      Plaintiff's Opposition

Contrary to Defendants' claim, Plaintiff, nonetheless, has responded to these issues in their opposition to Defendants' motion. In particular, Plaintiff notes that she is only pursuing one claim (a design defect claim) with regard to the anti-Factor Xa assay. Rec. Doc. 7001 at 3. Plaintiff argues that Xarelto was:

> . . . unreasonably dangerous because it was developed and designed in the United States without an anti-Factor Xa assay to evaluate each patient's anticoagulation status, notwithstanding the fact that prior to placing Xarelto on the market in the United States: (1) Defendants used an anti-Factor Xa assay to evaluate each patient's anticoagulation status in their own Xarelto clinical studies; (2) the Bayer Defendants provided instructions on how to safely use anti-Factor Xa assays to assess a patient's exposure to Xarelto in their Canadian label for Xarelto; and (3) anti-Factor Xa assays were commercially available in Europe.

*Id*.  Plaintiff argues that these testimony indicate that Defendants "could have developed and designed an anti-Factor Xa assay to be placed on the market in the United States at the same time, similar to what had been done abroad. . . ." *Id*. at 4.  Moreover, Plaintiff suggests that the opinions by Plaintiff's experts about Neoplastin PT testing "are supported by Defendants' own clinical trial (ROCKET), Defendants' own scientists, the scientific and regulatory communities, government agencies, medical associations, and peer-reviewed publications." *Id.* at 2.  Finally, Plaintiff represents that Defendants' remaining arguments made in support of the exclusion of expert opinions herein will not be offered.  *Id.* at 5.  These include opinions that:

> (1) Xarelto patients should be monitored on a routine warfarin-like basis with Neoplastin PT tests and/or anti-Factor Xa assays; (2) Xarelto patients should have their doses titrated based on such routine warfarin-like monitoring; (3) Xarelto patients should be dosed twice-daily rather than once-daily as approved by the FDA; (4) Xarelto patients should be provided unspecified doses that are lower than FDA-approved doses.

*Id*.  Thus, Defendants' challenge to these opinions are moot because Plaintiff does not intend to provide such testimony.  Accordingly, Plaintiff argues that the motion is improper, applying *Daubert* to particular topics rather than to the testimony of individual experts.  *Id.*

        3.      <u>Defendants' Renewed Motion Is Denied.</u>

The Court finds that the opinions Defendants seek to exclude go to the crux of Plaintiff's theory of the case.  Federal Rules of Evidence 702 is meant to exclude or allow particular witnesses based on their qualifications and methodology; it is not meant to exclude or allow entire issues. *Daubert* motions are meant to address methodology and qualifications; Defendants' motion does not do so.  Dosing and monitoring are relevant to Plaintiffs' theory that Xarelto was defectively designed and its label lacked relevant information or directions regarding its safe use.  Because of Xarelto's short half-life and the variability in patients, some patients will retain more Xarelto in

9

their system and will be subject to a greater bleeding risk. Xarelto's dosing scheme and the availability of monitoring bear on the individual risk to each plaintiff taking Xarelto. Plaintiff contends that proper usage requires testing or monitoring to ascertain the appropriate dosage. She argues that this was known or should have been known to Defendants and the label should contain information and instructions or directions as to proper use. Plaintiff points to various journals and studies supporting their position. Without judging the accuracy of this conclusion, the methodology supporting the Plaintiff's argument is appropriate. Defendants' quarrel is with the witnesses' conclusions and not their methodology. Accordingly, Defendants' renewed motion (Rec. Docs. 6740) is **DENIED**.

      **C.**    **Defendants' Motion to Exclude Expert Opinions and Testimony of Plaintiff's Case-Specific Expert Dr. Henry Rinder (Rec. Doc. 6820)**

           1.    <u>Dr. Henry Rinder</u>[2]

Dr. Henry Rinder is a physician who is board-certified in internal medicine and clinical pathology. He practices at Yale University School of Medicine, specializing in hematology. Dr. Rinder received his M.D. from the University of Vermont College of Medicine. Since 1992, he has been an attending physician at Yale, and since 1995, he has been a professor of laboratory medicine and internal medicine at Yale. Dr. Rinder's clinical practice over the past 20 years has included the diagnosis and treatment of patients with arterial thrombosis, venous thrombosis, and atrial fibrillation, the latter including patients with complications of ischemic and/or hemorrhagic stroke, systemic embolism, and bleeding while on anticoagulation. He has been involved in the diagnosis and treatment of hundreds of anticoagulated patients with atrial fibrillation and thousands of patients with thrombotic or bleeding disorders. In his clinical practice, Dr. Rinder

---

[2] Dr. Henry Rinder's qualification, described herein, are largely taken from Plaintiff's opposition brief. *See* Rec. Doc. 7000-2 at 4-6.

assists medical teams in making a decision regarding anticoagulation for patients who, for example, have undergone total hip replacement. He and his team help physicians determine which anticoagulant therapy should be administered to patients, and Dr. Rinder generally recommends warfarin therapy to patients for on average two weeks following surgery. In his practice, Dr. Rinder deals with patients with GI bleeding frequently because, as he explained at his deposition, "the GI tract is very sensitive, so many of the patients that we see have gastrointestinal diseases, have gastrointestinal bleeding or hematologic complications within their GI tract. . . ." As a hematologist, he also works with physicians who treat patients with deep vein thrombosis in an emergency room setting.

Dr. Rinder has elsewhere served as an expert in the Yaz/Yasmin MDL litigation ("Yaz") and most recently in the Testosterone Therapy MDL litigation ("TRT"), where he was allowed to testify by both courts as a general and case-specific expert. Similarly, Dr. Rinder has been allowed to testify as an expert in state court in Pennsylvania on issues involving the correct dose of anticoagulant drugs. In *Yaz, TRT* and *Frey*, Dr. Rinder was allowed to offer case-specific causation opinions.

      2.      Defendants' Motion

Defendants argue that Dr. Rinder case-specific causation opinion is unsupported by a known, published, validated or in any way reliable methodology, and which should be excluded as nothing more than "ipse dixit" of the expert. Rec. Doc. 6820 at 1. Defendants contend that Dr. Rinder's opinion—that Xarelto use, rather than her gastric ulcer, chronic use of Aspirin, or another underlying medical condition or disease, caused her GI bleed—is pure speculation. Therefore, Defendants argue that he arbitrarily excluded other known risk factors and potential causes of GI bleed. *Id.* at 7. Defendants also suggest that his testimony is unreliable because "there is no medically valid way for Dr. Rinder to support his opinion that Xarelto was 'the most probable

11

cause' and 'the most substantial and significant contributing factor' of Ms. Mingo's GI bleed." *Id.* at 2. Dr. Rinder's "ruling in and ruling out" of Ms. Mingo's risk factors suggests that he may have performed a "differential diagnosis" to arrive at his opinion that Xarelto, not other risk factors, caused Ms. Mingo's GI bleed. *See id.* at 8. Defendants aver, however, that Dr. Rinder has never offered a particular method or rationale for actually ruling out other risk factors. *Id.*

Without a method to calculate or quantify his opinion, Dr. Rinder's testimony, Defendants argue, amounts to mere guesswork. *Id.* In addition, Defendants take issue with the "temporal causation" here: Ms. Mingo took Xarelto and was diagnosed with a GI bleed 21 days later. *Id.* at 9. Therefore, Defendants argue that Dr. Rinder's Opinion is unreliable because he cannot calculate or quantify the likelihood that anticoagulant use caused Ms. Mingo's GI bleed. *Id.* at 11-13.

### 3. Plaintiff's Opposition

Plaintiff argues that a proper differential diagnosis is an appropriate methodology utilized by medical experts for assessing causation with respect to an individual. Rec. Doc. 7000-2 at 7-8. Dr. Rinder stated in his report that he employed the same scientific methodology that he applies in "the clinical setting when evaluating patients who present with or are at risk for hematologic disorders, including bleeding or thrombosis." *Id.* at 9. He further explained that, in arriving at his causation opinions, he also relied on his knowledge and experience gained over the past 30 years as a physician. Contrary to Defendants' allegations, Dr. Rinder stated in his report that in forming his causation opinions, he "considered all potential risk factors for GI bleeding," and that based on his "review of the relevant materials and information," and "after ruling in and ruling out potential risk factors," he concluded to a reasonable degree of medical certainty that, although Ms. Mingo's gastric ulcer was the likely anatomic etiology of her GI bleeding, her use of Xarelto was the most probable cause of her clinically significant GI hemorrhage. *Id.* at 11.

        4.        <u>Dr. Rinder's Testimony Is Admissible.</u>

The Court finds Dr. Rinder qualified by virtue of his training and experience. Moreover, an expert is not required to "disprove[] or discredit[] every possible cause other than the one espoused by him." *Viterbo v. Dow Chem. Co.*, 826 F.2d 420, 420 (5th Cir. 1987). In *Wagoner v. Exxon Mobil Corp.*, this Court explained that a standard way by which medical experts address the question of specific causation is by performing a differential diagnosis or a differential etiology. 813 F. Supp. 2d 771, 804 (E.D. La. 2011) (citations omitted). Defendants' objection to the opinions of Dr. Rinder pertains to his conclusions, which go to the weight of his testimony instead of admissibility. Thus, Defendants may cross-examine Dr. Rinder on these issues at trial in an attempt to establish the frailty of the basis of his conclusions, but excluding them at this time is inappropriate. Accordingly, Defendants' motion is **DENIED**.

### III. CONCLUSION

Based on the foregoing reasons, accordingly,

**IT IS ORDERED** that Plaintiff's motion to preclude testimony from six defense experts about the potential outcomes from other anticoagulants (Rec. Doc. 5517) is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendants' motion to exclude expert opinions and testimony regarding unapproved dosing and monitoring regimens (Rec. Doc. 6740) is hereby **DENIED**;

**IT IS FURTHER ORDERED** that Defendants' motion to exclude the opinions and testimony from Plaintiffs' case specific expert Dr. Henry Rinder (Rec. Doc. 6820) is hereby **DENIED**.

New Orleans, Louisiana, on this 21st day of July, 2017.

ELDON E. FALLON
United States District Judge