**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | | |
|---|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS | * | MDL NO. 2592 |
| LIABILITY LITIGATION | * | |
| | * | SECTION L |
| | * | |
| | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAG. JUDGE NORTH |
| ********************************************* | * | |

**THIS DOCUMENT RELATES TO:**
  *Dora Mingo v. Janssen, et al.* **(Rec. Doc. 6753)**

## ORDER AND REASONS

Before the Court is Defendants' motion for summary judgment on state-law grounds as to Plaintiff's design-defect claim.  *Mingo* is the third bellwether trial in this multidistrict litigation series; Mississippi law applies here.  Defendants ask this Court to find that Plaintiff's design-defect claim fails as a matter of law because, *inter alia*, Plaintiff has not put forward a feasible alternative design to Xarelto, as required under the Mississippi Products Liability Act.  Plaintiff opposes this motion.  Having considered the parties arguments, submissions, and the applicable law, the Court now issues this Order and Reasons.

## I.    BACKGROUND

### A.    Xarelto MDL

This matter arises from damages Plaintiffs claim to have suffered from the manufacture, sale, distribution, and/or use of the medication known as Xarelto, an anti-coagulant used for a variety of blood-thinning medical purposes.  Plaintiffs have filed suits against Defendants throughout the nation.  Plaintiffs allege that they or their family members suffered severe bleeding and other injuries due to Xarelto's allegedly defective design and inadequate warning label, among other issues.

1

The Judicial Panel on Multidistrict Litigation determined that the Plaintiffs' claims involved common questions of fact, and that centralization under 28 U.S.C. § 1407 would serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.   Therefore, on December 12, 2014, the Judicial Panel on Multidistrict Litigation consolidated the Plaintiffs' Xarelto claims into a single multidistrict proceeding ("MDL 2592").   MDL 2592 was assigned to this Court to coordinate discovery and other pretrial matters in the pending cases.   Subsequent Xarelto cases filed in federal court have been transferred to this district court to become part of MDL 2592 as "tag along" cases.   The Court has appointed committees to represent the parties, and discovery has commenced.   The Court adopted a discovery plan and set bellwether trials to begin in April 2017.   This Order and Reasons relates to the third bellwether trial, involving Plaintiff Dora Mingo, a resident of Mississippi.

### B.      Ms. Mingo's Incident[1]

Plaintiff Dora Mingo underwent a total right hip replacement surgery on January 6, 2015. On January 22, 2015, she was diagnosed with a deep vein thrombosis ("DVT") in her right lower leg at Southwest Mississippi Regional Medical Center.   She was admitted to the hospital under the care of Dr. Renie Jordon, who first evaluated Ms. Mingo on the morning of January 23, 2015, and prescribed Xarelto for her DVT, which developed while she was on Lovenox and then aspirin for anticoagulation after she underwent hip replacement surgery.   *See* Def.'s Mot. (Rec. Doc. 6753) at 2.   Dr. Jordon prescribed Xarelto 15 mg twice-daily for 21 days, then 20 mg once-daily thereafter.   Prior to receiving her first dose of Xarelto on January 23, 2015, Ms. Mingo's prothrombin (PT) was normal at 12.5 (reference range 12.1-15.2).   After receiving her first and

---

[1] Unless otherwise indicated, the events occurred herein are described from Plaintiffs' brief labeled under Rec. Doc. 7006-2.

second dose of Xarelto, a PT test performed on January 24, 2015 revealed Ms. Mingo's PT was high at 23.6 (reference range 12.1-15.2).

When Ms. Mingo was discharged from the hospital on January 24, 2015, she was instructed to continue taking Xarelto. On February 12, 2015, bloodwork performed by Ms. Mingo's primary care physician, Dr. Jennifer Gholson, showed her hemoglobin was 5.8 (reference range: 12.0-16.0) and her hematocrit was 19.8 (reference range: 36-48). On the morning of February 13, 2015, Ms. Mingo had already taken her last scheduled dose of Xarelto 15 mg, when she received a call from Dr. Gholson's office, instructing her to go to the emergency room immediately.

Ms. Mingo went to the emergency room at Southwest Mississippi Regional Medical Center. Additional tests confirmed severe anemia and an acute upper GI bleed, with a PT measurement of 26.2. Ms. Mingo was admitted to the ICU for further treatment, and her Xarelto use was discontinued upon admission.

That same day, Ms. Mingo was transfused with four units of packed red blood cells and two units of fresh frozen plasma. Dr. Stephen Keith, a gastroenterologist, also performed an esophagogastroduodenoscopy (EGD), which revealed a 6mm oozing ulcer of the fundus. Dr. Keith ablated the bleeding ulcer with Argon Plasma Coagulation and placed a hemoclip for hemostasis. Ms. Mingo remained in the ICU for two more days, until February 15, 2015.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When assessing whether a dispute as to any material fact exists, the Court considers "all

of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).

Under Federal Rule of Civil Procedure 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 322. When the moving party has met its Rule 56(c) burden, "[t]he non-movant cannot avoid summary judgment . . . by merely making 'conclusory allegations' or 'unsubstantiated assertions.'" *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002) (quoting *Little*, 37 F.3d at 1075). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

### B.     Mississippi Products Liability Act ("MPLA")

In order to prove a design-defect claim in Mississippi,

> the plaintiff must prove, by the preponderance of the evidence, that "the product was designed in a defective manner," that "[t]he defective condition rendered the product unreasonably dangerous to the user or consumer," and that "[t]he defective and unreasonably dangerous condition of the product proximately caused the damages for which recovery is sought."

* * *

4

Additionally, a plaintiff making a design-defect claim must prove by the preponderance of the evidence the existence of a feasible design alternative:

> The product failed to function as expected and there existed a feasible design alternative that would have to a reasonable probability prevented the harm. A feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers.

*Elliott v. El Paso Corp.*, 181 So. 3d 263, 271 (Miss. 2015) (quoting Miss. Code Ann. §§ 11-1-63(a)(i)(3), (a)(ii), (a)(iii), and (f)(ii)) (emphasis removed); *see also Williams v. Manitowoc Cranes, LLC*, No. 1:14CV383-HSO-JCG, 2016 WL 7665907, at *3 (S.D. Miss. Sept. 30, 2016). "[D]emonstrating a feasible alternative design as proof of a design defect is elemental to a claimant's prima facie case." *Id*. (quotation omitted).

The MPLA defines a "feasible design alternative" as "a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers." Miss. Code. Ann. § 11-1-63(f)(ii). "[A] plaintiff establishes a design defect by proving a product could have been made safer by the adoption of a reasonable alternative design." *Williams v. Bennett*, 921 So. 2d 1269, 1275 (Miss. 2006) (citing Restatement (Third) of Torts: Prod. Liab. § 2 (1998)). The Mississippi Supreme Court has explained that "[i]f an alternative design could have been practically adopted at the time of sale, and if the omission of such an alternative design rendered the product not reasonably safe, then a design is defective." *Id*.

## III.  PRESENT MOTION

Defendants argue that Plaintiff cannot satisfy her burden under the MPLA because she cannot present sufficient evidence (1) that a "feasible alternative design" existed, (2) that any proposed alternative design would have to have a reasonable probability to prevent her injury, and

5

(3) that any proposed alternative design "would avoid impairing the utility, usefulness, practicality, or desirability" of Xarelto.  Rec. Doc. 6753 at 4.  Each argument will be discussed in turn.

### A.    Whether There Is a Feasible Alternative Design

A feasible alternative design is "required by Miss. Code Ann. Section 11-1-63(f)(ii)." Williams, 921 So. 2d at 1277.  As the Mississippi Supreme Court has stated, "in Mississippi, the legislature has codified the requirements unique to a design defect claim and laid out an explicit blueprint for claimants to prove when advancing such a claim."  *Williams v. Manitowoc Cranes, LLC*, No. 1:14CV383-HSO-JCG, 2016 WL 7665907, at *3 (S.D. Miss. Sept. 30, 2016).

### 1.    Defendants' Argument

Defendants contend that a reversal agent and an anti-Factor Xa assay are different products than Xarelto under FDA classification.  The only possible reversal agent Plaintiff brought up is a biologic (21 C.F.R. part 601) and an anti-Factor Xa assay—and this would be considered a medical device (21 C.F.R. part 809).  *See* Rec. Doc. 6753 at 4.  Both of these products, Defendants argue, would be subject to a different FDA regulatory regime than prescription medicines (21 C.F.R. part 314).  Therefore, Defendants aver that reversal agents and assays are "additional" to Xarelto—not a feasible alternative design for Xarelto.

Defendants asks the Court to consider *Elliott v. El Paso Corp.*, 181 So. 3d 263 (Miss. 2015).  There, the plaintiffs sued the manufacturer and seller of a natural gas odorant on a design-defect theory, following a house fire allegedly caused by a gas leak.  *See Elliott*, 181 So. 3d at 265-67.  The plaintiffs did not detect the leak before the fire, allegedly because the natural-gas odorant had faded.  For their feasible alternative design, the plaintiffs did not propose a re-design of the odorant itself, but instead theorized that natural gas customers should have "gas detectors" in addition to odorized gas.  *Id*. at 271-72.  The Mississippi Supreme Court rejected that argument, holding that a gas detector is not an "alternative design for odorant," but rather "an additional

6

warning system." *Id*. at 272.  The Mississippi Supreme Court made clear that "[r]equiring an entirely different warning system, or requiring the affected public to use gas detectors in their homes, is not a feasible alternative design for natural-gas odorant." *Id*. at 273.

Defendants contend that because neither of the proposed adjunct products—an anti-factor Xa assay or reversal agent—could have been adopted at the time Plaintiff used Xarelto, they are not "feasible alternative designs" under the MPLA.  Rec. Doc. 6753 at 6.  Moreover, FDA approved Xarelto without any reversal agent, and has not approved of any such agents—then or now.  *See id.*  And to the extent Plaintiff claims that Defendants should have designed Xarelto differently before seeking FDA approval, Plaintiff's claim fails because the MPLA indicates that a manufacturer may be liable under a design-defect theory only if "when the product left the manufacturer's control, there existed a feasible alternative design that would have to a reasonable probability prevented the harm."  Rec. Doc. 6753 at 7 (citations omitted).  Thus, Defendants argue that the Court should not expand Mississippi law to accept Plaintiff's pre-approval design-defect theory.  *Id.* at 8.

### 2.    Plaintiff's Response

Plaintiff argues that Xarelto was defectively designed because of the absence of an anti-Factor Xa assay, which would have prevented Plaintiff's injuries.  Such anti-Factor Xa assays were available in the United States long before Xarelto was marketed.  *See* Rec. Doc. 7006-2 at 6.  Plaintiff analogizes the present case to *Standard Fire Ins. Co. v. Broan Nutone, LLC*, 2008 WL 5560882 (S.D. Miss. 2008).  In that case, a fire that originated in a bathroom ventilation fan caused significant damages to plaintiffs' home.  *Id.* at *1.  Plaintiffs claimed the fan was defective in design because it lacked a thermal protection device.  *Id.* at *1-2.  Plaintiffs' expert showed "at least one major competitor of [the manufacturer] has utilized thermal protection devices on its

electric fan motors." *Id.* at *2.  Defendants' summary judgment motion was denied because plaintiffs established a feasible design alternative.  *Id.* at *6.

### B.     Whether That Alternative Design Has a Reasonable Probability to Prevent Injury

MPLA requires any plaintiff to prove that the product in question was defective and unreasonably dangerous "at the time the product left the control of the manufacturer or seller." Miss. Code Ann. § 11-1-63(a).  To survive summary judgment, Plaintiff must show that one of her proposed alternative designs would have "to a reasonable probability prevented the harm" she experienced.  Miss. Code. Ann. § 11-1-63(f)(ii); *see also Barnett v. Deere & Co.*, No. 2:15-CV-2-KS-MTP, 2016 WL 6652750, at *3 (S.D. Miss. Nov. 10, 2016).

#### 1.     Defendants' Argument

Defendants contend that Plaintiff lacks evidence that either warfarin or a version of Xarelto with a lower dose, different dosing regimen, or routine monitoring requirement would have prevented her gastrointestinal bleeding.  Defendants allege that Plaintiff lacks data-supported expert testimony with respect to all of her potential alternative-design theories, and that a routine monitoring regimen, anti-Factor Xa assay, or even a reversal agent would have, "to a reasonable probability," prevented her injury.  Rec. Doc. 6753 at 11-12.

#### 2.     Plaintiff's Response

Plaintiff contends that an anti-Factor Xa assay would have allowed physicians to tailor Xarelto to the individual need of their patients, and thus prevent such damages sustained by Ms. Mingo.  Plaintiff clarifies:  "Plaintiff is not proposing that a PT test is an alternative design of Xarelto, but that a Xarelto specific anti-factor Xa assay is the alternative design. The precise design provided to physicians in Europe to identify high risk patients."  Rec. Doc. 7006-2 at 9.  Thus, Plaintiffs conclude that such alternative design is feasible and available.

### C.     Whether an Alternative Design Impairs the Utility, Usefulness, Practicality, or Desirability of Xarelto

According to the MPLA "[a] feasible design alternative is a design that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers."  Miss. Code. Ann. § 11-1-63(f)(ii).

#### 1.     Defendants' Argument

Defendants allege that any proposed alternative design would impair the "utility, usefulness, practicality or desirability of the product to users or consumers."  Rec. Doc. 6753 at 14.  Defendants note that Warfarin was available to Plaintiff's prescribing physician, Dr. Jordon, but he chose to prescribe Xarelto instead because he preferred its advantages over warfarin—such as not having a monitoring regimen, not having to hospitalize the patient while determining the appropriate dose of warfarin, and not facing the inconvenience and cost of frequent dose adjustments.  *Id*. at 14.  According to Defendants, Warfarin, or warfarin-like features, however, would negate the benefits that make Xarelto a desirable product for medical professionals and their patients.  Moreover, Defendants contend that anti-Factor Xa assay or reversal agent are adjunct products and thus have an entirely different "utility, usefulness, practicality or desirability" than Xarelto itself.  *Id*. at 16.

#### 2.     Plaintiff's Opposition

Plaintiff argues that Defendants' own conduct is strong evidence that a screening test—the anti-Factor Xa assay—would not impair the utility of Xarelto.  Rec. Doc. 7006-2 at 10.  Defendants used an anti-Factor Xa assay to evaluate patients' bleeding risks in their own Xarelto clinical studies.  *See id.*  Such assays are commercially available in Europe, and Defendants advise prescribers and treaters in Canada to use the anti-Factor Xa assays to assess patient exposure to Xarelto.  *See id.*  Moreover, Plaintiff argues that the cost of an anti-Factor Xa test is minimal.

Plaintiff highlights that Dr. Jordon, the prescribing physician for Ms. Mingo testified that he would have wanted to know about an available screening test.  *Id.*  Plaintiff suggests that Xarelto would be more useful and practicable with an anti-Factor Xa test; physicians would be more confident in properly dosing the drug for a particular patient, and therefore they would be more likely to prescribe Xarelto.  *Id.*

## IV.  DISCUSSION

The Court finds summary judgment on the design-defect claim inappropriate at this juncture.  To establish a design-defect claim under the MPLA, Plaintiff must prove the existence of a "feasible alternative design," meaning a design "that would have to a reasonable probability prevented the harm without impairing the utility, usefulness, practicality or desirability of the product to users or consumers."  Miss. Code. Ann. § 11-1-63(f).  Plaintiffs have shown genuine disputes of material facts.

*First*, a reasonable jury could find that the use of an anti-Factor Xa assay is a feasible alternative design.  The parties have highlighted three cases to illustrate "feasible alternative design."  In *Elliott*, the Mississippi Supreme Court rejected Plaintiff's argument that natural gas customers should have "gas detectors" in addition to the allegedly defective odorized gas.  181 So. 3d at 271-72.   In that instance, the court made clear that gas detectors are "an entirely different warning system" and therefore not a feasible alternative design for natural-gas odorant."  *Id*. at 273.  In *Clark v. Brass Eagle*, the state supreme court also held that plaintiffs "offered no feasible design alternative" to an allegedly defective paint gun simply by claiming that the manufacturer should have provided protective goggles.  866 So. 2d 456, 461-62 (Miss. 2004).  On the other hand, in *Standard Fire*, a sister court denied summary judgment because it found that the plaintiffs had put forth a feasible alternative design for a fan which caused plaintiffs' injury.  2008 WL 5560882 at *1.  The fan in *Standard Fire* was defective in design because it lacked a thermal

protection device, and plaintiffs' expert showed that another manufacturer had utilized thermal protection devices on its electric fan motors.  *Id.* at *2.

"An alternative design is by definition a different method of configuring the product." *Tassin v. Sears, Roebuck and Co.*, 946 F. Supp. 1241, 1247 (M.D. La. 1996).  Gas detectors and odorized gas serve as "entirely different warning system[s]," each individually—if effective— would alert occupants of hazardous gas leaks.  *See Elliott*, 181 So. 3d at 272-73.  Likewise, paint guns and protective goggles have separate uses, and each by itself is functional without the other. *See Brass Eagle*, 866 So. 2d at 461-62.  Instead, Plaintiff's design-defect claim is more accurately analogized to *Standard Fire*:  the absence of an assay test to be utilized in connection with and as a required part of a product, Xarelto, could reasonably be viewed as the basis for a design defect claim under the MPLA.

**Second**, Plaintiff has shown that one of her proposed alternative designs, the anti-Factor Xa assay, has a "reasonable probability" of preventing the harm she experienced.  According to Plaintiff, an anti-Factor Xa assay would have informed Ms. Mingo's physician, Dr. Jordon, that she was at a high risk for a bleeding event, and it would have allowed him to prescribe the appropriate dosage to her or discontinue her Xarelto therapy.  Rec. Doc. 7006-2 at 9.  This is corroborated by Dr. Jordon's testimony.  When asked whether he would have followed an instruction in the label to use a screening test for Xarelto at initiation to measure the effect that it was having on a patient's blood to ensure that the patient had the right dose, Dr. Jordon stated, "If the manufacturer of the drug and the FDA recommends that we as physicians do this, yes."  Rec. Doc. 7006-2 at 9.  Thus, Plaintiff has shown a reasonable probability that a lower dosage of Xarelto—which may have been warranted after a screening test—would have prevented her GI bleed.

***Third***, whether complementing an anti-Factor Xa assay with Xarelto would impair "the utility, usefulness, practicality or desirability of the product" is a question best left to reasonable consumers—and jurors.  *See* Miss. Code. Ann. § 11-1-63(f)(ii).  Defendants have not established that implementing Plaintiff's proposed alternative design would frustrate the Xarelto product and marketability.  Moreover, Defendants themselves have used an anti-Factor Xa assay to evaluate patients' bleeding risks in their own Xarelto clinical studies.

Accordingly, the Court finds that the success of Plaintiff's action boils down to questions of fact.

## V.    CONCLUSION

Based on the foregoing reasons, Defendants' motion for partial summary judgment on the design-defect claim is hereby **DENIED**.

New Orleans, Louisiana, on this 21st day of July, 2017.

_____
ELDON E. FALLON
United States District Judge

12