## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | * * * * * * * * | **MDL NO. 2592** |
| | | **SECTION L** |
| | | **JUDGE ELDON E. FALLON** |
| | | **MAG. JUDGE NORTH** |

**************************************************

**THIS DOCUMENT RELATES TO:**
   *Dora Mingo v. Janssen, et al.* **(Rec. Docs. 6739 & 6758)**

### ORDER AND REASONS

Before the Court are Defendants' motions for partial summary judgment dismissing claims for punitive damages in the third (*Mingo*)[1] and fourth (*Henry*) Xarelto multidistrict litigation bellwether series.[2]  This Order and Reasons will only address the *Mingo* case.[3]  Under choice of law rules, Defendants ask this Court to apply the laws of New Jersey or Germany to the punitive damage claims in the upcoming trials.  Plaintiff opposes the motions, instead suggesting the application of Mississippi law—the state where Mingo lives and was injured.  The Court held a hearing on this matter on July 21, 2017.  Having considered the parties' arguments, submissions, and the applicable law, the Court now issues this Order and Reasons.

---

[1] Johnson & Johnson, a holding company organized under the laws of New Jersey with its principal place of business in New Brunswick, New Jersey joins in this motion as a defendant named only in the *Mingo* action.  *See* Rec. Doc. 6739 at 1, fn. 1.

[2] Defendants Bayer Pharma AG ("BPAG"), Bayer HealthCare Pharmaceuticals Inc. ("BHCP"), and the four "Non-Litigating Bayer Defendants" (collectively, the "Bayer Defendants") move for partial summary judgment on Plaintiffs' demand for punitive damages, raising the additional option to apply German law to the instant issue.  Given the overlap between the motions of the Janssen Defendants and the Bayer Defendants, the Court shall analyze both motions jointly.

[3] The Court will bifurcate Defendants' motions and only consider matters related to the upcoming *Mingo* trial in Mississippi.  Parties may refile their motions and oppositions for *Henry* at a later time.

1

I.     **BACKGROUND**

   A.     **Xarelto MDL**

   This matter arises from damages Plaintiffs claim to have suffered from the manufacture, sale, distribution, and/or use of the medication known as Xarelto, an anti-coagulant used for a variety of blood-thinning medical purposes.   Plaintiffs have filed suits against Defendants throughout the nation.  Plaintiffs allege that they or their family members suffered severe bleeding and other injuries due to Xarelto's allegedly defective design and inadequate warning label, among other issues.

   The Judicial Panel on Multidistrict Litigation determined that the Plaintiffs' claims involved common questions of fact, and that centralization under 28 U.S.C. § 1407 would serve the convenience of the parties and witnesses and promote the just and efficient conduct of the litigation.   Therefore, on December 12, 2014, the Judicial Panel on Multidistrict Litigation consolidated the Plaintiffs' Xarelto claims into a single multidistrict proceeding ("MDL 2592").  MDL 2592 was assigned to this Court to coordinate discovery and other pretrial matters in the pending cases.  Subsequent Xarelto cases filed in federal court have been transferred to this district court to become part of MDL 2592 as "tag along" cases.  The Court has appointed committees to represent the parties, and discovery has commenced.  The Court, with assistance of counsel, identified a discovery pool of representative cases and selected four bellwether trials.

   The instant case is the third bellwether trial involving Plaintiff Dora Mingo.  Ms. Mingo, a resident of Mississippi (*see* Mingo Comp. ¶ 10), filed her Complaint directly in the Eastern District of Louisiana pursuant to PTO 9, which provides that direct-filing of a complaint in MDL No. 2952 "will have no impact on choice of law that otherwise would apply to an individual case had it been originally filed in another district and transferred to this Court pursuant to 28 U.S.C. § 1407."  PTO 9, ¶ G.  Because Ms. Mingo is a resident of Mississippi, PTO 9 dictates that

2

Mississippi choice of law rules apply to determine the substantive state law governing her claim for punitive damages.

**B.    Ms. Mingo's Incident[4]**

Plaintiff underwent a right total hip replacement surgery on January 6, 2015.  On January 22, 2015, she was diagnosed with a deep vein thrombosis ("DVT") in her right lower leg at Southwest Mississippi Regional Medical Center.  She was admitted to the hospital under the care of Dr. Renie Jordon, who first evaluated Ms. Mingo on the morning of January 23, 2015, and prescribed Xarelto for her DVT, which developed while she was on Lovenox and then aspirin for anticoagulation after she underwent hip replacement surgery.  *See* Def.'s Mot. (Rec. Doc. 6753) at 2.  Dr. Jordon prescribed Xarelto 15 mg twice-daily for 21 days, then 20 mg once-daily thereafter.  Prior to receiving her first dose of Xarelto on January 23, 2015, Ms. Mingo's PT was normal at 12.5 (reference range 12.1-15.2).  After receiving her first and second dose of Xarelto, a PT test performed on January 24, 2015 revealed Ms. Mingo's PT was high at 23.6 (reference range 12.1-15.2).

When Ms. Mingo was discharged from the hospital on January 24, 2015, she was instructed to continue taking Xarelto.  On February 12, 2015, bloodwork performed by Ms. Mingo's primary care physician, Dr. Jennifer Gholson, showed her hemoglobin was 5.8 (reference range: 12.0-16.0) and her hematocrit was 19.8 (reference range: 36-48).  On the morning of February 13, 2015, Ms. Mingo had already taken her last scheduled dose of Xarelto 15 mg, when she received a call from Dr. Gholson's office, instructing her to go to the emergency room immediately.

Ms. Mingo went to the emergency room at Southwest Mississippi Regional Medical Center.  Additional tests confirmed severe anemia and an acute upper GI bleed, with a PT

---

[4] Unless otherwise indicated, the events occurred herein are described from Plaintiffs' brief labeled under Rec. Doc. 7006-2.

3

measurement of 26.2.  Ms. Mingo was admitted to the ICU for further treatment, and her Xarelto use was discontinued upon admission.

That same day, Ms. Mingo was transfused with four units of packed red blood cells and two units of fresh frozen plasma.  Dr. Stephen Keith, a gastroenterologist, also performed an esophagogastroduodenoscopy (EGD), which revealed a 6mm oozing ulcer of the fundus.  Dr. Keith ablated the bleeding ulcer with Argon Plasma Coagulation and placed a hemoclip for hemostasis.  Ms. Mingo remained in the ICU for two more days, until February 15, 2015.

## II.    LEGAL STANDARDS

### A.    Summary Judgment

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994).  When assessing whether a dispute as to any material fact exists, the Court considers "all of the evidence in the record but refrains from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008).

Under Federal Rule of Civil Procedure 56(c), the moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 322. When the moving party has met its Rule 56(c) burden, "[t]he non-movant cannot avoid summary judgment . . . by merely making 'conclusory allegations' or 'unsubstantiated assertions.'" *Calbillo v. Cavender Oldsmobile, Inc.*, 288 F.3d 721, 725 (5th Cir. 2002) (quoting *Little*, 37 F.3d at 1075).  "The mere existence of a scintilla of evidence in support of the plaintiff's

4

position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 253 (1986). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with conclusory allegations or unsubstantiated assertions. *Little*, 37 F.3d at 1075. A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399.

### B. Choice of Law

A federal court sitting in diversity generally applies the forum state's choice-of-law rules. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941); *Mayo v. Hartford Life Ins. Co.*, 354 F.3d 400, 403 (5th Cir. 2004). An "MDL court must apply the law of the transferor forum, that is, the law of the state in which the action was filed, including the transferor forum's choice of law rules." *In re Vioxx Prods. Liab. Litig.*, 478 F. Supp. 2d 897, 903 (E.D. La. 2007). The instant case was filed in the transferee court but by agreement of the parties (*see* PTO 9 ¶ II.G), Ms. Mingo is to be treated as though it were filed in Plaintiff's home district (the Southern District of Mississippi). Thus, Mississippi's choice-of-law rules apply to *Mingo*.

Mississippi applies the "center of gravity test," otherwise known as "most-significant-relationship" test, set forth in sections 6 and 145 of the Restatement (Second) of Conflict of Laws. *See Mitchell v. Craft*, 211 So. 2d 509, 515-16 (Miss. 1968) (replacing the place-of-injury rule with the Restatement test). Under this approach, where there is a conflict between two or more potentially applicable states' laws, the law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue. *See Boardman v. United Servs. Auto. Ass'n*, 470 So. 2d 1024, 1031 (Miss. 1985).

Section 145 describes the "[c]ontacts to be taken into account" in determining which state has the most significant relationship to a specific tort issue, such as punitive damages. Restatement

(Second) § 145(2). These section 145 factors "are to be weighed in accordance with the general principles" set forth in section 6 of the Restatement (Second). *Coats v. Penrod Drilling Corp.*, 785 F. Supp. 614, 618 (S.D. Miss. 1992), *aff'd*, 5 F.3d 877 (5th Cir. 1993), *opinion reinstated in part & aff'd on reh'g*, 61 F.3d 1113 (5th Cir. 1995) (en banc). The Restatement (Second) instructs that "[e]ach issue" in a particular case "is to receive separate consideration if it is one which would be resolved differently under the local law rule of two or more of the potentially interested states." § 145, cmt. d. This principle, known as dépeçage, also applies to punitive damages. *See Restatement (Second)* § 171 cmt. d (noting that "exemplary damages" should be determined by applying section 145).

## III.   LAW AND ANALYSIS

The Court must engage in a choice-of-law analysis because there is a "true conflict between the laws of two states, each having an interest in the litigation," in terms of how those states view punitive damages. *Zurich Am. Ins. Co. v. Goodwin*, 920 So. 2d 427, 432 (Miss. 2006). On the one hand, the law of Mississippi—where Plaintiff resides, where the drug was prescribed, and where her injuries occurred—provides for punitive damages in certain circumstances. Mississippi allows punitive damages where there is "clear and convincing evidence" that the defendant "acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." Miss. Code. Ann. § 11-1-65(1)(a).

By contrast, the laws of Germany and New Jersey—the states where the Bayer Defendants maintain their principal places of business and the alleged improper conduct occurred—do not authorize punitive damages in a pharmaceutical case like this one. Under German law, punitive damages are categorically "unavailable." *See Exxon Shipping Co. v. Baker*, 554 U.S. 471, 497 (2008). As for New Jersey law, punitive damages are not allowed in a pharmaceutical case where

6

the challenged drug is FDA approved.  *See* N.J. Stat. Ann. § 2A:58C-5(c); *McDarby v. Merck & Co., Inc.*, 949 A.2d 223, 271-76 (N.J. Super. Ct. 2008).

In light of this conflict of laws—between the law of Plaintiff's home state and the law of Defendants' principal place of business—the Court must determine which state has "the most significant relationship" to Plaintiffs' demand for punitive damages.

### A.    Conflicting Forums

#### 1.    New Jersey

Defendants argue that New Jersey law should govern punitive damages in the instant case because it has the most significant contacts there.  Defendants aver that major decisions concerning the development, testing, marketing and labeling of Xarelto occurred in New Jersey.  Rec. Doc. 6739 at 3.  Janssen Defendants have their principal places of business in New Jersey:  Janssen Pharmaceuticals, Inc. is incorporated in Pennsylvania and has its principal place of business in New Jersey, and Janssen Research & Development, LLC is a New Jersey limited liability company with its principal place of business in New Jersey.  *Id.*  Janssen Defendants received the FDA Approval Letter for Xarelto in July 2011 in its New Jersey offices.  *Id.* at 3.  Decisions concerning changes to Xarelto label were also made at Janssen Defendants' offices in New Jersey.  *Id.*  Janssen Defendants' marketing and promotional materials originated in their New Jersey offices.  *Id.*  And, the FDA's communications concerning Xarelto are addressed to Janssen Pharmaceuticals, Inc.'s office in New Jersey.  *Id.*  Thus, even though Plaintiff alleges she used Xarelto in her home state of Mississippi, Defendants argue that all of the events that allegedly give rise to her claim of punitive damages took place in New Jersey.  *Id.*

Defendants ask this Court to consider the public policy reasons of punitive damages to find New Jersey law applicable.  Because the purpose of punitive damages is to punish and deter future

conduct, Defendants argue that courts generally grant more weight to the place of business of defendants—where the alleged improper conduct occurred. *Id.* at 9-10.

Moreover, Defendants suggest that the needs of the interstate and international systems would be best served by applying New Jersey punitive damages laws. Citing *Talley v. Novartis Pharms. Corp.*, Defendants aver that "New Jersey has made a policy decision on how to impose punitive damages, and has an interest in its citizens being governed by those provisions." *See* No. 3:08-CV-361-GCM, 2011 U.S. Dist. LEXIS 70201, at *12 (W.D.N.C. June 27, 2011).   In establishing their principal places of business in New Jersey, Janssen Defendants argue that they have a justified expectation of being subject to New Jersey law for punitive damages. Rec. Doc. 6739 at 10. Moreover, unlike compensatory damages, which are intended to make a plaintiff whole for their underlying torts claims, Plaintiffs have no justified expectation in punitive damages, according to Defendants. *Id.*

Thus, Defendants contend that under the New Jersey Product Liability Act, punitive damages are not available if a product was approved by the FDA, unless the "the product manufacturer knowingly withheld or misrepresented information required to be submitted under the agency's regulations, which information was material and relevant to the harm in question." N.J.S.A. § 2A:58C-5(c); *see also McDarby v. Merck & Co. Inc.*, 949 A.2d 223, 276 (N.J. Super. Ct. App. Div. 2008).   Accordingly, Defendants ask for summary judgment on Plaintiff's punitive damage claim.

2.   Germany

Alternatively, Bayer Defendants ask the Court to apply German law for reasons similar to those Janssen have already raised in favor of applying New Jersey law.  The Court will not restate their arguments here.  But chiefly, Bayer contends that all of the conduct that Plaintiff alleges as the basis for punitive damages—involving the design, manufacture, advertising, and/or

8

distribution of Xarelto—occurred at the Bayer Defendants' principal places of business in Germany and New Jersey. Rec. Doc. 6758 at 2. Bayer notes that the United States Supreme Court and other federal courts have recognized that German law is crystal clear that punitive damages are unavailable in that country: "Noncompensatory damages are not part of the civil code tradition and thus unavailable in such countries as . . . Germany . . . ." *Exxon Shipping*, 554 U.S. at 497; *accord, e.g.*, *Hefferan v. Ethicon Endo-Surgery, Inc.*, 828 F.3d 488, 495 (6th Cir. 2016) (recognizing that German law "lacks . . . punitive damages"). Thus, in the event that the Court applies German law, Defendants argue that summary judgment is warranted.

Plaintiff rejects application of German law under Federal Rules of Civil Procedure 44.1. Rule 44.1 requires that "[a] party who intends to raise an issue about a foreign country's law must give notice by pleading or other writing." Fed. R. Civ. P. 44.1. While "a high degree of specificity is not required," a Rule 44.1 notice "should specify the segment of the controversy. The Bayer Defendants have also moved for summary judgment, contending that German law also applies. According to Plaintiff, however, the Bayer Defendants never provided notice of their intent to raise foreign law about punitive pursuant to Fed. R. Civ. P. 44.1. Thus, Plaintiff argues that Bayer has waived its right to assert that German law applies.

        3.    <u>Mississippi</u>

Plaintiff requests this Court to apply Mississippi law on the punitive damages issue. Plaintiff notes: "Because Ms. Mingo is a resident of Mississippi who was prescribed Xarelto in Mississippi by a Mississippi physician and who suffered personal injuries in Mississippi for which she was treated in the state, the center of gravity of all of Ms. Mingo's tort claims are in Mississippi." Rec. Doc. 7033 at 6. Plaintiff relies on the Mississippi Supreme Court's holding in *Valley Forge Ins. Company/CNA Ins. Co. v. Strickland*, which requires the application of the

punitive damage law of the state whose substantive law has the most significant contacts. 620 So.2d 535 (Miss. 1993).

## B.     Analysis

Mississippi applies the "center of gravity test," s*ee Mitchell*, 211 So. 2d at 515-16, and courts consider four factors from the Restatement to determine the significant relationship: (1) "the domicil[e], residence, nationality, place of incorporation and place of business of the parties"; (2) "the place where the conduct causing the injury occurred"; (3) "the place where the relationship, if any, between the parties is centered"; and (4) "the place where the injury occurred." Sections 6 and 145 of the Restatement (Second) of Conflict of Laws; *see McDaniel v. Ritter*, 556 So. 2d 303, 310 (Miss. 1989)*.* These contacts "are to be evaluated according to their relative importance with respect to the particular issue," *see* Restatement (Second) of Conflict of Laws § 145, and "[c]ourts should evaluate these contacts for their quality, not their quantity." *Spence v. Glock, Ges.m.b.H*, 227 F.3d 308, 312 (5th Cir. 2000).

As to the first factor of the Restatement, Plaintiff is a resident of Mississippi, while Defendants have their business operations in New Jersey and Germany. Second, Plaintiff was prescribed Xarelto in Mississippi. (Defendants argue, however, that the alleged "conduct causing the injury"—the business decision—occurred in New Jersey and Germany, and should be given most weight in this four factor test.) Third, the relationship between Plaintiff and Defendants occurred in Mississippi, where she was prescribed Xarelto by a Mississippi physician. Fourth, Plaintiff allegedly suffered from Xarelto in Mississippi.

Defendants ask this Court to apply the most weight to the second factor—the place where the alleged conduct causing the alleged injury occurred. Rec. Doc. 6739 at 8. Defendants argue: "[W]hen the primary purpose of the tort rule involved is to deter or punish conduct, the place where the conduct occurred has peculiar significance." *Id.* (citing Restatement (Second) of Conflict of

Laws § 145, cmt. e). Plaintiff's claim for punitive damages are based on Janssen Defendants' alleged conduct related to the labeling, marketing and design of Xarelto, as well as regulatory decisions, in Germany and New Jersey. *See id.* at 8-9. Defendants argue that Germany and New Jersey have strong interests in determining the level of punishment and deterrence to be imposed on businesses that "operate in [those states] to design, make, and distribute products." Rec. Doc. 6758 at 11 (citation omitted). According to Defendants, these states also have interests in "(1) the financial stability of the businesses that conduct their affairs within its borders, and (2) the overall economic well-being of [their] citizenry," which may cause them to make policy decisions disallowing punitive damages. *See id.* (citing *In re Disaster at Detroit Metro. Airport on Aug. 16, 1987*, 750 F. Supp. 793, 805 (E.D. Mich. 1989); *see also Aguirre Cruz*, 435 F. Supp. 2d at 705 (recognizing the interest of the "principal place of business and location of much of the alleged misconduct . . . in shielding its resident defendants from excessive liability")); *see also In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 517 F. Supp. 2d 832, 852 (E.D. La. 2007) (holding that New Jersey law applied to plaintiffs' punitive-damages demands even though law of plaintiffs' residence governed liability issues because "[p]unitive damages . . . are intended to fulfill different policy objectives than other tort rights and remedies").

Such roundabout effort to circumvent punitive damages, however, is precisely what the Mississippi Supreme Court warned against in *Valley Forge Ins. Company/CNA Ins. Co. v. Strickland*, 620 So.2d 535 (Miss. 1993). In that case, the mother of a child severely injured in an automobile accident that occurred in Mississippi litigated a bad-faith claim against the mother's insurer for improperly asserting a subrogation claim. *Id.* at 537. Although no policy had yet issued as of the date of the accident, a binder had issued to the Plaintiff in Louisiana. *Id.* In response to the bad-faith claim, Valley Forge sought to avoid punitive damages by arguing that Louisiana law

11

(which does not recognize punitive damages), not Mississippi law, applied. *Id.* at 538. Valley Forge argued that the activities regarding the bad-faith claim occurred in the state where the contract was formed (Louisiana), not the location of the accident. A unanimous panel of the Mississippi Supreme Court rejected the insurer's arguments, concluding the law applicable to the underlying tort is also applicable on the issue of punitive damages. *Id.* at 539-40. *See also*, *Yocham v. Novartis Pharm. Corp*., 736 F.Supp. 2d 875, 882 (D.N.J. 2010) ("Where a party is domiciled in the place of injury, purchases the allegedly defective product there, and uses it only there, the place of injury is not fortuitous*.*"); *In re Nuvaring Prod. Liab. Litig.,* 957 F.Supp. 2d 1110, 1115 (E.D. Mo. 2013) ("Organon marketed and sold NuvaRing in Missouri, where Prather purchased and used it. Prather suffered her DVT and pulmonary emboli in Missouri. The place of injury is not fortuitous as that term is used in the choice-of-law analysis.").

The Seventh Circuit's holding in *In re Air Crash Disaster Near Chicago*, 644 F.2d 594 (7th Cir. 1981) provides some guidance on the development of jurisprudence on choice of law for punitive damages. An airplane designed and manufactured by McDonnell Douglas and operated by American Airlines crashed during takeoff, killing all 271 persons on board and two persons on the ground. McDonnell Douglas was a Maryland corporation with its principal place of business in Missouri; American Airlines was a Delaware corporation with its principal place of business in New York or Texas. The plane was designed and manufactured by McDonnell Douglas in California and maintained by American in Oklahoma. 644 F.2d at 604-05. Illinois uses the Restatement (Second)'s "most significant relationship" test. The court found that the defendant's home state (its principal place of business) and the state where the wrongful conduct took place had the greatest interest in applying their laws on punitive damages and, further, that these interests were evenly balanced. Although the Seventh Circuit recognized that the state where air crashes

occur is by happenchance, the court still held: "But the fact that the interest of the place of injury is less than the interest of the principal place of business and the interest of the place of alleged misconduct does not mean that Illinois has no interest in the punitive damages question. Illinois has very strong interests in not suffering air crash disasters and also in promoting airplane safety." *Id.* at 615. Thus, the Seventh Circuit applied the punitive damage law of Illinois, the state where the injury occurred. *Id.* Professor Larry Kramer nonetheless has pointed out that the Seventh Circuit "seamlessly transformed" the Restatement's "most significant relationship test" into a "most significant *interest* test." *See* Larry Kramer, *Choice of Law in Complex Litigation*, 71 N.Y.U. L. Rev. 547, 555-56 (1996) (emphasis original).

So, too, are Defendants blending the two standards—but arguing for a different result. Nevertheless, under either application, the significant relationship test or the state's interest test, Defendants' argument fails. The Court will address each in turn.

The Restatement (Second) Conflict of Laws provides four factors to consider when determining the most significant relationship. *See* Sections 6 and 145 of the Restatement (Second) of Conflict of Laws. Under Defendants' application, only the second factor—the place where the alleged improper conduct causing the injury occurred—would have any bearing, making the other three obsolete. That should not be. Although the place where the design, manufacture, and marketing conduct relating to the allegedly defective product occurred is of great importance, the location of other conduct that substantially contributed to the injury is also relevant and carries weight. *See Jones*, 460 F. Supp. 2d at 970. Indeed, this Court recognizes that a plaintiff's domicile—by itself—has little impact on choice of law application for punitive damages. But where there are other substantially contributing incidents that occurred in the place of injury, which happens to also be plaintiff's home state, then the center of gravity focuses there. Here, Plaintiff

13

is a resident of Mississippi, the drug was marketed in Mississippi, it was prescribed in Mississippi, by a Mississippi doctor, and Plaintiff allegedly suffered from Xarelto in Mississippi. It would be unfair to subject Plaintiff to the law of New Jersey, where she had little, if any, contact. On the other hand, Defendants have subjected themselves to the laws and jurisdiction of every state by entering those markets. Accordingly, under the significant relationship test, Mississippi's law on punitive damages applies.

The Court is cognizant that some trial courts have applied punitive damage laws in states where the business is established. *See, e.g.*, *Jones v. Winnebago Indus.*, 460 F. Supp. 2d 953, 970 (N.D. Iowa 2006) ("[I]n a products liability case, the place where the design, manufacture, and marketing conduct relating to the allegedly defective product occurred is of relatively greater weight than 'the place of injury,' at least in the absence of evidence that other conduct substantially contributing to the injury also occurred in the place of injury."); *In re Educ. Testing Serv. Praxis Principles of Learning & Teaching: Grades 7-12 Litig.*, 517 F. Supp. 2d 832, 852 (E.D. La. 2007) ("[I]n the case of punitive damages, the contacts of the state in which the allegedly wrongful conduct occurred and the state of the defendant's place of business take on a more prominent role."); *Cruz v. Ford Motor Co.*, 435 F. Supp. 2d 701, 705-07 (W.D. Tenn. 2006) ("Numerous courts have held that the state of the plaintiff's domicile does not have an interest in imposing its state law regarding punitive damages."); *Zimmerman v. Novartis Pharms. Corp.*, 889 F. Supp. 2d 757, 762 (D. Md. 2012) ("The place where the injury occurred, Maryland, is 'simply fortuitous' with respect to punitive damages as 'it bears little relation to the occurrence and the parties with respect to the particular issue."); *50-Off Stores v. Banque Paribas (Suisse) S.A.*, No. SA-95-CA-159, 1997 U.S. Dist. LEXIS 11136, at *36-37 (W.D. Tex. May 19, 1997) ("if the place of injury is fortuitous or bears little relation to the occurrence and parties, then this contact will not play an

important role."). But these cases could largely be distinguished because Mississippi is not simply Plaintiff's domicile—it is also the place of injury, where the drug was marketed, where the drug was prescribed, and where the relationship between the parties formed. Moreover, Defendants rely, in part, on punitive damages in contract cases—not products liability. *See, e.g.*, *In re Educational Testing Service Praxis Principles*, 517 F. Supp. 3d 832 (lawsuit principally involved claims based on negligence theories flowing from the defendant's failure to properly grade teacher exams – a contractual right).

Because Defendants have advanced arguments in favor of preserving New Jersey's state interest, the Court will now weigh in on that discussion, even though the significant relationship test is controlling here. The MDL court in *In re Tylenol (Acetaminophen) Marketing, Sales Practices & Products Liability Litigation* faced a similar issue as the one before this Court today. *See* No. 2:12-CV-07263, 2015 WL 2417411, at *1 (E.D. Pa. May 20, 2015). That MDL involved claims of liver damage from the use of Tylenol, and whether Tylenol poses a serious risk of liver damage to consumers taking it at or just above the recommended dosage. *Id.* Prior to the bellwether trial, the parties disputed whether Alabama law or New Jersey law applies to the claims for wrongful death and punitive damages. Despite the fact that the decedent was in Alabama, the case was originally filed in the Court of Common Pleas of Philadelphia, Pennsylvania, removed to the Eastern District of Pennsylvania based on diversity jurisdiction, and then transferred into the MDL court. Thus, Pennsylvania choice-of-law principles applied. *Id.* at *2.

Pennsylvania employs a "flexible rule" which combines the "significant contacts" analysis of Restatement (Second) of Conflict of Laws § 145 and a "governmental interest analysis." *See id.* In its significant contacts application, the court considered:

> Alabama has several significant contacts related to this action. It is
> the place of the decedent's injury and death. The decedent allegedly

15

> purchased Tylenol in Alabama, ingested Tylenol in Alabama, was treated by her doctors for her injuries in Alabama, and eventually died from those injuries in Alabama. Some of the conduct considered to have caused the injury occurred in Alabama. The decedent received warnings about the product in Alabama and viewed advertising about Tylenol in Alabama.

> On the other hand, New Jersey has contacts relevant to the issue of punitive damages—a claim which considers the egregiousness of the *defendants*' behavior. The defendants are incorporated in New Jersey. Both maintain their principal place of business is in New Jersey. Many of the corporate decisions about how to market Tylenol, how to test its efficacy, and how to comply with necessary regulations appear to have been made in New Jersey. Some conduct related to the defendants' conduct on the issue of punitive damages also appears to have taken place in Pennsylvania.

*Id.* at *4. On balance, the court found that the place in which the parties' relationship is centered is clearly Alabama. *Id.* "The defendants sold the Tylenol in Alabama, marketed the Tylenol in Alabama, and were expected to comply with the laws of Alabama. It appears the decedent had no contact with New Jersey. She didn't travel there, ingest Tylenol there, nor was she injured there. The two parties interacted through their consumer relationship in Alabama." *Id.*

And on the "governmental interest analysis," the *Tylenol* court balanced New Jersey's interest in promoting economic certainty and stability to pharmaceutical companies within its borders and Alabama's "longstanding policy to protect its citizens from fatal tortious conduct." *Id.* at *5. "Applying New Jersey law to the punitive damages claim would also substantially frustrate Alabama's state interest in protecting its citizens and regulating corporate entities doing business within its borders." *Id.*

So too here. Applying New Jersey law on punitive damages would defeat Mississippi's desire in protecting the welfare of its residents by deterring and punishing wrongdoers who do business in its state. Defendants have not proved that New Jersey's interest for shielding pharmaceutical companies from punitive damages is greater than Mississippi's concern for

16

consumer protection. All things being equal, the Court applies the law of the state where the injury occurred. *See In re Air Crash Disaster*, 644 F.2d at 616 ("The law of the place of injury is to be supplanted *only when* another state has a more significant relationship than the place of injury.") (emphasis added). Therefore, under either the "most significant relationship test" or the "most significant interest test," the Court finds Mississippi law to be proper for the instant case.

Janssen Defendants further argue that the needs of the interstate and international systems would be best served by applying New Jersey punitive damages laws. Moreover, Defendants aver that they have a justified expectation of being subject to New Jersey law for punitive damages. Rec. Doc. 6739 at 11. But so should Defendants expect to subject themselves to the laws of the states they serve. As the Seventh Circuit noted in lawsuits for plane accidents, "[f]uture defendants cannot predict, of course, where airplane disasters will occur." *In re Air Crash Disaster*, 644 F.2d at 616. "But air transportation companies will now be on notice that, under the 'most significant relationship' test, when there is a true conflict between laws of states having equal interests in the issue of punitive damages, and when the place of injury has a strong interest in air safety and in protection of air transportation corporations, the law of the place of injury will apply." *Id.* Likewise, pharmaceutical companies will now have the same notice, as they should have had following the *Tylenol* court's holding. "Determining that all other factors being equal, the law of the place of injury shall be used, [and this] provides a principled means of decision which also creates certainty." *Id.*

Finally, the Court cannot ignore the irony of Defendants' argument. On the one hand, Defendants argue that "[t]he basic policy underlying punitive damages is to punish and deter wrongful conduct." Rec. Doc. 6739 at 11. According to Defendants, "[t]he alleged conduct at issue occurred in New Jersey and thus, the interests of the tort are promoted through consistent

application of New Jersey law." *Id.* But at the same time, New Jersey coddles its pharmaceutical companies whose products have received FDA approval by denying a claim for punitive damages. *See* N.J. Stat. Ann. § 2A:58C-5c. This cannot deter wrongful conduct and is inconsistent with the public policy underlying punitive damages.

## IV.   CONCLUSION

Based on the foregoing reasons, Defendants' motions for partial summary judgment on punitive damages (Rec. Docs. 6739 & 6758) are hereby **DENIED**.

New Orleans, Louisiana, on this 24th day of July, 2017.

ELDON E. FALLON
United States District Judge