# EXHIBIT "2"

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO (RIVAROXABAN)  *
PRODUCTS LIABILITY LITIGATION  *        Docket No. 14-MD-2592
                               *
                               *        Section L
THIS DOCUMENT RELATES TO:      *
                               *        New Orleans, Louisiana
                               *
*Joseph Orr, et al.*           *
*v. Janssen Research &*         *        May 30, 2017
*Development, et. al.,*         *
Case No. 15-CV-3708            *
                               *
* * * * * * * * * * * * * * * *


TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE
VOLUME I - AFTERNOON SESSION


<u>Appearances:</u>


For the Plaintiffs:          Levin Papantonio Thomas Mitchell
                               Rafferty & Proctor, P.A.
                             BY:  BRIAN H. BARR, ESQ.
                             316 South Baylen Street, Suite 600
                             Pensacola, Florida  32502


For the Plaintiffs:          Beasley Allen Crow Methvin
                               Portis & Miles, PC
                             BY:  ANDY BIRCHFIELD, ESQ.
                             Post Office Box 4160
                             Montgomery, Alabama 36103


For the Plaintiffs:          Gainsburgh Benjamin David
                               Meunier & Warshauer, LLC
                             BY:  GERALD E. MEUNIER, ESQ.
                             1100 Poydras Street, Suite 2800
                             New Orleans, Louisiana 70163

Appearances:

| For the Plaintiffs: | Goza & Honnold, LLC |
|---|---|
| | BY:  BRADLEY D. HONNOLD, ESQ. |
| | 11181 Overbrook Road, Suite 200 |
| | Leawood, Kansas 66211 |

For the Plaintiffs:              The Lambert Firm
                                 BY:  EMILY C. JEFFCOTT, ESQ.
                                 701 Magazine Street
                                 New Orleans, Louisiana 70130


For Bayer Healthcare            Wilkinson Walsh + Eskovitz, LLP
Pharmaceuticals, Inc.           BY:  BETH A. WILKINSON, ESQ.
and Bayer Pharma AG:            1900 M Street NW, Suite 800
                                Washington, DC 20036


For Bayer Healthcare            Nelson Mullins Riley &
Pharmaceuticals, Inc.              Scarborough, LLP
and Bayer Pharma AG:            BY:  DAVID E. DUKES, ESQ.
                                1320 Main Street, 17th Floor
                                Columbia, South Carolina 29201


For Janssen Pharmaceuticals,    Irwin Fritchie Urquhart
Inc. and Janssen Research &       & Moore, LLC
Development, LLC:               BY:  JAMES B. IRWIN, ESQ.
                                400 Poydras Street, Suite 2700
                                New Orleans, Louisiana 70130


Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                500 Poydras Street, Room B-275
                                New Orleans, Louisiana 70130
                                (504) 589-7778




Proceedings recorded by mechanical stenography, transcript
produced by computer.

CHRISTOPHER C. NESSEL

04:16

1          So in collaboration with Dr. Horrow and the executive

2     committee, we considered actually several devices, three in

3     total:  the HemoSense device, called INRatio; and two other

4     devices, one called ProTime and one called the HemoChron.  They

5     were from a different manufacturer.

6          We believed, I think, that all three devices could

7     get the job done, I will say; but for the two devices, the

8     ProTime and the HemoChron, there was a challenge associated

9     with them.  What I mean by that is the testing strip they

10    used -- the company called it a cuvette -- needed to be

11    refrigerated -- needed to be refrigerated constantly between

12    2 and 8 degrees centigrade.  That meant that from the time that

13    cassette left the factory until the time it was used to treat a

14    patient, it had to be kept refrigerated at a very specific

15    range:  2 to 8 degrees centigrade.

16    Q.   You are talking about all over the world these have to

17    remain refrigerated?

18    A.   All over the world and until the time it is about to be

19    used.  I'm very specific about that because if the cassette --

20    say a patient was going to show up at 3:00 in the afternoon and

21    the cassette was taken out at 6:00 in the morning -- they left

22    it on the desktop -- that cassette would then expire.

23          So the executive committee and the sponsor together

24    and, I think, separately worried that if that refrigeration --

25    we called it cold chain.  If that cold chain was broken and the

CHRISTOPHER C. NESSEL

04:17

1    cassettes were left out in the sun, they were left on a loading

2    dock, they were left in the back of a truck, and they expired,

3    two things would happen:  One, we would never know about it;

4    and two, the results that were returned would very likely be

5    invalid.

6              So the HemoSense device was unique in that the test

7    strips could be stored at room temperature, no need for

8    refrigeration.  And in my mind that was one of the key deciding

9    factors in choosing the HemoSense device.

10   Q.   Were there any concerns about the necessity or the

11   potential need to unblind the HemoChron or the ProTime device

12   if it was selected?

13   A.   So the -- when this device -- when any device would have

14   been used in the ROCKET-AF study we were contemplating, the

15   actual INR would not be returned, the actual value.  Because if

16   the actual value was returned, the patient and the physician

17   might know which drug they are taking.

18             Instead, a seven-digit code was returned.  For

19   patients taking rivaroxaban, that code would return a value

20   that was likely to mimic what they would be taking if they were

21   taking warfarin therapy.  So when the physician received that

22   code, they would call in to the IVRS -- interactive voice

23   response system -- and it would be decoded for them.

24             If the patient was randomly assigned to receive

25   warfarin therapy, the value returned would be the true INR.  If

**CHRISTOPHER C. NESSEL**

1    the patient was assigned to receive rivaroxaban therapy, the

2    value returned would be something like it would be if they were

3    on warfarin.  So, say, an INR of 2.2 or 2.5, something we

4    called clinically reasonable, that would be the term:

5    clinically reasonable.

6    **Q.**   I believe you testified yesterday that you recall having

7    specific discussions with Dr. Becker, Dr. Halperin, and

8    Dr. Horrow about the selection of an appropriate device for the

9    ROCKET-AF study?

10   **A.**   That's correct.

11   **Q.**   During the pendency of the study, how were any potential

12   concerns about the Alere device handled?

13   **A.**   So it would really depend on the nature of the concern.

14   **Q.**   What do you mean by that, "the nature of the concern"?

15   There are different types of concerns you might have with a

16   device?

17   **A.**   Certainly.  Sometimes sites would call us and say, I'm

18   getting an error message.

19           So the screen would read E-R-R, ERR.  The user manual

20   would have plausible reasons why an error message might come

21   up.  Some of those reasons included if the batteries were worn

22   out or if the device was not plugged in conversely.

23           If the code on the test strip was not entered into

24   the machine, if there was inadequate blood -- so a tiny, little

25   drop of blood was needed to be put on the cassette.  If the

**CHRISTOPHER C. NESSEL**

04:21

1   machine didn't detect enough blood, they would get an error
2   message.
3           So the sponsor sometimes received calls, and they
4   said, This is Dr. Smith from Chicago, Illinois.  I have
5   received an error message.  Can you help me get to the bottom
6   of why I'm receiving this.
7           So certainly we would address those particular
8   concerns.
9           If a physician had a concern about the device and the
10  value that was returned, the sponsor put into place a mechanism
11  whereby those values could be checked.  I think I testified --
12  I can't remember if it was today or perhaps yesterday -- about
13  the Covance recheck.  That was a system whereby at the same
14  time the blood test was performed on the point-of-care device,
15  a tube of blood would be sent to Covance, which is a central
16  laboratory we use, and both measures could be determined
17  simultaneously.
18          The unblinded monitor, ma'am, that you and I
19  discussed just a few moments ago, would then get those results
20  and report them to the study site.  The unblinded monitor could
21  also answer questions about error messages or why a particular
22  result might be obtained, et cetera.
23  Q.   Did you ever offer retraining for the investigators if
24  they had any concerns about the device?
25  A.   I would answer that question with two yeses.  What I mean

**CHRISTOPHER C. NESSEL**

04:22

1    by that is retraining happened regularly, with or without

2    cause.  So at the fireside chats, at the investigator meetings,

3    on the DigiScript portal, through the ROCKET AF newsletters,

4    and through direct communication letters from the sponsor,

5    there was ongoing education about the INR monitor and about

6    other aspects of study conduct as well.

7            There were occasions, however, that it was brought to

8    the sponsors' attention that there were some concerns or issues

9    at particular sites.  We would dispatch and monitor, and

10   sometimes even a representative from clinical quality

11   assurance, who would very rigorously go through the data that

12   was collected at the site and question the investigator and

13   question the study coordinator to determine if, in fact, they

14   were conducting the study properly.  That was an added measure,

15   if you will, so that the sponsor could assure themselves, the

16   clinical community, and, in fact, the patients that patient

17   safety was the most important thing for us and that we were

18   ensuring it.

19   Q.   You were asked questions about, in general speaking, the

20   more you anticoagulate a patient, the more risk of bleeding.

21   I'm not sure you had an opportunity to fully explain your

22   answer.  Would you elaborate on the concept of the more of an

23   anticoagulant a patient receives, the potential greater risk of

24   bleeding?

25   A.   Certainly.  As I tried to express, the decision to

* * *

**<u>CERTIFICATE</u>**

I, Toni Doyle Tusa, CCR, FCRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of proceedings in the above-entitled matter.


*s/ Toni Doyle Tusa*
Toni Doyle Tusa, CCR, FCRR
Official Court Reporter

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION

                                    Docket No. 14-MD-2592
THIS DOCUMENT RELATES TO:           Section L
                                    New Orleans, Louisiana
Joseph Orr, Jr., as Lawful          Wednesday, June 7, 2017
Surviving Spouse of
*Sharyn Orr v. Janssen, et al.*
*Case No. 2:15-cv-03708*

*********************************************************************

**TRANSCRIPT OF TRIAL PROCEEDINGS**
**HEARD BEFORE THE HONORABLE ELDON E. FALLON,**
**UNITED STATES DISTRICT JUDGE,**
**AND A JURY.**
**VOLUME VII - MORNING SESSION**

*********************************************************************

**APPEARANCES:**


FOR THE PLAINTIFFS'              MR. ANTHONY BIRCHFIELD, JR.
LIAISON COUNSEL:                 Beasley Allen Crow Methvin
                                   Portis & Miles
                                 Post Office Box 4160
                                 Montgomery, AL  36103

                                 MR. BRIAN H. BARR
                                 MR. NEIL E. McWILLIAMS
                                 Levin Papantonio Thomas
                                   Mitchell Rafferty & Proctor
                                 316 Baylen Street
                                 Suite 600
                                 Pensacola, FL 32502

                                 MR. GERALD EDWARD MEUNIER
                                 Gainsburgh, Benjamin, David,
                                   Meunier & Warshauer
                                 Energy Centre
                                 1100 Poydras Street
                                 Suite 2800
                                 New Orleans, LA  70163-2800

**OFFICIAL TRANSCRIPT**

```
                                    MS. EMILY JEFFCOTT
                                    The Lambert Firm, PLC
                                    701 Magazine Street
                                    New Orleans, LA  70130


                                    MR. BRADLEY D. HONNOLD
                                    Goza & Honnold, LLC
                                    11181 Overbrook Road
                                    Suite 200
                                    Leawood, KS 66211


FOR THE DEFENDANT JANSSEN           MR. JAMES B. IRWIN, V
PHARMACEUTICALS, INC.,              Irwin Fritchie
and JANSSEN RESEARCH &                 Urquhart & Moore, LLC
DEVELOPMENT, LLC:                   400 Poydras Street
                                    Suite 2700
                                    New Orleans, LA  70130


FOR THE DEFENDANT                   MR. DAVID E. DUKES
BAYER HEALTHCARE                    Nelson Mullins Riley &
PHARMACEUTICALS, INC.,                 Scarborough, LLP and
BAYER PHARMA AG:                    Meridian, 17th Floor
                                    1320 Main Street
                                    Columbia, SC  29201


                                    MS. BETH A. WILKINSON
                                    Wilkinson Walsh + Eskovitz, LLP
                                    1900 M Street NW
                                    Suite 800
                                    Washington, DC 20036



REPORTED BY:  Mary V. Thompson, RMR, FCRR
              United States District Court
              500 Poydras, Room B275
              New Orleans, LA  70130
```

**OFFICIAL TRANSCRIPT**

1   laboratory, it's not a complex laboratory test.  It is a simple
2   test where you can look at the INR value to determine how your
3   warfarin dose is and if it needs to be changed.
4        Q.   Okay.  And I think you just said this, but just so it
5   is clear, what did the point of care device in the ROCKET
6   trial -- what was it measuring?
7        A.   The INR, supposedly.  But it was under a code.
8        Q.   What was this device used in the ROCKET trial?  What
9   was that device called?
10       A.   It was called the INRatio.
11       Q.   And was that made by a company called HemoSense?
12       A.   HemoSense.  And I believe they are called Alere now,
13   A-l-e-r-e.
14       Q.   And during the ROCKET trial, was the point of care
15   device used routinely in the warfarin arm?
16       A.   Yes.  It was supplied to each one of the
17   investigational sites throughout the world by the company.
18       Q.   And was -- would it have been important, in your
19   opinion, that the device accurately report INR?
20       A.   Everything about ROCKET was based on it providing
21   accurate information and also the protection of the patients on
22   warfarin.  They need to have an accurate machine.
23       Q.   Why does it matter that INR was accurately reported
24   with the HemoSense device?
25       A.   Because patients are being treated with this.  In terms

**OFFICIAL TRANSCRIPT**

1    of their warfarin and their Coumadin, if the value is not

2    correct, then the person who is just prescribing whether you

3    should go up or down with your dose won't know what to do with

4    that patient.

5          So if it is under-reading, it's not giving the right

6    INR, you're going to have patients walking around who are high in

7    terms of potential risk for bleeding, so you have set in an

8    increased risk for those patients.  It's a bias that these

9    patients would be more likely to bleed if they're not given an

10   accurate reading for the physicians or the people caring for

11   them.

12        **Q.**   And how would the device -- reporting low values and

13   putting warfarin people at higher bleed risk, how would that

14   impact the comparison of warfarin to Xarelto?

15        **A.**   So you have taken an arm of the study, which is

16   supposed to be well-controlled warfarin, and you have now given

17   doctors an inaccurate number, or reading, so those patients who

18   have the inaccurate number from the machine are at increased risk

19   of bleeding.

20        Now, you can be high in terms of your warfarin dose and

21   you may not bleed immediately, but you are at risk of bleeding.

22   Something may have to trigger you to bleed.  So you're letting a

23   group of people who are participating in this study be at high

24   risk of bleeding without the people caring for them knowing it.

25        **Q.**   And in or around 2014, was there important information

**OFFICIAL TRANSCRIPT**

1  learned about the HemoSense device that was used in the ROCKET

2  trial?

3  **A.**   Yes.

4  **Q.**   What was it?

5  **A.**   There was a recall in December of 2014.

6  **Q.**   And why was the device recalled?

7  **A.**   The device -- the commercial device was recalled

8  because it was giving a low value and it was not giving the

9  correct value.  So patients were being put at risk for bleeding

10  from this false value.  So the device outside of ROCKET was found

11  to be not reliable in terms of taking care of patients on

12  warfarin.

13  **Q.**   And at some point after the recall of the device in

14  December of 2014, was it confirmed that that same device was used

15  in the ROCKET trial?

16  **A.**   Yes.  It was accidently that it was identified that it

17  had been used in ROCKET.

18  **Q.**   And as a result of the recall -- and you recall there

19  was some publicity around that?

20  **A.**   Right.

21  **Q.**   And as a result of that, was an investigation conducted

22  as to whether the device malfunctioned in the ROCKET trial?

23  **A.**   Yes.

24  **Q.**   What did that investigation uncover?

25  **A.**   It documented that the device in ROCKET had

**OFFICIAL TRANSCRIPT**

1   malfunctioned.  There were blood values drawn at 12 weeks and

2   24 weeks that are split samples.  The comparison of the value

3   that was given in ROCKET versus the laboratory determination

4   clearly showed that they were not -- it was not reliable.  The

5   device was not giving the same value as the laboratory.

6        So that was confirmed because of those split samples,

7   and it was confirmed that it occurred in ROCKET.

8        **Q.**   Did the investigations that were conducted -- there

9   were multiple investigations, correct?

10       **A.**   Yes.

11       **Q.**   There was -- do you know who all conducted an

12   investigation?

13       **A.**   The FDA.  When it came to light that the ROCKET study

14   had a faulty device, the FDA got involved re-looking at ROCKET

15   data.

16       **Q.**   Did Bayer and Janssen investigate?

17       **A.**   Yes.  And that is where they used the split samples and

18   they found out that there was this discrepancy between the values

19   in the laboratory.

20       **Q.**   Did the investigations reveal that the device

21   malfunctioned in a large number of warfarin patients?

22       **A.**   Yes.  And we're talking about the warfarin arm so this

23   would be the 7,000 patients that were the group that was a

24   comparator for Xarelto.

25       **Q.**   And was this malfunction in a large number of

**OFFICIAL TRANSCRIPT**

1    patients -- did it have clinical significance?

2        A.   Right.  In terms of the FDA's mathematical review, they

3    said that 7 to 10 percent more patients than had been -- they had

4    been aware of had bleeding because of this device.

5        Q.   Okay.  And did you actually look at the data yourself?

6        A.   Yes.

7        Q.   What data did you look at to determine that the device

8    malfunctioned in ROCKET?

9        A.   Well, I looked at the split sample information that the

10   company had developed and I also looked at the FDA's

11   documentation.

12       Q.   So let's back that up a little bit.

13            As part of the ROCKET trial, split samples were taken?

14   Is that what I'm understanding?

15       A.   Right.  At 12 weeks -- it was part of the protocol.  At

16   12 weeks and 24 weeks, but the samples hadn't been run until

17   after this issue with the device came up.

18       Q.   Okay.  So let's explain what a split sample is.  What

19   do you mean by that?  What was that?

20       A.   Well, you'd have two tubes drawn when you get your

21   blood drawn.  You'd get one tube that would be the one for the

22   point of care.  You'd also get a tube that would be sent to a

23   laboratory.  So split samples, it's the same patient, two sets of

24   blood, and they would go to two different places for processing.

25       Q.   And these blood draws were taken at the same time?

**OFFICIAL TRANSCRIPT**

1     **A.**    Same time.

2     **Q.**    So how do you know, based upon your review of the

3  Week 12 and 24 samples, that the device malfunctioned in a large

4  number of warfarin patients?

5     **A.**    Well, that's based on the data, because you compare.

6  This is how you would validate a program to begin with.  So you

7  compare the consistency of the point of care machine versus the

8  laboratory.  And there was a discrepancy.  And the device tended

9  to give a low value compared to the laboratory value, what the

10  patient was really running at in terms of the warfarin.

11     **Q.**    So this wasn't limited to a small subset of patients?

12     **A.**    No.

13     **Q.**    How many patients are we talking about?

14     **A.**    We are talking about 7,000, the warfarin arm.

15     **Q.**    So how do you know that the device malfunctioned to a

16  clinical -- to a degree of clinical significance?

17     **A.**    Well, I know that, from having warfarin patients, you

18  would not want them to be high.  But you also -- when the FDA

19  recalled the device -- and they actually have withdrawn it off

20  the market.  They said based on the ROCKET and the significance

21  of the bleeding and the way that the device was performing, the

22  INRatio, that was part of the FDA's justification for pulling it

23  off -- for having the manufacturer pull it off the market.

24     **Q.**    Based upon the degree of the malfunction, would you

25  have expected it to result in more patients having bleeding

**OFFICIAL TRANSCRIPT**

1    events in the warfarin arm?

2        A.    Yes.  It would tend to be a bias to make it so that the

3    patients who are running high -- because the point of care

4    machine was to ensure that the patients stayed within the normal

5    range, that they were in therapeutic range, TTR.  You have heard

6    that?

7            So it was supposed to -- that was the way it was

8    supposed to be.  But even in the way it was supposed to be, the

9    FDA was concerned that they weren't well-controlled.  So having

10   this new bias, they were really not well-controlled because the

11   machine was wrong that they were using for the study.

12       Q.    So in addition to your clinical judgment, are you aware

13   of any data or analysis that has been -- that has concluded that

14   the malfunction resulted in additional bleeds in the ROCKET

15   trial?

16       A.    We know that the FDA's mathematical conclusion was that

17   there is 7 to 10 percent more bleeding than they were aware of in

18   the original ROCKET study.

19       Q.    And in your opinion, Doctor, did the device

20   malfunction -- let me restate that.  I'm sorry.

21           Did the device malfunction bias the results of the

22   ROCKET trial?

23       A.    Yes.  That's what the big word is, "bias," that you

24   would have a group of people on warfarin who were even at higher

25   risk of bleeding in the study.  You want them to be the same.

**OFFICIAL TRANSCRIPT**

1  You want the risks to be the same, particularly for a

2  noninferiority study, but now you have made it so that all the

3  warfarin patients are at an increased risk for bleeding.  So they

4  are more likely to bleed than you would have had in the original

5  plan.

6      Q.   So the FDA became aware of this malfunction in what

7  time frame?

8      A.   Around 2000 -- well, the recall was in 2014, but the

9  FDA didn't become aware until about 2015.

10     Q.   So let's be clear on that.

11     A.   The company told them.

12     Q.   But the FDA is a large organization, right?

13     A.   Oh, yeah.  Yes.

14     Q.   And there are multiple different divisions within the

15  FDA?

16     A.   That's right.

17     Q.   Do they all sit in one room at some point and talk to

18  each other every day?

19     A.   No.  And we're talking about an issue that involved The

20  Center For Drugs and then The Center For Devices and Radiological

21  Health.  They don't talk that much together anyway.  So you are

22  talking about big organizations, and it would have been unlikely

23  that they would have put the two together.

24          And if you looked at the label for Xarelto, it doesn't

25  say that it used the INRatio device in ROCKET, and so that was

**OFFICIAL TRANSCRIPT**

1  why the person who put it together -- it was a reporter for the
2  *British Medical Journal* -- did a wonderful job, because she
3  actually went and found what device had been used in ROCKET based
4  on European data and put the two together.
5      Q.   So the cardiorenal division of the FDA discovered this
6  information, did I get you right, from a reporter?
7      A.   From the -- well, the reporter brought it to everyone's
8  attention, yes.
9      Q.   And that was in 2015, right?
10     A.   Yes.
11     Q.   And did the FDA ultimately write a report about the
12  conclusions of their investigation?
13     A.   Yes.  CDER did write a report about the ROCKET study
14  specifically, and they -- it's hard to go back after a study has
15  been done, so they used mathematical modeling, based on the
16  information they had, to try to get your best guess using
17  mathematics.  And so -- of a completed study for a drug that is
18  already marketed.
19     Q.   So I would like to put up Plaintiffs' 5767737.  This is
20  the ROCKET reanalysis.
21          MR. DUKES:  No objection, Your Honor.
22          THE COURT:  Okay.
23  MR. BARR:  (CONTINUING)
24     Q.   Is this that report?
25     A.   Yes, sir.

**OFFICIAL TRANSCRIPT**

1    **Q.**   Okay.

2          MR. BARR:  And can we go to pdf 43 of this report,

3    please.

4    **MR. BARR:  (CONTINUING)**

5    **Q.**   Did the FDA come to any conclusions in this report that

6    are relevant to your opinions today?

7    **A.**   Yes.  And as part of the -- it's part of the history of

8    the evidence that is going on in terms of ROCKET.

9          MR. BARR:  And blow up -- there you go.

10   **MR. BARR:  (CONTINUING)**

11   **Q.**   What does the FDA say about whether or not doctors

12   should be told about the information on the use of the INRatio

13   device from the ROCKET trial?

14   **A.**   They thought that they might.  They were trying to come

15   out with what the FDA's role is, and so the FDA might issue a

16   simple statement to talk about what they did with ROCKET.

17          So they are not saying the physicians didn't know.

18   They are also leaving it open as to some people may want to

19   change the label.  So it's basically:  Well, now, what do we do?

20   Here it is.  And so they are putting forth some of the things

21   that are options for the FDA to do.

22          The bottom line is that the drug stays on the market.

23   **Q.**   But the FDA didn't say that this isn't important

24   information?

25   **A.**   Oh, no.  No.  It is important.  This is a big issue.

**OFFICIAL TRANSCRIPT**

1   This doesn't happen, fortunately, to the FDA very often.

2        Q.   Now, Doctor, in your review of materials in this case,

3   did you find evidence that the company knew or should have known

4   that the device was malfunctioning while the ROCKET trial was

5   ongoing?

6        A.   Yes.

7        Q.   And so while the trial itself was ongoing, you have

8   come across documents that show the company was aware that the

9   device was malfunctioning?

10       A.   Right.

11       Q.   Did the company -- at any point during the time the

12  ROCKET trial was ongoing through the approval and through 2015

13  when the FDA became aware of this, did the company at any point

14  report what they were seeing during the ROCKET trial?

15       A.   No.  And that is -- that's important also for all the

16  people on warfarin who are using this machine.  So during the

17  ROCKET trial, they knew that the machine wasn't functioning and

18  it took years for it to get pulled off the market.

19            And so there are a lot of warfarin patients who were

20  not in ROCKET who were also being exposed to this device, and the

21  company didn't tell the FDA.  And so to me that's, from a public

22  health point of view, important, too.

23       Q.   Did ROCKET have a group of independent doctors with the

24  sole responsibility of patient safety called an independent data

25  monitoring committee?

**OFFICIAL TRANSCRIPT**

1      **A.**    Yes.  They call them the IDMC, Independent Data

2  Monitoring Committee.

3          And their purpose is to make sure that everybody in the

4  clinical trial -- the warfarin arm, the drug arm -- are being

5  taken care of and it is safe for those patients to be in that

6  clinical trial.

7      **Q.**    And in your work in this case, did you review the

8  meeting minutes of the IDMC?

9      **A.**    Yes.

10      **Q.**    Have you seen any evidence that the company told the

11  IDMC about the device malfunctioning while the trial was ongoing?

12      **A.**    I didn't see any evidence that they did, no, sir.

13      **Q.**    In response to these incidents of the device

14  malfunctioning during the trial, did the company create a special

15  safety program to address this issue?

16      **A.**    Right.

17      **Q.**    And what was the name of this program?

18      **A.**    Covance Recheck.

19      **Q.**    And can you briefly describe for the jury what the

20  Covance Recheck program was?

21      **A.**    Well, it was triggered by physicians being concerned

22  that patients were bleeding in terms of they're seeing the

23  reading from the machine and yet the patients are coming in

24  bleeding on warfarin.

25          And so to answer some of the concerns of the physicians

**OFFICIAL TRANSCRIPT**

1  who are participating in this study, the company started a

2  process where they actually got some blood drawn and sent to a

3  laboratory to compare it to the machine.  Because the machine --

4  and then they often told them to use a second machine in their

5  facility.

6           So there are patients that did bleed and they went to

7  the emergency room, and you also had values for that.  So the

8  company was getting information about patients on warfarin that

9  were bleeding, and so they set up this other program in order to

10 look at the patients that they were getting reports about

11 bleeding and getting laboratory for them.

12 **Q.**   Have you reviewed the results of the Covance Recheck

13 program?

14 **A.**   Yes.

15 **Q.**   And can you briefly describe for the jury what those

16 results were.

17 **A.**   They were showing that the point-of-care machine was

18 inaccurate.  It was giving values that were too low in terms of

19 the potential bleeding of the patients.  So they had that

20 information internally.

21 **Q.**   And just so it's clear, being too low means they are

22 getting too much warfarin, right?

23 **A.**   They are at too high of a risk of bleeding.  And so

24 you've put one group of patients, 7,000 patients, at clinical

25 risk of bleeding, increased risk of bleeding.

**OFFICIAL TRANSCRIPT**

1          And, remember, this drug is being compared to that
2     group in terms of inferiority, the adverse events.  So bleeding
3     is an important risk that helps bias the data in favor of
4     Xarelto.
5          THE COURT:  I hope we're getting close to the
6     conclusion.
7          MR. BARR:  We are, Your Honor.  We are getting close.
8     **MR. BARR:  (CONTINUING)**
9     **Q.**   Did the company tell the FDA or the IDMC about the
10    existence of the Covance Recheck program while the trial was
11    ongoing?
12    **A.**   No.
13    **Q.**   Did the company tell the FDA or the IDMC about the
14    results of this program?
15    **A.**   No.  Or that they were even doing it, that they had
16    started it.
17    **Q.**   So I want to move forward a little bit.  The ROCKET
18    trial is over.  Xarelto is still not approved.  And the jury has
19    heard that one of the reasons the medical reviewers recommended
20    against approval was concern of a warfarin management mistake.
21    Do you remember that?
22    **A.**   Right.  And that is under the assumption that the
23    INRatio was working.
24    **Q.**   At that point in time when the medical officers were
25    reviewing the safety and efficacy of ROCKET [verbatim], did they

**OFFICIAL TRANSCRIPT**

1    send a specific request for specific information to the company

2    relating to the performance of the device in ROCKET?

3        A.    Yes, they did.

4        Q.    Let's take a look at that.

5              MR. BARR:  Can I get Plaintiffs' 748350.

6              MR. DUKES:  No objection.

7    MR. BARR:  (CONTINUING)

8        Q.    Is this the information request you are talking about,

9    Doctor?

10       A.    Yes.  It's a fax from the government.  And it says --

11   when it says "clinical IR," "IR" is information request.

12             And so this is getting the -- Alison Blaus is at the

13   FDA.  She is the consumer safety officer who interacts with the

14   company, and she is asking specifically for NDA 202439.  That

15   would be the Xarelto NDA for atrial fib.

16             And she's asking specifically for information about the

17   INR used in ROCKET:  Please provide the following information on

18   the INR point-of-care device used in ROCKET.

19       Q.    So did they specifically ask for performance

20   characteristics of the device beyond the information found in the

21   labeling?

22       A.    Yes.

23       Q.    And is this term "information request" -- is that

24   important?

25       A.    Yes.

**OFFICIAL TRANSCRIPT**

1    **Q.**   Could you explain that?

2    **A.**   It is like having someone from the IRS ask you for

3    information.  You are supposed to, as a manufacturer, provide

4    complete and accurate information back to the FDA.  It is the

5    federal government so you are required to respond and provide all

6    the information you have to address that issue.

7    **Q.**   So in March of 2011, the Covance Recheck program had

8    been started, right?

9    **A.**   Right.

10   **Q.**   And the results -- they knew the results, right?

11   **A.**   Right.

12   **Q.**   Was the Covance Recheck program disclosed as a result

13   of this information request?

14   **A.**   No.  And here the FDA is asking for the labeling for

15   the medical device.  The device is a cleared device.  It's not an

16   investigational device.  The FDA wants to have more information

17   about how it is performing than would be in the label for the

18   device.

19   **Q.**   So we've talked about what the company did.  Let's

20   briefly discuss what you feel they should have done.

21        Should the company have disclosed to the FDA and the

22   IDMC their initial concerns with respect to the device

23   malfunction in ROCKET?

24   **A.**   Yes.

25   **Q.**   Would that information, had it been disclosed, been

**OFFICIAL TRANSCRIPT**

1   significant to you as a medical officer at the FDA?

2       **A.**   It would have been significant information to the

3   clinical reviewers, because they were concerned about the

4   clinical trial, as well for to them to be able to talk to CDRH

5   and tell them there were issues occurring with a cleared device

6   that was being sold and used in the United States for warfarin

7   patients.

8       **Q.**   Should the company have disclosed to the FDA and the

9   IDMC the existence of the Covance Recheck program and its

10  results?

11              MR. DUKES:  Your Honor, objection.

12              May we approach?

13              THE COURT:  Yeah.

14                     **SIDEBAR ON THE RECORD**

15              MR. DUKES:  Your Honor, my objection is that this is

16  clearly an attempt to demonstrate fault on the FDA, which would

17  be a preemptive claim, so I move to strike the testimony that

18  relates to this particular level of testimony.

19              THE COURT:  What is the relevancy?

20              MR. BARR:  Your Honor, it informs their duty to warn.

21  This is what Dr. Smart was talking about.  It has to do with the

22  risk of this drug.

23              And you have this study that was done and a device that

24  was used that wasn't appropriately reported during the trial.

25  None of that information is disclosed.  Doctors don't know about

**OFFICIAL TRANSCRIPT**

1        MR. DUKES:  Your Honor, I can break or I can keep

2   going.  Your preference.

3        THE COURT:  Why don't we break here for lunch, ladies

4   and gentlemen.  We'll take a break for lunch and come back at

5   1:10.

6                          (Jury out at 11:56 a.m.)

7                          (Morning session concluded.)

8

9                        *  *  *  *

10                        CERTIFICATE

11

12        I hereby certify this 7th day of June, 2017, that the

13   foregoing is, to the best of my ability and understanding, a true

14   and correct transcript of the proceedings in the above-entitled

15   matter.

16

17                               /s/ Mary V. Thompson

18                        _____

19                            Official Court Reporter

20

21

22

23

24

25

**OFFICIAL TRANSCRIPT**

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2
      *******************************************************************
 3
      IN RE:  XARELTO (RIVAROXABAN)
 4    PRODUCTS LIABILITY LITIGATION        Docket No. 14-MD-2592
                                           Section "L"
 5                                         New Orleans, Louisiana
      THIS DOCUMENT RELATES TO:            Wednesday, June 7, 2017
 6    Joseph Orr, et al
      v. Janssen Research &
 7    Development, et. al.,
      Case No. 15-CV-3708
 8
      *******************************************************************
 9
                      TRANSCRIPT OF TRIAL PROCEEDINGS
10           HEARD BEFORE THE HONORABLE ELDON E. FALLON
                      UNITED STATES DISTRICT JUDGE
11                    VOLUME VIII - AFTERNOON SESSION

12
      APPEARANCES:
13
      FOR THE PLAINTIFFS'
14    LIAISON COUNSEL:                  LEVIN PAPANTONIO
                                        BRIAN H. BARR, ESQ.
15                                      316 Baylen Street, Suite 600
                                        Pensacola, FL 32502
16
                                        BEASLEY ALLEN
17                                      BY:  ANDY BIRCHFIELD, ESQ.
                                        P.O. Box 4160
18                                      Montgomery, AL 36103

19                                      GAINSBURGH BENJAMIN DAVID
                                        MEUNIER & WARSHAUER
20                                      BY:  GERALD E. MEUNIER, ESQ.
                                        2800 Energy Centre
21                                      1100 Poydras Street
                                        New Orleans, LA 70163
22
                                        GOZA & HONNOLD, LLC
23                                      BY:  BRADLEY D. HONNOLD, ESQ.
                                        11181 Overbrook Road, Suite 200
24                                      Leawood, Kansas 66211

25
```

```
 1                                    THE LAMBERT FIRM, PLC
                                      BY:  EMILY JEFFCOTT, ESQ.
 2                                    701 Magazine Street
                                      New Orleans, Louisiana 70130
 3

 4      FOR THE DEFENDANT BAYER
        HEALTHCARE PHARMACEUTICALS
 5      INC. and BAYER PHARMA AG:     WILKINSON WALSH & ESKOVITZ, LLP
                                      BY:  BETH A. WILKINSON, ESQ.
 6                                    1900 M Street NW, Suite 800
                                      Washington, DC 20036
 7
                                      Nelson Mullins Riley
 8                                    & Scarborough, LLP
                                      BY:  DAVID E. DUKES, ESQ.
 9                                    Meridian, 17th Floor
                                      1320 Main Street
10                                    Columbia, SC 29201

11
        FOR JANSSEN PHARMACEUTICALS,
12      INC. AND JANSSEN RESEARCH &
        DEVELOPMENT, LLC:             IRWIN FRITCHIE URQUHART & MOORE
13                                    BY:  JAMES B. IRWIN, ESQ.
                                      400 Poydras St., Suite 2700
14                                    New Orleans, LA 70130

15

16      Official Court Reporter:     Karen A. Ibos, CCR, RPR, CRR, RMR
                                      500 Poydras Street, B-275
17                                    New Orleans, Louisiana 70130
                                      (504) 589-7776
18

19         Proceedings recorded by mechanical stenography, transcript
        produced by computer.
20

21

22

23

24

25
```

16:43:50  1    A.  Got it.

16:43:52  2    Q.  So if we work our way down, the next one crosses 1, not

16:43:57  3    statistically significant.  The next one crosses 1, not

16:44:02  4    statistically significant.  Work our way all the way down, not

16:44:07  5    statistically significant.  Not statistically significant.

16:44:15  6            THE COURT:  You need to move it up.

16:44:17  7            MR. BIRCHFIELD:  Thank you, your Honor.

16:44:20  8    BY MR. BIRCHFIELD:

16:44:20  9    Q.  Here's one.  This one is statistically significant.  It does

16:44:25  10   not cross the 1 line; is that right?

16:44:27  11   A.  That looks correct to me, yes.

16:44:29  12   Q.  So let's see what that is.  That is U.S. patients, is that

16:44:41  13   right?  Well, let me get there.  So this is looking at U.S.

16:44:47  14   patients and it shows that it is statistically significant.  And if

16:44:55  15   we look over in the hazard ratio, it is 1.5, and it's -- and the

16:45:01  16   range is 1.14 to 1.98.  Do you see that, Dr. St. Martin?

16:45:06  17   A.  I see it.

16:45:08  18   Q.  Now, when we're looking at the hazard ratio, the hazard ratio,

16:45:28  19   that would tell us that that is a 50 percent increased risk for

16:45:32  20   major bleeding for Xarelto versus warfarin when you look at U.S.

16:45:37  21   patients only.  Is that right?

16:45:39  22   A.  That's what you're telling me.  I am not familiar with this

16:45:44  23   type of statistic, but that's what I hear you saying.

16:45:51  24   Q.  If this information -- if the information -- if the data from

16:45:55  25   ROCKET showed that there was a 50 percent increased risk in major

16:45:59 1  bleeding events for Xarelto versus warfarin and it's statistically

16:46:07 2  significant, that would be information you didn't know about,

16:46:12 3  right?

16:46:14 4  A.  Right.  I am going to assume that if this was before the drug

16:46:19 5  was approved, the FDA knew about it, though.

16:46:23 6  Q.  Right.  Okay.  So -- but if you were to know that there was a

16:46:33 7  50 percent increased risk for Xarelto patients versus warfarin when

16:46:42 8  you look at the U.S. data only, is that important safety

16:46:46 9  information that you would want to know about and discuss with your

16:46:49 10  patients, Dr. St. Martin?

16:46:50 11  A.  Yes.  And it's confusing because it's hard to know why it would

16:46:53 12  be different in the United States as opposed to somewhere else.

16:46:57 13  It's the same human beings and the same drug.

16:47:00 14  Q.  Okay.  So that would -- it would really matter why, is that

16:47:04 15  what you're telling us?

16:47:07 16  A.  Yes.

16:47:08 17  Q.  So, Dr. St. Martin, you are -- when -- do you have any idea why

16:47:13 18  there would be a difference in the risk of major bleeding when you

16:47:18 19  look at U.S. patients only --

16:47:20 20  A.  No.

16:47:20 21  Q.  -- in the ROCKET data?

16:47:21 22  A.  No.

16:47:21 23  Q.  So in the ROCKET study, Dr. St. Martin, what was the average

16:47:29 24  time in therapeutic range for the warfarin patients?

16:47:33 25  A.  I don't know.

16:47:39  1   Q.  Dr. St. Martin, you understand that -- when we talk about time

16:47:45  2   in therapeutic range, you understand what we're talking about,

16:47:48  3   right?

16:47:48  4   A.  It could have various interpretations, so if you want to

16:47:53  5   explain it to me, I'll be happy to listen.

16:47:55  6   Q.  Okay.  All right.  You prescribed -- let me use this

16:48:03  7   demonstrative.

16:48:05  8           You've prescribed warfarin or Coumadin for a large number

16:48:09  9   of years, right?

16:48:10  10  A.  Yes, yes.

16:48:11  11  Q.  And the time in therapeutic range is pretty well established

16:48:18  12  for warfarin and it's measured in INR; is that right?

16:48:21  13  A.  Yes.

16:48:23  14  Q.  And so if you are -- if you're below 2.0, then you're not --

16:48:31  15  your blood is not thin enough; is that right?

16:48:33  16  A.  Right.

16:48:33  17  Q.  And you are at an increased risk for a stroke, correct?

16:48:38  18  A.  (WITNESS NODS HEAD IN THE AFFIRMATIVE.)

16:48:39  19  Q.  And if you are -- if you are above 3.0, then you are -- your

16:48:46  20  blood's too thin and you're at risk for a bleed; is that right?

16:48:50  21  A.  Yes, in general.

16:48:52  22  Q.  And so if you are -- if you're managing a warfarin patient,

16:48:58  23  then you want to keep them in that therapeutic range for as much

16:49:03  24  time as possible, right?

16:49:04  25  A.  Right.

16:49:04  1   Q.  And I think that you have -- you've told us in your deposition

16:49:08  2   that you manage your patients?

16:49:11  3   A.  Yes.

16:49:11  4   Q.  And you manage your patients and you keep them in the

16:49:14  5   therapeutic range between 75 and 80 percent of the time; is that

16:49:18  6   right?

16:49:19  7   A.  Okay.  We're using time in two different ways here.  When I say

16:49:26  8   75 percent of the time, I mean the time each time they come.  Like

16:49:31  9   each time I go to the movie, I buy popcorn.  It's each visit.  But

16:49:37 10   I don't know -- this looks to me like time in therapeutic range --

16:49:44 11   would you want to an INR or prothrombin time every single day to

16:49:47 12   know how much time they really were in it?  I mean, that's --

16:49:54 13   that's confusing me.  I can't tell you that I understand it right

16:49:58 14   now.  If you're only looking at it at certain different punctuation

16:50:03 15   marks in the time, how do we know how much time you really are in

16:50:08 16   the therapeutic range?

16:50:09 17   Q.  So, Dr. St. Martin, if the time in therapeutic range for

16:50:18 18   warfarin arm in the ROCKET study, if that was 55 percent, would

16:50:22 19   that cause you some concern about how well controlled those

16:50:25 20   patients were?

16:50:26 21   A.  I really don't think I know that much about that statistic to

16:50:31 22   give you an honest answer.

16:50:33 23   Q.  All right.  So when you were talking about your understanding,

16:50:39 24   your fully understanding the risk and the benefits of Xarelto and

16:50:45 25   the other NOACs, you didn't take into account the time and

| | | |
|---|---|---|
| 16:50:50 | 1 | therapeutic range for any of these agents, sir? |
| 16:50:53 | 2 | A.  No, I don't think so. |
| 16:50:56 | 3 | THE COURT:  Get to a point where we can take a break. |
| 16:50:59 | 4 | The jury needs to take a break. |
| 16:51:03 | 5 | MR. BIRCHFIELD:  We can take a break now. |
| 16:51:05 | 6 | THE COURT:  All right.  Let's take a ten-minute break. |
| 16:51:08 | 7 | THE DEPUTY CLERK:  All rise. |
| 16:51:09 | 8 | (WHEREUPON, THE JURY EXITED THE COURTROOM AND A RECESS WAS |
| 17:05:05 | 9 | TAKEN.) |
| 17:05:05 | 10 | (OPEN COURT.) |
| 17:05:07 | 11 | (WHEREUPON, THE JURY ENTERED THE COURTROOM.) |
| 17:05:07 | 12 | THE COURT:  You can take the stand.  You're still under |
| 17:05:10 | 13 | oath.  Be seated, please. |
| 17:05:21 | 14 | BY MR. BIRCHFIELD: |
| 17:05:21 | 15 | Q.  So, Dr. St. Martin -- |
| 17:05:26 | 16 | MR. BIRCHFIELD:  May I proceed, your Honor? |
| 17:05:27 | 17 | THE COURT:  Yes. |
| 17:05:28 | 18 | BY MR. BIRCHFIELD: |
| 17:05:29 | 19 | Q.  So, Dr. St. Martin, when we left off, we were looking at this |
| 17:05:35 | 20 | chart and we'll go back into that again.  But in looking at this, |
| 17:05:42 | 21 | Dr. St. Martin, does it tell you that there is a 50 percent |
| 17:05:48 | 22 | increased risk in major bleeds on Xarelto versus warfarin that is |
| 17:05:55 | 23 | statistically significant? |
| 17:05:58 | 24 | A.  My honest answer is I don't know enough about statistics to |
| 17:06:03 | 25 | tell you that absolutely I understand this chart. |

17:06:07  1    Q.  Okay.

17:06:08  2    A.  I mean, I see how it looks.

17:06:10  3    Q.  Right.  And so the label -- this information in the label does

17:06:15  4    not adequately communicate to you that there is a 50 percent

17:06:19  5    statistically significant increased risk in major bleeds on Xarelto

17:06:24  6    versus warfarin, correct?

17:06:25  7    A.  I would have to go get a statistic book and look up -- I

17:06:29  8    haven't seen a chart like this.

17:06:31  9    Q.  Dr. St. Martin, in the CMEs -- when we're talking about CMEs,

17:06:36  10   those are continuing medical education, right?

17:06:39  11   A.  Right.

17:06:39  12   Q.  And oftentimes are those sponsored by pharmaceutical companies

17:06:45  13   and they hire doctors to come and speak; is that right?

17:06:48  14   A.  I don't know exactly how they do it.

17:06:52  15   Q.  But at any rate, that's an event where you get information

17:06:57  16   about drugs, pharmaceuticals, right?

17:06:59  17   A.  I think -- that's not one that I get a lot of information.  I'm

17:07:05  18   not too sure which CMEs are you talking about.

17:07:08  19   Q.  I was really going back to what you told us, Dr. St. Martin.

17:07:12  20   You told us that -- you felt like you fully understood --

17:07:17  21   A.  Yes.

17:07:17  22   Q.  -- the risk and benefits of Xarelto based on the product label.

17:07:20  23   A.  Yes.

17:07:21  24   Q.  And CMEs?

17:07:23  25   A.  Yes.

17:07:24  1    Q.  And talking to other doctors?

17:07:26  2    A.  Yeah.

17:07:26  3    Q.  Right.  And your search of the literature.  Is that right?

17:07:31  4    A.  I understood it to the best of my ability to understand it.

17:07:35  5    Q.  And so from all of those sources, was it ever adequately

17:07:42  6    communicated to you that there was a 50 percent increased risk of

17:07:47  7    major bleeds on Xarelto versus warfarin when you looked at U.S.

17:07:50  8    population only?

17:07:51  9    A.  Not that I remember, no.

17:07:52 10    Q.  And one of the questions that you raised with me is why, why

17:07:58 11    would you have people -- or people all over, right?

17:08:00 12    A.  Yes.

17:08:02 13    Q.  And when you're looking at -- when we look at the ROCKET study,

17:08:09 14    do you understand that that included people enrolled from all over

17:08:14 15    the world?

17:08:16 16    A.  From lots of countries, 45 countries, I see that, yes.

17:08:20 17    Q.  And so that includes the United States, but it also includes

17:08:26 18    Venezuela, Colombia, Peru, it includes India and the Ukraine and

17:08:33 19    Romania and Hungary; do you see that, Dr. St. Martin?

17:08:36 20    A.  Yes.

17:08:37 21    Q.  And do you think it's possible, Dr. St. Martin, that the

17:08:44 22    warfarin management, how well they manage patients on warfarin, may

17:08:49 23    not be as good in some of those countries as it is in the U.S.?

17:08:53 24    A.  Certainly that's a possibility, yes.

17:08:58 25    Q.  And, Dr. St. Martin, Mr. Irwin gave you a copy of Defense

17:09:07  1    Exhibit 6, and that's the product label for February of 2014.  Do

17:09:14  2    you have that with you?  I can give you another copy if you want

17:09:17  3    it.

17:09:18  4    A.  That's it (INDICATING)?  It's about 40 pages?

17:09:26  5    Q.  Let's see.  No, that's the one we just looked at.

17:09:30  6    A.  Okay.

17:09:30  7    Q.  This is February of 2014.

17:09:33  8    A.  Okay.

17:09:36  9    Q.  So I want to -- I just want to put that in context.  So the

17:09:39 10    chart that we just looked at, that forest plot that showed the

17:09:44 11    50 percent increase for U.S. patients --

17:09:46 12    A.  Yes.

17:09:47 13    Q.  -- that was in the September of 2015 label, right?

17:09:51 14    A.  If you tell me.

17:09:52 15    Q.  That's what we just looked at.

17:09:55 16    A.  If you tell me.

17:09:56 17    Q.  And, Dr. St. Martin, you understand that Sharyn Orr died on

17:10:01 18    May 4th of 2015, right?

17:10:03 19    A.  Yes.

17:10:04 20    Q.  So that label with the U.S. data that we just looked at, that

17:10:11 21    was after her death, correct?

17:10:13 22    A.  That's what you're telling me, yes.

17:10:15 23    Q.  Now, looking at Defense Exhibit 6, the February of 2014 label

17:10:23 24    and, Dr. St. Martin, what I would ask is if you would just look and

17:10:28 25    see if you can find that table with the U.S. data, if you can find

17:10:32  1   it in there.  I'll represent to you that it's not, but I'll give

17:10:39  2   you the opportunity to take a look.

17:10:41  3   A.  This is -- the entire 46 pages is the label?

17:10:44  4   Q.  The chart.  The chart that we looked at that showed the

17:10:47  5   50 percent risk, increased risk for major bleeds in the U.S. data.

17:10:53  6   A.  No, but you're asking me to look at all 46 pages?

17:10:58  7            THE COURT:  He is representing that it's not in there.

17:11:01  8            THE WITNESS:  Okay.  Well, I don't know that yet unless I

17:11:04  9   look at all 46 pages.  That's the question?

17:11:08  10  BY MR. BIRCHFIELD

17:11:08  11  Q.  Yes.

17:11:09  12  A.  Do I agree with you?  (WITNESS REVIEWS DOCUMENT.)  Okay.  I

17:11:42  13  don't see such a chart.

17:11:43  14  Q.  So that information was not in the label when you prescribed it

17:11:46  15  to Sharyn Orr.  It was only included in the label after Sharyn

17:11:50  16  Orr's death, correct?

17:11:52  17  A.  That's what you're telling me, yes, I believe.

17:11:55  18  Q.  So, Dr. St. Martin, if you knew, if you knew that there was a

17:12:04  19  50 percent increased risk of major bleeding on Xarelto versus

17:12:10  20  warfarin for U.S. patients, would that have affected the way you

17:12:16  21  prescribe the drug?  Would you have at least discussed that risk

17:12:19  22  with your patients?

17:12:20  23  A.  I would first have tried to find out why that is and how that

17:12:27  24  happened so I would have something to really discuss with the

17:12:33  25  patient.

17:12:33  1  Q.  And did you do that, Dr. St. Martin?

17:12:36  2  A.  Because I didn't know it, I didn't do it.

17:12:40  3  Q.  If that risk was explained because the time in therapeutic

17:12:45  4  range in the ROCKET study was much higher for the U.S. than it was

17:12:50  5  on average, would you then have discussed that risk with your

17:12:54  6  patients?

17:12:55  7          MR. IRWIN:  Your Honor, speculation.

17:12:57  8          THE COURT:  Well, but you've asked him about whether it

17:13:00  9  changes his thinking.

17:13:03 10          MR. IRWIN:  Yes, your Honor.

17:13:04 11          THE COURT:  I understand.

17:13:06 12          THE WITNESS:  So what's the question again?

17:13:08 13  BY MR. BIRCHFIELD:

17:13:09 14  Q.  All right.  I asked you if you knew that there was a

17:13:11 15  statistically significant 50 percent increased risk for Xarelto

17:13:16 16  patients, a risk of major bleeds, would you have discussed that

17:13:21 17  risk with your patients?

17:13:23 18  A.  If I was absolutely certain that it was a fact, I would, yes.

17:13:26 19  Q.  And if your patients didn't want to take that risk, would you

17:13:33 20  consider other options?

17:13:34 21  A.  Sure.

17:13:38 22  Q.  And if you knew that there was a 50 percent increased risk of

17:13:44 23  major bleeds on Xarelto versus warfarin, would you recommend that

17:13:48 24  your patients at least try warfarin first?

17:13:52 25  A.  Probably, yes.

1

2                              * * * * * *

3

4                       REPORTER'S CERTIFICATE

5

6        I, Karen A. Ibos, CCR, Official Court Reporter, United

7   States District Court, Eastern District of Louisiana, do hereby

8   certify that the foregoing is a true and correct transcript, to the

9   best of my ability and understanding, from the record of the

10  proceedings in the above-entitled and numbered matter.

11

12

13                       /s/ Karen A. Ibos

14                       Karen A. Ibos, CCR, RPR, CRR, RMR

15                       Official Court Reporter

16

17

18

19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT