# EXHIBIT "3"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                       )
LI LIU and DR. EMILY LIU, as           )
Co-Administrators of the Estate of     )
DR. ZHENSHENG LIU, and                 )
Personal Representatives of the        )
Heirs at Law of DR. LIU,               )
                                       )
            Plaintiffs,                )
                                       )   JURY TRIAL DEMANDED
v.                                     )
                                       )   CIVIL ACTION NO: 14-CV-13234
BOEHRINGER INGELHEIM                   )
PHARMACEUTICALS, INC.,                 )
BOEHRINGER INGELHEIM                   )
CORPORATION, BOEHRINGER                )
INGELHEIM USA CORPORATION,             )
and BOEHRINGER INGELHEIM               )
INTERNATIONAL GMBH,                    )
                                       )
            Defendants.                )
_____ )

**DEFENDANTS' MOTION *IN LIMINE* NO. 1 TO EXCLUDE EVIDENCE RELATED TO THE 110 MILLIGRAM DOSE OF PRADAXA**

The Boehringer Ingelheim defendants (collectively, "BI") move *in limine* to exclude evidence and argument related to the 110 mg dose of Pradaxa, a dose never approved by the FDA, never marketed in the United States, and never ingested by Dr. Liu. Allowing evidence or argument about the 110 mg dose would confuse the issues and present a misleading account of the medical options available to Dr. Liu. Such evidence also opens the door to time-consuming mini-trials on tangential issues such as BI's efforts to gain FDA approval of the 110 mg dose or the varying regulatory standards of foreign countries that diverged from the FDA to approve the dose. Accordingly, the Court should exclude this evidence under Federal Rules of Evidence 402 and 403. In addition, this evidence is inadmissible because federal law preempts any state tort

DC: 6260131-9

claims premised on the theory that BI should have made the 110 mg dose and related prescribing information available in the United States.

## BACKGROUND

### A. FDA's Rejection of the 110 mg Dose

In the pivotal clinical trial evaluating Pradaxa's efficacy as a treatment to reduce the risk of stroke in patients with non-valvular atrial fibrillation, BI studied two doses of the medicine, a 110 mg and 150 mg dose, relative to warfarin. The results showed that patients on the 150 mg dose of Pradaxa had lower rates of stroke than those on warfarin. *See* Ex. A, Stuart Connolly et al., *Dabigatran Versus Warfarin in Patients with Atrial Fibrillation*, 361 New Eng. J. Med. 1139, 1139 (Sept. 17, 2009). Patients on the 110 mg dose experienced comparable stroke protection to those on warfarin but had lower rates of major bleeding. *Id.*

Although BI submitted both doses for approval, the FDA ultimately approved the 150 mg and not the 110 mg dose for marketing in the United States. After examining the clinical trial data, the FDA concluded that BI "ha[d] not identified a population in whom there is compelling evidence that the net benefit of the 110-mg dose exceeds that of the 150-mg dose." Ex. B, NDA Approval Letter (Oct. 19, 2010) at 1. In addition, the mortality rate was lower on the 150 mg dose than the 110 mg dose (and was highest on warfarin). Ex. C, FDA Center for Drug Evaluation and Research Office Director Memo (Oct. 14, 2010) at 3. The FDA also sought to avoid overly cautious prescribing practices in patients with increased stroke risk, expressing "concern[s] that physicians and patients will use the 110-mg dose instead of the 150-mg dose, when the clinical data suggest that the 150-mg dose is superior" for stroke prevention. NDA Approval Letter at 1. The FDA took the unusual step of further explaining its reasoning in an article published in the New England Journal of Medicine, stating that "[m]ost people would agree . . . that the irreversible effects of strokes and systemic emboli have greater clinical

significance than nonfatal bleeding" and thus, "[a]ny benefit–risk assessment in which strokes and systemic emboli are given more weight than nonfatal bleeding events would find the higher dose more favorable [than the 110 mg dose] in elderly patients." Ex. D, B. Nhi Beasley et al., *Anticoagulant Options — Why the FDA Approved a Higher but Not a Lower Dose of Dabigatran*, 364 New Eng. J. Med. 1788, 1788-89 (May 12, 2011). Finding no patient population for which the 110 mg dose would be superior, the FDA concluded that approving the 110 mg dose would encourage physicians and patients "to use a less-effective regimen and would lead to unnecessary strokes and disability." *Id.* at 1790. Even though BI initially proposed that patients with severe renal impairment, demonstrated by creatinine clearance between 15 and 30 mL/min, not receive Pradaxa, the FDA wanted a broader population to obtain the benefits of Pradaxa, and thus ultimately approved a 75 mg dose for those patients with such severe renal impairment. *See* Ex. E, U.S. Pradaxa Prescribing Information, Oct. 2010, § 2.1. For patients in the United States with renal function above 30 mL/min, including Dr. Zhengsheng Liu, Pradaxa 150 mg is the only FDA-approved Pradaxa dosage.

Although unavailable in the United States, the 110 mg dose of Pradaxa is approved and marketed in most other countries, reflecting the variation in regulatory approaches and outcomes in different countries regulating the same medicine. The Pradaxa labeling and product information in those foreign markets is tailored accordingly and contains information about Pradaxa 110 mg and a recommendation for its potential use in patients aged 80 or above. *See* Ex. F, Summary of Product Characteristics (EU Pradaxa Label) § 4.2.

    **B.**    **Dr. Liu's Treatment with Pradaxa**

Dr. Liu's cardiologist, Dr. Seth Bilazarian, prescribed the 150 mg dose of Pradaxa in March 2011 based upon his assessment of Dr. Liu's stroke risk arising from his non-valvular atrial fibrillation. Dr. Liu's medical history showed that he had poorly controlled atrial

3

fibrillation and a significant risk of stroke based on multiple risk factors.  At the time of Dr. Liu's prescription, the only available anticoagulants indicated for patients in the United States with atrial fibrillation who do not have severely impaired renal function were warfarin and Pradaxa 150 mg.  *See* Ex. G, Mar. 14, 2017 Deposition of Dr. Molofsky ("Molofsky Dep.") at 145:3-16.  Dr. Liu's renal function was "in good range," making him an appropriate candidate for Pradaxa 150 mg on that metric.  Ex. H, Liu Medical Records (Dec. 14, 2011) at 4.  Indeed, Dr. Walter Molofsky, Plaintiffs' sole medical expert, acknowledged that Dr. Liu's renal function did not fall into the range that would have made him an unsuitable candidate for Pradaxa 150 mg.  Molofsky Dep. at 198:11-19 (noting Dr. Liu's renal creatinine clearance was "in the moderate range" and "not less than 30").

### C. Plaintiffs' Arguments Related to the 110 mg Dose

Despite the fact that the 110 mg dose of Pradaxa was never available for prescription to Dr. Liu, BI anticipates that Plaintiffs intend to make it a central feature of their case-in-chief at trial.  Plaintiffs contend that the U.S. Prescribing Information for Pradaxa (also known as the "label") was inadequate in part for recommending "only one dosage strength for virtually all patients on the drug without monitoring," Pls' Opp'n to Summ. J. at 9 (Dkt. 46), a criticism that the 110 mg dose was not listed as an available dose.  Indeed, one of Dr. Molofsky's central opinions on the adequacy of the Pradaxa label is not that BI's warning was inadequate with respect to its articulation of how Pradaxa fared relative to warfarin — but that the label should have said more about how the 150 mg dose fared relative to the unapproved 110 mg dose.  *See* Molofsky Dep. at 149:7-12 ("Q. And so is it your opinion that Boehringer Ingelheim should have included information about the 110-milligram dose in the label, even though the 110 is not approved for use in the United States? / A. I think they should have included it.").  For example, Dr. Molofsky purports to demonstrate the high risk of intracranial bleeding on Pradaxa 150 mg

by comparing it to the risk on the 110 mg dose, noting that such relative risk comparisons should have been in the label:

> [A]lthough BI had data that demonstrated that for patients with a CHADS2 score of 3 or more, the risk of intracranial hemorrhage was 50% less for patients treated with 110 mg Pradaxa than for those treated with 150 mg Pradaxa, information concerning risks of intracranial hemorrhage tied to CHADS2 scores is nowhere set out in the Pradaxa label.

Ex. I, Molofsky Rep. (Feb. 21, 2017) at 4. Dr. Molofsky conceded that he had no basis for knowing whether the FDA would have permitted BI to include language in the Pradaxa label regarding an unapproved dose. Molofsky Dep. at 196:21-197:3 ("I'm not aware that it's possible or not. I don't know.").

Plaintiffs support these points by citing foreign regulatory documents from Canada and Europe that discuss the 110 mg dose, which is approved and available in those non-U.S. markets. *See, e.g.*, Molofsky Rep. at 6 ("[T]he Canadian monograph discloses that the rates of intracranial hemorrhage in patients ≥ 80 years treated with D150 mg are almost twice that of patients treated with D110."). Dr. Molofsky further relies on a collection of documents relating to BI's renewed efforts to secure approval of the 110 mg dose following Pradaxa's initial approval. *Id.* at 7-8, 10.

These arguments and evidence should be excluded under Federal Rules of Evidence 402 and 403 as irrelevant and to prevent unfair prejudice, confusing the issues, misleading the jury, and undue delay. Furthermore, any claim that BI should have offered the 110 mg dose of Pradaxa in the United States or offered expanded information about the dose is preempted by federal law.

## **LEGAL STANDARD**

Relevant evidence is that which has a tendency to make a fact of consequence more or less probable. Fed. R. Evid. 401. Where a party seeks to introduce evidence that does not bear a

5

logical connection to a fact at issue, the court must exclude it under Federal Rule of Evidence 402. Even if relevant, evidence may nevertheless be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403.

## ARGUMENT

### I. The 110 mg Dose of Pradaxa Is Irrelevant.

Plaintiffs' negligent failure-to-warn claim is premised on their assertion that the U.S. Prescribing Information for Pradaxa failed to warn adequately of the risk of severe and potentially fatal bleeding. Under their theory, that failure to warn proximately caused Dr. Liu's death after he fell and fractured his skull while on the 150 mg dose of Pradaxa. Evidence related to the 110 mg dose of Pradaxa, which Dr. Liu never ingested and which has never been approved or marketed in the United States, has no logical connection to those basic claims. The 110 mg dose is not mentioned in Dr. Liu's medical records or his prescribing doctor's testimony, and Dr. Bilazarian could not have prescribed it. Indeed, Dr. Liu's medical records confirm that Dr. Bilazarian viewed the 150 mg dose of Pradaxa as the appropriate therapeutic option for Dr. Liu given his high risk of stroke and kidney function. Liu Medical Records (Dec. 14, 2011) at 4 ("CHADS 5 / he is doing well on Pradaxa / [h]is creatinine clearance is in good range"); Molofsky Dep. at 198:11-19. Plaintiffs offer no explanation of how additional information about an unapproved dose would have had any bearing on this decision, and there is no evidence in the record to support that proposition. Thus, the properties, target patient cohort, and foreign labeling information relating to the 110 mg dose of Pradaxa have no relevance in this case.

6

**II.      Evidence of the 110 mg Dose Would Confuse the Issues.**

Admission of evidence related to the 110 mg dose also bears a substantial risk of confusing the issues, misleading the jury, and generating mini-trials on tangential issues.

First, to the extent that Plaintiffs seek to demonstrate that Pradaxa 150 mg was an inappropriate medicine for Dr. Liu by comparing it to Pradaxa 110 mg, this puts forward a false comparison.  Due to the FDA's decision not to approve the 110 mg dose of Pradaxa, that dose was never available for prescription by Dr. Bilazarian.  Indeed, the Pradaxa label contains a disclaimer when presenting data from the Pradaxa clinical trial, that "[l]imited information is presented on the 110 mg dosing arm because this dose is not approved." U.S. Pradaxa Prescribing Information, Oct. 2010, § 6.1.  Plaintiffs' expert Dr. Molofsky concedes that Dr. Liu needed to be on an anticoagulant and that the choices available to his cardiologist were warfarin and Pradaxa 150 mg.  Molofsky Dep. at 123:3-5 ("Q. You would agree with me that Dr. Liu needed anticoagulant therapy? / A. Yes."); *id.* at 145:3-16 ("So the options presented were really Pradaxa 150 or warfarin, correct? / A. Pradaxa 150 versus warfarin.").  Dr. Molofsky also acknowledges that the risk of intracranial hemorrhage — the type of bleed Dr. Liu eventually experienced — was higher on warfarin than on Pradaxa 150 mg for patients of Dr. Liu's age.  *Id.* at 145:17-24.  For Plaintiffs to introduce evidence of comparisons to the unapproved 110 dose muddies the issue and misleads the jury by encouraging speculation about hypothetical medical alternatives that never existed.

Second, introduction of evidence related to the 110 dose would lead to a series of time-consuming mini-trials.  Should the jury be presented with such evidence, BI would be required to introduce evidence on its efforts to secure approval for the 110 mg dose in the United States; the FDA's stated reasoning for not approving a 110 mg dose (concern regarding undertreatment); and BI's attempts to challenge the FDA's decision.  This evidence, while necessary to present a

7

full regulatory picture of the 110 mg dose, is tangential to the core issues of this case where Pradaxa 150 mg was the only available dose for treatment, Dr. Bilazarian only ever contemplated prescribing the 150 mg dose, and Dr. Liu only ever received that dosage. The Court should exclude evidence related to the 110 mg dose to avoid devolving into peripheral issues that would waste time and cause delay.

### III.    Foreign Regulatory Evidence Related to the 110 mg Dose Is Inadmissible

Evidence related to the 110 dose is also irrelevant and would confuse the jury because it largely relies on foreign regulatory evidence and decisions of non-U.S. agencies. "[W]hatever minimal relevance the foreign regulatory actions might have is clearly overwhelmed by the likelihood of jury confusion." *In re Seroquel Prods. Liab. Litig.*, No. 6:06-md-1769-Orl-22DAB, 2009 WL 223140, at *6 (M.D. Fla. Jan. 30, 2009), *aff'd*, 601 F. Supp. 2d 1313 (M.D. Fla. 2009). Thus, "[c]ourts have found that evidence of foreign regulatory actions in products liability litigation is properly excluded as irrelevant and/or confusing." *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 488 n.87 (S.D.N.Y. 2016); *see, e.g.*, *In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 950, 965 (D. Minn. 2009) (excluding "discussion of foreign regulatory actions [as] irrelevant"); *In re Seroquel Prods. Liab. Litig.*, 601 F. Supp. 2d 1313, 1318 (M.D. Fla. 2009) (excluding evidence of foreign regulatory actions because the jury did not have "any framework within which to evaluate the meaning of that evidence"); *In re Baycol Prods. Litig.*, 532 F. Supp. 2d 1029, 1054 (D. Minn. 2007) (excluding testimony about foreign regulatory actions, which, "in a case that is governed by domestic law, would likely cause jury confusion"), *aff'd*, 596 F.3d 884 (8th Cir. 2010).

The FDA concluded that Pradaxa 150 mg was "superior" to 110 mg in all patient populations — with a carve out for those with severely impaired renal function — and rejected the 110 mg dose on that basis. Introducing foreign labeling and materials discussing Pradaxa

110 mg, such as the Canadian monograph, invites the jury to disregard the FDA's conclusions and instead rely on foreign regulatory assessments about Pradaxa. *See In re Seroquel*, 2009 WL 223140, at *6 (excluding foreign labeling as "akin to evidence of foreign legal standards"). Evidence of foreign regulatory information related to the 110 mg dose of Pradaxa should be excluded to avoid confusing the issues about the standards that are applicable to the development of prescription medicines and labeling in the United States.

Furthermore, admitting evidence related to the 110 mg dose would also open the door to a distracting mini-trial about varying regulatory processes in different countries that resulted in FDA rejection of Pradaxa 110 mg in the United States but its approval in other countries. First, Dr. Molofsky has no basis to opine about foreign regulatory materials, having never reviewed regulatory correspondence between BI and European or Canadian regulators related to Pradaxa and lacking any special expertise in the regulatory regimes of Europe or Canada. Molofsky Dep. at 116:11-118:23. Second, to place evidence of the 110 mg dose in context and counter an inaccurate implication that BI denied U.S. physicians information provided in other countries, BI would have to introduce evidence of the differing reasoning of foreign health ministries that led them to diverge from the FDA's conclusion. To avoid the potential confusion and delay from presentation of these issues, the Court should exclude evidence of the 110 mg dose.

**IV.  Federal Law Preempts Plaintiffs' Claims that BI Should Have Marketed the 110 Dose and Related Information.**

Finally, to the extent Plaintiffs claim that BI should have offered the 110 dose in the United States, those arguments are preempted by federal law for two independent reasons. First, federal law prohibits BI from marketing that dose or including prescribing information about it in its labeling without prior FDA approval. Second, because the FDA declined to approve the 110 mg dose of Pradaxa after full consideration of the very clinical trial data on which Plaintiffs now

9

rests their claims, BI could not unilaterally amend its label to include this very information that FDA decided should not be included in the Pradaxa labeling.

     First, BI simply cannot market or promote a dose of a medicine not approved by the FDA. "Once a drug—whether generic or brand-name—is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product, including active ingredients, or in the specifications provided in the approved application.'" *Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2471 (2013) (quoting 21 C.F.R. § 314.70(b)(2)(i)). As a result, state law claims "that place a duty on manufacturers to render a drug safer by either altering its composition or altering its labeling are in conflict with federal laws that prohibit manufacturers from unilaterally altering drug composition or labeling." *Id.* at 2479. If a manufacturer "cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *PLIVA, Inc. v. Mensing*, 131 S. Ct. 2567, 2581 (2011).[1] If by authorizing state law suits, Massachusetts "were able to countermand the FDA's determinations and substitute its own requirements, it would undermine the FDA's ability to make drugs available to promote and protect the public health." *Zogenix, Inc. v. Patrick*, No. 14-11689-RWZ, 2014 WL 1454696, at *2 (D. Mass. Apr. 15, 2014). Because BI could not unilaterally change the dosing recommendations for Pradaxa

---

[1] *See also Yates v. Ortho-McNeil-Janssen Pharm., Inc.*, 808 F.3d 281, 297-300 (6th Cir. 2015) (holding plaintiffs' claims that the defendant should have altered the formulation of the medicine, which is prohibited under federal law, to be preempted); *Fleming v. Janssen Pharm., Inc.*, 186 F. Supp. 3d 826, 832–34 (W.D. Tenn. 2016) (same); *Barcal v. EMD Serono, Inc.*, No. 5:14-cv-01709-MHH, 2016 WL 1086028, at *4 (N.D. Ala. Mar. 21, 2016) (same); *Rheinfrank v. Abbott Labs., Inc.*, 137 F. Supp. 3d 1035, 1041 (S.D. Ohio 2015) (same), *aff'd* --- F. App'x ----, (6th Cir. Feb. 21, 2017).

without FDA approval, any state law claim seeking to impose liability for not doing so is preempted.

Second, Plaintiff's claims are also preempted because the information upon which Plaintiffs' arguments about the 110 mg dose rely — data from the pivotal pre-approval clinical trial — is not "newly acquired information" that would allow BI to independently amend its Pradaxa labeling. The First Circuit recently reiterated this principle, holding that federal preemption barred plaintiff's failure-to-warn claims predicated on the plaintiffs' "tak[ing] issue with the FDA's acceptance" and interpretation of certain clinical trial data that supported approval of the medicine, which the plaintiffs argued rendered the label "misleading and inadequate." *See In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34, 38 (1st Cir. 2015). In its ruling, the Court examined the Changes Being Effected ("CBE") regulation, the only regulatory mechanism that permits manufacturers to make changes to a product's label without prior FDA approval. *Id.* at 37 (citing 21 C.F.R. § 314.70(c)(6)(iii)). Manufacturers can use the CBE process only to add "newly acquired information" to the label that falls into certain categories. 21 C.F.R. § 314.70(c)(6)(iii). The First Circuit explained that the plaintiffs' claims hinged on information from the pre-approval clinical trials for Celexa — information that was indisputably provided to the FDA and duly considered prior to approving the medicine. *In re Celexa*, 779 F.3d at 43. As such, the manufacturer could not use the CBE process to amend its label in a manner that took a different interpretation of the data than the FDA in its approval process. *Id.* Because the manufacturer could thus not independently amend its label as plaintiffs advocated, their failure-to-warn claims were preempted. *Id.*

The same situation exists here. Plaintiffs contend that the initial Pradaxa label should have said something different about the 110 mg dose of Pradaxa, including related to data from

11

the pre-approval clinical trial. Importantly, Plaintiffs do not allege that the information about the 110 mg dose that they assert belongs in the label was somehow withheld from or unavailable to the FDA. *See* Molofsky Dep. at 189:2-14. This is precisely the type of claim that the First Circuit found preempted in *Celexa*: a claim that rests on a disagreement with FDA's regulatory conclusion, after a thorough and well-documented review of the clinical trial evidence, not to approve the 110 mg dose. *See In re Celexa*, 779 F.3d at 43 ("[T]he change plaintiffs seek in the label is indeed based on information . . . that was plainly known to the FDA prior to approving the label."). Thus, even if BI could use the CBE process to amend its dosing recommendation (which it cannot), here there is no "newly acquired information" that could be submitted as part of a CBE labeling change, and thus BI "could not independently change its label to read as plaintiffs say it should." *Id.*

In short, BI cannot face state tort liability for marketing only FDA-approved dosages of Pradaxa, nor could BI independently amend the labeling for Pradaxa to include additional information from Pradaxa's pre-approval clinical trial about Pradaxa's 110 mg dose. As such, Plaintiffs should not be able to press such a theory at trial, either directly or indirectly. Any effort by Plaintiffs to suggest that the 110 mg dose should have been available to Dr. Liu, or that Pradaxa's labeling was inadequate because it did not contain more information about the 110 mg dose, should be rejected, and any such evidence about the 110 mg dose should be excluded.

## CONCLUSION

For the foregoing reasons, the Court should exclude all evidence and testimony related to the 110 mg dose of Pradaxa, including foreign regulatory materials, FDA communications, BI company documents, and medical literature. This evidence is inadmissible under Rules 402, 403, and the doctrine of federal preemption.

Respectfully submitted,

*/s/Phyllis A. Jones*
Phyllis A. Jones (*admitted pro hac vice*)
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-5272
pschmidt@cov.com

William Joseph Flanagan, BBO #556598
MORRISON MAHONEY LLP
205 Summer Street
Boston, MA 02210-1181
(617) 439-7500
jflanagan@morrisonmahoney.com

Eric E. Hudson (*admitted pro hac vice*)
BUTLER SNOW LLP
6075 Poplar Avenue, Suite 500
Memphis, TN 38117
(901) 680-7201
eric.hudson@butlersnow.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on April 21, 2017.

/s/*Phyllis A. Jones*
Phyllis A. Jones