# EXHIBIT "4"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| IN RE: Pradaxa (Dabigatran Etexilate) Products Liability Litigation | MDL 2385 |
| LI LIU and DR. EMILY LIU, AS CO-ADMINISTRATORS OF THE ESTATE OF DR. ZHENSHENG LIU and PERSONAL REPRESENTATIVES OF THE HEIRS AT LAW OF DR. LIU,<br><br>Plaintiffs,<br><br>v.<br><br>BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., BOEHRINGER INGELHEIM CORPORATION, BOEHRINGER INGELHEIM USA CORPORATION, and BOEHRINGER INGELHEIM INTERNATIONAL GMBH<br><br>Defendants. | CIVIL ACTION NO.<br><br>14-cv-13234-WGY |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE #1
TO EXCLUDE EVIDENCE RELATED TO THE 110MG DOSE OF PRADAXA**

BI seeks to bar the Plaintiffs from proffering evidence concerning the existence of a 110mg dose of Pradaxa, claiming such evidence is irrelevant to the matter before the Court since Plaintiffs' decedent did not consume that dose, and the dose has never been available in the United States. Whatever surface appeal the contention may have, the relevance of such evidence is plain when it is viewed through the lens of the elements of Plaintiffs' failure to warn claim.

As summarized in *Tersigni v. Wyeth*, 2013 U.S. Dist. LEXIS 174762, *15 (D. Mass. Dec. 13, 2013), "'[u]nder Massachusetts law, a product may be unreasonably dangerous if the manufacturer fails to warn of a non-obvious risk associated with the normal use of the product *about which the manufacturer knows or has reason to know*.' In the ordinary course, the manufacturer of a product that

1

is dangerous in nature or is in a dangerous condition has a duty to warn consumers or others who will foreseeably come in contact with the product." *Id*. quoting *Garside v. Osco Drug, Inc.*, 976 F.2d 77, 80 (1st Cir. 1992); *H.P. Hood & Sons v. Ford Motor Co.*, 370 Mass. 69, 75, (1976) (emphasis supplied).

Massachusetts applies the "learned intermediary" doctrine which "carves out a 'middleman' exception that has a particular relevance to pharmaceutical drugs: it permits a drug manufacturer to discharge its duty to warn the consumer by instead providing appropriate warnings to the prescribing physician. The justification for the doctrine is that 'the prescribing physician, as the 'learned intermediary' standing between the manufacturer and the consumer/patient, is generally in the best position to evaluate the potential risks and benefits of ingesting a certain drug and to advise the patient accordingly. The immunity conferred by the doctrine is, however, limited: when the manufacturer breaches the duty to warn the doctor, it is directly liable to the patient." *Tersigni*, 2013 U.S. Dist. LEXIS 174762 at *16, quoting *MacDonald v. Ortho Pharm. Corp.*, 394 Mass. 131, 135-136 (1985); *Garside*, 976 F. 2d at 80. Further, the standard is an objective one – the question is whether the labeling contains all the information known or knowable by the manufacturer that a "reasonable physician" would use to evaluate the risks and benefits of the drug. *Calisi v. Abbott Labs.*, 2013 U.S. Dist. LEXIS 139257 (D. Mass. Sept. 27, 2013) ("A pharmaceutical company discharges its duty … by providing a warning that is appropriate to inform a *reasonable doctor*.") (emphasis added).

Thus, the central liability question for the jury is whether BI disclosed information about its product that it either knew or had reason to know sufficient to enable a reasonable physician first, to make an evaluation of the risks and benefits of Pradaxa treatment, based on accurate and complete information, and then to advise his patient. See *Garside*, 976 F.2d 77 at 80. As a result, any evidence that touches on BI's knowledge about the risks and benefits of Pradaxa treatment is plainly relevant.

When BI submitted its original NDA 22-512 [BIPI-PRA-0000200082] for stroke prevention in atrial fibrillation on December 15, 2009 (and thereafter submitted revisions to the NDA on April 19, 2010 [BIPI-PRA-0001422372]), it did so on the basis of a Phase III study entitled "The Randomized Evaluation of Long-Term Anticoagulation" (RE-LY) study. The RE-LY study was a "randomized trial designed to compare two fixed doses of dabigatran (110 mg and 150 mg), each administered in a blinded manner, with open-label use of warfarin in patients who had atrial fibrillation and were at increased risk for stroke." Connolly, S. J., Ezekowitz, M.D., Yusuf, S., Eikelboom, J., Oldgren, J., Parekh, A. Wallentin, L., Dabigatran versus warfarin in patients with atrial fibrillation. *New England Journal of Medicine*, 2009; 361:1139-1151 at p. 1140, Sept. 17, 2009. The core of the dispute between the parties is about whether BI's disclosures of the RE-LY data and its analysis of that data were adequate. The data that RE-LY generated – including data about the risks posed by both doses of the drug to an elderly ($\geq$80 years old) demographic, forms the foundation for Plaintiffs' claim that BI failed to adequately warn of the actual risk/benefit profile of the 150mg dose when used in this group.

BI argues that the Court should exclude all evidence concerning the 110mg dose because information about it would not have been relevant to a physician in the United States evaluating whether to recommend Pradaxa treatment for a patient since that dose was not available here. But the assertion is directly contradicted by the content of the label itself. BI demonstrated that it believed information about the RE-LY study was relevant to US patients and prescribers when it chose to include data from the study in its label. See Def. Mem. Ex. E, Docket # 96-5 at sections 5.1 (WARNINGS AND PRECAUTIONS; Risk of Bleeding), 6.1 (ADVERSE REACTIONS; Clinical Trial Experience), 8.5 (USE IN SPECIFIC POPULATIONS; Geriatric Use) 12.3 (CLINICAL PHARMACOLOGY; Pharmacokinetics); and 14 (CLINICAL STUDIES). BI not only discussed RE-LY in the label, ***it discussed data from RE-LY that pertains directly to the 110mg dose***. See *Id.* at

3

sections 6.1 and 14. Thus, BI itself has already judged information concerning the 110mg dose relevant to inform patients and prescribers in the United States about the risks and benefits of the drug, and evidence about the 110mg dose is both relevant and admissible.

Not only was Pradaxa approved in the United States based on a clinical trial (RE-LY) that included use of the 110mg dose, but the data from that study gave BI information about the risks and benefits of Pradaxa that it could have presented to doctors to improve their ability to evaluate the safety and efficacy of the drug for their patients, but which it chose to withhold. Importantly, the United States Supreme Court has held that: "…a central premise of federal drug regulation [is] that the manufacturer bears responsibility for the content of its label at all times. It is charged both with crafting an adequate label and with ensuring that its warnings remain adequate." *Wyeth v. Levine*, 555 U.S. 555, 571 (2009). In this context, the existence of a 110mg dose is not only relevant to Plaintiffs' claims, it goes to heart of the information the Defendants had but chose not to disclose to Dr. Liu or his prescribing physician.[1]

The primary efficacy outcome studied in RE-LY was stroke or systemic embolism, and the primary safety outcome was major hemorrhage; and the study had a median follow-up period of two years. Assessing the relative risks of bleeding posed by 110mg Pradaxa; 150mg Pradaxa and Warfarin was central to the purpose of RE-LY. Put another way, the existence of a 110mg dose in the study (even if same is not available for treatment of AFib in the US) is part and parcel of the Pradaxa prescribing information considered by physicians in the prescription of Pradaxa to patients in the

---

[1] BI's argument that evidence of foreign regulatory action is inadmissible falls wide of the mark. Plaintiffs are not seeking to introduce evidence concerning the labeling information in Europe and Canada for the purpose of claiming that FDA should have taken the same or similar action on BI's Pradaxa application or to support an argument that FDA erred in denying BI the opportunity to market the 110mg dose in the US. Rather, evidence of the content of BI's labeling in other markets goes directly to question of BI's knowledge concerning the risks of 150mg Pradaxa for elderly patients and those with compromised renal function. Statements it made in its label in other markets is extraordinarily probative of that question and, contrary to BI's contention, will not lead to "mini-trials" about foreign regulatory action.

United States, as well as in the treatment of their bleeds. In fact, it is the very nature of the RE-LY trial that is at the heart of the claims in this case: the RE-LY study findings/results, together with the results from other phase III clinical trials like RE-COVER – and the evidence adduced therein that demonstrate increased bleeding risks for older patients like Dr. Liu. This has been re-confirmed in recent scientific literature analyzing the data from RE-LY. Lauw MN, Eikelboom JW, Coppens M, et al, *Effects of dabigatran according to age in atrial fibrillation,* Heart, Published Online First: 17 February 2017. doi: 10.1136/heartjnl-2016-310358.

Although the FDA declined to approve the 110mg dose for sale in United States to treat AFib, the 110mg dose is available in Canada, Europe and virtually everywhere else in world. Regardless that the dosing recommendations for those aged 80 and older are different outside of the US (e.g., the Company Core Data Sheet for Pradaxa, a document that reflects global safety information for the drug [PX-2017_003545], states that "Patients aged 80 years and above should be treated with a daily dose of 220 mg taken orally as 110 mg hard capsules twice daily"), the science behind the 110mg dose is reflected in the European Medicines Association's (EMA) April 25, 2014 Pradaxa Assessment Report (attached hereto as Exhibit A), in which the EMA states:

> The PK analysis of the RE-COVER study is largely in line with results from the RE-LY study. Trough dabigatran concentrations by the three categories of renal function are similar to the ones obtained for the 150mg dose in the RE-LY study. **The high dependence of dabigatran clearance on renal function, age and P-gp activity is confirmed**. Also the effect of gender and body weight on dabigatran is in line with previous experience. The Applicant has provided a further analysis and discussion of the PK results of the RE-COVER study. **There was a more than 2-fold increase in dabigatran exposure in patients aged 80 years or more compared to non-elderly patients, an about 3-fold increase in patients with moderate renal impairment (CrCL 30-50 mL/min) compared to patients without renal impairment**, and an about 1.5-fold increase in patients taking verapamil compared to patients not taking verapamil. Based on these PK results and the clinical outcome data, the MAH [Boehringer Ingelheim] agreed with **reduced dose recommendations (daily dose of 220 mg taken as two 110mg capsules) for patients aged 80 years** or above and for patients who receive concomitant verapamil. (Emphasis added)

Significantly, the language concerning the doubling of exposure to the drug in patients 80 and older is absent from the US label at issue in this litigation, as is the information concerning a three-fold increase in Pradaxa exposure for patients with moderate renal impairment.[2]

In *Dabigatran Exposure Response in AF Patients,* Reilly, et al, JACC Vol 63 No.4 2014, February 4, 2014; 321-8, a scientific paper authored by the Defendants' senior scientist, Dr. Paul Reilly, BI reevaluated the RE-LY clinical trial data and found that,

> "[a]cross the 10th to 90th percentile range of steady-state trough plasma concentrations achieved for the 150-mg bid dose **the overall risk of major bleeding during the trial ranges from approximately 2% to 7%** approximately 1.0% to 3.5% per year **with substantial impact of age** and concomitant antiplatelet use with sex history of diabetes and CAD also significant covariates in the model. *** **The risk of ischemic stroke over the same concentration range shows only limited variation for example from 1.1% to 1.5% for 72-year-old AF patient and 1.5% to 2.1% for an 80-year-old patient**."

(Emphasis added). Notwithstanding that BI plainly knew these facts, its US Pradaxa label makes no mention of this increasing bleed risk in the context of essentially stable stroke prevention.[3] See Def. Memo., Ex. E. It should also be noted that Dr. Reilly has testified that he does not weigh the risk of stroke as more significant than the risk of bleed,[4] so accurately and completely communicating that

---

[2] The product label BI utilizes in Europe addresses this issue directly, stating "The effect by age on exposure to dabigatran was confirmed in the RE-LY study with an about 31 % higher trough concentration for subjects ≥ 75 years and by about 22 % lower trough level for subjects < 65 years compared to subjects between 65 and 75 years (see sections 4.2 and 4.4)." The label further states "Patients aged 80 years or above should be treated with a daily dose of 220 mg taken as one 110 mg capsule twice daily *due to the increased risk of bleeding in this population*." See European Medicines Agency, Pradaxa, Summary of Product Characteristics, pp. 63, 91, available at http://www.ema.europa.eu/docs/en_GB/document_library/ EPAR_-_Product_Information/human/000829/ WC500041059.pdf (emphasis added). Additional facts known to BI about the risk/benefit profile of Pradaxa in patients over 80, but not disclosed in the product label, are outlined at *Appendix A* to *Plaintiffs' Memorandum in Opposition to Defendants Motion in Limine #4* (Docket # 112) and the *Affidavit of Michael D. Lurie* and exhibits thereto (Docket # 113).

[3] Any argument that Dr. Reilly's analysis of the RE-LY data is irrelevant because it was performed after Dr. Liu's death begs the question whether BI *had reason to know* this information before November 2012. After all, BI had all the data from RE-LY in mid-2009. It is therefore a fact question for the jury whether the analysis reflected in Dr. Reilly's article was information BI had reason to know (and an obligation to disclose) by November 2012.

[4] See Deposition of Paul Reilly, January 17, 2017, Page 353:19 to 353:22 (copy attached as Exhibit B):

19   when you're doing
20   this work, do you weight bleeds differently than

6

patients over 80 who take Pradaxa 150mg face a significantly increased risk of bleed, without a material increase in protection from stroke over the 110mg dose is almost by definition essential for a proper risk-benefit assessment of the drug. BI's failure to convey this information in the operative Pradaxa label (*or to this very day*), effectively prevented Dr. Liu's prescribing physician from fulfilling his "learned intermediary" role, and denied Dr. Liu the benefit of fully informed advice whether to choose Pradaxa treatment or treatment with warfarin.

As noted above, the Defendants are responsible for the adequacy and accuracy of the Pradaxa labeling at all times. *Wyeth v. Levine*, 555 U.S. 555, 571 (2009). The "labeling" for Pradaxa also includes materials that "accompany" such labeling. *Kordel v. U.S.*, 335 U.S. 345, 350 (1948). These items "encompass nearly every form of promotional activity, including…, pamphlets, mailing pieces … and… literature that…is… textually related to the product." *United States v. Harkonen*, 2009 U.S. Dist. LEXIS 47255, *33 (N.D. Cal. June 3, 2009).[5] A label may be found inadequate if over-promotion erodes the warning's effectiveness. *Salmon v. Parke Davis*, 520 F.2d 1359, 1362 (4th Cir. 1975). Further, compliance with FDA regulations alone does not establish that a warning is adequate. *Wyeth v. Levine*, 555 U.S. at 562.

In Massachusetts, "'[t]he fact finder may find a warning to be unreasonable, hence inadequate, in its factual content, its expression of the facts, or the method or form in which it is conveyed. . . . The adequacy of such warnings is measured not only by what is stated, but also by the manner in which it

---

21  you weight strokes?
22      A.   I do not.

[5] The FDA determined on May 22, 2013 (letter attached as <u>Exhibit C</u>) that BI had been engaged in "misleading" marketing practices and ordered that the communications be changed or stopped. Specifically, BI claimed that "'"In a clinical trial, PRADAXA 150 mg reduced stroke risk 35% more than warfarin." FDA concluded that because the *actual* reduction in risk demonstrated in RE-LY was only 1.2% (from 3.4% to 2.2%) BI's statement concerning the 35% reduction – which referred to the percentage by which 2.2 is less than 3.4 – misleadingly suggested to patients and physicians that there was an absolute 35% risk reduction -- a misrepresentation that has skewed prescribers' risk benefit analysis to this very day.

is stated. A reasonable warning not only conveys a fair indication of the nature of the dangers involved, but also warns with the degree of intensity demanded by the nature of the risk. A warning may be found to be unreasonable in that it was unduly delayed, reluctant in tone or lacking in a sense of urgency.'" *MacDonald v. Ortho Pharmaceutical Corp.*, 394 Mass. 131, 141 (1985).

Here, it is for the jury to determine what information, and in what form, had to be included in the Pradaxa label to render its warnings adequate. That some of that information was generated through study of a lower dose of the drug is, in truth, immaterial. BI may argue to the jury that it had good reasons to include some data concerning the 110mg dose in the label, and equally good reason to exclude other data, but its argument that the evidence is inadmissible because it is irrelevant is simply wrong.

A brief comment on BI's focus on the fact that FDA did not approve the 110mg dose in the US is warranted. Notwithstanding that BI couldn't market that dose in the US, it was not relieved of its obligation to disclose to doctors and patients that -- as an entity held to be expert about its product -- it had concluded that the 150mg dose was not appropriate for patients over 80 years of age because the increased risk of major and life-threatening bleeds was not balanced by a similar increase in protection from stroke. Its obligation was to include in its label *all* information that would be material to a reasonable physician in evaluating whether to prescribe. The suggestion that its evaluation that the 150mg dose was not safe for patients over 80 was not information that a reasonable physician treating an 82-year-old would find material because there was no 110mg dosing alternative available beggars belief. The fact that a physician, if practicing in the US, would not have the option of prescribing a lower dose of Pradaxa is beside the point. In the absence of the lower dose, physicians with patients over 80, like Dr. Liu's physician, had to make a different assessment: whether to recommend Pradaxa 150mg or manage the patient's stroke risk with warfarin. BI's failure to disclose its knowledge about

8

the true hazards of the 150mg dose was not excused simply because it was not permitted to market a lower dose.

As noted in *Wyeth*, a drug maker must completely and accurately supply information relevant to the prescriber's risk-benefit analysis. *Wyeth v. Levine*, 555 U.S. at 562.  Data pertinent to a physician's assessment whether Pradaxa treatment at 150mg is appropriate for his patient was extrapolated from a study that included the 110mg dose.  It is impossible to unravel the data to re-make the RE-LY study solely as a comparison of 150mg Pradaxa to warfarin.  BI chose to conduct the RE-LY study in the manner it did, and chose to seek approval for both doses of the drug based on the RE-LY data.  That the FDA ultimately declined to approve marketing of the 110mg dose does not alter BI's obligation to disclose all the material information it has about its product – regardless that it may have been generated in studying a different dose of the drug. In truth, there is simply no way to separate the data out and evidence concerning the 110mg dose should be admitted at trial.

## CONCLUSION

For all the foregoing reasons, Plaintiffs respectfully request that the Court DENY, in its entirety, Defendants' *Motion in Limine* #1 to exclude evidence concerning the 110mg dose of Pradaxa.

>
> Respectfully submitted,
> PLAINTIFFS,
> By their counsel
>
> */s/ Michael D. Lurie*
> Alex H. MacDonald, BBO #310360
> amacdonald@mlglegal.com
> Michael D. Lurie, BBO #553024
> mlurie@mlglegal.com
> Rebecca A.G. Robertson, BBO #670529
> rrobertson@mlglegal.com
> MACDONALD LAW GROUP LLC
> One Bowdoin Square
> Boston, MA  02114

phone: 617-747-7550
fax: 617-747-7551

Dated: May 12, 2017

## CERTIFICATE OF SERVICE

I, Michael D. Lurie, hereby certify that on this 12th day of May, 2017, I caused a copy of the foregoing to be served on the parties to their counsel of record by filing same through the Court's CM/ECF system, which automatically forwards all filings to counsel of record via electronic mail.

*/s/ Michael D. Lurie*