# EXHIBIT "5"

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| LI LIU and DR. EMILY LIU, as Co-Administrators of the Estate of DR. ZHENSHENG LIU, and Personal Representatives of the Heirs at Law of DR. LIU, <br><br> Plaintiffs, <br><br> v. <br><br> BOEHRINGER INGELHEIM PHARMACEUTICALS, INC., BOEHRINGER INGELHEIM CORPORATION, BOEHRINGER INGELHEIM USA CORPORATION, and BOEHRINGER INGELHEIM INTERNATIONAL GMBH, <br><br> Defendants. | JURY TRIAL DEMANDED <br><br> CIVIL ACTION NO: 14-CV-13234 <br><br> [Leave to File Granted May 17, 2017] |

### REPLY IN SUPPORT OF DEFENDANTS' MOTION *IN LIMINE* NO. 1 TO EXCLUDE EVIDENCE RELATED TO THE 110 MILLIGRAM DOSE OF PRADAXA

Plaintiffs' Opposition to BI's motion on the Pradaxa 110 mg dose proceeds on the premise that "any evidence that touches on BI's knowledge about the risks and benefits of Pradaxa treatment is plainly relevant." Pls.' Opp. to Mot. in Limine #1 to Excl. 110 mg Dose ("Pls' Opp.") at 2. Under this sweeping formulation, any evidence relating to Pradaxa (including on different indications or unrelated safety issues) is fodder for admission at trial. But that is plainly not the test of relevance, particularly where the Court has carefully defined the remaining triable issue and where it is not disputed that the 110 mg dose was not an option for Dr. Liu. Instead, Plaintiffs' Opposition confirms their intention to transform the trial into a referendum on the FDA's decision not to approve the 110 mg dose and Pradaxa's labeling on the 110 mg dose

around the world. This irrelevant, distracting, time-consuming excursion should be foreclosed under Federal Rules of Evidence 402 and 403.

Plaintiffs' implicit criticisms of the FDA's judgment on the 110 mg dose, including the labeling on the dose in the Pradaxa Package Insert, are also preempted by federal law. This additional dispositive legal issue goes unmentioned in Plaintiffs' Opposition.

**I.      The 110 mg Dose is Irrelevant to Plaintiffs' Claims.**

Despite offering a lengthy disquisition on the 110 mg dose, Plaintiffs fail to draw a logical connection between that dose and the remaining claims in this case. It is not sufficient that this evidence simply relates to BI's knowledge of the benefits and risks of Pradaxa by virtue of coming out of the RE-LY trial. *See* Pls. Opp. at 4-5. The evidence must be probative of an issue to be tried. On the question of adequacy, this Court ruled that the remaining issue is whether Pradaxa's Package Insert contained information sufficient to enable a prescribing doctor to evaluate the benefits and risk of Pradaxa treatment to a man of Dr. Liu's age. *See* Summ. J. Mem. of Decision at 9 (Dkt. 94). Plaintiffs have not articulated how data on the 110 mg and foreign regulatory documents relating to that dose have any bearing on that question.

To the contrary, the 110 mg dose has no connection to Dr. Liu's Pradaxa treatment. Plaintiffs' sole medical expert, Dr. Molofsky, has conceded that Dr. Liu required anticoagulant therapy and that the only two available choices in the United States at that time for someone with Dr. Liu's renal function were Pradaxa 150 mg and warfarin. *See* Defs.' Mot. in Limine #1 to Exclude 110 mg Dose ("Mot.") at 7. Plaintiffs claim that BI's "evaluation that the 150 mg dose was not safe for patients over 80" would be "material information" to this choice. Pls. Opp. at 8. But Plaintiffs offer this dramatic claim without any citation. Indeed, neither BI nor the FDA ever determined that the 150 mg dose was "not safe" for patients in Dr. Liu's age group. To the contrary, the FDA specifically evaluated the question of whether the 150 mg dose might be less

2

desirable for certain patient groups, including elderly patients, and specifically rejected that view: "We were thus unable to find any population for whom the availability of a lower dose would improve dabigatran's benefit-risk profile, and it appeared clear that most, if not all, patients should receive the higher dose." Ex. D to Mot. (Beasley 2011) (Dkt. 96-4)

Plaintiffs are left, then, to rely on recommendations on dosing in other countries where regulators approved the 110 mg dose and where different dosing recommendations are provided consistent with this distinct dosing regime. But Plaintiffs offer no explanation of why labeling information arising from a distinct regulatory and dosing framework would be relevant to the question of Dr. Liu's Pradaxa treatment in the United States. Nor do they explain why information on the comparative safety risks of the Pradaxa 110 mg and 150 mg doses, Pls. Opp. at 5-6, would have been relevant to Dr. Bilazarian's decision about whether to prescribe Dr. Liu warfarin or Pradaxa 150 mg.

In advocating for the admission of the irrelevant evidence, Plaintiffs meanwhile ignore the data that actually bears on the question that would have been relevant to the decision presented to Dr. Liu's prescriber: "whether to recommend Pradaxa 150mg or manage the patient's stroke risk with warfarin." Pls. Opp. at 8. The FDA-approved Pradaxa Package Insert speaks directly to that question. There, BI extensively communicated relevant information about bleeding risk— the potential of serious or fatal bleeding, the fact that elderly patients have a higher risk of bleeding, particularly those over 75, and data comparing the risk of bleeding between the 150 mg dose and warfarin. *See* Pradaxa U.S. Prescribing Information at Highlights, §§ 6.1, 8.5 (Oct. 2010) (Dkt. 96-5). The parties undoubtedly disagree over whether these warnings sufficiently advised Dr. Bilazarian of the relevant risks of treating Dr. Liu with Pradaxa 150 mg. But it is beyond reasonable dispute that the warnings in the U.S. Package Insert on the

3

150 mg dose of Pradaxa — not data on an unapproved dose unavailable to Dr. Bilazarian — should guide the jury's resolution of the factual questions in this case.

If Plaintiffs are permitted to stray from this core evidence, the threat of juror confusion, wasted time, and distracting mini-trials on irrelevant issues is significant. Plaintiffs appear to invite this confusion, contending that "BI may argue to the jury that it had good reasons to include some data concerning the 110 mg dose in the label, and equally good reason to exclude other data." Pls. Opp. at 8. Evidence of why data related to the 110 mg dose was included or excluded from the label will derail the trial presentation, requiring an in-depth discussion of the data on the 110 mg dose, the FDA's rationale for declining to approve the 110 mg dose, BI's subsequent efforts to get it approved, and discussions between BI and the agency regarding the labeling on the 110 mg dose. *See* Mot. at 7-8. So, too, will Plaintiffs' apparent intention to litigate "the content of BI's labeling in other markets." Pls' Opp. at 4 n.1. If Plaintiffs present evidence of foreign labeling or foreign regulatory activities in the context of this trial, BI would be required to explain not only the contents of its labeling outside of the United States, but also the differences across regulatory regimes, basis for the approval of the 110 mg dose in other countries, and BI's discussions with various foreign regulatory bodies regarding the 110 mg dose. BI respectfully submits that the Court should foreclose this diversion, which does not speak to the central factual questions in this suit.

## II. Plaintiffs' Arguments Challenging the Labeling on the 110 mg Dose Are Preempted.

Plaintiffs also offer no response to BI's preemption argument, repeating only that a manufacturer maintains responsibility for its label and that FDA approval does not automatically render a warning adequate for purposes of a failure-to-warn claim. *See* Pls. Opp. at 1-2, 7. BI never challenged these general principles. But Plaintiffs fail to address First Circuit precedent foreclosing arguments based on a plaintiff's second guessing of the FDA's evaluation of clinical

4

trial data. *See In re Celexa & Lexapro Mktg. & Sales Practices Litigation*, 779 F.3d 34 (1st Cir. 2015); Mot. at 11-12.

Although thinly veiled, at bottom, Plaintiffs' argument regarding the 110 mg dose is that the FDA got it wrong. Plaintiffs' theory rests on rejecting the FDA's conclusion, rendered after examining the RE-LY clinical trial data, that the 150 mg dose had a superior net benefit profile than the 110 mg dose in all age populations. *See* Mot. at 2-3 (detailing FDA rationale). BI was held to this conclusion and labeled the Pradaxa warning accordingly. But Plaintiffs contend that BI should have put information in the label directly contradicting the FDA's assessment:

> Notwithstanding that BI couldn't market [the 110 mg] dose in the US, it was not relieved of its obligation to disclose . . . that it had concluded that the 150mg dose was not appropriate for patients over 80 years of age because the increased risk of major and life-threatening bleeds was not balanced by a similar increase in protection from stroke [as compared to the lower dose].

Pls. Opp. at 8. As noted, this assertion relies on a faulty factual premise: the unsupported claim — offered without any citation — that BI had concluded that 150 mg dose was not appropriate for patients over 80. More fundamentally, it was impossible for the company to insert language to this effect in its label that was incompatible with the FDA's position. To the extent BI included information in its label about the 110 mg dose, it was limited and in line with the FDA's conclusions: information that the dose was studied, the number of patients in the dosing arm, and data showing that the 150 mg dose was superior in stroke protection. *See* Pradaxa U.S. Prescribing Information § 6.1, 14 (Oct. 2010) (Dkt. 96-5). BI does not object to this information coming into evidence along with the rest of the Pradaxa label. Plaintiffs should not be permitted, however, to introduce evidence comparing the 110 mg dose and 150 mg dose to buttress their failure-to-warn argument by pressing conclusions that conflict with the FDA's. This line of argument is precisely what *Celexa* forbids.

5

Furthermore, to support their argument about the 110 mg versus the 150 mg dose, Plaintiffs largely point to inadmissible foreign regulatory materials, offered presumably to support their implicit challenge to the FDA's decision on the 110 mg dose. Citing no case law, Plaintiffs defend their reliance on foreign regulatory materials in a single footnote of their Opposition, arguing that these materials demonstrate BI's knowledge about the risk of Pradaxa 150 mg. *See* Opp. 4 n.1. But the document Plaintiffs quote in the body of their brief was authored by the European Medicines Agency ("EMA"), not by BI, and represents a foreign regulator's assessments of the two doses rather than the company's own views.[1] *See id.* at 5 (quoting EMA April 25, 2014 Pradaxa Assessment Report). Although Plaintiffs insist they do not intend to introduce foreign regulatory evidence related to the 110 mg dose "for the purpose of claiming that FDA should have taken the same or similar action" as its international counterparts, *id.* at 4 n.1, the example of this EMA document demonstrates that, under the guise of showing BI's "knowledge," Plaintiffs' do in fact plan to showcase foreign regulatory assessments and recommendations, a tacit argument that the FDA's own standards and conclusions should be ignored. For the reasons discussed in BI's opening brief, such evidence is inadmissible under Rule 403. *See* Mot. at 8-9.

## CONCLUSION

For the foregoing reasons and those in BI's opening brief, the Court should exclude all evidence and testimony related to the 110 mg dose of Pradaxa, including foreign regulatory materials, FDA communications, BI company documents, and medical literature. This evidence is inadmissible under Rules 402, 403, and the doctrine of federal preemption.

---

[1] Furthermore, this particular document was issued by the EMA in 2014, more than a year after Dr. Liu's death and more than three years after Dr. Bilazarian decided to prescribe him Pradaxa, making it even less relevant to BI's knowledge at the time of Dr. Liu's treatment.

6

Respectfully submitted,

/s/Phyllis A. Jones
Phyllis A. Jones (*admitted pro hac vice*)
Paul W. Schmidt (*admitted pro hac vice*)
Michael X. Imbroscio (*admitted pro hac vice*)
COVINGTON & BURLING LLP
One City Center
850 Tenth Street, NW
Washington, DC 20001-4956
(202) 662-5272
pajones@cov.com
pschmidt@cov.com
mimbroscio@cov.com

William Joseph Flanagan, BBO #556598
MORRISON MAHONEY LLP
205 Summer Street
Boston, MA 02210-1181
(617) 439-7500
jflanagan@morrisonmahoney.com

Eric E. Hudson (*admitted pro hac vice*)
BUTLER SNOW LLP
6075 Poplar Avenue, Suite 500
Memphis, TN 38117
(901) 680-7201
eric.hudson@butlersnow.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 18, 2017.

/s/*Phyllis A. Jones*
Phyllis A. Jones