# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

1: 1        UNITED STATES DISTRICT COURT
2
3     -------------------------------
4   IN RE: XARELTO (RIVAROXABAN) '
5
6             '
7     -------------------------------'
8
9   PROTECTED - SUBJECT TO FURTHER PROTECTIVE RE
10         ---
11     Wednesday, November 9, 2016
12         ---
13
14   M.D., Ph.D, held at Simmons & Simmons, Claude
15   Netherlands, commencing at 9:17 a.m., on the
16   Registered Professional Reporter, Certified
17   Certified Manager of Reporting Services, Florida
18   (New Jersey), and Realtime Systems Administrator
19
20
21      877.370.3377 ph | 917.591.5672 fax
22
23
24
25

2: 1   APPEARANCES:
2
3     BY: NEIL OVERHOLTZ, ESQUIRE
4        E. SAMUEL GEISLER, ESQUIRE
5     17 East Main Street, Suite 200
6     (850) 916-7450
7     nbess@awkolaw.com
8     Representing Plaintiffs
9
10    KAYE SCHOLER, LLP
11    250 West 55th Street
12    (212) 836-7572
13    Representing Defendants Bayer HealthCare
14
15
16    BY: STEVEN E. DERRINGER, ESQUIRE
17    54 West Hubbard Street, Suite 300
18    (312) 494-4415
19    Representing Defendants Bayer HealthCare
20
21
22    BY: CHANDA A. MILLER, ESQUIRE
23    18th and Cherry Streets
24    (215) 988-1197
25    Representing the Janssen Defendants

3: 1   ALSO PRESENT:
2     DARNELL BROWN, Videographer
3     JON KNOWLES, Trial Technician
4     KATJA KUPER, Videographer
5     EVA BODOR, Interpreter
6     MAX THUEMMEL, Bayer
7     LORISSA EUSTICE, Bayer

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

4: 1       ---
2       ---
3   Testimony of: FRANK MISSELWITZ, M.D., Ph.D
4            PAGE
5   BY MR. OVERHOLTZ.......................  10
6   BY MR. HOROWITZ.................. 238
7   BY MR. OVERHOLTZ................ 282
8   BY MR. HOROWITZ.................. 288
9
10
11
12
13
14   Plaintiffs' Third Amended Notice to
15   Defendants Through Designated
16
17   Deposition of the Bayer Defendants
18
19   Expert Meeting on VTE-Treatment in
20   XARELTO_BPAG_19150684
21   Exhibit 4 Planning group meeting ODIXa-Bay   25
22   July 17th, 2004, Amsterdam
23   19150689
24
25

5: 1     E X H I B I T S
2     (Attached to transcript)
3   EINSTEIN 30(b)(6) EXHIBITS     PAGE
4   Exhibit 5 VTE-Treatment EINSTEIN GDC   69
5     XARELTO_BPAG_00072428
6   Exhibit 6 E-mail - Subject: Minutes CDP-RC   99
7
8   Haven
9
10   20 and ad-hoc CDP-RC May 18, 2006 -
11   XARELTO_BPAG_28066580 and 28066581
12   Exhibit 9 CDP-RC Meeting - Wuppertal / West   111
13   Minutes - April 20, 2006 and May 18,
14   XARELTO_BPAG_28066582 through

Misselwitz
V.P. of Bayer
Head of clinical
development in
the therapeutic
area of cardiovascular

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

| | |
|---|---|
| 15 | 22 |
| 16     briefing package/protocols final | 23 |
| 17     XARELTO_JANSSEN_00087929 and 87930 | 24 |
| 18   Exhibit 11 E-mail - Subject: Antwort: Einstein  140 | 25 |
| 19     Barcelona | 8:   1         E X H I B I T S |
| 20 | 2     (Attached to transcript) |
| 21     todays GDC-MC 06:30PM CET | 3   EINSTEIN 30(b)(6) EXHIBITS      PAGE |
| 22 | 4   Exhibit 29 E-mail - Subject: Dose Selection   215 |
| 23     1-0.ppt | 5     backgrounder in preparation for |
| 24 | 6     XARELTO_BPAG_01573051 and 1573052 |
| 25 | 7   Exhibit 30 PowerPoint Presentation: Dose   215 |
| 6:   1         E X H I B I T S | 8     XARELTO_BPAG_01573053 |
| 2     (Attached to transcript) | 9   Exhibit 31 Memorandum of Meeting Minutes   231 |
| 3   EINSTEIN 30(b)(6) EXHIBITS      PAGE | 10     End of Phase 2 (Type B) |
| 4   Exhibit 14 E-mail - Subject: EINSTEIN (DVT&PE)  176 | 11     1099278 |
| 5     XARELTO_JANSSEN_15848474 | 12   Exhibit 32 NDA 022406 Final Approval Action   275 |
| 6   Exhibit 15 Statistical Analysis Plan - Study BAY  179 | 13     XARELTO_JANSSEN_01166029 |
| 7     11702 (Einstein-DVT treatment study) | 14   Exhibit 33 Assessment Report - Xarelto   276 |
| 8     15848640 | 15     XARELTO_BPAG_10929210 through |
| 9   Exhibit 16 Statistical Analysis Plan - Study BAY  181 | 16 |
| 10     11702 (meta analysis of the | 17     28 January 2013 |
| 11     studies) | 18   Exhibit 35 Article - Safety and effectiveness of  279 |
| 12     15848805 | 19     anticoagulation for the treatment of |
| 13   Exhibit 17 Statistical Analysis Plan - Study BAY  182 | 20     (XALIA): An international, |
| 14     11702 (Einstein-PE Study) | 21     Walter Ageno, et al. |
| 15     15848980 | 22 |
| 16   Exhibit 18 Bayer Integrated Protocol - Study   185 | 23 |
| 17     XARELTO_BPAG_02363367 through 2363454 | 24 |
| 18   Exhibit 19 Bayer Clinical Study Protocol   186 | 25 |
| 19     XARELTO_JANSSEN_18667795 through | 9:   1         - - - |
| 20 | 2      THE VIDEOGRAPHER:  Good morning.  We are now |
| 21     Treatment of Proximal Deep-Vein | 3   on the record.  My name is Darnell Brown.  I'm |
| 22     Xa Inhibitor Rivaroxaban (BAY | 4   the videographer with Golkow Technologies. |
| 23     Giancarlo Agnelli, MD, et al. | 5   Today's date is November 9th, 2016, and the time |
| 24 | 6   is 9:17 a.m. |
| 25 | 7      This video deposition is being held in |
| 7:   1         E X H I B I T S | 8   Amsterdam, Netherlands, in the matter of In Re: |
| 2     (Attached to transcript) | 9   Xarelto, for the United States District Court for |
| 3   EINSTEIN 30(b)(6) EXHIBITS      PAGE | 10   the Eastern District of Louisiana.  The deponent |
| 4   Exhibit 21 Record 920896      190 | 11   is Frank Misselwitz. |
| 5 | 12      Counsel will be noted on the stenographic |
| 6     The EINSTEIN PE Study | 13   record. |
| 7 | 14      The court reporter is Susan Wasilewski, who |
| 8     The EINSTEIN DVT Study | 15   will now swear in the interpreter and then the |
| 9 | 16   witness. |
| 10     The EINSTEIN Extension Study | 17      THE COURT REPORTER:  Ma'am, would you raise |
| 11 | 18   your right hand? |
| 12     Symptomatic Venous Thromboembolism | 19      Do you solemnly swear to translate from -- |
| 13     FM-200 | 20      THE INTERPRETER:  I do. |
| 14   Exhibit 26 Article - Oral Rivaroxaban for the   199 | 21      THE COURT REPORTER:  -- German to English and |
| 15     Embolism | 22   English to German the questions and answers to |
| 16     FM-201 | 23   the best of your ability? |
| 17   Exhibit 27 Article - Oral rivaroxaban versus   202 | 24      THE INTERPRETER:  I do. |
| 18     symptomatic venous thromboembolism: A | 25      THE COURT REPORTER:  Thank you. |
| 19     and PE randomized studies | 10:   1      Would you raise your right hand? |
| 20   Exhibit 28 E-mails - Subject:  Consolidated J&J   204 | 2      Do you solemnly swear or affirm the testimony |
| 21     package | 3   you're about to give will be the truth, the whole |

## Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

| | |
|---|---|
| 4 | truth, and nothing but the truth? |
| 5 | THE WITNESS: I swear. |
| 6 | THE COURT REPORTER: Thank you. |
| 7 | THE VIDEOGRAPHER: You may begin. |
| 8 | FRANK MISSELWITZ, M.D., PH.D., called as |
| 9 | a witness by Plaintiffs, having been duly sworn, |
| 10 | testified as follows: |
| 11 | DIRECT EXAMINATION |
| 12 | BY MR. OVERHOLTZ: |
| 13 | Q. Good morning, Dr. Misselwitz. |
| 14 | A. Good morning. |
| 15 | Q. My name is Neil Overholtz, and just -- we're |
| 16 | going to take care of a couple of matters before we |
| 17 | really get started. We're going to attach as |
| 18 | Exhibit 1 to this deposition, which is what we're |
| 19 | referring to as the EINSTEIN 30(b)(6) that's being |
| 20 | taken subject to what we're attaching as Exhibit 1, |
| 21 | which is the Third Amended Notice to Take Oral |
| 22 | Deposition of the Bayer Defendants Through Designated |
| 23 | Witnesses that we've attached as Exhibit 1. |
| 24 | (EINSTEIN 30(b)(6) Exhibit 1 was marked for |
| 25 | identification.) |

11:
| | |
|---|---|
| 1 | MR. OVERHOLTZ: And I understand that |
| 2 | Mr. Horowitz wants to attach their objections as |
| 3 | well. |
| 4 | (EINSTEIN 30(b)(6) Exhibit 2 was marked for |
| 5 | identification.) |
| 6 | MR. HOROWITZ: Yes. Thank you, Neil. |
| 7 | And let me just put on the record that we're |
| 8 | going to attach as Exhibit 2 to the EINSTEIN |
| 9 | 30(b)(6) deposition -- and by the way, just -- |
| 10 | just I'll also put on the record, although the |
| 11 | exhibits are going to be identified as EINSTEIN |
| 12 | 30(b)(6) and then with a corresponding exhibit |
| 13 | number, for purposes of moving things forward |
| 14 | we've agreed that Mr. Overholtz and I can just |
| 15 | say that -- just refer on this record to the |
| 16 | exhibits as Exhibit 1, Exhibit 2, so that we all |
| 17 | know what we're talking about and don't have to |
| 18 | waste time. |
| 19 | Exhibit Number 2 is going to be "Responses |
| 20 | and Objections to Plaintiffs' Third Amended |
| 21 | Notice to Take Oral Deposition of the Bayer |
| 22 | Defendants Through Designated Witnesses." It |
| 23 | sets forth the general objections to plaintiffs' |
| 24 | deposition notice and, of course, specific |
| 25 | objections to each of the topics identified in |

12:
| | |
|---|---|
| 1 | the notice. |
| 2 | And I'd like to just read into the record -- |
| 3 | I'm not going to read all of the objections, of |
| 4 | course, but we're going to stand on the written |
| 5 | document, but with respect to Topic Number 1, |
| 6 | subject to the -- and without waiving the |
| 7 | objections set forth in that, in Exhibit 2, the |
| 8 | Bayer defendants will designate and produce a |
| 9 | witness, who will be Dr. Misselwitz, to testify |
| 10 | about the design and results of the Phase II, |

| | |
|---|---|
| 11 | III, and IV trials relating to the VTE treatment |
| 12 | indication, including the Phase III EINSTEIN DVT, |
| 13 | PE, and extension studies, and Phase II EINSTEIN |
| 14 | DVT and ODIXa-DVT studies. |
| 15 | And then with respect to Topic Number 3, |
| 16 | again, subject to and without waiving the |
| 17 | objections set forth in Exhibit 2, the Bayer |
| 18 | defendants will designate and produce a witness, |
| 19 | that being Dr. Misselwitz, to testify about |
| 20 | articles that have been printed, the medical |
| 21 | records -- I'm sorry, the medical journals that |
| 22 | discuss the results of clinical trials that Bayer |
| 23 | has performed that relate directly to the VTE |
| 24 | treatment indication. |
| 25 | And with respect to Topics 2, 4, 5, 6, and 7, |

13:
| | |
|---|---|
| 1 | I should know that Bayer will stand on the |
| 2 | objections set forth in Exhibit 2. |
| 3 | MR. OVERHOLTZ: Okay. |
| 4 | MR. HOROWITZ: And with that, Mr. Overholtz, |
| 5 | I appreciate your courtesy. |
| 6 | MR. OVERHOLTZ: Okay. For purposes of |
| 7 | the record, we will be going through with the |
| 8 | witness the items subject matter of the 30(b)(6) |
| 9 | deposition notice, and specifically we'll look at |
| 10 | Number 1 and Number 3, that they have indicated |
| 11 | they're producing documents we're going to talk |
| 12 | about, and we understand the objections, the |
| 13 | number -- the other 2 and 5, I guess that's 4 |
| 14 | through 7, and we can discuss those as we get |
| 15 | there. We believe they are covered with -- |
| 16 | probably within 1 and 3, but we'll see what you |
| 17 | can provide answers to and what you can't. |
| 18 | MR. HOROWITZ: Okay. We'll take it as it |
| 19 | comes. If I think you're getting outside the |
| 20 | scope, I will raise it per our discussion before |
| 21 | this deposition. |
| 22 | BY MR. OVERHOLTZ: |
| 23 | Q. So, Dr. Misselwitz, I'll hand you what we've |
| 24 | marked as Exhibit Number 1, which is the third amended |
| 25 | notice. |

14:
| | |
|---|---|
| 1 | MR. OVERHOLTZ: There is an extra copy there |
| 2 | in case someone needs one. |
| 3 | BY MR. OVERHOLTZ: |
| 4 | Q. I'll let you take a second and take a look at |
| 5 | it. You've probably seen it, or at least a version of |
| 6 | this, and then we'll go through some of the specific |
| 7 | items. |
| 8 | So Dr. Misselwitz, we look at the first page |
| 9 | of the notice, it says that the -- it's "This Third |
| 10 | Amended Notice to Take Oral Deposition of Bayer |
| 11 | Defendants Through Designated Witnesses," and it |
| 12 | states that: "Please take notice that pursuant to |
| 13 | Rule 30(b)(6) of the Federal Rules of Civil Procedure, |
| 14 | Plaintiffs, by and through their counsel, will take |
| 15 | the video deposition of a designated witness or |
| 16 | witnesses of the Bayer defendants." |
| 17 | Do you have an understanding that you're here |

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

| | |
|---|---|
| 18 | today to testify on behalf of Bayer? |
| 19 | A. I do understand. |
| 20 | Q. Okay. Now, why don't you state your full |
| 21 | name for the record? |
| 22 | A. I'm Frank Misselwitz. |
| 23 | Q. Okay. And, Dr. Misselwitz, what is your |
| 24 | current position at Bayer? |
| 25 | A. I'm the head of clinical development in the |

| | |
|---|---|
| 15: 1 | therapeutic area of cardiovascular. It's a vice |
| 2 | president position and consists of a number of |
| 3 | indication areas, including thrombosis, but also |
| 4 | cardiology, nephrology, and pulmonology. |
| 5 | Q. Okay. And how long have you held that |
| 6 | position? |
| 7 | A. This very position since 2005. |
| 8 | Q. Okay. So if you will look with me at |
| 9 | Exhibit 1, you will see at the bottom of the page, it |
| 10 | says: "The witnesses shall be prepared to testify |
| 11 | concerning the subject matters identified in Exhibit A |
| 12 | attached hereto." |
| 13 | Do you see that? |
| 14 | A. I see that. |
| 15 | Q. Okay. And so if we could take a look over at |
| 16 | Exhibit A, which is attached to the notice, if you |
| 17 | will look with me at the top, it just -- it just -- it |
| 18 | says "Exhibit A, Deposition Subject Matter." And the |
| 19 | first subject matter listed under item capital letter |
| 20 | A. there is: "The indication for rivaroxaban for |
| 21 | treatment of acute venous thromboembolism (i.e., |
| 22 | deep-vein thrombosis [DVT] or pulmonary embolism), the |
| 23 | so-called 'EINSTEIN indication.'" |
| 24 | Do you see that? |
| 25 | A. I see that. |

| | |
|---|---|
| 16: 1 | Q. And at Bayer, did you refer to the |
| 2 | indication for the use of Xarelto, rivaroxaban, for |
| 3 | either DVT or PE as the "EINSTEIN indication"? |
| 4 | A. No, actually not, but we referred to that |
| 5 | indication as the VTE treatment indication. |
| 6 | Q. Okay. I think sometimes we've gotten in the |
| 7 | habit of referring to it as the "EINSTEIN indication" |
| 8 | to keep from confusing it with DVT prevention |
| 9 | indication. |
| 10 | A. I understand. |
| 11 | Q. If I use the term "EINSTEIN indication," |
| 12 | that's the indication I'll be talking about today, |
| 13 | okay? |
| 14 | A. Okay. |
| 15 | Q. Okay. So the first subject under Number A |
| 16 | was: "Any and all studies relating to the indication |
| 17 | for rivaroxaban for the treatment of acute venous |
| 18 | thromboembolism, (i.e. deep vein thrombosis [DVT] or |
| 19 | pulmonary embolism), including particularly the |
| 20 | EINSTEIN study, the EINSTEIN-Extension study, the |
| 21 | Phase II studies - EINSTEIN-DVT and ODIXa-DVT studies, |
| 22 | and any other related clinical trials or studies." |
| 23 | Do you see that? |
| 24 | A. I see that. |

| | |
|---|---|
| 25 | Q. Okay. And you have, based on your role at |
| | Bayer, you have familiarity with the EINSTEIN studies |
| | described there, both the Phase II and the Phase III |
| | study program, correct? |

| | |
|---|---|
| 17: 1 | Bayer, you have familiarity with the EINSTEIN studies |
| 2 | described there, both the Phase II and the Phase III |
| 3 | study program, correct? |
| 4 | A. That is correct. |
| 5 | Q. Okay. And I believe it is also as part of |
| 6 | the objections that were filed, it was indicated that |
| 7 | you would also be able to testify related to any of |
| 8 | the Phase IV studies, the Phase IV EINSTEIN-related |
| 9 | studies; is that right? |
| 10 | A. That is correct. |
| 11 | Q. Number 2 is: "The activities and |
| 12 | communications related to the steering committees and |
| 13 | data safety monitoring board committees of any |
| 14 | EINSTEIN indication-related studies." |
| 15 | Do you see that? |
| 16 | A. I see that. |
| 17 | Q. Now, do you have personal familiarity with |
| 18 | that topic? |
| 19 | A. Yes, I did. Actually, back in the times of |
| 20 | the Phase II trials, I conducted the ODIXa-DVT trial |
| 21 | as a responsible clinical leader, and I was involved |
| 22 | in activities and communications of the steering |
| 23 | committees on the Phase III trials. |
| 24 | Q. Okay. Were you a member of the steering |
| 25 | committee of the Phase III trials? |

| | |
|---|---|
| 18: 1 | A. No, I was not, but I was a member of the |
| 2 | writing committee of these trials. |
| 3 | Q. Okay. There was, in fact, a steering |
| 4 | committee for the Phase II and Phase III trials for |
| 5 | the EINSTEIN studies? |
| 6 | A. Why. |
| 7 | Q. Okay. And did each of those studies also |
| 8 | have a DSMB or Data Safety Monitoring Board? |
| 9 | A. That is correct. |
| 10 | Q. Okay. Number 3, Item Number 3 is: "Any and |
| 11 | all publications related to the EINSTEIN indication |
| 12 | and the underlying and supporting EINSTEIN studies." |
| 13 | Do you see that? |
| 14 | A. I see that. |
| 15 | Q. Okay. And you mentioned you were part of the |
| 16 | writing team for the EINSTEIN studies. Do you have |
| 17 | familiarity with the publications related to the |
| 18 | Phase II and Phase III trials that were conducted |
| 19 | under the EINSTEIN umbrella, is that right? |
| 20 | A. That is correct. |
| 21 | Q. Okay. Number 4 is: "Any and all adverse |
| 22 | event adjudications related to EINSTEIN studies." |
| 23 | Do you see that? |
| 24 | A. I see that. |
| 25 | Q. Okay. And are you aware that there were |

| | |
|---|---|
| 19: 1 | adjudications made by -- for any of the -- and let's |
| 2 | limit this to the primary and secondary endpoints of |
| 3 | those trials. Were there adjudications made in those |
| 4 | trials of either efficacy or safety endpoints? |
| 5 | A. With this important limitation, I do agree, |
| 6 | yes, that is correct -- |

## Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

7   Q. Okay.

8   A. -- but not for any adverse event.

9   Q. Okay. Any regulatory -- and Number 5 is:

10   "Any regulatory interactions related to the indication

11   for rivaroxaban, Xarelto, for treatment of acute

12   venous thromboembolism."

13        Were you personally involved with regulatory

14   interactions related to the VTE treatment indication?

15   A. As a member of the project team, I was

16   involved, I certainly familiarized myself with all

17   the regulatory core documents. Of course, any

18   regulatory interaction is a very broad term. I was

19   not involved in terms of day-to-day interaction, say

20   with project managers from any national regulatory

21   authority.

22   Q. Sure. And so you were involved with -- let's

23   be a little more specific about some of the regulatory

24   bodies that we might talk a little bit about today,

25   because I think you had some personal involvement

20: 1   there.

2        The US FDA, you had some involvement with the

3   regulatory interactions?

4   A. Yes.

5   Q. Okay. And with the EEU or the EMEA; is that

6   correct?

7   A. That is correct.

8   Q. Okay. Japan as well?

9   A. To some extent.

10   Q. Okay. Now, Number 6 says: "All internal

11   communications, meeting minutes, presentations,

12   analysis, considerations, and deliberations at Bayer

13   related to the indication for rivaroxaban for

14   treatment of acute venous thromboembolism and

15   underlying and supporting studies and publications."

16        Of course, that is related to the VTE

17   treatment indication. Do you have personal knowledge

18   and were you personally involved in the communications

19   and presentations and the decisions that were made

20   related to the VTE treatment indication?

21   A. Broadly speaking, yes; but again, the term

22   "all communications," et cetera, et cetera, is very,

23   very broad, and I can testify that I was involved in

24   the key discussions that had happened internally.

25   Q. Okay. And I think we'll probably take a look

21: 1   at some of those key things that you were involved

2   with today. And if you don't have knowledge about it,

3   you can let me know that you don't have knowledge

4   about it. Okay?

5        Number 7 is: "All activities related to

6   follow-up, analysis, utilization, implementation, of

7   additional studies, and marketing or safety

8   evaluations related to the EINSTEIN indication studies

9   or related data."

10        Do you see that?

11   A. I see that.

12   Q. And perhaps this subject is better talked

13   about from a perspective of Phase II and then

14   Phase III trials. There were first Phase II studies

15   done under -- for EINSTEIN, and those being the

16   EINSTEIN DVT study and the ODIXa-DVT study; is that

17   right?

18   A. That is correct, yes.

19   Q. Okay. And then following those two studies,

20   that led to the Phase III program for EINSTEIN; is

21   that right?

22   A. That is correct.

23   Q. Okay. Now, one of the committees that is

24   listed on your CV that is part of Exhibit 2 which is

25   attached to this deposition was the joint steering

22: 1   committee between Bayer and J & J; is that right?

2   A. That is -- that is correct.

3   Q. Okay. And you, of course, were aware that

4   there was an agreement with the J & J on

5   codevelopment of Xarelto; is that correct?

6   A. That is correct.

7   Q. Okay. And did that joint agreement with J &

8   J cover the development of the VTE treatment or

9   EINSTEIN indication?

10   A. I -- as -- I mean, related to the activities

11   that had happened after we concluded that

12   collaboration and partnership with J & J, yes.

13   Q. Okay.

14   A. Meaning that there had been activities before

15   we concluded that partnership agreement.

16   Q. Right. That partnership agreement wasn't

17   reached until sometime in late 2005?

18   A. Correct.

19   Q. All right. But after that point, J & J? The

20   development of the VTE treatment indication was part

21   of the joint development agreement; is that right?

22   A. Yes.

23   Q. Okay. Between Bayer and J & J, did you --

24   who had primary responsibility for the development

25   activities related to the VTE treatment indication?

23: 1   A. It was Bayer.

2   Q. Okay. And J & J's responsibility with

3   respect to the development and the clinical trial

4   program for VTE treatment, what did that involve?

5   A. Say it again.

6   Q. Sure. I was going to try to say what I

7   thought it was, but I'm going to let you tell me.

8        What was -- what was J & J's responsibility

9   with respect to the VTE treatment development, the

10   clinical trial program for the VTE treatment

11   indication?

12   A. They were regularly apprised and informed

13   about everything that was going on. And of course

14   they had had a say in all key decisions, like the

15   design of the clinical trial, et cetera, but they

16   were not involved in the day-to-day operational

17   conduct of the trial.

18   Q. Okay. The regulatory submissions to the US

19   FDA, were they responsible for those?

20   A. Yes.

## Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

| | |
|---|---|
| 21 Q. Okay. | 3 guess, 3 is the e-mail that you sent on July 20th of |
| 22    MR. HOROWITZ: Just give a little pause | 4 2004, the subject being "Minutes of the Expert Meeting |
| 23 between his question. | 5 on VTE Treatment in Amsterdam July 17, 2004." |
| 24 BY MR. OVERHOLTZ: | 6    Do you see that? |
| 25 Q. I know you can understand where I'm going to | 7 A. I do see. |
| 24: 1 go, but it's better for the court reporter and the | 8 Q. Okay. And do you recall there being a |
| 2 video and everything else if you let me finish my | 9 meeting related to VTE treatment in Amsterdam back in |
| 3 questions before you answer. | 10 2004? |
| 4    MR. HOROWITZ: Also gives me a chance to | 11 A. I recall that, yes. |
| 5 shout at Neil if I have to. | 12 Q. Okay. Were there any expert meetings |
| 6 BY MR. OVERHOLTZ: | 13 regarding VTE treatment prior to this Amsterdam |
| 7 Q. So let's -- let's start kind of back in time. | 14 meeting in July of 2004? |
| 8 You mentioned that there had been some activities even | 15 A. Yes. |
| 9 before the J & J collaboration. Do you recall when | 16 Q. Okay. Can you tell me when and where those |
| 10 the decision was made to pursue the VTE treatment | 17 were? |
| 11 indication for Xarelto by Bayer? | 18 A. Not exactly the date, but I can testify that |
| 12 A. At a strategically high level, that has been | 19 we had had meetings in setting up and planning the |
| 13 in the plans very early on, from the beginning. It | 20 ODIXa-DVT trial which was already running during that |
| 14 was clear in the early years of starting the clinical | 21 expert meeting on July 17th, 2004. |
| 15 development which started in the indication of VTE | 22 Q. Do you recall the locations of any of those |
| 16 prevention, but it was already clear at that time | 23 meetings? |
| 17 that people want to eventually move into the | 24 A. Not by heart. I would need to look it up. |
| 18 indication of VTE treatment as well. | 25 Q. Okay. And if we -- if you look at your |
| 19 Q. Okay. And do -- do you have an understanding | 27: 1 e-mail, you send it to several people, including Klaus |
| 20 that the VTE treatment indication was intertwined with | 2 Wehling, as well as Dagmar Kubitza, and you say: |
| 21 the AFib indication? | 3 "Dear All, please find the final draft of the minutes |
| 22    MR. HOROWITZ: Objection; form. | 4 of the AM meeting." |
| 23 A. It -- it was always our desire to develop | 5    Do you see that? |
| 24 rivaroxaban in a broad set of indications that would | 6 A. I see that. |
| 25 typically be served either with low molecular weight | 7 Q. And then if we can look at Exhibit 4, is the |
| 25: 1 heparins or Zofran or vitamin K antagonists, broadly | 8 attachment to this e-mail, correct? |
| 2 speaking. So, of course, chronic indications would | 9 A. Uh-huh. That is correct. |
| 3 include stroke prevention and atrial fibrillation, as | 10 Q. And if we look at Exhibit 4, it says: |
| 4 well as VTE treatment. | 11 "Planning group meeting, ODIXa- Bay 59-9939, |
| 5 Q. Did Bayer have a belief that the VTE | 12 July 17th, 2004, Amsterdam." |
| 6 treatment development program was necessary in order | 13    That Bay 59-9939, just so we're clear for |
| 7 to have a timely submission for regulatory approval | 14 this deposition, that's Bayer's way of relating -- |
| 8 for the AFib indication? | 15 referring to rivaroxaban; is that correct? |
| 9    MR. HOROWITZ: Form. | 16 A. That is correct. |
| 10 A. I -- no. The answer is no. | 17 Q. Okay. And listed as present are several |
| 11    MR. OVERHOLTZ: Okay. Let me show you what | 18 people there, including G. Agnelli, H. Bounameaux, |
| 12 we'll mark as -- this is going to be Exhibit | 19 H. Buller, as well as several other people, including |
| 13 Number 3. It's Bates Xarelto BPAG19150684. It's | 20 yourself. |
| 14 Record Number 3228102. | 21    Do you see that? |
| 15 And I'll go ahead and give you what we'll | 22 A. I see that. |
| 16 mark as Exhibit Number 4, which is Record Number | 23 Q. Okay. Now, this group of experts, were these |
| 17 3228103, which is Bates BPAG19150685. | 24 experts that you were working with in relation to the |
| 18    (EINSTEIN 30(b)(6) Exhibit 3 was marked for | 25 ODIXa-DVT treatment study? |
| 19 identification.) | 28: 1 A. Partly. |
| 20    (EINSTEIN 30(b)(6) Exhibit 4 was marked for | 2 Q. Okay. Were some of these experts working on |
| 21 identification.) | 3 the VTE prophylaxis or prevention indication studies? |
| 22    (Discussion off the record.) | 4 A. No. |
| 23 BY MR. OVERHOLTZ: | 5 Q. Okay. |
| 24 Q. Exhibit 4 is the attachment. | 6 A. Well, with the exception of the Sebastian |
| 25    MR. HOROWITZ: When you're ready. | 7 Schellong. |
| 5: 1 Q. Yeah. Just let me know. | 8 Q. Okay. So Bayer employees listed here include |
| 2 The -- what is marked as Exhibit Number, I | 9 yourself as well as Ton Lensing? |

*Handwritten annotation: Overruled 611(c)*

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

10    A. That is correct.

11    Q. Okay. And which of these experts were

12      working on the VTE treatment indication?

13    A. Meaning generally --

14    Q. Yes, generally.

15    A. -- as their field of expertise?

16    Q. Yes.

17    A. Basically all of them.

18    Q. Okay. And did some of them end up working

19      through the -- and being part of the clinical trial

20      team for the -- either the Phase II or the Phase III

21      EINSTEIN trials?

22    A. Correct.

23    Q. And who would that be?

24    A. Giancarlo Agnelli and Alexander Gallus

25      participated in the ODIXa-DVT trial and then also

29:   1      later in more activities, but starting with that.

2    Q. Okay.

3    A. And Harry Buller, Mike Gent, Martin Prins,

4      Gary Raskob, and Annelise Segers also participated in

5      the EINSTEIN program.

6    Q. Okay. And you see that this, according to

7      these meeting minutes that you attached, the meeting

8      was organized to discuss the clinical development

9      program for Xarelto and venous and arterial

10      thrombosis.

11      Do you see that?

12    A. Yes, I do see that.

13    Q. Okay. And if we look under the "Agenda

14      items," under the first item is "Background," and

15      there are three bullet points.

16      Do you follow with me?

17    A. Uh-huh. Yes.

18    Q. Okay. And listed on Number 3 is the "Current

19      dose finding study."

20      Do you see that?

21    A. Yes, I do.

22    Q. Okay. And that was referring to the

23      ODIXa-DVT dose-finding study?

24    A. Correct.

25    Q. Okay. And second listed is: "Strategies for

30:   1      fast development, Alternative/next Phase II/III

2      studies."

3      Do you see that?

4    A. Correct.

5    Q. Okay. Was there a desire at Bayer that the

6      development of Xarelto needed to be fast?

7      MR. HOROWITZ: Objection; form.

8    A. Well, I mean, that, I guess, is a general

9      statement. We always want to develop important new

10      drugs that have the potential to address important

11      medical needs as far as possible.

12    Q. Okay. And if we look under "Background," the

13      first bullet point, it says: "Taking into account the

14      competition, the development of Bay 59-7937," or

15      Xarelto, "must be fast."

16      Do you see that?

17    A. I see that sentence.

18    Q. Okay. So Bayer was aware that there were

19      other pharmaceutical companies developing potential

20      other oral anticoagulants that would be in the same

21      marketplace as Xarelto; is that right?

22    A. That is correct.

23    Q. Okay.

24    A. But it was also meant to say that it makes

25      sense to have broad and strategic discussions even

31:   1      before the data from the ODIXa-DVT trial become

2      available.

3    Q. And the next sentence, you say -- or the

4      minutes of this meeting say that: "In June 2005, data

5      should be available to make sound decisions regarding

6      the dose for the Phase III program."

7      Is that what it said?

8    A. That is correct.

9    Q. Okay. And so we talked a little bit about

10      the fact that there was the current dose-finding study

11      underway, the ODIXa-DVT, and that is described down

12      below in the last bullet point on the page; is that

13      right?

14    A. That is correct.

15    Q. Okay. And so we can kind of have an

16      understanding of what the ODIXa dose-finding study

17      was, tell me what's your understanding of what was

18      that -- what doses was that study looking at and about

19      how many patients were being studied in the ODIXa-DVT

20      study?

21    A. The ODIXa-DVT was a typical Phase IIB trial

22      in the indication of VTE treatment, to be precise,

23      deep vein thrombosis treatment, so we did exclude

24      patients presenting with a pulmonary embolism. We

25      studied, in the parallel group design, a number of

32:   1      doses and in particular BID doses, namely 10, 20, and

2      30 milligrams given twice a day, as well as in one

3      dose arm a 40 milligram once-a-day dosing regime, in

4      comparison to the standard of care, which was the

5      combination of a low molecular weight heparin given

6      initially, in this case enoxaparin, overlapped and

7      followed chronically by a vitamin K antagonist.

8      As it is typically the case in these type of

9      dose-finding trials, you aim to have about 100

10      patients per dose arm so that you can reasonably well

11      predict dose trials.

12    Q. Okay. Now, we -- you mentioned that there

13      were three BID or twice daily dosing arms to the

14      study; is that right?

15    A. That is correct.

16    Q. Okay. And those were done in 10-, 20-, and

17      30-milligram doses, correct?

18    A. That is correct.

19    Q. Okay. The 40-milligram OD doze, that's a

20      once daily dose; is that right?

21    A. That is correct.

22    Q. Okay. The OD -- the 40-milligram OD dose,

23      was that part of the original protocol for the

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

24 ODIXa-DVT study?

25 A. Yes.

33: 1 Q. Okay. The company had also conducted

2 Phase II studies in the VTE prevention or prophylaxis

3 development; is that right?

4 A. That is correct.

5 Q. Okay. And the -- in that development

6 program, in the Phase II program for the VTE

7 prevention indication, had both BID and OD doses been

8 studied?

9 A. In the very early Phase IIA trials, yes.

10 Q. Okay. So was the ODIXa-DVT trial the first

11 Phase IIB trial to look at once daily dosing?

12 A. Only the first in the VTE treatment

13 indication, not for the VTE prevention setting.

14 Q. Okay. In the VTE prevention setting, had any

15 Phase IIB studies been conducted looking at once daily

16 dosing?

17 MR. HOROWITZ: Let me just object to the

18 form. I think this is okay because you're tying

19 it to ODIXa-DVT, but just leaving the objection

20 there.

21 But go ahead and answer.

22 A. We had performed dedicated specific Phase IIB

23 trials in the setting or for the indication of VTE

24 prevention utilizing a once a day dosing regimen.

25 Q. Okay. Was the information related from the

4: 1 ODIXa hip study related to the once daily and twice

2 daily dosing, did that help inform the decision of

3 which doses to study in the ODIXa-DVT -- VTE treatment

4 trial?

5 A. Indirectly, certainly, yes. We know that as

6 a general rule, anticoagulants are typically being

7 given at higher doses for the treatment and so-called

8 therapeutic doses relative to the indication of VTE

9 prevention. Typically you would require a threefold

10 higher dose.

11 Q. Okay. And if you look with me just above the

12 bullet point related to the ODIXa dose-finding study

13 in DVT patients, it says: "PK/PD data. It was

14 perceived that the PK/PD data are in support of OD

15 administration. Food interaction studies showed a

16 improved absorption with food intake. A recent

17 Phase I study in elderly females revealed that there

18 is no further absorption if the OD dosage is above 40

19 milligrams. This indicates that 40 milligrams is the

20 highest OD dosage for future evaluation."

21 Do you see that?

22 A. I see that.

23 Q. Okay. And that was talking about a Phase I

24 study that was being conducted in elderly females; is

25 that right?

35: 1 A. Correct.

2 Q. Okay. What does it mean when it talks about

3 the fact that there is no further absorption if the

4 dosage is above 40 milligrams?

5 A. It says that there is a linear dose

6 relationship in terms of the absorption and a close

7 to 100 percent bioavailability of the drug after oral

8 intake up until doses of approximately 10, 15

9 milligram. The bioavailability drops slightly when

10 you administer higher doses. It improves with food.

11 And we have for the 20 milligram a bioavailability in

12 the range of 80 percent, 85 percent, which is very,

13 very good relative to many other drugs.

14 And when you give even more at even higher

15 doses, the absorption would drop further so basically

16 more drug is simply eliminated unchanged via the

17 feces.

18 Q. So there comes a point -- just so we

19 understand this, there comes a point in the dosing

20 where the patient is no longer having the drug

21 available for them once you go above a certain dose?

22 MR. HOROWITZ: Objection; form.

23 A. It -- it's not that the drug is not

24 available. It just says that the absorption pattern

25 is no longer linear and that your bioavailability

36: 1 drops.

2 Q. If there --

3 A. I mean, just to give an example, there are

4 other anticoagulants out there with an oral

5 bioavailability of 6 percent. We still enjoy a

6 bioavailability of exceeding 80 percent.

7 Q. But if there was a curve, the bioavailability

8 curve begins to flatten out above certain doses?

9 A. That is correct.

10 Q. Okay. And look with me at the third page.

11 There is an Item Number 2.

12 A. Uh-huh.

13 Q. And I want to look just above there. There

14 is a section that's still -- it's still within the

15 section talking about the ODIXa-DVT dose-finding

16 study.

17 Do you see that?

18 A. Yes.

19 Q. And it said: "The planning group

20 participants suggested," and there are three bullet

21 points.

22 Do you see that?

23 A. Yes.

24 Q. Okay. And the first suggestion was: "To

25 simplify PK/PD sampling and to stop sampling when a

37: 1 sufficient number of patients have been included."

2 Do you see that?

3 A. I see that.

4 Q. Okay. Now, I know that -- and some of your

5 other colleagues have been deposed a lot about PK/PD

6 and I know you were asked some questions about PK/PD,

7 but for the VTE treatment indication in ODIXa-DVT,

8 were PK/PD sampling -- samples being taken?

9 A. Indeed, yes.

10 Q. Okay. And what was the program for PK/PD

11 sampling in the ODIXa-DVT study?

12 A. We had performed frequently at a number of

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

13　visits blood draws to measure the plasma

14　concentrations of PK as well as measurement of

15　important pharmacodynamic parameters, including PT

16　measurements, a test called PiCT test, and a thrombin

17　generation potential.

18　Q. The plasma concentration measurements, how --

19　how was plasma concentration determined by Bayer in

20　the ODIXa-DVT study?

21　A. The way we determined the plasma

22　concentration of rivaroxaban is by mass spectrometry.

23　It's a sophisticated chemical test.

24　Q. If you look with me below -- well, let me ask

25　you this: This suggestion was -- was this suggestion

38:　1　taken by Bayer and were changes made to respect to the

2　PK/PD sampling?

3　A. Well, this suggestion has been made by

4　participants of that meeting and it was driven by

5　feasibility ideas and to keep a trial relatively

6　straightforward and simple, easy to perform,

7　et cetera. Not all of these suggestions had been

8　implemented.

9　Q. Do you know if there was a change made to the

10　PK/PD sampling program for the ODIXa-DVT trial?

11　A. For the ODIXa-DVT, no, not at all.

12　Q. Okay. Okay.

13　A. That was a running trial. We did not

14　interfere with the conduct of the trial based on such

15　expert meeting.

16　Q. Okay. Now were any PK/PD samples taken in

17　the Phase III EINSTEIN trials?

18　A. We did take PD samplings, yes.

19　Q. PD samplings?

20　A. Yeah.

21　Q. And when were those samples taken?

22　A. Again, at various time points, just making

23　sure that the drug is at steady stage and to capture

24　both trough and peak values.

25　THE COURT REPORTER: And to?

39:　1　THE WITNESS: Capture those trough and peak

2　values.

3　BY MR. OVERHOLTZ:

4　Q. Just so we're clear, you're talking about PT,

5　prothrombin time?

6　A. Correct.

7　Q. Okay. And do you know how PT was measured in

8　the Phase III EINSTEIN trials? Is that Neoplastine?

9　A. As far as I remember, it has been Neoplastine

10　Plus as a very sensitive PT reagent.

11　Q. If we look under Item Number 2, it says:

12　"Strategy for an accelerated development."

13　Do you see that?

14　A. Yeah, I do see that.

15　Q. Okay. Now, at this point in time, had the --

16　had anything been done with respect to the EINSTEIN

17　DVT dose-finding study?

18　MR. HOROWITZ: Objection; form.

19　A. No. That has -- I mean, it -- this was in

20　part the topic for discussion here at that meeting.

21　Q. Right. And so part of this discussion that's

22　listed here under Item Number 2 is to determine what

23　type of additional dose-finding study could be done or

24　should be done; is that right?

40:　1　A. Correct. But not limited to it. This expert

2　panel discussion in July in Amsterdam was a very

3　broad meeting, brainstorming on options how to move

4　then late in the program also into Phase III.

5　But there was more of a brainstorming type of

6　discussion and, indeed, more detailed ideas or

7　proposals or scenarios have been discussed with

8　regard to what later became the EINSTEIN DVT

9　dose-finding trial.

10　Q. Okay. And the EINSTEIN DVT dose-finding

11　trial, it looked at several different once daily

12　dosing regimens; is that right?

13　A. Correct.

14　Q. Okay. And what -- what dosing regimens did

15　EINSTEIN DVT dose-finding study look at?

16　A. We elected to investigate 20, 30, and 40

17　milligram once a day, relative to the standard of

18　care at that time, once again the enoxaparin --

19　overlapped and chronically continued by vitamin K

20　antagonists.

21　Q. Was the comparator in the EINSTEIN DVT trial

22　the same as in the ODIXa-DVT trial?

23　A. Yes.

24　Q. Okay. What about the determination of the

25　efficacy outcome? In the ODIXa-DVT trial, a surrogate

41:　1　outcome had been used; is that right?

2　A. Yes, that is correct. We always need to keep

3　in mind that Phase II trials are learning trials,

4　exploratory trials. So regardless of what has been

5　defined as a primary outcome, we always look at

6　multiple other outcomes as well. And so indeed there

7　had been focus on a surrogate outcome after three

8　weeks, while we also looked at clinical outcomes

9　throughout the conduct of the trial.

10　Q. Okay. And what was the surrogate outcome

11　that was looked at in the ODIXa-DVT dose-finding

12　study?

13　A. It was an extremely important surrogate

14　outcome that really informed us a lot about the

15　ability of rivaroxaban to treat an active clot.

16　Unlike in the prevention study, here we have a

17　present clot and we want to look whether the clot

18　reduces in size upon treatment.

19　So what we have done is to measure the clot

20　at presentation, and conclusion of patients, and then

21　repeat the measurement after three weeks to see

22　whether or not the thrombus would regress, would

23　actually melt down, become smaller, and we can

24　measure that and determine the number or the

25　proportion of patients who would respond to

treatment.

42:　1　Q. So in the ODIXa-DVT trial, the clot size was

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

2    measured using an imaging technique; is that right?

3    A. That's correct.

4    Q. And was the -- was it ultrasound?

5    A. That is ultrasound.

6    Q. Okay. And in the EINSTEIN DVT dose-finding

7    Phase II trial, what were the efficacy outcomes that

8    were looked at there and were they different from the

9    ODIXa-DVT trial?

10    A. Here, the emphasis was put on clinical

11    outcomes, so recurrent venothrombotic events, but

12    also what has been called asymptomatic recurrences,

13    so in other words, again, an imaging technique to see

14    whether the thrombus would deteriorate.

15    Q. Okay. The patient population for EINSTEIN

16    DVT also excluded PE patients?

17    A. Yes.

18    Q. Okay. So we're just looking at deep vein

19    thrombosis patients?

20    A. Yes.

21    Q. Okay.

22    A. The patient population by and large was the

23    same.

24    Q. Okay. Now the asymptomatic recurrence, that

25    was looking at proximal DVTs; is that right?

43:  1    A. Yes, it was correct, because we focused

2    actually, the inclusion of patients with proximal

3    clots.

4    Q. Okay. And what is a "proximal clot"? What

5    does that mean?

6    A. Above the knee.

7    Q. Okay. And -- and the significance of being

8    above the knee for a patient was what?

9    A. These clots are larger, they have a greater

10    clinical impact, and importantly, they tend to break

11    up and embolize as a pulmonary embolism, which, of

12    course, is a very dangerous situation and can be

13    fatal.

14    Q. And how were the asymptomatic recurrences

15    determined? Through -- was there a particular

16    technique in the EINSTEIN DVT or just as reported by

17    the clinical investigators?

18    A. No, as reported by the clinical

19    investigators, that is the clinical recurrence rate.

20    Q. Okay.

21    A. And then there was another ultrasound imaging

22    performed to see whether there was asymptomatic

23    deterioration.

24    Q. Okay. So now if you look with me on this

25    planning program, the document from the planning group

44:  1    meeting, there's several scenarios listed. And the

2    first scenario is a new study with 20/30/40 milligram

3    OD surrogate outcome at three weeks.

4    That is essentially what the EINSTEIN DVT

5    trial did; is that right?

6    A. No, because we finally elected exactly these

7    doses, and we elected the once-a-day dosing regimen,

8    but no surrogate outcome at three weeks.

9    Q. Okay. So that was the difference, same

10    doses?

11    A. Yeah.

12    Q. Okay. Now, if you look with me in the -- so

13    what was the -- the surrogate outcome was measured in

14    EINSTEIN DVT at what time period, or was it just any

15    time during the --

16    A. It -- it -- I mean, if there was suspicion,

17    it could have been done at any time, but we

18    systematically did it at the end of the treatment

19    course.

20    Q. Okay. So if a clinical investigator

21    suspected that there might be and it was -- what would

22    be the -- could they use the imaging technique and

23    would it be used as the -- that would be one of the

24    clinical outcomes from the trial, if they then

25    discovered that there was, in fact, a proximal

45:  1    thrombus?

2    A. Yeah, just to -- to explain a little bit,

3    there -- there was the initial clot and that clot is

4    supposed to melt down and to get smaller. It, in

5    some cases, will disappear; in some cases, it

6    actually remains but pacifies over time.

7    Now, when you only look after clinical

8    recurrent events, you would see and look and apply

9    imaging techniques as to whether at another location,

10    not the location of the primary clot, there is a new

11    clot. So that is the recurrent events that must be

12    clinically symptomatic and will be very fine by

13    ultrasound or any other imaging technique.

14    Now, we added here whether or not the initial

15    clot was, again, growing. So that was a systematic

16    recurrent -- not recurrent, but actually a thrombus

17    deterioration.

18    Q. Okay. So if we look under the advantages of

19    the Scenario Number 1 was: "Comparison with initial

20    study and OD versus BID administration will be

21    possible."

22    Do you see that?

23    A. Yeah.

24    Q. And there's also disadvantages and it says:

46:  1    "3 weeks US as surrogate outcome is an unproven

2    concept. This surrogate outcome is not the outcome

3    that will be evaluated in the Phase III program."

4    Do you see that?

5    A. That is correct.

6    Q. Okay. And was that -- was that, in fact,

7    true, that that was not used in the EINSTEIN Phase III

8    trials?

9    A. That is what is actually -- the answer is

10    yes, and this is not unusual at all because very

11    often in dose-finding trials, you power the trial for

12    a surrogate outcome, whereas a clinically more

13    potentially relevant outcome would be tested in

14    Phase III. So it's not an unusual concept at all.

15    Q. So the fact that there was a different

16    outcome tested in the Phase III program, you didn't

## Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

16 believe to be an unusual situation?

17 A. Correct. However, it is desirable, generally

18 speaking, to be able to also test the

19 relevance for the Phase III already in Phase II.

20 Q. Okay. And so -- and we'll talk about the

21 Phase III EINSTEIN trials a little bit later, but just

22 for purposes of this discussion, what was outcome was

23 tested in the EINSTEIN Phase III DVT trial?

24 A. Recurrence of clinical symptomatic events.

25 Q. As reported by the clinical investigators?

47:1 A. And verified objectively by diagnostic

2 imaging.

3 Q. Okay.

4 THE COURT REPORTER: Say it again?

5 THE WITNESS: And verified objectively by

6 diagnostic imaging. I'm sorry if I'm speaking

7 too fast.

8 THE COURT REPORTER: And softly.

9 BY MR. OVERHOLTZ:

10 Q. The second scenario that was suggested was to

11 amend the present study and add the 20 and 30 OD, but

12 that was not what was done, right? A new EINSTEIN DVT

13 study was, in fact, undertaken, correct?

14 A. That is correct.

15 Q. Okay. Now, if you can turn with me over to

16 the next page, there is a "Conclusions" section. And

17 just so we're clear, I mean, the purpose of conducting

18 these two Phase II VTE treatment indication trials is

19 to choose a dose or doses to study in the Phase III

20 trial program; is that right?

21 A. That's an important objective, yeah.

22 Q. Okay. You want to make sure you have doses

23 that are being studied that are going to be

24 efficacious, but also doses that are within the safety

25 margin for the drug; is that right?

48:1 A. That is correct.

2 Q. Okay. And if you look with me under

3 conclusions, it says: "Scenario 2 and 5 were

4 considered as the most realistic option."

5 And it says: "The preferred dose rage for

6 Scenario 2 would be 20 and 30 milligrams OD."

7 Do you know why it was, at this meeting, it

8 was discussed that 20 and 30 milligrams OD would be

9 preferred?

10 A. I mean, this was one of the options. As you

11 can see, there are more options that have been

12 discussed. And the background against which we need

13 to interpret these discussions here that really were

14 brought up as a brainstorming from this group of

15 experts was we have that in VTE prevention, the

16 10-milligram dose OD had been selected to be tested

17 in Phase III, so that was deemed and determined as

18 the preventive dose.

19 And we know from many instances in the

20 literature, and it was actually really a paradigm,

21 that for a full-blown therapy of an existing clot,

22 typically a threefold higher dose would be required.

23 So that would lead you to expect that the

24 most likely dose is to be 30 milligram.

25 Q. Okay. And if you look with me, kind of the

49:1 second sentence there, it says: "The preferred dose

2 range for Scenario 5 would be 20 and 40 milligrams.

3 It might be more sensible however to choose 30

4 milligrams, this to be on the safer side to assure

5 efficacy since in this design the lower dosage will be

6 necessary as bailout if there is a bleeding problem."

7 Do you see that?

8 A. I see that.

9 Q. Okay. And too high a dose in the VTE

10 treatment indication could result in a bleeding

11 problem; is that right?

12 A. It was a theoretical consideration, as with

13 any other anticoagulant.

14 Q. But based on what information Bayer had with

15 respect to the use of enoxaparin in this scenario,

16 followed by vitamin K, that you needed a dose that

17 would at least be as efficacious as what is currently

18 the standard of care, right?

19 A. That is partly correct. And I also want to

20 add here that at that time, we had these discussions

21 ongoing, there was a lot of anxiety to underdose,

22 because of the fear particularly, when it comes to

23 the treatment of pulmonary embolisms, a not effective

24 dose leading to potentially fatal pulmonary embolisms

25 as this had recently been documented for other

50:1 anticoagulants under development.

2 Q. You didn't want to go into the trial with too

3 low of a doses?

4 A. It would actually harm the patient. It has a

5 potential to put the patient as unnecessary risk.

6 Q. And that's the -- really the issue, and I

7 know you've talked about this in your previous

8 deposition, but that's the issue with anticoagulation.

9 You need high enough to be efficacious but a low

10 enough dose to avoid unnecessary bleeding?

11 A. We need to do a lot of clinical workup to

12 define the right balance of benefit/risk.

13 Q. Okay. The -- there's an additional

14 discussion points down below, and the first one says:

15 "Separate studies for PE and DVT,"

16 Do you see that?

17 A. I see that, sir.

18 Q. Okay. Now, was this discussion regarding the

19 Phase II or the potential Phase III studies that would

20 be conducted?

21 A. This is more a very early general discussion

22 about options we have for Phase III.

23 Q. Okay. In the Phase III program, there was

24 the EINSTEIN Phase III trial, but there are

25 essentially two trials within one protocol; is that

51:1 right?

2 A. Correct.

3 Q. There was one protocol but one DVT Phase III

4 trial, and then a pulmonary embolism Phase III trial?

5   A. Correct.

6   Q. Okay. The dose-finding studies that were

7   done were only conducted in DVT patients, not

8   pulmonary embolism patients?

9   A. Correct.

10   Q. Okay. It says: "Separate PE and DVT studies

11   seem to be the best approach since two pivotal trials

12   are required by the authorities due to the

13   noninferiority design."

14     Do you see that?

15   A. I see that.

16   Q. Okay. It says: "The PE study might be done

17   with only two arms, one dosage, a comparator, and can

18   start once the interim analysis has been concluded of

19   the Scenario 5 DVT study."

20     Do you see that?

21   A. I see that.

22   Q. Okay. The EINSTEIN Phase III DVT study

23   started before the EINSTEIN Phase III pulmonary

24   embolism study; is that right?

25   A. We actually proceeded with the preparation of

52: 1   both trials at the same time. We approved the

2   protocol at the same time, and, maybe due to trial

3   logistics, one trial, the DVT trial, may have started

4   earlier; but there was no intended big delay between

5   the two trials.

6   Q. As far as the difference of when those trials

7   concluded, that was driven more as a result of

8   logistics, issues like recruitment, things like that;

9   is that right?

10   A. Indeed. That is correct.

11   Q. Okay. Now, the second bullet point talks

12   about: "Extension of treatment up to one year or

13   longer incorporated in the same study or a new study."

14     Do you see that?

15   A. Yes, I do see that.

16   Q. There, in fact, was a EINSTEIN extension

17   study conducted; is that right?

18   A. Correct.

19   Q. Okay. And that was a separate study

20   conducted under the same protocol as well; is that

21   right?

22   A. That was a different protocol.

23   Q. Had a different protocol? Had its own

24   protocol?

25   A. Yeah.

53: 1   Q. Okay. And the EINSTEIN extension study

2   involved the continued use or -- well, let me ask you

3   this: People that had been involved in the EINSTEIN

4   DVT trial, or the EINSTEIN PE trial, they can be

5   enrolled into the EINSTEIN extension study; is that

6   correct?

7   A. As part of it, but it was not limited to

8   earlier study participants.

9   Q. Patients that had not been part of this study

10   at all could also become enrolled in the extended

11   study?

12   A. Yes.

13   Q. There was only requirements related to

14   whether or not they had completed a treatment program

15   for either their DVT or PE; is that right?

16   A. Correct.

17   Q. Okay. And there was some debate, but

18   eventually they ended they had either completed six or

19   12 months of treatment, plus or minus a couple of

20   months, for their DVT?

21   A. That is correct. And that is correct for the

22   reason that this trial aimed to randomize patients to

23   placebo, and of course you need to make sure that

24   only patients who completed their guideline

25   recommended treatment duration would then become

54: 1   eligible for that randomization to placebo.

2   Q. Was there -- did the protocol set out the

3   percentage makeup of how the extension trial would be

4   conducted with respect to how many would have been

5   part of the EINSTEIN Phase III trial program or how

6   many would be new patients coming into the study?

7   A. No, we did not prespecify any particular

8   proportion.

9   Q. Okay. How were patients from the EINSTEIN

10   either DVT or PE Phase III trials, how were they

11   recruited into the EINSTEIN extension study?

12   A. Upon completion of the trial, once they

13   completed the initial typically EINSTEIN DVT trial,

14   they were offered the option of participating in the

15   EINSTEIN extension trial, particularly if and when

16   the treating physician found that the patient has

17   equipoise to potentially benefit from an extended

18   treatment.

19   Q. Okay. So the -- was every patient offered

20   the opportunity to enroll into the EINSTEIN extension

21   study?

22   A. No, because some were deemed to not

23   benefitting from an extended treatment use. I give

24   you an example. A patient who would develop a deep

25   vein thrombosis as a result of a broken leg and

55: 1   plaster cast, that is what we call a "trigger event"

2   that leads potentially to a thrombosis, but typically

3   these thrombosis are relatively mild and, according

4   to guidelines, require a treatment of only a few

5   months and then you stop. The risk of recurrent

6   events is relatively low for these particular

7   patients.

8     So they would actually not be eligible to be

9   randomized into an extension trial because the

10   anticipated benefit is low. whereas a patient who

11   would have completed -- who developed a clot

12   spontaneously, unprovoked, and was treated for six

13   months, and there is some doubt as to whether should

14   I potentially extend the treatment for another six

15   months up until 12 months, these were the patients

16   that were offered to randomize in the extension

17   trial.

18   Q. And was it the judgment of the clinical

## Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

19 investigator that would make that decision?

20 A. Yes. Well, it -- the situation --

21     MR. HOROWITZ: Slow down a little bit.

22 You jumped over him. It's understandable.

23     THE WITNESS: Sorry.

24     MR. HOROWITZ: Just try to let him finish his

25 question, a little pause, and then give your

56: 1 answer.

2 BY MR. OVERHOLTZ:

3 Q. Okay. Was it the judgment of the clinical

4 investigator to decide who to offer the extension

5 study to?

6 A. Indeed, it was finally the judgment of the

7 treating physician and investigator; but it was also

8 in accordance to existing guidelines. The situation

9 is relatively clearly described in guideline

10 documents.

11     MR. OVERHOLTZ: And we're probably moving up

12 on -- well, I don't know -- how long do we want

13 to go before we take breaks today?

14     MR. HOROWITZ: Are you still good or -- are

15 you good?

16     MR. OVERHOLTZ: I'm good for right now, yeah.

17 Why don't we go for a few more minutes and go for

18 a little bit.

19     MR. HOROWITZ: It's a friendly discussion so

20 far.

21     MR. OVERHOLTZ: Certainly a little bit

22 faster. I appreciate your speaking English

23 today. It moves a little bit quicker than our

24 German language deposition.

25     MR. HOROWITZ: You can speak in Russian if

57: 1 you want.

2     MR. OVERHOLTZ: He certainly can.

3 BY MR. OVERHOLTZ:

4 Q. The extension -- the Phase -- the Phase III

5 EINSTEIN trials were open label, the DVT, and the PE?

6 A. That's correct.

7 Q. Okay. The extension study was double blind;

8 is that right?

9 A. That is correct.

10 Q. Okay. When patients were recruited into the

11 extension study, were they told that they would be

12 going into a double-blind study where they might get

13 the treatment or they might get placebo?

14 A. Sure.

15 Q. Oh. And so a patient would know that

16 "There's a chance I'm going to get into an extension

17 trial where I might not get any treatment at all; I

18 might just take a placebo pill"?

19 A. That's fully correct. And that's a matter of

20 informed consent, and that's why taking the informed

21 consent is so important.

22 Q. Okay. And just so we're clear, because I was

23 going to ask you about it before, but you mentioned

24 that the comparator that was set up for the extension

25 trial was placebo, right?

58: 1 A. Correct.

2 Q. Some form of a sugar pill with no active

3 medicine; is that right?

4 A. That is correct.

5 Q. Okay. Who made the decision that the

6 comparator for the extension trial would be a placebo?

7 A. Well, we finally made that decision. We, of

8 course, sought advice by our group of experts and by

9 then also the steering committee of the trial

10 program. But it was also fully in line with the

11 guidelines at that time, and still these guidelines

12 are in place.

13 Q. There's a sort of trial ongoing now in

14 EINSTEIN comparing long-term continued usage of

15 Xarelto as compared with daily aspirin.

16 A. That is correct.

17 Q. Okay. And Bayer makes aspirin, of course?

18 A. We do make aspirin, yes.

19 Q. Why didn't the initial EINSTEIN extension

20 study compare to at least aspirin?

21 A. For a very simple reason: We simply did not

22 have any clinical data about the effectiveness and

23 safety of aspirin in this indication. But during the

24 last couple of years, there had been two important

25 large clinical trials published, using aspirin versus

59: 1 placebo, showing that aspirin is actually provided

2 some level -- albeit limited level, but some level of

3 efficacy and was proven to be well protected and

4 relatively safe in this indication. And hence, we

5 felt it was appropriate to utilize this as a

6 potential new standard for these type of extension

7 trials.

8     These data only became available after we had

9 concluded the EINSTEIN program for the initial

10 submission.

11 Q. Were those trials that -- were those studies

12 that Bayer conducted or others?

13 A. No, no. Those were trials by academic groups

14 in Australia and Canada, if my memory is correct.

15 Q. Is that -- I'm sorry. I didn't mean to

16 interrupt you.

17     The Phase IV trial related to comparison of

18 Xarelto to aspirin use. Is that a -- is that the

19 EINSTEIN Choice trial?

20 A. This trial is called EINSTEIN Choice, but

21 it's not a Phase IV trial.

22 Q. Oh, it's not a --

23 A. It's another Phase III trial.

24 Q. Okay. If you look with me under that second

25 bullet point, the last sentence of that point says:

60: 1 "The preference would be to use ximelagatran as a

2 comparator because this would allow a double-blind

3 design."

4 A. Where are you?

5 Q. The second bullet point under "Additional

6 Discussion Point."

7 A. Yeah, I've got it. Yeah.

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

8  Q. Yeah. Now, "The preference would be to

9  use" -- I call it ximelagatran -- "as a comparator

10  because this would allow a double-blind design."

11    Do you see that?

12  A. I see it.

13  Q. Now, what was ximelagatran?

14  A. Ximelagatran was a direct thrombin inhibitor

15  drug that was under development and recently -- I'm

16  actually not even sure if it was approved by that

17  time we had this discussion, but it was about to be

18  approved soon.

19    So that was another novel oral anticoagulant,

20  actually, the very first one, amongst others, that

21  had been developed from AstraZeneca. And it was,

22  unfortunately, associated with liver problems and

23  later withdrawn from the market.

24  Q. Was it ever approved in the United States?

25  A. No.

61: 1  Q. And that was as a result of liver toxicity;

2  is that right?

3  A. Yeah.

4  Q. The next bullet point talks about dose

5  finding in atrial fibrillation.

6    Do you see that?

7  A. Uh-huh, yes.

8  Q. And it was -- in fact, there was no -- and

9  I'm not trying to go off topic here, but just to talk

10  **about the use of VTE data. The VTE treatment**

11  **data, those are the only dose finding studies that**

12  **were done to choose the dose for the Phase III Afib**

13  **trials, right?**

14  **A. That is correct.**

15  **Q. The ROCKET trial, right?**

16  **A. (Nodding head.)**

17  **Q. Is that right?**

18  **A. That is correct.**

19  Q. And what this bullet point says is that:

20  "Although with ximelagatran, a dose-finding study was

21  done in this indication, it is possible to select a

22  dose for this indication based on the information from

23  the VTE treatment and prophylaxis studies."

24    Do you see that?

25  A. I see that.

62: 1  **Q. Okay. And that is, in fact, what was done by**

2  **Bayer with respect to Xarelto, is that the dose for**

3  **the ROCKET Afib trial was based upon the VTE treatment**

4  **dose finding studies, ODIXa-DVT, and EINSTEIN DVT; is**

5  **that correct?**

6  **A. That is correct.**

7    MR. HOROWITZ: Let me just put an objection

8    to preserve it for the record and just make it

9    clear that that's where -- nobody is disputing

10    that fact. So that's -- if that's as far as

11    you're going to go, that's fine.

12  Q. The Phase III VTE treatment program,

13  EINSTEIN, and the EINSTEIN extension, tested one

14  dosing regimen even though there was an initial

15  three-week period of BID dosing and then followed up

16  by 20 milligrams once daily dosing; is that right?

17  A. The long-term maintenance indeed was a once a

18  day dosing regimen preceded by, as you mentioned,

19  this intensified treatment regimen BID for the first

20  three weeks.

21  Q. So when we talk about the long-term --

22  there's -- for the EINSTEIN Phase III trials, there is

23  an intensified treatment regimen period, three-week

24  initial period?

25  A. That is correct.

63: 1  Q. And then that's followed by the long-term

2  treatment period; is that correct?

3  A. That is correct.

4  Q. Okay. And so let's just talk about the

5  long-term treatment period for a minute, and then

6  we'll come back and talk about the intensified

7  treatment period.

8    Under the long-term treatment period, the

9  dose that was studied in the Phase III trials was the

10  20 milligram OD dose, correct?

11  A. Correct.

12  Q. That was the same dose that was used in the

13  ROCKET Afib trial; is that right?

14  A. That is correct.

15  Q. Okay.

16  A. With the caveat that we offered a dose

17  adaptation in renally impaired patients to 15

18  milligram in ROCKET.

19  **Q. Correct. The -- and only the 20 milligram OD**

20  **dose was the only dose studied for the long-term**

21  **treatment period in the EINSTEIN Phase III trials,**

22  **right?**

23  **A. That -- do you mean the setting of EINSTEIN**

24  **extension?**

25  **Q. Just the EINSTEIN PE and EINSTEIN DVT trial.**

64: 1  **A. Yes, that's correct.**

2  **Q. No other doses as far as, for example, 15**

3  **milligrams or 10 milligrams, just the 20 milligram OD**

4  **dose, right?**

5  **A. That is correct.**

6  **Q. Okay. And also a BID dose -- for that part**

7  **of the trial, the long-term treatment period of the**

8  **EINSTEIN studies, there was no BID dose studied?**

9  **A. That is correct, as well.**

10  **Q. Okay. If you look at this last bullet point,**

11  **it says: "Although most participants were in favor of**

12  **once daily dosing, some remained in favor of BID**

13  **dosing and proposed to proceed also with this dosing**

14  **regimen."**

15    Do you see that?

16  A. I see that sentence.

17  **Q. It would have been possible for Bayer to test**

18  **both a BID and once daily dose for the long-term**

19  **treatment period in the EINSTEIN Phase III trials,**

20  **correct?**

21  **A. It's a theoretical consideration.**

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

| | | |
|---|---|---|
| 22 | Participants, in part, included individuals that were | |
| 23 | actively involved in the conduct of the ODIXa-DVT | |
| 24 | trial. And I think the discussion, once daily dosing | |
| 25 | was twice daily dosing, was also influenced by the | |
| 65: 1 | strongly felt necessity for an intensified regimen at | |
| 2 | the very beginning. So I think this particular | |
| 3 | bullet point cannot be seen just for the long-term | |
| 4 | chronic treatment phase. | |
| 5 | MR. OVERHOLTZ: I'm just going to object to | |
| 6 | the part after "it's a theoretical consideration" | |
| 7 | as nonresponsive. | |
| 8 | BY MR. OVERHOLTZ: | |
| 9 | Q. Sometimes I'll object, as well, but you don't | |
| 10 | have to take it personally. | |
| 11 | A. Right. | |
| 12 | Q. The -- it's certainly possible to study both | |
| 13 | the once daily or twice daily dosing regimen in a | |
| 14 | Phase III clinical trial? | |
| 15 | MR. HOROWITZ: Objection; form. | |
| 16 | A. It may be possible, but it is actually not | |
| 17 | usual at all. Typically, that's remit of Phase II | |
| 18 | trials, to determine one dose that you would then | |
| 19 | study further on in your pivotal program. | |
| 20 | **Q. You would certainly agree that at the time** | |
| 21 | **that the Phase III EINSTEIN trials began, that Bayer** | |
| 22 | **had very limited data comparing the efficacy and** | |
| 23 | **safety of once daily dosing to twice daily dosing for** | |
| 24 | **Xarelto, correct?** | |
| 25 | **A. We had found a number of comparisons between** | |
| 66: 1 | **OD and BID, and we had done -- considering the time** | |
| 2 | **we embarked on the Phase III program, we had done two** | |
| 3 | **dose ranging trials, one predominantly with BID** | |
| 4 | **dosing and another one which predominantly was OD** | |
| 5 | **dosing, so I think we did fully explore that space** | |
| 6 | **and were able to derive an appropriate dosing** | |
| 7 | **selection.** | |
| 8 | Q. You agree that the most important indication | |
| 9 | for Bayer at this time, with respect to the | |
| 10 | development of Xarelto, was the Afib indication? | |
| 11 | MR. HOROWITZ: Objection; form. You know, | |
| 12 | that I'm not going to have him answer. You're | |
| 13 | getting outside -- he's not here to talk about | |
| 14 | Afib. I understand the question is about, you | |
| 15 | know, the very basic questions about the | |
| 16 | relationship between the Phase II and the Phase | |
| 17 | III, but he's not going to talk about Afib. He's not | |
| 18 | here to talk about that. | |
| 19 | So don't answer the question. | |
| 20 | MR. OVERHOLTZ: I would disagree with your | |
| 21 | objection, Jeff. I think we can clear it up | |
| 22 | maybe with a document, but I think it's part of | |
| 23 | this because how Bayer conducted the VTE trial | |
| 24 | program is certainly influenced by how they saw | |
| 25 | that indication. | |
| 67: 1 | MR. HOROWITZ: Maybe there is a way that you | |
| 2 | can get there. But the way you asked that | |
| 3 | question, he's not going to answer it. | |

| | | |
|---|---|---|
| 4 | BY MR. OVERHOLTZ: | |
| 5 | **Q. Do you agree, Dr. Misselwitz, that Bayer** | |
| 6 | **believed that the VTE indications were simply** | |
| 7 | **premarketing for the Afib indication?** | |
| 8 | MR. HOROWITZ: Objection; form. | |
| 9 | A. I would not agree. | |
| 10 | Q. And do you believe that Bayer believed that | |
| 11 | any delay in the submission of VTE indications would | |
| 12 | jeopardize the submission of the Afib package for | |
| 13 | approval? | |
| 14 | A. No. | |
| 15 | Q. At this point in development -- I mean, we | |
| 16 | just got through talking in 2004. In this 2004 or | |
| 17 | 2005 time frame, did Bayer believe that the | |
| 18 | competitors in the VTE treatment indication arena | |
| 19 | would be likely using once daily formulations? | |
| 20 | MR. HOROWITZ: Objection; form. | |
| 21 | A. I think we had knowledge of both options, OD | |
| 22 | and BID; and I think it was, at that point in time, | |
| 23 | hard to predict how things would be going. | |
| 24 | Q. I asked you about the possibility of studying | |
| 25 | both BID and OD studies in the VTE treatment Phase III | |
| 68: 1 | trials. | |
| 2 | Was one of the reasons why Bayer chose not to | |
| 3 | study both the BID and once daily dose in the Phase | |
| 4 | III VTE trial because they believed that it would be | |
| 5 | difficult to recruit enough patients to study those? | |
| 6 | A. No. | |
| 7 | Q. Let me show you what we'll mark as Exhibit 5 | |
| 8 | and 6, Record 43438 and 43439. | |
| 9 | MR. OVERHOLTZ: Let's pause that. Let's not | |
| 10 | do that. Let's come back to those. | |
| 11 | MR. HOROWITZ: Neil, I just wanted to put on | |
| 12 | the record, I'm not sure how this got recorded | |
| 13 | here -- | |
| 14 | MR. OVERHOLTZ: Okay. | |
| 15 | MR. HOROWITZ: I allowed him to answer the | |
| 16 | two follow-up questions, subject to my objection, | |
| 17 | and I think it's beyond the scope, and I'm going | |
| 18 | to preserve the right to have those stricken, but | |
| 19 | they are in the record, it is what it is, but I | |
| 20 | don't want it to be read as consent that those | |
| 21 | are answers that should be for the company and | |
| 22 | that portion was appropriate with respect to | |
| 23 | SPAF. | |
| 24 | MR. OVERHOLTZ: Okay. | |
| 25 | BY MR. OVERHOLTZ: | |
| 69: 1 | **Q. Let me show you what we'll mark as Exhibit** | |
| 2 | **Number 5, which is Record Number 92914.** | |
| 3 | (EINSTEIN 30(b)(6) Exhibit 5 was marked for | |
| 4 | identification.) | |
| 5 | BY MR. OVERHOLTZ: | |
| 6 | Q. I'm showing you what we'll mark as Exhibit | |
| 7 | Number 5, which is Record Number 92914. It's Bates | |
| 8 | BPAG_00072428. It's a PowerPoint presentation | |
| 9 | entitled "VTE-Treatment EINSTEIN GDC April 2006." | |
| 10 | A. Okay. | |

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

| | |
|---|---|
| 11 | Q. So this is a PowerPoint presentation from 5 |
| 12 | April 2006 to the GDCMC. |
| 13 | Can you tell me what the GDCMC was? |
| 14 | A. It's a Global Development Committee. The |
| 15 | exact abbreviation lacks my memory. |
| 16 | Q. Okay. |
| 17 | A. Long ago. |
| 18 | Q. According to this PowerPoint presentation, |
| 19 | it's being presented by yourself, Frank Misselwitz, as |
| 20 | well as Ton Lensing. |
| 21 | Do you see that? |
| 22 | A. Yes. |
| 23 | Q. And it's -- "Clinical Development Program in |
| 24 | VTE-Treatment" is the title on the first page? |
| 25 | A. Yes. |

70:
1 Q. What was Ton Lensing's role with respect to
2 the VTE treatment indication?
3 A. He was the global clinic leader, who was --
4 who did run the EINSTEIN DVT dose finding trial and
5 who was the global clinical leader in charge for the
6 Phase III program. He had reported to me.
7 Q. You had hired Dr. Lensing to work
8 specifically on Xarelto in the VTE EINSTEIN
9 indication; is that correct?
10 A. That is correct.
11 Q. If you can turn with me over to the second
12 page, which has the slide at the top of the page as
13 the "Encouraging Results of Phase IIb Dose Finding
14 Studies."
15 Do you see that?
16 A. That's correct.
17 Q. Okay. And we talked about that being the
18 EINSTEIN DVT and the ODIXa-DVT trial. And according
19 to this trial, you see where the dose finding has the
20 arrows that point both to the Phase III SPAF
21 indication, the Afib indication, as well as to the
22 Phase III VTE treatment indication, correct?
23 A. That is correct.
24 Q. Okay. Now, and this was the 5 April 2006.
25 By 5 April 2006, a decision had been made with Bayer

71:
1 to use a once daily dosing regimen for the VTE
2 treatment indication; is that right?
3 A. That is correct.
4 Q. Okay. And according to this, for looking
5 over at the far right, it says: "20 milligram as the
6 main dose."
7 Right?
8 A. Uh-huh, correct.
9 Q. And it says: "Intensified treatment regimen
10 for the initial (5 to 7 days) treatment phase."
11 Do you see that?
12 A. I see that.
13 Q. Okay. Now, this desire to have an
14 intensified treatment regimen for the initial five to
15 seven days treatment phase, was that -- had that been
16 used as part of the dose finding studies?
17 MR. HOROWITZ: Objection; form.

18 A. It was derived from the totality of data
19 generated in the two dose finding trials and was
20 particularly based on some of the three-week
21 surrogate outcome data from the ODIXa-DVT.
22 Q. To try to summarize it, there -- the belief
23 was that successful treatment during that initial
24 phase would result in better outcomes for the longer
25 follow-up treatment period; is that right?

72:
1 A. That is correct.
2 Q. Okay. And there's a bullet point here below
3 that that says: "To be decided." And one is: "Dose
4 for subpopulations (if required)."
5 Do you see that?
6 A. I can see that.
7 Q. Okay. That might be, for example, like in
8 Afib, there was a dose adaptation for renally impaired
9 patients. That's what that's referring to?
10 A. We have many subgroups.
11 Q. Elderly, fragile patients?
12 A. Yes.
13 Q. It could be any different type of
14 subpopulation?
15 A. Yes.
16 Q. Okay. The Phase III program for VTE
17 treatment did not use any type of dose adaptation for
18 any subpopulations, correct?
19 A. That is correct.
20 Q. Okay. "Type of intensified treatment" is the
21 second.
22 That's referring to that intense identified
23 treatment regimen for the initial treatment phase,
24 correct?
25 A. (No audible answer.)

73:
1 Q. And it says: "Rivaroxaban 10 milligrams BID
2 or Heparins."
3 Correct?
4 A. Correct.
5 Q. Okay. So just so we're clear, in April 2006,
6 prior to the EINSTEIN VTE treatment program starting,
7 the discussion within Bayer was about using an
8 intensified treatment period for an initial five- to
9 seven-day period, and then whether or not they would
10 use 10 milligrams twice daily Xarelto or use the low
11 molecular weight heparins during that time period?
12 MR. HOROWITZ: Objection; form.
13 A. These were options we were discussing. It's
14 important to note that this is not the final decision
15 on the trial protocol. That is intermediate status
16 update to inform senior management about the status
17 and, of course, also the options we wanted to explore
18 further. And this was part of the considerations and
19 discussions.
20 Q. And, in fact, the final program changed so
21 that the intensified treatment period ended up being a
22 three-week period as opposed to a five- to seven-day
23 period, correct?
24 A. Correct.

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

25 Q. Okay. And then also as opposed to the

74: 1 intense identified treatment regimen, the final

2 intensified treatment regimen was Xarelto 15

3 milligrams twice daily, correct?

4 A. Correct.

5 Q. Who made the decision to -- for the

6 intensified treatment regimen, to move the Xarelto

7 dose up to 15 milligrams instead of 10 milligrams?

8 A. That has been done based on careful analysis

9 of the available data from the two dose finding

10 trials, in particular, EINSTEIN -- the ODIXa-DVT

11 trial, and also modeling and simulation approach,

12 helping us to understand how best we could achieve,

13 in the shortest possible time, the therapeutic levels

14 of rivaroxaban.

15 Q. Did you -- did you have concerns about moving

16 the dose to -- up from 10 milligrams BID to a 15

17 milligram BID dose during this intensified treatment

18 regimen period?

19 MR. HOROWITZ: Objection; form.

20 A. We carefully analyzed the data, and there was

21 no reason of a particular concern. So I -- to answer

22 the question, I had no concern about that because we

23 had good data enabling us to predict that dose to be

24 optimal.

25 Q. Had you -- had you opposed that change

75: 1 initially and then accepted the change later?

2 MR. HOROWITZ: Objection; form.

3 A. No, not that I would recall.

4 Q. Who was it that made that decision, to change

5 from the 10 milligram intensified regimen to 15?

6 A. Well, it -- first of all, it's always a team

7 decision; and the team at that time was led and

8 guided by me.

9 But I want to testify that there was no firm

10 decision for the 10 milligram BID that, for whatever

11 reason, needed to be revised.

12 We outlined here two options of rivaroxaban

13 in an early BID regimen, or heparins. So that was

14 more the focus here. And upon analyzing all the data

15 as they had become available from the two dose

16 ranging trials, we came to the conclusion that the 15

17 BID would be the best choice.

18 Q. Now, this committee that you're presenting to

19 on April 5th was the GDC, the Global Development

20 Committee, MC, Management Committee; is that right?

21 A. Perhaps, yeah.

22 Q. Okay. You also presented information related

23 to this study to other committees within Bayer, as

24 well, correct?

25 A. That is correct. That's a typical way we try

76: 1 to make sure that we have appropriate technical

2 oversight and review of all senior management

3 functions.

4 Q. I've seen reference that you -- that you also

5 presented this to the DP3 meeting committee?

6 A. The DP3 is just the Decision Point Number 3.

7 That is a certain milestone decision to be taken in a

8 certain management committee.

9 Q. Okay. And the DP3 meeting is held before a

10 management committee at Bayer?

11 A. The DP3 is typically the final decision to go

12 into Phase III for a certain compound.

13 Q. And who sits on the committee at that DP3

14 meeting, as far as -- you don't have to give me names.

15 But is it a management committee?

16 A. It's a management committee of senior

17 management involving all cross-functions that are

18 stakeholders in making clinical development

19 decisions.

20 Q. If you look with me on the next page, the

21 slide at the top of the page, the period of -- were

22 patients randomized as to whether or not they would be

23 followed up with treatment on the comparator arm

24 for -- in the final VTE trial, were they randomized as

25 to whether they would be followed for three months or

77: 1 six months or 12 months? Is that how that worked?

2 A. Correct.

3 Q. Okay. Was there any -- was that purely

4 random, or was it -- was it based upon their

5 presentation at all, or was it a pure randomization as

6 to which time period they would be followed?

7 A. No, it was not pure randomization. And as

8 outlined here on the slide, there was first

9 stratification and then followed by randomization.

10 In order to avoid any imbalances in the

11 different treatment durations and in order to cope

12 with the different possible treatment durations as

13 specified in the guideline documents, we allowed the

14 treating physician to define that patient should get

15 three months, that patient should get 12 months, and

16 that patient should get six months of treatment

17 duration, according to the risk profile, according to

18 how the patient presented to the doctor.

19 So that has been first defined, and then

20 these patients were accordingly randomized to receive

21 either the experimental drug or the standard of care.

22 Q. Okay. If you can look with me at the next

23 page, there is a main inclusion and main exclusion

24 criteria.

25 There were -- the final version of the Phase

78: 1 III trial program excluded certain patients, correct?

2 A. That is correct.

3 Q. Okay. And patients with renal impairment,

4 creatinine clearance numbers less than 30 milliliters

5 per minute, they were excluded from the study,

6 correct?

7 A. That is correct.

8 Q. Okay.

9 A. In part, simply because of the fact that it's

10 a contraindication to get treatment -- in part,

11 because these patients would be contraindicated to

12 receive enoxaparin, the comparator drug.

13 Q. It would have affected the comparator arm?

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

---

14   A. Yeah.

15   Q. The second slide on that page lists the

16   "Efficacy and Safety Outcomes." And we've talked

17   about the fact that it's either a symptomatic

18   recurrent VTE or it's the primary efficacy outcome,

19   correct?

20        MR. HOROWITZ: Just to be clear, because the

21        record is getting funky, obviously confused here,

22        you've got a copy with two.

23        MR. OVERHOLTZ: Oh, okay.

24        MR. HOROWITZ: And he's got one.

25        MR. OVERHOLTZ: Okay.

79:  1   BY MR. OVERHOLTZ:

2   Q. The next slide, Slide 7. Slide 7, that's the

3   "Efficacy and Safety Outcomes"?

4   A. Yeah.

5   Q. Is this consistent with what ended up being

6   the efficacy outcomes for the Phase III VTE treatment

7   trial?

8   A. Yeah.

9   Q. And so the efficacy outcome was either

10   they've had a recurrent VTE or the composite of a

11   recurrent — and also the composite of a recurrent VTE

12   or fatal or nonfatal pulmonary embolism, correct?

13   A. The composite is an explanation of what we

14   mean with symptomatic recurrent VTE.

15   Q. Okay.

16   Q. So it could be either the recurrent deep vein

17   thrombosis or recurrent pulmonary embolism or a

18   mixture of both.

19   Q. Okay. And then the secondary efficacy

20   outcomes were each of those separately, right?

21   A. Right.

22   Q. And then the primary safety outcome in the

23   VTE treatment EINSTEIN trial was defined as clinically

24   relevant bleeding?

25   A. That's correct.

80:  1   Q. And clinically relevant bleeding meant either

2   a bleed that was defined as a major bleed or a bleed

3   that was defined as a clinically relevant, but

4   non-major bleed; is that right?

5   A. Correct.

6   Q. And we can talk a little bit about those

7   definitions, but generally, what is your understanding

8   of the difference between — or what is a clinically

9   relevant non-major bleed?

10   A. The major bleeding definition is very clear

11   and always outlined precisely in a number of

12   guideline documents. And it's a very severe bleeding

13   event typically, and we felt that it's important to

14   look — so to, say, one step below that; in other

15   words, to capture bleeding events that would not fit

16   the definition of a major bleed, so would not be

17   life-threatening, would not be into a critical organ

18   or into the brain, but would require, say,

19   hospitalization, urgent medical consultation,

20   et cetera; so requiring medical action in one or the

21   other form.

22   Q. Okay. And then the "Secondary Safety

23   Outcome" is listed as: "Major bleeding, all cause

24   mortality, other cardiovascular events."

25        Do you see that?

81:  1   A. Yes.

2   Q. Now, is that -- was that a composite

3   secondary outcome or --

4   A. No. Each separately. Each separately.

5   Q. Each separately. Okay. Now, if you look

6   with me at Slide 9.

7        MR. OVERHOLTZ: A break? Time for a comfort

8        stretch?

9        MR. HOROWITZ: I was going to say when you

10        get through this, but why don't we just go now.

11        MR. OVERHOLTZ: If it is fine, just a bio

12        break.

13        THE VIDEOGRAPHER: It is now 11:10. We're

14        going off the record.

15        (Recess from 11:10 a.m. until 11:34 a.m.)

16        THE VIDEOGRAPHER: The time is now 11:34 and

17        we're back on the record.

18   BY MR. OVERHOLTZ:

19   Q. Dr. Misselwitz, if I could have you turn to

20   slide 8; and it's a slide entitled "Sample Size

21   Considerations." And one of the things I want to ask

22   you about is there is a bullet point that talks about

23   "Aim: to demonstrate the 75 percent of efficacy is

24   maintained."

25        Do you see that?

82:  1   A. Yes, I do.

2   Q. What is that referring to?

3   A. This refers to the way non-inferiority trials

4   are designed, to be able to demonstrate that a new

5   drug is at least as good – could be better, but at

6   least as good as standard of care.

7   Q. Okay. So the Phase III EINSTEIN VTE

8   treatment trials were designed as non-inferiority

9   trials; is that correct?

10   A. That is correct.

11   Q. All right. And non-inferiority referring to

12   as compared to the comparator in the trial, here being

13   some form of low molecular weight heparin plus a

14   vitamin K antagonist?

15   A. Correct.

16   Q. Okay. And when you design a non-inferiority

17   trial, one of the things that you do is predetermine

18   the non-inferiority margin; is that correct?

19   A. That is correct.

20   Q. Okay. And when it talks about that 75

21   percent number here, that's referring to that

22   non-inferiority margin?

23   A. Yeah. Indirectly, yes.

24   Q. Right. Could -- if you look a couple bullet

25   points down, it says: "Non-inferiority Upper

83:  1   Confidence Interval Margin of HR: 1.75." Correct?

2   A. That's correct.

---

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

3 Q. And so a lot of times, when we see the
4 relative risk of an event in one of these clinical
5 trials, it's expressed as a point value; but then
6 there is a confidence interval out to the side that
7 has a lower limit confidence interval and then a upper
8 limit confidence interval, right?
9 A. That is correct.
10 Q. Okay. And what this is saying is that in
11 order for, here, the active drug being tested,
12 Xarelto, to meet its efficacy endpoint in the study,
13 the confidence interval limit cannot be higher
14 than 1.75?
15 A. That is correct.
16 Q. Basically meaning the upper limit of
17 the confidence interval cannot show that the Xarelto
18 could be up to or greater than 75 percent worse than
19 the comparator drug here being tested, the low
20 molecular weight heparin plus vitamin K antagonist,
21 right?
22 A. In terms of the upper bound of the confidence
23 interval, not in terms of the point estimate.
24 Q. Only in terms as to the upper limit of the
25 confidence interval?

84: 1 A. Yes.
2 Q. And while we don't need to have a statistics
3 lessen here --
4 MR. HOROWITZ: I think I just did.
5 Q. The upper limit of that confidence interval
6 represents the range in which that point value could
7 fit within and the lower -- as the greater amount, and
8 the lower limit in the confidence interval is the
9 lower range that it would fit within; is that right?
10 A. Yes.
11 Q. Okay. And just for -- I think an example I
12 used, if I had a confidence interval that was between
13 .5 and 1.5 with a point value of 1.0, the upper limit
14 of that confidence interval is 1.5, or a 50 percent
15 greater -- if we're talking about it has a ratio of
16 risk of the event happening, and the lower limit being
17 .5, or 50 percent of the risk of that event happening;
18 is that right?
19 A. I'm not 100 percent sure whether I can follow
20 your example, but as I got it, it seems to be
21 correct, at least for the upper bound.
22 Q. Okay. Now, another type of design of the
23 trial that could have been considered for the VTE
24 treatment would have been a superiority trial; is that
25 correct?

85: 1 A. Theoretically, but in this case, you would
2 have needed to have evidence that you are superior.
3 Q. Okay. And typically, that decision is made
4 at the outset of the trial. You don't make that
5 decision once you have results. Correct?
6 A. That's clearcut, yes.
7 Q. Okay. And so the decision here was made that
8 this was going to be a trial designed to demonstrate
9 non-inferiority?

10 A. That is correct.
11 Q. And not superiority, correct?
12 A. Correct.
13 Q. Okay. Now, this 1.75 non-inferiority margin,
14 that was for the combined results of the EINSTEIN
15 Phase III trials, the DVT and PE trial and extension
16 trial together, correct?
17 A. The slides in front of me are relative to a
18 draft version of the clinical development plan that
19 was working under the assumption that we have one
20 large trial investigating DVT and PE patients
21 together.
22 Q. So the -- in final Phase III trial we
23 talked about before, there was a separate trial for
24 DVT, a separate trial for VTE, and then a separate
25 EINSTEIN extension trial?

86: 1 A. Correct.
2 Q. And in that -- in the final version, the
3 non-inferiority for the combined results, the pooled
4 results was a 1.75; is that right?
5 A. Correct.
6 Q. For the individual pulmonary embolism trial,
7 the PE trial, and the DVT trial, the confidence -- the
8 non-inferiority margin was set at 2.0, correct?
9 A. That is correct.
10 Q. Okay. Meaning that within those individual
11 trials, to meet the efficacy endpoint, the incidence
12 of the efficacy outcome, a recurrence of a VTE could
13 be up to twice as often as the standard of care
14 treatment being tested against the low molecular
15 weight heparin plus vitamin K antagonist, and the drug
16 would still meet its efficacy endpoint?
17 MR. HOROWITZ: Objection; form.
18 Q. Is that right?
19 A. The -- as we see here in this exhibit, the
20 plan was to have, for regulatory purposes, a
21 consideration of both trials, taken together with
22 this non-inferiority margin, as you mentioned, that
23 preserves 75 percent of the efficacy at least.
24 Again, we are talking about the upper bound
25 of the confidence interval. And the confidence

87: 1 interval, not the point estimate of what we finally
2 have as a ratio, but the certainty of how good we can
3 determine it depends on the size of the trial and on
4 the number of events we secure.
5 And when splitting up a large trial in the
6 initial plan into two trials, the DVT trial and the
7 PE trial, you simply end up having slightly smaller
8 number of events for each of them; however, taken
9 together an even larger number of events than
10 initially planned.
11 Q. So because of the smaller number of patients
12 in each individual trial, the idea being that you may
13 have a wider confidence interval than you would expect
14 to see in a larger trial?
15 A. The certainty with which you determine your
16 point estimate, of course, is little wider.

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

17 Q. Okay. And it's your testimony that was the

18 basis for the non-inferiority margin being set higher

19 than the 75 percent, but the non-inferiority margin

20 being set at 2.0?

21 A. Correct. And based on the assumption that

22 approval will be granted based on the two trials

23 taken together.

24 Q. Now, was there some pushback from the US FDA

25 with respect to the size of the non-inferiority margin

88: 1 in the VTE Phase III trials?

2 MR. HOROWITZ: Objection; form.

3 A. I remember very well that the FDA, whenever

4 it comes to non-inferiority designs, discusses the

5 margin very critically and aims to the lowest

6 possible -- the lowest feasible margin that you can

7 achieve in these type of trials.

8 So this is in a way not unique to this very

9 indication, but general theme when discussing

10 non-inferiority trials with the FDA.

11 Q. The FDA wanted the company to use a smaller

12 non-inferiority margin; is that a fair statement?

13 A. I remember the discussions. I don't remember

14 any particular margin.

15 Q. Did you have those same discussions

16 with the European regulatory agency, the MEA?

17 A. Not in the sense that we had with the FDA.

18 Q. Okay. So one of the things that we talked

19 about was the fact that there was a -- one study

20 protocol that covered both the EINSTEIN DVT trial and

21 the EINSTEIN PE Phase III trial, correct?

22 A. Correct.

23 Q. Okay. And a study protocol is made before

24 you begin a study. And it describes how the study is

25 going to be conducted, the doses that are going to be

89: 1 tested, the efficacy outcomes, the primary safety

2 outcomes, all before the trial even begins, correct?

3 A. That is correct.

4 Q. Okay. And do you agree that once a trial

5 protocol has been designed, that it should remain

6 essentially unchanged going forward?

7 MR. HOROWITZ: Objection; form.

8 A. Not necessarily. You quite often have what

9 we call amendments that need to be documented,

10 introduced, discussed, and approved by ethics

11 committees again.

12 So while you, of course, strive to identify

13 as much as you can up front before you even begin the

14 trial, that would not preclude that for reasons of

15 feasibility, practicability, changing guidelines

16 sometimes, changing environment, therapeutic

17 landscape, that you would need to amend the trial.

18 Q. So there are instances in which amendments

19 are allowed and reasonable when you are conducting a

20 clinical trial?

21 A. Correct.

22 Q. Okay. But there are certain ways in which

23 those amendments are enacted; is that correct?

24 A. That is correct.

25 Q. They have to be approved by the committees

90: 1 that oversee the trial, correct?

2 A. That is correct.

3 Q. And to the extent that these are trials being

4 conducted as part of a regulatory Phase III program

5 for approval of an indication, submitted to regulatory

6 authorities; is that true?

7 A. That is correct, as well.

8 Q. Okay. And is it true that the -- in

9 conducting the study, that every effort should be made

10 to adhere to that protocol?

11 MR. HOROWITZ: Objection; form.

12 A. That is true.

13 Q. Okay. Do you believe it would be appropriate

14 to change the efficacy outcome of a study protocol

15 once the -- once the trial is started?

16 MR. HOROWITZ: Objection; form.

17 A. The question cannot be answered to in a -- in

18 such a general way. It depends whether we're talking

19 about the primary outcome of the trial, the secondary

20 outcome, and in what way it would be altered.

21 Q. The -- we talked about the fact that in the

22 protocol for the VTE Phase III trials, the -- it

23 was -- the safety outcome was defined as clinically

24 relevant bleeds, which is the major bleeds or

25 clinically relevant non-major bleeds, correct?

91: 1 A. Correct.

2 Q. Okay. And if a bleeding event was reported

3 by a clinical investigator under the study's protocol,

4 those bleeding events would be adjudicated by a

5 blinded committee; is that correct?

6 A. That is correct.

7 Q. And that was set up for both the EINSTEIN DVT

8 Phase III trial, the EINSTEIN PE Phase III trial, and

9 the EINSTEIN extension trial; is that correct?

10 A. That is correct.

11 Q. Okay. And who made up that adjudication

12 committee for those trials?

13 A. We approached experts in the field who have

14 to have a proven track record of being the true

15 experts, being able to adjudicate these type of

16 events, and agreed the composition also with the

17 steering committee of the trial.

18 Q. Was the same committee used for all three of

19 those trials, or different committees?

20 A. To the best of my knowledge, the same.

21 Q. The same committee. Okay.

22 And the investigators, the clinical

23 investigators in the trial, they knew what treatment

24 the patients were taking, whether they were getting

25 Xarelto or whether they were either on the low

92: 1 molecular weight heparin or, you know, had moved on to

2 the vitamin K antagonist?

3 A. Correct.

4 Q. Okay. But the -- it was -- the protocol

5 called for the adjudication committee to be blinded to

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

6    treatment?

7    A. That is correct.

8    Q. When they adjudicated either a efficacy

9    outcome or a safety outcome?

10    A. That is correct.

11    Q. Okay. And so did the -- did the protocol

12    call for the clinical investigator to provide their

13    own opinion or adjudication of what they believed the

14    bleed -- the bleed, if we're talking about bleeds, to

15    be, whether it was the major or clinically relevant or

16    trivial bleed?

17    A. We asked the investigator to document the

18    bleeding and to report the bleeding as an adverse

19    event or as a serious adverse event. That's the --

20    that's the duty of the principal investigator or any

21    investigator in a trial.

22    Q. If the patient had a bleed, the investigator

23    was supposed to document and report that bleed and

24    report it according to the standards for whether it

25    was adverse event or if it met the definition of a

93: 1    serious adverse event?

2    A. That is correct.

3    Q. Okay. And those definitions are typically

4    laid out as part of the regulatory scheme depending on

5    what country you are reporting to, correct?

6    A. That is correct.

7    Q. Okay. And then the adjudication committee

8    would adjudicate the bleed based on the definition of

9    the safety outcome as defined in the protocol; is that

10    right?

11    A. That is correct.

12    Q. Okay. And in order to adjudicate those

13    bleeds, what information would be provided to the

14    adjudication committee?

15    A. First and foremost, the information recorded

16    in the case record form of the clinical trial, and in

17    some cases -- and could have been upon request of the

18    adjudication committee, additional information,

19    copies from the medical records of the patient, and

20    more detailed information, when and if required.

21    Q. In the VTE trials -- just for context, in the

22    ROCKET trial, because of it being a blinded trial,

23    there was this sham INR testing that was created so

24    that the investigators would not become unblinded. Do

25    you recall it?

94: 1    A. I recall it.

2    Q. Okay. Contrast that for me with the VTE

3    clinical trials as -- with -- considering that the

4    investigators knew what treatment they were on. Would

5    clinical investigators in the VTE trial know to not

6    use an INR test for the patients taking Xarelto?

7    A. That is correct.

8    Q. Okay. And what were -- what was told to the

9    investigators to use as far as lab values for the

10    people in the -- that were taking Xarelto in the

11    EINSTEIN trials?

12    A. I don't exactly understand what you mean with

13    "lab values."

14    Q. Let me -- let me try again. Let's -- they

15    were told that INR was not a valuable measurement to

16    use for the patients taking Xarelto; is that right?

17    A. That is correct.

18    Q. Were they told they could take a PT

19    measurement?

20      MR. HOROWITZ: Objection; form.

21    A. No, at least not regularly. To explain my

22    response, we implemented and studied rivaroxaban in

23    this, but also in other trials, as a fixed dose,

24    unmonitored drug. And no regular lab monitoring was

25    implemented in the trial and was necessary; hence,

95: 1    there was no particular instruction to the

2    investigators to regularly provide lab values and

3    report them in the --

4    Q. The patients that were randomized to receive

5    the vitamin K antagonist part of the treatment, of

6    course, they would have had their INR tested?

7    A. Correct.

8    Q. And as you and I know, if you are taking a

9    vitamin K antagonist like warfarin, regular monitoring

10    is required to make sure they stay within the direct

11    INR range; is that right?

12    A. That is correct.

13    Q. Okay. Isn't it possible that when the

14    adjudication committee would adjudicate bleeding

15    events from the EINSTEIN trials, that the presence of

16    regular INR measurements in the medical records they

17    would receive would indicate to them and give them a

18    clue as to which treatment arm these patients were --

19    which they belonged to in the clinical trial?

20    A. Theoretically, yes. But we implemented

21    measures to avoid exactly that because there was an

22    organization in between of the investigator and the

23    adjudication committee making sure that entries would

24    be blackened indicating any particular INR value or

25    these kind of things that could have led to an

96: 1    unblinding of the adjudication committee.

2    Q. Okay. So there was actually a in-between

3    reviewer of any materials provided to the adjudication

4    committee that would look for anything such as INR

5    values that might clue an -- clue an adjudication

6    member in as to what treatment arm a patient belonged

7    to?

8    A. A reviewer in the sense of making sure that

9    they keep it blind, not in assessing any of those

10    events.

11    Q. Okay. Who conducted those reviews? Was it

12    the CRO, or was it someone else?

13    A. That was a contract research organization.

14    Q. And specifically, was INR described as

15    something that should be removed so that the committee

16    member would not receive that information, or was it a

17    general --

18    A. I can only attest that we generally

19    instructed that individual or group of individuals at

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

---

20     the CRO to eliminate any information that could

21     potentially lead to unblinding.

22     Q. Okay. So the instruction was to eliminate

23     information that might lead to unblinding for the

24     adjudication committee member?

25     A. Correct.

97: 1     Q. You don't know whether there was any specific

2     instructions provided to the reviewers to remove INR

3     measurements?

4     A. I would need to look it up. I don't remember

5     it by heart.

6     Q. Okay. We talked about the fact there was a

7     DSMB for these trials, a drug safety monitoring board,

8     correct?

9     A. Yeah.

10     Q. And, of course, the incidence rate of

11     bleeding events was provided to the DSMB throughout

12     the trial; is that right?

13     A. That is correct.

14     Q. Okay. And was that information -- in light

15     of the open label design, was that unblinded to the

16     DSMB so they would know what the incidence was for --

17     A. The DSMB always receives unblinded

18     information.

19     Q. Do you agree that the open label design of

20     these DVT trials potentially could lead to bias in the

21     trial design?

22         MR. HOROWITZ: Objection; form.

23     A. Yes. Potentially open label designs, in

24     general, could lead to bias. And in any case,

25     measures to avoid that bias need to be implemented

98: 1     and discussed.

2     Q. Bayer, as the sponsor of the trials, they

3     made the decision to use an open label design,

4     correct?

5     A. That is correct.

6     Q. For example, the US FDA didn't force Bayer

7     to use an open label design for those trials, correct?

8         MR. HOROWITZ: Objection to form.

9     A. The FDA did not force us into such design.

10     Q. Do you recall, in fact, that the FDA was

11     critical of the decision to use an open label design

12     for these trials?

13     A. We had regulatory interactions and

14     discussions with the FDA on that topic.

15     Q. And do you recall that the FDA were critical

16     of the decision to use an open label design?

17         MR. HOROWITZ: Objection to form; asked and

18     answered.

19     A. We discussed this question with the FDA. The

20     FDA is of the general opinion that a trial that can

21     feasibly be blinded should ideally be conducted as a

22     blinded trial, but we had brought forward good

23     reasons why we would not do so and agreed finally

24     with the FDA that we are going to perform the trial

25     as an open label trial, and that had not been

99: 1     objected to.

2     Q. Let me show you what we'll mark as Exhibit

3     Number 6 and 7, which is Record Number 3151667 and

4     3151668. The Bates is BPAG_24863625 for Exhibit 6,

5     and the attachment is Exhibit 7 to that document.

6         (EINSTEIN 30(b)(6) Exhibit 6 was marked for

7     identification.)

8         (EINSTEIN 30(b)(6) Exhibit 7 was marked for

9     identification.)

10         THE WITNESS: I'm ready.

11     BY MR. OVERHOLTZ:

12     Q. Okay. So I've shown you what is an e-mail

13     that was forwarded by Dagmar Kubitza to several people

14     of the minutes of the CDP-RC; and it's forwarding an

15     e-mail that was sent to several people, including

16     yourself, below that on January 28th of 2004.

17         Do you see that?

18     A. Correct. Yes, I see that.

19     Q. Okay. And you see you were copied on the

20     e-mail down below. It says "Minutes CDP-RC."

21         Do you know what the CDP-RC was?

22     A. It's clinical development plan review

23     committee.

24     Q. Okay. And attached to this e-mail that was

100: 1     sent to you was the approved minutes of yesterday's

2     CDP-RC, correct?

3     A. Correct.

4     Q. And so if we can look then at the attachment

5     to this, is the meeting minutes from the CDP-RC

6     meeting of January 27th, 2004, which is Record Number

7     3151668. And there is a list of participants and the

8     chair of the minutes.

9         Do you see that?

10     A. Yes, I do.

11     Q. Okay. And who made up the CDP-RC meeting as

12     far as the types of Bayer employees that would have

13     made up such a committee?

14     A. The CDP-RC is a technical committee not

15     finally deciding on milestone decisions or whether or

16     not a program can move into the next phase. And it

17     is composed cross-functionally of all important

18     stakeholders that input into a clinical development

19     program; i.e., clinical development itself, clinical

20     pharmacology, biostats, drug safety, regulatory, to

21     name the most important ones.

22     Q. And so if you can turn with me over to the

23     second page, there is a section regarding Xarelto,

24     Section Number 1.

25     A. I see that.

101: 1     Q. It looks like you were the presenter there?

2     A. I'm one of two presenters.

3     Q. Okay. The other presenter is Klaus Wehling;

4     is that right?

5     A. That's right.

6     Q. What was Klaus's position?

7     A. Klaus was at that time project manager for

8     the project.

    Q. Okay. And do you know how long Klaus Wehling

# Misselwitz, Frank 2016-11-09
Misselwitz PA DC PCC merged on 7-20-17

9    was involved with the Xarelto development?

10    A.  Not exactly, but he retired maybe two years

11    from that time point.

12    Q.  Okay.  Now, it says:  "Goals of the CDP-RC

13    meeting."

14        Do you see that?

15    A.  Yes.

16    Q.  Okay.  And there's two bullet points, the

17    second being:  "Continue phase iib with bid

18    formulation."

19        Right?

20    A.  Yes.

21    Q.  Okay.  And then:  "Start phase ii with od

22    formulation."

23        Do you see that?

24    A.  Correct.

25    Q.  Okay.  And then the third bullet point is:

102:  1    "Develop od" -- that's once daily -- "for all

2    indications."

3        Do you see that?

4    A.  I see that.

5    Q.  Okay.  And it says:  "informal

6    recommendation, no DP3 for this formulation."

7        Do you see that?

8    A.  Yes.

9    Q.  Do you know what that means?

10    A.  The DP3 is a Decision Point 3.  Basically,

11    that would enable the team to progress into pivotal

12    development in this indication.

13        (Discussion off the record.)

14    BY MR. OVERHOLTZ:

15    Q.  Now, if you look under the "See

16    presentation," it says:  "Cave pricing implication if

17    launch with bid and within one year od formulation.

18    Commercial implications?"

19        Do you see that?

20    A.  I see that.

21    Q.  Okay.  At this time, was there a discussion

22    of potentially launching the drug with a twice daily

23    formulation and then moving forward with a once daily

24    formulation?

25        MR. HOROWITZ:  Objection, form.

103:  1        Can you clarify which indication you're

2    talking about?

3    Q.  Okay.  Let's say -- let's talk about VTE

4    treatment or -- well, any of the formulations.  Was

5    there an idea that you would start with BID back in

6    January of 2004?

7        MR. HOROWITZ:  Well, objection again.  When

8    you say -- when you say "formulation," are you

9    talking about indication?

10        MR. OVERHOLTZ:  Or a once daily formulation.

11        MR. HOROWITZ:  Once daily formulation, but

12    for which indication.  Because, again, obviously,

13    I want you to focus your questions on EINSTEIN

14    and VTE treatment.  And it's unclear from the

15    documents you're using.  There may be a way to

16    get there, but maybe some more foundational

17    questions.  But in the abstract now, it seems

18    like you're talking about everything and getting

19    beyond the scope.

20    BY MR. OVERHOLTZ:

21    Q.  Well, let me ask it this way:  We know that

22    the VTE treatment indication has the BID formulation

23    at the very beginning for a three-week period, the VTE

24    treatment indication, and then has a once daily

25    follow-up period, correct?

104:  1    A.  Correct.

2    Q.  Okay.  But early on in development, when it

3    came to VTE treatment, was there an idea that BID

4    treatment may be necessary to develop initially and

5    then later try to introduce a once daily formulation?

6    A.  I am not certain, based on that document that

7    is in front of me, whether we talked about the VTE

8    treatment indication at all.  I actually would

9    suspect that it refers to the VTE prevention

10    indication.

11    Q.  Okay.  And the VTE prevention indication was

12    a -- was marketed initially as a once daily

13    indication, correct?

14    A.  We did perform the early dose ranging studies

15    even for VTE prevention in -- with BID doses, and

16    only then added more trials assessing once a day

17    dosing regimens for VTE prevention.

18    Q.  Okay.  Of course, the VTE Phase II dose

19    finding trials, the initial was in BID with one OD

20    formulation, correct?

21    A.  Correct.  That is correct.

22    Q.  Okay.  And then a second dose finding study

23    was added, and we've talked about that?

24    A.  That is correct.

25    Q.  Okay.  Now, if you a look with me to the

105:  1    fourth bullet point down in this presentation that you

2    and Mr. Wehling made to the committee, it says the:

3    "Clear guiding principle should be to safeguard the

4    compound."

5        Do you see that?

6    A.  I see that.

7    Q.  "Therefore bid development should continue."

8        Do you see that?

9    A.  I do see that, yes.

10    Q.  Okay.  And what you're talking about there is

11    the fact that there was concern that unless the BID

12    development continued, that once daily may not be able

13    to be either proven to work or even approved by

14    regulatory authorities for Xarelto; is that correct?

15        MR. HOROWITZ:  Well, again, Neil, he just

16    testified earlier that he thinks this document is

17    talking about the prevention indication.  And now

18    you're asking questions in the abstract, and it's

19    unclear -- you know, you're reading from a

20    document he says he doesn't know that those involve

21    the indication we're here to talk about and then

22    asking questions, you know, that try to tie this

## Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

23  document to just general questions about Xarelto.

24  So I'm not sure that, you know, it's

25  appropriate for -- in a 30(b)(6) to be asking

106: 1  these types of questions.

2  MR. OVERHOLTZ:  Well, let's try to tie it

3  together.  I think I'm asking the question

4  generally, was there this concern.  So I think it

5  would cover the VTE treatment.

6  MR. HOROWITZ:  Why don't you at least give us

7  a hint that, you know, you're looping into the

8  VTE treatment, then ask if there was a concern

9  about the VTE treatment.

10  BY MR. OVERHOLTZ:

11  Q.  Let's look at the conclusions from the CDP-RC

12  meeting down at the bottom.  Do you see that?

13  A.  I see that, yes.

14  Q.  Okay.  It says:  "The CDP-RC recommends to

15  keep all options open for the once daily development

16  and accepts the team's recommendations to."

17  And there are three bullet points listed,

18  right?  Is that correct?

19  A.  That is correct.

20  Q.  Okay.  "Continue phase 2b studies with BID

21  administration."

22  Correct?

23  A.  Yes.

24  Q.  And by January 2004, was the ODIXa-DVT trial

25  ongoing?

107: 1  A.  I'm not 100 percent certain.  I would need to

2  look it up.

3  Q.  Okay.

4  A.  It was certainly at the same time when we

5  still had VTE prevention trials, as well, ongoing.

6  Q.  Okay.  Number 3 is:  "Start phase I dose

7  finding once daily in DVT-prevention and DVT treatment

8  (Afib)."

9  Do you see that?

10  A.  I see that, yes.

11  Q.  Okay.  And that "(Afib)" indicates that the

12  dose finding for DVT treatment would apply to Afib, as

13  we've discussed before?

14  A.  That is correct.

15  Q.  Okay.  So this meeting was talking about

16  starting dose finding for once daily in DVT treatment

17  indication, correct?

18  A.  That is correct.

19  Q.  And it was you and Klaus Wehling's

20  recommendation to start once daily dose finding

21  studies for DVT treatment in January of 2004, right?

22  A.  That's part of the discussion.  But just to

23  put things into perspective or in context, we wanted

24  to generate all data that are necessary to finally

25  make a decision as to whether the drug needs to be

108: 1  developed as a BID drug or as a once a day drug, and

2  hence, also the discussion, very importantly, to

3  continue and not to cut corners and to complete all

4  of Phase IIB BID studies.

5  Q.  Okay.  So you've made two recommendations

6  here to the CDP-RC -- you made three recommendations

7  that they accepted, but two relate to continuing the

8  Phase II studies for BID?

9  A.  Right.

10  Q.  And then -- and "Start Phase II dose finding

11  for once daily in both DVT-prevention and DVT

12  treatment"?

13  A.  That's correct.

14  Q.  Okay.  And so then, if we can go back up to

15  the presentation section of this meeting minutes, if

16  you look with me the second bullet point, it says:

17  "Regulatory:  if the overall risk benefit slightly

18  better with od, the RA" -- regulatory authority --

19  "may prefer od."

20  Right?

21  A.  Correct.

22  Q.  "A direct comparison may be asked by a

23  regulatory authority but could be a post marketing

24  commitment, to be taken up with HA.  A direct

25  comparison would need to show non-inferiority of the

109: 1  od."

2  Do you see that?

3  A.  I see that.

4  Q.  "This is a very large trial."

5  Do you see that?

6  A.  I see that.

7  Q.  So one of the things that was discussed in

8  this presentation is the fact that if you're going to

9  pursue an OD, that a regulatory authority may require

10  you to show that the OD is non-inferior to BID use of

11  the drug, correct?

12  A.  It's one of the discussions we've anticipated

13  at the time, but as a matter of fact, did not happen.

14  Q.  And this indicates that if a study would have

15  been designed that would have compared BID to OD

16  therapy, that would demonstrate non-inferiority of OD,

17  that would be -- have to be a very large trial,

18  correct?

19  A.  Depending on the non-inferiority margin, that

20  could be a very large trial.

21  Q.  Okay.  And so then if we can drop back down

22  to that fourth bullet point again, the "Clear guiding

23  principle should be to safeguard the compound --

24  therefore bid development should continue."

25  That's the statement that's made in these

110: 1  meeting minutes, correct?

2  MR. HOROWITZ:  Objection, form; asked and

3  answered.

4  A.  It's written here, yes.

5  Q.  Okay.  And the reason why BID development had

6  to continue was because there was concern about the

7  potentials for success of demonstrating that once

8  daily would be non-inferior to BID, right?

9  A.  That's not correct.  I respectfully disagree.

10  We wanted to generate appropriate data to make a

11  data-driven decision as to what is the best regimen

## Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

| | |
|---|---|
| 12 | and the best dose. |
| 13 | Q. And it was your belief that doing so would |
| 14 | help maintain that clear guiding principle to |
| 15 | safeguard the compound, here being Xarelto, correct? |
| 16 | MR. HOROWITZ: Objection, form; asked and |
| 17 | answered. |
| 18 | You can answer. |
| 19 | A. Clinical development is always guided by the |
| 20 | principle to first safeguard the patient, but then |
| 21 | also to minimize the risk for the developmental |
| 22 | compound. |
| 23 | Q. Yeah. You would say that a clear guiding |
| 24 | principle should be to safeguard the patient first, |
| 25 | right? |

111:
1 A. Yes, indeed. That's an overarching
2 principle.
3 Q. And that should be the overarching principle
4 even if that means that the compound isn't successful?
5 A. We have overarching principles that would not
6 need to be repeated at each and every meeting
7 minutes. These are laid out in different places.
8 But we do have different development paths for
9 different compounds. You could have time-optimized
10 development. You could have risk-optimized
11 development. But here, we put emphasis on minimizing
12 the risk.
13 (EINSTEIN 30(b)(6) Exhibit 8 was marked for
14 identification.)
15 (EINSTEIN 30(b)(6) Exhibit 9 was marked for
16 identification.)
17 BY MR. OVERHOLTZ:
18 Q. Let me show you what we'll mark as Exhibit
19 Numbers 8 and 9, which is Record Number 3885700 and
20 Record Number 3885701. And the Bates for Exhibit 8 is
21 BPAG_2806580 and the Bates for 9 is Bates 20866582.
22 And just while you take a look at that, this
23 was an e-mail that was forwarded by Christoph Dierig
24 to Martin Homering on June 12th, 2006 of an e-mail
25 that was sent to you and many other people at Bayer on

112:
1 June 7th, 2006, where the subject was the "CDP-RC
2 April 20th and ad-hoc CDP-RC May 18 2006 - Minutes,"
3 and its attachment which is the minutes for those
4 meetings.
5 A. I'm good.
6 Q. Okay. So you received this e-mail from
7 Martina Berner, that's listed on Exhibit 8, on June
8 7th, 2006. You're listed down at the bottom of the
9 people that received this e-mail.
10 Do you see that?
11 A. Correct.
12 Q. Okay. And this was the combined minutes of
13 the CDP-RC meeting of April 20th and May 18th of 2006,
14 correct?
15 A. Correct.
16 Q. Okay. And this is that same CDP-RC meeting
17 that we've been talking about that you presented at in
18 January 2004 that we just finished looking at, right?

19 A. Correct.
20 Q. Okay. And if we look at the actual
21 attachment, the attachment is Exhibit 9; and these are
22 the actual minutes from those two CDP-RC minutes,
23 correct?
24 A. Correct.
25 Q. Okay. And the title of these minutes says:

113:
1 "Minutes CDP-RC Conferences for DP3 Preparations
2 Factor Xa Inhibitor for Stroke Prevention in Atrial
3 Fibrillation (A'fib) and Treatment of Venous
4 Thromboembolism (VTE Treatment)."
5 Right?
6 A. That is correct.
7 Q. Okay. And so this is getting closer in time
8 to the actual -- this DP3 decision point meeting
9 that's going to be held to go forward with Phase III
10 development, right?
11 A. It's -- yes, that's correct.
12 Q. This meeting is about getting ready for that
13 DP3 decision?
14 A. Correct.
15 Q. Okay. And you were a participant in both
16 meetings, the regular meeting on April 20th and then
17 the ad hoc meeting on May 18th, correct?
18 A. That is correct.
19 Q. Okay. And it looks like Ton Lensing was also
20 a guest at that meeting, correct?
21 A. Correct.
22 Q. And there were two topics discussed at this
23 meeting. One was the Factor Xa inhibitor for the Afib
24 indication, and the second being for the VTE treatment
25 development plan, correct?

114:
1 A. Correct.
2 Q. Okay. And you presented on the Afib
3 indication, and yourself and Ton Lensing presented on
4 the VTE treatment?
5 A. That is correct.
6 Q. And it says that this was distributed to all
7 of the people above, including Kemal Malik.
8 Do you see that?
9 A. Yes.
10 Q. Who is Kemal Malik?
11 A. At that time, head of development.
12 Q. Okay. Do you know what his current position
13 is?
14 A. He's a member of the board of Bayer.
15 Q. Okay. If you can turn with me to the section
16 related to the VTE treatment indication, which I think
17 starts on Page 4 of 5.
18 A. Okay.
19 Q. And it says the goals of the presentation was
20 to "Obtain approval for proposed development plan for
21 treatment of VTE."
22 Do you see that?
23 A. Correct.
24 Q. And I know you had a chance to take a look at
25 this. But basically, it describes the fact that there

**Misselwitz, Frank 2016-11-09**

Misselwitz PA DC PCC merged on 7-20-17

115:
1  were going to be two Phase III studies for the
2  indication, one being in DVT and the other in
3  pulmonary embolism, correct?
4  A. Correct.
5  Q. Okay. And then --
6  A. Well --
7  Q. And then also a second study for the
8  long-term extension study?
9  A. Yeah. So the first was, at this point in
10  time, still the mixture of DVT and PE and the second
11  trial being the extension trial.
12  Q. Okay. Right. And so if you can look with
13  me, the -- there's a description here in this -- you
14  know, the meeting minutes from these two -- these two
15  meetings from April and May of 2006.
16  And it says: "The first study is a
17  multicenter, randomized, open-label, assessor-blind,
18  event-driven, non-inferiority study for efficacy with
19  a study treatment duration of 3, 6, or 12 months.
20  Patients allocated to rivaroxaban will receive a dose
21  of 20 milligrams once daily, preceded by a dose of 10
22  milligrams bid for the initial 3 week period."
23  Do you see that?
24  A. Yes.
25  Q. Okay. Now, eventually this study gets split

116:
1  into two separate studies under one protocol, as we've
2  discussed?
3  A. Correct.
4  Q. DVT separate, PE separate?
5  A. Correct.
6  Q. The -- at this time, in May -- by -- through
7  May of 2006, in these June minutes, the discussion is
8  indicating that the studies -- that initial
9  intensified treatment is going to use a 10 milligram
10  BID dose of Xarelto, correct?
11  A. That is correct.
12  Q. Okay. That -- in the final studies, both VTE
13  and DVT, that dose was changed to a 15 milligram BID
14  dose, correct?
15  A. Correct.
16  Q. And then it describes the comparator arm,
17  which is the low molecular weight heparin, in
18  combination with a vitamin K antagonist, and then
19  continue with the vitamin K antagonist as long as
20  their INR reaches a certain level. Is that right?
21  A. Correct.
22  Q. Okay. And a vitamin K antagonist, just so
23  we're clear at this part of the deposition, that's
24  something like Coumadin or warfarin?
25  A. Right.

117:
1  Q. Now, in the VTE trials, Coumadin was not the
2  only vitamin K antagonist study, correct?
3  A. We did also allow for Acenocoumarol to be
4  used.
5  Q. And that was because of certain countries
6  where -- that were part of the clinical trial plan --
7  A. We felt strongly that forcing physicians into

8  the use of a vitamin K antagonist that is not even
9  available in the country, and certainly not widely
10  used, would not lead to an optimal treatment; and it
11  could definitely be better when the physician is
12  using what they are used to using.
13  Q. So they used the vitamin K antagonist that
14  was typically available to them in their clinical
15  practice?
16  A. Yes.
17  Q. Okay. The second paragraph talks -- or third
18  paragraph here talks about the principal safety
19  outcome.
20  Do you see that?
21  A. Yes.
22  Q. And it's the same outcome that we've been
23  talking about, this combination of major and
24  clinically relevant non-major bleeding?
25  A. Correct.

118:
1  Q. And then it says: "All suspected
2  thromboembolic complications, death, as well as
3  episodes of overt bleeding, will be evaluated by a
4  central, blinded, independent adjudication committee.
5  And we've talked about that, right?
6  A. Yes.
7  Q. Now, I want to ask you about this term "overt
8  bleeding"?
9  A. Okay.
10  Q. Okay? What does -- for purposes of the VTE
11  trials, what did overt bleeding mean?
12  A. Overt bleeding means an overt bleeding, so
13  you see blood, you see it's excess, you see blood in
14  stool and urine, and that is then called an overt
15  bleed.
16  Q. Okay. You're familiar with -- I've seen the
17  term used in some of the documents, occult bleeds?
18  A. Yes, I'm familiar with that term.
19  Q. Okay. Would those not be covered by the
20  overt bleeding definition that's being described here?
21  A. It is -- it is covered by the definition of
22  any bleeds, which were, as well, part of the
23  secondary outcomes, but the way I've heard the
24  condition, not part from the clinically relevant
25  major bleeding events.

119:
1  Q. Okay. What about -- what about bruising?
2  What would -- how would bruising be classified under
3  the definition? Would it be considered an overt
4  bleed?
5  A. I mean, again, the question whether it is a
6  major, clinically relevant, non-major, or any bleed,
7  and that is an important differentiation, because it
8  is, of course, we call it as any bleed. But whether
9  it actually makes up to the -- to the grading of a
10  clinically relevant non-major bleed, that is
11  oftentimes not the case for a bruise.
12  Q. All right. So, you know, my mom takes
13  warfarin. And so she bumps her arm hard, sometimes
14  she will get a pretty big bruise. You can tell there

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

```
15   was bleeding there. That would be classified under
16   the VTE trials as any bleed, correct?
17   A. It will certainly be reported as a bleed, so
18   that is important. Nothing has been hidden or
19   unreported. It is -- it is up to the blinded
20   adjudication committee, according to their
21   definitions, to grade whether it was a major or a
22   non-major clinically irrelevant bleed.
23   Q. What about nonovert bleeds, but where you
24   have drops in the hemoglobin, how do those get
25   classified under the VTE trials?
120: 1 A. It depends. There is no clearcut answer to
2   that question, because the definition of a major
3   bleed, for instance, stipulates importantly a drop of
4   hemoglobin within a certain time frame and not just
5   within, say, a couple of months from one measurement
6   to the other measurement.
7        You need to have -- you need to make sure
8   that you document the bleeding source and that the
9   drop of hemoglobin is not having another etiology.
10   It could be Vitamin B12 deficiency. It could be many
11   things. I mean, it's not necessarily a bleed.
12   Q. All right. So a simple drop in hemoglobin,
13   even if it meets that definition of the amount of
14   hemoglobin loss, without any documented source of that
15   bleed, where that bleed is occurring, whether it's a
16   gastrointestinal bleed or some other bleed, wouldn't
17   be documented as a principal safety outcome bleed in
18   the VTE trials; is that right?
19        MR. HOROWITZ: Objection; form.
20   A. It -- I mean, again, that's exactly the
21   reason why we have the blinded adjudication
22   committee, to exactly garner all necessary
23   information to make that call in a blinded manner.
24   Q. So if a patient comes in, they're in the
25   trial, they're feeling weak, the doctor -- the
121: 1 clinical investigators say, "Let's run your labs."
2   They notice that they have a hemoglobin drop, but
3   there is no overt bleed. The doctor is unable to say
4   where this bleed is or where it's coming from. There
5   is no blood in the stool. There is no hematuria,
6   there is no -- where is this bleed happening. That
7   bleed does not get documented as either a major or
8   clinically relevant non-major bleed in the VTE trials;
9   is that right?
10        MR. HOROWITZ: Objection; form.
11   A. And rightly though so, because there are many
12   medical circumstances where this could happen.
13   Again, I mentioned absorption problems. I mentioned
14   Vitamin B12 deficiencies. I mentioned other forms of
15   anemia. It could be renal anemia, lack of folate
16   anemia. It could be many forms. I can continue that
17   list here for quite some minutes. It's not certain
18   to say that a drop of hemoglobin equals a bleed.
19   That's simply medically not correct.
20        MR. OVERHOLTZ: I'm just going to object to
21   your answer as nonresponsive.
```

```
22   BY MR. OVERHOLTZ:
23   Q. But I will tell you I'm not suggesting it was
24   a wrong or bad decision. I just want to make sure
25   that I have it clear.
122: 1      So just -- the answer to my question is: It
2   doesn't get documented, but you believe you have --
3   there's reasons why it wouldn't be documented as a
4   major or clinically relevant bleed, but it could not
5   be documented as such, the example I gave you?
6        MR. HOROWITZ: Objection to form.
7   A. It's getting documented as the lab
8   measurement of hemoglobin and hematocrit. That's
9   important. So these documentations are available for
10   every patient, but it may not be graded for all the
11   reasons I explained by the blinded adjudication
12   committee as a primary safety outcome.
13   Q. Yeah, I appreciate that distinction that you
14   made. Let me -- let me state it this way.
15   A. person in the trial that has a drop in
16   hemoglobin without any documentation of an overt bleed
17   or a source of that bleed would not be adjudicated by
18   the adjudication committee as having a major or
19   clinically relevant non-major bleed in the VTE
20   EINSTEIN Phase III trials, correct?
21        MR. HOROWITZ: Objection; form, incomplete
22   hypothetical.
23   A. The adjudication committee cannot just come
123: 1 up with certain definitions. There is an existing
2   guideline and a definition of what exactly comprises
3   a major bleed, and that does contain the statement of
4   an overt bleed. And it's also not limited to just a
5   drop of hemoglobin, but it is linked to the
6   transfusion of two or more blood units.
7        So there are important definitions that are
8   widely accepted and completely independent of the
9   sponsor of that trial that the adjudication committee
10   adhered to.
11        MR. OVERHOLTZ: So again, I'm going to object
12   as being -- the answer as being nonresponsive.
13   BY MR. OVERHOLTZ:
14   Q. A person in the trial that does not have an
15   overt bleed as documented by the clinical
16   investigator, that can be found by the doctor, but has
17   a drop in hemoglobin that meets the definition of --
18   for hemoglobin loss would not be adjudicated as having
19   had a major or clinically relevant non-major bleed by
20   the adjudication committee under the VTE Phase III
21   protocols, correct?
22        MR. HOROWITZ: Objection; form, asked and
23   answered, incomplete hypothetical. I'll let him
24   answer one more time.
124: 1 A. It's very hypothetical. To finally make --
2   have a clear answer, I would need to see the patient
3   record of -- that is concerned here. But as a matter
4   of fact, the blind adjudication committee took into
5   consideration all factors and all available
6   information to decide whether or not a certain drop
```

[Handwritten annotations: "Overruled 611(c)" appearing twice]

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

| | |
|---|---|
| 4 | of hemoglobin would match and reach the criteria of a |
| 5 | major bleed or a clinically relevant non-major bleed. |
| 6 | Q. Let me ask you this: You're a medical |
| 7 | doctor, correct? |
| 8 | A. That is correct. |
| 9 | Q. Okay. You understand that doctors do come |
| 10 | across patients regularly that have drops in |
| 11 | hemoglobin, and they can't -- and they may have |
| 12 | bleeding, but they can't find the source of the bleed? |
| 13 | MR. HOROWITZ: Well, Neil, objection to form. |
| 14 | Again, that's not his purpose for being here. |
| 15 | You know, if you want him to talk a little bit in |
| 16 | his individual capacity, if you want to have this |
| 17 | conversation, that's fine, I would object, |
| 18 | anyways, even in a personal deposition, but I'll |
| 19 | allow the question. So understanding that this |
| 20 | is beyond the 30(b)(6), I'll let him chat with |
| 21 | you a little bit about this, if that's what you |
| 22 | want to do, under objection. |
| 23 | A. The reasons can be manifold. In fact, I |
| 24 | would -- I would search for the source of bleeding. |
| 25 | I would also search whether there is renal |

| | |
|---|---|
| 125: 1 | dysfunction, because there is a renal anemia |
| 2 | suspicion. I would search whether the iron level is |
| 3 | okay, and I would search for a cancer. |
| 4 | So there are many different good medical |
| 5 | explanations why the patient may experience a drop of |
| 6 | hemoglobin not necessarily linked to a bleeding |
| 7 | event. |
| 8 | Q. And that's why the requirement of finding an |
| 9 | overt bleed was part of the protocol, in your |
| 10 | understanding; is that right? |
| 11 | A. It's not only part of the protocol, it's part |
| 12 | of the official, independent of the sponsor |
| 13 | definition of a major bleed. |
| 14 | MR. HOROWITZ: Neil, it's been -- |
| 15 | MR. OVERHOLTZ: I was thinking about the same |
| 16 | thing. Can we stop in about 10 minutes? |
| 17 | MR. HOROWITZ: Can you do 10 more minutes? |
| 18 | THE WITNESS: Sure. |
| 19 | MR. HOROWITZ: Everything good? Al right. |
| 20 | 10 more minutes. |
| 21 | BY MR. OVERHOLTZ: |
| 22 | Q. So if you look with me down below in the last |
| 23 | paragraph, it says: "The study is event-driven." |
| 24 | Do you see that? |
| 25 | A. Yes. |

| | |
|---|---|
| 126: 1 | Q. And it says: "and requires 134 confirmed |
| 2 | thrombotic complications." |
| 3 | That number changed because the study got |
| 4 | split apart, correct? |
| 5 | A. It did. |
| 6 | Q. Okay. But the event-driven study, can you |
| 7 | just tell me what that meant? |
| 8 | A. Yeah. Sure, I ask explain that. An |
| 9 | event-driven study means that you would not run the |
| 10 | trial for a defined duration of treatment and then |

| | |
|---|---|
| 11 | just stop it after that duration as -- so to say |
| 12 | finished, but you would keep recruiting patients and |
| 13 | treating them until you have recruited a number of |
| 14 | events that are sufficiently high to make your |
| 15 | statistical analysis. |
| 16 | And, of course, in this particular case, you |
| 17 | need to have thrombotic events at a certain number. |
| 18 | And in order to reach the statistical power required, |
| 19 | we had to have -- well, in this version, 134, in the |
| 20 | latter version, after having split the two trials, |
| 21 | more than 160 events. |
| 22 | Q. Okay. So then if we turn over to the next |
| 23 | page, the second study is described there. And that's |
| 24 | the -- what turned into the EINSTEIN extension study, |
| 25 | correct? |

| | |
|---|---|
| 127: 1 | A. Correct. |
| 2 | Q. Okay. And this is for the patients that have |
| 3 | completed their treatment for either 6 or 12 months of |
| 4 | either their symptomatic DVT or pulmonary embolism, |
| 5 | correct? |
| 6 | A. Correct. |
| 7 | Q. Okay. And we talked about the fact that this |
| 8 | was a double-blind trial, correct? |
| 9 | A. Correct. |
| 10 | Q. Okay. And the principal safety outcome is |
| 11 | listed below for the VTE extension trial as major |
| 12 | bleeding. |
| 13 | Do you see that? |
| 14 | A. That is correct. |
| 15 | Q. Okay. Do you recall what the rationale was |
| 16 | for using a different principal safety outcome for the |
| 17 | extension study? |
| 18 | A. I recall that, yes. It was indeed here to |
| 19 | show superiority versus placebo and enhance in order |
| 20 | to match to the design of the trial and to the |
| 21 | benefit/risk assessment, that we would typically run |
| 22 | in such a placebo-controlled trial, we switched the |
| 23 | endpoint to major bleeds. |
| 24 | Q. Now, there is a conclusion section, and it |
| 25 | says the conclusion: "The CDP-RC endorses the |

| | |
|---|---|
| 128: 1 | proposed clinical development plan of VTE." |
| 2 | Correct? |
| 3 | A. Correct. |
| 4 | Q. So by May of 2006 in the -- at the CDP-RC |
| 5 | meeting, the CDP-RC had endorsed the plan of studying |
| 6 | VTE treatment using one study that looked at DVT and |
| 7 | PE using a 10 milligram intensified treatment period |
| 8 | dose for three weeks, followed by 20 milligrams once |
| 9 | daily, and then a second study that was a double-blind |
| 10 | study comparing 20 milligrams to placebo; is that |
| 11 | right? |
| 12 | A. That is correct. |
| 13 | Q. Okay. Now, if you could just flip with me |
| 14 | real quick to the Page 3. And just so we have some |
| 15 | context, that's under the section related to the Afib |
| 16 | development plan, but on Page 3 there is some |
| 17 | discussions of the VTE from the Phase IIb dose finding |

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

18 studies.
19     Do you see that?
20  A. I see that.
21  Q. Okay. And the Phase IIb dose finding studies
22     for VTE were the source for determining the dose to go
23     into the Phase III for the ROCKET Afib program, right?
24  A. Correct.
25  Q. Okay. So if you look with me in the middle

129: 1  of the page, it says: "The VTE recurrence and
2     bleeding rates observed in the phase IIb dose-finding
3     studies 11223 and 11528 studies were in accordance
4     with those reported in the literature in patients
5     effectively treated."
6     Do you see that?
7  A. Yes.
8  Q. Okay. Now, 11223, that was the ODIXa-DVT
9     study. Do you know?
10  A. Yes.
11  Q. That's right?
12  A. That's right.
13  Q. And 11528 is the EINSTEIN DVT study?
14  A. Yes.
15  Q. That was kind of Bayer's internal number for
16     those studies?
17  A. Correct.
18  Q. Okay. Now, the -- this sentence describing
19     that the VTE occurrence of bleeding rates were -- that
20     had been observed from those studies, was this
21     determined from the pooled analysis of those studies?
22  A. It was actually taking the totality of data
23     generated in the two trials.
24  Q. Okay. And there was, in fact, a pooled
25     analysis of those studies conducted, correct?

130: 1  A. There was a pooled analysis of the two
2     trials, but this very statement related to the
3     totality of data generated in the two trials.
4  Q. It says: "The 11" -- if you look in kind of
5     the middle of that paragraph: "The 11528" -- that's
6     the EINSTEIN DVT -- "study demonstrated that an OD
7     regimen of rivaroxaban was at least as efficacious as
8     enoxaparin/VKA in patients with confirmed, thrombotic
9     disease and that at high risk for life-threatening VTE
10     recurrence."
11     Do you see that?
12  A. I see that.
13  Q. Now, if you can look with me in the next
14     paragraph, it talks about the safety in -- for
15     bleeding events.
16     Do you see that paragraph?
17  A. Yeah.
18  Q. Okay. It says: "The relative safety in
19     terms of bleeding compared to standard of care was
20     better for all od regimens (hazard ratio below 1 for
21     all doses) as compared to the bid regimen for which a
22     slightly increased risk of bleeding was demonstrated
23     for the 20 milligram bid and the 30 milligram bid
24     doses."

25     Do you see that?

131: 1  A. Yes, I do see that.
2  Q. Okay. Now, when it talks about the fact that
3     the relative safety in terms of bleeding was better
4     for all OD regimens, hazard ratio below 1, do you know
5     if these findings were statistically significant?
6  A. No. This was a dose finding trial, which was
7     not powered to derive statistical analyses.
8  Q. Okay. So the 20 milligram BID and 30
9     milligram BID doses had higher bleeding risk compared
10     to the standard of care, and the standard of care
11     would have been the low molecular weight heparin
12     vitamin K antagonist, right?
13  A. Correct.
14  Q. Okay. Now, it says: "The 10 milligram BID
15     dose in study 11223 seemed to be comparable to the OD
16     doses in study 11528 in terms of safety."
17     Do you see that?
18  A. I see that.
19  Q. Okay. Was that the basis for using the 10
20     milligram BID dose at this point in time as that
21     intensified treatment period for the three-week
22     period?
23  A. I'm not sure that this -- this may have been
24     one of the reasons. But we typically take dose
25     decisions or recommendations, again, on the totality

132: 1  of data, including simulation, modeling simulation
2     approaches. So it -- this may have contributed to
3     it, but it is definitely not the only reason.
4     MR. OVERHOLTZ: Why don't we take our lunch
5     break now.
6     THE VIDEOGRAPHER: The time is now 12:54.
7     We're going off the record.
8     (Recess from 12:54 p.m. to 2:03 p.m.)
9     THE VIDEOGRAPHER: The time is now 2:03 and
10     we're back on record.
11  BY MR. OVERHOLTZ:
12  Q. Okay. Dr. Misselwitz, let's see. I think
13     we're waiting for a couple of documents to get in
14     here.
15     MR. OVERHOLTZ: But I need the ones right
16     before that. I apologize, let's just go off the
17     record for a second. I thought we were ready.
18     THE VIDEOGRAPHER: The time is now 2:03.
19     Going off the record.
20     (Recess from 2:03 p.m. until 2:11 p.m.)
21     THE VIDEOGRAPHER: Time is now 2:11, and we
22     are back on record.
23  BY MR. OVERHOLTZ:
24  Q. Dr. Misselwitz, one of the things that we
25     talked about earlier was the three-week period of

133: 1     intense treatment regimen. Do you recall that?
2  A. I do.
3  Q. Okay. And let me show you what we'll mark as
4     Exhibit Number --
5     MR. OVERHOLTZ: 10?
6     MR. HOROWITZ: I will tell you. It's 10.

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

| | |
|---|---|
| 7 | (EINSTEIN 30(b)(6) Exhibit 10 was marked for |
| 8 | identification.) |
| 9 | BY MR. OVERHOLTZ: |
| 10 | Q. This is Bates Janssen 00087929, and it's |
| 11 | Record 113917. And it's an e-mail dated June 12th, |
| 12 | 2006, from Sanjay Jalota to several people, including |
| 13 | Frank Misselwitz. |
| 14 | Okay. So if you will look with me, this is |
| 15 | an e-mail that you received from Sanjay Jalota at |
| 16 | Janssen on June 12, 2006, correct? |
| 17 | A. Correct. |
| 18 | Q. It's sent to several people at Bayer as well |
| 19 | as other people at Janssen; is that right? |
| 20 | A. Correct. |
| 21 | Q. Now, at this time in 2006, all of these |
| 22 | people were working as part of the VTE treatment team; |
| 23 | is that right? |
| 24 | A. As part of the overall rivaroxaban team, not |
| 25 | just treatment. |

| | |
|---|---|
| 134: 1 | Q. Okay. And so one of the people we see at the |
| 2 | very top is -- is -- it's an awalensing@planet.nl |
| 3 | address. Do you see that? |
| 4 | A. I see that. |
| 5 | Q. That's Ton Lensing. That was, like, his |
| 6 | personal e-mail address? |
| 7 | A. That's right. |
| 8 | Q. Who else was working on the VTE treatment at |
| 9 | this time frame, the development? Who were the main |
| 10 | people working on the development plan? |
| 11 | A. Can I clarify the question? |
| 12 | Q. Sure. |
| 13 | A. Working on the clinical development plan in a |
| 14 | narrow sense, or working on the Xarelto team in a |
| 15 | broader sense? |
| 16 | Q. Okay. We'll talk about the clinical -- I |
| 17 | thought we -- let's talk about the clinical |
| 18 | development plan and then maybe who was doing the |
| 19 | regulatory and some of the broader sense stuff after |
| 20 | that. |
| 21 | A. I see that. |
| 22 | Q. So who was working on the clinical plan at |
| 23 | this point in time period? |
| 24 | A. The clinical plan in the narrow sense was Ton |
| 25 | Lensing, myself, and then, of course, statistical |

| | |
|---|---|
| 135: 1 | considerations and expertise brought in by Torsten |
| 2 | Westermeier, Martin Homering. |
| 3 | From a regulatory point of view, we had Max |
| 4 | Wegner and Andrea Derix, Rene Kluensch, Isabelle |
| 5 | Stoeckert, and Joseph Scheeren. |
| 6 | Those were the Bayer people. |
| 7 | Q. The Bayer people? |
| 8 | A. Yeah. |
| 9 | Q. Right. |
| 10 | From Janssen, did you have an understanding |
| 11 | who were the primary people responsible for the VTE |
| 12 | treatment indication? |
| 13 | A. Lloyd Haskell and Christopher Nessel were the |

| | |
|---|---|
| 14 | two that -- well, and -- and -- and -- and Gary |
| 15 | Peters. |
| 16 | Q. We mentioned the fact that you were receiving |
| 17 | statistical support from Martin Homering and Torsten |
| 18 | Westermeier at that time, right? |
| 19 | A. Correct. |
| 20 | Q. Okay. And then we know that Ton Lensing |
| 21 | reported directly to you, correct? |
| 22 | A. He started reporting to me, and then -- I'm |
| 23 | not 100 percent sure how it matches with this date -- |
| 24 | we created a whole group of antithrombotic treatment |
| 25 | led by Scott Berkowitz who, in turn, reported it to |

| | |
|---|---|
| 136: 1 | me, so I don't recall exactly the date when we |
| 2 | created that intermediate level. |
| 3 | Q. Right. Okay. But sometime after this, there |
| 4 | became an intermediate level where Scott Berkowitz and |
| 5 | his group was kind of in between the development |
| 6 | program for VTE treatment? |
| 7 | A. Yeah, because just all -- all the groups in |
| 8 | my area of responsibility grew a bit larger and we |
| 9 | elected to have three group heads reporting in to me |
| 10 | rather than all the clinical leaders directly. |
| 11 | Q. Okay. Now, if you look with me, the subject |
| 12 | of this e-mail that you received in June of '06 was |
| 13 | "VTE treatment briefing package/protocols final |
| 14 | draft." Do you see that? |
| 15 | A. Yeah. |
| 16 | Q. And the attachment to this e-mail is listed |
| 17 | as the "EMEA_VTE treatment SUNDAY final draft"? |
| 18 | Do you see that? |
| 19 | A. I see that. |
| 20 | Q. Okay. Now, if we can look at the e-mail, |
| 21 | Sanjay Jalota is e-mailing several people, including |
| 22 | Andrea Derix at Bayer, and she says: "Dear Andrea - |
| 23 | thanks for the information - There was a Global |
| 24 | Advisory Council meeting today (Sunday 11 June) in New |
| 25 | York where the dose for the intensive VTE treatment |

| | |
|---|---|
| 137: 1 | was extensively discussed." |
| 2 | Do you see that? |
| 3 | A. I see that. |
| 4 | Q. Now, the Global Advisory Council meeting, was |
| 5 | that a joint meeting between J&J and Bayer? |
| 6 | A. Yes. |
| 7 | Q. And did it have a particular purpose, this |
| 8 | GAC? |
| 9 | A. This is a standing group of experts in the |
| 10 | field of antithrombotic drug development and |
| 11 | antithrombotic treatments both from many countries, |
| 12 | not just US -- a Global Advisory Council, as said -- |
| 13 | that advised us throughout a number of years on -- on |
| 14 | the topic of -- of the key important indications we |
| 15 | developed Xarelto in. |
| 16 | Q. And this says: "There was a post GAC |
| 17 | meeting (Joerg, Bernhard, Andreas, Martina, Ludwig |
| 18 | from Bayer, Gary, Bill, Lloyd and myself from J&J) |
| 19 | with the common consensus that based on the feedback |
| 20 | from the external consultants, the dose for the |

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

| | |
|---|---|
| 21 | intensive VTE treatment should be changed from 10 |
| 22 | milligrams BID to 15 milligrams BID." |
| 23 | Do you see that? |
| 24 | A. I see that. |
| 25 | Q. "I have made this change in the attached |
| 138: 1 | briefing document (with some supporting rationale |
| 2 | which we may have to update for the final version or |
| 3 | prepare for the meeting) along with (the) other |
| 4 | changes." |
| 5 | Do you see that? |
| 6 | A. I see that, yes. |
| 7 | Q. Okay. And so it seems that it was at this |
| 8 | GAC meeting in June of '06 in which the decision was |
| 9 | made to change the BID intensive treatment regimen |
| 10 | from 10 milligrams to 15, correct? |
| 11 | A. It was a recommendation, yes indeed. |
| 12 | Q. Okay. And it says: "It was recognized that |
| 13 | there is no data on 15 milligrams BID - only bridging |
| 14 | data between 10 milligrams BID and 20 milligrams BID." |
| 15 | Do you see that? |
| 16 | A. I see that. |
| 17 | Q. Because at this point, none of the Phase II |
| 18 | studies had looked at a 15 milligram dose; is that |
| 19 | right? |
| 20 | A. Not directly but, of course, you can always |
| 21 | bridge between two doses if and when the two doses |
| 22 | have directly been studied. |
| 23 | Q. But there had been no study of a 15 milligram |
| 24 | dose at this time period? |
| 25 | A. That's correct. |
| 139: 1 | Q. Okay. And the Phase III program in ROCKET |
| 2 | that looked at a dose adaptation of the 15 milligram |
| 3 | dose for the renally impaired patients, that had not |
| 4 | yet begun at this point in time, either, correct? |
| 5 | A. I think that statement is correct, yeah. |
| 6 | Q. This is what were leading up to, those |
| 7 | decisions coming pretty soon, to start the Phase III |
| 8 | program for ROCKET and VTE treatment? |
| 9 | A. Indeed, yeah. |
| 10 | Q. Okay. It says: It was felt that the |
| 11 | intense -- "It was also felt that the intensive dose |
| 12 | change should be made before the briefing package was |
| 13 | submitted to EMEA (rather than wait and make the |
| 14 | change in the final version) - there was a recognition |
| 15 | that the submission may be delayed but the consensus |
| 16 | is that we need to give a definite position on the |
| 17 | dose - we can discuss this at the CDC tomorrow (Monday |
| 18 | 12 June). We also need to update the protocol |
| 19 | accordingly." |
| 20 | Do you see that? |
| 21 | A. I do see that, yes. |
| 22 | Q. At this point in time, a protocol -- had a |
| 23 | protocol been finalized for the VTE treatment study, |
| 24 | or was it still being drafted, do you know? |
| 25 | A. It was what we call a "prefinal draft." And |
| 140: 1 | if I may explain, this is very typical, that unless |
| 2 | you have garnered all the feedback from FDA and EMEA, |

| | |
|---|---|
| 3 | sometimes even more regulatory bodies, you would not |
| 4 | want to finalize a protocol. |
| 5 | So you -- you come in with something that is |
| 6 | a mature draft for the discussion with the |
| 7 | authorities and then, after having got the feedback |
| 8 | from authorities, you finalize it. |
| 9 | Q. All right. If we can -- I'll show you what |
| 10 | we'll mark as Exhibit Number 11. |
| 11 | (EINSTEIN 30(b)(6) Exhibit 11 was marked for |
| 12 | identification.) |
| 13 | THE WITNESS: I'm through. |
| 14 | BY MR. OVERHOLTZ: |
| 15 | Q. Okay. Great. If you can look with me, this |
| 16 | is Bates BPAG_19176820, Record 3233767; and it's an |
| 17 | e-mail chain between yourself and Ton Lensing and a |
| 18 | couple of other people at Bayer from June of 2006; is |
| 19 | that correct? |
| 20 | A. That is correct. |
| 21 | Q. Okay. And if you'll look with me at 3233767, |
| 22 | it's an e-mail that is forwarded -- well, you -- you |
| 23 | send an e-mail to Ton Lensing, Marc van Unen, and |
| 24 | Martina Evertz regarding the EINSTEIN SMCC/ExCie |
| 25 | meeting at ESC in Barcelona. |
| 141: 1 | Do you see that? |
| 2 | A. That's correct. |
| 3 | Q. Okay. Now, this -- I want to ask you a |
| 4 | couple of questions about that. The ExCie, that's the |
| 5 | executive committee for the study, correct? |
| 6 | A. Correct. |
| 7 | Q. Okay. And the SMCC, what was that? |
| 8 | A. Study Management and Coordination Committee. |
| 9 | Q. Now, those are two different committees, or |
| 10 | they were kind of being called the same thing, or -- |
| 11 | the different names at the time? |
| 12 | A. The executive committee is kind of a more |
| 13 | narrow core group, and the SMCC was composed by the |
| 14 | ExCie plus -- sorry -- plus a group of national lead |
| 15 | investigators from each of the participating |
| 16 | countries. |
| 17 | Q. Okay. And so, now, they're going to have |
| 18 | this meeting at ESC. Now, is that the European |
| 19 | Society of Cardiology? |
| 20 | A. Correct. |
| 21 | Q. And you send this e-mail to Ton Lensing, who |
| 22 | we've talked about, but also Marc van Unen and Martina |
| 23 | Evertz. |
| 24 | Can you tell me what Marc van Unen's role was |
| 25 | with VTE? |
| 142: 1 | A. Both Marc van Unen as well as Martina Evertz |
| 2 | had been in the strategic marketing function for |
| 3 | antithrombotic therapies. |
| 4 | Q. You write to Ton Lensing. Down at the |
| 5 | bottom, you say: "Hi Ton," I "hope you are doing |
| 6 | well! Congratulations for fighting --" I think you |
| 7 | meant "through" -- |
| 8 | A. Yeah. |
| 9 | Q. -- "all the difficult decisions around the |

## Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

10    VTE-Treatment package submission."
11         Do you see that?
12    A. I see that.
13    Q. "I will give you a call anyway to discuss"
14    vari- -- "various matters. In general, I can live
15    with the decision to now take 15 milligram bid for the
16    initial treatment."
17         Do you see that?
18    A. I see that.
19    Q. Okay. And so this was following up that
20    decision at the GAC on June 12th, a few days before,
21    to switch from 10 to 15 BID for that initial treatment
22    period, correct?
23    A. That is correct.
24    Q. Okay. And so does this e-mail that you sent
25    to Ton indicate that you -- that you had some pushback

143: 1    as far as moving to that 15 milligram dose?
2    A. "Pushback" meaning that I pushed back?
3    Q. Yes.
4    A. No.
5    Q. The -- your statement that "I can live with
6    the decision to now take 15 ... for the initial
7    treatment" sounds to me like you were having a little
8    bit of problems making that move before now.
9         MR. HOROWITZ: Is that a question? That
10         sounds like a grand declaration.
11         MR. OVERHOLTZ: No, it's a question.
12    A. No, I don't have a problem with that; and I'm
13    happy to explain some of the background, if you wish
14    to.
15    BY MR. OVERHOLTZ:
16    Q. Well, why would you say, I can now -- "I can
17    live with the decision to now take 15 milligrams BID
18    for the initial treatment" if before you had not
19    opposed such a change?
20    A. I think this is to say that it was not my
21    primary preference in terms of dose of action, but
22    this is certainly a very viable option; and taking
23    into consideration the discussions we have had at the
24    Global Advisory Council, I -- I am content with that
25    change.

144: 1    Q. Your primary preference had been the
2    10 milligram BID therapy, correct?
3    A. It's very difficult to answer that question
4    with "yes" and "no" without knowing the content why
5    the Global Advisory Council had gave us that very
6    recommendation, but it is factually correct that my
7    team initially had worked out a plan with 10 BID as
8    the initial treatment.
9    Q. Was one of the reasons why you had selected
10    and had preferred the 10 milligram BID because you
11    believed the 10 milligram BID offered the broadest
12    therapeutic window?
13    A. No. It was the dose we have studied and we
14    had clinical data to conclude on.
15    Q. Okay. Now, it looks like you were going to
16    try to have a VTE meeting in Barcelona at this

17    cardiology meeting; is that right?
18    A. Correct.
19    Q. Okay. And do you recall having that meeting
20    in Barcelona?
21    A. Yes, I do.
22         (EINSTEIN 30(b)(6) Exhibit 12 was marked for
23    identification.)
24    BY MR. OVERHOLTZ:
25    Q. Let me show you what we'll mark as Exhibit

145: 1    Number 12, which is Record 1231088, Bates 02660438;
2    and then we'll also mark as Exhibit Number 13 its
3    attachment, which is Record 1231089, which is Bates
4    BPAG_02660439.
5         (Discussion off the record.)
6         (EINSTEIN 30(b)(6) Exhibit 13 was marked for
7    identification.)
8         MR. HOROWITZ: Are you good?
9         THE WITNESS: Yeah.
10         MR. HOROWITZ: Neil, when you're ready.
11         MR. OVERHOLTZ: Okay. Great.
12    BY MR. OVERHOLTZ:
13    Q. So there's -- the e-mail is Exhibit -- I
14    think it's --
15         MR. OVERHOLTZ: Is it 12?
16         MR. GEISLER: The e-mail is 12.
17         MR. OVERHOLTZ: Yeah.
18    BY MR. OVERHOLTZ:
19    Q. -- which is an e-mail that you received from
20    Bernhard Glombitza on April 26 of 2006.
21         Do you see that?
22    A. Yes.
23    Q. And it's entitled "presentation for todays
24    GDC-MC," and attached to this e-mail was a PowerPoint
25    entitled "Rivaroxaban DP3 for GDC MC," correct?

146: 1    A. Correct.
2    Q. And this attachment, if we look at
3    Exhibit 13, is a PowerPoint presentation entitled
4    "Rivaroxaban DP3 for GDC MC" and MC version 1.0.
5         And if we look at this -- the first page of
6    the PowerPoint, you can see that the title after that
7    is "Decision to start Phase III programs for the
8    indications" of "VTE treatment" and "Stroke prevention
9    in patients with atrial fibrillation," right?
10    A. Right.
11    Q. So this is now the presentation that's being
12    given related to this DP3, this decision-point time
13    period to start Phase III trials; is that right?
14    A. Correct.
15    Q. Okay. And do you recall presenting at this
16    DP3 meeting at the -- at the -- for the GDC in April
17    2006?
18    A. I was part of the team presenting.
19    Q. Okay. So if you can turn with me over to
20    Slide Number 4 --
21    A. Yeah.
22    Q. -- this is similar to a slide we saw before
23    where the dosing finding for the VTE Phase II study

## Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

24 supported both the Phase III dose selection for SPAF
25 as well as VTE treatment, correct?

147:
1 A. Correct.
2 Q. If we look down below, we see that -- the
3 20 milligram OD is the main dose and that rivaroxaban
4 10 milligrams BID for the first three weeks, do you
5 see that?
6 A. Yeah.
7 Q. So -- and we're going back in time a little
8 bit but -- so in April, you guys were still supporting
9 the 10 milligram dose, correct?
10 A. Correct.
11 Q. Okay. Now, above that, it says: "No dose
12 adaptation in subpopulations." Do you see that?
13 A. Indeed, yes.
14 Q. Okay. Now, was there a time where you were
15 actually recommending a dose adaptation for certain
16 populations in the V- -- VTE treatment study?
17 A. In designing the program for both
18 indications, we've discussed all options; but based
19 on the data generated in the Phase II program, we
20 came to the conclusion that there is no reason for a
21 dose adaptation in subpopulations in this particular
22 indication.
23 Q. So you made a -- was there a specific time,
24 though, where you went from supporting a dose
25 adaptation in this Phase III VTE treatment program to

148:
1 dropping your recommendation for a dose adaptation for
2 subpopulations?
3 A. I do not recall that. I do recall
4 discussions and scientific debate amongst team
5 members outlining the pros and cons for these
6 options.
7 Q. If you could turn with me over to Slide 10,
8 there's a slide called "The VTE treatment study
9 strives to optimize the product profile and keeps a
10 solid PTS."
11 A. I see it.
12 Q. Okay. And PTS stands for "probability of
13 technical success"; is that correct?
14 A. That is correct.
15 Q. Okay. And this document is listing that the
16 "Probability of technical success" for VTE treatment
17 at the time was estimated to be 63 percent; is that
18 right?
19 A. That is correct.
20 Q. Okay. Now, was that a higher probability of
21 technical success than the afib indication?
22 A. I don't recall the exact numbers. I would
23 need to look it up, but it could well be that it's
24 slightly higher.
25 Q. Okay. And this document is still listing

149:
1 that the initial treatment for rivaroxaban was the
2 10 milligram BID dose, right?
3 A. That is correct.
4 Q. Kind of about middle bullet point, "Initial
5 treatment," rivaroxaban 10 milligrams BID; is that

6 right? It's like the fourth bullet point up in that
7 first set.
8 A. That is correct.
9 Q. Okay. And so it looks like, according to
10 this document, back in 2006, the idea was that this
11 enrollment in the study and leaving the study would
12 end by the third quarter of 2009 with submission by
13 first quarter of 2010. That was the plan, right?
14 A. That is the plan as -- as we can read here in
15 the text.
16 Q. Now, that plan ended up getting modified and
17 pushed out a couple of years; is that right?
18 A. I wouldn't say "a couple of years," but it
19 got extended because the program got extended.
20 Q. Now, there was some debate originally, I
21 think we saw earlier, regarding that initial treatment
22 as to whether or not, instead of using Xarelto, you
23 would use the standard of care at the time, the low
24 molecular weight heparin. Do you recall that?
25 A. Yeah, I do.

150:
1 Q. Now, is it fair to say that the company
2 preferred, from a commercial perspective, that that
3 initial treatment period be with Xarelto?
4 MR. HOROWITZ: Objection; form.
5 A. No, there was no commercial consideration.
6 It was primarily a consideration of meeting a certain
7 medical need; and, that is, that many patients
8 presenting with VTE, particularly with deep vein
9 thrombosis, can be treated as outpatients, which is
10 often hampered by the initial parenteral treatment,
11 so that for actually no good reason other than the
12 administration of a parenteral drug, the patients got
13 hospitalized. So we felt that it was to the benefit
14 of patients to start even the initial treatment phase
15 with a tablet.
16 Q. Now, in the VTE Phase III trials, both the
17 DVT and the PE side, all of those -- well, take that
18 back.
19 Is it fair to say that a large percentage of
20 those patients actually did receive low molecular
21 weight heparin treatment before they were randomized
22 either the comparator or to the Xarelto arm?
23 A. That is correct. In the frame of a clinical
24 trial, it can't be done differently because you need
25 time to confirm the diagnosis and you need time to

151:
1 obtain the informed consent from the patient, and you
2 cannot reasonably -- to safeguard the safety of the
3 patients, you cannot reasonably keep these patients
4 untreated.
5 Q. So a patient comes into the hospital, they
6 have a suspected DVT, and -- but that DVT needs to be
7 confirmed with testing. You start treatment during
8 that confirmation period and you -- and the right
9 thing to do is to start them on some form of
10 treatment?
11 A. Correct.
12 Q. Okay. And because of that, somewhere close

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

13  to, I think I read, 90 percent of the patients that
14  were in the VTE trials actually received at least some
15  treatment with low molecular weight heparin before
16  they were randomized into the trial?
17  A. That is correct. And the trial protocol was
18  very specific about that because we said that the
19  number of doses of injections of low molecular weight
20  heparin needed to be limited; otherwise, if it is too
21  long, the patient would become ineligible for being
22  enrolled into the trial.
23  Q. If they had already received a certain amount
24  of low molecular weight heparin therapy, that would
25  skew the results of the -- of what's supposed to be a

152: 1  comparator trial between Xarelto and low molecular
2  weight heparin?
3  A. I respectfully disagree with this notion,
4  sir, and the reason for that being that, first of
5  all, it happened prior to the randomization, so there
6  is no bias at all because it applies to all the
7  patients treated in the trial, and it was typically
8  one shot of a low molecular weight heparin on the
9  background of an up to 12 months treatment duration.
10  Q. What was the limit on the amount of low
11  molecular weight heparin they could be treated with in
12  order to be -- in order to still be randomized into
13  the trial?
14  A. To the best of my memory, there -- there are
15  a number of options how low molecular weight heparin
16  can be given. There's a BID and an OD option. And
17  if the OD option would have been given, it was just
18  one shot; and if the BID option would have been
19  chosen by the treating physician, it could have been
20  a maximum of two shots, as far as my memory serves
21  me.
22  Q. So essentially, a one-day treatment for a --
23  of low molecular weight heparin. Anything greater
24  than one day, either a one -- a one once-daily dose or
25  two twice-daily doses would disqualify them from

153: 1  randomization?
2  A. That is to the best of my memory, what has
3  been specified.
4  Q. If you can turn with me to the next page,
5  there is a "Pros" and a "Cons." Do you see that?
6  A. Yeah.
7  Q. And the Pros says Chronic label, Full
8  coverage of DVT & PE; and the third bullet point says
9  "Initial treatment with Rivaroxaban is the
10  commercially preferred option."
11      Do you see that?
12  A. I see that.
13  Q. Now, who do you think came up with this idea
14  that this was a commercially preferred option?
15      MR. HOROWITZ: Objection; form.
16  A. Present -- well, who had -- well, it most
17  likely had been in the -- from our commercial
18  function, but we have to keep in mind that this
19  presentation is a presentation to a committee that

20  was composed both by representatives of clinical
21  development as well as of the commercial function.
22  So it was a mixed senior management group of people,
23  and, hence, both aspects needed to be represented in
24  the presentation.
25  Q. So this -- this committee that's hearing this

154: 1  presentation both has clinical development management
2  people, as well as business side management people?
3  A. Correct.
4  Q. One of the things it says is that the initial
5  treatment with rivaroxaban, if you look down,
6  "Supports formulary listings."
7      Do you see that?
8  A. I see that.
9  Q. Okay. Now, there's a bullet point down below
10  that says "Program favoured by J&J."
11      Do you see that?
12  A. I do, yeah.
13  Q. Was there another option on the table that
14  Bayer supported as opposed to this program?
15  A. No. This was just an additional bullet point
16  under the Pros, that this is the particular "program
17  favoured by J&J." That does not mean that we do not
18  favor it. We brought forward that -- that option as
19  well, but we wanted to make sure that the management
20  committee knows that this particular program was the
21  one supported both by J&J.
22  Q. Now, the Cons says that the "Initial
23  treatment with Rivaroxaban (NCE) has a slightly lower
24  probability of technical success" than low molecular
25  weight heparin "(approved medicine) pretreatment,

155: 1  though both treatments have PTS above standard."
2      Do you see that?
3  A. Correct.
4  Q. And eventually, as we've talked about, the
5  decision was made to use Xarelto at that pretreatment
6  period but at the 15 milligram BID dose, right?
7  A. Correct.
8  Q. Okay. If you look with me on the next page,
9  there's a cost indication for SPAF and VTE, and it
10  looks like the total cost for the VTE treatment was
11  being estimated to be around 91 -- is that million
12  euros?
13  A. Correct.
14  Q. Okay. That was to be through 2009, right?
15  A. Correct.
16  Q. Do you know how much it ended up costing?
17  A. I don't recall.
18  Q. Now, if you can turn with me -- it's Slide
19  16, I don't think it has a number on it. It's a title
20  slide, "Initial Treatment in VTE-Treatment," Frank
21  Misselwitz --
22  A. Yes.
23  Q. -- 25 April 2006. Do you see that?
24  A. Yeah.
25  Q. Okay. And this has been part of the

156: 1  presentation that you would have made; is that

Case 2:14-md-02592-EEF-MBN   Document 7192   Filed 08/02/17   Page 35 of 65

2   correct?
3   A. That is correct.
4   Q. So if you will turn with me over to Slide
5   20 -- you have a slide in your presentation that says
6   "The first 3-4 weeks are critical"?
7        Do you see that?
8   A. Yes.
9   Q. And so what you're describing here in this
10   slide, to try to summarize it, is that this is a
11   serious situation because you have an active clot, as
12   compared to the prophylaxis indication where you are
13   just trying to prevent a clot from forming, right?
14   A. Yes, that's correct.
15   Q. And so what you say in that second bullet
16   point is that "The initial intensity of
17   anticoagulation must be able to provide sustainable
18   inhibition of thrombin generation over the entire 24
19   hours," right?
20   A. That is correct.
21   Q. Okay. And now Xarelto has a half-life that
22   does -- is less than 12 hours; is that right?
23   A. It depends on the target population and
24   health of people. It appears the half-life was
25   shorter than 12 hours. In the elderly population, it

157:
1   is between nine and 13 hours.
2   Q. Okay. And so one of the things that is --
3   during this initial period is that you want to make
4   sure that you have efficacy of the anticoagulation
5   through an entire 24-hour period; is that right?
6   A. That is correct. And --
7   Q. Okay. And --
8   A. Not only efficacy but therapeutic levels, so
9   to say, of anticoagulation, right.
10   Q. You want to continue to inhibit thrombin
11   generation during the full 24-hour period; is that
12   right?
13   A. That is correct, on the background of an
14   active clot.
15   Q. And, therefore, for the efficacy of Xarelto
16   during this time period, BID dosing was felt to be a
17   better choice for this initial treatment period?
18   A. Indeed, that is correct, but for more reasons
19   than this only reason, and one additional reason
20   being that you achieve steady-state plasma levels
21   just faster.
22   Q. And was it fair to also say that you have
23   higher troughs when it comes to levels of the drug by
24   dosing through the BID dosing?
25   A. That is correct.

158:
1   Q. You want the third bullet point that you say on
2   this page is that "If initial coagulation is not
3   intense enough early recurrent VTE will result."
4        Do you see that?
5   A. Uh-huh.
6   Q. And so that's one of the things that you're
7   trying to prevent, and you need a dose that's going to
8   be high enough to prevent this -- another occurrence

9   of a clot. Is that fair?
10   A. That is correct.
11   Q. Now, do you agree that for Xarelto, one of
12   the things that's seen is a, when it comes to
13   efficacy, is that there is a flat-dose response for
14   the drug?
15   A. Within the ranges of this -- of the doses
16   that we studied, we haven't seen a big difference in
17   efficacy, that's correct.
18   Q. And, therefore, if you want to provide --
19   should the goal be to find the lowest possible dose
20   that doesn't raise the risk of a significant bleed in
21   a patient, knowing that you have this flat dose
22   response on the efficacy side?
23        MR. HOROWITZ: Objection; form.
24   A. It's a general principle to select the lowest
25   effective dose under these circumstances when there

159:
1   are no notable differences in efficacy.
2   Q. So if we look over at Slide 26, there is an
3   Efficacy of Initial Intensified Treatment Relative to
4   standard of care and Benchmark Trials.
5        Do you see that?
6   A. I do.
7   Q. Okay. And there -- standard of care is on
8   the right, which is the heparins and vitamin K
9   antagonist, and then on the left, there's -- one is --
10   one example given is the CORTES Trial, and the other
11   example is the ODIXa-DVT 11223 trial, correct?
12   A. Correct.
13   Q. And event rates are -- the efficacy of the
14   treatment rates are calculated here based on
15   deterioration of the clot based on different testing,
16   including ultrasound.
17        And there's a conclusion at the bottom.
18        Do you see that?
19   A. I see that, yes.
20   Q. It says: OD regimen comparable to standard
21   of care; BID regimen better.
22        Do you see that?
23   A. I do see that, yes.
24   Q. So did that support your decision that the
25   BID dosing would be the best dosing to use during that
       initial intensive treatment period?

160:
1   A. This is one of the factors to justify why we
2   selected a BID regime in the beginning.
3   Q. So if you will turn with me to Slide 31, it's
4   a slide titled "Options for Initial Treatment."
5        Do you see that?
6   A. I do.
7   Q. So we have the low molecular weight heparin
8   option for five to seven days, we have the Xarelto BID
9   option for the first three to four weeks as Number 2,
10   see, correct?
11   A. Uh-huh.
12   Q. And the third says: Why does 10 milligram
13   BID Xarelto provide a more intense level of
14   anticoagulation compared to 20 milligrams OD?

## Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

16 Do you see that?

17 A. I do.

18 Q. And the first bullet point says there is "No

19 big difference in Cmax." Do you see that?

20 A. Yeah.

21 Q. Cmax is -- Cmax is the highest blood levels of

22 the drug as measured in blood plasma when you take

23 that dose, correct?

24 A. Correct.

25 Q. Okay. And "Ctrough level is much higher in the

161: 1 bid regimen - resulting in a more sustainable

2 suppression of thrombin generation over time."

3 Do you see that?

4 A. That's correct.

5 Q. Okay. If you look with me at the next

6 section, Section 33 is the "DP 3 Recommendation on VTE

7 Treatment and SPAF." Do you see that?

8 It's a title slide. It doesn't have a page

9 number on it.

10 A. Yes. I see it.

11 Q. Okay. Now, I just want to ask you about a

12 couple of things in here.

13 If you look with me at Slide 37, there is a

14 "Brand Vision & Goals."

15 Do you see that?

16 A. Yeah, I do.

17 Q. Okay. It says: Brand Vision & Goals need to

18 guide the Phase III design in VTE/SPAF.

19 Do you see that?

20 A. I do.

21 Q. Okay. Now, the first one says: "Our vision

22 is to create the new gold standard for prevention and

23 treatment of thromboembolic disease."

24 Do you see that?

25 A. I do.

162: 1 Q. By creating the gold standard, you're talking

2 about creating the standard that doctors would want to

3 use for their patients as providing the best level of

4 care. Is that a fair statement?

5 A. That is a fair statement, yes.

6 Q. Okay. And so if you want to create the gold

7 standard for treatment of VTE, wouldn't you want to

8 design and do a superiority trial instead of a

9 noninferiority trial?

10 A. Not necessarily, no.

11 Q. Because it seems to me that you -- that Bayer

12 wasn't setting their sights very high here when they

13 decided to only go after noninferiority with a

14 noninferiority margin of 2.0 for their VTE Phase III

15 trials if their vision was to create a gold standard.

16 MR. HOROWITZ: Objection; form, argument.

17 A. First, this is a very broad vision that is

18 not linked to just one indication, and it is

19 basically the broad vision to provide improved

20 treatment modalities for both the prevention and the

21 treatment of thromboembolic disease. And the gold

22 standard is not necessarily a standard that is

23 superior on efficacy. It could be a standard that is

24 superior on safety or easier to administer, more

25 feasible to be used in broad clinical practice.

163: 1 So there are many factors playing into the

2 definition of a gold standard.

3 BY MR. OVERHOLTZ:

4 Q. Okay. And so when it comes to designing

5 clinical trials and choosing the dose that's going to

6 provide the best treatment for patients, do you think

7 that concern for how much money you can make should

8 play a role in those design decisions?

9 MR. HOROWITZ: Objection; form.

10 A. I think it's a very general statement. I am

11 personally, as a medical doctor and as the

12 accountable person to run this clinical development

13 program back in these years, I was really concerned

14 in providing the best and safest possible -- and best

15 in terms of benefit/risk balance -- new medicine to

16 patients at need.

17 Q. Do you think that it's the science that

18 should drive the decisions for how a Phase III

19 clinical trial is designed?

20 A. That is very clearly the first layer. It's

21 about science, it's about the regulatory environment;

22 and, of course, other factors need to be taken into

23 consideration but after that first layer.

24 Q. This says the -- the second bullet point

25 says: "Our goal is to improve the lives of patients

164: 1 and create a multi- billion dollar antithrombotic

2 franchise to prevent and treat both venous and

3 arterial thrombosis."

4 Do you see that?

5 A. I see that.

6 Q. Okay. Let's look at the next slide for a

7 second, Slide 38. It's the slide titled "Brand

8 ambition: The promises we need to deliver on."

9 Do you see that?

10 A. Yeah.

11 Q. Okay. The first one is "Redefine the

12 antithrombotic market by fulfilling a high unmet

13 medical need.

14 "Providing safe and simple and effective

15 therapy without monitoring."

16 Do you see that?

17 A. I do.

18 Q. That was a key component to the ambitions

19 that Xarel- -- that the company had for Xarelto, is

20 that it could be sold to patients without the need for

21 any form of regular routine monitoring, correct?

22 MR. HOROWITZ: Form.

23 A. It is correct to say that there is an

24 important medical need that was unmet back in the

25 time to have therapies, simple and effective

165: 1 therapies out there that would not require

2 monitoring, because this exactly is one of the

3 aspects why warfarin is underused.

4 Q. The second big arrow bullet point says:

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

5   "Establish a leading global brand with blockbuster

6   sales."

7       Do you see that?

8   A. I do see that.

9   Q. Okay. Now, I want to ask you about this

10  trial design for a minute. The --

11      MR. HOROWITZ: Neil, are you done with

12  Exhibit 13?

13      MR. OVERHOLTZ: I may be. I may have to come

14  back to it.

15      MR. HOROWITZ: Just wondering. I'm going to

16  put it aside so he's not distracted by your

17  trickery.

18      MR. OVERHOLTZ: Well, actually, you know

19  what, let's go back and just look at Slide 37 for

20  a minute.

21      MR. HOROWITZ: You're killing me.

22      MR. OVERHOLTZ: Sorry.

23  BY MR. OVERHOLTZ:

24  Q. Let's look at 37, which is the Brand Vision &

25  Goals."

166: 1      So we've got one bullet point that is talking

2   about creating a "gold standard for the prevention and

3   treatment of thromboembolic disease."

4       Sounds like it's a medical goal. Is that a

5   fair statement?

6   A. Yeah.

7   Q. And then you have a second goal that both

8   includes improving the lives of patients, which is a

9   medical-based goal -- correct? -- and then second,

10  creating a multi- billion dollar franchise, right?

11  A. That is correct.

12  Q. Okay. So now, it seems to me that if you

13  really wanted to show that your drug works better and

14  improves the lives of patients, that you would study

15  this drug using a superiority design but -- I mean,

16  does that sound fair to you?

17      MR. HOROWITZ: Objection; form, asked and

18  answered.

19      By the way, I meant to object to the form of

20  the prior question as well.

21  A. I respectfully disagree. Medical treatment

22  is often so complicated that it is an important

23  advancement of medical care if you provide better

24  modalities, even if you are non-inferior to the

25  current standard of care.

167: 1  Q. Dr. Misselwitz, do you play golf?

2   A. No, I don't.

3   Q. Do you ever watch golf?

4       MR. HOROWITZ: Neil, let's just call time out

5   here for a second. His personal golf

6   proclivities, a 30(b)(6) witness?

7   A. I -- I don't play, and actually, I don't

8   watch often.

9   Q. Okay.

10      MR. HOROWITZ: Neil, come on --

11  Q. Does -- do you know what a golf handicap is?

12  A. I know that, yes.

13  Q. And isn't designing a trial with a

14  noninferiority margin as high as 2.0 for the upper

15  confidence interval limit kind of like playing golf

16  with an 18 handicap to help out your score?

17      MR. HOROWITZ: Objection; form.

18  A. I would not go into that direction by making

19  that comparison, and I would want to state that

20  whenever you have a very effective standard of care

21  that has been proven to provide huge treatment

22  benefit versus placebo -- and that is the case for

23  warfarin -- then there are clear regulatory

24  guidelines how to assess new drugs in this framework,

25  and they do recommend performing noninferiority

168: 1  trials because of the very high treatment benefit the

2   comparator would already provide.

3       But it is important to be able to switch

4   from, say, injectables to a tablet. That's a major

5   advantage.

6   Q. If you want to show that you are as good a

7   golfer as Arnie Palmer, wouldn't you want to play him

8   straight up and not with a handicap?

9       MR. HOROWITZ: Objection; form.

10  A. I think this is the whole idea of a handicap,

11  but I think I -- I would not want to comment on

12  golfing because I'm not a pro.

13  Q. And because at the end of the day in the VTE

14  treatment trial for, let's say, pulmonary embolism, it

15  had a upper limit of the confidence interval that was,

16  like, 1.68, didn't it?

17      MR. HOROWITZ: Let me object to the form.

18  A. So I --

19  Q. That's true, right?

20  A. -- that wasn't the question or --

21  Q. That's true, right?

22  A. Yeah, that is true.

23  Q. And so this -- in the PE trial, the drug,

24  based on the projections, could have been as worse as

25  70 percent worse, almost 70 percent worse than the

169: 1  standard of care; is that right?

2   A. It's not right, because the -- this is just

3   the upper bound of the confidence interval. The

4   point estimate was actually very close to 1. And in

5   the case of the DVT trial, you may remember that

6   the point estimate was actually even favoring

7   rivaroxaban.

8   Q. But the upper limit confidence interval was

9   all the way to 1.68, right?

10  A. Which is clearly lower than the prespecified

11  noninferiority margin of 1.75.

12  Q. And so when it comes to treatment of

13  pulmonary embolism, Xarelto kind of came out like a 18

14  handicap golfer; whereas, the Lovenox looked like

15  Arnold Palmer, right?

16      MR. HOROWITZ: Objection; form.

17      You don't have to answer golf questions.

18  A. I disagree with that notion.

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

| | |
|---|---|
| 19 | MR. HOROWITZ: Why don't we, Neil -- it's |
| 20 | been a little over an hour. You want to -- |
| 21 | MR. OVERHOLTZ: I think I'm almost done with |
| 22 | this document, and then we can take a break. |
| 23 | MR. HOROWITZ: All right. Let's finish this |
| 24 | up -- |
| 25 | MR. OVERHOLTZ: Okay. |
| 170: 1 | MR. HOROWITZ: -- and break after this |
| 2 | document. |
| 3 | BY MR. OVERHOLTZ: |
| 4 | Q. Let's look at Slide 42, if we can. |
| 5 | It says: Commercial objectives for Phase III |
| 6 | program in VTE treatment and SPAF. |
| 7 | Do you see that? |
| 8 | A. I do. |
| 9 | Q. It says: "Ensure full alignment to desired |
| 10 | labeling based on product target profile/claims list, |
| 11 | but we need to balance the technical and operational |
| 12 | risk vs. the ideal profile and maximum speed of |
| 13 | development." |
| 14 | Do you see that? |
| 15 | A. I do. |
| 16 | Q. It then says: "Safeguard SPAF first: SPAF |
| 17 | is far more important than VTE treatment." |
| 18 | Do you see that? |
| 19 | MR. HOROWITZ: Objection. |
| 20 | A. I read that sentence. |
| 21 | Q. Knowing that the VTE treatment studies could |
| 22 | have an impact on the more important SPAF indication |
| 23 | that needed to be safeguarded first, do you think that |
| 24 | could have biased some of the decisions that were |
| 25 | being made regarding how the VTE trial was being |
| 171: 1 | designed? |
| 2 | MR. HOROWITZ: Objection; form. |
| 3 | A. No, I don't think so. |
| 4 | Q. I mean, what this document is talking about |
| 5 | is not letting the VTE treatment trial design |
| 6 | decisions hurt the company's commercial objectives for |
| 7 | afib, right? |
| 8 | MR. HOROWITZ: Objection; form. |
| 9 | A. I -- I can't interpret that bullet point the |
| 10 | way you -- you just interpreted it. |
| 11 | Q. Let's look at Slide 52, if we can. |
| 12 | It says: "Preliminary US MR data indicate, |
| 13 | that a lack of acute DVT/PE label will drive down |
| 14 | chronic usage of Rivaroxaban." |
| 15 | Do you see that? |
| 16 | A. I do. |
| 17 | Q. And so there was market research done that |
| 18 | was presented at this DP3 meeting that you were |
| 19 | presenting at that indicated that if the DVT/PE |
| 20 | treatment indication was not approved that that would |
| 21 | result in less chronic usage of Xarelto for things |
| 22 | like afib, right? |
| 23 | MR. HOROWITZ: Objection; form. |
| 24 | A. Give me, please, time to read that. |
| 25 | This is in the commercial section, which I |

| | |
|---|---|
| 172: 1 | have not familiarized myself with before. |
| 2 | Q. Okay. |
| 3 | A. I want to read it. |
| 4 | So I now familiarized myself with this slide. |
| 5 | Q. Okay. |
| 6 | A. I think the interpretation is different from |
| 7 | the market research in a way that emphasis is made on |
| 8 | the differential label for the acute initial |
| 9 | treatment phase in VTE treatment on the one hand and |
| 10 | the chronic maintenance treatment on the other hand |
| 11 | and the importance, based on that market research, to |
| 12 | have both labels, the acute intensified initial |
| 13 | treatment, as well as the maintenance chronic |
| 14 | treatment, because the use of the new drug in that |
| 15 | chronic maintenance phase is partly dependent on |
| 16 | whether or not the acute phase has been approved. |
| 17 | Q. And so, yeah, if we look at the three bullet |
| 18 | points down with the square around them in the bottom, |
| 19 | the last one talks about the fact that it is |
| 20 | approved "for acute and chronic outpatient treatment |
| 21 | of DVT and PE, the 'halo' effect or likelihood of |
| 22 | success in medically ill, SPAF, or ACS is reasonably |
| 23 | likely," correct? |
| 24 | MR. HOROWITZ: Objection; form. |
| 173: 1 | A. It is correctly read out, but it -- it also |
| 2 | says this -- this is a halo effect, very vague |
| 3 | formulation and very, kind of, soft result of that |
| 4 | market research. |
| 5 | Q. And the first bullet point indicates: |
| 6 | "Without the Acute indication in DVT/PE and only the |
| 7 | Chronic DVT/PE approval, the use of Rivaroxaban drops |
| 8 | to 35% in Acute and 58% in Chronic." |
| 9 | Correct? |
| 10 | A. That is a correct statement, and I think it |
| 11 | underlines the medical need having actually a single |
| 12 | drug approach for both the initial acute treatment |
| 13 | phase as well as the chronic maintenance phase. |
| 14 | Q. All right. So let's look at the last slide, |
| 15 | and we'll take our break, Slide 56. |
| 16 | It's a "Recommendation" slide. |
| 17 | Do you see that? |
| 18 | A. Uh-huh. |
| 19 | Q. The first bullet point says: The strategic |
| 20 | analysis of the various options to conduct the |
| 21 | Phase III program in VTE treatment integrating the |
| 22 | holistic medical, technical and commercial view favors |
| 23 | an intensified initial treatment regimen with |
| 24 | Rivaroxaban. |
| 25 | Correct? |
| 174: 1 | A. Correct. |
| 2 | Q. And that was opposed to using the standard of |
| 3 | care during that initial period, low molecular weight |
| 4 | heparin, correct? |
| 5 | MR. HOROWITZ: Objection; form. |
| 6 | A. That would be one other alternative option. |
| 7 | Q. Okay. And that's what -- the decision this |
| 8 | DP3 committee was being asked to make, correct? |

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

| | |
|---|---|
| 8 | MR. HOROWITZ: Objection; form. |
| 9 | A. I understand the decision to be made was the |
| 10 | Decision Point 3, what -- what we asked to be |
| 11 | granted, and this is a recommendation from the team. |
| 12 | Q. Bullet Point 2 says: "All other options |
| 13 | don't exploit the value of the asset." |
| 14 | Do you see that? |
| 15 | A. I do. |
| 16 | Q. Isn't it more important to not exploit the |
| 17 | safety of the patients when making clinical trial |
| 18 | design decisions than worried about -- than worrying |
| 19 | about whether you should be exploiting the value of |
| 20 | the asset? |
| 21 | MR. HOROWITZ: Objection; form, argument. |
| 22 | A. I think in the context of that presentation, |
| 23 | it -- it's, in fact, both. I personally read this as |
| 24 | a medical -- a new chemical entity, a new drug under |
| 25 | development, has its value by showing that it |

| | |
|---|---|
| 175: 1 | addresses an important medical need. So, for me, |
| 2 | value doesn't -- doesn't come with a connotation of |
| 3 | only a commercial value, but also the value for |
| 4 | patients. |
| 5 | Q. Then finally, at the bottom, it says: |
| 6 | "Further elaboration on the BID vs OD approach in the |
| 7 | preferred option approach is recommended." |
| 8 | Do you see that? |
| 9 | A. I do. |
| 10 | Q. So they were asking to look further into |
| 11 | whether or not the BID versus an OD approach should be |
| 12 | used? |
| 13 | A. Indeed. |
| 14 | Q. Okay. |
| 15 | MR. OVERHOLTZ: All right. Let's take our |
| 16 | break. |
| 17 | THE VIDEOGRAPHER: The time is now 3:22, and |
| 18 | we're going off the record. |
| 19 | (Recess from 3:22 p.m. until 3:45 p.m.) |
| 20 | THE VIDEOGRAPHER: The time is now 3:45, and |
| 21 | we're back on the record. |
| 22 | BY MR. OVERHOLTZ: |
| 23 | Q. Okay. All right. Dr. Misselwitz, we are |
| 24 | into the easy portion of the deposition now. I'm |
| 25 | actually going to show you several documents, just ask |

| | |
|---|---|
| 176: 1 | you to identify what they are and we're going to |
| 2 | attach them to the record and then we'll move forward. |
| 3 | Okay? So this shouldn't be too difficult. |
| 4 | A. Okay. |
| 5 | Q. All right. So first let me show you |
| 6 | what we'll mark as -- |
| 7 | MR. OVERHOLTZ: What number are we on? |
| 8 | MR. GEISLER: 14. |
| 9 | Q. -- 14, which is going to be Record |
| 10 | No. 3303605. |
| 11 | (EINSTEIN 30(b)(6) Exhibit 14 was marked for |
| 12 | identification.) |
| 13 | BY MR. OVERHOLTZ: |
| 14 | Q. And this is an e-mail. It's Bates Janssen |

| | |
|---|---|
| 15 | 15848474, an e-mail from January 26, 2010, Subject is |
| 16 | the Einstein (DVT & PE) SAP and Protocol, and it's |
| 17 | from a Martin Gebel to Bennett Levitan at Janssen as |
| 18 | well as copied to a couple other folks at Janssen. |
| 19 | Do you see that? |
| 20 | A. Yeah, I do see that. |
| 21 | Q. And there are several attachments here, some |
| 22 | of which are labeled "SAP" and some of which are |
| 23 | labeled "The Integrated Protocol." |
| 24 | Do you see that, the listing of the |
| 25 | attachments? |

| | |
|---|---|
| 177: 1 | A. Yeah. |
| 2 | MR. HOROWITZ: Are you looking at the |
| 3 | attachments here? |
| 4 | A. Ah, here we go. |
| 5 | Q. Yes. |
| 6 | A. Okay. Yeah, I do see that. |
| 7 | Q. Okay. There is an SAP for DVT, an SAP for |
| 8 | meta with signatures, an SAP for PE, and then the |
| 9 | integrated protocol attachment. |
| 10 | Do you see that? |
| 11 | A. Yeah. |
| 12 | Q. Okay. And when it talks about the SAP, is |
| 13 | that a Statistical Analysis Plan? |
| 14 | A. That is correct. |
| 15 | Q. Is that something that goes along with the |
| 16 | protocol, usually? |
| 17 | It's developed alongside the protocol? |
| 18 | A. Yes. |
| 19 | Q. And what does the SAP govern for this study? |
| 20 | A. I'm not sure I fully understand the question. |
| 21 | What? |
| 22 | Q. What is the SAP used for -- |
| 23 | A. Ah, right. |
| 24 | Q. -- in the clinical trial. |
| 25 | A. The Statistical Analysis Plan is a document |

| | |
|---|---|
| 178: 1 | that describes the main outcome measures and the way |
| 2 | they are to be analyzed in that trial. |
| 3 | Q. Okay. And like a protocol, once a |
| 4 | Statistical Analysis Plan has been finalized, it |
| 5 | should be adhered to by the people that are conducting |
| 6 | the trial; is that correct? |
| 7 | MR. HOROWITZ: Objection; form. |
| 8 | A. It is clear in any case that prior to |
| 9 | unblinding of the clinical trial, the SAP needs to be |
| 10 | finalized and fixed and there is an FDA rule to say |
| 11 | that typically it should be fixed prior to having |
| 12 | enrolled 50, 60 percent of the -- of the patients. |
| 13 | BY MR. OVERHOLTZ: |
| 14 | Q. Okay. And if there are any amendments to the |
| 15 | Statistical Analysis Plan, the same type of procedures |
| 16 | are in place that we talked about earlier for a |
| 17 | protocol, it needs to be approved by a committee and |
| 18 | perhaps submitted for review to regulatory if they |
| 19 | require that? |
| 20 | A. Not to the same extent as the protocol |
| 21 | itself. It would, for instance, not automatically go |

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

| | |
|---|---|
| 22 | out to all the IRBs, but it would go out to, say, FDA |
| 23 | and EMEA. |
| 24 | Q. Okay. All right. So let's look at, then -- |
| 25 | if I've got the right numbers here -- Exhibit 15, |
| 179: 1 | which is 3303606, which is Bates Janssen 15848475. |
| 2 | (EINSTEIN 30(b)(6) Exhibit 15 was marked for |
| 3 | identification.) |
| 4 | BY MR. OVERHOLTZ: |
| 5 | Q. And if you just look at the front page for |
| 6 | me -- and you can flip through if you need to, but |
| 7 | this indicates that this would be the Statistical |
| 8 | Analysis Plan for the Einstein-DVT Phase III trial; is |
| 9 | that correct? |
| 10 | A. That is correct. |
| 11 | Q. Okay. And it's signed by three people, one |
| 12 | being Akos F. Pap, and that person is listed as |
| 13 | statistician; is that correct? |
| 14 | A. That is correct. Akos -- |
| 15 | Q. Is that -- |
| 16 | A. Akos is -- |
| 17 | Q. She is -- |
| 18 | A. -- Hungarian -- he is -- |
| 19 | Q. Oh. |
| 20 | A. -- Hungarian by origin, and Akos is the |
| 21 | pronunciation. |
| 22 | Q. Okay. Akos. And Akos is a Bayer employee? |
| 23 | A. Yes. |
| 24 | Q. What was Akos's role with respect to the |
| 25 | EINSTEIN clinical trial program? |
| 180: 1 | A. He was the study statistician assigned to |
| 2 | that study. |
| 3 | Q. Okay. Did he work under or with someone like |
| 4 | Martin Homering or Torsten Westermeier or -- or did |
| 5 | they have different roles? |
| 6 | A. They -- they had different roles. Generally |
| 7 | speaking, Martin Homering is in a different shop. He |
| 8 | runs what we call "integrated analysis." |
| 9 | And Akos is reporting to a line manager, and |
| 10 | that line manager -- actually, I don't know who it |
| 11 | is -- would then be on the same level as Torsten |
| 12 | Westermeier, who was the expert statistician for |
| 13 | cardiovascular. |
| 14 | THE COURT REPORTER: Pardon me? |
| 15 | MR. OVERHOLTZ: Cardiovascular. |
| 16 | Q. Okay. And it's also signed by Ton Lensing -- |
| 17 | A. Correct. |
| 18 | Q. -- in February 2007 and then also signed by |
| 19 | Harry Buller also in February 2007? |
| 20 | A. Correct. |
| 21 | Q. And Harry Buller was one of the outside |
| 22 | expert consultants that was involved -- |
| 23 | A. He is a PI of the trial. He is the head of |
| 24 | the steering committee or, in this context, we call |
| 25 | it executive committee; and he was the principal |
| 181: 1 | investigator of the trial. |
| 2 | Q. Okay. Then if we can look at what we'll mark |
| 3 | as Exhibit 16, which is Record 3303607, Janssen |

| | |
|---|---|
| 4 | 15848641, this is another attachment to that e-mail |
| 5 | that we saw in Exhibit 14. |
| 6 | (EINSTEIN 30(b)(6) Exhibit 16 was marked for |
| 7 | identification.) |
| 8 | Q. This is the Statistical Analysis Plan and |
| 9 | indicated by the top, to be the Statistical Analysis |
| 10 | Plan for the meta-analysis of the EINSTEIN PE and DVT |
| 11 | treatment studies; is that correct? |
| 12 | A. That is correct. |
| 13 | Q. Okay. And this document contains the same |
| 14 | signatures that we saw in the previous document; is |
| 15 | that correct? |
| 16 | A. Correct. |
| 17 | Q. Okay. And this document would have |
| 18 | controlled how the statistical analysis of the data |
| 19 | that had been contained that was gathered in the |
| 20 | EINSTEIN PE and DVT treatment trials would be |
| 21 | analyzed; is that right? |
| 22 | A. How the meta-analysis would be -- would be |
| 23 | performed? |
| 24 | Q. For the meta-analysis that was called for? |
| 25 | A. Yeah. Uh-huh. |
| 182: 1 | Q. And that meta-analysis was called for in the |
| 2 | protocol for the study, if you know? |
| 3 | A. I don't know as to whether or not the |
| 4 | individual protocols of DVT and PE had -- had |
| 5 | mentioned that, but all of -- all appropriate |
| 6 | regulatory documents, as well as that SAP, had |
| 7 | prespecified the meta-analysis. |
| 8 | Q. And then finally, Exhibit -- |
| 9 | MR. OVERHOLTZ: 17? |
| 10 | MR. GEISLER: 17. |
| 11 | BY MR. OVERHOLTZ: |
| 12 | Q. -- is the 3303608, Janssen 15848806, and this |
| 13 | is the Statistical Analysis Plan for the EINSTEIN |
| 14 | pulmonary embolism 11702 study, according to its |
| 15 | title. |
| 16 | (EINSTEIN 30(b)(6) Exhibit 17 was marked for |
| 17 | identification.) |
| 18 | BY MR. OVERHOLTZ: |
| 19 | Q. Do you see that? |
| 20 | A. I do. |
| 21 | Q. And it also has the same signatures like Akos |
| 22 | Pap and Ton Lensing and Harry Buller, correct? |
| 23 | A. That is correct. |
| 24 | Q. Okay. And this would have governed the |
| 25 | statistical analysis of the data collected in the |
| 183: 1 | EINSTEIN pulmonary embolism Phase III trial; is that |
| 2 | right? |
| 3 | A. That is correct. |
| 4 | Q. Okay. So let me show you what is going to be |
| 5 | marked as Exhibit 18. |
| 6 | MR. OVERHOLTZ: And this is my copy. It will |
| 7 | be the copy, and I can get you guys copies. It's |
| 8 | got Bates -- let me identify it for the record |
| 9 | first. |
| 10 | It's Record 1203527. It's Bates |

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

11 BPAG_02363367. It's the 11702 protocol,
12 integrated protocol for the deep vein thrombosis
13 or pulmonary embolism Phase III trial through
14 Amendment No. 5 of July 2010 with Amendments 2,
15 3, 4, and 5 incorporated. I'll let you take a
16 look at that.
17     MR. HOROWITZ: That's the only copy you have?
18     MR. OVERHOLTZ: That's the only copy that I
19 have.
20     MR. HOROWITZ: You know, Neil, it's also --
21 this copy has got your writing on it. I think
22 that's your writing, isn't it?
23     MR. OVERHOLTZ: Oh, that is my writing, yeah.
24     MR. OVERHOLTZ: Why don't we -- why don't we
25 just -- can you guys -- can we skip this one,
184: 1 we'll come back to it? We'll get a clean copy
2 marked, and you can do the usual --
3     MR. OVERHOLTZ: Well, can we just agree to
4 replace the front pages?
5     MR. OVERHOLTZ: Yeah, why don't we just -- why
6 don't we just replace the exhibit to be safe and
7 then...
8     MR. OVERHOLTZ: Well, I don't think -- I
9 don't think we're going to be able to print --
10 unless y'all can print a clean copy.
11     MR. HOROWITZ: We can probably get it.
12     MR. HOROWITZ: A clean copy printed?
13     MR. HOROWITZ: Yeah.
14     MR. OVERHOLTZ: Or provide it to the court
15 reporter? We can do that, too.
16     MR. HOROWITZ: Whatever. Are you going to do
17 any substance on this, or is it literally the
18 same thing?
19     MR. OVERHOLTZ: Same thing, no substance.
20     MR. HOROWITZ: Okay. Let's move things
21 along.
22     MR. OVERHOLTZ: And we'll agree, we'll get
23 the court reporter a clean version.
24     MR. HOROWITZ: A clean version.
25     MR. OVERHOLTZ: Does that sound like a good
185: 1 agreement?
2     MR. HOROWITZ: That is a great agreement.
3     MR. OVERHOLTZ: Okay. That's fine. Okay.
4 Great.
5     MR. HOROWITZ: Court reporter agrees, Neil
6 agrees, Jeff agrees. We all agree.
7     (EINSTEIN 30(b)(6) Exhibit 18 was marked for
8 identification.)
9 BY MR. OVERHOLTZ:
10 Q. Okay. Now, of course, once the decision was
11 made to move forward with Phase III, those Phase III
12 trials were concluded, correct?
13 A. Yeah.
14 Q. Okay. And they would have been governed by
15 the protocol and any of the protocol amendments that
16 were agreed to as part of the study; is that correct?
17 A. Correct.

18 Q. Okay. And the document you're looking at is
19 Exhibit 17, is the integrated protocol for the PE and
20 DVT study; is that correct?
21 A. That is correct.
22 Q. And the -- even though the two trials were
23 conducted separately, the 11702 DVT --
24 A. Under one umbrella protocol.
25 Q. One umbrella protocol, correct.
186: 1     And that's the protocol through Amendment
2 No. 5 of -- through 2010, correct?
3 A. That's correct.
4 Q. Now, let me --
5     MR. OVERHOLTZ: Actually, do we have this
6 one?
7     (EINSTEIN 30(b)(6) Exhibit 19 was marked for
8 identification.)
9 BY MR. OVERHOLTZ:
10 Q. I'm going to show you what we'll mark as
11 Exhibit 18 [sic], which is Record 3645718, Bates
12 Janssen 18667795, which is -- this document is titled
13 "Clinical Study Protocol Amendment," and it's the
14 "Once-daily oral direct factor Xa inhibitor
15 rivaroxaban in the long-term prevention of recurrent
16 symptomatic venous thromboembolism in patients with
17 symptomatic deep-vein thrombosis or pulmonary
18 embolism. The Einstein-Extension study."
19     Do you see that?
20 A. Correct.
21 Q. So this would have been the -- and that study
22 was used as an internal number at Bayer, the 11899
23 number; is that right?
24 A. Correct.
25 Q. Okay. And this would have been the protocol
187: 1 with the first amendment dated March 21st, 2007; is
2 that right?
3 A. Correct.
4 Q. Okay. And if we look in the document, you
5 can see that the -- this is a document that actually
6 describes the way in which the protocol for the
7 extension study is being amended.
8     Do you see that?
9 A. I see that. And as I can see it from the
10 cover version -- or from the cover page, this is
11 amendment what we call a local amendment that is
12 applicable only to Germany as a participating
13 country.
14 Q. Right. It says "applicable to" at the --
15 before the signature line, which is Germany?
16 A. Correct.
17 Q. And this was an amendment that had to deal
18 with the change that just dealt with the investigator
19 sites that were treating patients under the study in
20 Germany; is that correct?
21 A. That is correct.
22 Q. Do you recall what the basis for that local
23 amendment was?
24 A. I would need to read it through to

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

25  familiarize myself first with the contents of the

188: 1  amendment.

2  Q. Okay. Well, before we do that, just let me

3  ask you to scroll over with me to -- past page 8 of 8,

4  and then there is an actual -- the actual protocol.

5  It has kind of a picture of Albert Einstein on it. At

6  the very bottom is -- the Bates range is 817, if you

7  look at that number on the bottom of the page.

8      MR. HOROWITZ: This here, so if you go to

9  817.

10  A. Yes. Got it.

11  Q. Okay. And this document that's attached to

12  the amendment is the actual protocol for the EINSTEIN

13  extension study; is that correct?

14  A. Correct.

15  Q. Okay. And if you look at the cover page, the

16  principal investigator is Dr. Harry Buller, correct?

17  A. Correct.

18  Q. And it was signed by -- if you turn over to

19  the page ending in 818, Dr. Harry Buller, as well as

20  Anthonie Lensing on November 28 of 2006, right?

21  A. Correct.

22  Q. Okay. Now, let me -- we talked earlier about

23  the two dose ranging studies. Both of those dose

24  ranging studies ended up being published in the

25  medical literature as articles; is that correct?

189: 1  A. That is correct.

2  Q. Okay. Let me show you first what we'll mark

3  as Exhibit 19, which is -- or 20, Exhibit 20, which is

4  Record 5755, Bates BHCP_0006466.

5      (EINSTEIN 30(b)(6) Exhibit 20 was marked for

6  identification.)

7      THE WITNESS: Okay.

8  BY MR. OVERHOLTZ:

9  Q. And this is the publication of the ODIXa-DVT

10  Phase IIb trial for the DVT treatment; is that

11  correct?

12  A. Correct.

13  Q. Okay. And if we look at the main page of the

14  article, this is the author who -- this is the article

15  with the lead author of Giancarlo Agnelli; is that

16  correct?

17  A. That is correct.

18  Q. Okay. And you were also a listed author for

19  this article, correct?

20  A. That is correct.

21  Q. And you were on the writing team for this

22  Phase II clinical trial; is that correct?

23  A. Back in that time, I was actually the

24  responsible global clinical leader for that trial.

25  Q. Okay. Because this was the Phase IIb

190: 1  program?

2  A. Yeah.

3  Q. Okay. And did you participate in the

4  finalization of this manuscript for publication?

5  A. I did.

6  Q. Were there any outside writing companies

7  associated with the publication of this article?

8  A. I do not recall exactly for this very paper;

9  but we do -- did engage a company called Chameleon

10  that provided editorial assistance, formatting,

11  spell-checking, et cetera.

12  Q. Did Chameleon ever provide out any

13  substantive editing of these -- of these medical

14  articles for publication?

15  A. No.

16      (EINSTEIN 30(b)(6) Exhibit 21 was marked for

17  identification.)

18  BY MR. OVERHOLTZ:

19  Q. Let me show you what we'll mark as

20  Exhibit 21, which is Record Number 920896.

21      MR. OVERHOLTZ: Too short of a wire there?

22      MR. HOROWITZ: I keep stepping on it.

23  Q. And this Exhibit 21 is the article that was

24  published in Blood, by the American Society of

25  Hematology Journal, where the lead author is Harry

191: 1  Buller. It's the EINSTEIN DVT dose findings study,

2  correct?

3  A. Correct.

4  Q. And you also were a listed author of this

5  study, as well, correct?

6  A. That is correct.

7  Q. Okay. And along with yourself, Anthonie

8  Lensing was another Bayer employee listed on the

9  article; is that right?

10  A. That is correct.

11  Q. Okay. All right. So I'm going to ask you a

12  little bit about the Phase III trials, the D -- PE,

13  DVT and extension studies.

14      Those trials also ended up as publications

15  published in the medical literature, as well, correct?

16  A. That is correct.

17  Q. Okay. But also, the company also created

18  clinical study reports for those trials; is that

19  right?

20  A. Yeah, that is right.

21  Q. And those clinical study reports are provided

22  to the regulatory authorities where approval of the

23  drug is sought; is that correct?

24  A. That is correct.

25  Q. Okay. And were you involved in the creation

192: 1  and development of the clinical study reports for

2  those EINSTEIN Phase III trials?

3  A. I was involved in the review.

4  Q. Okay. So let me show you -- I'm going to

5  show you Exhibit 22, 23, and 24.

6      (EINSTEIN 30(b)(6) Exhibit 22 was marked for

7  identification.)

8      (EINSTEIN 30(b)(6) Exhibit 23 was marked for

9  identification.)

10      (EINSTEIN 30(b)(6) Exhibit 24 was marked for

11  identification.)

12      MR. OVERHOLTZ: And I'll give them to you one

13  at a time. And we'll reach the same agreement to

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

14  replace these because it has my handwriting on
15  there. The first --
16      MR. HOROWITZ: Are these the only copies you
17  have?
18      MR. OVERHOLTZ: Only copies I have.
19      MR. HOROWITZ: Are you doing substance?
20      MR. OVERHOLTZ: No, no substance.
21  BY MR. OVERHOLTZ:
22  Q. The first is Janssen 00582486, Record Number
23  193800.
24      And it is the -- described as the EINSTEIN PE
25  Clinical Study Report signed on March 28, 2012, by Ton
193: 1  Lensing.
2      And I'll show you that exhibit and have you
3  confirm.
4      MR. OVERHOLTZ: That was 22.
5  Q. Okay. And this would have been the clinical
6  study report that would have been provided -- the
7  company would have obligation to provide the final
8  clinical study report to regulatory authorities before
9  approval; is that correct?
10  A. That is correct.
11  Q. Also, I'm going to attach Exhibit 23, which
12  is Bates BHCP_00499238, Record 424906, which is
13  described as the DVT study -- the EINSTEIN DVT study,
14  Phase III Clinical Study Report, 22 March 2007. And
15  I'll represent to you that this is an unsigned version
16  that has some highlighting, so this could be a draft.
17      But I'll let you take a look and confirm with
18  me whether you think that's a draft or the final.
19  A. It's clearly a draft version --
20  Q. Right.
21  A. -- because the version number is below 1.
22  Q. Right.
23  A. It's version 0.8, so it's a draft.
24  Q. So that would have been a draft. The final
25  version would have needed to have been submitted to
194: 1  the regulatory authorities; is that correct?
2  A. Correct.
3  Q. And you know that one was finalized and would
4  have been provided to the regulatory authorities?
5  A. Indeed.
6  Q. Okay.
7  A. But I cannot attest how they may differ.
8  Q. Okay. That's fine.
9      Then I'll show you Exhibit 24, which is
10  described as the final version 1.0 Clinical Study
11  Report for the EINSTEIN extension study, 11899, that
12  ended on September 17th, 2009. And the date of the
13  report is July 30th at 2010. It's Bates
14  BHCP_00526099, and the record number is 425838.
15      And I'll let you confirm that.
16  A. So it is the version 1.0. Seems to me to be
17  that this is the final version, but it is an unsigned
18  version.
19  Q. Okay. And we talked about the fact that
20  these became publications.

21      Let me show you what we'll mark as
22  Exhibit 25, which has designation as FM-200. It's
23  Exhibit 25.
24      (EINSTEIN 30(b)(6) Exhibit 25 was marked for
25  identification.)
195: 1  BY MR. OVERHOLTZ:
2  Q. This is an article dated December 23rd, 2010,
3  in the New England Journal of Medicine entitled "Oral
4  Rivaroxaban For Symptomatic Venous Thromboembolism.
5  The EINSTEIN Investigators is listed as the author.
6  A. That is correct.
7  Q. Okay. And if you look at the background, it
8  says this is -- "Rivaroxaban, an oral factor Xa
9  inhibitor, may provide a simple, fixed-dose regimen
10  for treating acute deep-vein thrombosis (DVT) and for
11  continued treatment, without the need for laboratory
12  monitoring."
13      Do you see that?
14  A. Correct.
15  Q. And so this was the published article of the
16  EINSTEIN DVT Phase III trial; is that correct?
17  A. It was actually a combination of the EINSTEIN
18  DVT and the EINSTEIN extension trial taken together
19  in one publication.
20  Q. Okay. And we see that if we look down in the
21  methods, they describe the fact that there were two --
22  there was an open label, as well as, in parallel, a
23  double-blind, event-driven, the extension study; is
24  that right?
25  A. Correct.
196: 1  Q. Okay. Now, the -- we talked a little bit
2  about the -- we've -- I think we've talked about each
3  of them separately as far as the primary safety
4  endpoint.
5      The safety endpoint -- the primary safety
6  endpoint for the DVT trial, EINSTEIN DVT and the
7  EINSTEIN extension study, were different; is that
8  correct?
9  A. That's correct.
10  Q. The primary endpoint for the -- for the
11  extension trial was major bleeds, correct?
12  A. That is correct.
13  Q. And the primary endpoint for the DVT trial
14  was, of course, the combination of major plus
15  clinically relevant non-major bleeds; is that right?
16  A. That is correct.
17  Q. Okay. The drugs were also -- one was --
18  there were differences between the studies as far as
19  one was open label, one was double blind, one was a
20  non-inferiority, the other was a superiority trial?
21  A. Uh-huh.
22  Q. Is that correct?
23  A. That is correct.
24  Q. Okay. Did the protocol call for the combined
25  analysis of the two trials?
197: 1  A. This is not a combined analysis of the two
2  trials. This is one publication representing two

## Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

| | |
|---|---|
| 3 trials. | 10 randomized to receive Xarelto, compared to 216 initial |
| 4 Q. Representing the DVT results for the | 11 diagnosis of pulmonary embolism patients? |
| 5 extension study; is that right? | 12 A. Correct. |
| 6 A. I don't understand the question. | 13 Q. Okay. And then for placebo, 356 to 238; is |
| 7 Q. Okay. So -- | 14 that right? |
| 8 MR. HOROWITZ: And I'll object to the form. | 15 A. Correct. |
| 9 Q. Let me ask -- let me go back, because I think | 16 Q. Okay. More DVT than PE patients in the |
| 10 I confused myself and you. | 17 extension setup? |
| 11 The DVT trial results are provided in this | 18 A. Yeah. |
| 12 publication; is that correct? | 19 Q. And if you -- you were listed as one of the |
| 13 A. Uh-huh. | 20 members of the writing committee on the right side of |
| 14 Q. And -- | 21 this publication on the first page. |
| 15 MR. HOROWITZ: You've got to say "yes" or | 22 A. That's correct. |
| 16 "no." | 23 Q. All right. Now let me show you what we'll |
| 17 A. Yes. | 24 mark as Exhibit Number 26. |
| 18 Q. As well as the EINSTEIN extension results; is | 25 (EINSTEIN 30(b)(6) Exhibit 26 was marked for |
| 19 that correct? | 200: 1 identification.) |
| 20 A. That is correct. | 2 BY MR. OVERHOLTZ: |
| 21 Q. Okay. What's described, if you look with me | 3 Q. Which is designated with the designation |
| 22 on the Page 2503, as the continued treatment study in | 4 FM-201. I'll have to get you a copy later. |
| 23 the -- in the chart? | 5 It's the publication in the New England |
| 24 A. That is how the steering committee worded the | 6 Journal of Medicine, dated April 5th, 2012, titled |
| 25 EINSTEIN extension trial. | 7 "Oral Rivaroxaban for the Treatment of Symptomatic |
| 198: 1 Q. Right. | 8 Pulmonary Embolism, The EINSTEIN-PE Investigators." |
| 2 A. Yeah. | 9 Do you see that? |
| 3 Q. Okay. And the patients that were included in | 10 A. I see that, yes. |
| 4 the EINSTEIN extension trial could have undergone | 11 Q. So this would have been the publication for |
| 5 treatment in the past for either PE or DVT, is that | 12 the Phase III EINSTEIN pulmonary embolism trial? |
| 6 correct, to be randomized into that trial? | 13 A. Correct. |
| 7 A. Yes. The point here is, just to explain, | 14 Q. So I'm going to ask you about -- we've talked |
| 8 that only patients could have been randomized to | 15 a little bit about the definition of major bleeds |
| 9 placebo in that study who had completed, in at least | 16 today, the EINSTEIN Phase III trial? |
| 10 six months treatment duration or 12 months treatment | 17 A. Uh-huh. |
| 11 duration, and would not, according to the guideline, | 18 Q. So that would have been described in this |
| 12 require continued treatment, because that would | 19 publication that was related to the EINSTEIN pulmonary |
| 13 preclude inclusion in a placebo control trial. | 20 embolism trial, correct? And I'll direct your |
| 14 Often, often as a general guidance, this | 21 attention to Page 1289, the "Outcome Assessment." |
| 15 would apply to DVT patients. However, it may be the | 22 A. I mean, in this case, the more elaborate and |
| 16 assessment of the treating physician that also a few | 23 more complete description was referred to a previous |
| 17 PE patients may actually not require a longer | 24 publication, but this is a place where it is |
| 18 treatment duration. But, typically, PE patients are | 25 described. |
| 19 being treated longer and, hence, would not become | 201: 1 Q. Okay. And so if we look at the bottom |
| 20 eligible to be randomized in EINSTEIN extension. | 2 paragraph on Page 1289, it says: "The principal |
| 21 Q. And so it's less likely that a patient who | 3 safety outcome was clinically relevant bleeding, which |
| 22 has undergone treatment for pulmonary embolism would | 4 was defined as a composite of major or clinically |
| 23 have been randomized into the extension study? | 5 relevant nonmajor bleeding, as described previously." |
| 24 A. It's less likely, yes. | 6 And we've talked about that before, correct? |
| 25 Q. Do you know if there -- what the breakdown | 7 A. Uh-huh, correct. |
| 199: 1 was as far as percentage was as far as the | 8 Q. It then says that: Bleeding was defined as |
| 2 randomization? | 9 major if it was clinically overt and associated with, |
| 3 A. I would need to look it up, and I think it's | 10 one, a decrease in the hemoglobin level of 2.0 grams |
| 4 in one of the tables. | 11 per deciliter or more; two, if bleeding led to the |
| 5 Q. Table 1, initial diagnosis, about halfway | 12 transfusion of 2 or more units of red cells; or, |
| 6 down; is that correct? | 13 three, if bleeding was intracranial or |
| 7 A. Indeed, yeah. | 14 retroperitoneal; four, occurred in another critical |
| 8 Q. So based on this, there were -- in the | 15 site; or, five, contributed to death. |
| 9 continued treatment study, 386 DVT patients were | 16 Is that correct? |

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

17　A. Correct.

18　Q. And then: "Clinically relevant nonmajor

19　　bleeding was defined" at the bottom, and we can flip

20　　over to Page 1291 -- "as overt bleeding that did not

21　　meet the criteria for major bleeding, but was

22　　associated with medical intervention, unscheduled

23　　contact with a physician, interruption or

24　　discontinuation of a study drug, or discomfort or

25　　impairment of activities of daily life."

202: 1　　　Do you see that?

2　A. I see that.

3　Q. Okay. And those would have been the

4　　definitions that would have been applied by the

5　　adjudication committee in determining the adjudication

6　　of any bleeds that were reported as adverse events in

7　　the trial; is that correct?

8　A. Correct.

9　Q. Now, let me show you what we'll mark as

10　　Exhibit 27 --

11　　　(EINSTEIN 30(b)(6) Exhibit 27 was marked for

12　　identification.)

13　Q. -- which is designated as FM-202. It is --

14　　I'll give it to you so you can look at it.

15　　　It's an article entitled "Oral rivaroxaban

16　　versus standard therapy for the treatment of

17　　symptomatic venous thromboembolism: a pooled analysis

18　　of the EINSTEIN-DVT and PE randomized studies."

19　　　Do you see that?

20　A. I see that.

21　Q. And the lead author was Martin Prins and

22　　included Anthonie Lensing and Scott Berkowitz from

23　　Bayer; is that correct?

24　A. Correct.

25　Q. And this would have been the report of the

203: 1　　pooled analysis of the EINSTEIN DVT and pulmonary

2　　embolism randomized studies; is that right?

3　A. That is correct.

4　Q. Okay. This pooled analysis of the DVT and PE

5　　studies, was that called for in the original protocol?

6　A. It was prespecified, and I think we just

7　　reviewed the statistical analysis plan from February

8　　of 2007 specifying that.

9　Q. And the pooled analysis, in fact, if we look

10　　at the first page, had a prespecified noninferiority

11　　margin was 1.75; is that right?

12　A. That is correct.

13　　　MR. OVERHOLTZ: Why don't we take a quick

14　　break and see how much I need to do, and I may

15　　be -- we'll see if I can turn over the witness or

16　　not.

17　　　MR. HOROWITZ: Sure.

18　　　THE VIDEOGRAPHER: The time is now 4:25.

19　　Going off the record.

20　　　(Recess from 4:25 p.m. until 4:54 p.m.)

21　　　THE VIDEOGRAPHER: The time is now 4:53, and

22　　we're back on the record.

23　　BY MR. OVERHOLTZ:

24　Q. Dr. Misselwitz, earlier we talked a little

25　　bit about the -- we looked at a document related to

204: 1　　the VTE treatment briefing package that was submitted

2　　to the European regulatory authorities.

3　　　Do you recall that?

4　A. I do recall, yes.

5　Q. Okay. Let me show you what is -- we'll mark

6　　as Exhibit 28, which is Record Number 699806, Bates

7　　XARELTO_JANSSEN 04203026.

8　　　(EINSTEIN 30(b)(6) Exhibit 28 was marked for

9　　identification.)

10　BY MR. OVERHOLTZ:

11　Q. And so if we look at this, this is an e-mail

12　　string -- I'll let you finish looking at it, but it's

13　　just an e-mail string that goes back and forth related

14　　to the subject matter being the EMEA VTE treatment

15　　briefing package.

16　A. Yeah.

17　Q. Okay. So I want to start with an e-mail that

18　　was sent to you by Sanjay Jalota at the bottom of the

19　　first page on June 8 of 2006.

20　　　Do you see that?

21　A. I do.

22　Q. Okay. And you see you received that e-mail,

23　　you were one of the recipients at Bayer, from Sanjay

24　　Jalota's e-mail?

25　A. Correct.

205: 1　Q. And Sanjay Jalota was with Janssen, correct?

2　A. That is correct.

3　Q. Okay. And she tells Andrea Derix at Bayer,

4　　along -- in this e-mail that you received: "Dear

5　　Andrea. Thank you for the VTE draft treatment

6　　package. Please find enclosed the consolidated J & J

7　　comments. We have taken into account that the same

8　　justification questions will be submitted to both the

9　　FDA and EMEA, as well as Canada."

10　　　Do you see that?

11　A. Yes.

12　Q. And so the idea was that these questions and

13　　justifications for the study design would be provided

14　　to the regulatory authorities for the US, the Europe,

15　　as well as Canadian?

16　A. Sure.

17　Q. Okay. She says that: "Some aspects need

18　　further discussion. "Loading or no loading dose, in

19　　addition to the initial intensive regimen."

20　　　Do you see that?

21　A. Yes.

22　Q. Was there a discussion at one point to

23　　include a loading dose at the beginning of the

24　　treatment period in addition to that initial intensive

25　　regimen that we've talked about?

206: 1　A. I -- I mean, Sanjay is actually a gentleman.

2　　Sanjay brought up that question, which, on a team

3　　level, actually had not been widely discussed. So it

4　　is just a reflection, perhaps, on the lack of

5　　communication on what exact status had been discussed

## Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

6    with the drawing team up to that point in time.

7    Q. Was there, in fact, a discussion as to

8    whether or not perhaps a loading dose should be used

9    in addition to the three-week intense regimen?

10    A. I actually do not recollect any in-depth or

11    longer or more thorough discussions on a loading

12    dose. It, obviously, may have been a question that

13    has been raised, but was not really addressed in

14    greater detail.

15    Q. Okay. And then the third point she raises is

16    justification for open label, correct?

17    A. Correct.

18    Q. And that's open label for the Phase III DVT

19    and PE trials, correct?

20    A. That is correct.

21    Q. Okay. And so Bayer had provided Janssen with

22    the draft briefing package. And now you have

23    received, along with some of your other colleagues at

24    Bayer, their comments back. Is that right?

25    A. That is correct.

207: 1    Q. Okay. Now, if you can look with me at the

2    e-mail -- the next e-mail, it comes from a gentleman

3    at Janssen named Leonard Oppenheimer. And he sends it

4    to Torsten Westermeyer.

5    Do you see that?

6    A. Correct.

7    Q. Do you know who Leonard Oppenheimer is?

8    A. I know him, yes.

9    Q. Okay. And do you know what his role was with

10    Janssen?

11    A. He's a biostatistician who retired from Merck

12    and was then a senior advisor to J & J.

13    Q. Okay. And he makes some comments to Torsten

14    and has several comments.

15    Do you see those?

16    A. I do see them, yes.

17    Q. Okay. The first comment he makes is: "The

18    data to support the dose selection, i.e., 10

19    milligrams BID for three weeks, followed by 20

20    milligrams OD, seems tenuous at best. Why not pick

21    one or the other?"

22    Do you see that, yes.

23    A. I do see that, yes.

24    Q. Okay. Did you ever -- do you know if you

25    ever received these comments from Janssen?

208: 1    A. I'm not certain.

2    Q. Okay. Did you ever hear that the -- that

3    your development partners at Janssen believed that the

4    data to select the 10 milligrams BID dose for three

5    weeks followed by 20 milligrams OD seemed tenuous?

6    MR. HOROWITZ: Objection; form.

7    A. I think we have to keep in mind, first, these

8    are comments made by one individual. They are not

9    part of the consolidated comments that had been

10    provided from J & J to us before, and that

11    Oppenheimer is a biostatistician. So he's not a

12    medical doctor, and certainly comments here from a --

13    kind of more formalistic biostats perspective.

14    Q. Okay. So you don't recall whether you heard

15    that the biostatistician advisor at Janssen had

16    believed that the data to support the dosing selection

17    of a 10 milligram BID for three weeks, followed by the

18    OD, was tenuous?

19    MR. HOROWITZ: Objection; form.

20    MS. MILLER: Objection.

21    A. I do not recall having been involved with

22    these discussions.

23    Q. Okay. The next comments he makes is: "I

24    didn't find the arguments to find the two Phase II

25    studies, 11223 and 11528, as pivotal, compelling. Did

209: 1    we meet the 'success criteria' in the prespecified SAP

2    to fully support the conclusion that they are

3    positive?"

4    Do you see that?

5    A. I see that, yes.

6    Q. Okay. You were aware that the study results

7    between 11223 and 11528 were contradictory with

8    respect to bleeding events.

9    Do you recall that?

10    A. I do not agree that they would contradict

11    each other, and I actually do not agree with this

12    argument brought forward by Len Oppenheimer as the

13    two trials mentioned were Phase II trials and they

14    are clearly not pivotal trials in such sense.

15    We typically say that a pivotal trial is one

16    that supports or actually justifies approval, so it's

17    typically a Phase III trial. And the success

18    criteria for such trial was to explore a dose range

19    and to establish a senior factor, and I think that was

20    done in the two trials.

21    Q. There was a pooling of the 11223 and 11528

22    data by Martin Homering, correct?

23    A. Correct.

24    Q. Mr. Oppenheimer's third comment says: "Since

25    the second pivotal study, 11889, is an extension

210: 1    study, i.e., uses most of the same patients as in the

2    first pivotal study, 11702, you really only have one

3    pure pivotal study."

4    Do you see that?

5    A. I see that, and I would respectfully

6    disagree.

7    Q. So what he's suggesting there is that the

8    extension study, the 11899 study, uses the -- some of

9    the same patients as the primary VTE treatment Phase

10    III trial, either the PE or DVT, correct.

11    MS. MILLER: Objection.

12    A. It is correctly read, but, again, I

13    respectfully disagree with this notion, because, as I

14    already explained in the previous discussion, the

15    extension trial did not solely recruit patients that

16    had been previously treated in the 11702 trial, but

17    actually was open for inclusion of patients outside

18    the program.

19    Q. Mr. Oppenheimer goes on and says: "The

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

| | |
|---|---|
| 20 | patients in the extension study are 'self-selected' |
| 21 | cohort, and thus any conclusions derived from this |
| 22 | study need to apply to the population understudy, i.e. |
| 23 | 'survivors' of the first study." |
| 24 | Do you see that? |
| 25 | A. I see that. And again, for the same reason I |
| 211: 1 | already mentioned, I respectfully disagree with this |
| 2 | notion, because we already -- we also included |
| 3 | patients who were not initially treated in the 11702 |
| 4 | trial. And as a matter of fact, any patient who |
| 5 | would be included in an extension trial has, of |
| 6 | course, survived the initial treatment period, |
| 7 | regardless whether on rivaroxaban or on standard of |
| 8 | care. |
| 9 | Q. And the fact that they are, quote, survivors, |
| 10 | of the initial treatment period, does that, in fact, |
| 11 | bias the results in favor of the treatment given |
| 12 | during the extension study? |
| 13 | MR. HOROWITZ: Objection; form. |
| 14 | A. It does not, because it is very clear that |
| 15 | the extension trial was to explore whether a patient |
| 16 | who actually survived, literally, and also, of |
| 17 | course, in a nondirect sense, the first initial |
| 18 | treatment phase, where eligible, and could benefit |
| 19 | from an extended treatment duration. |
| 20 | So it is methodologically inconceivable to |
| 21 | perform a trial that would, in its first trial part, |
| 22 | randomize patients to a comparison versus standard of |
| 23 | care and then with the same randomization, to |
| 24 | continue testing with placebo. |
| 25 | Q. The -- you would agree that it's true that |
| 212: 1 | patients who did not complete the study period in the |
| 2 | VTE treatment, DVT or PE trials as a result of |
| 3 | bleeding adverse events that resulted in |
| 4 | discontinuation from the study could not be randomized |
| 5 | into the extension study? |
| 6 | A. I'm actually not sure that this is a true |
| 7 | statement. I'm certainly sure testifying that |
| 8 | patients who may have had bleeding on the standard of |
| 9 | care outside the clinic program would be eligible to |
| 10 | be treated in the extension trial. |
| 11 | Q. But patients had to complete treatment of |
| 12 | either six or 12 months of either DVT or PE to be |
| 13 | randomized, correct? |
| 14 | A. That is correct, but it could well be that a |
| 15 | bleeding could occur at month seven. |
| 16 | Q. But if a bleeding event occurred that |
| 17 | resulted in their inability to complete the study |
| 18 | period of the trial, that resulted in their |
| 19 | discontinuation from the study, those patients would |
| 20 | be out of the running to be included in the extension |
| 21 | study, correct? |
| 22 | A. Those patients who had experienced a bleeding |
| 23 | prior to month six. |
| 24 | Q. And so, in fact, you have filtered out those |
| 25 | patients that may have had a higher absorption and |
| 213: 1 | higher plasma concentration levels of Xarelto if they |

| | |
|---|---|
| 2 | were randomized to the Xarelto treatment and had |
| 3 | bleeding events during the initial phase from |
| 4 | participating in the extension study; correct? |
| 5 | MR. HOROWITZ: Objection; form. |
| 6 | A. That is factually incorrect, and I do not |
| 7 | agree with the statement for a number of reasons. |
| 8 | First, the selection into the extension trial |
| 9 | was open for patients that had not initially been |
| 10 | treated in the 11702 trial, as I mentioned a number |
| 11 | of times. And secondly, we selected patients for the |
| 12 | participation in the EINSTEIN extension trial not |
| 13 | based on their PK/PD profiles; and nor did we |
| 14 | preclude the inclusion of patients into the extension |
| 15 | trial who may have experienced a bleeding event after |
| 16 | six months. |
| 17 | Q. Mr. Oppenheimer goes on and says: "This is |
| 18 | particularly problematic for safety analysis. The |
| 19 | experimental unit for safety assessments is the |
| 20 | 'individual patient.' Treating one patient in 100 |
| 21 | different studies doesn't provide equivalent |
| 22 | information as for a 100 different patients." |
| 23 | Do you see that? |
| 24 | A. I see that. |
| 25 | Q. Did you ever hear this criticism by Janssen's |
| 214: 1 | biostatistician advisor? |
| 2 | MS. MILLER: Objection. |
| 3 | A. I did not hear that. And while the general |
| 4 | reading seems compelling, it simply does not apply to |
| 5 | the case at hand here because of the reasons I |
| 6 | explained before. |
| 7 | Q. Okay. Let's look at Point Number 4 that |
| 8 | Mr. Oppenheimer makes. He says: "Since the lowest |
| 9 | dose, 20 milligrams per day, works, how do we know |
| 10 | that 10 milligrams once a day, five milligrams BID or |
| 11 | 10 milligram QD" -- that's once daily -- "isn't |
| 12 | equally efficacious? Won't regulators be interested |
| 13 | in establishing a less effective dose to be sure |
| 14 | you're not giving more drug than you need?" |
| 15 | That's what his comment is. |
| 16 | A. I can read that comment, and it is what is |
| 17 | written here, yes. And I do not agree with that |
| 18 | notion. |
| 19 | MS. MILLER: Objection. |
| 20 | Q. Okay. And was there a consideration to study |
| 21 | a dose in the Phase III trial such as 10 milligrams |
| 22 | once daily? |
| 23 | A. No. We did select the lowest effective dose |
| 24 | based on the totality data generated in our Phase II |
| 25 | program. |
| 215: 1 | Q. Okay. Let me show you what we'll mark as |
| 2 | Exhibits 29 and 30. It's Record Number 88254 and |
| 3 | 88255. And it's Bates -- 29 is BPAG_01573051 and |
| 4 | Bates the second is BPAG_01573053. |
| 5 | (EINSTEIN 30(b)(6) Exhibit 29 was marked for |
| 6 | identification.) |
| 7 | (EINSTEIN 30(b)(6) Exhibit 30 was marked for |
| 8 | identification.) |

## Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

9  BY MR. OVERHOLTZ:
10  Q. And if we look at the e-mail first, this is
11  an e-mail that you sent to Ton Lensing, as well as
12  several other people at Bayer, on March 9th of 2006,
13  correct?
14  A. Correct.
15  Q. And the subject is: "Dose selection VTE
16  treatment: My proposal and backgrounding in
17  preparation for CDP-RC."
18     Do you see that?
19  A. That is correct.
20  Q. And it says "Dose selection for VTE treatment
21  March 2006 PowerPoint" is attached, correct?
22  A. Correct.
23  Q. You say: "Dear all. Please find attached my
24  dose selection proposal for VTE treatment as a draft
25  for your comments."

216:  1     Do you see that?
2  A. Yes.
3  Q. And you give thanks to Ton Lensing, Martin
4  Homering, Wolfgang Mueck, Dagmar Kubitza, and others
5  who contributed to your proposal; is that right?
6  A. That is correct.
7  Q. Okay. And you let Ton know that this may be
8  help for his expert meeting in Rome on March 11th; is
9  that right?
10  A. Correct.
11  Q. Okay. So now, if we can look and see the
12  attachment that you attached in your e-mail to
13  Mr. Lensing and others on March 9th, 2006, that is the
14  next document, BPAG_01573053. It's -- it's a
15  PowerPoint entitled "Dose selection for VTE treatment
16  March 2006"?
17  A. Correct.
18     MR. HOROWITZ: Why don't you give him --
19  Q. Yeah, I'll give you a second to look at it,
20  or more than a second if you need it.
21     MR. HOROWITZ: I was going to say.
22  A. Yes, I am ready.
23  Q. Okay. Would you agree that a drug with a
24  broader therapeutic window is safer than one with a
25  more narrow therapeutic window if they have the same

217:  1  efficacy?
2     MR. HOROWITZ: Objection; form.
3  A. Generally speaking, yes.
4  Q. If a drug can be dosed to deliver the same or
5  better efficacy, but with a broader therapeutic
6  window, then dosing for that drug would be safer,
7  correct?
8     MR. HOROWITZ: Same objection.
9  A. Again, it's a theoretical consideration which
10  needs to be proven in clinical practice.
11  Q. By April -- by 2006, by March of 2006, when
12  you made this -- when you were preparing this
13  PowerPoint presentation, did Bayer have an
14  understanding that dosing Xarelto 10 milligrams BID
15  would potentially have a broader therapeutic window

16  than 20 milligrams OD?
17  A. No. And I think this is nothing we can
18  derive from that very slide deck. It's not based on
19  our data.
20  Q. Let's look, if we can, at a couple of items
21  in the slide deck from this draft presentation that
22  you prepared leading up to the CDP committee meeting.
23     If you look with me at Slide 16, there is a
24  decision tree, dose selection.
25     Do you see that?

218:  1  A. I see that.
2  Q. Okay. And the first point, of course, is OD
3  or BID, question mark, right?
4  A. Right.
5  Q. Then the second is the initial VTE treatment
6  using the more intensified anticoagulation, and the
7  first option is BID in the beginning for two to three
8  weeks followed by once daily secondary prevention,
9  correct?
10  A. Correct.
11  Q. And then the second point is pretreatment
12  with low molecular weight heparin, question mark,
13  right?
14  A. Correct.
15  Q. Now, that pretreatment, was that as an
16  alternative to the BID Xarelto; or was that that
17  loading dose that Mr. Jalota at Janssen had been
18  talking about?
19     MR. HOROWITZ: Objection to form.
20  A. It was an alternative to the BID beginning
21  for the first two or three weeks, and it was not
22  discussed with the connotation of a loading dose.
23  Q. Okay. Now, if you could turn with me over to
24  Slide 28, there's an exposure categorization slide
25  from the Phase II studies.

219:  1     Do you see that?
2  A. Yes.
3  Q. And you had told me earlier that PK
4  measurements for patients in the Phase II dose finding
5  studies, ODIXa-DVT and EINSTEIN DVT, had be taken fr
6  patients, right?
7  A. Correct.
8  Q. And this chart represents the PK from the
9  patients divided by terciles of exposures; is that
10  correct?
11  A. That is correct.
12  Q. And so we see that there are three different
13  groups, one being the -- and it's divided by area
14  under the curve, Cmax and Ctrough, correct?
15  A. Correct.
16  Q. So if we look at the Cmax numbers, the lower
17  tercile has a range of 106.9 to 285.6, correct?
18  A. For the Cmax, yes.
19  Q. Okay. And then the up -- the middle level is
20  285 to 383, correct?
21  A. Correct.
22  Q. And then the third level is 383 to 1317,

Overruled
611(c)
607

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

23  correct?

24  A. Correct.

25  Q. And so that's a range between 106 for a Cmax

220: 1  and 1317 for the Cmax exposure measurements taken

2  during these Phase II trials, correct?

3  A. That is correct, particularly as a result of

4  the inclusion of a very wide range of doses. We have

5  not studied just one dose, but we have studied a very

6  wide range of doses. And, of course, there is a

7  large spread of exposure; and that is the whole

8  reason why we run dose-ranging trials, to see how

9  this exposure relates to outcome.

10  Q. And that's one of the things that was done

11  next. If we turn over to Slide 29, there was a

12  comparison of these exposure terciles compared to the

13  observed efficacy event rates, the deterioration of

14  DVT until Week 12, correct?

15  A. Correct.

16  Q. And this shows the different numbers of

17  patients who had a deterioration of DVT at Week 12

18  based on their exposure tercile, correct?

19      MR. HOROWITZ: Objection; form.

20  A. Seems to be correct.

21  BY MR. OVERHOLTZ:

22  Q. Okay. If we turn to the next page, Slide 30,

23  this is an Exposure-Response Analysis that compared

24  exposure levels to the safety event rates for the two

25  Phase II trials, correct?

221: 1  A. Correct.

2  Q. This Exposure-Response Analysis that's shown

3  here, if we look at the Cmax numbers for -- for both

4  Study 11223, the ODIXa-DVT, and Study 11528,

5  EINSTEIN-DVT, we see that the number of patients in

6  the lower tercile of exposure, had 4.9 percent rate of

7  any or clinically relevant bleeding, and -- for

8  ODIXa-DVT, and about 4 percent for EINSTEIN-DVT; is

9  that correct?

10  A. That is correct.

11  Q. Now, when we get to the middle level of

12  exposure, for the EINSTEIN-DVT study, the event rate

13  stays about the same, 3.9 percent, correct?

14  A. Correct.

15  Q. But it is increased to 12.7 percent in the

16  ODIXa-DVT trial, correct?

17  A. Correct.

18  Q. Okay. And then if we look at the third

19  tercile of exposure, the event rate for the ODIXa-DVT

20  goes up to 11.4 percent compared to the lower level at

21  4.9 percent, correct?

22  A. Uh-huh. Correct.

23  Q. But the ODIXa-DVT trial, the upper terciles

24  of exposure only shows a 6.6 percent event rate,

25  correct?

222: 1  A. That's the EINSTEIN-DVT trial.

2  Q. EINSTEIN-DVT, correct.

3      Now, you would expect to see more events of

4  any or clinically relevant bleeding as exposure

5  increases among groups of patients, correct?

6  A. Generally speaking, yes. It depends on the

7  way the drug is administered and -- and many other

8  factors, but I think it is important to reemphasize

9  that, in this analysis, we've included very high

10  doses, up to total daily doses of 60 milligrams,

11  which, of course, stretched the dose range to very

12  high exposure levels.

13  Q. We saw that there were exposure levels of a

14  pretty big range in these studies as measured by Cmax

15  as a result of those higher doses being tested,

16  correct? We had a pretty big range.

17  A. That is correct, but it's also correct to

18  mention that particularly in the EINSTEIN-DVT 011528

19  study, all the bleeding levels remained, at least in

20  terms of the point estimate, below that of standard

21  of care.

22  Q. Yeah. Something seemed to be wrong about

23  that EINSTEIN-DVT trial, didn't there?

24      MR. HOROWITZ: Objection; form.

25  A. I mean, data are data, and I wouldn't call

223: 1  them wrong.

2  BY MR. OVERHOLTZ:

3  Q. I mean, the -- the bleeding event rates in

4  11223 seem to be in line with what you would expect as

5  exposure increases, correct?

6  A. Again, generally, it is correct to expect

7  that this increasing exposure, the bleeding would go

8  up, but we are currently reviewing only Cmax, and there

9  are more than -- there are many other exposure

10  measures, such as area under the curve, for instance.

11  Q. If we look at 11223 for a minute, of the 45

12  events that are described there -- 8 plus 18 plus 19.

13  If I do my math right, of the 45 events, 37 of the 45

14  occur in the two highest terciles of -- of exposure;

15  is that correct?

16  A. I do not do the math, but that seems to be

17  correct, yes.

18  Q. Now, in the Phase III clinical trials for VTE

19  treatment, was there an Exposure-Response Analysis

20  that divided exposure by terciles or quartiles or

21  anything that like we see here?

22  A. We measured PT in these Phase III trials, and

23  we did Exposure-Response Analysis based on that.

24  Q. When did you do that Exposure-Response

25  Analysis?

224: 1  A. This is a -- I mean, we did one directly in

2  reporting the trials, and we did additional analysis

3  recently.

4  Q. As part of the EMEA request to do Exposure --

5  A. Correct.

6  Q. -- Response Analysis; is that right?

7  A. Correct.

8  Q. So the VTE trials were included in the

9  analysis for the VTE treatment as part of the EMEA

10  request for Exposure-Response Analysis?

11  A. That is correct.

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

12  Q. And there was, in fact, some efforts to do
13  some additional modeling -- different modeling based
14  on risk factors in the VTE treatment population that
15  was necessary; is that correct?
16  A. We tried to understand, as best as we could,
17  all available data, and it is correct to say that we
18  have submitted new modeling data in that report.
19  Q. Let me show you what we'll just -- if you go
20  to Slide 40 for me. And you can look at Slide 38, if
21  you want to, which is the beginning of this section of
22  the presentation that you e-mailed regarding your dose
23  selection proposal. It's titled "In Silico Model of
24  Coagulation."
25      Do you see that?

225:  1  A. Correct.
2  Q. Okay. And this was a type of modeling that
3  takes into consideration kind of clinical factors
4  in -- in people that are going to be given the drug in
5  looking at dosing and exposure; is that correct?
6  A. Not exactly correct. This is an in silico
7  model that is based on mathematical modeling of the
8  biochemical parameters of all the constituents of the
9  clotting cascade.
10  Q. Okay. And if you'll look with me at Slide
11  40, it says: "The following doses, regimens, and
12  intensities were studied," and it lists warfarin with
13  different -- several different INR ranges, and then as
14  well as rivaroxaban (Xarelto) at 5, 10, and 20, all
15  BID and OD, as well as 53 milligrams BID and OD
16  resulting in a twofold higher exposure compared to
17  20 milligrams.
18      Do you see that?
19  A. I see that.
20  Q. And the second bullet point says: "Xarelto
21  (rivaroxaban) 10 milligrams BID and 20 milligram OD
22  provide the best intensity of anticoagulation, which
23  should be efficacious and safe. This dose compared to
24  warfarin INR 2.5 and shall be more potent compared to
25  ximelagatran 24 milligram BID and INR of 2.0."

226:  1      Do you see that?
2  A. Correct.
3  Q. Okay. So, then, the third bullet point --
4  it equates that the 10 milligram BID or 20 milligram
5  total daily dose or 20 milligram OD dose provides the
6  best intensity of anticoagulation that's both
7  efficacious and safe is what the conclusion of this
8  bullet point is, correct?
9      MR. HOROWITZ: O0bjection; form.
10  A. This is what is written here, but we need to
11  remind ourselves that this is a purely mathematical
12  model that is not based on clinical data but on
13  basically modeling the properties of the different
14  coagulation factors, and the model, by its design,
15  favors a BID or a more potent -- a more frequent
16  dosing regimen to, so to say, allow for smoother
17  plasma concentrations.
18  BY MR. OVERHOLTZ:

19  Q. The dose -- the third bullet point says
20  10 milligrams BID twice daily is preferred over
21  20 milligrams once daily as it provides the
22  potentially broader therapeutic window, correct?
23      MR. HOROWITZ: Same objection.
24  A. That is correct. It's correctly stated in
25  terms of reading that bullet point, but it comes with

227:  1  the limitation of a purely mathematical model that is
2  not based on clinical data.
3  BY MR. OVERHOLTZ:
4  Q. Based on this idea that perhaps the
5  10 milligrams BID would provide a broader therapeutic
6  window, wouldn't it have been reasonable to study a
7  10 milligram BID dose in the Phase III trials for VTE
8  treatment?
9      MR. HOROWITZ: Objection; form.
10  A. As a matter of fact, we did study the
11  10 milligram BID in the ODIXa-DVT trial and we can
12  also link it to the dose of 20 milligram OD, and
13  there was no difference, as you have seen in the
14  slides before.
15  BY MR. OVERHOLTZ:
16  Q. So if it had a broader therapeutic window
17  that may have resulted in a safer therapeutic window
18  for patients, shouldn't it have been tested in the
19  pivotal Phase III trials for VTE?
20      MR. HOROWITZ: Objection; form.
21  A. We had included this very comparison in our
22  dose-finding studies; and based on clinical data
23  derived from our dose-finding studies, we decided or
24  make -- made our dose recommendation going forward
25  for Phase III.

228:  1  BY MR. OVERHOLTZ:
2  Q. Okay. Let's move over to the Summary slides,
3  which start on Slide 47. Okay?
4  A. Okay.
5  Q. Okay.
6      MR. HOROWITZ: You're really going to skip
7  this one?
8      MR. OVERHOLTZ: Yeah.
9  BY MR. OVERHOLTZ:
10  Q. So if we can look at Slide 48, the Summary
11  slide, it says: "All doses tested work, both OD and
12  BID regimens work."
13      Do you see that?
14  A. Yes.
15  Q. The fifth bullet point down says:  "Treatment
16  doses of more than 10 milligrams OD shall be given
17  with food."
18      Do you see that?
19  A. Correct.
20  Q. And is that a recommendation in VTE
21  treatment, that the dose given for VTE treatment be
22  given with food?
23  A. To the best of my knowledge, yes.
24  Q. Food -- given with food increases exposure to
25  the drug; is that right?

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

_9: 1   A. It -- importantly, it increases the
2   bioavailability and reduces variability.
3   Q. Turn with me to Slide 49. The Summary says:
4   "Total daily dose of 20 milligrams can be selected as
5   optimal dose." Correct?
6   A. Correct.
7   Q. And that could either be 10 milligrams BID or
8   20 milligrams once daily, correct?
9   A. Correct.
10   Q. The second bullet says: "Increased
11   doses do not translate into better efficacy but may
12   increase the risk of bleeding." Correct?
13   A. Correct.
14   Q. And that's consistent with what you -- the
15   biostatistician from Janssen, Mr. Oppenheimer, was
16   saying regarding the fact that regulators are going to
17   push forward to select the lowest possible dose,
18   correct?
19      MS. MILLER: Objection.
20      MR. HOROWITZ: Objection; form.
21   A. I think it's exactly the statement as stated
22   here, that, of course, increasing doses and
23   increasing exposure levels have the potential to
24   increase the risk of bleeding.
25   BY MR. OVERHOLTZ:

230: 1   Q. Turn with me over to Slide 51, the final
2   overall conclusion slide. It says: "We do not
3   recommend to use the 10 milligram BID regimen
4   long-term."
5      Do you see that?
6      That's the initial intensive treatment phase
7   at this time that was being recommended, right?
8   A. Correct.
9   Q. Okay. Then if you will look with me at the
10   third bullet point, it says: "Fragile patients could
11   receive 10 milligrams OD." Correct?
12   A. Correct.
13   Q. That was not, in fact, studied in the
14   Phase III trial program, correct?
15   A. Correct.
16   Q. And is there any dose adaptation recommended
17   in the label for VTE treatment today for fragile
18   patients?
19      MR. HOROWITZ: Objection; form.
20   A. There is no mandatory dose reduction. There
21   is -- physicians are given the option of considering
22   a lower dose.
23   BY MR. OVERHOLTZ:
24   Q. Let me show you what we'll mark as Exhibit --
25      MR. OVERHOLTZ: What?

231: 1      MR. GEISLER: 32.
2   BY MR. OVERHOLTZ:
3   Q. -- 32. It's Bates Janssen 01099263, and it's
4   a facsimile from the FDA. It's Record No. 245248
5   dated September 5th, 2006.
6      MR. HOROWITZ: I think it's 31.
7      MR. GEISLER: Yeah, I think it was 31.

8      MR. OVERHOLTZ: 31?
9      MR. HOROWITZ: Yeah, there's the sticker
10   there. I'm just going to put it on top.
11      (EINSTEIN 30(b)(6) Exhibit 31 was marked for
12   identification.)
13      MR. HOROWITZ: Do you want to give him a sec?
14      MR. OVERHOLTZ: Yeah, sure thing.
15      MR. HOROWITZ: Neil, was there a particular
16   part?
17      MR. OVERHOLTZ: Yeah.
18   BY MR. OVERHOLTZ:
19   Q. I'm going to be asking you about the Decision
20   section on page 4 regarding Question Number 1, and
21   then I'm going to ask you about the Question Number 2.
22   That will help you out a little bit.
23   A. Yeah.
24   Q. Okay. So this document is the meeting
25   minutes of an end of Phase II meeting that was held

232: 1   with the FDA with both Bayer and Janssen; is that
2   correct?
3   A. That's correct.
4   Q. Okay. And you, in fact, were one of the
5   attendees of this meeting with the FDA on behalf of
6   Bayer, correct?
7   A. That's correct.
8   Q. This meeting was held in August of 2006; is
9   that right?
10   A. Correct.
11   Q. Okay. And if you could turn with me -- and
12   this meeting was about the end of the Phase II program
13   for VTE treatment indication?
14   A. Correct.
15   Q. Okay. So if we can turn over to page 4,
16   there is a Decisions/Agreements reached section.
17      Do you see that?
18   A. Yes.
19   Q. And typically what happens in this situation
20   is the company puts forth questions to the regulatory
21   agency, like the FDA, and asks whether or not they
22   agree with these components of their Phase III
23   program?
24   A. Correct.
25   Q. And so, if we can look at Number 1, it says:

233: 1   "Dose selection, dose regimen." Right?
2   A. Uh-huh.
3   Q. It says: "Based on the results from the
4   Phase II VTE treatment studies with rivaroxaban, Bayer
5   proposes to use a dosage regime of 15 milligram BID
6   dose regimen for the first three weeks of therapy
7   followed by a 20 milligram once-daily regimen. Does
8   the agency concur with the above-mentioned dosing
9   strategy and regimen in the Phase III study?"
10   Correct?
11   A. Yes.
12   Q. And the FDA responds below, right?
13   A. Yes.
14   Q. And they say: "No, we do not concur."

## Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

15 A. That is correct.
16 Q. Okay. "Instead of your current dose plans,
17 we recommend that you propose a dose of 10 milligrams
18 BID for your Phase III study based on the following."
19        Do you see that?
20 A. Yes, I see it.
21 Q. And one of the -- they raise several
22 different issues, including organ toxicity at higher
23 doses; more bleeding events in higher-dose
24 experiences; and third, a more favorable PK profile
25 for the 10 milligram BID dose when compared to 20
234: 1 milligram OD.
2        Do you see that?
3 A. Correct.
4 Q. Okay. Now, in the end, it's the sponsor
5 here, Bayer and Janssen's decision as to what dose to
6 study in their Phase III trial, correct?
7 A. Correct, yes.
8 Q. Okay. Bullet Point 2 says: The PK profile
9 in moderately renal -- moderately impaired renal
10 patient appears to be similar to that in severely
11 impaired renal patients, and both PK profiles differ
12 from those of subjects with normal renal function.
13        Please propose a dose adjustment plan for
14 moderate to severe renally impaired patients.
15        Do you see that?
16 A. Yes.
17 Q. That was, in fact, not done in the Phase III
18 trials for VTE treatment, correct?
19 A. We, for that reason, excluded severe renally
20 impaired patients from the Phase III program and
21 provided additional data from a separate Phase I
22 trial.
23 Q. Okay.
24      MR. HOROWITZ: Neil, I've got us down for --
25 you've got about two more minutes.
235: 1      MR. OVERHOLTZ: Is that right?
2      THE VIDEOGRAPHER: Yeah, we're at -- it's
3 6:44. You've got like five, four or five
4 minutes.
5      MR. OVERHOLTZ: Okay.
6      MR. HOROWITZ: I don't know. Darrell, you're
7 killing me.
8      MR. OVERHOLTZ: I think there has been a good
9 bit of downtime on the record. I've got a couple
10 more questions about Number 2 and we'll wrap it
11 up.
12      MR. HOROWITZ: Wrap it up.
13 BY MR. OVERHOLTZ:
14 Q. All right. So if we can look at Number 2,
15 Choice of Comparator, Dr. Misselwitz.
16 A. Yes.
17 Q. Okay. And the question is whether or not the
18 agency agrees that a choice of heparin limited to only
19 one type of heparin per center and a choice of the
20 vitamin K antagonist limited to either warfarin or --
21 is it acenocoumarol?

22 A. Acenocoumarol, yes.
23 Q. Yeah.
24      -- acenocoumarol would be acceptable,
25 correct?
236: 1 A. Correct.
2 Q. Okay. The FDA responds, and I want to direct
3 your attention to Point Number 2. Do you see that?
4 A. Yeah.
5 Q. And it says: "You propose a single
6 non-inferiority trial for acute treatment of VTE. Two
7 adequate and well-controlled studies are generally
8 needed to support a new indication. There is a risk
9 in performing a single trial that may not have
10 convincingly positive results to support the proposed
11 indication. In addition, a non-inferiority trial is
12 less likely to be persuasive."
13      Do you see that?
14 A. Yes.
15 Q. Okay. Moving to the next page: "The
16 acceptance of the single study as a sufficient
17 scientific and regulatory basis for approval of a new
18 indication will be determined by its adequacy to
19 support the efficacy claim."
20      Do you see that?
21 A. Yes.
22 Q. It says -- further down, it says:
23 "Consistent with the information in this guidance, we
24 are very concerned that your proposed open label
25 non-inferiority study, Study 11702, will not provide
237: 1 robust evidence of safety and efficacy."
2      Do you see that?
3 A. I see that, and I agree this is what is
4 written here. And as a response, we decided then to
5 run two trials, the EINSTEIN-DVT and a separate
6 EINSTEIN-PE trial so that we have two -- each other
7 confirming trials.
8 Q. And that's the two trials that fall under the
9 same protocol, the 11702, EINSTEIN --
10 A. It's an umbrella protocol, yes.
11 Q. Okay. And that's based on this, is why you
12 split them apart?
13 A. And made them larger, considerably larger
14 with considerably more events.
15 Q. They still both were non-inferiority trials?
16 A. Yeah, but that is exactly according to the
17 guidelines. When you have a non-inferiority trial,
18 you need to have two confirmatory trials, and that's
19 what we've done.
20      MR. OVERHOLTZ: All right. Pass the witness.
21      MR. HOROWITZ: Let's take a break for a
22 minute since you went a little longer.
23      THE VIDEOGRAPHER: The time is now 5:47.
24 Going off the record.
25      (Recess from 5:47 p.m. until 5:59 p.m.)
238: 1      THE VIDEOGRAPHER: The time is now 5:59, and
2 we're back on the record.
3      CROSS-EXAMINATION

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

BY MR. HOROWITZ:

Q. Dr. Misselwitz, as you know, my name is Jeff Horowitz. I represent Bayer, and it's my chance to ask you some questions in follow-up to Mr. Overholtz's questions, plaintiffs' counsel's questions, and maybe some other things about the EINSTEIN study we want to talk about.

Do you understand?

A. I do understand, yes.

Q. Okay. Doctor, how long have you been sitting here today, since like 8:00 o'clock this morning?

A. Quite a while, yeah, a couple of hours.

Q. Are you ready, can you hang in there for me?

A. That's fine.

Q. Dr. Misselwitz, where do you currently work?

A. I work with Bayer, and I'm having the pleasure to -- leading the clinical development in the field of cardiovascular medicine.

Q. How long have you worked at Bayer?

A. Fourteen years now.

Q. Since about 2000 --

A. Since April 2002.

Q. And when you say you're the head of clinical development in cardiovascular medicine, what -- what exactly does that mean?

A. That comprises four therapeutic indication franchises: Number 1, thrombosis, so anticoagulation medicine; Number 2, cardiology and specifically -- more specifically, heart failure drugs; Number 3, nephrology, so chronic kidney disease; and Number 4, last but not least, pulmonology, pulmonary circulation.

Q. And thrombosis, is that the category that Xarelto would fall into?

A. Indeed, yes.

Q. And what is thrombosis?

A. Thrombosis is a medical condition which the blood clots and forms clots that may obstruct the vessels, either in the arteries or in the veins, and regardless of arterial or venous clots, this may have deleterious and sometimes fatal, deadly outcomes to the patients.

Q. Now, I've been calling you Doctor, as has Mr. Overholtz. Are you a medical doctor?

A. I'm a medical doctor indeed, yes.

Q. I just want to talk to you a little bit about your experience and the things that you did before you came to Bayer. Okay?

A. Okay.

Q. Tell us a little bit -- well, what area of medicine did you focus on and have you focused on, are you board certified, that sort of thing.

A. So I finished medical school with an MD in 1981. I then had a MD Ph.D. training, so I did a couple of years in a lab doing basic science research. I went back to the clinical practice and accomplished my board certification as a vascular medicine specialist. That comprises, by specialty, thrombosis as a big and important area. And I used to work, then, for a number of years, a total of 10 years after my MD degree in University Hospital as a head of the anticoagulation clinic and research group focusing on thrombosis.

Q. During your time as the head of the anticoagulation clinic focusing on thrombosis, did you actually care for and treat patients as a practicing doctor?

A. Yes, of course. It was one of my duties to regularly see patients who are anticoagulated with vitamin K antagonists. It was the time we had no normal anticoagulant and neither did we widely use low molecular weight heparins, of course. Basically, back in the time, we had old unfractionated heparin and vitamin K antagonists.

Q. So you actually had hands-on experience in prescribing vitamin K antagonists and the heparin -- unfractionated heparin medicines?

A. In -- in my outpatient clinics, we had a total of three-and-a-half thousand patients on vitamin K antagonists, regularly managed.

Q. And just remind folks, what are vitamin K antagonists?

A. Well, this is Coumadin, or warfarin, in the US; but there are other chemical specialties grouped under the group of vitamin K antagonists, so it's a group of drug that suppresses the synthesis of clotting factors in the liver.

Q. And this was what you used to treat a potential thrombosis and the conditions that involved thrombosis or blood clots?

A. We used both for preventive settings as well as for treatment settings.

Q. Okay. We're going to come back to that in a little bit. Let's just finish up with your background before you got to Bayer.

A. Sure.

Q. So after you -- you were the head of the anticoagulation clinic, what did you do after that, before you came to Bayer? In particular, of course, I want to hear you talk about what you did with respect to antithrombosis and antithrombosis medicines.

A. Sure. So during my time in -- in -- in the academic institution, I also did clinical research as a principal investigator of clinical trials, which actually brought me into and interested me in working in the pharmaceutical industry; and I then elected to join the pharmaceutical industry, which was back in 1992.

And I was first in medical affairs and later in our clinical development working for a German company called Knoll, or Knoll, and that was later acquired by Abbott, and now Abbvie, and was developing cardiovascular drugs there, with a particular focus on new anticoagulant drugs. I

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

| | |
|---|---|
| 18 specifically developed a low molecular weight | 25 A. Correct. |
| 19 heparin. | 245: 1 Q. If I jump back and forth, you're okay with |
| 20 Q. So you actually worked on the clinical | 2 that? |
| 21 development program for some drugs, including low | 3 A. Uh-huh, yeah. |
| 22 molecular weight heparin? | 4 Q. Okay. So you had a personal role in the |
| 23 A. That is correct. | 5 EINSTEIN program, the VTE treatment program; is that |
| 24 Q. And what is low molecular weight heparin? | 6 fair? |
| 25 A. Low molecular weight heparin is a modified | 7 A. That is fair to say. I was always -- kept |
| 243: 1 form of heparin. It's an anticoagulant that needs to | 8 being involved very closely, even after I hired Ton |
| 2 be injected and can be injected either directly into | 9 Lensing as an expert in the field of VTE treatment. |
| 3 the blood vessels or can also be administered | 10 And so he reported in to me, and, of course, I was |
| 4 subcutaneously, and it has been used for both | 11 closely apprised of what's going on. |
| 5 prevention and treatment of thrombosis. | 12 Q. And you understand, Dr. Misselwitz, that you |
| 6 Q. And when you came into Bayer in 2002, what | 13 are here today to speak on behalf of Bayer about the |
| 7 was your understanding as to the work or the nature of | 14 EINSTEIN or VTE treatment program? |
| 8 the work that you would be doing, what was your title, | 15 A. That is correct, I do understand that. |
| 9 what was your role? | 16 Q. What are the medical conditions -- I mean, |
| 10 A. To Bayer? | 17 we've used this phrase "VTE treatment," but I want to |
| 11 Q. Yes, to Bayer. I'm sorry. I jumped ahead a | 18 break that down a little bit. |
| 12 little bit. | 19 What are the conditions that were being |
| 13 A. Yeah. So I joined Bayer in April of 2002 as | 20 looked at in terms of treating conditions in the |
| 14 the global clinical leader -- so as the sort of | 21 EINSTEIN program? |
| 15 program director, if you wish -- being accountable | 22 A. It's actually two important presentations |
| 16 for the early clinical development of what is now | 23 that are typical symptoms, or presentations, of what |
| 17 Xarelto. That was the primary reason why I was | 24 we believe is the same disease, one being called deep |
| 18 brought into Bayer and why I was very interested in | 25 vein thrombosis -- so a clot that develops in the |
| 19 doing that, and I was the -- initially for the first | 246: 1 deep veins of the leg or in other locations -- and |
| 20 couple of years, the only clinical person running | 2 the other presentation being pulmonary embolism. |
| 21 that program. And then, of course, it got larger, | 3 As a result of such clot in the deep veins |
| 22 and I started to hire colleagues. And since 2005, we | 4 breaking off and dislodging, traveling through the |
| 23 created the therapeutic area under my leadership, | 5 heart into the lung, that causes a pulmonary embolism |
| 24 cardiovascular drug development. | 6 which is very often fatal and a highly dangerous |
| 25 Q. And so is it fair to say before you got to | 7 situation. |
| 244: 1 Bayer in 2002, that the 21 years or so that you had | 8 Q. So it can be broken into -- to DVT, or deep |
| 2 been a physician, the focus of both your clinical | 9 vein thrombosis; is that right? |
| 3 practice and then your research and clinical | 10 A. Correct, and pulmonary embolism. |
| 4 development had been on antithrombosis medications? | 11 Q. What happens if -- well, let's take DVT |
| 5 A. Clearly a big emphasis and focus on that but | 12 first. |
| 6 not exclusively. I -- I was also part of the | 13 What happens if DVT goes untreated? What |
| 7 development team of Humira, which is a drug to treat | 14 could happen? |
| 8 rheumatoid arthritis, and -- which is a very | 15 A. Well, again, it depends on the size and on |
| 9 successful drug and very helpful for many patients. | 16 the way, on the -- on -- on -- on the exact location |
| 10 But you are right, my main focus has always been | 17 in the vascular system. But if it goes untreated, |
| 11 antithrombotic, anticoagulants. | 18 there is a very, very high likelihood that the |
| 12 Q. And when you got to Bayer and began to work | 19 disease would aggravate further, that it could lead |
| 13 on Xarelto, was one of the programs that you worked on | 20 then to pulmonary embolism, which, again, can be |
| 14 what we've talked about today as the EINSTEIN or VTE | 21 fatal; and even if it is not leading to a pulmonary |
| 15 treatment program? | 22 embolism, it leads, basically, to the destruction of |
| 16 A. That is correct. I conceptualized the first | 23 the venous valves and would lead to long-term sequela |
| 17 Phase IIb trials -- or trial, singular, in this | 24 called post-thrombotic syndrome, which can actually |
| 18 indication; namely, the ODIXa-DVT trial. | 25 lead to ulcerations at the ankle and really painful |
| 19 Q. And like Mr. Overholtz, sometimes I go back | 247: 1 situations that visibly take the patient. |
| 20 and forth between the EINSTEIN program, which we've | 2 Q. When you say "pulmonary embolism" -- and |
| 21 come to know it as a little bit because that's what we | 3 that's the clot that goes to the lung, right? |
| 22 know it as now in dealing with these cases -- but also | 4 A. Uh-huh. |
| 23 I understand it really internally was more the VTE | 5 Q. When you say that that "can be fatal," do you |
| 24 treatment program. | 6 have a sense of, I mean, how frequently it is fatal |

## Misselwitz, Frank 2016-11-09
Misselwitz PA DC PCC merged on 7-20-17

7   and the relationship between that and treatment?

8        Have you looked at literature and data on

9   that?

10       MR. OVERHOLTZ: Object to form.

11   A. I think the pulmonary embolism or, in

12   general, fatality or death caused by these venous

13   thromboembolic events in general occurs much more

14   frequently than we typically think of.

15        The death rate of these patients is as large

16   as — as a matter of fact, it's twice as large as

17   fatalities from HIV/AIDS, from breast cancer, from

18   prostate cancer, and from traffic accidents all

19   together combined.  So it's a very important medical

20   condition; however, it often goes underrecognized.

21   Q. During your discussion with plaintiff's

22   counsel, you referred several times to guidelines for

23   treatment.  Do you recall that?

24   A. I do recall that, yes.

25   Q. Could you explain to us what you were

248: 1   referring to when you -- when you talk about

2   guidelines for treatment of VTE?

3   A. Sure, I'm happy to explain.  These guidelines

4   are guidelines that independent academic bodies,

5   international bodies work on and keep them

6   up-to-date.  So typically, every two to three years,

7   we have a new update of these guidelines.

8        One, just to give an example -- but that's

9   not the only guideline, but one very important one is

10   the American College of Chest Physicians guideline,

11   the ACCP, that is now existing since, basically,

12   I'm a -- I'm an MD.  So I think it is now existing

13   and highly recognized worldwide since at least 30

14   years, with an update, as I said, every two to three

15   years.

16        And these guidelines are clearly describing

17   the disease entity, the epidemiology, the diagnostic

18   workup, and also, of course, the treatment.  And they

19   adapt the treatment recommendations according to new

20   treatment modalities that would become available.

21       Importantly, in the field of DVT treatment

22   or, also, PE treatment, there is a recommendation

23   framework for the different type of diseases, and

24   I've tried to explain this.

25   A. clot may arise, provoked in an otherwise

249: 1   healthy individual, such as after a long-haul travel

2   or after a broken leg and an immobilization in a

3   plaster cast.  These are triggered deep vein

4   thrombosis and typically would not require a

5   long-term treatment duration but typically would be

6   good after three months of treatment.

7       However, in some cases, the clot has no

8   trigger event, it just happens without a provoking

9   event, and we call that unprovoked deep vein

10   thrombosis or pulmonary embolism, and these cases

11   require a much longer treatment duration of six to

12   12 months.

13       In rare cases, particularly when there is a

14   genetic predisposition, patients may require lifelong

15   treatment.

16   Q. And the guidelines that you refer to give

17   recommendations for, as you said, the length of

18   therapy and the type of therapy depending on the

19   nature of the thrombosis and the conditions, the

20   various conditions you described.

21   A. Indeed, yes.

22   Q. Did you consider these guidelines in your

23   work in implementing and designing the EINSTEIN

24   clinical trial program?

25   A. Absolutely.  We -- we fully considered these

250: 1   guidelines, and one of the visible precipitation of

2   that consideration is the fact that we allowed the

3   EINSTEIN program to include patients with different

4   treatment durations to reflect exactly that

5   guideline.  So we allowed patients to be treated

6   three months, six months, or 12 months in the

7   program.

8   Q. Now, when you were working on the Xarelto

9   EINSTEIN program and VTE treatment program, what wa

10   it that you were trying to accomplish with respect to

11   the medical needs of the scientific and medical

12   community?  What were you trying to solve?

13       MR. OVERHOLTZ: Object to form.

14   A. I think it is important to understand that

15   the management of patients presenting with deep vein

16   thrombosis or pulmonary embolism is relatively

17   complex.

18       First, they go to the emergency room.

19   Depending on the severity of their disease, they have

20   a diagnostic workup.  They, where the standard of

21   care is concerned, get parenteral treatment first;

22   and that parenteral treatment then needs to be

23   overlapped with very frequent monitoring visits with

24   warfarin or a vitamin K antagonist, generally

25   speaking, and then these warfarin-treated patients

251: 1   needs to be closely monitored.  Because of the

2   frequent dose adaptations, patients require to be

3   kept within the therapeutic range of an INR -- that

4   is a readout of a lab test -- between 2 and 3.

5       So it's complex.  It requires many follow-up

6   visits, and it very often requires, during the time

7   of the parenteral injectable treatment,

8   hospitalization of the patient.

9       And we felt very strongly that by providing

10   an option of an oral fixed-dose tablet that doesn't

11   require that frequent dose adaptation and monitoring

12   and that would not require injectables in the

13   beginning, that we can actually reduce the need for

14   hospitalization, patients can be treated as

15   outpatients, which is always greatly appreciated by

16   patients; and the long-term treatment is actually

17   much easier to be accomplished with a pill.

18   Q. Is it fair to say that there are challenges

19   with respect to the use of warfarin in VTE treatment?

20       MR. OVERHOLTZ: Objection.

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

21  A.  No.  I think it is fair to say that,
22  particularly in the VTE treatment, there are
23  challenges, because when you give warfarin over a
24  long enough period in a chronic condition, people are
25  better trained, they are -- sometimes are more stable
252: 1  on a certain dose; whereas, the big trouble putting a
2  patient on warfarin is actually happening during the
3  first months of treatment because the dose is very
4  unstable, lab monitoring needs to happen very
5  frequently.
6      So I think the gain of a fixed, unmonitored
7  oral medication is particularly great in VTE
8  treatment.
9  Q.  When Bayer engaged in the EINSTEIN program to
10  work on a new VTE treatment, what was the -- what was
11  the issue that Bayer was trying to solve?
12      MR. OVERHOLTZ:  Object to form.
13  A.  I think the issue was to provide something
14  that is actually much easier to be used, much more
15  predictable in terms of pharmacokinetics and
16  pharmacodynamics, would not require frequent dose
17  adaptations according to lab measurements, and would
18  avoid the involvement of injectables.
19      So even though the treatment would only be,
20  efficacy-wise, as good as the standard of care, you
21  certainly have the potential to improve on the
22  safety.  And you make the life of the patients much
23  easier and allow them to be treated as outpatients.
24      And not to be forgotten, vitamin K antagonist
25  is tricky medicine.  It's very effective on the one
253: 1  hand, but it is actually not used due to all the
2  difficulties in quite a high proportion of patients.
3      And still, nowadays, when you look at
4  patients who would require -- who would be eligible
5  to receive warfarin, up to 40 percent of those
6  patients actually do not receive anticoagulation with
7  warfarin, so --
8  Q.  When you say they don't receive it, what
9  is -- what are you talking about?
10  A.  Well, they run the risk of thrombotic events;
11  and, of course, they go unprotected.
12  Q.  Well, are you talking about patients, though,
13  who are prescribed warfarin and just choose not to
14  take it, or are you talking about something else?
15  A.  Both.  It's actually who, from the beginning,
16  would choose not to take it, but it is also including
17  patients who, after having experienced bleeding
18  events or other hassle, can simply not build up this
19  monitoring regime into their daily schedule,
20  particularly when they are still working.
21  Q.  And just don't take the medicine?
22  A.  Yeah.
23  Q.  Let's talk a little bit now about the
24  clinical trial program for EINSTEIN.
25      We talked about different phases today -- or
254: 1  you talked with plaintiff's counsel about the Phase II
2  program and Phase III program.

3  Could you just give us a sense what the Phase
4  II program is, in general terms, what it's designed to
5  do, versus what a Phase III program is?
6  A.  Sure.  The very first administration of a new
7  investigational drug to a human being is in the
8  Phase I.  That's where, in healthy volunteers and
9  healthy subjects, typically pharmacokinetic and
10  pharmacodynamics parameters, are being explored.
11      The first administration to patients that
12  would also potentially derive benefit from these
13  medications happens in Phase II.  And this is where
14  we would explore different doses, dosing regimens, to
15  find out what is the optimal dose and to further
16  learn about the drug, how it behaves, how would it be
17  helpful to patients, and how it would behave in
18  certain subpopulations.
19      The final stage of clinical development is
20  the Phase III.  Phase III trials are larger trials
21  that are designed to secure the regulatory approval
22  of a drug.  And these trials involve -- and they are
23  statistically powered to demonstrate a certain
24  benefit and a positive benefit/risk balance of the
25  drug in a certain population.
255: 1  Q.  You said Phase II studies are dose finding or
2  doze ranging studies to help select the appropriate
3  doses to take forward in Phase III; is that right?
4  A.  That is correct, yeah.
5  Q.  Are there unique considerations in selecting
6  appropriate doses even in the Phase II VTE program,
7  the context of those kinds of trials?
8  A.  Sure.  My remark around dose ranging trials
9  was a general remark.  Now, when we come back to the
10  specific indication of VTE treatment --
11  Q.  Right.
12  A.  -- we have to keep in mind that there is
13  general knowledge of the use of anticoagulants in
14  that field to treat a clot, and this indication is
15  different from basically all other indications that
16  use -- that basically use the drug to prevent the
17  formation of a clot.
18      Here, we have an existing clot that is
19  active, that actually tends to grow further if it
20  goes untreated.  And for that reason, all --
21  practically all anticoagulant drugs so far being used
22  in this indication are to be used in what we call a
23  therapeutic dose relative to a preventive dose.
24      And the therapeutic dose is typically, in
25  general, higher.  And as a matter of a rule, you can
256: 1  say it's typically threefold higher than the
2  preventive dose.
3  Q.  Which --
4  A.  That holds true regardless whether you
5  consider heparin or low molecular weight heparin or
6  Fondaparinux or ximelagatran, I mean, you name it,
7  there is literally no exception from that rule.
8  Q.  What's the concern about using too low of a
9  dose in a Phase II VTE trial?

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

10  MR. OVERHOLTZ: Object to form.

11  A. We put patient safety first. And, of course,

12  patient safety is not just related to safety in the

13  narrow sense. I mean, I would, of course, want to

14  prevent a patient being exposed to a risk of a

15  pulmonary embolism, of recurrent thrombotic events,

16  due to a too low of a dose. And so that basically

17  was a main reason why we decided the dose range in

18  our development program, Phase II program, to have

19  the middle dose of 30 milligram, because we

20  established the 10 milligram as the effective and

21  safe dose in VTE prevention.

22      And following that general rule that the

23  treatment dose is typically three times larger, we

24  selected the 30 milligram as the putative most likely

25  optimal dose in this setting, and then went one dose

257: 1  step below, namely 20 milligram, and one dose step

2  above, namely 40 milligram, to explore a larger dose

3  range.

4  Q. You were asked some questions about a

5  document that counsel for plaintiff used that talked

6  about safeguarding the compound, and that led to a

7  discussion about safeguarding patients.

8      Do you recall that?

9  A. Yes, I do.

10  Q. How does that relate, if at all, to designing

11  of Phase II studies with respect to VTE treatment in

12  this notion of, you know, making sure you don't dose

13  too low?

14  A. Yeah. I think it is important to perform

15  these kind of dose ranging trials very carefully with

16  a very close monitoring of patients, selecting

17  appropriate dose ranges, and as we've done in the

18  ODIXa-DVT trial. And that was one of the main

19  reasons we elected to have this early endpoint after

20  three weeks of treatment, because we wanted to see

21  whether the clot indeed would disappear or would

22  actually even grow. And, of course, if the clot

23  would grow in too many patients in a certain dose

24  group, we would then stop that particular dose group

25  because of lack of efficacy.

258: 1      So having an early readout is actually a

2  measure to safeguard patient lives and to not let

3  them progress into a dangerous situation.

4  Q. You used -- or you described the three times

5  prevention dose, and I know you talked to counsel for

6  plaintiff about that, as well.

7      But just to make sure we all understand what

8  we're talking about, what -- when you say

9  "prevention," how is that different from treatment in

10  the VTE context?

11  A. Well, I mean, the VTE prevention, for

12  instance, after major orthopedic surgery for patients

13  who undergo a hip or a knee replacement surgery, is a

14  relatively short-term course of prevention, typically

15  for roughly a month after that surgery, and would

16  use, in case of Xarelto, the dose of 10 milligrams.

17  And again, that dose has been found out in very

18  rigorous dose ranging trials utilizing both BID and

19  OD dosing.

20  Q. So when you went to design phase -- the Phase

21  II study program for EINSTEIN for VTE treatment, how

22  did the findings from the prevention program inform

23  your choice of doses?

24      MR. OVERHOLTZ: Object to form.

259: 1  A. Well, I mean, first of all, you always want

2  to consider all the totality of data you have

3  generated so far in the clinical development program,

4  just generally speaking; safety profile, doses,

5  behavior, regimens, et cetera.

6      But you, of course, would rely -- if, say, in

7  our case, the preventive dose is 10, you would

8  anticipate, based on all that I've said, that the

9  treatment dose is around 30 milligram.

10  Q. What were the two studies that you looked at?

11  And we don't need to go into super micro detail, but

12  just remind the jury, what were the two primary or the

13  two Phase II studies that were the dose ranging

14  studies for the VTE program treatment that you used to

15  design your Phase III studies?

16  A. Right. I mean, we -- initially, as we did in

17  VTE prevention, as well, we initially started the

18  development program utilizing a BID regimen, a twice

19  a day regimen of Xarelto. And we studied a very wide

20  range of doses, starting from 10 milligram BID up to

21  30 milligram BID. So that was a total daily dose of

22  60 milligrams, so a wide range of doses.

23      And we elected to explore whether a once a

24  day dosing regimen would actually be effective and

25  safe in this indication. So we included a fourth

260: 1  dose arm utilizing the dose of 40 milligram once a

2  day in that trial.

3      And then, of course, there was a comparator

4  drug, the standard of care, low molecular weight

5  heparin, warfarin. And as I said before, in order to

6  safeguard patients and to be on the safe side, not

7  risking an excess of pulmonary embolisms to occur, we

8  implemented early readout in the trial as soon as

9  three weeks of treatment with a second imaging

10  technique, ultrasound in this case, so that we can

11  measure whether the clot indeed disappears or not.

12  Q. And then -- go ahead.

13  A. And then the second trial was a trial that we

14  then initiated to come closer in terms of endpoints

15  to the Phase III. This is what you would typically

16  do in the setting of your Phase II program, that you

17  would run the later part of the Phase II program with

18  the outcomes -- you consider the relevant outcomes

19  for your Phase III. And here, we elected, then, to

20  test three once a day doses, namely 20, 30, and 40

21  milligram.

22  Q. So the first was the ODIXa-DVT, or Study

23  11223, where you looked at three BID dose and the one

OD dose?

**Misselwitz, Frank 2016-11-09**

Misselwitz PA DC PCC merged on 7-20-17

| | |
|---|---|
| 24 | A. Correct. |
| 25 | Q. And the second was the EINSTEIN DVT, or the |
| 261: 1 | Study 11528, where you looked at the three OD doses? |
| 2 | A. Correct. And we utilized clinical recurrent |
| 3 | events as the outcome readout. |
| 4 | Q. And that mirrored more what you were planning |
| 5 | to do in the Phase III? |
| 6 | A. Correct. |
| 7 | Q. One of the things you were asked was why -- |
| 8 | well, I don't know if you were asked the why. I'm |
| 9 | going to ask you the why. |
| 10 | But you talked a little bit about the fact |
| 11 | with plaintiff's counsel that there was only VTE |
| 12 | patients, but not PE, or pulmonary embolism, patients |
| 13 | studied in Phase II. |
| 14 | What was the rationale for that? |
| 15 | A. Well, first and foremost, to safeguard |
| 16 | patients and to avoid that, due to potentially |
| 17 | inappropriate doses, you would run the risk of an |
| 18 | excessive pulmonary embolism. |
| 19 | You have to know that patients presenting |
| 20 | with a deep vein thrombosis most often, at least |
| 21 | two-thirds of the time, recur with a deep vein |
| 22 | thrombosis; whereas patients presenting as a |
| 23 | pulmonary embolism most often recur as a pulmonary |
| 24 | embolism. And that, of course, can be potentially |
| 25 | fatal. |
| 262: 1 | So we, hence, avoided in the earlier part of |
| 2 | the program to involve these pulmonary embolism |
| 3 | patients. |
| 4 | Q. Based on the totality of data that came out |
| 5 | of your Phase II program for VTE treatment, what doses |
| 6 | did you select to take forward into the Phase III |
| 7 | program? |
| 8 | A. We elected to be taking into the Phase III |
| 9 | program the maintenance dose for the chronic part of |
| 10 | the secondary prevention or treatment of 20 milligram |
| 11 | once a day; but based on a number of |
| 12 | considerations -- and I'm happy to explain them in |
| 13 | greater detail -- we felt it was very important to |
| 14 | have an intensified treatment regimen early in the |
| 15 | beginning to really melt down the clot and help this |
| 16 | thrombus mass to digress, to disappear, ideally. |
| 17 | Q. What dose was selected for that initial |
| 18 | intensified treatment phase to bring forward into |
| 19 | Phase III? |
| 20 | A. We finally decided to take forward 15 |
| 21 | milligram BID, twice a day. |
| 22 | Q. Now, there was a lot of discussion with |
| 23 | counsel for plaintiff about what it looked like |
| 24 | 10 milligrams BID, and then -- but ultimately 15 |
| 25 | milligrams was taken forward. |
| 263: 1 | Do you recall those discussions? |
| 2 | A. I certainly recall these discussions, yes. |
| 3 | Q. How did you go from 10 milligrams to 15 |
| 4 | milligrams? How did that come about? |
| 5 | A. Well, I mean, I will come back to the |
| 6 | question how we bridged the dose, because 15 |
| 7 | milligram BID wasn't a dose that was directly studied |
| 8 | in our dose finding program; but I will come back to |
| 9 | that. |
| 10 | But it was predominantly driven by something |
| 11 | that happened outside of Bayer and outside our |
| 12 | development program and was actually reflected upon |
| 13 | in intense discussions with our advisors, thought |
| 14 | leaders, and the steering committee of the EINSTEIN |
| 15 | program. |
| 16 | Q. And what was that? I know you mentioned to |
| 17 | Mr. Overholtz something about an advisory council |
| 18 | discussion. What are you talking about? |
| 19 | A. Yeah. We -- I'm talking about a number of |
| 20 | trials, and one in particular, that had been |
| 21 | published during the time we were discussing that. |
| 22 | And that was the Van Gogh PE trial, also run by |
| 23 | Professor Buller with a drug called idraparinux, and |
| 24 | this drug was used in a way that it actually did not |
| 25 | cover enough the early critical treatment phase of PE |
| 264: 1 | patients and led in the clinical program, in the |
| 2 | Van Gogh PE clinical trial to an excess of pulmonary |
| 3 | embolism and even to an excess of fatal pulmonary |
| 4 | embolisms. |
| 5 | And our advisors were extremely concerned |
| 6 | about that, as they actually were involved in a trial |
| 7 | that was resulting to harm to patients. And they |
| 8 | simply said, no, we -- I mean, we have to avoid that |
| 9 | happening again. And we have to safeguard patients |
| 10 | to not actually let them run in a -- in a situation |
| 11 | that we would have, again, an excess of pulmonary |
| 12 | embolisms. |
| 13 | And that actually led them to recommend very |
| 14 | strongly to us that we should carefully analyze all |
| 15 | the data and consider whether an even higher dose |
| 16 | compared to the -- to the studied dose of 10 |
| 17 | milligram BID would be -- would be appropriate. |
| 18 | So we bridged -- now I'm coming back to -- |
| 19 | Q. Yeah. Let's talk about bridge for second. |
| 20 | The jury doesn't need, like, the technical -- you |
| 21 | know, they don't need to be in the lab. But just at a |
| 22 | high level, what is bridging; and what does that mean? |
| 23 | A. Well, that is actually quite a standard |
| 24 | procedure. You study a dose range from the lowest to |
| 25 | the highest dose ranging Phase II |
| 265: 1 | trials. And as long as you have -- as long as you |
| 2 | can describe the relationship of outcomes and safety |
| 3 | aspects within that continuum of doses, you can |
| 4 | actually quite nicely predict what would happen in |
| 5 | between of two doses you have studies. And that is |
| 6 | exactly what we have done. |
| 7 | Q. One of the things you were asked about -- |
| 8 | well, you were asked about it in two different ways. |
| 9 | I'll break it into two parts, which is: When |
| 10 | you went from Phase II to Phase III, did you recommend |
| 11 | any lower dose or dose adjustment for patients that |
| 12 | were -- had renal impairment, you know, kidney |

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

13  dysfunction, similar to the recommendation that there
14  was a 15 milligram dose for renally impaired SPAF
15  patients.
16       Do you recall that?
17  A. I do recall that. And we decided after very
18  intense discussions and good discussions and we
19  decided for good reason to not do that, and the main
20  reason being that unlike in the stroke prevention
21  setting, where we decided to dose down to a lower
22  dose, here, we have a setting of an active clot.
23       And we do know that patients with renal
24  impairment, while having a higher tendency to bleed,
25  they also have a much higher tendency to develop

266:
1   thrombotic events. And we knew from other drugs,
2   such as low molecular weight heparins, that patients,
3   even without dose adaptation, would benefit from that
4   full blown dose because of the -- even sometimes
5   improved benefit/risk ratio in renal impairment.
6        And so we decided against dose adaptation,
7   and the data actually fully justified that because
8   the data generated in the EINSTEIN programs show
9   that, yes, thrombosis rate goes up, yes, bleeding
10  goes up. But the net benefit is hugely better than
11  standard of care.
12  Q. You were also asked a similar question with
13  respect to, I think the phrase, "fragile patients" and
14  why there was no dosage upwards or downward dose -- or
15  I should say, I'm sorry, lower dose in the Phase III
16  studies for fragile patients.
17       How come there wasn't?
18  A. Well, I mean, fragility in our program was
19  defined as a combination of two or three factors, one
20  being renal impairment, the other being very low body
21  weight, and the third being age. And basically,
22  frailty in this definition is not identical, but
23  often coincides with renal impairment.
24  Q. So similar rationale?
25  A. Yeah.

267:
1   Q. One of the other questions you were asked
2   is -- was a discussion about the choice between using
3   rivaroxaban BID as the intensified initial treatment
4   phase, as opposed to low molecular weight heparin,
5   which was, at the time, the standard of care, and an
6   implication that there was a decision to go with
7   rivaroxaban for commercial reasons.
8        Do you -- do you recall those discussions?
9   A. I recall the discussions, yeah.
10  Q. Did you choose the rivaroxaban regimen for
11  commercial reasons, to make money?
12  A. Not at all. And, I mean, first of all, it's
13  very clear that the initial couple of days we are
14  talking about have actually very little commercial
15  impact on the six months, or whatever, 12 months
16  treatment duration in total.
17       But the main and much more important argument
18  is that working with only one drug from the
19  beginning, and that drug being an oral tablet that is

20  easy to administer, allows patients to be treated at
21  home without the need for hospitalizations, if
22  otherwise their condition would allow.
23       And that is very important. That's a great
24  benefit because many patients who are treated with a
25  low molecular weight heparin are -- need to be

268:
1   hospitalized and approximately 30 to 40 percent are
2   being hospitalized, which is not necessary within the
3   single drug approach as studied in the EINSTEIN
4   program.
5   Q. I want to turn now to the Phase III program.
6   Okay?
7   A. Uh-huh.
8   Q. You were asked an awful lot of questions
9   about the design of the studies, but just remind us
10  briefly. What were the three primary trials that were
11  run to support the applications around the world for
12  the VTE treatment indications?
13  A. And this family of EINSTEIN trials, if you
14  wish, consisted of a deep vein thrombosis treatment
15  trial, the EINSTEIN DVT trial, a second trial called
16  the EINSTEIN PE trial, addressing patients with
17  pulmonary embolism.
18       Both of these trials were run under one
19  umbrella protocol, but having been separately powered
20  for separate statistical tests and with a
21  prespecified metanalysis of the two trials together.
22  So this require -- this fulfills the requirement that
23  regulators told us we must fulfill to have two
24  confirmatory Phase III trials that would confirm each
25  other.

269:
1        And then the third trial we elected to
2   perform was the EINSTEIN extension trial. And that
3   is a trial in a different population, namely in a
4   population of patients who completed their initial
5   treatment and whether -- and where there was the
6   equipoise whether or not these patients should or
7   could benefit from an extended treatment duration.
8        And for that reason, the trial was a placebo
9   controlled trial.
10  Q. The EINSTEIN DVT and EINSTEIN PE studies were
11  of a non-inferiority design, correct?
12  A. That is correct.
13  Q. And there was a lot of discussion with
14  counsel for plaintiff about the 18 handicap and, you
15  know, what -- somehow suggesting that the
16  non-inferiority design isn't a very high bar and a
17  suggestion somehow, you know, the companies were
18  stacking the deck in its favor, again, the golf
19  handicap analogy.
20       Why don't we just -- let me ask you: What is
21  a non-inferiority design in this context, and why did
22  you choose non-inferiority design in the EINSTEIN DVT
23  and EINSTEIN PE studies?
24       MR. OVERHOLTZ: Object to form.
25  A. I think it is important to understand that

270:
1   warfarin or vitamin K antagonist is very effective.

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

2   It's -- when used according to guidelines and label,
3   et cetera, and then appropriate monitoring and
4   appropriate dose adapted, it's a very, very effective
5   drug that has the ability to reduce thrombotic events
6   by two-thirds relative to placebo. This is historic
7   data, back in the time where people still were able
8   to run placebo controlled trials versus warfarin, so
9   two-thirds relative risk reduction versus placebo.
10       This is a high level of efficacy that
11   basically is very hard to beat, and it's not
12   necessary to beat because of all the other advantages
13   an oral, fixed, unmonitored drug may have.
14       Hence, what you typically do -- and this is
15   what we've also done in other programs, in the ROCKET
16   AF trial, as well as in the RECORD program, we
17   designed the trial the way that you would first test
18   for non-inferiority; and after having achieved that
19   test, you would, statistically speaking, be allowed
20   to proceed into a superiority test.
21   Q. And one of the other criticisms that you were
22   engaged in a discussion about, with respect to the
23   design of the EINSTEIN PE and DVT trials, was the fact
24   that they were open labeling.
25       Do you recall that discussion?
271: 1   A. I recall that, yes.
2   Q. Why -- well, first of all, just to cut to the
3   chase, there was a suggestion that open label studies
4   could be biased.
5       Do you recall that discussion?
6   A. I do.
7   Q. And is that, of course, something that you
8   know, is not unheard of in the context of open label
9   trials; people are concerned about bias?
10  A. That is true.
11  Q. What steps, if any, did Bayer take to address
12  the issue of bias in the EINSTEIN PE and EINSTEIN DVT
13  studies?
14  A. I think it is a fair point, and it was a very
15  conscious decision to run the trials as open label
16  trials for a number of good reasons, but we
17  implemented a large number of measures to exactly
18  avoid this bias, and there are a couple of potential
19  biases.
20      The first bias starts with selecting patients
21  for one or the other group of treatment. That, of
22  course, can be avoided by using appropriate
23  randomization techniques and by providing an
24  interactive telephone randomization all over the
25  world so that all patients worldwide would actually
272: 1   be subjected to the different treatment groups to
2   avoid that allocation bias.
3       Then we made sure that for the different
4   treatment durations, we have no imbalance, because we
5   did allow the patients to be treated for three
6   months, six months, or 12 months. And we made that
7   stratification decision prior to the randomization,
8   not knowing, for the treating physician, whether the

9   patient would actually then be randomized to one or
10  the other treatment group.
11      We also made sure to avoid what we call a
12  reporting bias. A reporting bias may happen if you
13  see one group of patients more frequently than the
14  other group of patients. So we have implemented a
15  similar number of visits for the two treatment arms,
16  even though the rivaroxaban-treated patients would
17  actually not require that many visits.
18  Q. One of the other discussions that occurred
19  with respect to the EINSTEIN trials was the definition
20  of major bleeds, the clinical safety -- well, the
21  clinical safety endpoint, major bleeds.
22      Do you recall that?
23  A. Correct.
24  Q. Where does that definition come from?
25  A. The major bleeding definition is, again,
273: 1   worked upon and worked out by a number of academic
2   institutions and groups. It's reflected, again, in
3   the guidelines. As I said, in the ACCP guideline
4   document, there is a very clear delineation of the
5   major bleed definition.
6       And there is the International Society of
7   Thrombosis and Hemostasis, ISTH abbreviated, that is
8   worldwide renown body of academic thought leaders,
9   and they also had come up with a major bleeding
10  definition, and this is the particular one we were
11  using.
12  Q. You also discussed a difference in the safety
13  endpoints between the EINSTEIN VTE and PE studies
14  versus the extension studies.
15      Do you recall that?
16  A. That is correct, yeah.
17  Q. What was the difference, and can you just
18  briefly explain the rationale for that difference?
19  A. Yes, clearly. The two trials, EINSTEIN DVT
20  and EINSTEIN PE, that were run against standard of
21  care, namely, the combination of low molecular weight
22  heparin and then warfarin or vitamin K antagonist,
23  had selected the clinically relevant major and
24  non-major bleeding events as primary safety outcome.
25      And that is important to understand because
274: 1   both drugs have the potential to increase bleeding
2   events; and both drugs, of course, would need to be
3   assessed in terms of their relative safety.
4       And, hence, we clearly agreed with all our
5   advisors and also with the health authorities that
6   the endpoint of clinically relevant major and
7   non-major bleeding events is more informative about
8   the relative bleeding tendency in this setting.
9       Now, turning to the placebo controlled
10  EINSTEIN extension trial, here it is, of course, very
11  clear that bleeding of any kind, any bleed,
12  clinically relevant and major bleed, will likely be,
13  at least numerically, increased in a relative setting
14  versus placebo.
15      But it is important to contrast all the

## Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

16  benefit/risk assessment now.  How would the potential
17  success of thrombotic recurrent events compare to the
18  potential success of major bleeding events?  So you
19  basically need to compare apples to apples and not
20  apples to whatever, oranges.
21      And it is strongly felt that the major
22  bleeds, in terms of their severity, matched better to
23  the thrombotic outcomes for the benefit/risk
24  assessment.
25  Q. Dr. Misselwitz, did you apply -- "you" being
275: 1  Bayer and Janssen -- for approval of the VTE treatment
2  indications in the United States with the FDA?
3  A. That is correct.
4  Q. And you looked at, for example, Exhibits 22,
5  23, and 24, which were examples of clinical study
6  reports that were put together based on the EINSTEIN
7  Phase III trials.
8      Do you recall that?
9  A. That is correct.
10      (EINSTEIN 30(b)(6) Exhibit 32 was marked for
11  identification.)
12  BY MR. HOROWITZ:
13  Q. Let me show you what we'll mark as Exhibit 32
14  to your deposition and ask you to just briefly take a
15  look.
16      And can you identify Exhibit 32 for us,
17  please.
18  A. Yeah.
19  Q. What is Exhibit 32?
20  A. This is the final approval action regarding
21  the supplemental new drug application of May 1 and
22  28th of 2012 granted from the FDA, Food and Drug
23  Administration, with regard to the indication of VTE
24  treatment.
25  Q. And was this approval based on the Phase III
276: 1  EINSTEIN PE, EINSTEIN DVT, and EINSTEIN extension
2  studies which we've been discussing?
3  A. That is correct.
4      MR. OVERHOLTZ:  Object to form.
5  A. That is correct.
6  Q. What studies was the FDA approval based upon?
7  I just have to clean up the way I ask you the
8  question, so...
9  A. This approval of the F&DA was based upon the
10  Phase III trials, EINSTEIN DVT, EINSTEIN PE, and
11  EINSTEIN extension, and, of course, with supplemental
12  consideration for the Phase II program.
13  Q. Did you also -- and "you" being Bayer -- also
14  apply for approval of the VTE treatment indications in
15  Europe?
16  A. That is correct, yes.
17  Q. And let me show you Exhibits 33 and 34 to
18  your deposition --
19      (EINSTEIN 30(b)(6) Exhibit 33 was marked for
20  identification.)
21      (EINSTEIN 30(b)(6) Exhibit 34 was marked for
22  identification.)

23  BY MR. HOROWITZ:
24  Q. -- and ask you if you could take a look at
25  those and then identify those for us.
277: 1  A. Yeah.  Those are assessment reports issued by
2  the European Medicines Agency assessing the
3  submission of -- two submissions, one in late 2010
4  and the assessment report has been issued in 2011,
5  with regards to the EINSTEIN DVT and EINSTEIN
6  extension trial, and a second one dated January 28th,
7  2013, that is based on the additional submission of
8  EINSTEIN PE trial for the indication of the treatment
9  of pulmonary embolism.
10  Q. And what was the outcome of the review by the
11  EMA based on the EINSTEIN studies submitted to support
12  the application for VTE treatment indications in
13  Europe?
14  A. It was favorable.  The marketing
15  authorization has been granted with relatively little
16  questions or delays.  It was a very fast approval
17  process.
18  Q. Just a couple more things, Doctor, as we're
19  coming to the end of our time together.
20      If you could, take a brief look at Exhibits
21  25 and 26.  Maybe Mr. Overholtz can help you out.  You
22  can use mine just to move things along.
23      MR. OVERHOLTZ:  Here we go.
24      MR. HOROWITZ:  You've got them?
25      MR. OVERHOLTZ:  Uh-huh.
278: 1  BY MR. HOROWITZ:
2  Q. And Exhibit 25 and Exhibit 26, I think you
3  told Mr. Overholtz that Exhibit 25 is the publication
4  of the EINSTEIN DVT and EINSTEIN extension studies
5  in the New England Journal of Medicine?
6  A. That is correct.
7  Q. And then Exhibit 26 is the publication of the
8  EINSTEIN PE study in the New England Journal of
9  Medicine?
10  A. That is correct, as well.
11  Q. How would you characterize the New England
12  Journal of Medicine, and how hard is it to get
13  something published in the New England Journal of
14  Medicine?
15      MR. OVERHOLTZ:  Object to form.
16  A. Well, the New England Journal of Medicine is
17  definitely one of the, if not the leading biomedical
18  journals in the world.  And it has an extremely high
19  reputation.  It is typically widely read and highly
20  cited by others, leading to a very high impact
21  factor.
22      And it is important that this journal, as one
23  of the really leading medical journals in the world,
24  has a very rigorous peer review process that
25  basically leads to the rejection of approximately
279: 1  98.5 percent of all submitted papers.  So only very
2  few papers survive that rigorous peer review process.
3  Q. I'm going to show you one more exhibit, which
4  is Exhibit 35.

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

5    (EINSTEIN 30(b)(6) Exhibit 35 was marked for
6    identification.)
7    BY MR. HOROWITZ:
8    Q. And as I'm showing that to you, Mr. Overholtz
9    asked you at the beginning -- when he was discussing
10    your knowledge of EINSTEIN and what you might be
11    prepared to talk about, he mentioned Phase IV studies.
12    Do you recall that?
13    A. I do recall that, yes.
14    Q. And are you familiar with the XALIA study?
15    A. I am familiar with the XALIA study.
16    Q. Okay. Well, briefly, because we're running
17    short on time, but what is -- what is the XALIA study?
18    A. XALIA is a noninterventional study, a Phase
19    IV noninterventional study, that was done basically
20    upon request of the EMA, because it is a
21    postmarketing safety study that was requested by EMA.
22    And we performed that trial in the indication
23    of VTE treatment as a multicenter, international
24    prospective, but observational trial, in two cohorts,
25    namely standard of care and rivaroxaban cohorts.

280:
1    And it is important to understand that there
2    was no randomization involved; and we basically
3    observed patients as they treated, which is very
4    important to understand how the safety profile of a
5    newly approved drug would look like under real-life
6    conditions.
7    Q. And what is the conclusion based on the XALIA
8    study with respect to use of rivaroxaban in VTE
9    treatment under real-life conditions?
10    A. I think the XALIA trial resulted in an
11    outcome to reconfirm the favorable benefit/risk of
12    rivaroxaban in this particular indication.
13    Q. And is Exhibit 35 also published in the
14    medical literature?
15    A. It is published, as we have here in front of
16    us in the Lancet Journal, which is another highly
17    reputed and well-recognized journal in the medical
18    literature.
19    Q. Doctor, just one more thing I want to talk to
20    you briefly about, which is: You were asked some
21    questions, based upon one of the several documents
22    plaintiff's counsel showed you, about the gold
23    standard in commercial success.
24    Do you recall that discussion?
25    A. Uh-huh, I do.

281:
1    Q. You, as a -- as a medical doctor and the head
2    of the clinical trial program for Xarelto and the VTE
3    treatment EINSTEIN program, how is it that you view
4    the gold standard? What is your view of that?
5    A. Well, for me, a gold standard, first of all,
6    it's an evolving thing. I mean, gold standard may
7    move as medicine progresses due to developing new
8    diagnostic techniques, new drug interventions.
9    And I think our aim was a -- to indeed
10    develop a new gold standard that would be able to
11    replace, particularly in the VTE treatment field, the

12    cumbersome, difficult, and often leading to
13    hospitalization combination of an injectable low
14    molecular weight heparin followed and overlapped with
15    vitamin K antagonist, with all the difficulties it
16    has for frequent drug adjustments, dose adjustments,
17    and laboratory monitoring.
18    Q. And at the end of the day, who are you
19    helping by following that gold standard that you
20    described?
21    A. Well, I mean, this is to the benefit of the
22    patients, because we wanted to have a new treatment
23    modality that would replace the old standard of care
24    with the aim to be at least as effective, ideally
25    safer, more easy to use, allowing patients to be

282:
1    treated as outpatients, and with less necessity to
2    monitor it.
3    MR. HOROWITZ: Thank you, Doctor.
4    MR. OVERHOLTZ: Object to the last question,
5    by the way.
6    MR. HOROWITZ: Thank you, Dr. Misselwitz.
7    MR. OVERHOLTZ: Thank you. Can I have two
8    very quick questions?
9    THE VIDEOGRAPHER: The time is now 7:06.
10    We're going off the record.
11    (Recess from 7:06 p.m. until 7:13 p.m.)
12    THE VIDEOGRAPHER: The time is now 7:13, and
13    we're back on the record.
14    REDIRECT EXAMINATION
15    BY MR. OVERHOLTZ:
16    Q. Dr. Misselwitz, I just have a couple
17    follow-up questions for you.
18    A. Sure.
19    Q. In preparation for this deposition, did you
20    spend time meeting with counsel for Bayer in
21    preparation?
22    A. Yes, I did.
23    Q. Can you just tell me how many times and about
24    how long you spent?
25    A. Two-and-a-half days.

283:
1    Q. And during that time of preparation, did you
2    review documents in preparation for this deposition?
3    A. Indeed, yes.
4    Q. Okay. And can you give me an approximation
5    about how many documents you took a look at during
6    that preparation period?
7    A. I looked at a quite extensive list. I
8    haven't counted them, but I spent at least two full
9    days reading these documents.
10    Q. Okay. Did you look at them in hard copy or
11    electronic format?
12    A. Both.
13    Q. Okay. You recall there being some
14    discussions, both when I was questioning you and then
15    when counsel for Bayer was questioning you, regarding
16    the use of rivaroxaban twice daily during that
17    intensive treatment regimen period?
18    A. Uh-huh.

19  Q. Okay. And we talked about the fact that
20  there was this option of potentially, as opposed to
21  using rivaroxaban, using low molecular weight heparin
22  during that time period?
23  A. Sure.
24  Q. Okay. Either for a five- to seven-day period
25  or maybe even longer, correct?

284: 1  A. Correct.
2  Q. Now, during this period, the idea is, because
3  an active thrombus has been discovered in the patient,
4  that you want to have an intensified treatment,
5  correct?
6  A. That is correct.
7  Q. Okay. And with intensified treatment,
8  though, with an anticoagulant, whether it's low
9  molecular weight heparin or whether it's one of the
10  new oral anticoagulants like Xarelto, that's going to
11  come with an increased risk of bleeding, correct?
12  A. Theoretically, it needs to be proven
13  depending on the dose and the duration of that
14  intensified treatment, based on clinical data.
15  Q. But I think you told counsel for Bayer that
16  during that period, because of this active clot, and
17  you're at this initial period, and because of
18  experience maybe in some other clinical trials, it's
19  very important that that treatment is intensive enough
20  to protect the patient, right?
21  A. Indeed, to protect the patient to not allow
22  the clot to progress into a lung embolism.
23  Q. Even with an increased risk of bleeding
24  during that time period?
25      MR. HOROWITZ: Objection; form.

285: 1  A. For me, it's always important, as a medical
2  doctor who has long enough treated these patients in
3  clinical practice, making sure that there is an
4  appropriate benefit/risk balance. So you need to
5  make sure that you have efficacy at an acceptable
6  safety profile.
7  Q. Okay. And so one of the tenets of the
8  development for Xarelto for VTE treatment was the
9  ability to market the drug as a fixed, unmonitored
10  dose. That's been your testimony, correct?
11      MR. HOROWITZ: Objection; form.
12  A. That was early on, so to say, the vision of
13  how we wanted to develop that drug to basically help
14  patients.
15  Q. Okay. The drug was developed to be given as
16  a fixed, unmonitored dose?
17  A. Indeed.
18  Q. Okay. But during this time of intense
19  treatment, when the active clot is present in VTE,
20  isn't that the time when the ability to monitor a
21  patient's levels of the drug and their bleeding risk,
22  which we know is increased during this time period, is
23  even more important than during the chronic dosing
24  period?
25      MR. HOROWITZ: Objection; form.

286: 1  A. I would not agree to that notion because we
2  don't have any clinical data confirming that.
3  Q. And isn't it true that low molecular weight
4  heparin during such a period could be dose adapted and
5  the dose changed depending on the blood levels in the
6  patient's body, correct, and their PTINR measurements?
7  A. No, I respectfully disagree. The dose of low
8  molecular weight heparin being used in this
9  indication is a body weight adjusted dose that's been
10  given as a fixed dose and is not typically routinely
11  dose adapted according to plasma levels.
12  Q. Okay. And once the patient transitions to
13  warfarin, their dose can be adapted based on PTINR
14  levels; is that right?
15  A. That is correct.
16  Q. Okay. And did Bayer give any consideration,
17  during this intensive treatment period, of
18  recommending to doctors that some type of test be
19  given to make sure that a patient's PT is not too
20  elevated during this intensive treatment period?
21      MR. HOROWITZ: Objection; foundation.
22  A. We conducted the entire development program
23  in a way that we explored whether a fixed,
24  unmonitored dose would be safe and efficacious. And
25  we generated data that upped to doses of 60 milligram

287: 1  total daily dose, which is double the dose we are
2  using in the intensified treatment. The safety
3  profile was very acceptable.
4  Q. During this time of intensive treatment,
5  where a higher bleeding risk may be present for a
6  patient because of the higher doses being given, isn't
7  that also a time when it would be even more important
8  that an antidote be available for doctors in case a
9  patient's levels are too high or they experience a
10  bleeding event?
11      MR. HOROWITZ: Objection; form, foundation.
12  And, Neil, timewise, we're -- I'll let him answer
13  this question but timewise, we're running past
14  it.
15  Go ahead and answer.
16  A. Well, it's a theoretical consideration. As a
17  matter of fact, antidotes are not being used
18  frequently also for standard of care, in particular,
19  low molecular weight heparin. And we have identified
20  extremely few patients who theoretically would
21  have -- or where the treating physician would have
22  used an antidote.
23  Q. And just one last question: At the time that
24  the approval for Xarelto in the United States was
25  given for the VTE treatment indication, there was no

288: 1  approved antidote available for Xarelto, correct?
2  A. That is correct.
3      MR. OVERHOLTZ: Okay. That's all I have.
4      MR. HOROWITZ: I just have one follow-up, and
5  I think I can literally do this from here.
6      MR. OVERHOLTZ: Okay. Fair enough.
7      RECROSS-EXAMINATION

*Overruled*
*6-11(c)*
*6-20-17*

# Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

```
 8    BY MR. HOROWITZ:
 9    Q. Dr. Misselwitz, counsel for plaintiff just
10    asked you about -- again, about the dosing regimen of
11    the BID -- 15 milligrams BID intensive for three
12    weeks, followed by the 20 milligrams OD for the
13    continued treatment.
14        Do you recall that?
15    A. Yeah.
16    Q. Okay. I'm glad you do because it just
17    happened eight seconds ago.
18        And here's my question: What's the rationale
19    for having taken the OD, as opposed to BID, into Phase
20    III for the treatment period after the intensive
21    treatment? Why did you go with OD instead of BID?
22    A. Well, I think it is very important to convey,
23    to the fullest possible extent, the benefit of that
24    new medicine to patients. And what I mean here is,
25    really, we know that the long-term compliance and
289: 1    adherence to a once a day drug is considerably higher
 2    than the adherence to a BID or TID drug.
 3        And just to give some numbers here, we know
 4    that a twice a day administration of a drug, when
 5    given chronically, leads up to 40 percent dropouts
 6    after one year of treatment, and only 60 percent of
 7    the patients would actually still take that
 8    particular drug in a BID regimen.
 9        Whereas, in contrast, a once a day drug leads
10    to a much higher compliance and adherence, that in
11    case of Xarelto, and we did measure the adherence
12    long-term in chronic use, real-life studies, was
13    clearly exceeding 80 percent, close to 85 percent.
14    And that is a huge advantage to actually patients
15    being treated with a drug long-term and not dropping
16    off the treatment just because of an inconvenient
17    administration regimen.
18    Q. And last question: Why 20 milligrams OD for
19    the continued treatment period after the intensive
20    treatment, why the 20 milligrams?
21    A. Well, this was, amongst all doses studied,
22    the lowest effective dose and the dose that provided
23    clearly the best benefit /risk profile.
24    Q. And after the Phase III programs, what did
25    you learn about the 20 milligram dose?
290: 1    A. I think it fully reconfirmed our
 2    expectations. It did provide efficacy at a very
 3    acceptable safety profile.
 4        MR. HOROWITZ: Thank you.
 5        MR. OVERHOLTZ: That's all I have.
 6        MR. HOROWITZ: Thank you, Dr. Misselwitz.
 7        THE VIDEOGRAPHER: The time is now 7:23.
 8    This concludes the deposition. Going off the
 9    record.
10        (Whereupon, the deposition concluded at
11    7:23 p.m.)
12
13
14
```

```
15
16
17
18
19
20
21
22
23
24
25
291: 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
292: 1
 2
 3
 4
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
```

```
                  C E R T I F I C A T E
         I, SUSAN D. WASILEWSKI, Registered
     Professional Reporter, Certified Realtime Reporter,
     Certified Realtime Captioner, Certified Manager of
     Reporting Services, Florida Professional Reporter,
     and Certified Court Reporter (New Jersey), do hereby
     certify that, pursuant to notice, the deposition of
     FRANK MISSELWITZ, M.D., Ph.D, was duly taken on
     Wednesday, November 9, 2016, at 9:17 a.m., before me.
         The said FRANK MISSELWITZ, M.D., Ph.D, was
     duly sworn by me according to law to tell the truth,
     the whole truth and nothing but the truth and
     thereupon did testify as set forth in the above
     transcript of testimony. The testimony was taken
     down stenographically by me. I do further certify
     that the above deposition is full, complete, and a
     true record of all the testimony given by the said
     witness, and that a review of the transcript was not
     requested.


     Susan D. Wasilewski, RPR, CRR, CRC, CMRS, FPR, CCR(NJ
     (The foregoing certification of this transcript does
     not apply to any reproduction of the same by any
     means, unless under the direct control and/or
     supervision of the certifying reporter.)
                  LAWYER'S NOTES
     PAGE  LINE
```

## Misselwitz, Frank 2016-11-09

Misselwitz PA DC PCC merged on 7-20-17

22
23
24
25