07/20/17 14:02

## Imingo v bayer video tmax db
## Deposition Designations for Misselwitz F 20161109

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**14:12 – 15:7**   1:05

14 12   Misselwitz, Frank 2016-11-09
14 13   states that: "Please take notice that pursuant to
14 14   Rule 30(b)(6) of the Federal Rules of Civil Procedure,
14 15   Plaintiffs, by and through their counsel, will take
14 16   the video deposition of a designated witness or
14 17   witnesses of the Bayer defendants."
14 18       Do you have an understanding that you're here
14 19   today to testify on behalf of Bayer?
14 20   A.  I do understand.
14 21   Q.  Okay.  Now, why don't you state your full
14 22   name for the record?
14 23   A.  I'm Frank Misselwitz.
14 24   Q.  Okay.  And, Dr. Misselwitz, what is your
14 25   current position at Bayer?
15 1   A.  I'm the head of clinical development in the
15 2   therapeutic area of cardiovascular.  It's a vice
15 3   president position and consists of a number of
15 4   indication areas, including thrombosis, but also
15 5   cardiology, nephrology, and pulmonology.
15 6   Q.  Okay.  And how long have you held that
15 7   position?
    A.  This very position since 2005.

**16:25 – 17:4**   0:15

16 25   Misselwitz, Frank 2016-11-09
17 1   Q.  Okay.  And you have, based on your role at
17 2   Bayer, you have familiarity with the EINSTEIN studies
17 3   described there, both the Phase II and the Phase III
17 4   study program, correct?
    A.  That is correct.

**21:12 – 21:22**   0:58

21 12   Misselwitz, Frank 2016-11-09
21 13   Q.  And perhaps this subject is better talked
21 14   about from a perspective of Phase II and then
21 15   Phase III trials.  There were first Phase II studies
21 16   done under -- for EINSTEIN, and those being the
21 17   EINSTEIN DVT study and the ODIXa-DVT study; is that
21 18   right?
21 19   A.  That is correct, yes.
    Q.  Okay.  And then following those two studies,

1

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

| | | | |
|---|---|---|---|
| 21 20 | that led to the Phase III program for EINSTEIN; is | | |
| 21 21 | that right? | | |
| 21 22 | A.  That is correct. | | |
| 22:3  -  22:6 | Misselwitz, Frank 2016-11-09 | 0:10 | |
| 22  3 | Q.  Okay.  And you, of course, were aware that | | |
| 22  4 | there was an agreement made with J & J on | | |
| 22  5 | codevelopment of Xarelto; is that correct? | | |
| 22  6 | A.  That is correct. | | |
| 22:16  -  23:1 | Misselwitz, Frank 2016-11-09 | 0:38 | |
| 22 16 | Q.  Right.  That partnership agreement wasn't | | |
| 22 17 | reached until sometime in late 2005? | | |
| 22 18 | A.  Correct. | | |
| 22 19 | Q.  All right.  But after that point, J & J?  The | | |
| 22 20 | development of the VTE treatment indication was part | | |
| 22 21 | of the joint development agreement; is that right? | | |
| 22 22 | A.  Yes. | | |
| 22 23 | Q.  Okay.  Between Bayer and J & J, did you -- | | |
| 22 24 | who had primary responsibility for the development | | |
| 22 25 | activities related to the VTE treatment indication? | | |
| 23  1 | A.  It was Bayer. | | |
| 23:8  -  23:20 | Misselwitz, Frank 2016-11-09 | 0:43 | |
| 23  8 | What was --what was J & J's responsibility | | |
| 23  9 | with respect to the VTE treatment development, the | | |
| 23 10 | clinical trial program for the VTE treatment | | |
| 23 11 | indication? | | |
| 23 12 | A.  They were regularly apprised and informed | | |
| 23 13 | about everything that was going on.  And of course | | |
| 23 14 | they had had a say in all key decisions, like the | | |
| 23 15 | design of the clinical trial, et cetera, but they | | |
| 23 16 | were not involved in the day-to-day operational | | |
| 23 17 | conduct of the trial. | | |
| 23 18 | Q.  Okay.  The regulatory submissions to the US | | |
| 23 19 | FDA, were they responsible for those? | | |
| 23 20 | A.  Yes. | | |
| 25:5  -  25:8 | Misselwitz, Frank 2016-11-09 | 0:14 | |
| 25  5 | Q.  Did Bayer have a belief that the VTE | | |
| 25  6 | treatment development program was necessary in order | | |
| 25  7 | to have a timely submission for regulatory approval | | |
| 25  8 | for the AFib indication? | | |
| 25:10  -  25:10 | Misselwitz, Frank 2016-11-09 | 0:06 | |
| 25 10 | A.  I -- no.  The answer is no. | | |

2

| | Rulings | Responses In | Objections In | |
|---|---|---|---|---|

**25:18 - 25:21**   0:16

Misselwitz, Frank 2016-11-09

```
25 18        (EINSTEIN 30(b)(6) Exhibit 3 was marked for
   19    identification.)
   20        (EINSTEIN 30(b)(6) Exhibit 4 was marked for
   21    identification.)
```

**26:2 - 26:11**   0:42

Misselwitz, Frank 2016-11-09

```
26  2    The -- what is marked as Exhibit Number, I
    3    guess, 3 is the e-mail that you sent on July 20th of
    4    2004, the subject being "Minutes of the Expert Meeting
    5    on VTE Treatment in Amsterdam July 17, 2004."
    6        Do you see that?
    7    A. I do see.
    8    Q. Okay. And do you recall there being a
    9    meeting related to VTE treatment in Amsterdam back in
   10    2004?
   11    A. I recall that, yes.
```

**27:7 - 27:16**   0:36

Misselwitz, Frank 2016-11-09

```
27  7    Q. And then if we can look at Exhibit 4, is the
    8    attachment to this e-mail, correct?
    9    A. Uh-huh. That is correct.
   10    Q. And if we look at Exhibit 4, it says:
   11    "Planning group meeting, ODIXa- Bay 59-7939,
   12    July 17th, 2004, Amsterdam."
   13        That Bay 59-7939, just so we're clear for
   14    this deposition, that was Bayer's way of relating --
   15    referring to rivaroxaban; is that correct?
   16    A. That is correct.
```

**30:12 - 30:17**   0:14

Misselwitz, Frank 2016-11-09

```
30 12    Q. Okay. And if we look under "Background," the
   13    first bullet point, it says: "Taking into account the
   14    competition, the development of Bay 59-7937," or
   15    Xarelto, "must be fast."
   16        Do you see that?
   17    A. I see that sentence.
```

**31:3 - 31:8**   0:14

Misselwitz, Frank 2016-11-09

```
31  3    Q. And the next sentence, you say -- or the
    4    minutes of this meeting say that: "In June 2005, data
    5    should be available to make sound decisions regarding
    6    the dose for the Phase III program."
    7        Is that what it said?
    8    A. That is correct.
```

07/20/17 14:02

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

31:15 - 32:25    2:11

```
31 15   Misselwitz, Frank 2016-11-09
31 16   Q. Okay. And so we can kind of have an
31 17   understanding of what the ODIXa dose-finding study
31 18   was, tell me what's your understanding of what was
31 19   that -- what doses was that study looking at and about
31 20   how many patients were being studied in the ODIXa-DVT
31 21   study?
31 22   A. The ODIXa-DVT was a typical Phase IIB trial
31 22   in the indication of VTE treatment, to be precise,
31 23   deep vein thrombosis treatment, so we did exclude
31 24   patients presenting with a pulmonary embolism. We
31 25   studied, in the parallel group design, a number of
32 1    doses and in particular BID doses, namely 10, 20, and
32 2    30 milligrams given twice a day, as well as in one
32 3    dose arm a 40 milligram once-a-day dosing regime, in
32 4    comparison to the standard of care, which was the
32 5    combination of a low molecular weight heparin given
32 6    initially, in this case enoxaparin, overlapped and
32 7    followed chronically by a vitamin K antagonist.
32 8    As it is typically the case in these type of
32 9    dose-finding trials, you aim to have about 100
32 10   patients per dose arm so that you can reasonably well
32 11   predict dose trials.
32 12   Q. Okay. Now, we -- you mentioned that there
32 13   were three BID or twice daily dosing arms to the
32 14   study; is that right?
32 15   A. That is correct.
32 16   Q. Okay. And those were done in 10-, 20-, and
32 17   30-milligram doses, correct?
32 18   A. That is correct.
32 19   Q. Okay. The 40-milligram OD dose, that's a
32 20   once daily dose; is that right?
32 21   A. That is correct.
32 22   Q. Okay. The OD -- the 40-milligram OD dose,
32 23   was that part of the original protocol for the
32 24   ODIXa-DVT study?
32 25   A. Yes.
```

38:16 - 39:10    1:10

```
38 16   Misselwitz, Frank 2016-11-09
38 17   Q. Okay. Now were any PK/PD samples taken in
38 17   the Phase III EINSTEIN trials?
38 18   A. We did take PD samplings, yes.
38 19   Q. PD samplings?
38 20   A. Yeah.
38 21   Q. And when were those samples taken?
```

4

| | Objections In | Responses In | Rulings |
|---|---|---|---|

| | | |
|---|---|---|
| 38 22 | A. Again, at various time points, just making | |
| 38 23 | sure that the drug is at steady stage and to capture | |
| 38 24 | both trough and peak values. | |
| 38 25 | THE COURT REPORTER: And to? | |
| 39 1 | THE WITNESS: Capture those trough and peak | |
| 39 2 | values. | |
| 39 3 | BY MR. OVERHOLTZ: | |
| 39 4 | Q. Just so we're clear, you're talking about PT, | |
| 39 5 | prothrombin time? | |
| 39 6 | A. Correct. | |
| 39 7 | Q. Okay. And do you know how PT was measured in | |
| 39 8 | the Phase III EINSTEIN trials? Is that Neoplastine? | |
| 39 9 | A. As far as I remember, it has been Neoplastine | |
| 39 10 | Plus a very sensitive PT reagent. | |
| 39:11 - 39:14 | Misselwitz, Frank 2016-11-09 | 0:07 |
| 39 11 | Q. If we look under Item Number 2, it says: | |
| 39 12 | "Strategy for an accelerated development." | |
| 39 13 | Do you see that? | |
| 39 14 | A. Yeah, I do see that. | |
| 46:20 - 47:2 | Misselwitz, Frank 2016-11-09 | 0:20 |
| 46 20 | Q. Okay. And so -- and we'll talk about the | |
| 46 21 | Phase III EINSTEIN trials a little bit later, but just | |
| 46 22 | for purposes of this discussion, what was outcome was | |
| 46 23 | tested in the EINSTEIN Phase III DVT trial? | |
| 46 24 | A. Recurrence of clinical symptomatic events. | |
| 46 25 | Q. As reported by the clinical investigators? | |
| 47 1 | A. And verified objectively by diagnostic | |
| 47 2 | imaging. | |
| 47:15 - 48:1 | Misselwitz, Frank 2016-11-09 | 0:46 |
| 47 15 | Q. Okay. Now, if you can turn with me over to | |
| 47 16 | the next page, there is a "Conclusions" section. And | |
| 47 17 | just so we're clear, I mean, the purpose of conducting | |
| 47 18 | these two Phase II VTE treatment indication trials is | |
| 47 19 | to choose a dose or doses to study in the Phase III | |
| 47 20 | trial program; is that right? | |
| 47 21 | A. That's an important objective, yeah. | |
| 47 22 | Q. Okay. You want to make sure you have doses | |
| 47 23 | that are being studied that are going to be | |
| 47 24 | efficacious, but also doses that are within the safety | |
| 47 25 | margin for the drug; is that right? | |
| 48 1 | A. That is correct. | |
| 48:2 - 48:24 | Misselwitz, Frank 2016-11-09 | 1:37 |

07/20/17 14:02

| | Objections In | Responses In | Rulings |
|---|---|---|---|

48  2   Q. Okay. And if you look with me under
48  3   conclusions, it says: "Scenario 2 and 5 were
48  4   considered as the most realistic option."
48  5       And it says: "The preferred dose rage for
48  6   Scenario 2 would be 20 and 30 milligrams OD."
48  7       Do you know why it was, at this meeting, it
48  8   was discussed that 20 and 30 milligrams OD would be
48  9   preferred?
48  10  A. I mean, this was one of the options. As you
48  11  can see, there are more options that have been
48  12  discussed. And the background against which we need
48  13  to interpret these discussions here that really were
48  14  brought up as a brainstorming from this group of
48  15  experts was we knew that in VTE prevention, the
48  16  10-milligram dose OD had been selected to be tested
48  17  in Phase III, so that was deemed and determined as
48  18  the preventive dose.
48  19      And we know from many instances in the
48  20  literature, and it was actually really a paradigm,
48  21  that for a full-blown therapy of an existing clot,
48  22  typically a threefold higher dose would be required.
48  23      So that would lead you to expect that the
48  24  most likely dose is to be 30 milligram.

48:25  -  49:13   Misselwitz, Frank 2016-11-09   0:39
48  25  Q. Okay. And if you look with me, kind of the
49  1   second sentence there, it says: "The preferred dose
49  2   range for Scenario 5 would be 20 and 40 milligrams.
49  3   It might be more sensible however to choose 30
49  4   milligrams, this to be on the safer side to assure
49  5   efficacy since in this design the lower dosage will be
49  6   necessary as bailout if there is a bleeding problem."
49  7       Do you see that?
49  8   A. I see that.
49  9   Q. Okay. And too high a dose in the VTE
49  10  treatment indication could result in a bleeding
49  11  problem; is that right?
49  12  A. It was a theoretical consideration, as with
49  13  any other anticoagulant.

49:14  -  50:5   Misselwitz, Frank 2016-11-09   0:58
49  14  Q. But based on what information Bayer had with
49  15  respect to the use of enoxaparin in this scenario,
49  16  followed by vitamin K, that you needed a dose that
49  17  would at least be as efficacious as what is currently
49  18  the standard of care, right?

07/20/17 14:02

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

49 19  A. That is partly correct. And I also want to
49 20  add here that at that time, we had these discussions
49 21  ongoing, there was a lot of anxiety to underdose,
49 22  because of the fear particularly, when it comes to
49 23  the treatment of pulmonary embolisms, a not effective
49 24  dose leading to potentially fatal pulmonary embolisms
49 25  as this had recently been documented for other
50 1  anticoagulants under development.
50 2  Q. You didn't want to go into the trial with too
50 3  low of a doses?
50 4  A. It would actually harm the patient. It has a
50 5  potential to put the patient as unnecessary risk.

50:13 - 51:9  Misselwitz, Frank 2016-11-09   1:03
50 13  Q. Okay. The -- there's an additional
50 14  discussion points down below, and the first one says:
50 15  "Separate studies for PE and DVT."
50 16    Do you see that?
50 17  A. I see that, sir.
50 18  Q. Okay. Now, was this discussion regarding the
50 19  Phase II or the potential Phase III studies that would
50 20  be conducted?
50 21  A. This is more a very early general discussion
50 22  about options we have for Phase III.
50 23  Q. Okay. In the Phase III program, there was
50 24  the EINSTEIN Phase III trial, but there are
50 25  essentially two trials within one protocol; is that
51 1  right?
51 2  A. Correct.
51 3  Q. There was one protocol but one DVT Phase III
51 4  trial, and then a pulmonary embolism Phase III trial?
51 5  A. Correct.
51 6  Q. Okay. The dose-finding studies that were
51 7  done were only conducted in DVT patients, not
51 8  pulmonary embolism patients?
51 9  A. Correct.

51:10 - 52:25  Misselwitz, Frank 2016-11-09   1:59
51 10  Q. Okay. It says: "Separate PE and DVT studies
51 11  seem to be the best approach since two pivotal trials
51 12  are required by the authorities due to the
51 13  noninferiority design."
51 14    Do you see that?
51 15  A. I see that.
51 16  Q. Okay. It says: "The PE study might be done
51 17  with only two arms, one dosage, a comparator, and can

**Objections In (Re: [51:10-52:25]):** Def Obj Relevance/403. The "extension of treatment" arm of EINSTEIN (referred to at 52:11-25) has no relevance here as Plaintiff did not undergo

**Responses In (Re: [51:10-52:25]):** Pltf Resp The risk of juror confusion is null considering the DVT treatment [DVT-T] indication and phase 3 study are described and

**Rulings:** Pending



| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| 51 18 | start once the interim analysis has been concluded of | extended Xarelto treatment. This risks juror confusion as to which trial data are relevant. | distinguished on page 51. Even so, the EINSTEIN-Extension [EINSTEIN-EXT] study entails data relevant to study conduct and safety data [as well as Defendants' handling thereof] and is extremely relevant. This recalls Defendants' repeated, unsuccessful attempts to prevent testimony pertaining to the ACS studies, which involved an indication that never received approval in the US. The Court overruled this objections without exception and should do so here. | |
| 51 19 | the Scenario 5 DVT study." | | | |
| 51 20 | Do you see that? | | | |
| 51 21 | A. I see that. | | | |
| 51 22 | Q. Okay. The EINSTEIN Phase III DVT study | | | |
| 51 23 | started before the EINSTEIN Phase III pulmonary | | | |
| 51 24 | embolism study; is that right? | | | |
| 51 25 | A. We actually proceeded with the preparation of | | | |
| 52 1 | both trials at the same time. We approved the | | | |
| 52 2 | protocol at the same time and, maybe due to trial | | | |
| 52 3 | logistics, one trial, the DVT trial, may have started | | | |
| 52 4 | earlier, but there was no intended big delay between | | | |
| 52 5 | the two trials. | | | |
| 52 6 | Q. As far as the difference of when those trials | | | |
| 52 7 | concluded, that was driven more as a result of | | | |
| 52 8 | logistics, issues like recruitment, things like that; | | | |
| 52 9 | is that right? | | | |
| 52 10 | A. Indeed. That is correct. | | | |
| 52 11 | Q. Okay. Now, the second bullet point talks | | | |
| 52 12 | about: "Extension of treatment up to one year or | | | |
| 52 13 | longer incorporated in the same study or a new study." | | | |
| 52 14 | Do you see that? | | | |
| 52 15 | A. Yes, I do see that. | | | |
| 52 16 | Q. There, in fact, was a EINSTEIN extension | | | |
| 52 17 | study conducted; is that right? | | | |
| 52 18 | A. Correct. | | | |
| 52 19 | Q. Okay. And that was a separate study | | | |
| 52 20 | conducted under the same protocol as well; is that | | | |
| 52 21 | right? | | | |
| 52 22 | A. That was a different protocol. | | | |
| 52 23 | Q. Had a different protocol? Had its own | | | |
| 52 24 | protocol? | | | |
| 52 25 | A. Yeah. | | | |
| | | 0:35 | | |
| 53:3 – 53:16 | Misselwitz, Frank 2016-11-09 | **Re: [53:3-53:16] Def Obj** See objection regarding EINSTEIN extension arm at 51:10-52:25. | **Re: [53:3-53:16] Pltf Resp** The risk of juror confusion is null considering the DVT treatment (DVT-T) indication and phase 3 study are described and distinguished on page 51. Even so, the EINSTEIN- | Pending |
| 53 3 | this: People that had been involved in the EINSTEIN | | | |
| 53 4 | DVT trial, or the EINSTEIN PE trial, they can be | | | |
| 53 5 | enrolled into the EINSTEIN extension study; is that | | | |
| 53 6 | correct? | | | |
| 53 7 | A. As part of it, but it was not limited to | | | |
| 53 8 | earlier study participants. | | | |
| 53 9 | Q. Patients that had not been part of this study | | | |
| 53 10 | at all could also become enrolled in the extended | | | |
| 53 11 | study? | | | |
| 53 12 | A. Yes. | | | |
| 53 13 | Q. There was only requirements related to | | | |

8

07/20/17 14:02

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| | | Extension [EINSTEIN-EXT] study entails data relevant to study conduct and safety data [as well as Defendants' handling thereof] and is extremely relevent. This recalls Defendants' repeated, unsuccesful attempts to prevent testimony pertaining to the ACS studies, which involved an indication that never received approval in the US. The Court overruled this objections without exception and should do so here. | |



| | | | Pending |
|---|---|---|---|
| 1:33 | **Re: [57:4-58:4]**<br>**Def Obj** See objection regarding EINSTEIN extension arm at 51:10-52:25. | **Re: [57:4-58:4]**<br>Pltf Resp The risk of juror confusion is null considering the DVT treatment [DVT-T] indication and phase 3 study are described and distinguished on page 51. Even so, the EINSTEIN-Extension [EINSTEIN- | |
| | 9 | | |

| | |
|---|---|
| 53  14 | whether or not they had completed a treatment program |
| 53  15 | for either their DVT or PE; is that right? |
| 53  16 | A.  Correct. |

| | |
|---|---|
| 57:4  -  58:4 | Misselwitz, Frank 2016-11-09 |
| 57   4 | Q.  The extension -- the Phase III |
| 57   5 | EINSTEIN trials were open label, the DVT, and the PE? |
| 57   6 | A.  That's correct. |
| 57   7 | Q.  Okay.  The extension study was double blind; |
| 57   8 | is that right? |
| 57   9 | A.  That is correct. |
| 57  10 | Q.  Okay.  When patients were recruited into the |
| 57  11 | extension study, were they told that they would be |
| 57  12 | going into a double-blind study where they might get |
| 57  13 | the treatment or they might get placebo? |
| 57  14 | A.  Sure. |
| 57  15 | Q.  Okay.  And so a patient would know that |



| | Objections In | Responses In | Rulings |
|---|---|---|---|
| 57 16 "There's a chance I'm going to get into an extension<br>57 17 trial where I might not get any treatment at all; I<br>57 18 might just take a placebo pill"?<br>57 19 A. That's fully correct. And that's a matter of<br>57 20 informed consent, and that's why taking the informed<br>57 21 consent is so important.<br>57 22 Q. Okay. And just so we're clear, because I was<br>57 23 going to ask you about it before, but you mentioned<br>57 24 that the comparator that was set up for the extension<br>57 25 trial was placebo, right?<br>58 1 A. Correct.<br>58 2 Q. Some form of a sugar pill with no active<br>58 3 medicine; is that right?<br>58 4 A. That is correct. | | EXT] study entails data relevant to study conduct and safety data [as well as Defendants' handling thereof] and is extremely relevent. This recalls Defendants' repeated, unsuccessful attempts to prevent testimony pertaining to the ACS studies, which involved an indication that never received approval in the US. The Court overruled this objections without exception and should do so here. | |
| 58:5  -  58:12   Misselwitz, Frank 2016-11-09<br>58 5 Q. Okay. Who made the decision that the<br>58 6 comparator for the extension trial would be a placebo?<br>58 7 A. Well, we finally made that decision. We, of<br>58 8 course, seeked advice by our group of experts and by<br>58 9 then also the steering committee of the trial<br>58 10 program. But it was also fully in line with the<br>58 11 guidelines at that time, and still these guidelines<br>58 12 are in place. | Re: [58:5-58:12]<br>Def Obj See objection regarding EINSTEIN extension arm at 51:10-52:25. | Re: [58:5-58:12]<br>Pltf Resp The risk of juror confusion is null considering the DVT treatment [DVT-T] indication and phase 3 study are described and | Pending |

0:30



07/20/17 14:02

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**58:14 – 58:18   Misselwitz, Frank 2016-11-09**

58 14   EINSTEIN comparing long-term continued usage of
58 15   Xarelto as compared with daily aspirin.
58 16   A.   That is correct.
58 17   Q.   Okay. And Bayer makes aspirin, of course?

0:15

Re: [58:14-58:18]
**Def Obj**
Incomplete/Relevance/4
03. See objection
03.

distinguished on
page 51. Even so,
the EINSTEIN-
Extension [EINSTEIN-
EXT] study entails
data relevant to
study conduct and
safety data [as well
as Defendants'
handling thereof]
and is extremely
relevant. This recalls
Defendants'
repeated,
unsuccesful attempts
to prevent testimony
pertaining to the ACS
studies, which
involved an
indication that never
received approval in
the US. The Court
overruled this
objections without
exception and should
do so here.

Re: [58:14-58:18]
Pltf Resp The risk of
juror confusion is
null considering the

Pending

11

07/20/17 14:02

| | | Objections in | Responses in | Rulings |
|---|---|---|---|---|
| 58 | 18 | regarding EINSTEIN extension arm at 51:10-52:25. Furthermore, that Bayer makes aspirin has no bearing on Mrs. Mingo's claims and is therefore irrelevant. It also risks confusion, as some jurors may believe Bayer could be liable for any role aspirin is alleged to have have played in contributing to Mrs. Mingo's injuries. | DVT treatment [DVT-T] indication and phase 3 study are described and distinguished on page 51. Even so, the EINSTEIN-Extension [EINSTEIN-EXT] study entails data relevant to study conduct and safety data [as well as Defendants' handling thereof] and is extremely relevant. This recalls Defendants' repeated, unsuccesful attempts to prevent testimony pertaining to the ACS studies, which involved an indication that never | |

A.  We do make aspirin, yes.

12

07/20/17 14:02

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| 61:10 - 61:18 | Misselwitz, Frank 2016-11-09 | | | |
| 61 10 | about the use of the VTE data. The VTE treatment | | received approval in the US. The Court overruled this objections without exception and should do so here. That Bayer makes Aspirin is crucial to imparting upon them their knowledge of that product both as a competing agent as well as a blood thinning agent. | |
| 61 11 | data, those are the only dose finding studies that | | | |
| 61 12 | were done to choose the dose for the Phase III Afib | | | |
| 61 13 | trials, right? | | | |
| 61 14 | A.   That is correct. | | | |
| 61 15 | Q.   The ROCKET trial, right? | | | |
| 61 16 | A.   (Nodding head.) | | | |
| 61 17 | Q.   Is that correct? | | | |
| 61 18 | A.   That is correct. | | | |
| | | 0:20 | | |
| | | Re: [61:10-61:18] | Re: [61:10-61:18] | Pending |
| | | Def Obj Relevance. 403. ROCKET and the Afib indication are not relevant to Plaintiff's claims. This risks serious juror confusion and it will prejudice Defendants if Plaintiffs | Pltf Resp Time and time again, this Court overruled Defendants' attempts to confined testimony to a singular Xarelto indication. | |

13

07/20/17 14:02

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| 62:1 - 62:6 | Misselwitz, Frank 2016-11-09<br>62 1 Q. Okay. And that is, in fact, what was done by<br>62 2 Bayer with respect to Xarelto, is that the dose for<br>62 3 the ROCKET Afib trial was based upon the VTE treatment<br>62 4 dose finding studies, ODIXa-DVT, and EINSTEIN DVT; is<br>62 5 that correct?<br>62 6 A. That is correct. | 0:17 | are permitted to elicit testimony regarding what they perceive to be flaws in the ROCKET trials.<br><br>Re: [62:1-62:6]<br>Def Obj] See objection regarding ROCKET/Afib at 61:10-61:18. | Testimony pertaining to other indications is relevant to study conduct and safety data as well as motive, considering the perceived importance of the AFIB indication. Furthermore, the DVT-T studies were relied upon by Defendants to arrive at a dosage for ROCKET as is set forth in this very testimony. The indications are inextricable as shown by Defendants' own treatment of the respective data across all indications.<br><br>Re: [62:1-62:6]<br>Pltf Resp Time and time again, this Court overruled Defendants' attempts to confined testimony to a singular Xarelto indication. | Pending |
| 62:21 - 63:3 | Misselwitz, Frank 2016-11-09<br>62 21 Q. So when we talk about the long-term --<br>62 22 there's -- for the EINSTEIN Phase III trials, there is<br>62 23 an intensified treatment regimen period, three-week<br>62 24 initial period?<br>62 25 A. That is correct.<br>63 1 Q. And then that's followed by the long-term<br>63 2 treatment period; is that correct?<br>63 3 A. That is correct. | 0:15 | | Testimony pertaining to other indications is relevant to study conduct and safety data as well as motive, considering the perceived |

14

07/20/17 14:02



| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| 63:19 – 64:21 | | | | |
| 63 19 | Misselwitz, Frank 2016-11-09 | | | |
| 63 20 | Q. Correct. The -- and only the 20 milligram OD | | importance of the | |
| 63 21 | dose was the only dose studied for the long-term | | AFIB indication. | |
| 63 22 | treatment period in the EINSTEIN Phase III trials, | | Furthermore, the | |
| | right? | | DVT-T studies were | |
| 63 23 | A. That -- do you mean the setting of EINSTEIN | | relied upon by | |
| 63 24 | extension? | | Defendants to arrive | |
| 63 25 | Q. Just the EINSTEIN PE and EINSTEIN DVT trial. | | at a dosage for | |
| 64 1 | A. Yes, that's correct. | | ROCKET as is set | |
| 64 2 | Q. No other doses as far as, for example, 15 | | forth in this very | |
| 64 3 | milligrams or 10 milligrams, just the 20 milligram OD | | tesitmony. The | |
| 64 4 | dose, right? | | indications are | |
| 64 5 | A. That is correct. | | inextricable as shown | |
| 64 6 | Q. Okay. And also a BID dose -- for that part | | by Defendants' own | |
| 64 7 | of the trial, the long-term treatment period of the | | treatment of the | |
| 64 8 | EINSTEIN studies, there was no BID dose studied? | | respective data | |
| 64 9 | A. That is correct, as well. | | across all indications. | |
| 64 10 | Q. Okay. If you look at this last bullet point, | | | |
| 64 11 | it says: "Although most participants were in favor of | | | |
| 64 12 | once daily dosing, some remained in favor of BID | | | |
| 64 13 | dosing and proposed to proceed also with this dosing | | | |
| 64 14 | regimen." | | | |
| 64 15 | Do you see that? | | | |
| | 1:45 | Re: [63:19-64:21] | Re: [63:19-64:21] | Pending |
| | | Def Obj See objection | Pltf Resp The risk of | |
| | | regarding EINSTEIN | juror confusion is | |
| | | extension arm at 51:10- | null considering the | |
| | | 52:25. | DVT treatment [DVT- | |
| | | | T] indication and | |
| | | | phase 3 study are | |
| | | | described and | |
| | | | distinguished on | |
| | | | page 51. Even so, | |
| | | | the EINSTEIN- | |
| | | | Extension [EINSTEIN- | |
| | | | EXT] study entails | |
| | | | data relevant to | |
| | | | study conduct and | |
| | | | safety data [as well | |
| | | | as Defendants' | |
| | | | handling thereof] | |
| | | | and is extremely | |
| | | | relevent. This recalls | |
| | | | Defendants' | |
| | | | repeated, | |

15

| | | | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|
| 64 16 | A. I see that sentence. | | | unsuccesful attempts to prevent testimony pertaining to the ACS studies, which involved an indication that never received approval in the US. The Court overruled this objections without exception and should do so here. | |
| 64 17 | Q. It would have been possible for Bayer to test | | | | |
| 64 18 | both a BID and once daily dose for the long-term | | | | |
| 64 19 | treatment period in the EINSTEIN Phase III trials, | | | | |
| 64 20 | correct? | | | | |
| 64 21 | A. It's a theoretical consideration. | | | | |
| 65:20 – 66:7 | Misselwitz, Frank 2016-11-09 | 1:40 | | | |
| 65 20 | Q. You would certainly agree that at the time | | | | |
| 65 21 | that the Phase III EINSTEIN trials began, that Bayer | | | | |
| 65 22 | had very limited data comparing the efficacy and | | | | |
| 65 23 | safety of once daily dosing to twice daily dosing for | | | | |
| 65 24 | Xarelto, correct? | | | | |
| 65 25 | A. We had found a number of comparisons between | | | | |
| 66 1 | OD and BID, and we had done -- considering the time | | | | |
| 66 2 | we embarked on the Phase III program, we had done two | | | | |
| 66 3 | dose ranging trials, one predominantly with BID | | | | |
| 66 4 | dosing and another one which predominantly was OD | | | | |
| 66 5 | dosing, so I think we did fully explore that space | | | | |
| 66 6 | and were able to derive an appropriate dosing | | | | |
| 66 7 | selection. | | | | |
| 67:5 – 67:7 | Misselwitz, Frank 2016-11-09 | 0:12 | | | |
| 67 5 | Q. Do you agree, Dr. Misselwitz, that Bayer | | | | |
| 67 6 | believed that the VTE indications were simply | | | | |
| 67 7 | premarketing for the Afib indication? | | | | |
| 67:9 – 67:14 | Misselwitz, Frank 2016-11-09 | 1:00 | | | |
| 67 9 | A. I would not agree. | | | | |
| 67 10 | Q. And do you believe that Bayer believed that | | | | |
| 67 11 | any delay in the submission of VTE indications would | | | | |
| 67 12 | jeopardize the submission of the Afib package for | | | | |
| 67 13 | approval? | | | | |
| 67 14 | A. No. | | | | |
| 67:15 – 68:1 | Misselwitz, Frank 2016-11-09 | 0:57 | | | |
| 67 15 | Q. At this point in development -- I mean, we | | | | |
| 67 16 | just got through talking in 2004. In this 2004 or | | | | |
| 67 17 | 2005 time frame, did Bayer believe that the | | | | |
| 67 18 | competitors in the VTE treatment indication arena | | | | |
| 67 19 | would be likely using once daily formulations? | | | | |
| 67 20 | MR. HOROWITZ: Objection; form. | | | | |
| 67 21 | A. I think we had knowledge of both options, OD | | | | |
| 67 22 | and BID; and I think it was, at that point in time, | | | | |
| 67 23 | hard to predict how things would be going. | | | | |
| 67 24 | Q. I asked you about the possibility of studying | | | | |

16

| | | Rulings | Responses In | Objections In | | |
|---|---|---|---|---|---|---|

07/20/17 14:02

67 25    both BID and OD studies in the VTE treatment Phase III
68 1      trials.

68:2  -  68:6    Misselwitz, Frank 2016-11-09      1:09
68  2      Was one of the reasons why Bayer chose not to
68  3    study both the BID and once daily dose in the Phase
68  4    III VTE trial because they believed that it would be
68  5    difficult to recruit enough patients to study those?
68  6    A. No.

69:1  -  69:4    Misselwitz, Frank 2016-11-09      0:23
69  1    Q. Let me show you what we'll mark as Exhibit
69  2    Number 5, which is Record Number 92914.
69  3    (EINSTEIN 30(b)(6) Exhibit 5 was marked for
69  4    identification.)

69:11 -  69:25    Misselwitz, Frank 2016-11-09      0:38
69 11    Q. So this is a PowerPoint presentation from 5
69 12    April 2006 to the GDCMC.
69 13    Can you tell me what the GDCMC was?
69 14    A. It's a Global Development Committee. The
69 15    exact abbreviation lacks my memory.
69 16    Q. Okay.
69 17    A. Long ago.
69 18    Q. According to this PowerPoint presentation,
69 19    it's being presented by yourself, Frank Misselwitz, as
69 20    well as Ton Lensing.
69 21    Do you see that?
69 22    A. Yes.
69 23    Q. And it's -- "Clinical Development Program in
69 24    VTE-Treatment" is the title on the first page?
69 25    A. Yes.

70:1  -  70:10    Misselwitz, Frank 2016-11-09      0:43
70  1    Q. What was Ton Lansing's role with respect to
70  2    the VTE treatment indication?
70  3    A. He was the global clinic leader, who was --
70  4    who did run the EINSTEIN DVT dose finding trial and
70  5    who was the global clinical leader in charge for the
70  6    Phase III program. He had reported to me.
70  7    Q. You had hired Dr. Lensing to work
70  8    specifically on Xarelto in the VTE EINSTEIN
70  9    indication; is that correct?
70 10    A. That is correct.

70:24 -  71:12    Misselwitz, Frank 2016-11-09      0:30

17

**Rulings**

**Responses In**

**Objections In**

| | | |
|---|---|---|
| 70 24 | Q. Okay. Now, and this was the 5 April 2006. | |
| 70 25 | By 5 April 2006, a decision had been made with Bayer | |
| 71 1 | to use a once daily dosing regimen for the VTE | |
| 71 2 | treatment indication; is that right? | |
| 71 3 | A. That is correct. | |
| 71 4 | Q. Okay. And according to this, for looking | |
| 71 5 | over at the far right, it says: "20 milligram as the | |
| 71 6 | main dose." | |
| 71 7 | Right? | |
| 71 8 | A. Uh-huh, correct. | |
| 71 9 | Q. And it says: "Intensified treatment regimen | |
| 71 10 | for the initial (5 to 7 days) treatment phase." | |
| 71 11 | Do you see that? | |
| 71 12 | A. I see that. | |

| | | |
|---|---|---|
| 71:22 - 72:1 | Misselwitz, Frank 2016-11-09 | 0:17 |
| 71 22 | Q. To try to summarize it, there -- the belief | |
| 71 23 | was that successful treatment during that initial | |
| 71 24 | phase would result in better outcomes for the longer | |
| 71 25 | follow-up treatment period; is that right? | |
| 72 1 | A. That is correct. | |

| | | |
|---|---|---|
| 72:2 - 72:19 | Misselwitz, Frank 2016-11-09 | 0:46 |
| 72 2 | Q. Okay. And there's a bullet point here below | |
| 72 3 | that that says: "To be decided." And one is: "Dose | |
| 72 4 | for subpopulations (if required)." | |
| 72 5 | Do you see that? | |
| 72 6 | A. I can see that. | |
| 72 7 | Q. Okay. That might be, for example, like in | |
| 72 8 | Afib, there was a dose adaptation for renally impaired | |
| 72 9 | patients. That's what that's referring to? | |
| 72 10 | A. We have many subgroups. | |
| 72 11 | Q. Elderly, fragile patients? | |
| 72 12 | A. Yes. | |
| 72 13 | Q. It could be any different type of | |
| 72 14 | subpopulation? | |
| 72 15 | A. Yes. | |
| 72 16 | Q. Okay. The Phase III program for VTE | |
| 72 17 | treatment did not use any type of dose adaptation for | |
| 72 18 | any subpopulations, correct? | |
| 72 19 | A. That is correct. | |

| | | |
|---|---|---|
| 72:20 - 73:4 | Misselwitz, Frank 2016-11-09 | 0:18 |
| 72 20 | Q. Okay. "Type of intensified treatment" is the | |
| 72 21 | second. | |
| 72 22 | That's referring to that intense identified | |

18

07/20/17 14:02

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

72 23    treatment regimen for the initial
72 24    treatment phase,
72 25    correct?
73 1     A. (No audible answer.)
73 2     Q. And it says: "Rivaroxaban 10 milligrams BID
73 3     or Heparins."
73 4     Correct?
         A. Correct.

73:5  –  73:11    Misselwitz, Frank 2016-11-09    0:29
73 5     Q. Okay. So just so we're clear, in April 2006,
73 6     prior to the EINSTEIN VTE treatment program starting,
73 7     the discussion within Bayer was about using an
73 8     intensified treatment period for an initial five- to
73 9     seven-day period, and then whether or not they would
73 10    use 10 milligrams twice daily Xarelto or use the low
73 11    molecular weight heparins during that time period?

73:13  –  73:19    Misselwitz, Frank 2016-11-09    0:23
73 13    A. These were options we were discussing. It's
73 14    important to note that this is not the final decision
73 15    on the trial protocol. That is intermediate status
73 16    update to inform senior management about the status
73 17    and, of course, also the options we wanted to explore
73 18    further. And this was part of the considerations and
73 19    discussions.

73:20  –  74:4    Misselwitz, Frank 2016-11-09    0:29
73 20    Q. And, in fact, the final program changed so
73 21    that the intensified treatment period ended up being a
73 22    three-week period as opposed to a five- to seven-day
73 23    period, correct?
73 24    A. Correct.
73 25    Q. Okay. And then also as opposed to the
74 1     intense identified treatment regimen, the final
74 2     intensified treatment regimen was Xarelto 15
74 3     milligrams twice daily, correct?
74 4     A. Correct.

74:5  –  74:18    Misselwitz, Frank 2016-11-09    0:56
74 5     Q. Who made the decision to -- for the
74 6     intensified treatment regimen, to move the Xarelto
74 7     dose up to 15 milligrams instead of 10 milligrams?
74 8     A. That has been done based on careful analysis
74 9     of the available data from the two dose finding
74 10    trials, in particular, EINSTEIN -- the ODIXa-DVT
74 11    trial, and also modeling and simulation approach,

19

| | Objections In | Responses In | Rulings |
|---|---|---|---|

74 12    helping us to understand how best we could achieve,
74 13    in the shortest possible time, the therapeutic levels
74 14    of rivaroxaban.
74 15    Q. Did you -- did you have concerns about moving
74 16    the dose to -- up from 10 milligrams BID to a 15
74 17    milligram BID dose during this intensified treatment
74 18    regimen period?

74:20 - 74:24    Misselwitz, Frank 2016-11-09    0:17
74 20    A. We carefully analyzed the data, and there was
74 21    no reason of a particular concern. So I -- to answer
74 22    the question, I had no concern about that because we
74 23    had good data enabling us to predict that dose to be
74 24    optimal.

74:25 - 75:1    Misselwitz, Frank 2016-11-09    0:06
74 25    Q. Had you -- had you opposed that change
75 1    initially and then accepted the change later?

75:3 - 75:3    Misselwitz, Frank 2016-11-09    0:03
75 3    A. No, not that I would recall.

79:1 - 79:21    Misselwitz, Frank 2016-11-09    1:00
79 1    BY MR. OVERHOLTZ:
79 2    Q. The next slide, Slide 7. Slide 7, that's the
79 3    "Efficacy and Safety Outcomes"?
79 4    A. Yeah.
79 5    Q. Is this consistent with what ended up being
79 6    the efficacy outcomes for the Phase III VTE treatment
79 7    trial?
79 8    A. Yeah.
79 9    Q. And so the efficacy outcome was either
79 10    they've had a recurrent VTE or the composite of a
79 11    recurrent -- and also the composite of a recurrent VTE
79 12    or fatal or nonfatal pulmonary embolism, correct?
79 13    A. The composite is an explanation of what we
79 14    mean with symptomatic recurrent VTE.
79 15    Q. Okay.
79 16    A. So it could be either the recurrent deep vein
79 17    thrombosis or recurrent pulmonary embolism or a
79 18    mixture of both.
79 19    Q. Okay. And then the secondary efficacy
79 20    outcomes were each of those separately, right?
79 21    A. Right.

79:22 - 80:5    Misselwitz, Frank 2016-11-09    0:21

20

| | Objections In | Responses In | Rulings |
|---|---|---|---|

| Line | | Time |
|---|---|---|
| 79 22 | Q. And then the primary safety outcome in the | |
| 79 23 | VTE treatment EINSTEIN trial was defined as clinically | |
| 79 24 | relevant bleeding? | |
| 79 25 | A. That's correct. | |
| 80 1 | Q. And clinically relevant bleeding meant either | |
| 80 2 | a bleed that was defined as a major bleed or a bleed | |
| 80 3 | that was defined as a clinically relevant, but | |
| 80 4 | non-major bleed; is that right? | |
| 80 5 | A. Correct. | |
| 81:19 – 82:6 | | 0:58 |
| 81 19 | Misselwitz, Frank 2016-11-09 | |
| 81 20 | Q. Dr. Misselwitz, if I could have you turn to | |
| 81 21 | slide 8; and it's a slide entitled "Sample Size | |
| 81 22 | Considerations." And one of the things I want to ask | |
| 81 23 | you about is there is a bullet point that talks about | |
| 81 24 | "Aim: to demonstrate the 75 percent of efficacy is | |
| 81 25 | maintained." | |
| 82 1 | Do you see that? | |
| 82 2 | A. Yes, I do. | |
| 82 3 | Q. What is that referring to? | |
| 82 4 | A. This refers to the way non-inferiority trials | |
| 82 5 | are designed, to be able to demonstrate that a new | |
| 82 6 | drug is at least as good -- could be better, but at | |
| | least as good as standard of care. | |
| 82:7 – 83:2 | | 1:00 |
| 82 7 | Misselwitz, Frank 2016-11-09 | |
| 82 8 | Q. Okay. So the Phase III EINSTEIN VTE | |
| 82 9 | treatment trials were designed as non-inferiority | |
| 82 10 | trials; is that correct? | |
| 82 11 | A. That is correct. | |
| 82 12 | Q. All right. And non-inferiority referring to | |
| 82 13 | as compared to the comparator in the trial, here being | |
| 82 14 | some form of low molecular weight heparin plus a | |
| 82 15 | vitamin K antagonist? | |
| 82 16 | A. Correct. | |
| 82 17 | Q. Okay. And when you design a non-inferiority | |
| 82 18 | trial, one of the things that you do is predetermine | |
| 82 19 | the non-inferiority margin; is that correct? | |
| 82 20 | A. That is correct. | |
| 82 21 | Q. Okay. And when it talks about that 75 | |
| 82 22 | percent number here, that's referring to that | |
| 82 23 | non-inferiority margin? | |
| 82 24 | A. Yeah. Indirectly, yes. | |
| 82 25 | Q. Right. Could -- if you look a couple bullet | |
| | points down, it says: "Non-inferiority Upper | |
| 83 1 | Confidence Interval Margin of HR: 1.75." Correct? | |

07/20/17 14:02

| | | | | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|---|

| 83 | 2 | | | A.  That's correct. | | |
| 83:3 | - | 83:9 | 0:18 | Misselwitz, Frank 2016-11-09 | | |
| 83 | 3 | | | Q.  And so a lot of times, when we see the | | |
| 83 | 4 | | | relative risk of an event in one of these clinical | | |
| 83 | 5 | | | trials, it's expressed as a point value; but then | | |
| 83 | 6 | | | there is a confidence interval out to the side that | | |
| 83 | 7 | | | has a lower limit confidence interval and then a upper | | |
| 83 | 8 | | | limit confidence interval, right? | | |
| 83 | 9 | | | A.  That is correct. | | |
| 83:10 | - | 84:10 | 1:31 | Misselwitz, Frank 2016-11-09 | | |
| 83 | 10 | | | Q.  Okay.  And what this is saying is that in | | |
| 83 | 11 | | | order for, here, the active drug being tested, | | |
| 83 | 12 | | | Xarelto, to meet its efficacy endpoint in the study, | | |
| 83 | 13 | | | the upper confidence interval limit cannot be higher | | |
| 83 | 14 | | | than 1.75? | | |
| 83 | 15 | | | A.  That is correct. | | |
| 83 | 16 | | | Q.  Okay.  Basically meaning the upper limit of | | |
| 83 | 17 | | | the confidence interval cannot show that the Xarelto | | |
| 83 | 18 | | | could be up to or greater than 75 percent worse than | | |
| 83 | 19 | | | the comparator drug here being tested, the low | | |
| 83 | 20 | | | molecular weight heparin plus vitamin K antagonist, | | |
| 83 | 21 | | | right? | | |
| 83 | 22 | | | A.  In terms of the upper bound of the confidence | | |
| 83 | 23 | | | interval, not in terms of the point estimate. | | |
| 83 | 24 | | | Q.  Only in terms as to the upper limit of the | | |
| 83 | 25 | | | confidence interval? | | |
| 84 | 1 | | | A.  Yes. | | |
| 84 | 2 | | | Q.  And while we don't need to have a statistics | | |
| 84 | 3 | | | lesson here -- | | |
| 84 | 4 | | | MR. HOROWITZ:  I think I just did. | | |
| 84 | 5 | | | Q.  The upper limit of that confidence interval | | |
| 84 | 6 | | | represents the range in which that point value could | | |
| 84 | 7 | | | fit within and the lower -- as the greater amount, and | | |
| 84 | 8 | | | the lower limit in the confidence interval is the | | |
| 84 | 9 | | | lower range that it would fit within; is that right? | | |
| 84 | 10 | | | A.  Yes. | | |
| 84:22 | - | 85:12 | 0:50 | Misselwitz, Frank 2016-11-09 | | |
| 84 | 22 | | | Q.  Okay.  Now, another type of design of the | | |
| 84 | 23 | | | trial that could have been considered for the VTE | | |
| 84 | 24 | | | treatment would have been a superiority trial; is that | | |
| 84 | 25 | | | correct? | | |
| 85 | 1 | | | A.  Theoretically, but in this case, you would | | |
| 85 | 2 | | | have needed to have evidence that you are superior. | | |

22

| Rulings | Responses In | Objections In | | | |
|---|---|---|---|---|---|
| | | | | 85 3 | Q. Okay. And typically, that decision is made |
| | | | | 85 4 | at the outset of the trial. You don't make that |
| | | | | 85 5 | decision once you have results. Correct? |
| | | | | 85 6 | A. That's clearcut, yes. |
| | | | | 85 7 | Q. Okay. And so the decision here was made that |
| | | | | 85 8 | this was going to be a trial designed to demonstrate |
| | | | | 85 9 | non-inferiority? |
| | | | | 85 10 | A. Correct. |
| | | | | 85 11 | Q. And not superiority, correct? |
| | | | | 85 12 | A. Correct. |
| | | | 0:41 | 85:22 - 86:9 | Misselwitz, Frank 2016-11-09 |
| | | | | 85 22 | Q. So the -- in the final Phase III trial we |
| | | | | 85 23 | talked about before, there was a separate trial for |
| | | | | 85 24 | DVT, a separate trial for VTE, and then a separate |
| | | | | 85 25 | EINSTEIN extension trial? |
| | | | | 86 1 | A. Correct. |
| | | | | 86 2 | Q. And in that -- in the final version, the |
| | | | | 86 3 | non-inferiority for the combined results, the pooled |
| | | | | 86 4 | results was a 1.75; is that right? |
| | | | | 86 5 | A. Correct. |
| | | | | 86 6 | Q. For the individual pulmonary embolism trial, |
| | | | | 86 7 | the PE trial, and the DVT trial, the confidence -- the |
| | | | | 86 8 | non-inferiority margin was set at 2.0, correct? |
| | | | | 86 9 | A. That is correct. |
| | | | 1:07 | 87:24 - 88:14 | Misselwitz, Frank 2016-11-09 |
| | | | | 87 24 | Q. Now, was there some pushback from the US FDA |
| | | | | 87 25 | with respect to the size of the non-inferiority margin |
| | | | | 88 1 | in the VTE Phase III trials? |
| | | | | 88 2 | MR. HOROWITZ: Objection; form. |
| | | | | 88 3 | A. I remember very well that the FDA, whenever |
| | | | | 88 4 | it comes to non-inferiority designs, discusses the |
| | | | | 88 5 | margin very critically and aims to the lowest |
| | | | | 88 6 | possible -- the lowest feasible margin that you can |
| | | | | 88 7 | achieve in these type of trials. |
| | | | | 88 8 | So this is in a way not unique to this very |
| | | | | 88 9 | indication, but general theme when discussing |
| | | | | 88 10 | non-inferiority trials with the FDA. |
| | | | | 88 11 | Q. The FDA wanted the company to use a smaller |
| | | | | 88 12 | non-inferiority margin; is that a fair statement? |
| | | | | 88 13 | A. I remember the discussions. I don't remember |
| | | | | 88 14 | any particular margin. |
| | | | 1:00 | 90:21 - 91:10 | Misselwitz, Frank 2016-11-09 |
| | | | | 90 21 | Q. The -- we talked about the fact that in the |

23

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

```
90  22            protocol for the VTE Phase III trials, the -- it
90  23            was -- the safety outcome was defined as clinically
90  24            relevant bleeds, which is the major bleeds or
90  25            clinically relevant non-major bleeds, correct?
91   1        A.  Correct.
91   2        Q.  Okay. And if a bleeding event was reported
91   3            by a clinical investigator under the study's protocol,
91   4            those bleeding events would be adjudicated by a
91   5            blinded committee; is that correct?
91   6        A.  That is correct.
91   7        Q.  And that was set up for both the EINSTEIN DVT
91   8            Phase III trial, the EINSTEIN PE Phase III trial, and
91   9            the EINSTEIN extension trial; is that correct?
91  10        A.  That is correct.

91:21  -  92:3    Misselwitz, Frank 2016-11-09                        0:19
91  21        Q.  The same committee. Okay.
91  22                And the investigators, the clinical
91  23            investigators in the trial, they knew what treatment
91  24            the patients were taking, whether they were getting
91  25            Xarelto or whether they were either on the low
92   1            molecular weight heparin or, you know, had moved on to
92   2            the vitamin K antagonist?
92   3        A.  Correct.

92:4  -  92:10    Misselwitz, Frank 2016-11-09                        0:16
92   4        Q.  Okay. But the -- it was -- the protocol
92   5            called for the adjudication committee to be blinded to
92   6            treatment?
92   7        A.  That is correct.
92   8        Q.  When they adjudicated either a efficacy
92   9            outcome or a safety outcome?
92  10        A.  That is correct.

92:22  -  93:6    Misselwitz, Frank 2016-11-09                        0:25
92  22        Q.  If the patient had a bleed, the investigator
92  23            was supposed to document and report that bleed and
92  24            report it according to the standards for whether it
92  25            was adverse event or if it met the definition of a
93   1            serious adverse event?
93   2        A.  That is correct.
93   3        Q.  Okay. And those definitions are typically
93   4            laid out as part of the regulatory scheme depending on
93   5            what country you are reporting to, correct?
93   6        A.  That is correct.
```

24

07/20/17 14:02

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**93:7 - 93:20**  Misselwitz, Frank 2016-11-09  1:08

```
93  7   Q. Okay. And then the adjudication committee
93  8   would adjudicate the bleed based on the definition of
93  9   the safety outcome as defined in the protocol; is that
93 10   right?
93 11   A. That is correct.
93 12   Q. Okay. And in order to adjudicate those
93 13   bleeds, what information would be provided to the
93 14   adjudication committee?
93 15   A. First and foremost, the information recorded
93 16   in the case record form of the clinical trial, and in
93 17   some cases -- and could have been upon request of the
93 18   adjudication committee, additional information,
93 19   copies from the medical records of the patient, and
93 20   more detailed information, when and if required.
```

**94:2 - 94:17**  Misselwitz, Frank 2016-11-09  0:45

```
94  2   Q. Okay. Contrast that for me with the VTE
94  3   clinical trials as -- with -- considering that the
94  4   investigators knew what treatment they were on. Would
94  5   clinical investigators in the VTE trial know to not
94  6   use an INR test for the patients taking Xarelto?
94  7   A. That is correct.
94  8   Q. Okay. And what were -- what was told to the
94  9   investigators to use as far as lab values for the
94 10   people in the -- that were taking Xarelto in the
94 11   EINSTEIN trials?
94 12   A. I don't exactly understand what you mean with
94 13   "lab values."
94 14   Q. Let me -- let me try again. Let's -- they
94 15   were told that INR was not a valuable measurement to
94 16   use for the patients taking Xarelto; is that right?
94 17   A. That is correct.
```

**94:18 - 94:19**  Misselwitz, Frank 2016-11-09  0:06

```
94 18   Q. Okay. Were they told they could take a PT
94 19   measurement?
```

**94:21 - 95:3**  Misselwitz, Frank 2016-11-09  0:40

```
94 21   A. No, at least not regularly. To explain my
94 22   response, we implemented and studied rivaroxaban in
94 23   this, but also in other trials, as a fixed dose,
94 24   unmonitored drug. And no regular lab monitoring was
94 25   implemented in the trial and was necessary; hence,
95  1   there was no particular instruction to the
95  2   investigators to regularly provide lab values and
```

07/20/17 14:02

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

| 95 | 3 | report them in the -- |
|---|---|---|

**95:4 - 96:1**   1:37

Misselwitz, Frank 2016-11-09

| 95 | 4 | Q. The patients that were randomized to receive |
|---|---|---|
| 95 | 5 | the vitamin K antagonist part of the treatment, of |
| 95 | 6 | course, they would have had their INR tested? |
| 95 | 7 | A. Correct. |
| 95 | 8 | Q. And as you and I know, if you are taking a |
| 95 | 9 | vitamin K antagonist like warfarin, regular monitoring |
| 95 | 10 | is required to make sure they stay within the direct |
| 95 | 11 | INR range; is that right? |
| 95 | 12 | A. That is correct. |
| 95 | 13 | Q. Okay. Isn't it possible that when the |
| 95 | 14 | adjudication committee would adjudicate bleeding |
| 95 | 15 | events from the EINSTEIN trials, that the presence of |
| 95 | 16 | regular INR measurements in the medical records they |
| 95 | 17 | would receive would indicate to them and give them a |
| 95 | 18 | clue as to which treatment arm these patients were -- |
| 95 | 19 | which they belonged to in the clinical trial? |
| 95 | 20 | A. Theoretically, yes. But we implemented |
| 95 | 21 | measures to avoid exactly that because there was an |
| 95 | 22 | organization in between of the investigator and the |
| 95 | 23 | adjudication committee making sure that entries would |
| 95 | 24 | be blackened indicating any particular INR value or |
| 95 | 25 | these kind of things that could have led to an |
| 96 | 1 | unblinding of the adjudication committee. |

**96:2 - 96:10**   0:31

Misselwitz, Frank 2016-11-09

| 96 | 2 | Q. Okay. So there was actually a in-between |
|---|---|---|
| 96 | 3 | reviewer of any materials provided to the adjudication |
| 96 | 4 | committee that would look for anything such as INR |
| 96 | 5 | values that might clue an -- clue an adjudication |
| 96 | 6 | member in as to what treatment arm a patient belonged |
| 96 | 7 | to? |
| 96 | 8 | A. A reviewer in the sense of making sure that |
| 96 | 9 | they keep it blind, not in assessing any of those |
| 96 | 10 | events. |

**96:11 - 97:5**   2:02

Misselwitz, Frank 2016-11-09

| 96 | 11 | Q. Okay. Who conducted those reviews? Was it |
|---|---|---|
| 96 | 12 | the CRO, or was it someone else? |
| 96 | 13 | A. That was a contract research organization. |
| 96 | 14 | Q. And specifically, was INR described as |
| 96 | 15 | something that should be removed so that the committee |
| 96 | 16 | member would not receive that information, or was it a |
| 96 | 17 | general -- |

07/20/17 14:02

| | Rulings | Responses In | Objections In | | |
|---|---|---|---|---|---|

| Page/Line | | Time | Deposition Text |
|---|---|---|---|
| 96 18 | | | A.  I can only attest that we generally |
| 96 19 | | | instructed that individual or group of individuals at |
| 96 20 | | | the CRO to eliminate any information that could |
| 96 21 | | | potentially lead to unblinding. |
| 96 22 | | | Q.  Okay.  So the instruction was to eliminate |
| 96 23 | | | information that might lead to unblinding for the |
| 96 24 | | | adjudication committee member? |
| 96 25 | | | A.  Correct. |
| 97 1 | | | Q.  You don't know whether there was any specific |
| 97 2 | | | instructions provided to the reviewers to remove INR |
| 97 3 | | | measurements? |
| 97 4 | | | A.  I would need to look it up.  I don't remember |
| 97 5 | | | it by heart. |

| 97:19 - 97:21 | | 0:11 | Misselwitz, Frank 2016-11-09 |
| 97 19 | | | Q.  Do you agree that the open label design of |
| 97 20 | | | these DVT trials potentially could lead to bias in the |
| 97 21 | | | trial design? |

| 97:23 - 98:1 | | 0:19 | Misselwitz, Frank 2016-11-09 |
| 97 23 | | | A.  Yes.  Potentially open label designs, in |
| 97 24 | | | general, could lead to bias.  And in any case, |
| 97 25 | | | measures to avoid that bias need to be implemented |
| 98 1 | | | and discussed. |

| 98:2 - 98:14 | | 0:39 | Misselwitz, Frank 2016-11-09 |
| 98 2 | | | Q.  Bayer, as the sponsor of the trials, they |
| 98 3 | | | made the decision to use an open label design, |
| 98 4 | | | correct? |
| 98 5 | | | A.  That is correct. |
| 98 6 | | | Q.  For example, the US FDA didn't force Bayer |
| 98 7 | | | to use an open label design for those trials, correct? |
| 98 8 | | | MR. HOROWITZ:  Objection to form. |
| 98 9 | | | A.  The FDA did not force us into such design. |
| 98 10 | | | Q.  Do you recall, in fact, that the FDA was |
| 98 11 | | | critical of the decision to use an open label design |
| 98 12 | | | for these trials? |
| 98 13 | | | A.  We had regulatory interactions and |
| 98 14 | | | discussions with the FDA on that topic. |

| 98:15 - 98:16 | | 0:07 | Misselwitz, Frank 2016-11-09 |
| 98 15 | | | Q.  And do you recall that the FDA were critical |
| 98 16 | | | of the decision to use an open label design? |

Re: [98:15-98:16]
Pltf Obj Defendants

Pending

27

07/20/17 14:02

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| 98:19 - 99:1<br>98 19<br>98 20<br>98 21<br>98 22<br>98 23<br>98 24<br>98 25<br>99 1<br>Misselwitz, Frank 2016-11-09<br>A. We discussed this question with the FDA. The FDA is of the general opinion that a trial that can feasibly be blinded should ideally be conducted as a blinded trial, but we had brought forward good reasons why we would not do so and agreed finally with the FDA that we are going to perform the trial as an open label trial, and that had not been objected to. | 2:18<br>objected to this questioning as asked and answered and should not now be able to designate this testimony as a counter-designation to the very question they claimed to have been answered completely. | | |
| 99:2 - 99:9<br>99 2<br>99 3<br>99 4<br>99 5<br>99 6<br>99 7<br>99 8<br>99 9<br>Misselwitz, Frank 2016-11-09<br>Q. Let me show you what we'll mark as Exhibit Number 6 and 7, which is Record Number 3151667 and 3151668. The Bates is BPAG_24863625 for Exhibit 6, and the attachment is Exhibit 7 to that document.<br>(EINSTEIN 30(b)(6) Exhibit 6 was marked for identification.)<br>(EINSTEIN 30(b)(6) Exhibit 7 was marked for identification.) | 2:33<br>Re: [98:19-99:1]<br>Pltf Obj Defendants objected to this questioning as asked and answered and should not now be able to designate this testimony as a counter-designation to the very question they claimed to have been answered completely. | Pending | |
| 99:11 - 99:23<br>99 11<br>99 12<br>99 13<br>99 14<br>99 15<br>99 16<br>99 17<br>99 18<br>99 19<br>99 20<br>99 21<br>99 22<br>99 23<br>Misselwitz, Frank 2016-11-09<br>BY MR. OVERHOLTZ:<br>Q. Okay. So I've shown you what is an e-mail that was forwarded by Dagmar Kubitza to several people of the minutes of the CDP-RC; and it's forwarding an e-mail that was sent to several people, including yourself, below that on January 28th of 2004.<br>Do you see that?<br>A. Correct. Yes, I see that.<br>Q. Okay. And you see you were copied on the e-mail down below. And it's "Minutes CDP-RC."<br>Do you know what the CDP-RC was?<br>A. It's clinical development plan review committee. | 0:43 | | |

28

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**100:21 - 101:7** Misselwitz, Frank 2016-11-09 — 0:24

100 21  Q.  And so if can you turn with me over to the
100 22  second page, there is a section regarding Xarelto,
100 23  Section Number 1.
100 24  A.  I see that.
100 25  Q.  It looks like you were the presenter there?
101 1  A.  I'm one of two presenters.
101 2  Q.  Okay.  The other presenter is Klaus Wehling;
101 3  is that right?
101 4  A.  That's right.
101 5  Q.  What was Klaus's position?
101 6  A.  Klaus was at that time project manager for
101 7  the project.

**101:12 - 102:4** Misselwitz, Frank 2016-11-09 — 0:31

101 12  Q.  Okay.  Now, it says:  "Goals of the CDP-RC
101 13  meeting."
101 14  Do you see that?
101 15  A.  Yes.
101 16  Q.  Okay.  And there's two bullet points, the
101 17  second being:  "Continue phase iib with bid
101 18  formulation."
101 19  Right?
101 20  A.  Yes.
101 21  Q.  Okay.  And then:  "Start phase ii with od
101 22  formulation."
101 23  Do you see that?
101 24  A.  Correct.
101 25  Q.  Okay.  And then the third bullet point is:
102 1  "Develop od" -- that's once daily -- "for all
102 2  indications."
102 3  Do you see that?
102 4  A.  I see that.

**104:6 - 104:10** Misselwitz, Frank 2016-11-09 — 0:17

104 6  A.  I am not certain, based on that document that
104 7  is in front of me, whether we talked about the VTE
104 8  treatment indication at all.  I actually would
104 9  suspect that it refers to the VTE prevention
104 10  indication.

**104:25 - 105:9** Misselwitz, Frank 2016-11-09 — 0:28

Re: [104:25-105:9]
Def Obj Relevance/403.
The witness testifies at
[104:6-10 that this

Re: [104:25-105:9]
Pltf Resp Again, the
relevance of data
and defendants'

Pending

104 25  Q.  Okay.  Now, if you a look with me to the
105 1  fourth bullet point down in this presentation that you
105 2  and Mr. Wehling made to the committee, it says the
105 3  "Clear guiding principle should be to safeguard the

29

| | | | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|
| 105 4 | compound." | | document refers to a different indication (that of VTE prevention). Counsel for Plaintiffs later amended his questioning as a result, but still chose to designate the pre-amended questioning (which is simply Counsel reading from the document). It is irrelevant and risks juror confusion. See objection to Exhibit 7. | conduct pertaining to each indication ripples across all indications. This specific testimony is demonstrative of this fact, considering a "clear guiding principle ... to safeguard the compound" was recognize. Data from dose-finding studies were used across indication, such as the DVT-T dose-finding studies were used to determine the AFIB dosage. The confusion and relevance concerns raised by Defendants' simply do not exist in this context. | |
| 105 5 | Do you see that? | | | | |
| 105 6 | A. I see that. | | | | |
| 105 7 | Q. "Therefore bid development should continue." | | | | |
| 105 8 | Do you see that? | | | | |
| 105 9 | A. I do see that, yes. | | | | |
| 109:21 - | Misselwitz, Frank 2016-11-09 | 0:19 | | | |
| 110 2 | | | | | |
| 109 21 | Q. Okay. And so then if we can drop back down | | | | |
| 109 22 | to that fourth bullet point again, the "Clear guiding | | | | |
| 109 23 | principle should be to safeguard the compound -- | | | | |
| 109 24 | therefore bid development should continue." | | | | |
| 109 25 | That's the statement that's made in these | | | | |
| 110 1 | meeting minutes, correct? | | | | |
| 110 2 | MR. HOROWITZ: Objection, form; asked and | | | | |
| 110:4 - | Misselwitz, Frank 2016-11-09 | 0:02 | | | |
| 110 4 | | | | | |
| 110 4 | A. It's written here, yes. | | | | |
| 110:5 - | Misselwitz, Frank 2016-11-09 | 0:38 | | | |
| 110 5 | Q. Okay. And the reason why BID development had | | | | |
| 110 6 | to continue was because there was concern about the | | | | |
| 110 7 | potentials for success of demonstrating that once | | | | |
| 110 8 | daily would be non-inferior to BID, right? | | | | |
| 110 9 | A. That's not correct. I respectfully disagree. | | | | |
| 110 10 | We wanted to generate appropriate data to make a | | | | |
| 110 11 | data-driven decision as to what is the best regimen | | | | |
| 110 12 | and the best dose. | | | | |
| 110 13 | Q. And it was your belief that doing so would | | | | |
| 110 14 | help maintain that clear guiding principle to | | | | |
| 110 15 | safeguard the compound, here being Xarelto, correct? | | | | |
| 110:19 - | Misselwitz, Frank 2016-11-09 | 0:22 | | | |
| 110 19 | A. Clinical development is always guided by the | | | | |
| 110 20 | principle to first safeguard the patient, but then | | | | |
| 110 21 | also to minimize the risk for the developmental | | | | |
| 110 22 | compound. | | | | |
| 110:23 - | Misselwitz, Frank 2016-11-09 | 0:51 | | | |
| 110 23 | Q. Yeah. You would say that a clear guiding | | | | |
| 110 24 | principle should be to safeguard the patient first, | | | | |
| 110 25 | right? | | | | |
| 111 1 | A. Yes, indeed. That's an overarching | | | | |
| 111 2 | principle. | | | | |
| 111 3 | Q. And that should be the overarching principle | | | | |
| 111 4 | even if that means that the compound isn't successful? | | | | |

07/20/17 14:02

| | Objections in | Responses in | Rulings |
|---|---|---|---|

111  5      A.  We have overarching principles that would not
111  6          need to be repeated at each and every meeting
111  7          minutes.  These are laid out in different places.
111  8          But we do have different development paths for
111  9          different compounds.  You could have time-optimized
111  10         development.  You could have risk-optimized
111  11         development.  But here, we put emphasis on minimizing
111  12         the risk.

111:13  -   111:16 Misselwitz, Frank 2016-11-09                    0:11
111  13          (EINSTEIN 30(b)(6) Exhibit 8 was marked for
111  14      identification.)
111  15          (EINSTEIN 30(b)(6) Exhibit 9 was marked for
111  16      identification.)

111:22  -   112:5 Misselwitz, Frank 2016-11-09                     2:51
111  22          And just while you take a look at that, this
111  23          was an e-mail that was forwarded by Christoph Dierig
111  24          to Martin Homering on June 12th, 2006 of an e-mail
111  25          that was sent to you and many other people at Bayer on
112  1           June 7th, 2006, where the subject was the "CDP-RC
112  2           April 20th and ad-hoc CDP-RC May 18 2006 - Minutes,"
112  3           and its attachment which is the minutes for those
112  4           meetings.
112  5       A.  I'm good.

112:6   -   112:19 Misselwitz, Frank 2016-11-09                    0:37
112  6       Q.  Okay.  So you received this e-mail from
112  7           Martina Berner, that's listed on Exhibit 8, on June
112  8           7th, 2006.  You're listed down at the bottom of the
112  9           people that received this e-mail.
112  10          Do you see that?
112  11      A.  Correct.
112  12      Q.  Okay.  And this was the combined minutes of
112  13          the CDP-RC meeting of April 20th and May 18th of 2006,
112  14          correct?
112  15      A.  Correct.
112  16      Q.  Okay.  And this is that same CDP-RC meeting
112  17          that we've been talking about that you presented at in
112  18          January 2004 that we just finished looking at, right?
112  19      A.  Correct.

112:20  -   113:21 Misselwitz, Frank 2016-11-09                    1:15
112  20      Q.  Okay.  And if we look at the actual
112  21          attachment, the attachment is Exhibit 9; and these are
112  22          the actual minutes from those two CDP-RC minutes,

31

| | Objections In | Responses In | Rulings |
|---|---|---|---|

112 23   correct?
112 24   A.  Correct.
112 25   Q.  Okay.  And the title of these minutes says:
113 1    "Minutes CDP-RC Conferences for DP3 Preparations
113 2    Factor Xa Inhibitor for Stroke Prevention in Atrial
113 3    Fibrillation (AFib) and Treatment of Venous
113 4    Thromboembolism (VTE Treatment)."
113 5    Right?
113 6    A.  That is correct.
113 7    Q.  Okay.  And so this is getting closer in time
113 8    to the actual -- this DP3 decision point meeting
113 9    that's going to be held to go forward with Phase III
113 10   development, right?
113 11   A.  It's -- yes, that's correct.
113 12   Q.  This meeting is about getting ready for that
113 13   DP3 decision?
113 14   A.  Correct.
113 15   Q.  Okay.  And you were a participant in both
113 16   meetings, the regular meeting on April 20th and then
113 17   the ad hoc meeting on May 18th, correct?
113 18   A.  That is correct.
113 19   Q.  Okay.  And it looks like Ton Lensing was also
113 20   a guest at that meeting, correct?
113 21   A.  Correct.

113:22 -  114:14 Misselwitz, Frank 2016-11-09          0:58
113 22   Q.  And there were two topics discussed at this
113 23   meeting.  One was the Factor Xa inhibitor for the Afib
113 24   indication, and the second being for the VTE treatment
113 25   development plan, correct?
114 1    A.  Correct.
114 2    Q.  Okay.  And you presented on the Afib
114 3    indication, and yourself and Ton Lensing presented on
114 4    the VTE treatment?
114 5    A.  That is correct.
114 6    Q.  And it says that this was distributed to all
114 7    of the people above, including Kemal Malik.
114 8    Do you see that?
114 9    A.  Yes.
114 10   Q.  Who is Kemal Malik?
114 11   A.  At that time, head of development.
114 12   Q.  Okay.  Do you know what his current position
114 13   is?
114 14   A.  He's a member of the board of Bayer.

115:12 -  115:24 Misselwitz, Frank 2016-11-09          0:45

| | Rulings | Responses In | Objections In | |
|---|---|---|---|---|

115 12    Q. Okay. Right. And so if you can look with

115 13    me, the -- there's a description here in this -- you

115 14    know, the meeting minutes from these two -- these two

115 15    meetings from April and May of 2006.

115 16    And it says: "The first study is a

115 17    multicenter, randomized, open-label, assessor-blind,

115 18    event-driven, non-inferiority study for efficacy with

115 19    a study treatment duration of 3, 6, or 12 months.

115 20    Patients allocated to rivaroxaban will receive a dose

115 21    of 20 milligrams once daily, preceded by a dose of 10

115 22    milligrams bid for the initial 3 week period."

115 23    Do you see that?

115 24    A. Yes.

**115:25 -  116:25 Misselwitz, Frank 2016-11-09**     1:24

115 25    Q. Okay. Now, eventually this study gets split

116 1    into two separate studies under one protocol, as we've

116 2    discussed?

116 3    A. Correct.

116 4    Q. DVT separate, PE separate?

116 5    A. Correct.

116 6    Q. The -- at this time, in May -- by -- through

116 7    May of 2006, in these June minutes, the discussion is

116 8    indicating that the studies -- that initial

116 9    intensified treatment is going to use a 10 milligram

116 10    BID dose of Xarelto, correct?

116 11    A. That is correct.

116 12    Q. Okay. That -- in the final studies, both VTE

116 13    and DVT, that dose was changed to a 15 milligram BID

116 14    dose, correct?

116 15    A. Correct.

116 16    Q. And then it describes the comparator arm,

116 17    which is the low molecular weight heparin, in

116 18    combination with a vitamin K antagonist, and then

116 19    continue with the vitamin K antagonist as long as

116 20    their INR reaches a certain level. Is that right?

116 21    A. Correct.

116 22    Q. Okay. And a vitamin K antagonist, just so

116 23    we're clear at this part of the deposition, that's

116 24    something like Coumadin or warfarin?

116 25    A. Right.

**117:17 -  118:18 Misselwitz, Frank 2016-11-09**     1:07

117 17    Q. Okay. The second paragraph talks -- or third

117 18    paragraph here talks about the principal safety

117 19    outcome.

07/20/17 14:02

| | Objections In | Responses In | Rulings |
|---|---|---|---|

117 20   Do you see that?
117 21   A.  Yes.
117 22   Q.  And it's the same outcome that we've been
117 23   talking about, this combination of major and
117 24   clinically relevant non-major bleeding?
117 25   A.  Correct.
118 1   Q.  And then it says: "All suspected
118 2   thromboembolic complications, death, as well as
118 3   episodes of overt bleeding, will be evaluated by a
118 4   central, blinded, independent adjudication committee.
118 5   And we've talked about that, right?
118 6   A.  Yes.
118 7   Q.  Now, I want to ask you about this term "overt
118 8   bleeding"?
118 9   A.  Okay.
118 10   Q.  Okay?  What does -- for purposes of the VTE
118 11   trials, what did overt bleeding mean?
118 12   A.  Overt bleeding means an overt bleeding, so
118 13   you see blood, you see it's excess, you see blood in
118 14   stool and urine, and that is then called an overt
118 15   bleed.
118 16   Q.  Okay.  You're familiar with -- I've seen the
118 17   term used in some of the documents, occult bleeds?
118 18   A.  Yes, I'm familiar with that term.

119:12 -   119:22 Misselwitz, Frank 2016-11-09                0:43
119 12   A.  All right.  So, you know, my mom takes
119 13   warfarin.  And so she bumps her arm hard, sometimes
119 14   she will get a pretty big bruise.  You can tell there
119 15   was bleeding there.  That would be classified under
119 16   the VTE trials as an any bleed, correct?
119 17   A.  It will certainly be reported as a bleed, so
119 18   that is important.  Nothing has been hidden or
119 19   unreported.  It is -- it is up to the blinded
119 20   adjudication committee, according to their
119 21   definitions, to grade whether it was a major or a
119 22   non-major clinically irrelevant bleed.

119:23 -   120:18 Misselwitz, Frank 2016-11-09                1:21
119 23   Q.  What about nonovert bleeds, but where you
119 24   have drops in the hemoglobin, how do those get
119 25   classified under the VTE trials?
120 1   A.  It depends.  There is no clearcut answer to
120 2   that question, because the definition of a major
120 3   bleed, for instance, stipulates importantly a drop of
120 4   hemoglobin within a certain time frame and not just

07/20/17 14:02

| | Objections In | Responses In | Rulings |
|---|---|---|---|

120  5    within, say, a couple of months from one measurement
120  6    to the other measurement.
120  7        You need to have -- you need to make sure
120  8    that you document the bleeding source and that the
120  9    drop of hemoglobin is not having another etiology.
120 10    It could be Vitamin B12 deficiency. It could be many
120 11    things. I mean, it's not necessarily a bleed.
120 12    Q.  All right. So a simple drop in hemoglobin,
120 13    even if it meets that definition of the amount of
120 14    hemoglobin loss, without any documented source of that
120 15    bleed, where that bleed is occurring, whether it's a
120 16    gastrointestinal bleed or some other bleed, wouldn't
120 17    be documented as a principal safety outcome bleed in
120 18    the VTE trials; is that right?

120:20 -  120:23 Misselwitz, Frank 2016-11-09                    0:12
120 20    A.  It -- I mean, again, that's exactly the
120 21    reason why we have the blinded adjudication
120 22    committee, to exactly garner all necessary
120 23    information to make that call in a blinded manner.

122:1 -   122:12 Misselwitz, Frank 2016-11-09                    0:33
122  1        So just -- the answer to my question is: It
122  2    doesn't get documented, but you believe you have --
122  3    there's reasons why it wouldn't be documented as a
122  4    major or clinically relevant bleed, but it could not
122  5    be documented as such, the example I gave you?
122  6        MR. HOROWITZ:  Objection to form.
122  7    A.  It's getting documented as the lab
122  8    measurement of hemoglobin and hematocrit. That's
122  9    important. So these documentations are available for
122 10    every patient, but it may not be graded for all the
122 11    reasons I explained by the blinded adjudication
122 12    committee as a primary safety outcome.

127:24 -  128:12 Misselwitz, Frank 2016-11-09                    0:54
127 24    Q.  Now, there is a conclusion section, and it
127 25    says the conclusion: "The CDP-RC endorses the
128  1    proposed clinical development plan of VTE."
128  2        Correct?
128  3    A.  Correct.
128  4    Q.  So by May of 2006 in the -- at the CDP-RC
128  5    meeting, the CDP-RC had endorsed the plan of studying
128  6    VTE treatment using one study that looked at DVT and
128  7    PE using a 10 milligram intensified treatment period
128  8    dose for three weeks, followed by 20 milligrams once

35

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

128:21 -   129:16 Misselwitz, Frank 2016-11-09    0:44

| | |
|---|---|
| 128 9 | daily, and then a second study that was a double-blind |
| 128 10 | study comparing 20 milligrams to placebo; is that |
| 128 11 | right? |
| 128 12 | A.  That is correct. |
| 128 21 | Q.  Okay.  And the Phase IIb dose finding studies |
| 128 22 | for VTE were the source for determining the dose to go |
| 128 23 | into the Phase III for the ROCKET Afib program, right? |
| 128 24 | A.  Correct. |
| 128 25 | Q.  Okay.  So if you look with me in the middle |
| 129 1 | of the page, it says:  "The VTE recurrence and |
| 129 2 | bleeding rates observed in the phase IIb dose-finding |
| 129 3 | studies 11223 and 11528 studies were in accordance |
| 129 4 | with those reported in the literature in patients |
| 129 5 | effectively treated." |
| 129 6 | Do you see that? |
| 129 7 | A.  Yes. |
| 129 8 | Q.  Okay.  Now, 11223, that was the ODIXa-DVT |
| 129 9 | study.  Do you know? |
| 129 10 | A.  Yes. |
| 129 11 | Q.  That's right? |
| 129 12 | A.  That's right. |
| 129 13 | Q.  And 11528 is the EINSTEIN DVT study? |
| 129 14 | A.  Yes. |
| 129 15 | Q.  That was kind of Bayer's internal number for |
| 129 16 | those studies? |

130:18 -   131:13 Misselwitz, Frank 2016-11-09    1:06

| | |
|---|---|
| 130 18 | Q.  Okay.  It says:  "The relative safety in |
| 130 19 | terms of bleeding compared to standard of care was |
| 130 20 | better for all od regimens (hazard ratio below 1 for |
| 130 21 | all doses) as compared to the bid regimen for which a |
| 130 22 | slightly increased risk of bleeding was demonstrated |
| 130 23 | for the 20 milligram bid and the 30 milligram bid |
| 130 24 | doses." |
| 130 25 | Do you see that? |
| 131 1 | A.  Yes, I do see that. |
| 131 2 | Q.  Okay.  Now, when it talks about the fact that |
| 131 3 | the relative safety in terms of bleeding was better |
| 131 4 | for all OD regimens, hazard ratio below 1, do you know |
| 131 5 | if these findings were statistically significant? |
| 131 6 | A.  No.  This was a dose finding trial, which was |
| 131 7 | not powered to derive statistical analyses. |
| 131 8 | Q.  Okay.  So the 20 milligram BID and 30 |
| 131 9 | milligram BID doses had higher bleeding risk compared |

07/20/17 14:02

07/20/17 14:02

| | | | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|

131 10    to the standard of care, and the standard of care
131 11    would have been the low molecular weight heparin
131 12    vitamin K antagonist, right?
131 13    A.  Correct.

131:14 - 131:18   Misselwitz, Frank 2016-11-09    0:17
131 14    Q.  Okay.  Now, it says:  "The 10 milligram BID
131 15    dose in study 11223 seemed to be comparable to the OD
131 16    doses in study 11528 in terms of safety."
131 17    Do you see that?
131 18    A.  I see that.

131:19 - 132:3   Misselwitz, Frank 2016-11-09    0:40
131 19    Q.  Okay.  Was that the basis for using the 10
131 20    milligram BID dose at this point in time as that
131 21    intensified treatment period for the three-week
131 22    period?
131 23    A.  I'm not sure that this -- this may have been
131 24    one of the reasons.  But we typically take dose
131 25    decisions or recommendations, again, on the totality
132 1    of data, including, simulation, modeling simulation
132 2    approaches.  So it -- this may have contributed to
132 3    it, but it is definitely not the only reason.

132:24 - 133:5   Misselwitz, Frank 2016-11-09    0:17
132 24    Q.  Dr. Misselwitz, one of the things that we
132 25    talked about earlier was the three-week period of
133 1    intense treatment regimen.  Do you recall that?
133 2    A.  I do.
133 3    Q.  Okay.  And let me show you what we'll mark as
133 4    Exhibit Number --
133 5    MR. OVERHOLTZ:  10?

133:7 - 133:8   Misselwitz, Frank 2016-11-09    0:12
133 7    (EINSTEIN 30(b)(6) Exhibit 10 was marked for
133 8    identification.)

133:14 - 133:20   Misselwitz, Frank 2016-11-09    0:17
133 14    Okay.  So if you will look with me, this is
133 15    an e-mail that you received from Sanjay Jalota at
133 16    Janssen on June 12, 2006, correct?
133 17    A.  Correct.
133 18    Q.  It's sent to several people at Bayer as well
133 19    as other people at Janssen; is that right?
133 20    A.  Correct.

07/20/17 14:02

| | | | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|

**134:1 - 134:7**   Misselwitz, Frank 2016-11-09   0:17

134  1    Q.  Okay.  And so one of the people we see at the
134  2        very top is -- is -- it's an awalensing@planet.nl
134  3        address.  Do you see that?
134  4    A.  I see that.
134  5    Q.  That's Ton Lensing.  That was, like, his
134  6        personal e-mail address?
134  7    A.  That's right.

**134:22 - 135:15**   Misselwitz, Frank 2016-11-09   1:19

134  22   Q.  So who was working on the clinical plan at
134  23       this point in time period?
134  24   A.  The clinical plan in the narrow sense was Ton
134  25       Lensing, myself, and then, of course, statistical
135  1        considerations and expertise brought in by Torsten
135  2        Westermeier, Martin Homering.
135  3            From a regulatory point of view, we had Max
135  4        Wegner and Andrea Derix, Rene Kluensch, Isabelle
135  5        Stoeckert, and Joseph Scheeren.
135  6            Those were the Bayer people.
135  7    Q.  The Bayer people?
135  8    A.  Yeah.
135  9    Q.  Right.
135  10           From Janssen, did you have an understanding
135  11       who were the primary people responsible for the VTE
135  12       treatment indication?
135  13   A.  Lloyd Haskell and Christopher Nessel were the
135  14       two that -- well, and -- and -- and Gary
135  15       Peters.

**136:20 - 137:6**   Misselwitz, Frank 2016-11-09   0:30

136  20   Q.  Okay.  Now, if we can look at the e-mail,
136  21       Sanjay Jalota is e-mailing several people, including
136  22       Andrea Derix at Bayer, and she says: "Dear Andrea -
136  23       thanks for the information - There was a Global
136  24       Advisory Council meeting today (Sunday 11 June) in New
136  25       York where the dose for the intensive VTE treatment
137  1        was extensively discussed."
137  2            Do you see that?
137  3    A.  I see that.
137  4    Q.  Now, the Global Advisory Council meeting, was
137  5        that a joint meeting between J&J and Bayer?
137  6    A.  Yes.

**137:16 - 137:24**   Misselwitz, Frank 2016-11-09   0:30

137  16   Q.  Okay.  And this says: "There was a post GAC

38

| | Objections In | Responses In | Rulings |
|---|---|---|---|

137 17   meeting (Joerg, Bernhard, Andreas, Martina, Ludwig
137 18   from Bayer, Gary, Bill, Lloyd and myself from J&J)
137 19   with the common consensus that based on the feedback
137 20   from the external consultants, the dose for the
137 21   intensive VTE treatment should be changed from 10
137 22   milligrams BID to 15 milligrams BID."
137 23       Do you see that?
137 24   A.  I see that.

137:25 -   138:11 Misselwitz, Frank 2016-11-09   0:33
137 25   Q.  "I have made this change in the attached
138 1    briefing document (with some supporting rationale
138 2    which we may have to update for the final version or
138 3    prepare for the meeting) along with (the) other
138 4    changes."
138 5        Do you see that?
138 6    A.  I see that, yes.
138 7    Q.  Okay.  And so it seems that it was at this
138 8    GAC meeting in June of '06 in which the decision was
138 9    made to change the BID intensive treatment regimen
138 10   from 10 milligrams to 15, correct?
138 11   A.  It was a recommendation, yes indeed.

138:12 -   138:16 Misselwitz, Frank 2016-11-09   0:13
138 12   Q.  Okay.  And it says:  "It was recognized that
138 13   there is no data on 15 milligrams BID - only bridging
138 14   data between 10 milligrams BID and 20 milligrams BID."
138 15       Do you see that?
138 16   A.  I see that.

138:17 -   138:22 Misselwitz, Frank 2016-11-09   0:17
138 17   Q.  Because at this point, none of the Phase II
138 18   studies had looked at a 15 milligram dose; is that
138 19   right?
138 20   A.  Not directly but, of course, you can always
138 21   bridge between two doses if and when the two doses
138 22   have directly been studied.

138:23 -   138:25 Misselwitz, Frank 2016-11-09   0:04
138 23   Q.  But there had been no study of a 15 milligram
138 24   dose at this time period?
138 25   A.  That's correct.

140:9 -   140:12 Misselwitz, Frank 2016-11-09   2:01
140  9   Q.  All right.  If we can -- I'll show you what
140 10   we'll mark as Exhibit Number 11.

39

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

| 140 11 | | | | |
| 140 12 | (EINSTEIN 30(b)(6) Exhibit 11 was marked for identification.) | | | |
| | | | | |
| 140:21 – 141:18 | 0:46 | | | |
| | Misselwitz, Frank 2016-11-09 | | | |
| 140 21 | Q. Okay. And if you'll look with me at 3233767, | | | |
| 140 22 | it's an e-mail that is forwarded -- well, you -- you | | | |
| 140 23 | send an e-mail to Ton Lensing, Marc van Unen, and | | | |
| 140 24 | Martina Evertz regarding the EINSTEIN SMCC/ExCie | | | |
| 140 25 | meeting at ESC in Barcelona. | | | |
| 141 1 | Do you see that? | | | |
| 141 2 | A. That's correct. | | | |
| 141 3 | Q. Okay. Now, this -- I want to ask you a | | | |
| 141 4 | couple of questions about that. The ExCie, that's the | | | |
| 141 5 | executive committee for the study, correct? | | | |
| 141 6 | A. Correct. | | | |
| 141 7 | Q. Okay. And the SMCC, what was that? | | | |
| 141 8 | A. Study Management and Coordination Committee. | | | |
| | | | | |
| 141:17 – 142:3 | 0:50 | | | |
| | Misselwitz, Frank 2016-11-09 | | | |
| 141 17 | Q. Okay. And so, now, they're going to have | | | |
| 141 18 | this meeting at ESC. Now, is that the European | | | |
| 141 19 | Society of Cardiology? | | | |
| 141 20 | A. Correct. | | | |
| 141 21 | Q. And you send this e-mail to Ton Lensing, who | | | |
| 141 22 | we've talked about, but also Marc van Unen and Martina | | | |
| 141 23 | Evertz. | | | |
| 141 24 | Can you tell me what Marc van Unen's role was | | | |
| 141 25 | with VTE? | | | |
| 142 1 | A. Both Marc van Unen as well as Martina Evertz | | | |
| 142 2 | had been in the strategic marketing function for | | | |
| 142 3 | antithrombotic therapies. | | | |
| | | | | |
| 142:4 – 142:23 | 0:44 | | | |
| | Misselwitz, Frank 2016-11-09 | | | |
| 142 4 | Q. You write to Ton Lensing. Down at the | | | |
| 142 5 | bottom, you say: "Hi Ton," I "hope you are doing | | | |
| 142 6 | well. Congratulations for fighting --" I think you | | | |
| 142 7 | meant "through" -- | | | |
| 142 8 | A. Yeah. | | | |
| 142 9 | Q. -- "all the difficult decisions around the | | | |
| 142 10 | VTE-Treatment package submission." | | | |
| 142 11 | Do you see that? | | | |
| 142 12 | A. I see that. | | | |
| 142 13 | Q. "I will give you a call anyway to discuss" | | | |
| 142 14 | vari-- "various matters. In general, I can live | | | |
| 142 15 | with the decision to now take 15 milligram bid for the | | | |
| 142 16 | initial treatment." | | | |

| | Objections In | Responses In | Rulings |
|---|---|---|---|

142 17      Do you see that?
142 18   A.  I see that.
142 19   Q.  Okay.  And so this was following up that
142 20   decision at the GAC on June 12th, a few days before,
142 21   to switch from 10 to 15 BID for that initial treatment
142 22   period, correct?
142 23   A.  That is correct.

142:24 -   143:8   Misselwitz, Frank 2016-11-09   0:31
142 24   Q.  Okay.  And so does this e-mail that you sent
142 25   to Ton indicate that you -- that you had some pushback
143 1    as far as moving to that 15 milligram dose?
143 2    A.  "Pushback" meaning that I pushed back?
143 3    Q.  Yes.
143 4    A.  No.
143 5    Q.  The -- your statement that "I can live with
143 6    the decision to now take 15 ... for the initial
143 7    treatment" sounds to me like you were having a little
143 8    bit of problems making that move before now.

143:12 -   143:25   Misselwitz, Frank 2016-11-09   0:55
143 12   A.  No, I don't have a problem with that; and I'm
143 13   happy to explain some of the background, if you wish
143 14   to.
143 15   BY MR. OVERHOLTZ:
143 16   Q.  Well, why would you say, I can now -- "I can
143 17   live with the decision to now take 15 milligrams BID
143 18   for the initial treatment" if before you had not
143 19   opposed such a change?
143 20   A.  I think this is to say that it was not my
143 21   primary preference in terms of dose of action, but
143 22   this is certainly a very viable option; and taking
143 23   into consideration the discussions we have had at the
143 24   Global Advisory Council, I -- I am content with that
143 25   change.

144:1 -   144:8   Misselwitz, Frank 2016-11-09   0:29
144 1    Q.  Your primary preference had been the
144 2    10 milligram BID therapy, correct?
144 3    A.  It's very difficult to answer that question
144 4    with "yes" and "no" without knowing the content why
144 5    the Global Advisory Council had gave us that very
144 6    recommendation, but it is factually correct that my
144 7    team initially had worked out a plan with 10 BID as
144 8    the initial treatment.

| | Rulings | Responses In | Objections In | | |
|---|---|---|---|---|---|

**144:15 - 144:21 Misselwitz, Frank 2016-11-09**   0:34
144 15   Q. Okay. Now, it looks like you were going to
144 16   try to have a VTE meeting in Barcelona at this
144 17   cardiology meeting; is that right?
144 18   A. Correct.
144 19   Q. Okay. And do you recall having that meeting
144 20   in Barcelona?
144 21   A. Yes, I do.

**144:22 - 144:23 Misselwitz, Frank 2016-11-09**   0:05
144 22   (EINSTEIN 30(b)(6) Exhibit 12 was marked for
144 23   identification.)

**144:25 - 145:7 Misselwitz, Frank 2016-11-09**   4:42
144 25   Q. Let me show you what we'll mark as Exhibit
145 1   Number 12, which is Record 1231088, Bates 02660438;
145 2   and then we'll also mark as Exhibit Number 13 its
145 3   attachment, which is Record 1231089, which is Bates
145 4   BPAG_02660439.
145 5   (Discussion off the record.)
145 6   (EINSTEIN 30(b)(6) Exhibit 13 was marked for
145 7   identification.)

**145:13 - 147:10 Misselwitz, Frank 2016-11-09**   2:25
145 13   Q. So there's -- the e-mail is Exhibit -- I
145 14   think it's --
145 15   MR. OVERHOLTZ: Is it 12?
145 16   MR. GEISLER: The e-mail is 12.
145 17   MR. OVERHOLTZ: Yeah.
145 18   BY MR. OVERHOLTZ:
145 19   Q. -- which is an e-mail that you received from
145 20   Bernhard Glombitza on April 26 of 2006.
145 21   Do you see that?
145 22   A. Yes.
145 23   Q. And it's entitled "presentation for todays
145 24   GDC-MC," and attached to this e-mail was a PowerPoint
145 25   entitled "Rivaroxaban DP3 for GDC MC," correct?
146 1   A. Correct.
146 2   Q. And this attachment, if we look at
146 3   Exhibit 13, is a PowerPoint presentation entitled
146 4   "Rivaroxaban DP3 for GDC MC" and MC version 1.0.
146 5   And if we look at this -- the first page of
146 6   the PowerPoint, you can see that the title after that
146 7   is "Decision to start Phase III programs for the
146 8   indications" of "VTE treatment" and "Stroke prevention
146 9   in patients with atrial fibrillation," right?

07/20/17 14:02

| | Objections In | Responses In | Rulings |
|---|---|---|---|

| | | |
|---|---|---|
| 146 10 | A. Right. | |
| 146 11 | Q. So this is now the presentation that's being | |
| 146 12 | given related to this DP3, this decision-point time | |
| 146 13 | period to start Phase III trials; is that right? | |
| 146 14 | A. Correct. | |
| 146 15 | Q. Okay. And do you recall presenting at this | |
| 146 16 | DP3 meeting at the -- at the -- for the GDC in April | |
| 146 17 | 2006? | |
| 146 18 | A. I was part of the team presenting. | |
| 146 19 | Q. Okay. So if you can turn with me over to | |
| 146 20 | Slide Number 4 -- | |
| 146 21 | A. Yeah. | |
| 146 22 | Q. -- this is similar to a slide we saw before | |
| 146 23 | where the dosing finding for the VTE Phase II study | |
| 146 24 | supported both the Phase III dose selection for SPAF | |
| 146 25 | as well as VTE treatment, correct? | |
| 147 1 | A. Correct. | |
| 147 2 | Q. If we look down below, we see that -- the | |
| 147 3 | 20 milligram OD is the main dose and that rivaroxaban | |
| 147 4 | 10 milligrams BID for the first three weeks, do you | |
| 147 5 | see that? | |
| 147 6 | A. Yeah. | |
| 147 7 | Q. So -- and we're going back in time a little | |
| 147 8 | bit but -- so in April, you guys were still supporting | |
| 147 9 | the 10 milligram dose, correct? | |
| 147 10 | A. Correct. | |

148:15 - 149:8   0:54

| | | |
|---|---|---|
| 148 15 | Misselwitz, Frank 2016-11-09 | |
| 148 16 | Q. Okay. And this document is listing that the | |
| 148 17 | "Probability of technical success" for VTE treatment | |
| 148 18 | at the time was estimated to be 63 percent; is that | |
| 148 19 | right? | |
| 148 20 | A. That is correct. | |
| 148 21 | Q. Okay. Now, was that a higher probability of | |
| 148 22 | technical success than the afib indication? | |
| 148 23 | A. I don't recall the exact numbers. I would | |
| 148 24 | need to look it up, but it could well be that it's | |
| 148 25 | slightly higher. | |
| 149 1 | Q. Okay. And this document is still listing | |
| 149 2 | that the initial treatment for rivaroxaban was the | |
| 149 3 | 10 milligram BID dose, right? | |
| 149 4 | A. That is correct. | |
| 149 5 | Q. Kind of about middle bullet point, "Initial | |
| 149 6 | treatment," rivaroxaban 10 milligrams BID; is that | |
| 149 7 | right? It's like the fourth bullet point up in that | |
| 149 8 | first set. | |

07/20/17 14:02

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

149    8        A.   That is correct.

149:20 -   150:3   Misselwitz, Frank 2016-11-09      0:26
149 20     Q.   Now, there was some debate originally, I
149 21     think we saw earlier, regarding that initial treatment
149 22     as to whether or not, instead of using Xarelto, you
149 23     would use the standard of care at the time, the low
149 24     molecular weight heparin.  Do you recall that?
149 25     A.   Yeah, I do.
150  1     Q.   Now, is it fair to say that the company
150  2     preferred, from a commercial perspective, that that
150  3     initial treatment period be with Xarelto?

150:5  -   150:15   Misselwitz, Frank 2016-11-09      0:44
150  5     A.   No, there was no commercial consideration.
150  6     It was primarily a consideration of meeting a certain
150  7     medical need; and, that is, that many patients
150  8     presenting with VTE, particularly with deep vein
150  9     thrombosis, can be treated as outpatients, which is
150 10     often hampered by the initial parenteral treatment,
150 11     so that for actually no good reason other than the
150 12     administration of a parenteral drug, the patients got
150 13     hospitalized.  So we felt that it was to the benefit
150 14     of patients to start even the initial treatment phase
150 15     with a tablet.

150:19 -   151:4   Misselwitz, Frank 2016-11-09      0:38
150 19     Q.   Is it fair to say that a large percentage of
150 20     those patients actually did receive low molecular
150 21     weight heparin treatment before they were randomized
150 22     either the comparator or to the Xarelto arm?
150 23     A.   That is correct.  In the frame of a clinical
150 24     trial, it can't be done differently because you need
150 25     time to confirm the diagnosis and you need time to
151  1     obtain the informed consent from the patient, and you
151  2     cannot reasonably -- to safeguard the safety of the
151  3     patients, you cannot reasonably keep these patients
151  4     untreated.

151:12 -   151:22   Misselwitz, Frank 2016-11-09      0:36
151 12     Q.   Okay.  And because of that, somewhere close
151 13     to, I think I read, 90 percent of the patients that
151 14     were in the VTE trials actually received at least some
151 15     treatment with low molecular weight heparin before
151 16     they were randomized into the trial?
151 17     A.   That is correct.  And the trial protocol was

07/20/17 14:02

| | | | | Rulings | Responses In | Objections In | |
|---|---|---|---|---|---|---|---|

151 18  very specific about that because we said that the
151 19  number of doses of injections of low molecular weight
151 20  heparin needed to be limited; otherwise, if it is too
151 21  long, the patient would become ineligible for being
151 22  enrolled into the trial.

153:4 - 153:14  Misselwitz, Frank 2016-11-09    0:44
153 4   Q. If you can turn with me to the next page,
153 5   there is a "Pros" and a "Cons." Do you see that?
153 6   A. Yeah.
153 7   Q. And the Pros says Chronic label, Full
153 8   coverage of DVT & PE; and the third bullet point says
153 9   "Initial treatment with Rivaroxaban is the
153 10  commercially preferred option."
153 11  Do you see that?
153 12  A. I see that.
153 13  Q. Now, who do you think came up with this idea
153 14  that this was a commercially preferred option?

153:16 - 154:3  Misselwitz, Frank 2016-11-09    0:41
153 16  A. Present -- well, who had -- well, it most
153 17  likely had been in the -- from our commercial
153 18  function, but we have to keep in mind that this
153 19  presentation is a presentation to a committee that
153 20  was composed both by representatives of clinical
153 21  development as well as of the commercial function.
153 22  So it was a mixed senior management group of people,
153 23  and, hence, both aspects needed to be represented in
153 24  the presentation.
153 25  Q. So this -- this committee that's hearing this
154 1   presentation both has clinical development management
154 2   people, as well as business side management people?
154 3   A. Correct.

154:22 - 155:7  Misselwitz, Frank 2016-11-09    0:37
154 22  Q. Now, the Cons says that the "Initial
154 23  treatment with Rivaroxaban (NCE) has a slightly lower
154 24  probability of technical success" than low molecular
154 25  weight heparin "(approved medicine) pretreatment,
155 1   though both treatments have PTS above standard."
155 2   Do you see that?
155 3   A. Correct.
155 4   Q. And eventually, as we've talked about, the
155 5   decision was made to use Xarelto at that pretreatment
155 6   period but at the 15 milligram BID dose, right?
155 7   A. Correct.

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**155:18 - 156:8**   1:03

Misselwitz, Frank 2016-11-09

155 18  Q.  Now, if you can turn with me -- it's Slide
155 19  16, I don't think it has a number on it.  It's a title
155 20  slide, "Initial Treatment in VTE-Treatment," Frank
155 21  Misselwitz --
155 22  A.  Yes.
155 23  Q.  -- 25 April 2006.  Do you see that?
155 24  A.  Yeah.
155 25  Q.  Okay.  And this has been part of the
156 1  presentation that you would have made; is that
156 2  correct?
156 3  A.  That is correct.
156 4  Q.  So if you will turn with me over to Slide
156 5  20 -- you have a slide in your presentation that says
156 6  "The first 3-4 weeks are critical"?
156 7  Do you see that?
156 8  A.  Yes.

**158:11 - 158:22**   0:41

Misselwitz, Frank 2016-11-09

158 11  Q.  Now, do you agree that for Xarelto, one of
158 12  the things that's seen is a, when it comes to
158 13  efficacy, is that there is a flat-dose response for
158 14  the drug?
158 15  A.  Within the ranges of this -- of the doses
158 16  that we studied, we haven't seen a big difference in
158 17  efficacy, that's correct.
158 18  Q.  And, therefore, if you want to provide --
158 19  should the goal be to find the lowest possible dose
158 20  that doesn't raise the risk of a significant bleed in
158 21  a patient, knowing that you have this flat dose
158 22  response on the efficacy side?

**158:24 - 159:6**   0:35

Misselwitz, Frank 2016-11-09

158 24  A.  It's a general principle to select the lowest
158 25  effective dose under these circumstances when there
159 1  are no notable differences in efficacy.
159 2  Q.  So if we look over at Slide 26, there is an
159 3  Efficacy of Initial Intensified Treatment Relative to
159 4  standard of care and Benchmark Trials.
159 5  Do you see that?
159 6  A.  I do.

**159:17 - 162:15**   4:21

Misselwitz, Frank 2016-11-09

159 17  And there's a conclusion at the bottom.
159 18  Do you see that?

| | Objections In | Responses In | Rulings |
|---|---|---|---|

159 19   A.   I see that, yes.

159 20   Q.   It says: OD regimen comparable to standard

159 21   of care; BID regimen better.

159 22   Do you see that?

159 23   A.   I do see that, yes.

159 24   Q.   So did that support your decision that the

159 25   BID dosing would be the best dosing to use during that

160 1   initial intensive treatment period?

160 2   A.   This is one of the factors to justify why we

160 3   selected a BID regime in the beginning.

160 4   Q.   So if you will turn with me to Slide 31, it's

160 5   a slide titled "Options for Initial Treatment."

160 6   Do you see that?

160 7   A.   I do.

160 8   Q.   So we have the low molecular weight heparin

160 9   option for five to seven days, we have the Xarelto BID

160 10   option for the first three to four weeks as Number 2,

160 11   see, correct?

160 12   A.   Uh-huh.

160 13   Q.   And the third says:  Why does 10 milligram

160 14   BID Xarelto provide a more intense level of

160 15   anticoagulation compared to 20 milligrams OD?

160 16   Do you see that?

160 17   A.   I do.

160 18   Q.   And the first bullet point says there is "No

160 19   big difference in Cmax." Do you see that?

160 20   A.   Yeah.

160 21   Q.   Cmax is -- Cmax is the highest blood levels of

160 22   the drug as measured in blood plasma when you take

160 23   that dose, correct?

160 24   A.   Correct.

160 25   Q.   Okay. And "Ctrough level is much higher in the

161 1   bid regimen - resulting in a more sustainable

161 2   suppression of thrombin generation over time."

161 3   Do you see that?

161 4   A.   That's correct.

161 5   Q.   Okay. If you look with me at the next

161 6   section, Section 33 is the "DP 3 Recommendation on VTE

161 7   Treatment and SPAF." Do you see that?

161 8   It's a title slide.  It doesn't have a page

161 9   number on it.

161 10   A.   Yes.  I see it.

161 11   Q.   Okay.  Now, I just want to ask you about a

161 12   couple of things in here.

161 13   If you look with me at Slide 37, there is a

161 14   "Brand Vision & Goals."

07/20/17 14:02

| | Objections In | Responses In | Rulings |
|---|---|---|---|

161 15   Do you see that?
161 16 A. Yeah, I do.
161 17 Q. Okay. It says: Brand Vision & Goals need to
161 18 guide the Phase III design in VTE/SPAF.
161 19   Do you see that?
161 20 A. I do.
161 21 Q. Okay. Now, the first one says: "Our vision
161 22 is to create the new gold standard for prevention and
161 23 treatment of thromboembolic disease."
161 24   Do you see that?
161 25 A. I do.
162 1 Q. By creating the gold standard, you're talking
162 2 about creating the standard that doctors would want to
162 3 use for their patients as providing the best level of
162 4 care. Is that a fair statement?
162 5 A. That is a fair statement, yes.
162 6 Q. Okay. And so if you want to create the gold
162 7 standard for treatment of VTE, wouldn't you want to
162 8 design and do a superiority trial instead of a
162 9 noninferiority trial?
162 10 A. Not necessarily, no.
162 11 Q. Because it seems to me that you -- that Bayer
162 12 wasn't setting their sights very high here when they
162 13 decided to only go after noninferiority with a
162 14 noninferiority margin of 2.0 for their VTE Phase III
162 15 trials if their vision was to create a gold standard.

**162:17 - 163:8** Misselwitz, Frank 2016-11-09  1:15

162 17 A. First, this is a very broad vision that is
162 18 not linked to just one indication, and it is
162 19 basically the broad vision to provide improved
162 20 treatment modalities for both the prevention and the
162 21 treatment of thromboembolic disease. And the gold
162 22 standard is not necessarily a standard that is
162 23 superior on efficacy. It could be a standard that is
162 24 superior on safety or easier to administer, more
162 25 feasible to be used in broad clinical practice.
163 1   So there are many factors playing into the
163 2 definition of a gold standard.
163 3 BY MR. OVERHOLTZ:
163 4 Q. Okay. And so when it comes to designing
163 5 clinical trials and choosing the dose that's going to
163 6 provide the best treatment for patients, do you think
163 7 that concern for how much money you can make should
163 8 play a role in those design decisions?

48

07/20/17 14:02

| | Objections In | Responses In | Rulings |
|---|---|---|---|

163:10 - 164:21  Misselwitz, Frank 2016-11-09   1:59

163 10  A. I think it's a very general statement. I am
163 11      personally, as a medical doctor and as the
163 12      accountable person to run this clinical development
163 13      program back in these years, I was really concerned
163 14      in providing the best and safest possible -- and best
163 15      in terms of benefit/risk balance -- new medicine to
163 16      patients at need.
163 17  Q. Do you think that it's the science that
163 18      should drive the decisions for how a Phase III
163 19      clinical trial is designed?
163 20  A. That is very clearly the first layer. It's
163 21      about science, it's about the regulatory environment;
163 22      and, of course, other factors need to be taken into
163 23      consideration but after that first layer.
163 24  Q. This says the -- the second bullet point
163 25      says: "Our goal is to improve the lives of patients
164 1       and create a multi- billion dollar antithrombotic
164 2       franchise to prevent and treat both venous and
164 3       arterial thrombosis."
164 4       Do you see that?
164 5  A. I see that.
164 6  Q. Okay. Let's look at the next slide for a
164 7       second, Slide 38. It's the slide titled "Brand
164 8       ambition: The promises we need to deliver on."
164 9       Do you see that?
164 10 A. Yeah.
164 11 Q. Okay. The first one is "Redefine the
164 12      antithrombotic market by fulfilling a high unmet
164 13      medical need.
164 14      "Providing safe and simple and effective
164 15      therapy without monitoring."
164 16      Do you see that?
164 17 A. I do.
164 18 Q. That was a key component to the ambitions
164 19      that Xarel- -- that the company had for Xarelto, is
164 20      that it could be sold to patients without the need for
164 21      any form of regular routine monitoring, correct?

164:23 - 165:8  Misselwitz, Frank 2016-11-09   0:43

164 23 A. It is correct to say that there is an
164 24      important medical need that was unmet back in the
164 25      time to have therapies, simple and effective
165 1       therapies out there that would not require
165 2       monitoring, because this exactly is one of the
165 3       aspects why warfarin is underused.

49

| | | | | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|---|

| 165 | 4 | Q. The second big arrow bullet point says: | | | | |
| 165 | 5 | "Establish a leading global brand with blockbuster | | | | |
| 165 | 6 | sales." | | | | |
| 165 | 7 | Do you see that? | | | | |
| 165 | 8 | A. I do see that. | | | | |
| 165:24 – | | | 1:19 | | | |
| 165 | 24 | Q. Let's look at 37, which is the Brand Vision & | | | | |
| 165 | 25 | Goals." | | | | |
| 166 | 1 | So we've got one bullet point that is talking | | | | |
| 166 | 2 | about creating a "gold standard for the prevention and | | | | |
| 166 | 3 | treatment of thromboembolic disease." | | | | |
| 166 | 4 | Sounds like it's a medical goal. Is that a | | | | |
| 166 | 5 | fair statement? | | | | |
| 166 | 6 | A. Yeah. | | | | |
| 166 | 7 | Q. And then you have a second goal that both | | | | |
| 166 | 8 | includes improving the lives of patients, which is a | | | | |
| 166 | 9 | medical-based goal -- correct? -- and then second, | | | | |
| 166 | 10 | creating a multi-billion dollar franchise, right? | | | | |
| 166 | 11 | A. That is correct. | | | | |
| 166 | 12 | Q. Okay. So, now, it seems to me that if you | | | | |
| 166 | 13 | really wanted to show that your drug works better and | | | | |
| 166 | 14 | improves the lives of patients, that you would study | | | | |
| 166 | 15 | this drug using a superiority design but -- I mean, | | | | |
| 166 | 16 | does that sound fair to you? | | | | |
| 166:19 – | | | 0:28 | | | |
| 166 | 19 | By the way, I meant to object to the form of | | | | |
| 166 | 20 | the prior question as well. | | | | |
| 166 | 21 | A. I respectfully disagree. Medical treatment | | | | |
| 166 | 22 | is often so complicated that it is an important | | | | |
| 166 | 23 | advancement of medical care if you provide better | | | | |
| 166 | 24 | modalities, even if you are non-inferior to the | | | | |
| 166 | 25 | current standard of care. | | | | |
| 167:1 – 167:3 | | | 0:06 | | | |
| 167 | 1 | Q. Dr. Misselwitz, do you play golf? | | | | |
| 167 | 2 | A. No, I don't. | | | | |
| 167 | 3 | Q. Do you ever watch golf? | | | | |
| 167:7 – 167:9 | | | 0:05 | | | |
| 167 | 7 | A. I -- I don't play, and actually, I don't | | | | |
| 167 | 8 | watch often. | | | | |
| 167 | 9 | Q. Okay. | | | | |
| 167:11 – 167:16 Misselwitz, Frank 2016-11-09 | | | 0:32 | | | |

Note — section headers between blocks:
166:16 Misselwitz, Frank 2016-11-09
166:25 Misselwitz, Frank 2016-11-09
167:3 Misselwitz, Frank 2016-11-09
167:9 Misselwitz, Frank 2016-11-09



| | Objections In | Responses In | Rulings |
|---|---|---|---|

167 11  Q. Does – do you know what a golf handicap is?
167 12  A. I know that, yes.
167 13  Q. And isn't designing a trial with a
167 14  noninferiority margin as high as 2.0 for the upper
167 15  confidence interval limit kind of like playing golf
167 16  with an 18 handicap to help out your score?

1:00

**167:18 – 168:8**

167:18  Misselwitz, Frank 2016-11-09
167 18  A. I would not go into that direction by making
167 19  that comparison, and I would want to state that
167 20  whenever you have a very effective standard of care
167 21  that has been proven to provide huge treatment
167 22  benefit versus placebo – and that is the case for
167 23  warfarin – then there are clear regulatory
167 24  guidelines how to assess new drugs in this framework,
167 25  and they do recommend performing noninferiority
168 1  trials because of the very high treatment benefit the
168 2  comparator would already provide.
168 3  But it is important to be able to switch
168 4  from, say, injectables to a tablet. That's a major
168 5  advantage.
168 6  Q. If you want to show that you are as good a
168 7  golfer as Arnie Palmer, wouldn't you want to play him
168 8  straight up and not with a handicap?

**Re: [167:18-168:8]**
**Def Obj 403.**
Argumentative.
Foundation. The witness
testifies at 167:1-167:9
that he neither plays nor
watches golf. His
testimony demonstrates
that he was confused by
Counsel's golf-related
questioning. This
testimony contains no
probative value and is
prejudicial due to its
argumentative nature.

Re: [167:18-168:8]
Pltf Resp The
witness, however,
does understand
what a golf handicap
is; however, [167:11-
12], which weakens
Defendants'
suggestion of his
ignorance of the
sport. Furthermore,
his testimony reflects
full control of what is
suggested by the
metaphor and his
control and use of
terms like
"noninferiority." The
questioning of this
adverse witness may
be rigorous but
hardly overly
argumentative.

Pending

0:27

**168:10 – 168:16**

168:10  Misselwitz, Frank 2016-11-09
168 10  A. I think this is the whole idea of a handicap,
168 11  but I think I – I would not want to comment on
168 12  golfing because I'm not a pro.
168 13  Q. And because at the end of the day in the VTE
168 14  treatment trial for, let's say, pulmonary embolism, it
168 15  had a upper limit of the confidence interval that was,
168 16  like, 1.68, didn't it?

**Re: [168:10-168:16]**
**Def Obj 403.**
Argumentative.
Foundation. The witness
testifies at 167:1-167:9
that he neither plays nor
watches golf. His

Re: [168:10-168:16]
Pltf Resp The
witness, however,
does understand
what a golf handicap
is; however, [167:11-
12], which weakens

Pending

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| | testimony demonstrates that he was confused by Counsel's golf-related questioning. This testimony contains no probative value and is prejudicial due to its argumentative nature. | Defendants' suggestion of his ignorance of the sport. Furthermore, his testimony reflects full control of what is suggested by the metaphor and his control and use of terms like "noninferiority." The questioning of this adverse witness may be rigorous but hardly overly argumentative. | |
| 1:05 | Re: [168:19-169:15] Def Obj 403. Argumentative. Foundation. The witness testifies at 167:1-167:9 that he neither plays nor watches golf. His testimony demonstrates that he was confused by Counsel's golf-related questioning. This testimony contains no probative value and is prejudicial due to its argumentative nature. | Re: [168:25-169:15] Pltf Resp The witness, however, does understand what a golf handicap is, however, [167:11-12], which weakens Defendants' suggestion of his ignorance of the sport. Furthermore, his testimony reflects full control of what is suggested by the metaphor and his control and use of terms like "noninferiority." The questioning of this adverse witness may be rigorous but hardly overly | Pending |

168:19 –   169:15  Misselwitz, Frank 2016-11-09

168  19   Q.  That's true, right?
168  20   A.  – that wasn't the question or –
168  21   Q.  That's true, right?
168  22   A.  Yeah, that is true.
168  23   Q.  And so this – in the PE trial, the drug,
168  24       based on the projections, could have been as worse as
168  25       70 percent worse, almost 70 percent worse than the
169  1        standard of care; is that right?
169  2    A.  It's not right, because the – this is just
169  3        the upper bound of the confidence interval.  The
169  4        point estimate was actually very close to 1.  And in
169  5        the case of the DVT trial, you may remember that the
169  6        point estimate was actually even favoring
169  7        rivaroxaban.
169  8    Q.  But the upper limit confidence interval was
169  9        all the way to 1.68, right?
169  10   A.  Which is clearly lower than the prespecified
169  11       noninferiority margin of 1.75.
169  12   Q.  And so when it comes to treatment of
169  13       pulmonary embolism, Xarelto kind of came out like a 18
169  14       handicap golfer; whereas, the Lovenox looked like
169  15       Arnold Palmer, right?

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| **169:17 - 169:18 Misselwitz, Frank 2016-11-09**<br>169 17 "You don't have to answer golf questions."<br>169 18 A. I disagree with that notion.<br>*0:03* | | argumentative. | |
| **170:4 - 170:18 Misselwitz, Frank 2016-11-09**<br>170 4 Q. Let's look at Slide 42, if we can.<br>170 5 It says: Commercial objectives for Phase III<br>170 6 program in VTE treatment and SPAF.<br>170 7 Do you see that?<br>170 8 A. I do.<br>170 9 Q. It says: "Ensure full alignment to desired<br>170 10 labeling based on product target profile/claims list,<br>170 11 but we need to balance the technical and operational<br>170 12 risk vs. the ideal profile and maximum speed of<br>170 13 development."<br>170 14 Do you see that?<br>170 15 A. I do.<br>170 16 Q. It then says: "Safeguard SPAF first: SPAF<br>170 17 is far more important than VTE treatment."<br>170 18 Do you see that?<br>*0:55* | Re: [169:17-169:18]<br>Def Obj 403.<br>Argumentative.<br>Foundation. The witness testifies at 167:1-167:9 that he neither plays nor watches golf. His testimony demonstrates that he was confused by Counsel's golf-related questioning. This testimony contains no probative value and is prejudicial due to its argumentative nature. | Re: [169:17-169:18]<br>Pltf Resp The witness, however, does understand what a golf handicap is, however, [167:11-12], which weakens Defendants' suggestion of his ignorance of the sport. Furthermore, his testimony reflects full control of what is suggested by the metaphor and his control and use of terms like "noninferiority." The questioning of this adverse witness may be rigourous but hardly overly argumentative. | Pending |
| **170:21 - 171:1 Misselwitz, Frank 2016-11-09**<br>170 21 Q. Knowing that the VTE treatment studies could<br>170 22 have an impact on the more important SPAF indication<br>170 23 that needed to be safeguarded first, do you think that<br>170 24 could have biased some of the decisions that were<br>170 25 being made regarding how the VTE trial was being<br>171 1 designed?<br>*0:21* | | | |
| **171:3 - 171:7 Misselwitz, Frank 2016-11-09**<br>171 3 A. No, I don't think so.<br>171 4 Q. I mean, what this document is talking about<br>171 5 is not letting the VTE treatment trial design<br>171 6 decisions hurt the company's commercial objectives for<br>171 7 afib, right?<br>*0:19* | | | |
| **171:9 - 171:22 Misselwitz, Frank 2016-11-09**<br>171 9 A. I -- I can't interpret that bullet point the<br>*1:51* | | | |

07/20/17 14:02

| | Objections in | Responses in | Rulings |
|---|---|---|---|

171:10   way you -- you just interpreted it.
171:11   Q. Let's look at Slide S2, if we can.
171:12   It says: "Preliminary US MR data indicate,
171:13   that a lack of acute DVT/PE label will drive down
171:14   chronic usage of Rivaroxaban."
171:15   Do you see that?
171:16   A. I do.
171:17   Q. And so there was market research done that
171:18   was presented at this DP3 meeting that you were
171:19   presenting at that indicated that if the DVT/PE
171:20   treatment indication was not approved that that would
171:21   result in less chronic usage of Xarelto for things
171:22   like afib, right?

171:24 - 172:16 Misselwitz, Frank 2016-11-09   1:45
171:24   A. Give me, please, time to read that.
171:25   This is in the commercial section, which I
172:1   have not familiarized myself with before.
172:2   Q. Okay.
172:3   A. I want to read it.
172:4   So I now familiarized myself with this slide.
172:5   Q. Okay.
172:6   A. I think the interpretation is different from
172:7   the market research in a way that emphasis is made on
172:8   the differential label for the acute initial
172:9   treatment phase in VTE treatment on the one hand and
172:10   the chronic maintenance treatment on the other hand
172:11   and the importance, based on that market research, to
172:12   have both labels, the acute intensified initial
172:13   treatment, as well as the maintenance chronic
172:14   treatment, because the use of the new drug in that
172:15   chronic maintenance phase is partly dependent on
172:16   whether or not the acute phase has been approved.

172:17 - 172:23 Misselwitz, Frank 2016-11-09   0:21
172:17   Q. And so, yeah, if we look at the three bullet
172:18   points down with the square around them in the bottom,
172:19   the last one talks about the fact that it is
172:20   approved "for acute and chronic outpatient treatment
172:21   of DVT and PE, the 'halo' effect or likelihood of
172:22   success in medically ill, SPAF, or ACS is reasonably
172:23   likely," correct?

172:25 - 172:25 Misselwitz, Frank 2016-11-09   0:03
172:25   A. It is correctly read out, but it -- it also

07/20/17 14:02

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**1:17**

173:1 - 174:3   Misselwitz, Frank 2016-11-09
173 1   says this -- this is a halo effect, very vague
173 2   formulation and very, kind of, soft result of that
173 3   market research.
173 4   Q. And the first bullet point indicates:
173 5   "Without the Acute indication in DVT/PE and only the
173 6   Chronic DVT/PE approval, the use of Rivaroxaban drops
173 7   to 35% in Acute and 58% in Chronic."
173 8   Correct?
173 9   A. That is a correct statement, and I think it
173 10   underlines the medical need having actually a single
173 11   drug approach for both the initial acute treatment
173 12   phase as well as the chronic maintenance phase.
173 13   Q. All right. So let's look at the last slide,
173 14   and we'll take our break, Slide 56.
173 15   It's a "Recommendation" slide.
173 16   Do you see that?
173 17   A. Uh-huh.
173 18   Q. The first bullet point says: The strategic
173 19   analysis of the various options to conduct the
173 20   Phase III program in VTE treatment integrating the
173 21   holistic medical, technical and commercial view favors
173 22   an intensified initial treatment regimen with
173 23   Rivaroxaban.
173 24   Correct?
173 25   A. Correct.
174 1   Q. And that was opposed to using the standard of
174 2   care during that initial period, low molecular weight
174 3   heparin, correct?

**0:10**

174:5 - 174:7   Misselwitz, Frank 2016-11-09
174 5   A. That would be one other alternative option.
174 6   Q. Okay. And that's what -- the decision this
174 7   DP3 committee was being asked to make, correct?

**0:35**

174:9 - 174:20   Misselwitz, Frank 2016-11-09
174 9   A. I understand the decision to be made was the
174 10   Decision Point 3, what -- what we asked to be
174 11   granted, and this is a recommendation from the team.
174 12   Q. Bullet Point 2 says: "All other options
174 13   don't exploit the value of the asset."
174 14   Do you see that?
174 15   A. I do.
174 16   Q. Isn't it more important to not exploit the
174 17   safety of the patients when making clinical trial
174 18   design decisions than worrying about -- than worrying



| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

174 19
174 20
about whether you should be exploiting the value of the asset?

0:29

174:22 - 175:4   Misselwitz, Frank 2016-11-09
174 22
174 23   A.  I think in the context of that presentation,
174 24   it -- it's, in fact, both.  I personally read this as
174 25   a medical -- a new chemical entity, a new drug under
175 1   development, has its value by showing that it
175 2   addresses an important medical need.  So, for me,
175 3   value doesn't -- doesn't come with a connotation of
175 4   only a commercial value, but also the value for
         patients.

0:20

175:5 - 175:13   Misselwitz, Frank 2016-11-09
175 5   Q.  Then finally, at the bottom, it says:
175 6   "Further elaboration on the BID vs OD approach in the
175 7   preferred option approach is recommended."
175 8          Do you see that?
175 9   A.  I do.
175 10  Q.  So they were asking to look further into
175 11  whether or not the BID versus an OD approach should be
175 12  used?
175 13  A.  Indeed.

0:54

176:11 - 177:1   Misselwitz, Frank 2016-11-09
176 11         (EINSTEIN 30(b)(6) Exhibit 14 was marked for
176 12  identification.)
176 13  BY MR. OVERHOLTZ:
176 14  Q.  And this is an e-mail.  It's Bates Janssen
176 15  15848474, an e-mail from January 26, 2010, Subject is
176 16  the Einstein (DVT & PE) SAP and Protocol, and it's
176 17  from a Martin Gebel to Bennett Levitan at Janssen as
176 18  well as copied to a couple other folks at Janssen.
176 19         Do you see that?
176 20  A.  Yeah, I do see that.
176 21  Q.  And there are several attachments here, some
176 22  of which are labeled "SAP" and some of which are
176 23  labeled "The Integrated Protocol."
176 24         Do you see that, the listing of the
176 25  attachments?
177 1   A.  Yeah.

0:28

177:7 - 177:18   Misselwitz, Frank 2016-11-09
177 7   Q.  Okay.  There is an SAP for DVT, an SAP for
177 8   meta with signatures, an SAP for PE, and then the
177 9   integrated protocol attachment.

**Re: [176:11-177:1]**
(EINSTEIN 30(b)(6) Exhibit 14 was marked for identification.  The witness was not copied on this email. See objection to Exhibit 14.

**Def Obj** Foundation.  The witness was not copied on this email. See objection to Exhibit 14.

**Re: [176:11-177:1]**
Pltf Resp That Defendants put forward this witness as the corporate designee for the EINSTEIN trials and VTE-TI indication, defies any attempt to know claim he was unfamiliar with such crucial EINSTEIN documents as the Statistical Analysis Plan.  Furthermore, Dr. Misselwitz' testimony makes clear his command of the document and of the concepts and directives set forth

Pending

07/20/17 14:02

07/20/17 14:02

| | Testimony | | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|
| 177 10 | Do you see that? | | | therein. | |
| 177 11 | A. Yeah. | | | | |
| 177 12 | Q. Okay. And when it talks about the SAP, is | | | | |
| 177 13 | that a Statistical Analysis Plan? | | | | |
| 177 14 | A. That is correct. | | | | |
| 177 15 | Q. Is that something that goes along with the | | | | |
| 177 16 | protocol, usually? | | | | |
| 177 17 | It's developed alongside the protocol? | | | | |
| 177 18 | A. Yes. | | | | |
| 177:22 - | 178:12 Misselwitz, Frank 2016-11-09 | 0:50 | | | |
| 177 22 | Q. What is the SAP used for -- | | | | |
| 177 23 | A. Ah, right. | | | | |
| 177 24 | Q. -- in the clinical trial? | | | | |
| 177 25 | A. The Statistical Analysis Plan is a document | | | | |
| 178 1 | that describes the main outcome measures and the way | | | | |
| 178 2 | they are to be analyzed in that trial. | | | | |
| 178 3 | Q. Okay. And like a protocol, once a | | | | |
| 178 4 | Statistical Analysis Plan has been finalized, it | | | | |
| 178 5 | should be adhered to by the people that are conducting | | | | |
| 178 6 | the trial; is that correct? | | | | |
| 178 7 | MR. HOROWITZ: Objection; form. | | | | |
| 178 8 | A. It is clear in any case that prior to | | | | |
| 178 9 | unblinding of the clinical trial, the SAP needs to be | | | | |
| 178 10 | finalized and fixed and there is an FDA rule to say | | | | |
| 178 11 | that typically it should be fixed prior to having | | | | |
| 178 12 | enrolled 50, 60 percent of the -- of the patients. | | | | |
| 179:2 - | 179:10 Misselwitz, Frank 2016-11-09 | 0:21 | Re: [179:2-179:10] | Re: [179:2-179:10] | Pending |
| 179 2 | (EINSTEIN 30(b)(6) Exhibit 15 was marked for | | Def Obj Foundation. The | Pltf Resp That | |
| 179 3 | identification.) | | witness was not copied | Defendants put | |
| 179 4 | BY MR. OVERHOLTZ: | | on the email transmitting | forward this witness | |
| 179 5 | Q. And if you just look at the front page for | | this document as an | as the corporate | |
| 179 6 | me -- and you can flip through if you need to, but | | attachment. See | designee for the | |
| 179 7 | this indicates that this would be the Statistical | | objection to Exhibit 15. | EINSTEIN trials and | |
| 179 8 | Analysis Plan for the Einstein-DVT Phase III trial; is | | | VTE-T indication, | |
| 179 9 | that correct? | | | defies any attempt to | |
| 179 10 | A. That is correct. | | | know claim he was | |
| | | | | unfamiliar with such | |
| 180:16 - | 180:17 Misselwitz, Frank 2016-11-09 | 0:02 | | crucial EINSTEIN | |
| 180 16 | Q. Okay. And it's also signed by Ton Lensing -- | | | documents as the | |
| 180 17 | A. Correct. | | | Statistical Analysis | |
| | | | | Plan. Furthermore, | |
| 181:2 - | 181:12 Misselwitz, Frank 2016-11-09 | 0:31 | | Dr. Misselwitz' | |
| 181 2 | Q. Okay. Then if we can look at what we'll mark | | | testimony makes | |
| 181 3 | as Exhibit 16, which is Record 3303607, Janssen | | | | |

57

07/20/17 14:02

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| 181 4 | 1S848641, this is another attachment to that e-mail | | clear his command of | |
| 181 5 | that we saw in Exhibit 14. | | the document and of | |
| 181 6 | (EINSTEIN 30(b)(6) Exhibit 16 was marked for | | the concepts and | |
| 181 7 | identification.) | | directives set forth | |
| 181 8 | Q. This is the Statistical Analysis Plan and | | therein. | |
| 181 9 | indicated by the top, to be the Statistical Analysis | | | |
| 181 10 | Plan for the meta-analysis of the EINSTEIN PE and DVT | | | |
| 181 11 | treatment studies; is that correct? | | | |
| 181 12 | A. That is correct. | | | |
| | | 0:20 | | |
| 181:17 - | Misselwitz, Frank 2016-11-09 | | | |
| 181 17 | Q. Okay. And this document would have | | | |
| 181 18 | controlled how the statistical analysis of the data | | | |
| 181 19 | that had been contained that was gathered in the | | | |
| 181 20 | EINSTEIN PE and DVT treatment trials would be | | | |
| 181 21 | analyzed; is that right? | | | |
| 181 22 | A. How the meta-analysis would be -- would be | | | |
| 181 23 | performed? | | | |
| 181 24 | Q. For the meta-analysis that was called for? | | | |
| 181 25 | A. Yeah. Uh-huh. | | | |
| | | 1:04 | | |
| 182:9 - 183:3 | Misselwitz, Frank 2016-11-09 | Re: [182:9-183:3] | Re: [182:9-183:3] | Pending |
| 182 9 | MR. OVERHOLTZ: 17? | Def Obj See objection to | Ptf Resp The meta- | |
| 182 10 | MR. GEISLER: 17. | Exhibit 17. | analysis was not | |
| 182 11 | BY MR. OVERHOLTZ: | Relevance/403. This | confined to the PE | |
| 182 12 | Q. -- is the 3303608, Janssen 1S848806, and this | document deals | arm of EINSTEIN, but | |
| 182 13 | is the Statistical Analysis Plan for the EINSTEIN | exclusively with the | included the DVT- | |
| 182 14 | pulmonary embolism 11702 study, according to its | Pulmonary Embolism | Treatment EINSTEIN | |
| 182 15 | title. | (PE) arm of EINSTEIN. | arm, so claims that | |
| 182 16 | (EINSTEIN 30(b)(6) Exhibit 17 was marked for | Such arm has no | the PE arm is | |
| 182 17 | identification.) | relevance here as | irrelevant or | |
| 182 18 | BY MR. OVERHOLTZ: | Plaintiff did not undergo | confusing does not | |
| 182 19 | Q. Do you see that? | Xarelto treatment for a | hold water. As | |
| 182 20 | A. I do. | PE. This risks juror | stated above, data | |
| 182 21 | Q. And it also has the same signatures like Akos | confusion as to which | and study conduct | |
| 182 22 | Pap and Ton Lensing and Harry Buller, correct? | trial data are relevant. It | pertaining to non- | |
| 182 23 | A. That is correct. | also allows Defendants | DVT-T indications | |
| 182 24 | Q. Okay. And this would have governed the | to raise issues that had | and studies are | |
| 182 25 | statistical analysis of the data collected in the | no bearing on Plaintiff's | inextricable with the | |
| 183 1 | EINSTEIN pulmonary embolism Phase III trial; is that | outcome. | entire body of | |
| 183 2 | right? | | Xarelto data, studies, | |
| 183 3 | A. That is correct. | | and literature across | |
| | | | all indications. This | |
| | | | Court has already | |
| | | | recognized this in | |
| | | 0:27 | | |
| 183:4 - 183:5 | Misselwitz, Frank 2016-11-09 | | | |
| 183 4 | Q. Okay. So let me show you what is going to be | | | |
| 183 5 | marked as Exhibit 18. | | | |

58

07/20/17 14:02

**Rulings**

**Responses In**

other depositions by overruling Defendants' objections to references to the ACS indication—an indication not even approved in the U.S.

**Objections In**

183:10 - 183:16 Misselwitz, Frank 2016-11-09
0:31

183 10    It's Record 1203527.  It's Bates
183 11    BPAG_02363367.  It's the 11702 protocol,
183 12    integrated protocol for the deep vein thrombosis
183 13    or pulmonary embolism Phase III trial through
183 14    Amendment No. 5 of July 2010 with Amendments 2,
183 15    3, 4, and 5 incorporated.  I'll let you take a
183 16    look at that.

185:7 - 186:3  Misselwitz, Frank 2016-11-09
1:01

185 7     (EINSTEIN 30(b)(6) Exhibit 18 was marked for
185 8     identification.)
185 9     BY MR. OVERHOLTZ:
185 10    Q.  Okay.  Now, of course, once the decision was
185 11    made to move forward with Phase III, those Phase III
185 12    trials were concluded, correct?
185 13    A.  Yeah.
185 14    Q.  Okay.  And they would have been governed by
185 15    the protocol and any of the protocol amendments that
185 16    were agreed to as part of the study; is that correct?
185 17    A.  Correct.
185 18    Q.  Okay.  And the document you're looking at is
185 19    Exhibit 17, is the integrated protocol for the PE and
185 20    DVT study; is that correct?
185 21    A.  That is correct.
185 22    Q.  And the -- even though the two trials were
185 23    conducted separately, the 11702 DVT --
185 24    A.  Under one umbrella protocol.
185 25    Q.  One umbrella protocol, correct.
186 1     And that's the protocol through Amendment
186 2     No. 5 of -- through 2010, correct?
186 3     A.  That's correct.

191:11 - 192:11 Misselwitz, Frank 2016-11-09
1:09

191 11    Q.  Okay.  All right.  So I'm going to ask you a
191 12    little bit about the Phase III trials, the D -- PE,
191 13    DVT and extension studies.
191 14    Those trials also ended up as publications
191 15    published in the medical literature, as well, correct?
191 16    A.  That is correct.
191 17    Q.  Okay.  But also, the company also created
191 18    clinical study reports for those trials; is that
191 19    right?
191 20    A.  Yeah, that is right.
191 21    Q.  And those clinical study reports are provided

| | Objections In | Responses In | Rulings |
|---|---|---|---|

| | | | |
|---|---|---|---|
| 191 22 | to the regulatory authorities where approval of the |
| 191 23 | drug is sought; is that correct? |
| 191 24 | A. That is correct. |
| 191 25 | Q. Okay. And were you involved in the creation |
| 192 1 | and development of the clinical study reports for |
| 192 2 | those EINSTEIN Phase III trials? |
| 192 3 | A. I was involved in the review. |
| 192 4 | Q. Okay. So let me show you -- I'm going to |
| 192 5 | show you Exhibit 22, 23, and 24. |
| 192 6 | (EINSTEIN 30(b)(6) Exhibit 22 was marked for |
| 192 7 | identification.) |
| 192 8 | (EINSTEIN 30(b)(6) Exhibit 23 was marked for |
| 192 9 | identification.) |
| 192 10 | (EINSTEIN 30(b)(6) Exhibit 24 was marked for |
| 192 11 | identification.) |

**191:24 - 193:10 Misselwitz, Frank 2016-11-09**    1:44

| | |
|---|---|
| 191 24 | A. That is correct. |
| 191 25 | Q. Okay. And were you involved in the creation |
| 192 1 | and development of the clinical study reports for |
| 192 2 | those EINSTEIN Phase III trials? |
| 192 3 | A. I was involved in the review. |
| 192 4 | Q. Okay. So let me show you -- I'm going to |
| 192 5 | show you Exhibit 22, 23, and 24. |
| 192 6 | (EINSTEIN 30(b)(6) Exhibit 22 was marked for |
| 192 7 | identification.) |
| 192 8 | (EINSTEIN 30(b)(6) Exhibit 23 was marked for |
| 192 9 | identification.) |
| 192 10 | (EINSTEIN 30(b)(6) Exhibit 24 was marked for |
| 192 11 | identification.) |
| 192 12 | MR. OVERHOLTZ: And I'll give them to you one |
| 192 13 | at a time. And we'll reach the same agreement to |
| 192 14 | replace these because it has my handwriting on |
| 192 15 | there. The first -- |
| 192 16 | MR. HOROWITZ: Are these the only copies you |
| 192 17 | have? |
| 192 18 | MR. OVERHOLTZ: Only copies I have. |
| 192 19 | MR. HOROWITZ: Are you doing substance? |
| 192 20 | MR. OVERHOLTZ: No, no substance. |
| 192 21 | BY MR. OVERHOLTZ: |
| 192 22 | Q. The first is Janssen 00582486, Record Number |
| 192 23 | 193800 |
| 192 24 | And it is the -- described as the EINSTEIN PE |
| 192 25 | Clinical Study Report signed on March 28, 2012, by Ton |
| 193 1 | Lensing. |
| 193 2 | And I'll show you that exhibit and have you |

| | Rulings | Responses In | Objections In |
|---|---|---|---|

193  3      confirm.
193  4         MR. OVERHOLTZ: That was 22.
193  5      Q. Okay. And this would have been the clinical
193  6      study report that would have been provided -- the
193  7      company would have obligation to provide the final
193  8      clinical study report to regulatory authorities before
193  9      approval; is that correct?
193  10     A. That is correct.

194:9  -  195:19 Misselwitz, Frank 2016-11-09                    2:26

194  9         Then I'll show you Exhibit 24, which is
194  10     described as the final version 1.0 Clinical Study
194  11     Report for the EINSTEIN extension study, 11899, that
194  12     ended on September 17th, 2009. And the date of the
194  13     report is July 30th at 2010. It's Bates
194  14     BHCP_00526099, and the record number is 425838.
194  15        And I'll let you confirm that.
194  16     A. So it is the version 1.0. Seems to me to be
194  17     that this is the final version, but it is an unsigned
194  18     version.
194  19     Q. Okay. And we talked about the fact that
194  20     these became publications.
194  21        Let me show you what we'll mark as
194  22     Exhibit 25, which has designation as FM-200. It's
194  23     Exhibit 25.
194  24        (EINSTEIN 30(b)(6) Exhibit 25 was marked for
194  25     identification.)
195  1   BY MR. OVERHOLTZ:
195  2      Q. This is an article dated December 23rd, 2010,
195  3      in the New England Journal of Medicine entitled "Oral
195  4      Rivaroxaban For Symptomatic Venous Thromboembolism."
195  5      The EINSTEIN Investigators is listed as the author.
195  6      A. That is correct.
195  7      Q. Okay. And if you look at the background, it
195  8      says this is -- "Rivaroxaban, an oral factor Xa
195  9      inhibitor, may provide a simple, fixed-dose regimen
195  10     for treating acute deep-vein thrombosis (DVT) and for
195  11     continued treatment, without the need for laboratory
195  12     monitoring."
195  13        Do you see that?
195  14     A. Correct.
195  15     Q. And so this was the published article of the
195  16     EINSTEIN DVT Phase III trial; is that correct?
195  17     A. It was actually a combination of the EINSTEIN
195  18     DVT and the EINSTEIN extension trial taken together
195  19     in one publication.

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| **196:10 - 196:16 Misselwitz, Frank 2016-11-09**<br>196 10 Q. The primary endpoint for the -- for the<br>196 11 extension trial was major bleeds, correct?<br>196 12 A. That is correct.<br>196 13 Q. And the primary endpoint for the DVT trial<br>196 14 was, of course, the combination of major plus<br>196 15 clinically relevant non-major bleeds; is that right?<br>196 16 A. That is correct.<br><br>0:17 | Re: [196:10-196:16]<br>Def Obj See objection regarding EINSTEIN extension arm at 51:10-52:25. See also objection regarding Exhibit 24. | Re: [196:10-196:16]<br>Pltf Resp The meta-analysis was not confined to the PE arm of EINSTEIN, but included the PE Treatment EINSTEIN arm, so claims that the PE arm is irrelevant or confusing does not hold water. As stated above, data and study conduct pertaining to non-DVT-T indications and studies are inextricable with the entire body of Xarelto data, studies, and literature across all indications. This Court has already recognized this in other depositions by overruling Defendants' objections to references to the ACS indication—an indication not even approved in the U.S. | Pending |
| **199:23 - 200:13 Misselwitz, Frank 2016-11-09**<br>199 23 Q. All right. Now let me show you what we'll<br>199 24 mark as Exhibit Number 26.<br>199 25 (EINSTEIN 30(b)(6) Exhibit 26 was marked for<br>200 1 identification.)<br>200 2 BY MR. OVERHOLTZ:<br>200 3 Q. Which is designated with the designation<br>200 4 FM-201. I'll have to get you a copy later.<br>200 5 It's the publication in the New England<br>200 6 Journal of Medicine, dated April 5th, 2012, titled<br><br>1:14 | Re: [199:23-200:13]<br>Def Obj Relevance/403. The Pulmonary Embolism (PE) arm of EINSTEIN has no relevance here as Plaintiff did not undergo Xarelto treatment for a PE. This risks juro62 | Re: [199:23-200:13]<br>Pltf Resp The meta-analysis was not confined to the PE arm of EINSTEIN, but included the DVT-Treatment EINSTEIN arm, so claims that the PE arm is | Pending |

07/20/17 14:02

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| 200 | 7 | confusion as to which trial data are relevant. See objection to Exhibit 22. | irrelevant or confusing does not hold water. As stated above, data and study conduct pertaining to non-DVT-T indications and studies are inextricable with the entire body of Xarelto data, studies, and literature across all indications. This Court has already recognized this in other depositions by overruling Defendants' objections to references to the ACS indication–an indication not even approved in the U.S. | |

200 7   "Oral Rivaroxaban for the Treatment of Symptomatic
200 8   Pulmonary Embolism, The EINSTEIN-PE Investigators.'"
200 9     Do you see that?
200 10  A. I see that, yes.
200 11  Q. So this would have been the publication for
200 12  the Phase III EINSTEIN pulmonary embolism trial?
200 13  A. Correct.

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| 201:1 – 203:12 | Missel witz, Frank 2016-11-09     4:18 | Re: [201:1-203:12] Def Obj See objection regarding the PE arm at 199:23-200:13. | [Re: [201:1-203:12] Pltf Resp The meta-analysis was not confined to the PE arm of EINSTEIN, but included the DVT-Treatment EINSTEIN arm, so claims that the PE arm is irrelevant or confusing does not hold water. As stated above, data and study conduct pertaining to non-DVT-T indications and studies are inextricable with the entire body of | Pending |

201 1   Q. Okay. And so if we look at the bottom
201 2   paragraph on Page 1289, it says: "The principal
201 3   safety outcome was clinically relevant bleeding, which
201 4   was defined as a composite of major or clinically
201 5   relevant nonmajor bleeding, as described previously."
201 6     And we've talked about that before, correct?
201 7   A. Uh-huh, correct.
201 8   Q. It then says that: Bleeding was defined as
201 9   major if it was clinically overt and associated with,
201 10  one, a decrease in the hemoglobin level of 2.0 grams
201 11  per deciliter or more; two, if bleeding led to the
201 12  transfusion of 2 or more units of red cells; or,
201 13  three, if bleeding was intracranial or
201 14  retroperitoneal; four, occurred in another critical
201 15  site; or, five, contributed to death.
201 16    Is that correct?
201 17  A. Correct.
201 18  Q. And then: "Clinically relevant nonmajor
201 19  bleeding was defined" at the bottom, and we can flip

07/20/17 14:02

| | Objections In | Responses In | Rulings |
|---|---|---|---|

| | |
|---|---|

201 20  over to Page 1291 -- "as overt bleeding that did not
201 21  meet the criteria for major bleeding, but was
201 22  associated with medical intervention, unscheduled
201 23  contact with a physician, interruption or
201 24  discontinuation of a study drug, or discomfort or
201 25  impairment of activities of daily life."
202 1   Do you see that?
202 2   A.  I see that.
202 3   Q.  Okay.  And those would have been the
202 4   definitions that would have been applied by the
202 5   adjudication committee in determining the adjudication
202 6   of any bleeds that were reported as adverse events in
202 7   the trial; is that correct?
202 8   A.  Correct.
202 9   Q.  Now, let me show you what we'll mark as
202 10  Exhibit 27 --
202 11  (EINSTEIN 30(b)(6) Exhibit 27 was marked for
202 12  identification.)
202 13  Q.  -- which is designated as FM-202.  It is --
202 14  I'll give it to you so you can look at it.
202 15  It's an article entitled "Oral rivaroxaban
202 16  versus standard therapy for the treatment of
202 17  symptomatic venous thromboembolism: a pooled analysis
202 18  of the EINSTEIN-DVT and PE randomized studies."
202 19  Do you see that?
202 20  A.  I see that.
202 21  Q.  And the lead author was Martin Prins and
202 22  included Anthonie Lensing and Scott Berkowitz from
202 23  Bayer; is that correct?
202 24  A.  Correct.
202 25  Q.  And this would have been the report of the
203 1   pooled analysis of the EINSTEIN DVT and pulmonary
203 2   embolism randomized studies; is that right?
203 3   A.  That is correct.
203 4   Q.  Okay.  This pooled analysis of the DVT and PE
203 5   studies, was that called for in the original protocol?
203 6   A.  It was prespecified, and I think we just
203 7   reviewed the statistical analysis plan from February
203 8   of 2007 specifying that.
203 9   Q.  And the pooled analysis, in fact, if we look
203 10  at the first page, had a prespecified noninferiority
203 11  margin was 1.75; is that right?
203 12  A.  That is correct.

For the first block (201 20 – 202 7), under Responses In:
"Xarelto data, studies, and literature across all indications. This Court has already recognized this in other depositions by overruling Defendants' objections to references to the ACS indication—an indication not even approved in the U.S."

204 5 testimony:
2045 - 205:21  Missefwitz, Frank 2016-11-09
204 5   Q.  Okay.  Let me show you what is -- we'll mark

3:33

| Re: [204:5-205:21] | Re: [204:5-205:21] | Pending |
|---|---|---|

64

07/20/17 14:02

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| 204  6 | as Exhibit 28, which is Record Number 699806, Bates | **Def Obj** Foundation. See | Pltf Resp Whether | |
| 204  7 | XARELTO_JANSSEN 04203026. | objection to Exhibit 28. | Dr. Misselwitz recalls | |
| 204  8 | (EINSTEIN 30(b)(6) Exhibit 28 was marked for | Foundation. The witness | involvement in | |
| 204  9 | identification.) | was not copied on this | discussions with Mr. | |
| 204 10 | BY MR. OVERHOLTZ: | email chain and testifies | Oppenheimer or not | |
| 204 11 | Q.  And so if we look at this, this is an e-mail | at 208:21-22 that he was | is irrelevant and a | |
| 204 12 | string -- I'll let you finish looking at it, but it's | not involved in | fact judges can readily | |
| 204 13 | just an email string that goes back and forth related | discussions with Mr. | assess.  Dr. | |
| 204 14 | to the subject matter being the EMEA VTE treatment | Oppenheimer. | Misselwitz received | |
| 204 15 | briefing package. | | emails within Ex. 28 | |
| 204 16 | A.  Yeah. | | by his own | |
| 204 17 | Q.  Okay.  So I want to start with an e-mail that | | testimony. 204:17- | |
| 204 18 | was sent to you by Sanjay Jalota at the bottom of the | | 25. An email sent | |
| 204 19 | first page on June 8 of 2006. | | later pertains the | |
| 204 20 | Do you see that? | | precise subject he | |
| 204 21 | A.  I do. | | was sent in the | |
| 204 22 | Q.  Okay.  And you see you received that e-mail, | | earlier email, both of | |
| 204 23 | you were one of the recipients at Bayer, from Sanjay | | which relate to | |
| 204 24 | Jalota's e-mail? | | comments on the | |
| 204 25 | A.  Correct. | | VTE-T briefing | |
| 205  1 | Q.  And Sanjay Jalota was with Janssen, correct? | | package, a matter | |
| 205  2 | A.  That is correct. | | with which Dr. | |
| 205  3 | Q.  Okay.  And she tells Andrea Derix at Bayer, | | Misselwitz has full | |
| 205  4 | along -- in this e-mail that you received: "Dear | | command of | |
| 205  5 | Andrea. Thank you for the VTE draft treatment | | considering his role | |
| 205  6 | package. Please find enclosed the consolidated J & J | | and that he was put | |
| 205  7 | comments.  We have taken into account that the same | | forward without | |
| 205  8 | justification questions will be submitted to both the | | Janssen objection as | |
| 205  9 | FDA and EMEA, as well as Canada." | | the Corporate | |
| 205 10 | Do you see that? | | Representative for | |
| 205 11 | A.  Yes. | | the EINSTEIN studies | |
| 205 12 | Q.  And so the idea was that these questions and | | and the DVT-T | |
| 205 13 | justifications for the study design would be provided | | indication. | |
| 205 14 | to the regulatory authorities for the US, the Europe, | | | |
| 205 15 | as well as Canadian? | | | |
| 205 16 | A.  Sure. | | | |
| 205 17 | Q.  Okay.  She says that: "Some aspects need | | | |
| 205 18 | further discussion.  "Loading or no loading dose, in | | | |
| 205 19 | addition to the initial intensive regimen." | | | |
| 205 20 | Do you see that? | | | |
| 205 21 | A.  Yes. | | | |

206:21 -   207:23 Misselwitz, Frank 2016-11-09        1:29

| | |
|---|---|
| 206 21 | Q.  Okay. And so Bayer had provided Janssen with |
| 206 22 | the draft briefing package. And now you have |
| 206 23 | received, along with some of your other colleagues at |

| | Testimony | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| 206 24 | Bayer, their comments back. Is that right? | | | |
| 206 25 | A. That is correct. | | | |
| 207 1 | Q. Okay. Now, if you can look with me at the | | | |
| 207 2 | e-mail -- the next e-mail, it comes from a gentleman | | | |
| 207 3 | at Janssen named Leonard Oppenheimer. And he sends it | | | |
| 207 4 | to Torsten Westermeyer. | | | |
| 207 5 | Do you see that? | | | |
| 207 6 | A. Correct. | | | |
| 207 7 | Q. Do you know who Leonard Oppenheimer is? | | | |
| 207 8 | A. I know him, yes. | | | |
| 207 9 | Q. Okay. And do you know what his role was with | | | |
| 207 10 | Janssen? | | | |
| 207 11 | A. He's a biostatistician who retired from Merck | | | |
| 207 12 | and was then a senior advisor to J & J. | | | |
| 207 13 | Q. Okay. And he makes some comments to Torsten | | | |
| 207 14 | and has several comments. | | | |
| 207 15 | Do you see those? | | | |
| 207 16 | A. I do see them, yes. | | | |
| 207 17 | Q. Okay. The first comment he makes is: "The | | | |
| 207 18 | data to support the dose selection, i.e., 10 | | | |
| 207 19 | milligrams BID for three weeks, followed by 20 | | | |
| 207 20 | milligrams OD, seems tenuous at best. Why not pick | | | |
| 207 21 | one or the other?" | | | |
| 207 22 | Do you see that? | | | |
| 207 23 | A. I do see that, yes. | | | |
| | | | | |
| 208:1 – 208:5 | Misselwitz, Frank 2016-11-09 | 0:15 | Re: [208:1-208:5] | Pending |
| 208 1 | A. I'm not certain. | | Ptf Resp Not only | |
| 208 2 | Q. Okay. Did you ever hear that the -- that | Re: [208:1-208:5] | did Dr. Misselwitz | |
| 208 3 | your development partners at Janssen believed that the | Def Obj Foundation. The | receive this email, he | |
| 208 4 | data to select the 10 milligrams BID dose for three | witness testifies at | was designated by | |
| 208 5 | weeks followed by 20 milligrams OD seemed tenuous? | 208:21-22 that he was | | |
| | | not involved in any such | | |

66

07/20/17 14:02

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| discussions. | | Bayer as the corporate representative for EINSTEIN studies and the DVT-T indication, and inquiries whether he was aware of certain discussions and topics are established not only by his receipt of the email but by the fact of his being designated accordingly and given his role and experience. His denial of recalling a conversation is not an erasure of that foundation. | |

**208:6 - 208:18 Misselwitz, Frank 2016-11-09**
208  6
208  7
208  8
208  9
208 10
208 11
208 12
208 13
208 14
208 15
208 16
208 17
208 18

MR. HOROWITZ: Objection; form.
A.  I think we have to keep in mind, first, these are comments made by one individual. They are not part of the consolidated comments that had been provided from J & J to us before, and that Oppenheimer is a biostatistician. So he's not a medical doctor, and certainly comments here from a — kind of more formalistic biostats perspective.
Q.  Okay.  So you don't recall whether you heard that the biostatistician advisor at Janssen had believed that the data to support the dosing selection of a 10 milligram BID for three weeks, followed by the OD, was tenuous?

0:57 — Re: [208:6-208:18] Def Obj Asked and answered; argumentative.

Re: [208:6-208:18] Pltf Resp The witness' response was not direct and evasive warranting the issue to be reframed in a second question seeking a more direct and clear response.

Pending

**208:21 - 208:22 Misselwitz, Frank 2016-11-09**
208 21
208 22

A.  I do not recall having been involved with these discussions.

0:08

**211:25 - 214:6 Misselwitz, Frank 2016-11-09**
211 25
212  1
212  2

Q.  The — you would agree that it's true that patients who did not complete the study period in the VTE treatment, DVT or PE trials as a result of

3:22

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| | 68 | | |

212 3    bleeding adverse events that resulted in
212 4    discontinuation from the study could not be randomized
212 5    into the extension study?
212 6    A.   I'm actually not sure that this is a true
212 7    statement. I'm certainly sure testifying that
212 8    patients who may have had bleeding on the standard of
212 9    care outside the clinic program would be eligible to
212 10   be treated in the extension trial.
212 11   Q.   But patients had to complete treatment of
212 12   either six or 12 months of either DVT or PE to be
212 13   randomized, correct?
212 14   A.   That is correct, but it could well be that a
212 15   bleeding could occur at month seven.
212 16   Q.   But if a bleeding event occurred that
212 17   resulted in their inability to complete the study
212 18   period of the trial, that resulted in their
212 19   discontinuation from the study, those patients would
212 20   be out of the running to be included in the extension
212 21   study, correct?
212 22   A.   Those patients who had experienced a bleeding
212 23   prior to month six.
212 24   Q.   And so, in fact, you have filtered out those
212 25   patients that may have had a higher absorption and
213 1    higher plasma concentration levels of Xarelto if they
213 2    were randomized to the Xarelto treatment and had
213 3    bleeding events during the initial phase from
213 4    participating in the extension study, correct?
213 5           MR. HOROWITZ:  Objection; form.
213 6    A.   That is factually incorrect, and I do not
213 7    agree with the statement for a number of reasons.
213 8           First, the selection into the extension trial
213 9    was open for patients that had not initially been
213 10   treated in the 11702 trial, as I mentioned a number
213 11   of times. And secondly, we selected patients for the
213 12   participation in the EINSTEIN extension trial not
213 13   based on their PK/PD profiles; and nor did we
213 14   preclude the inclusion of patients into the extension
213 15   trial who may have experienced a bleeding event after
213 16   six months.
213 17   Q.   Mr. Oppenheimer goes on and says: "This is
213 18   particularly problematic for safety analysis. The
213 19   experimental unit for safety assessments is the
213 20   'individual patient.' Treating one patient in 100
213 21   different studies doesn't provide equivalent
213 22   information as for a 100 different patients."
213 23   Do you see that?

07/20/17 14:02

| | Objections In | Responses In | Rulings |
|---|---|---|---|

213 24   A.  I see that.
213 25   Q.  Did you ever hear this criticism by Janssen's
214 1   biostatistician advisor?
214 2       MS. MILLER:  Objection.
214 3   A.  I did not hear that.  And while the general
214 4   reading seems compelling, it simply does not apply to
214 5   the case at hand here because of the reasons I
214 6   explained before.

214:7  -  214:18 Misselwitz, Frank 2016-11-09          0:37
214 7   Q.  Okay.  Let's look at Point Number 4 that
214 8   Mr. Oppenheimer makes.  He says:  "Since the lowest
214 9   dose, 20 milligrams per day, works, how do we know
214 10  that 10 milligrams once a day, five milligrams BID or
214 11  10 milligram QD" -- that's once daily -- "isn't
214 12  equally efficacious?  Won't regulators be interested
214 13  in establishing a less effective dose to be sure
214 14  you're not giving more drug than you need?"
214 15      That's what his comment is.
214 16  A.  I can read that comment, and it is what is
214 17  written here, yes.  And I do not agree with that
214 18  notion.

215:1  -  215:22 Misselwitz, Frank 2016-11-09          1:35
215 1   Q.  Okay.  Let me show you what we'll mark as
215 2   Exhibits 29 and 30.  It's Record Number 88254 and
215 3   88255.  And it's Bates -- 29 is BPAG_01573051 and
215 4   Bates the second is BPAG_01573053.
215 5       (EINSTEIN 30(b)(6) Exhibit 29 was marked for
215 6   identification.)
215 7       (EINSTEIN 30(b)(6) Exhibit 30 was marked for
215 8   identification.)
215 9   BY MR. OVERHOLTZ:
215 10  Q.  And if we look at the e-mail first, this is
215 11  an e-mail that you sent to Ton Lensing, as well as
215 12  several other people at Bayer, on March 9th of 2006,
215 13  correct?
215 14  A.  Correct.
215 15  Q.  And the subject is:  "Dose selection VTE
215 16  treatment:  My proposal and backgrounding in
215 17  preparation for CDP-RC."
215 18      Do you see that?
215 19  A.  That is correct.
215 20  Q.  And it says "Dose selection for VTE treatment
215 21  March 2006 PowerPoint" is attached, correct?
215 22  A.  Correct.

69

07/20/17 14:02

| | Rulings | Responses In | Objections In | | |
|---|---|---|---|---|---|

216:23 - 217:1

216 23
216 24
216 25
217  1

0:13

**Misselwitz, Frank 2016-11-09**
Q. Okay. Would you agree that a drug with a broader therapeutic window is safer than one with a more narrow therapeutic window if they have the same efficacy?

217:3 - 217:7

217  3
217  4
217  5
217  6
217  7

0:14

**Misselwitz, Frank 2016-11-09**
A. Generally speaking, yes.
Q. If a drug can be dosed to deliver the same or better efficacy, but with a broader therapeutic window, that dosing for that drug would be safer, correct?

217:9 - 217:19 **Misselwitz, Frank 2016-11-09**

217  9
217 10
217 11
217 12
217 13
217 14
217 15
217 16
217 17
217 18
217 19

0:37

A. Again, it's a theoretical consideration which needs to be proven in clinical practice.
Q. By April -- by 2006, by March of 2006, when you made this -- when you were preparing this PowerPoint presentation, did Bayer have an understanding that dosing Xarelto 10 milligrams BID would potentially have a broader therapeutic window than 20 milligrams OD?
A. No. And I think this is nothing we can derive from that very slide deck. It's not based on our data.

218:23 - 219:11 **Misselwitz, Frank 2016-11-09**

218 23
218 24
218 25
219  1
219  2
219  3
219  4
219  5
219  6
219  7
219  8
219  9
219 10
219 11

0:45

Q. Okay. Now, if you could turn with me over to Slide 28, there's an exposure categorization slide from the Phase II studies.
Do you see that?
A. Yes.
Q. And you had told me earlier that PK measurements for patients in the Phase II dose finding studies, ODIXa-DVT and EINSTEIN DVT, had be taken from patients, right?
A. Correct.
Q. And this chart represents the PK from the patients divided by terciles of exposures; is that correct?
A. That is correct.

220:22 - 221:1 **Misselwitz, Frank 2016-11-09**

220 22
220 23

0:26

Q. Okay. If we turn to the next page, Slide 30, this is an Exposure-Response Analysis that compared

70

07/20/17 14:02

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

220 24    exposure levels to the safety event rates for the two
220 25    Phase II trials, correct?
221 1     A.  Correct.

221:2  -  222:2   Misselwitz, Frank 2016-11-09                    1:27
221 2     Q.  This Exposure-Response Analysis that's shown
221 3     here, if we look at the Cmax numbers for -- for both
221 4     Study 11223, the ODIXa-DVT, and Study 11528,
221 5     EINSTEIN-DVT, we see that the number of patients in
221 6     the lower tercile of exposure, had 4.9 percent rate of
221 7     any or clinically relevant bleeding, and -- for
221 8     ODIXa-DVT, and about 4 percent for EINSTEIN-DVT; is
221 9     that correct?
221 10    A.  That is correct.
221 11    Q.  Now, when we get to the middle level of
221 12    exposure, for the EINSTEIN-DVT study, the event rate
221 13    stays about the same, 3.9 percent, correct?
221 14    A.  Correct.
221 15    Q.  But it is increased to 12.7 percent in the
221 16    ODIXa-DVT trial, correct?
221 17    A.  Correct.
221 18    Q.  Okay. And then if we look at the third
221 19    tercile of exposure, the event rate for the ODIXa-DVT
221 20    goes up to 11.4 percent compared to the lower level at
221 21    4.9 percent, correct?
221 22    A.  Uh-huh. Correct.
221 23    Q.  But the ODIXa-DVT trial, the upper terciles
221 24    of exposure only shows a 6.6 percent event rate,
221 25    correct?
222 1     A.  That's the EINSTEIN-DVT trial.
222 2     Q.  EINSTEIN-DVT, correct.

223:3  -  223:17  Misselwitz, Frank 2016-11-09                    0:55
223 3     Q.  I mean, the -- the bleeding event rates in
223 4     11223 seem to be in line with what you would expect as
223 5     exposure increases, correct?
223 6     A.  Again, generally, it is correct to expect
223 7     that this increasing exposure, the bleeding would go
223 8     up, but we are currently reviewing only Cmax, and there
223 9     are more than -- there are many other exposure
223 10    measures, such as area under the curve, for instance.
223 11    Q.  If we look at 11223 for a minute, of the 45
223 12    events that are described there -- 8 plus 18 plus 19.
223 13    If I do my math right, of the 45 events, 37 of the 45
223 14    occur in the two highest terciles of -- of exposure;
223 15    is that correct?

71

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

| 223 16 | A.  I do not do the math, but that seems to be | | | |
| 223 17 | correct, yes. | | | |
| | | | | |
| 228:10 - | **229:13 Misselwitz, Frank 2016-11-09** | 1:18 | | |
| 228 10 | Q.  So if we can look at Slide 48, the Summary | | | |
| 228 11 | slide, it says: "All doses tested work, both OD and | | | |
| 228 12 | BID regimens work." | | | |
| 228 13 | Do you see that? | | | |
| 228 14 | A.  Yes. | | | |
| 228 15 | Q.  The fifth bullet point down says: "Treatment | | | |
| 228 16 | doses of more than 10 milligrams OD shall be given | | | |
| 228 17 | with food." | | | |
| 228 18 | Do you see that? | | | |
| 228 19 | A.  Correct. | | | |
| 228 20 | Q.  And is that a recommendation in VTE | | | |
| 228 21 | treatment, that the dose given for VTE treatment be | | | |
| 228 22 | given with food? | | | |
| 228 23 | A.  To the best of my knowledge, yes. | | | |
| 228 24 | Q.  Food – given with food increases exposure to | | | |
| 228 25 | the drug; is that right? | | | |
| 229 1 | A.  It – importantly, it increases the | | | |
| 229 2 | bioavailability and reduces variability. | | | |
| 229 3 | Q.  Turn with me to Slide 49.  The Summary says: | | | |
| 229 4 | "Total daily dose of 20 milligrams can be selected as | | | |
| 229 5 | optimal dose." Correct? | | | |
| 229 6 | A.  Correct. | | | |
| 229 7 | Q.  And that could either be 10 milligrams BID or | | | |
| 229 8 | 20 milligrams once daily, correct? | | | |
| 229 9 | A.  Correct. | | | |
| 229 10 | Q.  The second bullet point says: "Increased | | | |
| 229 11 | doses do not translate into better efficacy but may | | | |
| 229 12 | increase the risk of bleeding." Correct? | | | |
| 229 13 | A.  Correct. | | | |
| | | | | |
| 230:1 - | **230:15 Misselwitz, Frank 2016-11-09** | 0:43 | | |
| 230 1 | Q.  Turn with me over to Slide 51, the final | | | |
| 230 2 | overall conclusion slide.  It says: "We do not | | | |
| 230 3 | recommend to use the 10 milligram BID regimen | | | |
| 230 4 | long-term." | | | |
| 230 5 | Do you see that? | | | |
| 230 6 | That's the initial intensive treatment phase | | | |
| 230 7 | at this time that was being recommended, right? | | | |
| 230 8 | A.  Correct. | | | |
| 230 9 | Q.  Okay.  Then if you will look with me at the- | | | |
| 230 10 | third bullet point, it says: "Fragile patients could | | | |
| 230 11 | receive 10 milligrams OD." Correct? | | | |

07/20/17 14:02

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

230 12   A.  Correct.
230 13   Q.  That was not, in fact, studied in the
230 14       Phase III trial program, correct?
230 15   A.  Correct.

231:11 -   231:12 Misselwitz, Frank 2016-11-09          0:11
231 11       (EINSTEIN 30(b)(6) Exhibit 31 was marked for
231 12       identification.)

231:19 -   232:7 Misselwitz, Frank 2016-11-09          0:52
231 19   Q.  I'm going to be asking you about the Decision
231 20       section on page 4 regarding Question Number 1, and
231 21       then I'm going to ask you about the Question Number 2.
231 22       That will help you out a little bit.
231 23   A.  Yeah.
231 24   Q.  Okay.  So this document is the meeting
231 25       minutes of an end of Phase II meeting that was held
232  1       with the FDA with both Bayer and Janssen; is that
232  2       correct?
232  3   A.  That's correct.
232  4   Q.  Okay.  And you, in fact, were one of the
232  5       attendees of this meeting with the FDA on behalf of
232  6       Bayer, correct?
232  7   A.  That's correct.

232:19 -   234:7 Misselwitz, Frank 2016-11-09          1:32
232 19   Q.  And typically what happens in this situation
232 20       is the company puts forth questions to the regulatory
232 21       agency, like the FDA, and asks whether or not they
232 22       agree with these components of their Phase III
232 23       program?
232 24   A.  Correct.
232 25   Q.  And so, if we can look at Number 1, it says:
233  1       "Dose selection, dose regimen."  Right?
233  2   A.  Uh-huh.
233  3   Q.  It says:  "Based on the results from the
233  4       Phase II VTE treatment studies with rivaroxaban, Bayer
233  5       proposes to use a dosage regime of 15 milligram BID
233  6       dose regimen for the first three weeks of therapy
233  7       followed by a 20 milligram once-daily regimen.  Does
233  8       the agency concur with the above-mentioned dosing
233  9       strategy and regimen in the Phase III study?"
233 10       Correct?
233 11   A.  Yes.
233 12   Q.  And the FDA responds below, right?
233 13   A.  Yes.

| | Objections In | Responses In | Rulings |
|---|---|---|---|

233 14 Q. And they say: "No, we do not concur."
233 15 A. That is correct.
233 16 Q. Okay. "Instead of your current dose plans,
233 17 we recommend that you propose a dose of 10 milligrams
233 18 BID for your Phase III study based on the following."
233 19 Do you see that?
233 20 A. Yes, I see it.
233 21 Q. And one of the -- they raise several
233 22 different issues, including organ toxicity at higher
233 23 doses; more bleeding events in higher-dose
233 24 experiences; and third, a more favorable PK profile
233 25 for the 10 milligram BID dose when compared to 20
234 1 milligram OD.
234 2 Do you see that?
234 3 A. Correct.
234 4 Q. Okay. Now, in the end, it's the sponsor
234 5 here, Bayer and Janssen's decision as to what dose to
234 6 study in their Phase III trial, correct?
234 7 A. Correct, yes.

235:14 - 235:16 Misselwitz, Frank 2016-11-09    0:11
235 14 Q. All right. So if we can look at Number 2,
235 15 Choice of Comparator, Dr. Misselwitz.
235 16 A. Yes.

236:2 - 237:19 Misselwitz, Frank 2016-11-09    1:41
236 2 Q. Okay. The FDA responds, and I want to direct
236 3 your attention to Point Number 2. Do you see that?
236 4 A. Yeah.
236 5 Q. And it says: "You propose a single
236 6 non-inferiority trial for acute treatment of VTE. Two
236 7 adequate and well-controlled studies are generally
236 8 needed to support a new indication. There is a risk
236 9 in performing a single trial that may not have
236 10 convincingly positive results to support the proposed
236 11 indication. In addition, a non-inferiority trial is
236 12 less likely to be persuasive."
236 13 Do you see that?
236 14 A. Yes.
236 15 Q. Okay. Moving to the next page: "The
236 16 acceptance of the single study as a sufficient
236 17 scientific and regulatory basis for approval of a new
236 18 indication will be determined by its adequacy to
236 19 support the efficacy claim."
236 20 Do you see that?
236 21 A. Yes.

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

236 22  Q. It says -- further down, it says:
236 23  "Consistent with the information in this guidance, we
236 24  are very concerned that your proposed open label
236 25  non-inferiority study, Study 11702, will not provide
237 1  robust evidence of safety and efficacy."
237 2     Do you see that?
237 3  A. I see that, and I agree this is what is
237 4  written here. And as a response, we decided then to
237 5  run two trials, the EINSTEIN-DVT and a separate
237 6  EINSTEIN-PE trial so that we have two -- each other
237 7  confirming trials.
237 8  Q. And that's the two trials that fall under the
237 9  same protocol, the 11702, EINSTEIN --
237 10  A. It's an umbrella protocol, yes.
237 11  Q. Okay. And that's based on this, is why you
237 12  split them apart?
237 13  A. And made them larger, considerably larger
237 14  with considerably more events.
237 15  Q. They still both were non-inferiority trials?
237 16  A. Yeah, but that is exactly according to the
237 17  guidelines. When you have a non-inferiority trial,
237 18  you need to have two confirmatory trials, and that's
237 19  what we've done.

238:5 – 238:15 Misselwitz, Frank 2016-11-09    0:22
238 5  Q. Dr. Misselwitz, as you know, my name is Jeff
238 6  Horowitz. I represent Bayer, and it's my chance to
238 7  ask you some questions in follow-up to Mr. Overholtz's
238 8  questions, plaintiffs' counsel's questions, and maybe
238 9  some other things about the EINSTEIN study we want to
238 10  talk about.
238 11     Do you understand?
238 12  A. I do understand, yes.
238 13  Q. Okay. Doctor, how long have you been sitting
238 14  here today, since like 8:00 o'clock this morning?
238 15  A. Quite a while, yeah, a couple of hours.

238:18 – 238:23 Misselwitz, Frank 2016-11-09    0:20
238 18  Q. Dr. Misselwitz, where do you currently work?
238 19  A. I work with Bayer, and I'm having the
238 20  pleasure to -- leading the clinical development in
238 21  the field of cardiovascular medicine.
238 22  Q. How long have you worked at Bayer?
238 23  A. Fourteen years now.

239:1 – 239:23 Misselwitz, Frank 2016-11-09    1:27

75

07/20/17 14:02

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

239  1    Q.  And when you say you're the head of clinical
239  2  development in cardiovascular medicine, what -- what
239  3  exactly does that mean?
239  4    A.  That comprises four therapeutic indication
239  5  franchises: Number 1, thrombosis, so anticoagulation
239  6  medicine; Number 2, cardiology and specifically --
239  7  more specifically, heart failure drugs; Number 3,
239  8  nephrology, so chronic kidney disease; and Number 4,
239  9  last but not least, pulmonology, pulmonary
239 10  circulation.
239 11    Q.  And thrombosis, is that the category that
239 12  Xarelto would fall into?
239 13    A.  Indeed, yes.
239 14    Q.  And what is thrombosis?
239 15    A.  Thrombosis is a medical condition which the
239 16  blood clots and forms clots that may obstruct the
239 17  vessels, either in the arteries or in the veins, and
239 18  regardless of arterial or venous clots, this may have
239 19  deleterious and sometimes fatal, deadly outcomes to
239 20  the patients.
239 21    Q.  Now, I've been calling you Doctor, as has
239 22  Mr. Overholtz. Are you a medical doctor?
239 23    A.  I'm a medical doctor indeed, yes.

240:3  -  241:2   Misselwitz, Frank 2016-11-09      1:50

240  3    Q.  Tell us a little bit -- well, what area of
240  4  medicine did you focus on and have you focused on, are
240  5  you board certified, that sort of thing.
240  6    A.  So I finished medical school with an MD in
240  7  1981. I then had a MD Ph.D. training, so I did a
240  8  couple of years in a lab doing basic science
240  9  research. I went back to the clinical practice and
240 10  accomplished my board certification as a vascular
240 11  medicine specialist. That comprises, by specialty,
240 12  thrombosis as a big and important area. And I used
240 13  to work, then, for a number of years, a total of 10
240 14  years after my MD degree in University Hospital as a
240 15  head of the anticoagulation clinic and research group
240 16  focusing on thrombosis.
240 17    Q.  During your time as the head of the
240 18  anticoagulation clinic focusing on thrombosis, did you
240 19  actually care for and treat patients as a practicing
240 20  doctor?
240 21    A.  Yes, of course. It was one of my duties to
240 22  regularly see patients who are anticoagulated with
240 23  vitamin K antagonists. It was the time we had no

07/20/17 14:02

| | Rulings | Responses In | Objections In | |
|---|---|---|---|---|

240 24 | normal anticoagulant and neither did we widely use
240 25 | low molecular weight heparins, of course. Basically,
241 1 | back in the time, we had old unfractionated heparin
241 2 | and vitamin K antagonists.

1:13

241:1 - | 241:24 Misselwitz, Frank 2016-11-09
241 1 | back in the time, we had old unfractionated heparin
241 2 | and vitamin K antagonists.
241 3 | Q. So you actually had hands-on experience in
241 4 | prescribing vitamin K antagonists and the heparin --
241 5 | unfractionated heparin medicines?
241 6 | A. In -- in my outpatient clinics, we had a
241 7 | total of three-and-a-half thousand patients on
241 8 | vitamin K antagonists, regularly managed.
241 9 | Q. And just remind folks, what are vitamin K
241 10 | antagonists?
241 11 | A. Well, this is Coumadin, or warfarin, in the
241 12 | US; but there are other chemical specialties grouped
241 13 | under the group of vitamin K antagonists, so it's a
241 14 | group of drug that suppresses the synthesis of
241 15 | clotting factors in the liver.
241 16 | Q. And this was what you used to treat a
241 17 | potential thrombosis and the conditions that involved
241 18 | thrombosis or blood clots?
241 19 | A. We used both for preventive settings as well
241 20 | as for treatment settings.
241 21 | Q. Okay. We're going to come back to that in a
241 22 | little bit. Let's just finish up with your background
241 23 | before you got to Bayer.
241 24 | A. Sure.

1:26

241:25 - | 242:23 Misselwitz, Frank 2016-11-09
241 25 | Q. So after you -- you were the head of the
242 1 | anticoagulation clinic, what did you do after that,
242 2 | before you came to Bayer? In particular, of course, I
242 3 | want to hear you talk about what you did with respect
242 4 | to antithrombosis and antithrombosis medicines.
242 5 | A. Sure. So during my time in -- in -- in the
242 6 | academic institution, I also did clinical research as
242 7 | a principal investigator of clinical trials, which
242 8 | actually brought me into and interested me in working
242 9 | in the pharmaceutical industry; and I then elected to
242 10 | join the pharmaceutical industry, which was back in
242 11 | 1992
242 12 | And I was first in medical affairs and later
242 13 | in our clinical development working for a German

07/20/17 14:02

| | Objections In | Responses In | Rulings |
|---|---|---|---|

242 14    company called Knoll, or Knoll, and that was later
242 15    acquired by Abbott, and now Abbvie, and was
242 16    developing cardiovascular drugs there, with a
242 17    particular focus on new anticoagulant drugs. I
242 18    specifically developed a low molecular weight
242 19    heparin.
242 20    Q.  So you actually worked on the clinical
242 21    development program for some drugs, including low
242 22    molecular weight heparin?
242 23    A.  That is correct.

242:24 -    243:5    Misselwitz, Frank 2016-11-09    0:30
242 24    Q.  And what is low molecular weight heparin?
242 25    A.  Low molecular weight heparin is a modified
243  1    form of heparin. It's an anticoagulant that needs to
243  2    be injected and can be injected either directly into
243  3    the blood vessels or can also be administered
243  4    subcutaneously, and it has been used for both
243  5    prevention and treatment of thrombosis.

243:6  -    243:9    Misselwitz, Frank 2016-11-09    0:11
243  6    Q.  And when you came into Bayer in 2002, what
243  7    was your understanding as to the work or the nature of
243  8    the work that you would be doing, what was your title,
243  9    what was your role?

243:13 -    243:24    Misselwitz, Frank 2016-11-09    0:55
243 13    A.  Yeah. So I joined Bayer in April of 2002 as
243 14    the global clinical leader -- so as the sort of
243 15    program director, if you wish -- being accountable
243 16    for the early clinical development of what is now
243 17    Xarelto. That was the primary reason why I was
243 18    brought into Bayer and why I was very interested in
243 19    doing that, and I was the -- initially for the first
243 20    couple of years, the only clinical person running
243 21    that program. And then, of course, it got larger,
243 22    and I started to hire colleagues. And since 2005, we
243 23    created the therapeutic area under my leadership,
243 24    cardiovascular drug development.

244:12 -    244:18    Misselwitz, Frank 2016-11-09    0:32
244 12    Q.  And when you got to Bayer and began to work
244 13    on Xarelto, was one of the programs that you worked on
244 14    what we've talked about today as the EINSTEIN or VTE
244 15    treatment program?
244 16    A.  That is correct. I conceptualized the first

78

07/20/17 14:02

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

244 17
244 18

Phase IIb trials -- or trial, singular, in this indication; namely, the ODIXa-DVT trial.

245:4 - 245:11 Misselwitz, Frank 2016-11-09          0:27
245  4
245  5
245  6
245  7
245  8
245  9
245 10
245 11

Q. Okay. So you had a personal role in the EINSTEIN program, the VTE treatment program; is that fair?

A. That is fair to say. I was always -- kept being involved very closely, even after I hired Ton Lensing as an expert in the field of VTE treatment. And so he reported in to me, and, of course, I was closely apprised of what's going on.

245:16 - 246:7 Misselwitz, Frank 2016-11-09          1:07
245 16
245 17
245 18
245 19
245 20
245 21
245 22
245 23
245 24
245 25
246  1
246  2
246  3
246  4
246  5
246  6
246  7

Q. What are the medical conditions -- I mean, we've used this phrase "VTE treatment," but I want to break that down a little bit.

What are the conditions that were being looked at in terms of treating conditions in the EINSTEIN program?

A. It's actually two important presentations that are typical symptoms, or presentations, of what we believe is the same disease, one being called deep vein thrombosis -- so a clot that develops in the deep veins of the leg or in other locations -- and the other presentation being pulmonary embolism.

As a result of such clot in the deep veins breaking off and dislodging, traveling through the heart into the lung, that causes a pulmonary embolism which is very often fatal and a highly dangerous situation.

246:13 - 247:9 Misselwitz, Frank 2016-11-09          1:12
246 13
246 14
246 15
246 16
246 17
246 18
246 19
246 20
246 21
246 22
246 23
246 24
246 25

What happens if DVT goes untreated? What could happen?

A. Well, again, it depends on the size and on the way, on the -- on -- on -- on the exact location in the vascular system. But if it goes untreated, there is a very, very high likelihood that the disease would aggravate further, that it could lead then to pulmonary embolism, which, again, can be fatal; and even if it is not leading to a pulmonary embolism, it leads, basically, to the destruction of the venous valves and would lead to long-term sequela called post-thrombotic syndrome, which can actually lead to ulcerations at the ankle and really painful

07/20/17 14:02



| | Objections In | Responses In | Rulings |
|---|---|---|---|

| | | |
|---|---|---|

**247:11 - 247:24** Misselwitz, Frank 2016-11-09

247    1    situations that visibly take the patient.
247    2    Q. When you say "pulmonary embolism" -- and
247    3    that's the clot that goes to the lung, right?
247    4    A. Uh-huh.
247    5    Q. When you say that that "can be fatal," do you
247    6    have a sense of, I mean, how frequently it is fatal
247    7    and the relationship between that and treatment?
247    8    Have you looked at literature and data on
247    9    that?

**247:11 - 247:24** Misselwitz, Frank 2016-11-09    0:55

247   11    A. I think the pulmonary embolism or, in
247   12    general, fatality or death caused by these venous
247   13    thromboembolic events in general occurs much more
247   14    frequently than we typically think of.
247   15    The death rate of these patients is as large
247   16    as -- as a matter of fact, it's twice as large as
247   17    fatalities from HIV/AIDS, from breast cancer, from
247   18    prostate cancer, and from traffic accidents all
247   19    together combined. So it's a very important medical
247   20    condition; however, it often goes underrecognized.
247   21    Q. During your discussion with plaintiffs'
247   22    counsel, you referred several times to guidelines for
247   23    treatment. Do you recall that?
247   24    A. I do recall that, yes.

Re: [247:11-247:24] /
Pltf Obj Compound /
Foundation lacking /
Improper expert opinion
/ 401-403 - [247:5-20] -
Witness postulates ["I
think..."] as to the
prevalence of thrombotic
events against HIV/AIDs,
breast cancers, and even
traffic accidents--all
combined. Such
testimony is offered
without foundation and,
as such, is not helpful to
the jury and extremely
prejudicial to the
Plaintiffs' case.

Pending

**249:16 - 250:12** Misselwitz, Frank 2016-11-09    1:17

249   16    Q. And the guidelines that you refer to give
249   17    recommendations for, as you said, the length of
249   18    therapy and the type of therapy depending on the
249   19    nature of the thrombosis and the conditions, the
249   20    various conditions you described.
249   21    A. Indeed, yes.
249   22    Q. Did you consider these guidelines in your
249   23    work in implementing and designing the EINSTEIN
249   24    clinical trial program?
249   25    A. Absolutely. We -- we fully considered these
250    1    guidelines, and one of the visible precipitation of
250    2    that consideration is the fact that we allowed the
250    3    EINSTEIN program to include patients with different
250    4    treatment durations to reflect exactly that
250    5    guideline. So we allowed patients to be treated
250    6    three months, six months, or 12 months in the
250    7    program.
250    8    Q. Now, when you were working on the Xarelto
250    9    EINSTEIN program and VTE treatment program, what was

07/20/17 14:02

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

250:14 – 251:19 | 2:04 | | | Pending

250 10 | it that you were trying to accomplish with respect to
250 11 | the medical needs of the scientific and medical
250 12 | community?  What were you trying to solve?

250:14 –   251:19  Misselwitz, Frank 2016-11-09

250 14 | A.  I think it is important to understand that
250 15 | the management of patients presenting with deep vein
250 16 | thrombosis or pulmonary embolism is relatively
250 17 | complex.
250 18 | First, they go to the emergency room.
250 19 | Depending on the severity of their disease, they have
250 20 | a diagnostic workup.  They, where the standard of
250 21 | care is concerned, get parenteral treatment first;
250 22 | and that parenteral treatment then needs to be
250 23 | overlapped with very frequent monitoring visits with
250 24 | warfarin or a vitamin K antagonist, generally
250 25 | speaking, and then these warfarin-treated patients
251 1 | needs to be closely monitored.  Because of the
251 2 | frequent dose adaptations, patients require to be
251 3 | kept within the therapeutic range of an INR -- that
251 4 | is a readout of a lab test -- between 2 and 3.
251 5 | So it's complex.  It requires many follow-up
251 6 | visits, and it very often requires, during the time
251 7 | of the parenteral injectable treatment,
251 8 | hospitalization of the patient.
251 9 | And we felt very strongly that by providing
251 10 | an option of an oral fixed-dose tablet that doesn't
251 11 | require that frequent dose adaptation and monitoring
251 12 | and that would not require injectables in the
251 13 | beginning, that we can actually reduce the need for
251 14 | hospitalization, patients can be treated as
251 15 | outpatients, which is always greatly appreciated by
251 16 | patients; and the long-term treatment is actually
251 17 | much easier to be accomplished with a pill.
251 18 | Q.  Is it fair to say that there are challenges
251 19 | with respect to the use of warfarin in VTE treatment?

Re: [250:14-251:19]
Pltf Obj Compound –
250:8-251:19.  Leading /
Foundation – 251:18-
252: 11 – witness applies
perceived struggles of
Warfarin use across an
entire patient population
who uses the compound,
which is a statement
without any predicate
and is generalized.

251:21 –   252:11  Misselwitz, Frank 2016-11-09 | 1:01

251 21 | A.  No.  I think it is fair to say that,
251 22 | particularly in the VTE treatment, there are
251 23 | challenges, because when you give warfarin over a
251 24 | long enough period in a chronic condition, people are
251 25 | better trained, they are -- sometimes are more stable
252 1 | on a certain dose; whereas, the big trouble putting a
252 2 | patient on warfarin is actually happening during the
252 3 | first months of treatment because the dose is very

| | Responses In | Objections In | Rulings |
|---|---|---|---|

| 252 | 4 | unstable, lab monitoring needs to happen very |
| 252 | 5 | frequently. |
| 252 | 6 | So I think the gain of a fixed, unmonitored |
| 252 | 7 | oral medication is particularly great in VTE |
| 252 | 8 | treatment. |
| 252 | 9 | Q. When Bayer engaged in the EINSTEIN program to |
| 252 | 10 | work on a new VTE treatment, what was the -- what was |
| 252 | 11 | the issue that Bayer was trying to solve? |

**252:13 – 252:18 Misselwitz, Frank 2016-11-09**   0:21

| 252 | 13 | A. I think the issue was to provide something |
| 252 | 14 | that is actually much easier to be used, much more |
| 252 | 15 | predictable in terms of pharmacokinetics and |
| 252 | 16 | pharmacodynamics, would not require frequent dose |
| 252 | 17 | adaptations according to lab measurements, and would |
| 252 | 18 | avoid the involvement of injectables. |

**254:3 – 256:9 Misselwitz, Frank 2016-11-09**   3:32

Objections In: Re: [254:3-256:9] Pltf Obj Improper narrative / nonresponsive - 254:3-256:7. Specifically, 255:12 to 256:7 is volunteered testimony without a question pending.

Rulings: *Pending*

| 254 | 3 | Could you just give us a sense what the Phase |
| 254 | 4 | II program is, in general terms, what it's designed to |
| 254 | 5 | do, versus what a Phase III program is? |
| 254 | 6 | A. Sure. The very first administration of a new |
| 254 | 7 | investigational drug to a human being is in the |
| 254 | 8 | Phase I. That's where, in healthy volunteers and |
| 254 | 9 | healthy subjects, typically pharmacokinetic, |
| 254 | 10 | pharmacodynamics parameters, are being explored. |
| 254 | 11 | The first administration to patients that |
| 254 | 12 | would also potentially derive benefit from these |
| 254 | 13 | medications happens in Phase II. And this is where |
| 254 | 14 | we would explore different doses, dosing regimens, to |
| 254 | 15 | find out what is the optimal dose and to further |
| 254 | 16 | learn about the drug, how it behaves, how would it be |
| 254 | 17 | helpful to patients, and how it would behave in |
| 254 | 18 | certain subpopulations. |
| 254 | 19 | The final stage of clinical development is |
| 254 | 20 | the Phase III. Phase III trials are larger trials |
| 254 | 21 | that are designed to secure the regulatory approval |
| 254 | 22 | of a drug. And these trials involve -- and they are |
| 254 | 23 | statistically powered to demonstrate a certain |
| 254 | 24 | benefit and a positive benefit/risk balance of the |
| 254 | 25 | drug in a certain population. |
| 255 | 1 | Q. You said Phase II studies are dose finding or |
| 255 | 2 | doze ranging studies to help select the appropriate |
| 255 | 3 | doses to take forward in Phase III; is that right? |
| 255 | 4 | A. That is correct, yeah. |
| 255 | 5 | Q. Are there unique considerations in selecting |

07/20/17 14:02

| | Objections In | Responses In | Rulings |
|---|---|---|---|

| Line | Testimony | Objections In | Rulings |
|---|---|---|---|
| 255  6 | appropriate doses even in the Phase II VTE program, | | |
| 255  7 | the context of those kinds of trials? | | |
| 255  8 | A.  Sure.  My remark around dose ranging trials | | |
| 255  9 | was a general remark.  Now, when we come back to the | | |
| 255 10 | specific indication of VTE treatment -- | | |
| 255 11 | Q.  Right. | | |
| 255 12 | A.  -- we have to keep in mind that there is | | |
| 255 13 | general knowledge of the use of anticoagulants in | | |
| 255 14 | that field to treat a clot, and this indication is | | |
| 255 15 | different from basically all other indications that | | |
| 255 16 | use -- that basically use the drug to prevent the | | |
| 255 17 | formation of a clot. | | |
| 255 18 | Here, we have an existing clot that is | | |
| 255 19 | active, that actually tends to grow further if it | | |
| 255 20 | goes untreated.  And for that reason, all -- | | |
| 255 21 | practically all anticoagulant drugs so far being used | | |
| 255 22 | in this indication are to be used in what we call a | | |
| 255 23 | therapeutic dose relative to a preventive dose. | | |
| 255 24 | And the therapeutic dose is typically, in | | |
| 255 25 | general, higher.  And as a matter of a rule, you can | | |
| 256  1 | say it's typically threefold higher than the | | |
| 256  2 | preventive dose. | | |
| 256  3 | Q.  Which -- | | |
| 256  4 | A.  That holds true regardless whether you | | |
| 256  5 | consider heparin or low molecular weight heparin or | | |
| 256  6 | Fondaparinux or ximelagatran, I mean, you name it, | | |
| 256  7 | there is literally no exception from that rule. | | |
| 256  8 | Q.  What's the concern about using too low of a | | |
| 256  9 | dose in a Phase II VTE trial? | | |
| 256:11 -  257:3 | | 1:15 | Pending |
| | Misselwitz, Frank 2016-11-09 | Re: [256:11-257:3] | |
| 256 11 | A.  We put patient safety first.  And, of course, | Pltf Obj Foundation | |
| 256 12 | patient safety is not just related to safety in the | lacking - 256:8-257:3. | |
| 256 13 | narrow sense.  I mean, I would, of course, want to | Questioner is asked | |
| 256 14 | prevent a patient being exposed to a risk of a | universally about "the | |
| 256 15 | pulmonary embolism, of recurrent thrombotic events, | concern" about using too | |
| 256 16 | due to a too low of a dose.  And so that basically | low of a dose in a Phase | |
| 256 17 | was a main reason why we decided the dose range in | II VTE trial and offers a | |
| 256 18 | our development program, Phase II program, to have | "general rule" about | |
| 256 19 | the middle dose of 30 milligram, because we | using three times larger | |
| 256 20 | established the 10 milligram as the effective and | treatment dose without | |
| 256 21 | safe dose in VTE prevention. | ever establishing a | |
| 256 22 | And following that general rule that the | foundation for this | |
| 256 23 | treatment dose is typically three times larger, we | testimony. | |
| 256 24 | selected the 30 milligram as the putative most likely | | |
| 256 25 | optimal dose in this setting, and then went one dose | | |

83

| | Objections In | Responses In | Rulings |
|---|---|---|---|

| | |
|---|---|
| 257 1 | step below, namely 20 milligram, and one dose step |
| 257 2 | above, namely 40 milligram, to explore a larger dose |
| 257 3 | range. |

258:20 - 258:23 Misselwitz, Frank 2016-11-09    0:14

| | |
|---|---|
| 258 20 | Q. So when you went to design phase -- the Phase |
| 258 21 | II study program for EINSTEIN for VTE treatment, how |
| 258 22 | did the findings from the prevention program inform |
| 258 23 | your choice of doses? |

258:25 - 261:3 Misselwitz, Frank 2016-11-09    3:29

| | |
|---|---|
| 258 25 | A. Well, I mean, first of all, you always want |
| 259 1 | to consider all the totality of data you have |
| 259 2 | generated so far in the clinical development program, |
| 259 3 | just generally speaking; safety profile, doses, |
| 259 4 | behavior, regimens, et cetera. |
| 259 5 | But you, of course, would rely -- if, say, in |
| 259 6 | our case, the preventive dose is 10, you would |
| 259 7 | anticipate, based on all that I've said, that the |
| 259 8 | treatment dose is around 30 milligram. |
| 259 9 | Q. What were the two studies that you looked at? |
| 259 10 | And we don't need to go into super micro detail, but |
| 259 11 | just remind the jury, what were the two primary or the |
| 259 12 | two Phase II studies that were the dose ranging |
| 259 13 | studies for the VTE program treatment that you used to |
| 259 14 | design your Phase III studies? |
| 259 15 | A. Right. I mean, we -- initially, as we did in |
| 259 16 | VTE prevention, as well, we initially started the |
| 259 17 | development program utilizing a BID regimen, a twice |
| 259 18 | a day regimen of Xarelto. And we studied a very wide |
| 259 19 | range of doses, starting from 10 milligram BID up to |
| 259 20 | 30 milligram BID. So that was a total daily dose of |
| 259 21 | 60 milligrams, so a wide range of doses. |
| 259 22 | And we elected to explore whether a once a |
| 259 23 | day dosing regimen would actually be effective and |
| 259 24 | safe in this indication. So we included a fourth |
| 259 25 | dose arm utilizing the dose of 40 milligram once a |
| 260 1 | day in that trial. |
| 260 2 | And then, of course, there was a comparator |
| 260 3 | drug, the standard of care, low molecular weight |
| 260 4 | heparin, warfarin. And as I said before, in order to |
| 260 5 | safeguard patients and to be on the safe side, not |
| 260 6 | risking an excess of pulmonary embolisms to occur, we |
| 260 7 | implemented early readout in the trial as soon as |
| 260 8 | three weeks of treatment with a second imaging |
| 260 9 | technique, ultrasound in this case, so that we can |

07/20/17 14:02

| | Objections In | Responses In | Rulings |
|---|---|---|---|

85

262:4 - 266:11  Misselwitz, Frank 2016-11-09

6:39

| Line | Text |
|---|---|
| 260 10 | measure whether the clot indeed disappears or not. |
| 260 11 | Q. And then -- go ahead. |
| 260 12 | A. And then the second trial was a trial that we |
| 260 13 | then initiated to come closer in terms of endpoints |
| 260 14 | to the Phase III. This is what you would typically |
| 260 15 | do in the setting of your Phase II program, that you |
| 260 16 | would run the later part of the Phase II program with |
| 260 17 | the outcomes -- you consider the relevant outcomes |
| 260 18 | for your Phase III. And here, we elected, then, to |
| 260 19 | test three once a day doses, namely 20, 30, and 40 |
| 260 20 | milligram. |
| 260 21 | Q. So the first was the ODIXa-DVT, or Study |
| 260 22 | 11223, where you looked at three BID dose and the one |
| 260 23 | OD dose? |
| 260 24 | A. Correct. |
| 260 25 | Q. And the second was the EINSTEIN DVT, or the |
| 261 1 | Study 11528, where you looked at the three OD doses? |
| 261 2 | A. Correct. And we utilized clinical recurrent |
| 261 3 | events as the outcome readout. |
| 262 4 | Q. Based on the totality of data that came out |
| 262 5 | of your Phase II program for VTE treatment, what doses |
| 262 6 | did you select to take forward into the Phase III |
| 262 7 | program? |
| 262 8 | A. We elected to be taking into the Phase III |
| 262 9 | program the maintenance dose for the chronic part of |
| 262 10 | the secondary prevention or treatment of 20 milligram |
| 262 11 | once a day; but based on a number of |
| 262 12 | considerations -- and I'm happy to explain them in |
| 262 13 | greater detail -- we felt it was very important to |
| 262 14 | have an intensified treatment regimen early in the |
| 262 15 | beginning to really melt down the clot and help this |
| 262 16 | thrombus mass to digress, to disappear, ideally. |
| 262 17 | Q. What dose was selected for that initial |
| 262 18 | intensified treatment phase to bring forward into |
| 262 19 | Phase III? |
| 262 20 | A. We finally decided to take forward 15 |
| 262 21 | milligram BID, twice a day. |
| 262 22 | Q. Now, there was a lot of discussion with |
| 262 23 | counsel for plaintiff about originally it looked like |
| 262 24 | 10 milligrams BID, and then -- but ultimately 15 |
| 262 25 | milligrams was taken forward. |
| 263 1 | Do you recall those discussions? |
| 263 2 | A. I certainly recall these discussions, yes. |
| 263 3 | Q. How did you go from 10 milligrams to 15 |

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

263 4    milligrams? How did that come about?

263 5    A. Well, I mean, I will come back to the

263 6    question how we bridged the dose, because 15

263 7    milligram BID wasn't a dose that was directly studied

263 8    in our dose finding program; but I will come back to

263 9    that.

263 10    But it was predominantly driven by something

263 11    that happened outside of Bayer and outside our

263 12    development program and was actually reflected upon

263 13    in intense discussions with our advisors, thought

263 14    leaders, and the steering committee of the EINSTEIN

263 15    program.

263 16    Q. And what was that? I know you mentioned to

263 17    Mr. Overholtz something about an advisory council

263 18    discussion. What are you talking about?

263 19    A. Yeah. We -- I'm talking about a number of

263 20    trials, and one in particular, that had been

263 21    published during the time we were discussing that.

263 22    And that was the Van Gogh PE trial, also run by

263 23    Professor Buller with a drug called Idraparinux, and

263 24    this drug was used in a way that it actually did not

263 25    cover enough the early critical treatment phase of PE

264 1    patients and led in the clinical program, in the

264 2    Van Gogh PE clinical trial to an excess of pulmonary

264 3    embolism and even to an excess of fatal pulmonary

264 4    embolisms.

264 5    And our advisors were extremely concerned

264 6    about that, as they actually were involved in a trial

264 7    that was resulting to harm to patients. And they

264 8    simply said, no, we -- I mean, we have to avoid that

264 9    happening again. And we have to safeguard patients

264 10    to not actually let them run in a -- in a situation

264 11    that we would have, again, an excess of pulmonary

264 12    embolisms.

264 13    And that actually led them to recommend very

264 14    strongly to us that we should carefully analyze all

264 15    the data and consider whether an even higher dose

264 16    compared to the -- to the studied dose of 10

264 17    milligram BID would be -- would be appropriate.

264 18    So we bridged -- now I'm coming back to --

264 19    Q. Yeah. Let's talk about bridge for second.

264 20    The jury doesn't need, like, the technical -- you

264 21    know, they don't need to be in the lab. But just at a

264 22    high level, what is bridging; and what does that mean?

264 23    A. Well, that is actually quite a standard

264 24    procedure. You study a dose range from the lowest to

| | Objections In | Responses In | Rulings |
|---|---|---|---|

264 25  the highest dose in your dose ranging Phase II
265 1  trials. And as long as you have -- as long as you
265 2  can describe the relationship of outcomes and safety
265 3  aspects within that continuum of doses, you can
265 4  actually quite nicely predict what would happen in
265 5  between of two doses you have studies. And that is
265 6  exactly what we have done.
265 7  Q.  One of the things you were asked about --
265 8  well, you were asked about it in two different ways.
265 9  I'll break it into two parts, which is: When
265 10  you went from Phase II to Phase III, did you recommend
265 11  any lower dose or dose adjustment for patients that
265 12  were -- had renal impairment, you know, kidney
265 13  dysfunction, similar to the recommendation that there
265 14  was a 15 milligram dose for renally impaired SPAF
265 15  patients.
265 16  Do you recall that?
265 17  A.  I do recall that. And we decided after very
265 18  intense discussions and good discussions and we
265 19  decided for good reason to not do that, and the main
265 20  reason being that unlike in the stroke prevention
265 21  setting, where we decided to dose down to a lower
265 22  dose, here, we have a setting of an active clot.
265 23  And we do know that patients with renal
265 24  impairment, while having a higher tendency to bleed,
265 25  they also have a much higher tendency to develop
266 1  thrombotic events. And we knew from other drugs,
266 2  such as low molecular weight heparins, that patients,
266 3  even without dose adaptation, would benefit from that
266 4  full blown dose because of the -- even sometimes
266 5  improved benefit/risk ratio in renal impairment.
266 6  And so we decided against dose adaptation,
266 7  and the data actually fully justified that because
266 8  the data generated in the EINSTEIN programs show
266 9  that, yes, thrombosis rate goes up, yes, bleeding
266 10  goes up. But the net benefit is hugely better than
266 11  standard of care.

267:1 - 269:12 Misselwitz, Frank 2016-11-09        3:33
267 1  Q.  One of the other questions you were asked
267 2  is -- was a discussion about the choice between using
267 3  rivaroxaban BID as the intensified initial treatment
267 4  phase, as opposed to low molecular weight heparin,
267 5  which was, at the time, the standard of care, and an
267 6  implication that there was a decision to go with
267 7  rivaroxaban for commercial reasons.

87

07/20/17 14:02

Rulings

Responses In

Objections
In

88

267  8    Do you -- do you recall those discussions?
267  9    A.  I recall the discussions, yeah.
267 10    Q.  Did you choose the rivaroxaban regimen for
267 11    commercial reasons, to make money?
267 12    A.  Not at all.  And, I mean, first of all, it's
267 13    very clear that the initial couple of days we are
267 14    talking about have actually very little commercial
267 15    impact on the six months, or whatever, 12 months
267 16    treatment duration in total.
267 17         But the main and much more important argument
267 18    is that working with only one drug from the
267 19    beginning, and that drug being an oral tablet that is
267 20    easy to administer, allows patients to be treated at
267 21    home without the need for hospitalizations, if
267 22    otherwise their condition would allow.
267 23         And that is very important.  That's a great
267 24    benefit because many patients who are treated with a
267 25    low molecular weight heparin are -- need to be
268  1    hospitalized and approximately 30 to 40 percent are
268  2    being hospitalized, which is not necessary with the
268  3    single drug approach as studied in the EINSTEIN
268  4    program.
268  5    Q.  I want to turn now to the Phase III program.
268  6    Okay?
268  7    A.  Uh-huh.
268  8    Q.  You were asked an awful lot of questions
268  9    about the design of the studies, but just remind us
268 10    briefly.  What were the three primary trials that were
268 11    run to support the applications around the world for
268 12    the VTE treatment indications?
268 13    A.  And this family of EINSTEIN trials, if you
268 14    wish, consisted of a deep vein thrombosis treatment
268 15    trial, the EINSTEIN DVT trial, a second trial called
268 16    the EINSTEIN PE trial, addressing patients with
268 17    pulmonary embolism.
268 18         Both of these trials were run under one
268 19    umbrella protocol, but having been separately powered
268 20    for separate statistical tests and with a
268 21    prespecified metaanalysis of the two trials together.
268 22    So this require -- this fulfills the requirement that
268 23    regulators told us we must fulfil to have two
268 24    confirmatory Phase III trials that would confirm each
268 25    other.
269  1         And then the third trial we elected to
269  2    perform was the EINSTEIN extension trial.  And that
269  3    is a trial in a different population, namely in a

| | Objections In | Responses In | Rulings |
|---|---|---|---|

269  4       population of patients who completed their initial
269  5       treatment and whether -- and where there was the
269  6       equipoise whether or not these patients should or
269  7       could benefit from an extended treatment duration.
269  8       And for that reason, the trial was a placebo
269  9       controlled trial.
269  10      Q.  The EINSTEIN DVT and EINSTEIN PE studies were
269  11      of a non-inferiority design, correct?
269  12      A.  That is correct.

269:20 -   269:23 Misselwitz, Frank 2016-11-09       0:11
269  20      Why don't we just -- let me ask you:  What is
269  21      a non-inferiority design in this context, and why did
269  22      you choose non-inferiority design in the EINSTEIN DVT
269  23      and EINSTEIN PE studies?

269:25 -   270:20 Misselwitz, Frank 2016-11-09       1:24
269  25      A.  I think it is important to understand that
270  1       warfarin or vitamin K antagonist is very effective.
270  2       It's -- when used according to guidelines and label,
270  3       et cetera, and then appropriate monitoring and
270  4       appropriate dose adapted, it's a very, very effective
270  5       drug that has the ability to reduce thrombotic events
270  6       by two-thirds relative to placebo.  This is historic
270  7       data, back in the time where people still were able
270  8       to run placebo controlled trials versus warfarin, so
270  9       two-thirds relative risk reduction versus placebo.
270  10     This is a high level of efficacy that
270  11     basically is very hard to beat, and it's not
270  12     necessary to beat because of all the other advantages
270  13     an oral, fixed, unmonitored drug may have.
270  14     Hence, what you typically do -- and this is
270  15     what we've also done in other programs, in the ROCKET
270  16     AF trial, as well as in the RECORD program, we
270  17     designed the trial the way that you would first test
270  18     for non-inferiority; and after having achieved that
270  19     test, you would, statistically speaking, be allowed
270  20     to proceed into a superiority test.

274:25 -   275:3 Misselwitz, Frank 2016-11-09       0:14
274  25     Q.  Dr. Misselwitz, did you apply -- "you" being
275  1       Bayer and Janssen -- for approval of the VTE treatment
275  2       indications in the United States with the FDA?
275  3       A.  That is correct.

275:19 -   275:24 Misselwitz, Frank 2016-11-09       0:24

07/20/17 14:02

| | | | Responses In | Objections In | Rulings |
|---|---|---|---|---|---|



275  19    Q.  What is Exhibit 32?
275  20    A.  This is the final approval action regarding
275  21    the supplemental new drug application of May 1 and
275  22    28th of 2012 granted from the FDA, Food and Drug
275  23    Administration, with regard to the indication of VTE
275  24    treatment.

275:25 - 276:3   Misselwitz, Frank 2016-11-09
275  25    Q.  And was this approval based on the Phase III
276   1    EINSTEIN PE, EINSTEIN DVT, and EINSTEIN extension
276   2    studies which we've been discussing?
276   3    A.  That is correct.

**0:10**

276:6 - 276:6   Misselwitz, Frank 2016-11-09
276   6    Q.  What studies was the FDA approval based upon?

**0:03**

Re: [276:6-276:6]
Pltf Obj Foundation

276:9 - 276:12  Misselwitz, Frank 2016-11-09
276   9    A.  This approval of the F&DA was based upon the
276  10    Phase III trials, EINSTEIN DVT, EINSTEIN PE, and
276  11    EINSTEIN extension, and, of course, with supplemental
276  12    consideration for the Phase II program.

**0:20**  lacking / improper expert
opinion - 276:6-276:12.
Witness is not disclosed
as a regulatory expert
nor has the foundation
for an opinion been laid
that incorporates a
comprehensive view of
the FDA's considerations
when approving the
indication.

**Pending**

279:14 - 280:12  Misselwitz, Frank 2016-11-09
279  14    Q.  And are you familiar with the XALIA study?
279  15    A.  I am familiar with the XALIA study.
279  16    Q.  Okay.  Well, briefly, because we're running
279  17    short on time, but what is -- what is the XALIA study?
279  18    A.  XALIA is a noninterventional study, a Phase
279  19    IV noninterventional study, that was done basically
279  20    upon request of the EMA, because it is a
279  21    postmarketing safety study that was requested by EMA.
279  22    And we performed that trial in the indication
279  23    of VTE treatment as a multicenter, international
279  24    prospective, but observational trial, in two cohorts,
279  25    namely standard of care and rivaroxaban cohorts.
280   1    And it is important to understand that there
280   2    was no randomization involved; and we basically
280   3    observed patients as they treated, which is very

**1:31**

Re: [279:14-280:12]
Pltf Obj Foundation
lacking / hearsay - 280:7-
12. Foundation not laid
for witness' testimony on
his thoughts on what the
XALIA study concluded.

**Pending**

07/20/17 14:02

| | Rulings | Responses In | Objections In |
|---|---|---|---|

| | | |
|---|---|---|
| 280 4 | | important to understand how the safety profile of a |
| 280 5 | | newly approved drug would look like under real-life |
| 280 6 | | conditions. |
| 280 7 | | Q. And what is the conclusion based on the XALIA |
| 280 8 | | study with respect to use of rivaroxaban in VTE |
| 280 9 | | treatment under real-life conditions? |
| 280 10 | | A. I think the XALIA trial resulted in an |
| 280 11 | | outcome to reconfirm the favorable benefit/risk of |
| 280 12 | | rivaroxaban in this particular indication. |

283:13 -    284:14 Misselwitz, Frank 2016-11-09        1:18

| | |
|---|---|
| 283 13 | Q. Okay. You recall there being some |
| 283 14 | discussions, both when I was questioning you and then |
| 283 15 | when counsel for Bayer was questioning you, regarding |
| 283 16 | the use of rivaroxaban twice daily during that |
| 283 17 | intensive treatment regimen period? |
| 283 18 | A. Uh-huh. |
| 283 19 | Q. Okay. And we talked about the fact that |
| 283 20 | there was this option of potentially, as opposed to |
| 283 21 | using rivaroxaban, using low molecular weight heparin |
| 283 22 | during that time period? |
| 283 23 | A. Sure. |
| 283 24 | Q. Okay. Either for a five- to seven-day period |
| 283 25 | or maybe even longer, correct? |
| 284 1 | A. Correct. |
| 284 2 | Q. Now, during this period, the idea is, because |
| 284 3 | an active thrombus has been discovered in the patient, |
| 284 4 | that you want to have an intensified treatment, |
| 284 5 | correct? |
| 284 6 | A. That is correct. |
| 284 7 | Q. Okay. And with intensified treatment, |
| 284 8 | though, with an anticoagulant, whether it's low |
| 284 9 | molecular weight heparin or whether it's one of the |
| 284 10 | new oral anticoagulants like Xarelto, that's going to |
| 284 11 | come with an increased risk of bleeding, correct? |
| 284 12 | A. Theoretically, it needs to be proven |
| 284 13 | depending on the dose and the duration of that |
| 284 14 | intensified treatment, based on clinical data. |

284:15 -    284:24 Misselwitz, Frank 2016-11-09        0:27

| | |
|---|---|
| 284 15 | Q. But I think you told counsel for Bayer that |
| 284 16 | during that period, because of this active clot, and |
| 284 17 | you're at this initial period, and because of |
| 284 18 | experience maybe in some other clinical trials, it's |
| 284 19 | very important that that treatment is intensive enough |
| 284 20 | to protect the patient, right? |

07/20/17 14:02

| | | | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|

| | | 0:19 | | |
|---|---|---|---|---|
| 284 21 | | A. Indeed, to protect the patient to not allow | | |
| 284 22 | | the clot to progress into a lung embolism. | | |
| 284 23 | | Q. Even with an increased risk of bleeding | | |
| 284 24 | | during that time period? | | |

285:1 - 285:6   Misselwitz, Frank 2016-11-09
285  1   A. For me, it's always important, as a medical
285  2   doctor who has long enough treated these patients in
285  3   clinical practice, making sure that there is an
285  4   appropriate benefit/risk balance. So you need to
285  5   make sure that you have efficacy at an acceptable
285  6   safety profile.

285:7 - 285:10   Misselwitz, Frank 2016-11-09   0:17
285  7   Q. Okay. And so one of the tenets of the
285  8   development for Xarelto for VTE treatment was the
285  9   ability to market the drug as a fixed, unmonitored
285 10   dose. That's been your testimony, correct?

285:12 - 285:24   Misselwitz, Frank 2016-11-09   0:38
285 12   A. That was early on, so to say, the vision of
285 13   how we wanted to develop that drug to basically help
285 14   patients.
285 15   Q. Okay. The drug was developed to be given as
285 16   a fixed, unmonitored dose?
285 17   A. Indeed.
285 18   Q. Okay. But during this time of intense
285 19   treatment, when the active clot is present in VTE,
285 20   isn't that the time when the ability to monitor a
285 21   patient's levels of the drug and their bleeding risk,
285 22   which we know is increased during this time period, is
285 23   even more important than during the chronic dosing
285 24   period?

286:1 - 286:2   Misselwitz, Frank 2016-11-09   0:06
286  1   A. I would not agree to that notion because we
286  2   don't have any clinical data confirming that.

286:3 - 286:11   Misselwitz, Frank 2016-11-09   0:42
286  3   Q. And isn't it true that low molecular weight
286  4   heparin during such a period could be dose adapted and
286  5   the dose changed depending on the blood levels in the
286  6   patient's body, correct, and their PT/INR measurements?
286  7   A. No, I respectfully disagree. The dose of low
286  8   molecular weight heparin being used in this
286  9   indication is a body weight adjusted dose that's been

92

07/20/17 14:02

| Lines | Testimony | | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|
| 286 10<br>286 11 | given as a fixed dose and is not typically routinely dose adapted according to plasma levels. | | | | |
| 286:12 - 287:3 | Misselwitz, Frank 2016-11-09 | 0:56 | | | |
| 286 12 | Q. Okay. And once the patient transitions to | | | | |
| 286 13 | warfarin, their dose can be adapted based on PT/INR | | | | |
| 286 14 | levels; is that right? | | | | |
| 286 15 | A. That is correct. | | | | |
| 286 16 | Q. Okay. And did Bayer give any consideration, | | | | |
| 286 17 | during this intensive treatment period, of | | | | |
| 286 18 | recommending to doctors that some type of test be | | | | |
| 286 19 | given to make sure that a patient's PT is not too | | | | |
| 286 20 | elevated during this intensive treatment period? | | | | |
| 286 21 | MR. HOROWITZ: Objection; form, foundation. | | | | |
| 286 22 | A. We conducted the entire development program | | | | |
| 286 23 | in a way that we explored whether a fixed, | | | | |
| 286 24 | unmonitored dose would be safe and efficacious. And | | | | |
| 286 25 | we generated data that upped to doses of 60 milligram | | | | |
| 287 1 | total daily dose, which is double the dose we are | | | | |
| 287 2 | using in the intensified treatment. The safety | | | | |
| 287 3 | profile was very acceptable. | | | | |
| 287:4 - 287:10 | Misselwitz, Frank 2016-11-09 | 0:24 | Re: [287:4-287:10] Def Obj 401/403. There is no evidence that a reversal agent would have affected Plaintiff's outcome in any way. And no one will offer | Re: [287:4-287:10] Pltf Resp Testimony relating to the lack of a Xarelto reversal agent has been come up in both Boudreaux and Orr | Pending |
| 287 4 | Q. During this time of intensive treatment, | | | | |
| 287 5 | where a higher bleeding risk may be present for a | | | | |
| 287 6 | patient because of the higher doses being given, isn't | | | | |
| 287 7 | that also a time when it would be even more important | | | | |
| 287 8 | that an antidote be available for doctors in case a | | | | |
| 287 9 | patient's levels are too high or they experience a | | | | |
| 287 10 | bleeding event? | | | | |

07/20/17 14:02

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| | such an opinion at trial. The whole topic of reversal agent is therefore irrelevant to Plaintiff's claims and will serve only to inflame the jury and prejudice Defendants. | trials and is just as relevant in the Mingo case, both in the context of Xarelto's safety and the possibility of mitigating her bleeding, especially where VTE-T patients are given the highest Xarelto dose available - 15 mg. BID. | |

287:16 -  287:22 Misselwitz, Frank 2016-11-09

287 16   A. Well, it's a theoretical consideration. As a
287 17   matter of fact, antidotes are not being used
287 18   frequently also for standard of care, in particular,
287 19   low molecular weight heparin. And we have identified
287 20   extremely few patients who theoretically would
287 21   have -- or where the treating physician would have
287 22   used an antidote.

0:34

| Objections In | Responses In | Rulings |
|---|---|---|
| Re: [287:16-287:22] Def Obj 401/403. There is no evidence that a reversal agent would have affected Plaintiff's outcome in any way. And no one will offer such an opinion at trial. The whole topic of reversal agent is therefore irrelevant to Plaintiff's claims and will serve only to inflame the jury and prejudice Defendants. | Re: [287:16-287:22] Pltf Resp Testimony relating to the lack of a Xarelto reversal agent has become come up in both Boudreaux and Orr trials and is just as relevant in the Mingo case, both in the context of Xarelto's safety and the possibility of mitigating her bleeding, especially where VTE-T patients are given the highest Xarelto dose available - 15 mg. BID. | Pending |