07/28/17 16:09

Imingo v bayer video tmax db

Deposition Designations for Homering M 20160621, Homering M 20160622, Homering M 20160623

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**Def Obj** Introduction and Standing Objection to Plaintiffs' Designations and Plaintiffs' Counters to Defendants' Counters: The testimony designated from this deposition, which was conducted in German and runs several hours, largely focuses on studies and indications relating to the clinical trials and associated documents for Record and Rocket rather than Einstein, the latter of which is relevant in Mingo. When the FDA examined EINSTEIN in approving VTE-T, it was the conduct and dose studied in EINSTEIN that was relevant, not that of either RECORD or ROCKET. Plaintiffs fail to distinguish between the clinical trials and associated issues in the affirmative designations brought here. If such testimony is played, Defendants will have no choice but to introduce evidence with respect to both RECORD and ROCKET. Such risks confusing the jury and wasting the jury's time on issues that are not germane to Ms. Mingo's case.

Pending

1

---

5:22   -   6:21     Homering, Martin 2016-06-21     2:23
5   22
5   23        Q. Mr. Homering, my name is Neil Overholtz. I
5   24     represent the plaintiffs in the Xarelto litigation in
5   25     the United States, okay?
6   1        A. Yeah.
6   2        Q. Why don't you state your full name, for the
6   3     record.
6   4        A. Martin Hans Homering.
6   5        Q. Okay. And, Mr. Homering, you currently work
6   5     for Bayer?
6   6        A. Yes.
6   7        Q. And what is your current position with Bayer?
6   8        A. I work as a biometrician in the department for
6   9     integrated analysis with Bayer Healthcare, in the City
6   10    of Wuppertal, in the Clinical Division -- Development,
6   11    excuse me.
6   12       Q. And when you say "biometrician," does your job
6   13    involve statistics and being a statistician?
6   14       A. Yes, in principle.
6   15       Q. Now, in your job as a statistician and working
6   16    in integrated analysis, you've worked on the Xarelto
6   17    project, correct?
6   18       A. That is correct.
6   19       Q. Okay. And do you recall when you first started
6   20    working on Xarelto?
6   21       A. Yes.

7:7   -   7:18     Homering, Martin 2016-06-21     1:49
7    7
7    8        Q. Okay. And is it fair to say that Xarelto has
             been a significant part of your work?



| | | | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|

7  9   A. Yes, I would agree to that.
7 10   Q. Okay. What would you describe as being your
7 11   primary role or job on the Xarelto project?
7 12   A. As an employee of the department of integrated
7 13   analysis, the main role consisted of inputting finalized
7 14   studies of Phase II and III trials into a database, and
7 15   then answering requests from the clinical or safety side
7 16   in analyses of those data.
7 17   (Homering Exhibit No. 1 was marked for
7 18   identification.)

**8:6 - 8:13**   **0:55**

8  6   Homering, Martin 2016-06-21
8  7   Q. Okay. So what I'm showing you is Homering 1,
8  8   Record No. 2724327, and it's a PowerPoint from June of
8  8   2009, labeled Xarelto Experiences. Do you see that?
8  9   A. Yes.
8 10   Q. Okay. And it looks like there was a Global
8 11   Biostatistics Meeting in Cologne on June 24th, 2009. Do
8 12   you recall that meeting?
8 13   A. Vaguely, vaguely.

**9:14 - 9:19**   **0:50**

9 14   Homering, Martin 2016-06-21
9 15   Q. Did you provide statistical support for the
9 15   Einstein study?
9 16   A. I believe I forgot to mention that we also did
9 17   analyses for the Phase II treatment of the RECORD
9 18   trials; but they weren't called RECORD, they had a
9 19   different name. RECORD is Phase III.

**10:25 - 11:9**   **1:11**

10 25  Homering, Martin 2016-06-21
11  1   Q. Okay. Now, one of the things you said you
11  2   worked on was the VTE-prevention studies, the Phase II
11  3   and then the Phase III RECORD studies. If you can look
11  3   with me over at Page 24.
11  4   THE WITNESS: Yeah.
11  5   Q. Okay. So you can see that for RECORD 1
11  6   through 3 there are study statisticians listed, and then
11  7   you're listed at the bottom under integrated analysis.
11  8   Do you see that?
11  9   A. Yes, I see that.

**12:19 - 13:10**   **2:12**

### Objections In

Re: [10:25-11:9]
Def Obj 403/Relevance: This line of questioning pertains to VTE-prevention and to the RECORD studies, which were the clinical trials done to support the VTE-prevention indication. This case, however, involves the use of Xarelto to treat DVT, which was based on EINSTEIN. This important distinction is not made clear at all in the designations, and there is a real danger of jury confusion and prejudice – the designations leave the impression that these are issues from studies related to the indication for which this plaintiff used Xarelto, and that is simply not true. Further, to the extent RECORD4 is at all implicated, it is wholly irrelevant because it was never used as a basis for any indication or approval at all.

### Responses In

Re: [10:25-11:9]
Pltf Resp: It is an oversimplification to say that one indication was based on one study. In fact, data from all of the RECORD studies were the basis of supporting all of the indications to some extent, and certainly, were used to inform the defendants' understanding of the safety and efficacy profiles of Xarelto. The jury must be trusted to distinguish the studies from one another. Additionally, the RECORD studies are relevant for a host of other reasons, including the defendants' notice of critical safety issues of Xarelto, as well as flaws in the RECORD studies which call the safety of the drug into question. For this reason and others, this testimony is relevant and there is no significant risk of confusion that outweighs the probative value of this evidence.

### Rulings

Pending

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|



| | | | | |
|---|---|---|---|---|
| 12 19 | Q. The first bullet point says, "Integrated | **Re: [12:19-13:10]** | **Re: [12:19-13:10]** | Pending |
| 12 20 | Phase II and III Analyses for VTE-Prevention." That was | **Def Obj** 403/Relevance. See objection to 10:25 - 11:9 | Pltf Resp It is an oversimplification to say that one indication | |
| 12 21 | something that you worked on? | regarding RECORD and VTE-prevention. | was based on one study. In fact, data from all of the RECORD | |
| 12 22 | A. In the sense of separate analyses, Phase II and | | studies were the basis of supporting all of the indications to | |
| 12 23 | III, not together, I cannot remember of an analysis of | | some extent, and certainly, were used to inform the | |
| 12 24 | both phases together. But that in principle is correct, | | defendants' understanding of the safety and efficacy profiles of | |
| 12 25 | yes. | | Xarelto. The jury must be trusted to distinguish the studies | |
| 13 1 | Q. You did some Phase II analyses. | | from one another. Additionally, the RECORD studies are | |
| 13 2 | THE WITNESS: Yeah, yeah. | | relevant for a host of other reasons, including the defendants' | |
| 13 3 | Q. And Phase III analyses, correct? | | notice of critical safety issues of Xarelto, as well as flaws in the | |
| 13 4 | A. Yes. | | RECORD studies which call the safety of the drug into question. | |
| 13 5 | Q. Okay. It says, "Work related to FDA Advisory | | For this reason and others, this testimony is relevant and there | |
| 13 6 | Committee meeting." Were you part of the team to get | | is no significant risk of confusion that outweighs the probative | |
| 13 7 | ready for the FDA advisory committee meeting for the | | value of this evidence. | |
| 13 8 | VTE-prevention indication? | | | |
| 13 9 | A. Yes, I have to have a look. This refers to the | | | |
| 13 10 | FDA ad co meeting, ad com meeting, in 2009, yes. | | | |
| | | | | |
| 13:14 - 14:13 | | | | |
| 13 14 | Q. Okay. Now, we've talked about pooled analyses | **Re: [13:14-14:13]** | **Re: [13:14-14:13]** | Pending |
| 13 15 | a little bit. Let's look at the next slide, which is | **Def Obj** 403/Relevance with respect to 13:14 - 13:16 | Pltf Resp It is an oversimplification to say that one indication | |
| 13 16 | Page 32. And it says, "VTE-Prevention Pooled Analyses." | and 14:23 - 14:13 that concern RECORD. See objection | was based on one study. In fact, data from all of the RECORD | |
| 13 17 | What does "pooled analyses" mean when we're | to 10:25 - 11:9 regarding RECORD and VTE- | studies were the basis of supporting all of the indications to | |
| 13 18 | taking about a drug, clinical studies? | prevention. | some extent, and certainly, were used to inform the | |
| 13 19 | A. Pooled analysis in general means an analysis on | | defendants' understanding of the safety and efficacy profiles of | |
| 13 20 | the basis of individual data for patients from more than | | Xarelto. The jury must be trusted to distinguish the studies | |
| 13 21 | one study. And I would like to say that again, in a | | from one another. Additionally, the RECORD studies are | |
| 13 22 | different wording, just to make it very clear. | | relevant for a host of other reasons, including the defendants' | |
| 13 23 | This is a study overarching, a sort of -- well, | | notice of critical safety issues of Xarelto, as well as flaws in the | |
| 13 24 | the witness is indicating the word "overlapping" to talk | | RECORD studies which call the safety of the drug into question. | |
| 13 25 | about these analyses where individual data of patients | | For this reason and others, this testimony is relevant and there | |
| 14 1 | from a number of studies are considered. | | is no significant risk of confusion that outweighs the probative | |
| 14 2 | THE INTERPRETER: Interpreter change. | | value of this evidence. | |
| 14 3 | Q. And for the VTE-prevention indication you | | | |
| 14 4 | actually conducted pooled analyses of the RECORD | | | |
| 14 5 | studies; is that correct? | | | |
| 14 6 | A. Let me say at this point that I did not do all | | | |
| 14 7 | these studies alone. We see a team of statisticians and | | | |
| 14 8 | programmers, and I didn't mean that I was doing all the | | | |
| 14 9 | analyses, but we did this together, in a team. | | | |
| 14 10 | Q. And by "did this together," you mean conducted | | | |
| 14 11 | pooled analysis of the RECORD studies. | | | |
| 14 12 | A. Yes, different people in our departments dealt | | | |
| 14 13 | with different topics. | | | |

3:54

07/28/17 16:09

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**15:1 – 15:24**

15:1  Q.  So you do recall doing analysis for PT and its
15:2      association with bleeding events in Xarelto patients in
15:3      the RECORD studies.
15:4  A.  There should be a technical report on this.
15:5  Q.  And were you -- were you involved personally in
15:6      the preparation of those technical reports?
15:7  A.  I do recall having read them, but I do not
15:8      remember whether I was rather the co-author or the
15:9      author, but I was definitely involved in these reports.
15:10 Q.  Okay. The analysis that would look at the
15:11     association between PT and bleeding events, do you
15:12     recall who at Bayer requested that that analysis be
15:13     done?
15:14 A.  Probably these were the colleagues from
15:15     Clinical Development Pharmacology and Clinical, but I
15:16     cannot recall exactly who was in the lead coming up with
15:17     this request.
15:18 Q.  What about for VTE-treatment, the Einstein
15:19     Phase III study and the ODIXa DVT treatment study. Did
15:20     you ever do analysis of the association of PT in those
15:21     studies with bleeding events?
15:22 A.  For the treatment indication another colleague
15:23     in our department was responsible, but I do recall that
15:24     there were technical reports.

3:40

**Re: [15:1-15:24]**
Def Obj 403/Relevance with respect to 15:1 - 15:17
that concern RECORD. See objection to 10:25 - 11:9
regarding RECORD and VTE-prevention.

27G24S38

**Re: [15:1-15:24]**
Pltf Resp It is an oversimplification to say that one indication
was based on one study. In fact, data from all of the RECORD
studies were the basis of supporting all of the indications to
some extent, and certainly, were used to inform the
defendants' understanding of the safety and efficacy profiles of
Xarelto. The jury must be trusted to distinguish the studies
from one another. Additionally, the RECORD studies are
relevant for a host of other reasons, including the defendants'
notice of critical safety issues of Xarelto, as well as flaws in the
RECORD studies which call the safety of the drug into question.
For this reason and others, this testimony is relevant and there
is no significant risk of confusion that outweighs the probative
value of this evidence.

Pending



**16:14 – 16:16**

16:14 Q.  You knew that the FDA did an analysis looking
16:15     at PT and bleeding events for Rocket.
16:16 A.  I heard about that, yes.

0:23

**Re: [16:14-16:16]**
Def Obj 403/Relevance. This line of questioning
pertains to ROCKET which was the clinical trial that
supported approval for treatment of atrial fibrillation.

**Re: [16:14-16:16]**
Pltf Resp It is an oversimplification to say that one indication
was based on one study. In fact, data from many studies,
including ROCKET were the basis of supporting all of the
indications to some extent, and certainly, were used to inform
the defendants' understanding of the safety and efficacy
profiles of Xarelto. The jury must be trusted to distinguish the
studies from one another. Additionally, ROCKET is relevant for
a host of other reasons, including the defendants' notice of
critical safety issues of Xarelto, as well as flaws in the RECORD
studies which call the safety of the drug into question. This
evidence is relevant to Plaintiff's failure to warn claim. It
establishes that Defendants knew they might not have the
safest dose for patients with Afib which made it even more
important to instruct physicians about the advisability of
measuring and the ability to measure, the anticoagulant effect
of Xarelto using Neoplastin PT and or to include in the design of
Xarelto an anti-Factor Xa assay and reversal agent. For this
reason and others, this testimony is relevant and there is no
significant risk of confusion that outweighs the probative value
of this evidence.

Pending

**18:13 – 18:17**

18:13     (Homering Exhibit No. 2 was marked for
18:14     identification.)
18:15 Q.  Let me show you what we'll mark as Homering
18:16     Exhibit 2, Record No. 3859854, Bates Xarelto_BPAG_
18:17     27624538

1:10

**Re: [18:13-18:17]**
Def Obj 403/Relevance. The indication at issue here is VTE-treatment, which
was supported by the EINSTEIN studies. What the FDA
analyzed with respect to PT and bleeding events is not
relevant to the issues in this case and only serves to
confuse the jury, who may mistakenly think the FDA
conducted a PT and bleeding analysis relevant to this
case.

**18:22 – 19:11**

18:22 Q.  The title of the slide set is called,
18:23     "Statistical Aspects of Clinical Trial
18:24     Adverse Event Data." Do you see that?
18:25 A.  Yes, I do.
19:1  Q.  Okay. And was that one of the roles of your
19:2      department was performing statistical analysis of
19:3      adverse events from clinical trials?
19:4  A.  This is definitely one aspect of pooled
19:5      analyses.

1:53

4

07/28/17 16:09

| Objections In | Responses In | Rulings |
|---|---|---|

---

**19:6**
Q. Okay. And do you recall this meeting in
November of 2009 in Berlin? And you're listed there as
one of the authors of this PowerPoint, correct?
A. Yes, I do see myself as one of the authors
here; but I do not recall this meeting in Berlin and I
cannot recall having presented something there.  **0:03**

**19:12 - 19:13**   Homering, Martin 2015-06-21
Q. Okay.
A. Or even preparing some of the slides.

**19:16 - 20:1**   Homering, Martin 2015-06-21   **1:01**
And if you'll look with me in the bottom-left
corner it says, "Criteria for Inclusion, CCDS workshop,
November, 2009." Do you see that?
A. Yes, I see that.
Q. Okay. And CCDS. What is CCDS?
A. I cannot tell you what type of a workshop it
was.
Q. Okay. Well, are you familiar with the company
core data sheet?
THE INTERPRETER: Company core data sheet.
A. Yes, I have heard this term, yes.

**20:2 - 20:6**   Homering, Martin 2015-06-21   **0:35**
Q. Okay. And what is your understanding of what
the company core data sheet is?
A. In my opinion this is a regulatory document,
and we've got a specialist department maintaining this
data, this document.

**21:3 - 21:6**   Homering, Martin 2015-06-21   **0:17**
Q. Okay. If you'll look with me, I think we're
going to look at Slide 14, but these don't have page
numbers on it. It's that slide there. It's about 14
pages in.

**21:10 - 21:23**   Homering, Martin 2015-06-21   **1:43**
Q. So this slide is titled, "Statistical Aspects
in Safety Analysis, Time Dependency of Risk." Do you
see that?
A. I can see that, yes.
Q. And there's a chart there that is regarding
cumulative adverse events, and then there's a couple of
bullet points at the bottom, and I want to ask you about
the first bullet point. It says, "Crude (simple) rate
may underestimate risk." Do you see that?
A. I see that.
Q. Okay. And when it says, "Crude (simple) rate
for adverse events," what does it mean?
A. I would have to ask the author to give you a
good answer to this question.

**22:17 - 22:24**   Homering, Martin 2015-06-21   **1:13**
Q. And you agreed with that statement that the
crude rate may underestimate risk.
A. It is definitely important to see the qualifier
"may" here. It always depends on the situation.
Q. Do you agree that sometimes you may need a more

| | | | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|

detailed statistical analysis to truly evaluate the
risk of adverse events in a clinical trial?
A.  It definitely depends on the situation.

**26:19 - 27:15**   **Homering, Martin 2016-06-21**   *3:13*
Q.  If we can look at Slide 20. It says,
"Statistical Aspect and Safety Analyses Summary," and
there's a first bullet point there.  Do you see that?
A.  I do.
Q.  Okay.  And it says, "Lack of evidence is not
evidence for lack of effect."  Do you see that?
A.  I do.
Q.  Okay.  And do you agree with that statement?
A.  I think this is a general principle that
describes that if you treat 100 or 1,000 patients and
you don't see any events, that that doesn't necessarily
mean that there are no such events.  That's how I
interpret it.
Q.  Well, the next bullet points says, "Only
dedicated prospective adequately-powered safety studies
can generate 'proof' of relative safety, quite similar
to proof of non-inferiority for efficacy."  Do you see
that?
A.  Yes, that's what it says here.
Q.  And it says, "But even here no proof for safety
in real-life populations."  Do you see that?
A.  Yes, I see that.

**27:16 - 27:20**   **Homering, Martin 2016-06-21**   *0:47*
Q.  And do you agree with that concept that even if
a clinical study doesn't show a problem, that doesn't
mean the drug is going to be safe when you start giving
it to real-life populations, correct?
A.  No, I cannot agree with this.

**28:14 - 29:1**   **Homering, Martin 2016-06-21**   *1:22*
Q.  Let me ask you about Slide 24 for a minute.  It
says, "Aspects for Adverse Event Analysis, When to Pool
Studies."  Do you see that?
A.  Yes, I do.
Q.  And do you agree that sometimes it's
appropriate to pool study information to do analyses and
sometimes it's not appropriate?
A.  Yes.  It always depends on the situation.
Q.  Okay.  And it says, "The pro for pooling
studies is will increase precision when studies are of
similar design, dose, duration, data collection
methods."  Do you see that?
A.  Yes, I do.

**29:18 - 29:19**   **Homering, Martin 2016-06-21**   *0:08*
Q.  You see it says, "Further challenges in
presenting AEs in CCDS."  Do you see that?

**29:23 - 30:16**   **Homering, Martin 2016-06-21**   *1:52*
A.  I see that.
Q.  Okay.  The first is, "Multiple events within
subjects over time.  For example, bleeding events."  Do
you see that?

07/28/17 16:09

| | Objections In | Responses In | Rulings |
|---|---|---|---|

30   2
30   3
30   4
30   5
30   6
30   7
30   8
30   9
30  10
30  11
30  12
30  13
30  14
30  15
30  16

A. I see that.
Q. Okay. So, for example, a patient on Xarelto in a clinical trial may have one bleeding event, and have to go to the hospital, and then a couple of weeks later have a different bleeding event. And the question is, how do you count those events; is that right?
A. To me the sentence refers to multiple events of the same nature, because if it's different events they will always be presented in a different way.
Q. Right.
So for Xarelto we're talking about a particular patient having more than one event of bleeding.
A. As long as there are different preferred terms they will be -- they will be presented in a different way.

30:17 - 31:5   1:27

30  17
30  18
30  19
30  20
30  21
30  22
30  23
30  24
30  25
31   1
31   2
31   3
31   4
31   5

Homering, Martin 2016-06-21
Q. Were there different preferred terms for bleeding in adverse event analysis for Xarelto?
A. Yes, there are.
Q. And so if a bleeding event was coded under a different preferred term, then that would be counted as two events in Bayer's adverse event system?
A. I'm not sure what you mean when you refer to "Bayer's adverse event system". But, in the table, one patient with GI bleeding and intracranial bleeding would be listed under two separate entries.
Q. So in the pooled analyses that you performed, or your department performed, if a patient had more than one bleeding event during a clinical study, how were those events counted in your analysis?

31:7 - 31:14   0:38

31   7
31   8
31   9
31  10
31  11
31  12
31  13
31  14

Homering, Martin 2016-06-21
A. In the standard table a patient with both GI bleeding and intracranial bleeding would be listed under two entries; whereas, one patient with two events of GI bleeding will be listed as one patient with GI bleeding event.
And I would like to add the following: Of course, there are special analyses regarding multiple adjudicated bleeding events.

31:15 - 31:19   0:28

31  15
31  16
31  17
31  18
31  19

Homering, Martin 2016-06-21
Q. Okay. So in a pooled analysis, a statistical analysis of bleeding event rates, if a patient had two events of GI bleeding coded the same, in the analysis that analysis would count that patient as one bleed, correct?

31:21 - 31:23   0:18

31  21
31  22
31  23

Homering, Martin 2016-06-21
A. In some tables the incidence is defined as the number of patients with a certain bleeding event.
THE WITNESS: Proportion.

32:1 - 32:7   0:46

32   1
32   2
32   3
32   4

Homering, Martin 2016-06-21
A. The proportion of subjects with this event.
Q. So sometimes the analysis, depending on the type of analyses that are being performed, what is being evaluated is simply the proportion or the percentages of

|  | Objections In | Responses In | Rulings |
|---|---|---|---|
| 32 5<br>32 6<br>32 7<br>patients that had that event in that clinical study or group of studies, correct?<br>A. Sometimes that is the case, yes. |  |  |  |
| **32:15 - 32:16**<br>32 15<br>32 16<br>(Homering Exhibit No. 3 was marked for identification.)<br>0:00 |  |  | Pending |
| **32:24 - 33:10**  Homering, Martin 2016-06-21<br>32 24<br>32 25<br>33 1<br>33 2<br>33 3<br>33 4<br>33 5<br>33 6<br>33 7<br>33 8<br>33 9<br>33 10<br>Q. So if you'll look with me this says, "Workshop, An AE Reporting to ADR Profile-How to Prepare the First CCDS End of Phase III, November 24th, 2006." And this was around the time that the Phase III program for Xarelto was either concluded for certain indications or under way for AFib, correct?<br>A. I know that RECORD one to four was concluded. With respect to the timing of other studies, I cannot say anything.<br>Q. Okay. And you see under "participants," you're listed as a participant in the meeting.<br>A. Yes, I see that.<br>1:35 |  |  |  |
| **35:18 - 36:2**  Homering, Martin 2016-06-21<br>35 18<br>35 19<br>35 20<br>35 21<br>35 22<br>35 23<br>35 24<br>35 25<br>36 1<br>36 2<br>Q. Let's look at the second page, Part No. 3, which says, "Relevant databases and principles of data analysis," and then you're listed as the presenter. Do you see that section?<br>A. Yes.<br>Q. Okay. And clinical study reports and integrated analysis, pooling concepts, and methods of analysis and data presentation are the three points for your presentation. Do you see that?<br>A. Yes.<br>0:51 |  |  |  |
| **40:15 - 40:23**  Homering, Martin 2016-06-21<br>40 15<br>40 16<br>40 17<br>40 18<br>40 19<br>40 20<br>40 21<br>40 22<br>40 23<br>Q. Okay. So one of the things that you worked on that we talked about earlier was the evaluation of the association of coagulation parameters like PT with bleeding events in the clinical trials for Xarelto. Do you recall that?<br>MR. STOFFELMAYR: Objection to form.<br>A. I thought I said that we had a team of statisticians and programmers who, amongst others, also dealt with this matter.<br>1:18 | Re: [40:15-40:23]<br>**Def Obj** Relevancy/A03 - RECORD: Subsequent testimony shows his evaluation of coagulation parameters and PT was done with respect to RECORD, VTE-prevention. See objection to 10:25 - 11:9 regarding RECORD and | Re: [40:15-40:23]<br>**Pltf Resp** It is an oversimplification to say that one indication was based on one study. In fact, data from all of the RECORD studies were the basis of supporting all of the indications to some extent, and certainly, were used to inform the defendants' understanding of the safety and efficacy profiles of Xarelto. The jury must be trusted to distinguish the studies from one another. Additionally, the RECORD studies are relevant for a host of other reasons, including the defendants' |  |

07/28/17 16:09

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

41:4 - 41:21   2:48

41:4     You and your colleagues in the statistics
41:5   department, the integrated analysis department, worked
41:6   on analysis of the evaluation of the association of PT
41:7   and bleeding events in Phase III trials for Xarelto,
41:8   including the RECORD studies, correct?
41:9   A. Yes, for RECORD and colleagues for Einstein.
41:10   Q. Okay. You told me earlier that you were aware
41:11   that the FDA had done an analysis looking at PT and
41:12   bleeding events for the Phase III Rocket AFib trial,
41:13   correct?
41:14   A. Yes.
41:15   Q. And you understand that PT, or
41:16   prothrombin time, is a pharmacodynamic measurement or PD
41:17   measurement, correct?
41:18   A. Well, in my role as an integrated analysis
41:19   statistician I am not familiar with the differences
41:20   between PD or PK parameters. I know that this is a
41:21   relevant measurement in the context of bleeding events.

**Objections In:** Re: [41:4-41:21]
Def Obj: 403/Relevance. See objection to 10:25 - 11:9 regarding RECORD and VTE-prevention; see objection to 16:14-16 regarding ROCKET.

**Responses In:** Re: [41:4-41:21]
Pltf Resp: It is an oversimplification to say that one indication was based on one study. In fact, data from all of the RECORD studies were the basis of supporting all of the indications to some extent, and certainly, were used to inform the defendants' understanding of the safety and efficacy profiles of Xarelto. The jury must be trusted to distinguish the studies from one another. Additionally, the RECORD studies are relevant for a host of other reasons, including the defendants' notice of critical safety issues of Xarelto, as well as flaws in the RECORD studies which call the safety of the drug into question. For this reason and others, this testimony is relevant and there is no significant risk of confusion that outweighs the probative value of this evidence.

**Rulings:** Pending

41:22 - 42:7   1:31

41:22   Homering, Martin 2016-06-21
41:23   Q. Okay. You know there is a difference between
41:24   PD, pharmacodynamic, and PK, pharmacokinetic
41:25   measurements.
42:1   A. Yes, I know that there are differences, but I
42:2   couldn't explain them.
42:3   Q. Okay. And so we've talked a little bit about
42:3   analysis that have been done evaluating a PD measurement
42:4   like prothrombin time, PT. Has your department also
42:5   been involved in an analysis of the association with PK
42:6   measurements like drug concentration and the association
42:7   with bleeding events?

42:9 - 42:12   0:24

42:9   Homering, Martin 2016-06-21
42:9   A. I can recall an analysis within the Einstein
42:10   Phase I where we received from clinical pharmacology
42:11   concentration values. For the rest we have nothing to
42:12   do with such analyses in our department.

42:18 - 42:25   0:53

42:18   Homering, Martin 2016-06-21

**Responses In (top of page continuation):** notice of critical safety issues of Xarelto, as well as flaws in the RECORD studies which call the safety of the drug into question. For this reason and others, this testimony is relevant and there is no significant risk of confusion that outweighs the probative value of this evidence.

9

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| 42:18 - 42:25<br>42:19<br>42:20<br>42:21<br>42:22<br>42:23<br>42:24<br>42:25<br><br>Q. So are you -- you're aware of the EMA's current request to Bayer related to therapeutic drug monitoring and an exposure-response analysis, correct?<br>A. Yes, I do.<br>Q. Okay. And the EMA's exposure-response analysis request is asking Bayer to look at the association between PK parameters like drug concentration and bleeding events, correct? | Re: [42:18-42:25]<br>Def Obj 403/Relevance - foreign regulatory. This testimony concerns a foreign regulatory agency's request and has no bearing on the issues in this case. As such, it will only serve to confuse the jury. Lack of foundation. M. Homering testifies at 43:15 - 43:17 that he would need to consult with his colleagues from clinical pharmacology regarding the specific interpretation of the EMA. | Re: [42:18-42:25]<br>Pltf Resp This Court has repeatedly ruled that communications with foreign regulatory bodies is admissible evidence, as long as the content of foreign labels is distinguished from the labels in effect in the US. There is more than adequate foundation; the deponent testifies that he is aware of both the request by the EMA and the underlying exposure-response analysis. | Pending |
| 43:2 - 43:6<br>43 2<br>43 3<br>43 4<br>43 5<br>43 6<br><br>Homering, Martin 2016-06-21<br>A. I think the outcomes are efficacy and bleedings. Regarding the specific parameters I would always go back to my colleagues from clinical pharma. And it is my understanding that it is about efficacy and bleedings. | Re: [43:2-43:6]<br>Def Obj 403/Relevance - foreign regulatory. See objection to 42:18-25.<br><br>0:15 | Re: [43:2-43:6]<br>Pltf Resp This Court has repeatedly ruled that communications with foreign regulatory bodies is admissible evidence, as long as the content of foreign labels is distinguished from the labels in effect in the US. There is more than adequate foundation; the deponent testifies that he is aware of both the request by the EMA and the underlying exposure-response analysis, which in itself, is relevant to a host of issues, particularly the safety profile of Xarelto. | Pending |
| 43:7 - 43:17<br>43 7<br>43 8<br>43 9<br>43 10<br>43 11<br>43 12<br>43 13<br>43 14<br>43 15<br>43 16<br>43 17<br><br>Homering, Martin 2016-06-21<br>Q. So the exposure-response analysis request is looking for an analysis comparing exposure, as measured by PK parameters, and outcomes both with respect to efficacy and bleeding.<br>MR. STOFFELMAYR: Objection to form.<br>A. Yes, I would have to take a closer look at the request by the EMA what exactly they are saying in the exposure-related tests and what they concretely aim at. I would have to check back with my colleagues from clinical pharmacology regarding the specific interpretation of the EMA.<br><br>1:46 | | | |
| 43:18 - 43:21<br>43 18<br>43 19<br><br>Homering, Martin 2016-06-21<br>Q. Bayer's working on responding to the EMA's request now, correct? | Re: [43:18-43:21]<br>[Def Obj 403/Relevance - foreign regulatory. This one<br><br>0:27 | Re: [43:18-43:21]<br>Pltf Resp This Court has repeatedly ruled that communications | Pending |

07/28/17 16:09

| | Objections In | Responses In | Rulings |
|---|---|---|---|

A- As far as I know, some parts have been answered
already and some other parts are still underway.

43 20
43 21

| | | |
|---|---|---|
| of questioning concerns a foreign regulatory agency's request and has no bearing on the issues in this case. As such it is likely to confuse the jury. | with foreign regulatory bodies is admissible evidence, as long as the content of foreign labels is distinguished from the labels in effect in the US. There is more than adequate foundation; the deponent testifies that he is aware of both the request by the EMA and the underlying exposure-response analysis, which in itself, is relevant to a host of issues, particularly the safety profile of Xarelto. |  |

| 43:22 - 44:16 | Homering, Martin 2016-06-21 | | 2:44 | Re: [43:22-44:16]<br>Def Obj 403/Relevance - foreign regulatory. See objection to 42:18-25. | | Re: [43:22-44:16]<br>Pltf Resp This Court has repeatedly ruled that communications with foreign regulatory bodies is admissible evidence, as long as the content of foreign labels is distinguished from the labels in effect in the US. There is more than adequate foundation; the deponent testifies that he is aware of both the request by the EMA and the underlying exposure-response analysis, which in itself, is relevant to a host of issues, particularly the safety profile of Xarelto. | Pending |

43 22  Q.  Okay. One of the parts that Bayer has been
43 23      working on is an exposure model; is that right?
43 24  A.  I'm not quite sure whether they're still
43 25      working on this or whether this has been finished
44 1       already.
44 2   Q.  Okay. And this was a computer model to predict
44 3       the exposure to Xarelto for patients in the clinical
44 4       trial database for Bayer, correct?
44 5   A.  I'm not quite sure what you're referring to
44 6       when you say "computer model". I'm not familiar with
44 7       this term in this context.
44 8   Q.  Okay. Well, you understand that the model is
44 9       -- uses software to make predictions with respect to
44 10      exposure parameters for patients in the clinical trial
44 11      database, correct?
44 12  A.  That is my understanding regarding the high-
44 13      level objectives of this request; but regarding the
44 14      details and the derivation of the parameters based on
44 15      this computer model I would have to refer you to my
44 16      colleagues.

| 47:20 - 47:24 | Homering, Martin 2016-06-21 | | 0:45 | Re: [47:20-47:24] | | Re: [47:20-47:24] | Pending |

47 20  Q.  Okay. Have you attended any meetings in which

11

| Line | Deposition | Objections in | Responses in | Rulings |
|---|---|---|---|---|
| 47:21<br>47:22<br>47:23<br>47:24 | the results of the exposure-response analysis have been discussed?<br>A. There was a meeting held last week, but no final results were shown there. | Def Obj 403/Relevance - foreign regulatory. See objection to 42:18-25. | Pltf Resp This Court has repeatedly ruled that communications with foreign regulatory bodies is admissible evidence, as long as the content of foreign labels is distinguished from the labels in effect in the US. There is more than adequate foundation; the deponent testifies that he is aware of both the request by the EMA and the underlying exposure-response analysis, which in itself, is relevant to a host of issues, particularly the safety profile of Xarelto. |  |
| 48:6 - 48:12  0:27<br>48:6<br>48:7<br>48:8<br>48:9<br>48:10<br>48:11<br>48:12 | Homering, Martin 2015-06-21<br>Q. From your department you attended. Did anyone else from your department attend?<br>A. No.<br>Q. Okay. Dr. Misselwitz was there?<br>A. Partly.<br>Q. And how about Dr. Berkowitz?<br>MR. STOFFELMAYR: That could mean different | Re: [48:6-48:12]<br>Def Obj 403/Relevance - foreign regulatory. See objection to 42:18-25. | Re: [48:6-48:12]<br>Pltf Resp This Court has repeatedly ruled that communications with foreign regulatory bodies is admissible evidence, as long as the content of foreign labels is distinguished from the labels in effect in the US. There is more than adequate foundation; the deponent testifies that he is aware of both the request by the EMA and the underlying exposure-response analysis, which in itself, is relevant to a host of issues, particularly the safety profile of Xarelto. | Pending |
| 48:18 - 48:21  0:10<br>48:18<br>48:19 | Homering, Martin 2015-06-21<br>A. "Partly" meaning he was not there all the time during the meeting. | Re: [48:18-48:21]<br>Def Obj 403/Relevance - foreign regulatory. | Re: [48:18-48:21]<br>Pltf Resp This Court has repeatedly ruled that communications | Pending |

12

07/28/17 16:09

| Lines | Deposition Text | Time | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|
| 48 20 – 48 21 | Q. Correct.<br>A. And the same is true for Scott Berkowitz. | | objection to 42:18-25. | with foreign regulatory bodies is admissible evidence, as long as the content of foreign labels is distinguished from the labels in effect in the US. There is more than adequate foundation; the deponent testifies that he is aware of both the request by the EMA and the underlying exposure-response analysis, which in itself, is relevant to a host of issues, particularly the safety profile of Xarelto. | |
| 50:14 – 50:20 | Homering, Martin 2016-06-21<br>Q. And we'll talk a little bit about Kaplan-Meier stuff a little bit later, but just so we're clear on the record here, Kaplan-Meier is a graph curve that can graphically display the results of something like a safety event over time.<br>A. Yes, Kaplan-Meier shows the share of the patients with this event as a function of time. | 0:55 | | | |
| 51:16 – 52:1 | Homering, Martin 2016-06-21<br>Q. Have you seen a Kaplan-Meier curve, even a draft version of a Kaplan-Meier curve, for the exposure-response analysis for any of the indications?<br>A. Yes, I have.<br>Q. Was that presented at the meeting last week?<br>A. What was presented was TIMI 46, Phase II.<br>Q. Okay.<br>THE WITNESS: For example.<br>Q. That was the study – that was the Kaplan-Meier curve and analysis that showed the higher exposure groups having a higher risk of bleeding, right? | 1:13 | Re: [51:16-52:1]<br>Def Obj 403/Relevance. This line of questioning concerns the studies, ATLAS TIMI 46, supporting an indication that is not approved in the United States, ACS. Indeed, ACS relates to a different patient population and has a different dosing regimen and bleeding risk. Such questioning has no context and only serves to confuse the jury. | Re: [51:16-52:1]<br>Pltf Resp This Court has already found evidence related to the ACS indication to be admissible evidence in previous rulings in both the Mingo and Orr trials. Again, this evidence is relevant and probative of the safety data that the defendants had available to them indicating critical safety issues with Xarelto. | Pending |
| 52:3 – 52:5 | Homering, Martin 2016-06-21<br>Q. I don't recall the exact details, but I think that there was a report that was issued in the past on this study. | 0:12 | | | |
| 63:23 – 64:1 | Homering, Martin 2016-06-21<br>(Homering Exhibit No. 7 was marked for identification.)<br>(Homering Exhibit No. 8 was marked for identification.) | 0:01 | Re: [63:23-64:1]<br>Def Obj Objection to underlying documents lodged. | Re: [63:23-64:1]<br>Pltf Resp See Plaintiffs' response. | Pending |
| 64:7 – 64:12 | Homering, Martin 2016-06-21 | 0:40 | | | |

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

| | | | |
|---|---|---|---|

64   7
64   8
64   9
64   10
64   11
64   12

And if you can just look with me at Exhibit 7 for a minute, which is the 2727462, this is an E-mail chain from August of 2011, and it starts at the top, the last E-mail in the chain is from Torsten Westermeier to yourself on August 2nd. Do you see that?
A.   That is correct, yes.

64:17 - 65:1

64   17
64   18
64   19
64   20
64   21
64   22
64   23
64   24
64   25
65   1

Homering, Martin 2016-06-21
Q.   Okay. Now, I think you told me earlier Torsten Westermeier, he was primary statistician for the Xarelto clinical trial program; is that correct?
A.   He certainly had a coordinating function and was also the direct contact to Janssen.
Q.   Okay. So if we can look at the E-mail that Andrea Derix sent to Torsten and others, that was then forwarded to you, it says, "Dear all, we received the below report from FDA." Do you see the
A.   Yes, I see that.

**1:12**   Re: [64:17-65:1]
**Def Obj 403/Relevance.** This testimony concerns an FDA document analyzing data derived from ROCKET, titled Clinical Pharmacology Technical Report for PD-Outcome Analysis. Therefore, testimony about this document and the corresponding email attaching this document is not relevant to the issues here and serves to confuse the jury who may think the FDA's analysis applies to EINSTEIN or is generally applicable.

**1:12**   Re: [64:17-65:1]
Pltf Resp: It is an oversimplification to say that one indication was based on one study. In fact, data from many studies, including ROCKET were the basis of supporting all of the indications to some extent, and certainly, were used to inform the defendants' understanding of the safety and efficacy profiles of Xarelto. The jury must be trusted to distinguish the studies from one another. Additionally, ROCKET is relevant for a host of other reasons, including the defendants' notice of critical safety issues of Xarelto, as well as flaws in the RECORD studies which call the safety of the drug into question. This evidence is relevant to Plaintiff's failure to warn claim. It establishes that Defendants knew they might not have the safest dose for patients with Afib which made it even more important to instruct physicians about the advisability of measuring and the ability to measure, the anticoagulant effect of Xarelto using Neoplastin PT and or to include in its design of Xarelto an anti-Factor Xa assay and reversal agent. For this reason and others, this testimony is relevant and there is no significant risk of confusion that outweighs the probative value of this evidence.

Pending

66:15 - 66:23

66   15
66   16
66   17
66   18
66   19
66   20
66   21
66   22
66   23

Homering, Martin 2016-06-21
Q.   Okay. And we see Andrea Derix listed, and she's the one who forwarded it to Torsten and others, who then forwarded it to you.  She was in the regulatory department?
A.   I know that Andrea Derix held various roles in the Xarelto project.  Which role she held at this point in time, I do not know.
Q.   Okay. I see that also copied on here was Bernhard Glombitza.  Do you know Bernhard Glombitza?

**1:12**

67:2 - 67:5

67   2
67   3
67   4
67   5

Homering, Martin 2016-06-21
Q.   And do you know Bernhard Glombitza's role?
A.   To that point in time, not clear to me what role he had then, but he was involved at a relatively early stage in the Xarelto project.

**0:16**

67:17 - 68:15

67   17
67   18
67   19
67   20
67   21
67   22
67   23
67   24
67   25
68   1
68   2
68   3
68   4
68   5
68   6
68   7
68   8
68   9
68   10

Homering, Martin 2016-06-21
Q.   Okay. So if you look with me on the third page to see what is being attached, Alla Rbuge says, "Dear all, please find enclosed the Office of Clinical Pharmacology analysis received today." And Office of Clinical Pharmacology, that was a section of the FDA, correct?
A.   Yes, I would interpret it as such.
Q.   Okay. And it says, "They, reviewers, looked at three perspectives related to PD-outcome relationship. Prothrombin ischemic stroke relationship; prothrombin major bleeding relationship; and concomitant aspirin use efficacy and safety analysis." Do you see that?
A.   Yes, I can read that.
Q.   Okay. And she concludes and says, "Among others, of note is one of the conclusions that the probability of bleeding was associated with PD measurements, PT, FXa, Factor Xa, or PiCT." Do you see that?
A.   Yes, indeed. It says here, "One of the

**3:01**   Re: [67:17-68:15]
**Def Obj 403/Relevance.** See objection to 64:17 - 65:1 regarding ROCKET.

**3:01**   Re: [67:17-68:15]
Pltf Resp: It is an oversimplification to say that one indication was based on one study. In fact, data from many studies, including ROCKET were the basis of supporting all of the indications to some extent, and certainly, were used to inform the defendants' understanding of the safety and efficacy profiles of Xarelto. The jury must be trusted to distinguish the studies from one another. Additionally, ROCKET is relevant for a host of other reasons, including the defendants' notice of critical safety issues of Xarelto, as well as flaws in the RECORD studies which call the safety of the drug into question. This evidence is relevant to Plaintiff's failure to warn claim. It establishes that Defendants knew they might not have the safest dose for patients with Afib which made it even more important to instruct physicians about the advisability of measuring and the ability to measure, the anticoagulant effect of Xarelto using Neoplastin PT and or to include in its design of Xarelto an anti-Factor Xa assay and reversal agent. For this reason and others, this testimony is relevant and there is no

Pending

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

| 68 11 | conclusions", and then follows a text in quotation | | significant risk of confusion that outweighs the probative value | |
| 68 12 | marks. I can read that. | | of this evidence. | |
| 68 13 | Q. And do you recall that the FDA had concluded | | | |
| 68 14 | that there was an association between PT and bleeding | | | |
| 68 15 | risk in their analysis of the Rocket data? | | | |

| 68:17 - 68:22 | 0:51 | Re: [68:17-68:22] | Re: [68:17-68:22] | Pending |
| 68 17 | Homering, Martin 2016-06-21 | Def Obj 403/Relevance. See objection to 64:17 - 65:1 | Pltf Resp It is an oversimplification to say that one indication | |
| 68 18 | A. No, I cannot recall which conclusions third | regarding ROCKET. | was based on one study. In fact, data from many studies, | |
| 68 19 | parties drew from the analyses. | | including ROCKET were the basis of supporting all of the | |
| 68 20 | Q. Okay. Well, let's -- certainly Alla Rhoge | | indications to some extent, and certainly, were used to inform | |
| 68 21 | thought that the conclusion was important enough to | | the defendants' understanding of the safety and efficacy | |
| 68 22 | E-mail about 50 people at Bayer and J&J on August 2nd of | | profiles of Xarelto. The jury must be trusted to distinguish the | |
| | 2011, correct? | | studies from one another. Additionally, ROCKET is relevant for | |
| | | | a host of other reasons, including the defendants' notice of | |
| | | | critical safety issues of Xarelto, as well as flaws in the RECORD | |
| | | | studies which call the safety of the drug into question. This | |
| | | | evidence is relevant to Plaintiff's failure to warn claim. It | |
| | | | establishes that Defendants knew they might not have the | |
| | | | safest dose for patients with Afib which made it even more | |
| | | | important to instruct physicians about the advisability of | |
| | | | measuring and the ability to measure, the anticoagulant effect | |
| | | | of Xarelto using Neoplastin PT and or to include in its design of | |
| | | | Xarelto an anti-Factor Xa assay and reversal agent. For this | |
| | | | reason and others, this testimony is relevant and there is no | |
| | | | significant risk of confusion that outweighs the probative value | |
| | | | of this evidence. | |

| 68:24 - 69:1 | 0:10 | Re: [70:15-71:8] | Re: [70:15-71:8] | |
| 68 24 | Homering, Martin 2016-06-21 | Def Obj 403/Relevance. See objection to 64:17 - 65:1 | Pltf Resp It is an oversimplification to say that one indication | |
| 68 25 | A. Well, I don't know what was important or | regarding ROCKET. Lack of foundation. Martin | was based on one study. In fact, data from many studies, | |
| 69 1 | unimportant from her point of view or what was the focus | Homering testifies at 72:1-2 that he is not an expert | including ROCKET were the basis of supporting all of the | |
| | of her E-mail here. I cannot make any guesses there. | on statistical tools to measure exposure-outcome | indications to some extent, and certainly, were used to inform | |
| | | analyses. | the defendants' understanding of the safety and efficacy | |
| | | | profiles of Xarelto. The jury must be trusted to distinguish the | |
| | | | studies from one another. Additionally, ROCKET is relevant for | |
| | | | a host of other reasons, including the defendants' notice of | |
| | | | critical safety issues of Xarelto, as well as flaws in the RECORD | |
| | | | studies which call the safety of the drug into question. This | |
| | | | evidence is relevant to Plaintiff's failure to warn claim. It | |
| | | | establishes that Defendants knew they might not have the | |
| | | | safest dose for patients with Afib which made it even more | |
| | | | important to instruct physicians about the advisability of | |
| | | | measuring and the ability to measure, the anticoagulant effect | |
| | | | of Xarelto using Neoplastin PT and or to include in its design | |

| 70:15 - 71:8 | 2:07 | | | Pending |
| 70 15 | Homering, Martin 2016-06-21 | | | |
| 70 16 | Q. And it says, "To examine the PD outcome | | | |
| 70 17 | relationship, a PD measurement that was collected closer | | | |
| 70 18 | and prior to the target event was used, i.e., the last | | | |
| 70 19 | observed PD measurement before an event." Do you see | | | |
| 70 20 | that? | | | |
| 70 21 | A. Yes, it says so there. | | | |
| 70 22 | Q. Okay. Now, if you can look with me at the next | | | |
| 70 23 | paragraph, it says, "Two approaches were used to | | | |
| 70 24 | evaluate the PD outcome relationship. One, a logistic | | | |
| 70 25 | regression and, two, time to event analysis using Cox | | | |
| 71 1 | proportional hazards model." Do you see that? | | | |
| 71 2 | A. It says so there. | | | |
| 71 3 | Q. Okay. And those were two statistical methods | | | |
| 71 4 | that can be used to evaluate the relationship between | | | |
| 71 5 | exposure and an outcome event; is that correct? | | | |
| 71 6 | A. These are two common regression models which | | | |
| | can correct -- | | | |

15

07/28/17 16:09

07/28/17 16:09



|  | | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| 71 7 | THE WITNESS: Correlate. | | Xarelto an anti-Factor Xa assay and reversal agent. For this reason and others, this testimony is relevant and there is no significant risk of confusion that outweighs the probative value of this evidence. There is more than adequate foundation for this testimony. Not only is M. Homering one of the chief biostatisticians at Bayer, he testified that he is familiar with the underlying models and testified to his interpretation of the results. | |
| 71 8 | A. Which can correlate. | | | |
| | **71:9 - 72:2**  2:43 | | | |
| | Homering, Martin 2016-06-21 | | | |
| 71 9 | THE WITNESS: Yeah. | | | |
| 71 10 | A. -- which can correlate binary outcomes with | | | |
| 71 11 | categorical or continuous co-variables. | | | |
| 71 12 | Q. Okay. And so if I wanted to determine whether | | | |
| 71 13 | an exposure to a drug was related to a particular | | | |
| 71 14 | adverse event, like bleeding, these are two common | | | |
| 71 15 | statistical methods I might use. | | | |
| 71 16 | A. Whether they are common in exposure response, I | | | |
| 71 17 | cannot say, but these are two tools which set a yes-no | | | |
| 71 18 | outcome in relationship to a co-variable, and on top of | | | |
| 71 19 | that further factors can be taken into account. | | | |
| 71 20 | Q. And within Bayer you're considered one of the | | | |
| 71 21 | experts at using those type of statistical tools to | | | |
| 71 22 | measure exposure-outcome analyses, correct? | | | |
| 71 23 | A. I do not see it that way, that I was involved | | | |
| 71 24 | on the basis of this fact. | | | |
| 71 25 | Q. Okay. | | | |
| 72 1 | A. And I wouldn't call myself the Bayer expert in | | | |
| 72 2 | this context. | | | |
| | **72:4 - 73:18**  4:18 | Re: [72:4-73:18] | Re: [72:4-73:18] | Pending |
| | Homering, Martin 2016-06-21 | Def Obj 403/Relevance. See objection to 64:17 - 65:1 regarding ROCKET. Lack of foundation. Martin Homering testifies at 72:1-2 that he is not an expert on statistical tools to measure exposure-outcome analyses. | Pltf Resp: It is an oversimplification to say that one indication was based on one study. In fact, data from many studies, including ROCKET were the basis of supporting all of the indications to some extent, and certainly, were used to inform the defendants' understanding of the safety and efficacy profiles of Xarelto. The jury must be trusted to distinguish the studies from one another. Additionally, ROCKET is relevant for a host of other reasons, including the defendants' notice of critical safety issues of Xarelto, as well as flaws in the RECORD studies which call the safety of the drug into question. This evidence is relevant to Plaintiff's failure to warn claim. It establishes that Defendants knew they might not have the safest dose for patients with Afib which made it even more important to instruct physicians about the advisability of measuring and the ability to measure, the anticoagulant effect of Xarelto using Neopiastin PT and or to include in its design of Xarelto an anti-Factor Xa assay and reversal agent. For this reason and others, this testimony is relevant and there is no significant risk of confusion that outweighs the probative value of this evidence. There is more than adequate foundation for this testimony. Not only is M. Homering one of the chief biostatisticians at Bayer, he testified that he is familiar with the underlying models and testified to his interpretation of the results. | |
| 72 4 | Q. So I want to look at the results section, and | | | |
| 72 5 | if we can turn over to Page 2, Section B, prothrombin | | | |
| 72 6 | time, major bleeding relationship. | | | |
| 72 7 | A. Yes. | | | |
| 72 8 | Q. So under this results section, it says, "A | | | |
| 72 9 | subset of rivaroxaban per-protocol analysis set, | | | |
| 72 10 | including all patients with an available PT measurement | | | |
| 72 11 | prior to the first major bleeding event as defined in | | | |
| 72 12 | the protocol was used in this analysis." Do you see | | | |
| 72 13 | that? | | | |
| 72 14 | A. Yes, I see that. | | | |
| 72 15 | Q. Okay. And major bleeding event was | | | |
| 72 16 | specifically defined in the Rocket protocol, correct? | | | |
| 72 17 | A. Yes, I would understand it that way, that this | | | |
| 72 18 | is the major bleeding event definition based on the | | | |
| 72 19 | Rocket protocol. | | | |
| 72 20 | Q. Okay. It gives the number of major bleeding | | | |
| 72 21 | events in the subset, and then it says, "The probability | | | |
| 72 22 | for major bleeding event, the primary safety endpoint | | | |
| 72 23 | increased with increase in PT," and then lists Figure 2. | | | |
| 72 24 | Do you see that? | | | |
| 72 25 | A. I can see that this is what is written here, | | | |
| 73 1 | but I do not know what the term "primary safety | | | |
| 73 2 | endpoint," where it comes from, because I am not | | | |
| 73 3 | familiar with this term. | | | |
| 73 4 | Q. Okay. Do you know whether or not major | | | |
| 73 5 | bleeding was the primary safety endpoint for the Rocket | | | |
| 73 6 | trial? | | | |
| 73 7 | A. There is the major and non-major clinical | | | |
| 73 8 | relevant endpoint as well, but I'm not sure which one | | | |
| 73 9 | was used in this study here. | | | |
| 73 10 | Q. All right. So in defining bleeding events, you | | | |
| 73 11 | have major bleeds, and then you also have what was | | | |
| 73 12 | called non-major, clinically-relevant bleeds, right? | | | |

07/28/17 16:09

| | Objections In | Responses In | Rulings |
|---|---|---|---|

73 13   A.  Yes, this is a difference that was made in
73 14        these studies.
73 15   Q.  And the major bleeds were the more serious
73 16        bleeds.
73 17   A.  I would have to speculate here, but I would
73 18        think so.

74:7 - 74:12   Homering, Martin 2016-06-21                                   0:42
74  7   Q.  Let's look at the figure, on the next page.
74  8        And so if we look, there's two different
74  9        graphs.  The first on the left is the logistic
74 10        regression analysis, and the one on the right is the Cox
74 11        regression analysis, correct?
74 12   A.  That's how the two figures are described.

74:13 - 76:3   Homering, Martin 2016-06-21                                   5:56
74 13   Q.  Okay.  So let's look at the one on the right
74 14        first, which is Cox regression, and that's reporting on
74 15        the Y axis, the up-and-down axis, a probability of major
74 16        bleed within one year, correct?
74 17   A.  That is correct.
74 18   Q.  Okay.  And that's measured against the Y axis
74 19        of prothrombin time, and it goes from 10 to 36 on this
74 20        graph, correct?
74 21   A.  If these values were measured I cannot tell
74 22        right now, but at least this graph covers this range.
74 23   Q.  Okay.  And the graph shows that the probability
74 24        increases as prothrombin time increases, correct?
74 25   A.  Yes, the graph slightly increases from the
75  1        left-hand side of the graph to the right-hand side.
75  2   Q.  Okay.  And then on the logistic regression, the
75  3        A side of the graph, describes on the left the percent
75  4        with major bleed percentage as graphed against
75  5        prothrombin time on the Y axis from 10 to 30, correct?
75  6   A.  The curve goes from 10 to 30, yes, this is
75  7        right, and the Y axis is also described in this way.
75  8   Q.  Okay.  And this graph also shows increasing
75  9        probability of a major bleed as prothrombin time
75 10        increases, correct?
75 11       MR. STOFFELMAYR:  Objection to form.
75 12   A.  Yes, the graph is based on two things, or there
75 13        are two things which are shown here, the prothrombin
75 14        time and the number of patients with a major bleed, but
75 15        I cannot see from this graph what the group size or
75 16        sample size was, so it's difficult to interpret this
75 17        graph.
75 18   Q.  You know the graph came from the FDA's analysis
75 19        of the Rocket data for patients that had available PT
75 20        data before their major bleed, correct?
75 21   A.  I do not know this, but this is what I would
75 22        assume when I read Page 2 here.
75 23   Q.  And if you look at the description of Figure 2,
75 24        just below that, it says, "Major bleeding events are
75 25        dependent on PT over the observed range," correct?
76  1   A.  This is what is written here, what is said
76  2        here, but I do not know whether this is a conclusion or
76  3        a description of this graph.

77:3 - 78:8   Homering, Martin 2016-06-21                                   4:20

**Objections column:**

Re: [74:13-76:3]
Def Obj 403/Relevance. See objection to 64:17 - 65:1
regarding ROCKET.  Lack of foundation, Martin
Homering testifies at 72:1-2 that he is not an expert
on statistical tools to measure exposure-outcome
analyses.

**Responses column:**

Re: [74:13-76:3]
Pltf Resp It is an oversimplification to say that one indication
was based on one study.  In fact, data from many studies,
including ROCKET were the basis of supporting all of the
indications to some extent, and certainly, were used to inform
the defendants' understanding of the safety and efficacy
profiles of Xarelto.  The jury must be trusted to distinguish the
studies from one another.  Additionally, ROCKET is relevant for
a host of other reasons, including the defendants' notice of
critical safety issues of Xarelto, as well as flaws in the RECORD
studies which call the safety of the drug into question.  This
evidence is relevant to Plaintiff"s failure to warn claim.  It
establishes that Defendants knew they might not have the
safest dose for patients with Afib which made it even more
important to instruct physicians about the advisability of
measuring and the ability to measure, the anticoagulant effect
of Xarelto using Neoplastin PT and or to include in its design of
Xarelto an anti-Factor Xa assay and reversal agent.  For this
reason and others, this testimony is relevant and there is no
significant risk of confusion that outweighs the probative value
of this evidence.  There is more than adequate foundation for
this testimony.  Not only is M. Homering one of the chief
biostatisticians at Bayer, he testified that he is familiar with the
underlying models and testified to his interpretation of the
results.

**Rulings column:**

Pending

17

07/28/17 16:09

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

| | | **Re: [77:3-78:8]** | **Re: [77:3-78:8]** | Pending |
| 77 | 3 | Def Obj 403/Relevance. See objection to 64:17 – 65:1 | Ptf Resp It is an oversimplification to say that one indication | |
| 77 | 4 | regarding ROCKET. Lack of foundation. Martin | was based on one study, in fact, data from many studies, | |
| 77 | 5 | Hornering testifies at 72:1-2 that he is not an expert | including ROCKET were the basis of supporting all of the | |
| 77 | 6 | on statistical tools to measure exposure-outcome | indications to some extent, and certainly, were used to inform | |
| 77 | 7 | analyses. | the defendants' understanding of the safety and efficacy | |
| 77 | 8 | | profiles of Xarelto. The jury must be trusted to distinguish the | |

Q. So if we look at what the FDA said in fact,
they said, "The PT major," it's the second sentence,
"The PT major bleeding relationship for rivaroxaban was
steeper among the aspirin users," right?
A. I read this as follows: If you look at
Figure 3, this gives you the unadjusted logistic
regression probability, and you can see that the light
gray area is steeper than the dark gray area; but I do
not know or I cannot tell you whether this is a
statement to the content of this graph or whether this
is only a description of this figure.
Q. Let's look at the figure for a minute. And,
just so we're clear, the – the light gray area
represents those patients, Xarelto patients, who were
aspirin users, correct?
A. Not the light gray area, but the curve in the
light gray area.
Q. And then the – the dotted line that's within
the darker gray area, that is the curve for the
relationship between PT and bleeding for Xarelto users
who were not taking aspirin.
MR. STOFFELMAYR: Objection to form.
A. This is what is said in the annotations of this
curve; but in how far this is really true, whether the
values are really aspirin users or non-aspirin users I
cannot say.
Q. That's what the FDA was saying, and this report
that you received from J&J, that's what it said, right?
A. On Page 31 I read those who used aspirin more
than 50 percent of the cases or the time in the
double-blind phase.

studies from one another. Additionally, ROCKET is relevant for
a host of other reasons, including the defendants' notice of
critical safety issues of Xarelto, as well as flaws in the RECORD
studies which call the safety of the drug into question. This
evidence is relevant to Plaintiff's failure to warn claim. It
establishes that Defendants knew they might not have the
safest dose for patients with Afib which made it even more
important to instruct physicians about the advisability of
measuring and the ability to measure, the anticoagulant effect
of Xarelto using Neoplastin PT and or to include in its design of
Xarelto an anti-Factor Xa assay and reversal agent. For this
reason and others, this testimony is relevant and there is no
significant risk of confusion that outweighs the probative value
of this evidence. There is more than adequate foundation for
this testimony. Not only is M. Hornering one of the chief
biostatisticians at Bayer, he testified that he is familiar with the
underlying models and testified to his interpretation of the
results.

| | | **Re: [81:17-81:18]** | **Re: [81:17-81:18]** | Pending |
| 81:17 | – | 81:18 | Def Obj Objection to underlying document lodged. | Ptf Resp See Plaintiffs' response. | |
| 81 | 17 | Hornering, Martin 2016-06-21 | | |
| 81 | 18 | (Hornering Exhibit No. 10 was marked for | | |

0:03

identification.)

| | | **Re: [82:2-82:19]** | **Re: [82:2-82:19]** | Pending |
| 82:2 | – | 82:19 | Def Obj 403/Relevance - This document is an email | Ptf Resp It is an oversimplification to say that one indication | |
| 82 | 2 | discussing Exhibit 8 - FDA PD-Outcome Analysis with | was based on one study, in fact, data from many studies, | |
| 82 | 3 | respect to ROCKET. As such, it is not relevant to the | including ROCKET were the basis of supporting all of the | |
| 82 | 4 | issues in this case and only serves to confuse the jury | indications to some extent, and certainly, were used to inform | |
| 82 | 5 | who may mistakenly think it is relevant to EINSTEIN. | the defendants' understanding of the safety and efficacy | |
| 82 | 6 | | profiles of Xarelto. The jury must be trusted to distinguish the | |

3:55

So if you look at the first E-mail in the chain
on the last page it's an E-mail from Inââo Girgis to
several people at J&J, as well as yourself, Martin
Gabel, Andrea Nadel at Bayer, correct?
A. Correct.
Q. And you kind of show up on that third line from
the bottom of all the people that received it, Martin
Hornering, correct?
A. Correct.
Q. Okay. And this E-mail is sent on August 3rd,
so the day after the E-mail – the report had been sent
over from J&J to Bayer, correct?
A. I don't recall the precise date, but I'm sure
it was a meeting after the report had been received.
Q. Okay. And the subject of this E-mail was the
FDA PD outcome analysis, correct?
A. I think the topic was the report that had been
sent.

studies from one another. Additionally, ROCKET is relevant for
a host of other reasons, including the defendants' notice of
critical safety issues of Xarelto, as well as flaws in the RECORD
studies which call the safety of the drug into question. This
evidence is relevant to Plaintiff's failure to warn claim. It
establishes that Defendants knew they might not have the
safest dose for patients with Afib which made it even more
important to instruct physicians about the advisability of
measuring and the ability to measure, the anticoagulant effect
of Xarelto using Neoplastin PT and or to include in its design of
Xarelto an anti-Factor Xa assay and reversal agent. For this

07/28/17 16:09

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

reason and others, this testimony is relevant and there is no significant risk of confusion that outweighs the probative value of this evidence. There is more than adequate foundation for this testimony. Not only is M. Homering one of the chief biostatisticians at Bayer, he testified that he is familiar with the underlying models and testified to his interpretation of the results.

---

**82:25 - 83:12**    1:29

Homering, Martin 2015-06-21

82 25 Q. Okay. And what Mr. Girgis said was, "Dear all,
83 1 thanks for joining the TC today." Teleconference,
83 2 right?
83 3 A. Yes. "TC" stands for telephone conference.
83 4 Q. And do you recall there being a teleconference
83 5 to discuss this report from the FDA back in 2011 that
83 6 showed an increased association between PT and bleeding
83 7 risk in patients taking Xarelto?
83 8     MR. STOFFELMAYR: Objection to form.
83 9 A. I cannot assess what the report shows or it
83 10 doesn't show, but the teleconference certainly was meant
83 11 to better understand the tables and figures from the
83 12 report.

**Objections In:**
Re: [82:25-83:12]
Def Obj 403/Relevance. See objection to 82:2-82:19 regarding ROCKET.

**Responses In:**
Re: [82:25-83:12]
Pltf Resp It is an oversimplification to say that one indication was based on one study. In fact, data from many studies, including ROCKET were the basis of supporting all of the indications to some extent, and certainly, were used to inform the defendants' understanding of the safety and efficacy profiles of Xarelto. The jury must be trusted to distinguish the studies from one another. Additionally, ROCKET is relevant for a host of other reasons, including the defendants' notice of critical safety issues of Xarelto, as well as flaws in the RECORD studies which call the safety of the drug into question. This evidence is relevant to Plaintiff's failure to warn claim. It establishes that Defendants knew they might not have the safest dose for patients with Afib which made it even more important to instruct physicians about the advisability of measuring and the ability to measure, the anticoagulant effect of Xarelto using Neoplastin PT and or to include in its design of Xarelto an anti-Factor Xa assay and reversal agent. For this reason and others, this testimony is relevant and there is no significant risk of confusion that outweighs the probative value of this evidence. There is more than adequate foundation for this testimony. Not only is M. Homering one of the chief biostatisticians at Bayer, he testified that he is familiar with the underlying models and testified to his interpretation of the results.

**Rulings:** Pending

---

**85:1 - 85:7**    1:00

Homering, Martin 2015-06-21

85 1 Q. In responding to something like an FDA request,
85 2 or an FDA report like this, that was a joint
85 3 responsibility of Bayer and J&J, right?
85 4     MS. TERSIGNI: Form.
85 5 A. I cannot tell you the details of the regulatory
85 6 construction regarding AFib in this respect, but the
85 7 teams did work jointly and exchanged experience.

**Objections In:**
Re: [85:1-85:7]
Def Obj 403/Relevance. See objection to 82:2-82:19 regarding ROCKET.

**Responses In:**
Re: [85:1-85:7]
Pltf Resp It is an oversimplification to say that one indication was based on one study. In fact, data from many studies, including ROCKET were the basis of supporting all of the indications to some extent, and certainly, were used to inform the defendants' understanding of the safety and efficacy profiles of Xarelto. The jury must be trusted to distinguish the

**Rulings:** Pending

---

19

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**86:14 - 86:19**

86 14
86 15
86 16
86 17
86 18
86 19

Homering, Martin 2016-06-21
Q. Okay. So if we can look at one more document before we take our break, I want to go back to Exhibit No. 5. And so this is a clinical pharmacology responses to the sponsor's questions, and so J&J and Bayer proposed questions to the FDA regarding their analysis, and this is the FDA's response; is that right?

2:01

Re: [86:14-86:19]
Pltf Obj Attorney banter should be removed.

studies from one another. Additionally, ROCKET is relevant for a host of other reasons, including the defendants' notice of critical safety issues of Xarelto, as well as flaws in the RECORD studies which call the safety of the drug into question. This evidence is relevant to Plaintiff''s failure to warn claim. It establishes that Defendants knew they might not have the safest dose for patients with Afib which made it even more important to instruct physicians about the advisability of measuring and the ability to measure, the anticoagulant effect of Xarelto using Neoplastin PT and/or to include in its design of Xarelto an anti-Factor Xa assay and reversal agent. For this reason and others, this testimony is relevant and there is no significant risk of confusion that outweighs the probative value of this evidence. There is more than adequate foundation for this testimony. Not only is M. Homering one of the chief biostatisticians at Bayer, he testified that he is familiar with the underlying models and testified to his interpretation of the results.



Pending

**86:22 - 86:24**

86 22
86 23
86 24

Homering, Martin 2016-06-21
A. I cannot assess this. As far as I know, the correspondence between the FDA -- with the FDA is taken care of by Janssen and not by Bayer.

0:11

**90:19 - 91:15**

90 19
90 20
90 21
90 22
90 23
90 24
90 25
91 1
91 2
91 3
91 4
91 5
91 6
91 7
91 8
91 9
91 10
91 11
91 12
91 13
91 14
91 15

Homering, Martin 2016-06-21
Q. So let's look -- the FDA went on and said, "Further, to explore the impact of timing of the samples, sensitivity analysis only including PT measured between the 12 to 24 hours showed results consistent to that demonstrated in Figures 1A, ischemic stroke, and 2A, major bleeding, of the technical reports. See Figure 3. Therefore, it was reasonable to explore the relationship between PT measured in Rocket AF and outcome for rivaroxaban." That's what the FDA said there, correct?
A. Yes, I have also read it like this.
Q. And when they talk about sensitivity analysis, is that another statistical analysis method that can be used to determine whether or not your results have been biased in any way?
A. Usually sensitivity analyses are used to see whether anything changes in the results when you change the assumptions. But if the whole -- the dataset as a whole is questionable, sensitivity analysis will not really get you anywhere.
Q. But that's the purpose of performing a sensitivity analysis, correct?

2:18

Re: [90:19-91:15]
Def Obj Lack of foundation. This line of questioning relates to Exhibit 5 which was not designated (see 86:14 - 24); regardless, it is not relevant/403 because Exhibit 5 pertains to ROCKET. See objection to 64:17-65:1 regarding ROCKET. Lack of foundation. Martin Homering testified at 86:22-24 that he could not assess this document.

Re: [90:19-91:15]
Pltf Resp Plaintiffs would agree to designate Exhibit 5. This testimony relates to the sensitivity analysis, which M. Homering was significantly involved with, as a biostatistician at Bayer, and as such, there is more than adequate foundation for this testimony. Please see also Plaintiffs' previous responses regarding the evidentiary value of the ROCKET data.

Pending

07/28/17 16:09

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**91:17 - 91:18**   Homering, Martin 2016-06-21
91 17    A. Sensitivity analysis provides a view of the
91 18    data from a slightly different perspective.

0:06

**Re: [91:17-91:18]**
**Def Obj** Lack of foundation and 403/relevance - ROCKET. See objection to 90:19 - 91:15.

**Re: [91:17-91:18]**
**Ptf Resp** Plaintiffs would agree to designate Exhibit 5. This testimony relates to the sensitivity analysis, which M. Homering was significantly involved with, as a biostatistician at Bayer, and as such, there is more than adequate foundation for this testimony. Please see also Plaintiffs' previous responses regarding the evidentiary value of the ROCKET data.

Pending



**92:10 - 92:16**   Homering, Martin 2016-06-21
92 10    Q. And so if we look back at the 8 chart a little
92 11    closer and we look at the four points and error bars, we
92 12    know that the FDA divided the patients' PT measurements
92 13    into four quartiles, and that's what those points and
92 14    bars represent, right?
92 15    A. Yes, the patient groups were put into those
92 16    four different quartiles.

0:59

**Re: [92:10-92:16]**
**Def Obj** Lack of foundation and 403/relevance - ROCKET. See objection to 90:19 - 91:15.

**Re: [92:10-92:16]**
**Ptf Resp** Plaintiffs would agree to designate Exhibit 5. This testimony relates to the sensitivity analysis, which M. Homering was significantly involved with, as a biostatistician at Bayer, and as such, there is more than adequate foundation for this testimony. Please see also Plaintiffs' previous responses regarding the evidentiary value of the ROCKET data.

Pending

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**93:17 - 94:10   Homering, Martin 2016-06-21**

94:10

93 17 Q. Okay. And so with respect to quartile one and
93 18 the median PT, that -- the first one on the far left,
93 19 bottom left point, that corresponded to a probability of
93 20 a bleeding event of about one percent; is that right?
93 21 MR. STOFFELMAYR: Objection to form.
93 22 A. The figure shows to my mind the proportion of
93 23 patients with major bleeding in the observation period
93 24 indeed, and this proportion is just about above one
93 25 patient of the patients in the first quartile.
94 1 Q. One percent of the patients.
94 2 A. And at the same time it is unclear how -- for
94 3 how long these patients remained under observation from
94 4 here on.
94 5 Q. Okay. And then if we look at the median PT for
94 6 the fourth quartile at the top right, it corresponds
94 7 with a proportion of patients with a major bleeding
94 8 event somewhere between four and five, right?
94 9 A. In this patient group the proportion with the
94 10 event is around about that site, yes.

3:03

**Re: [93:17-94:10]**
**Def Obj:** Lack of foundation and 403/relevance -
ROCKET. See objection to 90:19 - 91:15.

**Re: [93:17-94:10]**
Pltf Resp Plaintiffs would agree to designate Exhibit 5. This
testimony relates to the sensitivity analysis, which M. Homering
was significantly involved with, as a biostatistician at Bayer, and
as such, there is more than adequate foundation for this
testimony. Please see also Plaintiffs'' previous responses
regarding the evidentiary value of the ROCKET data.

Pending



**94:17 - 95:11   Homering, Martin 2016-06-21**

95:11

94 17 Q. Okay. But if, according to this FDA
94 18 sensitivity analysis, the patients in the fourth
94 19 quartile of PT with less -- less than a doubling of
94 20 their PT value in seconds, have greater -- have a
94 21 greater proportion of probability of having a major
94 22 bleeding event than those patients in the first
94 23 quartile, right?
94 24 MR. STOFFELMAYR: Objection to form.

3:16

**Re: [94:17-95:11]**
**Def Obj:** Lack of foundation and 403/relevance -
ROCKET. See objection to 90:19 - 91:15.

**Re: [94:17-95:11]**
Pltf Resp Plaintiffs would agree to designate Exhibit 5. This
testimony relates to the sensitivity analysis, which M. Homering
was significantly involved with, as a biostatistician at Bayer, and
as such, there is more than adequate foundation for this
testimony. Please see also Plaintiffs'' previous responses
regarding the evidentiary value of the ROCKET data.

Pending

22

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| 94 25<br>95 1<br>95 2<br>95 3<br>95 4<br>95 5<br>95 6<br>95 7<br>95 8<br>95 9<br>95 10<br>95 11<br><br>A. This figure shows different probabilities for four points, and it does not indicate anything about comparability, about measuring time points, about the further length of the observation of these patients. So, from a statistical point of view, these results are not interpretable with respect to different risks.<br>Q. What the figure does show is that the proportion of patients with major bleeds for those who had their PT measured between 12 and 24 hours was four times higher than those in those patients in the fourth or top quartile of PT, compared to those in the first quartile, correct? | | | |
| 95:13  -  96:1<br>95 13<br>95 14<br>95 15<br>95 16<br>95 17<br>95 18<br>95 19<br>95 20<br>95 21<br>95 22<br>95 23<br>95 24<br>95 25<br>96 1<br><br>Homering, Martin 2016-06-21<br>A. What this figure shows is that if we look at existing PT measurements, and then divide the patients into four groups, that these four patient groups are different with respect to major bleeding. It doesn't say anything about how comparable these groups are.<br>Q. And just so we're clear, when we talk about four patient groups, four quartiles, each quartile represents 25 percent of the patients that you're evaluating, correct?<br>A. That is how I understand these quartiles, that roughly 25 percent, not of all patients participating in the RECORD trial, but of those patients in -- in this -- thank you -- that contribute to this analysis are in a quartile. | 1:44<br><br>Re: [95:13-96:1]<br>Def Obj Lack of foundation and  403/relevance - ROCKET. See objection to 90:19 - 91:15. | Re: [95:13-96:1]<br>Pltf Resp Plaintiffs would agree to designate Exhibit 5. This testimony relates to the sensitivity analysis, which M. Homering was significantly involved with, as a biostatistician at Bayer, and as such, there is more than adequate foundation for this testimony.  Please see also Plaintiffs' previous responses regarding the evidentiary value of the ROCKET data. | Pending |
| 96:2  -  96:6<br>96 2<br>96 3<br>96 4<br>96 5<br>96 6<br><br>Homering, Martin 2016-06-21<br>Q.  Right.<br>And I think you meant Rocket trial for this, not RECORD.<br>THE WITNESS:  Rocket.  Sorry.<br>A.  Rocket, of course. | 0:12 | | |
| 96:17  -  97:13<br>96 17<br>96 18<br>96 19<br>96 20<br>96 21<br>96 22<br>96 23<br><br>Homering, Martin 2016-06-21<br>Q.  Sorry -- of follow-up questions.  I want to ask you to look at Question No. 5, which is on Page 5 of the document.<br>A.  Yeah.<br>Q.  Okay.  So Question 5 that was posed to FDA is, "In evaluating the bleeding relationship to PD, Section B, the report states, 'overall the results demonstrated | 2:07<br><br>Re: [96:17-97:13]<br>Def Obj Lack of foundation and  403/relevance - ROCKET. See objection to 90:19 - 91:15. | Re: [96:17-97:13]<br>Pltf Resp Plaintiffs would agree to designate Exhibit 5. This testimony relates to the sensitivity analysis, which M. Homering was significantly involved with, as a biostatistician at Bayer, and as such, there is more than adequate foundation for this testimony.  Please see also Plaintiffs' previous responses regarding the evidentiary value of the ROCKET data. | Pending |

23

07/28/17 16:09



| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

| 96:24 | that risk of bleeding was associated with PD | | | |
| 96:25 | measurements, PT, PDA or PICT.' The results were | | | |
| 97:1 | consistent with the findings from our primary analysis | | | |
| 97:2 | of PT major bleeding relationship, reference Section B, | | | |
| 97:3 | prothrombin time major bleeding relationship. Could the | | | |
| 97:4 | agency indicate whether the noted relationship was | | | |
| 97:5 | statistically significant in an adjusted analysis or an | | | |
| 97:6 | inference based on qualitative assessment?"  That was | | | |
| 97:7 | the question posed to the FDA in 2011, correct? | | | |
| 97:8 | A.  That is what it reads. | | | |
| 97:9 | Q.  Okay.  And the response from the FDA states, | | | |
| 97:10 | "The observed relationship between the PD markers and | | | |
| 97:11 | major bleeding was the strongest and significant with | | | |
| 97:12 | PT," correct? | | | |
| 97:13 | A.  That's what it says, yes. | | | |

| 165:15 - 165:24 | Homering, Martin 2016-06-22 | 1:33 | Re: [165:15-165:24] | Re: [165:15-165:24] |
| 165:15 | (Homering Exhibit No. 16 was marked for | | Def Obj Lack of foundation. M. Homering testifies at | Pltf Resp Later testimony makes it clear that there is more than |
| 165:16 | identification.) | | 166:8 - 10 that he cannot recall ever having seen this | adequate foundation for this testimony.  Homering was familiar |
| 165:17 | Q.  Okay, I'm going to show you a document that | | PowerPoint. 403/Relevance. See objection to 10:25 - | with the Clinical Development Review Committee and was |
| 165:18 | we'll mark as Homering 16.  It's Record No. 3409115. | | 11:9 re VTE-Prevention/RECORD. | involved with determining the sample size for the VTE Phase III |
| 165:19 | This has a Bates number of 25648099. | | | program and developing the related statistical analysis.  Please |
| 165:20 | And I want to look at the -- look at the first | | | see also Plaintiffs' previous responses regarding the evidentiary |
| 165:21 | page of this, it's on the screen, and it's called, | | | value of the RECORD data. |
| 165:22 | "Bayer 59-7939 Xarelto CDP VTE-prevention EoP-2," or end | | | |
| 165:23 | of Phase II, "April of 2005".  Do you see that? | | | |
| 165:24 | A.  Yes, I can read that text. | | | |

Pending

| 166:8 - 166:10 | Homering, Martin 2016-06-22 | 0:18 | | |
| 166:8 | Q.  Okay, Did you -- do you recognize this | | | |
| 166:9 | PowerPoint? | | | |
| 166:10 | A.  I cannot recall ever having seen it. | | | |

| 166:15 - 166:25 | Homering, Martin 2016-06-22 | 1:13 | Re: [166:15-166:24] | Re: [166:15-166:24] |
| 166:15 | Q.  Okay. And the first bullet point says, "VTE- | | Def Obj Lack of foundation. M. Homering testifies at | Pltf Resp Later testimony makes it clear that there is more than |
| 166:16 | prevention shall be developed with a limited scope of | | 166:8 - 10 that he cannot recall ever having seen this | adequate foundation for this testimony.  Homering was familiar |
| 166:17 | indication to ensure fastest market entry."  Do you see | | PowerPoint. 403/Relevance. See objection to 10:25 - | with the Clinical Development Review Committee and was |
| 166:18 | that? | | 11:9 re VTE-Prevention/RECORD. | involved with determining the sample size for the VTE Phase III |
| 166:19 | A.  Yes, I can read that. | | | |

Pending

24

07/28/17 16:09

| | Objections In | Responses In | Rulings |
|---|---|---|---|

166:20  Q.  Okay.  And do you recall being told by the
166:21        people developing the clinical plan for Xarelto that
166:22        they wanted to ensure the fastest market entry for the
166:23        drug?
166:24  A.  I do not know those people, nor do I recall
166:25        anything of this kind.

program and developing the related statistical analysis.  Please see also Plaintiffs' previous responses regarding the evidentiary value of the RECORD data.

---

167:6  -  167:22  Homering, Martin 2015-06-22                                  1:26

167  6   Q.  Okay.  Let's look at the next page, if we can,
167  7        "The clinical development of Xarelto recommendations,
167  8        VTE-Prevention," and let's look at the first bullet
167  9        point, if we can.  Do you have that in front of you?
167 10   A.  Yes.
167 11   Q.  It says, "Pivotal VTE-prevention package to
167 12        focus on a more limited range of indications in major
167 13        orthopedic surgery with the primary goal, time to
167 14        market."  Do you see that?
167 15   A.  Yes.
167 16   Q.  Now, if you can look with me at the fourth
167 17        bullet point, it says, "Although non-inferiority versus
167 18        enoxaparin would match current PTP, trials shall strive
167 19        for superiority to limit sample size; caveat, different
167 20        endpoints in superiority versus non-inferiority trials
167 21        to be used."  Do you see that?
167 22   A.  I can read that.

**Re: [167:6-167:22]**
**Def Obj** Lack of foundation. M. Homering testifies at 166:8 - 10 that he cannot recall ever having seen this PowerPoint. Lack of foundation. M. Homering testifies at 167:23 - 168:4 that it is not his or his department's function to determine sample sizes. 403/Relevance. See objection to 10:25 - 11:9 re VTE-Prevention/RECORD.

**Re: [167:6-167:22]**
Plf Resp Later testimony makes it clear that there is more than adequate foundation for this testimony.  Homering was familiar with the Clinical Development Review Committee and was involved with determining the sample size for the VTE Phase III program and developing the related statistical analysis.  Please see also Plaintiffs' previous responses regarding the evidentiary value of the RECORD data.

Pending

---

167:23  -  168:4  Homering, Martin 2015-06-22                                 1:00

167 23   Q.  Okay.  And were you involved in helping
167 24        determine how the sample size could be limited for the
167 25        VTE-prevention trials?
168  1   A.  No.  As I said earlier, these kind of
168  2        development issues are nothing that our department would
168  3        work on, nor would I personally work on them.  That is
168  4        just not my function.

---

168:5  -  168:12  Homering, Martin 2015-06-22                                 1:09

168  5   Q.  Okay.  So let's look at two pages over, if we
168  6        can, "The clinical development of Xarelto BAY 59-7939

**Re: [168:5-168:12]**
**Def Obj** Lack of foundation. M. Homering testifies at

**Re: [168:5-168:12]**
Plf Resp Later testimony makes it clear that there is more than

Pending

25

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| 168  7<br>168  8<br>168  9<br>168 10<br>168 11<br>168 12 | conflict." Do you see that slide?<br>A. Yes.<br>Q. Okay. And it says, "It is not a medical decision but a management decision to balance speed of development versus risk." Did I read that correctly?<br>A. That text stands there, yes. | 166:8 - 10 that he cannot recall ever having seen this PowerPoint. Lack of foundation. M. Homering testifies at 168:17 - 168:20 that it is not his function to deal with the terms counsel asked about that appear in the underlying PowerPoint. 403/Relevance. See objection to 10:25 - 11:9 re VTE-Prevention/RECORD. | adequate foundation for this testimony. Homering was familiar with the Clinical Development Review Committee and was involved with determining the sample size for the VTE Phase III program and developing the related statistical analysis.   Please see also Plaintiffs' previous responses regarding the evidentiary value of the RECORD data. |
| 168:13 -<br>168 13<br>168 14<br>168 15 | 168:15 Homering, Martin 2015-06-22<br>Q. And when it comes to balancing risk, do you think that's a management decision or a medical decision? | 0:30 | |
| 168:17 -<br>168 17<br>168 18<br>168 19<br>168 20<br>168 21<br>168 22<br>168 23<br>168 24<br>168 25<br>169  1<br>169  2<br>169  3 | 169:3 Homering, Martin 2015-06-22<br>A. As I said already, I have no definition of these terms, "speed or risk". I just don't deal with them in my function, so I cannot give any interpretation of them.<br>Q. So when this PowerPoint talks about "fast track, and if we believe in superiority, we design superiority trials, enroll considerably number of patients equal faster approval, equals earlier market entry," that's not something you'd be involved with.<br>A. That is the case. That is something I cannot interpret. Those are topics that I do not deal or work with. | 1:13 | |
| 169:12 -<br>169 12<br>169 13<br>169 14<br>169 15<br>169 16<br>169 17<br>169 18<br>169 19<br>169 20<br>169 21 | 169:21 Homering, Martin 2015-06-22<br>(Homering Exhibit No. 17 was marked for identification.)<br>Q. Okay. All right. So this is Exhibit 17, 3409114, and it's Xarelto, BPAG, 25648097.<br>And you saw you this is an E-mail from Monday, April 4th of 2005, from Frank Misselwitz to Christoph Dierig and yourself, the subject, "Sample size calculations for Phase III," as Exhibit 17. Do you see that?<br>A. That is correct. | 2:14<br>Re: [169:12-169:21]<br>Def Obj 403/Relevance. See objection to 10:25 - 11:9 re VTE-Prevention/RECORD. Lack of foundation. M. Homering testifies at 172:24 - 173:2 that he does not see himself as the primary addressee of the underlying email because it is not his function to "look into sample sizes." | Re: [169:12-169:21]<br>Pltf Resp: Regardless of what M. Homering said, he was indeed a primary recipient of the email and was specifically asked for his input into the sample size of the Phase III CDP plan and the statistical plan for the data.  Please see also Plaintiffs' previous responses regarding the evidentiary value of the RECORD data. | Pending |
| 169:22 -<br>169 22<br>169 23<br>169 24<br>169 25<br>170  1<br>170  2<br>170  3<br>170  4<br>170  5 | 170:5 Homering, Martin 2015-06-22<br>Q. Okay. And if you can -- this E-mail is in German, but at the very bottom you can see that what's attached is the CDP-RC Xarelto End of Phase II 04-07-2005 PowerPoint file, which was the PowerPoint that were looking at previously in Exhibit No. 16.<br>A. Yes. Yes, I see that. Above that I see the indication, Pages 6 to 9, and Page 14.  So I don't know if that referred to the whole document or only to these pages. | 1:39 | |
| 170:6 -<br>170  6<br>170  7 | 170:13 Homering, Martin 2015-06-22<br>Q. Okay. And I'll represent to you that the whole file was attached to the E-mail. I'm not sure what the | 0:45<br>Re: [170:6-170:13]<br>Def Obj 403/Relevance. See objection to 10:25 - 11:9 | Pending |

07/28/17 16:09

| | Objections In | Responses In | Rulings |
|---|---|---|---|

170  8
170  9
170  10
170  11
170  12
170  13

reference was on the pages, but the whole file was
attached to the E-mail.

    All right. And as much as I'd like to go
through this E-mail in German I actually have an
official translation of the E-mail in English that I'm
going to give you as Exhibit 18.

170:18 - 172:5

Homering, Martin 2016-06-22
    (Homering Exhibit No. 18 was marked for
identification.)
170  18
170  19
170  20
170  21
170  22
170  23
170  24
170  25
171  1
171  2
171  3
171  4
171  5
171  6
171  7
171  8
171  9
171  10
171  11
171  12
171  13
171  14
171  15
171  16
171  17
171  18
171  19
171  20
171  21
171  22
171  23
171  24
171  25
172  1
172  2
172  3
172  4
172  5

    Q.  Now you should have in front of you both the
German version and the translated version.  So I just
have a couple of questions about this E-mail.
    So you did in fact receive the PowerPoint that
we were talking about that was talking about the
management decision related to balancing the speed of
development versus risk and early market entry, correct?
    A.  That is correct.
    Q.  Okay.  And so Dr. Misselwitz sends you and
Christoph Dierig this E-mail, and he tells you that the
Phase III VTE-prevention now critically depends on the
planned sample size, and may require a change in our
PTP.  We will not present a final version of the Phase
III program at the upcoming CDP-RC, but several options.
We in the management can and must then weigh these
options against one another.  That's what he told you
and Christoph Dierig, correct?
    A.  Yes, it says so here.
    Q.  Okay.  And the next thing that Dr. Misselwitz
told you and Christoph Dierig was that the decision
criterion will be:  One, time to market; two, money and
resources; and, three, probability of success, right?
    A.  Yes, it says so here.
    Q.  Okay.  He says, "The desired strategic fit,
extended prevention, and a large variety of different
indications, probably cannot be upheld," right?
    A.  Yes, it says so here.
    Q.  Okay.  He then presents what he describes as
two extreme scenarios regarding how the studies will be
performed on VTE-prevention in Phase III, correct?
    A.  It says so here, yes.
    Q.  And then for the first study, which would be a
superiority study where total VTE is the endpoint, he
says, "The objective is a minimal sample size on the
basis of the highest possible RRR."  Do you see that?
    A.  Yes, it says so here.

172:16 - 173:9

Homering, Martin 2016-06-22
172  16
172  17
172  18
172  19
172  20
172  21
172  22
172  23
172  24
172  25
173  1

    Q.  So you would agree that Dr. Misselwitz was
asking about sample size differences in a large
non-inferiority trial depending on the endpoint that the
study was evaluating.
    A.  I cannot assess this because all of those
aspects mentioned, superiority, non-inferiority, which
outcomes, which relative risks, are not intended for me;
but they must have come up in discussions with the
project statistician, Christoph Dierig.  I was not the
primary addressee of this E-mail, or I do not see myself
as the primary addressee, because it is not my function

re VTE-Prevention/RECORD.

4:57

Re: [170:18-172:25]

Def Obj: 403/Relevance. See objection to 10:25 - 11:9
re VTE-Prevention/RECORD.  Lack of foundation. M.
Homering testifies at 172:24 - 173:2 that he does not
see himself as the primary addressee of the
underlying email because it is not his function to "look
into sample sizes."

2:43

Re: [170:18-172:25]

Pltf Resp: Regardless of what M. Homering said, he was indeed a
primary recipient of the email and was specifically asked for his
input into the sample size of the Phase III CDP plan and the
statistical plan for the data.  Please see also Plaintiffs' previous
responses regarding the evidentiary value of the RECORD data.

Pending

27

| | Objections In | Responses In | Rulings |
|---|---|---|---|

173  2    to look into sample sizes.
173  3    Q. Dr. Misselwitz E-mailed two people about this
173  4    issue, and said that you and Christoph Dierig and
173  5    himself, with management, had to weigh the options
173  6    against one another and apply decision criteria,
173  7    including time to market, money and resources, and
173  8    probability of success. He included you in this E-mail,
173  9    didn't he?

**0:29**

173:11 –   173:16 Homering, Martin 2015-06-22
173 11    A. I am included, but I am not part of the
173 12    clinical development team, nor of the decision-making.
173 13    I interpret my inclusion in this E-mail as having
173 14    reference to the request made on pooled analysis in one
173 15    of the paragraphs. All other items are outside of my
173 16    expertise and line of work.

**2:22**

174:14 –   175:1 Homering, Martin 2015-06-22
174 14    Q. Okay. So the title of this slide, on 12, in
174 15    the PowerPoint that Dr. Misselwitz sent you in April of
174 16    2005 is, "Dose Selection for BID VTE-Prevention Trials,"
174 17    correct?
174 18    A. This is what it written here.
174 19    Q. Right.
174 20    And in the pre-planned pooled analysis from
174 21    July of '04, you had helped evaluate the BID Phase II
174 22    studies in a draft document of a pooled analysis that
174 23    could be done to look at dose-finding for the BID
174 24    prevention trials, correct?
174 25    A. As I said, this is a document describing
175  1    explorative pooled analysis depending on daily doses.

Re: [174:14 –175:1]
Def Obj 403/Relevance. See objection to
re VTE-Prevention/RECORD.

Re: [174:14-175:1]
Pltf Resp Later testimony makes it clear that there is more than
adequate foundation for this testimony. Homering was familiar
with the Clinical Development Review Committee and was
involved with determining the sample size for the VTE Phase III
program and developing the related statistical analysis.   Please
see also Plaintiffs' previous responses regarding the evidentiary
value of the RECORD data.

**Pending**

**0:35**

175:19 –   175:24 Homering, Martin 2015-06-22
175 19    Q. And if we look at the second bullet point it
175 20    says, "Doses higher than five milligram BID increase
175 21    interpatient variability without predictably increasing
175 22    AUC, area under the curve, and Cmax, for single
175 23    patients." Do you see that?
175 24    A. This is text written here.

Re: [175:19-175:24]
Def Obj 403/Relevance. See objection to
re VTE-Prevention/RECORD.

Re: [175:19-175:24]
Pltf Resp Later testimony makes it clear that there is more than
adequate foundation for this testimony. Homering was familiar
with the Clinical Development Review Committee and was
involved with determining the sample size for the VTE Phase III
program and developing the related statistical analysis.   Please
see also Plaintiffs' previous responses regarding the evidentiary
value of the RECORD data.

**Pending**

**2:09**

175:25 –   176:15 Homering, Martin 2015-06-22
175 25    Q. Okay. This was the text written in the
176  1    PowerPoint that Dr. Misselwitz sent you and Christoph
176  2    Dierig in April of 2005, right?



07/28/17 16:09

07/28/17 16:09

| | Objections In | Responses In | Rulings |
|---|---|---|---|

176  3
176  4
176  5
176  6
176  7
176  8
176  9
176 10
176 11
176 12
176 13
176 14
176 15

A. I cannot really assess this because I do not
know which pages I looked at, because in his PowerPoint,
or in his E-mail, he mentioned the Pages 6 to 9, and 14.
Q. But he sent you the entire PowerPoint, and so
the PowerPoint that Dr. Misselwitz sent you in April of
'05, included this statement, that doses higher than
five milligram BID increase interpatient variability
without predictably increasing AUC and Cmax for single
patients, correct?
A. Yes; but as many slides in this presentation
deals with issues that are outside of my expertise, I
cannot really say which ones I read. These topics are
not in my area of expertise.

---

180:23 - 181:3

0:53

180 23
180 24
180 25
181  1
181  2
181  3

Homering, Martin 2016-06-22
Q. If we look at the chart on the left, which is
just 10944 and 10945, this shows an increasing
odds-ratio of major bleeding as the dosage increases,
correct?
A. We can see a relative increase in the point
estimators the odds-ratio compared to enoxaparin.

**Objections In:** Re: [180:23-181:3]
Def Obj 403/Relevance. See objection to 10:25 - 11:9
re VTE-Prevention/RECORD.

**Responses In:** Re: [180:23-181:3]
Pltf Resp Later testimony makes it clear that there is more than
adequate foundation for this testimony. Homering was familiar
with the Clinical Development Review Committee and was
involved with determining the sample size for the VTE Phase III
program and developing the related statistical analysis. Please
see also Plaintiffs' previous responses regarding the evidentiary
value of the RECORD data.

**Rulings:** Pending

---

182:23 - 183:5

0:55

182 23
182 24
182 25
183  1
183  2
183  3
183  4
183  5

Homering, Martin 2016-06-22
Q. All right. So the -- the other axis is --
represents drug concentration levels that were measured
during sparse sampling on days six and seven in the
10944 study, correct?
A. Since I don't work with this kind of data I can
only say what it says here to describe the axis.
Q. Okay. And what does -- what do the little
black dots represent?



---

187:7 - 189:9

0:07

187  7
188  8
188  9

Homering, Martin 2016-06-22
A. I wouldn't be able to tell you. I haven't made
this graph and I don't routinely work with this kind of
analysis.

---

183:10 - 183:22

1:37

183 10
183 11
183 12
183 13
183 14
183 15
183 16

Homering, Martin 2016-06-22
Q. Okay. So what does the statement say regarding
doses and 10 milligrams BID? It says that doses greater
than -- that symbol, that means greater than or equal
to, correct?
A. Yes; mathematically, that means greater than or
equal.
Q. Okay. And so this says that doses that are

**Objections In:** Re: [183:10-183:22]
Def Obj 403/Relevance. See objection to 10:25 - 11:9
re VTE-Prevention/RECORD.

**Responses In:** Re: [183:10-183:22]
Pltf Resp Later testimony makes it clear that there is more than
adequate foundation for this testimony. Homering was familiar
with the Clinical Development Review Committee and was
involved with determining the sample size for the VTE Phase III
program and developing the related statistical analysis. Please
see also Plaintiffs' previous responses regarding the evidentiary

**Rulings:** Pending

29

07/28/17 16:09

**Rulings**

**Responses In**

value of the RECORD data.

**Objections In**

| | | |
|---|---|---|
| 183 17 | greater than or equal to 10 milligrams BID result in | |
| 183 18 | higher variability, correct? | |
| 183 19 | A. That's what it says here. | |
| 183 20 | Q. Okay. And 10 milligrams BID again would be a | |
| 183 21 | 20 milligram total daily dose, correct? | |
| 183 22 | A. Correct. | |
| 201:24 - 201:25 | Homering, Martin 2016-06-22 | 0:04 |
| 201 24 | (Homering Exhibit No. 25 was marked for | |
| 201 25 | identification.) | |
| 202:12 - 202:24 | Homering, Martin 2016-06-22 | 1:41 |
| 202 12 | Q. Okay. And did you help create this PowerPoint? | |
| 202 13 | A. Yes, this would partly be based on analysis | |
| 202 14 | done by me. | |
| 202 15 | Q. And so if we can look at the next slide, the | |
| 202 16 | title of the slide describes this as a posthoc analysis | |
| 202 17 | of study number 11223 and 11528. | |
| 202 18 | A. That's correct. | |
| 202 19 | Q. So it says it wants to look at event rates on | |
| 202 20 | the second bullet point by, and then the third one, | |
| 202 21 | steady-state exposure parameters AUC, Cmax and Crough, | |
| 202 22 | categorized into three levels, with approximately equal | |
| 202 23 | number of patients pooled across studies. That was the | |
| 202 24 | analysis that you performed, correct? | |
| 203:1 - 203:3 | Homering, Martin 2016-06-22 | 0:27 |
| 203 1 | A. This describes the analysis performed with the | |
| 203 2 | data that was made available by Dr. Mueck to global | |
| 203 3 | biometry. | |
| 214:25 - 215:25 | Homering, Martin 2016-06-22 | 3:40 |
| 214 25 | Q. So, Mr. Homering, you have four charts here. | |
| 215 1 | One is for area under the curve, one is for Cmax, one is | |
| 215 2 | for Crough, and the other for total daily dosage, and | |
| 215 3 | they compare the adjusted event rates for clinically | |
| 215 4 | relevant/any bleeds for both studies 11223 and 11528, | |
| 215 5 | right? | |
| 215 6 | A. The title is not entirely correct because it | |
| 215 7 | says "study adjusted". But "study adjusted" refers to | |
| 215 8 | pooled results, whereas these graphs represent results | |
| 215 9 | per study. | |
| 215 10 | Q. Your department generated these charts from | |
| 215 11 | your analysis, correct? | |
| 215 12 | A. Correct. | |
| 215 13 | Q. Okay. So if we look at area under the curve, | |
| 215 14 | the top left chart, it demonstrates that the event rate | |
| 215 15 | for 11223 increases as exposure is measured by area | |
| 215 16 | under the curve increases, and that it's greater than | |
| 215 17 | the incidence rate that was seen in 11528. Is that a | |
| 215 18 | fair statement? | |
| 215 19 | A. The blue curve and the blue points are above | |
| 215 20 | the red ones; and, as I said, blue is any bleeding and | |
| 215 21 | red are the clinically-relevant bleeding events. With | |
| 215 22 | regard to the straight blue line, there's a rather big | |
| 215 23 | range of variation here.  It increases slightly, looking | |
| 215 24 | from left to right, with increasing values on the X | |
| 215 25 | axis. | |

07/28/17 16:09

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**216:8 - 217:13 Homering, Martin 2015-06-22**          3:36

```
216  8   Q. Okay. And so then eventually though you did an
216  9   analysis once you pooled this data together; is that
216 10   right?
216 11   A. Correct.
216 12   Q. Okay. So let's slide over to Slide 23,
216 13   findings from exposure analysis.
216 14   MR. STOFFELMAYR: One more.
216 15   Q. Okay. And this slide says, "Findings from
216 16   exposure analysis." and there are two trends reported.
216 17   The first is a trend to lower rates of DVT deterioration
216 18   until week 12, with increasing Ctrough levels, correct?
216 19   A. Trend in the sense of a trend test, yes.
216 20   Q. Okay. And then a second trend that's reported
216 21   is trend to higher bleeding rates, any or clinically-
216 22   relevant bleeding increasing Cmax levels. Do you see
216 23   that?
216 24   A. I do.
216 25   Q. And you actually performed trend test analysis
217  1   based on the evaluation between the studies in the
217  2   pooled analysis in order to make those observations; is
217  3   that right?
217  4   A. Yes, trend tests were calculated for continuous
217  5   exposure; but you have to see those in the context of
217  6   the number of events, the data, and the location of the
217  7   point estimates in the terciles, because it's not
217  8   possible to know whether a linear trend test is correct
217  9   or not.
217 10   Q. But what was reported in this PowerPoint that
217 11   your department created was that there was a trend to
217 12   higher bleeding rates with increasing Cmax levels,
217 13   correct?
```

**217:15 - 217:15 Homering, Martin 2015-06-22**          0:07

```
217 15   A. Just like for the total daily dose, yes.
```

**252:25 - 255:9 Homering, Martin 2015-06-22**          5:40

```
252 25   Q. I'm going to show you what we'll mark as
253  1   Exhibit No. 34. I'm showing you an E-mail, Bates
253  2   BPAG_0194615, from Kemal Malik, on May 31st of 2006, so
253  3   about 13 days after the last CDP-RC meeting that we
253  4   looked at in the previous Exhibit 33.
253  5   A. Yes.
253  6   Q. And who is Kemal Malik?
253  7   A. I don't know what was his role. I would have
253  8   to speculate.
253  9   Q. You understood he was upper-level management at
253 10   Bayer, correct?
253 11   A. That's correct.
253 12   Q. Okay. And Kemal Malik E-mails Andrea Derix,
253 13   Dagmar Kubitza, Dr. Misselwitz, Klaus Wehling, Rene
253 14   Kluensch, Bernhard Glombitza, Ton Lensing, Torsten
253 15   Westermeier, Martin Homering, Martina Evertz, Andreas
253 16   Nauck, Reinhard Fescharek, and copies Iris Howell,
253 17   correct?
253 18   A. That's correct.
253 19   Q. Okay. And Dr. Malik says to you and the others
253 20   that have been E-mailed here, it says, "Dear al, last
253 21   week the last of the scheduled DP3 decisions was made
```

| Objections In | Responses In | Rulings |
|---|---|---|

| | |
|---|---|
| 253:22 | for rivaroxaban (VTE treatment). This means we are now |
| 253:23 | ready to initiate the Phase III activities for SPAF, |
| 253:24 | AFib, and VTE-treatment on schedule and, as previously |
| 253:25 | externally communicated, in the first half of 2006," |
| 254:1 | correct? |
| 254:2 | A. Correct. |
| 254:3 | Q. The next thing he told you was, "This is a |
| 254:4 | truly outstanding outcome and each of you should be |
| 254:5 | truly proud of this achievement. The Phase II program, |
| 254:6 | which was exclusively conducted by Bayer, was the |
| 254:7 | largest Phase II program in our history. As a team you |
| 254:8 | have steered rivaroxaban forward, adhering to the most |
| 254:9 | challenging timelines but, equally importantly, you have |
| 254:10 | ensured that we have continued to seize all |
| 254:11 | opportunities to maximize the value of this asset." Did |
| 254:12 | I read that correctly? |
| 254:13 | A. Yes, you did. |
| 254:14 | Q. Okay. It says, "I personally know that your |
| 254:15 | performance is being discussed as a benchmark in our |
| 254:16 | competitor companies." That's what he told you next, |
| 254:17 | right? |
| 254:18 | A. That's -- that's what he wrote to this list of |
| 254:19 | recipients, yes. |
| 254:20 | Q. Okay. It says, "Over the last few days I have |
| 254:21 | been on the IR road show in New York/Boston with |
| 254:22 | Wolfgang Plischke and Alexander Rosar. This project has |
| 254:23 | the highest possible visibility amongst our investor |
| 254:24 | community," correct? |
| 254:25 | A. Correct. |
| 255:1 | Q. Did you have an understanding that Xarelto's |
| 255:2 | success was crucial to the company's positioning in the |
| 255:3 | investor community back in 2006 when you were working on |
| 255:4 | those pooled analyses? |
| 255:5 | A. No, and I don't know what visibility means, |
| 255:6 | visibility in the investor community. Those are aspects |
| 255:7 | I don't look into normally. |
| 255:8 | Q. You suspect it means that it might help Bayer's |
| 255:9 | stock price? |

| | | |
|---|---|---|
| 255:11 - 257:7 | Homering, Martin 2015-06-22 | 5:03 |
| 255:11 | A. I cannot judge this, but I wouldn't exclude it. |
| 255:12 | However, I cannot tell whether this would influence -- |
| 255:13 | in what way this would influence the stock price. |
| 255:14 | Q. Was one part of your compensation at Bayer |
| 255:15 | stock options or any type of stock purchase plan? |
| 255:16 | A. As far as I know all Bayer AG employees in |
| 255:17 | Germany have an option to convert the Government |
| 255:18 | payments that you can receive into shares. So shares |
| 255:19 | are regularly offered to -- to Bayer employees. |
| 255:20 | Q. Okay. And do you own Bayer shares? |
| 255:21 | A. Yes, I do. |
| 255:22 | Q. Okay. Kemal next says, "Rivaroxaban truly has |
| 255:23 | the potential to be transformational for our company and |
| 255:24 | this is certainly perceived externally. It was a source |
| 255:25 | of great pride for me to be able to outline your |
| 256:1 | achievements and I really wish you had been able to hear |
| 256:2 | the most enthusiastic feedback that we received from the |
| 256:3 | investor community in the U.S." Did I read that |
| 256:4 | correctly? |

32

| | Objections In | Responses In | Rulings |
|---|---|---|---|

256   5      A. That's correct.
256   6      Q. Okay. He then says that the investor community
256   7      in the U.S. is a group of individuals who are usually
256   8      amazingly cynical about everything, right?
256   9      A. Correct.
256  10      Q. Do you remember hearing that Xarelto had the
256  11      potential to be a transformational drug for the company
256  12      back in 2006?
256  13      A. That's what it says here, but what this means,
256  14      I cannot judge.
256  15      Q. It says, "This is a direct result of your
256  16      efforts." Do you see that?
256  17      A. I do.
256  18      Q. Now he says, "You should truly be proud of your
256  19      achievements. Well done indeed!!" And then he invites
256  20      you to come in person for a celebratory dinner on the
256  21      evening of June 13th. Do you remember going to a
256  22      celebratory dinner with Kemal Malik back in 2006?
256  23      A. Whether it was on the 13th of June, I don't
256  24      know. But I do remember that there was once a dinner
256  25      with Kemal Malik, yes.
257   1      Q. Do you remember where that dinner was?
257   2      A. I believe it was close to Wuppertal.
257   3      Q. Okay. Now, he says, "I do hope you'll be able
257   4      to join me. Let my assistant, Iris Howell, know. Once
257   5      again, my personal congratulations and thanks. Kemal."
257   6      Now, you don't believe that Kemal Malik
257   7      accidentally included you in this E-mail, do you?

257:9  -  257:12  Homering, Martin 2016-06-22          0:12
257   9      A. I didn't say that I ended up on any E-mail list
257  10      by accident, I just said I didn't know how I came to be
257  11      there, and I don't know why Kemal included me in this
257  12      list either.

257:13  -  257:18  Homering, Martin 2016-06-22          0:37
257  13      Q. Do you think you deserved these congratulations
257  14      that Dr. Malik was giving out in this E-mail?
257  15      A. I always see this kind of invitation as
257  16      directed at a department, so that the people from a
257  17      department who have worked on a project are invited to
257  18      events like this.

272:5  -  272:8  Homering, Martin 2016-06-23          0:03
272   5          (Homering Exhibit No. 35 was marked for
272   6      identification.)
272   7          (Homering Exhibit No. 36 was marked for
272   8      identification.)

272:20  -  273:13  Homering, Martin 2016-06-23          2:02
272  20      Q. So if we can look at this E-mail chain, it's an
272  21      E-mail between you, Frank Misselwitz, Wolfgang Mueck,
272  22      and Sigrid Becker, back on March 30th of 2006, the
272  23      subject being "Dose Selection."
272  24      A. Yes.
272  25      Q. Then if we can look at this slide you can see
273   1      that you send this E-mail to Dr. Misselwitz on
273   2      March 30th, and you basically tell him that here are the
273   3      slides with my changes, correct?

33



07/28/17 16:09

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

273    4    A.   That's what it says, yes.
273    5    Q.   Okay.  And you can see the little attachment
273    6         icon there where you attached the dose selection for
273    7         VTE-treatment April, 2006, underscore, comments, MH,
273    8         March 30th, dot PowerPoint, dot zip, right?
273    9    A.   Correct.
273   10    Q.   Okay.  And just above that you say that amended
273   11         or edited text passages had been identified with some
273   12         type of rose text; is that right?
273   13    A.   Correct.

273:14 –    273:23 Homering, Martin 2015-06-23

Re: [273:14-273:23]

Pltf Obj Relevance

1:41                Pending

273   14    Q.   Okay.  And so let's look then at Exhibit 36,
273   15         which is the PowerPoint that you attached, and that's
273   16         Record 13186746, Bates BPAG_17307865.  And you see
273   17         the PowerPoint slides that you attached were the section
273   18         called "Pooled Analyses of 11223 and 11528," that were
273   19         part of – that ended up being part of Exhibit 30, the
273   20         PowerPoint that Dr. Misselwitz sent the next day.  Do
273   21         you see that?
273   22    A.   What I added, I cannot tell anymore where the
273   23         charges are and what the chronology of these slides is.

274:24 –    275:11 Homering, Martin 2015-06-23

1:31

274   24    Q.   Okay.  And we'll talk about that maybe in a
274   25         minute.  But let's look at slide two over, Slide 6, the
275    1         conclusion slide.
275    2                And if we look at the conclusion slide you can
275    3         see that it has the same statements under the Cmax
275    4         section that we looked at yesterday that low body weight
275    5         is associated with a higher Cmax in both regimens and
275    6         results in higher major bleeding rates.  And the same is
275    7         true for low creatinine clearance.  Do you recall those
275    8         statements being in the conclusion section yesterday?
275    9    A.   I would not exclude that, but I would have to
275   10         compare the wording exactly; but low body weight and low
275   11         creatinine did appear.

280:10 –    282:4 Homering, Martin 2015-06-23

Re: [280:10-282:4]

Def Obj 403/Relevance - This testimony involves dose adaptation for subpopulations in ROCKET and does not concern EINSTEIN and is therefore likely to confuse the jury.

Re: [280:10-282:4]

Pltf Resp It is an oversimplification to say that one indication was based on one study.  In fact, data from many studies, including ROCKET were the basis of supporting all of the indications to some extent, and certainly, were used to inform the defendants' understanding of the safety and efficacy profiles of Xarelto.  The jury must be trusted to distinguish the studies from one another.  Additionally, ROCKET is relevant for a host of other reasons, including the defendants' notice of critical safety issues of Xarelto, as well as flaws in the RECORD studies which call the safety of the drug into question.  This evidence is relevant to Plaintiff*'s failure to warn claim.  It establishes that Defendants knew they might not have the safest dose for patients with Afib which made it even more important to instruct physicians about the advisability of measuring and the ability to measure, the anticoagulant effect of Xarelto using Neoplastin PT and or to include in its design of Xarelto an anti-Factor Xa assay and reversal agent.  For this reason and others, this testimony is relevant and there is no significant risk of confusion that outweighs the probative value

5:34                Pending

280   10    Q.   So let's look at Slide 13 for a moment, in
280   11         Exhibit 36.  And this is an overall conclusion slide
280   12         from the subgroup section for efficacy and safety, and
280   13         you see the top bullet point at the top in the pink
280   14         text, light gray on the printed copy?
280   15    A.   I see that.
280   16    Q.   Okay.  And this comment says, "Question,
280   17         question question.  Dose adaptation in subpopulations,
280   18         fragile patients should receive 10, (157) Milligram OD.
280   19         Definition of fragile patients:  Creatinine clearance
280   20         below 40 to 50 milliliters per minute or a combination
280   21         of body weight, less than 60 kilograms, plus age,
280   22         greater than 75 years, and female gender."  Do you see
280   23         that?
280   24    A.   I see that, yes.
280   25    Q.   But when you made that comment you were also
281    1         concerned that that type of recommendation for dose
281    2         adaptations in subpopulations might have implications
281    3         for the Afib indication, right?
281    4         MR. STOFFELMAYR:  Objection to form.

34

Rulings

Responses In

of this evidence.

Objections In

281  5    A.  No, I do not recall having added anything on
281  6    this overall conclusion slide.  Just because I made the
281  7    question marks here regarding the subpopulations does
281  8    not mean that I wrote this text, and I cannot recall
281  9    having written this, the question marks in the slide
281  10   sets regarding the subpopulations before that, earlier
281  11   in the set of slides, on Slide 11.
281  12   Q.  So when it says "SPAF," that stands for stroke
281  13   prevention in AFib, right?
281  14   A.  That's my understanding.
281  15   Q.  Okay.  And this pink, rosa text comment at the
281  16   very end said, in brackets, "Caveat, implications for
281  17   SPAF, question, question, question," correct?
281  18   A.  Correct.
281  19   Q.  Okay.  The next statement on this overall
281  20   conclusion slide said that severe renal, creatinine
281  21   clearance less than 30 milliliters per minute, and
281  22   hepatic impairment shall be excluded and studied in a
281  23   smaller, separate study.  Do you see that?
281  24   A.  I see that.
281  25   Q.  Do you know whether or not severe renal
282  1    patients were studied in the Rocket study?
282  2    A.  I know that there was an exclusion criterion
282  3    for renal function, but whether these are exactly these
282  4    patients I cannot say.

298:3  -  298:9    0:46

298  3    Homering, Martin 2016-06-23
298  4             (Homering Exhibit No. 39 was marked for
298  5    identification.)
298  6    Q.  So looking at these pooled analyses of 11223
298  7    and 11528, I want to show you what we'll mark as Exhibit
298  8    No. 39.  This is Record 3859476, and it says Xarelto,
298  9    BPAG, 27613483.  This was an E-mail that we found that
         someone had printed, it looks like, then it got scanned.

298:15  -  301:5    6:14

298:15   Homering, Martin 2016-06-23
298  16   Q.  And this is an E-mail chain between you and
298  17   Frank Misselwitz, copying Tom Lensing, as well as
298  18   Torsten Westermeier, and the subject, of course, is
298  19   pooled analysis 11223, 11528.  And this is actually a
298  20   follow-up, if you look on the -- kind of the third page
         of this document.
298  21       We saw this E-mail from Frank Misselwitz to
298  22   Torsten yesterday from January 6th where he said the
298  23   primary endpoints of the two trials are different in
298  24   terms of timing and definition.  For this reason a
298  25   full-blown pooled analysis will not be possible.  Do you
299  1    recall that E-mail that we looked at yesterday?
299  2    A.  Yes, I can remember.
299  3    Q.  Okay.  And so what Dr. Misselwitz had said
299  4    there after that was that, "However, we need to pool all
299  5    safety parameters, bleeding, liver, et cetera, and we
299  6    also can pool all the clinical recurrent events, primary
299  7    outcome of Einstein and secondary endpoint of 11223.
299  8    Another important issue will be to understand what are
299  9    the differences between OD and BID in terms of efficacy
299  10   of initial treatment, time to event in the early weeks,
299  11   and in terms of bleeding safety.  I also want to learn
299  12   more about the safety in subgroups, elderly, low body

35



| | Objections In | Responses In | Rulings |
|---|---|---|---|

259:13 weight, et cetera." Correct?
259:14 A. Yes, that is what it says.
259:15 Q. Okay. And this was in response to Torsten
259:16 Westermeier's E-mail to you, copying Tori Lensing and
259:17 Frank Misselwitz, down at the bottom of the page, where
259:18 he had told you that at the moment Tori does not request
259:19 any pooled analysis of the two studies back on January
259:20 5th, but it may be possible that we need some pooled
259:21 safety analysis for discussions with the FDA on the
259:22 prevention program, and he copied Frank Misselwitz at
259:23 the bottom of the page.   Do you see that?
259:24 A. Yes, I can read that.
259:25 Q. Okay. And so in response, on January 12th,

300:1 2006, on the first page, you say, "Frank, Tori and
300:2 Torsten, would it be possible to have a brief meeting
300:3 next week to discuss the scope and timeliness of pooled
300:4 analysis," correct?
300:5 A. That's what it says there, yes.
300:6 Q. And you went on, "From the data I have seen
300:7 so," I think you meant Dr, "it seems that compared to
300:8 the prevention studies the event rates for outcomes of
300:9 interest are low, which makes subgroup and time to event
300:10 analyses difficult to do. Also, a key issue would be to
300:11 define outcomes that are comparable across studies,
300:12 i.e, independent of study definitions and visit
300:13 patterns." Do you see that?
300:14 A. Yes, that's what it says.
300:15 Q. Okay. And you say, "In that meeting we would
300:16 need," and the first bullet point says, "to define the
300:17 outcomes of interest and, two, to discuss whether we
300:18 could pool certain dosages to increase sample size for
300:19 subgroup analyses." Correct?
300:20 A. That was correctly read, yes.
300:21 Q. Okay. And then if you look down to the next
300:22 paragraph, you say, "For contrasting all BID versus OD
300:23 treatment groups, we could provide figures similar to
300:24 those attached, example based on the two prevention
300:25 studies 10942 and 10944, with dots representing the
301:1 treatment group rates and the regression lines for the
301:2 dose trend regression, based on the three BID dosage,
301:3 10, 20 and 30 for 11223, and based on the four OD
301:4 dosages, 10, 20, 30 and 40 in 11528." Correct?
301:5 A. Correctly read.

| 302:5 – 303:6 | Homering, Martin 2016-06-23 | 4:16 | | | Pending |
|---|---|---|---|---|---|

302:5 Q. Okay. And so then despite some of the issues
302:6 that Dr. Misselwitz had raised and that you had raised
302:7 in this E-mail above regarding the low rates of outcomes
302:8 of interest and making the analyses difficult to do, you
302:9 in fact did move forward with this pooled analysis in
302:10 the early part of '06; is that correct?
302:11      MR. STOFFELMAYR: Objection to form.
302:12 A. I have to say something about the low rates. I
302:13 read here that it says, "Low compared to". So that is a
302:14 relative statement.
302:15 Q. Okay. All right. Let's put that aside for a
302:16 moment and let's move forward about nine years.
302:17      So do you recall sometime in mid 2015, or early
302:18 2015, the CHMP sending a request to Bayer to look at the

**Objections In:**
Re: [302:5-303:6]
Def Obj 403/Relevance - foreign regulatory. This line of questioning concerns a foreign regulatory agency's request and has no bearing on the issues in this case. As such it is likely to confuse the jury.

**Responses In:**
Re: [302:5-303:6]
Pltf Resp This Court has repeatedly ruled that communications with foreign regulatory bodies is admissible evidence, as long as the content of foreign labels is distinguished from the labels in effect in the US. There is more than adequate foundation; the deponent testifies that he both remembers the request from the CHMP and was a member of the team that was tasked with responding to the request.

36

07/28/17 16:09

07/28/17 16:09

| | Objections In | | Responses In | Rulings |
|---|---|---|---|---|

302:19   issue of whether or not the benefit-risk balance for
302:20   Xarelto could be enhanced by using some form of
302:21   therapeutic drug monitoring?
302:22   A.  I can recall such a request by EMA, but I do
302:23   not recall the exact wording, nor the scope of this
302:24   request.
302:25   Q.  Okay.  And did you become part of a team of
303:1    individuals at Bayer that were working on and
303:2    responsible for responding to the CHMP EMA request
303:3    regarding therapeutic drug monitoring?
303:4    A.  Yes, I became a member of a team; but what
303:5    exactly the scope of this request was I cannot say right
303:6    now.

0:01

323:17 -  323:22 Homering, Martin 2015-06-23
323:17        (Homering Exhibit No. 44 was marked for
323:18    identification.)
323:19        (Homering Exhibit No. 45 was marked for
323:20    identification.)
323:21        (Homering Exhibit No. 46 was marked for
323:22    identification.)

Re: [323:17-323:22]
Def Obj 403/ Relevance - foreign regulatory. This line
of questioning relates to a foreign regulatory
proceeding and the company's response thereto.  As
such it only serves to confuse the jury. Objection
lodged to underlying documents.

Re: [323:17-323:22]
Pltf Resp This Court has repeatedly ruled that communications
with foreign regulatory bodies is admissible evidence, as long as
the content of foreign labels is distinguished from the labels in
effect in the US.  There is more than adequate foundation; the
deponent testifies that he both remembers the request from
the CHMP and was a member of the team that was tasked with
responding to the request.

Pending

1:52

324:6 -   324:25 Homering, Martin 2015-06-23
324:6    So if we can look at the E-mail first, you can
324:7    see it's an E-mail chain in December of 2015, and it --
324:8    the title of the E-mail that you sent to Mahtesh Samtani,
324:9    as well as Eun Young Suh, Xiang Sun and Stefan Willmann
324:10   is, "Save the date, team meeting regarding TDM
324:11   analysis," right?
324:12   A.  That's correct.
324:13   Q.  Okay.  And you say, "Attached please find a
324:14   slide last I compiled for the December 17th meeting.
324:15   Idea is to briefly present the slides and agree with the
324:16   clinical team on or how to quickly define the risk
324:17   factors," right?

Re: [324:6-324:25]
Def Obj 403/Relevance - foreign regulatory. See
objection to 323:17 - 323:22.

Re: [324:6-324:25]
Pltf Resp This Court has repeatedly ruled that communications
with foreign regulatory bodies is admissible evidence, as long as
the content of foreign labels is distinguished from the labels in
effect in the US.  There is more than adequate foundation; the
deponent testifies that he both remembers the request from
the CHMP and was a member of the team that was tasked with
responding to the request.

Pending

37

07/28/17 16:09

| | Objections In | Responses In | Rulings |
|---|---|---|---|

324  18    A.  Yes, I can read that.
324  19    Q.  And then you also say, "I also attach the Excel
324  20    sheet on observed rates, annualized rates, for SPAF that
324  21    I compiled." Do you see that?
324  22    A.  Correct, I can read that.
324  23    Q.  Okay. And SPAF there would stand for the AFib
324  24    indication, right?
324  25    A.  Correct.



**0:40**

326:12 -   326:17  Homering, Martin 2016-06-23
326  12    Q.  Okay. And so the PowerPoint you attached is
326  13    the next exhibit, which is the aspects on clinical risk
326  14    factors. Okay, and if we can look we see here that this
326  15    is the PowerPoint that you attached regarding how to
326  16    deal with clinical risk factors, right?
326  17    A.  That's correct.

Re: [326:12-326:17]
Def Obj 403/Relevance – foreign regulatory. See
objection to 323:17 - 323:22.

Re: [326:12-326:17]
Ptf Resp This Court has repeatedly ruled that communications
with foreign regulatory bodies is admissible evidence, as long as
the content of foreign labels is distinguished from the labels in
effect in the US. There is more than adequate foundation; the
deponent testifies that he both remembers the request from
the ChMP and was a member of the team that was tasked with
responding to the request.

Pending

**0:53**

327:25 -   328:9   Homering, Martin 2016-06-23
327  25    Q.  Okay. Now, if we could look over at the third
328  1    slide.
328  2    A.  Yes.
328  3    Q.  This slide is titled, Clinical Risk Factors'
328  4    Purpose, and the first purpose is listed as identical --
328  5    Identify clinical risk factors to adjust for when
328  6    assessing, ER relationship. Subjects with high exposure
328  7    relative to low exposure levels differ WRT" with
328  8    respect to, "factors correlated with outcomes, e.g.,
328  9    age, diabetes, et cetera." Is that what that says?

Re: [327:25-328:9]
Def Obj 403/Relevance – foreign regulatory. See
objection to 323:17 - 323:22.

Re: [327:25-328:9]
Ptf Resp This Court has repeatedly ruled that communications
with foreign regulatory bodies is admissible evidence, as long as
the content of foreign labels is distinguished from the labels in
effect in the US. There is more than adequate foundation; the
deponent testifies that he both remembers the request from
the ChMP and was a member of the team that was tasked with
responding to the request.

Pending

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**328:22 - 330:6**   3:06

Homering, Martin 2016-05-23

| Line | | |
|---|---|---|
| 328 22 | Q. Okay. If you'll look with me under the | |
| 328 23 | VTE-treatment indication. | |
| 328 24 | A. Yes. | |
| 328 25 | Q. Okay. And so if we look under the bleeding | |
| 329 1 | section at the bottom, there's two definitions. One is | |
| 329 2 | ISTH major, and the other is major plus clinically | |
| 329 3 | relevant non-major. Do you see that? | |
| 329 4 | A. I do. | |
| 329 5 | Q. Okay. And so both types of bleeding were going | |
| 329 6 | to be analyzed at this point for the exposure-response | |
| 329 7 | analysis, correct? | |
| 329 8 | A. Yes, two outcomes were supposed to be looked | |
| 329 9 | at. | |
| 329 10 | Q. Okay. Now, in the BID phase in the Einstein | |
| 329 11 | DVT study, the patients were given 15 milligrams, twice | |
| 329 12 | daily, for a total daily dose of 30 milligrams for three | |
| 329 13 | weeks, correct? | |
| 329 14 | A. That is how I remember the planned protocol | |
| 329 15 | medication, yes. | |
| 329 16 | Q. Okay. And so under the BID phase, there were | |
| 329 17 | 16 events of ISTH major bleeding out of a total number | |
| 329 18 | of evaluated patients in this analysis of 4,130, right? | |
| 329 19 | A. That's correct. | |
| 329 20 | Q. Okay. And then for the OD phase these patients | |
| 329 21 | were given 20 milligrams, once daily, right? | |
| 329 22 | A. Correct. | |
| 329 23 | Q. Okay. And for that it's listed here that there | |
| 329 24 | were 25 ISTH major bleed events out of 3,951 patients to | |
| 329 25 | be evaluated; is that right? | |
| 330 1 | A. Twenty-five events out of 3,951 patients in the | |
| 330 2 | OD phase. | |
| 330 3 | Q. Okay. All right. If we could look at the next | |
| 330 4 | slide, Clinical Risk Factors identified, SPAF, and you | |
| 330 5 | see the bleeding risk factors are listed there? | |
| 330 6 | A. I see that. | |

**330:11 - 330:22**   Homering, Martin 2016-05-23   0:57

| Line | | |
|---|---|---|
| 330 11 | Q. And these are risk factors that you had | |
| 330 12 | identified? | |
| 330 13 | A. No. | |

**Objections In:**

3:24

Re: [328:22-330:6]

Def Obj 403/Relevance - foreign regulatory. See objection to 323:17 - 323:22.

**Responses In:**

Re: [328:22-330:6]

Pltf Resp: This Court has repeatedly ruled that communications with foreign regulatory bodies is admissible evidence, as long as the content of foreign labels is distinguished from the labels in effect in the US. There is more than adequate foundation; the deponent testifies that he both remembers the request from the CHMP and was a member of the team that was tasked with responding to the request.

**Rulings:**

Pending

39

| | Objections In | Responses In | Rulings |
|---|---|---|---|

330 14 | Q.  How were these risk factors identified?
330 15 | A.  They were identified -- they were identified by
330 16 | the Janssen clinicians.
330 17 | Q.  By the Janssen clinicians.
330 18 | A.  Yes.
330 19 | Q.  Okay.  And you took information that you
330 20 | received from Janssen and included it in this
330 21 | PowerPoint?
330 22 | A.  That's correct.

**331:24 -  332:5**     0:33

331:24 | Homering, Martin 2016-06-23
331 25 | (Homering Exhibit No. 47 was marked for
332  1 | identification.)
332  2 | Q.  All right.  Mr. Homering, I'm going to give you
332  3 | two exhibits, Exhibit 47, which is Record No. 4770226,
332  4 | Bates BPAG_34932910; and then I'm also going to give you
332  5 | Exhibit 48, same record number, but it's our -- our
  | translation of a German E-mail.

**Objections In**

Re: [331:24-332:5]
Def Obj Relevance/403. This testimony concerns a model prepared in response to the EMA's LEG 036 procedure which had the company analyze whether monitoring could improve the drug's benefit risk profile. However, the testimony and underlying document does not concern the final model submitted to EMA, and shared with FDA, and therefore is misleading and confusing. Objection lodged to underlying document.

**Responses In**

Re: [331:24-332:5]
Pltf Resp This Court has repeatedly ruled that communications with foreign regulatory bodies is admissible evidence, as long as the content of foreign labels is distinguished from the labels in effect in the US. There is more than adequate foundation; the deponent testifies that he both remembers the request from the CHMP and was a member of the team that was tasked with responding to the request.  It is the work that was done in responding the request that is of the greatest probative value to the jury, and as such, this testimony is helpful in that regard.

**Rulings**

Pending

**332:25 -  333:14**     1:53

332 25 | 333:14 Homering, Martin 2016-06-23
333  1 | Q.  Okay.  Well, let's look first at the first
333  2 | E-mail in the chain, which is -- you received an E-mail
333  3 | from Sabine Frenzen on February 13th of 2016, in which
333  4 | she told you that, "Dear all, regarding the EMA PK/PD
333  5 | request and TDM, we would like to update the whole team
333  6 | regarding what has been achieved so far and to discuss
333  7 | the finalized popPK model that is now available,"
  | correct?
333  8 | A.  Please bear with me for a minute.  Yes, I see
333  9 | this mail that went to a large list of addressees.
333 10 | Q.  All right.  And then if we look on Page 2, Gary
333 11 | Peters responded to the E-mail, and copied yourself, as
333 12 | well as the others, related to Sabine Frenzen's original
333 13 | E-mail, correct?
333 14 | A.  Yes, I can see that here.

**Objections In**

Re: [332:25-333:14]
Def Obj Relevance/403.  See objection to 331:24-332:5 regarding foreign regulatory/EMA request.

**Responses In**

Re: [332:25-333:14]
Pltf Resp This Court has repeatedly ruled that communications with foreign regulatory bodies is admissible evidence, as long as the content of foreign labels is distinguished from the labels in effect in the US.  There is more than adequate foundation; the deponent testifies that he both remembers the request from the CHMP and was a member of the team that was tasked with responding to the request.  It is the work that was done in responding the request that is of the greatest probative value to the jury, and as such, this testimony is helpful in that regard.

**Rulings**

Pending

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

07/28/17 16:09

**3369 – 337:5**

3369   9
336   10
336   11
336   12
336   13
336   14
336   15
336   16
336   17
336   18
336   19
336   20
336   21
336   22
336   23
336   24
336   25
337    1
337    2
337    3
337    4
337    5

**Homering, Martin 2016-06-23**

Q.  So I'm going to ask you about the fifth point next, which is, Gary Peters says to you in this E-mail, "I've been thinking about a quote Len once told me. Don't remember his source. That quote, all models are wrong but some are useful, dot, dot, dot.  So my view is that this discussion is not about which of the models is right since both are wrong in different ways but about which is most useful for what we have been asked to do." Did I read that correctly?

A.  That's what it says there, yes.

Q.  Okay. Now, you recall that sometime in the spring of 2016, winter, spring, that the companies were going to have to choose between at least a couple of different models, right?

A.  I do not know which kind of decision had to be taken, but the estimated exposure for Phase III patients had to be concluded to be able to continue work.

Q.  And did you agree that the creation of the new models had uncovered problems with the models that the companies were continuing to have to work on to adjust to try to make consistent with what the company had expected the models to show?

3:05

**Re: [336:9-337:5]**
**Def Obj** Relevance/403. See objection to 331:24 - 332:5 regarding foreign regulatory/EMA request.

**Re: [336:9-337:5]**
Pltf Resp This Court has repeatedly ruled that communications with foreign regulatory bodies is admissible evidence, as long as the content of foreign labels is distinguished from the labels in effect in the US. There is more than adequate foundation; the deponent testifies that he both remembers the request from the CHMP and was a member of the team that was tasked with responding to the request.  It is the work that was done in responding the request that is of the greatest probative value to the jury, and as such, this testimony is helpful in that regard.

Pending

---

**337:7 – 338:6**

337    7
337    8
337    9
337   10
337   11
337   12
337   13
337   14
337   15
337   16
337   17
337   18

**Homering, Martin 2016-06-23**

A.  I cannot assess that.

Q.  You're aware, through your E-mail and meetings and phone calls, that the companies continued to tinker with the model during the early parts of 2016, in order to try to reach a decision as to which model to put forward to the EMA; is that right?

A.  "To tinker with" is certainly not the right term.  I understood that experts on both sides, Bayer and Janssen, were working on optimizing the model.

Q.  Okay. So let's look at -- Gary Peters says next to you in his E-mail, "Depending on the answers to my questions above I currently favor the 'old model'

3:32

**Re: [337:7-338:6]**
**Def Obj** Relevance/403. See objection to 331:24 - 332:5 regarding foreign regulatory/EMA request.

**Re: [337:7-338:6]**
Pltf Resp This Court has repeatedly ruled that communications with foreign regulatory bodies is admissible evidence, as long as the content of foreign labels is distinguished from the labels in effect in the US.  There is more than adequate foundation; the deponent testifies that he both remembers the request from the CHMP and was a member of the team that was tasked with responding the request.  It is the work that was done in responding the request that is of the greatest probative value to the jury, and as such, this testimony is helpful in that regard.

Pending

41

07/28/17 16:09

| | Objections In | Responses In | Rulings |
|---|---|---|---|

337 19   over the 'new model' since I think the 'new model'
337 20   raises a lot of questions that will be difficult to
337 21   address." Do you see that?
337 22   A.   That's what it says there.
337 23   Q.   Okay. And I think we've talked previously that
337 74   the colleagues in the M&S department, modeling and
337 25   simulation department, were responsible for development
338 1    of this model and then moving forward with the
338 2    exposure-response analysis, correct?
338 3    A.   I have to say no to this because I always
338 4    consider it as a joint effort of experts from both
338 5    firms. It is not one modeling and simulation, but this
338 6    is a joint work effort.

339:10 -   339:22 Homering, Martin 2016-06-23

1:17
339 10     (Homering Exhibit No. 48 was marked for
339 11     identification.)
339 12     Q.   Okay. And Stefan Willmann tells Joerge
339 13     Lipper, "Hello, Joerge. Sorry for storming in." Let's
339 13     move to Exhibit 48, if we can, and look at the English
339 14     version. And he says, "Hello, Joerge. Sorry for
339 15     storming in with an acute topic just before the weekend,
339 16     but the CHMP discussion on the popPK model for the ER
339 17     analysis is boiling right now and you should be
339 18     informed. No immediate action required."
339 19     Did you agree with Stefan Willmann, back in
339 20     late February of this year, that the discussion on the
339 21     popPK model for the ER analysis was boiling?
339 22

**Objections In:** Re: [339:10-339:22]
Def Obj Relevancy/403. See objection to 331:24 -
332:5 regarding foreign regulatory/EMA request.

**Responses In:** Re: [339:10-339:22]
Pltf Resp This Court has repeatedly ruled that communications
with foreign regulatory bodies is admissible evidence, as long as
the content of foreign labels is distinguished from the labels in
effect in the US. There is more than adequate foundation; the
deponent testifies that he both remembers the request from
the CHMP and was a member of the team that was tasked with
responding to the request. It is the work that was done in
responding the request that is of the greatest probative value
to the jury, and as such, this testimony is helpful in that regard.

**Rulings:** Pending

339:24 -   340:04 Homering, Martin 2016-06-23

0:23
339 24     A.   I do not know what Stefan Willmann meant when
339 25     he said "boiling". As I already said earlier, I'm not
340 1      part of the expert discussion.
340 2      Q.   Did you have a feeling that it was a very
340 3      serious situation regarding which model was going to be
340 4      selected?

**Objections In:** Re: [339:24-340:4]
Def Obj Relevancy/403. See objection to 331:24 -
332:5 regarding foreign regulatory/EMA request. Lack
of foundation see objection to 339:10 - 339:22.

**Responses In:** Re: [339:24-340:4]
Pltf Resp This Court has repeatedly ruled that communications
with foreign regulatory bodies is admissible evidence, as long as
the content of foreign labels is distinguished from the labels in
effect in the US. There is more than adequate foundation; the
deponent testifies that he both remembers the request from

**Rulings:** Pending

07/28/17 16:09

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**340:6 - 340:7   Homering, Martin 2016-06-23**

340   6   A.  I don't know what the term "serious" is
340   7   supposed to mean.

0:10

**Re: [340:6-340:7]**
**Def Obj** Lack of foundation see objection to 339:10 -
339:22.

**Re: [340:6-340:7]**
**Ptf Resp** This Court has repeatedly ruled that communications
with foreign regulatory bodies is admissible evidence, as long as
the content of foreign labels is distinguished from the labels in
effect in the US.  There is more than adequate foundation; the
deponent testifies that he both remembers the request from
the CHMP and was a member of the team that was tasked with
responding to the request.  It is the work that was done in
responding the request that is of the greatest probative value
to the jury, and as such, this testimony is helpful in that regard.

Pending

**340:16 - 341:13   Homering, Martin 2016-06-23**

340   16   Q.  All right.  Stefan Willmann says, "Since we saw
340   17   in December that the first Riva pooled popPK model
340   18   prepared by Janssen generates statements that do not
340   19   correspond to our label, 15 versus 20 milligrams, with
340   20   and without RI, we started a new model development in
340   21   early 2016.  In the course of our work we, first and
340   22   foremost, Matthias, whose expertise and competence are
340   23   extremely valuable here, tested a number of different

1:41

**Re: [340:16-341:13]**
**Def Obj** Relevance/403. See objection to 331:24-
332:5 regarding foreign regulatory/EMA request. Lack
of foundation see objection to 339:10 - 339:22.

**Re: [340:16-341:13]**
**Ptf Resp** This Court has repeatedly ruled that communications
with foreign regulatory bodies is admissible evidence, as long as
the content of foreign labels is distinguished from the labels in
effect in the US.  There is more than adequate foundation; the
deponent testifies that he both remembers the request from
the CHMP and was a member of the team that was tasked with
responding to the request.  It is the work that was done in

Pending

43

| | Objections In | Responses In | Rulings |
|---|---|---|---|

responding the request that is of the greatest probative value to the jury, and as such, this testimony is helpful in that regard.

**340** 24
**340** 25
**341** 1
**341** 2
**341** 3
**341** 4
**341** 5
**341** 6
**341** 7
**341** 8
**341** 9
**341** 10
**341** 11
**341** 12
**341** 13

model variations. The tests taught us a lot, e.g., in regards to the significance of high sample sizes and they were also successful in the sense that we were able to quickly identify models that solved the problem with the 20 greater than 15 milligram with Ri, renal insufficiency, and overall it significantly better with our understanding of Riva PK and the data than the original model." Do you see that?
A. Yes, I can read the text here.
Q. Okay. And had you become aware that there was a problem with the initial model, that the exposure levels in the renal insufficient patients getting 15 milligrams were coming out higher than the patients without renal insufficiency that were taking 20 milligrams?

**341:15 - 341.20** Homering, Martin 2016-06-23 — 0:54

**341** 15
**341** 16
**341** 17
**341** 18
**341** 19
**341** 20

A. I don't know what in the course of building models construes a problem for the experts working on them. The results were possibly shown in the course of a larger team meeting, but I do not recall that either. And, I have to add, as it is not my expertise, I do not follow this in detail.

**342:19 - 343:9** Homering, Martin 2016-06-23 — 1:47

Re: [342:19-343:9]

**Def Obj** Relevancy/403. See objection to 331:24 - 332:5 regarding foreign regulatory/EMA request. Lack of foundation see objection to 339:10 - 339:22.

**Pltf Resp** This Court has repeatedly ruled that communications with foreign regulatory bodies is admissible evidence, as long as the content of foreign labels is distinguished from the labels in effect in the US. There is more than adequate foundation; the deponent testifies that he both remembers the request from the CHMP and was a member of the team that was tasked with responding to the request. It is the work that was done in responding the request that is of the greatest probative value to the jury, and as such, this testimony is helpful in that regard. — Pending

**342** 19
**342** 20
**342** 21
**342** 22
**342** 23
**342** 24
**342** 25
**343** 1
**343** 2
**343** 3
**343** 4
**343** 5
**343** 6
**343** 7
**343** 8
**343** 9

Q. Okay. So the next thing that Stefan Willmann says, if you look at the translated version, says, "However, we also must dispel some old myths, for the pooled model has the tendency to see more significant influence factors than the earlier individual models. For instance, there is an influence factor, AF patient, that cannot be discussed away numerically." Do you see that?
A. Yes, I can read the text here.
Q. Okay. And you recall when the dose was selected for the AFib patients back in 2006, and we looked at those documents, that there were questions raised by Dr. Misselwitz as to whether or not the AFib population was such different than the other indications that a lower dose should be used in those AFib population patients. Do you recall that?

**343:11 - 343:22** Homering, Martin 2016-06-23 — 1:27

**343** 11
**343** 12
**343** 13
**343** 14
**343** 15
**343** 16
**343** 17
**343** 18
**343** 19
**343** 20
**343** 21
**343** 22

A. I cannot remember now the exact wording of what the discussions were.
Q. You had an understanding, from your work with Dr. Misselwitz and doing the pooled analysis, that the AFib population group was an older population group with other medical conditions, compared to the VTE-treatment group.
A. According to my understanding, patients showed different clinical properties or characteristics according to the indications they have. That is what you can generally read in clinical studies -- correction -- clinical reports.

**343:25 - 344:15** Homering, Martin 2016-06-23 — 1:12

Re: [343:25-344:15]

**Def Obj** Relevancy/403. See objection to 331:24

**Pltf Resp** This Court has repeatedly ruled that communications — Pending

**343** 25
**344** 1

THE INTERPRETER: Apologies. In the clinical study reports.

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| 344:2 Q. The next thing that Stefan Willmann says is that, "The plan was the M&S sub team presents the model candidate for the ER analysis favored by us during the scheduled two-hour teleconference on Monday to have it approved by the CHMP team. This is the point we had reached in the M&S sub team meeting last Monday. The team had approved the model candidate together." On Tuesday, however, J&J backtracked, criticizing the ranging of the AUC versus BW, higher BWs, body weights, lead on average to higher AUC with large variability. The point is valid and not a hundred percent intuitive, but is explainable and rather marginal in scope." Do you see that?<br>A. Yes, I can read that here. | 332:5 regarding foreign regulatory/EMA request. Lack of foundation see objection to 339:10 - 339:22. | 332:5 regarding foreign regulatory bodies is admissible evidence, as long as the content of foreign labels is distinguished from the labels in effect in the US. There is more than adequate foundation; the deponent testifies that he both remembers the request from the CHMP and was a member of the team that was tasked with responding to the request. It is the work that was done in responding the request that is of the greatest probative value to the jury, and as such, this testimony is helpful in that regard. | |
| 344:16 - 344:22 Homering, Martin 2016-06-23  0:47<br>Q. Okay. And as a member of this team working on the EMA response regarding the exposure-response analysis, did you learn that J&J had backtracked from their agreement regarding which model to put forward to the EMA for the exposure-response analysis because of a concern about the way body weight and the effect on the area under the curve had been modeled? | | | |
| 344:24 - 345:12 Homering, Martin 2016-06-23  1:07<br>A. As I said, I wasn't part of the M&S sub team, I mean the modeling experts, and whether and in how far the discussion and the whole team was around these aspects, I cannot recall. With respect to the models specifically on problems, limitations and pros and cons, I cannot recall that.<br>Q. Let's look down, he talks a little bit about some of the work they did, but if we could look at the sentence on the third line from the bottom of this paragraph, kind of halfway through, it starts with "Compared to". Do you see that?<br>A. Yes. I have to read. Yes. It's the third line from below, I can read that.<br>Q. Right. | | | |
| 345:5 - 345:9 Homering, Martin 2016-06-23  0:29<br>Q. Let's look down, he talks a little bit about some of the work they did, but if we could look at the sentence on the third line from the bottom of this paragraph, kind of halfway through, it starts with "Compared to". Do you see that? | | | |
| 345:13 - 345:21 Homering, Martin 2016-06-23  0:38<br>And it says, "Compared to the issues brought up by the first model, the ranking question is a joke, in my view, a last attempt on Dirk's part on Thursday evening to explain the BW effect once more and to have an alignment with lipping done by janssen did not receive a clear, 'okay', but it showed, albeit timidly, that an alignment until Monday is possible," quote, "I am in favor of trying." Do you see that?<br>A. Yes, I can read that. | Re: [345:13-345:21]<br>Def Obj Relevancy/403. See objection to 331:24 - 332:5 regarding foreign regulatory/EMA request. Lack of foundation see objection to 339:10 - 339:22. | Re: [345:13-345:21]<br>Pltf Resp: This Court has repeatedly ruled that communications with foreign regulatory bodies is admissible evidence, as long as the content of foreign labels is distinguished from the labels in effect in the US. There is more than adequate foundation; the deponent testifies that he both remembers the request from the CHMP and was a member of the team that was tasked with responding to the request. It is the work that was done in responding the request that is of the greatest probative value to the jury, and as such, this testimony is helpful in that regard. | Pending |
| 345:22 - 346:1 Homering, Martin 2016-06-23  0:28 | | | |

45

| | Objections In | Responses In | Rulings |
|---|---|---|---|

345:22
345:23
345:24
345:25
346:1

Q. Okay. And when -- when Stefan Willmann is talking about these ranking questions regarding things like area under the curve versus body weight, he's talking about ranking of issues within the popPK model; is that right?

346:3 - 346:4    Homering, Martin 2015-06-23    0:06

346:3
346:4

A. I do not know what Stefan Willmann is talking about or writing about here.

346:17 - 346:24    Homering, Martin 2015-06-23    0:59

346:17
346:18
346:19
346:20
346:21
346:22
346:23
346:24

Q. He even said, "In the view of the murky situation he let IKA know yesterday that we may not get to a consensus-model presentation on Monday, but a controversial technical discussion is rather more likely."

Did you have an understanding that the situation related to which model to select had become a murky situation and a controversial situation?

Re: [346:17-346:24]
**Def Obj** Relevance/403. See objection to 331:24 - 332:5 regarding foreign regulatory/EMA request. Lack of foundation see objection to 339:10 - 339:22.

Re: [346:17-346:24]
Pltf Resp This Court has repeatedly ruled that communications with foreign regulatory bodies is admissible evidence, as long as the content of foreign labels is distinguished from the labels in effect in the US. There is more than adequate foundation; the deponent testifies that he both remembers the request from the CHMP and was a member of the team that was tasked with responding to the request. It is the work that was done in responding the request that is of the greatest probative value to the jury, and as such, this testimony is helpful in that regard.

Pending

347:1 - 347:12    Homering, Martin 2015-06-23    0:55

347:1
347:2
347:3
347:4
347:5
347:6
347:7
347:8
347:9
347:10

A. I -- I do not know. I read here technical discussion, that that is what it is about, but what "murky" means, I don't even know that English word, I don't know what it's supposed to say.

Q. Okay. If we can look over on the next page, I have a question about a couple of people there. There's a sentence at the top that says, "The result was that there should be preliminary discussions at the PM level, Andrea Derix, Anne Vosatka at J&J, that we're in urgent need of a decision for a popPK model so that we can

Re: [347:1-347:12]
**Def Obj** Relevance/403. See objection to 331:24 - 332:5 regarding foreign regulatory/EMA request.

Re: [347:1-347:12]
Pltf Resp This Court has repeatedly ruled that communications with foreign regulatory bodies is admissible evidence, as long as the content of foreign labels is distinguished from the labels in effect in the US. There is more than adequate foundation; the deponent testifies that he both remembers the request from the CHMP and was a member of the team that was tasked with responding to the request. It is the work that was done in responding the request that is of the greatest probative value to the jury, and as such, this testimony is helpful in that regard.

Pending

07/28/17 16:09

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

347  11    finally start with the actual ER." Do you see that?
347  12    A.  Yes, I can see that sentence.

347:23 -   348:18 Hornering, Martin 2016-06-23
347  23            (Hornering Exhibit No. 49 was marked for
347  24            identification.)
347  25            (Hornering Exhibit No. 50 was marked for
348  1             identification.)
348  2     Q.  Let me show you what we'll mark as Exhibits 49
348  3     and 50, an E-mail and attachment.  And we'll look at the
348  4     E-mail first, which is 4571943, BPAG_34962511, and the
348  5     attachment is 4571944 record, BPAG_34962514.  I just
348  6     want to take a look at the E-mail first.  And if you
348  7     could take a first look with me at the E-mail on the
348  8     second page from Sabine Frenzen to you and several
348  9     others on March 9th.
348  10    A.  Please give me a little bit of time.
348  11    Q.  Okay.
348  12    A.  Yes, I'm ready.
348  13    Q.  Okay.  And so on the second page Sabine Frenzen
348  14    had sent an E-mail to several people, including
348  15    yourself, regarding the team update on EMA TDM requests
348  16    for a Thursday, March 10th, 2016, webex meeting.  Do you
348  17    see that?
348  18    A.  Yes, I see that.

349:5 -    349:14 Hornering, Martin 2016-06-23
349  5     Q.  Okay.  And you state to them, PY, and it's in
349  6     German, but basically you're telling them that we must
349  7     choose between two models, correct?
349  8     A.  It's not we must choose, but a choice must be
349  9     made.
349  10    Q.  Okay.  So you're telling them that a choice
349  11    must be made; is that right?
349  12    A.  Yes; but I'm not telling them that they have to

3:27  Re: [347:23-348:18]
      Def Obj Relevance/403. See objection to 331:24 -
      332:5 regarding foreign regulatory/EMA request..

      Re: [347:23-348:18]
      Pltf Resp This Court has repeatedly ruled that communications
      with foreign regulatory bodies is admissible evidence, as long as
      the content of foreign labels is distinguished from the labels in
      effect in the US.  There is more than adequate foundation; the
      deponent testifies that he both remembers the request from
      the CHMP and was a member of the team that was tasked with
      responding to the request.  It is the work that was done in
      responding the request that is of the greatest probative value
      to the jury, and as such, this testimony is helpful in that regard.

      Pending

1:08  Re: [349:5-349:14]
      Def Obj Relevance/403. See objection to 331:24 -
      332:5 regarding foreign regulatory/EMA request..

      Re: [349:5-349:14]
      Pltf Resp This Court has repeatedly ruled that communications
      with foreign regulatory bodies is admissible evidence, as long as
      the content of foreign labels is distinguished from the labels in
      effect in the US.  There is more than adequate foundation; the
      deponent testifies that he both remembers the request from
      the CHMP and was a member of the team that was tasked with
      responding to the request.  It is the work that was done in

      Pending

47

07/28/17 16:09

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

349 13    take the decision, but that the decision has to be taken
349 14    in this context.

349:15 – 349:20 Homerin, Martin 2016-06-23    0:37
349 15    Q. Okay. And you attach what we've marked as
349 16    Exhibit 50, this TDM PPK I&J position PowerPoint that
349 17    we've marked as Exhibit 50, correct?
349 18    A. Attach in the sense of forwarding.
349 19    Q. Yes.
349 20    A. Yeah.

responding the request that is of the greatest probative value
to the jury, and as such, this testimony is helpful in that regard.



349:21 – 349:24 Homerin, Martin 2016-06-23    0:25
349 21    Q. Okay. And so do you recall receiving this
349 22    PowerPoint from – that Janssen had prepared in
349 23    anticipation of the meeting?
349 24    A. I assume that I received it, yes.

Re: [349:21-349:24]
Def Obj Relevance/403. See objection to 331:24-
332:5 regarding foreign regulatory/EMA request.

Re: [349:21-349:24]
Pltf Resp This Court has repeatedly ruled that communications
with foreign regulatory bodies is admissible evidence, as long as
the content of foreign labels is distinguished from the labels in
effect in the US. There is more than adequate foundation; the
deponent testifies that he both remembers the request from
the CHMP and was a member of the team that was tasked with
responding to the request. It is the work that was done in
responding the request that is of the greatest probative value
to the jury, and as such, this testimony is helpful in that regard.

Pending

351:16 – 351:19 Homerin, Martin 2016-06-23    1:19
351 6    Q. Okay. So then if you look down at the bottom
351 7    it says, under this further development M2 slide, under
351 8    pros it says, "Previous issue, Slide 4, and exposures in
351 9    moderate RI is resolved." Do you see that?
351 10    A. This is the text written here.
351 11    Q. Okay. And then the cons though were not able
351 12    to compare Japan versus rest of world, AF difference,
351 13    counterintuitive body weight effect, and need to explain

Re: [351:6-351:19]
Def Obj Relevance/403. See objection to 331:24-
332:5 regarding foreign regulatory/EMA request.

Re: [351:6-351:19]
Pltf Resp This Court has repeatedly ruled that communications
with foreign regulatory bodies is admissible evidence, as long as
the content of foreign labels is distinguished from the labels in
effect in the US. There is more than adequate foundation; the
deponent testifies that he both remembers the request from
the CHMP and was a member of the team that was tasked with
responding to the request. It is the work that was done in

Pending

48

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

| 351:14 | the difference with M1 to EMEA, right? | | responding the request that is of the greatest probative value to the jury, and as such, this testimony is helpful in that regard. | |
| 351:15 | A. This is what is written here, right. | | | |
| 351:16 | Q. Okay. And so then the next slides talk about | | | |
| 351:17 | development of what they describe as V11.1. Do you see | | | |
| 351:18 | that? | | | |
| 351:19 | A. That's right. | | | |

352:1 - 352:18 Homering, Martin 2016-06-23   2:07

| 352:1 | So in this slide there's three different models | Re: [352:1-352:18] | Re: [352:1-352:18] | Pending |
| 352:2 | shown, correct? | Def Obj: Relevance/403. See objection to 331:24 - | Pltf Resp: This Court has repeatedly ruled that communications | |
| 352:3 | A. Three columns that are described as M1, M11, | 332:5 regarding foreign regulatory/EMA request. | with foreign regulatory bodies is admissible evidence, as long as | |
| 352:4 | and M2. | | the content of foreign labels is distinguished from the labels in | |
| 352:5 | Q. Okay. And the bottom it says, "Janssen | | effect in the US. There is more than adequate foundation; the | |
| 352:6 | position, recommend M11.1 as final PPK." Do you see | | deponent testifies that he both remembers the request from | |
| 352:7 | that? | | the CHMP and was a member of the team that was tasked with | |
| 352:8 | A. That is what is written there, yes. | | responding to the request. It is the work that was done in | |
| 352:9 | Q. And so do you know whether which of these | | responding the request that is of the greatest probative value | |
| 352:10 | models or another model was actually submitted to the | | to the jury, and as such, this testimony is helpful in that regard. | |
| 352:11 | EMA as the final model in the response that was provided | | | |
| 352:12 | to the EMA in April? | | | |
| 352:13 | A. I do not know. | | | |
| 352:14 | Q. As part of the meetings did anyone suggest | | | |
| 352:15 | which model was the final choice between the companies? | | | |
| 352:16 | A. I cannot really recall, but I'm also not | | | |
| 352:17 | familiar with the content of what is here described as | | | |
| 352:18 | M1, M11, and M2. | | | |

352:19 - 352:25 Homering, Martin 2016-06-23   0:41

| 352:19 | Q. So you're not sure which one of these models | | | |
| 352:20 | was actually put forward to the EMA. | | | |
| 352:21 | A. I do not even know whether the model that was | | | |
| 352:22 | forwarded is part of the list there or whether it was | | | |
| 352:23 | something totally different. I don't know. | | | |
| 352:24 | Q. Okay. So by this time you're actually down to | | | |
| 352:25 | three models to choose from, right? | | | |

353:2 - 353:8 Homering, Martin 2016-06-23   0:32

| 353:2 | A. I'm not quite sure what you mean when you say | | | |
| 353:3 | "to choose from". | | | |
| 353:4 | Q. Well, according to this slide there's Model 1, | | | |
| 353:5 | Model 1.1, and Model 2. So that's three, right? | | | |
| 353:6 | A. Yes, that's three columns. | | | |
| 353:7 | Q. Okay. And each of these models have different | | | |
| 353:8 | features, right? | | | |

07/28/17 16:09

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

353:10 - 353:18  Homerig, Martin 2016-06-23    0:58

353 10   A. As I said, as a non-modeler I cannot say what
353 11   feature of model means.
353 12   Q. Right.
353 13   And so if we even wanted to judge how good the
353 14   modeling people had been at creating the models, if we
353 15   look at the three models in the row described as
353 16   consistent with clinical data and label, of the three
353 17   models listed, only one of the models is described as
353 18   being consistent with clinical data and label, right?

353:20 - 353:21  Homerig, Martin 2016-06-23    0:05

353 20   A. I cannot assess what is meant here with these
353 21   features.

353:22 - 354:1  Homerig, Martin 2016-06-23    0:30

353 22   Q. You know the difference between a checkmark and
353 23   an X, right?
353 24   A. Yes, these are two different symbols.
353 25   Q. Yeah. And X means not and check means yes,
354 1   right?

Re: [353:22-354:1]
Def Obj Relevancy/403. See objection to 331:24 -
332:25 regarding foreign regulatory/EMA request.

Re: [353:22-354:1]
Ptf Resp This Court has repeatedly ruled that communications with foreign regulatory bodies is admissible evidence, as long as the content of foreign labels is distinguished from the labels in effect in the US. There is more than adequate foundation; the deponent testifies that he both remembers the request from the CHMP and was a member of the team that was tasked with responding to the request. It is the work that was done in responding the request that is of the greatest probative value to the jury, and as such, this testimony is helpful in that regard.

Pending

354:3 - 354:5  Homerig, Martin 2016-06-23    0:13

354 3   A. I cannot confirm this 100 percent because I do
354 4   not know what the author means if he writes X and then
354 5   something in brackets, or the check, the checkmark.

Re: [354:3-354:5]
Def Obj

Pending

355:6 - 355:13  Homerig, Martin 2016-06-23    0:50

355 6   Q. The question was, was it pretty clear, in
355 7   looking at this exhibit, that of the three models only
355 8   one has a checkmark as being consistent with clinical
355 9   data and label, and the other two models had problems
355 10   that did not allow them to be characterized as
355 11   consistent with clinical data and label according to
355 12   this chart, if we assume that a checkmark means yes and
355 13   an X means no.

Re: [355:6-355:13]
Def Obj Relevancy/403. See objection to 331:24 -
332:25 regarding foreign regulatory/EMA request.

Re: [355:6-355:13]
Ptf Resp This Court has repeatedly ruled that communications with foreign regulatory bodies is admissible evidence, as long as the content of foreign labels is distinguished from the labels in effect in the US. There is more than adequate foundation; the deponent testifies that he both remembers the request from the CHMP and was a member of the team that was tasked with responding to the request. It is the work that was done in responding the request that is of the greatest probative value

Pending

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**355:15 - 355:20 Homering, Martin 2016-06-23** — 0:25

355 15  A. Well, I would have to interpret the slide here,
355 16  and I can only look at this but I cannot really assess
355 17  this on the basis of my expertise. If you believe that
355 18  the checkmark means yes then there are various yes
355 19  answers here, and some others that are marked X, but I'm
355 20  not sure regarding the relative weighting.

to the jury, and as such, this testimony is helpful in that regard.

**361:22 - 362:3 Homering, Martin 2016-06-23** — 0:48

361 22  A. All right. Well, let me ask you specifically.
361 23  When it comes to bleeding risk associated with Xarelto,
361 24  do you think it's important that Bayer tell doctors what
361 25  they know about Xarelto and its bleeding risk when they
362 1   communicate with them?
362 2   A. Yes, I think the communication about risks and
362 3   adverse events and risk-benefit is important.

**362:9 - 362:14 Homering, Martin 2016-06-23** — 0:44

362 9   Q. Do you think that Bayer should let doctors know
362 10  what they know about the bleeding risk and not try to
362 11  bury that information so that doctors can't find it?
362 12  A. I'm not sure what you mean by "bury". It
362 13  should be communicated in a way that can be understood
362 14  by the doctors.

**369:19 Homering, Martin 2016-06-23** — 2:45

(Homering Exhibit No. 56 was marked for

369 1   identification.)
369 2   Q. Okay. So let's move forward a little bit. Let
369 3   me show you what we'll mark as Exhibit No. 56, which is
369 4   an E-mail, and I'm going to start again at the back.
369 5   This is Record No. 1759458, Bates BPAG_04455019.
369 6   So you can see that you get an E-mail from
369 7   Julie Cox on July 11th or November 7th. Let me make
369 8   sure I get my dates right here. November 11th —
369 9   November 7th of 2008, to Martin Homering, and copying
369 10  Seamus McMillan, and Julie Cox is also from that
369 11  Chameleon Communications Company. Do you see that?
369 12  A. I see that, yes.
369 13  Q. Okay. And so she asked you to find attached a
369 14  current draft of the pooled data comedications' poster
369 15  for this year's ASH meeting originally authored by Bengt
369 16  Eriksson and now being presented by Graham Turpie. Do
369 17  you see that?
369 18  A. Yes, I see that.
369 19

**Re: [369:1-369:19]**
Def Obj 403/Relevance. This line of questioning pertains to VTE-prevention and to the RECORD studies, which were the clinical trials done to support the VTE-prevention indication. This case, however, involves the use of Xarelto to treat DVT, which was based on EINSTEIN. This important distinction is not made clear at all in the designations, and there is a real danger of jury confusion and prejudice – the designations leave the impression that these are issues from studies related to the indication for which this plaintiff used Xarelto, and that is simply not true. To the extent RECORD4 is implicated, it is wholly irrelevant because it was never used as a basis for any indication or approval at all.

**Re: [369:1-369:19]**
Pltf Resp: It is an oversimplification to say that one indication was based on one study. In fact, data from all of the RECORD studies were the basis of supporting all of the indications to some extent, and certainly, were used to inform the defendants' understanding of the safety and efficacy profiles of Xarelto. The jury must be trusted to distinguish the studies from one another. Additionally, the RECORD studies are relevant for a host of other reasons, including the defendants' notice of critical safety issues of Xarelto, as well as flaws in the RECORD studies which call the safety of the drug into question. For this reason and others, this testimony is relevant and there is no significant risk of confusion that outweighs the probative value of this evidence.

Pending

**370:1 - 372:25 Homering, Martin 2016-06-23** — 8:02

370 1   Q. Okay. So then when you're talking to Ms. Cox
370 2   you say, "Is the reason for these changes is that the

**Re: [370:1-372:25]**
Def Obj 403/Relevance. See objection to 369:1-

**Re: [370:1-372:25]**
Pltf Resp: It is an oversimplification to say that one indication

Pending

51

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

| Page:Line | Testimony | | |
|---|---|---|---|
| 370  3 | outcome of post-tablet bleedings is not a fair one in | | was based on one study. In fact, data from all of the RECORD |
| 370  4 | terms of comparing Xiva and enox regimen, as the | | studies were the basis of supporting all of the indications to |
| 370  5 | post-tablet events exclude the RECORD one through three | | some extent, and certainly, were used to inform the |
| 370  6 | pre-tablet intake bleeds."  Do you see that? | | defendants' understanding of the safety and efficacy profiles of |
| 370  7 | A.  Yes, I can read that. | | Xarelto. The jury must be trusted to distinguish the studies |
| 370  8 | Q.  Okay.  And so you then follow up with that | | from one another. Additionally, the RECORD studies are |
| 370  9 | E-mail, and you send the E-mail to Scott Berkowitz and | | relevant for a host of other reasons, including the defendants' |
| 370  10 | you include Torsten Westermeier and Frank Misselwitz on | | notice of critical safety issues of Xarelto, as well as flaws in the |
| 370  11 | your E-mail on November 10th of 2008.  Do you see that? | | RECORD studies which call the safety of the drug into question. |
| 370  12 | A.  Yes, I do. | 369:19 regarding RECORD. | For this reason and others, this testimony is relevant and there |
| 370  13 | Q.  Okay.  And you can see that you've taken | | is no significant risk of confusion that outweighs the probative |
| 370  14 | Ms. Cox from Chameleon off the E-mail, right? | | value of this evidence. |
| 370  15 | A.  I see that there is now a different person from | | |
| 370  16 | Chameleon. | | |
| 370  17 | Q.  Right. | | |
| 370  18 | And you say, "Dear all, if you get together | | |
| 370  19 | today can you briefly find out what prior discussions | | |
| 370  20 | there have been with Bengt Eriksson or Graham Turpie. I | | |
| 370  21 | find this poster much more complex than the Turpie and | | |
| 370  22 | Bauer presentation, so time needs to be invested here | | |
| 370  23 | ASAP."  Do you see that? | | |
| 370  24 | A.  Yes, I see that. | | |
| 370  25 | Q.  Okay.  And so then you say, "I think we need | | |
| 371  1 | discussions alignment on this, as well to make sure that | | |
| 371  2 | the poster is consistent with outcomes mentioned in the | | |
| 371  3 | ASH abstract.  The poster shows data we submitted for | | |
| 371  4 | EFORT and does not open new data views and, three, Table | | |
| 371  5 | 3 is currently comparing Xarelto to enox in NSAID users | | |
| 371  6 | but the analysis focus was more use versus no use of | | |
| 371  7 | comeds. Otherwise, we would discuss bleeding | | |
| 371  8 | difference, which was not the primary objective."  Do | | |
| 371  9 | you see that? | | |
| 371  10 | A.  I can see that. | | |
| 371  11 | Q.  And when it talks about comparing Xarelto to | | |
| 371  12 | enox in NSAID users, you're talking about patients that | | |
| 371  13 | take drugs like aspirin, right? | | |
| 371  14 | A.  I'm not sure that aspirin would be counted as | | |
| 371  15 | an NSAID in this study, but I can't exclude it either. | | |
| 371  16 | Q.  Okay.  And so if you look with me you quote the | | |
| 371  17 | EFORT information, and if you can look to the conclusion | | |
| 371  18 | there, it says, "In the RECORD one through four | | |
| 371  19 | subanalysis, there was no indication of increased | | |
| 371  20 | bleeding associated with the use of these comedications | | |
| 371  21 | in patients taking rivaroxaban compared with | | |
| 371  22 | enoxaparin."  Do you see that? | | |
| 371  23 | A.  Yes, I see that. | | |
| 371  24 | Q.  Okay, And then you have a-d 3, and you say, | | |
| 371  25 | "Suggest not to report the data as currently shown. We | | |
| 372  1 | clearly show a significant bleeding risk."  Do you see | | |
| 372  2 | that? | | |
| 372  3 | A.  I can read that, yes. | | |
| 372  4 | Q.  Okay. And you can see just below that you have | | |
| 372  5 | cut and pasted Table 3 into your E-mail, right? | | |
| 372  6 | A.  Yes. | | |
| 372  7 | Q.  Please bear with me a minute. | | |
| 372  8 | Okay.  You then follow up with that E-mail to | | |
| 372  9 | Scott Berkowitz and Frank Misselwitz and the others and | | |
| 372  10 | say, "Scott, Frank, I think this ASH presentation poster | | |
| 372  11 | needs to be pushed as well. I've added my comments, | | |

52

|  | Objections In | Responses In | Rulings |
|---|---|---|---|

372 12     suggested changes. When can we discuss?" Right?
372 13     A. That's correct.
372 14     Q. Okay. And then if we look at the final E-mail
372 15     in the chain, Frank Misselwitz sends an E-mail to Chris
372 16     Thomas at Chameleon, and says, "Dear Chris," and it's
372 17     the last E-mail in the document on the top of the first
372 18     page. It says, "Dear Chris, I fully agree with Martin's
372 19     comments. We shall show the relative risk of bleeding
372 20     between users, non-users, not the relative risk versus
372 21     enox. I'm not sure how the currently-changed version of
372 22     the poster text looks like." Do you see that?
372 23     A. That's correct, yes.
372 24     (Homering Exhibit No. 57 was marked for
372 25     identification)

**373:12 – 374:3**    1:22

373:12   Homering, Martin 2016-06-23

373 12     Q. All right. So this is a presentation of this
373 13     pooled analysis, and it says, "A pooled analysis of four
373 14     pivotal studies of rivaroxaban for the prevention of
373 15     venous thromboembolism after orthopedic surgery, effects
373 16     of specified comedications." Do you see that?
373 17     A. Correct.
373 18     Q. And you see down at the bottom it says, "The
373 19     data source is the RECORD 1.4 pooled analysis," right?
373 20     A. Correct.
373 21     Q. And the name of the person responsible for the
373 22     project is Frank Misselwitz. Do you see that?
373 23     A. Correct.
373 24     Q. Okay. And under authors we see that the
373 25     author, lead author, is Bengt Eriksson, right?
374 1     A. I don't know what it means to stand at first
374 2     place. I believe this is a team -- this is a team
374 3     effort.

Re: [373:12-374:3]
Def Obj 403/Relevance. See objection to 369:1 –
369:19 regarding RECORD.

Re: [373:12-374:3]
Pltf Resp It is an oversimplification to say that one indication
was based on one study. In fact, data from all of the RECORD
studies were the basis of supporting all of the indications to
some extent, and certainly, were used to inform the
defendants' understanding of the safety and efficacy profiles of
Xarelto. The jury must be trusted to distinguish the studies
from one another. Additionally, the RECORD studies are
relevant for a host of other reasons, including the defendants'
notice of critical safety issues of Xarelto, as well as flaws in the
RECORD studies which call the safety of the drug into question.
For this reason and others, this testimony is relevant and there
is no significant risk of confusion that outweighs the probative
value of this evidence.

Pending

**374:17 – 375:3**    0:58

374:17   Homering, Martin 2016-06-23

374 17     Q. And the meeting's going to be at the American
374 18     Society of Hematology, ASH, 2008. Do you see that?
374 19     A. Correct.
374 20     Q. Okay. And those are doctors that are concerned
374 21     with bleeding, right?
374 22     A. Correct.
374 23     Q. Okay. So let's turn over for a minute, I want
374 24     to turn over to Page 7.
374 25     A. Yes.
375 1     Q. Okay. And there we see Table 3 again. Do you
375 2     see that?
375 3     A. Yes.

Re: [374:17-375:3]
Def Obj 403/Relevance. See objection to 369:1 –
369:19 regarding RECORD.

Re: [374:17-375:3]
Pltf Resp It is an oversimplification to say that one indication
was based on one study. In fact, data from all of the RECORD
studies were the basis of supporting all of the indications to
some extent, and certainly, were used to inform the
defendants' understanding of the safety and efficacy profiles of
Xarelto. The jury must be trusted to distinguish the studies
from one another. Additionally, the RECORD studies are
relevant for a host of other reasons, including the defendants'
notice of critical safety issues of Xarelto, as well as flaws in the
RECORD studies which call the safety of the drug into question.
For this reason and others, this testimony is relevant and there

Pending

07/28/17 16:09

| | Objections In | Responses In | Rulings |
|---|---|---|---|

375:13 - 377:7

Homering, Martin 2016-06-23

Q. Okay, okay. It's the same Table 3 regarding
the results of the analysis of on treatment major and
clinically relevant non-major bleeding in rivaroxaban
patients and enoxaparin patients in these studies that
were also taking either NSAIDs or platelet aggregate
inhibitors, right?

A. Yes, I assume so.

Q. Okay. But now this table, you can see that all
of the information on the table is struck through with
lines, correct?

A. Correct.

Q. Okay. Now, if we could look at -- just go back
a page, I want to look at the couple of pages, Page 4,
the conclusions section. And the conclusions has --
there's two bullet points there. Do you see that?

A. Yes.

Q. Okay. And the first conclusion says, "This
RECORD one through four explorative analysis indicates
that the use of NSAIDs or platelet aggregation
inhibitors or ASA does not increase the risk of major
and clinically-relevant non-major bleeding in patients
taking rivaroxaban compared to enoxaparin-based
regimens." Do you see that?

A. Correct.

Q. Okay. And then there's an alternative
conclusion that says, "This RECORD one through four
explorative analysis shows that the concomitant use of
NSAIDs or platelet aggregation inhibitors, ASA, with
rivaroxaban, 10 milligrams, once daily, is associated
with only a marginal increase in bleeding risk, and that
this increase is of a magnitude similar to risk
increases seen with the studied enoxaparin treatment
regimens." Do you see that?

A. Correct.

Q. And neither one of those suggested conclusions
included the statement that you had made in your E-mail
to your colleagues when you suggested removing the table
that we clearly show a significant bleeding risk, do
they?

A. I don't know what the term "significant
bleeding risk" means here, but I can explain the

Objections column:

Re: [375:13-377:7]

Def Obj 403/Relevance. See objection to 369:1 -
369:19 regarding RECORD.

Responses column:

Re: [375:13-377:7]

Pltf Resp It is an oversimplification to say that one indication
was based on one study. In fact, data from all of the RECORD
studies were the basis of supporting all of the indications to
some extent, and certainly, were used to inform the
defendants' understanding of the safety and efficacy profiles of
Xarelto. The jury must be trusted to distinguish the studies
from one another. Additionally, the RECORD studies are
relevant for a host of other reasons, including the defendants'
notice of critical safety issues of Xarelto, as well as flaws in the
RECORD studies which call the safety of the drug into question.
For this reason and others, this testimony is relevant and there
is no significant risk of confusion that outweighs the probative
value of this evidence.

Rulings column:

Pending

Top of Responses column (continuation):

is no significant risk of confusion that outweighs the probative
value of this evidence.

4:39

54

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| 377 4<br>377 5<br>377 6<br>377 7 | rationale behind the reason why I think the table should be amended.<br>(Homering Exhibit No. 58 was marked for identification.) | | | |
| 377:17 - 378:6   1:25 | | Re: [377:17-378:6]<br>Def Obj 403/Relevance. See objection to 369:1-369:19 regarding RECORD. | Re: [377:17-378:6]<br>Pltf Resp It is an oversimplification to say that one indication was based on one study. In fact, data from all of the RECORD studies were the basis of supporting all of the indications to some extent, and certainly, were used to inform the defendants' understanding of the safety and efficacy profiles of Xarelto. The jury must be trusted to distinguish the studies from one another. Additionally, the RECORD studies are relevant for a host of other reasons, including the defendants' notice of critical safety issues of Xarelto, as well as flaws in the RECORD studies which call the safety of the drug into question. For this reason and others, this testimony is relevant and there is no significant risk of confusion that outweighs the probative value of this evidence. | Pending |
| 377 17<br>377 18<br>377 19<br>377 20<br>377 21<br>377 22<br>377 23<br>377 24<br>377 25<br>378 1<br>378 2<br>378 3<br>378 4<br>378 5<br>378 6 | Homering, Martin 2016-06-23<br>Q. And you can see now the title of the -- of this paper is, 'A Pooled Analysis of Four Clinical Studies of Rivaroxaban After Hip and Knee Replacement Concomitant of Specified Medications Does Not Increase the Risk of Bleeding.' Do you see that?<br>A. Yes, I see that.<br>Q. And you can see that the target meeting here for this paper is listed as EAHP 2009, and not the American Society of Hematology, 2008. Do you see that?<br>A. Yes, I see that.<br>Q. It says, "Coadministration of NSAIDs and platelet aggregation inhibitors, or ASA, does not increase bleeding risk" is the communication objective, right?<br>A. That's what it says. | | | |
| 378:13 - 378:18   0:43 | | Re: [378:13-378:18]<br>Def Obj 403/Relevance. See objection to 369:1-369:19 regarding RECORD. | Re: [378:13-378:18]<br>Pltf Resp It is an oversimplification to say that one indication was based on one study. In fact, data from all of the RECORD studies were the basis of supporting all of the indications to some extent, and certainly, were used to inform the defendants' understanding of the safety and efficacy profiles of | Pending |
| 378 13<br>378 14<br>378 15<br>378 16<br>378 17<br>378 18 | Homering, Martin 2016-06-23<br>Both of these papers that we're looking at, the draft that we were looking at back in 2008 that was going to go to the ASH meeting, and now this new one for EAHP of 2009, they're both talking about the same pooled analysis of the RECORD studies, right?<br>A. That is my understanding, yes. | | | |

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**379:3 - 380:4**

379:3    380:4  Q.  All right.  And so I've got a couple more
379   3  questions for you.
379   4
379   5      If you look through this paper, after the
379   6  conclusions, do you see that version of Table 3 that had
379   7  the strike-throughs on the last exhibit anywhere in this
379   8  poster that was going to be presented at the EAHP, the
379   9  European Association of Hospital Pharmacists, in 2009?
379  10  A.  No, I cannot see it.
379  11  Q.  And so -- so your recommendation, that
379  12  Dr. Misselwitz agreed, with to remove that table that
379  13  you described as showing a significant bleeding risk was
379  14  taken up and it was removed from the paper regarding the
379  15  pooled analysis looking at the use of NSAIDs and ASAs
379  16  with Xarelto and enoxaprin in the RECORD studies,
379  17  right?
379  18      MR. STOFFELMAYR:  Objection to the form.
379  19  A.  Yes, the table isn't shown because it is an
379  20  unfair comparison of the two treatment regimens.  It's
379  21  based on misleading analyses.  It does not show the data
379  22  in the correct context.  And I can elaborate on why.
379  23  Q.  You don't think it was removed because you told
379  24  your colleagues that it showed a significant bleeding
379  25  risk with Xarelto?
380   1  A.  No, I don't believe that.  It was because it
380   2  was a biased comparison of the two groups, and also not
380   3  intended for this kind of presentation, as was explained
380   4  in the SAP report for the analysis.

**3:44** — Re: [379:3-380:4]
Def Obj 403/Relevance. See objection to 369:1-
369:19 regarding RECORD.

**Pending** — Re: [379:3-380:4]
Pltf Resp It is an oversimplification to say that one indication
was based on one study.  In fact, data from all of the RECORD
studies were the basis of supporting all of the indications to
some extent, and certainly, were used to inform the
defendants' understanding of the safety and efficacy profiles of
Xarelto.  The jury must be trusted to distinguish the studies
from one another.  Additionally, the RECORD studies are
relevant for a host of other reasons, including the defendants'
notice of critical safety issues of Xarelto, as well as flaws in the
RECORD studies which call the safety of the drug into question.
For this reason and others, this testimony is relevant and there
is no significant risk of confusion that outweighs the probative
value of this evidence.

**380:17 -**

380:17    0:09
380  17      380:19  Homering, Martin 2016-06-23
380  18  Q.  Okay.  Good afternoon, Dr. Homering,
380  19  Mr. Homering, sorry.  How are you?
              A.  Hello, yes, fine.

**381:15 -**

381:15    0:43
381  15      381:22  Homering, Martin 2016-06-23
381  16  Q.  In your job at Bayer, are you responsible for
              the design and running of clinical trials?

07/28/17 16:09

| | | | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|

| 381 17 | A. No, my department is not concerned with these | | | | |
| 381 18 | two fields. | | | | |
| 381 19 | Q. And would you ever be responsible for making a | | | | |
| 381 20 | decision about which dose of a drug to use in a clinical | | | | |
| 381 21 | trial? | | | | |
| 381 22 | A. No. | | | | |
| | | | | | |
| 381:23 - 383:23 | Homering, Martin 2015-06-23 | 6:19 | Re: [381:23-383:23] | | Pending |
| 381 23 | Q. Let me ask you to take a -- get back in front | | Pltf Obj Leading questions without probative value to | | |
| 381 24 | of you Exhibits 56 and 57 that were discussed this | | the jury. | | |
| 381 25 | afternoon. Let's start with Exhibit 57. Do you have | | | | |
| 382 1 | that in front of you? | | | | |
| 382 2 | A. Yes. | | | | |
| 382 3 | Q. And that's the draft of a -- I'm not sure if | | | | |
| 382 4 | it's an abstract or a poster -- for which the lead | | | | |
| 382 5 | author was Bengt Eriksson, correct? | | | | |
| 382 6 | A. Correct. | | | | |
| 382 7 | Q. And on the very first page do you see near the | | | | |
| 382 8 | top there's a draft number? | | | | |
| 382 9 | A. Yes, that is what it says. | | | | |
| 382 10 | Q. It says draft one, correct? | | | | |
| 382 11 | A. Correct. | | | | |
| 382 12 | Q. And if we flip to Page 7 that Mr. Overholtz | | | | |
| 382 13 | showed you, that's that Table 3 with all the strike | | | | |
| 382 14 | marks, correct? | | | | |
| 382 15 | A. Correct. | | | | |
| 382 16 | Q. What is the date of this draft one that's | | | | |
| 382 17 | Exhibit 57 where Table 3 has the strike marks? | | | | |
| 382 18 | A. I read there 27 October, 2008. | | | | |
| 382 19 | Q. Okay. Let's go to Homering Exhibit 56 now, | | | | |
| 382 20 | and on the third page there's the E-mail that | | | | |
| 382 21 | Mr. Overholtz discussed with you from you to Scott | | | | |
| 382 22 | Berkowitz and others, correct? | | | | |
| 382 23 | A. Correct. | | | | |
| 382 24 | Q. And this is the -- the E-mail in which you | | | | |
| 382 25 | suggested removing Table 3 from the abstract, correct, | | | | |
| 383 1 | or the poster rather. | | | | |
| 383 2 | A. Correct. | | | | |
| 383 3 | Q. What's the date of your E-mail making the | | | | |
| 383 4 | suggestion? | | | | |
| 383 5 | A. I read 10 November, 2008. | | | | |
| 383 6 | Q. So your suggestion to remove Table 3 comes | | | | |
| 383 7 | after the draft that's Homering 57 where it had already | | | | |
| 383 8 | been removed, correct? | | | | |
| 383 9 | A. It looks like it, yes. | | | | |
| 383 10 | Q. Okay. Now, I noticed during counsel's | | | | |
| 383 11 | examination at one point you offered to explain why you | | | | |
| 383 12 | thought Table 3 should be removed from the poster, and | | | | |
| 383 13 | counsel didn't take you up on that, so I'm going to ask | | | | |
| 383 14 | you now. | | | | |
| 383 15 | Could you please explain to the jury why you | | | | |
| 383 16 | believed that Table 3 should have been removed from the | | | | |
| 383 17 | poster. | | | | |
| 383 18 | A. These -- this prospective planned analysis was | | | | |
| 383 19 | never intended to compare rivaroxaban and enoxaparin | | | | |
| 383 20 | because the events under enoxaparin come up | | | | |
| 383 21 | preoperatively. Enoxaparin typically is a drug | | | | |
| 383 22 | administered before operation, in contrast to | | | | |
| 383 23 | rivaroxaban. That was not taken into account. | | | | |

Rulings



57

07/28/17 16:09

| | Objections In | Responses In | Rulings |
|---|---|---|---|



383:25 - 384:6 Homering, Martin 2016-06-23
0:48
383 25
384 1    A.   And events were therefore not considered.  This
384 2    means that enoxaparin indications miss out on events, so
384 3    no comparison between enoxaparin and rivaroxaban is
384 4    possible in this way.
384 5    Q.   Are you saying that the analysis in Table 3
384 6    undercounts bleeding events for enoxaparin compared to
         rivaroxaban?

Re: [383:25-384:6]
Pltf Obj Leading questions without probative value to the jury.

Pending

384:8 - 384:13 Homering, Martin 2016-06-23
0:39
384 8
384 9    A.   The events which happened preoperatively and
384 10   before the intake of the first tablet postoperatively
384 11   are not accounted for, not part of this table.
384 12   Q.   And why does that make a difference?
384 13   A.   Because active enoxaparin starts before the
         operation, but active rivaroxaban only starts after.

391:25 - 392:18 Homering, Martin 2016-06-23
1:41
391 25   Q.   Let's look now at Exhibits 47 and 48, and 48
392 1    was the translation of Exhibit 47, so you can look at
392 2    whichever one is easiest for you.
392 3    A.   Yes.
392 4    Q.   And at the top of the E-mail string is a fairly
392 5    long E-mail from Stefan Willmann to a number of people,
392 6    correct?
392 7    A.   That's correct.
392 8    Q.   Were -- strike that.
392 9         Did you receive this E-mail, Exhibit 47 or 48,
392 10   from Dr. Willmann?
392 11   A.   No.
392 12   Q.   Before today have you ever seen this E-mail?
392 13   A.   No, I never saw it.
392 14   Q.   You were asked quite a number of questions
392 15   about Mr. -- sorry -- Dr. Willmann's E-mail.  Is there
392 16   anybody you can think of, besides yourself, who would be
392 17   a better source of information about what Dr. Willmann
392 18   meant?

392:20 - 392:21 Homering, Martin 2016-06-23
0:04
392 20   A.   Yes, it would be Stefan Willmann personally,
392 21   himself.

392:22 - 393:3 Homering, Martin 2016-06-23
0:27
392 22   Q.   Do you remember being asked a lot of questions
392 23   about a Janssen PowerPoint presentation on the popPK
392 24   model?
392 25   A.   Yes.
393 1    Q.   Is there someone who might be a better person
393 2    to answer questions about what that PowerPoint meant
393 3    besides yourself?

Re: [392:22-393:3]
Pltf Obj Relevance, hearsay, foundation, and relates to facts not in evidence.  Unless portions of the Willmann deposition are designated and played at trial, this testimony is nonsensical and confusing to the jury.

Pending

393:5 - 393:15 Homering, Martin 2016-06-23
0:54
393 5    A.   Yes, I think Stefan Willmann would also be a

Re: [393:5-393:15]

Pending

58

| | | Objections in | Responses In | Rulings |
|---|---|---|---|---|



| | | | | |
|---|---|---|---|---|
| 393 | 6 | good person. | | |
| 393 | 7 | Q. Dr. Willmann gave a deposition last week and | | |
| 393 | 8 | was asked questions about the back and forth between | | |
| 393 | 9 | Bayer and Janssen on the popPK model. Would you be | | |
| 393 | 10 | comfortable to -- comfortable deferring to his views | | |
| 393 | 11 | about that back and forth? | | |
| 393 | 12 | A. Yes, Stefan Willmann is the Bayer expert in | | |
| 393 | 13 | this field. | | |
| 393 | 14 | Q. Who knows more about the popPK model currently | | |
| 393 | 15 | being worked on, you or Stefan Willmann? | | |

393:17 –   393:17 Homering, Martin 2016-06-23                    0:03
393 17      A. Stefan Willmann.

Plhf Obj Relevance, hearsay, foundation, and relates to facts not in evidence. Unless portions of the Willmann deposition are designated and played at trial, this testimony is nonsensical and confusing to the jury.

399:11 –                                                        1:15
399:11   Homering, Martin 2016-06-23

| 399:11 | Q. Okay. Mr. Homering, you recall the questions |
| 399:12 | from counsel for Bayer regarding the dates of the -- I |
| 399:13 | think it was regarding the -- some of the last exhibits |
| 399:14 | that I showed you regarding the ASH poster and the |
| 399:15 | Table 3 and whether or not Table 3 had been removed. Do |
| 399:16 | you recall those questions? |
| 399:17 | A. I do. |
| 399:18 | Q. Right. |
| 399:19 |      And he showed you that on Exhibit 57, the draft |
| 399:20 | of that ASH poster was listed as draft one, and there |
| 399:21 | was a date listed of sometime in October of 2008, |
| 399:22 | correct? |
| 399:23 | A. Correct. |

Re: [399:11-399:23]
Def Obj 403/Relevance. This line of questioning pertains to VTE-prevention and to the RECORD studies, which were the clinical trials done to support the VTE-prevention indication. This case, however, involves the use of Xarelto to treat DVT, which was based on EINSTEIN. This important distinction is not made clear at all in the designations, and there is a real danger of jury confusion and prejudice – the designations leave the impression that these are issues from studies related to the indication for which this plaintiff used Xarelto, and that is simply not true. To the extent RECORD is implicated, it is wholly irrelevant because it was never used as a basis for any indication or approval at all.

Re: [399:11-399:23]
Plhf Resp Further, Data pertaining to studies conducted in support of other Xarelto indications is hugely relevant to Defendants' conduct and handling of studies in the context of getting to market as well as handling matters of patient safety. It is an oversimplification to say that one indication was based on one study. In fact, data from all of the RECORD studies were the basis of supporting all of the indications to some extent, and certainly, were used to inform the defendants' understanding of the safety and efficacy profiles of Xarelto. The jury must be trusted to distinguish the studies from one another. Additionally, the RECORD studies are relevant for a host of other reasons, including the defendants' notice of critical safety issues of Xarelto, as well as flaws in the RECORD studies which call the safety of the drug into question. For this reason and others, this testimony is relevant and there is no significant risk of confusion that outweighs the probative value of this evidence.

Pending

400:3 –   400:4 Homering, Martin 2016-06-23                    0:01
400   3      (Homering Exhibit No. 59 was marked for
400   4      identification.)

Re: [400:3-400:4]
Def Obj Lack of Foundation. Homering testifies at

Re: [400:3-400:4]
Plhf Resp Further, Data pertaining to studies conducted in

Pending

59



| | Objections In | Responses In | Rulings |
|---|---|---|---|

**400:10 – 401:1**   1:54

```
400  10
400  11
400  12
400  13
400  14
400  15
400  16
400  17
400  18
400  19
400  20
400  21
400  22
400  23
400  24
400  25
401   1
```

**Homering, Martin 2015-06-23**

So looking in now Exhibit 59, it's an e-mail that you sent to Sekoti Berkowic and Torsten Worstermten and Frank Misslwitz, on November 13th, 2008, where you said, "Scott and Frank and Ikka, I think this A&A presentation poster needs to be pushed as well, and you see there's an attachment of the Einlarson RECORD one through four complete draft 18 commons h/n dot doct. Do you see that?

A. Yes, I see that.

Q. And it says, "I have added my comments, suggested changes", right?

A. Yes.

Q. Okay. And so and then the Exhibit 57 or that we – that counsel – that's how I you and then counsel for Bayer asked you about was the actual attachment to your E-mail that contained those pink-through edits to Table 3.

**Re: [400:10-401:1]**

**Def Obj** Lack of foundation. Homering testifies at 401:12-13 that he cannot tell [nor exclude] whether Exhibit 57 was the actual attachment to the email that was marked as Exhibit 59. 403/Relevance – VTE-prevention and Record. See objection to 399:11 – 23.

**Re: [400:10-401:1]**

Plff Resp That Homering, an adverse witness, won't acknowledge an attachment is indeed, what it purports to be, an attachment he forwarded to others, is no failure of foundation. Plaintiffs establish that Ex. 57 is an attachment to Exh. 59's. Homering acknowledges the email lists the filename of Ex. 59 is an attachment and that the email and attachment were produced within 399:11-402:11. This is set forth in designations within 399:11-402:11. See objection response to 399:11-23.

**Pending**

40:17-13 that he cannot tell [nor exclude] whether Exhibit 57 was the actual attachment to the email that was marked as Exhibit 59. 403/Relevance – VTE-prevention and Record. See objection to 399:11 – 23.

support of other Xarelto indications is hugely relevant to Defendants' conduct and handling of studies in the context of getting to market as well as handling matters of patient safety. It is an oversimplification to say that one indication was based on one study. In fact, data from all of the RECORD studies were the basis of supporting all of the indications to some extent, and certainly, were used to inform the defendants' understanding of the safety and efficacy profiles of Xarelto. The jury must be trusted to distinguish the studies from one another. Additionally, the RECORD studies are relevant for a host of other reasons, including the defendants' notice of critical safety issues of Xarelto, as well as flaws in the RECORD studies which call the safety of the drug into question.

**401:7 – 401:10 Homering, Martin 2015-06-23**   0:30

```
401   7
401   8
```

Q. So it was in fact your edit to that draft one, even though the date from October had not been updated,

**Re: [401:7-401:10]**

**Def Obj** Lack of foundation. Homering testifies at 60

**Re: [401:7-401:10]**

Plff Resp That Homering, an adverse witness, won't

**Pending**

| | Objections In | Responses In | Rulings |
|---|---|---|---|

| 401:9 401:10 | this was the version that was E-mailed around by you on November 13th, 2008, correct? | 401:12-13 that he cannot tell (nor exclude) whether Exhibit 57 was the actual attachment to the email that was marked as Exhibit 59. 403/Relevance -VTE-prevention and Record. See objection to 399:11-23. | acknowledge an attachment is indeed, what it purports to be, an attachment he forwarded to others, is no failure of foundation. Plaintiffs establish that Ex. 57 is an attachment to Exh. 59 t. Homering acknowledges the email lists the filename of Ex. 59 as an attachment and that the email and attachment were produced as email and attachment. This is set forth in designations within 399:11-402:11. See objection response to 399:11-23. | |

**401:12 - 402:21 Homering, Martin 2016-06-23**

3:21

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| 401:12 A. I cannot tell at this point in time, but I
401:13 wouldn't exclude it either.
401:14 (Homering, Exhibit No. 80 was marked for
401:15 identification.)
401:16 Q. Okay, Mr. Homering, I'm going to show you
401:17 just to help clarify this issue just a little more, what
401:18 we'll mark as Exhibit 80, which is a printout of the
401:19 information of the Exhibit 57 that was produced to us
401:20 for the -- that ASH poster that had the strikes-through
401:21 edits of Table 2.
401:22 Okay. And if you can look with me you can see,
401:23 when we're talking about the document that had the
401:24 Record No. 13134111, and you can see that the custodian
401:25 was Frank Misselwitz. Do you see that? And the File
402:1 name is the same attachment that we saw in your E-mail,
402:2 the OS102?P=08 Eriksson RECCAD one through four, comes
402:3 dash draft 18, underscore, comments MM, dot dot, and
402:4 that was the same E-mail that you attached in your
402:5 E-mail to Scott Berkowitz, and others, including Frank
402:6 Misselwitz, on November 13th, 2008. Do you see that?
402:7 A. Yes, this looks like identical names.
402:8 Q. Okay. And you can see that according to this
402:9 information that was provided by Bayer with this
402:10 document, the document was last modified on
402:11 November 13th, 2008. Do you see that, Dr. --
402:12 Mr. Homering?
402:13 A. Yes, I see that.
402:14 (Homering Exhibit No. 61 was marked for
402:15 identification.)
402:16 (Homering Exhibit No. 62 was marked for
402:17 identification.)
402:18 Q. All right. Let me show you what we'll mark as
402:19 Exhibits 61 and 62, which is an E-mail and an attachment | Re: [401:12-402:21]
Def Obj Lack of foundation. This testimony concerns Exhibit 61 and 62, exhibit 61 is a Janssen email chain that does not involve Homering per his testimony at 402:24-403:2; exhibit 62 is a poster circulated by Janssen attached to this email. 403/Relevance - VTE-prevention and Record. See objection to 399:11 - 23. | Re: [401:12-402:21]
Plf Resp That Homering, an adverse witness, won't acknowledge an attachment is indeed, what it purports to be, an attachment he forwarded to others, is no failure of foundation. Plaintiffs establish that Ex. 57 is an attachment to Exh. 59 t. Homering acknowledges the email lists the filename of Ex. 59 as an attachment and that the email and attachment were produced as email and attachment. This is set forth in designations within 399:11-402:11. See objection response to 399:11-23. | Pending |

| | Objections In | Responses In | Rulings |
|---|---|---|---|

402:20   from December 23rd, 2008. It's Bates-Xarelto_Janssen_
402:21   23576895, and the subject is ASH poster PDFs.

**402:24 - 403:25 Homering, Martin 2015-06-23**    2:56

402:24   Q. Okay. And you can see that this is an E-mail
402:25   between folks at Janssen, and you're not on it, right?
403:1   A. Please bear with me. Correct, I don't see my
403:2   name here.
403:3   Q. Okay. So then if you look under attachments
403:4   with me on the fourth line, one of the attachments is
403:5   0B1128-PASHDB, Erikkson RECORD univ through four; consals
403:6   first dot PDFs. Do you see that?
403:7   A. Yes, I see that.
403:8   Q. Okay. And the Janssen employee writes, "Hello,
403:9   team. Thank you to Derrick for providing these posters
403:10   from ASH. I sent them to our MedCom colleagues and I
403:11   assume they will be added to the bibliography in WIKI
403:12   with the poster links included." Do you see that?
403:13   A. Yes, I do.
403:14   Q. Okay. And if we look at this attachment, which
403:15   is Exhibit 62, you see -- and it's Record No. 4751083,
403:16   this is a poster of, A Pooled Analyses of Four Pivotal
403:17   Studies of Rivaroxaban for the Prevention of Venous
403:18   Thromboembolism After Orthopedic Surgery, Effects of
403:19   Specified Complications. That's that same title of the
403:20   poster that we looked at as Exhibit 57, correct?
403:21   A. Yes, it looks as if this was correct.
403:22   Q. Okay. And in this poster that J&J was
403:23   E-mailing to their medical communication colleagues, the
403:24   lines poster from ASH, Table 2 does not appear, does it?
403:25   A. That's correct.

**Objections In**

Re: [402:24-403:25]
Def Obj Lack of foundation. This testimony concerns Exhibit 61 and 62; exhibit 61 is a Janssen email chain that does not involve Homering per his testimony at 402:24-403:2, exhibit 62 is a poster circulated by Janssen attached to this email. 403/Relevance - VTE-prevention and Record. See objection to 399:11 - 23.

**Responses In**

Re: [402:24-403:25]
Pltf Resp That Homering, an adverse witness, won't acknowledge an attachment is indeed, what it purports to be, an attachment he forwarded to others, is no failure of foundaiton. Plaintiffs establish that Ex. 57 is an attachment to Exh. 59 t. Homering acknowledges the email lists the filename of Ex. 59 as an attachment and that the email and attachment were produced as email and attachment. This is set forth in designations within 399:11-402:11. See objection response to 399:11-23.

**Rulings**

Pending