Inmigo v bayer video tmax db
Deposition Designations for Lensing A 20170724, Lensing A 20170725, Lensing A 20170726, Lensing A 20170727

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**10:4 - 11:2**  Lensing, Anthonie 2017-07-24  1:48
10  4     Good morning, Dr. Lensing.  My name is
10  5     Neil Overholtz, and I'll be asking you some
10  6     questions today.
10  7     Okay?
10  8     A.  Okay.
10  9     Q.  Can you please state your full name for
10 10     the record.
10 11     A.  My complete name is Anthonie Wilhelmus
10 12     Arnold Lensing.
10 13     Q.  And, Dr. Lensing, who do you work for?
10 14     A.  I work for Bayer.
10 15     Q.  That's fine.  And do you work for Bayer
10 16     here in the Netherlands?
10 17     A.  Yes.
10 18     Q.  How long have you worked for Bayer?
10 19     A.  Since 2004.
10 20     Q.  Can you tell me what your current
10 21     position is at Bayer?
10 22     A.  My current position is global clinical
10 23     leader related to rivaroxaban.
10 24     Q.  Okay.  And when you say "rivaroxaban,"
10 25     is that the drug sold in the United States under
11  1     the brand name Xarelto?
11  2     A.  That's correct.

**17:5 - 17:6**  Lensing, Anthonie 2017-07-24  0:17
17  5     (Lensing Exhibit No. 2 was marked
17  6     for identification.)

Re: [17:5-17:6]
Def Obj See objection to Exhibit 2.

Re: [17:5-17:6]
Pltf Resp See Plaintiffs' response to
Defendants' objection to this exhibit.

Pending

**17:11 - 17:13**  Lensing, Anthonie 2017-07-24  0:32
17 11     Q.  Can you tell me when what we've marked
17 12     as Exhibit 2, the CV, was prepared?
17 13     A.  It was prepared in 2016.

**18:14 - 18:17**  Lensing, Anthonie 2017-07-24  0:31
18 14     Q.  Okay.  And then it looks like you did a
18 15     fellowship at McMaster University in Canada; is
18 16     that right?
18 17     A.  Yes, that's correct.

**26:3 - 26:11**  Lensing, Anthonie 2017-07-24  0:51
26  3     Q.  So if I can show you what we'll mark as
26  4     Exhibit No. 3.  It's Bates No. BPAG_1928551.
26  5     (Lensing Exhibit No. 3 was marked
26  6     for identification.)
26  7     BY MR. OVERHOLTZ:
26  8     Q.  It's an e-mail from yourself to Frank
26  9     Misselwitz at the top from February 11th of 2004,
26 10     and the record number is 943932.  Do you see that?
26 11     A.  Yes, indeed, I see this.

Re: [26:3-26:11]
Def Obj See objection to Exhibit 3.

Re: [26:3-26:11]
Pltf Resp See Plaintiffs' response to
Defendants' objection to this exhibit.

Pending

**26:18 - 26:24**  Lensing, Anthonie 2017-07-24  0:37
26 18     Q.  And the subject of his e-mail is "The
26 19     Bayer factor Xa inhibitor project."  Right?
26 20     A.  That's correct.
26 21     Q.  And that would have been referring to
26 22     rivaroxaban or what's now known as Xarelto,
26 23     correct?
26 24     A.  That is correct.

**28:4 - 28:17**  Lensing, Anthonie 2017-07-24  1:29
28  4     Q.  Dr. Misselwitz e-mails you in February
28  5     of 2004, and he says: "As you are aware of, the
28  6     Bayer factor Xa inhibitor project is gaining
28  7     speed, and we have a new position of global
28  8     clinical leader being responsible for this
28  9     program."
28 10     Do you see that?
28 11     A.  I do see this.
28 12     Q.  He says: "This is a very senior
28 13     position, resides in the global pharma research
28 14     and development headquarters, and reports to the
28 15     VP/Head Global Clinical Development."
28 16     Do you see that?
28 17     A.  I do see that.

|  | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

**30:4 – 30:7   Lensing, Anthonie 2017-07-24**   0:28
30  4   Q.   So at some point in 2004, you did become
30  5   the global clinical leader for Xarelto or
30  6   rivaroxaban, right?
30  7   A.   That is correct.

**30:12 – 30:22   Lensing, Anthonie 2017-07-24**   0:52
30 12   Q.   Okay.  So it was your understanding when
30 13   you took the position that the indication that you
30 14   would have responsibility for would be for VTE
30 15   treatment; is that right?
30 16   A.   It was completely clear to me.
30 17   Q.   Okay.  And when we say "VTE treatment,"
30 18   VTE is venous thromboembolism?
30 19   A.   That is correct.
30 20   Q.   And is VTE another way of describing a
30 21   blood clot?  A type of blood clot?
30 22   A.   (In English)  A type of blood clot, that

**30:23 – 31:18   Lensing, Anthonie 2017-07-24**   1:37
30 23   is correct.
30 24        (Interpreter)  That is quite correct.
30 25   It is like a cow is an animal, but an animal is
31  1   not always a cow.
31  2   Q.   And the type of blood clot that was
31  3   referred to in the VTE treatment, those were
31  4   either DVTs or pulmonary embolisms; is that
31  5   correct?
31  6   A.   (In English)  Yeah, that is correct.
31  7   Q.   And when we say "DVT," that stands for
31  8   deep vein thrombosis; is that correct?
31  9   A.   Yeah, that is correct.
31 10   Q.   And is that a type of blood clot that
31 11   forms in the legs?
31 12   A.   Yes, it is a blood clot that is formed
31 13   in the deep veins of the leg.
31 14   Q.   Okay.  Did you have an understanding
31 15   that Bayer was also developing Xarelto for other
31 16   indications at the time that you were coming into
31 17   the company?
31 18   A.   Yes, I did know that.

**32:20 – 33:4   Lensing, Anthonie 2017-07-24**   1:29
32 20   BY MR. OVERHOLTZ:
32 21   Q.   Okay.  So if we can look at Exhibit 5,
32 22   which is an e-mail to -- from Martina Duda to
32 23   Scott Berkowitz on June 29th, 2011.  It has an
32 24   attachment listed on the e-mail, which is GCL Job
32 25   Description 063011.
33  1   A.   Yes, I see that.
33  2   Q.   Okay.  And did you report in June -- by
33  3   June of 2011, did you report to Dr. Berkowitz?
33  4   A.   Yes, that's correct.

Re: [32:20-33:4]
Def Obj See objection to Exhibit 5.

Re: [32:20-33:4]
Pltf Resp See Plaintiffs' response to Defendants' objection to this exhibit.

Pending

**33:15 – 34:8   Lensing, Anthonie 2017-07-24**   1:16
33 15   Q.   So I want to ask you a couple of
33 16   questions about this PowerPoint.  The first is, if
33 17   we go over to the second -- the next page in the
33 18   PowerPoint, you can see that about middle of the
33 19   page, you're listed as the GCL T-VTE for Xarelto,
33 20   Anthonie Lensing.  Do you see that?
33 21   A.   Yes.
33 22   Q.   Okay.  And T-VTE again would have stood
33 23   for the VTE treatment indication?
33 24   A.   (In English)  Treatment of VTE.  Not
33 25   prophylaxis but treatment.
34  1        (Interpreter)  Treatment of VTE.  Not
34  2   prophylaxis but treatment.
34  3   Q.   One of the other indications for Xarelto
34  4   is the prophylaxis of VTE; is that right?
34  5   A.   Yes, that's correct.
34  6   Q.   Sometimes I think we see it referred to
34  7   as prevention of DVT or PE, correct?
34  8   A.   Prevention of the emergence of a clot.

Re: [33:15-34:8]
Pltf Obj Counter is duplicative of what is already designated at 30:12-22 and serves only as filler to drown out the substance of Dr. Lensing's testimony on matters central to this case.

Re: [33:15-34:8]
Def Resp This testimony is more comprehensive/informative than that at 30:12-22. In designating this testimony, Defendants seek not to drown out Dr. Lensing's testimony, but rather to help the jury understand the many different indications and dosing regiments Plaintiffs are putting at issue in this case.

Pending

**35:9 – 35:12   Lensing, Anthonie 2017-07-24**   0:10
35  9   Q.   Okay.  And Dr. Berkowitz reports to
35 10   Dr. Misselwitz, and you report to Dr. Misselwitz
35 11   through Dr. Berkowitz; is that right?
35 12   A.   (In English)  That's correct.

**35:22 – 36:5   Lensing, Anthonie 2017-07-24**   0:25
35 22   Q.   And it describes that: "The global
35 23   clinical development leader will be responsible

2

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

35 24  for all strategic phase II through III and
35 25  operational clinical development activities for
36 1  development projects phase II through III or
36 2  clinical life cycle management activities for
36 3  marketed products."
36 4      Did I read that right?
36 5  A. Yes, you read that correctly.

36:12 - 36:15  Lensing, Anthonie 2017-07-24    0:34
36 12  Q. Okay. And the responsibilities that you
36 13  had as GCL from 2004, were they consistent through
36 14  your time today?
36 15  A. Yes, they were.

37:21 - 37:24  Lensing, Anthonie 2017-07-24    0:10
37 21  Q. The next bullet point lists as one of
37 22  the major tasks, marketing support. Do you see
37 23  that?
37 24  A. Yes.

39:5 - 39:8  Lensing, Anthonie 2017-07-24    0:18
39 5  Q. Okay. The next bullet point says:
39 6  "Contributes to opinion leader development." Do
39 7  you see that?
39 8  A. Yes, I see that too.

39:19 - 39:22  Lensing, Anthonie 2017-07-24    0:27
39 19  Q. Have you been involved in opinion leader
39 20  development as a GCL at Bayer?
39 21  A. I don't think that Bayer makes opinion
39 22  leaders but works with opinion leaders.

39:23 - 40:1  Lensing, Anthonie 2017-07-24    0:08
39 23  Q. Okay. And have you done that work with
39 24  opinion leaders as a GCL for Xarelto VTE treatment
39 25  at Bayer?
40 1  A. Yes, I have.

43:14 - 43:22  Lensing, Anthonie 2017-07-24    0:40
43 14  Q. And if we look at the second bullet
43 15  point, it says: "Provide -- provides medical
43 16  expertise to global strategic marketing for
43 17  marketed products."
43 18      Do you see that?
43 19  A. Yes, I see that.
43 20  Q. And currently Xarelto would be
43 21  considered a marketed product, correct?
43 22  A. Yes, that's correct.

44:9 - 44:15  Lensing, Anthonie 2017-07-24    0:28
44 9  BY MR. OVERHOLTZ:
44 10  Q. Okay. And so then if we look at the
44 11  next part of this bullet point under "Marketing
44 12  Support," it says: "Defines the publication
44 13  strategy together with the marketing manager." Do
44 14  you see that?
44 15  A. Yes, that's what it says, indeed.

45:18 - 46:5  Lensing, Anthonie 2017-07-24    1:18
45 18  Q. And was that one of your
45 19  responsibilities as global clinic -- clinical
45 20  leader for Xarelto was designing or participating
45 21  in the design of the clinical program for Xarelto
45 22  for VTE treatment?
45 23  A. Yes, that was my responsibility.
45 24  Q. Now, the next statement says: "These
45 25  programs must meet the needs of high stakes
46 1  customers ..." Do you see that?
46 2  A. Yes, I see.
46 3  Q. And it describes health authorities
46 4  worldwide, right?
46 5  A. Yeah, I see.

46:17 - 46:21  Lensing, Anthonie 2017-07-24    0:18
46 17  BY MR. OVERHOLTZ:
46 18  Q. Okay. And it next describes that it
46 19  would also include reimbursement and pricing
46 20  authorities. Do you see that?
46 21  A. Yes, I see that.

47:3 - 47:10  Lensing, Anthonie 2017-07-24    0:37
47 3  BY MR. OVERHOLTZ:
47 4  Q. Okay. And the next statement says -- it
47 5  includes as one of these high stakes customers

| | Objections In | Responses In | Rulings |
|---|---|---|---|

```
47  6    marketing/sales. Do you see that?
47  7    A.  Yes, I see that.
47  8    Q.  And it describes them as "who need to be
47  9    commercially successful," correct?
47 10    A.  That's what it says, indeed.


53:18  -  53:23  Lensing, Anthonie 2017-07-24          0:38
53 18          I want to talk a little bit now about
53 19    the VTE development program and the studies that
53 20    led to that indication.  Okay?
53 21    A.  Okay, that is fine.
53 22          (Lensing Exhibit No. 7 was marked
53 23          for identification.)


54:19  -  54:24  Lensing, Anthonie 2017-07-24          0:39
54 19    Q.  Okay.  So if we look at Exhibit 7, which
54 20    is this PowerPoint, on page 6, you're listed as
54 21    giving a presentation related to the overview of
54 22    VTE treatment in clinical trials.  Do you see
54 23    that?
54 24    A.  I do see this.


55:9  -  55:12  Lensing, Anthonie 2017-07-24           0:26
55  9    Q.  Okay.  And Einstein was the name of the
55 10    clinical trials to support the VTE treatment
55 11    indication; is that right?
55 12    A.  Yes, we gave that name to that program.


55:21  -  55:25  Lensing, Anthonie 2017-07-24          0:33
55 21    Q.  Okay.  And this slide looks to describe
55 22    the Einstein phase III study designs, and there
55 23    are three separate boxes on the left related to
55 24    the Einstein studies; is that right?
55 25    A.  That is correct.


56:1  -  56:5  Lensing, Anthonie 2017-07-24            0:30
56  1    Q.  Okay.  And these in fact were the
56  2    Einstein phase III trials that led to the
56  3    regulatory approval of Xarelto for VTE treatment;
56  4    is that right?
56  5    A.  That is correct.


56:14  -  57:11  Lensing, Anthonie 2017-07-24          2:13
56 14    BY MR. OVERHOLTZ:
56 15    Q.  Okay.  And so what -- if we look at the
56 16    first box under "Einstein" for acute symptomatic
56 17    DVT without symptomatic PE, that's referring to
56 18    the Einstein DVT study?
56 19    A.  That is correct.
56 20    Q.  And the second box refers to acute
56 21    symptomatic PE with or without symptomatic DVT.
56 22    That would be referring to the Einstein pulmonary
56 23    embolism or PE study; is that right?
56 24    A.  That is also correct.
56 25    Q.  Okay.  And both of those studies were
57  1    conducted under the same study protocol, correct?
57  2    A.  That is correct.
57  3    Q.  And the patients in those phase III
57  4    studies, if we look at the chart, would have been
57  5    given rivaroxaban or Xarelto 15 milligrams BID for
57  6    21 days.  Is that right?
57  7    A.  That is correct.
57  8    Q.  Okay.  And when it says "15 milligrams
57  9    BID," BID refers to taking the drug twice daily,
57 10    correct?
57 11    A.  That is correct.


58:11  -  58:17  Lensing, Anthonie 2017-07-24          0:49
58 11          So the purpose of the study was to
58 12    compare the use of Xarelto 15 milligrams twice
58 13    daily followed by 20 milligrams once daily
58 14    compared to the use of enoxaparin for up to -- for
58 15    at least five days followed by a vitamin K
58 16    antagonist, correct?
58 17    A.  Yes, that is correctly said.


58:18  -  58:25  Lensing, Anthonie 2017-07-24          1:03
58 18    Q.  Okay.  And these studies were randomized
58 19    trials; is that right?
58 20    A.  Yes, all three were randomized studies.
58 21    Q.  Okay.  And that means that the patients,
58 22    whether they're going to receive the Xarelto study
58 23    drug or the comparator drug, is a random decision.
58 24    Is that right?
```

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| 58 25 | A.  It was a random decision. | | | |

| | | | | | |
|---|---|---|---|---|---|
| 59:1 - 59:4 | Lensing, Anthonie 2017-07-24 | 0:13 | | | |
| 59  1 | Q.  Now, the Einstein DVT and the Einstein | | | | |
| 59  2 | PE trials, they were open-label trials, correct? | | | | |
| 59  3 | A.  Yes, indeed, those were open-label | | | | |
| 59  4 | trials. | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 59:7 - 59:15 | Lensing, Anthonie 2017-07-24 | 1:18 | | | |
| 59  7 | Q.  So in an open-label study, the doctors | | | | |
| 59  8 | that are treating the patient in the study know | | | | |
| 59  9 | which drug the patient is getting; is that right? | | | | |
| 59 10 | A.  Yes, that's right. | | | | |
| 59 11 | Q.  Now, the Einstein DVT and PE studies, | | | | |
| 59 12 | they weren't designed to show that Xarelto was | | | | |
| 59 13 | superior or better than the enoxaparin plus VKA | | | | |
| 59 14 | treatment for VTE, correct? | | | | |
| 59 15 | A.  That's correct. | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 59:16 - 59:24 | Lensing, Anthonie 2017-07-24 | 1:21 | Re: [59:16-59:24] | Re: [59:16-59:24] | Pending |
| 59 16 | Q.  Okay.  It's referred to in the study as | | Pltf Obj Counter is duplicative of what is | Def Resp Plaintiffs introduce the concept | |
| 59 17 | a noninferiority design; is that right? | | already designated repeatedly | of non-inferiority (one they will | |
| 59 18 | A.  Yes, that's correct. | | throughout this deposition [106:3-20, | consistently put at issue in this trial). If | |
| 59 19 | Q.  And that just means that the study's | | 374:18-375:1, 378:15-378:23, etc.] and | their other designations are any | |
| 59 20 | designed to — to show that the study drug, here | | serves only as filler to drown out the | indication) early on in these designations. | |
| 59 21 | Xarelto, is noninferior to the comparator | | substance of Dr. Lensing's testimony on | Defendants should not have to wait until | |
| 59 22 | enoxaparin plus VKA treatment, right? | | matters central to this case. | later on in the designations to further | |
| 59 23 | A.  That's correct, with the stipulation | | | clarify that concept. | |
| 59 24 | that it applied for the efficacy outcome. | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 61:12 - 61:24 | Lensing, Anthonie 2017-07-24 | 1:11 | Re: [61:12-61:24] | Re: [61:12-61:24] | Pending |
| 61 12 | Q.  Okay.  All right.  Just really quickly, | | Pltf Obj Counter is duplicative of what is | Def Resp It will be helpful for the jury to | |
| 61 13 | and then we'll take a break for our lunch. | | already designated as a counter at 572: | hear this testimony while counsel for | |
| 61 14 | The third study listed below is the | | 21-573:22 and serves only as filler to | Plaintiffs is examining the witness | |
| 61 15 | Einstein-Extension study.  Is that right? | | drown out the substance of Dr. Lensing's | regarding the structure of the various | |
| 61 16 | A.  Yes, that's right. | | testimony on matters central to this case. | trials referenced in this testimony. | |
| 61 17 | Q.  Okay.  And for Einstein-Extension, those | | | | |
| 61 18 | were patients that had already completed either 6 | | | | |
| 61 19 | or 12 months of VTE treatment; is that right? | | | | |
| 61 20 | A.  That's right. | | | | |
| 61 21 | Q.  And it compared Xarelto 20 milligrams | | | | |
| 61 22 | once daily to placebo for this extended treatment | | | | |
| 61 23 | period of 6 or 12 months; is that right? | | | | |
| 61 24 | A.  That's right. | | | | |

| | | | | | |
|---|---|---|---|---|---|
| 63:23 - 65:1 | Lensing, Anthonie 2017-07-24 | 2:57 | | | |
| 63 23 | Q.  So when we talk about Xarelto | | | | |
| 63 24 | indications, the indications, we're talking about | | | | |
| 63 25 | what disease the drug is being used to treat.  Is | | | | |
| 64  1 | that a fair statement? | | | | |
| 64  2 | A.  Yes, that's correct. | | | | |
| 64  3 | Q.  Okay.  So if we talk about indications | | | | |
| 64  4 | that have been approved for Xarelto in the U.S., | | | | |
| 64  5 | the main ones are the AFib indication for short, | | | | |
| 64  6 | the VTE prevention indication or DVT prevention | | | | |
| 64  7 | and VTE treatment; is that right? | | | | |
| 64  8 | A.  Yes, that's correct. | | | | |
| 64  9 | Q.  Okay.  And so I've put a demonstrative | | | | |
| 64 10 | up on the screen.  But for the AFib indication, | | | | |
| 64 11 | stroke and embolism risk reduction in patients | | | | |
| 64 12 | with nonvalvular atrial fibrillation, that's what | | | | |
| 64 13 | Xarelto is trying to do for patients that have | | | | |
| 64 14 | AFib, right? | | | | |
| 64 15 | A.  Yes, that's about it. | | | | |
| 64 16 | Q.  And if we look down at the second | | | | |
| 64 17 | indication, VTE prevention, DVT prevention, which | | | | |
| 64 18 | may lead to pulmonary embolism in patients | | | | |
| 64 19 | undergoing knee or hip surgery, that's the DVT | | | | |
| 64 20 | prevention or VTE prevention indication; is that | | | | |
| 64 21 | right? | | | | |
| 64 22 | A.  That's correct. | | | | |
| 64 23 | Q.  And so the — the third indication, VTE | | | | |
| 64 24 | treatment, that's the indication that you're the | | | | |

| | Objections In | Responses In | Rulings |
|---|---|---|---|

64 25   global clinical lead, right?
65 1   A. Absolutely correct.

66:1 - 66:2   Lensing, Anthonie 2017-07-24   0:04
66 1   (Lensing Exhibit No. 8 was marked
66 2   for identification.)

**Re: [66:1-66:2]** Def Obj See objection to Exhibit 8.

**Re: [66:1-66:2]** Pltf Resp See Plaintiffs' response to Defendants' objection to this exhibit.

Pending

66:4 - 66:6   Lensing, Anthonie 2017-07-24   0:04
66 4   MR. OVERHOLTZ: Okay. And then we will
66 5   look at this demonstrative that talks about AFib,
66 6   and we'll call it Exhibit No. 9.

66:7 - 66:8   Lensing, Anthonie 2017-07-24   0:03
66 7   (Lensing Exhibit No. 9 were marked
66 8   for identification.)

**Re: [66:7-66:8]** Def Obj See objection to Exhibit 9.

**Re: [66:7-66:8]** Pltf Resp See Plaintiffs' response to Defendants' objection to this exhibit.

Pending

66:10 - 66:20   Lensing, Anthonie 2017-07-24   1:14
66 10   Q. And the -- AFib is a separate indication
66 11   for Xarelto, and the dose for AFib patients is
66 12   20 milligrams once daily with the evening meal, or
66 13   for persons with renal clearance between 15 and 50
66 14   milliliters, 15 milligrams once daily in the
66 15   United States, correct?
66 16   A. That's correct.
66 17   Q. Okay. And in order to get the AFib
66 18   indication, Bayer and Janssen conducted the --
66 19   ROCKET study, which was a pivotal phase III study,
66 20   right?

66:23 - 67:7   Lensing, Anthonie 2017-07-24   0:44
66 23   THE WITNESS: The ROCKET study was
66 24   performed to get the AFib indication.
66 25   BY MR. OVERHOLTZ:
67 1   Q. Okay. So when we hear -- when we see
67 2   discussions in documents talking about ROCKET,
67 3   that's talking about the study in the AFib
67 4   patients, right?
67 5   A. If they're Bayer documents, then it's
67 6   very likely to concern the ROCKET AF study. I
67 7   know the study as ROCKET AF.

67:21 - 68:7   Lensing, Anthonie 2017-07-24   1:29
67 21   Q. So I've listed here on this
67 22   demonstrative that there were two phase II
67 23   dose-finding studies, ODIXa-DVT and Einstein DVT,
67 24   that allowed for the dose selection for the
67 25   ROCKET AF study; is that right?
68 1   A. Yes, that's correct.
68 2   Q. And so one of the differences here we
68 3   talk about is a phase III and a phase II study.
68 4   Phase II studies are usually smaller studies, and
68 5   one type of phase II study can be a dose-finding
68 6   study; is that right?
68 7   A. Yes, that's correct.

68:8 - 68:12   Lensing, Anthonie 2017-07-24   0:30
68 8   Q. Okay. And the purpose of a dose-finding
68 9   study is to help you find the right dose or doses
68 10   to study in a phase III trial; is that right?
68 11   A. Yes, that's generally the purpose in a
68 12   phase II study.

68:13 - 68:19   Lensing, Anthonie 2017-07-24   0:54
68 13   Q. Okay. Now, the ODIXa-DVT and Einstein
68 14   DVT dose-finding studies, those were both VTE
68 15   treatment dose-finding studies, correct?
68 16   A. Yes, that's correct.
68 17   Q. Okay. Because there -- there was not a
68 18   separate dose-finding study for AFib.
68 19   A. Fortunately, not.

68:22 - 69:3   Lensing, Anthonie 2017-07-24   0:40
68 22   And then if we can look at what we'll
68 23   mark as Exhibit 10, which is a demonstrative
68 24   related to the VTE treatment indication, this
68 25   indicates that this was the VTE treatment
69 1   indication, this was the treatment you worked on,
69 2   right?
69 3   A. That's correct.

69:4 - 69:5   Lensing, Anthonie 2017-07-24   0:00
69 4   (Lensing Exhibit No. 10 was marked
69 5   for identification.)

**Re: [69:4-69:5]** Def Obj See objection to Exhibit 10.

**Re: [69:4-69:5]** Pltf Resp See Plaintiffs' response to Defendants' objection to this exhibit.

Pending

Overrule
bo d.

6

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

**70:17 - 71:1** — Lensing, Anthonie 2017-07-24 — 0:47

70 17   Q. Now, just so we're clear about all the
70 18   indications, the first indication that was
70 19   approved in the U.S. in the summer of 2011 was the
70 20   VTE prevention -- or DVT prevention indication,
70 21   and that had a different phase III study program,
70 22   right?
70 23   A. That's correct.
70 24   Q. Okay. And that was the RECORD clinical
70 25   trial program?
71 1   A. That's correct.

**71:22 - 72:3** — Lensing, Anthonie 2017-07-24 — 0:34

71 22   Q. Okay. And the dose for -- that was used
71 23   in the RECORD studies and then as the approved
71 24   dose was 10 milligrams once daily with or without
71 25   food, right?
72 1   A. That's correct.
72 2   MR. OVERHOLTZ: And we'll mark this one
72 3   as demonstrative Exhibit 11. Okay?

**72:4 - 72:5** — Lensing, Anthonie 2017-07-24 — 0:03

72 4   (Lensing Exhibit No. 11 was marked
72 5   for identification.)

Re: [72:4-72:5]
Def Obj See objection to Exhibit 11.

Re: [72:4-72:5]
Pltf Resp See Plaintiffs' response to
Defendants' objection to this exhibit.

Pending

**73:4 - 74:2** — Lensing, Anthonie 2017-07-24 — 2:10

73 4   Q. So if I refer to it as the Einstein
73 5   indication, you'll know I'm talking about the VTE
73 6   treatment indication, right?
73 7   A. (In English) Yeah.
73 8   Q. Okay. So we talked about there being
73 9   two dose-finding studies. The first dose-finding
73 10   study for the VTE treatment was the ODIXa-DVT or
73 11   11223 study, right?
73 12   A. That's correct.
73 13   Q. Okay. And so that ODIXa phase II study
73 14   looked at three twice daily doses, 10, 20 and 30
73 15   milligrams, correct?
73 16   A. That's correct.
73 17   Q. And then it also looked at one
73 18   40-milligram once daily dose, right?
73 19   A. That's also correct.
73 20   Q. Okay. Now, the second phase II study
73 21   was called the Einstein DVT study, correct?
73 22   A. That's correct.
73 23   Q. Okay. And it looked at three once daily
73 24   doses, 20, 30 and 40, right?
73 25   A. That's correct. But I would also like
74 1   to remark that for both studies there was also a
74 2   control group.

**74:23 - 75:3** — Lensing, Anthonie 2017-07-24 — 0:22

74 23   BY MR. OVERHOLTZ:
74 24   Q. As far as the initial treatment, it was
74 25   with enoxaparin; is that right? Followed by
75 1   vitamin K.
75 2   A. Yes, for the standard of care group, but
75 3   not for the rivaroxaban group.

**76:2 - 76:9** — Lensing, Anthonie 2017-07-24 — 0:32

76 2   Q. The ODIXa-DVT dose-finding study, that
76 3   was underway when you started with the company; is
76 4   that right?
76 5   A. Yes, that's correct.
76 6   Q. And at some point a decision was made to
76 7   do a second dose-finding study, the Einstein DVT
76 8   study, correct?
76 9   A. That's correct.

**76:10 - 76:13** — Lensing, Anthonie 2017-07-24 — 0:26

76 10   Q. And you personally participated in the
76 11   design and conduct of the Einstein DVT phase II
76 12   study, right?
76 13   A. Yes, that's correct.

**76:14 - 76:20** — Lensing, Anthonie 2017-07-24 — 0:58

76 14   Q. And that decision to pursue the
76 15   Einstein DVT dose-finding study, was that decision
76 16   made to determine if the primary treatment for the
76 17   study could be a once-daily dosing regimen?
76 18   A. That was one part of the study, but also
76 19   to see what kind of dosage would be the safest and
76 20   most effective one.

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**88:6 - 88:24  Lensing, Anthonie 2017-07-24**   1:46

88 6   Q.  Now, if we can look back at the -- the
88 7   abstract part of the article which you were
88 8   coauthor on, Exhibit 14, in the middle column, you
88 9   see it describes that main safety outcome. In the
88 10   middle column that we just talked about.
88 11   A.  Mm-hmm.
88 12   Q.  And if we keep going, we see it says:
88 13   "The primary efficacy outcome occurred in 6.1, 5.4
88 14   and 6.6 percent of the rivaroxaban, 20-, 30- and
88 15   40-milligram treatment groups." Right?
88 16   A.  That is correct.
88 17   Q.  The -- I think I've seen this described
88 18   as a flat dose response for the efficacy outcome;
88 19   is that right?
88 20   A.   That seems to be the only possible
88 21   conclusion.
88 22   Q.  Okay. The efficacy outcome didn't
88 23   improve with higher doses. Is that what that
88 24   means?

Re: [88:6-88:24]
Def Obj See objection to Exhibit 14.

Re: [88:6-88:24]
Pltf Resp See Plaintiffs' response to Defendants' objection to this exhibit.

Pending

**89:4 - 89:5  Lensing, Anthonie 2017-07-24**   0:03

89 4   THE WITNESS: There was indeed the
89 5   impression that that did not happen.

**90:17 - 91:3  Lensing, Anthonie 2017-07-24**   1:03

90 17   BY MR. OVERHOLTZ:
90 18   Q.   All right. So -- so if we -- we've now
90 19   finished the phase II studies, and it's time to
90 20   move into the phase III trial program. That's
90 21   what happens next, right?
90 22   A.  Yes, after phase II, there is phase III.
90 23   Q.  Okay. So what I've seen it sometimes
90 24   referred to as is the end of phase II. You're
90 25   familiar with that?
91 1   A.  This is the phase in which it is
91 2   absolutely impossible for me to take any
91 3   vacations.

**91:9 - 91:18  Lensing, Anthonie 2017-07-24**   0:57

91 9   Q.  Okay. And it's fair to say at this
91 10   point in time that a lot of decisions have to be
91 11   made related to the design and conduct of the
91 12   phase III trial program, right?
91 13   A.  It's totally correct.
91 14   Q.  And so one of those decisions that had
91 15   to be made for Xarelto was what the initial
91 16   treatment dose would be for the phase III trial;
91 17   is that right?
91 18   A.  That is correct.

**92:12 - 93:4  Lensing, Anthonie 2017-07-24**   1:40

92 12   Q.  Okay. So in this initial treatment
92 13   dose, we talked about you have to make the initial
92 14   treatment dose decision. The next decision that
92 15   you have to make is the continued treatment dose.
92 16   Is that right?
92 17   A.  Correct.
92 18   Q.  All right. Now, is it fair to say that
92 19   when it came to making this initial treatment dose
92 20   decision for Xarelto, one of the decisions that
92 21   had to be made is whether the initial treatment
92 22   would be the use of a low-molecular-weight heparin
92 23   or Xarelto for that initial period?
92 24   A.  Correct.
92 25   Q.  Okay. And as we've talked about, the
93 1   low-molecular-weight heparin treatment was an
93 2   accepted standard of care for this indication,
93 3   right?
93 4   A.  It is correct.

**93:5 - 93:20  Lensing, Anthonie 2017-07-24**   2:12

93 5   Q.  Okay. Now, is it fair to say that there
93 6   was a good amount of debate regarding that
93 7   decision headed into phase III?
93 8   A.  For over 40 years, patients with
93 9   thrombosis have been treated by that dual
93 10   combination of heparin and VKA. So the switch
93 11   from that dual therapy to only Xarelto was a huge
93 12   matter, and, therefore, yes, indeed, there was
93 13   quite a bit of discussion.
93 14   Q.  Okay. So there's been 40 years of this
93 15   treatment being used.
93 16   A.  Yeah, warfarin was discovered a long

Re: [93:5-93:20]
Pltf Obj 93:14-20; 401/403 - testimony relating to the discovery of warfarin based on its effect killing cows is entirely irrelevant and prejudicial, not to mention nonresponsive.

Re: [93:5-93:20]
Def Resp Reference to warfarin and its long-running dominance of the anticoagulant market provides important context and helps the jury understand the medical advance that the NOACs represented. Similar testimony came in during each of the first two trials.

Pending

*[Handwritten annotation: Med lit overruled as in past... not admitted into evidence but can be used in... but parts shown... or used to impeach or 803(18) A + B... overruled]*

08/06/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

93 17    time ago in Wisconsin, and after it was found that
93 18    cows died, it was -- we started -- it was started
93 19    to be used in thrombosis in combination with the
93 20    heparin.

**93:21 - 94:6** Lensing, Anthonie 2017-07-24    0:41
93 21    Q.  So if Xarelto was going to be used as
93 22    this initial treatment drug, a decision also had
93 23    to be made as to whether it would be given BID, or
93 24    -- that's twice daily -- or OD, which is one time
93 25    daily, right?
94  1    A.  Yep.  Yes.
94  2    Q.  And then -- now, eventually a decision
94  3    was made that the initial treatment dose, if it
94  4    was going to be Xarelto, would be a twice daily
94  5    dosing regimen; is that right?
94  6    A.  Yes.

**96:9 - 96:14** Lensing, Anthonie 2017-07-24    0:32
96  9    Q.  Okay.  And one of the doses that was
96 10    considered to use as the initial treatment period
96 11    going into phase III was the 10-milligram BID dose
96 12    that had been tested in the ODIXa dose-finding
96 13    study, correct?
96 14    A.  Yes, that is correct.

**98:16 - 98:20** Lensing, Anthonie 2017-07-24    0:12
98 16    BY MR. OVERHOLTZ:
98 17    Q.  Just to be clear, you've indicated to me
98 18    that marketing did not have input into the
98 19    decision.
98 20    A.  No.

**98:21 - 99:3** Lensing, Anthonie 2017-07-24    1:04
98 21    Q.  Was the decision discussed with
98 22    regulatory agencies like the FDA?
98 23    A.  The choice of the 15 milligrams twice
98 24    daily for 21 days followed by the 20 milligrams
98 25    once daily was discussed with the FDA.  When we
99  1    were going -- when we were trying to get their
99  2    approval of the study designs, the protocol was
99  3    also discussed.

**99:4 - 99:7** Lensing, Anthonie 2017-07-24    0:18
99  4    Q.  Okay.  And you mentioned that
99  5    eventually the dose -- the choice was made to go
99  6    with 15 milligrams BID for 21 days, right?
99  7    A.  Yes, that is correct.

**100:24 - 101:17** Lensing, Anthonie 2017-07-24    1:47
100 24    Q.  So we've been talking a little bit about
100 25    the end of phase II decisions that have to be
101  1    made, and we've gone over the fact that the
101  2    decision had to be made of the initial treatment
101  3    dose.  Right?
101  4    A.  That's correct.
101  5    Q.  Okay.  And then the decision for that
101  6    was whether or not it was going to be the standard
101  7    of care, low-molecular-weight heparin or Xarelto,
101  8    and then whether Xarelto would be twice daily or
101  9    once daily, and then what that dosing would be,
101 10    right?
101 11    A.  Yes, that's correct.
101 12    Q.  Okay.  And the other decision we talked
101 13    about was you have to make the decision for the
101 14    continued treatment dose, and that's the dose that
101 15    would be given after the initial treatment period,
101 16    right?
101 17    A.  Yes, that's correct.

**101:18 - 101:24** Lensing, Anthonie 2017-07-24    0:39
101 18    Q.  Okay.  And eventually the dose that was
101 19    decided upon was the 20 -- 20 milligrams OD dose
101 20    for this continued treatment period, right?
101 21    A.  Yes, that's correct.
101 22    Q.  Okay.  And that was the same dose that
101 23    was chosen for the majority of the patients in the
101 24    ROCKET AF trial.

**102:1 - 102:3** Lensing, Anthonie 2017-07-24    0:09
102  1    THE WITNESS:  Yeah.  Yes, 20 milligrams
102  2    was indeed the dose selected for treating patients
102  3    to prevent stroke in AT -- fibrillation.

**Objections In** (for 100:24-101:17):
Re: [100:24-101:17]
Pltf Obj This line of questioning ("So
we've been talking a little bit about...")
serves only to orientate a witness
following a break during the deposition
itself.  Its being designated as a counter
serves only as filler to drown out the
substance of Dr. Lensing's testimony on
matters central to this case.

**Responses In** (for 100:24-101:17):
Re: [100:24-101:17]
Def Resp This is perfectly appropriate
testimony for counter-designations as it
puts Plaintiff's designations in context
and helps the jury better understand the
witness's testimony.

**Rulings**: Pending

9

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

102:19 - 102:23 Lensing, Anthonie 2017-07-24    0:28
102 19   Q.   Now, there had to be a decision made for
102 20   VTE treatment as to whether there would be a
102 21   similar dose adaptation for renal patients; is
102 22   that right?
102 23   A.   That's correct.

102:24 - 103:4 Lensing, Anthonie 2017-07-24    0:49
102 24   Q.   Okay. And eventually a decision was
102 25   made to not have dose adaptation for renal
103 1   patients in the Einstein trial, right?
103 2   A.   We did not find -- find any evidence
103 3   based on which we could decide to apply a reduced
103 4   dose.

103:5 - 104:1 Lensing, Anthonie 2017-07-24    3:11
103 5   Q.   Okay. Were renally impaired patients
103 6   studied in the phase ii dose-finding studies for
103 7   VTE treatment?
103 8   A.   We did have some thrombosis patients
103 9   between ages 55 and 60 -- excuse me. Thrombosis
103 10   patients tend to be between 55 and 60 years old,
103 11   and we did have a great many patients with renal
103 12   impairment, so, yes, in phase II we did include
103 13   them.
103 14   Q.   So based on the experience observed in
103 15   those phase II studies, you determined that dose
103 16   adaptation wasn't necessary in the population that
103 17   would be studied in the Einstein phase iii trials;
103 18   is that right?
103 19   A.   The higher exposure of renally impaired
103 20   patients that we saw was not associated with an
103 21   increase in bleeding, and, therefore, we did not
103 22   see cause to -- the patients with renal impairment
103 23   did show an increase of thromboembolism --
103 24   thrombosis, and, therefore, we did not decide to
103 25   reduce the dosage for patients with
104 1   thromboembolism from 20 to 15.

106:3 - 106:20 Lensing, Anthonie 2017-07-24    2:39
106 3   Q.   Sure. At the end of phase II, was one
106 4   of the decisions that had to be made whether or
106 5   not the phase III trial -- trials would be
106 6   designed as superiority or noninferiority trials?
106 7   A.   I don't think we had to think about that
106 8   very long because the numbers for vitamin K
106 9   antagonist together with heparin revealed that the
106 10   incidence of new thrombosis in combination with
106 11   warfarin and enoxaparin is so low that a
106 12   superiority study would be pointless.
106 13   But given that treatment with warfarin
106 14   is so complex for patients and warfarin needs to
106 15   be monitored and the doses -- the dosage adjusted,
106 16   that's why treatment with rivaroxaban was to be
106 17   set up as a treatment with -- this was not
106 18   necessary with rivaroxaban, and that made such a
106 19   huge difference for patients that that's why a
106 20   noninferiority approach in the study was chosen.

**Re: [106:3-106:20]**
Pltf Obj Non-responsive. Dr. Lensing simply asked to clarify whether he refers to Phase II or Phase III timeframes, yet he expounds well beyond. The question is asked once again at 107:1-14, where he offers a responsive answer. Its being designated as a counter serves only as filler to drown out the substance of Dr. Lensing's testimony on matters central to this case.

Re: [106:3-106:20]
Def Resp The witness's entire answer speaks to the decision regarding noninferiority, which is exactly what counsel asked about.

Pending

107:1 - 107:4 Lensing, Anthonie 2017-07-24    0:08
107 1   Q.   You agree that there was a choice to be
107 2   made as to whether or not the phase III trials
107 3   would be conducted as superiority or
107 4   noninferiority trials, right?

107:6 - 107:14 Lensing, Anthonie 2017-07-24    0:38
107 6   THE WITNESS: From the outset, the
107 7   phase III study was set up as a noninferiority
107 8   study, and I never heard anybody speak about a
107 9   primary superiority objective.
107 10   BY MR. OVERHOLTZ:
107 11   Q.   So the noninferiority determination was
107 12   made from the outset.
107 13   A.   As set forth in the protocol, it's
107 14   always been a noninferiority study.

114:11 - 114:15 Lensing, Anthonie 2017-07-24    0:14
114 11   BY MR. OVERHOLTZ:
114 12   Q.   Okay. And when it comes to the area of
114 13   drug development, getting to the decision to enter
114 14   into phase III is a very important milestone for
114 15   the company. Do you agree?

114:17 - 114:18 Lensing, Anthonie 2017-07-24    0:05

08/05/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

114 17         THE WITNESS: Yes, in the development of
114 18         a drug, that's a very important milestone.

114:24 - 115:2 Lensing, Anthonie 2017-07-24    0:14
114 24         Q.   And you agree that moving forward in
114 25         phase III as soon as possible in the drug's
115  1         development allows the company to maximize the
115  2         value of the drug asset, correct?

115:5 - 115:14 Lensing, Anthonie 2017-07-24    0:34
115  5                 THE WITNESS: A company needs to have an
115  6         adequate and careful analysis, and not a study
115  7         which goes too quickly and is not carried out in a
115  8         careful way. So I don't agree with what you just
115  9         said.
115 10         BY MR. OVERHOLTZ:
115 11         Q.   And moving forward -- you agree that
115 12         moving forward into phase III for an indication
115 13         for a drug is also beneficial to investor
115 14         relations for a company?

115:17 - 115:20 Lensing, Anthonie 2017-07-24    0:10
115 17                 THE WITNESS: Luckily, in my job I don't
115 18         have any responsibility for these things, and,
115 19         honestly speaking, I have no idea how these things
115 20         work.

115:21 - 116:15 Lensing, Anthonie 2017-07-24    2:23
115 21         BY MR. OVERHOLTZ:
115 22         Q.   Let me show you what we'll mark
115 23         as Exhibit 18, Dr. Lensing, which is Plaintiffs'
115 24         Exhibit 948640. It's an e-mail from May 31st,
115 25         2006, and just let me know whenever you have the
116  1         document.
116  2             (Lensing Exhibit No. 18 was marked
116  3             for identification.)
116  4         THE WITNESS: (Peruses document.) Okay.
116  5         BY MR. OVERHOLTZ:
116  6         Q.   Okay. So, Dr. Lensing, if we can look
116  7         at the top, this is an e-mail from Kemal Malik.
116  8         Do you see that?
116  9         A.   Yes.
116 10         Q.   Okay. And Dr. -- and Mr. Malik, he was
116 11         with Bayer management at the time back in 2006?
116 12         A.   That's correct.
116 13         Q.   And Mr. Malik is now a member of the
116 14         board of directors for the company; is that right?
116 15         A.   Yes. He's a fantastic guy.

Re: [115:21-116:15]
Def Obj See objection to Exhibit 18.

Re: [115:21-116:15]
Pltf Resp See Plaintiffs' response to
Defendants' objection to this exhibit.

Pending

116:16 - 117:14 Lensing, Anthonie 2017-07-24    2:08
116 16         Q.   And you can see that he sends this
116 17         e-mail to several people at Bayer HealthCare,
116 18         including yourself, about halfway down on the
116 19         right side. Do you see that?
116 20         A.   I see that.
116 21         Q.   Okay. And included in this is
116 22         Dr. Misselwitz, Dr. Kubitza, Dr. Bernhard
116 23         Glombitza, Martin Homering, correct?
116 24         A.   Mm-hmm.
116 25         Q.   Is that right?
117  1         A.   That's correct.
117  2         Q.   And I also see an Andreas Nauck. Are
117  3         you familiar with Andreas?
117  4         A.   Yes, I do.
117  5         Q.   And what department does Andreas Nauck
117  6         work in?
117  7         A.   I think at the time he worked in the
117  8         marketing department.
117  9         Q.   And the date of this e-mail is May 31st
117 10         of 2006. Do you see that?
117 11         A.   Yes, I see that.
117 12         Q.   And it's "Rivaroxaban, Xarelto DP3
117 13         Decisions 2006," correct?
117 14         A.   That's correct.

117:21 - 119:8 Lensing, Anthonie 2017-07-24    3:46
117 21         Q.   Okay. So if we look at the e-mail that
117 22         -- that Mr. Malik sent you and others, he says:
117 23         "Dear All: Last week the last of the scheduled
117 24         DP3 decisions was made for rivaroxaban VTE
117 25         treatment."
118  1             Do you see that?
118  2         A.   Yes, I see that.
118  3         Q.   Okay. And the next sentence says:

Overruled
602/401(re
info. + notice +
actions)

08/06/17 17:59

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

118  4    "This means we are now ready to initiate the
118  5    phase III activities for SPAF and VTE treatment on
118  6    schedule, and as previously externally
118  7    communicated, in the first half of 2006." Right?
118  8    A.    That's correct.
118  9    Q.    Okay. Mr. Malik says to you that, "This
118  10    is a truly outstanding outcome." Right?
118  11    A.    That's what he says, indeed.
118  12    Q.    Okay. And he says that: "And each of
118  13    you should be truly proud of this achievement.
118  14    The phase II program, which was exclusively
118  15    conducted by Bayer, was the largest phase II
118  16    program in our history."
118  17        Do you see that?
118  18    A.    Yes, I see that.
118  19    Q.    Okay. It says: "As a team, you have
118  20    steered rivaroxaban forward, adhering to the most
118  21    challenging timelines, but, equally importantly,
118  22    you have ensured that we have continued to seize
118  23    all opportunities to maximize the value of this
118  24    asset." Correct?
118  25    A.    That's what it says here.
119  1    Q.    It talks about the challenging
119  2    timelines, right?
119  3    A.    Apparently he found the timelines
119  4    challenging.
119  5    Q.    And you told us that the end of phase II
119  6    is certainly a time in which you can't take any
119  7    vacations, right?
119  8    A.    That's certainly the case.

119:10 -   119:20 Lensing, Anthonie 2017-07-24                    **1:11**
119  10    BY MR. OVERHOLTZ:
119  11    Q.    He says, next to you in his e-mail in
119  12    May of 2006: "Over the last few days, I have been
119  13    on the IR road show in New York/Boston with
119  14    Wolfgang Plischke and Alexander Rosar."
119  15        Do you see that?
119  16    A.    I do see that.
119  17    Q.    Okay. And one of Mr. Malik's
119  18    responsibilities, when it says "IR road show," one
119  19    of his responsibilities would have been investor
119  20    relations, right?

119:23 -   120:14 Lensing, Anthonie 2017-07-24                    **1:31**
119  23    THE WITNESS: I wouldn't have a clue.
119  24    BY MR. OVERHOLTZ:
119  25    Q.    The next thing he says, of course, is:
120  1    "This project has the highest possible visibility
120  2    amongst our investor community." Right?
120  3    A.    Yes, that is what it says.
120  4    Q.    Okay. In his next paragraph, Mr. Malik
120  5    says: "Rivaroxaban truly has the potential to be
120  6    transformational for our company, and this is
120  7    certainly perceived externally."
120  8        Do you see that?
120  9    A.    That is what it reads.
120  10    Q.    And this transformational potential for
120  11    Xarelto for Bayer was what Mr. Malik communicated
120  12    to you back in May of 2006 before the beginning of
120  13    the phase III program for Xarelto for VTE
120  14    treatment, correct?

120:17 -   120:18 Lensing, Anthonie 2017-07-24                    **0:03**
120  17    THE WITNESS: Yes, the timelines do seem
120  18    to indicate this.

121:22 -   121:23 Lensing, Anthonie 2017-07-24                    **0:03**
121  22    (Lensing Exhibit No. 19 was marked
121  23    for identification.)

122:5 -   122:11 Lensing, Anthonie 2017-07-24                    **0:50**
122  5    Q.    Okay. So if we can look first at
122  6    Exhibit 19, it's an e-mail from Dr. Misselwitz to
122  7    you copying a Marc van Uhen and a Martina Evertz
122  8    on June 21st, 2006, with the subject "Einstein
122  9    SMCC/ExCie meeting at ESC in Barcelona." Do you
122  10    see that?
122  11    A.    I do see that.

122:20 -   122:24 Lensing, Anthonie 2017-07-24                    **0:30**
122  20    Q.    Okay. So the Einstein ExCie meeting
122  21    referred to the executive committee meeting?
122  22    A.    This was a combined meeting of the

Re: [121:22-121:23]
Def Obj See objection to Exhibit 19.

Re: [121:22-121:23]
Pltf Resp See Plaintiffs' response to
Defendants' objection to this exhibit.

Pending

Overruled ✗
602
607

| | Objections In | Responses In | Rulings |
|---|---|---|---|

122 23    executive committee for the Einstein and also the
122 24    representatives of the countries.

123:4  -  123:11 Lensing, Anthonie 2017-07-24          0:39
123  4    Q.   And so Dr. Misselwitz e-mails you and
123  5    says: "Hi Ton: Hope you are doing well."
123  6         Do you see that?
123  7    A.   Yes.
123  8    Q.   He next says: "Congratulations for
123  9    fighting through all the difficult decisions
123 10    around the VTE treatment package submission."
123 11    Correct?

123:13  -  123:13 Lensing, Anthonie 2017-07-24          0:01
123 13    THE WITNESS: Yes, that is what it says.

123:19  -  123:23 Lensing, Anthonie 2017-07-24          0:25
123 19    Q.   And he goes on in this e-mail to discuss
123 20    the fact that the idea would be to have this
123 21    meeting in Barcelona with the executive committee
123 22    and the SMCC, correct?
123 23    A.   Yeah.

125:12  -  125:17 Lensing, Anthonie 2017-07-24          0:39
125 12    Q.   Okay. So let me show you -- show you
125 13    what we'll mark as Exhibit No. 20. And this is
125 14    just a couple of slides I put together related to
125 15    the Einstein studies, and see if you can -- see if
125 16    we can agree as to what they made up.
125 17    So --

125:22  -  125:23 Lensing, Anthonie 2017-07-24          0:17
125 22    (Lensing Exhibit No. 20 was marked
125 23    for identification.)

129:18  -  129:22 Lensing, Anthonie 2017-07-24          0:40
129 18    Q.   Okay. And acenocoumarol was used in
129 19    certain sites because in some countries warfarin
129 20    is not a typically used vitamin K antagonist; is
129 21    that right?
129 22    A.   Yes, that's correct.

133:23  -  133:24 Lensing, Anthonie 2017-07-24          0:04
133 23    (Lensing Exhibit No. 21 was marked
133 24    for identification.)

134:3  -  134:13 Lensing, Anthonie 2017-07-24          1:56
134  3    BY MR. OVERHOLTZ:
134  4    Q.   So, Dr. Lensing, we're looking at
134  5    Exhibit 21, which is a -- described on the first
134  6    page here as version 9 -- draft version 9 of
134  7    June 9, 2006, of the 11702 study, the VTE
134  8    treatment study for DVT and PE patients, correct?
134  9    A.   That's correct.
134 10    Q.   Okay. And we can look up at the title
134 11    was the -- the "Einstein-VTE Treatment Study" was
134 12    the short description, correct?
134 13    A.   That's correct.

Re: [134:3-134:13]
Def Obj See objection to Exhibit 21.

Re: [134:3-134:13]
Pltf Resp See Plaintiffs' response to Defendants' objection to this exhibit.

Pending

134:23  -  135:1  Lensing, Anthonie 2017-07-24          0:16
134 23    Q.   And then you're listed as the Bayer
134 24    HealthCare AG party there, right, Dr. Anthonie W.
134 25    Lensing, right?
135  1    A.   That's correct.

137:3  -  137:6  Lensing, Anthonie 2017-07-24          0:34
137  3    Q.   Okay. And so if we look at this, as of
137  4    June 9th of 2006, the protocol called for the
137  5    initial three-week treatment period to be 10
137  6    milligrams BID; is that right?

137:8  -  137:17 Lensing, Anthonie 2017-07-24          0:47
137  8    THE WITNESS: Yes, in this proposal as
137  9    for June, indeed the protocol says 10 milligrams.
137 10    BY MR. OVERHOLTZ:
137 11    Q.   Okay. And this choice of 10 milligrams
137 12    BID as represented in this protocol dated
137 13    June 9th, 2006, that was nine days after Kemal
137 14    Malik in Exhibit 18 that we looked at before had
137 15    said that the last of the scheduled DP3 decisions
137 16    for rivaroxaban VTE treatment had been made,
137 17    correct?

137:20  -  138:2  Lensing, Anthonie 2017-07-24          0:31

08/06/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

137 20   THE WITNESS: Yes, whatever DP3 may
137 21   mean, the date was 31 May, and here we are in the
137 22   first week of June, indeed.
137 23   BY MR. OVERHOLTZ:
137 24   Q.   And that's where Mr. Malik said that the
137 25   company was now ready to begin the phase III
138  1   activities for VTE treatment, right?
138  2   A.   Yes, that is indeed what he says there.

138:11 -   138:18 Lensing, Anthonie 2017-07-24          1:16
138 11   Q.   So sometime between Mr. Malik saying
138 12   that the company was now ready to make these
138 13   initial phase III activities after the last of the
138 14   scheduled DP3 decisions were made, the study was
138 15   split into two separate arms, and the 10-milligram
138 16   initial treatment dose was switched from 10
138 17   milligrams BID to 15 milligrams BID for the first
138 18   three weeks, correct?

138:20 -   138:22 Lensing, Anthonie 2017-07-24          0:20
138 20   THE WITNESS: That's what the time
138 21   schedule shows, but there's no relation to any DP3
138 22   decision; otherwise, it would not have happened.

157:16 -   157:17 Lensing, Anthonie 2017-07-25          0:10
157 16   (Lensing Exhibit No. 22 was marked
157 17   for identification.)

157:23 -   158:6  Lensing, Anthonie 2017-07-25          1:02
157 23   Q.   Okay. So, Dr. Lensing, you've had an
157 24   opportunity to read through Exhibit 22 now; is
157 25   that right?
158  1   A.   Yes, I have read it.
158  2   Q.   Okay. So let's take a look at the top
158  3   of the page for context, and it says "Planning
158  4   Group Meeting ODIXa BAY 59-7939," which we know is
158  5   Xarelto, "July 17, 2004, Amsterdam," right?
158  6   A.   That is correct.

160:6  -   161:2  Lensing, Anthonie 2017-07-25          2:57
160  6   Q.   Let's see what it says about the
160  7   meeting. It says: "The meeting was organized to
160  8   discuss the clinical development program for
160  9   Xarelto in venous and arterial thrombosis."
160 10   Correct?
160 11   A.   That is indeed what it says.
160 12   Q.   Okay. And if we can look, there are
160 13   three agenda items. And if we look at number 2,
160 14   it says: "Strategies for fast development,"
160 15   right?
160 16   A.   That is indeed what it says.
160 17   Q.   Okay. And then if we look under the
160 18   "Background" section, just below this, it says:
160 19   "Taking into account the competition, the
160 20   development of Xarelto must be fast." Right?
160 21   A.   Indeed, it reads so in this document.
160 22   Q.   Okay. And it says: "In June 2005, data
160 23   should be available to make a sound decision
160 24   regarding the dose for the phase III program." Do
160 25   you see that?
161  1   A.   Well, apparently the person who took the
161  2   minutes and wrote the minutes was of this opinion.

164:12 -   164:25 Lensing, Anthonie 2017-07-25          2:18
164 12   Q.   Dr. Lensing, let me try to show you
164 13   something here on the screen.
164 14   You mentioned a flat dose response curve
164 15   for efficacy, right?
164 16   A.   Yes. That's correct.
164 17   Q.   Okay. So if I draw a graph here, and if
164 18   this is dose across the bottom of the graph, and
164 19   this is the number of blood clots. Okay.
164 20   The problem with Xarelto is that as the
164 21   dose goes up, the number of blood clots you
164 22   prevent stays the same, but the number of bleeds
164 23   just gets higher and higher. Right? That's
164 24   what's wrong with Xarelto as an anticoagulant,
164 25   right?

165:3  -   165:11 Lensing, Anthonie 2017-07-25          0:59
165  3   THE WITNESS: I think you are seeing
165  4   that entirely wrong.
165  5   BY MR. OVERHOLTZ:
165  6   Q.   So if we have the number of blood clots

08/06/17 17:59

| | Objections In | Responses In | Rulings |

165  7   and bleeds on the left, and as the dose of Xarelto
165  8   goes up, as Bayer studied it, what they saw was as
165  9   clots stay the same, even with higher doses, no
165  10  increased efficacy, you just get more bleeds.
165  11       That's what's wrong with Xarelto, right?

165:14 -  165:19 Lensing, Anthonie 2017-07-25              0:44
165  14       THE WITNESS: I disagree with you
165  15  because this reveals something entirely different.
165  16  This shows that Xarelto is -- has a very broad
165  17  therapeutic window where a low dosage is affective
165  18  in preventing blood clots, and bleeds only occur
165  19  when the dose rises.

165:21 -  166:3 Lensing, Anthonie 2017-07-25               0:48
165  21   Q.   Okay. Let me ask you a couple of
165  22  follow-up questions to this. So here I've graphed
165  23  on this exhibit as dose increases.
165  24       You understand that, right?
165  25   A.   I understand that.
166  1    Q.   Okay. What if as opposed to dose, we
166  2   did exposure.
166  3        You know what I mean by exposure, right?

**Re: [165:21-166:3]**
**Pltf Obj** The counters designated between pages 165 and 167 serves only as filler to drown out the substance of Dr. Lensing's testimony on matters central to this case.  Indeed, this line of questioning is highly objected-to by defense counsel and includes questions that the witness disclaims knowledge of such as his disclaiming of involvement in the ODIX-a HIP dosage study at 166:16-18.

**Re: [165:21-166:3]**
**Def Resp** These counter-designations address not just the core issues addressed in Plaintiff's designations, but the core issues Plaintiff has chosen to put at the center of this case (i.e., whether there is a clinically useful relationship between prothrombin time and bleeding risk). Plaintiff's claim that Defendants intend to drown out the "substance" of Dr. Lensing's testimony is nonsensical. These designations form part of that very substance. That simple fact is not rendered untrue just because counsel for Plaintiff does not like the answers Dr. Lensing gave to his questions.

Pending

*overrule 106*

166:6 -  166:7 Lensing, Anthonie 2017-07-25                0:02
166  6        THE WITNESS: Yes, I know what the word
166  7   "exposure" means.

**Re: [166:6-166:7]**
**Pltf Obj** The counters designated between pages 165 and 167 serves only as filler to drown out the substance of Dr. Lensing's testimony on matters central to this case.  Indeed, this line of questioning is highly objected-to by defense counsel and includes questions that the witness disclaims knowledge of such as his disclaiming of involvement in the ODIX-a HIP dosage study at 166:16-18.

**Re: [166:6-166:7]**
**Def Resp** These counter-designations address not just the core issues addressed in Plaintiff's designations, but the core issues Plaintiff has chosen to put at the center of this case (i.e., whether there is a clinically useful relationship between prothrombin time and bleeding risk). Plaintiff's claim that Defendants intend to drown out the "substance" of Dr. Lensing's testimony is nonsensical. These designations form part of that very substance. That simple fact is not rendered untrue just because counsel for Plaintiff does not like the answers Dr. Lensing gave to his questions.

Pending

166:9 -  166:12 Lensing, Anthonie 2017-07-25               0:18
166  9    Q.   All right. We're talking about plasma
166  10  concentrations. Is that fair?
166  11   A.   Yes, it's true that "exposure" means
166  12  plasma concentration.

**Re: [166:9-166:12]**
**Pltf Obj** The counters designated between pages 165 and 167 serves only as filler to drown out the substance of Dr.

**Re: [166:9-166:12]**
**Def Resp** These counter-designations address not just the core issues addressed in Plaintiff's designations, but

Pending

08/06/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| | Lensing's testimony on matters central to this case. Indeed, this line of questioning is highly objected-to by defense counsel and includes questions that the witness disclaims knowledge of such as his disclaiming of involvement in the ODIX-a HIP dosage study at 166:16-18. | the core issues Plaintiff has chosen to put at the center of this case (i.e., whether there is a clinically useful relationship between prothrombin time and bleeding risk). Plaintiff's claim that Defendants intend to drown out the "substance" of Dr. Lensing's testimony is nonsensical. These designations form part of that very substance. That simple fact is not rendered untrue just because counsel for Plaintiff does not like the answers Dr. Lensing gave to his questions. | |

*Overruled* 166

**166:20 - 167:3 Lensing, Anthonie 2017-07-25**

| | |
|---|---|
| 166 20 | Q. In the VTE treatment studies, as |
| 166 21 | exposure increased, did bleeds also increase? |
| 166 22 | A. In the Einstein-DVT and PE studies, we |
| 166 23 | tested extensively with the prothrombin time, and |
| 166 24 | we determined that there was no relationship |
| 166 25 | between extended increasing prothrombin time and |
| 167 1 | an increase in bleeds. |
| 167 2 | Q. That's because you did the wrong type of |
| 167 3 | analysis, right? |

1:26

**Re: [166:20-167:3]**
Pltf Obj The counters designated between pages 165 and 167 serves only as filler to drown out the substance of Dr. Lensing's testimony on matters central to this case. Indeed, this line of questioning is highly objected-to by defense counsel and includes questions that the witness disclaims knowledge of such as his disclaiming of involvement in the ODIX-a HIP dosage study at 166:16-18.

**Re: [166:20-167:3]**
Def Resp These counter-designations address not just the core issues addressed in Plaintiff's designations, but the core issues Plaintiff has chosen to put at the center of this case (i.e., whether there is a clinically useful relationship between prothrombin time and bleeding risk). Plaintiff's claim that Defendants intend to drown out the "substance" of Dr. Lensing's testimony is nonsensical. These designations form part of that very substance. That simple fact is not rendered untrue just because counsel for Plaintiff does not like the answers Dr. Lensing gave to his questions.

Pending

**167:5 - 167:6 Lensing, Anthonie 2017-07-25**

| | |
|---|---|
| 167 5 | THE WITNESS: I don't know who told you |
| 167 6 | that, but that's not true. |

0:01

**Re: [167:5-167:6]**
Pltf Obj The counters designated between pages 165 and 167 serves only as filler to drown out the substance of Dr. Lensing's testimony on matters central to this case. Indeed, this line of questioning is highly objected-to by defense counsel and includes questions that the witness disclaims knowledge of such as his disclaiming of involvement in the ODIX-a HIP dosage study at 166:16-18.

**Re: [167:5-167:6]**
Def Resp These counter-designations address not just the core issues addressed in Plaintiff's designations, but the core issues Plaintiff has chosen to put at the center of this case (i.e., whether there is a clinically useful relationship between prothrombin time and bleeding risk). Plaintiff's claim that Defendants intend to drown out the "substance" of Dr. Lensing's testimony is nonsensical. These designations form part of that very substance. That simple fact is not rendered untrue just because counsel for Plaintiff does not like the answers Dr. Lensing gave to his questions.

Pending

**167:8 - 167:10 Lensing, Anthonie 2017-07-25**

| | |
|---|---|
| 167 8 | Q. You don't find that when you break up |

0:33

Re: [167:8-167:10]

Re: [167:8-167:10]

Pending

08/06/17 17:59

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

167  9      prothrombin time by quartiles and look at bleeding
167  10     risk, right?

**Pltf Obj** The counters designated between pages 165 and 167 serves only as filler to drown out the substance of Dr. Lensing's testimony on matters central to this case. Indeed, this line of questioning is highly objected-to by defense counsel and includes questions that the witness disclaims knowledge of such as his disclaiming of inovlvement in the ODIX-a HIP dosage study at 166:16-18.

**Def Resp** These counter-designations address not just the core issues addressed in Plaintiff's designations, but the core issues Plaintiff has chosen to put at the center of this case (i.e., whether there is a clinically useful relationship between prothrombin time and bleeding risk). Plaintiff's claim that Defendants intend to drown out the "substance" of Dr. Lensing's testimony is nonsensical. These designations form part of that very substance. That simple fact is not rendered untrue just because counsel for Plaintiff does not like the answers Dr. Lensing gave to his questions.

---

167:12 -   167:21 Lensing, Anthonie 2017-07-25                         0:52

167  12        THE WITNESS: It's true that if you
167  13     divide it into quartiles, there is no relationship
167  14     at all between the prothrombin time and the
167  15     occurrence of major bleeds, but that's not the
167  16     only thing.
167  17        If you look at the extreme, so the
167  18     patients with the lowest increase versus the
167  19     patients with the highest increase, even there we
167  20     found no relationship at all between the
167  21     prothrombin time and major bleeds.

**Re: [167:12-167:21]**

**Pltf Obj** The counters designated between pages 165 and 167 serves only as filler to drown out the substance of Dr. Lensing's testimony on matters central to this case. Indeed, this line of questioning is highly objected-to by defense counsel and includes questions that the witness disclaims knowledge of such as his disclaiming of inovlvement in the ODIX-a HIP dosage study at 166:16-18.

**Re: [167:12-167:21]**

**Def Resp** These counter-designations address not just the core issues addressed in Plaintiff's designations, but the core issues Plaintiff has chosen to put at the center of this case (i.e., whether there is a clinically useful relationship between prothrombin time and bleeding risk). Plaintiff's claim that Defendants intend to drown out the "substance" of Dr. Lensing's testimony is nonsensical. These designations form part of that very substance. That simple fact is not rendered untrue just because counsel for Plaintiff does not like the answers Dr. Lensing gave to his questions.

Pending

---

168:17 -   168:25 Lensing, Anthonie 2017-07-25                         0:56

168  17     Q.  And in those dose-finding studies,
168  18     ODIXa-DVT, Einstein-DVT, was a flat efficacy dose
168  19     curve also seen?
168  20     A.  Yes, a broad therapeutic window was
168  21     confirmed in both studies.
168  22     Q.  And by "broad therapeutic window," you
168  23     mean that a lower dose works just as well as a
168  24     higher dose, right?
168  25     A.  Yes, that's what I mean.

---

169:2  -   169:5 Lensing, Anthonie 2017-07-25                          0:08

169  2         MR. OVERHOLTZ: I'm going to mark this
169  3      as Exhibit 23.
169  4         (Lensing Exhibit No. 23 was marked
169  5      for identification.)

**Re: [169:2-169:5]**
**Def Obj** See objection to Exhibit 23.

**Re: [169:2-169:5]**
**Pltf Resp** See Plaintiffs' response to Defendants' objection to this exhibit.

Pending

*Overruled*

---

181:6  -   181:17 Lensing, Anthonie 2017-07-25                         1:12

181  6      Q.  Dr. Lensing, let me have you take a look
181  7      at the page 3 of Exhibit 22.
181  8         And if you look with me at the top,
181  9      we're still talking about this July 17, 2004
181  10     meeting in Amsterdam, right?
181  11     A.  That is correct.
181  12     Q.  It says: "The planning group
181  13     participant suggested to simplify PK/PD sampling
181  14     and to stop sampling when a sufficient number of
181  15     patients have been included."
181  16        Do you see that?
181  17     A.  I do see that.

*Overruled*
*600, 602*
*801 (d) (2)*

---

182:5  -   182:7 Lensing, Anthonie 2017-07-25                          0:06

182  5      Q.  These were all things that the planning
182  6      group was suggesting to try to speed up the
182  7      study --

182:10 -   182:11 Lensing, Anthonie 2017-07-25                         0:03

08/06/17 17:59

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

182 10   Q.   -- because you had to beat the
182 11   competition, right?

182:13 -   182:17 Lensing, Anthonie 2017-07-25
182 13        THE WITNESS: Yes, you add that actually
182 14   that beating the competition, because what it
182 15   actually says is that simplifying the protocol
182 16   could lead to a more successful study, which would
182 17   be to the benefit.

0:14

182:18 -   182:20 Lensing, Anthonie 2017-07-25
182 18   BY MR. OVERHOLTZ:
182 19   Q.   It's easier to recruit more people into
182 20   the study if you simplify it?

0:14

182:22 -   183:6 Lensing, Anthonie 2017-07-25
182 22        THE WITNESS: If a study is extremely
182 23   complicated, it would benefit from a
182 24   simplification.
182 25   BY MR. OVERHOLTZ:
183 1   Q.   Okay. It next says: "It was felt that
183 2   the present dose-finding study would not provide
183 3   sufficient data for a phase III study with a OD
183 4   dosage, since only one OD dosage is evaluated, and
183 5   there will be limited data on clinical efficacy."
183 6   Right?

0:54

Re: [182:22-183:6]
Pltf Obj 183:1-183:6; this counter only
serves as filler to drown out the
substance of Dr. Lensing's testimony on
matters central to this case. Indeed, this
line of questioning is highly objected-to
by defense counsel and delves into a
subtopic not reached by what is
designated above.

Re: [182:22-183:6]
Def Resp Plaintiff has put the highly
irrelevant dosing at issue repeatedly
throughout its designations to date,
including this one. Defendants are
entitled to respond and defend their
case.

Pending



183:9 -   183:16 Lensing, Anthonie 2017-07-25
183 9        THE WITNESS: Well, I understand from
183 10   this sentence that it reads that there is only the
183 11   one OD dosage, and then it is not possible to get
183 12   a good insight into the regimens for the treatment
183 13   of DVT.
183 14   BY MR. OVERHOLTZ:
183 15   Q.   So Bayer wants to conduct a phase III
183 16   study with an OD, once-daily dose, right?

0:24

Re: [183:9-183:16]
Pltf Obj This counter only serves as filler
to drown out the substance of Dr.
Lensing's testimony on matters central to
this case. Indeed, this line of questioning
is highly objected-to by defense counsel
and delves into a subtopic not reached by
what is designated above.

Re: [183:9-183:16]
Def Resp Plaintiff has put the highly
irrelevant dosing at issue repeatedly
throughout its designations to date,
including this one. Defendants are
entitled to respond and defend their
case.

Pending

183:19 -   183:22 Lensing, Anthonie 2017-07-25
183 19        THE WITNESS: A study with a BID regimen
183 20   but also one with an OD regimen, which is usual in
183 21   clinical studies, and the results of these will
183 22   show you what the best regimen will be.

0:09

Re: [183:19-183:22]
Pltf Obj This counter only serves as filler
to drown out the substance of Dr.
Lensing's testimony on matters central to
this case. Indeed, this line of questioning
is highly objected-to by defense counsel
and delves into a subtopic not reached by
what is designated above.

Re: [183:19-183:22]
Def Resp Plaintiff has put the highly
irrelevant dosing at issue repeatedly
throughout its designations to date,
including this one. Defendants are
entitled to respond and defend their
case.

Pending

184:10 -   184:12 Lensing, Anthonie 2017-07-25
184 10   Q.   At this point in time there was a desire
184 11   to be able to study an OD dose, a once-daily dose,
184 12   in the phase III trials, right?

0:09

Re: [184:10-184:12]
Pltf Obj This counter only serves as filler
to drown out the substance of Dr.
Lensing's testimony on matters central to
this case. Indeed, this line of questioning
is highly objected-to by defense counsel
and delves into a subtopic not reached by
what is designated above.

Re: [184:10-184:12]
Def Resp Plaintiff has put the highly
irrelevant dosing at issue repeatedly
throughout its designations to date,
including this one. Defendants are
entitled to respond and defend their
case.

Pending

08/06/17 17:59

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

**184:15 – 184:22 Lensing, Anthonie 2017-07-25** — 0:55

184 15     THE WITNESS: I do not know who
184 16     wanted -- who had this wish, but the independent
184 17     advisors that were involved in this suggested to
184 18     do a BID and an OD, and then to make a choice
184 19     depending on the outcomes.
184 20     (In English) The scientific data.
184 21     (Interpreter) The scientific data
184 22     outcomes.

Re: [184:15-184:22]
Pltf Obj This counter only serves as filler to drown out the substance of Dr. Lensing's testimony on matters central to this case.  Indeed, this line of questioning is highly objected-to by defense counsel and delves into a subtopic not reached by what is designated above.

Re: [184:15-184:22]
Def Resp Plaintiff has put the highly irrelevant dosing at issue repeatedly throughout its designations to date, including this one. Defendants are entitled to respond and defend their case.

Pending

**185:7 – 185:10 Lensing, Anthonie 2017-07-25** — 0:14

185 7     Q. Whatever dose you study in phase III, if
185 8     you meet your outcome endpoints that you want to
185 9     meet, that's going to become the dose that you can
185 10     sell on the marketplace, right?

**185:13 – 185:16 Lensing, Anthonie 2017-07-25** — 0:13

185 13     THE WITNESS: Usually, the dosage that
185 14     is evaluated in the phase III is also the dosage,
185 15     If approved by the health authorities, that will
185 16     be given to patients for treatment.

**185:18 – 186:13 Lensing, Anthonie 2017-07-25** — 2:13

185 18     Q. So the next part of this discussion at
185 19     this 2004 Amsterdam meeting is titled "Strategy
185 20     for Accelerated Development." Do you see that?
185 21     A. Yes, I see that. That is what is
185 22     written there.
185 23     Q. All right. And it says: "To obtain
185 24     sufficient data for dose selection by May 2005,
185 25     two options are available: To amend the present
186 1     study or to perform an additional dose-finding
186 2     study. The following five scenarios were
186 3     discussed," and then there's a table down below.
186 4     Do you see that?
186 5     A. Right. I can see that table with those
186 6     five scenarios, and, indeed, I can see what you
186 7     just read out is indeed what is written here, but
186 8     I would like to comment and say to you that the
186 9     person who drafted these minutes did not know what
186 10     he or she was talking about.
186 11     Q. You were at this meeting, right?
186 12     A. Yes, I was present. I did attend this
186 13     meeting.

**187:12 – 188:4 Lensing, Anthonie 2017-07-25** — 2:17

187 12     Q. It simply wasn't feasible to do another
187 13     dose-finding study for a once-daily dose in a
187 14     year.
187 15     A. If the idea for this crops up in July
187 16     2004, I do not think that it is possible to have
187 17     this done within 12 months.
187 18     Q. And as we saw, the eventual dose
187 19     selection decisions for phase III occurred in the
187 20     spring and summer of 2006. Right?
187 21     A. The final decision regarding the dosage
187 22     of the rivar- -- excuse me, the rivaroxaban for
187 23     phase III was made during a meeting of the
187 24     independent expert group, the steering committee,
187 25     and the SMCC, during a gathering of the European
188 1     Society of Cardiology in Barcelona, of which I
188 2     already saw an e-mail earlier on, and to the best
188 3     of my knowledge, that was in August or September
188 4     of that year.

**188:5 – 188:9 Lensing, Anthonie 2017-07-25** — 0:27

188 5     Q. And so even if Bayer in the summer of
188 6     2004 had a goal of making phase III dose decisions
188 7     by May or June of 2005, the OD dose taking into
188 8     phase III was so important they were willing to
188 9     postpone those dose decisions, right?

**188:12 – 188:21 Lensing, Anthonie 2017-07-25** — 0:33

188 12     THE WITNESS: No, that is not correct,
188 13     of course, and I talked to you about this earlier.
188 14     Bayer decided to have a BID and an OD study, and
188 15     this was not because Bayer thought that the OD was
188 16     the path forward. It is because responsible
188 17     clinical research must be done, and you must do it
188 18     responsibly. You must make sure that you get good
188 19     evaluations. Good clinical trials need time to
188 20     achieve the relevant data with which you treat the
188 21     patient in the best way possible.

19

08/06/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

190:4 - 190:8 Lensing, Anthonie 2017-07-25                    0:43
190  4     Q.  And the main driving reason
190  5     alternatives for an additional dose-finding study
190  6     in VTE treatment was to obtain more once-daily
190  7     data so that a once-daily dose could be studied in
190  8     phase III, correct?

190:10 - 190:16 Lensing, Anthonie 2017-07-25                  0:22
190 10         THE WITNESS: No, that is not correct,
190 11     and I have said that to you before.
190 12         The decision regarding the OD regimen
190 13     evaluation was based on the fact that we wanted to
190 14     provide the safest and most effective treatment
190 15     for people with a thrombosis leg or with pulmonary
190 16     embolism.

190:18 - 190:23 Lensing, Anthonie 2017-07-25                  1:05
190 18     Q.  All of the alternatives in that chart
190 19     involve further study of once-daily dosing, right?
190 20     A.  Yes, that is correct. Mainly because in
190 21     the ODIXa-DVT study there was -- that was a study
190 22     into BID, so there was a need to get further
190 23     information regarding once-daily dosage.

190:24 - 191:4 Lensing, Anthonie 2017-07-25                   0:41
190 24     Q.  At some point the company began
190 25     receiving the results of the ODIXa-DVT
191  1     dose-finding study. Those happened before the
191  2     Einstein-DVT study results, right?
191  3     A.  Indeed, the ODIXa-DVT study finished
191  4     before the Einstein-DVT study.

191:8 - 191:17 Lensing, Anthonie 2017-07-25                   0:59
191  8     Q.  So those results began coming in in
191  9     early -- late 2005, early 2006, for ODIXa-DVT?
191 10     A.  I believe I remember that that's the
191 11     case, yes.
191 12     Q.  And do you recall learning that the
191 13     businesspeople at Bayer believed it was so
191 14     important that the right decision was made for the
191 15     phase III trial for VTE treatment that they should
191 16     keep the BID results secret and only within a
191 17     certain group of people within the company?

191:20 - 192:1 Lensing, Anthonie 2017-07-25                   0:29
191 20         THE WITNESS: I can tell you that I
191 21     don't remember that, and it never happened,
191 22     because our data are transparent and they're
191 23     shared with the outside world, they're disclosed
191 24     in conferences and they're published, and they're
191 25     also posted on clinicaltrial.gov, which entails a
192  1     reporting obligation.

192:2 - 192:8 Lensing, Anthonie 2017-07-25                    0:19
192  2         And, in addition, the independents from
192  3     the Einstein committee were responsible for the
192  4     dose and regimen in phase III.
192  5         (In English)  Dose and regimen selection
192  6     in phase III.
192  7         (Interpreter)  Dose and regimen
192  8     selection in phase III.

195:1 - 195:4 Lensing, Anthonie 2017-07-25                    0:12
195  1     Q.  The best dose that creates the best
195  2     balance between efficacy and safety for an
195  3     anticoagulant for patients should be the goal. Do
195  4     you agree?

195:6 - 195:6 Lensing, Anthonie 2017-07-25                    0:01
195  6         THE WITNESS: I agree with that.

195:8 - 195:11 Lensing, Anthonie 2017-07-25                   0:15
195  8     Q.  And the patient safety, whether it's
195  9     treating a blood clot and preventing it from
195 10     deteriorating or preventing a major bleed, that's
195 11     the most important goal. Do you agree?

195:14 - 195:14 Lensing, Anthonie 2017-07-25                  0:00
195 14         THE WITNESS: Yes, I agree with that.

195:16 - 195:22 Lensing, Anthonie 2017-07-25                  0:43
195 16     Q.  And business goals or sales
195 17     opportunities should not influence the decision of
195 18     the choosing the best dose for patients. You

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

195 19    agree with that?
195 20    A.  I agree with that. That would have been
195 21    unacceptable to me and for the independent
195 22    steering group,

196:7  -  196:8  Lensing, Anthonie 2017-07-25          0:35
196  7        (Lensing Exhibit No. 24 was marked
196  8        for identification.)

Re: [196:7-196:8]
Def Obj See objection to Exhibit 24.

Re: [196:7-196:8]
Pltf Resp See Plaintiffs' response to
Defendants' objection to this exhibit.

Pending

196:13 -  196:16 Lensing, Anthonie 2017-07-25         0:18
196 13    Q.  And so this document is an e-mail from
196 14    Bernhard Glombitza in January of 2006. Do you see
196 15    that?
196 16    A.  Yes, I see it.

196:22 -  196:24 Lensing, Anthonie 2017-07-25         0:11
196 22    Q.  Okay. And you, Anthonie Lensing, were
196 23    copied, correct?
196 24    A.  Yes.

197:3  -  197:9  Lensing, Anthonie 2017-07-25          0:45
197  3    Q.  And the subject of this e-mail are the
197  4    "Headline results from BID, VTE treatment trial
197  5    11223 available." Correct?
197  6    A.  That's correct.
197  7    Q.  And that's the ODIXa-DVT dose-finding
197  8    trial.
197  9    A.  Yes, that's correct.

197:20 -  198:24 Lensing, Anthonie 2017-07-25         3:22
197 20    Q.  In the next paragraph, Mr. Glombitza
197 21    says:  "To allow to draw the right conclusions for
197 22    the further VTE treatment program, we need to
197 23    consider beside the full BID dataset, also the
197 24    data from the OD trial, Einstein 11528, which will
197 25    become available soon."
198  1        Do you see that?
198  2    A.  Yes, that's correct, that's what it
198  3    says.
198  4    Q.  He goes on:  "Because of this, we
198  5    currently keep the communication of the BID twice
198  6    daily headline results within BHC, Limited." Is
198  7    that correct?
198  8    A.  Yes, that's what it says.
198  9    Q.  And BHC refers to Bayer HealthCare.
198 10    A.  That's correct.
198 11    Q.  Okay. He goes on:  "Individuals to
198 12    share/discuss the headline results of the BID
198 13    trial are restricted to factor Xa members of
198 14    clinical development and project management."
198 15        Do you see that?
198 16    A.  Yes, I see that too.
198 17    Q.  And Bernhard Glombitza says:  "We would
198 18    very much appreciate if within J&J a similar
198 19    communication approach could be followed." Right?
198 20    A.  Yes, he says that.
198 21    Q.  Bernhard Glombitza was a business person
198 22    at Bayer?
198 23    A.  As far as I remember, he was involved in
198 24    project management in 2004 -- excuse me, 2006.

200:8  -  200:11 Lensing, Anthonie 2017-07-25         0:35
200  8    Q.  Mr. Glombitza has said in this e-mail in
200  9    January of '06 to J&J that, We want to keep the
200 10    results of the twice-daily trial limited to who
200 11    knows about it, right?

200:13 -  200:14 Lensing, Anthonie 2017-07-25         0:02
200 13        THE WITNESS: That is what it says here,
200 14    indeed.

206:15 -  206:18 Lensing, Anthonie 2017-07-25         0:14
206 15    Q.  Dr. Lensing, we've been talking about
206 16    the dose selection. I want to show you what we'll
206 17    mark as Exhibit No. 26, which is record number
206 18                                                    1300123

206:19 -  206:20 Lensing, Anthonie 2017-07-25         0:10
206 19        (Lensing Exhibit No. 26 was marked
206 20        for identification.)

Re: [206:19-206:20]
Def Obj See objection to Exhibit 26.

Re: [206:19-206:20]
Pltf Resp See Plaintiffs' response to
Defendants' objection to this exhibit.

Pending

206:25 -  207:14 Lensing, Anthonie 2017-07-25         1:31
206 25    Q.  Okay. So this is an e-mail from Frank
207  1    Misselwitz to you on March 30th of 2006, with the



Overruled 602 best not relevant 607

Overruled 602 607

21

08/06/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

207  2    subject being "New Draft on Dose Selection." Do
207  3    you see that?
207  4    A.  I can see that.
207  5    Q.  So in Exhibit 26, Mr. -- Dr. Misselwitz
207  6    says: "Hi, Ton: Please find attached a revised
207  7    newer draft of my," quote, "dose selection,"
207  8    quote, "presentation."
207  9         Do you see that?
207 10    A.  I do see that.
207 11    Q.  Okay.  And Dr. Misselwitz copied
207 12    Mr. Glombitza and Joerg Moeller on the e-mail,
207 13    right?
207 14    A.  That is correct.

208:2  -  208:8  Lensing, Anthonie 2017-07-25     1:17
208  2    Q.  Okay.  He says: "The," quote, "signal,"
208  3    quote, "of an excess bleeding disappears if we
208  4    take into consideration menorrhagia."  Right?
208  5    A.  It is correct that it says that.
208  6    Q.  This signal that he's talking about of
208  7    excess bleeding, was that a signal that was seen
208  8    in certain groups of patients considered fragile?

208:11 -  208:18 Lensing, Anthonie 2017-07-25     0:27
208 11         THE WITNESS:  Patients who are defined
208 12    as fragile:  One, patients below the weight of 50
208 13    kilograms; two, with a creatinine clearing under
208 14    50; and patients who are aged 75 and over.  The
208 15    signal, as it mentions here, was found in women
208 16    with menorrhagia, which means they are of a
208 17    fertile age.  So I do not think that this -- that
208 18    excludes this because of those signals.

209:22 -  210:2  Lensing, Anthonie 2017-07-25     0:39
209 22    Q.  Dr. Misselwitz goes on and says to you:
209 23    "At the last global development committee with
209 24    J&J, the following option regarding initial
209 25    treatment was discussed."
210  1         Do you see that?
210  2    A.  I do see that.

210:9  -  210:14 Lensing, Anthonie 2017-07-25     0:49
210  9         And then it says:  "For patients to be
210 10    treated with BAY," Xarelto, "second randomization
210 11    to received blinded LMWH," low-molecular-weight
210 12    heparin, "or 10-milligram BID of BAY," Xarelto,
210 13    correct?
210 14    A.  That is correct.

211:11 -  211:15 Lensing, Anthonie 2017-07-25     0:18
211 11    Q.  Okay.  So that would be the standard of
211 12    care arm that's being discussed here in
211 13    Exhibit 26, correct?
211 14    A.  Yes, I do see that.  I do consider that
211 15    to be so.

213:7  -  213:21 Lensing, Anthonie 2017-07-25     1:50
213  7    Q.  Okay.  Let's just be clear.  What they
213  8    were talking about in Exhibit 26 was the potential
213  9    way in which study 11702, the -- the phase III
213 10    trial, could be conducted, right?
213 11    A.  Yes, that is correct.
213 12    Q.  The Einstein phase III trial.
213 13    A.  Yes.
213 14    Q.  Okay.  And so here we've talked about
213 15    there being a second randomization for the Xarelto
213 16    where some patients would get the intensified
213 17    treatment to be low-molecular-weight heparin and
213 18    other patients would get 10 milligrams twice daily
213 19    Xarelto, right?
213 20    A.  This is indeed the proposal that is
213 21    discussed here in my opinion.

213:22 -  214:6  Lensing, Anthonie 2017-07-25     1:09
213 22    Q.  Okay.  And so this is the -- this is a
213 23    potential design for Einstein phase III.  Correct?
213 24    A.  Okay.  Design of P-III, that was
213 25    actually done by independent -- this independent
214  1    steering committee with independent experts, who
214  2    included me, and I reported to Bayer.  If
214  3    independent people want to independently think
214  4    about design, that is fine, but I do not think
214  5    that the international committee would look at
214  6    this for more than two minutes.

| | Objections in | Responses in | Rulings |
|---|---|---|---|

**215:3 - 215:5 Lensing, Anthonie 2017-07-25**   0:11
215  3    Q.  So let me show you what we'll mark next
215  4    as Exhibit 27. And this will be the PowerPoint
215  5    presentation that he sent to you.

**215:6 - 215:7 Lensing, Anthonie 2017-07-25**   0:08
215  6    (Lensing Exhibit No. 27 was marked
215  7    for identification.)

**216:18 - 216:22 Lensing, Anthonie 2017-07-25**   0:30
216  18    The first bullet point under the
216  19    executive summary states that: "20 milligrams is
216  20    the optimal total daily dose to be studied in VTE
216  21    treatment." Correct?
216  22    A.  That's correct, it says so.

**217:3 - 217:12 Lensing, Anthonie 2017-07-25**   1:08
217  3    Q.  Okay. And then it refers to the
217  4    intensified regimen that we've discussed to be
217  5    used for the first week or weeks, right?
217  6    A.  Yes, that's correct.
217  7    Q.  And then the final bullet point on this
217  8    slide says: "In order to achieve an early
217  9    intensive treatment, we recommend a mandatory
217  10    pretreatment with low-molecular-weight heparin for
217  11    five to seven days." Correct.
217  12    A.  Yes, it says that too.

**217:25 - 218:4 Lensing, Anthonie 2017-07-25**   0:27
217  25    Q.  But certainly the draft that he e-mailed
218  1    you on March 30th included that recommendation of
218  2    the mandatory low-molecular-weight heparin
218  3    intensified treatment, correct?
218  4    A.  Yes, that's correct.

**220:16 - 221:13 Lensing, Anthonie 2017-07-25**   1:58
220  16    Q.  Okay. And you had had responsibility
220  17    for conduct of the 11528 Einstein-DVT study,
220  18    right?
220  19    A.  Yes, I was.
220  20    Q.  Okay. So now if we can go back one
220  21    slide to kind of see what we're trying to decide,
220  22    and we've been talking about decisions, you see
220  23    that there is a "Decision Tree Dose Selection"
220  24    slide, right?
220  25    Do you see that slide?
221  1    A.  Yes, I see the slide.
221  2    Q.  Okay. And as we've been discussing
221  3    decisions here, the first one is OD or BID, right?
221  4    A.  Yes, that's correct.
221  5    Q.  And then again, "Initial VTE treatment
221  6    using more intensified anticoagulation."
221  7    A.  That's also correct.
221  8    Q.  And then the second -- and then there
221  9    are two options there: One is BID for two to
221  10    three weeks followed by once-daily secondary
221  11    prevention or pretreatment with low-molecular-
221  12    weight heparin, correct?
221  13    A.  Yes, that's what it says here.

**224:8 - 224:14 Lensing, Anthonie 2017-07-25**   1:07
224  8    Q.  If we can turn to slide 20.
224  9    Okay. Let's look at slide 20. And it's
224  10    the "Initial Treatment Regimen" slide, and the
224  11    first bullet point says: "We discourage using a
224  12    once-daily rivaroxaban regimen for the initial
224  13    treatment period." Correct?
224  14    A.  That's what it says here.

**224:21 - 224:25 Lensing, Anthonie 2017-07-25**   0:46
224  21    Q.  And then the third bullet point again
224  22    talks about this option of using low-molecular-
224  23    weight heparin for the initial treatment phase as
224  24    an alternative to use the Xarelto, correct?
224  25    A.  That's what it says, indeed.

**226:8 - 226:21 Lensing, Anthonie 2017-07-25**   1:29
226  8    Q.  And so you can see here the key tells us
226  9    that the light gray is the 11223, the ODiXa-DVT
226  10    dose-finding study for the twice-daily doses,
226  11    correct?
226  12    A.  That's correct.
226  13    Q.  And the dark gray is the 40-milligram

| | Objections In | Responses In | Rulings |
|---|---|---|---|

226 14    once-daily dose from the ODIXa-DVT.
226 15    A. That's correct.
226 16    Q. And then the medium gray are the
226 17    once-daily doses from the Einstein-DVT dose-
226 18    finding study.
226 19    A. Yes. That's correct.
226 20    Q. So here, looking at a 20-milligram dose
226 21    of Xarelto total daily dose, right?

**227:7 - 227:12 Lensing, Anthonie 2017-07-25**    0:44
227 7    Q. Okay. And then if we look at the
227 8    10-milligram BID plot, that's 10 milligrams given
227 9    twice daily for a total of 20, we see that the
227 10    trough values are higher than those that were seen
227 11    in the 20-milligram once daily, correct?
227 12    A. That's correct.

**228:12 - 228:17 Lensing, Anthonie 2017-07-25**    0:55
228 12    Q. Let me ask you this: This -- this graph
228 13    certainly demonstrates that the interpatient
228 14    variability for trough values is much greater for
228 15    the BID doses used in the dose-finding study than
228 16    that seen for the once-daily dose, talking about a
228 17    total daily dose of 20 milligrams, correct?

Re: [228:12-228:17]
Def Obj Foundation. Argumentative.

Re: [228:12-228:17]
Pltf Resp As a Global Clinical Leader for Xarelto and given Dr. Lensing's admitted responsibility for the EINSTEIN DVT study (220:16-19), as well as his ability to interpret the slide (testimony at 226:8-227:12, for example), ample foundation is laid. The question is hardly argumentative and well within bounds with an adverse witness.

_Sustained atty testify & witness doesn't know why answer is ___ correct_ — Pending

**228:20 - 228:22 Lensing, Anthonie 2017-07-25**    0:06
228 20    THE WITNESS: I don't know whether your
228 21    conclusion is correct. I can't corroborate it,
228 22    but I can't exclude it either.

Re: [228:20-228:22]
Def Obj Foundation. Argumentative.

Re: [228:20-228:22]
Pltf Resp As a Global Clinical Leader for Xarelto and given Dr. Lensing's admitted responsibility for the EINSTEIN DVT study (220:16-19), as well as his ability to interpret the slide (testimony at 226:8-227:12, for example), ample foundation is laid. The question is hardly argumentative and well within bounds with an adverse witness.

Pending

**228:24 - 228:25 Lensing, Anthonie 2017-07-25**    0:07
228 24    Q. Okay. Certainly you see that the red
228 25    line is longer than the blue line, right?

**229:3 - 229:9 Lensing, Anthonie 2017-07-25**    0:24
229 3    THE WITNESS: My -- but I don't know
229 4    which conclusions you could connect with these
229 5    graphic illustrations.
229 6    And seeing the fact that Dr. Mueck is
229 7    the expert in these things, I would recommend that
229 8    you ask him, and I'm sure that he could answer
229 9    satisfactorily.

**235:8 - 235:9 Lensing, Anthonie 2017-07-25**    0:09
235 8    Q. You agree this information was available
235 9    to you and Dr. Misselwitz, correct?

**235:11 - 235:12 Lensing, Anthonie 2017-07-25**    0:01
235 11    THE WITNESS: I did see this slide
235 12    before, yes.

_Overrule demonstrative_

**235:17 - 235:18 Lensing, Anthonie 2017-07-25**    0:04
235 17    (Lensing Exhibit No. 28 was marked
235 18    for identification.)

Re: [235:17-235:18]
Def Obj See objection to Exhibit 28.

Re: [235:17-235:18]
Pltf Resp See Plaintiffs' response to Defendants' objection to this exhibit.

Pending

**236:6 - 236:17 Lensing, Anthonie 2017-07-25**    1:29
236 6    Q. Okay. And so for the final Einstein --
236 7    so for the final Einstein phase III studies,
236 8    the -- for the Xarelto arm, there was no
236 9    intensified low-molecular-weight heparin option,
235 10    right?
236 11    A. In the final choice, we chose 15
236 12    milligrams twice daily for 21 days without the
236 13    low-molecular-weight heparin.

08/06/17 17:59

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

236 14   Q.  So -- so the final resulted in the
236 15   Intensified period being 15 milligrams BID, right?
236 16   A.  15 milligrams, that's correct.
236 17   Q.  Twice daily?

236:21 -   236:22 Lensing, Anthonie 2017-07-25   0:02
236 21   THE WITNESS: (Interpreter) Fifteen
236 22   twice daily.

236:24 -   237:4 Lensing, Anthonie 2017-07-25   0:34
236 24   Q.  So looking back at Dr. Mueck's chart, if
236 25   we look here in the dose-finding studies, there --
237 1   the dose-finding studies never studied 15
237 2   milligrams twice daily, right?
237 3   A.  That's correct.
237 4   Q.  Never studied, right?

237:8   -   237:10 Lensing, Anthonie 2017-07-25   0:18
237 8   Q.  Never studied in the two dose-finding
237 9   studies.
237 10   A.  That's correct.

242:23 -   243:8 Lensing, Anthonie 2017-07-25   1:07
242 23   Q.  Let's turn to the next page then, page
242 24   50 -- slide 50. And it says: "Total daily dose
242 25   of 20 milligrams can be selected as optimal dose."
243 1   Do you see that?
243 2   A.  Yes, I see it.
243 3   Q.  Then it says: "Increased doses do not
243 4   translate into better efficacy but may increase
243 5   the risk of bleeding."
243 6   Do you see that?
243 7   A.  We did not see that, but in principle,
243 8   it would always be possible.

243:9 -   243:12 Lensing, Anthonie 2017-07-25   0:15
243 9   Q.  And in fact, at the end of the day,
243 10   the final Einstein phase III trials used a
243 11   30-milligram totally -- total daily dose for the
243 12   Intensified treatment period, right?

243:15 -   243:15 Lensing, Anthonie 2017-07-25   0:11
243 15   THE WITNESS: That's correct.

243:17 -   243:22 Lensing, Anthonie 2017-07-25   0:38
243 17   Q.  One of the topics we've been discussing
243 18   was this decision as to whether or not to use
243 19   low-molecular-weight heparin as the intensified
243 20   treatment period in the Xarelto arm of the
243 21   phase III trials, right?
243 22   A.  That's correct.

244:20 -   245:2 Lensing, Anthonie 2017-07-25   1:16
244 20   Q.  Okay. And so this -- in Exhibit 29,
244 21   Dr. Misselwitz e-mails yourself, Anthonie Lensing,
244 22   there on the second line, as well as an M. M.
244 23   Veenbolrp; is that right?
244 24   A.  (in English) This is the secretary of
244 25   the Department of Vascular Medicine at the
245 1   University of Amsterdam where we all resorted at
245 2   that time. Dr. Buller, I and Dr. Segers.

**Re: [244:20-245:2]**
**Def Obj** See objection to Exhibit 29.

**Re: [244:20-245:2]**
Pltf Resp See Plaintiffs' response to
Defendants' objection to this exhibit.

Pending

245:7 -   245:9 Lensing, Anthonie 2017-07-25   0:29
245 7   Q.  And if we can look, he sends this e-mail
245 8   on March 30th, 2006, at 2:10 p.m., correct?
245 9   A.  That's what it says, yes.

245:16 -   246:15 Lensing, Anthonie 2017-07-25   2:10
245 16   Q.  Do you have 26 in front of you so you
245 17   can check the time?
245 18   A.  (In English) Ten to 6:00 p.m. Yeah,
245 19   that is suggesting that this is indeed four
245 20   minutes later.
245 21   Q.  Okay. And in this e-mail Dr. Misselwitz
245 22   says: "Dear Annelise, Harry and Ton: I think it
245 23   is indeed important to have a follow-up
245 24   conversation tomorrow. I would like to ensure
245 25   you that we are completely on the same page, but
246 1   to be honest, the low-molecular-weight heparin
246 2   pretreatment somehow derailed us."
246 3   Do you see that?
246 4   A.  I see it.
246 5   Q.  Okay. Below that he says -- he makes
246 6   several statements, but the third statement he

*[Handwritten annotation: Overruled 402/ (re notice) 602, 601]*

08/06/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

246  7  says: "We meanwhile agreed on the dose of
246  8  20 milligrams OD."
246  9  That would be for the continued
246  10  treatment phase, correct?
246  11  A.  I understand that.
246  12  Q.  And he said: "We mutually understand
246  13  that an intensified pretreatment is necessary."
246  14  Right?
246  15  A.  Yes, that's correct.

252:5  -  252:16 Lensing, Anthonie 2017-07-25          1:12
252  5  Q.  Okay.  The next paragraph, he says: "We
252  6  prepared all internal discussions as well as the
252  7  discussions with J&J based on the assumption of an
252  8  initial intensified regimen of 10-milligram BID.
252  9  There was reluctance to switch to low-molecular-
252  10  weight heparin pretreatment for a number of
252  11  reasons."
252  12  Do you see that?
252  13  A.  Yes, I see that.
252  14  Q.  Okay.  And he's telling this to
252  15  Dr. Segers and Dr. Buller, who are part of the
252  16  steering committee for the study, correct?

252:18  -  252:18 Lensing, Anthonie 2017-07-25          0:01
252  18  THE WITNESS: Yes, that's correct.

252:20  -  253:3  Lensing, Anthonie 2017-07-25          1:19
252  20  Q.  And he tells these steering committee
252  21  members that: "There is reluctance to switch to
252  22  LMWH pretreatment for a number of reasons. One,
252  23  it hasn't been tested in phase II; and two, data
252  24  driven, the BID regimen was more effective on
252  25  initial thrombus regression, 21 days, and size of
253  1  the PLS defect compared to standard of care."
253  2  Right?
253  3  A.  Yes, that's what it says.

253:4  -  253:16 Lensing, Anthonie 2017-07-25          1:15
253  4  Q.  And number three, he says: Low-
253  5  molecular-weight heparin pretreatment is
253  6  commercially and medically not important."
253  7  That is what he tells Dr. Buller and
253  8  Dr. Segers, right?
253  9  A.  That's what it says.
253  10  Q.  And then he goes on and tells them:
253  11  "However, it may send the wrong signal as it may
253  12  be interpreted as," quote, "Bayer is not sure
253  13  about the efficacy of its drug."
253  14  Do you see that?
253  15  A.  Yes, I see that, that it says that
253  16  there.

253:19  -  253:20 Lensing, Anthonie 2017-07-25          0:03
253  19  (Lensing Exhibit No. 30 was marked
253  20  for identification.)

253:1  -  254:21 Lensing, Anthonie 2017-07-25          2:06
254  1  Q.  Okay.  So if you look with me, on the
254  2  second page is an e-mail from Dr. Misselwitz to --
254  3  it's to -- I'm sorry, it's to Dr. Misselwitz from
254  4  Dr. Buller through the secretary on April 19th of
254  5  2006, for Exhibit 30.
254  6  Do you see that?
254  7  A.  Yes, I see it.
254  8  Q.  And Dr. Buller asks Dr. Misselwitz, and
254  9  says: "Dear Frank: It is so silent both for the
254  10  VTE program and AF.  Is the old adaglum, no news
254  11  is good news, applicable?  Looking forward to hear
254  12  something from the dark caves of J&J.  Best
254  13  regards, Harry."
254  14  Do you see that?
254  15  A.  Yes, I see it.
254  16  Q.  Okay.  And so about 19 days have passed
254  17  since the e-mail that Dr. Misselwitz sent to
254  18  Dr. Buller and Dr. Segers regarding the fact that
254  19  this low-molecular-weight pretreatment had somehow
254  20  derailed the discussions.
254  21  Do you recall that?

254:23  -  254:24 Lensing, Anthonie 2017-07-25          0:03
254  23  THE WITNESS: Yes, there is such a
254  24  period between the two events.

**Objections In column:**
Re: [253:19-253:20]
Def Obj See objection to Exhibit 30.

**Responses In column:**
Re: [253:19-253:20]
Pltf Resp See Plaintiffs' response to
Defendants' objection to this exhibit.

**Rulings column:**
Pending

Overruled
607, 602
401 (notice)

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**255:1 - 256:1** Lensing, Anthonie 2017-07-25                    3:12

255  1   Q.   And if you turn with me down to the
255  2   first page of Exhibit 30, we see Dr. Misselwitz's
255  3   response, and he copies you as well as Joerg
255  4   Moeller, correct?
255  5   A.   Yes, that's correct.
255  6   Q.   And he says: "Dear Harry: A very
255  7   timely question. On Thursday last week, the day
255  8   before good Friday, we had the joint steering
255  9   committee with Bayer and J&J on our rivaroxaban
255 10   project. We discussed extensively both the VTE
255 11   treatment and the AF programs. Whereas overall we
255 12   achieved a great deal of mutual understanding and
255 13   agreement, one very important point was discussed
255 14   controversially. The LMWH pretreatment for the
255 15   initial week. This option was, and is, supported
255 16   by Joerg and myself, but the vast majority of the
255 17   JSC members from both companies, not only J&J,
255 18   clearly favored the initial treatment with
255 19   rivaroxaban instead of low-molecular-weight
255 20   heparin."
255 21             Do you see that?
255 22   A.   Yes, I see it.
255 23   Q.   And Dr. Misselwitz has indicated that
255 24   he and Joerg Moeller supported using the low-
255 25   molecular-weight pretreatment option.
256  1   A.   I see that.

**257:5 - 257:6** Lensing, Anthonie 2017-07-25                    0:01

257  5        (Lensing Exhibit No. 31 was marked
257  6        for identification.)

Re: [257:5-257:6]
Def Obj See objection to Exhibit 31.

Re: [257:5-257:6]
Pltf Resp See Plaintiffs' response to
Defendants' objection to this exhibit.

Pending

**257:13 - 259:9** Lensing, Anthonie 2017-07-25                    5:31

257 13   Q.   Okay. So in Exhibit 31, we see an
257 14   e-mail chain between Dr. -- Dr. Berkowitz and
257 15   Dr. Misselwitz in which the subject is: "I have
257 16   concerns about Einstein-VTE study design, no
257 17   pre-RX heparin." Is that right?
257 18   A.   Yes, that's correct.
257 19   Q.   Okay. So if we look at the bottom of
257 20   page 1, we see that Dr. Berkowitz e-mails on
257 21   April 26th this e-mail to Frank Misselwitz, and
257 22   starts off with "Dear Frank."
257 23             Are you with me?
257 24   A.   Yes, I can.
257 25   Q.   And so he says in this e-mail: "Dear
258  1   Frank: I understand that important decisions are
258  2   being made right now about the design of the
258  3   phase III Einstein-VTE treatment study," question
258  4   mark. You see that?
258  5   A.   Yes, I see it.
258  6   Q.   Okay. He says: "I have -- I admit that
258  7   I am not up to speed in regard to what data we
258  8   have and all that has gone into the current
258  9   design. I also realize that the end of phase II
258 10   briefing document for FDA and EMEA must be written
258 11   and submitted very soon to keep to timeline.
258 12   However, as we have discussed, these are the most
258 13   critical days, and I find myself asking if we have
258 14   all the information we need before go forward with
258 15   phase III." Right?
258 16   A.   That's correct.
258 17   Q.   He says: "On today's teleconference,
258 18   you briefly mentioned a decision regarding no
258 19   pre-RX heparin for patients to be randomized to
258 20   Xarelto in the phase III Einstein-VTE treatment
258 21   study. I would like to weigh in here if I may,"
258 22   and then he continues, correct?
258 23   A.   Yes, that's correct.
258 24   Q.   He says: "The phase III program as
258 25   designed really has one pivotal trial -- has just
259  1   one pivotal trial to obtain the indication, but
259  2   tries to address three questions. As you know,
259  3   treatment of VTE involves a shorter acute phase,
259  4   five to," question mark, "days, and a long chronic
259  5   phase, out to one year or longer. The acute phase
259  6   has a variable length and is on a continuum, not a
259  7   set period like five to seven days."
259  8             Do you see that?
259  9   A.   Yes, I see that.

**259:19 - 260:3** Lensing, Anthonie 2017-07-25                    0:41

259 19   He says: "With our current design, we
259 20   are assuming that Xarelto is as good as a heparin

| | | Objections In | Responses In | Rulings |

```
259 21   Initially, that our intensified 10-milligram BID
259 22   regimen is equivalent to a heparin regimen, and
259 23   that our 20-milligram once-daily dose is as good
259 24   as warfarin for all types of patients. I guess my
259 25   concerns come down to whether we have the data to
260  1   support these contentions."
260  2        Do you see that?
260  3   A.  Yes, I see that.
```

261:19 - 261:20 Lensing, Anthonie 2017-07-25                    0:06
```
261 19        (Lensing Exhibit No. 32 was marked
261 20   for identification.)
```

Re: [261:19-261:20]                Re: [261:19-261:20]                Pending
Def Obj See objection to Exhibit 32.    Pltf Resp See Plaintiffs' response to
                                   Defendants' objection to this exhibit.

261:25 - 263:7 Lensing, Anthonie 2017-07-25                    3:07
```
261 25   Q.  Okay. So, as we saw in Exhibit 31,
262  1   there had been a teleconference on April 26th, and
262  2   so in Exhibit 32, Dr. Misselwitz is e-mailing his
262  3   personal opinion as a follow-up to that
262  4   teleconference, correct?
262  5   A.  That's correct.
262  6   Q.  And so Dr. Misselwitz e-mails, and
262  7   you're sent this e-mail along with Joerg Moeller
262  8   and others, correct?
262  9   A.  That's correct.
262 10   Q.  He also includes an Andreas Nauck from
262 11   marketing, correct?
262 12   A.  That's correct. That's the study team.
262 13   Q.  Okay. And Joseph Scheeren, he was on
262 14   the business side as well, correct?
262 15   A.  No, he was regulatory.
262 16   Q.  He was regulatory at the time. Okay.
262 17        And he also copies Kamal Malik, who we
262 18   talked about.
262 19   A.  That's correct.
262 20   Q.  And he says: "Dear all: As follow-up
262 21   to our yesterday's discussions: As Kamal asked me
262 22   explicitly what was my personal opinion as a
262 23   clinical developer, let me briefly explain my
262 24   preferences."
262 25        Do you see that?
263  1   A.  I see that.
263  2   Q.  If the decision regarding the dosing
263  3   regimen for the phase III VTE trial is going to be
263  4   made by an independent committee, why is Bayer
263  5   management asking Dr. Misselwitz to provide his
263  6   preferences to people from marketing and
263  7   regulatory?
```

263:10 - 263:11 Lensing, Anthonie 2017-07-25                    0:05
```
263 10        THE WITNESS: I can't tell why Kamal
263 11   asked that. I assume it's to be informed.
```

263:13 - 264:3 Lensing, Anthonie 2017-07-25                    1:17
```
263 13   Q.  He has a section for "VTE Treatment."
263 14   Do you see that?
263 15   A.  Yes, I see that.
263 16   Q.  He says: "My ultimate goal will be to
263 17   confirm that a rivaroxaban-only regimen, including
263 18   a more intensified BID regimen for the first three
263 19   to four weeks, is noninferior to standard of care.
263 20   Study open-label. Everything else as discussed."
263 21   Right?
263 22   A.  Yes, that's correct.
263 23   Q.  He says: "To increase the PTS,"
263 24   probability of technical success, "an initial
263 25   treatment with low-molecular-weight heparin is
264  1   recommended in order to utilize a well-documented
264  2   regimen which allows investigators to also enroll
264  3   PE patients." Right?
```

264:6 - 264:6 Lensing, Anthonie 2017-07-25                    0:01
```
264  6        THE WITNESS: Yes, that's correct.
```

266:2 - 266:8 Lensing, Anthonie 2017-07-25                    0:32
```
266  2   Q.  Dr. Misselwitz says: "We all understand
266  3   that the final label shall include the initial
266  4   treatment with rivaroxaban." Right?
266  5   A.  Yes, that's correct.
266  6   Q.  The phase III trial hasn't started yet,
266  7   right?
266  8   A.  No. We're preparing it.
```

266:13 - 266:17 Lensing, Anthonie 2017-07-25                    0:16
```
266 13   Q.  But by this time, Dr. Misselwitz knows
```

| | Objections In | Responses In | Rulings |
|---|---|---|---|

266 14    that from a commercial perspective, Bayer needs
266 15    the final label to have the Intensified treatment
266 16    period to be Xarelto and not low-molecular-weight
266 17    heparin, right?

266:20 -   266:22 Lensing, Anthonie 2017-07-25    0:07
266 20      THE WITNESS: I do not know exactly what
266 21    Dr. Misselwitz thought. You would have to check
266 22    with him.

266:24 -   267:11 Lensing, Anthonie 2017-07-25    1:57
266 24    Q. Let's see what he says. The next thing
266 25    he says is: "The clinical team will explore
267 1    options to perform a phase IIIb trial with a
267 2    limited sample size, using surrogate outcomes and
267 3    a short treatment duration, to compare initial
267 4    rivaroxaban treatment to initial low-molecular-
267 5    weight treatment in PE patients."
267 6      Do you see that?
267 7    A. Yes, I can see it. And as I said
267 8    before, this was a study into PE patients, and it
267 9    was not phase IIIb, but it was done in the first
267 10    400 patients in Einstein PE through repeat CT
267 11    scans and 15-milligram BID.

Re: [266:24-267:11]
Pltf Obj Non-responsive after "Yes, I can see it" at 267:7. Witness simply asked if a line was read correctly but goes on to repeat testimony after confirming that the line was correct.

Re: [266:24-267:11]
Def Resp The witness is very appropriately adding context to a document he was being asked about.

Pending

*Overruled*
*106*

268:16 -   269:7 Lensing, Anthonie 2017-07-25    1:35
268 16    Q. Okay. Dr. Misselwitz goes on and he
268 17    says: "This is my personal purely clinical
268 18    opinion." Right?
268 19    A. That is what it says, indeed.
268 20    Q. And you agreed with me earlier that when
268 21    it came to choosing the best dose that benefitted
268 22    the patients, that it should be based upon the
268 23    science and the medical information, correct?
268 24    A. Yes, I do agree with you there.
268 25    Q. Frank Misselwitz goes on and says: "Of
269 1    course, we need to take into consideration the
269 2    regulatory aspects as well as the commercial
269 3    case." Right?
269 4    A. Yes, that is right, it does say that.
269 5    Q. When it comes to patient safety, do you
269 6    think it's important not to make compromises based
269 7    on commercial interest?

269:10 -   269:10 Lensing, Anthonie 2017-07-25    0:07
269 10      THE WITNESS: That is obvious.

269:12 -   270:17 Lensing, Anthonie 2017-07-25    4:10
269 12    Q. Dr. Misselwitz says: "I understand that
269 13    VTE treatment may be of limited commercial
269 14    interest" -- he says: "I understand that VTE
269 15    treatment may be of limited commercial interest
269 16    without replacing initial low-molecular-weight
269 17    heparin." Correct?
269 18    A. It is correct that it says that there.
269 19    Q. He says: "In this case, to me the main
269 20    question will be to outline what is the fastest
269 21    way to get to this label. One way could be to
269 22    either force investigators to accept the
269 23    rivaroxaban-only approach and to accept that we
269 24    may not get the PE label, or to run the trial with
269 25    low-molecular-weight heparin initial treatment and
270 1    start in parallel a smaller surrogate outcome
270 2    trial in PE patients with a comparison of the two
270 3    initial treatment options."
270 4      Correct?
270 5    A. That is correct.
270 6    Q. Okay. And if you can turn with me to
270 7    the next page, Dr. Misselwitz includes a general
270 8    comment.
270 9      He says: "General comment: I see
270 10    currently a danger that given the importance of
270 11    this asset for Bayer HealthCare, clinical is
270 12    pushed to answer too many questions already in
270 13    phase III. The usual way is to first get a
270 14    somehow limited label which is then broadened in
270 15    phase IIIb and IV trials."
270 16    Did I read that right?
270 17    A. You did read that right.

271:6 -   271:6 Lensing, Anthonie 2017-07-25    0:08
271 6    (Lensing Exhibit No. 33 was marked

Re: [271:6-271:6]
Def Obj See objection to Exhibit 35.

Re: [271:6-271:6]
Pltf Resp See Plaintiffs' response to Defendants' objection to this exhibit.

Pending

272:12 -   273:9 Lensing, Anthonie 2017-07-25    2:13

29

08/05/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

272 12    Q.  Let's be clear then.  If we look at
272 13    page 4 of Exhibit 33, Dr. Lensing, do you see this
272 14    is the same e-mail chain that we looked at -- this
272 15    is the same e-mail that we looked at in Exhibit 32
272 16    from Dr. Misselwitz to yourself and several
272 17    others, including Kamel Malik, on April 27th,
272 18    2006
272 19        Do you see that?
272 20    A.  Yes, I see that.
272 21    Q.  Okay.  And if we turn to page 3, you can
272 22    see that Joerg Moeller responds to this e-mail,
272 23    and also your -- you receive Dr. Moeller's
272 24    response.  Do you see that?
272 25    A.  I see that.
273  1    Q.  And Dr. Moeller says in response:
273  2    "Dear Frank:  Nothing to add from my side.  I
273  3    concur with your view."  Right?
273  4    A.  That's correct.
273  5    Q.  And Dr. Moeller, as we can see here on
273  6    this page, was Vice President, Head, Global
273  7    Clinical Development, Bayer HealthCare AG,
273  8    correct?
273  9    A.  Yes, that's correct.

273:14 -    273:21 Lensing, Anthonie 2017-07-25    1:03
273 14    Q.  So if you can look with me on the first
273 15    page, you can see that Andrea Derix writes her own
273 16    e-mail in response to this chain, but she doesn't
273 17    copy you or Dr. Misselwitz or Kamel Malik and most
273 18    of the people that were in the original e-mail
273 19    chain between Dr. Misselwitz and yourself,
273 20    correct?
273 21    A.  I see that.  That's correct.

274:2  -    274:15 Lensing, Anthonie 2017-07-25    0:43
274  2    Q.  Okay.  And she has only chosen to e-mail
274  3    to people in the regulatory department this
274  4    e-mail, right?
274  5    A.  Yes, that's correct.
274  6    Q.  Okay.  And so if we look at Ms. Derix's
274  7    e-mail to her regulatory colleagues, she says --
274  8    if we look in the e-mail, it says:  "In VTE
274  9    treatment, we are still discussing two different
274 10    design options for VTE treatment of patients with
274 11    DVT and PE:  10-milligram BID for three weeks
274 12    followed by 20-milligram or, B, high dose
274 13    low-molecular-weight heparin for five days
274 14    followed by 30-milligram OD."
274 15        That's what she says, right?

274:19 -    274:22 Lensing, Anthonie 2017-07-25    0:08
274 19        THE WITNESS:  It's what it says.
274 20    However, I do want to make a remark because where
274 21    it says "30," it is probably wrong.  It should be
274 22    20

274:24 -    275:5  Lensing, Anthonie 2017-07-25    0:21
274 24    Q.  You don't recall there ever being a
274 25    discussion of using 30 milligrams?
275 . 1    A.  Absolutely not.
275  2    Q.  But it is accurate with respect to the
275  3    time that there was a decision to be made whether
275  4    to use the Xarelto as the intensified treatment or
275  5    low-molecular-weight heparin, correct?

275:7  -    275:7  Lensing, Anthonie 2017-07-25    0:00
275  7        THE WITNESS:  Yes, that's correct.

275:17 -    276:3  Lensing, Anthonie 2017-07-25    1:00
275 17    Q.  Ms. Derix's option B is the
275 18    low-molecular-weight heparin followed by Xarelto
275 19    option, okay?  You see that in her e-mail, right?
275 20    A.  I can see that too.
275 21    Q.  And so if we turn over to the top of the
275 22    next page, Ms. Derix says:  "With study type b, we
275 23    are not meeting the target profile for our drug in
275 24    the indication (initial treatment of VTE and
275 25    secondary prevention).  Therefore, the marketing
276  1    pressure is high to get an alternative proposal
276  2    for development of initial treatment."
276  3        Do you see that?

276:6  -    276:6  Lensing, Anthonie 2017-07-25    0:00
276  6        THE WITNESS:  Yes, I can see that.

08/06/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

276:8  -  276:12 Lensing, Anthonie 2017-07-25          0:32
276  8      Q.  In your role as global clinical lead for
276  9      VTE treatment, did you know there was marketing
276  10     pressure to not use the low-molecular-weight
276  11     heparin as the intensified treatment regimen in
276  12     phase III?

276:15 -  276:16 Lensing, Anthonie 2017-07-25          0:08
276  15          THE WITNESS:  I did know about that, but
276  16     I did not pay any attention to that.

276:18 -  276:23 Lensing, Anthonie 2017-07-25          0:19
276  18     Q.  She next says, in bold:  "I would like
276  19     to discuss with you which type of additional
276  20     studies would be required to change the label from
276  21     initial treatment with low-molecular-weight
276  22     heparin for five days to initial treatment with
276  23     Xarelto."

277:1  -  277:1 Lensing, Anthonie 2017-07-25           0:01
277  1           THE WITNESS:  I see that.

277:3  -  277:8 Lensing, Anthonie 2017-07-25           0:21
277  3      Q.  And that question that she's asking is
277  4      consistent with what Dr. Misselwitz had e-mailed
277  5      you and others regarding the way that he saw the
277  6      development could go with an initial label with
277  7      low-molecular-weight heparin followed by a label
277  8      using Xarelto as the intensified treatment, right?

277:11 -  277:11 Lensing, Anthonie 2017-07-25          0:01
277  11          THE WITNESS:  Yes, that's correct.

277:13 -  277:23 Lensing, Anthonie 2017-07-25          1:27
277  13     Q.  She then gives some preliminary
277  14     thoughts, and if you could look with me down at
277  15     the bottom, she says:  "Do you see other
277  16     alternative approaches?  For marketing, it will be
277  17     important that we can get the label change before
277  18     a potential competitor can come on the market with
277  19     initial treatment label, competitive intelligence.
277  20     BI dabigatran study running according to option b.
277  21     BMS phase II study in DVT currently ongoing.
277  22     Phase III started — start planned in April '07."
277  23     Right?

278:1  -  278:2 Lensing, Anthonie 2017-07-25           0:01
278  1           THE WITNESS:  You've read it out
278  2      correctly.

279:3  -  279:4 Lensing, Anthonie 2017-07-25           0:03
279  3           (Lensing Exhibit No. 34 was marked
279  4      for identification.)

| | Re: [279:3-279:4] | Re: [279:3-279:4] | Pending |
|---|---|---|---|
| | Def Obj See objection to Exhibit 34. | Pltf Resp See Plaintiffs' response to Defendants' objection to this exhibit. | |

279:9  -  280:18 Lensing, Anthonie 2017-07-25          3:59
279  9      Q.  Okay.  So in Exhibit 34, Dr. Misselwitz
279  10     e-mails yourself, correct?
279  11     A.  I am one of the people he sends this
279  12     e-mail to, indeed.
279  13     Q.  As well as Dr. Moeller, Mr. Glombitza
279  14     and Mr. Scheonessiffen, correct?
279  15     A.  Yes.
279  16     Q.  And this e-mail is sent on May 31st now
279  17     of 2006, correct?
279  18     A.  That is correct.
279  19     Q.  Okay.  And the subject is "J&J view on
279  20     revised VTE treatment design."  Do you see that?
279  21     A.  I do see that.
279  22     Q.  And he says:  "Dear all:  I had a long
279  23     telecon with Pete DiBattiste today.  He confirmed
279  24     that J&J is fully aligned with the new proposal to
279  25     study only rivaroxaban BID initially in the PE
280  1      stratum; i.e., no second randomization to initial
280  2      low-molecular-weight heparin versus rivaroxaban
280  3      BID, with sequential PLS," perfusion lung scan,
280  4      "for the first 500," question mark, "patients."
280  5           That's what he said, right?
280  6      A.  That is correct.
280  7      Q.  Okay.  If you can go down with me to the
280  8      last paragraph, he says:  "There was some
280  9      uncertainty as to whether the initial trial
280  10     regimen shall be 15 milligrams BID for two weeks
280  11     or 10 milligrams BID for three weeks."  Right?

08/08/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

280 12   A.   That is correct.
280 13   Q.   Okay. Dr. Misselwitz says: "I
280 14   explained that my preference would be to stick-
280 15   with 10-milligram BID twice daily for three weeks,
280 16   as this is better to be justified (briefing
280 17   package) based on our own data." Right?
280 18   A.   That is correct.

280:19 –   280:23 Lansing, Anthonie 2017-07-25   **0:34**
280 19   Q.   He says: "On the other hand, I would
280 20   not object choosing 15-milligram BID. I feel that
280 21   there is quite a strong rationale for three weeks
280 22   instead of two weeks." Right?
280 23   A.   That is correct.

298:8  –   298:9  Lansing, Anthonie 2017-07-26   **0:04**
298  8     (Lansing Exhibit No. 35 was marked
298  9     for identification.)

Re: [298:8-298:9] · Re: [298:8-298:9] · Pending
Def Obj See objection to Exhibit 35. · Pltf Resp See Plaintiffs' response to Defendants' objection to this exhibit.

298:16 –   298:20 Lansing, Anthonie 2017-07-26   **0:42**
298 16   Q.   Okay. And in this e-mail chain from
298 17   June of 2006, you -- you were copied on a response
298 18   by Dr. Misselwitz to a Pierre Arvis of Bayer
298 19   France; is that right?
298 20   A.   Yes, that's what I see.

300:7  –   300:9  Lansing, Anthonie 2017-07-26   **0:11**
300  7   Q.   Okay. And whenever you received and
300  8   were copied on Dr. Misselwitz's reply, you could
300  9   understand what Mr. Arvis was asking about, right?

300:12 –   300:20 Lansing, Anthonie 2017-07-26   **0:29**
300 12     THE WITNESS: I can't recall what I
300 13   thought when I received this e-mail, and I can't
300 14   remember this e-mail.
300 15   BY MR. OVERHOLTZ:
300 16   Q.   But certainly you wouldn't have had a
300 17   problem understanding what Mr. Arvis was
300 18   discussing with respect to the design of the
300 19   phase III trial. That was your responsibility,
300 20   right?

300:22 –   300:25 Lansing, Anthonie 2017-07-26   **0:08**
300 22     THE WITNESS: Phase III was indeed my
300 23   responsibility, but I do not recall this name
300 24   Mr. Pierre Arvis, and I don't know what his role
300 25   was in the study team.

301:1  –   301:5  Lansing, Anthonie 2017-07-26   **0:08**
301  1     (In English) And he was not in our
301  2   study team.
301  3     (Interpreter) He was not in our study
301  4   team, and I can't say what he was thinking when he
301  5   wrote this e-mail.

308:6  –   308:13 Lansing, Anthonie 2017-07-26   **0:27**
308  6   Q.   Okay. Let's go back to -- a minute to
308  7   the e-mail chain, and you can look with me that
308  8   Mr. Arvis tells Dr. Misselwitz: "As you can
308  9   imagine, from a marketing point of view, it's very
308 10   important that our compound is not considered less
308 11   effective than low-molecular-weight, LMW, for the
308 12   treatment of VTE."
308 13     Do you see that?

308:16 –   308:19 Lansing, Anthonie 2017-07-26   **0:12**
308 16     THE WITNESS: I can see that in this
308 17   sentence he says he didn't want rivaroxaban to be
308 18   worse off than low-molecular-weight heparin, and I
308 19   agree with him.

308:25 –   309:14 Lansing, Anthonie 2017-07-26   **2:17**
308 25   Q.   Okay. So in his reply, now in June of
309  1   2006, he says: "I completely understand your
309  2   question. We are currently in the process to
309  3   finalize our briefing package with respect to VTE
309  4   treatment for both EMEA and FDA. We also had
309  5   intensive discussions with J&J. We are
309  6   implementing some," quote, "last minute," quote,
309  7   changes into the protocol to exactly improve on
309  8   the," quote, "initial treatment part. All
309  9   patients will be treated with an initial treatment
309 10   with rivaroxaban 10-milligram BID for three weeks
309 11   followed by 20-milligram OD in the longer term."

| | Objections in | Responses in | Rulings |
|---|---|---|---|

309 12      Do you see that part?
309 13      A.   That is indeed what was said in early
309 14      June 2006 by Dr. Misselwitz.

309:21 -   310:5   Lensing, Anthonie 2017-07-26      **1:51**
309 21      Q.   Okay.  So one of the things that you've
309 22      told us is that the decision to change the final
309 23      initial intensified treatment period from 10 to 15
309 24      was made by the executive committee and the SMCC
309 25      group in, I think you said, fall of 2006, correct?
310  1      A.   This did indeed take place somewhat
310  2      later in the year.  It wasn't the fall.  It was
310  3      September, early September.  And that was at a
310  4      joint session of the executive committee with
310  5      SMCC.

310:11 -   310:12 Lensing, Anthonie 2017-07-26      **0:15**
310 11      (Lensing Exhibit Nos. 36 and 37
310 12      were marked for identification.)

Re: [310:11-310:12]
Def Obj See objections to Exhibits 36 & 37.

Re: [310:11-310:12]
Pltf Resp See Plaintiffs' response to Defendants' objection to these exhibits.

Pending

310:25 -   311:10 Lensing, Anthonie 2017-07-26      **1:35**
310 25      BY MR. OVERHOLTZ:
311  1      Q.   Okay.  So, Dr. Lensing, Exhibit 36 is an
311  2      e-mail chain that begins on June 12th, 2006, ten
311  3      days after we just looked at this response from
311  4      Dr. Misselwitz to Mr. Arvis, in which Andrea Derix
311  5      from Bayer e-mails several people, including
311  6      yourself at the bottom of the first page,
311  7      regarding the VTE treatment briefing package
311  8      protocols, final draft.
311  9      Do you see that?
311 10      A.   Yes, I can see that.

*(handwritten: Overruled — see above)*

312:11 -   312:21 Lensing, Anthonie 2017-07-26      **1:27**
312 11      So, if we look at Exhibit 36, several
312 12      other people at Bayer, including Joerg Moeller and
312 13      Frank Misselwitz as well as I think -- let's
312 14      see -- she copies Sanjay Jalota from J&J at the
312 15      top of the second page.
312 16      Do you see that?
312 17      A.   I can see that.
312 18      Q.   And did you know Mr. Jalota at J&J?
312 19      A.   At the time Mr. Jalota was responsible
312 20      for regulatory affairs with regard to the Einstein
312 21      project.

313:25 -   314:7   Lensing, Anthonie 2017-07-26      **0:54**
313 25      BY MR. OVERHOLTZ:
314  1      Q.   And Ms. Derix goes on in this e-mail to
314  2      you and others at Bayer and Mr. Jalota and says:
314  3      "The dosage regimen in the briefing package is
314  4      still unchanged - 10-milligram BID for three weeks
314  5      followed by 20 milligrams QD," once daily.
314  6      Correct?
314  7      A.   That is indeed what it says.

314:23 -   315:5   Lensing, Anthonie 2017-07-26      **0:46**
314 23      Q.   So on the same day, June 12, Mr. Jalota
314 24      responds and says:  "Dear Andrea:  Thanks for the
314 25      information.  There was a Global Advisory Council
315  1      meeting today, Sunday, 11 June, in New York, where
315  2      the dose for the intensive VTE treatment was
315  3      extensively discussed."
315  4      Do you see that?
315  5      A.   That is what it says there.

315:6  -   315:10 Lensing, Anthonie 2017-07-26      **0:32**
315  6      Q.   Now, you didn't attend that GAC meeting,
315  7      did you?
315  8      A.   I think this was a meeting organized by
315  9      Johnson & Johnson, and I do not recall being
315 10      present at that meeting.

315:11 -   316:2   Lensing, Anthonie 2017-07-26      **1:53**
315 11      Q.   The next paragraph says:  "There was a
315 12      post-GAC meeting, Joerg, Bernhard, Andreas,
315 13      Martina, Ludwig from Bayer, Gary, Bill, Lloyd and
315 14      myself from J&J, with the common consensus that
315 15      based on the feedback from the external
315 16      consultants, the dose for the intensive VTE
315 17      treatment should be changed from 10 milligrams BID
315 18      to 15 milligrams BID."
315 19      Do you see that?
315 20      A.   Yes, I can see that.

| | Objections In | Responses In | Rulings |
|---|---|---|---|

315 21   Q.   And so this indicates that in a post-GAC
315 22   meeting, Mr. Moeller and Mr. Glombitza, as well as
315 23   some people from marketing from Bayer, met with
315 24   some of the regulatory and clinicians at J&J, and
315 25   decided to change the dose for the intensified
316  1   treatment from 10 milligrams to 15 milligrams BID
316  2   in June of 2006, correct?

316:5  -  316:6   Lansing, Anthonie 2017-07-26          0:04
316  5        THE WITNESS: I find your summary highly
316  6   inadequate.

318:23 -  319:4   Lansing, Anthonie 2017-07-26          0:28
318 23   Q.   So based on this post-GAC meeting
318 24   between several people that he lists from Bayer,
318 25   as well as himself and others from J&J, he
319  1   initiates a change into the briefing document for
319  2   the regulatory authority to switch 10 milligrams
319  3   BID to 15 milligrams BID for the intensified
319  4   treatment regimen, correct?

319:7  -  319:8   Lansing, Anthonie 2017-07-26          0:03
319  7        THE WITNESS: He says he made a change
319  8   to the attached briefing document.

319:12 -  319:19   Lansing, Anthonie 2017-07-26         0:54
319 12        Mr. Jalota goes further and says: "It
319 13   was recognized that there is no data on 15
319 14   milligrams BID, only bridging data between 10
319 15   milligrams BID and 20 milligrams BID."
319 16        That's what he said to you in this
319 17   e-mail, right?
319 18   A.   That is what he says in his e-mail that
319 19   states me in cc.

320:2  -  320:8   Lansing, Anthonie 2017-07-26          0:20
320  2   Q.   And you see this -- if you look at 88
320  3   with me for just a second, you see that this is
320  4   describing the design of a phase III trial for VTE
320  5   treatment, and it still lists 10 milligrams BID
320  6   three weeks followed by 20 milligrams OD, which
320  7   had been the idea up until this point in June of
320  8   2006, right?

320:11 -  320:20 Lansing, Anthonie 2017-07-26          0:47
320 11        THE WITNESS: It's true that we read
320 12   here about 10 milligrams BID for three weeks, but
320 13   to say that this was the idea to that point in
320 14   time is not true because, as you have been able to
320 15   read, during the period of the dose-finding
320 16   studies up to the final protocols, we have gone
320 17   through a thorough process of assessing and
320 18   evaluating and hearing a great many experts in
320 19   order to come to what would be best for a
320 20   phase III trial.

321:23 -  322:10 Lansing, Anthonie 2017-07-26          1:19
321 23   Q.   Mr. Jalota next says: "It was also felt
321 24   that the intensive dose change should be made
321 25   before the briefing package was submitted to EMEA
322  1   rather than wait and make the change in the final,
322  2   final version. There was a recognition that the
322  3   submission may be delayed, but the consensus is
322  4   we need to give a definite position on the dose.
322  5   We can discuss this at the GDC tomorrow, Monday,
322  6   12 June. We also need to update the protocol
322  7   accordingly."
322  8        That's what he wrote, correct?
322  9   A.   That's exactly -- that's correct, that's
322 10   what he wrote.

324:21 -  325:9   Lansing, Anthonie 2017-07-26          1:14
324 21   BY MR. OVERHOLTZ:
324 22   Q.   Okay. So if we look at Exhibit 37,
324 23   which was the attachment to the e-mail, at the
324 24   very top is a question, "Dose selection." Do you
324 25   see that?
325  1   A.   Yes, I can see that.
325  2   Q.   Okay. And if you can see with me that
325  3   in this question, it now reflects that the initial
325  4   first three-week dose regimen would be 15
325  5   milligrams BID. Do you see that?
325  6   A.   I can see that somebody made a change
325  7   from 10 to 15. I can see that through track

08/06/17 17:59

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

325  8    changes. It seems to me that somebody made a
325  9    proposal in this case.

**325:12 – 325:13 Lensing, Anthonie 2017-07-26**
325 12    (Lensing Exhibit No. 39 was marked
325 13    for identification.)

0:18

Re: [325:12-325:13]
**Def Obj** See objection to Exhibit 39.

Re: [325:12-325:13]
Pltf Resp See Plaintiffs' response to
Defendants' objection to this exhibit.

Pending

**327:11 – 328:11 Lensing, Anthonie 2017-07-26**
327 11    BY MR. OVERHOLTZ:
327 12    Q. Okay. So in Exhibit 39, Max Wegner from
327 13    regulatory at Bayer e-mails on Monday, June 12th,
327 14    2006. He forwards the e-mail that we looked at,
327 15    Exhibit 38, from Sanjay Jalota to Joseph Scheeren,
327 16    Rene Kluensch and Andrea Derix at Bayer the e-mail
327 17    that he had received from Sanjay Jalota.
327 18    Do you see that?
327 19    A. Yes, I can see that.
327 20    Q. Okay. And so Mr. Wegner says: "Dear
327 21    Joseph: This comes quite as a surprise for us.
327 22    At Friday's finalization meeting of the briefing
327 23    package, exactly the opposite was decided. In
327 24    addition, this is lagging any justification from a
327 25    clinical perspective. Regulatory was not at the
328  1    meeting, except Sanjay, and we are not sure what
328  2    is meant by," quote, "feedback from external
328  3    experts," quote, "as neither the principal
328  4    investigator nor Ton Lensing were at the meeting."
328  5    Do you see that?
328  6    A. Yes, I can see that.
328  7    Q. He goes further and says: "Ton seems
328  8    not supportive of a dose change for the
328  9    intensified VTE treatment." Right?
328 10    A. It seems like -- it seems that I didn't
328 11    want that.

3:13

**328:12 – 328:19 Lensing, Anthonie 2017-07-26**
328 12    Q. Okay. And had you told Mr. Wegner that,
328 13    from a clinical perspective, there was no
328 14    justification of changing the intensified dose
328 15    regimen from 10 milligrams BID to 15 milligrams
328 16    BID?
328 17    A. If I read the text correctly, you can
328 18    find out for yourself that I didn't say that, but
328 19    that's what he thinks himself.

0:52

**328:20 – 328:22 Lensing, Anthonie 2017-07-26**
328 20    Q. And that makes sense because of the flat
328 21    efficacy dose curve that was seen in the phase II
328 22    dose-finding studies, right?

0:24

Re: [328:20-328:22]
**Def Obj** Plaintiff's counsel lodged
multiple objections regarding purportedly
"duplicative" testimony; yet here they
designate a question that was rephrased
in the very next designation. The witness
did not understand the question; this
testimony has no relevance.

Re: [328:20-328:22]
Pltf Resp This counter-counter is offered
simply as clarification to the Defendants'
counter and provides further context to
the question asked at 329: 3-7. Plaintiffs'
would withdraw this counter-counter if
that question and answer were removed.

Pending

**328:24 – 329:2 Lensing, Anthonie 2017-07-26**
328 24    THE WITNESS: And you mean -- you say
328 25    "that makes sense." What do you mean by "that"?
329  1    BY MR. OVERHOLTZ:
329  2    Q. I'll rephrase.

0:10

Re: [328:24-329:2]
**Def Obj** Plaintiff's counsel lodged
multiple objections regarding purportedly
"duplicative" testimony; yet here they
designate a question that was rephrased
in the very next designation. The witness
did not understand the question; this
testimony has no relevance.

Re: [328:24-329:2]
Pltf Resp This counter-counter is offered
simply as clarification to the Defendants'
counter and provides further context to
the question asked at 329: 3-7. Plaintiffs'
would withdraw this counter-counter if
that question and answer were removed.

Pending

**329:3 – 329:7 Lensing, Anthonie 2017-07-26**
329  3    There wouldn't be a justification from a
329  4    clinical perspective to increase the pretreatment
329  5    dose from 10 milligrams BID to 15 BID because what
329  6    was seen in all of the phase II dose studies was a
329  7    flat efficacy dose curve, correct?

0:17

**329:9 – 329:17 Lensing, Anthonie 2017-07-26**
329  9    THE WITNESS: Obviously the choice of
329 10    the dose was highly impacted by the findings of
329 11    the dose-finding studies, but it would be an
329 12    enormous mistake to limit yourself only to
329 13    dose-finding results because over the past 30 to
329 14    40 years, we have done extensive studies into DVT

1:02

| | Objections In | Responses In | Rulings |
|---|---|---|---|

329 15    and we've learned a lot, and we should obviously
329 16    also involve that knowledge.
329 17    BY MR. OVERHOLTZ:

329:17 -  329:20 Lensing, Anthonie 2017-07-26    0:20
329 17    BY MR. OVERHOLTZ:
329 18    Q.  This is a chart you're familiar with.
329 19    A.  Yes, I recognize.
329 20    Q.  That's the flat dose curve, right?

329:22 -  329:23 Lensing, Anthonie 2017-07-26    0:07
329 22    THE WITNESS:  It is the flat dose curve
329 23    of the ODIXa-DVT study and --

330:7 -  330:9 Lensing, Anthonie 2017-07-26    1:28
330 7    Q.  So, first, for the record, I'm going to
330 8    mark the ODIXa-DVT 1123 dose efficacy curve chart
330 9    that I showed as Exhibit 40.

330:10 -  330:11 Lensing, Anthonie 2017-07-26    0:09
330 10    (Lensing Exhibit No. 40 was marked
330 11    for identification.)

Re: [330:10-330:11]
Def Obj See objection to Exhibit 40

Re: [330:10-330:11]
Pltf Resp See Plaintiffs' response to
Defendants' objection to this exhibit.

Pending

330:19 -  331:7 Lensing, Anthonie 2017-07-26    1:48
330 19    look at Exhibit 19, which was the e-mail that we
330 20    talked about from Frank Misselwitz to yourself on
330 21    June 21st of 2006.
330 22    And do you recall this is the e-mail in
330 23    which he said:  "Congratulations for fighting
330 24    through all the difficult decisions around the VTE
330 25    treatment package submission."
331 1    Do you see that?
331 2    A.  Yes, I see that.
331 3    Q.  Okay.  He goes on and says:  "In
331 4    general, I can live with the decision to now take
331 5    15-milligram BID for the initial treatment."
331 6    Do you see where he says that to you?
331 7    A.  I can see that.

332:6 -  332:19 Lensing, Anthonie 2017-07-26    1:24
332 6    Q.  Okay.  He goes on and says:  "The reason
332 7    why I am writing you, we had planned for two
332 8    expert meetings before, during, after the ESC WCC
332 9    in Barcelona from September 1st through the 6th:
332 10    One for SPAF to be organized in close contact with
332 11    J&J, and, importantly, another one on VTE
332 12    treatment."
332 13    Do you see that?
332 14    A.  Yes, I see that.
332 15    Q.  Okay.  So this would indicate that the
332 16    decision to move from 10 milligrams BID to 15
332 17    milligrams BID was made well in advance of the
332 18    Barcelona meeting of the executive committee in
332 19    September of 2006, correct?

332:22 -  332:22 Lensing, Anthonie 2017-07-26    0:04
332 22    THE WITNESS:  No, that is not correct.

333:11 -  333:21 Lensing, Anthonie 2017-07-26    0:54
333 11    Q.  Okay.  Now, you respond to
333 12    Dr. Misselwitz on June 22nd, 2006, above.  Do you
333 13    see that?
333 14    A.  Yes, I see that.
333 15    Q.  And can you read for us what you told
333 16    Dr. Misselwitz.
333 17    A.  (In English) "Dear Frank:  I agree that
333 18    Barcelona will be a nice opportunity for an
333 19    Einstein meeting.  I will discuss this Friday with
333 20    Harry when we have our Einstein meeting.  Best
333 21    regards."

334:11 -  334:13 Lensing, Anthonie 2017-07-26    0:02
334 11    (Lensing Exhibit Nos. 41 through
334 12    43 were marked for
334 13    identification.)

Re: [334:11-334:13]
Def Obj See objections to Exhibits 41-42.

Re: [334:11-334:13]
Pltf Resp See Plaintiffs' response to
Defendants' objection to these exhibits.

Pending

334:19 -  335:11 Lensing, Anthonie 2017-07-26    1:33
334 19    Q.  Okay.  So, Dr. Lensing, if we can
334 20    look at Exhibit 41, this is an e-mail from Petro
334 21    van Bergen with ICTOM to multiple people,
334 22    including yourself, about halfway down the page,
334 23    again to your AWALensing@planet.nl e-mail, on
334 24    September 12th, 2006.  The subject "Barcelona
334 25    Meeting, September 2nd, 2006."

*(handwritten: Overruled 40 60 a)*

| | Objections In | Responses In | Rulings |
|---|---|---|---|

335  1             Do you see that?
335  2      A.  Yes, I can see that.
335  3      Q.  And who was ICTOM with respect to
335  4   Einstein?
335  5      A.  (In English) ICTOM was the academic
335  6   research organization that was involved with
335  7   organizing the Einstein study.
335  8      Q.  Right. And in this e-mail, it says:
335  9   "Dear Colleagues: Please find herewith attached
335 10   the minutes of the Barcelona meeting,
335 11   September 2nd, 2006."

335:22 –  336:1  Lensing, Anthonie 2017-07-26         0:25
335 22      Q.  And if you can look with me on the next
335 23   page, there's a listing of the participants, and
335 24   you're listed as being present at this Barcelona
335 25   meeting, correct?
336  1      A.  That is correct.

338:5 –  338:10  Lensing, Anthonie 2017-07-26         0:17
338  5   BY MR. OVERHOLTZ:
338  6      Q.  Okay. And so reading verbatim: "The
338  7   Division stated that, on a decreasing scale, they
338  8   believe the most convincing efficacy data would
338  9   result from a double-blind study; two studies
338 10   open-label; one study open-label," correct?

338:12 –  339:1  Lensing, Anthonie 2017-07-26         1:32
338 12         THE WITNESS: That is correct.
338 13   BY MR. OVERHOLTZ:
338 14      Q.  The next bullet point says: "Dose
338 15   selection," right?
338 16      A.  That is right.
338 17      Q.  "OD or BID: The Division recommended
338 18   using the lowest dose, 10 milligrams BID, in the
338 19   clinical studies. The presence of cardio-renal
338 20   personnel (AFib) will impact further discussion of
338 21   dose regarding VTE treatment studies. The
338 22   Division also suggested that Bayer consider using
338 23   10 milligrams OD as is currently used in the
338 24   VTE -- VTE prevention program."
338 25         Do you see that?
339  1      A.  I can see that.

339:21 –  339:23  Lensing, Anthonie 2017-07-26         0:23
339 21      Q.  You were aware that the FDA had concerns
339 22   about the design of the Einstein phase III trial
339 23   program, right?

340:3 –  340:6  Lensing, Anthonie 2017-07-26          0:14
340  3         THE WITNESS: (Same interpreter) The
340  4   FDA proposed to take a different approach to a
340  5   number of things, but when you use the word
340  6   "concern," that is your interpretation.

342:20 –  343:2  Lensing, Anthonie 2017-07-26         0:35
342 20      Q.  So now let's take a look at the -- I
342 21   think it's Exhibit 42, which were the meeting
342 22   minutes from the Barcelona meeting that were
342 23   attached.
342 24         And do you see that you're listed as
342 25   being present at the meeting at the bottom of the
343  1   present list?
343  2      A.  Yes, I see that, and I do remember.

343:9 –  343:16  Lensing, Anthonie 2017-07-26         0:49
343  9   BY MR. OVERHOLTZ:
343 10      Q.  Rephrase. There's no one on the SMCC or
343 11   the executive committee from the United States
343 12   that attended this meeting, correct?
343 13      A.  Yes, that's correct. For the
343 14   representatives of the United States, Doctor -- or
343 15   Professors Davidson and Raskob are stated as
343 16   apologized for this meeting.

344:2 –  344:6  Lensing, Anthonie 2017-07-26          0:18
344  2   BY MR. OVERHOLTZ:
344  3      Q.  Okay. Now, there were representatives
344  4   from Bayer and Janssen, Johnson & Johnson at the
344  5   meeting, correct?
344  6      A.  Yes, that's correct.

344:14 –  344:22  Lensing, Anthonie 2017-07-26        1:26
344 14      Q.  Okay. And Martina Evertz, she was

37

| | Objections In | Responses In | Rulings |
|---|---|---|---|

344 15    marketing, correct?
344 16    A.  I believe she was marketing, yes.
344 17    Q.  Okay.  Now, if you can look with me at
344 18    these meeting minutes of the Barcelona meeting.
344 19    Do you see any mention or discussion of changing
344 20    the dose from 10 milligrams to 15 milligrams for
344 21    the initial intensified treatment period?
344 22    A.  At first glance, I see no such thing.

347:21 -  347:22 Lensing, Anthonie 2017-07-26   0:07
347 21    [Lensing Exhibit Nos. 44 and 45
347 22    were marked for identification.]

Re: [347:21-347:22]
Def Obj See objection to Exhibit 44.

Re: [347:21-347:22]
Pltf Resp See Plaintiffs' response to
Defendants' objection to this exhibit.

Pending

350:2 -  350:11 Lensing, Anthonie 2017-07-26   1:18
350  2    Q.  Okay.  So you see that Exhibit 44 is an
350  3    e-mail from Bernhard Giombitza to Andrea Derix,
350  4    Frank Misselwitz and Joerg Moeller regarding the
350  5    GAC meeting minutes dose adaptation in SPAF.  Do
350  6    you see that?
350  7    A.  Yes, I see that.
350  8    Q.  Okay.  And you recall that before we
350  9    were looking at the e-mail from Mr. Jalota in
350 10    Exhibit 36, which was -- go ahead.
350 11    A.  Yes, I remember.

350:12 -  350:16 Lensing, Anthonie 2017-07-26   0:26
350 12    Q.  Okay.  And this was the meeting where
350 13    Mr. Jalota e-mailed, and you were copied, and said
350 14    that there had been a Global Advisory committee
350 15    meeting in New York on the 11th of June, right?
350 16    A.  That's correct.

350:17 -  350:21 Lensing, Anthonie 2017-07-26   0:30
350 17    Q.  And then he described that there was a
350 18    post-GAC meeting with Joerg, Barnhard, Andreas,
350 19    Martina, Ludwig from Bayer, Gary, Bill, Lloyd and
350 20    Mr. Jalota from J&J.
350 21    A.  Yes, that's what it says.

351:4 -  351:7 Lensing, Anthonie 2017-07-26   0:28
351  4    Q.  Okay.  So if you can look with me now at
351  5    Exhibit 45, which was the attachment to the
351  6    Giombitza e-mail for the GAC meeting minutes.
351  7    A.  Mm-hmm.

351:13 -  351:16 Lensing, Anthonie 2017-07-26   0:20
351 13    Q.  Okay.  And then if you can look with me
351 14    on page 4, there's a list of participants from --
351 15    from Bayer.  Do you see those?
351 16    A.  Yes, I see that.

351:24 -  352:5 Lensing, Anthonie 2017-07-26   0:49
351 24    Q.  All right.  And -- and we know from our
351 25    discussions that Andreas Nauck was in marketing,
352  1    right?
352  2    A.  Yes, that's correct.
352  3    Q.  Okay.  And we know that Martina Evertz
352  4    was from marketing, right?
352  5    A.  That's correct.

353:2 -  353:10 Lensing, Anthonie 2017-07-26   1:07
353  2    Q.  Okay.  It says: "The competitive
353  3    marketplace, including the clinical activities and
353  4    likely target indications of the major
353  5    competitors, particularly dabigatran, apixaban,
353  6    and edipacril, were presented by Andreas Nauck in
353  7    order to put the CDP," the clinical development
353  8    plan, "for rivaroxaban into context of the likely
353  9    launch marketplaces."
353 10    Do you see that?

353:13 -  353:13 Lensing, Anthonie 2017-07-26   0:02
353 13    THE WITNESS:  I see it says that, yes.

357:4 -  357:4 Lensing, Anthonie 2017-07-26   0:01
357  4    BY MR. OVERHOLTZ:

357:19 -  357:21 Lensing, Anthonie 2017-07-26   0:18
357 19    Q.  In the final phase III Einstein for the
357 20    initial treatment phase, there was only one
357 21    Xarelto dose studied, correct?

Re: [357:19-357:21]
Pltf Obj The design of the EINSTEIN Phase
III study is repeatedly unnecessarily and

Re: [357:19-357:21]
Def Resp It is an oversimplification to say
that the very complex design of EINSTEIN

Pending



| | Objections In | Responses In | Rulings |
|---|---|---|---|

was covered as an initial matter at 58:11-17. This counter only serves as filler to drown out the substance of Dr. Lensing's testimony on matters central to this case. . Not to mention, this line of questioning was highly objected-to by defense counsel throughout.

was "covered" previously. If it was covered in such sufficient detail, and was not necessary to revisit, then why did Plaintiff's counsel revisit it during the deposition? The testimony differs and will help the jury better understand the trial and evaluate Plaintiff's claims of flaws with its design and execution. Defendants are entitled to defend their case.



**357:23 - 358:2** Lensing, Anthonie 2017-07-26

357 23   THE WITNESS: We studied one rivaroxaban
357 24   regimen with various doses in the first three
357 25   weeks, we studied 15 milligrams twice daily for
358 1    the first three weeks, and 20 milligrams once
358 2    daily for the remaining period.

0:14

Re: [357:23-358:2]
Ptf Obj The design of the EINSTEIN Phase III study is repeatedly unnecessarily and was covered as an initial matter at 58:11-17. This counter only serves as filler to drown out the substance of Dr. Lensing's testimony on matters central to this case. Not to mention, this line of questioning was highly objected-to by defense counsel throughout.

Re: [357:23-358:2]
Def Resp It is an oversimplification to say that the very complex design of EINSTEIN was "covered" previously. If it was covered in such sufficient detail, and was not necessary to revisit, then why did Plaintiff's counsel revisit it during the deposition? The testimony differs and will help the jury better understand the trial and evaluate Plaintiff's claims of flaws with its design and execution. Defendants are entitled to defend their case.

Pending

**358:16 - 358:19** Lensing, Anthonie 2017-07-26

358 16   Q.   You had no way to know whether a lower
358 17   BID dose during the phase III initial treatment
358 18   period would have been just as efficacious but
358 19   safer, right?

1:12

Re: [358:16-358:19]
Ptf Obj The design of the EINSTEIN Phase III study is repeatedly unnecessarily and was covered as an initial matter at 58:11-17. This counter only serves as filler to drown out the substance of Dr. Lensing's testimony on matters central to this case. Not to mention, this line of questioning was highly objected-to by defense counsel throughout.

Re: [358:16-358:19]
Def Resp It is an oversimplification to say that the very complex design of EINSTEIN was "covered" previously. If it was covered in such sufficient detail, and was not necessary to revisit, then why did Plaintiff's counsel revisit it during the deposition? The testimony differs and will help the jury better understand the trial and evaluate Plaintiff's claims of flaws with its design and execution. Defendants are entitled to defend their case.

Pending

**358:21 - 359:11** Lensing, Anthonie 2017-07-26

358 21   THE WITNESS: I'm so very glad that you

0:59

Re: [358:21-359:11]

Re: [358:21-359:11]

Pending

08/06/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

358 22 raised this item because that was exactly the
358 23 biggest problem we faced when we were selecting
358 24 the regimen for rivaroxaban. Because only
358 25 recently data has become available on idraparinux,
359 1 which is a Xa inhibitor, and these data had just
359 2 become available from the van Gogh PE study. And
359 3 based on the dosage-finding study, the patients
359 4 showed a flat response because the dosage had been
359 5 too low in the first weeks, so within two to three
359 6 weeks, a number of patients developed a pulmonary
359 7 emboli which was fatal.
359 8    So that was not just noninferior to the
359 9 standard of care, but it was even inferior to the
359 10 standard of care. So it was very traumatic and it
359 11 was very important at that time.

**Pltf Obj** Non-responsive - witness goes well beyond the question asked and delves into a non-Xarelto study . The design of the EINSTEIN Phase III study is repeatedly unnecessarily and was covered as an initial matter at 58:11-17. Counter does not draw on existing questioning and incorporates a non-responsive answer which is entirely self-serving.  Not to mention, this line of questioning was highly objected-to by defense counsel throughout.

**Def Resp** The witness adds appropriate context to counsel's question.

*Overruled 106 401* (handwritten)

---

359:16 - 359:18 Lensing, Anthonie 2017-07-26    0:16
359 16 Q.  You never studied a lower dose for the
359 17 initial treatment period in the Xarelto phase III
359 18 studies, correct?

**Re: [359:16-359:18]**
**Pltf Obj** The design of the EINSTEIN Phase III study is repeatedly unnecessarily and was covered as an initial matter at 58:11-17. This counter only serves as filler to drown out the substance of Dr. Lensing's testimony on matters central to this case. Not to mention, this line of questioning was highly objected-to by defense counsel throughout.

**Re: [359:16-359:18]**
**Def Resp** It is an oversimplification to say that the very complex design of EINSTEIN was "covered" previously. If it was covered in such sufficient detail, and was not necessary to revisit, then why did Plaintiff's counsel revisit it during the deposition? The testimony differs and will help the jury better understand the trial and evaluate Plaintiff's claims of flaws with its design and execution. Defendants are entitled to defend their case.

Pending

---

359:20 - 359:24 Lensing, Anthonie 2017-07-26    0:13
359 20 THE WITNESS: Indeed, no, because we
359 21 thought it would be very irresponsible, and now on
359 22 the basis of the results that we have now, we deem
359 23 it totally unnecessary to do.
359 24 BY MR. OVERHOLTZ:

**Re: [359:20-359:24]**
**Pltf Obj** The design of the EINSTEIN Phase III study is repeatedly unnecessarily and was covered as an initial matter at 58:11-17. Counter does not draw on existing questioning and incorporates a non-responsive answer which is entirely self-serving.  Not to mention, this line of questioning was highly objected-to by defense counsel throughout.

**Re: [359:20-359:24]**
**Def Resp** It is an oversimplification to say that the very complex design of EINSTEIN was "covered" previously. If it was covered in such sufficient detail, and was not necessary to revisit, then why did Plaintiff's counsel revisit it during the deposition? The testimony differs and will help the jury better understand the trial and evaluate Plaintiff's claims of flaws with its design and execution. Defendants are entitled to defend their case.

Pending

---

359:25 - 360:3 Lensing, Anthonie 2017-07-26    0:11

08/06/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

| 359 25 | Q.   Just days before you're going to present | **Re: [359:25-360:3]** | **Re: [359:25-360:3]** | Pending |
| 360 1 | the study to the FDA, you and Dr. Misselwitz were | **Pltf Obj** The design of the EINSTEIN Phase | **Def Resp** It is an oversimplification to say | |
| 360 2 | favoring a 10-milligram dose to be the dose | III study is repeatedly unnecessarily and | that the very complex design of EINSTEIN | |
| 360 3 | studied, right? | was covered as an initial matter at 58:11- | was "covered" previously. If it was | |
| | | 17. This counter only serves as filler to | covered in such sufficient detail, and was | |
| | | drown out the substance of Dr. Lensing's | not necessary to revisit, then why did | |
| | | testimony on matters central to this case. | Plaintiff's counsel revisit it during the | |
| | | Not to mention, this line of questioning | deposition? The testimony differs and | |
| | | was highly objected-to by defense | will help the jury better understand the | |
| | | counsel throughout. | trial and evaluate Plaintiff's claims of | |
| | | | flaws with its design and execution. | |
| | | | Defendants are entitled to defend their | |
| | | | case. | |

| 360:5 - | 360:13 Lensing, Anthonie 2017-07-26 | | | |
| 360 5 | THE WITNESS: Before the final protocol | 0:34 | | |
| 360 6 | was determined, we had extensive thinking | **Re: [360:5-360:13]** | **Re: [360:5-360:13]** | Pending |
| 360 7 | exercises, and reconsidered all | **Pltf Obj** The design of the EINSTEIN Phase | **Def Resp** It is an oversimplification to say | |
| 360 8 | arguments, and looked at all different scenarios. | III study is repeatedly unnecessarily and | that the very complex design of EINSTEIN | |
| 360 9 | And the choice we made eventually was for the most | was covered as an initial matter at 58:11- | was "covered" previously. If it was | |
| 360 10 | efficacious and safe version; namely, 15 | 17. This counter only serves as filler to | covered in such sufficient detail, and was | |
| 360 11 | milligrams BID for three weeks followed by 20 | drown out the substance of Dr. Lensing's | not necessary to revisit, then why did | |
| 360 12 | milligrams OD. And looking back, we were proven | testimony on matters central to this case. | Plaintiff's counsel revisit it during the | |
| 360 13 | to have made the right choice. | Not to mention, this line of questioning | deposition? The testimony differs and | |
| | | was highly objected-to by defense | will help the jury better understand the | |
| | | counsel throughout. | trial and evaluate Plaintiff's claims of | |
| | | | flaws with its design and execution. | |
| | | | Defendants are entitled to defend their | |
| | | | case. | |

| 362:1 - | 362:5 Lensing, Anthonie 2017-07-26 | | | |
| 362 1 | Q.   The truth is you agree there's no | 0:16 | | |
| 362 2 | evidence from any of Bayer's studies that 15 | **Re: [362:1-362:5]** | **Re: [362:1-362:5]** | Pending |
| 362 3 | milligrams BID Xarelto would have been better than | **Pltf Obj** This counter is several tight | **Def Resp** It is an oversimplication to call | |
| 362 4 | 10 milligrams BID for the intensive treatment | variations of the same question (asked at | this swath of testimony "variations of the | |
| 362 5 | period. | 357: 19-21, 358: 16-19, 359: 16-18, | same question." There are significant | |
| | | 359:25-360:3, 362: 1-5, and 363:21-25) | differences between the respective | |

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| | pertaining to Bayer's decision to study a single dose during the EINSTEIN Phase III study, covering no new ground and serving merely as filler to drown out the substance of Dr. Lensing's testimony on matters central to this case. | questions and answers. While there is overlap in the general topic, counsel for Plaintiff repeatedly put this at issue during the deposition. It is not fair to allow Plaintiff to simply designate the answer they like best. Defendants are entitled to defend their case and offer variants where the witness adds additional helpful context. That is the risk Plaintiff's counsel runs by repeatedly asking the same questions. | |

**362:7 – 362:19 Lensing, Anthonie 2017-07-26**

| | 0:44 | | Pending |
|---|---|---|---|

362 7     THE WITNESS: There is indirect evidence
362 8     here that it is so, but you removed that part from
362 9     my answer a minute ago.
362 10        We have experience with Xa inhibitors
362 11     that show that it is possible to have a dose at
362 12     the outset which is rather low but in the long
362 13     term proves to be efficacious. And we've
362 14     published -- we have information published in the
362 15     New England Journal of Medicine, the van Gogh
362 16     study. I would advise you to read this because
362 17     then you would understand the dilemma that we were
362 18     faced with back when we had to make the choice for
362 19     the Einstein project.

**Re: [362:7-362:19]**
Pltf Obj This counter is several tight variations of the same question (asked at 357: 19-21, 358: 16-19, 359: 16-18, 359:25-360:3, 362: 1-5, and 363:21-25) pertaining to Bayer's decision to study a single dose during the EINSTEIN Phase III study, covering no new ground and serving merely as filler to drown out the substance of Dr. Lensing's testimony on matters central to this case.

**Re: [362:7-362:19]**
Def Resp It is an oversimplication to call this swath of testimony "variations of the same question." There are significant differences between the respective questions and answers. While there is overlap in the general topic, counsel for Plaintiff repeatedly put this at issue during the deposition. It is not fair to allow Plaintiff to simply designate the answer they like best. Defendants are entitled to defend their case and offer variants where the witness adds additional helpful context. That is the risk Plaintiff's counsel runs by repeatedly asking the same questions.

**362:21 – 363:3 Lensing, Anthonie 2017-07-26**

| | 1:18 | | Pending |
|---|---|---|---|

362 21     Q. Van Gogh wasn't a Xarelto study, right?
362 22     A. But there was also a Xa inhibitor just
362 23     like Xarelto, and it was also in patients with DVT
362 24     and PE, and unfortunately, we lost many patients
362 25     that died because there was another dose that was
363 1     used plus a Xa inhibitor at the start. And I can
363 2     assure you, if you have that happen to you once in
363 3     your life, you never want it to happen again.

**363:4 – 363:20 Lensing, Anthonie 2017-07-26**

363 4     Q. Of course, you have to have a balance
363 5     between efficacy and safety for an anticoagulant,
363 6     right?
363 7     A. Well, balance, what is balance? That's
363 8     a very vague term. What does it mean precisely?
363 9        In thrombotic and PE patients, there is
363 10     one huge risk, and that is the risk of recurrence.
363 11     There's 10 to 15 percent that has recurrence if
363 12     they're not treated properly. 10 percent --
363 13     10 percent of those end in fatality. That is a
363 14     huge problem. Add to that the risk of bleeding,
363 15     it's 1 in 10 vis-`-vis the risk of recurrence. So
363 16     that would be a balance that would be
363 17     unacceptable. Therefore, you have to look for a
363 18     dose that will make sure that this 10 to 15
363 19     percent recurrence goes down to a level where the
363 20     bleeding does not increase.

**Re: [362:21-363:3]**
Pltf Obj This counter is several tight variations of the same question (asked at 357: 19-21, 358: 16-19, 359: 16-18, 359:25-360:3, 362: 1-5, and 363:21-25) pertaining to Bayer's decision to study a single dose during the EINSTEIN Phase III study, covering no new ground and serving merely as filler to drown out the substance of Dr. Lensing's testimony on matters central to this case.

2:15

**Re: [362:21-363:3]**
Def Resp It is an oversimplication to call this swath of testimony "variations of the same question." There are significant differences between the respective questions and answers. While there is overlap in the general topic, counsel for Plaintiff repeatedly put this at issue during the deposition. It is not fair to allow Plaintiff to simply designate the answer they like best. Defendants are entitled to defend their case and offer variants where the witness adds additional helpful context. That is the risk Plaintiff's counsel runs by repeatedly asking the same questions.

Pending

| | Objections In | Responses In | Rulings |
|---|---|---|---|

363:21 - 363:25 Lensing, Anthonie 2017-07-26

0:16

363 21    Q. But if there's no evidence that you have
363 22    that increasing the dose makes the drug work any
363 23    better or help patients more, and all you've done
363 24    is increase the risk of bleeding, you haven't
363 25    helped patients at all, have you?

**Re: [363:21-363:25]**
Pltf Obj This counter is several tight variations of the same question (asked at 357: 19-21, 358: 16-19, 359: 16-18, 359:25-360:3, 362: 1-5, and 363:21-25) pertaining to Bayer's decision to study a single dose during the EINSTEIN Phase III study, covering no new ground and serving merely as filler to drown out the substance of Dr. Lensing's testimony on matters central to this case.

**Re: [363:21-363:25]**
Def Resp It is an oversimplification to call this swath of testimony "variations of the same question." There are significant differences between the respective questions and answers. While there is overlap in the general topic, counsel for Plaintiff repeatedly put this at issue during the deposition. It is not fair to allow Plaintiff to simply designate the answer they like best. Defendants are entitled to defend their case and offer variants where the witness adds additional helpful context. That is the risk Plaintiff's counsel runs by repeatedly asking the same questions.

Pending

364:3 - 364:16 Lensing, Anthonie 2017-07-26

2:12

364 3    THE WITNESS: The Einstein-DVT and PE
364 4    study show that with rivaroxaban used in
364 5    thrombotic patients, there was a 2.1 percent over
364 6    a period of ten months recurrence, and that's the
364 7    lowest recurrence ever recorded in a clinical
364 8    study that was worldwide.
364 9    Add to that that the Einstein-DVT and PE
364 10    study with regard to major bleeding rate recorded
364 11    a percentage of 1.0 over a period for ten months,
364 12    which is also one of the lowest rates ever
364 13    recorded. Therefore, the choice that we made for
364 14    this regimen is really very good, and it combines
364 15    preventing fatal PE for the patients involved
364 16    whilst keeping the bleeds at a minimum.

**Re: [364:3-364:16]**
Pltf Obj This counter is several tight variations of the same question (asked at 357: 19-21, 358: 16-19, 359: 16-18, 359:25-360:3, 362: 1-5, and 363:21-25) pertaining to Bayer's decision to study a single dose during the EINSTEIN Phase III study, covering no new ground and serving merely as filler to drown out the substance of Dr. Lensing's testimony on matters central to this case.

**Re: [364:3-364:16]**
Def Resp It is an oversimplification to call this swath of testimony "variations of the same question." There are significant differences between the respective questions and answers. While there is overlap in the general topic, counsel for Plaintiff repeatedly put this at issue during the deposition. It is not fair to allow Plaintiff to simply designate the answer they like best. Defendants are entitled to defend their case and offer variants where the witness adds additional helpful context. That is the risk Plaintiff's counsel runs by repeatedly asking the same questions.

Pending

365:23 - 366:2 Lensing, Anthonie 2017-07-26

0:44

365 23    Q. Okay. Dr. Lensing, Exhibit 46 is the
365 24    FDA fax of August 14th, 2006, to Bayer regarding
365 25    the end of phase II meeting that was upcoming. Do
366 1    you see that?
366 2    A. Yes, I can see that.

366:25 - 367:17 Lensing, Anthonie 2017-07-26

2:11

366 25    Q. Okay. So under item number 1, "Dose
367 1    Selection, Dose Regimen," it describes what had
367 2    been proposed by Bayer for the phase III program
367 3    of a 15-milligram twice-daily dose for the initial
367 4    three-week treatment period followed by 20
367 5    milligrams once daily Xarelto, right?
367 6    A. That's right.
367 7    Q. And so the question asked by Bayer was:
367 8    "Does the Agency concur with the above-mentioned
367 9    dosing strategy and regimen in the phase III
367 10    study?" Followed by the FDA response, right?
367 11    A. That's right.
367 12    Q. The FDA says: "No, we do not concur.
367 13    Instead of your current dose plans, we recommend
367 14    that you propose a dose of 10 milligrams BID for
367 15    your phase III studies based on the following,"
367 16    followed by three bullet points, correct?
367 17    A. That's correct.

367:22 - 368:10 Lensing, Anthonie 2017-07-26

1:21

367 22    Q. Okay. They say: "Similar pilot
367 23    efficacy yet more bleeding events in the higher
367 24    dose experience, 20-milligram and 30-milligram
367 25    BID." Right?
368 1    A. That's right.
368 2    Q. And that would have been referring to
368 3    the data from the ODIXa-DVT dose-finding study,

| | Objections In | Responses In | Rulings |
|---|---|---|---|

368  4        right?
368  5        A.   It refers to that study, that's correct.
368  6        Q.   That's the study we looked at, the chart
368  7        that had the flat dose efficacy curve.
368  8        A.   Both dose-finding studies had a flat
368  9        dosage curve including -- dose response curve
368 10        including the one that you are referring to.

372:7  -  372:17 Lensing, Anthonie 2017-07-26          1:18
372  7        BY MR. OVERHOLTZ:
372  8        Q.   If you can look with me at the top of --
372  9        I guess it's page 3 of the fax. It's page 2
372 10        listed on the top left.
372 11             "Does the Agency agree that a choice of
372 12        heparin limited to only one type of heparin per
372 13        center and a choice of VKA limited to warfarin or
372 14        acenocoumarol is acceptable?"
372 15             That would have been Bayer's question to
372 16        the FDA.
372 17        A.   That's correct.

374:18 -  375:6  Lensing, Anthonie 2017-07-26          1:19
374 18        Q.   Okay. The next bullet point says: "You
374 19        proposed a single noninferiority trial for acute
374 20        treatment of VTE. Two adequate and well-
374 21        controlled studies are generally needed to support
374 22        a new indication. There is a risk in performing a
374 23        single trial that may not have convincingly
374 24        positive results to support the proposed
374 25        indication."
375  1             Do you see that?
375  2        A.   Yes, I see that.
375  3        Q.   Okay. And they say: "In addition, a
375  4        noninferiority trial is less likely to be
375  5        persuasive." Right?
375  6        A.   That is what it says.

378:5  -  378:24 Lensing, Anthonie 2017-07-26          1:57
378  5        BY MR. OVERHOLTZ:
378  6        Q.   Let's look at page 3, point number 4,
378  7        which is the primary efficacy endpoint section,
378  8        and you see that there is a question proposed by
378  9        Bayer regarding whether the composite primary
378 10        efficacy endpoint, recurrent symptomatic VTE
378 11        including fatal PE and unexplained death, would be
378 12        sufficient to support the approval of rivaroxaban
378 13        in the desired indication.
378 14             Do you see that?
378 15        A.   Yes, I see that.
378 16        Q.   And there's an FDA response, and it
378 17        says: "No. We reiterate the design limitations
378 18        associated with study 11702: Open-label, multiple
378 19        comparator agents, noninferiority design. We are
378 20        especially concerned regarding the subjectivity
378 21        associated with unexplained death and symptomatic
378 22        VTE in an open-label study."
378 23             Do you see that?
378 24        A.   Yes, I see that.

379:8  -  379:17 Lensing, Anthonie 2017-07-26          1:22
379  8        Q.   The FDA says: "We request that you
379  9        redesign the analytical aspects of this study to
379 10        use a superiority approach on a primary endpoint
379 11        that includes a composite of symptomatic VTE or
379 12        death for any cause. Given an open-label design
379 13        and your proposal for a single confirmatory study,
379 14        we have substantial concerns that a noninferiority
379 15        analytical approach to the primary endpoint would
379 16        result in non-persuasive results." Right?
379 17        A.   It is what it says, yes.

379:18 -  379:25 Lensing, Anthonie 2017-07-26          0:39
379 18        Q.   Okay. The next section is for primary
379 19        safety endpoint, and Bayer asks the FDA if they
379 20        concurred with the definitions of "major bleeding"
379 21        and "clinically relevant non-major bleeding."
379 22        Right?
379 23        A.   Yes, that's correct.
379 24        Q.   And the FDA said that those definitions
379 25        were acceptable.

380:16 -  381:9  Lensing, Anthonie 2017-07-26          1:57
380 16        Q.   The FDA says: "We do not regard this
380 17        study design as sufficient to support a claim of

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

380 18   superior safety, predominantly due to the use of
380 19   multiple comparator agents in the control arm as
380 20   well as the analytic approach."
380 21       Do you see that?
380 22   A.  Yes, I see that.
380 23   Q.  If you look with me at the third bullet
380 24   point, the FDA states that: "The comparator
380 25   agents may differ in safety outcomes that fail to
381  1   be detected due to sample size considerations
381  2   under powering. Additionally, the open-label
381  3   nature of the study is conducive to undetectable
381  4   bias in patient management that may impact safety
381  5   outcomes."
381  6       That's what the FDA said to Bayer in
381  7   August of 2006, correct?
381  8   A.  That's correct.
381  9   Q.  Okay. If we can turn over to --

386:21 -  387:14 Lensing, Anthonie 2017-07-26          1:55
386 21   BY MR. OVERHOLTZ:
386 22   Q.  So if you can look with me, Dr. Lensing,
386 23   at Exhibit 50, you see that this is the fax from
386 24   the FDA of September 5th, 2006, to Larry Winick,
386 25   which is the minutes of the August 23rd, 2006
387  1   meeting.
387  2       Do you see that?
387  3   A.  Yes, I see that.
387  4   Q.  Okay. And so if we can turn over and
387  5   look at page 3, the Memorandum of Meeting Minutes.
387  6   You see it's dated August 23rd, 2006, and it lists
387  7   who the attendees were from the FDA, and then it
387  8   lists at the bottom external constituent
387  9   attendees, and Bayer is listed first.
387 10       Do you see that?
387 11   A.  I see that.
387 12   Q.  Okay. And we can see that you were an
387 13   attendee at the meeting, right?
387 14   A.  That's right.

390:3 -  390:10 Lensing, Anthonie 2017-07-26          0:48
390  3   Q.  If you look with me at the second bullet
390  4   point under number 2, it says: "The Agency
390  5   acknowledged the sponsor's remarks, but expressed
390  6   concerns that the proposed study design may not
390  7   result in persuasive results.  See prior
390  8   comments."
390  9       Do you see that?
390 10   A.  I see that.

390:17 -  391:4 Lensing, Anthonie 2017-07-26          2:14
390 17   Q.  Okay. Let's turn to the next page.
390 18   There's a section related to dose.  And the first
390 19   thing it says under "Dose" is: "A flat dose-VTE
390 20   incidence rate relationship was seen over a range
390 21   of 2.5 milligrams to 30 milligrams BID
390 22   (twelvefold) for VTE prevention in major
390 23   orthopedic surgery (four trials), and from 10 to
390 24   30 milligrams BID, 20 to 40 milligrams OD in the
390 25   dose selection trials for the treatment of acute
391  1   symptomatic DVT (two trials)."
391  2       Do you see that?
391  3   A.  Yes, I see that.
391  4   Q.  Okay.

391:6 -  391:17 Lensing, Anthonie 2017-07-26          2:00
391  6   BY MR. OVERHOLTZ:
391  7   Q.  Okay. They say: "However, a dose
391  8   response with increased bleeding at higher dose --
391  9   at higher doses was noticed.  Hence, the Agency
391 10   suggested that a lower dose may be more
391 11   appropriate in the studies."
391 12       That's what the FDA states in these
391 13   minutes, correct?
391 14   A.  What the FDA did establish in those
391 15   minutes is that the bleeding incident -- incidence
391 16   increases with 20-milligram BID and 30-milligram
391 17   BID.

397:2 -  397:8 Lensing, Anthonie 2017-07-26          1:28
397  2       Does Exhibit 50 still continue to have
397  3   the FDA's responses in relation to the question
397  4   that they did not concur, and that instead of the
397  5   current dose plans, we recommend that you propose
397  6   a dose of 10 milligrams BID for your phase III

45

| | Objections In | Responses In | Rulings |
|---|---|---|---|

397 7    studies?
397 8    A. Yes, that's correct.

397:9 – 397:25 Lensing, Anthonie 2017-07-26          1:53
397 9    Q. Okay. Dr. Lensing, one of the things
397 10    that we discussed is the basis for choosing the
397 11    15-milligram BID dosing regimen for the
397 12    intensified treatment, and I want to talk to you a
397 13    little bit about the -- the reasons for that
397 14    decision.
397 15        So you and I agree that the dose that is
397 16    selected should obviously be a dose that's going
397 17    to ensure efficacy.
397 18    A. Yes, of course.
397 19    Q. Okay. Do you agree that one of the
397 20    reasons why the intensified dose was selected to
397 21    be 15 milligrams BID was because in the clinical
397 22    experience in the past of treatment of VTE, that
397 23    clinicians were used to the treatment dose being
397 24    two to three times greater than the prevention
397 25    dose?

398:2 – 398:16 Lensing, Anthonie 2017-07-26          1:05
398 2        THE WITNESS: Definitely that did play a
398 3    role, but our cumulative experience with
398 4    anticoagulants over the past 30 to 40 years shows
398 5    that therapeutic doses of two to three times
398 6    higher is not enough; that it should be three to
398 7    five times higher than prophylactic doses,
398 8    definitely.
398 9        However, it is not just simple
398 10    experience, but it is also demonstrated by 12 to
398 11    14 studies in which it appears that if you
398 12    underdose an anticoagulant just a little bit, that
398 13    there is a threshold of a number of patients with
398 14    new thrombosis that is catastrophic and that rises
398 15    immediately.
398 16    BY MR. OVERHOLTZ:

401:19 – 402:21 Lensing, Anthonie 2017-07-26          5:03
401 19    Q. Whenever the original decisions were
401 20    made to propose 10 milligrams twice daily as the
401 21    intensified dose, the van Gogh study was within
401 22    the consideration of you and Dr. Misselwitz and
401 23    the commit- -- the executive committee members of
401 24    the study at that time, wasn't it?
401 25    A. In that -- at that time the results of
402 1    the van Gogh study -- PE study were recently
402 2    published, so that must have played a role.
402 3        However, it is very important that you
402 4    know that it wasn't an instant decision to simply
402 5    choose a totally different path, but that it was a
402 6    very gradual procedure in which people met, in
402 7    which the pros and cons were considered, and in
402 8    which this -- this process in itself was a very
402 9    careful process, and we arrived at an end dose to
402 10    which all parties could agree.
402 11        Moreover, this dose that was chosen was
402 12    extremely efficient. It was much, much safer than
402 13    the comparative agents, and the reduction in
402 14    bleeding, major bleedings was 50 percent.
402 15        Now, not only was it -- were
402 16    bleedings -- was the incidence of bleedings a lot
402 17    lower, but they were also less often fatal
402 18    bleedings, and they were less often in very
402 19    critical locations, such as intracranially. We
402 20    found only five with rivaroxaban, and 30 in the
402 21    comparator products.

403:15 – 404:12 Lensing, Anthonie 2017-07-26          2:19
403 15    Q. Do you -- one of the concerns was
403 16    whether or not you would get acceptance of the
403 17    dose by the clinical investigators in the Einstein
403 18    trial, right?
403 19    A. Of course. A dose that we proposed must
403 20    be accepted, and you don't know that beforehand.
403 21    Q. Especially for the treatment of
403 22    pulmonary emboli.
403 23    A. And also for treatment of thrombosis
403 24    legs. You mustn't forget that many patients that
403 25    have a thrombosis leg also have a pulmonary emboli
404 1    that is asymptomatic. 50, 60, 70 percent.
404 2    Q. PE and DVT.
404 3    A. (In English) Yeah.

**Objections In:**

Re: [401:19-402:21]
Pltf Obj Non-responsive at 402:11-21.
Dr. Lensing goes well beyond the
question asked pertaining to Bayer's
consideration of the van Gogh study.

**Responses In:**

Re: [401:19-402:21]
Def Resp The witness added appropriate
context when answering counsel's
question.

**Rulings:**

Pending

08/06/17 17:59

| | | | Objections In | Responses In | Rulings |
|---|---|---|---|---|---|

404 4   Q.   And so was one of the concerns also that
404 5   if the drug met its approval, that whether or not
404 6   you would receive acceptance by clinicians in the
404 7   marketplace?
404 8   A.   I don't care about that at all.  I only
404 9   worry about the safety of my patients and whether
404 10   they are treated correctly or not.  That's my
404 11   target, and I dedicate 100 percent of my efforts
404 12   to that.

415:16 - 415:17 Lensing, Anthonie 2017-07-26      0:18
415 16   Q.   Let me show you what we'll mark as
415 17   Exhibit No. 56, as well as 57, 58, and 59.  And

**Objections In:** Re: [415:16-415:17]
Def Obj See objections to Exhibits 56 & 57.

**Responses In:** Re: [415:16-415:17]
Pltf Resp See Plaintiffs' response to Defendants' objection to these exhibits.

**Rulings:** Pending

415:20 - 415:22 Lensing, Anthonie 2017-07-26      0:15
415 20   (Lensing Exhibit Nos. 56
415 21   through 59 were marked for
415 22   identification.)

416:17 - 417:7 Lensing, Anthonie 2017-07-26      1:24
416 17   BY MR. OVERHOLTZ:
416 18   Q.   Okay.  So, Dr. Lensing, you see that the
416 19   e-mail on the front page is an e-mail from
416 20   Dr. Misselwitz to Dr. Berkowitz, and you're copied
416 21   in the cc line, on April 26, 2006.
416 22   "In response to Dr. Berkowitz's e-mail
416 23   that we looked at yesterday, I have concerns about
416 24   Einstein VTE study design, no pre-RX heparin."
416 25   Do you see that?
417 1   A.   Yes, I've seen it.
417 2   Q.   Okay.  And you can see that this is the
417 3   response to the e-mail we looked at where
417 4   Dr. Berkowitz said, I understand that important
417 5   decisions are being made now.  Right?
417 6   A.   That's correct, I believe we've seen
417 7   that yesterday.

417:11 - 417:18 Lensing, Anthonie 2017-07-26      0:55
417 11   "Dear Scott:  Thank you for your detailed and very
417 12   thoughtful response to yesterday's discussion.
417 13   Much appreciated.  I agree with you 100 percent
417 14   that the less riskiest option from a
417 15   clinical/technical point of view would be to go to
417 16   low-molecular-weight heparin initial treatment."
417 17   Do you see that?
417 18   A.   Yes, I see that.

421:7 - 422:4 Lensing, Anthonie 2017-07-26      2:16
421 7   Q.   Let's look at slide 16.
421 8   "Options for initial treatment," and the
421 9   first option listed is low-molecular-weight
421 10   heparin five to seven days, and next, rivaroxaban
421 11   BID for the first three to four weeks, correct?
421 12   A.   That is correct.
421 13   Q.   Okay.  The next question asks: "Why
421 14   does 10 milligrams BID of rivaroxaban provide a
421 15   more intense level of an anticoagulation compared
421 16   to 20 milligrams OD," question mark.
421 17   Do you see that?
421 18   A.   Yes, I see that.
421 19   Q.   Okay.  And then you can see that the
421 20   next bullet point says: "C trough level" -- well,
421 21   the first bullet point says: "No big difference
421 22   in Cmax."  Right?
421 23   A.   That's correct.
421 24   Q.   And then the second bullet point says:
421 25   "C trough level is much higher in the BID regimen,
422 1   resulting in a more sustainable suppression of
422 2   thrombin generation over time."
422 3   Do you see that?
422 4   A.   Yes, I see that too.

422:5 - 422:14 Lensing, Anthonie 2017-07-26      1:13
422 5   Q.   Okay.  So if you know that you're going
422 6   to be giving Xarelto at a twice-daily dose, 15
422 7   milligrams BID, that results in trough levels
422 8   that are much higher than what you see with a
422 9   20-milligram dose that's given, for example, in
422 10   the AFib indication, wouldn't it make sense to
422 11   instruct doctors that they should test the
422 12   anticoagulation status of their patients to make
422 13   sure they're not overly anticoagulated during that
422 14   time period and at risk of significant bleeding?

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**422:16 – 424:24 Lansing, Anthonia 2017-07-26**   7:07

422 16   THE WITNESS: I do understand you
422 17   wondering, asking the question and thinking this.
422 18   It is a very complicated issue, but, once again, I
422 19   will try to explain it.
422 20   And I will try to explain why you aren't
422 21   right.
422 22   In those finding studies, we have
422 23   evaluated increasing doses up to 60-milligram
422 24   daily doses.
422 25   And that is the dose, 60-milligram OD,
423 1   the dose that we stay far away from.
423 2   Because what was shown in the efficacy
423 3   analysis is that we could stay at the lower end
423 4   level of the total daily dose, which was 20
423 5   milligrams.
423 6   This dose gave the same bleeding
423 7   incidence as 30-milligram once daily or
423 8   40-milligram once daily or 20-milligram twice
423 9   daily.
423 10   So the decision to move from
423 11   20-milligram OD or 10-milligram BID towards
423 12   50-milligram BID, this decision could be taken
423 13   knowing that our dose-finding studies had shown
423 14   that the increase could not be associated with an
423 15   increased bleeding rate.
423 16   And fortunately, since then we have even
423 17   learned much more about it because, as you know,
423 18   in our Einstein-DVT and PE studies, we have
423 19   examined 4,000 patients -- patients that were
423 20   under rivaroxaban.
423 21   And what we looked at is the relation
423 22   between the exposure that you've mentioned, and on
423 23   the other hand, occurrence of thrombo --
423 24   thrombotic events and major bleedings. And what
423 25   have we discovered?
424 1   And what we've discovered is that you
424 2   fear that a higher exposure can be associated to
424 3   more major bleeding simply does not exist within
424 4   the doses provided under the Einstein PE and the
424 5   Einstein-DVT studies.
424 6   To illustrate what I've been saying, on
424 7   day 21, we saw that the -- at the end of the --
424 8   excuse me -- of the 15-milligram twice-daily
424 9   treatment with rivaroxaban, the incidence of major
424 10   bleedings was only 0.4 percent, which is a lot,
424 11   but compared to the standard of care, the standard
424 12   of care showed an incidence that was twice as
424 13   high. It was 0.8 percent, and I'm talking about
424 14   day 21.
424 15   So we see that on rivaroxaban, after the
424 16   21st day, you see a steady increase up to 1.0
424 17   percent for the patients on rivaroxaban, whereas
424 18   those in the standard of care group amounted to
424 19   1.7 percent.
424 20   So this goes to show for the first 21st
424 21   days, the formidable result of rivaroxaban
424 22   compared to the standard of care. 0.4 is one of
424 23   the lowest incidences ever in an international
424 24   research on major bleedings.

**425:3 – 425:21 Lansing, Anthonie 2017-07-26**   0:59

425 3   Q. Dr. Lansing, based on the information
425 4   that we see here that the C trough level, when you
425 5   give the drug BID, is much higher even for the
425 6   10-milligram BID dose than what you would see in
425 7   the patients given the 20-milligram dose once
425 8   daily.
425 9   You don't believe it would make sense to
425 10   at least instruct doctors to give a one-time PT
425 11   test to find out if the patient somehow has had an
425 12   exposure to the drug that is much higher than what
425 13   would be expected in the limited number of
425 14   patients in the clinical trials, and therefore is
425 15   at an increased risk of bleeding, so that he can
425 16   at least discuss the information with his patient
425 17   and make a determination that perhaps a drug
425 18   choice that would allow him to -- that has more
425 19   experience, like low-molecular-weight heparin or
425 20   Vitamin K antagonist, might be the better choice
425 21   for that patient?

**Re: [425:3-425:21]**
**Pltf Obj** The counter incorporated immediately below serves the same purpose as this counter and should be excluded for the same reason set forth immediately below.

**Re: [425:3-425:21]**
**Def Resp** This testimony concerns the core question in this case - whether a one-time PT test would make Xarelto safer, and whether information regarding such a drug should be added to the US label. Counsel for Plaintiff asked a very open-ended question about why such a test would make sense. The entire answer is responsive; that Plaintiff's counsel does not like the answer does not change that simple fact.

Pending

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**426:3 - 426:5** Lensing, Anthonie 2017-07-26 — *0:16*

426  3    Q.   And please answer my question as to
426  4    whether you don't believe that this one-time test
426  5    would make sense.

**426:10 - 427:10** Lensing, Anthonie 2017-07-26 — *2:17*

426 10    THE WITNESS: My answer to that is, no,
426 11    it is absolutely not useful at all. What you
426 12    think is apparently suggested to you by an expert.
426 13    However, this expert doesn't understand a bit
426 14    about this. Totally nothing. Something like that
426 15    would indeed be life-threatening.
426 16    In the Iceland DVT studies, we checked
426 17    3,800 patients for their blood values, PTs, so we
426 18    already did that. And we followed up on the
426 19    patients that had high PT scores, and it was
426 20    demonstrated that chances of bleedings were
426 21    totally unrelated.
426 22    So in order to suggest to a doctor that
426 23    he should check PTs, because that would suggest a
426 24    risk of bleeding, would only lead to them
426 25    indicating to their patients that the dosage
427  1    should be lower if their high -- if their PT rates
427  2    were high, although there is no relation with
427  3    bleeding.
427  4    So that means that it would be a huge
427  5    risk to the patients, and that's exactly what we
427  6    noticed in the van Gogh studies. It would mean
427  7    that many, many patients would suffer from fatal
427  8    pulmonary emboli. So that proposal is really
427  9    life-threatening, and I hope to God that doctors
427 10    will not hear about it and do so.

**447:22 - 448:4** Lensing, Anthonie 2017-07-27 — *1:19*

447 22    BY MR. OVERHOLTZ:
447 23    Q.   And the way that Xarelto creates an
447 24    anticoagulant effect is through factor Xa
447 25    inhibition, correct?
448  1    A.   That's the main target of rivaroxaban,
448  2    yes.
448  3    Q.   Do you believe that the anticoagulant
448  4    effect of Xarelto can be measured?

**448:6 - 449:1** Lensing, Anthonie 2017-07-27 — *2:43*

448  6    THE WITNESS: There are laboratory tests
448  7    with which you can measure the effect of
448  8    rivaroxaban on blood coagulation.
448  9    BY MR. OVERHOLTZ:
448 10    Q.   Is one of those laboratory tests an
448 11    anti-factor Xa assay?
448 12    A.   It is indeed.
448 13    Q.   Okay. And what about prothrombin time
448 14    if you use the -- a sensitive reagent?
448 15    A.   It is important indeed to have such a
448 16    sensitive reagent, and there is Neoplastine --
448 17    Neoplastine Plus, which is a prothrombin reagent
448 18    which is sensitive for rivaroxaban, and thanks to
448 19    that reagent, we can measure the effect of
448 20    rivaroxaban on blood coagulation via -- via the
448 21    prothrombin time.
448 22    Q.   And is there a relationship -- I think
448 23    I've seen it described as a close to linear
448 24    relationship between prothrombin time Neoplastin
448 25    and the concentration levels of Xarelto in the
449  1    blood.

**449:15 - 449:17** Lensing, Anthonie 2017-07-27 — *0:10*

449 15    Q.   And is the drug label, is that something
449 16    that the company uses to communicate to doctors
449 17    information about the drug?

**449:20 - 450:3** Lensing, Anthonie 2017-07-27 — *0:28*

449 20    THE WITNESS: The label, which in this

**Re: [426:3-426:5]**
Pltf Obj) This designation is entirely non-sensical as a counter-designation, as it begins "And please answer my question," which follows a several questions and which relates to no affirmatively designated preceding question. Rather, this designation is intended as a vehicle for Dr. Lensing's 35-line answer that is non-responsive to a question that isn't even affirmatively designated and even speculates as to the origin of such a question. Further, the response lacks foundation and is an impermissible expert opinion. Finally, the "question" is objected to on four, separate grounds by defense counsel.

**Re: [426:3-426:5]**
Def Resp (Defendants have added 425:3-21 to address Plaintiff's objection). This testimony concerns the core question in this case - whether a one-time PT test would make Xarelto safer, and whether information regarding such a drug should be added to the US label. Counsel for Plaintiff asked a very open-ended question about why such a test would make sense. The entire answer is responsive; that Plaintiff's counsel does not like the answer does not change that simple fact.

Pending

| | Objections In | Responses In | Rulings |
|---|---|---|---|

449 21    case was drawn up by Bayer in cooperation with the
449 22    health authorities, was drawn up on the basis of
449 23    the results that were generated, and, as such, the
449 24    label is used to inform the physicians.
449 25    BY MR. OVERHOLTZ:
450 1    Q.  And, Dr. Lensing, you've worked on the
450 2    development of the drug labeling for Xarelto; is
450 3    that true?

450:6 - 450:15 Lensing, Anthonie 2017-07-27      1:04
450 6    THE WITNESS: I was involved in setting
450 7    up the label for this drug for DVT and PE, in
450 8    particular for the clinical part.
450 9    (In English) Treatment.
450 10    (Interpreter) Treatment.
450 11    BY MR. OVERHOLTZ:
450 12    Q.  And do you agree that for the drug
450 13    label, that you would not expect Bayer to provide
450 14    false or misleading information in the drug label
450 15    for Xarelto?

450:17 - 451:4 Lensing, Anthonie 2017-07-27      1:25
450 17    THE WITNESS: No, I don't.
450 18    BY MR. OVERHOLTZ:
450 19    Q.  You don't believe that Bayer should
450 20    provide false or misleading information in a drug
450 21    label, right?
450 22    A.  The purpose is to provide objective
450 23    information and an inventory of the effectiveness
450 24    and the side effects of a drug. A lot of time is
450 25    invested in doing that in cooperation with the
451 1    health authorities.
451 2    Q.  And do you believe that Bayer provides
451 3    accurate information to physicians in their drug
451 4    labels for Xarelto?

451:7 - 451:9 Lensing, Anthonie 2017-07-27      0:12
451 7    THE WITNESS: I believe that the label
451 8    that was drawn up by Bayer in cooperation with the
451 9    health authorities is accurate.

451:11 - 451:23 Lensing, Anthonie 2017-07-27      2:08
451 11    Q.  And you wouldn't want Bayer to put
451 12    anything in the product label that would
451 13    potentially put patients in danger, would you?
451 14    A.  The answer to that question in general
451 15    will always be a plain no, but you have to realize
451 16    that we're talking about patients with an
451 17    increased risk on a side effect. So the use of
451 18    rivaroxaban in certain patients may lead to an
451 19    adverse event, and that is why it's important to
451 20    express in a label what those adverse events may
451 21    be and warn both patients and doctors about
451 22    possible adverse events associated with the use of
451 23    rivaroxaban.

454:1 - 454:4 Lensing, Anthonie 2017-07-27      0:22
454 1    BY MR. OVERHOLTZ:
454 2    Q.  As a physician in Europe, you understood
454 3    that the labeling for the drug is called the SPC
454 4    or Summary of Product Characteristics, correct?



**Re: [454:1-454:4]**
**Def Obj** As Plaintiffs must well know, this testimony is in direct violation of the Court's prior rulings regarding foreign labels. As the Court stated during the Orr trial, what Defendants "put on Xarelto's label in other countries in order to comply with foreign regulatory bodies or agencies . . . is irrelevant" and therefore "not admissible." Dkt. No. 6645. Nothing about this testimony suggests it would form an exception to that clear statement of the Court's position on this issue.

**Re: [454:1-454:4]**
**Pltf Resp** Dr. Lensing repeatedly confirms these statements as an accurate account of Bayer's understanding of the usefulness of PT (455:1-455:7, 456:24-457:2, 459:22-460:2, 467:7-467:11, for example), making them extremely probative, versus an offering of data made pursuant to a regulatory framework.  That Dr. Lensing consistently confirms the statements as true, despite the position Bayer now takes in the Courtroom, makes them not only centrally relevant but also clarifying as well as within the Court's reservation of ruling on Defendants™ Motion in Limine on Labeling and Regulatory Actions (Rec. Doc. 7052).  Finally, Dr. Lensing takes a polar opposite position during his direct examination on pgs. 580-591.  Finally, Dr. Lensing takes a polar opposite position during his direct examination on pgs. 580-591.

Pending

08/06/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**454:7 -   454:19** Lensing, Anthonie 2017-07-27

1:04

454  7       THE WITNESS: I just told you that I'm
454  8   not an expert in that field, but I think you're
454  9   right.
454  10  Q.   And you have worked on the Summary of
454  11  Product Characteristics, the SPCs, for Xarelto
454  12  with respect to VTE treatment for Bayer; is that
454  13  correct?
454  14  A.   Yes, it is correct that I have been
454  15  involved in it.
454  16  Q.   Okay. And so in -- in Europe, is the
454  17  SPC the way in which Bayer communicates
454  18  information about Xarelto to doctors?
454  19

**Re: [454:7-454:19]**
**Def Obj** As Plaintiffs must well know, this testimony is in direct violation of the Court's prior rulings regarding foreign labels. As the Court stated during the Orr trial, what Defendants "put on Xarelto's label in other countries in order to comply with foreign regulatory bodies or agencies . . . is irrelevant" and therefore "not admissible." Dkt. No. 6645. Nothing about this testimony suggests it would form an exception to that clear statement of the Court's position on this issue.

**Re: [454:7-454:19]**
Pltf Resp Dr. Lensing repeatedly confirms these statements as an accurate account of Bayer™'s understanding of the usefulness of PT (455:1-455:7, 456:24-457:2, 459:22-460:2, 467:7-467:11, for example), making them extremely probative, versus an offering of data made pursuant to a regulatory framework. That Dr. Lensing consistently confirms the statements as true, despite the position Bayer now takes in the Courtroom, makes them not only centrally relevant but also clarifying as well as within the Court™s reservation of ruling on Defendants™ Motion in Limine on Labeling and Regulatory Actions (Rec. Doc. 7052). Finally, Dr. Lensing takes a polar opposite position during his direct examination on pgs. 580-591. Finally, Dr. Lensing takes a polar opposite position during his direct examination on pgs. 580-591.

Pending

**454:22 -   455:7** Lensing, Anthonie 2017-07-27

1:11

454  22       THE WITNESS: I think that is the case,
454  23  indeed.
454  24  BY MR. OVERHOLTZ:
454  25  Q.   And when you were involved in working on
455  1   the SPC in Europe for Xarelto, you expected that
455  2   the information that would be communicated through
455  3   that SPC to be accurate. Is that fair?
455  4   A.   What I find that whenever information is
455  5   being generated for the external world, it always
455  6   needs to be accurate; hence, it also needs to be
455  7   accurate in this case.

**Re: [454:22-455:7]**
**Def Obj** As Plaintiffs must well know, this testimony is in direct violation of the Court's prior rulings regarding foreign labels. As the Court stated during the Orr trial, what Defendants "put on Xarelto's label in other countries in order to comply with foreign regulatory bodies or agencies . . . is irrelevant" and therefore "not admissible." Dkt. No. 6645. Nothing about this testimony suggests it would form an exception to that clear statement of the Court's position on this issue.

**Re: [454:22-455:7]**
Pltf Resp Dr. Lensing repeatedly confirms these statements as an accurate account of Bayer™'s understanding of the usefulness of PT (455:1-455:7, 456:24-457:2, 459:22-460:2, 467:7-467:11, for example), making them extremely probative, versus an offering of data made pursuant to a regulatory framework. That Dr. Lensing consistently confirms the statements as true, despite the position Bayer now takes in the Courtroom, makes them not only centrally relevant but also clarifying as well as within the Court™s reservation of ruling on Defendants™ Motion in Limine on Labeling and Regulatory Actions (Rec. Doc. 7052). Finally, Dr. Lensing takes a polar opposite position during his direct examination on pgs. 580-591.

Pending

**455:13 -   455:21** Lensing, Anthonie 2017-07-27

1:11

455  13  Q.   Have you worked on the product monograph
455  14  for Xarelto with respect to VTE treatment for the
455  15  product monograph in Canada for Xarelto?
455  16  MS. YATES: Objection. Form.
455  17       THE WITNESS: I do not really recall
455  18  whether I have worked on the monograph. What I do
455  19  remember is that I have been involved in the
455  20  consultation with the health authorities in
455  21  Canada.

**Re: [455:13-455:21]**
**Def Obj** As Plaintiffs must well know, this testimony is in direct violation of the Court's prior rulings regarding foreign labels. As the Court stated during the Orr trial, what Defendants "put on Xarelto's label in other countries in order to comply with foreign regulatory bodies or agencies . . . is irrelevant" and therefore

**Re: [455:13-455:21]**
Pltf Resp Dr. Lensing repeatedly confirms these statements as an accurate account of Bayer™'s understanding of the usefulness of PT (455:1-455:7, 456:24-457:2, 459:22-460:2, 467:7-467:11, for example), making them extremely probative, versus an offering of data made pursuant to a regulatory

Pending

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| | "not admissible." Dkt. No. 6645. Nothing about this testimony suggests it would form an exception to that clear statement of the Court's position on this issue. | framework.  That Dr. Lensing consistently confirms the statements as true, despite the position Bayer now takes in the Courtroom, makes them not only centrally relevant but also clarifying as well as within the Court™s reservation of ruling on Defendants™ Motion In Limine on Labeling and Regulatory Actions (Rec. Doc. 7052). Finally, Dr. Lensing takes a polar opposite position during his direct examination on pgs. 580-591. | |

**456:8 - 456:15** Lensing, Anthonia 2017-07-27    0:50

| 456  8 | Q.  Whenever you were involved in |
|---|---|
| 456  9 | interacting with the regulatory authority in |
| 456  10 | Canada, is that called Health Canada? |
| 456  11 | A.  That's correct. |
| 456  12 | Q.  Okay. So when you were interacting with |
| 456  13 | Health Canada, did Bayer provide information to |
| 456  14 | Health Canada about Xarelto in order to seek |
| 456  15 | approval for the drug? |

Re: [456:8-456:15]
**Def Obj** References herein to foreign regulatory authorities will serve only to confuse the jury and the questions at issue. They will also require Defendants to put on trials within trials, delving into the nuance of differences between regulatory bodies from one country to another. The FDA is the only regulatory body with any relevance to Plaintiff's claims. 401/403.

Re: [456:8-456:15]
**Pltf Resp** Dr. Lensing repeatedly confirms these statements as an accurate account of Bayer™s understanding of the usefulness of PT (455:1-455:7, 456:24-457:2, 459:22-460:2, 467:7-467:11, for example), making them extremely probative, versus an offering of data made pursuant to a regulatory framework.  That Dr. Lensing consistently confirms the statements as true, despite the position Bayer now takes in the Courtroom, makes them not only centrally relevant but also clarifying as well as within the Court™s reservation of ruling on Defendants™ Motion In Limine on Labeling and Regulatory Actions (Rec. Doc. 7052). Finally, Dr. Lensing takes a polar opposite position during his direct examination on pgs. 580-591.

Pending

**456:18 - 457:7** Lensing, Anthonie 2017-07-27    1:21

| 456  18 | THE WITNESS:  I can only speak on the |
|---|---|
| 456  19 | basis of my experience, and indeed, Bayer has |
| 456  20 | provided information to Health Canada as part of |
| 456  21 | the approval of the Xarelto, and for -- and this |
| 456  22 | for the indication of DVT and PE. |
| 456  23 | BY MR. OVERHOLTZ: |
| 456  24 | Q.  And did -- was it your understanding |
| 456  25 | that the information that Bayer would provide to |
| 457  1 | Health Canada about Xarelto would be accurate? |
| 457  2 | A.  Yes. |
| 457  3 | Q.  Let me show you what we'll mark 60 -- as |
| 457  4 | Exhibit 60, which is record 371020, Bates |
| 457  5 | BHCP_00149563. |
| 457  6 | (Lensing Exhibit No. 60 was marked |
| 457  7 | for identification.) |

Re: [456:18-457:7]
**Def Obj** While the Court has previously ruled that statements Defendants made to foreign regulatory agencies are admissible (a ruling to which Defendants continue to object, with such objection incorporated herein for preservation), the Court has made clear that "that's where it's got to stop." See Orr. Tr. at 1978:7-20. In other words, the Court has not allowed admission of statements the foreign regulatory authorities made to Defendants (rather, the Court has admitted only the reverse). That is precisely what Plaintiff seeks to designate here, and it is irrelevant, prejudicial and will confuse the jury and the issues as well as waste time and require mini-trials. In addition, this testimony directly references the Canadian label, which the Court has repeatedly held is inadmissible. See Dkt. No. 6645. 401/403. See objection to Exhibit 60.

Re: [456:18-457:7]
**Pltf Resp** Plaintiffs repeat there response to Defendants' objection at 454:1-4.  This exhibit and testimony relate to an email exchange with Dara Cusack, a Canadian Bayer employee--not an employee of Health Canada.  This email exchange (Ex. 60) and the attachment (Ex. 61) contain Bayer statements and positions, not those of Health Canada, which Defendants' acknowledge in the instant objection has been previously found admissible.

Pending

**458:9 - 460:8** Lensing, Anthonie 2017-07-27    5:58

| 458  9 | BY MR. OVERHOLTZ: |
|---|---|
| 458  10 | Q.  If we look at this e-mail chain, it's |
| 458  11 | from back in 2011, and the subject was "The final |
| 458  12 | global review of Canadian Xarelto PM VTE-t and |

Re: [458:9-460:8]
**Def Obj** As Plaintiffs must well know, this testimony is in direct violation of the Court's prior rulings regarding foreign

Re: [458:9-460:8]
**Pltf Resp** Dr. Lensing repeatedly confirms these statements as an accurate account of Bayer™s understanding of the

Pending

08/06/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

| 458 13 | notes to reviewer," and I'm looking on the back | labels. As the Court stated during the Orr | usefulness of PT (455:1-455:7, 456:24- | |
| 458 14 | page. | trial, what Defendants "put on Xarelto's | 457:2, 459:22-460:2, 467:7-467:11, for | |
| 458 15 | Do you see that? | label in other countries in order to | example), making them extremely | |
| 458 16 | A. I can see it. | comply with foreign regulatory bodies or | probative, versus an offering of data | |
| 458 17 | Q. Okay. And so in Exhibit 60, if you look | agencies . . . is irrelevant" and therefore | made pursuant to a regulatory | |
| 458 18 | with me on the, I guess it's the second page, | "not admissible." Dkt. No. 6645. Nothing | framework. That Dr. Lensing consistently | |
| 458 19 | there is an e-mail to you from a Dana Cusack from | about this testimony suggests it would | confirms the statements as true, despite | |
| 458 20 | Health Canada, Bayer, to yourself as well as | form an exception to that clear | the position Bayer now takes in the | |
| 458 21 | several other people at Bayer, including Akos Pap | statement of the Court's position on this | Courtroom, makes them not only | |
| 458 22 | and Dr. Horvat-Broecker. | issue. See objection to Exhibit 61. | centrally relevant but also clarifying as | |
| 458 23 | Do you see that? | | well as within the Court™'s reservation of | |
| 458 24 | A. Yes, I see. | | ruling on Defendants™ Motion in Limine | |
| 458 25 | Q. And it looks like Ms. Cusack is -- is | | on Labeling and Regulatory Actions (Rec. | |
| 459 1 | attaching some VTE review notes and the Xarelto | | Doc. 7052). Finally, Dr. Lensing takes a | |
| 459 2 | annotated product monograph for you to review, and | | polar opposite position during his direct | |
| 459 3 | she asked for comments. | | examination on pgs. 580-591. | |
| 459 4 | Do you see that? | | | |
| 459 5 | A. Yes, I see that. | | | |
| 459 6 | Q. Okay. And so then if we turn back to | | | |
| 459 7 | the first page, it looks like Ms. Cusack e-mails | | | |
| 459 8 | you on February 9th of 2011, and says: "Dear Ton: | | | |
| 459 9 | Greetings from Canada. I hope you are well. I | | | |
| 459 10 | just wanted to confirm that you are okay with the | | | |
| 459 11 | text for VTE treatment as presented in this final | | | |
| 459 12 | draft Canadian product monograph as well as the | | | |
| 459 13 | reviewers' notes." | | | |
| 459 14 | Do you see that? | | | |
| 459 15 | A. I see it. | | | |
| 459 16 | Q. Okay. And did you in fact review the | | | |
| 459 17 | text related to the VTE treatment and provide -- | | | |
| 459 18 | and indicate to Ms. Cusack that you did not have | | | |
| 459 19 | any comments? | | | |
| 459 20 | A. I have indeed read it, and I have indeed | | | |
| 459 21 | no comments. | | | |
| 459 22 | Q. Okay. And did you want to ensure in | | | |
| 459 23 | your review that the information that was going to | | | |
| 459 24 | be told to doctors in Canada in this product | | | |
| 459 25 | monograph would be accurate? | | | |
| 460 1 | A. I always strive for accuracy; hence, I | | | |
| 460 2 | also do in this case. | | | |
| 460 3 | Q. Let me show you what we'll mark as | | | |
| 460 4 | Exhibit 61, which is exhibit 371022, which is the | | | |
| 460 5 | product monograph attachment -- draft product | | | |
| 460 6 | monograph attachment to this e-mail. | | | |
| 460 7 | (Lensing Exhibit No. 61 was marked | | | |
| 460 8 | for identification.) | | | |

460:25 -   461:6   Lensing, Anthonie 2017-07-27

| 460 25 | Q. Okay. So, Dr. Lensing, if we can look | 0:41 | | | Pending |
| 461 1 | at this draft product monograph attached, you can | | Re: [460:25-461:6] | Re: [460:25-461:6] | |
| 461 2 | see that on the first page they're adding a 15- | | Def Obj As Plaintiffs must well know, this | Pltf Resp Dr. Lensing repeatedly confirms | |
| 461 3 | and 20-milligram dose to the -- to the labeling, | | testimony is in direct violation of the | these statements as an accurate account | |
| 461 4 | as highlighted in yellow, on February 28, 2011. | | Court's prior rulings regarding foreign | of Bayer™'s understanding of the | |
| 461 5 | Do you see that? | | labels. As the Court stated during the Orr | usefulness of PT (455:1-455:7, 456:24- | |
| 461 6 | A. I can see that. | | trial, what Defendants "put on Xarelto's | 457:2, 459:22-460:2, 467:7-467:11, for | |
| | | | label in other countries in order to | example), making them extremely | |
| | | | comply with foreign regulatory bodies or | probative, versus an offering of data | |
| | | | agencies . . . is irrelevant" and therefore | made pursuant to a regulatory | |
| | | | "not admissible." Dkt. No. 6645. Nothing | framework. That Dr. Lensing consistently | |
| | | | about this testimony suggests it would | confirms the statements as true, despite | |
| | | | form an exception to that clear | the position Bayer now takes in the | |
| | | | statement of the Court's position on this | Courtroom, makes them not only | |
| | | | issue. | centrally relevant but also clarifying as | |
| | | | | well as within the Court™'s reservation of | |
| | | | | ruling on Defendants™ Motion in Limine | |
| | | | | on Labeling and Regulatory Actions (Rec. | |
| | | | | Doc. 7052). Finally, Dr. Lensing takes a | |
| | | | | polar opposite position during his direct | |
| | | | | examination on pgs. 580-591. | |

463:14 -   464:3   Lensing, Anthonie 2017-07-27

| 463 14 | Q. Okay. And just -- I know I didn't point | 1:09 | | | Pending |
| 463 15 | you to this one earlier, but on page 19, you see | | Re: [463:14-464:3] | Re: [463:14-464:3] | |
| 463 16 | that a section has been added for treatment of DVT | | Def Obj As Plaintiffs must well know, this | Pltf Resp Dr. Lensing repeatedly confirms | |
| 463 17 | and prevention of recurrent VTE that describes the | | testimony is in direct violation of the | these statements as an accurate account | |
| 463 18 | dose of 15 milligrams twice daily for three weeks | | Court's prior rulings regarding foreign | of Bayer™'s understanding of the | |
| 463 19 | and 20 milligrams of Xarelto once daily after | | labels. As the Court stated during the Orr | usefulness of PT (455:1-455:7, 456:24- | |
| 463 20 | that. | | trial, what Defendants "put on Xarelto's | 457:2, 459:22-460:2, 467:7-467:11, for | |
| | | | label in other countries in order to | example), making them extremely | |

| Designations | Objections In | Responses In | Rulings |
|---|---|---|---|
| 463 21 A. Yes, that's what it says.<br>463 22 Q. And that's the same dosing regimen that<br>463 23 was approved for use in the United States for the<br>463 24 treatment of DVT; is that right?<br>463 25 A. Yes, that's correct.<br>464 1 Q. Now, in Canada, did Bayer get the DVT<br>464 2 indication first and then seek PE indication<br>464 3 later? | comply with foreign regulatory bodies or agencies . . . is irrelevant" and therefore "not admissible." Dkt. No. 6645. Nothing about this testimony suggests it would form an exception to that clear statement of the Court's position on this issue. | probative, versus an offering of data made pursuant to a regulatory framework. That Dr. Lensing consistently confirms the statements as true, despite the position Bayer now takes in the Courtroom, makes them not only centrally relevant but also clarifying as well as within the Court's reservation of ruling on Defendants' Motion in Limine on Labeling and Regulatory Actions (Rec. Doc. 7052). Finally, Dr. Lensing takes a polar opposite position during his direct examination on pgs. 580-591. | |

464:6 - 466:3  Lensing, Anthonie 2017-07-27    4:52

| | Objections | Responses | Rulings |
|---|---|---|---|
| 464 6 THE WITNESS: That's correct.<br>464 7 BY MR. OVERHOLTZ:<br>464 8 Q. Now, if you could turn with me over to<br>464 9 page 24, there's a section entitled<br>464 10 "Pharmacodynamics." Do you see that?<br>464 11 A. Yes, I see that.<br>464 12 Q. Okay. And what's stated here under<br>464 13 pharmaco -- "Pharmacodynamics" is: "There is a<br>464 14 clear correlation between plasma rivaroxaban<br>464 15 concentration and the degree of anticoagulant<br>464 16 effect.".<br>464 17 Do you see that?<br>464 18 A. That is what it says, indeed.<br>464 19 Q. Okay. It says: "The max effect of<br>464 20 Xarelto on pharmacodynamic parameters occurs at<br>464 21 the same time as Cmax."<br>464 22 Do you see that?<br>464 23 A. Yeah, I see.<br>464 24 Q. Okay. You see there are two bullet<br>464 25 points, and the first talks about factor Xa<br>465 1 activity. And if you look at the bottom, it says:<br>465 2 "There is a close correlation between factor Xa<br>465 3 inhibition and plasma concentrations with an R<br>465 4 value of 0.97."<br>465 5 Do you see that?<br>465 6 A. I see that.<br>465 7 Q. Okay. And then if you look with me at<br>465 8 the next bullet point, it says: "PT is influenced<br>465 9 by rivaroxaban in a dose-dependent way with a<br>465 10 close correlation to plasma concentrations, R<br>465 11 equals 0.98, if Neoplastin is used for the assay."<br>465 12 Do you see that?<br>465 13 A. I see that.<br>465 14 Q. Okay. And so you see here highlighted<br>465 15 in yellow, and this was highlighted on the version<br>465 16 produced to us by Bayer, that the -- there's a<br>465 17 Table 8 added which provides the 5th and 95th<br>465 18 percentiles for PT Neoplastin by indication.<br>465 19 Do you see that chart?<br>465 20 A. Yes, I see the table.<br>465 21 Q. And you see that they provide -- for<br>465 22 treatment of DVT and prevention of recurrent VTE,<br>465 23 they provide both doses, the 15 BID and the 20 OD,<br>465 24 and then provide the range of PT times for the 5th<br>465 25 and 95th percentiles using the Neoplastin reagent<br>466 1 in the chart.<br>466 2 Do you see that?<br>466 3 A. Yes, I see that. | Re: [464:6-466:3]<br>Def Obj As Plaintiffs must well know, this testimony is in direct violation of the Court's prior rulings regarding foreign labels. As the Court stated during the Orr trial, what Defendants "put on Xarelto's label in other countries in order to comply with foreign regulatory bodies or agencies . . . is irrelevant" and therefore "not admissible." Dkt. No. 6645. Nothing about this testimony suggests it would form an exception to that clear statement of the Court's position on this issue. | Re: [464:6-466:3]<br>Pltf Resp Dr. Lensing repeatedly confirms these statements as an accurate account of Bayer's understanding of the usefulness of PT (455:1-455:7, 456:24-457:2, 459:22-460:2, 467:7-467:11, for example), making them extremely probative, versus an offering of data made pursuant to a regulatory framework. That Dr. Lensing consistently confirms the statements as true, despite the position Bayer now takes in the Courtroom, makes them not only centrally relevant but also clarifying as well as within the Court's reservation of ruling on Defendants' Motion in Limine on Labeling and Regulatory Actions (Rec. Doc. 7052). Finally, Dr. Lensing takes a polar opposite position during his direct examination on pgs. 580-591. | Pending<br>Overruled |

466:4 - 466:8  Lensing, Anthonie 2017-07-27    0:35

466 4 Q. And this draft proposed labeling was<br>466 5 something that you were working on along with the<br>466 6 folks from Bayer in Canada to present to the<br>466 7 Canadian health authority, Health Canada, about<br>466 8 Xarelto, correct?

466:11 - 466:16  Lensing, Anthonie 2017-07-27    0:26

466 11 THE WITNESS: I was involved in this,<br>466 12 and as I've told you before, I was involved in the<br>466 13 clinic -- clinical part of this monograph.<br>466 14 I was not involved in the

54

| | Objections In | Responses In | Rulings |
|---|---|---|---|

466 15    pharmacokinetics and pharmacodynamics part. We
466 16    have special experts for that, and you know this.

466:18 -   466:23 Lensing, Anthonie 2017-07-27     0:18

466 18    Q. Okay. And, Dr. Lensing, I'm just
466 19    asking, did you understand that when you reviewed
466 20    this product monograph, according to the e-mails
466 21    from Ms. Cusack, as she indicated, that this was a
466 22    draft label adding the VTE treatment indication
466 23    that would be submitted to Health Canada?

**Re: [466:18-466:23]**
Def Obj While the Court has previously ruled that statements Defendants made to foreign regulatory agencies are admissible (a ruling to which Defendants continue to object, with such objection incorporated herein for preservation), the Court has made clear that "that's where it's got to stop." See Orr. Tr. at 1978:7-20. In other words, the Court has not allowed admission of statements the foreign regulatory authorities made to Defendants (rather, the Court has admitted only the reverse). That is precisely what Plaintiff seeks to designate here, and it is irrelevant, prejudicial and will confuse the jury and the issues as well as waste time and require mini-trials. In addition, this testimony directly references the Canadian label, which the Court has repeatedly held is inadmissible. See Dkt. No. 6645. 401/403.

Re: [466:18-466:23]
Pltf Resp Plaintiffs repeat there response to Defendants' objection at 454:1-4. This exhibit and testimony relate to an email exchange with Dara Cusack, a Canadian Bayer employee--not an employee of Health Canada. This email exchange (Ex. 60) and the attachment (Ex. 61) contain Bayer statements and positions, not those of Health Canada, which Defendants' acknowledge in the instant objection has been previously found admissible.

Pending

466:25 -   467:21 Lensing, Anthonie 2017-07-27     2:12

466 25    THE WITNESS: I understood that
467 1    eventually this would be submitted to Health
467 2    Canada.
467 3    This is a draft. I don't know if this
467 4    was the final version, but the eventual object was
467 5    to submit it to Health Canada.
467 6    BY MR. OVERHOLTZ:
467 7    Q. And was the object to provide accurate
467 8    information to Health Canada about Xarelto?
467 9    A. I repeat, my object is always to provide
467 10    accurate information, so that also applies to this
467 11    case.
467 12    Q. Let me show you what we'll mark as
467 13    Exhibit No. 62. And this is the product monograph
467 14    for Xarelto that was in effect as of September of
467 15    2011
467 16    (Lensing Exhibit No. 62 was marked
467 17    for identification.)
467 18    BY MR. OVERHOLTZ:
467 19    Q. And if you can look with me on the front
467 20    page, you see the date of September 24, 2011 --
467 21    oh, this is AWL005 as plaintiffs' exhibit number.

**Re: [466:25-467:21]**
Def Obj While the Court has previously ruled that statements Defendants made to foreign regulatory agencies are admissible (a ruling to which Defendants continue to object, with such objection incorporated herein for preservation), the Court has made clear that "that's where it's got to stop." See Orr. Tr. at 1978:7-20. In other words, the Court has not allowed admission of statements the foreign regulatory authorities made to Defendants (rather, the Court has admitted only the reverse). That is precisely what Plaintiff seeks to designate here, and it is irrelevant, prejudicial and will confuse the jury and the issues as well as waste time and require mini-trials. In addition, this testimony directly references the Canadian label, which the Court has repeatedly held is inadmissible. See Dkt. No. 6645. 401/403. See objection to Exhibit 62.

Re: [466:25-467:21]
Pltf Resp Plaintiffs repeat there response to Defendants' objection at 454:1-4. This exhibit and testimony relate to an email exchange with Dara Cusack, a Canadian Bayer employee--not an employee of Health Canada. This email exchange (Ex. 60) and the attachment (Ex. 61) contain Bayer statements and positions, not those of Health Canada, which Defendants' acknowledge in the instant objection has been previously found admissible.

Pending

469:1 -   470:13 Lensing, Anthonie 2017-07-27     3:44

469 1    of September of 2011. And this is on page 7. And
469 2    it has a "Monitoring and Laboratory Tests"
469 3    section. Do you see that?
469 4    A. Yes, I see that.
469 5    Q. Okay. And it describes that Xarelto at
469 6    recommended doses prolongs several global, and
469 7    including prothrombin time and specific inhibition
469 8    of factor Xa activity, clotting tests.
469 9    Do you see that?
469 10    A. Yes, I see that.
469 11    Q. Okay. And then specifically, as we've
469 12    discussed, it says that: "Prothrombin time, PT,
469 13    is influenced by Xarelto in a dose-dependent way
469 14    if Neoplastin is used for the assay." Correct?
469 15    A. That's correct.
469 16    Q. It then provides for the 10-milligram
469 17    prevention dose, the 5th and 95th percentiles for
469 18    PT, Neoplastin, two to four hours after tablet
469 19    intake, indicating that those times ranged from 13
469 20    to 25 seconds.

**Re: [469:1-470:13]**
Def Obj While the Court has previously ruled that statements Defendants made to foreign regulatory agencies are admissible (a ruling to which Defendants continue to object, with such objection incorporated herein for preservation), the Court has made clear that "that's where it's got to stop." See Orr. Tr. at 1978:7-20. In other words, the Court has not allowed admission of statements the foreign regulatory authorities made to Defendants (rather, the Court has admitted only the reverse). That is precisely what Plaintiff seeks to designate here, and it is irrelevant, prejudicial and will confuse the jury and the issues as well as waste time and require mini-trials. In addition, this testimony directly references the Canadian label, which the

Re: [469:1-470:13]
Pltf Resp Plaintiffs repeat there response to Defendants' objection at 454:1-4. This exhibit and testimony relate to an email exchange with Dara Cusack, a Canadian Bayer employee--not an employee of Health Canada. This email exchange (Ex. 60) and the attachment (Ex. 61) contain Bayer statements and positions, not those of Health Canada, which Defendants' acknowledge in the instant objection has been previously found admissible.

Pending

| | Objections In | Responses In | Rulings |
|---|---|---|---|

469 21      Do you see that?
469 22    A.  Yes, I see that.
469 23    Q.  Okay. And it says: "In cases of
469 24    excessive doses, the PT is expected to be outside
469 25    of this range."
470 1      Do you see that?
470 2    A.  I see this, and I understand that they
470 3    mean over this range.
470 4    Q.  And there is a section below that that
470 5    indicates that the aPTT and Heptest are also both
470 6    prolonged dose dependently, but that neither test
470 7    is recommended for the assessment of
470 8    pharmacodynamic effects.
470 9      Do you see that?
470 10    A.  Yes, I see that.
470 11    Q.  Okay. And so they've provided
470 12    instructions to physicians in Canada about which
470 13    tests are not recommended to use.

**470:15 -   470:15** Lensing, Anthonie 2017-07-27      **[0:13]**
470 15    THE WITNESS: I see that.

| Objections In | Responses In | Rulings |
|---|---|---|
| Re: [470:15-470:15] **Def Obj** While the Court has previously ruled that statements Defendants made to foreign regulatory agencies are admissible (a ruling to which Defendants continue to object, with such objection incorporated herein for preservation), the Court has made clear that "that's where it's got to stop." See Orr. Tr. at 1978:7-20. In other words, the Court has not allowed admission of statements the foreign regulatory authorities made to Defendants (rather, the Court has admitted only the reverse). That is precisely what Plaintiff seeks to designate here, and it is irrelevant, prejudicial and will confuse the jury and the issues as well as waste time and require mini-trials. In addition, this testimony directly references the Canadian label, which the Court has repeatedly held is inadmissible. See Dkt. No. 6645. 401/403. | Re: [470:15-470:15] Pltf Resp Plaintiffs repeat these response to Defendants' objection at 454:1-4.  This exhibit and testimony relate to an email exchange with Dara Cusack, a Canadian Bayer employee—not an employee of Health Canada. This email exchange (Ex. 60) and the attachment (Ex. 61) contain Bayer statements and positions, not those of Health Canada, which Defendants' acknowledge in the instant objection has been previously found admissible. | Pending |


*Overruled see above* (handwritten)

**470:21 -   471:3** Lensing, Anthonie 2017-07-27      **[1:50]**
470 21    (Lensing Exhibit Nos. 63
470 22    through 65 were marked for
470 23    identification.)
470 24    BY MR. OVERHOLTZ:
470 25    Q.  And, Dr. Lensing, if you will look at
471 1    the Exhibits 63 and 64, which are two e-mails, and
471 2    then I can direct you to the pages we'll look at
471 3    in Exhibit 65.

| Objections In | Responses In | Rulings |
|---|---|---|
| Re: [470:21-471:3] **Def Obj** While the Court has previously ruled that statements Defendants made to foreign regulatory agencies are admissible (a ruling to which Defendants continue to object, with such objection incorporated herein for preservation), the Court has made clear that "that's where it's got to stop." See Orr. Tr. at 1978:7-20. In other words, the Court has not allowed admission of statements the foreign regulatory authorities made to Defendants (rather, the Court has admitted only the reverse). That is precisely what Plaintiff seeks to designate here, and it is irrelevant, prejudicial and will confuse the jury and the issues as well as waste time and require mini-trials. In addition, this testimony directly references the Canadian label, which the Court has repeatedly held is inadmissible. See Dkt. No. 6645. 401/403. See objections to Exhibits 63-65. | Re: [470:21-471:3] Pltf Resp Plaintiffs repeat there response to Defendants' objection at 454:1-4.  This exhibit and testimony relate to an email exchange with Dara Cusack, a Canadian Bayer employee—not an employee of Health Canada. This email exchange (Ex. 60) and the attachment (Ex. 61) contain Bayer statements and positions, not those of Health Canada, which Defendants' acknowledge in the instant objection has been previously found admissible. | Pending |

**471:12 -   471:12** Lensing, Anthonie 2017-07-27      **[0:05]**
471 12    BY MR. OVERHOLTZ:

| Objections In | Responses In | Rulings |
|---|---|---|
| Re: [471:12-471:12] | Re: [471:12-471:12] | Pending |

08/06/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|
| | **Def Obj** While the Court has previously ruled that statements Defendants made to foreign regulatory agencies are admissible (a ruling to which Defendants continue to object, with such objection incorporated herein for preservation), the Court has made clear that "that's where it's got to stop." See Orr. Tr. at 1978:7-20. In other words, the Court has not allowed admission of statements the foreign regulatory authorities made to Defendants (rather, the Court has admitted only the reverse). That is precisely what Plaintiff seeks to designate here, and it is irrelevant, prejudicial and will confuse the jury and the issues as well as waste time and require mini-trials. In addition, this testimony directly references the Canadian label, which the Court has repeatedly held is inadmissible. See Dkt. No. 6645. 401/403. | Pltf Resp Plaintiffs repeat there response to Defendants' objection at 454:1-4. This exhibit and testimony relate to an email exchange with Dara Cusack, a Canadian Bayer employee--not an employee of Health Canada. This email exchange (Ex. 60) and the attachment (Ex. 61) contain Bayer statements and positions, not those of Health Canada, which Defendants' acknowledge in the instant objection has been previously found admissible. | |

471:23 -   472:6 Lensing, Anthonie 2017-07-27

| | | | 0:27 |
|---|---|---|---|

471 23     So, Dr. Lensing, I'm showing you an
471 24     e-mail chain, and if we can start at the bottom of
471 25     the page, there is an e-mail from Susan Morency on
472  1     April 30th of 2015, and the subject is "Xarelto
472  2     response to Health Canada interaction with P-gp
472  3     and moderate CYP 3A4 inhibitors in patients with
472  4     mild and moderate renal impairment."
472  5         Do you see that?
472  6     A.  I can see that, yes.

| **Re: [471:23-472:6]** | **Re: [471:23-472:6]** | Pending |
|---|---|---|
| **Def Obj** As Plaintiffs must well know, this testimony is in direct violation of the Court's prior rulings regarding foreign labels. As the Court stated during the Orr trial, what Defendants "put on Xarelto's label in other countries in order to comply with foreign regulatory bodies or agencies . . . is irrelevant" and therefore "not admissible." Dkt. No. 6645. Nothing about this testimony suggests it would form an exception to that clear statement of the Court's position on this issue. | Pltf Resp Dr. Lensing repeatedly confirms these statements as an accurate account of Bayer™s understanding of the usefulness of PT (455:1-455:7, 456:24-457:2, 459:22-460:2, 467:7-467:11, for example), making them extremely probative, versus an offering of data made pursuant to a regulatory framework. That Dr. Lensing consistently confirms the statements as true, despite the position Bayer now takes in the Courtroom, makes them not only centrally relevant but also clarifying as well as within the Court™s reservation of ruling on Defendants™ Motion in Limine on Labeling and Regulatory Actions (Rec. Doc. 7052). Finally, Dr. Lensing takes a polar opposite position during his direct examination on pgs. 580-591. | |

474:6 -   476:17 Lensing, Anthonie 2017-07-27

| | | | 6:34 |
|---|---|---|---|

       BY MR. OVERHOLTZ:
474  6
474  7     Q.  Do you see that it's the same e-mail,
474  8     Dr. Lensing?
474  9     A.  I think it is indeed the same e-mail.
474 10     Q.  Okay. And if you can now take a look
474 11     with me at Exhibit 65, which is the attachment
474 12     annotated "Product Monograph." If we can look at
474 13     the first page, we see now that we have the 10-,
474 14     15- and 20-milligram tablets. And the date of
474 15     this is the -- March 13, 2015, and now being
474 16     revised on May 6, 2015.
474 17         Do you see that?
474 18     A.  Yes, I see that.
474 19     Q.  Okay. So now if we can look over at
474 20     page 9, there is a section for "Monitoring and
474 21     Laboratory Tests." Do you see that?
474 22     A.  Yes, I see that.
474 23     Q.  Okay. And it says: "The prothrombin
474 24     time, measured in seconds, is influenced by
474 25     Xarelto in a dose-dependent way with a close
475  1     correlation to plasma concentration if the
475  2     Neoplastin reagent is used."
475  3         Do you see that?
475  4     A.  Yes, I see that.
475  5     Q.  Okay. And then it says: "In patients
475  6     who are bleeding, measuring the PT using
475  7     Neoplastin reagent may be useful to assist in

| **Re: [474:6-476:17]** | **Re: [474:6-476:17]** | Pending |
|---|---|---|
| **Def Obj** As Plaintiffs must well know, this testimony is in direct violation of the Court's prior rulings regarding foreign labels. As the Court stated during the Orr trial, what Defendants "put on Xarelto's label in other countries in order to comply with foreign regulatory bodies or agencies . . . is irrelevant" and therefore "not admissible." Dkt. No. 6645. Nothing about this testimony suggests it would form an exception to that clear statement of the Court's position on this issue. | Pltf Resp Dr. Lensing repeatedly confirms these statements as an accurate account of Bayer™s understanding of the usefulness of PT (455:1-455:7, 456:24-457:2, 459:22-460:2, 467:7-467:11, for example), making them extremely probative, versus an offering of data made pursuant to a regulatory framework. That Dr. Lensing consistently confirms the statements as true, despite the position Bayer now takes in the Courtroom, makes them not only centrally relevant but also clarifying as well as within the Court™s reservation of ruling on Defendants™ Motion in Limine on Labeling and Regulatory Actions (Rec. Doc. 7052). Finally, Dr. Lensing takes a polar opposite position during his direct examination on pgs. 580-591. | |

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

| | | | | |
|---|---|---|---|---|
| 475  8 | determining an excess of anticoagulant activity." | | | |
| 475  9 | Do you see that? | | | |
| 475  10 | A.   Yes, that is what is assumed here. | | | |
| 475  11 | Q.   And then if we look at page 29, we see | | | |
| 475  12 | the same statement again:  "In patients who are | | | |
| 475  13 | bleeding" -- | | | |
| 475  14 | I'll wait for you to get there? | | | |
| 475  15 | A.   I'm there. | | | |
| 475  16 | Q.   There the same statement appears again: | | | |
| 475  17 | "In patients who are bleeding, measuring the PT | | | |
| 475  18 | Neoplastin reagent may be useful to assist in | | | |
| 475  19 | determining the excess of anticoagulant activity." | | | |
| 475  20 | Do you see that sentence? | | | |
| 475  21 | A.   Yes, that is what is assumed here. | | | |
| 475  22 | Q.   Okay.  And then we see at the bottom of | | | |
| 475  23 | this page, there is a section for pharmacodynamics | | | |
| 475  24 | that again talks about the clear correlation | | | |
| 475  25 | between concentration and anticoagulant effect. | | | |
| 476  1 | Do you see that? | | | |
| 476  2 | A.   Yes, I see that. | | | |
| 476  3 | Q.   And then if we turn to the next page in | | | |
| 476  4 | that section, we see that there's a section about | | | |
| 476  5 | factor Xa activity. Do you see that? | | | |
| 476  6 | A.   Yes, that is there. | | | |
| 476  7 | Q.   Okay.  And then there's a section that | | | |
| 476  8 | says: "Factor Xa assay tests require calibration | | | |
| 476  9 | and should not be used unless rivaroxaban-specific | | | |
| 476  10 | calibrators and controls are available." | | | |
| 476  11 | Do you see that? | | | |
| 476  12 | A.   Yes, I see that. | | | |
| 476  13 | Q.   Okay.  And this is instructing | | | |
| 476  14 | physicians and laboratory doctors that if they're | | | |
| 476  15 | going to use a factor Xa test to measure Xarelto, | | | |
| 476  16 | they need to use a rivaroxaban-specific calibrator | | | |
| 476  17 | and control, correct? | | | |

| | | | | |
|---|---|---|---|---|
| 476:20 -   476:20 Lensing, Anthonie 2017-07-27 | | 0:00 | | |
| 476  20 | THE WITNESS: Yes, that's correct. | | | |

**Re: [476:20-476:20]**
**Def Obj** As Plaintiffs must well know, this testimony is in direct violation of the Court's prior rulings regarding foreign labels. As the Court stated during the Orr trial, what Defendants "put on Xarelto's label in other countries in order to comply with foreign regulatory bodies or agencies . . . is irrelevant" and therefore "not admissible." Dkt. No. 6645. Nothing about this testimony suggests it would form an exception to that clear statement of the Court's position on this issue.

**Re: [476:20-476:20]**
Pltf Resp Dr. Lensing repeatedly confirms these statements as an accurate account of Bayer™s understanding of the usefulness of PT (455:1-455:7, 456:24-457:2, 459:22-460:2, 467:7-467:11, for example), making them extremely probative, versus an offering of data made pursuant to a regulatory framework.  That Dr. Lensing consistently confirms the statements as true, despite the position Bayer now takes in the Courtroom, makes them not only centrally relevant but also clarifying as well as within the Court™s reservation of ruling on Defendants™ Motion in Limine on Labeling and Regulatory Actions (Rec. Doc. 7052). Finally, Dr. Lensing takes a polar opposite position during his direct examination on pgs. 580-591.

Pending

| | | | | |
|---|---|---|---|---|
| 476:21 -   477:4 Lensing, Anthonie 2017-07-27 | | 0:59 | | |
| 476  21 | BY MR. OVERHOLTZ: | | | |
| 476  22 | Q.   And then we see the same sentence that | | | |
| 476  23 | we've been looking at for the third time in this | | | |
| 476  24 | draft label: "In patients who are bleeding, | | | |
| 476  25 | measuring the PT may be useful to assist in | | | |
| 477  1 | determining the excess of anticoagulant activity. | | | |
| 477  2 | See warnings and precautions." | | | |
| 477  3 | Do you see that? | | | |
| 477  4 | A.   Yes, that is what is assumed here. | | | |

**Re: [476:21-477:4]**
**Def Obj** As Plaintiffs must well know, this testimony is in direct violation of the Court's prior rulings regarding foreign labels. As the Court stated during the Orr trial, what Defendants "put on Xarelto's label in other countries in order to comply with foreign regulatory bodies or agencies . . . is irrelevant" and therefore

**Re: [476:21-477:4]**
Pltf Resp Dr. Lensing repeatedly confirms these statements as an accurate account of Bayer™s understanding of the usefulness of PT (455:1-455:7, 456:24-457:2, 459:22-460:2, 467:7-467:11, for example), making them extremely probative, versus an offering of data made pursuant to a regulatory

Pending

08/06/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

| | | | |
|---|---|---|---|
| | "not admissible." Dkt. No. 6645. Nothing about this testimony suggests it would form an exception to that clear statement of the Court's position on this issue. | framework. That Dr. Lensing consistently confirms the statements as true, despite the position Bayer now takes in the Courtroom, makes them not only centrally relevant but also clarifying as well as within the Court™s reservation of ruling on Defendants™ Motion in Limine on Labeling and Regulatory Actions (Rec. Doc. 7052). Finally, Dr. Lensing takes a polar opposite position during his direct examination on pgs. 580-591. | |

477:10 - 477:17 Lensing, Anthonie 2017-07-27    0:54

477 10    BY MR. OVERHOLTZ:
477 11    Q.   You see, Dr. Lensing, that there is a
477 12    chart provided that shows the relative
477 13    prolongation of PT related to baseline as compared
477 14    to warfarin.
477 15         Do you see that? For PT Neoplastin.
477 16         And that's after -- after stopping
477 17    warfarin and transferring to Xarelto.

| Re: [477:10-477:17] | Re: [477:10-477:17] | Pending |
|---|---|---|
| Def Obj As Plaintiffs must well know, this testimony is in direct violation of the Court's prior rulings regarding foreign labels. As the Court stated during the Orr trial, what Defendants "put on Xarelto's label in other countries in order to comply with foreign regulatory bodies or agencies . . . is irrelevant" and therefore "not admissible." Dkt. No. 6645. Nothing about this testimony suggests it would form an exception to that clear statement of the Court's position on this issue. | Pltf Resp Dr. Lensing repeatedly confirms these statements as an accurate account of Bayer™s understanding of the usefulness of PT (455:1-455:7, 456:24-457:2, 459:22-460:2, 467:7-467:11, for example), making them extremely probative, versus an offering of data made pursuant to a regulatory framework. That Dr. Lensing consistently confirms the statements as true, despite the position Bayer now takes in the Courtroom, makes them not only centrally relevant but also clarifying as well as within the Court™s reservation of ruling on Defendants™ Motion in Limine on Labeling and Regulatory Actions (Rec. Doc. 7052). Finally, Dr. Lensing takes a polar opposite position during his direct examination on pgs. 580-591. | |

477:20 - 478:12 Lensing, Anthonie 2017-07-27    2:17

477 20         THE WITNESS: Yes, I see that.
477 21    BY MR. OVERHOLTZ:
477 22    Q.   Okay. And then finally, if we look over
477 23    on the next page, you see that there's a Table 11
477 24    again, and it says: "The usual expected effect of
477 25    Xarelto on PT when the Neoplastin reagent is used
478 1    ... in Table 11 below."
478 2         Do you see that?
478 3    A.   Yes, I see that.
478 4    Q.   Okay. And this draft labeling, based on
478 5    the e-mail that we saw from Susan Morency
478 6    regarding -- in Exhibits 63 and 64, this is draft
478 7    labeling that's going to be provided to Health
478 8    Canada about Xarelto back in May of 2015, correct?
478 9    A.   I do not know what was provided to
478 10    Health Canada precisely.
478 11    Q.   You understood that the goal was to
478 12    provide this in response to Health Canada.

| Re: [477:20-478:12] | Re: [477:20-478:12] | Pending |
|---|---|---|
| Def Obj As Plaintiffs must well know, this testimony is in direct violation of the Court's prior rulings regarding foreign labels. As the Court stated during the Orr trial, what Defendants "put on Xarelto's label in other countries in order to comply with foreign regulatory bodies or agencies . . . is irrelevant" and therefore "not admissible." Dkt. No. 6645. Nothing about this testimony suggests it would form an exception to that clear statement of the Court's position on this issue. | Pltf Resp Dr. Lensing repeatedly confirms these statements as an accurate account of Bayer™s understanding of the usefulness of PT (455:1-455:7, 456:24-457:2, 459:22-460:2, 467:7-467:11, for example), making them extremely probative, versus an offering of data made pursuant to a regulatory framework. That Dr. Lensing consistently confirms the statements as true, despite the position Bayer now takes in the Courtroom, makes them not only centrally relevant but also clarifying as well as within the Court™s reservation of ruling on Defendants™ Motion in Limine on Labeling and Regulatory Actions (Rec. Doc. 7052). Finally, Dr. Lensing takes a polar opposite position during his direct examination on pgs. 580-591. | |

478:14 - 478:15 Lensing, Anthonie 2017-07-27    0:04

478 14         THE WITNESS: This -- these are the
478 15    preparatory works for the submission.

| Re: [478:14-478:15] | Re: [478:14-478:15] | Pending |
|---|---|---|
| Def Obj As Plaintiffs must well know, this | Pltf Resp Dr. Lensing repeatedly confirms | |

| | Objections In | Responses In | Rulings |
|---|---|---|---|

testimony is in direct violation of the Court's prior rulings regarding foreign labels. As the Court stated during the Orr trial, what Defendants "put on Xarelto's label in other countries in order to comply with foreign regulatory bodies or agencies . . . is irrelevant" and therefore "not admissible." Dkt. No. 6645. Nothing about this testimony suggests it would form an exception to that clear statement of the Court's position on this issue.

these statements as an accurate account of Bayer™s understanding of the usefulness of PT (455:1-455:7, 456:24-457:2, 459:22-460:2, 467:7-467:11, for example), making them extremely probative, versus an offering of data made pursuant to a regulatory framework. That Dr. Lensing consistently confirms the statements as true, despite the position Bayer now takes in the Courtroom, makes them not only centrally relevant but also clarifying as well as within the Court™s reservation of ruling on Defendants™ Motion in Limine on Labeling and Regulatory Actions (Rec. Doc. 7052). Finally, Dr. Lensing takes a polar opposite position during his direct examination on pgs. 580-591.

---

479:2 - 479:12 Lensing, Anthonie 2017-07-27    0:46

479  2  Q.  If you saw we were looking at
479  3       Exhibit 60 — 65? Yeah, 65, and this was the
479  4       revised Health Canada product monograph for
479  5       Canadian doctors that was being revised from the
479  6       March 13, 2015 version to the May 6, 2015 version.
479  7       That's what we were looking at on Exhibit 5 — I
479  8       mean Exhibit 65.
479  9  A.  (In English) 65.
479 10  Q.  Yes.
479 11  A.  Yes.
479 12  Q.  Okay.

**Re: [479:2-479:12]**
**Def Obj** As Plaintiffs must well know, this testimony is in direct violation of the Court's prior rulings regarding foreign labels. As the Court stated during the Orr trial, what Defendants "put on Xarelto's label in other countries in order to comply with foreign regulatory bodies or agencies . . . is irrelevant" and therefore "not admissible." Dkt. No. 6645. Nothing about this testimony suggests it would form an exception to that clear statement of the Court's position on this issue.

**Re: [479:2-479:12]**
**Pltf Resp** Dr. Lensing repeatedly confirms these statements as an accurate account of Bayer™s understanding of the usefulness of PT (455:1-455:7, 456:24-457:2, 459:22-460:2, 467:7-467:11, for example), making them extremely probative, versus an offering of data made pursuant to a regulatory framework.  That Dr. Lensing consistently confirms the statements as true, despite the position Bayer now takes in the Courtroom, makes them not only centrally relevant but also clarifying as well as within the Court™s reservation of ruling on Defendants™ Motion in Limine on Labeling and Regulatory Actions (Rec. Doc. 7052). Finally, Dr. Lensing takes a polar opposite position during his direct examination on pgs. 580-591.

Pending

---

479:17 - 480:19 Lensing, Anthonie 2017-07-27    2:15

479 17       (Lensing Exhibit No. 66 was marked
479 18        for identification.)
479 19  BY MR. OVERHOLTZ:
479 20  Q.  So you can see the draft was set to have
479 21       the revision occur in May of 2015, it was back
479 22       from the March version.  And then we see that on
479 23       Exhibit 66, there was actually a final version
479 24       issued on May 22nd of 2015.
479 25       Do you see that?
480  1  A.  What I see that there is a product
480  2       monograph for Xarelto with a date of revision
480  3       May 22nd.
480  4  Q.  Okay. I want to just take a look at
480  5       what ended up being in the final version of the
480  6       pharmacodynamic section, which started on the
480  7       bottom of page 29.
480  8       Do you see that?
480  9  A.  (No response.)
480 10  Q.  Do you see that, Dr. Lensing?
480 11  A.  Yes, I see that.
480 12  Q.  Okay. So then if we can turn to the
480 13       next page, we see in this product monograph final
480 14       from May of 2015, the statement made: "In
480 15       patients who are bleeding, measuring the PT
480 16       Neoplastin reagent may be useful to assist in
480 17       determining the excess of anticoagulant activity."
480 18       Do you see that?
480 19  A.  I see that this is being assumed.

**Re: [479:17-480:19]**
**Def Obj** As Plaintiffs must well know, this testimony is in direct violation of the Court's prior rulings regarding foreign labels. As the Court stated during the Orr trial, what Defendants "put on Xarelto's label in other countries in order to comply with foreign regulatory bodies or agencies . . . is irrelevant" and therefore "not admissible." Dkt. No. 6645. Nothing about this testimony suggests it would form an exception to that clear statement of the Court's position on this issue. See objection to Exhibit 66.

**Re: [479:17-480:19]**
**Pltf Resp** Dr. Lensing repeatedly confirms these statements as an accurate account of Bayer™s understanding of the usefulness of PT (455:1-455:7, 456:24-457:2, 459:22-460:2, 467:7-467:11, for example), making them extremely probative, versus an offering of data made pursuant to a regulatory framework. That Dr. Lensing consistently confirms the statements as true, despite the position Bayer now takes in the Courtroom, makes them not only centrally relevant but also clarifying as well as within the Court™s reservation of ruling on Defendants™ Motion in Limine on Labeling and Regulatory Actions (Rec. Doc. 7052). Finally, Dr. Lensing takes a polar opposite position during his direct examination on pgs. 580-591.

Pending

| | Objections In | Responses In | Rulings |
|---|---|---|---|

481:1 - 481:4 Lensing, Anthonie 2017-07-27     0:15

481   1   BY MR. OVERHOLTZ:
481   2   Q.   If you can look with me at the next
481   3   page. There's information provided here regarding
481   4   Table 11 again regarding the usual expected effect

**Re: [481:1-481:4]**
**Def Obj** As Plaintiffs must well know, this testimony is in direct violation of the Court's prior rulings regarding foreign labels. As the Court stated during the Orr trial, what Defendants "put on Xarelto's label in other countries in order to comply with foreign regulatory bodies or agencies . . . is irrelevant" and therefore "not admissible." Dkt. No. 6645. Nothing about this testimony suggests it would form an exception to that clear statement of the Court's position on this issue.

**Re: [481:1-481:4]**
Pltf Resp Dr. Lensing repeatedly confirms these statements as an accurate account of Bayer™s understanding of the usefulness of PT (455:1-455:7, 456:24-457:2, 459:22-460:2, 467:7-467:11, for example), making them extremely probative, versus an offering of data made pursuant to a regulatory framework. That Dr. Lensing consistently confirms the statements as true, despite the position Bayer now takes in the Courtroom, makes them not only centrally relevant but also clarifying as well as within the Court™s reservation of ruling on Defendants™ Motion in Limine on Labeling and Regulatory Actions (Rec. Doc. 7052). Finally, Dr. Lensing takes a polar opposite position during his direct examination on pgs. 580-591.

Pending

482:1 - 482:12 Lensing, Anthonie 2017-07-27     1:48

482   1   max for 17 to 32 seconds.  Do you see that?
482   2   A.   I see that.
482   3   Q.   Okay.  And is this information, as you
482   4   understand it, correct with respect to the PT
482   5   ranges for max and trough for the VTE indication
482   6   for the 15-milligram twice-daily dose?
482   7   A.   These figures were based on blood
482   8   samplings taken as part of the Einstein-DVT and
482   9   Einstein PE studies for the prolongation of DVT,
482   10  and this was documented through Cmax and Ctrough
482   11  in order to see a correlation with the occurrence
482   12  of bleeding afterwards.  So that's correct.

**Re: [482:1-482:12]**
**Def Obj** As Plaintiffs must well know, this testimony is in direct violation of the Court's prior rulings regarding foreign labels. As the Court stated during the Orr trial, what Defendants "put on Xarelto's label in other countries in order to comply with foreign regulatory bodies or agencies . . . is irrelevant" and therefore "not admissible." Dkt. No. 6645. Nothing about this testimony suggests it would form an exception to that clear statement of the Court's position on this issue.

**Re: [482:1-482:12]**
Pltf Resp Dr. Lensing repeatedly confirms these statements as an accurate account of Bayer™s understanding of the usefulness of PT (455:1-455:7, 456:24-457:2, 459:22-460:2, 467:7-467:11, for example), making them extremely probative, versus an offering of data made pursuant to a regulatory framework. That Dr. Lensing consistently confirms the statements as true, despite the position Bayer now takes in the Courtroom, makes them not only centrally relevant but also clarifying as well as within the Court™s reservation of ruling on Defendants™ Motion in Limine on Labeling and Regulatory Actions (Rec. Doc. 7052). Finally, Dr. Lensing takes a polar opposite position during his direct examination on pgs. 580-591.

Pending

483:4 - 483:13 Lensing, Anthonie 2017-07-27     0:53

483   4   (Lensing Exhibit No. 67 was marked
483   5   for identification.)
483   6   BY MR. OVERHOLTZ:
483   7   Q.   Dr. Lensing, you're familiar with this
483   8   article?
483   9   A.   I am coauthor, so I'm familiar with it.
483   10  Q.   Okay.  And if we can see, as you just
483   11  said, you're listed as the coauthor, along with
483   12  Wolfgang Mueck.  Do you see that?
483   13  A.   I see that.

483:19 - 484:1 Lensing, Anthonie 2017-07-27     0:36

483   19  Q.   And the title of this article, if I can
483   20  get it to fit on the screen, is "Population
483   21  pharmacokinetic analysis in patients treated for
483   22  acute deep vein thrombosis and exposure
483   23  simulations in patients with atrial fibrillation
483   24  treated for stroke prevention."
483   25       Do you see that?
484   1   A.   I see that.

484:2 - 484:11 Lensing, Anthonie 2017-07-27     1:14

484   2   Q.   Okay.  And this study involved you using
484   3   pharmacokinetic modeling to predict exposures for
484   4   AFib patients based on the plasma samples that had
484   5   been taken in the DVT patients; is that right?
484   6   A.   Indeed, our pharmacokineticists have
484   7   performed that modeling -- that analysis.  Sorry.
484   8   Q.   Okay.  And this article was published in
484   9   2011 in the journal Clinical Pharmacokinetics; is
484   10  that right?
484   11  A.   That's correct.

484:21 - 484:24 Lensing, Anthonie 2017-07-27     0:18

484   21  Q.   It was certainly written before you knew
484   22  that you were going to have your deposition taken
484   23  like we're doing today in litigation, correct?

08/06/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

484 24     A.  That's correct.

486:7 —  486:20 Lensing, Anthonie 2017-07-27          1:16
486  7     Q.  Okay.  Now, let's look at the top of
486  8     page 678 on the right column.
486  9         It says: "The PT was determined
486 10     according to standard procedures at a central
486 11     laboratory using Stago Neoplastin."
486 12         Do you see that?
486 13     A.  Yes, I see that.
486 14     Q.  Okay.  Now, PT Neoplastin, that's not --
486 15     that's not INR, right?
486 16     A.  That's correct.
486 17     Q.  Okay.  And it's not a PT test that
486 18     compares the value to baseline.  Do you agree with
486 19     that?
486 20     A.  This is an absolute PT value.

488:12 —  488:18 Lensing, Anthonie 2017-07-27        0:35
488 12     Q.  Now, if we can look at the next page,
488 13     this statement in this article written by
488 14     Dr. Mueck and yourself says:  "No other
488 15     demographic factors or concomitant medications had
488 16     a significant effect on the relationship between
488 17     the plasma rivaroxaban concentrations and PT."
488 18         Do you see that?

489:3 —   489:4 Lensing, Anthonie 2017-07-27         0:05
489  3         THE WITNESS:  (Peruses document.)  Yes,
489  4     I've read that.

489:6 —   489:10 Lensing, Anthonie 2017-07-27        0:30
489  6     Q.  Okay.  And you see there's a chart here
489  7     and it shows the concentration PT relationship as
489  8     observed in the DVT and Einstein-DVT dose-finding
489  9     studies, correct?
489 10     A.  That's correct.

490:2 —   490:16 Lensing, Anthonie 2017-07-27        1:22
490  2     Q.  Okay.  If you can turn with me to
490  3     page 684.  This -- this is a discussion and
490  4     conclusion section.  There is a paragraph in the
490  5     middle of the page that starts with "The slope
490  6     from the plasma concentration."  Do you see that?
490  7         And it says:  "The slope of the plasma
490  8     concentration PT correlation graph reflected the
490  9     sensitivity of the PT to increases in rivaroxaban
490 10     exposure.  The PT correlated in an almost linear
490 11     faction -- fashion with rivaroxaban
490 12     concentrations, less than or equal to 500
490 13     micrograms per liter, confirming that the PT could
490 14     be used to assess exposure."
490 15         Do you see that?
490 16     A.  I see.

500:8 —   500:19 Lensing, Anthonie 2017-07-27        3:18
500  8     Q.  Okay.  Now, if I can show you what we'll
500  9     mark as Exhibit No. 70.
500 10         (Lensing Exhibit No. 70 was marked
500 11     for identification.)
500 12         THE WITNESS:  (Peruses document.)
500 13     BY MR. OVERHOLTZ:
500 14     Q.  Dr. Lensing, looking at Exhibit 70, it's
500 15     an e-mail from April 2009, from yourself to a
500 16     Nicole Diedrichs at Bayer HealthCare, and Frank
500 17     Misselwitz is copied.
500 18         Do you see that?
500 19     A.  I see it.

Re: [500:8-500:19]
Def Obj See objection to Exhibit 70.

Pending

501:2 —   502:5 Lensing, Anthonie 2017-07-27         2:00
501  2     Q.  And so you wrote this e-mail to Nicole,
501  3     and you say:  "Dear Nicole: You are right.  This
501  4     article initially contained Agnelli, Buller,
501  5     myself and Frank as authors."
501  6         Do you see that?
501  7     A.  Yes, I see that.
501  8     Q.  Okay.  You next say:  "Besides
501  9     Wolfgang's careful analyses, this article is
501 10     written completely amateuristic by Chameleon.  It
501 11     is a mass."
501 12         Do you see that?
501 13         MS. YATES:  Actually, form.  It says:
501 14     "It is a mass."
501 15         THE WITNESS:  I think your

Re: [501:2-502:5]
Def Obj That the witness had a low
opinion of the quality of writing of a draft
of an article (the final version of which he
says he was happy with - see 503:23-
504:1) has no bearing on any of Plaintiff's
claims. This testimony was designated
with only one goal in mind: to inflame the
jury. It is substantially more prejudicial
than probative. 401/403. Furthermore, it
contains hearsay without exception.

Re: [501:2-502:5]
Pltf Resp This evidence and testimony is
highly probative to the process that
Bayer employs in order to convey and
shape the results of its studies to the
outside medical and scientific world--
such as their reliance upon outside
medical writing firms, such as
Chameleon.

Pending

| | | Objections in | Responses In | Rulings |
|---|---|---|---|---|

501 16   Interpretation of "mass" and "mess" is correct.
501 17   (In English) I mean "mess."
501 18   BY MR. OVERHOLTZ:
501 19   Q.   You meant "mess"?
501 20   A.   (In English) Yes.
501 21   MS. YATES: But you wrote "mass."
501 22   THE WITNESS: (In English) I wrote
501 23   "mass," but it was not something Catholic I was
501 24   referring to.
501 25   BY MR. OVERHOLTZ:
502 1   Q.   Okay. You say: "No rationale behind
502 2   It. Data not presented in a way to guide readers
502 3   to the most important conclusion of our program.
502 4   OD rIva and no monitoring."
502 5   Do you see that?

502:8 - 503:8  Lensing, Anthonie 2017-07-27     2:13
502 8   THE WITNESS: That is indeed almost what
502 9   it says here.
502 10   BY MR. OVERHOLTZ:
502 11   Q.   You also list: "Fixed dose, dose
502 12   adjustment for renal function to be assessed in
502 13   phase III studies." Correct?
502 14   A.   That is correct.
502 15   Q.   You said: "Agnelli liked it very much
502 16   and announced a major -- a minor comment." Do you
502 17   see that?
502 18   A.   Yes, I see that.
502 19   Q.   Okay. And so the e-mail that we saw
502 20   previously, that had been the first time that
502 21   Dr. Agnelli had ever seen this article that he
502 22   ended up being a listed author on, correct?
502 23   MS. YATES: Objection. Form,
502 24   foundation.
502 25   THE WITNESS: I do not think that that
503 1   is what appears from this.
503 2   BY MR. OVERHOLTZ:
503 3   Q.   You said: "Harry said thank you."
503 4   You're talking about Harry Buller?
503 5   A.   Yes. Harry was not interested in a
503 6   pharmacokinetics and pharmacodynamics article
503 7   because he doesn't know the first thing about
503 8   that.

503:23 - 504:9  Lensing, Anthonie 2017-07-27     1:28
503 23   Q.   Okay. Now, were you happy with the
503 24   final paper as it -- as it came together for the
503 25   final published version?
504 1   A.   Yes, I was.
504 2   Q.   Okay. And that was the paper that we
504 3   looked at in Exhibit 67 that said: "The PT
504 4   correlated in an almost linear fashion with
504 5   rivaroxaban concentrations, less than or equal to
504 6   500 micrograms per liter, confirming that PT could
504 7   be used to assess exposure." Right?
504 8   A.   This sentence is what we wrote in this
504 9   article, that is right.

*Re: [503:23-504:9]* — Objections column: **Def Obj** See objection to Exhibit 67.
*Re: [503:23-504:9]* — Responses column: Pltf Resp See Plaintiffs' response to Defendants' objection to this exhibit.
Rulings column: Pending

504:22 - 505:12  Lensing, Anthonie 2017-07-27     2:03
504 22   (Lensing Exhibit No. 71 was marked
504 23   for identification.)
504 24   BY MR. OVERHOLTZ:
504 25   Q.   Dr. Lensing, you see you received an
505 1   e-mail on March 5th of 2012 from a Petra Hoeh at
505 2   Bayer, along with several others, regarding report
505 3   PH36711, "Explorative analysis of prothrombin time
505 4   measured by Neoplastin reagent in subjects treated
505 5   with rivaroxaban."
505 6   Do you see that?
505 7   A.   I see that.
505 8   Q.   And that's in the pool of studies, 11702
505 9   DVT, Einstein-DVT, and 11702 PE, Einstein PE.
505 10   That's the phase III Einstein PE/DVT trials,
505 11   correct?
505 12   A.   That is correct.

*Re: [504:22-505:12]* — Objections column: **Def Obj** See objection to Exhibit 71.
*Re: [504:22-505:12]* — Responses column: Pltf Resp See Plaintiffs' response to Defendants' objection to this exhibit.
Rulings column: Pending

506:6 - 506:7  Lensing, Anthonie 2017-07-27     0:12
506 6   (Lensing Exhibit No. 72 was marked
506 7   for identification.)

509:2 - 509:24  Lensing, Anthonie 2017-07-27     2:03
509 2   Q.   Okay. So looking at Exhibit 73,
509 3   Dr. Lensing, I've made a composite of what we
509 4   looked at, Exhibit 71, which was the e-mail from

*Re: [509:2-509:24]* — Objections column: **Def Obj** See objection to Exhibit 73.
*Re: [509:2-509:24]* — Responses column: Pltf Resp See Plaintiffs' response to Defendants' objection to this exhibit.
Rulings column: Pending

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

509  5   Petra Hoeh to you indicating that the report
509  6   36711, explorative analysis of prothrombin time
509  7   measured by Neoplastin in the Einstein studies,
509  8   was available for your review.
509  9        Do you see that?
509 10   A.  I see that.
509 11   Q.  Okay. And are you familiar with this
509 12   report, the explorative analysis of PT in the
509 13   Einstein-DVT studies?
509 14   A.  It is indeed the kind of report that is
509 15   published as a result, and it provides a first
509 16   analysis on this topic as such.
509 17   Q.  Okay. And this was from March of 2012,
509 18   correct?
509 19   A.  That's correct.
509 20   Q.  Okay. And this explorative analysis
509 21   data that's in this paper has not been published
509 22   in the medical literature yet, correct?
509 23   A.   Up till now, it has not yet been
509 24   published.

510:21 -  511:6 Lensing, Anthonie 2017-07-27          0:32
510 21   Q.  So if we can look at the next page. It
510 22   says for the objectives: "Describe the
510 23   distribution of PT measurements at the various
510 24   assessment time points in rivaroxaban subjects and
510 25   subgroups."
511  1        And number 2: "Investigate the
511  2   relationship between measurements of PT Neoplastin
511  3   and first occurrence of a confirmed bleeding event
511  4   among rivaroxaban exposed subjects overall and in
511  5   subpopulations."
511  6        Do you see that?

511:1 -  511:6 Lensing, Anthonie 2017-07-27          0:15
511  1        And number 2: "Investigate the
511  2   relationship between measurements of PT Neoplastin
511  3   and first occurrence of a confirmed bleeding event
511  4   among rivaroxaban exposed subjects overall and in
511  5   subpopulations."
511  6        Do you see that?

512:4 -  513:14 Lensing, Anthonie 2017-07-27          3:42
512  4   BY MR. OVERHOLTZ:
512  5   Q.  Dr. Lensing, if you can look with me at
512  6   slide 4, there are several pages that are pulled
512  7   from the 2,000-page report, and I want to draw
512  8   your attention to the page 594 of 2007.
512  9        Do you see that?
512 10   A.  I see that.
512 11   Q.  Okay. And if you look at page 594, it
512 12   says: "Number of subject and observed event rate
512 13   for clinically relevant bleeding in BID dosing
512 14   phase by quartiles of PT Neoplastin. Population:
512 15   Subjects valid for safety."
512 16        Do you see that?
512 17   A.  I see that.
512 18   Q.  Okay. And so if we look here, the first
512 19   grouping lists the PTs divided by quartile for
512 20   peak PT values. Do you see that?
512 21   A.  I see that.
512 22   Q.  Okay. And you can see that the
512 23   quartiles are divided. The first quartile is 11.6
512 24   to 19.7; second, 19.7 to 22.2; third, 22.2 to
512 25   25.1. And those are all peak PT values, correct?
513  1   A.  It is probably so; however, it is
513  2   difficult to really see, but for the most, this
513  3   document is consistent.  So I think it's the PT
513  4   Neoplastin day 15 peak during the BID phase. So I
513  5   think that is right.
513  6   Q.  Okay. And so just to be clear, so it's
513  7   a little clearer for you maybe, I've put the --
513  8   the version that I pulled from the -- from the
513  9   2,000-page document, so we can see it clearly.
513 10        Again, page 594 of 2007. And it's
513 11   Table 14.4.2. And again, the four quartiles, as
513 12   we discussed, for day 15 peak, PT Neoplastin,
513 13   correct?
513 14   A.  That's correct.

513:18 -  516:12 Lensing, Anthonie 2017-07-27          6:52
513 18        (Lensing Exhibit No. 74 was marked
513 19        for identification.)
513 20   BY MR. OVERHOLTZ:



Re: [513:18-516:12]
Def Obj See objection to Exhibit 74.

Re: [513:18-516:12]
Pltf Resp See Plaintiffs' response to
Defendants' objection to this exhibit.

Pending

08/06/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

513 21    Q.   And so if you look with me under the

513 22    column here, "N/ALL Percentage," this represents

513 23    the percentage of patients who had a clinically

513 24    relevant bleed by quartile, correct?

513 25    A.   That's correct.

514 1    Q.   Okay. And so you can see that the

514 2    percentage for patients in the first quartile, the

514 3    lowest quartile PT, had a rate of 3.15 percent

514 4    clinically relevant bleeding.  Do you see that?

514 5        And that's by PT measured at peak,

514 6    correct?

514 7    A.   That's correct.

514 8    Q.   Okay. And then the second quartile, the

514 9    percentage is about 2.8. Do you see that?

514 10    A.   I see that.

514 11    Q.   It's up to 3.98 for the third quartile.

514 12    Do you see that?

514 13    A.   I see that.

514 14    Q.   And then there are -- It's up to 5.91

514 15    percent for the fourth quartile. Do you see that?

514 16    A.   That's what it says, yes.

514 17    Q.   Okay. Now, if we look below, it also

514 18    reports the PT Neoplastin quartiles at day 15

514 19    trough. Correct?

514 20    A.   I see that.

514 21    Q.   And you see that the first quartile is

514 22    from 11.0 to 15.4; second, 15.4 to 16.8; and third

514 23    quartile is 16.8 to 19.0.  Right?

514 24    A.   I see that.

514 25    Q.   And the fourth quartile for PTs greater

515 1    than 19.0 up to 69.1. Do you see that?

515 2    A.   Yes, I see that.

515 3    Q.   And we're still talking about trough PT

515 4    values by Neoplastin, right?

515 5    A.   Yes, of course.

515 6    Q.   And we see that the percentage of

515 7    patients in the first quartile for day 15 trough

515 8    is 2.43 for the first quartile and 2.58 for the

515 9    second quartile. Do you see that?

515 10    A.   I see that.

515 11    Q.   And the percentage for the third

515 12    quartile is 4.765 -- 76. Correct?

515 13    A.   That's correct.

515 14    Q.   And the quartile for the -- the fourth

515 15    quartile for PT trough at day 15 is 4.65 percent,

515 16    right?

515 17    A.   That's correct.

515 18    Q.   And if we look at absolute numbers, you

515 19    see that the quartile numbers are close to the

515 20    same, they are not exact, 700, 658, 651 and 667,

515 21    correct?

515 22    A.   That's correct.

515 23    Q.   And the total numbers, we had 34

515 24    patients with clinically relevant bleed in the

515 25    first two quarters -- quartiles of PT, correct?

516 1    A.   If you add up the two quartiles?

516 2    Q.   Yes.

516 3    A.   That -- yes, 51.

516 4    Q.   Oh, the -- the 17 of 750 and 17 of 658

516 5    would add up to a total of 34, correct?

516 6    A.   (In English)  17 and 17, 34, yep.

516 7    Q.   Okay. And then if we look at the

516 8    patients in the third and fourth quartile, those

516 9    quartiles for trough above 16.8, there were 62,

516 10    right?

516 11    A.   If you were to do that, yes, that will

516 12    be correct.

516:13 -  516:15 Lensing, Anthonie 2017-07-27    0:17

516 13    Q.   Okay. Now, it's almost twice as much if

516 14    you add quartiles 3 and 4 and compare them to

516 15    quartiles 1 and 2, correct?

516:17 -  516:20 Lensing, Anthonie 2017-07-27    0:09

516 17    THE WITNESS: You are a lawyer, so you

516 18    are not an expert in biostatistics, and in all

516 19    modesty, I must say that your conclusion is not

516 20    valid.

525:13 -  525:18 Lensing, Anthonie 2017-07-27    0:41

525 13    BY MR. OVERHOLTZ:

525 14    Q.   Have you seen the data from this report

525 15    that indicates that fragile patients were more

525 16    likely to be in the upper quartiles compared to

| | Objections In | Responses In | Rulings |
|---|---|---|---|

525 17   the bottom quartiles? Fragile, yes. Have you --
525 18   have you seen that information?

525:25 -  526:12 Lensing, Anthonie 2017-07-27
525 25      THE WITNESS: I didn't see that, but the
526  1   results are absolutely obvious. If patients have
526  2   any type of renal impairment, and there will be
526  3   some adding up of the rivaroxaban, there will
526  4   obviously be much more exposure, and that means
526  5   that they will end up in the higher quartiles, the
526  6   third or the fourth quartiles.
526  7   BY MR. OVERHOLTZ:
526  8   Q.   Of PT?
526  9   A.   Yes. Because PT is linearly related to
526 10   correlation.
526 11   Q.   You can see here --
526 12   A.   Concentration. Excuse me.

527:1 -  527:14 Lensing, Anthonie 2017-07-27
527  1      (Lensing Exhibit No. 75 was marked
527  2      for identification.)
527  3   BY MR. OVERHOLTZ:
527  4   Q.   Just on this page, the quartiles are
527  5   expressed across the page, right?
527  6   A.   Yes.
527  7   Q.   Okay. And they have results for major
527  8   and clinically relevant bleeding listed there.
527  9   A.   Yes, I see that.
527 10      Do you have a question about this?
527 11   Q.   Yes. The -- the major bleeding and
527 12   clinically relevant bleeding is represented here
527 13   by quartile across the page; is that right?
527 14   A.   Yes.

**Re: [527:1-527:14]**
Def Obj See objection to Exhibit 75.

**Re: [527:1-527:14]**
Pltf Resp See Plaintiffs' response to
Defendants' objection to this exhibit.

Pending

527:23 -  527:25 Lensing, Anthonie 2017-07-27
527 23      MR. OVERHOLTZ: Yeah, 76.
527 24      (Lensing Exhibit No. 76 was marked
527 25      for identification.)

528:3 -  529:3 Lensing, Anthonie 2017-07-27
528  3   Q.   So have you seen this data that for
528  4   patients with clinically relevant bleeding, as
528  5   looking at PT by quartile, that black patients who
528  6   had a clinically relevant bleed were more likely
528  7   to be in the third and fourth quartile PT?
528  8   A.   I don't know how to say it to you
528  9   anymore, because your knowledge of biostatistics
528 10   is really inferior. I am trying to tell you that
528 11   you cannot make these statements.
528 12      Why are black people more represented in
528 13   the fourth quartile? Well, maybe because many of
528 14   them are older, maybe because many of them had
528 15   cancer. So this conclusion is really a violation
528 16   of the truth. Rule number one in academic
528 17   research is that you have to stick to conventions,
528 18   and you can't go on interpreting like you do. So
528 19   my answer is, no, that is not true.
528 20      You can only say that if you would have
528 21   an adjusted analysis with the independent
528 22   predictors, and only in that case, the
528 23   concentration of rivaroxaban may be higher. These
528 24   indicators may be age, renal function, may be
528 25   morbidity, and only if that conclusion would be
529  1   justified, it -- you could be able to say that
529  2   Africa -- Afro-Americans have a higher chance of
529  3   ending up in the fourth quartile.

**Re: [528:3-529:3]**
Pltf Obj Non-responsive. Dr. Lensing
begins by not responding to the question
asked but by offering the exclamation, "I
don't know how to say it to you,
anymore, because your knowledge of
biostatistics is really inferior."
Foundation and speculation, as well - the
witness is clear that he is unsure of why
"are black people more represented in
the fourth quartile."

**Re: [528:3-529:3]**
Def Resp The answer is perfectly
responsive and adds necessary context -
i.e., that counsel's questions, as phrases,
are oversimplified and do not reflect the
science.

Pending

529:4 -  529:8 Lensing, Anthonie 2017-07-27
529  4   Q.   Dr. Lensing, if we add these four
529  5   quartiles together for patients that had these PT
529  6   value measurements, and there's only 72
529  7   African-American patients in the analysis -- do
529  8   you see that?

529:11 -  529:22 Lensing, Anthonie 2017-07-27
529 11      THE WITNESS: Yes, I see that.
529 12   BY MR. OVERHOLTZ:
529 13   Q.   And there were over 2,600 patients in
529 14   the total analysis. I think it's 2,673, if my
529 15   math added quickly.
529 16   A.   Well, the reason -- one of the reasons,
529 17   of course, is that we performed an international
529 18   study, and not many African-Americans live outside
529 19   the United States.

| | Objections In | Responses In | Rulings |
|---|---|---|---|

529 20    Q.   So is it fair to say there were few
529 21    numbers of African-American patients included in
529 22    the Einstein-DVT and PE trials?

529:24 -   530:1 Lensing, Anthonie 2017-07-27    0:23
529 24    THE WITNESS: There were fewer
529 25    African-Americans included in this study than
530  1    Caucasians or Asians.

534:23 -   534:23 Lensing, Anthonie 2017-07-27    0:03
534 23    Q.   Good afternoon, Dr. Lensing.

534:24 -   535:7  Lensing, Anthonie 2017-07-27    0:24
534 24    A.   Good afternoon.
534 25    Q.   Would you please introduce yourself to
535  1    the ladies and gentlemen of the jury. Who are
535  2    you?
535  3    A.   My name is Anthonie Lensing. I am
535  4    Dutch. I live in Amsterdam, The Netherlands. And
535  5    I'm a doctor specialized in neurosurgery and
535  6    neurology with a super specialization in vascular
535  7    medicine.

535:25 -   536:13 Lensing, Anthonie 2017-07-27    1:50
535 25    Q.   Have you ever had your deposition taken
536  1    before?
536  2    A.   No, I've never had a deposition taken.
536  3    Q.   And so even though sometimes in your
536  4    professional life you speak English, you are here
536  5    primarily testifying in Dutch. Why did you make
536  6    that decision?
536  7    A.   The reason why I chose to speak Dutch is
536  8    that because I am being questioned here not by a
536  9    physician but by a lawyer, and the non-medical
536 10    language in English is more difficult to me. For
536 11    example, if I watch American television "Games of
536 12    Thrones," to name one, I do not understand the
536 13    half of what is said there.

537:15 -   537:19 Lensing, Anthonie 2017-07-27    0:29
537 15    Q.   Doctor, we're here in Amsterdam. Did
537 16    you grow up in Amsterdam?
537 17    A.   Yes, I was born in Amsterdam, I grew up
537 18    here, and I also followed my training to become a
537 19    physician and a specialist in Amsterdam.

538:8  -   539:6  Lensing, Anthonie 2017-07-27    3:50
538  8    Q.   Doctor, do you also have a Ph.D.?
538  9    A.   I obtained a Ph.D., yes, at the
538 10    University in Amsterdam in 1990.
538 11    Q.   And can you tell the jury about the
538 12    research that you did as part of that Ph.D.?
538 13    A.   Yes. That was related to three
538 14    subjects. The first being diagnostics for
538 15    thrombosis. I developed an ultrasound test for
538 16    thrombosis diagnosis, and I published that in the
538 17    New England Journal of Medicine. I believe that
538 18    was in 1990. And that test has now become the
538 19    world standard.
538 20    The second subject was treatment of
538 21    thrombosis with low-molecular-weight heparin.
538 22    That was along with a colleague, Mr. Prandoni, and
538 23    that was the first research in the world using
538 24    low-molecular-weight heparin instead of
538 25    unfractioned heparin for treatment of thrombosis
539  1    legs. And up until now, that's -- has also been
539  2    the standard worldwide before rivaroxaban and
539  3    other NOACs came into the picture.
539  4    And the last subject was risk factors.
539  5    I've done quite a lot of research into factors
539  6    that might increase the risk of thrombosis.

541:3  -   541:11 Lensing, Anthonie 2017-07-27    1:24
541  3    Q.   Doctor, it sounds as if -- well, let me
541  4    ask you: Is it accurate to say that your entire
541  5    medical career has really focussed on the treatment
541  6    of thrombosis?
541  7    A.   Yes, that is right. My entire
541  8    professional life I've been involved in the
541  9    treatment of many thousands of adults, including
541 10    children, and I specialized in optimizing
541 11    anticoagulant treatment.

547:15 -   548:5  Lensing, Anthonie 2017-07-27    1:58

08/06/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

547 15    Q.  Do you know how many articles you have
547 16    published in the peer-reviewed literature relating
547 17    to the area of medicine that you specialize in,
547 18    thrombosis?
547 19    A.  I have published around 150 to 170
547 20    articles and/or chapters in the medical
547 21    literature.
547 22    Q.  And do some of those publications relate
547 23    to the work you have performed on Xarelto?
547 24    A.  Yes, absolutely.  Because of the fact
547 25    that the Einstein-DVT and PE studies were so vast
548  1    and concerned over 8,000 patients, we have also
548  2    been able to look at subgroups in order to see how
548  3    good or how bad rivaroxaban was compared to the
548  4    standard of care.  So that is what I did and what
548  5    I published about in medical literature.

**548:10 -  549:3** Lensing, Anthonie 2017-07-27    2:02
548 10      Your title today, global clinical
548 11    leader, was that the same title that you had when
548 12    you joined in 2004?
548 13    A.  That's correct.  My ambitions were to
548 14    perform large scale clinical research.  These
548 15    ambitions remain unchanged and are still that, and
548 16    that is why I have not tried to make any changes
548 17    to the title.
548 18      (In English) Position.
548 19      (Interpreter) Position.
548 20    Q.  And, Dr. Lensing, as global clinical
548 21    leader, were you in charge of a specific area of
548 22    research that related -- that relates to Xarelto?
548 23    A.  That's correct.  I was in charge of
548 24    research into the treatment of VTE, which is the
548 25    combination of DVT plus PE.
549  1    Q.  And is that research known as the
549  2    Einstein clinical program?
549  3    A.  That's correct.

Re: [548:10-549:3]
Pltf Obj Duplicative to testimony
designated at pg. 28: 12-22 and again at
33: 15-34:8. As well as nearly word for
word as designated at 36:12-15.

Re: [548:10-549:3]
Def Resp Due to the length of Plaintiff's
designations, roughly two hours will have
passed since the jury will have heard this
background information (which is very
brief). It adds context to forthcoming
testimony.

Pending

**550:5 -  550:16** Lensing, Anthonie 2017-07-27    1:43
550  5    Q.  And, Doctor, do you know approximately
550  6    the time frame that the phase II Einstein studies
550  7    occurred over?
550  8    A.  The phase II studies into the treatment
550  9    of thrombosis took place in the period 2004, 2005,
550 10    and a part of 2006.
550 11    Q.  And if I recall correctly, there were
550 12    two phase II studies, ODIXa-DVT and Einstein-DVT;
550 13    is that correct?
550 14    A.  That's correct.  ODIXa-DVT looked into
550 15    rivaroxaban twice daily, whereas Einstein-DVT
550 16    studied rivaroxaban once daily.

**550:23 -  551:4** Lensing, Anthonie 2017-07-27    1:09
550 23    Q.  And, Doctor, so then after phase II, the
550 24    next phase is phase III.  Do you know the time
550 25    frame covered by the phase III research relating
551  1    to Einstein?
551  2    A.  That was approximately over the period
551  3    between 2007 up and including -- up to and
551  4    including 2011.

**553:23 -  554:2** Lensing, Anthonie 2017-07-27    1:06
553 23    Q.  And based upon your experience in
553 24    designing and running clinical trials, is that
553 25    normal for a company and regulators to go back and
554  1    forth and discuss the design of the phase III
554  2    studies?

Re: [553:23-554:2]
Pltf Obj Foundation and improper expert
opinion, as witness is asked "Is that
normal" pertaining to regulatory matters
on the design of studies.

Re: [553:23-554:2]
Def Resp As the question makes clear,
the witness was asked to answer "based
upon [his] experience designing and
running clinical trials."

Pending

**554:5 -  554:14** Lensing, Anthonie 2017-07-27    0:41
554  5      THE WITNESS:  I have to say that it is
554  6    highly normal.  This is what always happens.  But
554  7    in case of rivaroxaban for the indication
554  8    thrombosis leg and pulmonary embolism, the
554  9    discussions we had with the FDA were extremely
554 10    simple and very constructively, and they -- when
554 11    the details became available, the numbers became
554 12    available, they recognized immediately that it was
554 13    a highly important substance; and, therefore, the
554 14    FDA approved it and allowed it really quickly.

**554:24 -  555:11** Lensing, Anthonie 2017-07-27    1:45
554 24    Q.  And based upon your experience in
554 25    designing and running clinical trials and your
555  1    expertise in the area of thrombosis, is it normal

*(handwritten: Sustained  [illegible] the earlier ... Overruled ... 701)*

08/06/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

555  2   to see scientific debate around the design of the
555  3   phase III studies?
555  4   A.   Well, it's absolutely normal -- It's an
555  5   absolutely normal procedure. If you generate so
555  6   many data in a dose-finding study, you have to
555  7   take time in order to understand what has
555  8   happened. You have to allow people to respond to
555  9   that. And along the way, slowly you get an idea
555 10   what the substance can do, what it cannot do, and
555 11   what you have to study in the future.

556:5  -  556:21 Lensing, Anthonie 2017-07-27          2:08
556  5   Q.   Doctor, were you a member of the
556  6   steering committee for Einstein?
556  7   A.   Yes, that's correct, I was a member.
556  8   Q.   Can you tell the ladies and gentlemen of
556  9   the jury who else was on the steering committee
556 10   with you?
556 11   A.   On the one hand, there were four members
556 12   of Bayer and Johnson & Johnson.  On the other
556 13   hand, there were eight members that were
556 14   international experts with vast expertise in the
556 15   field of anticoagulants for DVT and PE treatment.
556 16   And these external members, they were --
556 17   they had high expertise in designing guidelines
556 18   for the antithrombotic treatment of the ACCP,
556 19   which is the organization of chest physicians.
556 20   They have guidelines that are the most prestigious
556 21   guidelines for DVT treatment worldwide.

557:15  -  557:18 Lensing, Anthonie 2017-07-27          0:42
557 15   Q.   And, Doctor, who -- who made the
557 16   decision to utilize that dose of 15 milligrams
557 17   twice a day for 21 -- 21 days followed by 20
557 18   milligrams a day in phase III?

557:20  -  557:24 Lensing, Anthonie 2017-07-27          0:12
557 20   THE WITNESS:  Initially, it was a group
557 21   process in which many people were involved, but
557 22   eventually it was the responsibility of the
557 23   steering committee of the Einstein-DVT and PE
557 24   trials to approve treatment by this doses.

558:20  -  560:4  Lensing, Anthonie 2017-07-27          4:34

| | Re: [558:20-560:4] | Re: [558:20-560:4] | Pending |
|---|---|---|---|

558 20   Q.   And, Doctor, you said that the selection

**Pltf Obj** Statement made without

**Def Resp** The witness is simply asked

558 21   of the dose for phase III and the one that was

question asked at 558:20-22.

about his experience on the steering

558 22   approved by the FDA was a collaborative process.

Foundation, vague, and improper

committee. At best, Plaintiff's objection

558 23   Can you explain to the ladies and

narrative - witness asked on behalf of the

capitalizes on a speaking error Defense

558 24   gentlemen of the jury, what did you as the

steering committee to account for the

counsel made during the deposition. He

558 25   steering committee look at in order to determine

"appropriate dose." Also improper

was never asked to speak on behalf of

559  1   that was the appropriate dose that should be

hearsay without exception in so far as Dr.

the entire Steering Committee.

559  2   tested going forward?

Lensing speaks for the entire steering

559  3   A.   Yes.  We know that patients that suffer

committee.

559  4   from acute DVT or PE have a very high risk of
559  5   developing new thrombotic complications which can
559  6   be fatal to them. You have to think about 10 to
559  7   20 to even 30 percent now. Such new episodes is
559  8   something that doctors don't want, so they have to
559  9   make sure that they treat patients adequately with
559 10   an anticoagulant in the acute phase, because
559 11   doctors are very afraid that patients will develop
559 12   new clots in the first weeks after they suffered
559 13   an acute thrombosis. The risk is lower in the
559 14   period afterwards, but still patients can develop
559 15   new thrombosis. Therefore, we have to continue
559 16   treatment long term.
559 17   Now, based on the dose-finding studies,
559 18   we know that the acute phase in the first three
559 19   weeks, if we treat patients properly, chances of
559 20   new occurrence are low or chances that patients
559 21   will die of these new incidences are very small.
559 22   However, the dosage you want is the one that has
559 23   the lowest risks of -- lowest risk of bleeding.
559 24   Luckily, we have a very wide choice,
559 25   because none of the dosages we tested increased
560  1   the risk of bleeding. It wasn't true for a
560  2   20-milligram dose, not for a 30-milligram dose, or
560  3   not for a 40-milligram dose. So we eventually
560  4   chose the lowest dose.

560:8  -  560:9 Lensing, Anthonie 2017-07-27          0:26
560  8   Q.   Well, but, Doctor, you could have chosen
560  9   10 milligrams twice a day.

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

**560:12 - 561:3 Lansing, Anthonie 2017-07-27**                    1:48

560 12  Q.  Right?
560 13  A.  Well, the 10-milligram twice-a-day dose
560 14  was one option that we considered. In the end, we
560 15  decided not to go for that because many of us felt
560 16  that it might be too low a dose; hence, increasing
560 17  the risk of -- increasing unexpected mortality
560 18  rate at the start of the treatment, and we wanted
560 19  to prevent that at all cost.
560 20       Moreover, there was sufficient space to
560 21  go for a higher dose, because in the dose-finding
560 22  study there had been no relationship that was
560 23  established between dose and the occurrence of
560 24  major bleeds.
560 25  Q.  And, Doctor, was there some data that
561  1  had become available back during this time frame
561  2  where in fact the dose they selected had been too
561  3  low?

Re: [560:12-561:3]
Pltf Obj No question asked - and improper leading question to the extent the question was intended to be asked as "Well, but, Doctor, you could have chosen 10 milligrams twice a day [, Right?]."

Re: [560:12-561:3]
Def Resp 560:12 added

Pending

**561:5 - 561:24 Lansing, Anthonie 2017-07-27**                    1:10

561  5       THE WITNESS: Well, shortly before that,
561  6  the results were published in the New England
561  7  Journal of Medicine of the van Gogh study, which
561  8  performed a comparison of idraparinux with
561  9  warfarin.
561 10       Now, idraparinux, like rivaroxaban, is a
561 11  factor Xa inhibitor, and this idraparinux was
561 12  given in the acute phase of thrombotic legs and
561 13  PE. Unfortunately, in this study what they saw
561 14  was an extreme increase over doubling of the
561 15  occurrence of PE in the first weeks of treatment
561 16  with idraparinux.
561 17       (in English) And mortality.
561 18       (Interpreter) Mortality. Sorry.
561 19       And that indicated that using
561 20  idraparinux at the start of the treatment -- or,
561 21  rather, that at the start of the treatment,
561 22  idraparinux is absolutely inadequate.
561 23       (in English) Was given in doses that
561 24  was too low.

**562:1 - 562:12 Lansing, Anthonie 2017-07-27**                    1:59

562  1  Q.  And so you had -- you and your other
562  2  doctor colleagues, you had the benefit of the
562  3  phase II studies on Xarelto and also other science
562  4  that had developed regarding this acute phase of
562  5  treatment. Is that -- do I understand you
562  6  correctly?
562  6  A.  As I also tried to explain to the
562  7  plaintiffs' counsel, we looked not only at the
562  8  data from the dose-finding study but included
562  9  other information, among others, from experience
562 10  that we had with similar drugs that -- from the
562 11  past, where it showed that the starting dose, if
562 12  that was too low, could have catastrophic

Re: [562:1-562:12]
Pltf Obj Improper leading question.

Re: [562:1-562:12]
Def Resp The form of the question is proper.

Pending

**565:10 - 565:13 Lansing, Anthonie 2017-07-27**                    0:27

565 10       You were asked a couple of questions
565 11  about something called noninferiority margin. Do
565 12  you remember those questions?
565 13  A.  Yes, I remember.

**567:15 - 568:5 Lansing, Anthonie 2017-07-27**                    2:11

567 15  Q.  And, Doctor, so I understand, this is a
567 16  scientific calculation that depends on many
567 17  factors, including the standard of care that you
567 18  are comparing your drug to. Is that right?
567 19  A.  That is right. But we need to add to
567 20  that one comment that this is about the comparator
567 21  but also about the indications, so this is
567 22  comparator specific as well as indication
567 23  specific, meaning we're only talking about this
567 24  combination low-molecular-weight heparin/warfarin.
567 25  Q.  So you look at multiple things including
568  1  the indication, the medicine you're studying for,
568  2  the standard of care, and then based upon that
568  3  science, a number is come up -- that's come up
568  4  with is known as the inferiority margin --
568  5  noninferiority margin?

Re: [567:15-568:5]
Pltf Obj Improper leading question.

Re: [567:15-568:5]
Def Resp The form of the question is proper.

Pending

**568:7 - 568:8 Lansing, Anthonie 2017-07-27**                    0:02

568  7       THE WITNESS: That is the most adequate
568  8  summary that you've given there.

**568:11 - 568:13 Lansing, Anthonie 2017-07-27**                    0:22

*(handwritten, center of page)* Overruled 611(c); Mourand 570 F 2d 626

| | Objections In | Responses In | Rulings |
|---|---|---|---|

568 11    And my point is, Bayer doesn't just pick
568 12    these numbers out of the air. They're based on
568 13    science, right?

**Re: [568:11-568:13]**
Pltf Obj Improper hearsay without exception. Improper leading question.

**Re: [568:11-568:13]**
Def Resp The form of the question is proper. If it contained hearsay, then every one of counsel's questions would constitute hearsay.

Pending

568:16 - 568:20 Lansing, Anthonie 2017-07-27    0:18
568 16    And let me tell you, moreover, that the FDA in the
568 17    U.S. agreed with our noninferiority margin, and
568 18    the FDA is a very strict institution. If they do
568 19    not agree with something, I can assure you, you
568 20    will know.

569:3 - 569:4 Lansing, Anthonie 2017-07-27    0:15
569 3    Q. Doctor, do you know what a clinical
569 4    study report is?

569:8 - 569:11 Lansing, Anthonie 2017-07-27    0:09
569 8    A. (In English) It is the summary of
569 9    documents that will be sent to the health
569 10    authorities summarizing the findings of our
569 11    studies.

569:22 - 570:5 Lansing, Anthonie 2017-07-27    1:05
569 22    Q. And when you said that these clinical
569 23    study reports are compiled and sent to the
569 24    authorities, do you mean -- what do you mean by
569 25    that? Do you mean the health authorities? Do you
570 1    mean the FDA? Please explain.
570 2    A. Yes, that's correct. I thereby meant
570 3    the health authorities, including the FDA but also
570 4    EMA in Europe. Those are the institutions that we
570 5    send our report to for approval of the drug.

**Re: [569:22-570:5]**
Pltf Obj Compound, improper leading question.

**Re: [569:22-570:5]**
Def Resp The form of the question is proper.

Pending

570:11 - 571:7 Lansing, Anthonie 2017-07-27    2:42
570 11    Q. And what is Exhibit 83, Doctor?
570 12    A. It is the synopsis of the study protocol
570 13    of the ODIXa-DVT dose-finding study. And it also
570 14    includes the results that were obtained in this
570 15    study.
570 16    Q. Now, Doctor, you said it's the study
570 17    synopsis. Is the full clinical study report
570 18    bigger than just the synopsis?
570 19    A. Yes. The full clinical study report is
570 20    as high as this. It is really many times more.
570 21    What we have here is really a top-line summary.
570 22    Q. And, Doctor, when you say "as high as
570 23    this," "this" doesn't communicate to the jurors
570 24    what you mean.
570 25    Is it a hundred pages? Is it thousands
571 1    of pages? What do you mean by "this"?
571 2    A. I mean by that thousands of pages.
571 3    Q. And, Doctor, Exhibit 83 is for the
571 4    ODIXa-DVT study, and would that be the phase II
571 5    study?
571 6    A. Yes, but it is phase I of the two
571 7    phase II studies --

571:10 - 571:16 Lansing, Anthonie 2017-07-27    0:37
571 10    It's one of the phase II studies for
571 11    rivaroxaban that we have conducted for the
571 12    indication thrombosis.
571 13    Q. And is it your understanding that the
571 14    complete -- so the big document, the complete
571 15    clinical study report, is submitted to the FDA and
571 16    regulatory authorities?

**Re: [571:10-571:16]**
Pltf Obj Foundation lacking as to what was or was not provided to regulatory authorities.

**Re: [571:10-571:16]**
Def Resp The witness is testifying based on his personal experience as a member of the Steering Committee.

Pending

571:18 - 571:19 Lansing, Anthonie 2017-07-27    0:03
571 18    THE WITNESS: That is correct. We have
571 19    provided full insight in all our data.

571:21 - 572:8 Lansing, Anthonie 2017-07-27    1:34
571 21    Q. And does the clinical study report
571 22    include safety data?
571 23    A. Absolutely. Safety data are part and
571 24    parcel of a clinical study report.
571 25    Q. Does a clinical study report include
572 1    data about the effectiveness of the medicine?
572 2    A. Yes, absolutely, the efficacy of
572 3    rivaroxaban is also included in the CSR.
572 4    Q. When we say it includes the safety data
572 5    of -- here we're talking obviously about Xarelto,
572 6    does that mean it includes adverse events such as
572 7    bleeding?
572 8    A. Yes, absolutely.

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**572:21 - 573:22 Lensing, Anthonie 2017-07-27**  —  3:13

572 21   Q. Now, I just want to go back to my -- my
572 22   drawing, Doctor, that's Exhibit 80. Not a very
572 23   pretty drawing. But we talked about the names of
572 24   the studies for phase II, ODIXa-DVT, Einstein-DVT.
572 25     What were the names of the study in the
573 1   Einstein program in phase III?
573 2   A. So there were three studies: The
573 3   Einstein-DVT, the Einstein PE, and the Einstein-
573 4   Extension study.
573 5   Q. And do you know how many patients were
573 6   included in these phase III studies,
573 7   approximately?
573 8   A. In the Einstein-DVT and PE studies, we
573 9   included 8,282 patients. And in the Einstein-
573 10   Extension study, we had over a thousand patients.
573 11   So this adds up to a total of over 9,000 patients.
573 12   Q. In your experience, Doctor, would you
573 13   describe this as a large phase III program based
573 14   on that number of patients?
573 15   A. Yes. The patients that we have studied
573 16   as part of the Einstein program are as many
573 17   patients as the total number of patients studied
573 18   over a period of 30, 40 years. So it's as many as
573 19   all patients taken together over that period of
573 20   time.
573 21   Q. So that's a large phase III program,
573 22   right, Doctor?

Re: [572:21-573:22]
Pltf Obj Duplicative. This is yet another pass at describing the EINSTEIN studies (pp 67-76) as well as an account of the number of patients in these studies.

Re: [572:21-573:22]
Def Resp This testimony is focused uniquely on the size of the program.

Pending

*Sustained already provided in detail* [handwritten]

**573:24 - 573:25 Lensing, Anthonie 2017-07-27**  —  0:06

573 24   THE WITNESS: Yes. It was the biggest
573 25   study performed ever.

**574:2 - 574:2 Lensing, Anthonie 2017-07-27**  —  0:01

574 2   Q. In this indication.

**574:4 - 574:4 Lensing, Anthonie 2017-07-27**  —  0:00

574 4   THE WITNESS: For this indication.

**574:8 - 575:20 Lensing, Anthonie 2017-07-27**  —  3:41

574 8   Q. I'm handing you what has been marked as
574 9   Exhibit 84. Sorry. Can you just take a minute to
574 10   take a look at Exhibit 84.
574 11   A. (Peruses document.) Yes.
574 12   Q. So there should be four -- four
574 13   documents there, right, Doctor?
574 14   A. Yes.
574 15   Q. And can you identify those documents for
574 16   us?
574 17   A. The first document is the CSR for the
574 18   phase II of Einstein-DVT.
574 19     The second document is the CSR of the
574 20   Einstein-DVT phase III study.
574 21     The third document is the CSR of the
574 22   Einstein-Extension study.
574 23     And the last document is the CSR of the
574 24   Einstein PE phase III study.
574 25   Q. And to be clear again, Doctor, what I've
575 1   handed you is what's called the synopsis of the
575 2   clinical study reports or the CSRs. Is that
575 3   right?
575 4   A. That's correct.
575 5   Q. Would you turn to the last one, the
575 6   Einstein PE study.
575 7   A. Yes.
575 8   Q. And do you see on the top right-hand
575 9   corner, it says "1 of 274,020." Do you see that?
575 10   A. Yes, I see that.
575 11   Q. Is that the number of pages in the total
575 12   report?
575 13   A. Yes, it was over a quarter of a million
575 14   pages.
575 15   Q. And they're not all that long, right,
575 16   Doctor, the CSRs?
575 17   A. No, not all CSRs are that long. They
575 18   are all substantial, but this CSR was a very long
575 19   one because it had to do with a very vast and
575 20   large study and many analyses.

**576:14 - 576:22 Lensing, Anthonie 2017-07-27**  —  1:14

576 14   Q. Now, Doctor, in addition, are the
576 15   Einstein trials from phase II and phase III, are
576 16   they also -- have they also been published in the
576 17   peer-reviewed medical literature?

| | Objections In | Responses In | Rulings |
|---|---|---|---|

576 18    A. Yes. All studies that we have performed
576 19    were published in the top medical journals,
576 20    including circulation as well as the New England
576 21    Journal of Medicine twice, but also Blood, which
576 22    is part of the American Society of Hematology.

577:1 - 577:15 Lensing, Anthonie 2017-07-27     2:11
577 1    Doctor, within the full study -- the
577 2    clinic study reports, did that also report on PT
577 3    and PT measurements?
577 4    A. Yes, certainly. That was a very
577 5    important question beforehand, whether there was a
577 6    need to use PT for monitoring major bleeding. And
577 7    as a result, we have reported in the CSR and
577 8    informed the health authorities that monitoring PT
577 9    to prevent major bleeding made no sense at all.
577 10    Q. And -- and we will go into a little bit
577 11    more detail on that in a minute, but which PT
577 12    reagent was used?
577 13    A. We have used the PT reagent that is most
577 14    sensitive to rivaroxaban, which is the Neoplastin
577 15    Plus.

577:25 - 578:12 Lensing, Anthonie 2017-07-27     1:42
577 25    Q. And, Doctor, do you agree that using a
578 1    sensitive PT reagent, Neoplastin Plus, that the
578 2    clinical trials did show a correlation between PT
578 3    and concentration of Xarelto?
578 4    A. Yes, there exists a correlation --
578 5    sorry, correlation between the increase of
578 6    rivaroxaban concentration and the prolongation of
578 7    the prothrombin time, and this correlation is
578 8    linear.
578 9    Q. And, Doctor, what does that tell a
578 10    doctor? When he has a PT value from a clinical
578 11    trial using Neoplastin, what does that tell you
578 12    about Xarelto?

578:14 - 578:16 Lensing, Anthonie 2017-07-27     0:11
578 14    THE WITNESS: That is a very important
578 15    question. It tells you -- a longer PT tells you
578 16    that a patient has got rivaroxaban in his blood.

578:18 - 578:18 Lensing, Anthonie 2017-07-27     0:10
578 18    Q. Does it tell you anything else?

578:20 - 578:23 Lensing, Anthonie 2017-07-27     0:11
578 20    THE WITNESS: When the value is higher,
578 21    it demonstrates that there is more rivaroxaban in
578 22    the blood. When the value is low, it demonstrates
578 23    that there is less rivaroxaban in the blood.

579:2 - 579:13 Lensing, Anthonie 2017-07-27     1:27
579 2    Q. And can that be affected by the time the
579 3    patient took the dose and the time of the
579 4    measurement?
579 5    A. Yes, it definitely can, because a few
579 6    hours after taking rivaroxaban, concentration in
579 7    blood is highest, and about 12 hours after taking
579 8    rivaroxaban, the concentration in blood is lowest.
579 9    Q. Doctor, if someone was to tell the jury
579 10    that in the Einstein clinical trials there was a
579 11    relationship, a correlation between an increase in
579 12    PT time and the patients who had bleeds, would
579 13    that be accurate?

**Re: [579:2-579:13]**
**Pltf Obj** Foundation lacking, improper expert opinion, argumentative and overwhelmingly prejudicial. Witness' offers improper comment on Plaintiffs' questions, stating "I believe it has been made up by the other party."

Re: [579:2-579:13]
Def Resp The witness is appropriately sharing his opinion on theories that were advances via questioning throughout the deposition.

Pending

579:15 - 579:20 Lensing, Anthonie 2017-07-27     0:23
579 15    THE WITNESS: No, absolutely not. The
579 16    data we have gave no reason to believe that the
579 17    bleeding in patients would be more with a -- an
579 18    elongated PT. You can't derive those results from
579 19    the study, and I believe it has been made up by
579 20    the other party.

**Re: [579:15-579:20]**
**Pltf Obj** Foundation lacking, improper expert opinion, argumentative and overwhelmingly prejudicial. Witness' offers improper comment on Plaintiffs' questions, stating "I believe it has been made up by the other party."

Re: [579:15-579:20]
Def Resp The witness is appropriately sharing his opinion on theories that were advances via questioning throughout the deposition.

Pending

579:22 - 580:1 Lensing, Anthonie 2017-07-27     0:37
579 22    Q. So I understand, Doctor, is it your

Re: [579:22-580:1]

Re: [579:22-580:1]

Pending

08/06/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

579 23   testimony that the bleed data that's shown in the
579 24   Einstein clinical trials does or does not show a
579 25   correlation with an increased or elongated PT
580  1   time?

**Pltf Obj** Foundation lacking and improper expert opinion.

**Def Resp** The witness is speaking from his personal and professional experience - precisely the experience that made him the subject of this deposition.

---

580:3 - 580:4 Lensing, Anthonie 2017-07-27

580  3         THE WITNESS: There's totally no
580  4   relationship.

0:02

Re: [580:3-580:4]
**Pltf Obj** Foundation lacking and improper expert opinion.

Re: [580:3-580:4]
**Def Resp** The witness is speaking from his personal and professional experience - precisely the experience that made him the subject of this deposition.

Pending

---

580:6 - 580:15 Lensing, Anthonie 2017-07-27

580  6   Q.  Did you and Bayer look at the data to
580  7   see if there was a correlation?
580  8   A.  Obviously, it was a very important
580  9   question we had when we started the project. We
580  10  wanted to know if there was a relation between
580  11  elongated PT and the occurrence of bleeding.
580  12  Because if it would be the case, we could easily
580  13  change the treatment.  But it wasn't the case,
580  14  there is no relation, and everybody who says so
580  15  makes it up.

1:16

Re: [580:6-580:15]
**Pltf Obj** Foundation lacking and improper expert opinion along with improper hearsay without exception.

Re: [580:6-580:15]
**Def Resp** The witness is speaking from his personal and professional experience - precisely the experience that made him the subject of this deposition. It is unclear what Plaintiff's counsel believes is hearsay.

Pending

---

581:5 - 582:3 Lensing, Anthonie 2017-07-27

581  5   Q.  Doctor, I'm going to hand you what I've
581  6   marked as Exhibit 85.  And it's DX 6079.
581  7         Doctor, that's an Integrated Summary of
581  8   Safety.
581  9   A.  You don't expect me to read all of this
581  10  before we start?
581  11  Q.  No.  But, Doctor, are you familiar with
581  12  the Integrated Summary of Safety?
581  13  A.  Yes, indeed.  Indeed, this document
581  14  combines all the safety details of the studies
581  15  that were performed on rivaroxaban.
581  16  Q.  Do you know if the PT testing results
581  17  are described -- discussed in the Integrated
581  18  Summary of Safety?
581  19  A.  Yes.  This was a principal definition of
581  20  the study.  Therefore, we reported it to the
581  21  health authorities, and, therefore, we also
581  22  incorporated it in the summary.
581  23  Q.  And, Doctor, if you would turn to the
581  24  table of contents there.
581  25  A.  Yes.
582  1   Q.  Do you see section 1.1.2, it says "Study
582  2   11702, DVT."
582  3   A.  Yes, I can see that.

2:37

---

582:11 - 583:6 Lensing, Anthonie 2017-07-27

582  11  Q.  Section 1.1.2.5.11 is entitled "Bleeding
582  12  Risk and Correlation to Prothrombin Time
582  13  Prolongation."  Do you see that?
582  14  A.  Yes, I see that.
582  15  Q.  And, Doctor, it says page 66, so let's
582  16  turn to page 66.
582  17        Doctor, page 66, are you with me?
582  18  A.  Yes, that's where I am.
582  19  Q.  And if we go to the top of the page,
582  20  there's that section that refers to "Bleeding Risk
582  21  and Correlation to Prothrombin Time Prolongation."
582  22  A.  That's correct.
582  23  Q.  And, Doctor, what is the conclusion?
582  24  A.  (In English)  The conclusion: "In
582  25  general, there was no evidence that PT Neoplastin
583  1   measured in seconds at peak was different in
583  2   subjects with bleeding events compared to subjects
583  3   without bleeding events.  The analyses were also
583  4   performed for the subgroups as defined for the
583  5   safety analysis and also did not indicate

1:58



08/06/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

583  6    different values between the bleeding categorles."

583:15 –   584:16 Lensing, Anthonie 2017-07-27    2:00
583  15          If we continue down the table of
583  16          contents, Doctor, we now come to study 11702 PE.
583  17          Are you with me?
583  18    A.  Yes, I see that.
583  19    Q.  And if we go down to section 1.1.3.5.11,
583  20          it says: "Bleeding Risk and Correlation to
583  21          Prothrombin Time Prolongation," page 112. See
583  22          that?
583  23    A.  I have that.
583  24    Q.  Okay. And then if we go to page 112,
583  25          I'll just show the page number, 112.
584  1    A.  Yeah.
584  2    Q.  And if we go to that section that I just
584  3          read, do we see "Bleeding Risk and Correlation to
584  4          Prothrombin Time Prolongation"?
584  5    A.  Yes.
584  6    Q.  And, Doctor, what is the conclusion from
584  7          the PE study?
584  8    A.  (In English)  The conclusion from the
584  9          study was: "In general, there was no evidence
584  10          that PT Neoplastin measured in seconds at peak was
584  11          different in subjects with bleeding events
584  12          compared to subjects without bleeding events. For
584  13          the overall safety population, the peak values for
584  14          PT Neoplastin when compared to baseline increased
584  15          similarly in subjects with bleeding events
584  16          compared to those without bleeding events."

| | | | |
|---|---|---|---|
| 584:20 –   585:21 Lensing, Anthonie 2017-07-27    2:04 | | | |
| 584  20    Q.  And, Doctor, if we go back to the table | Re: [584:20-585:21] | Re: [584:20-585:21] | Pending |
| 584  21          of contents, we now come to section 1.1.4 on | Pltf Obj Foundation lacking and improper | Def Resp The witness is speaking from his | |
| 584  22          page 4 of the table of contents.  And it says: | expert opinion. | personal and professional experience – | |
| 584  23          "Pooled analyses of 11702 DVT and 11702 PE | | precisely the experience that made him | |
| 584  24          studies." | | the subject of this deposition. | |

584  25          Are you with me?
585  1    A.  I'm with you.
585  2    Q.  And then if we go down the table of
585  3          contents, again we come to section 1.1.4.5.10,
585  4          "Bleeding Risk and Correlation to Prothrombin Time
585  5          Prolongation," page 168. Do you see that?
585  6    A.  Yes, I see that.
585  7    Q.  So now let's turn to page 168. And do
585  8          we see there "Bleeding Risk and Correlation to
585  9          Prothrombin Time Prolongation"?
585  10    A.  That's correct.
585  11    Q.  And, Doctor, what is the conclusion from
585  12          the pooled studies?
585  13    A.  (In English)  I quote: "In general,
585  14          there was no evidence that PT Neoplastin measured
585  15          in seconds at peak was different in subjects with
585  16          bleeding events compared to subjects without
585  17          bleeding events. For the overall safety
585  18          population, the peak values for PT Neoplastin when
585  19          compared to baseline increased similarly in
585  20          subjects with bleeding events compared to those
585  21          without bleeding events."

585:25 –   586:2  Lensing, Anthonie 2017-07-27    0:11
585  25    Q.  And all of this data, Doctor, in this
586  1          Integrated Summary of Safety was provided to the
586  2          FDA; is that right?

| | | | |
|---|---|---|---|
| 586:22 –   587:1  Lensing, Anthonie 2017-07-27    0:31 | | | |
| 586  22    Q.  Doctor, do you know if the Integrated | Re: [586:22-587:1] | Re: [586:22-587:1] | Pending |
| 586  23          Summary of Safety goes to the regulatory | Pltf Obj Foundation lacking and improper | Def Resp The witness is speaking from his | |
| 586  24          authorities, including the FDA? | expert opinion. | personal and professional experience – | |
| 586  25    A.  Yes, obviously that is the reason why it | | precisely the experience that made him | |
| 587  1          is created especially. | | the subject of this deposition. | |

588:4  –   588:5  Lensing, Anthonie 2017-07-27    0:14
588  4    Q.  Doctor, I'm going to hand you what was
588  5          marked as Exhibit 73.

588:10 –   588:13 Lensing, Anthonie 2017-07-27    0:16
588  10    Q.  And, Doctor, Mr. Overholtz asked you
588  11          some questions about this exhibit. Do you
588  12          remember that?
588  13    A.  Yes, I can.

| | | | |
|---|---|---|---|
| 588:18 –   588:24 Lensing, Anthonie 2017-07-27    0:42 | | | |
| 588  18    Q.  And then on pages 5 and 6 and 8 and 9, | Re: [588:18-588:24] | Re: [588:18-588:24] | Pending |

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**588 19 – 588 24**

588 19    we learned that Mr. Overholtz had done some
588 20    calculations. Do you remember that?
588 21    A.  Yes, I remember, and I can see it.
588 22    Q.  Are those calculations scientifically
588 23    accurate in order to try and show if there's a
588 24    correlation between bleeding and PT?

Pltf Obj Argumentative and invades the province of the fact-finder. 401 and 403 - extremely prejudicial and hardly relevant to attack the professionalism of the questioner as well as state directly the jurors are being misled.

Def Resp The witness is simply given an opportunity to expand on questions he was asked earlier in the deposition; that is the point of this portion of the deposition.

*(handwritten ruling spanning right margin:)* Order ruled ... Proper cross to go. ... This area was focused on by P. ... he has a right to ... explain the area responding to theories advanced by P. in it, questioning of this wit.

**589:1 – 589:7   Lensing, Anthonie 2017-07-27**    0:29

589 1    THE WITNESS:  No, this analysis was
589 2    performed highly inaccurately, and it is not
589 3    professional at all.
589 4    (In English) And it doesn't make any
589 5    sense.
589 6    (Interpreter) Excuse me. It doesn't
589 7    make any sense at all.

Re: [589:1-589:7]
Pltf Obj Argumentative and invades the province of the fact-finder. 401 and 403 - extremely prejudicial and hardly relevant to attack the professionalism of the questioner as well as state directly the jurors are being misled.

Re: [589:1-589:7]
Def Resp The witness is simply given an opportunity to expand on questions he was asked earlier in the deposition; that is the point of this portion of the deposition.

Pending

**589:9 – 589:9   Lensing, Anthonie 2017-07-27**    0:06

589 9    Q.  Would it be misleading to a jury?

Re: [589:9-589:9]
Pltf Obj Argumentative and invades the province of the fact-finder. 401 and 403 - extremely prejudicial and hardly relevant to attack the professionalism of the questioner as well as state directly the jurors are being misled.

Re: [589:9-589:9]
Def Resp The witness is simply given an opportunity to expand on questions he was asked earlier in the deposition; that is the point of this portion of the deposition.

Pending

**589:11 – 589:15   Lensing, Anthonie 2017-07-27**    0:15

589 11    THE WITNESS:  To suggest that there is a
589 12    higher incidence of bleeding based on these data
589 13    with the knowledge we now have that -- and the
589 14    fact that an adjusted analysis is needed, I think
589 15    that it is indeed misleading to show those data.

Re: [589:11-589:15]
Pltf Obj Argumentative and invades the province of the fact-finder. 401 and 403 - extremely prejudicial and hardly relevant to attack the professionalism of the questioner as well as state directly the jurors are being misled.

Re: [589:11-589:15]
Def Resp The witness is simply given an opportunity to expand on questions he was asked earlier in the deposition; that is the point of this portion of the deposition.

Pending

**589:17 – 589:21   Lensing, Anthonie 2017-07-27**    0:53

589 17    Q.  And, Doctor, is that based upon your
589 18    background and training and experience not only
589 19    medically but also with regard to the data that
589 20    you're familiar with from the Einstein clinical
589 21    trials?

Re: [589:17-589:21]
Pltf Obj Argumentative and invades the province of the fact-finder. 401 and 403 - extremely prejudicial and hardly relevant to attack the professionalism of the questioner as well as state directly the jurors are being misled.

Re: [589:17-589:21]
Def Resp The witness is simply given an opportunity to expand on questions he was asked earlier in the deposition; that is the point of this portion of the deposition.

Pending

**589:23 – 590:19   Lensing, Anthonie 2017-07-27**    2:49

589 23    THE WITNESS:  It is general science that
589 24    in situations like this, you can't just like that
589 25    use absolute frequencies without an adjustment for
590 1    predictors that would cause higher PT values.
590 2    And there are predictors that are known
590 3    for rivaroxaban. We've known that since 2005.
590 4    Age is a predictor. Renal function is a
590 5    predictor. The presence of cancer is a predictor.
590 6    And of course, we also know for some

Re: [589:23-590:19]
Pltf Obj Argumentative and invades the province of the fact-finder. Witness answer is also non-responsive.

Re: [589:23-590:19]
Def Resp The witness is simply given an opportunity to expand on questions he was asked earlier in the deposition; that is the point of this portion of the deposition.

Pending

08/06/17 17:59

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

590  7   comedication that there is a relation between the
590  8   use and the PT time.
590  9   The analysis that is provided here is
590 10   not adjusted for these predictors, and if you do
590 11   so, you can see that there is no effect at all for
590 12   a limited prolonged PT time or a seriously
590 13   prolonged PT time. And if you were to take action
590 14   on a prolonged PT time by lowering the doses of
590 15   rivaroxaban, you wouldn't protect your patients
590 16   against the occurrence of possible bleedings, but
590 17   you would expose them to a potential dosage that
590 18   is too low. It would be an unethical decision to
590 19   do so.

**590:22 – 591:2 Lensing, Anthonie 2017-07-27**   0:31

590 22   Q.  So, Doctor, based upon the scientific
590 23   data in the Einstein clinical trials that looked
590 24   at PT, would an elevated PT value of 23 seconds
590 25   indicate to you that the patient was more likely
591  1   to have a bleed than a patient who had a lower PT
591  2   in the normal range?

Re: [590:22-591:2]
**Pltf Obj** Improper case-specific expert opinion, lacks foundation, and incomplete hypothetical. Further, this is highly prejudicial without providing any probative value--strongly suggesting Dr. Lensing is familiar with the facts of the case before the jurors.

Re: [590:22-591:2]
**Def Resp** The witness is appropriately asked his view of PT scores Plaintiff alleges are high in a way that is clinically meaningful. Based on his experience with this indication, the witness is answering appropriately.

Pending

**591:4 – 591:12 Lensing, Anthonie 2017-07-27**   0:33

591  4   THE WITNESS:  There is no relation
591  5   between longer PT time and the occurrence of
591  6   bleeds, so there is also no relation between a PT
591  7   value that was longer by 23 seconds or a shorter
591  8   PT.
591  9   So there is no relation whatsoever. I
591 10   don't know where this came from.  The data is very
591 11   clear. It's a relation that was made up, and it
591 12   makes no sense whatsoever.

Re: [591:4-591:12]
**Pltf Obj** Improper case-specific expert opinion, lacks foundation, and incomplete hypothetical. Further, this is highly prejudicial without providing any probative value--strongly suggesting Dr. Lensing is familiar with the facts of the case before the jurors.

Re: [591:4-591:12]
**Def Resp** The witness is appropriately asked his view of PT scores Plaintiff alleges are high in a way that is clinically meaningful. Based on his experience with this indication, the witness is answering appropriately.

Pending

**591:14 – 591:18 Lensing, Anthonie 2017-07-27**   0:24

591 14   Q.  Doctor, if a patient had an elevated PT
591 15   of 26 based on the Einstein clinical trial data,
591 16   does that elevated PT show that the patient was
591 17   more likely to have a bleed than someone with a PT
591 18   in the normal range?

Re: [591:14-591:18]
**Pltf Obj** Improper case-specific expert opinion, lacks foundation, and incomplete hypothetical. Further, this is highly prejudicial without providing any probative value--strongly suggesting Dr. Lensing is familiar with the facts of the case before the jurors.

Re: [591:14-591:18]
**Def Resp** The witness is appropriately asked his view of PT scores Plaintiff alleges are high in a way that is clinically meaningful. Based on his experience with this indication, the witness is answering appropriately.

Pending

**591:20 – 591:20 Lensing, Anthonie 2017-07-27**   0:02

591 20   THE WITNESS:  No, that is not the case.

Re: [591:20-591:20]

Re: [591:20-591:20]

Pending

08/06/17 17:59

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|
| | | **Pltf Obj** Improper case-specific expert opinion, lacks foundation, and incomplete hypothetical. Further, this is highly prejudicial without providing any probative value--strongly suggesting Dr. Lensing is familiar with the facts of the case before the jurors. | **Def Resp** The witness is appropriately asked his view of PT scores Plaintiff alleges are high in a way that is clinically meaningful. Based on his experience with this indication, the witness is answering appropriately. | |

**591:22 – 592:5  Lensing, Anthonie 2017-07-27**  `2:07`

591 22  Q.  And, Doctor, counsel showed you some
591 23  subgroup data, and some subgroups had higher PTs.
591 24  Do you remember that?
591 25  A.  Yes, I believe those were the subgroups
592  1  age, renal function impairment, and CYP3A4
592  2  inhibitors.
592  3  Q.  And even in subgroups where there were
592  4  higher PTs, was there a correlation with bleeding
592  5  in those subgroups?

| | | |
|---|---|---|
| Re: [591:22-592:5] **Pltf Obj** Improper expert opinion, lacking foundation. | Re: [591:22-592:5] **Def Resp** The witness is simply given an opportunity to expand on questions he was asked earlier in the deposition; that is the point of this portion of the deposition. | Pending |

**592:8 – 593:1  Lensing, Anthonie 2017-07-27**  `1:28`

592  8        THE WITNESS: Well, obviously that is
592  9  the most important question to be asked.  And what
592 10  did we find with those patients?  If the renal
592 11  function decreased, then exertion of rivaroxaban
592 12  decreased.  Hence, the concentration in the blood
592 13  increased.  Hence, the PT time was prolonged.
592 14        Now, if you see at how is the patient
592 15  doing or how are the patients doing, which is the
592 16  point at stake here, this patient with this renal
592 17  function impairment with a longer PT turned out to
592 18  have a significantly -- or significantly less
592 19  bleedings than the ones that were given enoxaparin
592 20  or warfarin.
592 21        So the effect was much greater vis-`-vis
592 22  the healthy patients.  It was not increased in
592 23  comparison with the rivaroxaban patients with a
592 24  normal renal function, and there was a mega
592 25  difference compared with patients that were on
593  1  low-molecular-weight heparin and warfarin.

| | | |
|---|---|---|
| Re: [592:8-593:1] **Pltf Obj** Improper expert opinion, lacking foundation. 403.  The question asked without foundation is highly prejudicial without referencing or clarifying what data set is being referred to herein. | Re: [592:8-593:1] **Def Resp** The witness is simply given an opportunity to expand on questions he was asked earlier in the deposition; that is the point of this portion of the deposition. | Pending |

**593:3 – 593:15  Lensing, Anthonie 2017-07-27**  `1:53`

593  3  Q.  Doctor, have you -- in addition to the
593  4  bleed and PT data being provided to the FDA in the
593  5  Integrated Summary of Safety, have you also, sir,
593  6  undertaken to prepare an article on whether there
593  7  is a correlation?
593  8  A.  Well, that question has become of lesser
593  9  importance scientifically because the FDA
593 10  indicated that they weren't interested in PT.
593 11  But, indeed, an article is currently under
593 12  preparation with regard to the relation between PT
593 13  and bleeds.  We'll probably finish it by the end
593 14  of this summer and send it to a medical magazine
593 15  for publication.

**594:6 – 594:10  Lensing, Anthonie 2017-07-27**  `0:35`

594  6  Q.  All right.  Doctor, you were asked a lot
594  7  of questions today about Health Canada and the
594  8  label that goes to Canadian physicians.  Do you
594  9  remember those questions?
594 10  A.  Yes, I remember them.

**594:18 – 595:2  Lensing, Anthonie 2017-07-27**  `1:20`

594 18  Q.  And can you just clarify for the ladies
594 19  and gentlemen of the jury, what role did you play,
594 20  what data did you help submit.
594 21  A.  Well, as the international leader in
594 22  this research on behalf of Bayer, I did help when
594 23  other countries and their health authorities asked
594 24  questions.  And in this case, it was the Canadian
594 25  authorities that asked questions of a clinical
595  1  nature related to efficacy and safety, and I
595  2  indeed did help answer those questions.

78

| | Objections In | Responses In | Rulings |
|---|---|---|---|

**596:1 - 596:3 Lensing, Anthonie 2017-07-27**  `0:37`

596  1  Q.  Do you know if the lab testing
596  2  information that relates to PT was provided to the
596  3  FDA by Janssen?

**Re: [596:1-596:3]**
Pltf Obj Foundation lacking, improper expert opinion - witness offers opinion insofar as what is compulsory to "notify health authorities."

**Re: [596:1-596:3]**
Def Resp This is within the scope of the witness's experiences and job responsibilities.

Pending

---

**596:5 - 596:8 Lensing, Anthonie 2017-07-27**  `0:16`

596  5  THE WITNESS: Obviously that was part of
596  6  a prospective study in the Einstein DVT/PE study,
596  7  so it's compulsory to notify health authorities,
596  8  including the FDA. So for sure, they got it.

**Re: [596:5-596:8]**
Pltf Obj Foundation lacking, improper expert opinion and hearsay without exception. Witness is asked generally about whether "language that was proposed for the label that related to PT testing" without being directed to any specific language or example.  This is highly prejudicial and begs confusion.

**Re: [596:5-596:8]**
Def Resp This is highly probative testimony regarding the central issue in this case

Pending

---

**596:10 - 596:12 Lensing, Anthonie 2017-07-27**  `0:11`

596  10  Q.  Do you know if the FDA struck out or
596  11  rejected label -- language that was proposed for
596  12  the label that related to PT testing?

**Re: [596:10-596:12]**
Pltf Obj Foundation lacking, improper expert opinion and hearsay without exception. Witness is asked generally about whether "language that was proposed for the label that related to PT testing" without being directed to any specific language or example.  This is highly prejudicial and begs confusion.

**Re: [596:10-596:12]**
Def Resp This is highly probative testimony regarding the central issue in this case

Pending

---

**596:15 - 596:17 Lensing, Anthonie 2017-07-27**  `0:26`

596  15  Q.  Do you know?
596  16  A.  Yes. The FDA was not interested in this
596  17  text about PT.

**Re: [596:15-596:17]**
Pltf Obj Foundation lacking, improper expert opinion and hearsay without exception. Witness is asked generally about whether "language that was proposed for the label that related to PT testing" without being directed to any specific language or example.  This is highly prejudicial and begs confusion.

**Re: [596:15-596:17]**
Def Resp This is highly probative testimony regarding the central issue in this case

Pending

---

**603:2 - 603:12 Lensing, Anthonie 2017-07-27**  `0:53`

603  2  Q.  And can you describe your relationship
603  3  with Dr. Buller?
603  4  A.  (In English)  Long term. Almost 40
603  5  years.
603  6  (Interpreter)  It is a long-term
603  7  relationship. It dates back to almost 40 years.
603  8  Harry is like a brother to me, which means that we
603  9  can really tell each other what we think very
603  10  frankly, tell each other the truth, and then just
603  11  continue like friends.
603  12  (In English)  Rough each other up.

**Re: [603:2-603:12]**
Pltf Obj 401/403 - Dr. Lensing's personal relationship has no bearing on his decision to withdraw from the Pooled Analysis publication.

**Re: [603:2-603:12]**
Def Resp This provides context for some of the language Plaintiff designated from Dr. Buller.

Pending

---

**605:3 - 605:22 Lensing, Anthonie 2017-07-27**  `2:18`

605  3  Q.  Doctor, is there another clinical trial
605  4  called Einstein Choice?
605  5  A.  That is correct.  Recently we have
605  6  completed a study by the name of Einstein Choice
605  7  study.  And what we did is the following.
605  8  Q.  Briefly.

08/06/17 17:59

| | | Objections In | Responses In | Rulings |
|---|---|---|---|---|

605 9    A.   So what the Einstein Choice study was
605 10   about is a study into the comparison between
605 11   rivaroxaban 20 milligram and 10 milligram compared
605 12   to aspirin, and it looked into over 3,000
605 13   patients.  And the results of the study were that
605 14   aspirin should not be used.  There is too much
605 15   occurrence of thrombosis.
605 16        What it also indicated is that if you
605 17   compare the 10 milligram to 20 milligram as
605 18   regards the efficacy, they're similar.  And also
605 19   it indicated that with the 10 milligram, the
605 20   result is numerically slightly better with respect
605 21   to bleedings.
605 22        (In English)  With 10 milligram.

606:8 –   607:14 Lensing, Anthonie 2017-07-27    **3:55**

606 8    Q.   Doctor, I would now like you to explain
606 9    why the dose was different in Einstein Choice
606 10   versus Einstein-Extension.
606 11   A.   In the Einstein program, we started
606 12   treating the patient with a dose of 15-milligram
606 13   twice daily.  And that was because the dosage was
606 14   because the patients were in a phase where they
606 15   run a very high risk of fatal or nonfatal
606 16   thrombolic event.
606 17        After the initial three weeks, we
606 18   followed up with 20 milligram, a full
606 19   therapeutical dosage.  Because we know that with
606 20   the higher doses, the risk of thrombotic events is
606 21   still very high -- excuse me -- with the lower
606 22   doses the risk of occurrence -- thrombotic events
606 23   is still very high.
606 24        Then the question is asked, should we
606 25   continue treatment, yes or no, and with what dose.
607 1        There are a great number of doctors who
607 2    stop after six or twelve months.  Because they
607 3    fear that continuing with the 20 milligrams will
607 4    lead to bleedings.  And they fear that it won't
607 5    enable to prevent as many thrombotic events.  And
607 6    that is why -- the reason why we undertook the
607 7    Einstein Choice.
607 8        And now we know that after a period of
607 9    six to twelve months, we can safely lower the dose
607 10   of rivaroxaban from 20 to 10 milligram.  The
607 11   patients do not present with more thrombotic
607 12   events than with 20 milligrams.
607 13        And fortunately, the bleedings are also
607 14   slightly less.

**Re: [606:8-607:14]**
Pltf Obj No question pending, improper narrative, and non-responsive.

**Re: [606:8-607:14]**
Def Resp Counsel clearly asked a question and the witness answered in a responsive manner.

Pending

610:13 –   610:17 Lensing, Anthonie 2017-07-27    **0:37**

610 13        Now, Doctor, as you sit here in 2017,
610 14   and you look back over the 13 years that you've
610 15   been at Bayer, so more than a decade, how do you
610 16   explain to the jury what you think you've
610 17   achieved?

**Re: [610:13-610:17]**
Pltf Obj 401/403, overbroad - testimony goes well beyond his experience at Bayer to include his entire career.  Further, testimony is overwhelmingly prejudicial, invoking his treatment of dying children.

**Re: [610:13-610:17]**
Def Resp Plaintiff's entire case is an attack on Defendants, their drug, and their professional integrity. Defendants have a right to defend themselves and are doing so here through the scientists behind the drug's development. It is not prejudicial for the jury to know that thrombosis can be a deadly condition - indeed it is a necessary for their determination of the questions at issue in this case.

Pending

610:19 –   611:17 Lensing, Anthonie 2017-07-27    **2:05**

610 19        THE WITNESS:  I look back and see that
610 20   we've taken a really big step in the treatment of
610 21   thrombosis, and it has a huge impact on so many
610 22   people.  And I'm incredibly proud and glad that I
610 23   was able to participate in this project and to

**Re: [610:19-611:17]**
Pltf Obj 401/403, overbroad - testimony goes well beyond his experience at Bayer to include his entire career.  Further, testimony is overwhelmingly prejudicial,

**Re: [610:19-611:17]**
Def Resp Plaintiff's entire case is an attack on Defendants, their drug, and their professional integrity. Defendants have a right to defend themselves and

Pending

| | Objections In | Responses In | Rulings |
|---|---|---|---|

610 24   contribute to it.
610 25        For many, many years, I've treated
611 1    patients, both adults and children, with
611 2    thrombosis, and I noticed that they came back to
611 3    me with serious thrombotic complications and with
611 4    serious bleedings. And I noticed -- I watched
611 5    them die.
611 6        And It's a very important disease, and
611 7    it is so because it happens quite often. The
611 8    incidence rate is high. And it is a very
611 9    dangerous disease, it can be fatal. Even if it's
611 10   not fatal, it can have a large impact on quality
611 11   of life of patients.
611 12        So every improvement you can reach in
611 13   anticoagulation means that more people will
611 14   survive and fewer people will suffer from serious
611 15   impacts or injuries.
611 16        And I am really proud to have
611 17   contributed to that.

Objections In: Invoking his treatment of dying children.

Responses In: are doing so here through the scientists behind the drug's development. It is not prejudicial for the jury to know that thrombosis can be a deadly condition - indeed it is a necessary for their determination of the questions at issue in this case.

Ruling (handwritten): *Sustained This is a dist over the top. Goes on too long an answer to a simple Q*

---

**613:17 - 613:21  Lensing, Anthonie 2017-07-27**   0:17
613 17   BY MR. OVERHOLTZ:
613 18   Q.  Let me show you what we will mark as
613 19   Exhibit 88, which is 5404271.
613 20        (Lensing Exhibit No. 88 was marked
613 21        for identification.)

Objections In: Re: [613:17-613:21] Def Obj See objection to Exhibit 88.

Responses In: Re: [613:17-613:21] Pltf Resp See Plaintiffs' response to Defendants' objection to this exhibit.

Rulings: Pending

---

**614:14 - 614:20  Lensing, Anthonie 2017-07-27**   0:36
614 14   BY MR. OVERHOLTZ:
614 15   Q.  If you can see, Dr. Lensing, this is an
614 16   e-mail between you and Dr. Bruce Davidson; is that
614 17   right?
614 18   A.  That is right.
614 19   Q.  And, Dr. Davidson, was he a member of
614 20   the steering committee for Einstein?

Ruling (handwritten): *Overrule see supra*

---

**614:24 - 615:6  Lensing, Anthonie 2017-07-27**   0:31
614 24   Q.  Okay. And you can see here that the
614 25   only people on this e-mail is yourself and
615 1    Dr. Davidson; is that right?
615 2    A.  Yes, that's right.
615 3    Q.  Okay. And in this e-mail you see that
615 4    you're talking about the Einstein Choice study,
615 5    correct?
615 6    A.  That's correct.

Ruling (handwritten): *Overruled 607*

---

**615:12 - 615:23  Lensing, Anthonie 2017-07-27**   1:03
615 12   Q.  Okay. And you make some comments
615 13   regarding Choice, and then you say: "Junior is in
615 14   the hands of three study managers who are crazy
615 15   and two medical experts from Brazil who do not
615 16   talk English."
615 17        Do you see that?
615 18   A.  Yes, I see that.
615 19   Q.  Okay. And it says: "It's in close
615 20   collaboration with J&J, which assigned two
615 21   pediatricians with no knowledge but b/g egos."
615 22        Do you see that?
615 23   A.  Yes, I see that.

Objections In: Re: [615:12-615:23] Def Obj Dr. Lensing's opinion about two doctors in a study related to the pediatric indication has no relevance to any of Plaintiff's claims. It is designated only to inflame the jury. 401/403.

Responses In: Re: [615:12-615:23] Pltf Resp This testimony and evidence conveys a candid account of Dr. Lensing's assessment of a Xarelto orthopedic study, which is highly relevant to study conduct.

Rulings: Pending

---

**616:12 - 616:18  Lensing, Anthonie 2017-07-27**   0:41
616 12   Q.  Okay. He says: "Yet, this weekend I am
616 13   an invitee to a Janssen training session for
616 14   community physicians to use the Xarelto slide
616 15   sets. A ton will be spent on marketing, as
616 16   usual."
616 17        Do you see that?
616 18   A.  I see that.

Objections In: Re: [616:12-616:18] Def Obj The amount of money Defendants spend on marketing has no bearing on any of Plaintiff's claims. It is designated solely to inflame the jury, and would be highly prejudicial to Defendants, if admitted. Indeed,

Responses In: Re: [616:12-616:18] Pltf Resp This testimony conveys not a direct or specific dollar figure, but rather reflects Dr. Lensing's assessment of the proportion of funds directed to marketing, which is relevant to study conduct as assessed by Bayer's Global

Rulings: Pending

08/06/17 17:59

| | Objections In | Responses In | Rulings |
|---|---|---|---|

admission of this testimony would be counter to the Court's rulings on Omnibus MIL's 1 and 2. (Dkt. No. 6254). 401/403. Furthermore, this testimony contains hearsay without exception. Dr. Davidson is not an employee of either Bayer or Janssen, nor was he at the time he made the statement Plaintiffs now attempt to designate.

Clinical Lead overseeing the indication at the heart of this trial. This is not a marketing material or profit/revenue figure subject to the Court's earlier rulings. Business records exception to hearsay, this is an email composed or received by Dr. Lensing within the normal course of business, establishing the company's knowledge and notice of issues pertaining to study conduct. Bruce Davidson may not be a Bayer or Janssen employee, but he is an important key opinion leader as Dr. Lensing establishes.



616:21 - 617:4  Lensing, Anthonie 2017-07-27                0:54
616 21        BY MR. OVERHOLTZ:
616 22        Q.  Okay.  Now, picking up on the Einstein
616 23        Choice study that Ms. Yates asked you about, let's
616 24        look at Exhibit No. 89, which will be record
616 25                                              5399133
617  1               And you see this is an e-mail between
617  2        yourself and Rodney Hughes in April of 2015 with
617  3        the subject being "Menorrhagia." Do you see that?
617  4        A.  Yes, I see that.

Re: [616:21-617:4]
Def Obj See objection to Exhibit 89.

Re: [616:21-617:4]
Pltf Resp See Plaintiffs' response to Defendants' objection to this exhibit.

Pending

617:19 - 618:1  Lensing, Anthonie 2017-07-27                0:40
617 19        Q.  And if you can look with me, at the
617 20        bottom of the first page, Rodney says: "As a side
617 21        issue, what is your take on the potential
617 22        interaction between antiplatelets, NSAIDS and
617 23        rivaroxaban in Einstein-Extension? Two of the
617 24        four major bleeds where -- were taking aspirin as
617 25        well."
618  1                Do you see that?

618:3 - 618:3  Lensing, Anthonie 2017-07-27                0:00
618  3        THE WITNESS: Yes, I see that.

618:10 - 618:18 Lensing, Anthonie 2017-07-27               0:28
618 10        Q.  And he says -- you say: "Thanks. The
618 11        most important reason for Einstein Choice to
618 12        include an aspirin arm was that thereby I could
618 13        exclude aspirin treatment for the rivaroxaban
618 14        arms. That will result in a 50 percent reduction
618 15        of major bleeding. The effects of concomitant use
618 16        of aspirin and NSAIDS on all anticoagulants is
618 17        overly clear."
618 18        A.  (in English) That's correct.

619:18 - 620:6  Lensing, Anthonie 2017-07-27               1:07
619 18        (Lensing Exhibit No. 90 was marked
619 19        for identification.)
619 20        BY MR. OVERHOLTZ:
619 21        Q.  -- No. 90, which is the -- is an e-mail
619 22        from September 19th of 2016.  And you recall
619 23        counsel for Bayer showed you a copy of the draft
619 24        in Exhibit 86, the draft PD paper from the VTE
619 25        study -- Einstein studies that you testified
620  1        about.
620  2               Do you remember the -- those questions?
620  3        A.  Yes, I do.
620  4        Q.  Okay. And you can see that you sent a
620  5        copy of the draft on September 14th, 2016, to
620  6        Mr. Berkowitz.  Do you see that?

Re: [619:18-620:6]
Def Obj See objection to Exhibit 90.

Re: [619:18-620:6]
Pltf Resp See Plaintiffs' response to Defendants' objection to this exhibit.

Pending

620:12 - 620:17 Lensing, Anthonie 2017-07-27               0:36
620 12        Q.  And then Dr. Berkowitz responds to you
620 13        on September 19th, and says: "Dear Ton:  Thanks
620 14        for sending. Here are my initial thoughts
620 15        embedded as comments in the attached version."
620 16               Do you see that?
620 17        A.  Yes, I see that.

621:12 - 621:22 Lensing, Anthonie 2017-07-27               0:57
621 12        Q.  Okay. Let me show you a statement from
621 13        the draft is -- that was Exhibit 86, that you're
621 14        working on, and it's Exhibit 86.

| | Objections In | Responses In | Rulings |
|---|---|---|---|

621 15      And it says: "There is a linear
621 16      correlation between rivaroxaban plasma
621 17      concentration and prothrombin time, PT, through
621 18      inhibition of factor Xa. Neoplastin was the most
621 19      sensitive PT reagent to rivaroxaban and might be
621 20      an option for monitoring select patients on
621 21      rivaroxaban."
621 22        Do you see that?

621:25 – 622:1 Lensing, Anthonie 2017-07-27    0:02
621 25      THE WITNESS: That was the whole
622 1      rationale behind this activity.

622:14 – 622:24 Lensing, Anthonie 2017-07-27    0:56
622 14      BY MR. OVERHOLTZ:
622 15      Q. And the analysis that was done in this
622 16      draft looking at the correlation between PT and
622 17      bleeding, the endpoint study was major bleeding,
622 18      correct?
622 19      A. Yes, up till now that's how the article
622 20      is drafted.
622 21      Q. Okay. The primary endpoint in the
622 22      Einstein-DVT and PE trials was clinically relevant
622 23      bleeding. Correct?
622 24      A. That is correct.

624:15 – 625:3 Lensing, Anthonie 2017-07-27    1:08
624 15      BY MR. OVERHOLTZ:
624 16      Q. The definition of "clinically relevant
624 17      bleeding" in the Einstein trials included both
624 18      major bleeding and non-major clinically relevant
624 19      bleeding, correct?
624 20      A. That is correct.
624 21      Q. And it would include bleedings requiring
624 22      hospitalizations and transfusions, correct?
624 23      A. That is correct.
624 24      Q. Okay. You were asked some questions
624 25      about the pooled analysis. You're familiar with
625 1      the pooled analysis article by Prins and Lensing
625 2      and several other authors. It's your paper.
625 3      A. Yes, of course, I'm familiar with that.

625:12 – 625:20 Lensing, Anthonie 2017-07-27    0:55
625 12      BY MR. OVERHOLTZ:
625 13      Q. Dr. Lensing, was Dr. Buller an author in
625 14      the pooled analysis paper?
625 15      A. No, he wasn't.
625 16      Q. So if we look at Exhibit 91, Dr. Buller
625 17      has e-mailed you, Ton Lensing, as well as
625 18      Dr. Prins and Dr. Raskob. Do you see that?
625 19      A. He sent a letter to Professor Prins and
625 20      Professor Raskob.

**Objections In:** Re: [625:12-625:20]
Def Obj See objection to Exhibit 91.

**Responses In:** Re: [625:12-625:20]
Pltf Resp See Plaintiffs' response to
Defendants' objection to this exhibit.

**Rulings:** Pending

625:1 – 627:11 Lensing, Anthonie 2017-07-27    3:07
626 1      Q. But the e-mail below was only between
626 2      outside physicians and steering committee and SMCC
626 3      members and yourself, correct?
626 4      A. Only members of the executive steering
626 5      committee.
626 6      Q. And yourself?
626 7      A. Yes. I was also a member of the
626 8      steering committee.
626 9      Q. Okay. And Dr. Buller has e-mailed you
626 10      and said: "Dear Ton: Much to my regret, I have
626 11      to inform you that I will not serve further as an
626 12      author on the pooled analysis manuscript." Right?
626 13      A. That's what it says.
626 14      Q. He says there are three reasons, right?
626 15      A. Yeah.
626 16      Q. His first reason deals with the fact
626 17      that there are -- the data was available to
626 18      everyone through a policy at Bayer, and he said:
626 19      "I consider the distribution as an insult to the
626 20      integrity of the scientific work in progress."
626 21        Do you see that?
626 22      A. That's his conclusion, indeed.
626 23      Q. Okay. He comments on the additional
626 24      cancer analysis, and he says "which are too
626 25      pushy," right?
627 1      A. That is what he writes, indeed.
627 2      Q. He says: "However, the real blow came
627 3      when I read the introduction again last night. My
627 4      sentence in the first line on the two recent
627 5      improvements have been changed in marketing

**Objections In:** Re: [626:1-627:11]
Def Obj This testimony contains hearsay
without exception. Dr. Buller is not an
employee of either Bayer or Janssen, nor
was he at the time he made the
statement Plaintiffs now attempt to
designate. Furthermore, the statement's
limited probative value is substantially
outweighed by its prejudice. Counsel for
Plaintiff laid no foundation as to why Dr.
Buller's opinion - as compared to that of
the many other hundreds of doctors that
worked on this drug - should carry
weight. Yet his strong words will inflame
the jury, which is why, of course,
Plaintiffs have designated this testimony.
401/403. It is also an improper opinion.

**Responses In:** Re: [626:1-627:11]
Pltf Resp This is a business record, as it
was an email received by Dr. Lensing in
the regular course of business. Dr.
Buller was the principal investigator of
EINSTEIN VTE-T study (Ex. 21) as well as a
steering comm'ee member. 252:14-18.
That he held such crucial roles, was not a
Bayer employee and withdrew from the
pooled analysis paper is enormously
probative and his opinion should carry
even more weight than a Bayer
employee.

**Rulings:** Pending

|  | Objections In | Responses In | Rulings |
|---|---|---|---|

| 627 6 | language about rivaroxaban. I did not know this, |
| 627 7 | and it suggests that others are changing the text |
| 627 8 | of this developing manuscript without informing |
| 627 9 | us." |
| 627 10 | Do you see that? |
| 627 11 | A. Yes. |

637:7 -   637:12 Lensing, Anthonie 2017-07-27       0:36
| 637 7 | Q.   Let me ask you this, Dr. Lensing: Do |
| 637 8 | you believe that physicians in the United States |
| 637 9 | deserve to have the same information about the |
| 637 10 | drugs that physicians in Canada or physicians in |
| 637 11 | Europe have about the drug when they make |
| 637 12 | decisions about treating their patients? |

637:15 -   637:17 Lensing, Anthonie 2017-07-27       0:07
| 637 15 | THE WITNESS: What I find in principle |
| 637 16 | is that a physician is entitled to receiving |
| 637 17 | information. |