UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO: | JUDGE ELDON E. FALLON |
| Dora Mingo v. Janssen Research & Development, LLC et al. Case No. 2:15-cv-03469 | MAGISTRATE NORTH |

**DEFENDANTS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR JUDGMENT AS A MATTER OF LAW ON PLAINTIFFS'
CLAIMS RELATING TO ANTI-FACTOR Xa ASSAY ON THE GROUNDS OF
<u>NO PROOF OF SPECIFIC CAUSATION</u>**

A remarkable thing has happened in this case. Plaintiff has taken seven days to put on her case, and never once asked any witness—expert or treating physician—whether the absence of a rivaroxaban-specific anti-Factor Xa assay ("anti-Factor Xa assay") caused any harm to Ms. Mingo. Nor was anyone asked whether the existence of an anti-Factor Xa assay would have prevented, or even lessened, Ms. Mingo's alleged injury.

This is not a situation where the parties debate whether a scintilla of evidence is enough to avoid judgment as a matter of law. In this case, there is a total failure of proof. Nothing.

The facts, set out in more detail in the body of this memorandum, are as follows:

- Plaintiff called three experts on liability issues concerning an anti-Factor Xa assay (Dr. Plunkett, Mr. Gosselin, and Dr. Parisian), but each of them explicitly disclaimed having any case-specific opinion concerning Ms. Mingo's case.

- Plaintiff called one case-specific expert (Dr. Rinder) on causation. But the only causation opinion Dr. Rinder was asked about, and the only one he gave, was about PT testing. Dr. Rinder was not asked—and gave no opinion as to—whether an anti-

        Factor Xa assay would have been of any use to Ms. Mingo or her physicians in avoiding or lessening her alleged injuries.

- Plaintiff also questioned Dr. Jordon on causation. But all causation questions to Dr. Jordon either specifically referenced PT and/or focused on whether it would be useful to have a test like the one used for coumadin/warfarin—*i.e.*, a PT test. The words "anti-Factor Xa" were never uttered once during the entirety of Dr. Jordon's examination. Not on direct, not on cross, not on redirect.

As the Court knows, Plaintiff must prove both general and specific causation. *See Knight v. Kirby Inland Marine, Inc.*, 482 F.3d 347, 351 (5th Cir. 2007). Testimony that a particular test might be generally helpful to physicians cannot substitute for testimony that—in the particular case of the particular plaintiff before the Court—the test more probably than not would have prevented or lessened the plaintiff's injury. Causation is an essential element of a claim for either design defect or for failure to warn or instruct under the Mississippi Product Liability Act. *See* Miss. Code Ann. § 11-1-63; *accord Williams v. Bennett*, 921 So. 2d 1269, 1273 (Miss. 2006). Because there is "no evidence" to support the essential element of specific causation connecting the anti-Factor Xa assay to Ms. Mingo's treatment and care, Defendants are entitled to judgment as a matter of law on all claims relating to such an assay. *Vance v. Union Planters Corp.*, 209 F.3d 438, 441 (5th Cir. 2000).

## ARGUMENT

**I.    Plaintiff has no presented no evidence as to how an anti-Factor Xa assay would have mattered in her case.**

There is no testimony linking an anti-Factor Xa assay to Ms. Mingo.

1. **Generic Experts**

Dr. Plunkett, Mr. Gosselin, and Dr. Parisian all expressly disclaimed that they were offering any case-specific opinions with respect to Ms. Mingo. *See* Trial Tr. at 641:18–20, 642:1–3 (Dr. Plunkett) (testifying that she was "not a case-specific expert" and had not looked at any laboratory test results for Ms. Mingo); *id.* 820:4-12 (Gosselin) ("Q. All right. Is it correct that you've not provided any opinions at all about Ms. Mingo? A. I'm sorry. Ms. Who? Q. Ms. Mingo is our plaintiff here. We should introduce you. This is Dora Mingo. You don't know her, and you don't have any opinions about Ms. Mingo? A. No, sir. I'm sorry. I don't know her, that's correct, and I have no opinions on Ms. Mingo."); *id.* 1145:10–12 (Dr. Parisian) ("But that's correct, I'm not her medical person to discuss in her case.").

2. **Dr. Rinder**

Dr. Rinder offered causation opinions *only* about PT testing. None of Dr. Rinder's causation testimony, reproduced below, references anti-Factor Xa assay testing with respect to Ms. Mingo:

> Q. Dr. Rinder, if there were information in the Xarelto label about the usefulness of **PT** in circumstances like this, would you have expected a different course of treatment by her healthcare providers here?
> 
> A. Yes.
> 
> Q. What would you have expected?
> 
> MS. PRUITT: Your Honor, I'm going to object. That's calling for speculation as to what Dr. Jordon may have done or may not have done.
> 
> THE COURT: Well, it's not calling for that. It's his opinion as to her treatment. I'll overrule the objection and allow it.
> 
> EXAMINATION BY MR. BIRCHFIELD: Q. What would you have expected from the healthcare providers?
> 
> A. If that data is in the label, and doctors know that **a prothrombin time** done with this reagent and corresponding exactly to the data from the EINSTEIN study puts them at a higher risk of bleeding, at the least, Dr. Jordon is going to have a discussion with the patient saying, gee, we've done a blood test, and you're in that group that has a higher risk of bleeding, and is going to have that discussion with

3

> Ms. Mingo. I would think -- if I was the doctor, I would basically have that discussion, and I would be -- and I would have to say, well, there is an increased risk of bleeding, but I don't know that there is any increase in benefit.
>
> Q. Dr. Rinder, just so that we're clear, there is not any information in the Xarelto label that would provide information about this to Dr. Jordon, is there?
>
> A. No, there was no information on the label, so Dr. Jordon did not know that this was in the fourth quartile of bleeding risks.
>
> Q. You're not being critical of Dr. Jordon regarding his treatment?
>
> A. I'm not.

Trial Tr. 1315:1–1316:10 (emphasis added).

### 3.  Dr. Jordon

Dr. Jordon offered no testimony about whether instructions about an anti-Factor Xa assay would have altered his prescribing decision or conduct or as to whether such an assay would have otherwise mattered in Ms. Mingo's case. The words "anti-Factor Xa" were not mentioned once during Dr. Jordon's testimony. In contrast, PT was referenced 33 times—21 times on direct, 9 times on cross, and 3 times on redirect. The causation questions posed to Dr. Jordon explicitly referenced PT and/or used terms like "warfarin," "INR," anticoagulant effect,"[1] and "coumadin"— which refer to PT, not anti-Factor Xa:

> Q. Let's start over. You see where the label says that "The anticoagulant effect of Xarelto cannot be monitored with standard laboratory testing." Do you see that?
>
> A. Yes.
>
> Q. If, in fact, you can use **PT** to monitor the anticoagulant effect of Xarelto, regardless of what the sales representatives say, this label was wrong, isn't it?
>
> A. Yes, in this case it would be wrong.
>
> Q. Now, you talked about the discussion and the type of discussion that you have with patients when you are going to prescribe them an anticoagulant. Do you remember that?

---

[1] PT measures "anticoagulant effect," as measured in the time it takes blood to clot, while an anti-Factor Xa assay measures Xarelto "concentration," or the "levels" of drug in the blood. As Plaintiff's expert explained, anti-Factor Xa does not measure anticoagulant effect. Trial Tr. 803:2–23, 836:12–18 (explaining that there is a difference between measuring the effects of a drug and the levels of a drug; PT only measures the coagulation effect) (Gosselin).

A. Yes.

Q. You talked about the fact that you would probably, best practices, tell them that there's a risk of bleeding?

A. Yes.

Q. Now, with a drug **like Coumadin**, I would assume -- tell me if I'm wrong. Would you tell them, "Listen. We are going to start you out on a dose. We're going to get some blood tests, and we're going to see how you handle that medication"?

A. **Coumadin**, yes.

Q. It might take you a couple days, "But we are going to figure out the best dose for you," correct?

A. Correct.

Q. That's the kind of information you would have a discussion with -- with your patient?

A. Yes.

Q. Now, with Xarelto you would not be able to have that conversation, based upon what these defendants told you?

A. As it pertains to laboratory monitoring of the drug, no.

Q. So you wouldn't be able to tell a lady like Ms. Mingo that she might fall into this high bleeding risk area, would you?

A. No.

. . .

Q. Well, if, in fact, that's true that that the manufacturers of Xarelto would have told you that there was, in fact, some relevance between **PT** and her risk of bleeding, is that something you would have considered?

A. Yes.

Q. If you felt that it was too high, you would have had a discussion with her?

A. I would have stopped the medication, yes.

Trial Tr. 1446:4–1447:10; *id.* 1423:21–1424:3 (emphasis added).

Q. Now, we know with **warfarin**, you could check by looking at her **INR** to see whether or not she could tolerate the medicine, right?

A. Correct.

Q. But was there any guidance given to you by the manufacturers of Xarelto as to how to check and see if she was tolerating it?

A. No.

5

> Q. So I suppose, then, other than –
>
> A. It would be a clinical assessment -- sorry to interrupt you -- it would be a clinical assessment and a judgment, yes.
>
> Q. Clinical assessment. So if she was bleeding, you would know she was not tolerating it?
>
> A. Correct.
>
> Q. In terms of getting a routine laboratory test such as you were able to do with warfarin, Bayer and Janssen didn't give you any guidance in that regard?
>
> A. No.
>
> Q. If, in fact, it would have been possible to monitor the **anticoagulant effect** of Xarelto in January 2015 while Ms. Mingo was there in your hospital receiving the medication for the first time, is that something you would have wanted to do?
>
> A. As a basic standard of care, if there was a requirement that we as a physician follow that, yes, I would have been forced to comply with that, yes.
>
> Q. Well, if it was something that you were told it was possible for the safety of your patient, is that something you would have wanted to do?
>
> A. Yes. Yes.

Trial Tr. 1419:20–1420:23 (emphasis added).

### 4. Absence of Laboratory Results

On her PT claim, Plaintiff's case-specific expert used an actual PT test result for Ms. Mingo to opine that she had a "high" value that could have affected her treatment.[2] There was no comparable testimony regarding an anti-Factor Xa assay. There were no anti-Factor Xa lab results and no testimony (even hypothetical or speculative) of what an anti-Factor Xa assay would have shown in Ms. Mingo's particular case.

In short, Plaintiff's case is based solely on use of Neoplastin PT and she has failed to provide any evidence that links her proposed alternative design—an anti-Factor Xa assay—to her case. She has not offered any proof as to (1) what an assay would have told Ms. Mingo's

---

[2] As Defendants have previously explained and re-asserted in their motion for judgment as a matter of law, this opinion should have been excluded under *Daubert*, (*see* Docs. 6820, 7065). But at least Plaintiff has attempted to introduce evidence on PT causation—something she did not even try to do on anti-Factor Xa causation.

physicians; (2) whether it would have shown anything clinically relevant for Ms. Mingo; (3) how her physicians would have responded to an anti-Factor Xa assay; or (4) how the results from an anti-Factor Xa assay test would have influenced Ms. Mingo's outcome.

### 5. Design Causation vs. Warnings Causation

We point out as well that the causation questions asked of Drs. Rinder and Jordon were warnings causation questions, not design causation questions. Whether different information on the Xarelto label would have led to a different outcome—which is all that Drs. Rinder and Jordon were asked—addresses only the question of whether a defect in Xarelto's warnings or instructions caused harm to Ms. Mingo. But a design-defect claim requires proof that a change in the product's design would, by itself, prevent or lessen the injury. No such questions were asked.[3]

## CONCLUSION

For the foregoing reasons, and for the reasons stated in Defendants' accompanying motion and memorandum of law,[4] Defendants respectfully request that the Court grant them judgment as a matter of law on any claim regarding an anti-Factor Xa assay.

---

[3] If Plaintiff seeks to change her anti-Factor Xa claim from a design-defect claim into a failure-to-warn claim, that claim is waived for the reasons set forth in Defendants' motion for judgment as a matter of law and memorandum of law in support of that motion. Due process and basic fairness bar the assertion of a new claim in the middle of trial.

[4] Defendants submit this memorandum of law (without waiver of any the grounds set forth in their separate motion and brief filed simultaneously) at the close of Plaintiff's case-in-chief, for judgment as a matter of law on Plaintiff's claims relating to an anti-Factor Xa assay. Defendants have filed a separate motion and brief explaining other grounds why Defendants are entitled to judgment as a matter of law on Plaintiff's claims. Defendants make this motion at the close of Plaintiff's case-in-chief without waiver of their right to move for judgment as a matter of law more broadly—including but not limited to the arguments in this motion, as well as arguments related to Plaintiff's demand for punitive damages—at the close of all evidence. *See, e.g.*, *Gonzales v. Ysleta Indep. Sch. Dist.*, 996 F.2d 745, 750–52 (5th Cir. 1993) (holding that defendant may move for judgment as a matter of law on fewer than all issues at the close of plaintiffs' case, and then move more broadly at the close of all evidence).

Respectfully submitted,

| | |
|---|---|
| BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C. | MITCHELL, WILLIAMS, SELIG, GATES & WOODYARD, P.L.L.C. |
| BY: /s/ *Richard E. Sarver* | By: */s/ Lyn P. Pruitt* |
| Richard E. Sarver | Lyn P. Pruitt |
| Celeste R. Coco-Ewing | Adria W. Conklin |
| BARRASSO USDIN KUPPERMAN FREEMAN & SARVER, L.L.C. | Benjamin D. Brenner |
| 909 Poydras Street, 24th Floor | Mary Catherine Way |
| New Orleans, Louisiana 70112 | MITCHELL, WILLIAMS, SELIG, GATES & WOODYARD, P.L.L.C. |
| Telephone: (504) 589-9700 | 425 West Capitol Ave., Suite 1800 |
| rsarver@barrassousdin.com | Little Rock, AR 72201 |
| ccoco-ewing@barrassousdin.com | Telephone: (501) 688-8800 |
| | lpruitt@mwlaw.com |
| | aconklin@mwlaw.com |
| DRINKER BIDDLE & REATH LLP | bbrenner@mwlaw.com |
| | mway@mwlaw.com |
| By: /s/ *Susan M. Sharko* | |
| Susan M. Sharko | |
| DRINKER BIDDLE & REATH LLP | WATKINS & EAGER PLLC |
| 600 Campus Drive | |
| Florham Park, NJ 07932-1047 | By: */s/ Walter T. Johnson* |
| Telephone: (973) 549-7000 | Walter T. Johnson |
| susan.sharko@dbr.com | WATKINS & EAGER PLLC |
| | The Emporium Building |
| Rodney M. Hudson | 400 East Capitol Street |
| DRINKER BIDDLE & REATH LLP | Jackson, Mississippi 39201 |
| 50 Fremont Street, 20th Floor | Telephone: (601) 965-1846 |
| San Francisco, CA 94105-2235 | wjohnson@watkinseager.com |
| Telephone: (415) 591-7500 | |
| Rodney.hudson@dbr.com | ARNOLD & PORTER KAYE SCHOLER LLP |
| Chanda A. Miller | By: /s/ *William Hoffman* |
| DRINKER BIDDLE & REATH LLP | William Hoffman |
| One Logan Square, Suite 2000 | ARNOLD & PORTER KAYE SCHOLER LLP |
| Philadelphia, PA 19103-6996 | 601 Massachusetts Ave., NW |
| Telephone: (215) 988-2500 | Washington, D.C. 20001 |
| Chanda.Miller@dbr.com | Telephone: (202) 942-5000 |
| | william.hoffman@apks.com |
| IRWIN FRITCHIE URQUHART & MOORE LLC | Andrew K. Solow |
| | Steven Glickstein |
| By: /s/ *James B. Irwin* | ARNOLD & PORTER KAYE SCHOLER LLP |
| James B. Irwin | 250 West 55th Street |

8

Kim E. Moore
IRWIN FRITCHIE URQUHART & MOORE LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

*Attorneys for Defendants Janssen Pharmaceuticals, Inc. and Janssen Research & Development, LLC*

New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: */s/ Lindsey C Boney IV*
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
lboney@bradley.com


CHAFFE MCCALL L.L.P.

By: /s/ *John F. Olinde*
John F. Olinde
CHAFFE MCCALL L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer HealthCare Pharmaceuticals Inc. and Bayer Pharma AG*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 16th day of August, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system and a copy of the proposed documents to be placed under seal sent to Plaintiffs' Liaison Counsel by email transmission.

*/s/    John F. Olinde*