UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE:  XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * | |
| *Mingo v. Janssen Research &* | * | |
| *Development, LLC et al.* | * | JUDGE ELDON E. FALLON |
| **Case No. 2:15-cv-03469** | * | |
| | * | MAGISTRATE JUDGE NORTH |

* * * * * * * * * * * * * * * * * * * * * * *

**PLAINTIFF'S RESPONSE TO DEFENDANTS'
MOTION FOR JUDGMENT
AS A MATTER OF LAW AT THE CLOSE OF PLAINTIFF'S CASE**

**I.    INTRODUCTION**

Defendants have filed for judgment as a matter of law at the close of Plaintiff's case (Rec. Doc. 7361).  Their motion fails to meet the high burden needed to demonstrate that a reasonable jury would not have a legally sufficient evidentiary basis to find for Plaintiff on the issues of inadequate warnings and design defect because Plaintiff's evidence meets all the elements of a failure to warn/instruct claim and design defect claim under the Mississippi Products Liability Act ("MPLA"), Miss Code Ann. §11-1-63.

Drawing all reasonable inferences in Plaintiffs' favor as required under Rule 50(a), the preponderance of evidence at trial established that Xarelto was unreasonably dangerous because Defendants failed to adequately instruct physicians, including Dr. Renie Jordon, Ms. Mingo's doctor. She points to a clinically significant variability among Xarelto users, meaning that certain Xarelto-treated patients will have a higher bleeding risk than others even though put on the same dose as others; and she alleges that standard laboratory testing is available and can be used to identify those patients who are at a higher risk for bleeding. Ms.

1

Mingo claims that she was one of these patients, and that Defendants failed to adequately instruct Dr. Jordon regarding the need for and ability to use already-available standard laboratory testing to determine that she had a greater risk of bleeding on Xarelto, and therefore should have been given different medication for her condition.

Ms. Mingo proved that her G.I. bleed would have been avoided if Defendants had adequately instructed Dr. Jordon about such standard testing, because these instructions would have caused Dr. Jordon to alter his treatment of Ms. Mingo by changing her medication.

Further, Ms. Mingo proved that Xarelto was "unreasonably dangerous" in how it was designed because, despite Defendants' knowledge that certain Xarelto-treated patients will have a higher bleeding risk, those manufacturers failed to provide an anti-Factor Xa assay to allow physicians to identify inappropriate Xarelto patients who are at too high a risk of bleeding, like Ms. Mingo, who could then alter their anticoagulation therapy.

The remainder of Defendants' "catch-all" motion is boilerplate from previous motions that have already been denied by the Court. Plaintiffs incorporate by reference their prior submissions and this Court's prior rulings to contend that these frivolous contentions should be denied.

## II.    ARGUMENT

### A.    STANDARD OF REVIEW

A motion for judgment as a matter of law should only be granted if "a reasonable jury would not have a legally sufficient basis to find for [a] party on that issue." Fed. R. Civ. P. 50(a). A judgment as a matter of law pursuant to Rule 50 is proper only if the facts and inferences point so strongly in favor of one party that reasonable minds could not disagree. *See Piotrowski v. City of Houston*, 237 F.3d 567, 576 n.9 (5th Cir. 2001). The district court should review all of the

evidence in the record … [but] must draw all reasonable inferences in favor of the nonmoving party, and may not make credibility determinations or weigh evidence. Although the court should review the record as a whole, it must disregard all evidence favorable to the moving party that the jury is not required to believe. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000) (citations omitted). In other words, "'the court should give credence to the evidence favoring the nonmovant as well as that evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses.'" *Brennan's Inc. v. Dickie Brennan & Co. Inc.*, 376 F.3d 356, 362 (5th Cir. 2004) (quoting, *Reeves,* 530 U.S. at 151). "Credibility determinations, the weighing of the evidence, and the drawing of the legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*, 530 U.S. at 150-51 (quotation and citations omitted).

### B. PLAINTIFF'S EVIDENCE SATISFIED ALL THE ELEMENTS FOR HER FAILURE TO WARN/ INSTRUCT & DESIGN DEFECT CLAIMS

### 1) THE ELEMENTS OF PLAINTIFF'S SEPARATE CLAIMS

Under the MPLA, Miss. Code Ann. §§ 11-1-63(a) and (c), to establish a failure to warn/instruct plaintiff must show:

1. That when Xarelto was placed on the market, Defendants knew, or in light of reasonably available knowledge should have known, about the danger of a patient taking Xarelto if her physician does not refer to standard laboratory testing to evaluate that patient's exposure and risk of bleeding on Xarelto;

2. That an ordinary physician prescribing Xarelto would not recognize such a danger without being given proper instructions by the manufacturer;

3. That a reasonably prudent manufacturer in the same or similar circumstances as the Defendants would have provided such instructions, even though these Defendants did not do so; and;

4. That the failure of Defendants to provide such instructions to Ms. Mingo's physician, Dr. Jordon, made Xarelto

unreasonably dangerous in the case of Ms. Mingo and was a
proximate cause of her injuries.

To establish a design defect claim under the MPLA, Miss. Code Ann. §§ 11-1-63(a)(i)(3), (b) and (f), a plaintiff must show:

> 1. That the harm for which Ms. Mingo seeks to recover damages is not due to a built in characteristic of Xarelto which could only be eliminated by substantially compromising the usefulness of the drug as recognized by physicians with knowledge common to the medical community;
>
> 2. That, at the time Xarelto was placed on the market, Defendants knew, or in light of reasonably available knowledge should have known, about the danger posed by Xarelto because the drug was not designed with an anti-Factor Xa assay to evaluate a patient's exposure and risk of bleeding on Xarelto;
>
> 3. That Xarelto, as designed, failed to function safely and effectively as expected in the case of Ms. Mingo;
>
> 4. That it was feasible for Defendants to design Xarelto with an anti-Factor Xa assay to evaluate a patient's exposure and risk of bleeding on Xarelto, and, to a reasonable probability, such an alternative design would have prevented the G.I. bleed suffered by Ms. Mingo without impairing the practical usefulness or desirability of Xarelto for patients; and
>
> 5. That the failure to design Xarelto with an anti-Factor Xa assay made Xarelto unreasonably dangerous in the case of Ms. Mingo, and was a proximate cause of her injury.

As explained at length below, Plaintiff has introduced evidence sufficient to satisfy her burden for both claims by the preponderance of the evidence standard.

## 2. PLAINTIFF HAS ESTABLISHED BY A PREPONDERANCE OF THE EVIDENCE HER FAILURE TO INSTRUCT CLAIM

In seriatim fashion, Plaintiff will briefly set forth the evidence which satisfies each of the elements of her failure to instruct claim.

4

**1. That when Xarelto was placed on the market, Defendants knew, or in light of reasonably available knowledge should have known, about the danger of a patient taking Xarelto if her physician does not refer to standard laboratory testing to evaluate that patient's exposure and risk of bleeding on Xarelto**

    a. Dr. Laura Plunket testified that there was not great range between the effectiveness and toxicity of Xarelto, that there was significant variability among patients and that Neoplastin was confirmed reagent that was sensitive enough to measure Xarelto's foibles.

        i. <u>Flat dose response</u>. "In other words, you're not getting any greater benefit in 10, 20, or 30. They appear to be acting very similar in the patients. But when you look at that same doses, they will say there was a dose response -- there was a dose response for toxicity. So they were seeing that toxicity started to the creep up as dose rose. So that's the data I'm referring to."  Trial Tr. at 601.

        ii. <u>Variability in absorption</u>:
"It's a delicate balance between efficacy and toxicity (bleeding).  Trial Tr. at 613 (The exposure that produces effects and the exposure that produces toxicity. And because of that, this interindividual variability is important.")."
- Well known to Company, *e.g*., Mueck Article (2014)

        iii. <u>PK/PD studies all used Neoplastin and found correlation between drug concentration and clotting.</u>
- Trial Tr. at 628 ("clinical studies with this reagent Neoplastin, they indeed show that there was a correlation again between the exposure, the amount of Xarelto in the blood, and the -- the presence of -- or the activity to clot, so how fast blood clotted or how slow the blood clotted.").

    b)  Dr. Susanne Parisian confirmed from a regulatory point of view that the Defendants did not behave a reasonable manufacturer because they withheld information about helpful tests from the warning section of their label.

5

    a. The manufacturer is responsible for the label at all times. Trial Tr. at 1054.

    b. The Label was insufficient because it did not INSTRUCT in Section 5 of helpful test. This handicaps doctors.

> "**Q.** If you look at the current form of the Xarelto label in Section 5 as you see it there, is there anything in this highlights section that would suggest that there is information in the warnings and precautions section about laboratory tests to be used with Xarelto?
> **A.** No.
> **Q.** And is it your opinion that there should be such information in Section 5?
> **A.** Yes, based on the documents that I reviewed. Yes, sir.
> **Q.** And is it your view that there are particular federal regulations relating to drug labeling that require and mandate in the situation with Xarelto that laboratory testing information be included in the warnings and precautions section?
> **A.** Yes, in your 21 CFR 201.57(C)(6)(iii)." (Trial Tr. at 1086)

c) Dr Rinder confirmed that PT Neoplastin would be a great tool but there is no instruction in the label.

> "Q. Dr. Rinder, given what you know about variability and PT and the risk of bleeding, would it be helpful for a physician to use PT -- Neoplastin PT to determine an individual's risk of bleeding?
> A. Absolutely. It would be a great tool for a doctor to measure very easily and to be able to say, well, I see that your value -- and then I can make a decision on it. You're not in the fourth quartile, I'm okay with that, if possible. If you're in that fourth quartile, you have too much risk of bleeding.
> Q. Is there information in the Xarelto label about -- to provide instructions to doctors about using PT to measure the amount of Xarelto in a patient's blood to determine their risk of bleeding?
> A. No." (Trial Tr. at 1300)

**2. That an ordinary physician prescribing Xarelto would not recognize such a danger without being given proper instructions by the manufacturer;**

- The Xarelto Label states that it is not possible to monitor Xarelto (DX10).

- Dr. Jordon testified that he was told by the label and sales representatives that it was not even possible to monitor the anticoagulation effect of Xarelto.

    > 2017-0814-fallon_pm final - Vol. VI PM, (Pages 1414:22 to 1415:12)
    >             1414
    > 22  Q.  At the time that you prescribed Xarelto to Ms. Mingo, were
    > 23  you under the impression that there was no need to test the
    > 24  anticoagulation effect of that drug?
    > 25  A.  Yes, I was under the impression at that time and even now.
    >             1415
    >  1  Q.  And even now it's your impression?
    >  2  A.  Yes.
    >  3  Q.  Were you also under the impression that it was not even
    >  4  possible to monitor the anticoagulation effect of Xarelto?
    >  5  A.  That's correct.
    >  6  Q.  That impression about those two items came to you from
    >  7  where?  Sales representatives?
    >  8  A.  From the sales representative, the package insert, and the
    >  9  FDA guidelines in prescribing that drug, yes.
    > 10  Q.  I think you told us, in your deposition, you had even seen
    > 11  some ads on television that further gave you that impression.
    > 12  A.  Correct.

- Mr. Goselin: It is false to say that the anticoagulant effect of Xarelto cannot be measured by standard laboratory tests. It is possible to measure Xarelto levels with standard laboratory tests, e.g,, anti-factor Xa Assay or PT with Neoplastin. Trial Tr. at 788:23 – 789:1.

- Dr. Rinder: There is no instruction on the proper use of PT Neoplastin in the Label. Trial Tr. at 1300.

**3. That a reasonably prudent manufacturer in the same or similar circumstances as the Defendants would have provided such instructions, even though these Defendants did not do so; and;**

Bayer provides a more instructive warning about using PT Neoplastin in other countries, which is demonstrated by information given to physicians in Canada.

7

- Dr. Lensing testified that the information disclosed to physicians in Canada was accurate. Specifically, he agreed to the accuracy of the information in the Canadian Monograph, to wit:
    - "PT is influenced by Xarelto in a dose-dependent way if Neoplastin is used for the assay."
    - "In patients who are bleeding, measuring the PT using Neoplastin reagent may be useful to assist in determining an excess anticoagulant activity."
    - "The usual and expected effect of Xarelto on PT when the Neoplastin reagent is used . . . in Table"
    - The information was correct and based on "blood samplings from the Einstein-DVT and Einstein PE studies. Trial Tr. at 1462:25 - 1466:25.

4. **That the failure of Defendants to provide such instructions to Ms. Mingo's physician, Dr. Jordon, made Xarelto unreasonably dangerous in the case of Ms. Mingo and was a proximate cause of her injuries.**

- Dr. Jordon testified that he would have stopped Xarelto if he had been properly instructed to test PT levels to evaluate Ms. Mingo's bleeding risk:

    2017-0814-fallon_pm final - Vol. VI PM, (Pages 1423:21 to 1424:16)
    ```
                1423
    21  Q.  Well, if, in fact, that's true that the manufacturers of
    22  Xarelto would have told you that there was, in fact, some
    23  relevance between PT and her risk of bleeding, is that
    24  something you would have considered?
    25  A.  Yes.
                1424
     1  Q.  If you felt that it was too high, you would have had a
     2  discussion with her?
     3  A.  I would have stopped the medication, yes.
     4  Q.  Stopped the medication.
     5      There has been some testimony in this courtroom today
     6  that the significance of these PT levels indicated that, in
     7  fact, Ms. Mingo was in the highest quartile, she was in the
     8  highest 25 percent of people at risk of bleeding based upon
     9  those PT results.  Is that the type of information you would
    10  have wanted to know?
    11  A.  Yes.
    12  Q.  Is that the type of information that you would have talked
    13  to her about?
    14  A.  Yes.
    15  Q.  And then you may have stopped the medication yourself?
    16  A.  Yes.
    ```

Causation was established through the testimony of Dr. Rinder who stated that Xarelto was the significant contributing factor to Ms. Mingo's GI bleed, after ruling out through a differential diagnosis all other potential concerns, including Ms. Mingo's use of aspirin. Dr. Rinder testified:

- Q. Dr. Rinder, do you have an opinion to a reasonable degree
- 17 of medical certainty whether Xarelto was a substantial
- 18 contributing factor in Ms. Mingo's GI bleed?
- 19 A. Yes, I do.
- 20 Q. And what is that?
- 21 A. Xarelto was the significant contributing factor to her
- 22 GI bleed. (Trial Tr. at 1332-1333)

He further stated that objective data supports his opinion: Ms. Mingo's PT of Jan 13, and Feb. 23. (Trial Tr. at 1334).

Plaintiff has also proven her damages through her personal testimony, that of her daughter, and the parties' stipulation to medical expenses. As a consequence, all of the elements of plaintiffs' failure to instruct claim have been established.

The additional challenge presented by the Defendants that there does not exist a sufficient evidentiary basis for a reasonable jury to find that the lack of adequate warning caused Ms. Mingo's injuries is equally maladroit.

To begin, the Defendants misconstrue plaintiffs' failure to instruct theory as a failure to warn claim based on a hypothetical counter-factual scenario. Improperly using impeachment testimony from her deposition, Defendants posed the following testimony at trial:

16  Q.  Do you remember saying that if you had read that, you
17   would have never, ever taken Xarelto?
18  A.  Yes, sir.
19  Q.  Because that would have told you everything you needed to

```
20  know?
21  A.  Yes, sir.
22  Q.  You would not have taken the medication?
23  A.  No, sir.
24  Q.  You would have heeded that instruction or that warning; is
25      that right?
                1568
 1  A.  Yes, sir.
```

(Trial Tr. at 1567:16 to 1568:1).

Ms. Mingo was under no obligation to read the Medication Guide. She testified that she relies on her doctor's advice to warn of risks and generally she takes the medications they prescribe. *Id*. at 1528:24 – 1529:13. Thus, when Dr. Jordon prescribed Xarelto to her in the hospital, she took the drug. *Id.* at 1534:19-23. In fact, she was already taking Xarelto *before* she even received the Medication Guide which she obtained later upon her discharge from the hospital. By then, the injury from the Defendants' failure to instruct Dr. Jordon about the proper use of a PT test to assess her bleeding risk had already manifested.

More importantly, there is a fundamental legal flaw in the Defendants' position. Under the MPLA, the duty to adequately warn or instruct extends to the prescribing or treating physician, the learned intermediary. That duty cannot be discharged by construing a separate duty to the patient that was somehow discharged by the warning in the Medication Guide. Under *Wyeth v. Fortenberry*, 530 So. 2d 688, 691 (Miss. 1988), the plaintiff must establish that had a proper warning or instruction been given, the conduct of the *physician* would have been altered, not the patient. [1]

---

[1] Defendants' reliance upon caselaw addressing unread warnings in the context of this failure to instruct case is misplaced. *See, e.g., Wallace v. Ford Motor Co.,* No. 3:11-CV-567, 2013 WL 3288435 (S.D. Miss. June 28, 2013).

Defendants' suggestion that Ms. Mingo's testimony regarding the Medication Guide breaks the causal chain is therefore misplaced both factually and legally. Their contentions should be denied.

3. **PLAINTIFF HAS ESTABLISHED BY A PREPONDERANCE OF THE EVIDENCE HER FAILURE TO DESIGN DEFECT CLAIM**

In seriatim fashion, Plaintiff will briefly set forth the evidence which satisfies each of the elements of her design defect claim.

**1) That the harm for which Ms. Mingo seeks to recover damages is not due to a built-in characteristic of Xarelto which could only be eliminated by substantially compromising the usefulness of the drug as recognized by physicians with knowledge common to the medical community;**

\*      Mr. Robert Gosselin testified to the ready avaialability of an anti-Factor Xa assay that could measure levels of Xarelto in the blood which could be useful to physicians.

> Q. And is it your opinion that the anti-Factor Xa assay is an effective tool to measure the levels of Xarelto?
> **A.**  A. Yes, absolutely (Trial Tr. at 897)

Dr. Ted Spiro
2017-0815-fallon_pm final - Vol. VII PM, (Page 1625:3 to 1625:10)
```
            1625
 3  Q.  So what you told Dr. Eby was, even though the purpose of
 4  the study was to assess clinically practicable tools for
 5  measuring rivaroxaban blood concentrations, Bayer didn't have
 6  any financial incentive to develop such tools, because they
 7  didn't have a laboratory business anymore.  Right?
 8  A.  Oh, yes.  We didn't have a specific incentive ourselves to
 9  further develop assays, which we might have done if we had
10   maintained our laboratory division, but it was gone.
```

**2) That, at the time Xarelto was placed on the market, Defendants knew, or in light of reasonably available knowledge should have known, about the danger posed by Xarelto because the drug was not designed with an anti-Factor Xa assay to evaluate a patient's exposure and risk of bleeding on Xarelto;**

11

One of Bayer's leading scientists, Dr. Ted Spiro, testified that the company knew of commercially available assays that could be used for Xarelto, but that for purely selfish commercial reasons the company chose not develop a Rivaroxaban specific assay.

```
15   And you were aware that there were actually factor Xa
16   inhibitory assays available on the market at this time,
17   correct?
18   A.  Yes, there were. (Trial Tr. at 1604).
```

***

- 3   Q.  So what you told Dr. Eby was, even though the purpose of
- 4   the study was to assess clinically practicable tools for
- 5   measuring rivaroxaban blood concentrations, Bayer didn't have
- 6   any financial incentive to develop such tools, because they
- 7   didn't have a laboratory business anymore.  Right?
- 8   A.  Oh, yes.  We didn't have a specific incentive ourselves to
- 9   further develop assays, which we might have done if we had
- 10  maintained our laboratory division, but it was gone.  (Trial Tr. at 1625).

Similarly, Dr. Plunkett testified about the availability of Factor Xa assay that could determine exposure.

> "**Q.** All right. And then are there other methods? Does the company use other means to measure the exposure, a patient's exposure, to Xarelto?
>
> **A.** Yes. So remember I mentioned that it inhibits the Factor Xa activity? So there's another assay that the company could use where they actually monitored the percent $$ the percent inhibition of the activity of this factor 11:01 in a test tube. So this is a laboratory test where you can take a test tube and you can put a sample of the plasma in there, and you can interact it with this -- this factor, and you can look at how much of the activity is inhibited. And that activity is going to be seen by a color change in the test tube, and that's the typical type of assay." (Trial Tr. at 584:19-585:6).

Finally, Dr. Wu testified that anti-Factor Xa Assays are routine tests. (Trial Tr. at 913).

    **3) That Xarelto, as designed, failed to function safely and effectively as expected in the case of Ms. Mingo;**

Dr. Susanne Parisian testified that the Defendants could have used a Facto Xa assay to allow doctors to determine the amount of drug on board/ risk of bleed for patients that are high responders.

- It is appropriate and permissible within FDA regulations to state that the Factor Xa assay is available on a research-use-only or an LDT basis. Manufacturers can state "it's available, let a physician use it." (Trial Tr. at 1120:21-1121:7).
- It would be appropriate for the warning section of Xarelto's label, Section 5, to include information about the helpfulness and usefulness of the Factor Xa assay. "It's available to most research laboratories. So it would be another tool that would be available for a physician caring for patients to use." (Trial Tr. at 1120:8-16).
- Manufacturers can state "it's available, let a physician use it." (Trial Tr. at 1120:21-1121:7).

Dr. Ton Lensing, Bayer's global clinical lead, confirmed that "the statement to Canadian physicians -- "There is a clear correlation between plasma rivaroxaban concentration and the degree of anticoagulant effect" – is accurate. (Trial Tr. at 1463:19 -21).

    **4) That it was feasible for Defendants to design Xarelto with an anti-Factor Xa assay to evaluate a patient's exposure and risk of bleeding on Xarelto, and, to a reasonable probability, such an alternative design would have prevented the G.I. bleed suffered by Ms. Mingo without impairing the practical usefulness or desirability of Xarelto for patients**

Mr. Robert Gosselin addressed the feasibility of an anti-Factor Xa assay, which could serve as an alternative design for Xarelto.

> Q. Using this model machine -- using this model machine, could you do -- could you do a Xarelto calibrated anti-Factor Xa assay using this machine?
> A. Yes.

(Trial Tr. at 809). Mr. Gosselin further testified that virtually 100% of hospitals have laboratories capable of performing Anti-factor Xa Assays. (Trial Tr. at 890).

13

Further, Dr. Lensing admitted to the usefulness of an anti-Factor Xa assay.

> A. 2017-0814-fallon_pm final rev 1 - Vol. VI PM, (Page 1453:3 to 1453:20)
> B.     1453
> C. 3 Q. Do you believe that the anticoagulant effect of Xarelto
> D. 4 can be measured?
> E. 5 A. There are laboratory tests with which you can measure the
> F. 6 effect of rivaroxaban on blood coagulation.
> G. 7 Q. Is one of those laboratory tests an anti-factor Xa assay?
> H. 8 A. It is indeed.

5) **That the failure to design Xarelto with an anti-Factor Xa assay made Xarelto unreasonably dangerous in the case of Ms. Mingo, and was a proximate cause of her injuries**.

Finally, Mr. Nauman Shah testified that Janssen long-ago recognized the important need for an assay. Specifically, he testified:

> 25 Q. Then it states: "However, there is a critically important
> 1 need for a coagulation assessment assay" --
> 2     Do you see that, Mr. Shah?
> 3 A. I do.
> 4 Q. -- "in a number of situations, to determine if a patient
> 5 has been compliant with the regimen, to better understand how
> 6 to deal with bleeding or therapy failure with the drug on board
> 7 versus not on board, and physician desire to titrate dose, even
> 8 if not recommended."
> 9     Do you see that, sir?
> 10 A. Yes, that's what's written here.
> 11 Q. So some of the feedback that you were getting from your
> 12 advisors is that it would be important, it would be critically
> 13 important to have a way to measure the coagulation effect of
> 14 Xarelto; is that fair, sir?
> 15 A. Yes. I mean, that was certainly not uncommon at that
> 16 point for us to be getting that feedback, given that the agents
> 17 on the market at that time, specifically warfarin, had
> 18 monitoring available. Certainly, there was a desire, including
> 19 by us, to have it, if there was a scientifically valid way to
> 20 do so.
>
>     * * *

```
10  Q.  And it states: "Although there is no need for routine
11  coagulation monitoring with rivaroxaban, an oral, direct
12  Factor Xa inhibitor, a hemostasis assay:
13       And a hemostasis assay, that's a coagulation test,
14  correct?
15  A.  I believe that's what it refers to.  But again, our
16  clinicians would be better able to answer that.
17  Q.  Okay.
18       -- "a hemostasis assay might be valuable to measure
19  its pharmacodynamic effects.  This study aimed to find assays,
20  among those commercially available, to measure rivaroxaban
21  pharmacodynamics."
22       Is that correct, Mr. Shah?
23  A.  Yes, that's what it states.
```

(Trial Tr. at 1737:10 to 1737:23; 1722:25 to 1723:20; PX 126).

Absent the development of this important test, Dr. Jordon was not aware of it or its ability to identify Ms. Mingo has a high responder to Xarleto, and the consequent need to remove her from Xarelto therapy.

```
 9  Q.  In terms of getting a routine laboratory test such as you
10  were able to do with warfarin, Bayer and Janssen didn't give
11  you any guidance in that regard?
12  A.  No."
```

(Trial Tr. 1420:9 to 1420:12).

Ms. Mingo's Medical Records reveal that on January 24, 2015, after Ms. Mingo's first dose of Xarelto, her PT was 23.6, which placed her in the highest quartile for PT, and revealed her to be a high absorber. Dr. Rinder testified to these matters, and noted that PT is a surrogate for the measure of Xarelto in patients, which is the identical measure that anti-Factor Xa assays discloses. (Trial Tr. at 1313).[2] Dr. Rinder specifically opined that bleed risk rises with the level

---

[2] *See also* Lensing testimony (recognizing that Bayer told Health Canada that "The prothrombin time, measured in seconds, is influenced by Xarelto in a dose-dependent way with a close correlation to plasma concentration if the Neoplastin reagent is used? and provided a table reflecting "the usual expected effect of Xarelto on PT when the Neoplastin reagent is used?" Trial Tr. at 1462 -1465; PX 77.

15

of anticoagulant effect of Xarelto. Thus, Dr. Rinder's testimony to the effect that Xarelto was a substantial contributing factor to Ms. Mingo's injury (quoted above), applies with equal force to Ms. Mingo's design defect claim.

## IV. CONCLUSION

For the reasons set forth above, the Defendants are not entitled to judgment as a matter of law under Fed. R. Civ. P. 50(a) because there is more than a legally sufficient evidentiary basis for a reasonable jury to find for the Plaintiff. Defendants' motion should be denied and this case should be submitted to the jury.

For the reasons set forth above, Defendants' motion should be denied.

Dated: August 17, 2017

Respectfully submitted,

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA 70113
PH: (504) 581-4892
FAX: (504) 561-6024
Email: ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
**GAINSBURGH BENJAMIN DAVID MEUNIER
 & WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
PH: (504) 522-2304
FAX: (504) 528-9973
Email: gmeunier@gainsben.com

*Plaintiffs' Liaison Counsel*

# PLAINTIFFS' STEERING COMMITTEE

Andy D. Birchfield, Jr. (Co-Lead Counsel)
234 Commerce Street
Post Office Box 4160
Montgomery, Alabama 36103-4160
Phone: (334) 269-2343
Fax: (334) 954-7555
Email: Andy.Birchfield@BeasleyAllen.com

Brian H. Barr (Co-Lead Counsel)
316 Baylen Street, Suite 600
Pensacola, FL 32502
Phone: (850) 435-7045
Fax: (850) 436-6044
Email: bbarr@levinlaw.com

Russell T. Abney
2100 RiverEdge Parkway,
Suite 720
Atlanta, Georgia 30328
Email: rabney@lawyerworks.com

Dr. Mark Alan Hoffman
1650 Market Street, Suite 3450
Philadelphia, PA 19103
Phone: (215) 574-2000
Fax: (215) 574-3080
Email: mhoffman@rossfellercasey.com

Michael Goetz
201 N. Franklin St., 7th Floor
Tampa, FL 33602
Phone: (813) 221-6581
Fax: (813) 222-4737
Email: MGoetz@ForThePeople.com

Neil D. Overholtz
17 E. Main Street, Suite 200
Pensacola, Florida 32501
Phone: (850) 916-7450
Fax: (850) 916-7449
Email: noverholtz@awkolaw.com

Bradley D. Honnold
11150 Overbrook Rd., Ste. 200
Leawood, KS 66211
Phone: (913) 266-2300
Fax: (913) 266-2366
Email: bhonnold@bflawfirm.com

Frederick Longer
510 Walnut Street, Suite 500
Philadelphia, PA 19106
Phone: (215) 592-1500
Fax: (215-592-4663
Email: flonger@lfsblaw.com

Jeffrey S. Grand
Seeger Weiss
77 Water Street
New York, NY 10005
Phone: (212) 584-0700
Fax: (212) 584-0799
Email: jgrand@seegerweiss.com

Roger C. Denton
100 S. 4th Street
St. Louis, MO 63102
Phone: (314) 621-6115
Email: rdenton@uselaws.com

Dianne M. Nast
1101 Market Street, Suite 2801
Philadelphia, Pennsylvania 19107
Phone: (215) 923-9300
Email: dnast@nastlaw.com

Ellen Relkin
700 Broadway
New York, New York 10003
Phone: (212) 558-5500
Fax: (212) 344-5461
Email: Erelkin@weitzlux.com

**CERTIFICATE OF SERVICE**

    I hereby certify that on August 17, 2017 a copy of the above and foregoing Plaintiff's Response To Defendants' Motion For Judgment As A Matter Of Law At The Close Of Plaintiff's Case has contemporaneously with or before filing been served on all parties or their attorneys in a manner authorized by FRCP 5(b)(2), Local Rule 5.1 of the Eastern District of Louisiana and via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.


                                          */s/ Leonard A. Davis*
                                          **Leonard A. Davis**