# EXHIBIT A

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO (RIVAROXABAN)  *
PRODUCTS LIABILITY LITIGATION  *        Docket No. 14-MD-2592
                               *
                               *        Section L
                               *
THIS DOCUMENT RELATES TO:      *
                               *        New Orleans, Louisiana
                               *
*Joseph Orr, et al.*           *
*v. Janssen Research &*        *        May 30, 2017
*Development, et. al.,*        *
Case No. 15-CV-3708            *
                               *
* * * * * * * * * * * * * * *  *


TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE
VOLUME I - AFTERNOON SESSION


<u>Appearances:</u>


For the Plaintiffs:          Levin Papantonio Thomas Mitchell
                               Rafferty & Proctor, P.A.
                             BY:  BRIAN H. BARR, ESQ.
                             316 South Baylen Street, Suite 600
                             Pensacola, Florida  32502


For the Plaintiffs:          Beasley Allen Crow Methvin
                               Portis & Miles, PC
                             BY:  ANDY BIRCHFIELD, ESQ.
                             Post Office Box 4160
                             Montgomery, Alabama 36103


For the Plaintiffs:          Gainsburgh Benjamin David
                               Meunier & Warshauer, LLC
                             BY:  GERALD E. MEUNIER, ESQ.
                             1100 Poydras Street, Suite 2800
                             New Orleans, Louisiana 70163

01:04

1    to hear this is what Dr. Bui understood about Xarelto.  You are
2    also going to see that this statement is false.  It's not true.
3                   The defendants know now, knew then, and have
4    known for years that PT is a simple indicator test that a
5    doctor can order to indicate whether it's safe to proceed to
6    emergency surgery, the same test that was perfectly normal for
7    Ms. Orr the night she went to the ER.
8                   But doctors have to be told the truth.  They
9    have to be told the test can be used with Xarelto and not be
10   told there is no test or that the test is meaningless.
11                  Now, PT isn't perfect.  You are not going to
12   hear us say it's a perfect test.  There's no such thing as a
13   perfect test in medicine.  But it doesn't need to be perfect.
14   It only needs to be helpful, to be useful to doctors making
15   clinical decisions for patients.  PT is a good, helpful test.
16                  The defendants aren't honest about how to use
17   it.  A helpful test, you will hear, the defendants are legally
18   required to put it into the label.  That's because, according
19   to the law, helpful laboratory testing not only should be, it
20   must be in the warning section of the drug label.  You will see
21   that at no point have these defendants ever proposed or
22   suggested that doctors should actually use the PT test to
23   measure the thinness of the blood to conduct emergency surgery.
24   Defendants have never proposed such language in the
25   United States.

17:25:21  1    morning at 8:30.  Okay.

17:25:47  2         (WHEREUPON, THE JURY EXITED THE COURTROOM.)

17:25:47  3         THE COURT:  Okay.  I will see you all tomorrow at 8:15,

17:25:51  4    and I'll either rule at that time or whatever on that other matter

17:25:55  5    that we have before me.

17:25:59  6         MR. BARR:  We will probably have to take up the Canadian

17:26:02  7    issue in the morning, the Canadian label issue, that will come up

17:26:05  8    with Mr. Jalota.

17:26:06  9         THE COURT:  Okay.  I can do that now, if you want.  Are

17:26:11 10    you tired?

17:26:12 11         MR. BARR:  I am happy to do it now -- or I should say I

17:26:16 12    am happy to let Jerry do it now.

17:26:18 13         THE COURT:  I really understand the issue, I read it, I

17:26:21 14    heard you all before, so I am ready to do a ruling.

17:26:24 15         I have before me a motion, the defendant seeks to exclude

17:26:28 16    certain documents and statements reflecting what the doctor told or

17:26:34 17    communicated in some way to a foreign regulatory agency; namely,

17:26:41 18    the Canadian Regulatory Agency.  I assume it's something like the

17:26:46 19    FDA here.

17:26:48 20         In the opening statement, the defendant said the

17:26:51 21    following:  "The plaintiffs have suggested to you that there is

17:26:55 22    actually tests that that we wouldn't put on the label.  Think about

17:27:02 23    what they're saying.  They're saying that we know about a test and

17:27:07 24    we lied about it because we didn't want to save people's lives.

17:27:12 25    That's what they're asking you to believe in this case."

17:27:17  1          In short, it seems to me the defendant suggests that

17:27:20  2     there is no such test and that the defendants know of no such test

17:27:27  3     or any test.  This is consistent, frankly, with what the

17:27:32  4     defendant's position is, that there is no test and they don't know

17:27:37  5     of any.

17:27:37  6          Yet they told the Canadian authorities the following:

17:27:42  7     "Although there is no need to monitor clinical practice in certain

17:27:49  8     in-treatment situations such as an overdose, acute bleeding, or

17:27:54  9     urgent surgery, in cases of suspected or noncompliance, I assume

17:27:59  10    not taking the drug, or in other unusual circumstances, assessment

17:28:06  11    of the anticoagulant effect of rivaroxaban may be appropriate."

17:28:12  12    "Accordingly," they say, "measuring PT may be useful to inform

17:28:19  13    clinical decisions in these circumstances."

17:28:23  14          The significant issue in the case, it seems to me, is

17:28:26  15    what the defendant knew, when they knew it, and whether or not any

17:28:34  16    prior statements that conflict with their position is admissible.

17:28:40  17          I am concerned about the fact that this is a statement

17:28:44  18    made in connection, I assume, with the approval of the label by

17:28:52  19    Canada.  Canada, like Europe, has a different process and they do

17:28:57  20    have a different process and, therefore, I had felt that it was

17:29:04  21    confusing, at best, to perhaps not even relevant under 401, but if

17:29:12  22    relevant, certainly not admissible under 403 to allow labels from

17:29:18  23    Canada to come into the litigation or labels from Europe to come

17:29:22  24    into the litigation.

17:29:25  25          But this is a statement made, and it's at least arguably

17:29:33  1    inconsistent with what the position of the defendant is.  It's

17:29:42  2    certainly an 801(d)(2) situation where it would be admissible, even

17:29:48  3    though it's a prior statement; it would also be admissible under

17:29:54  4    613 as a prior statement.

17:29:57  5            So I am going to allow it, but I will instruct the jury

17:30:03  6    that it's only relevant to what the defendant knew or when they

17:30:08  7    knew it.  Knowledge of the defendant.

17:30:13  8            Any reference to any Canadian label, I am going to tell

17:30:19  9    them to disregard.  I would hope I wouldn't have to do that because

17:30:22  10   I hope that doesn't come up from the plaintiff's standpoint.  I am

17:30:25  11   not interested in what the label is or any reference to the label.

17:30:31  12   If a reference does come into -- mentioning the label, I am going

17:30:36  13   to instruct the jury to disregard that and to only consider it

17:30:41  14   insofar as a statement is made regarding when the defendant knew

17:30:47  15   the information and what they knew.

17:30:51  16           So that's going to be my ruling.  I will allow it, but I

17:30:55  17   will -- I may have to have an instruction to the jury to that

17:30:59  18   effect.

17:31:00  19           MR. MEUNIER:  Your Honor, I understand the Court's

17:31:03  20   ruling, and there will be reference to the label, so I think that

17:31:05  21   limiting instruction you mentioned --

17:31:07  22           THE COURT:  Well, I will instruct the jury then to

17:31:09  23   disregard.  And I'll explain why.  The label reference can be

17:31:14  24   confusing, and I am going to have to surgically remove that.

17:31:20  25           I wish I didn't have to, but it's a situation where the

17:31:25 1   whole theory of the defendant's case is based on that, that there

17:31:33 2   was no test available.

17:31:36 3        Now, you can weasel word it or at least use words like

17:31:41 4   "no credible test," "no satisfactory test," but, really, that

17:31:49 5   created the situation where there is no test that does this.  The

17:31:52 6   plaintiffs say there is a test that would be helpful.  The

17:31:56 7   defendants say it's not helpful.

17:31:59 8        So the concepts -- I mean, words that put this issue, at

17:32:06 9   least, in play, I think the jury ought to hear it.  But I am going

17:32:13 10   to try to surgically remove that from the label and explain to them

17:32:17 11   why.

17:32:18 12        Thank you very much.  The court will stand in recess.

17:32:20 13        THE DEPUTY CLERK:  All rise.

17:32:22 14     (WHEREUPON, THE PROCEEDINGS WERE CONCLUDED.)

15

16                   * * * * * *

17

18            REPORTER'S CERTIFICATE

19        I, Karen A. Ibos, CCR, Official Court Reporter, United
States District Court, Eastern District of Louisiana, do hereby
20   certify that the foregoing is a true and correct transcript, to the
best of my ability and understanding, from the record of the
21   proceedings in the above-entitled and numbered matter.

22

                 /s/ Karen A. Ibos
23              Karen A. Ibos, CCR, RPR, CRR, RMR
             Official Court Reporter

24

25

1    **A.**   It is a competitor of Xarelto, that's correct.

2    **Q.**   You're competing for the same patient population?

3    **A.**   I would say we are competing for the atrial

4    fibrillation indication, that's correct.

5         MR. BARR:  I only want to blow up this section right

6    here, right there (indicating).

7         MR. IRWIN:  Please note our objection.

8         THE COURT:  Okay.  Yeah.

9         Members of the jury, there's something there called a

10   Canadian label.  Disregard the Canadian label.  And the reason

11   for that is that it is a different country.  It has different

12   rules, different regulations, different procedures, and different

13   requirements.

14        The only relevance of this testimony is what the

15   defendant knew and when they knew it.  That's the only thing.

16   Not anything that the Canadian -- that needs to be on a Canadian

17   label or doesn't need to be on the Canadian label.

18        We're talking about the United States naval -- label,

19   and there's different rules, different laws, different

20   regulations.

21        So from the standpoint of what's on the Canadian label,

22   that has no relevance.  The only relevance is if there is -- if

23   you find it relevant, the only relevance is what they knew and

24   when they knew it.

25        Let's proceed.

**OFFICIAL TRANSCRIPT**

1    A.    That is what the article states, correct.

2    Q.    After this time, if the PTT and APPT are normal,

3   Pradaxa, Xarelto, or edoxoban are unlikely to be present in

4   significant quantities.

5          Right?

6    A.    That is what the author states.

7    Q.    That's what it says, that it can identify that a normal

8   PTT test means that it is unlikely that Xarelto is present in

9   significant quantities, right?

10   A.    I'm reading it.  Yes, correct, sir.

11   Q.    And there has been no effort to change the label to let

12  doctors know this since that time, right?

13   A.    The label has not been changed, that's correct, sir.

14   Q.    It hasn't only not been changed, there has not even

15  been an effort to change it, right?

16   A.    Again, I argue that the data we have still confirms

17  this.  This is the author's perspective.

18          And, again, I would defer to our clinical team if there

19  was something, but right now we have not changed the label

20  because our data as such doesn't require the change of the label.

21   Q.    You know -- you're fully aware that outside of the

22  United States, Bayer admits that PT can be used by doctors to

23  determine if it's safe to proceed to surgery, right?

24   A.    I'm not -- my jurisdiction was with the -- was with the

25  U.S.  Bayer was handling the European and the rest of the world,

**OFFICIAL TRANSCRIPT**

1    and so I would have probably got informed of it, but I was not

2    involved in any of that discussion.

3         Q.   Okay.  But you were certainly informed that Bayer said

4    that, right?

5         A.   You would have to show me some documents to show that.

6              But, in general, we were made aware of aspects.  But,

7    again, my perspective -- I was handling the U.S. specifically.

8         Q.   I'm happy to show you a document.

9              MR. BARR:  Can we hand Mr. Jalota 3061443 and 3061444.

10             MR. IRWIN:  And before we do that, Your Honor, for the

11   sake of completeness, can we put that back up on the screen and

12   ask the witness to read the last sentence that was not

13   highlighted?

14             THE COURT:  Okay.  Let's do that.  He has a right to do

15   that.  It's 106.

16             MR. BARR:  I don't remember what number it was.  Do

17   y'all have that?

18             THE WITNESS:  Mr. Barr, we don't know which one --

19             MR. BARR:  Hold on one second.  We are just pulling

20   something up.

21             THE COURT:  Is that it?

22             MR. BARR:  Yes, sir.  That's it.

23             That's the one you want, isn't it?

24             MR. IRWIN:  It is 3062811.  Pdf 4.

25             Let's highlight right down to here where you stopped

**OFFICIAL TRANSCRIPT**

1    (indicating).

2            MR. BARR:  Can we highlight that.

3            MR. IRWIN:  Let's focus on that last sentence, if the

4    witness would kindly read that.

5    **MR. BARR:  (CONTINUING)**

6        Q.    Do you want to go ahead, sir, and read that?

7            MR. IRWIN:  Mr. Jalota, would you please read the final

8    sentence?  Can you see that on the screen?  That was not

9    highlighted by plaintiff counsel.

10           THE WITNESS:  Right.

11           However, this approach may misidentify some patients as

12   being free of anticoagulant effect when, in actuality, they are

13   anticoagulated.

14           MR. IRWIN:  Thank you, Your Honor.

15   **MR. BARR:  (CONTINUING)**

16       Q.    Since we went there, let's keep it up.

17             Does the word "unlikely" -- what does that word mean?

18       A.    "Not possible."

19       Q.    Right.  And it says it's unlikely to be present in

20   significant quantities.

21             There is a chance, maybe some small chance, it could

22   be, but it's unlikely, right?

23       A.    I'm not sure what you're saying.  What is -- what is

24   the context of what you are trying to say, sir?  Sorry.

25       Q.    If the question is, is the person more likely than not

**OFFICIAL TRANSCRIPT**

1  anticoagulated, that answer says they're more likely than not not

2  anticoagulated, right?

3      **A.**   I'm reading it as if the PT is normal, it appears that

4  dabigatran is unlikely to be present.

5      **Q.**   And?

6          There are a couple other drugs listed there.  Xarelto

7  is listed there, isn't it?

8      **A.**   That's correct, sir.

9      **Q.**   And it says, more likely than not, Xarelto is not

10  present in significant quantities, right?

11     **A.**   Yes.

12     **Q.**   We can move on.

13     **A.**   However, this approach may misidentify, and this is the

14  author's perspective about that.  I don't know where -- I don't

15  know how he or she -- I don't know how Drs. Crowther and Crowther

16  came to this perspective or this phrase.

17     **Q.**   It appears they have done more work than your company

18  has?

19          THE COURT:  No, that's argumentative.  I sustain the

20  objection.

21  **MR. BARR:   (CONTINUING)**

22     **Q.**   So we were talking about whether or not you knew that

23  Bayer admits, outside of the United States, that PT can be used

24  by doctors to determine if it's safe to proceed to surgery.  Do

25  you remember that?

**OFFICIAL TRANSCRIPT**

1     **A.**   I do.

2     **Q.**   And you said that you may get updates about it, but you

3     weren't directly involved, right?

4     **A.**   Correct.  We get updates.  We may be asked to provide

5     our perspectives, but the final decision is with Bayer, sir.

6     **Q.**   So you are aware of the position that Bayer takes

7     outside of the United States, right?

8     **A.**   I would have to see what you're trying to refer to,

9     sir.

10    **Q.**   Okay.  Did somebody hand you 3061443 and 3061444?

11          MR. BARR:  Your Honor, at this time plaintiffs move

12    into evidence 3061443 as Exhibit 161 and 3061444 as Exhibit 162.

13          MR. IRWIN:  Your Honor, may we approach?

14          THE COURT:  Yeah.

15                    **SIDEBAR ON THE RECORD**

16          MR. IRWIN:  Your Honor, it's the same slippery slope.

17    It is a quilt and a dialogue back and forth between the regulator

18    and the company, and it is impossible, really, to separate one

19    from the other.  They're joined at the hip.  And all this will do

20    is lead the jury to be misled about the situation that we're

21    concerned about.  It invites confusion under 403, and we would

22    ask that it not be used at all.

23          MR. BARR:  Your Honor, the exact question that they

24    were responding to was to provide a summary of all information

25    known to you relevant to this issue.

**OFFICIAL TRANSCRIPT**

1          That's what we're talking about.  We're talking about

2   what they knew and when they knew it.

3          THE COURT:  I understand that.  But you -- we've got a

4   problem that I'm trying to solve, and we can't get into what you

5   are doing with regulatory and what's regulatory's response to it.

6   It's what they knew and when they knew it.

7          Now, we've got to figure a way of dealing with that so

8   I don't have to keep telling the jury to disregard it.

9          MR. MEUNIER:  Your Honor, again just for the record, I

10  want to revert to your ruling which is what we are relying on.

11         THE COURT:  I got it.  I understand the issue.

12         MR. BARR:  And I'm not going to go into this.  This is

13  going to be the last time I cover it.

14         THE COURT:  I'm not going to admit it into evidence,

15  then.  You can use it and show him and say, Didn't Bayer say such

16  and such.

17         But if you put stuff in that there's discussion by and

18  between the regulatory agencies, there's a problem there that I'm

19  trying to avoid.  If we contaminate the evidence, any verdict is

20  going to be contaminated.  So I'm trying to deal with it so that

21  they understand -- the jury understands whether or not they knew.

22  And not -- you know, the context of it is not the significant

23  part.  What they knew and when they knew it is the significant

24  part.

25         MR. BARR:  Okay.

**OFFICIAL TRANSCRIPT**

1    THE COURT:  When you start putting it in context, it

2    becomes problematic.

3    MR. BARR:  Can we --

4    MR. IRWIN:  There's no way to avoid that respectfully,

5    Your Honor, and putting it up in front of the jury is what --

6    THE COURT:  That's what I'm saying.  Maybe the way of

7    doing it is to say look at it just like you do with the journals.

8    MR. IRWIN:  And don't flash it up on the screen.

9    MR. BARR:  But it needs to be on the screen for the

10   jury to follow.  If we don't want to admit it into evidence, I

11   can live with that.  And I'll try to ask the question in a way

12   where it is, You know Bayer said this, instead of This is what

13   they said to the Canadian regulator.

14   THE COURT:  I'm going to have to tell them to disregard

15   things, and the more the judge says "disregard," it's a problem.

16   MR. BARR:  I understand, Your Honor.  This is the last

17   time we're going into this, but it's --

18   MR. IRWIN:  Your Honor, he has -- the only way he can

19   respond to it is a response from a regulatory question coming

20   from a foreign regulator.  That's the only response he can make.

21   MR. BARR:  I don't agree with that.  He can say this is

22   what Bayer said.  This is what they said.  This is what they

23   knew.

24   I mean, they represented in opening statement that they

25   don't know any of this and that we think that they are lying

**OFFICIAL TRANSCRIPT**

1  about it.  You can't open that door like that and accuse us of

2  that and then not say what they know.

3       MR. IRWIN:  Ask him the question, "If Bayer said this."

4  And he can read it, you direct him to it.  Don't show it to the

5  jury, and he'll answer the question, Bayer said this.

6       THE COURT:  Let's try this.

7       MR. BARR:  So this is complete, we had to listen to a

8  cross-examination yesterday where Ms. Wilkinson sat there and

9  cross-examined Dr. Liechty accusing him of doing something

10  dangerous by using PT.  This directly contradicts that it is

11  dangerous.

12       THE COURT:  I understand it.  I'm trying to keep it out

13  of context.  That's the deal.  So let's see if you can ask him

14  the question --

15       MR. BARR:  Okay.

16       THE COURT:  -- without going there.  Let's go with

17  that.

18       MR. BARR:  I'll do my best.

19       THE COURT:  Yeah.

20            **AFTER THE SIDEBAR IN OPEN COURT**

21       THE COURT:  Members of the jury, the problem that's

22  presented is I'm trying to focus the attorneys on what the

23  company knew and when they knew it.

24       And some of the discussion -- the context is within

25  other regulatory agencies, which has nothing to do with this

**OFFICIAL TRANSCRIPT**

1    particular case.

2           Why they did it or whatever is context.  What they knew

3    and when they knew it is the whole relevance of this line of

4    questioning.

5           So let's ask the question.

6           MR. BARR:  Your Honor, may I publish this?

7           THE COURT:  Well --

8           MR. BARR:  Not admit it.

9           THE COURT:  -- let's ask the question first.

10   MR. BARR:  (CONTINUING)

11       Q.   Mr. Jalota, you have in front of you a document,

12   3061443.  Do you see that?

13       A.   -1443, I do.

14       Q.   This is an e-mail you received on November 19, 2014,

15   right?

16       A.   That is correct.  Lori is my direct report and she

17   forwarded it to me because -- as information.  But, again, I was

18   not involved in it, nor would have probably spent more time

19   looking at it also.

20          MR. IRWIN:  Your Honor, then I move to strike any

21   questions that -- this witness has said he was not involved in

22   these arrangements.

23          MR. BARR:  Your Honor, he got the e-mail.  We've

24   established it's a business record he received.

25          THE COURT:  Okay.  I understand.  He received the

**OFFICIAL TRANSCRIPT**

1  e-mail.

2        I assume you received the e-mail and I assume you read

3  the e-mail; is that correct?

4        THE WITNESS:  I would have -- Your Honor, it appears I

5  received the e-mail.  I don't recall it.  But as to any more

6  information, looking at the attachments, I don't recall even -- I

7  don't recall looking at it or -- I don't recall.  That's all I

8  can say to you, sir.

9  MR. BARR:  (CONTINUING)

10       Q.   You clearly received it, right?

11       A.   I received it as -- but not as a direct person.  This

12  is because Lori is my direct report.  So she forwarded it to me

13  as this is it.  Other than that, she didn't ask for comments.

14  She didn't ask for anything else, just this is what is happening.

15       Q.   So you received this e-mail?

16       A.   But --

17       Q.   Go ahead.

18       THE COURT:  Go ahead.  Ask the question.

19  MR. BARR:  (CONTINUING)

20       Q.   You received this e-mail in the ordinary course of

21  business, correct?

22       A.   I would have -- I would have received it as part of her

23  sending something to me.  Again, she doesn't send me everything.

24  There may have been a reason for this.  I don't know, sir.

25       Q.   And she sent to you a document that Bayer wrote, right?

**OFFICIAL TRANSCRIPT**

1    A.    That is correct, sir.

2    Q.    Okay.  And so let's look at that document.

3          MR. IRWIN:  I object, Your Honor.

4          THE COURT:  Just let him look at the document.  That's

5    the question.

6          MR. BARR:  That's all I'm doing.

7          THE COURT:  Look at the document, sir.

8          THE WITNESS:  I have, sir.

9          THE COURT:  Tell him the page.

10   MR. BARR:  (CONTINUING)

11   Q.    What I'm looking at is Page -- let's start with Page 2

12   of the document.  Are you there?

13   A.    Yes.

14   Q.    Bayer was asked a series of questions, and they say

15   that we're providing our full response, right?

16   A.    I would add a clarification --

17         MR. IRWIN:  Your Honor, I would like to ask this

18   witness if he read -- excuse me.

19         THE COURT:  Wait just a minute.

20         MR. IRWIN:  I'd ask him to -- I would like him to ask

21   this witness if he has read this page -- if he ever read this

22   page or ever did anything with it.

23   MR. BARR:  (CONTINUING)

24   Q.    Have you read this page?

25   A.    I have not -- I've not read it.  If you would like me

**OFFICIAL TRANSCRIPT**

1    to read it now, I'm happy to do that, sir.

2        **Q.**    So in the course of your duties, you routinely get

3    e-mails and just ignore them and don't read them?

4            MR. IRWIN:  Object, Your Honor.  No foundation,

5    argumentative.

6            THE COURT:  I sustain the objection.  Let's move on.

7    We're going to have to move on.

8            MR. BARR:  It would be a lot easier if I could just ask

9    him the question.

10           THE COURT:  Well, no.  If he --

11           MR. BARR:  I'm sorry.

12           THE COURT:  -- hasn't even read the page, I'm not going

13   to -- let's get on to something else.

14           MR. BARR:  Your Honor, he received this e-mail.

15           THE COURT:  Yeah, he received it, but he said he didn't

16   even read it.

17           MR. BARR:  Your Honor, can we approach?

18           THE COURT:  Yeah.  Sure.

19                        SIDEBAR ON THE RECORD

20           THE COURT:  The problem you're having is that e-mails

21   don't get into evidence simply because they're used in the usual

22   course of business.  Otherwise, you could put e-mails in without

23   any witness.

24           If a witness got the e-mail but they didn't read it,

25   what's he going to testify to?  I don't know.  He is going to

**OFFICIAL TRANSCRIPT**

1  say, I haven't read it.

2          MR. BARR:  Your Honor, there's no question he received

3  the e-mail.  We have been -- throughout this trial -- throughout

4  this trial, if somebody receives an e-mail, there has been no

5  objection, none.  And now we're doing this solely to keep this

6  out.

7          THE COURT:  No.  The problem is that this e-mail is

8  just more than just an e-mail, it's an attachment.  And the

9  fellow gets the attachment, as I understand it.  He's not a part

10 of it.  He gets an attachment.  He says now that he hasn't even

11 read the attachment.

12         So how does it get in if he didn't read it, doesn't

13 know anything about it, and it's not a question -- and it's not

14 business records?  It's not a business record.

15         MR. BARR:  Your Honor, he said he got it in the

16 ordinary course of business.  That's what he said.

17         THE COURT:  But that doesn't make an e-mail a business

18 record.  It just -- you can't do that.  Otherwise, every e-mail

19 you wouldn't even need a witness for.

20         MR. BIRCHFIELD:  Your Honor, as opposed to admitting

21 the e-mail or the attachment, where Mr. Barr was headed was

22 reading him the statement in there and asking him if he

23 understands that that is what Bayer tells people outside the U.S.

24         Ask him -- ask him that question.  We're not asking --

25 at this point we're not asking to move the document into

**OFFICIAL TRANSCRIPT**

1   evidence.

2           THE COURT:  All right.

3           MR. IRWIN:  Your Honor, they could ask any question

4   like that, but they shouldn't imply that it's in this document,

5   that has been such a subject of controversy, in front of the

6   jury.

7           And another thing about the fact that this is just an

8   attachment to an e-mail, he does not deal with Canadian labeling.

9   That's not what he does.  He deals with U.S. labeling.

10          THE COURT:  No, I understand.

11          MR. IRWIN:  All the more reason --

12          THE COURT:  That's part of it.

13          MR. BARR:  Your Honor, part of the problem here is Jim

14  can say that all he wants.  Somebody decided it was important

15  enough to send him the e-mail to tell him here's what's going on

16  in Canada.  And maybe they wanted this historical perspective,

17  who knows.  But they sent it to him.  And he says he gets his

18  e-mails and he looks at them.

19          And, Your Honor, your motion *in limine* order said that

20  what they say to regulators is admissible.  Anything they say to

21  regulators is admissible, and this is Bayer talking to a

22  regulator.  And we relied upon that.  I got up in opening and I

23  said they say these things outside of the United States based

24  upon that.

25          THE COURT:  But --

**OFFICIAL TRANSCRIPT**

```
 1              MR. IRWIN:  There is no foundation.
 2              THE COURT:  It's a play-within-a-play situation and
 3   that's what I'm trying to deal with.  And it's a complicated
 4   problem, because, as I said, there is -- both sides of it is a
 5   problem.
 6              You're right about they said things, but when you put
 7   them in context, it gets confusing to the jury.  And they say
 8   certain things in response back and forth.  It is just the
 9   problem when you are dealing with FDA and Canadian or FDA and
10   Europe.
11              Look, I think that they may have a point, but let's do
12   it that way.  But just ask him.  The point is whether they knew
13   it -- whether he knew it, whether Bayer knew it, and when they
14   knew it.
15              MR. BARR:  Okay.
16              THE COURT:  Let's ask him, you know -- that's the
17   issue.
18              MR. BARR:  Then I'll read the statement and I'll ask
19   him if he understood that.
20              MR. BIRCHFIELD:  That's where we were headed, Your
21   Honor, when Jim objected.
22              THE COURT:  Okay.
23              MR. BARR:  I'm trying to do it without mentioning
24   Canada or the label, and we're not putting it up.
25              THE COURT:  But then you are showing the document.
```

**OFFICIAL TRANSCRIPT**

1    Just ask him the question.

2              MR. BARR:  I'm not going to put it up on the screen.

3              MR. IRWIN:  Don't hold it up.  Just read it on your --

4              MR. BARR:  They can't see it.

5              MS. WILKINSON:  And don't ask him to refer to it

6    because then you're implying it's in the document.

7              MR. MEUNIER:  Oh, come on.

8              THE COURT:  "Don't you know Bayer knows this?"

9              MR. BARR:  But, Your Honor --

10             MR. MEUNIER:  He has to be referring to the document.

11             MR. BARR:  It's an unimpeachable --

12             MR. MEUNIER:  You're saying he can't refer to a

13   business record to answer that question?  We are not going to

14   admit the business record.

15             THE COURT:  The problem is that -- it's a 403 problem

16   when you put it in, in context, and I'm trying to keep it out of

17   the context.

18             MR. BARR:  Your Honor, what I'm hearing from Jim is he

19   is not making a 403 objection.

20             MR. IRWIN:  Yes, he is.

21             MR. BARR:  No, you're making an "he hasn't seen the

22   document" objection.

23             MR. IRWIN:  I mentioned 403 from the beginning.

24             THE COURT:  I understand the issue.

25             You say it's a business record; therefore, it gets in.

**OFFICIAL TRANSCRIPT**

1    I disagree with that.  I don't think it is a business record.

2              MR. MEUNIER:  No, I wasn't going to say that, Judge.  I

3    realize there's a problem and I realize we're trying to thread a

4    needle.

5              The only thing, we came into the trial based on an

6    express ruling that anything Bayer said to regulators was

7    admissible.  That's what your ruling was.

8              We could not get into what they did to comply with

9    regulations in the foreign scheme, but anything they said to

10   regulators.  It was an express ruling on our motion *in limine*.

11   We relied on it.  So what Bayer tells regulators goes to the

12   heart of what they knew.

13             THE COURT:  The problem is what they said to regulators

14   is contextual.

15             MR. MEUNIER:  I understand.

16             THE COURT:  That's the problem.

17             MR. MEUNIER:  I understand, Judge.

18             THE COURT:  Because what they said to one regulator is

19   not necessarily accurate with the other regulator.  So you've got

20   a situation where, when they say, What did you say to this

21   regulator, you're taking it out of the context of the case.

22             MR. MEUNIER:  I understand, Your Honor.

23             And all I was trying to get across is that we did rely

24   on a ruling that made it relevant and admissible to talk about

25   what Bayer said to regulators.

**OFFICIAL TRANSCRIPT**

1    THE COURT:  I understand.  It's in the record.  Let's

2    see if we can get through it.

3                    **AFTER THE SIDEBAR IN OPEN COURT**

4    THE COURT:  We have to take a break for lunch.

5    MR. BARR:  Okay.

6    **MR. BARR:  (CONTINUING)**

7    **Q.**  Mr. Jalota, are you aware that Bayer has said outside

8    of the United States that, Although there is no need to monitor

9    clinical practice, in certain infrequent situations such as

10   overdosage, acute bleeding, urgent surgery, in cases of suspected

11   non-compliance, or in other unusual circumstances, assessment of

12   the anticoagulant effect of rivaroxaban may be appropriate.

13   Accordingly, measuring PT using the Neoplastine reagent or a

14   Factor Xa assay using riva-specific calibrators and controls may

15   be useful to inform clinical decisions in these circumstances.

16         Are you aware of that?

17   **A.**  I would say to you that I'm not aware of the current

18   label.  In 2008 and 2011, that text, if it was similar to what

19   was presented to the FDA, would be there.

20         I don't know whether that text you're saying is how it

21   came about if it isn't in the label.  I confess you'd have to

22   show me the label.

23         I'm not -- I can tell you this, I'm not aware -- I'm

24   aware that there are -- there may be some language, but I don't

25   know what the language is and what was agreed with the agencies

**OFFICIAL TRANSCRIPT**

1    outside of the U.S.

2              THE COURT:  That's not the question, sir.  The question

3    is whether or not you're aware that Bayer knew or did not know

4    what he just read.

5              THE WITNESS:  I would say -- that's difficult for me to

6    say, sir.  The information we proposed in 2008 is what was agreed

7    with both companies, so if there is some text, then Bayer would

8    be aware.  But I simply don't know what is in the labels to tell

9    you, sir.

10             MR. BARR:  Do you want to break at this point?

11             THE COURT:  Let's take a break here.  We're going to

12   have a break for -- until 1:15.  We stand in recess until then.

13                                    (Jury out at 11:53 a.m.)

14             THE COURT:  Be seated, please.

15             Folks, I know that some of you disagree with my ruling,

16   but that's my ruling so let's move on with it.

17             MR. BARR:  Your Honor, I'm not going to bring up the

18   Canadian thing again.  We're done with that.

19             THE COURT:  Court will stand in recess until 1:15.

20                                    (A recess was taken.)

21                                    (End of morning session.)

22

23                        *  *  *  *

24

25

**OFFICIAL TRANSCRIPT**

14:11:44  1   05286 as Defense Exhibits 19 and 20.

14:11:53  2             MR. BARR:  He signed this one, your Honor.  No objection.

14:11:57  3             MR. IRWIN:  Are they admitted, your Honor?

14:12:01  4             THE COURT:  Admitted.

14:12:02  5             MR. IRWIN:  Thank you, sir.

14:12:03  6   BY MR. IRWIN:

14:12:03  7   Q.  Let's take a look.  We'll go straight to the label.  And would

14:12:08  8   you read that again before we move to the next section.  What is

14:12:12  9   the highlighted labelling language say, please?

14:12:15  10  A.  "The relationship between PT and rivaroxaban plasma

14:12:20  11  concentration is linear and closely correlated.  If assessment of

14:12:27  12  the pharmacodynamic effect of rivaroxaban is considered necessary

14:12:30  13  in individual cases, PT (measured in seconds) is recommended."

14:12:36  14  Q.  This is the fifth time that language -- that identical language

14:12:40  15  was submitted to FDA?

14:12:42  16  A.  That is correct.

14:12:43  17  Q.  Did there come a time when the FDA struck that language out?

14:12:46  18  A.  Yes, they did.  In June --

14:12:50  19  Q.  Then if we -- I'm sorry.  Please go ahead.

14:12:54  20  A.  I was just going to say -- there's an echo on the line.  I'm

14:12:59  21  sorry.

14:13:01  22            MR. IRWIN:  We will offer defense exhibits, it's actually

14:13:06  23  a DX number, 5221 and 5222.  First is an e-mail and the next is an

14:13:16  24  transmission back from FDA with the strike through.

14:13:33  25            We offer them, your Honor, as Defense Exhibits 20 and 21.

OFFICIAL TRANSCRIPT

1      **A.**    It's so you know how to use the drug and so that a

2   physician or prescriber -- it could be a nurse practitioner --

3   they know how to use this drug.

4           It tells you what it is good for.  There is

5   indications.  It is supposed to tell you the risks.  It is

6   supposed to tell you anything you need to know about that drug,

7   like don't give it to someone who is allergic to this.

8           So it's supposed to be for patient safety.  And it's

9   written for a prescriber, somebody with training who can

10  interpret what they are reading in the label.

11     **Q.**    Okay.  So now let's move into the Xarelto label itself.

12          Are there regulations that discuss whether information

13  about helpful laboratory tests are required to be in the warning

14  section of a drug label?

15     **A.**    Yes.  That would be in that -- remember I told you that

16  labeling format is specified by the FDA, so it would be 21 CFR

17  201.57.  And it specifically addresses putting helpful laboratory

18  information in a label.

19     **Q.**    Did you create a demonstrative that has the language of

20  21 CFR 201.57(c)(6)(iii)?

21     **A.**    I didn't want to get that fancy.

22     **Q.**    I can't believe I said it.

23          Did you create a demonstrative that has the language

24  that would help the jury?

25     **A.**    Yes.

**OFFICIAL TRANSCRIPT**

1           MR. BARR:  Any objection to that demonstrative going

2    up?  It is just the helpful laboratory testing.

3           MR. DUKES:  No objection.

4    **MR. BARR:   (CONTINUING)**

5       **Q.**   And is this a demonstrative?

6       **A.**   Right.  And the book on the side is CFR, Code of

7    Federal Regulations.  This is what the FDA has interpreted

8    Congress wanted them to do.

9           Congress makes the act.  The FDA makes the Code of

10   Federal Regulations.  The 201.57(c)(6)(iii), that's what -- if

11   you went into that book, that's where you would find it.  And it

12   has a component in here about they can put helpful laboratory

13   tests in the label.

14          So there is even a place in the Code of Federal

15   Regulations that helpful laboratory tests are required to be put

16   in there.

17      **Q.**   Can you give the jury just a little history of this

18   regulation.

19      **A.**   The history?  It's -- basically, it was -- in 2006, the

20   FDA went and tuned up its format for labeling, and it kept

21   including -- this had actually been in the law before, but it

22   included it in 2006 again.

23          And they say "must."  When the FDA uses "must," it

24   means you must do it.  It is not "you shall" or "you should."  It

25   is "must."  You must include that information.

**OFFICIAL TRANSCRIPT**

1        So it's requiring the manufacturer must identify any
2   helpful tests.  So it is a part of a requirement for a
3   manufacturer selling a drug.
4        **Q.**   And whose obligation is it to put this helpful
5   laboratory test into the warning section of the label?
6        **A.**   The manufacturer's.
7        **Q.**   Was this 2006 regulation in place at the time of
8   Xarelto's approval for the AFib indication?
9        **A.**   Yes.
10        **Q.**   Now, is it also true that, beyond this helpful
11   laboratory testing regulation, the FDA has a regulatory
12   requirement that manufacturers must provide adequate instructions
13   for safe use?
14        **A.**   Yes.  And that comes right out of the act, that you --
15   the FDA's act, 21 USC 352(a)(f)(1) and (f)(2) [verbatim] requires
16   that you provide adequate instructions for use.
17        In the CFR, the FDA then said you had to do that.
18        And so you're required to provide that adequate
19   instruction.  That is part of all drug labels, part of all the
20   information that you give a physician or a person using that
21   drug.
22        **Q.**   Now, in your review of all the documents you looked at,
23   your review of the medical literature, your review of the
24   peer-reviewed science, what is the most serious adverse event
25   associated with the use of Xarelto?

**OFFICIAL TRANSCRIPT**

1    **A.**    Yes.

2    **Q.**    In your opinion, what responsibility does a drug

3    company have to patients that end up in the ER with a bleeding

4    event as a result of taking the drug Xarelto?

5    **A.**    They have the responsibility to make sure, if there is

6    any information -- that the physicians or the people caring for

7    that patient have as much information as they possibly can about

8    their drug so that they can treat that patient.

9    **Q.**    And if it were true that there was a standard

10   laboratory test that could help a doctor treat a patient bleeding

11   on Xarelto, should that information be included in the warning

12   label?

13   **A.**    Yes.

14   **Q.**    Now, Doctor, are there generally accepted laboratory

15   tests that follow a patient's response to Xarelto, including

16   bleeding?

17   **A.**    In the label?

18   **Q.**    No.  Are they available?  Are there generally accepted

19   laboratory tests available, you know, for doctors that follow a

20   patient's response to Xarelto?

21   **A.**    In the company's documents there are.  And in their

22   clinical studies and in their animal studies.  Yes, sir.

23   **Q.**    Is there a generally available laboratory test that

24   doctors in the United States have access to that is capable of

25   following a patient's response to Xarelto?

**OFFICIAL TRANSCRIPT**

1      A.   Of monitoring or just following?

2      Q.   Just following the response.

3      A.   And knowing how much the anticoagulant effect is, yes.

4      Q.   What is that test?

5      A.   That would be the prothrombin test.

6      Q.   And what does the prothrombin time test do?

7      A.   Well, it's a simple test that tells how long it takes

8  for your blood to clot.

9      Q.   Now, did Bayer and Janssen study whether using the PT

10  test correlated with the amount of Xarelto in the blood?

11      A.   Internally, yes, sir.

12      Q.   Did the company publish this correlation?

13      A.   It has been published.

14      Q.   Do you know when it was published?

15      A.   It was published in 2005.  I think Kubitza was the

16  first publication.

17      Q.   So that's the publication by Dagmar Kubitza in 2005?

18      A.   Right.

19      Q.   Dr. Kubitza, is that a doctor for Bayer?

20      A.   Yes.

21      Q.   Now, did Dr. Kubitza's article have certain graphs that

22  would be helpful to your testimony today?

23      A.   Yes.

24          MR. BARR:  Your Honor, at this time I would like to

25  show Plaintiffs' 5767878 as a demonstrative.  It is the

**OFFICIAL TRANSCRIPT**

1   Dr. Kubitza, 2005.

2            THE COURT:  Okay.  Allowed.

3   MR. BARR:  (CONTINUING)

4       Q.   Now, Doctor, I believe this graph is on Page 6.  Is it

5   Figure 4b?

6       A.   Yes, sir.  There it is.

7       Q.   So can you explain what we're looking at here.

8       A.   Okay.  This is a graph.  They have patient -- these are

9   patient blood values.  And they've taken the blood value from a

10  patient and they've gotten a prothrombin time, clotting time, and

11  they've looked also at plasma concentration.

12           So what you have on that -- the up-and-down one is the

13  y-axis.

14      Q.   Would it help if I gave you a pointer to be able to

15  point at the axis?

16      A.   Okay.  Okay.

17           MR. BARR:  May I approach, Your Honor?

18           THE COURT:  Yes.

19  MR. BARR:  (CONTINUING)

20      Q.   Just so they can see what you are pointing at.

21      A.   Right.

22      Q.   It is hard to follow your finger.

23      A.   Okay.  Now, if I don't blind anybody.  Do I push the

24  little button?  There we go.  I figured it out.

25           So here is the prothrombin time (indicating).  This

**OFFICIAL TRANSCRIPT**

1  would be your clotting time (indicating).  And down on the bottom
2  is the concentration.
3         This is what they've measured as the drug Xarelto.
4  That's the name at the company, 59-7939.  That was what
5  eventually became Xarelto.
6         And so they plotted them on a graph.  And so you see
7  the dots?  Each one of those dots represents a patient and
8  patient values.
9         And you see most of the patients cluster down here in
10  terms of their clotting time, in terms of the length of time, and
11  their concentration (indicating).
12         There are a few patients out here that have a high
13  concentration and a really high clotting time (indicating).
14         What we have here is that you take all these dots and
15  they put a straight line so you know that there is a direct
16  relationship between the blood concentration and the delay or the
17  clotting time.
18         So the higher the drug, the longer your clotting time.
19  So your blood doesn't clot as fast if you have higher Xarelto on
20  board.  And that's what this table is showing.
21     Q.    And what is the significance of the relationship there?
22     A.    Well, it's information about the concentration of
23  Xarelto so a doctor would have that.  If you have more Xarelto on
24  board, you're likely to have a longer clotting time.  So your
25  blood is not going to clot as quickly.

1          And if you have less Xarelto on board, then you
2     probably would be in the normal range down here where all these
3     little dots are, where most people are, in terms of clotting time
4     (indicating).
5          So you can use the clotting time to have some feel for
6     the amount of drug that the patient has.
7     Q.   So do you have an opinion as to whether or not the PT
8     test that is represented here is informative as to whether
9     someone has Xarelto in their blood?
10    A.   It would be, yes, particularly if you have a patient in
11    the ER and you're trying to figure out what is going on, how much
12    clotting effect do they have in terms of a drug.
13    Q.   And does this chart show that PT can give you a sense
14    of how much drug is on board?
15    A.   Yes.
16    Q.   And what is the significance of somebody having a low
17    PT?  What does that mean?
18    A.   Well, it means that their blood -- they're not at much
19    risk for bleeding because your blood is clotting and so you also
20    have a lower concentration of Xarelto on board.
21         And so this is the type of study that was being done
22    all the way from the animal studies on, that the company knew
23    that you could correlate, basically, PT with the amount of drug
24    you had in that animal or that patient.
25    Q.   Now, in your opinion, is the PT test clinically useful

**OFFICIAL TRANSCRIPT**

1   to a physician in an emergency setting?

2       A.    In an emergency setting, yes, that a physician would

3   know -- I mean, it's a common test.  Anyone who has been in

4   medicine knows that a PT has been around forever, and that right

5   now there is all kinds of confusion that the PT, about clotting,

6   and Xarelto having any relationship together.

7           So it would be helpful to a patient -- to a physician

8   caring for a patient to know that, if they didn't have Xarelto on

9   board, their PT would normally be in the normal range.

10          And so if they had a lot of -- say in an overdose

11  patient, if you had a lot of Xarelto on board, you would see that

12  the PT has been expanded in terms of not clotting.

13          So it helps you -- gives you an idea, as a physician,

14  how to care for that risk of bleeding for that patient.

15      Q.    Now, Dr. Parisian, there has been a representation made

16  in this trial that there is not a single piece of literature that

17  says that you can use PT to determine whether it is safe to do an

18  emergency surgery.  Is that correct?

19      A.    No.   Not if you're talking about published literature.

20  Because Dr. Mueck actually in 2013 came out with talking about

21  using it for emergency use, the PT.

22      Q.    Okay.  And so you're talking about the -- is that the

23  Mueck paper from 2013?

24      A.    Yea.  The Mueck paper.  Mueck (muk) paper, Mueck (moke)

25  paper.

1    Q.   And is that a study you referred to and relied upon in

2  offering this opinion?

3    A.   Yes.  And it is consistent with the documents that I

4  saw internally, too.

5    Q.   Okay.

6         MR. BARR:  Your Honor, I would like to put up

7  Exhibit 5768548 as a demonstrative, which is the Mueck 2013

8  paper.

9         MR. DUKES:  No objection.

10        THE COURT:  Okay.

11  **MR. BARR:  (CONTINUING)**

12    Q.   So, Dr. Parisian, is this the article you're talking

13  about by Dr. -- I don't know if it's Mueck (mook) or Mueck (muk),

14  I've heard it said both ways during this trial -- but published

15  in 2013?

16    A.   Yes, sir.

17    Q.   Is the part you're looking for -- is that on

18  approximately Page 11?

19    A.   Yes.  It talks about emergency use.

20        MR. BARR:  Can we --

21        THE WITNESS:  There it is.

22  **MR. BARR:  (CONTINUING)**

23    Q.   Is this the section right here (indicating)?

24    A.   Right.

25    Q.   So what is this saying?  What is Dr. Mueck saying?

**OFFICIAL TRANSCRIPT**

1    A.    Well, Dr. Mueck is saying that, in an emergency

2 situation, which is what we're talking about, not the day-to-day

3 monitoring of patients -- but in an emergency situation, that you

4 could use the PT test, which is Neoplastine Plus, which is the PT

5 test expressed in seconds.  That's the time it takes for your

6 blood to clot.

7         And it would be helpful for assessing the anticoagulant

8 effect of the rivaroxaban, telling that, in an emergency, if you

9 need something, use the PT, and it will give the doctor at least

10 an idea of the anticoagulant effect, how much Xarelto is in there

11 changing the patient's clotting.

12    Q.    At least Dr. Mueck, in this paper, recommends this?

13    A.    Right.  And going through the Bayer development of this

14 product, he was like number one involved in all of it.  So, you

15 know, he is an authority, and I would trust what he says.  And he

16 is saying that you would use it as an emergency treatment or a

17 test for when you are caring for a patient.

18    Q.    Now, this says Neoplastine Plus.  Do you know from your

19 review of the literature and the documents reviewed whether that

20 is referring to a PT test?

21    A.    Yes, it is a PT test.  It is a type of cleared PT test.

22 They use Neoplastine as the agent for triggering the blood clot.

23         So it is a common test.  It is not something exotic.

24 It is cleared for the United States.  It has been cleared since

25 the '90s.

**OFFICIAL TRANSCRIPT**

1    Q.    You mentioned earlier that you've reviewed depositions

2    of internal company witnesses, right?

3    A.    Yes, sir.

4    Q.    And in your review of the internal company depositions,

5    did any of those witnesses share similar views regarding the use

6    of PT?

7    A.    Yes.

8    Q.    And did you create a demonstrative to highlight that?

9    A.    Yes.  Some of the people who've testified said you

10   could use the PT.

11          MR. BARR:  So let's put up that demonstrative.

12   MR. BARR:  (CONTINUING)

13   Q.    And so are you referring to these doctors here at Bayer

14   (indicating)?

15   A.    Yes.  And I particularly focused on Dr. Berkowitz

16   because he is a hematologist.  And so he also said that you could

17   use the PT in an emergency situation.

18   Q.    And just to be clear, Dr. Kubitza and Dr. Mueck are

19   Bayer employees?

20   A.    Yes.

21   Q.    So the studies -- those are studies written by people

22   at Bayer?

23   A.    Right.  And they were the ones who developed the

24   product to start with.

25   Q.    Now, you've reviewed the Xarelto label from --

**OFFICIAL TRANSCRIPT**

1          MR. BARR:  You can take that down.

2   MR. BARR:  (CONTINUING)

3      Q.   -- from the time of approval to the time of Mrs. Orr's

4   prescription of the drug, correct?

5      A.   And before.  Before approval, through that, to the time

6   of Mrs. Orr.

7      Q.   So you have a good working knowledge of what is

8   included in that label?

9      A.   Yes, sir.

10     Q.   Does the United States' label for Xarelto recommend PT

11  for assessing the anticoagulant effect of Xarelto?

12     A.   No.

13     Q.   Should it?

14     A.   Yes.

15     Q.   Why should it?

16     A.   Because I -- the physicians who are treating patients

17  or nurses, they need to know that it affects -- it is a simple

18  test and it will at least give you a ballpark figure as to the

19  amount of Xarelto on board and the likelihood of this patient to

20  clot or not clot, particularly if you are going to take them to

21  the OR.

22          So it is not being used and it needs to be in there so

23  that people can at least give it to the doctors and let them put

24  it in their differential as to how to use this for the patient.

25     Q.   So, in your opinion, it is helpful information?

**OFFICIAL TRANSCRIPT**

1      **A.**   If I was in the ER and I had a bleeding patient, I

2    would want to know this.  Or if I had an overdose patient, I

3    would want to know this.  What can I do to determine what the

4    effect of the Xarelto is on this patient if I have clotting time?

5    Does it mean anything?

6           At this point in time, it's a lot of confusion because

7    it doesn't say that it means something.  So you have taken away a

8    laboratory test that's -- an old laboratory test that has been

9    around and added lot of confusion about it.

10     **Q.**   And you used to be an emergency room doctor?

11     **A.**   Right.  So I would look at this as if I had a bleeding

12    patient.

13     **Q.**   Did you assist in the creation of a demonstrative to

14    explain to the jury what information, in your opinion, should be

15    included in the warning section of the label?

16     **A.**   Yes.

17           MR. BARR:  Can I have that demonstrative put up.

18           MR. DUKES:  May I see -- can we take that down before I

19    see it?

20           MR. BARR:  Sure.

21           MR. DUKES:  Your Honor, can we have a quick sidebar and

22    I can look at this.

23           THE COURT:  Okay.

24                              (A pause in the proceedings.)

25           MR. DUKES:  Your Honor, can we approach?

**OFFICIAL TRANSCRIPT**

1        THE COURT:  Yes.

2                    **SIDEBAR ON THE RECORD**

3        MR. DUKES:  Your Honor, my objection is this is an

4   opinion, and this is not an opinion that was disclosed in her

5   report or deposition.  And it says:  Information Missing from

6   U.S. Label -- that's the heading -- Laboratory Test.   In

7   situations of urgent surgery, assessment of the anticoagulation

8   effect of rivaroxaban is appropriate.  Accordingly, measuring PT

9   may be useful in informed clinical decisions in this

10  circumstance.  A normal PT value indicates that clinically

11  significant levels of rivaroxaban are unlikely.

12        This is yet again an undisclosed opinion that I haven't

13  had an opportunity to cross-examine the witness on.

14        THE COURT:  Isn't that what she has been saying,

15  though?

16        MR. BARR:  It's what she has been saying.  And at some

17  point the jury is going to want to know what needs to be in the

18  label.

19        And she is saying, based upon my review of documents,

20  based upon my knowledge of PT, what I've disclosed in the report,

21  this is the information that needs to be in the label.  It is a

22  demonstrative.

23        THE COURT:  I thought she already said this.

24        MR. BARR:  She did.  But the point is here -- I mean,

25  they've made --

**OFFICIAL TRANSCRIPT**

1        THE COURT:  No, I understand.

2        I think she has already said that.  She said -- I mean,

3   I think that's exactly what she said.

4        Now, you know, I know what you're, I guess, objecting

5   to this.  This is a form of a label.  I mean, she has been

6   testifying to everything so far.

7        MR. DUKES:  Yes, Your Honor, she is testifying to it

8   over my early objection that she did not disclose anything about

9   using PT tests for surgery, she only talked about prescribing.

10  So that is my continuing objection.

11       And here is a proposed label which she is going to put

12  up which is further prejudicial.

13       THE COURT:  I understand.  I'll overrule the objection,

14  but I'll make it continuing and a part of the record.

15       MR. DUKES:  Thank you, Your Honor.

16                **AFTER THE SIDEBAR IN OPEN COURT**

17       MR. BARR:  Can we get the demonstrative put back up.

18  **MR. BARR:   (CONTINUING)**

19    **Q.**   All right, Dr. Parisian, is this a draft of the

20  information you believe needs to be in the warning label for

21  Xarelto?

22    **A.**   Yes.  Particularly since we're talking about Ms. Ross

23  [verbatim] and surgery.  So it's urgent surgery and it would be

24  that you could have assessed the effect of rivaroxaban.

25       So, yes, this is exactly what I just said a second ago.

**OFFICIAL TRANSCRIPT**

1    **Q.**   Can you explain the significance of this language in
2    the label, how a doctor would use this?
3    **A.**   It would tell them that they could draw a PT and they
4    could use the information clinically to make a decision about
5    what is going on.
6         And in a normal PT -- if you draw and you get a normal
7    PT, that probably means -- and you know usually when the patient
8    took it or have a feeling for when the patient took it, that
9    would tell you that it is unlikely the rivaroxaban is creating an
10   effect, that your blood clotting should be fine.
11        So it's basically a ballpark figure like in an
12   emergency situation as to how -- if you take someone to the OR,
13   are they going to bleed to death?  So it gives the physician
14   caring for the patient just more information about what to do
15   with that patient.
16   **Q.**   So if I understand what you are saying, this
17   information provides what to do and what the result means?
18   **A.**   Right.  And this is consistent with what I saw
19   internally.  And the issue is that the medical literature has
20   made this very confusing, and this would be just -- it seems
21   simple, as we sit here, but it needs to be given to physicians
22   that they could get a PT.
23   **Q.**   Doctor, if the label were just to say you can measure
24   the anticoagulant effect with PT, if that's all it said, is that
25   useful information?  Does that provide anything for the doctor to

1    actually do with that test?

2        A.    Well, it's not -- it's something.  It's not really

3    enough, but it -- I think it is better this in terms of

4    likelihood, particularly in overdose patients.

5            What is the likelihood -- how much drug is on board

6    with this patient and what is the effect?

7        Q.    Can you just -- so we have this in the record, can you

8    just read what the label should say.

9        A.    (As read:)  In situations of urgent surgery, assessment

10   of the anticoagulation effect of rivaroxaban is appropriate.

11           It is telling them they can assess that.

12           Accordingly --

13           And they're telling them now how.

14           -- measuring PT may be useful to inform clinical

15   decisions in this circumstance.  A normal PT value indicates that

16   clinically significant levels of rivaroxaban are unlikely.

17           So a physician could then proceed knowing that if --

18   what the likelihood of this person bleeding was because of

19   rivaroxaban.

20           So it's just -- it's giving information.  The best way

21   to give information is to give them what happens if you do

22   something, and so it is giving them, at the very end, if it's

23   normal, it's unlikely the effect and so the patient is not going

24   to bleed to death.

25       Q.    It's been suggested to the jury by the lawyers for the

**OFFICIAL TRANSCRIPT**

1   drug company that this information has been disclosed in the

2   label.

3           Have you looked at the label and do you have a view on

4   that?

5       A.   I don't believe it has been in there.

6       Q.   Would looking at the present label assist you in

7   testifying to this?

8       A.   Well, yes.  And I think they're specifically referring

9   to the pharmacodynamic -- it's not in the label.  I know that

10  it's been referred to in the pharmacodynamic section, and it is

11  not there.  This information is not in that section.

12      Q.   Let's look at Trial Exhibit 2, No. 6.

13           MR. BARR:  And let's go to Section 12.2, which is on

14  Page 21.

15           And let's blow out Section 12.2.

16  MR. BARR:  (CONTINUING)

17      Q.   And Dr. Parisian, can you just read what that says?

18      A.   (As read:)  Dose-dependent inhibition of Factor Xa

19  activity was observed in humans in the Neoplastine prothrombin

20  time, PT, activated partial thromboplastin time, APTT, and hep

21  test are prolonged dosed dependently.  Anti-factor Xa activity is

22  also influenced by rivaroxaban.

23      Q.   Now, Dr. Parisian, does this language in the current

24  Xarelto label adequately communicate to doctors that PT can be

25  used in an emergency situation to assess the anticoagulant effect

**OFFICIAL TRANSCRIPT**

1    in a Xarelto-treated patient?

2        A.    No, not in terms of that warning.  That warning

3    basically describes what is occurring if you give a patient

4    Xarelto.  It's not saying anything about using those tests or

5    what any kind of a value would mean.  So the words are there, but

6    they're not telling the physician how to use it for a patient.

7        Q.    And under the regulatory scheme, the warning about a

8    helpful laboratory test is required to be in what section of the

9    label?

10       A.    It would be up in the Warnings/Precautions.

11       Q.    Is that where this language is?

12       A.    No.  This is describing the pharmacodynamics, the way

13   the drug works.  And so it's not telling -- it actually is more

14   saying this is the good thing about this drug, this is what it

15   will do, but it's not saying how to use it if you had a patient.

16       Q.    Would this language, in your opinion, tell a doctor

17   that they can use PT to determine whether it's safe to proceed

18   with emergency surgery in a Xarelto-treated patient?

19       A.    No.

20       Q.    Is there anything in the label about the use of

21   standard laboratory testing to measure the anticoagulant effect

22   of Xarelto?

23       A.    There is -- in terms of standard testing, there is

24   something under the Hemorrhaging and Pregnancy.  I think it is

25   5.6 or something.

**OFFICIAL TRANSCRIPT**

1          MR. BARR:   If we can go to Section 8.1 of Page 18.

2    MR. BARR:  (CONTINUING)

3          Q.   Is this what you were referring to?

4          A.   Yes.  And it says don't measure -- it originally was

5    going to be under Pregnancy and Hemorrhaging and now it is under

6    there.  So, no, that doesn't tell you anything.  This is buried

7    under the Pregnancy Category C.

8               So it is saying -- if a doctor were to read this far

9    down, they would see that you can't reliably monitor with

10   standard laboratory testing.  So this doesn't tell you about an

11   emergency situation, and it implies that you can't use standard

12   laboratory testing.

13         Q.   And would that inference be correct?

14         A.   No, not in terms of what we're talking about as an

15   emergency situation with a PT.

16         Q.   Is PT a standard laboratory test?

17         A.   Yes, very standard, very old.  It has been around for a

18   long time.

19         Q.   Now, do you have an opinion as to whether the

20   defendants used reasonable care in warning of the foreseeable

21   risks associated with Xarelto?

22         A.   Yes, I have an opinion.

23         Q.   What is that opinion?

24         A.   They didn't.

25         Q.   Do you have an opinion as to whether the defendants

**OFFICIAL TRANSCRIPT**

1    failed to use reasonable care in providing adequate warnings and

2    instructions to doctors for the safe use of Xarelto?

3         **A.**    Yes, I have an opinion.

4         **Q.**    What is that opinion?

5         **A.**    They did not.

6         **Q.**    And that opinion relates specifically to the failure to

7    disclose a helpful laboratory test?

8         **A.**    Yes.

9         **Q.**    I now want to move on to the other opinions you've

10   offered with respect to your opinion regarding whether defendants

11   used reasonable care in warning of the foreseeable risks with

12   Xarelto based on the way they conducted and ran the ROCKET study.

13   Okay?

14        **A.**    Okay.

15        **Q.**    As part of the ROCKET study, were the patients in the

16   warfarin arm monitored with what is called a point of care

17   device?

18        **A.**    Yes.

19        **Q.**    Can you just explain quickly to the jury what a point

20   of care device is?

21        **A.**    It's a simple testing device that is in clinics, now

22   they are starting to sell them for home, that gives you a

23   ballpark figure as to the warfarin dose in terms of -- because

24   the patients have to monitor their warfarin dose all the time,

25   people on warfarin.  So "point of care" just means it is not a

**OFFICIAL TRANSCRIPT**

14:09:58  1    about with emergency, and I was trying to find where that was

14:10:01  2    because I don't know if that footnote 3 belongs with that.  So can

14:10:05  3    you find me where we were talking about the emergency use in here?

14:10:08  4    Because that's what -- that was what I discussed.

14:10:12  5    Q.  Well, that's my recollection on the direct testimony.

14:10:16  6              THE COURT:  In any event, members of the jury, as I

14:10:18  7    mentioned before, the relevance of that is what the defendant knew

14:10:23  8    and when they knew it.  The reference to foreign labels are not --

14:10:28  9    you can disregard anything regarding a foreign label insofar as a

14:10:32 10    foreign label approving it, disapproving it, changing it, doing

14:10:37 11    different things, because there's different law involved with

14:10:40 12    different procedures.  But it has some relevance to what the

14:10:43 13    defendant knew and when they knew it.  That's it.

14:10:46 14    BY MR. DUKES:

14:10:47 15    Q.  Now, Dr. Parisian, in June of 2011, FDA provided comments on

14:10:51 16    Janssen's proposed labelling for the first new drug indication, the

14:10:55 17    deep vein thrombosis application, didn't it?

14:10:57 18    A.  Yes, sir.

14:10:57 19    Q.  Let me hand you DX 5221 and 5222.  Doctor, I need to reclaim

14:11:56 20    5251 and give you 5221.

14:11:56 21    A.  Wait, wait, wait.  Did you want 5221 or 5251?

14:11:56 22    Q.  5251.

14:12:04 23    A.  There's 5251.

14:12:09 24    Q.  I apologize for that.

14:12:10 25    A.  No problem.

14:35:43 1   I think you ultimately said it, it's 25 people, right --

14:35:46 2   A.  Right.

14:35:46 3   Q.  -- at the FDA that touched the application?

14:35:50 4   A.  Right.  You get credit at the FDA if you have been involved in

14:35:54 5   so many NDAs and supplements.  So they want to get their names

14:35:58 6   listed as credit for their workload.

14:36:00 7   Q.  How many people at Bayer and Janssen worked on the application

14:36:06 8   over a period of ten years before the drug -- before the

14:36:09 9   application was even submitted to the FDA?

14:36:11 10  A.  Hundreds.  Hundreds.  It would be their R&D development.  It

14:36:16 11  would be their animal studies people.  It would be their

14:36:18 12  clinical trial -- there's hundreds of people.

14:36:19 13  Q.  Now, can we get back up on the screen the labelling information

14:36:30 14  that Dr. Parisian believes should be in the United States label.

14:36:44 15           Dr. Parisian, you recall that this is the information you

14:36:46 16  believe should be in the United States' label about the ability to

14:36:50 17  use PT to determine whether it's safe to proceed to surgery.  Do

14:36:55 18  you recall that?

14:36:55 19  A.  Yes.

14:36:56 20  Q.  Have you -- are you aware of statements made by Bayer that they

14:37:07 21  continue to make today that support the language you have provided

14:37:12 22  in your label?

14:37:13 23  A.  Yes.

14:37:14 24           MR. DUKES:  Your Honor, objection.  May we approach?

14:37:25 25      (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

1686

14:37:31  1          MR. DUKES:  Your Honor, this particular document is a

14:37:35  2   document that's redacted, but basically relates to foreign

14:37:39  3   labelling.  And I would object to it, Rules 401, 403, as it relates

14:37:45  4   to foreign labelling.  I would also object to this as being

14:37:48  5   improper scope of redirect because we're basically looking at a

14:37:52  6   proposed warning which we objected on direct, but that was covered

14:37:57  7   on direct.

14:37:57  8          MR. BARR:  Your Honor, they talked about PT, called it

14:38:01  9   dangerous, and we've already had this discussion, and we would

14:38:04 10   stand by what we previously argued in chambers.

14:38:07 11          THE COURT:  I understand the issue, and I feel that has

14:38:15 12   been covered on cross and it's appropriate redirect.  And I'm going

14:38:20 13   to deal with the foreign labelling if it comes up.  I'll tell the

14:38:24 14   jury the same way.  It's a question of what they knew and when they

14:38:28 15   knew it.

14:38:28 16          And if they sent it to anybody, that's significant; not

14:38:33 17   why they sent it or what the other person did about it.  It's only

14:38:39 18   relevant as to what they knew and when they knew it.  And one way

14:38:43 19   of doing that is to find out what they said and that's it.

14:38:50 20          I understand it's a problem that foreign labelling, but

14:38:54 21   I've done my best to instruct the jury every time it's come up to

14:38:57 22   disregard the foreign labelling.  I'm more interested in what they

14:39:02 23   knew and when they knew it, and I am confident in looking at them

14:39:05 24   and listening that they understand what I am saying.  I've said it

14:39:09 25   enough times to them.  So if it comes up, I'll say the same thing.

14:39:13  1          MR. BARR:  Your Honor, for purposes of the record, we've

14:39:15  2   redacted any mention of the reference to foreign label to Canada,

14:39:19  3   and we've instructed the witness not to raise those issues in her

14:39:23  4   answer.

14:39:24  5          THE COURT:  Okay.  We'll see what happens.  Thank you.

14:39:38  6      (OPEN COURT.)

14:39:38  7          THE COURT:  I hope we're getting to an end of redirect

14:39:40  8   soon?

14:39:53  9          MR. BARR:  Your Honor, give me one second.  I'm sorry,

14:40:26 10   your Honor, just give me one brief second here.  I am trying to...

14:40:44 11          THE COURT:  I said I hope you're getting to the end.

14:40:47 12          MR. BARR:  Yes.  This is it, your Honor.

14:40:49 13   BY MR. BARR:

14:40:49 14   Q.  Let me restate that.  Are you aware of statements made by

14:40:52 15   Bayer -- a statement Bayer continues to make today -- that supports

14:40:56 16   the language in the label you're offering and what you say needs to

14:41:01 17   be in the label?

14:41:02 18   A.  Yes.

14:41:02 19   Q.  Have you reviewed or relied upon such statements in coming to

14:41:06 20   your opinions?

14:41:07 21   A.  Yes.

14:41:07 22   Q.  Dr. Parisian, is this the statement by Bayer, this document on

14:41:21 23   the screen, the document you have reviewed or relied upon in coming

14:41:25 24   to your conclusions that Bayer supports the statements you've

14:41:30 25   offered in your label?

14:41:31  1    A.  Yes.

14:41:32  2    Q.  Could you please read for the jury the statement made by Bayer?

14:41:37  3    A.  "Although there is no need to monitor clinical practice, in

14:41:43  4    concern" --

14:41:44  5    Q.  Wait.  Start with the first paragraph.

14:41:47  6    A.  "The sponsor"?

14:41:48  7    Q.  Yes, ma'am.

14:41:49  8    A.  "The sponsor recognizes that in certain infrequent situations

14:41:54  9    (such as overdosage, acute bleeding, urgent surgery, suspected

14:41:59 10    noncompliance, or in other unusual circumstances) assessment of the

14:42:07 11    anticoagulant effect of Xarelto may be desirable.  In these

14:42:12 12    circumstances, chromogenic assays can be utilized.

14:42:16 13            Although there is no need to monitor clinical practice,

14:42:22 14    in certain infrequent situations such as overdosage, acute

14:42:28 15    bleeding, urgent surgery, in cases of suspected noncompliance, or

14:42:33 16    in other unusual circumstances, assessment of the anticoagulant

14:42:38 17    effect of rivaroxaban may be appropriate.  Accordingly, measuring

14:42:44 18    PT using the Neoplastin reagent, or Factor Xa assay using

14:42:50 19    rivaroxaban-specific calibrators and controls may be useful to

14:42:55 20    inform clinical decisions in these circumstances."

14:42:59 21    Q.  When did Bayer make this statement?

14:43:01 22    A.  Well, years before, but this one is in 2014.

14:43:06 23    Q.  Is this -- does this statement contradict the position Bayer

14:43:11 24    has taken in this courtroom?

14:43:13 25    A.  Yes.

14:43:14  1   Q.  Is this statement anywhere in the U.S. label or available to

14:43:19  2   doctors in the United States?

14:43:20  3   A.  No.

14:43:22  4           MR. BARR:  No more questions, your Honor.

14:43:24  5           THE COURT:  Thank you.  You're excused, ma'am.

14:43:24  6           THE WITNESS:  Thank you, your Honor.

14:43:26  7           THE COURT:  Let's take a ten-minute break here and

14:43:29  8   we'll go with the other witness.

14:43:32  9           THE DEPUTY CLERK:  All rise.

14:43:32  10     (WHEREUPON, THE JURY EXITED THE COURTROOM AND A RECESS WAS

15:10:32  11       TAKEN.)

15:10:32  12     (OPEN COURT.)

15:10:34  13     (WHEREUPON, THE JURY ENTERED THE COURTROOM.)

15:10:34  14           THE COURT:  Be seated, please.  We have a matter.

15:10:39  15           MR. DUKES:  Thank you, your Honor.  With regard to the

15:10:41  16   last document that Dr. Parisian was testifying about, under the

15:10:44  17   rule for completeness, I would like to show the jury another

15:10:47  18   statement that's in that same document that was not shown.

15:10:51  19           MR. BARR:  And, your Honor, for the record, plaintiffs

15:10:54  20   object.  We actually believe the entirety of the document should

15:10:57  21   come in and not bits and pieces.  So for the purposes of the

15:11:01  22   record, for that reason, we think the entire document should come

15:11:04  23   in.

15:11:05  24           THE COURT:  Thank you.  Under 611(c), I'll allow the

15:11:09  25   defendants to do that, which would be under cross, direct, or

15:11:18  1    re-redirect on that particular point, and under 106, I think the

15:11:23  2    rest of the document would have a right to go in.

15:11:26  3            MR. DUKES:  Thank you, your Honor.  So this comes from

15:11:28  4    the same document Dr. Parisian was talking about.  If I could have

15:11:33  5    the ELMO.

15:11:45  6            So the other statement that is in the same document that

15:11:47  7    Dr. Parisian was talking about says, "However, the response of the

15:11:51  8    PT varies both dependent on PT reagent (which is not standardized)

15:11:57  9    and coagulometer.  Thus, the PT cannot be used to reliably measure

15:12:04 10    the anticoagulant effect of Xarelto since a normal PT may be found

15:12:08 11    in patients with therapeutic Xarelto levels if measured using

15:12:12 12    selected machine/reagent combinations."

15:12:16 13            And, your Honor, that's the additional part, and I

15:12:18 14    appreciate the opportunity.

15:12:19 15            THE COURT:  All right.  Okay.  Thank you.  Okay.  Let's

15:12:23 16    call a witness.

15:12:25 17            Let me mention this to you, members of the jury.  As I

15:12:28 18    told you at the outset, the way the case proceeds is that after

15:12:32 19    opening statements, the plaintiff has a right to put on their case.

15:12:35 20    When they rest, the defendant has the right to put on their case.

15:12:41 21            Sometimes because of scheduling issues, we have to

15:12:46 22    interrupt that, and that's what we're doing at this point.  The

15:12:49 23    plaintiff has not rested yet, but the defendant is calling a

15:12:54 24    witness in their portion of the case, but it's just interrupting

15:13:00 25    the plaintiff's case and allowing them to call them at this time.

1    patients.  That was seen in ROCKET.

2        And so I think -- I'm not comfortable with utilizing

3    PT.  Believe me, if it was effective, I would -- and reliable and

4    something that I could use, I would use it.  I would want it.  I

5    want to help -- we're here for our patients.

6        And this is -- so if this were something that I thought

7    was comfortable, I'm not going to withhold that.  I would want

8    that.  But the PT test is not a reliable test.  It doesn't -- it

9    can't be applied in a clinical context in a meaningful manner.

10       Q.  Let's take a look at the proposed label change that

11   Dr. Parisian presented yesterday and get your opinion on that.

12   This is what Dr. Parisian said should be in a label -- the

13   Xarelto label to help clinicians to treat patients that are

14   prescribed Xarelto.

15       MR. BARR:  Objection, Your Honor.  Dr. Parisian talked

16   about what should be in the label from a regulatory perspective,

17   what is required according to the regulations.

18       THE COURT:  Well, I thought it was a little broader

19   than that.  The question is different than what -- I'll allow the

20   question.

21       THE WITNESS:  I'll give my opinion, not a regulatory...

22   **MS. WILKINSON:  (CONTINUING)**

23       Q.  Yeah.  We're not talking about regulatory.

24       We want to know from your point of view, as a clinician

25   and an expert who prescribes this drug, would this language be

**OFFICIAL TRANSCRIPT**

1  useful or helpful to you with your patients?

2      A.    So I'm specifically --

3      Q.    Just first answer that question.

4            Would it be helpful?

5      A.    No.  Sorry.

6      Q.    Now let's go through it and you tell us why this would

7  not be helpful.

8      A.    The one that troubles me the most is that middle thing:

9  Accordingly, measuring PT may be useful to inform clinical

10 decisions in this circumstance.

11           I have no data to tell me how that will inform my

12 clinical decisions.  There is no studies that have looked at PT

13 and said, Okay, if someone comes in and they're bleeding and they

14 have a normal PT, you can take them to surgery and they do well.

15           That has not been studied.

16           You have to look at a situation and test it out in

17 people, and there's no data that actually looks at changing dose

18 based on PT, or withholding surgery based on PT, and that having

19 a net clinical benefit.

20           And that's why I think it's inappropriate to imply that

21 there is -- it's useful in informing clinical decisions, because

22 I don't think it can help me.  If it would help me, I would use

23 it.

24           My study of this is not scant.  I have looked at this

25 extensively, and I do not feel it is of value.  Not only that,

**OFFICIAL TRANSCRIPT**

1    but in the field of EP, in the Heart Rhythm society itself,

2    people are not using PT.

3        Q.   Do you believe that is because people don't know about

4    it because somebody has hidden this information or because they

5    don't believe it's useful?

6        A.   So when we do our journal clubs and we go over articles

7    and studies, these are the things that kind of come up when we

8    discuss this.

9             So I don't -- I think that it was appreciated.  And,

10   again, we looked at it and our impression was that that was not

11   the case.

12       Q.   And do you agree or disagree that a normal PT value

13   indicates that clinically significant levels of rivaroxaban are

14   unlikely?

15       A.   I think that there is -- so I can't explain why

16   10 percent of patients go from a normal PT to a high PT with

17   absolutely no change in their dosing.  So I can't --

18       Q.   Does that mean you don't agree?

19       A.   I don't agree.  Sorry.  Yes.

20       Q.   And tell us -- we've heard about a false negative in

21   testing.  Are you familiar with that?

22       A.   Yes.

23       Q.   Have you seen that in PT where someone could have

24   either -- a normal level and still have an anticoagulation effect

25   in their blood?

**OFFICIAL TRANSCRIPT**

13:40:49  1          MS. WILKINSON:  Your Honor, he can explain.

13:40:52  2          THE COURT:  He can explain himself, but he is bringing in

13:40:55  3   new theory.  So I think counsel is right.  Just listen to the

13:40:58  4   question and answer the question.  If they have any questions,

13:41:01  5   they'll be resolved, I hope.

13:41:02  6          THE WITNESS:  Okay.

13:41:03  7   BY MR. BARR:

13:41:03  8   Q.  Okay.  This was the article you hadn't seen, right?

13:41:06  9   A.  Yes.

13:41:06 10   Q.  And this is Bayer saying that this PT test could be used,

13:41:13 11   correct?

13:41:13 12   A.  Correct.

13:41:14 13   Q.  Do you know of any studies Bayer did to try to prove this?

13:41:19 14   A.  No, not familiar.

13:41:22 15   Q.  So let's take this down.  Can I get my demonstrative back.

13:41:33 16          So we've now got you didn't read Lippi and you didn't

13:41:37 17   read Kubitza, right?

13:41:40 18   A.  Correct.

13:41:41 19   Q.  Let's talk about another one.  Can I get 5767837.

13:42:30 20          Let me skip that one until we find it.  Let me show you

13:42:40 21   5767502.

13:42:56 22   A.  Thank you.

13:42:57 23   Q.  You're welcome.  You see that this is an article by a

13:43:42 24   Dr. Tripodi.  Do you see that?

13:43:42 25   A.  I do.

13:47:59  1   hospitals; it is relatively cheap; it is adequately responsive to

13:48:03  2   Xarelto; and it can be easily standardized."  Did I read that

13:48:06  3   right?

13:48:07  4   A.  You did.

13:48:46  5   Q.  I want to show you another one.  You didn't come across an

13:48:46  6   article by Dr. Mueck in 2013 either, did you?

13:48:46  7   A.  I've read some of his publications.  The name sounds familiar.

13:48:46  8   Q.  Can I get 5768548.  You see this is another article in the

13:48:46  9   peer-reviewed literature, and this is in the Thrombosis Journal.

13:49:13 10   Do you see that?

13:49:14 11   A.  Yes.

13:49:16 12   Q.  And this is an article by Wolfgang Mueck, who this jury knows

13:49:21 13   is an employee of Bayer.  Did you know that?

13:49:23 14   A.  I did.

13:49:23 15   Q.  So you're aware of that?

13:49:24 16   A.  Uh-huh.

13:49:25 17   Q.  And the title of this is, "Rivaroxaban and other novel oral

13:49:25 18   anticoagulants:  Pharmacokinetics in healthy subjects, specific

13:49:39 19   patient populations and relevance of coagulation monitoring."  Did

13:49:39 20   I read that right?

13:49:39 21   A.  I'm sorry, what?

13:49:41 22   Q.  Did I read the title correctly?

13:49:42 23   A.  Yes, you did.

13:49:44 24   Q.  Hopefully you trust me.

13:49:46 25   A.  I do.

13:49:51  1    Q.  Beth might not.

13:49:53  2         If we can go to page 11, and you see we're talking about

13:50:01  3    clot-based assays, do you see that?

13:50:02  4    A.  I do.

13:50:03  5    Q.  And what Dr. Mueck is talking about is, "The most commonly

13:50:06  6    available clot-based assays include the PT, dilute PT, APTT, and

13:50:14  7    ECT, HepTest and prothrombinase-induced clotting time," right, or

13:50:19  8    the PiCT.

13:50:21  9    A.  Okay.

13:50:21  10   Q.  Okay.  And so if we go down -- take this down.  And I want to

13:50:24  11   blow up right here (INDICATING).

13:50:30  12        What Dr. Mueck writes is, "Nevertheless, if used in an

13:50:34  13   emergency and in the absence of any other available test,

13:50:37  14   Neoplastine Plus (with results expressed in seconds) is the

13:50:41  15   recommended agent for assessing the anticoagulant effect of

13:50:46  16   Xarelto," right?

13:50:48  17   A.  That's what it says, yes.

13:50:49  18   Q.  This is another article you didn't refer to or rely upon in

13:51:02  19   coming to the conclusions and opinions you've offered to this jury,

13:51:05  20   right?

13:51:05  21   A.  I've seen -- maybe not this specific article, but I've read

13:51:11  22   Mueck.  That name is familiar, so I know I've read.  I thought I

13:51:15  23   read something again more recent, but I don't know off the top of

13:51:19  24   my head.

13:51:19  25   Q.  Okay.  Would you accept my representation that it's not

13:51:25  1    referenced or relied upon in your report?

13:51:27  2    A.  Sure.  I would accept that.

13:51:32  3    Q.  Can we go back to the demonstrative just so we can catch up.

13:51:35  4            So we have Lippi, no; Kubitza, no; Tripodi, no; and Mueck

13:51:44  5    2013, no.  Right.  You haven't looked at any of those?

13:51:48  6    A.  Sure.

13:51:56  7    Q.  Let me show you 5768436.

13:52:23  8    A.  Thanks.

13:52:30  9    Q.  This is an article by Dr. Jurgen Koscielny.  Do you see that?

13:52:39 10    A.  Yes.

13:52:39 11    Q.  And you've not seen this article before, correct?

13:52:41 12    A.  Definitely not.

13:52:43 13    Q.  Definitely not?

13:52:44 14    A.  I know I haven't seen this one for sure.

13:52:47 15    Q.  And what this says -- if you come up here, because this is

13:52:51 16    small.  So we might -- I don't know if there's a way to blow it up

13:52:54 17    even bigger.

13:52:57 18            It says, "confirmation of rivaroxaban levels may be

13:53:05 19    required in circumstances such as life-threatening bleeding or

13:53:09 20    perioperative management," right?

13:53:11 21    A.  I see that, yes.

13:53:12 22    Q.  So let's go to the next page.  And let's blow up this,

13:53:21 23    "Nevertheless" language again.

13:53:27 24            It says, "Nevertheless, in an acute situation, the

13:53:31 25    determination of PT could deliver valuable preliminary information

14:38:07  1    Q.  Are you aware, as you sit here and testify today, that Bayer

14:38:11  2    tells doctors outside of the United States this exact language?

14:38:17  3    A.  No.

14:38:19  4    Q.  So you have no knowledge of that.

14:38:44  5          Let me show you what the company says.  You see right

14:38:51  6    here that this is Bayer telling doctors that "Although there is no

14:38:57  7    need to monitor in clinical practice, in certain infrequent

14:39:01  8    situations such as overdosage, acute bleeding, urgent surgery, in

14:39:07  9    cases of suspected noncompliance, or in other unusual

14:39:11 10    circumstances, assessment of the anticoagulant effect of

14:39:13 11    rivaroxaban may be appropriate.  Accordingly, measuring PT using

14:39:17 12    the Neoplastin reagent or Factor Xa, may be useful to inform

14:39:25 13    clinical decisions in these circumstances."  Did you know that?

14:39:29 14    A.  I see that.

14:39:30 15    Q.  According to that sentence, Bayer disagrees with you, don't

14:39:34 16    they?

14:39:34 17    A.  I'm -- you're giving me one -- I don't have a whole document

14:39:39 18    here.  I am not going to comment on what Bayer thinks or doesn't

14:39:42 19    think.  I am not going to look at snippets.

14:39:44 20          MR. BARR:  That's all.

14:39:45 21          THE COURT:  All right.  Any redirect?

14:39:47 22          MS. WILKINSON:  Yes, your Honor.

14:39:59 23                    REDIRECT EXAMINATION

14:39:59 24    BY MS. WILKINSON:

14:39:59 25    Q.  Doctor, if you can speak up and lean into the microphone so we

14:41:20  1    plaintiffs that we can't show the label.  It has -- I mean, they

14:41:26  2    keep criticizing the language from their own label, and they put up

14:41:31  3    language -- I don't think that's anywhere in the actual label about

14:41:35  4    not being able to use the PT.

14:41:39  5            MR. BIRCHFIELD:  And, your Honor, their own witness just

14:41:42  6    asked to see the whole document.  That's --

14:41:46  7            THE COURT:  I understand.  The way I see it, and I've

14:41:49  8    said it several times, the issue is really what the defendant knew

14:41:56  9    and when they knew it.  It's not what's in one label or what's in

14:42:02 10    another label, because the rules are different, the laws are

14:42:06 11    different, the specifics are different.

14:42:08 12            We're going to get in a situation where we then have to

14:42:11 13    try the Canadian label, and then we're going to be with witnesses

14:42:16 14    about what the Canadian label says and why it says that.  And then

14:42:19 15    we're going to go into the France label.  It's really involving the

14:42:24 16    United States label.  It's the FDA's label.

14:42:27 17            And I'll let you get in what they said, what they told

14:42:31 18    other people, obviously what they knew.  But that's where it's got

14:42:37 19    to stop.  We can't put in different labels.  It just doesn't -- it

14:42:43 20    would be impossible to deal with.  It's a different jurisdiction.

14:42:47 21            MS. WILKINSON:  Your Honor, just for the record, the

14:42:49 22    statement they put up was from a submission to a regulator, and all

14:42:53 23    you allowed us to do yesterday was show the complete statement.  It

14:42:56 24    wasn't -- this particular statement where they took the document

14:42:59 25    out was not the label.  It was in answer to a regulatory request in

14:49:24  1   to most of us.

14:49:25  2   A.  I get it.  You're right.

14:49:26  3   Q.  Okay.  So when we go back, and we're not going to go through

14:49:29  4   all of those studies again, I just want to point out a few

14:49:31  5   things --

14:49:31  6   A.  Please don't.

14:49:32  7   Q.  -- with your standard of reading the whole article.  Is this

14:49:36  8   what you're concerned about when using the PT test in an emergency

14:49:39  9   situation?

14:49:40  10  A.  That's my concern is that it doesn't correlate to actual

14:49:44  11  effect.  We don't know how it works in that setting.

14:49:46  12  Q.  So when you look at this -- Dr. Parisian's proposed label

14:49:54  13  change, it says you can actually assess the anticoagulation effect

14:50:00  14  in rivaroxaban.  Is that true in a PT test?  She is saying you can

14:50:04  15  assess the coagulation effect.

14:50:07  16  A.  I disagree with that statement.  I think putting that in a

14:50:10  17  label would be reckless.

14:50:11  18  Q.  And have you been shown any data that shows how you would

14:50:13  19  actually measure that?  What numbers you would use as a clinician?

14:50:17  20  A.  No.

14:50:17  21  Q.  Did Dr. Parisian give any numbers, any way that a clinician

14:50:21  22  would know, once that PT test was taken, what you were supposed to

14:50:27  23  do when a patient was at certain level?

14:50:29  24  A.  I don't know what Dr. Parisian gave.  I just know from

14:50:30  25  basing --

14:50:30  1  Q.  Is there anything in that label that tells you that?

14:50:32  2  A.  No.

14:50:32  3  Q.  So if this was in the label and you were treating Mrs. Orr and

14:50:38  4  she had an 11.5 PT test, right, and you were advising her

14:50:43  5  neurosurgeon whether to go into surgery, would this give you any

14:50:47  6  information about what to tell him?

14:50:48  7  A.  I would go based on the time from last ingestion and creatinine

14:50:53  8  clearance.

14:50:53  9  Q.  That's not what I asked you.  Would this give you any basis to

14:50:56 10  tell him anything?

14:50:57 11  A.  I would not feel comfortable rendering a clinically important

14:51:01 12  decision based on that; so, no.

14:51:02 13  Q.  Would you know how to interpret the PT number?

14:51:04 14  A.  No.  I don't even know if this was Neoplastin.

14:51:09 15  Q.  And the Neoplastin makes a difference?

14:51:12 16  A.  Yes.  That's the only reagent that's been correlated with this.

14:51:15 17  I'm at Ochsner and I don't know which reagent we use.

14:51:18 18  Q.  Let's go back, if we could, just briefly to the articles.  You

14:51:23 19  were not given your reliance list when you were asked those

14:51:26 20  questions, right?  Would you like to take a look at it so you can

14:51:27 21  see whether some of those articles are actually on there?

14:51:30 22  A.  Sure.

14:51:31 23  Q.  Take a look.  Now, you have quite a few articles listed on your

14:51:41 24  reliance list, do you not?

14:51:43 25  A.  I have a few, yes.  Yes.

13:23:02  1    question, that:  Insofar as Mrs. Orr's condition is concerned, you

13:23:05  2    can't say that her event or its outcome would have been any

13:23:08  3    different had she been on warfarin; is that correct?

13:23:11  4        And his answer was:  "I can't say from an outcome

13:23:14  5    perspective, no."

13:23:15  6        I want you to assume that.  And if that was the question,

13:23:19  7    if that was the answer, would you agree or disagree with that?

13:23:22  8    A.  I agree.

13:23:23  9    Q.  Doctor, a suggested warning label has been proposed by

13:23:41 10    plaintiffs.  I would like to ask you to look at this warning --

13:23:44 11    suggested warning label and ask you, from a neurosurgeon

13:23:48 12    standpoint, would this warning label be of any help to you.

13:23:51 13        MR. IRWIN:  If we could have the ELMO, please.  And --

13:24:00 14        MR. HONNOLD:  Could we just note an objection that we

13:24:03 15    made previously for the record?

13:24:04 16        THE COURT:  Right.

13:24:19 17        THE WITNESS:  (WITNESS REVIEWS DOCUMENT.)  Okay.

13:24:28 18    BY MR. IRWIN:

13:24:29 19    Q.  My question is, would this proposed label, proposed by the

13:24:34 20    plaintiff -- plaintiff lawyers be of help to you as a neurosurgeon?

13:24:41 21    A.  So for me as a neurosurgeon, when I treat patients, hemostasis,

13:24:46 22    which is stopping of blood, whether it be -- bleeding, rather --

13:24:50 23    stop it in an elective surgery, emergency surgery, brain surgery,

13:24:54 24    spine surgery is of the utmost importance because we operate in

13:24:59 25    small compartments that are confined.  And so because we operate in

13:25:03  1   small compartments that are confined, bleeding can cause

13:25:06  2   significant issues.

13:25:07  3          My understanding, if I read this, if I was a

13:25:12  4   practitioner, I would think, okay, a normal PT value indicates that

13:25:15  5   maybe levels of rivaroxaban are clinically significant unlikely and

13:25:21  6   it's okay to operate.  But you can have a normal PT and you can

13:25:24  7   have levels of rivaroxaban in your system that are still causing

13:25:27  8   the blood to be thinner and anticoagulated and which would be

13:25:31  9   dangerous.

13:25:31 10          MR. HONNOLD:  Your Honor, this is exactly what we had

13:25:33 11   discussed when we brought the objection up.

13:25:36 12          MR. IRWIN:  Your Honor, he deals with this all the time.

13:25:39 13          THE COURT:  I'll let him go into it.  Overrule the

13:25:43 14   objection.

13:25:45 15   BY MR. IRWIN:

13:25:45 16   Q.  Please continue, Doctor.

13:25:46 17   A.  My understanding, that a patient with a normal PT, you can

13:25:50 18   still have anticoagulation of the blood and that would be dangerous

13:25:53 19   in neurosurgery.

13:26:17 20          THE COURT:  Anything further?

13:26:18 21          MR. IRWIN:  Just about, your Honor.  I am just trying to

13:26:20 22   move through it.

13:26:31 23   BY MR. IRWIN:

13:26:31 24   Q.  Back to the screen, please.  Doctor, these are my last

13:26:46 25   questions.

13:59:19  1   does the plaintiff do at that point?  And the Court said, well, in

13:59:22  2   that situation, we can use other evidence to show what a reasonable

13:59:28  3   person would do.

13:59:29  4           But in this case we have a treater; the treater's

13:59:32  5   testified.  The treater's credibility is at issue at this point,

13:59:37  6   and that's before the jury.  So I understand the issue, but I'll

13:59:41  7   deny it.

13:59:42  8           Thank you very much, and I'll see you in ten minutes on

13:59:46  9   the jury --

13:59:48 10           MR. BARR:  Your Honor, before we go off the record with

13:59:50 11   what we talked about in chambers -- Brian Barr for the

13:59:52 12   plaintiffs -- we want to now move in the exhibit that we referred

13:59:55 13   to.

13:59:56 14           THE COURT:  Yes.

13:59:57 15           MR. IRWIN:  Can I complain about this?  They have

13:59:59 16   redacted everything.  You complained about us redacting everything,

14:00:03 17   but look what you've done.

14:00:04 18           MR. BARR:  I did exactly what I said I would do.

14:00:08 19           So at this time, your Honor, plaintiffs move in 30614444

14:00:14 20   as redacted to have only the language that was used with the

14:00:20 21   witnesses in court.

14:00:22 22           MR. DUKES:  Your Honor, I understand that's over our

14:00:24 23   objections which included 401 --

14:00:27 24           THE COURT:  Yes.  Right.  The way I see it, as I

14:00:29 25   mentioned, I don't feel that it's appropriate for a party, be it

14:00:35 1    plaintiff or defendant, to introduce into evidence labels from a

14:00:39 2    foreign country.  It has nothing to do with the case before us.

14:00:44 3            On the other hand, the issue is what did the defendants

14:00:50 4    say in this case?

14:00:52 5            So you have a situation where it's hearsay, but it's an

14:00:58 6    exception to the hearsay rule, which 801(d)(2) comes in.  The

14:01:05 7    question is how does it come in?

14:01:08 8            Well, we look to 613 in that situation.  When a witness

14:01:13 9    has made a statement, a prior statement and is questioned on the

14:01:17 10   statement, that portion of the statement can come in.

14:01:20 11           Then the issue is, well, the plaintiff put in a

14:01:24 12   particular portion that the defendants said to a foreign entity.

14:01:33 13   To me that comes in because it's a statement.  The plaintiff

14:01:37 14   (VERBATIM) can't say, well, we said it to a foreign entity, but it

14:01:40 15   was a lie.  It doesn't make sense to me.

14:01:43 16           So they said it to a foreign entity because they believed

14:01:46 17   it to be true or in response to a question, but they said it.  And

14:01:50 18   so that comes in.

14:01:51 19           On the other hand, the defendant (VERBATIM) then says,

14:01:53 20   well, look, if you let in a portion of the statement, I want the

14:01:56 21   rest of the statement.  106, they have a right to do that.

14:01:59 22           So I put it in both.  Seems to me to be the way to do it.

14:02:04 23           MR. BARR:  We agree, your Honor.

14:02:05 24           THE COURT:  Yeah.  Well, all right.

14:02:05 25           MR. DUKES:  Your Honor, with regard to this document,

14:02:07  1    Mr. Barr and I have an agreement.  There's a statement at the

14:02:10  2    bottom left corner of each page that's says highly protected

14:02:12  3    information subject to protective order.  I think he's agreed to

14:02:15  4    submit that as redacted on the official version.

14:02:19  5         THE COURT:  Okay.  I've given to you all a copy of the

14:02:22  6    jury charges.  You know what I do.  I meet with you and I get

14:02:25  7    suggestions from you.  I'll give you another draft that has taken

14:02:28  8    into consideration those objections.  And then I'll meet with you

14:02:32  9    again.

14:02:33  10        It's probably best if we try to do this today however

14:02:38  11   long it takes, and then my thinking is, is that probably on Monday,

14:02:43  12   since we're going to the jury at 9 o'clock, it will be helpful if

14:02:47  13   you all came at 8 o'clock, put on the record all of your objections

14:02:51  14   to it.

14:02:51  15        At that point -- before that point, I'll send it to you

14:02:55  16   the Saturday or Sunday, my final charge.  You'll know what it is.

14:03:00  17   You'll be able to then make your objections, put it in the record.

14:03:04  18        And, again, in the Fifth Circuit, they like you to be

14:03:07  19   specific rather than general.  So take that into consideration.

14:03:11  20   Tell me whatever you need, and we'll do it that way.

14:03:15  21        MR. BARR:  Okay.  Thank you.  Your Honor, this will be

14:03:19  22   Exhibit 190, for the record.

14:03:21  23        THE COURT:  Okay.

14:03:21  24        MR. MEUNIER:  We will continue going through the charge

14:03:22  25   now with you in chambers?

OFFICIAL TRANSCRIPT

knew that, I would sit down with the clients and -- the patient
and maybe come to a different decision.  We think it's
precisely when the subjective testimony on the causation prong
is equivocal, it's precisely in those cases that the jury
should also hear what a reasonable physician would have done
and be able to decide causation on that basis.

And so for the reasons we've previously argued,
Your Honor, we object to the Court's not having given
Plaintiffs' proposed charges 9 and 25 on the objective evidence
standard.

THE COURT:  You know, I think that the cases, when
you look at them closely, they indicate to me in any event that
the -- that that standard of objective evidence is -- is alive
and well, but it's alive and well in a fact pattern where there
is no treater or there is a treater who is -- has forgotten or
is absent or has not even expressed an opinion.

Here the treaters have expressed an opinion,
although frankly, their opinion seems to coincide with both
parties.  So I -- I understand Plaintiffs' position, but I
think that that introduces a credibility quotient, and it's
just up to the jury to decide on credibility.  So that's the
reason I deny the motion.

MR. MEUNIER:  Your Honor, our next objection again
can be discussed in reference to two of our proposed charges,
proposed charge Number 12 and proposed charge Number 3.  These

8:07AM 1  deal with federal regulations.

8:07AM 2             Proposed charge Number 12 instructs the jury

8:07AM 3  that the regulations set forth in 21 CFR Section

8:07AM 4  201.57(c)(6)(iii) sets forth a mandatory requirement that

8:07AM 5  helpful liability -- helpful laboratory tests be disclosed in a

8:08AM 6  warnings label for a prescription drug.  This regulation was in

8:08AM 7  fact shown to the jury, and it's clearly relevant to the case.

8:08AM 8  And we believe the Court should instruct the jury that the

8:08AM 9  referenced regulation specifically is relevant to the failure

8:08AM 10  to warn case made -- offered by Plaintiffs.

8:08AM 11             And then in jury charge Number 13, Judge, we

8:08AM 12  asked the Court to instruct the jury that the violation of such

8:08AM 13  regulatory standards may be considered as evidence of the

8:08AM 14  appropriate standard for determining whether instructions were

8:08AM 15  adequate, and we cite case law for that.

8:08AM 16             So we respectfully object to the failure to give

8:08AM 17  charges 12 and 13 proposed by Plaintiffs.

8:08AM 18      THE COURT:  I think taken as a whole, the jury

8:08AM 19  charges are accurate and they express what the Plaintiff has

8:08AM 20  indicated.  I don't think that zeroing in on something is even

8:08AM 21  helpful to the jury or helpful to the parties.  So that's the

8:08AM 22  reason I deny it.

8:09AM 23      MR. MEUNIER:  Our final objection, Judge, again, can

8:09AM 24  be referenced with two of the proposed charges, Numbers 27 and

8:09AM 25  28.  This deals with the strike-through label that the

2318

| | |
|---|---|
| 8:09 AM | 1 |
| 8:09 AM | 2 |
| 8:09 AM | 3 |
| 8:09 AM | 4 |
| 8:09 AM | 5 |
| 8:09 AM | 6 |
| 8:09 AM | 7 |
| 8:09 AM | 8 |
| 8:09 AM | 9 |
| 8:09 AM | 10 |

1  Defendants have offered into evidence.  And with regard to that
2  exhibit and the evidence and the testimony, regarding the fact
3  that the FDA struck through certain language which was proposed
4  by Janssen for the Xarelto label, we have asked the Court to
5  instruct the jury that they are not to consider that evidence
6  as proof that the FDA either refused to approve or would not
7  have approved the nature and extent of warnings and
8  instructions which the Plaintiffs claim were needed to properly
9  instruct Mrs. Orr's prescribing and treating physicians about
10 the dangers and safeties of Xarelto.

11         We believe that this instruction, Your Honor, is
12 critically important because the jury otherwise might be led to
13 believe that the PT language which the Plaintiffs proposed was
14 proposed by Janssen and rejected by the FDA.  And even if the
15 FDA approval is not conclusive, as you will instruct the jury,
16 that rejection of label language should not be seen as having
17 any preemptive effect.  And in fact, Judge, you have ruled
18 prior to this case that the Defendants are not in a position to
19 assert a preemptory defense.  The Defendants have not even
20 sought to do so, to meet the clear evidence standard for a
21 preemption defense, and yet through this, I think we have, in
22 effect, back-door preemption in the case.

23         And so we respectfully object to the Court not
24 giving that limiting instruction about what is not to be taken
25 from that strike-through label or any argument of counsel that

| | | |
|---|---|---|
| 8:10 AM | 1 | may -- we may now hear about it. |
| 8:10 AM | 2 | And in connection with that, we've also |
| 8:10 AM | 3 | submitted a proposed charge 28, which again says that if the |
| 8:10 AM | 4 | Defendants are going to suggest that some rejection or action |
| 8:11 AM | 5 | by the FDA has a preemptive effect, then they have a clear |
| 8:11 AM | 6 | evidence standard that the FDA would not have approved the |
| 8:11 AM | 7 | label proposal that the Plaintiffs are putting forward.  So we |
| 8:11 AM | 8 | object to the Court not having given Plaintiff charges 27 and |
| 8:11 AM | 9 | 28. |
| 8:11 AM | 10 | **THE COURT:** I understand.  The jury has been advised |
| 8:11 AM | 11 | that the actions of the FDA are not dispositive.  I |
| 8:11 AM | 12 | specifically have a charge on that.  Also from the Plaintiffs' |
| 8:11 AM | 13 | standpoint, they take the position that -- and they focus the |
| 8:11 AM | 14 | jury on what the Defendant knew and when they knew it and what |
| 8:11 AM | 15 | they did or failed to do about it.  And that's the whole |
| 8:11 AM | 16 | concept, that the Defendants knew that this test should have |
| 8:11 AM | 17 | been included and they used it themselves.  They were satisfied |
| 8:11 AM | 18 | when they used it themselves.  They didn't tell the FDA that it |
| 8:11 AM | 19 | was a test, a good test, a test albeit had some false positives |
| 8:12 AM | 20 | or false negatives, not accurate all the time, but it was close |
| 8:12 AM | 21 | enough for them to use it.  They didn't tell the FDA that. |
| 8:12 AM | 22 | That's the whole position of the Plaintiffs. |
| 8:12 AM | 23 | Well, the Defendants have an opportunity to say |
| 8:12 AM | 24 | what they did tell the FDA and what they suggested to the FDA |
| 8:12 AM | 25 | and why it is -- why they -- they said it, they did what the |

8:26AM   1   burden-shifting rule, not one of evidence particularly the way

8:26AM   2   it's been rebutted as in this case.  And so we ask that the

8:26AM   3   Court reject that instruction.

8:26AM   4       **THE COURT:**  Okay.  The reason I gave it is because I

8:26AM   5   put the other side of that nickel also and say for the treating

8:26AM   6   presumption, and then I say, "However, may be overcome by

8:26AM   7   evidence that a different warning or instruction would not have

8:27AM   8   made any difference."  In other words, it would have been

8:27AM   9   futile under the circumstances.  So I think I've covered that

8:27AM  10   as well as -- as well as rebutting that presumption.  So I'll

8:27AM  11   deny it for that reason.

8:27AM  12       **MR. BONEY:**  Thank you, Your Honor.

8:27AM  13       The next is the labeling and the federal

8:27AM  14   regulations.  This is in the Court's final charge at Page 25,

8:27AM  15   Line 1, to Page 26, Line 10.  And Your Honor, Defendants object

8:27AM  16   on the ground that the instruction gives insufficient attention

8:27AM  17   to and obscures the relevance of FDA's approval of Xarelto and

8:27AM  18   Defendants' compliance with regulatory standards which,

8:27AM  19   although not conclusive, do bear on the non-defectiveness of

8:27AM  20   the product, the adequacy of the label, and the reasonableness

8:27AM  21   of the Defendants' conduct.

8:27AM  22       Moreover, the charge is unfairly balanced in

8:27AM  23   Plaintiffs' favor.  The instruction provides one sentence that

8:27AM  24   the jury can consider FDA approval, but at the same time on the

8:27AM  25   flip side, there are four sentences, all stating the same

8:28AM   1    proposition, that the jury need not give FDA approval much, if
8:28AM   2    any, weight.  And the imbalance is made worse, Your Honor, by
8:28AM   3    the different levels of specificity in the charge, charges more
8:28AM   4    specific in terms of how the jury can disregard FDA approval
8:28AM   5    and, much vaguer, in terms of how it can consider FDA approval
8:28AM   6    in determining liability.  And the charge is further incorrect
8:28AM   7    in several respects as explained in our written objections and
8:28AM   8    as Mr. Irwin just discussed with the CBE provision.
8:28AM   9            THE COURT:  I spoke on that.  Okay.  Anything else?
8:28AM  10            MR. BONEY:  Thank you, Your Honor.  Just a couple
8:28AM  11    more.  There's the foreseeability component of the
8:28AM  12    instructions.  This is Page 27, Line 10, to Page 28, Line 2.
8:28AM  13    Defendants object simply that this could be stricken because
8:28AM  14    foreseeability has not been an issue in the case, and that the
8:28AM  15    instruction could therefore confuse jurors.
8:28AM  16            THE COURT:  I think in whole it covers all of those
8:28AM  17    things.  I'll deny it for that reason.
8:28AM  18            MR. BONEY:  Thank you, Your Honor.  Just a couple
8:29AM  19    more.
8:29AM  20                 The next is warnings, causation, and learned
8:29AM  21    intermediary.  This is Page 29, Lines 1 to 10.  And we object
8:29AM  22    on the ground that the instruction does not fully state the
8:29AM  23    warnings causation standard.  And this is in addition to the
8:29AM  24    treating physician objection that we've already identified.
8:29AM  25    But it -- it states the standard incorrectly inasmuch as it

9:04AM
9:04AM
9:04AM
9:04AM
9:04AM
9:04AM
9:04AM
9:05AM
9:05AM
9:05AM
9:05AM
9:05AM
9:05AM
9:05AM
9:05AM
9:05AM
9:05AM
9:05AM
9:05AM
9:05AM
9:05AM
9:05AM
9:05AM
9:05AM
9:06AM

1        **MR. BARR:**  May it please the Court, counsel, ladies

2    and gentlemen of the jury.  This is what Bayer says outside of

3    the United States.  They say that PT is a useful test in the

4    face of urgent surgery; that it can inform clinical decisions.

5    This language right here that you see on the screen is what

6    this whole case is about.  Are doctors in the United States

7    entitled to this same information?  That's what you have to

8    decide.

9        Sharyn Orr lost her life because Bayer and

10   Janssen didn't tell her doctors the truth; didn't tell her

11   doctors what they know about the drug Xarelto.  Failed to tell

12   the doctors everything they know.

13       Is that a standard of conduct that we find

14   acceptable in this community?  Is that what we expect from

15   companies that make the prescription drugs that we all take?

16   You have to decide that.

17       But we have to expect better than what we saw

18   from these two companies in this trial.  We have to expect that

19   drug companies will provide doctors everything they know about

20   a drug, talk about all the risks.  They owe that to the doctors

21   and patients that have entrusted their lives to the

22   prescription drugs that they make.

23       We don't have to accept that companies can be so

24   misguided that they don't provide doctors, doctors like Dr. St.

25   Martin and Dr. Bui, everything they need to know about a drug.

9:21AM    1    burden.

9:21AM    2              **MR. BARR:**  May I continue, Your Honor?

9:21AM    3              **THE COURT:**  Yes.

9:21AM    4              **MR. BARR:**  They brought doctors who haven't seen

9:21AM    5    everything, everything that you have seen.  And the label

9:21AM    6    Dr. Parisian proposed was information that met the regulatory

9:22AM    7    mandate to provide helpful laboratory testing in the warning

9:22AM    8    section of the label.  Now, I can't stress enough that helpful

9:22AM    9    laboratory testing is required to be in Section 5, the warning

9:22AM   10    section of the label.  The language she proposed provides

9:22AM   11    useful information, and Dr. Khatib called it reckless.  Focus

9:22AM   12    in on that second step, the same information that's buried on

9:22AM   13    their website, the same information Bayer says outside of the

9:22AM   14    United States.  Is Janssen really burying reckless and

9:22AM   15    dangerous information on its website?  Or is it that the

9:22AM   16    statement is true, that Janssen doesn't really want US doctors

9:22AM   17    to find out about it?  Use your good judgment to figure that

9:22AM   18    one out.

9:22AM   19              This is what they tell doctors outside of the

9:22AM   20    United States.  It's Plaintiffs' Exhibit 190.  Read it yourself

9:22AM   21    back in the jury room.  You're going to have it back there with

9:22AM   22    you.  It's what Bayer says, it's what Bayer knows, and they

9:23AM   23    never disputed that this is what they say.  It's a strange

9:23AM   24    position, isn't it, saying to someone you can use PT to assess

9:23AM   25    anticoagulant effect when considering emergency surgery, yet

1:35PM   1   Number 3061443, and if you can just let me know when you have
1:36PM   2   that in front of you.
1:36PM   3   **A.**   I do.
1:36PM   4   **Q.**   Okay.  And this was the email that was sent to you that
1:36PM   5   you testified about last week, and you testified that you have
1:36PM   6   no reason to doubt that you did, in fact, receive this email;
1:36PM   7   correct?
1:36PM   8   **A.**   Correct.  If it was sent from -- if I'm on the "to" list,
1:36PM   9   I would have received it, sure.
1:36PM   10  **Q.**   Can you repeat your answer?  We had difficulty hearing you
1:36PM   11  here.
1:36PM   12  **A.**   Oh, yes.  I was saying I have no reason to doubt it,
1:36PM   13  because I'm on there on the "to" distribution list.
1:36PM   14  **Q.**   Okay.  So you're on the "to" distribution list of the
1:36PM   15  email from Lori Birkenberger; correct?
1:36PM   16  **A.**   That is correct.
1:36PM   17  **Q.**   Okay.  And it's your testimony from last week that you
1:36PM   18  don't recall the email.  Is that still true today, that you do
1:36PM   19  not recall receiving this email?
1:36PM   20  **A.**   That is correct, yes.
1:36PM   21  **Q.**   Okay.  Now, let me ask you a little bit about that.  You
1:37PM   22  know, I may not recall an email that I received, you know,
1:37PM   23  yesterday, but do you have any reason to believe that when you
1:37PM   24  received this email, you would not have received it -- you
1:37PM   25  would not have read it at the time?

OFFICIAL TRANSCRIPT

1:37PM   1   A.   Yes, that's actually a good possibility, because in 2014 I

1:37PM   2   was involved in other projects, and Lori had sent me saying

1:37PM   3   something for appreciation what's going in Canada.  If she had

1:37PM   4   specifically said, "Look at it and you review it and let me

1:37PM   5   know if you have anything", I would have probably looked at it

1:37PM   6   in more detail, but what she said was for appreciation.  I may

1:37PM   7   have looked at the email without spending too much time on it.

1:37PM   8   Q.   Okay.  Let me ask you this.  Independent of the email, did

1:37PM   9   anyone from Janssen or Bayer ask you to review the Health

1:38PM   10  Canada clarification request response of November of 2014?

1:38PM   11  A.   I don't recollect anybody doing that because, again, I got

1:38PM   12  off the project for two and a half years, so I wasn't the

1:38PM   13  principal contact or the principal regulatory calling on the

1:38PM   14  team.

1:38PM   15  Q.   Mr. Jalota, we may -- Mr. Jalota, if I can interrupt you.

1:38PM   16  You may want to slow down just a little bit.  Because the court

1:38PM   17  reporter can't see you speaking, it makes it difficult.  If you

1:38PM   18  could just slow down and try to speak clearly into the

1:38PM   19  microphone, that should help the court reporter in giving your

1:38PM   20  answers.  So if you want to repeat your answer --

1:38PM   21  A.   Actually, you know what?  Do you mind doing me a favor?

1:38PM   22  Could you maybe mute your phone while I talk, because I'm

1:38PM   23  getting some background sounds.

1:38PM   24  Q.   I'm not sure if we can do that.

1:38PM   25  A.   Okay.  Let me just -- I'll try again.  So do you mind

1:38PM   1   repeating the question again, please?

1:39PM   2   **Q.**   Sure.  I asked you whether or not independent of the

1:39PM   3   email, had anyone from Bayer or Janssen requested that you

1:39PM   4   review the Health Canada clarification response from November

1:39PM   5   of 2014?

1:39PM   6   **A.**   And so my response is I don't recall, but what I'm saying

1:39PM   7   is because I've not been involved -- because I was not actively

1:39PM   8   involved for two and a half years, they wouldn't have contacted

1:39PM   9   me unless it was something specifically for like a management

1:39PM  10   review or for historical purposes.

1:39PM  11   **Q.**   Okay.  So at this time in November of 2014, you were a

1:39PM  12   senior director in the regulatory affairs department, correct,

1:39PM  13   at Janssen?

1:39PM  14   **A.**   Yes, I was.

1:39PM  15   **Q.**   Okay.  And you did not have day-to-day responsibility for

1:39PM  16   Xarelto, but your direct report, Lori Birkenberger, who sent

1:40PM  17   this email to you on November 9th, 2014, she did in fact have

1:40PM  18   Xarelto responsibility here in the United States; is that

1:40PM  19   correct?

1:40PM  20   **A.**   That is correct.

1:40PM  21   **Q.**   Okay.  Mrs. Birkenberger forwarded you this email, and if

1:40PM  22   we can look back at the email, she says to you, "F.Y.I., for

1:40PM  23   appreciation what's going on in Canada."  Do you see that?

1:40PM  24   **A.**   I do.  I did see the note from Dr. Birkenberger, yes.

1:40PM  25   **Q.**   Okay.  Now, what she has done here is forwarded an email

1:40PM  1    that starts at the bottom of this page on Plaintiffs' Exhibit

1:40PM  2    191, which is an email from Natasha Sidhu at Bayer to several

1:40PM  3    employees at Bayer and Janssen in which the subject is

1:40PM  4    "Canadian Xarelto class label -- review needed by noon November

1:40PM  5    20th"; correct?

1:40PM  6    A.   That is correct.

1:40PM  7    Q.   Okay.  And she copies on this email several people from

1:41PM  8    Janssen, including Lori Birkenberger, Purve Patel and Chris

1:41PM  9    Nessel, Dr. Nessel; correct?

1:41PM  10   A.   That is correct.

1:41PM  11   Q.   Okay.  Did you have an understanding that along with

1:41PM  12   Miss Birkenberger, that Purve Patel as well as Dr. Nessel were

1:41PM  13   involved in the activities related to Health Canada's

1:41PM  14   clarification request in November of 2014?

1:41PM  15   A.   I don't.  Other than seeing this note, I wouldn't have

1:41PM  16   known.  The only thing I can say to you is Miss Purve Patel and

1:41PM  17   Dr. Nessel are involved in day-to-day activities of Xarelto, so

1:41PM  18   if it -- it's perfectly logical for them to be copied on this

1:41PM  19   letter.

1:41PM  20   Q.   Okay.  And so Purve Patel also worked in the regulatory

1:41PM  21   affairs department; is that right?

1:42PM  22   A.   That is correct.

1:42PM  23   Q.   And she would have had Xarelto responsibilities here in

1:42PM  24   the United States as well; is that correct?

1:42PM  25   A.   That is correct.

1:42PM  1   Q.   Okay.  And both Purve Patel and Lori Birkenberger reported
1:42PM  2   to you as their supervisor; correct?
1:42PM  3   A.   That is correct.
1:42PM  4   Q.   Okay.  Attached to the email that you received was a draft
1:42PM  5   response to the Health Canada clarification request, and we
1:42PM  6   will give you a copy of that, which is 3061444.  Do you have
1:42PM  7   that?
1:42PM  8   A.   I just received it, yes.
1:42PM  9   Q.   Okay.  And the Plaintiffs are offering this 306144
1:42PM  10  (verbatim) as Plaintiffs' Exhibit 192 for the trial.
1:42PM  11          And you were shown this document last week in your
1:42PM  12  testimony.  This is the attachment to the email.  Do you have
1:43PM  13  recollection of reviewing this draft response to Health Canada
1:43PM  14  back in November of 2014?
1:43PM  15  A.   No, I do not.
1:43PM  16  Q.   Okay.  Do you have any reason to believe that you would
1:43PM  17  not have reviewed this attachment when you received the email
1:43PM  18  from Miss Birkenberger in November of 2014?
1:43PM  19  A.   Again, unless -- unless Miss Birkenberger asked me to look
1:43PM  20  at something specifically, I would have not -- I would have not
1:43PM  21  reviewed it.  I receive so many things.  Unless somebody
1:43PM  22  specifically tells me to look at something, I'd find it and may
1:43PM  23  look at it at a future date, but I don't recollect seeing it.
1:43PM  24  Q.   Okay.  Well, we'll get back to that.  Let me ask you a
1:43PM  25  couple of questions about the actual response to Health Canada,

2456

1:46PM  1  it looks like Bayer is providing an Executive Summary, and they

1:46PM  2  state at the bottom that "The Xarelto product monograph

1:46PM  3  includes the available information on coagulation monitoring

1:46PM  4  and laboratory testing from the Xarelto clinical development

1:46PM  5  program, including the correlation between rivaroxaban plasma

1:46PM  6  concentration and commonly used coagulation tests."  Do you see

1:47PM  7  that?

1:47PM  8  A.   I do.

1:47PM  9  Q.   Okay.  And were you aware that the product monograph, the

1:47PM  10  label, in Canada for Xarelto included information related to

1:47PM  11  the correlation between Xarelto concentration levels and

1:47PM  12  commonly used coagulation tests?

1:47PM  13  A.   No, I didn't.  I mean, all I can say to you is that could

1:47PM  14  be what Canada -- what they would have submitted very early on

1:47PM  15  may have been very similar to what we submitted in Section 12.

1:47PM  16  But other than that, I don't know what negotiations took place

1:47PM  17  at Health Canada.

1:47PM  18  Q.   Okay.  So it's your testimony you were not involved in any

1:47PM  19  of the further labeling work on Xarelto in Canada after the

1:47PM  20  early approval from Xarelto in Canada; is that right?

1:48PM  21  A.   So what happened was Janssen and Bayer collaborated very

1:48PM  22  closely, so we would have got -- we would have received

1:48PM  23  documents here -- we would have received some of the key label

1:48PM  24  changes that Bayer would have sent us just for information,

1:48PM  25  nothing else, because we -- we weren't responsible for the

OFFICIAL TRANSCRIPT

3:42PM    1           And this was signed by the jury foreperson on

3:42PM    2   June 12th, 2017.  Members of the jury, is that your verdict?

3:42PM    3         (All jurors indicating in the affirmative.)

3:42PM    4         **THE COURT:**  Does anybody wish the jury to be polled?

3:42PM    5         **MR. BIRCHFIELD:**  No, Your Honor.

3:42PM    6         **MS. WILKINSON:**  No, Your Honor.

3:42PM    7         **THE COURT:**  Okay.  Then jury, we'll make this a part

3:42PM    8   of the record, and the jury is discharged with the thanks of

3:42PM    9   the Court.

3:42PM   10         **THE CASE MANAGER:**  All rise.

3:42PM   11         (Whereupon the jury was excused from the courtroom.)

3:43PM   12         **THE COURT:**  Okay.  Court will stand in recess.

           13

           14

           15

           16                 **CERTIFICATE**

           17         I, Tana J. Hess, CCR, FCRR, Official Court Reporter for the

           18   United States District Court, Eastern District of Louisiana, certify

           19   that the foregoing is a true and correct transcript, to the best of

           20   my ability and understanding, from the record of proceedings in the

           21   above-entitled matter.

           22

           23

           24                Tana J. Hess, CCR, FCRR, RMR

           25                Official Court Reporter