1               UNITED STATES DISTRICT COURT

2             SOUTHERN DISTRICT OF MISSISSIPPI

3

4

5   IN RE:  XARELTO              *
    (RIVAROXABAN) PRODUCTS       *
6   LIABILITY LITIGATION         *
                                 *
7   THIS DOCUMENT RELATES TO:    *   Docket No.: 14-MD-2592
                                 *   Section "L"
8   *Dora Mingo, et al. v.*       *   Jackson, Mississippi
    *Janssen Research &*          *   August 7, 2017
9   *Development, LLC, et. al.,*  *
    Case No.: 15-CV-3469         *
10  * * * * * * * * * * * * * * * *

11               VOLUME I- MORNING SESSION
              TRANSCRIPT OF JURY TRIAL PROCEEDINGS
12           BEFORE THE HONORABLE ELDON E. FALLON
                UNITED STATES DISTRICT JUDGE
13

14  APPEARANCES:

15

    For the Plaintiffs'
16  Liaison Counsel:            Gainsburg Benjamin David
                                  Meunier & Warshauer
17                              BY:  GERALD E. MEUNIER, ESQ.
                                2800 Energy Centre
18                              1100 Poydras Street
                                New Orleans, Louisiana 70163
19

20
    For the Plaintiffs:         Beasley Allen
21                              BY:  ANDY BIRCHFIELD, ESQ.
                                P.O. Box 4160
22                              Montgomery, Alabama 36103

23

24

25

                     OFFICIAL REALTIME TRANSCRIPT

```
 1    APPEARANCES:

 2                              Gainsburg Benjamin Davis
                                  Meunier & Warshauer
 3                              BY:  WALTER C. MORRISON, IV, ESQ.
                                240 Trace Colony Park Drive
 4                              Suite 100
                                Ridgeland, Mississippi 39157
 5

 6
                                Goza Honnold
 7                              BY:  BRADLEY D. HONNOLD, ESQ.
                                11181 Overbrook Road, Suite 200
 8                              Leawood, Kansas 66211

 9

10                              The Lambert Firm
                                BY:  EMILY JEFFCOTT, ESQ.
11                              701 Magazine Street
                                New Orleans, Louisiana 70130
12

13
      For the Defendant Bayer
14    HealthCare Pharmaceuticals
      Inc. and Bayer Pharma AG:   Mitchell, Williams, Selig, Gates &
15                                  Woodyard, P.L.L.C.
                                BY:  LYN P. PRUITT, ESQ.
16                              425 W. Capitol Avenue, Suite 1800
                                Little Rock, Arkansas 72201
17

18
                                Watkins & Eager, PLCC
19                              BY:  WALTER T. JOHNSON, ESQ.
                                400 East Capitol Street
20                              Jackson, Mississippi 39201

21

22    For Janssen Pharmaceuticals,
      Inc. and Janssen Research &
23    Development, LLC:          Barrasso Usdin Kupperman Freeman &
                                  Sarver, LLC
24                              BY:  RICHARD E. SARVER, ESQ.
                                909 Poydras Street, 24th Floor
25                              New Orleans, Louisiana 70112
```

OFFICIAL REALTIME TRANSCRIPT

1   APPEARANCES:

2

3   Official Court Reporter:      Jodi Simcox, RMR, FCRR
                                  500 Poydras Street
                                  Room HB-406
4                                 New Orleans, Louisiana 70130
                                  (504) 589-7780
5

6

7   Proceedings recorded by mechanical stenography, transcript

8   produced by computer.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                    OFFICIAL REALTIME TRANSCRIPT

1                        <u>I N D E X</u>

2                                                    <u>Page</u>

3
     VENIRE SWORN                                       9
4
     JURY VOIR DIRE                                     9
5
     VOIR DIRE BY MR. BIRCHFIELD                        78
6
     VOIR DIRE BY MR. JOHNSON                           91
7
     JURY SWORN                                        115
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 08:29 | 1 | **PROCEEDINGS** |
| 08:29 | 2 | **(August 7, 2017)** |
| 08:29 | 3 | **\*\*\*\*\*\*** |
| 08:29 | 4 | |
| 08:29 | 5 | (COURT CALLED TO ORDER) |
| 08:29 | 6 | **THE COURT:** Be seated, please. Good morning, ladies |
| 08:50 | 7 | and gentlemen of the jury. My name is Eldon Fallon, and I'm |
| 08:51 | 8 | the judge who will preside over this case. I first want to |
| 08:51 | 9 | take the opportunity to welcome each of you to the court. I |
| 08:51 | 10 | know and all of you know that we have a busy life, we have |
| 08:51 | 11 | things to do, other things that you would like to be doing |
| 08:51 | 12 | rather than sitting here today. I recognize that it's an |
| 08:51 | 13 | inconvenience for you. |
| 08:51 | 14 | But I call to your attention the fact that our |
| 08:51 | 15 | country is the oldest democratic republic on the face of the |
| 08:51 | 16 | earth, and one of the reasons is that our citizens have the |
| 08:51 | 17 | opportunity and the duty and obligation to assist in the |
| 08:51 | 18 | running of the government. We have duties sometimes to serve |
| 08:51 | 19 | in the military. That's an important duty. |
| 08:51 | 20 | The other duty is a jury service. We can't |
| 08:51 | 21 | function without citizens' participation and active |
| 08:52 | 22 | participation. So although it is an inconvenience for you, I |
| 08:52 | 23 | take the opportunity to remind you of that, and to also thank |
| 08:52 | 24 | you for being here today. |
| 08:52 | 25 | This is a civil case, ladies and gentlemen. The |

OFFICIAL REALTIME TRANSCRIPT

08:52  1    person who has brought the lawsuit is Ms. Dora Mingo.  The
08:52  2    defendants, the parties sued by the plaintiff, are Janssen
08:52  3    Research & Development, LLC, Janssen Pharmaceuticals, Inc.,
08:52  4    Bayer HealthCare Pharmaceuticals, Inc., and Bayer Pharma, Inc.
08:52  5            The Bayer and Janssen defendants manufactured a
08:52  6    medication called Xarelto.  Xarelto is on the market today and
08:52  7    has been on the market continuously since 2011.  Xarelto is a
08:52  8    prescription drug.  It's an anticoagulant, sometimes called a
08:52  9    blood thinner.  The lawsuit is based upon injuries that
08:53  10   Ms. Mingo claims to have sustained due to the defective design
08:53  11   or inadequate warnings or instructions in connection with the
08:53  12   taking of Xarelto.
08:53  13           The plaintiff claims that, because Xarelto is
08:53  14   defectively designed, was sold with adequate warnings or
08:53  15   instructions to the physicians, this caused Ms. Mingo's GI
08:53  16   bleed.  She claims that this GI bleed was preventable had the
08:53  17   drug been designed differently or there had been adequate
08:53  18   warnings and instructions provided with the drug.
08:53  19           The defendants deny all of these claims, all of
08:53  20   these allegations that -- and they claim the Xarelto label
08:53  21   adequately instructed and warned about the risks of Xarelto.
08:53  22           This, ladies and gentlemen, raises a question of
08:53  23   fact, which must be decided by you, the jury.  Each of the
08:54  24   parties have a right to have their claim -- their case tried by
08:54  25   a qualified, fair, and impartial jury.  A qualified and

OFFICIAL REALTIME TRANSCRIPT

impartial jury is one which is responsible and capable and which will, without any fear, favor, bias, prejudice, sympathy, or passion, hear and decide the issues to be tried objectively and one which will render its verdict based solely on the evidence presented at this trial and the law applicable to the case as the Court gives it to you.

It is the law, ladies and gentlemen, that a juror's qualifications and impartiality may not be assumed without some inquiry.  This inquiry, which is about to be made, is known as the voir dire, or voir dire, examination.  It is a time-honored process by which the qualifications and impartiality of prospective jurors may be determined.  Its purpose, and its sole purpose, is to develop the whole truth concerning the competency of each juror, each prospective juror, his or her frame of mind, and ability to do his or her sworn duty in accordance with the juror's oath.

I will propose questions to all of you first as a group, and the answers to the questions to be put to you by the Court will not only enable the Court to determine whether any of you should be excused for cause, either upon the Court's own motion or when challenged for cause by a party, but will also allow counsel to make intelligent use of what we call peremptory challenges; that is to say, challenges which the law gives each side simply to exclude someone because they feel that this person could better serve in another jury and not

1  this particular jury.

2            It's -- of course, peremptory challenges must be

3  legal.  They can't be based on improper means, but they can be

4  excluded for any reason.  You should understand, therefore,

5  that it's expected of each of you that your answers be truthful

6  and complete.  Each juror is under a compulsion to disclose

7  upon a general question any matters which might tend to

8  disqualify him or her for any reason from sitting on this

9  particular case.  False or misleading answers, I remind you,

10  may result in the seating of a juror who might have been

11  discharged by the Court for cause or stricken through the

12  exercise of peremptory challenge and could well result in a

13  miscarriage of justice.

14            Now, my questions are not intended to pry into

15  your personal life.  It's just -- I remind you that all of us,

16  all of us, come to every occasion with baggage.  We have prior

17  experiences in our lifetime, and that sometimes affects the way

18  we look at new things.  And it's an opportunity for you to tell

19  us about those prior experiences.

20            If, for any reason, you feel that you want to

21  approach the bench, talk to me personally rather than out loud,

22  please let me know, and I'll have you come up and the attorneys

23  will also come up and we'll talk about it, if you feel that

24  anything is too private that you don't want to share with the

25  group.

OFFICIAL REALTIME TRANSCRIPT

08:57  1          First, we thank you for answering the
08:57  2  questionnaires.  The questionnaire is intended to move this
08:57  3  process along so that you don't have to be too long in
08:57  4  answering the questions.  It's been very helpful to all of us,
08:58  5  and I just have a few questions to ask of you now.
08:58  6          As I mentioned, I'll be questioning -- asking
08:58  7  you questions collectively.  They should be considered,
08:58  8  however, as being answered by you individually.  If any of the
08:58  9  answers to the following questions are yes, please raise your
08:58 10  hand and please rise and state your name and your jury number,
08:58 11  and we'll discuss it further with you.
08:58 12          I'll require that your answers be given under
08:58 13  oath, so now I'll direct my courtroom deputy to administer the
08:58 14  oath to you at this time.
08:58 15          (WHEREUPON, the venire was duly sworn.)
08:59 16          **THE COURT:**  Okay.  Ladies and gentlemen, as I said
08:59 17  before, this is a civil action.  In any civil case, the
08:59 18  plaintiff has the burden of proving his case or her case by
08:59 19  what is called a preponderance of the evidence, which means
08:59 20  that the plaintiff has to produce evidence which, considered in
08:59 21  light of all the facts, leads you to believe that what the
08:59 22  plaintiff claims is more likely true than not true.  If the
08:59 23  plaintiff fails to meet this burden, the verdict must be for
08:59 24  the defendant.
08:59 25          Those of you who may have sat on criminal cases

OFFICIAL REALTIME TRANSCRIPT

08:59  1  will have heard of proof beyond a reasonable doubt.  That
08:59  2  requirement does not apply in a civil case, and you should,
08:59  3  therefore, put it out of your mind.
08:59  4          Is there anyone who is unable or unwilling to
09:00  5  follow that time-honored rule of law?  The burden of proof is
09:00  6  more likely so than not so, not beyond a reasonable doubt in
09:00  7  this particular case.
09:00  8          Would you be unable or unwilling to firmly put
09:00  9  aside any feelings of sympathy or passion for the defendant or
09:00 10  the plaintiff and decide this case solely on the merits
09:00 11  according to the law that I will give to you?  Anyone have any
09:00 12  problem with that rule of law?
09:00 13          Why don't the individuals at this time rise and
09:00 14  introduce themselves, please, first the plaintiff lawyers.
09:00 15      MR. BIRCHFIELD:  Good morning, Your Honor.  Andy
09:00 16  Birchfield on behalf of the plaintiff, Ms. Dora Mingo.  We
09:00 17  have -- Ms. Mingo is right here at the table.  I'm from
09:00 18  Montgomery, Alabama; Emily Jeffcott is from New Orleans; Bubba
09:00 19  Morrison is from Jackson, Mississippi; and Mr. Brad Honnold
09:01 20  from Kansas City.
09:01 21      THE COURT:  My question to you, members of the
09:01 22  prospective jury, do you know any of these individuals?  Have
09:01 23  the attorneys represented you or any of your friends or anyone
09:01 24  that you're associated with?
09:01 25          And with regard to the plaintiff, does anybody

09:01  1    know the plaintiff, Ms. Mingo?

09:01  2             MR. BIRCHFIELD:  Your Honor, her daughter,

09:01  3    Miss Jileta, is not a party, but she's here today.

09:01  4             THE COURT:  Same question there.

09:01  5             All right.  Thank you very much.

09:01  6             Would the defendants please stand and introduce

09:01  7    yourself.

09:01  8             MS. PRUITT:  I'm Lyn Pruitt, I'm from Little Rock,

09:01  9    Arkansas, and along with Walter Johnson -- he's from Jackson,

09:01  10   Mississippi -- we represent the Bayer defendants.

09:02  11            MR. SARVER:  And I'm Rick Sarver, from New Orleans.

09:02  12   Along with the other two counsel, we represent Janssen.

09:02  13            THE COURT:  And the same question to you about those

09:02  14   individuals.  Does anybody know any of them?  Anybody have

09:02  15   anything to do with them?  Anybody represented them?

09:02  16            Thank you very much.

09:02  17            MR. SARVER:  Thank you, Your Honor.

09:02  18            THE COURT:  Now, ladies and gentlemen, in this claim

09:02  19   the plaintiff seeks monetary damages.  Now, we know from old

09:02  20   Biblical times that it was an eye for an eye and a tooth or a

09:02  21   tooth.  But we have learned through society that that only

09:02  22   leads to toothless and blind people, so we don't do it that way

09:02  23   anymore.  If you feel you're injured, rather than take to the

09:02  24   streets or try to do the same injury to someone that you feel

09:02  25   is responsible, you sue them in court and seek monetary

OFFICIAL REALTIME TRANSCRIPT

damages.

Does anybody have any philosophical or religious or personal problems with anyone filing a suit in court and seeking monetary damages?

Do you know anything about this case?  Anybody talk to you about this case, other than the questionnaires?  Have you seen anything in the newspaper or read anything in any other magazine, social media, or anything of that sort?  Heard anything on the radio?  Saw anything on television?  Anybody know anything or been exposed to anything in the preses or any other social media about this particular case?

Have any of your answers changed since you've filled out the questionnaire?  Anybody has had anything that they need to add since you filled out the questionnaire?

If you were one of the parties sitting at these tables, would you be satisfied having a juror in your state of mind decide the case if you would switch places with them?  Do you know of any reason why you wouldn't want to be tried by someone in your present state of mind?

Anyone have anything else on their mind which would in any effect affect your ability to serve as a juror?  Anything on your mind?  You can come to the bench if you would like or just tell us about it.  Anything on your mind in that respect?

Yes.  Would you please rise, ma'am.

OFFICIAL REALTIME TRANSCRIPT

|       |    |                                                                                 |
|-------|----|---------------------------------------------------------------------------------|
| 09:05 | 1  | **PROSPECTIVE JUROR NO. 1:**  Margaret Root, No. 1.  I                           |
| 09:05 | 2  | would like to approach privately, please.                                       |
| 09:05 | 3  | **THE COURT:**  Sure.  Come up.                                                  |
| 09:05 | 4  | (WHEREUPON, the following proceedings were held at                              |
| 09:05 | 5  | the bench.)                                                                      |
| 09:05 | 6  | (WHEREUPON, Juror No. 1 approached the bench.)                                   |
| 09:05 | 7  | **THE COURT:**  Yes, ma'am.  Thank you for serving.  I                           |
| 09:05 | 8  | really appreciate you coming today.                                             |
| 09:05 | 9  | **JUROR NO. 1:**  Thank you.  It's just I take a                                 |
| 09:05 | 10 | diuretic, and I take several drugs that you're supposed to take                 |
| 09:05 | 11 | a lot of water with, and I have to go to the bathroom a lot.                     |
| 09:05 | 12 | **THE COURT:**  Sure.  Okay.                                                     |
| 09:05 | 13 | **JUROR NO. 1:**  And the idea of sitting for hours                              |
| 09:05 | 14 | without a break...                                                              |
| 09:05 | 15 | **THE COURT:**  No, we won't do that.  We'll take a                              |
| 09:06 | 16 | break.  Also, if there's any time during the time that I                        |
| 09:06 | 17 | haven't taken a break and you need to, just mention it to Dean,                 |
| 09:06 | 18 | and we'll take an immediate break, and for everybody.                           |
| 09:06 | 19 | **JUROR NO. 1:**  Thank you.  I appreciate it.                                   |
| 09:06 | 20 | **THE COURT:**  Thank you for being here.                                        |
| 09:06 | 21 | Anything from anybody?                                                           |
| 09:06 | 22 | **MR. BIRCHFIELD:**  No.                                                         |
| 09:06 | 23 | **MS. PRUITT:**  No, Your Honor.                                                 |
| 09:06 | 24 | (WHEREUPON, Juror No. 1 returned to her seat.)                                   |
| 09:06 | 25 | **THE COURT:**  Wait.  Stay with me, folks.                                      |

09:06  1              (WHEREUPON, Juror No. 9 approached the bench.)

09:06  2              **THE COURT:**  Hi.  How are you, sir?  Would you give us

09:06  3  your name and number, please?

09:06  4              **JUROR NO. 9:**  My name is Rossie Coates, Jr., No. 9.

09:06  5              **THE COURT:**  Okay, Mr. Coates.

09:06  6              **JUROR NO. 9:**  Well, I have a hardship problem --

09:06  7  well, a hardship problem, but also a problem with me serving at

09:06  8  this time.

09:06  9              **THE COURT:**  Yes, sir.

09:06  10             **JUROR NO. 9:**  Well, initially, I stated on the

09:06  11  questionnaire I have a church revival this week that I was

09:06  12  going on.  In addition to that, I live on a farm and I have hay

09:06  13  to cut.  And my brother had a heart attack two weeks ago, and

09:07  14  he helped me.  Now I have to do it by myself.  And serving

09:07  15  maybe a week, but two weeks at a time is a hardship on me.  But

09:07  16  other than that -- you know, that's the time frame.  Other than

09:07  17  that, I don't have a problem.

09:07  18             **THE COURT:**  Any questions?

09:07  19             **MR. BIRCHFIELD:**  Sir, the revival that you have going

09:07  20  on now, is it at night?

09:07  21             **JUROR NO. 9:**  It's at night.

09:07  22             **MR. BIRCHFIELD:**  But the biggest problem would be

09:07  23  the --

09:07  24             **JUROR NO. 9:**  The hay during the daytime.  That would

09:07  25  delay me.  So I need to cut it.  If it rains, it's going to

OFFICIAL REALTIME TRANSCRIPT

09:07  1    delay me even more.

09:07  2            MR. JOHNSON:  Mr. Coates, where do you live?

09:07  3            JUROR NO. 9:  I live in Daleville, Mississippi, about

09:07  4    108 miles from here.

09:07  5            THE COURT:  Okay.  Why don't you go back to your

09:07  6    chair, and we'll take that under consideration and maybe we'll

09:07  7    excuse you, sir.

09:07  8            JUROR NO. 9:  Thank you, sir.

09:07  9            THE COURT:  I hope it doesn't rain so you can get

09:07  10   that hay cut.

09:07  11           JUROR NO. 9:  I appreciate it.  Thank you.

09:08  12           (WHEREUPON, Juror No. 9 returned to his seat.)

09:08  13           (WHEREUPON, Juror No. 11 approached the bench.)

09:08  14           THE COURT:  Yes, ma'am.  Give us your name and

09:08  15   number.

09:08  16           JUROR NO. 11:  Mary Martin, No. 11.  I just have a

09:08  17   hardship of I have a three-year-old and a five-month-old that I

09:08  18   don't have child care for on Fridays because I stay at home on

09:08  19   Fridays.

09:08  20           THE COURT:  I see.  Where do you live?

09:08  21           JUROR NO. 11:  I live in Brandon.

09:08  22           THE COURT:  I'm sorry?

09:08  23           JUROR NO. 11:  Brandon.  Reservoir, Brandon.

09:08  24           THE COURT:  Is there any way you can make

09:08  25   arrangements for them on Friday?  We've got probably two weeks,

OFFICIAL REALTIME TRANSCRIPT

1   so it would be two Fridays.

2          JUROR NO. 11:  I could try.  If -- I mean, if I knew

3   it was just one week.  I just don't know how long.

4          THE COURT:  Yeah.  We've been -- we expect to be two

5   weeks.  It won't be three, that's for sure, three Fridays; it

6   will be two Fridays.  What do you think?

7          JUROR NO. 11:  I could try.  I just don't know how

8   this works as far as, you know, if I don't have someone.

9          THE COURT:  We stop about 5:00 or 5:30, absolutely at

10  the most.  How long does it take you to get home?

11         JUROR NO. 11:  It will probably take about 45 minutes

12  from here with 5:00 traffic.

13         THE COURT:  Any questions from anybody?

14         MS. PRUITT:  No questions.

15         THE COURT:  Okay.  Ms. Martin, why don't you go back

16  to your seat.

17         (WHEREUPON, Juror No. 11 returned to her seat.)

18         (WHEREUPON, Juror No. 21 approached the bench.)

19         THE COURT:  Yes, ma'am.  Would you give us your name.

20         JUROR NO. 21:  I'm Mary Pipper, P-I-P-P-E-R.  I'm

21  Juror No. 21.  I'm in graduate school.

22         THE COURT:  You're starting school?

23         JUROR NO. 21:  Yes, sir.  And I'll miss class.

24  And -- on the 18th of August, and we get participation points.

25  And everybody's got a job, but we're a little shorter staffed.

OFFICIAL REALTIME TRANSCRIPT

09:10   1    And so if I'm not there, it makes it harder on my coworkers,

09:10   2    which also makes it harder on my patients.

09:10   3            THE COURT:  One thing, we probably will finish this

09:10   4    in two weeks.

09:10   5            JUROR NO. 21:  Okay.

09:10   6            MR. BIRCHFIELD:  The 18th would be the Friday week,

09:10   7    so we'd be on the second Friday, I believe.

09:10   8            THE COURT:  Yeah.  Any questions?

09:10   9            MR. BIRCHFIELD:  So you're working now as a nurse;

09:10   10   right?

09:10   11           JUROR NO. 21:  I work full-time, yes, sir.

09:10   12           MR. BIRCHFIELD:  Are you taking classes?  Are you

09:10   13   studying now?

09:10   14           THE COURT:  She's enrolled in a Ph.D. program.  She's

09:10   15   working as an RN.

09:10   16           JUROR NO. 21:  Yes, sir.

09:11   17           MR. BIRCHFIELD:  So is your only difficulty on the

09:11   18   18th or is there a difficulty for you during the two weeks up

09:11   19   to the 18th?

09:11   20           JUROR NO. 21:  As far as showing up for class, it's

09:11   21   only the 18th.  But between then and now, it will be harder on

09:11   22   my coworkers and my patients because we're a smaller facility.

09:11   23   And then financially it's a pretty significant burden for me.

09:11   24   I'm solely responsible for myself.  But as far as school goes,

09:11   25   the semester starts, I believe, this week or next week.  So

```
09:11  1   I'll also have schoolwork and everything I need to be doing as
09:11  2   well.
09:11  3             MR. BIRCHFIELD:  Okay.  Schoolwork and work at the
09:11  4   same time?
09:11  5             JUROR NO. 21:  Yes, sir.
09:11  6             THE COURT:  Okay.
09:11  7             MS. PRUITT:  Would you be willing to serve but for
09:11  8   the 18th?
09:11  9             JUROR NO. 21:  Is that -- I didn't know if that was
09:11  10  an option.
09:11  11            MS. PRUITT:  There's a possibility we could get
09:11  12  finished earlier than that.  Would you be willing to serve even
09:11  13  though you have the job?
09:11  14            JUROR NO. 21:  Right.  If I'm selected, yes.
09:12  15            THE COURT:  What was the question that you asked?
09:12  16            MS. PRUITT:  I asked her if she would be willing to
09:12  17  serve if we finished by the 17th, and she said yes.
09:12  18            THE COURT:  Okay.  All right.  Thank you, ma'am.
09:12  19  Would you go back to your seat, and we'll talk later.
09:12  20            JUROR NO. 21:  Yes.
09:12  21            (WHEREUPON, Juror No. 21 returned to her seat.)
09:12  22            THE COURT:  Let me ask you all about her.  One thing,
09:12  23  she has also a family member that took blood thinners.  She is
09:12  24  in her fall semester.  She's in a Ph.D. program.  She's working
09:12  25  as a nurse at Surgicare of Jackson.  What's your input?
```

OFFICIAL REALTIME TRANSCRIPT

09:12  1          **MR. BIRCHFIELD:**  Your Honor, she's one that we

09:12  2    suggested we bring her in, I think with her work schedule, her

09:12  3    connections with the medical field.  But working and being a

09:12  4    student at the same time, I think that it would be difficult

09:12  5    for her to give us the attention that we need.  And to say that

09:12  6    we'll finish before the 18th, I think that's a possibility, but

09:12  7    that's cutting it too close.  I would be inclined to excuse her

09:13  8    on hardship.

09:13  9          **THE COURT:**  What's the defendants say?

09:13  10          **MS. PRUITT:**  Your Honor, our position is she does

09:13  11    have a job, and so does everybody else over there.  She

09:13  12    acknowledged that she would be willing to serve.  I know that

09:13  13    she works in the health care field, but a lot of people do.

09:13  14    And the fact that a relative took blood thinners, we've got a

09:13  15    lot of people on this panel whose relatives took blood

09:13  16    thinners.  I don't think that should be a reason to excuse her.

09:13  17    If we can explore it, if they can explore it.

09:13  18          **THE COURT:**  Let me get her back up, then.

09:13  19          Ms. Pipper, would you come forward, please?

09:13  20          (WHEREUPON, Juror No. 21 approached the bench.)

09:13  21          **THE COURT:**  I'm sorry, Ms. Pipper.  Maybe I

09:13  22    mispronounced your name.

09:13  23          **JUROR NO. 21:**  It's okay.

09:13  24          **THE COURT:**  In your questionnaire you mentioned to us

09:13  25    that someone in your family took a blood thinner.  What was

OFFICIAL REALTIME TRANSCRIPT

1    that about?

2            JUROR NO. 21:  Oh, my grandfather took a blood

3    thinner.

4            THE COURT:  Do you know what it was?

5            JUROR NO. 21:  It was probably -- he was on several

6    things, but I know he was at least taking aspirin.  And I'm not

7    sure of the specifics, but I know he's on blood thinners and he

8    bruises real easily.

9            THE COURT:  I see.  All of us are concerned about

10   your schooling.  How is that?  Is there any way that you can

11   make some arrangements for that or...

12           JUROR NO. 21:  So far the only excuse that's been

13   acceptable for missing class has been somebody was flooded in

14   because we meet only once a month.  It's a hybrid program, and

15   we meet only once a month, and so attendance is really

16   important to them.

17               And it's usually when we give presentations,

18   review past papers.  So that's when we receive, like, feedback

19   for improvement.  And also too, this is the semester before we

20   sit for comps, and so -- and we also have, like, a group

21   presentation we need to be doing.  And so we would be receiving

22   a lot of information.

23           THE COURT:  Would you be doing that the first day?

24           JUROR NO. 21:  The first day would be more like going

25   over everything, and then I believe it's when we'll start

OFFICIAL REALTIME TRANSCRIPT

09:15  1    talking about comps.  I'm not really sure.  They haven't

09:15  2    released our syllabus yet, so I'm not 100 percent sure what it

09:15  3    will be.

09:15  4            THE COURT:  This is on the 18th?

09:15  5            MR. BIRCHFIELD:  Your first day of class is on the

09:15  6    18th?

09:15  7            JUROR NO. 21:  Yes.  So I have two classes on the

09:15  8    18th, and then one class on Saturday, which would be the 19th.

09:15  9    And, like, you know, we're in class for six hours apiece.

09:15  10           THE COURT:  And the 18th is the second --

09:15  11           MR. BIRCHFIELD:  -- Friday.

09:15  12           THE COURT:  -- Friday.  It will be in the defendant's

09:15  13   case.  Will you be finished then?

09:15  14           MS. PRUITT:  We could possibly be finished.

09:15  15           THE COURT:  In that situation, do you want to chance

09:15  16   it, or do you want to...

09:16  17           JUROR NO. 21:  I need to go to class.  And it's out

09:16  18   of town, too.  So I go to Hattiesburg.

09:16  19           THE COURT:  Where is it, Hattiesburg?

09:16  20           JUROR NO. 21:  Yes, sir.

09:16  21           THE COURT:  All right.  Thank you very much.

09:16  22           (WHEREUPON, Juror No. 21 returned to her seat.)

09:16  23           THE COURT:  I'll excuse her for cause.  Let's go back

09:16  24   to the other one too that we dealt with.

      25           Mr. Coates -- what was it?  Coates?

OFFICIAL REALTIME TRANSCRIPT

09:16    1          **THE DEPUTY CLERK:**  No. 9.

09:16    2          **MR. BIRCHFIELD:**  Rossie Coates.

09:16    3          **THE COURT:**  No, it's not No. 9; it's 13.  Well, in

09:16    4    any event, that's your 13.  What about Coates?  Any input on

09:16    5    that?

09:16    6          **MR. BIRCHFIELD:**  I mean, Your Honor, I think he would

09:16    7    be an excellent juror, but I think for the hardship, he should

09:17    8    be excused.

09:17    9          **MR. JOHNSON:**  I agree with you.  I've had to cut hay

09:17   10    before.

09:17   11          **THE COURT:**  Okay.  Let's excuse him, 9.

09:17   12              Anyone else that we did?

09:17   13          **THE DEPUTY CLERK:**  We had No. 1.

09:17   14          **MR. BIRCHFIELD:**  She needs the restroom breaks.

09:17   15          **THE DEPUTY CLERK:**  Margaret Root.

09:17   16          **THE COURT:**  Say again?

09:17   17          **THE DEPUTY CLERK:**  Margaret Root, R-O-O-T.

09:17   18          **MR. JOHNSON:**  Your Honor, she was the first one that

09:17   19    came up.

09:17   20          **MR. BIRCHFIELD:**  She's on the diuretics and needs

09:17   21    frequent restroom breaks.

09:17   22          **THE COURT:**  Okay.  That's fine.

09:17   23          **THE DEPUTY CLERK:**  She already went to the bathroom

09:17   24    while we were talking.

09:17   25              (WHEREUPON, Juror No. 19 approached the bench.)

OFFICIAL REALTIME TRANSCRIPT

| | | |
|---|---|---|
| 09:17 | 1 | **THE COURT:**  Yes, ma'am.  Would you give us your name |
| 09:17 | 2 | and jury number, please. |
| 09:17 | 3 | **JUROR NO. 19:**  Mary Lou Powell, No. 19. |
| 09:18 | 4 | **THE COURT:**  Okay.  Ms. Powell. |
| 09:18 | 5 | **JUROR NO. 19:**  I work for an attorney. |
| 09:18 | 6 | **THE COURT:**  Yes, ma'am.  As a paralegal. |
| 09:18 | 7 | **JUROR NO. 19:**  He's a sole practicing attorney.  I do |
| 09:18 | 8 | the land work, the research, the title work.  For me to be |
| 09:18 | 9 | gone, I mean, that part of work would be just shut down. |
| 09:18 | 10 | It's -- it's just a hardship at work. |
| 09:18 | 11 | **THE COURT:**  Where is the attorney? |
| 09:18 | 12 | **JUROR NO. 19:**  In Raleigh, Smith County. |
| 09:18 | 13 | **THE COURT:**  And he does real estate work? |
| 09:18 | 14 | **JUROR NO. 19:**  He does.  I mean, that's not all he |
| 09:18 | 15 | does. |
| 09:18 | 16 | **THE COURT:**  Yeah.  And what's your role?  You do the |
| 09:18 | 17 | title searches? |
| 09:18 | 18 | **JUROR NO. 19:**  I do the title research, the warranty |
| 09:18 | 19 | deed preparation. |
| 09:18 | 20 | **THE COURT:**  Do you have anybody else in your office |
| 09:18 | 21 | that does that? |
| 09:18 | 22 | **JUROR NO. 19:**  Not that does that. |
| 09:18 | 23 | **THE COURT:**  What's the attorney's name? |
| 09:18 | 24 | **JUROR NO. 19:**  David Garner, G-A-R-N-E-R. |
| 09:18 | 25 | **THE COURT:**  What type of work does he do? |

OFFICIAL REALTIME TRANSCRIPT

09:18  1         **JUROR NO. 19:**  It's general practice.

09:19  2         **THE COURT:**  Does he represent plaintiffs or

09:19  3  defendants, or do you know?  Does he do any personal injury

09:19  4  work?

09:19  5         **JUROR NO. 19:**  He does.

09:19  6         **THE COURT:**  When he does that, does he represent the

09:19  7  plaintiff or the defendant?

09:19  8         **JUROR NO. 19:**  I would think the defendant.  But,

09:19  9  honestly, I'm not sure.  That's not my area.

09:19  10         **MR. JOHNSON:**  Your Honor, I've worked with David

09:19  11  Garner before.  He and I tried to get a case together, probably

09:19  12  about two years ago.  It was a silica case.  I don't know if

09:19  13  you remember that, a silica case in Judge Billy Joe Adams'

09:19  14  courtroom.

09:19  15         Were you aware of that?

09:19  16         **JUROR NO. 19:**  Huh-uh.

09:19  17         **MR. JOHNSON:**  You don't know me from Adam, do you?

09:19  18         **JUROR NO. 19:**  No.

09:19  19         **MR. JOHNSON:**  Okay.  That's all.

09:19  20         **MR. BIRCHFIELD:**  Ms. Powell, do you have any closings

09:19  21  that are scheduled in the next two weeks?

09:19  22         **JUROR NO. 19:**  No.

09:19  23         **MR. BIRCHFIELD:**  Okay.

09:19  24         **MS. PRUITT:**  Ms. Powell, in addition to your real

09:19  25  estate stuff, do you run the office as well and do the mail and

OFFICIAL REALTIME TRANSCRIPT

1    keep up with getting documents out the door and everything?

2              JUROR NO. 19:  I do not do the books.  I do assist

3    Mr. Garner with other things.

4              MS. PRUITT:  So you're his direct assistant?

5              JUROR NO. 19:  Yes.

6              MS. PRUITT:  And you do a lot of different tasks for

7    him other than just closings?

8              JUROR NO. 19:  I do.

9              MS. PRUITT:  Okay.

10             THE COURT:  Anything else?  Any other questions?

11             MR. BIRCHFIELD:  No, Your Honor.

12             THE COURT:  Okay.  Thank you very much, ma'am.  We'll

13   get back to you.

14             (WHEREUPON, Juror No. 19 returned to her seat.)

15             THE COURT:  Give me some input on Ms. Powell.

16             MR. BIRCHFIELD:  Your Honor, if anyone should

17   understand the importance of jury service, it would be a

18   lawyer.  I don't think that -- she has no closings scheduled in

19   the next two weeks.  I don't think that rises to the level of a

20   hardship.

21             THE COURT:  How do you all see it?

22             MR. JOHNSON:  I agree with him.  Just for the record,

23   I have worked with that lawyer.  We tried a pretty hard case

24   together as a codefendant, just for the record.

25             THE COURT:  Okay.  I'll keep her.

OFFICIAL REALTIME TRANSCRIPT

```
09:21   1              (WHEREUPON, Juror No. 17 approached the bench.)
09:21   2         THE COURT:  Give us your name and jury number.
09:21   3         JUROR NO. 17:  Veronica Lee, No. 17.
09:21   4         THE COURT:  Okay.  Ms. Lee, you're tech support for a
09:21   5    telenetwork company.
09:21   6              What's the problem, as you see it?
09:21   7         JUROR NO. 17:  The problem?  Oh, I'm moving this
09:21   8    week.  And my job don't pay me for being on jury duty, and I
09:21   9    have four underage kids.
09:21  10         THE COURT:  I'm sorry.  You have what?
09:21  11         JUROR NO. 17:  Four.
09:21  12         THE COURT:  Four children?
09:21  13         JUROR NO. 17:  Yes.
09:21  14         THE COURT:  Do you have a husband?
09:21  15         JUROR NO. 17:  We're separated.
09:21  16         THE COURT:  I'm sorry?
09:21  17         JUROR NO. 17:  We're separated.
09:21  18         THE COURT:  Any questions for Ms. Lee?
09:21  19         MR. BIRCHFIELD:  What type of work do you do,
09:21  20    Ms. Lee?
09:22  21         JUROR NO. 17:  I'm a help desk specialist in IT.
09:22  22         MR. BIRCHFIELD:  And so then they don't pay you at
09:22  23    all?
09:22  24         JUROR NO. 17:  No.
09:22  25         MR. BIRCHFIELD:  Would that present a financial
```

OFFICIAL REALTIME TRANSCRIPT

09:22  1   hardship for you?

09:22  2            JUROR NO. 17:  Yes.

09:22  3            MR. BIRCHFIELD:  And how old are your children?

09:22  4            JUROR NO. 17:  The youngest one is 1, 12, 10, and 17.

09:22  5            MR. BIRCHFIELD:  Do you have someone that takes care

09:22  6   of them while you're at work?

09:22  7            JUROR NO. 17:  They're at school.  And I have a small

09:22  8   one-year-old.

09:22  9            MR. BIRCHFIELD:  Who takes care of your one-year-old

09:22 10   when you're --

09:22 11            JUROR NO. 17:  I work from home, so I do.

09:22 12            MR. BIRCHFIELD:  Oh, I see.

09:22 13            THE COURT:  Any questions?

09:22 14            MS. PRUITT:  I don't have any questions.

09:22 15            MR. JOHNSON:  No.  Thank you very much.

09:22 16            THE COURT:  Okay.  Thank you very much.

09:22 17            (WHEREUPON, Juror No. 17 returned to her seat.)

09:22 18            THE COURT:  Usually, I don't excuse somebody for

09:22 19   working except when they work like this; if they don't work,

09:22 20   they don't get paid.  That concerns me a little bit.  I don't

09:23 21   think I can force her employer to pay her.  She's a high school

09:23 22   graduate.  She's got young kids.  My inclination is to excuse

09:23 23   her for cause.

09:23 24            Any problems with that?

09:23 25            MS. PRUITT:  No, Your Honor.

09:23 1          MR. JOHNSON:  Yes, agree, Your Honor.

09:23 2          THE COURT:  Excuse Veronica Lee for cause.

09:23 3          (WHEREUPON, Juror No. 29 approached the bench.)

09:23 4          JUROR NO. 29:  John Wilkerson, Juror No. 29.

09:23 5          THE COURT:  Okay.  Mr. Wilkerson.  Yes?

09:23 6          JUROR NO. 29:  I had -- do you want me to just tell

09:23 7  you?

09:23 8          THE COURT:  Yes.

09:23 9          JUROR NO. 29:  All right.  I had disclosed on my

09:23 10 questionnaire that my stepfather takes a lot of these blood

09:23 11 thinners.  I had a chance to learn that he does take Xarelto

09:23 12 currently, and I just wanted to disclose that.

09:23 13         THE COURT:  Okay.  Any questions?

09:23 14         MS. PRUITT:  No, I don't have any questions.

09:23 15         THE COURT:  Anything?

09:23 16         MR. BIRCHFIELD:  Would that present -- would you be

09:23 17 able to be open-minded and sit as a juror in this case?

09:24 18         JUROR NO. 29:  He tells me that's what's keeping him

09:24 19 alive.

09:24 20         MR. BIRCHFIELD:  Okay.  All right.  Thank you, sir.

09:24 21         (WHEREUPON, Juror No. 29 returned to his seat.)

09:24 22         THE COURT:  What I've been trying to do for you all

09:24 23 is exclude people who are taking Xarelto for the obvious

09:24 24 reasons.  If they have a problem with it, it's not good for the

09:24 25 defense; if they don't have a problem with it, it's a potential

OFFICIAL REALTIME TRANSCRIPT

09:24   1   problem for the plaintiffs.  That's been consistent with what
09:24   2   I've been trying to do.
09:24   3           I think it's a hot potato that's very difficult
09:24   4   to handle if all of a sudden this person's stepfather has a
09:24   5   problem.  You're not going to unring that bell.
09:24   6           MR. BIRCHFIELD:  I think he should be excused, Your
09:24   7   Honor.
09:24   8           MR. JOHNSON:  I agree with you.
09:24   9           THE COURT:  What's his name again?
09:24  10           JUROR NO. 29:  John Wilkerson.
09:24  11           THE COURT:  I excuse John Wilkerson.
09:24  12           Boy, we're getting close.
09:24  13           (WHEREUPON, Juror No. 35 approached the bench.)
09:25  14           THE COURT:  Give us your name and number, please.
09:25  15           JUROR NO. 35:  Kanavis Denson, No. 35.
09:25  16           THE COURT:  Yes, sir.  You're a student at college,
09:25  17   and you're a cashier at Sam's.
09:25  18           JUROR NO. 35:  Yes, sir.
09:25  19           THE COURT:  Okay.  What's the issue?
09:25  20           JUROR NO. 35:  I just feel like with me only being
09:25  21   22 years of age and me being so young, it's like what you said
09:25  22   earlier, you know, if we had to switch roles, I would want
09:25  23   somebody to understand the importance of the justice system,
09:25  24   which I don't really have much experience in.  I just feel like
09:25  25   it would be a big decision for me.

OFFICIAL REALTIME TRANSCRIPT

1    **THE COURT:**  Well, I think Napoleon was something like
2    24 when he conquered the world, and Julius Caesar was about the
3    same age, and Christ did it when he was 32, but you've got a
4    couple of years to go for that.
5    **JUROR NO. 35:**  Yes, sir.
6    **THE COURT:**  Youth alone doesn't mean you're not smart
7    or can't handle the problem, but I appreciate your sharing that
8    with us.
9    Anything from either side?
10    **MR. BIRCHFIELD:**  I appreciate your candor.  But you'd
11    be willing to serve and bring your life experiences to the
12    process?  That's what we're counting on.
13    **JUROR NO. 35:**  Yes, sir.
14    **THE COURT:**  Anything from the defense?
15    **MR. JOHNSON:**  You would base any decision you render
16    based on the evidence that you heard and whatever instructions
17    that the judge gave you; right?
18    **JUROR NO. 35:**  Yes, sir.
19    **THE COURT:**  And you would base your decision solely
20    on what you hear in this courtroom and not anything else?
21    **JUROR NO. 35:**  Yes, sir.
22    **THE COURT:**  Thank you very much for being candid with
23    us.  I appreciate it.
24    (WHEREUPON, Juror No. 35 returned to his seat.)
25    **THE COURT:**  Sometimes old age is a reason for

OFFICIAL REALTIME TRANSCRIPT

excluding somebody, but if we start excluding people because they're young, we're going to have a problem in this society. So unless I hear from you all to the contrary, I'll let him on.

MR. JOHNSON:  Nothing from the defendant.

MR. BIRCHFIELD:  We agree, Your Honor.

THE DEPUTY CLERK:  Next.

(WHEREUPON, Juror No. 31 approached the bench.)

THE COURT:  Yes, ma'am.  Would you give us your name and number, please.

JUROR NO. 31:  Hi.  My name is Kix Cosby.  I'm Juror No. 31.

THE COURT:  What's the last name?

JUROR NO. 31:  Cosby.

THE COURT:  Sorry, Ms. Cosby.  Go ahead.  You're a college student, and you also serve as a nanny, as I understand it?

JUROR NO. 31:  Yes, sir.  That's why I wanted to speak with you all.  Because of my work, it's very difficult for me to be off for such a long period of time because it makes it difficult for the family to be able to get off. Because for me to be off for three weeks, one or both of the parents would need to be off for three weeks because they have three children ranging from ages 3, 6 and 9.

With school coming back up, they have school pickups, after-school activities.  The youngest boy, he only

OFFICIAL REALTIME TRANSCRIPT

| | |
|---|---|
| 09:28 | 1 |
| 09:28 | 2 |
| 09:28 | 3 |
| 09:28 | 4 |
| 09:28 | 5 |
| 09:28 | 6 |
| 09:28 | 7 |
| 09:28 | 8 |
| 09:28 | 9 |
| 09:28 | 10 |
| 09:29 | 11 |
| 09:29 | 12 |
| 09:29 | 13 |
| 09:29 | 14 |
| 09:29 | 15 |
| 09:29 | 16 |
| 09:29 | 17 |
| 09:29 | 18 |
| 09:29 | 19 |
| 09:29 | 20 |
| 09:29 | 21 |
| 09:29 | 22 |
| 09:29 | 23 |
| 09:29 | 24 |
| 09:29 | 25 |

1  goes to school three days a week.  So someone would have to be
2  at home with him at least two days out of the week.  So it will
3  be a bit of a strain to have -- you know, for the parents to
4  say, "I need off because my nanny has jury duty."  It would be
5  difficult for them to do that.
6      THE COURT:  It looks like we will be able to finish
7  this case, from what the attorneys tell me, in two weeks.
8      Does that do anything to change your view of it?
9      JUROR NO. 31:  I don't know.
10     THE COURT:  How often do you serve as a nanny?
11     JUROR NO. 31:  Five days a week.
12     THE COURT:  Five days a week.  Do you live with the
13  family or do you go there?
14     JUROR NO. 31:  No, I drive to work every morning.
15     THE COURT:  Where is the work?
16     JUROR NO. 31:  In Canton.  Well, it's technically
17  Madison, but it's right off of 22.
18     THE COURT:  Okay.  Any questions?
19     MR. BIRCHFIELD:  Ms. Cosby, do you take the children
20  and drop them off at school?
21     JUROR NO. 31:  Mom drops them off at school.  I pick
22  them up.  Pickups start at 11:30 or either 2:00.  It just
23  depends on the day of the week.
24     MR. BIRCHFIELD:  The parents, what jobs do they have?
25     JUROR NO. 31:  Mom is a dentist and an instructor at

OFFICIAL REALTIME TRANSCRIPT

| | | |
|---|---|---|
| 09:29 | 1 | University of Mississippi Medical Center.  She works at the |
| 09:29 | 2 | School of Dentistry. |
| 09:29 | 3 | And Dad does pond management.  So he goes to |
| 09:29 | 4 | different ponds and lakes around the state of Mississippi, |
| 09:29 | 5 | Alabama and New Orleans.  He inspects the ponds and checks the |
| 09:30 | 6 | population of the fish and the condition of the lakes and all |
| 09:30 | 7 | that. |
| 09:30 | 8 | THE COURT:  Any questions? |
| 09:30 | 9 | MR. JOHNSON:  Let me ask you, will you get paid if |
| 09:30 | 10 | you are not being a nanny for the next two weeks? |
| 09:30 | 11 | JUROR NO. 31:  I'm not sure.  We hadn't discussed it |
| 09:30 | 12 | yet, so I'm not positive. |
| 09:30 | 13 | THE COURT:  Any questions?  Anything? |
| 09:30 | 14 | MR. BIRCHFIELD:  No, Your Honor. |
| 09:30 | 15 | THE COURT:  Okay.  We'll get back to you.  Let me |
| 09:30 | 16 | talk to counsel. |
| 09:30 | 17 | JUROR NO. 31:  Okay. |
| 09:30 | 18 | (WHEREUPON, Juror No. 31 returned to her seat.) |
| 09:30 | 19 | THE COURT:  What's your input on that? |
| 09:30 | 20 | MR. BIRCHFIELD:  Your Honor, when we're talking about |
| 09:30 | 21 | hardship on the parents' jobs, and the parents of the children, |
| 09:30 | 22 | I don't think that rises to the level of excusing her for |
| 09:30 | 23 | hardship.  I don't think we're going to get to her anyway. |
| 09:30 | 24 | MR. JOHNSON:  Well, I think that's probably true, |
| 09:30 | 25 | that we're not going to get to her, but it would be a hardship |

OFFICIAL REALTIME TRANSCRIPT

09:30   1    all right.  It would be a hardship on the parents, and I think
09:30   2    it would be a hardship on her too as well.  Just maintaining a
09:30   3    job is not always easy.
09:30   4              THE COURT:  Let's do this.  Let's put a question mark
09:30   5    by her.  We're probably not going to get to her.  But if we do,
09:31   6    flag her for me, and we may have to excuse her.
09:31   7              MR. BIRCHFIELD:  When I said that, Your Honor, I
09:31   8    didn't realize that our line is continuing to grow.  So we may
09:31   9    get to her.
09:31   10             THE COURT:  Yes, we may need her.
09:31   11             (WHEREUPON, Juror No. 39 approached the bench.)
09:31   12             THE COURT:  Yes, ma'am.  Give us your name and
09:31   13   number, please.
09:31   14             JUROR NO. 39:  Teresa Chapman, No. 39.
09:31   15             THE COURT:  And you're college-educated.  You're an
09:31   16   assistant to architects.
09:31   17                  What's your problem, ma'am?
09:31   18             JUROR NO. 39:  The issue is I have no one to take my
09:31   19   place at work, and my employer did write a letter explaining
09:31   20   that.  There's 21 people.  I'm the only administrative
09:31   21   assistant for the whole office.  Last year wouldn't have been a
09:31   22   problem.  We had a lady that does the same thing as me that
09:31   23   retired, and they've not replaced her yet.
09:31   24                  And we were told it would take like two to three
09:31   25   weeks.  The length is the main issue, that they don't have

1    anyone.  There would be no one there to do the work.

2            THE COURT:  This looks like it's going to finish in

3    two weeks.

4            JUROR NO. 39:  I still don't know.  That's -- like I

5    said, there is no one else.  There's two other ladies in the

6    area, but we don't do anything the same.  Literally, the only

7    thing they could do is answer the phones to do my part.  The

8    rest of it would just sit there.

9            THE COURT:  What do you do?  Do you run the office?

10   Or what exactly do you do?

11           JUROR NO. 39:  You could say that.  Not my title, but

12   you could say that.  I do everything clerical for everyone in

13   there from the architects to the designers to the CAD drawers

14   to just everything general office in there with all the rest of

15   it.

16           MR. BIRCHFIELD:  What do they do when you're sick?

17           JUROR NO. 39:  Well, a day or two at a time is no big

18   deal.  I've taken one day vacation this year so far.  But last

19   year, I was out two weeks for surgery, but the other lady was

20   there.  She retired in January.

21               So I hate to ask this because I wanted to come,

22   but I hate to ask this.  They just -- right now -- and business

23   is very slow.  We've talked about a temp.  There's not that

24   much cash flow coming in right now, and that's just an issue.

25   And I'm sorry.  I hate to ask that.

OFFICIAL REALTIME TRANSCRIPT

09:33  1          THE COURT:  Do you have some questions?

09:33  2          MS. PRUITT:  I just missed -- I probably didn't hear.

09:33  3  Where do you work?

09:33  4          JUROR NO. 39:  Dean and Dean Architects.

09:33  5          MS. PRUITT:  Oh, okay.  Thank you.

09:33  6          MR. JOHNSON:   No, sir.

09:33  7          THE COURT:  Okay.  We'll get back to you on it.

09:33  8          (WHEREUPON, Juror No. 39 returned to her seat.)

09:33  9          THE COURT:  I put a question mark by her because she

09:33  10 said that on her questionnaire.

09:33  11             How many do we have, Dean?

09:33  12         THE DEPUTY CLERK:  We've only gotten rid of 4 total.

09:33  13 So we have 20 available.

09:33  14         THE COURT:  20 available.

09:33  15         THE DEPUTY CLERK:  The 9 that we'll pick plus the 6

09:34  16 that will get stricken leaves us still with 20.

09:34  17         MR. MEUNIER:  20 extra.

09:34  18         MR. BIRCHFIELD:  20 more.

09:34  19         THE COURT:  What's your view?  Any input?

09:34  20         MR. BIRCHFIELD:  If we had -- if it wasn't close, I

09:34  21 would say let her go, but we've got a lot of folks here.  I

09:34  22 will be inclined to hold on to her for now.

09:34  23         THE COURT:  We have 20 extra?

09:34  24         THE DEPUTY CLERK:  Yes.

09:34  25         MR. BIRCHFIELD:  But it's highly unlikely we'd reach

OFFICIAL REALTIME TRANSCRIPT

1    her.

2             THE DEPUTY CLERK:  She's Juror No. 39.

3             THE COURT:  Let's put a question mark by her.  If we

4    need her, we're going to have to do something, but,

5    otherwise -- Teresa Chapman, bring her to my attention, please

6    if we get to her.

7             MS. PRUITT:  Okay.

8             (WHEREUPON, Juror No. 20 approached the bench.)

9             THE COURT:  Yes, sir.  Give us your name and number.

10             JUROR NO. 20:  Gary Guynes, No. 20.

11             THE COURT:  Okay.  What's your issue?

12             JUROR NO. 20:  Well, I just thought  -- it may be

13    insignificant, but my dad takes Xarelto.  I knew he was on

14    blood thinners.  I wasn't sure which one until after taking the

15    questionnaire.  I'm not really saying it's going to influence

16    me.  I just thought it needed to be said before now -- before

17    later.  And I don't know -- I don't know if -- my wife's having

18    surgery on the 23rd of this month, and if at all possible, I'd

19    like to be there, but I understand.

20             THE COURT:  We'll be finished by the 23rd.

21             JUROR NO. 20:  That would be wonderful.

22             THE COURT:  How long has your dad been taking

23    Xarelto?

24             JUROR NO. 20:  I'm going to say -- I'm going to guess

25    a year.

OFFICIAL REALTIME TRANSCRIPT

09:35  1          THE COURT:  Okay.

09:35  2          JUROR NO. 20:  He had AFib and he takes it now.

09:35  3          THE COURT:  Any questions?

09:35  4          MS. PRUITT:  Yes, Your Honor.  You didn't even know

09:35  5     which medication your dad took until after the questionnaire

09:35  6     came out?

09:35  7          JUROR NO. 20:  That's correct.

09:36  8          MS. PRUITT:  So is there anything about him taking

09:36  9     Xarelto that causes you to have any preconceived opinions or

09:36  10    ideas about this case already before you heard the evidence?

09:36  11         JUROR NO. 20:  No, ma'am.

09:36  12         MS. PRUITT:  Do you think you could set aside that

09:36  13    and not speak with your father about it if you were chosen to

09:36  14    sit as a juror?

09:36  15         JUROR NO. 20:  Sure.  I do think so.

09:36  16         MS. PRUITT:  And you would be glad to do that?

09:36  17         JUROR NO. 20:  I will.

09:36  18         MR. BIRCHFIELD:  Have you talked to your dad about

09:36  19    his experience with Xarelto?

09:36  20         JUROR NO. 20:  I mean, I'm pretty involved in his

09:36  21    medical care, so I kind of know.  I know that he tried several

09:36  22    other blood thinners until they got it corrected, and this is

09:36  23    what he's taking.  But other than that, like I said, I don't

09:36  24    have --

09:36  25         MR. BIRCHFIELD:  Okay.  What I was getting at is, at

OFFICIAL REALTIME TRANSCRIPT

| | |
|---|---|
| 09:36 | 1 the time of the questionnaire, you weren't sure? |
| 09:36 | 2         **JUROR NO. 20:**  I was pretty sure, but I asked him if |
| 09:36 | 3 he was taking Xarelto. |
| 09:36 | 4         **MR. BIRCHFIELD:**  All right.  Thank you, sir. |
| 09:36 | 5         **THE COURT:**  Okay.  All right.  Thank you, Mr. Guynes. |
| 09:36 | 6         **JUROR NO. 20:**  Yes, sir. |
| 09:36 | 7         (WHEREUPON, Juror No. 20 returned to his seat.) |
| 09:37 | 8         **THE COURT:**  I've been trying to do this for you all, |
| 09:37 | 9 exclude people who's taking it.  Unless you all agree, I will |
| 09:37 | 10 exclude him. |
| 09:37 | 11         **MR. BIRCHFIELD:**  Yes, Your Honor. |
| 09:37 | 12         **MS. PRUITT:**  Your Honor, how far have you been |
| 09:37 | 13 extending it into a family since he's not the one actually |
| 09:37 | 14 taking it? |
| 09:37 | 15         **THE COURT:**  I guess what I've tried to do is parents. |
| 09:37 | 16 I'm not as concerned about somebody who's down the line, |
| 09:37 | 17 somebody taking it unless they have some information, they live |
| 09:37 | 18 with the individual, and that sort of thing. |
| 09:37 | 19         But one of the things I've tried to do in these |
| 09:37 | 20 drug cases is to exclude people who have somebody who's taking |
| 09:37 | 21 it.  Because if something happens to them, that's a problem for |
| 09:37 | 22 the defendant.  If something doesn't happen to them, it may or |
| 09:37 | 23 may not be a problem for the plaintiffs.  So I've been |
| 09:37 | 24 excluding them. |
| 09:38 | 25         Certainly, his dad, that's a hot potato that we |

OFFICIAL REALTIME TRANSCRIPT

1    don't want to live with.

2         MS. PRUITT:  I understand your position.  We would

3    just on behalf of the defendants, because he said he didn't

4    have any preconceived ideas about it and it wouldn't affect

5    him, we're going to object for cause.  Obviously, you know,

6    they could use a strike.

7         THE COURT:  I understand.  It's Gary G-U-Y-N-E-S?

8         MR. BIRCHFIELD:  Yes.

9         THE COURT:  Okay.  I'm going to have to be a little

10   more tougher.

11        THE DEPUTY CLERK:  You still have 19 extra, Judge.

12   You're still good.

13        (WHEREUPON, Juror No. 4 approached the bench.)

14        THE COURT:  How are you, sir?  Give us your name and

15   number, please.

16        JUROR NO. 4:  Jeremy Pittman.  I don't remember my

17   number.

18        THE COURT:  Okay.  I'll get you, Mr. Pittman.  I've

19   got you.  Junior college, senior systems engineer for Pileum

20   Corporation.

21        JUROR NO. 4:  Yes, sir.  So I have some life

22   experiences that I feel may make me biased in this situation.

23        THE COURT:  Okay.

24        JUROR NO. 4:  Because before I was born, I guess my

25   mom took some certain medicine.  And throughout -- or my early

OFFICIAL REALTIME TRANSCRIPT

09:39  1    years of my life, I had some medical problems, and my
09:39  2    intestines were all turned around, and I had a second stomach
09:39  3    basically.  And so food would dump into it, and I got sick in
09:39  4    the early years of my life, and so forth, and different things
09:39  5    like that.  And so I just kind of can relate to both sides of
09:39  6    this.
09:39  7         **THE COURT:**  Well, maybe that's a good thing, from
09:39  8    your standpoint, because you can relate to both sides.
09:39  9         **JUROR NO. 4:**  I understand.
09:39  10         **THE COURT:**  I guess the question really is, is
09:39  11    whether you'd be able to listen to the evidence and give each
09:39  12    side a fair decision based solely on the evidence in the case.
09:39  13         **JUROR NO. 4:**  I feel that I could.  I mean, I also
09:39  14    have a lot of things at work.  I mean, me being here for three
09:40  15    weeks would delay some certain things.
09:40  16         **THE COURT:**  It looks like we'll be finished in two
09:40  17    weeks.
09:40  18         **JUROR NO. 4:**  Two weeks okay.
09:40  19         **THE COURT:**  Where do you live?
09:40  20         **JUROR NO. 4:**  I live in Clinton.
09:40  21         **THE COURT:**  Down the block, sort of?
09:40  22         **JUROR NO. 4:**  Yes, sir.
09:40  23         **THE COURT:**  Any questions from the plaintiff?
09:40  24         **MR. BIRCHFIELD:**  You mentioned in your questionnaire
09:40  25    with your work, you mentioned that Watkins & Eager is a client

OFFICIAL REALTIME TRANSCRIPT

09:40   1   of yours.

09:40   2            JUROR NO. 4:  I think we've done forensic work for

09:40   3   them in the past.  Not personally, I guess, but there have been

09:40   4   some things that we've done for them as a company.

09:40   5            MR. JOHNSON:  What kind of company?

09:40   6            JUROR NO. 4:  Pileum Corporation.  We're a technology

09:40   7   consulting company.  We do security work, IT work, forensic

09:40   8   work, a little bit of all of the above.

09:40   9            MR. JOHNSON:  You've not personally done any work for

09:40  10   Watkins & Eager, have you?

09:40  11            JUROR NO. 4:  Not that I recall.

09:40  12            MR. JOHNSON:  The fact that your company may have

09:40  13   done some work with Watkins & Eager --

09:40  14            JUROR NO. 4:  Yes, sir.

09:40  15            MR. JOHNSON:  -- or for Watkins & Eager, would that

09:41  16   impact or affect your ability to be fair to the plaintiff or

09:41  17   fair to the defendant?

09:41  18            JUROR NO. 4:  No, sir.

09:41  19            MR. JOHNSON:  You know, you said you might be able to

09:41  20   be fair based on your prior experiences.

09:41  21            Do you know you can be fair to both sides, or

09:41  22   you just think you might be able to be fair?

09:41  23            JUROR NO. 4:  I can hear -- I understand that there

09:41  24   are side effects to medicine.  There's unforeseen side effects

09:41  25   to medicine.  And sometimes -- I mean, I know that's why we

OFFICIAL REALTIME TRANSCRIPT

1  have the regulations that are in place now, to kind of see what

2  those are, but other times they're unforeseen.  And I guess I'm

3  one of those prime examples too that I can kind of relate to

4  that.

5          MR. JOHNSON:  Will you be fair?  Will you listen to

6  the evidence?

7          JUROR NO. 4:  I will listen to the evidence.

8          MR. JOHNSON:  And only make a decision based on the

9  evidence that you hear and the instruction that Your Honor

10  gives you?

11         JUROR NO. 4:  Yes, sir.

12         MR. JOHNSON:  Not your personal experiences

13  necessarily, but the evidence; is that right?

14         JUROR NO. 4:  Yes, sir.

15         MR. BIRCHFIELD:  At the beginning -- I mean, based on

16  your experiences, do you feel pretty strongly that you're

17  leaning one way or the other from the very beginning?

18         JUROR NO. 4:  I do feel that I could relate to the

19  patient with her experiences more than something.  So I do feel

20  that I -- after the questionnaire and everything, I guess,

21  thinking through that.

22         THE COURT:  But as counsel says, will you listen to

23  the evidence, and if the evidence doesn't support the

24  plaintiff's position, doesn't satisfy the burden of proof,

25  would you be able to rule for the defendant?

OFFICIAL REALTIME TRANSCRIPT

09:42 1              **JUROR NO. 4:**  I will listen to the evidence.  Yes,
09:42 2    sir.
09:42 3              **THE COURT:**  And if you listen to the evidence and
09:42 4    make that conclusion, will you be able to rule for the
09:42 5    defendant?  You could look them in the eye and tell them that?
09:42 6              **JUROR NO. 4:**  Absolutely.
09:42 7              **THE COURT:**  Okay.  All right.  Thanks.
09:42 8              (WHEREUPON, Juror No. 4 returned to his seat.)
09:42 9              **THE COURT:**  I won't excuse him.  We'll keep him.
09:42 10             **THE DEPUTY CLERK:**  Judge, can -- I'm sorry.  You said
09:42 11   won't?
09:42 12             **THE COURT:**  Will not.
09:43 13             (WHEREUPON, Juror No. 22 approached the bench.)
09:43 14             **THE COURT:**  Yes, sir.  Give us your name and juror
09:43 15   number.
09:43 16             **JUROR NO. 22:**  Jon Calder, No. 22.
09:43 17             **THE COURT:**  What's your issue, as you see it?
09:43 18             **JUROR NO. 22:**  I've got two scheduled trips, one on
09:43 19   the 15th and the 17th.  One for work; one for personal reasons.
09:43 20             **THE COURT:**  When are the trips?
09:43 21             **JUROR NO. 22:**  The 15th and the 17th.
09:43 22             **THE COURT:**  The 15th and the 17th.
09:43 23             **JUROR NO. 22:**  And then the last one is the last
09:43 24   Wednesday of the month to the end of Monday.
09:43 25             **THE COURT:**  Okay.

OFFICIAL REALTIME TRANSCRIPT

| | | |
|---|---|---|
| 09:43 | 1 | **JUROR NO. 22:**  So it's for Labor Day. |
| 09:43 | 2 | **THE COURT:**  It looks like this case will be, from |
| 09:43 | 3 | what counsel is telling me, about two weeks.  So that would |
| 09:43 | 4 | be -- |
| 09:43 | 5 | **MR. BIRCHFIELD:**  So your first trip, that would |
| 09:43 | 6 | impact his first trip but not the second one.  So is your first |
| 09:43 | 7 | trip, is that the business trip? |
| 09:43 | 8 | **JUROR NO. 22:**  Business, right.  To DC. |
| 09:43 | 9 | **MR. BIRCHFIELD:**  To DC? |
| 09:43 | 10 | **JUROR NO. 22:**  Yes. |
| 09:43 | 11 | **MR. BIRCHFIELD:**  Is there any way that you can get |
| 09:43 | 12 | someone else to cover that trip?  Is there any way you can |
| 09:43 | 13 | reschedule it or work around it? |
| 09:43 | 14 | **JUROR NO. 22:**  The flight's already paid for and the |
| 09:44 | 15 | hotel is already paid for. |
| 09:44 | 16 | **MR. BIRCHFIELD:**  Is that a cost that you incur or -- |
| 09:44 | 17 | **JUROR NO. 22:**  It's a cost that the company incurs. |
| 09:44 | 18 | I pay for the flight, and then I expense it. |
| 09:44 | 19 | **MR. BIRCHFIELD:**  I see. |
| 09:44 | 20 | **JUROR NO. 22:**  The hotel is already paid for. |
| 09:44 | 21 | **MR. BIRCHFIELD:**  Okay. |
| 09:44 | 22 | **THE COURT:**  Anything from the defense? |
| 09:44 | 23 | **MS. PRUITT:**  I missed what company you work for, sir. |
| 09:44 | 24 | **JUROR NO. 22:**  Common CENTS Solutions. |
| 09:44 | 25 | **MS. PRUITT:**  What is your job there? |

OFFICIAL REALTIME TRANSCRIPT

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
| 09:44 | 1  | **JUROR NO. 22:**  I'm the customer support manager.                 |
| 09:44 | 2  | **MS. PRUITT:**  You have some kind of meeting in DC that            |
| 09:44 | 3  | you're supposed to go to?                                            |
| 09:44 | 4  | **JUROR NO. 22:**  It's a conference.                                |
| 09:44 | 5  | **MS. PRUITT:**  A conference.  Do they have any other               |
| 09:44 | 6  | conferences like that that you might be able to substitute in?       |
| 09:44 | 7  | **JUROR NO. 22:**  This particular one is once every                 |
| 09:44 | 8  | year.                                                                |
| 09:44 | 9  | **MS. PRUITT:**  Have you spoken with your company about             |
| 09:44 | 10 | being called for jury duty?                                          |
| 09:44 | 11 | **JUROR NO. 22:**  Yes.                                              |
| 09:44 | 12 | **MS. PRUITT:**  What was their position on that?                    |
| 09:44 | 13 | **JUROR NO. 22:**  They said, "See if you can get out of             |
| 09:44 | 14 | it.  The hotel's already paid for."  And I haven't expensed my       |
| 09:45 | 15 | flight yet -- actually, I have expensed my flight.                   |
| 09:45 | 16 | **MS. PRUITT:**  So they've already reimbursed you?                  |
| 09:45 | 17 | **JUROR NO. 22:**  They haven't reimbursed me yet.                   |
| 09:45 | 18 | **THE COURT:**  Okay.  Anything?                                     |
| 09:45 | 19 | **MR. JOHNSON:**  No.                                                |
| 09:45 | 20 | **THE COURT:**  Okay.  Thanks for telling us that.                   |
| 09:45 | 21 | (WHEREUPON, Juror No. 22 returned to his seat.)                      |
| 09:45 | 22 | **THE COURT:**  It's a prepaid trip.  We've been excusing            |
| 09:45 | 23 | people on that basis.                                                |
| 09:45 | 24 | Any issues?  Problems?                                               |
| 09:45 | 25 | **MS. PRUITT:**  No.                                                 |

OFFICIAL REALTIME TRANSCRIPT

| | | |
|---|---|---|
| 09:45 | 1 | **MR. BIRCHFIELD:**  No, Your Honor. |
| 09:45 | 2 | **THE COURT:**  Okay.  Let's excuse him then.  Jon |
| 09:45 | 3 | Calder, C-A-L-D-E-R. |
| 09:45 | 4 | (WHEREUPON, Juror No. 26 approached the bench.) |
| 09:45 | 5 | **THE COURT:**  Come forward, please, ma'am.  Hello.  How |
| 09:45 | 6 | are you?  Would you give us your name and number, please? |
| 09:45 | 7 | **JUROR NO. 26:**  Yes, Harriet Bilbo, No. 26. |
| 09:45 | 8 | **THE COURT:**  Yes, ma'am. |
| 09:45 | 9 | **JUROR NO. 26:**  I have a work conflict.  I work for |
| 09:46 | 10 | Samsung NeuroLogica and I sell ultrasound equipment for them. |
| 09:46 | 11 | I was supposed to be on a flight to work this morning in |
| 09:46 | 12 | Portland, Maine, and then next week I'm supposed to be upstate |
| 09:46 | 13 | New York.  I just got back from Orlando last night.  So I |
| 09:46 | 14 | pretty much work traveling -- there are only five of us in the |
| 09:46 | 15 | U.S. to work for them.  So... |
| 09:46 | 16 | **THE COURT:**  Any questions, plaintiff? |
| 09:46 | 17 | **MR. BIRCHFIELD:**  Yes.  You mentioned in your |
| 09:46 | 18 | questionnaire that you also have an in-law that has worked |
| 09:46 | 19 | for -- been a representative for J&J for about ten years as |
| 09:46 | 20 | well; is that right? |
| 09:46 | 21 | **JUROR NO. 26:**  Right.  Yes. |
| 09:46 | 22 | **MR. BIRCHFIELD:**  Do you think that would affect your |
| 09:46 | 23 | ability to be fair and impartial in this case in addition to |
| 09:46 | 24 | the hardship? |
| 09:46 | 25 | **JUROR NO. 26:**  I don't. |

OFFICIAL REALTIME TRANSCRIPT

09:46  1           MR. BIRCHFIELD:  Okay.

09:46  2           JUROR NO. 26:  I don't.

09:46  3           MR. BIRCHFIELD:  You could set that aside?

09:46  4           JUROR NO. 26:  I can see these things both ways.

09:46  5           THE COURT:  It looks like the case will be two weeks,

09:47  6  rather than three.

09:47  7           JUROR NO. 26:  Right.

09:47  8           THE COURT:  But you have a trip planned for next

09:47  9  week?

09:47  10           JUROR NO. 26:  I have one.  I'm supposed to let them

09:47  11  know today whether to fly out at 2:00 today, and then next week

09:47  12  as well for an upstate New York account in a radiology group

09:47  13  there.

09:47  14           THE COURT:  Any questions from defendant?

09:47  15           MS. PRUITT:  Ms. Bilbo, thank you.

09:47  16           JUROR NO. 26:  Yes.

09:47  17           MS. PRUITT:  Has your employer been willing to work

09:47  18  with you on rescheduling these trips if it's necessary --

09:47  19           JUROR NO. 26:  They are.

09:47  20           MS. PRUITT:  -- if you're selected?

09:47  21           JUROR NO. 26:  They are.

09:47  22           MS. PRUITT:  So you don't feel like being selected

09:47  23  and having to serve for two weeks, although a pain, you don't

09:47  24  feel like it would affect your job?  Your employer would be

09:47  25  okay with that?

OFFICIAL REALTIME TRANSCRIPT

09:47  1        **JUROR NO. 26:**  Yeah.  It's just very difficult for

09:47  2   them because there are only five of us, and they've had to call

09:47  3   someone in that's not really qualified to do their work.  So

09:47  4   today, like, the demo today is a lady they called in that's

09:47  5   going to be there maybe one hour for the sales rep.

09:47  6        **MS. PRUITT:**  But they called somebody in --

09:47  7        **JUROR NO. 26:**  They did.

09:48  8        **MS. PRUITT:**  -- for your job today so you could

09:48  9   appear?

09:48 10        **JUROR NO. 26:**  They did.

09:48 11        **MS. PRUITT:**  Thank you.

09:48 12        **JUROR NO. 26:**  Uh-huh.

09:48 13        **MR. BIRCHFIELD:**  Have these flights already been

09:48 14   booked and paid for, the schedules?

09:48 15        **JUROR NO. 26:**  The one today I was able to cancel.

09:48 16   It's very dynamic.  The one next week, no.  It's been booked

09:48 17   and...

09:48 18        **THE COURT:**  Any questions further?

09:48 19             Okay.  We'll talk to you about it later,

09:48 20   Ms. Bilbo.  Thank you.

09:48 21        (WHEREUPON, Juror No. 26 returned to her seat.)

09:48 22        **THE COURT:**  What's your input on Ms. Bilbo?

09:48 23        **MS. PRUITT:**  She told me that she wouldn't suffer

09:48 24   because of having to do it.  She doesn't want to, but she

09:48 25   wouldn't lose her job or anything.  So we think she should

OFFICIAL REALTIME TRANSCRIPT

1    stay.

2              THE COURT:  I get the feeling that she could make

3    other arrangements from what she says.  Any issues?

4              Okay.  I'll keep Ms. Bilbo, then.  Keep that in

5    mind on your peremptories.

6              Let's see.  The next one.

7         (WHEREUPON, Juror No. 25 approached the bench.)

8              THE COURT:  Yes, sir.  Give us your name and number.

9         JUROR NO. 25:  William Featherston, No. 25.

10             THE COURT:  Okay.  Mr. Featherston, I know you're an

11   attorney, a sole practitioner.

12             JUROR NO. 25:  Yes, sir.

13             THE COURT:  And you know some of the attorneys here.

14             JUROR NO. 25:  Yes, sir, I do.  My main problem is

15   I'm a sole practitioner.  I have court scheduled tomorrow in

16   two different courts, and I have court scheduled next week.

17   It's a conflict with my practice, and I don't think I can get

18   out of them.

19             THE COURT:  Which attorneys do you know?

20             JUROR NO. 25:  I know Mr. Morrison, Mr. Anderson, and

21   I've consulted with Beasley Allen on cases.

22             THE COURT:  Okay.  All right.  I'm going to excuse

23   you, Mr. Featherston.  But sit there so you don't start

24   everybody leaving.  Thank you for telling us.  Good luck to

25   you.

OFFICIAL REALTIME TRANSCRIPT

| | | |
|---|---|---|
| 09:50 | 1 | **JUROR NO. 25:**  Thank you, Judge. |
| 09:50 | 2 | **THE COURT:**  Mr. Featherston, we talked about this off |
| 09:50 | 3 | the record. |
| 09:50 | 4 | **JUROR NO. 25:**  I really wanted to serve. |
| 09:50 | 5 | **THE COURT:**  I'm sorry. |
| 09:50 | 6 | (WHEREUPON, Juror No. 25 returned to his seat.) |
| 09:50 | 7 | **THE COURT:**  Yes.  We talked about Mr. Featherston |
| 09:50 | 8 | before, and he consulted with plaintiff counsel in another |
| 09:50 | 9 | matter.  The defendants raised an issue.  I think it's a |
| 09:50 | 10 | reasonable issue, particularly in view of the fact that he's a |
| 09:50 | 11 | sole practitioner and he's got other court appearances.  This |
| 09:50 | 12 | is just -- I'm going to excuse him for cause. |
| 09:50 | 13 | **THE DEPUTY CLERK:**  We're still good, Judge. |
| 09:50 | 14 | **THE COURT:**  How many do we have? |
| 09:50 | 15 | **THE DEPUTY CLERK:**  Counting the 6 strikes and 9 that |
| 09:50 | 16 | will be selected, we still have 17. |
| 09:50 | 17 | **THE COURT:**  So we still have 17 additional to the |
| 09:50 | 18 | strikes.  Okay, folks.  Hopefully this has shortened it a bit. |
| 09:50 | 19 | **MS. PRUITT:**  Your Honor, while we're here, would the |
| 09:50 | 20 | Court prefer us to call up those individuals that we had |
| 09:51 | 21 | concerns about now? |
| 09:51 | 22 | **THE COURT:**  Sure.  Whatever you tell me, I'll try to |
| 09:51 | 23 | do for you.  What do you want to do? |
| 09:51 | 24 | **MS. PRUITT:**  Okay.  I think we should call them up |
| 09:51 | 25 | here.  I just need to get my list. |

OFFICIAL REALTIME TRANSCRIPT

```
09:51   1          THE COURT:  Let's call her up.  Who do we need?
09:52   2          MS. PRUITT:  Aisha Eason.
09:52   3          THE COURT:  Everybody okay?  Ms. Eason.  Aisha Eason,
09:52   4   E-A-S-O-N.
09:52   5          (WHEREUPON, Juror No. 16 approached the bench.)
09:52   6          THE COURT:  Hi, Ms. Eason.  Thank you for being with
09:52   7   us today.  What's your name and jury number?
09:52   8          JUROR NO. 16:  Aisha Eason, No. 16.
09:52   9          THE COURT:  Okay.  And I'm going to ask the attorneys
09:52  10   whether they have any questions, and please listen closely to
09:52  11   them and answer, as I know you will, truthfully.
09:52  12          JUROR NO. 16:  Yes, sir.
09:52  13          MS. PRUITT:  Ms. Eason, when you filled out your
09:53  14   questionnaire, there were some questions about prescription
09:53  15   drugs and you answered a question about warnings.  And you
09:53  16   said, "I feel prescription drug companies no longer make an
09:53  17   effort for safety after the medications are on the market
09:53  18   because their whole purpose is to get it on the market."
09:53  19          Can you tell me how you feel about that?
09:53  20          JUROR NO. 16:  I just feel like they're just making
09:53  21   medicines just to put them out.  I don't think they -- I think
09:53  22   they find something to cure something, but it's not fully -- I
09:53  23   guess you could say they don't fully look into it.  I guess
09:53  24   it's just enough to get by.  I feel like it's enough to get by.
09:53  25   They put it out on the market because it cured it and they made
```

1   it and they seen that it cured it, but it may have cured it,

2   but it may have caused another problem at the same time.  So I

3   don't think they're weighing out all the options.

4           THE COURT:  Ms. Eason, the questions I think that we

5   have basically is whether you can be fair to both sides and

6   base your decision solely on the evidence that you hear in this

7   particular courtroom.

8           JUROR NO. 16:  Oh, yes, sir.

9           THE COURT:  Can you do that?

10          JUROR NO. 16:  Yes, sir.

11          THE COURT:  And put aside your own personal feelings,

12  whatever they may be, listen to the evidence, and if you can

13  look these defendant lawyers in the eye and say, "I can be fair

14  to your client.  If the plaintiff fails to prove his case by a

15  preponderance of the evidence, I can be fair to you and I can

16  rule in your favor."

17          Can you do that, ma'am?

18          JUROR NO. 16:  Yes, sir.

19          MS. PRUITT:  Ms. Eason, I also noted that you had a

20  bad experience at UMMC or somebody that you know has had a bad

21  experience.

22          Can you tell me about that, please, ma'am?

23          JUROR NO. 16:  I just recently lost my uncle in June

24  at UMMC, and we're thinking it's coming from a medicine that he

25  was allergic to, that he had allergies that he was allergic to.

1    And they didn't investigate like they needed to to know that.

2    He had an allergic reaction and ended up choking.

3              MS. PRUITT:  That was who?

4              JUROR NO. 16:  My uncle.

5              MS. PRUITT:  And so in your mind at least, your uncle

6    had an allergic reaction to a medicine that actually killed

7    him?

8              JUROR NO. 16:  Yes.

9              THE COURT:  Now, you know that this has nothing to do

10   with this particular case.

11             JUROR NO. 16:  Right.

12             THE COURT:  And, as you say, you had that experience,

13   but you need to put that experience to one side, listen closely

14   to the evidence, and then decide the case in accordance with

15   the evidence and the law applicable to the case.

16             Can you do that, ma'am?

17             JUROR NO. 16:  Yes, sir.

18             THE COURT:  Anything further from the plaintiff?

19             MR. BIRCHFIELD:  No, Your Honor.

20             THE COURT:  The defendant?

21             MS. PRUITT:  No.

22             THE COURT:  Thank you very much.

23             (WHEREUPON, Juror No. 16 returned to her seat.)

24             THE COURT:  You're going to have to take that into

25   consideration with peremptory challenges.  I got the feeling,

09:55  1   the lady looked you in the eye and said, "I can be fair to your
09:55  2   client."  That's the best I can hope for in a jury.  I'm going
09:56  3   to remind them of that when we get into jury charges.  So keep
09:56  4   that in mind with peremptories, but I'm going to deny the
09:56  5   motion to excuse her for cause.
09:56  6                Anyone else?
09:56  7                MR. JOHNSON:  Yes, Your Honor.  Ms. Glenda Olive.
09:56  8                THE COURT:  Olive.  Ms. Olive.  Glenda Olive.
09:56  9                THE DEPUTY CLERK:  Glenda Olive.
09:56  10               (WHEREUPON, Juror No. 28 approached the bench.)
09:56  11               THE COURT:  Ms. Olive, thank you for being here.
09:56  12   Everybody wants to thank you for coming to court today.
09:56  13               We notice that you had in your questionnaire
09:57  14   that you had a blood clot.  What was that about, ma'am?
09:57  15               JUROR NO. 28:  I had a child, and after the birth of
09:57  16   the child, I had a blood clot under my bladder.  And I had
09:57  17   to -- I had to stay in the hospital for ten days.  And after
09:57  18   that, I had to take an injection at home for ten days.  I'm not
09:57  19   sure of the medication or anything like that.  I was young.  I
09:57  20   didn't ask questions.  I just did what I needed to do to
09:57  21   survive.
09:57  22               THE COURT:  Sure.  Sure.  How long ago was that,
09:57  23   ma'am?
09:57  24               JUROR NO. 28:  That was -- my child is 18.
09:57  25               THE COURT:  18.  So it's been 18 years ago?

OFFICIAL REALTIME TRANSCRIPT

09:57  1          **JUROR NO. 28:**  Yes.

09:57  2          **THE COURT:**  Okay.  The counsel for both sides and the

09:57  3  Court needs to know whether you can listen to this case

09:57  4  closely, listen to the evidence, and make the decision solely

09:57  5  on the evidence and the law that I give to you.

09:57  6          Can you do that, ma'am?

09:57  7          **JUROR NO. 28:**  I believe I can.  I'm just not a big

09:58  8  fan of medication, period.  I have been on diabetic medication.

09:58  9  And I read a lot, and I myself took myself off of two

09:58  10  medications because I didn't like what the side effects were

09:58  11  and I did not like how they made me feel.

09:58  12          And I was on one medication.  The doctor gave it

09:58  13  to me.  I took it -- oh, I don't know -- six months to a year.

09:58  14  I didn't like the way it made me feel.  It made me gain weight.

09:58  15  And I went to him -- well, I called him and I said, "Well, I

09:58  16  don't like this medication.  Can you give me something else?"

09:58  17          He immediately said, "Okay.  You can get off it.

09:58  18  Come back in my office, and I will give you something else."

09:58  19          And when I went to his office, he tells me that

09:58  20  "My wife didn't like that either."

09:58  21          Okay.  But, you know, it affected your wife

09:58  22  negatively, so why did you give it to me?  You know what I'm

09:58  23  saying?  I'm just not a big fan of medication, period.

09:59  24          But --

09:59  25          **THE COURT:**  But some medications you agree help

OFFICIAL REALTIME TRANSCRIPT

1    people?

2              JUROR NO. 28:  Some, yes.

3              THE COURT:  Yeah.

4              JUROR NO. 28:  And I take medication.  But like I

5    said, I take myself off of medication also when I read and

6    understand the side effects and the long-term effects of that

7    medication.

8              THE COURT:  Yes, ma'am.  Okay.

9              MR. JOHNSON:  I do have a few questions.  Good

10   morning.

11             JUROR NO. 28:  Good morning.

12             MR. JOHNSON:  You were nice enough -- you gave us a

13   lot of information in that questionnaire that you filled out,

14   and you told us some things about some beliefs that you have.

15   I want to read a couple of them.

16                  "I believe prescription drugs are a money game,

17   and we are all guinea pigs."

18                  You believe that?

19             JUROR NO. 28:  I believe that.  I sure do.

20             MR. JOHNSON:  That's a strong opinion that you have.

21             JUROR NO. 28:  Yes.

22             MR. JOHNSON:  And, "Big companies are about money and

23   that these products kill us."

24             JUROR NO. 28:  Yes, I believe that.

25             MR. JOHNSON:  That's a strong opinion.

JUROR NO. 28:  Yes.

MR. JOHNSON:  That "The FDA does not have our best interests at heart.  They hide a lot of information.  It's all about the money."

Is that --

JUROR NO. 28:  That's my opinion, yes.

MR. JOHNSON:  Well, I represent one of those companies, and we rely on the FDA.  Do you think, honestly, that you might be a little tilted a little bit against the company that I represent because of these strong opinions that you have?

JUROR NO. 28:  Yes.  And the things that I went through, yes.

MR. JOHNSON:  That's understandable.  I appreciate you telling us that.

THE COURT:  Okay.  Thank you, Ms. Olive.  I appreciate it.

(WHEREUPON, Juror No. 28 returned to her seat.)

THE COURT:  I'm going to excuse Ms. Olive.

Anybody else?

All right.  Folks, let's see if we can pick up the pace a little bit.

MR. BIRCHFIELD:  Your Honor, in the previous voir dires, you've gone through and asked them to stand up and talk.  Are you going to do that again?

1    **THE COURT:**  Yes.  I'll do that right now.

2    (WHEREUPON, the following proceedings were held in

3    open court.)

4    **THE COURT:**  Okay.  Thank you very much, those of you

5    who came forward and those of you who patiently waited.

6    I'm almost finished now, but I would like to ask

7    each of you -- we'll start with Juror No. 1.  Stand up and tell

8    us your name, your jury number, and your employment and who you

9    work for, things of that sort, your duties and responsibilities

10   on the job.

11   **JUROR NO. 1:**  I'm Juror No. 1, Margaret Root.  I work

12   for Carr, Riggs & Ingram, an accounting firm.  I'm a bookkeeper

13   there, and I do payrolls, pay bills, do payroll tax returns,

14   different things like that.

15   **THE COURT:**  How long have you been working with them?

16   **JUROR NO. 1:**  I've been working there about eight

17   years.  Before that, I was an assistant librarian.  I made a

18   career change.

19   **THE COURT:**  Are you married? widowed? single?

20   divorced?

21   **JUROR NO. 1:**  I'm married, and I have two children

22   that live locally and six grandchildren.

23   **THE COURT:**  Does your spouse work outside of the

24   home?

25   **JUROR NO. 1:**  Oh, yes.

| | | |
|---|---|---|
| 10:02 | 1 | **THE COURT:**  What does he do? |
| 10:02 | 2 | **JUROR NO. 1:**  He is in product development at a small |
| 10:02 | 3 | electronics company, SkyHawke, in Ridgeland. |
| 10:02 | 4 | **THE COURT:**  Thank you very much, ma'am. |
| 10:02 | 5 | Give us your name and number, sir. |
| 10:02 | 6 | **JUROR NO. 2:**  Name is Stanley Johnson, Juror No. 2, |
| 10:02 | 7 | the assistant pastor at New Horizon Church International.  I'm |
| 10:02 | 8 | also a full-time counselor at the church.  My duties basically |
| 10:02 | 9 | cover the ministry side of the church.  I'm also -- that's what |
| 10:02 | 10 | I do for them, basically.  Retired military.  I've been here |
| 10:02 | 11 | about two years in Mississippi. |
| 10:02 | 12 | **THE COURT:**  What branch did you serve in the |
| 10:02 | 13 | military? |
| 10:02 | 14 | **JUROR NO. 2:**  The best branch, the Air Force. |
| 10:03 | 15 | **THE COURT:**  Okay.  All right.  And how long have you |
| 10:03 | 16 | been a pastor, sir? |
| 10:03 | 17 | **JUROR NO. 2:**  I've been assistant pastor for one |
| 10:03 | 18 | year.  I've been an associate pastor for about seven years with |
| 10:03 | 19 | the church doing various duties. |
| 10:03 | 20 | **THE COURT:**  What's your church?  What's the name of |
| 10:03 | 21 | your church? |
| 10:03 | 22 | **JUROR NO. 2:**  New Horizon Church International out of |
| 10:03 | 23 | Jackson. |
| 10:03 | 24 | **THE COURT:**  Out of Jackson? |
| 10:03 | 25 | **JUROR NO. 2:**  Yes. |

OFFICIAL REALTIME TRANSCRIPT

10:03   1            THE COURT:  Are you married? widowed? single?
10:03   2   divorced?
10:03   3            JUROR NO. 2:  Married for 33 years.
10:03   4            THE COURT:  Does your spouse work outside of the
10:03   5   home?
10:03   6            JUROR NO. 2:  She's -- yes, she does.  She has her
10:03   7   own business.
10:03   8            THE COURT:  What does she do?
10:03   9            JUROR NO. 2:  Beautician.
10:03  10            THE COURT:  Okay.  Thank you very much.
10:03  11            JUROR NO. 2:  You're welcome, sir.
10:03  12            JUROR NO. 3:  I'm Joyce Lawson, Juror No. 3.  I work
10:03  13   for Dr. Stephen Greer.  He's an oral surgeon in Madison.  I
10:03  14   check patients in, check patients out.  I check their
10:03  15   insurance.  Anything that's office-related, I do.
10:03  16            THE COURT:  How long have you worked for him?
10:03  17            JUROR NO. 3:  A year and a half.
10:03  18            THE COURT:  What's your educational background for
10:03  19   that?
10:03  20            JUROR NO. 3:  Well, I've been in the dental field for
10:04  21   about 30 years.
10:04  22            THE COURT:  I see.
10:04  23            JUROR NO. 3:  I'm married.  I have two kids.
10:04  24            THE COURT:  Does your spouse work outside of the
10:04  25   home?

OFFICIAL REALTIME TRANSCRIPT

|        |    |                                                                    |
|--------|----|--------------------------------------------------------------------|
| 10:04  | 1  | JUROR NO. 3:  Yes.  He's a lineman for an electric                 |
| 10:04  | 2  | company.                                                           |
| 10:04  | 3  | THE COURT:  Okay.  Thank you very much.                            |
| 10:04  | 4  | Yes, sir.                                                          |
| 10:04  | 5  | JUROR NO. 4:  Juror No. 4, Jeremy Pittman.  I work                 |
| 10:04  | 6  | for Pileum Corporation, and responsibilities include project       |
| 10:04  | 7  | management, account manager, also sales responsibilities.          |
| 10:04  | 8  | Again, I'm a lead engineer on multiple projects that are kind      |
| 10:04  | 9  | of going on right now.                                             |
| 10:04  | 10 | THE COURT:  How long have you done that?                           |
| 10:04  | 11 | JUROR NO. 4:  I've been there for 14 years.  I have a              |
| 10:04  | 12 | wife and seven-month-old in the house.                             |
| 10:04  | 13 | THE COURT:  Does she work outside of the home?                     |
| 10:04  | 14 | JUROR NO. 4:  No, sir.  She's a housewife.                         |
| 10:04  | 15 | THE COURT:  She has a full-time job there.                         |
| 10:04  | 16 | JUROR NO. 4:  Yes, sir.                                            |
| 10:04  | 17 | THE COURT:  What's your day-to-day job?  What do you               |
| 10:04  | 18 | do?  What are your day-to-day duties?                              |
| 10:04  | 19 | JUROR NO. 4:  Typically, we have a schedule where                  |
| 10:04  | 20 | we're going to on-site customers for our responsibilities, or      |
| 10:04  | 21 | we're IT staff supplement.  It's their IT staff.  And other        |
| 10:04  | 22 | times it's a break/fix or other projects, anything from           |
| 10:05  | 23 | security to forensics, et cetera.                                 |
| 10:05  | 24 | THE COURT:  Okay.  Thank you very much.  Yes, ma'am.               |
| 10:05  | 25 | JUROR NO. 5:  My name is Bettie Parker.                            |

OFFICIAL REALTIME TRANSCRIPT

| | | |
|---|---|---|
| 10:05 | 1 | **THE COURT:**  Ms. Parker. |
| 10:05 | 2 | **JUROR NO. 5:**  I am Juror No. 5. |
| 10:05 | 3 | **THE COURT:**  Yes, ma'am. |
| 10:05 | 4 | **JUROR NO. 5:**  I work for Jackson Public Schools as a |
| 10:05 | 5 | physical education teacher.  I've been doing that for the past |
| 10:05 | 6 | 13 years.  I am married. |
| 10:05 | 7 | **THE COURT:**  Does your spouse work outside of the |
| 10:05 | 8 | home? |
| 10:05 | 9 | **JUROR NO. 5:**  Yes, sir, he does, in law enforcement. |
| 10:05 | 10 | **THE COURT:**  Okay. |
| 10:05 | 11 | **JUROR NO. 5:**  I've been married for 37 years. |
| 10:05 | 12 | **THE COURT:**  Okay.  And your day-to-day job, I know it |
| 10:05 | 13 | must vary a lot, but what do you do day to day? |
| 10:05 | 14 | **JUROR NO. 5:**  I teach PE every day and get my |
| 10:05 | 15 | students physically fit. |
| 10:05 | 16 | **THE COURT:**  Okay.  All right.  Any particular sports |
| 10:05 | 17 | you like the most? |
| 10:05 | 18 | **JUROR NO. 5:**  I'm a tennis coach, and that will come |
| 10:05 | 19 | about in the spring. |
| 10:05 | 20 | **THE COURT:**  Okay.  Thank you very much. |
| 10:06 | 21 | **JUROR NO. 5:**  You're welcome. |
| 10:06 | 22 | **JUROR NO. 6:**  Danny Beeland, Juror No. 6.  I work for |
| 10:06 | 23 | Packaging Corporation of America in Pearl, Mississippi.  I've |
| 10:06 | 24 | been there 38 years.  I'm married.  My wife works for Rankin |
| 10:06 | 25 | County School District. |

| | | |
|---|---|---|
| 10:06 | 1 | THE COURT:  What do you do on a day-to-day basis, |
| 10:06 | 2 | sir? |
| 10:06 | 3 | JUROR NO. 6:  Customer service, manager of, quote, |
| 10:06 | 4 | pressing, and orders.  I spend a lot of time on the phone. |
| 10:06 | 5 | THE COURT:  Are you married? widowed? single? |
| 10:06 | 6 | divorced? |
| 10:06 | 7 | JUROR NO. 6:  Married. |
| 10:06 | 8 | THE COURT:  Does your spouse work outside of the |
| 10:06 | 9 | home? |
| 10:06 | 10 | JUROR NO. 6:  Yes, sir. |
| 10:06 | 11 | THE COURT:  What does she do? |
| 10:06 | 12 | JUROR NO. 6:  She works for Rankin County School |
| 10:06 | 13 | District in the insurance department. |
| 10:06 | 14 | THE COURT:  Thank you very much. |
| 10:06 | 15 | JUROR NO. 7:  Good morning. |
| 10:06 | 16 | THE COURT:  Good morning. |
| 10:06 | 17 | JUROR NO. 7:  I'm Chrissy Rivers, Juror No. 7.  I |
| 10:06 | 18 | work for Taylor Power Company.  It's a generator company |
| 10:06 | 19 | outside of Clinton.  I'm a service coordinator there.  Day to |
| 10:06 | 20 | day, I schedule the technicians out where they need to be, take |
| 10:07 | 21 | phone calls from customers and invoice for them on service |
| 10:07 | 22 | calls. |
| 10:07 | 23 | THE COURT:  Okay.  Are you married? widowed? |
| 10:07 | 24 | single -- |
| 10:07 | 25 | JUROR NO. 7:  I'm married, 17 years.  My husband does |

OFFICIAL REALTIME TRANSCRIPT

| | |
|---|---|
| 10:07 | 1 |
| 10:07 | 2 |
| 10:07 | 3 |
| 10:07 | 4 |
| 10:07 | 5 |
| 10:07 | 6 |
| 10:07 | 7 |
| | 8 |
| | 9 |
| 10:07 | 10 |

work outside the home.  He owns his own flooring business.

THE COURT:  What does he do?

JUROR NO. 7:  He has -- he owns his own flooring business.

THE COURT:  Installs floors?

JUROR NO. 7:  Yes, sir.  We have three children, 22, 16, and 15.

THE COURT:  Thank you so much.

JUROR NO. 8:  I'm Russell Robbins, Juror No. 8.  I'm retired.

THE COURT:  Mr. Robbins.

JUROR NO. 8:  I'm retired.  I worked for the State Department of Agriculture for 30 years.  My wife is -- was an RN, but she is mentally disabled.  She doesn't work.  We have two kids.

THE COURT:  Which area do you live in, sir?

JUROR NO. 8:  I live in Rankin County.

THE COURT:  All right.  Thank you very much.

JUROR NO. 9:  My name is Rossie Coates, Jr., Juror No. 4.  I live in Daleville, Mississippi, about 15 miles north of Meridian.  I'm retired from the Naval Reserve.  I was in the active duty for four years and in reserves for 44 years.  I worked for a logging company for 30 years, and I retired June of this year.

THE COURT:  June of this year.  Good.

OFFICIAL REALTIME TRANSCRIPT

1    10:08   Congratulations on your retirement.  How do you like it so far?

2    10:08         **JUROR NO. 9:**  Oh, perfect, perfect.  There's nothing

3    10:08   better.  My wife got me to retire, and it's so peaceful.

4    10:08         **THE COURT:**  Does your wife work outside of the home?

5    10:08         **JUROR NO. 9:**  No.  She's disabled, on disability.

6    10:08   She worked for a bakery for 15 years, and then she worked for

7    10:08   Weems Mental Health for 17 years until she had to retire

8    10:08   because she had back problems.  So she's on disability.

9    10:08         So now I manage a cattle farm with my brother.

10   10:09   As I told you earlier, he had a heart attack about two months

11   10:09   ago.  So everything now kind of falls on me for, you know,

12   10:09   working the hay and everything like that.  But other than that,

13   10:09   I've been married for 35 years, and I have three kids.

14   10:09         **THE COURT:**  Okay.  Thank you very much.  I appreciate

15   10:09   it.  I hope the sun comes out a little bit for you with that

16   10:09   hay.

17   10:09         **JUROR NO. 10:**  Hi.  My name is Virginia Tew, and I'm

18   10:09   Juror No. 10.  I am a secretary at Russell Baptist Church in

19   10:09   Meridian, Mississippi.  I've been there since January.  Before

20   10:09   that, I was working here at St. Dominic's as a respiratory

21   10:09   therapist, just prn.

22   10:09         **THE COURT:**  What do you do now as

23   10:09   day-to-day-activity?

24   10:09         **JUROR NO. 10:**  Just secretarial duties, payroll, do

25   10:09   the bulletin for Sunday, pay bills.  That's pretty much --

| | | |
|---|---|---|
| 10:09 | 1 | **THE COURT:**  And how long have you been doing that? |
| 10:09 | 2 | **JUROR NO. 10:**  Since January. |
| 10:10 | 3 | **THE COURT:**  And are you married? widowed? single? |
| 10:10 | 4 | **JUROR NO. 10:**  I am married, and my husband is |
| 10:10 | 5 | self-employed in a heating and air business. |
| 10:10 | 6 | **THE COURT:**  Thank you very much. |
| 10:10 | 7 | **JUROR NO. 11:**  I'm Mary Martin, Juror No. 11.  I work |
| 10:10 | 8 | for Wimberly & Associates.  It's a financial advising firm, and |
| 10:10 | 9 | I sell life insurance. |
| 10:10 | 10 | And my husband -- I'm married.  He works for |
| 10:10 | 11 | Ross & Yerger.  He's a producer.  And we have a five-month-old |
| 10:10 | 12 | baby and a three-year-old son. |
| 10:10 | 13 | **THE COURT:**  Thank you very much, Ms. Martin. |
| 10:10 | 14 | **JUROR NO. 12:**  Hi.  I'm Toni Hilson.  I'm assistant |
| 10:10 | 15 | manager at the Dollar General.  I've been there for five years. |
| 10:10 | 16 | My main responsibility is great customer service, making sure |
| 10:10 | 17 | my customers are satisfied, stocking shelves, receiving the |
| 10:10 | 18 | truck, paperwork.  You name it, I do it. |
| 10:11 | 19 | **THE COURT:**  How long have you been doing that? |
| 10:11 | 20 | **JUROR NO. 12:**  Five years. |
| 10:11 | 21 | **THE COURT:**  And before that? |
| 10:11 | 22 | **JUROR NO. 12:**  Before that, I was at CVS Pharmacy for |
| 10:11 | 23 | 16 years. |
| 10:11 | 24 | **THE COURT:**  Doing the same thing? |
| 10:11 | 25 | **JUROR NO. 12:**  Doing the same -- well, stocker, |

| | | |
|---|---|---|
| 10:11 | 1 | cashier. |
| 10:11 | 2 | THE COURT:  Are you married? widowed? single? |
| 10:11 | 3 | divorced? |
| 10:11 | 4 | JUROR NO. 12:  Single, two kids. |
| 10:11 | 5 | THE COURT:  Thank you. |
| 10:11 | 6 | JUROR NO. 13:  I'm Mark Howell.  I'm a commercial |
| 10:11 | 7 | photographer.  I work for a company called Forestry Suppliers, |
| 10:11 | 8 | Incorporated, in Jackson, Mississippi.  And I'm divorced. |
| 10:11 | 9 | THE COURT:  What do you do on a day-to-day basis? |
| 10:11 | 10 | JUROR NO. 13:  Take photographs of products and |
| 10:11 | 11 | people and go set up photo shoots around the area. |
| 10:11 | 12 | THE COURT:  Do you go out to the field? |
| 10:11 | 13 | JUROR NO. 13:  Yes.  I process photographs and |
| 10:11 | 14 | maintain the website for our company. |
| 10:11 | 15 | THE COURT:  When you say "photographs," what do you |
| 10:11 | 16 | do?  Take pictures of trees? |
| 10:11 | 17 | JUROR NO. 13:  No.  We sell -- we're the largest |
| 10:11 | 18 | supplier of outdoor professional products.  We're kind of like |
| 10:12 | 19 | the Cabela's of professional equipment.  We have an 800-page |
| 10:12 | 20 | catalog which our company produces year in, year out. |
| 10:12 | 21 | THE COURT:  That's forestry equipment? |
| 10:12 | 22 | JUROR NO. 13:  Well, it's forestry; it's -- anything |
| 10:12 | 23 | related professionalwise, we sell.  Anything from surveying |
| 10:12 | 24 | equipment down to -- like $20,000 down to a little flag for a |
| 10:12 | 25 | dollar, we sell it. |

OFFICIAL REALTIME TRANSCRIPT

10:12  1          THE COURT:  How long have you done that?

10:12  2          JUROR NO. 13:  I've been there for 20 years as a

10:12  3   photographer, and I was there -- I left and came back.  I was

10:12  4   there for three years as a copywriter.

10:12  5          THE COURT:  All right.  Thank you very much.

10:12  6          JUROR NO. 14:  Brian Isaac.  I work for J.L. Roberts

10:12  7   Mechanical in Richland, Mississippi.  I'm a HVAC service

10:12  8   technician.  I've been married for 22 years.

10:12  9          THE COURT:  What do you do on your job as a service

10:12  10  technician?

10:12  11         JUROR NO. 14:  Air-conditioning repair, diagnostics.

10:12  12  I do specialized controls.  That type of stuff.

10:13  13         THE COURT:  All right.  Are you married? widowed?

10:13  14  single? divorced?

10:13  15         JUROR NO. 14:  Yes, sir.  Married for 22 years.

10:13  16         THE COURT:  And does your spouse work outside the

10:13  17  home?

10:13  18         JUROR NO. 14:  Yes, sir.  For Pearl Junior High

10:13  19  School.

10:13  20         THE COURT:  What does she do there?

10:13  21         JUROR NO. 14:  Custodian.

10:13  22         THE COURT:  Thanks very much.

10:13  23         JUROR NO. 15:  I'm Randy Creel, Juror No. 15.  I work

10:13  24  for Trustmark National Bank.  I've been in banking for

10:13  25  42 years.  My wife is retired from teaching, and now she's

OFFICIAL REALTIME TRANSCRIPT

1   still -- she went back to work, working full-time for Southern
2   Pine Electric.
3           THE COURT:  What do you do as vice president of the
4   bank?
5           JUROR NO. 15:  Well, I have two branches that I
6   manage.  The biggest thing, I have five women that I manage.
7           THE COURT:  Okay.  That's a tough one.  Okay.  Thank
8   you, sir.
9           JUROR NO. 15:  My name is Aisha Eason.  My juror
10  number is 16.  I work for Conduent, which is formerly known as
11  Xerox Services.  I'm engaged, and I have three kids.
12          THE COURT:  Okay.  Good.  Where does your fiancé
13  work?
14          JUROR NO. 15:  Olive Garden.  He's cooking manager at
15  Olive Garden.
16          THE COURT:  Thank you very much.  He'll do the
17  cooking for you.
18          JUROR NO. 17:  My name is Veronica Lee.  I'm Juror
19  No. 17.  I'm work-at-home help desk specialist.  I'm single
20  with four kids.  And my day-to-day duties is to basically
21  troubleshoot.  I deal with cable, telephone lines, and also
22  router boxes.
23          THE COURT:  All right.  Thank you very much, Ms. Lee.
24          JUROR NO. 18:  Good morning.  My name is Felicia
25  Lyles.  I'm Juror No. 18.  I work for Hope Credit Union.  I'm a

10:14 1    regional vice president.  And there are obviously 13 of our
10:14 2    retail branches, which are in the delta.  We have them in east
10:14 3    Mississippi and the central Mississippi, Jackson area.
10:14 4                I am married, and my husband is the sanitation
10:15 5    supervisor at Sanderson Farms.  He works overnight, and we have
10:15 6    three kids.
10:15 7            THE COURT:  Thanks very much.
10:15 8            JUROR NO. 19:  I'm Mary Lou Powell, No. 19.  For the
10:15 9    past 19 years, I've worked for an attorney in a small law
10:15 10   office.  I do the land research and assist him with all other
10:15 11   duties.  Prior to that, I worked for Smith County for 25 years.
10:15 12               I'm married.  I have two grown children.  My
10:15 13   husband has a mechanic shop.
10:15 14           THE COURT:  Okay.  Thank you very much.
10:15 15           JUROR NO. 20:  Gary Guynes, Jr.  I'm from Crystal
10:15 16   Springs, Mississippi.  I work for Entergy.  I worked at the
10:15 17   Baxter Wilson power plant in Vicksburg, a power plant operator.
10:15 18   I maintain equipment that's there to power.
10:15 19               I'm married.  I've got -- my wife is a ICU
10:15 20   nurse, RN, at St. Dominic's Hospital.  I have no kids.
10:16 21           THE COURT:  All right.  Thank you very much.
10:16 22           JUROR NO. 21:  My name is Mary Pipper.  I'm Juror
10:16 23   No. 21.  I am a registered nurse at Surgicare.  I work in the
10:16 24   recovery room.  I'm not married, and I don't have any kids.
10:16 25           THE COURT:  Okay.  Thank you, Ms. Pipper.

OFFICIAL REALTIME TRANSCRIPT

1    **JUROR NO. 22:**  Jon Calder, Juror No. 22.  Customer
2    support manager at Common CENTS Solutions.  I've been there
3    almost six years.  I manage day-to-day operations for our
4    support team, provide technical support for point-of-sale
5    systems.  Married, three kids.
6    **THE COURT:**  All right.  Thank you, Mr. Calder.
7    **JUROR NO. 23:**  Terrance Bailey, Juror No. 23.  I'm a
8    quality control shift leader at J.A. King, which is a side of
9    Nissan.  I'm married.  My wife is a cycle counter for Calsonic.
10   **THE COURT:**  What do you do on a day-to-day basis,
11   Mr. Bailey?
12   **JUROR NO. 23:**  If all of my technicians are at work,
13   I normally just -- I might make rounds, make sure everyone is
14   doing what they're supposed to be doing.  Or if someone is out,
15   I fill in for their route and pull and make sure that all the
16   torques the Nissan technicians shoot, they're shot down to the
17   torque they're supposed to be.
18   **THE COURT:**  What do they specialize in?  What do they
19   do?
20   **JUROR NO. 23:**  Nissan?
21   **THE COURT:**  Yeah.
22   **JUROR NO. 23:**  Building the Titan, Frontier, and
23   Murano vehicles.
24   **THE COURT:**  Thank you.
25   **JUROR NO. 31:**  Hello.  I'm Kix Cosby.  I'm Juror No.

OFFICIAL REALTIME TRANSCRIPT

10:17  1   31.  I work as a nanny.  My day-to-day duties, I pick up -- I

10:17  2   have three children that I take care of.  I am there most days

10:18  3   from 7:00-7:30 to about 5:00-6:00, somewhere in there.

10:18  4              I am single.  I have no children of my own.  If

10:18  5   you ask me, I have a couple dozen that I care for and that I do

10:18  6   help take care of in my spare time.

10:18  7              THE COURT:  And you're a student also?

10:18  8              JUROR NO. 31:  Yes.  I'm a student at Hinds Community

10:18  9   College.  I am currently studying to become a teacher.

10:18  10             THE COURT:  Okay.  Thank you very much.

10:18  11             JUROR NO. 30:  Good morning.  My name is Vincent

10:18  12   Kirksey.  I'm Juror No. 30.  I work for the Federal Bureau of

10:18  13   Prisons in Mississippi.  I'm a correctional officer there.

10:18  14   I've been there for 17 years.

10:18  15             I've been married for 32 years.  I have two

10:18  16   children.  My wife works for MAP Head Start.  She's a facility

10:19  17   and a transportation manager.

10:19  18             THE COURT:  And what is your day-to-day job?  What

10:19  19   are you doing?

10:19  20             JUROR NO. 30:  Correction officer.  Basically, I

10:19  21   watch over the inmates there.  We have approximately 4,000

10:19  22   inmates.  I'm normally at the medium facility.

10:19  23             THE COURT:  It's a federal prison?

10:19  24             JUROR NO. 30:  Federal prison, yes.

10:19  25             THE COURT:  And where is that?

OFFICIAL REALTIME TRANSCRIPT

10:19  1          **JUROR NO. 30:**  Yazoo City, Mississippi.

10:19  2          **THE COURT:**  How long have you been doing that?

10:19  3          **JUROR NO. 30:**  17 years.

10:19  4          **THE COURT:**  At that prison?

10:19  5          **JUROR NO. 30:**  Yes, sir.

10:19  6          **THE COURT:**  Okay.  Thank you.

10:19  7          **JUROR NO. 29:**  John Wilkerson, Juror No. 29.  I work

10:19  8  for Central Water Association.  I'm a well operator.  I

10:19  9  maintain wells at each one of our plants in terms of the whole

10:19  10  county, Neshoba County.

10:19  11          I have a wife.  She's a dental hygienist.

10:19  12  Seven-year-old son and a two-year-old daughter.

10:19  13          **THE COURT:**  Thank you, Mr. Wilkerson.

10:19  14          **JUROR NO. 28:**  My name is Glenda Olive.  I'm Juror

10:19  15  No. 28.  I am from Canton, Mississippi, in Madison County.  I

10:20  16  work for Michaels Arts and Crafts in Madison.  My duties is to

10:20  17  unload trucks, stock merchandise, do resets, and customer

10:20  18  service.  I've done that for five years.  And before that, I

10:20  19  worked for Walgreen's in Madison as a cashier, beauty adviser.

10:20  20          I am married.  My husband works as a maintenance

10:20  21  person at DeBeukelaer Corporation cookie company.

10:20  22          **THE COURT:**  Okay.  That's fine.  Thank you very much,

10:20  23  Ms. Olive.

10:20  24          **JUROR NO. 27:**  My name is Lawrence Sutton.  I own

10:20  25  Four Seasons Construction and Architecture Engineering.  I've

10:20  1  owned that for 32 years.  I'm semiretired.  I have two brothers
10:20  2  that's now doing the day-to-day operation of the business.  And
10:21  3  I'm widowed.  I have four adult children.
10:21  4          THE COURT:  Okay.  Thank you, Mr. Sutton.
10:21  5          JUROR NO. 26:  Harriet Bilbo.  I'm No. 26.  I work
10:21  6  for Samsung NeuroLogica, medical device industry.  I've been in
10:21  7  the industry for -- since 2005.
10:21  8          THE COURT:  Okay.  All right.  Thank you, Ms. Bilbo.
10:21  9          JUROR NO. 25:  I'm Bill Featherston.  I'm an attorney
10:21 10  who has been practicing law in the Jackson area for 42 years.
10:21 11  I live in Richland.  Divorced, no children.
10:21 12          THE COURT:  Thank you, Mr. Featherston.
10:21 13          JUROR NO. 24:  My name is Tarra Riggs.  I am a mother
10:21 14  of two children.  I am -- well, I'm a homemaker, wife of 18
10:21 15  years, and an actor.  My husband works for the Corps of
10:21 16  Engineers.
10:21 17          THE COURT:  You say you're an actor?
10:21 18          JUROR NO. 24:  Yes.
10:22 19          THE COURT:  What did you do?
10:22 20          JUROR NO. 24:  The last thing I done was *The Butler*,
10:22 21  *Treme*, *The Last Exorcism*, *The Help*, and right now *Dekalb*
10:22 22  *Elementary*.
10:22 23          THE COURT:  Well, good.  Congratulations.
10:22 24          JUROR NO. 32:  Number 32, Steven Tucker.  I'm a
10:22 25  quality assurance representative at NAS Meridian on the T-45

OFFICIAL REALTIME TRANSCRIPT

10:22  1    Goshawk program.  I've been there 17 years.  We make sure the
10:22  2    nation's finest fly the nation's safest trainer.
10:22  3            I have a wife.  We've been married for 11 years.
10:22  4    She is a hospital administrator at Anderson Regional Medical
10:22  5    Center, and we have a seven-year-old little girl.
10:22  6            THE COURT:  Thank you.
10:22  7            JUROR NO. 33:  My name is Sonya McCormick, Juror No.
10:22  8    33.  I am a senior tax specialist for H&R Block.  I've worked
10:22  9    for them for six years.  I'm a widowed mother of three boys.
10:22 10    Right now -- you know, everyone knows tax season is a seasonal
10:23 11    job, and so we're -- on the off-season, I basically, you know,
10:23 12    get the letters -- everyone gets the letters from the IRS.  So
10:23 13    I go ahead and try to, you know, fix those problems that arise.
10:23 14            THE COURT:  Okay.  Thank you very much.
10:23 15            JUROR NO. 34:  I'm Juror No. 34.  My name is Nicole
10:23 16    Jackson.  I have two jobs.  One is my part-time job.  I work at
10:23 17    Canton Public School District.  I work in the cafeteria.  I
10:23 18    feed the babies, make sure they get a balanced meal in the
10:23 19    morning.  I'm the first face they see in the morning, ask them
10:23 20    how their day is going.
10:23 21            I've been employed by Walmart for 13 years.  I'm
10:23 22    a customer service supervisor.  I make sure I take care of
10:23 23    customers' complaints, make sure that my cashiers -- that they
10:23 24    having a good day.  If they're having a bad day, I ask them
10:23 25    what their problem is and make sure everything is going good.

OFFICIAL REALTIME TRANSCRIPT

10:24  1          THE COURT:  Fine.  Thank you very much.

10:24  2          JUROR NO. 35:  My name is Kanavis Denson, Juror No.

10:24  3  35.  I study civil engineering right here down the road at

10:24  4  Jackson State University.  I'm a day-to-day cashier working at

10:24  5  Sam's.  No kids, no wife.

10:24  6          THE COURT:  Good.  Okay.  Thank you very much.

10:24  7          JUROR NO. 36:  My name is Justin Carillo, Juror No.

10:24  8  36.  I'm a engineer for the U.S. Army Corps of Engineers.

10:24  9  Married, two kids.  My wife works for the same organization as

10:24  10 an engineer.

10:24  11         THE COURT:  Thanks so much.

10:24  12         JUROR NO. 37:  Juror No. 37, Thomas Cranfield, a

10:24  13 trouble man in Vicksburg.  I've been doing that for 28 years.

10:24  14 I've been in the business 43 years.

10:24  15              I'm married.  My wife is a loan specialist at

10:24  16 River Hills Bank.  We have four kids.  The last two were twins,

10:24  17 and we're getting them in college.

10:24  18         THE COURT:  Okay.  Thank you so much.

10:25  19         JUROR NO. 38:  Hello.  I'm Angela Anderson.  I'm

10:25  20 Juror No. 38.  I'm a human resources representative for Quality

10:25  21 Service Integrity.  It's a sanitation department in Tyson.  My

10:25  22 day-to-day duties are payroll, hiring.  I do daily staffing

10:25  23 reports.  I assist all my supervisors.

10:25  24         THE COURT:  Okay.  Thank you very much.

10:25  25         JUROR NO. 39:  I'm Teresa Chapman, Juror No. 39.  I

10:25   1   work for Dean and Dean Architects.  I'm an administrative
10:25   2   assistant, the only one right now, for 21 people.  I do not
10:25   3   have a daily schedule that I go by.  It's just anything that
10:25   4   hits my desk that I'll take care of fast.
10:25   5            I'm divorced with two grown children and a
10:25   6   beautiful grandbaby.
10:25   7            THE COURT:  Good.  Thank you very much.
10:25   8            Anyone else?  That's it?
10:25   9            Okay.  You all certainly have interesting lives
10:25   10  and interesting positions, and I really thank you for sharing
10:26   11  those things with us.
10:26   12           Now, what we do at this point is I'm going to
10:26   13  let the lawyers ask you some questions, but you all have been
10:26   14  so forthcoming that hopefully we'll be able to get through this
10:26   15  very quickly.
10:26   16           We'll hear from the parties.
10:26   17           MR. BIRCHFIELD:  May it please the Court.
10:26   18           Good morning.  I want to talk to you for just a
10:26   19  few minutes about this process.  Judge Fallon described for you
10:26   20  that this is a process where we get to ask you questions, and
10:26   21  we're really looking for ways to identify folks that are the
10:26   22  right jurors for this case.  And we've -- you've answered
10:26   23  questions that Judge Fallon asked and assured us that you can
10:26   24  follow the law in this case.
10:26   25           Here's what I'm looking for.  I'm looking for

OFFICIAL REALTIME TRANSCRIPT

| 10:26 | 1 | something a little bit different from that.  I want to ask you |
| 10:26 | 2 | to have a discussion about any biases that you may have that |
| 10:27 | 3 | would make it maybe not -- this might not be the best case for |
| 10:27 | 4 | you. |
| 10:27 | 5 | So outside the courtroom, "bias" is a dirty |
| 10:27 | 6 | word, you know.  But here what we're looking for are just life |
| 10:27 | 7 | experiences that may make it, you know, difficult, may tend to |
| 10:27 | 8 | have you prejudge this case.  That's what we're looking for, |
| 10:27 | 9 | just to get a little more information to find the right jurors |
| 10:27 | 10 | for this particular case. |
| 10:27 | 11 | Let me give you just a quick example.  My wife |
| 10:27 | 12 | and I, we adopted three kids.  So if I'm called -- if I was |
| 10:27 | 13 | called to be a potential juror on a case that involved neglect |
| 10:27 | 14 | or abuse of a child, I would have to say that's probably not |
| 10:27 | 15 | the best case for me. |
| 10:27 | 16 | So that's what we're looking for.  If there are |
| 10:27 | 17 | certain life experiences that would make it challenging for you |
| 10:27 | 18 | to allow both parties to start off even or as close to even as |
| 10:28 | 19 | we can, that's what we're looking for. |
| 10:28 | 20 | So Judge Fallon has told you that this case |
| 10:28 | 21 | involves -- it involves Mrs. Mingo, who suffered a stomach |
| 10:28 | 22 | bleed, a GI bleed.  And she was taking the prescription |
| 10:28 | 23 | medicine Xarelto. |
| 10:28 | 24 | So with that bit of information, is there anyone |
| 10:28 | 25 | who thinks, you know, that Ms. Mingo shouldn't be here?  Anyone |

OFFICIAL REALTIME TRANSCRIPT

| | | |
|---|---|---|
| 10:28 | 1 | who thinks maybe they would start out favoring one side or the |
| 10:28 | 2 | other just based on that information, based on your life |
| 10:28 | 3 | experiences? |
| 10:28 | 4 | **THE COURT:**  Some of you all have shared some |
| 10:28 | 5 | information with us already.  So we're looking for those who |
| 10:28 | 6 | have not. |
| 10:28 | 7 | **MR. BIRCHFIELD:**  Yes.  If you went up to the bench |
| 10:28 | 8 | and you shared information, no need to share that again.  I'm |
| 10:28 | 9 | just looking for if you haven't shared with us that there are |
| 10:28 | 10 | certain experiences that may impact you. |
| 10:29 | 11 | Is there anyone that thinks that, because this |
| 10:29 | 12 | involves prescription medicines, it involves a lawsuit against |
| 10:29 | 13 | prescription medicines, you may start out leaning one way or |
| 10:29 | 14 | the other?  Concerned about drug prices or lawsuits, putting |
| 10:29 | 15 | folks out of jobs? |
| 10:29 | 16 | Is there anyone who has those types of |
| 10:29 | 17 | attitudes, mindsets that may make it difficult to let both |
| 10:29 | 18 | parties start out even? |
| 10:29 | 19 | All right.  Not to pick on anyone, but let me |
| 10:29 | 20 | just -- let me ask you, Mr. Creel, in your job as a -- you're |
| 10:29 | 21 | in the banking field; right?  If you had -- if you had |
| 10:29 | 22 | experience with litigation, either personally or with your |
| 10:29 | 23 | company, that may make it difficult for you to serve in this |
| 10:30 | 24 | case or to allow both start parties to start out even. |
| 10:30 | 25 | **JUROR 15:**  No, I wouldn't think so.  I don't know if |

OFFICIAL REALTIME TRANSCRIPT

| | | |
|---|---|---|
| 10:30 | 1 | you're going to ask about being on a jury before or not. |
| 10:30 | 2 | But do I need to wait on that? |
| 10:30 | 3 | MR. BIRCHFIELD:  No, sir.  Because really what I'm |
| 10:30 | 4 | asking right now is if you had any experiences -- if you've had |
| 10:30 | 5 | any life experiences that would put you in a position that you |
| 10:30 | 6 | may want to tend to prejudge or may not allow you to have both |
| 10:30 | 7 | parties start out even. |
| 10:30 | 8 | JUROR 15:  No, I think I could be good with that. |
| 10:30 | 9 | MR. BIRCHFIELD:  Okay.  So tell us about your prior |
| 10:30 | 10 | jury experience. |
| 10:30 | 11 | JUROR 15:  Well, there's usually -- I've been called |
| 10:30 | 12 | four or five times.  The attorneys strike me right off the bat |
| 10:30 | 13 | usually before I get seated.  One time, they did not and I |
| 10:30 | 14 | ended up in the jury pool on the case.  It was an insurance |
| 10:30 | 15 | case that a guy had an accident. |
| 10:30 | 16 | Do I need to tell you the details on it? |
| 04:52 | 17 | MR. BIRCHFIELD:  Sure. |
| 04:52 | 18 | JUROR NO. 15:  He had an accident, and he sued his |
| 10:31 | 19 | insurance company for lost wages.  This guy -- it was his own |
| 10:31 | 20 | insurance company, and they already paid more than they were |
| 10:31 | 21 | supposed to pay.  And the guy hadn't worked for ten years |
| 10:31 | 22 | before he caused the accident.  And I just -- I was the only |
| 10:31 | 23 | one on the jury that couldn't go along with giving him money |
| 10:31 | 24 | for that.  That's all. |
| 10:31 | 25 | MR. BIRCHFIELD:  So your past jury experience, would |

OFFICIAL REALTIME TRANSCRIPT

1  that litigation -- would it --

2          JUROR NO. 15:  No, not on this.  It would not.

3          MR. BIRCHFIELD:  We could start off even?

4          JUROR NO. 15:  Yes.

5          MR. BIRCHFIELD:  Ms. Mingo would start on level

6  footing with the companies here?

7          JUROR NO. 15:  Yes.

8          MR. BIRCHFIELD:  Okay.  Thank you, Mr. Creel.

9          So that's really what we're looking for.  We're

10  looking for, okay, what life experiences do you have that may

11  impact how you start out?  Have you prejudged the case, leaning

12  one way or another?  That's what we're looking to share to find

13  the right folks for this jury.

14          Is there anyone that would start out about what

15  is -- start out leaning one way or the other about the

16  responsibilities for drug companies in providing information

17  about their drugs?

18          We have your questionnaires, and we have the

19  responses.  Some would say there's too much information in the

20  label, and some would say there's not enough information.

21          Anybody have strong feelings one way or the

22  other about what's included in the drug labels?  Anybody want

23  to share your views on that?

24          JUROR NO. 14:  A lot of information.

25          MR. BIRCHFIELD:  Mr. Isaac, so tell us about that.

OFFICIAL REALTIME TRANSCRIPT

| | |
|---|---|
| 10:32 | 1 |
| 10:32 | 2 |
| 10:33 | 3 |
| 10:33 | 4 |
| 10:33 | 5 |

1  You think that there's too much information in the label?

2            JUROR NO. 14:  It's not necessarily too much.  It's

3  just the amount of information that's put there, it does

4  this -- it does this -- it does -- in my opinion, sometimes

5  it's difficult to be able to keep up with everything.

6            MR. BIRCHFIELD:  Okay.  All right.  So with that

7  view, would you start out -- would you start out favoring

8  either the plaintiff, Ms. Mingo, or the drug companies?

9            JUROR NO. 14:  Not necessarily.  I would still play

10  on a level field, but what I'm saying is it's just my opinion

11  that a lot of information comes out.

12            MR. BIRCHFIELD:  Thank you.  Thank you for sharing

13  that.

14            Ms. Tew, in your questionnaire, you had said

15  that most people don't think about warnings until they apply to

16  them.

17            Can you tell me what you mean by that?

18            JUROR NO. 10:  Well, kind of the same line that he

19  was saying, that there are a lot of side effects for a lot of

20  drugs.  And a lot of times patients, they're there but they

21  don't necessarily pay attention to them, you know.  So that's

22  what I meant.  Does that make sense?

23            MR. BIRCHFIELD:  So you're saying that patients

24  should have more responsibility in reading and understanding --

25            JUROR NO. 10:  Physicians together -- working

OFFICIAL REALTIME TRANSCRIPT

| | |
|---|---|
| 10:34 | 1 |
| 10:34 | 2 |
| 10:34 | 3 |
| 10:34 | 4 |
| 10:34 | 5 |
| 10:34 | 6 |
| 10:34 | 7 |
| 10:34 | 8 |
| 10:34 | 9 |
| 10:34 | 10 |
| 10:35 | 11 |
| 10:35 | 12 |
| 10:35 | 13 |
| 10:35 | 14 |
| 10:35 | 15 |
| 10:35 | 16 |
| 10:35 | 17 |
| 10:35 | 18 |
| 10:35 | 19 |
| 10:35 | 20 |
| 10:35 | 21 |
| 10:35 | 22 |
| 10:35 | 23 |
| 10:35 | 24 |
| 10:36 | 25 |

together.  You know, I think it's both responsibility to help
the patient and the patient to be aware, make sure that you
know what is said.

          MR. BIRCHFIELD:  So there's responsibility on the
patient side, and there's a responsibility on the doctor side
as well?

          JUROR NO. 10:  Correct.  Yes.

          MR. BIRCHFIELD:  Would you agree that there's a
responsibility on the pharmaceutical company's side as well?

          JUROR NO. 10:  I do.  But if it's a warning that's
been stated -- you know, that is usually in all prescriptions.
You know, you have a list of warnings and side effects of the
particular drug.  You know, it just -- if that warning is
there, this may cause certain side effects.

          MR. BIRCHFIELD:  All right.  Thank you.  All right.

          So anyone else have views on that, the
pharmaceutical company's responsibility to inform doctors, the
patient's responsibility to talk with doctors and doctors to
share?

          Anybody have experiences with that or views on
those responsibilities that may impact your -- the way you
start -- start this case?

          Okay.  Ms. Riggs, let me ask you, in your
questionnaire -- and if I ask you a question that is personal
or calls for sharing something that you don't really feel

OFFICIAL REALTIME TRANSCRIPT

10:36   1   comfortable sharing in a large group, you can ask to approach

10:36   2   and share that privately.

10:36   3               Now, you wrote that drug companies should

10:36   4   continue to ensure safety and update with new discoveries.

10:36   5               Did I get that right from your questionnaire?

10:36   6        JUROR NO. 24:  Yes.

10:36   7        MR. BIRCHFIELD:  Okay.  Tell us what you mean by

10:36   8   that, where you come from with that.

10:36   9        JUROR NO. 24:  Well, pretty much the same as the two

10:36  10   before me.  The instructions sometimes, when we read them, can

10:36  11   be confusing.  And to trust the doctor with what they say and

10:36  12   you do the research that you can do on whatever you're taking,

10:36  13   I personally think you should be responsible for what you put

10:36  14   in your body.

10:37  15               But this is a physician who went to school for

10:37  16   years and you trust this person.  And -- but sometimes I feel

10:37  17   that it -- just from what I know, you know, that a company -- a

10:37  18   pharmaceutical company should, when they're aware of new things

10:37  19   or side effects that come about, it should be immediately

10:37  20   reported to physicians from whatever field that is.

10:37  21        MR. BIRCHFIELD:  All right.  Thank you, Ms. Riggs.  I

10:37  22   appreciate you sharing that.  But you haven't -- you don't have

10:37  23   any information about this case?  You haven't prejudged this

10:37  24   case?

10:37  25        JUROR NO. 24:  No, I have no idea about this case at

OFFICIAL REALTIME TRANSCRIPT

1   all.

2          **MR. BIRCHFIELD:**  All right.  Thank you, Ms. Riggs.

3          On that note, is there -- what about that

4   information?  Anyone have strong feelings about the

5   responsibility of drug companies keeping their -- keeping the

6   information up to date in the label with what they're providing

7   to doctors?

8          Mr. Creel?

9          **JUROR NO. 15:**  I just feel like they need to.

10         **MR. BIRCHFIELD:**  Okay.  Is it Mr. Guynes?  Did I

11   pronounce that right?

12         **JUROR NO. 20:**  Yes, sir.  I don't believe that every

13   patient has the mental ability to do their own research.  I

14   believe that some -- especially other people that are taking so

15   many pills at one time, you've got to be pretty intelligent to

16   understand each side effect of each drug.

17         I believe their doctor -- you know, I don't

18   believe a lot of -- especially elderly people, I don't believe

19   they really even know what all they're taking anymore.  And if

20   they do, they still rely on the doctor's care to advise them

21   what to do, you know, and they do what they tell them to do.

22         **MR. BIRCHFIELD:**  Thank you, Mr. Guynes.  I appreciate

23   you sharing that.

24         And that ties into what Ms. Riggs had said.  I

25   want to explore that just a bit because there are views out

1  there that the patients are fully responsible.  You got to know
2  everything about the medicines that you're putting -- and
3  others -- and Mr. Guynes says that you should be able to trust
4  your doctor.
5          Does anybody have really strong feelings one way
6  or the other about patients should not be able to trust their
7  doctor?  Anyone have any strong feelings in that regard that
8  you really got to do it all on your own, your own research?
9          All right.  And then what about the other part
10 of that equation?  Can doctors rely -- is it okay for doctors
11 to rely on the information that -- about a particular drug that
12 they get from the drug companies?  Does anyone -- would anyone
13 hold the doctor to a higher standard and say, no, you got to do
14 your own research, and expect that from your doctor?
15         All right.  So one other question I wanted to
16 ask about, and that is the role of the -- the role of the FDA.
17 Does anyone think that the FDA does not do their own testing?
18 Would anybody be surprised to know that the FDA doesn't do
19 testing on drugs?  Everybody understands that the FDA doesn't
20 do testing, that they rely on the drug -- I'm sorry,
21 Mr. Beeland.
22    **JUROR NO. 6:**  I'm not 100 percent -- I wasn't
23 100 percent that they test everything.  I would say one way or
24 the other, I think we're okay.  I mean, I don't know what they
25 do.  I don't put my trust so much in other people, you know, as

OFFICIAL REALTIME TRANSCRIPT

1   far as that goes.  Hopefully, they do.  I'm hoping.

2              Hopefully -- I don't know what the steps are

3   from the drug to the drug store to the doctor.  I'm not sure

4   what all the steps are.  For me to say I did understand, I

5   don't fully understand, but I would be kind of disappointed if

6   they just put something out there and said, no, we didn't test

7   it.  I would --

8              MR. BIRCHFIELD:  That would surprise you?  Anybody

9   else surprised?

10              JUROR NO. 6:  It would really tick me off.

11              MR. BIRCHFIELD:  I'm sorry?

12              JUROR NO. 6:  It would tick me off.

13              MR. BIRCHFIELD:  Would anybody else be surprised to

14   learn that the FDA doesn't do the testing on the drugs?  Okay.

15   All right.

16              So you'll hear that the FDA doesn't do the

17   testing.  They just rely on the information, the studies, and

18   the information that the drug companies provide.  Okay.

19              Does anyone come to this case with the mindset

20   prejudging that, if the FDA allows a drug to be sold, then

21   that's good enough?  There shouldn't be any lawsuits?  Anybody

22   have that mindset starting off this case?

23              Everybody okay that it's the drug company's

24   responsibility for its product?

25              THE COURT:  Do you have much more, counselor?

OFFICIAL REALTIME TRANSCRIPT

10:42  1          **MR. BIRCHFIELD:**  Your Honor, just a few more minutes.

10:42  2          **THE COURT:**  Okay.

10:42  3          **MR. BIRCHFIELD:**  I want to touch on one other

10:42  4    instruction that Judge Fallon gave you, and that's the

10:42  5    plaintiff's burden here of a preponderance of the evidence or

10:42  6    more likely than not, and Judge Fallon asked you if you could

10:42  7    follow that instruction.

10:42  8              Here's what I want to know:  Based on what you

10:42  9    know so far about this case, that Ms. Mingo had a GI bleed, she

10:42  10   was taking the prescription drug Xarelto, the FDA has allowed

10:42  11   the drug to be sold, based on what you know, would it be hard

10:42  12   for you -- you told Judge Fallon you would, but would it be

10:43  13   hard for you to make your decision just based on more likely

10:43  14   than not?

10:43  15             Is there something about those facts that say,

10:43  16   "Oh, if I'm going to hold the drug company responsible, I'm

10:43  17   going to hold Ms. Mingo to a higher than just more likely than

10:43  18   not standard?"

10:43  19             Do you follow what I'm saying?  Does anybody

10:43  20   have a difficult time applying the more-likely-than-not

10:43  21   standard in this case?

10:43  22             Okay.  All right.  One last question, Your

10:43  23   Honor.

10:43  24             All right.  Judge Fallon asked the question

10:43  25   about, if you were in our spot, if you were in Ms. Mingo's

10:43  1   spot, is there something that you would want us to know about?
10:43  2   If you were called to switch places, is there something that we
10:43  3   should know about?  The reason I asked this again is because
10:43  4   you've been sitting here now and you've had a chance to think
10:44  5   about that and you've learned a little bit more about what to
10:44  6   expect in this case.
10:44  7              So given that time of reflection, is there
10:44  8   anything that you say, "You know, if I was in your spot, I'd
10:44  9   want to know this about me"?  Is there anything that you want
10:44 10   to share?  Anybody?
10:44 11              All right.  Thank you.
10:44 12         THE COURT:  Okay.  Thank you, counselor.
10:44 13              Jury, do you all need a break at this point?
10:44 14   All right.  Let's take a ten-minute break, and then we'll come
10:44 15   back and hear from the defendants.
10:44 16              Court will stand in recess.
10:44 17         THE DEPUTY CLERK:  All rise.
10:44 18         (WHEREUPON, the jury exited the courtroom.)
10:44 19         (WHEREUPON, the Court took a recess.)
10:59 20         THE DEPUTY CLERK:  All rise.
10:59 21         THE COURT:  Okay.  Be seated, please.  All right.
10:59 22   Ladies and gentlemen, we're almost through.  We have now to
10:59 23   hear from the defendant.
10:59 24              Thank you all for answering those questions.
10:59 25   All of us appreciate it.

OFFICIAL REALTIME TRANSCRIPT

10:59  1          **MR. JOHNSON:**  Good morning.  I'm going to try not to

10:59  2    be long with you, but I do have some questions that I want to

10:59  3    ask.

10:59  4                You've told us a lot of information on the

10:59  5    questionnaires already, and several of you approached the bench

10:59  6    and we've had individual conversations.  But I want to ask some

10:59  7    questions of each of you, and just briefly.  I don't want to

10:59  8    spend a lot of time on it, because I've got some questions from

11:00  9    the questionnaires and based on some things that you've already

11:00  10   said.

11:00  11               Ms. Root, you've already been up there and we've

11:00  12   talked with you, so I don't have any reason to talk to you.

11:00  13   Don't take it personally.  Okay?  We've had several of you that

11:00  14   have already been up there, and I probably won't speak to y'all

11:00  15   either.

11:00  16               So, Mr. Johnson, you're the first man up, and

11:00  17   I'm a Johnson too.  We're not related.  But you are an

11:00  18   assistant pastor over at New Horizon Church.

11:00  19          **JUROR NO. 2:**  Juror No. 2, Stanley Johnson.  Yes, I

11:00  20   am.

11:00  21          **MR. JOHNSON:**  And you're retired military?

11:00  22          **JUROR NO. 2:**  Yes, sir.  25 years, Air Force.

11:00  23          **MR. JOHNSON:**  And you're also a counselor?

11:00  24          **JUROR NO. 2:**  Yes, sir, a professional marriage and

11:00  25   family counselor.

OFFICIAL REALTIME TRANSCRIPT

|        |    |
|--------|----|
| 11:00  | 1  |
| 11:00  | 2  |
| 11:00  | 3  |
| 11:00  | 4  |
| 11:00  | 5  |
| 11:00  | 6  |
| 11:01  | 7  |
| 11:01  | 8  |
| 11:01  | 9  |
| 11:01  | 10 |
| 11:01  | 11 |
| 11:01  | 12 |
| 11:01  | 13 |
| 11:01  | 14 |
| 11:01  | 15 |
| 11:01  | 16 |
| 11:01  | 17 |
| 11:01  | 18 |
| 11:01  | 19 |
| 11:01  | 20 |
| 11:01  | 21 |
| 11:01  | 22 |
| 11:01  | 23 |
| 11:01  | 24 |
| 11:01  | 25 |

1    **MR. JOHNSON:**  Now, you know, pastors tend to have
2    good hearts, and as a counselor, you tend to empathize with
3    people that are injured, sometimes; is that right?  Is that
4    fair to say?
5         **JUROR NO. 2:**  That's true.  Yes, sir.
6         **MR. JOHNSON:**  What I want to know is, see, this is a
7    case, I represent a pharmaceutical company, Bayer and Janssen,
8    and I'm not an injured victim here, necessarily, but Ms. Mingo
9    has made allegations against us and she's blamed us for things
10   that's happened to her.
11        My question is could you listen to the evidence
12   in its entirety as well as listen to the instructions that
13   Judge Fallon gives you to follow and could you do that and set
14   sympathy aside?
15        **JUROR NO. 2:**  Yes, sir, I can.
16        **MR. JOHNSON:**  Are you sure you can do that for us?
17        **JUROR NO. 2:**  Yes, sir.
18        **MR. JOHNSON:**  Is there anybody else who thinks they
19   might have a problem with just not being able to set sympathy
20   aside in making a decision?  Just square up.  Anybody who might
21   have a problem with that?
22        Thank you, Mr. Johnson.
23        Ms. Lawson, you've already talked to the Court.
24   I guess I'm going to ask you one question, if we could just
25   pass mic down.

OFFICIAL REALTIME TRANSCRIPT

|       |    |                                                                      |
|-------|----|----------------------------------------------------------------------|
| 11:01 | 1  | Ms. Lawson, you can listen to the evidence and                       |
| 11:02 | 2  | make a decision in this case, can't you?                             |
| 11:02 | 3  | JUROR NO. 3:  Yes, sir.                                              |
| 11:02 | 4  | MR. JOHNSON:  The question both that Mr. Birchfield                   |
| 11:02 | 5  | and I both want to know the answers to, you can be fair to both      |
| 11:02 | 6  | parties, can't you?                                                  |
| 11:02 | 7  | JUROR NO. 3:  Yes, sir, I can.                                       |
| 11:02 | 8  | MR. JOHNSON:  And you'll abide by the instructions of                |
| 11:02 | 9  | Court?                                                               |
| 11:02 | 10 | JUROR NO. 3:  Yes, sir.                                              |
| 11:02 | 11 | MR. JOHNSON:  Thank you.                                             |
| 11:02 | 12 | Mr. Pittman, we've already talked with you, so                       |
| 11:02 | 13 | I'm going it let you pass it off.                                    |
| 11:02 | 14 | JUROR NO. 4:  Yes, sir.                                              |
| 11:02 | 15 | MR. JOHNSON:  Ms. Parker, you have the best                          |
| 11:02 | 16 | enunciation of anybody I've ever heard.                             |
| 11:02 | 17 | JUROR NO. 5:  Thank you.                                             |
| 11:02 | 18 | MR. JOHNSON:  You're a physical education teacher?                   |
| 11:02 | 19 | JUROR NO. 5:  I am.                                                  |
| 11:02 | 20 | MR. JOHNSON:  This is a case involving a                            |
| 11:02 | 21 | pharmaceutical company as well as an individual who was taking       |
| 11:02 | 22 | their medication, and while she was taking her medication, she       |
| 11:02 | 23 | had a GI bleed.                                                      |
| 11:02 | 24 | Do you know what that is, a GI bleed?                                |
| 11:02 | 25 | JUROR NO. 5:  Yes.                                                   |

OFFICIAL REALTIME TRANSCRIPT

11:02  1          **MR. JOHNSON:**  Okay.  From an ulcer.  And I guess my

11:02  2   question to you is, as a physical education teacher, you're all

11:02  3   about health and physical fitness, aren't you?

11:03  4          **JUROR NO. 5:**  I am.

11:03  5          **MR. JOHNSON:**  Juror No. 5.  And physicians are

11:03  6   involved because Xarelto is not a medication you can buy over

11:03  7   the counter.  It's required that a physician prescribe that

11:03  8   medication to you.  So a physician's involved, a patient's

11:03  9   involved, and there's a company that knows nothing about the

11:03  10  patient or the doctor.  They just simply manufactured the

11:03  11  medication.

11:03  12         Do you believe that a physician and a patient

11:03  13  ultimately have the sole decision-making process about the drug

11:03  14  that's taken, whether they'll take the drug?  Do you believe

11:03  15  that?

11:03  16         **JUROR NO. 5:**  Do I believe that they have the sole

11:03  17  responsibility?

11:03  18         **MR. JOHNSON:**  That the patient and the physician,

11:03  19  that they have the responsibility of deciding what medication

11:03  20  to take, as opposed to another medication.

11:03  21         **JUROR NO. 5:**  I believe that all parties share in

11:03  22  that responsibility.

11:03  23         **MR. JOHNSON:**  Okay.  That would be the patient, the

11:03  24  manufacturer, and the physician?

11:04  25         **JUROR NO. 5:**  That is correct.

OFFICIAL REALTIME TRANSCRIPT

11:04   1           MR. JOHNSON:  Okay.  And you, like the other jurors

11:04   2   that I've spoken with, you would listen to all of the evidence

11:04   3   in this case before you made a decision, wouldn't you?

11:04   4           JUROR NO. 5:  I would.

11:04   5           MR. JOHNSON:  And you would set sympathy aside?

11:04   6           JUROR NO. 5:  I would.

11:04   7           MR. JOHNSON:  Okay.  Thank you.  You can pass it

11:04   8   down.

11:04   9               Mr. Breeland.

11:04  10           JUROR NO. 6:  Beeland, Juror No. 6.

11:04  11           MR. JOHNSON:  Mr. Beeland, I'm sorry.  You were asked

11:04  12   a question and you responded to it, and if I remember -- let me

11:04  13   see what it was -- you were surprised that the FDA didn't do

11:04  14   its own research.  You found that shocking almost, didn't you?

11:04  15           JUROR NO. 6:  Well, it's just, I thought that's what

11:04  16   they did.  You know, I don't know -- I don't really know all

11:04  17   their responsibilities, but when I hear the name, that's what I

11:04  18   think.

11:04  19           MR. JOHNSON:  Most people don't.  But my question is

11:04  20   would you be willing to listen to the evidence to find out just

11:04  21   what the FDA does?

11:04  22           JUROR NO. 6:  Sure.

11:04  23           MR. JOHNSON:  And where they get their information

11:04  24   from?

11:04  25           JUROR NO. 6:  Yes.

OFFICIAL REALTIME TRANSCRIPT

11:05  1          **MR. JOHNSON:**  Would it shock you to learn that the

11:05  2  manufacturer provides the FDA information, as well as

11:05  3  independent agencies provide information as well?  Would that

11:05  4  shock you?

11:05  5          **JUROR NO. 6:**  No.

11:05  6          **MR. JOHNSON:**  You haven't made up your mind about

11:05  7  anything yet?

11:05  8          **JUROR NO. 6:**  No, sir.

11:05  9          **MR. JOHNSON:**  Has anybody here made up their mind

11:05  10  already about this case based on what you've heard?

11:05  11              Will Mr. Beeland pass it down.

11:05  12          **JUROR NO. 7:**  Juror No. 7.

11:05  13          **MR. JOHNSON:**  Ms. Rivers.

11:05  14          **JUROR NO. 7:**  Yes, sir.

11:05  15          **MR. JOHNSON:**  I think you said you are a service

11:05  16  coordinator?

11:05  17          **JUROR NO. 7:**  That's right.

11:05  18          **MR. JOHNSON:**  And you're in Rankin County?

11:05  19          **JUROR NO. 7:**  I live in Rankin County; I work in

11:05  20  Hinds County.

11:05  21          **MR. JOHNSON:**  Have you heard anything today that kind

11:05  22  of helps you make up your mind about this case already?

11:05  23          **JUROR NO. 7:**  No, sir.

11:05  24          **MR. JOHNSON:**  Because you really haven't heard

11:05  25  anything at all about the case, have you?

OFFICIAL REALTIME TRANSCRIPT

| | |
|---|---|
| 11:05 | 1 |
| 11:05 | 2 |
| 11:05 | 3 |
| 11:05 | 4 |
| 11:06 | 5 |
| 11:06 | 6 |
| 11:06 | 7 |
| 11:06 | 8 |
| 11:06 | 9 |
| 11:06 | 10 |
| 11:06 | 11 |
| 11:06 | 12 |
| 11:06 | 13 |
| 11:06 | 14 |
| 11:06 | 15 |
| 11:06 | 16 |
| 11:06 | 17 |
| 11:06 | 18 |
| 11:06 | 19 |
| 11:06 | 20 |
| 11:06 | 21 |
| 11:06 | 22 |
| 11:06 | 23 |
| 11:06 | 24 |
| 11:06 | 25 |

1   **JUROR NO. 7:**  No, sir, I haven't.

2   **MR. JOHNSON:**  You know, the lawyers will be doing a

3   lot of talking, but my question to you is will you base your

4   decision based on the evidence that you hear from the witness

5   stand?  And that is the evidence that the judge allows in, that

6   he finds admissible.  Can you do that?

7   **JUROR NO. 7:**  I can.

8   **MR. JOHNSON:**  And not base your decisions on anything

9   else you might think or might have heard or anything like that?

10   **JUROR NO. 7:**  No, sir.

11   **MR. JOHNSON:**  Thank you very much.  Would you pass it

12   back to that gentleman.

13   Sir, can you remind me of your name?

14   **JUROR NO. 14:**  Brian Isaac.

15   **MR. JOHNSON:**  Mr. Isaac, are we starting out at a

16   level place here today?

17   **JUROR NO. 14:**  Yes, sir.

18   **MR. JOHNSON:**  You don't have any preconceived notions

19   about the FDA?

20   **JUROR NO. 14:**  No, sir.

21   **MR. JOHNSON:**  About drug companies?

22   **JUROR NO. 14:**  No, sir.

23   **MR. JOHNSON:**  And the reason I ask you is, you've got

24   to understand my position, I represent a drug company.  And so

25   if you were standing in my shoes, would you accept you as a

OFFICIAL REALTIME TRANSCRIPT

```
11:06   1   juror?
11:06   2           JUROR NO. 14:  Hard to say, sir.
11:06   3           MR. JOHNSON:  If you were standing in the plaintiff's
11:06   4   shoes, would you accept you as a juror?
11:06   5           JUROR NO. 14:  It will be hard to say, sir.
11:07   6           MR. JOHNSON:  Okay.  So right now, you're just dead
11:07   7   even, huh?  We're dead even, aren't we?
11:07   8           JUROR NO. 14:  Pretty much, yes, sir.
11:07   9           JUROR NO. 13:  Mark Howell, No. 13.
11:07   10          MR. JOHNSON:  Mr. Howell, tell me again, what is it
11:07   11  that you do?
11:07   12          JUROR NO. 13:  I'm a commercial photographer.
11:07   13          MR. JOHNSON:  Commercial photographer?
11:07   14          JUROR NO. 13:  Yes.
11:07   15          MR. JOHNSON:  And you've sat here and listened to the
11:07   16  questions that I've asked and the questions that Mr. Birchfield
11:07   17  has asked.
11:07   18               Do you want to change your answers about
11:07   19  anything?
11:07   20          JUROR NO. 13:  No.
11:07   21          MR. JOHNSON:  Can you be fair to Ms. Mingo --
11:07   22          JUROR NO. 13:  Yes.
11:07   23          MR. JOHNSON:  -- as well as the drug company?
11:07   24          JUROR NO. 13:  Yes, sir.
11:07   25          MR. JOHNSON:  Does anybody have any preconceived
```

OFFICIAL REALTIME TRANSCRIPT

1    notions about corporate America, about companies and

2    corporations in America?  If you do, it's all right.  But

3    everybody would just like to know before we get engaged in this

4    trial.  Okay.

5              JUROR NO. 12:  Toni Hilson, Juror No. 12.

6              MR. JOHNSON:  Ms. Hilson, you said you give great

7    customer service.  That's what you do; is that right?

8              JUROR NO. 12:  Yes.

9              MR. JOHNSON:  I was looking at your questionnaire.

10   After you said that, I said, "Who is Ms. Hilson?"  And you

11   said, "Sometimes I'm a little concerned about the side effects

12   of medications."  Is that right?

13             JUROR NO. 12:  Sometimes I'm a little concerned about

14   it.

15             MR. JOHNSON:  And we all are.

16             JUROR NO. 12:  Yeah, I am.

17             MR. JOHNSON:  But my question to you is do you

18   believe that, if a drug has side effects, that means it's not a

19   safe drug?

20             JUROR NO. 12:  If it wasn't safe, I don't think my

21   doctor would have prescribed it.  But I'm always reading the

22   side effects, which some of them don't really affect me, but I

23   just always read them.

24             MR. JOHNSON:  Do you think most medications have some

25   side effects?

11:08   1          **JUROR NO. 12:**  Some, yes.

11:08   2          **MR. JOHNSON:**  And it's for your doctor to make a

11:08   3   determination as to whether or not the benefit outweighs the

11:08   4   risk of the drug.  Is that a fair statement?

11:09   5          **JUROR NO. 12:**  Yes.

11:09   6          **MR. JOHNSON:**  Do you rely on your doctor to do that?

11:09   7          **JUROR NO. 12:**  I do.

11:09   8          **MR. JOHNSON:**  Do you follow your doctor's

11:09   9   instructions?

11:09   10         **JUROR NO. 12:**  Yes.

11:09   11         **MR. JOHNSON:**  Do you think that's incumbent upon all

11:09   12  of us as patients to follow the instructions of our physician?

11:09   13         **JUROR NO. 12:** Yes.

11:09   14         **MR. JOHNSON:**  Well, thank you.  Would you pass it

11:09   15  down.

11:09   16         **JUROR NO. 11:**  Mary Martin, Juror No. 11.

11:09   17         **MR. JOHNSON:**  Ms. Martin, I think we've talked with

11:09   18  you, haven't we?

11:09   19         **JUROR NO. 11:**  Yes, sir.

11:09   20         **MR. JOHNSON:**  Well, you can pass it down.  Thank you.

11:09   21            Ms. Tew, you currently work at a church?

11:09   22         **JUROR NO. 10:**  Right.

11:09   23         **MR. JOHNSON:**  But you were previously a respiratory

11:09   24  therapist; is that right?

11:09   25         **JUROR NO. 10:**  Correct.

OFFICIAL REALTIME TRANSCRIPT

| | | |
|---|---|---|
| 11:09 | 1 | **MR. JOHNSON:**  And you heard me speak with the pastor. |
| 11:09 | 2 | **JUROR NO. 10:**  Correct. |
| 11:09 | 3 | **MR. JOHNSON:**  Will your good heart get in the way? |
| 11:09 | 4 | **JUROR NO. 10:**  I'm sorry? |
| 11:09 | 5 | **MR. JOHNSON:**  Will your heart, will your sympathy for |
| 11:09 | 6 | those -- natural sympathy for somebody who's had medical |
| 11:10 | 7 | problems, will that get in the way of you looking at this case |
| 11:10 | 8 | and making a decision based on the evidence? |
| 11:10 | 9 | **JUROR NO. 10:**  No, sir. |
| 11:10 | 10 | **MR. JOHNSON:**  Not even a little bit? |
| 11:10 | 11 | **JUROR NO. 10:**  No, sir. |
| 11:10 | 12 | **MR. JOHNSON:**  Just a little bit? |
| 11:10 | 13 | **JUROR NO. 10:**  No, sir. |
| 11:10 | 14 | **MR. JOHNSON:**  Okay.  Thank you.  You can pass it |
| 11:10 | 15 | down. |
| 11:10 | 16 | Sir, we've talked with you.  Would you pass it |
| 11:10 | 17 | to Mr. Robbins. |
| 11:10 | 18 | Mr. Robbins, do you know me? |
| 11:10 | 19 | **JUROR NO. 8:**  No. |
| 11:10 | 20 | **MR. JOHNSON:**  Well, let me ask you something.  Your |
| 11:10 | 21 | wife is a nurse? |
| 11:10 | 22 | **JUROR NO. 8:**  Yes. |
| 11:10 | 23 | **MR. JOHNSON:**  I went to school with your wife in |
| 11:10 | 24 | 1977.  Do you know what your wife was doing in '77?  I didn't |
| 11:10 | 25 | mean it that way. |

OFFICIAL REALTIME TRANSCRIPT

1    **JUROR NO. 8:**  We weren't even dating then.

2    **MR. JOHNSON:**  We went to x-ray school together for

3    about a year.  Nothing about that that's going to impact or

4    affect?

5    **JUROR NO. 8:**  Well, she didn't go to x-ray school.

6    My sister-in-law went to x-ray school.

7    **MR. JOHNSON:**  Well, see, I've got the wrong person.

8    Thank you for straightening me out.  I thought Sherry Faulkner.

9    **JUROR NO. 8:**  No, that's my brother's wife.

10    **MR. JOHNSON:**  That's your brother's wife.  You're

11    from Morton, Mississippi?

12    **JUROR NO. 8:**  Right.

13    **MR. JOHNSON:**  Okay.  Your father used to own a

14    drugstore?

15    **JUROR NO. 8:**  That's right.

16    **MR. JOHNSON:**  Well, thank you, sir.

17    But is there anything about this case right now

18    as you look at it that makes you decide one way or the other?

19    **JUROR NO. 8:**  No.

20    **MR. JOHNSON:**  You can look at it --

21    **JUROR NO. 8:**  I believe I can.

22    **THE COURT:**  And the fact that he knows something

23    about you, would that interfere with anything?

24    **JUROR NO. 8:**  No.

25    **THE COURT:**  You can still be fair to the plaintiffs

| | | |
|---|---|---|
| 11:11 | 1 | as well as the defendants? |
| 11:11 | 2 | **JUROR NO. 8:**  Yes. |
| 11:11 | 3 | **THE COURT:**  All right. |
| 11:11 | 4 | **MR. JOHNSON:**  Sir, can we pass it down.  That's |
| 11:11 | 5 | probably as far as I'm going to go the next row. |
| 11:11 | 6 | **THE MARSHAL:**  The first row? |
| 11:11 | 7 | **MR. JOHNSON:**  Yes, sir. |
| 11:11 | 8 | **JUROR NO. 15:**  Randy Creel, Juror No. 15. |
| 11:11 | 9 | **MR. JOHNSON:**  Mr. Creel. |
| | 10 | **JUROR NO. 15:**  Yes, sir. |
| 11:11 | 11 | **MR. JOHNSON:**  Yes, sir. |
| 11:11 | 12 | **JUROR NO. 15:**  Right. |
| 11:11 | 13 | **MR. JOHNSON:**  You've sat here and you've listened to |
| 11:11 | 14 | this case.  You listened to us do this voir dire, but I want to |
| 11:12 | 15 | tell you something.  During this case, there are going to be |
| 11:12 | 16 | some people that come in and the judge is going to qualify them |
| 11:12 | 17 | as expert witnesses.  You can listen to that evidence for us, |
| 11:12 | 18 | can't you? |
| 11:12 | 19 | **JUROR NO. 15:**  Yes, sir. |
| 11:12 | 20 | **MR. JOHNSON:**  And I'm really talking to everybody |
| 11:12 | 21 | here right now, so if you could just show me your hands.  But |
| 11:12 | 22 | would you agree with this statement, that it is not how loud I |
| 11:12 | 23 | say a thing or how many times I say a thing that makes it true. |
| 11:12 | 24 | It's how strong the basis of my opinion is?  Is that -- |
| 11:12 | 25 | **JUROR NO. 15:**  Yes, that's fair. |

1    **MR. JOHNSON:**  Will you hold the experts that come in
2    to testify to the standard of "What is the basis of your
3    opinion?"  And will you look at that basis as opposed to how
4    often they say it, how loud they say it?  Will you do that?
5    Because I'm going to tell you something,
6    everything that's wrong with this world today is because we
7    pulled out of Vietnam too early.  Now, that's my opinion.  But
8    this doesn't make it true, does it?
9    That was my question to you.  Just will you --
10   will you judge the experts, because if you're selected to serve
11   on the jury, you get to make the determination of whether or
12   not a witness is credible or not.
13   Can all of you do that?  Can all of you judge
14   the credibility of witnesses that take the stand?
15   Okay.  Would you mind passing it down?
16   **JUROR NO. 16:**  Aisha Eason, No. 16.
17   **MR. JOHNSON:**  I think we talked to you up at the
18   bench.  Don't take it personally, but you can pass it down a
19   couple.
20   Yes, ma'am.
21   **JUROR NO. 18:**  Felicia Lyles, juror No. 18.
22   **MR. JOHNSON:**  Ms. Lyles, you just told us that you
23   were a regional manager?
24   **JUROR NO. 18:**  Yes.
25   **MR. JOHNSON:**  You know, when jurors deliberate,

OFFICIAL REALTIME TRANSCRIPT

1  everybody has an opportunity to talk to the room.  And you're a
2  manager.  You're not going to take charge of the room
3  necessarily; right?
4          JUROR NO. 18:  I don't.  I have a personality where I
5  listen and observe.  I wouldn't.
6          MR. JOHNSON:  Okay.  Is there anything about what's
7  occurred here so far this morning that you find disturbing?
8          JUROR NO. 18:  No, sir.
9          MR. JOHNSON:  That would make you favor one side over
10  the other?
11          JUROR NO. 18:  No, sir.
12          MR. JOHNSON:  What we all want is just for you to
13  listen to the evidence and make a determination not based on
14  whether you like me, you don't like me, or whether anything
15  I've said has offended you, but just what the evidence is.  You
16  can do that?
17          JUROR NO. 18:  Yes, sir.
18          THE COURT:  Okay.  Counsel, we're about finished with
19  that now.  We've had enough.
20          MR. JOHNSON:  All right.  We've talked to you.  I've
21  got one other question, Your Honor, if I may.
22          Mr. Birchfield told you, and I also mentioned
23  it, that Ms. Mingo had a GI bleed while she was taking Xarelto.
24  Is there anyone who believes -- well, let me back up.  That's
25  really not going to be the issue in the case.

OFFICIAL REALTIME TRANSCRIPT

| | |
|---|---|
| 11:15 | 1 |
| 11:15 | 2 |
| 11:15 | 3 |
| 11:15 | 4 |
| 11:15 | 5 |
| 11:15 | 6 |
| 11:15 | 7 |
| 11:15 | 8 |
| 11:15 | 9 |
| 11:15 | 10 |
| 11:15 | 11 |
| 11:15 | 12 |
| 11:15 | 13 |
| 11:15 | 14 |
| 11:15 | 15 |
| 11:15 | 16 |
| 11:15 | 17 |
| 11:16 | 18 |
| 11:16 | 19 |
| 11:16 | 20 |
| 11:16 | 21 |
| 11:16 | 22 |
| 11:16 | 23 |
| 11:16 | 24 |
| 11:16 | 25 |

1    We all have stipulated that she had a bleed.

2 Will you be able to put that aside and look at the issues that

3 the Court instructs you to look at?  Can you do that even in

4 light of the fact that she had a GI bleed?  Can you do that?

5    One, that's all I have.

6    THE COURT:  Thank you, Counselor.

7    Anything from --

8    MS. PRUITT:  No, Your Honor.

9    THE COURT:  Okay.  All right.  Let me see counsel up

10 here.

11    (WHEREUPON, the following proceedings were held at

12 the bench.)

13    THE COURT:  We're finished with voir dire now, so

14 we'll start striking.

15    Dean will come to you with the one, two, three.

16 One, two, three for the plaintiff.  He comes to the defendant

17 first.  You pick just one, and then it goes to the plaintiffs.

18 You pick another one; it goes to the plaintiffs.  You pick a

19 third, and then it goes to the plaintiffs.  And then we have a

20 jury.

21    MR. JOHNSON:  We can back-strike, can we?

22    THE COURT:  Yes.  And the reason for that, in my

23 opinion, is that in the federal system, it's a unanimous jury.

24 And so if he strikes some juror -- every time you strike, it's

25 a new jury.  Every time he strikes, it's a new jury.

OFFICIAL REALTIME TRANSCRIPT

11:16  1          So let's assume he strikes -- we're picking 9.

11:16  2  He strikes Number 9.  You strike No. 7.  You can go back to No.

11:16  3  1 because he messed with the jury, and the same way from your

11:16  4  standpoint.

11:16  5          Any question about that back-striking?

11:16  6          Okay.  You're going to wind up with nine jurors.

11:16  7  Okay.  So we've got -- you all know you stopped on the one that

11:16  8  gives us that number.  So don't strike somebody that we're

11:17  9  never going to use.  Okay.  You all know that?

11:17  10         **MR. BIRCHFIELD:**  Yes, sir.

11:17  11         **THE COURT:**  All right, folks.  Let's do it.

11:17  12         (WHEREUPON, the following proceedings were held in

11:17  13  open court.)

11:17  14         **THE COURT:**  Okay.  Members of the jury, we've

11:17  15  finished with voir dire.  Now, what the attorneys are going to

11:17  16  do -- in the United States, we have something called

11:17  17  "striking."  Each side has an opportunity to do so.  And we've

11:17  18  already dealt with cause challenges.

11:17  19         On that question, let me see counsel again just

11:17  20  for a moment.

11:17  21         Dean, let's put this on first.

11:18  22         (WHEREUPON, the following proceedings were held at

11:18  23  the bench.)

11:18  24         **THE COURT:**  I'm sorry to get you all up here again.

11:18  25  We've done so many cause challenges already.  But are there any

| | |
|---|---|
| 11:18 | 1 |
| 11:18 | 2 |
| 11:18 | 3 |
| 11:18 | 4 |
| 11:18 | 5 |
| 11:18 | 6 |
| 11:18 | 7 |
| 11:18 | 8 |
| 11:18 | 9 |
| 11:18 | 10 |
| 11:18 | 11 |
| 11:19 | 12 |
| 11:19 | 13 |
| 11:19 | 14 |
| 11:19 | 15 |
| 11:19 | 16 |
| 11:19 | 17 |
| 11:19 | 18 |
| 11:19 | 19 |
| 11:19 | 20 |
| 11:19 | 21 |
| 11:19 | 22 |
| 11:19 | 23 |
| 11:19 | 24 |
| 11:19 | 25 |

1  other cause challenges that anybody wishes to bring up?

2        MR. JOHNSON:  We would renew our challenge of Aisha

3  Eason.  Other than that...

4        THE COURT:  Any *Batson* issues that anybody has?

5        MR. BIRCHFIELD:  Well, we need to strike first, Your

6  Honor.

7        THE COURT:  Well, I mean, from the cause challenges.

8        MR. BIRCHFIELD:  No, Your Honor, from our

9  perspective.

10        (WHEREUPON, the following proceedings were held in

11  open court.)

12        THE COURT:  Okay.  As I was saying, we have what we

13  call peremptory challenges.  Each side has an opportunity to

14  strike three jurors for any reason at all, as long as it's a

15  legal reason.  You can't strike somebody because they don't

16  like men or women, they don't like African-Americans or white

17  people or whatever, but any other reason they feel that the

18  answers that you've given indicated to them that they would be

19  best served if you serve on another jury.  That's what they're

20  doing now.

21        And you all have been very good in your answers.

22  You've been very thorough in your answers.  And all of us

23  appreciate that.

24        For those teachers among you, you should know

25  that, in our system, we do have peremptory challenges.  We

OFFICIAL REALTIME TRANSCRIPT

1   inherited this system from England.  We've been doing it now
2   for about 500 years, using jurors from the citizens --
3   600 years.  It's a good system.  It works.  And, obviously, it
4   worked for 500 years.  So it's a good system.
5            In criminal matters, for your information, 12
6   jurors are picked.  Somehow with Western civilization, we feel
7   12 is important.  There are 12 months in a year, 12 tribes of
8   Israel, 12 apostles, 12 signs of the zodiac, all of those
9   things.  We somehow rather feel 12 is good.
10           I mention that to you because, for those of
11  interest, because we're now sharing a lot of our system with
12  the former Soviet Union countries and also in the Far East, and
13  they're interested in the jury system because it's worked so
14  effectively for us.  But particularly in the Far East, they
15  seem to like more people than 12.  So they're studying it.
16  They have a lot of people participate in their jury.
17           But the point I make is that it's a good system.
18  It works.  And you've seen how it operates now.  You've seen
19  what the lawyers do, what the judge does.  And that's part of
20  your citizen education.
21           I appreciate you being here.  All of us
22  appreciate it.
23           The lawyers are now almost finished with their
24  peremptory challenges, and I've decided the cause challenges
25  already.

OFFICIAL REALTIME TRANSCRIPT

| | | |
|---|---|---|
| 11:31 | 1 | Let me see counsel, please. |
| 11:31 | 2 | (WHEREUPON, the following proceedings were held at |
| 11:31 | 3 | the bench.) |
| 11:31 | 4 | **THE COURT:**  Okay.  I need you all to check your |
| 11:31 | 5 | notes.  What I have as the first juror is No. 2, Stanley |
| 11:31 | 6 | Johnson.  The second juror is No. 3, Joyce Lawson.  The third |
| 11:31 | 7 | juror is No. 4, Jeremy Pittman.  The fourth juror is No. 6, |
| 11:32 | 8 | Danny Beeland.  The fifth juror is No. 7, Chrissy Rivers.  The |
| 11:32 | 9 | sixth juror is No. 8, Russell Robbins.  The seventh juror is |
| 11:32 | 10 | No. 11, Mary Elizabeth Martin.  The eighth juror is No. 12, |
| 11:32 | 11 | Toni Hilson.  And the ninth juror is No. 13, Mark Howell. |
| 11:32 | 12 | Does that comport with your notes? |
| 11:32 | 13 | **MR. JOHNSON:**  Yes, sir. |
| 11:32 | 14 | **THE COURT:**  Any *Batson* issues? |
| 11:32 | 15 | **MR. MEUNIER:**  Your Honor, we do have a *Batson* |
| 11:32 | 16 | challenge we'd like to make for the record. |
| 11:32 | 17 | **THE COURT:**  Okay. |
| 11:32 | 18 | **MR. MEUNIER:**  When all the excuses for cause have |
| 11:32 | 19 | been concluded, with a total of six peremptory strikes |
| 11:32 | 20 | available to each side, that meant that the peremptory strike |
| 11:32 | 21 | zone, if you will, included Jurors No. 1 through 16.  One of |
| 11:33 | 22 | those having been excused, No. 9, for cause. |
| 11:33 | 23 | So Nos. 1 through 16 were in the so-called |
| 11:33 | 24 | peremptory strike zone.  In that group, there were a total of |
| 11:33 | 25 | four African-Americans.  In that group, the defendants |

OFFICIAL REALTIME TRANSCRIPT

11:33  1  exercised two of their peremptories to strike two of those four
11:33  2  African-Americans.  And we believe that, under the *Batson*
11:33  3  decision of 1986, this constitutes a prima facie showing of
11:33  4  discrimination based on race in the pattern of their strikes.
11:33  5          THE COURT:  Let's take it one at a time.  What's the
11:33  6  first one?
11:33  7          MR. MEUNIER:  The defendants first strike was No. 5,
11:33  8  Bettie Parker.
11:33  9          THE COURT:  What's the reason for Parker?
11:33 10          MR. JOHNSON:  Your Honor, her questionnaire, Bettie
11:33 11  Parker said, in new development, the product should be removed
11:33 12  if something surfaces.  She takes a cholesterol medicine that
11:34 13  requires monitoring.  Her sister had a stroke and was disabled.
11:34 14  It was her response to the questionnaire about the warning that
11:34 15  concerned us, and that's why we struck her.
11:34 16          THE COURT:  Okay.  Go ahead.
11:34 17          MR. MEUNIER:  May I respond?  First of all, she was
11:34 18  not questioned about that at all in the voir dire exercise.
11:34 19          The two post-*Batson* decisions of the Supreme
11:34 20  Court, *Snyder v. Louisiana* and *Foster v. Chapman*, both make it
11:34 21  clear that if white jurors in the venire have the same or
11:34 22  similar circumstances and were not challenged, that that puts
11:34 23  into question the intent to strike a juror.
11:34 24          Now, it's not necessary to show that there's an
11:34 25  identical white juror that was not struck, but there were other

OFFICIAL REALTIME TRANSCRIPT

11:34 1    jurors in this venire who had a similar situation that's just

11:34 2    been described by counsel.

11:34 3            THE COURT:  Okay.  Any response?

11:34 4        MR. JOHNSON:  One, I don't think that's accurate.

11:34 5    There is no other white juror that concerned us with their

11:35 6    responses with the questionnaire.

11:35 7            What Mr. Meunier says is probably true.  We, in

11:35 8    this particular case, though, have a questionnaire where the

11:35 9    jurors have had time to think about their responses and they're

11:35 10   reading it to us and tell us what they have opinions about.

11:35 11           THE COURT:  I've heard from both sides.  I'm going to

11:35 12   deny that *Batson* motion.

11:35 13           What's the second one?

11:35 14       MR. MEUNIER:  The second strike by the defendants was

11:35 15   Juror No. 16, Aisha Marsha Eason, E-A-S-O-N.  Your Honor, I

11:35 16   know you're handling these on a single basis, but it's the

11:35 17   pattern of -- that two of their three strikes represented 50

11:35 18   percent of the African-Americans in the strike zone.

11:35 19       MR. JOHNSON:  The reason that we struck Aisha Eason

11:35 20   was the first thing she said was she had a negative experience

11:35 21   with UMMC, and most times, the student misdiagnoses, it's

11:35 22   mostly student training, and poor care that's rendered.

11:36 23           All of our experts come from the University of

11:36 24   Mississippi Medical Center.  That's one of the concerns.

11:36 25           The other is "I feel prescription drug companies

11:36
11:36
11:36
11:36
11:36
11:36
11:36
11:36
11:36
11:36
11:36
11:36
11:36
11:36
11:36
11:36
11:36
11:36
11:36
11:37
11:37
11:37
11:37
11:37
11:37

1    no longer make an effort for safety after the medication is on
2    the market because their whole purpose is to get it on the
3    market."
4            That's the theme that they have, Your Honor.
5        THE COURT:  We've had questionnaires on this.  I put
6    her as a question mark.  I was concerned about her answers.  So
7    I don't think that that's a valid *Batson* challenge, and I'll
8    deny that.
9            What's the last one?
10       MR. MEUNIER:  Well, those were the two that they
11   exercised peremptories.
12       THE COURT:  I notice, for the record, that there are
13   African-Americans on the jury in this particular case.  I don't
14   think that there's a valid *Batson* challenge, so I'll deny the
15   challenges.
16           So what I'll do is I'll advise these individuals
17   that they are members of the jury.  I'll have some words for
18   them, and then we'll take a break and we'll do opening
19   statements after lunch.
20           We'll take an hour and 15 minutes for lunch.
21       MS. PRUITT:  Judge, could I put one other thing on
22   the record for the *Batson* charge?  We did strike a white juror,
23   No. 1, Margaret Root who is a Caucasian female.
24       THE COURT:  Okay.  Thank you very much.
25           (WHEREUPON, the following proceedings were held in

| | |
|---|---|
| 11:37 | 1 |
| 11:37 | 2 |
| 11:37 | 3 |
| 11:37 | 4 |
| 11:37 | 5 |
| 11:37 | 6 |
| 11:37 | 7 |
| 11:37 | 8 |
| 11:37 | 9 |
| 11:38 | 10 |
| 11:38 | 11 |
| 11:38 | 12 |
| 11:38 | 13 |
| 11:38 | 14 |
| 11:38 | 15 |
| 11:38 | 16 |
| 11:38 | 17 |
| 11:38 | 18 |
| 11:38 | 19 |
| 11:39 | 20 |
| 11:39 | 21 |
| 11:39 | 22 |
| 11:39 | 23 |
| 11:39 | 24 |
| 11:39 | 25 |

open court)

            THE COURT:  The first juror -- I'll call the names of
the jury.  Those I do not call or excuse --

            Do you know if they have --

        THE DEPUTY CLERK:  Second floor, back to the jury
room, Judge.

        THE COURT:  Okay.  So if your name is not called, go
back to the second floor, the jury room, and they'll process
you out.

            The first juror in this case -- those
individuals that I have called their names, remain and we'll --
I'll have a few words, and then we'll take a break and come
back in the afternoon for opening statement.

            The first juror is No. 2, Stanley Johnson.  The
second juror is No. 3, Joyce Lawson.  The third juror is No. 4,
Jeremy Pittman.  The fourth juror is No. 6, Danny Beeland.  The
fifth juror is No. 7, Chrissy Rivers.  The sixth juror is
No. 8, Russell Robbins.  The seventh juror is No. 11, Mary
Elizabeth Martin.  The eighth juror is No. 12, Toni Hilson.
And the ninth juror is No. 13, Mark Howell.

            If your name has been called, please remain.  If
your name has not been called, please go to the second floor.

            Before you leave, I'd ask -- I'd like to tell
you, those of you who have not been called for this jury, I
appreciate you being here.  Your answers have been very helpful

| | | |
|---|---|---|
| 11:39 | 1 | to us in selecting a jury.  So you have served your court |
| 11:39 | 2 | system and you served your country well, and all of us |
| 11:39 | 3 | appreciate it. |
| 11:39 | 4 | I ask everybody to rise out of respect for these |
| 11:39 | 5 | individuals as they leave. |
| 11:40 | 6 | THE COURT:  Swear in the jury, please. |
| 11:40 | 7 | (WHEREUPON, the jury was sworn.) |
| 11:40 | 8 | THE COURT:  Okay.  Be seated, please. |
| 11:40 | 9 | Ladies and gentlemen, you have now been selected |
| 11:40 | 10 | to serve as jurors in this case.  I have no doubt that you, as |
| 11:40 | 11 | jurors, are mindful of your great responsibilities. |
| 11:40 | 12 | Let's wait for a moment. |
| 11:40 | 13 | (WHEREUPON, the venire exited the courtroom.) |
| 11:41 | 14 | THE COURT:  I should say congratulations to each of |
| 11:41 | 15 | you.  You have been the chosen ones for this particular case. |
| 11:41 | 16 | I have no doubt that you, as jurors, are mindful of your great |
| 11:41 | 17 | responsibility.  And, certainly, you will be aware that your |
| 11:41 | 18 | conduct during the trial will be observed by the Court, your |
| 11:41 | 19 | fellow jurors, the parties, the attorneys for all the parties, |
| 11:41 | 20 | and other persons both inside and outside of this courtroom. |
| 11:41 | 21 | I expect -- and your responsibility demands -- |
| 11:41 | 22 | that you be extremely careful in the manner in which you |
| 11:41 | 23 | conduct yourselves in order that no one has any doubt that this |
| 11:41 | 24 | case has been fairly and impartially tried and that, in the |
| 11:41 | 25 | end, justice has been done. |

OFFICIAL REALTIME TRANSCRIPT

1    For the same reason, the attorneys in the case,

2  the parties, witnesses, and all others identified or connected

3  in any way with this trial should equally be careful with their

4  conduct.

5    During the course of the trial, the jurors

6  should not engage or even attempt to engage or have any

7  conversation of any kind whatsoever with any of the persons

8  connected with this trial, including the parties, the

9  relatives, families, the attorneys for the parties, the

10  witnesses, and parties identified with this trial.  And,

11  likewise, any person identified with this trial should never

12  attempt to have any conversation with any jurors.

13    Now, ladies and gentlemen, you and I know that

14  simple conversation wouldn't mean anything, but it's important

15  in justice that justice not only be done but justice appear to

16  be done.  And if people see jurors talking to the attorneys for

17  one side or the other, they may have an appearance of

18  impropriety.  So let's not do that.

19    I know that the attorneys are personable and

20  would like to greet you in the morning and say hello because

21  they're friendly individuals.  I've asked them not to do that

22  in the future because -- for that same reason.  So don't take

23  it against them that they don't greet you as I know they would

24  ordinarily.

25    I'd like to give you some specific instructions

OFFICIAL REALTIME TRANSCRIPT

| | | |
|---|---|---|
| 11:43 | 1 | about the case.  You're not to discuss the case with anyone |
| 11:43 | 2 | during the course of the trial.  This includes your spouse, |
| 11:43 | 3 | your child, your relatives, friends, and strangers.  You're not |
| 11:43 | 4 | even to discuss the case among yourselves until the witnesses |
| 11:43 | 5 | are finished and the evidence is in. |
| 11:43 | 6 | Now, the reason for that is that oftentimes, |
| 11:43 | 7 | when you begin discussing things, that is to say, we reach some |
| 11:43 | 8 | conclusions, some verdict.  And you're not to do that until you |
| 11:43 | 9 | hear all of the evidence and the statements of law by the |
| 11:44 | 10 | Court. |
| 11:44 | 11 | And oftentimes you and I know that, when we say |
| 11:44 | 12 | something, we then have to stick with it because we said it. |
| 11:44 | 13 | So it's better not to say anything to anybody until you've got |
| 11:44 | 14 | all the evidence in, and then you can discuss it until you feel |
| 11:44 | 15 | you're able to reach a verdict. |
| 11:44 | 16 | If any publicity about this case has come to |
| 11:44 | 17 | your attention before, you should strike it from your minds and |
| 11:44 | 18 | completely disregard anything that has come to your attention. |
| 11:44 | 19 | From this moment on, you're not to read anything in the |
| 11:44 | 20 | newspapers or other accounts of the trial, if there be any.  If |
| 11:44 | 21 | anything comes on television that pertains to this trial, |
| 11:44 | 22 | please leave the room.  Don't look at it. |
| 11:44 | 23 | The reason for that is that the decision -- your |
| 11:44 | 24 | whole decision in this case must be from the evidence and the |
| 11:44 | 25 | testimony that you hear while you're a member of the jury in |

| | | |
|---|---|---|
| 11:44 | 1 | this courtroom.  And, likewise, I ask that you not access |
| 11:45 | 2 | Facebook or Google or any social media, such as search engines |
| 11:45 | 3 | or anything, and find anything out about this case. |
| 11:45 | 4 | And the reason for that, ladies and gentlemen, |
| 11:45 | 5 | is that, in a very real sense, we are going to study this |
| 11:45 | 6 | particular case.  And this is kind of like a laboratory where |
| 11:45 | 7 | we're going to discuss this case and discover together.  And if |
| 11:45 | 8 | you find anything outside of this laboratory, it's going to be |
| 11:45 | 9 | a germ that you're going to bring in and contaminate justice. |
| 11:45 | 10 | And the reason for that is that, in this |
| 11:45 | 11 | laboratory, which we call a courtroom, we have certain rules. |
| 11:45 | 12 | And each side has the opportunity to cross-examine the witness. |
| 11:45 | 13 | And that cross-examination is two sides to the issue.  It's |
| 11:45 | 14 | like somebody said -- you see my hand.  You don't really see my |
| 11:45 | 15 | hand until you've seen both sides of my hand.  And that's what |
| 11:46 | 16 | we do in this courtroom. |
| 11:46 | 17 | We have the opportunity to cross-examine, and |
| 11:46 | 18 | you'll have an opportunity to listen to both the examination |
| 11:46 | 19 | and the cross-examination.  And when you access something |
| 11:46 | 20 | outside of the courtroom, you don't have that same facility. |
| 11:46 | 21 | You just get one side of it.  And when you bring it back into |
| 11:46 | 22 | this courtroom, into this laboratory of justice, you |
| 11:46 | 23 | contaminate it with a germ. |
| 11:46 | 24 | So please don't do it.  I know it's hard |
| 11:46 | 25 | sometimes.  I know my kids and my grandkids -- I think they're |

OFFICIAL REALTIME TRANSCRIPT

| | | |
|---|---|---|
| 11:46 | 1 | attached to their devices.  They can't get along without them, |
| 11:46 | 2 | and that's just the way we live these days.  But please don't |
| 11:46 | 3 | do it.  I'd like to count on you for that. |
| 11:46 | 4 | Finally, you're not to reach any conclusion in |
| 11:46 | 5 | the case until all the evidence has been presented and the |
| 11:46 | 6 | Court has instructed you on the law applicable to the case and |
| 11:46 | 7 | it is given to you for deliberation and decision. |
| 11:47 | 8 | In the morning when you arrive and during the |
| 11:47 | 9 | day when you're in the building and the Court is in recess for |
| 11:47 | 10 | any reason the jury is not required in the courtroom, I ask |
| 11:47 | 11 | that you go to and remain in the jury room or remain under the |
| 11:47 | 12 | direct supervision of the United States marshal.  I'll assign a |
| 11:47 | 13 | marshal to be of assistance to you all during the course of |
| 11:47 | 14 | this trial. |
| 11:47 | 15 | If the jury room is too hot or too cold, let him |
| 11:47 | 16 | know and he'll do something about it.  We'll provide you with |
| 11:47 | 17 | coffee and drinks and things of that sort -- soft drinks, not |
| 11:47 | 18 | alcoholic beverages.  But we'll try to make it as comfortable |
| 11:47 | 19 | for you as possible.  I know they do a good job of that here. |
| 11:47 | 20 | So the case will proceed in the following |
| 11:47 | 21 | manner:  First, the counsel for the plaintiff and counsel for |
| 11:47 | 22 | the defendant will have an opportunity to make what we call |
| 11:47 | 23 | opening statements.  We'll do that after lunch. |
| 11:48 | 24 | An opening statement by a party is simply a |
| 11:48 | 25 | party -- the lawyer's explanation of what he or she expects the |

OFFICIAL REALTIME TRANSCRIPT

1    evidence to show.  It's sort of like a verbal program that they

2    give you so that you can better follow the evidence.

3           They'll tell you what they expect the evidence

4    to show so that you feel a general feeling of where they're

5    going with the case.  But the point I make to you is that that

6    is not evidence.  It's only their view of what the evidence is

7    to show.  Opening statements, just like closing arguments, are

8    not evidence.

9           After the opening statement -- the plaintiff,

10   the defendant make opening statements.  And then the plaintiff

11   will introduce evidence in support of their allegations.  At

12   the conclusion of the plaintiff's evidence, counsel for the

13   defendant may well introduce evidence.

14          Following that, the plaintiff has an opportunity

15   to call what we call rebuttal evidence to rebut anything.  They

16   may or may not put on rebuttal evidence.  They may feel it's

17   not necessary, for whatever reason.

18          The fourth, at the conclusion of evidence, the

19   parties will have an opportunity to make what we call

20   summations, closing arguments sometimes.  They'll sum up the

21   evidence and show you what the evidence is, as they see it, and

22   how it supports their respective positions.

23          Just as with opening statement, closing argument

24   is not evidence.  It's just what the attorneys feel that the

25   evidence has shown and what inferences you may draw from the

1    evidence.

2             Finally, I'll have an opportunity to talk to you

3    about the law.  I'll instruct you on the law, and I'll give you

4    what we call jury charges.  I'll talk to them with you about

5    them, and I'll give you a copy of them to take with you in the

6    jury room.

7             It's your duty to determine the facts and to

8    determine them from the evidence.  And in so doing, you must

9    not indulge in any speculation or guesswork.  The evidence that

10   you are to consider consists of the testimony of the witnesses

11   and the exhibits admitted into evidence.

12            In considering the weight and value of the

13   testimony of any witness, you may take into consideration the

14   appearance, the attitude, and the behavior of the witness, the

15   interest of the witness in the outcome of the suit, the

16   relation of the witness to the parties, the inclination of the

17   witness to speak truthfully or not, the probabilty or

18   improbability of the witness' statements, and all other facts

19   and circumstances in evidence.

20            Thus you may give the testimony of any witness

21   just such weight and just such value as you, the jury, believe

22   that testimony is entitled to receive.

23            In every jury trial, there are, in effect, two

24   judges.  I'm one of the judges, but you are the other judge,

25   you the jury.  You will determine the facts of the case.  And

OFFICIAL REALTIME TRANSCRIPT

1    you and you alone will determine the facts of this case.

2            Now, the admission of evidence in court is

3    governed by what we call the rules of law, sometimes rules of

4    evidence.  From time to time, it may be the duty of the

5    attorneys to make objections to the admissibility of evidence.

6    It is my duty as the judge to rule on those objections.

7            My ruling may well affect whether you can

8    consider certain evidence.  You must not concern yourself with

9    the objections or the Court's reasons for its ruling on them.

10   You must not consider the testimony or exhibits to which an

11   objection was sustained or which has been ordered stricken.

12           If I instruct you not to consider testimony or

13   evidence to which an objection is sustained or which has been

14   ordered stricken, you must completely ignore such testimony or

15   evidence and not take it into consideration when deciding the

16   case.

17           You must not be influenced to any degree by any

18   personal feelings or sympathy for or prejudice against any

19   party or their counsel.  No statement or ruling or remark which

20   I may make during the presentation of testimony or evidence is

21   intended to indicate my opinion as to the facts of this case.

22           As I mentioned, you are to determine the facts

23   of this case, and you alone must decide upon the believability

24   of the evidence and its weight and value.

25           Now, if you would like to take notes during this

OFFICIAL REALTIME TRANSCRIPT

| | | |
|---|---|---|
| 11:52 | 1 | trial, you may do so.  On the other hand, you're not required |
| 11:52 | 2 | to take notes.  If you do not take notes, please decide the |
| 11:53 | 3 | case solely on what you hear and the testimony.  If you decide |
| 11:53 | 4 | to take notes, please be careful to get -- not to get so |
| 11:53 | 5 | involved in note-taking that you become distracted from the |
| 11:53 | 6 | ongoing proceedings. |
| 11:53 | 7 | Remember, your notes should be used only as |
| 11:53 | 8 | memory aids.  You should not give the notes any precedence over |
| 11:53 | 9 | your independent recollection of the evidence.  Now, whether or |
| 11:53 | 10 | not you take notes, you should rely upon your own independent |
| 11:53 | 11 | recollection of the proceedings, and you should not be unduly |
| 11:53 | 12 | influenced by the notes of other jurors. |
| 11:53 | 13 | Remember that notes are not entitled to any |
| 11:53 | 14 | greater weight than the memory or impression of each juror as |
| 11:53 | 15 | to what the testimony may have been.  Whether or not you take |
| 11:53 | 16 | notes, each of you must form and express your own opinion as to |
| 11:53 | 17 | the facts of this case. |
| 11:53 | 18 | I ask that you pay close attention because, at |
| 11:54 | 19 | the end of the trial, we'll not be able to give you any |
| 11:54 | 20 | particular transcript of any particular witness because you |
| 11:54 | 21 | should make your decision based on the whole evidence, the |
| 11:54 | 22 | whole trial.  So please listen closely, take notes if you need |
| 11:54 | 23 | to, but pay close attention. |
| 11:54 | 24 | All right.  At this time, we'll take a break, |
| 11:54 | 25 | and the attorneys will have an opportunity to make opening |

OFFICIAL REALTIME TRANSCRIPT

| | | |
|---|---|---|
| 11:54 | 1 | statements to you.  We'll take a break for an hour and |
| 11:54 | 2 | 15 minutes. |
| 11:54 | 3 | Court will stand in recess for an hour and |
| 11:54 | 4 | 15 minutes. |
| 11:54 | 5 | THE DEPUTY CLERK:  All rise. |
| 11:54 | 6 | (WHEREUPON, the jury exited the courtroom.) |
| 11:55 | 7 | THE COURT:  Counsel, from the standpoint of opening, |
| 11:55 | 8 | I think in a case of this sort, it seems to me that an opening |
| 11:55 | 9 | from half an hour, 35-40 minutes, is appropriate.  I'm not |
| 11:55 | 10 | going to put any time limits on you.  I will in closing |
| 11:55 | 11 | argument.  But opening statements, I think you have to kind of |
| 11:55 | 12 | keep it down.  I don't want to go over an hour for opening |
| 11:55 | 13 | statements for each side.  So 40-45 minutes, something like |
| 11:55 | 14 | that is appropriate. |
| 11:55 | 15 | All right.  Court will stand in recess. |
| 11:55 | 16 | THE DEPUTY CLERK:  All rise. |
| 11:55 | 17 | (LUNCHEON RECESS) |
| 11:55 | 18 | ***** |
| 11:55 | 19 | CERTIFICATE |
| 11:55 | 20 | I, Jodi Simcox, RMR, FCRR, Official Court Reporter |
| 11:55 | 21 | for the United States District Court, Eastern District of Louisiana, do hereby certify that the foregoing is a true and |
| 11:55 | 22 | correct transcript, to the best of my ability and understanding, from the record of the proceedings in the |
| 11:55 | 23 | above-entitled and numbered matter. |
| 11:55 | 24 | s/Jodi Simcox, RMR, FCRR |
| | | Jodi Simcox, RMR, FCRR |
| 11:55 | 25 | Official Court Reporter |

OFFICIAL REALTIME TRANSCRIPT