1            UNITED STATES DISTRICT COURT

2           SOUTHERN DISTRICT OF MISSISSIPPI

3

4

5   IN RE:  XARELTO              *
    (RIVAROXABAN) PRODUCTS       *
6   LIABILITY LITIGATION         *
                                 *
7   THIS DOCUMENT RELATES TO:    *   Docket No.: 14-MD-2592
                                 *   Section "L"
8   *Dora Mingo, et al. v.*      *   Jackson, Mississippi
    *Janssen Research &*         *   August 7, 2017
9   *Development, LLC, et. al.,* *
    Case No.: 15-CV-3469         *
10  * * * * * * * * * * * * * * * *

11              VOLUME I - AFTERNOON SESSION
            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
12         BEFORE THE HONORABLE ELDON E. FALLON
               UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15

    For the Plaintiffs'
16  Liaison Counsel:            Gainsburg Benjamin David
                                  Meunier & Warshauer
17                              BY:  GERALD E. MEUNIER, ESQ.
                                2800 Energy Centre
18                              1100 Poydras Street
                                New Orleans, Louisiana 70163
19

20
    For the Plaintiffs:         Beasley Allen
21                              BY:  ANDY BIRCHFIELD, ESQ.
                                P.O. Box 4160
22                              Montgomery, Alabama 36103

23

24

25

*OFFICIAL TRANSCRIPT*

```
 1   APPEARANCES:

 2                                   Gainsburg Benjamin Davis
                                       Meunier & Warshauer
 3                                   BY:  WALTER C. MORRISON, IV, ESQ.
                                     240 Trace Colony Park Drive
 4                                   Suite 100
                                     Ridgeland, Mississippi 39157
 5

 6
                                     Goza Honnold
 7                                   BY:  BRADLEY D. HONNOLD, ESQ.
                                     11181 Overbrook Road, Suite 200
 8                                   Leawood, Kansas 66211

 9
                                     The Lambert Firm
10                                   BY:  EMILY JEFFCOTT, ESQ.
                                     701 Magazine Street
11                                   New Orleans, Louisiana 70130

12
     For the Defendant Bayer
13   HealthCare Pharmaceuticals
     Inc. and Bayer Pharma AG:       Mitchell, Williams, Selig, Gates &
14                                     Woodyard, P.L.L.C.
                                     BY:  LYN P. PRUITT, ESQ.
15                                   425 W. Capitol Avenue, Suite 1800
                                     Little Rock, Arkansas 72201
16

17
                                     Watkins & Eager, PLCC
18                                   BY:  WALTER T. JOHNSON, ESQ.
                                     400 East Capitol Street
19                                   Jackson, Mississippi 39201

20

21   For Janssen Pharmaceuticals,
     Inc. and Janssen Research &
22   Development, LLC:               Barrasso Usdin Kupperman Freeman &
                                       Sarver, LLC
23                                   BY:  RICHARD E. SARVER, ESQ.
                                     909 Poydras Street, 24th Floor
24                                   New Orleans, Louisiana 70112

25
```

*OFFICIAL  TRANSCRIPT*

127

1

2

3      Official Court Reporter:        Tana J. Hess, CRR, RMR
                                       500 Poydras Street
                                       Room B275
4                                      New Orleans, Louisiana 70130
                                       (504) 589-7781
5

6

7      Proceedings recorded by mechanical stenography using
       computer-aided transcription software.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**OPENING STATEMENTS**

                                                          PAGE

Opening Statement by Mr. Birchfield                          5

Opening Statement by Ms. Pruitt                             30


**INDEX OF WITNESSES**

NAME                                                      PAGE

Susan Geiger

        Direct Examination by Mr. Birchfield             53

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
| 12:00AM  | 1  | (Afternoon session.)                                         |
| 1:15PM   | 2  | (Whereupon the jury entered the courtroom.)                  |
| 1:16PM   | 3  | **THE COURT:**  Okay.  Be seated, please.                    |
| 1:16PM   | 4  | Ladies and gentlemen, we're here -- we'll hear               |
| 1:16PM   | 5  | opening statements from the parties.  Hear from the plaintiffs |
| 1:16PM   | 6  | first.                                                       |
| 1:16PM   | 7  | **MR. BIRCHFIELD:**  Thank you, Your Honor.                  |
| 1:16PM   | 8  | Good afternoon.  Thank you for coming back.                  |
| 1:16PM   | 9  | Thank you for serving as jurors in this case.                |
| 1:16PM   | 10 | And I think that you will -- you will see that               |
| 1:16PM   | 11 | in your role -- your role as jurors is vitally important.    |
| 1:16PM   | 12 | There are things you'd rather be doing, but this is vitally  |
| 1:16PM   | 13 | important.  It's important to Ms. Mingo.  And, as the evidence |
| 1:16PM   | 14 | comes in, I think that you will see that your role as jurors is |
| 1:16PM   | 15 | important to our community and our society.                  |
| 1:16PM   | 16 | This case is a story about a time when marketing            |
| 1:17PM   | 17 | outran science.  One company did it, and the others stood by |
| 1:17PM   | 18 | and let it happen.                                           |
| 1:17PM   | 19 | The blood thinner market is a big market.  It's             |
| 1:17PM   | 20 | a highly competitive market.  It's a big market because there |
| 1:17PM   | 21 | are many people in the US and all across the world that are on |
| 1:17PM   | 22 | blood thinners.  The conditions that blood thinners are     |
| 1:17PM   | 23 | prescribed for are -- there are a lot of them, and they affect |
| 1:17PM   | 24 | so many people.                                             |
| 1:17PM   | 25 | The blood thinner market is growing, and it's              |

1:17PM
1:17PM
1:17PM
1:17PM
1:17PM
1:17PM
1:17PM
1:18PM
1:18PM
1:18PM
1:18PM
1:18PM
1:18PM
1:18PM
1:18PM
1:18PM
1:18PM
1:18PM
1:18PM
1:18PM
1:18PM
1:18PM
1:18PM
1:19PM
1:19PM

1  projected to continue to grow.  So these corporations saw that

2  there was a benefit in having a product in the -- in the blood

3  thinner market.

4         Janssen.  Janssen is a large corporation, but

5  its parent corporation is Johnson & Johnson.  And Janssen and

6  Johnson & Johnson had some of its key products, some of its key

7  drugs, with the patents about to expire.  So when a patent

8  expires, then generic competition can come in, and the price of

9  the brand-name drug and the profit from that drug can drop

10  dramatically.

11         So Janssen is looking forward.  They see that

12  they have a number of their key products that are losing patent

13  protection, and so they're looking for -- they're looking for a

14  revenue source to fill that gap.

15         And they -- they are looking for a blood

16  thinner.  They see the opportunity in the blood thinner market,

17  that a blood thinner, if it's marketed properly, could become a

18  blockbuster drug.  More than just a blockbuster drug, they

19  expected, with the right marketing plan, that a blood

20  thinner -- a blood thinner could be the number one selling

21  product for Johnson & Johnson, the daddy corporation.

22         Now, Johnson & Johnson sells hundreds of

23  products, so the target of making a product the number one

24  selling product for J&J is an aggressive target.

25         Johnson & Johnson and Janssen, they didn't have

1:19PM  1  a workable blood thinner in the pipeline, but Bayer did.  Bayer
1:19PM  2  was developing the drug that has now become known as Xarelto.
1:19PM  3  So Bayer is looking for a partner to sell its drug in the US,
1:19PM  4  and Janssen is looking for a blood thinner to get into this
1:19PM  5  blood thinner market.  And so they struck a deal.
1:19PM  6          Now, at this point -- at this point the studies
1:19PM  7  that were being -- that were done to see how the drug really
1:19PM  8  works in real patients, they hadn't been done yet.  Those
1:19PM  9  hadn't been finished, but they struck a deal.  They began the
1:19PM 10  business discussions, and they reached an agreement.  They
1:19PM 11  negotiated an agreement, and that agreement, it included key
1:19PM 12  provisions about how the -- how this drug would be marketed,
1:19PM 13  how it would be presented to doctors and patients in the US.
1:20PM 14          Now, normally you do the studies, you understand
1:20PM 15  how the drug actually works in real life and with real
1:20PM 16  patients, and then you develop a marketing plan.  Then you
1:20PM 17  develop how you're going to present those -- those attributes
1:20PM 18  to the public.
1:20PM 19          Not here.  Not with Xarelto.  They reached this
1:20PM 20  agreement that included these key provisions because Janssen
1:20PM 21  knew, Janssen knew the messages that would sell in this market.
1:20PM 22  So they made it a matter of contract.  This would be the way
1:20PM 23  that the drug would be marketed here.  In that contract, those
1:20PM 24  key provisions have major safety implications for patients in
1:20PM 25  the US.

1:20PM 1          The evidence that you will hear in this case, we

1:20PM 2     will present two competing narratives or story lines, if you

1:20PM 3     will.  The narrative that you will hear, the story that you

1:21PM 4     will hear from the companies is that blood thinners are

1:21PM 5     lifesaving drugs.  And we agree.  And you will hear from the

1:21PM 6     company that the conditions that blood thinners are prescribed

1:21PM 7     for, some of those conditions are life-threatening conditions.

1:21PM 8     We agree.

1:21PM 9          You will hear from the companies that they tell

1:21PM 10    all the important information to doctors and that the FDA has

1:21PM 11    approved this drug and its label multiple times, planting the

1:21PM 12    idea that because the FDA allows it to be sold, then you should

1:21PM 13    accept that it is good and safe.  We don't agree with that.

1:21PM 14          You will hear from the companies -- all of us

1:21PM 15    agree -- that Ms. Mingo suffered a GI bleed, a stomach bleed.

1:21PM 16          The companies will say that Ms. Mingo's GI bleed

1:21PM 17    was caused by something else other than Xarelto.  They

1:21PM 18    acknowledge that Xarelto causes bleeding and even GI bleeding;

1:22PM 19    but now that Ms. Mingo has suffered her bleed, they say her GI

1:22PM 20    bleed was caused by something else.

1:22PM 21          Our narrative.  Our narrative is different.  The

1:22PM 22    evidence that we will present in this case will show that to

1:22PM 23    compete in this highly competitive blood thinner market, that

1:22PM 24    these companies, they cut corners.  They cut corners with

1:22PM 25    their -- with the studies, the studies that they did on the

drug to get approval to sell it.  They cut corners by not doing tests that are important to find out about how the drug really works.  These are things that don't happen often, but these corners that were cut, they happened here.  They happened with Xarelto.

The evidence that you will see and hear about Xarelto is that it has certain characteristics that makes it different than other blood thinners.  One of those important characteristics is what's called "variability," the way that it affects the body.  It can have a tenfold difference.

So if there's a hundred people here in the courtroom, and we all take the same dose pill, some would have ten times more of the drug in our blood, effective, working in our blood.  And so we say that the tests need to be done to determine those patients that are at that high level, those that are at an extra-high risk of a bleed.

The evidence will show that the defendants know that there's a test that can be done.  They even say so to doctors in other countries, but not here.  Janssen made a choice not to tell doctors, and Bayer stood by and let it happen.  They did not tell doctors because fear of telling doctors about a testing that may be helpful and provide helpful information would hurt sales, especially at this critical time, this all-important time when the drug is going onto the market, because the companies know that that initial time getting the

drug established by doctors very early on is important because they know that doctors, once they get a patient on a drug, they don't want to change it.  They're reluctant to make those changes.  So they know that it's important to get there early and get in to the doctors early.

      If the doctors -- if the doctors in this community acknowledge that there's a way to test, that there's a way to test to identify those patients that are at high risk on this drug, then they would have known -- the doctors in this community would have known very early that Xarelto was not the right drug for Dora Mingo.

      It boils down to this.  There's a way to test, and they should tell.

      The evidence will present these two competing narratives.  And the way you view these two competing narratives, the one that you decide is more likely true than not will guide how you answer the key questions at the end of this case.  If we've done our job right, you are the perfect people to figure this out.  We have a pastor and a counselor. We have businessmen.  We have managers.  We have customer service.  You're dealing with problems every day.  You're having to sort through the truth from fiction.  So we think that you are the right people to figure this out.

      So what are the three questions?  We don't have power?  On the --

1:25PM 1      THE DEPUTY CLERK:  Yep.

1:25PM 2      MR. BIRCHFIELD:  What are the three questions, the

1:25PM 3  main questions, that you're going to be called on to decide?

1:26PM 4      The first one is did these companies -- did

1:26PM 5  these companies act as reasonable pharmaceutical companies

1:26PM 6  should act in instructing doctors about Xarelto?

1:26PM 7      All blood thinners -- all blood thinners -- have

1:26PM 8  a risk of bleeding, and all blood thinners warn about that

1:26PM 9  risk.  There is no marketing disadvantage to putting a warning

1:26PM 10  on a blood thinner because they are all in that same boat.

1:26PM 11      This is not a failure-to-warn case.  This is a

1:26PM 12  failure-to-properly-instruct case.  This morning, as Judge

1:26PM 13  Fallon was talking about the case, failure to warn or a failure

1:26PM 14  to properly instruct, this is a failure-to-properly-instruct

1:26PM 15  case.

1:26PM 16      Part of that question, part of the question is

1:26PM 17  did they properly instruct?  It's easy.  In fact, I think it

1:26PM 18  will even be undisputed.  They did not tell.  They did not tell

1:27PM 19  doctors here in the US.  They did not tell doctors in this

1:27PM 20  community about a way to test to see how Xarelto affects a

1:27PM 21  patient's body.

1:27PM 22      In fact, they did just the opposite.  Their

1:27PM 23  message to doctors, their message to doctors through the label

1:27PM 24  and through other means was that it is not possible to test.

1:27PM 25  There is no way to test.  That was their message.

1:27PM 1        So what you will need to decide is, is there a

1:27PM 2   way to test?  Is there a helpful test that doctors should be

1:27PM 3   made aware of?  The evidence that we will bring for you will

1:27PM 4   show that there is a way to test, but Janssen chose not to tell

1:27PM 5   doctors in the US, and Bayer stood by and let them do it.

1:27PM 6        Withholding helpful information, helpful testing

1:27PM 7   information, is not what a reasonable pharmaceutical company

1:28PM 8   would do.  But that's what happened here.

1:28PM 9        The highly contested issue in this trial is

1:28PM 10  going to be whether there is a way to test.  We say yes; the

1:28PM 11  defendants say no.

1:28PM 12       In order for us to get to the bottom of that --

1:28PM 13  of that issue, to decide that question, it's helpful to

1:28PM 14  understand how blood thinners work.

1:28PM 15       Our bodies are fearfully and wonderfully made.

1:28PM 16  It's amazing.  Our bodies are designed to fix themselves.  We

1:28PM 17  always are having cuts or wounds, and our bodies spring into

1:28PM 18  action, and they will form clots.  Our blood will form clots at

1:28PM 19  that site and allow that wound to begin to heal.

1:28PM 20       A lot of times this happens on the outside.  We

1:28PM 21  see it.  We see the scabs there.  But oftentimes this happens

1:28PM 22  on the inside, and we never see it.  We're eating a bag of

1:28PM 23  potato chips.  The potato chips have sharp little edges.  We

1:29PM 24  get nicks and cuts along the way, and our body just springs

1:29PM 25  into action and forms little clots.  It will stop the bleeding,

1:29PM   1   and our body will heal.

1:29PM   2   　　　　　Our blood.  Our blood needs to be liquid so we

1:29PM   3   can carry oxygen to the cells, but it also needs to clot so

1:29PM   4   that we don't bleed out from small nicks or cuts or scrapes.

1:29PM   5   It's a very delicate balance.

1:29PM   6   　　　　　Sometimes we have -- sometimes we have

1:29PM   7   conditions like heart conditions that may make us more prone to

1:29PM   8   the form a clot, or we may have major surgery like hip surgery,

1:29PM   9   like Ms. Mingo had here, and you're not able to move around.

1:29PM   10  You're immobile for a period of time, and our blood will tend

1:29PM   11  to clot in those circumstances.  So to maintain this balance,

1:29PM   12  if our body is prone to clot, then blood thinners, blood

1:29PM   13  thinners serve an important role by making -- by making it --

1:29PM   14  that balance come back, by having that balance.

1:30PM   15  　　　　　So it's -- blood thinners are very important.

1:30PM   16  And it's important that we clot just enough so that our -- a

1:30PM   17  blood clot will form if we have some type of injury, but not

1:30PM   18  too -- not too thin, because if it's too thin, then we have

1:30PM   19  major bleeding like a GI bleed or a brain bleed.  That can be

1:30PM   20  fatal.  So it's a delicate balance that blood thinners are

1:30PM   21  seeking to achieve here.

1:30PM   22  　　　　　The blood thinners serve an important role, but

1:30PM   23  they work differently.  Warfarin -- warfarin or Coumadin -- is

1:30PM   24  a blood thinner that's been around for 60 years.  It's

1:30PM   25  interesting that warfarin actually started out as rat poison,

1:30PM   1   and then it was found to have this amazing ability to thin our

1:30PM   2   blood if needed.  It's funny how some really important medicine

1:30PM   3   comes from funny places:  Warfarin from rat poison, penicillin

1:30PM   4   from bread mold.

1:30PM   5           But one of the things about warfarin is that you

1:31PM   6   need to get your blood checked.  You need to get your blood

1:31PM   7   checked usually about once a month.  You check your blood.  If

1:31PM   8   your blood is too thin, then you lower the dose.  If it's too

1:31PM   9   thick, then they'll raise the dose.  It's a very delicate

1:31PM  10   balance that must be maintained.

1:31PM  11           So here's what happened.  With this blood

1:31PM  12   thinner market growing, companies began to look to get into

1:31PM  13   this market.  Scientists began to say, can we -- can we make a

1:31PM  14   blood thinner that is better than warfarin?  And that's good.

1:31PM  15   Better is good.  Scientists are always looking for ways to make

1:31PM  16   things better.  If it works well for 97 percent of the people,

1:31PM  17   let's see if we can make it work better for 98 or 99 percent of

1:31PM  18   the people.

1:31PM  19           So companies started looking to get into this

1:31PM  20   blood thinner market to see if they could make a product, a

1:31PM  21   drug that would work better than warfarin.  And so we have this

1:31PM  22   new class of drugs called NOACs, or sometimes it's called

1:31PM  23   DOACs, novel oral anticoagulants or direct oral anticoagulants.

1:32PM  24   Same thing.

1:32PM  25           You probably have heard of some of these.  We

1:32PM   1    talked about Xarelto.  There's Eliquis.  There's Pradaxa and

1:32PM   2    Savaysa.  There's different brands, almost like different

1:32PM   3    models of trucks -- Ford, Chevy, Nissan, Toyota.  You got

1:32PM   4    different models.  There are different blood thinners.  They

1:32PM   5    are all blood thinners, but they work differently.  And so you

1:32PM   6    need different tools in order to measure the effects of these

1:32PM   7    different blood thinners.

1:32PM   8            To help explain this, I went to -- I went to

1:32PM   9    AutoZone the other day.  And I've got two sons.  I've got one

1:32PM  10    son who is -- who just graduated, and he just graduated from

1:32PM  11    college and he started a job.  But -- but I also have a

1:32PM  12    9-year-old.  My wife and I adopted him from Eastern Europe

1:32PM  13    about three years ago.  My older son knows all about cars.  My

1:32PM  14    younger son, he doesn't know anything except how to get in and

1:33PM  15    buckle up.

1:33PM  16            So I went to AutoZone, and I picked up some

1:33PM  17    tools.  So here's -- that'll check your air conditioner and

1:33PM  18    that would check the level of antifreeze, and then there's

1:33PM  19    some -- there's some -- here's an air gauge to check the air

1:33PM  20    pressure.  Or actually I got several of those.  And, you know,

1:33PM  21    these will -- they all check air pressure, but they'll work in

1:33PM  22    different ways.

1:33PM  23            So if I give this bag of tools to my son and I

1:33PM  24    don't tell him that you need to check air pressure, that if

1:33PM  25    it's too high, that could be dangerous, if it's too low, that

1:33PM  1    that could be dangerous, if I just give him a bag of tools and

1:33PM  2    I don't tell him that you need to measure and how to measure, I

1:33PM  3    don't give him those instructions, I haven't done much for him.

1:33PM  4              Blood thinners.  Blood thinners work

1:33PM  5    differently.  Doctors have a bag of tools.  They have tools

1:33PM  6    that can be used to measure the effect of blood thinners, but

1:33PM  7    they need the instructions.  They need to know, you know, which

1:34PM  8    one of these -- which one of these air gauges would work, if

1:34PM  9    you will.

1:34PM  10             They're not air gauges.  It's called

1:34PM  11   "prothrombin time."  This one will check your air pressure, and

1:34PM  12   it'll get you close.  This one, that's more sensitive, and that

1:34PM  13   gets you even closer.  This one will measure to the tenths.

1:34PM  14   Some of these tools are more sensitive than others, and that's

1:34PM  15   true in measuring the anticoagulants as well.

1:34PM  16             The medical community here was told that you --

1:34PM  17   it's not possible to measure with Xarelto.  This information

1:34PM  18   was withheld from them.  If you agree -- if you agree with the

1:34PM  19   evidence that we present that there is a way to test, then your

1:34PM  20   answer to question number one at the end of the case when Judge

1:34PM  21   Fallon gives you the instructions, the answer to question

1:34PM  22   number one -- did they fail to properly instruct? -- would be

1:34PM  23   yes.

1:34PM  24             The second question is, was -- that you'll be

1:35PM  25   presented at the end of the case, was Xarelto defectively

1:35PM    1    designed?  We're not talking about changing up the way the

1:35PM    2    molecule is constructed.  What we're talking about here is

1:35PM    3    should it have been marketed with its own test?

1:35PM    4                And so Judge Fallon at the end of the -- at the

1:35PM    5    end of the evidence, he will give you instructions on the law

1:35PM    6    that applies to this case.  And I believe that he will talk to

1:35PM    7    you about what it means to have a defectively designed product.

1:35PM    8                The sellers -- did the sellers know about the

1:35PM    9    danger with this product?  Was there a danger that the sellers

1:35PM    10   knew about?  And did that danger cause the product to work less

1:35PM    11   effectively and less safely than was expected?  And was there a

1:35PM    12   safer, feasible design?

1:35PM    13               And I think that you will see the evidence in

1:36PM    14   this case that there is a danger, and this danger was known to

1:36PM    15   the sellers, and this danger keeps Xarelto from working as

1:36PM    16   safely and effectively as you would expect, not being at too

1:36PM    17   high a risk of thin blood, and that there is an alternative

1:36PM    18   design, a feasible design, a design that will really work.

1:36PM    19               Before Xarelto was ever sold here in the United

1:36PM    20   States, these corporations had some decisions to make, some

1:36PM    21   important decisions.  And the decisions that they made had

1:36PM    22   safety implications and selling implications.  Health versus

1:36PM    23   wealth, if you will.

1:36PM    24               One of the key decisions that the company had to

1:36PM    25   make -- several of these key decisions involved the design of

1:36PM   1    the drug.  One was whether this drug, whether Xarelto, should
1:36PM   2    be marketed with its own safety indicator test.  Should it come
1:37PM   3    with an indicator test, identify those patients that are at
1:37PM   4    high risk?
1:37PM   5              So as the company is making this decision on the
1:37PM   6    health side, the answer to that question, should it have an
1:37PM   7    indicator test, is yes, absolutely.  There will be patients --
1:37PM   8    there will be patients that are at extra-high risk.  They have
1:37PM   9    this high variability.  They need to be identified so that
1:37PM  10    those patients can be taken off Xarelto early, before they have
1:37PM  11    a major bleeding event.
1:37PM  12              There will be emergency surgery situations.
1:37PM  13    There will be patients on Xarelto -- there may be a patient on
1:37PM  14    Xarelto that has a stroke or they have some other type of
1:37PM  15    problem that needs immediate surgery.  You got a patient on
1:37PM  16    Xarelto.  They have a brain bleed and a stroke, and the doctors
1:37PM  17    know that there's pressure building.  They need to do surgery.
1:37PM  18    They need to do it immediately.  Should there be a test, an
1:37PM  19    indicator test, to let them know whether they can do surgery
1:38PM  20    immediately?  Or do they need to wait until more of the drug
1:38PM  21    clears the system?
1:38PM  22              On the health side of the equation, the answer
1:38PM  23    was yes.  Yes, there should be -- there should be a safety
1:38PM  24    test.  Xarelto should be marketed with its own safety indicator
1:38PM  25    test.

On the wealth side of the equation, the answer was no, because there was concern.  There was concern that if there is -- if doctors know that there's a test, they know that there's a way to test, they'll think they should test, and that will make us too much like -- that will make us too much like warfarin.

In marketing, one of the key things that you need is differentiation.  You want differentiation in a positive way, not in a negative way.  And so they did not want to be in that same boat with warfarin.  So the marketing side, the sales and marketing side, said no -- or at least the loudest voices on the marketing side said, "No, do not -- do not put this on safety indicator test.  Do not tell doctors about a test."

You will see that the decision was made to go forward marketing Xarelto in the US without its own -- without its own safety indicator test.

That test is in addition to the PT test, that tool kit that the doctors have.  They've got a way to measure the PT.  They just don't have the instructions to it.  We're talking about two different ways to address this problem.

How do you identify those patients that are at extra-high risk?  One, you tell doctors about the tool that's in their kit already.  Tell them about the PT test.  Don't tell them it's not possible.

1:39PM
1:39PM
1:39PM
1:39PM
1:40PM
1:40PM
1:40PM
1:40PM
1:40PM
1:40PM
1:40PM
1:40PM
1:40PM
1:40PM
1:40PM
1:40PM
1:40PM
1:40PM
1:40PM
1:41PM
1:41PM
1:41PM
1:41PM
1:41PM
1:41PM

1    The other way is to market Xarelto with its own

2  test, with its own indicator test.  That test -- that second

3  test is what's called a Factor Xa test or the anti-Factor Xa

4  test.  And the way that -- all these blood thinners work in

5  different ways.  And our body has different proteins, different

6  factors that are involved in the clotting process.  One of

7  those factors is Factor X, Factor Xa, when it becomes

8  activated.

9    And so Xarelto, that's the factor that Xarelto

10 affects.  So you can measure.  You can measure the effect that

11 Xarelto is having blocking Factor Xa.  That's a test that is

12 used in other places and other places Xarelto is marketed where

13 Factor Xa test is readily available; not here in the US.  They

14 use the Factor Xa test in their own studies to get approval for

15 the drug.  It is -- it is a test that is -- that is used in

16 other places, and the companies know about it, but they made

17 the decision not to market Xarelto in the US with this test.

18    The tests that we are talking about, the tests

19 that we are offering you as evidence in this case, are proven,

20 valid, scientific tests.  We are not offering you any unproven

21 theories.  We are offering you valid science.

22    Now, you may hear that doctors in the

23 community -- in this community do not do what we suggest, and

24 that's true.  But all of that would change, all of that would

25 change, if the -- if the defendants would tell doctors about

1:41PM 1  this test.  Otherwise, doctors feel like they're going out on a

1:41PM 2  limb.  If the makers and the sellers of the drug won't tell

1:41PM 3  them about the test, won't put this information in the label,

1:41PM 4  they feel like they're going out on a limb.

1:41PM 5           But they would.  They would follow those

1:41PM 6  instructions.  The evidence will show they would follow those

1:41PM 7  instructions if the defendants would tell them about this test.

1:41PM 8           There is a safer alternative design.  So the

1:41PM 9  answer to Question 2, do you accept that evidence that there is

1:42PM 10  a safer alternative design, the defendants know about it, they

1:42PM 11  use it in other places?  If you agree with that, then the

1:42PM 12  answer to Question Number 2 would be yes.

1:42PM 13           Before we move to Question Number 3, I want

1:42PM 14  to -- I want to talk to you about the evidence that you will

1:42PM 15  see in this case and the way that you will receive evidence in

1:42PM 16  this case.

1:42PM 17           One is that you'll have exhibits or documents

1:42PM 18  that will be admitted by Judge Fallon through the course of

1:42PM 19  this trial.  You'll be able to take those documents with you

1:42PM 20  back into the jury room in your deliberations and review those

1:42PM 21  exhibits.

1:42PM 22           And then there will be witnesses that --

1:42PM 23  witnesses that will come live and take this witness stand, and

1:42PM 24  they will give testimony under oath.  So if a witness lives

1:42PM 25  within the state, they live within a hundred miles, then a

1:42PM 1    subpoena can be issued, and they can be brought here, and they

1:42PM 2    can provide live testimony for you.

1:42PM 3                   You're also going to have -- you're also going

1:42PM 4    to have testimony that's going to come by satellite, and that's

1:42PM 5    because Janssen is a New Jersey corporation.  It's more than a

1:43PM 6    hundred miles.  It's outside of the state.  We cannot issue a

1:43PM 7    subpoena and compel them to come to this courthouse.

1:43PM 8                   But the Court can order them to appear.  A

1:43PM 9    subpoena can be issued, and they can appear to a courthouse

1:43PM 10   within a hundred miles of where they live; and by satellite,

1:43PM 11   they can appear.  So you will have some testimony that will

1:43PM 12   come in by way of satellite.

1:43PM 13                  And then you will have video.  Video

1:43PM 14   depositions.  And Bayer is a German corporation.  Many of the

1:43PM 15   witnesses are beyond where we can even have them appear in a

1:43PM 16   courthouse and do them by satellite.  So their testimony will

1:43PM 17   come in by way of video deposition.

1:43PM 18                  And this is the -- I want you to understand how

1:43PM 19   this process works because you -- there may be hours and hours

1:43PM 20   of deposition, and both sides get to ask, and if there's two or

1:44PM 21   three or four points that we want, that we think it's important

1:44PM 22   to be presented, it will be in that deposition.  But it may be,

1:44PM 23   you know, among several hours of deposition testimony.

1:44PM 24                  That's the process, but it's important.  This is

1:44PM 25   important information for you in deciding this case.  So that's

1    the way you will have evidence in this case.

2            So now to the third question.  And the third

3    question goes to proximate cause.  Judge Fallon, at the end of

4    the case, he will give you instructions on the law.  He'll talk

5    to you about proximate cause.  I believe that he will tell you

6    that what Ms. Mingo must prove in this case is that Xarelto was

7    a substantial contributing factor; more likely than not,

8    Xarelto was a substantial contributing factor in producing her

9    GI bleed.

10            I mean, there can be other things that played a

11   part.  If Ms. Mingo had an ulcer, but Xarelto made that ulcer

12   into a bleeding ulcer, the answer to Question 3 would be yes.

13   If there were other medicines or aspirins that could cause --

14   that could cause bleeding but Xarelto was a substantial

15   contributing factor in her bleeding, then the answer to

16   Question 3 would be yes.

17            And that brings us to -- that brings us to

18   Ms. Mingo.  You met Ms. Mingo for -- just briefly this morning.

19   Ms. Mingo lives in southern Mississippi.  She -- born, raised

20   all her life in southern Mississippi.  She went to high school

21   in Beaumont.  She attended Alcorn State, graduated in 1970 with

22   a degree in business education.

23            She went to Southern Miss and got a

24   certification in remedial reading and then to Jackson State for

25   special education.

1:45PM  1          For 37 years, Ms. Mingo has been a teacher in

1:46PM  2    the public school system.  She retired in 2010.  She still does

1:46PM  3    some substitute teaching.  But Ms. Mingo, she taught -- but

1:46PM  4    most of the time that she taught, she was dealing with children

1:46PM  5    with special needs, with Down syndrome and children with severe

1:46PM  6    disabilities.

1:46PM  7          Ms. Mingo was a special woman doing a special

1:46PM  8    job.  She -- you met Jileta, her daughter.  And Jileta lives

1:46PM  9    next door with her three children, and those three children are

1:46PM  10   Dora Mingo's pride and joy.  You want to get her talking, you

1:46PM  11   ask her about her grandkids, and she'll get to talking.

1:46PM  12         I want to turn to the events that bring us here

1:46PM  13   today.  So in 2013, May of 2013, Ms. Mingo began having some

1:46PM  14   pain in her hips, and it got worse.  So about a year and a half

1:47PM  15   later, she is -- she's told that she needs to see an orthopedic

1:47PM  16   surgeon.  And the orthopedic surgeon says, "You need to have

1:47PM  17   hip replacement surgery."

1:47PM  18         So on January the 6th of 2015, Ms. Mingo goes

1:47PM  19   in, and she has hip replacement surgery done.  The surgery is

1:47PM  20   successful, and she's doing fine.  About two weeks later, she

1:47PM  21   develops a blood clot in her lower leg.  And blood clots are

1:47PM  22   common complications following hip surgery or knee surgery.

1:47PM  23         Ms. Mingo goes to the ER here in Macomb, and she

1:47PM  24   is -- she's admitted to the hospital.  And they start -- that

1:47PM  25   night, they do some blood work.  And the blood work -- one of

1:47PM
1:47PM
1:48PM
1:48PM
1:48PM
1:48PM
1:48PM
1:48PM
1:48PM
1:48PM
1:48PM
1:48PM
1:48PM
1:48PM
1:48PM
1:48PM
1:48PM
1:48PM
1:49PM
1:49PM
1:49PM
1:49PM
1:49PM
1:49PM
1:49PM

1   the tests -- you'll see when they do blood work in situations

2   like this, they'll get a whole panel of different types of

3   tests.  They're all done.  It's the standard.  One of the

4   standard tests that was done was the PT test, the test that I

5   was talking about earlier.

6          The PT test showed that Ms. Mingo's -- that

7   Ms. Mingo's PT was perfectly normal, range of 12 to 15, 12.5.

8   So she is -- she's perfectly normal.

9          The next day -- the next day she's switched from

10  the standard of care, which they started her on initially at

11  the hospital, Lovenox and warfarin.  She's switched the next

12  day by Dr. Renie Jordon to Xarelto, and he tells her to take

13  Xarelto twice a day.  She does.  Takes it that morning.  She

14  takes it that evening.

15         After one day of Xarelto, the next morning

16  before she takes her third dose, her PT test is taken again.

17  And the PT test results at this point are 23.6.  One day after

18  Xarelto, 23.6.

19         So what does Dr. Jordon and the other doctors

20  that are treating her -- what do they do?  Do they lower her

21  dose or switch her to a blood thinner with a lower bleeding

22  risk?  No, they don't change anything.  They continue her on

23  Xarelto.  She's discharged from the hospital and instructed to

24  continue taking -- taking her Xarelto.

25         And she does.  Why?  Why would Dr. Jordon or the

1:49PM   1
1:49PM   2
1:49PM   3
1:49PM   4
1:49PM   5
1:49PM   6
1:49PM   7
1:50PM   8
1:50PM   9
1:50PM  10
1:50PM  11
1:50PM  12
1:50PM  13
1:50PM  14
1:50PM  15
1:50PM  16
1:50PM  17
1:50PM  18
1:50PM  19
1:50PM  20
1:50PM  21
1:50PM  22
1:51PM  23
1:51PM  24
1:51PM  25

other doctors, why wouldn't they change things up?  Because Dr.
Jordon -- Dr. Jordon and the doctors in the community, they
believed what the companies told them about this drug.  They
believed what was in the label, that you can't monitor the
anticoagulant or blood-thinning effect of Xarelto with a
standard laboratory test.  PT is a standard laboratory test.
They believed that PT was irrelevant for patients on Xarelto.

So Ms. Mingo continues taking her Xarelto.  And
over the next few months, the next few months -- I mean -- I'm
sorry -- the next few weeks, she begins to experience some
symptoms.

On February the 12th, she goes to her regular
doctor.  They draw some blood work.  And then the next morning,
February the 13th -- the next morning, Ms. Mingo gets a call
from her doctor's office, and she's told, "Get to the ER.  Get
there immediately.  You've lost over half of your blood
volume."

So Ms. Mingo goes to -- she does as she's told.
She goes to the ER.  They do some additional tests.  They
confirm that she has suffered a major blood loss.  They
diagnose her with anemia and acute upper GI -- upper GI bleed.
And so she is -- she's hospitalized there.  And then
Dr. Keith -- Dr. Keith comes in, and he treats her.  He does
some additional tests, and he -- and he does what he describes
as a lifesaving procedure on Ms. Mingo.  He stops the bleed.

1:51PM  1        At that point Ms. Mingo's PT was 26.2.
1:51PM  2   Fortunately, Dr. Keith intervened and he was able to stop the
1:51PM  3   bleeding with this lifesaving procedure, and the bleeding was
1:51PM  4   stopped before organ failure set in for Ms. Mingo.
1:51PM  5        The reason that Ms. Mingo brought this case is
1:51PM  6   because all of this.  All of these problems could have been
1:51PM  7   avoided had the defendants simply told the doctors about the
1:51PM  8   test, that the test has meaning.
1:52PM  9        Did Dr. Jordon know about bleeding risk with
1:52PM  10  Xarelto?  Yes.  All doctors know about that.  It's in the
1:52PM  11  label.  There's no question about that.  But there is nothing
1:52PM  12  in the label, there's nothing in the information that they
1:52PM  13  provide doctors about an instruction to use the PT test to
1:52PM  14  identify those patients that are at extra-high risk of
1:52PM  15  bleeding.
1:52PM  16       One of the -- one of the issues that -- that you
1:52PM  17  will be called upon to decide at the end of the case is would
1:52PM  18  it have made any difference?  Would it have made any difference
1:52PM  19  if Dr. Jordon had known?  If he had known about this PT test,
1:52PM  20  would it have changed the way that he treated Ms. Mingo?
1:52PM  21       One of the things that -- one of the things that
1:52PM  22  you will hear is that he doesn't second-guess, you know, his
1:52PM  23  decision.  Of course not.  It's what -- he was making his
1:52PM  24  decision based on what the defendants had told him.  That's the
1:53PM  25  best information.  There's no reason for him to second-guess

1:53PM   1   that decision.

1:53PM   2           But one thing is clear.  His testimony is very

1:53PM   3   clear that, if he had -- if he had known about a test, he would

1:53PM   4   have used it.  He -- Dr. Jordon's testimony that you will hear

1:53PM   5   in this case -- we will call him as a witness in this case.

1:53PM   6   He'll take the stand, and he will testify live in this case.

1:53PM   7           But he's given a deposition.  We expect that his

1:53PM   8   testimony will be that if he had known that it was possible to

1:53PM   9   monitor Xarelto's effect on Ms. Mingo's blood, he would have

1:53PM  10   wanted to know it, and he would have done it.  If he had known

1:53PM  11   that it was beneficial to monitor the effect of Xarelto on

1:53PM  12   Ms. Mingo's blood after she had started taking the drug, that

1:53PM  13   is something that he wanted to know.

1:53PM  14           Dr. Jordon believed -- his testimony and is

1:53PM  15   expected to be that he believed it was not necessary or

1:53PM  16   possible to monitor Xarelto's effect.  He believed Xarelto

1:54PM  17   was -- I mean PT was irrelevant to someone on Xarelto.

1:54PM  18           In fact, he's asked about "What about this

1:54PM  19   23.6?"  And he -- "What about this 23.6 the day after she

1:54PM  20   started.  What about that?"

1:54PM  21           He said, "I don't know why they did the test.  I

1:54PM  22   don't know why they did it.  You know, I didn't -- I didn't

1:54PM  23   order it.  I don't think it had any relevance to Ms. Mingo

1:54PM  24   being on Xarelto."

1:54PM  25           You will hear very clear testimony from Dr.

1:54PM 1   Jordon that if he had known Xarelto had a test, it would have

1:54PM 2   changed the way he treated Dora Mingo.

1:54PM 3           If the defendants had been told about the way to

1:54PM 4   test, all of this could have been avoided.  That 23.6 would

1:54PM 5   have signaled to them that she needs to be switched to a

1:54PM 6   medicine with a lower bleed risk.  You need to change her

1:55PM 7   course of treatment.  But that's not what they were told.  They

1:55PM 8   were told instead that it was not possible.

1:55PM 9           THE COURT:  You have three minutes, counsel.

1:55PM 10          MR. BIRCHFIELD:  Thank you, Your Honor --

1:55PM 11          One of the -- one of the things that you will

1:55PM 12  see in this case is that these corporations, they know that

1:55PM 13  there is a way to test.  Janssen chose not to tell doctors in

1:55PM 14  the US, and Bayer stood by and let it happen.

1:55PM 15          Ms. Mingo, she's facing major challenges in her

1:55PM 16  life, but she's a fighter.  She gets back up, and she fights

1:55PM 17  on.  And we are not here to tell you that her life was

1:55PM 18  perfectly smooth before she had this Xarelto GI bleed.  But it

1:55PM 19  was a serious, life-threatening experience for her.  And she's

1:56PM 20  back up, and she's fighting on, but it was a serious event.

1:56PM 21          She's a special lady.  It's our privilege to

1:56PM 22  represent her and to present the evidence to you in this case.

1:56PM 23  I look forward to bringing this evidence to you, and I thank

1:56PM 24  you for your attention.

1:56PM 25          Thank you, Your Honor.

1:56PM   1          **THE COURT:**  Thank you, Counsel.

1:56PM   2                  Let's hear from the defendant.

1:56PM   3          **MS. PRUITT:**  Just making sure I could see, Judge.

1:56PM   4   Thank you.

1:56PM   5                  Good afternoon, ladies and gentlemen.  My name

1:56PM   6   is Lyn Pruitt.  I'm a lawyer representing Janssen and Bayer

1:56PM   7   along with Walter Johnson, who's sitting beside me, and Rick

1:57PM   8   Sarver.  We're here to represent Janssen and Bayer in this

1:57PM   9   case.

1:57PM   10                  Before we talk about the questions that you're

1:57PM   11   going to be asked to answer at the end, I would like to tell

1:57PM   12   you what this case is about.

1:57PM   13                  Ms. Mingo developed a blood clot in her lower

1:57PM   14   leg after her hip surgery.  She had hip replacement surgery.

1:57PM   15   Blood clots in the leg after a surgery can be dangerous and

1:57PM   16   potentially life-threatening.

1:57PM   17                  Ms. Mingo was prescribed Xarelto to treat the

1:57PM   18   extensive blood clots that she had in her leg.  Ms. Mingo --

1:57PM   19   excuse me.  Ms. Mingo needed this medication to treat the blood

1:57PM   20   clots.  Xarelto worked.  The blood clot went away, and she did

1:57PM   21   not have any other blood clots develop.

1:57PM   22                  Xarelto works because it causes your blood to be

1:58PM   23   thinner and not to clot as quickly.  Because of this, there is

1:58PM   24   an increased risk of bleeding.  So if you cut yourself while

1:58PM   25   taking a blood thinner, you might bleed more.  Janssen and

1    Bayer told doctors and patients about this increased risk of
2    bleeding while taking Xarelto.
3              What we know from the evidence is that Ms. Mingo
4    had an oozing ulcer that no one knew about.  And it was caused
5    by a longtime use of aspirin, which she had to have.  She took
6    it for her heart condition and potentially for her arthritis.
7    So she had an oozing ulcer that no one knew about caused by her
8    long-term use of aspirin.
9              If Ms. Mingo had not had an ulcer, she would not
10   have bled.  Any blood thinner that she took for the lower leg
11   clot would have done the very same thing.  They all carry an
12   increased risk of bleeding, especially when you have an ulcer.
13             Thankfully, Ms. Mingo's ulcer was fixed, and
14   thankfully she is recovered.
15             That is what the medical facts in evidence will
16   reveal for you in this case.
17             Now let's talk about the questions at the end.
18   If I was in your situation, I would want to know, if I heard
19   the evidence, what it was I was going to be asked to answer.
20   Right?  So at the end, one of the questions that you're going
21   to be asked about is -- what am I supposed to --
22             **THE COURT:**  There we go.
23             **MS. PRUITT:**  Did Ms. Mingo prove -- and the Judge has
24   already instructed you that in this lawsuit -- if you file a
25   lawsuit in this country, which you should be able to do -- if

| | |
|---|---|
| 2:00PM | 1 |
| 2:00PM | 2 |

you file a lawsuit, you have to come in, and you have to prove
each and every element of the case.

So the burden of proof is on the plaintiff on
each and every element of the claim.  And so when you get to
the end, the questions will be phrased this way:  Did Ms. Mingo
prove that Xarelto was defective and caused an injury?

And what you will come to learn is Xarelto is
not defective because Xarelto did exactly what it's designed to
do.  It's designed to thin your blood and to keep you from
clotting as quickly.  That's what it does.  And because of
that, it carries an increased risk of bleeding.  But it's not
defective in that way.

Second question is did Ms. Mingo prove that
Xarelto had inadequate warnings?  And what you will come to
learn is the very thing that occurred in Ms. Mingo was warned
about.  Bayer and Janssen told her doctor and Bayer and Janssen
told patients that this very thing could happen if you were in
a situation where you needed to take Xarelto.

And we all know that, when doctors are making
decisions, sometimes they're hard.  If you have a medical
condition that requires a medicine that has side effects
because of the way that medicine works, then you need to tell
the patient about it and the patient needs to understand that.
And then they can make a choice about whether they need the
medicine or not.

2:01PM   1          And the third thing you'll be asked is did

2:01PM   2   Ms. Mingo prove Dr. Jordon would not have prescribed Xarelto to

2:01PM   3   her if the label had a different warning?  And you are going to

2:01PM   4   be the judge of this.  The judge told you you're the judges of

2:01PM   5   the facts, and you're going to get to hear Dr. Jordon's

2:01PM   6   testimony.

2:01PM   7          And there was a deposition taken.

2:01PM   8   Mr. Birchfield is correct.  And at the very end of the

2:01PM   9   deposition, after all the documents had been shown to Dr.

2:02PM  10   Jordon and the lawyers had asked him questions on both sides --

2:02PM  11   I was there, and I took the deposition.  And I asked him, and

2:02PM  12   I'm going to ask him again, "After everything you've seen, Dr.

2:02PM  13   Jordon, would you still prescribe Xarelto to Ms. Mingo today?"

2:02PM  14   And his answer was, "Yes.  She needed it."

2:02PM  15          Ms. Xarelto -- Ms. Mingo took Xarelto for

2:02PM  16   21 days after she developed these life-threatening blood clots.

2:02PM  17   Dr. Keith is her gastroenterologist, and you'll hear from

2:02PM  18   Dr. Keith.  He diagnosed and treated her oozing ulcer on

2:02PM  19   February the 13th, 2015.  Her ulcer was treated by Dr. Keith,

2:02PM  20   and she recovered.

2:02PM  21          Now, there are other health conditions that will

2:02PM  22   come into play when you hear the evidence about Ms. Mingo.  She

2:02PM  23   had an arthritic condition.  That is the reason that she had to

2:02PM  24   have the total hip replacement surgery.  She had high blood

2:02PM  25   pressure.  She's a diabetic, and she had high cholesterol.

2:03PM   1          And the reason that is important is because she

2:03PM   2   was taking aspirin for some of her heart conditions as well as

2:03PM   3   some of the pain that she was having as a result of her

2:03PM   4   arthritis.  And these medications have something to do with

2:03PM   5   what happened in this case.

2:03PM   6          So what we know is, on January the 6th through

2:03PM   7   the 9th, she had a total hip replacement.  And after you have

2:03PM   8   total hip replacement, doctors prescribe you blood thinners so

2:03PM   9   that you won't develop blood clots.  They do that as a regular

2:03PM  10   matter of course.

2:03PM  11          So she was prescribed two different blood

2:03PM  12   thinners, and they didn't prevent her from developing a clot.

2:03PM  13   So these two blood thinners -- Lovenox and then she took

2:03PM  14   aspirin -- did not prevent her from developing a blood clot.

2:03PM  15   She developed a blood clot anyway about a week and a half

2:03PM  16   later.

2:03PM  17          She went into the emergency room, and this is

2:03PM  18   the medical record from the ultrasound, because that's what

2:03PM  19   they do.  They listen and look for the clot to see if you have

2:03PM  20   a clot in your leg.  In fact, she did.  And the ultrasound

2:04PM  21   suggested that she had extensive blood clots in the deep vein

2:04PM  22   system.  And this is from the emergency room visit.

2:04PM  23          Now, the blood clot that she had, ladies and

2:04PM  24   gentlemen, was in the lower leg in the deep vein.  What the

2:04PM  25   ultrasound report says is that it was an occlusion, and what

1   "occlusion" means is that it completely blocked that vein.   And
2   when it completely blocks that vein, you could have serious
3   harm.  It can cause swelling.  It can cause pain in your leg.
4           And what happens is, once you develop one clot,
5   you're at a higher risk to have more clots.  And if you develop
6   more clots, the problem gets more and more serious as it goes
7   along.
8           In addition, one of the risks when you have deep
9   vein clots is that that clot can break off.  And if it breaks
10  off, it travels.  And if it travels, it can go into your lungs.
11  And if the clot goes into your lungs, like this picture
12  indicates, it can result in a pulmonary embolism.  Pulmonary
13  embolisms are very serious and can be deadly.
14          What we know about blood clots is that up to
15  900,000 people in this country a year are diagnosed with them.
16  We know that up to 300,000 of those people die every year from
17  blood clots.  And we know that, if you have a blood clot that
18  travels and you get a pulmonary embolism, that 25 percent of
19  those people die.
20          So if the clot travels, one out of four people
21  if it goes into a pulmonary embolism die.  And that is why it's
22  so important when you develop a clot after a surgery to take
23  care of it and treat it.
24          Now, she was given -- when Dr. Jordon found out
25  she had this blood clot, she was given a couple of different

2:05PM  1   medicines on the first day.  They are anticoagulants.  And

2:06PM  2   we'll talk a lot about those, and they will become important

2:06PM  3   because they have something to do with this PT issue you've

2:06PM  4   been hearing about.

2:06PM  5           But Dr. Jordon changed her over to Xarelto twice

2:06PM  6   a day, 15 milligrams.  And the reason Dr. Jordon did that is

2:06PM  7   because he said under oath in his deposition that, "If you put

2:06PM  8   them on these new drugs" -- they're called NOACs.  "If you put

2:06PM  9   them on a novel oral anticoagulant, then I can discharge them,

2:06PM  10  and they can go home," because these anticoagulants, these

2:06PM  11  NOACs, get into your system very quickly and they are

2:06PM  12  eliminated from your system very quickly.

2:06PM  13          That's unlike the earlier drug that's been

2:06PM  14  referred to as Coumadin or warfarin.  That drug doesn't act

2:06PM  15  that way.  It takes a long time to regulate it, and it takes a

2:06PM  16  longer time to get it out of your system.  So if you're

2:06PM  17  treating a patient with the older drug, they may have to be

2:06PM  18  hospitalized.

2:06PM  19          We're going to bring you an expert from UMC who

2:07PM  20  is going to testify, and Dr. Demondes Haynes will tell you that

2:07PM  21  he treats patients with DVT and pulmonary embolism.  And he

2:07PM  22  looked at this case and has looked at the medical records.  And

2:07PM  23  he is going to come in and give you his expert opinion, which

2:07PM  24  is that Ms. Mingo needed treatment for these deep vein clots,

2:07PM  25  that Xarelto worked, the clot went away, she did not develop

any future clots, and it did not travel to her lungs.  He's
going to tell you that she would have bled on any other
anticoagulant because she had an ulcer.

Now, what we know about Coumadin or warfarin,
the old drug, it's been around for -- since the 1950s.  We know
that it can be a drug -- it's a good drug, but it was the only
thing available.  And it can be unpredictable and challenging
for patients.  And the doctors that we're going to bring that
treat patients with anticoagulants will tell you this as well.

We also know that if you're taking that older
drug, that it interacts -- it's affected by foods like green
salads, spinach, green foods, alcohol.  It's affected by drugs
that you have to take for cholesterol or depression or for
infections that require antibiotics.

So what was available could be affected by all
of these different things.  And so these newer drugs called
NOACs did not have those same problems with unpredictability.
They didn't -- they weren't affected by these things, by food,
alcohol, and prescription medications.

So these NOACs were an improvement for a lot of
different reasons.  They act more quickly.  They get out of
your system more quickly.  The patient can go home.  They don't
have to stay and be monitored.  They don't have to go back to
the doctor and get monitored with a blood test every time
something is off on their blood medication.

2:08PM
2:09PM
2:09PM
2:09PM
2:09PM
2:09PM
2:09PM
2:09PM
2:09PM
2:09PM
2:09PM
2:09PM
2:09PM
2:09PM
2:09PM
2:09PM
2:10PM
2:10PM
2:10PM
2:10PM
2:10PM
2:10PM
2:10PM
2:10PM
2:10PM

1        So these drugs were a big improvement, in some
2   doctors' view, for a number of patients.  And, in fact, for
3   this condition that Ms. Mingo had, a deep vein clot, the
4   American Academy of Chest Physicians recommends NOACs like
5   Xarelto as the number one line of treatment.
6        Now, we've talked little bit or you heard a
7   little bit about studies.  You will hear evidence in this case
8   about the studying that was done on Xarelto.
9        Xarelto took 14 years to develop.  There was --
10  there were clinical studies done in over 32,000 patients.  On
11  Xarelto, we did the largest study on deep vein clots and
12  pulmonary embolisms of any of the NOACs.  And these studies
13  were funded by both Bayer and Janssen, but they were also
14  funded by independent organizations and scientists.
15       All of that went on, and you're going to hear a
16  lot about that before the time has gone by, about all the work
17  that was done in developing this product.
18       Now, we know that all anticoagulants --
19  Coumadin, Xarelto, Pradaxa, Eliquis, and Savaysa -- you see
20  here, the ones in blue are the NOACs, the newer drugs.
21  Coumadin is the one over there to the far left in red.  We know
22  all of these anticoagulants reduce the risk of blood clots.
23       We also know that all of these anticoagulants
24  warn of an increased risk of bleeding, and you'll see the
25  warning for each of them.  The second -- the one in the middle

is Xarelto, which I'll show you its warning right here.

What did Bayer and Janssen tell doctors in the label? There was a label that went to doctors, and there was a label called a medication guide that was designed for patients. And in that, the warnings suggest that Xarelto causes you -- or you may be at risk of bleeding. "Xarelto can cause serious and fatal bleeding. Promptly evaluate signs and symptoms of blood loss."

And what we know is it didn't just warn about it in one place. We warned about it in a number of places in the label. In fact, because this is a blood thinner and it puts you at an increased risk of bleeding, you will see in this case that it mentioned "bleed" or "bleeding" over 70 times in the label.

Now, you're probably sitting there wondering, if you have a risk of bleeding, how big a risk is it? How big a risk is it? Because when you're making a decision about taking a medication or when a doctor is making a decision about prescribing it, you would want to know.

So what we know is in the test that was done on deep vein clots and pulmonary embolisms, we looked at that issue of bleeding. How much -- how many people bleed? And what we found was -- you'll see there in yellow that with Xarelto in that population, there were 4,130 patients, and they had 40 major bleeds. What you'll see on the right-hand column

is with Lovenox and VKA -- it's Coumadin.  And that's the
reason I put those definitions, because VKA you'll hear in this
trial is really Coumadin.

So what we did was we looked at the bleeding
risk between these three treatments, Coumadin and Lovenox and
Xarelto.  And what was found was there were 40 bleeds with
Xarelto and 72 with Coumadin and Lovenox.

And what does that mean?  That basically means
that, in that study, less than 1 percent of those individuals
had a major bleed, and 99 percent of the individuals in that
study had no major bleed.

Now, the treatment dose that you're going to
hear a lot about for the treatment of a preexisting blood clot
is higher than the prevention dose.  And you're going to hear a
lot about that.  The reason the treatment dose is higher is
because you already have a blood clot that's formed in your
system, so your clotting system is already disrupted.  And in
order to treat that clot, you have to treat it with a higher
dose.  So what you'll see with these medicines is treatment
dose is higher than the prevention dose.

If you have a treatment dose that is too low and
the clot doesn't go away or they develop more clots and it
travels to your lungs, you could have patients who die of
pulmonary embolism.

And, finally, the studies that you just -- one

2:13PM  1   of them you just saw and others do not show that there are

2:13PM  2   increased bleeds in patients that are being treated with

2:13PM  3   Xarelto that have DVTs or pulmonary embolisms.

2:13PM  4          Now, what we know is the FDA has continued to

2:13PM  5   approve this medication.  It's approved the label.  It's

2:13PM  6   approved the dosage.  It's approved it to be used like it was

2:13PM  7   used in Ms. Mingo's case.  And they've looked at this and the

2:14PM  8   label at least 14 times over the course of the time that

2:14PM  9   Xarelto has been on the market.

2:14PM  10         And when the FDA looks at it, they make a

2:14PM  11  determination that at this dosage for this indication, the

2:14PM  12  benefits for that outweigh the risk.  And when the FDA looks at

2:14PM  13  this, they have all of the data, all of the studies.  And, in

2:14PM  14  fact, Bayer and Janssen are required not just to provide their

2:14PM  15  studies and their information, but also after it gets on the

2:14PM  16  market to update and provide studies that are done out in the

2:14PM  17  scientific and medical community.

2:14PM  18         Now, you will see that the hip replaced

2:14PM  19  January 6th through the 9th, and one of the things that I want

2:14PM  20  you to note and you'll hear is that Ms. Mingo, in her medical

2:14PM  21  records on February the 13th reported to her doctor.  She says

2:14PM  22  on January the 9th that she had black stools.  And black stools

2:15PM  23  can mean that you have bleeding in your gastrointestinal tract.

2:15PM  24  Because if you have a bleeding ulcer or a bleeding hemorrhoid

2:15PM  25  or something like that, the blood can turn your stool black.

2:15 PM
2:15 PM
2:15 PM
2:15 PM
2:15 PM
2:15 PM
2:15 PM
2:15 PM
2:15 PM
2:15 PM
2:15 PM
2:15 PM
2:15 PM
2:16 PM
2:16 PM
2:16 PM
2:16 PM
2:16 PM
2:16 PM
2:16 PM
2:16 PM
2:16 PM
2:16 PM
2:16 PM
2:16 PM

1    She reported to her doctor that she had a black stool in

2    January before she ever began to take Xarelto.

3           We know she took Xarelto beginning on

4    January 23rd.  After that, she went into the ER, and there was

5    blood in her stool on that occasion, and Xarelto was continued.

6           She then went to her primary care physician, and

7    they did not take her off the Xarelto.  They knew of these

8    findings.  They knew what the findings were, and they did not

9    take her off of the Xarelto.  But what they did was lower her

10   aspirin dose.  They lowered it from 325 to 81.

11          And then she had another doctor visit, and her

12   gastroenterologist realized and knew she had blood in her

13   stool, and he scheduled her for a regular colonoscopy and a

14   regular EGD, and he scheduled them for out in March.

15          So then she has another lab value done, and her

16   values are down.  And she talked to her primary care physician,

17   and that office tells her that she needs to see the

18   gastroenterologist, to go back to the gastroenterologist.  He

19   was not available that day, you'll find the evidence to be.

20          And they -- she was told then she needed to go to the

21   emergency room.  When she got there -- and that's the timeline

22   that you'll see with witnesses.  You're going to see all of

23   this again during the evidence as to who she saw when and what

24   was going on during these periods of time.

25          Dr. Keith found an oozing ulcer.  He came in that

2:16PM
2:16PM
2:17PM
2:17PM
2:17PM
2:17PM
2:17PM
2:17PM
2:17PM
2:17PM
2:17PM
2:17PM
2:17PM
2:17PM
2:17PM
2:17PM
2:17PM
2:17PM
2:17PM
2:17PM
2:18PM
2:18PM
2:18PM
2:18PM
2:18PM

1   very day, did his procedure, found a 6-millimeter oozing ulcer.

2   And he cauterized it and clipped it and discharged -- she

3   stayed in the hospital two nights, and then he discharged her.

4          Now, Dr. Keith is going to come testify.  He's a

5   board-certified gastroenterologist.  He's her treating

6   physician.  He recommended after he fixed the ulcer that

7   Ms. Mingo restart Xarelto to prevent blood clots.

8          Now, why would a doctor do that?  It's because if

9   you've already developed a clot post-surgery, you're at a

10  higher risk to develop other blood clots.  And he fixed her

11  bleed and said, "You're still at a high risk for blood clots.

12  You should go back on the Xarelto."  And that's because he's

13  going to say the benefits of Xarelto outweighed an additional

14  risk of bleeding.

15         He will also tell you that -- Dr. Keith, he said --

16  he's going to tell you about the PT.  He didn't find much

17  meaning in it, not because some company told him something,

18  because he said, "Whether the PT was 13 or 26, I was going to

19  go in and fix the ulcer," and that's what he did.

20         Now, this is a medical record, February 13th, where

21  Ms. Mingo, she reports black stools since January the 9th and

22  says she was put on Xarelto around the 23rd.

23         Now, what we know about her medical history is that

24  over time, from 2007 to 2015, she took a lot of aspirin and a

25  lot of NSAIDs.  She needed those medications for other

conditions.  She had to take NSAIDs for her arthritis, and she had to take aspirin for her heart conditions and pain from her arthritis.

So over the course of time, she had a lot of aspirin and a lot of NSAIDs.  And that's important because in the label, what did Bayer and Janssen tell doctors?  We told doctors in a section in the label called "Anticoagulants, NSAIDs, and aspirin," we told them, "Concomitant aspirin use" -- and that just means using aspirin at the same time you're using Xarelto -- "has been identified as an independent risk factor for major bleeding."  And that was in the label to the doctors.

We also know that when Ms. Mingo was discharged from the hospital after she had the blood clot and after Dr. Jordon put her on Xarelto, she was told by her discharge physician stop taking these medications:  Aspirin, 325 milligram by mouth every day.

So she was -- the doctors obviously appreciated the idea that taking both aspirin and an anticoagulant could even increase your risk to bleed further.  They appreciated it.  They told her to d/c her aspirin.  And along the way -- and we don't know exactly how this happened.  We don't know whether -- it's not in the medical records whether a doctor told her to go back on or what happened that she began to take her aspirin again at 325 milligrams of aspirin while she was taking the

2:19PM 1    Xarelto for those 21 days.

2:20PM 2           Now, what the evidence will show that we know -- and

2:20PM 3    there's no dispute about this -- that aspirin can cause ulcers.

2:20PM 4    All the doctors that you'll hear from will agree with that.

2:20PM 5    There's also no dispute that Xarelto does not cause ulcers.  No

2:20PM 6    dispute.

2:20PM 7           And we also know that her own treating

2:20PM 8    gastroenterologist will tell you that he believes her aspirin

2:20PM 9    caused Ms. Mingo's ulcer.

2:20PM 10          Now, you heard some this morning about this PT test,

2:20PM 11   and you've heard that it's important to decide whether the PT

2:20PM 12   test is helpful or not helpful.  We agree with that.

2:21PM 13          The reason it's important is because of the way these

2:21PM 14   medications work.  Coumadin or warfarin, which is the older

2:21PM 15   medication, the way it thins people's blood is it works on

2:21PM 16   several factors:  II, VII, IX, and X.  The way Xarelto works is

2:21PM 17   it works on Factor X only.  And what we know, you'll hear about

2:21PM 18   the PT test is it's sensitive.  It's particularly sensitive to

2:21PM 19   measuring Factor VII, and Xarelto does not even affect

2:21PM 20   Factor VII.

2:21PM 21          So you'll hear all the testimony about Xarelto -- PT

2:21PM 22   is not particularly sensitive when it's measuring the effects

2:22PM 23   of Xarelto, and this is the reason, because the PT test is

2:22PM 24   particularly sensitive to Factor VII.  And because of that,

2:22PM 25   it's not as sensitive in measuring the effect, and doctors know

2:22PM
2:22PM
2:22PM
2:22PM
2:22PM
2:22PM
2:22PM
2:22PM
2:22PM
2:22PM
2:22PM
2:22PM
2:23PM
2:23PM
2:23PM
2:23PM
2:23PM
2:23PM
2:23PM
2:23PM
2:23PM
2:23PM
2:23PM
2:23PM
2:23PM

1   this.  What the PT test will not do is it does not tell a

2   doctor which patients have an ulcer, because if you have an

3   ulcer and you take an anticoagulant, you may bleed.  It does

4   not tell a doctor which of the patients are going to bleed.

5           And that's the disconnect in this evidence, ladies

6   and gentlemen.  They're going to say the test is helpful to

7   show some effect.  The PT test, you will hear, does not tell a

8   doctor which of his patients or her patients are going to

9   bleed.

10          Now, Bayer and Janssen did tell doctors some

11  information about PT in the label that you'll hear about.  It's

12  in Section 12.2 that you'll hear about a lot, and you're going

13  to hear about what we wanted to put in the label.  You're going

14  to hear about what is in the label.  You're going to hear a lot

15  of testimony about this.

16          And the point is we told doctors that neoplastin PT

17  time is prolonged dose dependently.  In other words, it's

18  dependent upon the dose.  And the reason we told doctors that

19  is because PT just is a measurement of blood you put it in a

20  test tube, you put in the factor, and you measure how long it

21  takes the blood to clot.  That's what PT does.

22          When you're taking an anticoagulant, you know that

23  you're going to have a higher PT.  Of course you are, because

24  the medicine is doing its job, and it's taking your blood

25  longer to clot.  So that is what the medicine is designed to

do.

We know that the FDA, even today, does not recommend using a PT test for doctors to tell them what effect Xarelto is having in a patient's blood because they know that it doesn't predict the risk of bleeding.  They know that the medicine is designed and would make your clotting time prolonged, and we told doctors about that in the label.

What we also know is that medical organizations and the literature -- what do they say about this PT test being used with Xarelto?  The American College of Chest Physicians, the American Society for Gastrointestinal Endoscopy, the American Heart Association, the American College of Cardiology, none of these organizations who treat people that take anticoagulants recommend that a PT test be used in figuring out how to treat a patient.  They don't recommend that you use it to figure out how to dose a patient.  They don't recommend that you use it to figure out whether to take a patient off of an anticoagulant.

We also know that medical literature, even as late as 2017, ladies and gentlemen, you can see here the name of that article, "The Danger of Relying on PT in Patients on DOAC Therapy," which is the same as NOAC, "A Potential Safety Patient -- Patient Safety Issue."

Clinicians must acknowledge that PT can no longer be used as a gauge of a patient's level of anticoagulation and

hence bleeding risk.  And the reason for that is because you
don't want to take somebody off an anticoagulant because they
have normal PT, because you could harm that patient.  You don't
want to take them off their anticoagulant because they have too
high a PT and then they have a blood clot and die.

        The PT test does not tell a doctor which patients are
at the highest bleeding risk, and that's why doctors don't find
it to be helpful.  That's why the FDA doesn't find it to be
helpful.  That's why the scientific literature does not show it
to be helpful.  That's why the expert witnesses that we will
bring you in this case will tell you that it's not helpful in
making treatment decisions for the patients.  And the treating
physicians, Dr. Jordon and Dr. Keith, will also tell you they
don't find it to be helpful.

        We know this:  At the very end of the deposition, I
asked Dr. Jordon if he thought Ms. Mingo needed the
anticoagulant, and I think it's undisputed she did.  I think
the plaintiffs acknowledge that she had to have an
anticoagulant.  And he stated at the very end that he still
believes Xarelto was the right medication for Ms. Mingo.

        So at the end what you have to decide is did they
prove that Xarelto was defective and caused an injury?  The
drug was acting as the drug was supposed to act for her
condition.  Did Ms. Mingo -- and we also know that had she not
had an ulcer, she wouldn't have bled.

Second question:  Did they prove that Xarelto had
inadequate warnings?  We warned of the very thing that happened
to Ms. Mingo.

And, finally, did they prove that Dr. Jordon would
have made a different choice and not prescribed Xarelto if
there had been some kind of a different instruction or warning?
And we think the evidence -- you're the fact finder, but we
think you'll hear Dr. Jordon's testimony, and we think the
evidence establishes that he stands by his prescription for
Xarelto for Ms. Mingo.

Thank you very much for your time.

**THE COURT:**  Okay.  We'll take a break in a moment,
but we'll now hear the evidence in the case.

Let me say a word about the evidence.  The
evidence in this case will consist of the following:  The sworn
testimony of the witnesses, no matter who has called the
witness; all exhibits received into evidence, regardless of who
may have produced the exhibits.

I may take judicial notice of certain facts or
events.  When I declare that I will take judicial notice of
some fact or event, you must accept that as true for purposes
of this case.

And depositions, as counsel mentioned, may also
be received in evidence.  Depositions are simply sworn
testimony that the lawyers for each party be entitled to ask

questions.  The deposition is played either -- in this case, it would be played by videotape.  Deposition testimony may be accepted by you subject to the same instructions that apply to all other witnesses.  You are to assume that it is your job to determine the credibility of the witness, whether they appear live or whether they appear by deposition.

Statements and arguments of counsel, as I mentioned, are not evidence, unless made as an admission or a stipulation of fact.

A stipulation is simply an agreement between both sides that certain facts are true or that a person would be giving certain testimony.  When the lawyers on both sides stipulate or agree to the existence of a fact, you must, unless otherwise instructed, accept the stipulation as evidence and regard the fact proved.

As I stated before, if I sustain an objection to any evidence or if I order it stricken, that evidence must be entirely ignored.  Some evidence may be admitted for a limited purpose only.  When I instruct you that an item of evidence has been admitted only for a limited purpose, you must consider it only for that limited purpose and for no other purpose.

You are to consider only the evidence in this case, but in your consideration of the evidence, you may draw from the facts that you find that have been proved, such reasonable inferences or conclusions as you feel are justified

2:30PM   1    in light of your experience.

2:30PM   2                    At the end of the trial, as I mentioned, you

2:30PM   3    will have to make your decision based on what you recall of the

2:30PM   4    evidence.  You will not have any written transcript to consult,

2:30PM   5    and it's very difficult and also time-consuming for a reporter

2:30PM   6    to read back lengthy testimony.  So I urge you to pay close

2:30PM   7    attention to the testimony of the witnesses.

2:30PM   8                    We'll take a 10-minute break at this time and

2:30PM   9    resume with the evidence in the case.  Court will stand in

2:30PM   10   recess.

2:30PM   11                   **THE DEPUTY CLERK:**  All rise.

2:30PM   12        (Whereupon the jury was excused from the courtroom.)

2:30PM   13                          **(Recess.)**

2:48PM   14        (Whereupon the jury entered the courtroom.)

2:49PM   15                   **THE COURT:**  Okay.  Be seated, please.

2:49PM   16                   Ladies and gentlemen, you were told that some of

2:49PM   17   the case would be presented by depositions, some of it by

2:49PM   18   satellite.  A federal judge has a lot of powers, but we can't

2:49PM   19   stop the rain from falling, and we can't get people to come

2:49PM   20   over 100 miles from the state.  So this individual is in

2:49PM   21   Newark, New Jersey, at the Federal Courthouse there, and we are

2:49PM   22   streaming the testimony.  The lawyers are here; she is there.

2:49PM   23                   You may proceed, Counsel.

2:49PM   24                   **MR. JOHNSON:**  Your Honor, we would invoke the rule.

2:49PM   25                   **THE COURT:**  Yes, sir.

2:49PM
2:49PM
2:49PM
2:49PM
2:49PM
2:50PM
2:50PM
2:50PM
2:50PM
2:50PM
2:50PM
2:50PM
2:50PM
2:50PM
2:50PM
2:50PM
2:50PM
2:50PM
2:50PM
2:50PM
2:50PM
2:50PM
2:50PM
2:50PM
2:50PM

1           **MR. MORRISON:**  Your Honor, I would assume that that

2  does not apply to expert witnesses, first; and then the second

3  thing is I would also ask the rule be invoked in the remote

4  locations where these witnesses are testifying.

5           **THE COURT:**  Okay.  Who are the other witnesses in the

6  case?  Anybody in the courtroom from either side, other than

7  the experts?

8           **MR. SARVER:**  There should not be anybody else in

9  Newark, Your Honor.

10           **THE COURT:**  Okay.  All right.  How about in this

11  courtroom, other than the experts?

12           **MR. SARVER:**  None from us, no, Your Honor.

13           **THE COURT:**  Members of the jury, what that means is

14  that witnesses other than experts or a representative of the

15  parties, like a plaintiff or some representative of the

16  defendant, is asked to step outside of the courtroom so that

17  when they come into the courtroom, they can tell you what their

18  evidence is, not what they heard somebody else do.  So it's

19  nothing unusual.  People ask that witnesses be separated, with

20  the exception of expert witnesses.

21           Okay.

22           **MR. BIRCHFIELD:**  Thank you, Your Honor.

23           At this time the plaintiff will call Susan

24  Geiger, employee of Janssen.

25           **THE COURT:**  Okay.  Would you swear her in, Dean?

|       |    |                                                                          |
|-------|----|--------------------------------------------------------------------------|
| 2:50PM | 1  | **THE DEPUTY CLERK:**  Would you stand and raise your                    |
| 2:51PM | 2  | right hand, Ms. GeigeR.                                                   |
| 2:51PM | 3  | **MS. GEIGER:**  Yes.  Should I go here so you can see                    |
| 2:51PM | 4  | me?                                                                       |
| 2:51PM | 5  | **THE COURT:**  Yes, we can hear you.                                     |
| 2:51PM | 6  | **MS. GEIGER:**  Okay.                                                    |
| 2:51PM | 7  | **THE DEPUTY CLERK:**  Step to your right, please.                       |
| 2:51PM | 8  | That's good.  That's good.                                               |
| 2:51PM | 9  | **MS. GEIGER:**  Okay.                                                    |
| 2:51PM | 10 | **(Witness sworn.)**                                                     |
| 2:51PM | 11 | **THE DEPUTY CLERK:**  Please have a seat, state and                     |
| 2:51PM | 12 | spell your name for the record.                                          |
| 2:51PM | 13 | **THE WITNESS:**  My name is Susan Geiger, S-U-S-A-N,                     |
| 2:51PM | 14 | G-E-I-G-E-R.                                                             |
| 1:36PM | 15 | **SUSAN GEIGER,**                                                        |
| 1:36PM | 16 | a witness called on behalf of the Plaintiff, being first duly            |
| 1:36PM | 17 | sworn, was examined and testified as follows:                            |
| 1:36PM | 18 | **DIRECT EXAMINATION**                                                   |
| 1:36PM | 19 | **BY MR. BIRCHFIELD:**                                                   |
| 2:51PM | 20 | **Q.**   Good afternoon, Ms. Geiger.                                     |
| 2:51PM | 21 | **A.**   Good afternoon.                                                 |
| 2:51PM | 22 | **Q.**   And you're currently an employee of Janssen; is that            |
| 2:51PM | 23 | correct?                                                                 |
| 2:51PM | 24 | **A.**   That's correct.                                                 |
| 2:51PM | 25 | **Q.**   And you served as director of marketing at Janssen; is          |

2:51PM   1    that correct?

2:51PM   2    **A.**    Yes, I'm the director of marketing in my current role,

2:51PM   3    yes.

2:51PM   4    **Q.**    Okay.  And for a number of years you had responsibilities

2:52PM   5    for the marketing of the product Xarelto; is that right?

2:52PM   6    **A.**    That's true, yes.

2:52PM   7    **Q.**    All right.  And so what year did you begin

2:52PM   8    responsibilities related to Xarelto?

2:52PM   9    **A.**    I joined the Xarelto brand team in August of 2008.

2:52PM  10    **Q.**    Okay.  In August of 2008, Janssen was aware that there

2:52PM  11    were key products that -- with patents that were about to

2:52PM  12    expire; is that correct?

2:52PM  13    **A.**    I -- I recollect or believe that to be the case, yes.

2:52PM  14    There were some products that were going off patent.

2:52PM  15    **Q.**    All right.  Are you -- are you sure about that?  I mean,

2:52PM  16    you sound like you're not sure.  I mean, you know that Janssen

2:52PM  17    had products with patents that were about to expire in the

2:52PM  18    coming years; right?

2:52PM  19    **A.**    At any given time there's always products that are coming

2:52PM  20    off patent.  I don't recall if -- what I, you know, was aware

2:53PM  21    of in August of 2008 or not.  But it's common, yes, so --

2:53PM  22    **Q.**    All right.  Well, I'll show you exhibit -- Record Number

2:53PM  23    5767361.

2:53PM  24            **MR. BIRCHFIELD:**  We'll mark this as Plaintiff's

2:53PM  25    Exhibit Number 1, Your Honor.

2:53PM 1        **MR. SARVER:**  And, Your Honor, because of the

2:53PM 2  discussion this morning, I'll need to have a moment to review

2:53PM 3  it.

2:53PM 4        **THE COURT:**  Okay.

2:53PM 5        **MR. SARVER:**  Okay.

2:53PM 6                    **(Pause.)**

2:53PM 7  BY MR. BIRCHFIELD:

2:53PM 8  Q.   Do you have the document, Ms. Geiger?

2:53PM 9  A.   Yes.  Yes, I do.

2:53PM 10 Q.   Okay.  And you recognize this as a report of

2:53PM 11 pharmaceutical products of Janssen; is that right?

2:53PM 12 A.   Yes.  On the left side there are products that have been

2:53PM 13 part of Janssen, and it does say "Reported Sales", so yes.

2:53PM 14       **MR. SARVER:**  This is one of the problems with --

2:53PM 15       **THE COURT:**  Yeah, right.

2:53PM 16       **MR. SARVER:**  We object to the document.  There are

2:54PM 17 some handwritten notations in here that are not part of the

2:54PM 18 original document.

2:54PM 19       **THE COURT:**  Okay.  Let's ask her about that.

2:54PM 20 BY MR. BIRCHFIELD:

2:54PM 21 Q.   Okay.  Ms. Geiger, the document that you're looking at,

2:54PM 22 this is a document that was covered with you in your

2:54PM 23 deposition; is that correct?

2:54PM 24 A.   I believe so.  I saw a lot of documents there, but I think

2:54PM 25 I've seen a grid like this before, so --

**Q.** Okay. And -- and --

THE COURT: Who made the handwritten notations?

**MR. BIRCHFIELD:** Your Honor, the handwritten notations are the highlights, the highlighting of the drugs that were going off patent.

**BY MR. BIRCHFIELD:**

**Q.** Ms. Geiger --

THE COURT: Okay.

**MR. SARVER:** That wasn't the answer -- the answer to your question is I think the plaintiff lawyers made that.

THE COURT: Right. Okay. I understand the issue. It's just a highlight to bring her testimony around. I'll overrule the objection. It's admissible as a business record.

**MR. BIRCHFIELD:** Your Honor, at this time we'd offer Plaintiff's Exhibit Number 1.

THE COURT: That will be admitted.

**BY MR. BIRCHFIELD:**

**Q.** Ms. Geiger, if you'll notice, do you see Risperdal shown there?

**A.** This is on the second page for 2008 and '9, is that --

**Q.** Yes, right.

**A.** Okay.

**Q.** Okay. And do you recall --

**A.** Yes, I do see it.

**Q.** And Risperdal, the patent for Risperdal expired in 2008;

2:55PM  1   is that correct?

2:55PM  2   **A.**   I don't see a date.  I didn't work on Risperdal, so I

2:55PM  3   don't know the exact date it expired.  It doesn't have an

2:55PM  4   expiration date here that I can see.

2:55PM  5   **Q.**   Okay.

2:55PM  6   **A.**   I can see negative numbers, but --

2:55PM  7   **Q.**   Okay.  All right.  So, Ms. Geiger, you understand -- you

2:55PM  8   know that when a product's patent expires, that the price and

2:55PM  9   the profit margin of that drug drops dramatically; correct?

2:56PM 10   **A.**   What -- what happens -- or my understanding of what

2:56PM 11   happens when a product's patent expires is that then other

2:56PM 12   products can come into the market, more generic.  So it doesn't

2:56PM 13   always happen that other generics come.  So when a patent

2:56PM 14   expires, it just means we're no longer the only game in town.

2:56PM 15   **Q.**   But as a pharmaceutical company and in the marketing

2:56PM 16   department, the expiration of patents for a product, for a key

2:56PM 17   product, is something that you keep an eye on; right?

2:56PM 18   **A.**   Absolutely.  We want to know when -- you know, when that

2:56PM 19   transition is possible, it's possible to happen.

2:56PM 20   **Q.**   Because you know that that's going to result in a -- in a

2:56PM 21   substantial drop in revenue from that product; right?

2:56PM 22   **A.**   If another product comes to market that's a generic, yes,

2:56PM 23   that can happen.

2:56PM 24   **Q.**   Okay.  And so in the time frame when you started with the

2:56PM 25   marketing department, you knew that Risperdal was a key product

2:57PM  1   for Janssen; right?

2:57PM  2   A.    Yes.

2:57PM  3   Q.    Okay.

2:57PM  4   A.    I remember hearing a lot about Risperdal.

2:57PM  5   Q.    And the patent was expiring; right?

2:57PM  6   A.    I guess.  You know, I don't see it written here.  I don't

2:57PM  7   recall specifically then, but it has expired, I believe, so --

2:57PM  8   Q.    And Topamax was a key product for Janssen; right?

2:57PM  9   A.    Yes, it was a product.

2:57PM  10  Q.    Was it a key product for Janssen?

2:57PM  11  A.    The way that Janssen is designed, our different businesses

2:57PM  12  are very separate from one another.  I wasn't very close to

2:57PM  13  what was happening with Topamax.  It was a name I heard a lot.

2:57PM  14  So I would think it was a product, an important product for us.

2:57PM  15  I just doesn't know if it was key in the grand scheme of

2:57PM  16  things.

2:57PM  17  Q.    And Levaquin was a pharmaceutical product of Janssen;

2:57PM  18  right?

2:57PM  19  A.    Yes, it was.

2:57PM  20  Q.    Okay.  And the patent for Levaquin was about to expire; is

2:58PM  21  that right?

2:58PM  22  A.    Yes.  When I joined the Xarelto team, I recall that

2:58PM  23  Levaquin, which was in that part of the business, was going to

2:58PM  24  be expiring soon.  Yes, I remember that.

2:58PM  25  Q.    All right.  And let me show you what's marked as

2:58PM   1   Plaintiff's Exhibit 3017856.  That's the identification number.

2:58PM   2        MR. BIRCHFIELD:  And I would offer this as

2:58PM   3   Plaintiff's Exhibit Number 2.

2:58PM   4        THE COURT:  Show it to him.  Wait a second.  Just a

2:58PM   5   moment.

2:58PM   6        MR. SARVER:  Your Honor, I need a moment each time he

2:58PM   7   shows an exhibit that I haven't seen.

2:58PM   8                  (Pause.)

2:58PM   9        MR. SARVER:  No objection, Your Honor.

2:58PM   10       THE COURT:  Okay.  That will be admitted.

2:58PM   11  BY MR. BIRCHFIELD:

2:58PM   12  Q.   Ms. Geiger, this is an email exchange between you and

2:58PM   13  Nauman Shah; is that correct?

2:58PM   14  A.   Yes, I saw the email.

2:59PM   15  Q.   Okay.  And you are asking Nauman Shah about the patent

2:59PM   16  expiration for riva; is that right?

2:59PM   17  A.   Yes, that's correct.

2:59PM   18  Q.   And riva, that's short for rivaroxaban or Xarelto; is that

2:59PM   19  right?

2:59PM   20  A.   Yes.

2:59PM   21  Q.   And Mr. Shah responds that it will not expire until 2023;

2:59PM   22  is that right?

2:59PM   23  A.   That's correct.

2:59PM   24  Q.   And then you forward this email to some other Janssen

2:59PM   25  employees, stating that, "We've got a little time;" right?

A.   Yes.  If I recall, I had done a presentation to these individuals, and they work in the side of the business that has wholesalers and so forth, so they needed to understand when the product was going to expire, so I got the information and shared it.

Q.   So patent expiration is something that you keep track of in marketing; right?  I mean, it's an important issue; right?

A.   For the products you work on, it's important to know, yes, when the patent expires, and I had just joined the team just a month before and wanted to understand that and share it with someone who had asked a question.

Q.   All right.  And you knew that -- that at this time that J&J had several key products going off patent, the 2008 to 2010 time frame, and that Xarelto had the potential to be a blockbuster drug for J&J; right?

A.   I can't agree with -- there was a lot in that statement. When I joined the rivaroxaban team, Levaquin was part of that group, and so I do recall that was going off patent.  I don't recall the specific timing for the other products you mentioned.

     And I knew -- you asked something about a blockbuster product.  Could you -- could you ask that question again or help me understand your question?

Q.   Okay.  Well, first of all, the term "blockbuster," that is a -- that's a term of art in the pharmaceutical industry;

1   right?

2   **A.**   What do you mean by a "term of art"?

3   **Q.**   Well, in the pharmaceutical industry, in the parlance of

4   the pharmaceutical industry, when you talk about a blockbuster

5   drug, that means a drug that is expected to generate a billion

6   dollars a year or more; correct?

7   **A.**   Yes.  There isn't a dollar amount for sales that makes it

8   a blockbuster drug, and that's a term that's used in our

9   industry, yes.

10   **Q.**   Okay.  All right.  Let me show you what's marked as

11   Plaintiff's Exhibit 3041252.

12           **MR. BIRCHFIELD:**  Offer this as Plaintiff's Exhibit

13   Number 3.

14           **MR. SARVER:**  Your Honor, I'm going to object.  I

15   don't see any indication that this is a document Ms. Geiger has

16   been part of or seen.

17   **BY MR. BIRCHFIELD:**

18   **Q.**   Ms. Geiger, do you have -- do you have the document in

19   front of you?

20   **A.**   I do.

21   **Q.**   Okay.  And this is a -- this is a document -- this is

22   actually a PowerPoint that you prepared; is that correct?

23   **A.**   Yes, it is.

24   **Q.**   Okay.

25           **MR. SARVER:**  No objection.

| | | |
|---|---|---|
| 3:02PM | 1 | THE COURT:  Let it be admitted. |
| 3:02PM | 2 | BY MR. BIRCHFIELD: |
| 3:02PM | 3 | Q.   All right.  And if you will turn to the -- the pages are |
| 3:02PM | 4 | not -- are not numbered.  Do you see the page that is labeled |
| 3:02PM | 5 | "Xarelto Launch"? |
| 3:02PM | 6 | Ms. Geiger, for your help, the -- that page is on the |
| 3:02PM | 7 | screen.  You're welcome to turn to it in the document, but we |
| 3:02PM | 8 | pulled it up on the screen for your assistance, if you'd like. |
| 3:02PM | 9 | A.   There's -- I don't see a screen here. |
| 3:02PM | 10 | Q.   Okay.  So if you'll turn then to the -- turn then to the |
| 3:02PM | 11 | page that the jury looking at -- |
| 3:02PM | 12 | A.   Is this the page?  That page? |
| 3:03PM | 13 | Q.   Yes.  All right.  And so this is -- |
| 3:03PM | 14 | A.   That's Xarelto. |
| 3:03PM | 15 | Q.   Yes.  So this is a document that you prepared; right? |
| 3:03PM | 16 | A.   Yes, I was getting ready for an interview and put some |
| 3:03PM | 17 | slides together. |
| 3:03PM | 18 | Q.   All right.  And so -- and what you put together in this |
| 3:03PM | 19 | PowerPoint is that J&J has several key products going off |
| 3:03PM | 20 | patient -- you actually -- that's a typo, right?  You mean |
| 3:03PM | 21 | patent; right? |
| 3:03PM | 22 | A.   That is.  I made a typo. |
| 3:03PM | 23 | Q.   -- in 2008 and -- to 2010; is that correct? |
| 3:03PM | 24 | A.   That's what I wrote here, yes. |
| 3:03PM | 25 | Q.   Okay.  Now J&J, that is -- that stands for Johnson & |

3:03PM 1   Johnson; right?

3:03PM 2   A.   Yes, that's correct.

3:03PM 3   Q.   And Johnson & Johnson is the -- is the parent company of

3:03PM 4   Janssen; is that correct?

3:03PM 5   A.   Yes, it is.

3:03PM 6   Q.   Okay.  All right.  And if you will -- if you'll turn to

3:04PM 7   the page just a little bit farther, it says "Key Learnings."

3:04PM 8            Do you see that page?

3:04PM 9   A.   Is that after or before?  I don't see a key learnings

3:04PM 10  after the Xarelto.

3:04PM 11  Q.   I'm sorry.  It's actually before.  It's four pages into

3:04PM 12  your document.

3:04PM 13  A.   Okay.  And just because we don't have the screen, this is

3:04PM 14  the one you're looking for?

3:04PM 15  Q.   Yes.

3:04PM 16  A.   Am I supposed to look at it?

3:04PM 17  Q.   Yes.

3:04PM 18  A.   Okay.

3:04PM 19  Q.   So, Ms. Geiger, let me -- let me set the time frame.  This

3:04PM 20  is in the 2008 time period that you put this PowerPoint

3:04PM 21  together; is that right?

3:04PM 22  A.   Yes, this would have been in the summer of '08.  I was

3:04PM 23  looking -- you know, searched for information to prepare for an

3:04PM 24  interview so I could put my best foot forward.

3:05PM 25  Q.   Okay.  And at this -- and Xarelto did not go on the market

3:05PM 1   in the US until 2011; right?

3:05PM 2   **A.**   Yeah.  I think it was middle of 2011 when the first

3:05PM 3   indication was approved.

3:05PM 4   **Q.**   Okay.  All right.  And so at this point it is seen -- look

3:05PM 5   at the first, the second bullet point, and it says that the

3:05PM 6   anticoagulant market is very large and continues to grow; is

3:05PM 7   that right?

3:05PM 8   **A.**   Yeah.  Yes, that's what it says there.

3:05PM 9   **Q.**   And that's true?  That was what you understood about the

3:05PM 10  anticoagulant market at this point?  It was a large market, and

3:05PM 11  it was growing and continuing to grow; right?

3:05PM 12  **A.**   Yeah.  Yes.  There's -- the diseases that anticoagulants

3:05PM 13  are used in are growing, heart disease and so forth, so there's

3:05PM 14  lots -- going to be lots of patients who need anticoagulants.

3:05PM 15  **Q.**   All right.  And if you'll go a little bit further in this

3:06PM 16  document, you'll see -- you'll turn to the page that -- that

3:06PM 17  has "Launch Readiness Framework."

3:06PM 18        Do you see that?

3:06PM 19  **A.**   Is it this one with the picture on the side --

3:06PM 20  **Q.**   Yes.

3:06PM 21  **A.**   -- that you're referring to?

3:06PM 22  **Q.**   No.  The "Launch Readiness Framework," the next page.

3:06PM 23  **A.**   So that's this one?

3:06PM 24  **Q.**   Yes.

3:06PM 25  **A.**   Correct?  Okay.

3:06PM    1  **Q.**    All right.  And so -- and this is -- this is you're

3:06PM    2  preparing for the launch of Xarelto, correct, launch into the

3:06PM    3  market in the US?

3:07PM    4  **A.**    Yes.  This was just to give you -- to give some

3:07PM    5  background, this was -- the launch readiness framework is a

3:07PM    6  bunch of steps that you need to prepare to bring a product to

3:07PM    7  market, and I was trying to demonstrate that I knew marketing

3:07PM    8  well enough that I was the right person for this job by

3:07PM    9  referring to this new kind of road map, let's say, that Janssen

3:07PM   10  had introduced to marketers.  So that's what this is.  This is

3:07PM   11  that part.

3:07PM   12  **Q.**    Okay.  All right.  In that middle column under

3:07PM   13  "brand/marketplace readiness," do you see that?

3:07PM   14  **A.**    I do, yes.

3:07PM   15  **Q.**    All right.  And there on that -- you see "positioning and

3:07PM   16  messaging"; right?

3:07PM   17  **A.**    Yes.  That's one of the -- one of the key steps throughout

3:07PM   18  the process, yes.

3:07PM   19  **Q.**    So one of the goals in positioning Xarelto and in

3:07PM   20  messaging Xarelto was identifying the key marketing messages

3:07PM   21  and working to protect and promote those messages; right?

3:08PM   22  **A.**    The way we do positioning and messaging is to do a lot of

3:08PM   23  research to understand what's the unmet need from doctors and

3:08PM   24  from patients, to understand what is the clinical profile of

3:08PM   25  our product, and then to -- before we even have a label, just

3:08PM   1   think about what are the many scenarios.  But the final

3:08PM   2   messaging and positioning is really dependent upon what the FDA

3:08PM   3   puts in our label.

3:08PM   4   Q.    Okay.  Now, you had -- you had key marketing messages that

3:08PM   5   were in place long before there was an FDA-approved label for

3:08PM   6   Xarelto; true?

3:08PM   7   A.    We had done -- after I joined the team in 2008, we

3:08PM   8   developed several scenarios based on what we knew at that time

3:08PM   9   of the clinical profile, but it's not until you get to the

3:08PM   10  Phase III studies and the label that you have what we call your

3:08PM   11  final messages.

3:08PM   12         Everything before then is sort of scenario planning

3:09PM   13  and -- and anticipation -- hopeful anticipation of what the

3:09PM   14  product could -- you know, how the product could perform based

3:09PM   15  on the science so far.

3:09PM   16  Q.    Okay.  Because that's important; right?  It's important

3:09PM   17  for your marketing messages to actually be developed around the

3:09PM   18  way the drug actually works in clinical studies, in human

3:09PM   19  bodies, in patients; right?

3:09PM   20  A.    Yes.  What's really most important is that our messages

3:09PM   21  are shaped around what the FDA label and the final Phase III

3:09PM   22  clinical trial that was the basis for that label forms.  So

3:09PM   23  that's -- on the hierarchy, the most important is that our

3:09PM   24  messages match the label.

3:09PM   25  Q.    So it would be a serious problem to have a marketing

3:09PM   1   message that is locked in even before the clinical studies for

3:09PM   2   the drug are done; right?

3:09PM   3   A.   I think that really depends.  There's certain clinical

3:09PM   4   attributes of a product, like maybe its half-life, that doesn't

3:10PM   5   change no matter how -- you know, over the course of time.

3:10PM   6            But certainly any safety or efficacy claim would

3:10PM   7   be -- you know, the most important safety and efficacy claim

3:10PM   8   comes after your Phase III trials and after your FDA label is

3:10PM   9   granted.

3:10PM   10  Q.   All right.  So when you came -- you were hired as -- in

3:10PM   11  the marketing department for Xarelto?  You were interviewing

3:10PM   12  for --

3:10PM   13  A.   I was hired, yes.  Yes.

3:10PM   14  Q.   Okay.  And so you -- when you came on board, were you --

3:10PM   15  were you told -- were you informed that there was an actual

3:10PM   16  agreement that had a key provision about how Xarelto would be

3:10PM   17  marketing a contract between Janssen and Bayer?

3:10PM   18  A.   No.  I didn't know there was a contract with all that

3:10PM   19  detail.  There were -- when I joined the team, there were

3:10PM   20  internal websites that told us about this product rivaroxaban

3:10PM   21  that Janssen was developing and all the excitement around it.

3:10PM   22  And there was some research on Google that I found to create

3:11PM   23  this.

3:11PM   24            But you mentioned the contract.  I didn't know there

3:11PM   25  was a contract with all that detail in it.

**Q.**   Okay.  Well, let's -- let's pull that apart just a little bit.  Okay?

**A.**   Okay.

**Q.**   Were you aware -- before today, were you aware that there was an agreement -- a collaboration agreement between Bayer and Janssen that was a document that was signed by these parties?

**A.**   Before today?

**Q.**   Yes.

**A.**   Yes.  I mean, I knew there was an agreement.  I don't know what that agreement said.  And then I believe they showed me an agreement that was there for my first time in the deposition, but I didn't -- prior to that, I hadn't seen the legalese and all the agreement and the signatures or anything.

**Q.**   All right.  So when you came on board with Xarelto, even before -- even before it was sold in the US, before the clinical studies were completed, were you ever told that no monitoring was a -- was a non -- a nonnegotiable term -- marketing term for this product?

**A.**   I was never told that.  I knew that the product was going to -- not going to require routine monitoring or they thought it wouldn't, but I don't remember hearing anything about a requirement or an agreement related to that.

**Q.**   Because you would really want to wait?  You'd want to wait and see what the clinical studies show before you lock in a core message like that, wouldn't you?

3:12PM    1    **A.**   Well, we wait until the FDA gives us our label before we

3:12PM    2    lock in any of our core messages.  That's -- that's sort of our

3:12PM    3    road map is the FDA label and everything included in that.

3:12PM    4    **Q.**   Okay.  So we look at the positioning and messaging, and

3:12PM    5    then we go down a little bit further, and you see a market

3:12PM    6    research plan.  Do you see that?

3:12PM    7    **A.**   Yep.

3:12PM    8    **Q.**   All right.  A market research plan, that's an effort to

3:13PM    9    identify what messages would resonate best with doctors and

3:13PM   10    patients; right?

3:13PM   11    **A.**   Actually, our market research plan is much more

3:13PM   12    comprehensive than that.  We do market research with patients

3:13PM   13    to understand what it's like to have these diseases and some of

3:13PM   14    the challenges that they may face with it.  We do market

3:13PM   15    research to see what all the different types of treatments

3:13PM   16    might be.

3:13PM   17            We do market research on our products, you know, both

3:13PM   18    as they're approved and, as you say, messages.  But then we do

3:13PM   19    market research afterwards as well.  So market research plans

3:13PM   20    are really, really comprehensive and much broader than just

3:13PM   21    that.

3:13PM   22    **Q.**   Okay.  Well, thank you.  Thank you for that.  But you do

3:13PM   23    market research to see what messages will actually sell best.

3:13PM   24    That is part of the market research plan; right?

3:13PM   25    **A.**   We do market research to see which messages resonate.  Are

3:13PM   1   they clear and easy to understand?  Are they compelling?  And

3:13PM   2   then sometimes our market research tells us that what we said

3:14PM   3   didn't land right or didn't sound accurate or, you know,

3:14PM   4   appropriate.  So --

3:14PM   5   Q.   Okay.

3:14PM   6   A.   -- we do that, yes.

3:14PM   7   Q.   So you do the test to see what messages will resonate, and

3:14PM   8   you do tests to follow-up and see if they are resonating;

3:14PM   9   right?

3:14PM  10   A.   Yeah.  We're in the business of educating and informing

3:14PM  11   clinicians about the benefits and risks of our products.  So

3:14PM  12   it's really, really important that whatever information we put

3:14PM  13   out there is clear and easy to understand and that when we say

3:14PM  14   it that our practitioners, our physicians are understanding and

3:14PM  15   interpreting correctly.  And that's why we do the research, to

3:14PM  16   see if they understood what we said.

3:14PM  17   Q.   All right.  So as the -- you said that the role of

3:14PM  18   marketing is to educate physicians; is that right?

3:14PM  19   A.   Yes.  You know, physicians, especially primary care

3:14PM  20   physicians, they're extremely busy.  They don't have time to go

3:14PM  21   to conferences all the time or read journals.

3:15PM  22         So we send a sales force out there that goes out and

3:15PM  23   educates them on our products and what the FDA has given us as

3:15PM  24   a label and what the FDA allows us to say about them.

3:15PM  25   Q.   All right.  So would you say that -- I mean, these are

3:15PM
3:15PM
3:15PM
3:15PM
3:15PM
3:15PM
3:15PM
3:15PM
3:15PM
3:15PM
3:15PM
3:15PM
3:15PM
3:15PM
3:15PM
3:15PM
3:16PM
3:16PM
3:16PM
3:16PM
3:16PM
3:16PM
3:16PM
3:16PM
3:16PM

1   prescription drugs.  I mean, a doctor has to -- if there's a
2   sale, it's because a doctor has written a prescription for this
3   drug; right?
4   A.   Yes.  That's why we're informing physicians.  Right?  They
5   ultimately decide what to prescribe for the patients in front
6   of them.  That's wholly in their business.  We just educate and
7   inform them so they can make the right decision for the patient
8   they're treating.
9   Q.   And that's a very important distinction; right?  I mean,
10  because anticoagulants, these -- these drugs are -- they're
11  treating very serious conditions; right?
12  A.   Absolutely.
13  Q.   Okay.  And this -- the relationship that the doctor has
14  with the patient, that's -- that's very important; right?  The
15  doctor needs the right information to talk to the patient about
16  the prescribing decision; right?
17  A.   Yes.  They -- the physician is the, you know, most
18  important person in this whole continuum.
19  Q.   And so it's -- it's important that you, as a
20  pharmaceutical company, in your marketing, that you provide
21  education.  You're educating; you're not selling.  Right?
22  A.   Yes, we're educating.  That's why there's so many
23  regulations in what we do and why we have so many stopgaps,
24  because the information that we tell providers and doctors has
25  to be balanced, it has to be accurate, and it has to be aligned

3:16PM   1   with our label.  So we have a lot of regulations to make sure

3:16PM   2   that happens.

3:16PM   3   Q.   So if you go from -- if you go from educating to selling,

3:16PM   4   that would be stepping over the line; right?

3:16PM   5   A.   Well, there's shorthand of our -- our representatives, our

3:16PM   6   sales representatives.  They have information to inform

3:16PM   7   physicians.  So our representatives aren't handing a pill to a

3:16PM   8   doctor and selling it, but they are influencing and informing

3:16PM   9   physicians.  And, you know, the hope is that the physician

3:17PM  10   chooses to prescribe our products for patients and that that

3:17PM  11   ultimately results in a sale.

3:17PM  12   Q.   So if the marketing -- if the marketing effort -- for a

3:17PM  13   prescription drug, if the marketing effort goes from educating

3:17PM  14   to selling, that would be stepping over the line; right?

3:17PM  15   A.   It's probably a bit of a nuance.  Our efforts -- anyone in

3:17PM  16   pharmaceutical sales -- it's called the pharmaceutical sales

3:17PM  17   arena.  There's sales and marketing.  Our job is defined by

3:17PM  18   having information given in an FDA label and in our studies and

3:17PM  19   portraying that and communicating it to physicians.

3:17PM  20          That is our definition of sales, right, is that we

3:17PM  21   are out there as individual people having one-on-one

3:17PM  22   discussions with providers and providing them information.

3:17PM  23   That's what we call pharmaceutical sales or selling.

3:17PM  24   Q.   Okay.  Let's look down just a little -- no, still on that

3:17PM  25   same column.  You've got KOL interactions.

3:18PM   1          And KOL, that is key opinion leaders; right?

3:18PM   2   **A.**   Yes, that's correct.

3:18PM   3   **Q.**   Okay.  And so part of the marketing plan that is put in

3:18PM   4   place for Xarelto was to identify key opinion leaders; right?

3:18PM   5   **A.**   Yeah, physicians who are very knowledgeable and

3:18PM   6   well-respected in their area.

3:18PM   7   **Q.**   Physicians that are respected and that you could hire,

3:18PM   8   that you could pay to deliver Janssen or Johnson & Johnson's

3:18PM   9   messages to other doctors; right?

3:18PM   10  **A.**   Actually, we use key opinion leaders for a variety of

3:18PM   11  things.  We identify physicians who are well -- you know,

3:18PM   12  well-informed in our disease states, who are well-respected.

3:18PM   13  And we use them from -- for ad boards.  And those key opinion

3:18PM   14  leaders come, and they advise us on the latest science.

3:18PM   15          We use them, the physicians who choose to -- to, you

3:18PM   16  know, speak about our products aligned with the FDA label.  We

3:19PM   17  also use key opinion leaders to inform our marketing teams to

3:19PM   18  come and visit and inform us.

3:19PM   19          So we use key opinion leaders in a variety of ways.

3:19PM   20  One way is in promotional efforts to speak to their peers with

3:19PM   21  on-label and, you know, FDA messaging -- approved messaging.

3:19PM   22  **Q.**   FDA -- FDA messaging --

3:19PM   23  **A.**   Yeah.  I -- pardon me.  FDA-approved -- FDA-approved --

3:19PM   24  let me rephrase that.

3:19PM   25          We have them speak with our promotionally approved

3:19PM   1   messaging, which comes from our FDA-approved label.  So I

3:19PM   2   apologize for not being clear.

3:19PM   3   **Q.**   The Xarelto label, that is Janssen's label; right?  I

3:19PM   4   mean, Janssen owns that label; Janssen controls that label;

3:19PM   5   right?

3:19PM   6   **A.**   No.  We -- Janssen doesn't control our FDA label.  The FDA

3:19PM   7   reviews all the reams of scientific data and grants us a label.

3:20PM   8   Actually, we often use the terms "grants," grants us our label.

3:20PM   9   So we don't own or control that label --

3:20PM   10  **Q.**   Okay.  So the --

3:20PM   11  **A.**   -- to my knowledge.

3:20PM   12  **Q.**   The Xarelto label, it's your position -- your

3:20PM   13  understanding is that the Xarelto label is the FDA's label and

3:20PM   14  not Janssen's?

3:20PM   15  **A.**   You know, I -- all of the labeling discussions with the

3:20PM   16  FDA happen between the scientists and the FDA, but I -- I

3:20PM   17  personally don't view the Xarelto label as Janssen's label to

3:20PM   18  control.

3:20PM   19          In fact, in my role, we get a lot of letters -- you

3:20PM   20  know, we've gotten -- I should say in my role in marketing over

3:20PM   21  however many years, we've gotten letters from the FDA

3:20PM   22  correcting or asking us to change that label.  And so that's

3:20PM   23  really not something we control.  That's something the FDA

3:20PM   24  controls.  That's why I don't feel like we control the label.

3:20PM   25  **Q.**   Hmm.  Okay.  Let's go back to the key opinion leaders.

3:20PM  1   All right?

3:20PM  2   A.    Sure.

3:20PM  3   Q.    So you described a broad range of how key opinion leaders

3:21PM  4   can be used, but --

3:21PM  5   A.    Yep.

3:21PM  6   Q.    -- the primary role for identifying key opinion leaders

3:21PM  7   and hiring key opinion leaders is so that they can meet with

3:21PM  8   other doctors and deliver messages that are controlled by

3:21PM  9   Janssen about Xarelto; correct?

3:21PM  10  A.    I couldn't agree that we hire them because we compensate

3:21PM  11  them for their time, much like you'd compensate any

3:21PM  12  professional for the time that they're away from their day job.

3:21PM  13  And it's not primary that we -- that's not the only reason we

3:21PM  14  use them.

3:21PM  15        But frequently physicians want to hear from their

3:21PM  16  peers about what their peers believe.  And if there are

3:21PM  17  physicians who believe in the benefits of our product and

3:21PM  18  they're willing to speak to other physicians about that, we'd

3:21PM  19  be happy to have another -- you know, experts come in and share

3:21PM  20  their perspective.  And that's how we use our key opinion

3:21PM  21  leaders when we use them for speaker promotional programs.

3:22PM  22  Q.    Okay.  So you have a concern about me using the term

3:22PM  23  "hire," but you agree that you do pay the key opinion leaders;

3:22PM  24  right?

3:22PM  25  A.    Yes.  When a key opinion leader leaves their practice and

3:22PM  1    comes to do a talk, we're obligated to compensate them for the

3:22PM  2    time away from their job.

3:22PM  3    Q.    Okay.  And -- but you do more than just paying them to go

3:22PM  4    out and talk; you actually control the message that they can

3:22PM  5    deliver.  Right?

3:22PM  6    A.    Well, as I mentioned before, we are only allowed to speak

3:22PM  7    to what's in the FDA label.  So if we didn't provide those key

3:22PM  8    opinion leaders with the approved language and the approved

3:22PM  9    messaging, we'd be going off label.  And so we can't allow

3:22PM  10   physicians who are working for -- or, you know, supporting

3:22PM  11   Janssen to their peers, we can't allow them to just speak off

3:22PM  12   the cuff.  We have to provide them with the approved

3:22PM  13   promotional messages aligned with our label.

3:22PM  14   Q.    Okay.  All right.  I think we're getting there.  So I

3:23PM  15   think -- I mean, you say that they are supporting Janssen.

3:23PM  16   They are delivering Janssen's message.  So you must control and

3:23PM  17   make sure that their message aligns with what you expect;

3:23PM  18   right?  These are mandatory messages that the key opinion

3:23PM  19   leaders must deliver to other doctors; right?

3:23PM  20   A.    If a key opinion leader were out in the marketplace

3:23PM  21   talking about Xarelto in a promotional program, and they did

3:23PM  22   not say what was in the FDA-approved label, we would be

3:23PM  23   penalized for it.  So we have to -- we're obligated, we're

3:23PM  24   regulated to ensure that physicians who speak about Janssen's

3:23PM  25   products in a promotional setting, that they say what's aligned

201

3:23PM 1 with our label and they don't go off label in any way, shape,

3:23PM 2 or form.  We would be penalized, and they might be.

3:23PM 3 Q.   All right.  Let's -- let's go back to the page that has --

3:23PM 4 where we were earlier, the Xarelto launch in the background.

3:23PM 5       Do you see that?

3:23PM 6 A.   I'm sorry.  Which page?  There were lots that we've looked

3:24PM 7 at.

3:24PM 8 Q.   It is -- it's the page that says "Xarelto launch."  At the

3:24PM 9 top, it has "Background" and "Strategic Objective."

3:24PM 10       Do you see that?

3:24PM 11 A.   Let me find it.

3:24PM 12       **THE COURT:**  Two pages before.

3:24PM 13 **BY MR. BIRCHFIELD:**

3:24PM 14 Q.   Two pages before.

3:24PM 15 A.   Page 4, you said?

3:24PM 16 Q.   No.  Two pages earlier than the page we were just on.

3:24PM 17 A.   It has "Background" and then "Strategic Objective."

3:24PM 18 Right?

3:24PM 19 Q.   Yes.

3:24PM 20 A.   That one?

3:24PM 21 Q.   All right.  So let's -- I want to revisit the -- the

3:24PM 22 discussion earlier about the importance of the doctor-patient

3:24PM 23 relationship.

3:24PM 24       It's important for the doctor to have the best

3:24PM 25 information and the best drugs available to offer to his

| | | |
|---|---|---|
| 3:24PM | 1 | patients; right? |
| 3:24PM | 2 | A.   Absolutely. |
| 3:25PM | 3 | Q.   And -- and one of the -- one of the objectives that you |
| 3:25PM | 4 | set forth here is to create multiple barriers for entry of a |
| 3:25PM | 5 | competitor. |
| 3:25PM | 6 |         Do you see that? |
| 3:25PM | 7 | A.   Yes, that's what's written here. |
| 3:25PM | 8 | Q.   Right.  So when you are -- when you are creating barriers |
| 3:25PM | 9 | for entry of a competitor, you're talking about other |
| 3:25PM | 10 | anticoagulants, right?  Other blood thinners? |
| 3:25PM | 11 | A.   You know, I think any competitors in any of our markets. |
| 3:25PM | 12 | So -- |
| 3:25PM | 13 | Q.   Okay. |
| 3:25PM | 14 | A.   I can assume that that's probably what I meant at the |
| 3:25PM | 15 | time, but it's been a while.  So... |
| 3:25PM | 16 | Q.   All right.  But you would agree, wouldn't you, that if you |
| 3:25PM | 17 | are -- if you are creating barriers for competitors for other |
| 3:25PM | 18 | blood thinners, that would not be putting patients' interests, |
| 3:25PM | 19 | first, would it? |
| 3:25PM | 20 | A.   What I can tell you -- what I mean or what my intent is of |
| 3:26PM | 21 | any of this, right, creating barriers, is that as an |
| 3:26PM | 22 | organization, there is a lot of excitement about Xarelto and |
| 3:26PM | 23 | the things that it could bring to market to meet unmet needs. |
| 3:26PM | 24 | And if the product proved to be as good as we thought it was, |
| 3:26PM | 25 | we really felt strongly that patients should get this above all |

3:26PM  1   others.

3:26PM  2          And so that creating multiple barriers to entry is

3:26PM  3   that intention.  You know, if you've got something that works

3:26PM  4   really well and you really love it and it works well for your

3:26PM  5   patients, that's inherently a barrier to changing your habits

3:26PM  6   or trying something new.

3:26PM  7   Q.   But it's a real problem if the other products are actually

3:26PM  8   superior, if the other products actually are safer and more

3:26PM  9   effective, and you're blocking entry to them into the market,

3:26PM  10  that would be a problem; right?

3:26PM  11  A.   So run the question by me again, because I wasn't clear if

3:26PM  12  you were talking about if there was a problem if we had a

3:26PM  13  competitor.  So if you can help me clarify your question a bit

3:27PM  14  so I could answer it, that would be great.

3:27PM  15  Q.   Okay.  All right.  So we know that other NOACs, novel oral

3:27PM  16  anticoagulants, came on the market; right?

3:27PM  17  A.   Yes.

3:27PM  18  Q.   Pradaxa, Eliquis, Savaysa; right?

3:27PM  19  A.   Yes.

3:27PM  20  Q.   And those are -- those are competitors of Xarelto; right?

3:27PM  21  A.   They are, yep.

3:27PM  22  Q.   And each of those products has been shown in clinical

3:27PM  23  studies to be superior to the gold standard, superior to

3:27PM  24  warfarin; right?

3:27PM  25  A.   Yes.  In their clinical trials, they demonstrated -- I

204

3:27PM   1    don't recall Savaysa because I was off the brand at that time,

3:27PM   2    but they have all been able to make claims of superiority,

3:27PM   3    sure.

3:27PM   4    Q.   And Xarelto could not -- could not -- couldn't show that

3:27PM   5    it was any better than warfarin on safety or efficacy; right?

3:27PM   6    A.   We did a very different kind of study, so -- in our study

3:27PM   7    against warfarin, which had a great degree of very sick AFib

3:27PM   8    patients, so -- and that's important.

3:28PM   9         I think you're speaking about the AFib indication?

3:28PM   10   Or are you speaking about our other indication?  Because each

3:28PM   11   study was different.  So...

3:28PM   12   Q.   All right.  So did you get in trouble with the FDA for

3:28PM   13   making superiority claims about Xarelto?

3:28PM   14   A.   No.  We never used the word "superior" in our messaging --

3:28PM   15   Q.   But --

3:28PM   16   A.   -- for AFib.  That's the one I was working on.  I don't

3:28PM   17   know about our other --

3:28PM   18   Q.   There are different ways to express superiority without

3:28PM   19   using that exact word; right?  There are ways to communicate in

3:28PM   20   a less explicit way superiority.

3:28PM   21        And you got in trouble with the FDA about promoting

3:28PM   22   Xarelto for being superior; right?

3:28PM   23   A.   Can you give me a specific example?  Because I don't

3:28PM   24   recall the situation you're referring to.

3:28PM   25   Q.   That's fine.  If you're saying that you don't recall that

| | |
|---|---|
| 3:28PM | 1 |

the FDA warned you about making superiority promotions, then
okay.  We'll move on.
A.   In AFib, I -- we never used the term "superior" in our
messaging, so I'd have to see what you're speaking to.
Q.   Okay.  All right.  So -- but let's go back.  So if there
are other products in your class that are actually better,
better at treating the condition and better on the safety
scale, if you're blocking entry to the marketplace for those
products, that is putting the company's interest ahead of
patients; true?
A.   We're not really able to block other products entering the
marketplace.  Our job is to really promote the highlights and
the features of our products aligned with our FDA label.  And
unless there was a head-to-head trial of Xarelto versus one of
the other NOACs that you mentioned, that would be the only way
to be able to tell if Xarelto was better or worse than any of
those products you mentioned.

         What we did show was that Xarelto -- in the atrial
fibrillation indication, we were able to show that Xarelto was
non-inferior to warfarin, and that's the label that we had and
what we promoted off of.
Q.   "Non-inferior" meaning it's no worse than Xarelto -- I
mean, worse than warfarin; right?
A.   Yes, not inferior to warfarin.
Q.   All right.  Let me show you what's marked as Exhibit

206

| | |
|---|---|
| 3:30PM | 1 |
| 3:31PM | 2 |
| 3:31PM | 3 |
| 3:31PM | 4 |
| 3:31PM | 5 |
| 3:31PM | 6 |
| 3:31PM | 7 |
| 3:31PM | 8 |
| 3:31PM | 9 |
| 3:31PM | 10 |
| 3:31PM | 11 |
| 3:31PM | 12 |
| 3:31PM | 13 |
| 3:31PM | 14 |
| 3:31PM | 15 |
| 3:31PM | 16 |
| 3:31PM | 17 |
| 3:31PM | 18 |
| 3:31PM | 19 |
| 3:31PM | 20 |
| 3:31PM | 21 |
| 3:31PM | 22 |
| 3:31PM | 23 |
| 3:32PM | 24 |
| 3:32PM | 25 |

1    Number -- identification number is 2040674.

2         Do you recognize this document as the document --

3         **MR. SARVER:**  May I see it, Your Honor?  I've not seen

4    it.  It was just handed to me.

5                         (Pause.)

6         **MR. SARVER:**  Your Honor, I don't know whether or not

7    this witness has ever seen the document.  That'll have to be

8    the first thing we talk about.

9         **THE COURT:**  Let's ask that first.

10        **MR. BIRCHFIELD:**  That's where I was headed, Your

11   Honor.

12   **BY MR. BIRCHFIELD:**

13   **Q.**  Ms. Geiger, this is a document that you created; right?

14   **A.**  I don't know that I created this.  This looks like one of

15   our business plans, which is created by really everybody on the

16   team and represents all of our indications.

17   **Q.**  So you were -- you were at least a part in preparing this

18   document; right?

19   **A.**  Oh, yes.

20   **Q.**  Okay.  All right.

21        **MR. BIRCHFIELD:**  Your Honor, we'd offer this as

22   Plaintiff's Exhibit 4.

23        **THE COURT:**  Let it be admitted.

24        **MR. SARVER:**  Your Honor, we object.  Certain of your

25   rulings are violated by this document -- by information in the

| | | |
|---|---|---|
| 3:32PM | 1 | document. |
| 3:32PM | 2 | MR. BIRCHFIELD:  I don't -- I don't think so, Your |
| 3:32PM | 3 | Honor. |
| 3:32PM | 4 | MR. SARVER:  Your Honor, I don't want to argue. |
| 3:32PM | 5 | THE COURT:  Well, let's approach the bench, then. |
| 3:32PM | 6 | (Whereupon the following proceedings were held at the |
| 3:32PM | 7 | bench out of the hearing of the jury:) |
| 3:32PM | 8 | MR. SARVER:  One of your rulings was on the numbers |
| 3:32PM | 9 | involved in sales and marketing, and it's right there at the |
| 3:32PM | 10 | very top.  I think that's just one of the areas where -- |
| 3:32PM | 11 | THE COURT:  Anything else? |
| 3:32PM | 12 | MR. SARVER:  Well, I'd have to look through the whole |
| 3:32PM | 13 | document. |
| 3:32PM | 14 | THE COURT:  You want to take a break, keep her on the |
| 3:32PM | 15 | line, take a break for a half an hour? |
| 3:32PM | 16 | MR. SARVER:  Thank you, Your Honor. |
| 3:32PM | 17 | (Whereupon the following proceedings were held in |
| 3:32PM | 18 | open court in the presence and hearing of the jury:) |
| 3:32PM | 19 | THE COURT:  Let's take a break at this time while |
| 3:32PM | 20 | counsel looks over the document.  He'll tell us when he's |
| 3:32PM | 21 | ready, and we'll come back. |
| 3:33PM | 22 | MR. SARVER:  Thanks, Your Honor. |
| 3:33PM | 23 | THE DEPUTY CLERK:  All rise. |
| 3:33PM | 24 | (Whereupon the jury was excused from the courtroom.) |
| 3:33PM | 25 | (Recess.) |

|   |   |
|---|---|
| 3:45 PM | 1 |
| 3:45 PM | 2 |

(whereupon the following proceedings were held at the bench out of the hearing of the jury:)

**THE COURT:** I noticed that there are several pages where amounts necessarily are stated. This may or may not be significant in the punitive damage aspect of the case, but we're not there.

**MR. MEUNIER:** Uh-huh.

**THE COURT:** So my feeling on the amounts, it's really a 403 situation. It's just -- it may contaminate the testimony. So we can do it either way -- either of several ways; is use portions of this -- introduce portions of it, or you can blank out the amounts. The problem with blanking it out is there's too many of them. There's too many pages.

**MR. BIRCHFIELD:** Judge, part of the challenge that we face here -- and these are not actual sales numbers. These are projections.

**THE COURT:** Yeah.

**MR. BIRCHFIELD:** And so -- but this goes to the -- this goes to the heart of motive, of the motive issue. In each of these cases, what we've faced in closing argument is, "The plaintiff says that we're not -- we're holding back on a test that would be helpful to patients. That's stupid. Why would we ever do that?" Well, this shows -- this shows why they would do that. They were -- they were looking to this drug to be the number one selling product for J&J. This shows that.

3:48PM  1   This is showing how aggressive they were in this marketing

3:48PM  2   campaign.  They couldn't give motive on these messages.  So

3:48PM  3   their motive here is critical to our case.

3:48PM  4           THE COURT:  Yeah, I see that.  It's just a question

3:48PM  5   of amounts in it.  I think we can -- you can fashion the term

3:48PM  6   in terms of what you just said without saying amounts.  That's

3:48PM  7   the problem as I see it.  When we start saying billions of

3:48PM  8   dollars, that has some problem with -- with loading the scales.

3:49PM  9   It's a 403 situation.  I can't get away from that, but your

3:49PM  10  point is well taken.  It's motive.

3:49PM  11           So we're going to have to figure out a way of

3:49PM  12  just saying exactly what you said.  You told me about it

3:49PM  13  without mentioning amounts.

3:49PM  14          MR. MEUNIER:  Your Honor, for the record, I want to

3:49PM  15  make sure.  Glombitza gave testimony that the companies wanted

3:49PM  16  to create a multibillion-dollar anticoagulant franchise.  The

3:49PM  17  defendants objected to that coming in, citing Record Doc 6254,

3:49PM  18  which had to do with past sales, not anticipated profits, and

3:49PM  19  you did overrule the objection.  So to be consistent again in

3:49PM  20  terms of what's anticipated here, not --

3:49PM  21          MR. BIRCHFIELD:  So, Judge, what's your suggestion

3:49PM  22  here?  I mean, do we put the document in and black out those

3:49PM  23  places?  I mean, the other part that they hang around our neck

3:49PM  24  every time is that, "The plaintiffs are giving you snippets,

3:50PM  25  bits and pieces."  I don't want to be in that boat.

3:50PM
3:50PM
3:50PM
3:50PM
3:50PM
3:50PM
3:50PM
3:50PM
3:50PM
3:50PM
3:50PM
3:50PM
3:50PM
3:50PM
3:50PM
3:50PM
3:51PM
3:51PM
3:51PM
3:51PM
3:51PM
3:51PM
3:51PM
3:51PM
3:51PM

1    **THE COURT:** Yes.  No, I understand.  We've got to

2  figure a way -- I don't know whether blocking out is necessary.

3  I think you ought to make your point about a significant amount

4  of money.  A blockbuster you've already got in.  That's a -- it

5  would be a blockbuster.

6            It's -- my concern is when you start talking

7  about a billion dollars here and a billion dollars there and a

8  billion dollars the other, it presents some issue, you know,

9  that starts getting more and more and more into the 403 area.

10    **MR. BIRCHFIELD:** So, Your Honor, with this -- with

11  this witness, then -- and I'm going to show her the document,

12  and then -- and I'll lay that framework, that --

13    **THE COURT:** It's a significant amount of money.

14    **MR. BIRCHFIELD:** If I can, if I can, if she will

15  acknowledge that they were looking for this to be the number

16  one selling product, and it required an aggressive marketing

17  campaign.  We'll admit this, but if we find a way to redact

18  whatever we need to do on the dollar figures --

19    **MR. SARVER:** We'll object to admitting it, Your

20  Honor.  It's just rife with things that have been excluded.

21    **MR. MEUNIER:** Can she be referred to the actual

22  figures and asked if they're substantial?

23    **MR. BIRCHFIELD:** But it also -- beyond the figures, I

24  mean, it shows the -- it shows the overall plan, the marketing

25  plan for what they were going to do, with the thought leaders,

1   the PR campaigns.  It's all laid out here.

2        MR. SARVER:  We don't have any objection to

3   Mr. Birchfield talking with her about specific pages of this

4   that haven't been excluded because of the money, and they only

5   identified two pages that he wanted to talk about.  One had

6   billions of dollars on it, so that can't come in.  But if you

7   want to talk about the document and go to the pages you want to

8   talk about that aren't diluted, we don't object to that.

9        MR. BIRCHFIELD:  So the pages where I was going, one

10  is that it's a premier product, that it exceeds the 2 billion;

11  and the other page where I was going with her was on the

12  tactical plan that includes the key opinion leaders, the PR and

13  all of that.  There were a couple of other places that I had

14  noted, but I decided not to go there.  It's a duplicate on the

15  KOLs, but that doesn't -- that doesn't cure the problem that I

16  have.  "Plaintiffs are only" -- we'll hear it.  "Plaintiffs are

17  giving you snippets.  They're only giving you part," and it's

18  their doing.  How do I get around that?

19        THE COURT:  Well, maybe I can instruct the jury to

20  deal with it and disregard -- I don't know.  I'll explain to

21  them that this is a plan, and I've -- I have excluded

22  references to amounts because that's not significant for them

23  to consider or something.  I think, you know, amounts are

24  problematic.  I don't know how to get around amounts.

25        MR. BIRCHFIELD:  Okay.  We'll offer it then subject

3:51PM
3:51PM
3:51PM
3:51PM
3:51PM
3:51PM
3:51PM
3:51PM
3:51PM
3:51PM
3:52PM
3:52PM
3:52PM
3:52PM
3:52PM
3:52PM
3:52PM
3:52PM
3:52PM
3:52PM
3:52PM
3:52PM
3:52PM
3:52PM
3:52PM

1   to -- I'll have someone go through, dark out all the figures.

2             THE COURT:  I won't admit it, but I'll -- okay.

3   Tender it, and then we'll see what comes in.

4             MR. SARVER:  Yes, Your Honor.  And then we won't

5   refer to any of the pages with money on them during the

6   questioning.

7             MR. MORRISON:  Do you need to instruct your witness

8   at all?  Ask her not to discuss --

9             MR. BIRCHFIELD:  I'll ask her about this document.

10  "This document shows you were looking for Xarelto to be a

11  premier product for --"

12            THE COURT:  Right.

13            MR. SARVER:  We don't have any problem with those

14  questions, Your Honor.

15            THE COURT:  Premier product in terms of money means

16  it outdistances the other product in terms of money.

17            MR. BIRCHFIELD:  The problem will be if she -- she's

18  probably going to say, "I don't remember any of that," and not

19  give me that.  That's -- then I'm in a quandary.

20            THE COURT:  You're going to have to ask her to look

21  through the -- look at the document and refer her to that.

22            MR. SARVER:  I don't think you'll have a problem

23  having her give you what you're entitled to.

24            MR. BIRCHFIELD:  You just think I'm entitled to

25  nothing.  That's --

3:54PM
3:54PM
3:54PM
3:54PM
3:54PM
3:54PM
3:54PM
3:54PM
3:54PM
3:54PM
3:54PM
3:54PM
3:54PM
3:54PM
3:54PM
3:55PM
3:55PM
3:55PM
3:55PM
3:55PM
3:55PM
3:55PM
3:55PM
3:55PM
3:55PM

1          **MR. SARVER:**  It's always "More, please."  It's like

2   Oliver Twist.

3          **THE COURT:**  Okay.  I'll talk with you all about it

4   probably tomorrow, but we've got a problem with one of the

5   jurors, Juror Number 7.  It's the second juror at the top.

6   She's written a note saying that she's got a doctor's

7   appointment on Thursday at 9:00, and she also has a problem

8   with the babysitting for a child that she didn't tell us about.

9   So that's a problem.  We may have to exclude her.  I don't know

10  what to do.

11         The minister has an issue, but I think we can

12  accommodate him.  He would like to go to a -- what do you call

13  it?  A meeting, a church meeting, revival, on Friday at 7:00 in

14  Gulfport, so we may have to break at 4:30.  We can accommodate

15  him to that, keep him in the mix.

16         What I'll do is I'll get the lady before we

17  break today, and we'll voir dire her and see what the situation

18  is and make a decision.  We may have to cut her loose.

19         Okay.  We've got to pick up the pace, guys,

20  because we're beginning to slow down now.  The issue that I'm

21  faced with -- and this is the problem.  I think the defendants

22  are correct.  When they are going to cross-examine somebody,

23  it's not appropriate for them to have to give the documents to

24  the witness to show the witness what they're going to

25  cross-examine them on, because the purpose of cross-examination

3:55PM 1  is to impeach the witness, or one of the purposes.

3:55PM 2              And by giving them the documents ahead of time,

3:55PM 3  that tips the witness off and it tips the scales in view of --

3:55PM 4  against the potential for impeachment.  I think that's a

3:55PM 5  correct statement.

3:55PM 6              So the plaintiffs are calling a witness under

3:56PM 7  611(c) which is cross-examination.  So I can't say, "Okay,

3:56PM 8  defendants.  You can do it, but plaintiffs can't do it."

3:56PM 9  That's the issue.  I'm not blaming anybody.

3:56PM 10             **MR. SARVER:**  No, no, I understand, Your Honor.

3:56PM 11             **THE COURT:**  That's the issue that is complicated.

3:56PM 12             **MR. SARVER:**  I'm just trying to protect my client.

3:56PM 13             **THE COURT:**  No, I got it.  I understand that, but

3:56PM 14  that the reason for it.

3:56PM 15             **MR. MEUNIER:**  Appreciate it if Rick doesn't keep

3:56PM 16  repeating he hasn't seen it before as if we've trying to spring

3:56PM 17  something on him.

3:56PM 18             **MR. SARVER:**  But it's just the truth.

3:56PM 19             **MR. MEUNIER:**  I know, but the jury doesn't have to

3:56PM 20  keep hearing it.

3:56PM 21             **MR. BIRCHFIELD:**  Maybe I can counter that that it's

3:56PM 22  on the exhibit list.  It has been provided for X couple of

3:56PM 23  weeks.

3:56PM 24             **MR. SARVER:**  Yeah, right.  If you want me to make

3:56PM 25  that speech, I will.

215

3:56PM  1    **MR. BIRCHFIELD:**  That's the point.

3:56PM  2    **THE COURT:**  Let's just say, "Can I see the document?"

3:56PM  3    **MR. SARVER:**  Okay.  I'll do that, Your Honor.

3:56PM  4    **THE COURT:**  All right.

3:56PM  5                    (Recess.)

3:58PM  6         (Whereupon the jury entered the courtroom.)

3:58PM  7    **THE DEPUTY CLERK:**  All rise.

3:58PM  8    **THE COURT:**  Okay.  Be seated, please.  Members of the

3:58PM  9    jury, I'm sorry we're slowing down a little bit.  There's an

3:58PM  10   issue, evidentiary issue.  It's just an issue that's arisen

3:58PM  11   that I'm trying to deal with, but you need not be concerned

3:59PM  12   with the -- with the rulings on the evidence.  That's my job,

3:59PM  13   not yours.

3:59PM  14                    Let's proceed.

3:59PM  15   BY MR. BIRCHFIELD:

3:59PM  16   Q.   Ms. Geiger, if you'll turn back to Plaintiff's Exhibit 4,

3:59PM  17   the 2011 business plan; right?

3:59PM  18   A.   Yes.

3:59PM  19   Q.   And this is a -- this is a document -- this is a business

3:59PM  20   plan that -- that you -- you helped create; right?

3:59PM  21   A.   Yes, I contributed to it.

3:59PM  22   Q.   And in this business plan, it's set out that Xarelto is

3:59PM  23   expected to be a premier product for J&J; right?

3:59PM  24   A.   Is that Page 2 you're referring to at the top?

3:59PM  25   Q.   Well, I'm just asking you.  You put this plan together.

3:59PM 1    Were you expecting -- were you and the marketing department at

3:59PM 2    Janssen, were you expecting this to be a premier product for

3:59PM 3    J&J in terms of sales?

4:00PM 4    A.   This was a premier product because it had so many

4:00PM 5    potential indications and such a large group of patients who

4:00PM 6    had an unmet need.  So, yeah, this was a great opportunity for

4:00PM 7    our organization and for patients.

4:00PM 8    Q.   All right.  Well, in this document, you laid out that it

4:00PM 9    remains a premier opportunity for J&J, and then right across

4:00PM 10   from that, you put in terms of the -- of the sales that's

4:00PM 11   expected to be generated by this product; right?

4:00PM 12   A.   When you say "you," you mean the marketing team as whole,

4:00PM 13   not me personally; correct?

4:00PM 14   Q.   You and the marketing team that put this together, right.

4:00PM 15   A.   Okay.  Yes.  So that's what it says here.  There was a

4:00PM 16   great opportunity for our organization to -- with this product,

4:00PM 17   for sure.

4:00PM 18   Q.   All right.  And -- all right.  Let's just make sure we got

4:00PM 19   the time frame.

4:00PM 20        You were looking -- you knew that you had drugs that

4:00PM 21   were going off patent -- right? -- and that the sales from

4:00PM 22   those products would drop dramatically; right?

4:00PM 23   A.   Yes.  And this was July of 2010.  So at that point, yes,

4:01PM 24   we had had some products come off patent.

4:01PM 25   Q.   And you were looking for Xarelto to be a -- to be a

blockbuster, to be a number one selling product for J&J to fill
that gap; right?

**A.**    I don't do the finances as far as pipeline and what fills
the gap, but clearly Xarelto -- it was a big unmet need.  We
had compounds that appeared to have a great opportunity to help
patients and to improve care.  So, yes, this was a great
opportunity with so many indications.

**Q.**    All right.  And you put together -- you put together an
extensive marketing plan on how you were going to be able to
position this -- this product to be the number one selling
product for J&J; right?

**A.**    Our business plans, we build every year.  They're
comprehensive.  Everything from marketing and then other
departments across the organization contribute to -- this was
July of 2010 -- what was our plan for what the activities we
were going to do in 2011.

          So, yes, we -- this is standard.  We call it business
plan.  It's not just a marketing plan.  It's everything we're
going to do six months later or start doing six months later.

          **MR. BIRCHFIELD:**  Your Honor, at this time we would
tender Plaintiff's Exhibit Number 4.

          **THE COURT:**  I'll take it -- put it into a suspension
at this point.  I'll give the parties an opportunity to look at
it.

          Members of the jury, let me explain what we're

4:02PM   1    doing.  There's been some references to certain things in this

4:02PM   2    document that may not be relevant to your consideration of it.

4:02PM   3    And so it's not either the plaintiff's or the defendants'

4:02PM   4    fault.  It's just that that's the way the document is.

4:02PM   5               So I'm going to admit it, assuming that the

4:03PM   6    document can be put in a form or fashion that you can look at

4:03PM   7    it and that it will not be misleading or any -- deal with any

4:03PM   8    other issues in it.  So I'll -- I'll reserve my ruling on that

4:03PM   9    until I see the appropriate document.

4:03PM   10              MR. SARVER:  And, Your Honor, just so that it's on

4:03PM   11   the record, we do object to the document.

4:03PM   12              THE COURT:  Yes.

4:03PM   13              MR. SARVER:  Thank you.

4:03PM   14   BY MR. BIRCHFIELD:

4:03PM   15   Q.    Now, Ms. Geiger, I want to see if we can agree on a couple

4:03PM   16   of points at least here; okay?

4:03PM   17   A.    Okay.

4:03PM   18   Q.    In the 2008-2000 (verbatim) time frame, Janssen, J&J were

4:03PM   19   looking at the anticoagulant market and -- with the

4:03PM   20   understanding that this was a large market, and it was expected

4:03PM   21   to continue to grow; right?

4:03PM   22   A.    Yes.  Patients' health is always declining.

4:04PM   23   Q.    All right.  And in -- and Janssen and Johnson & Johnson,

4:04PM   24   you've got multiple products; right?

4:04PM   25   A.    Yes, there's many products in Janssen.

**Q.**   And you have -- you have multiple prescription drugs that are on the market; right?

**A.**   That's correct.

**Q.**   And -- but Xarelto, it's not just, you know, any one of those other products.  You were looking to make it the number one selling product for J&J; right?

**A.**   I -- I can't say that that's -- I don't know how Janssen's like top, top leadership prioritizes all products.  This was a very important product, one that had potential to help a lot of patients and to generate a fair amount of sales.  So, yes, I could agree to that.  I just don't know how like my leaders prioritize all the different products we have.

            **THE COURT:**  Just a moment, Ms. Geiger.  Look, you're director of marketing.  Marketing has to do with sales; is that correct?

            **THE WITNESS:**  That's correct.

            **THE COURT:**  I'm not saying your company is only interested in sales, but that is your primary interest, isn't it?  You're marketing?

            **THE WITNESS:**  Yes, Your Honor.  You know, we market to generate sales.  That's true.

            **THE COURT:**  All right.

BY MR. BIRCHFIELD:

**Q.**   And in order for -- in order for Xarelto to be the premier product, to be a top-selling product, it was critical that

4:05PM 1    Xarelto get to market first; right?  It needed to be

4:05PM 2    approved --

4:05PM 3    **A.**    Whenever --

4:05PM 4    **Q.**    It needed to be approved first?

4:05PM 5    **A.**    Whenever -- I'm sorry.  Can you repeat your question?

4:05PM 6    **Q.**    It was important for the success of Xarelto in the

4:05PM 7    market -- in the marketplace to generate these types of sales,

4:05PM 8    it was important that it get to market as fast as possible.

4:05PM 9    Right?

4:06PM 10   **A.**    Products that get to market first generally have an

4:06PM 11   advantage of, you know, awareness and being the first in line.

4:06PM 12   So if our product could be first, it was a definitely an

4:06PM 13   advantage.

4:06PM 14   **Q.**    And there was a big push within Janssen to get Xarelto to

4:06PM 15   the market first, to be the first in class for these

4:06PM 16   anticoagulants; right?

4:06PM 17   **A.**    I don't -- I don't know what you mean by a "push".  We

4:06PM 18   can't control how fast the clinical trials accrue and finish

4:06PM 19   and how fast events happen, but certainly anything that the

4:06PM 20   organization could do to make the right decisions and start

4:06PM 21   some of these trials was going to be an advantage.  So I'm not

4:06PM 22   sure what you mean by there being a big push, but --

4:06PM 23   **Q.**    Was it important to Janssen to get Xarelto to the market

4:06PM 24   first among the NOACs?

4:06PM 25   **A.**    If our -- if our product was the first to market and got a

4:07PM
4:07PM
4:07PM
4:07PM
4:07PM
4:07PM
4:07PM
4:07PM
4:07PM
4:07PM
4:07PM
4:07PM
4:07PM
4:07PM
4:07PM
4:07PM
4:07PM
4:08PM
4:08PM
4:08PM
4:08PM
4:08PM
4:08PM
4:08PM
4:08PM

1   label in first, yes, that was going to be an advantage for

2   sure.

3   Q.   And there are some -- there are some decisions that can be

4   made that can speed up Xarelto being approved for the market;

5   right?

6   A.   You know, Janssen's approval comes through all the

7   clinical studies, and I don't design them or run them.  So off

8   the top of my head, I can't think of something I would be able

9   to do in my role to speed a product's place in the market.

10  Q.   You -- you've been a key person in the marketing of

11  Xarelto for a number of years, nearly ten years; right?  You

12  were for nearly ten years.

13  A.   I was on the brand team from, yeah, 2008 until 2013, so

14  five years.

15  Q.   So are you telling us -- are you telling the jury that you

16  don't know about things that can -- can accelerate or slow down

17  the process of approval for a drug?

18  A.   I -- I can't tell you anything that -- in my job that we

19  would do to speed a market -- or a product's path to market.

20  That's all driven by the science and the clinical trials and

21  the work with the FDA, and that's not what I do in my job.

22  Q.   Okay.  Well, marketing weighed in on the studies that were

23  being done and decisions that were being made about studies to

24  do with the product; right?

25  A.   I didn't weigh in on any of the studies, so I can't speak.

1    I don't know what any of my colleagues did.

2    **Q.**   So did you ever -- Xarelto was a really important product

3    for the market. Did you not have discussions with your

4    supervisor, Mr. Shah, who was the director of marketing at that

5    time, or Mr. Moye? You didn't have any discussions with them?

6    **A.**   I spoke with them a lot, but in context to what --

7    **Q.**   Were you aware that there were -- you're aware of the

8    ROCKET study; right?

9    **A.**   Oh, yes, of course.

10    **Q.**   Okay. And the ROCKET study was the key study for getting

11    the -- one of the indications for Xarelto; right? The biggest

12    indication for Xarelto; right?

13    **A.**   ROCKET was the critical -- or pivotal trial for the AFib

14    indication, yes.

15         **MR. SARVER:** Your Honor, we're going to object to the

16    relevancy of this line of questioning because it is a different

17    indication that is at issue in this case. This is not what

18    Ms. Mingo took the drug for.

19         **THE COURT:** I understand. Overrule the objection.

20    Although it is different, it also can inform a company; as to

21    what they knew in one area, may inform them in another area.

22    So I can't just simply say it's not relevant as something for

23    you to hear.

24         **MR. BIRCHFIELD:** Thank you.

25

**BY MR. BIRCHFIELD:**

**Q.**   Ms. Geiger, you were aware that there were concerns within the company about the ROCKET study and the device that was used in the ROCKET study; right?

**A.**   I don't -- I don't recall the -- any company concerns.  I believe there was a letter later on about that, but I wasn't involved in those discussions or wasn't aware of any buzz in the company prior to that.

**Q.**   Were you aware that there was a -- that there was critical importance to get Xarelto to the market as fast as possible?  Were you aware of that in your role in marketing?

   **MR. SARVER:**  Objection, Your Honor.  This has been asked now about four times.

   **THE COURT:**  This is the last time.  If she is, fine.  If she's not, let's move on.

   **THE WITNESS:**  As I mentioned, if our product could, you know, finish the trials and the FDA labeling and the product was available and the indication was approved first, that was definitely going to be an advantage for us.

    In my role, I have no control over that.  I'm waiting for the FDA to grant our label, and then we run.

**BY MR. BIRCHFIELD:**

**Q.**   But it would be -- it would be problematic to not do tests, not do important tests, because you're rushing the drug to the market; right?

224

4:11PM
4:11PM
4:11PM
4:11PM
4:11PM
4:11PM
4:11PM
4:11PM
4:11PM
4:11PM
4:12PM
4:12PM
4:12PM
4:12PM
4:12PM
4:12PM
4:12PM
4:12PM
4:12PM
4:12PM
4:12PM
4:12PM
4:12PM
4:12PM
4:12PM

1  **A.**   If a company failed to do something important in a rush,

2  that would be a problem, I guess.

3  **Q.**   And it would be -- it would be a problem to go forward

4  with a study knowing that a key component of that study was a

5  faulty device that could impact the results of that study, to

6  go forward with that study, because you needed to get there

7  first?  That would be a problem, wouldn't it?

8  **A.**   You know, I can't comment.  My area of expertise is on the

9  commercial side.  Study, design, what impacts studies, that's

10  really all in our R&D's perspective, so it wouldn't be fair for

11  me to, you know, be able to provide you feedback on that.  I'm

12  just not close enough to it.

13  **Q.**   All right.  The -- at least the -- you knew that the

14  competition was -- was fierce, that there was a battle that was

15  fierce and intense to get to market ahead of your competitors,

16  ahead of Xarelto (verbatim) and ahead of Eliquis, right?

17  **A.**   Our studies I think had started earlier than others.  We

18  had this opportunity to be first, and that was really exciting

19  and very important.  And if everything were out and we -- our

20  FDA -- our indication was approved first, then that was going

21  to be an advantage for sure.

22        **MR. BIRCHFIELD:**  Okay.  All right.  Your Honor, may

23  we approach for a second?

24        **THE COURT:**  Yeah.

25        (whereupon the following proceedings were held at the

bench out of the hearing of the jury:)

**MR. BIRCHFIELD:** So the documents that we have, all the documents that are -- you know, that have the -- the key themes, you know, that show that there was a rush to get this drug to market, that there was fierce competition, all of these are laced with dollar figures. And she -- you know, I asked these questions, you know, that could be avoided, but she won't -- she won't answer the question directly. It's all laced with -- it's all about -- it's all about good product for patients, not about the dollars.

So here we have, you know, PowerPoint that is -- it's her document, and it describes the competition as fierce, a battle, fierce and intense, and she's quibbling on that, and my hands are tied. I can't get in the document because it has -- it has sales figures on this as well.

**MR. SARVER:** Your Honor, that's not a fair characterization. There's lots of ways to do what Mr. Birchfield is trying to do. He doesn't need a document with dollars on it to do that. It's simply not necessary.

**MR. BIRCHFIELD:** Well, this document, I mean --

**THE COURT:** Let's show her the document and just say, "Doesn't this document indicate," whatever you want to indicate.

**MR. BIRCHFIELD:** Okay.

**THE COURT:** If she says, "No, it doesn't indicate

| | | |
|---|---|---|
| 4:14 PM | 1 | that," then I'll let the jury see the document. |
| 4:14 PM | 2 | MR. BIRCHFIELD:  Okay.  Thank you, Your Honor. |
| 4:14 PM | 3 | MR. SARVER:  Your Honor, you're going to have him |
| 4:14 PM | 4 | show the document to -- |
| 4:14 PM | 5 | THE COURT:  No, show her the document. |
| 4:14 PM | 6 | MR. SARVER:  Oh, show her the document.  Yes. |
| 4:14 PM | 7 | (whereupon the following proceedings were held in |
| 4:14 PM | 8 | open court in the presence and hearing of the jury:) |
| 4:14 PM | 9 | BY MR. BIRCHFIELD: |
| 4:14 PM | 10 | Q.  Ms. Geiger -- |
| 4:14 PM | 11 | THE COURT:  Tell the witness, "Take a look at |
| 4:14 PM | 12 | document such and such.  Doesn't it indicate," whatever you |
| 4:14 PM | 13 | want to -- |
| 4:14 PM | 14 | BY MR. BIRCHFIELD: |
| 4:14 PM | 15 | Q.  Ms. Geiger, will you take a look at Document 3054065? |
| 4:15 PM | 16 | MR. BIRCHFIELD:  And, Your Honor, I'll mark this for |
| 4:15 PM | 17 | identification purposes as Plaintiff's Exhibit 5. |
| 4:15 PM | 18 | THE WITNESS:  This is 5? |
| 4:15 PM | 19 | BY MR. BIRCHFIELD: |
| 4:15 PM | 20 | Q.  And, Ms. Geiger, do you have the document? |
| 4:15 PM | 21 | A.  I do. |
| 4:15 PM | 22 | Q.  All right.  And this is a document from your custodial |
| 4:15 PM | 23 | file; right?  This is part of your file? |
| 4:15 PM | 24 | A.  Sure.  Yeah, if you say it's part of my custodial file, it |
| 4:15 PM | 25 | must have been on my computer. |

227

| | | |
|---|---|---|
| 4:15PM | 1 | **Q.**   Okay.  So if you'll turn to Page 3, do you see -- do you |
| 4:15PM | 2 | see the slide there that describes, "The competition and battle |
| 4:15PM | 3 | for market share will be fierce and intense"?  Do you see that? |
| 4:15PM | 4 | **A.**   Yes. |
| 4:15PM | 5 | **Q.**   Okay. |
| 4:15PM | 6 | **A.**   I do. |
| 4:15PM | 7 | **Q.**   And that's in the context of the timeline of when the drug |
| 4:15PM | 8 | is approved for market, approved for sale; right? |
| 4:16PM | 9 | **A.**   Yes.  This is in anticipation of when -- when do we |
| 4:16PM | 10 | estimate the product -- the Phase III trial will be completed, |
| 4:16PM | 11 | and then they project months ahead to when it could be |
| 4:16PM | 12 | approved. |
| 4:16PM | 13 | **Q.**   Okay.  All right.  So can we -- can we at least agree that |
| 4:16PM | 14 | the competition was fierce and intense, getting the drug to -- |
| 4:16PM | 15 | approved, getting it to market ahead of Pradaxa and Eliquis? |
| 4:16PM | 16 | **A.**   Yes, that's what the title says.  And there are a lot of |
| 4:16PM | 17 | products here and a lot of indications, so seems accurate. |
| 4:16PM | 18 | **Q.**   When you say "a lot of products and a lot of indications," |
| 4:16PM | 19 | you're talking about for the -- you're talking about for other |
| 4:16PM | 20 | anticoagulants; right? |
| 4:16PM | 21 | **A.**   Yes.  It looks like there's maybe five potential |
| 4:16PM | 22 | medications here with many studies for each medication, so |
| 4:16PM | 23 | that's what I meant. |
| 4:17PM | 24 | **Q.**   Different companies trying to get to market as quick as |
| 4:17PM | 25 | possible? |

| | | |
|---|---|---|
| 4:17PM | 1 | **A.**   Yes, I think it's indicative of the unmet need. |
| 4:17PM | 2 | **Q.**   And let me show you what's marked as Exhibit 3008368. |
| 4:17PM | 3 | **MR. BIRCHFIELD:**  Your Honor, I'm going to mark this |
| 4:17PM | 4 | as Plaintiff's Exhibit Number 6. |
| 4:17PM | 5 | **THE COURT:**  Okay. |
| 4:17PM | 6 | **MR. BIRCHFIELD:**  I'm not going to offer it at this |
| 4:18PM | 7 | time consistent with your other rulings, but I will ask the |
| 4:18PM | 8 | witness to refer to it. |
| 4:18PM | 9 | **THE COURT:**  Okay. |
| 4:18PM | 10 | BY MR. BIRCHFIELD: |
| 4:18PM | 11 | **Q.**   Ms. Geiger, if you will -- if you will turn to the last |
| 4:18PM | 12 | four numbers in the right-hand corner, 5663.  Do you see that? |
| 4:18PM | 13 | **A.**   Turn to -- no, I'm sorry, I don't.  Is that a page? |
| 4:18PM | 14 | **Q.**   It's the number, the identification number at the bottom |
| 4:18PM | 15 | right-hand corner or the page that says, "Xarelto is a critical |
| 4:18PM | 16 | part of the Janssen growth story." |
| 4:18PM | 17 | Do you see that slide?  Six, seven pages in. |
| 4:18PM | 18 | **A.**   Yes.  This is the -- is this what you're referring to, |
| 4:18PM | 19 | sir? |
| 4:18PM | 20 | **Q.**   Yes.  And this is -- this states that, "Xarelto is |
| 4:19PM | 21 | expected to be the number one J&J," Johnson & Johnson, "brand |
| 4:19PM | 22 | by 2020." |
| 4:19PM | 23 | Is that correct? |
| 4:19PM | 24 | **A.**   That's what it says here.  This was created a year after I |
| 4:19PM | 25 | left that team.  So short of what I can read on here, I don't |

4:19PM 1    have much context, but, yes, that's what it says here.

4:19PM 2    Q.    And part of the -- and part of the way that Xarelto was

4:19PM 3    going to be built into the number one selling brand is that

4:19PM 4    there were going to be multiple indications that were approved

4:19PM 5    for this drug; right?

4:19PM 6    A.    Yes.  Xarelto had a huge clinical trial program, so all of

4:19PM 7    them are seeking indications, yes.

4:19PM 8    Q.    And that was part of the plan, to get other indications

4:19PM 9    that would pave the way for the atrial fibrillation, or the

4:19PM 10   AFib indication; right?

4:20PM 11   A.    Well, there are so many uses for anticoagulants, and

4:20PM 12   warfarin had challenges for patients.  But, yes, there's many

4:20PM 13   ways to use it.  And, obviously, that could be a benefit to us

4:20PM 14   as well as to patients and physicians.

4:20PM 15   Q.    Part of the plan was to get Xarelto approved for other

4:20PM 16   indications in order to pave the way for the AFib indication;

4:20PM 17   true?

4:20PM 18   A.    I'm sorry.  Help me understand your question again.  I

4:20PM 19   didn't quite understand what you're asking.

4:20PM 20   Q.    Part of the plan for building Xarelto into the number one

4:20PM 21   selling product for Johnson & Johnson was to get approvals for

4:20PM 22   other indications, easier indications, in order to pave the way

4:20PM 23   for the atrial fibrillation indication; correct?

4:20PM 24   A.    This was -- the date on this is after the AFib indication

4:20PM 25   was approved.  This was October of 2014, and AFib had already

4:20PM   1   been approved back in November of 2011.  So that's why I didn't
4:21PM   2   understand your question.
4:21PM   3   **Q.**   Okay.  So if you -- aside from the document, if you will
4:21PM   4   listen my question, please, ma'am.
4:21PM   5   **A.**   Sure.
4:21PM   6   **Q.**   Part of the plan for building Xarelto into the number one
4:21PM   7   selling product for Johnson & Johnson was to get approval for
4:21PM   8   other indications, indications that would come easier, in order
4:21PM   9   to pave the way for the atrial fibrillation indication;
4:21PM  10   correct?
4:21PM  11   **A.**   I don't know that any indication is easier or not easier,
4:21PM  12   but certainly AFib -- when I joined the team in 2008, AFib was
4:21PM  13   going to be our second indication, and that was the biggest
4:21PM  14   indication.  And so that was really, you know, going to be very
4:21PM  15   beneficial and helpful to the brand.
4:21PM  16   **Q.**   And part of the -- part of the marketing plan was to --
4:21PM  17   was to get doctors more comfortable for prescribing it for DVT,
4:21PM  18   short-term use, in order that they would prescribe it for AFib;
4:22PM  19   right?
4:22PM  20   **A.**   The doctors -- so the first indication at that time was to
4:22PM  21   be orthopedic surgery, and the way -- the diseases that
4:22PM  22   orthopedic surgeons are treating is so different than
4:22PM  23   cardiologists, that one really wouldn't influence the other.
4:22PM  24   So an orthopedic surgeon getting comfortable with Xarelto for
4:22PM  25   that, what we thought was going to be first indication,

4:22PM  1  wouldn't have impacted a cardiologist in his decision treating
4:22PM  2  atrial fibrillation.  So --
4:22PM  3  Q.  But that's not really true, though, is it, Ms. Geiger?  I
4:22PM  4  mean, because one of your marketing plans was to use the total
4:22PM  5  number of prescriptions, whether it was for DVT or some other
4:22PM  6  indication, in order to drive sales across all indications?
4:22PM  7  You were using the number of prescriptions to make doctors more
4:22PM  8  comfortable prescribing the drug; true?
4:22PM  9  A.  More generally -- so at one point, and I don't remember
4:23PM 10  when it was, after we had multiple indications, we wanted
4:23PM 11  physicians, usually generalists, like maybe primary care or
4:23PM 12  someone, a hospitalist who covers multiple indications, to have
4:23PM 13  confidence that the drug had been safely prescribed to however
4:23PM 14  many patients are quoted in what you're referring to.
4:23PM 15  Q.  All right.  If you will turn to -- turn to the page that
4:23PM 16  shows Xarelto, Eliquis, Pradaxa, and Savaysa.  It's two pages
4:23PM 17  over.
4:23PM 18  A.  The document has slide numbers on it.  Is there a slide
4:23PM 19  number I should go to?  Because there is something with Eliquis
4:23PM 20  on it, but the other ones are marked out.
4:23PM 21  Q.  Okay.  Slide Number -- I'm sorry.  I didn't see the slide
4:23PM 22  number.  Slide Number 8.
4:23PM 23  A.  Yep.  Okay.  My document only says Eliquis on it.  It
4:23PM 24  doesn't have any other brand names.  This is different.
4:24PM 25  Q.  All right.  So the -- this slide -- this slide shows

4:24PM 1    that -- I mean, it's talking about Xarelto, Eliquis, Pradaxa,

4:24PM 2    and Savaysa; is that correct?

4:24PM 3    A.   My document has only Eliquis on it, so I would have to

4:24PM 4    guess that those are the other products, but I don't see

4:24PM 5    anything other than Eliquis here.  So I --

4:24PM 6    Q.   All right.  The -- Xarelto was the only one of the NOACs

4:24PM 7    that could not claim superiority versus warfarin; correct?

4:24PM 8    A.   ROCKET studied a different patient population.  And so our

4:24PM 9    results demonstrated that we could only say we were

4:25PM 10   non-inferior to warfarin.  The other products conducted

4:25PM 11   different studies with different patient populations, and they

4:25PM 12   were able to say the term "superior," as it says here.

4:25PM 13   Q.   And so Xarelto -- but you wanted to be able to claim that

4:25PM 14   Xarelto was superior to warfarin; correct?

4:25PM 15   A.   Well, any time you could claim superiority, that is an

4:25PM 16   advantage for sure, but that's based on the patients we studied

4:25PM 17   in the trial.  And the results, the FDA, our label, said

4:25PM 18   non-inferior, and that's what we worked from.

4:25PM 19   Q.   So the clinical studies showed that you were not superior

4:25PM 20   to warfarin; right?

4:25PM 21   A.   Yeah.  The ROCKET trial studied a sicker patient

4:25PM 22   population.  The average CHADS score, the average risk for the

4:25PM 23   ROCKET trial was much higher than the risk of the other

4:25PM 24   studies.  And that was an important distinction, because you

4:25PM 25   really can't compare the results of different clinical trials

1    against each other.

2    Q.    Okay.  But --

3    A.    So our label was our label, and it did not say "superior."

4    Q.    But in each of these studies, Xarelto was studied against

5    warfarin; right?

6    A.    In a specific patient population, that's correct.

7    Q.    Right.  Both sides, the Xarelto patients and the warfarin

8    patients, all had the same level CHADS score.  They had the

9    same level of sickness; right?

10   A.    In the ROCKET trial, are you speaking of?

11   Q.    Yes.  That's the way a clinical trial works.

12   A.    Yeah.

13   Q.    I mean, the two arms are equal?

14   A.    So the two arms are balanced, yes.

15   Q.    So --

16   A.    So warfarin and Xarelto patients have similar -- there

17   were similar patients in each arm with the ROCKET trial, yes.

18   Q.    And then when they did the study for Eliquis, the patient

19   population for Eliquis was the same as it was for warfarin;

20   right?

21   A.    I can't, you know, comment on all the details of their

22   Eliquis trials.  What I can say is that the patient population,

23   they allowed lower-risk patients into the Eliquis trial, and

24   the Eliquis arm in that trial with lower-risk patients compared

25   to the warfarin trial with lower-risk patients had similar

234

4:27PM   1   patient types.  But that's a perfect example of why you can't
4:27PM   2   take the results of one trial and compare them to the other,
4:27PM   3   because they're all so different.
4:27PM   4   Q.    But one thing that we do know is that each of these other
4:27PM   5   drugs in their clinical studies were able to show that they
4:27PM   6   were superior to warfarin, but Xarelto could not; correct?
4:27PM   7   A.    Based on their clinical trials and how they were designed
4:27PM   8   and patient population, yes, their label for the patient
4:27PM   9   population they studied demonstrated the results that are now,
4:27PM  10   you know, in their promotional materials and in their FDA
4:27PM  11   label.
4:27PM  12   Q.    And in the -- one other reason or one other factor in
4:27PM  13   studying the sicker population, even though warfarin was the
4:27PM  14   same, same sick population, but one advantage to doing that is
4:27PM  15   you would get to the number of events, you could finish that
4:28PM  16   study quicker; right?
4:28PM  17   A.    Actually, we learned from research that physicians were
4:28PM  18   more likely to treat a sicker patient, a CHADS score or higher,
4:28PM  19   with an anticoagulant, and lower-risk patients because of the
4:28PM  20   challenges that patients and physicians faced in managing
4:28PM  21   warfarin, they were less likely to prescribe an anticoagulant.
4:28PM  22          So the ROCKET trial, from what I learned coming into
4:28PM  23   the team, was designed to really help the sickest patients who
4:28PM  24   were most likely to need an anticoagulant and most likely to
4:28PM  25   maybe have a stroke or even a -- you know, a hemorrhage --

| | |
|---|---|
| 4:28PM | 1 |
| 4:28PM | 2 |
| 4:28PM | 3 |
| 4:28PM | 4 |
| 4:28PM | 5 |
| 4:29PM | 6 |
| 4:29PM | 7 |
| 4:29PM | 8 |
| 4:29PM | 9 |
| 4:29PM | 10 |
| 4:29PM | 11 |
| 4:29PM | 12 |
| 4:29PM | 13 |
| 4:29PM | 14 |
| 4:29PM | 15 |
| 4:29PM | 16 |
| 4:29PM | 17 |
| 4:29PM | 18 |
| 4:29PM | 19 |
| 4:29PM | 20 |
| 4:29PM | 21 |
| 4:29PM | 22 |
| 4:29PM | 23 |
| 4:29PM | 24 |
| 4:29PM | 25 |

other event, the embolism.  So they were most likely to have an event that you would need an anticoagulant to prevent.

Q.   Thank you for that answer, but that was not my question.

My question was one advantage of studying a sicker population was that you would get that study done faster; right?

A.   You'd have to ask the folks who designed the clinical trials and hired the research organizations.  I can't comment on how fast or slow different studies accrue or finish.  That's really not my area of expertise.

Q.   Well, Ms. Geiger, you gave us quite a detailed explanation about the ROCKET study and the importance of the patients in there, but you don't --

A.   Right.

Q.   -- you don't understand that the sicker the population, the quicker you get to the number of events that's needed to conclude the trial?

A.   You asked me how quick events would happen and how fast a trial would accrue or finish.  I don't -- that's not my area.

What I can tell you, I've spent a lot of time in the AFib space and learned from physicians and experts about sick -- you know, how they treat patients across the spectrum of the disease of AFib.  So based on what I've learned there, I'm very comfortable with that.

I'm not comfortable with how fast trials accrue or

4:29PM
4:30PM
4:30PM
4:30PM
4:30PM
4:30PM
4:30PM
4:30PM
4:30PM
4:30PM
4:30PM
4:30PM
4:30PM
4:30PM
4:30PM
4:30PM
4:31PM
4:31PM
4:31PM
4:31PM
4:31PM
4:31PM
4:31PM
4:31PM
4:31PM

1    how they're designed or why you would design them a certain

2    way.  It's just not what I get involved with on a daily basis,

3    not my area of expertise.  So I can't agree.  I don't have an

4    answer for you.

5    Q.   If you'll turn back to Slide Number 7, and this slide

6    reflects what your understanding -- what market research had

7    shown about the primary drivers, what would be the key factors

8    that doctors were looking at in choosing among the NOACs;

9    right?

10   A.   You mentioned "you."  Again, I wasn't on the brand team in

11   October of 2014 when all of this was -- was created.  This was

12   something I received.  So I can't tell you what the market

13   research said at that time except what's here.

14          So, yes, these appear to be what the brand team at

15   the time was learning from all of the things noted above.

16   Q.   Ms. Geiger, you're not saying that the -- that you

17   yourself or the people in marketing did not know before 2014

18   that safety was a primary driver in doctors choosing which --

19   which NOAC, which anticoagulant they would prescribe to a

20   patient?

21   A.   I don't dispute that that's true.  I just wanted you to

22   understand that this was not my document.  I didn't create it,

23   and I didn't do the research that would have resulted in it.

24   So that's all I was trying to clarify.

25          But, yes, that's what we hear a lot.  Safety is a big

237

| | |
|---|---|
| 4:31PM | 1 |

concern for physicians.

**Q.**   All right.  And so safety would be the primary driver, and then next would be efficacy, right?

**A.**   Yes, that's what it says here.  It's always a balance, but certainly safety is paramount for everybody involved.

**Q.**   Okay.  So when we're talking about efficacy, we're talking about how well the drug works for the indication that it's prescribed for; right?  That's what efficacy is?

**A.**   That's correct, yes.

**Q.**   So then, so if you're looking at the priority, you've got safety first, efficacy second, and convenience third; right?

**A.**   That's true.

**Q.**   Okay.  And so when you're looking at a doctor prescribing among the anticoagulants, Xarelto has no advantage on safety, right, against the other NOACs?  Has no --

**A.**   For which indication?  I'm sorry.

**Q.**   -- advantage on efficacy.  And the only area that it has is on the lower level which is convenience; right?

**MR. SARVER:**  Objection, Your Honor.

**THE WITNESS:**  Well, it depends on the indication you're referring to, because the safety results across the different indications were different, and the dosing across the different indications was different.  So that convenience piece is also at -- you know, unless I can understand what indication we're talking about specifically, I can provide a better

4:32PM 1    context.

4:32PM 2    **BY MR. BIRCHFIELD:**

4:32PM 3    **Q.**    You had -- you had a -- you had a major marketing

4:32PM 4    disadvantage because Xarelto could not claim superiority across

4:33PM 5    any indication.  In any indication, Xarelto could not claim

4:33PM 6    superiority for safety or efficacy; true?

4:33PM 7    **A.**    I'd have to refresh myself on the orthopedic surgery

4:33PM 8    indication, but I know for AFib and for DVT, the treatment and

4:33PM 9    subsequent recurrent -- prevention of recurrence, we were

4:33PM 10   deemed, I think the label says, non-inferior.

4:33PM 11   **Q.**    And the lack of superiority presented a major marketing

4:33PM 12   disadvantage for Xarelto; correct?

4:33PM 13   **A.**    I can't say that that's true, because if you're at least

4:33PM 14   as effective -- warfarin is a very effective product.  It's

4:33PM 15   just very challenging to use for patients and providers.  So

4:33PM 16   being as good as warfarin, we heard, was actually a really good

4:33PM 17   thing.  Then you started to think about the other

4:33PM 18   characteristics.

4:33PM 19   **Q.**    Okay.  Well, that would be -- that would be okay if there

4:34PM 20   were only two choices, if there were only Xarelto and warfarin.

4:34PM 21   But that's not the case, is it?

4:34PM 22   **A.**    No.  There's multiple different products out now.

4:34PM 23   **Q.**    Right.  And so you've got warfarin, and -- that Xarelto is

4:34PM 24   no better than.  And then you have Eliquis, which shows

4:34PM 25   superiority to warfarin; you have Pradaxa that shows

4:34PM
4:34PM
4:34PM
4:34PM
4:34PM
4:34PM
4:34PM
4:34PM
4:34PM
4:34PM
4:34PM
4:34PM
4:34PM
4:35PM
4:35PM
4:35PM
4:35PM
4:35PM
4:35PM
4:35PM
4:35PM
4:35PM
4:35PM
4:35PM
4:35PM

1    superiority to warfarin; and you have Savaysa that shows
2    superiority to warfarin.  And you were competing against those
3    three products, those other NOACs; right?
4    A.   When the AFib indication was approved, dabigatran,
5    Pradaxa, was already out there.  It didn't have that claim, and
6    yet there were physicians who had some experiences with it that
7    didn't use it as much.  So, you know, you can't definitively
8    say -- I can't definitively agree that all that's true.  It
9    depends on a variety of factors.
10   Q.   Okay.
11   A.   But, yes, we did not have a superiority claim.  That is
12   true.
13   Q.   The lack of superiority claim was a marketing
14   disadvantage; true or false, Ms. Geiger?
15   A.   In the AFib indication were other products later after us,
16   other similar products, like Factor Xa's, did not have a
17   superiority claim.  It was very important for us to clarify the
18   differences in the patient population, because if physicians
19   were not informed of the differences in the different trials,
20   they may, you know, assume that the products were the same, and
21   they're not.
22   Q.   Lack of superiority was a marketing disadvantage; true or
23   false, Ms. Geiger?
24   A.   Sure.  If the label says "superior" and ours says
25   "inferior," that's an inherent risk for us, sure.  That's

| | | |
|---|---|---|
| 4:35PM | 1 | something we need to address appropriately. |
| 4:35PM | 2 | **Q.**   Let me show you what's marked as Exhibit 3043971.  And, |
| 4:36PM | 3 | Ms. Geiger, this is a -- this is a document that you had; |
| 4:36PM | 4 | right?  This was -- |
| 4:36PM | 5 | **A.**   I -- this is -- this is not familiar to me as far as -- |
| 4:36PM | 6 | you know, if it was in my custodial file, I'm sure it was on my |
| 4:36PM | 7 | computer.  I just -- |
| 4:36PM | 8 | **Q.**   All right. |
| 4:36PM | 9 | **A.**   -- don't have a lot of background on it.  It was from |
| 4:36PM | 10 | March of '08 before I joined the team. |
| 4:36PM | 11 | **MR. SARVER:**  Objection. |
| 4:36PM | 12 | **THE COURT:**  If she doesn't know about it, let's get |
| 4:36PM | 13 | on with something else.  If she does -- |
| 4:36PM | 14 | **BY MR. BIRCHFIELD:** |
| 4:36PM | 15 | **Q.**   Ms. Geiger, let me show you what's marked as Plaintiff's |
| 4:37PM | 16 | Exhibit 3043970. |
| 4:37PM | 17 | **A.**   Yes. |
| 4:37PM | 18 | **MR. BIRCHFIELD:**  All right.  And, Your Honor, at this |
| 4:37PM | 19 | time, we'd offer Plaintiff's Exhibit 7. |
| 4:37PM | 20 | **THE CLERK:**  That one is 8. |
| 4:37PM | 21 | **MR. BIRCHFIELD:**  Okay.  Let me show you Plaintiff's |
| 4:37PM | 22 | Exhibit 8. |
| 4:37PM | 23 | **MR. SARVER:**  Is that the one-page document, |
| 4:37PM | 24 | Mr. Birchfield? |
| 4:37PM | 25 | **MR. BIRCHFIELD:**  Yes. |

4:37PM 1          **MR. SARVER:**  No objection, Your Honor.

4:37PM 2  **BY MR. BIRCHFIELD:**

4:37PM 3  **Q.**   And, Ms. Geiger, if you look at this -- at this document,

4:37PM 4  this is an email from Nauman Shah to you; correct?

4:37PM 5  **A.**   That's true.

4:37PM 6  **Q.**   And then it has attachments.  And it says "Marketing Plan,

4:37PM 7  Exhibit E4-808."

4:37PM 8          Do you see that?

4:37PM 9  **A.**   I do.

4:37PM 10  **Q.**   Okay.  All right.  Now, if you'll go back to Plaintiff's

4:37PM 11  Exhibit Number 7, the document marked 3043971.

4:38PM 12  **A.**   Just for a point of clarity, it looks like this says "One

4:38PM 13  More Item" as the subject on Exhibit 8, which means it must

4:38PM 14  have been -- I was new to the team.  I know he sent me a lot of

4:38PM 15  different documents, and this must have been one of them.

4:38PM 16  **Q.**   Okay.  All right.  So now that you have reviewed that

4:38PM 17  email, you see that you were sent Plaintiff's Exhibit 7 as --

4:38PM 18  as an attachment to that email; correct?

4:38PM 19  **A.**   Yes.  And I recall it was the time I was joining on.  He

4:38PM 20  was giving me all the information he had on his computer that

4:38PM 21  might help me get up to speed.

4:38PM 22  **Q.**   Okay.  All right.  And this is the -- Exhibit E is the US

4:38PM 23  commercial strategy and marketing plan for Xarelto.

4:38PM 24          Do you see the first page, Page 1 of 36?

4:38PM 25  **A.**   Yes.  This was just -- this was from the team at Scios.

4:38PM 1    We had -- there was a team at Scios who had done all this work,

4:38PM 2    and they, you know, had passed their work over to us.  That's

4:39PM 3    just the context around where it says "Written Plan From The

4:39PM 4    Team At Scios" on Exhibit 8.

4:39PM 5            So, yes, I received this.  And when I joined the

4:39PM 6    team, it had been created by a team that had been working on

4:39PM 7    Xarelto.

4:39PM 8    Q.   All right.  And as part of this plan, this marketing

4:39PM 9    strategy and plan, you understood that it was -- that it was

4:39PM 10   perhaps most important in order to maintain the financial

4:39PM 11   projections of Xarelto that it must be best in class; right?

4:39PM 12   A.   Is there a page that that's stated that you're referring

4:39PM 13   to?

4:39PM 14   Q.   Sure.  If you'll turn to Page 10 of 36.

4:39PM 15   A.   Sure.  Okay.

4:39PM 16   Q.   And so it says, "Xarelto must be first in class and, where

4:39PM 17   possible, be first to market in future indications."

4:39PM 18           Do you see that?

4:40PM 19   A.   Which paragraph on -- on the page?  I apologize.  If you

4:40PM 20   said it, I missed it.  I'm very sorry.

4:40PM 21   Q.   It's the first paragraph.  It's the --

4:40PM 22   A.   Okay.

4:40PM 23   Q.   -- the last sentence maybe or two of the -- of that page.

4:40PM 24   A.   Now I see it, yes.

4:40PM 25           MR. BIRCHFIELD:  Carl, will you pull that up?

1          **THE WITNESS:**  Yeah.  So what you just read is what's

2    written here.  And so that was the Scios team's assessment at

3    that time.  It's what they wrote.

4    **BY MR. BIRCHFIELD:**

5    **Q.**    So you understood that it was important to be best in

6    class, and you understood that it was important to be first

7    in -- first to the market in future indications; right?

8    **A.**    I don't -- I'm sure I glanced through this as part of the

9    new job.  What I read this to say is that they probably had

10   some financial projections and that those assumed that the

11   product would be first in class and first to market.  If it's

12   not first in class and first to market, then the financial

13   projections they're talking about might be different.  That's

14   how I read what that says there.

15   **Q.**    Okay.  But Xarelto was not best in class for the NOACs,

16   the anticoagulants; was it?

17   **A.**    I think it really depends on the indication.  It is the --

18   I think it's the market leader in orthopedic surgery.  I

19   believe it's -- if not the market -- I believe it's the market

20   leader in DVT and PE.  And I don't know where it stands with

21   AFib right now.

22          So as a compound with many indications, I don't --

23   one could argue whether it's best in class or not.

24   **Q.**    Okay.

25   **A.**    That depends on the definition of "best in class."

4:41 PM
4:41 PM
4:41 PM
4:41 PM
4:41 PM
4:42 PM
4:42 PM
4:42 PM
4:42 PM
4:42 PM
4:42 PM
4:42 PM
4:42 PM
4:42 PM
4:42 PM
4:42 PM
4:42 PM
4:42 PM
4:42 PM
4:42 PM
4:42 PM
4:42 PM
4:42 PM
4:42 PM
4:43 PM

1  **Q.**   All right.  So when you're talking about it's best in
2  class in DVT and ortho and maybe AFib, you're talking about
3  best in class in the number of sales; right?  You're not
4  talking about the best in class in providing treatment to
5  patients?
6  **A.**   I'm not sure what the Scios team when they wrote this in
7  2008 was referring to with "best in class."  When I think of
8  best in class, it's not just about sales.  It is what is the
9  product that is safe and effective with the most convenient use
10  that can be used in many ways.
11       The best in class for a patient might be a different
12  assessment than a physician.  So without a definition of this,
13  what they meant there, I can only tell you what my
14  interpretation would be.  And, for me, the interpretation of
15  "best in class" is not just about sales.  But, again, I didn't
16  write this.  I don't know what their context was.
17  **Q.**   But when I asked you about whether Xarelto was best in
18  class, you said, "Well, maybe best in class in AFib and ortho
19  and DVT."  You were talking about best in class in terms of
20  sales; right?  Because it's not better in treating patients.
21       **MR. SARVER:**  Objection, Your Honor.  No foundation.
22       **THE COURT:**  Well, she said what she said.
23       **MR. SARVER:**  Right.
24       **THE WITNESS:**  I was referring to -- you were reading
25  me the sentence --

4:43 PM   1           Oh, pardon me.  I'm sorry, Your Honor.

4:43 PM   2           **THE COURT:**  Did you understand the question?  You

4:43 PM   3   said something, and he was asking you about what you had said.

4:43 PM   4           **THE WITNESS:**  Yes.  So I understand the question, and

4:43 PM   5   I think as we were speaking of the sentence about financial

4:43 PM   6   projections and you mentioned best in class, by your

4:43 PM   7   characterization of sales, I responded.

4:43 PM   8           As I think about best in class, that -- I

4:43 PM   9   provided my definition and my opinion there.  But -- so, yes,

4:43 PM  10   based on your definition of "best in class," I provided insight

4:43 PM  11   on where Xarelto is across the indications.

4:43 PM  12   **BY MR. BIRCHFIELD:**

4:43 PM  13   **Q.**   Okay.  All right.  So can we agree, Ms. Geiger, that the

4:43 PM  14   marketing team there involved in Xarelto understood that once a

4:43 PM  15   doctor starts a patient on a particular drug, that it's -- that

4:43 PM  16   doctors are hesitant to switch?

4:44 PM  17   **A.**   So that was my understanding in this space that, you know,

4:44 PM  18   once -- if a physician starts a patient on a product and it

4:44 PM  19   works for them after a certain period of time and the patient

4:44 PM  20   is doing well, they're getting the results they need, they're

4:44 PM  21   less likely to switch.  That's for sure.

4:44 PM  22           I can't agree -- you know, because this particular

4:44 PM  23   document you're referring to came from a different team, and I

4:44 PM  24   don't know what their opinion was.  So that's my opinion.

4:44 PM  25   **Q.**   Okay.  All right.  You can set that document aside for

now.

In order to -- and the marketing team -- you and the marketing team involved in Xarelto understood that if a doctor starts a patient on a drug, if they're going to get that doctor to switch, they must get -- you must get the patient to ask the doctor; right?  That's what it was going to take to get a patient to switch?

A.   You know, my focus in marketing was on physicians and physician behaviors.  There's a lot of things that would cause a physician to switch their medication.  It could be anything from they weren't seeing the trial -- or the results in that patient that they desired.  Maybe there's a cost reason why they would switch a patient.  There's a variety of reasons.

You know, certainly a patient asking to change their medication would be one reason a physician might consider switching.  But, you know, that's -- there's a -- a physician has to make a decision, you know, based on, I guess, their clinical knowledge --

Q.   And --

A.   -- on what to do.

Q.   The Xarelto marketing team designed a plan for TV commercials that was designed specifically to get patients to ask their doctors to switch them from warfarin to Xarelto; right?

A.   So our direct consumer efforts were run by a different

4:45PM
4:46PM
4:46PM
4:46PM
4:46PM
4:46PM
4:46PM
4:46PM
4:46PM
4:46PM
4:46PM
4:46PM
4:46PM
4:46PM
4:46PM
4:46PM
4:46PM
4:47PM
4:47PM
4:47PM
4:47PM
4:47PM
4:47PM
4:47PM
4:47PM

1   member of our team, and consumer marketing is very different

2   than the marketing that I do.  But part of the plan was to --

3   you mentioned ask patients to switch.  I believe all of our

4   material said -- were intended to drive patients to ask their

5   doctor about Xarelto as a treatment option.

6        I -- I don't believe that we would have, you know,

7   designed something just to ask them to switch.  That's --

8   again, it's not my -- I, you know, didn't do the consumer

9   marketing, but --

10  Q.  It would have been -- it would have been -- it would have

11  been a big problem to overtly ask doctors to switch a patient

12  that is stable, well-controlled on warfarin, to ask them to

13  switch from or to try to get them to switch -- some campaign

14  method to switch a patient that is well-controlled on warfarin

15  to Xarelto.  That would have been a problem; right?

16  A.  Are you referring to your question before about patients

17  asking doctors to switch their medication, or are you talking

18  about something else?

19  Q.  I'm just asking you the question.  It would be a big

20  problem for the marketing team to design a campaign that tries

21  to get well-controlled warfarin patients to switch to Xarelto;

22  correct?

23  A.  I don't know that it would be a big problem.  Physicians

24  were in the habit of prescribing warfarin because they had done

25  so for 50 years.  We had a product that showed itself to be

4:47PM
4:47PM
4:47PM
4:47PM
4:47PM
4:47PM
4:47PM
4:47PM
4:48PM
4:48PM
4:48PM
4:48PM
4:48PM
4:48PM
4:48PM
4:48PM
4:48PM
4:48PM
4:48PM
4:48PM
4:48PM
4:48PM
4:48PM
4:48PM
4:48PM

1   just as good as warfarin, you know, in our label.

2           And so in educating physicians on this new option for

3   patients who were maybe -- you know, warfarin patients told us

4   that having -- using warfarin was a struggle for them, because

5   if they took -- if they ate a salad that day, they couldn't eat

6   one the other day, or if it was allergy season and they took

7   their allergy meds, they had to go to the doctor more often and

8   get their INR shots.  Their doses would change.  It was

9   confusing.

10           Stability of a warfarin patient is an idea that many

11   doctors debate.  So I don't know if it would be a -- be a big

12   problem to talk to physicians about switching patients on

13   warfarin.  I think that's very much what we were trying to do,

14   is educate them that there was an option that patients might

15   find easier to manage.

16   **Q.**   Did you have any discussions with the FDA about efforts to

17   switch stable, well-controlled warfarin patients to Xarelto?

18   **A.**   I went by our FDA label that said that, you know, patients

19   with AFib at risk of stroke.  But I went by our indication,

20   which said that we could use Xarelto in nonvalvular AFib

21   patients.  And so that meant to me that any patients who fit

22   the description in the package insert were appropriate for

23   Xarelto -- for a physician to consider actually, appropriate

24   for us to promote about.

25   **Q.**   So -- so what does the -- what does the Xarelto label say

249

4:49PM
4:49PM
4:49PM
4:49PM
4:49PM
4:49PM
4:49PM
4:49PM
4:49PM
4:49PM
4:49PM
4:49PM
4:49PM
4:49PM
4:49PM
4:49PM
4:50PM
4:50PM
4:50PM
4:50PM
4:50PM
4:50PM
4:50PM
4:50PM
4:50PM

1    about well-controlled warfarin patients that makes it okay?

2    **A.**   There is a sentence -- I mean, so -- I don't have the

3    label in front of me, but there is the indication for Xarelto

4    which is indicated for nonvalvular AFib patients for the

5    prevention of stroke -- of risk of stroke and systemic

6    embolism.  That is our indication.

7              There is a note below that that says something to the

8    effect of in the ROCKET trial, you know, it's unknown what the

9    results were in stable patients.  Again, I would have to read

10   it.  If you have it, I could read it to you.  But there is a

11   note.  It doesn't say it can't be used in stable patients.  It

12   just makes physicians aware of some things they found in the

13   ROCKET trial.

14   **Q.**   Right.  So if the label -- the label says it's not

15   adequately studied, there's not evidence to support switching,

16   would it be better to switch a patient to -- from a -- a stable

17   patient, somebody that's doing well on warfarin, to Xarelto?

18   You would still design a marketing campaign to get patients to

19   switch?

20   **A.**   I don't recall a statement in the label that says that you

21   shouldn't switch warfarin patients.  I know there's lots of

22   information about switching amongst warfarin and other

23   anticoagulants there.  I don't recall a specific statement

24   there that says you shouldn't switch patients.

25              **MR. SARVER:**  Your Honor, we are going to object.

| | | |
|---|---|---|
| 4:50PM | 1 | THE COURT:  Let's move on.  We're really -- |
| 4:50PM | 2 | BY MR. BIRCHFIELD: |
| 4:50PM | 3 | Q.   Ms. Geiger, before Xarelto was approved to be sold in the |
| 4:50PM | 4 | United States, was there a -- was there a study done to |
| 4:50PM | 5 | determine the lowest effective dose of Xarelto? |
| 4:50PM | 6 | A.   I don't know off the top of my head.  All those studies |
| 4:50PM | 7 | were run by the R&D team called JJPRD.  I am sure, just |
| 4:51PM | 8 | understanding the way drugs are developed, there must have been |
| 4:51PM | 9 | a dose-finding study done, but I can't comment on the nuances |
| 4:51PM | 10 | of that.  I just wasn't involved in it. |
| 4:51PM | 11 | Q.   Well, in the pharmaceutical world, it's important to find |
| 4:51PM | 12 | the lowest effective dose for a medicine; right? |
| 4:51PM | 13 | A.   Again, yeah, I -- they are always working to find the dose |
| 4:51PM | 14 | that, you know, results in the outcomes they're looking for at |
| 4:51PM | 15 | the least toxic -- or, you know, the one that has less |
| 4:51PM | 16 | complications or side effects.  And so if you -- the lowest |
| 4:51PM | 17 | effective dose, there might be higher doses that are just as |
| 4:51PM | 18 | effective and -- that they may choose to use.  So I can't say |
| 4:51PM | 19 | that that's true. |
| 4:51PM | 20 | THE COURT:  Counsel, this person is in advertising. |
| 4:51PM | 21 | They're in the economic aspect of it and not the scientific |
| 4:51PM | 22 | aspect.  She doesn't know these things. |
| 4:52PM | 23 | BY MR. BIRCHFIELD: |
| 4:52PM | 24 | Q.   Ms. Geiger, in marketing a -- in marketing the product -- |
| 4:52PM | 25 | marketing Xarelto to doctors, did you get any indication from |

doctors that they wanted to know the therapeutic range for
Xarelto?  How much drug do you need to be effective and what
amount is too high?

**A.**   I don't recall ever hearing that because, in my role, the
label always tells us exactly what dose should be used at what
frequency, how it should be administered.  So I don't -- if a
physician asked that over the course of time, I don't recall
it.

          But what we talk about is what's in the label, and
the label is always very definitive, or at least the Xarelto
label for AFib was very definitive, in what the dose should be
and how frequently it should be administered and what other
things should go around its administration, like taking it with
food.

**Q.**   Did you do any market research to see if doctors were
interested in a reversal agent for Xarelto?

**A.**   I'd have to go back.  I know that, because physicians were
used to using warfarin -- you know, warfarin was rat poison.
It was -- you had a lot of, like, flexibility or variations in
it.  They asked, is there a reversal agent?  I would imagine --
and I don't recall specifics, but I would imagine if that was
something we were hearing from the market, we would have done
some research to explore it, but I don't recall the specifics.
It was quite a long time ago.

**Q.**   All right.  Let me show you what's marked as Plaintiff's

| | | |
|---|---|---|
| 4:53PM | 1 | Exhibit 102048. |
| 4:54PM | 2 | **A.**   Am I supposed to see this?  This says Bayer on it.  Sorry. |
| 4:54PM | 3 | **THE COURT:**  Counsel, you're going to have to stop |
| 4:54PM | 4 | soon at some spot. |
| 4:54PM | 5 | **MR. BIRCHFIELD:**  Your Honor, this is a large |
| 4:54PM | 6 | document.  She's probably going to look at this.  You want to |
| 4:54PM | 7 | take a break at this point?  Let her look at it overnight and |
| 4:54PM | 8 | start back here? |
| 4:54PM | 9 | **MR. SARVER:**  Your Honor, I'm going to object to the |
| 4:54PM | 10 | use of this document in any way.  It predates Ms. Geiger's |
| 4:54PM | 11 | time.  It's a 2006 document. |
| 4:54PM | 12 | **THE COURT:**  Okay.  Let's stop here and come back |
| 4:54PM | 13 | tomorrow. |
| 4:54PM | 14 | Ms. Geiger, you're going to have to come back |
| 4:54PM | 15 | tomorrow. |
| 4:55PM | 16 | (Pause.) |
| 4:55PM | 17 | **THE COURT:**  Members of the jury, we're trying to |
| 4:55PM | 18 | finish this case for you as quickly as we can.  I know that |
| 4:55PM | 19 | it's difficult -- it's going to be difficult to start early, |
| 4:55PM | 20 | but I generally start at 8:30.  Would that give anybody any |
| 4:55PM | 21 | serious problem?  I know one of you has a hundred miles or so |
| 4:55PM | 22 | to travel. |
| 4:55PM | 23 | **A JUROR:**  That's fine. |
| 4:55PM | 24 | **THE COURT:**  Is that okay?  Okay.  Let's be here at |
| 4:55PM | 25 | 8:30 and start again. |

4:55 PM
4:55 PM
4:55 PM
4:55 PM
4:55 PM
4:55 PM
4:55 PM
4:55 PM
4:56 PM
4:56 PM
4:56 PM
4:56 PM
4:56 PM
4:56 PM
4:56 PM
4:56 PM
4:56 PM
4:56 PM
4:56 PM
4:56 PM
4:56 PM
4:56 PM
4:56 PM
4:57 PM
4:57 PM

1          Thank you very much for all of the help that

2    you've given us and all the information that you've been able

3    to process and also the information you've given us during the

4    voir dire examination.

5          I'm going to ask that you leave your booklets in

6    the jury room.  We'll secure them, and tomorrow when you come

7    back, we'll give them to you again.  Okay?

8          Please don't speak to anyone about the case, and

9    don't look at any television, social media for the reasons that

10   I've asked you not to.

11          All rise as the jury leaves, please.

12          (Whereupon the jury was excused from the courtroom.)

13          THE COURT:  Okay.  The jury is outside of the

14   courtroom.  There's an issue of if we can discharge the witness

15   and come back tomorrow for the witness, but then I'll --

16          MR. SARVER:  May the witness be excused, Your Honor?

17          THE COURT:  Yes.

18          MR. BIRCHFIELD:  Your Honor, before she's excused,

19   she's still under examination.  Could you just give your

20   instruction about counsel, please?

21          THE COURT:  Yeah, I'll do that.  You're still under

22   examination, ma'am, and so please don't speak to anyone about

23   it, about your examination or see any document that's not shown

24   to you.  That I think would be unfair to one side.  So I'm

25   going to ask you not to talk to anybody about your examination

| | | |
|---|---|---|
| 4:57PM | 1 | and have to ask you that.  So please don't speak to anyone. |
| 4:57PM | 2 | Okay? |
| 4:57PM | 3 | THE WITNESS:  Yes, sir.  No problem. |
| 4:57PM | 4 | THE COURT:  All right. |
| 4:57PM | 5 | THE WITNESS:  Absolutely. |
| 4:57PM | 6 | THE COURT:  You have a good evening. |
| 4:57PM | 7 | THE WITNESS:  Thank you, sir. |
| 4:57PM | 8 | THE COURT:  Thank you. |
| 4:57PM | 9 | Tell me about the document.  What are we talking |
| 4:57PM | 10 | about? |
| 4:57PM | 11 | MR. BIRCHFIELD:  Your Honor, this is marketing |
| 4:57PM | 12 | research that -- and I'll just go through the foundation, which |
| 4:57PM | 13 | is -- but this was a substantial marketing research product |
| 4:57PM | 14 | that was put together.  She comes into -- into the marketing |
| 4:57PM | 15 | department, and so she said that there was information that was |
| 4:57PM | 16 | shared with her to get her up to speed, and I'll walk through |
| 4:57PM | 17 | the foundation. |
| 4:57PM | 18 | THE COURT:  Well we'd have to see what the foundation |
| 4:57PM | 19 | is.  Okay.  All right.  Okay.  So we'll stand in recess until |
| 4:58PM | 20 | tomorrow at 8:30.  Can I see counsel at 8:15 in the morning? |
| 4:58PM | 21 | MR. SARVER:  Thank you, Your Honor. |
| 4:58PM | 22 | |
| | 23 | |
| | 24 | |
| | 25 | |

## CERTIFICATE

I, Tana J. Hess, CCR, FCRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of proceedings in the above-entitled matter.

Tana J. Hess, CCR, FCRR, RMR
Official Court Reporter