1          UNITED STATES DISTRICT COURT

2         SOUTHERN DISTRICT OF MISSISSIPPI

3

4

5   IN RE:  XARELTO              *
    (RIVAROXABAN) PRODUCTS       *
6   LIABILITY LITIGATION         *
                                 *
7   THIS DOCUMENT RELATES TO:    *   Docket No.: 14-MD-2592
                                 *   Section "L"
8   *Dora Mingo, et al. v.*      *   Jackson, Mississippi
    *Janssen Research &*         *   August 8, 2017
9   *Development, LLC, et. al.,* *
    Case No.: 15-CV-3469         *
10  * * * * * * * * * * * * * * * *

11            VOLUME II- MORNING SESSION
         TRANSCRIPT OF JURY TRIAL PROCEEDINGS
12       BEFORE THE HONORABLE ELDON E. FALLON
            UNITED STATES DISTRICT JUDGE

13

14  APPEARANCES:

15

    For the Plaintiffs'
16  Liaison Counsel:              Gainsburg Benjamin David
                                    Meunier & Warshauer
17                                BY:  GERALD E. MEUNIER, ESQ.
                                  2800 Energy Centre
18                                1100 Poydras Street
                                  New Orleans, Louisiana 70163
19

20
    For the Plaintiffs:           Beasley Allen
21                                BY:  ANDY BIRCHFIELD, ESQ.
                                  P.O. Box 4160
22                                Montgomery, Alabama 36103

23

24

25

              OFFICIAL REALTIME TRANSCRIPT

```
 1   APPEARANCES:

 2                            Gainsburg Benjamin Davis
                               Meunier & Warshauer
 3                           BY:  WALTER C. MORRISON, IV, ESQ.
                             240 Trace Colony Park Drive
 4                           Suite 100
                             Ridgeland, Mississippi 39157
 5

 6
                             Goza Honnold
 7                           BY:  BRADLEY D. HONNOLD, ESQ.
                             11181 Overbrook Road, Suite 200
 8                           Leawood, Kansas 66211

 9

10                           The Lambert Firm
                             BY:  EMILY JEFFCOTT, ESQ.
11                           701 Magazine Street
                             New Orleans, Louisiana 70130
12

13
                             Levin, Fishbein, Sedran & Berman
14                           BY: FREDERICK S. LONGER, ESQ.
                             510 Walnut Street
15                           Suite 500
                             Philadelphia, Pennsylvania 19106
16

17
     For the Defendant Bayer
18   HealthCare Pharmaceuticals
     Inc. and Bayer Pharma AG:   Mitchell, Williams, Selig, Gates &
19                                 Woodyard, P.L.L.C.
                             BY:  LYN P. PRUITT, ESQ.
20                           425 W. Capitol Avenue, Suite 1800
                             Little Rock, Arkansas 72201
21

22
                             Watkins & Eager, PLCC
23                           BY:  WALTER T. JOHNSON, ESQ.
                             400 East Capitol Street
24                           Jackson, Mississippi 39201

25
```

OFFICIAL REALTIME TRANSCRIPT

1   APPEARANCES:

2   For Janssen Pharmaceuticals,
    Inc. and Janssen Research &
3   Development, LLC:              Barrasso Usdin Kupperman Freeman &
                                      Sarver, LLC
4                                 BY:  RICHARD E. SARVER, ESQ.
                                  909 Poydras Street, 24th Floor
5                                 New Orleans, Louisiana 70112

6

7   Official Court Reporter:      Jodi Simcox, RMR, FCRR
                                  500 Poydras Street
8                                 Room HB-406
                                  New Orleans, Louisiana 70130
9                                 (504) 589-7780

10

11
    Proceedings recorded by mechanical stenography, transcript
12  produced by computer.

13

14

15

16

17

18

19

20

21

22

23

24

25

OFFICIAL REALTIME TRANSCRIPT

1                          <u>I N D E X</u>

2                                                    <u>Page</u>

3
   SUSAN GEIGER
4        Direct Examination By Mr. Birchfield:        262
         Cross-Examination By Mr. Sarver:             293
5        Redirect Examination By Mr. Birchfield:      323

6  SHAWN RAQUEL COLLIER
         Direct Examination By Mr. Honnold:           338
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

08:03   1   <u>**PROCEEDINGS**</u>

08:03   2   **(August 8, 2017)**

08:03   3   **\*\*\*\*\*\***

08:03   4

08:03   5   (COURT CALLED TO ORDER)

08:03   6   (WHEREUPON, the following proceedings were held in

08:03   7   chambers.)

08:03   8   **THE COURT:**  We're talking to Ms. Martin, and

08:31   9   Ms. Martin indicates that she has a ruptured eardrum and she

08:31   10   needs to go to a doctor.  She's scheduled presently to go to

08:31   11   the doctor at 9:30 on Thursday.  She also has young children

08:31   12   and needs some child care on Friday.  She usually takes off.

08:31   13   She's trying her best to get someone to substitute for her on

08:32   14   Friday, and she potentially might be able to reschedule the

08:32   15   appointment earlier on Thursday so that she can come back for

08:32   16   about 9:00 or thereabouts so they can start the trial.

08:32   17   I mentioned that we'll keep her here and give

08:32   18   her an opportunity to try to do that.  If she is not able to do

08:32   19   it, then we'll have to consider discharging her.  So we're

08:32   20   pleased and honored that she's been with us, and all of the

08:32   21   work that she's done has been appreciated by counsel and also

08:32   22   by the Court.  She's going to do her best to see if she can

08:32   23   remain with us and be in the family of the jury.  All right.

08:32   24   **JUROR NO. 7:**  Thank you for your time.

08:33   25   (WHEREUPON, Ms. Martin exited the conference room.)

OFFICIAL REALTIME TRANSCRIPT

08:33  1          **THE COURT:**  She seems like a hard-working juror, if

08:33  2  we can keep her fine, if not --

08:33  3          **MR. BIRCHFIELD:**  She seemed to suggest that after

08:33  4  this initial appointment she's -- she may need a procedure, and

08:33  5  that's --

08:33  6          **THE COURT:**  Yes.  I'll have to keep an eye on that.

08:33  7          (WHEREUPON, the in-chambers conference was concluded.

08:33  8                          ******

08:33  9

08:33  10         (WHEREUPON, the following proceedings were held in

08:33  11  open court.)

08:34  12

08:34  13         (COURT CALLED TO ORDER)

08:34  14         **THE DEPUTY CLERK:**  All rise.

08:39  15         (WHEREUPON, the jury entered the courtroom.)

08:40  16         **THE COURT:**  Be seated, please.  Good morning, ladies

08:40  17  and gentlemen.  I appreciate, and the attorneys appreciate, you

08:40  18  being here early and ready to start, so thank you for that.

08:40  19  You'll remember that we have a witness far away, and we're

08:40  20  questioning her from here.

08:40  21         You may proceed, counsel.

08:40  22         **MR. BIRCHFIELD:**  Thank you, Your Honor.  Good

08:40  23  morning.

08:40  24         (WHEREUPON, **SUSAN GEIGER**, having been previously duly

08:40  25  sworn, testified as follows**:)**

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

**DIRECT EXAMINATION**

08:40  1

08:40  2  BY MR. BIRCHFIELD:

08:40  3  **Q.**    Good morning, Ms. Geiger.

08:40  4  **A.**    Good morning.

08:40  5  **Q.**    "No monitoring" is a key marketing message for Xarelto;

08:40  6  true?

08:40  7  **A.**    Yeah.  The message is no routine monitoring.

08:40  8  **Q.**    The marketing message -- the key marketing message is no

08:41  9  monitoring for Xarelto; correct?

08:41  10  **A.**    Yes, that's the theme.  But the reason routine monitoring

08:41  11  is important is because warfarin is routinely monitored and --

08:41  12  **Q.**    Ms. Geiger -- Ms. Geiger, if I may, if you will answer my

08:41  13  question?

08:41  14  **A.**    Sure.

08:41  15  **Q.**    All I asked is whether or not "no monitoring" is a key

08:41  16  marketing message for Xarelto; true?

08:41  17  **A.**    The way you've stated it, I can't agree that that's true

08:41  18  because that's not the message.

08:41  19  **Q.**    Okay.  So no monitoring, no regular monitoring, was a

08:41  20  matter of contract with Bayer regarding Xarelto; correct?

08:41  21  **A.**    You stated that.  I don't -- I'm not privy to the

08:41  22  documents, but if you state that's in the documents, I can't

08:41  23  disagree.

08:41  24  **Q.**    All right.  Well, what I'm trying to determine is, is what

08:41  25  you know.  So if I ask you a question, if you'll just tell me

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

08:42  1   yes or no or I don't know, that's fine.  Okay.
08:42  2           Is "no monitoring" a matter of contract with Bayer
08:42  3   regarding Xarelto in the U.S.?
08:42  4   A.   I don't know.
08:42  5   Q.   Okay.  You know that "no monitoring" was a -- was a
08:42  6   message that was identified by market research as one that
08:42  7   would resonate with doctors before Xarelto was ever sold; true?
08:42  8   A.   What was the statement that you asked about the -- if you
08:42  9   don't mind repeating it.  I'm sorry.  I just want to make sure
08:42  10  I heard your statement correctly.
08:42  11  Q.   Marketing research showed that "no monitoring" was a
08:42  12  message that would resonate with doctors; true?
08:42  13  A.   Yeah.  No required routine monitoring was something that
08:42  14  doctors thought would be a very good benefit of the medication,
08:42  15  yes.
08:42  16  Q.   And Janssen did market research before it ever went on the
08:43  17  market that confirmed that no monitoring was a critical message
08:43  18  for sales; true?
08:43  19  A.   Yeah.  We did market research, and physicians said that no
08:43  20  routine monitoring would be a very compelling and interesting,
08:43  21  you know, attribute of the medicine.
08:43  22  Q.   And Bayer did market research that confirmed that no
08:43  23  monitoring would be a critical message for doctors for this
08:43  24  drug; true?
08:43  25  A.   I don't know.  We didn't -- because Bayer was outside the

SUSAN GEIGER - DIRECT

08:43  1   U.S., we didn't really get involved in their market research.
08:43  2   Q.   But at Janssen you had what was called eRooms; right?
08:43  3   Electronic rooms where documents were shared between Bayer and
08:43  4   Janssen and Janssen employees; right?
08:43  5   A.   I don't remember accessing it very often.
08:43  6   Q.   Ms. Geiger.
08:43  7   A.   Now that you mention it, I recall there was an eRoom.
08:44  8   Q.   Ms. Geiger.
08:44  9   A.   Yes.
08:44  10  Q.   My question was is there an eRoom?  Is there an eRoom
08:44  11  where documents are shared?
08:44  12  A.   And I'm trying to answer your questions.  I just -- if
08:44  13  it's definitive, is there or is there not, I don't recall.  You
08:44  14  know, it was a long time ago.
08:44  15  Q.   Okay.  Well, you don't have eRooms now at Janssen?
08:44  16  A.   No, we don't use eRooms.  We have share point sites for
08:44  17  our team, but nothing with Bayer.
08:44  18  Q.   All right.  So you have -- is it your testimony that you
08:44  19  have never seen market research regarding Xarelto performed by
08:44  20  Bayer or on behalf of Bayer?
08:44  21  A.   I don't recall seeing any Bayer market research.  When I
08:44  22  joined, we were focused on the U.S. marketing efforts, and that
08:44  23  wouldn't have included Bayer.
08:45  24  Q.   All right.  The no marketing research that was done by
08:45  25  Janssen that identified "no monitoring" as a key message, that

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

1    was done before the clinical trials were ever completed for

2    Xarelto; is that correct?

3    **A.**   Yes.  There's months of work that goes into preparations

4    so we know every scenario we want to prepare for.  That's

5    correct.

6    **Q.**   And part of marketing's objective is to deliver the key

7    marketing messages to doctors; is that correct?

8    **A.**   A technicality.  We don't deliver the key marketing

9    message.  But, yes, our objective is to design messages aligned

10   with the label and then ensure they get delivered to physicians

11   so they can make decisions on what to prescribe their patients.

12   **Q.**   So you're not saying that marketing doesn't deliver

13   messages to doctors?  You're not saying that you're not

14   responsible for getting these key messages to doctors, are you?

15   **A.**   Yes, we get them through a variety of vehicles, websites,

16   mailings, our sales representatives.  So there's a variety of

17   mechanisms we use.  I, as a marketer, don't usually go out and

18   talk to doctors.

19   **Q.**   All right.  So you're saying that the marketing executives

20   themselves won't actually go into the doctor's office, but,

21   yet --

22            **MR. SARVER:**  Your Honor, may I move so I can see?

23            **THE COURT:**  Sure.

24            **MR. SARVER:**  Where would you like me to go, Judge?

25            **THE COURT:**  You can come over here so you can see it

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

08:46  1   better.
08:46  2          MR. SARVER:  Thank you, Judge.
08:46  3   BY MR. BIRCHFIELD:
08:46  4   Q.   Okay.  So the company, the marketing department
08:46  5   particularly, forms -- formulates key messages to be delivered
08:47  6   to doctors; true?
08:47  7   A.   That's true.
08:47  8   Q.   Okay.  And the goal of these messages, delivering these
08:47  9   messages, is so that doctors will write prescriptions for
08:47  10  Xarelto to patients; right?
08:47  11  A.   The first goal is to inform, and we hope that the
08:47  12  information we provide is compelling enough that physicians
08:47  13  will choose Xarelto.  So in the end, yes, that's the end game.
08:47  14  Q.   All right.  And you said that now there are a number of
08:47  15  tools that the marketing department uses to get the core
08:47  16  messages, the key messages to doctors; true?
08:47  17  A.   Yes, that's true.
08:47  18  Q.   Okay.  And one of those -- one of those messages you
08:47  19  mentioned is the label; right?
08:48  20  A.   Yes.  That's really the center point that we work from.
08:48  21  Q.   So the label is a key marketing tool; correct?
08:48  22  A.   Yeah, I would say that, you know, we do sell off the
08:48  23  package insert on occasion.  So, yeah, that's an important
08:48  24  tool.
08:48  25  Q.   And the sales reps are responsible for delivering messages

SUSAN GEIGER - DIRECT

08:48  1  from the label to doctors; correct?

08:48  2  A.   That's correct.  Yes.

08:48  3  Q.   Okay.  And other tools that are used by the marketing

08:48  4  department to get messages to doctors include KOLs that we

08:48  5  talked about yesterday; correct?

08:48  6  A.   Yes.  We use key opinion leaders for promotional speaker

08:49  7  programs.

08:49  8  Q.   And these are -- the key opinion leaders are -- these are

08:49  9  doctors that receive money from Janssen for their work; right?

08:49  10  A.   They're doctors who volunteer to speak for us, and we

08:49  11  compensate them for their time, yes.

08:49  12  Q.   Well, I mean, when you just say "volunteer their time" --

08:49  13  A.   Yeah.

08:49  14  Q.   -- we covered this yesterday.

08:49  15  A.   I mean --

08:49  16  Q.   They have to deliver the messages that you prepare.  These

08:49  17  are mandatory messages.  They cannot deviate from your

08:49  18  messages; right?

08:49  19       MR. SARVER:  Objection, Your Honor.  He misstated the

08:49  20  prior testimony of the witness.

08:49  21       THE COURT:  All right.  Restate the question.

08:49  22  BY MR. BIRCHFIELD:

08:49  23  Q.   The messages that key opinion leaders deliver are messages

08:49  24  that are controlled by Janssen; correct?

08:49  25  A.   We need to ensure that they stay on label, so, yes, we

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER – DIRECT

08:49  1    need to provide them with particular messages.  And they don't

08:50  2    volunteer their time.  They sign up and say, "I'd like to speak

08:50  3    for you."

08:50  4    Q.   All right.  So, Ms. Geiger, the answer to that question is

08:50  5    just yes; right?

08:50  6              MR. SARVER:  Objection.  Argumentative.

08:50  7              THE WITNESS:  Yes.

08:50  8    BY MR. BIRCHFIELD:

08:50  9    Q.   All right.  And another way that the marketing messages

08:50  10   are delivered from the company to doctors is through the

08:50  11   medical literature; true?

08:50  12   A.   I can't agree that marketing messages are delivered

08:50  13   through medical literature because I think of clinical studies

08:50  14   when you say "medical literature."

08:50  15   Q.   Well, medical literature includes --

08:50  16             MR. SARVER:  Your Honor, may we stop for a moment.

08:50  17             THE COURT:  Yes.  Please.

08:50  18             MR. GIARDELLA:  We're having a fire alarm here.  I

08:50  19   think we have to leave.

08:51  20             THE COURT:  Okay.  Well, we'll take a break.

08:51  21   Hopefully it's not a fire.

08:51  22             THE DEPUTY CLERK:  All rise.

08:51  23             (WHEREUPON, the jury exited the courtroom.)

08:51  24             (WHEREUPON, the Court took a recess.)

09:20  25             THE DEPUTY CLERK:  All rise.

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

09:20  1          (WHEREUPON, the jury entered the courtroom.)

09:21  2          **THE DEPUTY CLERK:**  All rise.

09:21  3          **THE COURT:**  Okay.  Be seated, please.  The good news,

09:21  4    ladies and gentlemen, is it was not a fire.  It was just a fire

09:21  5    drill.  Sorry for the inconvenience.

09:21  6          Let's go.

09:21  7    BY MR. BIRCHFIELD:

09:21  8    Q.   Welcome back, Ms. Geiger.  We had our break and we were

09:21  9    talking about KOLs.

09:21  10   A.   Yes.

09:21  11   Q.   And Janssen had been -- national KOLs and regional KOLs;

09:21  12   right?

09:21  13   A.   Yes.

09:22  14   Q.   And there were -- you maintained lists, you maintained

09:22  15   spreadsheets of these national and regional KOLs; right?

09:22  16   A.   Yes, we keep those for a variety of reasons.  Yes.

09:22  17   Q.   And you were privy to those -- to those documents, those

09:22  18   spreadsheets; right?

09:22  19   A.   Yes.  They were shared amongst the team.

09:22  20   Q.   Let me hand you what's marked as -- identified as

09:22  21   Plaintiff's Exhibit 2054294.

09:22  22         Ms. Geiger, I'm just going to ask you, that's a copy

09:22  23   of the spreadsheet of the national KOLs; is that right?

09:22  24   A.   I don't know if it's the national KOLs.  It looks like too

09:23  25   big a file to be our national KOLs.  But it looks like a local

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

09:23  1    and regional KOL list.

09:23  2    Q.   Okay.  And national, regional, and local; is that right?

09:23  3    A.   That's what one of the tabs says.

09:23  4         MR. BIRCHFIELD:  Your Honor, we'd offer this as

09:23  5    Plaintiff's Exhibit No. 7 -- 9.

09:23  6         THE COURT:  Let it be admitted.

09:23  7    BY MR. BIRCHFIELD:

09:23  8    Q.   All right.  And so the KOLs, they would meet with the

09:23  9    doctors, and they would help deliver the marketing messages for

09:23  10   Xarelto from the company to doctors; correct?

09:23  11   A.   I don't know if this list of KOLs -- so this has the name

09:23  12   of one of the national sales directors at the time.  I don't

09:23  13   know how this particular list was.  I don't think this was a

09:23  14   marking list of people we used or engaged.  This might be for

09:23  15   the local people to be aware of who the influencers are.

09:23  16   Q.   Let's set the list aside for a moment.  Okay?

09:24  17   A.   Okay.  Sure.

09:24  18   Q.   But KOLs were hired by Janssen, and they delivered the

09:24  19   messages -- Janssen's messages to doctors; right?  Doctors that

09:24  20   would prescribe Xarelto?

09:24  21   A.   Only the doctors who said they wanted to be part of our

09:24  22   promotional speakers bureau.  Those KOLs, yes, they did

09:24  23   programs that were on label and were compensated for their

09:24  24   time.

09:24  25   Q.   All right.  And then the company also -- also delivered

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

1   their marketing messages through the medical literature;
2   correct?
3   A.   Yeah.  You have been asking that before.  What sort of --
4   when I think of medical literature, I think of clinical
5   studies, and we don't deliver marketing messages through
6   clinical studies, so...
7   Q.   Okay.  Let's make sure we're on the same page.
8   A.   Okay.
9   Q.   But as a pharmaceutical company, you know that there are
10  studies that are published in the medical literature, like *The*
11  *New England Journal of Medicine* or *The Journal of the American*
12  *Medical Association*; right?
13  A.   Absolutely.  Yep.
14  Q.   And so Janssen would work and Bayer would work to have
15  information, studies, published in the medical literature about
16  Xarelto; correct?
17  A.   From a scientific side, what I understand is any time you
18  do a study with humans, you have to publish it.  So, you know,
19  if Janssen was involved in a study, they were required to be
20  part of the publication of it.
21  Q.   But marketing was involved in this process as well;
22  correct?  And marketing would actually review and have input in
23  the draft articles that were submitted to the medical
24  literature; correct?
25  A.   I don't recall ever doing that, but, you know, so I

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

09:25  1  can't --

09:25  2  Q.    All right.  Okay.  Ms. Geiger, so you say you don't

09:25  3  recall.  But you were working very closely with your colleagues

09:26  4  in the marketing department for Xarelto; right?

09:26  5  A.    Yes.

09:26  6  Q.    You were the product director, right, for Xarelto?

09:26  7  A.    I was a group product director for Xarelto as well as the

09:26  8  product director, yes.

09:26  9  Q.    And so you had responsibilities for professional

09:26  10  development, but you also knew what your colleagues were doing?

09:26  11  You knew what your colleagues were doing, the director of

09:26  12  consumer advertising and different areas of the marketing plan

09:26  13  for Xarelto; true?

09:26  14  A.    So there were two parts of that question.  I can't really

09:26  15  answer it as true or false.  But I did not have responsibility

09:26  16  for the sort of professional work with KOLs.  That was

09:26  17  professional education.  That was a different part.  Nor did I

09:26  18  have DTC.

09:26  19        In answer to your second question, I was aware of, in

09:26  20  general, about maybe some different activities going on, but

09:26  21  where I really focused my time, energy, and learning was on my

09:27  22  role and my responsibilities.

09:27  23  Q.    So if the company had marketing influence on the medical

09:27  24  literature, you were not aware of that?

09:27  25  A.    I don't recall -- I don't recall ever reviewing or, you

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

09:27  1   know, putting messages into any study like you had mentioned.
09:27  2   So I can't really comment on what other people's breadth and
09:27  3   depth of responsibility was, what they did every day, or what
09:27  4   e-mails they got.
09:27  5   **Q.**   Okay.  Are you familiar with a company called Chameleon?
09:27  6   **A.**   Yes, I've heard of Chameleon.
09:27  7   **Q.**   And Chameleon is a company that was hired by Janssen for
09:27  8   work on Xarelto; correct?
09:27  9   **A.**   Like I said, I know that they worked with us, so someone
09:27  10  must have hired them.  Sure.
09:27  11  **Q.**   All right.  And Chameleon's job, their responsibility, was
09:27  12  to monitor the medical literature and help influence that,
09:28  13  consistent with Janssen's marketing messages; correct?
09:28  14  **A.**   I can't say that that's correct, no.  I don't know what
09:28  15  Chameleon was asked to do, what their sort of, you know,
09:28  16  responsibilities for us were when they hired them.
09:28  17  **Q.**   So you don't have any idea about what Chameleon did for
09:28  18  Janssen related to Xarelto?
09:28  19  **A.**   The specifics of what Chameleon did for whatever project
09:28  20  they were hired for, I really couldn't comment.  In general,
09:28  21  companies like Chameleon, they, you know, track and help
09:28  22  facilitate publication of articles or publication of studies,
09:28  23  because, like I mentioned, there's an obligation when a study
09:28  24  is done on humans that it must be published.  So groups like
09:28  25  Chameleon help coordinate that effort to make sure it happens

SUSAN GEIGER - DIRECT

09:28  1   and they keep track of timing of publications.

09:28  2   **Q.**   So part of what Chameleon would do is to monitor the

09:29  3   medical literature, what is -- drafts that are being proposed,

09:29  4   articles that are in the works.  They would monitor and see if

09:29  5   any of those articles would have a message that may be counter

09:29  6   to your marketing messages; correct?  That would be part of

09:29  7   their responsibility?

09:29  8   **A.**   I don't know that to be true.  The way you said it doesn't

09:29  9   sound like something that we would be able to do.  But, like I

09:29  10  say, I wasn't -- that was on the prof ed side or maybe other

09:29  11  folks.  I didn't work in that part of the business.

09:29  12  **Q.**   Some of the articles that were published had Janssen and

09:29  13  Bayer authors; right?

09:29  14  **A.**   Yeah.  If there -- if a study was conducted by our

09:29  15  research group, they were obligated to be an author.  So, yeah,

09:29  16  I guess.  I would imagine, sure.

09:29  17  **Q.**   The medical literature is one avenue of getting messages

09:29  18  related to the product to doctors; right?

09:29  19  **A.**   That's not -- from the work that I did in sort of the

09:30  20  commercial side, medical literature has been very much cordoned

09:30  21  off from the commercial piece of things.  So I can't -- again,

09:30  22  I wasn't in that area of professional education.  So when I

09:30  23  think of my role in commercial marketing to physicians, I don't

09:30  24  think about a medical literature --

09:30  25  **Q.**   Ms. Geiger.

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

09:30  1   **A.**   -- path per se.

09:30  2   **Q.**   Ms. Geiger.

09:30  3   **A.**   Sure.

09:30  4   **Q.**   So is it your testimony that, if there was an effort and

09:30  5   there were marketing people involved in tailoring the medical

09:30  6   literature, articles that are published, that is something that

09:30  7   you had no idea was going on?

09:30  8   **A.**   I said I wasn't responsible for that, so I can't comment

09:30  9   on tailoring.  I mean, that doesn't really sound like something

09:30  10  we would do.  But I wasn't involved with the clinical side or

09:30  11  the publication of our --

09:30  12  **Q.**   Ms. Geiger.  Ms. Geiger.

09:30  13        **MR. SARVER:**  Objection to interrupting the witness.

09:30  14        **THE COURT:**  Look, Ms. Geiger, we've got to get over

09:30  15  this.  So if you can answer quickly rather than making

09:31  16  speeches, we could move faster.

09:31  17        **THE WITNESS:**  I apologize.

09:31  18        **THE COURT:**  An attorney is going to have an

09:31  19  opportunity to ask questions to you, and he can clarify

09:31  20  whatever you need clarified.

09:31  21        **THE WITNESS:**  Okay, Your Honor.

09:31  22        **THE COURT:**  I don't want to interrupt any of your

09:31  23  comments, but let's focus on what the question is and see how

09:31  24  you can answer the question.

09:31  25        **THE WITNESS:**  Yes, sir.

SUSAN GEIGER - DIRECT

09:31    1   **BY MR. BIRCHFIELD:**

09:31    2   **Q.**   Are you aware of any marketing personnel being involved in

09:31    3   helping draft or craft messages that are to be published in the

09:31    4   medical literature?

09:31    5   **A.**   I don't recall that, no.

09:31    6   **Q.**   And you don't recall whether Chameleon actually had a role

09:31    7   in influencing the medical literature favorable to Xarelto's

09:31    8   marketing messages?

09:31    9   **A.**   That's not something I was involved in, so I don't recall.

09:32   10   **Q.**   Okay.  And another tool that the company had, the

09:32   11   marketing department had, to deliver its messages relating to

09:32   12   Xarelto was called direct-to-consumer advertising and

09:32   13   marketing; is that right?

09:32   14              **MR. SARVER:**  Objection, Your Honor.  There's a motion

09:32   15   in limine on this, and the criteria are not satisfied in this

09:32   16   case.

09:32   17              **MR. BIRCHFIELD:**  There's a motion in limine about

09:32   18   direct-to-consumer advertising?

09:32   19              **MR. SARVER:**  There is.

09:32   20              **MR. BIRCHFIELD:**  Your Honor, could I have a moment on

09:32   21   that?

09:32   22              **THE COURT:**  Yes.

09:33   23              **MR. BIRCHFIELD:**  Your Honor, may we approach?

09:33   24              **THE COURT:**  Yes.

09:33   25              (WHEREUPON, the following proceedings were held at

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

09:33   1   the bench.)

09:33   2           THE COURT:  What is this, Rick?  What's the problem?

09:33   3           MR. SARVER:  Your Honor, we filed a motion in limine

09:33   4   on direct-to-consumer advertising.  You sustained it unless the

09:33   5   plaintiffs can show that the plaintiff in this case saw the ad

09:33   6   or the doctor in this case saw the ad.  So general discussions

09:33   7   about direct-to-consumer advertising in a case where that

09:33   8   doesn't happen, is inappropriate.

09:33   9           MR. BIRCHFIELD:  It did happen, and Dr. Jordon's

09:33  10   testimony is that he saw and was influenced by the TV

09:33  11   commercials.

09:33  12           THE COURT:  Okay.

09:33  13           MR. SARVER:  But he doesn't identify any particular

09:33  14   ad, or any particular --

09:33  15           MR. BIRCHFIELD:  I'm not getting into any particular

09:33  16   ad.

09:33  17           MR. SARVER:  And he doesn't say he was influenced.

09:33  18   He said he considered it.  That's all.

09:33  19           THE COURT:  Look, I'm going to allow it.  You can

09:34  20   make your objection.  But if he doesn't do it, then I'll have

09:34  21   to tell the jury to disregard it.  But let's go into it.  We'll

09:34  22   take it a step at a time.

09:34  23           MR. BIRCHFIELD:  Thank you, Your Honor.

09:34  24           (WHEREUPON, the following proceedings were held in

09:34  25   open court.)

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

09:34  1        **THE COURT:**  Let's proceed, Counsel.

09:34  2  **BY MR. BIRCHFIELD:**

09:34  3  **Q.**   Ms. Geiger, one of the tools -- one of the tools that the

09:34  4  marketing department had in order to deliver some messages to

09:34  5  patients and doctors was direct-to-consumer marketing; correct?

09:34  6  **A.**   Yes.  There was someone on our team in charge of that.

09:34  7  **Q.**   Okay.  I'm going to put DTC, direct-to-consumer; right?

09:34  8  **A.**   Yes, that's how it's referred to.

09:34  9  **Q.**   Okay.  And the direct-to-consumer advertising, that would

09:35 10  include -- that would include TV commercials; right?

09:35 11  **A.**   Yes, that does.

09:35 12  **Q.**   And it would include -- and that would use celebrities

09:35 13  like Arnold Palmer and Kevin Nealon, Dave [verbatim] Vickers;

09:35 14  right?

09:35 15  **A.**   Yes, there were advertisements with spokespeople.

09:35 16  **Q.**   Okay.  And it would include ads in magazines; right?

09:35 17  **A.**   Yes, I'm sure there was.  Like I said, it was a different

09:35 18  part of our group.  So I can't remember exactly everything they

09:35 19  did, but adds in magazines seems -- sure.  That's something I'm

09:35 20  sure they would do.

09:35 21  **Q.**   And radio and Internet; right?

09:35 22  **A.**   I don't know about radio.  I do believe they must have had

09:35 23  ads on the Internet.  It just wasn't my responsibility.

09:35 24  **Q.**   And ads on social media?  Ads on social media?

09:35 25  **A.**   It was not my responsibility, so I don't know or recall

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

09:35   1   what their entire plan was about.  I know there were
09:36   2   advertisements on TV.  I think there were websites.  I don't
09:36   3   know if there were print ads.  So I don't know about social
09:36   4   media.
09:36   5   Q.   All right.  I'll put a question mark by radio and social
09:36   6   media.  All right.
09:36   7   A.   Sure.
09:36   8   Q.   And the direct-to-consumer marketing, Janssen knew that
09:36   9   not only would that influence patients to ask their doctors to
09:36  10   prescribe Xarelto -- I mean, it did that; right?
09:36  11        That was the purpose -- I think you told us that
09:36  12   yesterday -- was to drive patients to ask their doctors about
09:36  13   Xarelto; correct?
09:36  14   A.   Yes.  I think it was to ask them to, you know -- ask their
09:36  15   doctor about Xarelto.  Sure.
09:36  16   Q.   And the direct-to-consumer advertising, you also knew that
09:36  17   it influenced doctors.  Doctors were receiving messages about
09:36  18   Xarelto through the direct-to-consumer marketing as well;
09:36  19   right?
09:36  20   A.   I can't say I saw any data, but we always say that doctors
09:37  21   are also people too.  Right?  So if there was an ad on TV, then
09:37  22   they would see it.  They're consumers as well as doctors.  So
09:37  23   it would make sense doctors would see our advertisements on TV.
09:37  24   Q.   And all of this -- the direct-to-consumer, the KOLs, the
09:37  25   medical literature, all of that is designed to get doctors to

SUSAN GEIGER - DIRECT

1    write prescriptions for Xarelto; correct?

2    **A.**   It's all designed to educate and inform with the hope that

3    a physician will choose Xarelto for their patients, but that's

4    not our decision to make.

5    **Q.**   Okay.  All right.  And the -- and you had an annual budget

6    for this marketing effort, right, an annual budget?

7    **A.**   Yeah.  Every company has a budget.  We had a budget.

8    **Q.**   And I think you testified in your deposition that it was

9    hundreds of millions of dollars; right?

10   **A.**   If that's how I -- my depositions was a while ago.  That

11   seems accurate.  I don't recall exactly the hundreds of

12   millions, but it doesn't seem inaccurate.

13   **Q.**   And Michael Moye, he was a director of marketing.  He was

14   your supervisor during the time that you were working on

15   Xarelto; right?

16   **A.**   For about half of my time, he was my supervisor, yes.

17   Nauman Shah was my supervisor for the other part.

18   **Q.**   And if Mr. Moye had testified that it was an annual budget

19   of $200 million from the time of launch every year, does that

20   sound about right to you?

21   **A.**   If he said that was from the time of launch every year,

22   that sounds right.  I didn't work with him the whole time he

23   was on the brand.  I left in 2013.  So if he said that was from

24   beginning to end, it's -- he'd be right.

25   **Q.**   All right.  And then another way that the company

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

09:38  1   influenced or directed its messages to doctors was through
09:39  2   medical associations; right?
09:39  3   **A.**   What do you mean?  I'm not sure I understand what you mean
09:39  4   by "through medical associations."
09:39  5   **Q.**   Like the -- like -- organizations like the American Heart
09:39  6   Association or --
09:39  7   **A.**   Oh, yes.
09:39  8   **Q.**   -- American College of Cardiology.
09:39  9   **A.**   So I know what you mean by medical -- I know what you mean
09:39  10  by medical associations.  I just don't know what you mean by
09:39  11  messaging through them.
09:39  12  **Q.**   Okay.  And Janssen had -- Janssen had money flow into
09:39  13  these medical organizations; right?  You would sponsor events
09:39  14  at conferences, you paid KOLs that were members of these
09:39  15  medical organizations; right?
09:39  16  **A.**   I don't know that the way you're characterizing it sounds
09:39  17  like how we are -- our intent for doing it.  When there's a
09:40  18  medical meeting, they go to every pharmaceutical company and
09:40  19  ask do you want a booth?  And if you want a booth, you have to
09:40  20  pay for it.  And, you know, if you want to do a symposium,
09:40  21  you've got to pay for that.
09:40  22       So they come to all pharmaceutical companies.  They
09:40  23  ask for money for activities, and that's what we do.
09:40  24       I don't -- the piece on key opinion leaders, we don't
09:40  25  control if they're part of a medical association or not.  So I

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

1    can't say that that's characterized correctly.

2    **Q.**   But you know that the key opinion leaders that you hire or

3    you pay, you compensate -- whatever term you want to use --

4    that they are also members of the medical organizations; right?

5    **A.**   Any key opinion leader worth their weight is going to be

6    part of the large association of their peers.  I mean, that's

7    just sort of a fact.  It's nothing we have control over.

8    **Q.**   All right.  And the objective of this marketing campaign

9    is to deliver the key messages related to Xarelto through

10   doctors; true?

11   **A.**   Run that by me again.  I just -- am I supposed to be able

12   to see what you're drawing or no?

13   **Q.**   Sure.  I'll turn it around so you can see it.

14   **A.**   Thank you.  You pointed to it, so I couldn't see it.

15   **Q.**   Do you see?

16   **A.**   Yeah, I see a bunch of boxes and it looks like words.

17   That's fine.  You pointed.  I wasn't sure if you wanted me to

18   look at it.

19   **Q.**   All right.  So I want to go back for just a minute --

20   **A.**   Sure.

21   **Q.**   -- to the message of no monitoring.

22          When you're talking about no monitoring, you're

23   talking about monitoring the anticoagulation effect of Xarelto;

24   right?

25   **A.**   Technically, the full term on shorthand is "no routine

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

1  coagulation monitoring," and that was that it wasn't required
2  to do something similar to an INR test for Xarelto.
3  Q.   Ms. Geiger, is it possible to measure the anticoagulant
4  effect of Xarelto?
5  A.   I don't know -- I don't know the science behind it.  I
6  know we -- our label didn't have a requirement for monitoring,
7  and I also recall that the INR test was designed specifically
8  for warfarin.  So I know that that test wouldn't have worked to
9  measure Xarelto.
10  Q.   Okay.  All right.  So I have written the question up here:
11  Is it possible to measure the anticoagulant effect of Xarelto?
12  And I want to make sure that I get your answer right.
13        Is that yes, no, or I don't know?
14  A.   That sounds more like a scientific question, so I would
15  say I don't know.  I just know what was in our label and that
16  it said no required -- no INR -- or no routine monitoring was
17  required.
18  Q.   Okay.
19  A.   I don't know all the scientific tests that are possible.
20  Q.   Okay.  So I have -- I've written up here "Susan Geiger."
21  And your answer is "I don't know"; is that fair?
22  A.   To that specific?
23  Q.   Yes.
24  A.   Sure.
25  Q.   All right.  And it's your responsibility -- it's your

SUSAN GEIGER - DIRECT

09:43   1   responsibility, as a marketing department and you as the
09:43   2   product director, to get messages -- key messages to doctors to
09:44   3   educate doctors; right?
09:44   4   A.   Based on our FDA-approved label, yes, that's correct.
09:44   5   Q.   Okay.  And you mentioned -- you mentioned INR.
09:44   6        INR is -- that's looking at the PT or the prothrombin
09:44   7   time; right?
09:44   8   A.   I can't say that that's -- I don't know what exactly
09:44   9   the -- I know that INR stands for international normalized
09:44  10   ratio, and it's a test they use specific to warfarin.
09:44  11        What all it measures, I honestly don't know.  I mean,
09:44  12   it measures the blood somehow; right?
09:44  13   Q.   So if it takes PT test and normalizes those across
09:44  14   reagents, it would be still looking at the PT test; true?
09:44  15   A.   If that's what it does, then, yeah, I guess you're right.
09:44  16   Q.   Okay.
09:44  17   A.   I just --
09:45  18   Q.   All right.  Let me ask one more question.  Don't hold me
09:45  19   to that.
09:45  20        Let me ask you this:  The anticoagulant effect of
09:45  21   Xarelto cannot be monitored with standard laboratory testing.
09:45  22   Is that true or false, Ms. Geiger?
09:45  23   A.   I do not believe there is a Xarelto-specific test.  It
09:45  24   sounds like you're reading that from something.
09:45  25        Xarelto has no routine monitoring required.  I know

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

09:45    1    the INR test is not a test that can tell you anything about
09:45    2    Xarelto.  So that's...
09:45    3    Q.   Are you familiar with that language, "The anticoagulant
09:45    4    effect of Xarelto cannot be monitored with standard laboratory
09:45    5    testing"?
09:45    6    A.   I feel like I've heard it before.  Where exactly it comes
09:45    7    from -- it seems like it might come from our package insert.
09:46    8    But as far as verbatim, I'd probably just have to see it to
09:46    9    trigger my memory of where I've heard it from.  But I've heard
09:46   10    it before, for sure.
09:46   11    Q.   All right.  So I'm going to write up an answer here --
09:46   12    your answer here.  True or false or I don't know.
09:46   13    A.   Okay.
09:46   14    Q.   Okay.  So what would you have me circle as that answer
09:46   15    here?
09:46   16    A.   Can you repeat the question you're asking?
09:46   17    Q.   Yes.  The anticoagulant effect of Xarelto cannot be
09:46   18    monitored with standard laboratory testing?
09:46   19    A.   That sounds accurate.  It sounds like something I've heard
09:46   20    before.  So I would have to say, I guess, yes.  I mean...
09:47   21    Q.   Okay.  So the answer to that is true?
09:47   22    A.   I can't tell you the context it came from or where it's
09:47   23    listed, but I've heard that before.  So that sounds accurate.
09:47   24    Q.   So is your answer true or false or I don't know?
09:47   25    A.   I can't comment on the validity of that statement because

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

09:47  1   I don't know where it came from.  So I would have to say I
09:47  2   don't know because I don't know where it came from.  It sounds
09:47  3   familiar, so it seems like it would be true.  But I --
09:47  4   Q.   All right.
09:47  5   A.   It's just difficult for me to answer that yes or no.
09:47  6   Q.   If you looked at -- do you have a product label here with
09:47  7   you?
09:47  8   A.   No, I don't have -- I only have the exhibits you provided
09:47  9   me.
09:47  10  Q.   If that language is directly from the product label, would
09:47  11  that change your answer from "I don't know"?
09:47  12  A.   As I mentioned before, I didn't know where it came from.
09:47  13  If you say it's from the label, then it's true.  And I said I
09:47  14  had heard it before, and that's probably where I heard it from.
09:48  15  So -- or read it from.
09:48  16  Q.   All right.  And that would be consistent with the
09:48  17  marketing message "no monitoring required"; right?
09:48  18  A.   As I mentioned, our label said there was no need for
09:48  19  routine monitoring, and so that's what we shared with
09:48  20  physicians.
09:48  21  Q.   Ms. Geiger, yesterday you were talking about the FDA
09:48  22  label.  Do you remember that?  We were talking about the
09:48  23  Xarelto label, and you --
09:48  24  A.   Yeah.  Sure.
09:48  25  Q.   -- and you referred to it as the FDA label?

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

09:48  1   **A.**    Yes.  The FDA-approved label.

09:48  2   **Q.**    And you understand that it's really the company's label;

09:48  3   right?

09:49  4   **A.**    When we talked about this yesterday, that's probably a

09:49  5   nuance.  The way I treat the label or see the label is the

09:49  6   final determinant of what's in it and what we can and can't

09:49  7   say.  So FDA versus our label is probably...

09:49  8   **Q.**    Okay.  And you understand that the company -- I mean, all

09:49  9   of your marketing is driven from the label; right?

09:49  10  **A.**    It has to be or -- we're not allowed to say anything

09:49  11  that's not in the label or in the studies that, you know,

09:49  12  resulted in the label.

09:49  13  **Q.**    And do you understand that it's the company's

09:49  14  responsibility for the contents of the label?

09:49  15  **A.**    Our research and development group submits thousands upon

09:49  16  thousands of pages of data to the FDA.  And they work with the

09:49  17  FDA, and ultimately the FDA grants a label and determines

09:49  18  what's in it.

09:49  19  **Q.**    Okay.

09:49  20  **A.**    That's my understanding of it.

09:49  21  **Q.**    And do you understand that it is the company's

09:50  22  responsibility to maintain the label?  So if new information is

09:50  23  learned about the drug, it's the company's responsibility to

09:50  24  update the label?

09:50  25  **A.**    We're responsible to keep it updated.  If new data is

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

09:50  1  available, we submit it to the FDA, from what I -- again, it's
09:50  2  not my area, but the regulatory team is an expert in this.
09:50  3      New data is available.  Our regulatory people submit
09:50  4  it to the FDA.  Discussions happen.  And then, as a marketer, I
09:50  5  get "Here is your final label.  Make any adjustments you need
09:50  6  to make based on what's in this document here."  And that's
09:50  7  what we do.
09:50  8  Q.   Okay.  But marketing is involved in that process.
09:50  9      You're involved with regulatory and crafting the
09:50  10 label that is submitted to the FDA and changes that are
09:50  11 submitted to the FDA?
09:50  12 A.   I'm not responsible.  I've never been part of any of that,
09:50  13 and I don't know that marketing is responsible.  The regulatory
09:51  14 team and the medical team does all of that, from my knowledge.
09:51  15 Q.   All right.  Ms. Geiger, when did you learn that you might
09:51  16 be called to testify in this case?
09:51  17 A.   Somewhere in late 2015 maybe.
09:51  18 Q.   When did you --
09:51  19 A.   Oh, to testify.  I apologize.  Sorry.  I was going back to
09:51  20 the depositions.  A couple weeks ago.
09:51  21 Q.   And what did you do to prepare for your testimony in this
09:51  22 trial?
09:51  23 A.   I met with my attorney once or twice, and I, you know,
09:51  24 looked at -- I don't know.  I looked at my computer, looked at
09:51  25 a couple of documents, looked at the package insert.

SUSAN GEIGER - DIRECT

09:51  1   **Q.**   Okay.  So you say you met with your attorney, and I'm not
09:51  2   going to ask you what you discussed.  How long did you meet
09:51  3   with your attorney?
09:51  4   **A.**   I probably saw him in person for a half a day, a couple
09:52  5   hours.
09:52  6   **Q.**   Did you -- when you say you met with him in person for a
09:52  7   couple of hours, did you meet by phone?
09:52  8   **A.**   No, we didn't meet by phone.
09:52  9   **Q.**   So the total extent of any preparation time with your
09:52  10  attorney was a couple of hours on a couple of occasions?
09:52  11  **A.**   Yes, that seems logical.
09:52  12  **Q.**   Did you review any deposition testimony?
09:52  13  **A.**   No, I didn't.
09:52  14  **Q.**   Did you review any documents?
09:52  15  **A.**   No.
09:52  16  **Q.**   When you said that you spent time on your computer, what
09:52  17  did you look at on your computer?
09:52  18  **A.**   I went to the Xarelto website, and I looked to see what
09:52  19  are their current messages, because I'm not really involved in
09:52  20  their day-to-day.  And I looked at the package insert to remind
09:52  21  myself of what was in it because it's been a while since I was
09:52  22  involved in the team.
09:53  23  **Q.**   Ms. Geiger, when you were -- when you were responsible for
09:53  24  Xarelto, you were involved in crafting the messages that would
09:53  25  be delivered through print media, to doctors, and to patients.

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

09:53  1    That was part of your responsibility; right?

09:53  2    A.   As I mentioned before, absolutely, I was in charge of

09:53  3    getting information to doctors about Xarelto.

09:53  4    Q.   And you were involved in, like, crafting the exact

09:53  5    language that would be used, key marketing messages; right?

09:53  6    A.   Yes, I was.  And we put it through a whole process before

09:53  7    it leaves the building.  So, yes, I was responsible for that,

09:53  8    for sure.

09:53  9    Q.   And when you knew that you were not -- you were not able

09:53  10   to claim superiority for Xarelto versus warfarin for the AFib

09:54  11   indication, you crafted language to suggest that Xarelto was

09:54  12   superior; right?

09:54  13   A.   Well, I worked on the AFib indication.  That indication --

09:54  14   the statement in the label says it is the noninferior.  So we

09:54  15   crafted messages.  And then it went to a committee called the

09:54  16   promotional review committee, which is attorneys and regulatory

09:54  17   people and medical people.  And they review all of it.  They

09:54  18   all vote as to what we can and can't say, and that's when it's

09:54  19   allowed to leave the bilging.

09:54  20        So I crafted things, but there was a stopgap before

09:54  21   it could leave the building and go do doctors, and that was

09:54  22   those experts.

09:54  23   Q.   And you came up with the language "at least as effective

09:54  24   as"; right?

09:54  25   A.   Yes, that was one of the -- that was one of the messages

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

09:54  1  coming out of my team at that time.

09:54  2  **Q.**   Well, I mean, more than just coming out of your team.  I

09:54  3  mean, you personally crafted that message; right?

09:54  4  **A.**   Yeah.  I was part -- we worked with creative agencies and

09:55  5  so forth.  And, yeah, I was part of that decision and that --

09:55  6  creation of those.  And then we put it through our regulatory

09:55  7  and legal folks and asked if that was something we could say

09:55  8  based on the label, and it was approved to leave the building.

09:55  9  **Q.**   And it was a very effective message; right?  I mean, you

09:55  10  got market research back that determined that this was a

09:55  11  message -- this phraseology was something that stuck with

09:55  12  doctors and cardiologists; right?

09:55  13  **A.**   Well, the first two said it was accurate.  And the second

09:55  14  was that it meant something to clinicians.  They understood

09:55  15  what that message meant.  And it had an impact, sure.

09:55  16  **Q.**   But regulatory authorities said that's misleading; right?

09:55  17  You had to change this?

09:55  18  **A.**   At some point -- and I think it was after I had left the

09:55  19  team -- there was a communication from the FDA.  They -- we

09:55  20  send them -- when we approve material to go out of the building

09:55  21  and to be used with doctors, we send them a copy and give them

09:56  22  the opportunity -- the FDA the opportunity to review and

09:56  23  comment on it.

09:56  24       So I don't think I was on the team at that time.  The

09:56  25  FDA did come back and ask us to change that wording, and I

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - DIRECT

09:56   1   think that the team at the time did.

09:56   2   **Q.**   Was it determined that it was misleading?

09:56   3   **A.**   I don't recall seeing the letter or the specifics around

09:56   4   it.   If the FDA letter said they felt it was misleading, then

09:56   5   that would have been the impetus for us to change it.   And I

09:56   6   believe the team did.   So...

09:56   7   **Q.**   Was there any corrective action taken to dislodge this

09:56   8   misleading notion from doctors?

09:56   9   **A.**   As I mentioned, I think that came after I left the team.

09:56  10   Whenever we get a letter from the FDA, we take it extremely

09:56  11   seriously.   There's usually a meeting, and we learn from our

09:56  12   regulatory experts what the FDA has said.   And we start working

09:56  13   on how to address their comments and their, you know, mandates.

09:56  14   And we have a certain period of time to do so.

09:56  15        So anytime we get a letter from the FDA, we take it

09:57  16   seriously and we make the changes that they request.

09:57  17   **Q.**   Good.   But my question is did you take action to get word

09:57  18   out to the doctors that "We used this languages.   It is

09:57  19   misleading.   Please disregard this.   We cannot claim

09:57  20   superiority"?

09:57  21        Did you make any type of effort to correct the

09:57  22   misunderstanding of doctors?

09:57  23   **A.**   I would need to know when that letter came to know, you

09:57  24   know, whether I was part of any of that.   It is not usually

09:57  25   something we do to take the privileged communications between

SUSAN GEIGER - CROSS

09:57  1  the FDA and our company and put that out in the public domain.
09:57  2       And you mentioned claiming superiority, and none of
09:57  3  our messages ever said superiority in AFib.
09:57  4  **Q.**   They never used the word "superiority"; right?
09:57  5  **A.**   We never -- in my time on the brand and in atrial
09:57  6  fibrillation, we never used the word "superiority" in our
09:57  7  material that went to physicians.
09:58  8       **MR. BIRCHFIELD:**  Okay.  That's all I have, Your
09:58  9  Honor.
09:58  10       **MR. SARVER:**  Your Honor, may I proceed?
09:59  11       **THE COURT:**  Yes.
09:59  12       **MR. SARVER:**  Good morning, Ms. Geiger.
09:59  13                      **CROSS-EXAMINATION**
09:59  14  BY MR. SARVER:
09:59  15  **Q.**   Can you hear me?
09:59  16  **A.**   I can hear you, yes.
09:59  17  **Q.**   My name is Rick Sarver.  I don't think we've ever met.
09:59  18  **A.**   No, we haven't.  It's nice to meet you.
09:59  19  **Q.**   Good to meet you.
09:59  20       You've been on stand for quite a while.  I'd like to
09:59  21  talk to you about a few things that you and the lawyer for the
09:59  22  plaintiff have talked about.  I want to start you out with
09:59  23  something that you didn't hear but the jury did hear.
09:59  24       During opening statements -- and I want to make sure
09:59  25  I get it as close to possible as correct -- Mr. Birchfield told

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

| | | |
|---|---|---|
| 09:59 | 1 | the jury that, with Xarelto, marketing ran out ahead of the |
| 09:59 | 2 | science.  That's what he said. |
| 09:59 | 3 | Is that true? |
| 09:59 | 4 | **A.**   No.   I think pharmaceuticals is one of the most regulated |
| 10:00 | 5 | industries around.  And as a marketer, I'm waiting for the |
| 10:00 | 6 | science to tell me sort of what I can and can't say and waiting |
| 10:00 | 7 | for the FDA to tell me what I can and can't say.  So I couldn't |
| 10:00 | 8 | disagree with that more. |
| 10:00 | 9 | **Q.**   Mr. Birchfield also told the jury that marketing decided |
| 10:00 | 10 | the rules on monitoring Xarelto. |
| 10:00 | 11 | Is that true? |
| 10:00 | 12 | **A.**   No.  Monitoring and anything related to Xarelto, the |
| 10:00 | 13 | medication, comes from the science.  It's -- these are |
| 10:00 | 14 | chemicals; right?  They're pills that are -- they come from the |
| 10:00 | 15 | science, not from -- and from, I guess, chemistry, not from us. |
| 10:00 | 16 | **Q.**   All right.  Going back just a little bit.  You've been |
| 10:00 | 17 | talking to the jurors now for the better part of a day and a |
| 10:00 | 18 | half.  They don't know you. |
| 10:00 | 19 | Could you please introduce yourself to the jury. |
| 10:00 | 20 | That's kind of the polite thing to do. |
| 10:00 | 21 | **A.**   Sure.  I'm Susan Geiger.  I work for Janssen.  I have for |
| 10:01 | 22 | 19 years now.  I don't know how far -- you know, I'm the |
| 10:01 | 23 | youngest of six kids.  Blah, blah, blah.  But, you know, |
| 10:01 | 24 | that's -- I've been in marketing for J&J for 12 of those 18 -- |
| 10:01 | 25 | or 19 years. |

SUSAN GEIGER - CROSS

10:01    1    **Q.**    Are you a mom?

10:01    2    **A.**    I am.  I have twin boys, 3; and a husband, another.

10:01    3    **Q.**    Well, that's a good thing too.  You went to your kids,

10:01    4    first.  All right.

10:01    5            You worked for Janssen for a number of years;

10:01    6    correct?

10:01    7    **A.**    Yes.  I've worked on a couple of products over the years.

10:01    8    **Q.**    When did you first become involved with the product

10:01    9    Xarelto?

10:01    10   **A.**    I had been working my first 10 years on a drug called

10:01    11   Procrit for cancer patients to help give them energy to get

10:01    12   through their chemotherapy.  And in 2008, I learned that we

10:01    13   were working on another product that impacted the blood called

10:02    14   Xarelto that was going to be, you know, meeting this big unmet

10:02    15   need and a great opportunity.

10:02    16           And so that was when I applied for the job.  And

10:02    17   there was -- I don't know -- like 50 different résumés of

10:02    18   people who were interested in joining that team.  And I was

10:02    19   fortunate enough to join the team in 2008.

10:02    20   **Q.**    We've heard you use the term "unmet need."

10:02    21           What is that?

10:02    22   **A.**    So anytime you look at how diseases are managed or care is

10:02    23   delivered in health care, we talk to physicians and patients.

10:02    24   We seek to understand where are there unmet needs, where are

10:02    25   there gaps that could make the patient experience or the

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

1   outcomes of their treatment better.  And that's sort of what we

2   characterize as an unmet need.

3        Janssen isn't an organization that makes "me too"

4   products and, you know, so forth.  We really -- there's a big

5   focus at Janssen on innovative products and, you know, patients

6   being at the center of what we do.  And so we identify gaps in

7   health care, and we design products to fill those gaps.  That's

8   the unmet need.

9   Q.   Are you part of the marketing department at Janssen?

10   A.   Right now, my title is director of marketing for strategic

11   customer group.  So the group of individuals that myself and my

12   team work with are the decision makers at health insurance

13   companies and hospital systems.

14        So it is a marketing role, but I don't market

15   products or medications anymore.  I actually work with insurers

16   and health systems to look at how are you managing big diseases

17   and how can we help you maybe provide more education on

18   different diseases.

19        So we work to support everything that's happening in

20   health care now where we're trying to move to better overall

21   care and outcomes for patients.  So that's what I do now.

22   Q.   Does the marketing department at Janssen make scientific

23   decisions for the company?

24   A.   No.  We're very much -- it's very much a separation of

25   church and state that way.  Right?  There is a clear line

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

10:04  1    between what they do and then what we do.  So I don't influence
10:04  2    the science.  The science is what it is.  Right?
10:04  3    **Q.**   Does Janssen employ doctors?
10:04  4    **A.**   Oh, absolutely, yeah.  Our research and development and
10:04  5    our medical team is all made up of doctors and PhDs and PharmDs
10:04  6    and nurses.  Everyone who is an expert in science and health
10:04  7    care, they're over there.
10:04  8    **Q.**   We've heard the term -- and, you know, we've been talking
10:04  9    for a while about some terms, and probably fair to the jury to
10:04  10   actually define them for us.  And maybe you could help.
10:04  11          We've heard a term called "clinical trials."  Could
10:04  12   you tell the jury what that is.
10:04  13   **A.**   So a clinical trial is a study that is designed by, you
10:04  14   know, scientists.  Right?  Doctors or PhDs or what have you.
10:05  15          And there's all different kinds of clinical trials.
10:05  16   One's very early where they just, like, measure a medicine in a
10:05  17   petri dish and the chemistry of it.  Then they go to Phase I
10:05  18   and Phase II and Phase III clinical trials, which is, I think,
10:05  19   a lot of what we were talking about earlier, which are the
10:05  20   trials done in hundreds, sometimes thousands, of patients where
10:05  21   you test a medication versus another medication.
10:05  22          And there is a ton of data that comes out there to
10:05  23   tell us how effective is it, is it achieving what it was
10:05  24   intended to achieve what are the side effects that come with
10:05  25   using it, what are the safety concerns that come with using it,

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

10:05  1  how should you dose it, how frequently should you dose it.

10:05  2          So that's just like the tip of the iceberg of, you

10:05  3  know, what they do in clinical trials, but...

10:05  4  Q.   In the United States, can any medicine be provided to

10:05  5  patients in the United States without first doing clinical

10:05  6  trials to show the medicine is both safe and effective?

10:06  7  A.   Yes.  There's years of clinical trials.  I think the

10:06  8  trials for Xarelto or for rivaroxaban started back in the late

10:06  9  '90s, and it didn't come to market until 2011, I think.  So,

10:06  10  yeah, there's lots of clinical trials.

10:06  11  Q.   So one of the things that you were asked by Mr. Birchfield

10:06  12  is whether or not there was some push for Xarelto to get to

10:06  13  market to soon or a rush.

10:06  14          Do you remember those questions?

10:06  15  A.   I remember that, yeah.

10:06  16  Q.   Was that true?

10:06  17  A.   It's not even possible.  You start a clinical study.  They

10:06  18  have to find doctors who want to run the study and then

10:06  19  patients who want to be in it.  And then, you know, you don't

10:06  20  know when an event is going to happen to know whether or not --

10:06  21  so there's really nothing we can control on the timing of a

10:06  22  clinical trial.

10:06  23          And even when it's done, we've got to wait for the

10:06  24  FDA to make their decisions, and we don't really have control

10:06  25  over that either.

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

10:06  1  **Q.**   So you told us just a moment ago.  When did the study, the

10:07  2  research, the science looking at the rivaroxaban molecule

10:07  3  begin?

10:07  4  **A.**   I remember when I joined the team in about 2008 that

10:07  5  there -- that, you know, when they were kind of telling me what

10:07  6  had been happening, they mentioned that in the late '90s or so

10:07  7  they started exploring the compound.  I don't have all the

10:07  8  exact dates.  I just remember when I joined the team, they had

10:07  9  been working on it for quite a while.

10:07  10  **Q.**   So sometime before the year 2000; fair?

10:07  11  **A.**   I think so, yes.

10:07  12  **Q.**   And when was the first indication of Xarelto approved for

10:07  13  use in patients in this country?

10:07  14  **A.**   Initially I think they thought it would be in 2009 or so.

10:07  15  But because of, you know, the time it takes that we don't have

10:07  16  control over, it didn't come out -- orthopedic surgery was the

10:07  17  first indication, and that was in July of 2011.

10:07  18  **Q.**   I'm going to ask you to help us with -- so 2011 was when

10:07  19  it was first approved by the FDA?

10:08  20  **A.**   Yes.  The orthopedic surgery indication, yes.

10:08  21  **Q.**   I'm going to ask you to help us with a definition again

10:08  22  because I did something bad.  I used the term "rivaroxaban."

10:08  23  Do you know what that means?

10:08  24  **A.**   Yes.  It's the -- whenever a medication is created, it

10:08  25  first gets a number.  I don't know what the number for this one

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

1   was.  One I worked on -- I can recall the number of one I

2   worked on a long time ago.  Then they call it the generic name,

3   which is rivaroxaban.  And then when it is approved by the FDA,

4   it's granted a name.  And in this case, rivaroxaban was given

5   the name Xarelto.

6   Q.   Is it okay if I write "rivaroxaban equals Xarelto"?

7   A.   That's 100 percent accurate.

8   Q.   Will that help the jury to understand that rivaroxaban is

9   the molecule and it is the product Xarelto?

10   A.   Yes.  That's true.

11   Q.   Is that fair?

12        Okay.  Good.  Now, one of the things that you were

13   asked about by Mr. Birchfield was whether or not there was an

14   effort to try to be the first anticoagulant on the market.

15        Do you remember those questions?

16   A.   I do.  I do.

17   Q.   Did that happen?  Was Xarelto the first?

18   A.   No.  Pradaxa, which is a direct thrombin inhibitor,

19   sightly different but does the same thing, that was approved, I

20   think, maybe a year before we were.  It was a while before, for

21   sure.

22   Q.   So all the --

23   A.   So they were the first to market.

24   Q.   My fault.  All the discussion about first to market,

25   Pradaxa was the first to market and not Xarelto?

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

| | | |
|---|---|---|
| 10:09 | 1 | **A.**   Absolutely.  It was the first new products after warfarin |
| 10:09 | 2 | in however many years, 50 years. |
| 10:09 | 3 | **Q.**   And we've heard some other terms I want to make sure the |
| 10:09 | 4 | jury understands. |
| 10:09 | 5 | Do you know what the term "DOAC" means? |
| 10:09 | 6 | **A.**   Yes. |
| 10:09 | 7 | **Q.**   What is it? |
| 10:09 | 8 | **A.**   It is the term "novel oral anticoagulant."  So warfarin |
| 10:10 | 9 | was the only oral anticoagulant, and throughout the years they |
| 10:10 | 10 | have created products or medications like Lovenox and |
| 10:10 | 11 | Enoxaparin -- or Lovenox and Enoxaparin are the same thing, but |
| 10:10 | 12 | they're injections, like shots patients have to give themselves |
| 10:10 | 13 | in the belly. |
| 10:10 | 14 | So this new group of novel oral anticoagulants, which |
| 10:10 | 15 | included Pradaxa and Xarelto and Eliquis and Savaysa, are all |
| 10:10 | 16 | new -- or novel -- oral -- because the other ones had been |
| 10:10 | 17 | injection other than warfarin -- anticoagulants. |
| 10:10 | 18 | Does that help? |
| 10:10 | 19 | **Q.**   Yes.  Yes, ma'am.  You took us to a term we didn't use. |
| 10:10 | 20 | You used the term NOAC, novel oral anticoagulant.  Correct? |
| 10:10 | 21 | **A.**   Yes. |
| 10:10 | 22 | **Q.**   Is that the same as a DOAC, a direct-acting oral |
| 10:10 | 23 | anticoagulant? |
| 10:10 | 24 | **A.**   I've never heard the term "DOAC." |
| 10:10 | 25 | **Q.**   My fault.  Let's go with the term that you're familiar |

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

1    with, NOAC.

2    **A.**    Okay.

3    **Q.**    And is that a class of drugs?

4    **A.**    Yeah.  That's really any oral anticoagulant that's not

5    warfarin or -- warfarin is also called Coumadin.  Right?

6    Warfarin equals Coumadin; rivaroxaban equals Xarelto.

7            So novel oral anticoagulants are really anything

8    that's oral that's not Coumadin.

9    **Q.**    All right.  So warfarin equals Coumadin.  And that's the

10   one that Mr. Birchfield described as starting out as a rat

11   poison; correct?

12   **A.**    Yes.  That was an interesting piece I learned when I

13   joined the team, was that Coumadin was rat poison.  I didn't

14   know that.

15   **Q.**    And that's the wonderful thing about science.  You can

16   make good use of other things for other reasons; right?  But

17   that's great.

18            But it was developed when?  Do you remember when

19   Coumadin was developed?

20   **A.**    I don't.  You know, what you heard a lot on the team was

21   that we were creating a product that, you know, hadn't -- that

22   the last one had been created 50 years ago.  So you work

23   backwards, and it had to be in maybe the 1920s or '30s.  Well,

24   I guess even later than that.  Probably the '40s or '50s.

25   **Q.**    It was a drug that actually treated Franklin Roosevelt

SUSAN GEIGER - CROSS

10:12  1   when he had his stroke.  Did you know that?

10:12  2   A.   Oh, really?  Didn't know that.

10:12  3   Q.   Been around many, many years.  Fair?

10:12  4   A.   Oh, yes.  And it was a very powerful and efficacious drug.

10:12  5   There was no doubt.  That's what we talked a lot with

10:12  6   physicians about.  They just said it was so difficult for them

10:12  7   to manage and for their patients to manage.

10:12  8         So really effective drug.  We wanted it to be as good

10:12  9   as it was because it was well-respected.

10:12  10  Q.   I'll ask you another term that we've heard before.  It is

10:12  11  the term "indication."  What is an indication?

10:12  12  A.   So I mentioned that our scientific team does studies and

10:12  13  they submit all that data to the FDA, and those studies are

10:12  14  done in specific patient populations.  Right?  Patients with

10:12  15  AFib, patients who had a knee replacement, what have you.  The

10:12  16  FDA will grant us what's called an indication.

10:13  17        So the FDA has a statement in front of our package

10:13  18  insert that says, "Xarelto is indicated," or "it's supposed to

10:13  19  be used for," or "it should be used for," you know, and then it

10:13  20  goes on to make a statement.

10:13  21        So in Xarelto's case for AFib, which I'm most

10:13  22  familiar with, it was -- the indication was to reduce the risk

10:13  23  of stroke in systemic embolism in patients with nonvalvular

10:13  24  atrial fibrillation.  So that is that statement of "Doctor,

10:13  25  here's how you should use this product and in whom."

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

10:13  1    **Q.**   To be fair to our jury who just got here, we need to

10:13  2    define some terms.

10:13  3          You used the word with a lot of your answers "AFib,"

10:13  4    and that's atrial fibrillation; is that correct?

10:13  5    **A.**   Yes.  It's a heart condition.

10:13  6    **Q.**   It's a heart condition that, if you have it, you have an

10:13  7    increased risk of having a stroke; is that right?

10:13  8    **A.**   Yes.  And what I've learned is AFib strokes are actually

10:13  9    amongst the most debilitating because the clot goes from your

10:13  10   heart straight up to your brain.  I had one doctor on our team

10:14  11   tell me once that it only takes a teaspoon of blood in the

10:14  12   brain to render patients or people very debilitated.  So that

10:14  13   was an interesting insight for me to know it just took so

10:14  14   little for something terrible.

10:14  15   **Q.**   And so Xarelto was designed to prevent that effect of

10:14  16   having a stroke if you had atrial fibrillation?

10:14  17   **A.**   Yes.

10:14  18   **Q.**   Now, that's one of the indications.  That's not why we're

10:14  19   here.

10:14  20         Did you understand that Ms. Mingo doesn't have atrial

10:14  21   fibrillation?  Did you learn that?

10:14  22   **A.**   Yeah, I think they mentioned it earlier, but thank you for

10:14  23   clarifying it.

10:14  24   **Q.**   So the indication for Ms. Mingo was due to -- she had

10:14  25   extensive blood clots in her leg.

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

**A.**   Okay.

**Q.**   And when you have blood clots in your leg, there is the potential for them to travel up your body and go into your lungs, and often the first symptom you have is you die.

        Is there an indication for that disease?  It's called deep vein thrombosis that Ms. Mingo had.  Does Xarelto have an indication for deep vein thrombosis?

**A.**   Yes, it does.  Admittedly, I wasn't -- I never worked on that indication, but obviously I know it is one of our -- one of our indications, deep vein thrombosis, PE, and so forth.

**Q.**   Now -- and this is why I'm asking you that.  Was there a clinical trial specifically done for the atrial fibrillation indication?

**A.**   Yes, there was a specific trial done in those patients with that disease.

**Q.**   Was there a different clinical trial done for deep vein thrombosis prevention?

**A.**   Yes.  I think that there were -- I just remember there being pooled studies.  I believe they had a trial for patients with a DVT and a trial for patients with PE and another trial about using it longer than standard, so I'm going to guess there were three to five --

**Q.**   Don't guess.  It's not appropriate.  It's not appropriate to guess.

**A.**   Sorry.

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

10:16  1   **Q.**   Whatever you know, you know.  Okay?

10:16  2   **A.**   Yes, sir.

10:16  3   **Q.**   So the atrial fibrillation indication, the clinical trial,

10:16  4   did it have a name?

10:16  5   **A.**   Yes.  It was called ROCKET AF.

10:16  6   **Q.**   ROCKET.  Was ROCKET the clinical trial that studied

10:16  7   Xarelto in the population of patients that are like Ms. Mingo?

10:16  8   **A.**   No, it wasn't.

10:16  9   **Q.**   What was the name of the clinical trial that studied

10:16  10  patients like Ms. Mingo?

10:16  11  **A.**   I think it was the EINSTEIN trials.

10:16  12  **Q.**   And these are different trials, different patients,

10:16  13  different indications.  Is that all true?

10:16  14  **A.**   Yeah.  Different diseases, different ways clots are

10:17  15  formed, and different everything.

10:17  16  **Q.**   I'm going to go back and talk with you a little bit about

10:17  17  some of the label.

10:17  18  **A.**   Sure.

10:17  19  **Q.**   And you Mr. Birchfield talked for a long time about the

10:17  20  label.

10:17  21          Do you remember that?

10:17  22  **A.**   Yes, I do.

10:17  23  **Q.**   Does the FDA approve every word in Xarelto's label?

10:17  24  **A.**   Yes, they do.

10:17  25  **Q.**   Is that important?

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

10:17  1   **A.**   It's required.  It's important.  We don't -- you know, we

10:17  2   receive the label that the FDA has approved to be used, and

10:17  3   it's important to me because that's what really is the basis of

10:17  4   the foundation for what I can and cannot do as a marketer.

10:17  5   **Q.**   And is it important for those involved in marketing to

10:17  6   stay on the label and not go off the label?

10:17  7   **A.**   Yes.  Not only do we have -- like I mentioned, there's

10:18  8   committees of people to make sure that nothing that leaves the

10:18  9   building, goes to doctors, is in violation of the label.

10:18  10          But if something -- if one of our reps is found

10:18  11  speaking off label, they can be written up and penalized.  If

10:18  12  the FDA finds that we're doing something off label, they can

10:18  13  come back to us, as they have in the past.  I think the

10:18  14  attorney was talking about letters from the FDA.

10:18  15          So, yes, there's -- we take it very seriously.  We

10:18  16  have to stay on label; otherwise, there's negative

10:18  17  repercussions for everybody.

10:18  18  **Q.**   Do you know a term called "fair balance"?

10:18  19  **A.**   Yes.

10:18  20  **Q.**   What is that?

10:18  21  **A.**   So anything that we -- any time we talk about our

10:18  22  medications in pharmaceuticals, and specifically for Xarelto,

10:18  23  we have to provide all of the information, not only the

10:18  24  efficacy, you know, the efficacy information, the good, the

10:18  25  bad, and the ugly, as well as the safety information, the good,

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

| | | |
|---|---|---|
| 10:18 | 1 | the bad, and the ugly. |
| 10:18 | 2 | So we can't -- we can't just highlight the good |
| 10:19 | 3 | stuff; we have to highlight the negative stuff as well.  And |
| 10:19 | 4 | that's in all of our training documents, that you present all |
| 10:19 | 5 | of the information for the physicians to understand. |
| 10:19 | 6 | Q.   Are you permitted to speak to doctors about what is in the |
| 10:19 | 7 | label or the package insert? |
| 10:19 | 8 | A.   Am I allowed to speak to doctors about what -- yeah.  Yes. |
| 10:19 | 9 | I mean, anyone -- anyone from my company, a sales and marketer, |
| 10:19 | 10 | can speak to the label, sure. |
| 10:19 | 11 | Q.   And my question was terrible.  I don't mean you |
| 10:19 | 12 | personally, Susan Geiger.  I mean people working with Janssen, |
| 10:19 | 13 | can they talk to doctors about the label? |
| 10:19 | 14 | A.   Yes.  Sometimes the representatives will use the package |
| 10:19 | 15 | insert to discuss or to share the information with the |
| 10:19 | 16 | physicians.  Sometimes, you know, they sell, right, right off |
| 10:19 | 17 | the package insert. |
| 10:19 | 18 | Q.   And are you, Janssen, are you able -- sorry, Ms. Geiger. |
| 10:19 | 19 | My questions sometimes are bad. |
| 10:20 | 20 | A.   No, I get it.  When you say "you," you mean "us."  I get |
| 10:20 | 21 | it. |
| 10:20 | 22 | Q.   Are you permitted to talk about the clinical trials that |
| 10:20 | 23 | we've talked about, EINSTEIN or ROCKET?  Are you permitted to |
| 10:20 | 24 | talk about those trials when you talk to the doctors? |
| 10:20 | 25 | A.   Yes.  So the first -- the first piece that we can speak to |

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

10:20  1   or the primary piece would be the package insert, and then we

10:20  2   can bring forth and share the publicly available and published

10:20  3   clinical trial that was the basis for that indication.

10:20  4          And all of our communication, all of -- everything

10:20  5   that we sort of proactively speak about or that we can bring up

10:20  6   with physicians is we can draw it from the reprint, but it has

10:20  7   to be only the stuff that is in the label and that's stated in

10:20  8   the label.

10:20  9   Q.   Is it appropriate to go beyond the label, beyond the

10:20  10  package insert, beyond the clinical trials when talking with

10:20  11  doctors?

10:21  12  A.   No.  We're not allowed to bring up anything that is not in

10:21  13  agreement or alignment and proactively talk to doctors about

10:21  14  that unless it is in agreement with what's in the label.  We

10:21  15  can't speak to it or characterize what it means or anything.

10:21  16  Q.   Does the FDA have the opportunity to review every

10:21  17  marketing document that can be provided either to patients or

10:21  18  to doctors?

10:21  19  A.   Yeah.  And as I mentioned before, we come up with a bunch

10:21  20  of different ideas for things we could say based on what we

10:21  21  know.  We put it through a review committee of experts.

10:21  22  Marketing isn't on that committee.  And they decide whether

10:21  23  that is accurate and aligned with the label, and then it leaves

10:21  24  the building.

10:21  25         When that determination is made and before it leaves

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

10:21  1   the building, all of our materials are mailed down to the FDA,
10:21  2   and the FDA is given the opportunity to review and comment on
10:21  3   those.  And if they choose to do so, that letter comes back to
10:21  4   our regulatory team, and we adjust accordingly.
10:21  5   Q.    And Mr. Birchfield gave you an example of that when he was
10:22  6   talking to you about the "at least as effective as."
10:22  7         Do you remember that?
10:22  8   A.    Yes, I do.
10:22  9   Q.    So FDA had the opportunity to review the material, did
10:22  10  review the material, made comments.  And what did Janssen do
10:22  11  when those comments came in?
10:22  12  A.    We changed the label.  I mean, the team at the time -- we
10:22  13  already changed the label.  Pardon me.  The team at the time, I
10:22  14  think, made adjustments to the messaging, because when it was
10:22  15  mentioned, I looked at the website.  The messaging is different
10:22  16  now than it was back then.  So they changed it.
10:22  17  Q.    You mentioned another thing that I think it's fair to the
10:22  18  jury to define.  You said something about the PRC.
10:22  19        What is that?
10:22  20  A.    That's the promotional review committee.  I mentioned
10:22  21  there's a medical -- usually a medical expert there, a medical
10:22  22  information expert, an attorney, a regulatory expert, a health
10:22  23  care compliance expert.
10:23  24        We submit all of our materials and all of the backup
10:23  25  information of materials to the PRC team.  They meet weekly.

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

10:23  1   They review, they provide comments, we make adjustments, and we

10:23  2   ultimately make any changes that they suggest.  And they then

10:23  3   vote.  They need to vote unanimously that, okay, we feel like

10:23  4   this document is okay to leave the building.

10:23  5          Marketing is -- we submit information there, but we

10:23  6   don't have a say in, you know, whether or not it's approved.

10:23  7   Q.   So the PRC with the doctor, the lawyer, the regulatory

10:23  8   expert, the compliance expert, they vote on everything that

10:23  9   comes out of the Janssen promotional materials; correct?

10:23  10  A.   Yeah.  They all have to -- it's online now, but they all

10:23  11  have to mark and say that they approve this to leave the

10:23  12  building.  So, yes, they all vote.  And it has to be unanimous.

10:23  13  Everyone has to weigh in.

10:24  14  Q.   We've got -- there's something you didn't mention there.

10:24  15  There's the doctor, the lawyer, the regulatory, the compliance

10:24  16  expert.  Is there a marketing person on the PRC?

10:24  17  A.   No, there's not.

10:24  18  Q.   You don't get a vote?

10:24  19  A.   No.  We submit, we do a lot of work to make the changes

10:24  20  they request to make sure it's more accurate, and we don't have

10:24  21  a vote.

10:24  22  Q.   I'd like to talk a little bit about some of the witnesses

10:24  23  who are going to come in just when you're done.

10:24  24         Do you know the term "detail representative"?

10:24  25  A.   Yes.  It's kind of an antiquated term, right, "detail."

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

10:24 1    But, yes, it's our sales representatives in the field, the
10:24 2    folks I mentioned earlier that are responsible to inform
10:24 3    physicians about the medication so that the medication -- or so
10:24 4    that the physicians will know about it and hopefully prescribe
10:24 5    it for their patients.
10:25 6    Q.    And for the jury, can we say that the term "detail
10:25 7    representative" and "sales representative" are the same thing?
10:25 8    A.    Oh, yes.  Pharmaceuticals sales representative, detail
10:25 9    rep, sales rep, they're all the same.
10:25 10   Q.    I'm going to ask you a kind of obvious question, but just
10:25 11   bear with me.  Does Janssen -- does anyone from Janssen make
10:25 12   the prescribing decision for any patient for Xarelto?
10:25 13   A.    No.
10:25 14   Q.    Who makes the prescribing decision for those patients?
10:25 15   A.    The physicians, ultimately.  Or I guess now there's nurse
10:25 16   practitioners who can prescribe.  So it's the health care
10:25 17   professional who's caring for that patient and who has the full
10:25 18   benefit of all that patient's information.
10:25 19   Q.    I'm going to show you this mysterious label we've been
10:25 20   talking about.  I'd like to look at Defense Exhibit 10, if I
10:25 21   could.
10:26 22          So do you have a copy of Defense Exhibit 10 in front
10:26 23   of you, Ms. Geiger?
10:26 24   A.    I do.
10:26 25   Q.    All right.  What is Defense Exhibit 10?

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

10:26  1   **A.**   This is our package insert for Xarelto.  It is the package

10:26  2   insert for Xarelto.

10:26  3          **MR. SARVER:**  Your Honor, I'd offer and introduce

10:26  4   Defense Exhibit 10.

10:26  5          **MR. BIRCHFIELD:**  No objection.

10:26  6          **THE COURT:**  Let it be admitted.

10:26  7   BY MR. SARVER:

10:26  8   **Q.**   Let's take a look at the very first page.  I don't know if

10:26  9   our jurors can see it.  But what do you see on page 1 starting

10:26  10  with the highlights of prescribing information?

10:26  11  **A.**   Do you want me to summarize or read it?

10:26  12  **Q.**   Well, let's try to go through it quickly.

10:26  13  **A.**   Sure.  So the very first part is the warnings.  So it

10:26  14  provides guidance on the most important warnings -- it's called

10:26  15  "black box warning" -- that a provider or a patient should know

10:26  16  about Xarelto.

10:26  17         And then the rest is a summary of what they can find.

10:26  18  It's kind of like a table of contents of what they can find in

10:27  19  the subsequent pages.

10:27  20  **Q.**   And in terms of the warnings, let's take a look at page 1

10:27  21  in terms of warnings.  We've got "Warning and Precaution."

10:27  22         Let's go to that first.  "Warning and Precaution,"

10:27  23  Jim, if you don't mind.

10:27  24  **A.**   Okay.  On the first page or in the --

10:27  25  **Q.**   On the very first page.

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

10:27  1    A.   Okay.  Yes, I see it.

10:27  2    Q.   What is the first warning and precaution for Xarelto?

10:27  3    A.   It says, "Risk of bleeding:  Xarelto can cause serious and

10:27  4    fatal bleeding.  Promptly evaluate signs and symptoms of blood

10:27  5    loss."

10:27  6         And then it gives a number of where you can find more

10:27  7    information in the label.

10:27  8    Q.   Have you gone through and taken a look at the number of

10:27  9    times that bleeding is actually referred to in the Xarelto

10:27 10    label?  If you haven't, that's okay.

10:27 11    A.   I haven't counted it, but because I was scanning through

10:27 12    it recently, I feel like it appears on every page.

10:28 13    Q.   A lot of times?

10:28 14    A.   If not more.

10:28 15    Q.   Can we say it's a lot of times?

10:28 16    A.   Yes, a lot of times.

10:28 17    Q.   All right.  To your knowledge, is -- in 2017, August of

10:28 18    2017 on the planet Earth, is there any anticoagulant that you

10:28 19    know of that doesn't have a risk of bleeding?

10:28 20    A.   No, because an anticoagulant thins the blood which can

10:28 21    result in bleeding.  So it's kind of -- you know, it's kind of

10:28 22    what it's supposed to do, is thin the blood, and that can cause

10:28 23    bleeding.

10:28 24    Q.   And if we look at adverse reactions, which I think is just

10:28 25    a little bit down, do you see that, Ms. Collier [verbatim]?

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

| | | |
|---|---|---|
| 10:28 | 1 | **A.**   Yes, I do. |
| 10:28 | 2 | **Q.**   What is the most common adverse reaction? |
| 10:28 | 3 | **A.**   It is bleeding at greater than 5 percent. |
| 10:28 | 4 | **Q.**   All right.  And is there any indication that this is |
| 10:28 | 5 | somehow hidden in the label? |
| 10:28 | 6 | **A.**   No, not at all. |
| 10:28 | 7 | **Q.**   Now, the plaintiff lawyer had asked you about a test |
| 10:29 | 8 | called the PT test.  Do you remember his questions? |
| 10:29 | 9 | **A.**   I do remember him asking me about that. |
| 10:29 | 10 | **Q.**   I'd like you to take a look at Section 12.2 of the label, |
| 10:29 | 11 | if you wouldn't mind. |
| 10:29 | 12 | **A.**   Okay.  Let me just get to it. |
| 10:29 | 13 | **Q.**   All right.  12.2 is a section titled "Pharmacodynamics." |
| 10:29 | 14 | Do you see that? |
| 10:29 | 15 | **A.**   I do. |
| 10:29 | 16 | **Q.**   Would you mind reading the first really one long sentence. |
| 10:29 | 17 | Would you read that for us? |
| 10:29 | 18 | **A.**   Sure.  "Dose-dependent inhibition of Factor Xa -- of |
| 10:29 | 19 | Factor Xa activity was observed in humans."  And then, |
| 10:29 | 20 | "Neoplastin prothrombin time, activated partial thromboplastin |
| 10:29 | 21 | time, and HepTest are prolonged dose-dependently. |
| 10:30 | 22 | Anti-Factor Xa activity is also influenced by rivaroxaban." |
| 10:30 | 23 | **Q.**   So is it fair to say there's an FDA-approved discussion of |
| 10:30 | 24 | PT in the label? |
| 10:30 | 25 | **A.**   Yes.  That appears to be what's here, yes. |

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

10:30  1   **Q.**   Now, I'd like to turn to a different section of the label
10:30  2   if you don't mind.
10:30  3   **A.**   Sure.
10:30  4   **Q.**   It's Section 5.7.  In Section 5.7, the title is "Risk of
10:30  5   Pregnancy-Related Hemorrhoid -- Hemorrhage."
10:30  6   **A.**   Hemorrhage.
10:30  7   **Q.**   There is another discussion that I think might be familiar
10:30  8   to you because I think this is where Mr. Birchfield got the
10:30  9   language that he used when he was talking with you.
10:30  10          Does it look like the same language to you?
10:30  11  **A.**   Yes, about the anticoagulant effect of Xarelto being
10:30  12  monitored?  Yes.
10:30  13  **Q.**   Yes, ma'am.
10:30  14  **A.**   That's where the language is.
10:31  15  **Q.**   Let me read it then.
10:31  16          "The anticoagulant effect of Xarelto cannot be
10:31  17  monitored with standard laboratory testing nor readily
10:31  18  reversed."
10:31  19          Did I read that correctly?
10:31  20  **A.**   That's what it says there.
10:31  21  **Q.**   Is that language that was specifically approved by the FDA
10:31  22  before this label could ever be used by Janssen?
10:31  23  **A.**   Yes, that was labeling that they approved -- or language
10:31  24  they approved.
10:31  25  **Q.**   Now, in order to make sure that sales reps or detail reps

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

10:31  1  do not say things that are not allowed by the FDA, what -- does
10:31  2  Janssen have any mechanisms in place to make sure that doesn't
10:31  3  happen?
10:31  4  **A.**   Yes, we have variety of them.  So I mentioned before that
10:31  5  we put information out there both for representatives and then
10:31  6  for any KOLs who speak for our promotional programs.  We have
10:32  7  specific language that they're trained to speak to and told
10:32  8  that they cannot go off label or off of that group of messages.
10:32  9       We also -- from a sales rep perspective, their
10:32 10  managers travel with them at least a couple days a month, if
10:32 11  not more.  They observe what they're doing.  They provide
10:32 12  coaching.  And then if they see that the representative is not,
10:32 13  you know, promoting on label, they will take action.  Sometimes
10:32 14  they will write them up the first time.  The next time there
10:32 15  might be disciplinary action.  They may be put on a plan, what
10:32 16  have you --
10:32 17       We also have a credo hotline, which is, J&J and
10:32 18  Janssen are really focused on our mission called the credo.
10:32 19  And there's a hotline that anybody can call and say
10:32 20  anonymously, "I saw something happening out there that I don't
10:32 21  think is right," and they can give details.  So that's another
10:32 22  mechanism.
10:32 23       And then physicians can call in.  If they deem that a
10:32 24  representative is being misleading or inaccurate, they can call
10:33 25  the company, and it gets back -- when I was in the sales

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

10:33  1  leadership organization, I would occasionally get calls that
10:33  2  there had been a phone call of someone complaining and we
10:33  3  needed to address it.
10:33  4         So there's a variety of ways we monitor it.  Our
10:33  5  compliance people go out in the field, actually, sometimes too
10:33  6  and make sure that people are doing the right thing.
10:33  7  Q.   All right.  Now I'd like to turn your attention to another
10:33  8  part of the package insert or the label.
10:33  9         Can -- for the jury, can we equate package insert
10:33 10  with label?  Are they the same?
10:33 11  A.   Yes, it's the same thing.
10:33 12  Q.   Fair enough.  Have you heard the term "medication guide"?
10:33 13  A.   Yes --
10:33 14  Q.   What is it?
10:33 15  A.   -- I have.
10:33 16  Q.   What is the medication guide?
10:33 17  A.   I want to say, within the last ten years, the FDA required
10:33 18  this medication guide.  And it is something that -- like, when
10:33 19  I pick up my prescription, you get all that paperwork.  And
10:33 20  that's the medication guide.
10:33 21         So it is maybe like a translation or a summary of the
10:34 22  package insert written in a way to help someone who has been
10:34 23  given the product -- prescribed the product to help them
10:34 24  understand what it is, how it's used, what the risks are, and
10:34 25  what have you.  So it's like a patient summary of, let's say,

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

10:34  1    the package insert.

10:34  2    **Q.**   And who is the intended audience for the medication guide?

10:34  3    **A.**   It is the person who has received the medication as a

10:34  4    prescription.  It's the patient --

10:34  5    **Q.**   So if I go to the pharmacy --

10:34  6    **A.**   -- or the caregiver.

10:34  7    **Q.**   I'm sorry.  I go to the pharmacy and I pick up my

10:34  8    medication, and we've got that paper on the outside.

10:34  9           Is that the medication guide?

10:34  10   **A.**   Right.  Yes.

10:34  11   **Q.**   And who created the medication guide for Xarelto?

10:34  12   **A.**   It comes through the whole FDA labeling process.  It's one

10:34  13   of the required pieces of the FDA-approved label.  So it is,

10:34  14   you know, guided and directed through the FDA.

10:34  15          And the scientists, obviously, in our organization,

10:35  16   because they work with the FDA, they usually are the ones that

10:35  17   write it.  Or somebody does.

10:35  18   **Q.**   Does the medication guide for Xarelto warn about the risk

10:35  19   of bleeding?

10:35  20   **A.**   Yes, it does.

10:35  21   **Q.**   Let's turn, if we could, together -- it's in Defense

10:35  22   Exhibit 10.  And if we turn to page 41 of 46.

10:35  23   **A.**   Yep.

10:35  24   **Q.**   Do you see?  Is that the medication guide?

10:35  25   **A.**   That is.

SUSAN GEIGER - CROSS

| | | |
|--|--|--|
| 10:35 | 1 | **Q.**   And looking down almost directly in the middle of the |
| 10:35 | 2 | page, do you see a bullet point -- |
| 10:35 | 3 |          **MR. SARVER:**  This is the medication guide.  Thank |
| 10:35 | 4 | you, Jim. |
| 10:35 | 5 | **BY MR. SARVER:** |
| 10:35 | 6 | **Q.**   Let's move down to the bullet point in the middle of the |
| 10:35 | 7 | page. |
| 10:35 | 8 |          What do we see here?  What do you see? |
| 10:35 | 9 | **A.**   I see a bullet that says "Xarelto can cause bleeding" in |
| 10:35 | 10 | bold.  And then there's the rest of the sentence talking about |
| 10:35 | 11 | how bleeding can be serious and rarely may lead to death. |
| 10:36 | 12 | **Q.**   And if we follow are little farther down, do you -- let me |
| 10:36 | 13 | the line for you. |
| 10:36 | 14 |          "You may have a higher risk of bleeding if you take |
| 10:36 | 15 | Xarelto and take other medicines that increase your risk of |
| 10:36 | 16 | bleeding, including" -- the first bullet point -- "aspirin or |
| 10:36 | 17 | aspirin-containing products." |
| 10:36 | 18 |          Is that information provided to patients? |
| 10:36 | 19 | **A.**   Yes, it is. |
| 10:36 | 20 | **Q.**   Is that information that was approved by the FDA? |
| 10:36 | 21 | **A.**   Yes.  The FDA requires this. |
| 10:36 | 22 | **Q.**   And if we look at -- again, we're still on the first page |
| 10:36 | 23 | of the medication guide. |
| 10:36 | 24 |          Is the -- very beginning, does it say to patients, |
| 10:36 | 25 | "What is the most important information that I should know |

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

10:36   1    about Xarelto?"  Do you see that?

10:36   2    **A.**   I do.  That's what it says.

10:36   3    **Q.**   And is that a good thing to tell patients?

10:36   4    **A.**   Yeah.  I think that a package insert can be really

10:36   5    daunting.  I know it's daunting to me because there's parts of

10:37   6    it about pharmacology that I really am not an expert in.

10:37   7            So, for me, this is really helpful if my mom got

10:37   8    Xarelto or if someone I know got it, this kind of puts in more

10:37   9    regular terms what it is and what they should be, you know,

10:37   10   watching for.  I think it's really helpful, frankly.

10:37   11   **Q.**   Now, I'm going to ask you a question, and I don't know if

10:37   12   you know the answer to this.

10:37   13           Do you know any of the details about the EINSTEIN

10:37   14   clinical trial that was studied where patients were studied

10:37   15   with the indication that Ms. Mingo has?  Are you familiar with

10:37   16   the details of EINSTEIN?

10:37   17   **A.**   I'm familiar with it as far as, you know, maybe like the

10:37   18   publication that came out or what's in the package insert.

10:37   19   Beyond that, I didn't -- of all the indications, I spent almost

10:37   20   zero time in that arena.  So I really don't -- I can't comment,

10:37   21   you know, beyond what's publicly available, I suppose.

10:37   22   **Q.**   That's the answer I needed to know.  We're not going to

10:37   23   move on.  We're not going to -- we'll have somebody else talk

10:37   24   about that.

10:37   25   **A.**   Okay.

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - CROSS

| 10:37 | 1 | **Q.**   In fact, let me wrap this up. |
| 10:38 | 2 | **A.**   Sure. |
| 10:38 | 3 | **Q.**   Ms. Geiger, you were shown documents from Mr. Birchfield |
| 10:38 | 4 | that talked about a blockbuster drug. |
| 10:38 | 5 | Do you remember that? |
| 10:38 | 6 | **A.**   I do. |
| 10:38 | 7 | **Q.**   And that there was a hope that Xarelto would be a big, |
| 10:38 | 8 | important drug for Janssen; correct?  Do you remember that? |
| 10:38 | 9 | **A.**   That's true.  I do. |
| 10:38 | 10 | **Q.**   In order for any medicine to become a blockbuster |
| 10:38 | 11 | medicine, what is the most important thing that must be there? |
| 10:38 | 12 | **A.**   Well, it must be deemed safe and effective and approved by |
| 10:38 | 13 | the FDA to be used in patients.  That's the -- you can have a |
| 10:38 | 14 | lot of clinical trials about a lot of things; but unless the |
| 10:38 | 15 | FDA approves it and tells you exactly how to use it and what |
| 10:38 | 16 | you can say about it, it can't be of benefit to anyone. |
| 10:38 | 17 | **Q.**   And Xarelto's been used by patients and doctors now for, |
| 10:38 | 18 | what?  Going on six years? |
| 10:39 | 19 | **A.**   Yeah.  July of '11.  Sure. |
| 10:39 | 20 | **Q.**   And in your experience with doctors who use your medicine, |
| 10:39 | 21 | are they -- are they smart people? |
| 10:39 | 22 | **A.**   Yes.  They're very smart.  I come from a physician family. |
| 10:39 | 23 | So I'd be cut off at the knees if I implied anything otherwise. |
| 10:39 | 24 | They're smart. |
| 10:39 | 25 | **Q.**   And in your experience, are they caring doctors?  Do they |

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - REDIRECT

| | | |
|---|---|---|
| 10:39 | 1 | care about their patients? |
| 10:39 | 2 | **A.**   Absolutely.  I don't think you could be a doctor today if |
| 10:39 | 3 | you didn't love what you did.  It's hard. |
| 10:39 | 4 | **Q.**   If Xarelto didn't work well for patients, would Xarelto |
| 10:39 | 5 | ever become a blockbuster drug? |
| 10:39 | 6 | **A.**   No.  Physicians, if they try a product, especially one |
| 10:39 | 7 | like Xarelto, and it doesn't work, they're going to move on.  I |
| 10:39 | 8 | mean, it's more of a hassle for them if it doesn't work. |
| 10:39 | 9 | Right?  There's risks. |
| 10:39 | 10 | **Q.**   Xarelto continues to be approved as safe and effective by |
| 10:39 | 11 | the FDA, used by doctors, as we sit here today in Jackson, |
| 10:40 | 12 | Mississippi; correct? |
| 10:40 | 13 | **A.**   It is.  It's on the market for many indications and still |
| 10:40 | 14 | being used by a lot of patients who benefit from it. |
| 10:40 | 15 | **MR. SARVER:**  Thank you very much, Ms. Geiger. |
| 10:40 | 16 | **THE COURT:**  Any redirect? |
| 10:40 | 17 | **MR. BIRCHFIELD:**  Thank you, Your Honor. |
| 10:40 | 18 | **REDIRECT EXAMINATION** |
| 10:40 | 19 | BY MR. BIRCHFIELD: |
| 10:40 | 20 | **Q.**   Ms. Geiger, I want to address the issue of separation of |
| 10:40 | 21 | church and state that you described, separation at this point |
| 10:40 | 22 | in science and marketing. |
| 10:40 | 23 | Do you recall that? |
| 10:40 | 24 | **A.**   I do. |
| 10:40 | 25 | **Q.**   You said there's separation just like separation between |

SUSAN GEIGER - REDIRECT

10:40  1   church and state; right?

10:40  2   A.    That's how I see it.

10:40  3   Q.    And that's the way it should work; right?

10:40  4   A.    Sure.

10:40  5   Q.    I mean, you should -- you should have -- you should have

10:41  6   science that is determining how the drug should work, how the

10:41  7   drug actually does work in human patients, in real patients

10:41  8   suffering from disease.  They should make those science

10:41  9   decisions, the medical decisions.

10:41  10          And then after that's determined, then you have

10:41  11  marketing making the messages that would be used to sell the

10:41  12  drug; right?

10:41  13  A.    That's how I see my role.  Absolutely.

10:41  14  Q.    Okay.  And --

10:41  15  A.    I'm a recipient of the science.

10:41  16          **THE COURT:**  Counsel, I understand we need to take a

10:41  17  break for one of jurors.  Let's take a break at this time, a

10:41  18  ten-minute break.  We'll be right back.

10:41  19          **THE DEPUTY CLERK:**  All rise.

10:41  20          (WHEREUPON, the jury exited the courtroom.)

10:41  21          (WHEREUPON, the Court took a recess.)

10:53  22          **THE DEPUTY CLERK:**  All rise.

10:53  23          (WHEREUPON, the jury entered the courtroom.)

10:54  24          **THE COURT:**  Okay.  Be seated, please.  Let's

10:54  25  continue.

SUSAN GEIGER - REDIRECT

**BY MR. BIRCHFIELD:**

**Q.**   Ms. Geiger, when we left off, you were talking about the separation between science and marketing; right?

**A.**   Yes.

         **THE COURT:**  You're cutting off and on.  Let's fix that.  That's a little bit better.

**BY MR. BIRCHFIELD:**

**Q.**   All right.  And you said that there should be a wall of separation between marketing and science; right?  That's the way it should work?

**A.**   I said separation of church and state.  It doesn't mean people don't talk to each other, but the decision rights are very clear who decides what on which side.

**Q.**   And if marketing is weighing in on important science issues like whether there should be an antidote with the drug, that be a problem; right?

**A.**   I think it just depends on the decision.  Right?  People can talk to each other, but who makes the ultimate decision?  Who's in charge?  Who has the decision rights?

**Q.**   Okay.  But if marketing is weighing in on important science issues, that's not -- if you're saying they're talking, they're influencing, they're having a major influence on these decisions, the science decisions, that's a problem; right?

         **MR. SARVER:**  Objection, Your Honor.  Asked and answered.

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - REDIRECT

10:55  1          **THE WITNESS:**  It's a little hard to hear what you're

10:55  2  saying.  It's cutting up a lot.

10:55  3          **THE COURT:**  See if you can help him, somebody.

10:55  4  BY MR. BIRCHFIELD:

10:55  5  **Q.**   So, Ms. Geiger, tell us what, if you know, what marketing

10:55  6  influences on science issues.  Who are some marketing people

10:56  7  that weighed in on science issues related to Xarelto?

10:56  8  **A.**   I don't know specifically who weighed in on what science

10:56  9  issues.  I know that everything about the product is discussed

10:56  10 by all the stakeholders.  It's just who has the decision rights

10:56  11 and who's in charge of making decisions.

10:56  12 **Q.**   Okay.  All right.  So to suggest that there is a wall of

10:56  13 separation between science and masking, that's not really the

10:56  14 way it worked with Xarelto; true?

10:56  15 **A.**   When it comes to -- well, with anything, right, there

10:56  16 is -- you've probably seen it in the news.  When you talk about

10:56  17 separation of church and state, it's this idea that there's

10:56  18 certain people responsible for certain decisions and they

10:56  19 are -- they are the experts in that area.

10:56  20          So it doesn't preclude the ability to talk to one

10:56  21 another.  But scientific decisions are made by the scientist;

10:56  22 commercial decisions are made by the commercial or marketing

10:56  23 people.

10:56  24 **Q.**   And so if there is a decision point with Xarelto about

10:57  25 whether to do a dose-finding study to see if a lower dose would

SUSAN GEIGER - REDIRECT

10:57  1   be effective, if marketing's input controlled that decision,
10:57  2   that would be wrong, wouldn't it?
10:57  3   A.   Marketing doesn't control that decision, so it wouldn't
10:57  4   have happened.
10:57  5   Q.   All right.  Do you know of any -- you personally.  Do you
10:57  6   know of any circumstances where marketing suggested one course
10:57  7   and science suggested another course and the marketing view
10:57  8   prevailed regarding Xarelto?
10:57  9   A.   I am not aware of any situations like that.
10:57  10  Q.   Okay.  All right.  I want to turn to one other issue right
10:57  11  now.  So you said -- you were asked by Mr. Sarver about a
10:57  12  rush -- a rush to market with Xarelto.
10:58  13       Do you recall that discussion?
10:58  14  A.   I do.
10:58  15  Q.   And you said that it is not possible; right?
10:58  16  A.   Right.
10:58  17  Q.   Okay.  And in that discussion, there was -- the point was
10:58  18  made that Xarelto was not the first to the market; Pradaxa was.
10:58  19       Do you recall that?
10:58  20  A.   That's correct.  Yep.
10:58  21  Q.   Okay.  But just because Pradaxa won and got to the market
10:58  22  first doesn't mean that you weren't trying -- you weren't
10:58  23  making an effort to get Xarelto to the market first, does it?
10:58  24  A.   So like I said before, we don't have control of how fast
10:58  25  studies accrue or finish or the FDA.  So we always desire to be

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - REDIRECT

10:59  1    on the market and be first or get there, you know, as soon as
10:59  2    we can because we think there's a great advantage to Xarelto
10:59  3    and a big unmet need.  But I can't push the gas or the brake on
10:59  4    that.  I'm not -- that's not, you know, in my purview.
10:59  5    Q.   Was there a push at Janssen to get Xarelto to the market
10:59  6    first among the NOACs?
10:59  7    A.   I don't know how we at Janssen would have pushed that
10:59  8    other than encouraging that the studies started when they were
10:59  9    supposed to, and then you've got it wait and see what happens
10:59  10   when they end.
10:59  11   Q.   Let's see if we can identify some ways that you could rush
10:59  12   to the market.
10:59  13         One is when you're -- you were talking about the
10:59  14   clinical studies, the various clinical studies that were done
10:59  15   for the different indications of Xarelto; right?
10:59  16   A.   Yep.
10:59  17   Q.   Okay.  And if you're doing one of those clinical studies
11:00  18   and it's discovered that there are major problems with that
11:00  19   clinical study, one option would be to stop and start over;
11:00  20   right?
11:00  21   A.   There's all of this structure around clinical trials, and
11:00  22   I'm not sort of a clinical trial expert.  But there's something
11:00  23   called an independent data monitoring committee.  So there's
11:00  24   like a third party that monitors studies and make decisions
11:00  25   like that.

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - REDIRECT

**Q.**   But my question is, the -- the company, if there are major problems that are identified, they have the option of starting over; right?

**A.**   I don't know that to be true or not.  Like I say, I don't -- I don't have all the nuances of how clinical trials are run.  I just know there's a thing called an independent data monitoring committee or data monitoring committee, some group that manages it all.

**Q.**   Okay.  So when you say you don't know whether that can happen or not, when you told us -- you told the jury that it's not possible to rush, this would be one example where you could rush and you just don't know about it; right?

**A.**   I guess I don't understand what you're asking.  You are saying marketing could rush a product to market?  That's at the hands of the -- how fast the clinical trial goes.  And I'm not aware of anything I could do to make a clinical trial move faster.

**Q.**   Well, Ms. Geiger, if you have major problems with a clinical trial, major problems are identified and you have to decide whether you push forward despite those problems or you start over and do it right, that would take longer, wouldn't it?

**A.**   The researchers who start studies make all those decisions.

**Q.**   Ms. Geiger, will you please answer the question.

SUSAN GEIGER - REDIRECT

1      Would it take longer to stop the clinical trial and
2  start over?
3          THE COURT:  Now, wait a minute.  If she knows.
4          THE WITNESS:  I would imagine --
5          THE COURT:  Yeah, she's guessing at this point.
6  She's in advertising and the commercial end, and you're asking
7  questions dealing with the scientific end.  So you've got to --
8  you're moving into an area that she's guessing at, I guess.
9          MR. BIRCHFIELD:  Right.  I was just -- I was just
10 challenging her.  When she said that it's not possible to rush,
11 I thought that I'd give some decision points that --
12 BY MR. BIRCHFIELD:
13 Q.   One way that you could rush a drug to market is choosing
14 not to do additional dosing studies; right?
15 A.   In marketing, we don't make those choices.  So I
16 couldn't -- or I, being my whole marketing team, doesn't make
17 those choices.
18 Q.   So if someone in the marketing department was weighing in
19 on dosing, that took place at a level higher than you.  Is that
20 what you're telling us?
21 A.   Yes, it must have.
22         MR. SARVER:  Objection.
23         THE WITNESS:  People have a lot of opinions.  But
24 unless you can make the decision or are charged with making the
25 decision, you can say what you want.

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - REDIRECT

11:03   1          **MR. SARVER:**  It's asking for speculation, Your Honor.

11:03   2          **THE COURT:**  I sustain that, and I agree with that.

11:03   3   BY MR. BIRCHFIELD:

11:03   4   Q.    If -- could you -- could marketing weigh in on whether or

11:03   5   not there is an antidote?  Would that be appropriate for

11:03   6   marketing to weigh in on whether there was an antidote for the

11:03   7   drug?

11:03   8   A.    Again, that's on the science side of things.  Right?  I --

11:03   9   whether there is or isn't an antidote is a fact out in the

11:03  10   world somewhere.  Right?  It's not something I -- whether some

11:03  11   doctor somewhere creates an antidote or not is not in my

11:03  12   control.

11:03  13   Q.    Would the drug get to market faster without developing an

11:03  14   antidote to go along with it?

11:03  15          **MR. SARVER:**  Again, Your Honor, object.  Speculation.

11:03  16          **THE COURT:**  Wait just a moment.  I sustain that

11:04  17   objection.  Let's go to the next question.

11:04  18   BY MR. BIRCHFIELD:

11:04  19   Q.    Just very briefly, you talked about the different studies

11:04  20   that were done for the various indications for Xarelto.

11:04  21          Do you remember that?

11:04  22   A.    I do, yes.

11:04  23   Q.    You talked about AFib and the DVT indication; right?

11:04  24   A.    Yes.

11:04  25   Q.    And the DVT treatment and the prophylaxis of preventing

OFFICIAL REALTIME TRANSCRIPT

11:04  1  DVT; right?

11:04  2  **A.**   Yes.  That's all in the label.

11:04  3  **Q.**   And one thing that's common in all those studies is that

11:04  4  the bleeding risk was evaluated in each of those studies;

11:04  5  right?

11:04  6  **A.**   Yes.  Every anticoagulant has the chance of bleeding.

11:04  7  **Q.**   And on the -- if you'll take a look at the label.  I think

11:04  8  it's Defense Exhibit 10.

11:04  9         **MR. SARVER:**  10.

11:04  10  **BY MR. BIRCHFIELD:**

11:04  11  **Q.**   Do you have the label, Ms. Geiger?

11:04  12  **A.**   I do.  Yes, it's here.

11:05  13  **Q.**   All right.  And you were asked about bleeding risks.

11:05  14         Do you recall that?

11:05  15  **A.**   I do.

11:05  16  **Q.**   You talked about bleeding is mentioned throughout the

11:05  17  label multiple times?

11:05  18  **A.**   Yes, it is and in all of our materials as well.

11:05  19  **Q.**   Right.  And do you understand that Ms. Mingo is not making

11:05  20  a failure-to-warn claim but rather a failure-to-instruct claim?

11:05  21  **A.**   I wouldn't have any way to understand that.  If that's

11:05  22  what you say, then -- you're the attorney.  You would know.

11:05  23  **Q.**   All right.  So, Ms. Geiger, will you take a look -- will

11:05  24  you show us where in the label there is an instruction about

11:05  25  using laboratory testing to identify patients at an extra-high

SUSAN GEIGER - REDIRECT

11:06  1  risk on Xarelto?

11:06  2  **A.**   Do you want me to go through it?  I mean, there's some

11:06  3  pharmacologic stuff.  Where do you want me to look?

11:06  4  **Q.**   I suggest to you, Ms. Geiger, that there's not any

11:06  5  instructions about using a laboratory test to identify at-risk

11:06  6  patients.  But if you think that's in the label, I would ask

11:06  7  you to identify it for us, please.

11:06  8  **A.**   I know that there's a statement in the label that Xarelto

11:06  9  can be administered and that there's no routine monitoring

11:06  10  required.  I think there's something in pharmacology about --

11:06  11  that we read before about these testing and pharmacodynamics.

11:06  12      The FDA approved Xarelto without a requirement for

11:06  13  routine monitoring.  That's how it was studied in its clinical

11:06  14  studies.  That's how it was approved, and that's how we should

11:06  15  talk about using it.

11:06  16  **Q.**   All right.  So can we agree that there is not any

11:06  17  instructions in the label for doctors to use laboratory testing

11:07  18  to identify at-risk patients?

11:07  19      **THE COURT:**  Wait just a moment.

11:07  20      **MR. SARVER:**  Objection, Your Honor.  It misstates her

11:07  21  testimony.  She answered that very question just a moment ago.

11:07  22      **THE COURT:**  She's under cross.  I'll allow him to do

11:07  23  that.

11:07  24      **MR. SARVER:**  Thank you, Your Honor.

11:07  25      **THE WITNESS:**  I'm sorry.  Can you ask your question

SUSAN GEIGER - REDIRECT

11:07  1   again?  Are you waiting for an answer from me?  I'm not clear.
11:07  2   BY MR. BIRCHFIELD:
11:07  3   Q.   Are there any instructions for a doctor to use laboratory
11:07  4   testing to identify patients at an extra-high risk on Xarelto?
11:07  5          THE COURT:  If you know, ma'am.
11:07  6          THE WITNESS:  No, I've never heard of any tests that
11:07  7   can predict a patient bleeding or risk of -- I never heard of
11:07  8   that.  There's all this stuff about prothrombin time, about how
11:07  9   fast your blood clots, but not about whether you will bleed or
11:08  10  not.
11:08  11  BY MR. BIRCHFIELD:
11:08  12  Q.   There's all this stuff about prothrombin time.
11:08  13         What are you talking about?  Tell us about that.  You
11:08  14  just volunteered that.
11:08  15  A.   Well, one of the other attorneys had me read a statement
11:08  16  about prothrombin time, and so I -- that's, I guess, in this
11:08  17  pharmacology part.  And it talks about pharmacodynamics, and
11:08  18  that talks about prothrombin time.
11:08  19  Q.   Okay.  All right.  But it doesn't provide any instructions
11:08  20  for using prothrombin time to identify patients at an
11:08  21  extra-high risk of bleeding, does it, Ms. Geiger?
11:08  22  A.   No.  I've never seen anything about predicting risks of
11:08  23  bleed.  If we could, that would be great.
11:08  24  Q.   If you could provide information about risk for bleeding,
11:08  25  that would be great?  That would be something you would want to

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - REDIRECT

11:08  1   do?

11:08  2   A.   If the FDA had a test that could -- or if there existed a

11:08  3   test that could predict someone who could bleed, we would --

11:08  4   you know, if it was in the label, we'd definitely use it.  We

11:08  5   don't want that to happen to patients.  We want them to -- to,

11:09  6   you know, be able to use the product safely and effectively and

11:09  7   have a good experience.

11:09  8   Q.   Okay.  All right.  I want to wrap it up with this.  I want

11:09  9   to ask you a couple of true/false questions.  Okay?

11:09  10  A.   Okay.

11:09  11  Q.   The manufacturer -- I'm going to ask you if this is true

11:09  12  or false.  The manufacturer bears responsibility at all times

11:09  13  for the contents of its labels at all times.

11:10  14         Ms. Geiger, is the answer to that question true,

11:10  15  false, or you don't know?

11:10  16  A.   It was really hard for me to hear what you were saying and

11:10  17  writing behind the board.  So if you don't mind repeating it,

11:10  18  I'd be happy it answer.

11:10  19  Q.   Sure.  The manufacturer bears responsibility for the

11:10  20  contents of its label at all times?

11:10  21  A.   We have responsibility to -- to, you know, make -- we have

11:10  22  responsibility to provide the inputs, and the FDA has the

11:10  23  responsibility to deem the final label.

11:10  24         So if that's a true/false, I would say it's probably

11:10  25  true.

OFFICIAL REALTIME TRANSCRIPT

SUSAN GEIGER - REDIRECT

11:10  1    Q.   Okay.  All right.  So you're qualifying that a little bit.
11:10  2    I want to know what you want me to indicate as your answer
11:10  3    here.  Is it true, false, or I don't know?
11:11  4    A.   That Bayer has a responsibility to update the label?
11:11  5    Q.   The manufacturer bears responsibility for the contents of
11:11  6    its label at all times.
11:11  7    A.   I'm going to say I don't know because I don't know who --
11:11  8    you know, I feel like the FDA has a responsibility for the
11:11  9    label as well.  So I'd say I don't know.
11:11  10   Q.   One more.  The manufacturer is charged -- whoops; I messed
11:11  11   that up -- is charged both with crafting an adequate label and
11:12  12   with ensuring that its warnings remain adequate as long as the
11:12  13   drug is on the market.
11:13  14         Are you with me there, Ms. Geiger?
11:13  15         The manufacturer is charged both with crafting an
11:13  16   adequate label and with ensuring that its warnings remain
11:13  17   adequate as long as the drug is on the market.
11:13  18         Is that true or false or I don't know?
11:13  19   A.   In partnership with the FDA, I would say that was true.
11:13  20   Q.   Okay.  But that's not the question.
11:13  21         The question is, the manufacturer is -- so is that
11:13  22   true or false?
11:13  23   A.   So it's our responsibility to take any data that avails
11:13  24   itself, submit it to the FDA for consideration and discussion
11:13  25   in the label.

SUSAN GEIGER - REDIRECT

| | | |
|---|---|---|
| 11:13 | 1 | So the way you've written that I don't think fully |
| 11:13 | 2 | characterizes how it works.  So it's not an easy yes, no, or "I |
| 11:14 | 3 | don't know" question. |
| 11:14 | 4 | Q.   All right.  So will you answer true, false, or don't know? |
| 11:14 | 5 | MR. SARVER:  Your Honor -- |
| 11:14 | 6 | THE COURT:  Wait.  She said -- come on now.  She said |
| 11:14 | 7 | what she said.  She said, as I understand it, it's not fully |
| 11:14 | 8 | accurate.  She feels that the FDA has to weigh in on it.  So |
| 11:14 | 9 | it's not an unknown.  It's not -- she qualifies it. |
| 11:14 | 10 | BY MR. BIRCHFIELD: |
| 11:14 | 11 | Q.   Ms. Geiger, have you had any training on regulatory |
| 11:14 | 12 | obligations of the company? |
| 11:14 | 13 | A.   No.  I mean, that's why -- well, regulatory obligations, |
| 11:14 | 14 | as far as what I, as a marketer, can do and not do, we have |
| 11:14 | 15 | compliance training about how we can act as a pharmaceutical |
| 11:14 | 16 | company every year.  I'm not a trained regulatory expert. |
| 11:14 | 17 | Q.   What training have you received on the regulatory |
| 11:14 | 18 | obligations of the manufacturer with the FDA? |
| 11:15 | 19 | A.   None.  That's why it's really difficult for me to answer |
| 11:15 | 20 | all those questions.  I just am not a regulatory expert.  I |
| 11:15 | 21 | just know what I've experienced. |
| 11:15 | 22 | THE COURT:  Is that it? |
| 11:15 | 23 | MR. BIRCHFIELD:  I think so, Your Honor.  Could I |
| 11:15 | 24 | have one second, please, sir? |
| 11:15 | 25 | That's all I have, Your Honor. |

SHAWN RAQUEL COLLIER - DIRECT

| | | |
|---|---|---|
| 11:15 | 1 | **THE COURT:**  All right.  Let's call the next witness, |
| 11:15 | 2 | please. |
| 11:15 | 3 | **MR. HONNOLD:**  Your Honor, the plaintiffs would like |
| 11:15 | 4 | to call Shawn Collier to the stand. |
| 11:16 | 5 | **MR. SARVER:**  Your Honor, we've got our witness here, |
| 11:16 | 6 | but I believe she's -- |
| 11:16 | 7 | **THE COURT:**  Yes.  We need a moment. |
| 11:18 | 8 | Thank you very much. |
| 11:18 | 9 | Swear her in, Dean. |
| 11:18 | 10 | **THE DEPUTY CLERK:**  Yes, sir. |
| 11:18 | 11 | (WHEREUPON, **SHAWN RAQUEL COLLIER**, having been duly |
| 11:18 | 12 | sworn, testified as follows**:)** |
| 11:18 | 13 | **THE DEPUTY CLERK:**  Please have a seat.  State and |
| 11:18 | 14 | spell your name for the record, ma'am. |
| 11:19 | 15 | **THE WITNESS:**  My name is Shawn Raquel Collier, |
| 11:19 | 16 | spelled S-H-A-W-N, R-A-Q-U-E-L, Collier, C-O-L-L-I-E-R. |
| 11:19 | 17 | **DIRECT EXAMINATION** |
| 11:19 | 18 | BY MR. HONNOLD: |
| 11:19 | 19 | **Q.**   Ms. Collier, good morning. |
| 11:19 | 20 | **A.**   Good morning. |
| 11:19 | 21 | **Q.**   How are you today? |
| 11:19 | 22 | **A.**   I'm okay.  I'm nervous. |
| 11:19 | 23 | **Q.**   We met before today; right? |
| 11:19 | 24 | **A.**   Yes, sir, we have. |
| 11:19 | 25 | **Q.**   You said that you're nervous? |

SHAWN RAQUEL COLLIER - DIRECT

11:19  1   **A.**   Of course.

11:19  2   **Q.**   You've never testified in federal court before?

11:19  3   **A.**   No, sir.

11:19  4   **Q.**   Okay.  We'll try to get through it together.

11:19  5           We met before previously when we took your deposition

11:19  6   in this case back on September 20th, 2016.  Do you remember

11:19  7   that?

11:20  8   **A.**   Yes, sir.

11:20  9           **MR. HONNOLD:**  Your Honor, may I approach with a copy

11:20  10  of the deposition?

11:20  11          **THE COURT:**  Sure.

11:20  12  BY MR. HONNOLD:

11:20  13  **Q.**   I'm going to put before you, Ms. Collier, a copy of that

11:20  14  deposition, your sworn testimony that day in case we need to

11:20  15  refer to it.

11:20  16  **A.**   Okay.

11:20  17  **Q.**   A couple of things about the deposition, ma'am.  You

11:20  18  recall -- just background, so we don't need to go through it if

11:20  19  we get to it.  Before today, we did have the opportunity to

11:20  20  take your deposition in this case; right?

11:20  21  **A.**   Yes.

11:20  22  **Q.**   And just like you were sworn in here today, you were sworn

11:20  23  in at your deposition; correct?

11:20  24  **A.**   Yes.

11:20  25  **Q.**   That day, September 20th, 2016, you know that you swore to

OFFICIAL REALTIME TRANSCRIPT

SHAWN RAQUEL COLLIER - DIRECT

11:20   1    tell the truth and give your full and complete answers?

11:20   2              MR. SARVER:  Your Honor, these are not proper

11:20   3    questions.  There's no impeachment going on.

11:20   4              THE COURT:  What are you doing?

11:20   5              MR. HONNOLD:  I just want to have it clear that the

11:21   6    background for the deposition, so that's done so I don't have

11:21   7    to go through that, because I think we will be visiting it.

11:21   8              THE COURT:  All right.  Let's get it done.

11:21   9    BY MR. HONNOLD:

11:21   10   Q.   You recall that, and you gave me your best answers that

11:21   11   day; correct?

11:21   12   A.   Yes, sir.

11:21   13   Q.   And you mentioned your name, Shawn Collier; correct?

11:21   14   A.   Yes, sir.

11:21   15   Q.   You're employed by Janssen; is that right?

11:21   16   A.   Yes, sir.

11:21   17   Q.   You are a pharmaceutical sales representative; is that

11:21   18   correct?

11:21   19   A.   Professional sales representative, yes, sir.

11:21   20   Q.   Professional sales representative.  "Professional" meaning

11:21   21   you get paid for it?  Or you call on professionals to do it?

11:21   22   A.   It's just the title that's on my business card.

11:21   23   Q.   So you're a professional sales representative and you work

11:21   24   for Janssen; is that correct?

11:21   25   A.   That's correct.

SHAWN RAQUEL COLLIER - DIRECT

11:21  1   **Q.**   You've been employed for Janssen since April of 2013; is
11:21  2   that correct?
11:21  3   **A.**   Yes, sir.
11:21  4   **Q.**   And the particular lines of medications that you are
11:21  5   responsible for with Janssen include both the drug Xarelto and
11:21  6   another medication called Invokana; correct?
11:21  7   **A.**   Yes, sir.
11:21  8   **Q.**   Invokana is a diabetes medication; is that right?
11:22  9   **A.**   Yes, sir.
11:22  10  **Q.**   So you've spent and have spent -- since your date of hire,
11:22  11  you've spent your professional time on educating physicians,
11:22  12  marketing to physicians, attempting to sell physicians, or
11:22  13  encouraging the prescription of both of those medications; is
11:22  14  that right?
11:22  15  **A.**   I go into my physicians' offices and, with time allowed,
11:22  16  answer the questions they may have regarding the medicines I'm
11:22  17  there to talk about.
11:22  18  **Q.**   Certainly you agree that education is an important role in
11:22  19  your job as a professional sales representative; is that
11:22  20  correct?
11:22  21  **A.**   Yes, sir.
11:22  22  **Q.**   It is your goal -- it is one of your objectives of your
11:22  23  job to educate physicians and provide them about information
11:22  24  about the products that you are promoting; correct?
11:22  25  **A.**   It is.  How do I say this?  It is just -- I consider

OFFICIAL REALTIME TRANSCRIPT

SHAWN RAQUEL COLLIER - DIRECT

| | | |
|---|---|---|
| 11:22 | 1 | myself just one resource to the physician.  There's not |
| 11:23 | 2 | necessarily a goal involved, but I'm just a resource.  So if |
| 11:23 | 3 | I'm there and they have any questions about any of the |
| 11:23 | 4 | medicines that I represent, they can ask me at that time. |
| 11:23 | 5 | Q.   Okay.  And I'll just show you how this is going to go. |
| 11:23 | 6 | Okay? |
| 11:23 | 7 | A.   Yes, sir. |
| 11:23 | 8 | Q.   The question I asked, would you agree with me that one of |
| 11:23 | 9 | you roles as a pharmaceutical sales rep is to educate doctors |
| 11:23 | 10 | about the products you sell?  I asked you that question; right? |
| 11:23 | 11 | A.   Yes, sir. |
| 11:23 | 12 | Q.   And why don't you turn to your deposition there before |
| 11:23 | 13 | you, page 7.  Go to page 7. |
| 11:23 | 14 | MR. SARVER:  Your Honor, she didn't disagree with |
| 11:23 | 15 | him.  There's no impeachment here. |
| 11:23 | 16 | THE COURT:  Well, is there impeachment? |
| 11:23 | 17 | MR. HONNOLD:  I'm just trying to get short, succinct |
| 11:23 | 18 | answers on certain things.  When I asked her that question at |
| 11:23 | 19 | her deposition, her simple answer was yes. |
| 11:23 | 20 | MR. SARVER:  Your Honor, that's not fair.  Nobody can |
| 11:23 | 21 | remember precisely the verbatim transcript of something taken |
| 11:23 | 22 | long ago.  If she gives an answer that's consistent, that's |
| 11:23 | 23 | fine.  He doesn't get to impeach just because he doesn't get |
| 11:23 | 24 | the precise word. |
| 11:24 | 25 | THE COURT:  I sustain that objection. |

SHAWN RAQUEL COLLIER - DIRECT

BY MR. HONNOLD:

Q.   One of your jobs is to educate doctors; right?

A.   Yes, sir.

Q.   There's also no doubt that you were also a sales person in terms of the job that you performed; is that true?

A.   Yes, sir.

Q.   You are judged by Janssen based upon how well you sell their products; correct?

A.   That is one measurement, but there's other things that are involved with how I'm, to use your word, judged.

Q.   But in terms of how you were evaluated by Janssen, one important way that you were evaluated is based upon how well you sell their products in terms of volume and amount; correct?

A.   Yes, sir.

Q.   And, in fact, Janssen provides you very routinely and regularly with materials that set forth the details of your sales figures as to whether they're going up or going down and the details about your sales to specific physicians; correct?

A.   Would you reask the question?  I'm sorry.

Q.   Sure.  You were provided by Janssen, on a very routine basis, with regular information that outlines your sales in terms of amount of sales and who those sales are being made to; correct?

A.   Who -- the prescribers who are writing the scrips, yes, sir.

SHAWN RAQUEL COLLIER - DIRECT

11:25    1    **Q.**    You know at any given point in time you have up-to-date

11:25    2    information as to the physicians that you call on, as to

11:25    3    whether the prescriptions that they're writing, whether they're

11:25    4    trending going up, staying the same, or going down; correct?

11:25    5    **A.**    Well, "up-to-date" is -- can be a flexible term.  The data

11:25    6    is delayed by at least three or four weeks.

11:25    7    **Q.**    You get data that's at least within a month old as to the

11:25    8    specific information about your doctors as to whether they're

11:25    9    trending up, staying the same, or going down in terms of the

11:25   10    prescriptions they write of your products; correct?

11:25   11    **A.**    Yes, sir.

11:25   12    **Q.**    Let's talk a little bit about your territory.  Your

11:25   13    territory is the Hattiesburg territory; is that right?

11:25   14    **A.**    Yes, sir.

11:25   15    **Q.**    And that includes McComb, Mississippi; correct?

11:25   16    **A.**    Yes, sir.

11:26   17    **Q.**    And your territory is actually part of the district; is

11:26   18    that right?

11:26   19    **A.**    Yes, sir.

11:26   20    **Q.**    And which sales district is your territory part of?

11:26   21    **A.**    I work for the district of Jackson, Mississippi.

11:26   22    **Q.**    And you have a district manager; correct?

11:26   23    **A.**    Yes, sir.

11:26   24    **Q.**    And what is his name?

11:26   25    **A.**    David Lindsey.

OFFICIAL REALTIME TRANSCRIPT

SHAWN RAQUEL COLLIER - DIRECT

11:26  1   Q.   And then your district, the Jackson district, is then part
11:26  2   of a larger region in terms of how Janssen structures its sales
11:26  3   force; correct?
11:26  4   A.   Yes, sir.
11:26  5   Q.   And your district is part of the Jackson -- or the Memphis
11:26  6   region; correct?
11:26  7   A.   No, sir, it's mid south.
11:26  8   Q.   So the mid south region is overseen by a woman by the name
11:26  9   of Ms. Wood, Elizabeth Wood; is that correct?
11:26  10  A.   That is correct.
11:26  11  Q.   So those are all individuals who are looking over within
11:26  12  the structure, sales management structure at Janssen, in terms
11:26  13  of how things are going, in terms of how you and others are
11:26  14  performing your jobs?
11:26  15  A.   That is the level of hierarchy, yes, sir.
11:26  16  Q.   Now, when you were hired by Janssen back in April of 2013,
11:26  17  you did receive some training about the products that you were
11:27  18  going to be selling; isn't that true?
11:27  19  A.   Of course, yes, sir.
11:27  20  Q.   And that initial training was done in two different parts.
11:27  21  You were sent to a home office of Janssen; is that correct?
11:27  22  A.   That was the second part, yes, sir.
11:27  23  Q.   The first part was then some training that you did some
11:27  24  home study?
11:27  25  A.   About a six- to eight-week intense home study, yes, sir.

OFFICIAL REALTIME TRANSCRIPT

SHAWN RAQUEL COLLIER - DIRECT

11:27  1  **Q.**   And when you say "intense," that means that you received a
11:27  2  great deal of information that was set up on a computer for
11:27  3  you; right?
11:27  4  **A.**   Well, when I use the word "intense," we had to pass our
11:27  5  tests.  We had to be educated.  We had to be knowledgeable, had
11:27  6  to, on those tests, make a 90 or higher.  If there was a chance
11:27  7  where a test was not passed, you had to get consulted from --
11:27  8  your manager asked me questions and would take it again.
11:27  9  **Q.**   When you used the word "intense," though, you were saying
11:27  10 that it was -- you found it somewhat challenging in terms of
11:28  11 the information load that you needed to master?
11:28  12 **A.**   Challenging, but it's doable.  Yes, sir.
11:28  13 **Q.**   You were a biology major in college; right?
11:28  14 **A.**   Yes, sir.
11:28  15 **Q.**   You went to the University of Southern Mississippi; is
11:28  16 that correct?
11:28  17 **A.**   Yes, sir.
11:28  18 **Q.**   In addition to the home study you did, you then did go to
11:28  19 the Janssen headquarters or main office for additional
11:28  20 training; correct?
11:28  21 **A.**   That is correct.
11:28  22 **Q.**   And how much time did you spend there for your training?
11:28  23 **A.**   To the best of my recollection, about ten days.
11:28  24 **Q.**   Included in the -- when you went there for that training
11:28  25 at the home office for about ten days, did you receive that

OFFICIAL REALTIME TRANSCRIPT

SHAWN RAQUEL COLLIER - DIRECT

| | | |
|---|---|---|
| 11:28 | 1 | training by yourself, or were there a number of other |
| 11:28 | 2 | individuals who were also there receiving training? |
| 11:28 | 3 | **A.**   There were also other individuals there receiving |
| 11:28 | 4 | training. |
| 11:28 | 5 | **Q.**   Were they also being trained to be sales representatives |
| 11:29 | 6 | such as yourself on the product Xarelto? |
| 11:29 | 7 | **A.**   Yes, sir. |
| 11:29 | 8 | **Q.**   What I'd like to do -- |
| 11:29 | 9 | **MR. HONNOLD:**  Your Honor, could I bring a pen over |
| 11:29 | 10 | and figure out what the best way is to set that up so we can |
| 11:29 | 11 | all see it? |
| 11:29 | 12 | **THE COURT:**  Sure. |
| 11:29 | 13 | **MR. HONNOLD:**  I don't know what the best way to see |
| 11:29 | 14 | it is. |
| 11:29 | 15 | **THE COURT:**  How about the jury?  Can the jury see it? |
| 11:29 | 16 | **MR. HONNOLD:**  From way back here, it can be seen. |
| 11:29 | 17 | **MR. SARVER:**  Write big. |
| 11:29 | 18 | **MR. HONNOLD:**  I'll write big. |
| 11:29 | 19 | **THE WITNESS:**  I'm going to pivot myself so that I can |
| 11:29 | 20 | get the best view.  Okay? |
| 11:29 | 21 | **BY MR. HONNOLD:** |
| 11:29 | 22 | **Q.**   So there were just a couple of things that I'd like to go |
| 11:29 | 23 | over about the specific product that you sell, Xarelto.  Can we |
| 11:30 | 24 | do that? |
| 11:30 | 25 | **A.**   Sure. |

SHAWN RAQUEL COLLIER - DIRECT

11:30  1    **Q.**   Okay.  There has been mention --

11:30  2           **THE COURT:**  You have to write bigger.

11:30  3           **MR. HONNOLD:**  Okay.

11:30  4    **BY MR. HONNOLD:**

11:30  5    **Q.**   There's been mention of the word "superior" in the context

11:30  6    of Xarelto and warfarin.  It's true, is it not, that you have

11:30  7    never claimed that Xarelto is superior to warfarin in any

11:30  8    aspect; correct?

11:30  9    **A.**   That is correct, because it is not within our label.

11:30  10   **Q.**   And, in fact, if there was any attempt by you to claim in

11:30  11   some way that Xarelto was, in fact, superior to Xarelto

11:30  12   [verbatim], that would be -- that would be inappropriate;

11:30  13   correct?

11:30  14   **A.**   Yes, sir.

11:30  15   **Q.**   That would be contrary to your label and would be contrary

11:30  16   to your training; correct?

11:30  17   **A.**   Correct.

11:30  18   **Q.**   Now, a couple of things about Xarelto and the indications

11:31  19   for which you market it.  Can we cover those briefly?

11:31  20   **A.**   Sure.

11:31  21   **Q.**   There's been discussion about atrial fibrillation.  It's

11:31  22   been called AF.  You're familiar with that; correct?

11:31  23   **A.**   Yes, sir.

11:31  24   **Q.**   You know that atrial fibrillation is an abnormal heart

11:31  25   rhythm; right?

SHAWN RAQUEL COLLIER - DIRECT

| | | |
|---|---|---|
| 11:31 | 1 | **A.** Yes. |
| 11:31 | 2 | **Q.** And in terms of that indication, how you market the |
| 11:31 | 3 | product, you know that that -- Xarelto for that indication is |
| 11:31 | 4 | given 20 milligrams once a day; correct? |
| 11:31 | 5 | **A.** Yes. In certain patient types, that is correct. |
| 11:31 | 6 | **Q.** And the other way that Xarelto is given for atrial |
| 11:31 | 7 | fibrillation patients is 15 milligrams once a day for patients |
| 11:31 | 8 | that have renal insufficiency or some inadequacy of function of |
| 11:31 | 9 | their kidneys; correct? |
| 11:31 | 10 | **A.** Yes, sir. |
| 11:31 | 11 | **Q.** And we'll talk about that more in a little bit. But for |
| 11:31 | 12 | AF, you're familiar with that abbreviation; right? |
| 11:31 | 13 | **A.** The AF stands for atrial fibrillation or AFib. |
| 11:32 | 14 | **Q.** So those dosages are 20mg, o.d. And you're familiar with |
| 11:32 | 15 | what "o.d." means in pharmaceutical practice; right? Once a |
| 11:32 | 16 | day? |
| 11:32 | 17 | **A.** Q.d. is what I have. |
| 11:32 | 18 | **Q.** Q.d. All right. We'll use q.d. That's another way that |
| 11:32 | 19 | it's done. |
| 11:32 | 20 | And then for renal patients, 15 milligrams q.d.; |
| 11:32 | 21 | right? |
| 11:32 | 22 | **A.** Yes, sir. |
| 11:32 | 23 | **Q.** All right. So as it relates to atrial fibrillation, then, |
| 11:32 | 24 | the only way that patients take Xarelto is they take one tablet |
| 11:32 | 25 | a day, and they're either going to take the 20-milligram form |

OFFICIAL REALTIME TRANSCRIPT

SHAWN RAQUEL COLLIER - DIRECT

11:32   1   or the 15-milligram form; right?

11:32   2           MR. SARVER:  Your Honor, let me raise an objection

11:32   3   now to the discussion of atrial fibrillation as it relates to

11:32   4   this case because Ms. Mingo is not that patient.

11:32   5           THE COURT:  I understand it.  It isn't, but it may

11:32   6   have some relationship, so I overrule your objection.

11:33   7   BY MR. HONNOLD:

11:33   8   Q.   So are you with me on that?

11:33   9   A.   Ask your question again, please, Mr. Honnold.

11:33  10   Q.   Sure.  So for patients with atrial fibrillation, the only

11:33  11   ways that they'll receive the medication are either

11:33  12   20 milligrams once a day or 15 milligrams once a day if they

11:33  13   have renal insufficiency; right?

11:33  14   A.   Based upon the doctor's decision to write that, yes.

11:33  15   That's how it is indicated within our package insert.

11:33  16   Q.   So for atrial fibrillation, there is no option that's

11:33  17   marketed for Xarelto for a twice-a-day dosing?

11:33  18   A.   No, sir, it's not within our label.

11:33  19   Q.   You certainly don't ever suggest that somebody could take

11:33  20   10 milligrams twice a day or a 10-milligram and a 5 or anything

11:33  21   like that?

11:33  22   A.   Absolutely not.

11:33  23   Q.   So this is how it is for atrial fibrillation.

11:33  24           Now, in addition to atrial fibrillation, there are

11:33  25   other indications for Xarelto; right?

SHAWN RAQUEL COLLIER - DIRECT

| | | |
|---|---|---|
| 11:33 | 1 | **A.**   That is correct. |
| 11:34 | 2 | **Q.**   And I've written there "DVT prevention." |
| 11:34 | 3 |      Are you familiar with that term? |
| 11:34 | 4 | **A.**   Yes. |
| 11:34 | 5 | **Q.**   And you know DVT is deep vein thrombosis; right? |
| 11:34 | 6 | **A.**   A blood clot in the leg, yes, sir. |
| 11:34 | 7 | **Q.**   And DVT is something that can occur as a complication of |
| 11:34 | 8 | patients that have hip or knee replacement surgery; right? |
| 11:34 | 9 | **A.**   Yes. |
| 11:34 | 10 | **Q.**   Okay.  And so Xarelto has been studied to be used in |
| 11:34 | 11 | patients after hip or knee replacement surgery to hopefully |
| 11:34 | 12 | help prevent a DVT; is that correct? |
| 11:34 | 13 | **A.**   In our package insert, it's known as prophylaxis, to |
| 11:34 | 14 | prevent.  But that is using the 10-milligram dose, and I don't |
| 11:34 | 15 | talk about that. |
| 11:34 | 16 | **Q.**   You were generally aware of that and you were trained on |
| 11:34 | 17 | that; is that right? |
| 11:34 | 18 | **A.**   In the home study, yes, sir. |
| 11:34 | 19 | **Q.**   So if we were going to go through the routine like we did |
| 11:34 | 20 | for AF, then for DVT prevention, we would be talking about a |
| 11:34 | 21 | dosage that would be 10 milligrams q.d.; is that right? |
| 11:35 | 22 |      **MR. SARVER:**  Your Honor, to be consistent, I'm going |
| 11:35 | 23 | as to object to questions about an indication.  Again, that |
| 11:35 | 24 | isn't Ms. Mingo.  Not relevant. |
| 11:35 | 25 |      **THE COURT:**  Okay.  I'll overrule the objection.  It |

SHAWN RAQUEL COLLIER - DIRECT

11:35   1   may have some relevance.  Go ahead.
11:35   2   BY MR. HONNOLD:
11:35   3   Q.   You agree with me there?
11:35   4   A.   Let me answer your question the best that I can.  Part of
11:35   5   the home schooling that I received and the training up in New
11:35   6   Jersey that I received, we did go over the prophylaxis of DVT
11:35   7   and PE using the 10-milligram dose.  But as I sit here today, I
11:35   8   can't remember the once a day, twice a day with that particular
11:35   9   milligram and that indication.
11:35   10  Q.   Okay.  You're just generally familiar from your training.
11:35   11  You're not actively selling it or marketing the drug for that
11:35   12  purpose in your work; is that right?
11:35   13  A.   I don't talk about that.  That is correct.
11:35   14  Q.   If we move on, then, to another indication that you may be
11:36   15  more familiar with, that would be DVT or PE treatment.  Is that
11:36   16  the words that you use?
11:36   17  A.   Those are the abbreviations that I use.  I talk about deep
11:36   18  vein thrombosis, which is a blood clot in the leg, or a
11:36   19  pulmonary embolism, which is a blood clot in the lungs.
11:36   20  Q.   And, again, those are things that -- there are many things
11:36   21  that might cause those situations, but specifically there are
11:36   22  individuals who develop a DVT after they've had hip replacement
11:36   23  or knee replacement surgery; right?
11:36   24  A.   As far as know, but I'm not a medical doctor and haven't
11:36   25  had medical training.

OFFICIAL REALTIME TRANSCRIPT

SHAWN RAQUEL COLLIER - DIRECT

11:36  1   **Q.**    Were you informed of that or given that information during

11:36  2   your sales training, that postoperative DVTs after hip or knee

11:36  3   replacement was a common way that that would manifest?

11:36  4   **A.**    That DVTs can happen as a result of a knee or hip

11:37  5   replacement surgery, yes, I did receive that education.

11:37  6   **Q.**    Then to complete what we've done here in terms of the

11:37  7   indications and dosages for DVT, what are the doses -- doses?

11:37  8   How that is given?

11:37  9   **A.**    For DVT, for new onset DVT, there's 15 milligrams twice a

11:37  10  day, or what we call in the industry b.i.d., for the first 21

11:37  11  days.  And on day 22, it's a 20-milligram dose once a day, and

11:37  12  that's as long as the -- well --

11:37  13  **Q.**    Okay.  So -- did I capture that right in terms of writing

11:37  14  it down?

11:37  15  **A.**    As far as I can see, yes, sir.  Uh-huh.

11:37  16  **Q.**    Okay.  So DVT treatment, the active phase, 15 milligrams

11:37  17  twice a day for 21 days, meaning that the patient is going to

11:38  18  take a pill hopefully 12 hours apart or equidistance apart

11:38  19  during their waking hours; right?

11:38  20  **A.**    Well, just twice a day.  When they take it is a discussion

11:38  21  they have between their physician.  I'm not a part of that.

11:38  22  **Q.**    And then on day 22, they then convert over to now taking a

11:38  23  20-milligram pill one time a day; right?

11:38  24  **A.**    Yes, sir.

11:38  25  **Q.**    And for how long is that indication suggested, that

SHAWN RAQUEL COLLIER - DIRECT

| | | |
|---|---|---|
| 11:38 | 1 | once-a-day, 20-milligram once-a-day treatment continue? |
| 11:38 | 2 | A.   Well, just for -- to clarify for the jury, the |
| 11:38 | 3 | 15 milligrams twice a day is for new onset.  What I mean by new |
| 11:38 | 4 | onset is if the patient first starts developing, it's been |
| 11:38 | 5 | confirmed that they have a blood clot in their leg. |
| 11:38 | 6 | On day 22, when the package insert states to move |
| 11:38 | 7 | from the 15-milligram to the 20-milligram dose, the length of |
| 11:38 | 8 | treatment is just specific to the doctor.  There's nothing that |
| 11:39 | 9 | I can recall in the package insert that states how long |
| 11:39 | 10 | treatment is to resume -- how long it's supposed to take place. |
| 11:39 | 11 | Q.   So in terms of your interaction with physicians then, do |
| 11:39 | 12 | you advise them that that indication for the 20-milligram |
| 11:39 | 13 | treatment is at their discretion or at their judgment? |
| 11:39 | 14 | A.   The majority of the questions that I receive on Xarelto is |
| 11:39 | 15 | just how to dose it.  They want to know, "Refresh my memory, |
| 11:39 | 16 | Shawn, about what day do I transition a patient from 15 to |
| 11:39 | 17 | 20 milligrams?"  And that is day 22.  So I advise them what is |
| 11:39 | 18 | within the package insert. |
| 11:39 | 19 | Q.   Thank you.  I'd like to move forward now and talk about a |
| 11:39 | 20 | new topic, that being testing and monitoring. |
| 11:40 | 21 | First I want to ask you some questions about that |
| 11:40 | 22 | subject in the context of your training.  Is it true that, |
| 11:40 | 23 | neither in the home study training you did or the on-site |
| 11:40 | 24 | training that you did at Janssen headquarters, you were never |
| 11:40 | 25 | taught how Xarelto either did or and not affect the standard |

SHAWN RAQUEL COLLIER - DIRECT

11:40  1  lab coagulation test?  Is that correct?

11:40  2  **A.**   That is correct.

11:40  3  **Q.**   And as you sit here today, you cannot list any of the

11:40  4  standard lab coagulation tests that might reflect or show the

11:40  5  effects of Xarelto on the bloodstream; is that correct?

11:40  6  **A.**   Yes, sir.

11:40  7  **Q.**   And as far as you know, there is no test that you're aware

11:40  8  of that can measure the effects of Xarelto; correct?

11:41  9  **A.**   That is correct.

11:41 10  **Q.**   And, in fact, you know that statement -- you know that

11:41 11  statement as your truth about Xarelto; correct?

11:41 12  **A.**   Yes.  That is my truth, that Xarelto requires no routine

11:41 13  blood monitoring.

11:41 14  **Q.**   Well, let's go back.

11:41 15  **A.**   Okay.

11:41 16  **Q.**   That statement is your truth, being no test can measure

11:42 17  the effects of Xarelto.  That is your truth; correct?

11:42 18  **A.**   Yes.

11:42 19  **Q.**   That has been your truth about Xarelto since the first

11:42 20  time you undertook training about the drug; correct?

11:42 21  **A.**   Yes.

11:42 22  **Q.**   That has been your truth about Xarelto every day that

11:42 23  you've been in the field educating physicians about Xarelto or

11:42 24  promoting its sale; correct?

11:42 25  **A.**   That is correct.

OFFICIAL REALTIME TRANSCRIPT

SHAWN RAQUEL COLLIER - DIRECT

11:42  1   Q.   And that statement is your truth today about Xarelto, that

11:42  2   there is no test that can measure the effects of Xarelto;

11:42  3   correct?

11:42  4   A.   That is because it is -- the reason I say it is my truth

11:43  5   is because I go out and do my job every day, and I do it within

11:43  6   the -- what's in the package label, and I'm confident that the

11:43  7   FDA has put things in the package label.  And so that is my

11:43  8   truth, that there is no test that can monitor Xarelto.

11:43  9   Q.   And I appreciate all that.

11:43  10       My question for you simply was that, as of today,

11:43  11  that's your truth; right?

11:43  12  A.   Yes, sir.

11:43  13  Q.   That's your understanding about Xarelto, about whether

11:43  14  there is any type of test that can measure its effects; right?

11:43  15  A.   I'm not aware of any test that can measure the effects of

11:43  16  Xarelto.

11:43  17  Q.   That issue, whether there is a test that can measure the

11:43  18  effects of Xarelto, that is a big nada; right?  There is not?

11:43  19  A.   Not that I'm aware of, no, sir.

11:43  20  Q.   The reason that that is your truth is because that's how

11:43  21  you were trained and informed and educated by Janssen on that

11:44  22  issue; correct?

11:44  23  A.   Correct.  I was informed and educated on issues of

11:44  24  testing, a lot of the components of Xarelto, based of what was

11:44  25  in the FDA-approved package insert.

SHAWN RAQUEL COLLIER - DIRECT

11:44  1  **Q.**   You hold that as being your truth because that is how you

11:44  2  were trained and educated and informed by Xarelto from the date

11:44  3  of your hire; correct?  By Janssen about Xarelto from the date

11:44  4  of your hire; correct?

11:44  5  **A.**   Correct.

11:44  6  **Q.**   There is no other source of information that you have ever

11:44  7  received on that issue, that issue being that there is no test

11:44  8  that can measure the effects of Xarelto.  The only source of

11:44  9  your information in that regard has been the information that

11:44  10  you received during your training at and from Janssen; correct?

11:44  11  **A.**   It's not only during my training, but it's also throughout

11:44  12  the course.  I've been with Janssen almost five years in April.

11:45  13  And so I use the resources provided to me by my organization as

11:45  14  well as what's in the package resource to go out -- package

11:45  15  insert to go out and do my job.

11:45  16  **Q.**   You would never tell a doctor anything different than

11:45  17  that; correct?

11:45  18  **A.**   I have never told a doctor there's a test that can monitor

11:45  19  the -- measure the effects of Xarelto.  No, sir.

11:45  20  **Q.**   And one of the reasons -- one of the things that you

11:45  21  mentioned about why there is no test, and why you couldn't tell

11:45  22  a physician about that is because there is no such test

11:45  23  described in the package insert for Xarelto; correct?

11:45  24  **A.**   There is -- could you reask your question, please.

11:45  25  **Q.**   The reason that you don't tell physicians about such a

SHAWN RAQUEL COLLIER - DIRECT

11:45 1    test is that, within the package insert that you've mentioned,

11:45 2    there is no specific instruction or information directing the

11:45 3    physician as to when or how to perform a test or that any such

11:46 4    test exists; correct?

11:46 5    A.   There is no test that exists that can measure the effects

11:46 6    of Xarelto.  And what it says specifically in the package

11:46 7    insert, while I sit here today, I cannot recall everything

11:46 8    that's in the package insert.  Okay.

11:46 9    Q.   And when we talk about effects of Xarelto, what I'd like

11:46 10   to do is test your knowledge on that issue a little bit --

11:46 11   A.   Okay.

11:46 12   Q.   -- or get some understanding of that.

11:46 13       So in terms of the effects of Xarelto, what are they?

11:46 14   What is the effect that Xarelto has either on the bloodstream

11:46 15   or the human body?

11:46 16       MR. SARVER:  Your Honor, I'm going to object.  This

11:46 17   is a detail representative, a sales representative, a very

11:47 18   smart woman.  But this is not a science case.

11:47 19       THE COURT:  The way you have to approach is what she

11:47 20   tells the doctors about the effects of Xarelto.

11:47 21       MR. HONNOLD:  Okay.

11:47 22   BY MR. HONNOLD:

11:47 23   Q.   So as it relates to the effects of Xarelto, is there

11:47 24   something specific that you tell physicians?  Do you say,

11:47 25   "Dr. Jordon, here is what you should know about the effects of

SHAWN RAQUEL COLLIER - DIRECT

| | | |
|---|---|---|
| 11:47 | 1 | Xarelto on the body or the bloodstream"? |
| 11:47 | 2 | **A.**   With regards to Dr. Jordon, there's not been any |
| 11:47 | 3 | conversations with him regarding that.  But on my day-to-day |
| 11:47 | 4 | activities with my physicians, prescribers, I don't -- I don't |
| 11:47 | 5 | have a core responsibility for this medication.  My core |
| 11:47 | 6 | responsibility is for another medication. |
| 11:47 | 7 | But if prompted with a question about the effects of |
| 11:48 | 8 | Xarelto, I always go into my offices, sir, and I have my iPad, |
| 11:48 | 9 | and I can answer their questions using those resources. |
| 11:48 | 10 | Okay.  So -- but as I sit here today, to go over the |
| 11:48 | 11 | effects of Xarelto and what I talk about, I can't do that |
| 11:48 | 12 | without my iPad. |
| 11:48 | 13 | **Q.**   Do you recall what your iPad says about the effects of |
| 11:48 | 14 | Xarelto? |
| 11:48 | 15 | **A.**   There's lots of different things, and I don't -- again, if |
| 11:48 | 16 | a physician asks me about certain things about the effects of |
| 11:48 | 17 | Xarelto, I would have that information with me at that time in |
| 11:48 | 18 | the office. |
| 11:48 | 19 | **Q.**   So as you sit here today, you can't say specifically what |
| 11:48 | 20 | you tell physicians when asked about the effects of Xarelto |
| 11:48 | 21 | without the benefit of your iPad? |
| 11:48 | 22 | **A.**   First of all, do you mind if I ask what you mean by |
| 11:48 | 23 | "effects"? |
| 11:48 | 24 | **Q.**   Does that term have any meaning to you, "the effects of |
| 11:49 | 25 | Xarelto"? |

OFFICIAL REALTIME TRANSCRIPT

SHAWN RAQUEL COLLIER - DIRECT

11:49   1    **A.**   Well, I can answer for you what I talk about with Xarelto,

11:49   2    but it's not really with regards to effects.

11:49   3    **Q.**   Okay.  So then let's -- we can just end this line of

11:49   4    inquiry, then, that in terms of the effects of Xarelto on the

11:49   5    body, that that is something that you really don't get into

11:49   6    with physicians; is that true?

11:49   7    **A.**   Not -- not necessarily, no, sir.  As I sit here today, I

11:49   8    cannot talk about the effects of Xarelto on the body and go

11:49   9    over the statistical information.  I use my company-approved

11:49   10   iPad resources or the package insert if a question is asked.

11:49   11           But as I stated earlier, that's not my primary

11:49   12   responsibility to go in there and talk about Xarelto.  I'm

11:49   13   responsible for talking about another medicine.

11:49   14              **THE COURT:**  I think she's answered the question.

11:49   15              **MR. HONNOLD:**  Yes.  We're moving on, Your Honor.

11:49   16              I'm going to hand the witness a copy of the

11:50   17   package insert, the version of March of 2014.  It is Record

11:50   18   No. -- or Document No. 5767973 that will be marked as

11:50   19   Plaintiff's Exhibit 11 --

11:50   20              **THE DEPUTY CLERK:**  10.

        21              **MR. HONNOLD:**  10.  Excuse me.

11:50   22              **THE WITNESS:**  What do I do with this?

11:50   23   BY MR. HONNOLD:

11:50   24   **Q.**   You can just leave it right there.

11:50   25   **A.**   Okay.

SHAWN RAQUEL COLLIER - DIRECT

11:50  1   **Q.**   What I'd like to do, Ms. Collier, is first just let you
11:50  2   have a moment just to confirm that the document is what I say
11:50  3   and it is, the package insert for Xarelto, the March 2014
11:50  4   version.
11:51  5            If you go to the back page of the actual package
11:51  6   insert, not the patient guide --
11:51  7   **A.**   Is there a page number, specifically, Mr. Honnold that you
11:51  8   want me to look at?
11:51  9   **Q.**   Page 40, in the lower right-hand corner.
11:51  10  **A.**   Bear with me, y'all.
11:51  11  **Q.**   And then you see that the very last page of the package
11:51  12  insert label that actually says that the product is licensed
11:51  13  from Bayer and that it has the copyright of your employer,
11:51  14  Janssen Pharmaceuticals; correct?
11:51  15  **A.**   Yes, sir.  I see that.
11:51  16  **Q.**   And can we agree, then, that this does appear to be the
11:51  17  package insert for Xarelto, the March 2014 edition?
11:51  18  **A.**   The pages that I've looked at, yes, sir, it does.
11:51  19  **Q.**   What I would like you to do is to go to page 18, which is
11:52  20  Section 8.1.
11:52  21  **A.**   Okay.
11:52  22  **Q.**   And this is something that's been discussed already to
11:52  23  some degree, but I want to ask you a couple of questions about
11:52  24  this.
11:52  25           First of all, you see in that section the sentence in

OFFICIAL REALTIME TRANSCRIPT

SHAWN RAQUEL COLLIER - DIRECT

| | | |
|---|---|---|
| 11:52 | 1 | there that says, "The anticoagulant effect of Xarelto cannot be |
| 11:52 | 2 | reliably monitored with standard laboratory testing." |
| 11:52 | 3 | Do you see that? |
| 11:52 | 4 | A.   Yes, sir. |
| 11:52 | 5 | Q.   Now, you believe that to be true; correct? |
| 11:52 | 6 | A.   It is in the package insert; so, yes, that is true. |
| 11:52 | 7 | Q.   So it's part of your truth? |
| 11:52 | 8 | A.   Yes, that is correct. |
| 11:52 | 9 | Q.   And, actually, in addition to this being in the pregnancy |
| 11:53 | 10 | section, it is your view that you think that statement actually |
| 11:53 | 11 | applies to all patients; correct? |
| 11:53 | 12 | A.   I don't really understand your question.  Can you ask it |
| 11:53 | 13 | again, please? |
| 11:53 | 14 | Q.   You see that within the label that's before you, this |
| 11:53 | 15 | sentence that's listed in Section 8.1, Pregnancy. |
| 11:53 | 16 | Do you see that? |
| 11:53 | 17 | A.   Yes, sir, I do. |
| 11:53 | 18 | Q.   But it is your belief and part of your truth that you |
| 11:53 | 19 | think that this statement applies to all patients; correct? |
| 11:53 | 20 | A.   It's what is in the package insert.  So, yes, this is, |
| 11:53 | 21 | again, my guide when I go out and do my job every day. |
| 11:53 | 22 | Q.   But I want to make sure that we're clear on one point in |
| 11:53 | 23 | my question. |
| 11:53 | 24 | Is it your belief and understanding that that |
| 11:53 | 25 | statement actually, in your view, applies to all patients? |

OFFICIAL REALTIME TRANSCRIPT

SHAWN RAQUEL COLLIER - DIRECT

11:53  1   **A.**   In our package insert, it does not state that a routine

11:54  2   lab test is required to measure the effects of Xarelto.

11:54  3   **Q.**   And my question is a little bit different.

11:54  4         My question for you is, is part of your understanding

11:54  5   and truth that that statement that's in Section 8.1, Pregnancy,

11:54  6   actually applies for all patients, not just pregnant patients;

11:54  7   correct?

11:54  8   **A.**   Correct.

11:54  9   **Q.**   Correct?

11:54  10  **A.**   Correct.  I said correct.  Sorry.

11:54  11  **Q.**   So if you were asked about that specific issue by a

11:54  12  physician, just like you've given sworn testimony today that

11:54  13  it's your belief that that statement applies to all patients,

11:54  14  if a physician asked you about that, you would tell them the

11:54  15  same thing?

11:54  16  **A.**   Yes.  I would -- I would tell them the same thing.

11:54  17  **Q.**   Again, because it's part of your truth; right?

11:54  18  **A.**   It is part of the package insert, yes, sir.

11:54  19  **Q.**   That you believe to be true?

11:54  20  **A.**   That has -- yes, that has been approve by the FDA.

11:54  21  **Q.**   And in this instance, your belief is that statement

11:55  22  applies to all patients; right?

11:55  23  **A.**   Yes.

11:55  24  **Q.**   Okay.  Can you show me anywhere in the package insert

11:55  25  where the statement -- that statement actually exists with the

OFFICIAL REALTIME TRANSCRIPT

SHAWN RAQUEL COLLIER - DIRECT

1   qualification or addition that it says for all patients, the

2   anticoagulant effect of Xarelto cannot be reliably monitored

3   with standard laboratory testing?

4   A.    Oh, that will --

5   Q.    Take your time.  I'm just --

6   A.    So I just want to understand and be respectful of what

7   you're asking of me.  You want me to go through the package

8   insert that is 46 pages long and point out every section where

9   it says this?

10   Q.    Let me ask it this way.

11   A.    Okay.

12   Q.    Do you have an understanding or belief today, without

13   going through that task that you just mentioned, that is there

14   anywhere within the label where that specific statement is made

15   with the addition that it applies to all patients?

16   A.    I cannot recall.  These package inserts are very detailed

17   and based upon scientific studies by the FDA.  And I always

18   have access to them, but I don't memorize where things are

19   located within the package insert.

20   Q.    But without actually going page by page, line by line, you

21   couldn't tell me right now whether that statement exists

22   somewhere else in the label with the statement that that

23   statement is true for all patients?

24   A.    I would have to take a lot of time to do that.

25   Q.    When physicians ask you general questions -- general

OFFICIAL REALTIME TRANSCRIPT

11:56   1   questions about Xarelto that don't have to do with pregnant
11:56   2   patients, do you ever refer them to the pregnancy section?
11:56   3   A.   No, sir, because I've never been asked questions about
11:56   4   routine testing or any of that such since my tenure with
11:56   5   Janssen.  No, sir.
11:56   6   Q.   You made one mention earlier about scientific studies
11:56   7   performed by the FDA.
11:56   8            Is it your understanding that specifically the FDA
11:57   9   undertakes clinical trials for the testing and review of
11:57   10  pharmaceutical products like Xarelto?
11:57   11  A.   My understanding is that clinical trials are regulated by
11:57   12  the FDA, and there are scientists -- people that, you know, are
11:57   13  way above me and what I do with the scope of their duties every
11:57   14  day.  And I go out there, and I'm confident with that because I
11:57   15  have no medical training.
11:57   16           So does that answer your question, Mr. Honnold?  I'm
11:57   17  sorry.
11:57   18  Q.   You certainly don't tell physicians to represent to the
11:57   19  public that the FDA performed any of the clinical trials for
11:57   20  Xarelto; right?
11:57   21  A.   No, absolutely not.
11:57   22  Q.   Has anyone at Janssen ever instructed you about how
11:57   23  Xarelto affects a laboratory test called the PT or prothrombin
11:57   24  time?
11:57   25  A.   No.

SHAWN RAQUEL COLLIER - DIRECT

11:57  1   **Q.**   So not in your sales education and training, not in

11:58  2   materials that you reviewed, and not in any sort of interaction

11:58  3   you've gotten from the company since your time of hire?  They

11:58  4   have never instructed you about how Xarelto effects the lab

11:58  5   test called a PT or prothrombin time?

11:58  6   **A.**   No.  The only study I've had with regards to PT testing is

11:58  7   with Coumadin, also known as warfarin.

11:58  8   **Q.**   And based upon that, ma'am, would it be safe to assume,

11:58  9   then, that you have never talked with any doctors about how or

11:58  10  whether the PT test can be used to measure the effects of

11:58  11  Xarelto on a patient?

11:58  12  **A.**   No, sir.  I've never done that because it's not within our

11:58  13  package inserts and it's -- I have never done that.

11:58  14  **Q.**   And you've never presented information or instruction --

11:58  15  specific instruction to a physician when dealing with a Xarelto

11:58  16  patient who presents with major bleeding and how they can or

11:59  17  can't determine if the patient is under the blood thinning

11:59  18  effect of Xarelto?

11:59  19  **A.**   No, sir.  I've never encountered that question in the

11:59  20  territory.  No, sir, I have not.

11:59  21  **Q.**   You know, as an individual who is involved, both been

11:59  22  educated on Xarelto and sells it, you know that there are

11:59  23  occasions when patients do bleed on Xarelto; correct?

11:59  24  **A.**   Well, it is an anticoagulant, and what that means is it's

11:59  25  going to thin the blood.  So it's the doctor's responsibility

OFFICIAL REALTIME TRANSCRIPT

SHAWN RAQUEL COLLIER - DIRECT

11:59  1  to weigh out the risks versus the benefit.

11:59  2  **Q.**   So my question for you was a little bit different.

11:59  3  **A.**   Okay.

11:59  4  **Q.**   So I want to focus on a bleeding patient on Xarelto and

11:59  5  just ask you to think about, in your mind's eye, a situation

12:00  6  where a patient who has been prescribed and taken Xarelto then

12:00  7  does have the complication of bleeding develop and has to seek

12:00  8  medical care.

12:00  9       Have you ever instructed or informed a physician at

12:00  10  any time about whether there is a test to tell whether the

12:00  11  patient is still under the effects of Xarelto?

12:00  12  **A.**   No, sir, I never have.

12:00  13  **Q.**   And I take it that you have never been instructed about

12:00  14  such that issue by Janssen; correct?

12:00  15  **A.**   Correct.  Correct.

12:00  16       **THE COURT:**  Let's get to a point where we can take a

12:00  17  break for lunch.

12:00  18       **MR. HONNOLD:**  Yes, Your Honor.

12:00  19  BY MR. HONNOLD:

12:00  20  **Q.**   Similarly -- just two questions, and I think we'll be at a

12:00  21  good breaking point.

12:00  22       Similarly, ma'am, you have never talked with a

12:01  23  physician about whether there is a test that can be used as a

12:01  24  spot check for a patient to determine whether they're doing

12:01  25  okay on Xarelto?

OFFICIAL REALTIME TRANSCRIPT

SHAWN RAQUEL COLLIER - DIRECT

12:01  1   A.   No, sir, I never talked about a test that can measure the
12:01  2   effects of Xarelto.
12:01  3   Q.   Last question before we stop for a moment.
12:01  4   A.   By all means.
12:01  5   Q.   And I've written there "random PT on a patient."  So,
12:01  6   again, in your mind's eye, could you imagine a situation where
12:01  7   a patient who is on Xarelto is receiving some medical care and
12:01  8   someone for some reason orders a PT test on them?  Can you
12:01  9   imagine that scenario or assume that situation?
12:01 10   A.   No, sir.  I am not a medical professional.
12:01 11   Q.   Okay.  All right.  Let me ask it this way, then.
12:02 12   A.   Okay.
12:02 13   Q.   Have you ever received yourself any information or
12:02 14   education to be used in instructing physicians about whether a
12:02 15   physician could look at a PT test result taken on a patient who
12:02 16   is on Xarelto to determine something about the effects of
12:02 17   Xarelto on that patient, whether it's too high, too low, too
12:02 18   much?  Anything like that?
12:02 19   A.   No, sir.
12:02 20   Q.   Okay.  You've never -- you've never gotten any information
12:02 21   like that from Janssen ever?
12:02 22   A.   No, sir.
12:02 23        MR. HONNOLD:  Okay.  Thank you.
12:02 24        THE COURT:  Okay.  Let's take a break here, and we'll
12:02 25   come back at 1:15.  Court will stand in recess.

OFFICIAL REALTIME TRANSCRIPT

1    THE DEPUTY CLERK:  All rise.

2    THE COURT:  Ma'am, you're still under oath.  Please

3  don't talk to anybody about the case until you come back.

4    THE WITNESS:  Of course.  Yes, sir.

5    THE DEPUTY CLERK:  All rise.

6    (WHEREUPON, the jury exited the courtroom.)

7                      (LUNCHEON RECESS)

8                         * * * * *

9                         *****

10                       CERTIFICATE

11    I, Jodi Simcox, RMR, FCRR, Official Court Reporter

12  for the United States District Court, Eastern District of

13  Louisiana, do hereby certify that the foregoing is a true and

14  correct transcript, to the best of my ability and

15  understanding, from the record of the proceedings in the

16  above-entitled and numbered matter.


19                    s/Jodi Simcox, RMR, FCRR
                      Jodi Simcox, RMR, FCRR
20                    Official Court Reporter

21

22

23

24

25

                 OFFICIAL REALTIME TRANSCRIPT