1          UNITED STATES DISTRICT COURT

2         SOUTHERN DISTRICT OF MISSISSIPPI

3

4

5    IN RE:  XARELTO              *
     (RIVAROXABAN) PRODUCTS       *
6    LIABILITY LITIGATION         *
                                  *
7    THIS DOCUMENT RELATES TO:    *    Docket No.: 14-MD-2592
                                  *    Section "L"
8    *Dora Mingo, et al. v.*      *    Jackson, Mississippi
     *Janssen Research &*         *    August 8, 2017
9    *Development, LLC, et. al.,* *
     Case No.: 15-CV-3469         *
10   * * * * * * * * * * * * * * * *

11             VOLUME II - AFTERNOON SESSION
            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
12         BEFORE THE HONORABLE ELDON E. FALLON
              UNITED STATES DISTRICT JUDGE
13

14   <u>APPEARANCES</u>:

15

     For the Plaintiffs'
16   Liaison Counsel:            Gainsburg Benjamin David
                                    Meunier & Warshauer
17                               BY:  GERALD E. MEUNIER, ESQ.
                                 2800 Energy Centre
18                               1100 Poydras Street
                                 New Orleans, Louisiana 70163
19

20
     For the Plaintiffs:         Beasley Allen
21                               BY:  ANDY BIRCHFIELD, ESQ.
                                 P.O. Box 4160
22                               Montgomery, Alabama 36103

23

24

25

```
1   APPEARANCES:

2                               Gainsburg Benjamin Davis
                                  Meunier & Warshauer
3                               BY:  WALTER C. MORRISON, IV, ESQ.
                                240 Trace Colony Park Drive
4                               Suite 100
                                Ridgeland, Mississippi 39157
5

6
                                Goza Honnold
7                               BY:  BRADLEY D. HONNOLD, ESQ.
                                11181 Overbrook Road, Suite 200
8                               Leawood, Kansas 66211

9
                                The Lambert Firm
10                              BY:  EMILY JEFFCOTT, ESQ.
                                701 Magazine Street
11                              New Orleans, Louisiana 70130

12
    For the Defendant Bayer
13  HealthCare Pharmaceuticals
    Inc. and Bayer Pharma AG:   Mitchell, Williams, Selig, Gates &
14                                Woodyard, P.L.L.C.
                                BY:  LYN P. PRUITT, ESQ.
15                              425 W. Capitol Avenue, Suite 1800
                                Little Rock, Arkansas 72201
16

17
                                Watkins & Eager, PLCC
18                              BY:  WALTER T. JOHNSON, ESQ.
                                400 East Capitol Street
19                              Jackson, Mississippi 39201

20

21  For Janssen Pharmaceuticals,
    Inc. and Janssen Research &
22  Development, LLC:            Barrasso Usdin Kupperman Freeman &
                                  Sarver, LLC
23                              BY:  RICHARD E. SARVER, ESQ.
                                909 Poydras Street, 24th Floor
24                              New Orleans, Louisiana 70112

25
```

OFFICIAL TRANSCRIPT

1

2

3    Official Court Reporter:        Tana J. Hess, CRR, RMR
                                     500 Poydras Street
                                     Room B275
4                                    New Orleans, Louisiana 70130
                                     (504) 589-7781
5

6
     Proceedings recorded by mechanical stenography using
7    computer-aided transcription software.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8:29AM   1

**<u>INDEX OF WITNESSES</u>**

8:29AM   2    <u>NAME</u>                                                    <u>PAGE</u>

8:29AM   3    Shawn Collier

8:29AM   4         Direct Exam (Cont'd) by Mr. Honnold          374

8:29AM   5         Cross-Examination by Mr. Sarver              398

8:29AM   6         Redirect Examination by Mr. Honnold          412

8:29AM   7    Angela Seifert

8:29AM   8         Direct Examinaton by Mr. Birchfield          417

8:29AM   9    Frank Misselwitz

8:29AM  10         Direct Examination by Mr. Overholtz          435

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 12:00AM | 1 | (Afternoon session.) |
| 1:15PM | 2 | (Whereupon the jury entered the courtroom.) |
| 1:16PM | 3 | THE COURT:  Be seated, please.  Good afternoon, |
| 1:16PM | 4 | members of the jury. |
| 1:16PM | 5 | MR. HONNOLD:  Good afternoon, Your Honor. |
| 1:16PM | 6 | THE COURT:  You may be seated. |
| 1:16PM | 7 | BY MR. HONNOLD: |
| 1:16PM | 8 | Q.   Ms. Collier, I'd like to move on and continue talking |
| 1:16PM | 9 | about the Xarelto product label that is before you.  And I want |
| 1:16PM | 10 | to start talking about a new section of that label, |
| 1:16PM | 11 | Section 12.2.  So if you could turn to Section 12.2.  And it is |
| 1:16PM | 12 | in the lower right-hand corner, page 21.  And I want you to |
| 1:16PM | 13 | take a moment to look at that. |
| 1:17PM | 14 | Now, before you arrived here today, there was another |
| 1:17PM | 15 | witness who spoke a little bit about 12.2.  And 12.2 is about |
| 1:17PM | 16 | the topic of pharmacodynamics; right? |
| 1:17PM | 17 | A.   Yes, sir. |
| 1:17PM | 18 | Q.   Now, why don't you go ahead and read Section 12.2?  Just |
| 1:17PM | 19 | read it to yourself, and everyone in court can read it, and |
| 1:17PM | 20 | then I'm going to have a question for you. |
| 1:17PM | 21 | A.   Would you like me to read it out loud? |
| 1:17PM | 22 | Q.   No.  Just go ahead and read it to yourself. |
| 1:17PM | 23 | A.   Okay. |
| 1:17PM | 24 | (Pause.) |
| 1:17PM | 25 | BY MR. HONNOLD: |

**Q.** Now, it's true, is it not, that you have no idea what neoplastin or neoplastin PT is; correct?

**A.** I don't know what that is.

**Q.** Okay. As you sit here today, you just don't have any idea what that is at all?

**A.** I know that -- I know what a PT test is, but only when it comes to PT INR testing format.

**Q.** So as it relates to what is neoplastin and neoplastin PT in the context of Section 12.2, you have no idea what that is; correct?

**A.** I don't know how to interpret all this language.

**Q.** And this language is in the main document that you use to educate and inform physicians about your product; correct?

**A.** Yes, sir.

**Q.** This is a document that was a subject of your initial -- probably both your home training and your training at the Janssen home site. The package insert or label at the time was something that you studied and looked at intensively during that time; correct?

**A.** Not intensively. We just -- we got familiar with it, so to speak.

**Q.** And you've been employed now for Janssen doing work with Xarelto for over four years now; correct?

**A.** Yes, sir.

**Q.** Now, as it relates to the PT test itself, it's true that

1:19PM 1   you're not aware of the form of different type of reagents that

1:19PM 2   can be used for the PT test; correct?

1:19PM 3   A.   That is correct.  I'm not a scientist or a physician.

1:19PM 4   Q.   Okay.  So in terms of the different PT reagents, you don't

1:19PM 5   know about that.  In terms of neoplastin PT, similar.

1:19PM 6           In Section 12.2, there is also -- the last part talks

1:19PM 7   about there being -- makes reference to anti-Factor Xa

1:19PM 8   activity.

1:19PM 9           Do you see that?

1:19PM 10  A.   Yes, sir, I do.

1:19PM 11  Q.   And it's true, is it not, that you don't know or you're

1:20PM 12  not aware whether there is a specific lab test that can measure

1:20PM 13  Xa activity?  That's something you don't know about as well;

1:20PM 14  right?

1:20PM 15  A.   There is not a specific lab test that measures the

1:20PM 16  coagulation effects of Xarelto that I was ever taught or that

1:20PM 17  is within the package insert that states its effectiveness.

1:20PM 18  Q.   Okay.  So just so we're clear, that's not something that

1:20PM 19  you know anything about, correct, whether or not there's an

1:20PM 20  anti-Factor Xa test that can be used to assess the effects of

1:20PM 21  Xarelto?  You don't know anything about that; right?

1:20PM 22  A.   I don't know anything about most of this section, no, sir.

1:20PM 23  Q.   So I'm going to write "Xa assay," again, no knowledge.

1:21PM 24  A.   Where does it say "Xa assay"?  I'm --

1:21PM 25  Q.   Oh, I'll put "test."  Do you want me to put "test"

1:21PM 1   instead?

1:21PM 2   A.   I don't see it here in the pharmacodynamics area.

1:21PM 3   Q.   Okay.  Well, I asked you whether the -- as it relates to

1:21PM 4   that sentence, whether you knew whether or not there was a test

1:21PM 5   to measure anti-Factor Xa activity.

1:21PM 6   A.   I'm not aware.

1:21PM 7        What is a Xa assay?

1:21PM 8   Q.   You don't know what a Xa assay is?

1:21PM 9   A.   No.  And I don't see it in Section 12.2 either.

1:21PM 10  Q.   Okay.  Well, let's talk about that.

1:21PM 11  A.   Okay.

1:21PM 12  Q.   I just want it make sure that we -- that it's real clear.

1:21PM 13       That last sentence says, "Anti-Factor Xa activity is

1:21PM 14  also influenced by rivaroxaban."

1:21PM 15       Do you see that?

1:21PM 16  A.   It does say that, yes, sir.

1:21PM 17  Q.   And I read it correctly?

1:21PM 18  A.   Yes, sir, it does.

1:21PM 19  Q.   Okay.  Now, what does that mean?

1:21PM 20  A.   With me reading it -- and, again, it's not my job to

1:21PM 21  interpret the package insert -- my impression would be, how is

1:21PM 22  it influenced?

1:21PM 23       So I have never in the field gotten a question about

1:21PM 24  this.  And so that's all I can say about that.

1:22PM 25  Q.   You don't know about it, but you're supposed to be able to

*OFFICIAL TRANSCRIPT*

1:22PM   1    teach about it and educate about it?

1:22PM   2             MR. SARVER:  Objection, Your Honor.  That's not what

1:22PM   3    she said.

1:22PM   4             THE COURT:  Ask her.

1:22PM   5    BY MR. HONNOLD:

1:22PM   6    Q.   Sure.  You remember before lunch you said that one of your

1:22PM   7    primary jobs was to educate physicians; correct?

1:22PM   8    A.   Yes, sir.

1:22PM   9    Q.   We can at least agree that it relates to this Section 12.2

1:22PM  10    and the issue of anti-Factor Xa activity and whether or not

1:22PM  11    there's a test, that's something that you won't be able to help

1:22PM  12    physicians with in terms of their education?

1:22PM  13    A.   That is not correct.  And let me elaborate.

1:22PM  14             If I don't have an answer for a physician that he or

1:22PM  15    she has asked, I have resources that the company provides.  I

1:22PM  16    have a -- I have territory partners.  I have my district

1:22PM  17    manager.

1:22PM  18             I have the package insert if -- but if I can't

1:22PM  19    interpret that, my question to a physician would be, "I'm

1:23PM  20    sorry.  I don't know the answer to that question, but I can get

1:23PM  21    you the information.  Would you like to submit a medical

1:23PM  22    information request?"

1:23PM  23             And what a medical information request does, they ask

1:23PM  24    the question.  They have to sign, and I will submit the

1:23PM  25    question.  And it goes up somewhere.  And then I will ask if

1:23PM 1    they would like to have an email response, a fax response, or
1:23PM 2    someone to visit them in person.  And that person, as we call
1:23PM 3    it, is a medical science liaison.  They can talk about things.
1:23PM 4           So if I don't have the answer that physician is
1:23PM 5    asking me, I have the resources to help them get the answer.
1:23PM 6    Q.   Okay.  So in terms of your knowledge, though, in terms of
1:23PM 7    Shawn Collier knowledge, it's as you testified before, that's
1:24PM 8    something that you yourself personally don't have knowledge or
1:24PM 9    understanding of; correct?
1:24PM 10   A.   I would say, "I don't have any knowledge of that,
1:24PM 11   Dr. Smith," or -- "But I can get you that information.  How can
1:24PM 12   I help you?"
1:24PM 13   Q.   All right.  Let's move on, next topic.
1:24PM 14   A.   Yes, sir.
1:24PM 15   Q.   The next thing I want to talk about is interpatient
1:24PM 16   variability.  Now, during your sales training related to
1:24PM 17   Xarelto -- well, let me ask it this way.
1:24PM 18          As it relates to interpatient variability, it's true
1:25PM 19   you have no idea what I'm talking about; correct?
1:25PM 20   A.   I don't know.
1:25PM 21   Q.   Okay.
1:25PM 22   A.   It's a term that wasn't used in my training or today.
1:25PM 23   Q.   Okay.  And so do you have any understanding, then, if two
1:25PM 24   people -- two different patients take the same dose of
1:25PM 25   Xarelto --

*OFFICIAL TRANSCRIPT*

1:25PM    1              **MR. SARVER:**  Objection, Your Honor.  The witness has

1:25PM    2    just said she doesn't know this.

1:25PM    3              **THE COURT:**  She says she doesn't know what it means.

1:25PM    4              **MR. SARVER:**  It would be speculation; correct?

1:25PM    5              **THE COURT:**  Sustained.

1:25PM    6    **BY MR. HONNOLD:**

1:25PM    7    **Q.**   Ma'am, do you have any idea -- do you know what plasma or

1:25PM    8    serum concentration is?

1:25PM    9    **A.**   I have a general knowledge, but not a sound foundation --

1:25PM   10    not a solid foundation of knowledge about that topic.

1:25PM   11    **Q.**   Okay.  The issue of inter -- well, let me ask it this way,

1:25PM   12    then.

1:25PM   13              Do you have any knowledge, then, as to what the range

1:25PM   14    is, what the difference in serum concentration is in different

1:26PM   15    patients after they -- after they take the drug and it's been

1:26PM   16    on board for two, three, four hours?

1:26PM   17    **A.**   I can't sit here today and answer that question.  But, as

1:26PM   18    I've said earlier, I can get the question if a doctor has ever

1:26PM   19    asked me that.  I've never had a physician ask me those

1:26PM   20    questions.

1:26PM   21    **Q.**   Have you ever -- as part of your work in calling on

1:26PM   22    physicians, have you ever been instructed yourself to inform

1:26PM   23    and educate physicians that there is significant interpatient

1:26PM   24    variability from patient to patient in terms of what the

1:26PM   25    resulting blood level is in different patients that take the

*OFFICIAL TRANSCRIPT*

1:26PM  1    drug?

1:26PM  2    A.   As I said earlier, Mr. Honnold, I've never heard that term

1:26PM  3    before.  So to answer your question, no, sir.

1:26PM  4    Q.   And when you say never heard it before, that would include

1:26PM  5    in your sales training from Janssen related to Xarelto?

1:26PM  6    A.   Not that I can recall, no, sir.

1:27PM  7    Q.   And similarly, during your sales training, you don't know

1:27PM  8    whether Janssen taught you anything about the significance of

1:27PM  9    increased exposure to Xarelto in a patient's bloodstream?

1:27PM  10   A.   It could have been talked about.  The training was done

1:27PM  11   back in 2013.  And as I stated earlier, there's lots of

1:27PM  12   information given to us at that time.  So to remember a

1:27PM  13   specific detail like that, I can't recall that, sitting here

1:27PM  14   today.

1:27PM  15   Q.   Okay.  So while we're talking about the topic of exposure,

1:27PM  16   Xarelto exposure -- if I say "Xarelto exposure," does that have

1:27PM  17   any meaning to you?

1:27PM  18   A.   I know what the two individual words mean, Mr. Honnold.  I

1:27PM  19   can sit here and guess, but I don't want to.

1:27PM  20   Q.   I don't want you to guess.

1:27PM  21   A.   Okay.  I don't want to guess either.

1:27PM  22   Q.   As it relates to exposure then, do you have an

1:28PM  23   understanding as to why patients with renal insufficiency or

1:28PM  24   kidney disease are given a different dose of Xarelto?

1:28PM  25   A.   The only thing that I can say with regards to that,

1:28PM  1   patients are given a reduced dose of the medication based on

1:28PM  2   proper kidney function.

1:28PM  3          Now, what happens between -- what's the correlation

1:28PM  4   between the effects of the medication on the body and the

1:28PM  5   kidneys, I can't -- I'm not a medical physician.  I cannot -- I

1:28PM  6   don't understand all that.  But I know that patients that have

1:28PM  7   reduced kidney function, that the dosing is important to

1:28PM  8   understand.

1:28PM  9   Q.   We can agree that if patients that have renal

1:28PM  10  insufficiency are given the full 20-milligram dose, that can

1:28PM  11  have greater effect upon patients that have kidney disease;

1:28PM  12  right?

1:28PM  13  A.   It's not within our -- it's not within our label, but

1:29PM  14  to -- again, I don't have interaction with patients.  I can't

1:29PM  15  answer that, but what's in our label is what the proper dosing

1:29PM  16  is for particular stages of kidney disease.

1:29PM  17  Q.   Okay.  Could you please go to page 80 of your deposition?

1:29PM  18  A.   Yes, sir.

1:29PM  19         MR. SARVER:  Your Honor, I'm going to object unless

1:29PM  20  there's something here to impeach.  Perhaps they could lay the

1:29PM  21  foundation for whatever impeachment he has in mind.

1:29PM  22         THE COURT:  I assume you've asked the question --

1:29PM  23         MR. HONNOLD:  Yes.

1:29PM  24         THE COURT:  -- and now you're going to impeach her

1:29PM  25  with what she said?

*OFFICIAL TRANSCRIPT*

1:29PM  1          MR. HONNOLD:  Yes.

1:29PM  2   BY MR. HONNOLD:

1:29PM  3   Q.   Can you go to page 80, please, line 8?

1:29PM  4   A.   Just a second, please, if you don't mind.

1:29PM  5   Q.   And do you see page 80 in the lower left-hand corner?

1:29PM  6   A.   I do.  I do.

1:29PM  7   Q.   And if you go to line 8, let me read you the question:

1:29PM  8          "Do you have any understanding or did you get any

1:30PM  9   understanding in the training that Janssen provided to you

1:30PM 10   about the significance of increased drug exposure on patients

1:30PM 11   on Xarelto?"

1:30PM 12          Did I read the question correctly?

1:30PM 13   A.   Yes, sir.

1:30PM 14   Q.   And then do you see the answer that you gave at line 13?

1:30PM 15   A.   Yes, sir.

1:30PM 16   Q.   Can you read that, please?

1:30PM 17   A.   "What I can recall is the lower a patient's renal

1:30PM 18   function, the more -- the more effect that the medicine has on

1:30PM 19   the blood."

1:30PM 20   Q.   And then I said after that, "The greater the effect?"

1:30PM 21          Do you see that?

1:30PM 22   A.   Yes, sir.

1:30PM 23   Q.   And then what did you say?

1:30PM 24   A.   "The greater the effect.  Thank you."

1:30PM 25   Q.   All right.  So what I'm trying to understand is what

*OFFICIAL TRANSCRIPT*

1:30PM 1   you're talking about there.  I won't draw a picture.  I'll have

1:30PM 2   you explain it first.

1:30PM 3            So what do you mean there that, when a patient that

1:30PM 4   has renal insufficiency or kidney disease is given Xarelto, how

1:30PM 5   is it that the drug has a greater effect on them?

1:30PM 6   A.    I don't know exactly what the blood does.  I just know

1:30PM 7   that the medicines are metabolized differently, and so based

1:31PM 8   upon the -- how the kidney is working is how the drug is -- is

1:31PM 9   affected in the body, and so it's my recollection, when I gave

1:31PM 10  my deposition and as I sit here today, that when a patient's

1:31PM 11  kidney function declines, that there is a chance that the --

1:31PM 12  how do I say this? -- the blood may be too thin or something.

1:31PM 13  But that's just my understanding as I sit here today and as I

1:31PM 14  gave my deposition at the time.

1:31PM 15  Q.    So let's work through that, then.

1:31PM 16  A.    Okay.

1:31PM 17  Q.    Does it make sense to you that a patient that has renal

1:31PM 18  insufficiency, if they're given a full 20-milligram dose, that

1:31PM 19  they may have a higher exposure of plasma concentration to the

1:32PM 20  drug?

1:32PM 21  A.    I guess so, yes, sir.

1:32PM 22  Q.    Okay.  And then you said that if that happens, if

1:32PM 23  somebody's exposure or amount of drug in the blood goes up,

1:32PM 24  then you said that that may make their blood what?

1:32PM 25  A.    Ask your question again.  I'm sorry.

1:32PM 1    Q.   Sure.  Sure.  You said then that if that happens, that
1:32PM 2    they -- if they get more drug in their blood, then that may
1:32PM 3    make it what?  Too thin is what you said; right?
1:32PM 4    A.   It could be, yes.
1:32PM 5    Q.   So at least for kidney patients, that's a situation where
1:32PM 6    they can have increased drug in their blood; right?  Right?
1:32PM 7    A.   That's what I -- yes.
1:32PM 8    Q.   And then you said that can lead to too thin, blood too
1:32PM 9    thin.  That's what you said; right?
1:32PM 10   A.   That is what I said.
1:32PM 11   Q.   Okay.  So if you're on an anticoagulant and it's making
1:33PM 12   your blood too thin, what is the risk of -- what could happen
1:33PM 13   to the patient?
1:33PM 14   A.   As it states in our package insert, there is an increased
1:33PM 15   risk of bleeds.
1:33PM 16   Q.   Okay.  So if you -- so if you make a patient's blood too
1:33PM 17   thin, that increases risk of bleeding; right?
1:33PM 18   A.   And the contrary is also true.  If the blood was too thick
1:33PM 19   and not coagulated correctly, there's a risk of an event.  And
1:33PM 20   an event means a blood clot can happen in the leg or occur in
1:33PM 21   the lungs or a stroke could happen in some atrial fibrillation
1:33PM 22   patients.  So the reverse is also true.  There's a correlation.
1:33PM 23   Q.   And so the reason then for renal patients, because of
1:33PM 24   this, if they're on 20 milligrams and that may put too much
1:33PM 25   drug in their blood and make it too thin and increase the risk

*OFFICIAL TRANSCRIPT*

1:34PM   1   of bleeding, then for renal patients, is it your understanding,

1:34PM   2   then that's why they take the lower dose of 15 milligrams?

1:34PM   3   A.   The lower dose of 15 milligrams is indicated for an atrial

1:34PM   4   fibrillation patient.  If they have a kidney function, that's

1:34PM   5   lower than what physicians call normal.  And for --

1:34PM   6   Q.   Then on this issue of -- of whether there's too much drug

1:34PM   7   in the blood and the blood might be too thin and then there's

1:34PM   8   an increased risk of bleeding, are you aware, other than renal,

1:34PM   9   situations other than renal where patients can get a higher

1:34PM  10   level of drug in their blood and their blood be too thin and

1:35PM  11   they have an increased risk of bleeding?

1:35PM  12   A.   I don't know if I really understand your question,

1:35PM  13   Mr. Honnold.

1:35PM  14   Q.   Okay.  All right.  I'll try to do better.

1:35PM  15   A.   Okay.

1:35PM  16   Q.   Are -- other -- you were with me during the kidney patient

1:35PM  17   part?

1:35PM  18   A.   My leg's going to sleep.  I was recrossing.  Yes.

1:35PM  19   Q.   During the kidney part, you're with me, that your

1:35PM  20   understanding is consistent with what we outlined there; that

1:35PM  21   the kidney patients may get a lower dose so they don't have too

1:35PM  22   much and they don't get too thin and they don't have an

1:35PM  23   increased risk of bleeding; right?

1:35PM  24   A.   Yes.

1:35PM  25   Q.   Now, other than the situation of renal patients, are you

*OFFICIAL TRANSCRIPT*

1:35PM  1   aware of other situations where the patients can have increased

1:35PM  2   drug in the blood where the blood gets too thin, and then they

1:35PM  3   get -- let me use shorthand.  Arrow up for "increased," and ROB

1:35PM  4   for "risk of bleeding."

1:35PM  5            Are you aware of any other situations, any other

1:36PM  6   categories or types of patients where that's true?

1:36PM  7   A.   Not that I -- not as I sit here today.  Not as I sit here

1:36PM  8   today, no, sir.

1:36PM  9   Q.   As you sit here today, are you aware whether your package

1:36PM 10   insert for Xarelto identifies or outlines any other such groups

1:36PM 11   of patients?

1:36PM 12   A.   I think -- I just want to make sure I understand what

1:36PM 13   you're asking me.  It's not -- it's very vague to me.  I want

1:36PM 14   to make sure that I answer your question correctly.  So forgive

1:36PM 15   me for asking you to rephrase it.

1:36PM 16            I kind of understand, but I don't -- I can't sit here

1:36PM 17   and recall, other than kidney function, how it affects

1:36PM 18   Xarelto -- how Xarelto has affected the blood.  I can't sit

1:36PM 19   here today and say that.

1:36PM 20   Q.   Okay.  Well, I might refresh your recollection.  How about

1:36PM 21   drug interactions?

1:36PM 22   A.   Oh, okay.

1:36PM 23   Q.   Can people be on Xarelto and another kind of medicine and

1:36PM 24   that also makes the drug Xarelto level go up and that can make

1:37PM 25   their blood too thin and that can increase their risk of

1:37PM 1    bleeding?

1:37PM 2    **A.**    Well, I don't know what each specific drug-to-drug

1:37PM 3    interaction does, but there are drug-to-drug interactions

1:37PM 4    within our label.  But what effects it has on the blood, I'm

1:37PM 5    not -- I don't know that.

1:37PM 6    **Q.**    All right.  So working together, we stumbled upon another

1:37PM 7    one; right?  Drug interactions.

1:37PM 8            We can agree that those are both situations where a

1:37PM 9    patient's blood level of the drug goes up higher than what's

1:37PM 10   expected normal or anticipated and, as a result, the blood gets

1:37PM 11   too thin and there's an increased risk of bleeding; correct?

1:37PM 12           **MR. SARVER:**  Your Honor, objection.  That's exactly

1:37PM 13   the opposite of what she just told him.  That's not fair.

1:37PM 14           **THE COURT:**  Okay.  Do you understand the question,

1:37PM 15   ma'am?

1:37PM 16           **THE WITNESS:**  No, sir.  The only thing that I can

1:37PM 17   agree to answer is I know that kidney function has an effect

1:37PM 18   with Xarelto in the bloodstream, but I don't know how each drug

1:38PM 19   that's within our package insert, how that affects blood

1:38PM 20   concentrations, thick, thin.  I have no understanding or

1:38PM 21   training on that, sir.

1:38PM 22   **BY MR. HONNOLD:**

1:38PM 23   **Q.**    Okay.  Let me ask it this way then:  Are you aware whether

1:38PM 24   your package insert does talk about certain drug interactions

1:38PM 25   where that is anticipated to occur?

1:38PM 1   A.   It talks about with like CPY43A (verbatim) inhibitors and

1:38PM 2   certain medications like that.  But, again, as I stated here

1:38PM 3   under oath, that I don't know how -- if someone takes Xarelto

1:38PM 4   with one of these medications, how it's going to affect them, I

1:38PM 5   don't know.

1:38PM 6   Q.   But at least in those two situations that we talked about,

1:38PM 7   renal and the inhibitors that we talked about, those are both

1:38PM 8   situations where too much drug in the blood can lead to too

1:38PM 9   thin of blood --

1:38PM 10           THE COURT:  No, that's not what she said.

1:38PM 11           MR. SARVER:  She didn't say that.

1:38PM 12           THE COURT:  They have an effect.  She doesn't know

1:38PM 13   what the effect is, she says.

1:38PM 14           MR. HONNOLD:  Okay.  Okay.

1:38PM 15   BY MR. HONNOLD:

1:38PM 16   Q.   Are you aware that there are drug interactions identified

1:39PM 17   in the package insert or label that do speak to that situation

1:39PM 18   of increased effects or increased amount of drug in the blood

1:39PM 19   and greater effect of the drug in the blood?  Are you aware

1:39PM 20   whether the label speaks to those things or not, any type of

1:39PM 21   drug?

1:39PM 22   A.   Only thing that I'm aware of in the label is the

1:39PM 23   medications -- and I would have to flip to that section so I

1:39PM 24   can remember all the drug-to-drug interactions -- how it -- how

1:39PM 25   not to take or inform your physician if you're on these

1:39PM  1    medications.  But how it again affects the blood, Mr. Honnold,

1:39PM  2    I cannot answer that.  I don't know.

1:39PM  3    Q.    Just so it's clear then, you don't know whether there's a

1:39PM  4    drug interaction or more than one that's listed in the package

1:39PM  5    insert where there can be increased drug buildup and the blood

1:39PM  6    can get too thin?  You don't know whether there is such a drug

1:39PM  7    interaction described in the label?

1:39PM  8    A.    Actually, I'm -- your question is confusing to me.  There

1:40PM  9    are drug-to-drug interactions listed in our label, but how it

1:40PM  10   affects the blood, I cannot recall that in the package insert.

1:40PM  11   It could be there.  And again, I've never been asked that.  And

1:40PM  12   I could always get the answer using the processes as I've

1:40PM  13   explained earlier this morning.

1:40PM  14   Q.    Ma'am, is it -- is it fair to state that one of your

1:40PM  15   objectives in your job is that you try to impart your knowledge

1:40PM  16   and understanding from your training, both your original

1:40PM  17   training at hire and your ongoing training, to the physicians

1:40PM  18   in your territory every day?

1:40PM  19   A.    Can you be more specific in your terminology, "impart my

1:40PM  20   knowledge"?

1:40PM  21   Q.    Yeah.  Are you trying -- do you try every day to share

1:40PM  22   your knowledge about Xarelto with the physicians in your

1:40PM  23   territory?

1:40PM  24   A.    I go and do my job every day thinking of the patient

1:40PM  25   first.  I am there to allow the physician, if given ample time,

1:40PM 1    if he or she has a question for me related to the products and

1:41PM 2    the medicines that I'm there to talk about, to ask me

1:41PM 3    questions.  And I do the best that I can with the knowledge and

1:41PM 4    the training that I've had to answer those questions.  And if

1:41PM 5    again I can't get the answer, I have the processes in place to

1:41PM 6    get them.

1:41PM 7              MR. HONNOLD:  Your Honor, may I approach for an

1:41PM 8    exhibit?

1:41PM 9    BY MR. HONNOLD:

1:41PM 10   Q.   Ma'am --

1:41PM 11   A.   Would you like --

1:41PM 12   Q.   You can just put those in a separate stack.  I'm just

1:41PM 13   going to hand you another exhibit we're going to be talking

1:41PM 14   about.

1:41PM 15   A.   Okay.  Hold on just a second.  Uh-huh.  I'm going to place

1:41PM 16   these over here.  Okay.

1:42PM 17   Q.   Okay.  Give that back to me.  I may have done it wrong.

1:42PM 18             Let me ask you this:  Do you get data from the

1:42PM 19   company that shows how many sales calls and where you may make

1:42PM 20   them?

1:42PM 21   A.   I do.  I do.

1:42PM 22   Q.   And describe that data that you receive from the company

1:42PM 23   that gives you a chronology or an outline of the different

1:42PM 24   sales calls you make to the different doctors in your

1:42PM 25   territory.

1:42 PM  1   A.   Now, I need you to be more specific.  Is it still -- is it
1:42 PM  2   calls that I make after the calls are done or calls that are
1:42 PM  3   requested of me when I do my routing for a quarter?
1:42 PM  4   Q.   Let's do it this way.
1:42 PM  5   A.   Okay.
1:42 PM  6   Q.   When you do make a call upon a physician, do you then do
1:42 PM  7   something to record or document that?
1:42 PM  8   A.   I do.
1:42 PM  9   Q.   Okay.  And how do you record or document that call?
1:43 PM  10  A.   Okay.  I have an iPad, and I use a program called iRep,
1:43 PM  11  as I stated in my deposition, and I pull up the physician's
1:43 PM  12  name, and I am able to document the call that way.
1:43 PM  13  Q.   And then what sort of information do you put in about the
1:43 PM  14  call?
1:43 PM  15  A.   I will put in if I've left savings cards, trial cards.
1:43 PM  16  And for the jury's knowledge, a savings card is to help
1:43 PM  17  patients afford their medication, or a trial card is just --
1:43 PM  18  what that is is a 30-day trial to try the medicine.  And I
1:43 PM  19  record those.
1:43 PM  20          And if I have to leave samples for a provider, then
1:43 PM  21  the doctor or the provider has to sign for those samples, and I
1:43 PM  22  must watch that signature take place.
1:43 PM  23  Q.   And then the information that you enter into your system,
1:44 PM  24  do you also have to list whether you have a -- I don't know
1:44 PM  25  what the best word is -- an interaction or interactional detail

1:44PM    1    call with the physician?

1:44PM    2    **A.**   Either with the physician or the office staff.  We now

1:44PM    3    have the option, which we did not have when I started, or it

1:44PM    4    wasn't known to me, that we can put a nurse call in.

1:44PM    5          So my goal when I go and try to speak with a

1:44PM    6    physician's office, if they -- if the physician is busy with

1:44PM    7    patients, then I try to speak with the nurse.  And if the nurse

1:44PM    8    is busy with patients, then I leave information and talk to the

1:44PM    9    patient account representative.  The patient account

1:44PM   10    representative, their duty is to handle the insurance

1:44PM   11    companies.

1:44PM   12          And the reason I do that is because everybody in a

1:44PM   13    physician's office has contact with patient care, and if I can

1:44PM   14    help them in any way, that is why I am there.

1:45PM   15    **Q.**   I'm going to show you something that I'm not necessarily

1:45PM   16    going to offer as evidence, but I just want to kind of refresh

1:45PM   17    your recollection and ask you whether -- see if it refreshes

1:45PM   18    your recollection.

1:45PM   19          Could you look at the information that is at some of

1:45PM   20    those blue tabs and just tell me, is that the sort of document

1:45PM   21    that records -- that records your call information that you

1:45PM   22    just -- that you just talked about?

1:45PM   23          And I didn't mean to make it too daunting.  If you

1:45PM   24    just go to one of these --

1:45PM   25    **A.**   I've just never seen this document before.

Q.   Okay.  You can tell me that.  Let's just --

          MR. SARVER:  Your Honor, if she hasn't seen the

document before, we object to the use of the document.

          MR. HONNOLD:  Okay.  I just wanted to know whether

this compressed data that we have would be something that to

her knowledge would give an accurate chronology of all the

times she's called on a specific doctor.  That's all I'm trying

to get at.

          MR. SARVER:  I don't mind the question, Your Honor.

I just don't want her talking about a document she doesn't know

about.

          THE COURT:  Right.  Let's --

BY MR. HONNOLD:

Q.   Okay.  There would be a way -- do you know whether there's

a way to summarize that data, if you wanted to try to find out

how many times you'd called on a specific doctor or his office,

like Dr. Jordon, how you would do that?

A.   I don't know how to summarize the calls.  There's a --

there's a section but -- again, there's a section within iRep

where I can see calls, if my partners have been there, what

samples were left.  But it's not -- it purges, I guess, so to

speak, so it's not -- it's accurate, but there's only a certain

time period that those calls are shown there.

Q.   Would it be fair to say that between the time that you

were hired and the end of January 2015, you called on

*OFFICIAL TRANSCRIPT*

395

1:46PM    1   Dr. Jordon or his office many, many times?

1:46PM    2   A.   I went into his office many times, yes.

1:46PM    3   Q.   And is it true that you did have some detailed encounters

1:47PM    4   with Dr. Jordon during that period of time from the time that

1:47PM    5   you were hired until the end of January 2015?

1:47PM    6   A.   The recollections that I have with the encounters with

1:47PM    7   Dr. Jordon were just the very few times he signed for samples,

1:47PM    8   and at that time I would ask him -- or I would -- it's part of

1:47PM    9   our policies and procedures to have -- to watch the physician

1:47PM   10   with the nurse practitioner or physician assistant, we have to

1:47PM   11   watch them sign.  That is part of our policies and procedures,

1:47PM   12   and that was, you know, some of the stuff I learned in my

1:47PM   13   training.  And so that happened very few times, and I would

1:47PM   14   always ask, "Do you have any questions about, you know, product

1:47PM   15   A or Xarelto," if the product were Xarelto, and he always just

1:47PM   16   said no.

1:47PM   17   Q.   Would you note that as a detail on your call note?

1:47PM   18   A.   If there was a signature, that is -- it will be a call

1:47PM   19   that says "detail" and then "sample."

1:48PM   20   Q.   Okay.  And so when you -- when you put it in for a call

1:48PM   21   that says "detail" only, that just means you just dropped in

1:48PM   22   and left samples?

1:48PM   23   A.   I cannot leave samples.  It is against FDA regulations to

1:48PM   24   leave samples without an authorized signature from a licensed

1:48PM   25   health care provider.

1:48PM   1    **Q.**   So would it be consistent with your memory that you may

1:48PM   2    have had as many as 35 separate sales calls to Dr. Jordon or

1:48PM   3    his office between June of 2013 and March 10th of 2015?

1:48PM   4    **A.**   That would be a number, Mr. Honnold, I would have to grab

1:48PM   5    from the air, because I went into his office many times to be a

1:48PM   6    resource and answer any question that the staff had, that

1:48PM   7    Mr. Jordon had, his nurse practitioner may have had that was

1:48PM   8    there at the time.

1:48PM   9    **Q.**   But you don't have any specific reason to dispute that you

1:48PM   10   may have made as many as 35 sales calls to Dr. Renie Jordon or

1:48PM   11   his office during that time?

1:48PM   12       **MR. SARVER:**  Your Honor, I object.  It's speculation

1:49PM   13   now.  She said it's pulling it out of the air.

1:49PM   14       **THE COURT:**  Do you know that?  Can you answer that?

1:49PM   15       **THE WITNESS:**  I've been to his office, Your Honor,

1:49PM   16   many, many times.  I can't say --

1:49PM   17       **THE COURT:**  You just don't know how many?

1:49PM   18       **THE WITNESS:**  That's correct.  I don't know how many

1:49PM   19   numbers.  And since I'm under oath, I'm just being truthful.

1:49PM   20       **MR. HONNOLD:**  Your Honor, I would go ahead and move

1:49PM   21   into evidence as Plaintiff's Exhibit 11 and 12 the defendants'

1:49PM   22   fact sheets that reflect the information of the sales calls to

1:49PM   23   Dr. Jordon's office.

1:49PM   24       **MR. SARVER:**  Your Honor, we object.  There's tons of

1:49PM   25   information in there that has nothing to do with this witness,

1:49PM  1   nothing to do with Dr. Jordon, and plenty of information about

1:49PM  2   other doctors and other events that have nothing to do with

1:49PM  3   this case.

1:49PM  4            MR. HONNOLD:  We'll certainly tailor it and restrict

1:49PM  5   it just to show Dr. Jordon --

1:49PM  6            THE COURT:  Let's tailor it just to Dr. Jordon.

1:49PM  7            MR. HONNOLD:  I tender it at this time, Your Honor,

1:49PM  8   and then reoffer it with the redacted.

1:49PM  9            THE COURT:  Redact it, and then I'll allow it.

1:49PM  10           MR. HONNOLD:  Plaintiff's 11 and 12.

1:49PM  11           THE COURT:  Anything further?

1:49PM  12           MR. HONNOLD:  Yeah, last thing.

1:49PM  13  BY MR. HONNOLD:

1:49PM  14  Q.   The only times you and I have met have been today and then

1:49PM  15  at your deposition; right?

1:49PM  16  A.   Yes, sir.

1:49PM  17  Q.   We've never talked on the phone or had meetings or

1:50PM  18  anything of that nature; right?

1:50PM  19  A.   No, sir.

1:50PM  20  Q.   And you're here today under legal request in the form of a

1:50PM  21  subpoena to come here today and give testimony; correct?

1:50PM  22  A.   That is correct.

1:50PM  23           MR. HONNOLD:  Okay.  Thank you for your courtesy and

1:50PM  24  your time.  I don't have any further questions.

1:50PM  25           THE WITNESS:  Thank you, sir.

*OFFICIAL TRANSCRIPT*

|         |    |                                                              |
|---------|----|--------------------------------------------------------------|
| 1:50PM  | 1  | **THE COURT:**  Any cross?                                    |
| 1:50PM  | 2  | **MR. SARVER:**  Yes, Your Honor.                            |
| 1:50PM  | 3  | **CROSS-EXAMINATION**                                        |
| 1:50PM  | 4  | BY MR. SARVER:                                               |
| 1:50PM  | 5  | **Q.**   Good afternoon, Ms. Collier.                       |
| 1:50PM  | 6  | **A.**   Good afternoon.                                    |
| 1:50PM  | 7  | **Q.**   Once again, I'm going to ask you to introduce yourself to |
| 1:50PM  | 8  | the jury.  I don't think they know you.  Tell them a little bit |
| 1:50PM  | 9  | about yourself.                                             |
| 1:50PM  | 10 | **A.**   Yes, sir.  My name is Shawn Raquel Collier.  I'm a |
| 1:50PM  | 11 | graduate from the University of Southern Mississippi with a |
| 1:50PM  | 12 | degree in biology.  You know that.                         |
| 1:50PM  | 13 | I'm a mama.  I have two girls.  I have one getting         |
| 1:50PM  | 14 | ready to attend the University of Southern Mississippi, and I |
| 1:50PM  | 15 | also have a 10-year-old little girl whose first day of school |
| 1:50PM  | 16 | was today.  And I have been married and happily married for |
| 1:51PM  | 17 | almost 15 years.  We celebrate our anniversary in November. |
| 1:51PM  | 18 | **Q.**   Have you worked as a detail rep for Janssen for about four |
| 1:51PM  | 19 | years?                                                      |
| 1:51PM  | 20 | **A.**   Yes, sir.  I'm excited to have my five-year anniversary |
| 1:51PM  | 21 | next year.                                                  |
| 1:51PM  | 22 | **Q.**   And can you tell us, what is it you do as a detail rep? |
| 1:51PM  | 23 | **A.**   As a -- when I get up every morning, I go out and talk |
| 1:51PM  | 24 | with my physicians, have them -- when I walk in, my physicians, |
| 1:51PM  | 25 | if they have time, will have the ability to answer -- to ask me |

1:51PM  1    questions and just be one resource for them.  Okay?  And when I
1:51PM  2    do that, I have to, you know, stick within the policies and
1:51PM  3    procedures and just try to go in there to help.  That's just --
1:52PM  4    that's just it in a nutshell, just to help.
1:52PM  5    Q.   And when you say "the policy and procedures," what can you
1:52PM  6    talk to doctors about?
1:52PM  7    A.   I can talk to doctors about the medicines that I have been
1:52PM  8    trained on, and that is Xarelto as well as Invokana, as
1:52PM  9    Mr. Honnold mentioned before.  And I can only use
1:52PM  10   company-approved materials, and I can only use material -- I
1:52PM  11   can only use the package insert.  And, again, the package
1:52PM  12   insert is the -- the label, that big -- it's a large, huge
1:52PM  13   document.
1:52PM  14   Q.   All right.  Your territory is here surrounding Jackson; is
1:52PM  15   that correct?
1:52PM  16   A.   Well, I can tell you that the northern part of my
1:52PM  17   territory goes up to Mount Olive and as far south as Lumberton,
1:52PM  18   Mississippi -- excuse me; lunch is talking to me -- as far west
1:52PM  19   as Natchez, and as far east as Waynesboro.  That is the
1:53PM  20   dimensions of my territory.
1:53PM  21   Q.   And how many doctors do you see?
1:53PM  22   A.   That varies quarter to quarter.  We just did our call
1:53PM  23   plan, and my current physician responsibilities were around
1:53PM  24   123, 127.  It's in that number.
1:53PM  25   Q.   And of these 100-some doctors that you call upon --

1:53PM  1    A.    Yes, sir.

1:53PM  2    Q.    -- are many of them prescribing Xarelto to their patients?

1:53PM  3    A.    Yes, sir.

1:53PM  4    Q.    And you have gone to see these doctors on a number of

1:53PM  5    occasions; correct?

1:53PM  6    A.    Yes, sir.

1:53PM  7    Q.    And I think Mr. Honnold was quite correctly trying to get

1:53PM  8    you to remember, if you can, how many times you had visited one

1:53PM  9    particular doctor, a Dr. Renie Jordan.

1:53PM  10          Do you remember those questions?

1:53PM  11   A.    Yes, sir.

1:53PM  12   Q.    And you have visited Dr. Jordon on multiple occasions; is

1:53PM  13   that fair?

1:53PM  14   A.    That's fair.

1:53PM  15   Q.    You just simply can't tell us how many?

1:53PM  16   A.    I can't tell you how many.

1:54PM  17   Q.    All right.  So what I'd like you to do, because Dr. Jordon

1:54PM  18   is important to this case, I think everybody will agree,

1:54PM  19   because he prescribed Xarelto to Ms. Mingo.  Okay?

1:54PM  20   A.    Yes, sir.

1:54PM  21   Q.    All right.  I'd like you to tell the jury how your

1:54PM  22   interactions with Dr. Jordon went.

1:54PM  23   A.    The only conversation is -- what I call a conversation --

1:54PM  24   I've ever had with Dr. Jordon was at an event outside of his

1:54PM  25   office, and it was just a casual get-to-know-you kind of

*OFFICIAL TRANSCRIPT*

1:54PM  1   conversation.  Nothing medical was discussed.  Dr. Jordon has a

1:54PM  2   no-representative policy in his office.

1:54PM  3   Q.   Let me stop you there.  What is a no-representative

1:54PM  4   policy?

1:54PM  5   A.   That Dr. Jordon does not see representatives unless he has

1:54PM  6   a need for samples.

1:54PM  7   Q.   Just to be clear, are you one of those representatives

1:54PM  8   where he said, no, don't come in?

1:55PM  9   A.   Well, I am one of those representatives he -- it's not

1:55PM  10  that he says, "Oh, Shawn Collier is not allowed in my office."

1:55PM  11  It's nothing like that.

1:55PM  12  Q.   That's terrible.  I didn't mean Ms. Collier can't come in.

1:55PM  13  My apologies.

1:55PM  14  A.   All due respect, I understand.

1:55PM  15  Q.   Did Dr. Jordon have an across-the-board no-reps policy?

1:55PM  16  A.   He did, yes, sir.

1:55PM  17  Q.   Okay.  What did that mean?

1:55PM  18  A.   It meant that he -- you could not detail him, and that's

1:55PM  19  just it in a nutshell.  He did not allow time to detail.  And

1:55PM  20  so as a representative -- so I could still go into that office.

1:55PM  21  You respect that.  You respect the rule because that is his

1:55PM  22  turf.  That is -- you have to abide by the rules of each office

1:55PM  23  that you go into, and I abided by that rule.

1:55PM  24  Q.   Now, were there times when Dr. Jordon did make an

1:55PM  25  exception and have you come in?

1:56PM  1    A.    The time that I have spoken with Dr. Jordon is -- again,

1:56PM  2    as I have said, he's got -- I got to watch him sign for

1:56PM  3    samples, and I tell him, I have to -- I tell him what he's

1:56PM  4    signing for, and I ask him if he has any questions about any of

1:56PM  5    the products that I'm leaving today, and the conversation and

1:56PM  6    response he always said was no.

1:56PM  7    Q.    All right.  So let's make sure everyone understands.  You

1:56PM  8    have talked to Dr. Jordon and offered him your assistance in

1:56PM  9    terms of Xarelto; is that correct?

1:56PM  10   A.    Yes, sir.

1:56PM  11   Q.    And what did Dr. Jordon say in response to your offer to

1:56PM  12   talk about Xarelto?

1:56PM  13   A.    "No."

1:56PM  14   Q.    No questions?

1:56PM  15   A.    He would just say no.

1:56PM  16   Q.    So we've gone through -- and I think it's Plaintiff's

1:56PM  17   Exhibit 10, which is the label.  Take a look at that if that's

1:56PM  18   still in front of you.

1:56PM  19   A.    Hold on just a second.

1:56PM  20   Q.    If you can find it for us.

1:56PM  21   A.    I got it.  Whoops.  Sorry.

1:57PM  22   Q.    That's all right.  Take your time.

1:57PM  23   A.    Where would you like for me to go?

1:57PM  24   Q.    Well, let's go ahead and go to a couple of the sections

1:57PM  25   that Mr. Honnold went to.  For example, let's go to

*OFFICIAL TRANSCRIPT*

1:57PM    1    Section 12.2 on page 21.

1:57PM    2              MR. SARVER:  Jim, I don't know if you're able to do

1:57PM    3    that or not.  If you're not, don't worry about it.  There you

1:57PM    4    go.  You can do anything.

1:57PM    5              THE WITNESS:  I'm with you.

1:57PM    6    BY MR. SARVER:

1:57PM    7    Q.    Thank you.  Is that the section you and Mr. Honnold were

1:57PM    8    talking about?

1:57PM    9    A.    Yes, sir.

1:57PM   10    Q.    Did Dr. Jordon ever ask you a question about the

1:57PM   11    pharmacodynamics of Xarelto?

1:57PM   12    A.    No, sir.

1:57PM   13    Q.    Did Dr. Jordon ever ask you any question about PT at all?

1:57PM   14    A.    No, sir.

1:57PM   15    Q.    Did Dr. Jordon ever ask you any question about Factor Xa?

1:57PM   16    A.    No, sir.

1:57PM   17    Q.    Did Dr. Jordon ever ask you about this Factor Xa assay

1:58PM   18    ever?

1:58PM   19    A.    No, sir.

1:58PM   20    Q.    Now, one of the things that you and Mr. Honnold talked

1:58PM   21    about is that -- this pharmacodynamic section, is that

1:58PM   22    something that you have your own knowledge about?

1:58PM   23    A.    I have just a found -- just a small foundation.  I know

1:58PM   24    what the term -- I can describe -- I can define the term, but

1:58PM   25    what all that verbiage there says, it's -- I can't interpret

*OFFICIAL TRANSCRIPT*

1:58PM 1  that.

1:58PM 2  Q.   Like me.  Like two out of three times, I can get the word

1:58PM 3  right, pharmacodynamics.

1:58PM 4       So if a doctor ever had a question of you,

1:58PM 5  Ms. Collier -- Mrs. Collier, I'm sorry -- about

1:58PM 6  pharmacodynamics, what would you do?

1:58PM 7  A.   I would let them know -- is there a specific -- I would

1:58PM 8  ask, "Is there a specific reason why you're asking?  How can I

1:58PM 9  help?"  Okay.  Because there may be -- and if that question was

1:58PM 10  asked, if they would say, "Well, I'm concerned about" -- they

1:58PM 11  may say, "Well, I'm just concerned about how the drug interacts

1:59PM 12  in the body."  Okay?

1:59PM 13       And I was like, "Let me show you in the section right

1:59PM 14  here."  If I have the -- just for the jury's understanding,

1:59PM 15  this document here is within our iPad, and it's always

1:59PM 16  updated.  So I can pull that up, show him the section.  And I

1:59PM 17  actually let the physician read it because, again, they've had

1:59PM 18  more medical training than myself.

1:59PM 19       And I'm like, "Does that answer your question?"  And

1:59PM 20  if they would say yes, I'm like, "Okay.  Good."  And if it

1:59PM 21  didn't, I'm like, "Well, would you like me to submit a medical

1:59PM 22  information request?"

1:59PM 23  Q.   Hang on one second there.  What is a medical information

1:59PM 24  request?

1:59PM 25  A.   A medical information request is a -- is the ability for a

1:59PM 1    physician to ask a question that I am unable to answer or they

1:59PM 2    want more information on that I am not privy to because I

1:59PM 3    wasn't trained upon it.

1:59PM 4          They have to -- I actually in my iPad will type in

2:00PM 5    the question.  They have to verify that that question is

2:00PM 6    exactly what they want to know.

2:00PM 7    Q.   Make sure they get the right --

2:00PM 8    A.   Correct.

2:00PM 9    Q.   Okay.

2:00PM 10   A.   And make sure I heard them correctly with their question.

2:00PM 11   Q.   Yes, ma'am.

2:00PM 12   A.   They have to sign.  And also at that time, I have to

2:00PM 13   notify -- I have to make a distinction whether there was an

2:00PM 14   event reported or it's just a question.  Okay?

2:00PM 15         And so once they sign that and it goes up to wherever

2:00PM 16   it goes up, then they will have -- I will ask them if they want

2:00PM 17   to have a medical science liaison, a fax, or an email or a

2:00PM 18   snail mail.  And they will let me know how they would like to

2:00PM 19   receive the information that they've asked for that I am not

2:00PM 20   able to answer.

2:00PM 21   Q.   Did you also I think mention that if they ask for it, they

2:00PM 22   can get somebody to come to them live and in person?

2:00PM 23   A.   That is correct.

2:00PM 24   Q.   Now, if the impression was somehow left that because

2:00PM 25   Ms. Shawn Collier doesn't know some information, that you're

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 2:01PM | 1 | going to leave the doctor hanging, was that the correct |
| 2:01PM | 2 | impression? |
| 2:01PM | 3 | **A.**   No, sir. |
| 2:01PM | 4 | **Q.**   If the doctor needs information and you don't know it, |
| 2:01PM | 5 | will you find a way to get it to them? |
| 2:01PM | 6 | **A.**   I can get it. |
| 2:01PM | 7 | **Q.**   Did that apply to the other sections that Mr. Honnold went |
| 2:01PM | 8 | through in his label?  I think the one -- the other was 5.8, if |
| 2:01PM | 9 | I remember.  Let's see if my memory is good. |
| 2:01PM | 10 | **A.**   That -- in this industry, if I cannot answer correctly, |
| 2:01PM | 11 | then I will submit a medical information request or reach out |
| 2:01PM | 12 | to one of the resources that I have talked about, because if I |
| 2:01PM | 13 | answer wrong, it can affect patients. |
| 2:01PM | 14 | **Q.**   Would you ever want to provide a doctor with wrong |
| 2:01PM | 15 | information? |
| 2:01PM | 16 | **A.**   Absolutely not. |
| 2:01PM | 17 | **Q.**   Is that why you stick to the FDA-approved label and the |
| 2:01PM | 18 | FDA-approved materials? |
| 2:01PM | 19 | **A.**   Absolutely. |
| 2:01PM | 20 | **Q.**   And if there's other information that goes beyond the |
| 2:02PM | 21 | label, what do you do? |
| 2:02PM | 22 | **A.**   I will say, "Doctor, I cannot answer that question.  Would |
| 2:02PM | 23 | you like for me to submit a medical information request?"  And |
| 2:02PM | 24 | they will say yes or no. |
| 2:02PM | 25 | **Q.**   And if we go to Section 5.7 in this document. |

2:02PM  1          **MR. SARVER:**  Jim, I was wrong.

2:02PM  2  **BY MR. SARVER:**

2:02PM  3  **Q.**    Do you remember the early discussion you had with

2:02PM  4  Mr. Honnold concerning the anticoagulant effect of Xarelto?  Do

2:02PM  5  you remember that?

2:02PM  6  **A.**    Yes, sir.

2:02PM  7  **Q.**    Okay.  And that's found in Section 5.7, right where we

2:02PM  8  are.  Do you see it?

2:02PM  9  **A.**    I do.

2:02PM  10 **Q.**    "The anticoagulant effect of Xarelto cannot be monitored

2:02PM  11 with standard laboratory testing nor readily reversed."

2:02PM  12         Is that the language that was in the label when you

2:02PM  13 talked to doctors?

2:02PM  14 **A.**    As far as my recollection, yes.

2:02PM  15 **Q.**    Okay.  Now, did any doctor that you ever detailed ever ask

2:03PM  16 you a question about that?

2:03PM  17 **A.**    I have never been asked a question about that, no, sir.

2:03PM  18 **Q.**    Did any doctor that you've ever detailed ask you a

2:03PM  19 question about the pharmacodynamic effects of Xarelto?

2:03PM  20 **A.**    No, sir.

2:03PM  21 **Q.**    Had they, would you have helped them out by offering other

2:03PM  22 information?

2:03PM  23 **A.**    Again, I try to help out every day when I do my job.

2:03PM  24 **Q.**    Now, do you -- do you try to get to know the doctors that

2:03PM  25 you detail?

*OFFICIAL TRANSCRIPT*

2:03PM   1    **A.**   Yes, sir.

2:03PM   2    **Q.**   All right.  I think you told us that quite a few of them

2:03PM   3    are still today prescribing Xarelto?

2:03PM   4    **A.**   Yes, sir.

2:03PM   5    **Q.**   Are these -- are these smart doctors that you talk to?

2:03PM   6    **A.**   Well, they're definitely smarter than I am.  I did not go

2:03PM   7    to medical school, even though my father wanted me to.  But I

2:03PM   8    did not.  I had a family.  But they have more training than

2:03PM   9    I've had, yes, sir.

2:03PM   10   **Q.**   And can you tell by your discussions with these doctors

2:03PM   11   whether or not they care about their patients?

2:04PM   12   **A.**   I can tell in their unspoken words as well as their spoken

2:04PM   13   ones.  When I have been waiting to talk to a physician for

2:04PM   14   30 minutes, they will come in and say, "I'm so sorry.  I've

2:04PM   15   been with a patient."  And then my response is, "I understand.

2:04PM   16   Your patients come first."

2:04PM   17           And so I believe all of my physicians and providers

2:04PM   18   care for their patients; otherwise, they wouldn't have become a

2:04PM   19   medical provider to help treat the community.

2:04PM   20   **Q.**   And the many doctors that you work with who prescribe

2:04PM   21   Xarelto to their patients, what does it tell you that, after

2:04PM   22   four years of having Xarelto out there available for use, they

2:04PM   23   prescribe it today?  What does that tell you?

2:04PM   24   **A.**   It tells me that they believe in the medicine.  It tells

2:04PM   25   me that they believe that it works.  They -- it -- the reason I

*OFFICIAL TRANSCRIPT*

2:04PM  1    am confident in saying that, sitting here, is because I promise

2:05PM  2    y'all that my doctors are vocal and they will tell me the good,

2:05PM  3    the bad.  They do talk.  They do communicate.  And to this day,

2:05PM  4    I haven't, you know -- they're still prescribing it.

2:05PM  5    Q.    Are any of your doctors shy or afraid of telling you about

2:05PM  6    something that was wrong?

2:05PM  7    A.    No, sir.  Sometimes I wish they were.

2:05PM  8    Q.    If they've got a problem, do they tell you?

2:05PM  9    A.    Absolutely.  They always do, yes.

2:05PM  10   Q.    Have the doctors that you've worked with complained to you

2:05PM  11   about Xarelto?

2:05PM  12   A.    No, sir.

2:05PM  13   Q.    Now, there's one thing that --

2:05PM  14          MR. SARVER:  Mr. Honnold, do you mind if I flip one

2:05PM  15   of your charts over?

2:05PM  16          MR. HONNOLD:  Absolutely, not.

2:05PM  17          MR. SARVER:  Thank you, sir.

2:05PM  18   BY MR. SARVER:

2:05PM  19   Q.    There's one thing you and Mr. Honnold were talking about,

2:05PM  20   and I just want to make sure we're on the same page.  This was

2:06PM  21   the stuff about renal.  Remember that?

2:06PM  22   A.    Yes, sir, I do.

2:06PM  23   Q.    And you talked about thin blood, thick blood, all that

2:06PM  24   stuff.

2:06PM  25   A.    Yes, sir.

*OFFICIAL TRANSCRIPT*

2:06PM  1   Q.   Do you have any knowledge or training or understanding in

2:06PM  2   what it means to have blood that is too thin and might cause a

2:06PM  3   risk of bleeding?  Do you understand that at all?

2:06PM  4   A.   Not really.  Sorry.

2:06PM  5   Q.   That's all right.  Just wanted to make sure.

2:06PM  6           So if Mr. Honnold is going to tell the jury that too

2:06PM  7   thin blood means your risk of bleeding goes up, he shouldn't be

2:06PM  8   relying on Shawn Collier for that?

2:06PM  9   A.   I am not the correct person to ask that.  But if it was in

2:06PM  10  my job, if I was in my territory, I could get them in touch

2:06PM  11  with the right person to answer that.

2:06PM  12  Q.   You'd go out and find somebody else, but you wouldn't

2:06PM  13  answer that?

2:06PM  14          MR. HONNOLD:  I'm just going to object to the leading

2:06PM  15  nature at this point.

2:06PM  16          THE COURT:  Well, he's got her under -- he's got her

2:06PM  17  under cross, and he can do that under 611(c).

2:06PM  18  BY MR. SARVER:

2:06PM  19  Q.   If you had a question about what it means for blood to be

2:06PM  20  too thin and whether that has anything to do with bleeding

2:07PM  21  risk, would you go ask somebody else?

2:07PM  22  A.   Yes, sir.

2:07PM  23  Q.   That's not something for you to answer, is it?

2:07PM  24  A.   It's something I couldn't and I wouldn't answer.

2:07PM  25  Q.   I'm going to talk just a bit about some of the things you

| | | |
|---|---|---|
| 2:07PM | 1 | do every time you go to a doctor's office.  All right? |
| 2:07PM | 2 | A.   Yes, sir. |
| 2:07PM | 3 | Q.   Every time you go to a doctor's office, do you leave a |
| 2:07PM | 4 | copy of the warnings, the package insert, the label? |
| 2:07PM | 5 | A.   Yes, sir. |
| 2:07PM | 6 | Q.   Why do you do that? |
| 2:07PM | 7 | A.   Because if the physician is busy, as I said, running a |
| 2:07PM | 8 | business, taking care of the patients within their community, |
| 2:07PM | 9 | they're like, "Oh, I didn't speak with Shawn.  I had a question |
| 2:07PM | 10 | about Xarelto," they know the package insert is there. |
| 2:07PM | 11 | Q.   Are you familiar with something called the medication |
| 2:08PM | 12 | guide? |
| 2:08PM | 13 | A.   Yes, sir.  That is the document -- when representatives |
| 2:08PM | 14 | like myself provide samples to patients, there's a patient |
| 2:08PM | 15 | guide that is -- depending on, you know, whether the medication |
| 2:08PM | 16 | comes in a box, the medication guide is there.  But the Xarelto |
| 2:08PM | 17 | samples, the medication guide is stuck on the back with like |
| 2:08PM | 18 | a -- that light blue substance. |
| 2:08PM | 19 | Q.   So even for the sample bottles that you provide, are you |
| 2:08PM | 20 | telling the jury that the medication guide is attached to the |
| 2:08PM | 21 | sample bottle? |
| 2:08PM | 22 | A.   Yes, sir, it is. |
| 2:08PM | 23 | Q.   All right.  And we won't repeat it, but that was discussed |
| 2:08PM | 24 | earlier today with a witness by the name of Susan Geiger, and |
| 2:08PM | 25 | she talked about that. |

*OFFICIAL TRANSCRIPT*

2:08PM   1          Is it your experience that every time you gave a

2:08PM   2   sample, you also gave the medication guide?

2:08PM   3   **A.**   Yes.

2:08PM   4   **Q.**   Is that the same kind of medication guide that comes when

2:08PM   5   you get a prescription from Rite Aid or wherever you go to get

2:08PM   6   your medicines?

2:09PM   7   **A.**   I guess that's pharmacy-specific, but -- if that answers

2:09PM   8   your question.

2:09PM   9   **Q.**   All right.  Just want to be real clear.

2:09PM   10          Do you ever recall having any substantive

2:09PM   11   conversation with Dr. Renie Jordon about Xarelto?

2:09PM   12   **A.**   No, sir.

2:09PM   13          **MR. SARVER:**  Your Honor, those are all my questions.

2:09PM   14   Thank you very much.

2:09PM   15              Thank you, Ms. Collier.

2:09PM   16          **MR. HONNOLD:**  Just a couple, Your Honor.  I'll try to

2:09PM   17   be quick.

2:09PM   18                    **REDIRECT EXAMINATION**

2:09PM   19                    **BY MR. HONNOLD:**

2:09PM   20   **Q.**   Ma'am, if the Xarelto label did, in fact, give

2:09PM   21   instructions about instructing physicians on how to use a

2:09PM   22   neoplastin PT to assist in identifying patients who might be at

2:09PM   23   increased risk of bleeding, you would share that information

2:09PM   24   with physicians if it was included in the label; correct?

2:09PM   25   **A.**   Of course.  Every package label and update, I share, given

2:09PM   1   time, with the physician.

2:09PM   2   **Q.**   And if there were particular instructions where patients

2:09PM   3   might be able to avoid a particular bleed in a patient, you'd

2:09PM   4   want to share that with doctors; right?

2:10PM   5   **A.**   If it was within the confines of the package insert and if

2:10PM   6   there was a label update.

2:10PM   7   **Q.**   And if your company has the means to help identify

2:10PM   8   patients who might be at risk of increased bleeding and be able

2:10PM   9   to instruct doctors with a laboratory test, you'd want the

2:10PM  10   company to share that information if they had the means to do

2:10PM  11   it; correct?

2:10PM  12   **A.**   I don't understand what you mean by "the means."

2:10PM  13   **Q.**   If they had the ability -- if they have that information,

2:10PM  14   if they have the ability to instruct physicians to identify

2:10PM  15   patients who might be at increased risk of bleeding, you'd want

2:10PM  16   them to share that information; correct?

2:10PM  17   **A.**   If there was a -- if it had been FDA-approved in the label

2:10PM  18   and if it's company-provided, it -- if it was in the --

2:10PM  19           Hold on.  My mouth is dry.

2:10PM  20           If it was within the package insert and within the

2:10PM  21   label, the company would communicate that data.

2:10PM  22   **Q.**   And if it's out there and they have the means to put that

2:10PM  23   in there, you'd like them to do it; correct?

2:11PM  24   **A.**   I have confidence in my organization that they will convey

2:11PM  25   the information that is approved by the FDA and with their -- I

2:11PM 1  don't understand all what happens up there, but I'm confident
2:11PM 2  that they would communicate with offices and with providers.
2:11PM 3  **Q.**   You have diary notes for calls to Dr. Jordon where
2:11PM 4  sometimes it just says "detail" and then sometimes it says
2:11PM 5  "detail with sample" and then sometimes it says "presentation."
2:11PM 6      So if you noted for Dr. Jordon -- if you put in your
2:11PM 7  official company log about the calls that there was
2:11PM 8  presentation, what does that mean?
2:11PM 9  **A.**   Presentation, for example, if I could not get a
2:11PM 10 face-to-face interaction with Dr. Jordon and the nurse or
2:11PM 11 either the nurse practitioner that was in his office or the
2:11PM 12 nurse for Dr. Jordon would ask a question, I would pull up the
2:12PM 13 presentation to be able to answer the question compliantly.
2:12PM 14 **Q.**   The medical affairs thing that you talked about submitting
2:12PM 15 a request or submitting a medical request.
2:12PM 16 **A.**   Yes, sir.
2:12PM 17 **Q.**   Did you ever get exposed to something called JanssenMD in
2:12PM 18 your training?
2:12PM 19 **A.**   I recall it, but it's a not a resource that I use.
2:12PM 20 **Q.**   Do you know if JanssenMD has anything to do with medical
2:12PM 21 resources or medical affairs in terms of answering questions
2:12PM 22 like those that you were talking about?
2:12PM 23 **A.**   As I sit here today, I don't know exactly what the
2:12PM 24 conversation is.  I know I have some cards that can go into the
2:12PM 25 office Rolodex and I can order off our system, but it's just a

2:12PM   1    resource I don't have.

2:12PM   2              MR. HONNOLD:  Thank you, ma'am.

2:12PM   3              THE COURT:  Did you have any substantive discussions

2:12PM   4    with any of the people in the doctor's office, Dr. Jordon's

2:12PM   5    office?

2:12PM   6              THE WITNESS:  What do you mean, Your Honor, about --

2:12PM   7              THE COURT:  Well, you said something about

2:12PM   8    substantive, you hadn't had any substantive conversations with

2:12PM   9    Dr. Jordon.  Whatever you meant by that, did you have any

2:12PM   10   with --

2:12PM   11             THE WITNESS:  I would talk -- if there -- I would

2:13PM   12   talk with the nurses within his office.  I would talk with the

2:13PM   13   front office staff.

2:13PM   14                  If there was a package label insert -- excuse

2:13PM   15   me -- a package label update, I would make sure, say, "There

2:13PM   16   has been an update.  Let me go over this where the update has

2:13PM   17   occurred.  Could you make sure Dr. Jordon and the nurse

2:13PM   18   practitioner that was in there can get a copy?"  And they're

2:13PM   19   like, "Yes."

2:13PM   20                  And I would usually borrow one of their paper

2:13PM   21   clips.  And I would say, "I am working in McComb today.  If

2:13PM   22   they have any questions, please have them call me.  I'll be

2:13PM   23   more than happy to come back and talk to them, or I can talk to

2:13PM   24   them over the phone."  I never received a call, but --

2:13PM   25             THE COURT:  Did you get any questions from any of

```
2:13PM    1   their -- any of his staff or nurse practitioners or anything of
2:13PM    2   that sort?
2:13PM    3              THE WITNESS:  No, sir, no clinical questions.  Most
2:13PM    4   of the questions I got from the staff was insurance questions,
2:13PM    5   how the savings cards worked, how the trial cards worked.
2:14PM    6              THE COURT:  Okay.  Thank you.
2:14PM    7              THE WITNESS:  You're welcome.
2:14PM    8              THE COURT:  Okay.  You're excused.  Thank you.
2:14PM    9              THE WITNESS:  Thank you.
2:14PM   10                   (Witness excused.)
2:14PM   11              THE COURT:  Call your next witness, please.
2:14PM   12              MR. BIRCHFIELD:  Your Honor, at this time, the
2:14PM   13   plaintiff would call Angela Seifert.
2:14PM   14              MR. SARVER:  Ms. Collier, you can just leave
2:14PM   15   everything here and make yourself comfortable.  Thank you.
2:14PM   16              THE COURT:  Do we need to take a break, anybody?
2:14PM   17              Okay.  Let's a take a 10-minute break at this
2:14PM   18   time.
2:14PM   19              THE DEPUTY CLERK:  All rise.
2:14PM   20         (Whereupon the jury was excused from the courtroom.)
2:22PM   21                   (Recess.)
2:28PM   22         (Whereupon the jury entered the courtroom.)
2:29PM   23              THE COURT:  Be seated, please.
2:29PM   24              Call your witness.
2:29PM   25              MR. BIRCHFIELD:  At this time, the plaintiff calls
```

*OFFICIAL TRANSCRIPT*

2:29PM   1   Angela Seifert.

2:29PM   2           **MR. SARVER:**  Ms. Seifert, if you would go up there

2:29PM   3   and stand in that little gap, Dean going to swear you in.

2:29PM   4           **THE DEPUTY CLERK:**  You can step on right around and

2:29PM   5   raise your right hand.

2:29PM   6                       (Witness sworn.)

2:29PM   7           **THE DEPUTY CLERK:**  Please have a seat.  State and

2:29PM   8   spell your name for the record, ma'am.

2:29PM   9           **THE WITNESS:**  My name is Angela, A-n-g-e-l-a;

2:29PM  10   Seifert, S-e-i-f-e-r-t.

2:29PM  11                       ANGELA SEIFERT,

2:29PM  12   a witness called on behalf of the Plaintiff, being first duly

2:29PM  13   sworn, was examined and testified as follows:

2:29PM  14                   **DIRECT EXAMINATION**

2:29PM  15                   **BY MR. BIRCHFIELD:**

2:29PM  16   BY MR. BIRCHFIELD:

2:29PM  17   **Q.**   Good afternoon, Ms. Seifert.

2:29PM  18   **A.**   Hello.

2:29PM  19   **Q.**   I'm Andy Birchfield.  You and I have never met, have we?

2:30PM  20   **A.**   No, sir.

2:30PM  21   **Q.**   And you're a professional sales representative; is that

2:30PM  22   right?

2:30PM  23   **A.**   My title is senior sales representative.

2:30PM  24   **Q.**   Okay.  And you're employed by Janssen Pharmaceuticals; is

2:30PM  25   that right?

*OFFICIAL TRANSCRIPT*

2:30PM 1   **A.**   Yes, sir.

2:30PM 2          **MR. BIRCHFIELD:**  Your Honor, at this time, we seek to

2:30PM 3   question Ms. Seifert under Rule 611(c).

2:30PM 4          **THE COURT:**  You may do so.

2:30PM 5          **THE DEPUTY CLERK:**  One second.  Pull that a little

2:30PM 6   bit closer to you so the jury can hear you.  You can pull the

2:30PM 7   mic to you.

2:30PM 8          **THE COURT:**  Members of the jury, when someone calls a

2:30PM 9   witness, by and large, they're required to ask them questions

2:30PM 10  that are not leading.  When under cross-examination, they can

2:30PM 11  ask leading questions.

2:30PM 12         A leading question is, "Your name is Joe?"

2:30PM 13  That's a leading question.  "What is your name?" is the right

2:30PM 14  one -- right question.  It's not a leading question.

2:30PM 15         There's an exception to that rule, however.

2:30PM 16  When a witness is associated with a party adverse to the

2:30PM 17  plaintiff, then the plaintiff can call the person and ask them

2:31PM 18  leading questions.  And that's what we have here.

2:31PM 19         **MR. BIRCHFIELD:**  Thank you, Your Honor.

2:31PM 20  BY MR. BIRCHFIELD:

2:31PM 21  **Q.**   Ms. Seifert, as a sales representative, you have

2:31PM 22  responsibilities for the area that includes McComb,

2:31PM 23  Mississippi; is that right?

2:31PM 24  **A.**   Yes, sir, I do.

2:31PM 25  **Q.**   And that's where Dr. Renie Jordon has a medical practice;

*OFFICIAL TRANSCRIPT*

419

| | | |
|---|---|---|
| 2:31PM | 1 | is that right? |
| 2:31PM | 2 | A.   Yes, sir. |
| 2:31PM | 3 | Q.   And your responsibilities include providing information |
| 2:31PM | 4 | about the product Xarelto; is that true? |
| 2:31PM | 5 | A.   It's true.  I did a fair and balanced discussion on |
| 2:31PM | 6 | Xarelto, according to the package insert. |
| 2:31PM | 7 | Q.   Okay.  And "fair and balanced," that's important language, |
| 2:31PM | 8 | right, when you're talking about delivering your messages? |
| 2:31PM | 9 | A.   Yes, sir. |
| 2:31PM | 10 | Q.   And -- okay.  And you have not given a deposition in this |
| 2:31PM | 11 | case? |
| 2:31PM | 12 | A.   No, sir. |
| 2:31PM | 13 | Q.   Have you ever -- have you ever given any deposition |
| 2:31PM | 14 | before? |
| 2:31PM | 15 | A.   No, sir. |
| 2:31PM | 16 | Q.   Have you ever testified in court before? |
| 2:31PM | 17 | A.   No, sir. |
| 2:31PM | 18 | Q.   I just have a -- I have just a couple of areas of |
| 2:32PM | 19 | question.  I have another one now on fair and balanced, but I |
| 2:32PM | 20 | want to cover just a couple of areas with you this afternoon. |
| 2:32PM | 21 | And we've had some testimony already in this case about KOLs, |
| 2:32PM | 22 | or key opinion leaders.  Are you familiar with that term? |
| 2:32PM | 23 | A.   I am familiar with that term. |
| 2:32PM | 24 | Q.   And key opinion leaders are speakers -- sometimes they're |
| 2:32PM | 25 | called to speak in local events for doctors in your area; is |

*OFFICIAL TRANSCRIPT*

2:32PM 1  that right?

2:32PM 2  **A.**   I do not have any KOLs in my area, so I can't give any

2:32PM 3  details about exactly what they do.   I just know of them.

2:32PM 4  **Q.**   Okay.  But you also get information from key opinion

2:32PM 5  leaders that pertain to your products; is that right?

2:32PM 6  **A.**   I don't get information from them.

2:32PM 7  **Q.**   Okay.  Let me show you what is marked as Plaintiff's

2:32PM 8  Identification Number 4797236.

2:32PM 9         **MR. HONNOLD:**  And I'll mark this as Plaintiff's

2:32PM 10 Exhibit Number 12.

2:33PM 11        **THE DEPUTY CLERK:**  13.

2:33PM 12        **MR. BIRCHFIELD:**  13, Plaintiff's Exhibit Number 13.

2:33PM 13 BY MR. BIRCHFIELD:

2:33PM 14 **Q.**   And, Ms. Seifert, this is a -- this is a PowerPoint that

2:33PM 15 you received; correct?

2:33PM 16 **A.**   May I take a minute just to look at it?

2:33PM 17 **Q.**   Sure.

2:33PM 18 **A.**   I don't recall this PowerPoint.

2:33PM 19 **Q.**   Okay.  Are you saying that you've never received it, or

2:33PM 20 you just don't remember receiving it?

2:33PM 21 **A.**   I don't remember it.

2:33PM 22 **Q.**   Okay.  Let me show you what's marked as Plaintiff's

2:33PM 23 Identification Number 4797235.

2:34PM 24        Ms. Seifert, you recognize that as an email -- the

2:34PM 25 top email is an email sent from you to Lori Matthews; is that

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 2:34PM | 1 | right? |
| 2:34PM | 2 | A.   Yes, sir. |
| 2:34PM | 3 | Q.   Now, is Lori Matthews -- is she a contract representative? |
| 2:34PM | 4 | A.   I don't remember. |
| 2:34PM | 5 | Q.   Okay.  All right.  So let's look down little bit further. |
| 2:34PM | 6 | You see that this is a -- you were forwarding to her an email |
| 2:34PM | 7 | that you received from Paul Ruis; is that right? |
| 2:34PM | 8 | A.   Ruis, yes, sir. |
| 2:34PM | 9 | Q.   Okay.  And it attached -- that email attached this |
| 2:34PM | 10 | Xarelto, Pradaxa, warfarin PowerPoint; is that right? |
| 2:34PM | 11 | A.   I see where it says the attachment. |
| 2:34PM | 12 | Q.   Okay.  All right.  And so does that refresh your |
| 2:34PM | 13 | recollection?  You remember receiving this PowerPoint now? |
| 2:35PM | 14 | A.   No, sir, it does not. |
| 2:35PM | 15 | Q.   All right.  Let's take a look at the PowerPoint. |
| 2:35PM | 16 | MR. SARVER:  Objection, Your Honor.  He tried, but |
| 2:35PM | 17 | she doesn't remember this. |
| 2:35PM | 18 | THE COURT:  Yeah, she didn't.  Right. |
| 2:35PM | 19 | BY MR. BIRCHFIELD: |
| 2:35PM | 20 | Q.   Okay.  All right.  Let's -- okay.  Let's -- let's take a |
| 2:35PM | 21 | look at the first page. |
| 2:35PM | 22 | MR. SARVER:  Your Honor, I objected to the document, |
| 2:35PM | 23 | and I believe you sustained the objection. |
| 2:35PM | 24 | MR. BIRCHFIELD:  I'm not moving it into evidence, |
| 2:35PM | 25 | Your Honor, but it's a PowerPoint that she received by email |

2:35PM  1    from --
2:35PM  2              THE COURT:  But she just doesn't remember it.  I'll
2:35PM  3    see how it goes.
2:35PM  4              MR. SARVER:  Your Honor, there's another issue with
2:35PM  5    it.  At the bottom of this PowerPoint, it's a bit difficult to
2:35PM  6    figure out what this is.  It's a private practice blog with
2:35PM  7    some doctor who doesn't have anything to do with this case.
2:35PM  8              MR. BIRCHFIELD:  Well, that's not true, Your Honor.
2:35PM  9              THE COURT:  In any event, I'm not going to allow it
2:35PM  10   into evidence, at least at this point.
2:35PM  11             What's the -- take it a step at a time.  What's
2:35PM  12   your question?
2:35PM  13             MR. BIRCHFIELD:  Your Honor, may I -- may I get
2:35PM  14   Exhibit 10, Plaintiff's Exhibit 10?
2:36PM  15             THE DEPUTY CLERK:  I do not have them.
2:36PM  16             MR. BIRCHFIELD:  Okay.  This is the exhibit?
2:36PM  17             MR. SARVER:  One you've already introduced?
2:36PM  18             MR. BIRCHFIELD:  It's already introduced.
2:36PM  19             MR. SARVER:  Yeah, no problem.
2:36PM  20   BY MR. BIRCHFIELD:
2:36PM  21   Q.   I'll show you what has already been introduced into
2:36PM  22   evidence as Plaintiff's Exhibit 10.  And this is the key
2:36PM  23   opinion leaders for -- for Xarelto.  If you will -- if you will
2:36PM  24   turn to -- if you'll turn to page 8, PDF 8, do you see that,
2:36PM  25   Ms. Seifert?

*OFFICIAL TRANSCRIPT*

2:36PM   1   **A.**   Yes, sir.

2:36PM   2   **Q.**   Okay.  All right.  And if you will -- if you will look

2:36PM   3   one, two, three, four, five, six, seven, eight, nine -- nine

2:36PM   4   rows down, do you see -- do you see Dr. Seth Bilazarian?  Do

2:37PM   5   you see him listed there as a national Xarelto key opinion

2:37PM   6   leader?

2:37PM   7   **A.**   I see his name there.

2:37PM   8   **Q.**   Okay.  And the PowerPoint presentation that I just handed

2:37PM   9   you, that is a PowerPoint presentation that was authored by

2:37PM  10   Dr. Seth Bilazarian; is that correct?

2:37PM  11   **A.**   I don't know.

2:37PM  12        **MR. SARVER:**  Your Honor, objection.  The witness has

2:37PM  13   testified she doesn't know what this is.

2:37PM  14        **THE COURT:**  Just ask her questions without this then.

2:37PM  15   What's the question?

2:37PM  16        **MR. BIRCHFIELD:**  All right.

2:37PM  17   BY MR. BIRCHFIELD:

2:37PM  18   **Q.**   If the PowerPoint presentation says that it is not

2:37PM  19   possible to monitor Xarelto, would that be consistent with your

2:37PM  20   understanding of the drug?

2:37PM  21        **MR. SARVER:**  Objection to the question.  Now it is

2:37PM  22   calling for hearsay from a document not in evidence.  He can

2:37PM  23   simply ask the question.

2:37PM  24        **THE COURT:**  Just ask the question.

        25

BY MR. BIRCHFIELD:

Q.   Is it possible to monitor the effect of Xarelto?

A.   According to the package insert, there is no monitoring for Xarelto.

Q.   Okay.  All right.  So -- but that's not my question.

My question is is it possible to measure the effect of Xarelto?

A.   I'm not a physician, and I'm not a scientist.  I can't answer that.  I can tell you what it says according to the package insert.

Q.   Okay.  So whether it's possible or not, that's beyond your ability to answer?

A.   Yes, sir.

Q.   All right.  And you -- you said that you have -- you don't have speakers, key opinion leaders in your territory.

Did I hear you right on that?

A.   Yes, sir.  I'm not aware of any key opinion leaders in our area.

Q.   Okay.  But one of the things that -- one of the things that you would do is you would arrange for -- for doctors to come and speak to other doctors on your product, about your products; right?

A.   Are you referring to speaker programs?

Q.   Okay.  All right.  Well, with -- with speaker programs, you hire doctors, you pay for doctors to come, and there may be

2:39PM 1   a dinner meeting, and there would be other doctors that would
2:39PM 2   come, and they would gather, and you would have a speaker make
2:39PM 3   a presentation on Janssen's behalf; correct?
2:39PM 4   A.   I didn't have anything to do with -- you're asking if I
2:39PM 5   hired.  I -- I am allocated so many speaker programs as a
2:39PM 6   resource, and I am able to put that in to -- and it's a request
2:39PM 7   to do a speaker program.  It does have to be approved, but
2:39PM 8   that's all beyond -- I put it in, and then I have to wait.
2:39PM 9   Q.   All right.  But at these speaker programs, I mean, what
2:39PM 10  happens is a doctor that is paid by Janssen will come and speak
2:40PM 11  to other doctors about your product; right?
2:40PM 12  A.   They do speak about Xarelto.
2:40PM 13  Q.   Okay.  And the idea is that that doctor will influence the
2:40PM 14  prescribing practices of the doctors that are in attendance;
2:40PM 15  right?
2:40PM 16  A.   They are there to be a resource, just as I'm there to be a
2:40PM 17  resource.  But I'm not a doctor.  So when I am discussing
2:40PM 18  Xarelto, sometimes they like to discuss it with other
2:40PM 19  physicians that are on their level, and that's what a speaker
2:40PM 20  program does.  It's to provide information that they -- some
2:40PM 21  question -- for them to ask questions that maybe they're not
2:40PM 22  going to ask me.
2:40PM 23  Q.   All right.  And you understand that when doctors get
2:40PM 24  together, they talk about their prescribing practices; right?
2:40PM 25  A.   What --

|         |    |                                                                              |
|---------|----|------------------------------------------------------------------------------|
| 2:40PM  | 1  | Q.   They'll talk about the drugs that they prescribe; right?                |
| 2:40PM  | 2  |          MR. SARVER:  Objection, Your Honor.  This is calling                |
| 2:40PM  | 3  | for speculation.                                                             |
| 2:40PM  | 4  |          THE COURT:  Ask her whether she knows.                              |
| 2:40PM  | 5  |          Have you ever been to one of those speaker                          |
| 2:40PM  | 6  | programs?                                                                    |
| 2:40PM  | 7  |          THE WITNESS:  Yes, sir, I've been in attendance.                    |
| 2:41PM  | 8  | BY MR. BIRCHFIELD:                                                           |
| 2:41PM  | 9  | Q.   And at those events, you know that doctors discuss among                |
| 2:41PM  | 10 | themselves the drugs that they prescribe; right?                             |
| 2:41PM  | 11 | A.   The doctors that are in attendance will ask questions to                |
| 2:41PM  | 12 | the speaker.                                                                 |
| 2:41PM  | 13 | Q.   Okay.  But that's -- but I'm asking something a little                  |
| 2:41PM  | 14 | different than that.  I understand that there's that exchange                |
| 2:41PM  | 15 | between the speaker and those that are in attendance.  But when              |
| 2:41PM  | 16 | doctors get together, they discuss -- don't they discuss --                  |
| 2:41PM  | 17 | A.   That's where you're --                                                  |
| 2:41PM  | 18 | Q.   Don't you know that they discuss their prescribing                      |
| 2:41PM  | 19 | practices?                                                                   |
| 2:41PM  | 20 | A.   Yes, sir.  They'll discuss where they're using it in                    |
| 2:41PM  | 21 | appropriate patients, something that maybe they're not going to             |
| 2:41PM  | 22 | ask me because I'm not a physician.                                          |
| 2:41PM  | 23 | Q.   So if a doctor is in attendance at these meetings and he's              |
| 2:41PM  | 24 | been visited by a sales representative, he can pass that                     |
| 2:41PM  | 25 | information along to other doctors that he's talking with at                 |

| | | |
|---|---|---|
| 2:41PM | 1 | dinner; right? |
| 2:41PM | 2 | MR. SARVER:  Objection, Your Honor.  This is |
| 2:41PM | 3 | speculation. |
| 2:41PM | 4 | MR. BIRCHFIELD:  Your Honor, they arrange these |
| 2:42PM | 5 | dinner meetings. |
| 2:42PM | 6 | THE COURT:  I'll overrule the objection and allow it. |
| 2:42PM | 7 | THE WITNESS:  Can you repeat the question? |
| 2:42PM | 8 | BY MR. BIRCHFIELD: |
| 2:42PM | 9 | Q.   So at these -- at these dinner meetings, doctors are |
| 2:42PM | 10 | talking among themselves about the drugs that they prescribe; |
| 2:42PM | 11 | right? |
| 2:42PM | 12 | A.   Okay. |
| 2:42PM | 13 | Q.   Okay.  And so if one of those doctors has been visited by |
| 2:42PM | 14 | a sales representative and has had information about the drug |
| 2:42PM | 15 | imparted to them by that sales representative, he may pass that |
| 2:42PM | 16 | along to a doctor that hasn't seen the sales rep? |
| 2:42PM | 17 | MR. SARVER:  Speculation, Your Honor. |
| 2:42PM | 18 | THE COURT:  Have you seen that?  Have you heard that |
| 2:42PM | 19 | before? |
| 2:42PM | 20 | THE WITNESS:  No, sir, I haven't. |
| 2:42PM | 21 | BY MR. BIRCHFIELD: |
| 2:42PM | 22 | Q.   Let me show you what's marked as Plaintiff's Exhibit |
| 2:42PM | 23 | Number -- Identification Number 4797170 and 4797172.  The top |
| 2:43PM | 24 | one would be 13, and then 14. |
| 2:43PM | 25 | MR. BIRCHFIELD:  13 and 14, Dean? |

2:43PM  1          THE DEPUTY CLERK:  It's going to be 15 and 16,

2:43PM  2     actually.

2:43PM  3     BY MR. BIRCHFIELD:

2:43PM  4     Q.   Okay.  So 4797170, Plaintiff's Exhibit 17 (verbatim),

2:43PM  5     Ms. Seifert, that is an email from you to Shawn Collier; is

2:43PM  6     that correct?

2:43PM  7     A.   Yes, sir.

2:43PM  8          MR. BIRCHFIELD:  Your Honor, we offer Plaintiff's

2:43PM  9     Exhibit 15.

2:43PM  10          THE COURT:  Any objection?

2:43PM  11          MR. SARVER:  Well, until there's some relevance to

2:43PM  12    it, Your Honor, I do object.  It's simply a document at this

2:43PM  13    point.

2:43PM  14          THE COURT:  Well, yeah.  Well, it's from her.

2:43PM  15          MR. SARVER:  It is from her, yes, sir.

2:43PM  16          THE COURT:  Okay.  I'll admit it.

2:43PM  17    BY MR. BIRCHFIELD:

2:44PM  18    Q.   All right.  And in Document Number 4797172, Plaintiff's

2:44PM  19    Exhibit 16, that is the attachment from email, Plaintiff's

2:44PM  20    Exhibit 15; correct?

2:44PM  21    A.   On this top one?

2:44PM  22    Q.   Yes.

2:44PM  23    A.   Oh.

2:44PM  24    Q.   I'm sorry.  The top one is the email and the bottom one is

2:44PM  25    the attachment to the email; is that correct?

*OFFICIAL TRANSCRIPT*

|          |    |                                                                        |
|----------|----|------------------------------------------------------------------------|
| 2:44PM   | 1  | A.   Yes, sir, this -- yes, I believe that this is what this            |
| 2:44PM   | 2  | is.  I had forwarded this is what it looks like.                        |
| 2:44PM   | 3  | Q.   And this is a -- and this is a letter arranging Dr. Smith          |
| 2:44PM   | 4  | to come and speak at one of these speaker program events; is           |
| 2:44PM   | 5  | that right?                                                             |
| 2:44PM   | 6  | A.   This is utilizing MedForce that does arrange when -- once          |
| 2:44PM   | 7  | we've got a program approved.                                          |

**A.**   Yes, sir, this -- yes, I believe that this is what this is.  I had forwarded this is what it looks like.

**Q.**   And this is a -- and this is a letter arranging Dr. Smith to come and speak at one of these speaker program events; is that right?

**A.**   This is utilizing MedForce that does arrange when -- once we've got a program approved.

            **MR. BIRCHFIELD:**  All right.  Your Honor, we offer Plaintiff's Exhibit 16 as well.

            **THE COURT:**  I thought I'd already admitted it.

            **MR. BIRCHFIELD:**  Okay.

            **THE COURT:**  I'll admit it.

BY MR. BIRCHFIELD:

**Q.**   Ms. Seifert, let me show you what's marked as -- or for identification as 4797244.  And, Ms. Seifert, this is a -- this is an email from you to Shawn Collier, the Janssen employee we just heard from; is that right?

**A.**   Yes, sir.

**Q.**   Okay.  All right.  And this --

            **MR. BIRCHFIELD:**  This email, can we get this up? Dean, can I get this?  And --

            **MR. SARVER:**  I don't think it's been admitted, Your Honor, but no objection.

            **MR. BIRCHFIELD:**  Offer it as Plaintiff's Exhibit 17, Your Honor.

*OFFICIAL TRANSCRIPT*

2:44PM  1   **A.**   Yes, sir, this -- yes, I believe that this is what this

2:44PM  2   is.  I had forwarded this is what it looks like.

2:44PM  3   **Q.**   And this is a -- and this is a letter arranging Dr. Smith

2:44PM  4   to come and speak at one of these speaker program events; is

2:44PM  5   that right?

2:44PM  6   **A.**   This is utilizing MedForce that does arrange when -- once

2:44PM  7   we've got a program approved.

2:44PM  8            **MR. BIRCHFIELD:**  All right.  Your Honor, we offer

2:44PM  9   Plaintiff's Exhibit 16 as well.

2:44PM  10            **THE COURT:**  I thought I'd already admitted it.

2:45PM  11            **MR. BIRCHFIELD:**  Okay.

2:45PM  12            **THE COURT:**  I'll admit it.

2:45PM  13   BY MR. BIRCHFIELD:

2:45PM  14   **Q.**   Ms. Seifert, let me show you what's marked as -- or for

2:45PM  15   identification as 4797244.  And, Ms. Seifert, this is a -- this

2:45PM  16   is an email from you to Shawn Collier, the Janssen employee we

2:45PM  17   just heard from; is that right?

2:45PM  18   **A.**   Yes, sir.

2:45PM  19   **Q.**   Okay.  All right.  And this --

2:45PM  20            **MR. BIRCHFIELD:**  This email, can we get this up?

2:45PM  21   Dean, can I get this?  And --

2:46PM  22            **MR. SARVER:**  I don't think it's been admitted, Your

2:46PM  23   Honor, but no objection.

2:46PM  24            **MR. BIRCHFIELD:**  Offer it as Plaintiff's Exhibit 17,

2:46PM  25   Your Honor.

*OFFICIAL TRANSCRIPT*

2:46PM   1          THE COURT:  Admitted.

2:46PM   2    BY MR. BIRCHFIELD:

2:46PM   3    Q.   All right.  And this is -- this is an email regarding a

2:46PM   4    Xarelto speaker.

2:46PM   5              Do you -- do you see that?

2:46PM   6    A.   Yes, sir.

2:46PM   7    Q.   Okay.  And the speaker is Steven Boniol, Dr. Steven

2:46PM   8    Boniol, hematology/oncology, Shreveport, Louisiana; is that

2:46PM   9    right?

2:46PM   10   A.   Yes, sir.

2:46PM   11   Q.   And then you -- you reply to Ms. Collier, and you say,

2:46PM   12   "Yes, I've been texting with" -- is that Niema (phonetically)?

2:46PM   13   A.   Niema.

2:46PM   14   Q.   -- "Niema early today, and she found out that he is very

2:46PM   15   good also.  I'm still thinking," smiley face; is that right?

2:46PM   16   A.   That's what that says.

2:46PM   17   Q.   All right.  And this -- this was in the context of

2:46PM   18   arranging for -- for Dr. Boniol to be a speaker in McComb,

2:46PM   19   Mississippi.  Reference here earlier in the email, "Just spoke

2:47PM   20   with Bridget.  She said Dr. Boniol is wonderful."  Is that

2:47PM   21   right?

2:47PM   22   A.   That -- we were asking around for, you know, who would

2:47PM   23   recommend, because it's hard to get a lot of times people to

2:47PM   24   travel to our area.  And so it was really just a matter of

2:47PM   25   seeking, asking opinions from some of the other detail

| | | |
|---|---|---|
| 2:47PM | 1 | representatives. |
| 2:47PM | 2 | **Q.**   Okay.  So you were seeking to have Dr. Boniol come to |
| 2:47PM | 3 | McComb, Mississippi, and speak at one of the programs like |
| 2:47PM | 4 | we've been talking about; right? |
| 2:47PM | 5 | **A.**   He was recommended.  I wasn't seeking him out.  That's |
| 2:47PM | 6 | what I was saying.  I was -- you know, I was trying to get |
| 2:47PM | 7 | information. |
| 2:47PM | 8 | **Q.**   Okay.  All right.  If you'll take a look at Plaintiff's |
| 2:47PM | 9 | Exhibit 10 that you looked at earlier, that -- the key opinion |
| 2:47PM | 10 | leader list. |
| 2:47PM | 11 | Do you have that, Ms. Seifert? |
| 2:47PM | 12 | **A.**   I do. |
| 2:48PM | 13 | **Q.**   And if you'll turn to -- to page 108.  Do you see -- do |
| 2:48PM | 14 | you see Dr. Boniol listed there as a key opinion leader for -- |
| 2:48PM | 15 | for Xarelto? |
| 2:48PM | 16 | **A.**   Yes, sir, his name is here. |
| 2:48PM | 17 | **Q.**   Okay.  All right.  And do you know Dr. Boniol? |
| 2:48PM | 18 | **A.**   I only know him from him doing a program for me. |
| 2:48PM | 19 | **Q.**   You know that he is a paid speaker for -- for Xarelto; |
| 2:48PM | 20 | right? |
| 2:48PM | 21 | **A.**   He is a speaker for Xarelto, for Janssen. |
| 2:48PM | 22 | **Q.**   He's been paid a whole lot of money by Janssen; right? |
| 2:48PM | 23 | **A.**   I don't know. |
| 2:48PM | 24 | **Q.**   Okay.  So when you were arranging this, did you know -- |
| 2:48PM | 25 | when you were arranging him to come and talk to doctors, did |

2:48PM  1   you know that he had been paid over a quarter million dollars

2:48PM  2   by Janssen?

2:48PM  3   A.   Absolutely not.

2:48PM  4   Q.   All right.  So when you -- when you arranged these speaker

2:49PM  5   events and you invite doctors to come, do you tell them how

2:49PM  6   much money these speakers have been paid by your company?

2:49PM  7   A.   Absolutely not.

2:49PM  8              MR. BIRCHFIELD:  Thank you, Ms. Seifert.

2:49PM  9              THE COURT:  Any cross?

2:49PM  10             MR. SARVER:  No questions, Your Honor.

2:49PM  11             THE COURT:  Okay.  You're excused.  Thank you, ma'am.

2:49PM  12                  (Witness excused.)

2:49PM  13             THE COURT:  Let's call your next witness.

2:49PM  14             MS. PRUITT:  Your Honor, before we take up the next

2:49PM  15  witness, we have an objection to a document.  Go ahead.  We

2:49PM  16  have an objection to a document that Mr. Birchfield handed me.

2:49PM  17             THE COURT:  All right.

2:49PM  18             (Whereupon the following proceedings were held at the

2:49PM  19             bench out of the hearing of the jury:)

2:54PM  20             MS. PRUITT:  They just handed me a document printed

2:54PM  21  they wanted to read --

2:54PM  22             THE COURT:  Yeah.

2:54PM  23             MS. PRUITT:  -- about Dr. Misselwitz, and our

2:54PM  24  objections are that Paragraphs 2 and 3 are basically the lawyer

2:54PM  25  testifying, Your Honor, and that's not appropriate.  The

2:54PM   1   deposition speaks for itself.  I don't have a problem with them
2:55PM   2   introducing it or saying the order of questions, but when you
2:55PM   3   go through an explanation that's a summary of what he does,
2:55PM   4   where he works as well as the substance of what they think is
2:55PM   5   important about his testimony --
2:55PM   6           THE COURT:  Where did we get this?
2:55PM   7           MS. PRUITT:  They typed it.
2:55PM   8           MR. BIRCHFIELD:  Your Honor, this is a description.
2:55PM   9   We exchanged it with plaintiff's -- defense counsel much
2:55PM  10   earlier.  I did just give it to Miss Pruitt, but we had
2:55PM  11   provided it to them, Neil and the people who were dealing with
2:55PM  12   the depositions, provided it to him.  Oh, I'm sorry.  And so --
2:55PM  13   but, Your Honor --
2:55PM  14           THE COURT:  What do you plan on doing?  Were you
2:55PM  15   telling the jury this?
2:55PM  16           MR. BIRCHFIELD:  Yes.  Judge, we have done it in each
2:55PM  17   of the trials.  We've provided a description.  To present a
2:55PM  18   deposition without giving them any -- without giving them any
2:55PM  19   context is problematic.  The key part here is that this is a
2:55PM  20   30(b)(6) witness, and his testimony does bind the company.
2:55PM  21           THE COURT:  Well, let's do it this way.  Let's
2:56PM  22   just -- tell them the first paragraph, and then just say that
2:56PM  23   this is a 30(b)(6) and, I'll tell the jury what 30(b)(6)
2:56PM  24   deposition is.
2:56PM  25           MR. BIRCHFIELD:  That's good.  Okay.

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 2:56PM | 1 |

**MS. PRUITT:**  Thank you, Judge.

**2:51PM  2**        (Whereupon the following proceedings were held in

**2:51PM  3**        open court in the presence and hearing of the jury:)

**2:51PM  4**        **MR. BIRCHFIELD:**  Judge -- Judge, I want to do the

**2:51PM  5**   last paragraph too.  They had no problem with that.

**2:52PM  6**        Your Honor, at this time the plaintiffs will

**2:52PM  7**   play the videotaped deposition of Dr. Frank Misselwitz.  He was

**2:52PM  8**   identified as the corporate representative for the Bayer

**2:52PM  9**   defendants on topics regarding VTE treatment indication for

**2:52PM  10**  Xarelto, which is the reason Ms. Mingo was prescribed Xarelto.

**2:52PM  11**       The deposition starts by questioning from the --

**2:52PM  12**  by the lawyer for Ms. Mingo followed by questioning from the

**2:52PM  13**  defense -- defense counsel, and ends with brief questioning

**2:52PM  14**  from Ms. Mingo.  But this is a -- it is a 30(b)(6) deposition.

**2:52PM  15**       **THE COURT:**  Okay.  Let me mention, members of the

**2:52PM  16**  jury, you've heard depositions.  The last time we had a live

**2:52PM  17**  deposition, a person had a live deposition, a person from

**2:52PM  18**  another place, but lawyers here, they're there.

**2:52PM  19**       Occasionally we take depositions because

**2:52PM  20**  witnesses are not available.  They're not -- they're outside of

**2:53PM  21**  the subpoena power of the Court.  At that time the witness is

**2:53PM  22**  brought to an office.  Both sides are there.  One side asks

**2:53PM  23**  questions.  The other side has an opportunity to cross-examine.

**2:53PM  24**       First, the point is that deposition is going to

**2:53PM  25**  be played to you.  You're to make the same credibility calls as

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 2:53 PM | 1 |
| 2:53 PM | 2 |
| 2:53 PM | 3 |
| 2:53 PM | 4 |
| 2:53 PM | 5 |
| 2:53 PM | 6 |
| 2:53 PM | 7 |
| 2:53 PM | 8 |
| 2:53 PM | 9 |
| 2:54 PM | 10 |
| 2:54 PM | 11 |
| 2:54 PM | 12 |
| 2:54 PM | 13 |
| 2:54 PM | 14 |
| 2:54 PM | 15 |
| 2:54 PM | 16 |
| 2:54 PM | 17 |
| 2:54 PM | 18 |
| 2:54 PM | 19 |
| 2:54 PM | 20 |
| 2:54 PM | 21 |
| 2:54 PM | 22 |
| 2:54 PM | 23 |
| 2:54 PM | 24 |
| 2:54 PM | 25 |

you would if the person were here.  It's the same as if the individual were present.

Now, this deposition is -- as counsel says, is a 30(b)(6) deposition.  That's simply a big word for it's allowed under the federal rules when a party wants to call a corporation.  You can't call a corporation, so they call an individual under what's called 30(b)(6).  That individual speaks for the corporation.  And so whatever that individual says, that's what the corporation has said.  And this is a witness that has been called for that purpose.

(Whereupon the videotape deposition of Dr. Frank
          Misselwitz was played for the jury.)
                              FRANK MISSELWITZ,
a witness called on behalf of the Plaintiff, being first duly sworn, was examined and testified as follows:

**DIRECT EXAMINATION**

**BY MR. OVERHOLTZ:**

Q.    Please take notice that, pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, plaintiffs, by and through their counsel, take the video deposition of a designated witness or witnesses of the Bayer defendants.

Do you have an understanding that you're here today to testify on behalf of Bayer?

A.    I do understand.

Q.    Okay.  Now, why don't you state your full name for the

*OFFICIAL TRANSCRIPT*

1   record?

2   **A.**   I'm Frank Misselwitz.

3   **Q.**   Okay.  And, Dr. Misselwitz, what is your current position

4   at Bayer?

5   **A.**   I'm the head of clinical development in the therapeutic

6   area, cardiovascular.  It's a vice president position and

7   consists of a number of indication areas, including thrombosis,

8   but also cardiology, nephrology, and pulmonology.

9   **Q.**   And how long have you held that position?

10   **A.**   This very position, since 2005.

11   **Q.**   And you have -- based on your role at Bayer, you have

12   familiarity with the EINSTEIN studies described there, both the

13   Phase II and the Phase III study program; correct?

14   **A.**   That is correct.

15   **Q.**   And perhaps this subject is better talked about from a

16   perspective of Phase II and then Phase III trials.  There were

17   first Phase II studies done for EINSTEIN, and those being the

18   EINSTEIN-DVT study and the ODIXa-DVT study; is that right?

19   **A.**   That is correct, yes.

20   **Q.**   And then following those two studies, that led to the

21   Phase III program for EINSTEIN; is that right?

22   **A.**   That is correct.

23   **Q.**   Okay.  And you, of course, were aware that there was an

24   agreement made with J&J on the co-development of Xarelto; is

25   that correct?

*OFFICIAL TRANSCRIPT*

2:56PM 1  A.   That is correct, right.

2:56PM 2  Q.   That partnership agreement wasn't reached until sometime

2:56PM 3  in late 2005?

2:56PM 4  A.   Correct.

2:56PM 5  Q.   But after that point, J&J, the development of the VTE

2:56PM 6  treatment indication was part of the joint development

2:56PM 7  agreement; is that right?

2:56PM 8  A.   Yes.

2:56PM 9  Q.   Between Bayer and J&J, did you -- who had primary

2:56PM 10  responsibility for the development activities related to the

2:56PM 11  VTE treatment indication?

2:56PM 12  A.   It was Bayer.

2:56PM 13  Q.   What was -- what was J&J's responsibility with respect to

2:56PM 14  the VTE treatment development and clinical trial program for

2:56PM 15  the VTE treatment indication?

2:56PM 16  A.   They were regularly apprised and informed about everything

2:56PM 17  that was going on; and of course, they had a say in all key

2:56PM 18  decisions, like the design of the clinical trial, et cetera.

2:56PM 19  But they were not involved in the day-to-day operational

2:57PM 20  conduct of the trial.

2:57PM 21  Q.   Okay.  The regulatory submissions to the US FDA, were they

2:57PM 22  responsible for those?

2:57PM 23  A.   Yes.

2:57PM 24  Q.   Okay.  Did Bayer have a belief that the VTE treatment

2:57PM 25  development program was necessary in order to have a timely

*OFFICIAL TRANSCRIPT*

2:57PM 1 submission for regulatory approval for the AFib indication?

2:57PM 2 **A.** I -- no. The answer is no.

2:57PM 3 **Q.** Okay. Do you recall there being a meeting related to VTE

2:57PM 4 treatment in Amsterdam back in 2004?

2:57PM 5 **A.** I recall that, yes.

2:57PM 6 **Q.** And if we look at Exhibit 4, it says, "Planning group

2:57PM 7 meeting, ODIXa, BAY 59-7939, July 17th, 2004, Amsterdam."

2:57PM 8 That BAY 59-7939, just so we're clear for this

2:58PM 9 deposition, that's -- that was Bayer's way of relating --

2:58PM 10 referring to rivaroxaban; is that correct?

2:58PM 11 **A.** That is correct.

2:58PM 12 **Q.** Okay. And if we look under "Background," the first bullet

2:58PM 13 point, it says, "Taking into account the competition, the

2:58PM 14 development of BAY 59-7939, or Xarelto, must be fast."

2:58PM 15 Do you see that?

2:58PM 16 **A.** I see that sentence.

2:58PM 17 **Q.** Okay. And the next sentence, you say -- or the minutes of

2:58PM 18 this meeting say that, in June 2005, "Data should be available

2:58PM 19 to make sound decisions regarding the dose for the Phase III

2:58PM 20 program."

2:58PM 21 Is that what it said?

2:58PM 22 **A.** That is correct.

2:58PM 23 **Q.** So we can kind of have an understanding of what the

2:58PM 24 ODIXa-DVT dose-finding study was, tell me what your

2:58PM 25 understanding of -- what was that -- what doses was that study

2:58PM 1   looking at, and about how many patients were being studied in

2:58PM 2   the ODIXa-DVT study?

2:58PM 3   A.   The ODIXa-DVT was a typical Phase IIb trial in the

2:58PM 4   indication of VTE treatment, to be precise, deep vein

2:59PM 5   thrombosis treatment, so we did exclude patients presenting as

2:59PM 6   a pulmonary embolism.  We studied in the parallel group design

2:59PM 7   a number of doses, and in particular b.i.d. doses, namely 10-,

2:59PM 8   20-, and 30-milligram given twice a day, as well as in one dose

2:59PM 9   arm, a 40-milligram once-a-day dosing regime, in comparison to

2:59PM 10  the standard of care, which was the combination of a

2:59PM 11  low-molecular-weight heparin given initially, in this case

2:59PM 12  enoxaparin, overlapped and followed chronically by a vitamin K

2:59PM 13  antagonist.

2:59PM 14          As it is typically the case in these type of

2:59PM 15  dose-finding trials, you aim to have about 100 patients per

2:59PM 16  dose arm so that you can reasonably well predict dose trends.

3:00PM 17  Q.   Now, you mentioned that there were three b.i.d. or twice

3:00PM 18  daily dosing arms to the study; is that right?

3:00PM 19  A.   That is correct.

3:00PM 20  Q.   Okay.  And those were done in 10-, 20- and 30-milligram

3:00PM 21  doses; correct?

3:00PM 22  A.   That is correct.

3:00PM 23  Q.   Okay.  The 40-milligram o.d. dose, that's the once daily

3:00PM 24  dose; is that right?

3:00PM 25  A.   That is correct.

*OFFICIAL TRANSCRIPT*

|   |   |   |
|---|---|---|
| 3:00PM | 1 | **Q.**   Okay.   The o.d. -- the 40-milligram o.d. dose, was that |
| 3:00PM | 2 | part of the original protocol for the ODIXa-DVT study? |
| 3:00PM | 3 | **A.**   Yes. |
| 3:00PM | 4 | **Q.**   Now, were any PK/PD samples taken in the Phase III |
| 3:00PM | 5 | EINSTEIN trials? |
| 3:00PM | 6 | **A.**   We did take PD samplings, yes. |
| 3:00PM | 7 | **Q.**   PD samples? |
| 3:00PM | 8 | **A.**   Yeah. |
| 3:00PM | 9 | **Q.**   And when were those samples taken? |
| 3:00PM | 10 | **A.**   Again, at various time points, I was making sure that the |
| 3:00PM | 11 | drug is at a steady stage and tried to capture those trough and |
| 3:00PM | 12 | peak values -- to capture those trough and peak values. |
| 3:01PM | 13 | **Q.**   Just so we're clear, you're talking about PT, prothrombin |
| 3:01PM | 14 | time? |
| 3:01PM | 15 | **A.**   Correct. |
| 3:01PM | 16 | **Q.**   And do you know how PT was measured in the Phase III |
| 3:01PM | 17 | EINSTEIN trials? |
| 3:01PM | 18 | **A.**   I -- as far as I remember, it has been neoplastin plus |
| 3:01PM | 19 | there's a very sensitive PT reagent. |
| 3:01PM | 20 | **Q.**   Look under Item Number 2, it says, "Strategy for an |
| 3:01PM | 21 | accelerated development." |
| 3:01PM | 22 |         Do you see that? |
| 3:01PM | 23 | **A.**   Yeah, I do see that. |
| 3:01PM | 24 | **Q.**   And we'll talk about the Phase III EINSTEIN trials a |
| 3:01PM | 25 | little bit later, but just for purposes of this discussion, |

*OFFICIAL TRANSCRIPT*

3:01PM 1   what outcome was tested in the EINSTEIN Phase III DVT trial?

3:01PM 2   A.   Recurrence of clinical symptomatic events.

3:01PM 3   Q.   As reported by the clinical investigators?

3:01PM 4   A.   And verified objectively by diagnostic imaging.

3:01PM 5   Q.   Now, if you could turn over to the next page, there's a

3:01PM 6   "Conclusions" section.  And just so we're clear, I mean, the

3:02PM 7   purpose of conducting these two Phase II VTE treatment

3:02PM 8   indication trials is to choose a dose or doses to study in the

3:02PM 9   Phase III trial program; is that right?

3:02PM 10  A.   That's an important objective, yeah.

3:02PM 11  Q.   Okay.  And to make sure that you have doses that are being

3:02PM 12  studied that are going to be efficacious, but also doses that

3:02PM 13  are within the safety margin for the drug; is that right?

3:02PM 14  A.   That is correct.

3:02PM 15  Q.   And if you look with me under "Conclusions," it says,

3:02PM 16  "Scenario 2 and 5 were considered as the most realistic

3:02PM 17  option."  It says, "The preferred dose range for Scenario 2

3:02PM 18  would be 20 and 30 milligrams o.d."

3:03PM 19        Do you know why it was -- at this meeting it was

3:03PM 20  discussed that 20 and 30 milligrams o.d. would be preferred?

3:03PM 21  A.   I mean, this was one of the options.  As you can see,

3:03PM 22  there are more options that have been discussed, and the

3:03PM 23  background against which we need to interpret these discussions

3:03PM 24  here that really were brought up as a brainstorming from this

3:03PM 25  group of experts was we knew that in VTE prevention, the

3:03PM 1   10-milligram dose o.d. had been selected to be tested in

3:03PM 2   Phase III, so that was deemed and determined as the

3:03PM 3   preventative dose.

3:03PM 4         And we know from many instances in the literature,

3:03PM 5   and it was actually really a paradigm, that for a full-blown

3:04PM 6   therapy of an existing clot, typically a threefold-higher dose

3:04PM 7   would be required.  So that would lead you to expect that the

3:04PM 8   most likely dose is to be 30 milligram.

3:04PM 9   Q.   And if you look with me, the kind of the second sentence

3:04PM 10   there, it says, "The preferred dose range for Scenario 5 would

3:04PM 11   be 20 and 40 milligram.  It might be more sensible, however, to

3:04PM 12   choose 30 milligrams, this to be on the safer side to assure

3:04PM 13   efficacy since in this design the lower dosage will be

3:04PM 14   necessary as bailout if there is a bleeding problem."

3:04PM 15         Do you see that?

3:04PM 16   A.   I see that.

3:04PM 17   Q.   And too high a dose in the VTE treatment indication could

3:04PM 18   result in a bleeding problem; is that right?

3:04PM 19   A.   It was a theoretic consideration, as was any other

3:04PM 20   anticoagulant.

3:04PM 21   Q.   But based on what information Bayer had with respect to

3:04PM 22   the use of enoxaparin in this scenario followed by vitamin K,

3:05PM 23   that you needed a dose that would at least be as efficacious as

3:05PM 24   what was currently the standard of care; right?

3:05PM 25   A.   That is fully correct.  And I also want to add here that

3:05PM  1    at that time we had these discussions ongoing, there was a lot

3:05PM  2    of anxiety to underdose because of the fear, particularly when

3:05PM  3    it comes to the treatment of pulmonary embolisms, of a not

3:05PM  4    effective dose leading to potentially fatal pulmonary

3:05PM  5    embolisms, and this had been recently documented for other

3:05PM  6    anticoagulants under development.

3:05PM  7    Q.   You didn't want to go into the trial with too low of

3:05PM  8    doses?

3:05PM  9    A.   It would actually harm the patient, which has the

3:05PM  10   potential to put the patient at an unnecessary risk.

3:05PM  11   Q.   The Phase III program, there was the EINSTEIN Phase III

3:05PM  12   trial, but there are essentially two trials within one

3:06PM  13   protocol; is that right?

3:06PM  14   A.   Correct.

3:06PM  15   Q.   It was one protocol but one DVT Phase III trial and then a

3:06PM  16   pulmonary embolism Phase III trial?

3:06PM  17   A.   Correct.

3:06PM  18   Q.   Okay.  The dose-finding studies that were done were only

3:06PM  19   conducted in DVT patients, not pulmonary embolism patients?

3:06PM  20   A.   Correct.

3:06PM  21   Q.   Okay.  It says, "Separate PE and DVT studies seem to be

3:06PM  22   the best approach since two pivotal trials are required by the

3:06PM  23   authorities due to the noninferiority design."

3:06PM  24        Do you see that?

3:06PM  25   A.   I see that.

3:06PM  1    Q.   Okay.  It says, "The PE study might be done with only two
3:06PM  2    arms, one dosage, a comparator, and could start once the
3:06PM  3    interim analysis has been concluded of the Scenario 5 DVT
3:06PM  4    study."
3:06PM  5            Do you see that?
3:06PM  6    A.   I see that.
3:06PM  7    Q.   Okay.  The EINSTEIN Phase III DVT study started before the
3:06PM  8    EINSTEIN Phase III pulmonary embolism study; is that right?
3:07PM  9    A.   We -- we actually proceeded with the preparation of both
3:07PM 10    trials at the same time.  We approved the protocol at the same
3:07PM 11    time.  And maybe due to trial logistics, one trial, the DVT
3:07PM 12    trial, may have started earlier.  But there was no intended big
3:07PM 13    delay between the two trials.
3:07PM 14    Q.   As far as the difference of when the trials concluded,
3:07PM 15    that was driven more as a result of logistics, issues like
3:07PM 16    recruitment, things like that; is that right?
3:07PM 17    A.   Indeed, that is correct.
3:07PM 18    Q.   Okay.  Now, the second bullet point talks about "Extension
3:07PM 19    of treatment up to one year or longer incorporated in the same
3:07PM 20    study or a new study."
3:07PM 21            Do you see that?
3:07PM 22    A.   Yes, I see that.
3:07PM 23    Q.   There, in fact, was an EINSTEIN-Extension study conducted;
3:07PM 24    is that right?
3:07PM 25    A.   Correct.

3:07PM   1   Q.   Okay.   And that was a separate study conducted under the

3:08PM   2   same protocol as well; is that right?

3:08PM   3   A.   That was a different protocol.

3:08PM   4   Q.   Had a different protocol.   Had its own protocol?

3:08PM   5   A.   Yes.

3:08PM   6   Q.   Okay.   The extension -- the phase -- the Phase III

3:08PM   7   EINSTEIN trials were open label; is that right?   The DVT and

3:08PM   8   the PE?

3:08PM   9   A.   That is correct.

3:08PM   10   Q.   The extension study was double-blind; is that right?

3:08PM   11   A.   That is correct.

3:08PM   12   Q.   And that is, in fact, what was done by Bayer with respect

3:08PM   13   to Xarelto, is that the dose for the ROCKET AFib trial was

3:08PM   14   based upon the VTE treatment dose-finding studies, ODIXa-DVT

3:08PM   15   and EINSTEIN-DVT; is that correct?

3:08PM   16   A.   That is correct.

3:08PM   17   Q.   So when we talk about the long-term, there's -- for the

3:08PM   18   EINSTEIN Phase III trials, there's an intensified treatment

3:08PM   19   regimen period, the three-week initial period; correct?

3:08PM   20   A.   That is correct.

3:08PM   21   Q.   And then that's followed by the long-term treatment

3:08PM   22   period; is that correct?

3:08PM   23   A.   That is correct.

3:09PM   24   Q.   Okay.   And only -- the 20-milligram o.d. dose was the only

3:09PM   25   dose studied for the long-term treatment period in the EINSTEIN

| | | |
|---|---|---|
| 3:09PM | 1 | Phase III trials; right? |
| 3:09PM | 2 | **A.**   Do you mean the setting of EINSTEIN-Extension? |
| 3:09PM | 3 | **Q.**   Just the EINSTEIN-PE and EINSTEIN-DVT trials. |
| 3:09PM | 4 | **A.**   Yes, that's correct. |
| 3:09PM | 5 | **Q.**   No other doses as far as, for example, 15 milligrams or |
| 3:09PM | 6 | 10 milligrams?  Just the 20-milligram o.d. dose; right? |
| 3:09PM | 7 | **A.**   That is correct. |
| 3:09PM | 8 | **Q.**   Okay.  And also a b.i.d. dose for that part of the trial, |
| 3:09PM | 9 | the long-term treatment period of the EINSTEIN studies, there |
| 3:09PM | 10 | was no b.i.d. dose studied? |
| 3:09PM | 11 | **A.**   That is correct as well. |
| 3:09PM | 12 | **Q.**   Okay.  If you look at this last bullet point, it says, |
| 3:09PM | 13 | "Although most participants were in favor of once-daily dosing, |
| 3:10PM | 14 | some remained in favor of b.i.d. dosing and proposed to proceed |
| 3:10PM | 15 | also with this dosing regimen." |
| 3:10PM | 16 |         Do you see that? |
| 3:10PM | 17 | **A.**   I see that. |
| 3:10PM | 18 | **Q.**   It would have been possible for Bayer to test both the |
| 3:10PM | 19 | b.i.d. and once-daily dose for the long-term treatment period |
| 3:10PM | 20 | in the EINSTEIN Phase III trials; correct? |
| 3:10PM | 21 | **A.**   It's a theoretical consideration. |
| 3:10PM | 22 | **Q.**   You would certainly agree that at the time that the |
| 3:10PM | 23 | Phase III EINSTEIN trials began, that Bayer had very limited |
| 3:10PM | 24 | data comparing the efficacy and safety of once-daily dosing to |
| 3:10PM | 25 | twice-daily dosing for Xarelto; correct? |

A.    Well, we had performed a number of comparisons between

o.d. and b.i.d., and we had done -- considering the time we

embarked on the Phase III program, we had done two dose-ranging

trials.  One predominantly was b.i.d. dosing, and another one

predominantly was o.d. dosing.

So I think we did fully explore that space and were

able to derive an appropriate dosing selection.

Q.    Do you agree, Dr. Misselwitz, that Bayer believed that the

VTE indications were simply premarketing for the AFib

indication?

A.    I would not agree.

Q.    And did you agree that Bayer believed that any delay in

the submission of the VTE indications would jeopardize the

submission of the AFib package for approval?

A.    No.

Q.    At this point in development -- you know, we just got

through talking 2004.  In this 2004-2005 time frame, did Bayer

believe that the competitors in the VTE treatment indication

arena would be likely using once-daily formulations?

A.    I think we had knowledge of those options, o.d. and b.i.d.

And I think it was at that point in time hard to predict how

things would be going.

Q.    I asked you about the possibility of studying both b.i.d.

and o.d. studies in the VTE treatment Phase III trials.

Was one of the reasons why Bayer chose not to study

3:12PM  1    both the b.i.d. and once-daily dose in the Phase III VTE trial
3:12PM  2    because they believed that it would be difficult to recruit
3:13PM  3    enough patients to study those?
3:13PM  4    A.    No.
3:13PM  5    Q.    Let me show you what we'll mark as Exhibit Number 5 -- is
3:13PM  6    that right?  Which is Record Number 92914.
3:13PM  7          So this is a PowerPoint presentation from 5 April,
3:13PM  8    2006 to the GDCMC.
3:13PM  9          Can you tell me what the GDCMC was?
3:13PM  10   A.    It's a global development committee.  The exact
3:13PM  11   abbreviation lacks my memory.
3:13PM  12   Q.    Okay.  And according to this PowerPoint presentation, it's
3:13PM  13   being presented by yourself, Frank Misselwitz, as well as Ton
3:13PM  14   Lensing.
3:13PM  15         Do you see that?
3:13PM  16   A.    Yes.
3:13PM  17   Q.    It's the clinical development program, and "VTE Treatment"
3:13PM  18   is the title on the first page; correct?
3:13PM  19   A.    That is correct.
3:13PM  20   Q.    Okay.  What was Ton Lensing's role with respect to the VTE
3:13PM  21   treatment indication?
3:14PM  22   A.    He was the global clinic leader who was -- who did run the
3:14PM  23   EINSTEIN-DVT dose-finding trial and who was the global clinic
3:14PM  24   leader in charge for the Phase III program.  He reported in to
3:14PM  25   me.

3:14PM  1   **Q.**   And he -- he was hired, Dr. Lensing, to work specifically

3:14PM  2   on Xarelto in the VTE EINSTEIN indication; is that right?

3:14PM  3   **A.**   That's correct.

3:14PM  4   **Q.**   And this was 5 April 2006.  By 5 April 2006, a decision

3:14PM  5   had been made with Bayer to use a once-daily dosing regime for

3:14PM  6   the VTE treatment indication; is that right?

3:14PM  7   **A.**   That is correct.

3:14PM  8   **Q.**   Okay.  And according to this, if you're looking over to

3:14PM  9   the far right, it says 20 milligram is the main dose; right?

3:15PM  10  **A.**   Uh-huh.  Correct.

3:15PM  11  **Q.**   And then it says, "Intensified treatment regimen for the

3:15PM  12  initial five to seven days treatment phase."

3:15PM  13         Do you see that?

3:15PM  14  **A.**   I see that.

3:15PM  15  **Q.**   Okay.  To try to summarize it, there -- the belief was

3:15PM  16  that successful treatment during that initial phase would

3:15PM  17  result in better outcomes for the longer follow-up treatment

3:15PM  18  period; is that right?

3:15PM  19  **A.**   That is correct.

3:15PM  20  **Q.**   Okay.  And there's a bullet point here below that.  It

3:15PM  21  says, "To be decided."  And one is "Dose for subpopulations is

3:15PM  22  required."

3:15PM  23         Do you see that?

3:15PM  24  **A.**   I do see that.

3:15PM  25  **Q.**   Okay.  That might be, for example, like in AFib, there was

450

3:15PM   1    a dose adaptation for a renally impaired patient.

3:15PM   2              That's what that's referring to?

3:15PM   3    A.    We have many subgroups.

3:15PM   4    Q.    Elderly, fragile patients?

3:15PM   5    A.    Yes.

3:15PM   6    Q.    Could be any different type of subpopulation?

3:15PM   7    A.    Yes.

3:15PM   8    Q.    Okay.  The Phase III program for VTE treatment did not use

3:16PM   9    any type of dose adaptation for any subpopulations; correct?

3:16PM  10    A.    That is correct.

3:16PM  11    Q.    Okay.  Type of intensified treatment is the second.

3:16PM  12              That's referring to that intensified treatment

3:16PM  13    regimen for the initial treatment phase; correct?

3:16PM  14    A.    (Nodding head affirmatively.)

3:16PM  15    Q.    And it says, "Rivaroxaban 10 milligrams b.i.d. or

3:16PM  16    heparins."  Correct?

3:16PM  17    A.    Correct.

3:16PM  18    Q.    So just so we're clear, in April of 2006, prior to the

3:16PM  19    EINSTEIN VTE treatment program starting, the discussion within

3:16PM  20    Bayer was about using an intensified treatment period for an

3:16PM  21    initial five- to seven-day period and then whether or not they

3:16PM  22    would use 10 milligrams twice daily of Xarelto or use the

3:16PM  23    low-molecular-weight heparins during that time period?

3:17PM  24    A.    These were options we have been discussing.  It is

3:17PM  25    important to note that this is not the final decision on the

*OFFICIAL TRANSCRIPT*

3:17PM    1    trial protocol.  That is an intermediate status update to

3:17PM    2    inform senior management about the status and, of course, also

3:17PM    3    the options we want to explore further.  And this was part of

3:17PM    4    the considerations and discussions, indeed.

3:17PM    5    **Q.**   And, in fact, the final program changed so that the

3:17PM    6    intensified treatment period ended up being a three-week period

3:17PM    7    as opposed to a five- to seven-day period; correct?

3:17PM    8    **A.**   Correct.

3:17PM    9    **Q.**   Okay.  And then also, as opposed to the intensified

3:17PM   10    treatment regimen, the final intensified treatment regimen was

3:17PM   11    Xarelto 15 milligrams twice daily; correct?

3:17PM   12    **A.**   Correct.

3:17PM   13    **Q.**   Who made the decision to -- for the intensified treatment

3:17PM   14    regimen to move the Xarelto dose up to 15 milligrams instead of

3:17PM   15    10 milligrams?

3:17PM   16    **A.**   That has been done based on careful analysis of the

3:18PM   17    available data from the two dose-finding trials, in particular

3:18PM   18    EINSTEIN -- the ODIXa-DVT trial and also a modeling and

3:18PM   19    simulation approach helping us to understand how best we could

3:18PM   20    achieve in as short as possible time the therapeutic levels of

3:18PM   21    rivaroxaban.

3:18PM   22    **Q.**   Did you -- did you have concerns about moving the dose

3:18PM   23    to -- up from 10 milligrams b.i.d. to a 15-milligram b.i.d.

3:18PM   24    dose during this intensified treatment regimen period?

3:18PM   25    **A.**   We carefully analyzed the data, and there was no reason of

3:18PM 1   particular concern.  So I -- to answer the question, I had no
3:18PM 2   concern about that because we had good data, enabling us to
3:18PM 3   predict that dose to be optimal.
3:18PM 4   **Q.**  Had you opposed that change initially and then accepted
3:18PM 5   the change later?
3:19PM 6   **A.**  Not that I would recall.
3:19PM 7   **Q.**  The next slide, Slide 7.  Yeah, do it by number.  That's
3:19PM 8   easier.
3:19PM 9           Slide 7, that's the efficacy and safety outcomes?
3:19PM 10  **A.**  Yes.
3:19PM 11  **Q.**  And so the efficacy outcome was either they've had a
3:19PM 12  recurrent VTE or the composite of a recurrent -- and then also
3:19PM 13  the composite of a recurrent VTE or fatal or nonfatal pulmonary
3:19PM 14  embolism; correct?
3:19PM 15  **A.**  The composite is an explanation, what we mean by
3:19PM 16  symptomatic recurrent VTE.
3:19PM 17  **Q.**  Okay.
3:19PM 18  **A.**  So it could be either a recurrent deep vein thrombosis, a
3:19PM 19  recurrent pulmonary embolism, or a mixture of both.
3:19PM 20  **Q.**  And then the primary safety outcome in the VTE treatment
3:19PM 21  EINSTEIN trial was defined as clinically relevant bleeding;
3:19PM 22  correct?
3:19PM 23  **A.**  That is correct.
3:19PM 24  **Q.**  And clinical relevant bleeding meant either a bleed that
3:19PM 25  was defined as a major bleed or a bleed that was defined as a

3:19PM    1    clinically relevant but nonmajor bleed; is that right?

3:20PM    2    **A.**    Correct.

3:20PM    3    **Q.**    Okay.  And we could talk a little bit about those

3:20PM    4    definitions, but generally, what is your understanding of the

3:20PM    5    difference between -- well, what is a clinically relevant

3:20PM    6    nonmajor bleed?

3:20PM    7    **A.**    The major bleeding definition is very clear, and it's

3:20PM    8    always outlined very precisely in a number of guideline

3:20PM    9    documents.  It's a very severe bleeding event typically.

3:20PM   10            And we felt that it's important to look -- sort of

3:20PM   11    see one step below that; in other words, to capture bleeding

3:20PM   12    events that would not fit the definition of a major bleed, so

3:20PM   13    would not be life-threatening, would not be into a critical

3:20PM   14    organ or into the brain but would require, say,

3:20PM   15    hospitalization, urgent medical consultation, et cetera.  So

3:20PM   16    requiring medical action in one or the other form.

3:21PM   17    **Q.**    Okay.  Dr. Misselwitz, were -- if I could have you turn to

3:21PM   18    Slide 8.  And it's the slide entitled "Sample Size

3:21PM   19    Consideration."

3:21PM   20            And one of the things I want to ask you about is

3:21PM   21    there is a bullet point that talks about "aim to demonstrate

3:21PM   22    that 75 percent of efficacy is maintained."

3:21PM   23            Do you see that?

3:21PM   24    **A.**    Yes, I do.

3:21PM   25    **Q.**    What is that referring to?

*OFFICIAL TRANSCRIPT*

**A.**   This refers to the way noninferiority trials are designed to be able to demonstrate that a new drug is at least as good -- could be better, but at least as good as the standard of care.

**Q.**   So the Phase III EINSTEIN VTE treatment trials were designed as noninferiority trials; is that right?

**A.**   That is correct.

**Q.**   And noninferiority referring to as compared to the comparator in the trial here being some form of low-molecular-weight heparin plus a vitamin K antagonist?

**A.**   Correct.

**Q.**   And when you design a noninferiority trial, one of the things that you do is predetermine the noninferiority margin; is that correct?

**A.**   That is correct.

**Q.**   Okay.  And when it talks about that 75 percent number here, that's referring to that noninferiority margin?

**A.**   Yeah.  Indirectly, yeah.

**Q.**   Another type of design of the trial that could have been considered for the VTE treatment trial would have been a superiority trial; is that correct?

**A.**   Theoretically.  But in this case, you would have needed to have evidence that you are superior.

**Q.**   And, typically, that decision is made at the outset of the trial.  You don't make that decision once you have results;

*OFFICIAL TRANSCRIPT*

3:23PM  1   correct?

3:23PM  2   **A.**   That's clear-cut, yes.

3:23PM  3   **Q.**   Okay.  And so the decision here was made that this is

3:23PM  4   going to be a trial designed to demonstrate noninferiority?

3:23PM  5   **A.**   Correct.

3:23PM  6   **Q.**   And not superiority; correct?

3:23PM  7   **A.**   Correct.

3:23PM  8   **Q.**   In the final Phase III trial we talked about before, there

3:23PM  9   was a separate trial for DVT, separate trial for PE, and then

3:23PM  10  the separate EINSTEIN-Extension trial?

3:23PM  11  **A.**   Correct.

3:23PM  12  **Q.**   Okay.  And in that -- in the final version, the

3:23PM  13  noninferiority margin for the combined results, the pooled

3:23PM  14  results was a 1.75; is that right?

3:23PM  15  **A.**   Correct.

3:23PM  16  **Q.**   For the individual pulmonary embolism trial, the PE trial,

3:24PM  17  and the DVT trial, the noninferiority margin was set at 2.0;

3:24PM  18  correct?

3:24PM  19  **A.**   That is correct.

3:24PM  20  **Q.**   Okay.  Was there some pushback from the US FDA with

3:24PM  21  respect to the size of the noninferiority margin in the VTE

3:24PM  22  Phase III trials?

3:24PM  23  **A.**   I remember very well that the FDA, whenever it comes to

3:24PM  24  noninferiority designs, discusses the margin very critically

3:24PM  25  and aims to the lowest possible -- the lowest feasible margin

3:24PM 1    that you can achieve in these type of trials.

3:24PM 2             So this is in a way not unique to this very

3:24PM 3    indication but a general theme when discussing noninferiority

3:24PM 4    trials with the FDA.

3:24PM 5    Q.   The FDA wanted the company to use a smaller noninferiority

3:25PM 6    margin; is that a fair statement?

3:25PM 7    A.   I remember the discussions.  I don't remember any

3:25PM 8    particular margin.

3:25PM 9    Q.   If a bleeding event was reported by a clinical

3:25PM 10   investigator under the study protocol, those bleeding events

3:25PM 11   would be adjudicated by a blinded committee; is that correct?

3:25PM 12   A.   That is correct.

3:25PM 13   Q.   And that's how that was set up for both the EINSTEIN-DVT,

3:25PM 14   Phase III trial, the EINSTEIN-PE Phase III trial, and the

3:25PM 15   EINSTEIN-Extension trial; is that correct?

3:25PM 16   A.   That is correct.

3:25PM 17   Q.   Okay.  And the investigators -- the clinical investigators

3:25PM 18   in the trial, they knew what treatment the patients were

3:25PM 19   taking, whether they were getting Xarelto or whether they were

3:25PM 20   either on the low-molecular-weight heparin or they had moved on

3:25PM 21   to the vitamin K antagonist?

3:25PM 22   A.   Correct.

3:25PM 23   Q.   Okay.  But the -- it was -- the protocol called for the

3:26PM 24   adjudication committee to be blinded to treatment?

3:26PM 25   A.   That is correct.

*OFFICIAL TRANSCRIPT*

3:26PM  1   Q.   When they adjudicated either an efficacy outcome or a
3:26PM  2   safety outcome?
3:26PM  3   A.   That is correct.
3:26PM  4   Q.   Okay.  The patients that were randomized to receive the
3:26PM  5   vitamin K antagonist part of the treatment, of course, they
3:26PM  6   would have had their INR tested?
3:26PM  7   A.   Correct.
3:26PM  8   Q.   And as you and I know, if you're taking a vitamin K
3:26PM  9   antagonist like warfarin, regular monitoring is required to
3:26PM  10  make sure they stay within the correct INR range; is that
3:26PM  11  right?
3:26PM  12  A.   That is correct.
3:26PM  13  Q.   Okay.  Isn't it possible that when the adjudication
3:26PM  14  committee would adjudicate bleeding events from the EINSTEIN
3:26PM  15  trials, that the presence of regular INR measurements in the
3:26PM  16  medical records they would receive would indicate to them and
3:27PM  17  give them a clue as to which treatment arm these patients
3:27PM  18  were -- which they belonged to in the clinical trial?
3:27PM  19  A.   Theoretically, yes.  But we implemented measures to avoid
3:27PM  20  exactly that because there was an organization in between of
3:27PM  21  the investigator and the adjudication committee making sure
3:27PM  22  that entries would be blackened, indicating any particular INR
3:27PM  23  value or these kind of things that could have led to an
3:27PM  24  unblinding of the adjudication committee.
3:27PM  25  Q.   Okay.  So there was actually an in-between reviewer of any

*OFFICIAL TRANSCRIPT*

3:27PM 1  materials provided to the adjudication committee that would

3:27PM 2  look for anything such as INR values that might clue an

3:27PM 3  adjudication committee member in as to what treatment arm a

3:28PM 4  patient belonged to?

3:28PM 5  A.    A reviewer in the sense of making sure that they keep the

3:28PM 6  blind, not in assessing any of those events.

3:28PM 7  Q.    Do you agree that the open-label design of these DVT

3:28PM 8  trials potentially could lead to bias in the trial design?

3:28PM 9  A.    Yes, potentially open-label designs in general could lead

3:28PM 10 to bias.  And in any case, measures to avoid that bias need to

3:28PM 11 be implemented and discussed.

3:28PM 12 Q.    Bayer, as the sponsor of the trials, they made the

3:28PM 13 decision to use an open-label design; correct?

3:28PM 14 A.    That is correct.

3:28PM 15 Q.    For example, the US FDA didn't force Bayer to use an

3:28PM 16 open-label design for those trials; correct?

3:28PM 17 A.    The FDA did not force us into such design.

3:29PM 18 Q.    Do you recall, in fact, that the FDA was critical of the

3:29PM 19 decision to use an open-label design for these trials?

3:29PM 20 A.    We had regulatory interactions and discussions with the

3:29PM 21 FDA on that topic.

3:29PM 22 Q.    Do you recall that the FDA were critical of the decision

3:29PM 23 to use an open-label design?

3:29PM 24 A.    We discussed this question with the FDA.  The FDA is of

3:29PM 25 the general opinion that a trial that can feasibly be blinded,

3:29PM   1   should ideally be conducted as a blinded trial, but we had

3:29PM   2   brought forward good reasons why we would want to do so and

3:29PM   3   agreed finally with the FDA that we are going to perform the

3:29PM   4   trial as an open-label trial.  And that had not been objected.

3:29PM   5   Q.   So I'm showing you what is an email, that was forwarded by

3:30PM   6   Dagmar Kubitza to several people, of the minutes of the CDP-RC.

3:30PM   7   And it's forwarding an email that was sent to several people,

3:30PM   8   including yourself, below that on January 28th of 2004.

3:30PM   9        Do you see that?

3:30PM  10   A.   Correct.  Yes, I see it.

3:30PM  11   Q.   Okay.  And you see you were copied on the email down

3:30PM  12   below, and it's "Minutes CDP-RC."

3:30PM  13        Do you know what the CDP-RC was?

3:30PM  14   A.   It's a clinical development plan revenue committee.

3:30PM  15   Q.   I'm sorry.  And you were the presenter there?

3:30PM  16   A.   I'm one of two presenters.

3:30PM  17   Q.   Okay.  The other presenter is Klaus Wehling; is that

3:30PM  18   correct?

3:30PM  19   A.   That's correct.

3:30PM  20   Q.   And what was Klaus Wehling's position?

3:30PM  21   A.   Klaus was at that time the project manager for the

3:30PM  22   project.

3:30PM  23   Q.   Now, this says "Goals of the CDP-RC Meeting."

3:30PM  24        Do you see that?

3:30PM  25   A.   Yes.

*OFFICIAL TRANSCRIPT*

3:30PM  1  Q.   And there's two bullet points, the second being "Continue

3:30PM  2  Phase IIb with b.i.d. formulation"; right?

3:31PM  3  A.   Yes.

3:31PM  4  Q.   Okay.  And then "Start Phase II with o.d. formulation."

3:31PM  5       Do you see that?

3:31PM  6  A.   Correct.

3:31PM  7  Q.   And then the third bullet point is "Develop o.d." --

3:31PM  8  that's once daily -- "for all indications."

3:31PM  9       Do you see that?

3:31PM  10 A.   I see that.

3:31PM  11 Q.   Okay.

3:31PM  12 A.   I'm not certain based on that document that is in front of

3:31PM  13 me whether we talked about the VTE treatment indication at all.

3:31PM  14 I actually would suspect that it refers to the VTE prevention

3:31PM  15 indication.

3:31PM  16 Q.   If you look with me to the fourth bullet point down in

3:31PM  17 this presentation that you and Mr. Wehling made to the

3:31PM  18 committee, the CDP meeting, it says, "The clear guiding

3:31PM  19 principle should to be safeguard the compound."

3:31PM  20       Do you see that?

3:31PM  21 A.   I see that.

3:31PM  22 Q.   "Therefore, b.i.d. development should continue."

3:31PM  23       Do you see that?

3:31PM  24 A.   I do see that, yes.

3:31PM  25 Q.   So then if we can drop back down to that fourth bullet

*OFFICIAL TRANSCRIPT*

```
3:32PM    1   point again, "The clear guiding principle should be to
3:32PM    2   safeguard the compound.  Therefore, b.i.d. development should
3:32PM    3   continue."
3:32PM    4            That's the statement that's made in these meeting
3:32PM    5   minutes; correct?
3:32PM    6   A.   It's written here, yes, indeed.
3:32PM    7   Q.   Okay.  And the reason why b.i.d. development had to
3:32PM    8   continue was because there was concern about the potentials for
3:32PM    9   success of demonstrating the once-daily would be noninferior to
3:32PM   10   b.i.d.; right?
3:32PM   11   A.   No, that's not correct.  I respectfully disagree.  We
3:32PM   12   wanted to generate appropriate data to make a data-driven
3:32PM   13   decision as to what is the best regime and the best dose.
3:32PM   14   Q.   And it was your belief that doing so would help maintain
3:32PM   15   that clear, guiding principle to safeguard the compound, here
3:32PM   16   being Xarelto; right?
3:32PM   17   A.   Clinical development is always guided by the principle to
3:33PM   18   first safeguard the patient, but then also to minimize the risk
3:33PM   19   for the developmental compound.
3:33PM   20   Q.   Okay.  And you would say that the clear guiding principle
3:33PM   21   should be to safeguard the patient first; right?
3:33PM   22   A.   Yes, indeed.  That's an overarching principle.
3:33PM   23   Q.   And that should be the overarching principle even if that
3:33PM   24   means that the compound isn't successful?
3:33PM   25   A.   We have overarching principles that would not need to be
```

3:33PM  1   repeated in each and every meeting minutes.  These are laid out

3:33PM  2   in different places.

3:33PM  3           But we do have a different development path for

3:33PM  4   different compounds.  You could have time-optimized

3:33PM  5   development, and you could have risk-optimized development.

3:33PM  6   And here you put emphasis on minimizing the risk.

3:33PM  7   Q.   You received this email from Martina Berner, that's listed

3:33PM  8   on Exhibit 8, on June 7th, 2006.  You're listed down at the

3:34PM  9   bottom of the people that received this email.

3:34PM  10          Do you see that?

3:34PM  11  A.   Correct.

3:34PM  12  Q.   And this was the combined minutes of the CDP-RC meeting of

3:34PM  13  April 20th and May 18th of 2006; correct?

3:34PM  14  A.   Correct.

3:34PM  15  Q.   Okay.  And this is that same CDP-RC meeting that we've

3:34PM  16  been talking about that you presented in January of 2004 that

3:34PM  17  we just finished looking at; correct?

3:34PM  18  A.   Correct.

3:34PM  19  Q.   And the title of these minutes says, "Minutes CDP-RC

3:34PM  20  Conferences for DP3 Preparations Factor Xa Inhibitor for Stroke

3:34PM  21  Prevention in Atrial Fibrillation (AFib) and Treatment of

3:34PM  22  Venous Thromboembolism (VTE Treatment)."  Right?

3:34PM  23  A.   That is correct.

3:34PM  24  Q.   And so this is getting closer in time to the actual --

3:34PM  25  this DP3 decision point meeting that's going to be held to go

| | | |
|---|---|---|
| 3:34PM | 1 | forward with Phase III development; right? |
| 3:34PM | 2 | A.   It's -- yes, that's correct. |
| 3:34PM | 3 | Q.   And you presented on the AFib indication, and yourself and |
| 3:35PM | 4 | Ton Lensing presented on the VTE treatment? |
| 3:35PM | 5 | A.   That is correct. |
| 3:35PM | 6 | Q.   Okay.  And it says that this was distributed to all of the |
| 3:35PM | 7 | people above, including Kemal Malik. |
| 3:35PM | 8 | Do you see that? |
| 3:35PM | 9 | A.   I see that, yes. |
| 3:35PM | 10 | Q.   Who is Kemal Malik? |
| 3:35PM | 11 | A.   At that time, head of development. |
| 3:35PM | 12 | Q.   Do you know what his current position is? |
| 3:35PM | 13 | A.   He's a member of the board of Bayer. |
| 3:35PM | 14 | Q.   And so if you can look with me, there's a description here |
| 3:35PM | 15 | in this -- the meeting minutes from these two -- these two |
| 3:35PM | 16 | meetings from April and May of 2006, and it says, "The first |
| 3:35PM | 17 | study is a multicenter, randomized, open-label, assessor-blind, |
| 3:35PM | 18 | event-driven, noninferiority study for efficacy with a study |
| 3:35PM | 19 | treatment duration of 3, 6, or 12 months.  Patients allocated |
| 3:36PM | 20 | to rivaroxaban will receive a dose of 20 milligrams once daily, |
| 3:36PM | 21 | preceded by a dose of 10 milligrams b.i.d. for the initial |
| 3:36PM | 22 | three-week period." |
| 3:36PM | 23 | Do you see that? |
| 3:36PM | 24 | A.   Yes. |
| 3:36PM | 25 | Q.   Eventually this study gets split into two separate studies |

3:36PM  1   under one protocol, as we've discussed?

3:36PM  2   A.   Correct.

3:36PM  3   Q.   DVT separate, PE separate?

3:36PM  4   A.   Correct.

3:36PM  5   Q.   The -- at this time in May -- through May of 2006 in these

3:36PM  6   June minutes, the discussion is indicating that the study's --

3:36PM  7   that initial intensified treatment period is going to use a

3:36PM  8   10-milligram b.i.d. dose of Xarelto; correct?

3:36PM  9   A.   That is correct.

3:36PM  10  Q.   Okay.  That in the final studies, both VTE and DVT, that

3:36PM  11  dose was changed to a 15-milligram b.i.d. dose; correct?

3:36PM  12  A.   Correct.

3:37PM  13  Q.   Then described as the comparable arm, which is the

3:37PM  14  low-molecular-weight heparin, in combination with the vitamin K

3:37PM  15  antagonist, and then continued with the vitamin K antagonist as

3:37PM  16  long as the INR reaches a certain level; is that right?

3:37PM  17  A.   Correct.

3:37PM  18  Q.   Okay.  And the vitamin K antagonist, just so we're clear

3:37PM  19  in this part of the deposition, that's something like Coumadin

3:37PM  20  or warfarin; right?

3:37PM  21  A.   Correct.

3:37PM  22  Q.   Now, in the VTE trials, Coumadin was not the only

3:37PM  23  vitamin K antagonist studied; correct?

3:37PM  24  A.   We did allow for acenocoumarol to be used.

3:37PM  25  Q.   And that was because in certain countries where -- that

| | | |
|---|---|---|
| 3:37PM | 1 | were part of the clinical trial -- |
| 3:37PM | 2 | A.   We felt very strongly that forcing physicians into the use |
| 3:37PM | 3 | of a vitamin K antagonist that is not even available in the |
| 3:37PM | 4 | country and certainly not widely used would not lead to an |
| 3:37PM | 5 | optimal treatment and could definitely be better when the |
| 3:38PM | 6 | physician is using what they are used to using. |
| 3:38PM | 7 | Q.   So they used the vitamin K antagonist that was typically |
| 3:38PM | 8 | available to them in their clinical practice? |
| 3:38PM | 9 | A.   Yes. |
| 3:38PM | 10 | Q.   Okay.  The second paragraph talks -- or third paragraph |
| 3:38PM | 11 | here talks about the principal safety outcome. |
| 3:38PM | 12 | Do you see that? |
| 3:38PM | 13 | A.   Yes. |
| 3:38PM | 14 | Q.   And it's the same outcome that we've been talking about, |
| 3:38PM | 15 | this combination of major and clinically relevant nonmajor |
| 3:38PM | 16 | bleeding? |
| 3:38PM | 17 | A.   Correct. |
| 3:38PM | 18 | Q.   And then it says, "All suspected thromboembolic |
| 3:38PM | 19 | complications, deaths, as well as episodes of overt bleeding |
| 3:38PM | 20 | will be evaluated by a central blinded independent adjudication |
| 3:38PM | 21 | committee." |
| 3:38PM | 22 | And we've talked about that; right? |
| 3:38PM | 23 | A.   Correct. |
| 3:38PM | 24 | Q.   Now, I want to ask you about this term, "overt bleeding." |
| 3:38PM | 25 | A.   Okay. |

3:38PM  1   **Q.**   Now, what does -- for purposes of the VTE trials, what did
3:38PM  2   "overt bleeding" mean?
3:38PM  3   **A.**   Overt bleeding means an overt bleeding.  So you'll
3:38PM  4   basically see blood.  You'll see it's excess.  You see blood in
3:39PM  5   stool and urine, and that has been called a -- an overt bleed.
3:39PM  6   **Q.**   Okay.  You're familiar with -- I'm seeing the term used in
3:39PM  7   some of the documents "occult bleeds"?
3:39PM  8   **A.**   Yes, I'm familiar with that term.
3:39PM  9   **Q.**   So my mom takes warfarin, and so she bumps her arm hard,
3:39PM  10  sometimes she'll get a pretty big bruise.  You can tell there
3:39PM  11  was bleeding there.  That would be classified under the VTE
3:39PM  12  trials as an -- any bleed; correct?
3:39PM  13  **A.**   Well, certainly it would be referred to as a bleed, so
3:39PM  14  that is important.  Nothing has been hidden or unreported.  It
3:39PM  15  is -- it is up to the blinded adjudication committee, according
3:39PM  16  to their definitions, to grade whether it was a major a
3:39PM  17  nonmajor clinically irrelevant bleed.
3:40PM  18  **Q.**   What about nonovert bleeds but where you have drops in the
3:40PM  19  hemoglobin?  How do those get classified under the VTE trials?
3:40PM  20  **A.**   Depends.  There is no clear-cut answer to that question
3:40PM  21  because the definition of a major bleed, for instance, it
3:40PM  22  stipulates importantly a drop of hemoglobin within a certain
3:40PM  23  time frame and not just within say a couple of months from one
3:40PM  24  measurement to the other measurement.
3:40PM  25           You need to have -- you need to make sure that you

*OFFICIAL TRANSCRIPT*

467

3:40 PM   1   document the bleeding source and that -- that the drop of
3:40 PM   2   hemoglobin is not having another etiology.  Could be
3:40 PM   3   vitamin B12 deficiency.  It could be many things.  I mean, it's
3:40 PM   4   not necessarily you're bleeding.
3:40 PM   5   Q.   All right.  So a simple drop in hemoglobin, even if it
3:41 PM   6   meets that definition of the amount of hemoglobin lost, without
3:41 PM   7   any documented source of that bleed, where that bleed is
3:41 PM   8   occurring, whether it's a gastrointestinal bleed or some other
3:41 PM   9   bleed, wouldn't be documented as a principal safety outcome
3:41 PM   10  bleed in the VTE trials; is that right?
3:41 PM   11  A.   I mean, again, that's exactly the reason why we have the
3:41 PM   12  blinded adjudication committee, to exactly garner all necessary
3:41 PM   13  information to make that call in a blind manner.
3:41 PM   14  Q.   Just the answer to my question is it doesn't get
3:41 PM   15  documented, but you believe you have -- there's reasons why it
3:41 PM   16  wouldn't be documented as a major or clinically relevant bleed,
3:41 PM   17  but it would not be documented as such, the example I gave you?
3:41 PM   18  A.   It's getting documented as the lack measurement of
3:41 PM   19  hemoglobin and hematocrit.  That's important.  So these
3:41 PM   20  documentations are available for every patient, but it may not
3:42 PM   21  be graded, for all the reasons I explained, by the blinded
3:42 PM   22  adjudication committee as a primary safety outcome.
3:42 PM   23  Q.   Yeah.  Now, there's a "Conclusions" section, and it says,
3:42 PM   24  "The Conclusion.  The CDP-RC endorses the proposed clinical
3:42 PM   25  development plan of VTE."  Correct?

| | | |
|---|---|---|
| 3:42PM | 1 | **A.** Correct. |
| 3:42PM | 2 | **Q.** So by May of 2006 and the -- at the CDP-RC meeting, the |
| 3:42PM | 3 | CDP-RC had endorsed the plan of studying VTE treatment using |
| 3:42PM | 4 | one study that looked at DVT and PE using a 10-milligram |
| 3:42PM | 5 | intensified treatment period dose for three weeks followed by |
| 3:42PM | 6 | 20 milligrams once daily, and then a second study that was a |
| 3:42PM | 7 | double-blind study comparing 20 milligrams to placebo; is that |
| 3:42PM | 8 | right? |
| 3:42PM | 9 | **A.** That is correct. |
| 3:42PM | 10 | **Q.** Okay. So if you look with me in the middle of the page, |
| 3:43PM | 11 | it says, "The VTE recurrence and bleeding rates observed in the |
| 3:43PM | 12 | Phase IIb dose-finding studies, 11223 and 11528 studies, were |
| 3:43PM | 13 | in accordance with those reported in the literature in patients |
| 3:43PM | 14 | effectively treated." |
| 3:43PM | 15 | Do you see that? |
| 3:43PM | 16 | **A.** Yes. |
| 3:43PM | 17 | **Q.** Okay. It says, "The relative safety in terms of bleeding |
| 3:43PM | 18 | compared to standard of care was better for all o.d. (regimens |
| 3:43PM | 19 | hazard ratio below 1 for all doses) as compared to the b.i.d. |
| 3:43PM | 20 | regimen for which a slightly increased risk of bleeding was |
| 3:43PM | 21 | demonstrated for the 20-milligram b.i.d. and 30-milligram |
| 3:43PM | 22 | b.i.d. doses." |
| 3:43PM | 23 | Do you see that? |
| 3:43PM | 24 | **A.** Yes, I do see it. |
| 3:43PM | 25 | **Q.** Okay. So the 20-milligram b.i.d. and 30-milligram b.i.d. |

3:43PM   1   doses had higher bleeding risks compared to the standard of

3:43PM   2   care, and the standard of care would have been the

3:43PM   3   low-molecular-weight heparin, vitamin K antagonist; right?

3:43PM   4   A.   Correct.

3:43PM   5   Q.   Now, it says, "The 10-milligram b.i.d. dose study in Study

3:44PM   6   11223 seemed to be comparable to the o.d. doses in Study 11528

3:44PM   7   in terms of safety."

3:44PM   8           Do you see that?

3:44PM   9   A.   I see that.

3:44PM  10   Q.   Okay.  Was that the basis for using the 10-milligram

3:44PM  11   b.i.d. dose at this point in time as that intensified treatment

3:44PM  12   period for the three-week period?

3:44PM  13   A.   I'm not sure that this -- this may have been one of the

3:44PM  14   reasons, but we typically take dose decisions or

3:44PM  15   recommendations again on the totality of data, including

3:44PM  16   simulation, modeling simulation approaches.  So this may have

3:44PM  17   contributed to it, but it is definitely not the only reason.

3:44PM  18   Q.   And let me show you what we'll mark as Exhibit Number 10.

3:44PM  19   So if you look with me, this is an email that you received from

3:45PM  20   Sanjay Jalota at Janssen on June 12th of 2006; correct?

3:45PM  21   A.   Correct.

3:45PM  22   Q.   So who was working on the clinical plan at this point in

3:45PM  23   time period?

3:45PM  24   A.   The clinical plan in the narrow sense was Ton Lensing,

3:45PM  25   myself, and then, of course, statistical considerations and

3:45PM 1    expertise brought in by Torsten Westermeier, Martin Homering.

3:45PM 2           From a regulatory point of view, we had Max Wegner,

3:45PM 3    Andrea Derix, Rene Kluensch, Isabelle Stoeckert, and Joseph

3:45PM 4    Scheeren.

3:45PM 5           I mean, those are were the Bayer people.

3:45PM 6    Q.   The Bayer people?

3:45PM 7    A.   Yeah.

3:45PM 8    Q.   Right.  Now, if we can look at the email, Sanjay Jalota's

3:46PM 9    emailing several people, including Andrea Derix at Bayer, and

3:46PM 10   she says, "Dear Andrea-.  Thanks for the information.  There

3:46PM 11   was a Global Advisory Council meeting today (Sunday 11 June) in

3:46PM 12   New York, where the dose for the intensive VTE treatment was

3:46PM 13   extensively discussed."

3:46PM 14          Do you see that?

3:46PM 15   A.   I see that, yes.

3:46PM 16   Q.   Now, the Global Advisory Council meeting, was that a joint

3:46PM 17   meeting between J&J and Bayer?

3:46PM 18   A.   Yes.

3:46PM 19   Q.   And this says, "There was a post-GAC meeting (Joerg,

3:46PM 20   Bernhard, Andreas, Martina, Ludwig from Bayer; Gary, Bill,

3:46PM 21   Lloyd, and myself from J&J) with the common consensus that,

3:46PM 22   based on the feedback from the external consultants, the dose

3:46PM 23   for the intensive VTE treatment should be changed from 10

3:46PM 24   milligrams b.i.d. to 15 milligrams b.i.d."

3:46PM 25          Do you see that?

*OFFICIAL TRANSCRIPT*

3:46PM 1   A.   I see that, yes.

3:46PM 2   Q.   "I have made this change in the attached briefing document

3:46PM 3   (with some supporting rationale which we may have to update for

3:47PM 4   the final version or prepare for the meeting) along with the

3:47PM 5   other changes."

3:47PM 6        Do you see that?

3:47PM 7   A.   I see that, yes.

3:47PM 8   Q.   Okay.  And so it seems that it was at this GAC meeting in

3:47PM 9   June of '06 in which the decision was made to change the b.i.d.

3:47PM 10  intensive treatment regimen from 10 milligrams to 15; correct?

3:47PM 11  A.   It was a recommendation.  Yes, indeed.

3:47PM 12  Q.   Okay.  And it says, "It was recognized that there is no

3:47PM 13  data on 15 milligrams b.i.d., only bridging data between 10

3:47PM 14  milligrams b.i.d. and 20 milligrams b.i.d."

3:47PM 15       Do you see that?

3:47PM 16  A.   I see that.

3:47PM 17  Q.   Because at this point, none of the Phase II studies had

3:47PM 18  looked at a 15-milligram dose; is that right?

3:47PM 19  A.   Not directly, but, of course, you can always bridge

3:47PM 20  between two doses, if and when the two doses have directly been

3:47PM 21  studied.

3:47PM 22  Q.   But there had been no study of a 15-milligram dose at this

3:48PM 23  time?

3:48PM 24  A.   That's correct.

3:48PM 25  Q.   I'll show you what we'll mark as Exhibit Number 11.

3:48PM 1            And if you'll look with me at 3233767, it's an email

3:48PM 2    that is forwarded -- well, you -- you sent an email to Ton

3:48PM 3    Lensing, Marc van Unen, and Martina Evertz regarding the

3:48PM 4    EINSTEIN SMCC/ExCie meeting at ESC in Barcelona.

3:48PM 5            Do you see that?

3:48PM 6    A.   That's correct.

3:48PM 7    Q.   Now, this -- I want to ask you a couple of questions about

3:48PM 8    that.  The ExCie, that's the executive committee for the study;

3:48PM 9    correct?

3:48PM 10   A.   Correct.

3:48PM 11   Q.   And the SMCC.  What was that?

3:48PM 12   A.   Study management and coordination committee.

3:48PM 13   Q.   Okay.  And so now, they're going to have this meeting at

3:48PM 14   ESC.  Now, is that the European Society of Cardiology?

3:48PM 15   A.   Correct.

3:48PM 16   Q.   Okay.

3:48PM 17           THE COURT:  You want to stop here?  Let's take a

3:48PM 18   break here for just a second.  We'll stand in recess.

3:49PM 19           THE DEPUTY CLERK:  All rise.

3:49PM 20           (Whereupon the jury was excused from the courtroom.)

3:49PM 21           (Recess.)

4:05PM 22           (Whereupon the jury entered the courtroom.)

4:06PM 23           THE COURT:  Be seated, please.  Bet you all can't

4:06PM 24   wait to go home and watch television tonight, huh?

4:06PM 25   DIRECT EXAMINATION (CONT'D) BY MR. OVERHOLTZ:

*OFFICIAL TRANSCRIPT*

4:06PM 1   Q.   And you sent this email to Ton Lensing, who we've talked

4:06PM 2   about, but also Marc van Unen and Martina Evertz.

4:06PM 3        Can you tell me what Marc van Unen's role was with

4:06PM 4   VTE?

4:06PM 5   A.   Both Marc van Unen as well as Martina Evertz had been in

4:06PM 6   the strategic marketing function for antithrombotic therapies.

4:07PM 7   Q.   And you write to Ton Lensing.  Down at the bottom you say,

4:07PM 8   "Hi, Ton.  I hope you are doing well.  Congratulations for

4:07PM 9   fighting" -- I think you meant "through" --

4:07PM 10  A.   Yeah.

4:07PM 11  Q.   -- "all the difficult decisions around the VTE treatment

4:07PM 12  package submission."

4:07PM 13       Do you see that?

4:07PM 14  A.   I see that.

4:07PM 15  Q.   Okay.  "I will give you a call anyway to discuss various

4:07PM 16  matters.  In general, I can live with the decision to now take

4:07PM 17  15 milligram b.i.d. for the initial treatment."

4:07PM 18       Do you see that?

4:07PM 19  A.   I see that.

4:07PM 20  Q.   Okay.  And so this was following up that decision at the

4:07PM 21  GAC on June 12th, a few days before, to switch from 10 to 15

4:07PM 22  b.i.d. for that initial treatment period; correct?

4:07PM 23  A.   That is correct.

4:07PM 24  Q.   And so does this email that you sent to Ton indicate that

4:07PM 25  you -- that you would have some pushback as far as moving to

|  |  |  |
|---|---|---|
| 4:07PM | 1 | that 15-milligram dose? |
| 4:08PM | 2 | A.   Pushback meaning that I pushed back? |
| 4:08PM | 3 | Q.   Yes. |
| 4:08PM | 4 | A.   No. |
| 4:08PM | 5 | Q.   The -- your statement that "I can live with the decision |
| 4:08PM | 6 | to now take 15 for the initial treatment" sounds to me like you |
| 4:08PM | 7 | were having a little bit of problems making that move before |
| 4:08PM | 8 | now. |
| 4:08PM | 9 | A.   No, I don't have a problem with that.  And I'm happy to |
| 4:08PM | 10 | explain some of the background if you wish to. |
| 4:08PM | 11 | Q.   Well, why would you say "I can now -- I can live with the |
| 4:08PM | 12 | decision to now take 15 milligrams b.i.d. for the initial |
| 4:08PM | 13 | treatment" if before you had not opposed such a change? |
| 4:08PM | 14 | A.   I think this is to say that it was not my primary |
| 4:08PM | 15 | preference in terms of dose selection, but this is certainly a |
| 4:09PM | 16 | very viable option, and taking into consideration the |
| 4:09PM | 17 | discussions we have had at the Global Advisory Council, I -- I |
| 4:09PM | 18 | am content with that change. |
| 4:09PM | 19 | Q.   Your primary preference had been the 10 milligram b.i.d. |
| 4:09PM | 20 | therapy; correct? |
| 4:09PM | 21 | A.   It's very difficult to answer that question with yes and |
| 4:09PM | 22 | no without knowing the content why the Global Advisory Council |
| 4:09PM | 23 | gave us that very recommendation.  But it is factually correct |
| 4:09PM | 24 | that my team initially had worked out a plan with a 10 b.i.d. |
| 4:09PM | 25 | as the initial treatment. |

4:09PM 1    **Q.**   Now, it looks like you were going to try to have a VTE

4:09PM 2    meeting in Barcelona at this cardiology meeting.  Is that

4:09PM 3    right?

4:09PM 4    **A.**   Correct.

4:09PM 5    **Q.**   So there's -- the email is exhibit -- I think it's -- is

4:09PM 6    it 12?  Yeah.  Which is an email that you received from

4:10PM 7    Bernhard Glombitza on April 26th of 2006.

4:10PM 8            Do you see that?

4:10PM 9    **A.**   Yes.

4:10PM 10   **Q.**   And it's entitled "Presentation for Today's GDC-MC."

4:10PM 11   Correct?

4:10PM 12   **A.**   Correct.

4:10PM 13   **Q.**   Okay.  And attached to this email was a PowerPoint

4:10PM 14   entitled "Rivaroxaban DP3 for GDC-MC."  Correct?

4:10PM 15   **A.**   Correct.

4:10PM 16   **Q.**   And this attachment, if we look at Exhibit 13, is a

4:10PM 17   PowerPoint presentation entitled "Rivaroxaban DP3 for GDC-MC"

4:10PM 18   and MC version 1.0.

4:10PM 19           And if we look at the first page of the PowerPoint,

4:10PM 20   you can see that the title after that is "Decision to start

4:10PM 21   Phase III programs for the indications, VTE treatment" and

4:10PM 22   "Stroke prevention in patients with atrial fibrillation."

4:10PM 23   Right?

4:10PM 24   **A.**   Correct.

4:10PM 25   **Q.**   So this is now the presentation that's being given related

476

| | | |
|---|---|---|
| 4:11PM | 1 | to this DP3, this decision point time period to start Phase III |
| 4:11PM | 2 | trials; is that right? |
| 4:11PM | 3 | **A.**   Correct. |
| 4:11PM | 4 | **Q.**   Okay.  So if you can turn with me over to Slide Number 4. |
| 4:11PM | 5 | **A.**   Yeah. |
| 4:11PM | 6 | **Q.**   This is similar to a slide we saw before where the dosing |
| 4:11PM | 7 | finding for the VTE Phase II studies supported both the |
| 4:11PM | 8 | Phase III dose selection for SPAF as well as VTE treatment; |
| 4:11PM | 9 | correct? |
| 4:11PM | 10 | **A.**   Correct. |
| 4:11PM | 11 | **Q.**   And if we look down below, we see that the 20 milligram |
| 4:11PM | 12 | o.d. is the main dose and that rivaroxaban 10 milligrams b.i.d. |
| 4:11PM | 13 | for the first three weeks. |
| 4:11PM | 14 | Do you see that? |
| 4:11PM | 15 | **A.**   Yeah. |
| 4:11PM | 16 | **Q.**   So -- and we're going back in time a little bit, but so in |
| 4:11PM | 17 | April you guys were still supporting the 10-milligram dose; |
| 4:11PM | 18 | correct? |
| 4:11PM | 19 | **A.**   Correct. |
| 4:11PM | 20 | **Q.**   Okay.  This document is listing that the probability of |
| 4:12PM | 21 | technical success for VTE treatment at the time was estimated |
| 4:12PM | 22 | to be 63 percent; is that right? |
| 4:12PM | 23 | **A.**   That is correct. |
| 4:12PM | 24 | **Q.**   Okay.  Now, was that a higher probability of technical |
| 4:12PM | 25 | success than the AFib indication? |

4:12PM 1   A.   I don't recall the exact numbers.  I would need to look it
4:12PM 2   up, but it could well be that it is slightly higher.
4:12PM 3   Q.   There was some debate originally, I think we saw earlier,
4:12PM 4   regarding that initial treatment as to whether or not instead
4:12PM 5   of using Xarelto, you would use the standard of care at the
4:12PM 6   time, the low-molecular-weight heparin.
4:12PM 7          Do you recall that?
4:12PM 8   A.   Yeah, I do.
4:12PM 9   Q.   Now, is it fair to say that the company preferred, from a
4:12PM 10  commercial perspective, that that initial treatment period be
4:12PM 11  with Xarelto?
4:12PM 12  A.   No, there was no commercial consideration.  There was
4:12PM 13  primarily a consideration of meeting a certain medical need,
4:13PM 14  and that is that many patients presenting with VTE,
4:13PM 15  particularly this deep vein thrombosis, can be treated as
4:13PM 16  outpatients, which is often hampered by the initial parenteral
4:13PM 17  treatment, so that for actually no good reason other than the
4:13PM 18  administration of parenteral drug, patients got hospitalized.
4:13PM 19  So we felt that it was to the benefit of patients to start even
4:13PM 20  the initial treatment phase with a tablet.
4:13PM 21  Q.   Is it fair to say that a large percentage of those
4:13PM 22  patients actually did receive low-molecular-weight heparin
4:13PM 23  treatment before they were randomized, either the comparator or
4:13PM 24  to the Xarelto arm?
4:13PM 25  A.   That is correct.  In the frame of a clinical trial, it

4:14 PM 1 can't be done differently because you need time to confirm the

4:14 PM 2 diagnosis, and you need time to obtain the informed consent

4:14 PM 3 from the patient, as you cannot reasonably -- to safeguard the

4:14 PM 4 safety of the patients, you cannot reasonably keep these

4:14 PM 5 patients untreated.

4:14 PM 6 Q.   And because of that, somewhere close to I think I read 90

4:14 PM 7 percent of the patients that were in the VTE trials actually

4:14 PM 8 received at least some treatment with low-molecular-weight

4:14 PM 9 heparin before they were randomized into the trial?

4:14 PM 10 A.   That is correct.  And the trial protocol was very specific

4:14 PM 11 about that, because we said that the number of doses of

4:14 PM 12 injections of low-molecular-weight heparin needs to be limited.

4:14 PM 13 Otherwise, if it is too long, the patient would become

4:14 PM 14 ineligible for being enrolled into the trial.

4:14 PM 15 Q.   If you can turn with me to the next page, there's a "Pros"

4:15 PM 16 and a "Cons."  Do you see that?

4:15 PM 17 A.   Yeah.

4:15 PM 18 Q.   Okay.  And the pros says, "Chronic label, full coverage of

4:15 PM 19 DVT and PE," and the third bullet point says, "Initial

4:15 PM 20 treatment with rivaroxaban is the commercially preferred

4:15 PM 21 option."

4:15 PM 22          Do you see that?

4:15 PM 23 A.   I see that.

4:15 PM 24 Q.   Okay.  Now, who do you think came up with this idea that

4:15 PM 25 this was a commercially preferred option?

1    A.    The present -- well, who would -- well, it most likely

2    have been the clinics from our commercial function, but we have

3    to keep in mind that this presentation is a presentation to a

4    committee that was composed most by representatives of clinical

5    development as well as of the commercial functions.  So it was

6    a mixed senior management group of people, and hence both

7    aspects needed to be represented in the presentation.

8    Q.    So this -- this committee that's hearing this presentation

9    both has clinical development management people as well as

10   business side management people?

11   A.    Correct.

12   Q.    Now, the cons says that the "Initial treatment with

13   rivaroxaban (NCE) has a slightly lower probability of technical

14   success than low-molecular-weight heparin (approved medicine)

15   pretreatment, though both treatments have PTS above standard."

16         Do you see that?

17   A.    Yes.

18   Q.    Now, if you can turn with me, it's Slide 16.  I don't

19   think it has a number on it.  It's a title slide, "Initial

20   treatment in VTE treatment," Frank Misselwitz --

21   A.    Yes.

22   Q.    -- on 25 April 2006.  Do you see that?

23   A.    Yeah.

24   Q.    Okay.  And this has been part of the presentation that you

25   would have made; is that correct?

4:16PM  1   A.   That is correct.

4:16PM  2   Q.   Okay.  So if you'll turn with me over to Slide 20, you

4:16PM  3   have a slide in your presentation that says, "The first three

4:16PM  4   to four weeks are critical."

4:16PM  5            Do you see that?

4:16PM  6   A.   Yes.

4:17PM  7   Q.   Now, do you agree that for Xarelto, one of the things

4:17PM  8   that's seen is a -- when it comes to efficacy, is that there's

4:17PM  9   a flat-dose response for the drug?

4:17PM  10  A.   Within the ranges of the doses that we studied, we haven't

4:17PM  11  seen a big difference in efficacy, that's correct.

4:17PM  12  Q.   And, therefore, if you want to provide -- should the goal

4:17PM  13  be to find the lowest possible dose that doesn't raise the risk

4:17PM  14  of a significant bleed in a patient, knowing that you have this

4:17PM  15  flat-dose response on the efficacy side?

4:17PM  16  A.   It's a general principle to select the lowest effective

4:17PM  17  dose under these circumstances when there are no notable

4:17PM  18  differences in efficacy.

4:17PM  19  Q.   So if we look over at Slide 26, there is an efficacy of

4:17PM  20  initial intensified treatment relative to standard of care and

4:18PM  21  benchmark trials.

4:18PM  22            Do you see that?

4:18PM  23  A.   I do.

4:18PM  24  Q.   And there's a conclusion at the bottom.  Do you see that?

4:18PM  25  A.   I see that, yes.

4:18PM  1    Q.   It says, o.d. regimen comparable to standard of care;

4:18PM  2    b.i.d. regimen better.

4:18PM  3         Do you see that?

4:18PM  4    A.   I do see that, yes.

4:18PM  5    Q.   So did that support your decision that the b.i.d. dosing

4:18PM  6    would be the best dosing to use during that initial intensive

4:18PM  7    treatment period?

4:18PM  8    A.   This is one of the factors to justify why we've selected a

4:18PM  9    b.i.d. regime in the beginning.

4:18PM  10   Q.   So if you turn with me to Slide 31, it's a slide entitled

4:18PM  11   "Options for Initial Treatment."

4:18PM  12        Do you see that?

4:18PM  13   A.   I do.

4:18PM  14   Q.   So we have the low-molecular-weight heparin option for

4:18PM  15   five to seven days.  We have the Xarelto b.i.d. option for the

4:18PM  16   first three to four weeks as Number 2, see.  Correct?

4:18PM  17   A.   Uh-huh.

4:18PM  18   Q.   Okay.  And then the third says, "Why does 10 milligram

4:19PM  19   b.i.d. of Xarelto provide a more intense level of

4:19PM  20   anticoagulation compared to 20 milligrams o.d.?"

4:19PM  21        Do you see that?

4:19PM  22   A.   I do.

4:19PM  23   Q.   The first bullet point says, "There's no big difference in

4:19PM  24   Cmax."

4:19PM  25        Do you see that?

4:19PM  1   **A.**   Yes.

4:19PM  2   **Q.**   Cmax is -- Cmax is the highest blood levels of the drug as

4:19PM  3   measured in blood plasma when you take that dose; correct?

4:19PM  4   **A.**   Correct.

4:19PM  5   **Q.**   And "Ctrough level is much higher in the b.i.d. regimen,

4:19PM  6   resulting in a more sustainable suppression of thrombin

4:19PM  7   generation over time."

4:19PM  8         Do you see that?

4:19PM  9   **A.**   That's correct.

4:19PM  10  **Q.**   If you look with me at Slide 37, there's a "Brand Vision &

4:19PM  11  Goals."

4:19PM  12        Do you see that?

4:19PM  13  **A.**   Yeah, I do.

4:19PM  14  **Q.**   Okay.  It says, "Brand Vision & Goals need to guide the

4:19PM  15  Phase III design in VTE/SPAF."

4:19PM  16        Do you see that?

4:19PM  17  **A.**   I do.

4:19PM  18  **Q.**   Okay.  Now, the first one says, "Our vision is to create

4:19PM  19  the new gold standard for the prevention and treatment of

4:20PM  20  thromboembolic disease."

4:20PM  21        Do you see that?

4:20PM  22  **A.**   I do.

4:20PM  23  **Q.**   Okay.  So by creating the gold standard, you're talking

4:20PM  24  about recreating the standard that doctors would want to use

4:20PM  25  for their patients as providing the best level of care.

*OFFICIAL TRANSCRIPT*

4:20PM   1          Is that a fair statement?

4:20PM   2   A.   That is a fair statement, yes.

4:20PM   3   Q.   Okay.  And so if you want to create the gold standard for

4:20PM   4   treatment of VTE, wouldn't you want to design and do a

4:20PM   5   superiority trial instead of a noninferiority trial?

4:20PM   6   A.   Not necessarily, no.

4:20PM   7   Q.   Because it seems to me that you -- that Bayer wasn't

4:20PM   8   setting their sights very high here when they decided to only

4:20PM   9   go after noninferiority with a noninferiority margin of 2.0 for

4:20PM  10   their VTE Phase III trials if their vision was to create a gold

4:21PM  11   standard.

4:21PM  12   A.   First, this is a very broad vision that is not linked to

4:21PM  13   just one indication.  And it is basically the broad vision to

4:21PM  14   provide improved treatment modalities for both prevention and

4:21PM  15   for treatment of thromboembolic disease.

4:21PM  16          And the gold standard is not necessarily a standard

4:21PM  17   that is superior on efficacy.  It could be a standard that is

4:21PM  18   superior on safety or easier to administer, more feasible to be

4:21PM  19   used in broad clinical practice.

4:21PM  20          So there are many factors playing into the definition

4:21PM  21   of a gold standard.

4:21PM  22   Q.   Okay.  And so when it comes to designing clinical trials

4:21PM  23   and choosing the dose that's going to provide the best

4:22PM  24   treatment for patients, do you think that concern for how much

4:22PM  25   money you could make should play a role in those design

4:22PM 1    decisions?

4:22PM 2    **A.**   I think it's a very general statement.  I am personally --

4:22PM 3    as a medical doctor and as the accountable person to running

4:22PM 4    this clinical development program back in these years, I was

4:22PM 5    really concerned in providing the best and safest possible

4:22PM 6    and -- best in terms of benefit-risk balance -- new medicine to

4:22PM 7    patients at need.

4:22PM 8    **Q.**   Do you think that it's the science that should drive the

4:22PM 9    decisions for how a Phase III clinical trial is designed?

4:22PM 10   **A.**   That is very clear, the first layer.  It's about science.

4:22PM 11   It's about the regulatory environment.  And, of course, other

4:22PM 12   factors needs to be taken into consideration, but after that

4:23PM 13   first layer.

4:23PM 14   **Q.**   The second bullet point says, "Our goal is to improve the

4:23PM 15   lives of patients and create a multibillion-dollar

4:23PM 16   antithrombotic franchise to prevent and treat both venous and

4:23PM 17   arterial thrombosis."

4:23PM 18            Do you see that?

4:23PM 19   **A.**   I see that.

4:23PM 20   **Q.**   Let's look at the next slide for a second, Slide 38.  It's

4:23PM 21   the slide entitled "Brand Ambition:  The promises we need to

4:23PM 22   deliver on."

4:23PM 23            Do you see that?

4:23PM 24   **A.**   Yep.

4:23PM 25   **Q.**   The first one is "Redefine the antithrombotic market by

4:23PM   1   fulfilling a high unmet medical need, providing safe and simple
4:23PM   2   and effective therapy without monitoring."
4:23PM   3           Do you see that?
4:23PM   4   A.   I do.
4:23PM   5   Q.   That was a key component to the ambitions that Xarelto --
4:23PM   6   that the company had for Xarelto, is that it could be sold to
4:23PM   7   patients without the need for any form of regular or routine
4:23PM   8   monitoring; correct?
4:24PM   9   A.   It is correct to say that there is an important medical
4:24PM  10   need that was unmet back at the time to have therapies --
4:24PM  11   simple and effective therapies out there that would not require
4:24PM  12   monitoring, because this exactly is one of the aspects why
4:24PM  13   warfarin is underused.
4:24PM  14   Q.   The second big arrow bullet point says, "Establish a
4:24PM  15   leading global brand with blockbuster sales."
4:24PM  16           Do you see that?
4:24PM  17   A.   I do see that.
4:24PM  18   Q.   Let's look at 37, which is the brand, vision, and goals.
4:24PM  19   A.   Hold on just a second.
4:24PM  20   Q.   So we've got one bullet point that is talking about
4:24PM  21   creating a gold standard for prevention and treatment of
4:24PM  22   thromboembolic disease.  So it's like a medical goal.
4:25PM  23           Is that a fair statement?
4:25PM  24   A.   Yeah.
4:25PM  25   Q.   Okay.  And then you have a second goal that both includes

4:25PM 1    improving the lives of patients, which is a medical-based goal;
4:25PM 2    correct?  And then second, creating a multibillion-dollar
4:25PM 3    franchise; right?
4:25PM 4    A.   That's correct.
4:25PM 5    Q.   Now, it seems to me that if you really wanted to show that
4:25PM 6    your drug works better and improves the lives of patients, that
4:25PM 7    you would study this drug using a superiority design, but --
4:25PM 8    does that sound fair to you?
4:25PM 9    A.   I respectfully disagree.  Medical treatment is often so
4:25PM 10   complicated that it is an important advancement of medical care
4:26PM 11   if you provide better modalities even if you are noninferior to
4:26PM 12   the current standard of care.
4:26PM 13   Q.   Let's look at Slide 42, if we can.  It says, "Commercial
4:26PM 14   objectives for Phase III program in VTE treatment and SPAF."
4:26PM 15        Do you see that?
4:26PM 16   A.   I do.
4:26PM 17   Q.   It says, "Ensure full alignment to desired labeling based
4:26PM 18   on product target profile claims list, but we need to balance
4:26PM 19   the technical and operational risk versus the ideal profile and
4:26PM 20   maximum speed of development."
4:26PM 21        Do you see that?
4:26PM 22   A.   I do.
4:26PM 23   Q.   And then it says, "Safeguard SPAF first.  SPAF is far more
4:26PM 24   important than VTE treatment."
4:26PM 25        Do you see that?

A.   I do.  I read that sentence.

Q.   Knowing that the VTE treatment studies could have an impact on the more important SPAF indication that needed to be safeguarded first, do you think that could have biased some of the decisions that were being made regarding how the VTE trial was being designed?

A.   No, I don't think so.

Q.   Well, what this document is talking about is not letting the VTE treatment trial design decisions hurt the company's commercial objectives for AFib; right?

A.   I can't interpret that bullet point the way you -- you just interpreted it.

Q.   Let's look at Slide 52, if we can.  It says, "Preliminary US MR data indicate that a lack of acute DVT/PE label will drive down chronic usage of rivaroxaban."

Do you see that?

A.   I do.  This is in the commercial section, which I have not familiarized myself with before.

Q.   The first bullet point says, "The strategic analysis of the various options to conduct the Phase III program in VTE treatment integrating the holistic, medical, technical, and commercial view favors an intensified initial treatment regimen with rivaroxaban."

Correct?

A.   Correct.

488

**Q.**   And that was opposed to using the standard of care during that initial period, low-molecular-weight heparin; correct?

**A.**   That would be one other alternative option.

**Q.**   Okay.  And that's what the decision this DP3 committee was being asked to make; correct?

**A.**   I understand the decision to be made was the Decision Point 3 of what we asked to be granted, and this is a recommendation from the team.

**Q.**   Bullet Point 2 says, "All other options.  Don't exploit the value of the asset."

Do you see that?

**A.**   I do.

**Q.**   Isn't it more important to not exploit the safety of the patients when making clinical trial design decisions than worrying about whether you should be exploiting the value of the asset?

**A.**   I think in the context of that presentation, it's -- it's, in fact, both.  I personally read this as a medical -- a new chemical entity, a new drug under development has its value by showing that it addresses an important medical need.

So, for me, value doesn't come with the connotation of only a commercial value but also the value for patients.

**Q.**   And finally, at the bottom, it says, "Further elaboration on the b.i.d. versus o.d. approach."  And the preferred option approach is recommended.

4:29PM   1              Do you see that?

4:29PM   2   **A.**   I do.

4:29PM   3   **Q.**   So they're asking to look further into whether or not the

4:29PM   4   b.i.d. versus an o.d. approach should be used?

4:30PM   5   **A.**   They did.

4:30PM   6   **Q.**   And this is an email.  It's Bates Janssen 15848474, an

4:30PM   7   email from January 26th, 2010.  Subject is "The EINSTEIN (DVT &

4:30PM   8   PE) SAP and Protocol."  And it's from a Martin Gebel to Bennett

4:30PM   9   Levitan at Janssen as well as a copy to a couple of other folks

4:30PM   10  at Janssen.

4:30PM   11             Do you see that?

4:30PM   12  **A.**   Yes, I do see that.

4:30PM   13  **Q.**   Okay.  And there are several attachment here, some of

4:30PM   14  which are labeled SAP and some are which are labeled integrated

4:30PM   15  protocol.

4:30PM   16             Do you see that, the listing of the attachments?

4:30PM   17  **A.**   Yes, I do.

4:30PM   18  **Q.**   Okay.  There's an SAP for DVT, an SAP for meta with

4:30PM   19  signatures, an SAP for PE, and then the integrated protocol

4:30PM   20  attachment.

4:30PM   21             Do you see that?

4:30PM   22  **A.**   Yeah.

4:30PM   23  **Q.**   Okay.  And when it talks about the SAP, is that a

4:30PM   24  statistical analysis plan?

4:30PM   25  **A.**   That's correct.

*OFFICIAL TRANSCRIPT*

4:30PM 1    Q.    Okay.  Is that something that goes along with the protocol

4:31PM 2    usually?  It's developed alongside the protocol?

4:31PM 3    A.    Yes.

4:31PM 4    Q.    What is the SAP used for?

4:31PM 5    A.    The statistical analysis plan is a document that describes

4:31PM 6    the main outcome measures and the way they are to be analyzed

4:31PM 7    in that trial.

4:31PM 8    Q.    Okay.  And like a protocol, once a statistical analysis

4:31PM 9    plan has been finalized, it should be adhered to by the people

4:31PM 10   that are conducting the trial; is that correct?

4:31PM 11   A.    It is clear in any case that prior to unblinding of the

4:31PM 12   clinical trial, the SAP needs to be finalized and fixed.  And

4:31PM 13   there is an FDA rule to say that typically it should be fixed

4:31PM 14   prior to having enrolled 50 to 60 percent of the patients.

4:31PM 15   Q.    Okay.  And if you just look at the front page for me.  And

4:31PM 16   you can flip through if you need to.  But this indicates that

4:32PM 17   this would be the statistical analysis plan for the EINSTEIN

4:32PM 18   DVT Phase III trial; is that correct?

4:32PM 19   A.    That is correct.

4:32PM 20   Q.    Okay.  And it's also signed by Ton Lensing?

4:32PM 21   A.    Correct.

4:32PM 22   Q.    Then if we can look at what we'll mark as Exhibit 16,

4:32PM 23   which is record 3303607, Janssen 15848641.  This is another

4:32PM 24   attachment to that email that we saw in Exhibit 14.

4:32PM 25            This is the statistical analysis plan and indicated

4:32PM  1   by the top to be the statistical analysis plan for the

4:32PM  2   meta-analysis of the EINSTEIN-PE and DVT treatment studies; is

4:32PM  3   that correct?

4:32PM  4   A.   That is correct.

4:32PM  5   Q.   Okay.  And this document would have controlled how the

4:32PM  6   statistical analysis of the data that had been contained --

4:32PM  7   that was gathered in the EINSTEIN-PE and DVT treatment trials

4:32PM  8   would be analyzed; is that right?

4:32PM  9   A.   How the meta-analysis would be -- would be performed.

4:33PM  10  Q.   For the meta-analysis that was called for.

4:33PM  11           And then finally, Exhibit 17 is the 3303608,

4:33PM  12  Janssen 15848806.  And this is the statistical analysis plan

4:33PM  13  for the EINSTEIN pulmonary embolism 11702 study, according to

4:33PM  14  its title.

4:33PM  15           Do you see that?

4:33PM  16  A.   I do.

4:33PM  17  Q.   Okay.  And it also has the same signatures, Akos Pap and

4:33PM  18  Ton Lensing and Harry Buller; correct?

4:33PM  19  A.   That is correct.

4:33PM  20  Q.   Okay.  And this would have governed the statistical

4:33PM  21  analysis of the data collected in the EINSTEIN pulmonary

4:33PM  22  embolism Phase III trial; is that right?

4:33PM  23  A.   That is correct.

4:33PM  24  Q.   Okay.  So let me show you what is going to be marked as

4:33PM  25  Exhibit 18.  It's Record 1203527.  It's Bates BPAG_02363367.

*OFFICIAL TRANSCRIPT*

1   It's the 11702 protocol -- integrated protocol for the deep

2   vein thrombosis or pulmonary embolism Phase III trial through

3   Amendment Number 5 of July 2010 with Amendments 2, 3, 4, and 5

4   incorporated.  I'm going to let you take a look at that.

5          Now, of course, once the decision was made to move

6   forward with Phase III, those Phase III trials were concluded;

7   correct?

8   A.   Yes.

9   Q.   Okay.  And they would have been governed by the protocol

10  and any of the protocol amendments that were agreed to as part

11  of the study; is that correct?

12  A.   Correct.

13  Q.   Okay.  And the document you're looking at as Exhibit 17 is

14  the integrated protocol for the PE and DVT study; is that

15  correct?

16  A.   That is correct.

17  Q.   Even though the two trials were conducted separately, the

18  11702 DVT --

19  A.   Under one umbrella protocol.

20  Q.   One umbrella protocol.  Correct.

21         And that's the protocol through Amendment Number 5 of

22  2010; is that correct?

23  A.   That's correct.

24  Q.   Okay.  So I'm going to ask you a little bit about the

25  Phase III trials, the PE, DVT, and extension studies.

1    Those trials also ended up as publications published

2  in the medical literature as well; correct?

3  A.    That is correct.

4  Q.    Okay.  But also -- the company also created clinical study

5  reports for those trials; is that right?

6  A.    Yeah, that's right.

7  Q.    And those clinical study reports are provided to the

8  regulatory authorities where approval of the drug is sought; is

9  that correct?

10  A.    That is correct.

11  Q.    Okay.  And were you involved in the creation and

12  development of the clinical study reports for those EINSTEIN

13  Phase III trials?

14  A.    I was involved in the review.

15  Q.    Okay.  So let me show you -- I'm going to show you

16  Exhibit 22, 23, and 24.  The first is Janssen 00582486, Record

17  Number 193800.  And it is the -- described as the EINSTEIN-PE

18  clinical study report signed on March 28th, 2012, by Ton

19  Lensing.  And I'll show you that exhibit and have you confirm.

20  That was 22.

21    And this would have been the clinical study report

22  that would have been provided -- the company would have had an

23  obligation to provide the final clinical study report to the

24  regulatory authorities before approval; is that correct?

25  A.    That is correct.

4:36PM  1    **Q.**   Then I'll show you what's Exhibit 24, which is described

4:36PM  2    as the final Version 1.0 clinical study report for the

4:37PM  3    EINSTEIN-Extension study 11899 that ended on September 17th,

4:37PM  4    2009.  And the date of the report is July 30th of 2010.  It's

4:37PM  5    Bates BHCP 00526099, and the record number is 425838.  And I'll

4:37PM  6    let you refer to that.

4:37PM  7    **A.**   So it -- this Version 1.0 seems to be to me that this is a

4:37PM  8    final version, but it is an unsigned version.

4:37PM  9    **Q.**   Okay.  We talked about the fact that these became

4:37PM  10   publications.

4:37PM  11           Let me show you what we'll mark as Exhibit 25, which

4:37PM  12   has the designation FM-200.  It's Exhibit 25.  This is an

4:37PM  13   article dated December 23rd, 2010, in the New England Journal

4:37PM  14   of Medicine entitled "Oral Rivaroxaban for Symptomatic Venous

4:37PM  15   Thromboembolism."  The EINSTEIN investigator is listed as the

4:37PM  16   author.

4:37PM  17   **A.**   That is correct.

4:37PM  18   **Q.**   Okay.  And if you look at the background, it says this

4:38PM  19   is -- "Rivaroxaban, an oral Factor Xa inhibitor, may provide a

4:38PM  20   simple fixed-dose regimen for treating acute deep vein

4:38PM  21   thrombosis, DVT, and for continued treatment without the need

4:38PM  22   for laboratory monitoring."

4:38PM  23           Do you see that?

4:38PM  24   **A.**   Correct.

4:38PM  25   **Q.**   And so this was the published article of the EINSTEIN-DVT

4:38PM    1    Phase III trial; is that correct?

4:38PM    2    A.   It was actually a combination of the EINSTEIN-DVT and the

4:38PM    3    EINSTEIN-Extension trial taken together in one publication.

4:38PM    4    Q.   Now let me show you what we'll as Exhibit Number 26, which

4:38PM    5    is designated with the designation FM-201.  Get you a copy

4:38PM    6    later.

4:38PM    7           It's the publication in the New England Journal of

4:38PM    8    Medicine dated April 5th, 2012, title "Oral Rivaroxaban for the

4:38PM    9    Treatment of Symptomatic Pulmonary Embolism," the EINSTEIN-PE

4:39PM   10    investigators.

4:39PM   11           Do you see that?

4:39PM   12    A.   I see that, yes.

4:39PM   13    Q.   So this would have been the publication for the Phase III

4:39PM   14    EINSTEIN pulmonary embolism trial?

4:39PM   15    A.   Correct.

4:39PM   16    Q.   Okay.  And so if we look at the bottom paragraph on

4:39PM   17    page 1289, it says, "The principal safety outcome was

4:39PM   18    clinically relevant bleeding which was defined as a composite

4:39PM   19    of major clinically relevant nonmajor bleeding, as described

4:39PM   20    previously."

4:39PM   21           And we've talked about that before; correct?

4:39PM   22    A.   Uh-huh.  Correct.

4:39PM   23    Q.   It then says that bleeding was defined as major if it was

4:39PM   24    clinically overt and associated with, 1, a decrease in the

4:39PM   25    hemoglobin level of 2.0 grams per deciliter or more; 2, if

4:39PM 1   bleeding led to the transfusion of two or more units of red

4:39PM 2   cells; or, 3, if bleeding was intracranial or retroperitoneal;

4:39PM 3   4, occurred in another critical site; or, 5, contributed to

4:40PM 4   death.

4:40PM 5              Is that correct?

4:40PM 6   A.   Correct.

4:40PM 7   Q.   And then clinically relevant nonmajor bleeding was defined

4:40PM 8   at the bottom -- and then we can flip over to page 1291 -- as

4:40PM 9   overt bleeding that did not meet the criteria for major

4:40PM 10  bleeding but is associated with medical intervention,

4:40PM 11  unscheduled contact with a physician, interruption or

4:40PM 12  discontinuation of a study drug, or discomfort or impairment of

4:40PM 13  activities of daily life.

4:40PM 14             Do you see that?

4:40PM 15  A.   I see that.

4:40PM 16  Q.   Okay.  And those would have been the definitions that

4:40PM 17  would have been applied by the adjudication committee in

4:40PM 18  determining the adjudication of any bleeds that were reported

4:40PM 19  as adverse events in the trials; correct?

4:40PM 20  A.   Correct.

4:40PM 21  Q.   Let me show you what is -- we'll mark as Exhibit 28, which

4:40PM 22  is Record Number 699806, Bates XARELTO_JANSSEN 04203026.  So I

4:41PM 23  want to start with an email that was sent to you by Sanjay

4:41PM 24  Jalota at the bottom of the first page on June 8th of 2006.

4:41PM 25             Do you see that?

| | | |
|---|---|---|
| 4:41PM | 1 | **A.**   I do see. |
| 4:41PM | 2 | **Q.**   Okay.  And you see you received that email?  You were one |
| 4:41PM | 3 | of the recipients at Bayer from Sanjay Jalota's email? |
| 4:41PM | 4 | **A.**   Correct. |
| 4:41PM | 5 | **Q.**   And Sanjay Jalota was with Janssen; correct? |
| 4:41PM | 6 | **A.**   That is correct. |
| 4:41PM | 7 | **Q.**   Okay.  And she tells Andrea Derix at Bayer, along -- in |
| 4:41PM | 8 | this email that you received, "Dear Andrea.  Thank you for the |
| 4:41PM | 9 | VTE treatment draft briefing package.  Please find enclosed the |
| 4:41PM | 10 | consolidated J&J comments.  We have taken to account that the |
| 4:41PM | 11 | same justification questions will be submitted to both FDA and |
| 4:41PM | 12 | EMA as well as Canada." |
| 4:41PM | 13 | Do you see that? |
| 4:41PM | 14 | **A.**   Yeah. |
| 4:41PM | 15 | **Q.**   And so the idea was that these questions and |
| 4:41PM | 16 | justifications for the study design would be provided to the |
| 4:42PM | 17 | regulatory authorities for the US, Europe, as well as Canadian? |
| 4:42PM | 18 | **A.**   Sure. |
| 4:42PM | 19 | **Q.**   Okay.  She says that some aspects need further discussion, |
| 4:42PM | 20 | "loading or no-loading dose in addition to the initial |
| 4:42PM | 21 | intensive regimen." |
| 4:42PM | 22 | Do you see that? |
| 4:42PM | 23 | **A.**   Yes. |
| 4:42PM | 24 | **Q.**   Now, if you can look with me at the email -- the next |
| 4:42PM | 25 | email.  It comes from a gentleman at Janssen named Leonard |

| | | |
|---|---|---|
| 4:42PM | 1 | Oppenheimer, and he sends it to Torsten Westermeier. |
| 4:42PM | 2 | Do you see that? |
| 4:42PM | 3 | **A.**   Correct. |
| 4:42PM | 4 | **Q.**   Okay.  And did you know who Leonard Oppenheimer was? |
| 4:42PM | 5 | **A.**   I know him, yes. |
| 4:42PM | 6 | **Q.**   Okay.  And do you know what his role was at Janssen? |
| 4:42PM | 7 | **A.**   He was a biostatistician who retired from work and was |
| 4:42PM | 8 | then a senior adviser to J&J. |
| 4:42PM | 9 | **Q.**   Okay.  And he makes some comments to Torsten and has |
| 4:42PM | 10 | several comments. |
| 4:43PM | 11 | Do you see those? |
| 4:43PM | 12 | **A.**   I do see them, yes. |
| 4:43PM | 13 | **Q.**   Okay.  The first comment he makes is that, "The data to |
| 4:43PM | 14 | support the dose selection, i.e. 10 milligrams b.i.d. for three |
| 4:43PM | 15 | weeks followed by 20 milligrams o.d., seem tenuous at best. |
| 4:43PM | 16 | Why not pick one or the other?" |
| 4:43PM | 17 | Do you see that? |
| 4:43PM | 18 | **A.**   I do see that, yes. |
| 4:43PM | 19 | **Q.**   Okay.  Did you ever hear that your development partners at |
| 4:43PM | 20 | Janssen believed that the data to select the 10-milligram |
| 4:43PM | 21 | b.i.d. dose for three weeks followed by 20 milligrams o.d. |
| 4:43PM | 22 | seemed tenuous? |
| 4:43PM | 23 | **A.**   I think we have to keep in mind, first, these are comments |
| 4:43PM | 24 | made by one individual.  They are not part of the consolidated |
| 4:43PM | 25 | comments that had been provided from J&J to us before, and that |

4:43PM  1  Oppenheimer is a biostatistician, so he's not a medical doctor

4:43PM  2  and certainly comments here from a kind of more formalistic

4:44PM  3  biostats perspective.

4:44PM  4  **Q.**    Okay.  So you don't recall whether you heard that the

4:44PM  5  biostatistician adviser at Janssen had believed that the data

4:44PM  6  to support the dosing selection of a 10-milligram b.i.d. for

4:44PM  7  three weeks followed by the o.d. was tenuous?

4:44PM  8  **A.**    I do not recall having been involved in these discussions.

4:44PM  9  **Q.**    Okay.  But patients had to complete treatment of either 6

4:44PM  10  or 12 months of their DVT or PE to be randomized; correct?

4:44PM  11  **A.**    That's correct.  But it could well be that a bleeding

4:44PM  12  would occur at month 7.

4:44PM  13  **Q.**    But if a bleeding event occurred that resulted in their

4:44PM  14  inability to complete the study period of the trial that

4:44PM  15  resulted in their discontinuation from the study, those

4:45PM  16  patients would be out of the running to be included in the

4:45PM  17  extension study; correct?

4:45PM  18  **A.**    Those patients who have experienced a bleeding prior to

4:45PM  19  month 6.

4:45PM  20  **Q.**    And so, in fact, you had filtered out those patients that

4:45PM  21  may have had a higher absorption and higher plasma

4:45PM  22  concentration levels of Xarelto if they were randomized to the

4:45PM  23  Xarelto treatment and had bleeding events during the initial

4:45PM  24  phase from participating in the extension study; correct?

4:45PM  25  **A.**    That is factually incorrect, and I do not agree with the

500

4:45 PM
4:45 PM
4:45 PM
4:45 PM
4:45 PM
4:46 PM
4:46 PM
4:46 PM
4:46 PM
4:46 PM
4:46 PM
4:46 PM
4:46 PM
4:46 PM
4:46 PM
4:46 PM
4:46 PM
4:46 PM
4:46 PM
4:46 PM
4:47 PM
4:47 PM
4:47 PM
4:47 PM
4:47 PM

1    statement for a number of reasons.

2            First, the selection into the extension trial was

3    open for patients that had not initially been treated in the

4    11702 trial, as I mentioned a number of times.  And secondly,

5    we selected patients for their participation in the

6    EINSTEIN-Extension trial not based on their PK/PD profiles, and

7    nor did we preclude the inclusion of patients into the

8    extension trial who may have experienced a bleeding event after

9    six months.

10   Q.   Mr. Oppenheimer goes on and says, "This is particularly

11   problematic for safety analyses.  The experimental unit for

12   safety assessments is the 'individual patient.'  Treating one

13   patient in 100 different studies doesn't provide equivalent

14   information as for 100 different patients."

15           Do you see that?

16   A.   I see that.

17   Q.   Did you ever hear this criticism by Janssen's

18   biostatistician adviser?

19   A.   I did not hear that.  And while the general reading seems

20   compelling, it simply does not apply to the case at hand here

21   because of the reasons I explained before.

22   Q.   Okay.  Let's look at point Number 4 that Mr. Oppenheimer

23   makes.  He says, "Since the lowest dose, 20 milligrams per day,

24   works, how do we know that 10 milligrams once a day,

25   5-milligram b.i.d. or 10-milligram q.d." -- that's once

501

<div style="margin-left: 2em;">

4:47PM   1   daily -- "isn't equally efficacious?  Won't regulators be most

4:47PM   2   interested in establishing a less effective dose to be sure you

4:47PM   3   aren't giving more drug than you need?"

4:47PM   4          That's what his comment is; right?

4:47PM   5   **A.**   I can read that comment, and it is what is written here,

4:47PM   6   yes.  And I do not agree with that notion.

4:47PM   7   **Q.**   Let me show you what we'll mark as Exhibits 29 and 30.

4:47PM   8   All right.  It's Record Number 882454 and 882455.  And it's

4:47PM   9   Bates -- the -- 29 is BPAG_01573051, and Bates the second is

4:48PM   10   BPAG_01573053.

4:48PM   11          And if we look at the email first, this is an email

4:48PM   12   that you sent to Ton Lensing as well as several other people at

4:48PM   13   Bayer on March 9th of 2006; correct?

4:48PM   14   **A.**   Correct.

4:48PM   15   **Q.**   And the subject is "Dose Selection VTE Treatment:  My

4:48PM   16   Proposal and Backgrounding in Preparation for CDP-RC."

4:48PM   17          Do you see that?

4:48PM   18   **A.**   That is correct.

4:48PM   19   **Q.**   And it says, "Dose selection for VTE treatment March 2006

4:48PM   20   PowerPoint is attached."  Correct?

4:48PM   21   **A.**   Correct.

4:48PM   22   **Q.**   Okay.  Would you agree that a drug with a broader

4:48PM   23   therapeutic window is safer than one with a more narrow

4:48PM   24   therapeutic window if they have the same efficacy?

4:48PM   25   **A.**   Generally speaking, yes.

</div>

*OFFICIAL TRANSCRIPT*

4:48PM 1    Q.   Okay.  If a drug can be dosed to deliver the same or

4:49PM 2    better efficacy but with a broader therapeutic window, that

4:49PM 3    dosing for that drug would be safer; correct?

4:49PM 4    A.   Again, it's a theoretical consideration which needs to be

4:49PM 5    proven in clinical practice.

4:49PM 6    Q.   By April -- by 2006 -- by March of 2006 when you made

4:49PM 7    this -- when you were preparing this PowerPoint presentation,

4:49PM 8    did Bayer have an understanding that dosing Xarelto

4:49PM 9    10 milligrams b.i.d. would potentially have a broader therapy

4:49PM 10   window than 20 milligrams o.d.?

4:49PM 11   A.   No.  And I think this is nothing we can derive from that

4:49PM 12   very slide.  It's not based on our data.

4:49PM 13   Q.   Now, if you could turn with me over to Slide 28, there's

4:50PM 14   an exposure categorization slide from the Phase II studies.

4:50PM 15        Do you see that?

4:50PM 16   A.   Yes.

4:50PM 17   Q.   And you told me earlier that PK measurements for patients

4:50PM 18   in the Phase II dose-finding studies, ODIXa-DVT and

4:50PM 19   EINSTEIN-DVT, had been taken from patients; correct?

4:50PM 20   A.   Correct.

4:50PM 21   Q.   And this chart represents the PK measurements from the

4:50PM 22   patients divided by terciles of exposure; is that correct?

4:50PM 23   A.   That is correct.

4:50PM 24   Q.   If we turn to the next page, Slide 30, this is an exposure

4:50PM 25   response analysis that compared exposure levels to the safety

4:50PM  1   of event rates for the two Phase II trials; correct?

4:50PM  2   **A.**   Correct.

4:50PM  3   **Q.**   In this exposure response analysis that's shown here, if

4:50PM  4   we look at the Cmax numbers for -- for both Study 11223, the

4:51PM  5   ODIXa-DVT, and Study 11528, EINSTEIN-DVT, we see that the

4:51PM  6   number of patients in the lower tercile of exposure had

4:51PM  7   4.9 percent rate of any or clinically relevant bleeding for

4:51PM  8   ODIXa-DVT and about 4 percent for EINSTEIN-DVT; is that

4:51PM  9   correct?

4:51PM  10  **A.**   That's correct.

4:51PM  11  **Q.**   Okay.  Now, when we get to the middle level of exposure,

4:51PM  12  for the EINSTEIN-DVT study, the event rate stays about the

4:51PM  13  same, 3.9 percent; correct?

4:51PM  14  **A.**   Correct.

4:51PM  15  **Q.**   But it is increased to 12.7 percent in the ODIXa-DVT

4:51PM  16  trial; correct?

4:51PM  17  **A.**   Correct.

4:51PM  18  **Q.**   Okay.  And then if we look at the third tercile of

4:51PM  19  exposure, the event rate for the ODIXa-DVT goes up to 11.4

4:52PM  20  percent compared to the lower level at 4.9 percent; correct?

4:52PM  21  **A.**   Uh-huh, correct.

4:52PM  22  **Q.**   But the ODIXa-DVT trial, the upper terciles of exposure

4:52PM  23  only shows a 6.6 percent event rate; correct?

4:52PM  24  **A.**   That's the EINSTEIN-DVT trial.

4:52PM  25  **Q.**   EINSTEIN-DVT.  Correct.

4:52PM 1    The bleeding event rates in 11223 seem to be in line

4:52PM 2  with what you would expect as exposure increases; correct?

4:52PM 3  A.   Again, generally it is correct to expect that this

4:52PM 4  increasing exposure, the bleeding would go up, but we are

4:52PM 5  currently reviewing only Cmax, and there are more than -- there

4:52PM 6  are many other exposure measures, such as area under the curve,

4:52PM 7  for instance.

4:52PM 8  Q.   If we look at 11223 for a minute, of the 45 events that

4:52PM 9  are described there -- 8 plus 18 plus 19, if I do my math

4:52PM 10  right -- of the 45 events, 37 of the 45 occur in the two

4:53PM 11  highest terciles of exposure; is that correct?

4:53PM 12  A.   I do not do the math, but that seems to be correct, yes.

4:53PM 13  Q.   So if we can look at Slide 48, the summary slide, it says,

4:53PM 14  "All doses tested work, both o.d. and b.i.d. regimens work."

4:53PM 15    Do you see that?

4:53PM 16  A.   Correct.

4:53PM 17  Q.   Okay.  The fifth bullet point down says, "Treatment doses

4:53PM 18  of more than 10 milligrams o.d. shall be given with food."

4:53PM 19    Do you see that?

4:53PM 20  A.   Correct.

4:53PM 21  Q.   Okay.  And is that the recommendation in VTE treatment,

4:53PM 22  that the dose given for VTE treatment be given with food?

4:53PM 23  A.   To the best of my knowledge, yes.

4:53PM 24  Q.   Food -- given with food increases exposure to the drug; is

4:53PM 25  that right?

4:53PM   1   A.   It -- importantly, it increases the bioavailability and
4:53PM   2   reduces variability.
4:53PM   3   Q.   Turn with me to Slide 49.  The summary says, "Total daily
4:53PM   4   dose of 20 milligram can be selected as optimal dose."
4:53PM   5   Correct?
4:54PM   6   A.   Correct.
4:54PM   7   Q.   Okay.  And that could either be 10 milligrams b.i.d. or
4:54PM   8   20 milligrams once daily; correct?
4:54PM   9   A.   Correct.
4:54PM   10  Q.   The second bullet point says, "Increased doses do not
4:54PM   11  translate into better efficacy but may increase the risk of
4:54PM   12  bleeding."  Correct?
4:54PM   13  A.   Correct.
4:54PM   14  Q.   If you could turn with me over to Slide 51, the final
4:54PM   15  overall conclusion slide.  It says, "We do not recommend to use
4:54PM   16  the 10 milligram b.i.d. regimen long-term."
4:54PM   17          Do you see that?
4:54PM   18          That's the initial intensive treatment phase at this
4:54PM   19  time that was being recommended; right?
4:54PM   20  A.   Correct.
4:54PM   21  Q.   Okay.  Then if you'll look with me at the third bullet
4:54PM   22  point, it says, "Fragile patients could receive 10 milligrams
4:54PM   23  o.d."  Correct?
4:54PM   24  A.   Correct.
4:54PM   25  Q.   That was not, in fact, studied in the Phase III trial

| | | |
|---|---|---|
| 4:54PM | 1 | program; correct? |
| 4:54PM | 2 | **A.**   Correct. |
| 4:54PM | 3 | **Q.**   Okay.  So this document is the meeting minutes of an end |
| 4:55PM | 4 | of Phase II meeting that was held with the FDA with both Bayer |
| 4:55PM | 5 | and Janssen; is that correct? |
| 4:55PM | 6 | **A.**   That's correct. |
| 4:55PM | 7 | **Q.**   Okay.  And you, in fact, were one of the attendees of this |
| 4:55PM | 8 | meeting with the FDA on behalf of Bayer; correct? |
| 4:55PM | 9 | **A.**   That's correct. |
| 4:55PM | 10 | **Q.**   And typically what happens in this situation is the |
| 4:55PM | 11 | company puts forth questions to the regulatory agency like the |
| 4:55PM | 12 | FDA and asks whether or not they agree with these components of |
| 4:55PM | 13 | their Phase III program? |
| 4:55PM | 14 | **A.**   Correct. |
| 4:55PM | 15 | **Q.**   Okay.  And so if we can look at Number 1, it says, "Dose |
| 4:55PM | 16 | selection, dose regimen."  Right? |
| 4:55PM | 17 | **A.**   Uh-huh. |
| 4:55PM | 18 | **Q.**   It says, "Based on the results from the Phase II VTE |
| 4:55PM | 19 | treatment studies with rivaroxaban, Bayer proposes to use a |
| 4:55PM | 20 | dosage regimen of 15 milligram b.i.d. dose regimen for the |
| 4:55PM | 21 | first three weeks of therapy followed by a 20 milligram once |
| 4:55PM | 22 | daily regimen.  Does the agency concur with the above-mentioned |
| 4:55PM | 23 | dosing strategy and regimen in the Phase III study?"  Correct? |
| 4:55PM | 24 | **A.**   Correct. |
| 4:55PM | 25 | **Q.**   And the FDA responds below; right? |

4:56PM    1    **A.**    Yes.

4:56PM    2    **Q.**    And they say, "No, we do not concur."

4:56PM    3    **A.**    That is correct.

4:56PM    4    **Q.**    Okay.  "Instead of your current dose plans, we recommend

4:56PM    5    that you propose a dose of 10 milligrams b.i.d. for your

4:56PM    6    Phase III study based on the following."

4:56PM    7           Do you see that?

4:56PM    8    **A.**    Yes, I see it.

4:56PM    9    **Q.**    Okay.  And one of the -- they raise several different

4:56PM   10    issues, including organ toxicity at higher doses, more bleeding

4:56PM   11    events in higher dose experiences, and third, a more favorable

4:56PM   12    PK profile for the 10 milligram b.i. dose when compared to 20

4:56PM   13    milligram o.d.

4:56PM   14           Do you see that?

4:56PM   15    **A.**    Correct.

4:56PM   16    **Q.**    Now, in the end, it's the sponsor here, Bayer and

4:56PM   17    Janssen's, decision as to what dose to study in their Phase III

4:56PM   18    trial; correct?

4:56PM   19    **A.**    Correct, yes.

4:56PM   20    **Q.**    All right.  So if we can look at Number 2, choice of

4:56PM   21    comparator.

4:56PM   22    **A.**    Uh-huh, yes.

4:56PM   23    **Q.**    The FDA responds, and I want to direct your attention to

4:57PM   24    point Number 2.

4:57PM   25           Do you see that?

*OFFICIAL TRANSCRIPT*

508

**A.**   Yeah.

**Q.**   It says, "You propose a single noninferiority trial for acute treatment of VTE.  Two adequate and well-controlled studies are generally needed to support a new indication. There is a risk in performing a single trial that may not have convincingly positive results to support the proposed indication.  In addition, a noninferiority trial is less likely to be persuasive."

Do you see that?

**A.**   Yes.

**Q.**   Okay.  Moving to the next page:  "The acceptance of the single study as a sufficient scientific and regulatory basis for approval of a new indication will be determined by its adequacy to support the efficacy claim."

Do you see that?

**A.**   Yes.

**Q.**   Further down, it says, "Consistent with the information in this guidance, we are very concerned that your proposed open-label, noninferiority study, Study 11702, will not provide robust evidence of safety and efficacy."

Do you see that?

**A.**   I see that, and I agree that this is what is written here. And as a response, we decided then to run two trials, the EINSTEIN-DVT and a separate EINSTEIN-PE trial, so that we have two, each other confirming trials.

4:58PM     1    **Q.**   And that's the two trials that fall under the same

4:58PM     2    protocol, the 11702, EINSTEIN --

4:58PM     3    **A.**   It's an umbrella protocol, yes.

4:58PM     4    **Q.**   Okay.  And that's -- based on this is why you split them

4:58PM     5    apart?

4:58PM     6    **A.**   And made them larger, considerably larger, with

4:58PM     7    considerably more events.

4:58PM     8    **Q.**   They still both were noninferiority trials?

4:58PM     9    **A.**   Yeah, but that was exactly according to the guidelines.

4:58PM    10    When you have a noninferiority trial, you need to have two

4:58PM    11    confirmatory trials, and that's what we've done.

4:58PM    12            **MR. BIRCHFIELD:**  Your Honor, this would be a good

4:58PM    13    breaking point.

4:58PM    14            **THE COURT:**  Okay.  Let's stop here, members of the

4:58PM    15    jury.  We appreciate all the work that you've done.  It's very

4:58PM    16    difficult to watch television for this long.  We always

4:58PM    17    appreciate that.

4:58PM    18            We'll stop here and come back at 8:30 -- is that

4:58PM    19    okay -- in the morning for you all.  All right.  We'll start at

4:58PM    20    8:30 then in the morning.

4:59PM    21            Again, don't talk to anybody about it.  Don't

4:59PM    22    watch anymore television about it, and leave your notebooks,

4:59PM    23    and we'll take care of them.

4:59PM    24            All rise as the jury leaves, please.

4:59PM    25            (whereupon the jury was excused from the courtroom.)

4:59PM 1          **THE COURT:**  Okay.  Folks, I'm see you all at 8:15 in

4:59PM 2    the morning.

4:59PM 3          **MR. MEUNIER:**  Could we put something on the record,

4:59PM 4    Your Honor?

4:59PM 5          **THE COURT:**  Sure.

4:59PM 6          **MR. MEUNIER:**  May it please the Court, Jerry Meunier

4:59PM 7    for the plaintiffs.

4:59PM 8              Your Honor, in connection with today's testimony

4:59PM 9    of Janssen sales representative, Angela Seifert, the Court

4:59PM 10   sustained an objection by defendant's counsel to the

4:59PM 11   admissibility of a PowerPoint set of slides, which the witness

4:59PM 12   acknowledged receiving, but proposed -- professed not to

4:59PM 13   recall; and notwithstanding her professed inability to recall

5:00PM 14   the document, Your Honor, and even if on this basis we could

5:00PM 15   not further question her about it, we respectfully would submit

5:00PM 16   to the Court that the document should be and should have been

5:00PM 17   admitted into evidence for these reasons:

5:00PM 18              First, it sets forth information about the

5:00PM 19   marketing of Xarelto which is highly relevant and, therefore,

5:00PM 20   will assist the fact-finder in this case.

5:00PM 21              Second, it is authenticated in that it is what

5:00PM 22   it purports to be based upon the email which the witness

5:00PM 23   acknowledged receiving with the document.

5:00PM 24              Third, as part of a two-week training session,

5:00PM 25   handouts are made during that session.  This PowerPoint was

5:00PM  1  part of those handouts according to email which she had gone

5:00PM  2  through with the training and which were now being passed out

5:00PM  3  to participants in the training.

5:00PM  4          We don't feel it's hearsay under Federal Rule of

5:00PM  5  Evidence 801(d)(2)(C), which is the statement of an opposing

5:00PM  6  party through an authorized representative whose party has

5:00PM  7  adopted it as true.  Clearly, that was done for purposes of the

5:01PM  8  training.  And even if it is hearsay, Your Honor, we

5:01PM  9  respectfully submit that it falls within the exception to

5:01PM  10  hearsay under Federal Rule of Evidence 803(6) as a record of a

5:01PM  11  business activity regularly conducted.  Clearly, this was

5:01PM  12  training of a sales force and this would be a record as part of

5:01PM  13  the training and the handouts.

5:01PM  14          For those reasons, Judge, we respectfully ask

5:01PM  15  that it either be admitted or that the Court permit us to make

5:01PM  16  it Plaintiff's Proffer Number 1 for the record.

5:01PM  17          MR. SARVER:  We don't have any objection to a

5:01PM  18  proffer, Your Honor.  And while the Court is considering this,

5:01PM  19  we'd like the opportunity to do further research and provide

5:01PM  20  you with more information.

5:01PM  21          THE COURT:  Well, I'm -- I don't need to consider it.

5:01PM  22  I heard the witness say that she didn't recognize it.  She

5:01PM  23  wasn't able to confirm it.  Counsel says that -- that it's a

5:01PM  24  business record.  It is an email.  It says something is

5:02PM  25  attached.  Counsel indicated that this was the thing that was

5:02PM   1   attached.  The person didn't recognize it.  It's -- couldn't

5:02PM   2   say that she saw it before.

5:02PM   3               And so I just felt that it wasn't identified

5:02PM   4   enough.  I didn't get to the -- to the -- whether it was a

5:02PM   5   business record or not, because it's not identified.  If

5:02PM   6   somebody can take the stand and say that's it, whatever it is,

5:02PM   7   then I'll consider the exception as a business record or

5:02PM   8   statements of counsel -- of the parties, 801(d)(2) material,

5:02PM   9   but presently I don't have anything.

5:02PM   10               It's just a document that counsel for the

5:02PM   11   plaintiffs offered to the witness.  She didn't recognize it.

5:02PM   12   She didn't know what it was.  She couldn't testify about it.

5:02PM   13   It's not self-authenticating simply because counsel -- if that

5:03PM   14   were the case, we wouldn't need any witnesses.  We'd just be

5:03PM   15   putting in documents.

5:03PM   16               So I -- but I will allow, obviously, counsel to

5:03PM   17   make a proffer of it and make it Plaintiff Proffer 1.

5:03PM   18          MR. MEUNIER:  Thank you, Your Honor.

5:03PM   19          THE COURT:  Sure.  Thank you very much.

5:03PM   20               Okay, folks.  We'll stop today, and I'll see you

5:03PM   21   all tomorrow at 8:15.

5:03PM   22          THE DEPUTY CLERK:  All rise.

5:03PM   23

5:03PM   24

5:03PM   25

*OFFICIAL TRANSCRIPT*

5:03PM   1

5:03PM   2                        **<u>CERTIFICATE</u>**

5:03PM   3          I, Tana J. Hess, CCR, FCRR, Official Court Reporter

5:03PM   4    for the United States District Court, Eastern District of

5:03PM   5    Louisiana, certify that the foregoing is a true and correct

5:03PM   6    transcript, to the best of my ability and understanding, from

5:03PM   7    the record of proceedings in the above-entitled matter.

5:03PM   8
5:03PM   9
5:03PM   10                     _____
5:03PM
5:03PM   11                     Tana J. Hess, CCR, FCRR, RMR
5:03PM                         Official Court Reporter

5:03PM   12

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

*OFFICIAL TRANSCRIPT*