1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF MISSISSIPPI

3

4

5    IN RE:  XARELTO                    *
     (RIVAROXABAN) PRODUCTS             *
6    LIABILITY LITIGATION               *
                                        *
7    THIS DOCUMENT RELATES TO:          *    Docket No.: 14-MD-2592
                                        *    Section "L"
8    *Dora Mingo, et al. v.*            *    Jackson, Mississippi
     *Janssen Research &*               *    August 9, 2017
9    *Development, LLC, et. al.,*       *
     Case No.: 15-CV-3469               *
10   * * * * * * * * * * * * * * * *

11            VOLUME III - AFTERNOON SESSION
           TRANSCRIPT OF JURY TRIAL PROCEEDINGS
12         BEFORE THE HONORABLE ELDON E. FALLON
              UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15

     For the Plaintiffs'
16   Liaison Counsel:              Gainsburg Benjamin David
                                     Meunier & Warshauer
17                                 BY:  GERALD E. MEUNIER, ESQ.
                                   2800 Energy Centre
18                                 1100 Poydras Street
                                   New Orleans, Louisiana 70163
19

20
     For the Plaintiffs:          Beasley Allen
21                                BY:  ANDY BIRCHFIELD, ESQ.
                                  P.O. Box 4160
22                                Montgomery, Alabama 36103

23

24

25

*OFFICIAL TRANSCRIPT*

```
 1   APPEARANCES:

 2                              Gainsburg Benjamin Davis
                                  Meunier & Warshauer
 3                              BY:  WALTER C. MORRISON, IV, ESQ.
                               240 Trace Colony Park Drive
 4                             Suite 100
                               Ridgeland, Mississippi 39157
 5

 6
                               Goza Honnold
 7                             BY:  BRADLEY D. HONNOLD, ESQ.
                               11181 Overbrook Road, Suite 200
 8                             Leawood, Kansas 66211

 9
                               The Lambert Firm
10                             BY:  EMILY JEFFCOTT, ESQ.
                               701 Magazine Street
11                             New Orleans, Louisiana 70130

12
     For the Defendant Bayer
13   HealthCare Pharmaceuticals
     Inc. and Bayer Pharma AG:   Mitchell, Williams, Selig, Gates &
14                                 Woodyard, P.L.L.C.
                               BY:  LYN P. PRUITT, ESQ.
15                             425 W. Capitol Avenue, Suite 1800
                               Little Rock, Arkansas 72201
16

17
                               Watkins & Eager, PLCC
18                             BY:  WALTER T. JOHNSON, ESQ.
                               400 East Capitol Street
19                             Jackson, Mississippi 39201

20

21   For Janssen Pharmaceuticals,
     Inc. and Janssen Research &
22   Development, LLC:           Barrasso Usdin Kupperman Freeman &
                                   Sarver, LLC
23                             BY:  RICHARD E. SARVER, ESQ.
                               909 Poydras Street, 24th Floor
24                             New Orleans, Louisiana 70112

25
```

```
 1

 2
      Official Court Reporter:        Tana J. Hess, CRR, RMR
 3                                     500 Poydras Street
                                       Room B275
 4                                     New Orleans, Louisiana 70130
                                       (504) 589-7781
 5

 6
      Proceedings recorded by mechanical stenography using
 7    computer-aided transcription software.

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

624

8:29AM   1          **<u>INDEX OF WITNESSES</u>**

8:29AM   2   <u>NAME</u>                                              <u>PAGE</u>

8:29AM   3   Laura Plunkett

8:29AM   4        Direct Examination (Cont'd) by Ms. Jeffcott    625

8:29AM   5        Cross-Examination by Ms. Pruitt               638

8:29AM   6        Redirect Examination by Ms. Jeffcott          697

8:29AM   7   Anthonie Lensing

8:29AM   8        Direct Examination by Mr. Overholtz           726

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

| | | |
|---|---|---|
| 12:36PM | 1 | (Afternoon session.) |
| 1:20PM | 2 | (Whereupon the jury entered the courtroom.) |
| 1:20PM | 3 | **THE COURT:**  Be seated, please.  You may continue. |
| 1:20PM | 4 | **MS. JEFFCOTT:**  Thank you, Your Honor.  We don't have |
| 1:20PM | 5 | too much further. |
| 1:20PM | 6 | **DIRECT EXAMINATION (Cont'd)** |
| 1:20PM | 7 | **BY MS. JEFFCOTT:** |
| 1:20PM | 8 | **Q.**   Dr. Plunkett, before we get back to interpatient |
| 1:21PM | 9 | variability, I'd kind of like to do a recap of what we covered |
| 1:21PM | 10 | so far this morning after a full lunch.  All right.  So I |
| 1:21PM | 11 | mapped out here -- and I know I'm not doing your drawing |
| 1:21PM | 12 | justice, but it's the same concept of fibrin, fibrin |
| 1:21PM | 13 | generation. |
| 1:21PM | 14 | Is that a good rendering? |
| 1:21PM | 15 | **A.**   Yeah, that's close.  You need help with the little drop |
| 1:21PM | 16 | molecules. |
| 1:21PM | 17 | **Q.**   And so the concept is that when you have Xarelto in your |
| 1:21PM | 18 | blood, it results in less fiber production and, therefore, less |
| 1:21PM | 19 | clotting? |
| 1:21PM | 20 | **A.**   Yes. |
| 1:21PM | 21 | **Q.**   Okay.  And that when you increase the amount of Xarelto in |
| 1:21PM | 22 | the blood, you'll decrease the clot? |
| 1:21PM | 23 | **A.**   Yes.  That's the -- that's the desired effect. |
| 1:21PM | 24 | **Q.**   Okay.  And then what happens over time as the Xarelto |
| 1:21PM | 25 | concentration increases?  How does that impact the -- the |

1:21PM   1   clotting?

1:21PM   2   **A.**   So I'm assuming you're showing this as -- as looking

1:22PM   3   across a population?  Is that what you're showing here?  Yeah,

1:22PM   4   right.  So, yes.  So if you have different Xarelto

1:22PM   5   concentrations in the plasma for different people, as we talked

1:22PM   6   about, and we plot that against the clotting effect, less --

1:22PM   7   more clot -- less clotting is what you want with Xarelto, so

1:22PM   8   you decrease it as you go up.  We know that there's a dose

1:22PM   9   response where you do get an increase in -- in the

1:22PM   10  concentration over time, and you get more and more decrease in

1:22PM   11  clotting.

1:22PM   12         And when you move from the -- across the curve from

1:22PM   13  the doses that cause an effect that you desire, which is an

1:22PM   14  acceptable level of anticoagulation, to a dose -- that's what

1:22PM   15  you're showing here by toxic dose, to a dose that actually are

1:22PM   16  at an exposure level we talked about, that produces an

1:22PM   17  unacceptable level of anticoagulation where you bleed too much.

1:22PM   18  That's the issue with the drug.

1:22PM   19         So it's balancing that desired effect of

1:22PM   20  anticoagulation of the patient with, at the same time,

1:22PM   21  hopefully not moving them into that level of clot --

1:23PM   22  anticlotting or anticoagulation where they actually will

1:23PM   23  experience the toxicity or the exaggerated effect, which is the

1:23PM   24  bleeding.

1:23PM   25  **Q.**   And maybe I shouldn't have written "dose" here

1:23PM   1   necessarily, in terms of it would be the plasma concentrations.

1:23PM   2   Is that a better way to state it?

1:23PM   3   A.   Yes, that's correct.

1:23PM   4   Q.   Okay.  That's my bad.  So -- and then -- and you may have

1:23PM   5   already stated this, but the same concept, as you increase your

1:23PM   6   Xarelto concentration, your bleed risk increases?

1:23PM   7   A.   Yes.  And there's clinical data to show that that indeed

1:23PM   8   does occur.

1:23PM   9   Q.   Okay.  You talked about this over there, and you mapped

1:23PM   10  out the different ways to measure Xarelto, whether it's Xarelto

1:23PM   11  in the blood or Xarelto exposure.  And those three ways, if you

1:23PM   12  could just briefly recap?

1:23PM   13  A.   So there's the direct chemical measurement of the compound

1:23PM   14  in the blood.  That was the mass spectrometry method in the

1:24PM   15  laboratory.

1:24PM   16       Then there's two other methods that look at exposure

1:24PM   17  by correlating an effect that you get with Xarelto with a blood

1:24PM   18  level.  So the first was -- well, actually, the second one I

1:24PM   19  went over was the anti-Factor Xa.  You have it Number 3.  So

1:24PM   20  that's directly -- that's the direct target of Xarelto.  It's

1:24PM   21  inhibiting that activity, and the data they collected shows

1:24PM   22  that there's a correlation between inhibition of that activity

1:24PM   23  and blood levels.  So that's another way to determine exposure

1:24PM   24  to Xarelto in the patient's blood.

1:24PM   25       And then the third way, which is Number 2 here, is

1:24PM  1   the data that was collected looking at the clotting assay of
1:24PM  2   prothrombin time.  So that's how fast it takes blood to clot.
1:24PM  3   And when you use that tool in the way that they used in their
1:24PM  4   clinical studies with this reagent Neoplastin, they indeed show
1:24PM  5   that there was a correlation again between the exposure, the
1:24PM  6   amount of Xarelto in the blood, and the -- the presence of --
1:25PM  7   or the activity to clot, so how fast blood clotted or how slow
1:25PM  8   the blood clotted.
1:25PM  9   Q.    So there were correlations through studies that Bayer and
1:25PM  10  Janssen conducted.  They found correlations between the Xarelto
1:25PM  11  concentration in the blood and these last two bottom
1:25PM  12  measurements?
1:25PM  13  A.    Yes, that's exactly right.
1:25PM  14  Q.    Okay.  And I broke them down into PK/PD, just because
1:25PM  15  those are the terminology we've been using today.  Could you
1:25PM  16  kind of break out how each type of measurement applies to
1:25PM  17  whether it's PK or PD?
1:25PM  18  A.    So the first measurement, the concentration of blood is a
1:25PM  19  typical tool you use when you collect PK data.  So that's the
1:25PM  20  data on what is the drug, what does the body do to the drug, we
1:25PM  21  talked about.  So that is the process where the drug enters the
1:25PM  22  body, gets into the blood, and then it eventually gets
1:25PM  23  eliminated.
1:25PM  24          So measuring blood concentrations is a way to look at
1:25PM  25  the pharmacokinetics.

*OFFICIAL TRANSCRIPT*

1:25PM   1         The other two assays, those are end points that

1:25PM   2   relate to the pharmacodynamics:  What the drug does to the

1:26PM   3   body.

1:26PM   4         And they have been then correlated with the

1:26PM   5   pharmacokinetic parameter of the concentration of blood.  But

1:26PM   6   they are actually measures of the effect that you get.  One of

1:26PM   7   them is the effect, which is the inhibition of the target, and

1:26PM   8   the other is the effect which is the ultimate effect which is

1:26PM   9   the -- whether or not the blood clots quickly or not and

1:26PM  10   looking at anticoagulant activity.

1:26PM  11   Q.   So now that we've done that recap, let's go back to the

1:26PM  12   Mueck paper, paper by Bayer.

1:26PM  13         Is there a way to turn our screens on from here?

1:26PM  14         THE DEPUTY CLERK:  Let me flip it over to --

1:26PM  15         MS. JEFFCOTT:  Thanks, Dean.

1:26PM  16   BY MS. JEFFCOTT:

1:27PM  17   Q.   So my poor handwriting, we were looking at the DVT

1:27PM  18   treatment.  Now, one thing that you briefly mentioned before

1:27PM  19   lunch was the dosing, the 20-milligram once-daily dosing.

1:27PM  20         Was that the dose that Ms. Mingo, to your knowledge,

1:27PM  21   was on?

1:27PM  22   A.   No, that was not.

1:27PM  23   Q.   Okay.  And why is that significant here?

1:27PM  24   A.   Well, it's significant mainly because she was taking it

1:27PM  25   twice a day versus once a day, but also a different dose, and

1:27PM   1   that has to do with pharmacokinetics.  All those curves I
1:27PM   2   showed you, all of those curves, how the drug is handled by the
1:27PM   3   body, how much exposure you get, that's affected by not only
1:27PM   4   the amount of drug you give, but how often you give it.
1:27PM   5            So having an understanding of what variability in
1:27PM   6   exposure may be for patients that take it twice a day could end
1:28PM   7   up with different answers than looking at this data which is
1:28PM   8   showing me variability based on patients that took 20
1:28PM   9   milligrams once a day.  It's not that it's irrelevant data.
1:28PM  10   It's totally -- it is certainly relevant and gives me
1:28PM  11   information, but it is not exactly the same situation as
1:28PM  12   somebody who takes it in the way that Ms. Mingo, which is 15
1:28PM  13   milligrams twice a day.
1:28PM  14   Q.   And so why isn't there plasma concentration data for the
1:28PM  15   30 milligram twice daily?
1:28PM  16   A.   Because they didn't collect blood samples, to my
1:28PM  17   knowledge, in the -- in the same way.  They didn't collect the
1:28PM  18   data, pharmacokinetic data, in those trials.  That's at least
1:28PM  19   my understanding from seeing the records.
1:28PM  20   Q.   Well, I thought the EINSTEIN trial tested the 30-milligram
1:28PM  21   b.i.d. dosing structure.
1:28PM  22   A.   Yes.
1:28PM  23   Q.   Was it not collected during that trial?
1:28PM  24   A.   That's my understanding, that they didn't collect the data
1:28PM  25   like they did in those other trials.

*OFFICIAL TRANSCRIPT*

**Q.**   Okay.  So if we go down and look, there is a footnote
here.  If we go down and look at what that footnote says, what
does that mean for the source of the data, Footnote D?

**A.**   So the footnote is telling me where to go to look to find
the studies where the data came from.  And so if you look at D
down here, it says, "Parameter estimates at steady state --
geometric means in Phase II studies in the acute treatment of
DVT."

          So they're referring to Phase II studies, and the
studies that you were referring to is a Phase III study.  So
that's a -- it's a different study, in other words.  That's all
we probably need to worry about here, is it was a different
study that was collecting the pharmacokinetic information.

**Q.**   In terms of pharmacokinetic information that was gathered
in either study, for example in the ROCKET trial which also
looked at the 20 milligram once-daily dosing, is that
irrelevant for purposes of looking at EINSTEIN?

**A.**   No, it's not irrelevant.  You do need to understand that
patients in the ROCKET study for atrial fibrillation, it's a
different -- could have a different type of patient.  In fact,
the patients tended to be older and potentially even more --
have more other conditions and taking a variety of other drugs.
People with AFib tend to have other conditions like
hypertension and possibly -- and they may have high cholesterol
levels, a variety of things that they may have.  They may be on

1:30PM    1    an antiarrhythmic drug too because of having to treat the

1:30PM    2    arrhythmia that they have.

1:30PM    3           So it's not that the data is not relevant.  It is.

1:30PM    4    You can use that data to get an understanding generally of what

1:30PM    5    affects the pharmacokinetics, and that's useful because we have

1:30PM    6    older patients, sicker patients, with the variability there,

1:30PM    7    but it's still not exactly the same as collecting data in the

1:30PM    8    population, obviously, that you're treating.  So it's important

1:30PM    9    to understand pharmacokinetics in populations that you're

1:30PM   10    actually treating with the drug, and so you typically will

1:30PM   11    collect data in various population.

1:31PM   12    Q.   So looking at the data that we do have, the data that the

1:31PM   13    company collected, so regarding interpatient variability, can

1:31PM   14    you start by looking at trough and explaining what you mean by

1:31PM   15    "interpatient variability"?

1:31PM   16    A.   Okay.  So in the trough column, you see the numbers 26 and

1:31PM   17    in parentheses 6 to 87.  So what that means, what those data

1:31PM   18    numbers -- what those numbers represent is that the average

1:31PM   19    value across the patients that were tested in these trials for

1:31PM   20    their lowest level at trough, their Ctrough level, was 26.  And

1:31PM   21    the numbers around -- around that in the parentheses tell me

1:31PM   22    that there were some patients as low as 6 and some patients as

1:31PM   23    high as 87.  So that's the range around those numbers.

1:31PM   24           So it shows you that not everybody had the same

1:31PM   25    value.  In fact, not everybody had a number very close to the

| | | |
|---|---|---|
| 1:31PM | 1 | mean.  There were some people that were higher by a good bit |
| 1:32PM | 2 | and some people that were lower.  On the issue of variability, |
| 1:32PM | 3 | you can see that within that population they tested, that the |
| 1:32PM | 4 | numbers can be about 10 times different.  So if you take 6 |
| 1:32PM | 5 | times 10, you get something less than 87, but you're getting a |
| 1:32PM | 6 | number that's within that range. |
| 1:32PM | 7 | So some people will look at that and say, well, this |
| 1:32PM | 8 | shows that that range could be as much as tenfold on the |
| 1:32PM | 9 | Ctrough in this population based on the data they collected. |
| 1:32PM | 10 | Q.   And so why is this concerning for purposes of a given |
| 1:32PM | 11 | patient? |
| 1:32PM | 12 | A.   Because it's the idea of -- of understanding whether or |
| 1:32PM | 13 | not those levels that we get are within the acceptable range |
| 1:32PM | 14 | for the therapy that is safe and effective.  So it's the idea |
| 1:32PM | 15 | of knowing exposure.  How does that exposure, those numbers on |
| 1:32PM | 16 | Ctrough, relate to whether or not we would expect that person |
| 1:32PM | 17 | to be getting the effect they want to get, but then also |
| 1:32PM | 18 | looking at variability at the other level of the curve too, |
| 1:32PM | 19 | understanding how high the levels could go, because that could |
| 1:33PM | 20 | also be affecting safety. |
| 1:33PM | 21 | Q.   And that was going to be my next question, was to look at |
| 1:33PM | 22 | the Cmax, this last column.  What does that tell you? |
| 1:33PM | 23 | A.   So -- it's the same type of information.  The average |
| 1:33PM | 24 | value was 270 in this population, but the levels at max range |
| 1:33PM | 25 | from 189 to 419.  So not as much variability in the number, but |

1:33PM   1   certainly still significant variability in the numbers you're

1:33PM   2   getting.

1:33PM   3            And we need to be able to say by looking at that that

1:33PM   4   in this level -- in this trial, we had people that had blood

1:33PM   5   levels from 189 to 419 within that range.  And so the idea is

1:33PM   6   that when you expose people to this drug, you're going to get a

1:33PM   7   range of values not only at the low end, but also at the high

1:33PM   8   end.

1:33PM   9            And so it's understanding what that variability is to

1:33PM  10   be able to make a decision on what dose to give a person, for

1:33PM  11   example, but also to understand where your patient falls.  When

1:34PM  12   you give somebody the drug, are they going to be more like the

1:34PM  13   person with the 419 at max or more like the patient with the

1:34PM  14   189?  Or -- and on the other end, on the trough, are we going

1:34PM  15   to have people that have very low levels, close to 6, or are we

1:34PM  16   going to have people that have numbers closer to the median or

1:34PM  17   to the upper end?

1:34PM  18   Q.   Okay.  And going back and looking at the graph here, I'll

1:34PM  19   correct where it says regarding dose to concentration.

1:34PM  20            And part of the problem is that we don't know exactly

1:34PM  21   where that toxic concentration or minimum effect of

1:34PM  22   concentration; right?

1:34PM  23   A.   Yes.  We don't have enough data -- the data has not been

1:34PM  24   collected that allows us to identify the minimum effective

1:34PM  25   concentration, as low as you can go and still get the efficacy

1:34PM   1   that you want in the DVT population in this case.  And then we

1:34PM   2   also don't know the threshold for toxicity.

1:34PM   3          We know that, if exposure goes up at the doses that

1:34PM   4   were given clinically, we had people bleeding.  So we know that

1:35PM   5   it can occur within the range that people were getting in the

1:35PM   6   clinical studies, but we haven't identified -- it's not like

1:35PM   7   many toxicities.

1:35PM   8          There's a lot of toxicities for drugs that you can

1:35PM   9   identify are occurring at doses that are above -- or according

1:35PM  10   to blood levels that are clearly what I call overdose.  There

1:35PM  11   are people that have either taken more drug than they should

1:35PM  12   have or were not dosed properly by the doctor based on the

1:35PM  13   doses that are available.  And they get such a high blood level

1:35PM  14   that you've reached a level that's without -- beyond the

1:35PM  15   threshold that you may have actually identified within your

1:35PM  16   clinical studies.

1:35PM  17          But in this case, we don't have that information.  So

1:35PM  18   I can't -- I can't tell you that a blood level of X is always

1:35PM  19   going to be safe.  We can't tell you that.

1:35PM  20   Q.   Can you say, though, at a blood level of 419 micrograms

1:35PM  21   that somebody's going to bleed?

1:35PM  22   A.   I can tell -- we can't tell you at that blood level that

1:35PM  23   they're going to bleed, but we can tell you that as blood

1:36PM  24   levels increase, the risk of bleeding does increase.  And some

1:36PM  25   of the data that we do have from the clinical studies shows

1:36PM  1    that relationship, how when you -- when the blood level goes up

1:36PM  2    to a certain level, that the increase in risk goes up by a

1:36PM  3    certain amount.  So we have that data.

1:36PM  4            There are some of those analyses that were done for

1:36PM  5    the different clinical trials by the company, and so we have an

1:36PM  6    understanding of when bleed risk goes up.  And we know that the

1:36PM  7    higher the blood level goes, the more risk there is.

1:36PM  8            But we can't -- I can't tell you that a 419 is always

1:36PM  9    going to be a bleed.  And, in fact, I believe in this trial --

1:36PM 10    I don't believe they had any major bleeds in this trial.  So

1:36PM 11    this was -- somebody measured this level, and they did not

1:36PM 12    develop major bleed.  But that doesn't mean that everybody is

1:36PM 13    going to be safe at that level, based on the data that they

1:36PM 14    have collected.

1:36PM 15    Q.   And so, across this range, people obviously at the 419

1:37PM 16    range, would you agree, are at a higher risk of bleeding than

1:37PM 17    at the opposite end?

1:37PM 18    A.   Absolutely.  With these drugs, there is -- there is a

1:37PM 19    relationship between increased risk and blood levels.

1:37PM 20    Obviously, the higher these blood levels are going, that's what

1:37PM 21    they show in their clinical data.

1:37PM 22            And they have measured blood levels in their clinical

1:37PM 23    data that are this high, and they have -- with the data set

1:37PM 24    they went through, they were able to show that the higher the

1:37PM 25    level gets, the more the bleeding risk increases.

637

1:37PM  1        We just can't identify one level.  That's the

1:37PM  2   problem, because we don't have the data to be able to do that.

1:37PM  3   Q.   And so in terms of what we discussed today, variability

1:37PM  4   and uniqueness of the drug, what is concerning to you as a

1:37PM  5   pharmacologist?

1:37PM  6   A.   So what concerns me is the idea that we have such

1:37PM  7   variability of people's exposure.  We know that it occurs.  We

1:37PM  8   know you can give the same drug to two people and they can get

1:37PM  9   a different blood level.  And we know that people that take the

1:37PM  10  drug, the things about them, their characteristics, can affect

1:37PM  11  the exposure.

1:38PM  12       We know that age can affect the exposure to this

1:38PM  13  drug.  We know that kidney function.  We know that there's some

1:38PM  14  effect from liver function.  We know that fed versus fasted

1:38PM  15  state affects absorption.

1:38PM  16       We know that these drugs are dosed not on a -- taking

1:38PM  17  into account body size.  In other words, a 100-pound person

1:38PM  18  would get a 15-milligram tablet just like a 300-pound person

1:38PM  19  would get a 15-milligram tablet.  So there's more space for

1:38PM  20  that drug to distribute into.  You'd get a higher blood level

1:38PM  21  in the smaller person than you'd get in the larger person.

1:38PM  22       So knowing all those things exist, I believe, as a

1:38PM  23  pharmacologist, we need to have some understanding of what

1:38PM  24  people's exposure actually is at some point in time.  And

1:38PM  25  that's what we don't know.  To be able to understand the person

1:38PM   1   who comes in after they're on the drug, what exposure level
1:38PM   2   have they reached?
1:38PM   3           And if somebody gets sick or an emergency situation
1:39PM   4   or their physiology changes or they add another drug on board
1:39PM   5   to their -- to their regimen every day that we know interferes
1:39PM   6   with the way this drug is eliminated or the way the drug is
1:39PM   7   metabolized and they could increase their exposure, I mean,
1:39PM   8   those are all times when it would make sense to understand what
1:39PM   9   people's exposure is.  And that's something that is not being
1:39PM   10  done with the way the drug is being used.
1:39PM   11  Q.   Is it your opinion that it's possible?
1:39PM   12  A.   Yes.  My opinion is it's possible to determine exposure
1:39PM   13  for these drugs, yes, especially on this issue of safety.  We
1:39PM   14  have information about the -- about the issue of looking at how
1:39PM   15  blood levels increase.  Absolutely.
1:39PM   16          MS. JEFFCOTT:  That's all I have.  Thank you,
1:39PM   17  Dr. Plunkett.
1:39PM   18          THE COURT:  Any cross?
1:39PM   19                   CROSS-EXAMINATION
1:39PM   20                   BY MS. PRUITT:
         21  Q.   That's kind of in the way, isn't it?
1:40PM   22  A.   You are right.  Maybe I can scoot over a little bit.
1:40PM   23  Q.   That's all right.  I think it's -- I think I can move it
1:40PM   24  to this side.
1:40PM   25          And we can see one another?

1:40PM  1   **A.**   Does this help you?

1:40PM  2   **Q.**   There we go.  I want to make sure the court reporter can

1:40PM  3   hear me.

1:40PM  4        Good afternoon, Dr. Plunkett.

1:40PM  5   **A.**   Good afternoon.

1:40PM  6   **Q.**   My name is Lyn Pruitt, and I'm from Little Rock, Arkansas.

1:40PM  7   You mentioned UMAS for your studies.  Ph.D. or doctoral

1:40PM  8   studies?

1:40PM  9   **A.**   I had a job there.

1:40PM  10  **Q.**   You had a job in Little Rock.  Did you know a toxicologist

1:40PM  11  by the name of Dr. Hank Simmons?

1:40PM  12  **A.**   I know his name.  I did not know him personally.

1:40PM  13  **Q.**   Just wondering.  I saw that in your resumé.  I was

1:40PM  14  wondering.

1:40PM  15       Dr. Plunkett, I want to start with you today about

1:40PM  16  talking about the plaintiff in this case, Ms. Mingo.  Okay?

1:41PM  17  **A.**   Okay.

1:41PM  18  **Q.**   And do you understand that Ms. Mingo was first prescribed

1:41PM  19  Xarelto on January the 23rd, 2015?

1:41PM  20       **MS. JEFFCOTT:**  Your Honor, objection.  Dr. Plunkett

1:41PM  21  is not --

1:41PM  22       **THE COURT:**  I'm sorry.  I didn't hear.

1:41PM  23       **MS. JEFFCOTT:**  Objection, Your Honor.  Dr. Plunkett

1:41PM  24  is not a case-specific expert in this matter.

1:41PM  25       **MS. PRUITT:**  She was given information about

1:41PM  1   Ms. Mingo, Judge.

1:41PM  2           **THE COURT:**  I'll allow it.

1:41PM  3   **BY MS. PRUITT:**

1:41PM  4   **Q.**   Do you understand that Ms. Mingo was first prescribed

1:41PM  5   Xarelto on January 23rd, 2015?

1:41PM  6   **A.**   I knew she was prescribed, but not the date, no.  I have

1:41PM  7   not seen her medical records or her case specifics.

1:41PM  8   **Q.**   Okay.  And you understand that Ms. Mingo was prescribed

1:41PM  9   Xarelto to treat a deep vein blood clot; right?

1:41PM 10   **A.**   That I do know, yes.

1:41PM 11   **Q.**   And that she suffered that deep vein blood clot after hip

1:41PM 12   surgery?

1:41PM 13   **A.**   I don't recall that detail, no.

1:41PM 14   **Q.**   Okay.  You agree, Dr. Plunkett, that Xarelto was approved

1:41PM 15   by the FDA as safe and effective for the treatment of deep vein

1:41PM 16   clots; right?

1:41PM 17   **A.**   Yes, it did receive FDA approval.

1:41PM 18   **Q.**   Okay.  And your opinions that you're telling the jury in

1:41PM 19   this case today about Xarelto are general opinions; correct?

1:42PM 20   **A.**   I'm sorry.  They're?

1:42PM 21   **Q.**   They're general opinions about Xarelto; correct?

1:42PM 22   **A.**   Yes.  About the pharmacology and toxicology, yes.

1:42PM 23   **Q.**   And we can agree that, in forming your opinions, you did

1:42PM 24   not read Ms. Mingo's deposition testimony, did you?

1:42PM 25   **A.**   No, I did not.

*OFFICIAL TRANSCRIPT*

1:42PM  1    Q.   And you didn't review the deposition testimony of
1:42PM  2    Ms. Mingo's family members, did you?
1:42PM  3    A.   No, I did not.
1:42PM  4    Q.   And you did not review the deposition testimony of any of
1:42PM  5    Ms. Mingo's treating doctors, did you?
1:42PM  6    A.   I did not, that's correct.
1:42PM  7    Q.   And I think you just said that you haven't read any of
1:42PM  8    Ms. Mingo's medical records; correct?
1:42PM  9    A.   That's correct.  I have not.
1:42PM  10   Q.   So while Ms. Mingo was being treated for this blood clot,
1:42PM  11   you don't know whether she was taking any other anticoagulants
1:42PM  12   or not, do you?
1:42PM  13   A.   No, I do not.  I have not seen her medical record.
1:42PM  14   Q.   And you don't know when in time those anticoagulants were
1:42PM  15   given as far as whether they were different ones the day
1:42PM  16   before?  You don't have any knowledge of that?
1:42PM  17   A.   No, I do not.
1:43PM  18   Q.   Okay.  And you haven't yourself looked at any laboratory
1:43PM  19   test results for Ms. Mingo, have you?
1:43PM  20   A.   No.  That was not my job.
1:43PM  21   Q.   And so, for instance, you haven't actually looked at
1:43PM  22   Ms. Mingo's PT test results, have you?
1:43PM  23   A.   No, I have not.
1:43PM  24   Q.   And you don't know personally whether any of Ms. Mingo's
1:43PM  25   PT test results fall in the range that would be expected for a

1:43PM   1   patient taking 15 milligrams of Xarelto twice a day, do you?

1:43PM   2   A.   I have not made that assessment, no.  I'm not a

1:43PM   3   case-specific expert.

1:43PM   4   Q.   So you don't know whether her PT values fall in -- within

1:43PM   5   acceptable range?

1:43PM   6   A.   No.  It's my understanding there are other experts who

1:43PM   7   will address this.

1:43PM   8   Q.   You understand -- have you also looked at some other drugs

1:43PM   9   that are anticoagulants?  In your report, have you discussed

1:43PM  10   other drugs?

1:43PM  11   A.   Yes.  I talk -- give you a little bit of background on the

1:43PM  12   other drugs that have been approved that are in the same class

1:44PM  13   as Xarelto.

1:44PM  14   Q.   And warfarin would be one of those drugs; correct?

1:44PM  15   A.   Yes.

1:44PM  16   Q.   And it's sort of in a different class because it's an

1:44PM  17   older drug; right?

1:44PM  18   A.   Yes.  But it's an oral coagulant.  If you want to make the

1:44PM  19   class as large as that, yes.

1:44PM  20   Q.   And you're aware, from having looked at warfarin, that the

1:44PM  21   highest dose of Coumadin that you can give to somebody that's

1:44PM  22   available is 10 milligrams; right?

1:44PM  23   A.   For use as an anticoagulant, yes, that is true.

1:44PM  24   Q.   And you're also aware, as a pharmacologist, that the peak

1:44PM  25   anticoagulant effect of a 10-milligram dose of Coumadin could

1:44PM  1    be anywhere from 72 to 96 hours later; right?

1:44PM  2    A.    Yes.   It does take a little longer for the peak effect

1:44PM  3    based on -- it has a little different mechanism of action than

1:44PM  4    Xarelto, yes.

1:44PM  5    Q.    And, Dr. Plunkett, you're not here to give an opinion on

1:44PM  6    the efficacy and safety of Xarelto's use in patients with deep

1:44PM  7    vein blood clots, are you?

1:44PM  8    A.    No.   I have not been asked to come here and talk about the

1:45PM  9    clinical data, things like that.   I was asked to strictly focus

1:45PM  10   on the issues related to exposure response and the data that we

1:45PM  11   have on how it works -- how the drug works generally and what

1:45PM  12   the -- the balance is between a safe dose and a toxic dose.

1:45PM  13   Q.    And you understand, Dr. Plunkett, that the FDA has

1:45PM  14   approved this medication for the use of treating deep vein

1:45PM  15   blood clots in patients just like Ms. Mingo; right?

1:45PM  16   A.    Yes.   I believe you already asked me that, and I said yes.

1:45PM  17   That's true.

1:45PM  18   Q.    And you understand that they have approved as safe and

1:45PM  19   effective 15-milligram dose twice a day, just like Ms. Mingo

1:45PM  20   was taking; correct?

1:45PM  21   A.    Yes, that's correct.

1:45PM  22   Q.    Now, let's talk a little bit about your experience

1:45PM  23   testifying.

1:45PM  24         Since 2012, you've testified at least 60 different

1:46PM  25   times at deposition or at trial as an expert witness, haven't

OFFICIAL TRANSCRIPT

| | |
|---|---|
| 1:46PM | 1 |

you?

A.    Yes, that would be true.

Q.    And you provided us with a list of your testimony over that period of time; is that right?

A.    Yes, I did.

Q.    And on that list, it includes about 62 or 63 cases; right?

A.    They're not all different cases.  Some of them are the same case.  But, yes, it would have been 62, I believe, different times I've given testimony, sometimes for the same case, like deposition and trial, things like that.

Q.    And looking back over the last 20 years or so, you've worked as a paid litigation expert about 150 times; is that right?

A.    Over 20 years, yes, that's probably true.

Q.    Over the last 15 to 20 years, you've been paid more than $2 million by plaintiffs' lawyers to testify against companies, haven't you?

A.    Well, it wouldn't all be plaintiffs' lawyers to testify against companies.  But certainly over the time in my litigation practice, that's probably true.  Over those years, it would have amounted to about $2 million over about 15 to 18 years, yes.

Q.    And all of those cases in which you testified about pharmaceutical drugs or medical devices, in every one, you've testified on behalf of the plaintiffs and against the

1:47PM  1  pharmaceutical or medical device manufacturer; isn't that

1:47PM  2  right?

1:47PM  3  A.    In the pharmaceutical cases, yes, that's true.  My product

1:47PM  4  liability work has been for plaintiffs.

1:47PM  5  Q.    And you've been testifying as an expert witness for

1:47PM  6  plaintiffs' lawyers in pharmaceutical cases since around 2003;

1:47PM  7  haven't you?

1:47PM  8  A.    Yes, the first plaintiff's case.  Before that, I would

1:47PM  9  have been working for defense.

1:47PM  10  Q.    Now, Dr. Plunkett, you own a company called Integrative

1:47PM  11  Biostrategies; isn't that right?

1:47PM  12  A.    Yes, I do currently.

1:47PM  13  Q.    And that's the company through which you do your

1:47PM  14  consulting work; right?

1:47PM  15  A.    Yes.

1:47PM  16  Q.    Including your expert witness consulting work?

1:47PM  17  A.    Yes.

1:47PM  18  Q.    And Integrative Biostrategies only has two employees.

1:47PM  19  That's you and your husband; right?

1:47PM  20  A.    That's correct.

1:47PM  21  Q.    And your husband mainly does retrieval of information for

1:47PM  22  you; is that right?

1:47PM  23  A.    Well, he also has some of his own clients.  He's a

1:47PM  24  computer programmer/database designer.  But when he works with

1:48PM  25  me, yes, he's mainly doing information retrieval.

1:48PM   1   **Q.**   So the two of you operate out of your home; right?

1:48PM   2   **A.**   Yes, I have a home-based office.

1:48PM   3   **Q.**   There's no office space with desk and a receptionist and

1:48PM   4   employees for Integrative Biostrategies, is there?

1:48PM   5   **A.**   No.  We have a desk, but I don't rent an office space,

1:48PM   6   that's correct.

1:48PM   7   **Q.**   And about 50 percent of your income comes through this

1:48PM   8   litigation work, doesn't it?

1:48PM   9   **A.**   Yes, 50 percent of my income is through litigation.  The

1:48PM   10  other half of my income comes from regulatory and patent work.

1:48PM   11  **Q.**   So half of your income, or half of your living, is made

1:48PM   12  testifying for plaintiffs in cases like this one; isn't that

1:48PM   13  right?

1:48PM   14  **A.**   It's not all plaintiffs' cases, but in product liability

1:48PM   15  it is.  I also do expert work in other areas.  I do do some

1:48PM   16  defense work in areas of drugs of abuse and alcohol cases.  And

1:48PM   17  I also do -- I work for insurance companies defending cases as

1:48PM   18  well.

1:48PM   19  **Q.**   It's correct, Dr. Plunkett, that you did not form your

1:48PM   20  opinions you are testifying about today until after you were

1:49PM   21  hired by plaintiff's lawyers in this litigation; correct?

1:49PM   22  **A.**   I certainly -- as I laid out in my expert report, that is

1:49PM   23  true.  That was written after I had been hired by the

1:49PM   24  plaintiffs.  I had formed some basic opinions about Xarelto

1:49PM   25  before then based on knowing something about the drug, but

647

1   certainly as I was hired in this case, with my report, it was

2   after I was hired, yes.

3   **Q.**   So you had never formed an opinion about the variability

4   of Xarelto before you were hired by plaintiff's lawyers in this

5   case, had you?

6   **A.**   That's true.  I did not look into that data until after I

7   was hired.

8   **Q.**   And you haven't studied that data and published any

9   articles about Xarelto; have you, ma'am?

10   **A.**   No, I have not.

11   **Q.**   Now, you're not a practicing medical doctor --

12        **THE COURT:**  Excuse me?

13        **MS. JEFFCOTT:**  Your Honor, objection.  The question

14   regarding Dr. Plunkett's ability to publish, she wasn't

15   permitted to publish, due to the confidential nature that the

16   defendants imposed on the documents related to Xarelto.

17        **MS. PRUITT:**  Your Honor, we need to approach if we're

18   going to do this.

19        **THE COURT:**  Okay.  You can keep asking.

20   **BY MS. PRUITT:**

21   **Q.**   Dr. Plunkett, you're not a practicing medical doctor?

22   **A.**   No, I'm not an M.D.  I'm not a physician.

23   **Q.**   And when -- when we refer to you as "doctor," it's because

24   you have a doctorate in pharmacology; right?

25   **A.**   That's right.  I have a Ph.D. in pharmacology.

1:50PM   1   **Q.**   And so you're not licensed to actually practice medicine

1:50PM   2   as an M.D. in any state?

1:50PM   3   **A.**   That is correct, I am not.

1:50PM   4   **Q.**   And you don't diagnose or treat patients?

1:50PM   5   **A.**   No, I don't do that.

1:50PM   6   **Q.**   And you haven't diagnosed a patient with a deep vein blood

1:50PM   7   clot; isn't that true?

1:50PM   8   **A.**   That is correct, because I'm not a physician.

1:50PM   9   **Q.**   And you've never treated patient with a deep vein blood

1:50PM   10  clot?

1:50PM   11  **A.**   No, because only physicians would do that.

1:50PM   12  **Q.**   And you're not a hematologist?

1:50PM   13  **A.**   No, I'm not.

1:50PM   14  **Q.**   And so the things that you were talking about today, as

1:50PM   15  you were drawing those pictures for the jury, the blood

1:50PM   16  clotting process is really in the wheelhouse of the

1:51PM   17  hematologist.  That's what they look at, and that's what they

1:51PM   18  do; right?

1:51PM   19  **A.**   Well, a hematologist, on a daily basis, is studying that,

1:51PM   20  either under a microscope or within a laboratory; but certainly

1:51PM   21  within the basic training of a pharmacologist, anticoagulant

1:51PM   22  drugs were something I studied, and I had to understand the

1:51PM   23  physiology of the clotting system.  So it is something that's

1:51PM   24  broader than just a hematologist.

1:51PM   25           But, absolutely, I'm not a hematologist.  And

1:51PM   1   certainly I believe in this case there's somebody that's an

1:51PM   2   expert in those assays that will be here to talk to the jury.

1:51PM   3   **Q.**   You never prescribed yourself, obviously, an

1:51PM   4   anticoagulant.  That's true?

1:51PM   5   **A.**   No.  Again, I'm not a doctor, so I don't prescribe drugs.

1:51PM   6   **Q.**   Let's talk a little bit about your experience with the

1:51PM   7   FDA.  You've never been employed by the FDA, have you?

1:51PM   8   **A.**   No, I have not been an employee of the FDA.

1:51PM   9   **Q.**   And the FDA hasn't hired you as a consultant, have they?

1:51PM  10   **A.**   No, I have never been hired by the FDA.

1:51PM  11   **Q.**   You've not been asked to give opinions on labeling issues,

1:51PM  12   have you?

1:51PM  13   **A.**   No, not in this case.

1:51PM  14   **Q.**   And you've never participated in any FDA committee;

1:51PM  15   correct?

1:51PM  16   **A.**   That's correct.

1:51PM  17   **Q.**   And you've not testified in front of a FDA advisory

1:52PM  18   committee; is that right?

1:52PM  19   **A.**   I'm sorry?

1:52PM  20   **Q.**   You've never testified before an FDA advisory committee;

1:52PM  21   right?

1:52PM  22   **A.**   No, I have not done that.

1:52PM  23   **Q.**   The FDA has not consulted with you on any prescription

1:52PM  24   label, have they?

1:52PM  25   **A.**   No.  They don't do that, but, no, they haven't either.

*OFFICIAL TRANSCRIPT*

1:52PM 1    Q.    The FDA does consult advisory committees that's composed

1:52PM 2    of professionals; right?

1:52PM 3    A.    Yes.  But they don't go to outside consultants like me.

1:52PM 4    If I was on the advisory committee, you're right, but it's a

1:52PM 5    different role that I play.

1:52PM 6    Q.    But if they wanted to consult a pharmacologist, they can

1:52PM 7    consult any pharmacologist they want to in the country; right?

1:52PM 8    A.    Well, they would probably do it in-house, in my

1:52PM 9    experience, because they have pharmacologists on staff.  But,

1:52PM 10   certainly, yes, they could go to other people if they felt they

1:52PM 11   didn't have the expertise in-house.  Yes.

1:52PM 12   Q.    And not only do they have pharmacologists on staff, but

1:52PM 13   they have hematologists; correct?

1:52PM 14   A.    I don't know about that for sure, but they have doctors

1:52PM 15   with expertise in clotting, yes.

1:52PM 16   Q.    Statisticians?

1:52PM 17   A.    Yes, they do.

1:52PM 18   Q.    And epidemiologists?

1:52PM 19   A.    Yes.

1:53PM 20   Q.    Now, you don't hold any certification or academic degree

1:53PM 21   in regulatory affairs, do you?

1:53PM 22   A.    No, I don't.

1:53PM 23   Q.    You have not conducted any original laboratory research

1:53PM 24   concerning coagulation; have you, ma'am?

1:53PM 25   A.    No.  That was not my focus in my research years.

1:53PM   1    Q.    And you haven't done any laboratory research on clotting

1:53PM   2    factors, have you?

1:53PM   3    A.    No, I have not.

1:53PM   4    Q.    And you've not performed any laboratory research with

1:53PM   5    respect to anticoagulant therapies like Xarelto, have you?

1:53PM   6    A.    No.  I have not administered Xarelto or any other

1:53PM   7    anticoagulant to an animal or to a cell or tissue in the lab,

1:53PM   8    no.

1:53PM   9    Q.    You've never been involved in any clinical trial or study

1:53PM  10    that involved anticoagulant therapy, have you?

1:53PM  11    A.    No, I have not.

1:53PM  12    Q.    Now, you authored a report in this case; is that correct,

1:53PM  13    ma'am?

1:53PM  14    A.    Yes, I did.

1:53PM  15    Q.    I want to hand your report to you, please.

1:53PM  16          For identification purposes, it's Defense 310.  I've

1:54PM  17    got a copy of it.  Here we go.

1:54PM  18    A.    Thank you.

1:54PM  19    Q.    Now, this is the -- the body of this report is a 36-page

1:54PM  20    report; isn't that correct, Dr. Plunkett?  Or 38 maybe.

1:54PM  21    A.    Yeah, it goes to page 38 on the body.  Yes.

1:54PM  22    Q.    Okay.  And can you identify that this is the copy of your

1:54PM  23    report?

1:54PM  24    A.    Yes.  This is the copy that was filed in October -- on

1:54PM  25    October 14th of 2016.

1:54PM   1          **MS. PRUITT:**  Okay.  I'd like to put it up, Your

1:54PM   2   Honor.  May I publish?

1:54PM   3          **THE COURT:**  You may show it.

1:54PM   4          **MS. PRUITT:**  Sorry.

1:55PM   5   **BY MS. PRUITT:**

1:55PM   6   **Q.**   Yeah.  Is that your signature, Dr. Plunkett?

1:55PM   7   **A.**   Yes.

1:55PM   8   **Q.**   And what date did you sign that report?

1:55PM   9   **A.**   October 14th, 2016.

1:55PM  10   **Q.**   So on October 14th, 2016, you signed the report; correct?

1:55PM  11   **A.**   Yes.

1:55PM  12   **Q.**   I have looked at all 38 pages of your report, and I don't

1:55PM  13   see anything in there about the EINSTEIN-DVT study.

1:55PM  14          Did you put anything in your report about the

1:55PM  15   EINSTEIN-DVT study, Doctor?

1:55PM  16   **A.**   No, I don't have a mention of it specifically.  It might

1:55PM  17   have been in some of the references that I cited in Appendix C,

1:55PM  18   some of the publications that are in the literature, but I did

1:55PM  19   not cite the actual study report, no.

1:55PM  20   **Q.**   And I word-searched your report, both the appendices and

1:55PM  21   the body of it, and I didn't find a mention of EINSTEIN-DVT

1:55PM  22   anywhere in your report.

1:55PM  23          Do you have a reason to believe that's not correct?

1:55PM  24   **A.**   I have a reason to believe that in the -- let me see if

1:55PM  25   the -- that in the section in the back where I have references,

1:56PM  1    I think Appendix C, I don't give the titles, so it's possibly

1:56PM  2    in one of these articles, and, indeed, you wouldn't find it

1:56PM  3    with a word search.  But I'd have to go and look to tell you

1:56PM  4    which ones it may be.

1:56PM  5    Q.   In the body of your report, did you discuss the

1:56PM  6    EINSTEIN-DVT study and what the results were?

1:56PM  7    A.   No, I did not.  I think I already answered that for you.

1:56PM  8    Q.   In the body of your report, did you acknowledge that it

1:56PM  9    was the EINSTEIN-DVT study that actually looked at the use of

1:56PM  10   Xarelto in people who have deep vein clots?

1:56PM  11   A.   No, I don't mention that study specifically in the first

1:56PM  12   38 pages, if that is your question.  That is true.

1:56PM  13   Q.   So as of November (verbatim) the 14th, 2016, when you

1:56PM  14   authored this report, you hadn't given any information to the

1:56PM  15   lawyers in this case about your opinions on EINSTEIN-DVT, had

1:56PM  16   you?

1:56PM  17   A.   I had certainly not given you a paragraph that described

1:57PM  18   the report of that study.  That is true, I had not.

1:57PM  19   Q.   And you understand that EINSTEIN-DVT study is the study

1:57PM  20   that's applicable to the condition that Ms. Mingo has in this

1:57PM  21   case?

1:57PM  22   A.   Yes, because she is taking it for DVT, that is the

1:57PM  23   treatment.  That is exactly right.

1:57PM  24   Q.   When we took your deposition, do you recall that someone

1:57PM  25   asked you about the EINSTEIN study?  Do you have a recollection

1:57PM   1   of that?

1:57PM   2   A.   It's possible they did.  I've reviewed my deposition a few

1:57PM   3   days ago, and I believe there was a question about it, yes.

1:57PM   4   Q.   And do you recall that you said at that time -- and your

1:57PM   5   deposition was taken on December 6th, 2016, wasn't it?

1:57PM   6   A.   6th and 7th, I believe.  It went over to the second day,

1:57PM   7   but yes.

1:57PM   8   Q.   And do you recall that you said, "EINSTEIN, I believe, is

1:57PM   9   a later trial and possibly maybe that's a different drug"?

1:57PM  10   A.   Yes.  I may have said that at the time, yes.

1:58PM  11   Q.   So at the time you gave your deposition, you weren't even

1:58PM  12   sure what the EINSTEIN study was.  You thought it might have

1:58PM  13   been a later trial and you thought maybe it was a different

1:58PM  14   drug; is that correct?

1:58PM  15   A.   That was the answer at the time, yes.

1:58PM  16   Q.   So in October 14th, 2016, when you authored your report,

1:58PM  17   you didn't talk about EINSTEIN-DVT, and on December 6th, 2016,

1:58PM  18   when you gave your deposition, you didn't -- you thought

1:58PM  19   EINSTEIN was a later trial and it might have been a different

1:58PM  20   drug.  Is that accurate, Doctor?

1:58PM  21   A.   I don't know -- if that's my exact words, yes, that's what

1:58PM  22   I would have said based on what you've just read to me.

1:58PM  23   Q.   And today in this courtroom, you're not telling the ladies

1:58PM  24   and gentlemen of the jury that you have some opinion on the

1:58PM  25   issue of dose selection in the EINSTEIN studies, are you,

1:58PM 1   ma'am?

1:58PM 2   A.   No, I have not formed an opinion about the dose selection.

1:58PM 3   My opinions with EINSTEIN have to do with this issue of what

1:58PM 4   was reported with the variability.

1:58PM 5   Q.   Okay.  Now, let's talk about the EINSTEIN study since

1:59PM 6   that's the one that's applicable to Ms. Mingo.

1:59PM 7        You understand that when Bayer and Janssen have to

1:59PM 8   submit this for use in DVT, that they have to submit something

1:59PM 9   called "Integrated Summary of Safety"?

1:59PM 10  A.   Yes.  As part of their NDA submission, yes.

1:59PM 11  Q.   And you understand the integrated summary of safety does

1:59PM 12  get turned over to the FDA; correct?

1:59PM 13  A.   Yes, it's the document that the company prepared that

1:59PM 14  describes their opinions and their view of their data.

1:59PM 15  Q.   Now, you testified and you told the jury today that

1:59PM 16  bleeding risk increased with increasing PT values in the

1:59PM 17  Xarelto clinical trials, didn't you?

1:59PM 18  A.   Yes.

1:59PM 19  Q.   In the clinical trial of Xarelto, looking at patients like

1:59PM 20  Ms. Mingo with DVT, there was no correlation between PT and

1:59PM 21  bleeding risk.  Did you know that?

1:59PM 22  A.   I need to know what trial -- if you're talking about the

2:00PM 23  Phase III trial, where that -- that may be true, but there are

2:00PM 24  other DVT trials where there was such a relationship shown.

2:00PM 25  Q.   I'm talking about the EINSTEIN-DVT Phase III trial on

*OFFICIAL TRANSCRIPT*

humans where they looked at bleeding risk, the correlation

between PT and bleeding risk, and there was no correlation

between PT and bleeding risk.  Did you know that?

A.   In that study, that is true.  But, again, there are other

DVT studies where they, indeed, reported a dose response for

that.

Q.   And that is the study that is the last phase that's done

and used for the FDA, one of them used by the FDA to consider

whether this drug is safe and effective in humans; right?

A.   Yes.  It's not the only trial.  The other ones that I'm

discussing are also part of the NDA as well.

Q.   We're going to talk about the other EINSTEINs.  So you're

familiar with the FDA's requirement for including all of the

information in the integrated summary of safety with the

submission of new drug applications; right?

A.   Yes.

Q.   And that summary of safety includes all of the relevant

safety data from the clinical study reports that support a new

drug application; right?

A.   That's what it's supposed to be there, yes.

Q.   And you agree that the EINSTEIN study is actually two

studies; right?

A.   Yes, I believe that's true.

Q.   One of the studies was patients with deep vein clots like

Ms. Mingo; right?

657

| | | |
|---|---|---|
| 2:01PM | 1 | **A.**   Yes. |
| 2:01PM | 2 | **Q.**   And one of the patients involved those who had developed a |
| 2:01PM | 3 | pulmonary embolism; right? |
| 2:01PM | 4 | **A.**   That's true. |
| 2:01PM | 5 | **Q.**   In the EINSTEIN-DVT study, the companies gathered data |
| 2:01PM | 6 | about PT time on those patients, didn't they? |
| 2:01PM | 7 | **A.**   Yes, they did. |
| 2:01PM | 8 | **Q.**   And you told the jury you hadn't seen any bleeding data |
| 2:01PM | 9 | with two 15-milligram doses twice a day.  You just told the |
| 2:01PM | 10 | jury that; right? |
| 2:01PM | 11 | **A.**   No.  I think what I told the jury -- I hope they heard -- |
| 2:02PM | 12 | was that there was no pharmacokinetic data.  They didn't |
| 2:02PM | 13 | collect the pharmacokinetic information of the blood samples. |
| 2:02PM | 14 | **Q.**   Okay.  Right now, I'm talking about the PT, which is what |
| 2:02PM | 15 | you told the jury, that if the PT goes up, it can predict a |
| 2:02PM | 16 | bleeding risk; correct? |
| 2:02PM | 17 | **A.**   Yes.  I said that in the other data that I'm referring to, |
| 2:02PM | 18 | which is not this dataset, they had shown there would be |
| 2:02PM | 19 | correlations between PT and bleeding risk.  And certainly in |
| 2:02PM | 20 | this trial, it's my understanding that they did not collect the |
| 2:02PM | 21 | blood level data, but they did collect the PT data.  Yes, they |
| 2:02PM | 22 | did. |
| 2:02PM | 23 | **Q.**   Okay.  So when you collect the PT data, you have the data |
| 2:02PM | 24 | to look at to see whether those people with the highest PTs |
| 2:02PM | 25 | have bleeds, don't you, ma'am? |

*OFFICIAL TRANSCRIPT*

A.   Yes.  You would be able to correlate in that trial the PT
data, without the blood data, to the events.  That's true.  You
would have observed whether or not people bleed, and you have
different categories of bleeds that you can even look at.
Q.   And you know they collected that data within the first
three weeks when those patients were taking 15 milligrams twice
a day, just like Ms. Mingo, don't you?
A.   Yes, that's true.
Q.   And did you know that in this data they collected on the
PT, the EINSTEIN-DVT data, that the company compared the PT of
patients who had bleeding events with the PT of patients who
did not have bleeding events?  Did you know that?
A.   It's possible.  I haven't looked at the report in a while.
I'd have to go back and look at it, but it's very possible
that's there, yes.
Q.   And did you know that they found, when they compared the
PT time of patients who had bleeding events to the PT time of
patients who didn't have bleeding events, that there was no
difference in those two populations of people?
A.   I don't -- okay.  I don't recall the details.  I'd have to
pull it out to answer that question.
Q.   Well, that would be an important question to answer if
you're telling someone that PT can tell this jury that this
person was at an increased risk of bleeding.  You would want to
know that in the very study that applies to the dosage she took

OFFICIAL TRANSCRIPT

2:04PM  1   and the conditions she had, show -- that was looked at, and

2:04PM  2   showed that there was no difference in bleeding events based on

2:04PM  3   that PT?

2:04PM  4   A.   Well, that's a different question.  I would argue that the

2:04PM  5   question you're asking is different than the question I've been

2:04PM  6   addressing.  Do you want me to explain?

2:04PM  7   Q.   No, because I thought I read the same question.  Let's

2:04PM  8   read it again.

2:04PM  9        Did you know that the EINSTEIN-DVT data showed no

2:04PM 10   evidence that the PT Neoplastin time was different in patients

2:04PM 11   with bleeding events compared to patients without bleeding

2:04PM 12   events?

2:04PM 13   A.   When I answered that for you, I said I'd have to look to

2:04PM 14   verify that.  But that's a different question than I have been

2:04PM 15   trying to address with the jury.  I thought that's what you

2:05PM 16   asked me.

2:05PM 17   Q.   I'll let you explain on redirect if you need to.  I want

2:05PM 18   the jury to understand.  The data that was collected, that was

2:05PM 19   actually collected that you hadn't seen, so for patients like

2:05PM 20   Ms. Mingo, you didn't know that the EINSTEIN study found that

2:05PM 21   when you compared patients who had bleeds with patients who

2:05PM 22   didn't have bleeds, there was no evidence that the PT was

2:05PM 23   different.  Did you know that?

2:05PM 24   A.   And I'm saying it's not that I didn't know it.  I'm not

2:05PM 25   arguing.  It's probably true.  I'm just saying if you want me

2:05PM 1    to verify it, I'd have to pull it, because I don't recall that
2:05PM 2    specific result.
2:05PM 3    **Q.**   Because that's data that you didn't look at; right?
2:05PM 4    **A.**   No.  I have looked at it since my deposition, absolutely.
2:05PM 5    It's just been a while.  I haven't looked at it in the last
2:05PM 6    week.
2:05PM 7    **Q.**   Now, let's talk about that same study, the DVT study on
2:05PM 8    patients taking 15 milligrams twice a day.  You talked to the
2:06PM 9    jury about a reduced function, renal function or kidney
2:06PM 10   function.
2:06PM 11          Do you remember that?
2:06PM 12   **A.**   I talked about those as being variables that can affect
2:06PM 13   the exposure, yes.
2:06PM 14   **Q.**   I want to talk about that just a minute.  You understand
2:06PM 15   that Ms. Mingo had already developed a deep vein blood clot;
2:06PM 16   right?
2:06PM 17   **A.**   That I do know, although I have not seen all her records,
2:06PM 18   but I do know that.
2:06PM 19   **Q.**   And you understand in people that have developed a deep
2:06PM 20   vein blood clot, that if they have any renal issues at all --
2:06PM 21   and I'm not suggesting she did, but if she had any renal
2:06PM 22   issues, that she would be at an even higher risk to develop a
2:06PM 23   blood clot, wouldn't she?
2:06PM 24   **A.**   That I can't answer you.  I'm not a physician, so I have
2:06PM 25   not --

*OFFICIAL TRANSCRIPT*

2:06PM
2:06PM
2:06PM
2:06PM
2:06PM
2:06PM
2:07PM
2:07PM
2:07PM
2:07PM
2:07PM
2:07PM
2:07PM
2:07PM
2:07PM
2:07PM
2:07PM
2:07PM
2:07PM
2:07PM
2:08PM
2:08PM
2:08PM
2:08PM
2:08PM

1   **Q.**   Well, that would certainly be an important factor for a

2   doctor to consider when he was making -- or she was making a

3   determination about the benefits and the risks of taking the

4   medication, wouldn't it?

5   **A.**   That would absolutely be a patient-specific decision the

6   doctor should look at, absolutely, yes.

7   **Q.**   And if someone is at a higher risk to develop a clot,

8   certainly it would be reasonable for a doctor to want to make

9   sure they took an anticoagulant if they'd already developed a

10  clot, wouldn't it?

11  **A.**   Well, absolutely.  I don't think I've actually opined that

12  I don't believe that she needed an anticoagulant.  I'm not a

13  case-specific expert.

14  **Q.**   And do you realize -- do you also know that in that same

15  EINSTEIN data that we just talked about, that patients that had

16  renal problems and patients that didn't have renal problems and

17  took the very same dose of Xarelto, that there was no

18  difference in their bleeding events?  Did you know that?

19  **A.**   I don't recall that detail, but I wouldn't be surprised if

20  that was true.

21  **Q.**   And you also are aware -- you've looked at the label,

22  haven't you, Doctor?

23  **A.**   Yes, I have.

24  **Q.**   And you know that in the label, that the bleeding -- major

25  bleeding events were published in the label for everyone to

2:08PM  1    see; right?

2:08PM  2    A.    Are you asking me is there a warning about bleeding

2:08PM  3    events?  Yes, there is.

2:08PM  4    Q.    Yes.  And there's also a table specifically revealing to

2:08PM  5    anybody who wants to read the label what the bleeding events

2:08PM  6    were for the indication of DVT; is that correct?

2:08PM  7    A.    Are you asking me about in the clinical pharmacology

2:08PM  8    section where the safety data is presented?

2:08PM  9    Q.    Yes.

2:08PM  10   A.    Yes, there is some of that.

2:08PM  11   Q.    Now, you also told the jury that PT -- and let me make

2:08PM  12   sure that I get this right -- that PT was a way to somehow look

2:09PM  13   at Xarelto exposure; correct?  Or measure it?

2:09PM  14   A.    It's a way that you can indirectly look at exposure, yes.

2:09PM  15   Q.    And in your opinion, based on your report -- if you'll

2:09PM  16   just turn to page 8 of your report, please, ma'am, for me.

2:09PM  17   A.    I'm sorry.  Page 8?

2:09PM  18   Q.    Yes.

2:09PM  19   A.    Which paragraph?

2:09PM  20   Q.    Down at the bottom, last paragraph, second sentence.

2:09PM  21          MS. JEFFCOTT:  Wait, wait, wait.  Take that down.

2:09PM  22          Your Honor, I object.  May we approach?

2:09PM  23          THE COURT:  Sure.

2:09PM  24          (Whereupon the following proceedings were held at the

2:09PM  25          bench out of the hearing of the jury:)

2:14PM 1      **MS. JEFFCOTT:**  Your Honor, we are specifically not

2:14PM 2  offering regulatory opinions with Dr. Plunkett.  I did not go

2:14PM 3  there in my direct.  I specifically didn't go there, because we

2:14PM 4  have Dr. Parisian coming on Friday that will address regulatory

2:14PM 5  opinions.  It would be duplicitous, and I haven't gone through

2:14PM 6  in my direct.

2:15PM 7      **MS. PRUITT:**  Your Honor, she's talked about the PT,

2:15PM 8  and she's given this opinion in her report.

2:15PM 9      **THE COURT:**  Where is this, on page 8?

2:15PM 10      **MS. PRUITT:**  It's at the very bottom.  It says,

2:15PM 11  "Consistent with the FDA."  It's on page 8.  She says, "Second,

2:15PM 12  the label does not adequately describe that the

2:15PM 13  pharmacodynamics measurement tool, prothrombin time, is

2:15PM 14  linearly correlated with rivaroxaban blood levels and can be

2:15PM 15  used as a surrogate marker for drug blood level," which is

2:15PM 16  exactly what she's been telling the jury on that chart.  She

2:15PM 17  just wrote up that there PT can be used to determine the level

2:15PM 18  of rivaroxaban in the blood.

2:15PM 19      **MS. JEFFCOTT:**  However, she has not given an opinion

2:15PM 20  as to the inadequacy of the label.  That's going to be covered

2:15PM 21  by Dr. Parisian.

2:15PM 22      **MS. PRUITT:**  Your Honor, I think it's fair game.

2:15PM 23      **THE COURT:**  Why don't you ask her that question, and

2:15PM 24  if she says no, then you can impeach her with her prior

2:15PM 25  statement.

*OFFICIAL TRANSCRIPT*

2:15 PM  1            **MS. PRUITT:**  Okay.

2:15 PM  2            **THE COURT:**  Just ask her the question first and see

2:15 PM  3   what she says.

2:15 PM  4            **MS. PRUITT:**  All right.

2:15 PM  5            **MR. BIRCHFIELD:**  Your Honor, in this regard, though,

2:16 PM  6   one of the things that -- one of the things that the defense

2:16 PM  7   counsel asked us to do, and we did, was we discussed

2:16 PM  8   specifically -- they were fussing about experts, and they were

2:16 PM  9   fussing about that there would be overlap, so two weeks ago,

2:16 PM  10  two weeks ago we gave them the express representation that we

2:16 PM  11  would not go into regulatory matters with Dr. Plunkett.  This

2:16 PM  12  is -- this is clearly gamesmanship and an ambush.

2:16 PM  13           **MS. PRUITT:**  It's not gamesmanship, Your Honor.  I'm

2:16 PM  14  entitled to cross-examine her about her opinions.

2:16 PM  15           **MR. BIRCHFIELD:**  Okay.  So --

2:16 PM  16           **THE COURT:**  You have her on redirect, so you're going

2:16 PM  17  to have to bring out some of this, as to what she was hired for

2:16 PM  18  and what's the specifics of her testimony and let her explain

2:16 PM  19  what she's been trying to explain.

2:16 PM  20           **MR. BIRCHFIELD:**  Okay.

2:16 PM  21           **THE COURT:**  But you have a right to -- you know, if

2:16 PM  22  she says something in her report, she says something different

2:16 PM  23  now, seems to me that you have a right to show her, you know,

2:16 PM  24  what she said before and impeach her with her prior recorded

2:17 PM  25  statement.

2:17PM    1          MS. JEFFCOTT:  But she has to ask the question first.

2:17PM    2          THE COURT:  Yeah, ask the question first.

2:12PM    3          (Whereupon the following proceedings were held in

2:12PM    4          open court in the presence and hearing of the jury:)

2:12PM    5   BY MS. PRUITT:

2:12PM    6   Q.   Have you given the opinion, Doctor, that the label does

2:12PM    7   not adequately describe that the pharmacodynamics measurement

2:12PM    8   tool, prothrombin time, is linearly correlated with rivaroxaban

2:12PM    9   blood levels and can be used as a surrogate marker for drug

2:12PM   10   blood level?  Have you given that opinion?

2:12PM   11   A.   I would agree that it's in my report, yes.  I haven't

2:12PM   12   talked about that with the jury, but certainly it's in my

2:12PM   13   report.

2:12PM   14   Q.   And you know, Dr. Plunkett, don't you, that Janssen

2:13PM   15   submitted that very language in the label under the

2:13PM   16   pharmacokinetics and pharmacodynamics section, and the FDA

2:13PM   17   struck it out --

2:13PM   18          MS. JEFFCOTT:  Your Honor, objection.

2:13PM   19          THE COURT:  Sustain the objection.

2:13PM   20               And let me mention this to you, members of the

2:13PM   21   jury.  The defendant at all times has the responsibility of

2:13PM   22   producing an adequate label and to warn and instruct treaters

2:13PM   23   as to prescription drugs.  In fact, any action or inaction on

2:13PM   24   the part of the FDA, though somewhat relevant, does not

2:13PM   25   foreclose a claim against Mississippi law, against state law.

| | | |
|---|---|---|
| 2:13PM | 1 | That's the rules of that law.  Okay. |
| 2:13PM | 2 |         MS. PRUITT:  Your Honor, may I be permitted to |
| 2:13PM | 3 | refresh her recollection with the document? |
| 2:13PM | 4 |         MS. JEFFCOTT:  Your Honor, I object.  May we |
| 2:13PM | 5 | approach? |
| 2:13PM | 6 |         THE COURT:  Come on up. |
| 2:13PM | 7 |         (whereupon the following proceedings were held at the |
| 2:13PM | 8 |         bench out of the hearing of the jury:) |
| 2:13PM | 9 |         MS. PRUITT:  Your Honor, she said -- |
| 2:18PM | 10 |         THE COURT:  The thing that concerns me is if counsel |
| 2:18PM | 11 | are agreeing to something, then all bets are off then.  If you |
| 2:19PM | 12 | all have agreed and then you all -- you have different views of |
| 2:19PM | 13 | it, then -- then that's -- what's good for the goose is good |
| 2:19PM | 14 | for the gander. |
| 2:19PM | 15 |         MS. PRUITT:  Your Honor, the relevancy of the |
| 2:19PM | 16 | struck-through documents with this witness is that she's said |
| 2:19PM | 17 | the very thing that the FDA struck out.  She said she thought |
| 2:19PM | 18 | it should be in there, so I should be entitled to ask her. |
| 2:19PM | 19 | "You understand that that very thing that you mentioned in your |
| 2:19PM | 20 | report -- the very thing you mentioned in your report has been |
| 2:19PM | 21 | stricken by the FDA."  That's all I'm going to do.  I'm going |
| 2:19PM | 22 | to hand her one document. |
| 2:19PM | 23 |         MR. BIRCHFIELD:  Your Honor, this opens up the -- a |
| 2:19PM | 24 | whole can of worms.  I mean, this was -- this was the witness |
| 2:19PM | 25 | that they -- in her deposition that they used this document on |

|         |    |                                                                              |
|---------|----|------------------------------------------------------------------------------|
| 2:19PM  | 1  | right after we learned that they had -- that they had given us               |
| 2:20PM  | 2  | a document production that did not include the strike-throughs.              |
| 2:20PM  | 3  | It was all in that context.  So here again, you know, this                   |
| 2:20PM  | 4  | was -- this was part of -- part of the agreement that we made                |
| 2:20PM  | 5  | with counsel.  We're not going into regulatory.  That's where                |
| 2:20PM  | 6  | we were, and that was the agreement, and now they are turning                |
| 2:20PM  | 7  | around, they are taking her into regulatory, and they're using               |
| 2:20PM  | 8  | a document that is not in evidence.  They haven't established a               |
| 2:20PM  | 9  | foundation for the document.                                                 |
| 2:20PM  | 10 | MR. MEUNIER:  Your Honor, we have a Motion in Limine            |
| 2:20PM  | 11 | on this document, and you reserved ruling.                                   |
| 2:20PM  | 12 | THE COURT:  On which document are we talking about?            |
| 2:20PM  | 13 | MR. MEUNIER:  The strike-through label, because              |
| 2:20PM  | 14 | remember, there's a whole foundational argument that we made                 |
| 2:20PM  | 15 | that they have not yet established the fact that it was the FDA              |
| 2:20PM  | 16 | that struck through the material.  And we, in fact, have now                 |
| 2:20PM  | 17 | been given a different format of the same document which makes               |
| 2:20PM  | 18 | us even further question the authenticity of their assertion                 |
| 2:20PM  | 19 | that it was the FDA that did the strike-through.  So we have a               |
| 2:20PM  | 20 | Motion in Limine.  You reserved ruling and said, "I'm going to               |
| 2:21PM  | 21 | have the defendants lay a proper foundation."  To show it to                 |
| 2:21PM  | 22 | this witness before that foundation has been laid and before                 |
| 2:21PM  | 23 | the document has been admitted into evidence is --                           |
| 2:21PM  | 24 | MR. BONEY:  So, Your Honor, since the Boudreaux and              |
| 2:21PM  | 25 | Orr trials, the FDA has provided us per request the certified                |

668

| | |
|---|---|
| 2:21PM | 1 |

copies of the official documents.  The email and the red line
Word document that were sent to Janssen.  That document, we
have the certified copies here with the red ribbons, with
decorations from people at FDA, the custodians of record, that
says this is a true and correct copy of an official record.
Under 902(4) Federal Rules of Procedure 44, that's a
self-authenticating document.  It doesn't have to have a
sponsoring witness.  It doesn't have to have extensive
foundation.  In any event, Your Honor, this witness has given
PT opinions, has given PK/PD opinions.  It's important to the
jury whether or not she knows about it, and if she doesn't know
about it, it goes to her credibility.

        MS. JEFFCOTT:  Your Honor, the document itself, the
changes that are made are not identified as being made by the
FDA.  They don't resolve the foundational issues, because the
changes themselves have just "author" written by it.  They
don't say the FDA.  They don't identify who specifically made
the changes.

        MR. BONEY:  We can let the jury decide that, Your
Honor.

        THE COURT:  Well, let's do it this way.  Let's not at
this point show the FDA document, because you haven't
established the -- what did you say?  Whether it's
authenticated, but let's just ask her about it.  Does she know
whether or not the FDA has stricken that thing?  And you can

OFFICIAL TRANSCRIPT

2:22PM   1   bring it up in another -- in another area, but you have a right

2:22PM   2   to impeach the witness.

2:22PM   3               Now, I don't know about any agreements that you

2:22PM   4   all have made.  It concerns me when some lawyer says, "We had

2:22PM   5   an agreement, and you violated the agreement," whatever that

2:22PM   6   is, but I'm not privy to that.  I just have to look at this

2:22PM   7   witness, and the witness is under cross-examination, can be

2:23PM   8   impeached.

2:23PM   9               So -- but from the standpoint of utilizing a

2:23PM  10   document that hasn't been authenticated yet, let's do it in a

2:23PM  11   different way and lay a -- put on somebody who authenticates

2:23PM  12   the document or authenticate the document in some way, but to

2:23PM  13   put on a document that hasn't been authenticated yet and hasn't

2:23PM  14   been tested yet, it just gives me --

2:23PM  15               MR. BONEY:  I understand, Your Honor.  Can we at

2:23PM  16   least submit it in camera and show Your Honor that under

2:23PM  17   902(4), it's self-authenticating document that's a public

2:23PM  18   record that doesn't need to be authenticated.  It doesn't need

2:23PM  19   any extrinsic foundation.

2:23PM  20               MR. MEUNIER:  Judge, it's not authenticated as who

2:23PM  21   did the strike-through.  That's the --

2:23PM  22               MR. BONEY:  The document itself is authenticated.

2:23PM  23   That's -- it's a fact question that can be resolved.

2:23PM  24               THE COURT:  Let's do it in questioning rather than

2:23PM  25   showing her documents.

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 2:24PM | 1 | **THE DEPUTY CLERK:**  Judge -- |
| 2:24PM | 2 | **THE COURT:**  Need to take a break? |
| 2:24PM | 3 | **THE DEPUTY CLERK:**  Yeah, five minutes. |
| 2:24PM | 4 | (whereupon the following proceedings were held in |
| 2:24PM | 5 | open court in the presence and hearing of the jury:) |
| 2:19PM | 6 | **THE COURT:**  Okay.  We'll take a five-minute break. |
| 2:19PM | 7 | (whereupon the jury was excused from the courtroom.) |
| 2:19PM | 8 | (Recess.) |
| 2:31PM | 9 | (whereupon the jury entered the courtroom.) |
| 2:32PM | 10 | **THE COURT:**  Okay.  Be seated, please. |
| 2:32PM | 11 | Let's continue, Counsel. |
| 2:32PM | 12 | BY MS. PRUITT: |
| 2:32PM | 13 | **Q.**   Dr. Plunkett, you have in your report stated on page 7 |
| 2:32PM | 14 | here that prothrombin time -- which is PT; right? |
| 2:32PM | 15 | **A.**   Are you on 7 of 83, which is my 6?  Or are you on -- |
| 2:32PM | 16 | **Q.**   I know.  It's kind of hard to decide.  It says 7 in the |
| 2:33PM | 17 | one corner, 8 at the bottom. |
| 2:33PM | 18 | **A.**   Okay.  I'm there. |
| 2:33PM | 19 | **Q.**   And the sentence that starts with "second." |
| 2:33PM | 20 | **A.**   Yes. |
| 2:33PM | 21 | **Q.**   About the middle of it, you give the opinion in your |
| 2:33PM | 22 | report that "PT" -- which is prothrombin time; right? |
| 2:33PM | 23 | **A.**   Yeah. |
| 2:33PM | 24 | **Q.**   -- "is linearly correlated with rivaroxaban" -- and that's |
| 2:33PM | 25 | Xarelto; right? |

*OFFICIAL TRANSCRIPT*

2:33PM   1    **A.**   Yes.

2:33PM   2    **Q.**   -- "blood levels and can be used as a surrogate marker for

2:33PM   3    drug blood level."

2:33PM   4        That's the opinion you gave in your report; right?

2:33PM   5    **A.**   Yes.

2:33PM   6    **Q.**   Were you aware that that language was submitted for the

2:33PM   7    label in the pharmacodynamics section to the FDA and it was

2:33PM   8    stricken?

2:33PM   9    **A.**   That language specifically, no.

2:33PM  10        **MS. JEFFCOTT:**   Objection.

2:33PM  11    **BY MS. PRUITT:**

2:33PM  12    **Q.**   You're not aware of that?

2:33PM  13    **A.**   Not that specifically.

2:33PM  14        **THE COURT:**   I'll overrule the objection and allow it.

2:33PM  15    **BY MS. PRUITT:**

2:33PM  16    **Q.**   You're not aware as to whether it was stricken or not?

2:33PM  17    **A.**   The specific language that I have in my report, no, I'm

2:33PM  18    not aware that that was stricken.

2:33PM  19    **Q.**   Are you aware that language that may not be word for word

2:34PM  20    like this but says the same thing was stricken from the label?

2:34PM  21        **MS. JEFFCOTT:**   Your Honor --

2:34PM  22        **THE COURT:**   No, that's too broad.  I'll sustain the

2:34PM  23    objection.

2:34PM  24    **BY MS. PRUITT:**

2:34PM  25    **Q.**   Let's move on to something else.

2:34PM   1          Before Xarelto and the other novel oral

2:34PM   2   anticoagulants came on the market, Dr. Plunkett, the only

2:34PM   3   available oral anticoagulant for patients was Coumadin; right?

2:34PM   4   A.    Yes.  Warfarin, yes.

2:34PM   5   Q.    And we've been calling it Coumadin, warfarin.  The jury

2:34PM   6   knows, I think, those terms are interchangeable.

2:34PM   7          And that drug has been on the market by itself as a

2:34PM   8   anticoagulant for a number of years; right?

2:34PM   9   A.    Yes.  I believe as far back as the mid-1960s, yeah.

2:34PM  10   Q.    And making sure that a patient has the correct dose of

2:34PM  11   Coumadin is important because, if the patient gets too much

2:34PM  12   Coumadin, then the patient will have an increased risk of

2:34PM  13   bleeding; right?

2:34PM  14   A.    Yes, which is common to anticoagulants.

2:34PM  15   Q.    If a patient who has a deep vein blood clot does not get

2:34PM  16   enough Coumadin, the patient will be at increased risk of the

2:34PM  17   clot breaking up and traveling and going in their lungs; right?

2:35PM  18   A.    Yes.  It's the same as for other anticoagulants as well.

2:35PM  19   Q.    Now, you told the jury earlier -- and I think I wrote down

2:35PM  20   the way you described it -- that, in your opinion, there's not

2:35PM  21   much difference between toxicity for this drug -- the dosage,

2:35PM  22   there's not much difference between toxicity and efficacy.

2:35PM  23          Do you remember talking about that concept?

2:35PM  24   A.    If you're talking about dose level, yes.  That, I did

2:35PM  25   describe.  But they're definitely different end points.

2:35PM  1    Q.   And so is there a word that pharmacologists use when
2:35PM  2    they're describing that concept, that there's not much
2:35PM  3    difference between the toxicity and the efficacy as it goes to
2:35PM  4    the dose?
2:35PM  5    A.   Yes.
2:35PM  6    Q.   And tell me what that word is.
2:35PM  7    A.   It can be defined as a therapeutic index which is narrow.
2:35PM  8    It can also be called a small margin of safety.  There's
2:35PM  9    different terms.  And I think in my report, I use both of
2:35PM 10    those.
2:35PM 11    Q.   And so is it your opinion that Xarelto and the other novel
2:36PM 12    oral anticoagulants are drugs that have a narrow therapeutic
2:36PM 13    index?
2:36PM 14    A.   Yes.  As I state in my report, as -- it's a class issue as
2:36PM 15    well.  Anticoagulants generally have this issue.
2:36PM 16    Q.   Now, we know that Coumadin or warfarin is a drug with a
2:36PM 17    narrow therapeutic index; right?
2:36PM 18    A.   Yes.  Again, anticoagulants as a class, yes.
2:36PM 19    Q.   And you discussed the -- you discussed warfarin in your
2:36PM 20    report; right?
2:36PM 21    A.   Yes.
2:36PM 22    Q.   And you're familiar with the warfarin label, aren't you?
2:36PM 23    A.   Yes.
2:36PM 24    Q.   And you know that the warfarin or Coumadin label says
2:36PM 25    right there in the label that Coumadin is a drug that has a

2:36PM  1    narrow therapeutic index, doesn't it?

2:36PM  2    A.   You know, I don't recall that language.  I don't disagree

2:36PM  3    with you.  I'd have to go back and look.  I don't recall

2:36PM  4    looking for that language in the warfarin label.

2:36PM  5              MS. PRUITT:  Okay.  Can we pull up Exhibit 30,

2:36PM  6    please?  I think I gave you the wrong one, Dean.  Can I switch?

2:37PM  7    I gave you my highlighted copy, Judge.  I apologize.

2:37PM  8    BY MS. PRUITT:

2:37PM  9    Q.   Can you turn to page 7 of the Coumadin label for me?  7 at

2:37PM 10    the very bottom, Dr. Plunkett.

2:37PM 11    A.   Yes.

2:37PM 12    Q.   And I'm referring to Section 2.4 of the Coumadin label.

2:37PM 13    Okay?

2:37PM 14    A.   What you have highlighted?

2:37PM 15    Q.   Yes, ma'am.  I highlighted it so you could find it.

2:37PM 16    A.   That's helpful.  No, I appreciate that.  That's fine.

2:37PM 17    Q.   Okay.  And it says right here in the label that Coumadin

2:37PM 18    is a narrow therapeutic-range index drug, and its action may be

2:37PM 19    affected by factors such as other drugs and dietary vitamin K;

2:38PM 20    is that right?

2:38PM 21    A.   That's correct.

2:38PM 22    Q.   And you agree that Coumadin or warfarin can be affected by

2:38PM 23    dietary things like eating greens and eating salads and spinach

2:38PM 24    and broccoli and those kinds of things; right?

2:38PM 25    A.   Yes, there's certain dietary constituents that can affect

| | | |
|---|---|---|
| 2:38PM | 1 | it. |
| 2:38PM | 2 | **Q.**   And Xarelto doesn't have that same characteristic, does |
| 2:38PM | 3 | it? |
| 2:38PM | 4 | **A.**   Not the dietary issues, no. |
| 2:38PM | 5 | **Q.**   And then the next sentence reads, if you'll follow with |
| 2:38PM | 6 | me, "Therefore, anticoagulation must be carefully monitored |
| 2:38PM | 7 | during Coumadin therapy." |
| 2:38PM | 8 |       Did I read that correctly? |
| 2:38PM | 9 | **A.**   Yes, you did. |
| 2:38PM | 10 | **Q.**   And then it says, "The frequency of performing INR should |
| 2:38PM | 11 | be based on the clinical situation, but generally acceptable |
| 2:38PM | 12 | intervals for INR determinations are one to four weeks." |
| 2:38PM | 13 |       Did I read that right? |
| 2:38PM | 14 | **A.**   Yes, you did. |
| 2:38PM | 15 | **Q.**   And so Coumadin is a drug that has to be monitored |
| 2:38PM | 16 | somewhere between every one to four weeks to make sure its |
| 2:38PM | 17 | effect is not being disrupted by either dietary problems or |
| 2:38PM | 18 | other drugs and things like that; is that correct? |
| 2:39PM | 19 | **A.**   Yes.  And typically people, once they are well-controlled, |
| 2:39PM | 20 | go to a longer period.  The shorter period of monitoring is |
| 2:39PM | 21 | typically when people are first starting therapy. |
| 2:39PM | 22 | **Q.**   And this kind of monitoring, once a month, where you have |
| 2:39PM | 23 | to go into the doctor's office or the clinic and give blood so |
| 2:39PM | 24 | that it can be tested, that kind of monitoring is not what |
| 2:39PM | 25 | you're suggesting needs to happen with Xarelto, is it? |

2:39PM  1    A.    No, I have not formed the opinion that it needs to have
2:39PM  2    the exact same type of monitoring as Coumadin.  That is true.
2:39PM  3    Q.    And so when these novel oral anticoagulants came along, in
2:39PM  4    many ways, they were helpful to doctors and patients because
2:39PM  5    they didn't require some of the same things that Coumadin or
2:39PM  6    warfarin required.  Would you agree?
2:39PM  7    A.    Well, on the issue of that alone, that was perceived as an
2:39PM  8    advantage, yes.  But there's other comparisons that need to be
2:39PM  9    made.
2:39PM  10   Q.    And there are other comparisons that need to be made just
2:39PM  11   with any other type of drug, right, and class?
2:39PM  12   A.    Well, I would say anticoagulants are a bit unique.  But,
2:40PM  13   yes, generally, within a class, you always are comparing across
2:40PM  14   because it may be that one drug works better for somebody else.
2:40PM  15   It may be that one drug has something about its
2:40PM  16   pharmacokinetics that make you not want to use it in a certain
2:40PM  17   type of patient.  So, yes, doctors needs to make
2:40PM  18   patient-specific drug decisions.
2:40PM  19   Q.    Okay.  And that's a good thing for doctors to have more
2:40PM  20   tools and more things available for them to be able to treat
2:40PM  21   their patient; right?
2:40PM  22   A.    Yes, as long as they're given all the information they
2:40PM  23   need to use the drug safely.
2:40PM  24   Q.    Now, the other -- Xarelto -- the other novel
2:40PM  25   anticoagulants are Pradaxa, Eliquis, and Savaysa; right?

2:40PM  1   A.   Those are the three currently, yes.

2:40PM  2   Q.   And you discussed all of those other novel oral

2:40PM  3   anticoagulants in your report, didn't you?

2:40PM  4   A.   Yes.  I have a background section, if that's what you

2:40PM  5   mean, yes, where I describe what else is on the market.

2:40PM  6   Q.   Okay.  And is it your opinion that Pradaxa, Eliquis, and

2:40PM  7   Savaysa also are considered to be narrow therapeutic index

2:41PM  8   drugs?

2:41PM  9   A.   Generally, as a class, yes, I would put anticoagulants

2:41PM 10   generally within that group.

2:41PM 11   Q.   And you've looked at the label for Xarelto; right?

2:41PM 12   A.   Yes.

2:41PM 13   Q.   And you've looked at the label for Eliquis; correct?

2:41PM 14   A.   Yes.

2:41PM 15   Q.   You looked at the label for Pradaxa; right?

2:41PM 16   A.   Yes.

2:41PM 17   Q.   And you've looked at the label for Savaysa; right?

2:41PM 18   A.   Yes.

2:41PM 19   Q.   And none of those labels for those novel oral

2:41PM 20   anticoagulants describe those drugs as narrow therapeutic range

2:41PM 21   drugs, do they?

2:41PM 22   A.   They don't have this language, if that's what you're

2:41PM 23   asking.  That is true.

2:41PM 24   Q.   And the FDA has not required or asked that that language

2:41PM 25   be included for Xarelto; has it?

2:41PM  1   **A.**   I can't answer that.  I don't know.  I haven't done a
2:41PM  2   search to look if they ever asked for that language.  I don't
2:41PM  3   see it in the label, if that's what you're asking me.
2:41PM  4   **Q.**   It's not in there?
2:41PM  5   **A.**   It's not currently in the label.  That is true.
2:41PM  6   **Q.**   And some people actually hold the opinion that Xarelto and
2:42PM  7   the other anticoagulants are actually not narrow therapeutic
2:42PM  8   drugs, that they actual have a wide therapeutic range.
2:42PM  9           Would you agree?
2:42PM 10   **A.**   If you're asking me about whether or not there's
2:42PM 11   statements in literature that use similar language, yes, that
2:42PM 12   is true.
2:42PM 13   **Q.**   Okay.  Now, as to Coumadin, I just read with you there is
2:42PM 14   a monitoring requirement; right?
2:42PM 15   **A.**   Yes.
2:42PM 16   **Q.**   And it's in the label; correct?
2:42PM 17   **A.**   Yes.
2:42PM 18   **Q.**   And there is no such monitoring requirement in the label
2:42PM 19   for Xarelto; is that correct?
2:42PM 20   **A.**   That's correct.
2:42PM 21   **Q.**   And there's no such monitoring requirement in the label
2:42PM 22   for Pradaxa; right?
2:42PM 23   **A.**   That is true.
2:42PM 24   **Q.**   There is no such monitoring requirement for Savaysa; is
2:42PM 25   that right?

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 2:42PM | 1 | **A.**   That is correct. |
| 2:42PM | 2 | **Q.**   And there's no such monitoring requirement for Eliquis? |
| 2:42PM | 3 | **A.**   In the label.  That is true. |
| 2:43PM | 4 | **Q.**   Now, you told the jury that Xarelto has a narrow |
| 2:43PM | 5 | therapeutic index.  And what that means is, as you described |
| 2:43PM | 6 | it, as to dose, there's a small window between efficacy and |
| 2:43PM | 7 | toxicity. |
| 2:43PM | 8 |         Do you recall that? |
| 2:43PM | 9 | **A.**   Yes.  That's actually specifically what I told the jury. |
| 2:43PM | 10 | I described for them that there's a very small window where you |
| 2:43PM | 11 | have to -- where you're moving from a dose that's doing what |
| 2:43PM | 12 | you want it to do and a dose that is doing more than you want |
| 2:43PM | 13 | it to do. |
| 2:43PM | 14 | **Q.**   Right.  And you can actually calculate -- based on |
| 2:43PM | 15 | mathematical calculations, you can actually calculate a drug's |
| 2:43PM | 16 | therapeutic index, can't you? |
| 2:43PM | 17 | **A.**   If you have the appropriate data, you can do that, yes. |
| 2:43PM | 18 | **Q.**   And you have not calculated Xarelto's therapeutic index |
| 2:43PM | 19 | number, have you? |
| 2:43PM | 20 | **A.**   No, I have not. |
| 2:44PM | 21 |         **MS. PRUITT:**   Now, I would like to pull up |
| 2:44PM | 22 | Exhibit 1470, please. |
| 2:44PM | 23 | **BY MS. PRUITT:** |
| 2:44PM | 24 | **Q.**   Dr. Plunkett, is this an article published in the *Annals* |
| 2:44PM | 25 | *of Pharmacotherapy*? |

**A.**    Yes.

**Q.**    And is *Pharmacotherapy* a journal that's usually read and relied on by some people that are in your area of specialty, pharmacotherapy?

**A.**    Certainly there are people that do.  This is not one I look at routinely, but I have seen articles from here before.

**Q.**    But this is a peer-reviewed article like you suggested you had looked at for this case; right?

**A.**    Oh, absolutely, yes.  You'll find this in the peer-review section, yes.

**Q.**    Okay.  And the title for this article is "Heparin-Calibrated Chromogenic Anti-Xa Activity Measurements in Patients Receiving Rivaroxaban:  Can This Test be Used to Quantify Drug Level?"

Is that the title of the article?

**A.**    Yes, it is.

**Q.**    Okay.  Now, if you'll take a look at the authors here, I'd like to talk for a moment about them.

Robert C. Gosselin is the lead author; right?

**A.**    That's what's listed, yes.

**Q.**    And is normally the lead author the person that has written and been in charge of editing and so forth for the article?

**A.**    It depends.  And I don't know Dr. Gosselin personally, although I do know he's an expert in this litigation.

2:45PM  1   Sometimes the author at the end of the list is the senior

2:45PM  2   author and has lot of input.  So I don't know in this case the

2:45PM  3   relationship between Dr. Gosselin and Dorothy Adcock.  So I

2:45PM  4   can't tell you.

2:45PM  5           But certainly seeing the first author would at least

2:45PM  6   have a lot to do with if there's any experiments being done,

2:45PM  7   actually conducting them.

2:45PM  8   Q.   And so you mentioned in your answer that Dr. Gosselin is

2:46PM  9   one of the plaintiff's experts in this case; right?

2:46PM  10  A.   Yes.  I believe he'll be coming to talk to the jury.

2:46PM  11  Q.   Okay.  And Suzanne Francart is a PharmD.

2:46PM  12          That's the same thing you are; right?

2:46PM  13  A.   No, actually, I'm not.  PharmD is a different degree than

2:46PM  14  I have.  A PhD in PharmD is a pharmacy degree.

2:46PM  15  Q.   My able counsel told I misspoke.

2:46PM  16          Robert Gosselin is not a doctor, is he?  He's a CLS?

2:46PM  17  A.   That's correct.

2:46PM  18  Q.   And what does CLS stand for?

2:46PM  19  A.   I have no idea.  I don't know him personally.  It looks

2:46PM  20  like it has a footnote, but I don't know.  Maybe that's where

2:46PM  21  he --

2:46PM  22  Q.   That's where he went to school.  Okay.

2:46PM  23          Then we've got Emily Hawes.  She's a PharmD too;

2:46PM  24  right?

2:46PM  25  A.   Right.

*OFFICIAL TRANSCRIPT*

**Q.** And Stephan Moll is an MD.  This time I got that right; right?

**A.** That's correct.

**Q.** And William Dager is a PharmD like you; right?

**A.** I'm not a PharmD.  That's two different degrees.  PharmD is not a research degree.  It's a pharmacy degree when you complete your pharmacy training.

**Q.** Okay.  And then Dorothy Adcock is another MD; right?

**A.** That's correct.

**Q.** Let's look at the abstract, if you would, please, ma'am. The last sentence in the abstract, it says, "The routine use of heparin-calibrated anti-Factor Xa assays to quantify rivaroxaban" -- which is Xarelto -- "is not advocated, and when applied, it must be used with caution and limitations clearly understood."

        Did I read that correctly?

**A.** Yes, you did.

**Q.** And if you can look at the last paragraph there where Footnote 6 starts and read with me, if you would, please.

        "Because of its predictable pharmacokinetics, pharmacodynamics, and wide therapeutic range, routine laboratory measurement of the drug's anticoagulant effect is usually not required."

        Did I read that correctly?

**A.** Yes, you did.

2:48PM  1   Q.   "Approaches for quantifying NOACs are limited.  Screening

2:48PM  2   assays such as PT and activated partial thromboplastin time

2:48PM  3   have varying degrees of sensitivity to rivaroxaban, which are

2:48PM  4   reagent-dependent.  Thus screening assays are not suitable or

2:48PM  5   recommended for quantifying rivaroxaban, nor should they be

2:48PM  6   used to ensure the absence of the anticoagulant effect."

2:48PM  7        Did I read that correctly?

2:48PM  8   A.   You did.

2:48PM  9   Q.   And do you know -- this article was dated 2015, wasn't it,

2:49PM  10  Doctor?

2:49PM  11  A.   Yes.

2:49PM  12  Q.   And do you know when Dr. Gosselin was hired by the

2:49PM  13  plaintiff's lawyers to testify in the case?

2:49PM  14  A.   I have no idea.  I don't know him personally.

2:49PM  15  Q.   Okay.  So these six authors of this article -- two MDs,

2:49PM  16  four -- or three PharmDs and Mr. Gosselin -- you disagree with

2:49PM  17  them that Xarelto has a wide therapeutic range; right?

2:49PM  18  A.   Well, I don't know -- I don't know exactly what they're

2:49PM  19  referring to.  I would say that I wouldn't state the sentence,

2:49PM  20  the sentence on -- if you're on page 778, the sentence that

2:49PM  21  goes from 777 over, I wouldn't state it that way.

2:49PM  22       I have seen this description in the literature, and I

2:49PM  23  think what they're missing is this issue of what the actual

2:49PM  24  clinical data shows.

2:49PM  25  Q.   Mr. Gosselin and these other doctors and scientists

| | | |
|---|---|---|
| 2:50PM | 1 | published their medical and scientific opinion that Xarelto has |
| 2:50PM | 2 | predictable pharmacokinetics and pharmacodynamics, didn't they? |
| 2:50PM | 3 | A.   I would agree that's what is written, yes. |
| 2:50PM | 4 | Q.   Now, I want to talk a little bit about interpatient |
| 2:50PM | 5 | variability. |
| 2:50PM | 6 |      All drugs have some variability, don't they? |
| 2:50PM | 7 | A.   Yes.  And I think we told the jury that. |
| 2:50PM | 8 | Q.   Okay.  And I want to hand you the article that you showed |
| 2:50PM | 9 | the jury earlier in the day, the Mueck 2014 article.  I may |
| | 10 | already have it up there. |
| 2:50PM | 11 | A.   I do have it, but if you have it highlighted... |
| 2:50PM | 12 | Q.   I'll give you the judge's copy. |
| 2:50PM | 13 | A.   Okay. |
| 2:51PM | 14 | Q.   You've already testified that the lead author on this |
| 2:51PM | 15 | patient is Dr. Mueck from Bayer; correct? |
| 2:51PM | 16 | A.   Yes. |
| 2:51PM | 17 | Q.   And this article was published in the *Journal of Clinical* |
| 2:51PM | 18 | *Pharmacokinetics*; correct? |
| 2:51PM | 19 | A.   Yes. |
| 2:51PM | 20 | Q.   This is a well-respected journal, isn't it? |
| 2:51PM | 21 | A.   Yes. |
| 2:51PM | 22 | Q.   In fact, you relied upon this article in your report; |
| 2:51PM | 23 | right? |
| 2:51PM | 24 | A.   Yes. |
| 2:51PM | 25 | Q.   And, in fact, you relied upon this article in giving your |

2:51PM 1    testimony to the ladies and gentlemen of the jury earlier,

2:51PM 2    didn't you?

2:51PM 3    A.    That's correct.  We showed those to the jury.

2:51PM 4    Q.    Will you take a look, please, on the first page, the

2:51PM 5    right-hand column.  Well, let's look at the left-hand column

2:51PM 6    first.

2:51PM 7          Does it suggest "Variability in the pharmacokinetics

2:52PM 8    parameters is moderate, coefficient of variation of 30 to

2:52PM 9    40 percent"?

2:52PM 10         Did I read that correctly?

2:52PM 11   A.    Yes, you have read that correctly.

2:52PM 12   Q.    And then down in the right-hand column, it says, "Unlike

2:52PM 13   the VKAs" -- the VKAs are warfarin/Coumadin; correct?

2:52PM 14   A.    Yes.

2:52PM 15   Q.    -- "these direct oral anticoagulants" -- and those are

2:52PM 16   also called novel oral anticoagulants; right?

2:52PM 17   A.    Yes.

2:52PM 18   Q.    -- "these direct oral anticoagulants have been shown to

2:52PM 19   have predictable pharmacokinetics and pharmacodynamics, a low

2:52PM 20   potential for drug-drug interactions, and are given at fixed

2:52PM 21   doses without the need for routine coagulation monitoring."

2:52PM 22         Did I read that correctly?

2:52PM 23   A.    Yes, you did.

2:53PM 24   Q.    I want to ask you one question about the chart that you

2:53PM 25   referred to with the jury earlier.  This chart does not look at

the initial treatment phase for DVT, does it?

**A.**   Are you asking me on the second line where it says "continued treatment"?

**Q.**   Yes, ma'am, and the dose too.

**A.**   Yes.  That's -- yeah.  I think I pointed out, this is -- when you asked me that question, this is a different study and a different dose than you were describing, which is the 15 milligrams twice-a-day dose.

**Q.**   And so Table 3 -- Table 3 that you were discussing with the jury does not contain information about someone who's being in the initial treatment phase who's taking rivaroxaban 15 milligrams twice a day, does it?

**A.**   No, that's correct.  And I think we went over that and talked about that.

**Q.**   Now, if you'll turn with me to the very end of this article under "Conclusions," please.  I think it's "Conclusions."

There's a section called "Discussions and Conclusions," Section 8; right?

**A.**   What page does that start on?  I'm sorry.

**Q.**   It starts on Page 11 of 16.

**A.**   Yes, I see that.

**Q.**   And if you'll turn on over, this is the section where the authors put their conclusions about the information; correct?

**A.**   Where they're discussing their conclusions, yes.

Q.   And this is not highlighted, so let me get my highlighter
out here.  If you'll look at the first full sentence:
"However, there are currently no data showing a direct
correlation between bleeding events and rivaroxaban plasma
levels in patients receiving therapeutic doses of rivaroxaban."
          Did I read that correctly?
A.   Yes, you did.
Q.   And this article, "There are currently no data."  This
article was an article from 2014; correct?
A.   That is, yes.
Q.   Now, the last paragraph starting with "in conclusion," it
says, "In conclusion, the oral, direct Factor Xa inhibitor
rivaroxaban" -- which is Xarelto; right?
A.   Yes.
Q.   -- "has a fast onset of action, well-established
pharmacokinetics and pharmacodynamics in all patient
populations studied, and limited drug-drug interactions.  With
the fixed-dose regimens tailored for specific indications
without routine coagulation monitoring, rivaroxaban has the
potential to simplify and improve the management of
thromboembolic disorders."
          Did I read that correctly?
A.   Yes, you did.
Q.   Now, going back to that Table 3 where you were discussing
the dosages with the jury, you didn't mention this to the jury,

2:56PM  1   but it would be important to know that with twice-daily dosing,

2:56PM  2   the troughs are higher -- you were drawing those curves.  The

2:56PM  3   troughs are higher and the peaks are lower than they are with

2:56PM  4   once-daily dosing; right?

2:56PM  5   A.   Well, it depends on the dose you give, but typically if

2:56PM  6   you were giving the same -- if you were giving the same dose

2:57PM  7   split, you would expect that, yes, but you're talking about 30

2:57PM  8   total versus 20 here.  So I can't predict that they would be

2:57PM  9   exactly the same, but if I took 20 and gave it 10 and 10 twice

2:57PM  10  a day, yes, that's what I would expect.

2:57PM  11  Q.   My question is a little bit simpler.  Twice-daily dosing

2:57PM  12  has less variable concentration levels than once-daily dosing,

2:57PM  13  doesn't it?

2:57PM  14  A.   Not necessarily, no, not on the individual measures.  If

2:57PM  15  you're asking me about the differences between peak and trough,

2:57PM  16  yes, but that doesn't speak to the issue of individual

2:57PM  17  variability from patient to patient, which is what this

2:57PM  18  variability is.  Regardless of what the trough number is,

2:57PM  19  there's variability around it.  Regardless of what the peak is,

2:57PM  20  there's variability because of the interpatient variability.

2:57PM  21  Q.   I just want to make sure that I understand.  Is your

2:57PM  22  opinion that twice-daily dosing has less -- does not have less

2:57PM  23  variable concentration levels than once-daily dosing; is that

2:58PM  24  your opinion?

2:58PM  25  A.   Yes.  Based upon looking at troughs, looking at the data

2:58PM 1    around the troughs, and looking at the data around the Cmax,

2:58PM 2    yes.  You still have these individual patient issues to deal

2:58PM 3    with, apart from what the -- what the difference between Cmax

2:58PM 4    and Ctrough may show.

2:58PM 5    **Q.**   You understand, Doctor, that the FDA approved Xarelto for

2:58PM 6    multiple indications without the need for PT testing, didn't

2:58PM 7    it?

2:58PM 8    **A.**   Yes, they did make that decision.

2:58PM 9    **Q.**   And FDA did not require it in July 2011 when it approved

2:58PM 10   the prevention of deep vein blood clots indication, did it?

2:58PM 11   **A.**   That is correct, although there is -- there is information

2:58PM 12   now indicating that some at FDA have a different feeling.

2:58PM 13   **Q.**   The FDA didn't require it in November 2011, when it

2:58PM 14   approved Xarelto for stroke prevention in atrial fibrillation

2:58PM 15   patients, did it?

2:58PM 16   **A.**   That is true, they did not.

2:58PM 17   **Q.**   And the FDA didn't require PT testing in November 2012

2:59PM 18   when it approved the deep vein blood clot treatment indication,

2:59PM 19   did it?

2:59PM 20   **A.**   They did not.  That is true.

2:59PM 21   **Q.**   In fact, the FDA has never required PT testing of Xarelto,

2:59PM 22   has it?

2:59PM 23   **A.**   It's not a label requirement.  If you're asking me is it

2:59PM 24   in the label?  No, that is true.  And that's how they would

2:59PM 25   require it, putting it in its label.

690

**Q.**   DX-1400, for the record.  Do you see up in the left-hand corner there, Doctor, that this is an FDA consumer health information piece?

**A.**   Yes.

**Q.**   Did you know that this is on the FDA's website?

**A.**   I don't know if I've seen this particular one.  I have seen other articles, but I don't think I've seen this one.

**Q.**   Is the article entitled, "Have Atrial Fibrillation?  Blood Thinners Can Prevent Strokes and Save Lives"?  Is that the title?

**A.**   Yes, it is.

**Q.**   Can you look down, please, with me to the right-hand corner where it says, "New Blood Thinners Available"?

**A.**   Yes, I see that.

**Q.**   Under "New Blood Thinners Available," it says, "The FDA has approved four blood thinners in recent years -- dabigatran, (Pradaxa), rivaroxaban (Xarelto), apixaban (Eliquis), and edoxaban (Savaysa).  Along with warfarin" -- turn it over on the back.  "Along with warfarin, the drug approved 60 years ago, these drugs are used to prevent stroke in patients with atrial fibrillation.

         "There are some important differences among these drugs.  Warfarin interacts with certain drugs and foods that make it less effective or more likely to cause bleeding, and so its effects must be monitored with periodic blood tests.  The

691

3:00PM    1    new drugs have fewer interactions and don't require blood

3:01PM    2    monitoring."

3:01PM    3            Is that what the FDA said in this document?

3:01PM    4    A.   Well, I don't believe that this is the opinion of the

3:01PM    5    entire FDA, but I agree that's in this document, yes.

3:01PM    6    Q.   And do you know whether it's on their website?

3:01PM    7    A.   I said I have -- I don't think I've seen this one, but I

3:01PM    8    don't disagree based on what I see at the bottom.  It is

3:01PM    9    certainly something that I would expect to find there.  I know

3:01PM   10    they have similar documents.

3:01PM   11            THE COURT:  Anything further?

3:01PM   12            MS. PRUITT:  Yes.  I just have two other points, Your

3:01PM   13    Honor.

3:01PM   14    BY MS. PRUITT:

3:01PM   15    Q.   It is your opinion that PT should be used to determine if

3:01PM   16    certain patients are at an increased risk of bleeding; correct?

3:01PM   17    A.   It's my opinion -- I don't think I quite stated it quite

3:01PM   18    that way.  I said I believe PT should be used for exposure

3:01PM   19    monitoring at certain points in time in therapy, yes.  Would it

3:02PM   20    be to protect against bleeding?  Yes.

3:02PM   21    Q.   Let's see DX-2451, please.

3:02PM   22            And is this an article that's been published in the

3:02PM   23    *International Journal of Laboratory Hematology*?

3:02PM   24    A.   That's what it appears to be, yes.

3:02PM   25    Q.   And hematology is study of blood; right?

3:02PM  1   **A.**   Yes.

3:02PM  2   **Q.**   And the name of the article is "The Danger of Relying on

3:02PM  3   the APTT and PT of Patients on DOAC Therapy, a Potential

3:02PM  4   Patient Safety Issue."

3:03PM  5          Did I read that correctly?

3:03PM  6   **A.**   Yes.

3:03PM  7   **Q.**   And the authors of this article are Dr. Dorothy Hancock;

3:03PM  8   correct?

3:03PM  9   **A.**   Dr. Adcock, yes.

3:03PM 10   **Q.**   And Dr. -- and Mr. Gosselin; right?

3:03PM 11   **A.**   Yes, that's listed --

3:03PM 12   **Q.**   And that's the same Mr. Gosselin who's one of the experts

3:03PM 13   for the plaintiffs; correct?

3:03PM 14   **A.**   I believe so, yes.

3:03PM 15   **Q.**   And do you know whether he wrote this article when he

3:03PM 16   published this article?  Is it published in 2017?

3:03PM 17   **A.**   I don't know if he was the primary author.  I will say I

3:03PM 18   see the correspondence down there in the column.  I should have

3:03PM 19   looked for that on the other article.  Typically, the

3:03PM 20   corresponding author is the one that's primarily responsible

3:03PM 21   for the article, in the text.

3:03PM 22          So I would -- by that, I would be talking to

3:03PM 23   Dr. Adcock, but that doesn't mean -- I obviously expect Dr. --

3:03PM 24   Mr. Gosselin to have had input to the paper.

3:03PM 25   **Q.**   You're not trying to suggest that Dr. Gosselin -- putting

3:04PM 1   his name on here as an author means he didn't do anything on
3:04PM 2   it, are you?
3:04PM 3   **A.**   No, no, no.  I'm just saying it's -- in my experience with
3:04PM 4   how people publish, the corresponding author -- and actually,
3:04PM 5   the other paper that we looked at also lists Dr. Adcock as the
3:04PM 6   corresponding author.  The corresponding author is the person
3:04PM 7   who's taking responsibility for the article.  Typically they're
3:04PM 8   the driving force behind the article getting published.
3:04PM 9           I'm not saying that the other authors don't have
3:04PM 10  contributions, because absolutely they do, or they shouldn't be
3:04PM 11  on the paper.  But I'm just telling you, based on my experience
3:04PM 12  and how I know this kind of work is done, that is the role of
3:04PM 13  the corresponding author.
3:04PM 14  **Q.**   Let's look at the second column and the sentence that I'm
3:04PM 15  pointing to that starts "in 2016."  Do you see that?  "In
3:04PM 16  2016" -- that was last year; right?  It's on the first page,
3:04PM 17  second column -- first page.  Sorry.
3:04PM 18  **A.**   Okay.  I was looking for a highlight.  I'm sorry.  This
3:05PM 19  one's not highlighted.
3:05PM 20  **Q.**   Starts down here underneath Section 2.  "In 2016, the
3:05PM 21  American Association of Chest Physicians recommended the use of
3:05PM 22  DOACs" -- that's the novel oral anticoagulants; right?
3:05PM 23  **A.**   The direct -- yeah, they call them direct for the D or N
3:05PM 24  for the novel.
3:05PM 25  **Q.**   -- "over vitamin K antagonists" -- that's warfarin or

| | | |
|---|---|---|
| 3:05PM | 1 | Coumadin; right? |
| 3:05PM | 2 | A.    Yes. |
| 3:05PM | 3 | Q.    -- "for the treatment of noncancer-related VTE." |
| 3:05PM | 4 | Did I read that correctly? |
| 3:05PM | 5 | A.    Yes, you did. |
| 3:05PM | 6 | Q.    And VTE is venous thromboembolism; is that correct? |
| 3:05PM | 7 | A.    Yes. |
| 3:05PM | 8 | Q.    And a DVT is a venous thromboembolism; right? |
| 3:05PM | 9 | A.    It's one type, yes. |
| 3:05PM | 10 | Q.    And so in 2016, the American Academy -- Association of |
| 3:05PM | 11 | Chest Physicians recommended that the NOACs be used to treat |
| 3:05PM | 12 | DVT over Coumadin or warfarin, is that correct, in this |
| 3:05PM | 13 | article? |
| 3:05PM | 14 | A.    I would agree that's in this statement, yes. |
| 3:06PM | 15 | Q.    If you'll look at Section 2.1 for me, please, ma'am, first |
| 3:06PM | 16 | sentence:  "It is well-documented that there is often a poor |
| 3:06PM | 17 | correlation between plasma concentration of DOACs and |
| 3:06PM | 18 | prolongation of the APTT and PT." |
| 3:06PM | 19 | Did I read that correctly? |
| 3:06PM | 20 | A.    Yes.  But I disagree with that statement if you're talking |
| 3:06PM | 21 | about Xarelto. |
| 3:06PM | 22 | Q.    I understand you disagree with it, but that's what's |
| 3:06PM | 23 | published by these authors; correct? |
| 3:06PM | 24 | A.    Yes.  But they're talking about DOACs as a class, so I |
| 3:07PM | 25 | don't know that they would say the same thing specifically for |

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 3:07PM | 1 | Xarelto. |
| 3:07PM | 2 | Q.   Did I read the statement correctly? |
| 3:07PM | 3 | A.   I answered that first.  Yes, you did. |
| 3:07PM | 4 | Q.   Okay.  And prolongation of PT just means that the PT -- it |
| 3:07PM | 5 | takes longer for the blood to clot; correct? |
| 3:07PM | 6 | A.   Yes.  That's the second slide we were talking about. |
| 3:07PM | 7 | Q.   Okay.  One other statement I want to show you at the |
| 3:07PM | 8 | bottom.  "For rivaroxaban, published misprediction of the PT |
| 3:07PM | 9 | ranged from 10 to 52 percent and 31 to 59 percent for APTT |
| 3:07PM | 10 | depending on the reagent used." |
| 3:07PM | 11 |          Did I read that correctly? |
| 3:07PM | 12 | A.   Yes, and that's what's important.  The issue is the |
| 3:07PM | 13 | reagent. |
| 3:08PM | 14 | Q.   And so in treating patients as a physician -- you're not a |
| 3:08PM | 15 | physician.  But it would be important that if they relied on a |
| 3:08PM | 16 | test that actually helped them make correct clinical decisions |
| 3:08PM | 17 | when they were treating their patients; correct? |
| 3:08PM | 18 | A.   Yes.  You would want them to be using the best tools they |
| 3:08PM | 19 | have. |
| 3:08PM | 20 | Q.   Because it's really important when people have clotting |
| 3:08PM | 21 | disorders, because those are very serious diseases? |
| 3:08PM | 22 | A.   Yes, they are. |
| 3:08PM | 23 | Q.   And if you give -- if you take someone off of their |
| 3:08PM | 24 | anticoagulants because of a lab test that may not be that |
| 3:08PM | 25 | reliable, you could really do harm to that patient, couldn't |

3:08PM   1   you?

3:08PM   2   A.   If you used an unreliable tool, but there are reliable

3:08PM   3   tools that could be used.

3:08PM   4   Q.   I understand that's -- I understand that's what you're

3:08PM   5   telling the jury, but my --

3:08PM   6   A.   I have the data to back that up.

3:08PM   7   Q.   But my question is there's not any data -- we discussed

3:08PM   8   the data on EINSTEIN-DVT about PT and bleeding risk early -- at

3:08PM   9   the beginning of this examination, didn't we, Doctor?

3:08PM  10   A.   This is an issue related to the correlation --

3:08PM  11   Q.   Didn't we, Doctor?

3:08PM  12   A.   Yes, we did, but this is an issue of correlation of blood

3:09PM  13   levels and the exposure with PT.

3:09PM  14   Q.   Let's move on.

3:09PM  15        Overdose.  I want to talk a little bit about

3:09PM  16   overdose.  You suggested to the jury when we came back from

3:09PM  17   lunch something about overdosing.

3:09PM  18        Are you familiar with the case reports in the

3:09PM  19   literature that show that there is a ceiling effect for this

3:09PM  20   drug Xarelto?

3:09PM  21   A.   If by "ceiling effect" -- do you want to define that?  Or

3:09PM  22   do you want me to ask you what I think you mean?

3:09PM  23   Q.   Well, are you aware of case reports that show where people

3:09PM  24   took massive doses of Xarelto and they didn't bleed?

3:09PM  25   A.   Yes, I am aware of that.

OFFICIAL TRANSCRIPT

| | | |
|---|---|---|
| 3:09PM | 1 | **Q.**   Are you aware of case reports where people took massive |
| 3:09PM | 2 | doses, as much as 90 times the dose that you were supposed to |
| 3:09PM | 3 | take of Xarelto, and they didn't bleed? |
| 3:09PM | 4 | **A.**   Yes, but there's context around those case reports that's |
| 3:09PM | 5 | important. |
| 3:10PM | 6 | **Q.**   And that is because the way this drug is designed, there |
| 3:10PM | 7 | is a ceiling effect.  And you talked to the jury about that |
| 3:10PM | 8 | absorption and elimination, didn't you? |
| 3:10PM | 9 | **A.**   Yes.  But I still don't understand about the design of a |
| 3:10PM | 10 | ceiling effect.  I don't think I would agree with that.  What |
| 3:10PM | 11 | do you mean by that? |
| 3:10PM | 12 | **Q.**   Well, the jury is going to listen to testimony -- and I'll |
| 3:10PM | 13 | let them make the determination -- from the people that |
| 3:10PM | 14 | actually conducted the trials, and they'll be able to talk |
| 3:10PM | 15 | about it. |
| 3:10PM | 16 |         **MS. PRUITT:**  Your Honor, I appreciate it.  Thank you |
| 3:10PM | 17 | very much. |
| 3:10PM | 18 |             Thank you, Doctor.  That's all the questions I |
| 3:10PM | 19 | have. |
| 3:10PM | 20 |         **THE COURT:**  Any redirect? |
| 3:10PM | 21 |         **MS. JEFFCOTT:**  Yes, Your Honor. |
| 3:10PM | 22 |                    **REDIRECT EXAMINATION** |
| 3:10PM | 23 |                    **BY MS. JEFFCOTT:** |
| 3:11PM | 24 | **Q.**   Dr. Plunkett, Ms. Pruitt spent a lot of time talking to |
| 3:11PM | 25 | you about EINSTEIN Phase III trial.  Do you recall? |

A.   Yes.

Q.   And she indicated -- well, first off, did they collect plasma concentration data for Xarelto in EINSTEIN Phase III?

A.   No.

Q.   Okay.  So when I showed you this earlier and you talked about DVT -- make it easier to look at -- DVT treatment and why it was 20 milligrams once daily, what was your explanation?

A.   My explanation was these were the studies where you had collected plasma samples, which is why you're able to report the data this way.  In order to look at variability in the DVT population, you have to have plasma samples, and that's what's here.  We don't have that in the Phase III study.

Q.   And so they never collected plasma concentration data on 30 milligrams b.i.d.; is that right?

A.   That's correct.

Q.   Now, Ms. Pruitt also talked to you -- well, first off, did they collect Xarelto plasma concentration data in any of the other Phase III trials?

A.   Yes.  They did in the ROCKET trial, the one I had a senior moment on.

Q.   And did you look at that data?

A.   Yes.  And, actually, in my report, that's -- I spent a lot of time in my report on that because that was the Phase III data I had that had the blood level data to be able to look at in that Phase III population.

3:12PM   1    **Q.**    And did they also collect it in the Phase II studies?

3:12PM   2    **A.**    Yes.

3:12PM   3    **Q.**    And did you review that as well?

3:12PM   4    **A.**    Yes.

3:12PM   5    **Q.**    Now, Ms. Pruitt also asked you why you didn't calculate --

3:13PM   6    or rather she asked you if you calculated the therapeutic

3:13PM   7    range.

3:13PM   8    **A.**    That's correct, she did.

3:13PM   9    **Q.**    And what was your response?

3:13PM   10   **A.**    I did not.

3:13PM   11   **Q.**    And why didn't you?

3:13PM   12   **A.**    Because I can't.  I don't have the data.  I talked about

3:13PM   13   that issue of not knowing the minimum effective dose, and we

3:13PM   14   also don't know what the threshold for toxicity, which you need

3:13PM   15   to know in order to calculate it.  To do this calculation, I

3:13PM   16   have to have those quantified, and I pointed out we don't.

3:13PM   17          So instead what I look at is -- for therapeutic

3:13PM   18   index, when I formed the opinion that it has a narrow

3:13PM   19   therapeutic index in my report, it's based on the fact that at

3:13PM   20   the doses that were administered clinically, in the clinical

3:13PM   21   trials, they were getting bleeding events in those people.  And

3:13PM   22   I believe it's related to exposure differences more than

3:13PM   23   anything else.  And that's why I think exposure assessment in

3:13PM   24   some patients is important.

3:13PM   25   **Q.**    And who would have studied and gathered that data that you

3:13PM
3:13PM
3:14PM
3:14PM
3:14PM
3:14PM
3:14PM
3:14PM
3:14PM
3:14PM
3:14PM
3:14PM
3:14PM
3:14PM
3:14PM
3:14PM
3:14PM
3:14PM
3:14PM
3:14PM
3:14PM
3:14PM
3:14PM
3:14PM
3:15PM

1    could have used?

2    **A.**   The only person that would typically do it would be the

3    company that's marketing the drug or developing the drug.

4    That's the kind of information they would gather during

5    development, but they would have to have multiple doses in that

6    study, which they didn't have either.

7    **Q.**   And so that would be Bayer and Janssen in this case?

8    **A.**   Yes.

9    **Q.**   Now, Ms. Pruitt also talked to you about PT in the

10   EINSTEIN Phase III; is that right?

11   **A.**   Yes.

12   **Q.**   And she -- I think I wrote it down.  If I didn't write it

13   down correctly, just let me know, but I think she said that

14   there was no difference in PT between those who had bleeds and

15   those who didn't?

16   **A.**   Yes, I think she did say that.

17   **Q.**   And what's the significance of that, in your opinion?

18   **A.**   So it -- it isn't necessarily -- I don't have enough

19   information to say it's significant.  The problem is -- the

20   issue would be what is their exposure?  Okay.  And we haven't

21   correlated that in that population.

22           So I'd have to look -- I'd have to delve more into

23   the data to say whether I agree.  But, most importantly,

24   they've already proven with their data that bleeding risk

25   increases as -- as exposure increases.

3:15 PM
3:15 PM
3:15 PM
3:15 PM
3:15 PM
3:15 PM
3:15 PM
3:15 PM
3:15 PM
3:15 PM
3:16 PM
3:16 PM
3:16 PM
3:16 PM
3:16 PM
3:16 PM
3:16 PM
3:16 PM
3:16 PM
3:16 PM
3:16 PM
3:16 PM
3:16 PM
3:16 PM
3:16 PM

1            The other issue is DVT has a shorter term of dosing,

2    and so it may be that there would be a different exposure

3    threshold in that population, but we don't have the data to

4    know that.

5    Q.   Well, I pulled the data that she was referring to, and I'd

6    like to hand it out.  This will be Plaintiff's Identification

7    Number 3860407.

8            And, Dr. Plunkett, if you'd be so kind to review and

9    read the title of this document.  It's actually on the second

10   page.

11   A.   "Explorative analysis of prothrombin time measured by

12   Neoplastin reagent in subjects treated with rivaroxaban

13   (BAY 59-7939)" -- that's the name the company gives to their

14   drug -- "in pool of studies 11702 DVT, EINSTEIN-DVT, and 11702

15   PE, EINSTEIN-PE."

16   Q.   And so what is this report, if you could just summarize

17   and restate basically what this report's title is saying?

18   A.   So this report is saying in these clinical studies, the

19   DVT and the PE patients from the trials in EINSTEIN, they were

20   looking at the -- looking at the data on PT and looking at

21   what -- whether or not there was a -- there were relationships

22   they could pull out.  They were exploring the PT data, and

23   that's what they're presenting in this report.

24   Q.   And what reagent were they using?

25   A.   Neoplastin, which is the one that I talked about earlier.

3:16PM  1    That's the -- PT using Neoplastin is the data or the analysis

3:17PM  2    method that they have validated with their clinical data.

3:17PM  3    Q.    I want to pull up the Gosselin article real quick and show

3:17PM  4    you some of the language that Ms. Pruitt highlighted to see if

3:17PM  5    maybe we can get to the bottom of this a little bit.

3:17PM  6          Do you recall Ms. Pruitt highlighting this -- this

3:17PM  7    area right here where it states, "For rivaroxaban and edoxaban,

3:17PM  8    the degree of PT and APTT prolongation varied across reagents;

3:17PM  9    and while the PT and APTT tended to prolong in a

3:17PM 10    concentration-dependent manner, overall the correlations were

3:17PM 11    insufficiently sensitive"?

3:17PM 12          Now, Dr. Plunkett, is there identification of a

3:17PM 13    specific reagent in this paragraph?

3:17PM 14    A.    No.  And that's why I said I disagreed with the statement

3:17PM 15    that we read in.  I didn't believe that's true for all reagents

3:18PM 16    in the use of rivaroxaban, because I believe the Neoplastin

3:18PM 17    data come to -- you would come to a different conclusion, as

3:18PM 18    the company themselves came to when they reported it.

3:18PM 19    Q.    Okay.  And I'd like to turn your attention to 2.1, which

3:18PM 20    also Ms. Pruitt referred to.  And the sentence that she read to

3:18PM 21    the jury was, "For rivaroxaban, published misprediction of the

3:18PM 22    PT ranged from 10 to 52 percent and 31 to 59 percent for APTT,

3:18PM 23    depending on the reagent used."

3:18PM 24          Is that at issue here right now?

3:18PM 25    A.    Yes.  And that's what we mean when we talk about

| | |
|---|---|
| 3:18PM | 1 |
| 3:18PM | 2 |
| 3:18PM | 3 |
| 3:18PM | 4 |
| 3:18PM | 5 |
| 3:18PM | 6 |
| 3:19PM | 7 |
| 3:19PM | 8 |
| 3:19PM | 9 |
| 3:19PM | 10 |
| 3:19PM | 11 |
| 3:19PM | 12 |
| 3:19PM | 13 |
| 3:19PM | 14 |
| 3:19PM | 15 |
| 3:19PM | 16 |
| 3:19PM | 17 |
| 3:19PM | 18 |
| 3:19PM | 19 |
| 3:19PM | 20 |
| 3:20PM | 21 |
| 3:20PM | 22 |
| 3:20PM | 23 |
| 3:20PM | 24 |
| 3:20PM | 25 |

1  Neoplastin.  The Neoplastin PT reagent has been the one that
2  has been shown to be able to be used to identify exposure
3  response relationship.
4  Q.   Now, Dr. Plunkett, if you would go back to the handout
5  that I gave you, "The Explorative Analysis of PT Neoplastin in
6  the EINSTEIN Phase III trial."  And if you would go to the last
7  page, please.
8        Now, what is the title of this table?
9  A.   It says, "Number of subjects and observed event rate for
10  clinically relevant bleeding in b.i.d. dosing phase by
11  quartiles of PT Neoplastin," and then it says, "Population,
12  subjects valid for safety."
13  Q.   And based upon your analysis -- and I know it's hard to
14  read.  I apologize.  The quality is a little poor, but in
15  reviewing the quartiles -- well, first, let's explain
16  "quartiles."  How is this information broken out?
17  A.   Okay.  So in some of the analyses that the company did --
18  and I believe FDA talks about this too -- on PT, they would
19  break it into time, so they would take a bleeding time between
20  certain values.
21        So the quartile 1.  So they take the bleeding times
22  that fell within 11.6 to 19.7, if you look there.  I don't know
23  if you can highlight it.  Right there, yes.
24  Q.   And this is the PT range; right?
25  A.   Right.  So that's how they did -- they broke these

3:20PM   1   patients by bleeding time, those measurements from the test,

3:20PM   2   into four different quartiles based on longer and longer times

3:20PM   3   as you go down.

3:20PM   4   Q.   And so, essentially, the first quartile is 11.6 to 19.7 as

3:20PM   5   the PT range; right?

3:20PM   6   A.   Yes.

3:20PM   7   Q.   And then the second quartile is incrementally larger from

3:20PM   8   19.7 to 22.2?

3:20PM   9   A.   That's correct.

3:20PM  10   Q.   The third quartile for a PT range, PT Neoplastin day 15

3:20PM  11   peak is 22.2 to 25.1?

3:20PM  12   A.   That's correct.

3:20PM  13   Q.   The fourth range, which is the highest, starts at 25.1 and

3:20PM  14   goes all the way to 120?

3:20PM  15   A.   Yes.

3:20PM  16   Q.   Okay.  Now, the column over, this Column N, what does this

3:21PM  17   represent?

3:21PM  18   A.   So that's telling you how many people -- N is the number

3:21PM  19   of people that were in that quartile based -- and "All" is the

3:21PM  20   number of subjects that they had to look at totally.  So

3:21PM  21   within -- within this population, they had 25 subjects that

3:21PM  22   fell within that quartile, 21.

3:21PM  23   Q.   And in terms of those 25 subjects, those are ones that had

3:21PM  24   clinically relevant bleeding?

3:21PM  25   A.   That's what this table is looking at.  So I -- I think I

3:21PM 1  mentioned also with defense counsel that one of the issues too
3:21PM 2  when you look at this data is how you define bleeding.
3:21PM 3          So there's different ways.  There's any type of
3:21PM 4  bleeding.  There's clinically relevant bleeding.  There's
3:21PM 5  another definition people use about major bleeding.  Sometimes
3:21PM 6  they say it has to be bleeding where you have a hemoglobin drop
3:21PM 7  as well as transfusions given.
3:21PM 8          So you really need to look at how they define it
3:21PM 9  because that can make a difference too on what the data looks
3:22PM 10  like as far as where you may actually see a correlation or an
3:22PM 11  increased risk.
3:22PM 12  Q.  And in this case we have 25 in that first quarter with a I
3:22PM 13  would say lower PT range.
3:22PM 14          Now, if we go over two columns to the percentile,
3:22PM 15  what is that?
3:22PM 16  A.  So that's the percent in that quartile that they're
3:22PM 17  listing that had clinically relevant bleeding.  So this is
3:22PM 18  saying 25 people in this quartile had clinically relevant
3:22PM 19  bleeding out of the 793 that fell in that quartile.
3:22PM 20          So that's their percentage.  They're saying it's
3:22PM 21  3.15 percent, I think.  And then they're also giving those
3:22PM 22  ranges that we talked about before, the confidence intervals.
3:22PM 23  That's that -- that's those -- the variability, the not
3:22PM 24  understanding of where it falls.
3:22PM 25  Q.  And so when you compare people in that top quarter, in

3:22PM  1   that higher PT quarter, compare it to those in the bottom, the
3:23PM  2   lower PT, what do the percentiles say?
3:23PM  3   A.   The 5.91 percent and the confidence intervals also -- it's
3:23PM  4   important on here, if you want to say was it a statistically
3:23PM  5   significant result, notice that the confidence intervals don't
3:23PM  6   overlap very much with that bottom -- with the confidence level
3:23PM  7   there in quartile 1.  So it may be statistically significant.
3:23PM  8   I don't see that presented.  But certainly, to me, that's a
3:23PM  9   significant increase in -- and I'd want to see what the
3:23PM  10  statistics were.
3:23PM  11  Q.   Okay.  And do you find the same thing on day 15 trough at
3:23PM  12  the very bottom, that there is a -- essentially an increased
3:23PM  13  risk of bleeding as you move up the PT?
3:23PM  14  A.   Yes.  And this is consistent with the data I talked about
3:23PM  15  earlier.  I said that they were seeing a dose response.  So
3:23PM  16  this is it.  You're seeing the idea that, as prolongation of
3:23PM  17  the PT shows, you get an increased risk of bleeding.  And so
3:24PM  18  this data would support that finding as well.
3:24PM  19          MS. JEFFCOTT:  Your Honor, at this time, I'd like to
3:24PM  20  admit this document as Plaintiff's Exhibit --
3:24PM  21          THE DEPUTY CLERK:  18.
3:24PM  22          MS. JEFFCOTT:  18.
3:24PM  23          THE COURT:  Which one?
3:24PM  24          MS. JEFFCOTT:  It's Plaintiff's Identification
3:24PM  25  Number 3860407.

3:24PM  1      THE COURT:  Any objection?

3:24PM  2      MS. PRUITT:  No objection, Your Honor.

3:24PM  3      THE COURT:  Let it be admitted.

3:24PM  4  BY MS. JEFFCOTT:

3:24PM  5  Q.   And, Dr. Plunkett, were the companies aware that

3:24PM  6  Neoplastin PT was highly correlated with the blood level, with

3:24PM  7  the plasma concentration of the drug?

3:24PM  8  A.   Yes.  That was reported in their own clinical trials.

3:24PM  9  Q.   And because it was so well correlated, is that why the

3:24PM  10  companies used this Neoplastin PT in multiple clinical trials?

3:24PM  11  A.   Yes.  I mean, they started out in the initial trial --

3:25PM  12      MS. PRUITT:  Objection, Your Honor.  She's asking

3:25PM  13  this witness to speculate.  She doesn't know why the company --

3:25PM  14      THE COURT:  She doesn't know, so you'd have to frame

3:25PM  15  that as an opinion.

3:25PM  16      MS. JEFFCOTT:  I'll break it down.

3:25PM  17  BY MS. JEFFCOTT:

3:25PM  18  Q.   So in the Phase III clinical trials, what was the primary

3:25PM  19  measurer of exposure used by defendants Janssen and Bayer?

3:25PM  20  A.   Prothrombin time using the Neoplastin reagent.

3:25PM  21  Q.   So is it your opinion that because the PT Neoplastin was

3:25PM  22  so well correlated with plasma concentration of Xarelto, that's

3:25PM  23  why it was used?

3:25PM  24      MS. PRUITT:  Same objection, Your Honor.  There's no

3:25PM  25  way for her to know.

3:25PM    1          THE COURT:  That's her opinion.  It's not a fact.

3:25PM    2    It's her opinion.

3:25PM    3          MS. JEFFCOTT:  I'll restate it to get a complete

3:25PM    4    thought.

3:25PM    5    BY MS. JEFFCOTT:

3:25PM    6    Q.   So, Dr. Plunkett, is it your opinion that, because

3:25PM    7    Neoplastin PT was so well correlated, that that's why

3:25PM    8    defendants Bayer and Janssen used it in essentially their

3:26PM    9    Phase III trials?

3:26PM   10    A.   Yes.  And that -- my opinion is based on what their data

3:26PM   11    and their studies before showed where they actually

3:26PM   12    demonstrated correlations between blood levels and PT levels

3:26PM   13    and risk.

3:26PM   14          MS. JEFFCOTT:  That's all my questions.  Thank you.

3:26PM   15          THE COURT:  Okay.  Thank you.  Thank you, ma'am.

3:26PM   16                    (Witness excused.)

3:26PM   17          THE COURT:  You want to take a break at this time

3:26PM   18    or -- all right.  Let's call your next witness then.

3:26PM   19          MR. BIRCHFIELD:  Your Honor, at this time, we'll call

3:26PM   20    Dr. Anthonie Lensing by video deposition.

3:26PM   21          I think that we have an issue that we need to

3:26PM   22    discuss with the Court for just --

3:26PM   23          THE COURT:  Okay.  All right.  We'll take a break at

3:26PM   24    this time.  We'll stand in recess for ten minutes.

3:26PM   25          THE DEPUTY CLERK:  All rise.

*OFFICIAL TRANSCRIPT*

3:26PM  1          (whereupon the jury was excused from the courtroom.)

3:27PM  2        **THE COURT:**  Okay.  Do you want to take a break now or

3:27PM  3  do you want to discuss this?

3:27PM  4        **MR. MEUNIER:**  We can discuss it.  It doesn't have to

3:27PM  5  be on the record.

3:27PM  6        **THE COURT:**  Okay.

3:27PM  7        **MR. MEUNIER:**  We can put it on the record.

3:27PM  8        **MR. BONEY:**  He's got to make rulings on the -- I

3:27PM  9  thought that's what it was about.

3:27PM  10        **MR. MEUNIER:**  No, Your Honor.  This was the reading

3:27PM  11  of something before the Lensing depo.  I just wanted to advise

3:27PM  12  you where we are on that.

3:27PM  13        **THE COURT:**  Yeah, what's -- do you want this on the

3:27PM  14  record or not?

3:27PM  15        **MS. PRUITT:**  I think we do, because I don't have

3:27PM  16  anything to read because we hadn't agreed to read anything, or

3:27PM  17  at least nobody's told me.

3:28PM  18        **MR. MEUNIER:**  Well, you agreed to read something,

3:28PM  19  but --

3:28PM  20        **MS. PRUITT:**  Okay.  So my team has agreed to read

3:28PM  21  something?  Whoever agreed, get up here.

3:28PM  22        **MR. MEUNIER:**  Judge, I know you told us that both

3:28PM  23  sides should agree.  You know, the only anything I wanted to

3:28PM  24  make clear is that you could look at this as a moment of

3:28PM  25  advocacy opportunity, or you could look at it as something to

help the jury, which is about to hear a four-and-a-half-hour-long deposition.

Our thought was that if you made a mutual statement on each side -- as to what each side wanted the jury to particularly consider or pay attention to, that would be, if mutually stated, helpful to the fact finder.  So we presented the defendants with a slightly more than a page-long statement with four or five key subject areas that we wanted -- the reason we wanted the jury to hear from this witness.

The defendants gave us back basically a document that strikes all of the reference to key subject areas.  It just says who the witness is and that he's going to be questioned by both sides.

And I realize the Court wanted us to try to endeavor to come to an agreement, but we would urge Your Honor to consider letting each side just make a neutral statement before the four-and-a-half-hour long deposition as to what the jury is being asked to pay attention to, its key areas, without advocating anything.

And I thought that's what we were going to try to do, but -- there's no agreement on it; that's true, but --

**THE COURT:**  I'll take a look at this.  Let me speak on the deposition at this point, because I have some issues that you all presented to me.

This is Dr. Lensing's deposition.  And I

| | | |
|---|---|---|
| 3:29 PM | 1 | understand it's a long deposition, approximately four hours. |
| 3:29 PM | 2 | There is some issues that the defendants raise, and they focus |
| 3:30 PM | 3 | the Court on page 50 through 61. |
| 3:30 PM | 4 | This part of the deposition has to do with |
| 3:30 PM | 5 | foreign labels.  As I mentioned on several occasions now, as I |
| 3:30 PM | 6 | see it -- as we all know, the -- the only evidence relevant -- |
| 3:30 PM | 7 | or only evidence admissible is relevant evidence. |
| 3:30 PM | 8 | The issue presented by Dr. Lensing has to do |
| 3:30 PM | 9 | with the relevance of foreign labels.  I feel -- and I |
| 3:30 PM | 10 | mentioned it several times to the parties -- that foreign |
| 3:30 PM | 11 | labels by themselves I don't think are relevant.  I don't think |
| 3:30 PM | 12 | they're relevant because there are different laws applicable. |
| 3:30 PM | 13 | There are different regulations applicable.  There are |
| 3:30 PM | 14 | different administrative bodies applicable. |
| 3:31 PM | 15 | And also some administrative bodies invite |
| 3:31 PM | 16 | comment.  Other administrative bodies dictate what could or |
| 3:31 PM | 17 | should be on the label. |
| 3:31 PM | 18 | But, in any event, it raises issues that are |
| 3:31 PM | 19 | certainly confusing, if not, in a Shakespearian sense, a play |
| 3:31 PM | 20 | within a play.  Nobody has done that well except him probably. |
| 3:31 PM | 21 | In any event, I think it's more confusing, and I |
| 3:31 PM | 22 | don't even think it's admissible.  So it doesn't pass 401.  And |
| 3:31 PM | 23 | if it's somewhat similar to the FDA, I think it's confusing |
| 3:31 PM | 24 | under 403.  So I don't feel the labels themselves ought to be |
| 3:31 PM | 25 | shown to the jury.  And the argument that this label says this |

3:31PM   1   and this label says that and the FDA label doesn't, that, to

3:32PM   2   me, is -- would be improper.

3:32PM   3              However, I do feel that the statements by the

3:32PM   4   defendants during this process is or at least can be relevant

3:32PM   5   to show what the party knew and when they knew it.  And that's

3:32PM   6   a big issue in this particular case, at least on the theories

3:32PM   7   that are advocated by the plaintiffs and defended by the

3:32PM   8   defendants.

3:32PM   9              The admissibility of relevant statements seems

3:32PM   10  to me are admissible under 613.  Prior statements of a party be

3:32PM   11  admissible also under 801(d)(2) because they're statements

3:32PM   12  adverse to the party's position.  And we all know that the

3:33PM   13  method of proving that is in 1007, which talks about the way

3:33PM   14  you prove it.  And one way is through depositions; the other

3:33PM   15  way is statements and testimony.

3:33PM   16             So we're dealing with testimony.  We're dealing

3:33PM   17  with depositions.  So that is an appropriate way of showing the

3:33PM   18  prior statements.

3:33PM   19             I looked at the testimony that the parties asked

3:33PM   20  me to look at.  And under -- on page 51 -- first of all, we're

3:33PM   21  dealing with -- with Mr. Anthonie Wilhelmus Arnold Lensing.

3:33PM   22  And he is -- he works for Bayer.  He's been -- worked for Bayer

3:33PM   23  since 2004.  His current position is global clinical leader

3:33PM   24  related to rivaroxaban.

3:34PM   25             And on 51, he's questioned, and he says -- and

713

3:34PM 1    the question is.

3:34PM 2                "QUESTION:   And you have worked on summary product

3:34PM 3    characteristics, SPCs, for Xarelto with respect to VTE

3:34PM 4    treatment for Bayer; is that correct?

3:34PM 5                "ANSWER:   Yes," he says.

3:34PM 6                "QUESTION:   In Europe, is the SPC the way in which

3:34PM 7    Bayer communicates information about Xarelto to doctors?

3:34PM 8                "ANSWER:   I think that's the case, indeed."

3:34PM 9                And the question is:

3:34PM 10                "QUESTION:   And when you were involved in working on

3:34PM 11    the SPC in Europe for Xarelto, you expected that the

3:34PM 12    information that would be communicated through that SPC to

3:34PM 13    be accurate; is that right?"

3:34PM 14                And the answer is:

3:34PM 15                "ANSWER:   What -- I find that whenever information is

3:34PM 16    being generated for the external world, it always needs to

3:35PM 17    be accurate.   Hence, it also needs to be accurate in this

3:35PM 18    case."

3:35PM 19                And then on page -- the next page, the question

3:35PM 20    is:

3:35PM 21                "QUESTION:   So when you were interacting with Health

3:35PM 22    Care Canada, did Bayer provide information to Health Care

3:35PM 23    Canada about Xarelto in order to seek approval for the

3:35PM 24    drug?"

3:35PM 25                And, of course, the witness says he can only

714

3:35PM
3:35PM
3:35PM
3:35PM
3:35PM
3:35PM
3:35PM
3:36PM
3:36PM
3:36PM
3:36PM
3:36PM
3:36PM
3:36PM
3:36PM
3:36PM
3:36PM
3:36PM
3:36PM
3:36PM
3:36PM
3:36PM
3:37PM
3:37PM
3:37PM

1    speak on the basis of his experience.

2         "QUESTION:  And was it your understanding that the

3    information that Bayer would provide to Health Care Canada

4    about Xarelto would be accurate?

5         "ANSWER:  Yes," he says.

6              And then he's directed to look at an email, and

7    in Exhibit 60, if you look with me on the -- I guess it's the

8    second page.  That's an email to you from Dana Cusack from

9    Health Care -- at Health Canada Bayer to yourself, as well as

10   several other people at Bayer.  Dana Cusack is an employee of

11   Bayer, not a regulatory employee.

12             And the question is:

13        "QUESTION:  Did you, in fact, review the text" -- and

14   the text was sent to him, and he reviewed the text --

15   "related to VTE treatment and provide and indicate to

16   Ms. Cusack that you did not have any comment?

17        "ANSWER:  I had indeed read it, and I indeed had no

18   comment.

19        "QUESTION:  Did you want to ensure in your review

20   that the information that was going be told to doctors in

21   Canada and in this product monograph would be accurate?"

22             The answer is:  "I always strive to -- to

23   accuracy.  Hence, I also do in this case."

24             The other page that I've looked at, it says:

25             "And what's stated here under pharmaco --

1    pharmacodynamics is, 'There is clear correlation between
2    plasma rivaroxaban concentration and the degree of
3    anticoagulant effect.'"
4                  He says, "That's -- that's what it says."
5                  And this may or may not -- it's unclear to me
6    that it's the label.  He's really looking at a monograph, but
7    that's what he says, "The maximum effect of Xarelto on
8    pharmacodynamics parameters occur at the same time as the
9    Cmax."
10                 And the question is:
11                 "There is a close correlation between Factor Xa
12   inhibition and plasma concentration with an R value of
13   0.97."
14                 And he sees that.
15                 And then the question is:
16                 "PT is influenced" -- and it's quoted.  "PT is
17   influenced by rivaroxaban in a dose-dependent way with a
18   close correlation to plasma concentrations, R equals .98
19   if Neoplastin is used.  Do you see that?"
20                 And he says, yes, he does.
21                 It goes on.  He's using quotes here:
22                 "Okay.  Dr. Lensing, I'm just asking, did you
23   understand that what you reviewed that -- that which you
24   reviewed, this product monograph, according to the emails
25   from Ms. Cusack, as she indicated, that this was a draft

3:39PM 1       label adding the VTE treatment indications that would be

3:39PM 2       submitted to Health Canada?"

3:39PM 3               This was a document prepared by Bayer, submitted

3:39PM 4   to Health Canada.  And the question is:

3:39PM 5               "And was the object to provide accurate

3:39PM 6       information to Health Care Canada about Xarelto?"

3:39PM 7               And the answer is:

3:39PM 8               "I repeat, my object is always to provide

3:39PM 9       accurate information, so that also applies in this

3:39PM 10      particular case."

3:39PM 11              The next part of the quote that I think is

3:39PM 12  significant is:

3:39PM 13              "So, Dr. Lensing, I'm showing you an email

3:39PM 14      chain, and if we can start at the bottom of the page,

3:40PM 15      there is an email from Susan Morency on April the 30th,

3:40PM 16      2015, and that the subject is Xarelto's response to Health

3:40PM 17      Canada interaction with PEGP."

3:40PM 18              The question is -- he sees it, and he says

3:40PM 19  that's what it says.

3:40PM 20              "And if you can now take a look with me at

3:40PM 21      Exhibit 65, which is the attached annotated product

3:40PM 22      monograph.  And if we can look over at page 9, there's a

3:40PM 23      section for monitoring and laboratory tests.  Do you see

3:40PM 24      that?

3:40PM 25              "Yes, I see that.

1    "And it says, 'The prothrombin time measured in

2    seconds is influenced by Xarelto in a dose-dependent way

3    with a close correlation to plasma concentrations if the

4    Neoplastin reagent is used.'"

5              And he says, "I see that."

6              And the question is:

7              "Okay.  And then it says, 'In patients who are

8    bleeding, measuring the PT using Neoplastin reagent may be

9    useful to assist in determining an excess of anticoagulant

10   activity.'"

11             And he says he sees that.

12             And it goes on that:

13             "There's -- the same statement appears again in

14   patients who are bleeding, measuring the PT Neoplastin

15   reagent may be useful to assist in determining the excess

16   of anticoagulant activity.  Do you see that sentence?"

17             And he says, "I see it."

18             And it continues:

19             "And then there's a section that says Factor Xa

20   assay tests require calibration and should not be used

21   unless rivaroxaban-specific calibrators and controls are

22   available."

23             And the question again is:

24             "And this is instructing physicians and

25   laboratory doctors that if they are going to use Factor Xa

*OFFICIAL TRANSCRIPT*

3:42PM
3:42PM
3:42PM
3:42PM
3:42PM
3:42PM
3:42PM
3:42PM
3:43PM
3:43PM
3:43PM
3:43PM
3:43PM
3:43PM
3:43PM
3:43PM
3:43PM
3:43PM
3:43PM
3:43PM
3:43PM
3:43PM
3:44PM
3:44PM
3:44PM

1    tests to measure Xarelto, they need to use a

2    rivaroxaban-specific calibrator and control; correct?"

3              The witness says, "That is correct."

4              And finally, there's more questions on those

5    pages that you asked me to look at, that:

6              "We see this product monograph," and he's shown

7    a monograph prepared by Bayer, "a final from May of 2015,

8    the statement made, 'In patients who are bleeding,

9    measuring the PT Neoplastin reagent may be useful to

10   assist in determining an excess of anticoagulant

11   activity.'"

12             "I see that as being assumed.'"

13             And then finally, he says:

14             "Okay.  And is this information, as you

15   understand it, correct with respect to the PT ranges for

16   max and trough for the VTE indication for the 15-milligram

17   twice-daily dose?

18             "These figures were based on blood samplings

19   taken as part of the EINSTEIN-DVT and EINSTEIN-PE studies

20   for the prolongation of DVT, and this was documented

21   through Cmax and Ctrough in order to see a correlation

22   with the occurrence of bleeding afterwards.  So that is

23   correct."

24             So it seems to me that the comments and

25   instructions were made by the manufacturer of the drug, and the

| | |
|---|---|
| 3:44PM | 1 |
| 3:44PM | 2 |
| 3:44PM | 3 |
| 3:44PM | 4 |
| 3:44PM | 5 |
| 3:44PM | 6 |
| 3:44PM | 7 |
| 3:44PM | 8 |
| 3:44PM | 9 |
| 3:44PM | 10 |
| 3:44PM | 11 |
| 3:45PM | 12 |
| 3:45PM | 13 |
| 3:45PM | 14 |
| 3:45PM | 15 |
| 3:45PM | 16 |
| 3:55PM | 17 |
| 3:55PM | 18 |
| 3:55PM | 19 |
| 3:55PM | 20 |
| 3:55PM | 21 |
| 3:55PM | 22 |
| 3:55PM | 23 |
| 3:55PM | 24 |
| 3:55PM | 25 |

1  global clinical leader of the drug says that these statements,

2  which either he made or approved, are true and correct.  It

3  seems to me they're admissible, not simply because they're in a

4  foreign label, but because they are statements either made by

5  the -- a very high company representative and -- or approved by

6  him.

7            So I've looked over the material that the

8  parties asked me to look over, and I think that my rulings are

9  adequate and correct for those reasons.

10            MR. MEUNIER:  Thank you, Judge.

11            THE COURT:  So let me take a look at the other stuff.

12            MR. BONEY:  Thank you, Your Honor.

13            THE COURT:  Take a break at this time.  The Court

14  will stand in recess.

15            THE DEPUTY CLERK:  All rise.

16                  (Recess.)

17            THE COURT:  Okay.  Be seated, please.  The jury is

18  out of the courtroom.  Counsel wishes to talk about exhibits,

19  and consistent with my ruling just a moment ago, what's the

20  issue?

21            MR. BONEY:  Yes, sir, Your Honor.  Lindsey Boney for

22  the defendants.  And thank you for your indulgence.

23            I don't mean to press your patience, Your Honor.

24            THE COURT:  You're not.  I live for your questions.

25            MR. BONEY:  Thank you very much.  I know you do.  I

*OFFICIAL TRANSCRIPT*

720

3:55 PM 1   know you do.  I understand.  I didn't get that sense from the
3:56 PM 2   Court.
3:56 PM 3               But, Your Honor, I just want to make sure that
3:56 PM 4   we understand and get clarification on the exhibits that are
3:56 PM 5   connected to this deposition testimony.  So there were four --
3:56 PM 6   other than the two emails, there were four exhibits that were
3:56 PM 7   product monographs.
3:56 PM 8               "Product monograph" is the Canadian term for the
3:56 PM 9   label.  In the United States, the label is called the "US
3:56 PM 10  package insert."  In Europe, the label is called the "summary
3:56 PM 11  of product characteristics."  In Canada, the label is called
3:56 PM 12  the "product monograph."
3:56 PM 13              So there are four product monographs that are
3:56 PM 14  included in that deposition clip.  Two of them are drafts,
3:56 PM 15  Exhibit 61 and 65, and two of them are finals, Exhibit 62 and
3:56 PM 16  66.  That's the final product monograph that accompanies
3:56 PM 17  Xarelto and was approved by Health Canada.  The concern that we
3:56 PM 18  had, Your Honor, just the clarification we need is if the
3:57 PM 19  Court's ruling is that foreign labels are irrelevant, that
3:57 PM 20  those documents, the labels themselves, not be admitted.  I
3:57 PM 21  understand that the Court's position is that the testimony can
3:57 PM 22  be shown, but it's the question of the exhibits and being
3:57 PM 23  admitted into evidence.
3:57 PM 24              **THE COURT:**  That's a good point, Lindsey.  I
3:57 PM 25  appreciate you bringing it to my attention.

3:57PM   1        Yeah, we've got to deal with this.  I don't want

3:57PM   2   to give the label, whatever it's called, whatever term is

3:57PM   3   appropriate for a label, whether it's in Canada or the United

3:57PM   4   States or any other place, I don't think the label ought to be

3:57PM   5   introduced.  I think maybe sections of it or portions that were

3:57PM   6   standard or something of that sort might be appropriate.  But a

3:57PM   7   label, I don't know that the label will be introduced.

3:57PM   8        MR. MEUNIER:  Judge, I'm sure we can only introduce

3:57PM   9   it as an exhibit after the deposition, something that does not

3:58PM  10   identify it as a --

3:58PM  11        THE COURT:  Yeah.  And, again, I think the label

3:58PM  12   is -- as I say, the fact that it appears on the label is not

3:58PM  13   the concern that I think is admissible.  I think it's what the

3:58PM  14   defendant has said and what is given as truth.

3:58PM  15        So I agree with the defendant.  I don't want the

3:58PM  16   label in.  So let's excerpt that.

3:58PM  17        Take a look at it first, Lindsey, when they give

3:58PM  18   it to you.  If you have a problem, you can bring it to me.

3:58PM  19        MR. BONEY:  We will, Your Honor.  And it may be that

3:58PM  20   we end up with a situation like *wharf*, the rule of completeness

3:58PM  21   to include other portions, but we'll talk to the plaintiffs and

3:58PM  22   figure it out.

3:58PM  23        THE COURT:  Okay.

3:58PM  24        MR. BONEY:  Thank you.

3:58PM  25        MR. MEUNIER:  Your Honor, are we going to be

722

| | | |
|---|---|---|
| 3:58PM | 1 | permitted to say anything in advance of -- |
| 3:58PM | 2 | THE COURT:  No.  Yeah, I will.  I'm not going to have |
| 3:58PM | 3 | anybody say anything.  I'll tell them about this case. |
| 3:58PM | 4 | MR. BONEY:  Thank you, Your Honor. |
| 3:58PM | 5 | THE COURT:  Look, also I think we have to stop |
| 3:58PM | 6 | with -- this is -- I'm a guest here, so their rules are my |
| 3:59PM | 7 | rules, and so we stop at five.  And with this deposition, we'll |
| 3:59PM | 8 | tell the jury that it's going to be a long deposition.  We have |
| 3:59PM | 9 | to stop.  We have to take a break every hour or every 45 |
| 3:59PM | 10 | minutes or something for stretching or whatever, some exercise. |
| 3:59PM | 11 | MR. BONEY:  Thank you, Judge. |
| 3:59PM | 12 | MS. PRUITT:  Judge, can I just request that -- |
| 3:59PM | 13 | THE COURT:  Of course. |
| 3:59PM | 14 | MS. PRUITT:  -- when do you read your statement -- |
| 3:59PM | 15 | THE COURT:  Yes. |
| 3:59PM | 16 | MS. PRUITT:  -- that we make sure the jury |
| 3:59PM | 17 | understands, because there's not -- the witness is only |
| 3:59PM | 18 | speaking Dutch, and so -- |
| 3:59PM | 19 | THE COURT:  Yeah.  I'm going to use primarily yours. |
| 3:59PM | 20 | It says what it is. |
| 3:59PM | 21 | MS. PRUITT:  Thank you, Judge. |
| 3:59PM | 22 | THE COURT:  He's speaking Dutch, so I'll say that.  I |
| 3:59PM | 23 | have some additions and things to it, but let's bring them in. |
| 3:59PM | 24 | THE DEPUTY:  Yes, sir. |
| 4:00PM | 25 | MS. PRUITT:  Judge Fallon, I'm so sorry.  I'm being |

4:00PM  1   told by some of these people that -- can somebody please tell

4:00PM  2   him, explain the issue?

4:00PM  3              MR. LAPLANTE:  Your Honor, there's just one minor

4:00PM  4   issue.  It's that the portion of the translation was removed to

4:00PM  5   save time for the jury and for the Court, and we think it's

4:00PM  6   important that they know and understand that the witness didn't

4:00PM  7   just hear the question in English and then respond in Dutch,

4:00PM  8   but, rather, it was translated to Dutch and that portion was

4:00PM  9   removed.

4:00PM 10              THE COURT:  Sure.  Okay.

4:00PM 11              MR. LAPLANTE:  Thank you.

4:00PM 12              MR. BIRCHFIELD:  Judge, I'm being told that there's

4:00PM 13   an audio problem.

4:00PM 14              THE COURT:  I'm sorry?

4:00PM 15              MR. BIRCHFIELD:  There's an audio problem in the

4:00PM 16   courtroom and -- that they're working on right now.

4:00PM 17              THE COURT:  Okay.  We're going to have to hold the

4:00PM 18   jury then.  Let's get that taken care of.  Let me know when

4:00PM 19   it's ready.

4:00PM 20              Audio problem.  Do we have the people up here?

4:00PM 21              THE DEPUTY CLERK:  Not at the moment.

4:00PM 22              THE COURT:  Are you okay now?

4:01PM 23              MR. BIRCHFIELD:  I think we're closer.

4:01PM 24              THE COURT:  All right.

4:01PM 25                        (Pause.)

4:01PM   1          **MR. BIRCHFIELD:**  We're just going to try not to touch

4:01PM   2   the table, Your Honor.

4:01PM   3          **THE COURT:**  Are we ready?

4:01PM   4          **MR. BIRCHFIELD:**  I think so.  There's a short, so if

4:01PM   5   we bump the table -- we're just going to try not to touch it.

4:01PM   6          **THE COURT:**  Okay.  The question is are we ready?

4:01PM   7          **MR. BIRCHFIELD:**  Yes, sir.  I'm sorry.  Yes, we're

4:01PM   8   ready.

4:02PM   9          **THE DEPUTY CLERK:**  All rise.

4:02PM  10          (whereupon the jury entered the courtroom.)

4:02PM  11          **THE COURT:**  Okay.  Be seated, please.  Sorry to keep

4:02PM  12   you waiting, members of the jury.  I had to deal with some

4:02PM  13   evidentiary problems.  It wasn't anything to do with you.  We

4:02PM  14   also had some complications with the recording.

4:02PM  15          But let me say a word about this deposition.

4:02PM  16   You will now hear the deposition of Anthonie Lensing.  The

4:02PM  17   plaintiffs will present the deposition testimony of

4:02PM  18   Dr. Anthonie "Ton" Lensing.

4:02PM  19          Dr. Lensing is a global clinical leader for

4:02PM  20   Xarelto and for VTE treatment indication and has held this

4:03PM  21   position since 2004.  He was the primary individual at Bayer --

4:03PM  22   sometimes called Bayer -- responsible for running the clinical

4:03PM  23   development program for Xarelto for this indication.

4:03PM  24          Dr. Lensing lives and works in the Netherlands,

4:03PM  25   and he testified in Dutch.  Anybody speak Dutch here?  All

4:03PM   1    right.  In any event, we have interpreted it for you from

4:03PM   2    Dutch.  It's translated into English.

4:03PM   3             Now, there's some -- when the question is asked,

4:03PM   4    it has to be translated into Dutch to him, and he has to

4:03PM   5    respond in Dutch, and that has to be translated into English.

4:03PM   6    I think we've worked that problem out, but that was one thing

4:03PM   7    that had to be done.

4:03PM   8             The deposition starts with questioning by an

4:03PM   9    attorney from Ms. Mingo, followed by questions by an attorney

4:04PM  10    from the defendants, and concluded with follow-up questions by

4:04PM  11    Dr. Mingo's (verbatim) attorney.  He'll testify about the

4:04PM  12    design and structure of the clinical studies and trials, early

4:04PM  13    dose studies, among other things.

4:04PM  14             This is a long deposition, folks.  It's

4:04PM  15    approximately four hours.  We're going to stop today at 5:00.

4:04PM  16    We'll start again tomorrow, but every 45 minutes or so, we'll

4:04PM  17    stop.  I'd like to say we can run around the block, but we

4:04PM  18    can't do that.  We'll stop and take a rest and come back.

4:04PM  19             I know it will be hard on you.  They always are,

4:04PM  20    and courts are concerned about that because all of us want to

4:04PM  21    make life as easy for you as possible.  You've been kind enough

4:04PM  22    to be on time and you've been attentive, and all of us

4:04PM  23    appreciate that.  So we do everything we can to make life easy

4:05PM  24    for you.

4:05PM  25             Please listen closely and, if you feel it

726

| | | |
|---|---|---|
| 4:05PM | 1 | appropriate and necessary, take notes.  Sometimes this may help |
| 4:05PM | 2 | you remain focused on a particular issue. |
| 4:05PM | 3 | So we'll do our best to get it to you and we'll |
| 4:05PM | 4 | do our best to take into consideration if you need some breaks, |
| 4:05PM | 5 | but kind of bear with us a bit. |
| 4:05PM | 6 | You can start it now. |
| 4:05PM | 7 | *(WHEREUPON, the video clip was played as follows:)* |
| 4:05PM | 8 | **ANTHONIE LENSING, M.D.,** |
| 4:05PM | 9 | a witness called on behalf of the Plaintiff, being first duly |
| 4:05PM | 10 | sworn, was examined and testified as follows: |
| 4:05PM | 11 | **DIRECT EXAMINATION** |
| 4:05PM | 12 | **BY MR. OVERHOLTZ:** |
| 4:05PM | 13 | Q.   Good morning, Dr. Lensing.  My name is Neil Overholtz, and |
| 4:05PM | 14 | I'll be asking you some questions today.  Okay? |
| 4:05PM | 15 | A.   Okay. |
| 4:05PM | 16 | Q.   Can you please state your full name for the record? |
| 4:05PM | 17 | A.   My complete name is Anthonie Wilhelmus Arnold Lensing. |
| 4:05PM | 18 | Q.   And, Dr. Lensing, who do you work for? |
| 4:05PM | 19 | A.   I work for Bayer. |
| 4:06PM | 20 | Q.   And do you work for Bayer here in the Netherlands? |
| 4:06PM | 21 | A.   Yes. |
| 4:06PM | 22 | Q.   How long have you worked for Bayer? |
| 4:06PM | 23 | A.   Since 2004. |
| 4:06PM | 24 | Q.   Can you tell me what your current position is at Bayer? |
| 4:06PM | 25 | A.   My current position is global clinical leader related to |

| | |
|---|---|
| 4:06PM | 1 |

rivaroxaban.

**Q.**   Okay.  And when you say "rivaroxaban," is that the drug sold in the United States under the brand name Xarelto?

**A.**   That is correct.

**Q.**   So at some point in 2004, you did become the global clinical leader for Xarelto or rivaroxaban; right?

**A.**   That is correct.

**Q.**   So it was your understanding when you took the position that the indication that you would have responsibility for would be for VTE treatment; is that right?

**A.**   It was completely clear to me.

**Q.**   Okay.  And when we say "VTE treatment," VTE is venous thromboembolism?

**A.**   That is correct.

**Q.**   And is VTE another way of describing a blood clot, a type of blood clot?

**A.**   That is quite correct.  It is like a cow is an animal, but an animal is not always a cow.

**Q.**   And the type of blood clot that was referred to in the VTE treatment, those were either DVTs or pulmonary embolisms; is that correct?

**A.**   Yeah, that is correct.

**Q.**   And when we say "DVT," that stands for deep vein thrombosis; is that correct?

**A.**   Yeah, that is correct.

728

**Q.** Okay. And is that a type of blood clot that forms in the legs?

**A.** Yes, it is a blood clot that is formed in the deep veins of the leg.

**Q.** Okay. Did you have an understanding that Bayer was also developing Xarelto for other indications at the time that you were coming into the company?

**A.** Yes, I did know that.

**Q.** And if we can look at what we'll mark as Exhibit 10, which is demonstrative related to the VTE treatment indication, this indicates that this was the VTE treatment indication. This was the treatment you worked on; right?

**A.** That's correct.

**Q.** So if I refer to it as the EINSTEIN indication, you'll know I'm talking about the VTE treatment indication; right?

**A.** Yes.

**Q.** Okay. So we talked about there being two dose-finding studies. The first dose-finding study for the VTE treatment was the ODIXa-DVT or the 11223 study; right?

**A.** That's correct.

**Q.** Okay. And so that ODIXa Phase II study looked at three twice-daily doses, 10, 20, and 30 milligrams; correct?

**A.** That's correct.

**Q.** And then it also looked at one 40-milligram once-daily dose; right?

729

| | | |
|---|---|---|
| 4:09PM | 1 | **A.**   That's also correct. |
| 4:09PM | 2 | **Q.**   Okay.  Now, the second Phase II study was called the |
| 4:09PM | 3 | EINSTEIN-DVT study; correct? |
| 4:09PM | 4 | **A.**   That's correct. |
| 4:09PM | 5 | **Q.**   Okay.  And it looked at three once-daily doses:  20, 30, |
| 4:09PM | 6 | and 40; right? |
| 4:09PM | 7 | **A.**   That's correct.  But I would also like to remark that for |
| 4:09PM | 8 | both studies, there was also a control group. |
| 4:10PM | 9 | **Q.**   As far as the initial treatment, it was with enoxaparin; |
| 4:10PM | 10 | is that right?  Followed by vitamin K. |
| 4:10PM | 11 | **A.**   Yes for the standard of care group, but not for the |
| 4:10PM | 12 | rivaroxaban group. |
| 4:10PM | 13 | **Q.**   The ODIXa-DVT dose-finding study, that was under way when |
| 4:10PM | 14 | you started with the company; is that right? |
| 4:10PM | 15 | **A.**   Yes, that's correct. |
| 4:10PM | 16 | **Q.**   And at some point a decision was made to do a second |
| 4:10PM | 17 | dose-finding study, the EINSTEIN-DVT study; correct? |
| 4:10PM | 18 | **A.**   That's correct. |
| 4:10PM | 19 | **Q.**   And you personally participated in the design and conduct |
| 4:10PM | 20 | of the EINSTEIN-DVT Phase II study; right? |
| 4:10PM | 21 | **A.**   Yes, that's correct. |
| 4:10PM | 22 | **Q.**   And that decision to pursue the EINSTEIN-DVT dose-finding |
| 4:10PM | 23 | study, was that decision made to determine if the primary |
| 4:10PM | 24 | treatment for the study could be a once-daily dosing regimen? |
| 4:11PM | 25 | **A.**   That was one part of this study, but also to see what kind |

| | |
|---|---|
| 4:11PM | 1 |
| 4:11PM | 2 |
| 4:11PM | 3 |
| 4:11PM | 4 |
| 4:11PM | 5 |
| 4:11PM | 6 |
| 4:11PM | 7 |
| 4:11PM | 8 |
| 4:11PM | 9 |
| 4:11PM | 10 |
| 4:11PM | 11 |
| 4:11PM | 12 |
| 4:12PM | 13 |
| 4:12PM | 14 |
| 4:12PM | 15 |
| 4:12PM | 16 |
| 4:12PM | 17 |
| 4:12PM | 18 |
| 4:12PM | 19 |
| 4:12PM | 20 |
| 4:12PM | 21 |
| 4:12PM | 22 |
| 4:12PM | 23 |
| 4:12PM | 24 |
| 4:12PM | 25 |

of dosage would be the safest and most effective one.

Q.   Now, if we can look back at the abstract part of the
article, which you're coauthor on, Exhibit 14, in the middle
column, you see it describes that main safety outcome, in the
middle column that we just talked about.

A.   Uh-huh.

Q.   Now, if we keep going, we see it says, "The primary
efficacy outcome occurred in 6.1, 5.4, and 6.6 percent of the
rivaroxaban 20-, 30-, and 40-milligram treatment groups."
Right?

A.   That is correct.

Q.   The -- I think I've seen this described as a flat-dose
response for the efficacy outcome; is that right?

A.   That seems to be the only possible conclusion.

Q.   Okay.  The efficacy outcome didn't improve with higher
doses.  Is that what that means?

A.   There was, indeed, the impression that that did not
happen.

Q.   All right.  Now, is it fair to say that when it came to
making this initial treatment dose decision for Xarelto, one of
the decisions that had to be made is whether the initial
treatment would be the use of a low-molecular-weight heparin or
Xarelto for that initial period?

A.   Correct.

Q.   And as we talked about, the low-molecular-weight heparin

4:12PM 1    treatment was an accepted standard of care for this indication;
4:13PM 2    right?
4:13PM 3    A.   It's correct.
4:13PM 4    Q.   Now, is it fair to say that there was a good amount of
4:13PM 5    debate regarding that decision headed into Phase III?
4:13PM 6    A.   For over 40 years, patients with thrombosis had been
4:13PM 7    treated by that dual combination of heparin and VKA.  So the
4:13PM 8    switch from that dual therapy to only Xarelto was a huge
4:13PM 9    matter; and, therefore, yes, indeed, there was quite a bit of
4:13PM 10   discussion.
4:13PM 11   Q.   Okay.  So there's been 40 years of this treatment being
4:13PM 12   used?
4:14PM 13   A.   Yeah.  Warfarin was discovered a long time ago in
4:14PM 14   Wisconsin.  And after it was found that cows died, it was -- we
4:14PM 15   started -- it was started to be used in thrombosis in
4:14PM 16   combination with the -- with heparin.
4:14PM 17   Q.   So if Xarelto was going to be used as this initial
4:14PM 18   treatment drug, a decision also had to be made as to whether it
4:14PM 19   would be given b.i.d., or that's twice daily, or o.d., which is
4:15PM 20   one times daily; right?
4:15PM 21   A.   Yes.
4:15PM 22   Q.   And then -- now, eventually, a decision was made that the
4:15PM 23   initial treatment dose, if it was going to be Xarelto, would be
4:15PM 24   a twice-daily dosing regimen; is that right?
4:15PM 25   A.   Yes.

| | |
|---|---|
| 4:15 PM | 1 |
| 4:15 PM | 2 |
| 4:15 PM | 3 |
| 4:15 PM | 4 |
| 4:15 PM | 5 |
| 4:15 PM | 6 |
| 4:15 PM | 7 |
| 4:15 PM | 8 |
| 4:15 PM | 9 |
| 4:15 PM | 10 |
| 4:16 PM | 11 |
| 4:16 PM | 12 |
| 4:16 PM | 13 |
| 4:16 PM | 14 |
| 4:16 PM | 15 |
| 4:16 PM | 16 |
| 4:16 PM | 17 |
| 4:16 PM | 18 |
| 4:17 PM | 19 |
| 4:17 PM | 20 |
| 4:17 PM | 21 |
| 4:17 PM | 22 |
| 4:17 PM | 23 |
| 4:17 PM | 24 |
| 4:17 PM | 25 |

Q.   And one of the doses that was considered to be used as the initial treatment period going into Phase III was the 10-milligram b.i.d. dose that had been tested in the ODIXa dose-finding study; correct?

A.   Yes, that is correct.

Q.   Let's be clear.  You've indicated to me that marketing did not have input into the decision?

A.   No.

Q.   Was the decision discussed with regulatory agencies like the FDA?

A.   The choice of the 15 milligrams twice daily for 21 days followed by the 20 milligrams once daily was discussed with the FDA.  When we were going to -- when we were trying to get their approval of the study designs, the protocol was also discussed.

Q.   And you mentioned that, eventually, the dose -- the choice was made to go with 15 milligrams b.i.d. for 21 days; correct?

A.   Yes, that is correct.

Q.   So we've been talking a little bit about the end of Phase II decisions that have to be made, and we've gone over the fact that the decision had to be made of the initial treatment dose; right?

A.   That's correct.

Q.   Okay.  And then the decision for that was whether or not it was going to be the standard of care, low-molecular-weight heparin or Xarelto and then whether Xarelto would be twice

| | |
|---|---|
| 4:17PM | 1 |

4:17PM 1  daily or once daily and then what that dosing would be; right?

4:17PM 2  A.   Yes, that's correct.

4:17PM 3  Q.   Okay.  And the other decision we talked about was you have

4:17PM 4  to make the decision for the continued treatment dose, and

4:17PM 5  that's the dose that would be given after the initial treatment

4:17PM 6  period; right?

4:17PM 7  A.   Yes, that's correct.

4:17PM 8  Q.   Okay.  And, eventually, the dose that was decided upon was

4:17PM 9  the 20 -- 20 milligrams o.d. dose for this continued treatment

4:17PM 10  period; right?

4:17PM 11  A.   Yes, that's correct.

4:17PM 12  Q.   Okay.  And that was the same dose that was chosen for the

4:18PM 13  majority of the patients in the ROCKET-AF trial?

4:18PM 14  A.   Yeah.  Yes, 20 milligrams was indeed the dose selected for

4:18PM 15  treating patients to prevent stroke in AT fibrillation.

4:18PM 16  Q.   Now, there had to be a decision made for VTE treatment as

4:18PM 17  to whether there would be a similar dose adaptation for renal

4:18PM 18  patients; is that right?

4:18PM 19  A.   That's correct.

4:18PM 20  Q.   And eventually a decision was made to not have dose

4:18PM 21  adaptation for renal patients in the EINSTEIN trial; right?

4:18PM 22  A.   We did not find -- find any evidence based on which we

4:19PM 23  could decide to apply a reduced dose.

4:19PM 24  Q.   Were renally-impaired patients studied in the Phase II

4:19PM 25  dose-finding studies for VTE treatment?

A.   We did have some thrombosis patients between ages 55 and
60 -- excuse me.  Thrombosis patients tend to be between 55 and
60 years old, and we did have a great many patients with renal
impairment.  So, yes, in Phase II, we did include them.

Q.   So based on the experience observed in those Phase II
studies, you determined that dose adaptation wasn't necessary
in the population that would be studied in the EINSTEIN
Phase III trials; is that right?

A.   The higher exposure of renally-impaired patients that we
saw was not associated with an increase in bleeding, and,
therefore, we did not see cause to -- could you -- the patients
with renal impairment did show an increase of thromboembolism,
thrombosis; and, therefore, we did not decide to reduce the
dosage for patients with thromboembolism from 20 to 15.

Q.   At the end of Phase II, was one of the decisions that had
to be made whether or not the Phase III trial -- trials would
be designed as superiority or noninferiority trials?

A.   I don't think we had to think about that very long,
because the numbers for vitamin K antagonists together with
heparin revealed that the incidence of new thromboses in
combination with warfarin and enoxaparin is so low that a
superiority study would be pointless.

        Okay.  Given that treatment with warfarin is so
complex for patients and warfarin needs to be monitored and the
doses -- the dosage adjusted, that's why treatment with

735

1   rivaroxaban was to be set up as a treatment with -- this was
2   not necessary with rivaroxaban, and that made such a huge
3   difference for patients, that that's why a noninferiority
4   approach in the study was chosen.
5   **Q.**   You agree that there was a choice to be made as to whether
6   or not the Phase III trials would be conducted as superiority
7   or noninferiority trials; right?
8   **A.**   From the outset, the Phase III study was set up as a
9   noninferiority study, and I never heard anybody speak of that,
10  of primary superiority objective.
11  **Q.**   So the noninferiority determination was made from the
12  outset?
13  **A.**   As set forth in the protocol, it's always been a
14  noninferiority study.
15  **Q.**   And when it comes to the area of drug development, getting
16  to the decision to enter into Phase III is a very important
17  milestone for the company.  Do you agree?
18  **A.**   Yes.  In the development of a drug, that's a very
19  important milestone.
20  **Q.**   You agree that moving forward in Phase III as soon as
21  possible in the drug's development allows the company to
22  maximize the value of the drug asset; correct?
23  **A.**   A company needs to have an adequate and careful analysis
24  and not a study which goes too quickly and is not carried out
25  in a careful way.  So I don't agree with what you just said.

| | | |
|---|---|---|
| 4:26PM | 1 | **Q.**   And moving forward -- you agree that moving forward into |
| 4:26PM | 2 | Phase III for an indication for a drug is also beneficial to |
| 4:26PM | 3 | investor relations for a company? |
| 4:26PM | 4 | **A.**   Luckily in my job, I don't have any responsibility for |
| 4:26PM | 5 | these things, and, honestly speaking, I have no idea how these |
| 4:26PM | 6 | things work. |
| 4:26PM | 7 | **Q.**   Thank you.  So, Dr. Lensing, if we can look at the top, |
| 4:27PM | 8 | this is an email from Kemal Malik. |
| 4:27PM | 9 | Do you see that? |
| 4:27PM | 10 | **A.**   Yes. |
| 4:27PM | 11 | **Q.**   And Mr. Malik, he's with Bayer management at the time back |
| 4:27PM | 12 | in 2006? |
| 4:27PM | 13 | **A.**   That's correct. |
| 4:27PM | 14 | **Q.**   And Mr. Malik is now a member of the board of directors |
| 4:27PM | 15 | for the company; is that right? |
| 4:27PM | 16 | **A.**   Yes.  He's a fantastic guy. |
| 4:27PM | 17 | **Q.**   And you can see that he sends this email to several people |
| 4:27PM | 18 | in Bayer HealthCare, including yourself, about halfway down on |
| 4:27PM | 19 | the right side.  Do you see that? |
| 4:27PM | 20 | **A.**   I see that. |
| 4:27PM | 21 | **Q.**   And included in this is Dr. Misselwitz, Dr. Kubitza, |
| 4:27PM | 22 | doctor -- let's see -- Bernhard Glombitza, Martin Homering; |
| 4:27PM | 23 | correct? |
| 4:27PM | 24 | **A.**   Uh-huh. |
| 4:27PM | 25 | **Q.**   Is that right? |

| | | |
|---|---|---|
| 4:27PM | 1 | **A.**   That's correct. |
| 4:28PM | 2 | **Q.**   And I also see an Andreas Nauck.  Are you familiar with |
| 4:28PM | 3 | Andreas? |
| 4:28PM | 4 | **A.**   Yes, I do. |
| 4:28PM | 5 | **Q.**   And what department does Andreas Nauck work in? |
| 4:28PM | 6 | **A.**   I think at the time he worked in the marketing department. |
| 4:28PM | 7 | **Q.**   And the date of this email is May 31st of 2006.  Do you |
| 4:28PM | 8 | see that? |
| 4:28PM | 9 | **A.**   Yes, I see that. |
| 4:28PM | 10 | **Q.**   And it's "Rivaroxaban, Xarelto DP3 Decisions 2006." |
| 4:28PM | 11 | Correct? |
| 4:28PM | 12 | **A.**   That's correct. |
| 4:28PM | 13 | **Q.**   So if we look at the email that -- that Mr. Malik sent you |
| 4:28PM | 14 | and others, he says, "Dear All:  Last week the last of the |
| 4:28PM | 15 | scheduled DP3 decisions was made for rivaroxaban VTE |
| 4:28PM | 16 | treatment." |
| 4:28PM | 17 |         Do you see that? |
| 4:29PM | 18 | **A.**   Yes, I see that. |
| 4:29PM | 19 | **Q.**   Okay.  And the next sentence says, "This means we are now |
| 4:29PM | 20 | ready to initiate the Phase III activities for SPAF and VTE |
| 4:29PM | 21 | treatment on schedule and as previously externally communicated |
| 4:29PM | 22 | in the first half of 2006."  Right? |
| 4:29PM | 23 | **A.**   That's correct. |
| 4:29PM | 24 | **Q.**   Okay.  Mr. Malik says to you that, "This is a truly |
| 4:29PM | 25 | outstanding outcome."  Right? |

738

1   A.   That's what he says, indeed.

2   Q.   Okay.  And he says that, "And each of you should be truly

3   proud of this achievement.  The Phase II program, which was

4   exclusively conducted by Bayer, was the largest Phase II

5   program in our history."

6        Do you see that?

7   A.   Yes, I see that.

8   Q.   Okay.  It says, "As a team, you have steered rivaroxaban

9   forward, adhering to the most challenging timelines, but

10  equally importantly, you have ensured that we have continued to

11  seize all opportunities to maximize the value of this asset."

12  Correct?

13  A.   That's what it says here.

14  Q.   He says next to you in his email in May of 2006, "Over the

15  last few days, I have been on the IR road show in New

16  York/Boston with Wolfgang Plischke and Alexander Rosar."

17       Do you see that?

18  A.   I do see that.

19  Q.   Okay.  And one of Mr. Malik's responsibilities -- when it

20  says "IR road show," one of his responsibilities would have

21  been investor relations; right?

22  A.   I wouldn't have a clue.

23  Q.   The next thing he says, of course, is, "This project has

24  the highest possible visibility amongst our investor

25  community."  Right?

739

| | |
|---|---|
| 4:30PM | 1 |
| 4:31PM | 2 |
| 4:31PM | 3 |
| 4:31PM | 4 |
| 4:31PM | 5 |
| 4:31PM | 6 |
| 4:31PM | 7 |
| 4:31PM | 8 |
| 4:31PM | 9 |
| 4:31PM | 10 |
| 4:31PM | 11 |
| 4:31PM | 12 |
| 4:31PM | 13 |
| 4:31PM | 14 |
| 4:32PM | 15 |
| 4:32PM | 16 |
| 4:32PM | 17 |
| 4:32PM | 18 |
| 4:32PM | 19 |
| 4:32PM | 20 |
| 4:32PM | 21 |
| 4:32PM | 22 |
| 4:32PM | 23 |
| 4:32PM | 24 |
| 4:32PM | 25 |

A.   Yes, that is what it says.

Q.   Okay.  In his next paragraph, Mr. Malik says, "Rivaroxaban truly has the potential to be transformational for our company, and this is certainly perceived externally."

Do you see that?

A.   That is what it reads.

Q.   And this transformational potential for Xarelto for Bayer was what Mr. Malik communicated to you back in May of 2006 before the beginning of the Phase III program for Xarelto for VTE treatment; correct?

A.   Yes, the timelines do seem to indicate this.

Q.   So if we could look first at Exhibit 19, it's an email from Dr. Misselwitz to you copying a Marc van Unen and a Martina Evertz on June 21st, 2006, with the subject "EINSTEIN SMCC/ExCie meeting at ESC in Barcelona."

Do you see that?

A.   I do see that.

Q.   So the EINSTEIN ExCie meeting referred to the executive committee meeting?

A.   This was a combined meeting of the executive committee for the EINSTEIN and also the representatives of the countries.

Q.   And so Dr. Misselwitz emails you and says, "Hi, Ton:  Hope you are doing well."

Do you see that?

A.   Yes.

4:32PM  1   **Q.**   He next says, "Congratulations for fighting through all

4:32PM  2   the difficult decisions around the VTE treatment package

4:32PM  3   submission."  Correct?

4:33PM  4   **A.**   Yes, that is what it says.

4:33PM  5   **Q.**   So Dr. Lensing, we're looking at Exhibit 21, which is a --

4:33PM  6   described on the first page here as Version 9 -- Draft

4:33PM  7   Version 9 of June 9, 2006 of the 11702 study, the VTE treatment

4:33PM  8   study for DVT and PE patients; correct?

4:33PM  9   **A.**   It's correct.

4:33PM  10  **Q.**   Okay.  And then you're listed as the Bayer HealthCare AG

4:33PM  11  party there; right?  Dr. Anthonie W.A. Lensing; right?

4:33PM  12  **A.**   That's correct.

4:33PM  13  **Q.**   Okay.  And so if we look at this, as of June 9th of 2006,

4:33PM  14  the protocol called for the initial three-week treatment period

4:33PM  15  to be 10 milligrams b.i.d.; is that right?

4:34PM  16  **A.**   Yes.  In this proposal, as for June, indeed, the protocol

4:34PM  17  says 10 milligrams.

4:34PM  18  **Q.**   Okay.  And this choice of 10 milligrams b.i.d. as

4:34PM  19  represented in this protocol dated June 9th of 2006, that was

4:34PM  20  nine days after Kemal Malik, in Exhibit 18 that we looked at

4:34PM  21  before, had said that the last of the scheduled DP3 decisions

4:34PM  22  for rivaroxaban VTE treatment had been made; correct?

4:35PM  23  **A.**   Yes, whatever DP3 may mean.  The date was 31 May, and here

4:35PM  24  we are in the first week of June, indeed.

4:35PM  25  **Q.**   So sometime between Mr. Malik saying that the company was

4:35PM   1   now ready to make these initial Phase III activities after the

4:35PM   2   last of the scheduled DP3 decisions were made, the study was

4:35PM   3   split into two separate arms, and the 10-milligram initial

4:35PM   4   treatment dose was switched from 10 milligrams b.i.d. to

4:35PM   5   15 milligrams b.i.d. for the first three weeks; correct?

4:35PM   6   A.   That's what the time schedule shows, but there's no

4:35PM   7   relation to any DP3 decision; otherwise, it would not have

4:35PM   8   happened.

4:35PM   9   Q.   Dr. Lensing, let me try to show you something here on the

4:35PM   10   screen.

4:35PM   11         You mentioned a flat-dose response curve for

4:36PM   12   efficacy; right?

4:36PM   13   A.   Yes, that's correct.

4:36PM   14   Q.   Okay.  So if I draw a graph here, all right?  And if this

4:36PM   15   is dose across the bottom of the graph, and this is the number

4:36PM   16   of blood clots, okay?  The problem with Xarelto is that as the

4:36PM   17   dose goes up, the number of blood clots you prevent stays the

4:36PM   18   same, but the number of bleeds just gets higher and higher;

4:36PM   19   right?  That's what's wrong with Xarelto as an anticoagulant;

4:36PM   20   right?

4:37PM   21   A.   I think you're seeing that entirely wrong.

4:37PM   22   Q.   So if we had the number of blood clots and bleeds on the

4:37PM   23   left, and as the dose of Xarelto goes up, as Bayer studied it,

4:37PM   24   what they saw was as clots stay the same, even with higher

4:37PM   25   doses, no increased efficacy, you just get more bleeds.  That's

742

| | | |
|---|---|---|
| 4:37PM | 1 | what's wrong with Xarelto; right? |
| 4:37PM | 2 | **A.**   I disagree with you, because this reveals something |
| 4:37PM | 3 | entirely different.   This shows that Xarelto is -- has a very |
| 4:38PM | 4 | broad therapeutic window where a low dosage is effective in |
| 4:38PM | 5 | preventing blood clots and bleeds only occur when the dose |
| 4:38PM | 6 | rises. |
| 4:38PM | 7 | **Q.**   Let me ask a couple of follow-up questions to this. |
| 4:38PM | 8 | So here I've graphed on this exhibit as dose |
| 4:38PM | 9 | increases.   You understand that; right? |
| 4:38PM | 10 | **A.**   I understand that. |
| 4:38PM | 11 | **Q.**   Okay.   What if, as opposed to dose, we did exposure?   You |
| 4:38PM | 12 | know what I mean by exposure; right? |
| 4:38PM | 13 | **A.**   Yes, I know what the word "exposure" means. |
| 4:38PM | 14 | **Q.**   We're talking about plasma concentrations; is that fair? |
| 4:39PM | 15 | **A.**   Yes, it's true that exposure means plasma concentration. |
| 4:39PM | 16 | **Q.**   In the VTE treatment studies, as exposure increased, did |
| 4:39PM | 17 | bleeds also increase? |
| 4:39PM | 18 | **A.**   In the EINSTEIN-DVT and PE studies, we tested extensively |
| 4:39PM | 19 | with the prothrombin time, and we determined that there was no |
| 4:40PM | 20 | relationship between extended increasing prothrombin time and |
| 4:40PM | 21 | an increase in bleeds. |
| 4:40PM | 22 | **Q.**   That's because you did the wrong type of analysis; right? |
| 4:40PM | 23 | **A.**   I don't know who told you that, but that's not true. |
| 4:40PM | 24 | **Q.**   You don't find that when you break up prothrombin time by |
| 4:40PM | 25 | quartiles and look at bleeding risk; right? |

1   **A.**   It's true that if you divide it into quartiles, there's no

2   relationship at all between the prothrombin time and the

3   occurrence of major bleeds, but that's not the only thing.

4           If you look at the extreme, so the patients with the

5   lowest increase versus the patients with the highest increase,

6   even there we found no relationship at all between the

7   prothrombin time and major bleeds.

8   **Q.**   And in those dose-finding studies, ODIXa-DVT,

9   EINSTEIN-DVT, was a flat efficacy dose curve also seen?

10  **A.**   Yes, the broad therapeutic window was confirmed in both

11  studies.

12  **Q.**   And by "broad therapeutic window," you mean that a lower

13  dose works just as well as a higher dose; right?

14  **A.**   Yes, that's what I mean.

15  **Q.**   I'm going to mark this as Exhibit 23.

16          Dr. Lensing, let me have you take a look at the --

17  page 3 of Exhibit 22.  And if you look with me at the top,

18  we're still talking about this July 17th, 2004, meeting in

19  Amsterdam; right?

20  **A.**   That is correct.

21  **Q.**   It says, "The planning group participants suggested to

22  simplify PK/PD sampling and to stop sampling when a sufficient

23  number of patients have been included."

24          Do you see that?

25  **A.**   I do see that.

*OFFICIAL TRANSCRIPT*

4:42 PM   1   **Q.**   These were all things that the planning group was

4:42 PM   2   suggesting to try to speed up the study because you have to

4:42 PM   3   beat the competition; right?

4:43 PM   4   **A.**   Yes.  You add that actually, that beating the competition,

4:43 PM   5   because what it actually says is that simplifying the protocol

4:43 PM   6   could lead to more a successful study which would be to the

4:43 PM   7   benefit.

4:43 PM   8   **Q.**   It's easier to recruit more people into the study if you

4:43 PM   9   simplify it?

4:43 PM   10   **A.**   If a study is extremely complicated, it would benefit from

4:43 PM   11   a simplification.

4:43 PM   12   **Q.**   Okay.  It next says, "It was felt that the present

4:43 PM   13   dose-finding study would not provide sufficient data for a

4:44 PM   14   Phase III study with an o.d. dosage since only one o.d. dosage

4:44 PM   15   is evaluated, and there will be limited data on clinical

4:44 PM   16   efficacy."  Right?

4:44 PM   17   **A.**   Well, I understand from this sentence that it reads that

4:44 PM   18   there's only the one o.d. dosage and then it is not possible to

4:44 PM   19   get a good insight into the regimens for the treatment of DVT.

4:44 PM   20   **Q.**   So Bayer wants to conduct a Phase III study with an o.d.,

4:44 PM   21   once-daily dose; right?

4:45 PM   22   **A.**   Bayer did a study with a b.i.d. regimen, but also one with

4:45 PM   23   an o.d. regimen, which is usual in clinical studies, and the

4:45 PM   24   results of these will show you what the best regimen will be.

4:45 PM   25   **Q.**   At this point in time there was a desire to be able to

4:45PM 1    study an o.d. dose, a once-daily dose, in the Phase III trials;

4:45PM 2    right?

4:45PM 3    A.    I do not know who wanted -- who had this wish, but the

4:46PM 4    independent advisers that were involved in this suggested to do

4:46PM 5    a b.i.d. and an o.d. and then to make a choice depending on the

4:46PM 6    outcomes, the scientific data outcome.

4:46PM 7    Q.    Whatever dose you study in Phase III, if it meets your

4:46PM 8    outcome end points that you want to meet, that's going to

4:46PM 9    become the dose that you can sell in the marketplace; right?

4:46PM 10   A.    Usually the dosage that is evaluated in the Phase III is

4:46PM 11   also the dosage, if approved by the health authorities, that

4:46PM 12   will be given to patients for treatment.

4:46PM 13   Q.    So the next part of this discussion at this 2004 Amsterdam

4:47PM 14   meeting is titled "Strategy for Accelerated Development."

4:47PM 15         Do you see that?

4:47PM 16   A.    Yes, I see that.  That is what is written there.

4:47PM 17   Q.    All right.  And it says, "To obtain sufficient data for

4:47PM 18   dose selection by May 2005, two options are available:  To

4:47PM 19   amend the present study or to perform an additional

4:47PM 20   dose-finding study.  The following five scenarios were

4:47PM 21   discussed."  And then there's a table down below.

4:47PM 22         Do you see that?

4:47PM 23   A.    Right.  I can see that table with those five scenarios,

4:47PM 24   and, indeed, I can see what you just read out is indeed what is

4:48PM 25   written here.  But I'd like to comment and say to you that the

4:48PM  1  person who drafted these minutes did not know what he or she

4:48PM  2  was talking about.

4:48PM  3  Q.   You were at this meeting; right?

4:48PM  4  A.   Yes, I was present.  I did attend this meeting.

4:48PM  5  Q.   It simply wasn't feasible to do another dose-finding study

4:48PM  6  for a once-daily dose in a year?

4:48PM  7  A.   If the idea for this crops up in July 2004, I do not think

4:48PM  8  that it is possible to have this done within 12 months.

4:48PM  9  Q.   And as we saw, the eventual dose selection decisions for

4:48PM  10 Phase III occurred in the spring and summer of 2006; right?

4:49PM  11 A.   The final decision regarding the dosage of the riva --

4:49PM  12 excuse me -- the rivaroxaban for Phase III was made during a

4:49PM  13 meeting of the independent expert group, the Steering

4:49PM  14 Committee, and the SMCC during a gathering of the European

4:49PM  15 Society of Cardiology in Barcelona, of which I already saw an

4:49PM  16 email earlier on.  And to the best of my knowledge, that was in

4:50PM  17 August or September of that year.

4:50PM  18 Q.   And so even if Bayer in the summer of 2004 had a goal of

4:50PM  19 making Phase III dose decisions by May or June of 2005, the

4:50PM  20 o.d. dose taking into Phase III was so important, they were

4:50PM  21 willing to postpone those dose decisions; right?

4:51PM  22 A.   No, that is not correct, of course, and I talked to you

4:51PM  23 about this earlier.  Bayer decided to have a b.i.d. and an o.d.

4:51PM  24 study, and this was not because Bayer thought that the o.d. was

4:51PM  25 the path forward.  It is because responsible clinical research

| | | |
|---|---|---|
| 4:51 PM | 1 | must be done, and you must do it responsibly.  You must make |
| 4:51 PM | 2 | sure that you get good evaluations.  Good clinical trials need |
| 4:51 PM | 3 | time to achieve the relevant data with which you treat the |
| 4:51 PM | 4 | patient in the best way possible. |
| 4:51 PM | 5 | Q.   And the main driving reason, alternatives for an |
| 4:51 PM | 6 | additional dose-finding study and VTE treatment, was to obtain |
| 4:51 PM | 7 | more once-daily data so that a once-daily dose could be studied |
| 4:52 PM | 8 | in Phase III; correct? |
| 4:52 PM | 9 | A.   No, that is not correct, and I have said that to you |
| 4:52 PM | 10 | before.  The decision regarding the o.d. regimen evaluation was |
| 4:52 PM | 11 | based on the fact that we wanted to provide the safest and most |
| 4:52 PM | 12 | effective treatment for people with a thrombosis leg or with |
| 4:52 PM | 13 | pulmonary embolism. |
| 4:52 PM | 14 | Q.   All of the alternatives in that chart involve further |
| 4:52 PM | 15 | study of once-daily dosing; right? |
| 4:53 PM | 16 | A.   Yes, that is correct.  Mainly because in the ODIXa-DVT |
| 4:53 PM | 17 | study there was -- that was a study into b.i.d., so there was a |
| 4:53 PM | 18 | need to get further information regarding once-daily dosage. |
| 4:53 PM | 19 | Q.   At some point the company began receiving the results of |
| 4:53 PM | 20 | the ODIXa-DVT dose-finding study.  Those happened before the |
| 4:53 PM | 21 | EINSTEIN-DVT study results; right? |
| 4:53 PM | 22 | A.   Indeed, the ODIXa-DVT study finished before the |
| 4:53 PM | 23 | EINSTEIN-DVT study. |
| 4:53 PM | 24 | Q.   So those results began coming in in early -- late 2005 or |
| 4:53 PM | 25 | early 2006 for ODIXa-DVT? |

*OFFICIAL TRANSCRIPT*

4:54PM 1  **A.**    I believe I remember that that's the case, yes.

4:54PM 2  **Q.**    And do you recall learning that the business people at

4:54PM 3  Bayer believed it was so important that the right decision was

4:54PM 4  made for the Phase III trial for VTE treatment that they should

4:54PM 5  keep the b.i.d. results secret and only within a certain group

4:54PM 6  of people within the company?

4:55PM 7  **A.**    I can tell you that I don't remember that and it never

4:55PM 8  happened, because we -- our data are transparent, and they're

4:55PM 9  shared with the outside world.  They're disclosed at

4:55PM 10 conferences, and they're published.  And they're also posted on

4:55PM 11 clinicaltrial.gov, which entails a reporting obligation.  And,

4:55PM 12 in addition, the independents from the EINSTEIN committee were

4:55PM 13 responsible for the dose and regimen in Phase III, the dose and

4:56PM 14 regimen selection in Phase III.

4:56PM 15 **Q.**    The best dose that creates the best balance between

4:56PM 16 efficacy and safety for an anticoagulant for patients should be

4:56PM 17 the goal.  Do you agree?

4:56PM 18 **A.**    I agree with that.

4:56PM 19 **Q.**    And the patient's safety, whether it's treating a clot and

4:56PM 20 preventing it from deteriorating or preventing a major bleed,

4:56PM 21 that's the most important goal.  Do you agree?

4:56PM 22 **A.**    Yes, I agree with that.

4:56PM 23 **Q.**    And business goals or sales opportunities should not

4:56PM 24 influence the decision of the -- choosing the best dose for

4:56PM 25 patients.  You agree with that?

*OFFICIAL TRANSCRIPT*

4:56PM 1   A.   I agree with that.  That would have been unacceptable to

4:57PM 2 me and for the independent steering group.

4:57PM 3   Q.   And so this document is an email from Bernhard Glombitza

4:57PM 4 in January of 2006.  Do you see that?

4:57PM 5   A.   Yes, I see it.

4:57PM 6   Q.   And you, Anthonie Lensing, were copied; correct?

4:57PM 7   A.   Yes.

4:57PM 8   Q.   And the subject of this email are the "Headline results

4:57PM 9 from b.i.d. VTE treatment trial 11223 available."  Correct?

4:57PM 10   A.   That's correct.

4:57PM 11   Q.   And that's the ODIXa-DVT dose-finding trial?

4:57PM 12   A.   Yes, that's correct.

4:57PM 13   Q.   In the next paragraph, Mr. Glombitza says, "To allow to

4:57PM 14 draw the right conclusions for the further VTE treatment

4:57PM 15 program, we need to consider, beside the full b.i.d. dataset,

4:58PM 16 also the data from the o.d. trial, EINSTEIN 11528, which will

4:58PM 17 become available soon."

4:58PM 18      Do you see that?

4:58PM 19   A.   Yes, that's correct.  That's what it says.

4:58PM 20   Q.   He goes on, "Because of this, we currently keep the

4:58PM 21 communication of the b.i.d. twice-daily headline results within

4:58PM 22 BHC, Limited."

4:58PM 23      Is that correct?

4:58PM 24   A.   Yes, that's what it says.

4:58PM 25   Q.   And BHC refers to Bayer HealthCare?

4:58PM   1    **A.**    That's correct.

4:58PM   2    **Q.**    Okay.  He goes on, "Individuals to share/discuss the

4:58PM   3    headline results of the b.i.d. trial are restricted to

4:58PM   4    Factor Xa members of clinical development and project

4:58PM   5    management."

4:58PM   6              Do you see that?

4:59PM   7    **A.**    Yes, I see that too.

4:59PM   8    **Q.**    And Bernhard Glombitza says, "We would very much

4:59PM   9    appreciate if within J&J a similar communication approach could

4:59PM  10    be followed."  Right?

4:59PM  11    **A.**    Yes, he says that.

4:59PM  12    **Q.**    Bernhard Glombitza was a business person at Bayer?

4:59PM  13    **A.**    As far as I remember, he was involved in project

4:59PM  14    management in 2004 -- excuse me, 2006.

4:59PM  15    **Q.**    Mr. Glombitza has said in this email in January of '06 to

4:59PM  16    J&J that, we want to keep the results of the twice-daily trial

4:59PM  17    limited to who knows about them; right?

4:59PM  18    **A.**    That is what it says here, indeed.

4:59PM  19    **Q.**    Dr. Lensing --

5:00PM  20                        *(VIDEO STOPPED)*

5:00PM  21              **MR. BIRCHFIELD:**  Your Honor, is this a good stopping

5:00PM  22    point?

5:00PM  23              **THE COURT:**  Stop here?  All right.

5:00PM  24              Members of the jury, we'll stop here, and we'll

5:00PM  25    start again at 8:30.  I'll meet with the lawyers at 8:00

5:00PM  1    tomorrow instead of 8:15.

5:00PM  2              All rise as the jury leaves.  Thank you very

5:00PM  3    much.  Do the same thing.  Don't talk to anybody, and leave

5:00PM  4    your documents with us.  Thank you very much.

5:00PM  5              (whereupon the jury was excused from the courtroom.)

5:00PM  6              THE COURT:  Be seated.  I'd like to talk about

5:00PM  7    whether or not we're going to go back to the old-fashioned way

5:00PM  8    and just do it with a witness -- with a lawyer on the stand --

5:00PM  9    a reader on the stand and the question and answer would move it

5:00PM  10   faster.  If we do it that way, the lawyers who ask the

5:01PM  11   questions would be the ones who ask the questions, and each

5:01PM  12   side would pick their own answerer.

5:01PM  13             Give that some thought.  I think it would

5:01PM  14   shorten the deposition probably in half, and -- and I'll talk

5:01PM  15   with you all about it tomorrow.  Okay?

5:01PM  16             Court will stand in recess.

5:01PM  17             THE DEPUTY CLERK:  All rise.

5:01PM  18                       **CERTIFICATE**

5:01PM  19             I, Tana J. Hess, CCR, FCRR, Official Court Reporter

5:01PM  20   for the United States District Court, Eastern District of

5:01PM  21   Louisiana, certify that the foregoing is a true and correct

5:01PM  22   transcript, to the best of my ability and understanding, from

5:01PM  23   the record of proceedings in the above-entitled matter.

5:01PM  24
5:01PM

5:01PM  25                    _____
5:01PM                        Tana J. Hess, CCR, FCRR, RMR
                              Official Court Reporter

*OFFICIAL TRANSCRIPT*