1                    UNITED STATES DISTRICT COURT

2                  SOUTHERN DISTRICT OF MISSISSIPPI

3

4

5    IN RE:  XARELTO              *
     (RIVAROXABAN) PRODUCTS       *
6    LIABILITY LITIGATION         *
                                  *
7    THIS DOCUMENT RELATES TO:    *    Docket No.: 14-MD-2592
                                  *    Section "L"
8    *Dora Mingo, et al. v.*      *    Jackson, Mississippi
     *Janssen Research &*         *    August 10, 2017
9    *Development, LLC, et. al.,* *
     Case No.: 15-CV-3469         *
10   * * * * * * * * * * * * * * * *

11                  VOLUME IV - AFTERNOON SESSION
                 TRANSCRIPT OF JURY TRIAL PROCEEDINGS
12              BEFORE THE HONORABLE ELDON E. FALLON
                   UNITED STATES DISTRICT JUDGE
13

14   APPEARANCES:

15
     For the Plaintiffs'
16   Liaison Counsel:             Gainsburg Benjamin David
                                     Meunier & Warshauer
17                                BY:  GERALD E. MEUNIER, ESQ.
                                  2800 Energy Centre
18                                1100 Poydras Street
                                  New Orleans, Louisiana 70163
19

20
     For the Plaintiffs:          Beasley Allen
21                                BY:  ANDY BIRCHFIELD, ESQ.
                                  P.O. Box 4160
22                                Montgomery, Alabama 36103

23

24

25

**OFFICIAL TRANSCRIPT**

1    APPEARANCES:

2                                  Gainsburg Benjamin Davis
                                      Meunier & Warshauer
3                                  BY:  WALTER C. MORRISON, IV, ESQ.
                                   240 Trace Colony Park Drive
4                                  Suite 100
                                   Ridgeland, Mississippi 39157
5

6
                                   Goza Honnold
7                                  BY:  BRADLEY D. HONNOLD, ESQ.
                                   11181 Overbrook Road, Suite 200
8                                  Leawood, Kansas 66211

9
                                   The Lambert Firm
10                                 BY:  EMILY JEFFCOTT, ESQ.
                                   701 Magazine Street
11                                 New Orleans, Louisiana 70130

12
     For the Defendant Bayer
13   HealthCare Pharmaceuticals
     Inc. and Bayer Pharma AG:     Mitchell, Williams, Selig, Gates &
14                                    Woodyard, P.L.L.C.
                                   BY:  LYN P. PRUITT, ESQ.
15                                 425 W. Capitol Avenue, Suite 1800
                                   Little Rock, Arkansas 72201
16

17
                                   Watkins & Eager, PLCC
18                                 BY:  WALTER T. JOHNSON, ESQ.
                                   400 East Capitol Street
19                                 Jackson, Mississippi 39201

20

21   For Janssen Pharmaceuticals,
     Inc. and Janssen Research &
22   Development, LLC:             Barrasso Usdin Kupperman Freeman &
                                      Sarver, LLC
23                                 BY:  RICHARD E. SARVER, ESQ.
                                   909 Poydras Street, 24th Floor
24                                 New Orleans, Louisiana 70112

25

**OFFICIAL TRANSCRIPT**

1

2

3    Official Court Reporter:          Tana J. Hess, CRR, RMR
                                      500 Poydras Street
                                      Room B275
4                                     New Orleans, Louisiana 70130
                                      (504) 589-7781
5

6
     Proceedings recorded by mechanical stenography using
7    computer-aided transcription software.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

## INDEX OF WITNESSES

NAME                                                    PAGE

Robert Gosselin

    Redirect Examination by Mr. Birchfield       884

Shujian Wu, M.D. Ph.D.

    Direct Examination by Mr. Honnold            900

    Cross-Examination by Mr. Sarver              946

    Redirect Examination by Mr. Honnold          967

Anthonie Lensing

    Direct Examination (Cont'd) by Mr. Overholtz   977

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 12:00AM | 1 | (Afternoon session.) |
| 12:00AM | 2 | (Whereupon the jury entered the courtroom.) |
| 1:16PM | 3 | THE COURT:  Be seated, please. |
| 1:16PM | 4 | You may redirect. |
| 1:16PM | 5 | MR. BIRCHFIELD:  Thank you, Your Honor. |
| 1:16PM | 6 | REDIRECT EXAMINATION |
| 1:16PM | 7 | BY MR. BIRCHFIELD: |
| 1:16PM | 8 | Q.   Good afternoon, Mr. Gosselin.  I want to take just a few |
| 1:16PM | 9 | minutes and walk back through the articles that Mr. Sarver |
| 1:16PM | 10 | discussed with you, if we may. |
| 1:16PM | 11 | Before we -- before we do that, I want to us to go |
| 1:16PM | 12 | back to the discussion that we had this morning in regards to |
| 1:16PM | 13 | talking about DOACs as a group, an unspecified group, and PT as |
| 1:16PM | 14 | an unspecified group.  Okay? |
| 1:16PM | 15 | A.   Yes. |
| 1:16PM | 16 | Q.   Okay.  And so there are -- there are problems that can be |
| 1:16PM | 17 | even dangers if you're talking about DOACs as a group |
| 1:16PM | 18 | unspecified and PT as a group unspecified; right? |
| 1:16PM | 19 | A.   Yes. |
| 1:16PM | 20 | Q.   Okay.  And that's what's reflected in your articles? |
| 1:16PM | 21 | A.   Yes. |
| 1:16PM | 22 | Q.   But if we're talking about a specific DOAC, Xarelto, and a |
| 1:17PM | 23 | specific -- using a specific reagent, Neoplastin, that can |
| 1:17PM | 24 | provide reliable, helpful information; correct? |
| 1:17PM | 25 | A.   Yes. |

OFFICIAL TRANSCRIPT

1:17PM 1  **Q.**   Okay.  And Mr. Sarver showed you an article that we did

1:17PM 2  discuss.

1:17PM 3        **MR. BIRCHFIELD:**  And if I can get the ELMO, please.

1:17PM 4  **BY MR. BIRCHFIELD:**

1:17PM 5  **Q.**   Okay.  And this is -- again, this is an article that --

1:17PM 6  that you coauthored with D.M. Adcock, Dorothy Adcock; is that

1:17PM 7  right?

1:17PM 8  **A.**   Yes.

1:17PM 9  **Q.**   And Mr. Sarver showed you and highlighted the language in

1:17PM 10 this first paragraph.

1:17PM 11       Do I need to zoom in?  Can you see that?

1:17PM 12       **THE DEPUTY CLERK:**  The wheel on top.

1:17PM 13 **BY MR. BIRCHFIELD:**

1:17PM 14 **Q.**   Okay.  All right.  And the language here says, "As NOACs

1:18PM 15 are becoming more commonly used, the need to educate clinical

1:18PM 16 colleagues regarding this paradigm shift, specifically the lack

1:18PM 17 of utility of the APT and PT in patients on DOACs is

1:18PM 18 paramount."

1:18PM 19       Do you see that?

1:18PM 20 **A.**   Yes.

1:18PM 21 **Q.**   And, again, this is talking about DOACs, an unspecified

1:18PM 22 group, and PT as an unspecified group; is that right?

1:18PM 23       **MR. SARVER:**  Your Honor, could we do this without

1:18PM 24 leading?  I object to leading questions.

1:18PM 25       **THE COURT:**  Yeah.  Please don't lead.  Ask him the

**OFFICIAL TRANSCRIPT**

1:18PM 1    questions.

1:18PM 2            **MR. BIRCHFIELD:**  Okay.  I thought I was okay with an

1:18PM 3    expert, Your Honor.  My apologies.

1:18PM 4    **BY MR. BIRCHFIELD:**

1:18PM 5    **Q.**   And then in this article, you discussed the relationships

1:18PM 6    with DOACs and APTT and PT data; right?

1:18PM 7    **A.**   Yes.

1:18PM 8    **Q.**   Okay.  So will you describe for us once again, what was

1:18PM 9    the purpose behind this article?

1:18PM 10   **A.**   Again, if we can go to the beginning of the article, it

1:19PM 11   had to do with a consult for Dr. Adcock being called about

1:19PM 12   normal PT and PTT in a patient taking Eliquis, which does not

1:19PM 13   affect any one of those tests.

1:19PM 14           And the clinician assumed that because these tests

1:19PM 15   were normal, that the patient was not anticoagulated and they

1:19PM 16   can go ahead and do whatever conventional procedures they were

1:19PM 17   going to have, which was an alarm for her, which as a consult,

1:19PM 18   she called me and said, "We need to write a paper and get this

1:19PM 19   out, that normal PTs and APTTs do not rule out significant

1:19PM 20   levels of these new class of drugs."

1:19PM 21   **Q.**   All right.  And that was the object?  That was the purpose

1:19PM 22   behind this article?

1:19PM 23   **A.**   That was the whole premise of the article.

1:19PM 24   **Q.**   If we turn to the "Conclusion" section -- and I've

1:19PM 25   highlighted what Mr. Sarver covered with you again.  There it

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 1:19PM | 1 | states, "Clinicians must acknowledge that the APTT and PT can |
| 1:19PM | 2 | no longer be used as a general gauge of a patient's level of |
| 1:20PM | 3 | anticoagulation and, hence, bleeding risk." |
| 1:20PM | 4 | Do you see that? |
| 1:20PM | 5 | A.   I do see that. |
| 1:20PM | 6 | Q.   Okay.  And so what does that have to do in regards to |
| 1:20PM | 7 | Xarelto and the Neoplastin agents? |
| 1:20PM | 8 | A.   Again, in the context of this article, if you read the |
| 1:20PM | 9 | sentence before that, it had to do with fully anticoagulated |
| 1:20PM | 10 | patients with normal screening tests.  And so it's not really |
| 1:20PM | 11 | applicable to this case at all. |
| 1:20PM | 12 | Q.   Okay.  And I want to -- I want to go back to Ms. Dorothy |
| 1:20PM | 13 | Adcock, your coauthor here. |
| 1:20PM | 14 | A.   Yes. |
| 1:20PM | 15 | Q.   And in this article, did Ms. -- Dr. Adcock -- did |
| 1:20PM | 16 | Dr. Adcock -- did she make any disclosures, conflicts of |
| 1:20PM | 17 | interest, financial ties to the defendants, Bayer and Janssen, |
| 1:20PM | 18 | in this case? |
| 1:20PM | 19 | A.   There's no listing of that in the conflict of interest |
| 1:21PM | 20 | area. |
| 1:21PM | 21 | Q.   Okay.  And is -- Ms. Adcock, is she a consultant, a paid |
| 1:21PM | 22 | consultant, of Bayer and Janssen? |
| 1:21PM | 23 | A.   It's my understanding. |
| 1:21PM | 24 | Q.   And based on what? |
| 1:21PM | 25 | A.   So Dr. Adcock is the one who recommended me to the current |

1:21PM  1    law firm because they were contacting her first, and she could

1:21PM  2    not.  So they sent Russ Abney, and Mr. Abney is the one that

1:21PM  3    contacted me about doing the work with this lawyer firm.

1:21PM  4              When I was deposed in -- last year in November, it

1:21PM  5    was a grueling experience for me, my first, from 6:00 in the

1:21PM  6    morning to 5:00 at night.  And so when I left to go home -- and

1:21PM  7    I drove home at 5:00 at night -- I called Dr. Adcock to

1:21PM  8    tongue-in-cheek thank her for the experience I had with my

1:21PM  9    first deposition, at which point, she informed me that she

1:21PM  10   couldn't talk to me because she had been hired by Bayer.

1:21PM  11   Q.   And let's go to the next article.  I just want to make

1:22PM  12   sure that in each of the articles that Mr. Sarver showed you,

1:22PM  13   that -- that the statements here are talking about -- whether

1:22PM  14   they're talking about NOACs and DOACs as a general group or

1:22PM  15   Xarelto specifically versus PT as a general group versus PT

1:22PM  16   with the Neoplastin reagent.  Okay?

1:22PM  17             So Mr. Sarver showed you this article "Assessing

1:22PM  18   vitamin K antagonist oral anticoagulants (NOACs) in the

1:22PM  19   laboratory."

1:22PM  20             Do you see that?

1:22PM  21   A.   Yes.

1:22PM  22   Q.   And, again, this is an article that you published along

1:22PM  23   with Dorothy Adcock, Dr. Adcock?

1:22PM  24   A.   Dr. Adcock, yes.

1:22PM  25   Q.   Okay.  All right.  And is the discussion here in terms of

1:22PM  1   Xarelto specifically or NOACs as a group?

1:22PM  2   **A.**   It's for NOACs specifically.

1:22PM  3   **Q.**   NOACs?

1:22PM  4   **A.**   At the time we said NOACs, but it was all the direct oral

1:23PM  5   anticoagulants --

1:23PM  6   **Q.**   All of them?

1:23PM  7   **A.**   -- generically.  Sorry.

1:23PM  8   **Q.**   Okay.

1:23PM  9   **A.**   As a class of drugs and PT as a class of tests.

1:23PM  10  **Q.**   Okay.  And I want to go to -- this is an article that --

1:23PM  11  that you did not cover with Mr. Sarver, but I'd ask you to take

1:23PM  12  a look at this.  It's "Clinical Pearls:  Laboratory Assessments

1:23PM  13  of Direct Oral Anticoagulants."

1:23PM  14          **MR. SARVER:**  Your Honor, we're going to object to the

1:23PM  15  use of a document I didn't use unless I have the -- I'd be

1:23PM  16  delighted to cross -- recross, but I know that that's not your

1:23PM  17  practice.

1:23PM  18          **THE COURT:**  You're right.  Let's not deal with --

1:23PM  19          Members of the jury, what happens is that the

1:23PM  20  cross-examination of the credibility is limited to the direct

1:23PM  21  examination.  The redirect is limited to what's been on cross

1:23PM  22  so you don't keep going on and on and on.

1:24PM  23  BY MR. BIRCHFIELD:

1:24PM  24  **Q.**   Mr. Gosselin, in the cross-examination, were you

1:24PM  25  challenged on the position that Neoplastin PT is sensitive to

**OFFICIAL TRANSCRIPT**

1:24PM  1    Xarelto?

1:24PM  2    A.    Yes.

1:24PM  3    Q.    And have you published, along with Dorothy Adcock, on that

1:24PM  4    very issue?

1:24PM  5    A.    Yes.

1:24PM  6    Q.    And in the paper that you and Dr. Adcock published

1:24PM  7    together, do you state that Neoplastin PT is sensitive to

1:24PM  8    rivaroxaban?

1:24PM  9    A.    I believe we do, but I couldn't tell you which citation it

1:24PM  10   would be or which paper it was.

1:24PM  11   Q.    Mr. Gosselin, you mentioned that there were -- that Bayer

1:24PM  12   scientists had researched the issue of the sensitivity of

1:25PM  13   Neoplastin PT and rivaroxaban or Xarelto; is that right?

1:25PM  14   A.    That's what they published, yes.

1:25PM  15   Q.    Okay.  And what were their findings regarding the

1:25PM  16   sensitivity of Neoplastin PT specifically and Xarelto?

1:25PM  17   A.    Again, in the studies published in 2005, I think is when

1:25PM  18   they start, to 2008, the ones that I cite in my deposition --

1:25PM  19   in my report, was that they used Neoplastin.  And they, in

1:25PM  20   their own terminology, indicated that this test could be used

1:25PM  21   to determine the anticoagulation effect of Xarelto in patients

1:25PM  22   being treated -- or in clinical trials that they observed to be

1:25PM  23   accurate.

1:25PM  24   Q.    And that is the -- that's the position that you have

1:25PM  25   confirmed in the studies that you have done yourself?

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 1:25PM | 1 | **A.**   Yes. |
| 1:25PM | 2 | **Q.**   And Mr. Sarver asked you about if you had an opinion about |
| 1:26PM | 3 | high PTs, and you said that you expressed those opinions when |
| 1:26PM | 4 | you were consulted by physicians. |
| 1:26PM | 5 | Do you recall that exchange? |
| 1:26PM | 6 | **A.**   Yes. |
| 1:26PM | 7 | **Q.**   So tell us -- tell us about the type of exchange that you |
| 1:26PM | 8 | would have with physicians regarding high PT values. |
| 1:26PM | 9 | **A.**   Well, usually when they come to me and ask me for my |
| 1:26PM | 10 | advice, it's an exchange about the results, not just the |
| 1:26PM | 11 | PT-level results because we don't look at that in isolation. |
| 1:26PM | 12 | Because what would the PT results be?  What would |
| 1:26PM | 13 | other laboratory tests be that we may have in coagulation?  And |
| 1:26PM | 14 | then what's going on with the patients?  Are they bleeding? |
| 1:26PM | 15 | Are they not bleeding?  Are they on any antibiotics?  Are they |
| 1:26PM | 16 | on any drugs that may interfere with the test?  Because |
| 1:26PM | 17 | sometimes they take antibiotics that may interfere with the |
| 1:26PM | 18 | test. |
| 1:26PM | 19 | So those kind of discussion goes on.  And then once |
| 1:26PM | 20 | that occurs and we've ruled out kind of interference due to |
| 1:26PM | 21 | these extraneous reasons, then we proceed down a path of what |
| 1:26PM | 22 | we should be doing next.  If it's a patient with known drug |
| 1:27PM | 23 | exposure, an anticoagulant, we assume it's that drug effect |
| 1:27PM | 24 | first and then -- until we prove otherwise. |
| 1:27PM | 25 | **Q.**   Are those -- those types of discussions, discussions that |

1:27PM   1   you would have on a -- it wouldn't be uncommon for you to have

1:27PM   2   those kind of discussions, would it?

1:27PM   3   A.   No, not only with physicians but pharmacists as well.

1:27PM   4   Q.   And Mr. Sarver asked you about the FDA approval for

1:27PM   5   Neoplastin specifically for use with Xarelto.

1:27PM   6            Do you recall that?

1:27PM   7   A.   Yes.

1:27PM   8   Q.   So will you explain -- is it inappropriate to use the

1:27PM   9   Neoplastin PT on patients with Xarelto?

1:27PM  10   A.   In my opinion, no.  Again, I don't -- I'm not aware of the

1:27PM  11   regulatory restrictions of testing because we use the PT test

1:27PM  12   for a lot of indications that's not listed in the package

1:27PM  13   insert -- or the label.

1:27PM  14   Q.   And you were -- you were attempting to explain about the

1:27PM  15   intended use for Neoplastin.

1:28PM  16            Will you explain that for us, sir?

1:28PM  17   A.   Yeah.  I believe that's the ruling that the FDA uses, is

1:28PM  18   what's the test going to be used for?  So the test is being

1:28PM  19   used for, if you look at the Neoplastin label -- or what we

1:28PM  20   call the package insert in the lab -- it's quite clear that you

1:28PM  21   can run PT tests on their instruments, "their" being Stago

1:28PM  22   instruments, which is the STA R, the Satellite, and the

1:28PM  23   STA Compact.  So that's the intended use.  In my understanding

1:28PM  24   of the regulation, that's what FDA is approving.

1:28PM  25            Just below that, again, the package insert describes

**OFFICIAL TRANSCRIPT**

1:28PM   1   what a PT is, what it does, what does it measure, what are the

1:28PM   2   possible indications it could be used for.  That's not an

1:28PM   3   all-inclusive list.  It's just an example list.

1:28PM   4   **Q.**   And, Mr. Gosselin, I think that you described for us that

1:28PM   5   you have -- you've been involved -- you've been a researcher

1:28PM   6   doing studies that have been published involving the

1:28PM   7   Neoplastin PT reagent.  Is that right?

1:28PM   8   **A.**   Yes.

1:29PM   9   **Q.**   Okay.  All right.  And that was the study there at UNC?

1:29PM  10   **A.**   Well, that was using patient samples.  We also did a study

1:29PM  11   using contrived samples.  So we took normal plasma and added

1:29PM  12   drug to it.  So that was also including Neoplastin.

1:29PM  13   **Q.**   So, Mr. Gosselin, why is it that you don't -- you don't

1:29PM  14   use the Neoplastin PT reagent in your laboratory for Xarelto?

1:29PM  15   **A.**   Well, the primary reason is because we offer the

1:29PM  16   rivaroxaban measurements.  So we can measure the level of drug.

1:29PM  17   **Q.**   Okay.  All right.  So -- so you've got the Neoplastin --

1:29PM  18   you've got the Neoplastin PT that is sensitive to Xarelto;

1:29PM  19   right?

1:29PM  20   **A.**   Yes.

1:29PM  21   **Q.**   Okay.  But then you use the -- is it the anti-Factor Xa

1:29PM  22   assay?

1:29PM  23   **A.**   Yes, the drug calibrated anti-Xa assay.

1:29PM  24   **Q.**   And so tell us the difference between the Factor Xa assay

1:29PM  25   and the Neoplastin PT reagent.

**OFFICIAL TRANSCRIPT**

1:29PM    1    **A.**   As far as the technical difference or as far as what is it

1:30PM    2    measuring?

1:30PM    3    **Q.**   What are you measuring, and what are the results and

1:30PM    4    sensitivities?

1:30PM    5    **A.**   Sensitivities is a different issue.

1:30PM    6        So what is it measuring?  Again, we went over the PT

1:30PM    7    test.  It's a clot-based test.  So you're adding something to a

1:30PM    8    plasma sample, and you're waiting for the reaction to occur

1:30PM    9    with the end point being a clot formation.

1:30PM    10        With the anti-Xa test, it's a little bit of a

1:30PM    11    different piece.  It's a chromogenic assay.  You're adding some

1:30PM    12    material to the sample, and you're seeing how much of this

1:30PM    13    material you can recover back, "this material" being activated

1:30PM    14    Factor X.

1:30PM    15        And then we add another reagent that creates

1:30PM    16    this yellow color, and there's a relationship in the yellow

1:30PM    17    color and how much drug is on board or not on board.  One gets

1:30PM    18    reported in seconds, which would be the clot-based assay.  One

1:30PM    19    gets reported in nanograms per mL, which is measurement of the

1:30PM    20    drug.

1:30PM    21    **Q.**   And there was a discussion about whether or not they were

1:30PM    22    FDA-approved Xarelto-specific calibrators and controls.

1:30PM    23        Do you recall that?

1:30PM    24    **A.**   Yes.

1:30PM    25    **Q.**   Is it appropriate or inappropriate to use Factor Xa tests

1:31PM    1   without FDA-approved calibration controls?

1:31PM    2   A.   In my opinion, no.  It makes it a lab-developed test.

1:31PM    3   Q.   Lab-developed tests.  Let's revisit the lab-developed

1:31PM    4   test.

1:31PM    5           Are there protocols, guidelines in place for

1:31PM    6   laboratory-developed tests?

1:31PM    7   A.   It's a touchy issue with people in the labs who do

1:31PM    8   lab-developed tests.  The FDA was supposed to make a ruling

1:31PM    9   last I believe August, and they've kind of taken a little bit

1:31PM   10   of a step back.  But they did define "lab-developed tests" as

1:31PM   11   tests that you manufacture in your lab.  So if you make a

1:31PM   12   protocol change or you make a change to intended use of a kit,

1:31PM   13   that now becomes a lab-developed test.

1:31PM   14   Q.   All right.  So at UC Davis, how many lab-developed tests

1:31PM   15   did you have?

1:31PM   16   A.   At UC Davis?

1:31PM   17   Q.   Yes.

1:31PM   18   A.   I can't speak for the whole laboratory.  In my department,

1:31PM   19   I had 20 or 21.

1:31PM   20   Q.   Okay.  And what about -- what about at the Cleveland

1:32PM   21   Clinic?  How many lab-developed tests did they have?

1:32PM   22   A.   Again, just in the small section I looked at was the

1:32PM   23   special coag section, Cleveland Clinic had about the same

1:32PM   24   number, about 20.

1:32PM   25   Q.   So lab-developed tests are not uncommon?

**OFFICIAL TRANSCRIPT**

1:32PM  1    A.    No, sir.

1:32PM  2    Q.    Is it -- I want to go back to one other issue that

1:32PM  3    Mr. Sarver discussed with you, and that is in vivo tests versus

1:32PM  4    ex vivo tests.  The tests that you're doing, they're ex vivo

1:32PM  5    tests; right?

1:32PM  6    A.    They're outside the body, which is ex vivo, yes.

1:32PM  7    Q.    Okay.  All right.  So when you said that the -- that the

1:32PM  8    ex vivo test -- I think he said, "Are they always going to

1:32PM  9    reflect what happens in the body?"

1:32PM  10            Do you remember that?

1:32PM  11   A.    I remember the "always."  I'm not for sure the context of

1:32PM  12   the sentence, but I remember "always."

1:32PM  13   Q.    Okay.  So can ex vivo tests be reliable to tell you what's

1:33PM  14   going on in the body?

1:33PM  15   A.    I believe it does in certain situations.  It can in

1:33PM  16   patients that have deficiencies of factors.  It can in patients

1:33PM  17   that are anticoagulated.

1:33PM  18   Q.    So let's talk about some examples of ex vivo tests.  Do

1:33PM  19   you test cholesterol with an ex vivo test?

1:33PM  20   A.    I don't.  But somebody else does, yes.

1:33PM  21   Q.    Are cholesterol tests, are they ex vivo tests?

1:33PM  22   A.    Yes.  Those are common tests performed in chemistry

1:33PM  23   laboratories.

1:33PM  24   Q.    What are some other ex vivo tests that are fairly common?

1:33PM  25   A.    Potassium would be another offered one that's done quite

1:33PM 1    frequently.  Potassium, sodium, all the -- chloride, BUN,

1:33PM 2    creatinine.  There's a bunch.

1:33PM 3    Q.   If you're getting like a complete blood count, a CBC --

1:33PM 4    A.   Yes.

1:33PM 5    Q.   -- a panel, is that ex vivo?

1:33PM 6    A.   Yes.

1:33PM 7    Q.   If you're looking at white blood cell counts, is that ex

1:33PM 8    vivo?

1:33PM 9    A.   Yes.

1:33PM 10   Q.   Red blood cell count, that's ex vivo?

1:34PM 11   A.   Yes.

1:34PM 12   Q.   All of those are ex vivo tests?

1:34PM 13   A.   Yes.

1:34PM 14   Q.   All right.  And based on all of the articles that

15   Mr. Sarver showed you about the use of -- of PT in measuring or

16   monitoring the anticoagulant effect of Xarelto, is it your

17   opinion, Mr. Gosselin, that the Neoplastin PT reagent is an

18   effective tool to measure the anticoagulant effect of Xarelto?

1:34PM 19   A.   Based on the studies that we performed with UNC and based

1:34PM 20   on the literature by the Bayer scientists, I would say yes.

1:34PM 21   Q.   And is it your opinion that the anti-Factor Xa assay is an

1:34PM 22   effective tool to measure the levels of Xarelto?

1:34PM 23   A.   Yes, absolutely.

1:34PM 24        MR. SARVER:  Thank you, Your Honor.

1:34PM 25        THE COURT:  Okay.  All right.  Thank you.  You're

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 1:34PM | 1 | excused, sir. |
| 1:34PM | 2 | (Witness excused.) |
| 1:35PM | 3 | THE COURT:  Call your next witness.  Thank you. |
| 1:35PM | 4 | MR. BIRCHFIELD:  Your Honor, Mr. Honnold will be |
| 1:35PM | 5 | taking the next witness.  This will be by satellite.  There's |
| 1:35PM | 6 | one issue that we need to discuss. |
| 1:35PM | 7 | THE COURT:  Okay. |
| 1:35PM | 8 | (Whereupon the following proceedings were held at the |
| 1:35PM | 9 | bench out of the hearing of the jury:) |
| 1:40PM | 10 | THE COURT:  This is Dr. Wu? |
| 1:40PM | 11 | MR. SARVER:  This is Dr. Wu. |
| 1:40PM | 12 | MR. BIRCHFIELD:  Your Honor, in the -- the Court |
| 1:40PM | 13 | sustained our Motion in Limine about the FDA-approved |
| 1:40PM | 14 | Neoplastin.  We have raised that issue in -- it was part of the |
| 1:40PM | 15 | Boudreaux trial.  We briefed that issue in the Orr trial, and |
| 1:40PM | 16 | you granted it.  It's a Motion in Limine that was sustained in |
| 1:40PM | 17 | this case, and Mr. Sarver went specifically there in regards to |
| 1:40PM | 18 | the FDA-approved Neoplastin, and so we would ask the Court |
| 1:40PM | 19 | to -- to give an instruction to the jury regarding the lack of |
| 1:41PM | 20 | necessity of the FDA approval for Neoplastin PT.  I mean, |
| 1:41PM | 21 | this -- this is -- |
| 1:41PM | 22 | MR. SARVER:  We absolutely did.  We did because he |
| 1:41PM | 23 | opened the door wide open, walked through it with a Mack truck. |
| 1:41PM | 24 | THE COURT:  No.  I will at the appropriate time; just |
| 1:41PM | 25 | say it. |

1:41PM  1               **MR. SARVER:**  Yes, sir.  Thank you.

1:41PM  2               **THE COURT:**  Andy, why don't you all just request I

1:41PM  3  give an instruction?

1:41PM  4               **MR. SARVER:**  Yes.

1:37PM  5               (whereupon the following proceedings were held in

1:37PM  6               open court in the presence and hearing of the jury:)

1:39PM  7               **THE COURT:**  All right.  Let's take a five-minute

1:39PM  8  break, and we'll come back.

1:39PM  9               **THE DEPUTY CLERK:**  All rise.

1:39PM  10               (whereupon the jury was excused from the courtroom.)

1:46PM  11                       (Recess.)

1:46PM  12               (whereupon the jury entered the courtroom.)

1:46PM  13               **THE COURT:**  Be seated, please.

1:46PM  14                 Call your next witness.

1:46PM  15               **MR. BIRCHFIELD:**  Your Honor, the next witness is

1:46PM  16  Dr. Wu, and Mr. Honnold will be examining him.

1:46PM  17                 Before -- before the witness is sworn in, we

1:46PM  18  would ask the Court to give an instruction regarding the

1:47PM  19  Neoplastin PT and the FDA approval.

1:47PM  20               **THE COURT:**  Well, with regard to --

1:47PM  21               **MR. SARVER:**  Your Honor, we object to the language

1:47PM  22  that is proposed by the plaintiffs.

1:47PM  23               **THE COURT:**  I don't know what language they proposed.

1:47PM  24               **MR. SARVER:**  Okay.  Thanks, Judge.  Sorry.

1:47PM  25               **THE COURT:**  With regard to -- we've heard the FDA

1:47PM   1   approval with regard to labels, and you should know that the
1:47PM   2   defendant at all times has the responsibility of providing an
1:47PM   3   adequate label to warn and instruct treaters on prescription
1:47PM   4   drugs.  In fact, any action, or actually inaction, on the part
1:47PM   5   of the FDA, though relevant, does not foreclose a claim under
1:47PM   6   Mississippi law.  In other words, it's relevant, but not
1:47PM   7   dispositive.
1:47PM   8           Let's proceed.
1:47PM   9           MR. HONNOLD:  As Mr. Birchfield said, plaintiffs at
1:48PM  10   this time call Dr. Shujian Wu.
1:48PM  11           Dr. Wu, good afternoon.
1:48PM  12           THE DEPUTY CLERK:  I need to swear him in.
1:48PM  13           THE COURT:  First --
1:48PM  14           THE DEPUTY CLERK:  Would you raise your right hand,
1:48PM  15   Dr. Wu?
1:48PM  16                    **(Witness sworn.)**
9:10AM  17           THE DEPUTY CLERK:  Please state and spell your name
9:10AM  18   for the record.
1:48PM  19           THE WITNESS:  My name is Shujian Wu.
1:48PM  20           THE DEPUTY CLERK:  Could you ask him to spell it,
1:48PM  21   Brad?
1:48PM  22                    **SHUJIAN WU, M.D., Ph.D.,**
1:48PM  23   a witness called on behalf of the Plaintiff, being first duly
1:48PM  24   sworn, was examined and testified as follows:
        25                    **DIRECT EXAMINATION**

**OFFICIAL TRANSCRIPT**

BY MR. HONNOLD:

1:48PM  Q.   Dr. Wu, could you please spell for our court reporter both

1:48PM  your first and last names, slowly, please?

1:48PM  A.   Sure.  My first name is Shujian, spelled S-h-u-j-i-a-n,

1:48PM  and my last name is Wu, spelled as W-u.

1:49PM        THE COURT:  You may proceed, Counsel.

1:49PM        MR. HONNOLD:  Thanks, Your Honor.

1:49PM  BY MR. HONNOLD:

1:49PM  Q.   Dr. Wu, good afternoon.

1:49PM  A.   Good afternoon.

1:49PM  Q.   We are appearing here -- you are appearing in our

1:49PM  courtroom here in Jackson, Mississippi, by satellite.  Our

1:49PM  transmission of picture is good and our sound is good.

1:49PM        The one thing I would ask you to be attentive of is

1:49PM  let's make sure that I finish my question before you answer,

1:49PM  and I'll make sure that you finish your answer before we

1:49PM  speak -- before I speak again.  But will you try to observe

1:49PM  that rule, please?

1:49PM  A.   Sure.  Thank you.

1:49PM  Q.   And then also, just for the benefit of our court reporter,

1:49PM  so that she is able to get a clear record, will you try to

1:49PM  speak at a normal pace and not go too fast?  And I'll try to

1:49PM  show her the same courtesy.

1:49PM  A.   I'll try my best.

1:49PM  Q.   Thank you, sir.

OFFICIAL TRANSCRIPT

| | |
|---|---|
| 1:49PM | 1 |

         Doctor, you are an employee of Janssen; is that
correct?

A.   That's correct.

Q.   And your job title is medical safety officer in the
cardiovascular and metabolism division at Janssen; right?

A.   Correct.

Q.   And you are a physician by training; isn't that right?

A.   That's right.

Q.   And while you are a medical doctor or received that
training, you are not licensed to practice medicine in any
state in the United States; is that true?

A.   True.

Q.   Is it fair to state that you work at Janssen in the area
called pharmacovigilance?

A.   Yes.

Q.   I'm going to write that word on our pad here, so I'm going
to step away for a second, and then I'm going to have some
questions about that.

         Oh, I'm sorry.  I'm going to pull this to the side a
little bit.  Is that better?

         Dr. Wu, would it be fair to state that another term
for pharmacovigilance is "drug safety"?

A.   Yes.

Q.   And the word "pharmacovigilance," if you look at it and
break it down, obviously, the "pharmaco" part comes from a

1:51PM   1    pharmaceutical medicine or a drug; right?  That's the

1:51PM   2    "pharmaco"?

1:51PM   3    A.   Yes.

1:51PM   4    Q.   And then the next part "vigilance," meaning to look at or

1:51PM   5    watch carefully; is that true?

1:51PM   6    A.   Yes.

1:51PM   7    Q.   Would it be okay with you, instead of using the term

1:51PM   8    "pharmacovigilance" consistently that we just use the term

1:52PM   9    "drug safety" today as we talk about that subject?

1:52PM  10    A.   That would be fine.

1:52PM  11    Q.   You're certainly familiar with the Janssen product called

1:52PM  12    Xarelto; right?

1:52PM  13    A.   I'm familiar.

1:52PM  14    Q.   Janssen, over the years, has had various safety teams or

1:52PM  15    committees for its various products; is that true?

1:52PM  16    A.   Yes.

1:52PM  17    Q.   You are the chair -- you are the chairperson for the

1:52PM  18    Xarelto safety management team; is that right?

1:52PM  19    A.   Yes.

1:52PM  20    Q.   And that safety management team, the abbreviation that's

1:52PM  21    often used within the company is SMT; is that right?

1:52PM  22    A.   Correct.

1:52PM  23    Q.   And there has been occasion related to Xarelto where there

1:52PM  24    is also another committee called the joint -- joint safety

1:53PM  25    management team, and that would be where there's individuals

**OFFICIAL TRANSCRIPT**

1:53PM   1   both from Janssen and from Bayer; is that true?

1:53PM   2   A.    That's true.

1:53PM   3   Q.    And are you also the chair of the joint safety management

1:53PM   4   team?

1:53PM   5   A.    I'm the cochair of the joint safety management team.

1:53PM   6   Q.    And is it the purpose of the safety management team to

1:53PM   7   review and evaluate on an ongoing basis potential safety issues

1:53PM   8   or developments related to a product?

1:53PM   9   A.    I'd like to correct your statement.  The responsibility --

1:53PM   10  responsibility of the safety management team is to conduct and

1:53PM   11  evaluate potential safety signal.

1:53PM   12  Q.    All right.  So I think we were pretty close.  So my

1:53PM   13  statement was essentially true, but I didn't put in the "safety

1:54PM   14  signal" part; is that true?

1:54PM   15  A.    That's true.

1:54PM   16  Q.    And, Doctor, could you please share with us exactly what a

1:54PM   17  safety signal or potential safety signal is?

1:54PM   18  A.    So potential safety signal could come from various

1:54PM   19  sources.  It doesn't mean that a potential safety signal is a

1:54PM   20  safety issue, and that's part of the responsibility of safety

1:54PM   21  management team, is to evaluate what are these potential --

1:54PM   22  whether a potential safety signal truly is a safety issue for

1:54PM   23  the drug.

1:54PM   24  Q.    And, Doctor, is it true that the safety management team is

1:54PM   25  a committee that has met on an ongoing basis over the past few

**OFFICIAL TRANSCRIPT**

1:55PM   1   years on Xarelto; is that true?

1:55PM   2   A.   Sir, could you repeat your question, please?

1:55PM   3   Q.   Sure.  Is it true that there is a Xarelto safety

1:55PM   4   management team that has met on an ongoing basis over the past

1:55PM   5   several years regarding Xarelto?

1:55PM   6   A.   That's true.

1:55PM   7   Q.   And is it also true that the safety management team has

1:55PM   8   prepared minutes for its meetings?

1:55PM   9   A.   Yes.

1:55PM   10   Q.   And, in fact, was the safety management team required to

1:55PM   11   keep -- to prepare and to maintain minutes regarding its

1:55PM   12   meetings?

1:55PM   13   A.   Yes.

1:55PM   14   Q.   And is it true that those minutes are to be maintained by

1:55PM   15   Janssen?

1:55PM   16   A.   The Janssen safety management team meeting minutes

1:55PM   17   maintained by Janssens.  The joint safety management team

1:55PM   18   meeting minutes are maintained in a -- we call it eRoom, which

1:55PM   19   can be accessed by both Janssen and Bayer, two companies.

1:56PM   20   Q.   Is it true then, Doctor, that the safety management team

1:56PM   21   meetings are both created and maintained in the ordinary course

1:56PM   22   of Janssen's business?

1:56PM   23   A.   I'm sorry.  If you could repeat your question, sir.

1:56PM   24   Q.   Sure.  Is it true then, Doctor, that those safety

1:56PM   25   management team minutes are both created and maintained in the

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 1:56PM | 1 | ordinary course of Janssen's business?  That's -- |
| 1:56PM | 2 | A.    Yes. |
| 1:56PM | 3 | Q.    -- part of Janssen's business to keep those records; |
| 1:56PM | 4 | correct? |
| 1:56PM | 5 | A.    Correct. |
| 1:56PM | 6 | Q.    And, in fact, if you needed to at any given time to go |
| 1:56PM | 7 | back and determine whether a particular issue had been |
| 1:56PM | 8 | discussed or taken up by the safety management team, you could |
| 1:56PM | 9 | go back and look at those meeting minutes; correct? |
| 1:56PM | 10 | A.    Correct. |
| 1:56PM | 11 | Q.    And if an important issue was brought to the safety |
| 1:56PM | 12 | management team for discussion, that should be a topic that |
| 1:56PM | 13 | should be reflected in those minutes that could then be |
| 1:56PM | 14 | retrieved from the archive of those safety minute meeting -- or |
| 1:56PM | 15 | those safety minutes; correct? |
| 1:56PM | 16 | A.    So I want to explain to you the -- not all safety -- |
| 1:57PM | 17 | potential safety signal get to safety management team for |
| 1:57PM | 18 | discussion.  If some safety signal could be resolved within the |
| 1:57PM | 19 | specific functional area, they don't need to be discussed at a |
| 1:57PM | 20 | safety management team. |
| 1:57PM | 21 | Q.    But if an issue was important enough to rise to the level |
| 1:57PM | 22 | of the safety management team, it would be reflected in those |
| 1:57PM | 23 | minutes; correct? |
| 1:57PM | 24 | A.    If safety team believed that the topic is important and |
| 1:57PM | 25 | need to be discussed further, then the safety management team |

1:57PM   1   would discuss that.

1:57PM   2   Q.   I just want to put on the screen, and I would ask

1:57PM   3   Mr. Rivera there to hand you what has been marked -- or what's

1:57PM   4   marked as Document 106224.

1:58PM   5         And, Dr. Wu, what I'd like to do is just have you

1:58PM   6   look at that document, please, and ask you, is this an example

1:58PM   7   of a copy of joint safety management team minutes for a meeting

1:58PM   8   that was held on September 21st, 2011?

1:58PM   9   A.   Yes.   I looked at document.   I agree.

1:58PM   10  Q.   And so just based upon your experience then, is that an

1:58PM   11  exemplar or an example of how the joint safety management

1:58PM   12  minutes are constructed and set up?

1:58PM   13  A.   This is one example of the joint safety meeting minutes.

1:58PM   14  Q.   Okay.   Thank you.   When -- when Xarelto was approved back

1:59PM   15  in the latter parts of 2011, do you recall that the FDA did put

1:59PM   16  in place at the time of approval special requirements for

1:59PM   17  Xarelto?   Do you recall that?

1:59PM   18  A.   So I joined the safety management team after FDA approved

1:59PM   19  the fourth indication of -- for Xarelto in the United States.

1:59PM   20  So when I joined the safety management team, I have the -- some

1:59PM   21  information from previous discussions.

1:59PM   22  Q.   And do you recall that, as it relates specifically to

1:59PM   23  Xarelto at the time that it was approved in the latter months

1:59PM   24  of 2011, that the FDA placed upon Xarelto requirements that

1:59PM   25  were called "enhanced pharmacovigilance requirements"?   Do you

1:59PM     1    recall that?

2:00PM     2    A.   I recall that.

2:00PM     3    Q.   And those enhanced pharmacovigilance requirements

2:00PM     4    specifically meant that Janssen needed to do some extra things

2:00PM     5    in terms of drug safety for Xarelto; is that true?

2:00PM     6    A.   That's true.

2:00PM     7    Q.   And two of the specific enhanced pharmacovigilance

2:00PM     8    requirements -- one of them was to do a bleeding questionnaire;

2:00PM     9    is that true?

2:00PM    10    A.   The enhanced pharmacovigilance plan and also the

2:00PM    11    postmarketing safety study, two components.

2:00PM    12    Q.   And part of the enhanced pharmacovigilance plan was to do

2:00PM    13    or prepare a bleeding questionnaire; correct?

2:00PM    14    A.   Yes, there was a questionnaire for enhanced

2:01PM    15    pharmacovigilance plan.

2:01PM    16    Q.   And you were involved in the process of creating that

2:01PM    17    questionnaire; correct?

2:01PM    18    A.   I was involved in review of the questionnaire.

2:01PM    19    Q.   The purpose of the questionnaire was that when and if

2:01PM    20    Janssen received a report of a patient that had been taking

2:01PM    21    Xarelto that had a bleeding event, additional follow-up was to

2:01PM    22    be done regarding that patient.  And part of that follow-up was

2:01PM    23    the inclusion of sending a specific questionnaire that you had

2:01PM    24    participated in the creation of to someone who might be able to

2:01PM    25    provide additional information about that patient's bleeding

| | | |
|---|---|---|
| 2:01PM | 1 | event; correct? |
| 2:01PM | 2 | **A.**   Correct. |
| 2:01PM | 3 | **Q.**   You then mentioned a second part of the enhanced |
| 2:02PM | 4 | pharmacovigilance plan was to do some type of study. |
| 2:02PM | 5 | Do you recall that? |
| 2:02PM | 6 | **A.**   I recall that. |
| 2:02PM | 7 | **Q.**   And in terms of using your words, how is it that you would |
| 2:02PM | 8 | describe that study?  What type of study was to be done? |
| 2:02PM | 9 | **A.**   The study is called post -- postmarket safety study. |
| 2:02PM | 10 | **Q.**   And you have some familiarity with both of those things; |
| 2:02PM | 11 | correct? |
| 2:02PM | 12 | **A.**   I am more familiar with the enhanced pharmacovigilance |
| 2:02PM | 13 | plan, but the other component I mentioned moments ago called a |
| 2:02PM | 14 | postmarketing safety study, I'm not the -- I'm not a study |
| 2:02PM | 15 | leader for the study. |
| 2:03PM | 16 | **Q.**   Ultimately, there's been some interim data that's been |
| 2:03PM | 17 | published from that study, and you are a listed author of that |
| 2:03PM | 18 | study; correct? |
| 2:03PM | 19 | **A.**   Correct. |
| 2:03PM | 20 | **Q.**   Now, ultimately you and others at Janssen did come up with |
| 2:03PM | 21 | an agreed-upon form to use for this bleeding questionnaire; |
| 2:03PM | 22 | correct? |
| 2:03PM | 23 | **A.**   The questionnaire, we have a draft questionnaire, and we |
| 2:03PM | 24 | discuss with FDA, and FDA provide comment.  And then eventually |
| 2:03PM | 25 | we finalize the questionnaire in agreement with FDA. |

**OFFICIAL TRANSCRIPT**

2:03PM 1    **Q.**    But you worked significantly with individuals within

2:03PM 2    Janssen to come up with a form of that questionnaire; correct?

2:03PM 3    **A.**    Sir, would you repeat your question, please?

2:03PM 4    **Q.**    You worked in great detail with individuals at Janssen to

2:03PM 5    come up with the final form; correct?

2:03PM 6    **A.**    Correct.

2:03PM 7    **Q.**    The questionnaire basically asked numerous questions and

2:03PM 8    requested medical information on Xarelto patients who had had

2:04PM 9    bleeding events; is that right?

2:04PM 10    **A.**    That's right.

2:04PM 11    **Q.**    Among other things, the questionnaire asked many questions

2:04PM 12    about laboratory tests that were performed on the Xarelto

2:04PM 13    patients who had had bleeding; is that true?

2:04PM 14    **A.**    That's true.

2:04PM 15    **Q.**    And now if we could go to the document that's marked

2:04PM 16    2371986.

2:04PM 17            And, Doctor, what I'd like you to do -- what I'd like

2:04PM 18    you to do is move forward or go forward in that document to

2:04PM 19    what is page number 7.  And at page number 7, does essentially

2:05PM 20    the form for the bleeding questionnaire begin?  Does the

2:05PM 21    bleeding questionnaire start at page 7?

2:05PM 22    **A.**    Yes.

2:05PM 23    **Q.**    And if you move forward through the form, you see that it

2:05PM 24    asks about a number of things, including who is the person

2:05PM 25    providing the information, some demographic information about

| | | |
|---|---|---|
| 2:05 PM | 1 | the patient, details about them taking Xarelto, details about |
| 2:05 PM | 2 | the bleeding event, whether diagnostic evaluations were done |
| 2:05 PM | 3 | for the event.  And then on the next page, which is page 9, is |
| 2:05 PM | 4 | there a section for laboratory data?  Do you see that? |
| 2:05 PM | 5 | **A.**   I saw that. |
| 2:05 PM | 6 | **Q.**   Oh, excuse me.  Right.  And do you see Section 6 there, |
| 2:06 PM | 7 | laboratory data? |
| 2:06 PM | 8 | **A.**   Yes. |
| 2:06 PM | 9 | **Q.**   And those -- under the "Lab Test" section, there are a |
| 2:06 PM | 10 | number of specific laboratory tests that are listed; correct? |
| 2:06 PM | 11 | **A.**   Yes. |
| 2:06 PM | 12 | **Q.**   And is it your view as a physician who has some |
| 2:06 PM | 13 | familiarity with Xarelto and patients who might have bleeding |
| 2:06 PM | 14 | events from Xarelto, that those are laboratory -- the sorts of |
| 2:06 PM | 15 | laboratory tests that might provide some meaningful or |
| 2:06 PM | 16 | important information about the patient's bleeding event? |
| 2:06 PM | 17 | **A.**   Sorry to correct your statement.  These laboratory tests |
| 2:06 PM | 18 | are routine laboratory tests.  They are not unique for Xarelto |
| 2:06 PM | 19 | per se. |
| 2:06 PM | 20 | **Q.**   Okay.  I appreciate that.  Would it be fair to say, then, |
| 2:06 PM | 21 | that these laboratory tests are standard laboratory tests? |
| 2:06 PM | 22 | **A.**   They're routine laboratory tests for patients experiencing |
| 2:06 PM | 23 | bleeding. |
| 2:06 PM | 24 | **Q.**   And would another word for "routine" be "standard"? |
| 2:07 PM | 25 | **A.**   Yes, similar. |

**OFFICIAL TRANSCRIPT**

2:07PM   1    Q.   And I'm just writing on the board here that you agree with

2:07PM   2    me that "routine lab" equals "standard," standard laboratory

2:07PM   3    tests.

2:07PM   4              MR. SARVER:  Well, objection, Your Honor.  It was a

2:07PM   5    little more subtle than that.  He said they were similar.

2:07PM   6              THE COURT:  Let's clarify that.

2:07PM   7    BY MR. HONNOLD:

2:07PM   8    Q.   Okay.  Doctor, would it be true that another -- that

2:07PM   9    another word or word for "routine laboratory test" would be

2:07PM   10   "standard laboratory test"?

2:07PM   11   A.   I would prefer to use "routine laboratory test."  It is

2:07PM   12   routine, better than standard.

2:07PM   13   Q.   The laboratory tests that are performed there, are they

2:07PM   14   ones that are routinely available in hospitals to be performed

2:07PM   15   on a patient who has a bleeding event?

2:07PM   16   A.   They're routinely available.

2:08PM   17   Q.   Meaning that virtually every hospital in the country would

2:08PM   18   have the ability to perform a test like that on a routine or

2:08PM   19   standard basis; is that true?

2:08PM   20   A.   If a physician prescribed the test, they would be

2:08PM   21   available.

2:08PM   22   Q.   Yes.  And they could be performed on a routine or standard

2:08PM   23   basis; correct?

2:08PM   24   A.   They are routine laboratory tests.  I explained that to

2:08PM   25   you.

**OFFICIAL TRANSCRIPT**

2:08PM  1   Q.   And were you the one that chose those specific laboratory

2:08PM  2   tests to be followed up on by the bleeding questionnaire?

2:08PM  3   A.   I'm one of the person review the questionnaires and agree

2:08PM  4   these laboratory tests on the questionnaire.

2:08PM  5   Q.   And you see that the laboratory tests that are requested

2:08PM  6   on the questionnaire, it includes a PT test; correct?

2:08PM  7   A.   Correct.

2:08PM  8   Q.   And would you agree with me that a PT test is a routine

2:09PM  9   test of anticoagulation?

2:09PM  10  A.   I explained to you that only treating physician prescribe

2:09PM  11  the test and then use that as a laboratory test.  So it's a

2:09PM  12  routine test.

2:09PM  13  Q.   And it's a routine test of anticoagulation status of a

2:09PM  14  patient; correct?

2:09PM  15  A.   It's a routine test.  Also all the laboratory tests on

2:09PM  16  this table here, they're all considered routine laboratory

2:09PM  17  tests.

2:09PM  18  Q.   And so the other tests -- in addition to the PT, you

2:09PM  19  mentioned hemoglobin.  That would be a test that could be

2:09PM  20  performed to determine how much blood volume the patient might

2:09PM  21  have lost during a bleeding event; correct?

2:09PM  22  A.   Which particular test you refer to?

2:09PM  23  Q.   Hemoglobin.

2:09PM  24  A.   Yes.

2:09PM  25  Q.   And then hematocrit also speaks to blood volume or blood

**OFFICIAL TRANSCRIPT**

914

| | |
|---|---|
| 2:10PM | 1 |

concentration?

2:10PM   2   **A.**   Agreed.

2:10PM   3   **Q.**   The platelet test then would determine in the tested

2:10PM   4   patient what their platelet count was or platelet level?

2:10PM   5   **A.**   Yes.

2:10PM   6   **Q.**   And the PT test we've discussed, that would be a measure

2:10PM   7   of a certain part of the coagulation cascade; right?

2:10PM   8   **A.**   Yes.

2:10PM   9   **Q.**   And the PT test would be another standard or routine

2:10PM   10   anticoagulation test that looks at or assesses part of the

2:10PM   11   coagulation cascade; right?

2:10PM   12   **A.**   Yes, that is a routine test.

2:10PM   13   **Q.**   And INR is also a test that is routinely used to assess a

2:10PM   14   patient's anticoagulation status, especially if they've been

2:10PM   15   taking warfarin or Coumadin; correct?

2:10PM   16   **A.**   I -- the INR is routine test.  And from my experience, a

2:10PM   17   patient taking warfarin, this test commonly prescribed.

2:11PM   18   **Q.**   And so Janssen chose to gather PT test data for Xarelto

2:11PM   19   patients who had bleeding events; is that right?

2:11PM   20   **A.**   On this particular questionnaire, Janssen requests these

2:11PM   21   other laboratory tests, including PT, on the questionnaire.  So

2:11PM   22   it's not just the PT test, I just want to remind you.

2:11PM   23   **Q.**   One piece of information -- and it might be able to be

2:11PM   24   derived from this data -- for bleeding patients would be for

2:11PM   25   the patient, when they come in and are treated and if these

**OFFICIAL TRANSCRIPT**

2:11PM  1   laboratory tests are done, there would be potentially

2:11PM  2   laboratory data that would tell whether or not the patient was

2:11PM  3   anticoagulated on an anticoagulant medicine; correct?

2:11PM  4   A.   So these laboratory tests are very affected by many

2:11PM  5   factors, including such as the patient's underlying condition,

2:12PM  6   the concomitant medications, and, of course, that patient -- if

2:12PM  7   patient take any blood thinner could potentially affect this

2:12PM  8   type of test.

2:12PM  9   Q.   We could agree then that, amongst other things, the PT

2:12PM  10  test could reflect whether the patient had been taking a blood

2:12PM  11  thinner or anticoagulant; correct?

2:12PM  12  A.   Correct.

2:12PM  13  Q.   Including Xarelto; right?

2:12PM  14  A.   Yes.

2:12PM  15  Q.   And I'm writing on the chart now that -- I've written "PT

2:12PM  16  to detect anticoagulant, including Xarelto."  And I'm going to

2:12PM  17  put "other things also".

2:13PM  18       And so in terms of using this questionnaire, Janssen

2:13PM  19  had chosen then to elicit potentially information that would

2:13PM  20  let them know whether the patient -- the bleeding patient was

2:13PM  21  presenting in an anticoagulated state where they might have

2:13PM  22  been on a blood thinner, including Xarelto; correct?

2:13PM  23  A.   I'm sorry, sir.  If you could rephrase your question and

2:13PM  24  make it shorter, it would be appreciated.

2:13PM  25  Q.   It was a terrible, terrible question.

**OFFICIAL TRANSCRIPT**

|   | |
|---|---|
| 2:13PM | 1 |
| 2:13PM | 2 |
| 2:13PM | 3 |
| 2:13PM | 4 |
| 2:13PM | 5 |
| 2:13PM | 6 |
| 2:13PM | 7 |
| 2:14PM | 8 |
| 2:14PM | 9 |
| 2:14PM | 10 |
| 2:14PM | 11 |
| 2:14PM | 12 |
| 2:14PM | 13 |
| 2:14PM | 14 |
| 2:14PM | 15 |
| 2:14PM | 16 |
| 2:14PM | 17 |
| 2:14PM | 18 |
| 2:14PM | 19 |
| 2:14PM | 20 |
| 2:14PM | 21 |
| 2:14PM | 22 |
| 2:14PM | 23 |
| 2:14PM | 24 |
| 2:14PM | 25 |

1       So Janssen chose to get information back from the
2  patient or health care provider, if possible, that would give
3  information on the status of their PT test; correct?
4  A.  I explained to you that, in agreement with FDA, Janssen
5  and FDA review this questionnaire, and both party agree to use
6  this questionnaire to solicit additional information from
7  reporter, such as treating physicians.
8  Q.  And so this form was to be sent to patients or health care
9  providers or treating physicians to get this information;
10  correct?
11  A.  Correct.
12  Q.  And you -- you knew that when the form was received back
13  from a patient, it was to be noted as date-stamped by Janssen;
14  correct?
15  A.  I'm sorry, sir.  The questionnaire -- as you can see, the
16  information is a very scientific-oriented question.  This
17  questionnaire should be filled out by the physician, not a
18  patient.
19  Q.  Okay.  So if it was returned back from the physician when
20  it was received by Janssen, it was to be date-stamped
21  confirming receipt by Janssen; correct?
22  A.  Correct.
23  Q.  And then the information was to be assessed or evaluated
24  by members of the Janssen medical safety office; true?
25  A.  I missed the last part of your statement.  Could you

**OFFICIAL TRANSCRIPT**

2:15PM  1   repeat, please?

2:15PM  2   **Q.**   Sure.   Then the information in the questionnaire was to be

2:15PM  3   assessed or evaluated by members of the Janssen medical safety

2:15PM  4   office; correct?

2:15PM  5   **A.**   The questionnaire would be evaluated by the

2:15PM  6   pharmacovigilance case review physicians.

2:15PM  7   **Q.**   And they would be maintained by Janssen; correct?

2:15PM  8   **A.**   Yes.

2:15PM  9   **Q.**   And you've had the opportunity over time to review some of

2:15PM  10  these completed bleeding questionnaires in the past; correct?

2:15PM  11  **A.**   As a medical safety officer, my daily job is not directly

2:15PM  12  involved in review single cases, including questionnaires.

2:15PM  13  This is not my job.

2:15PM  14  **Q.**   But have you had the opportunity to review some of the

2:15PM  15  bleeding questionnaires in the past?

2:15PM  16  **A.**   I may have got copy of the email and maybe have attachment

2:16PM  17  of the questionnaire.   So from time to time, I may see this

2:16PM  18  type of questionnaire, but this is not my daily job.

2:16PM  19  **Q.**   So it was -- it was the daily job to review these

2:16PM  20  questionnaires of individuals that worked at your direction?

2:16PM  21  **A.**   In my direction?   Is that what you say?   I'm sorry.   Could

2:16PM  22  you repeat your question?

2:16PM  23  **Q.**   Yes.   At your direction, there were individuals that were

2:16PM  24  below you in the company that were to look at these forms when

2:16PM  25  they were returned?

**OFFICIAL TRANSCRIPT**

2:16PM   1   **A.**   So the structure -- let me explain to you. The review

2:16PM   2   physician, case review physician, they don't report to me.

2:16PM   3   They are the member of the safety management team, but they

2:16PM   4   don't report to me.

2:16PM   5   **Q.**   But on occasion you've had -- you have been notified about

2:16PM   6   certain pieces of information on questionnaires or you would

2:16PM   7   receive emails about specific issues that might arise on the

2:16PM   8   questionnaires; is that correct?

2:16PM   9   **A.**   It's possible.

2:16PM   10   **Q.**   And there certainly have been times -- well, strike that.

2:17PM   11   You know that -- you'd be able to confirm on

2:17PM   12   individual questionnaires whether, in fact, it was received by

2:17PM   13   Janssen and was to have been included as part of a single-case

2:17PM   14   review; correct?

2:17PM   15   **A.**   I'm sorry, sir. Could you --

2:17PM   16   **Q.**   Sure. Sure. If we looked at some of the individual

2:17PM   17   questionnaires, would you be able to look at that questionnaire

2:17PM   18   and confirm that it had been received by Janssen and would have

2:17PM   19   been, pursuant to policy, submitted to a single-case review

2:17PM   20   physician?

2:17PM   21   **A.**   Sir, I explained to you my daily job is not directly

2:17PM   22   involved in the case review, including the questionnaires. So

2:17PM   23   I would have to try my best to see the example they give to me.

2:17PM   24   **Q.**   So what I'd like to do is I'm going to ask now that we

2:17PM   25   look at Document 5503934, and I'm going to put that on the

2:18PM 1    screen.

2:19PM 2                        (Pause.)

2:19PM 3    BY MR. HONNOLD:

2:19PM 4    Q.   My question for you, Doctor, once you've had a chance to

2:19PM 5    look at that, does it appear that this questionnaire was

2:19PM 6    received by Janssen on September 10th, 2012?

2:19PM 7    A.   Sir, if you could give me a couple of minutes to look at

2:19PM 8    that, I appreciate it.

2:19PM 9    Q.   So, Doctor, I don't -- I don't want to rush your review of

2:19PM 10   the document.  The only thing I'd like to do first is just

2:19PM 11   point to you that, if you look at the date stamp, it does show

2:19PM 12   that it was received by Janssen on September 10th, 2012.

2:19PM 13            Do you see that?

2:19PM 14   A.   Yes, I see that.

2:19PM 15   Q.   Okay.  And is there any doubt in your mind that with that

2:19PM 16   date stamp, with the words that it says there, that this

2:20PM 17   questionnaire would have been received by Janssen?

2:20PM 18   A.   That is my understanding.

2:20PM 19   Q.   And since we looked at that blank form and kind of got

2:20PM 20   familiar with how it's set up, what I'd like to do is go to the

2:20PM 21   next page or the second page of the document where there's PT

2:20PM 22   information that's listed about two-thirds of the way down.

2:20PM 23            Do you see that?

2:20PM 24   A.   Yes, I saw that.

2:20PM 25   Q.   And so it appears then that this patient's PT information

**OFFICIAL TRANSCRIPT**

920

| | | |
|---|---|---|
| 2:20PM | 1 | then had been provided by the person who filled the form out; |
| 2:20PM | 2 | is that correct? |
| 2:20PM | 3 | A.   Correct. |
| 2:20PM | 4 | Q.   And it appears, then, that this form is reporting an event |
| 2:20PM | 5 | of bleeding for a patient that's on Xarelto that occurred |
| 2:21PM | 6 | around August 16th; is that true? |
| 2:21PM | 7 |       If you look up above, it says, "ER presentation on |
| 2:21PM | 8 | 8/16/22."  Do you see that?  "8/16/12." |
| 2:21PM | 9 | A.   All right.  So if you could tell me what page that you |
| 2:21PM | 10 | talking about and where it is about that information.  I'm |
| 2:21PM | 11 | lost. |
| 2:21PM | 12 | Q.   If you go up to the top where it says, "Bleeding event |
| 2:21PM | 13 | details," it says, "Patient presented on August 16th, 2012." |
| 2:21PM | 14 |       Do you see that? |
| 2:21PM | 15 | A.   Yes. |
| 2:21PM | 16 | Q.   And so it does look like that this is a patient then that |
| 2:21PM | 17 | had a bleeding event at that time, and they reported the PTs |
| 2:21PM | 18 | that are listed below; is that correct? |
| 2:21PM | 19 | A.   You -- it is correct to me, based on this questionnaire. |
| 2:21PM | 20 | Q.   And it appears that there's a PT that's noted on |
| 2:22PM | 21 | August 16th of 2012 of 42.7. |
| 2:22PM | 22 |       Do you see that? |
| 2:22PM | 23 | A.   I saw that. |
| 2:22PM | 24 | Q.   Sorry.  Okay.  Do you see that PT of 42.7 there marked on |
| 2:22PM | 25 | August 16th of 2012? |

2:22PM   1   **A.**   I saw that.

2:22PM   2   **Q.**   Moving forward, if you could be handed what is

2:22PM   3   Form 5503973.

2:22PM   4         **MR. HONNOLD:**  And, Your Honor, I would move for the

2:22PM   5   admission of that last questionnaire as Plaintiff's 18.

2:22PM   6         **THE DEPUTY CLERK:**  19.  19.

2:23PM   7         **MR. SARVER:**  Your Honor, so long as all the HIPAA

2:23PM   8   information is gone from it, we don't have an objection.

2:23PM   9         **THE COURT:**  Okay.  I'll admit it with that

2:23PM   10  reservation.

2:23PM   11        **THE DEPUTY CLERK:**  That'll be 19.

2:23PM   12        **MR. HONNOLD:**  19.

2:23PM   13  BY MR. HONNOLD:

2:23PM   14  **Q.**   Doctor, do you now have the form that is in the upper

2:23PM   15  left-hand corner marked as 5503973?

2:23PM   16  **A.**   Yes, I have it.

2:23PM   17  **Q.**   And if you would move forward in this form then, if you

2:23PM   18  go, as we did before, to the third page, you see that this

2:23PM   19  questionnaire would be received December 4th, 2012?

2:23PM   20  **A.**   Yes.

2:23PM   21  **Q.**   And, again, if you go to the next page, it shows that this

2:23PM   22  patient suffered a hemorrhagic stroke, meaning bleeding in the

2:23PM   23  brain, on July 9th, 2012; is that right?

2:24PM   24  **A.**   Yes.

2:24PM   25  **Q.**   If you go down to the laboratory section then for this

**OFFICIAL TRANSCRIPT**

2:24PM 1   particular bleeding event, the reporter has said, "See

2:24PM 2   attached."  Correct?

2:24PM 3   A.   Yes.

2:24PM 4   Q.   And then the individual has provided some additional

2:24PM 5   information in terms of the patient's pro time.  And this is on

2:24PM 6   page 9730 in the lower right-hand corner.  This patient had a

2:24PM 7   pro time that was reported on July 8th -- or July 9th, 2012, as

2:24PM 8   24.1.

2:24PM 9        Do you see that?

2:24PM 10  A.   I saw that.

2:24PM 11  Q.   And that would reflect then that the next day after the

2:24PM 12  patient's bleeding event -- well, let me ask you this.

2:24PM 13       Do you have familiarity oftentimes when a patient has

2:25PM 14  a bleeding event on an anticoagulant drug like Xarelto, that

2:25PM 15  the physicians then will stop administering the drug to the

2:25PM 16  patient?

2:25PM 17  A.   I'm not a treating physician, so this has to be

2:25PM 18  case-by-case.

2:25PM 19  Q.   Is that consistent with your understanding, though?  I

2:25PM 20  mean, you're the -- you're the safety manager -- drug safety

2:25PM 21  manager at Janssen.  Are you familiar with the concept that a

2:25PM 22  patient bleeding on Xarelto, the physicians might stop the

2:25PM 23  drug?

2:25PM 24  A.   I explained to you that every patient is different.  Only

2:25PM 25  the treating physician who knows where -- about the patient and

**OFFICIAL TRANSCRIPT**

2:25PM 1    the severity of the bleeding can order to make a decision

2:25PM 2    whether Xarelto need to be stopped or not.  So I would defer to

2:25PM 3    the treating physician.

2:25PM 4    Q.   And is it at least consistent with your medical knowledge

2:25PM 5    then that if this patient had a bleed on July 8th and had a PT

2:25PM 6    of 24.1 and in the next day had a PT of 13.0, that that would

2:26PM 7    be consistent with someone having stopped the drug?

2:26PM 8    A.   I didn't see this patient stop, so I don't know where you

2:26PM 9    refer to.  I have no information in front of me.

2:26PM 10   Q.   All right.

2:26PM 11        MR. SARVER:  Your Honor, I'm not sure I got the right

2:26PM 12   exhibit last time.  The exhibit Mr. Honnold gave me was about a

2:26PM 13   nose bleed.

2:26PM 14        MR. HONNOLD:  I'm sorry.  I must have given you the

2:26PM 15   wrong one.

2:26PM 16        MR. SARVER:  Thank you.

2:26PM 17        MR. HONNOLD:  Thank you.

2:26PM 18   BY MR. HONNOLD:

2:26PM 19   Q.   Doctor, do you have any knowledge as to whether physicians

2:26PM 20   will stop an anticoagulant when a patient has a bleeding event?

2:26PM 21   A.   I explained to you, sir, it all depends individual case

2:26PM 22   and patient's condition.  And physician need to evaluate

2:27PM 23   patients and make a decision on a case-by-case basis.

2:27PM 24   Q.   Thank you.  And, Doctor --

2:27PM 25        MR. HONNOLD:  Your Honor, we'd move for the admission

**OFFICIAL TRANSCRIPT**

2:27PM  1   of 550394 as Plaintiff's 19.

2:27PM  2             THE COURT:  It would be the same --

2:27PM  3             MR. SARVER:  The same issue, Your Honor; just

2:27PM  4   protecting the patient's privacy rights.

2:27PM  5             THE COURT:  Sure.  I understand.  I'll admit it with

2:27PM  6   that then.

2:27PM  7             Members of the jury, what we're doing is that

2:27PM  8   HIPAA requires that certain personal information not be

2:27PM  9   disclosed.

2:27PM  10  BY MR. HONNOLD:

2:27PM  11  Q.    Doctor, I'd like you now to be handed the form that is

2:27PM  12  numbered 5503996.  And as before, Doctor, I'd like you to

2:28PM  13  confirm, in fact, that this bleeding questionnaire was received

2:28PM  14  March 11th, 2014, by the global medical safety office at

2:28PM  15  Janssen; is that true?

2:28PM  16  A.    The stamp I see is March 11th, 2014.

2:28PM  17  Q.    And then if we move forward, as we've done before, Doctor,

2:28PM  18  if we go to the PT information now for this patient, does it

2:28PM  19  appear that the responder for this patient provided PT

2:28PM  20  information for various dates, including October 15th,

2:28PM  21  November 24th, and December 3rd?  Do you see that?

2:29PM  22  A.    I saw that.

2:29PM  23  Q.    And if you look up above, it appears that this event is

2:29PM  24  talking about a severe nose bleed that occurred on December 2nd

2:29PM  25  of 2012.

| | | |
|---|---|---|
| 2:29PM | 1 | Do you see that? |
| 2:29PM | 2 | A.   I saw that. |
| 2:29PM | 3 | Q.   There is additional information down below for this |
| 2:29PM | 4 | patient's PT.  And, again, I want to make sure that you're |
| 2:29PM | 5 | following here. |
| 2:29PM | 6 | But the date of this bleed is noted as December 2nd, |
| 2:29PM | 7 | 2012.  And if you look down below, there's additional PT |
| 2:29PM | 8 | information that shows this patient on that date had a PT of |
| 2:29PM | 9 | 76.3. |
| 2:29PM | 10 | Do you see that? |
| 2:29PM | 11 | A.   I -- I'm sorry.  Okay.  Where -- you say the handwriting |
| 2:30PM | 12 | here, right, the PT -- |
| 2:30PM | 13 | Q.   Yes, Doctor.  Below the -- I'm sorry. |
| 2:30PM | 14 | A.   Oh, okay. |
| 2:30PM | 15 | Q.   Do you see -- |
| 2:30PM | 16 | A.   Yes, I have that information. |
| 2:30PM | 17 | Q.   And based upon your general knowledge and understanding of |
| 2:30PM | 18 | laboratory PT values and normal ranges, would you agree with me |
| 2:30PM | 19 | that regardless of the hospital, a PT of 76.3 is significantly |
| 2:30PM | 20 | elevated? |
| 2:30PM | 21 | A.   From this -- this questionnaire, I know that the PT number |
| 2:30PM | 22 | is abnormal, is prolong -- prolongated. |
| 2:30PM | 23 | Q.   And, in fact, you would agree with me that a PT of 76.3 is |
| 2:30PM | 24 | significantly and severely prolonged; correct? |
| 2:30PM | 25 | A.   I -- when you talk about significant and severe, you have |

| | | |
|---|---|---|
| 2:30PM | 1 | to have some comparison.  So I would agree with you that the PT |
| 2:30PM | 2 | was prolongated.  But, you know -- |
| 2:31PM | 3 |        THE COURT:  Counsel, we may have to take a break for |
| 2:31PM | 4 | the jurors. |
| 2:31PM | 5 |        MR. HONNOLD:  Thank you, Your Honor. |
| 2:31PM | 6 |        THE COURT:  Ten-minute break is fine.  Court's in |
| 2:31PM | 7 | recess. |
| 2:31PM | 8 |        THE DEPUTY CLERK:  All rise. |
| 2:31PM | 9 |       (Whereupon the jury was excused from the courtroom.) |
| 2:31PM | 10 |               (Recess.) |
| 2:45PM | 11 |       (Whereupon the jury entered the courtroom.) |
| 2:46PM | 12 |        THE COURT:  Okay.  Please continue.  Continue. |
| 2:46PM | 13 | BY MR. HONNOLD: |
| 2:46PM | 14 | Q.   Doctor, I just want to make sure that we're done here. |
| 2:46PM | 15 |       The document that we're looking at that ended in 3996 |
| 2:46PM | 16 | that had the PT of 76.3, as it relates to these bleeding |
| 2:46PM | 17 | questionnaires, did Janssen do anything to determine or request |
| 2:46PM | 18 | what type of PT reagent was used for the particular test? |
| 2:46PM | 19 | A.   I'm not a case review physician, so I don't know what |
| 2:47PM | 20 | additional question they ask.  But I could give you a general |
| 2:47PM | 21 | medical comment here that the PT value could be affected by |
| 2:47PM | 22 | many factors, including the time when the blood was collected |
| 2:47PM | 23 | and what type of reagent was used and also the patient's |
| 2:47PM | 24 | underlying conditions, such as liver function. |
| 2:47PM | 25 |       These factors could influence PT values |

**OFFICIAL TRANSCRIPT**

2:47PM   1    significantly.

2:47PM   2              MR. HONNOLD:  Your Honor, I'd just move that be

2:47PM   3    stricken.  I had a completely different question for him.

2:47PM   4              THE COURT:  Yeah.  Just ask the question.  I'll

2:47PM   5    strike it; not responsive.

2:47PM   6    BY MR. HONNOLD:

2:47PM   7    Q.   Doctor, my only question for you is did the questionnaire

2:47PM   8    seek to elicit the information about what specific reagent was

2:47PM   9    used for the PT test?

2:47PM  10    A.   My answer is no, I don't know.

2:47PM  11    Q.   Okay.  I'm going to write on our chart here that in terms

2:48PM  12    of the reagent, that that information is not known.  As we move

2:48PM  13    forward about PT, I'd like to ask you another question.

2:48PM  14              Can you explain as it relates to PT what a reference

2:48PM  15    range is?

2:48PM  16    A.   According to this particular questionnaire?

2:48PM  17    Q.   Just in general.  What would be a -- what does the term

2:48PM  18    "reference range" mean in respect to the prothrombin time test?

2:48PM  19    A.   So the prothrombin test depends what reagent you use, and

2:48PM  20    different tests have a -- a range.  We call a normal range

2:48PM  21    that -- consider that if a number within this range would be

2:48PM  22    considered normal.

2:48PM  23    Q.   So is it fair to state that another term for the

2:48PM  24    "reference range" would be the "normal range"?

2:48PM  25    A.   You repeat -- what?  Could you repeat?

OFFICIAL TRANSCRIPT

928

| | | |
|---|---|---|
| 2:48PM | 1 | Q.    Would it be fair to state that another term for "reference |
| 2:49PM | 2 | range" would be "normal range" as it relates to the PT test? |
| 2:49PM | 3 | A.    Yes. |
| 2:49PM | 4 | Q.    And PT is measured in seconds; correct? |
| 2:49PM | 5 | A.    Yes. |
| 2:49PM | 6 | Q.    And so a normal range or reference range for a PT test |
| 2:49PM | 7 | would have a range from a certain number of seconds at the |
| 2:49PM | 8 | lower end of normal to another amount of seconds at the upper |
| 2:49PM | 9 | range of normal; correct?  Such as 10 seconds to 14 seconds, |
| 2:49PM | 10 | something like that? |
| 2:49PM | 11 | A.    Correct. |
| 2:49PM | 12 |        MR. HONNOLD:  Your Honor, we'd move for the admission |
| 2:49PM | 13 | of 5503996 as Plaintiff's 95. |
| 2:49PM | 14 |        THE COURT:  All right.  I'll admit it under the same |
| 2:50PM | 15 | conditions. |
| 2:50PM | 16 |        MR. SARVER:  Same issue, Your Honor. |
| 2:50PM | 17 |        MR. HONNOLD:  And, Your Honor, just in the name of |
| 2:50PM | 18 | speeding things up, I have several of those, but I think I'm |
| 2:50PM | 19 | just going to go through a couple more and move on to another |
| 2:50PM | 20 | topic. |
| 2:50PM | 21 |        THE COURT:  Good. |
| 2:50PM | 22 | BY MR. HONNOLD: |
| 2:50PM | 23 | Q.    Doctor, I'm going to put up on the screen now this |
| 2:50PM | 24 | Document 5504056, 5504056.  I've gone a little bit out of order |
| 2:50PM | 25 | for my document assistant there. |

2:50PM   1          Doctor, as we've done before, can you confirm by
2:50PM   2   looking at the date stamp that this is a questionnaire that
2:50PM   3   would have been received by Janssen on May 13th, 2013?
2:51PM   4   A.   Yes.
2:51PM   5   Q.   And this is -- looking at the date information like we've
2:51PM   6   done before, this is talking about a bleeding event that
2:51PM   7   occurred on August -- or October 3rd, 2012; is that correct?
2:51PM   8   A.   That's correct.
2:51PM   9   Q.   And this looks like a bleed that's in the left thalamic
2:51PM  10   region in the brain; is that true?
2:51PM  11   A.   Yes.
2:51PM  12   Q.   And then if we look at the PT information here, you see
2:51PM  13   that the PT for October 3rd is 21.4 and, for October 4th, it's
2:51PM  14   23.4; is that correct?
2:51PM  15   A.   That's correct, sir.
2:51PM  16   Q.   And here there is a reference range that's listed or the
2:51PM  17   normal range of 10 to 13; is that right?
2:52PM  18   A.   That's right.
2:52PM  19   Q.   And like these other questionnaires we've gone through,
2:52PM  20   this would have been received by Janssen and maintained in the
2:52PM  21   course of its business; is that true?
2:52PM  22   A.   That's true.
2:52PM  23          MR. HONNOLD:  Your Honor, we'd move 5504056 into
2:52PM  24   evidence as Plaintiff's 96.
2:52PM  25          THE COURT:  It will be admitted.

**OFFICIAL TRANSCRIPT**

930

2:52PM   1          MR. SARVER:  Thank you, Your Honor.  I assume the

2:52PM   2    same rules apply?

2:52PM   3          THE COURT:  Same ruling with all of these.

2:52PM   4          MR. SARVER:  Yes, sir.

2:52PM   5    BY MR. HONNOLD:

2:52PM   6    Q.   Doctor, I'm going to put on the screen now what is

2:52PM   7    Document 5504005.

2:52PM   8          And as we've done before, Doctor, can you confirm the

2:52PM   9    date stamp?

2:53PM   10   A.   Stamp is February 22nd, 2013.

2:53PM   11   Q.   And so this questionnaire would have been received by

2:53PM   12   Janssen on that date?  February 22nd, 2013, it would have been

2:53PM   13   received?

2:53PM   14   A.   Yes.

2:53PM   15   Q.   And this talks about the bleeding event.  We have to look

2:53PM   16   a little bit more closely for the date here, but it looks like

2:53PM   17   it's in early January of 2013.  I don't see the actual date of

2:53PM   18   admission.

2:53PM   19         But here we see that Xarelto was started on

2:53PM   20   January 6th of 2013.  And if we look down below at the PT

2:53PM   21   information then, do you see where it shows that the PT the day

2:54PM   22   after Xarelto was started at 21.6?  Do you see that?

2:54PM   23   A.   I saw that.

2:54PM   24   Q.   And then by January 11th, the PT is 49.2.

2:54PM   25         Do you see that?

**OFFICIAL TRANSCRIPT**

931

| | | |
|---|---|---|
| 2:54 PM | 1 | **A.**   I saw that. |
| 2:54 PM | 2 | **Q.**   And then on January 12th, the PT is 67.5. |
| 2:54 PM | 3 |        Do you see that? |
| 2:54 PM | 4 | **A.**   I saw that. |
| 2:54 PM | 5 | **Q.**   And like before, this would be another bleeding |
| 2:54 PM | 6 | questionnaire that would have been received by Janssen in the |
| 2:54 PM | 7 | medical safety office and maintained in the ordinary course of |
| 2:54 PM | 8 | Janssen's business? |
| 2:54 PM | 9 | **A.**   Yes. |
| 2:54 PM | 10 |        **MR. HONNOLD:**   Your Honor, we'd move 5504005 into |
| 2:54 PM | 11 | evidence as Plaintiff's 97. |
| 2:54 PM | 12 |        **THE COURT:**   Admitted with the same conditions. |
| 2:54 PM | 13 | BY MR. HONNOLD: |
| 2:54 PM | 14 | **Q.**   Doctor, I'd like to move forward to another topic now. |
| 2:54 PM | 15 |        In addition to the bleeding questionnaires as part of |
| 2:54 PM | 16 | the enhanced pharmacovigilance process for Janssen, you talked |
| 2:55 PM | 17 | about the study, is that right, the safety study? |
| 2:55 PM | 18 | **A.**   Yes. |
| 2:55 PM | 19 | **Q.**   And there were some requirements as to what that study |
| 2:55 PM | 20 | would specifically do and look at; is that true? |
| 2:55 PM | 21 | **A.**   Yes. |
| 2:55 PM | 22 | **Q.**   It certainly took some time to plan that study, to |
| 2:55 PM | 23 | formulate the study protocol, and to put things -- necessary |
| 2:55 PM | 24 | things in place to perform the study; right? |
| 2:55 PM | 25 | **A.**   Yes. |

**OFFICIAL TRANSCRIPT**

2:55PM  1  **Q.**   And, ultimately, did you and others at Janssen formulate

2:55PM  2  an agreed study plan with protocol for the study?

2:55PM  3  **A.**   Sir, can you repeat your question?

2:55PM  4  **Q.**   Certainly.  Ultimately, did you and others at Janssen

2:55PM  5  formulate an agreed study plan or protocol for the study?

2:55PM  6  **A.**   Eventually, Janssen team worked with FDA to finalize the

2:55PM  7  protocol of the FDA agreement.

2:56PM  8  **Q.**   And you keep mentioning the FDA.  I appreciate that.

2:56PM  9         The deal was with the FDA to get the drug approved,

2:56PM  10 you had to do ongoing -- a safety study; true?

2:56PM  11 **A.**   I'm sorry.  Could you repeat your question?

2:56PM  12 **Q.**   As a condition of approval, the FDA had concern about

2:56PM  13 bleeding risk with Xarelto and required the safety study;

2:56PM  14 correct?

2:56PM  15 **A.**   As part of the postmarketing requirement by FDA.

2:56PM  16 **Q.**   Well, it was unique for Xarelto, wasn't it?  It was

2:56PM  17 enhanced pharmacovigilance.  It was not what is usually

2:56PM  18 required of a drug when it's approved; correct?  It was extra?

2:56PM  19 **A.**   For this particular indication approval, FDA required

2:56PM  20 Janssen to conduct a postmarketing -- to have a postmarketing

2:56PM  21 requirement.  But I'd like to remind you that it actually is a

2:56PM  22 common practice for FDA to ask company to have a postmarketing

2:56PM  23 requirement for a new drug approval.

2:57PM  24 **Q.**   This particular plan, though, this particular program was

2:57PM  25 unique to Xarelto in terms of the bleeding questionnaire and

**OFFICIAL TRANSCRIPT**

2:57PM     1    the safety study; correct?

2:57PM     2    A.    I agree.

2:57PM     3    Q.    And you know that there actually was -- before the study

2:57PM     4    was started, there was a -- a study protocol or a plan design

2:57PM     5    that was put together by individuals at Johnson & Johnson

2:57PM     6    Pharmaceutical Research and Development; right?

2:57PM     7    A.    Right.

2:57PM     8    Q.    Now, I'm going to put on the screen that document which is

2:57PM     9    marked as 5813292.

2:57PM    10          And you're certainly familiar with this document;

2:57PM    11    correct?

2:57PM    12    A.    I'm familiar.

2:58PM    13    Q.    And the study was going to be called -- or generally the

2:58PM    14    topic was "Postmarketing pharmacovigilance study for the active

2:58PM    15    detection and evaluation of major bleeding events in Xarelto

2:58PM    16    users with atrial fibrillation or with total hip and total knee

2:58PM    17    arthroplasty."

2:58PM    18          Did I read it right?

2:58PM    19    A.    You're right.

2:58PM    20    Q.    So this study was going to be looking at patients that had

2:58PM    21    major bleeding events while taking Xarelto either for the

2:58PM    22    atrial fibrillation indication or the total hip or total knee

2:58PM    23    surgery indication; is that true?

2:58PM    24    A.    That's true.

2:58PM    25    Q.    And one thing about this study was that Janssen was

**OFFICIAL TRANSCRIPT**

2:58PM   1   going -- or the R&D -- Johnson & Johnson Pharmaceutical
2:58PM   2   Research and Development was going to be granted access to the
2:58PM   3   Department of Defense insurance -- or health insurance claims
2:58PM   4   database; correct?
2:59PM   5   **A.**   Correct.
2:59PM   6   **Q.**   And it was actually going to grant access to the
2:59PM   7   electronic medical records for those patients; is that right?
2:59PM   8   **A.**   I like to correct your statement here.  We work with a
2:59PM   9   business partner who has the access to the database.  And I'm
2:59PM  10   not sure whether Janssen could access the database directly or
2:59PM  11   not.  I'm not the study leader, so I would defer to the person
2:59PM  12   who did the study.
2:59PM  13   **Q.**   So Janssen partnered with a third-party vendor then to be
2:59PM  14   the one that would actually delve into the electronic medical
2:59PM  15   records for the Department of Defense claimants, health
2:59PM  16   insurance claimants?
2:59PM  17   **A.**   That is my recollection.
2:59PM  18   **Q.**   Okay.  I'd like you to go to page 14 of this document,
2:59PM  19   please.  And I'm specifically going to direct you to paragraph
3:00PM  20   5.5.1.  It's called "Event Assessment."
3:00PM  21        And this basically states what is going to be looked
3:00PM  22   at for these bleeding events; is that true?
3:00PM  23   **A.**   Yes.
3:00PM  24   **Q.**   And it says -- about halfway through the paragraph, it
3:00PM  25   says, "The collected information will include:  Patient

**OFFICIAL TRANSCRIPT**

3:00PM   1    medical/surgical history, risk factors, concomitant medication

3:00PM   2    use, bleed-related clinical management strategies, subsequent

3:00PM   3    treatment modalities, and bleeding-related clinical outcomes."

3:00PM   4           As you go on, it says that, "A computerized data

3:01PM   5    collection form with preloaded relevant diagnostic/procedure

3:01PM   6    code, list of therapeutics, and other reference items will be

3:01PM   7    used for that purpose, and this form, previously used for

3:01PM   8    evaluation of adverse events in hospital settings, will include

3:01PM   9    the following data modules."

3:01PM  10           Then it breaks down specific things that will be

3:01PM  11    looked at, and that includes "Patient information and medical

3:01PM  12    background to" -- "Patient information and medical background

3:01PM  13    to identify a major bleeding event."

3:01PM  14           Do you see that?

3:01PM  15    A.   I saw that.

3:01PM  16    Q.   Then the next part is on the next page, page 15, and you

3:01PM  17    see it says, "Characteristics of major bleeding."

3:01PM  18           Do you see that?

3:01PM  19    A.   I saw that.

3:01PM  20    Q.   And specifically in that section, it says, "Event clinical

3:01PM  21    features:  Location, type, duration, severity," et cetera, and

3:02PM  22    "results of relevant laboratory procedures and/or tests."

3:02PM  23           Do you see where it states that?

3:02PM  24    A.   I saw that.

3:02PM  25    Q.   So it looks like this study, in terms of looking at the

**OFFICIAL TRANSCRIPT**

3:02PM  1    bleeding events in the medical records database, is going to
3:02PM  2    include looking at and assessing results of relevant laboratory
3:02PM  3    procedures and/or tests; right?
3:02PM  4    A.   Right.
3:02PM  5    Q.   Okay.  Let's go back in time now.
3:02PM  6         When we talked about the bleeding questionnaire, we
3:02PM  7    can agree that the PT information that was solicited, one of
3:02PM  8    the reasons that it was solicited is because it was thought
3:02PM  9    that the pro time, or prothrombin time, test results were
3:02PM  10   relevant to look at; correct?
3:02PM  11   A.   Well, a piece of information that may be helpful to
3:02PM  12   evaluate individual cases.
3:03PM  13   Q.   And if it's helpful to evaluate, can we agree that that
3:03PM  14   might also include the term "relevant"?
3:03PM  15   A.   I'm sorry, sir.  I could not hear you.
3:03PM  16   Q.   Sure, sure.  If you said that getting a PT would be
3:03PM  17   helpful to evaluate the particular case, would it then be fair
3:03PM  18   to state that the pro time, or the prothrombin time, results
3:03PM  19   would be relevant information about the patient to assist
3:03PM  20   assessment or evaluation in the case?
3:03PM  21   A.   May be relevant.  Depends on the cases.
3:03PM  22   Q.   And it looks like here that the individuals or the study
3:03PM  23   design that is being put together, it's talking about again
3:03PM  24   results of relevant laboratory procedures and/or tests.
3:03PM  25         Would it be fair to state, Doctor, that in the

**OFFICIAL TRANSCRIPT**

3:03PM  1    context of the safety study related to bleeding, that PT would

3:03PM  2    also be -- in this context of the study, may also be a relevant

3:04PM  3    laboratory test?

3:04PM  4    A.    So, sir, I explained to you that I'm not a study leader

3:04PM  5    for this protocol.  I only provide some input in terms of the

3:04PM  6    study design, such as how to identify major bleeding events.

3:04PM  7    The specific procedure in terms of what data source and data

3:04PM  8    component should be collected, I will have to defer to the

3:04PM  9    study leader to explain to you precisely.

3:04PM  10   Q.    But it looks like, at least from the study design document

3:04PM  11   that we're looking at, that part of the study design is to look

3:04PM  12   at and evaluate the results of relevant laboratory procedures

3:04PM  13   and tests; right?

3:04PM  14   A.    It -- the second bullet point is what you said, yes.

3:04PM  15   Q.    And for bleeding patients on Xarelto, that could include

3:04PM  16   PT times; right?

3:05PM  17   A.    I did not look at the medical record for this database, so

3:05PM  18   I cannot answer your question.

3:05PM  19   Q.    If somebody was going to put together a study like this to

3:05PM  20   look at and evaluate and assess the bleeding events, major

3:05PM  21   bleeding events in patients taking Xarelto, it should include

3:05PM  22   an assessment and evaluation of patient's prothrombin time;

3:05PM  23   correct?  Just like your bleeding questionnaire did.  That's

3:05PM  24   true; right?

3:05PM  25   A.    It should including, as the protocol say, the relevant

**OFFICIAL TRANSCRIPT**

3:05PM  1    laboratory procedures.  So maybe the PT would be one of them,

3:05PM  2    but there may be other laboratory tests value to examine.

3:05PM  3    Q.    Thank you, Doctor.

3:05PM  4          MR. HONNOLD:  And, Your Honor, we'd move for

3:05PM  5    admission of 50 -- 5814292 as Plaintiff's 97.

3:05PM  6          THE DEPUTY CLERK:  98.

3:05PM  7          MR. SARVER:  No objection, Your Honor.

3:05PM  8          MR. HONNOLD:  98.  Excuse me.

3:05PM  9          THE COURT:  Admitted.

3:05PM  10   BY MR. HONNOLD:

3:06PM  11   Q.    And, Doctor, at the time that the study was put together,

3:06PM  12   the individuals that put the study together would have had the

3:06PM  13   benefit of the process they had gone through in terms of

3:06PM  14   identifying relevant laboratory tests when they prepared the

3:06PM  15   questionnaire; right?

3:06PM  16   A.    Could you be specific what laboratory tests you talk

3:06PM  17   about?

3:06PM  18   Q.    Sure.  Just like the questionnaire, the individuals

3:06PM  19   putting together the study would have had the benefit of

3:06PM  20   looking back and seeing what Janssen had done on the

3:06PM  21   questionnaire in terms of the laboratory tests specifically

3:06PM  22   that they looked at.

3:06PM  23   A.    It depends on the data, and also depends the -- the cases.

3:06PM  24   So I -- personally I was not directly involved in the study

3:06PM  25   data collection, so I really have no knowledge about -- to make

3:07PM  1    this comment.

3:07PM  2    **Q.**   Doctor, the study, is it still ongoing?

3:07PM  3    **A.**   The study actually has been completed.  FDA informed

3:07PM  4    company that the study fulfilled the FDA postmarketing

3:07PM  5    requirement.  So FDA agreed that the company could stop the

3:07PM  6    study, and the study has been stopped.

3:07PM  7    **Q.**   And before it was stopped, is it true that some interim

3:07PM  8    data was published?

3:07PM  9    **A.**   Yes.

3:07PM  10   **Q.**   And, Doctor, what I'd like to do is have you look at

3:07PM  11   Document 3890018.

3:08PM  12          And, Doctor, does it appear that this is a copy of

3:08PM  13   the interim study report that was published and has your name

3:08PM  14   on it?

3:08PM  15   **A.**   Yes.

3:08PM  16   **Q.**   And the study is called "Characterizing major bleeding in

3:08PM  17   patients with nonvalvular atrial fibrillation: a

3:08PM  18   pharmacovigilance study of 27,467 patients taking rivaroxaban."

3:08PM  19          Did I read the study title correctly?

3:08PM  20   **A.**   Correct.

3:08PM  21   **Q.**   And this essentially -- well, let me ask you this:

3:08PM  22   There's a number of authors; is that true?

3:08PM  23   **A.**   Yes.

3:08PM  24   **Q.**   Do you know which of them are employed by Janssen or

3:08PM  25   Bayer?

**OFFICIAL TRANSCRIPT**

3:08PM  1  A.    So like I said, we both work at Janssen, and there are few

3:09PM  2  people, Larry Fields, Troy Sarich, Daniel Yannicelli, Zhong

3:09PM  3  Yuan, they all be -- work at -- in Janssen.  And also other

3:09PM  4  people work in either the government, such as the Naval Medical

3:09PM  5  Center, and also academic, like Baylor College of Medicine.  So

3:09PM  6  there are a number of people work in different setting.

3:09PM  7  Q.    So Dr. Yannicelli, does he work for Janssen?

3:09PM  8  A.    I'm sorry.  Could you repeat your question?

3:09PM  9  Q.    Does Dr. Yannicelli work for Janssen, Y-a-n-n-i-c-e-l-l-i?

3:09PM  10  A.    Yes.

3:09PM  11  Q.    And then Dr. Yuan, does he work for Janssen?

3:09PM  12  A.    Yes.

3:09PM  13  Q.    And Troy Sarich, does he work for Bayer?

3:09PM  14  A.    Troy actually work for Janssen.

3:10PM  15  Q.    Oh, Troy Sarich works for Janssen.

3:10PM  16       Anyone else that works for Janssen that I have not

3:10PM  17  highlighted?

3:10PM  18  A.    Another person, Larry Fields.

3:10PM  19  Q.    And then I've also -- excuse me.  Go ahead.

3:10PM  20  A.    Larry Fields also work at Janssen.

3:10PM  21  Q.    I've highlighted Dr. Frank Peacock.  Do you know

3:10PM  22  Dr. Peacock?

3:10PM  23  A.    I know -- I don't have any direct interaction with him.  I

3:10PM  24  know he is a very renowned physician in this field.  That's the

3:10PM  25  only thing I know.

**OFFICIAL TRANSCRIPT**

3:10PM  1   **Q.**   Do you know him to be a key -- a national key opinion
3:10PM  2   leader for Bayer or Janssen?
3:10PM  3   **A.**   I don't know.
3:10PM  4   **Q.**   What I'd like you to do, Doctor, is take a moment to look
3:10PM  5   at the study and see if, in a single place in the study, there
3:11PM  6   is a single mention -- a word, a number, a phrase, a table, a
3:11PM  7   figure, a graph, anything -- that talks about laboratory data,
3:11PM  8   laboratory test results such as prothrombin time results for a
3:11PM  9   single patient.
3:11PM  10          **MR. SARVER:**   Your Honor, I object.  That's a bit of
3:11PM  11  an unfair question when we're looking at an entire study.  Do
3:11PM  12  you want him to sit here and go through --
3:11PM  13          **THE COURT:**   Yeah, let's do it another way, Counsel.
3:11PM  14  **BY MR. HONNOLD:**
3:11PM  15  **Q.**   Doctor, would it be fair to state -- I've looked at this
3:11PM  16  study several times.  Would it be fair to state that if you go
3:11PM  17  through the pages beginning with the abstract, is there any
3:11PM  18  reference in the abstract to measurement of prothrombin time?
3:11PM  19  **A.**   I did not see the prothrombin time mentioned in this
3:12PM  20  paper, in this table or figure.
3:12PM  21  **Q.**   If you go through the next page on the specific headings,
3:12PM  22  and I'm particularly interested in the heading that begins in
3:12PM  23  the lower right-hand corner, "Rivaroxaban exposure and bleed
3:12PM  24  event identification," if you scan that page, do you see
3:12PM  25  anything that lays out in graphic form anything about

| | | |
|---|---|---|
| 3:12PM | 1 | laboratory test data for these patients? |
| 3:12PM | 2 | **A.**   It is going to take me some time to look at that.  Which |
| 3:12PM | 3 | paragraph are you talking about? |
| 3:12PM | 4 | **THE COURT:**  Counsel, you've got it into evidence. |
| 3:12PM | 5 | **MR. HONNOLD:**  Okay. |
| 3:12PM | 6 | **THE COURT:**  We don't have the time to do that. |
| 3:12PM | 7 | **MR. HONNOLD:**  Your Honor, I'd move for admission of |
| 3:12PM | 8 | 3890018 as Plaintiff's 99. |
| 3:12PM | 9 | **THE COURT:**  I'll admit it. |
| 3:12PM | 10 | **MR. SARVER:**  Your Honor, we don't have any objection. |
| 3:12PM | 11 | **THE COURT:**  Admitted. |
| 3:13PM | 12 | Any more questions? |
| 3:13PM | 13 | **MR. HONNOLD:**  Just a couple -- just a couple others, |
| 3:13PM | 14 | Your Honor. |
| 3:13PM | 15 | **BY MR. HONNOLD:** |
| 3:13PM | 16 | **Q.**   Doctor, are you aware that many of the Xarelto clinical |
| 3:13PM | 17 | trials use the Neoplastin PT test?  Are you aware of that? |
| 3:13PM | 18 | **A.**   I know some clinical trial for Xareltos have the |
| 3:13PM | 19 | neoplastic PT time value and also have other laboratory value |
| 3:13PM | 20 | during the clinical trials. |
| 3:13PM | 21 | **Q.**   Doctor, you would agree with me that there is some |
| 3:13PM | 22 | connection between Xarelto and PT; correct? |
| 3:13PM | 23 | **A.**   I want you to be more specific.  What connection you |
| 3:13PM | 24 | talking about? |
| 3:13PM | 25 | **Q.**   Well, I asked you this question before today, and you were |

3:13PM   1   able to answer it without -- without that.  Doctor, you would

3:13PM   2   agree there was some connection between Xarelto and PT;

3:13PM   3   correct?

3:13PM   4   A.   So, if you look at the package insert, the -- there is

3:13PM   5   some connection between the neoplastic prothrombin time with

3:14PM   6   the plasma concentration of Xarelto.  So I just want to be

3:14PM   7   specific, answer your question.

3:14PM   8   Q.   Okay.  So we can agree that there is some connection

3:14PM   9   between Xarelto and PT; is that right?

3:14PM   10           MR. SARVER:  Objection, Your Honor.  He tried to be

3:14PM   11   very specific and --

3:14PM   12           THE WITNESS:  Some connection between the prothrombin

3:14PM   13   time and the plasma concentration of Xarelto.

3:14PM   14           THE COURT:  Okay.  That's --

3:14PM   15           THE WITNESS:  It's very specific.

3:14PM   16   BY MR. HONNOLD:

3:14PM   17   Q.   If I wanted to learn more about that, your view is that

3:14PM   18   I'd have to talk to a pharmacologist; right?

3:14PM   19   A.   Depends on your question, and I will try my best to answer

3:14PM   20   your question.

3:14PM   21   Q.   Doctor, do you remember telling me before today that if I

3:14PM   22   wanted more information in that connection, I'd need to speak

3:14PM   23   to a pharmacologist?  Do you remember telling me that before

3:14PM   24   today at your deposition?

3:15PM   25   A.   During the deposition, you asked me a lot of technical

**OFFICIAL TRANSCRIPT**

3:15PM 1    questions related to clinical pharmacology.  And I respect my
3:15PM 2    colleagues who work in clinical pharmacology, and I -- in my
3:15PM 3    opinion that they should be able to provide you a precise
3:15PM 4    answer, and that, you know, clinical pharmacology is not my
3:15PM 5    expertise.
3:15PM 6    Q.   But to get more information, I could speak -- or should
3:15PM 7    speak to a clinical pharmacologist; is that right?
3:15PM 8    A.   I'm sorry, sir.  Could you repeat your question?
3:15PM 9    Q.   But to get more information, I would have to speak to that
3:15PM 10   clinical pharmacologist; right?
3:15PM 11   A.   When you get into the technical question, very specific to
3:15PM 12   clinical pharmacologies, I would suggest you should talk to my
3:15PM 13   colleague, my clinical pharmacology colleagues.
3:15PM 14   Q.   And, Doctor, do you have any familiarity with a
3:15PM 15   pharmacologist named Laura Plunkett who testified in this
3:16PM 16   courtroom yesterday on that topic?
3:16PM 17   A.   I don't know who testified yesterday.
3:16PM 18       MR. HONNOLD:  Okay.  Thank you, Doctor.  I don't have
3:16PM 19   any questions right now.
3:16PM 20       MS. PRUITT:  Your Honor, before we get started, can I
3:16PM 21   bring up one issue at the bench, please?
3:16PM 22       THE COURT:  Can you do what?
3:16PM 23       MS. PRUITT:  Can I come to the bench?
3:16PM 24       THE COURT:  Yes.
3:16PM 25       (whereupon the following proceedings were held at the

**OFFICIAL TRANSCRIPT**

3:16PM  1          bench out of the hearing of the jury:)

3:21PM  2          MS. PRUITT:  I could be wrong, because I was kind of

3:21PM  3  falling asleep, but I think that last exhibit that Mr. Honnold

3:21PM  4  introduced was medical literature, and I know we have an

3:21PM  5  agreement that it doesn't come in because it's medical

3:21PM  6  literature.

3:21PM  7          THE COURT:  Yeah, but the medical literature, the

3:21PM  8  articles don't come in.  This is a little different than the

3:21PM  9  medical literature.  I thought this was a report.

3:21PM  10         MR. HONNOLD:  Their study.

3:21PM  11         THE COURT:  Their study.  Yeah, I saw this as a

3:21PM  12  little different than the medical literature, and the reason

3:21PM  13  for it frankly is that the concept is that you don't want

3:21PM  14  jurors to be reading medical literature and making decisions on

3:21PM  15  medical literature.

3:21PM  16         MS. PRUITT:  I agree.

3:21PM  17         THE COURT:  This is a little different.  As I

3:21PM  18  understand it, it's report from their material.

3:22PM  19         MS. PRUITT:  I just wanted to make sure I was

3:22PM  20  protecting my record if I needed to.

3:22PM  21         THE COURT:  Sure.  No, I understand.

3:22PM  22         MR. HONNOLD:  And he's a coauthor as well.

3:22PM  23         THE COURT:  Yeah.  Okay.  Thanks.

3:22PM  24         MS. PRUITT:  Just checking.  Thank you, Judge.

3:17PM  25         (whereupon the following proceedings were held in

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 3:17PM | 1 | open court in the presence and hearing of the jury:) |
| 3:18PM | 2 | MR. SARVER:  Your Honor, may I proceed? |
| 3:18PM | 3 | THE COURT:  Yes, please. |
| 3:18PM | 4 | CROSS-EXAMINATION |
| 3:18PM | 5 | BY MR. SARVER: |
| 3:18PM | 6 | Q.   Good afternoon, Dr. Wu.  My name is Richard Sarver.  I |
| 3:18PM | 7 | represent Janssen and Bayer.  How are you? |
| 3:18PM | 8 | A.   Good afternoon.  Good.  Thank you.  How are you? |
| 3:18PM | 9 | Q.   I'm fine.  Thank you.  I don't believe we've ever met.  Is |
| 3:18PM | 10 | that right, sir? |
| 3:18PM | 11 | A.   No. |
| 3:18PM | 12 | Q.   We spoke on the phone one evening; is that correct? |
| 3:18PM | 13 | A.   Yes. |
| 3:18PM | 14 | Q.   I've got some questions for you.  The first thing I'd like |
| 3:18PM | 15 | to ask you is a little bit more about yourself. |
| 3:18PM | 16 | Is it correct that you are a medical doctor? |
| 3:18PM | 17 | A.   Yes. |
| 3:18PM | 18 | Q.   And is your medical degree from China? |
| 3:18PM | 19 | A.   Yes. |
| 3:18PM | 20 | Q.   What kind of medicine did you practice? |
| 3:18PM | 21 | A.   I practiced internal medicine in China. |
| 3:18PM | 22 | Q.   When did you come to the United States, sir? |
| 3:18PM | 23 | A.   I came to United States in 1992. |
| 3:19PM | 24 | Q.   And when you came to the US, did you go back to school and |
| 3:19PM | 25 | obtain an advanced degree beyond your medical degree? |

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 3:19PM | 1 | **A.**   That's correct. |
| 3:19PM | 2 | **Q.**   Did you obtain a Ph.D.? |
| 3:19PM | 3 | **A.**   Yes. |
| 3:19PM | 4 | **Q.**   What was that Ph.D. in, sir? |
| 3:19PM | 5 | **A.**   My Ph.D. is in microbiology and immunology. |
| 3:19PM | 6 | **Q.**   And what university did you attend? |
| 3:19PM | 7 | **A.**   I received Ph.D. from Temple University, at Philadelphia, |
| 3:19PM | 8 | Pennsylvania. |
| 3:19PM | 9 | **Q.**   You began working for Janssen when, what year? |
| 3:19PM | 10 | **A.**   Sometime around 2010. |
| 3:19PM | 11 | **Q.**   You told Mr. Honnold that you're a medical safety officer. |
| 3:19PM | 12 |         Can you tell us what that means? |
| 3:19PM | 13 | **A.**   So a medical safety officer is responsible to chair the |
| 3:19PM | 14 | safety management team to discuss any potential safety signals |
| 3:20PM | 15 | and find a resolution.  So that's my responsibility. |
| 3:20PM | 16 | **Q.**   My apologies.  I didn't mean to interrupt you. |
| 3:20PM | 17 |         Were you working primarily on one medicine? |
| 3:20PM | 18 | **A.**   Yes. |
| 3:20PM | 19 | **Q.**   What was that? |
| 3:20PM | 20 | **A.**   Xarelto. |
| 3:20PM | 21 | **Q.**   Were you part of something called the global medical |
| 3:20PM | 22 | safety group at Janssen? |
| 3:20PM | 23 | **A.**   Yes. |
| 3:20PM | 24 | **Q.**   And could you tell us about that?  What is that? |
| 3:20PM | 25 | **A.**   Global medical safety group is a key function group within |

|         |    |                                                                    |
|---------|----|--------------------------------------------------------------------|
| 3:20PM  | 1  | Janssen.  The key responsibility is patient safety.                |
| 3:20PM  | 2  | **Q.**   And was your group something called the medical safety    |
| 3:20PM  | 3  | assessment group?                                                  |
| 3:20PM  | 4  | **A.**   Yes.                                                       |
| 3:20PM  | 5  | **Q.**   And could you tell the jury about that?  What is that?    |
| 3:20PM  | 6  | **A.**   The medical safety assessment group is under global       |
| 3:21PM  | 7  | medical safety.  It is a subdivision.  This particular group       |
| 3:21PM  | 8  | consists of physicians with different specialties, and            |
| 3:21PM  | 9  | individual physicians have a title called medical safety          |
| 3:21PM  | 10 | officer in charge of one or two or maybe three products'          |
| 3:21PM  | 11 | safety --                                                          |
| 3:21PM  | 12 | **Q.**   I'd like to --                                             |
| 3:21PM  | 13 | **A.**   -- and I'm one of them.                                    |
| 3:21PM  | 14 | **Q.**   Thank you, sir.  I interrupted you.  My fault.            |
| 3:21PM  | 15 |          You've been talking with Mr. Honnold for some time        |
| 3:21PM  | 16 | now about something called postmarket safety requirements.         |
| 3:21PM  | 17 |          Do you recall that discussion?                            |
| 3:21PM  | 18 | **A.**   Yes.                                                       |
| 3:21PM  | 19 | **Q.**   When a company like Janssen or Bayer has a medicine       |
| 3:21PM  | 20 | approved by the FDA as safe and effective, does that mean it      |
| 3:21PM  | 21 | stops monitoring, looking for, checking the safety of the         |
| 3:22PM  | 22 | medicine?                                                          |
| 3:22PM  | 23 | **A.**   The safety is an ongoing effort.  Any drugs on the market,|
| 3:22PM  | 24 | it is company's obligation to continue to monitor the safety      |
| 3:22PM  | 25 | profile of the medicines.                                         |

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 3:22PM | 1 | **Q.**   And -- |
| 3:22PM | 2 | **A.**   So it is a continual effort. |
| 3:22PM | 3 | **Q.**   You continue to monitor the safety of the medicine, and is |
| 3:22PM | 4 | that something called pharmacovigilance? |
| 3:22PM | 5 | **A.**   Yes. |
| 3:22PM | 6 | **Q.**   In terms of Xarelto, is Janssen still, today, monitoring |
| 3:22PM | 7 | the safety of Xarelto? |
| 3:22PM | 8 | **A.**   Yes, of course. |
| 3:22PM | 9 | **Q.**   Now, is it correct that for Xarelto, did Janssen do more |
| 3:22PM | 10 | than the ordinary pharmacovigilance?  Did it perform something |
| 3:22PM | 11 | called an enhanced pharmacovigilance program? |
| 3:23PM | 12 | **A.**   Yes, you're correct. |
| 3:23PM | 13 | **Q.**   Could you tell us about that, please? |
| 3:23PM | 14 | **A.**   So the enhanced pharmacovigilance plan is in addition to |
| 3:23PM | 15 | routine pharmacovigilance.  Routine pharmacovigilance is a |
| 3:23PM | 16 | mandatory process by regulatory health authorities such as FDA. |
| 3:23PM | 17 |         For Xarelto, in addition to routine |
| 3:23PM | 18 | pharmacovigilance, we also implement an enhanced |
| 3:23PM | 19 | pharmacovigilance plan.  So this is an additional effort in |
| 3:23PM | 20 | addition to routine activities. |
| 3:23PM | 21 | **Q.**   Now, do you recall, Dr. Wu, when Xarelto was first |
| 3:23PM | 22 | approved as safe and effective by the FDA, was there an |
| 3:23PM | 23 | approval letter that was sent to Janssen from the FDA? |
| 3:23PM | 24 | **A.**   I do remember that. |
| 3:24PM | 25 | **Q.**   If the counsel there in the room could show you Defense |

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 3:24PM | 1 | Exhibit 5357, then we can look at it together. |
| 3:24PM | 2 | Dr. Wu, what is Defense Exhibit 5357? |
| 3:24PM | 3 | A.   This exhibit is a -- is the approval letter from FDA about |
| 3:24PM | 4 | the orthopedic surgery indication for Xarelto. |
| 3:24PM | 5 | Q.   What's the date of the approval, sir? |
| 3:24PM | 6 | A.   Let me look at the date. |
| 3:24PM | 7 | Q.   Let me make it easier.  When was it received by Janssen? |
| 3:24PM | 8 | A.   So the stamp here I see is July 13, 2011. |
| 3:24PM | 9 | Q.   As part of the approval letter, did FDA and Janssen agree |
| 3:24PM | 10 | on an enhanced pharmacovigilance plan? |
| 3:24PM | 11 | A.   Sir, could you repeat your question, please? |
| 3:25PM | 12 | Q.   Yes, sir.  As -- in the FDA approval letter, was there a |
| 3:25PM | 13 | requirement and an agreement to perform an enhanced |
| 3:25PM | 14 | pharmacovigilance plan? |
| 3:25PM | 15 | A.   Yes. |
| 3:25PM | 16 | Q.   Did Janssen perform that plan? |
| 3:25PM | 17 | A.   Yes. |
| 3:25PM | 18 | Q.   Do you recall that the plan was called PMR 1797-1? |
| 3:25PM | 19 | A.   Yes. |
| 3:25PM | 20 | Q.   If I could take a look at Defense Exhibit 5357 on page 3. |
| 3:25PM | 21 | Do you see the requirement here where it's written, |
| 3:25PM | 22 | "You agree to conduct an enhanced pharmacovigilance plan"?  Do |
| 3:26PM | 23 | you see that? |
| 3:26PM | 24 | A.   I saw that. |
| 3:26PM | 25 | Q.   Are you familiar with that plan, Dr. Wu? |

**OFFICIAL TRANSCRIPT**

3:26PM  1    **A.**    I'm familiar.

3:26PM  2    **Q.**    Could you tell the jury, what did Janssen and the FDA

3:26PM  3    agree should be part of that vigilance plan?

3:26PM  4    **A.**    So under this enhanced pharmacovigilance plan, FDA and

3:26PM  5    Janssen agreed that for this plan, we need to have an enhanced

3:26PM  6    case follow-up, expedited any major bleeding events to FDA, and

3:26PM  7    third is to prepare periodical aggregate report about major

3:26PM  8    bleeding and share with the FDA.

3:26PM  9    **Q.**    What was the purpose of this enhanced pharmacovigilance

3:26PM  10   plan?

3:26PM  11   **A.**    The main purpose of this plan is to understand the safety

3:26PM  12   profile of Xarelto in a real-world setting, whether or not it

3:27PM  13   is consistent with the clinical trial experience.

3:27PM  14   **Q.**    Now, you mentioned in one of your answers that there was

3:27PM  15   an enhanced follow-up as part of the plan.

3:27PM  16            Could you describe that, please?

3:27PM  17   **A.**    So different from routine follow-up, the enhanced

3:27PM  18   follow-up, as you hear moments ago, we include a very

3:27PM  19   comprehensive questionnaire.  And we -- for some individual

3:27PM  20   case, the review physician or scientist will have to conduct

3:27PM  21   phone follow-up, pick up a phone, call a treating physician to

3:27PM  22   understand or to get more information.  And the questionnaire

3:27PM  23   is to be submitted -- I cannot remember how many times, but in

3:27PM  24   my recollection, probably two or three times, until that we

3:28PM  25   truly get additional information from treating physician.  This

952

3:28PM   1   is called enhanced case follow-up.

3:28PM   2   Q.   Now, do you recall that Mr. Honnold showed you a bleeding

3:28PM   3   questionnaire?

3:28PM   4   A.   I do recall.

3:28PM   5   Q.   And was that bleeding questionnaire provided to and

3:28PM   6   approved by the FDA?

3:28PM   7   A.   Yes.

3:28PM   8   Q.   I'd like to go to Defense Exhibit 5983.  And if your

3:28PM   9   counsel could provide you a copy.

3:28PM   10          Do you have that in front of you, sir?

3:28PM   11   A.   I have the copy in front of me.

3:28PM   12   Q.   What is Defense Exhibit 5983?

3:28PM   13   A.   This is the enhanced pharmacovigilance plan document.

3:28PM   14   Q.   And are you familiar with this document?

3:29PM   15   A.   I'm familiar.

3:29PM   16   Q.   And if we turn to page 8 -- I believe you have been there

3:29PM   17   already -- is that the beginning of the bleeding questionnaire?

3:29PM   18   A.   Yes.  Bleeding questionnaire is one of the appendix after

3:29PM   19   this document.

3:29PM   20   Q.   And that bleeding questionnaire, can you go through and

3:29PM   21   tell the jury, how many pages does that include?

3:29PM   22   A.   It's four pages.

3:29PM   23   Q.   And Mr. Honnold focused on some of the routine laboratory

3:29PM   24   testing that is on page 9 of the document.

3:29PM   25          Do you see that?

**OFFICIAL TRANSCRIPT**

3:29PM   1   **A.**  I saw that.

3:29PM   2   **Q.**  If we go to the previous page, do we see that there are

3:29PM   3   also in Section 5 diagnostic evaluations?

3:30PM   4   **A.**  Yes, I saw that.

3:30PM   5   **Q.**  You've got -- MRIs, MRAs, CTs, CTAs, and other.  What was

3:30PM   6   the purpose of having that information?

3:30PM   7   **A.**  The purpose of questionnaire is to gather information,

3:30PM   8   medical information as comprehensive as possible, so we like to

3:30PM   9   have this information in order to assess individual case to our

3:30PM   10   best knowledge.

3:30PM   11   **Q.**  And in the course of conducting the enhanced

3:30PM   12   pharmacovigilance plan, were these bleeding questionnaires sent

3:30PM   13   to Janssen?

3:30PM   14   **A.**  Yes.

3:30PM   15   **Q.**  And what did Janssen do with that information?

3:30PM   16   **A.**  So Janssen pays review physician, report to global medical

3:31PM   17   safety, receive a questionnaire and capture this information

3:31PM   18   provided by questionnaire, and then update the case narrative,

3:31PM   19   including medical record.  And the entire case, including case

3:31PM   20   narrative, the medical information such as laboratory and

3:31PM   21   diagnostic information, all shared with FDA.

3:31PM   22   **Q.**  And how would you, you Janssen, share the information from

3:31PM   23   all of these questions?  How would you share that with the FDA?

3:31PM   24   **A.**  There's a -- called a MedWatch form that allow you to

3:31PM   25   incorporate the information from a reporter and also the update

3:31PM  1    information such as from questionnaire into this MedWatch form

3:31PM  2    and then share with the FDA according to regulatory reporting

3:31PM  3    timeline.

3:32PM  4    Q.   Would Janssen also prepare something called aggregate

3:32PM  5    report?

3:32PM  6    A.   Yes.

3:32PM  7    Q.   And --

3:32PM  8    A.   So the one that I mentioned -- just explained to you is

3:32PM  9    called individual case, communication was FDA.  In addition,

3:32PM  10   based on the enhanced pharmacovigilance plan, we also prepare

3:32PM  11   aggregate report -- and this is a six-month interval -- and

3:32PM  12   share with FDA.

3:32PM  13   Q.   And if we take a look at page 11 of Defense Exhibit 5983,

3:32PM  14   do we see the outline for the aggregate bleeding report?

3:32PM  15   A.   Yes.

3:32PM  16   Q.   And is this a document that was submitted to the FDA at

3:32PM  17   certain intervals for a period of time?

3:32PM  18   A.   Yes.

3:32PM  19   Q.   And do you recall how many aggregate reports were

3:32PM  20   submitted to the FDA for this vigilance plan?

3:32PM  21   A.   I can remember six reports in total.

3:33PM  22   Q.   And at some point, did the FDA determine that Janssen had

3:33PM  23   satisfied its obligation under the enhanced pharmacovigilance

3:33PM  24   plan?

3:33PM  25   A.   That's correct.

**OFFICIAL TRANSCRIPT**

3:33PM  1    Q.    And when FDA determined that that requirement was

3:33PM  2    satisfied, did they provide a letter to Janssen saying it was

3:33PM  3    satisfied?

3:33PM  4    A.    I remember FDA did.

3:33PM  5    Q.    Now, one of the things that you talked about with

3:33PM  6    Mr. Honnold were a number of the bleeding questionnaires.

3:33PM  7          Do you remember that?

3:33PM  8    A.    Sir, could you repeat your question?

3:33PM  9    Q.    Yes, sir.  You and Mr. Honnold went through a number of

3:33PM  10   bleeding questionnaires that had been filled out for individual

3:33PM  11   patients.

3:33PM  12         Do you remember that?

3:33PM  13   A.    Yes, I remember.

3:34PM  14   Q.    And the questionnaires Mr. Honnold showed you, he would

3:34PM  15   point out the PT.

3:34PM  16         Do you remember that?

3:34PM  17   A.    I remember.

3:34PM  18   Q.    And from your review of the bleeding questionnaires,

3:34PM  19   Mr. Honnold had picked out some PTs that were on the higher

3:34PM  20   level.

3:34PM  21         Do you remember that?

3:34PM  22   A.    I remember.

3:34PM  23   Q.    Are there also many bleeding reports where the PT is low?

3:34PM  24   A.    Yes, we saw that.

3:34PM  25   Q.    And do you have any -- well, let's take a look at a

**OFFICIAL TRANSCRIPT**

3:34PM   1    couple.

3:34PM   2              MR. HONNOLD:  Your Honor, I'd just like to object.

3:34PM   3    He had said before he hadn't reviewed any of these in the

3:34PM   4    course of his work.

3:34PM   5              THE COURT:  I didn't get that.  I thought when you

3:34PM   6    were asking him, he was -- he recognized them.

3:34PM   7              MR. SARVER:  I thought he did too, or I would have

3:34PM   8    objected, Your Honor.

3:34PM   9              THE COURT:  Yeah.

3:34PM  10    BY MR. SARVER:

3:34PM  11    Q.   Let's take a look at Plaintiff's Exhibit 550419.

3:35PM  12         Do you see 550419, Dr. Wu?

3:35PM  13    A.   Yes, I have that document in front of me.

3:35PM  14    Q.   What is it?

3:35PM  15    A.   This is a -- another questionnaire.

3:35PM  16    Q.   Is it a bleeding questionnaire?

3:35PM  17    A.   Yes, it's a bleeding questionnaire with some information

3:35PM  18    provided by reporter.

3:35PM  19    Q.   And if we turn to the same section you looked at with

3:35PM  20    Mr. Honnold, can we find what the PT was?

3:35PM  21         Would you turn there, sir?

3:35PM  22    A.   Yes, I have this table.  I also see the PT data here.

3:36PM  23    Q.   And the PT here was 10.9; is that correct?

3:36PM  24    A.   Yes.

3:36PM  25    Q.   And the reference range was 8.9 to 12.5.

**OFFICIAL TRANSCRIPT**

3:36PM   1           Does that indicate anything to you, sir?

3:36PM   2   A.   Could you repeat your question?  I'm sorry.

3:36PM   3   Q.   Yes.  Do you see the normal range, which I think

3:36PM   4   Mr. Honnold called the reference range as well, was 8.9 to

3:36PM   5   12.5?

3:36PM   6   A.   I saw that.

3:36PM   7   Q.   Does a PT of 10.9 indicate that's in the normal range?

3:36PM   8   A.   The number is within the normal range.

3:36PM   9   Q.   Yes, sir.  That was the question.

3:36PM  10           If we could take a look at -- let's just do one more.

3:36PM  11   Plaintiff's Exhibit 5504318.

3:37PM  12           Just to speed us through, is this another bleeding

3:37PM  13   questionnaire?

3:37PM  14   A.   Yes, it's another bleeding questionnaire we received.

3:37PM  15   Q.   And the patient had recorded bleeding, and the doctor had

3:37PM  16   filled out the bleeding questionnaire and sent it to Janssen;

3:37PM  17   correct?

3:37PM  18   A.   Correct.

3:37PM  19   Q.   Is there a PT reference here?

3:37PM  20   A.   Yeah, I saw that.

3:37PM  21   Q.   And what is the PT for this patient?

3:37PM  22   A.   You asked me the PT range?

3:37PM  23   Q.   No.  The actual reported PT.

3:37PM  24   A.   Oh, I see.  So the actual report PT, according to the

3:37PM  25   reporter, is 13.5.

| | | |
|---|---|---|
| 3:37PM | 1 | **Q.**   And what was the normal range? |
| 3:37PM | 2 | **A.**   The normal range reported was from 11.6 to 15.2. |
| 3:37PM | 3 | **Q.**   So this PT for the patient who was found to be bleeding |
| 3:38PM | 4 | was normal? |
| 3:38PM | 5 | **A.**   That's my reading, too. |
| 3:38PM | 6 | **Q.**   Now, I'd like to talk -- you can put that one aside.  I'd |
| 3:38PM | 7 | like to move on and talk about the aggregate reports for a |
| 3:38PM | 8 | moment. |
| 3:38PM | 9 |          Were you involved in -- did you participate in |
| 3:38PM | 10 | reviewing and submitting the aggregate reports to the FDA? |
| 3:38PM | 11 | **A.**   I did. |
| 3:38PM | 12 | **Q.**   And I think you told us that Janssen submitted six |
| 3:38PM | 13 | aggregate reports.  Is that correct? |
| 3:38PM | 14 | **A.**   Correct. |
| 3:38PM | 15 | **Q.**   I'd like to take a look at Defense Exhibit 5599. |
| 3:38PM | 16 |          Do you have that in front of you, Dr. Wu? |
| 3:38PM | 17 | **A.**   Yes, sir. |
| 3:38PM | 18 | **Q.**   And what is it? |
| 3:38PM | 19 | **A.**   This is Aggregate Report 6 about the enhanced |
| 3:38PM | 20 | pharmacovigilance plan in the United States. |
| 3:39PM | 21 | **Q.**   You indicate that it's Aggregate Report Number 6. |
| 3:39PM | 22 |          Is that the last aggregate report? |
| 3:39PM | 23 | **A.**   Yes. |
| 3:39PM | 24 | **Q.**   Your -- on the third page of the report, do you see your |
| 3:39PM | 25 | name? |

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 3:39PM | 1 | **A.**   Yes, I saw my name. |
| 3:39PM | 2 | **Q.**   It says Shujian Wu, M.D., Ph.D.  Is that you? |
| 3:39PM | 3 | **A.**   Yes. |
| 3:39PM | 4 | **Q.**   Was this report submitted to the FDA? |
| 3:39PM | 5 | **A.**   Yes. |
| 3:39PM | 6 | **Q.**   If we look at page 6 of Defense Exhibit 5599, do you see |
| 3:39PM | 7 | the discussion at the bottom of the page? |
| 3:39PM | 8 | **A.**   Page 6?  Okay.  Yes.  I have a table.  Table 1? |
| 3:39PM | 9 | **Q.**   I'm actually one page ahead of you, I think.  It's -- it's |
| 3:39PM | 10 | actually page 5.  I'm sorry.  I misled you.  My fault.  Page 5. |
| 3:40PM | 11 | **A.**   Page 5? |
| 3:40PM | 12 | **Q.**   Yes, sir. |
| 3:40PM | 13 | **A.**   Yeah, this -- these are the -- in test figure?  Is that |
| 3:40PM | 14 | what you're talking about? |
| 3:40PM | 15 | **Q.**   I'm talking about the very bottom of the page, on page 5, |
| 3:40PM | 16 | where it says, "The current report is the sixth report." |
| 3:40PM | 17 |         Do you see that? |
| 3:40PM | 18 | **A.**   Yes. |
| 3:40PM | 19 | **Q.**   Thank you.  So, in fact, you're correct that this is the |
| 3:40PM | 20 | sixth report to the FDA; is that right? |
| 3:40PM | 21 | **A.**   That's correct. |
| 3:40PM | 22 | **Q.**   And for how long were you submitting these aggregate |
| 3:40PM | 23 | reports to the FDA? |
| 3:40PM | 24 | **A.**   My recollection is six -- three years. |
| 3:40PM | 25 | **Q.**   Three years? |

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 3:40PM | 1 | **A.**    Yes. |
| 3:40PM | 2 | **Q.**    And if we look at page 18 of this document, would you turn |
| 3:41PM | 3 | there with me, sir? |
| 3:41PM | 4 | **A.**    I'm on page 18. |
| 3:41PM | 5 | **Q.**    And what do you see on page 18 in Figure 1? |
| 3:41PM | 6 | **A.**    So the Figure 1 is about cumulative reporting rate of |
| 3:41PM | 7 | major bleeding happen in patient with orthopedic surgery |
| 3:41PM | 8 | indication. |
| 3:41PM | 9 | **Q.**    What does that mean -- |
| 3:41PM | 10 | **A.**    And if you look at -- |
| 3:41PM | 11 | **Q.**    Please, I interrupted you.  Please continue. |
| 3:41PM | 12 | **A.**    So we monitor the reporting rate on major bleeding for |
| 3:41PM | 13 | this particular indication, and we look at this three-year |
| 3:41PM | 14 | window quarter by quarter, and the figures show that the |
| 3:41PM | 15 | reporting range decrease in the three-year window. |
| 3:42PM | 16 | **Q.**    And is this something you reported to the FDA? |
| 3:42PM | 17 | **A.**    Yes, we reported this to FDA. |
| 3:42PM | 18 | **Q.**    All right.  I'd like you to take a look at page 26 of the |
| 3:42PM | 19 | report.  It's actually 25 of the document itself.  I'll ask you |
| 3:42PM | 20 | to turn to Figure 2. |
| 3:42PM | 21 | **A.**    I saw Figure 2. |
| 3:42PM | 22 | **Q.**    And tell us, what is Figure 2? |
| 3:42PM | 23 | **A.**    So Figure 2 is very similar to Figure 1.  The difference |
| 3:42PM | 24 | is that in Figure 2, we have both stroke prevention and VTE |
| 3:42PM | 25 | treatment indication together.  And another difference is that |

**OFFICIAL TRANSCRIPT**

3:42PM
3:42PM
3:42PM
3:43PM
3:43PM
3:43PM
3:43PM
3:43PM
3:43PM
3:43PM
3:43PM
3:43PM
3:43PM
3:43PM
3:44PM
3:44PM
3:44PM
3:44PM
3:44PM
3:44PM
3:44PM
3:44PM
3:44PM
3:44PM
3:44PM

1    Figure 2, you see there's two curves.  There's a blue one and a

2    red one.  The blue one represent the cumulative reporting rate

3    for all major bleeding.  The red curve represent the reporting

4    rate for intracranial bleeding.  So intracranial bleeding is

5    the subset of the major bleeding.  So it represent both -- two

6    pieces of information in this figure.

7    Q.   Dr. Wu, after Janssen had the opportunity to study the --

8    the bleeding of patients taking Xarelto in the real world, what

9    did you conclude?

10   A.   Our conclusion is that the major bleeding rate is

11   consistent with the clinical trial experience.

12   Q.   And is it correct then that after studying for three years

13   in the enhanced pharmacovigilance plan, there wasn't some

14   unknown safety signal?

15           MR. HONNOLD:  Object to the form.  It's leading, Your

16   Honor.

17   A.   We -- we did not --

18           THE COURT:  Wait.

19           MR. SARVER:  Let me ask another question, Your Honor.

20           THE COURT:  Okay.

21   BY MR. SARVER:

22   Q.   After studying the enhanced the pharmacovigilance plan,

23   the bleeding questionnaires, and all the information provided

24   to Janssen in the three years of the study, was there a safety

25   signal that was seen?

|          |    |                                                                        |
|----------|----|------------------------------------------------------------------------|
| 3:44 PM  | 1  | **A.**   We did not identify a safety signal.                          |
| 3:44 PM  | 2  | **Q.**   And did the FDA agree with Janssen?                           |
| 3:44 PM  | 3  | **A.**   FDA agreed with Janssen.                                      |
| 3:44 PM  | 4  | **Q.**   Let's take a look at Defense Exhibit 5721.                    |
| 3:44 PM  | 5  | **MR. SARVER:**  You can have a copy of this.                          |
| 3:44 PM  | 6  | **MR. HONNOLD:**  Thanks.                                              |
| 3:44 PM  | 7  | **MR. SARVER:**  You bet.                                              |
| 3:44 PM  | 8  | **BY MR. SARVER:**                                                     |
| 3:44 PM  | 9  | **Q.**   What is Defense Exhibit 5721?                                 |
| 3:44 PM  | 10 | **A.**   This is a letter from FDA.                                    |
| 3:45 PM  | 11 | **Q.**   And what's the date of this letter?                          |
| 3:45 PM  | 12 | **A.**   The date is March 2nd, 2016.                                  |
| 3:45 PM  | 13 | **Q.**   And if you look at -- is the letter from the FDA to          |
| 3:45 PM  | 14 | Janssen?                                                               |
| 3:45 PM  | 15 | **A.**   Yes, this is letter from FDA to Janssen.                     |
| 3:45 PM  | 16 | **Q.**   And could you tell us, what is the topic of the letter, if  |
| 3:45 PM  | 17 | you look at the top?                                                   |
| 3:45 PM  | 18 | **A.**   So this letter informed Janssen about the postmarketing     |
| 3:45 PM  | 19 | requirement 1797-1, and then if you look at second page, FDA          |
| 3:45 PM  | 20 | say that, "We have reviewed your submission and conclude that         |
| 3:45 PM  | 21 | the above requirement has been fulfilled."                            |
| 3:45 PM  | 22 | **Q.**   And if we take a look at the first page again and go to     |
| 3:46 PM  | 23 | the very top, the letter itself is entitled what,                     |
| 3:46 PM  | 24 | "Fulfillment" --                                                       |
| 3:46 PM  | 25 | **A.**   "Fulfillment of postmarketing requirement."                 |

3:46PM  1   Q.   And was it -- did Janssen receive the indication, the

3:46PM  2   letter, the approval from the FDA that you had done what you

3:46PM  3   were supposed to do to monitor the safety of Xarelto?

3:46PM  4   A.   Yes.

3:46PM  5           MR. SARVER:  Your Honor, I would offer into evidence

3:46PM  6   Defense Exhibit 5721.

3:46PM  7           THE COURT:  Any objection?  I'll admit it.

3:46PM  8           MR. HONNOLD:  No objection.

3:46PM  9           MR. SARVER:  And I'd offer into evidence Defense

3:46PM  10  Exhibit 5983.

3:46PM  11          THE COURT:  It will be admitted.

3:46PM  12          MR. SARVER:  And Defense Exhibit 5357.

3:46PM  13          THE COURT:  Let it be admitted.

3:46PM  14              Any further questions?

3:46PM  15          MR. SARVER:  As well as Defense Exhibit 5599.

3:47PM  16          THE COURT:  Let it be admitted.

3:47PM  17          MR. SARVER:  I do have one short area after this.  It

3:47PM  18  won't take long, Your Honor.

3:47PM  19          THE COURT:  Okay.

3:47PM  20  BY MR. SARVER:

3:47PM  21  Q.   Dr. Wu, you were discussing with Mr. Honnold the

3:47PM  22  postmarket safety study, the study that was published, and I

3:47PM  23  think the document is already in evidence.

3:47PM  24          Do you remember that?

3:47PM  25  A.   I remember it.

**OFFICIAL TRANSCRIPT**

**Q.**   Okay.  So was the enhanced pharmacovigilance plan we've just talked about the only thing that Janssen did to ensure the safety of Xarelto?

**A.**   No.  Actually, it's only one of the two.

**Q.**   And did Janssen submit a protocol for the postmarket safety study that has been now admitted into evidence?

**A.**   Yes.

**Q.**   Did FDA review and approve that protocol?

**A.**   Yes.

**Q.**   Did Janssen submit to the FDA the information that it gained from that postmarket safety study?

**A.**   Yes.

**Q.**   Now, one of the -- the primary author on the study was a Dr. Tamayo.

        Do you remember that?

**A.**   I remember.

**Q.**   And do you recall that Dr. Tamayo was actually a Navy officer?

              **MR. HONNOLD:**  Your Honor, it's leading.

              **MR. SARVER:**  I'm just trying to move through it, but I can --

              **THE COURT:**  I'll let him do that.  This is just -- not substantive.

              **MR. SARVER:**  Jim, can I have the -- there we go.

**OFFICIAL TRANSCRIPT**

BY MR. SARVER:

Q.   If we look at the study, do you recall seeing this study, Dr. Wu, the Tamayo study?

A.   I saw the name.

Q.   Do you have it in front of you, sir?

A.   I'm looking for the document now, if you could bear with me for one second.

Q.   That's all right.  It's my fault.

A.   Yes, I have this article in front of me.

Q.   And I'm going down to -- Mr. Honnold was asking you about a number of the authors.  If we take a look at the discussion of the authors and their connection --

         Jim, it's farther down.  There we are.  Could you highlight the part about Commander Sally Tamayo?  Second line, kind of in the middle, Jim.  There we are.

         Can you tell us, who was the employer of Commander Sally Tamayo?

A.   She employed at the Naval Medical Center, Department of Emergency Medicine -- I'm sorry.  The Naval Medical Center.

Q.   And how many -- I interrupted you.  My fault.

A.   No.  I say that I read the line wrongly.  So she work in Navy Medical Center.

Q.   At the time of this article's publication, how many patients had been studied?

A.   So looking at the paper, about 27,000 patients were

| | | |
|---|---|---|
| 3:50PM | 1 | studied. |
| 3:50PM | 2 | **Q.**   And if we look at the conclusion in the abstract -- |
| 3:50PM | 3 |        It's just at the bottom of the abstract, Jim. |
| 3:50PM | 4 | **A.**   Yes, I see that. |
| 3:50PM | 5 | **Q.**   Could you read to the jury, what was the conclusion of the |
| 3:50PM | 6 | study? |
| 3:50PM | 7 | **A.**   The conclusion from this study is, in this large |
| 3:50PM | 8 | observational study, the major bleeding rate was generally |
| 3:50PM | 9 | consistent with the registration trial results, and fatal |
| 3:50PM | 10 | bleeds were rare. |
| 3:50PM | 11 | **Q.**   And did this study continue to a larger population? |
| 3:50PM | 12 | Defense -- |
| 3:50PM | 13 | **A.**   Yes. |
| 3:51PM | 14 | **Q.**   I'd like you to take a look at Defense Exhibit 2262. |
| 3:51PM | 15 |        Do you have that in front of you, sir? |
| 3:51PM | 16 | **A.**   Yes, I have the document now. |
| 3:51PM | 17 | **Q.**   What is that? |
| 3:51PM | 18 | **A.**   So this is another interim results about this postmarket |
| 3:51PM | 19 | safety study in the *Circulation Journal*. |
| 3:51PM | 20 | **Q.**   And do you see that the lead author continues to be |
| 3:51PM | 21 | Dr. Tamayo? |
| 3:51PM | 22 | **A.**   I saw the name. |
| 3:51PM | 23 | **Q.**   And now at this point, we are up to 51,842 rivaroxaban |
| 3:51PM | 24 | users; correct? |
| 3:51PM | 25 | **A.**   Correct. |

3:51PM   1    **Q.**   If we take a look at the second page.

3:51PM   2            Do you see the conclusions?

3:51PM   3    **A.**   I saw the conclusions.

3:51PM   4    **Q.**   All right.  Could you read that for the jury, please?

3:51PM   5    **A.**   "The conclusion is the incidence, pattern, and management

3:52PM   6    of major bleeding in rivaroxaban users with nonvalvular atrial

3:52PM   7    fibrillation in this large, heterogeneous population were

3:52PM   8    generally consistent with the findings from the registration

3:52PM   9    trial.  Fatal bleeding was rare."

3:52PM   10   **Q.**   Now, sir, was this information provided to the FDA?

3:52PM   11   **A.**   Yes.

3:52PM   12           **MR. SARVER:**  Your Honor, I would offer into evidence

3:52PM   13   Defense Exhibit 2262.

3:52PM   14           **MR. HONNOLD:**  No objection.

3:52PM   15           **THE COURT:**  I'll admit it.

3:52PM   16           **MR. SARVER:**  Thank you very much, sir.  Appreciate

3:52PM   17   your time.

3:52PM   18           **THE COURT:**  Any redirect?

3:52PM   19           **THE WITNESS:**  Thank you, sir.

3:52PM   20           **MR. HONNOLD:**  Yes, Your Honor.  A couple of points.

3:52PM   21                     REDIRECT EXAMINATION

3:52PM   22                     BY MR. HONNOLD:

3:52PM   23   **Q.**   Doctor, what I'd like you to do is go to what was marked

3:52PM   24   as Defendants' Document 5983.  It was the postmarketing

3:53PM   25   protocol document.

**OFFICIAL TRANSCRIPT**

|  |  |  |
|---|---|---|
| 3:53PM | 1 | A.    I'm sorry.  What ID?  I was looking for -- |
| 3:53PM | 2 | Q.    It's Defendants' Exhibit 5983. |
| 3:53PM | 3 | A.    5983? |
| 3:53PM | 4 | Q.    Yes, sir.  Yes, Doctor. |
| 3:53PM | 5 | A.    Yes, I have the document now. |
| 3:53PM | 6 | Q.    If you go to page 11, please. |
| 3:53PM | 7 |       Dean, can you turn me on, please? |
| 3:53PM | 8 | A.    Yes, I'm on page 11. |
| 3:54PM | 9 | Q.    And what I'd like to do is go through -- I think you said |
| 3:54PM | 10 | that this was the proposed outline for how the details of the |
| 3:54PM | 11 | bleeding event cases would be reported; is that right? |
| 3:54PM | 12 | A.    Yes. |
| 3:54PM | 13 | Q.    Now, if you could go through those pages, page 11, page 12 |
| 3:54PM | 14 | page 13, page 14.  If you look at those carefully, is there |
| 3:54PM | 15 | anything in there that talks about submitting any specific |
| 3:54PM | 16 | details about laboratory test results, including prothrombin |
| 3:54PM | 17 | time, for the patients that had bleeding? |
| 3:54PM | 18 | A.    I don't see any laboratory test results in this template, |
| 3:54PM | 19 | not just the PT time. |
| 3:55PM | 20 | Q.    Not just what? |
| 3:55PM | 21 | A.    Not just prothrombin time. |
| 3:55PM | 22 | Q.    Okay.  There's no reference -- |
| 3:55PM | 23 | A.    I don't see -- there's no reference about laboratory |
| 3:55PM | 24 | tests. |
| 3:55PM | 25 | Q.    Thank you.  So let's move forward to the next document. |

**OFFICIAL TRANSCRIPT**

3:55PM  1   So we can agree there, on that recording summary, there's no

3:55PM  2   area that mentions reporting details of laboratory tests;

3:55PM  3   right?

3:55PM  4   A.   I also like to remind you that every -- if get report, we

3:55PM  5   have attachment including every single cases; and within a

3:55PM  6   single cases, all the laboratory test information is there and

3:55PM  7   share with FDA.

3:55PM  8   Q.   Okay.  But --

3:55PM  9   A.   So the information we have within Janssen, FDA also have

3:55PM  10  all the information.

3:55PM  11  Q.   Right here in this outline report, we can agree that in

3:55PM  12  terms of how the information is reported, there isn't any

3:55PM  13  reference to laboratory tests; correct?

3:55PM  14  A.   For this main test, we did not have laboratory tests

3:56PM  15  discussed, but in the report we have attachment of individual

3:56PM  16  cases, and individual cases has all the laboratory information

3:56PM  17  embedded there.

3:56PM  18  Q.   We'll get to that.  Let's go -- let's look at Defendants'

3:56PM  19  Exhibit 5599.  And let's go to page 26.

3:56PM  20  A.   I'm sorry?

3:56PM  21  Q.   Page 26.

3:56PM  22  A.   I haven't find the document.  You say 5599?

3:56PM  23  Q.   Yes, 5599.

3:56PM  24  A.   I have lots of documents in front of me, so bear with me

3:56PM  25  one second.  I appreciate it.

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 3:56PM | 1 | Yes, so I have this document now. |
| 3:57PM | 2 | **Q.**   And if you go to page 26, please. |
| 3:57PM | 3 | **A.**   26?  Yes. |
| 3:57PM | 4 | **Q.**   Yes.  And if you'd look at page 26, there is a starting of |
| 3:57PM | 5 | some case descriptions, some bleeding descriptions of some -- |
| 3:57PM | 6 | it says, "Overview of hemorrhage cases with rivaroxaban." |
| 3:57PM | 7 | Correct? |
| 3:57PM | 8 | **A.**   You are in Table 12; right? |
| 3:57PM | 9 | **Q.**   Yes. |
| 3:57PM | 10 | **A.**   Yes, I saw Table 12. |
| 3:57PM | 11 | **Q.**   So as we look at page 26 and look at those cases, as we go |
| 3:57PM | 12 | down through those cases, you'd agree with me that there's no |
| 3:57PM | 13 | recitation or statement about any laboratory tests, including |
| 3:57PM | 14 | prothrombin time there; right? |
| 3:57PM | 15 | **A.**   You talk about the first case or first two cases?  I need |
| 3:57PM | 16 | you to elaborate.  Which case you talk about, sir? |
| 3:58PM | 17 | **Q.**   Well, I'm asking you whether on any of those cases |
| 3:58PM | 18 | presented on page 26 there's any specific information about |
| 3:58PM | 19 | laboratory data. |
| 3:58PM | 20 | **A.**   Let me read it, if you could give me one minute. |
| 3:58PM | 21 | No, I don't see that. |
| 3:58PM | 22 | **Q.**   If we go to the next page, page 27. |
| 3:58PM | 23 | Now, these are all patients that are -- look like |
| 3:58PM | 24 | having bleeding events and going to the hospital; right? |
| 3:58PM | 25 | **A.**   I don't know whether they went to hospital, but these are |

**OFFICIAL TRANSCRIPT**

|          |    |                                                                    |
|----------|----|--------------------------------------------------------------------|
| 3:58PM   | 1  | serious -- these are serious bleeding events.                      |
| 3:58PM   | 2  | Q.    Okay.  And so if you'd look at this page, these cases on      |
| 3:58PM   | 3  | page 27, again, if you go down and read through this, those        |
| 3:58PM   | 4  | narrative case reports don't include any information about         |
| 3:58PM   | 5  | laboratory test results; right?                                    |
| 3:59PM   | 6  | A.    Sir, if you could give me one minute, I appreciate it.       |
| 3:59PM   | 7  | Let me quick -- read it quickly.                                   |
| 3:59PM   | 8  |        In the middle, there's a case from Holland talk about       |
| 3:59PM   | 9  | a CD test result, describe that.  I don't know whether you         |
| 3:59PM   | 10 | consider this is the medical laboratory and diagnostic test or     |
| 3:59PM   | 11 | not.  This is -- there is a description there.                     |
| 3:59PM   | 12 | Q.    Well, I appreciate that, but that's a diagnostic test.       |
| 3:59PM   | 13 |        There's nothing about laboratory tests in the               |
| 3:59PM   | 14 | description of any of those patients, are there?  Nothing about    |
| 3:59PM   | 15 | what their PT was or their PTT?                                    |
| 3:59PM   | 16 | A.    I believe so.                                                |
| 3:59PM   | 17 | Q.    And if we go to the next page, page 28, if you read those    |
| 3:59PM   | 18 | descriptions of those bleeding patients, serious bleeding          |
| 4:00PM   | 19 | events, as you've stated, there's no mention or description of     |
| 4:00PM   | 20 | what those patients' laboratory data was, is there?               |
| 4:00PM   | 21 | A.    Again, I need one minute to look at it.                      |
| 4:00PM   | 22 | Q.    Certainly.                                                   |
| 4:00PM   | 23 | A.    I don't see -- I didn't see laboratory tests.               |
| 4:00PM   | 24 | Q.    We move on to page 29.  Some additional cases are listed.    |
| 4:00PM   | 25 | If you look at those, do you see description in how those          |

4:00PM  1    cases, those serious bleeding events, are written up as to what
4:00PM  2    those patients' prothrombin times might have been when they
4:00PM  3    went to the hospital with those serious bleeds?
4:01PM  4    A.   I don't see any laboratory tests; not just prothrombin,
4:01PM  5    but any laboratory test was not presented in this table.
4:01PM  6    Q.   At all; right?
4:01PM  7    A.   Right.
4:01PM  8    Q.   Then if you go forward in the report, there's some
4:01PM  9    additional -- there's some additional cases that are reported,
4:01PM 10    and let's find those, where those tables start and where those
4:01PM 11    serious bleeding events are written up.
4:01PM 12         Let's go to page 42.  Here's a page -- these are
4:01PM 13    fatal hemorrhages; right?  When we look at this page, this is
4:01PM 14    summary of fatal hemorrhages with rivaroxaban; correct?
4:01PM 15    A.   I'm sorry.  You say 42?  42 is a table; right?
4:01PM 16    Q.   Yes.  We're looking at the table, which is the case
4:01PM 17    summary reports like we were looking at before, some additional
4:01PM 18    case summaries; right?
4:01PM 19    A.   I think we are talking about two different things.  It's
4:02PM 20    page 43, not 42?  43.  Right?
4:02PM 21    Q.   I've got page 42 in the lower right-hand corner.  You're
4:02PM 22    right, Doctor, we're looking at different things.  The page
4:02PM 23    number in the bottom center does say 43 of 78, and in the -- up
4:02PM 24    above under the table, it says page 42.  So I think there's
4:02PM 25    just two different markings.

4:02PM   1          I'm looking at what's called "Attachment 3, Summary
4:02PM   2    of fatal hemorrhages with rivaroxaban in the orthopedic surgery
4:02PM   3    indication."
4:02PM   4    A.    Yes.
4:02PM   5    Q.    So these are people who --
4:02PM   6    A.    Yes.
4:02PM   7    Q.    These are people that just had orthopedic surgery; right?
4:02PM   8    And had fatal hemorrhages after that; correct?
4:02PM   9    A.    Yes.
4:02PM  10    Q.    And if you look at the case summaries then, as we did
4:02PM  11    before for those -- that other series, if you look through
4:02PM  12    what's written about those, is there one mention of what their
4:02PM  13    laboratory tests were, those people who bled to death?
4:02PM  14    A.    Are you talking about --
4:02PM  15    Q.    I'm talking about --
4:03PM  16    A.    What's the page?
4:03PM  17    Q.    I'm talking about the words that are written under "Case
4:03PM  18    Summary," where someone had the ability in their own language,
4:03PM  19    their own words, to describe the case.  And in none of those in
4:03PM  20    there mention of the type of information that Bayer or Janssen
4:03PM  21    chose to get with the bleeding questionnaires like the ones we
4:03PM  22    saw that had elevated PTs when you requested the information.
4:03PM  23    There's no such summary of PT information at all there, is
4:03PM  24    there?
4:03PM  25    A.    Page 43, there are no laboratory information summarized in

4:03PM  1   the table, but I also just explained to you moments ago that

4:03PM  2   every single case, the laboratory information, how it presented

4:03PM  3   in the MedWatch form and share with FDA.

4:03PM  4   Q.   Then this is a special report about these bleeding events;

4:03PM  5   correct?  If you go to page 44, again, summary of more fatal

4:03PM  6   hemorrhages after orthopedic surgery.  If you look at those

4:04PM  7   pages on page 44 of 78, any statement there at all about

4:04PM  8   laboratory tests, PT, APTT, or otherwise?

4:04PM  9   A.   What is the pages?  I didn't see laboratory tests.

4:04PM  10  Q.   Let's move to the next page --

4:04PM  11          THE COURT:  Counsel, how many pages are we going to

4:04PM  12  do with this?

4:04PM  13          MR. SARVER:  Your Honor, we'll stipulate that none of

4:04PM  14  them talk about PT.

4:04PM  15          THE COURT:  Okay.  All right.

4:04PM  16          MR. HONNOLD:  Okay.  And last thing, Your Honor,

4:04PM  17  Defendants' Exhibit 2262.

4:04PM  18  BY MR. HONNOLD:

4:04PM  19  Q.   2262 was the article that was given to you, the last thing

4:04PM  20  that was shown to you?

4:04PM  21  A.   Sorry, I'm still looking.

4:04PM  22  Q.   2262.  It's *Circulation* on the first page.

4:05PM  23  A.   Yes, I have the document now.

4:05PM  24  Q.   Any mention whatsoever in the two -- actually, two pages

4:05PM  25  of information there, anything -- anything that speaks to --

4:05 PM  1  specifically speaks to laboratory result information, like PT

4:05 PM  2  or PTT, anything at all?

4:05 PM  3  A.   I need to take one or two minutes to look at this

4:05 PM  4  attachment in order to answer your question.  Can I?

4:05 PM  5  Q.   Certainly.  My only question is, is there anything in that

4:05 PM  6  case summary report that talks about what these bleeding

4:05 PM  7  patients' laboratory tests were?

4:06 PM  8  A.   So the document in front of me in *Circulation*, look at the

4:06 PM  9  title, it is an abstract.  So it's a high-level summary about

4:06 PM  10  these interim results.

4:06 PM  11  Q.   And so if there's all -- if there's all of this case

4:06 PM  12  information that's submitted without specific details of those

4:06 PM  13  patients' laboratory information, it's certainly possible,

4:06 PM  14  isn't it, that there could be a significant relationship

4:06 PM  15  between patients that have elevated PTs and their risk of

4:06 PM  16  bleeding?  That may, in fact, be true; right?

4:06 PM  17  A.   Sir, I'd like to correct you.  You confuse two different

4:06 PM  18  thing.

4:06 PM  19        Here the *Circulation*, this particular abstract is

4:06 PM  20  about a postmarketing safety study.

4:06 PM  21        The one that we just go through, the Aggregate

4:07 PM  22  Report 6, that is involved the enhanced pharmacovigilance plan.

4:07 PM  23        So these are two different activities.

4:07 PM  24  Q.   And in neither of the activities did we see mention of

4:07 PM  25  prothrombin time in those bleeding patients, some of whom died;

**OFFICIAL TRANSCRIPT**

4:07PM   1    right?

4:07PM   2    **A.**    For the table that you refer to and also the abstract that

4:07PM   3    you share with me, laboratory tests were not mentioned.

4:07PM   4            **MR. HONNOLD:**  Thank you.  That's all the questions I

4:07PM   5    have, Doctor.

4:07PM   6            **THE COURT:**  Okay.  You're excused.  Thank you,

4:07PM   7    Doctor.

4:07PM   8                        (Witness excused.)

4:07PM   9            **THE COURT:**  What are we doing now?

4:07PM  10            **MR. BIRCHFIELD:**  Your Honor, we'll continue the video

4:07PM  11    deposition of Dr. Lensing.

4:07PM  12            **THE COURT:**  Members of the jury, you all want to take

4:07PM  13    a break at this time?  Okay.  Let's take a five-minute break

4:07PM  14    and come back and finish.  And we'll finish at -- we'll go to

4:07PM  15    5:00, and tomorrow we'll stop at 4:00.  That will give you an

4:07PM  16    opportunity to leave earlier.

4:08PM  17                (Whereupon the jury was excused from the courtroom.)

4:14PM  18                            (Recess.)

4:16PM  19                (Whereupon the jury entered the courtroom.)

4:17PM  20            **THE COURT:**  Okay.  Be seated, please.  Let's continue

4:17PM  21    with the -- this is a continuation, members of the jury, of the

4:17PM  22    deposition of Dr. Lensing, L-e-n-s-i-n-g, Ton Lensing.

4:17PM  23            *(WHEREUPON, the video clip was played as follows:)*

4:05PM  24                    **ANTHONIE LENSING, M.D.,**

4:05PM  25    a witness called on behalf of the Plaintiff, being first duly

4:05PM 1   sworn, was examined and testified as follows:

4:05PM 2                    **DIRECT EXAMINATION (Cont.)**

4:05PM 3                        **BY MR. OVERHOLTZ:**

4:17PM 4   **Q.**   Dr. Lensing, we've been talking about the dose selection.

4:17PM 5   I want to show you what we'll mark as exhibit --

4:18PM 6              (Whereupon the video was restarted.)

4:18PM 7   **BY MR. OVERHOLTZ:**

4:18PM 8   **Q.**   Dr. Lensing, we've been talking about the dose selection.

4:18PM 9   I want to show you what we'll mark as Exhibit Number 26, which

4:18PM 10  is Record Number 1300123.

4:18PM 11             So this is an email from Frank Misselwitz to you on

4:18PM 12  March 30th of 2006 with the subject being "New Draft on Dose

4:18PM 13  Selection."

4:18PM 14             Do you see that?

4:18PM 15  **A.**   I can see that.

4:18PM 16  **Q.**   Okay.  So in Exhibit 26, Mr. -- Dr. Misselwitz says, "Hi,

4:18PM 17  Ton:  Please find attached a revised newer draft of my 'dose

4:18PM 18  selection' presentation."

4:18PM 19             Do you see that?

4:18PM 20  **A.**   I do see that.

4:18PM 21  **Q.**   Okay.  And Dr. Misselwitz copied Mr. Glombitza and Joerg

4:19PM 22  Moeller on the email; right?

4:19PM 23  **A.**   That is correct.

4:19PM 24  **Q.**   He says, "The 'signal' of an excess bleeding disappears if

4:19PM 25  we take into consideration menorrhagia."  Right?

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 4:19PM | 1 | **A.**   That is correct that it says that. |
| 4:19PM | 2 | **Q.**   This signal that he's talking about of excess bleeding, |
| 4:19PM | 3 | was that a signal that was seen in certain groups of patients |
| 4:19PM | 4 | considered fragile? |
| 4:20PM | 5 | **A.**   Patients who are defined as fragile:  One, patients below |
| 4:20PM | 6 | the weight of 50 kilograms; two, with a creatinine clearing of |
| 4:20PM | 7 | under 50; and patients who are aged 75 and over.  The signal, |
| 4:20PM | 8 | as it mentions here, was found in women with menorrhagia, which |
| 4:20PM | 9 | means that they are of fertile age.  So I do not think that |
| 4:20PM | 10 | this -- you know, that excludes this because of those signals. |
| 4:20PM | 11 | **Q.**   Dr. Misselwitz goes on and says to you, "At the last |
| 4:20PM | 12 | global development committee with J&J, the following option |
| 4:20PM | 13 | regarding initial treatment was discussed." |
| 4:20PM | 14 | Do you see that? |
| 4:20PM | 15 | **A.**   I do see that. |
| 4:20PM | 16 | **Q.**   And then it says, "For patients to be treated with BAY," |
| 4:20PM | 17 | Xarelto, "second randomization to received blinded LMWH," |
| 4:21PM | 18 | low-molecular-weight heparin, "or 10-milligram b.i.d. of BAY," |
| 4:21PM | 19 | Xarelto; correct? |
| 4:21PM | 20 | **A.**   That is correct. |
| 4:21PM | 21 | **Q.**   So that would be the standard of care arm that's being |
| 4:21PM | 22 | discussed here in Exhibit 26; correct? |
| 4:21PM | 23 | **A.**   Yeah, I do see that.  I do consider that to be so. |
| 4:21PM | 24 | **Q.**   Let's just be clear.  What they were talking about in |
| 4:21PM | 25 | Exhibit 26 was the potential way in which Study 11702, the |

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 4:21PM | 1 | Phase III trial, could be conducted; right? |
| 4:21PM | 2 | **A.**   Yes, that is correct. |
| 4:21PM | 3 | **Q.**   The EINSTEIN Phase III trial? |
| 4:21PM | 4 | **A.**   Yes. |
| 4:21PM | 5 | **Q.**   Okay.  And so here we've talked about there being a second |
| 4:21PM | 6 | randomization for the Xarelto where some patients would get the |
| 4:21PM | 7 | intensified treatment to be low-molecular-weight heparin, and |
| 4:21PM | 8 | other patients would get 10 milligrams twice daily Xarelto; |
| 4:22PM | 9 | right? |
| 4:22PM | 10 | **A.**   This is indeed the proposal that is discussed here in my |
| 4:22PM | 11 | opinion. |
| 4:22PM | 12 | **Q.**   Okay.  And so this is the -- this is a potential design |
| 4:22PM | 13 | for EINSTEIN Phase III; correct? |
| 4:23PM | 14 | **A.**   Okay.  Design of P-III, that was actually done by |
| 4:23PM | 15 | independent -- this independent steering committee with |
| 4:23PM | 16 | independent experts, who included me, and I reported to Bayer. |
| 4:23PM | 17 | If independent people wanted to independently think about a |
| 4:23PM | 18 | design, that is fine, but I do not think that the international |
| 4:23PM | 19 | committee would look at this for more than two minutes. |
| 4:23PM | 20 | **Q.**   The first bullet point under the executive summary states |
| 4:23PM | 21 | that, "20 milligrams is the optimal total daily dose to be |
| 4:23PM | 22 | studied in VTE treatment."  Correct? |
| 4:23PM | 23 | **A.**   That's correct. |
| 4:23PM | 24 | **Q.**   Okay. |
| 4:23PM | 25 | **A.**   It says so. |

980

4:23PM  1  Q.   Okay.  And then it refers to the intensified regimen that

4:23PM  2  we've discussed to be used for the first week or weeks; right?

4:24PM  3  A.   Yes, that's correct.

4:24PM  4  Q.   Okay.  And then the final bullet point on this slide says,

4:24PM  5  "In order to achieve an early intensive treatment, we recommend

4:24PM  6  a mandatory pretreatment with low-molecular-weight heparin for

4:24PM  7  five to seven days."  Correct?

4:24PM  8  A.   Yes, it says that, too.

4:24PM  9  Q.   But certainly the draft that he emailed you on March 30th

4:24PM  10  included that recommendation of the mandatory

4:24PM  11  low-molecular-weight heparin intensified treatment; correct?

4:24PM  12  A.   Yes, that's correct.

4:24PM  13  Q.   And you had had responsibility for conduct of the 11528

4:24PM  14  EINSTEIN-DVT study; right?

4:24PM  15  A.   Yes, I was.

4:24PM  16  Q.   Okay.  So now, if we can go back one slide to kind of see

4:24PM  17  what we're trying to decide -- and we've been talking about

4:24PM  18  decisions -- you see that there is a decision tree

4:24PM  19  dose-selection slide; right?

4:24PM  20  A.   Yes, I see the slide.

4:24PM  21  Q.   Okay.  And as we've been discussing decisions here, the

4:25PM  22  first one is o.d. or b.i.d.; right?

4:25PM  23  A.   Yes, that's correct.

4:25PM  24  Q.   And then again, "Initial VTE treatment using more

4:25PM  25  intensified anticoagulation."

**OFFICIAL TRANSCRIPT**

4:25PM    1    **A.**    That's also correct.

4:25PM    2    **Q.**    And then the second -- and then there are two options

4:25PM    3    there.   One is b.i.d. for two to three weeks followed by

4:25PM    4    once-daily secondary prevention or pretreatment with

4:25PM    5    low-molecular-weight heparin; correct?

4:25PM    6    **A.**    Yes, that's what it says here.

4:25PM    7    **Q.**    If we can turn to Slide 20.   Okay.   Let's look at

4:25PM    8    Slide 20.   And it's the initial treatment regimen slide.   And

4:25PM    9    the first bullet point says, "We discourage using a once-daily

4:25PM   10    rivaroxaban regimen for the initial treatment period."

4:25PM   11    Correct?

4:25PM   12    **A.**    That's what it says here.

4:25PM   13    **Q.**    And then the third bullet point again talks about this

4:25PM   14    option of using low-molecular-weight heparin for the initial

4:26PM   15    treatment phase as an alternative to using Xarelto; correct?

4:26PM   16    **A.**    That's what it says, indeed.

4:26PM   17    **Q.**    And so you can see here the key tells us that the light

4:26PM   18    gray is the 11223, the ODIXa-DVT dose-finding study for the

4:26PM   19    twice-daily doses; correct?

4:26PM   20    **A.**    That's correct.

4:26PM   21    **Q.**    And the dark gray is the 40-milligram once-daily dose from

4:26PM   22    the ODIXa-DVT?

4:26PM   23    **A.**    That's correct.

4:26PM   24    **Q.**    And then the medium gray are the once-daily doses from the

4:26PM   25    EINSTEIN-DVT dose-finding study?

4:26PM 1    A.   Yeah, that's correct.

4:26PM 2    Q.   So here, looking at a 20-milligram dose of Xarelto total

4:26PM 3    daily dose; right?

4:26PM 4    A.   That's correct.

4:26PM 5    Q.   Okay.  And then if we look at the 10-milligram b.i.d.

4:27PM 6    plot -- that's 10 milligrams given twice daily for a total of

4:27PM 7    20 -- we see that the trough values are higher than those that

4:27PM 8    were seen in the 20-milligram once-daily; correct?

4:27PM 9    A.   That's correct.

4:27PM 10   Q.   You agree this information was available to you and

4:27PM 11   Dr. Misselwitz; correct?

4:27PM 12   A.   I did see this slide before, yes.

4:27PM 13   Q.   And so for the final EINSTEIN -- so for the final EINSTEIN

4:27PM 14   Phase III studies, the -- for the Xarelto arm, there was no

4:27PM 15   intensified low-molecular-weight heparin option; right?

4:28PM 16   A.   In the final choice, we chose 15 milligrams twice daily

4:28PM 17   for 21 days without the low-molecular-weight heparin.

4:28PM 18   Q.   So the final resulted in the intensified period being

4:28PM 19   15 milligrams b.i.d.; right?

4:28PM 20   A.   15 milligrams, that's correct.

4:28PM 21   Q.   Twice daily?

4:28PM 22   A.   15, twice daily.

4:28PM 23   Q.   So looking back at Dr. Mueck's chart, if we look here in

4:28PM 24   the dose-finding studies, there -- the dose-finding studies

4:28PM 25   never studied 15 milligrams twice daily; right?

**OFFICIAL TRANSCRIPT**

4:28PM    1    A.   That's correct.

4:28PM    2    Q.   Never studied; right?  Never studied in the two

4:29PM    3    dose-finding studies?

4:29PM    4    A.   That's correct.

4:29PM    5    Q.   Let's turn to the next page then, page 50 -- Slide 50.

4:29PM    6    And it says, "Total daily dose of 20 milligrams can be selected

4:29PM    7    as optimal dose."

4:29PM    8         Do you see that?

4:29PM    9    A.   Yes, I see it.

4:29PM   10    Q.   Then it says, "Increased doses do not translate into

4:29PM   11    better efficacy, but may increase the risk of bleeding."

4:29PM   12         Do you see that?

4:29PM   13    A.   We did not see that, but, in principle, it would always be

4:29PM   14    possible.

4:29PM   15    Q.   And, in fact, at the end of the day, in the final EINSTEIN

4:29PM   16    Phase III trials, you say 30-milligram total daily dose for the

4:29PM   17    intensified treatment period; right?

4:29PM   18    A.   That's correct.

4:29PM   19    Q.   One of the topics we've been discussing was this decision

4:30PM   20    as to whether or not to use low-molecular-weight heparin as the

4:30PM   21    intensified treatment period in the Xarelto arm of the

4:30PM   22    Phase III trials; right?

4:30PM   23    A.   That's correct.

4:30PM   24    Q.   And if we look, he sends this email on March 30th, 2006,

4:30PM   25    at 2:10 p.m.; correct?

**OFFICIAL TRANSCRIPT**

|  |  |
|---|---|
| 4:30PM | 1 |
| 4:30PM | 2 |
| 4:30PM | 3 |
| 4:30PM | 4 |
| 4:30PM | 5 |
| 4:30PM | 6 |
| 4:30PM | 7 |
| 4:30PM | 8 |
| 4:30PM | 9 |
| 4:30PM | 10 |
| 4:30PM | 11 |
| 4:30PM | 12 |
| 4:31PM | 13 |
| 4:31PM | 14 |
| 4:31PM | 15 |
| 4:31PM | 16 |
| 4:31PM | 17 |
| 4:31PM | 18 |
| 4:31PM | 19 |
| 4:31PM | 20 |
| 4:31PM | 21 |
| 4:31PM | 22 |
| 4:31PM | 23 |
| 4:31PM | 24 |
| 4:31PM | 25 |

A.   That's what it says, yes.

Q.   Do you have 26 in front of you so you can check the time?

A.   2:10 and 2:06 p.m.  Yeah, that is suggesting that this is indeed four minutes later.

Q.   Okay.  And in this email, Dr. Misselwitz says, "Dear Annelise, Harry and Ton:  I think it is indeed important to have a follow-up conversation tomorrow.  I would like to ensure you that we are completely on the same page, but to be honest, the low-molecular-weight heparin pretreatment somehow derailed us."

         Do you see that?

A.   I see it.

Q.   He said, "We mutually understand that an intensified pretreatment is necessary."  Right?

A.   Yes, that's correct.

Q.   The next paragraph, he says, "We prepared all internal discussions as well as the discussions with J&J based on the assumption of an initial intensified regimen of 10 milligram b.i.d.  There was reluctance to switch to low-molecular-weight heparin pretreatment for a number of reasons."

         Do you see that?

A.   Yes, I see that.

Q.   And he's telling this to Dr. Segers and Dr. Buller, who are part of the steering committee for the study; correct?

A.   Yes, that's correct.

4:31PM 1    Q.    And he tells these steering committee members that, "There
4:31PM 2    was reluctance to switch to LMWH pretreatment for a number of
4:31PM 3    reasons.  One, it hasn't been tested in Phase II; and two,
4:32PM 4    data-driven, the b.i.d. regimen was more effective on initial
4:32PM 5    thrombus regression, 21 days, and size of the PLS defect
4:32PM 6    compared to standard of care."  Right?
4:32PM 7    A.    Yes, that's what it says.
4:32PM 8    Q.    And number three, he says, "Low-molecular-weight heparin
4:32PM 9    pretreatment is commercially and medically not important."
4:32PM 10           That's what he tells Dr. Buller and Dr. Segers;
4:32PM 11   right?
4:32PM 12   A.    That's what it says.
4:32PM 13   Q.    And then he goes on and tells them, "However, it may send
4:32PM 14   the wrong signal, as it may be interpreted as 'Bayer is not
4:32PM 15   sure about the efficacy of its drug.'"
4:32PM 16           Do you see that?
4:32PM 17   A.    Yes, I see that, that it says that there.
4:32PM 18   Q.    Okay.  So if you look with me, on the second page is an
4:32PM 19   email from Dr. Misselwitz to -- it's to -- I'm sorry.  It's to
4:33PM 20   Dr. Misselwitz from Dr. Buller through the secretary on April
4:33PM 21   19th of 2006, for Exhibit 30.
4:33PM 22           Do you see that?
4:33PM 23   A.    Yes, I see it.
4:33PM 24   Q.    And Dr. Buller asked Dr. Misselwitz, and it says, "Dear
4:33PM 25   Frank:  It is so silent, both for the VTE program and AF.  Is

4:33PM 1    the old adagium 'No news is good news' applicable?  Looking

4:33PM 2    forward to hear something from the dark caves of J&J.  Best

4:33PM 3    regards, Harry."

4:33PM 4            Do you see that?

4:33PM 5    A.   Yes, I see it.

4:33PM 6    Q.   Okay.  So about 19 days have passed since the email that

4:33PM 7    Dr. Misselwitz sent to Dr. Buller and Dr. Segers regarding the

4:33PM 8    fact that this low-molecular-weight pretreatment had somehow

4:33PM 9    derailed the discussions.

4:33PM 10           Do you recall that?

4:33PM 11   A.   Yes, there is such a period between the two events.

4:34PM 12   Q.   And if you turn with me down to the first page of

4:34PM 13   Exhibit 30, we see Dr. Misselwitz's response, and he copies you

4:34PM 14   as well as Joerg Moeller; correct?

4:34PM 15   A.   Yes, that's correct.

4:34PM 16   Q.   And he says, "Dear Harry:  A very timely question.  On

4:34PM 17   Thursday last week, the day before Good Friday, we had the

4:34PM 18   joint steering committee with Bayer and J&J on our rivaroxaban

4:34PM 19   project.  We discussed extensively both the VTE treatment and

4:34PM 20   the AF programs.  Whereas overall we achieved a great deal of

4:34PM 21   mutual understanding and agreement, one very important point

4:34PM 22   was discussed controversially, the LMWH pretreatment for the

4:34PM 23   initial week.  This option was and is supported Joerg and

4:34PM 24   myself, but the vast majority of the JSC members from both

4:35PM 25   companies, not only J&J, clearly favored the initial treatment

4:35PM 1   with rivaroxaban instead of low-molecular-weight heparin."

4:35PM 2          Do you see that?

4:35PM 3   A.   Yes, I see it.

4:35PM 4   Q.   And Dr. Misselwitz has indicated that he and Joerg Moeller

4:35PM 5   supported using the low-molecular-weight pretreatment option?

4:35PM 6   A.   I see that.

4:35PM 7   Q.   So in Exhibit 31, we see an email chain between Dr. --

4:35PM 8   let's see -- Dr. Berkowitz and Dr. Misselwitz in which the

4:35PM 9   subject is "I have concerns about EINSTEIN-VTE study design, no

4:35PM 10  pre-RX heparin."

4:35PM 11         Is that right?

4:35PM 12  A.   Yes, that's correct.

4:35PM 13  Q.   Okay.  So if we look at the bottom of page 1, we see that

4:35PM 14  Dr. Berkowitz emails on April 26th this email to Frank

4:36PM 15  Misselwitz, and starts off with "Dear Frank."

4:36PM 16         Are you with me?

4:36PM 17         He says, "With our current design, we are assuming

4:36PM 18  that Xarelto is as good as a heparin initially, that our

4:36PM 19  intensified 10-milligram b.i.d. regimen is equivalent to a

4:36PM 20  heparin regimen, and that our 20-milligram once-daily dose is

4:36PM 21  as good as warfarin for all types of patients.  I guess my

4:36PM 22  concerns come down to whether we have the data to support these

4:36PM 23  contentions."

4:36PM 24         Do you see that?

4:36PM 25  A.   Yes, I see that.

988

**Q.**   So as we saw in Exhibit 31, there had been a teleconference on April 26th, and so in Exhibit 32, Dr. Misselwitz is emailing his personal opinion as a follow-up to that teleconference; correct?

**A.**   That's correct.

**Q.**   And so Dr. Misselwitz emails, and you're sent this email, along with Joerg Moeller and others; correct?

**A.**   That's correct.

**Q.**   He also includes Andreas Nauck from marketing; correct?

**A.**   That's correct.  That's the study team.

**Q.**   Okay.  And Joseph Scheeren, he was on the business side as well; correct?

**A.**   No.  He was regulatory.

**Q.**   He was regulatory.

         Okay.  And he also copies Kemal Malik, who we've talked about?

**A.**   That's correct.

**Q.**   And he says, "Dear all:  As follow-up to our yesterday's discussions, as Kemal asked me explicitly what was my personal opinion as a clinical developer, let me briefly explain my preferences."

         Do you see that?

**A.**   I see that.

**Q.**   If the decision regarding the dosing regimen for the Phase III VTE trial is going to be made by an independent study

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 4:38PM | 1 | committee, why is Bayer management asking Dr. Misselwitz to |
| 4:38PM | 2 | provide his preferences to people from marketing and |
| 4:38PM | 3 | regulatory? |
| 4:38PM | 4 | A.    I can't tell why Kemal asked that.  I assume it's to be |
| 4:38PM | 5 | informed. |
| 4:38PM | 6 | Q.    He has a section for VTE treatment. |
| 4:38PM | 7 | Do you see that? |
| 4:38PM | 8 | A.    Yes, I see that. |
| 4:38PM | 9 | Q.    He says, "My ultimate goal will be to confirm that a |
| 4:38PM | 10 | rivaroxaban-only regimen, including a more intensified b.i.d. |
| 4:38PM | 11 | regimen for the first three to four weeks, is noninferior to |
| 4:39PM | 12 | standard of care.  Study, open-label, everything else as |
| 4:39PM | 13 | discussed."  Right? |
| 4:39PM | 14 | A.    Yes, that's correct. |
| 4:39PM | 15 | Q.    He says, "To increase the PTS," probability of technical |
| 4:39PM | 16 | success, "an initial treatment with low-molecular-weight |
| 4:39PM | 17 | heparin is recommended in order to utilize a well-documented |
| 4:39PM | 18 | regimen which allows investigators to also enroll PE patients." |
| 4:39PM | 19 | Right? |
| 4:39PM | 20 | A.    Yes, that's correct. |
| 4:39PM | 21 | Q.    Dr. Misselwitz says, "We all understand that the final |
| 4:39PM | 22 | label shall include the initial treatment with rivaroxaban." |
| 4:39PM | 23 | Right? |
| 4:39PM | 24 | A.    Yes, that's correct. |
| 4:39PM | 25 | Q.    Okay.  The Phase III trial hasn't started yet; right? |

4:39PM   1   **A.**   No.  We're preparing it.

4:39PM   2   **Q.**   But by this time, Dr. Misselwitz knows that from a

4:39PM   3   commercial perspective, Bayer needs the final label to have the

4:40PM   4   intensified treatment period to be Xarelto and not

4:40PM   5   low-molecular-weight heparin; right?

4:40PM   6   **A.**   I do not know exactly what Dr. Misselwitz's thoughts were.

4:40PM   7   You'd have to check with him.

4:40PM   8   **Q.**   Let's see what he says.  The next thing he says is, "The

4:40PM   9   clinical team will explore options to perform a Phase IIIb

4:40PM  10   trial with a limited sample size, using surrogate outcomes and

4:40PM  11   a short treatment duration to compare initial rivaroxaban

4:40PM  12   treatment to initial low-molecular-weight treatment in PE

4:40PM  13   patients."

4:40PM  14        Do you see that?

4:41PM  15   **A.**   Yes, I can see it.  And as I said before, this was a study

4:41PM  16   into PE patients, and it was not Phase IIIb, but it was done in

4:41PM  17   the first 400 patients in EINSTEIN-PE through repeat CT scans

4:41PM  18   and 15 milligram b.i.d.

4:41PM  19   **Q.**   Dr. Misselwitz goes on and says, "This is my personal

4:41PM  20   purely clinical opinion."  Right?

4:41PM  21   **A.**   That is what it says, indeed.

4:41PM  22   **Q.**   And you agreed with me earlier that when it came to

4:41PM  23   choosing the best dose that benefited the patients, that it

4:41PM  24   should be based upon the science and the medical information;

4:41PM  25   correct?

| | | |
|---|---|---|
| 4:41PM | 1 | **A.**   Yes, I do agree with you there. |
| 4:42PM | 2 | **Q.**   Frank Misselwitz goes on and says, "Of course, we need to |
| 4:42PM | 3 | take into consideration the regulatory aspects as well as the |
| 4:42PM | 4 | commercial case."  Right? |
| 4:42PM | 5 | **A.**   Yes, that is right.  It does say that. |
| 4:42PM | 6 | **Q.**   When it comes to patient safety, do you think it's |
| 4:42PM | 7 | important not to make compromises based on commercial |
| 4:42PM | 8 | interests? |
| 4:42PM | 9 | **A.**   That is obvious. |
| 4:42PM | 10 | **Q.**   Dr. Misselwitz says, "I understand that VTE treatment may |
| 4:42PM | 11 | be of limited commercial interest" -- he says, "I understand |
| 4:42PM | 12 | that VTE treatment may be of limited commercial interest |
| 4:42PM | 13 | without replacing initial low-molecular-weight heparin." |
| 4:42PM | 14 | Correct? |
| 4:42PM | 15 | **A.**   It is correct that it says that there. |
| 4:43PM | 16 | **Q.**   He says, "In this case, to me the main question will be to |
| 4:43PM | 17 | outline what is the fastest way to get to this label?  One way |
| 4:43PM | 18 | could be to either force investigators to accept the |
| 4:43PM | 19 | rivaroxaban-only approach and to accept that we may not get the |
| 4:43PM | 20 | PE label, or to run the trial with low-molecular-weight heparin |
| 4:43PM | 21 | initial treatment and start in parallel a smaller surrogate |
| 4:43PM | 22 | outcome trial in PE patients with a comparison of the two |
| 4:43PM | 23 | initial treatment options."  Correct? |
| 4:43PM | 24 | **A.**   That is correct. |
| 4:43PM | 25 | **Q.**   Okay.  And if you can turn with me to the next page, |

**OFFICIAL TRANSCRIPT**

992

| | | |
|---|---|---|
| 4:43PM | 1 | Dr. Misselwitz includes a general comment. |
| 4:43PM | 2 | He says, "General comment:  I see currently a danger |
| 4:43PM | 3 | that given the importance of this asset for Bayer HealthCare, |
| 4:43PM | 4 | clinical is pushed to answer too many questions already in |
| 4:44PM | 5 | Phase III.  The usual way is to first get a somehow limited |
| 4:44PM | 6 | label which is then broadened in Phase IIIb and IV trials." |
| 4:44PM | 7 | Did I read that right? |
| 4:44PM | 8 | A.   You did read that right. |
| 4:44PM | 9 | Q.   Look at this document.  If we look at page 4 of |
| 4:44PM | 10 | Exhibit 33, Dr. Lensing, you see this is the same email chain |
| 4:44PM | 11 | that we looked at.  This is the same email that we looked at in |
| 4:44PM | 12 | Exhibit 32 from Dr. Misselwitz to yourself and several others, |
| 4:44PM | 13 | including Kemal Malik, on April 27th, 2006. |
| 4:44PM | 14 | Do you see that? |
| 4:44PM | 15 | A.   Yes, I see that. |
| 4:44PM | 16 | Q.   And Dr. Moeller says in response, "Dear Frank:  Nothing to |
| 4:44PM | 17 | add from my side.  I concur with your view."  Right? |
| 4:44PM | 18 | A.   That's correct. |
| 4:44PM | 19 | Q.   And Dr. Moeller, as we can see here on this page, was vice |
| 4:44PM | 20 | president, head, global clinical development, Bayer HealthCare |
| 4:45PM | 21 | AG; correct? |
| 4:45PM | 22 | A.   Yes, that's correct. |
| 4:45PM | 23 | Q.   Okay.  And so if we look at Ms. Derix's email to her |
| 4:45PM | 24 | regulatory colleagues, she says -- if we look in the email, it |
| 4:45PM | 25 | says, "In VTE treatment, we are still discussing two different |

**OFFICIAL TRANSCRIPT**

4:45PM 1    design options for VTE treatment of patients with DVT and PE.
4:45PM 2    10 milligram b.i.d. for three weeks, followed by 20 milligram;
4:45PM 3    or, B, high-dose low-molecular-weight heparin for five days
4:45PM 4    followed by 30 milligram o.d."
4:45PM 5             That's what she says; right?
4:45PM 6    A.   It's what it says.  However, I do want to make a remark,
4:45PM 7    because where it says 30, it is probably wrong.  It should be
4:45PM 8    20.
4:45PM 9    Q.   You don't recall there ever being a discussion of using
4:45PM 10   30 milligrams?
4:46PM 11   A.   Absolutely not.
4:46PM 12   Q.   But it is accurate with respect to the time that there was
4:46PM 13   a decision to be made whether to use the Xarelto as the
4:46PM 14   intensified treatment or low-molecular-weight heparin; correct?
4:46PM 15   A.   Yes, that's correct.
4:46PM 16   Q.   Ms. Derix's option B is the low-molecular-weight heparin
4:46PM 17   followed by Xarelto option.  Okay?  You see that in her email;
4:46PM 18   right?
4:46PM 19   A.   I can see that too.
4:46PM 20   Q.   And so if we turn over to the top of the next page,
4:46PM 21   Ms. Derix says, "With study type B, we are not meeting the
4:46PM 22   target profile for our drug in the indication (initial
4:46PM 23   treatment of VTE and secondary prevention).  Therefore, the
4:46PM 24   marketing pressure is high to get an alternative proposal for
4:46PM 25   development of initial treatment."

4:46PM   1          Do you see that?

4:46PM   2   A.   Yes, I can see that.

4:46PM   3   Q.   In your role as global clinical lead for VTE treatment,

4:47PM   4   did you know there was marketing pressure to not use the

4:47PM   5   low-molecular-weight heparin as the intensified treatment in

4:47PM   6   Phase III?

4:47PM   7   A.   I did know about that, but I did not pay any attention to

4:47PM   8   that.

4:47PM   9   Q.   She next says in bold, "I would like to discuss with you

4:47PM   10  which type of additional studies would be required to change

4:47PM   11  the label from initial treatment with low-molecular-weight

4:47PM   12  heparin for five days to initial treatment with Xarelto."

4:47PM   13  A.   I see that.

4:47PM   14  Q.   And that question that she's asking is consistent with

4:47PM   15  what Dr. Misselwitz had emailed you and others regarding the

4:48PM   16  way that he saw the development could go with the initial label

4:48PM   17  with low-molecular-weight heparin followed by a label using

4:48PM   18  Xarelto as the intensified treatment; right?

4:48PM   19  A.   Yes, that's correct.

4:48PM   20  Q.   She then gives some preliminary thoughts.  And if you

4:48PM   21  could look with me down at the bottom, she says, "Do you see

4:48PM   22  other alternative approaches?  For marketing, it will be

4:48PM   23  important that we can get the label change before a potential

4:48PM   24  competitor can come on the market with initial treatment label,

4:48PM   25  competitive intelligence.  BI dabigatran study running

995

| | | |
|---|---|---|
| 4:48PM | 1 | according to option B.  BMS Phase II study in DVT currently |
| 4:48PM | 2 | ongoing.  Phase III started -- start planned in April '07." |
| 4:48PM | 3 | Right? |
| 4:48PM | 4 | A.   You have read it out correctly. |
| 4:48PM | 5 | Q.   So in Exhibit 34, Dr. Misselwitz emails yourself; correct? |
| 4:49PM | 6 | A.   I am one of the people he sends this email to, indeed. |
| 4:49PM | 7 | Q.   As well as Drs. Moeller, Mr. Glombitza, and |
| 4:49PM | 8 | Mr. Schoenseiffen (phonetically); correct? |
| 4:49PM | 9 | A.   Yes. |
| 4:49PM | 10 | Q.   And this email was sent on May 31st now of 2006; right? |
| 4:49PM | 11 | A.   That is correct. |
| 4:49PM | 12 | Q.   Okay.  And the subject is "J&J view on revised VTE |
| 4:49PM | 13 | treatment design." |
| 4:49PM | 14 | Do you see that? |
| 4:49PM | 15 | A.   I do see that. |
| 4:49PM | 16 | Q.   And he says, "Dear all:  I had a long telecon with Pete |
| 4:49PM | 17 | DiBattiste today.  He confirmed that J&J is fully aligned with |
| 4:49PM | 18 | the new proposal to study only rivaroxaban b.i.d. initially in |
| 4:49PM | 19 | the PE stratum; i.e., no second randomization to initial |
| 4:50PM | 20 | low-molecular-weight heparin versus rivaroxaban b.i.d., with |
| 4:50PM | 21 | sequential PLS," perfusion lung scan, "for the first 500," |
| 4:50PM | 22 | question mark, "patients." |
| 4:50PM | 23 | That's what he said; right? |
| 4:50PM | 24 | A.   That is correct. |
| 4:50PM | 25 | Q.   Okay.  If you can go down with me to the last paragraph, |

**OFFICIAL TRANSCRIPT**

4:50 PM 1    he says, "There was some uncertainty as to whether the initial
4:50 PM 2    trial regimen shall be 15 milligrams b.i.d. for two weeks or
4:50 PM 3    10 milligrams b.i.d. for three weeks."  Right?
4:50 PM 4    A.    That is correct.
4:50 PM 5    Q.    Okay.  Dr. Misselwitz says, "I explained that my
4:50 PM 6    preference would be to stick with 10 milligrams b.i.d. twice
4:50 PM 7    daily for three weeks, as this is better to be justified
4:50 PM 8    (briefing package) based on our own data."  Right?
4:51 PM 9    A.    That is correct.
4:51 PM 10   Q.    He says, "On the other hand, I would not object choosing
4:51 PM 11   15 milligram b.i.d.  I feel that there is quite a strong
4:51 PM 12   rationale for three weeks instead of two weeks."  Right?
4:51 PM 13   A.    That is correct.
4:51 PM 14   Q.    And in this email chain from June of 2006, you -- you were
4:51 PM 15   copied on a response by Dr. Misselwitz to a Pierre Arvis of
4:51 PM 16   Bayer France; is that right?
4:51 PM 17   A.    Yes, that's what I see.
4:51 PM 18   Q.    And whenever you received and were copied on
4:51 PM 19   Dr. Misselwitz's reply, you could understand what Mr. Arvis was
4:52 PM 20   asking about; right?
4:52 PM 21   A.    I can't recall what I thought when I received this, and I
4:52 PM 22   can't remember this email.
4:52 PM 23   Q.    But certainly you wouldn't have had a problem
4:52 PM 24   understanding what Mr. Arvis was discussing with respect to the
4:52 PM 25   design of the Phase III trial.  That was your responsibility;

4:52PM 1    right?

4:52PM 2    **A.**   Phase III was indeed my responsibility, but I do not

4:52PM 3    recall this name, Mr. Pierre Arvis, and I don't know what his

4:52PM 4    role was in the study team.  He was not on our study team, and

4:52PM 5    I can't say what he was thinking when he wrote this email.

4:52PM 6    **Q.**   Okay.  Let's go back to -- a minute to the email chain,

4:53PM 7    and you can look with me that Mr. Arvis tells Dr. Misselwitz,

4:53PM 8    "As you can imagine from a marketing point of view, it's very

4:53PM 9    important that our compound is not considered less effective

4:53PM 10   than low-molecular-weight, LMW, for the treatment of VTE."

4:53PM 11          Do you see that?

4:53PM 12   **A.**   I can see that in this sentence he says he didn't want

4:53PM 13   rivaroxaban to be worse off than low-molecular-weight heparin,

4:53PM 14   and I agreed with him.

4:53PM 15   **Q.**   So in his reply, now in June of 2006, he says, "I

4:54PM 16   completely understand your question.  We are currently in the

4:54PM 17   process to finalize our briefing package with respect to VTE

4:54PM 18   treatment for both EMEA and FDA.  We also had intensive

4:54PM 19   discussions with J&J.  We are implementing some 'last minute'

4:54PM 20   changes into the protocol to exactly improve on the 'initial

4:54PM 21   treatment' part.  All patients will be treated with an initial

4:54PM 22   treatment with rivaroxaban 10 milligram b.i.d. for three weeks

4:54PM 23   followed by 20 milligram o.d. in the longer term."

4:54PM 24          Do you see that part?

4:54PM 25   **A.**   That is indeed what was said in early June 2006 by

**OFFICIAL TRANSCRIPT**

998

| | | |
|---|---|---|
| 4:54 PM | 1 | Dr. Misselwitz. |
| 4:54 PM | 2 | **Q.**  So one of the things that you've told us is that the |
| 4:55 PM | 3 | decision to change the final initial intensified treatment |
| 4:55 PM | 4 | period from 10 to 15 was made by the executive committee and |
| 4:55 PM | 5 | the SMCC group in I think you said fall of 2006; correct? |
| 4:55 PM | 6 | MR. BIRCHFIELD:  Your Honor, this is a good breaking |
| 4:55 PM | 7 | point, right before 5:00. |
| 4:55 PM | 8 | THE COURT:  Okay.  All right.  Let's break here.  I |
| 4:55 PM | 9 | know it's been tough day, members of the jury, and all of us |
| 4:55 PM | 10 | appreciate that.  You all are hanging in there very well. |
| 4:56 PM | 11 | Okay.  We'll stop here and come back at 8:30 |
| 4:56 PM | 12 | tomorrow.  I'll see the lawyers at 8:00. |
| 4:56 PM | 13 | THE DEPUTY CLERK:  All rise. |
| 4:56 PM | 14 | (WHEREUPON, the jury was excused for the evening.) |
| 4:56 PM | 15 | THE COURT:  Court will stand in recess. |
| 4:56 PM | 16 | THE DEPUTY CLERK:  Judge, one thing. |
| 4:56 PM | 17 | MR. BONEY:  Couple of things, Your Honor. |
| 4:56 PM | 18 | THE COURT:  Sure. |
| 4:56 PM | 19 | MR. BONEY:  The first is we discussed this morning in |
| 4:56 PM | 20 | chambers about putting something on the record, and |
| 4:56 PM | 21 | additionally, the parties have been meeting and conferring on a |
| 4:56 PM | 22 | few issues -- |
| 4:56 PM | 23 | THE COURT:  Okay. |
| 4:56 PM | 24 | MR. BONEY:  -- we'd like the Court's advice on. |
| 4:56 PM | 25 | THE COURT:  Sure. |

**OFFICIAL TRANSCRIPT**

4:56 PM
4:56 PM
4:57 PM
4:57 PM
4:57 PM
4:57 PM
4:57 PM
4:57 PM
4:57 PM
4:57 PM
4:57 PM
4:57 PM
4:57 PM
4:57 PM
4:57 PM
4:58 PM
4:58 PM
4:58 PM
4:58 PM
4:58 PM
4:58 PM
4:58 PM
4:58 PM
4:58 PM
4:58 PM

1      **MR. BONEY:**  First thing, Your Honor -- Lindsey Boney

2  for the defendants -- is we talked with the Court this morning,

3  as we did yesterday, about the portion of the Lensing

4  deposition that has yet to be played to the jury in which he is

5  asked questions at his deposition about foreign labeling

6  issues, particularly about the Canadian label, and we'd like to

7  revisit the Court's rulings on this.

8          And just by way of a reminder for the record,

9  that the Court gave a limiting instruction in the *Orr* case at

10  1280 of the record telling -- 1280 of the trial transcript for

11  the jury to disregard any evidence of the Canadian label.  So

12  the Court overruled our objection to the Dr. Lensing testimony

13  that is set to be played.  It's page 454, line 1, to page 482,

14  line 12.  That's the designations, which is Document 7233 at

15  pages 50 to 61.  And it's also the Deposition Exhibits 60 to 66

16  from that deposition.

17          We asked for clarity yesterday on the exhibits

18  which are draft or final versions of the Canadian product

19  monograph, which is a Canadian label, and it was the Court's

20  ruling that we could redact portions of the exhibits.

21          But that, Your Honor, doesn't address the

22  question of the fact that the jury will be shown the documents

23  as part of the video.  We're told by plaintiffs that there is

24  no way to eliminate or redact the documents in the video.

25          Your Honor, we've gone back and watched the

**OFFICIAL TRANSCRIPT**

4:58PM
4:58PM
4:58PM
4:58PM
4:58PM
4:58PM
4:59PM
4:59PM
4:59PM
4:59PM
4:59PM
4:59PM
4:59PM
4:59PM
4:59PM
4:59PM
4:59PM
4:59PM
4:59PM
4:59PM
4:59PM
4:59PM
4:59PM
5:00PM
5:00PM

1   video, and there's really no way to cure the prejudice through

2   simply redacting exhibits that are admitted into evidence.  So

3   after the jury watches the video, Your Honor, based on the

4   Court's prior ruling, the deposition testimony is going to be

5   clear that what the questions are being asked are read directly

6   from the Canadian label.  There are references to this is

7   what's in the label, references to information going to doctors

8   in Canada, and this is how the Canadian label reads.

9          They've been shown numerous portions of the

10  Canadian label, and the plaintiff's counsel highlights in the

11  video that's going to be shown to the jury numerous portions of

12  the Canadian label for an extended period of time.  So after

13  the jury has seen those images, to redact the exhibits that

14  would be admitted into evidence, really -- it doesn't cure the

15  prejudice.

16         So, Your Honor, we continue to object to that

17  testimony and the foreign regulatory evidence generally and to

18  labels that we feel is a fundamental error in this case.

19         **THE COURT:**  Sure.

20         **MR. BONEY:**  Simply by reading these questions at the

21  deposition, by reading the statements to the witness and asking

22  the witness whether "Did I read that correctly?" is simply a

23  backdoor way to get in the Canadian label that's contrary to

24  your ruling in the other cases that you can't put in foreign

25  labels and you can't put in specifically the Canadian label.

**OFFICIAL TRANSCRIPT**

5:00PM
5:00PM
5:00PM
5:00PM
5:00PM
5:00PM
5:00PM
5:00PM
5:00PM
5:00PM
5:00PM
5:00PM
5:00PM
5:00PM
5:00PM
5:00PM
5:01PM
5:01PM
5:01PM
5:01PM
5:01PM
5:01PM
5:01PM
5:01PM
5:01PM

1        The argument has been made, Your Honor, by the

2   plaintiffs that this was somehow Bayer adopting the statements,

3   that Dr. Lensing testified that he was adopting the statements,

4   or that he was involved in these.  But if your ruling is simply

5   that Bayer adopted the statements by going on the label, that

6   eviscerates the rule.

7        And Dr. Lensing's testimony does not establish

8   that he was involved in the writing of that language.  It

9   doesn't establish that the language that was added was -- was

10  language that Bayer had recommended.  But even if the Court

11  plays the testimony, just to address the issue that we talked

12  about yesterday, we object to the labels themselves when

13  introduced into evidence.

14       **THE COURT:**  I got the message.  Let me hear your

15  opponent.

16       **MR. MEUNIER:**  Your Honor, I'm not sure whether this

17  is a motion to reconsider or not.  If it is, I suggest that the

18  Federal Rules don't allow it, but I think the Court in

19  yesterday's proceedings announced what the plaintiffs certainly

20  consider to be the correct and appropriate ruling, mainly that

21  the videotaped -- the trial testimony of Anthonie Lensing

22  reflecting the exchange between the Bayer defendants and health

23  regulators in Canada regarding language to be included in the

24  Canadian label in Canada should be admitted into evidence as

25  relevant.  Why?  Because in this case it goes to the critical

| | |
|---|---|
| 5:01 PM | 1 |
| 5:01 PM | 2 |
| 5:01 PM | 3 |

issue of the defendants' knowledge, awareness, and state of
mind regarding the usefulness of PT as a measure of the
anticoagulant effects of Xarelto.

Your Honor did, in making that ruling, invite
both sides to explore ways to alter the displayed images and
ultimately the actual copies of the exhibits discussed in this
exchange in the testimony, specifically those identified as a,
quote, "product monograph".

Both sides, Your Honor, not just the defense but
the plaintiffs, have endeavored to talk about that and explore
that possibility, and I think both sides have come to the
conclusion that any attempt to modify the displayed images or
exhibits would only serve as a potential confusion for the
jury.  And, therefore, consistent with the ruling that we
respectfully submit has properly been made, that these exhibits
and images must be included, and if the Court does believe --
after Your Honor hears the actual testimony and sees the actual
exhibits, if Your Honor does conclude that the jury may
possibly give undue weight to a Canadian drug label, then the
Court certainly has the power to give limiting instructions to
the effect that the relevant -- the relevance of this evidence
is only to show what the defendant knew and when it knew it
regarding this issue of PT, and that if the jury should -- and
the jury should understand that any action taken by regulators
in Canada should not be viewed as relevant to the question of

1003

5:03PM 1  reliability of the defendants under Mississippi law.

5:03PM 2          THE COURT:  I looked it over, and I made my ruling,

5:03PM 3  and I specifically referenced various testimony.  So I'm going

5:03PM 4  to stick to that ruling.  But I will do what the defendants

5:03PM 5  ask, and I'll give a limiting instruction.

5:03PM 6          I don't see any confusion, because the exhibits

5:03PM 7  are not clearly -- either the label or monograph or anything

5:03PM 8  else is just a sheet or two of paper that has nothing on it

5:03PM 9  other than what some of the testimony has been.

5:03PM 10          But in any event, I will express that to the

5:03PM 11  jury, tell them about the -- my ruling on labels and so forth.

5:03PM 12  I'll clarify.  I'll give them that instruction.

5:04PM 13          All right.  Thank you.  Anything else?

5:04PM 14          MR. BONEY:  Thank you, Your Honor.

5:04PM 15          The parties have been conferring today about a

5:04PM 16  few other issues related to the witnesses that will be called

5:04PM 17  tomorrow.

5:04PM 18          THE COURT:  Sure.  Who's going to be called?

5:04PM 19          MR. MEUNIER:  Dr. Parisian, Judge, and we're going to

5:04PM 20  endeavor to resolve the concerns that have been raised by the

5:04PM 21  defendants about certain demonstratives/exhibits that have been

5:04PM 22  disclosed and potentially the testimony.  It was our

5:04PM 23  understanding that they are objected to, because they're not on

5:04PM 24  the original exhibit list, and some of it was not identified as

5:04PM 25  her reliance material.

**OFFICIAL TRANSCRIPT**

5:04PM 1       We've had a discussion about it.  Our side
5:04PM 2   needs, frankly, some opportunity this evening to try to see if
5:04PM 3   we can't fix those concerns, but I understand the defendants
5:04PM 4   may still feel the need to file something by way of an
5:04PM 5   objection on the record, and we'll be prepared to respond if we
5:04PM 6   can't work it out.

5:04PM 7       But the time issue, Judge, is that she takes the
5:04PM 8   stand first thing in the morning, so we have to let you know
5:04PM 9   through Jason tonight whether we've worked it out, and if we
5:04PM 10  can't work it out, we'll try to file a terse, to-the-point
5:05PM 11  response to allow the Court to make the needed ruling before
5:05PM 12  she appears.

5:05PM 13      **THE COURT:**  Okay.  Is she going to -- the new witness
5:05PM 14  is going to be starting?  Or are we going to play this first?

5:05PM 15      **MR. BIRCHFIELD:**  Your Honor, I think the best course
5:05PM 16  would be to go ahead with the -- with Dr. Parisian, and then
5:05PM 17  we -- we can play the video deposition, if necessary, in order
5:05PM 18  to -- I mean, the issue that defense counsel raised this
5:05PM 19  morning regarding the treating doctors, we've tried, just out
5:05PM 20  of an abundance of caution, to see if they could be available
5:05PM 21  on Monday.

5:05PM 22      The prescribing doctor has said that he can be
5:05PM 23  available Monday.  The treater said he cannot, and he said he
5:05PM 24  could be here Tuesday.  So we said, no, be here tomorrow.  So
5:05PM 25  we'll just plan to put him on tomorrow afternoon at 1:00, and

1005

| | |
|---|---|
| 5:05PM | 1 |

then we'll resume with the video deposition, if that's okay
with the Court.

        THE COURT:  All right.  But I'd like to have the
defendant have an opportunity to call whoever you -- question
them the way that you need to question them, so -- whether you
call that -- who's the defendant concerned about?

        MR. MEUNIER:  Your Honor, the prescriber is appearing
tomorrow, we've said.

        THE COURT:  Tomorrow.

        MR. MEUNIER:  But the treater --

        MS. PRUITT:  Monday.

        MR. BONEY:  Is that right, or is it the reverse?  I
think it's the treater tomorrow.

        MR. BIRCHFIELD:  Treater tomorrow and the prescriber
on Monday, yes.

        MR. GLICKSTEIN:  Your Honor, a couple of housekeeping
matters, and I think we can go off the record.

        THE COURT:  All right.

        MR. GLICKSTEIN:  Just as a matter of protocol, we're,
of course, filing electronically in New Orleans.  Should we
give courtesy copies to Jason or --

        THE COURT:  Sure.  Yeah.  Do we get it --

        MR. GLICKSTEIN:  For example, we had updated some
proposed jury instructions.

        THE COURT:  I think we have those, but you can give

**OFFICIAL TRANSCRIPT**

5:07PM
5:07PM
5:07PM
5:07PM
5:07PM
5:07PM
5:07PM
5:07PM
5:07PM
5:07PM
5:07PM
5:07PM
5:07PM
5:07PM
5:07PM
5:07PM
5:08PM
5:08PM
5:08PM
5:08PM
5:08PM
5:08PM
5:08PM
5:08PM
5:08PM

1   us courtesy copies.  That certainly won't hurt.

2           MR. GLICKSTEIN:  Okay.  That would be great.

3                 Another issue that may be for discussion

4   tomorrow -- we won't discuss it today -- is just addressing the

5   question again of the redaction or nonredaction of Bayer from

6   the medical records.  I think we've prepared a binder with how

7   it would look redacted versus unredacted, and perhaps we could

8   give a copy to the plaintiffs and a copy to Your Honor and then

9   talk about that tomorrow.

10          THE COURT:  Sure.  Okay.  Okay.

11          MR. GLICKSTEIN:  And then my last question is, you

12   had asked the parties to think about scheduling in Henry, and

13   you mentioned October or November.  And is there any more

14   specificity to the window that's available so that we can --

15          THE COURT:  No.  I'm going to have to contact the --

16   Houston again to -- but as soon as I do, I'll get with you all.

17          MR. GLICKSTEIN:  Okay.

18          THE COURT:  I'll get some alternates so that you

19   can --

20          MR. MEUNIER:  I think both sides, Judge, are

21   concerned about the window of availability to do the needed

22   motion practice if we set a trial as early as the fall, so --

23          THE COURT:  No, I'll do that.  I'll make sure that

24   you all have motion practice.  So if we have to move it back,

25   we'll move it back.

**OFFICIAL TRANSCRIPT**

5:08PM     1          **MR. GLICKSTEIN:**  Okay.

5:08PM     2          **MR. MEUNIER:**  Thank you, Judge.

5:08PM     3          **MR. BONEY:**  Thank you, Your Honor.

           4

           5

           6

5:08PM     7                          **CERTIFICATE**

5:08PM     8          I, Tana J. Hess, CCR, FCRR, Official Court Reporter

5:08PM     9     for the United States District Court, Eastern District of

5:08PM    10     Louisiana, certify that the foregoing is a true and correct

5:08PM    11     transcript, to the best of my ability and understanding, from

5:08PM    12     the record of proceedings in the above-entitled matter.

5:08PM    13
5:08PM
5:08PM    14
5:08PM
5:08PM    15
5:08PM                     _____
5:08PM    16               Tana J. Hess, CCR, FCRR, RMR
5:08PM                     Official Court Reporter

          17

          18

          19

          20

          21

          22

          23

          24

          25


                          **OFFICIAL TRANSCRIPT**