1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF MISSISSIPPI

3

4

5    IN RE:  XARELTO                *
     (RIVAROXABAN) PRODUCTS         *
6    LIABILITY LITIGATION           *
                                    *
7    THIS DOCUMENT RELATES TO:      *   Docket No.: 14-MD-2592
                                    *   Section "L"
8    *Dora Mingo, et al. v.*        *   Jackson, Mississippi
     *Janssen Research &*           *   August 11, 2017
9    *Development, LLC, et. al.,*    *
     Case No.: 15-CV-3469           *
10   * * * * * * * * * * * * * * * *

11              VOLUME V- MORNING SESSION
          TRANSCRIPT OF JURY TRIAL PROCEEDINGS
12        BEFORE THE HONORABLE ELDON E. FALLON
             UNITED STATES DISTRICT JUDGE
13

14   APPEARANCES:

15

     For the Plaintiffs'
16   Liaison Counsel:              Gainsburg Benjamin David
                                     Meunier & Warshauer
17                                 BY:  GERALD E. MEUNIER, ESQ.
                                   2800 Energy Centre
18                                 1100 Poydras Street
                                   New Orleans, Louisiana 70163
19

20
     For the Plaintiffs:          Beasley Allen
21                                BY:  ANDY BIRCHFIELD, ESQ.
                                  P.O. Box 4160
22                                Montgomery, Alabama 36103

23

24

25

                    OFFICIAL REALTIME TRANSCRIPT

1    APPEARANCES:

2                                    Gainsburg Benjamin Davis
                                       Meunier & Warshauer
3                                    BY:  WALTER C. MORRISON, IV, ESQ.
                                     240 Trace Colony Park Drive
4                                    Suite 100
                                     Ridgeland, Mississippi 39157
5

6
                                     Goza Honnold
7                                    BY:  BRADLEY D. HONNOLD, ESQ.
                                     11181 Overbrook Road, Suite 200
8                                    Leawood, Kansas 66211

9

10                                   The Lambert Firm
                                     BY:  EMILY JEFFCOTT, ESQ.
11                                   701 Magazine Street
                                     New Orleans, Louisiana 70130
12

13
                                     Levin, Fishbein, Sedran & Berman
14                                   BY: FREDERICK S. LONGER, ESQ.
                                     510 Walnut Street
15                                   Suite 500
                                     Philadelphia, Pennsylvania 19106
16

17
     For the Defendant Bayer
18   HealthCare Pharmaceuticals
     Inc. and Bayer Pharma AG:       Mitchell, Williams, Selig, Gates &
19                                     Woodyard, P.L.L.C.
                                     BY:  LYN P. PRUITT, ESQ.
20                                   425 W. Capitol Avenue, Suite 1800
                                     Little Rock, Arkansas 72201
21

22
                                     Watkins & Eager, PLCC
23                                   BY:  WALTER T. JOHNSON, ESQ.
                                     400 East Capitol Street
24                                   Jackson, Mississippi 39201

25

OFFICIAL REALTIME TRANSCRIPT

1    <u>APPEARANCES</u>:

2    For Janssen Pharmaceuticals,
     Inc. and Janssen Research &
3    Development, LLC:              Barrasso Usdin Kupperman Freeman &
                                       Sarver, LLC
4                                  BY:  RICHARD E. SARVER, ESQ.
                                   909 Poydras Street, 24th Floor
5                                  New Orleans, Louisiana 70112

6

7    Official Court Reporter:      Jodi Simcox, RMR, FCRR
                                   500 Poydras Street
8                                  Room HB-406
                                   New Orleans, Louisiana 70130
9                                  (504) 589-7780

10

11
     Proceedings recorded by mechanical stenography, transcript
12   produced by computer.

13

14

15

16

17

18

19

20

21

22

23

24

25

OFFICIAL REALTIME TRANSCRIPT

1                            **I N D E X**

2                                                        Page

3
   SUZANNE PARISIAN
4        Voir Dire By Mr. Honnold:                      1013
         Direct Examination By Mr. Honnold:             1033
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OFFICIAL REALTIME TRANSCRIPT

<u>**PROCEEDINGS**</u>

**(August 11, 2017)**

**(MORNING SESSION)**

**\*\*\*\*\*\***

08:02  1
08:02  2
08:02  3
08:02  4
08:02  5
08:02  6      (COURT CALLED TO ORDER)
08:30  7      **THE DEPUTY CLERK:**  All rise.
08:30  8      (WHEREUPON, the jury entered the courtroom.)
08:31  9      **THE DEPUTY CLERK:**  All rise.
08:31 10      **THE COURT:**  Be seated, please.  Good morning, ladies
08:31 11  and gentlemen.
08:31 12           Okay.  The lawyers have asked me to thank each
08:31 13  of you for all of your hard work.  They recognize that you're
08:31 14  working hard, you've been here early and on time, and all of us
08:31 15  appreciate that.
08:31 16           You've seen the method of producing evidence.
08:31 17  Oftentimes in trials, you don't see as much of it as you see in
08:31 18  this particular case.  You've seen live testimony, you've seen
08:31 19  deposition testimony, you've seen video deposition, and you've
08:32 20  seen streaming.  So you've seen it all and you've been able to
08:32 21  handle it, and all of us appreciate it.  In addition to the
08:32 22  lawyers, you need to know that the Court appreciates it as
08:32 23  well.
08:32 24           Proceed, please.  Let's call your next witness.
08:32 25      **MR. HONNOLD:**  Yes, Your Honor.  The plaintiffs call

SUZANNE PARISIAN - VOIR DIRE

08:32  1    at this time Dr. Suzanne Parisian to the stand.

08:32  2            THE COURT:  Come forward, please, ma'am.  Have a seat

08:32  3    over here.

08:32  4            THE WITNESS:  Yes.  Thank you, Judge Fallon.

08:32  5            (WHEREUPON, **SUZANNE PARISIAN**, having been duly sworn,

08:32  6    testified as follows:**)**

08:33  7            THE DEPUTY CLERK:  Please have a seat.  State and

08:33  8    spell your name for the record, ma'am.

08:33  9            THE WITNESS:  Yes, sir.  My name is Dr. Suzanne

08:33  10   Parisian, S-U-Z-A-N-N-E, P-A-R-I-S-I-A-N.

08:33  11           THE COURT:  Have a seat, Doctor.

08:33  12                              **VOIR DIRE**

08:33  13   BY MR. HONNOLD:

08:33  14   **Q.**   Doctor, good morning.

08:33  15   **A.**   Good morning.

08:33  16   **Q.**   Why don't you go ahead and again introduce yourself to the

08:33  17   jury, and could you go ahead and tell us a little bit about

08:33  18   yourself, just beginning with your educational background.

08:33  19   **A.**   My name is Dr. Suzanne Parisian.  I have an FDA consulting

08:33  20   firm, and I'm from Phoenix, sunny Phoenix.  And my education is

08:33  21   I went to University of Central Florida in Orlando, Florida and

08:33  22   got a bachelor's degree in science and a master's degree.

08:34  23           Then I went to the University of South Florida

08:34  24   Medical School and got an MD degree from USF in 1978.

08:34  25   **Q.**   Doctor, have you prepared in the course of your

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - VOIR DIRE

08:34 1  professional work a document called a professional résumé or
08:34 2  curriculum vitae?
08:34 3  A.   Yes, sir.
08:34 4        MR. HONNOLD:  Mr. Carl, can we call that up as
08:34 5  PX-297, please.
08:34 6  BY MR. HONNOLD:
08:34 7  Q.   There's a screen there, Dr. Parisian.  You may look at
08:34 8  this document as we walk through it.
08:34 9        Is this a copy of your curriculum vita?
08:34 10 A.   Yes, sir.
08:34 11 Q.   What I'd like to do is go ahead and jump forward in terms
08:34 12 of talking about some of your educational background and
08:34 13 qualifications, and go ahead and jump to page 15, if we can,
08:34 14 where your educational information is listed.
08:34 15       Did you complete a residency in any medical
08:34 16 specialty?
08:34 17 A.   Yes, in anatomical and clinical pathology.
08:35 18 Q.   And you're the first physician that we've questioned about
08:35 19 these things, but can you explain just generally what a
08:35 20 residency is in a medical specialty area.
08:35 21 A.   It's specialized training in a specific area of medicine,
08:35 22 beginning usually as an intern, and then you move up.  Your
08:35 23 ability to act independently increases with each year of your
08:35 24 experience.
08:35 25       And so I did what they call a pathology residency.

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - VOIR DIRE

08:35  1    It was a four-year residency, but you can see there's multiple
08:35  2    entries there.  I had some time off to change my career for a
08:35  3    while, have some kids, and then come back and complete my
08:35  4    pathology residency.
08:35  5    Q.   I may be jumping forward too quickly.  At the top of your
08:35  6    training section there that's currently on the screen, I didn't
08:35  7    cover the flexible internship.  Can you describe that and what
08:35  8    was entailed in doing that during those years, '78 and '79?
08:36  9    A.   Yes, after I finished -- is there an echo?  Is it too
08:36  10   close for you?
08:36  11   Q.   It goes in and out a little bit.
08:36  12   A.   Okay.  I don't want to --
08:36  13   Q.   Just roll with it.
08:36  14   A.   Okay.  Testing.  Can you hear me?  Okay.
08:36  15        Flexible internship.  When I finished medical school,
08:36  16   you have to go practice as a doctor in order to get licensed so
08:36  17   that you can be an independent doctor.  One of the things you
08:36  18   do is I did a flexible internship, which is sometimes, in the
08:36  19   old days, was called a rotating internship.
08:36  20        And so I did all kinds of specialties in medicine.  I
08:36  21   did orthopedic surgery; I did general surgery, anesthesia,
08:36  22   psychiatry, family practice.  So it's a whole year of doing all
08:37  23   kinds of different things in medicine as an intern.
08:37  24        So that's what that flexible internship was, and that
08:37  25   was in Greenville, South Carolina.

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - VOIR DIRE

**Q.**   And then we've mentioned the residency in pathology a little bit.  But can you link together for us and explain those different years in different places where you did residency work in pathology?

**A.**   Right.  So I did the flexible internship, and under training, but then I went and got a job.  My husband is also a physician, so we were trying to link up two medical careers.  And he had decided really what he wanted to do when he grew up.

So we went and found a place in Lenoir, North Carolina, where I was -- and that's not on this list.  This would be employment, the employment part of this CV, where I was a family -- I was in a health department, basically, doing family practice medicine for a year.  And I had nurse practitioners and PAs under me.  We did everything except admit patients.  So it was basically general practice.

And then from there, I went into the emergency room as an emergency medicine physician for a year, and we began -- my husband and I and some other physicians began a company called Mountain Emergency that was in North Carolina.  So I was an ER doctor.

So after my flexible internship, I did family practice, general practice, then I was an ER doc.  And then I decided I wanted to go back and do pathology.  So that's why there's that gap there.  So I went to -- I got accepted at UC San Diego to do my pathology.

SUZANNE PARISIAN – VOIR DIRE

08:38  1          My husband got a position up in LA.  So I, the next

08:38  2  year, transferred to the University of Southern California to

08:38  3  do some more pathology.  He got finished with his anesthesia.

08:38  4  I was still doing pathology.  So then I took another break in

08:38  5  my training, and we moved back to North Carolina.

08:39  6          MR. HONNOLD:  Mr. Carl, can we jump to page 2 of the

08:39  7  CV so we can link together some of these things that

08:39  8  Dr. Parisian has talked about.

08:39  9  BY MR. HONNOLD:

08:39 10  Q.   Doctor, if we focus there on about the top fourth of that

08:39 11  page, that lists the general practice and the emergency

08:39 12  medicine and general practice experience, does that demonstrate

08:39 13  the details of what you just told us in terms of that work

08:39 14  experience?

08:39 15  A.   Yes.  So besides being a pathologist, I've also been a

08:39 16  regular doctor, taking care of patients in the ER, taking care

08:39 17  of patients in the clinics.  I took a break in my pathology

08:39 18  residence and went back to general practice at a place called

08:39 19  Avtex Fibers in Virginia.  I was a company doctor there for

08:39 20  about 5,000 employees, or their employees and families.  So

08:39 21  I've had kind of a gemisch of going back and forth between

08:39 22  general practice, ER, and pathology.

08:39 23  Q.   Dr. Parisian, in those employments that you had in the

08:39 24  general practice and emergency medicine, would you have had

08:40 25  occasion to prescribe medications for many patients?

SUZANNE PARISIAN - VOIR DIRE

| | | |
|---|---|---|
| 08:40 | 1 | **A.** Oh, sure.  These are all living patients.  Pathology, you |
| 08:40 | 2 | tend to think of dead patients.  But these are all living, |
| 08:40 | 3 | healthy patients.  Fortunately, none of them died, knock on |
| 08:40 | 4 | wood.  So these were living patients.  So I was prescribing |
| 08:40 | 5 | regular medicine.  I was like your regular doctor. |
| 08:40 | 6 | **Q.** And would you have been doing that, prescribing medicines, |
| 08:40 | 7 | for hundreds of thousands of patients? |
| 08:40 | 8 | **A.** I don't know about hundreds of thousands. |
| 08:40 | 9 | **Q.** No, no, if not hundreds -- |
| 08:40 | 10 | **A.** Lots.  Lots. |
| 08:40 | 11 | **Q.** Okay. |
| 08:40 | 12 | **A.** Also, you have to diagnose in the ER.  People come in with |
| 08:40 | 13 | clots and heart attacks and all kinds of strokes, and so you |
| 08:40 | 14 | were having to diagnose and treat patients in an ER facility in |
| 08:40 | 15 | rural North Carolina. |
| 08:40 | 16 | **Q.** In that work that you did, in practicing and prescribing |
| 08:40 | 17 | medication, did you become familiar at times with prescription |
| 08:40 | 18 | medication labels? |
| 08:40 | 19 | **A.** Oh, sure.  Sure.  I had to prescribe them all the time.  I |
| 08:40 | 20 | used the *PDR*, and a lot of times you would have to look at the |
| 08:41 | 21 | label before you gave it to a patient, like if it's an IV or |
| 08:41 | 22 | something like that.  You'd look at overdose information.  So |
| 08:41 | 23 | you had to be familiar with labeling. |
| 08:41 | 24 | **Q.** And, eventually, after completing your residency in |
| 08:41 | 25 | pathology, did you become board-certified at some pint? |

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - VOIR DIRE

08:41  1          **MR. HONNOLD:**  Mr. Carl, go back to page 16, please.
08:41  2          **THE WITNESS:**  Yes, sir.  I became board-certified in
08:41  3   anatomic and clinical pathology.  I did basically a four-year
08:41  4   residency in six years.  It's the long way to do it.  And I got
08:41  5   board-certified the first time I took the test.  So I'm
08:41  6   certified in both anatomic and clinical pathology.
08:41  7   BY MR. HONNOLD:
08:41  8   **Q.**   Can you just describe the process, please, or explain the
08:41  9   process of becoming board-certified and why it's significant in
08:41  10  terms of a physician embarking on a career?
08:41  11  **A.**   Well, you have to -- in pathology you have to have a
08:41  12  certain number of years.  To be boarded in anatomic pathology,
08:41  13  I also had to do a certain number of autopsies.
08:42  14         Clinical pathology, I had to show the ability to be
08:42  15  able to run a clinical laboratory.  You do your years of
08:42  16  residency, and then you take a test, a test that included
08:42  17  written tests, microscopic tests, all kinds of questions about
08:42  18  pathology.  And so you would be a doctor, like you see on
08:42  19  television, does forensic pathology.  I did an extra year of
08:42  20  forensics in terms of causes of death.
08:42  21         I did frozen sections.  I could be a doctor that
08:42  22  would say if something is benign or malignant in terms of OR.
08:42  23  That was anatomic pathology.  In clinical pathology, a clinical
08:42  24  pathologist at that time would run blood banks.  They would run
08:42  25  anything to do with a clinical laboratory, testing.  We even

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - VOIR DIRE

08:42  1    look at bone marrow biopsies.  So I was able to get certified

08:42  2    in both groups, anatomic and clinical.  There's a distinction

08:42  3    between the two.

08:42  4            So -- and that was in the day when pathologists were

08:43  5    people like Quincy on television, an old guy.  Now they've

08:43  6    become beautiful women, which is really cool.  So I was a

08:43  7    pathologist in those days, when it would be the old person.

08:43  8    Now I'm old, but --

08:43  9    Q.   Doctor, as it relates to hospitals and where they perform

08:43  10   laboratory tests, is it true, then, that it will be a

08:43  11   pathologist that will be at the top to oversee how the clinical

08:43  12   laboratory is run in a hospital?

08:43  13   A.   In some hospitals.  There's also people now that are

08:43  14   Ph.D.s in laboratory medicine that will run laboratory

08:43  15   hospitals.

08:43  16           So the clinical pathologist, at the time when I was

08:43  17   trained to do it, was trained to run clinical laboratories and

08:43  18   all the testing equipment and toxicology, so yeah.

08:43  19           But now, they've made it so other people can practice

08:43  20   too in terms of running the laboratory.

08:43  21   Q.   Doctor, what I'd like to do is move forward in your

08:43  22   experience and get to a point from '91 to '95 where you were in

08:44  23   the United States Public Health Service.

08:44  24           Can you discuss that a little bit?

08:44  25   A.   Yes.  My husband and I both moved back to Virginia, and I

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - VOIR DIRE

08:44  1    had the opportunity to join the United States Public Health

08:44  2    Service to do medicine, which was a shock to my husband.

08:44  3            But I would have looked like a Navy officer.  I wore

08:44  4    a Navy uniform, except they had all gold buttons instead of

08:44  5    silver buttons.  So I basically joined the unarmed military for

08:44  6    four years from 1991 through 1995.  And in the United States

08:44  7    Public Health Service, it's under the Department of Health and

08:44  8    Human Services.

08:44  9            In the old days, it was like the surgeon general was

08:44  10   my boss.  And they will assign doctors to the Food and Drug

08:44  11   Administration.  So there are a certain number of people at the

08:44  12   FDA who belong to the United States Public Health Service.

08:44  13   Q.   And we have on the screen that period of years, '91 to

08:45  14   '95.  We have highlighted the Armed Forces Institute of

08:45  15   Pathology.  Can you discuss what that entity is and what your

08:45  16   job duties were there?

08:45  17   A.   When I joined the United States Public Health Service, I

08:45  18   was assigned to the FDA, but I also needed to use my clinical

08:45  19   specialty as a physician.  And since I was the pathologist, I

08:45  20   was permitted to be assigned to the office of the medical

08:45  21   examiner for the Armed Forces at the Armed Forces Institute of

08:45  22   Pathology, which is like a -- it's based a Walter Reed

08:45  23   Hospital.

08:45  24            So half a day a week I would go and sign out

08:45  25   autopsies; government autopsies, not just military.  So it was

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - VOIR DIRE

1    basically a quality control for the autopsies that are being

2    done by various people all around the country that you would

3    have to sign out the final cause of death and make sure that

4    the autopsy had been done.

5         They would also use you to go over to Dover for

6    returning military bodies and people that came from the

7    government in order to do autopsies there.  At Dover, the

8    pathologist is supposed to pick out ordnance, unexploded

9    ordnance.  That was a different thing for a pathologist.

10        But so that's what -- so you were supposed to try to

11   figure out the cause of death, get certain samples that were

12   necessary, and help handle the body so that the military or

13   whoever you worked with could then go on to have a funeral and

14   stuff.  So that was also a role of the AFIP.

15   Q.   And, Doctor, in one of your prior answers, you briefly

16   mentioned the FDA and having a position there.  Before we get

17   into that, can you just describe generally what the FDA is and

18   what its roles and obligations are?

19   A.   The FDA is the federal Food and Drug Administration, and

20   it basically is a large public health organization trying to

21   ensure the safety of the public.  It gets its orders as to what

22   it does from Congress as to what the Food and Drug

23   Administration is to oversee.

24        Recently, they added tobacco to the role of the Food

25   and Drug Administration, and that comes from Congress wanting

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - VOIR DIRE

1    the FDA to look at tobacco.  So it looks at -- it oversees some

2    things before they go on the market.  That would be drugs,

3    biologics, and medical devices.

4         And then it looks at and oversees things that are

5    already on the market, but just to address safety issues, and

6    those would be, like, foods and cosmetics and animal products,

7    veterinary medicine products.  So it has a large group of

8    products that it oversees.

9         And they say that 25 cents of every dollar is somehow

10   spent on the product that the FDA has some role with in terms

11   of oversight.

12   Q.   Doctor, now, let's focus in on the time that you spent at

13   the FDA.  Can you just go ahead and describe for us exactly

14   what your involvement was during your years with the FDA?

15   A.   Yes.  Do we have any water?

16   Q.   Sure.

17   A.   Thank you.

18   Q.   It's not cold.

19   A.   I don't care if it's cold as long as it's wet.  Thank you.

20        All right.  So from 19 -- I was -- okay.  The United

21   States Public Health Service -- they call us "medical officers"

22   when you're at FDA.  So it's not just referring to the

23   medical -- but they -- what the FDA needs is it needs people

24   who have treated patients, who have some experience with

25   patients and how patient care.  So they call all doctors at the

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - VOIR DIRE

08:48   1   FDA medical officers.  Okay?

08:48   2           And you're supposed to bring your training and
08:48   3   experience from having taken care of patients to the FDA.  I
08:49   4   was originally assigned to the Center for Devices and
08:49   5   Radiological Health, which is all the medical devices that the
08:49   6   FDA oversees.  My experience actually had me use a lot of
08:49   7   medical devices, so it was a perfect fit in terms of assigning
08:49   8   me there.

08:49   9           And I was in the Office of Health Affairs in a center
08:49   10   that had very few doctors, and we were involved with products
08:49   11   that were being marketed.  In terms of the FDA lingo, that
08:49   12   would be postmarket issues.  That would be labeling; that would
08:49   13   be new products coming on the market, claims, safety issues,
08:49   14   things that are already being marketed.  So it was called the
08:49   15   postmarket arm.  And so that's what I did from '91 through
08:49   16   1993, and I was a medical officer.

08:49   17           And then in '93 through -- in '93 I was still a
08:49   18   medical officer but I got assigned now to premarket issues.
08:50   19   These are products that are not marketed yet.  And you'll hear
08:50   20   discussion of premarket, postmarket.

08:50   21           So at the FDA, things are divided as to whether
08:50   22   they've been marketed, because you have different issues versus
08:50   23   are they new products and is the FDA supposed to approve them
08:50   24   or clear them to go to market.

08:50   25           So in '93 I was transferred.  My office at OHA was

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - VOIR DIRE

08:50  1   disbanded, and all the doctors were transferred to premarket
08:50  2   issues.  So that's why I was -- and I was sent to the Division
08:50  3   of Reproductive, Abdominal, Ear, Nose and Throat and Radiology,
08:50  4   and I was supposed to look at new products.
08:50  5   Q.   And, Doctor, during the time that you were working at the
08:50  6   FDA, did the FDA rules and regulations -- did you become
08:50  7   familiar with them and were they part of your -- part of your
08:50  8   work at the agency?
08:50  9   A.   When I was in the Office of Health Affairs, my boss --
08:50  10  yes.  The answer is yes.
08:50  11         When I was in the Office of Health Affairs, my boss
08:50  12  was an MD/JD.  So he required, to support the agency, that I
08:51  13  learn the FDA regulations and rules and how they apply to
08:51  14  drugs, devices, biologics, all different products.
08:51  15         And so that's where I was required to learn how to
08:51  16  look at the regulations and then to interpret them and to see
08:51  17  if a manufacturer was fulfilling that and give recommendations
08:51  18  to the FDA.
08:51  19         So in OHA is where I learned to look at the
08:51  20  regulations and rules.  That's the postmarket group.
08:51  21  Q.   And I didn't ask you when we were talking about your
08:51  22  educational background and your training, but are you licensed
08:51  23  to practice medicine?
08:51  24  A.   Yes, in Arizona and Virginia.
08:51  25  Q.   And then during the years when you were working at the

SUZANNE PARISIAN - VOIR DIRE

08:51  1  FDA, did you maintain your medical licensure during those
08:51  2  times?
08:51  3  A.   All the time.  Yes, sir.  So I've had it ever since I left
08:51  4  medical school.  I've always had some license in one of the
08:51  5  states I practiced in.
08:51  6  Q.   Then at some point you separated from the FDA.  What was
08:51  7  the reason for that?
08:52  8  A.   Oh, I wanted to be with my children.  I usually worked 80
08:52  9  hours a week, and I had two little kids that I was never
08:52  10  seeing.  So I thought I should see them.  But in '93 I was a
08:52  11  medical officer, but then I got -- from '93 to '95, I was a
08:52  12  chief medical officer.
08:52  13  Q.   And, Doctor, what did you do after you finished your
08:52  14  tenure at the FDA?  What did you do?
08:52  15  A.   I left the FDA, and I decided to create a consulting
08:52  16  business about the FDA.
08:52  17  Q.   And can we talk about that?  Let's go back to page 1 of
08:52  18  your résumé.  Is that company the MD Assist company that's
08:52  19  listed there at the top?
08:52  20  A.   Yes, sir.
08:52  21  Q.   Can you explain what that is and what that group has done
08:52  22  over the years?
08:52  23  A.   When I left the FDA, I thought I had been trained about
08:52  24  the FDA and there's a need for people to talk about the FDA and
08:52  25  the FDA process.  So I opened a consulting firm originally

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - VOIR DIRE

08:53   1   called Medical Device Assistance, Inc.  About 14 years ago when
08:53   2   I moved to Arizona, I changed the name to MD Assist, Inc., and
08:53   3   it's basically a consulting firm for anyone to wants to know
08:53   4   about the FDA.
08:53   5          I've talked to industry about the FDA.  I've been a
08:53   6   talking head for TV in terms of Arizona and they need to know
08:53   7   things about the FDA.  I've -- so my whole role has been taking
08:53   8   the experience I learned as a medical officer at FDA and
08:53   9   talking about the FDA issues and for anyone who really needs to
08:53   10  have some reason to know about the FDA.
08:53   11  Q.   And during this time, can you give us a little bit more
08:53   12  information as to the types of entities or groups that you have
08:53   13  assisted with regulatory matters such as manufacturers and
08:53   14  other organizations about FDA requirements?
08:53   15  A.   Yeah.  I've talked to industry.  I was even a consultant
08:54   16  for Johnson & Johnson for an issue, a safety issue, and how to
08:54   17  work up safety issues and talked at one of their national
08:54   18  meetings about FDA, answered questions from their employees.
08:54   19         I've talked on television.  I've talked in films
08:54   20  about the FDA in terms of some news programs that are doing
08:54   21  issues of the FDA and they need to know background about the
08:54   22  FDA.  I wrote a book about the FDA.  And so I've lectured at
08:54   23  colleges about the FDA and some other classes that people want
08:54   24  to know how to get products on the market.
08:54   25         So I -- I got involved in litigation support, did

OFFICIAL REALTIME TRANSCRIPT

08:54  1    common talk about the FDA.  So I'm using that knowledge that I
08:54  2    gained from '91 through '95 at the FDA, and then I've kept up
08:54  3    with the FDA ever since in terms of all the different changes
08:54  4    and requirements.
08:54  5          So if you needed someone to talk about the FDA in
08:54  6    Phoenix, they'd call me up, the medical group, as to, you know,
08:55  7    to discuss the FDA.
08:55  8    Q.   Doctor, you mentioned the book that you published.
08:55  9          MR. HONNOLD:  Mr. Carl, if we could go to page 14,
08:55  10   please.
08:55  11   BY MR. HONNOLD:
08:55  12   Q.   Doctor, could you tell us in a little bit more detail
08:55  13   about the book that you've written about the FDA and what was
08:55  14   involved with that?
08:55  15   A.   It was called the *FDA Inside and Out*.  It was written by
08:55  16   me.  It was meant to be a book for people who wanted to know
08:55  17   the FDA, public health groups.  It basically goes through the
08:55  18   history of the different centers at the FDA, the history of the
08:55  19   law and the requirements if you were going to interact with the
08:55  20   FDA that you would know, you know, what kind of things that the
08:55  21   FDA looks for whether you're industry or whether you're
08:55  22   attorneys.
08:55  23         I also gave -- this book was written in 2001.  It
08:55  24   also gave websites.  Because no matter when you write a book,
08:55  25   it's going to be outdated.  So I gave websites so that people

SUZANNE PARISIAN - VOIR DIRE

08:55  1   could go find out information that was more current.  It was
08:56  2   kind of like a road map, how to get information from the FDA.
08:56  3   Q.   Doctor, when you were at the FDA, your work there
08:56  4   primarily focused on the medical devices; is that right?
08:56  5   A.   Yes, sir.
08:56  6   Q.   And did you -- over the years, as you were working in
08:56  7   regulatory consulting, did you work to become familiar
08:56  8   specifically with the FDA regulations that related to
08:56  9   prescription drug products?
08:56  10  A.   I had to, even when I was at the FDA, because I was the
08:56  11  person in charge of alternative medicine.  So I had to go out
08:56  12  and speak to various types of groups that were into alternative
08:56  13  medicine, dietary supplements, acupuncturists and be able to
08:56  14  converse with them and tell them what the FDA would require for
08:56  15  them to get a product through the FDA.
08:56  16       And I also dealt with the NIH group and had to be
08:56  17  able to be conversant in requirements for the drugs, foods,
08:56  18  biologics, you name it, in terms of products -- alternative-
08:56  19  type products that would have to go through the FDA.
08:56  20  Q.   And, Doctor, over the past several years since you've been
08:56  21  away from the FDA, what sort of work have you done yourself to
08:57  22  keep abreast on regulatory issues and maintaining your
08:57  23  expertise as it relates to FDA regulations?
08:57  24  A.   Every day, I start with little things from the FDA that --
08:57  25  updates as to what this center has done or what that center has

OFFICIAL REALTIME TRANSCRIPT

1030

SUZANNE PARISIAN - VOIR DIRE

08:57  1  done, keeping track of what the new requirements are, the

08:57  2  changes to the law.

08:57  3          So every day for 20 years, I've been involved with

08:57  4  the FDA issues.  So you have to keep current because it keeps

08:57  5  changing all the time, and you have to know what the latest

08:57  6  requirements are.  And then you have to adapt things in terms

08:57  7  of what -- what is required of industry or manufacturers and

08:57  8  changes sometimes for the FDA.

08:57  9          So you have to know -- you have to have a working

08:57  10  time frame of changes and types of things that occur.

08:57  11  **Q.**   And is that a significant part of your practice, just

08:57  12  working to maintain your knowledge and keep up to date?

08:57  13  **A.**   Yes.

08:57  14          **MR. HONNOLD:**  Your Honor, at this time, we would

08:57  15  tender Dr. Parisian as an expert in the area specifically of

08:58  16  FDA regulations, standards, and labeling of drugs, medical

08:58  17  pathology, and in clinical trials.

08:58  18          **THE COURT:**  Any questions on her qualifications?

08:58  19          **MS. PRUITT:**  Your Honor, we need to approach to make

08:58  20  a record.

08:58  21          **THE COURT:**  Okay.

08:58  22          (WHEREUPON, the following proceedings were held at

08:58  23  the bench.)

08:58  24          **MR. BONEY:**  Okay.  So, Your Honor --

08:58  25          **THE COURT:**  Wait.  You have to get a little closer so

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - VOIR DIRE

| | | |
|---|---|---|
| 08:58 | 1 | I can hear you. |
| 08:58 | 2 | MR. BONEY: Yes. Defendants object to Dr. Parisian's |
| 08:58 | 3 | testimony and would like to make the objections continuing |
| 08:58 | 4 | throughout her testimony. |
| 08:58 | 5 | THE COURT: Okay. |
| 08:58 | 6 | MR. BONEY: Dr. Parisian should not be allowed to |
| 08:58 | 7 | offer opinions about what the companies did or what they put on |
| 08:58 | 8 | Xarelto's label in other countries. I think we have an |
| 08:58 | 9 | agreement from the plaintiffs that they're not going to go |
| 08:58 | 10 | there, but if I'm wrong, we would like to object to that. |
| 08:59 | 11 | THE COURT: Okay. |
| 08:59 | 12 | MR. BONEY: And she's said before she's not an expert |
| 08:59 | 13 | in foreign regulatory. Dr. Parisian should not be allowed to |
| 08:59 | 14 | offer opinions about what a treating doctor would find useful |
| 08:59 | 15 | in the Xarelto label because she never prescribed Xarelto and |
| 08:59 | 16 | hasn't treated patients since the 1980s. This was in our |
| 08:59 | 17 | motion in limine about her which we incorporate here. |
| 08:59 | 18 | Dr. Parisian should not be allowed to offer an |
| 08:59 | 19 | opinion on the claims that the plaintiffs have abandoned here, |
| 08:59 | 20 | including the failure to test, absence of a black box warning, |
| 08:59 | 21 | dosing issues, and absence of a reversal agent or antidote. |
| 08:59 | 22 | And Dr. Parisian should not be allowed to offer |
| 08:59 | 23 | opinions about the dose selection in EINSTEIN because she did |
| 08:59 | 24 | not offer these opinions in her expert report? |
| 08:59 | 25 | THE COURT: Okay. Anything from you? |

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - VOIR DIRE

08:59 1     **MR. HONNOLD:**  Your Honor, that's quite a list, but I
08:59 2 don't think those are specific areas that we're going to just
08:59 3 get into directly.  If those things may happen as an aside, I'm
08:59 4 sure somebody will remind me of that, but I don't think those
08:59 5 are areas that we're going to delve into directly except for
09:00 6 the one thing that relates to the issue of -- I think there was
09:00 7 a reference to the helpfulness of a medication or something in
09:00 8 the label.
09:00 9            She is specifically going to offer testimony
09:00 10 relating to the federal regulation about Section 5 to 201.57
09:00 11 that does talk about that section of the labeling does require
09:00 12 laboratory testing information that would be helpful to assess
09:00 13 the patient's reaction to a medication.
09:00 14            And so I think that maybe is a little bit
09:00 15 different than what counsel mentioned, but that is a direct
09:00 16 issue that we're going to get into.  But it focuses more on the
09:00 17 helpfulness of the test in measuring or assessing a patient's
09:00 18 reaction to the drug.
09:00 19            **THE COURT:**  Okay.  All right.  I'll let you make
09:00 20 those objections continuing, but I'll overrule them for the
09:00 21 state of the record.  Okay.
09:00 22            **MR. BONEY:**  Thank you, Your Honor.
09:00 23            **MS. PRUITT:**  Thank you, Judge.
09:00 24            (WHEREUPON, the following proceedings were held in
09:00 25 open court.)

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

09:01   1      **THE COURT:**  Proceed, Counsel.

09:01   2              The Court will accept the witness as an expert.

09:01   3   As I mentioned to you, that means that she can be asked

09:01   4   questions of her opinion on things.  You treat her just like

09:01   5   any other witness.  You're to determine and weigh her

09:01   6   credibility and so forth just like you would any other witness.

09:01   7              You may proceed, Counselor.

09:01   8      **MR. HONNOLD:**  Yes, Your Honor.

09:01   9                    **DIRECT EXAMINATION**

09:01  10   BY MR. HONNOLD:

09:01  11   **Q.**   Dr. Parisian, moving forward, what I'd like to do is ask

09:01  12   you about your work as an expert witness in this matter as well

09:01  13   as other matters.

09:01  14              First, have you served as an expert witness in other

09:01  15   cases in court other than this one?

09:01  16   **A.**   Yes, sir.

09:01  17   **Q.**   And can we talk a little bit about your history in serving

09:01  18   as an expert witness.  Can you tell us how many times in the

09:01  19   past before the case dealing with Xarelto that you have served

09:01  20   as an expert witness.

09:01  21   **A.**   I think I've been involved with something like 20, 27 drug

09:02  22   issues and about maybe in the 40s of medical device issues,

09:02  23   various issues with products.  And I've been in court about 90

09:02  24   times.  And this is 20 years.  I'm getting old.

09:02  25   **Q.**   And so, as you talk about that, you were talking about it

SUZANNE PARISIAN - DIRECT

1  in the context of your work over the past 20 years.  Is that a

2  fair statement?

3  A.   Yes.

4  Q.   And I know you were -- you gave a deposition in this case.

5       Have you given deposition testimony in prior matters?

6  A.   Yes, sir.  Over 200.

7  Q.   And when you say that you've been in court over 90 times,

8  does that mean you appeared as an expert witness in a case,

9  been sworn in, and give testimony about a particular product

10  approximately 90 times in trial?

11 A.   Yes, sir.

12 Q.   Now --

13 A.   I didn't see the Bible.  I would have used the Bible, but

14 I didn't have one.

15 Q.   Doctor, have you served as an expert witness for both

16 plaintiffs and defendants?

17 A.   I have served as an expert witness for both.  I've not

18 gone to court or testified for defendants.

19 Q.   Okay.

20 A.   It just -- they have just not gone to court where I've

21 given testimony.

22 Q.   Let's delve into that in a bit.

23      In terms of the cases that you have worked on where

24 you've given depositions or testified in trial, how is it that

25 those have been primarily plaintiffs cases?  How has that

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

09:03  1  played out over the years?

09:03  2  **A.**   The cases that I've accepted that have been defense cases

09:03  3  haven't usually gone on to having a deposition.  Only one case

09:03  4  did, but most of them go -- if I say that I will support the

09:03  5  defendant, he usually doesn't go on beyond that.  I do get to

09:03  6  pick what cases I want to take and what I'm interested in and

09:03  7  which ones I think I have a role in.

09:03  8        And so there is some selection on me in terms of the

09:03  9  types of cases I take.  I refuse cases.  I don't take all cases

09:03  10  that come and ask me.  And so I have the cases that have

09:03  11  actually gone on are usually plaintiffs' cases.

09:04  12  **Q.**   And in those instances where plaintiffs' lawyers are

09:04  13  representing hurt folks have come to you and asked you to look

09:04  14  at or assess a matter, have you told them in the past that you

09:04  15  didn't think that they had a case and you wouldn't be able to

09:04  16  help them?

09:04  17  **A.**   Yes.

09:04  18  **Q.**   Okay.  And have you done that on numerous occasions?

09:04  19  **A.**   Yes, sir.

09:04  20  **Q.**   And, in fact, has there been instances where plaintiffs'

09:04  21  lawyers have come to you and asked you to look at or consider a

09:04  22  matter and you've had to spend a fair amount of time looking

09:04  23  into it and charging money only to have to tell them that you

09:04  24  did not believe that there was a case?

09:04  25  **A.**   Yes.

SUZANNE PARISIAN - DIRECT

1    Q.   And, as you sit here today, if you were approached by a
2    corporate defendant who manufactured a medical device or a
3    pharmaceutical product, would you be willing to review and
4    evaluate that matter if you were asked?
5    A.   Yes.  And I always say that I'm going to do the exact same
6    process that I would use for any case for the FDA, the same
7    methodology.  I say right up front, "I'm going to have to see
8    all the documents that I requested to see.  I'm going to have
9    to look at them all."  And that would be whether it's a
10   plaintiff's case or a defense case.  It's the same process for
11   everybody.
12   Q.   And you talked about that process of looking at
13   everything.
14        Can you explain that a little bit more in terms of
15   actually what your process of review or methodology is in
16   getting prepared to give a report and testify in a case?
17   A.   The process began at the FDA.  At the FDA, usually the
18   question was how did product get on the market?  What's the
19   safety issue that's occurring?  And what can the FDA do to
20   address the safety issue?
21        So from that training, for products that were
22   marketed, I do the same thing for products now in terms of --
23   if I'm consulting for a manufacturer, if I'm in litigation,
24   it's always the same.  I go and I look at the FDA documents,
25   the FDA history.  I usually survey the medical literature to

SUZANNE PARISIAN - DIRECT

09:05  1  see what's going on.  I look at as many documents as I possibly
09:05  2  can look at.
09:05  3        In terms of the FDA, you were limited as to what
09:06  4  documents you could look at.  You only had the documents that
09:06  5  were submitted to the FDA.  There were rare times when I was at
09:06  6  the FDA involved with mandatory health issues, mandatory
09:06  7  recalls, and the sheriffs would go out and literally get
09:06  8  document from the corporation.  And I would look at those
09:06  9  documents.  Those were corporate documents.
09:06 10        So I was trained to look at them, but you didn't get
09:06 11  them as much when you're at the FDA, because it's just very --
09:06 12  the FDA only usually sees what they're given by the company.
09:06 13  But -- so I would look at all that.
09:06 14        In terms of litigation, I get to look at more
09:06 15  documents because I get to look at employee testimony,
09:06 16  depositions.  I get to look at internal documents.  I look at
09:06 17  manufacturing documents.  I look at adverse event reports.  So
09:06 18  I get a lot more documents to look at in terms of litigation.
09:06 19        If I was consulting for a manufacturer, I would have
09:06 20  also have similar types of documents from the company.
09:07 21        So I try to look at everything, and I look at it in
09:07 22  the context of what the regulations are in terms of what --
09:07 23  I've been trained to know what should be there and what the
09:07 24  company is required to do or what any company is required to
09:07 25  do.  And then I formulate opinions based on the documents I've

SUZANNE PARISIAN - DIRECT

1   reviewed, based on what the requirements are.  And then I have

2   to write, usually, a report giving the basis of those opinions

3   to support those opinions so that I could be questioned on

4   them.

5          And so you have to kind of look at everything, put

6   your opinions down, what the regulations are you're using, and

7   then be able to answer questions about it at deposition or in

8   trial.

9   Q.   Doctor, let me ask you this:  The work that you have done

10  over the years on behalf of injured folks who have brought

11  lawsuits against manufacturers either of devices or

12  pharmaceutical products, do you consider that to be important

13  work?

14  A.   Yes.

15  Q.   Tell us why.

16  A.   Well, I'm a public health person.  And, to me, each

17  plaintiff in court is like a patient.  And so every patient

18  that I took care of, I relate to the plaintiff.

19         And so this is my clinical practice.  These are my

20  patients, and I want my patients to be taken care of.  And I

21  want the FDA and the whole process to make sure the patients

22  have safe and effective information and the physicians, because

23  I relate to being a physician, have adequate instructions as to

24  how to take care of those patients.

25         So my medical training and experience feeds into what

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

09:08    1    I'm looking at.  It puts people's faces and lives in terms of

09:08    2    the process.  So this is, to me, public health medicine, what

09:08    3    I'm still doing.  What I do for industry, what I do here, it's

09:08    4    public health.

09:08    5                THE COURT:  Let's get into the --

09:08    6                MR. HONNOLD:  Yes.

09:08    7    BY MR. HONNOLD:

09:08    8    Q.   And, Doctor, let's talk about the specific work that

09:09    9    you've done on this case.

09:09   10          Can you outline exactly what it is -- the type of

09:09   11    review that you did in this case, the things that you looked

09:09   12    at.

09:09   13    A.   I looked at all the documents that I was given in terms of

09:09   14    employee testimony.  I was given internal files.  I was given a

09:09   15    hard drive of documents that I could go through and look for

09:09   16    all the types of documents that are dealing with regulatory

09:09   17    issues.  And then I could ask for more information.

09:09   18          But we're talking about, you know, a hard drive full

09:09   19    of documents that comes from the company.  And I look at the

09:09   20    testimony from the employees as they relate to the certain

09:09   21    documents and try to explain what the company was doing at that

09:09   22    point in time.

09:09   23          And I try to make a framework, time frame, and

09:09   24    then -- because I'm looking at the whole -- the whole -- before

09:09   25    something was approved and then when it was approved.  So I'm

SUZANNE PARISIAN - DIRECT

09:09  1  making a large time frame for the history of this product.

09:09  2  **Q.**   Doctor, did you review significant amounts of testimony

09:09  3  from individuals associated with both Janssen and Bayer?

09:10  4  **A.**   Yes.  I think I looked at over 41 depositions and all the

09:10  5  exhibits.

09:10  6  **Q.**   Did you also review internal documents from each of the

09:10  7  companies?

09:10  8  **A.**   Yes, sir.

09:10  9  **Q.**   In reviewing those materials, did you essentially look at

09:10  10  tens of thousands of pages of material?

09:10  11  **A.**   Yes, sir.

09:10  12  **Q.**   And when was it when you were first retained to undertake

09:10  13  or start that work?

09:10  14  **A.**   I think it was spring of last year.

09:10  15  **Q.**   And doing that work on this case, reviewing those

09:10  16  materials, has it taken a substantial part of your professional

09:10  17  time during that time frame?

09:10  18  **A.**   Yes.  I think it's something like 450 hours.

09:10  19  **Q.**   And you charge for the work that you do in that regard?

09:10  20  **A.**   Yes, I do.

09:10  21  **Q.**   Can you explain that?

09:10  22  **A.**   I do charge.  It's $500 an hour for review, and it would

09:10  23  be $1,000 sitting in here or in a deposition testifying outside

09:10  24  of my office.

09:10  25  **Q.**   And --

SUZANNE PARISIAN - DIRECT

09:10  1  **A.**    And that's the going rate.

09:10  2  **Q.**    And when you say that, you're comparing your professional

09:10  3  rate to other experts in the field who also do litigation type

09:10  4  of work?

09:11  5  **A.**    Right.  There's only a few of us to come in and talk about

09:11  6  the FDA.

09:11  7  **Q.**    And you have billed us -- attorneys representing

09:11  8  Ms. Mingo, you have billed us for your work on the case over

09:11  9  that time; correct?

09:11  10  **A.**    Yes, sir.  But it's the whole case, and it would be like

09:11  11  $235,000-something and 20 cents.

09:11  12  **Q.**    Okay.  And that relates to all of the reviewing and all of

09:11  13  the depositions, the internal documents that you've reviewed,

09:11  14  all of the exhibits, all of the clinical trial material, FDA

09:11  15  submissions.

09:11  16        You have reviewed in detail all of that material; is

09:11  17  that true?

09:11  18  **A.**    Right.  And putting it into context of what the

09:11  19  regulations are.

09:11  20  **Q.**    And after undertaking that review then, did you formulate

09:11  21  certain opinions in this case?

09:11  22  **A.**    Yes, sir.

09:11  23  **Q.**    And specifically, Doctor, did you formulate certain

09:11  24  opinions with respect to the actions or inactions of the

09:11  25  defendants, Bayer and Janssen, in this case pertaining to the

SUZANNE PARISIAN - DIRECT

09:11  1   drug Xarelto?

09:11  2   A.   Yes, sir.

09:12  3   Q.   Doctor, can you talk a little bit about, when you're

09:12  4   reviewing materials like you reviewed in this case, how is it

09:12  5   that you rely upon or use training and experience as a

09:12  6   physician?

09:12  7   A.   Well, in terms of being able to look at medical articles,

09:12  8   clinical trials, knowing what the potential risks are, looking

09:12  9   at the discussion internally of the company when they're

09:12 10   talking about medical issues, looking at the advisory

09:12 11   committee.  So you need your background as a physician to look

09:12 12   at the clinical information.

09:12 13   Q.   And, Doctor, have you formed specific opinions in this

09:12 14   case as to whether Bayer and Janssen, whether they complied

09:12 15   with applicable FDA requirements regarding prescription drug

09:12 16   labeling?

09:12 17   A.   Yes, sir.

09:12 18   Q.   And we'll get into them in further detail as we go along.

09:12 19         But, generally, from the outset, do you have opinions

09:12 20   in this case that Bayer and Janssen did, in fact, violate or

09:12 21   fail to meet certain FDA regulations regarding the labeling of

09:13 22   their prescription product Xarelto?

09:13 23   A.   Yes.

09:13 24   Q.   And, specifically, have you formed any opinions in the

09:13 25   area as to whether the current label in effect for Xarelto

SUZANNE PARISIAN - DIRECT

09:13  1   provides adequate instruction and guidance to physicians in

09:13  2   prescribing Xarelto?

09:13  3   **A.**   Yes, I do have an opinion.

09:13  4   **Q.**   And is that area, though -- as to whether Bayer and

09:13  5   Janssen have provided adequate instruction and guidance to

09:13  6   prescribing physicians, is that a particular area of focus for

09:13  7   your opinions?

09:13  8   **A.**   Yes.  And it's based on the review of all the documents.

09:13  9   **Q.**   Now, we didn't mention it specifically, but did you, in

09:13 10   fact, prepare a written report in this case?

09:13 11   **A.**   Yes, I did.

09:13 12   **Q.**   And is it in the vicinity up there?  Can you --

09:13 13   **A.**   Here it is.

09:13 14   **Q.**   That's 400 pages of work?

09:13 15   **A.**   Yes, sir.

09:13 16   **Q.**   And you did give a deposition in this case; is that right?

09:14 17   **A.**   Yes, two days' worth.

09:14 18   **Q.**   And counsel for both Bayer and Janssen had the ability to

09:14 19   ask you detailed questions about your opinions?

09:14 20   **A.**   Yes, sir.

09:14 21   **Q.**   What I'd like to do before we get into specific opinions,

09:14 22   Dr. Parisian, have you talk a little bit about the

09:14 23   responsibilities of pharmaceutical companies in terms of their

09:14 24   relationship and interaction with the FDA.

09:14 25   **A.**   Yes, sir.

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

1  Q.   Can we talk a little bit -- can you explain to us briefly

2  by way of overview --

3       MR. HONNOLD:   And, Mr. Carl, we may have a specific

4  slide on this that we put together, a demonstrative.

5  BY MR. HONNOLD:

6  Q.   Can you talk a little bit about the size of FDA, again,

7  what it does and its particular resources?

8  A.   Well, the FDA -- the body of the FDA is, I think, about

9  13,000 employees.  And there will be offices of the FDA all

10 over the United States, and those are the district offices that

11 do inspections of facilities.

12      In terms of the FDA itself, when I was there, it was

13 basically six different centers and all individual centers.

14 And they regulate -- well, you can see the picture.  They

15 regulate the prescription drugs, human prescription drugs.

16 They regulate veterinary prescription drugs.  They regulate

17 foods, devices, biologics, and cosmetics.

18      So it's a wide assortment of products.  Only certain

19 products are looked at before they go on the market; and those

20 would be your drugs, your devices, and your medical devices.

21 Q.   Do you --

22 A.   No biologics.

23 Q.   I'm sorry, Doctor.

24 A.   Go ahead.

25 Q.   Do you have an estimation specifically how many commercial

SUZANNE PARISIAN - DIRECT

09:15  1  products there are that are under the purview and eye of the

09:15  2  FDA?

09:15  3  A.   I don't think I've seen a number, but that's where I've

09:15  4  seen that 25 cents of every dollar goes to something the FDA

09:15  5  has their hand involved with.

09:15  6  Q.   And, Doctor, what is the basis -- or what is the source

09:16  7  for guidance in terms of specifically what products are

09:16  8  overseen by the FDA?  Where does that come from?

09:16  9  A.   It comes from Congress.  Congress tells what products the

09:16  10 FDA is going to regulate and also whether they're going to look

09:16  11 at it before it goes on the market or after it goes on the

09:16  12 market.  All the authority for the FDA's actions comes from

09:16  13 Congress.

09:16  14 Q.   Let's talk a little bit about -- now I'm going to focus on

09:16  15 prescription drug products, Doctor.

09:16  16       Do you have an estimation as to how many current

09:16  17 prescription drug products are looked over by the FDA?

09:16  18 A.   There's, I think, about 1,300 what they call new molecular

09:16  19 entities, which are the component that's the part for the drug.

09:16  20 And so the FDA has approved about 1,300 of those.

09:16  21       Then there's about 10,000 over-the-counter drugs.  So

09:16  22 right, there we have about 11,000 drugs that the FDA is looking

09:17  23 at.  And then all of those have generic drugs too.  So there's

09:17  24 more than 11,000 drugs that the FDA is looking at.

09:17  25 Q.   Is the entirety of the FDA's resources focused on

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

1    prescription drugs?

2    **A.**    No.

3    **Q.**    Can you explain how the resources of FDA are allocated to

4    the issue of regulating prescription drugs?

5    **A.**    A lot of the funding for prescription drugs now comes

6    actually from industry.  In 1992, there was a Prescription Drug

7    User Fee Act, which they call PDUFA.  And in 1992, industry

8    agreed to pay fees to the FDA for certain actions in order that

9    the FDA would expedite getting new drugs on the market.

10           So in '92 through about 2007, these PDUFA fees

11   actually paid for new drug reviewers because the process that

12   the industry was agreeing to was that it would make it more

13   efficient to get new drugs to the market.

14   **Q.**    And then, specifically, what part of the FDA is it that

15   deals with prescription drugs?

16   **A.**    It would a center called CDER, Center for Drug Evaluation

17   and Research, CDER.  And so they are involved with new drug

18   approval, and every year they have to show industry and

19   Congress that they're approving new drugs and they're doing it

20   in a very expedite way.

21           The PDUFA Act made it so that there were certain time

22   frames for the FDA to get things approved, like ten months for

23   a new drug application and six months for other prioritized

24   drug applications.

25           So FDA, in beginning of '92, got put on a time frame.

SUZANNE PARISIAN - DIRECT

09:18  1   They had to try to make these PDUFA dates and show industry and

09:18  2   Congress that they were being efficient in terms of their

09:18  3   approval times.

09:18  4   **Q.**   You mentioned that there were approximately -- well, I

09:18  5   can't remember if I asked you.

09:19  6            How many total employees at the FDA?

09:19  7   **A.**   FDA total is 13,000.  At CDER, there's 1,300, 300 of which

09:19  8   are doctors.

09:19  9   **Q.**   And so approximately 10 percent of the FDA's human

09:19  10  resources in terms of workers are devoted to that job at CDER

09:19  11  looking at prescription medications?

09:19  12  **A.**   Right.  And over 50 percent of their budget comes from

09:19  13  this PDUFA fee.  So that's where they get most of their

09:19  14  funding.

09:19  15  **Q.**   Individuals that work at CDER on focusing on approval and

09:19  16  watching over prescription drugs, are they going to be working

09:19  17  on multiple products at a time?

09:19  18  **A.**   Yes.  You're getting applications.  It's the government.

09:19  19  You basically get applications, you get assigned different

09:19  20  drugs.  So you don't just stay -- one reviewer doesn't stay

09:19  21  with one drug application.  And that's why everything has to be

09:19  22  in writing at the FDA, because it changes all the time.

09:19  23           Medical officers come and go.  You have to write --

09:20  24  have a written record as to what was negotiated, what was

09:20  25  decided so that the next person coming along can then pick up

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

09:20  1  that application when the company comes back to get something
09:20  2  else approved.
09:20  3  Q.   And can you talk a little bit -- you mentioned PDUFA
09:20  4  but -- and some of its parts.
09:20  5       But can you talk a little bit about the time
09:20  6  constraints or deadlines that are part of PDUFA that affect the
09:20  7  process of drug review and approval?
09:20  8  A.   PDUFA requires that an NDA, which is a New Drug
09:20  9  Application, be completed within -- every application comes in
09:20 10  with a PDUFA date as to when it needs to be completed.  Ten
09:20 11  months is the time when the New Drug Application work by the
09:20 12  reviewers have to be completed and a decision made as to
09:20 13  whether to approve it or to ask for additional information.
09:20 14       And six months would be when you're given a priority
09:20 15  review.  So there's time frames that the medical officer has
09:20 16  to -- all the team -- there's a team of reviewers -- has to get
09:21 17  the application completed.  And that was part of PDUFA.
09:21 18       In '92 -- the FDA was approving drugs before the rest
09:21 19  of the world after 1992.  Before '92, we were always the one
09:21 20  who came after everybody else.  So it sped up the process under
09:21 21  the -- under the rationale by Congress that patients needed new
09:21 22  drugs, that the public needed access to new drugs.
09:21 23       So it kind of -- PDUFA was a turning point for the
09:21 24  FDA.
09:21 25  Q.   And can you talk a little bit, just briefly, about the

SUZANNE PARISIAN - DIRECT

09:21  1   role of funding for the FDA and where the FDA budget comes, in
09:21  2   part, from the PDUFA fees?  Where does that money come from?
09:21  3   A.    It comes from the industry, but they're paying for their
09:21  4   services.  It's not that they're paying for a decision.
09:21  5   They're paying for a service that the FDA says that they will
09:21  6   get this approval process done.  They pay for licensing their
09:22  7   facilities.  So the funding is coming from the industry in the
09:22  8   agreement that the FDA will speed up the drug process and be
09:22  9   more efficient.
09:22  10          And so, oh, 50 percent -- gradually, the budget for
09:22  11  FDA has been increasing in terms of the PDUFA fees taking up a
09:22  12  bigger part of it.
09:22  13          They've also used the same process now in medical
09:22  14  devices, so medical devices have similar fees.  So much of the
09:22  15  FDA's budget is coming from industry for the FDA to be making
09:22  16  themselves more efficient.
09:22  17  Q.    And, Doctor, let's talk a little bit more about the role
09:22  18  of the FDA.  As it relates to the FDA and prescription drug
09:22  19  products, who is it that is responsible for the safety --
09:22  20  ultimately for the safety of the drugs sold in the United
09:22  21  States?
09:22  22  A.    The manufacturer; not the FDA.
09:22  23  Q.    And specifically, then, as it relates to Xarelto, who is
09:22  24  it that ultimately is responsible for the safety of Xarelto
09:22  25  being sold in the United States?

SUZANNE PARISIAN - DIRECT

**A.**   The manufacturer.  The condition of when you get approved
to start marketing is that the manufacturer will take over
monitoring the drug, updating their labeling, ensuring it's
safe and effective, making sure their sales reps communicate
with doctors.

         So you get approved and the FDA approves you, but it
basically lets you on the market.  The letter of approval will
say, "You're approved with the condition that you're going to
continue monitoring and updating your label and updating your
sales and ensuring that the product is safe and effective,"
because when you get approved, you're getting approved usually
on a small clinical trial.

         If you have a successful drug, you're going to be
giving it to a lot more patients.  So the companies all have
groups that that's their role, is to continue to monitor the
drugs.  It's not the FDA.

**Q.**   Doctor, if I were to make the statement then that the FDA
is the entity that has the primary responsibility for the
safety of drugs sold in the U.S., would that be a true
statement?

**A.**   Not when you say "primary."  They do have a role.  The FDA
does have a role for patient safety.  They tend to get involved
when safety issues occur.

         They do have a role in approving new drugs, but when
it comes to monitoring the drug, it's the manufacturer who's

SUZANNE PARISIAN - DIRECT

09:24 1  selling the drug who the -- the Food, Drug, and Cosmetic Act
09:24 2  and the regulations has put the responsibility on.
09:24 3  **Q.**   As it relates to a prescription drug that has been
09:24 4  approved and on the market, in your experience and in your
09:24 5  view, who knows more about the specifics of that drug on the
09:24 6  market, the FDA or the manufacturer of the product?
09:24 7  **A.**   Oh, the manufacturer.  They're the ones who developed it.
09:24 8  They have all the researchers.  They have teams of people,
09:24 9  large groups of people that are working on it.
09:24 10       The FDA basically reviews the documents and
09:24 11  information that's given to them by the company but always with
09:24 12  the caveat that the company is the expert.  And so the FDA
09:24 13  relies on the company to be the expert in that drug when
09:24 14  they're interacting with them.
09:24 15 **Q.**   And just in terms of the relationship or ratio of numbers
09:25 16  of people who might have specific knowledge and understanding
09:25 17  of the drug at the company compared to those at the FDA, what
09:25 18  is the relationship between those numbers?
09:25 19 **A.**   We're talking hundreds of people at the company, and
09:25 20  you're talking maybe three reviewers, if you're talking about
09:25 21  clinical reviewers.  Then there's a chemist, there's a small
09:25 22  handful of about eight different teams of people at the FDA who
09:25 23  look at the application that's given to them.
09:25 24       But they're not -- they're not doing clinical trials.
09:25 25  They're not using the drug.  They're just looking at the

SUZANNE PARISIAN - DIRECT

1    documentation that's given to them.

2    **Q.**    From your perspective, Doctor, does it make sense from the

3    public health perspective or policy perspective for the drug

4    company to be responsible for the safety of their drugs?

5    **A.**    Sure.  They're the ones selling it every day.  They know

6    what happens with their drug.  And it's required that they make

7    sure that it's safe and effective and adequately labeled.

8    **Q.**    Let me ask you a little bit about clinical trials.  Does

9    the FDA itself conduct or perform its own clinical trials

10   leading to the approval of a prescription drug product?

11   **A.**    No.  They just review -- they review documents that come

12   in.  And remember, the FDA reviewers are looking at competitive

13   drugs, so they have blinders on.  You look at one application;

14   you don't talk about another person's drug.

15            So they're just looking at the application.  They're

16   not -- there is no FDA hospital.  The FDA clinicians are not

17   seeing patients.  It's basically a paper-review process.

18   **Q.**    I've written on the pad a dollar sign with money for

19   clinical trials.  In terms of the clinical trials, then, that

20   are done by industry, how -- based upon your knowledge and

21   experience in this area, how are those clinical trials funded

22   or paid for?

23   **A.**    By the company.

24   **Q.**    And can you talk about -- and you may give some insight

25   into this case in terms of how clinical trials are done.  But

SUZANNE PARISIAN - DIRECT

1  will it always be the company itself and its employees who are

2  performing the clinical trials?

3  **A.**   Yes.  And then they summarize the information for the FDA

4  within the application.

5  **Q.**   And do manufacturers at times rely upon outside entities,

6  such as academic institutions or other parties, to assist with

7  clinical trials?

8  **A.**   Right.  It's up to the company to determine people who can

9  be their investigators, if they want to hire a contract

10  research organization, but it's up to the company.  It all

11  comes from the company as to who's going to do their clinical

12  trials.  They do have a role to make sure that they're being

13  monitored and make sure that the patients are safe.

14        They do have a role to interact with the FDA to get

15  approval for certain stages.  But it's all coming from the

16  company.  They pay who does their research.

17  **Q.**   In terms of clinical trials themselves, does the FDA have

18  the power or authority to tell or direct or mandate drug

19  companies to do particular clinical trials?

20  **A.**   No.  No.  You can suggest things as an FDA person, because

21  the ultimate goal is that the manufacture will be able to get

22  approved.  But it's not -- the FDA doesn't mandate what a

23  clinical trial is.  The manufacturer designs what the clinical

24  trial is and what they say they're going to show and -- as

25  their endpoint.

SUZANNE PARISIAN - DIRECT

1       You can comment at the FDA.  But, ultimately, it's
2  the manufacturer who's responsible for doing the clinical
3  trial, making the protocol, the plan, and picking what the
4  endpoints are.  So it's the manufacturer.
5  Q.   In your view, Doctor, in terms of which entity or body is
6  best positioned and informed to give instruction and guidance
7  to physicians about allow to safely use a product, who would
8  that be?
9  A.   It's required to be the manufacturer.  Every manufacturer,
10  in terms of the NDA process, the New Drug Application, is
11  required to draft a label because they know what the label
12  should be, and they know what their -- they know their product
13  better than the FDA.
14       And so, ultimately, the label belongs to the
15  manufacturer, not the FDA.  The FDA can comment, can request,
16  particularly before a drug is approved.  They may make some
17  changes.  But it's the manufacturer who's ultimately
18  responsible for what's in the label.
19       21 CFR 314.5, I think, 1 will actually be saying that
20  they have to have a draft label.  So the manufacturer drafts
21  the label.
22  Q.   And we put a slide up, Doctor, about the FDA, and I think
23  we've covered this.  But is it fair to state here, as this
24  slide does, that the FDA does not perform any testing,
25  research, clinical studies, or experiments on drugs?

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

09:29  1    A.   In that sense, there is a chemistry department that will

09:29  2    look at the pills that the company actually is planning to

09:29  3    submit in terms of manufacturing.  But they're not doing any

09:29  4    research -- I mean, the FDA doesn't conduct research.  The

09:30  5    industry conducts research.  The FDA reviews it and approves

09:30  6    products if they meet certain standards.

09:30  7    Q.   Let's talk about the stages of the approval process, and I

09:30  8    think you've told me about it or tried to explain those stages

09:30  9    of approval, that there's a Stage I, a Stage II, and a

09:30  10   Stage III.

09:30  11          Can you explain that?  And can you help differentiate

09:30  12   how that's different than a Phase I trial, Phase II trial,

09:30  13   Phase III?  Can you talk about the stages of the actual

09:30  14   approval process and what's involved there?

09:30  15   A.   Okay.  We'll try that.

09:30  16   Q.   Do you want to come around?

09:30  17   A.   Yeah.  It might be easier.

09:30  18          MR. HONNOLD:  Is okay for her to step down, Your

09:30  19   Honor, to talk about this?

09:30  20          THE COURT:  Yes.

09:30  21          THE DEPUTY CLERK:  We'll need this.

09:30  22   BY MR. HONNOLD:

09:30  23   Q.   I'll arm you with the blue pen.

09:30  24   A.   Okay.  Hello.

09:31  25   Q.   Okay.  Go ahead.

SUZANNE PARISIAN - DIRECT

A.   Okay.  Stages is a different way of looking it.  It's not the FDA, but I think it might make sense.  So we'll do Stage I, II, and III.  Okay.

      Now, the way -- I think the way we've been talking about stages, here would be -- Stage I would be the premarket stage, Stage II would be the approval stage, and Stage III would be when it's marketed.  Okay?  Postmarket.

      Premarket and postmarket.

      Now, in terms of FDA speak, Stage I would be Phase I, Phase II, Phase III.

Q.   When you use the terms "phases" now, are you talking about clinical trials?

A.   Yes.  Phase IV.  Okay.  So you're going to probably hear things, for some of the studies, particularly for EINSTEIN, they talk about Phase II studies, Phase III studies.

      Phase I studies are your very basic laboratory studies, your PK studies your normal human beings.  They're just looking at how the drug performs.  I think Dr. Plunkett was talking about things like looking at the area under the curves, Cmax, just trying to get how the drug is handled.  That would be your Phase I study, basic -- just information about how the drug is handled.

      Also feeding into Phase I would be any animal studies that you had to show that it was safe to put this in a human being, this drug.  So Phase I are your basic -- well,

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

09:32  1   preclinical stuff, which is speak for laboratory and animal
09:32  2   testing, and then we'll also usually do your PK,
09:33  3   pharmacodynamics.  Those are usually healthy volunteers.
09:33  4        Phase II studies is when you're starting to -- I
09:33  5   don't know if I need this, do I?
09:33  6   Q.   It kind of goes in and out.
09:33  7   A.   Phase II studies are when you're starting to look at dose.
09:33  8   You're looking at what your drug actually does.  Is it going to
09:33  9   be effective for something?  In the discussion, I think, that
09:33 10   we're talking about with the EINSTEIN studies and the HIT
09:33 11   studies, they're doing dosing studies which are Phase II
09:33 12   studies.
09:33 13        So you've got your Phase I.  That's your basic
09:33 14   research, basically.  Phase II studies.  Okay.  What does the
09:33 15   drug do?  Looking at dosing, and you're getting ready to go
09:33 16   into your Phase III study.
09:33 17        Your Phase III study is your larger study to show
09:33 18   that your product is safe and effective for something and to
09:33 19   get approval.  That's what the goal of a Phase III study is.
09:34 20        So here's dosing.  And this is the one that you're
09:34 21   going to want to have a bigger study.  So the Phase II study's
09:34 22   usually smaller.  Phase III study is your approval study, is
09:34 23   what you're trying to do, and you're going to have an endpoint.
09:34 24   You're going to have a -- to say to the FDA, "See, we're
09:34 25   effective for something."  And that's what the purpose of a

SUZANNE PARISIAN - DIRECT

09:34  1  Phase III study is.
09:34  2          For all of this premarket stuff, you only have
09:34  3  limited safety data.  You only are giving it to a certain
09:34  4  smaller number of patients.  So you usually get approved based
09:34  5  on efficacy more than safety.  Okay?
09:34  6          And so dose is the large study, Phase III.  Okay.
09:34  7  All right.  These, if you're doing these in the United States,
09:34  8  are done under what they call an IND.
09:35  9  Q.   What's does IND stand for?
09:35  10  A.   Investigational New Drug.  If it's a clinical study, you
09:35  11  have to get approval to do research, basically, on human beings
09:35  12  in the United States.  Okay?
09:35  13          So you go to the FDA with a protocol, and that's your
09:35  14  plan, kind of like your recipe, and you say, "I want to start a
09:35  15  clinical trial with United States patients; therefore, I'm
09:35  16  going to need to have an approval of an IND."  Okay?  And some
09:35  17  of the studies, like ROCKET, they were multinational.  Not all
09:35  18  those patients were done under IND.  But if you treat United
09:35  19  States patients, you have to.  So that's the plan.
09:35  20          So all this research, Phase I, Phase II, Phase III,
09:35  21  are done under an IND.  But then when you want to get approval
09:35  22  to begin marketing --
09:35  23  Q.   You're writing "NDA" there.  What does that stand for?
09:36  24  A.   New Drug Application.  Okay.  So all your research in the
09:36  25  United States has been done under an IND.  And then when you

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

09:36  1   want to hit market, you take all that paperwork, and you put it
09:36  2   back into the FDA, and you call it a New Drug Application.  And
09:36  3   this is what FDA approves.  And that's what they're seeking.
09:36  4   Okay?
09:36  5   Q.   So let's put this in context then.  After the various
09:36  6   clinical trials, Phase I, Phase II, and Phase III, are done and
09:36  7   that data is developed, assessed, reviewed by the company, does
09:36  8   that lead, then, to the submission of the New Drug Application
09:36  9   seeking approval?
09:36  10  A.   Yes.  That's what -- okay.
09:36  11         So the IND, this research, is done under one
09:36  12  regulation, and it's 21 Code of Federal Regulations, CFR 312,
09:37  13  and there's a description of what you need to do to do your
09:37  14  research in the United States.
09:37  15         Then you take all this, you resummarize it, you put
09:37  16  it in a New Drug Application, and -- just the part that you
09:37  17  want to get approved, not all of, but just the part you want to
09:37  18  get approved.  And that's described in another set of
09:37  19  regulations, 21 CFR 314.
09:37  20         And this is where you're saying, "Hey, FDA, I want to
09:37  21  market this product for this indication.  Will you approve me?"
09:37  22  And so you saw the first -- the first approval of an NDA for
09:37  23  our drug, for Xarelto, was for the VTE prevention, and that was
09:37  24  the first NDA was submitted to say, "This is what we're going
09:37  25  to market this drug for," and FDA approves it.

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

1    Now, this is Stage I, Stage II.

2    Stage III is what is marketed.  Okay.  You got

3    approved.  Now what?  And so that is called, in FDA lingo,

4    Phase IV.  This would be a marketed drug, and this would begin

5    all the conditions that the FDA said when you got approved that

6    you're going to need to do.  So this is a drug that's marketed.

7    **Q.**   Dr. Parisian, you mentioned the fact that, in your view,

8    that the drug tends to be approved more on the efficacy than

9    safety.  How do those things change, then, once the drug

10    achieves or gets approval and it's now going to be marketed to

11    a larger population?

12    **A.**   Yes.  In terms of the clinical trial, if, indeed, you had

13    to develop a large safety database, you'd never get the drug

14    out on the market because it would stay back in the FDA process

15    for five years or six years to gather data.  So what is

16    happening is that drugs are approved based primarily on

17    efficacy.

18    The company has shown whatever point they said they

19    wanted to do with their drug, and then -- with the condition

20    that the company is going to continue to monitor their drugs.

21    I think you heard about pharmacovigilance yesterday.  But

22    they're going to continue to monitor their drugs and update

23    their label because their label is only going to reflect what

24    the clinical trials were.

25    So, obviously, once you take a drug and you start

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

09:39  1    giving it to a lot more people, you're going to see to lot more
09:39  2    differences and changes than you saw in the clinical trial.
09:39  3    This would be your real world.
09:39  4            So all of this is clinical trials.  So Stage I,
09:39  5    Stage II are your clinical trial phases.  Phase III, Phase IV
09:39  6    would be your real world.  This is when you start really giving
09:39  7    it to patients.  And these are not patients that were screened
09:39  8    for clinical trial; these are real people.
09:39  9            And so this is why you get approved, but with the
09:39  10   condition that you're going to update your own information
09:40  11   because your company is monitoring that drug and you're hearing
09:40  12   the reports; you're finding out what's going on; you have a
09:40  13   duty to look at the literature.  So you're updating it all.  So
09:40  14   this is the marketed drug.
09:40  15   Q.  Doctor, let me ask you:  You mentioned the issue of
09:40  16   safety.  Are we supposed, though, to understand what you've
09:40  17   said, that safety is not an important issue during the
09:40  18   Stage I and Stage II process where the clinical trials are
09:40  19   being done?
09:40  20   A.  Well, it's an important issue, but your populations are so
09:40  21   small, you're not going to see that many safety issues.  If you
09:40  22   see safety issues occurring in your clinical trials, then
09:40  23   that's something that's going to occur really frequently.
09:40  24           Like, one of the concerns was what happened with
09:40  25   liver -- patients with liver failure, patients with renal

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

09:40  1    failure.  Those are specific groups, smaller populations.
09:40  2    You're going to see those in a smaller group.
09:40  3         But you're not going to see the full spectrum with
09:40  4    safety issues in a clinical trial.  There's no way that all of
09:41  5    that information is going to be shown in a clinical trial,
09:41  6    particularly in that the clinical trial is using specially
09:41  7    selected patients and the point of clinical trial is to get
09:41  8    approved.
09:41  9         And so you want to be able to show efficacy.  So the
09:41  10   safety actually comes from the real world.
09:41  11   Q.   Can Phase III clinical trials, though, have enough data
09:41  12   where there are safety issues that become an issue that get
09:41  13   discussed as part of approval process?
09:41  14   A.   Yes.
09:41  15
09:41  16   Q.   To connect a few dots here, there's been a great deal of
09:41  17   discussion about Neoplastin PT.  From your review of materials
09:41  18   in this case, did the manufacturers of Xarelto, during the
09:41  19   Stage I and Stage II parts where the Phase I through III trials
09:41  20   are done, did the companies gain significant knowledge and
09:41  21   understanding about the Neoplastin PT?
09:41  22   A.   Yes.  They began the Neoplastin PT in the animal studies.
09:41  23   So all through all of this research, their company was always
09:41  24   using Neoplastin PT to show what the plasma concentration was
09:42  25   to look at the PT and the effects.

SUZANNE PARISIAN - DIRECT

09:42  1       So when you go back to the animal studies with
09:42  2   rabbits and rats, you see the Neoplastin PT.  So it's always
09:42  3   been -- throughout all these studies, it's been involved by the
09:42  4   company in terms of monitoring their drug and testing their
09:42  5   drug and finding out what's going on with it.
09:42  6       The other thing I want to say is that we have VTE
09:42  7   treatment and reduction.  That's other indications that were
09:42  8   cleared.  They were cleared as an NDA supplement.
09:42  9       MS. PRUITT:  Your Honor, I'm sorry to interrupt, but
09:42 10   could we have a question and an answer?
09:42 11       MR. HONNOLD:  Sure thing.  Oh, I'm sorry, Your Honor.
09:42 12       THE COURT:  Well, we have to take a break soon, so
09:42 13   let's get to a breaking point.
09:42 14       MR. HONNOLD:  Okay.
09:42 15   BY MR. HONNOLD:
09:42 16   Q.   Doctor, can you discuss the distinction between the
09:42 17   initial NDA approval and then supplements and how that's done?
09:42 18   And this will be our last short topic before break.
09:42 19   A.   Okay.  NDA supplements, you don't submit all this again.
09:42 20   You just submit the information that you need -- that you're
09:43 21   asking in terms of approval.  So the reviewers, the FDA, as we
09:43 22   said earlier, under the PDUFA, they're only going to look at
09:43 23   the information that you requesting.
09:43 24       So in the NDA supplements for the expansion to
09:43 25   treatment and reduction of VTE, the FDA's focus will not be to

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

1    go back and review everything but will only be to look at the
2    information that's being requested in terms of the supplement.
3    And even with the label, the change in the label will reflect
4    the new supplements.  Okay?
5  Q.    Last point before we break.  Once we get into the
6    real-world situation after approval, is there an important duty
7    of monitoring and evaluating safety on an ongoing basis upon
8    the company in the post-approval process?  Can you explain that
9    briefly?
10 A.    Okay.  That's the condition for approval, is that you're
11   going to continue to monitor your drug, and it will say it in
12   the letter that -- the approval letter.
13         Okay.  So your condition, manufacturer, for being
14   able to market a product is that you agree to continue to
15   monitor that product and to update the instructions for use,
16   for warnings, for safety information, to ensure that, as you
17   have a bigger population of patients, that it remains safe and
18   effective.  And the letter, the approval letter will say with
19   any approval by the FDA that 21 CFR 314.80, which is
20   pharmacovigilance, that you need to continue to monitor your
21   drug.  You have to have an adequate label, which is your
22   21 CFR 201.57.  So it's a condition for approval.
23 Q.    Thank you, Doctor.
24         MR. HONNOLD:  Good point for a break, Your Honor?
25         THE COURT:  We'll take a break at this time.

SUZANNE PARISIAN - DIRECT

09:45  1          Counsel, let's move along.

09:45  2          MR. HONNOLD:  Yes.

09:45  3          THE DEPUTY CLERK:  All rise.

09:45  4          (WHEREUPON, the jury exited the courtroom.)

09:45  5          (WHEREUPON, the Court took a recess.)

10:07  6          THE DEPUTY CLERK:  All rise.

10:07  7          (WHEREUPON, the jury entered the courtroom.)

10:07  8          THE DEPUTY CLERK:  All rise.

10:08  9          THE COURT:  Okay.  Be seated, please.

10:08  10         You may continue.

10:08  11         MR. HONNOLD:  Yes, Your Honor.

10:08  12   BY MR. HONNOLD:

10:08  13   Q.   Dr. Parisian, continuing now.  Thank you for walking

10:08  14   through generally about the Phase I, Phase II, and Phase III

10:08  15   leading up to drug approval.

10:08  16         What I'd like to do now is move into some other

10:09  17   areas, and specifically now, I'd like you to walk us through

10:09  18   just a brief overview, brief overview, of the dates that were

10:09  19   involved with various aspects of the Xarelto regulatory

10:09  20   history.

10:09  21         And I think Mr. Carl, we have a slide on this.

10:09  22         And using this as a guidance and a demonstrative

10:09  23   exhibit, Dr. Parisian, can you kind of walk us through the

10:09  24   Xarelto regulatory timeline, perhaps paying note to some of the

10:09  25   things that we talked about when you were up before the jury.

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

A.    Okay.  July 28th, 2008 is the time the NDA -- we talked about the NDA, the request for approval, was submitted to the FDA for the VTE prevention.

So at this time Xarelto had not been marketed.  This was the NDA, was the first approval to begin marketing Xarelto in the United States from the FDA.  So it was submitted in 2008.  And in January, the FDA had asked for some information, and that's what some of that delay was.  In 2009, the FDA had asked for more additional information.

And around January 2011, the company submitted the information for that first NDA about VTE prevention, and they also submitted another NDA at the same time for the atrial fib indication.

So same drug, two different doses, two different indications, two different clinical studies.  So we have two NDAs being looked at by different divisions of the FDA at the same time beginning January 4th, 2011.

Okay.  And so that's what we're seeing here with the purple dot.

Q.    Quick review.  So SPAF, where that shows up, S-P-A-F, that is the atrial fibrillation indication?

A.    Yes, sir, nonvalvular atrial fibrillation.  That's prevention indication.  That's the ROCKET study.  You've probably heard of the ROCKET study.  The VTE prevention study was the RECORD study.  So those were the clinical studies that

SUZANNE PARISIAN - DIRECT

10:11  1    were done using INDs and also other science doing clinical
10:11  2    studies.  So RECORD is summarized in July 28th, 2008, and
10:11  3    ROCKET is summarized for the FDA, 2004 to 2011.
10:11  4    Q.   And so with the SPAF indication there, in terms of what's
10:11  5    trying to be prevented, is it fair to state that the goal of
10:11  6    prevention there is to keep a clot from developing in a part of
10:11  7    a patient's heart so it hopefully wouldn't develop and go on to
10:11  8    cause a stroke?
10:11  9    A.   Right.  That will be one.  And systemic emboli too.  So
10:11 10    you're trying to stop a clot from being shedded into the
10:11 11    patient's body.  So it's a different indication, different
10:11 12    dose.
10:11 13    Q.   And then VTE prevention now, trying to prevent clots from
10:11 14    developing in the deep veins and other areas of the legs, and
10:11 15    that looked at patients right after they had hip replacement
10:12 16    and knee replacement surgery.  That's the RECORD trials; right?
10:12 17    A.   Right.
10:12 18    Q.   And then, what we haven't talked about yet then, is VTE
10:12 19    treatment, that then is an indication for a patient that's
10:12 20    developed a clot in the leg, and then they're given Xarelto to
10:12 21    treat that clot; right?
10:12 22    A.   Right.  And those are NDA supplements.  So they would be
10:12 23    the same division that's reviewing the prevention indication,
10:12 24    the hematology group, and they're under NDA supplement.  So the
10:12 25    approval would have already been received for VTE and for

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

1    prevention with Xarelto.

2            So Xarelto began getting marketed with that.  And the

3    company is requesting additional indications for that VTE

4    prevention NDA.

5    Q.   And as we look at this timeline, I'd like for you to talk

6    to us, if there's any significance about all this activity

7    that's going on in this compressed period of time, 2011 and

8    2012.

9    A.   Well, as you can see there, FDA is receiving additional

10   submissions to support the approval.  All of these submissions

11   have PDUFA dates in terms of the FDA has to get them completed

12   within those groups.

13           So there's 122 for the one NDA, and another one was

14   16.  So you have this -- two divisions of people with about two

15   different medical officers having to review all those NDA

16   submissions and try to get them completed to determine whether

17   to approve this product within ten months.

18   Q.   And then this timeline, can you go ahead and just, by way

19   of overview, play out -- or identify the approval dates for the

20   different purposes.

21   A.   Right.  July 1st, 2011, is the approval for the VTE

22   prevention.  So that's when the product can now legally start

23   being marketed in the United States.  It's got FDA's approval

24   for VTE prevention.  And shortly after, there is an approval,

25   November 4th, 2011, for a different indication and a different

SUZANNE PARISIAN - DIRECT

1    dose, which would be the SPAF dose.

2         And so patients who were getting the approval for the

3    SPAF dose will be on this forever in terms of you now have an

4    approval that the patient with a risk of atrial fibrillation

5    will take this probably for the rest of their life.

6         So it's a chronic use of 20 milligrams per day every

7    day by those patients as opposed to the prevention which was

8    more limited use.  So the product indications and marketing has

9    been expanded in 2011.

10   Q.   Then in terms of the history, let's attach some of the

11   words of the trials that go with each just so that's clear.

12        Can you -- for each of the indications, can you

13   attach the pivotal trial that goes with each of those

14   indications?

15   A.   Well, for the VTE prevention, it's RECORD.  And there were

16   four studies.  Three were used, 1 through 3.

17        The SPAF study has a clinical trial with a really

18   long name, but it's shortened to just ROCKET is what -- they

19   take initials from different words and make ROCKET study.  So

20   that's the study -- that is a Phase III study.

21        The dosing studies for VTE prevention were done --

22   remember we talked about the Phase II studies?  Those were for

23   the VTE prevention studies.  ROCKET began as a Phase III study,

24   and it was an international study.

25        Then you have the VTE prevention study -- the VTE

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

10:15   1    treatment and the SMDA, those are the EINSTEIN studies.  So
10:15   2    basically what you need to know is the RECORD, ROCKET, and
10:15   3    EINSTEIN.
10:15   4    Q.    RECORD, VTE prevention?  ROCKET, SPAF or AFib prevention?
10:16   5    EINSTEIN, DVT treatment?
10:16   6    A.    Right.  The treatment, but there also was an EINSTEIN
10:16   7    Phase II study, which was a dosing study.
10:16   8              So RECORD, you're talking about 10 milligrams every
10:16   9    day, one dose.  In ROCKET, you're talking 20 milligrams or
10:16   10   15 milligrams every day forever.  In EINSTEIN, you're talking
10:16   11   about a new dose for treatment, which is 15 milligrams every
10:16   12   day, twice a day; and then you switch to 20 milligrams every
10:16   13   day.
10:16   14             And the length of time that you're being prescribed
10:16   15   for treatment and recurrence is up to the doctor, basically,
10:16   16   how long he wants you to keep on in terms of DVT control for
10:16   17   PEs and VTE.
10:16   18   Q.    Okay.  Doctor, what I'd like to do is transition a little
10:16   19   bit.  Now that we've talked about the approval process
10:16   20   generally, how that regulatory process played out for Xarelto,
10:16   21   I'd like to transition now and talk about the topic area of a
10:16   22   drug product label and labeling and how those are different
10:17   23   words.  I'd like to direct you a little bit.
10:17   24             Can you talk first just a little bit about the
10:17   25   purpose of prescription drug product labeling and where the

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

1    responsibility lies for those things?

2    **A.**    Sure.  The purpose of the label is to tell the person

3    who's using the drug -- who's prescribing it, the health care

4    provider -- it doesn't have to be an MD -- but the health care

5    provider that's licensed by each state what they need to know

6    about the drug in order to be able to use it safely and

7    effectively for a patient.  And it also should provide some

8    risk information so that they can decide whether they want to

9    give this drug versus any other drug in terms of risk versus

10   benefit.

11          So it is the document that comes with the drug that

12   is supposed to provide the information, the instructions to the

13   physician on how to use it and the potential risks.  And it's

14   written -- a drug label is written at the level of a trained

15   health care provider.  It's not supposed to be necessarily for

16   a lay user, but it's supposed to convey information to a

17   licensed health care provider as to what he needs to know about

18   the drug, whether you're prescribing it or whether you're

19   treating a patient in the ER, what are the potential risks.

20          So it's basically information for the prescriber.

21   **Q.**    And that information for the prescriber, as well as

22   general information about the drug, does it also include

23   specific instruction as to how to use the drug safely?

24   **A.**    Yes.  Since 2006, it actually has a structure that's

25   required in terms of where the placement of the information is

SUZANNE PARISIAN - DIRECT

1    in the label for the physician or the health care provider, and
2    that was done so that they could quickly find the information
3    they need.
4    Q.   And we'll get to structure in just a moment.  Can you just
5    speak very briefly -- we've mentioned this somewhat -- but in
6    terms of responsibility for label and labeling, where that
7    lies?
8    A.   Well, the responsibility is the manufacturer.  The
9    manufacturer owns the label.  I mean, you look at the end of
10   label, and it has a copyright.  It's the manufacturer's label,
11   and they're responsible under the regulations in terms of the
12   Food, Drug, and Cosmetic Act under the regulations.
13          So it's their label, and they have to provide
14   information so it can be safe and effective.
15          Now, I didn't talk about labeling.  Labeling --
16   Q.   Let me ask you a question.
17   A.   Yeah.
18   Q.   Okay.  Because with my chart here, you kind of saw where I
19   was going.
20          Could you discuss the distinction between label, what
21   that is and what it means, and then labeling, what that
22   involves and how it's different or expands beyond just the
23   label.
24   A.   Yeah.  The label is what we've been talking about.  This
25   is the drug label.  You can see it in the *PDR*.  You can look it

SUZANNE PARISIAN - DIRECT

10:19    1    up online.  You can see the label that goes with the drug.

10:19    2            The labeling is everything else.  It's everything

10:19    3    that the sales rep says.  It's what the company would say at a

10:19    4    conference.  It's what they say on television in terms of their

10:19    5    ads.  It's what they say on the Internet.  So it's anything

10:19    6    that the manufacturer says or implies about their drug.  That's

10:19    7    labeling.

10:19    8            So the rest of world -- that includes all the

10:20    9    advertising, promotion, "dear doctor" letters -- it's described

10:20   10    that the manufacturer's responsible for that too, to make sure

10:20   11    it's accurate and it conveys the information that's acceptable

10:20   12    in terms of what the drug is approved for and it provides the

10:20   13    risk information.

10:20   14            It's supposed to be fair and balanced in terms of

10:20   15    information that's given to a physician.  So labeling is

10:20   16    everything else.

10:20   17    Q.   The process of labeling, is that the way that the specific

10:20   18    information from the label, the actual label, then may emanate

10:20   19    or expand outside the four corners of the label and then be

10:20   20    disseminated to the population of physicians or others who

10:20   21    might be prescribing the drug?

10:20   22            **MS. PRUITT:**  Your Honor, I'll object to the leading

10:20   23    nature of the question.

10:20   24            **THE COURT:**  Rephrase it.

10:20   25            **MR. HONNOLD:**  I'll ask another question.

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

10:20  1    BY MR. HONNOLD:

10:20  2    Q.   Dr. Parisian, can you talk about how the process of

10:20  3    information in the label then gets to the broader population

10:21  4    through labeling?

10:21  5    A.   The label sets up what you can say your product is good

10:21  6    for, and it can tell the risk information.

10:21  7         So manufacturers use the label to then go ahead with

10:21  8    their marketing to make sure that they stay in compliance with

10:21  9    their marketing with what they're approved for the label.

10:21  10        So the label -- FDA is the gatekeeper as to what you

10:21  11   can say a drug is good for or what are the potential risks, so

10:21  12   the information that you can give out.  So it really sets the

10:21  13   tone as to all the other statements that the manufacturer can

10:21  14   make about a product.

10:21  15   Q.   Is it appropriate or proper to say the FDA label, that

10:21  16   it's the FDA or FDA's label?

10:21  17   A.   No, it's not.  It's the manufacturer's label.  The FDA

10:21  18   approves the label based on the information they had at the

10:21  19   beginning but with the condition that the manufacturer updates

10:21  20   their own label.

10:21  21   Q.   What I'd like to do now, Doctor, is move forward and talk

10:21  22   a little bit about the actual structure of the label document.

10:21  23        MR. HONNOLD:  And, Mr. Carl, can you call up 5768764,

10:22  24   please.

10:22  25        And just by way of reference, for counsel and

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

10:22  1   the Court, this is a copy of the Xarelto label for

10:22  2   January 2015.

10:22  3   **BY MR. HONNOLD:**

10:22  4   **Q.**   What I'd like you to do, Dr. Parisian, if you could just

10:22  5   walk us through -- oh, thank you.  We're going to hand you a

10:22  6   copy of the actual label that we're going to use.

10:22  7           **MR. HONNOLD:**  And then, Mr. Carl, will you be able to

10:22  8   follow -- when the doctor talks about the different sections of

10:22  9   the label, will you able to follow through?

10:22  10  **BY MR. HONNOLD:**

10:22  11  **Q.**   Dr. Parisian, what I'd like you to do now is, by way of

10:22  12  just overview, to have you essentially walk us through the

10:22  13  general categories of the label and tell us what their primary

10:22  14  purpose is.

10:22  15          Can we do that?

10:22  16  **A.**   Yes, we can do that.

10:22  17          Okay.  This is a structured product label.  In 2006,

10:22  18  FDA -- we designed what the drug label should look like.  It's

10:22  19  now -- you'll see on the very top, it says "Highlights of

10:23  20  Prescribing Information."  The FDA created this structure so

10:23  21  that you would have a front page that basically gave a

10:23  22  physician, anyone looking at this label, highlights, the things

10:23  23  that they need to know quickly about a label in terms of what

10:23  24  was the rest of the label.

10:23  25          So it was to try to help the health care provider be

SUZANNE PARISIAN - DIRECT

10:23   1   able to identify some of the important issues of the label

10:23   2   quickly.  And then they could look at this, and it tells them

10:23   3   that that information would be in the more detailed label.

10:23   4         And it also tells when it was approved, and it also

10:23   5   marks when there were changes to the label so that the

10:23   6   physician or prescriber would know when certain changes

10:23   7   occurred.

10:23   8         But it's called -- the FDA calls it the highlights

10:23   9   label.  And so this is a highlights page that goes now with all

10:23   10  the recent drug approvals.

10:23   11  Q.   And you can see there "Recent major changes."  That would

10:23   12  alert somebody looking at this label, if they're not familiar

10:24   13  with prior labels, they can see where there might have been

10:24   14  some changes from the prior?

10:24   15  A.   That's right.

10:24   16  Q.   Okay.

10:24   17  A.   So like the box warning, their putting that date tells the

10:24   18  reviewer that -- or the physician, the health care provider

10:24   19  that there was new information put in the label in March 2014.

10:24   20  Same with the dosage and administration, the warnings and

10:24   21  precautions.

10:24   22         So it's a heads-up to the person, the physician or

10:24   23  prescriber or doctor, that there's new information that may

10:24   24  have been in the label they looked at last time.

10:24   25  Q.   Now, what I'd like to do is to have you -- so on the

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

1   bottom there of page 764 where it transitions to blue print, is
2   this essentially the overview, table of contents for the more
3   detailed information that follows in the label?
4   **A.**   Right.   Right.   If you look up at the top on the
5   highlights, it says not all the information is in the
6   highlights label, look in the label for more additional
7   information.
8          So then you have a table of contents as the -- where
9   you're going to find quickly the information when you're using
10  this product as a prescriber.  And it's basically a table of
11  contents telling you where things are located, and it's
12  designed to make it easier to locate things in the label.
13         Drug labels can get very long, and so the goal is
14  that the person can use this information quickly.
15  **Q.**   Let's scan through or breeze through the table of contents
16  then.   Section No. 1, Indications and Usage.  Can you gives a
17  brief description there.
18  **A.**   Well, there it's telling the approved indications.  The
19  SPAF one is the first one, treatment of deep vein thrombosis,
20  treatment of pulmonary embolism.
21         So the doctor or prescriber would know what it has
22  been approved for and what are the indications.  That's what is
23  it good for, what it is it effective for.  So these are the
24  approved indications.  These are what the manufacturer can
25  legally market the product for.

SUZANNE PARISIAN - DIRECT

10:25   1   **Q.**   Dosage and administration.  Can you tell us a little bit
10:26   2   about that section.
10:26   3   **A.**   Well, it tells you things that the physician or health
10:26   4   care provider needs to know for the dosage for each one of
10:26   5   those indications.  Here it also talks about food effect,
10:26   6   because this is absorbed in the GI tract.
10:26   7           So it's information you need to know when you're
10:26   8   writing a prescription or dosing a patient on it.  And that's
10:26   9   what Section 2 is.
10:26   10  **Q.**   Dosage Forms and Strengths, Section 3?
10:26   11  **A.**   Basically, what -- how it comes.
10:26   12  **Q.**   And Section 4 there, Contraindications.  Can you explain
10:26   13  what that section is and why that can be particularly important
10:26   14  for some drugs?
10:26   15  **A.**   Well, contraindications, you don't ever use this product
10:26   16  for that.  It would be like if you had a person with a known
10:26   17  allergy to penicillin, you'll see don't give it to a person
10:26   18  that's allergic to penicillin.
10:26   19          "Contraindication" means this is -- the risk versus
10:26   20  benefit doesn't justify the use, and so it's contraindicated
10:26   21  for this person.
10:26   22          A lot of times you saw where people are allergic to
10:26   23  iodine; you don't give them an iodine injection of a product
10:27   24  because it's contraindicated.  And for those people that are
10:27   25  going to have an allergic reaction, it would be dangerous.  So

SUZANNE PARISIAN - DIRECT

1  risk versus benefit, it's not justified.

2  **Q.**   Let's go ahead to Section 5, the Warnings and Precautions.

3       Can you perhaps spend a little bit more time on this

4  and talk about what the warnings and precautions section is and

5  why, in your experience, training, education, as a physician as

6  well as your work as a regulatory expert, the particular

7  importance of the warnings and precautions section.

8  **A.**   Warnings and precautions are things that the physician

9  needs to be concerned about.  They're not saying don't use it.

10  But if you use it, you need to have certain warnings and

11  precautions.  They used to be separate sections.  FDA put the

12  two of them together.

13       So to use the drug effectively for a patient, there's

14  certain actions you may need to take in order to make sure that

15  it's a safe drug for that person.  And so it's basically like a

16  caution light, you know, in terms of like a yellow light.  It's

17  warnings and precautions.  These are the things you need to

18  consider.

19       The contraindication would be a red light.  The

20  warnings and precautions are more a yellow light.

21       So this is how -- what a physician needs to think

22  about, a prescriber or someone treating a patient, as to things

23  you need to be concerned about.

24  **Q.**   And the information that's in Section 5, those specific

25  categories and the description may vary from product to

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

10:28  1   product, drug to drug; is that right?

10:28  2   A.    Right.  The headings are the same, but every drug may be

10:28  3   different in terms of what's contained in each section.

10:28  4   Q.    And then let's move on to Section 6, Adverse Reactions, a

10:28  5   brief description there.

10:28  6   A.    Yeah.  Adverse reactions are those issues that you see

10:28  7   occur with the drug, and they've broken them down into the

10:28  8   clinical trials -- that would be your premarket period -- and

10:28  9   postmarket.  What are things that have occurred with the drug

10:28  10  after it's been marketed, what are the safety issues, things

10:28  11  that have been reported with the drug.

10:29  12        And so you would look at the adverse reactions, say,

10:29  13  if you had a patient complaining that they broke out with

10:29  14  hives.  You'd look in this section to see if perhaps there's

10:29  15  been reporting of hives in patients taking this drug.  So

10:29  16  that's what that is.

10:29  17        So it's categorized, all these things, as to people

10:29  18  who are using this drug in terms of prescribers, what

10:29  19  information they need to know about a product and can find it

10:29  20  in the label.

10:29  21  Q.    And if you could just go ahead and direct us through some

10:29  22  of the remaining sections, both Drug Interaction, Section 7;

10:29  23  Specific Populations, Section 8.  Take us through Section 12,

10:29  24  for example, Clinical Pharmacology.

10:29  25  A.    Okay.  Drug interactions are, if you give two drugs

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

10:29  1  together, are you going to have an issue?  A lot of times that
10:29  2  happens with dietary supplements.  If you give St. John's wort,
10:29  3  is it to going to do something with the drug in terms of
10:29  4  affecting the dosing?
10:29  5           So it could be information -- don't combine this, do
10:29  6  combine that, you may increase the -- so it's drug
10:29  7  interactions, what kind of things occur when you combine drugs
10:30  8  or products.
10:30  9  Q.   Okay.  And why don't you go ahead and go forward.  Special
10:30  10  populations, overdose, prescription.
10:30  11  A.   Special populations are -- well, you can see.  This has
10:30  12  got the most recent changes to the pregnancy label, and so it
10:30  13  breaks down pregnancy now in terms of pregnancy, labor and
10:30  14  delivery, and nursing mothers.  So this is the new type of way
10:30  15  the FDA is doing pregnancy labeling.
10:30  16           Pediatric use.  The FDA has been trying -- and
10:30  17  Congress has been trying to get information about pediatric use
10:30  18  of products.  So if you have that information, you would put
10:30  19  that there because children can be different than adults in
10:30  20  terms of handling the drugs.  So the FDA and Congress is trying
10:30  21  to get more information about pediatric use of products.
10:30  22           Geriatric use.  Now I've become a geriatric person.
10:30  23  But Geriatric, to the FDA, is anything over 60, believe it or
10:30  24  not.
10:30  25           And geriatric use is an issue because, at about 50,

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

1    your renal -- your kidneys change.  So people who are older may
2    need to have certain changes to the drug, certain things that
3    they need to be concerned about.  And so the FDA has
4    specifically tried to focus on capturing geriatric use
5    information for labels because people, as they age, can handle
6    drugs differently.
7         And then females with reproductive potential, those
8    are women who are not yet pregnant but could potentially get
9    pregnant.  This is information they know.
10        Renal impairment.  Those would be people with kidney
11   function changes.  If your drug is handled by the kidney, this
12   is information you need to know about prescribing.  Same with
13   hepatic impairment, liver disease.
14        So those are special populations of people, and you
15   need to make changes.
16        Overdosage.  That would be a person that has taken
17   too much of a drug or seems to have -- they could have tried to
18   commit suicide or they could just have too much drug on board
19   in terms of they might have gotten a prescription messed up or
20   something.  So what does particularly an ER doctor need to
21   know?
22        The clinical pharma -- description of the drug.
23   There's a description at Section 11 about what the drug does,
24   the mechanism -- you know, what is this drug that you're
25   taking.

SUZANNE PARISIAN - DIRECT

10:32  1          Then you go into the clinical pharmacology, which
10:32  2   describes to a doctor how it works and the pharmacodynamics.
10:32  3   That would mean how it behaves in the person in terms of what
10:32  4   are the effects of the drug, what is anticipated is going to
10:32  5   happen once you give it to a patient.
10:32  6   Q.   Dr. Laura Plunkett testified previously this week and
10:32  7   talked about pharmacodynamics and pharmacokinetics specifically
10:32  8   of Xarelto.
10:32  9          Is that Section 112, Clinical Pharmacology, where
10:32  10  that type of information would go?
10:32  11  A.   Right.  Right.
10:32  12  Q.   Let me ask you, Doctor, in your experience, do you have a
10:32  13  view as to what is the section of the label that physicians
10:32  14  have a tendency to look at more so than other sections of
10:33  15  label?
10:33  16          MS. PRUITT:  Objection, Your Honor.  I think that
10:33  17  calls for speculation.  It doesn't go to what the physicians in
10:33  18  this case paid attention to or looked at.
10:33  19          THE COURT:  I understand.  Based on her experience;
10:33  20  that's the question.  I'll allow it.
10:33  21          THE WITNESS:  Okay.  The reason the highlight label
10:33  22  was written the way it was is so that the things that
10:33  23  physicians tend to look at are up front because physicians are
10:33  24  more interested in indications for use, dosage, and any kind of
10:33  25  precautions.  Because in caring for a patient, a doctor is

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

10:33  1    going to want to look at the information on the front.

10:33  2               The later stuff, in terms of pharmacodynamics,

10:33  3    that's later.  And that would not necessarily be where a

10:33  4    physician would go.  If you're in an ER or caring for a

10:33  5    patient, you would tend to look at the information up front.

10:33  6               That's why the highlights label was created this

10:33  7    way, to put the information that is used for patient care more

10:33  8    up front so it can be identified quickly by a doctor.

10:34  9    BY MR. HONNOLD:

10:34  10   Q.   If we could go forward -- back to Section 12.2, the

10:34  11   pharmacology section.

10:34  12             Doctor, in your view, is Section 12.2 the appropriate

10:34  13   section to place important information regarding warnings and

10:34  14   precautions?

10:34  15   A.   Not if it's involved with patient care.  That's not where

10:34  16   a physician would tend to look.

10:34  17   Q.   And is Section 12.2, in your view, the appropriate or

10:34  18   proper place to include important instruction about use of the

10:34  19   drug or laboratory tests to use when the drug is used?

10:34  20   A.   No.  Typically, that would be up in Section 5 where --

10:34  21   helpful information for laboratory, any kind of monitoring,

10:34  22   what you need to do in terms of daily care with a patient.  Or

10:34  23   if you have a potential issue, you would put it up higher under

10:34  24   laboratory sections.  That would make more sense in terms of

10:34  25   this label.

SUZANNE PARISIAN - DIRECT

10:34  1    Q.   Doctor, I'd now like to move forward and talk about, in

10:34  2    further detail, some of your opinions about the Xarelto label.

10:35  3         First, I'd like to ask you, in light of -- in

10:35  4    follow-up to what we've gone through, the different sections of

10:35  5    label.

10:35  6         Doctor, do you have an opinion as to whether the

10:35  7    Xarelto label contains the information you believe necessary

10:35  8    for physicians to consider when making their prescribing

10:35  9    decisions and clinical decisions in using Xarelto?

10:35  10   A.   I do have an opinion.

10:35  11   Q.   Okay.  And do you believe the label contains sufficient

10:35  12   information in that regard?

10:35  13   A.   No.  I think that there should be a section -- laboratory

10:35  14   section telling the physician any information that's available

10:35  15   as to how to use this product for treating a patient, not

10:35  16   necessarily for monitoring but for when you have a patient and

10:35  17   you have a concern, you may have a -- and so they need to have

10:35  18   more information about the laboratory results and what

10:35  19   information is in the document that the companies had.

10:35  20   Q.   And so just so we're clear, let's put some of this

10:35  21   together, then.

10:35  22        The opinion that you just voiced is that there should

10:36  23   be information about laboratory testing in the Xarelto label in

10:36  24   Section 5, the warnings and precautions; is that right?

10:36  25   A.   Yes.

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

10:36  1          MR. HONNOLD:  And, Mr. Carl, can we put the label
10:36  2    back up there.
10:36  3    BY MR. HONNOLD:
10:36  4    Q.    And I'd like to just go to the overview section first.
10:36  5          MR. HONNOLD:  Now, if we can expand down or blow up
10:36  6    Section 5, Mr.Carl, there on this page.
10:36  7    BY MR. HONNOLD:
10:36  8    Q.    If you look at the current form of the Xarelto label in
10:36  9    Section 5 as you see it there, is there anything in this
10:36 10    highlights section that would suggest that there is information
10:36 11    in the warnings and precautions section about laboratory tests
10:36 12    to be used with Xarelto?
10:36 13    A.    No.
10:36 14    Q.    And is it your opinion that there should be such
10:36 15    information in Section 5?
10:36 16    A.    Yes, based on the documents that I reviewed.  Yes, sir.
10:36 17    Q.    And is it your view that there are particular federal
10:37 18    regulations relating to drug labeling that require and mandate
10:37 19    in the situation with Xarelto that laboratory testing
10:37 20    information be included in the warnings and precautions
10:37 21    section?
10:37 22    A.    Yes, in your 21 CFR 201.57(C)(6)(iii).
10:37 23    Q.    Okay.  So there is a particular federal regulation
10:37 24    relating to drug labeling on the issue of laboratory
10:37 25    monitoring; isn't that right?  Or laboratory testing?

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

10:37 1   A.   Yeah.  It's for helpful laboratory information.  You need
10:37 2   to provide that to a doctor.  There it is.
10:37 3   Q.   Doctor, so we've put up on the screen a slide that has
10:37 4   some of the language from Section 21 CFR 201.57.  The part
10:37 5   that's up says, "Section 5, Warnings and Precautions, must
10:37 6   identify any laboratory tests helpful in following the
10:38 7   patient's response."
10:38 8          Can you explain how that language -- whether you feel
10:38 9   that that language is particularly applicable to Xarelto?
10:38 10  A.   Yes.  Particularly since I've seen the Neoplastin PT be
10:38 11  used all the way through all the studies from the animals to
10:38 12  monitor plasma concentration and the potential effect for a
10:38 13  patient.  So it seems like it should -- it is a helpful test.
10:38 14  I mean, it should -- and it should be included there to let a
10:38 15  physician know that you can still use PT, which is a standard
10:38 16  coagulation test, and that it's meaningful in a patient who has
10:38 17  an elevated PT level and you need to consider that.
10:38 18          You need to just consider, in terms of your patient,
10:38 19  whether this drug is acceptable for this patient or if there's
10:38 20  a potential risk of bleeding.
10:38 21  Q.   And you mentioned PT.  In the context of Xarelto in this
10:39 22  case, is there a particular form of PT test or reagent that you
10:39 23  feel is applicable to Section 5?
10:39 24  A.   Yes.  The Neoplastin PT.  I'm sure that you've heard about
10:39 25  that.  In terms of the thromboplastin, it's the tissue factor

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

1  that's used to look at clotting and to see how quickly a person

2  clots.

3  Q.  Can you really explain, as it relates to the

4  Neoplastin PT, how it is that it's helpful in following the

5  patient's response?  Can you connect those two things in terms

6  of a patient taking Xarelto, how they respond, and how that is

7  reflected in the results of the Neoplastin PT?

8          MS. PRUITT:  Your Honor, I'm going to object to this.

9  This doctor hasn't ever prescribed this medication, and she

10  doesn't do PT tests and she hasn't for years.

11          THE COURT:  All right.  I'll overrule the objection.

12  Thank you.

13          THE WITNESS:  In terms of the internal documents,

14  they've been using the Neoplastin PT in order to look at the

15  plasma concentration.  And when the plasma concentration is

16  high, the company is looking at the PT as being a marker, a

17  surrogate for the -- that level of the concentration of the

18  drug is high and you're at an increased risk of bleeding.  Not

19  everybody is going to bleed who has an elevated PT.  But some

20  patients, you put them now at an increased risk of bleeding.

21          So it's been through -- they used it in the

22  animals studies on to look at the plasma concentration and

23  potential risk of bleeding.

24  BY MR. HONNOLD:

25  Q.  Based upon the materials that you reviewed in the case,

SUZANNE PARISIAN - DIRECT

1  specifically the various trials from Phase I through Phase III,

2  was there any purpose for using the Neoplastin PT in those

3  trials other than being able to follow the patient's response

4  to the drug?

5  **A.**    No.

6  **Q.**    Is there any doubt in your mind about that?

7  **A.**    No.

8  **Q.**    Have you seen any suggestion in any document from Janssen

9  or Bayer to suggest that the Neoplastin PT was used in clinical

10  trials for any reason other than following the patients'

11  response to the drug?

12  **A.**    No.

13  **Q.**    Is that the reason why you feel that information about the

14  Neoplastin PT should be included in Section 5?

15  **A.**    Yes.  And because I also -- the PT is a standard

16  coagulation test.  And so the way it stands now, physicians are

17  not being told to use the tool they already have in their

18  toolbox, which is the standard coagulation test, to know when a

19  patient's at risk of bleeding.

20  **Q.**    Based upon the materials that you've reviewed and what

21  you've told us so far, is it your view in this case on the

22  issue of the Neoplastin PT and Section 5 of the Xarelto label

23  that federal law, in the form of 21 CFR 201.57, mandates that

24  this label contain that information?

25  **A.**    Based as being a regulatory consultant, yes, sir.

SUZANNE PARISIAN - DIRECT

10:41  1   Q.   And is there anything close to something like that in the
10:41  2   current Section 5 of the Xarelto label?
10:41  3   A.   No.
10:41  4   Q.   What I'd like to do now is move forward a little bit and
10:42  5   talk about some of the issues further -- well, let me ask you
10:42  6   this:  Are there further reasons, in terms of what you have
10:42  7   learned about Xarelto, that provide further support as to why
10:42  8   you believe it is a good idea for the Neoplastin PT information
10:42  9   to be included in Section 5?
10:42  10  A.   Well, based on the documents that I've seen from the
10:42  11  company, some of the published literature even from the
10:42  12  company, in terms of their experts, it supports it.
10:42  13  Q.   Okay.  What I'd like to do first is let's make a list of
10:42  14  those things that you feel, in addition to the actual words of
10:42  15  the regulation, additional reasons why you believe there is
10:42  16  good basis and reason to have the Neoplastin PT in Section 5.
10:43  17         So we have bleeding risk.  Can you explain just how
10:43  18  the general risk of the drug, the general risk of bleeding, is
10:43  19  one reason as to why the Neoplastin PT information should be in
10:43  20  Section 5?
10:43  21  A.   Well, the drug itself is a strong Factor Xa inhibitor.  So
10:43  22  it has a strong -- I'm sure you've gone through the coagulation
10:43  23  cascade.  So in terms of inhibition of the bleeding risk,
10:43  24  you're increasing the bleeding risk.  The issue is that,
10:43  25  without that being there, and if you look at the pregnancy

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

1  label saying there's no way to monitor, which is right next to
2  it, it's saying that you can't use this PT test, which is a
3  standard test to show that there's increased risk of bleeding.
4        So you've taken a tool that the doctors have for
5  bleeding risk and you've basically tossed it out and said you
6  can't use it.  So if you told the doctor that you have
7  Neoplastin PT, that you can use that, then they can go get that
8  test.  They can look at what the value is, and they can
9  determine whether it's high on this particular patient and they
10  want to use something else.
11  Q.   Doctor, is there information in the Xarelto label that
12  specifically identifies bleeding risk information that you
13  believe supports your opinion?
14  A.   The pharmacodynamic section actually says it.  There's a
15  direct relationship between the PT value and the plasma
16  concentration.  So the only thing that's missing is telling the
17  doctor to get a PT and see how that particular patient is
18  working.
19        The other issue is variability.  There's variability
20  in terms of the way patients handle this drug.  So some
21  people -- it's like hot sauce.  You know, you give somebody hot
22  sauce, and some people think it's nothing, and then other
23  people will go, "Oh, my God, this stuff is really hot."
24        So that's what variability is in terms of hot sauce.
25  You've got variability in terms of this drug.  The way it's

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

10:44  1  handled internally, some people will be lower, some people will

10:44  2  be high.  The company has documents that show that they know

10:44  3  that there are people that are slow absorbers of the drug and

10:45  4  fast absorbers.  Some people are going to hit really high Cmax,

10:45  5  from Dr. Plunkett, and some people aren't.

10:45  6          So you need to know when you're prescribing it that

10:45  7  there are people that will run high and that you might want to

10:45  8  consider whether you want this drug or some other drug.  So

10:45  9  variability.

10:45  10 Q.  I'm going to focus a little bit more on the bleeding risk.

10:45  11        MR. HONNOLD:  Carl, could you call up 5768764,

10:45  12 please, which is page 12 of the label.  Call up 5768764, which

10:45  13 the part of the Xarelto label, specifically, Table 12 at

10:45  14 page 12.

10:45  15 BY MR. HONNOLD:

10:45  16 Q.  Dr. Parisian, if you look at this information for the

10:45  17 Xarelto bleeding rates from the EINSTEIN-DVT and EINSTEIN-PE

10:45  18 study, the frequency of bleeding down here, clinically relevant

10:46  19 nonmajor bleeding, 8.6 percent.  Does that relate in some way

10:46  20 to provide further support for your view that the Neoplastin PT

10:46  21 should be in Section 5?

10:46  22 A.  Right.  You know, as a risk of this drug, which is an

10:46  23 anticoagulant, there are people even in the EINSTEIN study,

10:46  24 which is the Phase III EINSTEIN study for treatment, that there

10:46  25 are people who bleed.  So if you can do something, 8.6 percent,

SUZANNE PARISIAN - DIRECT

1    you got 100 patients and almost 9 patients were going to have a

2    significant bleed from the drug.  So why not give the doctor a

3    tool to be able to find those patients that are increased risk

4    for bleeding?

5    **Q.**   Doctor, additionally, on generalized frequency of bleeding

6    and its significance, are you familiar with the Institute for

7    Safe Medication Practices?

8    **A.**   Yes.

9    **Q.**   And have you seen their most recent report that talks

10   about the rates or incidence of bleeding associated with NOAC

11   medications, including Xarelto?

12              **MS. PRUITT:**  Your Honor, may we approach, please?

13              **THE COURT:**  Sure.

14              (WHEREUPON, the following proceedings were held at

15   the bench.)

16              **MS. PRUITT:**  Your Honor, I think he's getting ready

17   to get into this QuarterWatch report.  And, in fact, we have a

18   joint exhibit here.  This QuarterWatch report is the thing that

19   got put up on this website that we argued to the judge that it

20   was being put up on Beasley Allen's website, and it refers to

21   all these adverse event reports, Your Honor.

22              And the Court knows based on our motion that

23   these adverse event reports are no indication of medical

24   causations whatsoever.  It will bring into focus all of the

25   other cases that the Court has already ruled out and said can't

10:48   1   come into these trials, and have not come into these trials up

10:49   2   to this point.

10:49   3              And it also has opinions in here by Dr. Furberg,

10:49   4   who we deposed, and this -- they drew him down as an expert.

10:49   5   And they're trying to use this hearsay document, and it's

10:49   6   completely hearsay, to get all this information in, none of

10:49   7   which is admissible otherwise.

10:49   8              **THE COURT:**  What is it, the document?

10:49   9              **MR. HONNOLD:**  It's the Institute for Safe Medical

10:49   10  Practices.  It's their publication called QuarterWatch.  What

10:49   11  they do is they track the FDA data that appears, and then they

10:49   12  put it in a summary form, and they identify the frequency of

10:49   13  adverse reaction reports that are out there.

10:49   14             This particular summary just highlights the fact

10:49   15  that there are a very, very significant number of adverse event

10:49   16  reports of bleeding related to Xarelto, and the other NOACs,

10:49   17  quite frankly.  But it shows that the primary -- the primary

10:49   18  wave of the bleeding in the NOACs is with Xarelto.

10:49   19             **MS. PRUITT:**  Your Honor, this is all hearsay, and

10:50   20  it's driven by lawyer advertising.  That's why we moved to

10:50   21  exclude it when it went up on the website.

10:50   22             And the prejudicial nature of the language, it's

10:50   23  unbelievable.  Because the jury is not going to understand that

10:50   24  an adverse event report is just somebody calling up.  We don't

10:50   25  even know what other conditions they had, we don't know what

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

10:50  1    might have caused of bleeding other than this medication.

10:50  2              **THE COURT:**  I see this as different than a journal

10:50  3    article.  It really honestly is.  It's a different type

10:50  4    situation.  This is a report from a group.  I don't even know

10:50  5    anything about the group, and I don't know whether -- it is a

10:50  6    hearsay situation.  It's more --

10:50  7              You may be able to get into evidence some

10:50  8    knowledge that she has, but to put up something that's from a

10:50  9    particular group, you know, if it's -- it seems to me if it's a

10:51  10   medical periodical, it can be used.  I don't believe this

10:51  11   qualifies as a medical periodical.

10:51  12             **MR. HONNOLD:**  Okay.

10:51  13             **THE COURT:**  So I sustain the objection.

10:50  14             (WHEREUPON, the following proceedings were held in

10:50  15   open court.)

10:50  16   BY MR. HONNOLD:

10:50  17   Q.   Doctor, let me ask you this:  Based upon your work on this

10:50  18   case, have you paid particular attention over time to

10:50  19   information about the frequency of bleeding events that are

10:50  20   being reported related to patients that are on the new oral

10:50  21   anticoagulants, including Xarelto?

10:50  22   A.   Yes.

10:50  23   Q.   And is it your understanding that the --

10:50  24             **MS. PRUITT:**  I'm going to object, Your Honor.  This

10:50  25   is the same issue.  It's the same issue.

OFFICIAL REALTIME TRANSCRIPT

10:51  1        THE COURT:  Members of the jury, the issue that we're
10:51  2   trying to deal with is the question of evidence that falls into
10:51  3   what we call "hearsay," which means something outside of
10:51  4   admissibility.
10:51  5              Let's get to it some kind of way, folks.  I
10:51  6   sustained that objection.  I think it's exactly what we just
10:51  7   talked about.
10:51  8   BY MR. HONNOLD:
10:51  9   Q.   Doctor, let's move on.  In terms of additional information
10:51  10  that you're aware of that you believe gives additional support
10:51  11  to your view and opinion that Section 5 in the Xarelto label
10:51  12  requires the Neoplastin PT information, have you kept abreast
10:51  13  of comparing epidemiological literature that looks at relative
10:52  14  bleeding rates between Xarelto and other members of the NOAC
10:52  15  class?
10:52  16  A.   Yes.
10:52  17  Q.   Does that information, in terms of how Xarelto compares
10:52  18  with bleeding as to specifically Pradaxa and Eliquis, is that
10:52  19  information that also lends further support to your opinion?
10:52  20  A.   Yes.
10:52  21  Q.   Is that category of information fairly called "comparative
10:52  22  epidemiological data"?
10:52  23  A.   Yes.
10:52  24  Q.   And I'm going to shorten that by saying -- if I write
10:52  25  "comp epi data," will you know what I'm talking about there?

SUZANNE PARISIAN - DIRECT

10:52  1   **A.**   Yes, sir.

10:52  2   **Q.**   Can you briefly provide an overview of what you know about

10:52  3   comparative epidemiological data between Xarelto and the other

10:52  4   members of the class on bleeding frequency and why you think

10:52  5   that provides further basis for your report?

10:52  6   **A.**   Xarelto would be shown to be worse than some of the other

10:52  7   NOACs that are available.  One of the studies was funded by the

10:53  8   FDA, I think Dr. Graham, in terms of drug safety.

10:53  9          And so there's studies that are coming out because

10:53  10  there's never -- in the clinical trials, there's no

10:53  11  head-to-head comparison of one new drug versus another.  It was

10:53  12  only versus warfarin or something that's been on the market.

10:53  13         But the new literature is actually looking at the

10:53  14  individual NOACs and doing comparisons to -- Xarelto may be one

10:53  15  of the drugs that they include in there.  So in terms of some

10:53  16  of the studies, there's been recent studies showing that the

10:53  17  Xarelto would have greater risk of bleeding, particularly GI,

10:53  18  than the other NOACs.

10:53  19         **MR. HONNOLD:**   All right.  And, Mr. Carl, can we call

10:53  20  up 5767552, please.

10:53  21  **BY MR. HONNOLD:**

10:53  22  **Q.**   Doctor, we put up on the screen -- is this the Graham

10:53  23  article that you discussed?

10:53  24  **A.**   Yes.  And he is from the FDA.  After 2007, FDA was given

10:53  25  some funding to start doing some look-backs at drug safety

SUZANNE PARISIAN - DIRECT

10:53   1    issues, and so he's not new drugs; he's drug safety postmarket.

10:54   2           So he helped sponsor -- the FDA tends to get a

10:54   3    contract and starts looking at databases to find out what's in

10:54   4    a database.  They're looking at the Medicare database to see

10:54   5    what -- the potential risk of bleeding with -- with Xarelto

10:54   6    versus Pradaxa, I believe, yeah.

10:54   7           MR. HONNOLD:  And can we move down to the conclusion

10:54   8    section, please, Carl, on page 1 of this article.

10:54   9    BY MR. HONNOLD:

10:54  10    Q.   Doctor, first, have you had a chance in your work on this

10:54  11    case to review this article in its entirety?

10:54  12    A.   Right.

10:54  13    Q.   And then can you share with the jury the conclusion and

10:54  14    relevant section in the abstract?

10:54  15    A.   Well, it's talking about the dose, 20 milligrams a day,

10:54  16    that was used in ROCKET for the atrial fib patients.  So it's

10:54  17    looking at, in terms of atrial fib, showing there's a

10:54  18    statistically significant increase in intracranial hemorrhage,

10:54  19    bleeds, and major extracranial bleeding that would be every

10:55  20    other site other than the head, including major

10:55  21    gastrointestinal bleeding, with Xarelto compared to Pradaxa at

10:55  22    the same dose as approved for atrial fib.

10:55  23    Q.   And do you believe this data lends support to your view

10:55  24    about having the Neoplastin PT laboratory test data in

10:55  25    Section 5?

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

10:55  1  **A.**   Right.  And at the advisory committee, it was suggested
10:55  2  that this type of a study be done, instead of comparing Xarelto
10:55  3  to warfarin, that they compare it to a new NOAC, which would
10:55  4  have been Pradaxa was approved at that time.  So this is
10:55  5  basically a follow-up from the advisory committee suggestion
10:55  6  that this type of study be completed.
10:55  7  **Q.**   And, Doctor, in your view and opinion, given the fact that
10:55  8  this article suggests that there is an increased risk of
10:55  9  bleeding with Xarelto compared to another NOAC, does it make
10:55  10  sense, then, that physicians who are using rivaroxaban or
10:55  11  Xarelto for patients have the option of knowing, the ability to
10:56  12  know, and the ability to use the Neoplastin PT for the safety
10:56  13  and benefit of their patients?
10:56  14  **A.**   Right.  If you have a laboratory thing with a PT that
10:56  15  would actually help address public safety, then you could
10:56  16  actually address some of this risk.  Right now, there is no
10:56  17  information, whereas information for a physician may be able to
10:56  18  weed out the patients that you shouldn't use this drug on, use,
10:56  19  and that it would probably reduce the potential risk.
10:56  20         At this period of time, the CDC has said there are
10:56  21  more ER visits for bleeding from NOACs than even from opioids
10:56  22  at this point in time, in 2016.
10:56  23         **MS. PRUITT:**  Objection, Your Honor.  I hate to
10:56  24  distract.  She's quoting the information that we discussed at
10:56  25  the bench.  It's the same issue.

SUZANNE PARISIAN - DIRECT

| | | |
|---|---|---|
| 10:56 | 1 | **THE COURT:**  I'll overrule that objection. |
| 10:56 | 2 | BY MR. HONNOLD: |
| 10:56 | 3 | **Q.**   Doctor, have you reviewed another comparative |
| 10:56 | 4 | epidemiological study, the Deitelzweig study from 2017? |
| 10:57 | 5 | **A.**   Yes. |
| 10:57 | 6 | **MR. HONNOLD:**  Can we bring up 5769433, please. |
| 10:57 | 7 | BY MR. HONNOLD: |
| 10:57 | 8 | **Q.**   Now, on the screen, Dr. Parisian, do we have the |
| 10:57 | 9 | Deitelzweig study on the screen? |
| 10:57 | 10 | **A.**   Yes, sir. |
| 10:57 | 11 | **Q.**   And then, as the prior Graham study compared Xarelto |
| 10:57 | 12 | bleeding frequency with Pradaxa, what's the focus of the |
| 10:57 | 13 | Deitelzweig study in terms of comparison between Xarelto and |
| 10:57 | 14 | another agent? |
| 10:57 | 15 | **A.**   This is a comparison to apixaban, also called Eliquis. |
| 10:57 | 16 | So, again, it's a head-to-head comparison as to the potential |
| 10:57 | 17 | risk for one drug versus the other drug.  And so it's a similar |
| 10:57 | 18 | type of study.  It's published in, I think, 2017. |
| 10:57 | 19 | And it's specifically looking at elderly people |
| 10:57 | 20 | because they are the ones that are going to have the atrial fib |
| 10:57 | 21 | dose forever in terms of NOAC drugs. |
| 10:57 | 22 | **Q.**   And if we go to the conclusion section here that sits at |
| 10:58 | 23 | page 3, I believe, the conclusion section.  Can you share that |
| 10:58 | 24 | information with the jury, please? |
| 10:58 | 25 | **A.**   "In the real-world setting" -- that would be your |

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

1    postmarket setting -- "after controlling for the differences in
2    patient characteristics" -- they use populations where they can
3    control, trying to match, make sure they're similar patients --
4    "apixaban" -- which is Eliquis -- "was associated with a
5    significantly lower risk of stroke and systemic emboli" -- that
6    would be your SPAF indication -- "than rivaroxaban and warfarin
7    and a trend towards better outcomes versus dabigatran among
8    elderly, nonvalvular, atrial fib patients in the United
9    States."
10        This article is also good too about the variability
11   of patients, that a certain percentage of patients, I think
12   12 percent of patients, on rivaroxaban will run really high in
13   terms of their PT and their accumulation of the drug.
14   Q.    Can you break down this conclusion, then, in terms of the
15   actual comparison between apixaban, which is Eliquis, and
16   rivaroxaban on -- where it says "significantly lower risk,"
17   what is that S/SE and MB?
18   A.    That would your stroke and systemic emboli.  That would be
19   what your SPAF indication is.
20        And MB is major bleeding.  They have an increased --
21   lower risk of stroke and major bleeding than -- so let's say
22   Eliquis than Xarelto.
23   Q.    Thank you.
24        Doctor, given the issue and this risk of major
25   bleeding we've discussed as associated with the use of Xarelto,

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

10:59  1   does the -- do the manufacturers of Xarelto, in your view, that
10:59  2   have this common serious adverse event, have a duty to provide
10:59  3   all relevant information regarding helpful laboratory tests to
10:59  4   allow for the safest use of their products?
10:59  5   **A.**   Right.  To help make sure that the patients are safe.
10:59  6   **Q.**   Doctor, what I'd like to do is move forward a little bit
11:00  7   and talk about a couple additional reasons about the
11:00  8   helpfulness of the Neoplastin PT.
11:00  9         What I'd like to talk about is the issue of
11:00  10  correlation -- the correlation between PT and Xarelto.  And so
11:00  11  while I'm writing that, why don't you go ahead and explain your
11:00  12  views on that issue in terms of correlation between Xarelto in
11:00  13  the blood and PT.
11:00  14  **A.**   Well, the higher your concentration in the blood of the
11:00  15  drug, the more likely you're going to see a change in PT in
11:00  16  terms of blood clotting.  I mean, it's an anticoagulant.  So
11:00  17  certain patients will run fairly high in terms of their Cmax.
11:00  18        So those patients who get like a higher drug level --
11:00  19  like the hot sauce.  The people who really get a kick from the
11:01  20  hot sauce, they're going to have higher levels, and you're
11:01  21  going to see it in their PT.  Their PT is also going to be
11:01  22  prolonged in terms of clotting.  You're not going to clot as
11:01  23  fast as a person with a lower level.
11:01  24        So there's a direct relationship between the
11:01  25  concentration and your clotting and your risk of not clotting,

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

11:01   1   of bleeding.

11:01   2   Q.   And, Doctor, has Bayer published on this particular issue?

11:01   3   A.   Yes, they have.  Their employees have.  I think Kubitza in

11:01   4   2005 published an article about it.

11:01   5   Q.   Let me stop you there.

11:01   6        MR. HONNOLD:  Mr. Carl, can we put up the Kubitza

11:01   7   2005 article at 5767878?  And I'd like to go to pages 7 and 8,

11:01   8   please.  And there's a particular section at page 7, we can

11:02   9   highlight.  There's a sentence, Mr. Carl, that says, "There was

11:02   10  a direct linear relationship between plasma, BAY-7939

11:02   11  concentration in PT."  There you go.  Can you go down a little

11:02   12  bit and capture it a little bit more?  Thank you.

11:02   13  BY MR. HONNOLD:

11:02   14  Q.   So we've called out this specific section, Dr. Parisian,

11:02   15  this sentence that says, "There was a direct linear

11:03   16  relationship between plasma, BAY 59-7939 concentration, and PT.

11:03   17  This suggests that PT, a routinely used coagulation test, could

11:03   18  be used clinically to monitor the anticoagulant effect of

11:03   19  pharmacodynamic" -- excuse me -- "between plasma BAY 59-7939

11:03   20  concentration and PT.  This suggests that PT, a routinely used

11:03   21  coagulation test, could be used clinically to monitor the

11:03   22  anticoagulant effects of BAY 59-7939 if necessary."

11:03   23       Can you explain the significance of that findings and

11:03   24  statement in the Kubitza article?

11:03   25  A.   Well, yeah.  It's basically, this is a Bayer employee

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

11:03  1    saying -- who was head of the research in terms of this drug,
11:03  2    and she's saying that you could routinely use a coag test which
11:03  3    is your PT, and she goes down at the end to say, at the very
11:04  4    end, "This suggests that PT would be a viable monitoring test
11:04  5    of the anticoagulant effect of BAY 59-7939, whatever the ISI of
11:04  6    the reagent used."
11:04  7              She's talking about the tissue factor that's being
11:04  8    used.
11:04  9              So she -- this person is saying that PT should be
11:04  10   used for monitoring the effect, especially when necessary, if
11:04  11   there are patients that it's necessary to determine.  So this
11:04  12   internally is 2005.  So the company had that information.
11:04  13   Q.   And in 2005 and in other years, had Bayer specifically, in
11:04  14   terms of PT, identified that it was the Neoplastin PT reagent
11:04  15   that had particular or unique sensitivity to Xarelto?
11:04  16   A.   Yes.  And that's what they're talking about with the ISI
11:04  17   of 1.21.  It's talking about the tissue factor and the type of
11:04  18   clotting you're going to produce.
11:04  19   Q.   And, Doctor, was this information then confirmed and
11:05  20   repeated in a later year in the medical literature in an
11:05  21   article authored by another Bayer employee, specifically Dr. or
11:05  22   Mr. Mueck, M-U-E-C-K?
11:05  23   A.   Yes, Dr. Mueck.  He's been involved in the PK, the
11:05  24   development of this product from the get-go.  So he published
11:05  25   on it too, saying, when it's necessary, there are times when

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

1    the PT will be effective for giving you information about your

2    bleeding risk.

3            MR. HONNOLD:  Mr. Carl, can you call up exhibit

4    5768548, the Mueck paper.

5    BY MR. HONNOLD:

6    Q.   Specifically, Doctor, have you reviewed of the Mueck

7    paper, the 2014 Mueck paper?

8    A.   Yes.  And the 2013.  The 2013 is the one with a lot of the

9    PT information.

10   Q.   Let's go to 5768548, Table 4 at page 12.

11           And, Doctor, in your view, is there information in

12   the Mueck 2013 table that, again, shows the relationship

13   between how much Xarelto is in the blood and a patient's PT

14   level?

15   A.   Yes.

16   Q.   And if we look at this graph that's Graph B that's being

17   highlighted, it's a graph that shows rivaroxaban plasma

18   concentration on the lower on the axis on the bottom and

19   prothrombin time on the left.

20           Can you explain the significance of that graph.

21   A.   This graph is showing that there's a straight line

22   that's -- the straight line that's through all those patient

23   dots, and that shows there a linear straight-line relationship

24   between the concentration of rivaroxaban and your PT.  As your

25   PT prolongs, and that would be your second, as your second span

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

11:07 1    here, you're getting more and more dose.  Usually, like, around

11:07 2    400 may be what you'd think of as a cutoff for a dose.

11:07 3         And as you get out to those outer dots, those people

11:07 4    are people with higher PT levels.  And they also have higher

11:07 5    concentration.  So those patients would be at increased risk of

11:07 6    bleeding.  They may not bleed, but they're an increased risk of

11:07 7    bleeding.

11:07 8    Q.    And the data that's been published by Kubitza and Mueck,

11:07 9    the prothrombin time that's being spoken to there, is the

11:07 10   Neoplastin PT?

11:07 11   A.    Yes.

11:07 12   Q.    You've mentioned a topic that I want to just spend a

11:07 13   little bit of time on, and that is the issue of there might be

11:07 14   some people with a low PT who might bleed; there might be some

11:07 15   people with an average PT who might bleed or not; and then

11:08 16   there might be some people with a high PT who don't bleed.

11:08 17   A.    Uh-huh.

11:08 18   Q.    Is that true?

11:08 19   A.    Yes.

11:08 20   Q.    Can you put it into context or significance in terms of

11:08 21   how we're talking about risk as to populations about certain

11:08 22   things versus isolated incidence of looking at one person not

11:08 23   bleeding or bleeding in a particular situation?  Can you

11:08 24   discuss that?

11:08 25   A.    Well, yeah, you can have patients with a low PT, and they

SUZANNE PARISIAN - DIRECT

1   may get hit with a truck.  They're going to bleed.  They may

2   have surgery.  They may have something that causes them to

3   bleed.

4        But as you go up and you raise the PT and you prolong

5   your -- until you form a clot, you're making this group more

6   likely to be at increased risk of bleeding if anything comes

7   along to trigger their bleeding.  It can be something

8   internally in their GI tract because you're -- I'm sure people

9   have talked about your balance between clotting and bleeding

10  all the time.  Your body maintains a homeostasis.

11       So all it needs to do is have something trigger you

12  to bleed.  And those people walking around at a higher risk are

13  going to be more likely to bleed than someone who's at a lower

14  risk.

15       So it's basically risk.  If your blood takes longer

16  to clot, you're at more of a risk to bleed.  But not everybody

17  is going to bleed.  And that's the way it is in terms of

18  clotting, but you're putting yourself at a risk level in terms

19  of increasing your clotting risk.  If something happens -- it

20  could be something minor -- you're more likely to bleed than

21  somebody who has some other kind of stimulus and a lower PT and

22  they can form clots.

23  Q.   That phenomena, is that something that's been true in the

24  world of anticoagulation or giving anticoagulants to patients

25  for years and years, including with warfarin?

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

11:09  1  **A.**    Yes.  Yes.

11:09  2  **Q.**    Meaning it's been known -- has it been known for many

11:10  3  years that patients on warfarin, even with a normal INR, might

11:10  4  have bleeding events?

11:10  5  **A.**    Yes.

11:10  6  **Q.**    And patients with a high INR might not bleed?

11:10  7  **A.**    Yes.  But, now, if your INR is not well managed, you now

11:10  8  raise that group to be at an increased risk of bleeding.  And

11:10  9  that's what happens in the studies we've seen, like ROCKET

11:10  10  where there's not as good control -- and EINSTEIN too -- in

11:10  11  terms of risk of bleeding.  With warfarin, if you don't control

11:10  12  them, you can put those patients at an increased risk of

11:10  13  bleeding.

11:10  14  **Q.**    Doctor, have you also looked at or spent time looking at

11:10  15  the issue of the specific correlation between PT now and

11:10  16  bleeding risk?

11:10  17  **A.**    Yes.

11:10  18  **Q.**    Okay.  And can you tell us your views or opinions, based

11:10  19  upon all the material that you've reviewed, whether there is a

11:10  20  correlation between increasing PT level and bleeding risk?

11:10  21  **A.**    Yes, there is.  As your PT level raises, you're at

11:11  22  increased risk of bleeding.

11:11  23  **Q.**    And have you reviewed data that specifically supports your

11:11  24  opinion in that regard?

11:11  25  **A.**    Yes.

SUZANNE PARISIAN - DIRECT

11:11  1  **Q.**   And does this -- the data that you've reviewed, does that
11:11  2  suggest that a physician, an informed physician, who's informed
11:11  3  about the Neoplastin PT could use that test to identify
11:11  4  patients that have a lot of Xarelto in their blood compared to
11:11  5  those who have less?
11:11  6  **A.**   Right, in terms of risk.  You give a patient the drug,
11:11  7  then let the physician determine if the risk is high.  You can
11:11  8  talk about it with the patient, should you be on something
11:11  9  else.  So it's risk.
11:11  10  **Q.**   And, Doctor, is there specific evidence to support your
11:11  11  opinion in that regard?
11:11  12  **A.**   Yes.
11:11  13  **Q.**   And does that include information that was included in the
11:11  14  FDA AdCom brief related to the approval process of Xarelto?
11:11  15  **A.**   Yes.
11:12  16          **MR. HONNOLD:**  Mr. Carl, can we call up 5768754,
11:12  17  please, Figure 8 at page 41.
11:12  18  **BY MR. HONNOLD:**
11:12  19  **Q.**   And, Dr. Parisian, can you please explain to the ladies
11:12  20  and gentlemen of the jury the graph or figure that's up on the
11:12  21  screen right now and how it relates to your opinions.
11:12  22  **A.**   This was presented at the advisory committee meeting by
11:12  23  the FDA.  And it shows that, as your prothrombin time, which is
11:12  24  the bottom line, increases -- that's your clotting -- your lack
11:12  25  of clotting, you're going to stay not clotting.  As your

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

11:12   1   prothrombin time increases, you have a higher percentage of

11:12   2   major bleeds.

11:12   3        So it's showing that there is a correlation between

11:12   4   increase in clotting time and bleeding, which is what we've

11:12   5   been talking about, risk.

11:13   6        In terms of your risk, if your clotting time was

11:13   7   expanded, then you're going to be more likely to bleed because

11:13   8   you're not going to be able to form a clot.

11:13   9   Q.   In terms of a physician such as yourself coming to

11:13   10   opinions on issues like this, is consistency of data something

11:13   11   that's important?

11:13   12   A.   Yes.

11:13   13   Q.   Now, based upon the data that we've looked at on this

11:13   14   issue, relationship of Xarelto to PT and PT to bleeding risk,

11:13   15   does it appear that that data that you've reviewed and that

11:13   16   we've now discussed before the jury is consistent on this

11:13   17   point?

11:13   18   A.   Yes.

11:13   19   Q.   Now, to be clear, what we've looked at here is information

11:13   20   that comes from the ROCKET trial data that relates to the

11:13   21   atrial fibrillation indication; is that true?

11:13   22   A.   Yes, sir.

11:13   23   Q.   Okay.  So you know -- even though you're not giving

11:13   24   specific opinions about Ms. Mingo, you know that she was taking

11:13   25   Xarelto for the EINSTEIN indication twice a day, 15 milligrams,

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

1    for a total daily dose of 30 milligrams.

2          Do you have an opinion as to whether you believe the

3    ROCKET data that's here is also relevant and instructive to the

4    situation of Ms. Mingo and her dosage?

5    **A.**   Yes, because she's going to be taking more.

6    **Q.**   Her total daily dose is more?

7    **A.**   Yes.  She's taking 30 milligrams a day, and there really

8    was no dosing study done on the 30 milligrams a day in terms of

9    the Phase II study.  So it's a different -- it's the only dose

10   that's that high.

11   **Q.**   And, Doctor, in terms of your review of the material, do

12   you have an opinion as to whether the physiology related to

13   exposure to Xarelto and bleeding risk appears to be consistent

14   across indications and dosages?

15   **A.**   Yes.

16   **Q.**   Can you talk about that in further detail, please.

17   **A.**   Well, even in the ROCKET study, when they're only taking

18   10 milligrams a day, you're still seeing that, if you raise

19   people's PT, they're at increased risk of bleeding.  And the

20   same with the EINSTEIN study.

21          So it's all consistent.  There's nothing that's been

22   different in any of the studies that doesn't go with this

23   linear correlation between PT and plasma concentration,

24   increased risk of bleeding.

25   **Q.**   And similarly, Doctor, have you reviewed some data from

SUZANNE PARISIAN - DIRECT

| | |
|---|---|
| 11:15 | 1 |
| 11:15 | 2 |
| 11:15 | 3 |
| 11:15 | 4 |
| 11:15 | 5 |
| 11:15 | 6 |
| 11:15 | 7 |
| 11:15 | 8 |
| 11:15 | 9 |
| 11:15 | 10 |
| 11:16 | 11 |
| 11:16 | 12 |
| 11:16 | 13 |
| 11:16 | 14 |
| 11:16 | 15 |
| 11:16 | 16 |
| 11:16 | 17 |
| 11:16 | 18 |
| 11:16 | 19 |
| 11:16 | 20 |
| 11:16 | 21 |
| 11:16 | 22 |
| 11:16 | 23 |
| 11:17 | 24 |
| 11:17 | 25 |

1  the RECORD trial, which is the VTE prevention, that shows
2  similar trends and tendencies?
3  A.   Yes.  Yes.  There was a presentation at a meeting where
4  the company actually presented on a poster board showing that,
5  as you change the PT, you change the bleeding risk.
6  Q.   Are you familiar with some quartile analysis that has been
7  done, and that data was also discussed in the FDA AdCom brief
8  related to the approval of ROCKET?  Are you familiar with that?
9  A.   Yes.
10      MR. DAVIS:   Carl, can you up 5768754 please, which is
11 Table 6 at page 42.
12 BY MR. HONNOLD:
13 Q.   Doctor, can you explain this quartile analysis that's been
14 done for different types of aspects of looking at bleeding and
15 explain -- explain this data.
16 A.   The Q1, Q2, 3 data, those are based on PT in terms of your
17 PT prolongation, and they're showing here hemoglobin drop.
18 These are with patients that were in the ROCKET study.  And
19 it's showing that, as you change the quartiles and the
20 prolongation of the PT, you actually had greater drops in
21 hemoglobin, which would be bleeding.
22      And in terms of transfusion, you also have the same
23 type of a trend.  You don't have it in the critical organ
24 bleeding.  The data is a little bit -- not quite as
25 straightforward on that.

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

1    Okay.  And then the table underneath goes with that.

2 **Q.**   And then, Doctor, have you looked at data that then talks

3 about the issue of whether it makes sense for a patient to be

4 exposed to higher PT levels in terms of whether they're getting

5 any benefit from that?  Have you looked at that data?

6 **A.**   Well, that's important here.  The more -- because you

7 usually think, the more you get, the better it is with the

8 effect.

9    Whereas, this product actually has a flat dose

10 response.  You're not -- just because you get more drug doesn't

11 mean you're going to get better or more effect.  So it's

12 actually very flat in terms of -- a lower dose has been shown

13 to be just as good as a higher dose.  But with a higher dose,

14 you have an increased risk of bleeding.

15    So you're not getting better efficacy because you

16 have a higher dose.  It's what they call a flat -- a flat

17 response.  So you're better off with a lower dose -- a lower

18 dose with lower risk.

19 **Q.**   And is there a graph that you've seen that demonstrates

20 that concept?

21 **A.**   Right.  That's this graph.

22    **MR. HONNOLD:**  Can we go to 5768754, please, Carl.

23    Excuse me.  Carl, this is Figure 7 at page 40.  I'm

24 sorry.

25    **THE WITNESS:**  Okay.  So this is at FDA's AdCom brief

SUZANNE PARISIAN - DIRECT

11:18   1   meeting, talking about whether it should get approved or not.
11:18   2   And the FDA is presenting that this line in the middle is
11:18   3   basically the effectiveness.  And if you increase the
11:18   4   prothrombin time, you're still getting about the same effect
11:18   5   that you would have had at a 12-second prothrombin time in
11:18   6   terms of the ischemic stroke.
11:18   7           For prevention of stroke, which is why you're
11:18   8   giving this drug in ROCKET, you're not getting a better outcome
11:19   9   by increasing the PT.  It's -- basically, it's still the same
11:19  10   outcome, but you're increasing the risk of bleeding somewhere
11:19  11   else or somewhere in the brain, a hemorrhagic stroke.
11:19  12           So this is what they call a flat-dose response
11:19  13   curve in that you're not getting better because you're giving
11:19  14   more drug.  Your lower drug -- ultimately, a manufacturer would
11:19  15   want to give the lowest drug to get the best benefit with the
11:19  16   lowest risk.
11:19  17   BY MR. HONNOLD:
11:19  18   Q.   And does this particular graph suggest that -- provide
11:19  19   further basis for why it would be helpful to give physicians
11:19  20   information about being able to use the Neoplastin PT to
11:19  21   identify individuals with the higher PT levels that is not
11:19  22   providing additional protection from stroke?
11:19  23   A.   Right.  Because those are the patients that you're raising
11:19  24   their risk of bleeding and you're not getting any benefit for
11:19  25   stroke prevention.  So those are the patients that -- at an

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

11:20  1  increased risk, and you don't need to be because you're not --
11:20  2  if you were giving this for stroke prevention, you're not
11:20  3  getting an added benefit by putting these patients at an
11:20  4  increased risk.
11:20  5          MR. HONNOLD:  And, Your Honor, I'm trying to move on.
11:20  6  A couple more concepts here that I'd like to cover, and I'll be
11:20  7  wrapped up.
11:20  8          MS. PRUITT:  Your Honor, can we approach?
11:20  9          THE COURT:  Sure.
11:20  10          (WHEREUPON, the following proceedings were held at
11:20  11  the bench.)
11:21  12          MS. PRUITT:  Your Honor, I've been real patient about
11:21  13  this.  She's way outside her area of expertise on talking about
11:21  14  all of this from the doctor's standpoint.  She has not -- she's
11:21  15  not here for this.  She's an FDA expert.  She hasn't practiced
11:21  16  medicine in 20 years.  And so with the areas he's getting ready
11:21  17  to go into have to do with pharmacology or hematology or what a
11:21  18  doctor is going to do or not do, we object because she's not
11:21  19  qualified to do that.
11:22  20          THE COURT:  I understand.  She is a doctor in
11:22  21  addition to everything else.  So bring all that -- you can
11:22  22  bring that out in cross if you'd like, but at least she's
11:22  23  qualified to testify and give an opinion on it.
11:22  24          I'll overrule the objection.
11:21  25          (WHEREUPON, the following proceedings were held in

SUZANNE PARISIAN - DIRECT

11:21  1    open court.)

11:21  2    BY MR. HONNOLD:

11:21  3    Q.   I'd like to move forward to one -- actually, two more

11:21  4    points here, Dr. Parisian, and then I'll be done with my

11:21  5    questions.

11:21  6         This issue of laboratory tests being in Section 5 of

11:21  7    the label, is this something that is there with other

11:22  8    medicines?

11:22  9    A.   Yes.

11:22  10   Q.   Okay.  So there are some -- some medicines that you could

11:22  11   go to Section 5 for and specifically see information about

11:22  12   specific laboratory tests; is that right?

11:22  13   A.   Yes, especially coagulation drugs.

11:22  14   Q.   Okay.  And so Xarelto is an anticoagulant; right?

11:22  15   A.   Yes, sir.

11:22  16   Q.   And is it true that there are other anticoagulants that

11:22  17   do, in fact, list laboratory testing information in Section 5?

11:22  18   A.   Yes.

11:22  19   Q.   Okay.  And are you familiar with some of the product

11:22  20   labels of other anticoagulants that do that?

11:22  21   A.   Yes, sir.

11:22  22   Q.   Is there a medicine called Argatroban that, in its label,

11:22  23   includes specific laboratory test instruction in it's

11:22  24   Section 5?

11:22  25   A.   Yes, sir.

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

11:22  1          MR. HONNOLD:  I'd like to call up, Mr. Carl, 5813714.
11:22  2  And I'd like to go to the page 6 of that PDF.
11:23  3  BY MR. HONNOLD:
11:23  4  Q.   And, Doctor, we now have the chance to look at the
11:23  5  Argatroban label specifically in Section 5.  Now, we went
11:23  6  through the structure of a label where Section 5 has various
11:23  7  information.
11:23  8          Is this an example of a drug now that has made
11:23  9  special room in it's Section 5, Warnings and Precautions, to
11:23  10  put in information about a laboratory test?
11:23  11  A.   Yes.
11:23  12  Q.   And can you explain how Argatroban has set forth
11:23  13  information in that regard.
11:24  14  A.   It provided information about basic clotting tests to tell
11:24  15  a physician -- to instruct the physician as to whether they
11:24  16  could use this drug or some other drug and what they could look
11:24  17  at in terms of APTT.  And so it's laboratory tests, so -- and
11:24  18  it's under the heading Laboratory Tests.
11:24  19  Q.   Within the general heading of Section 5, which is Warnings
11:24  20  and Precautions; right?
11:24  21  A.   Yes, sir.
11:24  22  Q.   Now, Argatroban specifically discloses and points out that
11:24  23  a therapeutic range has not been specifically identified for
11:24  24  Argatroban therapy; is that right?
11:24  25  A.   Right.  And that would be correct for Xarelto, too.

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

11:24  1  **Q.**   And is this an example of a manufacturer giving complete

11:24  2  and candid information about what -- what may influence a

11:24  3  physician's particular view of the laboratory test information?

11:24  4  **A.**   Yes.

11:24  5  **Q.**   Is there -- would it be appropriate, in your view, under

11:24  6  the FDA regulations, for a Section 5, Laboratory Test section

11:24  7  to give what's called on-treatment data, meaning what has been

11:25  8  seen in patients for the laboratory tests from -- either in

11:25  9  clinical trials or in postmarket experience?

11:25  10  **A.**   Right.  It's the instructions that actually helps the

11:25  11  physician know what's out there, what they can consider when

11:25  12  they're treating a patient.

11:25  13         **MR. HONNOLD:**  And, Mr. Carl, can we move on to --

11:25  14  **BY MR. HONNOLD:**

11:25  15  **Q.**   Are there a couple other anticoagulants that you can think

11:25  16  of such, as Arixtra?

11:25  17  **A.**   Yes.

11:25  18         **MR. HONNOLD:**  And can we go to the Arixtra label,

11:25  19  Mr. Carl, 5813715, and we'll be going to page 9 of this PDF.

11:25  20  **BY MR. HONNOLD:**

11:25  21  **Q.**   And then can you explain how Arixtra has addressed the

11:25  22  issue of laboratory tests in its label?

11:25  23  **A.**   They put the heading Monitoring Laboratory Tests.  So

11:25  24  they're talking about monitoring their drug in terms of using

11:25  25  standard laboratory tests and the postmarketing experience.

SUZANNE PARISIAN - DIRECT

11:26  1   Q.   And is this another way that a manufacturer can set forth

11:26  2   laboratory test information in its warnings or precautions

11:26  3   section?

11:26  4   A.   Right.  And this is an important one because it's also a

11:26  5   Factor Xa activity.  And it talks about measuring it in terms

11:26  6   of assays or calibrators for the drug, which I don't know if

11:26  7   they're approved or cleared, but they're talking about that

11:26  8   there is availability of calibrators to determine what the

11:26  9   actual plasma concentration is.

11:26  10          So they're giving the standard coag tests at the top.

11:26  11  They're talking about routine things that you would continue to

11:26  12  monitor for a patient and the availability of the calibrators

11:26  13  to actually determine what the concentrations are.

11:26  14  Q.   And there's directions to a specific test; is that right?

11:26  15  A.   Right.

11:26  16  Q.   Next one, are you familiar with the Lovenox label?

11:26  17  A.   Yes.

11:26  18  Q.   And does it address laboratory tests in its Section 5?

11:27  19  A.   Yes.

11:27  20          MR. LONGER:  This will be the last example, Your

11:27  21  Honor.

11:27  22          Mr. Carl, can we go to Exhibit 5813724, and

11:27  23  we'll be going to page 11 of that PDF.

11:27  24          THE WITNESS:  Right.  So here it's talking about

11:27  25  Lovenox.  This is your low-molecular-weight heparin.  And it's

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

11:27 1   talking about the types of studies that you would do, routine

11:27 2   coag tests, giving doctors some information, instruction, as to

11:27 3   how to use those for monitoring their patient.

11:27 4   BY MR. HONNOLD:

11:27 5   Q.   The Lovenox section on laboratory tests also starts

11:27 6   talking about the Factor Xa assay that there's been some

11:27 7   testimony on in court.

11:27 8        Do you have an opinion as to whether it would also be

11:27 9   indicated and appropriate for the Xarelto Section 5 to include

11:27 10  information about the helpfulness and usefulness of the

11:27 11  Factor Xa assay?

11:27 12  A.   Yes.  Yes.  They can't make a specific claim that it's

11:27 13  going to give you the therapeutic range, but to say that it's

11:28 14  out there and available -- because it's available to most

11:28 15  research laboratories.  So it would be another tool that would

11:28 16  be available for a physician caring for patients to use.

11:28 17  Q.   And there's been some discussion by a laboratory medicine

11:28 18  expert by the name of Robert Gosselin.  He explained the issue

11:28 19  of the Xa assay in terms of research-use-only and a laboratory

11:28 20  developed-type of Xa assay.

11:28 21       Would it be appropriate and permissible within the

11:28 22  FDA regulations to go ahead and state that the Factor Xa assay

11:28 23  is available on a research-use-only or an LDT basis?

11:28 24  A.   Yes.  That's how you would put it in there, because it's

11:28 25  not clear for a manufacturer to market it for that, but as

SUZANNE PARISIAN - DIRECT

11:28  1    research tools, FDA allows those.

11:28  2            So you could say -- as long as you're saying it's a

11:28  3    research tool and you're not making any specific claims about

11:28  4    what it says, that you would say it's available, let a

11:29  5    physician use it.  It's actually pretty widely available now.

11:29  6    So it would make sense that the company would put that

11:29  7    information in.

11:29  8    Q.   And --

11:29  9    A.   And they use similar types of stuff internally in their

11:29 10    own testing of levels and activity of Factor Xa.

11:29 11    Q.   That's a good point.  On the issue of the Factor Xa assay,

11:29 12    does it have a similar history in the drug development process

11:29 13    of Xarelto and being used in clinical trials to assess patient

11:29 14    response as the Neoplastin PT was?

11:29 15    A.   Right.  I think that Mueck article, when we looked at the

11:29 16    straight line, the linear relationship, that actually had --

11:29 17    above it was the Factor Xa.  So it's been used by the company.

11:29 18    It's been used to look specifically at what the concentration

11:29 19    is.

11:29 20    Q.   Dr. Parisian, I'd like to move on now to a slightly

11:29 21    different -- different point.

11:29 22            Based upon the information and material that you have

11:29 23    reviewed, are you aware of any evidence supporting the fact

11:30 24    that the companies, Janssen and/or Bayer, knew of -- knew of

11:30 25    the fact that there are other competing drugs that do include

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

11:30 1   laboratory test information in Section 5 of the label?

11:30 2   A.   Oh, yes.

11:30 3   Q.   And is there a particular document that you -- as part of

11:30 4   your work in this case that you reviewed that shows or

11:30 5   demonstrates that specific knowledge that the companies had

11:30 6   about this issue of whether or not to put laboratory

11:30 7   information in Section 5?

11:30 8   A.   There's a 2009 contingency document where the company was

11:30 9   working on their labeling, and it has a -- potential laboratory

11:30 10  section that would be included in Section 5 based on Lovenox

11:30 11  and the other drugs that we looked at -- modeled after that,

11:30 12  but it says with the caveat "only if FDA asks."

11:30 13  Q.   Now, I want to go to a very specific section of this

11:31 14  labeling contingency document.

11:31 15       MR. HONNOLD:  Mr. Carl, I'd like to go to

11:31 16  Exhibit 859951, and we're going to go to the PDF, page 16, of

11:31 17  that exhibit.

11:31 18  BY MR. HONNOLD:

11:31 19  Q.   And can you orient us, Dr. Parisian, in terms of the date

11:31 20  of this article -- of this document?

11:31 21  A.   This document is April 23rd, 2009, and it's basically

11:31 22  talking about the U.S. product insert labeling contingency

11:31 23  document.  So the company is proposing whether they're going to

11:31 24  come in with their draft label.  And in this section, there's a

11:31 25  discussion about will we need to add a new 5.4 laboratory test

SUZANNE PARISIAN - DIRECT

1    section like Lovenox.

2            So it's specifically including what is in the label

3    for Lovenox and for Arixtra, the two labels that we just saw.

4    So it's saying what they know is in those labels, and then it's

5    proposing whether they were going to add that in terms of their

6    draft labeling.

7            So this is their labeling.  They're creating their

8    labeling, and this is -- they're drafting it, but they're

9    putting a contingency.  These are things that we might suggest

10   if we're required to provide this.

11   Q.   Does this suggest that the companies did have specific

12   knowledge of the fact that there is a Section 5.4 that speaks

13   to laboratory tests in the warnings and precautions section?

14   A.   Yes.  And they knew that -- Lovenox, actually, was

15   Section 5.9.  So they're proposing to make a Section 5.4 for

16   their label.

17   Q.   And in your view -- at that time, given this knowledge

18   that's being reflected by the companies at this point, is it

19   your view that they should have been fully prepared to have

20   gone forward with including the Neoplastin PT and Factor Xa

21   assay information within Section 5 of its warnings and

22   precautions section?

23   A.   Yes, based on that they'd been using those products

24   throughout the development of their drug.

25            MR. HONNOLD:  Your Honor, I'd like to move that into

SUZANNE PARISIAN - DIRECT

11:33  1   evidence, 859951.

11:33  2          **THE COURT:**  Let it be admitted.

11:33  3   BY MR. HONNOLD:

11:33  4   **Q.**   And is it fair to say, Doctor, that in this situation of

11:33  5   the warnings and precautions section of the label, that it was

11:33  6   the companies that was -- given their knowledge, they were

11:33  7   fully in charge of their Section 5 in terms of laboratory test

11:33  8   options?

11:33  9   **A.**   Yes.  It's their label.  They also could add this to their

11:33  10  label at any time.  In terms of way the regs are set up, a

11:33  11  manufacturer can add additional safety information to their

11:33  12  label without the prior approval of the FDA.

11:33  13          So that's under a "Changes Being Effected" process.

11:34  14  So, yeah, they knew about it.  They didn't get it the first

11:34  15  label, but they could have added it.  They could add it today,

11:34  16  if they want to, as they -- just it's their own addition.

11:34  17  **Q.**   And can you explain that process, how this information

11:34  18  today, tomorrow, could readily be added to the Xarelto label

11:34  19  right now.

11:34  20  **A.**   Well, the regulations make it that -- protection of public

11:34  21  safety is the number one thing.  So the Congress has set up a

11:34  22  thing called a "Changes Being Effected" NDA supplement --

11:34  23  special supplement where a manufacturer can begin to improve

11:34  24  the safety of their labeling, their information in it.  They

11:34  25  can delete false and misleading information without the prior

OFFICIAL REALTIME TRANSCRIPT

SUZANNE PARISIAN - DIRECT

11:34   1    approval of the FDA.

11:34   2           The FDA will approve it eventually or not.  But they

11:34   3    can start circulating that labeling, having their sales reps

11:34   4    tell people before you go through the FDA.

11:34   5           So it was made to protect public safety and to make

11:34   6    sure that the manufacturer was being able to give a safe and

11:35   7    effective label.  It protects the manufacturer and the public.

11:35   8    So it's a process that's always available for them to update

11:35   9    their label without the FDA's approval to make sure that it's a

11:35   10   safe label and that it's compliant with the requirements for a

11:35   11   manufacturer.

11:35   12          **MR. HONNOLD:**  A couple short counterpoints, Your

11:35   13   Honor.

11:35   14          Mr. Carl, can we go to another section of the

11:35   15   Xarelto label, and I want to go to page 18, which is

11:35   16   Section 8.1.

11:35   17          And I want to highlight the particular part that

11:35   18   says -- there's a sentence that says, "The anticoagulant effect

11:35   19   of Xarelto cannot be reliably monitored with standard

11:35   20   laboratory testing."

11:35   21   BY MR. HONNOLD:

11:35   22   **Q.**   Now, Dr. Parisian, are you familiar with this particular

11:35   23   statement that appears in the pregnancy section of the Xarelto

11:35   24   label?

11:36   25   **A.**   Well, yes.  It also appears up in Section 5 under

SUZANNE PARISIAN - DIRECT

1   pregnancy.

2   **Q.**   And we've heard some testimony earlier this week from a

3   Janssen sales representative who testified that it was her

4   belief -- it was her belief, consistent with her education and

5   training she received in her professional work training, that

6   there was no such test; the anticoagulant effects of Xarelto

7   could not be tested.  And she said that this statement in 8.1,

8   she felt, applied to all patients.

9         Taking all of this into account, how it appears in

10   the label here and what Ms. Collier told us about her

11   understanding, is all of that information true, the highlighted

12   portion there?

13   **A.**   No.  Well, they're talking about pregnancy, and so the

14   pregnancy risk is a different issue.  You're talking about a

15   fetus and a women.

16         But -- and "reliably monitored," that is not true if

17   you're worried about the anticoagulant effect on a pregnant

18   woman because a pregnant woman could hemorrhage out too, and so

19   the PT would be just as applicable to her if a doctor started

20   her on it.

21         It also says it up in Section 5, which implies up in

22   that section that there is no test for monitoring the

23   anticoagulant effect.  And that's not supported by the data

24   that the company has.

25   **Q.**   And is that statement -- that highlighted statement about

SUZANNE PARISIAN - DIRECT

1    Xarelto, is that just false?

2    **A.**   It's not accurate with the information that I've seen

3    internally, their own publications, the literature.  So it's

4    not -- if you're worried about an anticoagulant effect in a

5    pregnant woman, you still could use the PT.  There's no reason

6    a PT wouldn't apply to her too in terms of her potential risk

7    for bleeding.

8           So in terms of -- if you're measuring the

9    anticoagulant effect, then the PT would still apply.

10   **Q.**   Doctor, in summary, taking everything in account, do you

11   have an opinion regarding the current adequacy and sufficiency

12   of the label for Xarelto?

13   **A.**   I do have an opinion.

14   **Q.**   And what is your opinion in that regard?

15   **A.**   That it doesn't adequately instruct.  It doesn't tell the

16   physician how to use the PT test in order to look for a

17   potential risk of bleeding.  It doesn't talk about the

18   availability of Factor Xa assay.

19          So you've handicapped the physician in that you've

20   told them, basically, you can't do any laboratory testing to

21   look at the potential risk of bleeding.

22          And that's not consistent with their own documents

23   internally, that a PT test at least will identify patients who

24   are at increased risk of bleeding.  And it would let a doctor

25   decide, and a patient, what they to do in terms of perhaps

SUZANNE PARISIAN - DIRECT

11:38  1   switching to a different drug, perhaps taking some other

11:38  2   action.  It's just information that somehow has been taken away

11:39  3   from a doctor.

11:39  4        This pregnancy thing is the perfect example.  The PT

11:39  5   test applies to a pregnant woman, why not tell them that too.

11:39  6   It's just -- let the doctor know, let the patient know, and

11:39  7   they can decide whether they want this drug or some other drug

11:39  8   in terms of their anticoagulation drug.

11:39  9   BY MR. HONNOLD:

11:39  10  Q.   Doctor, finally, is it your opinion that changes to the

11:39  11  Section 5 label for Xarelto regarding the specific instruction

11:39  12  and direction on the use of Neoplastin PT are necessary and

11:39  13  mandated by federal regulations?

11:39  14  A.   Yes.  They have an adequate label in terms of adequate

11:39  15  information, adequate warnings, adequate instructions.  Yes, in

11:39  16  terms of -- it's just give -- you know, you need to give them

11:39  17  anticoagulation test so the people know.  You can identify

11:39  18  patients who are at increased risk of bleeding.

11:39  19       MR. HONNOLD:  Your Honor, I don't have any further

11:39  20  questions now.  Could I have just a moment to clear up in terms

11:39  21  of exhibits?  There are some things that need to be offered.

11:39  22       Specifically, the FDA AdCom brief, which would

11:40  23  be Plaintiff's Exhibit 101.  Much of the material we reviewed

11:40  24  is contained in that document.  We would offer it in its

11:40  25  entirety.

OFFICIAL REALTIME TRANSCRIPT

11:40   1          **MS. PRUITT:**  Is that this document, Brad?

11:40   2          **MR. HONNOLD:**  Yes.

11:40   3          **MS. PRUITT:**  No objection.

11:40   4          **THE COURT:**  Let it be admitted.

11:40   5          **MR. HONNOLD:**  Then the contingency label, which we

11:40   6   previously offered.  That was admitted, but just for the

11:40   7   record, that will be trial Exhibit 100.

11:40   8          **THE COURT:**  All right.  I admitted that.

11:40   9          **MR. HONNOLD:**  Thank you, Your Honor.

11:40   10          **THE COURT:**  Let's take a break here.  We'll take a

11:40   11   lunch break here and come back.

11:40   12          **MS. PRUITT:**  Your Honor, can I ask you a question

11:40   13   before we leave, about a witness?

11:40   14          **THE COURT:**  Sure.

11:40   15          (WHEREUPON, the following proceedings were held at

11:40   16   the bench.)

11:41   17          **THE COURT:**  Can we discharge the jury so they can

11:41   18   start --

11:41   19          **MS. PRUITT:**  Yes.

11:41   20          (WHEREUPON, the following proceedings were held in

11:41   21   open court.)

11:41   22          **THE COURT:**  Members of the jury, we're going to break

11:41   23   for lunch here and come back at 1:00 instead of 1:15 because

11:41   24   we're breaking early.

11:41   25          **THE DEPUTY CLERK:**  All rise.

OFFICIAL REALTIME TRANSCRIPT

11:41  1          (WHEREUPON, the jury exited the courtroom.)

11:41  2          (WHEREUPON, the following proceedings were held at

11:41  3   the bench.)

11:42  4          MS. PRUITT:  Dr. Keith is going to be here at 1:00,

11:42  5   Your Honor.

11:42  6          THE COURT:  Do you want to interrupt this witness?

11:42  7          MS. PRUITT:  Yes.

11:42  8          MR. BIRCHFIELD:  Your Honor, on this note, this is --

11:42  9   this is of critical importance, and we have accommodated their

11:42  10  employees.  We've adjusted our schedule.  What we cannot have

11:42  11  happen is we cannot be put in a place where Dr. Parisian is not

11:42  12  finished this afternoon.  We had her move her vacation an

11:42  13  entire week to do this.

11:42  14         We gave up the opportunity to call Dr. Keith in

11:42  15  our case because here was the situation:  We called him.  Bubba

11:42  16  talked to Walter yesterday.  We talked with their lawyers.

11:42  17  They raised this issue yesterday morning.  We called them to

11:42  18  see if they were available.

11:42  19         Dr. Keith said, "I can't come on Friday" --

11:42  20  initially, he told us he could only be here Friday or Tuesday.

11:42  21  We've made representations we're going to wrap up by Monday;

11:43  22  Tuesday would not work for us.  So we told the defense counsel

11:43  23  we're not going to call Dr. Keith.

11:43  24         Then Dr. Keith, through his lawyer -- because

11:43  25  he's not talking to us -- tells us, it's tomorrow or no time,

11:43  1    and so we informed the defense counsel of that as well.

11:43  2                    But there is no -- there's no suggestion that

11:43  3    he's not here or that he won't be here.  He may not want to be

11:43  4    here, but that should not impact our ability to put on

11:43  5    Mrs. Mingo's case.

11:43  6             THE COURT:  Is he under subpoena?

11:43  7             MR. BIRCHFIELD:  Yes.  He is under subpoena, Your

11:43  8    Honor.

11:43  9             MR. JOHNSON:  You know, the problem is we're ending

11:43 10    today at 4:00.  He's a treating physician, unlike a paid

11:43 11    expert.  Dr. Parisian has made a quarter of a million dollars

11:43 12    to testify.  If she has to testify on Monday, that's part of

11:43 13    the risk that she is involved in as an expert.

11:43 14                    But this treating physician, he schedules

11:43 15    patients.  He's a GI doctor, and he does procedures.  That's

11:44 16    how he makes a living.

11:44 17             THE COURT:  Well, I understand.  I have some say so

11:44 18    the subpoena power, and I'll make sure you have an opportunity

11:44 19    to cross-examine that person, take them under cross, that's

11:44 20    what you're going to do.

11:44 21                    You know, I hate to interrupt each side's case.

11:44 22    It's not fair for me to put the plaintiff's case in your area

11:44 23    or your area in the plaintiff's case without some agreement

11:44 24    between the parties.  He's really your witness.  I'll make sure

11:44 25    that he's here for you.

OFFICIAL REALTIME TRANSCRIPT

| | | |
|---|---|---|
| 11:44 | 1 | **MR. BIRCHFIELD:**  Your Honor, just so we're clear. |
| 11:44 | 2 | We're not objecting to them putting him on today, but just not |
| 11:44 | 3 | before Dr. Parisian is wrapped up.  So if Dr. Parisian is |
| 11:44 | 4 | finished and there's time to put Dr. Keith on the stand and we |
| 11:44 | 5 | have the opportunity to cross him, then we're fine with that. |
| 11:45 | 6 | We're not objecting to that. |
| 11:45 | 7 | What we're objecting to is interrupting |
| 11:45 | 8 | Dr. Parisian's testimony. |
| 11:45 | 9 | **MR. JOHNSON:**  If I could, the only problem is I don't |
| 11:45 | 10 | see how this plays out time-wise.  She's got to do her cross, |
| 11:45 | 11 | and then he's going to want to redirect some.  And what happens |
| 11:45 | 12 | is Dr. Keith goes on the stand at 3:30, and we're shutting down |
| 11:45 | 13 | at 4:00, they're not entitled to cross-examine him.  So you're |
| 11:45 | 14 | not going to let us put him on the stand is what's going to |
| 11:45 | 15 | happen. |
| 11:45 | 16 | **THE COURT:**  Well, let me think about it.  I've got |
| 11:45 | 17 | the whole issue.  Okay. |
| 11:45 | 18 | **MS. PRUITT:**  Sorry, Judge. |
| 11:45 | 19 | **THE COURT:**  That's all right.  We'll take a break. |
| 11:45 | 20 | Let's eat. |
| 11:45 | 21 | **(LUNCHEON RECESS)** |
| 11:45 | 22 | * * * * * |
| 10:39 | 23 | (WHEREUPON, the proceedings were concluded.) |
| | 24 | |
| | 25 | |

OFFICIAL REALTIME TRANSCRIPT

1                          *****

2                      **CERTIFICATE**

3          I, Jodi Simcox, RMR, FCRR, Official Court Reporter

4    for the United States District Court, Eastern District of

5    Louisiana, do hereby certify that the foregoing is a true and

6    correct transcript, to the best of my ability and

7    understanding, from the record of the proceedings in the

8    above-entitled and numbered matter.

9

10

11                            *s/Jodi Simcox, RMR, FCRR*
                             Jodi Simcox, RMR, FCRR
12                           Official Court Reporter

13

14

15

16

17

18

19

20

21

22

23

24

25

OFFICIAL REALTIME TRANSCRIPT