1    UNITED STATES DISTRICT COURT

2    SOUTHERN DISTRICT OF MISSISSIPPI

3

4

5    IN RE:  XARELTO                *
     (RIVAROXABAN) PRODUCTS         *
6    LIABILITY LITIGATION           *
                                    *
7    THIS DOCUMENT RELATES TO:      *    Docket No.: 14-MD-2592
                                    *    Section "L"
8    *Dora Mingo, et al. v.*        *    Jackson, Mississippi
     *Janssen Research &*           *    August 11, 2017
9    *Development, LLC, et. al.,*    *
     Case No.: 15-CV-3469           *
10   * * * * * * * * * * * * * * * *

11              VOLUME V - AFTERNOON SESSION
            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
12         BEFORE THE HONORABLE ELDON E. FALLON
               UNITED STATES DISTRICT JUDGE
13

14   APPEARANCES:

15
     For the Plaintiffs'
16   Liaison Counsel:              Gainsburg Benjamin David
                                     Meunier & Warshauer
17                                 BY:  GERALD E. MEUNIER, ESQ.
                                   2800 Energy Centre
18                                 1100 Poydras Street
                                   New Orleans, Louisiana 70163
19

20
     For the Plaintiffs:          Beasley Allen
21                                BY:  ANDY BIRCHFIELD, ESQ.
                                  P.O. Box 4160
22                                Montgomery, Alabama 36103

23

24

25

OFFICIAL TRANSCRIPT

1    APPEARANCES:

2                                    Gainsburg Benjamin Davis
                                       Meunier & Warshauer
3                                    BY:  WALTER C. MORRISON, IV, ESQ.
                                     240 Trace Colony Park Drive
4                                    Suite 100
                                     Ridgeland, Mississippi 39157

5

6

7                                    Goza Honnold
                                     BY:  BRADLEY D. HONNOLD, ESQ.
                                     11181 Overbrook Road, Suite 200
8                                    Leawood, Kansas 66211

9

10                                   The Lambert Firm
                                     BY:  EMILY JEFFCOTT, ESQ.
                                     701 Magazine Street
11                                   New Orleans, Louisiana 70130

12

13   For the Defendant Bayer
     HealthCare Pharmaceuticals
14   Inc. and Bayer Pharma AG:       Mitchell, Williams, Selig, Gates &
                                       Woodyard, P.L.L.C.
15                                   BY:  LYN P. PRUITT, ESQ.
                                     425 W. Capitol Avenue, Suite 1800
16                                   Little Rock, Arkansas 72201

17

18                                   Watkins & Eager, PLCC
                                     BY:  WALTER T. JOHNSON, ESQ.
19                                   400 East Capitol Street
                                     Jackson, Mississippi 39201

20

21   For Janssen Pharmaceuticals,
     Inc. and Janssen Research &
22   Development, LLC:               Barrasso Usdin Kupperman Freeman &
                                       Sarver, LLC
23                                   BY:  RICHARD E. SARVER, ESQ.
                                     909 Poydras Street, 24th Floor
24                                   New Orleans, Louisiana 70112

25

Official Court Reporter:        Tana J. Hess, CRR, RMR
                                500 Poydras Street
                                Room B275
                                New Orleans, Louisiana 70130
                                (504) 589-7781


Proceedings recorded by mechanical stenography using
computer-aided transcription software.

1  **INDEX OF WITNESSES**

2  <u>NAME</u>                                                    <u>PAGE</u>

3  Suzanne Parisian

4       Cross-Examination by Ms. Pruitt              1144

5       Redirect Examination by Mr. Honnold         1207

6  Anthonie Lensing

7       Direct Examination (Cont'd) by Mr. Overholtz  1220

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1   (Afternoon session.)

12:53PM 2   (Whereupon the following proceedings were held out of

12:53PM 3   the presence and hearing of the jury:)

12:58PM 4   **THE COURT:** Be seated.  Please.  Court is in session.

12:58PM 5   The jury is outside of the courtroom.  May it please the Court,

12:58PM 6   Jerry Meunier for plaintiff.

12:58PM 7   Your Honor, we understand that in the

12:58PM 8   cross-examination of Dr. Parisian, defense counsel does intend

12:58PM 9   to use the -- what we've been calling the strike-through label,

12:58PM 10   and for the record, we'd just like to make an objection.

12:58PM 11   And, Your Honor, we think there's a critical

12:59PM 12   distinction to be made between the authenticity of a document

12:59PM 13   for purposes of prospectively offering it into evidence and

12:59PM 14   whether counsel's characterization of the document signifies a

12:59PM 15   certain fact is permissible or authorized without a proper

12:59PM 16   foundation.

12:59PM 17   **MS. PRUITT:** Your Honor -- I hate to interrupt,

12:59PM 18   Jerry -- I think the doctor should not be in here while we're

12:59PM 19   discussing this.

12:59PM 20   **THE COURT:** I'm sorry?

12:59PM 21   **MS. PRUITT:** Without the witness.

12:59PM 22   **THE WITNESS:** You want me to leave?  All right.  Will

12:59PM 23   do.

12:59PM 24   (Whereupon the witness was excused from the courtroom.)

12:59PM 25   **MR. MEUNIER:** So, Your Honor, with that distinction,

12:59PM 1    you know, you've heard from counsel already that it's

12:59PM 2    self-authenticated.  They've got the certificate to prove it.

12:59PM 3    But that's really not sufficient to allow -- it addresses the

12:59PM 4    first part, which is authentication, but not the critical part,

12:59PM 5    which is whether it can be established or whether a foundation

12:59PM 6    has been made for this statement to either a witness or to

12:59PM 7    anyone in front of this jury that the FDA is the author of the

1:00PM 8    strike-through.

1:00PM 9              If the defendants have a witness who can

1:00PM 10   identify the document and provide competent and reliable

1:00PM 11   testimony that the author of the strike-through is the FDA,

1:00PM 12   then we'll look forward to questioning that witness.  But until

1:00PM 13   that time happens, and since the only relevance, the only

1:00PM 14   relevance of the material is the strike-through by the FDA, we

1:00PM 15   don't believe it's proper to bring that document into play at

1:00PM 16   this point.

1:00PM 17             THE COURT:  I understand your position.

1:00PM 18             MR. MEUNIER:  Thank you, Judge.

1:00PM 19             THE COURT:  Let me hear from the defendants.

1:00PM 20             MS. PRUITT:  Your Honor, this witness has actually

1:00PM 21   acknowledged -- been shown and acknowledged these documents

1:00PM 22   before.  I'm reading from her testimony.

1:00PM 23             "Will you agree that the FDA in June of 2011

1:00PM 24         made changes to Janssen's proposed language at

1:00PM 25         Section 12.2?

```
1:00PM    1              "Yes, sir.

1:00PM    2              "Where the FDA crossed out certain language

1:00PM    3       relating to PT under Section 12.2, do you see that?

1:01PM    4              "Yes, sir.

1:01PM    5              "Now, there's no dispute that the FDA crossed

1:01PM    6       that out; right?

1:01PM    7              "Not now.

1:01PM    8              "And you have -- you have no idea why the FDA

1:01PM    9       struck that language; correct?

1:01PM   10              "No.  It's just a fact, the FDA struck it.

1:01PM   11              "And the FDA would not have struck that language

1:01PM   12       if it didn't have a reason for striking it; right?

1:01PM   13              "Hopefully, yes, sir, that is correct."

1:01PM   14              And we also have an affidavit, Your Honor, from

1:01PM   15       the consumer safety officer which says, "Attached hereto is a

1:01PM   16       true copy of the June 13th, 2011, email communication with

1:01PM   17       attachment from Tyree Newman of the FDA to Andrea Kollath of

1:01PM   18       Janssen with the subject entitled 'NDA 22406 FDA letter

1:01PM   19       review.'"

1:01PM   20              This document consists of 50 pages.  And the

1:01PM   21       email says, "Good morning, Andrea.  Please see the attached

1:01PM   22       redline version of the label regarding NDA 22406 for your

1:01PM   23       review and comments.  Please accept changes you agree to and

1:01PM   24       for changes you do not, keep in track changes.  Please provide

1:02PM   25       your response by Thursday close of business, June 16th, 2011."
```

1:02PM   1          Your Honor, there is -- this is a

1:02PM   2   self-authenticated document.  This witness has seen it in her

1:02PM   3   deposition.  She's commented on it in her deposition.  It's

1:02PM   4   clearly from the FDA back to the company with the

1:02PM   5   strike-throughs or the changes in the label for the company to

1:02PM   6   make a decision about.

1:02PM   7          THE COURT:  Any response?

1:02PM   8          MR. MEUNIER:  Yes, Your Honor.  I'll have to maybe

1:02PM   9   ask -- I can't be more specific, but I'm told that what you

1:02PM  10   were -- just referred to was testimony that was in relationship

1:02PM  11   to a different document and not the strike-through document

1:02PM  12   that counsel now has said is self-authenticated and has been

1:02PM  13   shown to the witness.

1:02PM  14          Whatever this witness was asked to assume about,

1:02PM  15   whether the FDA struck it through or not, it isn't established,

1:02PM  16   and I don't think the email from someone who's not in court

1:02PM  17   establishes who struck that out.  And if you look at the

1:03PM  18   material, Judge, the actual strike-through, the author is not

1:03PM  19   identified.  We're still waiting for a witness to take the

1:03PM  20   stand and say, "The author was the FDA."

1:03PM  21          I think until that happens, it's just

1:03PM  22   prejudicial to suggest in a way that -- as we've told the Court

1:03PM  23   before, I know you've given the jury instructions about the FDA

1:03PM  24   approval and not being relevant -- being relevant but not

1:03PM  25   controlling, but this action by the FDA is being presented in

1:03PM 1    this case as a -- as having preemptive effect.  And it's

1:03PM 2    extremely prejudicial to the plaintiffs when the defense say,

1:03PM 3    "Look, we tried, and the FDA struck it out.  What do you expect

1:03PM 4    us to do?"  That's the argument they make with this, and it's

1:03PM 5    extremely prejudicial without authorship.

1:03PM 6            THE COURT:  I understand the issue.  This is an

1:03PM 7    expert witness, and the expert can be even asked to assume

1:03PM 8    certain things, which is a fair thing to do.  But this

1:03PM 9    situation -- look, to get an authentic document, you don't have

1:04PM 10   to have necessarily the person who writes the document.  You

1:04PM 11   could have the person who receives the document.  You can't ask

1:04PM 12   that person what they -- what was meant by it, but if they

1:04PM 13   receive something from the FDA, that's an authentication under

1:04PM 14   901, which is allowed.

1:04PM 15           Now, how far do you go with that?  What did they

1:04PM 16   mean?  What did they -- why did they do it?  What did they mean

1:04PM 17   by it?  They're not able to answer that question because they

1:04PM 18   didn't write it.  You need somebody from the FDA to answer

1:04PM 19   those questions, but from the standpoint of an authentic

1:04PM 20   document, that passes the rule for authenticity.

1:04PM 21           And in a witness like this, being an expert

1:04PM 22   witness, she can be asked to assume certain things and proved

1:04PM 23   up later for that matter.  It seems to me it's able to be used.

1:05PM 24           I'll overrule the objection and allow it.

1:05PM 25           MR. MEUNIER:  Thank you, Your Honor.

1:05PM 1      THE COURT:  Thank you very much.

1:05PM 2            Look, one thing.  It looks like that of the

1:05PM 3  witnesses, the doctor's witness was able to be -- able to

1:05PM 4  worked out.  The problem is is that it's on Friday.  That's

1:05PM 5  something that I don't know -- I don't know whether this case

1:05PM 6  is going to last that long.

1:05PM 7      MR. JOHNSON:  Your Honor, we'll make a decision

1:05PM 8  before Friday.

1:05PM 9      THE COURT:  All right.  Well, with the help and

1:05PM 10 support of counsel, the witness was able to reschedule or

1:05PM 11 decide that he could reschedule, so I appreciate the work that

1:05PM 12 counsel did.  Okay.

1:05PM 13     MR. MEUNIER:  I'll get the witness, Judge.

1:05PM 14     THE COURT:  Yeah.  You want to get the jury?  Let's

1:05PM 15 get the jury.

1:06PM 16           The plaintiff's making an objection.  Counsel?

1:06PM 17     MR. HONNOLD:  I just said would what transpired

1:06PM 18 suffice for our objection when it actually plays out without

1:06PM 19 having to repeat the objection again.

1:06PM 20           (Whereupon the jury entered the courtroom.)

1:07PM 21     THE COURT:  Okay.  Be seated, please.

1:07PM 22           You're still under oath, ma'am.

1:07PM 23     THE WITNESS:  Yes, Your Honor.

1:07PM 24     MS. PRUITT:  May I proceed?

1:07PM 25     THE COURT:  You may proceed.

|     |     |
| --- | --- |
| 1:07PM | 1 |
| 1:07PM | 2 |
| 1:07PM | 3 |
| 1:07PM | 4 |
| 1:07PM | 5 |
| 1:07PM | 6 |
| 1:07PM | 7 |
| 1:07PM | 8 |
| 1:07PM | 9 |
| 1:07PM | 10 |
| 1:07PM | 11 |
| 1:07PM | 12 |
| 1:07PM | 13 |
| 1:07PM | 14 |
| 1:07PM | 15 |
| 1:07PM | 16 |
| 1:07PM | 17 |
| 1:07PM | 18 |
| 1:07PM | 19 |
| 1:07PM | 20 |
| 1:07PM | 21 |
| 1:07PM | 22 |
| 1:07PM | 23 |
| 1:07PM | 24 |
| 1:07PM | 25 |

            **MS. PRUITT:**  Thank you, Your Honor.

                    **CROSS-EXAMINATION**

                    **BY MS. PRUITT:**

Q.   Dr. Parisian, my name is Lyn Pruitt.  I'm a lawyer from
Little Rock, and I represent Bayer and Janssen in this case.

        I need to talk to you for a few minutes this
afternoon about some things and want to start out by talking
about Ms. Mingo.  Okay?

        You understand that Ms. Mingo was prescribed Xarelto
to treat a deep vein blood clot; correct?

A.   Yes, ma'am.

Q.   And you agree that Xarelto was approved by the FDA as safe
and effective for the treatment of deep vein blood clots;
correct?

A.   Yes, ma'am.

Q.   And you're not here to give any opinion about the cause of
Ms. Mingo's bleed, are you?

A.   That's correct.

Q.   And you haven't looked at any of Ms. Mingo's medical
records, have you?

A.   That's correct.

Q.   You also haven't looked at any of Ms. Mingo's laboratory
test results; right?

A.   That's correct.

Q.   So, for example, you have not analyzed Ms. Mingo's PT test

| | | |
|---|---|---|
| 1:07PM | 1 | results at all, have you? |
| 1:08PM | 2 | A.   That's correct. |
| 1:08PM | 3 | Q.   And you don't know if any of Ms. Mingo's PT test results |
| 1:08PM | 4 | fall in the range that would be expected for a patient taking |
| 1:08PM | 5 | 15 milligrams twice a day; is that right? |
| 1:08PM | 6 | A.   That's correct. |
| 1:08PM | 7 | Q.   And you don't -- so you don't know whether or not those PT |
| 1:08PM | 8 | results for Ms. Mingo show any increased risk for her to bleed; |
| 1:08PM | 9 | right? |
| 1:08PM | 10 | A.   In terms of reviewing records, I mean, I've seen |
| 1:08PM | 11 | demonstratives that there was increase.  But that's correct, |
| 1:08PM | 12 | I'm not her medical person to discuss in her case. |
| 1:08PM | 13 | Q.   Okay.  And you would agree with me that when a person |
| 1:08PM | 14 | takes an anticoagulant, that one of the things the |
| 1:08PM | 15 | anticoagulant -- one of the things it does is prolong the PT |
| 1:08PM | 16 | time; correct? |
| 1:08PM | 17 | A.   Yes, correct. |
| 1:08PM | 18 | Q.   And they all do that; right? |
| 1:08PM | 19 | A.   They're supposed to, yes. |
| 1:08PM | 20 | Q.   I mean, that's their job; right? |
| 1:08PM | 21 | A.   Right. |
| 1:08PM | 22 | Q.   And so when someone is taking and has a therapeutic level |
| 1:08PM | 23 | of an anticoagulant in their blood, you would expect to see a |
| 1:09PM | 24 | higher PT than normal; correct? |
| 1:09PM | 25 | A.   Well, I don't think there's a therapeutic level that's |

1:09PM   1   been developed for Xarelto.  I mean, if you're talking about

1:09PM   2   warfarin or other anticoagulants, there are therapeutic levels.

1:09PM   3   There is no recommendation as to a therapeutic level for

1:09PM   4   Xarelto in the label.

1:09PM   5   Q.   But there have been studies and data gathered on what the

1:09PM   6   PT values are in these studies for Xarelto that you've been

1:09PM   7   describing; right?

1:09PM   8   A.   Yes, there have been PTs.  Yes, ma'am.

1:09PM   9   Q.   And so they have looked at what you might expect to see,

1:09PM   10   what the range that you might expect to see would be if

1:09PM   11   someone's taking 20 milligrams once a day or 15 milligrams

1:09PM   12   twice a day.  They've looked at that, haven't they?

1:09PM   13   A.   There has been PT information, but there has been no

1:09PM   14   therapeutic range.  So there's no information for a physician

1:09PM   15   as to what would be an acceptable therapeutic range.

1:09PM   16   Q.   So you've never seen any information -- just so we're

1:09PM   17   clear, you've not seen any information where PT is looked at

1:09PM   18   for someone being treated for a DVT to see where the quartile

1:10PM   19   is, Quartile 1, 2, 3, and 4?  Have you seen that?

1:10PM   20   A.   Well, that's different.  I've looked at information on

1:10PM   21   quartiles, particularly for RECORD.  I don't think EINSTEIN for

1:10PM   22   their Phase III actually had a breakdown that way.  There has

1:10PM   23   been information about PT levels, but nothing about a

1:10PM   24   therapeutic range.

1:10PM   25   Q.   So in your review of the records that you've looked at,

1:10PM  1    you have not seen for EINSTEIN the quartile data; would that be

1:10PM  2    correct?

1:10PM  3    A.    Yes.

1:10PM  4    Q.    Thank you.

1:10PM  5              Now, the last time that you prescribed a drug to a

1:10PM  6    patient in a clinical setting was in the late 1980s, wasn't it?

1:10PM  7    A.    That was the last time I was in clinical practice, yes,

1:10PM  8    ma'am.  I still prescribe.  I still prescribe it.  I think

1:10PM  9    that's what you mean.  As a clinician taking care of patients;

1:10PM  10   correct?

1:10PM  11   Q.    That's what I mean.  So the last time you did that as a

1:10PM  12   clinician taking care of patients was in the 1980s; right?

1:10PM  13   A.    Yes, ma'am.

1:10PM  14   Q.    And you've never prescribed Xarelto, have you?

1:11PM  15   A.    That is correct.

1:11PM  16   Q.    In fact, you've never prescribed any NOAC or DOAC because

1:11PM  17   they weren't around when you were prescribing medicines, were

1:11PM  18   they?

1:11PM  19   A.    That's correct.  We had warfarin and heparin.

1:11PM  20   Q.    And so, as a physician, you yourself don't have any

1:11PM  21   personal knowledge or real-world physician experience -- and by

1:11PM  22   that I mean clinical experience -- with Xarelto treating

1:11PM  23   patients, do you?

1:11PM  24   A.    Correct.

1:11PM  25   Q.    Your only experience with NOACs or DOACs like Xarelto is

1:11PM  1  from being an expert for the plaintiffs in this litigation,

1:11PM  2  isn't it?

1:11PM  3  A.   Yes.  In terms of researching and going through all the

1:11PM  4  documents, yes, ma'am.

1:11PM  5  Q.   Now, we can agree, Dr. Parisian, that blood clots are a

1:11PM  6  bad thing, can't we?

1:11PM  7  A.   Yes, ma'am.

1:11PM  8  Q.   And that -- does it sound about right to you that 60,000

1:11PM  9  to 100,000 people in the United States die each year from a

1:11PM  10  deep vein clot or a pulmonary embolism?

1:12PM  11  A.   I wouldn't know, but that sounds like it could be correct.

1:12PM  12  Q.   Okay.  And did you understand that about half of the

1:12PM  13  people who have a deep vein clot will have long-term

1:12PM  14  complications?

1:12PM  15  A.   Half of them, yes, ma'am.

1:12PM  16  Q.   Okay.  And a third of the people who have a deep vein

1:12PM  17  blood clot or a pulmonary embolism will have a reoccurrence?

1:12PM  18  A.   Right.  They're at risk.  Something triggered it in the

1:12PM  19  first place.  They're at risk.

1:12PM  20  Q.   And it's true, after someone develops a clot, that they're

1:12PM  21  at an even higher risk to develop another clot as a result; is

1:12PM  22  that right?

1:12PM  23  A.   That's what I just said, yes, ma'am.

1:12PM  24  Q.   You would agree that both doctors and patients are doing

1:12PM  25  their best and would like to try to avoid these blood clots;

1:12PM   1   right?

1:12PM   2   A.   Yes.

1:12PM   3   Q.   And that they would like to avoid a patient from having

1:12PM   4   clot that turns into a pulmonary embolism; right?

1:12PM   5   A.   Definitely.

1:12PM   6   Q.   And so the medicines that are used to treat this are the

1:13PM   7   anticoagulants; correct?

1:13PM   8   A.   Yes, ma'am.

1:13PM   9   Q.   And for years, the only one available was warfarin; is

1:13PM  10   that right?

1:13PM  11   A.   For years, yes, ma'am, that's the primary one.  There's

1:13PM  12   been modifications since then, but warfarin is the primary one.

1:13PM  13   Q.   And after warfarin, there came along some modifications.

1:13PM  14   And there was heparin; right?

1:13PM  15   A.   Right, low-molecular-weight heparin.  So they've done

1:13PM  16   things to change the heparin, yes, ma'am.

1:13PM  17   Q.   Okay.  And Lovenox is one of those low-molecular-weight

1:13PM  18   heparins; right?

1:13PM  19   A.   Yes, ma'am.

1:13PM  20   Q.   Now, you know that deep vein clots are a known risk and

1:13PM  21   complication following a hip replacement surgery; correct?

1:13PM  22   A.   Well, anytime you're immobilized -- that would be a hip

1:13PM  23   surgery, you riding on a plane for a long time.  So it's being

1:13PM  24   immobilized that creates the potential risk.

1:13PM  25   Q.   And so sometimes, too, a risk is created when you have a

1150

1:13PM  1   hip replacement surgery or some type of trauma or something,
1:13PM  2   having a surgery, that can also contribute to a clot, can't it?
1:13PM  3   A.   It can increase your risk because it's stasis.   Anything
1:14PM  4   that causes stasis.
1:14PM  5   Q.   Would you agree with me, Dr. Parisian, that a patient is
1:14PM  6   at the greatest risk for developing a deep vein clot during the
1:14PM  7   first few weeks after they've had a hip replacement surgery?
1:14PM  8   A.   Yes.   But usually they're treated by different things in
1:14PM  9   the hospital now.   So, I mean, that would be true.   But usually
1:14PM  10  they have on like stockings, and they have things that they're
1:14PM  11  doing.   So that's something that's commonly tried to prevent it
1:14PM  12  in terms of most surgery.
1:14PM  13  Q.   Right.
1:14PM  14  A.   So I think that's kind of reducing some of the risk.
1:14PM  15  Q.   Okay.   But the truth of the matter is the reason they're
1:14PM  16  treated with all those things is because they're at a high risk
1:14PM  17  to develop a clot in the first few weeks after a surgery;
1:14PM  18  right?
1:14PM  19  A.   Well, anytime you're going to be immobile, yes, you're at
1:14PM  20  increased risk.
1:14PM  21  Q.   And that's particularly true with either a hip or a knee
1:14PM  22  replacement surgery, isn't it, because of the place -- the
1:14PM  23  location where they're working?
1:14PM  24  A.   I don't know.   I mean, it is a risk of that surgery.   But
1:15PM  25  it's a risk with any type of being immobile, any kind of

1:15PM    1    surgery, any -- but that would be one risk for those types of

1:15PM    2    procedures.  But any type of immobility -- surgery is a risk.

1:15PM    3    Q.   Yeah.  And it's like -- I mean, if you flew a long way --

1:15PM    4    had a really long flight to China or somewhere like that and

1:15PM    5    you're immobile for a long time, that increases your risk;

1:15PM    6    right?

1:15PM    7    A.   Or you write a 400-page report, you're at risk of being

1:15PM    8    immobile.

1:15PM    9    Q.   I can imagine.  The only time I've seen that many

1:15PM   10    documents I think was when I was studying for the bar exam, and

1:15PM   11    that was a long time ago.

1:15PM   12          Now, if you have a deep vein clot, it can get bigger;

1:15PM   13    right?

1:15PM   14    A.   Yes.  It can break off.  That's the bigger risk.

1:15PM   15    Q.   And it can break off.  That's the next question I was

1:15PM   16    going to ask you.

1:15PM   17          If it breaks off, it can travel; right?

1:15PM   18    A.   That's right.

1:15PM   19    Q.   And it can go to your lungs; correct?

1:15PM   20    A.   Yes.

1:15PM   21    Q.   And 25 percent of people that have a pulmonary embolism

1:15PM   22    die.  Did you know that?

1:15PM   23    A.   Well, you don't die just from a pulmonary -- it's where it

1:15PM   24    goes and what it's blocking off.

1:16PM   25    Q.   Right.  But if it travels and goes to the lungs,

1152

1:16PM   1    25 percent of those people can -- their first symptom would be

1:16PM   2    death.

1:16PM   3              Did you understand that?

1:16PM   4    A.   Only 25 percent of them.  So of those patients who get a

1:16PM   5    PE, 25 percent will be symptomatic.  Saddle embolus is really

1:16PM   6    the worst kind.  It will kill you immediately.

1:16PM   7    Q.   Okay.  Now, you understand that there's a difference,

1:16PM   8    Dr. Parisian, in a treatment dose and a preventive dose, just

1:16PM   9    in general; correct?

1:16PM   10   A.   Right.  Because you have a clot with a treatment dose.

1:16PM   11   Q.   Okay.  And so when you already have a clot, it would be

1:16PM   12   important to use the treatment dose as opposed to a dose that's

1:16PM   13   just designed to prevent a clot; right?

1:16PM   14   A.   Right.  Because you're treating a condition already

1:16PM   15   that's -- you've gotten a clot.

1:16PM   16   Q.   And you know and agree with me that Xarelto is effective

1:16PM   17   in treating deep vein blood clots and pulmonary embolisms,

1:16PM   18   isn't it?

1:16PM   19   A.   It's been cleared as that.  It's been approved as that.

1:17PM   20   Q.   And it's effective?

1:17PM   21   A.   Based on joint efficacy, yes, ma'am.

1:17PM   22   Q.   And it's been proven to continue to be effective in the

1:17PM   23   real-world studies that you've discussed with the jury?

1:17PM   24   A.   It has had -- yes, it has.

1:17PM   25   Q.   Thank you.

*OFFICIAL TRANSCRIPT*

1:17PM   1    **A.**    Yeah.

1:17PM   2    **Q.**    Now, you would agree with me, Dr. Parisian, that -- as we

1:17PM   3    discussed earlier, that Xarelto is approved by the FDA as safe

1:17PM   4    and effective for the treatment of deep vein blood clots;

1:17PM   5    right?

1:17PM   6    **A.**    Yes, ma'am.

1:17PM   7    **Q.**    And we can also agree that the FDA approved Xarelto as

1:17PM   8    safe and effective based on the EINSTEIN study; right?

1:17PM   9    **A.**    Right.    If FDA approves it, they're always going to say

1:17PM  10    it's safe and effective.    That's just the boilerplate.    And

1:17PM  11    they did use the EINSTEIN studies as the Phase III for support

1:17PM  12    of the NDA supplement, yes, ma'am.

1:17PM  13    **Q.**    And in your report, you're not criticizing the EINSTEIN

1:17PM  14    study, are you?

1:17PM  15    **A.**    In my report?    I'm talking about some of the weaknesses of

1:18PM  16    the EINSTEIN study, like some of the questions from the

1:18PM  17    European Union asking about if they were actually monitoring

1:18PM  18    hemoglobin and hematocrit and in terms of GI bleeding risk.

1:18PM  19             So there are some criticisms about the EINSTEIN study

1:18PM  20    in my report.

1:18PM  21    **Q.**    You don't really have any opinions about the EINSTEIN

1:18PM  22    study, do you?

1:18PM  23    **A.**    The opinions -- if you look at the opinion section, that's

1:18PM  24    correct.    But if you look at my report, I actually do talk

1:18PM  25    about the EINSTEIN study, particularly the European Union's

1:18PM  1    involvement with it.

1:18PM  2    **Q.**   Okay.  Let's take a look.  I put up there for you a

1:18PM  3    notebook that says "Testimony".  It's the black one right

1:18PM  4    there.

1:18PM  5    **A.**   Uh-huh.

1:18PM  6    **Q.**   If you could turn behind Tab 2, please, ma'am?

1:18PM  7    **A.**   Yes, ma'am.

1:18PM  8    **Q.**   And look to page 734, if you would, please.

1:18PM  9    **A.**   Yes, ma'am.  Okay.  734.  Yes, ma'am.

1:18PM  10   **Q.**   Just let me know when you're there.

1:18PM  11   **A.**   Okay.

1:18PM  12   **Q.**   And if you'd look for me --

1:19PM  13           Can I get the ELMO?

1:19PM  14           If you'd look for me down at line 15.  You answered

1:19PM  15   this question and said, "It's not like I'm critiquing the

1:19PM  16   EINSTEIN.  I don't really have any opinions about the

1:19PM  17   EINSTEIN."

1:19PM  18           Is that correct?

1:19PM  19   **A.**   Yes, ma'am.  But this was at my deposition.  This was a

1:19PM  20   specific question that I was responding to.  It wasn't my

1:19PM  21   report.  That's what you asked me about, my report.

1:19PM  22   **Q.**   And so let me ask it again.  You don't really have any

1:19PM  23   opinions about the EINSTEIN, do you, ma'am?

1:19PM  24   **A.**   Well, in terms of what I was saying here, in this they're

1:19PM  25   asking me specifically -- the question is about the EMA's --

*OFFICIAL TRANSCRIPT*

1:19PM   1   the European Union's conclusion using the EINSTEIN study.

1:19PM   2           So it's very specific about what the EINSTEIN study

1:19PM   3   was doing in terms of Europeans.  And so I'm saying I'm not

1:20PM   4   critiquing the EINSTEIN in terms of European Union, but there

1:20PM   5   is a reference in my report about EINSTEIN.  So I'm answering a

1:20PM   6   specific question.

1:20PM   7   Q.   And you answered that specific question at line 16 and 17

1:20PM   8   by saying, "I don't really have any opinions about the

1:20PM   9   EINSTEIN."

1:20PM  10           Did I read it correctly?

1:20PM  11   A.   Yes, you did, but in the context of where it's given,

1:20PM  12   which was the European Union.

1:20PM  13   Q.   Now, let's change topics for just a moment, Dr. Parisian,

1:20PM  14   and talk about your works that you did at the FDA.

1:20PM  15   A.   Yes, ma'am.

1:20PM  16   Q.   You can keep that handy, just in case.

1:20PM  17   A.   Okay.  I'm sure I'll be seeing it.

1:20PM  18   Q.   You were at the FDA for just four years, weren't you,

1:20PM  19   ma'am?  From 1991 to 1995?

1:20PM  20   A.   Yes, ma'am.

1:20PM  21   Q.   So you left the FDA in 1995; didn't you?

1:20PM  22   A.   Yes, ma'am.

1:20PM  23   Q.   And that was obviously more than 20 years ago?

1:20PM  24   A.   Yes, ma'am.

1:20PM  25   Q.   And you are not here speaking on behalf of the FDA, are

1156

1:20PM   1   you?

1:20PM   2   **A.**   That is correct.

1:20PM   3   **Q.**   And you agree that when you were at the FDA, you worked

1:21PM   4   almost exclusively with medical devices, not prescription

1:21PM   5   drugs?

1:21PM   6   **A.**   That's correct.

1:21PM   7   **Q.**   Now, when you left the FDA in 1995, you started your own

1:21PM   8   consulting company, didn't you?

1:21PM   9   **A.**   Yes, ma'am.

1:21PM   10   **Q.**   And that company was originally called Medical Device

1:21PM   11   Assistance, I believe you said?

1:21PM   12   **A.**   Yes.  I said that this morning.

1:21PM   13   **Q.**   And you were consulting about medical devices, weren't

1:21PM   14   you?

1:21PM   15   **A.**   Yes, ma'am.

1:21PM   16   **Q.**   And then in 1997, you went into the expert witness

1:21PM   17   business working for lawyers and testifying, didn't you?

1:21PM   18   **A.**   I was asked to consult on a litigation.  Little did I know

1:21PM   19   it would lead this, but yes, ma'am.

1:21PM   20   **Q.**   Okay.  And that was in 1997?

1:21PM   21   **A.**   Yes, ma'am.

1:21PM   22   **Q.**   Okay.  Now, you have testified for plaintiffs,

1:21PM   23   Dr. Parisian, in cases involving a variety of products; is that

1:21PM   24   right?

1:21PM   25   **A.**   Yes, ma'am.

*OFFICIAL TRANSCRIPT*

|       |    |                                                             |
|-------|----|-------------------------------------------------------------|
| 1:21PM | 1  | **Q.**   And that would include pacemakers?                |
| 1:21PM | 2  | **A.**   Yes, ma'am.                                       |
| 1:21PM | 3  | **Q.**   Correct?                                          |
| 1:21PM | 4  | **A.**   All about the FDA.  Yes, ma'am.                   |
| 1:21PM | 5  | **Q.**   Pain pumps?                                       |
| 1:21PM | 6  | **A.**   Yes, ma'am.                                       |
| 1:21PM | 7  | **Q.**   Flu vaccine?                                      |
| 1:21PM | 8  | **A.**   Yes, ma'am.                                       |
| 1:21PM | 9  | **Q.**   Orthopedic products?                              |
| 1:21PM | 10 | **A.**   Yes, ma'am.                                       |
| 1:21PM | 11 | **Q.**   Facelift laser used in plastic surgery?          |
| 1:22PM | 12 | **A.**   Yes, ma'am.                                       |
| 1:22PM | 13 | **Q.**   Lasers used for prostate surgery?                |
| 1:22PM | 14 | **A.**   Yes, ma'am.                                       |
| 1:22PM | 15 | **Q.**   Robotic surgery devices?                         |
| 1:22PM | 16 | **A.**   Right.  And again, it's all how it got on the market with |
| 1:22PM | 17 | the FDA.                                                   |
| 1:22PM | 18 | **Q.**   Now I want to talk to you a moment about your work with |
| 1:22PM | 19 | lawyers.                                                   |
| 1:22PM | 20 |          Starting in 2009, you've worked exclusively with |
| 1:22PM | 21 | lawyers; right?                                            |
| 1:22PM | 22 | **A.**   Yes.  I was hoping to retire.                     |
| 1:22PM | 23 | **Q.**   In fact, since 2009, you've worked not only exclusively |
| 1:22PM | 24 | for lawyers, but exclusively for plaintiffs' lawyers; correct? |
| 1:22PM | 25 | **A.**   Yes, ma'am.  I was trying to finish up some of my cases. |

*OFFICIAL TRANSCRIPT*

1:22PM   1   Yes, ma'am.

1:22PM   2   **Q.**   Okay.  And all of your work for plaintiff's lawyers since

1:22PM   3   2009 is on litigation; correct?

1:22PM   4   **A.**   It somehow evolved into litigation support, again the FDA

1:22PM   5   role.

1:22PM   6   **Q.**   Now, in the year -- so in the year 2009, Dr. Parisian,

1:22PM   7   your income testifying for plaintiffs' lawyers in litigation in

1:22PM   8   2009 was -- make sure I get that right -- $800,000, wasn't it,

1:23PM   9   ma'am?

1:23PM   10   **A.**   Yes, ma'am.  I've given you all the numbers.

1:23PM   11   **Q.**   And then in 2010, your income for testifying for

1:23PM   12   plaintiff's lawyers was $900,000; correct?

1:23PM   13   **A.**   Right.  It's not really from testifying.  It's all the

1:23PM   14   work to create reports and do depositions and then testify.

1:23PM   15   **Q.**   I understand.

1:23PM   16   **A.**   Well, the jury doesn't know.

1:23PM   17   **Q.**   I think you said it this morning.  That's how I

1:23PM   18   understood.

1:23PM   19   **A.**   Well, you know what I do.

1:23PM   20   **Q.**   So do they.  And then in 2011 you made approximately

1:23PM   21   $800,000; right?

1:23PM   22   **A.**   Yes, ma'am.  And that's the business.  The company brings

1:23PM   23   that in.  I don't get to keep all of that.

1:23PM   24   **Q.**   And then from 2012 to 2015, each of those years, you made

1:23PM   25   approximately $800,000 each of those years; is that right?

*OFFICIAL TRANSCRIPT*

1:23PM   1   **A.**   Right.  That's an hourly rate.

1:24PM   2   **Q.**   And then last year in 2016, you made approximately

1:24PM   3   $700,000; correct?

1:24PM   4   **A.**   Yes, ma'am.  Again, it's the company, not me.

1:24PM   5   **Q.**   We'll talk about that in a minute.

1:24PM   6   **A.**   I know.

1:24PM   7   **Q.**   So if my math is correct, over the -- since 2009, you've

1:24PM   8   made $6,400,000 testifying in cases that you're working on with

1:24PM   9   plaintiffs' lawyers; is that right?

1:24PM  10   **A.**   Well, all the work that goes into testifying, yes, ma'am.

1:24PM  11   **Q.**   Now, this company that you referred to is just you and

1:25PM  12   your husband, isn't it, ma'am?

1:25PM  13   **A.**   Yes, ma'am.

1:25PM  14   **Q.**   And your husband keeps up with your billings and

1:25PM  15   collections; right?

1:25PM  16   **A.**   Right.  But he is now not an employee, since last June.

1:25PM  17   **Q.**   So you're the only employee?

1:25PM  18   **A.**   Yeah.  He's officially retired.

1:25PM  19   **Q.**   So it was just you and your husband before then, and it's

1:25PM  20   now just you?

1:25PM  21   **A.**   Yes, ma'am.

1:25PM  22   **Q.**   And you're the only person that had -- over the course of

1:25PM  23   these years actually did the consulting with lawyers and wrote

1:25PM  24   reports and testified; right?

1:25PM  25   **A.**   That's right.  He doesn't write reports.

*OFFICIAL TRANSCRIPT*

1160

1:25PM 1    Q.   Now, let's talk about your work in this case.  You charge

1:25PM 2    I think you said this morning $500 an hour for reviewing

1:25PM 3    documents and writing the report and preparing to testify;

1:25PM 4    right?

1:25PM 5    A.   That's right.

1:25PM 6    Q.   You charge about $1,000 an hour for testifying or being in

1:25PM 7    a deposition; right?

1:25PM 8    A.   Right, for leaving my office.

1:25PM 9    Q.   Now, I noticed when we were here last week -- oh, that was

1:25PM 10   this week.

1:25PM 11   A.   It was Monday.

1:25PM 12   Q.   It's been a long week.  You were here for opening

1:26PM 13   statement.  I saw you back in the audience.

1:26PM 14   A.   Yes, ma'am.

1:26PM 15   Q.   And -- so have you been here all week?

1:26PM 16   A.   Yes, ma'am.

1:26PM 17   Q.   And so when you are here all week, are you working at

1:26PM 18   $1,000 an hour, like 8 hours a day?

1:26PM 19   A.   No, no.

1:26PM 20   Q.   Okay.

1:26PM 21   A.   I'm really an hourly rate if I'm working on -- I only

1:26PM 22   charge if I'm working on something.

1:26PM 23   Q.   So were you working on things this week to get ready for

1:26PM 24   this case?

1:26PM 25   A.   Yes, ma'am.

1:26PM  1   **Q.**   And so how many hours a day would you have been working on

1:26PM  2   things?

1:26PM  3   **A.**   I don't know.  About maybe three, four.

1:26PM  4   **Q.**   And somebody is paying your expenses to stay in the hotel;

1:26PM  5   right?

1:26PM  6   **A.**   Yes, ma'am.

1:26PM  7   **Q.**   Okay.  And they paid you to fly out; correct?

1:26PM  8   **A.**   Yes, ma'am.

1:26PM  9   **Q.**   And I've forgotten where you live.

1:26PM  10  **A.**   Live in Phoenix, Arizona.

1:26PM  11  **Q.**   That's right.  I heard you say that this morning.  I

1:26PM  12  apologize.

1:26PM  13         So do you know how many hours this week that you

1:26PM  14  spent --

1:26PM  15  **A.**   No, ma'am.

1:26PM  16  **Q.**   -- working on this case?  And waiting over here to

1:26PM  17  testify, you were charging $1,000 an hour; right?

1:26PM  18  **A.**   Well, I just charge per the day.

1:26PM  19  **Q.**   How will you charge per the day?

1:26PM  20  **A.**   I will charge seven hours for the day.

1:27PM  21  **Q.**   Okay.  So for the day, if you have to wait around and

1:27PM  22  everything, you charge $7,000 a day?

1:27PM  23  **A.**   Right.  I'd rather be in my office.

1:27PM  24  **Q.**   Now, for this case, this particular case, I think I heard

1:27PM  25  you give the exact number as $237,000.20; right?

*OFFICIAL TRANSCRIPT*

1162

1:27PM   1   A.   Something like that, yes, ma'am.  It's 400 and I think 50

1:27PM   2   hours that I've worked on the case.

1:27PM   3   Q.   Now, I want to talk to you a little bit about your

1:27PM   4   experience testifying.  Since 1997, you've traveled all over

1:27PM   5   the country testifying in cases; right?

1:27PM   6   A.   I haven't.  My documents have.  They've been filed all

1:27PM   7   over the country, yes, ma'am.

1:27PM   8   Q.   Okay.  And I won't burden the jury with this, but if I

1:27PM   9   were to list out all the states where you've been involved in

1:27PM  10   cases, it would be a list of 41 different states; correct?

1:27PM  11   A.   I will accept that.

1:27PM  12   Q.   And you've also been involved in cases in Puerto Rico and

1:27PM  13   the District of Columbia; correct?

1:27PM  14   A.   Yes, ma'am.

1:27PM  15   Q.   And I think you said that you've given testimony in a

1:28PM  16   deposition about 230 times, haven't you, ma'am?

1:28PM  17   A.   To be exact, it's 235.

1:28PM  18   Q.   235.  And you've testified in court, like you are here

1:28PM  19   today, about 90 times; right?

1:28PM  20   A.   Yes, ma'am.  This is 20 years.

1:28PM  21   Q.   Okay.  Now, in the pharmaceutical drug cases where you

1:28PM  22   have come into court --

1:28PM  23   A.   Uh-huh.

1:28PM  24   Q.   -- and testified for plaintiffs -- you've done that;

1:28PM  25   right?

*OFFICIAL TRANSCRIPT*

1:28PM  1   **A.**   Yes, ma'am.

1:28PM  2   **Q.**   In a number of cases?

1:28PM  3   **A.**   Yes, ma'am.

1:28PM  4   **Q.**   And with respect to those cases, those pharmaceutical drug

1:28PM  5   cases, you've never testified for the drug manufacturer, have

1:28PM  6   you?

1:28PM  7   **A.**   Not in the cases that have gone to court, that's correct.

1:28PM  8   **Q.**   You primarily testify for plaintiffs against drug and

1:28PM  9   device manufacturers in cases like this one; isn't that right?

1:28PM  10  **A.**   Yes, ma'am.  Those are the ones I've selected.

1:28PM  11  **Q.**   And, in fact, you have testified for the plaintiffs in

1:28PM  12  personal injury litigation against 45 different drug and

1:28PM  13  medical device manufacturers; haven't you?

1:28PM  14  **A.**   At least, yes, ma'am, in 20 years.

1:29PM  15  **Q.**   And in all the pharmaceutical drug cases where you have

1:29PM  16  testified and given an opinion about the drug's labeling,

1:29PM  17  you've always testified that the label is inadequate; isn't

1:29PM  18  that right?

1:29PM  19  **A.**   When the label is the issue, yes, ma'am.

1:29PM  20  **Q.**   And the label -- they contact you because of your FDA

1:29PM  21  experience, so you're often talking about the label; correct?

1:29PM  22  **A.**   Right.  But I talk also to defense attorneys, and I've

1:29PM  23  said the label's been acceptable.

1:29PM  24  **Q.**   Now, let's talk a little bit more about the FDA.  Nothing

1:29PM  25  you said this morning -- you didn't mean to imply to the ladies

*OFFICIAL TRANSCRIPT*

1164

1:29PM   1    and gentlemen of the jury that the FDA does a bad job and they

1:29PM   2    don't know what they're doing, did you?

1:29PM   3    A.    No, I did not mean to.  They do a good job.  They're

1:29PM   4    trying the best they can do.

1:29PM   5    Q.    Because the FDA is the federal public health agency

1:29PM   6    charged by Congress with the responsibility for protecting the

1:29PM   7    public health by assuring the safety and effectiveness of all

1:29PM   8    drugs, isn't it?

1:29PM   9    A.    Yes, ma'am.

1:29PM   10   Q.    And the job of the Center for Drug Evaluation and Research

1:30PM   11   that you referred to is to perform the essential public health

1:30PM   12   task of making sure that safe and effective drugs are available

1:30PM   13   to take here, people in this country; right?

1:30PM   14   A.    Right.  They're the gatekeeper for the drugs being on the

1:30PM   15   market.  That's their role.

1:30PM   16   Q.    And FDA has the final drug approval authority; correct?

1:30PM   17   A.    Yes, ma'am, for a new drug particularly that's not

1:30PM   18   marketed.  Once it's marketed, that authority kind of goes down

1:30PM   19   because they're marketing the drug.

1:30PM   20   Q.    And the reason why the FDA has the power and the

1:30PM   21   obligation to approve a new drug is to ensure that all the

1:30PM   22   drugs out there are safe and effective; right?

1:30PM   23   A.    Within what they're allowed to do, yes, ma'am, in terms of

1:30PM   24   their authority.

1:30PM   25   Q.    And if they made a determination that a drug wasn't safe

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 1:30PM | 1 | and effective, they have the authority to ask the manufacturer |
| 1:30PM | 2 | to withdraw that product from the market, don't they? |
| 1:30PM | 3 | A.    Yes.  But all the burden falls on the FDA to prove that. |
| 1:30PM | 4 | Q.    But they don't? |
| 1:30PM | 5 | A.    No, they don't do it very often.  It's usually |
| 1:31PM | 6 | manufacturers voluntarily withdraw products from the market. |
| 1:31PM | 7 | The FDA rarely has done it. |
| 1:31PM | 8 | Q.    But they have the authority to? |
| 1:31PM | 9 | A.    They have the authority, but they rarely use it because of |
| 1:31PM | 10 | the cost to the FDA of trying to take on litigation to prove |
| 1:31PM | 11 | that a product is not safe. |
| 1:31PM | 12 | Q.    I just -- I thought I just heard something on the news |
| 1:31PM | 13 | locally where they were pulling something off the market. |
| 1:31PM | 14 | THE COURT:  Was that a question or just -- |
| 1:31PM | 15 | BY MS. PRUITT: |
| 1:31PM | 16 | Q.    No.  A New Drug Application, in general terms, is the |
| 1:31PM | 17 | application the drug manufacturer submits to the FDA to seek |
| 1:31PM | 18 | approval of a new drug, isn't it? |
| 1:31PM | 19 | A.    I didn't get all that question. |
| 1:31PM | 20 | Q.    A New Drug Application, which you described for the jury |
| 1:31PM | 21 | as an NDA, is the application the drug manufacturer submits to |
| 1:31PM | 22 | the FDA to seek approval of a new drug, isn't it? |
| 1:31PM | 23 | A.    Yes, ma'am. |
| 1:31PM | 24 | Q.    And you agree that if the FDA finds a drug is not safe and |
| 1:31PM | 25 | effective, that they are not supposed to approve it, are they? |

1:32PM   1   A.   Theoretically, they're not supposed to approve it.

1:32PM   2   Q.   Okay.  And the law requires the FDA to deny approval of a

1:32PM   3   new drug if, after evaluating the label, the FDA finds that the

1:32PM   4   labeling is false or misleading in any way, doesn't it?

1:32PM   5   A.   In terms of their review, yes, ma'am.  They're supposed to

1:32PM   6   look and make sure that it's an accurate label and reflects

1:32PM   7   what they considered.

1:32PM   8   Q.   And that's a statute at 21 CFR 355 that requires -- I'm

1:32PM   9   sorry -- 21 USC 355 that requires them if they make a finding

1:32PM   10  based on a fair evaluation of all material facts that the

1:32PM   11  labeling is false or misleading, then they don't approve the

1:32PM   12  drug; correct?

1:32PM   13  A.   That's what that states, yes, ma'am.

1:32PM   14  Q.   In fact, sitting here today, Dr. Parisian, you're not

1:32PM   15  second-guessing approval decisions of the Food and Drug

1:32PM   16  Administration, are you?

1:32PM   17  A.   NO.  Plus each company certifies to the FDA that the

1:33PM   18  information they're giving to them is truthful and accurate and

1:33PM   19  it's not false and misleading, under -- every form they submit

1:33PM   20  to the FDA, they have to certify that.  So the FDA would rely

1:33PM   21  on the manufacturer to provide them accurate information.

1:33PM   22  Q.   Okay.  Now, the FDA weighed the benefits and risks of

1:33PM   23  Xarelto before the initial approval in 2011 and has continued

1:33PM   24  throughout this five years, hasn't it?

1:33PM   25  A.   To --

1167

**Q.** To the label -- that was a bad question.  I apologize.

**A.** Thank you.

**Q.** The FDA weighed the benefits and potential risks of Xarelto before the initial approval in 2011; right?

**A.** Yes, ma'am.

**Q.** And they've continued to look at changes in the label since 2011; is that correct?

**A.** For various changes in the indications.  There's not really been any changes in indications, but there have been changes to the label.

**Q.** And they have made -- there have been changes made to the label, and they've looked at it about 14 times since 2011; is that correct?

**A.** Right.  And some of those were manufacturing changes, changes to the site.  So they're not all changes of an indication.  But they have looked at it, and they've approved the labels that the company submitted, but not for safety information or indication.

**Q.** And that's my question.  It's a little simpler than what you're answering.  The FDA has received the label, again 14 times for whatever reason, and reviewed the label 14 times since 2011; correct?

**A.** Based on what they're requesting.  Whatever the company is requesting is what the FDA reviews.

**Q.** And you don't disagree, Dr. Parisian, with the FDA's

1:34PM    1    assessment throughout that time period that the benefits of

1:34PM    2    Xarelto outweighed the risk for the approved indications, do

1:34PM    3    you, ma'am?

1:34PM    4    **A.**    I'm not -- no, I'm not second-guessing the FDA in terms of

1:34PM    5    the use of drug.

1:34PM    6    **Q.**    Now, I think I heard you tell the jury this morning that

1:34PM    7    the Xarelto label should have included language that PT can be

1:35PM    8    helpful in assessing the risk of bleeding in patients on

1:35PM    9    Xarelto; correct?

1:35PM   10    **A.**    Yes.  Neoplastin PT.

1:35PM   11    **Q.**    Okay.  And you also agree -- let's just go to the broad

1:35PM   12    general category.  You agree that the FDA's approval of a drug

1:35PM   13    does not mean that the drug has no risk, does it?

1:35PM   14    **A.**    That's correct.

1:35PM   15    **Q.**    Because all medicine -- all medicines have risk, don't

1:35PM   16    they?

1:35PM   17    **A.**    Right.  And as we talked about, that's part of their

1:35PM   18    postmarket role is to monitor the drug, update their label,

1:35PM   19    make sure it stays safe.

1:35PM   20    **Q.**    And, for example, all anticoagulants have a risk of

1:35PM   21    bleeding, don't they?

1:35PM   22    **A.**    That's right.

1:35PM   23    **Q.**    And so when the FDA approves a drug as safe and effective,

1:35PM   24    that doesn't mean there are no risks involved with taking a

1:35PM   25    drug for individuals; correct?

1:35PM    1    **A.**   Well, you have a risk of bleeding.

1:35PM    2    **Q.**   Right.  That's what I was saying.  That doesn't mean you

1:35PM    3    don't have a risk because you're taking an anticoagulant, does

1:35PM    4    it?

1:35PM    5    **A.**   No.

1:36PM    6    **Q.**   Now, when the FDA approves a New Drug Application, or an

1:36PM    7    NDA as you described it for the jury, like it did for Xarelto,

1:36PM    8    the label is part of what the FDA approves, isn't it?

1:36PM    9    **A.**   Yes, the draft label from the company.

1:36PM    10    **Q.**   And the FDA must establish to their satisfaction that the

1:36PM    11    labeling is adequate; correct?

1:36PM    12    **A.**   And it reflects the information that the FDA reviewed.

1:36PM    13    But they're not allowed to write the label.  They negotiate the

1:36PM    14    label.

1:36PM    15    **Q.**   I'll get there.  We agree that the first step in getting a

1:36PM    16    label approved is for the company to submit a proposed label to

1:36PM    17    the FDA; right?

1:36PM    18    **A.**   Draft label, yes, ma'am.

1:36PM    19    **Q.**   And so while the pharmaceutical company proposes the label

1:36PM    20    or the draft, FDA does not have to accept the proposed label as

1:36PM    21    is, do they?

1:36PM    22    **A.**   They're allowed to comment and try to negotiate on changes

1:37PM    23    in the label.

1:37PM    24    **Q.**   And they do that?

1:37PM    25    **A.**   They do that.

*OFFICIAL TRANSCRIPT*

1:37PM 1    **Q.**   Okay.

1:37PM 2    **A.**   It's an active negotiation process.

1:37PM 3    **Q.**   Okay.  And the FDA can refuse to approve a drug if the

1:37PM 4    proposed labeling is false or misleading, as we've just

1:37PM 5    discussed; right?

1:37PM 6    **A.**   Yes.  That would be based on the FDA knowing the

1:37PM 7    information is false and misleading.  So if the FDA knows that

1:37PM 8    ahead, they will not approve it.

1:37PM 9    **Q.**   And if the FDA does not like what the company proposes, it

1:37PM 10   can also let the company know their suggested edits for the

1:37PM 11   label; right?

1:37PM 12   **A.**   It can, but it's up to the company to either accept them

1:37PM 13   or not.

1:37PM 14   **Q.**   And if the company chooses not to accept them and the FDA

1:37PM 15   insists, they can't approve the drug if the FDA is not going to

1:37PM 16   say the label is adequate, can they?

1:37PM 17   **A.**   Well, the final approval is going to have to be adequate.

1:37PM 18   **Q.**   Yes, ma'am.

1:37PM 19   **A.**   But the company has the ability to negotiate, since

1:37PM 20   they're responsible for the label, to say if something is

1:37PM 21   important, and they did that for the prevention indication;

1:38PM 22   that, "We need to put something back in."  FDA said, "Fine."

1:38PM 23   **Q.**   Okay.  And ultimately the FDA -- you described for the

1:38PM 24   jury the label and how it's set up and all of that.

1:38PM 25   **A.**   Uh-huh.

*OFFICIAL TRANSCRIPT*

1:38PM  1  **Q.**   And that is dictated strictly by the FDA; is that correct?

1:38PM  2  **A.**   Well, the structure, yes.  The format, the structure is

1:38PM  3  dictated by the FDA's regs.

1:38PM  4  **Q.**   And, in fact, the FDA even has to have control over the

1:38PM  5  font, the font of the words and the size in the label, don't

1:38PM  6  they?

1:38PM  7  **A.**   That's the structure.  The content belongs to the

1:38PM  8  manufacturer.

1:38PM  9  **Q.**   Okay.

1:38PM 10  **A.**   As you saw, different labels have different things in

1:38PM 11  different sections.  That comes from the manufacturer.

1:38PM 12  **Q.**   I'm not trying to -- I'm not trying to interrupt you

1:38PM 13  because I don't want to cut you off, but we need to get out of

1:38PM 14  here, if we can.  So if you'll listen to my question, I'd

1:38PM 15  appreciate it.

1:38PM 16        The FDA approved the first New Drug Application for

1:38PM 17  Xarelto in July of 2011; correct?

1:38PM 18  **A.**   Yes, ma'am.

1:38PM 19  **Q.**   And the Xarelto application approved in July 2011 was for

1:39PM 20  the prevention of DVTs and pulmonary embolism; right?

1:39PM 21  **A.**   Yes, ma'am.

1:39PM 22  **Q.**   When the FDA approved that particular label, it determined

1:39PM 23  that the drug was safe and effective for that use and that

1:39PM 24  indication; right?

1:39PM 25  **A.**   Yes, ma'am.

1:39PM  1  **Q.**   And at the time the FDA approved that label, they also

1:39PM  2  approved -- I mean, that drug, they also approved the first

1:39PM  3  Xarelto label; correct?

1:39PM  4  **A.**   That's part of the approval process for the FDA, yes,

1:39PM  5  ma'am.

1:39PM  6  **Q.**   And FDA has reviewed and approved the Xarelto labeling on

1:39PM  7  multiple occasions since 2011.  We established that.

1:39PM  8  **A.**   For various different reasons, yes, ma'am.

1:39PM  9  **Q.**   And for other indications?

1:39PM  10  **A.**   Well, for some indications.  Not many, but yes, there have

1:39PM  11  been other indications.

1:39PM  12  **Q.**   Okay.  Now, you've looked at -- because you were asked to

1:39PM  13  come here and testify concerning the label, you are aware that

1:39PM  14  Janssen submitted proposed labeling to the FDA that discussed

1:39PM  15  the use of PT testing; correct?

1:40PM  16  **A.**   You want to show me what you mean or --

1:40PM  17  **Q.**   I sure do.  Let's pull up Defense Exhibit 5390, if we can.

1:40PM  18      **MR. HONNOLD:**  Your Honor, could I just renew the

1:40PM  19  prior objection?

1:40PM  20      **THE COURT:**  Right.  Okay.

1:40PM  21      **MR. HONNOLD:**  Thank you.

1:40PM  22      **THE COURT:**  I'll assume you've made it and that it's

1:40PM  23  continuing.

1:40PM  24      **THE WITNESS:**  Thank you.

25

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 1:40PM | 1 | **BY MS. PRUITT:** |
| 1:40PM | 2 | Q.   You're welcome.  This is Defense Exhibit 5390, for the |
| 1:40PM | 3 | record.  If you'll take a look at that for me, please. |
| 1:40PM | 4 | A.   Yes, ma'am.  Where do you want me to go? |
| 1:40PM | 5 | Q.   Let's pull up 5389, please.  Oh, I have it?  This might |
| 1:40PM | 6 | help you.  5389. |
| 1:40PM | 7 | A.   Thank you. |
| 1:40PM | 8 | Q.   You're welcome. |
| 1:41PM | 9 | A.   Okay. |
| 1:41PM | 10 | Q.   If you'll look at the first page there for me.  This is on |
| 1:41PM | 11 | J&J letterhead; is that correct? |
| 1:41PM | 12 | A.   Yes, ma'am. |
| 1:41PM | 13 | Q.   And it's addressed to Ann Farrell, the director of the |
| 1:41PM | 14 | Division of Hematology Products at the FDA; correct? |
| 1:41PM | 15 | A.   Yes, ma'am. |
| 1:41PM | 16 | Q.   And it's, "Reference is made to the original New Drug |
| 1:41PM | 17 | Application for the prophylaxis of deep vein thrombosis." |
| 1:41PM | 18 | Can you just pull that up for me?  I see you trying |
| 1:41PM | 19 | to help me there. |
| 1:41PM | 20 | And that was submitted on December 27th, 2010; is |
| 1:41PM | 21 | that right? |
| 1:41PM | 22 | A.   Right. |
| 1:41PM | 23 | MS. PRUITT:  And if you'll take the first paragraph, |
| 1:41PM | 24 | Joshu, on the second sentence there. |
| | 25 | |

**BY MS. PRUITT:**

Q.    "Reference is made to the original New Drug Application immediate-release tablets for the prophylaxis of deep vein thrombosis and pulmonary embolism in patients undergoing hip replacement surgery or knee replacement surgery."  Correct?

A.    Yes, ma'am, and that was filed in 2008.

MS. PRUITT:  Let's look at the next paragraph and pull that up, if you can, Joshu.  It starts with "in accordance."

**BY MS. PRUITT:**

Q.    "In accordance with 21 CFR 314, and on behalf of Ortho-McNeil-Janssen, J&J is submitting a complete response submission to NDA 22-406."

Did I read that correctly?

A.    Right.  This is in response to the May 27th, 2009, request for information from the FDA.

Q.    And then if you'll take a look at Defense Exhibit 5390 for me, please, this is a proposed draft label that was submitted by J&J in July of 2011 with this particular submission; correct?

A.    Right.  Actually, they submitted the label with the 2008 thing they had written in December 2008.  So it's basically a continuation from the December 2008 label.

MS. PRUITT:  And let's pull up page 12 of that document, please, Joshu, under "Pharmacodynamics."  And let's

*OFFICIAL TRANSCRIPT*

1:42PM   1   take a look at the second paragraph.

1:43PM   2   **BY MS. PRUITT:**

1:43PM   3   **Q.**   The submission by Janssen says, "Dose-dependent inhibition

1:43PM   4   of Factor Xa activity was observed in humans, and the

1:43PM   5   prothrombin time, activated partial thromboplastin time, and

1:43PM   6   HepTest, are prolonged dose dependently.  Anti-Factor Xa

1:43PM   7   activity is influenced by rivaroxaban."?

1:43PM   8   **A.**   Right.

1:43PM   9   **Q.**   Have you found it yet?

1:43PM  10   **A.**   I'm getting there.  Yep, got it, right here.

1:43PM  11   **Q.**   Okay.

1:43PM  12   **A.**   Okay.  Go ahead.  So that was the original label that was

1:43PM  13   submitted in December 2008.

1:43PM  14   **Q.**   And that's what I want to talk to you about for just a

1:43PM  15   minute.  Right there, the second sentence, Janssen submitted

1:43PM  16   this language:  "The relationship between PT and rivaroxaban

1:43PM  17   plasma concentration is linear and closely correlated.  If

1:43PM  18   assessment of the pharmacodynamic effect of rivaroxaban is

1:43PM  19   considered necessary in individual cases, PT measured in

1:43PM  20   seconds is recommended."

1:44PM  21          Did I read that correctly?

1:44PM  22   **A.**   Yes, ma'am.

1:44PM  23   **Q.**   And so the first time this label was submitted to the FDA,

1:44PM  24   they included these -- this sentence, these two sentences:

1:44PM  25   "The relationship between PT and Xarelto concentration is

*OFFICIAL TRANSCRIPT*

1:44PM   1   linear and closely correlated.  If assessment of the

1:44PM   2   pharmacodynamic effect is considered necessary, PT measured in

1:44PM   3   seconds is recommended."  Is that correct?

1:44PM   4   A.   Yes, ma'am.  But it's actually reflecting what's up in the

1:44PM   5   very first sentence about the dose-dependent inhibition, so

1:44PM   6   it's repeating what it already said.

1:44PM   7   Q.   Okay.  But this was the original submission; right?

1:44PM   8   A.   Right.  This was from 2008, right.

1:44PM   9        MS. PRUITT:  Your Honor, we would move in Defense

1:44PM  10   Exhibit 5390 and Defense Exhibit 5389, please.

1:44PM  11        MR. HONNOLD:  Objection.

1:44PM  12        THE COURT:  Objection noted.  It will be admitted

1:44PM  13   over objection.

        14   BY MS. PRUITT:

1:45PM  15   Q.   Now, as you already said, after that label gets submitted

1:45PM  16   to the FDA, there's a back-and-forth discussion about the

1:45PM  17   label; is that right?

1:45PM  18   A.   Right.

1:45PM  19   Q.   And that happened in this case, didn't it?

1:45PM  20   A.   Right.  One of the things in that label is the RECORD --

1:45PM  21   reference to RECORD, and so there was a lot of discussion about

1:45PM  22   the RECORD study.

1:45PM  23   Q.   Okay.  And that wasn't my question.  My question was there

1:45PM  24   was a negotiation on this label; correct?

1:45PM  25   A.   Yes, back and forth.

1:45PM   1    Q.   Thank you.

1:45PM   2    A.   And RECORD was part of it.

1:45PM   3    Q.   Now, in June of 2011, the FDA sent back to Janssen -- on

1:45PM   4    our proposed label, they made some changes, didn't they?

1:45PM   5    A.   They did make some, yes, ma'am.

1:45PM   6    Q.   Okay.  Can I have Defense Exhibit 6100?

1:45PM   7    A.   Thank you.

1:45PM   8    Q.   Now, if you'll turn with me to -- I believe it's page 18.

1:45PM   9         MS. PRUITT:  Joshu, if you can -- can you bring that

1:46PM   10   up?

1:46PM   11   BY MS. PRUITT:

1:46PM   12   Q.   We're going to go to the second under "Pharmacodynamics,"

1:46PM   13   and we're going to have to pull that out as far as we can

1:46PM   14   because -- you -- people that are -- I mean, you understand

1:46PM   15   track changes; right, Doctor?

1:46PM   16   A.   Yes, ma'am.

1:46PM   17        MS. PRUITT:  And so if you could pull up the comments

1:46PM   18   too, Joshu, because the jury needs to see the comments on the

1:46PM   19   side, where it says deleted and deleted.  In that section all

1:46PM   20   the way down.  The next section, please.

1:46PM   21   BY MS. PRUITT:

1:46PM   22   Q.   "Routine monitoring of coagulation parameters" -- "Routine

1:46PM   23   monitoring of coagulation parameters is not required with

1:46PM   24   Xarelto use."

1:46PM   25        Do you see that?

1178

| | | |
|---|---|---|
| 1:46PM | 1 | **A.**   Right.   That was deleted. |
| 1:46PM | 2 | **Q.**   That was deleted, and it was deleted by the FDA; correct? |
| 1:46PM | 3 | **A.**   It's hard to know -- |
| 1:46PM | 4 | **MR. HONNOLD:**  Objection, Your Honor.  There's no |
| 1:46PM | 5 | foundation to who did what here. |
| 1:46PM | 6 | **THE COURT:**  Okay.  She doesn't know. |
| 1:47PM | 7 | **MS. PRUITT:**  Your Honor, I was just asking her. |
| 1:47PM | 8 | **A.**   It's deleted. |
| 1:47PM | 9 | **BY MS. PRUITT:** |
| 1:47PM | 10 | **Q.**   Okay.? |
| 1:47PM | 11 | **A.**   I know that the company had proposed that statement, and |
| 1:47PM | 12 | it's now deleted.  So it's saying that monitoring is required |
| 1:47PM | 13 | for Xarelto. |
| 1:47PM | 14 | **Q.**   Well, and you also know that this 6100 is what the FDA |
| 1:47PM | 15 | sent back to Janssen; correct? |
| 1:47PM | 16 | **MR. HONNOLD:**  Your Honor, same objection.  There's no |
| 1:47PM | 17 | foundation as to which entity, company or FDA, did what.  There |
| 1:47PM | 18 | is no -- |
| 1:47PM | 19 | **THE COURT:**  Yeah, this witness may not be able to |
| 1:47PM | 20 | answer that.  I mean, she doesn't know. |
| 1:47PM | 21 | You know, if you want to show her this, but this |
| 1:47PM | 22 | witness doesn't know who made it or what they did or why they |
| 1:47PM | 23 | did it. |
| 1:47PM | 24 | Or do you know, ma'am? |
| 1:47PM | 25 | **THE WITNESS:**  No, I don't know.  There's been nothing |

*OFFICIAL TRANSCRIPT*

1:47PM 1  stated by the FDA to say why any of this was deleted or what

1:47PM 2  occurred with this.  It's not consistent with any of the

1:47PM 3  documents that FDA has published on their websites.  So it is

1:47PM 4  deleted.  There are statements deleted, but who did it and when

1:47PM 5  and why, there is no record of that.

1:48PM 6  BY MS. PRUITT:

1:48PM 7  Q.  No record that you've seen?

1:48PM 8  A.  I've looked at all the types of documents I can see.  I've

1:48PM 9  looked at all the documents on the website.  I've looked at all

1:48PM 10 the documents around this issue as to who deleted what lines,

1:48PM 11 and it's not a clear tracking as to who deleted it.

1:48PM 12        This is not the typical way that you would know who

1:48PM 13 deleted what.  So there are deletions, but who deleted them and

1:48PM 14 why, I don't know.  And they're not -- the deletions are not

1:48PM 15 consistent with anything the FDA subsequently said.  In fact,

1:48PM 16 it contradicts what FDA has said in other documents.

1:48PM 17 Q.  Will you turn to page 3 of that document, please, ma'am?

1:48PM 18 A.  Yes, ma'am.

1:48PM 19 Q.  Keep your finger there, because I'm going to go back.

1:48PM 20 A.  Right.

1:48PM 21 Q.  Page 3 is an email from Tyree Newman.

1:48PM 22        Tyree Newman is the regulatory project manager for

1:48PM 23 the Food and Drug Administration; right?

1:48PM 24 A.  Right.

1:48PM 25 Q.  And it says, "Good morning, Andrea.  Please see the

1:48PM 1    attached redlined version of the label regarding NDA 22-406 for

1:48PM 2    your review and comments.  Please accept changes you agree to.

1:49PM 3    For changes you do not, keep in track changes."

1:49PM 4         Did I read that correctly?

1:49PM 5    A.   Right.  But this document doesn't make it clear when

1:49PM 6    things got deleted and who.  Typically, the document will look

1:49PM 7    different and you will have who deleted what and why, but this

1:49PM 8    document is not the type that you can actually know when the --

1:49PM 9    there are deletions, and I'm sure that Tyree Newman is from the

1:49PM 10   FDA.  But when they were made, you can't be sure from this

1:49PM 11   document.

1:49PM 12        **MS. PRUITT:**  Let's go back to page 12, Joshu, and

1:49PM 13   pull up that second deleted section please, the second long

1:49PM 14   deleted box.

1:49PM 15        **THE WITNESS:**  Uh-huh.

1:49PM 16   BY MS. PRUITT:

1:49PM 17   Q.   "The relationship between PT and rivaroxaban plasma

1:49PM 18   concentration is linear and closely correlated."

1:49PM 19        That was deleted; correct?

1:49PM 20   A.   By someone, yes, ma'am.

1:49PM 21   Q.   "If assessment of the pharmacodynamic effect of

1:49PM 22   rivaroxaban is considered necessary in individual cases, PT

1:49PM 23   measured in seconds is recommended."

1:50PM 24        That was deleted; isn't that correct?

1:50PM 25   A.   By someone, yes, ma'am.

*OFFICIAL TRANSCRIPT*

1:50PM  1          **MS. PRUITT:**  Your Honor, if we would move in Defense

1:50PM  2   Exhibit 6100.

1:50PM  3   **A.**   But then --

1:50PM  4          **THE COURT:**  Wait, wait.  Please give us a moment.

1:50PM  5   Let me deal with this first.

1:50PM  6          The -- the material passes the 901 -- it's

1:50PM  7   authenticated.  It looks -- it looks to me what it appears to

1:50PM  8   be.  So I'll admit it.

1:50PM  9          But insofar as this witness's testimony

1:50PM 10   regarding it, she doesn't authenticate it.  The document is

1:50PM 11   authenticated because it appears to be what it is, a US Food

1:50PM 12   and Drug Administration certificate on it.  But who did what,

1:50PM 13   this witness is not able to testify to.

1:50PM 14          I'll admit the document, though.

1:50PM 15          **MS. PRUITT:**  Thank you, Your Honor.

1:50PM 16          **THE COURT:**  Uh-huh.

1:50PM 17   **BY MS. PRUITT:**

1:50PM 18   **Q.**   Now, you have given depositions in this case prior; is

1:51PM 19   that correct?

1:51PM 20   **A.**   Yes, ma'am.

1:51PM 21   **Q.**   And were you asked about that language in Section 12.2

1:51PM 22   being stricken?  Were you asked?

1:51PM 23   **A.**   Yes, I'm aware that it was stricken.

1:51PM 24   **Q.**   Okay.  And are you aware -- do you also remember that you

1:51PM 25   admitted that the FDA is the one that crossed it out?

1:51PM 1   **A.**   Well, no.  You want to show me where I said that?

1:51PM 2   **Q.**   Yes, I do.  Let's just look at Clip 2, if we can, the

1:51PM 3   question and answer.  It's in -- it's on Tab 2, page 660,

1:51PM 4   lines 4 through 18.?

1:51PM 5   **A.**   660.  Yes, ma'am.

1:51PM 6   **Q.**   Yes.

1:51PM 7          (whereupon the following video was played for the

1:51PM 8          jury:)

1:51PM 9          **"QUESTION:**  Where the FDA crossed out certain

1:51PM 10         language related to PT under Section 12.2.

1:51PM 11         Do you see that?"

1:51PM 12         **MR. HONNOLD:**  Objection, Your Honor.

1:51PM 13         (whereupon the video was paused.)

1:51PM 14         **THE COURT:**  Wait just a minute.

1:51PM 15         **MR. HONNOLD:**  This is speaking to a different aspect

1:51PM 16  of the document, not what's put at issue here.  And there's

1:51PM 17  no -- no foundation and not proper impeachment.

1:52PM 18         **THE COURT:**  Let me see that -- see whether or not

1:52PM 19  it's dealing with the same document.

1:52PM 20         **MR. HONNOLD:**  Your Honor, the issue is -- the

1:52PM 21  question was posed as the FDA cross-out for which there was no

1:52PM 22  foundation from anyone who has factual basis for that.  It's

1:52PM 23  the same problem that they're trying to inject in through the

1:52PM 24  videotape.

1:52PM 25         **MS. PRUITT:**  Your Honor, I don't want to argue in

*OFFICIAL TRANSCRIPT*

1:52PM 1    front of the jury.

1:52PM 2         THE COURT:  What they're trying to do is to impeach

1:52PM 3    this witness.  I mean, that's the basis of it, not prove the --

1:52PM 4         MS. PRUITT:  Yes, that's what she said.

1:52PM 5         MR. HONNOLD:  But it's improper impeachment.

1:52PM 6         MS. PRUITT:  Let's play Clip 2, please.

1:52PM 7         THE COURT:  Overrule the objection.

1:52PM 8         (Whereupon the following video was played for the

1:52PM 9         jury:)

1:52PM 10        "QUESTION:  Where the FDA crossed out certain

1:52PM 11        language relating to PT under Section 12.2.

1:52PM 12             "Do you see that?

1:52PM 13        "ANSWER:  Yes, sir.

1:52PM 14        "QUESTION:  Now, there's no dispute that the FDA

1:53PM 15        crossed that out; right?

1:53PM 16             "ANSWER:  Not now."

1:53PM 17   BY MS. PRUITT:

1:53PM 18   Q.   And that's what you said on that day at that time; is that

1:53PM 19   correct, Doctor?

1:53PM 20   A.   Based on what I was told by the company at that time, yes,

1:53PM 21   ma'am.

1:53PM 22        THE COURT:  Do you know of your own independent

1:53PM 23   knowledge who crossed that out?

1:53PM 24        THE WITNESS:  No, sir.  But the company had

1:53PM 25   represented before that deposition that it was crossed out by

*OFFICIAL TRANSCRIPT*

1184

| | | |
|---|---|---|
| 1:53PM | 1 | the FDA. |
| 1:53PM | 2 | **BY MS. PRUITT:** |
| 1:53PM | 3 | **Q.**  Let me show you another document, which is Defense |
| 1:53PM | 4 | Exhibit 5222, please, ma'am. |
| 1:53PM | 5 | Do you recall seeing this document at your |
| 1:53PM | 6 | deposition? |
| 1:53PM | 7 | **A.**  What is it?  There we go. |
| 1:53PM | 8 | **Q.**  It's another version of the -- I think that may be what |
| 1:53PM | 9 | counsel was referring to. |
| 1:54PM | 10 | **A.**  Okay.  So is there -- you want me to go to the same place? |
| 1:54PM | 11 | **Q.**  Yes.  I'm sorry.  Go to Section 12.2. |
| 1:54PM | 12 | **A.**  Okay. |
| 1:54PM | 13 | **Q.**  What page is that on?  18? |
| 1:54PM | 14 | **A.**  18.  Got it. |
| 1:54PM | 15 | **Q.**  We'll find it.? |
| 1:54PM | 16 | **A.**  So who is this -- |
| 1:54PM | 17 | **MR. HONNOLD:**  What page was that, Counsel? |
| 1:54PM | 18 | **A.**  Who is this label coming from? |
| 1:54PM | 19 | **MS. PRUITT:**  It's page 30 of 44.  Page 30 of 44. |
| 1:54PM | 20 | **BY MS. PRUITT:** |
| 1:54PM | 21 | **Q.**  I'm just asking you if you were shown this document at |
| 1:54PM | 22 | your deposition. |
| 1:54PM | 23 | **A.**  I don't know if I was.  I mean, who is this -- there's no |
| 1:54PM | 24 | cover sheet or anything. |
| 1:54PM | 25 | **Q.**  Okay.  So you don't know whether this was the document |

1:54 PM  1    that was shown to you when you were giving that testimony?

1:54 PM  2    **A.**   I don't know offhand.  There's no cover sheet.  Usually

1:54 PM  3    there's a cover sheet.

1:54 PM  4    **Q.**   Okay.  But this shows the same strike-through of the same

1:55 PM  5    language as the document that we just introduced; correct?

1:55 PM  6    **A.**   Right.  I have no -- the document does strike that

1:55 PM  7    language.  I have no argument with that.  It does strike it.

1:55 PM  8    Who struck it and why the FDA or anybody struck it, I don't

1:55 PM  9    know.

1:55 PM  10   **Q.**   You have discussed with this jury language in Section 5.3

1:55 PM  11   and 8.1 in the pregnancy sections that talk about the

1:55 PM  12   anticoagulant effect of Xarelto cannot be monitored with

1:55 PM  13   standard laboratory testing nor readily reversed.

1:55 PM  14         Do you recall that discussion?

1:55 PM  15   **A.**   Yes, ma'am.

1:55 PM  16   **Q.**   And you know that in that very label that came back, the

1:55 PM  17   FDA suggested at one point to put that language back into the

1:55 PM  18   pregnancy section, didn't they?

1:55 PM  19         **MR. HONNOLD:**  Objection, Your Honor.  Again, there's

1:55 PM  20   no factual basis for who said what about any of this.

1:55 PM  21         **THE COURT:**  Do you know that?

1:55 PM  22         **THE WITNESS:**  No, I don't know.  I mean, where are we

1:55 PM  23   talking about?

1:55 PM  24         **THE COURT:**  Counsel -- members of the jury, I

1:55 PM  25   admitted a document because it appears to be what it says it

1:56PM   1   is.  And there is some strikeouts, but it doesn't appear who

1:56PM   2   did it or why they did it.  This witness may have testified

1:56PM   3   before as to certain things, but she doesn't know who did it or

1:56PM   4   who -- or why they did it.  She's not an FDA person.  So it is

1:56PM   5   what it is, but --

1:56PM   6   **BY MS. PRUITT:**

1:56PM   7   **Q.**   Did you review the labeling documents in this case?

1:56PM   8   Because you told the jury you'd reviewed a lot of documents.?

1:56PM   9   **A.**   Yes, ma'am.  But what is it you want me to look at

1:56PM  10   specifically?

1:56PM  11   **Q.**   I'm just asking you if you know something.

1:56PM  12        Did you know the Maternal Health Advisory Committee

1:56PM  13   from the FDA added this language back into the label?  "The

1:56PM  14   anticoagulant effect of Xarelto cannot be monitored with

1:56PM  15   standard laboratory testing nor readily reversed."

1:56PM  16        They asked for it to be put in 5.3 and 8.1.

1:56PM  17        Did you know that?

1:56PM  18        **MR. HONNOLD:**  Same objection, Your Honor.

1:56PM  19        **THE WITNESS:**  I don't know.  Do you want me to look

1:56PM  20   at something?

1:56PM  21   **BY MS. PRUITT:**

1:56PM  22   **Q.**   No.  I'm just asking you if you knew that when you

1:57PM  23   reviewed all these records.

1:57PM  24   **A.**   No, I don't know that independently.

1:57PM  25   **Q.**   Did you review the summary review that you testified about

1:57PM   1   in other cases and I think a little bit today where the

1:57PM   2   Maternal Health Committee suggested that that language be put

1:57PM   3   in the label?  That's all I'm asking.

1:57PM   4   A.   I don't recall that.  Did I testify about it, or is there

1:57PM   5   a document?

1:57PM   6   Q.   I was just asking you if you saw it when you were

1:57PM   7   reviewing all these documents.

1:57PM   8   A.   I don't recall that right now at this point in time.  I

1:57PM   9   recall looking at pregnancy information and the new pregnancy

1:57PM  10   label.

1:57PM  11   Q.   Now, let's go to Exhibit 5357 please, ma'am.?

1:57PM  12   A.   5357.  Thank you.

1:57PM  13   Q.   You're welcome.  And can you identify that as the label

1:57PM  14   that was ultimately approved for the first indication for

1:58PM  15   Xarelto?

1:58PM  16   A.   Yes.  This is with the NDA approval letter, yes, ma'am.

1:58PM  17   Q.   So after all the negotiations, this is the actual label

1:58PM  18   that was approved by the FDA so that the company could start to

1:58PM  19   sell the product; correct?

1:58PM  20   A.   Yes, ma'am.

1:58PM  21   Q.   And so if you will turn with me to page 15 under the same

1:58PM  22   section, 12.2, Pharmacodynamics.

1:58PM  23   A.   Okay.

1:58PM  24   Q.   Can I have the ELMO?

1:58PM  25   A.   I got --

1:58PM 1    **Q.**   Oh, I already have it.

1:58PM 2            **MR. HONNOLD:**  Page 22, counsel?

1:58PM 3            **MS. PRUITT:**  Page 22.

1:58PM 4    **BY MS. PRUITT:**

1:58PM 5    **Q.**   And under "Pharmacodynamics," it says, "Dose-dependent

1:58PM 6    inhibition of Factor Xa activity was observed in humans and the

1:58PM 7    Neoplastin PT, activated partial thromboplastin time and

1:58PM 8    HepTest are prolonged dose-dependent.  Anti-Factor Xa activity

1:58PM 9    is also influenced by rivaroxaban.

1:58PM 10           "There are no data on the use of the INR.  The

1:59PM 11   predictive value of these coagulation parameters for bleeding

1:59PM 12   risk or efficacy has not been established."?

1:59PM 13   **A.**   Right.  Now, I know that the FDA struck those last two

1:59PM 14   sentences out.  The company asked to put them back, and they're

1:59PM 15   back.

1:59PM 16   **Q.**   Okay.  Now, this is what actually ended up in Section 12.2

1:59PM 17   at first; correct?

1:59PM 18   **A.**   Right.  And FDA allowed the company to put those two lines

1:59PM 19   back in, because they said --

1:59PM 20           **MS. PRUITT:**  I move in Defendants' Exhibit 5357,

1:59PM 21   please, Your Honor.

1:59PM 22           **MR. HONNOLD:**  No objection.

1:59PM 23           **THE COURT:**  It will be admitted.

1:59PM 24   **BY MS. PRUITT:**

1:59PM 25   **Q.**   Now, let's talk about that label.  Okay?

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 1:59PM | 1 | **A.**   Yeah. |
| 1:59PM | 2 | **Q.**   Let's look at Defense Exhibit 10.  You probably already |
| 1:59PM | 3 | have one up there, but I know how much paper is -- |
| 1:59PM | 4 | **A.**   Thank you. |
| 2:00PM | 5 | **Q.**   If you'll -- |
| 2:00PM | 6 | **THE DEPUTY CLERK:**  Is this 10? |
| 2:00PM | 7 | **MS. PRUITT:**  Yes. |
| 2:00PM | 8 | **THE DEPUTY CLERK:**  It's already in. |
| 2:00PM | 9 | **BY MS. PRUITT:** |
| 2:00PM | 10 | **Q.**   If you look at "Highlights of Prescribing Information" |
| 2:00PM | 11 | that you've already discussed with the jury please, ma'am, |
| 2:00PM | 12 | right there at the top. |
| 2:00PM | 13 | **A.**   Yes, ma'am. |
| 2:00PM | 14 | **Q.**   And on the first page under "Warnings and Precautions," |
| 2:00PM | 15 | doctors were told that the risk of bleeding -- "Xarelto can |
| 2:00PM | 16 | cause serious and fatal bleeding.  Promptly evaluate signs and |
| 2:00PM | 17 | symptoms of blood loss."  Correct? |
| 2:00PM | 18 | **A.**   Yes, ma'am. |
| 2:00PM | 19 | **Q.**   And that the most common adverse reaction greater than |
| 2:00PM | 20 | 5 percent was bleeding; correct? |
| 2:00PM | 21 | **A.**   Yes, ma'am. |
| 2:00PM | 22 | **Q.**   And this is the label that was in effect as of |
| 2:00PM | 23 | January 2015; right? |
| 2:00PM | 24 | **A.**   Yes, ma'am. |
| 2:00PM | 25 | **Q.**   And do you know that Ms. Mingo took Xarelto -- you don't |

1190

| | |
|---|---|
| 2:00PM | 1 |

know that she -- when she took Xarelto, do you?

| 2:00PM | 2 |

A.   I know it was in 2015.

| 2:01PM | 3 |

Q.   Now, let's go to Section 5, which is on page 10 of this

| 2:01PM | 4 |

label, under "Warnings and Precautions," if you will.

| 2:01PM | 5 |

A.   Yes, ma'am.

| 2:01PM | 6 |

Q.   And this is a section you've already discussed with the

| 2:01PM | 7 |

jury; correct?

| 2:01PM | 8 |

A.   Yes, ma'am.

| 2:01PM | 9 |

Q.   And the second bullet which is on the next page under

| 2:01PM | 10 |

"Warnings and Precautions" says, "Xarelto increases the risk of

| 2:01PM | 11 |

bleeding and can cause serious or fatal bleeding.  In deciding

| 2:01PM | 12 |

whether to prescribe Xarelto to patients at increased risk of

| 2:01PM | 13 |

bleeding, the risk of thrombotic events should be weighed

| 2:01PM | 14 |

against the risk of bleeding."  Is that correct?

| 2:01PM | 15 |

A.   Right.

| 2:01PM | 16 |

Q.   So the label was instructing physicians that they needed

| 2:01PM | 17 |

to weigh the risk of bleeding against the risk of a thrombotic

| 2:01PM | 18 |

event; correct?

| 2:01PM | 19 |

A.   Yes.  That would be a perfect place to put the PT.

| 2:01PM | 20 |

Q.   And they also instructed doctors in the next paragraph to

| 2:01PM | 21 |

"Promptly evaluate any signs or symptoms of blood loss and

| 2:01PM | 22 |

consider the need for blood replacement."

| 2:01PM | 23 |

        Did I read that correctly?

| 2:01PM | 24 |

A.   Yes, ma'am, you did.

| 2:01PM | 25 |

Q.   So they were instructing doctors that they needed to

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 2:02PM | 1 | evaluate signs and symptoms of blood loss; right? |
| 2:02PM | 2 | A.   Yes, ma'am. |
| 2:02PM | 3 | Q.   And if they saw it, they might have to do blood |
| 2:02PM | 4 | replacement; correct? |
| 2:02PM | 5 | A.   Yes, ma'am. |
| 2:02PM | 6 | Q.   Now, if you'll look at the next paragraph.  "Concomitant |
| 2:02PM | 7 | use of other drugs that impair hemostasis increases the risk of |
| 2:02PM | 8 | bleeding.  These include aspirin." |
| 2:02PM | 9 | Did I read that correctly? |
| 2:02PM | 10 | A.   Yes, ma'am, you did. |
| 2:02PM | 11 | Q.   And so "concomitant" means that you're using these drugs |
| 2:02PM | 12 | at the same time you're taking Xarelto; right? |
| 2:02PM | 13 | A.   Yes, ma'am. |
| 2:02PM | 14 | Q.   And so doctors were instructed that concomitant use of |
| 2:02PM | 15 | other drugs that impair hemostasis can increase the risk of |
| 2:02PM | 16 | bleeding; right? |
| 2:02PM | 17 | A.   Right.  But they were told they could later on in the |
| 2:02PM | 18 | label use other products. |
| 2:02PM | 19 | Q.   Now, on over on page 10, under "Adverse Reactions," if |
| 2:02PM | 20 | you'll go there for me. |
| 2:02PM | 21 | "The following adverse reactions are also discussed |
| 2:02PM | 22 | in other sections of the label." |
| 2:03PM | 23 | The bleeding risk is listed there; right? |
| 2:03PM | 24 | A.   Yes, ma'am. |
| 2:03PM | 25 | Q.   And it says, "See Warnings and Precautions," and it lists |

*OFFICIAL TRANSCRIPT*

2:03PM   1    all the sections where it's discussed; correct?

2:03PM   2    A.    Yes, ma'am.

2:03PM   3    Q.    Now, if you'll turn to page 17 in the label please, ma'am,

2:03PM   4    under "Anticoagulants and NSAIDs/Aspirin."?

2:03PM   5    A.    Uh-huh.

2:03PM   6    Q.    See where I have highlighted there, "Concomitant aspirin

2:03PM   7    use has been identified as an independent risk factor for major

2:03PM   8    bleeding in efficacy trials"?

2:03PM   9          Did I read that correctly?

2:03PM  10    A.    Yes, you read it correctly.

2:03PM  11    Q.    So the doctors are being instructed that concomitant

2:03PM  12    aspirin use has been identified as an independent risk factor

2:03PM  13    for major bleeding in efficacy trials.

2:03PM  14          And that's accurate, isn't it?

2:03PM  15    A.    Right.

2:03PM  16    Q.    You know that from reviewing the ROCKET data that aspirin

2:03PM  17    is an independent risk factor; right?

2:03PM  18    A.    Right.  And it's independent because it doesn't work

2:03PM  19    through Factor Xa.  It's through platelets.

2:04PM  20    Q.    Now, we go on to instruct doctors in the last paragraph,

2:04PM  21    Dr. Parisian, to, "Avoid concurrent use of Xarelto with other

2:04PM  22    anticoagulants due to increased bleeding risk unless the

2:04PM  23    benefits outweigh the risk."

2:04PM  24          Did I read that correctly?

2:04PM  25    A.    You read it correctly.

**Q.** And we instructed doctors in that second sentence to "Promptly evaluate any signs or symptoms of blood loss if patients are treated concomitantly with aspirin, other platelet aggregation inhibitors, or NSAIDs."

Did I read that correctly?

**A.** Yes, ma'am.

**Q.** And so that was an instruction to doctors about the risk involved with other various medications being taken at the same time as Xarelto; correct?

**A.** Well, they didn't tell them how to evaluate, which is the important part, but they said promptly evaluate.

**Q.** Now, let's look at -- this is the label that was in effect, as we've established, in January of 2015. Look at page 21, if you please.?

**A.** Yes, ma'am.

**Q.** And under the same section -- this is the way the section was at the time that Ms. Mingo was prescribed the medication.

And it says, "Dose-dependent inhibition of Xa activity was observed in humans, and the Neoplastin prothrombin time and HepTest are prolonged dose-dependently. Anti-Factor Xa activity is also influenced by rivaroxaban."

That's what Section 12.2 said as of January 2015; is that correct?

**A.** Yes, it does. But it doesn't say that there's an increased risk of bleeding, because "dose-dependent" could mean

2:05PM 1   to a doctor that actually it's a good thing.  If you get them

2:05PM 2   high, then it's probably more effective.  So it's not saying

2:05PM 3   there's an increased risk of bleeding or what you need to do to

2:05PM 4   determine that.

2:05PM 5   Q.   I understand that you don't think Section 12.2 is

2:05PM 6   adequate, because that's what you've been talking about to the

2:05PM 7   jury, but I was just asking you if that's what it said as of

2:05PM 8   January 2015.?

2:05PM 9   A.   Right, and I was trying to explain to the jury why I don't

2:05PM 10  think that's adequate.

2:05PM 11  Q.   Okay.  "Patient Counseling Information."  If you'll turn

2:05PM 12  to page 38, please, ma'am.?

2:05PM 13  A.   Yes, ma'am.

2:05PM 14  Q.   And at the end of the label, we instructed doctors how to

2:06PM 15  counsel patients on these medications; correct?

2:06PM 16  A.   Yes, ma'am.

2:06PM 17  Q.   And there's a whole section on patient counseling

2:06PM 18  information; is that right?

2:06PM 19  A.   Yes, ma'am.

2:06PM 20  Q.   And as part of that, if you'll turn to the next page,

2:06PM 21  Section 17.2 under "Patient Counseling," we instructed doctors

2:06PM 22  to "Advise patients to report any unusual bleeding or bruising

2:06PM 23  to their physician.  Inform patients that it might take them

2:06PM 24  longer than usual to stop bleeding and that they may bruise

2:06PM 25  and/or bleed more easily when they are treated with Xarelto."

2:06PM  1          Did I read that correctly?

2:06PM  2  A.   You read it correctly.

2:06PM  3  Q.   So under the patient medication -- counseling information,

2:06PM  4  we were instructing doctors about how to counsel their patients

2:06PM  5  on bleeding risk; right?

2:06PM  6  A.   Right.  But not giving them a mechanism to determine if a

2:06PM  7  patient was at increased risk.

2:06PM  8  Q.   Okay.  Now, the medication guide is a piece that the FDA

2:06PM  9  approved when they approved this medication; correct?

2:06PM  10  A.   Yes, ma'am.

2:06PM  11  Q.   And it's on Page 41.  This is the medication guide;

2:07PM  12  correct?

2:07PM  13  A.   Yes, ma'am.

2:07PM  14  Q.   And this is given to patients; right?

2:07PM  15  A.   Yes, ma'am.

2:07PM  16  Q.   And this says, "Read this medication guide before you

2:07PM  17  start taking Xarelto and each time you get a refill."?

2:07PM  18  A.   Right.  And it doesn't substitute talking to your doctor.

2:07PM  19  Q.   "What is the most important information I should know

2:07PM  20  about Xarelto?"

2:07PM  21          And if you go down, it says, "Xarelto can cause

2:07PM  22  bleeding, which can be serious and rarely may lead to death.

2:07PM  23  This is because Xarelto is a blood thinner medicine that

2:07PM  24  reduces blood clotting.  While you take Xarelto, you are likely

2:07PM  25  to bruise more easily, and it may take longer for bleeding to

2:07PM 1   stop."

2:07PM 2           Did I read that correctly?

2:07PM 3   A.   You read it correctly.

2:07PM 4   Q.   So we were informing patients in this piece about the risk

2:07PM 5   of bleeding; correct?

2:07PM 6   A.   Yes.

2:07PM 7   Q.   And the next paragraph says, "You may have a higher risk

2:07PM 8   of bleeding if you take Xarelto and take other medicines that

2:07PM 9   increase your risk of bleeding, including as aspirin or

2:07PM 10  aspirin-containing products."

2:07PM 11          Did I read that correctly?

2:07PM 12  A.   Yes, you did.

2:07PM 13  Q.   And the second bullet is, "Including nonsteroidal

2:08PM 14  anti-inflammatory drugs like NSAIDs."  Correct?

2:08PM 15  A.   Yes, ma'am.

2:08PM 16  Q.   And we also told patients at the bottom, "Call your doctor

2:08PM 17  or get medical help right away if you develop any of these

2:08PM 18  signs or symptoms of bleeding."  Correct?

2:08PM 19  A.   Yes, ma'am.

2:08PM 20  Q.   You could put that aside.  Thank you.

2:08PM 21  A.   Thank you.

2:08PM 22  Q.   Now, you were shown some documents by counsel for

2:08PM 23  Ms. Mingo, and one of the things you were shown was a

2:08PM 24  regulation that you said required that the company put this in

2:09PM 25  Section 5.2 or put something that was helpful --

1197

| | | |
|---|---|---|
| 2:09PM | 1 | **A.**   Laboratory information, yes, ma'am. |
| 2:09PM | 2 | **Q.**   Yes.  And I've got that 21 CFR right here.  I'm going to |
| 2:09PM | 3 | have to put it up on the -- |
| 2:09PM | 4 | **A.**   That's okay.  Go ahead. |
| 2:09PM | 5 | **Q.**   So you can see.  It's, for identification, Defense |
| 2:09PM | 6 | Exhibit 502, and that's 21 CFR 201.57; right? |
| 2:09PM | 7 | **A.**   Yes, ma'am. |
| 2:09PM | 8 | **Q.**   And that's specific requirements on content and format of |
| 2:09PM | 9 | labeling for human prescription drug and biological products; |
| 2:09PM | 10 | right? |
| 2:09PM | 11 | **A.**   Yes, ma'am. |
| 2:09PM | 12 | **Q.**   And if you'll turn over to the page where you were reading |
| 2:09PM | 13 | from, it's page 7 of 21, where it says "Monitoring", and read |
| 2:09PM | 14 | along with me please, ma'am. |
| 2:09PM | 15 | **A.**   You want me to read it? |
| 2:09PM | 16 | **Q.**   No, I'll read it. |
| 2:09PM | 17 | **A.**   Okay. |
| 2:09PM | 18 | **Q.**   "Monitoring:  Laboratory tests.  This section must |
| 2:09PM | 19 | identify any laboratory tests helpful in following the |
| 2:09PM | 20 | patient's response or in identifying possible adverse |
| 2:09PM | 21 | reactions.  If appropriate, information must be provided on |
| 2:09PM | 22 | such factors as the range of normal and abnormal values |
| 2:09PM | 23 | expected in the particular situation and the recommended |
| 2:10PM | 24 | frequency with which tests should be performed before, during, |
| 2:10PM | 25 | and after therapy." |

1198

2:10PM  1       Did I read that correctly?

2:10PM  2  **A.**   Yes, ma'am.

2:10PM  3  **Q.**   Okay.  Now, I think I heard you talk about

2:10PM  4  anti-Factor Xa.?

2:10PM  5  **A.**   Yes, ma'am.

2:10PM  6  **Q.**   Is there an anti-Factor Xa assay that's calibrated and

2:10PM  7  controlled for Xarelto approved by the FDA to be used in this

2:10PM  8  country?

2:10PM  9  **A.**   There's not a cleared one, but it is commonly used in

2:10PM 10  research facilities, and you could order that test to be done.

2:10PM 11  **Q.**   Did you say there's not a cleared one?

2:10PM 12  **A.**   Yeah, I said that this morning.  There wasn't a cleared

2:10PM 13  one.  It would still be under -- listed as research because the

2:10PM 14  FDA allows products that are research products to be used.  So

2:10PM 15  you can -- as long as you say it's for research, then companies

2:10PM 16  are -- or doctors are allowed to use it.  And so it's not a

2:11PM 17  cleared device, but -- you cannot make any specific claims

2:11PM 18  about a therapeutic index, but you can let doctors know it's

2:11PM 19  available.

2:11PM 20  **Q.**   Because there was -- there was some mention of one of

2:11PM 21  these in the opening, and I want to show you what is -- one of

2:11PM 22  these assays -- I think the jury saw this in opening -- this

2:11PM 23  bottle called Biophen Factor Xa chromogenic substrate.

2:11PM 24       Do you see that?

2:11PM 25  **A.**   Yes.

*OFFICIAL TRANSCRIPT*

1199

2:11PM  1   **Q.**   And if you'll look up there, in this corner it says
2:11PM  2   "Research use only."  Correct?
2:11PM  3   **A.**   Yes.  That's how you can market it in the United States,
2:11PM  4   but it has to be research only.
2:11PM  5   **Q.**   Now, I'm going to hand you another document about the same
2:11PM  6   medication, if I could.  And it's about Biophen Factor X;
2:12PM  7   correct?
2:12PM  8   **A.**   Yes.
2:12PM  9   **Q.**   And it also says about the same Xa assay, "For research
2:12PM  10  use only.  Not for use in diagnostic procedures."
2:12PM  11            Is that what it says?
2:12PM  12  **A.**   Yes, ma'am.
2:12PM  13  **Q.**   And then look down here under "Applications:  For the
2:12PM  14  measurement of Factor X in research applications."  Correct?
2:12PM  15  **A.**   Yes.
2:12PM  16  **Q.**   And then the next note that says, "Please note:  Results
2:12PM  17  obtained should be for research purposes only and not used for
2:12PM  18  patient diagnosis or treatment."
2:12PM  19  **A.**   Right.
2:12PM  20  **Q.**   Did I read that correctly?
2:12PM  21  **A.**   Yes.  And they can market it in the United States,
2:12PM  22  drugs -- devices are marketed like this all the time, and they
2:12PM  23  say "research only," and the physician is told it's for
2:12PM  24  research only, but they can order the test, and they can get
2:12PM  25  the information about how active the Factor X is in that

*OFFICIAL TRANSCRIPT*

1200

1  patient.

2  **Q.**   Are you suggesting to the jury that family practice

3  doctors and internal medicine doctors and cardiologist doctors

4  in McComb, Mississippi, and Augusta, Arkansas, and places like

5  that should prescribe medications for research purposes only to

6  just their clinical patients if they're not in a program?

7  **A.**   Hey, that's not what I'm saying.  I'm saying that in terms

8  of manufacturers selling medical devices that are the IVD

9  drugs, this type of in vitro drugs, that's how they sell them

10  when they've not been cleared yet.  And you can give a blood

11  sample to most of the large laboratories here and ask for a

12  Factor X result, and they can give it to you.

13        It's not saying I'm saying that doctors should

14  conduct research with their patients.  I'm saying that there

15  are products that are marketed that are medical devices under

16  the guise of research only, and it's mainly for manufacturers,

17  what a manufacturer can sell or what a manufacturer can claim.

18  But the products are out there available, and you could order

19  them from any large laboratory service if you want to have a

20  Factor X value on a patient.

21        If you have an elevated Neoplastin PT, then you may

22  want to order this from a consulting lab, and so it's available

23  there, but it's research.  But the patient isn't research.

24  It's the type of way it's being marketed in the United States.

25  **Q.**   Will you listen to my question, please?

*OFFICIAL TRANSCRIPT*

2:14PM
2:14PM
2:14PM
2:14PM
2:14PM
2:14PM
2:14PM
2:14PM
2:14PM
2:15PM
2:15PM
2:15PM
2:15PM
2:15PM
2:15PM
2:15PM
2:15PM
2:15PM
2:15PM
2:15PM
2:15PM
2:15PM
2:15PM
2:15PM
2:15PM

1    In the clinical practice of doctors all around this

2 country in small states, you're not suggesting to this jury

3 that they're going to be prescribing drugs like -- or

4 prescribing devices like this to be used in the lab when they

5 have not been FDA-approved and set for research purposes only,

6 are you?

7 **A.** I don't understand your question because it's done all the

8 time in terms of large consulting laboratories.  Things that

9 haven't gotten cleared by the FDA, a manufacturer can't sell

10 with specific claims.  They can't say, this is the therapeutic

11 window of -- you know, that you're going to be safe.

12    But in terms of laboratory testing, they are allowed

13 to be marketed without FDA clearance legally as research only

14 with a statement on the result that it's research only, and

15 most of your large consulting laboratories will offer this

16 service.

17    So it's not that I'm saying that all doctors in all

18 small counties should use research.  No.  I'm saying, if you

19 have a patient with a high PT, you want to know what their

20 actual plasma concentration is, then you can always send off to

21 one of these research labs, if you so want to, to find out what

22 the blood value is in terms of concentration.  It was used

23 throughout Bayer and Janssen's research to determine what the

24 plasma concentration is.  I think a cheaper and faster screen

25 would be using a Neoplastin PT test.

2:16PM  1   Q.   Dr. Parisian, I appreciate -- I think the jury understands

2:16PM  2   your opinion.  We need to move through some more things.

2:16PM  3   A.   Okay.

2:16PM  4   Q.   Can you answer my questions, please, ma'am?

2:16PM  5   A.   I think I did.

2:16PM  6   Q.   Okay.  Let's look at these studies.  You were shown some

2:16PM  7   studies, and counsel talked to you about the bleeding risk by

2:16PM  8   and among the various anticoagulants.

2:16PM  9        Do you remember that?

2:16PM  10  A.   Yes, ma'am.

2:16PM  11  Q.   Okay.  I want you to take a look at this study.  "The

2:16PM  12  effectiveness and safety of rivaroxaban versus warfarin for

2:16PM  13  treatment and prevention of recurrence of venous

2:16PM  14  thromboembolism."

2:16PM  15       Do you see that?

2:16PM  16  A.   Yes, ma'am.

2:16PM  17  Q.   And do you see here that, "Rivaroxaban was associated with

2:16PM  18  a 19 percent reduction in recurrent VTE and a 21 percent

2:16PM  19  reduction in major bleeding hazard versus warfarin.

2:16PM  20  Rivaroxaban was also associated with significantly decreased

2:16PM  21  hazards of intracranial hemorrhage and gastrointestinal

2:16PM  22  bleeds."  That's what GIB means.  "Rivaroxaban appears to

2:16PM  23  reduce patients' hazard of both recurrent VTE and major

2:17PM  24  bleeding in routine practice."

2:17PM  25       Did I read that correctly?

*OFFICIAL TRANSCRIPT*

1203

2:17PM  1    **A.**   You read it, but what it doesn't say is that in the

2:17PM  2    EINSTEIN studies, the patients weren't well controlled for

2:17PM  3    warfarin.   They had only what, 58 percent control for DVT and I

2:17PM  4    think 60 percent for PE.   So that's missing there in terms of

2:17PM  5    the warfarin risk for bleeding.

2:17PM  6    **Q.**   Let's look at one more study, "A comparison of the rate of

2:17PM  7    gastrointestinal bleeding in patients taking non-vitamin K

2:17PM  8    antagonist, oral anticoagulants, or warfarin."

2:17PM  9          If you look at "Conclusions:   In our patients the

2:17PM  10   incidence of gastrointestinal bleed for those on warfarin was

2:17PM  11   more than four times than that for those on NOACs."

2:17PM  12         Did I read that correctly?

2:17PM  13   **A.**   Were you --

2:17PM  14         **MR. HONNOLD:**   Is that a new study?   Counsel, do you

2:17PM  15   have a copy?

2:17PM  16   **BY MS. PRUITT:**

2:17PM  17   **Q.**   Defense Exhibit 2691.?

2:17PM  18   **A.**   Can I see the study?

2:17PM  19   **Q.**   I was just going to put it up.   I'm sorry, because I did

2:17PM  20   this while you testified this morning.   I apologize for not

2:17PM  21   having a copy.

2:18PM  22         **MR. HONNOLD:**   May I approach?   I'm going to go ahead

2:18PM  23   and -- if I may approach and --

2:18PM  24         **THE COURT:**   Yes, go ahead.

2:18PM  25         **MR. HONNOLD:**   -- since you don't have a copy.

*OFFICIAL TRANSCRIPT*

2:18PM   1   A.   Thank you.  All right.

2:18PM   2   BY MS. PRUITT:

2:18PM   3   Q.   The conclusion of this study is, "In our patients, the

2:18PM   4   incidence of gastrointestinal bleed for those on warfarin was

2:18PM   5   more than four times than that for those on NOACs."

2:18PM   6        That's all I'm asking you about.

2:18PM   7        Is that correct?

2:18PM   8   A.   Well, I don't know if it's correct, but that's what it

2:18PM   9   says, and it's pooling all -- together all NOACs, so I haven't

2:18PM  10   looked at all the data.

2:18PM  11   Q.   Now, you talked about some other labels when counsel was

2:18PM  12   talking to you; is that correct?

2:18PM  13   A.   We discussed other labels, yes, ma'am.

2:18PM  14   Q.   And let's look at the Arixtra label again.  Do you have it

2:18PM  15   up there?

2:18PM  16   A.   I don't know that I have it up here.

2:19PM  17   Q.   I'll be glad to put it up.  The Arixtra label that you

2:19PM  18   were shown, monitoring laboratory tests.

2:19PM  19        Do you see that?

2:19PM  20   A.   Right.

2:19PM  21   Q.   "Routine coagulation tests such as PT are relatively

2:19PM  22   insensitive measures of the activity of Arixtra."

2:19PM  23        Did I read that correctly?

2:19PM  24   A.   Yes, ma'am, you did.

2:19PM  25   Q.   And you said to the jury that this Arixtra was a Factor Xa

| | | |
|---|---|---|
| 2:19PM | 1 | inhibiting drug; correct? |
| 2:19PM | 2 | **A.**   No.  I was looking -- no, no.  No, no.  If you go back to |
| 2:19PM | 3 | the label, it talks about it's just not the inhibition of |
| 2:19PM | 4 | Factor X, but I was pointing out the anti-Factor X activity |
| 2:19PM | 5 | further down.  No, no, no.  Go down, third paragraph. |
| 2:19PM | 6 | "Anti-Factor Xa activity of fondaparinux sodium can |
| 2:19PM | 7 | be measured by anti-Factor Xa assay."  So I was just saying |
| 2:19PM | 8 | that there are assays that people discuss in their labeling |
| 2:20PM | 9 | about Factor Xa, because it's actually a different drug, but |
| 2:20PM | 10 | that's not -- |
| 2:20PM | 11 | **Q.**   We've already -- |
| 2:20PM | 12 | **A.**   -- its main function. |
| 2:20PM | 13 | **Q.**   Excuse me, Doctor.  We've already established that there |
| 2:20PM | 14 | is no anti-Factor Xa assay calibrated and controlled for |
| 2:20PM | 15 | Xarelto that's approved by the FDA in this country; is that |
| 2:20PM | 16 | correct? |
| 2:20PM | 17 | **A.**   Well, you're saying a couple of things wrong.  One, FDA |
| 2:20PM | 18 | doesn't approve in vitro devices.  They clear them by a 510(k) |
| 2:20PM | 19 | processing, you're substantially equivalent to another product. |
| 2:20PM | 20 | In terms of research, there are lots of laboratory |
| 2:20PM | 21 | products that are research listed, and they have highs and low |
| 2:20PM | 22 | values and stuff, so it's not like they just don't know |
| 2:20PM | 23 | anything about them.  This was an example of one that's out |
| 2:20PM | 24 | there and how someone included it in their label. |
| 2:20PM | 25 | **Q.**   I understand that.  But can you answer this question?  I |

| | | |
|---|---|---|
| 2:20PM | 1 | think you already did. |
| 2:20PM | 2 | There is not an anti-Factor Xa assay that's |
| 2:20PM | 3 | calibrated and controlled for use with Xarelto that's approved |
| 2:21PM | 4 | in the United States of America by the FDA, is there? |
| 2:21PM | 5 | A.   That's not correct, because if they're being used in a |
| 2:21PM | 6 | research laboratory, it's calibrated and controlled.  It is |
| 2:21PM | 7 | correct that it's not cleared, but every laboratory will |
| 2:21PM | 8 | actually calibrate their own tests, assays, and they will |
| 2:21PM | 9 | have -- all laboratories have this controlled.  So it's |
| 2:21PM | 10 | calibrated and controlled, but it's not been cleared by the FDA |
| 2:21PM | 11 | for marketing. |
| 2:21PM | 12 | Q.   Here's another document that you were shown by counsel for |
| 2:21PM | 13 | Ms. Mingo, and it was a contingency document, Plaintiff's |
| 2:21PM | 14 | Exhibit 859951, if you want to look at it. |
| 2:21PM | 15 | And I want to look at the third column there.  This |
| 2:21PM | 16 | is about Lovenox.  In the third column, it says, at 4/8/09, "We |
| 2:21PM | 17 | do not have data relating PT prolongation to bleeding risk.  We |
| 2:21PM | 18 | did look at the relationship between PT and bleeding, but could |
| 2:21PM | 19 | not identify a threshold predictive for bleeding or guidance |
| 2:22PM | 20 | around when to stop therapy." |
| 2:22PM | 21 | Did I read that correctly? |
| 2:22PM | 22 | A.   Right.  And that would be a therapeutic index in terms of |
| 2:22PM | 23 | setting up when somebody is at an increased risk of bleeding. |
| 2:22PM | 24 | The company did not develop that, and that's what they're |
| 2:22PM | 25 | saying there in terms of that middle part. |

2:22PM   1            **MS. PRUITT:**  Thank you.  Your Honor, I don't have any
2:22PM   2   further questions.
2:22PM   3            **THE COURT:**  Okay.  Any redirect?
2:22PM   4            **MR. HONNOLD:**  Yes, Your Honor.
2:22PM   5            **THE COURT:**  Why don't we take a break at this point?
2:22PM   6            **MR. HONNOLD:**  Certainly.
2:22PM   7            **THE COURT:**  Take a 10-minute break and come back.
2:22PM   8   We'll stand in recess for 10 minutes.
2:22PM   9            **THE DEPUTY CLERK:**  All rise.
2:22PM  10            (whereupon the jury was excused from the courtroom.)
2:23PM  11                         (Recess.)
2:41PM  12            (whereupon the jury entered the courtroom.)
2:41PM  13            **THE COURT:**  Okay.  Be seated, please.  Redirect?
2:41PM  14            **MR. HONNOLD:**  Briefly, Your Honor.  Thank you.
2:41PM  15            **THE COURT:**  We'll take you at your word "briefly."
2:41PM  16            **MR. HONNOLD:**  I'm pretty good for it.  I think I'm
2:41PM  17   pretty good for it.
2:41PM  18                      **REDIRECT EXAMINATION**
2:41PM  19                       **BY MR. HONNOLD:**
2:41PM  20   **Q.**   Dr. Parisian, I'm going to try to get you out of here.
2:41PM  21            There were some years and dollar figures that were up
2:41PM  22   on the board.  During those years that were reflected there, is
2:41PM  23   it true that those were years when there were drugs that were
2:42PM  24   removed, drugs or medical products that were removed from the
2:42PM  25   ROCKET -- from the market due to dangerous conditions by

2:42PM  1    manufacturers during those times?

2:42PM  2    **A.**   Yes, yes.

2:42PM  3    **Q.**   And those products that were removed from the market due

2:42PM  4    to safety concerns or significant FDA concern over safety, were

2:42PM  5    those the sorts of things that you were working on during those

2:42PM  6    years?

2:42PM  7    **A.**   Yes.  And there would be multiple patients involved and

2:42PM  8    issues, yes, ma'am -- yes, sir.

2:42PM  9    **Q.**   And that included both prescription drug products and

2:42PM  10   medical devices; correct?

2:42PM  11   **A.**   Yes, sir.

2:42PM  12   **Q.**   I'm not going to go through the list of those things that

2:42PM  13   might have been taken off the market, but they would be names

2:42PM  14   of medicines and products that people would recognize --

2:42PM  15   **A.**   Right.

2:42PM  16   **Q.**   -- here in the courtroom from things that appeared on TV

2:42PM  17   and being marketed as being safe and effective for a long time;

2:42PM  18   right?

2:42PM  19   **A.**   Right.  And my usual statements were consistent with what

2:42PM  20   the FDA was saying about those products.

2:42PM  21   **Q.**   And, Doctor, is it true that out of approximately 30 drugs

2:42PM  22   and devices that you worked on during those years, products

2:43PM  23   that were at issue, 17 of them had been voluntarily recalled

2:43PM  24   from the market due to significant concerns about safety by the

2:43PM  25   manufacturer?

1209

2:43PM  1    **A.**    Yes.

2:43PM  2    **Q.**    And that's what you were spending your time on,

2:43PM  3    representing -- looking into cases for folks that might have

2:43PM  4    been injured by those products?

2:43PM  5    **A.**    Yes, sir.

2:43PM  6    **Q.**    I want to follow up a little bit on this issue about the

2:43PM  7    Xa assay and the research-use-only issues.

2:43PM  8              Do you recall that?

2:43PM  9    **A.**    Yes, sir.

2:43PM  10   **Q.**    Is there any doubt that it's absolutely appropriate for a

2:43PM  11   prescription drug manufacturer to put into its label in

2:43PM  12   Section 5, in the laboratory test section, that there is a test

2:43PM  13   that has -- that is available on a research-use-only basis?

2:43PM  14   **A.**    Yes, you can do that.

2:43PM  15   **Q.**    That is specifically contemplated and allowed by the

2:43PM  16   regulations, is it not?

2:43PM  17   **A.**    Right.

2:44PM  18   **Q.**    And is it true that some research-use-only laboratory

2:44PM  19   tests might, in fact, be available at regional academic medical

2:44PM  20   centers, such as the University of Mississippi, I think was the

2:44PM  21   state that was mentioned, and Arkansas, so the University of

2:44PM  22   Arkansas, in Little Rock?  Those are the sorts of laboratories

2:44PM  23   that might actually use research-use-only materials; correct?

2:44PM  24   **A.**    Right.  And they can give values if a physician wants it.

2:44PM  25   Yes, sir.

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 2:44PM | 1 | **Q.**   And some of those entities actually put information like |
| 2:44PM | 2 | that on their websites to inform physicians that are in other |
| 2:44PM | 3 | places, smaller towns, that there might be some laboratory |
| 2:44PM | 4 | information useful that could help their patients; right? |
| 2:44PM | 5 | **A.**   Right. |
| 2:44PM | 6 | **MS. PRUITT:**  Your Honor, I'm going to object to this |
| 2:44PM | 7 | continued leading of this witness. |
| 2:44PM | 8 | **THE COURT:**  Please don't lead. |
| 2:44PM | 9 | **MR. HONNOLD:**  I apologize, Your Honor. |
| 2:44PM | 10 | BY MR. HONNOLD: |
| 2:44PM | 11 | **Q.**   Are there send-out laboratories, commercial laboratories, |
| 2:44PM | 12 | that use research-use-only products? |
| 2:44PM | 13 | **A.**   Yes.  And you can order the tests through them.  I've seen |
| 2:44PM | 14 | the tests.  I've seen the results. |
| 2:44PM | 15 | **Q.**   And are those send-out laboratories, are those services |
| 2:45PM | 16 | that are made available to physicians in small towns in |
| 2:45PM | 17 | Mississippi or Arkansas? |
| 2:45PM | 18 | **A.**   Yes. |
| 2:45PM | 19 | **Q.**   This conversation that we just had about the |
| 2:45PM | 20 | research-use-only products, does that also hold true for the |
| 2:45PM | 21 | laboratory developed tests? |
| 2:45PM | 22 | **A.**   Yes. |
| 2:45PM | 23 | **Q.**   Meaning that the regulation -- |
| 2:45PM | 24 | **THE COURT:**  "What does it mean?" |
| 2:45PM | 25 | **MR. HONNOLD:**  Oh, sorry. |

*OFFICIAL TRANSCRIPT*

THE WITNESS:  The laboratories develop its own test.

BY MR. HONNOLD:

Q.    So the LDT is a laboratory-developed test?

A.    Right.

Q.    Do the regulations allow for -- Section 5 of the label for laboratory tests to mention that a laboratory test is available only on a laboratory-developed-test basis?

A.    Right, with the caveat that the person who's getting the test knows that it's developed by the laboratory, but it's helpful information.

Q.    And that process of a laboratory-developed test, is that something that is -- that is watched over by the entities that regulate and certify hospital laboratories?

A.    Yes.

Q.    And do you know the names of those entities?

A.    The Clinical Pathology Group will actually look at these types of laboratory tests, the CAP group.  And then the hospital groups will also look at them if they're offered in a hospital.  And they're all controlled and calibrated, so there's oversight by the bodies that regulate where these are being issued from, where the test are coming from.

Q.    As you sit here today, is there any doubt in your mind that information about the Xa assay, either on an RUO basis or a laboratory-developed-test basis, could be included in Section 5 for Xarelto?

1212

2:46PM    1    A.    It could.   Just don't overstate what's going on with it,
2:46PM    2    and most of the FDA's emphasis is on the manufacturer who would
2:46PM    3    sell the test.   But you can put that information in there and
2:46PM    4    let the physician know about it, and they can get in contact
2:46PM    5    with a place that might have the test.
2:46PM    6    Q.    Doctor, are you familiar with the summary review that was
2:47PM    7    prepared by the FDA in early November 2011?
2:47PM    8    A.    Yes.
2:47PM    9    Q.    Is that a document that you have reviewed as part of your
2:47PM   10    work on this case?
2:47PM   11    A.    Yes.
2:47PM   12            MR. HONNOLD:   Mr. Carl, can we go to 5767781, please?
2:47PM   13    BY MR. HONNOLD:
2:47PM   14    Q.    And I'd like first to go to PDF Page Number 2.
2:47PM   15            First, Doctor, can you explain to us what an agency
2:47PM   16    summary review is?
2:47PM   17    A.    The FDA is required to put on -- to make available the
2:47PM   18    information that was considered for a decision that they made
2:47PM   19    to approve something.   So this is a summary that the deputy
2:47PM   20    division director put together about their involvement with the
2:47PM   21    VTE and then -- no, this is for ROCKET in terms of the SPAF
2:47PM   22    indications.
2:47PM   23            So it justifies the actions.   It memorializes it.
2:48PM   24    Remember, I was saying when new medical officers come, they
2:48PM   25    look at this type of a document to see what happened in the

2:48PM 1   past to get a product to where it is now.  So the medical

2:48PM 2   officers, people at the FDA, know to look at these documents.

2:48PM 3   And they're published on the FDA's website for the public and

2:48PM 4   physicians, anyone who wants to access item.

2:48PM 5   Q.   If we look at the -- what's on the screen here for

2:48PM 6   clinical review done by a Martin Rose and Preston Dunnmon,

2:48PM 7   would those individuals have been physicians?

2:48PM 8   A.   Yes, they were physicians.  I just happen to know they

2:48PM 9   are.  And they were assigned the clinical reviews for the --

2:48PM 10  the SPAF NDA.

2:48PM 11  Q.   And based upon your review of the summary review, did the

2:48PM 12  medical reviewers for Xarelto --

2:48PM 13       MS. PRUITT:  Your Honor, I'm going to object to this

2:48PM 14  line of questioning.  The summary review wasn't talked about in

2:48PM 15  either the direct examination or the cross-examination of this

2:48PM 16  witness.

2:48PM 17       MR. HONNOLD:  She significantly called into question

2:49PM 18  again the safety of the medication, and I'm simply pointing out

2:49PM 19  additional information that goes into that.

2:49PM 20       THE COURT:  This goes to something other than a

2:49PM 21  summary review.  He's dealing with another area, using this as

2:49PM 22  a reason to get to that other area.  I'll overrule the

2:49PM 23  objection and allow it.

2:49PM 24            Go ahead.

2:49PM 25       MR. HONNOLD:  Okay.

1214

| | |
|---|---|
| 2:49PM | 1 |
| 2:49PM | 2 |
| 2:49PM | 3 |
| 2:49PM | 4 |

**THE COURT:** I overruled the objection.

**MR. HONNOLD:** Thank you, Your Honor.

And could we go to PDF page 3 now, Mr. Carl? I'd like to highlight the sections that say "The primary clinical reviewers of this application, Dr. Rose and Dunnmon."

**BY MR. HONNOLD:**

Q. What is the significance of the two medical reviewers for a particular product and an indication voting against the medication being approved?

A. Well, it's unusual for a product to get approved when the medical officers who've been involved with the products and reviewed the data recommend against approval. And so that's what's happening here with the ROCKET studies, that the two medical officers are there. They're not in favor of approving it, and they give their justification.

This is coming from their boss, who's the division director, deputy director, and he's summarizing what the concerns were for the record to be left behind when they move on to other projects.

Q. So the two medical reviewers here that actually spent the time looking at all the material were against the approval of Xarelto for various reasons; is that correct?

A. Yes.

Q. If we move forward to page -- PDF page 9 in the summary review, do you recall, Doctor, that there were issues or

2:50PM   1   questioning about the dose that was to be used in the ROCKET

2:50PM   2   trial or doses that might be made available to patients?

2:50PM   3   A.   Right.  Because the company had chosen only one dose, and

2:50PM   4   the FDA was concerned that there should be -- have been other

2:50PM   5   doses tested, particularly at the twice-a-day dose versus the

2:51PM   6   one dose.  And they're basically saying that they -- the

2:51PM   7   company chose the dose in terms of the clinical trial, not the

2:51PM   8   FDA.

2:51PM   9   Q.   Based upon the materials that you reviewed, was there

2:51PM   10  significant concern that the 20-milligram dose for Xarelto was

2:51PM   11  too big and was causing too much bleeding?

2:51PM   12  A.   Yes, there was safety concerns.  There were also concerns

2:51PM   13  that -- of the warfarin arm that it hadn't been well

2:51PM   14  controlled.  So there were issues with the design and

2:51PM   15  implementation of the tests that the FDA was concerned about.

2:51PM   16  And here he says that they didn't have the authority to put the

2:51PM   17  clinical trial on hold because of inadequate dose selection.

2:51PM   18         The manufacturer makes the protocol.  They make the

2:51PM   19  clinical trial.  They make the dose that's going to be used,

2:51PM   20  what the endpoints are.  The FDA doesn't.

2:51PM   21         MS. PRUITT:  Your Honor, may we approach, please?

2:51PM   22         THE COURT:  Yeah.

2:51PM   23         (whereupon the following proceedings were held at the

2:51PM   24         bench out of the hearing of the jury:)

2:56PM   25         MS. PRUITT:  She hasn't given any dosing opinions,

2:56PM  1   Judge.  He's just going back and getting brand new opinions.

2:56PM  2          THE COURT:  Yeah, look.  You're moving out of the

2:56PM  3   area that deals with rehabilitation on redirect.  Let's not

2:57PM  4   introduce any new things.

2:57PM  5          MR. HONNOLD:  Okay.

2:57PM  6          THE COURT:  You can rehabilitate or feel like you

2:57PM  7   rehabilitate or let her express things she's already said,

2:57PM  8   but -- that you dealt with but didn't do it in the completeness

2:57PM  9   as you feel, but let's not introduce now areas.

2:57PM  10         MR. HONNOLD:  Got it.

2:52PM  11         (Whereupon, the following proceedings were held in

2:52PM  12         open court in the presence and hearing of the jury:)

2:52PM  13  BY MR. HONNOLD:

2:52PM  14  Q.   We can go ahead and move on to PDF page 10 of the summary

2:53PM  15  review, please, the paragraph "Additional Issues," and I'd like

2:53PM  16  to highlight down in that first paragraph through the word

2:53PM  17  "information."

2:53PM  18         Doctor, do you recall your testimony when I was

2:53PM  19  asking you questions earlier where we talked about the

2:53PM  20  relationship between rivaroxaban or Xarelto levels in the blood

2:53PM  21  and prothrombin time?

2:53PM  22  A.   Yes, sir.

2:53PM  23  Q.   And do you see here in the FDA summary review which was

2:53PM  24  dated November 4th of 2011 that the FDA is stating, "The

2:53PM  25  clinical pharmacology and clinical reviewers demonstrated that

2:53PM  1  there is a linear correlation between rivaroxaban levels and

2:53PM  2  prothrombin time"?

2:53PM  3      Do you see that?

2:53PM  4  A.   Yes, sir.

2:53PM  5  Q.   And, further, they also demonstrated that there is also a

2:53PM  6  correlation between PT and risk of bleeding?

2:54PM  7  A.   Right.

2:54PM  8  Q.   Does it appear that the things that you testified to on

2:54PM  9  direct examination have been supported to and agreed to by the

2:54PM  10  information in the FDA summary review?

2:54PM  11  A.   Yes.

2:54PM  12  Q.   And then the next sentence, last sentence, "This applicant

2:54PM  13  has not chosen to utilize this information."

2:54PM  14      Do you see that?

2:54PM  15  A.   Yes.

2:54PM  16  Q.   What does that mean?

2:54PM  17  A.   That means the applicant -- that would be Johnson &

2:54PM  18  Johnson, Janssen -- has chosen not to put that PT information

2:54PM  19  in their label.  That's the PT and bleeding risk which is what

2:54PM  20  we've been discussing.

2:54PM  21  Q.   As of today, Doctor, based upon your knowledge, training

2:54PM  22  and experience and all the material that you've reviewed in

2:54PM  23  this case, is there anything, any situation or condition that

2:54PM  24  would prohibit or -- prohibit the companies from putting

2:54PM  25  detailed Neoplastin PT information in Section 5 of the warnings

1218

| | | |
|---|---|---|
| 2:54PM | 1 | or precaution section of the label? |
| 2:54PM | 2 | **A.**   No. |
| 2:55PM | 3 | **Q.**   Similarly, is there anything that would prohibit the |
| 2:55PM | 4 | companies from putting detailed information and instructions |
| 2:55PM | 5 | regarding the use of the Factor Xa assay in Section 5 of the |
| 2:55PM | 6 | label for Xarelto? |
| 2:55PM | 7 | **A.**   No. |
| 2:55PM | 8 | THE COURT:  Anything further? |
| 2:55PM | 9 | MR. HONNOLD:  No.  And, Your Honor, we'd like to move |
| 2:55PM | 10 | into evidence 5767781.  And no further questions. |
| 2:55PM | 11 | THE COURT:  Okay. |
| 2:55PM | 12 | MS. PRUITT:  Your Honor, may we approach for just one |
| 2:55PM | 13 | moment? |
| 2:55PM | 14 | MR. HONNOLD:  It's Plaintiff's 102. |
| 2:55PM | 15 | THE COURT:  I'll admit it.  What's the -- |
| 2:55PM | 16 | MR. HONNOLD:  This will be Plaintiff's 102, Your |
| 2:55PM | 17 | Honor. |
| 2:55PM | 18 | THE COURT:  Yeah, I admitted it. |
| 2:55PM | 19 | MR. BIRCHFIELD:  Your Honor, the next witness will |
| 2:55PM | 20 | be -- we're continuing the video deposition of Dr. Lensing. |
| 2:55PM | 21 | THE COURT:  Okay. |
| 2:55PM | 22 | MR. BIRCHFIELD:  And with the Court's permission, we |
| 2:55PM | 23 | will -- |
| 2:55PM | 24 | MR. SARVER:  Your Honor, Ms. Pruitt wants to approach |
| 2:55PM | 25 | about this witness before we move on to the next. |

*OFFICIAL TRANSCRIPT*

1219

2:55PM  1          THE COURT:  Of course.

2:55PM  2          (Whereupon the following proceedings were held at the

2:55PM  3          bench out of the hearing of the jury:)

3:00PM  4          MS. PRUITT:  Your Honor, after the summary review

3:00PM  5   that they just used on their redirect, there was an FDA

3:00PM  6   guidance that came out right after this that talked about how

3:01PM  7   this drug was still safe and effective and that there shouldn't

3:01PM  8   be monitoring and several other things, and I would ask for

3:01PM  9   three minutes to just put up this 5840, because --

3:01PM  10         THE COURT:  You can do it on your side of the case;

3:01PM  11  not right now.

3:01PM  12         MS. PRUITT:  Okay.

3:01PM  13         THE COURT:  But put that in in your side of the case.

2:56PM  14         (Whereupon the following proceedings were held in

2:56PM  15         open court in the presence and hearing of the jury:)

2:56PM  16         MR. BIRCHFIELD:  Your Honor, with the Court's

2:56PM  17  permission, we will find a breaking time as close to 4:00, but

2:56PM  18  no later than 4:00 and stop at that time for the day.

2:56PM  19         THE COURT:  Okay.  Thank you.

2:57PM  20          I'm sorry.  You're excused.  Thank you.

2:57PM  21         THE WITNESS:  Thank you, Your Honor.

2:57PM  22         THE COURT:  You don't have to listen to this, unless

2:57PM  23  you speak Dutch.

2:57PM  24         THE WITNESS:  No.  Thank you.

2:57PM  25               (Witness excused.)

1220

|          |    |                                                                        |
|----------|----|------------------------------------------------------------------------|
| 2:57PM   | 1  | **THE COURT:**  Okay.  Folks, you remember Dr. Lensing.               |
| 2:57PM   | 2  | We've been with him a couple of days now.  Okay.                       |
| 2:57PM   | 3  | We're going to get you to that meeting.                                |
| 2:57PM   | 4  | **ANTHONIE LENSING,**                                                  |
| 2:57PM   | 5  | a witness called on behalf of the Plaintiff, being first duly          |
| 2:57PM   | 6  | sworn, was examined and testified as follows:                          |
| 2:57PM   | 7  | **DIRECT EXAMINATION (Cont.)**                                         |
| 2:57PM   | 8  | **BY MR. OVERHOLTZ:**                                                  |
| 2:57PM   | 9  | Q.   So one of the things that you've told us is that the              |
| 2:57PM   | 10 | decision to change the final initial intensified treatment            |
| 2:57PM   | 11 | period from 10 to 15 was made by the executive committee and          |
| 2:57PM   | 12 | the SMCC group in I think you said fall of 2006; correct?             |
| 2:58PM   | 13 | A.   This did indeed take place somewhat later in the year.  It       |
| 2:58PM   | 14 | wasn't the fall.  It was September, early September.  And that        |
| 2:58PM   | 15 | was at a joint session of the executive committee with SMCC.         |
| 2:58PM   | 16 | Q.   So, Dr. Lensing, Exhibit 36 is an email chain that begins        |
| 2:58PM   | 17 | on June 12th, 2006, ten days after we just looked at this            |
| 2:58PM   | 18 | response from Dr. Misselwitz to Mr. Arvis in which Andrea Derix      |
| 2:59PM   | 19 | from Bayer emails several people, including yourself, at the          |
| 2:59PM   | 20 | bottom of the first page, regarding the VTE treatment briefing       |
| 2:59PM   | 21 | package protocols final draft.                                        |
| 2:59PM   | 22 | Do you see that?                                                       |
| 2:59PM   | 23 | A.   Yes, I can see that.                                              |
| 2:59PM   | 24 | Q.   And Ms. Derix goes on in this email to you and others at        |
| 2:59PM   | 25 | Bayer, Mr. Jalota, and says, "The dosage regimen in the package      |

*OFFICIAL TRANSCRIPT*

2:59PM  1    is still unchanged, 10 milligram b.i.d. for three weeks

2:59PM  2    followed by 20-milligrams q.d., once daily."  Correct?

2:59PM  3    A.   That is indeed what it says.

2:59PM  4    Q.   So on the same day, June 12th, Mr. Jalota responds and

2:59PM  5    said, "Dear, Andrea.  Thanks for the information.  There was a

2:59PM  6    global advisory counsel meeting today, Sunday, 11 June, in New

3:00PM  7    York, where the dose for the intensive VTE treatment was

3:00PM  8    extensively discussed."

3:00PM  9         Do you see that?

3:00PM  10   A.   That is what it says there.

3:00PM  11   Q.   You didn't attend that GAC meeting; did you?

3:00PM  12   A.   I think this was a meeting organized by Johnson & Johnson,

3:00PM  13   and I do not recall being present at that meeting.

3:00PM  14   Q.   The next paragraph says, "There was a post-GAC meeting --

3:00PM  15   Joerg, Bernhard, Andreas, Martina, Ludwig from Bayer; Gary,

3:00PM  16   Bill, Lloyd, and myself from J&J -- with the common consensus

3:00PM  17   that based on the feedback from the external consultants, the

3:01PM  18   dose for the intensive VTE treatment should be changed from

3:01PM  19   10 milligrams b.i.d. to 15 milligrams b.i.d."

3:01PM  20        Do you see that?

3:01PM  21   A.   Yes, I can see that.

3:01PM  22   Q.   And so this indicates that in a post-GAC meeting,

3:01PM  23   Mr. Moeller and Mr. Glombitza as well as some people from

3:01PM  24   marketing from Bayer met with some of the regulatory and

3:01PM  25   clinicians at J&J and decided to change the dose for the

1222

1   intensified treatment from 10 milligrams to 15 milligrams

2   b.i.d. in June of 2006; correct?

3   A.   I find your summary highly inadequate.

4   Q.   Mr. Jalota goes further and says, "It was recognized that

5   there is no data on 15 milligrams b.i.d., only bridging data

6   between 10 milligrams b.i.d. and 20 milligrams b.i.d."

7         That's what he said to you in this email; right?

8   A.   That is what he says in his email that states me in cc.

9   Q.   And you see this -- if you look at 38 with me for just a

10  second, you see that this is describing the design of a

11  Phase III trial for VTE treatment.  And it still lists

12  10 milligrams b.i.d., 3 weeks; followed by 20 milligrams o.d.,

13  which had been the ideal up until this point in June of 2006;

14  right?

15  A.   It's true that we read here about 10 milligram b.i.d. for

16  three weeks, but to say that this was the idea to that point in

17  time is not true, because as you have been able to read, during

18  the period of the dose-finding studies up to the final

19  protocols, we had gone through a thorough process of assessing

20  and evaluating and hearing a great many experts in order to

21  come to what would be best for a Phase III trial.

22  Q.   Mr. Jalota next says, "It was also felt that the intensive

23  dose change should be made before the briefing package was

24  submitted to EMEA rather than wait and make the change in the

25  final final version.  There was a recognition that the

3:04PM   1    submission may be delayed, but the consensus is we need to give

3:04PM   2    a definite position on the dose.  We can discuss this at the

3:04PM   3    GDC tomorrow, Monday, 12 June.  We also need to update the

3:04PM   4    protocol accordingly."

3:04PM   5             That's what you wrote; correct?

3:04PM   6    A.   That's exactly -- that's correct.  That's what he wrote.

3:04PM   7    Q.   Okay.  So if we look at Exhibit 37, which was the

3:04PM   8    attachment to the email, at the very top is a question "Dose

3:04PM   9    selection."

3:04PM   10            Do you see that?

3:04PM   11   A.   Yes, I can see that.

3:05PM   12   Q.   Okay.  And if you can see with me that, in this question

3:05PM   13   it now reflects that the initial first three-week dose regimen

3:05PM   14   would be 15 milligrams b.i.d.

3:05PM   15            Do you see that?

3:05PM   16   A.   I can see that somebody made a change from 10 to 15.  I

3:05PM   17   can see that through track changes.  It seems to me that

3:05PM   18   somebody made a proposal in this case.

3:05PM   19   Q.   So in Exhibit 39, Max Wegner, from regulatory at Bayer,

3:05PM   20   emails on Monday, June 12th, 2006.  He forwards the email that

3:05PM   21   we looked at in Exhibit 38 from Sanjay Jalota to Joseph

3:05PM   22   Scheeren, Rene Kluensch and Andrea Derix at Bayer, the email

3:06PM   23   that he had received from Sanjay Jalota.

3:06PM   24            Do you see that?

3:06PM   25   A.   Yes, I can see that.

1224

| | | |
|---|---|---|
| 3:06PM | 1 | Q.   Okay.  And so Mr. Wegner says, "Dear, Joseph.  This comes |
| 3:06PM | 2 | quite as a surprise for us.  At Friday's finalization meeting |
| 3:06PM | 3 | of the briefing package, exactly the opposite was decided.  In |
| 3:06PM | 4 | addition, this is lagging any justification from a clinical |
| 3:06PM | 5 | perspective.  Regulatory was not at the meeting, except Sanjay. |
| 3:06PM | 6 | And we are not sure what is meant by 'feedback from external |
| 3:06PM | 7 | experts' as neither the principal investigator nor Ton Lensing |
| 3:06PM | 8 | were at the meeting." |
| 3:06PM | 9 |         Do you see that? |
| 3:06PM | 10 | A.   Yes, I can see that. |
| 3:06PM | 11 | Q.   He goes further and says, "Ton seemed not supportive of a |
| 3:06PM | 12 | dose change for the intensified VTE treatment."  Right? |
| 3:07PM | 13 | A.   It seems like -- it seems that I didn't want that. |
| 3:07PM | 14 | Q.   Okay.  And had you told Mr. Wegner that from a clinical |
| 3:07PM | 15 | perspective, there was no justification of changing the |
| 3:07PM | 16 | intensified dose regimen from 10 milligrams b.i.d. to |
| 3:07PM | 17 | 15 milligrams b.i.d.? |
| 3:07PM | 18 | A.   If I read the text correctly, you can find out for |
| 3:07PM | 19 | yourself that I didn't say that, but that's what he thinks |
| 3:07PM | 20 | himself. |
| 3:07PM | 21 | Q.   And that makes sense because of the flat efficacy dose |
| 3:07PM | 22 | curve that was seen in the Phase II dose-finding studies; |
| 3:07PM | 23 | right? |
| 3:07PM | 24 | A.   And you say "that" makes sense.  What do you mean by |
| 3:07PM | 25 | "that"? |

1225

3:07PM  1   **Q.**   I'll rephrase.

3:08PM  2          There wouldn't be a justification from a clinical

3:08PM  3   perspective to increase the pretreatment dose from

3:08PM  4   10 milligrams b.i.d. to 15 b.i.d. because what was seen in all

3:08PM  5   of the Phase II dose studies was a flat efficacy dose curve;

3:08PM  6   correct?

3:08PM  7   **A.**   Obviously, the choice of the dose was highly impacted by

3:08PM  8   the findings of the dose-finding studies, but it would be an

3:08PM  9   enormous mistake to limit yourself only to dose-finding

3:09PM  10  results, because over the past 30 to 40 years, we have done

3:09PM  11  extensive studies into DVT, and we've learned a lot, and we

3:09PM  12  should obviously also involve that knowledge.

3:09PM  13  **Q.**   This is a chart you're familiar with?

3:09PM  14  **A.**   Yes, I am.

3:09PM  15  **Q.**   That's the flat dose curve; right?

3:09PM  16  **A.**   It is a flat dose curve of the ODIXa-DVT study and --

3:09PM  17          **MR. OVERHOLTZ:**  So first, for the record, I'm going

3:09PM  18  to mark the ODIXa-DVT 1123 (verbatim) dose efficacy curve chart

3:09PM  19  that I've showed as Exhibit 40.

        20  **BY MR. OVERHOLTZ:**

        21  **Q.**   Take a look at Exhibit 19, which was the email that we

3:09PM  22  talked about from Frank Misselwitz to yourself on June 21st of

3:09PM  23  2006.  And you recall this is the email in which he said,

3:10PM  24  "Congratulations for fighting through all the difficult

3:10PM  25  decisions around the VTE treatment package submission."

*OFFICIAL TRANSCRIPT*

1        Do you see that?

3:10PM   2   A.   Yes, I see that.

3:10PM   3   Q.   Okay.  He goes on and says, "In general, I can live with

3:10PM   4   the decision to now take 15 milligram b.i.d. for the initial

3:10PM   5   treatment."

3:10PM   6        Do you see where he says that to you?

3:10PM   7   A.   I can see that.

3:10PM   8   Q.   He goes on and says, "The reason why I am writing you, we

3:10PM   9   have planned for two expert meetings before, during, after the

3:10PM   10  ESC WCC in Barcelona from September 1st through the 6th, one

3:10PM   11  for SPAF to be organized in close contact with J&J, and

3:10PM   12  importantly, another one on VTE treatment."

3:10PM   13       Do you see that?

3:10PM   14  A.   Yes, I see that.

3:11PM   15  Q.   Okay.  So this would indicate that the decision to move

3:11PM   16  from 10 milligrams b.i.d. to 15 milligrams b.i.d. was made well

3:11PM   17  in advance of the Barcelona meeting of the executive committee

3:11PM   18  in September of 2006; correct?

3:11PM   19  A.   No, that is not correct.

3:11PM   20  Q.   Now, you respond to Dr. Misselwitz on June 22nd, 2006,

3:11PM   21  above.

3:11PM   22       Do you see that?

3:11PM   23  A.   Yes, I see that.

3:11PM   24  Q.   Okay.  And can you read for us what you told

3:11PM   25  Dr. Misselwitz.

1227

| | |
|---|---|
| 3:11PM | 1 |
| 3:11PM | 2 |
| 3:11PM | 3 |
| 3:11PM | 4 |

**A.**   (In English)  "Dear, Frank.  I agree that Barcelona will be a nice opportunity for an EINSTEIN meeting.  I will discuss this Friday with Harry when we have our EINSTEIN meeting."

**Q.**   Okay.  So, Dr. Lensing, if we can look at Exhibit 41, this is an email from Petro van Bergen with ICTOM to multiple people, including yourself about halfway down the page, again to your awalensing@planet.nl email address on September 12th, 2006.  The subject, "Barcelona meeting, September 2nd, 2006."

Do you see that?

You were aware that the FDA had concerns about the design of the EINSTEIN Phase III trial program; right?

**A.**   The FDA proposed to take a different approach to a number of things, but when you use the word "concern," then that is your interpretation.

**Q.**   So now let's take a look at the -- I think it's Exhibit 42, which were the meeting minutes from the Barcelona meeting that were attached.

And do you see that you're listed as being present at the meeting at the bottom of the "present" list?

**A.**   Yes, I see that, and I do remember.

**Q.**   There's no one on the SMCC or the executive committee from the United States that attended this meeting; correct?

**A.**   Yes, that's correct.  For the representatives of the United States, Doctor -- or Professor Davidson and Raskob are stated as apologized for this meeting.

*OFFICIAL TRANSCRIPT*

| | | |
|---|---|---|
| 3:13PM | 1 | **Q.** Okay. Now, there were representatives from Bayer and |
| 3:13PM | 2 | Janssen, Johnson & Johnson at the meeting; correct? |
| 3:13PM | 3 | **A.** Yes, that's correct. |
| 3:13PM | 4 | **Q.** And Martina Evertz, she was marketing; correct? |
| 3:14PM | 5 | **A.** I believe she was marketing, yes. |
| 3:14PM | 6 | **Q.** Okay. Now, if you can look with me at these meeting |
| 3:14PM | 7 | minutes of the Barcelona meeting, do you see any mention or |
| 3:14PM | 8 | discussion of changing the dose from 10 milligrams to |
| 3:14PM | 9 | 15 milligrams for the initial intensified treatment period? |
| 3:14PM | 10 | **A.** At first glance, I see no such thing. |
| 3:14PM | 11 | **Q.** So you see that Exhibit 44 is an email from Bernhard |
| 3:14PM | 12 | Glombitza to Andrea Derix, Frank Misselwitz, and Joerg Moeller |
| 3:14PM | 13 | regarding the GAC meeting minutes dose adaptation in SPAF. |
| 3:14PM | 14 | Do you see that? |
| 3:14PM | 15 | **A.** Yes, I see that. |
| 3:14PM | 16 | **Q.** Okay. And you recall that before we were looking at the |
| 3:15PM | 17 | email from Mr. Jalota in Exhibit 36 -- |
| 3:15PM | 18 | **A.** Okay. |
| 3:15PM | 19 | **Q.** -- which was -- go ahead.? |
| 3:15PM | 20 | **A.** Yes, I remember. |
| 3:15PM | 21 | **Q.** And this was the meeting where Mr. Jalota emailed and you |
| 3:15PM | 22 | were copied and said that there had been a global advisory |
| 3:15PM | 23 | committee meeting in New York on the 11th of June; right? |
| 3:15PM | 24 | **A.** That's correct. |
| 3:15PM | 25 | **Q.** And then he described that there was a post-GAC meeting |

3:15PM 1   with the Joerg, Bernhard, Andreas, Martina, Ludwig from Bayer;

3:15PM 2   Gary, Bill, Lloyd and Mr. Jalota from J&J.?

3:15PM 3   A.   Yes, that's what it says.

3:15PM 4   Q.   So if you can look with me now at Exhibit 45, which was

3:15PM 5   the attachment to the Bernhard Glombitza email for the GAC

3:16PM 6   meeting minutes.?

3:16PM 7   A.   Uh-huh.

3:16PM 8   Q.   Okay.  And if you can look with me on page 4, there's a

3:16PM 9   list of participants from Bayer.

3:16PM 10            Do you see those?

3:16PM 11  A.   Yes, I see that.

3:16PM 12  Q.   All right.  And we know from our discussions that Andreas

3:16PM 13  Nauck was in marketing; right?

3:16PM 14  A.   Yes, that's correct.

3:16PM 15  Q.   Okay.  And we know that Martina Evertz was from marketing;

3:16PM 16  right?

3:16PM 17  A.   That's correct.

3:16PM 18  Q.   Okay.  It says, "The competitive marketplace, including

3:16PM 19  the clinical activities and likely target indications of the

3:16PM 20  major competitors -- particularly dabigatran, apixaban, and

3:16PM 21  odiparcil -- were presented by Andreas Nauck in order to put

3:16PM 22  the CDP, the clinical development plan, for rivaroxaban into

3:16PM 23  context of the likely launch marketplaces."

3:17PM 24            Do you see that?

3:17PM 25  A.   I see it says that, yes.

1230

3:17PM 1    Q.    In the final Phase III EINSTEIN for the initial treatment

3:17PM 2    phase, there was only one Xarelto dose studied; correct?

3:17PM 3    A.    We studied one rivaroxaban regimen with various doses in

3:17PM 4    the first three weeks.  We studied 50 milligrams twice daily

3:17PM 5    for the first three weeks and 20 milligrams once daily for the

3:17PM 6    remaining period.

3:17PM 7    Q.    You had no way to know whether a lower b.i.d. dose during

3:17PM 8    the Phase III initial treatment period would have been just as

3:18PM 9    efficacious but safer; right?

3:19PM 10   A.    I'm so very glad that you raised this item, because that

3:19PM 11   was exactly the biggest problem we faced when we were selecting

3:19PM 12   the regimen for rivaroxaban.  Because only recently data had

3:19PM 13   become available on idraparinux, which is a Xa inhibitor.  And

3:19PM 14   these data had just become available from the Van Gogh-PE

3:19PM 15   study.

3:19PM 16         And based on the dosage-finding study, the patients

3:19PM 17   showed a flat response because the dosage had been too low in

3:19PM 18   the first weeks.  So within two to three weeks, a number of

3:20PM 19   patients developed a pulmonary emboli which was fatal.

3:20PM 20         So -- and that was not just noninferior to the

3:20PM 21   standard of care, but it was even inferior to the standard of

3:20PM 22   care.  So it was very traumatic, and it was very important at

3:20PM 23   that time.

3:20PM 24   Q.    You never studied a lower dose for the initial treatment

3:20PM 25   period in the Xarelto Phase III studies; correct?

3:20PM 1  **A.**   Indeed no, because we thought it would be very

3:20PM 2  irresponsible.  And now on the basis of the results that we

3:20PM 3  have now, we deem it totally unnecessary to do.

3:20PM 4  **Q.**   Just days before you're going to present the study to the

3:21PM 5  FDA, you and Dr. Misselwitz were favoring a 10-milligram dose

3:21PM 6  to be the dose studied; right?

3:21PM 7  **A.**   Before the final protocol was determined, we had extensive

3:21PM 8  thinking exercises.  We considered and reconsidered all

3:21PM 9  arguments and looked at all different scenarios.

3:22PM 10       And the choice we made eventually was for the most

3:22PM 11 efficacious and safe version, namely 15 milligrams b.i.d. for

3:22PM 12 three weeks followed by 20 milligrams o.d.  And looking back,

3:22PM 13 we were proven to have made the right choice.

3:22PM 14 **Q.**   The truth is you agree there's no evidence from any of

3:22PM 15 Bayer's studies that 15 milligrams b.i.d. Xarelto would have

3:22PM 16 been better than 10 milligrams b.i.d. for the intensive

3:22PM 17 treatment period?

3:23PM 18 **A.**   There is indirect evidence here that it is so, but you

3:23PM 19 removed that part from my answer a minute ago.  We have

3:23PM 20 experience with Xa inhibitors that show that it is possible to

3:23PM 21 have a dose at the outset which is rather low, but in the long

3:24PM 22 term proves to be efficacious.

3:24PM 23       And we've published -- we have information published

3:24PM 24 in the *New England Journal of Medicine*, the Van Gogh study.  I

3:24PM 25 would advise you to read this because then you would understand

1232

| | | |
|---|---|---|
| 3:24 PM | 1 | the dilemma that we were faced with back when we had to make |
| 3:24 PM | 2 | the choice for the EINSTEIN project. |
| 3:24 PM | 3 | Q.   Van Gogh wasn't a Xarelto study; right? |
| 3:24 PM | 4 | A.   That was also a Xa inhibitor, just like in Xarelto.  And |
| 3:25 PM | 5 | it was also patients with DVT and PE.  And, unfortunately, we |
| 3:25 PM | 6 | lost many patients that died because there was another dose |
| 3:25 PM | 7 | that was used plus a Xa inhibitor at the start. |
| 3:25 PM | 8 | And I can assure you, if you have that happen to you |
| 3:25 PM | 9 | once in your life, you never want it to happen again. |
| 3:25 PM | 10 | Q.   Of course, you have to have a balance between efficacy and |
| 3:25 PM | 11 | safety for an anticoagulant; right? |
| 3:26 PM | 12 | A.   Well, balance -- what is balance?  That's a very vague |
| 3:26 PM | 13 | term.  What does it mean precisely? |
| 3:26 PM | 14 | In thrombotic and PE patients, there is one huge |
| 3:26 PM | 15 | risk, and that is the risk of recurrence.  There's 10 to 15 |
| 3:26 PM | 16 | percent that has recurrence if they're not treated properly. |
| 3:26 PM | 17 | 10 percent -- 10 percent of those end in fatality.  That is a |
| 3:27 PM | 18 | huge problem. |
| 3:27 PM | 19 | Add to that the risk of bleeding.  It's one in ten |
| 3:27 PM | 20 | vis-a-vis the risk of recurrence.  So that would be a balance |
| 3:27 PM | 21 | that would be unacceptable.  Therefore, you have to look for a |
| 3:27 PM | 22 | dose that will make sure that this 10 to 15 percent recurrence |
| 3:27 PM | 23 | goes down to a level where the bleeding does not increase. |
| 3:27 PM | 24 | Q.   But if there's no evidence that you have that increasing |
| 3:27 PM | 25 | the dose makes the drug work any better or help patients more |

3:27PM   1    and all you've done is increased the risk of bleeding, you

3:27PM   2    haven't helped patients at all; have you?

3:28PM   3    A.    The EINSTEIN-DVT and PE studies show that with rivaroxaban

3:29PM   4    used in thrombotic patients, there was a 2.1 percent over

3:29PM   5    period of ten months recurrence.  And that's the lowest

3:29PM   6    recurrence ever recorded in a clinical study.  That was

3:29PM   7    worldwide.

3:29PM   8           After that, the EINSTEIN-DVT and PE study, with

3:29PM   9    regard to major bleeding rate, recorded a percentage of 1.0

3:29PM   10   over a period for ten months, which is also one of the lowest

3:29PM   11   rates ever recorded.

3:29PM   12          Therefore, the choice that we made for this regimen

3:29PM   13   is really very good, and it combines preventing fatal PE for

3:29PM   14   the patients involved whilst keeping the bleeds at a minimum.

3:29PM   15   Q.    Dr. Lensing, Exhibit 46 is the FDA fax of August 14th,

3:30PM   16   2006, to Bayer regarding the end of Phase II meeting that was

3:30PM   17   upcoming.

3:30PM   18          Do you see that?

3:30PM   19   A.    Yes, I can see that.

3:30PM   20   Q.    Okay.  So under Item Number 1, "Dose Selection, Dose

3:30PM   21   Regimen," it describes what had been proposed by Bayer for the

3:30PM   22   Phase III program, the 15-milligram twice-daily dose for the

3:30PM   23   initial three-week treatment period followed by 20 milligrams

3:30PM   24   once-daily Xarelto; right?

3:30PM   25   A.    That's right.

3:30PM   1   **Q.**   Okay.   And so the question asked by Bayer was, "Does the
3:30PM   2   agency concur with the above-mentioned dosing strategy and
3:30PM   3   regimen in the Phase III study?" followed by the FDA response;
3:30PM   4   right?
3:30PM   5   **A.**   That's right.
3:31PM   6   **Q.**   The FDA says, "No, we do not concur.   Instead of your
3:31PM   7   current dose plans, we recommend that you propose a dose of
3:31PM   8   10 milligrams b.i.d. for your Phase III studies based on the
3:31PM   9   following," followed by three bullet points; correct?
3:31PM  10   **A.**   That's correct.
3:31PM  11   **Q.**   They say, "Similar pilot efficacy yet more bleeding events
3:31PM  12   in the higher dose experience, 20-milligram and 30-milligram
3:31PM  13   b.i.d."   Right?
3:31PM  14   **A.**   That's right.
3:31PM  15   **Q.**   And that would have been referring to the data from the
3:31PM  16   ODIXa-DVT dose-finding study; right?
3:31PM  17   **A.**   It referred to that study, that's correct.
3:31PM  18   **Q.**   That's the study we looked at, the chart that had the flat
3:31PM  19   dose efficacy curve?
3:32PM  20   **A.**   Both dose-finding studies had a flat dosage curve,
3:32PM  21   including -- dose response curve, including the one that you're
3:32PM  22   referring to.
3:32PM  23   **Q.**   If you can look with me in the top of -- I guess it's
3:32PM  24   page 3 of the fax.   It's page 2 listed on the top left.
3:32PM  25                 "Does the agency agree that a choice of heparin

1235

| | |
|---|---|
| 3:32PM | 1 |
| 3:32PM | 2 |
| 3:32PM | 3 |
| 3:32PM | 4 |
| 3:32PM | 5 |
| 3:32PM | 6 |
| 3:32PM | 7 |
| 3:32PM | 8 |
| 3:32PM | 9 |
| 3:33PM | 10 |
| 3:33PM | 11 |
| 3:33PM | 12 |
| 3:33PM | 13 |
| 3:33PM | 14 |
| 3:33PM | 15 |
| 3:33PM | 16 |
| 3:33PM | 17 |
| 3:33PM | 18 |
| 3:33PM | 19 |
| 3:33PM | 20 |
| 3:33PM | 21 |
| 3:33PM | 22 |
| 3:33PM | 23 |
| 3:33PM | 24 |
| 3:33PM | 25 |

1  limited to only one type of heparin per center and a choice of
2  VKA limited to warfarin or acenocoumarol is acceptable?"
3           That would have been Bayer's question to the FDA?
4  A.   That's correct.
5  Q.   The next bullet point says, "You proposed a single
6  noninferiority trial for acute treatment of VTE.  Two adequate
7  and well-controlled studies are generally needed to support a
8  new indication.  There is a risk in performing a single trial
9  that may not have convincingly positive results to support the
10  proposed indication."
11           Do you see that?
12  A.   Yes, I see that.
13  Q.   Okay.  And they say, "In addition, a noninferiority trial
14  is less likely to be persuasive."  Right?
15  A.   That is what it says.
16  Q.   Let's look at page 3, point number 4, which is the primary
17  efficacy endpoint section.  And you see that there's a question
18  proposed by Bayer regarding whether the composite primary
19  efficacy endpoint, recurrent symptomatic VTE, including fatal
20  PE and unexplained death, would be sufficient to support the
21  approval of Xarelto in the desired indication.
22           Do you see that?
23  A.   Yes, I see that.
24  Q.   And there's an FDA response, and it says, "No.  We
25  reiterate the design limitations associated with Study 11702:

3:33PM 1   open-label, multiple comparator agents, noninferiority

3:34PM 2   design.  We are especially concerned regarding the subjectivity

3:34PM 3   associated with unexplained death and symptomatic VTE in an

3:34PM 4   open-label study."

3:34PM 5         Do you see that?

3:34PM 6   A.   Yes, I see that.

3:34PM 7   Q.   The FDA says, "We request that you redesign the analytical

3:34PM 8   aspects of this study to use a superiority approach on a

3:34PM 9   primary endpoint that includes a composite of symptomatic VTE

3:34PM 10   or death for any cause.  Given an open-label design and your

3:34PM 11   proposal for a single confirmatory study, we have substantial

3:34PM 12   concerns that a noninferiority analytical approach to the

3:34PM 13   primary endpoint would result in non-persuasive results."

3:34PM 14   Right?

3:34PM 15   A.   It is what it says, yes.

3:34PM 16   Q.   The next section is for primary safety endpoint, and Bayer

3:34PM 17   asks the FDA if they concurred with the definitions of "major

3:34PM 18   bleeding" and "clinically relevant nonmajor bleeding"; right?

3:35PM 19   A.   Yes, that's correct.

3:35PM 20   Q.   And the FDA said that those definitions were acceptable?

3:35PM 21   A.   Yes, that's correct.

3:35PM 22   Q.   The FDA says, "We do not regard this study design as

3:35PM 23   sufficient to support a claim of superior safety predominantly

3:35PM 24   due to the use of multiple comparator agents in the control arm

3:35PM 25   as well as the analytic approach."

3:35PM  1           Do you see that?

3:35PM  2   A.   Yes, I see that.

3:35PM  3   Q.   If you look with me in the third bullet point, the FDA

3:35PM  4   states that, "The comparator agents may differ in safety

3:35PM  5   outcomes that fail to be detected due to sample size

3:35PM  6   considerations, underpowering.  Additionally, the open-label

3:35PM  7   nature of the study is conducive to undetectable bias in

3:35PM  8   patient management that may impact safety outcomes."

3:35PM  9           That's what the FDA said to Bayer in August of 2006;

3:35PM  10  correct?

3:35PM  11  A.   That's correct.

3:35PM  12  Q.   Okay.  If we can turn over to -- so if you look with me,

3:36PM  13  Dr. Lensing, at Exhibit 50.  You see that this is the fax from

3:36PM  14  the FDA of September 5th, 2006, to Larry Winick, which is the

3:36PM  15  minutes of the August 23rd, 2006, meeting.

3:36PM  16          Do you see that?

3:36PM  17  A.   Yes, I see that.

3:36PM  18  Q.   Okay.  And so if we can turn over and look at page 3, the

3:36PM  19  memorandum of meeting minutes.  You see it's dated August 23rd,

3:36PM  20  2006, and it lists who the attendees were from the FDA.  And

3:36PM  21  then it lists at the bottom external constituent attendees, and

3:36PM  22  Bayer is listed first.

3:36PM  23          Do you see that?

3:36PM  24  A.   I see that.

3:36PM  25  Q.   Okay.  And we can see that you were an attendee at the

1238

3:36PM  1    meeting; right?

3:36PM  2    A.   That's right.

3:36PM  3    Q.   If you look with me at the second bullet point under

3:36PM  4    Number 2, it says, "The agency acknowledged the sponsor's

3:37PM  5    remarks, but expressed concerns that the proposed study design

3:37PM  6    may not result in persuasive results.  See prior comments."

3:37PM  7            Do you see that?

3:37PM  8    A.   I see that.

3:37PM  9    Q.   Turn to the next page.  There's a section related to dose.

3:37PM  10   And the first thing that it says under "dose" is, "A flat dose

3:37PM  11   VTE incidence rate relationship was seen over a range of

3:37PM  12   2.5 milligrams to 30 milligrams b.i.d. (twelvefold) for VTE

3:37PM  13   prevention in major orthopedic surgery (four trials) and from

3:37PM  14   10 to 30 milligrams b.i.d., 20 to 40 milligrams o.d. in the

3:37PM  15   dose-selection trials for the treatment of acute symptomatic

3:37PM  16   DVT (two trials)."

3:37PM  17           Do you see that?

3:37PM  18   A.   Yes, I see that.

3:37PM  19   Q.   Okay.  They say, "However, a dose response with increased

3:38PM  20   bleeding at higher doses was noticed.  Hence, the agency

3:38PM  21   suggested that a lower dose may be more appropriate in the

3:38PM  22   studies."

3:38PM  23           That's what the FDA states in these minutes; correct?

3:38PM  24   A.   What the FDA did establish in those minutes is that the

3:38PM  25   bleeding incident -- incidence increases with 20 milligram

*OFFICIAL TRANSCRIPT*

3:38PM 1   b.i.d. and 30 milligram b.i.d.

3:38PM 2   Q.   Does Exhibit 50 still continue to have the FDA's responses

3:38PM 3   in relation to the question that they did not concur and that

3:38PM 4   instead of the current dose plans, we recommend that you

3:38PM 5   propose a dose of 10 milligrams b.i.d. for your Phase III

3:38PM 6   studies?

3:38PM 7   A.   Yes, that's correct.

3:38PM 8   Q.   Okay.  Dr. Lensing, one of the things that we've discussed

3:39PM 9   is the basis for choosing the 15 milligram b.i.d. dosing

3:39PM 10  regimen for the intensified treatment, and I want to talk to

3:39PM 11  you a little bit about the reasons for that decision.

3:39PM 12       So you and I agree with the dose that's selected

3:39PM 13  should obviously be a dose that's going to ensure efficacy?

3:39PM 14  A.   Yes, of course.

3:39PM 15  Q.   Okay.  Do you agree that one of the reasons why the

3:39PM 16  intensified dose was selected to be 15 milligrams b.i.d. was

3:39PM 17  because in the clinical experience in the past of treatment of

3:39PM 18  VTE that clinicians were used to the treatment dose being two

3:40PM 19  to three times greater than the prevention dose?

3:41PM 20  A.   Definitely that did play a role, and -- but our cumulative

3:41PM 21  experience with anticoagulants over the past 30 to 40 years

3:41PM 22  shows that therapeutic doses of two to three times higher is

3:41PM 23  not enough, that it should be three to five times higher than a

3:41PM 24  prophylactic doses, definitely.

3:41PM 25       However, it is not just simple experience when it is

1240

3:41PM  1   demonstrated by 12 to 14 studies in which it appears that if
3:41PM  2   you underdose an anticoagulant just a little bit, that there's
3:41PM  3   a threshold of a number of patients with new thrombosis that is
3:42PM  4   catastrophic and that rises immediately.
3:42PM  5   Q.   Whenever the original decisions were made to propose
3:42PM  6   10 milligrams twice daily as the intensified dose, the Van Gogh
3:42PM  7   study was within the consideration of you and Dr. Misselwitz
3:42PM  8   and the executive committee members of the study at that time,
3:42PM  9   wasn't it?
3:43PM  10  A.   In that -- at that time the results of the Van Gogh study,
3:43PM  11  PE study, were recently published, so that must have played a
3:43PM  12  role.  However, it is very important that you know that it
3:43PM  13  wasn't an instant decision to simply choose a totally different
3:43PM  14  path, but that it was a very gradual procedure in which people
3:43PM  15  met in which the pros and cons were considered and which
3:44PM  16  this -- this process in itself was a very careful process, and
3:44PM  17  we arrived at an end dose to which all parties could agree.
3:46PM  18        Moreover, this dose that was chosen was extremely
3:46PM  19  efficient.  It was much, much safer than the comparative
3:46PM  20  agents, and the reduction in bleeding, the major bleedings, was
3:46PM  21  50 percent.
3:46PM  22        Now, not only was it -- were bleedings -- was the
3:46PM  23  incidence of bleedings a lot lower, but they were also less
3:46PM  24  often fatal bleedings, and they were less often in very
3:46PM  25  critical locations, such as intracranially.  We found only five

3:46PM   1    with rivaroxaban and 30 in the comparative products.

3:46PM   2    **Q.**   One of the concerns was whether or not you would get

3:46PM   3    acceptance of the dose by the clinical investigators in the

3:46PM   4    EINSTEIN trial; right?

3:47PM   5    **A.**   Of course.  A dose that we propose must be accepted, and

3:47PM   6    you don't know that beforehand.

3:47PM   7    **Q.**   Especially for the treatment of pulmonary emboli?

3:47PM   8    **A.**   And also treatment for thrombosis legs.  You mustn't

3:47PM   9    forget that many patients that have a thrombosis leg also have

3:47PM   10   a pulmonary emboli that is asymptomatic.  50, 60, 70 percent.

3:47PM   11   **Q.**   PE and DVT?

3:47PM   12   **A.**   Yeah.

3:47PM   13   **Q.**   And so was one of the concerns also that if the drug met

3:47PM   14   its approval, that -- whether or not you would receive

3:47PM   15   acceptance by clinicians in the marketplace?

3:48PM   16   **A.**   I don't care about that at all.  I only worry about the

3:48PM   17   safety of my patients and whether they are treated correctly or

3:48PM   18   not.  That's my target, and I dedicate 100 percent of my

3:48PM   19   efforts to that.

3:48PM   20          **MR. BIRCHFIELD:**  Your Honor, that may be a good

3:48PM   21   breaking place.

3:48PM   22          **THE COURT:**  Okay.  Let's break here.

3:48PM   23          Members of the jury.  We'll stop here, and I'll

3:48PM   24   see you all on Monday at 8:30.  Have a good weekend, all of

3:48PM   25   you.  And thank you very much for all the hard work.  You all

3:48PM    1    have been working very hard this week.  Outstanding jury.

3:48PM    2    Thank you very much.

3:48PM    3                Court will stand in recess.

3:48PM    4            THE DEPUTY CLERK:  All rise.

3:49PM    5            (WHEREUPON, the jury was excused for the evening.)

3:49PM    6            THE DEPUTY CLERK:  Judge, what time do you want

3:49PM    7    counsel back on Monday?

3:49PM    8            THE COURT:  Do we have issues to talk about?

3:49PM    9            MR. BIRCHFIELD:  I don't know of any issues.

3:49PM   10            MS. PRUITT:  We're too tired to have any issues.

3:49PM   11            MR. HONNOLD:  We're issue-free at the moment.

3:49PM   12            THE COURT:  You all want to meet at 8:00 or 8:15?

3:49PM   13            MR. SARVER:  I think 8:15 is fine, Your Honor.  I

3:49PM   14    can't think of any issues.  We'll let Jason know.

3:49PM   15            THE COURT:  Jason, will be here, and I'm available.

3:49PM   16                Okay.  All right.  Thank you.  You all have a

3:49PM   17    good weekend.

3:49PM   18

3:49PM   19                        **CERTIFICATE**

3:49PM   20            I, Tana J. Hess, CCR, FCRR, Official Court Reporter
3:49PM         for the United States District Court, Eastern District of
3:49PM   21    Louisiana, certify that the foregoing is a true and correct
3:49PM         transcript, to the best of my ability and understanding, from
3:49PM   22    the record of proceedings in the above-entitled matter.
3:49PM
3:49PM   23
3:49PM
3:49PM   24                    _____
3:49PM                        Tana J. Hess, CCR, FCRR, RMR
3:49PM   25                    Official Court Reporter
3:49PM

*OFFICIAL TRANSCRIPT*