UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF MISSISSIPPI

| | |
|---|---|
| IN RE:  XARELTO (RIVAROXABAN)  *<br>PRODUCTS LIABILITY LITIGATION  *<br>                               *<br>                               *<br>THIS DOCUMENT RELATES TO:      *<br>                               *<br>*Dora Mingo, et al.*           *<br>*v. Janssen Research &*        *<br>*Development, LLC, et. al.,*   *<br>Case No. 15-CV-3469            *<br>                               *<br>*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  * | Docket No. 14-MD-2592<br><br>Section L<br><br>Jackson, Mississippi<br><br>August 14, 2017 |

VOLUME VI – AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

<u>Appearances</u>:

| | |
|---|---|
| For the Plaintiffs: | Beasley Allen Crow Methvin<br>   Portis & Miles, PC<br>BY:  ANDY BIRCHFIELD, ESQ.<br>Post Office Box 4160<br>Montgomery, Alabama 36103 |
| For the Plaintiffs: | Gainsburgh Benjamin David<br>   Meunier & Warshauer, LLC<br>BY:  GERALD E. MEUNIER, ESQ.<br>1100 Poydras Street, Suite 2800<br>New Orleans, Louisiana 70163 |
| For the Plaintiffs: | Gainsburgh Benjamin David<br>   Meunier & Warshauer, LLC<br>BY:  WALTER C. MORRISON IV, ESQ.<br>240 Trace Colony Park Drive<br>Suite 100<br>Ridgeland, Mississippi 39157 |

<u>Appearances</u>:

| | |
|---|---|
| For the Plaintiffs: | Goza & Honnold, LLC<br>BY:  BRADLEY D. HONNOLD, ESQ.<br>11181 Overbrook Road, Suite 200<br>Leawood, Kansas 66211 |
| For the Plaintiffs: | The Lambert Firm, PLC<br>BY:  EMILY C. JEFFCOTT, ESQ.<br>701 Magazine Street<br>New Orleans, Louisiana 70130 |
| For the Plaintiffs: | Levin Sedran & Berman<br>BY:  FRED S. LONGER, ESQ.<br>510 Walnut Street, Suite 500<br>Philadelphia, Pennsylvania 19106 |
| For Bayer Healthcare<br>Pharmaceuticals, Inc.<br>and Bayer Pharma AG: | Mitchell Williams Selig Gates<br>  & Woodyard, PLLC<br>BY:  LYN P. PRUITT, ESQ.<br>425 W. Capitol Avenue<br>Suite 1800<br>Little Rock, Arkansas 72201 |
| For Bayer Healthcare<br>Pharmaceuticals, Inc.<br>and Bayer Pharma AG: | Watkins & Eager, PLLC<br>BY:  WALTER T. JOHNSON, ESQ.<br>400 East Capitol Street<br>Jackson, Mississippi 39201 |
| For Bayer Healthcare<br>Pharmaceuticals, Inc.<br>and Bayer Pharma AG: | Bradley Arant Boult Cummings<br>BY:  LINDSEY C. BONEY IV, ESQ.<br>1819 5th Avenue N<br>Birmingham, Alabama 35203 |
| For Janssen Pharmaceuticals,<br>Inc. and Janssen Research<br>& Development, LLC: | Barrasso Usdin Kupperman Freeman<br>  & Sarver, LLC<br>BY:  RICHARD E. SARVER, ESQ.<br>909 Poydras Street, Suite 2400<br>New Orleans, Louisiana 70112 |

Official Court Reporter:          Toni Doyle Tusa, CCR, FCRR
                                  500 Poydras Street, Room B-275
                                  New Orleans, Louisiana 70130
                                  (504) 589-7778


Proceedings recorded by mechanical stenography, transcript
produced by computer.

<u>**INDEX**</u>

|                                                  | <u>Page</u> |
| ------------------------------------------------ | ---- |
| Conference in Chambers                           | 1349 |
| **Henry Rinder**                                 |      |
| Cross-Examination By Ms. Pruitt                  | 1351 |
| Redirect Examination By Mr. Birchfield           | 1393 |
| **Renie Jordon**                                 |      |
| Direct Examination By Mr. Morrison               | 1406 |
| Cross-Examination By Mr. Johnson                 | 1424 |
| Redirect Examination By Mr. Morrison             | 1443 |
| **Anthonie Lensing**                             |      |
| Examination By Mr. Overholtz                     | 1448 |

1                  **<u>AFTERNOON SESSION</u>**

2                    **(August 14, 2017)**

3        (The following proceedings were held in chambers.)

4        **THE COURT:**  Have a seat, please.

5            Folks, I just want to talk to the juror just to

6 see what we can do.

7        **MR. BIRCHFIELD:**  Judge, here is a concern that we

8 have.  We have some concerns about calling the juror in and

9 waking him up now.  He slept through our specific causation.

10 He didn't sleep all morning, but he slept through our specific

11 causation testimony.  He slept through the bulk of our case.

12 Now we wake him up for the defense cross and then the defense

13 case, he goes in and deliberates and says, "I didn't hear

14 anything about no specific causation," and we are in trouble.

15           So it is concerning to us to call him in and

16 then he corrects his behavior, hopefully -- that would be the

17 objective of doing this, anyway -- and then we are stuck.

18        **THE COURT:**  Okay.  I hear you.

19        **MS. PRUITT:**  I understand your concern.

20        (Juror 6 entered.)

21        **THE COURT:**  Hey, Mr. Robbins.  Have a seat.

22           Mr. Robbins, I just want to talk with you

23 because they have mentioned to me, both sides, that they are

24 just concerned that you were kind of listening with your eyes

25 closed probably.  They were concerned whether or not you were

12:25   1    feeling okay.

2              **JUROR 6:**  Yes, sir.

3              **THE COURT:**  Are you okay with that?

4              **JUROR 6:**  Uh-huh.

5              **THE COURT:**  For both sides, it's a really important

6    case --

7              **JUROR 6:**  I know it is.

8              **THE COURT:**  -- so we are just concerned.  If you

9    weren't feeling well, you would need to tell me.  If you are

10   and you can kind of -- I don't have any problem if you need to

11   stand up or if you want a cup of coffee or something.  I would

12   be happy to oblige you.  You all are doing a good job, and all

13   of us appreciate that.  Just see if you can keep attention a

14   little bit.  Okay?

15             **JUROR 6:**  Yes, sir.

16             **THE COURT:**  Any questions of me?

17             **JUROR 6:**  (Shakes head.)

18             **THE COURT:**  Thank you, Mr. Robbins.  I appreciate you

19   being with us.

20             (Juror 6 exited.)

21             **THE COURT:**  I think he got the message.  We will see

22   what happens.  I'm concerned that he wasn't paying attention to

23   either side.  I didn't see him sleeping only through or nodding

24   through the plaintiff's case, but I also saw it during the

25   defendants' case.  The best I can do is bring his attention to

12:26    1    it and keep an eye on it.  If there's another issue with him,

2    we may have to take a different tack.

3                            * * *

4              (The following proceedings were held in open court.)

5              **THE COURT:**  Be seated, please.

6                   You may cross-examine, Counsel.

7              **MS. PRUITT:**  Thank you, Your Honor.

8                       **HENRY RINDER,**

9    having been duly sworn, testified as follows:

10                      **CROSS-EXAMINATION**

11   **BY MS. PRUITT:**

12   **Q.**   Good afternoon, Dr. Rinder.

13   **A.**   Good afternoon.

14   **Q.**   My name is Lyn Pruitt.  I'm from Arkansas.  I'm a lawyer

15   here representing Bayer and Janssen.  I have a few questions

16   for you this afternoon.  Okay?

17   **A.**   Yes.

18   **Q.**   Dr. Rinder, Ms. Mingo had her hip surgery on January 6,

19   2015; is that right?

20   **A.**   That's my understanding.

21   **Q.**   You also remember that after her discharge from the hip

22   surgery, she was given seven days of Lovenox, followed by a

23   transition to 325 milligrams of aspirin to reduce her risk of

24   blood clots, right?

25   **A.**    My understanding is she was discharged on Lovenox and baby

HENRY RINDER - CROSS

12:36

1    aspirin, then stopped her Lovenox and was increased to a

2    standard dose of aspirin.

3    Q.    You told the jury several times earlier about a standard

4    dose of aspirin.  When you said "standard dose of aspirin," you

5    meant 325 milligrams?

6    A.    Yes.

7    Q.    Now, she was diagnosed with a blood clot in her leg on

8    January 2 -- excuse me -- 27, 2015, right?

9    A.    That's my understanding.

10   Q.    That was 16 days after her hip surgery?

11   A.    That's correct.

12   Q.    Now, Dr. Rinder, you're not critical of the decision made

13   by Dr. Jordon to treat Ms. Mingo's DVT with an anticoagulant,

14   are you?

15   A.    I'm not critical of Dr. Jordon.

16   Q.    You're not critical of Dr. Jordon's decision to treat

17   Ms. Mingo's DVT at 15 milligrams of Xarelto twice a day, are

18   you, sir?

19   A.    I'm not critical of Dr. Jordon's therapy with Xarelto.

20   Q.    You're not critical of his decision to prescribe that

21   therapy to her for that condition, right?

22   A.    I'm not critical of that decision, because I think

23   Dr. Jordon made the best decision with the information

24   available to him at that time.

25   Q.    You're not here, either, to criticize Dr. Keith, who was

HENRY RINDER - CROSS

12:37

1    the gastroenterologist, and he is the doctor that fixed

2    Ms. Mingo's ulcer, right?

3    A.    I'm not critical of Dr. Keith's performance of the EGD.

4    Q.    Are you criticizing Dr. Keith for anything in his

5    decisions in his care and treatment of Ms. Mingo?

6    A.    As far as I am concerned, what I reviewed regarding his

7    treatment of her ulcer, I'm not critical of that.

8    Q.    In fact, you would defer to Dr. Keith, her treating

9    gastroenterologist, as to when Ms. Mingo's ulcer developed,

10   right?

11   A.    No, I would not defer to him.

12   Q.    Do you recall, Dr. Rinder, when we took your deposition in

13   this case?

14   A.    As best I can.

15   Q.    I understand.  I put it in a book for you to make it

16   easier for you to look at.  If you could turn to Tab 1 for me,

17   please, sir.

18          If you would -- you gave a deposition in this case, I

19   believe it was February 7, 2016.  Correct?

20   A.    That sounds right.

21   Q.    Could you turn to page 142 for me, sir.  You will see the

22   pages there.  Page 142, if you look down there at line 7, you

23   state:  "So it's certainly possible that it was there, but I

24   don't have a crystal ball.  As I said, I would defer to the GI

25   specialist who examined the ulcer by endoscopy."

HENRY RINDER - CROSS

12:39

1      Did I read that correctly?

2  A.   I'm sorry.  This is on page 141?

3  Q.   142, lines 7 through 10.  It's highlighted there for you.

4      "So it's certainly possible it was there, but I don't

5  have a crystal ball.  As I said, I would defer to the GI

6  specialist who examined the ulcer by endoscopy."

7      Did I read that correctly?

8  A.   Yes, you did.  The context of that is I'm saying that the

9  exact examination of that ulcer by the person who is seeing

10  directly, the endoscopist, I would defer to their exact

11  examination of that ulcer.

12  Q.   That would be important because the gastroenterologist is

13  the person who is sending the scope down someone's esophagus

14  and actually going into the stomach with a camera and looking

15  around in there, correct?

16  A.   That is definitely a description of an EGD.

17  Q.   In this case, the person that did that and actually saw

18  this ulcer was Dr. Keith?

19  A.   Dr. Keith performed the EGD.

20  Q.   So you certainly would rely on Dr. Keith.  You're not

21  saying Dr. Keith was inaccurate in his assessment when he went

22  in there and did his Op note about what he saw, are you?

23  A.   I'm not going to criticize his anatomic description of the

24  ulcer.

25  Q.   For the treatment Ms. Mingo needed in the initial phase of

HENRY RINDER - CROSS

12:41

1  treating a DVT, the dosage -- the 15 milligrams twice a day was
2  the dose approved by the FDA, right?
3  A.  Yes, 15 milligrams b.i.d. for 21 days is the approved
4  dosage.
5  Q.  In Ms. Mingo's case, because she developed this bleeding,
6  she did not ever take a 20-milligram dose once a day, did she?
7  A.  She did not reach that time point in the course of the
8  treatment of her DVT with Xarelto.
9  Q.  Would you agree with me, Dr. Rinder, there's a difference
10  in treating a clot that has already developed and trying to
11  just prevent a clot in a person, as far as the dose that would
12  be appropriate?
13  A.  Well, to be medically accurate, the treatment that she is
14  receiving right now -- I'm sorry -- at the time of her DVT has
15  two purposes.  One purpose is to limit the clot that's already
16  there and to allow it time to heal and dissolve.  The other
17  purpose is to prevent propagation of that clot.
18         So you are kind of mixing apples and oranges here.
19  There are two purposes for the therapy she is receiving now for
20  her DVT.
21  Q.  Perhaps I just asked a bad question.  I probably did.
22         What I'm trying to get to is there's a difference in
23  a treatment dose and a preventive dose in most medications,
24  right, particularly with anticoagulants?
25  A.  So if you're referring to prophylaxis --

HENRY RINDER - CROSS

12:42

1  Q.    Yes, sir.

2  A.    So, for example, the patient who is having a total hip

3  replacement, they get therapy with an anticoagulant that may

4  have a different dose than if they actually develop a deep vein

5  thrombosis.  That may be a different dose.

6  Q.    Have you ever heard, as a person that deals with

7  anticoagulants, that the treatment dose for someone who already

8  has a clot is called a treatment dose?

9  A.    That's one way of putting it, yes.

10  Q.    A preventive dose is a dose you give someone that has not

11  yet developed a clot, but you are trying to prevent them from

12  developing one?

13  A.    You're giving that dose because -- you're giving the

14  preventive medication because they are at higher risk of

15  developing a clot.

16  Q.    So we are clear.  I think we agree.

17         Dr. Rinder, in your job there at Yale, you are not

18  the primary doctor who prescribes Xarelto, are you?

19  A.    Not usually.  At Yale we have a system, probably similar

20  to UMC, where you have interns, residents, fellows.  They are

21  primarily seeing the patients.  And at Yale they are the ones

22  that are writing the orders and putting all of that information

23  in the chart for the management of the patient.

24         The faculty are supervising that.  They are writing

25  their notes.  They are also seeing the patient.  But the people

1357

**HENRY RINDER - CROSS**

12:44

1    responsible for writing the orders are the doctors in training

2    and the junior faculty.

3    **Q.**    Have you ever prescribed Xarelto as a primary physician?

4    **A.**    I have not prescribed Xarelto specifically.  I have

5    patients -- I'm involved in their care -- who are on Xarelto.

6    **Q.**    In fact, in your practice what you do now at Yale is

7    primarily one of consulting and talking with residents and

8    fellows and others about their patients and what's going on

9    with their patients, right?

10   **A.**    No, I wouldn't describe it exactly that way.  That's one

11   part of it.

12            My consultation work is to take care of those

13   patients.  So as part of that, I am seeing the patients,

14   looking at their history and their results and helping to make

15   decisions for them.  I may not be the first person to see them.

16   I may not be taking care of them as their primary doctor in the

17   clinic, but I'm involved in their care.  I'm not simply talking

18   to other doctors.

19   **Q.**    Over the course of your career as a hematologist, you have

20   never prescribed Xarelto as the primary physician, right?

21   **A.**    As I said, at Yale, in our practice the prescription and

22   the writing of those prescriptions is done by the doctors in

23   training.  That is our practice at Yale.  As a senior doctor, I

24   don't write those prescriptions.

25   **Q.**    In fact, you have not prescribed any of the NOACs to any

HENRY RINDER - CROSS

12:45

1   patients as the primary prescriber, have you, Doctor?

2   **A.**   As I said, again, in our practice it is the common

3   practice that this is done by residents, the interns, and the

4   fellows.  We supervise that.  We help them make that decision,

5   and we oversee that decision and are responsible for those

6   decisions, but it is our practice to have them write the

7   orders.

8   **Q.**   Dr. Rinder, currently you are not board certified in

9   hematology, are you?

10   **A.**   That's correct.

11   **Q.**   Your board certification in hematology expired about

12   17 years ago; is that right?

13   **A.**   That's correct.

14   **Q.**   I want to ask you a question about something --

15           Can I have the ELMO, please.

16           -- something you said to the ladies and gentlemen of

17   the jury earlier.  You can look on the screen, sir.  You were

18   talking about Section 5.7, and you discussed this sentence with

19   Mr. Birchfield:  "The anticoagulant effect of Xarelto cannot be

20   monitored with standard laboratory testing nor readily

21   reversed."

22           Remember when you told the jury -- when

23   Mr. Birchfield asked you about that sentence, you said that was

24   false.  Do you recall that?

25   **A.**   Yes.

HENRY RINDER - CROSS

12:46

1  **Q.**   Now, in your work getting ready for this case, you have
2  reviewed some FDA records, because you talked to the jury about
3  them this morning, didn't you?
4  **A.**   I have reviewed FDA records for many, many times during
5  the review of this case.
6  **Q.**   Let me hand you what's been marked as DX 5373-A please,
7  sir.
8        Let's look at the first page of this document.
9  Department of Health and Human Services, correct, at the top?
10 **A.**   Yes, ma'am.
11 **Q.**   Do you see where it says "Maternal Health Team Review"?
12 **A.**   Yes.
13 **Q.**   "June 7, 2011"?
14 **A.**   Yes.
15 **Q.**   From -- I'm not going to try to pronounce that name.
16       Will you turn with me, please, to the red tab on
17 page 9 where it says "Recommendations."
18       "The maternal health team recommends labeling Xarelto
19 Category C in pregnancy.  Because the concerns regarding
20 Xarelto use in the setting of obstetrics hemorrhage remain,
21 additional language has been added to the warnings and
22 precautions section of labeling.  See 5.3."
23       Do you see down here the next sentence, where it says
24 "Maternal health labeling recommendations"?  Do you see that,
25 Doctor?

HENRY RINDER - CROSS

12:48

1  A.    Yes.

2  Q.    Turn to the next page, please.  They have suggested in

3  that part of the label that it be put in:  "The anticoagulant

4  effect of Xarelto can neither be monitored with standard

5  laboratory testing nor readily reversed."

6         Did I read that correctly?

7  A.    You did.

8  Q.    They have also recommended, in the pregnancy section, 8.1,

9  that "The anticoagulant effect of Xarelto cannot be reliably

10 monitored with laboratory testing" be put in the label.

11        Is that correct?

12 A.    You read that correctly.

13 Q.    Now, I heard you discuss with the jury this morning the

14 fact that your opinion is if the Xarelto concentration goes up,

15 you are at an increased risk of bleeding.  Correct?

16 A.    I think, to be more accurate, what I'm saying is that for

17 a patient who has a Neoplastin PT in the fourth quartile,

18 that's based on the studies from the ROCKET, EINSTEIN, and

19 RECORD studies done by the company, that group of patients has

20 a demonstrably higher risk of bleeding than patients in the

21 other quartiles.

22 Q.    We will talk about the quartiles in a moment.

23        Let me show you a document, a study, please.  I'm

24 going to put it up on the ELMO.  You can either look at it

25 yourself or look at the screen.

HENRY RINDER - CROSS

12:49

1    This is an article in the journal that you told the
2    jury was a peer-reviewed reliable journal in your area of
3    practice, correct -- called *Blood*?
4  A.   That is a peer-reviewed journal, correct.
5  Q.   The title of this article is "A dose-ranging study
6    evaluating once daily oral administration of the factor Xa
7    inhibitor rivaroxaban" -- which is Xarelto, right?
8  A.   That's correct.
9  Q.   -- "in the treatment of patients with acute symptomatic
10   deep vein thrombosis" -- that's what Ms. Mingo had, right?
11 A.   That's correct.
12 Q.   The EINSTEIN-DVT Dose-Ranging Study.
13        If you will turn with me, please, sir, to page 5 --
14   there at the bottom you can see "page 5 of 7."
15        These authors in this study in the *Blood Journal* say:
16   "Rivaroxaban concentrations were higher with increasing age,
17   decreasing renal function, and lower body weight.  However,
18   this was not associated with an increased risk for bleeding.
19   Data not shown."
20        Did I read that correctly?
21 A.   Can you give me a second to take a look at this study?  I
22   haven't seen it in a while.
23 Q.   Sure.
24        Can you answer my question?  Did I read that
25   correctly?

HENRY RINDER - CROSS

12:51

1  **A.**    You read that correctly.  However, this is a very small

2  study.  This has 130 patients randomized to each of several

3  different arms of rivaroxaban and the comparator of

4  low-molecular-weight heparin, and then patients are lost over

5  time.  That, I think, is too small a study for too short a

6  duration to be able to make any conclusions regarding risk for

7  bleeding.

8  **Q.**    This study was published in the journal *Blood*, so it was

9  peer-reviewed and accepted for publication; is that right, sir?

10  **A.**    It's accepted for publication.  That doesn't necessarily

11  mean that its conclusions are relevant.

12  **Q.**    Now, Dr. Rinder, you have given the opinion in the past

13  that if a patient taking Xarelto has a PT of 20 seconds or

14  longer, as measured with the appropriate agent and at the

15  appropriate time, his doctor should consider discontinuing the

16  patient's Xarelto prescription, haven't you?

17  **A.**    Yes, ma'am.

18  **Q.**    Now, have you ever published in a peer-reviewed article

19  the opinion you offered about the 20-second cut-off point at

20  which the risks outweigh the benefit?

21  **A.**    The data I have reviewed has been under work for this

22  study -- for this case, which I believe is confidential.  So I

23  have not attempted to write anything up or to send anything for

24  peer review.

25  **Q.**    You have not presented the opinion that Xarelto should be

**HENRY RINDER - CROSS**

12:52

1    discontinued in patients whose PT is greater than 20 seconds at
2    any national conference, have you, sir?
3    A.   I have not presented at a national conference; again,
4    because this data is confidential.  However, when I take care
5    of patients, I do review their prothrombin time and evaluate
6    that as part of my concern for their risk of bleeding if they
7    are on Xarelto.
8    Q.   Dr. Rinder, the FDA has never recommended to physicians or
9    patients any language that describes a cut-off for Xarelto use,
10   has it?
11   A.   I believe in the final label there is nothing in there.
12   But I believe that the FDA has looked at the data regarding
13   risk of bleeding and has made -- and made determinations in
14   their language that they felt the risk of bleeding with Xarelto
15   could be examined using the data that was developed in the
16   studies.
17   Q.   My question is a little bit different.  My question is,
18   Dr. Rinder:  The FDA has never recommended to physicians or
19   patients any language that describes a cut-off for Xarelto, has
20   it?
21   A.   That language is not in the label.
22   Q.   To your knowledge, there's no formal or final
23   recommendation from the FDA for clinicians to use Neoplastin PT
24   to monitor Xarelto concentration, correct?
25   A.   That is correct.  Although there is language in their

HENRY RINDER - CROSS

12:54

1  discussions regarding that, that they did not have that as a
2  formal or final notation.
3  Q.   Let me ask my question again.  So, to your knowledge,
4  there's no formal or final recommendation from the FDA for
5  clinicians to use Neoplastin PT to monitor Xarelto
6  concentration, correct?
7  A.   I have not seen it.
8  Q.   Dr. Rinder, no public health organization or regulatory
9  body has recommended a specific, reasonable, and conservative
10  cut-off point at which Xarelto should be discontinued using PT,
11  correct?
12  A.   There has not been a publication of a cut-off point.
13  However, there are several guidelines that have discussed using
14  the PT to evaluate rivaroxaban, or Xarelto.
15  Q.   My question is specific:  No public organization or
16  regulatory body has recommended a specific, reasonable, and
17  conservative cut-off point at which Xarelto should be
18  discontinued, using PT; is that right?
19  A.   With respect to a single cut-off value, no.
20  Q.   You yourself, Dr. Rinder, have never told a patient whose
21  PT was 20 or greater, based on Neoplastin taken between 13 and
22  15 hours, that he or she should be discontinued, have you?
23  A.   I haven't had that opportunity.
24         (Noise in courtroom.)
25         THE COURT:  Sorry.

1365

HENRY RINDER - CROSS

12:56

1        MS. PRUITT:  That's all right.  A little distraction
2  there.
3  BY MS. PRUITT:
4  Q.    I want to put up a slide that you showed the jury earlier.
5  I want to make sure I understand.
6        When you were giving your opinions today, you were
7  able to rule out preexisting GI pathology as the cause of
8  Ms. Mingo's bleeding.  Is that what your testimony was?
9  A.    As I said, aside from the anatomic etiology of her
10 bleeding, which was her ulcer, she had no other preexisting GI
11 pathology that could lead to a bleed.
12 Q.    Let's talk about anatomic etiology for just a minute.
13       You agree that the ulcer was the likely anatomic
14 etiology of this bleed, right?
15 A.    The doctor, Dr. Keith, looked inside her stomach and found
16 an ulcer.  That was where she was bleeding from.
17       A lot of times -- the doctor that is doing the EGD
18 when patients have a GI bleed, a lot of times they don't find
19 the etiology.  We assume they have bled from an ulcer they
20 either can't find or is healed.  But in this case he did find
21 an ulcer and he found that it was oozing blood.
22 Q.    My question is very specific:  Do you give the opinion
23 that the ulcer in this case was the likely anatomic etiology of
24 Ms. Mingo's GI bleed?
25 A.    The ulcer was there.  That's the anatomy.

HENRY RINDER - CROSS

12:57

1    Q.    You told us during your deposition that anatomic etiology
2    means something that you think is responsible, right?
3    A.    What I was probably inarticulately trying to say was if
4    you find an actual site of bleeding, then that's a reasonable
5    thing to say, that that is the anatomic site of bleeding.   But
6    as I said before, in many patients that have GI bleeding, we do
7    an endoscopy, and we can't actually find the site.   That
8    doesn't mean that we don't think they had a GI bleed; it just
9    means in that particular case we can't find the exact spot.
10   Q.    My question was very specific:  You told us during your
11   deposition the anatomic etiology means something you think is
12   responsible, right?
13   A.    I think what I was trying to say is that anatomic site is
14   the site of her bleed that they found.
15   Q.    So when you told the jury this morning that you had ruled
16   out preexisting GI pathology, what you really are saying is you
17   ruled everything out except this ulcer, right?
18   A.    That's what I said.
19   Q.    So the ulcer wasn't actually ruled out as the preexisting
20   GI pathology?
21   A.    What I was saying was that we know she has an ulcer.   It
22   was seen.  There was no other preexisting GI pathology.
23   Q.    Other than the ulcer?
24   A.    That's what I said:  No other.
25   Q.    Dr. Rinder, people that have ulcers bleed if they are not

HENRY RINDER - CROSS

12:59

1  taking anticoagulant therapy, don't they?

2  A.   I think, to be medically valid, patients have ulcers, and

3  the vast majority of those patients do not come to the

4  attention of their doctor because of bleeding.

5          As I said before, in our bodies we are always

6  bleeding and clotting.  That's a normal thing.  To call this

7  someone who has an ulcer bleeding is to in some way be a little

8  bit misleading.  When we think of bleeding, we think of someone

9  who bleeds and comes to the attention of their doctor.  The

10 vast majority of patients who have an ulcer are not bleeding to

11 the extent they need to be seen by their doctor.  They don't

12 have significant anemia or signs and symptoms.

13 Q.   Dr. Rinder, my question is very specific:  People who have

14 ulcers and don't take anticoagulants have bleeding ulcers,

15 don't they?

16 A.   It is possible to have a bleeding ulcer that comes to the

17 attention of a doctor without being on anticoagulation.  I'm

18 saying it's possible; it is very uncommon.

19 Q.   People -- this is not so uncommon, though.  People who

20 have ulcers and take aspirin come to the emergency room with

21 bleeding ulcers, don't they?

22 A.   That is also, again, a possibility.  But, again, it is not

23 that common.  I disagree that it is common.

24 Q.   Would you be the person, as a hematologist in the

25 emergency room, who is treating people that come in with GI

HENRY RINDER - CROSS

01:00

1  bleeds?

2  A.   I don't work in the emergency room, so that would be taken

3  care of by the interns or the residents and fellows that work

4  in the emergency room.

5  Q.   Those people who see patients in the emergency room would

6  be able to better give their clinical experience as to how

7  common it is for someone to come in with a bleeding ulcer from

8  taking aspirin, wouldn't they?

9  A.   I don't think that's a valid conclusion.  I think that

10 they are seeing patients coming into the emergency room with

11 symptoms, and so they are looking at people that are sick

12 enough to come in, and they are not looking at the entire

13 population.

14         There's plenty of literature out there that shows how

15 many patients have heme-positive stools or are on medications

16 like omeprazole or famotidine or antacids who have ulcers and

17 how the vast majority of them do not have clinically

18 significant bleeds.

19 Q.   My question is simply:  People who take aspirin a lot come

20 to the ER with bleeding ulcers, and they bleed whether they

21 take an anticoagulant or not, correct?

22 A.   You are saying that someone who takes aspirin a lot.  So

23 if someone overdoses on aspirin and is taking it more than the

24 recommended amount of time, then that would certainly increase

25 their risk of bleeding.  But, again, I'm looking at the overall

01:01

1    population.  The group that comes into the emergency department

2    is a very select group of people who have already reached a

3    threshold of having clinically significant symptoms such that

4    they are seeking a doctor's attention.

5    **Q.**   So is the answer to my question yes?

6    **A.**   I would have to go back to find out --

7    **Q.**   What was my question?

8    **A.**   Could you read that again to me?

9    **Q.**   Yes.  There are people who come into the ER who have

10   ulcers and take aspirin and bleed who are not on

11   anticoagulants, correct?

12   **A.**   That is -- any possibility can occur.  A patient can be on

13   aspirin and come in for bleeding.  That is certainly a

14   possibility.

15   **Q.**   You have ruled out aspirin use as having anything to do

16   with her bleed.  That's what you told the jury this morning,

17   correct?

18   **A.**   In looking at her records and her exposure to aspirin for

19   over 10 years without any evidence of clinically significant

20   bleeding during that entire time, in the 20 days that she was

21   on Xarelto is when she bled; as opposed to the over 10 years

22   prior to the Xarelto and the two-plus years after being on

23   Xarelto, on aspirin, she had no bleeding during that time.

24   That is very compelling evidence to me that she does not have a

25   bleeding disorder because of aspirin.

HENRY RINDER - CROSS

01:03

1   Q.   My question is simply this:  You have ruled out aspirin as
2   having anything to do with the bleed; isn't that correct?
3   A.   And I'm giving you basis for that opinion.
4   Q.   I heard the basis this morning.  If you don't -- so we can
5   move along -- if you are able to answer that question yes or
6   no:  You ruled it out?
7   A.   I'm saying I do not believe it is a significant
8   contributing factor to her bleeding ulcer.
9   Q.   Now, when Ms. Mingo came in and was diagnosed with a blood
10  clot, she was taking aspirin at that time, wasn't she?
11  A.   When she was on her -- when she came in with her blood
12  clot, she was on a standard dose of aspirin; that's correct.
13  Q.   A standard dose of aspirin is 325 milligrams, correct?
14  A.   That's correct.
15  Q.   Then she was put on Xarelto by Dr. Jordon, right?
16  A.   Yes.
17  Q.   At the time of her discharge, you know that she was told
18  to stop taking aspirin.  Did you see that?
19  A.   I believe that's correct.
20          MS. PRUITT:  Let's pull up Slide 15, please.  Change
21  from the ELMO.
22  BY MS. PRUITT:
23  Q.   This is a medical record of Ms. Mingo that you have seen;
24  isn't that right, Doctor?
25  A.   Yes.

HENRY RINDER - CROSS

01:04

1   **Q.**   If you will look there, it says at the top "Patient

2   Discharge Instructions."  Do you see that?

3   **A.**   I do.

4   **Q.**   It says "Attending physician, Renie Jordon."  Do you see

5   that?

6   **A.**   Yes, I do.

7   **Q.**   It says "Stop taking these medications," and it has a list

8   of medications.  And one of those is aspirin, 325 milligrams by

9   mouth every day."  Is that right?

10  **A.**   Yes, it is.

11  **Q.**   So in Ms. Mingo's case, Dr. Jordon put her on Xarelto, and

12  then her discharge physician or Dr. Jordon instructed her to

13  stop taking aspirin.  Correct?

14  **A.**   That's true.

15  **Q.**   We know that Ms. Mingo was diagnosed with this ulcer on

16  February 13, 2015, correct?

17  **A.**   That's the time when she underwent her EGD and they found

18  the ulcer.

19  **Q.**   Now, I'm going to hand you a paper and ask you to take a

20  look at it, sir.

21           **MS. PRUITT:**  For the record, it's DX 1308.  The title

22  of the article is -- I'm going to switch back to the ELMO.  I'm

23  going to keep you awake.

24  **BY MS. PRUITT:**

25  **Q.**   The title to the article is "Bleeding Risk of Patients

**HENRY RINDER - CROSS**

01:06   1   with Acute Venous Thromboembolism Taking Nonsteroidal

2   Antiinflammatory Drugs or Aspirin."

3   　　　　Is that the title of this article?

4   **A.**   Yes, it is.

5   **Q.**   If you will look at the conclusions and relevance, please,

6   sir, for me, the conclusions and relevance section states:

7   "Among patients with venous thromboembolism receiving

8   anticoagulant therapy, concomitant use of an NSAID or aspirin

9   is associated with an increased risk of clinically relevant and

10  major bleeding."

11  　　　　Did I read that correctly?

12  **A.**   Yes, you read that correctly.

13  **Q.**   And this is a peer-reviewed journal, isn't it?

14  **A.**   This is --

15  **Q.**   As a matter of fact, that's *JAMA*; that's the *Journal of*

16  *the American Medical Association*.  Isn't that what that means?

17  **A.**   *JAMA*, yes, this is the correct journal.

18  **Q.**   Thank you, Doctor.

19  　　　　Now, will you agree with me, Doctor, that currently

20  there are some certain guidelines about how to treat blood

21  clots in patients that are put out by the various

22  organizations, medical organizations that you doctors look at

23  and consider, right?

24  **A.**   There are many guidelines published by many organizations

25  in different journals, in textbooks, by individual hospitals,

HENRY RINDER - CROSS

01:07  1   and protocols; there are many guidelines out there.

2   Q.   Would you agree with me, Dr. Rinder, that today the

3   standard of care for the treatment of a deep vein clot like

4   Ms. Mingo's is to prescribe a NOAC as first-line therapy over

5   Coumadin and Lovenox?

6   A.   I think that guidelines are useful in a general way and

7   can be used in general when you are looking at a population,

8   but I think what we want to do for each patient is to

9   individualize their care.

10         So I agree that there are guidelines that state that,

11   but those guidelines do not mean that you must do this for

12   every patient.  Those decisions are left to each individual

13   doctor to personalize that for each individual patient and

14   their risk.

15   Q.   I agree.  I agree that that is what doctors do.  But if a

16   doctor does decide to prescribe an anticoagulant for a deep

17   vein clot, then would you agree that the guidelines, the

18   American Academy of Chest Physician guidelines, say that

19   prescribing a NOAC is the first-line therapy over Coumadin and

20   Lovenox?

21   A.   I'm not going to criticize any physician who uses NOACs as

22   first-line therapy for DVT in a general way.

23   Q.   Can we look at Exhibit 1007, please.

24         MS. PRUITT:  And for the record, it's DX 1007.  I

25   just said that.

HENRY RINDER - CROSS

01:09

1              Can I have the ELMO, please.

2    BY MS. PRUITT:

3    Q.   This is called *Chest*, right?

4    A.   Yes, this journal is called *Chest*.

5    Q.   And the title of this is Oral Anticoagulant Therapy,

6    correct?

7    A.   Yes.

8    Q.   And this article says this is evidence-based clinical

9    practice guidelines.  Is that right?

10   A.   You have read that correctly.

11   Q.   Turn to page 30 of the document for me, please, sir.

12            Under Section 3.5 -- are you with me?

13   A.   Yes.

14   Q.   "Monitoring anticoagulant intensity."  The *Chest*

15   guidelines say:  "Despite the predictable dose-dependent

16   effects of rivaroxaban on the PT, there are currently no

17   validated laboratory assays that can be recommended to monitor

18   rivaroxaban or any recommendations for dose adjustments based

19   on observed test results."

20            Did I read that correctly?

21   A.   You read that correctly, and I disagree with that

22   statement.

23   Q.   And at the bottom of that same column it says:  "Neither

24   the PT expressed in seconds nor the aPTT should be used to

25   monitor the anticoagulant effect of rivaroxaban."

1375

**HENRY RINDER - CROSS**

01:11

1        Did I read that correctly?

2  **A.**   Yes, you did.

3        I want to point out that the one aspect of this that
4  I think is medically in some ways misleading is I'm not saying
5  that someone should monitor rivaroxaban levels, Xarelto levels.
6  I'm saying that it is possible to measure a Xarelto level to
7  determine that they are at increased risk for bleeding.

8        I'm not saying they need to be monitored, which in my
9  mind means constant measuring of their results, on a weekly,
10  monthly, or however frequent basis.

11  **Q.**   And my question is simply:  The *Chest* guidelines have
12  concluded that neither the PT nor the aPTT should be used to
13  monitor the anticoagulant effect of rivaroxaban.  So you agree
14  with that, right?

15  **A.**   Well, I'm not sure how they are using the term "monitor."
16  To my mind, "monitor" means a certain frequency.  But I don't
17  know they are taking into account the aspect of measuring the
18  prothrombin time, which has been shown in multiple other
19  publications and in the FDA's own language to be useful for
20  guiding therapy.

21        So I can't know what is behind this.  I think they
22  are just being very conservative, as most guidelines usually
23  are, in writing something that's for general consumption.

24  **Q.**   But these are the guidelines that dictate and guide
25  pulmonologists who treat pulmonary embolisms, correct?

01:12

1    **A.**    No, these don't dictate.  These are simply guidelines that

2    are written by a bunch of people in a room that have taken

3    three or four years to come to a consensus, and this is what

4    their publication is.

5              This is used as a general use for physicians to

6    understand things but in no way dictates what they do or

7    requires that they follow these recommendations or conclusions.

8    **Q.**    Did I use the work "dictate"?

9    **A.**    Yes, you did, ma'am.

10   **Q.**    Then I shouldn't have used the work "dictate."

11             These are the guidelines for pulmonologists and

12   doctors like them who treat pulmonary embolisms, correct?

13   **A.**    As I said, yes.  These guidelines are simply, as I say,

14   they are out there.  They are multiple guidelines from multiple

15   institutions and multiple sources.  They are not meant to be

16   absolute.  They are simply out there for physicians to be able

17   to refer to and use in helping making medical decisions for

18   individual patients.

19   **Q.**    Are you a member of the American Academy of Chest

20   Physicians?

21   **A.**    I'm not a chest physician.

22   **Q.**    And so these guidelines for the chest physicians suggest

23   that neither the PT nor the aPTT should be used to monitor the

24   anticoagulant effect of rivaroxaban; isn't that correct?

25   **A.**    This is published in a journal for the American College of

01:13

1  Chest physicians, but it's available to any physician, so
2  anyone can examine this.  This happens to be what they have
3  written in their guidelines.
4  Q.   Thank you, Doctor.
5        Now I want to move a little bit to the PT numbers
6  that you discussed with the jury earlier.  I want to talk first
7  about the PT of 23.6.  Okay?
8  A.   Yes.
9  Q.   The PT of 23.6, the lab was drawn on January 24, that
10  morning; is that correct?
11  A.   That's my understanding.
12  Q.   You know that Ms. Mingo was given a 10-milligram dose of
13  Coumadin about 30 hours before that PT lab or PT blood was
14  drawn, correct?
15  A.   Yes.  She received a single dose of Coumadin two days
16  prior in the evening.
17        MS. PRUITT:  Can we pull up slide 14, please, from
18  the medical records.
19  BY MS. PRUITT:
20  Q.   You see here that this is a medical record of Ms. Mingo,
21  correct?
22  A.   Yes.
23  Q.   You have looked at this record, haven't you, Doctor?
24  A.   Yes.
25  Q.   It shows here that she received 10 milligrams -- it's not

HENRY RINDER - CROSS

01:15

1  highlighted, but it says underneath the highlighted part:

2  "Administered 122 at 22:17."  Is that right, over there to the

3  far right?

4  A.  Yes, that's correct.

5  Q.  And 22:17 in military time and doctor time is what time?

6  A.  I believe that's 10:17 p.m.

7  Q.  10:17 p.m.

8       And underneath it, it says "administered dose" -- I

9  think that says "dose" -- but it says "10 milligrams."  Is that

10  right?

11  A.  Yes, that's correct.

12  Q.  And 10 milligrams of Coumadin is referred to as a loading

13  dose; isn't that correct, Doctor?

14  A.  Well, I think any first dose of a drug would be called a

15  loading dose.

16  Q.  Actually, a 10-milligram loading dose of Coumadin is the

17  highest dose of Coumadin available in tablet form, correct?

18  A.  That's my understanding.

19       MS. PRUITT:  Can we pull up DX 30, the Coumadin

20  label, please.  It's already in evidence, I believe.

21  BY MS. PRUITT:

22  Q.  I want to hand you what is the Coumadin label, sir.  Could

23  you turn to page 21 of that?

24       MS. PRUITT:  Can we pull up slide 16, please?

25

HENRY RINDER - CROSS

01:16

1   BY MS. PRUITT:

2   Q.   Under "Pharmacodynamics" on this Coumadin label, it says:

3   "An anticoagulation effect generally occurs within 24 hours

4   after warfarin administration.  However, the peak anticoagulant

5   effect may be delayed 72 to 96 hours.  The duration of action

6   of a single dose of racemic warfarin is two to five days."

7        Did I read that correctly out of the Coumadin label?

8   A.   Yes, you did.

9   Q.   Now, Coumadin, if someone is just taking Coumadin,

10  Coumadin causes the PT to be prolonged, correct?

11  A.   Well, let's put that in the context of what's said here on

12  the label:  "The effects of Coumadin may become more pronounced

13  as effects of daily maintenance doses overlap."

14       That is the key point here.  A single dose of

15  Coumadin does not in most instances prolong the prothrombin

16  time.  It must be followed, as I said before, by daily doses

17  that are overlapping, and that will then prolong the

18  prothrombin time within four to six days to become therapeutic.

19       That is in the label:  "The effects of Coumadin may

20  become more pronounced as the effects of daily maintenance

21  doses overlap."  That is the key point there in terms of an

22  anticoagulant effect and prolonging the prothrombin time.

23  Q.   Are you saying to the jury that a loading dose of Coumadin

24  of 10 milligrams did not affect Ms. Mingo's PT value that was

25  drawn 30 hours later?

HENRY RINDER - CROSS

01:18

1  A.   Yes, it did not affect the prothrombin time.  And I have

2  seen that opinion, I believe, by other experts for the defense.

3  Q.   Now, I want to talk a little bit about the second PT if I

4  could, Dr. Rinder.  The second PT value was 26.2, correct?

5  A.   I believe that is correct.

6  Q.   Would you agree with me that 26.2 falls within the range

7  of 16.4 to 32.9?

8  A.   26.2 is between those numbers.

9  Q.   Thank you.

10        And you agree with me that in the EINSTEIN-DVT study,

11  that the peak PTs were measured two to four hours after a

12  patient took Xarelto, correct?

13  A.   I believe that that is the correct study protocol.

14  Q.   You agree that Ms. Mingo's PT of 26.2 was measured three

15  hours after she took her Xarelto, correct?

16  A.   I think it was between three and four hours.

17        MS. PRUITT:  Can I look at Defense Exhibit 6065,

18  page 52.  Can we pull up that slide?  Maybe we don't have a

19  slide.  Are you just pulling it up on the document?

20  BY MS. PRUITT:

21  Q.   Do you see where this is an exploratory analysis of

22  prothrombin time -- let me introduce it first.

23        MS. PRUITT:  Let me go back to the ELMO.  You can

24  pull it up on the second page.  That's probably easiest.

25        MR. BIRCHFIELD:  What page?

HENRY RINDER - CROSS

01:20

1          MS. PRUITT:  2.

2               Can you pull up the title there for me, please,

3   sir.

4   BY MS. PRUITT:

5   Q.   This is an "Exploratory analysis of prothrombin time

6   measured by Neoplastin reagent in subjects treated with

7   Xarelto."  And it's the DVT EINSTEIN study; is that correct?

8   A.   I believe that is correct, yes.

9   Q.   Can you go to page 52 for me, please, sir.

10  A.   Page 52.

11  Q.   Yes.

12  A.   I'm sorry, I'm not sure which is page 52 here.

13          MS. PRUITT:  Can we pull up 52?  Yeah.  And if you

14  will just call up, Joshu, Table 14.4.1.

15  BY MS. PRUITT:

16  Q.   Can you take a look at that table for me, please, sir.

17               This says:  "Descriptive summary status.  Statistics

18  for coagulation parameter PT Neoplastin peak measurements."

19  Which is when the 26.2 of Ms. Mingo was taken, right?

20  A.   Yes, that was her value was a peak measurement.

21  Q.   What it shows is between 5 percent and 95 percent, the

22  range of PTs for people taking this dosage for this indication

23  was between 16.4 and 32.9.  Isn't that what this table shows?

24  A.   Again, you are reading correctly.

25  Q.   Thank you.

HENRY RINDER - CROSS

01:22

1        Now, I want to talk about Neoplastin for just a
2   moment.  When we took your deposition in this case back in
3   February, you did not know what type of reagent was used on the
4   PT tests that were ordered for Ms. Mingo, did you?
5   **A.**   At that time, no, I did not.
6   **Q.**   You didn't know back at the time you gave your testimony
7   under oath whether the reagent was Neoplastin or not, did you?
8   **A.**   That is correct.
9   **Q.**   Your testimony back in February of this year was that the
10  type of reagent used at Southwest Mississippi Regional Medical
11  Center was irrelevant to your opinions in this case; isn't that
12  true?
13  **A.**   I think I can answer that, yes.  The reason why I was
14  saying that is because the Neoplastin PT reagent for the
15  prothrombin time with Xarelto is the most sensitive reagent in
16  several studies looking at different ways of measuring
17  prothrombin time.  So that is a very prolonged PT for
18  Neoplastin.
19       If it was measured with a different type of
20  prothrombin reagent that is less sensitive to Xarelto based on
21  those studies, that would be even higher as a level of
22  prothrombin time for these less-sensitive reagents.
23       That's why I was saying it was irrelevant.  That is a
24  very high prothrombin time, no matter what reagent is used,
25  based on the Xarelto prothrombin time studies.

HENRY RINDER - CROSS

01:23

1  Q.   My question is this:  Back in February of 2016, when you

2  gave your deposition under oath, you said the PT reagent was

3  irrelevant to your opinion, didn't you?

4  A.   Yes, ma'am, and with all due respect, I'm giving the

5  context for why I'm saying it was irrelevant.

6  Q.   In the deposition, you said it didn't really matter what

7  the reagent was that was used, didn't you?

8  A.   Again, all due respect, that was the context for that

9  opinion.

10  Q.   Now let's look for a moment at the Neoplastin label.

11  Exhibit 49, please.

12      MS. PRUITT:  May I have the ELMO, please.

13          No, never mind.  I'll do a slide.  Pull up

14  slide 8.

15  BY MS. PRUITT:

16  Q.   This is the Neoplastin label summary and explanation; is

17  that right, Doctor?

18  A.   Yes, ma'am, this is the Neoplastin label.

19  Q.   And it says:  "The PT is commonly used for monitoring

20  vitamin K antagonist therapy because of its sensitivity to

21  variations in the concentration of the vitamin K dependent

22  factors II, VII, and X."

23          That is referring to warfarin -- or Coumadin,

24  correct, sir?

25  A.   Yes, you have read that correctly, that the PT is commonly

HENRY RINDER - CROSS

01:24   1   used for monitoring that type of therapy.

2   **Q.**   It goes on to say:  "Consequently, the comparability of

3   the results of this test is essential for finding the

4   therapeutical range."

5         Did I read that correctly?

6   **A.**   You did, and I'm a little bit unclear what that sentence

7   means.

8   **Q.**   I'm not sure I understand either.

9         So what I want to get to is in this Neoplastin label,

10   it states that this Neoplastin can be used to measure

11   Coumadin -- warfarin -- right, sir?

12   **A.**   This is a label for an FDA-cleared test, and so they are

13   going to be very careful about the language that they put into

14   this label, and that is -- you have correctly read the

15   language.

16   **Q.**   The Neoplastin label does not state anywhere that PT can

17   be used to monitor other types of anticoagulants, does it?

18   **A.**   It does not say that, nor does it say that the PT value

19   can be used in any way by physicians to examine other

20   possibilities.

21         We use laboratory tests, based on our knowledge and

22   experience, for uses other than what are mentioned in an

23   FDA-cleared test.  So that does not obviate the ability of a

24   physician to use the results of that test in a way that they

25   think is valid.

1385

HENRY RINDER - CROSS

01:26

1  **Q.**   But the manufacturers of Neoplastin don't say to use it
2  with any of the NOACs in their label, do they?
3  **A.**   It is not here in the label; that is correct.
4  **Q.**   And, in fact, Dr. Rinder, Neoplastin is not used at your
5  institution, is it?
6  **A.**   No.  We have been using an Innovin reagent for a long
7  period of time.
8  **Q.**   The physicians at your institution at Yale do not use
9  Neoplastin as a reagent when measuring PT time, do they?
10 **A.**   No.  They have asked me about trying to monitor Xarelto
11 therapy, and I -- because I don't have the data in the label, I
12 can't use that as an argument to change or to add a different
13 Neoplastin PT reagent to our armamentarium.
14 **Q.**   I want to go back for a moment to this explorative
15 analysis and talk a little bit about this quartile data that
16 you told the jury about earlier.
17             **MS. PRUITT:**  Can we pull up -- let me just put it on
18 the ELMO, please.
19 **BY MS. PRUITT:**
20 **Q.**   Again, this is the exploratory analysis, correct, Doctor?
21 **A.**   Yes, ma'am.
22 **Q.**   If you can turn to page 4, please, sir.
23 **A.**   Page 4?
24 **Q.**   Yes, sir.  This is a synopsis, where it talks about the
25 objectives of this analysis.

HENRY RINDER - CROSS

01:27

1           The second objective is:  "To investigate the
2     relationship between measurements of PT Neoplastin and first
3     occurrence of a confirmed bleeding event among
4     rivaroxaban-exposed subjects."
5           Did I read that correctly?
6     A.  Yes, you did.
7           MS. PRUITT:  Can we call up slide 12, please.  I'll
8     change it again.
9     BY MS. PRUITT:
10    Q.  Slide 12 is Table 14.4.2-8.  This table deals with major
11    bleeding.  You told the jury this morning that Ms. Mingo had
12    major bleeding, right?
13    A.  Yes, I did.
14    Q.  And she was taking the medicine twice a day, right?
15    A.  Yes, I did.
16    Q.  Look there, where it says "PT Neoplastin, day 15 peak."
17    And do you see where it has the quartiles, the first one,
18    quartile level 12.5 to 19.7 is the range for the PT for the
19    first quartile, correct?
20    A.  Yes, ma'am.
21    Q.  For Quartile 4, PTs greater than 25, that's what they are
22    looking at in Quartile 4, correct?
23    A.  You have read that correctly.
24    Q.  And greater than 25 would be where Ms. Mingo's 26 fell
25    because it was done three hours after she took her last tablet,

**HENRY RINDER - CROSS**

01:29

1    right?

2    **A.**    She would definitely fit in the fourth quartile of

3    prothrombin time measurements.

4    **Q.**    Now, look over there to the next column to the right,

5    where it shows in Quartile 1 there were two bleeds out of 323,

6    .62 percent bled; and in the fourth quartile, only one out of

7    320 people bled, so it was .31 percent.

8            Did I read that correctly?

9    **A.**    Yes, you have read that correctly.

10           I would point out that this is a very small

11   subsampling of the study looking at these peak.  In fact, the

12   numbers at trough are even smaller.  And the data that I was

13   referring to had twice these numbers in terms of clinically

14   relevant bleeding.

15           So I was basing that on a larger group of patients in

16   order to have more validity for the fourth versus first

17   quartile.

18   **Q.**    But this particular table deals with people who had major

19   bleeding; is that correct?

20   **A.**    That is correct.  And as we are saying, we are talking

21   about numbers that go from zero to two.  It is very hard to

22   make any kind of relevant judgment when you have such small

23   numbers of events.  That's simply too small to make a good

24   scientific conclusion from it.

25           **MS. PRUITT:**  You can take that down, Joshu.  I need

**HENRY RINDER - CROSS**

01:30   1   to switch to the ELMO.

2   **BY MS. PRUITT:**

3   **Q.**   So let's talk about the trough that you were telling the

4   ladies and gentlemen about earlier.  Let's talk about a table

5   that you didn't show them in this document on troughs.

6            Table 14.4.2.  Again, this is EINSTEIN-DVT data,

7   correct?

8   **A.**   Yes.

9   **Q.**   And this one actually deals with clinically relevant

10   bleeding, which is what you discussed with the jury this

11   morning, correct?

12   **A.**   That's correct.

13   **Q.**   It says:  "Neoplastin day 15 trough."  You see the first

14   quartile, 11 to 15.3?

15   **A.**   Yes, ma'am.

16   **Q.**   Fourth quartile, greater than 19?

17   **A.**   Yes.

18   **Q.**   You see over here about the number of bleeds, you see

19   1.4 percent, 3.6, 4.5, 3.2.  But the point is, the bleeding

20   rates in Quartile 2 and 3 are higher than they are for

21   Quartile 4, aren't they?

22   **A.**   Well, again, you are correct.  But again, in context, I

23   would say that these are very small numbers of bleeding events.

24   And if anything -- I'm sorry, could you put that back up,

25   please?

01:31

1  **Q.**   Sure.  And context is very important because this has to

2  do with DVT, correct?

3  **A.**   Please let me finish.

4  **Q.**   Glad to.

5  **A.**   What I was going to point out was that in Quartile 1, even

6  though these are very small numbers, you only have about

7  1.4 percent of subjects with a clinically relevant bleed;

8  whereas, in Quartile 4, it's more than double that.

9         Now, again, these are very small numbers.  I would

10 rather have a group of patients that there's more like 6- or

11 700 patients, as in the other study that I showed, to be able

12 to draw conclusions from.  But even with this small number,

13 Quartile 4 versus Quartile 1, you can see is more than a

14 doubling of the bleeding rate.

15 **Q.**   You would expect, based on what you told the jury, though,

16 that Quartile 2 and 3 would not have as many bleeds, wouldn't

17 you, Doctor?

18 **A.**   That's because I would rather have a group of patients

19 that's much larger in order to be able to demonstrate an

20 increase with each quartile.

21        That's, for example, the data that we showed from

22 ROCKET, which has very, very large numbers of patients and

23 clearly showed an increase from each quartile, as the

24 prothrombin time went up, for risk of bleeding.

25 **Q.**   Are you familiar with an FDA document called an

HENRY RINDER - CROSS

01:32

1    "Integrated Summary of Safety" that someone has to submit to
2    the FDA with all the data in it?
3    A.    I believe so, yes.
4    Q.    This particular document, I've broken it down because it's
5    about 2,500 pages long.  This is DX 6079-A.
6             If you'll look at the last page there -- it's page 18
7    of that document -- do you see here "This Integrated Summary of
8    Safety includes the safety data of three of the EINSTEIN
9    studies, the supportive safety data from two Phase II DVT
10   treatment studies, and other safety data in the rivaroxaban
11   clinical development programs to support the indication of
12   Xarelto for the treatment of DVT and prevention of recurrent
13   DVT and/or PE"?
14            Did I read that correctly?
15   A.    Yes, you did.
16   Q.    I'm going to hand you another document out of that same
17   study, DX 6079, again.  If you could turn with me to the second
18   page there.
19            This section that was submitted to the FDA on all the
20   data is entitled "Bleeding risk and correlation to prothrombin
21   time prolongation."
22            Let me read the second paragraph:  "In general, there
23   was no evidence that PT Neoplastin measured in seconds at peak
24   was different in subjects with bleeding events compared to
25   subjects without bleeding events.  For the overall safety

HENRY RINDER - CROSS

01:34

1  population, the peak values for PT Neoplastin, when compared to

2  baseline, increased similarly in subjects with bleeding events

3  compared to those without bleeding events."

4       Did I read that correctly?

5  A.   Yes, you did.  And what I'm -- that is not what I said in

6  my prior testimony.  Average prothrombin times in patients with

7  and without bleeding is not what we've discussed.  What we've

8  discussed is first, second, and third quartile of prothrombin

9  times and patients in the fourth quartile having a higher risk

10  of bleeding.

11  Q.   So you agree with this statement, then?

12  A.   I don't think that this statement is -- I don't have any

13  reason to disagree with this, but I think this statement is a

14  general relationship of patients who are not bleeding and

15  patients who are bleeding.

16       It's as if I was to take patients who had high

17  cholesterol and -- I'm sorry, patients who have heart attacks

18  and not heart attacks, just because their cholesterols are

19  similar doesn't mean that I'm not going to take patients who

20  have a high cholesterol because I know that's a risk factor for

21  heart attack and treat those patients.

22       So I'm not contesting this, but I'm saying it is the

23  wrong way or it is an incorrect way to view the risks when you

24  have quartile data that does give you a way of evaluating risk

25  of bleeding.

HENRY RINDER - CROSS

01:36

1  **Q.**   So you do agree with the statement?

2  **A.**   I agree with this statement and would argue that it is

3  limited in its ability to differentiate patients based on the

4  Neoplastin PT.

5  **Q.**   Now, one thing I want to go back to, Doctor.  You told the

6  jury this morning that after Ms. Mingo had her ulcer repaired,

7  she went back on 325 milligrams of aspirin, right?

8  **A.**   I believe that is correct.  She left the hospital on the

9  standard dose of aspirin.

10  **Q.**   And you know that her -- one of her treating physicians

11  after the ulcer was repaired recommended that she go back on

12  Xarelto, right?

13  **A.**   I believe I saw that in a note from Dr. Keith, the GI

14  physician.

15  **Q.**   Dr. Keith, who was there treating her and fixed her ulcer

16  and her bleed, made the determination that for her, in that

17  situation, that the benefits of the anticoagulant at that point

18  in time outweighed the risk, didn't he?

19  **A.**   I don't know what Dr. Keith's thinking was during that

20  time period.  I don't know if he has any experience with

21  anticoagulation or not.

22       I would respectfully disagree with his opinion that

23  it is okay to restart Xarelto.  Any physician looking at a

24  patient who comes in with a GI bleed on anticoagulation is

25  going to look very, very hard at that; and unless there is a

HENRY RINDER - REDIRECT

01:38

1   very extremely compelling reason why that patient must remain
2   on anticoagulation, that that benefit is that much higher in
3   someone who has actually demonstrated that they have bled on
4   anticoagulation, the vast majority of physicians are going to
5   say, We have to stop anticoagulation in this patient.  This is
6   not an unusual case.  This happens all the time.
7   Q.   So you are critical of her treating gastroenterologist for
8   making such a recommendation; is that correct?
9   A.   I'm saying I don't know what his rationale was during
10  that.  I don't agree with that.  That was not the ultimate
11  dispensation of her case.  She was not given Xarelto.  I don't
12  agree with that opinion.
13          MS. PRUITT:  Thank you, Doctor.  That's all I have.
14          THE COURT:  Any redirect?
15          MR. BIRCHFIELD:  Yes, Your Honor.
16          THE COURT:  Let's see if we can hurry.
17          MS. PRUITT:  Your Honor, I've been told I need to
18  move to admit 6065, 6079-A, 6079-D, 5373-A.  I move to admit.
19          THE COURT:  I'll admit it.
20                     REDIRECT EXAMINATION
21  BY MR. BIRCHFIELD:
22  Q.   Dr. Rinder, you were asked about Dr. Keith's opinion about
23  when the ulcer began.  Do you recall Dr. Keith's testimony
24  describing the ulcer as an acute ulcer?
25  A.   Yes.  I actually have his deposition testimony here, if I

HENRY RINDER - REDIRECT

01:39    1    could refer to it so that I could be accurate --

2    **Q.**    Sure.

3    **A.**    -- and specific.

4    **Q.**    Okay.

5    **A.**    Maybe I don't.  I think I recall it enough.  I'm sorry.

6    **Q.**    Did he describe her ulcer as an acute ulcer?

7    **A.**    He described her bleeding event as an acute GI bleed from

8    the ulcer.

9    **Q.**    So what does it mean when doctors refer to an event as

10    *acute*?

11    **A.**    When they look at that, they mean within hours to days.

12    **Q.**    So based on Dr. Keith's testimony, this ulcer became an

13    acute or a bleeding ulcer within a matter of days?

14    **A.**    Yes.  In other words, gastroenterologists are looking in

15    the stomach of people all the time.  They are finding

16    gastritis; they are finding ulcers.  They can look at that

17    anatomy and, as best they can, try to determine what's going

18    on.  He is looking at that anatomy.  His judgment was that it

19    was acute.  To my mind, that means days, not weeks; not more

20    than a couple days, but with within hours to days, that's his

21    judgment.  I have no reason to disagree with that based on the

22    symptoms and signs that I looked for in the record.

23    **Q.**    Dr. Rinder, Ms. Pruitt showed you what's marked as Defense

24    Exhibit 5373-A.  Do you recall this?

25    **A.**    Yes.

HENRY RINDER - REDIRECT

01:41

1    Q.    Do you recall this discussion about the pregnancy section
2    of the label and the FDA's recommendation that this language go
3    in the label?  Do you remember that testimony?
4    A.    Yes.
5    Q.    What is the date on this letter, sir?
6    A.    The date is June 7, 2011.
7    Q.    Is that the final word from the FDA on the issue, sir?
8    A.    No.  I believe there's fairly strong language from the FDA
9    regarding use of the PT from November of 2011.
10   Q.    What's the significance of this later date, November of
11   2011?  Did the FDA have additional information at that point?
12   A.    That is my understanding.
13   Q.    By November of 2011, did the FDA have the benefit of the
14   ROCKET data?
15   A.    Yes.
16   Q.    Was there an evaluation of the ROCKET data in regards to
17   PT and its predicted value of bleeding risk?
18   A.    Yes, they did.
19   Q.    In November of 2011 -- let's take a look at what's
20   marked -- it's already in evidence as Plaintiff's Exhibit 12,
21   the FDA summary review.
22           Are you familiar with this document?  You reviewed
23   this, sir?
24   A.    Yes, sir.
25   Q.    If you will look at the next page, you see November 2011.

HENRY RINDER - REDIRECT

01:43

1   That's what you were referring to just a moment ago, right?

2   **A.**   That is correct.

3   **Q.**   We will turn to the -- turn to page 9 of the FDA summary

4   review, where it discusses additional issues.  Do you see that,

5   Dr. Rinder?

6   **A.**   Yes, I see the highlighted area.

7   **Q.**   So, Dr. Rinder --

8   **A.**   Thank you very much.

9   **Q.**   Sorry.

10          The heading "Additional issues, desirability of

11  monitoring for adjustment of Xarelto dose," do you see that,

12  Dr. Rinder?

13  **A.**   Yes, I do.

14  **Q.**   What's the FDA's position at this point?  Would you read

15  that for us, sir.

16  **A.**   They are saying that the clinical pharmacology, which is

17  one group of experts, and the clinical reviewers, a second

18  group of experts, "demonstrated that there is a linear

19  correlation between rivaroxaban levels and prothrombin time,

20  PT."

21          Just as an aside, that is the prothrombin time, PT,

22  using Neoplastin, conducted in all of the trials for the safety

23  monitoring of Xarelto.

24          To continue reading:  "They also demonstrated that

25  there is also a correlation between PT and risk of bleeding."

HENRY RINDER - REDIRECT

01:44

1    That's what I'm referring to as the quartiles.  "This applicant
2    has not chosen to utilize this information."
3    **Q.**   When it says "applicant," who is that referring to?
4    **A.**   I believe that's the company that is making the drug.
5    **Q.**   So what's the FDA's position in November of 2011?  Five
6    months after that previous letter, what's their position at
7    this point, with the ROCKET data in hand, about the correlation
8    between PT and bleeding risk?
9    **A.**   They are saying that it exists.  And my reading of this
10   and interpretation is that this Neoplastin PT could be a useful
11   tool for -- to guide therapy, for physicians to know about and
12   to use.
13   **Q.**   Dr. Rinder, Ms. Pruitt also showed you this article from
14   *Blood* in 2008.  Do you recall looking at this with Ms. Pruitt?
15   **A.**   Yes, sir.
16   **Q.**   Again, the date of this is July 11, 2008; is that right?
17   Prepublished online?
18   **A.**   I believe that is correct.
19   **Q.**   If we can, let's take a look at the authors here.  First
20   we see an Anthonie Lensing.  Do you see that?
21   **A.**   Yes, sir.
22   **Q.**   The jury has met Mr. Lensing through a video deposition.
23   He is a Bayer scientist; is that right?
24   **A.**   I believe so.
25   **Q.**   There's another author here that I have highlighted,

HENRY RINDER - REDIRECT

01:46

1   Agnelli.  Do you see that?

2   A.    Yes, I do.

3   Q.    Can you help me with the pronunciation?  I'll put you on

4   the spot here, Dr. Rinder.

5   A.    I believe that's Giancarlo Agnelli.

6   Q.    If we look at what Ms. Pruitt asked you to read.  That was

7   on page -- about "The rivaroxaban concentrations were higher,

8   increasing age, decreasing renal function, lower body weight.

9   However, this was not associated with an increased risk for

10  bleeding."

11          Do you recall reading that with Ms. Pruitt?

12  A.    Yes.  I would also add that behind that it says "Data not

13  shown," which is always a little bit of a tickle for doctors

14  when they are looking at data, when it says, "Oh, yes, we said

15  that, but we are not going to show you data."

16  Q.    Dr. Rinder, you mentioned to Ms. Pruitt -- we are talking

17  about a small population size in this study; is that right?

18  A.    Yes.  These numbers are very, very small with regard to

19  the risk of bleeding.

20  Q.    So would it be accurate or misleading to use this data to

21  suggest there is no bleeding risk associated with increased

22  levels of Xarelto?

23  A.    I would think it's misleading.

24  Q.    I'm going to ask you to go to --

25          If we can pull up Exhibit 581376, please.

**HENRY RINDER - REDIRECT**

01:48

1          I'll hand you a copy if it will be easier.

2   A.   Thank you.

3   Q.   Dr. Rinder, this publication is in the *New England Journal*

4   *of Medicine*; is that right?

5   A.   That is correct.

6   Q.   The date is August 29, 2013; is that right?

7   A.   That's right.

8   Q.   Let's take a look at the lead author here.  So we look at

9   the lead author?

10  A.   Yes.  I'm sorry.  That, again, is Dr. Agnelli, from Italy.

11  Q.   The same author we saw in the publication that Ms. Pruitt

12  showed you; is that right?

13  A.   Yes.  I believe that's the same author.

14  Q.   We are talking about five years later?

15  A.   That's correct.

16  Q.   The conclusions in this article -- can you take a look at

17  the conclusions here.

18          "A fixed dose regimen of apixaban" -- apixaban, is

19  that what we call Eliquis?

20  A.   Yes.  As I said, that's Eliquis, which is another of the

21  DOACs and works in the same general way as Xarelto.

22  Q.   -- "was not inferior to conventional therapy for the

23  treatment of acute venous thromboembolism and was associated

24  with significantly less bleeding."

25          Do you see that?

HENRY RINDER - REDIRECT

01:50

1   **A.**   Yes, I do.

2   **Q.**   So what's that talking about?  What's that telling us when

3   he says "with significantly less bleeding"?

4   **A.**   So in this study, which I have looked at previously, they

5   are comparing apixaban -- Eliquis -- to giving a patient low

6   molecular weight heparin followed by warfarin orally and then

7   following them over time.  And they found that major bleeding

8   was about 70 percent less in patients who were on Eliquis than

9   patients who were on warfarin.

10   **Q.**   Let's go quickly back to --

11         **MS. PRUITT:**  Your Honor, may we approach, please?

12         **THE COURT:**  Sure.

13         (The following proceedings were held at the bench.)

14         **MS. PRUITT:**  Your Honor, I'm going to object to him

15   showing any articles about the comparisons between the other

16   NOACs because that is way outside the scope of anything he said

17   on direct, anything I said on cross, and they are just waiting

18   for their redirect to bring up a brand-new issue, Judge.

19   That's just not fair.

20         **MR. BIRCHFIELD:**  Well, Your Honor, that's not what's

21   happening here.  She put up an article from 2008.  I'm taking

22   that same article, the author of that article, and showing the

23   conclusion of that author, who became a lead author five years

24   later, and that's the point.

25         **THE COURT:**  Are you moving on to something else,

HENRY RINDER - REDIRECT

01:51

1  then?  I do think that this is a whole new thing other than the

2  author.

3          MR. BIRCHFIELD:  Right.  I have moved on from that.

4  I'm actually back to the study that she has shown.

5          THE COURT:  Okay.  I'll let that in.  Let's get on to

6  something else.  Let's try to finish this witness as quickly as

7  possible, please.

8          MR. BIRCHFIELD:  Yes, sir.

9          (End of bench conference.)

10  BY MR. BIRCHFIELD:

11  Q.   Dr. Rinder, taking a look again at the *Blood* article that

12  Ms. Pruitt showed you.  I ask you to turn to the next to the

13  last page.

14  A.   Okay.

15  Q.   Again, this is the study with the small number of patients

16  that Ms. Pruitt highlighted, suggesting it was not associated

17  with a bleeding risk -- Xarelto was not associated with a

18  bleeding risk.  Is that right?

19  A.   Yes.

20  Q.   I will put it up on the screen for you, for time's sake.

21          Here we see an acknowledgment.  What does it tell us

22  here in the acknowledgment section about who sponsored this

23  study?

24  A.   It says "This work was sponsored by Bayer HealthCare."

25  Q.   You were asked about whether the FDA had made any

1402

01:53

1    recommendations about a cut-off point -- a cut-off point or a

2    threshold where the PT range should indicate a patient should

3    not be taken off the drug.

4            Do you recall that line of questions?

5    A.    Yes.

6    Q.    Who has responsibility for identifying that cut-off point?

7    The FDA or the manufacturer?

8    A.    Well, in my opinion, all of the trial data that comes out

9    of EINSTEIN, RECORD, and ROCKET shows the fourth quartile,

10   which starts at about 19-and-change seconds.  That data is

11   consistent throughout all those studies.  So it would seem to

12   me that data should be shared with physicians to let them know

13   that a prothrombin time with the Neoplastin reagent above that

14   level identifies a group of patients at higher bleeding risk.

15   Q.    You were asked about guidelines.  Are there guidelines in

16   organizations now that actually suggest measuring the effects

17   of Xarelto?

18   A.    Yes.  They don't specifically mention a cut-off point.

19   But, for example, the International Society for Thrombosis and

20   Hemostasis has written saying that prothrombin time can be used

21   to measure the effect of rivaroxaban.

22            The American Society of Hematology, which publishes

23   *Blood*, has a clinical practice guideline which is disseminated

24   to all members of the society and is available online, which

25   also says that using the PT to measure Xarelto levels is an

HENRY RINDER - REDIRECT

01:54  1  option and can be utilized.

2  **Q.**    Dr. Rinder, Ms. Pruitt asked you about the one dose of

3  Coumadin that Ms. Mingo took on January 22, 2015.

4        Do you recall that?

5  **A.**    Yes, I do.

6  **Q.**    She showed you the Coumadin label?

7  **A.**    Yes, she did.

8  **Q.**    You stated that one dose of Coumadin would not affect that

9  PT, that 23.6 PT; is that right?

10  **A.**    That is what I stated.

11  **Q.**    So explain to us why one dose of Coumadin would not affect

12  the PT reading 35 hours later.

13  **A.**    So when Coumadin is given, it has to be metabolized and

14  then has its effect.  Its effect is relatively slow and

15  relatively incomplete.  It's one of those drugs that, unlike

16  Xarelto, which immediately gives a therapeutic level and then

17  falls off, Coumadin requires daily doses of overlap.  That's

18  where I read to you from the guidelines that you need

19  consecutive daily -- meaning overlapping doses in order to get

20  the anticoagulant effect up into a range where it will have an

21  effect on the patient and the prothrombin time.

22        In my experience, a single dose of Coumadin, whether

23  it's 5 milligrams or 10 milligrams, does not elevate the

24  prothrombin time.

25        Moreover, even if there was a partial effect of the

**HENRY RINDER - REDIRECT**

01:56

1   Coumadin, because it works in a different way than Xarelto, I

2   would not expect even a partial effect of the Coumadin to

3   synergize or add to the Xarelto effect to prolong the

4   prothrombin time.  I believe that the Xarelto by itself

5   prolonged the prothrombin time.

6           And we have additional evidence that that is true

7   because of the patient's elevated prothrombin time at the peak

8   time, when she was admitted to the hospital weeks after she was

9   on Coumadin, where there's no possibility of a Coumadin effect.

10          I think this is objective data that supports my

11  conclusion.

12  **Q.**   Dr. Rinder, just to make sure, aspirin would not affect

13  the PT time?

14  **A.**   Aspirin does not affect the prothrombin time.  Nor does

15  Lovenox.

16  **Q.**   Ms. Pruitt asked you about the time of your deposition,

17  you did not know the reagent that was used at the hospital.  Is

18  that correct?

19  **A.**   That's correct.

20  **Q.**   That's typically not information that's printed on lab

21  results.  That's not a normal -- it's not the normal process to

22  identify the reagent?

23  **A.**   No, that's correct.  When you get a laboratory result,

24  whether it's for a doctor to look at -- or a patient can see

25  their own laboratory results -- the actual methodology,

**HENRY RINDER – REDIRECT**

01:57  1   especially for tests that are FDA cleared, that methodology is

2   not present there.  It's not in the medical record.  You would

3   have to go to the laboratory to investigate that.

4   **Q.**   Quickly.  Ms. Pruitt also showed you the Neoplastin label.

5   Do you recall that?

6   **A.**   Yes.

7   **Q.**   Let me ask you, Dr. Rinder:  Would it be accurate or would

8   it be misleading to suggest that it would be unlawful or

9   inappropriate to use Neoplastin reagent to measure PT?

10  **A.**   Misleading.

11  **Q.**   Why is that, Dr. Rinder?

12  **A.**   Because doctors use lab tests all the time outside of

13  their indication.

14          It's like doctors can go off label for prescribing

15  drugs.  They can prescribe drugs in a way that's different than

16  what the FDA approves.  They can do the same for tests that are

17  cleared by the FDA.  They can use them for ways that are useful

18  but not necessarily indicated in the methods.

19          **MR. BIRCHFIELD:**  Your Honor, could I have one minute,

20  just one minute?

21          **THE COURT:**  (Nods head.)

22          **MR. BIRCHFIELD:**  That's all.  Thank you.

23          **THE COURT:**  Members of the jury, you all heard the

24  question of medical records.  Some of the records, we see some

25  redactions.  It's routine in cases of this sort to black out

**RENIE JORDON - DIRECT**

01:59

1    irrelevant information and also personal information the HIPAA

2    law and other laws require.

3                Both parties agree that the redacted information

4    is not relevant to this case.  As I said, this is routine and

5    should not concern you at all.

6                We will take a 10-minute break here and come

7    back.  Let's get the other witness ready.

8                Court will stand in recess for 10 minutes.

9                **THE DEPUTY CLERK:**  All rise.

10               (Recess.)

11               **THE COURT:**  Be seated, please.

12               Call your next witness.

13               **MR. MORRISON:**  Your Honor, at this time we call

14   Dr. Renie Jordon.

15               **THE COURT:**  Come forward, please, Doctor.

16                         **RENIE JORDON,**

17   having been duly sworn, testified as follows:

18               **THE DEPUTY CLERK:**  State your full name and correct

19   spelling for the record, please.

20               **THE WITNESS:**  My name is Renie Armstrong Jordon.

21   Renie, R-E-N-I-E; Armstrong, A-R-M-S-T-R-O-N-G; Jordon, with

22   two Os, J-O-R-D-O-N.

23                       **DIRECT EXAMINATION**

24   BY MR. MORRISON:

25   **Q.**   Dr. Jordon, good afternoon.  My name is Walter Morrison.

RENIE JORDON - DIRECT

02:17  1    I, along with these lawyers, represent Ms. Mingo.

2              Tell the member of the juries where you live.

3    **A.**   I live in McComb, Mississippi.

4    **Q.**   What do you do down there?

5    **A.**   I'm an internal medicine physician.

6    **Q.**   How long have you been doing that down there?

7    **A.**   I came in '96.  21 years.

8    **Q.**   Pull that microphone just a little closer so we can

9    understand.

10             Tell us a little bit about your educational

11   background.  Where did you go to school?

12   **A.**   Well, I am originally from Guyana, in South America, where

13   I did my primary and secondary education.  In 1987 I went to

14   Byelorussia in the former Soviet Union.  I got a scholarship at

15   that time.

16             Spent seven years there, completed internal medicine

17   training.  I subsequently left there in '87 and went to Guyana,

18   where I practiced there for five years, until 1992.  '92, I

19   came to Howard University in Washington, D.C.  I did a

20   residence fellowship in geriatric medicine.  That was concluded

21   in July -- June/July '95.

22             I subsequently went to work with the U.S. Army in

23   Fort Meade, Maryland, at the NSA, as a contractor-physician

24   until June of '96, in the United States Department of

25   Agriculture.  Under visa waiver program, sent me to Walthall

**RENIE JORDON – DIRECT**

02:19

1  General in Walthall County, Mississippi, as a physician.

2  Originally was for two years, but I'm still here.

3  **Q.**   Are you board certified in internal medicine?

4  **A.**   I am.

5  **Q.**   Tell the jury what internal medicine is.

6  **A.**   Well, internal medicine is a study -- we say adult

7  medicine.  It starts from the age of 16 until you are old.  I

8  do everything except fix bones or cut on folks.  The full

9  array.

10  **Q.**   Do you see patients for DVT?

11  **A.**   Yes.

12  **Q.**   And you prescribe blood thinners, generally?

13  **A.**   Yes.

14  **Q.**   You are obviously licensed to practice medicine in

15  Mississippi?

16  **A.**   Yes.

17  **Q.**   Tell the members of the jury what you do in your practice

18  daily.

19  **A.**   Well, I have a combined practice clinic with hospital

20  privileges.  So I start around 6:00 in the morning.  I go to

21  the hospital.  I see the patients that are assigned to me.

22  After that I go to the office and spend the rest of my day

23  until completion.

24  **Q.**   How many patients do you think you see on a daily basis?

25  **A.**   I usually schedule 35, but with cancellations, so maybe

RENIE JORDON - DIRECT

02:21  1    30, 28 patients.

2    Q.   About 30 a day?

3    A.   Yes.

4    Q.   I would imagine in the course of your practice you

5    probably prescribe hundreds of medications.  Is that safe?

6    A.   Yes.

7    Q.   I want to talk to you a little bit about prescription

8    drugs and obligations you feel you owe to your patients in that

9    regard.

10          Do you know what the Hippocratic Oath is?

11   A.   Do no harm.

12   Q.   First, do no harm, right?

13   A.   Uh-huh.

14   Q.   The point of that would be you don't want to impose a

15   therapy on somebody that might wind up doing more harm than

16   good, right?

17   A.   That's correct.

18   Q.   Do you recognize you owe your patients an obligation to

19   prescribe them medications they can use safely?

20   A.   That's correct.

21   Q.   When you are having your discussion with your patients, is

22   that something that you try to convey to them?

23   A.   That's correct.

24   Q.   Do you try to give your patients good instructions about

25   how to use a drug?

**RENIE JORDON - DIRECT**

02:22

1    **A.**    Yes.

2    **Q.**    Do you want your patients to trust you when you are having

3    that discussion with them?

4    **A.**    Correct.

5    **Q.**    Do you find that your patients do, in fact, trust you?

6    **A.**    Yes.  I would say that they do.

7    **Q.**    During the course of your practice, do you have time to

8    sift through mountains of medical literature about every drug

9    that you might prescribe?

10   **A.**    I do it as best that I can with the available time that I

11   have.  I try to keep up with what's happening, what's the

12   latest that's happening in medicine, yes.

13   **Q.**    Would it be fair to say that you primarily rely upon the

14   drug label?

15   **A.**    I rely on the drug label and the FDA recommendations for

16   any particular drug, yeah.

17   **Q.**    Do you expect the information that you are being provided

18   in the label to be complete and accurate?

19   **A.**    Well, I'll explain it this way.  I would say yes, but I

20   will explain it this way:  In the practice of medicine we work

21   on a -- we have to trust the information that we are being

22   provided with.  As such, I start out on the premise that what

23   I'm going to be reading or what is being told to me is true and

24   correct, yes.

25   **Q.**    Would it be fair to say that you expect important

**RENIE JORDON - DIRECT**

02:23

1   information about a drug you are going to prescribe to one of
2   your patients to be in the label?
3   **A.**   Yes.
4   **Q.**   Just like you expect your patients to trust you, is it
5   fair to say you trust the drug manufacturers?
6   **A.**   The information that they provide to us I trust, yes.
7   **Q.**   If you have a particular question about how a patient may
8   be tolerating a drug or handling a drug, do you go to the
9   label?
10  **A.**   Yes, I do go to the label.  Yes.
11  **Q.**   If you then find something in the label that suggests to
12  you that maybe this drug is not the right drug for this
13  patient, is that something that you consider and maybe decide
14  to switch them?
15  **A.**   Sure.  I mean, in prescribing, recommending a drug, one
16  has to know the patient, know what the drug is going to be
17  given for, and there has to be some compatibility.  If the
18  patient is not a candidate, that drug will not be administered.
19  It's as simple as that.
20  **Q.**   Would it be fair to say that not all patients can take all
21  drugs?
22  **A.**   Correct.
23  **Q.**   We have heard some testimony this week or last week from
24  some sales representatives.  Are you familiar with the drug
25  sales representatives?

RENIE JORDON - DIRECT

02:24

1  A.    I do.

2  Q.    When a new drug comes on the market, is it your experience

3  that those folks will frequently come around to your office and

4  want to talk to you about the drugs?

5  A.    Yes.

6  Q.    Do you expect those sales representatives to be

7  knowledgeable about the drugs that they are there promoting?

8  A.    Yes.

9  Q.    Do you expect that they will have the information

10 necessary to help you use the drug safely?

11 A.    I'll answer your question this way:  By nature, I'm a very

12 skeptical person.  So inasmuch as I entertain them in their

13 visit, I retain some level of independency in whether I

14 prescribe or administer a drug.

15 Q.    Do you expect those sales representatives to be honest and

16 truthful with you?

17 A.    On the surface, yes.  I don't expect anyone to lie to me.

18 Q.    I want to talk a little bit about blood thinners.

19        You have been practicing internal medicine how many

20 years, did you tell us?

21 A.    From '87 to now.  So I don't know, 31 -- I don't know.  A

22 long time.  30 years.

23 Q.    I would imagine in that time period you have prescribed

24 all sorts of blood thinners.

25 A.    Yes.

RENIE JORDON - DIRECT

02:26

1   Q.   Can those drugs be dangerous?

2   A.   They are dangerous drugs, yes.

3   Q.   Is that because when you use a blood thinner, there is a

4   risk that a patient may become so anticoagulated that they

5   could bleed?

6   A.   That's one of the risks involved in administering that

7   drug, yes.

8   Q.   As I understand it, the goal with a blood thinner is that

9   you anticoagulate a patient enough to protect them against a

10  blood clot, but not so much that they bleed, correct?

11  A.   Correct.

12  Q.   In your experience with regard to, for instance, drugs

13  such as warfarin, are tests ordered to monitor patients to see

14  how they will tolerate a drug?

15  A.   Yes.

16  Q.   Those would include PT and INR, things like that?

17  A.   Correct.

18  Q.   Is it true that generally what you do is you give a

19  patient a dose -- let's just use warfarin, for example.  You

20  get a blood test and you see how their body is going to respond

21  to the drug?

22  A.   Correct.

23  Q.   Do patients respond differently?  In other words, one

24  patient might respond one way, another completely different?

25  A.   Correct.

**RENIE JORDON - DIRECT**

02:27

1  **Q.**   So in your practice of internal medicine, prescribing a
2  blood thinner and using a test to see how a patient responds to
3  it is something that you are very used to doing, correct?
4  **A.**   Correct.
5  **Q.**   Dr. Jordon, would you ever start a patient on a blood
6  thinner if you thought that they were actively bleeding?
7  **A.**   No.
8  **Q.**   That's a contraindication, isn't it?
9  **A.**   Well, it's against the law.
10  **Q.**   Against the law.  Okay.  Good.
11         Now, let's talk a little bit about Xarelto.  And the
12  evidence is pretty clear in this case that you started
13  Ms. Mingo on Xarelto in January 2015.  Is that your
14  understanding?
15  **A.**   Yes.  The record said that my first contact was -- my
16  first and only contact was January 2015 with Ms. Mingo, yes.
17  **Q.**   As far as I know, that was it; that was the only -- the
18  one and only day, right?
19  **A.**   One and only day.
20  **Q.**   You probably never thought you would be here, did you?
21  **A.**   Correct.
22  **Q.**   At the time that you prescribed Xarelto to Ms. Mingo, were
23  you under the impression that there was no need to test the
24  anticoagulation effect of that drug?
25  **A.**   Yes, I was under the impression at that time and even now.

RENIE JORDON - DIRECT

02:28

1   Q.   And even now it's your impression?

2   A.   Yes.

3   Q.   Were you also under the impression that it was not even

4   possible to monitor the anticoagulation effect of Xarelto?

5   A.   That's correct.

6   Q.   That impression about those two items came to you from

7   where?  Sales representatives?

8   A.   From the sales representative, the package insert, and the

9   FDA guidelines in prescribing that drug, yes.

10  Q.   I think you told us, in your deposition, you had even seen

11  some ads on television that further gave you that impression.

12  A.   Correct.

13  Q.   So let me show you what the members of the jury have seen.

14  This is from the applicable label.

15           MR. MORRISON:   If you would give me this, please,

16  sir.  Let me see if I can figure out how to use this here.

17  BY MR. MORRISON:

18  Q.   This is the label that was in effect in January 2015.  It

19  talks about the fact that the anticoagulant effect of Xarelto

20  cannot be monitored with standard laboratory testing nor

21  readily reversed.

22           Is that the way you thought things worked in

23  January 2015?

24  A.   Yes.

25  Q.   Certainly nobody from Bayer or Janssen ever told you that

RENIE JORDON - DIRECT

02:30

1   PT was relevant; is that true?

2   **A.**   No, no one has ever told me that, no.

3   **Q.**   Dora Mingo was in the hospital in McComb in January 2015

4   with regard to Xarelto.  In her anticoagulated status, you

5   thought PT was completely irrelevant?

6   **A.**   Correct.

7   **Q.**   All right.  Now let's talk a little bit about your first

8   interaction with her.  Do you recall the details of that?

9   **A.**   No, I don't even recall Ms. Mingo, to be honest.  The

10  first time when I got the notification of her deposition, I

11  pulled the charts.  She never came back to mind.

12          As I said, there was one meeting with Ms. Mingo, and

13  she was admitted to me as an unreferred patient on a Friday.

14  **Q.**   Let me interrupt you, and I'm sorry to do that.  But when

15  you say an "unreferred patient," what does that mean?

16  **A.**   Well, she came to the emergency room and she had a

17  problem, and patients who do not have a physician on staff,

18  there's a roster of physicians.  It was my time up.

19  **Q.**   So Ms. Mingo was not a regular patient of you in your

20  clinic where you had seen her for years and she winds up in the

21  hospital and you go there and check on her?

22  **A.**   Correct.  She was not a regular patient of mine.

23  **Q.**   So it just happened to be your day to go see patients

24  there in the hospital?

25  **A.**   Uh-huh.

**RENIE JORDON - DIRECT**

02:31

1   **Q.**   And did you understand at the time that she had been
2   admitted for treatment of DVT?
3   **A.**   Yes.
4   **Q.**   I'm assuming that you performed a history and physical on
5   her?
6   **A.**   Correct.
7          **MR. MORRISON:**   Please pull up that 5812914 -- 174.
8   That's a copy of the history and physical.
9   **BY MR. MORRISON:**
10  **Q.**   Dr. Jordon, I've handed you what I believe to be your
11  history and physical; is that true?
12  **A.**   Correct.  Yeah, that's true.
13  **Q.**   Is it fair to say that other than for swelling in her
14  right lower leg, she didn't have any other complaints?
15  **A.**   That would be fair to say, yes.
16  **Q.**   Based upon your document there, the history and physical,
17  you certainly found no evidence that she was actively bleeding
18  at that time, right?
19  **A.**   Based on my assessment, no.
20  **Q.**   We know that you ultimately prescribed Xarelto, and again,
21  you wouldn't prescribe Xarelto on a patient that was bleeding,
22  would you?
23  **A.**   I would not.
24  **Q.**   Now, I notice on this next page of your history and
25  physical that there was some laboratory data and you reviewed

RENIE JORDON - DIRECT

02:33

1    that?

2    **A.**   I did review the laboratory data, yes.

3    **Q.**   There's a reference there to the hemoglobin and hematocrit

4    levels, what we have called H&H in this case.  How would you

5    characterize those?

6    **A.**   The H&H was slightly below normal, but it hadn't reached

7    that level for any intervention.

8    **Q.**   And certainly, given a lady -- I'm sorry -- Ms. Mingo's

9    age, that's certainly not abnormal, is it?

10   **A.**   No.

11   **Q.**   And again, those H&H levels would not be indicative of

12   somebody actively bleeding?

13   **A.**   No.

14   **Q.**   You understood at the time that the standard of care was

15   that she needed to be placed on a blood thinner?

16   **A.**   Yes.

17   **Q.**   And as I understand it, you placed her on Xarelto.

18   **A.**   Yes, correct.

19   **Q.**   Now, let me also show you --

20            **MR. MORRISON:**  If you could pull up 5812914177.

21   BY MR. MORRISON:

22   **Q.**   Dr. Jordon, these are the lab results from that period of

23   time.  And I wanted to ask you about the January 22 PT --

24   prothrombin time -- at that point 12.5.  How would you

25   characterize that?  Is it normal?

**RENIE JORDON - DIRECT**

02:35

1   **A.**   January 22, yeah, that was normal, yes.

2   **Q.**   That's before Ms. Mingo was given Xarelto; is that true?

3   **A.**   That's true.

4   **Q.**   Now, back to your history and physical, you make reference

5   to the fact that you were going to start her on Xarelto --

6           **MR. MORRISON:**  Would you pull that up, please, sir.

7   BY MR. MORRISON:

8   **Q.**   You were going to start her on Xarelto and you were going

9   to observe her for 24 hours.  Do you see that?

10  **A.**   Yes.

11  **Q.**   Why would you, on a new patient, newly hospitalized,

12  started on a new blood thinner, why would you want to observe

13  her for 24 hours?

14  **A.**   Well, first to see whether she tolerated the drug, one.

15  Secondly, to see whether there was any abnormal effect of the

16  medication.  And primarily that, yes.

17  **Q.**   So see if she would tolerate the drug or if there would be

18  any abnormal reaction to it?

19  **A.**   Yes.

20  **Q.**   Now, we know with warfarin, you could check by looking at

21  her INR to see whether or not she could tolerate the medicine,

22  right?

23  **A.**   Correct.

24  **Q.**   But was there any guidance given to you by the

25  manufacturers of Xarelto as to how to check and see if she was

**RENIE JORDON - DIRECT**

02:36

1    tolerating it?

2    **A.**    No.

3    **Q.**    So I suppose, then, other than --

4    **A.**    It would be a clinical assessment -- sorry to interrupt

5    you -- it would be a clinical assessment and a judgment, yes.

6    **Q.**    Clinical assessment.  So if she was bleeding, you would

7    know she was not tolerating it?

8    **A.**    Correct.

9    **Q.**    In terms of getting a routine laboratory test such as you

10   were able to do with warfarin, Bayer and Janssen didn't give

11   you any guidance in that regard?

12   **A.**    No.

13   **Q.**    If, in fact, it would have been possible to monitor the

14   anticoagulant effect of Xarelto in January 2015 while Ms. Mingo

15   was there in your hospital receiving the medication for the

16   first time, is that something you would have wanted to do?

17   **A.**    As a basic standard of care, if there was a requirement

18   that we as a physician follow that, yes, I would have been

19   forced to comply with that, yes.

20   **Q.**    Well, if it was something that you were told it was

21   possible for the safety of your patient, is that something you

22   would have wanted to do?

23   **A.**    Yes.  Yes.

24   **Q.**    Now, do you understand that Ms. Mingo actually received

25   two doses of Xarelto on January 23?

RENIE JORDON - DIRECT

02:37

1    A.    Yes, from the record it said that, yes.

2    Q.    And then the following day yet another laboratory test was

3    run.  And you had that there before you.  I wanted to look at

4    that PT test.

5              MR. MORRISON:  If you can pull that up, that's -- the

6    number is 581294177.  It was one of the prior ones you pulled

7    up.

8    BY MR. MORRISON:

9    Q.    And I wanted to direct your attention to the "PT" at the

10   bottom.  So we had already talked about the 12.5, and now we

11   are looking at one 24 hours or so after she has received her

12   first dose of Xarelto, and it's 23.6.  Do you see that?

13   A.    I do.

14   Q.    Based upon the laboratory's reference range there, would

15   you agree that that's clearly abnormal?

16   A.    I would agree it was abnormal, yes.

17   Q.    I think you told us in your deposition you didn't even

18   know why a PT was obtained.

19   A.    And I still maintain that today.

20   Q.    I suppose that testimony is based on the fact that in

21   their label, they say you can't monitor it.

22   A.    That's correct.

23   Q.    Nonetheless, despite the fact of that 23.6 PT level, you

24   allowed Ms. Mingo to be discharged?

25   A.    Actually, I'm not the one that discharged Ms. Mingo.  As I

RENIE JORDON - DIRECT

02:39

1    said, it was on a Friday, and then the other crew had came on

2    on Saturday, on the weekend.

3    Q.   Dr. Haddad?

4    A.   Dr. Zevallos I think was the one who came on on the

5    weekend.

6    Q.   I stand corrected.  I stand corrected.

7         So is it fair for me to assume that that 23.6 PT in

8    your mind was just completely irrelevant?

9    A.   Well, first of all, I would not have seen the 23.6,

10   because I would not have been there on the Saturday, when it

11   was drawn.

12        Secondly, in answer to your question, I could not see

13   the relevance of drawing the PT INR on that day.

14   Q.   Well, if you had wanted to monitor Ms. Mingo to determine

15   how she tolerated the Xarelto, then going and looking at that

16   PT would have been something for you to do?

17   A.   I don't understand your question.  The question for me was

18   I would not have ordered a PT INR for Ms. Mingo, because at

19   that time and even now -- a funny thing that happened as a

20   result of this case and deposition is my patients on Xarelto I

21   would measure PT INR, not because it's recommended, just

22   because of the sensitivity of what happened here in this

23   situation right now.

24        But at that time, 2015, I never saw it on a Saturday,

25   and I would not have recommended that we do a follow-up PT INR

RENIE JORDON - DIRECT

02:40

1  on Ms. Mingo.

2  **Q.**  Had the manufacturers of Xarelto recommended the PT blood

3  test to assess the anticoagulant effect of Xarelto in Ms. Mingo

4  in 2015, the test didn't even need to be ordered; it had

5  already been ordered, right?

6  **A.**  That's correct.

7  **Q.**  And PT is a widely available test; it's available in

8  McComb, Mississippi?

9  **A.**  That's correct.

10  **Q.**  If, in fact, Ms. Mingo's PT result as shown here of 23.6

11  indicated that she was at increased risk of bleeding or that

12  her blood was too thin, would you have communicated those

13  results to her?

14  **A.**  Again, that's theoretical because on the Saturday

15  following her admission, I did see her and I didn't see the

16  result.  Honestly, it would have raised a red flag and I would

17  have disputed it, based on my knowledge at that time that

18  there's no correlation between PT INR and Xarelto.  But as I

19  said, I didn't see it, because I never followed her that

20  Saturday, so I can't really comment on that.

21  **Q.**  Well, if, in fact, that's true that the manufacturers of

22  Xarelto would have told you that there was, in fact, some

23  relevance between PT and her risk of bleeding, is that

24  something you would have considered?

25  **A.**  Yes.

RENIE JORDON - CROSS

02:42

1    **Q.**   If you felt that it was too high, you would have had a

2    discussion with her?

3    **A.**   I would have stopped the medication, yes.

4    **Q.**   Stopped the medication.

5            There has been some testimony in this courtroom today

6    that the significance of these PT levels indicated that, in

7    fact, Ms. Mingo was in the highest quartile, she was in the

8    highest 25 percent of people at risk of bleeding based upon

9    those PT results.  Is that the type of information you would

10   have wanted to know?

11   **A.**   Yes.

12   **Q.**   Is that the type of information that you would have talked

13   to her about?

14   **A.**   Yes.

15   **Q.**   And then you may have stopped the medication yourself?

16   **A.**   Yes.

17           **MR. MORRISON:**  Your Honor, I have no further

18   questions.

19           **THE COURT:**  Any cross?

20                         **CROSS-EXAMINATION**

21   BY MR. JOHNSON:

22   **Q.**   Dr. Jordon, how are you, sir?

23   **A.**   I'm doing fine, thank you.

24   **Q.**   I am Walter Johnson.  I represent Bayer and Janssen.

25           You have an interesting background.  You went to

RENIE JORDON - CROSS

02:43

1  medical school in Russia?

2  **A.**   In Byelorussia.

3  **Q.**   Do you speak Russian?

4  **A.**   I do.

5  **Q.**   Do you speak Dutch?

6  **A.**   No, I don't.

7  **Q.**   That's what we need here.

8          I want to ask you some questions, just a few.  I want

9  to talk to you about PT since that's something you all talked

10  about.  But I want to talk to you about Ms. Mingo's medical

11  records a little more in detail and about your involvement in

12  her care.

13          Let me ask you some general questions first if I

14  could.  We've had a couple witnesses that showed up here early

15  in the trial last week and they were sales representatives for

16  Janssen.  Do you know either Shawn Collier or Angela Seifert?

17  I think you told us in your deposition you didn't know them.

18  **A.**   I don't know them.

19  **Q.**   As a matter of fact, you have a policy within your office,

20  I believe, and you restrict pharmaceutical sales reps pretty

21  much?

22  **A.**   That was instituted lately, but before it was an open

23  policy.

24  **Q.**   Well, let me ask you this, Doctor:  You were asked a

25  question about do you expect sales reps to be honest with you.

1426

**RENIE JORDON - CROSS**

02:44

1   Have any sales reps been dishonest with you as it relates to

2   Xarelto?

3   **A.**   No.

4   **Q.**   Doctor, in your prescribing practices, when you clinically

5   assess a patient and you prescribe medication, you don't rely

6   on anything that a salesperson tells you, do you?

7   **A.**   That's correct.

8   **Q.**   You rely on the information that you get from the FDA

9   label; is that correct?

10  **A.**   I rely on my training and --

11  **Q.**   Your experience?

12  **A.**   -- the label and my experience.  It's not one factor.

13  **Q.**   As well as meetings that you attend and conversations you

14  have with your colleagues; is that correct?

15  **A.**   Correct.

16  **Q.**   Doctor, at the end of the day, regardless of who you

17  talked to or whatever, television advertisements you look at,

18  the decision to prescribe a drug is yours, based on your

19  education, training, and experience; is that right?

20  **A.**   That's correct.

21  **Q.**   Doctor, you've found in your many years of practice that

22  the information that you gleaned from a label provided by the

23  FDA has been pretty much true and accurate, hasn't it?

24  **A.**   Yes.

25  **Q.**   I want to ask you just a couple questions about the FDA.

**RENIE JORDON - CROSS**

02:46

1    I know you're not an FDA expert and I'm not asking you about

2    that, but I want to know:  In the United States of America,

3    before a manufacturer can introduce a drug onto the market,

4    that drug has to receive FDA approval, doesn't it?

5    **A.**    Correct.

6    **Q.**    The FDA is the agency of the United States government

7    that's charged with making sure that a drug is safe and

8    effective; isn't that right?

9    **A.**    That's correct.

10   **Q.**    Before the FDA approves a drug, the manufacturer has to

11   conduct clinical trials and submit all of that data to the FDA,

12   proving to the FDA that the drug is safe and effective.  You

13   know that, don't you?

14   **A.**    That's my understanding, yes.

15   **Q.**    In addition to approving the drug, the FDA also approves

16   the label that's on the drug or the package insert, doesn't it?

17   **A.**    Correct.

18   **Q.**    And that information that is given to the pharmacist that

19   they give to the patients, that's also approved by the FDA,

20   isn't it?

21   **A.**    It's my understanding, yes.

22   **Q.**    Now, Doctor, I want to talk with you about -- they showed

23   you just a couple records and I'm going to show you a few more.

24   I want to talk to you specifically about Ms. Mingo.

25             **MR. JOHNSON:**  If I could have the ELMO.

**RENIE JORDON - CROSS**

02:47

**BY MR. JOHNSON:**

1

2 **Q.**   Doctor, we talked about Ms. Mingo and her problem that she

3 had with the deep vein thrombosis.  Did you actually see this

4 report or do you recall seeing this report when you treated

5 Ms. Mingo?

6 **A.**   The record would reflect that.  I must have seen it.

7 **Q.**   Exactly.  And what this is, is a sonogram or a Doppler was

8 taken of her lower legs because she had been complaining of leg

9 pain, and they concluded, based on the study, that she had a

10 clot in one of her legs, didn't they?

11 **A.**   That is what was concluded, yes.

12      **MR. JOHNSON:**  For the record, that's

13 DX Mingo 70000014.

14 **BY MR. JOHNSON:**

15 **Q.**   Doctor, we've talked about this, but I just want to show

16 the record so the jury can see it on paper.

17      When Ms. Mingo came to the emergency room and they

18 did that Doppler study, they asked her what drugs she was

19 taking.  And at the time -- I'll show you this.

20      **MR. JOHNSON:**  I'm referring to SMRMC.  This is

21 000297.  That's DX Mingo 31, Your Honor.  I'm sorry.

22 **BY MR. JOHNSON:**

23 **Q.**   Doctor, that would be -- it says "ASA, 325 milligrams by

24 mouth daily."  What is ASA?

25 **A.**   That's aspirin.

**RENIE JORDON - CROSS**

02:49

1  **Q.**  She was taking aspirin when she arrived, and she was

2  received in the emergency room by a physician by the name of --

3  is it William Clifton [sic]?  Is that his name?

4  **A.**  That's what the record shows.

5  **Q.**  Now, do you know him?

6  **A.**  Yes, I do.

7  **Q.**  Is he an emergency room physician there in McComb

8  Hospital?

9  **A.**  Yes.

10  **Q.**  Let me ask you a question.  How large of an area does that

11  hospital service?  How many counties?

12  **A.**  We have patients as far as Copiah County this way, over

13  the line in Louisiana that way to Hattiesburg.  It serves quite

14  a large area.

15  **Q.**  It's a significant patient population that comes through?

16  **A.**  Yes.

17  **Q.**  When Dr. Clifton [sic] received the patient, he

18  immediately started treating her for blood clot?

19  **A.**  That's what the record showed.

20  **Q.**  The record shows he gave her a shot of warfarin -- I mean,

21  I'm sorry, he gave her a dose of warfarin?

22  **A.**  He gave her a dose of warfarin.

23  **Q.**  He also gave her a shot of Lovenox; is that right?

24  **A.**  Right.

25  **Q.**  The dosage that he gave of warfarin was 10 milligrams.

RENIE JORDON - CROSS

02:50

1    That's not a prophylactic dose at all, is it?

2    A.    Prophylactic dose?

3    Q.    Yes.  Usually I think they give 5 milligrams for

4    prevention and then 10 milligrams for treatment?

5    A.    No, no, no.  It's based on the patient.  As I said,

6    patients are sensitive.  1 milligram might be a prophylactic.

7    Q.    Well, in this particular case, they gave 10 milligrams to

8    Ms. Mingo.

9    A.    Yes.

10   Q.    Doctor, you were contacted and Ms. Mingo was actually

11   added to your service; is that right?

12   A.    That's correct.

13   Q.    When you saw her, you took a history, didn't you?

14   A.    Yes.

15   Q.    You had a conversation with her?

16   A.    I did.

17   Q.    Did you tell her that you were going to prescribe an

18   anticoagulant to her?

19   A.    Correct.

20   Q.    Did you tell her that you were going to give her Xarelto?

21   A.    Correct.

22   Q.    Now, let me ask you so that we have an understanding:

23   You've prescribed anticoagulants before, haven't you?

24   A.    Yes.

25   Q.    And you still prescribe them today?

1431

**RENIE JORDON - CROSS**

02:51  1  **A.**    Yes.

2  **Q.**    You've prescribed NOACs, haven't you, or these novel oral

3  anticoagulants like Xarelto?

4  **A.**    Yes.

5  **Q.**    Have you prescribed Pradaxa?

6  **A.**    Yes.

7  **Q.**    Eliquis?

8  **A.**    Yes.

9  **Q.**    You still prescribe those?

10  **A.**    Yes.

11  **Q.**    Of all those NOACs, these new oral anticoagulants, you

12  don't monitor any of those, do you?

13  **A.**    No.

14  **Q.**    It's not just Xarelto?

15  **A.**    It's not just Xarelto.

16  **Q.**    It's Pradaxa, Eliquis, Savaysa.  That's the technology,

17  isn't it?

18  **A.**    Correct.

19  **Q.**    Why don't you tell the jury -- I'm going to show you this.

20  I'm referring to DX Mingo 71000175.

21        It says:  "This plan of care has been discussed with

22  the patient.  Expected length of stay is probably two days."

23        That's what it says, isn't it?

24  **A.**    Yes.

25  **Q.**    Why don't you tell the jury -- just assume the jury is a

RENIE JORDON - CROSS

02:52

1    patient.  What kind of conversation would you have with that
2    patient about their need for an anticoagulant, which
3    anticoagulant you are going to use?
4         Just talk to the jury and tell them that for me.
5    A.   Well, Patient A has a DVT.  First of all, you try to
6    explain to them what it is.
7    Q.   Why don't you explain it to them.
8    A.   A DVT is a blood clot in the deep veinous system of the
9    blood.  In our case, in Ms. Mingo's case, it was in her lower
10   leg, but it could be in any part of the body, an arm, anywhere.
11        A blood clot of that nature, if not treated, can lead
12   to ultimately demise of the patient, meaning it can kill the
13   patient.  My responsibility is to prevent that.  There are
14   several ways you can do that based on the products that are out
15   there.
16        That decision -- first of all, you discuss it with
17   the patient.  You tell them, "We can go this route.  We can go
18   heparin, Coumadin.  We can do Lovenox, Coumadin.  Or we can go
19   with some of the newer drugs that are out there."
20        This is based primarily, one, on cost, insurance
21   coverage, patient preference, convenience.  Because if you put
22   them on Coumadin and they are working, they have to come back,
23   get the drug checked periodically.
24   Q.   Let me just interrupt you for one-minute, Doctor.
25        Is it necessary to hospitalize a patient when you

**RENIE JORDON - CROSS**

02:54  1    start Coumadin?

2    **A.**    On Coumadin?

3    **Q.**    Yes, sir.

4    **A.**    That's a yes-or-no answer -- that is not a simple answer,

5    yes or no.

6    **Q.**    Okay.

7    **A.**    Today if somebody comes with a new DVT, the patient --

8    Coumadin initially would not work.  It takes three or four days

9    before the dose reaches that level to prevent a propagation and

10    prevention of another clot.  That patient would have to be on

11    Coumadin or some alternative drug, in this case Lovenox or

12    heparin or one of the other injectable anticoagulant drugs.

13            After that discussion with the patient, the options

14    are provided.  As I said, based on a number of factors, it's

15    not a simple case.  We say, "You can take Coumadin, take

16    Xarelto."  You cannot administer a product to a patient without

17    their permission.  So it goes to say I cannot remember the

18    conversation I had with Ms. Mingo, but the basic standard of

19    care is that you provide the information to the patient.

20            Obviously as a physician you come with a

21    recommendation and say, "I think this would be the preferred

22    way to go."  The patient is the ultimate decider that makes

23    that decision, "I want to go X route," and that's the way we

24    go.

25    **Q.**    Let me ask you something, Doctor.  Did you have a

1434

RENIE JORDON - CROSS

02:56

1   conversation with Ms. Mingo about her options?

2   A.   As I said, I can't recall Ms. Mingo.  I have seen so many

3   patients.  But best practices, each patient that comes in

4   contact with me that I have to do, for any condition, they are

5   given an array of options.  I make my recommendation, and I

6   advocate my recommendation:  "I think this is best for you."

7          It's up to the patient to agree or disagree.  As I

8   said, many of them respect you and they believe you because

9   this is -- medicine is based on trust.  My job is not to hurt

10   or harm you.  So if I make a recommendation, it's in your best

11   interest.  Most of the time they go along with that.

12          I'm presuming -- because I can't recall, I don't have

13   a record of the conversation -- that is what happened in this

14   case.

15   Q.   Based on your practices, Doctor, would you prescribe an

16   anticoagulant with a patient without telling them the risks of

17   the anticoagulant?

18   A.   No.

19   Q.   Would you have told Ms. Mingo that there was a risk

20   associated with bleeding?

21   A.   As I said, I can't recall the specific conversation, but

22   best practices, I'm pretty sure that I did.

23   Q.   Would you give a patient a medication without telling them

24   the risks associated with the medication?

25   A.   No.  No.  You can't do that.

RENIE JORDON - CROSS

02:57

1    **Q.**   You would not have done it in this case, I take it?

2    **A.**   No.

3    **Q.**   Well, Doctor, I looked at a deposition that you gave.  You

4    were asked about the difference between Coumadin and/or

5    warfarin and Xarelto.  And you said that "Before the advent of

6    Xarelto, Eliquis, and Pradaxa, a patient could stay in the

7    hospital four to five days until their PT INR reached

8    therapeutic level."

9          Is that still a true statement?

10   **A.**   It's still a true statement, yes.

11   **Q.**   You believe that Xarelto was much more predictable in its

12   effect on the coagulation system?

13   **A.**   Much more predictable?

14   **Q.**   Much more predictable.

15   **A.**   I don't understand the question.  Predictable in what

16   sense?

17   **Q.**   Well, I wasn't at your deposition.  I'm just reading.

18   Here is a sentence that you were asked:  "Xarelto is more

19   predictable in its effect on the coagulation system, isn't it?"

20          And you said:  "That's correct."

21          Is that a correct statement that I just made?

22   **A.**   The FDA and the package insert said one to two hours after

23   you prescribe the drug, the anticoagulant effect is

24   therapeutic.

25   **Q.**   That's with Xarelto, one to two hours after you give it?

1436

**RENIE JORDON - CROSS**

02:59

1   A.   That's what they say, so I believe them.

2   Q.   Doctor, the standard of care requires you to discuss with

3   your patient the risk and benefits of the medication, don't

4   they?

5   A.   Yes.

6   Q.   I want to show you now part of the label, Doctor.  You

7   have seen the Xarelto label.  You have reviewed it, haven't

8   you?

9   A.   (No audible response.)

10  Q.   The indication for usage, Doctor, that's what I want to

11  show you.  The indication for usage in this particular case was

12  for deep vein thrombosis treatment, wasn't it?

13  A.   Yes.

14  Q.   The label tells you that -- it tells you how to prescribe

15  the medication, doesn't it?  And for treatment of DVT, you get

16  15 milligrams twice a day with food --

17  A.   Correct.

18  Q.   -- for 21 days?

19  A.   Correct.

20  Q.   Did you do that with Ms. Mingo?

21  A.   That is what I recommended.  As I said, I never discharged

22  her.  So the person who discharged her I presume followed the

23  recommendation.  But that was what was told to her in the

24  recommendation that was made.

25  Q.   That's what you wanted to have done?

RENIE JORDON - CROSS

03:00

1   **A.**   Yes.

2   **Q.**   Probably, if it hadn't been done, you wouldn't be sitting

3   here today?

4   **A.**   Correct.

5   **Q.**   I want to look at a couple of other parts of the label,

6   Doctor.  I want to look at Section 5.2 of the label.  This is

7   Exhibit DX 10.

8         You knew at the time that you prescribed the

9   medication that Xarelto increased the risk of bleeding and

10   could cause serious or fatal bleeding; is that correct?

11  **A.**   Yes.

12  **Q.**   Look at the third little paragraph here:  "Concomitant use

13  of other drugs that impair hemostasis increase the risk of

14  bleeding."

15        *Concomitant* means giving a particular thing along

16  with the Xarelto, doesn't it?

17  **A.**   Correct.

18  **Q.**   These include aspirin, several other things, and

19  nonsteroidal anti-inflammatory drugs.  Those are NSAIDs, aren't

20  they?

21  **A.**   Correct.

22  **Q.**   I want to ask you about that, Doctor.  Mobic, is that an

23  NSAID?

24  **A.**   It's a special category.  It's not an NSAID per se, no.

25  **Q.**   It's like Celebrex?

RENIE JORDON - CROSS

03:01

1   **A.**   Yes.

2   **Q.**   Naprosyn is an NSAID?

3   **A.**   Yes.

4   **Q.**   I want to show you another part of the label we kind of

5   talked about.

6          You have seen this before, haven't you, Doctor,

7   Section 7.3?  I'm going to read it.  You just read long with

8   me, if you will.

9          "Single doses of" -- what is that?  Enoxaparin?

10  **A.**   That's Lovenox.

11  **Q.**   -- "and Xarelto given concomitantly" -- that means giving

12  it together -- "results in an additive effect on anti-factor Xa

13  activity.  Single doses of warfarin and Xarelto resulted in an

14  additive effect on factor Xa inhibition and NPT."

15         So a dose of warfarin or Coumadin and Xarelto given

16  together resulted in an additive effect, correct?

17  **A.**   That's what it says.

18  **Q.**   "Concomitant aspirin use has been identified as an

19  independent risk factor for major bleeding in efficacy trials.

20  NSAIDs are known to increase bleeding."

21         Doctor, when Ms. Mingo presented to the ER at your

22  hospital, she was given a dose of 10 milligrams, I believe, of

23  warfarin.  Wasn't she?

24  **A.**   That's what the record shows.

25  **Q.**   If someone said that giving warfarin and Xarelto did not

RENIE JORDON - CROSS

03:03    1   result in an additive effect and increased your PT, that would

         2   be wrong, wouldn't it?

         3          MR. MORRISON:  Your Honor, I object.  He is not an

         4   expert.  This is certainly outside of his direct examination.

         5          THE COURT:  It's cross-examination.  I'll allow it.

         6   BY MR. JOHNSON:

         7   Q.   That's what the label says, isn't it?

         8   A.   Could I ask you to rephrase the question.

         9   Q.   Why don't you just read this sentence, "Single dose."

        10   A.   "Single doses of warfarin and Xarelto resulted in an

        11   additive effect on factor Xa inhibition and PT."

        12   Q.   It would increase the PT, I take it?

        13   A.   That's correct.

        14   Q.   So if someone walked in and represented to the Court or to

        15   this jury that that wasn't true, that would be a

        16   misrepresentation? -- or misleading I think is how it was put.

        17   A.   Based on what is written here, that is correct.

        18   Q.   Let me ask you, then, Doctor, when you prescribe a

        19   medicine to prevent the formation of blood clots, such as

        20   Xarelto, you can't prevent the risk of bleeding, can you?

        21   A.   Based on the history and physical of the patient, no one

        22   can predict whether that patient is going to bleed or not.  At

        23   least I can't.  I can take into consideration the history,

        24   physical, their medication.

        25          I make an informed decision.  I can't predict that,

RENIE JORDON - CROSS

03:05   1   no.

2   **Q.**   Even if you have PT, you can't predict bleeding with

3   Xarelto, can you?

4   **A.**   With Xarelto?  No.

5   **Q.**   Or any of the other NOACs, can you?

6   **A.**   The Eliquis and the Pradaxas, no.

7   **Q.**   The label actually warned doctors of this, didn't it, that

8   you can't rely on PT in making a determination about a bleeding

9   risk?

10   **A.**   My understanding is that you don't follow the PT INR in

11   the prescription -- the management or the monitoring of the

12   drug.  That's my understanding.

13   **Q.**   Let me ask you a question, Doctor.  If a patient has a

14   bleeding ulcer and you give them an anticoagulant -- I mean any

15   anticoagulant -- Lovenox, Coumadin, Xarelto, Pradaxa,

16   Eliquis -- will the patient bleed, Doctor?

17   **A.**   What?

18   **Q.**   Will the patient bleed if they have a bleeding ulcer and

19   you give them a blood thinner?

20           **MR. MORRISON:**  Your Honor, objection.

21           **THE COURT:**  I sustain the objection.  You added

22   bleeding at the time.  He said he wouldn't give them an

23   anticoagulant if they were bleeding.

24               Anything further?

25           **MR. JOHNSON:**  Just a couple things, Your Honor.

RENIE JORDON - CROSS

03:07

| | |
|---|---|
| 1 | BY MR. JOHNSON: |
| 2 | Q.   Just so I'm clear, Doctor, PT isn't something that would |
| 3 | have helped you make a decision with respect to prescribing |
| 4 | Xarelto to Ms. Mingo, would it? |
| 5 | A.   No. |
| 6 | Q.   Doctor, as you sit here today, would you still prescribe |
| 7 | Xarelto to a patient that presented with a DVT in the lower |
| 8 | leg? |
| 9 | A.   Yes. |
| 10 | Q.   Do you still prescribe it today? |
| 11 | A.   Yes. |
| 12 | Q.   Are you aware that the treatment you prescribed, Xarelto |
| 13 | 15 milligrams b.i.d. -- two times a day -- effectively resolved |
| 14 | Ms. Mingo's blood clot?  Did you know that? |
| 15 | A.   No. |
| 16 | Q.   You did not know that images were later obtained that |
| 17 | confirmed that the blood clot resolved?  You were not aware? |
| 18 | A.   There's a way -- to say I wasn't aware would not be a |
| 19 | total answer.  We do not, as a practice, repeat the ultrasound |
| 20 | to confirm or to ascertain whether the clot has resolved.  Once |
| 21 | you have a clot and it's diagnosed, the assumption -- there are |
| 22 | fixed guidelines you follow.  One of them is not to repeat it, |
| 23 | no. |
| 24 | So whether Ms. Mingo had a repetition of the study |
| 25 | that showed clearance of the clot would not have factored in in |

RENIE JORDON - CROSS

03:08   1   the way she was managed, no.

2   Q.   I'm simply asking you:  Did the Xarelto work if, in fact,

3   the blood clot resolved and she did not develop any other blood

4   clots?

5   A.   After one administering of Xarelto?

6   Q.   It would have been a 21-day administering.

7   A.   I didn't follow her, and I don't want to comment on

8   something I didn't follow.

9   Q.   Well, let me show you this document, Doctor.  This is --

10   another venous Doppler was done on Ms. Mingo bilaterally.  This

11   is going to be Ms. Mingo's record, which would be -- it was a

12   document the plaintiff just introduced.

13           MR. JOHNSON:  There's not a number on it yet,

14   Your Honor, but it's SMRMC000508.

15   BY MR. JOHNSON:

16   Q.   Let me show you this, Doctor.  A study was actually done

17   while she was in the hospital for a GI bleed.  They did a

18   venous duplex bilateral.  That would be the same study they

19   would have performed to check her DVT on her lower legs,

20   wouldn't it?

21   A.   Correct.

22   Q.   They found that to be a normal study.  If that's true, the

23   Xarelto worked as intended, didn't it?

24   A.   It's not like that.

25   Q.   Explain it to us.

**RENIE JORDON - REDIRECT**

03:10

1  **A.**   If you came to me for the first time with a blood clot and

2  I prescribed Xarelto, the recommendation guidelines is that you

3  stay on the medication at least three months.  In some case we

4  keep the patient on the medication for one year.  It's an

5  individual approach.  Three weeks later, if we repeated the

6  study and the clot had cleared, that does not exempt you from

7  taking the medication, following the guidelines.

8  **Q.**   If you had been treating Ms. Mingo, after the 21 days you

9  would have continued her on Xarelto?

10 **A.**   Barring any unforeseen circumstances, yes.

11 **Q.**   Would you say that the benefit of the Xarelto outweighed

12 any risk associated with bleeding or anything like that?

13 **A.**   I didn't say that.  What I said was that after starting

14 Ms. Mingo on the medication, three weeks later, if the study

15 had been repeated and the clot had cleared, Ms. Mingo,

16 according to the guidelines that we use and follow, would still

17 have to continue on the medication until the recommendation

18 time had expired.

19 **Q.**   Okay.  Thank you, Doctor, very much.

20        **MR. JOHNSON:**  I think that's all.

21        **THE COURT:**  Any redirect?

22        **MR. MORRISON:**  Very briefly, Your Honor.

23                    **REDIRECT EXAMINATION**

24 BY MR. MORRISON:

25 **Q.**   Dr. Jordon, I want to pick up where we left off with

**RENIE JORDON - REDIRECT**

03:11

1   Mr. Johnson.

2           It has been said several times in this courtroom

3   within the last several days that Xarelto must have worked

4   because Ms. Mingo's clot went away.  Is that true?

5   **A.**    No.

6   **Q.**   Explain to the jury why that's not true.

7   **A.**   Xarelto, the use of it does not clear the clot that the

8   patient presented with.  What it does, it prevents further

9   clot.  It prevents the clot that the patient presented with

10  from getting larger or expanding or what it is.

11          The clot itself -- even if Ms. Mingo hadn't been

12  placed on the medication, our internal body system, the

13  magnesium we have would have cleared that clot regardless of

14  the medication.

15          Xarelto, Coumadin, warfarin -- whichever one of

16  them -- prevents new clots and prevents the clot that was

17  present on presentation from getting worse.  It doesn't clear

18  it, no.

19  **Q.**   Thank you, Dr. Jordon.

20          Let me ask you:  Do you recall the questions you were

21  asked by Mr. Johnson about the label in this case?  Do you

22  remember generally he asked you about those?  I think he

23  referred to it as an FDA label.  I'm going to look here at the

24  last page of the label in this case.  It indicates that this

25  drug, Xarelto, is manufactured by Janssen and Bayer.

RENIE JORDON - REDIRECT

03:13

1          Do you see that?

2    A.   Yes.

3    Q.   Do you understand that manufacturers of drugs have an

4    obligation to keep their label accurate, updated, and timely?

5    A.   Yes.

6    Q.   In fact, if you just look over on the front page of this

7    label, you can see where they have, in fact, at some period of

8    time made changes to this label, right?

9    A.   I don't know the chronology of it, but I'm going to

10   assume, if that's there, it is correct.

11   Q.   Mr. Johnson asked you some questions about whether you

12   knew or not whether or not the sales representatives had been

13   truthful to you.  Do you remember that?

14   A.   Yes.

15   Q.   Well, if, in fact, it's true that PT can, in fact, be used

16   to measure the anticoagulant effect of Xarelto, the sales

17   representatives may not have been untruthful; but the label

18   would be wrong, wouldn't it?

19   A.   You will have to rephrase the question.

20   Q.   Yes, sir.  If, in fact, it is true that PT can be used to

21   measure the anticoagulant effect of Xarelto, the label would be

22   wrong; is that true?

23        MR. JOHNSON:  Let me object, Your Honor.  It calls

24   for pure speculation.

25        THE COURT:  I overrule the objection.

**RENIE JORDON - REDIRECT**

03:14

1   BY MR. MORRISON:

2   Q.   Do you understand my question?

3   A.   No.

4   Q.   Let's start over.  You see where the label says that "The

5   anticoagulant effect of Xarelto cannot be monitored with

6   standard laboratory testing."  Do you see that?

7   A.   Yes.

8   Q.   If, in fact, you can use PT to monitor the anticoagulant

9   effect of Xarelto, regardless of what the sales representatives

10  say, this label was wrong, isn't it?

11  A.   Yes, in this case it would be wrong.

12  Q.   Now, you talked about the discussion and the type of

13  discussion that you have with patients when you are going to

14  prescribe them an anticoagulant.  Do you remember that?

15  A.   Yes.

16  Q.   You talked about the fact that you would probably, best

17  practices, tell them that there's a risk of bleeding?

18  A.   Yes.

19  Q.   Now, with a drug like Coumadin, I would assume -- tell me

20  if I'm wrong.  Would you tell them, "Listen.  We are going to

21  start you out on a dose.  We're going to get some blood tests,

22  and we're going to see how you handle that medication"?

23  A.   Coumadin, yes.

24  Q.   It might take you a couple days, "But we are going to

25  figure out the best dose for you," correct?

1447

**RENIE JORDON - REDIRECT**

03:15

1   **A.**   Correct.

2   **Q.**   That's the kind of information you would have a discussion

3   with -- with your patient?

4   **A.**   Yes.

5   **Q.**   Now, with Xarelto you would not be able to have that

6   conversation, based upon what these defendants told you?

7   **A.**   As it pertains to laboratory monitoring of the drug, no.

8   **Q.**   So you wouldn't be able to tell a lady like Ms. Mingo that

9   she might fall into this high bleeding risk area, would you?

10  **A.**   No.

11              **MR. MORRISON:**   Your Honor, that's all the questions I

12  have.

13              **THE COURT:**   You are excused.   Thank you, Doctor.

14                  We will take a 10-minute break.

15              **THE DEPUTY CLERK:**   All rise.

16              (Recess.)

17              **THE COURT:**   Be seated, please.

18              **MR. BIRCHFIELD:**   Your Honor, at this time we will

19  continue the videotape deposition of Anthonie Lensing.

20              **THE COURT:**   You will remember him, members of the

21  jury.

22                          **ANTHONIE LENSING,**

23  having been duly sworn, testified by deposition as follows:

24

25

1448

ANTHONIE LENSING - EXAMINATION

03:31

1                              EXAMINATION

2    BY MR. OVERHOLTZ:

3    Q.    Let me show you what we will mark as Exhibit 56, as well

4    as 57, 58, 59.

5              So, Dr. Lensing, you see that the email on the front

6    page is an email from Dr. Misselwitz to Dr. Berkowitz, and

7    you're copied in the CC line, on April 26, 2006.

8              "In response to Dr. Berkowitz's email that we looked

9    at yesterday, I have concerns about EINSTEIN DVT study design

10   and PRx heparin."

11             Do you see that?

12   A.    Yes.

13   Q.    "Dear Scott.  Thank you for your detailed and very

14   thoughtful response to yesterday's discussion.  Much

15   appreciated.  I agree with you 100 percent that the less

16   riskiest option from a clinical and technical point of view

17   would be to go to low-molecular-weight heparin initial

18   treatment."

19             Do you see that?

20   A.    Yes, I see that.

21   Q.    Let's look at 516.  "Options for initial treatment."

22             The first option listed is low-molecular-weight

23   heparin, five to seven days.  Next, rivaroxaban b.i.d. for the

24   first three to four weeks, correct?

25   A.    That is correct.

ANTHONIE LENSING – EXAMINATION

03:32

1   Q.   The next question asked:  "Why does 10 milligram b.i.d. of
2   rivaroxaban provide a more intense level of an anticoagulation
3   compared to 20 milligrams o.d.?"
4        Do you see that?
5   A.   Yes, I see that.
6   Q.   Then you can see that the next bullet point says "Ctrough
7   level."
8        Well, the first bullet point says "No big difference
9   in Cmax," right?
10  A.   That's correct.
11  Q.   Then the second bullet point says "Ctrough level is much
12  higher in the b.i.d. regimen, resulting in a more sustainable
13  suppression of thrombin generation over time."
14  A.   Yes, I see that too.
15  Q.   So if you know that you're going to be giving Xarelto at a
16  twice-daily dose, 15 milligrams b.i.d., that results in trough
17  levels that are much higher than what you see with the
18  20-milligram dose that's given, for example, in the AFib
19  indication, wouldn't it make sense to instruct doctors that
20  they should test the anticoagulation status of their patients
21  to make sure they are not overly anticoagulated during that
22  time period and at risk of significant bleeding?
23  A.   I do understand you wondering, asking the question and
24  thinking this.  It is a very complicated issue.  But once
25  again, I try to explain it.  I will try to explain why you

ANTHONIE LENSING - EXAMINATION

03:34
1    aren't right.

2           In those finding studies, we have evaluated

3    increasing doses up to 60-milligram daily doses.  That is the

4    dose, 60-milligram o.d., the dose that we stay far away from

5    because what was shown in the efficacy analysis is that we

6    could stay at the lower-end level of the total daily dose,

7    which was 20-milligram.

8           This dose gave the same bleeding incidence as

9    30-milligram once daily or 40-milligram once daily or

10   20-milligram twice daily.  So the decision to move from

11   20-milligram o.d. or 10-milligram b.i.d. towards 50-milligram

12   b.i.d., this decision could be taken knowing that our

13   dose-finding studies had shown that the increase could not be

14   associated with an increased bleeding rate.

15          Since then we have even learned much more about it

16   because, as you know, in our EINSTEIN-DVT and PE studies, we

17   examined 4,000 patients that were under rivaroxaban.  And what

18   we looked at is the relation between the exposure that you have

19   mentioned and, on the other hand, occurrence of thrombotic

20   events and major bleedings.

21          And what we have discovered -- and what we discovered

22   is that your fear that a higher exposure can be associated to

23   more major bleeding simply does not exist within the doses

24   provided under the EINSTEIN-PE and EINSTEIN-DVT studies.

25          To illustrate what I have been saying, on Day 21 we

ANTHONIE LENSING - EXAMINATION

03:40

1    saw that the -- at the end of the -- excuse me -- the end of

2    the 15-milligram twice daily treatment with rivaroxaban, the

3    incidence of major bleedings was only 0.4 percent, which is a

4    lot; but compared to the standard of care, the standard of care

5    showed an incidence that was twice as high.  It was

6    0.8 percent.  I'm talking about Day 21.

7            So we see that on rivaroxaban, after the 21st day you

8    see a steady increase, up to 1 percent, for the patients under

9    rivaroxaban; whereas those in the standard of care group

10   amounted to 1.7 percent.  So this goes to show for the first

11   21 days the formidable result of rivaroxaban compared to the

12   standard of care.  0.4 is one of the lowest incidences ever in

13   an international research on major bleedings.

14   Q.   Dr. Lensing, based on the information that we see here,

15   that the Ctrough level when you give the drug b.i.d. is much

16   higher, even for the 10-milligram b.i.d. dose, than what you

17   would see in the patients given the 20-milligram dose once

18   daily, you don't believe it would make sense to at least

19   instruct doctors to give a one-time PT test to find out if the

20   patient somehow has had an exposure to the drug that is much

21   higher than would be expected in the limited number of patients

22   in the clinical trials and therefore is at an increased risk of

23   bleeding, so that he can at least discuss the information with

24   his patient and make a determination that perhaps a drug choice

25   that would allow him to have more experience, like

ANTHONIE LENSING - EXAMINATION

03:42

1  low-molecular-weight heparin or vitamin K antagonist, might be
2  the best choice for that patient?
3          Please answer my question as to whether you don't
4  believe that this one-time test would make sense.
5  **A.**  My answer to that is no, it is absolutely not useful at
6  all, what you think is apparently suggested to you by an
7  expert.  However, this expert doesn't understand a bit about
8  this, totally nothing.
9          Something like that would indeed be life-threatening.
10 In the Iceland DVT studies, we checked 3,800 patients for their
11 blood values, PTs, so we already did that.  And we followed up
12 on the patients that had high PT scores, and it was
13 demonstrated that chances of bleedings were totally unrelated.
14         So in order to suggest to a doctor that he should
15 check PTs because that would suggest a risk of bleeding would
16 only lead to them indicating to their patients that the dosage
17 should be lower if their PT rates were high, although there was
18 no relation with bleeding.
19         So that means that it would be a huge risk to the
20 patients, and that's exactly what we noticed in the van Gogh
21 studies.  It would mean that many, many patients would suffer
22 from fatal pulmonary embolus.  So that proposal is really
23 life-threatening, and I hope to God that doctors will not hear
24 about it and do so.
25 **Q.**  The way that Xarelto creates an anticoagulant effect is

ANTHONIE LENSING - EXAMINATION

03:46

1   through factor Xa inhibition, correct?

2   **A.**    That's the main target of rivaroxaban, yes.

3   **Q.**    Do you believe that the anticoagulant effect of Xarelto

4   can be measured?

5   **A.**    There are laboratory tests with which you can measure the

6   effect of rivaroxaban on blood coagulation.

7   **Q.**    Is one of those laboratory tests an anti-factor Xa assay?

8   **A.**    It is indeed.

9   **Q.**    What about prothrombin time if you use a sensitive

10   reagent?

11   **A.**    It is important indeed to have such sensitive reagents,

12   and the Neoplastin plus, which is a prothrombin reagent --

13   which is sensitive for rivaroxaban.  And thanks to that

14   reagents, we can measure the effect of rivaroxaban on blood

15   coagulation via the prothrombin time.

16   **Q.**    Is there a relationship -- I think I have seen it

17   described as a close-to-linear relationship between prothrombin

18   time, Neoplastin, and the concentration levels of Xarelto in

19   the blood.

20   **A.**    That is correct.

21   **Q.**    The drug label, is that something that the company uses to

22   communicate to doctors information about the drug?

23   **A.**    The label, which in this case was drawn up by Bayer in

24   cooperation with the health authorities, was drawn up on the

25   basis of the results that were generated, and as such, the

ANTHONIE LENSING – EXAMINATION

03:49   1   label is used to inform the physicians.

2   **Q.**   Dr. Lensing, you've worked on the development of the drug

3   labeling for Xarelto.  Is that true?

4   **A.**   I was involved in setting up the label for this drug for

5   DVT and PE, in particular for the clinical part treatment.

6   **Q.**   Do you agree that, for the drug label, that you would not

7   expect Bayer to provide false or misleading information in the

8   drug label for Xarelto?

9   **A.**   No, I don't.

10   **Q.**   You don't believe that Bayer should provide false or

11   misleading information in a drug label?

12   **A.**   The purpose is to provide objective information and an

13   inventory of the effectiveness and the side effects of a drug.

14   A lot of time is invested in doing that in cooperation with the

15   health authorities.

16   **Q.**   Do you believe that Bayer provides accurate information to

17   physicians in their drug labels for Xarelto?

18   **A.**   I believe that the label that was drawn up by Bayer in

19   cooperation with the health authorities is accurate.

20   **Q.**   And you wouldn't want Bayer to put anything in the product

21   label that would potentially put patients in danger, would you?

22   **A.**   The answer to that question in general will always be a

23   plain no.  But you have to realize that we're talking about

24   patients with an increased risk on a side effect, so the use of

25   rivaroxaban in certain patients may lead to an adverse event,

ANTHONIE LENSING - EXAMINATION

03:53

1    and that is why it's important to express in a label what those

2    adverse events may be and warn both patients and doctors about

3    possible adverse events associated with the use of rivaroxaban.

4    **Q.**   As a physician, in your review, you understood that the

5    labeling for the drug is called the SPC or Summary of Product

6    Characteristics, correct?

7    **A.**   I just told you that I'm not an expert in that field, but

8    I think you're right.

9    **Q.**   You have worked on the Summary of Product

10   Characteristics -- the SPCs -- for Xarelto with respect to VTE

11   treatment, for Bayer; is that correct?

12   **A.**   Yes, it is correct that I have been involved in it.

13   **Q.**   Okay.  And so in Europe, is the SPC the way in which Bayer

14   communicates information about Xarelto to doctors?

15   **A.**   I think that is the case indeed.

16   **Q.**   And when you were involved in working on the SPC in Europe

17   for Xarelto, you expected the information that would be

18   communicated through that SPC to be accurate.  Is that fair?

19   **A.**   What I find, that whenever information is being generated

20   for the external world, it always needs to be accurate; hence,

21   it also needs to be accurate in this case.

22   **Q.**   Have you worked on the product monograph for Xarelto with

23   respect to VTE treatment for the product monograph in Canada

24   for Xarelto?

25   **A.**   I do not really recall whether I have worked on the

ANTHONIE LENSING - EXAMINATION

03:55

1    monograph.  What I do remember is that I have been involved in
2    the consultation with the health authorities in Canada.
3    **Q.**    Whenever you were involved in interacting with the
4    regulatory authority in Canada, was that called Health Canada?
5    **A.**    That's correct.
6    **Q.**    So when you were interacting with Health Canada, did Bayer
7    provide information to Health Canada about Xarelto in order to
8    seek approval for the drug?
9    **A.**    I can only speak on the basis of my experience, and
10   indeed, Bayer has provided information to Health Canada as part
11   of the approval of the Xarelto, and this for an indication of
12   DVT and PE.
13   **Q.**    Was it your understanding that the information that Bayer
14   would provide to Health Canada about Xarelto would be accurate?
15   **A.**    Yes.
16   **Q.**    So Exhibit 60, if you look with me on the -- I guess it's
17   the second page, there's an email to you from a Dana Cusack
18   from Health Canada, Bayer, to yourself as well as several other
19   people at Bayer, including Akos Pap and Dr. Horvat-Broecker.
20          Do you see that?
21   **A.**    Yes, I see it.
22   **Q.**    So then if we turn back to the first page, it looks like
23   Ms. Cusack emails you February 9, 2011, and says:  "Dear Ton,
24   greetings from Canada.  I hope you are well.  I just wanted to
25   confirm that you are okay with the text for VTE treatment as

ANTHONIE LENSING - EXAMINATION

03:58

1    presented in this final draft Canadian product monograph, as

2    well as the reviewers's notes."

3              Do you see that?

4    A.   I see it.

5    Q.   Did you, in fact, review the text related to the VTE

6    treatment and indicate to Ms. Cusack that you did not have any

7    comments?

8    A.   I have indeed read it, and I have indeed no comments.

9    Q.   Did you want to ensure in your review that the information

10   that was going to be told to doctors in Canada in this product

11   monograph would be accurate?

12   A.   I always try for accuracy; hence, I also do in this case.

13   Q.   Let me show you what we will mark as Exhibit 61, which is

14   Exhibit 371022, which is the product monograph attachment --

15   draft product monograph attachment to this email.

16              So Dr. Lensing, if we can look at this draft product

17   monograph attached, you can see that on the first page they are

18   adding a 15- and 20-milligram dose to the labeling -- it's

19   highlighted in yellow -- on February 28, 2011.  Do you see

20   that?

21   A.   I can see that.

22   Q.   I know I didn't point you to this one earlier, but on

23   page 19, do you see that a section has been added for treatment

24   of DVT and prevention of recurrent VTE that describes the dose

25   of 15 milligrams twice daily for three weeks and 20 milligrams

ANTHONIE LENSING - EXAMINATION

04:00

1    of Xarelto once daily after that?

2    A.    Yes, that's what it says.

3    Q.    That's the same dosing regimen that was approved for use

4    in the United States for the treatment of DVT; is that right?

5    A.    Yes, that's correct.

6    Q.    Now, in Canada, did Bayer get the DVT indication first and

7    then seek PE indications later?

8    A.    That's correct.

9    Q.    Now, if you can turn with me over to page 24, there's a

10   section entitled "Pharmacodynamics."  Do you see that?

11   A.    Yes, I see that.

12   Q.    What's stated here under "Pharmacodynamics" is:  "There is

13   a clear correlation between plasma rivaroxaban concentration

14   and the degree of anticoagulant effect."

15           Do you see that?

16   A.    That is what it says indeed.

17   Q.    It says:  "The max effect of Xarelto on pharmacodynamic

18   parameters occurs at the same time as Cmax."

19           Do you see that?

20   A.    Yes, I see it.

21   Q.    You see there are two bullet points, and the first talks

22   about factor Xa activity.  If you look at the bottom, it says:

23   "There is a close correlation between factor Xa inhibition and

24   plasma concentration with an R-value of 0.97."

25           Do you see that?

ANTHONIE LENSING - EXAMINATION

04:01

1   A.   I see that.

2   Q.   If you look with me at the next bullet point, it says:

3   "PT is influenced by rivaroxaban in a dose-dependent way with a

4   close correlation to plasma concentration R equals 0.98 if

5   Neoplastin is used for the assay."

6        Do you see that?

7   A.   I see that.

8   Q.   So you see here highlighted in yellow -- and this was

9   highlighted on the version produced to us by Bayer -- that

10  there is a Table 8 added which provides the 5th and 95th

11  percentiles for PT Neoplastin by indication.  Do you see that

12  chart?

13  A.   Yes, I see the table.

14  Q.   And you see that they provide -- for treatment of DVT and

15  prevention of recurrent VTE, they provide both doses, the

16  15 b.i.d. and the 20 o.d., and then provide the range of PT

17  times for the 5th and 95th percentiles using the Neoplastin

18  reagent in the chart.  Do you see that?

19  A.   Yes, I see that.

20  Q.   This draft proposed labeling was something that you were

21  working on along with the folks from Bayer in Canada to present

22  to the Canadian Health Authority, Health Canada, about Xarelto,

23  correct?

24  A.   I was involved in this.  And as I told you before, I was

25  involved in the clinical part of this monograph.  I was not

ANTHONIE LENSING - EXAMINATION

04:03

1   involved in the pharmacokinetics and pharmacodynamics part.  We

2   have special experts for that and you know these.

3   **Q.**   Dr. Lensing, I'm just asking:  Did you understand that

4   when you reviewed this product monograph, according to the

5   emails from Ms. Cusack, as she indicated, this was a draft

6   label adding the VTE treatment indication that would be

7   submitted to Health Canada?

8   **A.**   I understood that eventually this would be submitted to

9   Health Canada.  This is a draft.  I don't know if this was the

10   final version, but the eventual object was to submit it to

11   Health Canada.

12   **Q.**   Was the object to provide accurate information to Health

13   Canada about Xarelto?

14   **A.**   I repeat:  My object is always to provide accurate

15   information, so that also applies to this case.

16   **Q.**   Let me show you what we will mark as Exhibit No. 62.  This

17   is the product monograph for Xarelto that was in effect as of

18   September of 2011.  If you can look with me on the front page,

19   we see the date of September 24, 2011.

20        Oh, this is AWL005, the plaintiff's exhibit number,

21   and this is on page 7.  It has a monitoring and laboratory

22   section.  Do you see that?

23   **A.**   Yes, I see that.

24   **Q.**   It describes that Xarelto at recommended doses prolongs

25   several global, including prothrombin time and specific

ANTHONIE LENSING - EXAMINATION

04:05

1    inhibition of factor Xa activity, clotting tests.

2              Do you see that?

3    A.   Yes, I see that.

4    Q.   Then specifically, as we have discussed, says that

5    prothrombin time, PT, is influenced by Xarelto in a

6    dose-dependent way if Neoplastin is used for the assay.

7    Correct?

8    A.   That's correct.

9    Q.   It then provides for the 10-milligram prevention dose, the

10   5th and 95th percentiles for PT Neoplastin two to four hours

11   after tablet intake, indicating that those times range from 13

12   to 25 seconds.  Do you see that?

13   A.   Yes, I see that.

14   Q.   It says:  "In cases of excessive doses, the PT is expected

15   to be outside of this range."

16              Do you see that?

17   A.   I see that, and I understand that they mean over this

18   range.

19   Q.   There is a section below that that indicates that the aPTT

20   and HepTest are also both prolonged dose dependently, but that

21   neither test is recommended for the assessment of

22   pharmacodynamic effects.  Do you see that?

23   A.   Yes, I see that.

24   Q.   So they have provided instructions to physicians in Canada

25   about which tests are not recommended to be used?

1462

ANTHONIE LENSING - EXAMINATION

04:07

1    A.   I see that.

2    Q.   Dr. Lensing, if you will look at Exhibit 63 and 64, which

3    are two emails, and then I can direct you to the pages we will

4    look at of Exhibit 65.

5            So, Dr. Lensing I'm showing you an email chain.  If

6    we can start at the bottom of the page, there is an email from

7    Susan Morency on April 30, 2015, and the subject is:  Xarelto

8    response to Health Canada, interaction with P-gp and moderate

9    CYP3A4 inhibitors in patients with mild and moderate renal

10   impairment.

11           Do you see that?

12   A.   I can see that, yes.

13   Q.   Do you see it's the same email?

14   A.   I think it is indeed the same email.

15   Q.   If you can now take a look with me at Exhibit 65, which is

16   the attachment annotated "Product Monograph," if you can look

17   at the first page, we see now that we have the 10-, 15-, and

18   20-milligram tablets.  And the date of this is March 13, 2015,

19   and now being revised on May 6, 2015.

20           Do you see that?

21   A.   Yes, I see that.

22   Q.   So now if we can look over at page 9, there's a section

23   for "Monitoring and Laboratory Tests."  Do you see that?

24   A.   Yes, I see that.

25   Q.   It says:  "The prothrombin time, measured in seconds, is

1463

ANTHONIE LENSING - EXAMINATION

04:08

1  influenced by Xarelto in a dose-dependent way with a close

2  correlation to plasma concentration if the Neoplastin reagent

3  is used."  Do you see that?

4  A.   Yes, I see that.

5  Q.   Then it says:  "In patients who are bleeding, measuring

6  the PT using Neoplastin reagent may be useful to assist in

7  determining an excess of anticoagulant activity."

8         Do you see that?

9  A.   Yes, that is what is assumed here.

10  Q.   Then if we look at page 29, we see the same statement

11  again.  "In patients who are bleeding" -- I'll wait for you to

12  get there?

13  A.   I'm there.

14  Q.   The same statement appears again.  "In patients who are

15  bleeding, measuring the PT, Neoplastin reagent, may be useful

16  to assist in determining the excess of anticoagulant activity."

17         Do you see that sentence?

18  A.   Yes, that is what is assumed here.

19  Q.   Then we see at the bottom of this page, there's a section

20  for pharmacodynamics that again talks about the clear

21  correlation between concentration and anticoagulant effect.

22         Do you see that?

23  A.   Yes, I see that.

24  Q.   Then if we turn to the next page in that section, we see

25  that there's a section about factor Xa activity.  Do you see

ANTHONIE LENSING - EXAMINATION

04:10

1    that?

2    **A.**   Yes, that is there.

3    **Q.**   Then there's a section that says:  "Factor Xa assay tests

4    require calibration and should not be used unless

5    rivaroxaban-specific calibrators and controls are available."

6            Do you see that?

7    **A.**   Yes, I see that.

8    **Q.**   This is instructing physicians and laboratory doctors that

9    if they are going to use a factor Xa test to measure Xarelto,

10   they need to use a rivaroxaban-specific calibrator and control,

11   correct?

12   **A.**   Yes, that is correct.

13   **Q.**   Then we see the same sentence that we have been looking at

14   for the third time in this draft label:  "In patients who are

15   bleeding, measuring the PT may be useful to assist in

16   determining the excess of anticoagulant activity.  See warnings

17   and precautions."

18           Do you see that?

19   **A.**   Yes, that is what is assumed here.

20   **Q.**   You see, Dr. Lensing, that there is a chart provided that

21   shows the relative prolongation of PT related to baseline as

22   compared to warfarin.  Do you see that?  For PT Neoplastin.

23   And that's after stopping warfarin and transferring to Xarelto.

24   **A.**   Yes, I see that.

25   **Q.**   And then finally, if we look over on the next page, you

ANTHONIE LENSING - EXAMINATION

04:12

1   will see that there's a Table 11 again, and it says:  "The

2   usual expected effect of Xarelto on PT when the Neoplastin

3   reagent is used in Table 11 below."

4           Do you see that?

5   A.   Yes, I see that.

6   Q.   This draft labeling, based on the email that we saw from

7   Susan Morency regarding -- in Exhibit 63 and 64, this is draft

8   labeling that's going to be provided to Health Canada about

9   Xarelto back in May of 2015, correct?

10  A.   I do not know what was provided to Health Canada

11  precisely.

12  Q.   You understood that the goal was to provide this in

13  response to Health Canada?

14  A.   These are the preparatory works for the submission.

15  Q.   If you saw, we were looking at Exhibit 65, and this was

16  the revised Health Canada product monograph for Canadian

17  doctors that was being revised from the March 13, 2015, version

18  to the May 6, 2015, version.  That's what we were looking at on

19  Exhibit 65?

20  A.   65, yes.

21  Q.   So you can see the draft was set to have the revision

22  occur in May 2015, it was back from the March version.  And

23  then we see that on Exhibit 66, there was actually a final

24  version issued on May 22, 2015.  Do you see that?

25  A.   I see that there is a product monograph for Xarelto with a

ANTHONIE LENSING - EXAMINATION

04:14

1  date of revision May 22nd.

2  **Q.**   I want to just take a look at what ended up being in the

3  final version of the pharmacodynamic section which started on

4  the bottom of page 29.

5              Do you see that?  Do you see that, Dr. Lensing?

6  **A.**   Yes, I see that.

7  **Q.**   So then if we turn to the next page, we see in this

8  product monograph final from May 2015 the statement made:  "In

9  patients who are bleeding, measuring the PT Neoplastin reagent

10  may be useful to assist in determining the excess of

11  anticoagulant activity."

12             Do you see that?

13  **A.**   I see that this is being assumed.

14  **Q.**   If you can look with me at the next page, there's

15  information provided here regarding Table 11 again.  Do you see

16  that?

17  **A.**   I see that.

18  **Q.**   Is this information, as you understand it, correct with

19  respect to the PT ranges for max and trough for the VTE

20  indication for the 15-milligram twice-daily dose?

21  **A.**   These figures were based on blood samplings taken as part

22  of the EINSTEIN-DVT and EINSTEIN PE studies for the

23  prolongation of PT.  And this was documented through Cmax and

24  Ctrough in order to see a correlation with the occurrence of

25  bleeding afterwards.  So that's correct.

1467

ANTHONIE LENSING - EXAMINATION

04:16

1    **Q.**   Dr. Lensing, you are familiar with this article?

2    **A.**   I am coauthor, so I'm familiar with it.

3    **Q.**   And if we can see, as you just said, you're listed as the

4    coauthor along with Wolfgang Mueck.  Do you see that?

5    **A.**   I see that.

6    **Q.**   The title of this article is "Population pharmacokinetic

7    analysis in patients treated for acute deep vein thrombosis and

8    exposure simulations in patients with atrial fibrillation

9    treated for stroke prevention."

10            Do you see that?

11   **A.**   I see that.

12   **Q.**   And this study involved you using pharmacokinetic modeling

13   to predict exposures for AFib patients based on the plasma

14   samples that have been taken in the DVT patients; is that

15   right?

16   **A.**   Indeed, our pharmacokineticists have performed that

17   modeling -- that analysis, sorry.

18   **Q.**   This article was published in 2011 in the *Journal of*

19   *Clinical Pharmacokinetics;* is that right?

20   **A.**   That's correct.

21   **Q.**   It was certainly written before you knew that you were

22   going to have your deposition taken, like we are doing today,

23   in litigation, correct?

24   **A.**   That's correct.

25   **Q.**   Now, let's look at the top of page 678, on the right

1468

ANTHONIE LENSING - EXAMINATION

04:18

1  column.  It says:  "The PT was determined according to standard

2  procedures at a central laboratory using Stago Neoplastin."

3         Do you see that?

4  A.  Yes, I see that.

5  Q.  Now, PT Neoplastin, that's not INR, right?

6  A.  That's correct.

7  Q.  And it's not a PT test that compares the value to

8  baseline.  Do you agree with that?

9  A.  This is an absolute PT value.

10  Q.  Now, if we can look at the next page, this statement in

11  this article written by Dr. Mueck and yourself says:  "No other

12  demographic factors or concomitant medications had a

13  significant effect on the relationship between the plasma

14  rivaroxaban concentrations and PT."

15         Do you see that?

16  A.  Yes, I have read that.

17  Q.  And you see there's a chart here, and it shows the

18  concentration PT relationship as observed in the DVT and

19  EINSTEIN-DVT dose-finding studies, correct?

20  A.  That's correct.

21  Q.  If you can turn with me to page 684.  This is a discussion

22  in the conclusion section.  There's a paragraph in the middle

23  of the page that starts with "The slope of the plasma

24  concentration."  Do you see that?

25         It says:  "The slope of the plasma concentration PT

ANTHONIE LENSING - EXAMINATION

04:20

1   correlation graph reflected the sensitivity of the PT to

2   increases in rivaroxaban exposure.  The PT correlated in an

3   almost linear fashion with rivaroxaban concentrations less than

4   or equal to 500 micrograms per liter, confirming that the PT

5   could be used to assess exposure."

6          Do you see that?

7   A.   I see that.

8   Q.   Now, if I can show you what we'll mark as Exhibit No. 70.

9          Dr. Lensing, looking at Exhibit 70, it's an email

10  from April 2009 from yourself to a Nicole Diedrichs at Bayer

11  Health Care, and Frank Misselwitz is copied.

12         Do you see that?

13  A.   I see it.

14  Q.   So you write this email to Nicole, and you say:  "Dear

15  Nicole.  You were right.  This article initially contained

16  Agnelli, Buller, myself, and Frank as authors."

17         Do you see that?

18  A.   Yes, I see that.

19  Q.   You next say:  "Besides Wolfgang's careful analyses, this

20  article is written completely amateuristic by Chameleon.  It is

21  a mess."  Do you see that?

22         MS. YATES:  Actually, form.  It says:  "It is a

23  mass."

24         THE WITNESS:  I think your interpretation of "mass"

25  and "mess" is correct.

1470

ANTHONIE LENSING – EXAMINATION

04:22

1  BY MR. OVERHOLTZ:

2  Q.    You meant "mess"?

3  A.    (In English) Yes.

4          MS. YATES:  But you wrote "mass."

5          THE WITNESS:  (In English) I wrote "mass," but it was

6  not something Catholic I was referring to.

7  BY MR. OVERHOLTZ:

8  Q.    You say:  "No rationale behind it.  Data not presented in

9  a way to guide readers to the most important conclusion of our

10 program.  O.d. riva. and no monitoring."

11         Do you see that?

12 A.    That is indeed almost what it says here.

13 Q.    You also list:  "Fixed dose, dose adjustment for renal

14 function to be assessed in Phase III studies."  Correct?

15 A.    That is correct.

16 Q.    You said:  "Agnelli liked it very much and announced a

17 major -- a minor comment."  Do you see that?

18 A.    Yes, I see that.

19 Q.    So the email that we saw previously, that had been the

20 first time that Dr. Agnelli had ever seen this article that he

21 ended up being a listed author on, correct?

22 A.    I do not think that that is what appears from this.

23 Q.    You said:  "Harry said thank you."  You're talking about

24 Harry Buller?

25 A.    Yes.  Harry was not interested in a pharmacokinetics and

ANTHONIE LENSING - EXAMINATION

04:23

1  pharmacodynamics article, because he doesn't know the first

2  thing about that.

3  **Q.**   Now, were you happy with the final paper as it came

4  together for the final published version?

5  **A.**   Yes, I was.

6  **Q.**   That was the paper that we looked in Exhibit 67 that said:

7  "The PT correlated in an almost linear fashion with rivaroxaban

8  concentrations less than or equal to 500 micrograms per liter,

9  confirming that PT could be used to assess exposure."  Right?

10  **A.**   This sentence is what we wrote in this article; that is

11  right.

12  **Q.**   Dr. Lensing, you see you received an email on March 5,

13  2012, from a Petra Hoeh at Bayer, along with several others,

14  regarding report PH36711:  "Explorative analysis of prothrombin

15  time measured by Neoplastin reagent in subjects treated with

16  rivaroxaban."

17          Do you see that?

18  **A.**   I see that.

19  **Q.**   And that's in the pool of studies, 11702 DVT,

20  EINSTEIN-DVT, and 11702 PE EINSTEIN-PE.

21          That's the Phase III EINSTEIN PE/DVT trials, correct?

22  **A.**   That is correct.

23  **Q.**   So looking at Exhibit 73, Dr. Lensing, I have made a

24  composite of what we looked at Exhibit 71, which was the email

25  from Petra Hoeh to you indicating that the report 36711,

ANTHONIE LENSING - EXAMINATION

04:25

1    "Exploratory analysis of prothrombin time measured by
2    Neoplastin in the EINSTEIN studies," was available for your
3    review.
4              Do you see that?
5    A.   I see that.
6    Q.   Are you familiar with this report, "Exploratory analysis
7    of PT in the EINSTEIN-DVT studies"?
8    A.   It is indeed the kind of report that is published as a
9    result.  It provides a first analysis on this topic as such.
10   Q.   This was from March of 2012, correct?
11   A.   That's correct.
12   Q.   The exploratory analysis data that's in this paper has not
13   been published in the medical literature yet, correct?
14   A.   Up to now it has not yet been published.
15   Q.   If we can look at the next page.  It says, for the
16   objectives:  "Describe the distribution of PT measurements at
17   the various assessment time points in rivaroxaban subjects and
18   subgroups."  And No. 2:  "Investigate the relationship between
19   measurements of PT Neoplastin and first occurrence of a
20   confirmed bleeding event among rivaroxaban-exposed subjects
21   overall and in subpopulations."
22             Do you see that?
23   A.   That's correct.
24   Q.   Dr. Lensing, if you can look with me at Slide 4.  There
25   are several pages that are pulled from the 2,000-page report.

ANTHONIE LENSING - EXAMINATION

04:27

1   I want to draw your attention to page 594 of 2007.  Do you see
2   that?
3   **A.**   I see that.
4   **Q.**   If you look at page 594, it says:  "Number of subjects and
5   observed event rate for clinically relevant breeding in b.i.d.
6   dosing phase by quartile of PT Neoplastin.  Population.
7   Subjects valid for safety."  Do you see that?
8   **A.**   I see that.
9   **Q.**   So if we look here, the first grouping lists the PTs
10  divided by quartile for peak PT values.  Do you see that?
11  **A.**   I see that.
12  **Q.**   You can see that the quartiles are divided:  The first
13  quartile is 11.6 to 19.7; second, 19.7 to 22.2; third, 22.2 to
14  25.1.  And those are all peak PT values, correct?
15  **A.**   It is probably so.  However, it is difficult to really
16  see.  But for the most, this document is consistent.  So I
17  think it's the PT Neoplastin Day 15 peak during the b.i.d.
18  phase.  I think that is right.
19  **Q.**   Just to be clear, so it's a little clearer for you, I have
20  put the version that I pulled from the 2,000-page document so
21  we can see it clearly.  Again, page 594 of 2,007.  It's
22  Table 14.4.2.
23          And, again, the four quartiles, as we have discussed,
24  for Day 15 PT Neoplastin, correct?
25  **A.**   That's correct.

1474

ANTHONIE LENSING - EXAMINATION

04:29

1  **Q.**   So if you look with me under the column here "N/All
2  Percentage," this represents the percentage of patients who had
3  a clinically relevant bleed by quartile, correct?
4  **A.**   That's correct.
5  **Q.**   So you can see that the percentage for patients in the
6  first quartile, the lowest quartile PT, had a rate of
7  3.15 percent clinically relevant bleeding.  Do you see that?
8  That's by PT measured at peak, correct?
9  **A.**   That's correct.
10  **Q.**   Then the second quartile, the percentage is about 2.8.  Do
11  you see that?
12  **A.**   I see that.
13  **Q.**   It's up to 3.98 for the third quartile.  Do you see that?
14  **A.**   I see that.
15  **Q.**   Then it's up to 5.91 percent for the fourth quartile.  Do
16  you see that?
17  **A.**   That's what it says, yes.
18  **Q.**   If we look below, it also reports the PT Neoplastin
19  quartiles at Day 15 trough, correct?
20  **A.**   Yes, I see that.
21  **Q.**   You see that the first quartile is from 11 to 15.4; the
22  second, 15.4 to 16.8; and third quartile, 16.8 to 19.  Right?
23  **A.**   I see that.
24  **Q.**   The fourth quartile for PTs greater than 19, up to 69.1.
25  Do you see that?

ANTHONIE LENSING - EXAMINATION

04:31

1  **A.**   Yes, I see that.

2  **Q.**   We are still talking about trough PT values by Neoplastin,

3  right?

4  **A.**   Yes, of course.

5  **Q.**   We see that the percentage of patients in the first

6  quartile for Day 15 trough is 2.43 for the first quartile and

7  2.58 for the second quartile.  Do you see that?

8  **A.**   I see that.

9  **Q.**   The percentage for the third quartile is 4.765 -- 76,

10  correct?

11  **A.**   That's correct.

12  **Q.**   The quartile for -- the fourth quartile for PT trough at

13  Day 15 is 4.65 percent, right?

14  **A.**   That's correct.

15  **Q.**   The total numbers, we had 34 patients with clinically

16  relevant bleeds in the first two quartiles of PT, correct?

17  **A.**   If you add up the two quartiles?

18  **Q.**   Yes.

19  **A.**   Yes, 51.

20  **Q.**   The 17 of 750 and 17 of 658 would add up to a total of 34,

21  correct?

22  **A.**   Yes.

23  **Q.**   Then if we look at the patients in the third and fourth

24  quartile, the quartiles for trough above 16.8, there were 62,

25  right?

ANTHONIE LENSING - EXAMINATION

04:32

1    A.    If you were to do that, yes, that would be correct.

2    Q.    Now, it's almost twice as much if you add Quartiles 3

3    and 4 and compare them to Quartiles 1 and 2, correct?

4    A.    You are a lawyer, so you are not an expert in

5    biostatistics.  And in all modesty I must say that your

6    conclusion is not valid.

7    Q.    Have you seen the data from this report that indicates

8    that fragile patients are more likely to be in the upper

9    quartiles compared to the bottom quartiles?  Fragile, yes?

10   Have you seen that information?

11   A.    I didn't see that, but the results are absolutely obvious.

12   If patients have any type of renal impairment, and there will

13   be some adding up of the rivaroxaban, there will obviously be

14   much more exposure.  And that means they will end up in the

15   higher quartiles, the third or the forth quartile.

16   Q.    Of PT?

17   A.    Yes.  Because PT is linearly related to correlation --

18   concentration.  Excuse me.

19   Q.    Just on this page the quartiles are expressed across the

20   page, right?

21   A.    Yes.

22   Q.    They have results for major and clinically relevant

23   bleeding listed there?

24   A.    Yes, I see that.  Do you have a question about this?

25   Q.    Yes.  The major bleeding, clinically relevant bleeding is

ANTHONIE LENSING - EXAMINATION

04:35

1    represented here by quartile across the page; is that right?

2    **A.**    Yes.

3    **Q.**    So have you seen this data that for patients with

4    clinically relevant bleeding, as looking at PT by quartile,

5    that black patients who had a clinically relevant bleed were

6    more likely to be in the third and fourth quartile PT?

7    **A.**    I don't know how to say it to you any more, because your

8    knowledge of biostatistics is really inferior.  I am trying to

9    tell you that you cannot make these statements.

10          Why are black people more represented in the fourth

11   quartile?  Well, maybe because many of them were older, maybe

12   because many of them had cancer.  So this conclusion is really

13   a violation of the truth.

14          Rule number one in academic research is that you have

15   to stick to conventions, and you can't go on interpreting like

16   you do.  So my answer is no, that is not true.

17          You can only say that if you would have an adjusted

18   analysis with the independent predictors and, only in that

19   case, the concentration of rivaroxaban may be higher.  These

20   indicators may be age, renal function, may be morbidity.  And

21   only if that conclusion would be justified, you could be able

22   to say that Afro-Americans have a higher chance of ending up in

23   the fourth quartile.

24   **Q.**    Dr. Lensing, if we add these four quartiles together, for

25   patients that had these PT value measurements, there's only 72

1478

ANTHONIE LENSING - EXAMINATION

04:39

1   African-American patients in the analysis.  Do you see that?

2   **A.**   Yes, I see that.

3   **Q.**   There were over 2,600 patients in the total analysis.  I

4   think it's 2,673, if my math added quickly.

5   **A.**   Well, one of the reasons, of course, is that we perform an

6   international study, and not many African-Americans live

7   outside the United States.

8   **Q.**   So is it fair to say there were few numbers of

9   Afro-American patients included in the EINSTEIN-DVT and PE

10  trials?

11  **A.**   There were fewer African-Americans included in the study

12  than Caucasians or Asians.

13          **MS. PRUITT:**  Your Honor, may we approach for a

14  moment?

15          **THE COURT:**  Yes.

16          (The following proceedings were held at the bench.)

17          **MS. PRUITT:**  We are getting ready to start our part

18  of the video.  The Court, I think, has already told us you

19  would give this limiting instruction on the foreign labels, so

20  I was going to ask you to do that.

21          **THE COURT:**  I'll do that right now.

22          **MR. BIRCHFIELD:**  Your Honor, we would just ask that

23  you draw a distinction between the label and the information

24  that was provided.

25          **THE COURT:**  Sure.

04:40

1        (End of bench conference.)

2        **THE COURT:**  We're going to stop here for the day.  Is

3 that it?

4        **MR. BIRCHFIELD:**  We can do that, Your Honor.  At this

5 point there's more of his deposition.  It's starting the

6 defense counsel's examination of Dr. Lensing.

7        **THE COURT:**  Let's do that.  We will come back at 8:30

8 tomorrow.

9        **MS. PRUITT:**  I think that's right.

10        **THE COURT:**  Before you leave, members of the jury,

11 the witnesses talk about labels, specifically a Canadian label.

12 He may have mentioned a European label at one time too.  This

13 drug, of course, is worldwide.  Everything these days is

14 worldwide, as you know.

15        The point that I do want to make to you is that

16 what appears in a foreign label has no relevance to the

17 United States label.  The reason for that is that the laws are

18 different.  The regulatory agencies are different.  Their

19 requirements are different, things of that sort.  So what

20 appears on the label is not relevant.

21        However, statements made by the defendant during

22 the labeling process have some potential relevance in showing

23 you what they knew, what they knew at the time and when they

24 knew it.  So you are to consider that not from the standpoint

25 of what's the label -- that is not relevant.

04:42

1        As I say, what was said during the labeling
2   process may or may not be relevant, but that's the potential
3   relevance.  So the evidence, you are to consider it with that
4   limited instruction.
5        Thank you very much for today.  It's very hard
6   on you all; I know that.  You are doing the best you can.  I
7   appreciate all the work that you all are doing.
8        Please, again, don't discuss the case with
9   anyone.  We are coming to hopefully the end of the trail soon.
10  We will get it to you as quickly as we can.
11       All rise as the jury leaves.
12       (Jury exited.)
13  **THE COURT:**  Be seated, please.  Just from a
14  logistical standpoint, I've started working on the jury
15  charges.  What I do for those of you who may not have been
16  through this process before, at a stage prior to the end of the
17  case, I will give you a draft of the jury charges.  It is in
18  draft form when I give it to you the first time.  I'm
19  interested in your input, observations, comments.
20       I'll take those comments and consider a second
21  draft.  I will go through drafts until I'm at the point where I
22  feel that I'm satisfied that the charge accurately discusses
23  and outlines the law.  Then I will tell you that it is a final
24  draft.  And then, of course, I will give you an opportunity on
25  the record to speak to that final draft, make any objections or

04:44

1    observations that you may wish to make at that time.

2                  I do have a couple of other logistical matters.

3    One is the PowerPoint.  I have received comments from you all.

4    I really don't need any oral argument on it.  I understand the

5    issue.  You have favored me with your views prior to this time.

6                  The PowerPoint, as I see it -- and to put it in

7    reference, this was a PowerPoint attached to an email received

8    by one of the witnesses, a detail person or a supervisor of

9    several detail people employed by the defendant.  She received

10   the email, indicated she did receive the email, indicated that

11   there was an attachment and recognized the attachment on the

12   email.  She didn't remember anything about the attachment,

13   however.  She was shown the attachment, which was a PowerPoint.

14   She didn't recognize it, couldn't testify to it.

15                  The issue really is whether or not it's

16   admissible.  Most of the time admissibility and use we consider

17   together, because there's usually no reason for admitting

18   something if it can't be used.  So we consider it most of the

19   time together.  But I do recognize that there are some

20   situations that develop during the evidence process where

21   admissibility may be different from use.  Admissibility has to

22   do with whether the material is relevant and also whether it is

23   admissible evidence.

24                  This PowerPoint is obviously a document.  It's

25   prepared outside of the jury -- outside of the court and,

04:46

1    therefore, it's clearly hearsay.  The question is whether or

2    not it is an exception to the hearsay rule.

3            First, with regard to relevance, it seems to me

4    that it deals with some material which was either available,

5    known, or could have been used by the party.  I think it is

6    relevant, passes 401.  I don't see any inhibition to keep it

7    from the 403.  I don't think it's that type of material where

8    it can be confusing in any way.

9            The attachment apparently is a PowerPoint which

10   contains information that the witness retained, kept on her

11   computer.  She recognized it, obviously, as being significant.

12   She kept it on her computer, didn't delete it.  She kept it

13   either to look at it herself as a reference or to distribute it

14   to others.  There's some indication that she did, in fact,

15   distribute it to individuals that were under her at that time

16   as a teaching tool to those individuals.  Notwithstanding that,

17   she kept it in her archives, presumably to either refer to it

18   or send it to future detail people under her supervision.

19           So the purpose of the PowerPoint was to instruct

20   individuals, advise them of information that was significant,

21   important, relevant to their job.  I think that it was kept by

22   her for business purposes, and it was kept by her for her

23   official -- satisfaction of official duties; namely, to

24   instruct and supervise.

25           It seems to me it's relevant under 401.

04:49

1    Not all emails are business records.  You can

2  find cases throughout the country where certain emails may have

3  been found to be business records.  Other emails are not

4  business records.  Simply the fact that you write an email

5  during the course of your day-to-day activity doesn't

6  automatically make it a business record.  It seems like these

7  days we don't use any written material anymore.  In fact, we

8  even have a name for it that's not necessarily a pleasant name.

9  We call it snail mail.  We disparage that.  We do everything by

10 email now.  Every email is not a business record.  This

11 material, it seems to me, qualifies as a business record.  The

12 fact it is an email doesn't mean it can't be a business record.

13 Here it was attached to an email.  It was kept in the ordinary

14 course of business.  It was kept for a business purpose.

15 Therefore, I think it rises to the level of business records.

16    So I find it relevant and I find it admissible

17 under 803(6).

18    We have something also involving Dr. Gary

19 Peters.  There was some objection.  Is this individual going to

20 be called now?

21    **MR. BIRCHFIELD:**  Your Honor, it's a very short video

22 deposition.  It depends on where we stand tomorrow and how much

23 time we have.

24    **THE COURT:**  I won't rule on it until you tell me

25 you're going to call him.

04:51

1          At this level, at this stage the parties ought
2     to be thinking about what they have done and what is in and not
3     to gild the lily or take up time.  You have to constantly
4     evaluate this.  We have had now 12 or 13 witnesses.  That ought
5     to be considered.
6          **MR. BIRCHFIELD:**  Yes, sir, Your Honor.  We do that
7     every evening.
8          **THE COURT:**  Okay.
9          **MR. SARVER:**  Your Honor, before you leave, I know you
10    said you don't need argument.  I'm not going to give you
11    argument.
12         On the document that you just admitted, the
13    PowerPoint, her name is Angela Seifert -- was the company
14    detail rep.  We want to make sure that our objection is
15    preserved for the record.
16         **THE COURT:**  I was just going to say that your
17    objection was received.  It was well made.  I understood it.
18    It's protected.
19         **MR. SARVER:**  Not made well enough apparently.  I gave
20    it a shot.
21         The other point I want to make sure Your Honor
22    is clear, some of your comments indicated Ms. Seifert was a
23    supervisor and had the potential for using the document to send
24    to anyone she supervised.  The facts don't support that.  She
25    did not say she was a supervisor.  She is not a supervisor, has

04:52

1    not been a supervisor.  To the extent that was important for

2    your ruling, I wanted to point it out for Your Honor.

3              THE COURT:  Okay.

4              MR. SARVER:  Thank you, Your Honor.

5              THE COURT:  Thank you very much.

6              MR. MEUNIER:  Your Honor, procedurally speaking,

7    given the Court's ruling, I want to make it clear for the

8    record that our supplemental witness list is now withdrawn, no

9    longer needed.

10             We would ask permission tomorrow on the record

11   in front of the jury -- Mr. Birchfield would offer for

12   admission in the record both those exhibits with the

13   appropriate numbers and just reference they were shown during

14   the testimony of Ms. Seifert.

15             Thank you, Judge.

16             THE COURT:  We will see you all tomorrow at 8:30 --

17   no, 8:15.  We will start at 8:30.

18             (Proceedings adjourned.)

19                          *  *  *

20

21

22

23

24

25

1

## CERTIFICATE

2          I, Toni Doyle Tusa, CCR, FCRR, Official Court

3 Reporter for the United States District Court, Eastern District

4 of Louisiana, certify that the foregoing is a true and correct

5 transcript, to the best of my ability and understanding, from

6 the record of proceedings in the above-entitled matter.

7

8

9                              *s/ Toni Doyle Tusa*
                             Toni Doyle Tusa, CCR, FCRR
10                            Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25