UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF MISSISSIPPI

IN RE:  XARELTO (RIVAROXABAN)  *
PRODUCTS LIABILITY LITIGATION  *      Docket No. 14-MD-2592
                               *
                               *      Section L
THIS DOCUMENT RELATES TO:      *
                               *      Jackson, Mississippi
*Dora Mingo, et al.*           *
*v. Janssen Research &*        *      August 15, 2017
*Development, LLC, et. al.,*   *
Case No. 15-CV-3469            *
                               *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *

VOLUME VII – AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE

<u>Appearances</u>:

For the Plaintiffs:           Beasley Allen Crow Methvin
                                 Portis & Miles, PC
                              BY:  ANDY BIRCHFIELD, ESQ.
                              Post Office Box 4160
                              Montgomery, Alabama 36103


For the Plaintiffs:           Gainsburgh Benjamin David
                                 Meunier & Warshauer, LLC
                              BY:  GERALD E. MEUNIER, ESQ.
                              1100 Poydras Street, Suite 2800
                              New Orleans, Louisiana 70163


For the Plaintiffs:           Gainsburgh Benjamin David
                                 Meunier & Warshauer, LLC
                              BY:  WALTER C. MORRISON IV, ESQ.
                              240 Trace Colony Park Drive
                              Suite 100
                              Ridgeland, Mississippi 39157

<u>Appearances</u>:

For the Plaintiffs:                          Goza & Honnold, LLC
                                             BY:  BRADLEY D. HONNOLD, ESQ.
                                             11181 Overbrook Road, Suite 200
                                             Leawood, Kansas 66211


For the Plaintiffs:                          The Lambert Firm, PLC
                                             BY:  EMILY C. JEFFCOTT, ESQ.
                                             701 Magazine Street
                                             New Orleans, Louisiana 70130


For the Plaintiffs:                          Levin Sedran & Berman
                                             BY:  FRED S. LONGER, ESQ.
                                             510 Walnut Street, Suite 500
                                             Philadelphia, Pennsylvania 19106


For Bayer Healthcare                         Mitchell Williams Selig Gates
Pharmaceuticals, Inc.                          & Woodyard, PLLC
and Bayer Pharma AG:                         BY:  LYN P. PRUITT, ESQ.
                                             425 W. Capitol Avenue
                                             Suite 1800
                                             Little Rock, Arkansas 72201


For Bayer Healthcare                         Watkins & Eager, PLLC
Pharmaceuticals, Inc.                        BY:  WALTER T. JOHNSON, ESQ.
and Bayer Pharma AG:                         400 East Capitol Street
                                             Jackson, Mississippi 39201


For Bayer Healthcare                         Bradley Arant Boult Cummings
Pharmaceuticals, Inc.                        BY:  LINDSEY C. BONEY IV, ESQ.
and Bayer Pharma AG:                         1819 5th Avenue N
                                             Birmingham, Alabama 35203


For Janssen Pharmaceuticals,                 Barrasso Usdin Kupperman Freeman
Inc. and Janssen Research                      & Sarver, LLC
& Development, LLC:                           BY:  RICHARD E. SARVER, ESQ.
                                             909 Poydras Street, Suite 2400
                                             New Orleans, Louisiana 70112

Official Court Reporter:          Toni Doyle Tusa, CCR, FCRR
                                   500 Poydras Street, Room B-275
                                   New Orleans, Louisiana 70130
                                   (504) 589-7778


Proceedings recorded by mechanical stenography, transcript
produced by computer.

## <u>INDEX</u>

|                                   | <u>Page</u> |
| --------------------------------- | ----------- |
| Theodore Spiro (By Deposition)    | 1598        |
| Stephen Keith (By Deposition)     | 1657        |

1    **<u>AFTERNOON SESSION</u>**

2    **(August 15, 2017)**

3         (The following proceedings were held outside the

4    presence of the jury.)

5         **THE DEPUTY CLERK:**  We are going to have these as of

6    today, I guess, to make things easy.

7         **MR. GEISLER:**  Sam Geisler for the plaintiff.

8              Plaintiffs move into evidence the deposition

9    exhibits, the videotape depositions of Drs. Misselwitz and

10   Lensing played before the jury.

11             We will start with, as Plaintiff's Exhibit 20,

12   Misselwitz Deposition Exhibit 4.  That's 3228103.

13             As Plaintiff's Exhibit 21, Misselwitz Deposition

14   Exhibit 5, which is 92914.

15             As Plaintiff's Exhibit 22, Misselwitz Deposition

16   Exhibit 6, as Plaintiff's 3151667.

17             As Plaintiff's Exhibit 23 is Misselwitz

18   Deposition Exhibit 7, as Plaintiff's Exhibit 3151668.

19             Let me reverse this a little bit.

20             Plaintiffs move Misselwitz Deposition Exhibit 8,

21   which is Plaintiff's 3885700, as Plaintiff's Exhibit 24.

22             Plaintiffs move Misselwitz Deposition Exhibit 9,

23   which is 3885701, as Plaintiff's Exhibit 25.

24             Plaintiffs move Misselwitz Deposition

25   Exhibit 10, which is 113917, as Plaintiff's Exhibit 26.

01:12

1    Plaintiffs move Misselwitz Deposition
2    Exhibit 11, which is Plaintiff's 3233767, as Plaintiff's
3    Exhibit 27.
4    Plaintiffs move Misselwitz Deposition
5    Exhibit 12, which is Plaintiff's 1231088, as Plaintiff's
6    Exhibit 28.
7    Plaintiffs move Misselwitz Deposition
8    Exhibit 13, which is Plaintiff's 1231089, as Plaintiff's
9    Exhibit 29.
10   Plaintiffs move Misselwitz Deposition
11   Exhibit 14, which is Plaintiff's 3303605, as Plaintiff's
12   Exhibit 30.
13   Plaintiffs move Misselwitz Deposition
14   Exhibit 15, which is Plaintiff's 3303606, in as
15   Plaintiff's Exhibit 31.
16   Plaintiffs move Misselwitz Deposition
17   Exhibit 16, which is Plaintiff's 3303607, in as Plaintiff's
18   Exhibit 32.
19   Plaintiffs move Misselwitz Deposition
20   Exhibit 17, which is Plaintiff's 3303608, we move that in as
21   Plaintiff's Exhibit 33.
22   Next is plaintiffs move Misselwitz Deposition
23   Exhibit 18, which is 1203527, in as Plaintiff's Exhibit 34.
24   Plaintiffs next move Misselwitz Deposition
25   Exhibit 22, which is 193800, in as Plaintiff's Exhibit 35.

01:14  1          Plaintiffs move Misselwitz Deposition

2  Exhibit 24, which is 425838, in as Plaintiff's Exhibit 36.

3          Just for the record, Misselwitz Deposition

4  Exhibit 25 and 26 were used as demonstratives in the Misselwitz

5  deposition.

6          MS. MILLER:  So they are not being moved into

7  evidence.

8          MR. GEISLER:  Not being moved into evidence.

9          Next is Misselwitz Deposition Exhibit 28, which

10  is 699806, plaintiffs move in as Plaintiff's Exhibit 39.

11          Plaintiffs move Misselwitz Deposition

12  Exhibit 29, which is 882454, into evidence as Plaintiff's

13  Exhibit 40.

14          Plaintiffs move Misselwitz Deposition

15  Exhibit 30, which is 882455, into evidence as Plaintiff's

16  Exhibit 41.

17          Plaintiffs move Misselwitz Deposition

18  Exhibit 31, which is 245248, into evidence as Plaintiff's

19  Exhibit 42.

20          Plaintiffs move Misselwitz Deposition

21  Exhibit 32 -- sorry.  Let me start again.

22          Plaintiffs move Misselwitz Deposition

23  Exhibit 32, which is 253870, into evidence as Plaintiff's

24  Exhibit 43.

25          That is all the Misselwitz deposition exhibits.

01:16   1           **MS. MILLER:**  Just for the Misselwitz deposition

2      exhibits, they are being moved in subject to defendants'

3      objections and the Court's prior rulings on those.

4           **MR. GEISLER:**  Plaintiffs move Lensing Deposition

5      Exhibit 18, which is 948640, into evidence as Plaintiff's

6      Exhibit 44.

7                Plaintiffs move Lensing Deposition Exhibit 19,

8      which is 3233767, into evidence as Plaintiff's Exhibit 45.

9                Plaintiffs move Lensing Deposition Exhibit 21,

10     which is 647513, into evidence as Plaintiff's Exhibit 46.

11               Plaintiffs move Lensing Deposition Exhibit 22,

12     which is 3228103, into evidence as Plaintiff's Exhibit 47.

13               Plaintiffs move --

14          **MR. LAPLANTE:**  Wait.  We talked about 22, didn't we?

15          **MR. GEISLER:**  No.

16          **MR. LAPLANTE:**  We talked about Misselwitz 1.

17               I take it back.  We are fine on 22.  Sorry.

18          **MR. GEISLER:**  We had just stopped at Plaintiff's

19     Exhibit 47, I believe.

20               Plaintiffs move Lensing Deposition Exhibit 24,

21     which is 982091, into evidence as Plaintiff's Exhibit 48.

22               Plaintiffs move Lensing Deposition Exhibit 26,

23     which is 1300123, into evidence as Plaintiff's Exhibit 49.

24               Plaintiffs move Lensing Deposition Exhibit 27,

25     which is 1300124, into evidence as Plaintiff's Exhibit 50.  I'm

01:19   1    sorry.

2                    Plaintiffs move Lensing Deposition Exhibit 29,

3    which is 3237870, into evidence as Plaintiff's Exhibit 51.

4                    Plaintiffs move Lensing Deposition Exhibit 30,

5    which is 951546, into evidence as Plaintiff's Exhibit 52.

6                    Plaintiffs move Lensing Deposition Exhibit 31,

7    which is 1117899, into evidence as Plaintiff's Exhibit 53.

8                    Plaintiffs move Lensing Deposition Exhibit 32,

9    which is 951538, into evidence as Plaintiff's Exhibit 54.

10                   Plaintiffs move Lensing Deposition Exhibit 33,

11   which is 1818797, into evidence as Plaintiff's Exhibit 55.

12                   Plaintiffs move Lensing Deposition Exhibit 34,

13   which is 949127, into evidence as Plaintiff's Exhibit 56.

14                   Plaintiffs move Lensing Deposition Exhibit 35,

15   which is 948630, into evidence as Plaintiff's Exhibit 57.

16                   Plaintiffs move Lensing Deposition Exhibit 36,

17   which is 113917, into evidence as Plaintiff's Exhibit 58.

18                   Plaintiffs move Lensing Deposition Exhibit 37,

19   which is 119918, into evidence as Plaintiff's Exhibit 59.

20              MR. LAPLANTE:  That's Lensing 37, right?  I think you

21   said "119918."  It's 113918, isn't it?

22              MR. GEISLER:  113918?

23              MR. LAPLANTE:  Yes.

24              MR. GEISLER:  Just to be clear, plaintiffs move

25   Lensing Deposition Exhibit 37, which is 113918, into evidence

01:21  1   as Plaintiff's Exhibit 59.

2              Plaintiffs move Lensing Deposition Exhibit 38,

3   which is 113919, into evidence as Plaintiff's Exhibit 60.

4         MR. LAPLANTE:   38 was never on the spreadsheet.   I

5   don't think it's on the list that you guys recently gave us.

6   We don't have that anywhere.   We'll have to revisit that.   Can

7   we withdraw that for now?

8         MR. GEISLER:   Sure.   Plaintiffs are withdrawing

9   Plaintiff Exhibit 60, which is Lensing Deposition Exhibit 38,

10   for further consideration.   Plaintiffs are not moving that into

11   evidence at this time.

12              Plaintiffs next move Lensing Deposition

13   Exhibit 39, which is 3169350, into evidence as Plaintiff's

14   Exhibit 61.

15              Plaintiffs move Lensing Deposition Exhibit 41,

16   which is 948027, into evidence as Plaintiff's Exhibit 62.

17              Plaintiffs move Lensing Deposition Exhibit 42,

18   which is 948028, into evidence as Plaintiff's Exhibit 63.

19              Plaintiffs move Lensing Deposition Exhibit 43,

20   which is 948029, into evidence as Plaintiff's Exhibit 46.

21              Plaintiffs move Lensing Deposition Exhibit 44,

22   which is 1750962, into evidence --

23         THE DEPUTY CLERK:   That last one is 64.

24         MR. GEISLER:   64.   I'm sorry.

25              Lensing Deposition Exhibit 43, plaintiffs move

01:23   1   in as Plaintiff's Exhibit 64 -- to be clear.

   2                   Thank you.

   3                   Plaintiffs move Lensing Deposition Exhibit 44,

   4   which is 1750962, into evidence as Plaintiff's Exhibit 65.

   5                   Plaintiffs move Lensing Deposition Exhibit 45,

   6   which is 1750963, into evidence as Plaintiff's Exhibit 66.

   7           **THE DEPUTY CLERK:**  Is that a good place to stop?

   8   What do we have, about 30 more?

   9           **MR. GEISLER:**  It's as good a place as any.

  10           **THE DEPUTY CLERK:**  I think we picked up with 95.

  11   Yeah, we picked up with 95.  So what's that, 29 more that we

  12   will try to --

  13           **MR. GEISLER:**  What was the last one, 65?

  14           **THE DEPUTY CLERK:**  66.

  15                   We have to get that rolling.  That was a good

  16   bit.  That was a good chunk of them.

  17           **THE COURT:**  You want to do it at the end of the day?

  18           **THE DEPUTY CLERK:**  Yes, time permitting.

  19           (Jury entered.)

  20           **THE COURT:**  Be seated, please.

  21           Call your next witness.

  22           **MR. BIRCHFIELD:**  Yes, sir.

  23                   Your Honor, at this time the plaintiff will

  24   present the videotape testimony of Theodore Spiro, MD.  It was

  25   taken on May 10 and 11, 2016, in New York City.

01:33

1        Dr. Spiro began his role as a Bayer global
2   clinical leader in 2006, and his present role is senior
3   director, clinician.
4        The deposition starts with questioning from
5   Ms. Mingo's lawyers followed by questions from the defense
6   lawyers, which in turn is followed by questions from
7   Ms. Mingo's lawyers.
8        Your Honor, this deposition is about an hour and
9   24 minutes.
10                      **THEODORE SPIRO,**
11   having been duly sworn, testified by deposition as follows:
12                      **EXAMINATION**
13   **Q.**   Where do you currently work, Dr. Spiro?
14   **A.**   I work in New Jersey.
15   **Q.**   For what company?
16   **A.**   For Bayer HealthCare Pharmaceuticals.
17   **Q.**   What's your current position with Bayer?
18   **A.**   My current position is senior director, clinician.
19   **Q.**   Since you joined Bayer -- and I think we will figure out
20   it was sometime in early 2006 or the 2006 timeframe -- has
21   rivaroxaban been the primary drug you have worked on?
22   **A.**   Yes, it has.
23   **Q.**   Now, so we've talked about some of the different projects
24   that you were involved with at your time for Bayer, and we are
25   going to talk more specifically about some of those as the day

## THEODORE SPIRO - EXAMINATION

01:34   1   goes on.  But one of the things that we didn't really talk

2   about was you worked with -- on the issue of assay development

3   for determining exposure levels to Xarelto?

4   **A.**   To measure concentrations, plasma concentrations.

5   **Q.**   Was that work specific to any particular indication or was

6   it an across-the-board, drug-based project?

7   **A.**   It was a development -- assay development that would be

8   applicable to all indications under development.

9   **Q.**   Was that something that you began working on very soon

10   after you started with Bayer?

11   **A.**   Within the first year, yes.  Within the second year.

12   **Q.**   How did you come to work on that project of assay

13   development?

14   **A.**   I was asked to join the project, as I remember -- well,

15   the first activities in regards to that took place already in

16   2006, and at which time I had organized a meeting of experts to

17   discuss approaches to measuring rivaroxaban concentrations in

18   biological fluids and a more theoretical discussion of

19   approaches that might be undertaken.

20   **Q.**   Was it your idea to organize a team to look at this assay

21   development idea, or were you asked by someone else at Bayer to

22   work on it?

23   **A.**   I would have been asked by my supervisor to develop such

24   an undertaking.  I would not have undertook it without

25   agreement from my management.

THEODORE SPIRO - EXAMINATION

01:36

1         And I think in retrospect that the more experienced
2    individuals in the Bayer organization had already been thinking
3    about this and it was an extension of their thought.
4    **Q.**   Your work on the assay development began, I think you
5    said, a few months after you started with the company.  And how
6    long did you continue to be involved with that project?
7    **A.**   Our first -- our completion of the project took place in
8    2012.  So from 2006, when I joined the company and became aware
9    of the assay development activities that were already ongoing
10   and then intensified over the years with the approval of --
11   first approvals of indications and requirements from the
12   European Medicine Agency to support assay development.
13   **Q.**   Was there a team or a committee that was assigned to
14   working on this assay development project at Bayer?
15   **A.**   Yes, there was.
16   **Q.**   Was there some pushback within Bayer on doing assay
17   development?
18   **A.**   Of course, we had already developed an assay for the drug,
19   because in order to develop a drug, we have to have methods --
20   method or methods to measure its concentrations for our Phase I
21   program.  So we had a gold standard assay that was available
22   and published at some point in time in the literature as a
23   method, and we were looking at additional assay development in
24   order to have assays more available at the level of a routine
25   clinical laboratory.

THEODORE SPIRO - EXAMINATION

01:38

1    Q.   Dr. Spiro, earlier you told me about a meeting that you

2    put together to look at assay development with respect to

3    measuring Xarelto plasma concentrations.  Do you recall that?

4    A.   Yes, I do.

5    Q.   We were referring to the meeting you put together in Paris

6    in December of 2006?

7    A.   Yes, I was.

8    Q.   What was the purpose of that meeting in December of 2006?

9    A.   It was to discuss laboratory methods that could be used to

10   measure rivaroxaban pharmacodynamic effects and potentially

11   might be used to measure rivaroxaban concentrations in

12   biological fluids such as plasma or urine.

13   Q.   Was one of the considerations for this meeting to

14   determine whether or not assays could be used for measuring

15   plasma concentrations that could be used for monitoring

16   patients who were taking Xarelto?

17   A.   Our development program for rivaroxaban proceeded on the

18   basis of an unmonitored approach to anticoagulant

19   administration.  We have a very well-studied anticoagulant

20   available for use in the clinics, but it required routine

21   monitoring and dosage adjustment.

22   Q.   Warfarin?

23   A.   The vitamin K antagonist class of drugs, including

24   warfarin, which is used very commonly here in the United States

25   and elsewhere.

THEODORE SPIRO - EXAMINATION

01:40

1   **Q.**   So these new oral anticoagulants like Xarelto, the
2   development plan for Xarelto was to create an unmonitored drug.
3   That was your understanding of the development program?
4   **A.**   Yes.  The clinical community together was looking for
5   novel oral anticoagulants, as they were called then, that would
6   not require a dosage adjustment and would be effective in the
7   group of indications for which the vitamin K antagonists,
8   including warfarin, were used.
9   **Q.**   Let me show you what we will mark as Exhibit 6.
10         Does this look like, to you, the agenda for the Paris
11   meeting that you put together with respect to assay development
12   and measurement of plasma drug concentrations of Xarelto?
13   **A.**   Yes, it does.
14   **Q.**   And if you look with me, there's a list of consultants in
15   the middle of the page.  Do you see that?
16   **A.**   Yes.
17   **Q.**   The first one is Michael Meyer Samama, do you see that?
18   **A.**   Yes.
19   **Q.**   And did you, in fact, work with Dr. Samama in assay
20   development with respect to your job at Bayer with Xarelto?
21   **A.**   Yes, I did.
22   **Q.**   How did you come about consulting with Dr. Samama on this
23   assay development issue?
24   **A.**   Professor Samama was a well-known hematologist in the
25   world of antithrombotic drugs.  I had been working with him

THEODORE SPIRO - EXAMINATION

01:42   1   since 1988, so we knew each other over a long period of time up

   2   to his demise this past year.

   3           He was already, when I joined Bayer, involved with

   4   the company in looking at different types of coagulation

   5   testing that could be used for helping determine the degree of

   6   anticoagulation present in patients being treated with the

   7   non-vitamin K or the novel oral anticoagulants.

   8   Q.   Yourself as planned attendee.  Dr. Misselwitz, correct?

   9   A.   Correct.

  10   Q.   Under Item 3, "listed prothrombin time."  Do you see that?

  11   A.   Yes.

  12   Q.   So you learned that Bayer in their development program up

  13   to this point in time had used a specific prothrombin time, PT

  14   reagent, in their testing, correct?

  15   A.   Correct.

  16   Q.   Was that the Neoplastin reagent?

  17   A.   Yes, it was.

  18   Q.   And using that Neoplastin reagent, did you learn that the

  19   people at Bayer that had been involved in the development

  20   believed that there was a strong correlation between PT and

  21   drug exposure levels?

  22   A.   There was a correlation between the prothrombin time

  23   prolongation in seconds and the concentration of rivaroxaban

  24   present in the patient plasma.

  25   Q.   So you understood from the people at Bayer that had worked

THEODORE SPIRO - EXAMINATION

01:44   1    on this development that using the Neoplastin PT, there was a

2    correlation between the PT, using that reagent, and plasma

3    concentration of Xarelto.  Is that fair?

4    A.    Yes, it is.

5    Q.    And who did you learn that information from specifically

6    at Bayer?

7    A.    I think it would have been in discussions certainly with

8    the clinical pharmacologists involved in the program.  That

9    would have been Dr. Dagmar Kubitza and Dr. Wolfgang Mueck.  And

10   certainly Dr. Frank Misselwitz would have also been

11   communicating to me that information.

12   Q.    And then No. 5, a factor Xa inhibitory assay, do you see

13   that?

14   A.    Yes.

15   Q.    And you were aware that there were actually factor Xa

16   inhibitory assays available on the market at this time,

17   correct?

18   A.    Yes, there were.

19   Q.    Did you understand whether or not they would work in

20   evaluating the activity of the Xarelto in patients that were

21   taking Xarelto?

22   A.    These assays were very specialized assays.  As I remember,

23   they were research-use-only assays, and they were not widely

24   used in clinical -- in the clinical settings.

25            We did discuss them at the meeting, and our

**THEODORE SPIRO - EXAMINATION**

01:45

1    conclusion was that they were not generalizable to a broad

2    community of practitioners and laboraticians.

3    **Q.**    PT would be considered a widely available test?

4    **A.**    Coagulation test being used for the past 60, 70 years.

5    **Q.**    You see there's a conclusion section?

6    **A.**    Yes.

7    **Q.**    And then there's a second bullet point, "Recommendations

8    for monitoring."  Do you see that?

9    **A.**    Yes.

10   **Q.**    There's two options there, short-term and long-term?

11   **A.**    Yes.

12   **Q.**    So as of December 2006, leading this meeting, ideas for

13   short-term or long-term monitoring recommendations were part of

14   the discussion at Bayer.  Do you agree?

15   **A.**    Yes, they were.

16   **Q.**    So let's look at what we will mark as Exhibit 7.

17          This is a document that's labeled "Laboratory Methods

18   Advisory Board Meeting Minutes, Held 19 December 2006, Paris

19   Meridien Etoile Hotel."  It has the agenda as well as what

20   looks to be meeting minutes.  Do you see that?

21   **A.**    Yes, I do.

22   **Q.**    It says:  "What is the purpose of testing plasma samples?

23   Identification of overdoses, achievable.  Assessment of

24   compliance, achievable.  Correlation with clinical outcomes,

25   difficult to achieve?"

THEODORE SPIRO - EXAMINATION

01:47

1          Do you see that?

2   A.    Yes, I do.

3   Q.    Do you know what it meant by "correlation with clinical

4   outcomes"?

5   A.    The development program for these non-vitamin K oral

6   anticoagulants, as we now refer to them, was predicated on

7   using a non-monitored approach, so without dosage adaptations

8   to achieve clinical -- the desired clinical outcomes.

9          So we were -- since our strategy was to not use the

10  dosage adjustments that we, for instance, used with warfarin in

11  later programs, we were specifically testing whether it was

12  possible with a anticoagulant to have a fixed dose across a

13  broad range of patients within specific indications.

14         The whole program was predicated on the need for not

15  having a second generation of drugs such as the vitamin K

16  antagonists that required monitoring and dose adaptation.

17  Q.    So one of the discussions that took place in your meeting

18  in December 2006 in Paris is whether or not measurement of or

19  monitoring of either PT or plasma concentrations could be

20  correlated to these efficacy or safety outcomes.  Correct?

21  A.    Yes, that was part of the conversation, yes.

22  Q.    And then if you look with me down -- one, two, three,

23  four -- the fourth bullet point down, it says:  "Will the

24  manufacturer provide information about correlation of plasma

25  concentrations and preclinical and clinical outcomes?"

THEODORE SPIRO - EXAMINATION

01:49

1          Do you see that?

2   A.    Yes.

3   Q.    So that was a question that these physician consultants

4   that had been invited to these advisory board meeting had, was

5   whether or not the company was going to be able to provide this

6   correlation between either safety or efficacy events and how

7   those correlated with the plasma concentration of the drug,

8   correct?

9   A.    Yes, the question was asked in that regard.

10  Q.    The two main types of assays that were discussed at this

11  meeting seemed to be both use of some type of PT assay, or

12  potentially use of a factor Xa assay which was clearly not as

13  widely available or widely used in the clinical practice at

14  this point in time, correct?

15  A.    Correct.

16  Q.    Now, when it comes to the factor Xa inhibitory assay,

17  those were used for Lovenox monitoring, correct?

18  A.    For Lovenox monitoring, we used a different assay, an

19  anti-factor Xa activity assay.  It's a slightly different

20  assay.  This one is measuring the blocking of transformation of

21  factor X to factor Xa, and the other is measuring the amount of

22  anti-factor Xa in the assay.

23          I would have to look more directly into these assays'

24  methodology to really very well explain it to interested

25  parties.

1608

THEODORE SPIRO - EXAMINATION

01:51

1        But the anti-factor Xa assay was the assay that we
2   used for monitoring low-molecular-weight heparins.
3   **Q.**    Two different types of factor Xa inhibitory assays were
4   discussed.  One was presented by Dagmar Kubitza that used a
5   certain way of measuring factor Xa inhibition, correct?
6   **A.**    Yes.
7   **Q.**    The other looked at a different type of assay factor Xa
8   inhibition assay that had been used for the monitoring of
9   low-molecular-weight heparin in the clinic; is that fair?
10  **A.**    Yes, that's fair.
11  **Q.**    And in discussion of the second type that been used in
12  monitoring low-molecular-weight heparins, there were several
13  points under that section, including the section that clinical
14  relevance is generally accepted.  Do you see that?
15  **A.**    Yes.
16  **Q.**    The next point says:  "Rivaroxaban standards could be
17  prepared as calibration reagents and tests used to quantitate
18  rivaroxaban plasma levels, which could then be correlated to
19  the pharmacokinetic of the dose being administered to see
20  whether the patient was within the expected concentration
21  ranges, given the timing of the sample draw."
22        Do you see that?
23  **A.**    Yes.
24  **Q.**    So it was discussed at this meeting that these factor Xa
25  inhibition assays that used added factor Xa bovine source could

THEODORE SPIRO - EXAMINATION

01:53

1  be calibrated to be used to measure rivaroxaban plasma levels

2  and then correlate that to see whether the patient was in the

3  level that you expect them to be, considering when they took

4  the dose of the drug, right?

5  A.   Yes, that is correct.

6  Q.   First bullet point just says that "PT is a global clotting

7  test used for workup thrombosis, and more particularly,

8  bleeds."

9         Does it say that?

10  A.   Yes, it does.

11  Q.   That was what was described at the meeting in Paris in

12  2006, correct?

13  A.   Right.

14  Q.   Let's flip over to the conclusion section.  It says:

15  "Routine monitoring of rivaroxaban (Xarelto) is not necessary,

16  but the drug can be monitored very well by several options."

17         Do you see that?

18  A.   Yes.

19  Q.   So in 2006, this advisory board meeting that you put

20  together in Paris and the meeting minutes that you wrote

21  concluded that Xarelto could be monitored very well by several

22  options, correct?

23  A.   Yes, but let me clarify one word.  When we said

24  "monitoring," we meant measuring the plasma concentrations, and

25  we did not have in mind a monitoring with the purpose of dosage

THEODORE SPIRO - EXAMINATION

01:54

1  adaptation based on the results of the measured concentrations.

2  Q.   Well, what would you do if you measured someone's

3  concentrations and they were way too high?

4  A.   Interesting question.  I think the clinical context of

5  the -- the clinical context would have to be looked at.  If the

6  patient was a patient with renal failure and had deteriorating

7  renal function, you probably withhold the dose.

8  Q.   What if they didn't have renal failure?  Would you

9  withhold the dose as well?

10  A.   As I said, it's a hypothetical question.  The information

11  that we had from our Phase I and Phase II programs was that

12  these types of observations would not be routine.  We did not

13  have available strategies to address this type of specific

14  condition.

15          In a clinical practice, you might want to hold one

16  day's dose of medication, but that's not something that is

17  recommended in our prescribing information provided to

18  physicians.

19  Q.   The next sentence says:  "This is a clear advantage of the

20  substance" -- talking about the fact the drug can be monitored

21  very well by several options.

22          "This is a clear advantage of the substance,

23  comparing other anticoagulants.  The aspect that Bayer is open

24  to monitoring and supports physicians that want to monitor

25  their patients should facilitate the market introduction of

THEODORE SPIRO - EXAMINATION

01:56

1    rivaroxaban."

2            Do you see that?

3    A.   Yes.

4    Q.   Were you guys telling these consultants at this Paris

5    meeting that Bayer was open to monitoring?

6    A.   We were using the term "monitoring" in the context of

7    measurement of concentrations of drug so that in specific

8    patients, the amount of drug in the plasma could be determined.

9    But we did not mean by this monitoring the type of monitoring

10   that was under -- that had been conducted for the vitamin K

11   antagonists, which was monitoring to obtain a specific

12   intensity of pharmaco -- of anticoagulation -- of coagulation

13   inhibition.  So it was a different type of approach.

14   Q.   So in the meeting minutes, under "Conclusion," you wrote

15   that:  "The aspect that Bayer is open to monitoring and

16   supports physicians that want to monitor their patients should

17   facilitate the market introduction of rivaroxaban."  Correct?

18   A.   Yes, it said that.

19   Q.   And it specifically talks about that Bayer supports

20   physicians that want to monitor their patients.

21           Do you see that?

22   A.   Yes, I see that.

23   Q.   So when you wrote that Bayer would support physicians that

24   want to monitor their patients, that aspect, what type of

25   monitoring the patients were you talking about?

THEODORE SPIRO - EXAMINATION

01:57

1   A.   When we had this meeting, we were exploring what might be

2   done in specific clinical situations.  Situations that were

3   being discussed included the -- as I previously mentioned, the

4   very small patient, such as a child.  It included patients with

5   renal failure, where we were concerned about accumulation of

6   drug.  It included issues related to compliance.  Patients with

7   impaired liver function.

8           So specific clinical settings where we knew there

9   were -- there could be increased exposures to rivaroxaban, and

10  when the drug became available clinically, in the clinic, when

11  physicians might require tools to measure its concentration.

12  Q.   Let me show you what we will mark as Exhibit 9.  It starts

13  with an email that Frank Misselwitz sent to you on November 6,

14  2006.  Do you see that?

15  A.   Yes.

16  Q.   He says:  "I would like to make sure that you organize a

17  prep meeting, ideally in Wuppertal before the ASH in order to

18  fully align our presentations, but also the agenda and the

19  goals of this meeting."  Right?

20  A.   Yes.

21  Q.   ASH was the -- is the American Society of Hematology -- is

22  that the American Society of Hematology?

23  A.   Yes, it is.

24  Q.   The next thing he told you was that:  "The external

25  communication shall always be in 'rivaroxaban does not require

THEODORE SPIRO - EXAMINATION

01:59   1    regular coagulation monitoring, but due to its predictable

2    PK/PD profile, it can be monitored if necessary (in

3    subpopulation, in case of overdose . . .).'"

4            That's what he told you, right?

5    A.   That is what he wrote.

6    Q.   He said:  "We do not intend to develop methods for

7    routine/regular coag monitoring of rivaroxaban."

8            That's the next thing he told you, correct?

9    A.   Correct.

10   Q.   This is an email chain from -- it looks like August of

11   2007, between Dr. Samama and Elisabeth Perzborn, and then

12   Elisabeth Perzborn forwards the information to a large group at

13   Bayer, including yourself.

14           So first Dr. Samama emails Dr. Perzborn and describes

15   two protocols for studies he would like to do with respect to

16   Xarelto.

17           Is that a fair statement?

18   A.   Yes.

19   Q.   Then Dr. Perzborn forwards Dr. Samama's email where he

20   lays out the two protocols for studies to Dr. Misselwitz, your

21   supervisor, yourself, as well as several other people at Bayer,

22   including Dr. Kubitza, Dr. Mueck, Dr. Berkowitz, as well as

23   Harald Kallabis and Bernhard Glombitza.

24           Do you see that?

25   A.   Yes.

THEODORE SPIRO - EXAMINATION

02:01

1  Q.   What about Martina Evertz?  Did you know who she was?
2  A.   Yes.  She would have been in the marketing organization.
3  Q.   She was in marketing, right?
4  A.   Right.
5  Q.   She says:  "Dear All.  As you know, Professor Samama is
6  very interested in the question, what is the best way to
7  monitor Xarelto if necessary?"
8       Do you see that?
9  A.   Yes.
10  Q.   Let me ask you this:  As part of the review process for a
11  study related to laboratory assays, did that require the
12  approval of marketing at Bayer?
13  A.   To the best of my knowledge, no, marketing would not have
14  been involved in that.
15  Q.   So earlier you and I talked about the fact that if you
16  measured someone and their drug plasma concentrations were too
17  high, one of the things that you could do in the clinical
18  setting is miss a dose, correct?
19  A.   Yes, that would be an option.
20  Q.   What would you do next for that patient?  Would you put
21  them back on the exact same dose when they have already
22  demonstrated that they have high plasma concentrations of the
23  drug?
24  A.   It's a difficult question.  It would have to be viewed in
25  the context of the -- of an individual patient as to what might

THEODORE SPIRO - EXAMINATION

02:02

1    be done.  What always was an alternative for certain types of

2    patients would be treatments with standard of care.

3    **Q.**    So don't put them back on Xarelto?

4    **A.**    That's an option.

5    **Q.**    Instead, switch them over to a warfarin therapy, perhaps?

6    **A.**    Perhaps.

7    **Q.**    Let me show you what we will mark as Exhibit 18.  This is

8    Record 169-0921, Bates BHCP 05104216.  There's an email chain

9    that goes several pages.

10           It starts with an email from Yong-Ling Liu at

11   Chameleon, to several people at Bayer.  We can start on kind of

12   the bottom of the first page.  You see at the very bottom

13   there's an email from Nancy Cook-Bruns to yourself on June 17,

14   2009, copying Elisabeth Perzborn, where she says:  "Dear

15   Theo" -- at the top of the second page -- "Can you please get

16   in touch with Garreth" --

17   **A.**    Yes.

18   **Q.**    She says:  "Dear Theo.  Can you please get in touch with

19   Garreth at Chameleon regarding the poster from Dr. Samama for

20   ISTH?"  Do you see that?

21   **A.**    Yes.

22   **Q.**    So you see where she forwards the Samama poster related to

23   the effects of rivaroxaban, a novel oral direct factor Xa, on

24   coagulation assays, for your review?

25   **A.**    Yes.

1616

THEODORE SPIRO - EXAMINATION

02:04

1  Q.   In responses to that, Warren Cowell at Bayer responds.  Do
2  you see that?
3  A.   Yes.
4  Q.   Just above?
5  A.   Uh-huh.
6  Q.   Warren Cowell is listed as global project leader, global
7  health economics outcomes and reimbursement.  Do you see that?
8  A.   Yes.
9  Q.   He says:  "Dear Yong-Ling.  Please see some comments from
10  a nonspecialist perspective."
11       If we can look at the top of the next page, there's
12  two bullet points.  He says, the first bullet point:  "There is
13  an assumption explicitly stated that riva does not require
14  routine monitoring, which is presented within this poster as
15  contextual information, but also positioned as one of the
16  'communication objectives.'"
17       Do you see that?
18  A.   Yes, I do.
19  Q.   He says:  "Perhaps we should explain or reference this
20  claim, as I am not sure how this claim is currently supported
21  or even if it is defensible."
22       Do you see that?
23  A.   Yes, I do.
24  Q.   Did you ever talk to Dr. Cowell about his concerns about
25  the claim for no routine monitoring may not even be defensible?

THEODORE SPIRO - EXAMINATION

02:05

1  **A.**   No, I did not have any -- I do not remember having

2  conversations with Warren Cowell, no, in this regard.

3  **Q.**   So Warren Cowell says:  "Also, from the contextual

4  perspective, it may not be clear to nonspecialists how any

5  results of riva assays would be used in clinical practice,

6  *i.e.*, if a physician already knows a patient has overdosed/bled

7  on riva, what would they do with the results of such an assay?"

8          So he is asking:  What is a physician supposed to do

9  with the results of these measurements, right?

10  **A.**   There are, I think, clinical situations in which it is

11  helpful to know the concentration of rivaroxaban, what the

12  concentration of rivaroxaban is in the plasma of the specific

13  patient.  This brings us to the assumption that the patient can

14  tell us that, in fact, he or she is using rivaroxaban.

15          I don't know exactly what Warren Cowell's background

16  was, so it's difficult for me to understand exactly where

17  his -- where his concern is directed.

18          But as an example, a patient who has overdosed on --

19  as has been reported in the literature -- 100 tablets of

20  rivaroxaban, it may be helpful to know that this patient has a

21  certain plasma concentration and be able to monitor it for --

22  measure it for one or two days to see that the drug is being

23  eliminated from the plasma compartment and to take measures

24  during that period of time to protect the patient from risk of

25  bleeding.

THEODORE SPIRO - EXAMINATION

02:08
1      The assay, as we were thinking about it, was a
2 measurement assay and not a dose-adaptation assay.  We were
3 considering it to be of value and of use in the setting of a
4 patient who might require an emergency surgery, as an example,
5 to provide guidance to the surgeon as to the concentration of
6 rivaroxaban in the -- in the patient's plasma.
7      So there are some situations in which this
8 information can be of use to a physician?
9      And I think in this ongoing discussion, we are
10 continuing the conversation of when and where that might be the
11 case.
12 Q.   This is the question:  If you are going to create a way to
13 measure the drug levels, isn't the right thing to do to tell
14 physicians what they should do about it?
15 A.   At this point in time we are developing the assay -- we
16 are not developing the assay.  We are supporting diagnostic --
17 companies that specialize in coagulation testing.  We are
18 supporting some companies in their efforts to develop assays
19 for measurement of rivaroxaban.
20      We agree that there is a need to have an assay for
21 measurement.  We are not developing dose-adapted treatment
22 regimen that require dosage adjustments.  But we do feel that
23 as the use of these non-vitamin K oral anticoagulants
24 increases, and in particular with the additional indications
25 under investigation, that the circumstances in which a

THEODORE SPIRO - EXAMINATION

02:10

1  measurement might be helpful to a physician would increase.

2          I have already mentioned two of the more obvious

3  situations:  suicidal attempts, overdoses, and the -- in the

4  setting of a requirement for emergency surgery or invasive

5  procedures.

6          But we do not have -- we don't really have further

7  instructions to give to physicians, because, again, our

8  development program is predicated on a treatment regimen that

9  has a larger therapeutic window than was the case for the

10  vitamin K antagonist and does not require a dose-adaptation

11  strategy.

12  Q.   You see where it's signed "Sue" there, at the top?

13  A.   Yes.

14  Q.   She says:  "Sorry for the delay.  Been on the road.  The

15  discussion below is compelling and confusing to physicians, but

16  Peter, Paul, Roger, and Warren, clinical colleagues, need to

17  make the final decision on whether we should elaborate on the

18  INR/warfarin, riva, need to resist monitoring with riva."

19          Do you see that?

20  A.   Yes.

21  Q.   And Chris Nessel responds -- and did you know Dr. Nessel?

22  A.   Yes, I know Dr. Nessel.

23  Q.   He was with J&J, correct?

24  A.   Yes.

25  Q.   He says:  "Dear Sue.  As I review the poster, there are at

THEODORE SPIRO - EXAMINATION

02:12   1   least two issues extant.  The first is to appropriately caution

2   clinicians against monitoring the pharmacologic activity of

3   rivaroxaban.  I recommend strengthening the introduction as

4   follows:

5             "Change 'There is no requirement for routine

6   coagulation monitoring' to 'There is no clinical value or

7   utility in routine coagulation monitoring.'

8             "The absence of a requirement does not adequately

9   convey the matter.  The trials were performed without any

10   coagulation monitoring, not even if it was desired."

11             Did I read that correctly?

12   A.   Yes, you did.

13   Q.   He says:  "Moreover, I disagree that monitoring may be

14   valuable in certain instances."

15             Do you see that?

16             He says:  "It may be desired, but that is distinctly

17   different from the presence of clinical value."

18             Do you see that?

19   A.   Yes.

20   Q.   So you have had a chance to review Exhibit 19, familiarize

21   yourself with it a little bit?

22   A.   Yes.

23   Q.   Let's turn our attention to that email from July 3, 2009,

24   4 p.m.

25             And you email Dr. Eby and copy several other people,

THEODORE SPIRO - EXAMINATION

02:13

1   including Dr. Samama, as well as some of the folks at Stago,
2   correct?
3   **A.**   Yes.
4   **Q.**   Dr. Eby was Charles Eby, and he was a laboratory genomic
5   medicine -- division of the laboratory of genomic medicine at
6   Washington University School of Medicine in St. Louis,
7   Missouri, correct?
8   **A.**   Yes, that's correct.
9   **Q.**   The subject of the email is "Rivaroxaban Xarelto
10  Laboratory Monitoring Assay Development Field Trial," correct?
11  **A.**   Correct.
12  **Q.**   You say:  "Dear Dr. Eby.  I am contacting you on behalf of
13  Professor Samama, Laboratory Biomnis, and Dr. Martinoli,
14  Diagnostica Stago, to invite you to participate to a program in
15  which we are assessing methods to develop monitoring procedures
16  for novel anticoagulants, in specific, a direct factor Xa
17  inhibitor, rivaroxaban."  Correct?
18  **A.**   Yes, that is correct.
19  **Q.**   You ask him to let you know if he was interested in
20  participating in the program.  Do you see that?
21  **A.**   Yes.
22  **Q.**   So Dr. Eby responded to you -- if you flip with me to the
23  next page -- on July 7 of 2009, and says:  "Hello, Dr. Spiro."
24  Do you see that?
25  **A.**   Yes, I do.

THEODORE SPIRO - EXAMINATION

02:14

1  **Q.**   He says:  "I am very interested in this important topic.

2  There will definitely be situations where laboratory monitoring

3  of the anticoagulant activity of oral direct Xa and IIa

4  inhibitors will be necessary."

5           Do you see that?

6  **A.**   Yes, I do.

7  **Q.**   He says:  "I am on the faculty of Washington University

8  School of Medicine, department of pathology."

9           That's in St. Louis, correct?

10  **A.**   Correct, that is in St. Louis.

11  **Q.**   He says:  "My department has a contract to provide

12  laboratory director services to Barnes Jewish Hospital, which

13  is where all Washington University faculty practice medicine.

14  I cannot direct laboratory employees to conduct tests to

15  support a commercial project, no matter how modest the time,

16  reagent, and equipment requirements, without external financial

17  support.

18           "This would require a contract between Washington

19  University and Bayer/Stago, legal review, and an overhead

20  charge of approximately 26 percent."

21           Correct?

22  **A.**   Yes, that is what it says.

23  **Q.**   Then he wants you to let him know if you would be

24  interested in pursuing the collaboration, right?

25  **A.**   Correct, that is what it said.

1623

THEODORE SPIRO - EXAMINATION

02:15

1   **Q.**   You respond to him later that day, and you copy

2   Dr. Martinoli and Dr. Samama, on July 7 at 11:12 a.m.

3          Do you see that?

4   **A.**   Yes.

5   **Q.**   You let them know that these issues regarding compensation

6   or funding by Bayer has arisen before, right?

7   **A.**   Yes.

8   **Q.**   You say:  "This trial and its protocol are a hybrid

9   project.  While Bayer is the sponsor in terms of financial

10  support, the program falls closer to an investigator-initiated

11  study, IIS, than to a company-sponsored study.

12         "However, as we, Bayer, are more involved in this

13  program than is the case for the usual IIS, Bayer 'sponsorship'

14  is cited."

15         Do you see that?

16  **A.**   Yes.

17  **Q.**   You then let him know, based on the discussions with

18  Dr. Samama and Dr. Martinoli at Stago that:  "We have decided

19  not to offer compensation and apply this decision to all

20  participating.  The actual logistics behind securing additional

21  corporate funding for this study and the logistics behind

22  negotiating contracts with 15 laboratories would engender many

23  months of delay in the startup and completion of the field

24  trial of calibrators and controls platformed on the PT assay,

25  as described in the protocol."

**THEODORE SPIRO - EXAMINATION**

02:17

1        Did I read that correctly?

2   **A.**   Yes, and that answers also your question of which assay we

3   were talking about in this email string.

4   **Q.**   So this would be talking about the PT assay field trial

5   test?

6   **A.**   Prothrombin time assay.

7   **Q.**   "The purpose of this study is to assess clinically

8   practicable tools for measuring rivaroxaban blood

9   concentrations."

10        Did I read that correctly?

11   **A.**   Yes, you did.

12   **Q.**   "For Bayer, no financial incentive exists in the

13   development of such tools, as Bayer has no longer a clinical

14   laboratory business -- sold to Siemens two years ago."

15        Do you see that?

16   **A.**   Yes.

17   **Q.**   That was your explanation of why Bayer is not interested

18   in funding his laboratory's participation, correct?

19   **A.**   We did not have a budget to fund individual laboratories

20   for this program.  The collaboration that was in place was

21   between Bayer -- I think we were Bayer Schering AG at that

22   time -- Diagnostica Stago and Professor Samama, Biomnis.

23        We were supporting, in particular,

24   Diagnostica Stago's interest in having the rivaroxaban

25   measurement assay available as one of their tests in order for

THEODORE SPIRO - EXAMINATION

02:19

1  them to stay current with the contemporary evolution of

2  coagulation treatments being used in the clinic.

3  Q.    So what you told Dr. Eby was, even though the purpose of

4  the study was to assess clinically practicable tools for

5  measuring rivaroxaban blood concentrations, Bayer didn't have

6  any financial incentive to develop such tools, because they

7  didn't have a laboratory business anymore.  Right?

8  A.    Oh, yes.  We didn't have a specific incentive ourselves to

9  further develop assays, which we might have done if we had

10  maintained our laboratory division, but it was gone.

11 Q.    Now, if I can show you what we will mark as Exhibit 22,

12 which is Record 1145884.  That's Bates 02485568.

13        This is an email from the next day, from Yong-Ling

14 Liu at Chameleon, the medical writing company we talked about,

15 to yourself, Garreth Tucker, at Chameleon, as well as also Anja

16 Alpers at Bayer.  Do you see that?

17 A.    Yes.

18 Q.    This is on June 18, 2009, a day later, and it refers to

19 Dr. Samama's ISTH poster.

20        Do you see that?

21 A.    Yes.

22 Q.    Yong-Ling Liu thanks yourself and Anja for taking the time

23 to discuss Dr. Samama's ISTH poster with us today.  "As

24 mentioned, some concerns were raised during the GEST review

25 process regarding the messages around the aims of these studies

THEODORE SPIRO - EXAMINATION

02:20   1   and the conclusions about the potential use of some of these

2   assays for measuring the pharmacodynamics of rivaroxaban."

3           Do you see that?

4   A.   Yes.

5   Q.   We are talking about Dr. Samama's paper, right?

6   A.   Yes, Dr. Samama's poster.

7   Q.   The next paragraph says:  "In light of the discussion we

8   had yesterday with the A-GEST, we have modified the

9   introduction to reflect that although routine coagulation

10   monitoring is not required, some assays may be of value in

11   certain rare circumstances.  In addition, it was suggested that

12   the potential utility of PiCt, HepTest, or PT for the

13   measurement of rivaroxaban should be deleted from the

14   conclusion.  We have, therefore, modified the conclusion to

15   give a more general statement about the potential of these

16   assays."

17           Do you see that?

18   A.   Yes, I do.

19   Q.   These were the attachments of emails from Yong-Ling Liu,

20   the writer at Chameleon.  You see the first is similar to the

21   draft we saw before of the poster.  It's the draft for GEST on

22   the front page.

23           Do you see that?

24   A.   Yes, I do.

25   Q.   So if you recall when we looked at 1701567, which I think

THEODORE SPIRO - EXAMINATION

02:22

1  was Exhibit 22, that conclusion -- or actually 21 -- that

2  conclusion, the first bullet point, said:  "Although there was

3  no requirement for routine coagulation monitoring with

4  rivaroxaban, appropriate assays may be useful in certain

5  circumstances."

6          Now, if we look at the conclusion in Exhibit 23, as

7  indicated in the email, the conclusion has been changed to say

8  that "The appropriate assay may be useful in rare

9  circumstances."  Correct?

10  A.   Yes, that is correct.

11  Q.   So the third bullet point in Exhibit 21, that had been

12  circulated around and comments had been received from people

13  like Christopher Nessel and Warren Cowell, indicated that there

14  was a linear relationship between prothrombin time and Xarelto

15  concentrations and that those prothrombin time measurements

16  could be expressed as Xarelto plasma concentrations.

17          Do you recall that in Point No. 3 we talked about?

18  A.   Yes.

19  Q.   Now, if we look at the conclusions in Exhibit 23 after the

20  call with Chameleon, the medical writing company, that

21  paragraph is not there anymore, correct?

22  A.   Correct, it is no longer there.

23  Q.   That's consistent with the email from Yong-Ling Liu that

24  during the discussion with the A-GEST members, it was suggested

25  that the potential utility for PT for the measurement of

THEODORE SPIRO - EXAMINATION

02:23  1   rivaroxaban should be deleted from the conclusion.  "We have,

2   therefore, modified the conclusion to give a more general

3   statement about the potential of these assays."

4           That's what's been done in this new draft of the

5   poster, correct?

6   A.   Yes, that appears to be the case.

7   Q.   So the conclusion we saw from Dr. Samama's poster, that

8   was circulated around to Chris Nessel and others, had a fourth

9   bullet point that says:  "Prothrombin time assay calibrated to

10   Xarelto concentration appears to be a simple and valuable assay

11   for measuring the pharmacodynamic effects of Xarelto in a

12   standardized manner."

13           Do you see that?

14   A.   Yes, I do.

15   Q.   Then the bullet point on the new version of the poster,

16   after this call with Chameleon, says:  "Further development

17   will be required to establish one of these assays as a simple,

18   reliable, and accurate test for rivaroxaban plasma

19   concentration."

20           Do you see that?

21   A.   Yes, I do see that.

22   Q.   These were all changes that Chameleon made on behalf of

23   the discussion that was had with the Bayer A-GEST publication

24   committee, correct?

25   A.   Yes, that appears to be the case.

THEODORE SPIRO - EXAMINATION

02:25

1   **Q.**   My simple question was:  Did you provide information -- or

2   were you able to provide information to Yong-Ling Liu related

3   to a therapeutic plasma concentration range that could be given

4   in the objective of Dr. Samama's paper for ISTH?

5   **A.**   I don't remember if I gave it or not.  Would it have been

6   possible to give a therapeutic concentration range for the one

7   approved indication?  Yes, it would have been.

8   **Q.**   Okay.  You don't believe the company has ever provided to

9   clinicians a therapeutic plasma concentration range in any of

10  their labeling or studies for the product, correct?

11  **A.**   In the prescribing information in the United States, I do

12  not believe there is a table showing estimated or measured

13  plasma concentrations for the three approved doses available to

14  the clinicians in publications in the medical literature.  We

15  have provided that information, and it is present in those

16  publications.

17  **Q.**   So let's start with an email from Scott Berkowitz to Gary

18  Peters, Chris Nessel, Bernhard Glombitza, and others, on the

19  second page, on January 11, 2007.  Or actually -- yeah,

20  January 11, 2007, at 1:17.  It says "Dear All."

21           Do you see that?

22  **A.**   Yes, I do.

23  **Q.**   It says:  "The news that the apixaban program has enrolled

24  its first SPAF patient, along with the availability for review

25  of the transcript of BMS investors relations meeting in

THEODORE SPIRO - EXAMINATION

02:27  1   December, and comments about apixaban with it, has raised some

2   concern within Bayer about their position taken and how we

3   should respond to the investor and medical community if asked

4   for our response."

5          Do you see that?

6   A.   Yes, I see that.

7   Q.   Apixaban was another novel oral anticoagulant being

8   developed by Bristol-Myers Squibb, correct?

9   A.   Yes.

10  Q.   Let's now look at your response to Scott Berkowitz's

11  email.  You say:  "Hi, Scott.  Well, this is very interesting

12  information indeed.  First patient in Afib, AF, chapeau to the

13  BMS team.  We have an advance apparently in OS and VTE

14  treatment.  They are ahead in ACS, and we are neck and neck in

15  AFib.  I would say we are a bit ahead of them."

16         You're talking about whether or not you're going to

17  reach approvals by the regulatory authorities at certain

18  timeframes; is that correct?

19  A.   Yes, that's correct.

20  Q.   The "neck and neck" is referring to that race?

21  A.   Yes, it's referring to that race.

22  Q.   You say:  "They may be right that with a b.i.d. dose they

23  have better efficacy with their compound."

24         That's what you told Scott Berkowitz in January 2007,

25  correct?

THEODORE SPIRO - EXAMINATION

02:28

1   A.   Yes, that is what I said to Scott Berkowitz.

2   Q.   You say:  "We can only make our decisions based on our

3   data.  Is the 20/15 approach the best one in AFib?"

4        That was the approach that was being considered at

5   the time, going into the ROCKET trial, correct?

6   A.   Yes, that's correct.

7   Q.   The next thing you say is:  "The future of Bayer

8   Healthcare AG, of course, rides on this decision, and the OS

9   element of this puzzle impacts the entire game."

10       That's what you said to Ted Spiro back in

11   January 2007, correct?

12  A.   Right.  That's what Theodore Spiro said to Scott Berkowitz

13  in 2007.  But I understood what you said.

14  Q.   The "OS element," you're talking about orthopedic?

15  A.   Orthopedic surgery.

16  Q.   And because of the many types of situations in which

17  monitoring of rivaroxaban exposure levels, as measured by

18  plasma concentration, might be important, that's the reason why

19  you were working on these potential assays that could be used

20  for monitoring?

21  A.   Yes, that is correct.

22  Q.   Let me show you what we will mark as Exhibit 35, which is

23  Record 411373, Bates BPAG 01136560.  This is an email chain

24  between Corinne Debroye, Elisabeth Perzborn, and yourself, back

25  in 2008.  And we can start with the first email, if we can,

THEODORE SPIRO - EXAMINATION

02:30  1  which was an email from Corinne Debroye to Elisabeth Perzborn.

2  The subject line was "Monitoring with rivaroxaban."

3       Do you see that?

4  A.   Yes, I do.

5  Q.   Corinne Debroye was a medical adviser, hematology, with

6  Bayer in Belgium, correct?

7  A.   Yes, she was.

8  Q.   Corinne Debroye forwards this email to you -- if you can

9  look with me on the first page of this email that ends in

10  560 -- copies Martine Debecker and several others.

11       Then Corinne Debroye -- Elisabeth Perzborn forwards

12  this to you.  Then Corinne Debroye responds.

13       Do you see that?

14  A.   Yes, I see that.

15  Q.   So what Elisabeth Perzborn says in the email that she

16  forwarded to you on April 23, 2008, at 15:46 -- if you flip

17  with me to the next page -- says:  "Dear Corinne.  Thank you

18  very much for letting me know the suggestions from Walter

19  Wijns."

20       Are you with me?

21  A.   Yes.

22  Q.   "What I learned from you and various colleagues from the

23  different countries is the demand of having the possibility to

24  monitor rivaroxaban if required."

25       Do you see that?

THEODORE SPIRO - EXAMINATION

02:32

1   **A.**   Yes, I do.

2   **Q.**   What Elisabeth Perzborn is recognizing, based on her

3   communication with Corinne Debroye in Belgium, is that the

4   colleagues that were from different countries were wanting to

5   have the possibility to monitor Xarelto, correct?

6   **A.**   They are looking for the ability to, I think, measure

7   rivaroxaban plasma concentrations.  They know that we do not

8   have an adjusted-dose program that would be an adjusting

9   regimen that would be amenable to traditional drug monitoring,

10  as the drug was developed to not require monitoring and dosage

11  adaptation.

12  **Q.**   So then Corinne Debroye responds to Dr. Perzborn and

13  copies you on April 28, 2008, on the first page.  Do you have

14  that email?

15  **A.**   Yes, I do.

16  **Q.**   It says:  "Dear Elisabeth.  Thank you very much for your

17  feedback.  Meanwhile, I contacted Dr. Arnouts from the

18  hemostasis lab at the University Hospital Leuven, and he agreed

19  that monitoring needs to be possible, preferably with the

20  anti-Xa, and that calibration should be done with Xarelto."

21          Correct?

22  **A.**   Yes, that is what is written here.

23  **Q.**   So this advisory board that was being held in Brussels in

24  June of 2008, the main topic was going to be monitoring of

25  rivaroxaban, Xarelto, correct?

THEODORE SPIRO - EXAMINATION

02:33

1   A.   Yes, it was. as indicated here.

2   Q.   I'm going to show you what we will mark as Exhibit 36,

3   Record 1158771.  And this is Bates BHCP 02644383.

4        And if you will look with me on the first page, just

5   so we're clear what you are looking at, this file was produced

6   to us as a PowerPoint file, and the file name was described as

7   "TES Edits Advisory Board 19 June 2008 Agenda and Presentation

8   bis.PowerPoint."

9        Do you see that?

10  A.   Yes.

11  Q.   And if we look at the screen, it talks about the TES Edits

12  Advisory Board.  The TES, that would be yourself?

13  A.   Correct.

14  Q.   And then the next section is "Xarelto and Monitoring,"

15  correct?

16  A.   Yes, it is.

17  Q.   And you're listed as the presenter there and described as

18  the global clinical leader, correct?

19  A.   Yes.

20  Q.   So if we can flip over to page 25, there's a description

21  of the new anticoagulants, correct?

22  A.   Yes, there is.

23  Q.   And on the left side, you see rivaroxaban listed at the

24  top, correct?

25  A.   Correct.

THEODORE SPIRO - EXAMINATION

02:35
1   **Q.**   And the arrow points to the Xa circle, which means
2   rivaroxaban was one of the factor Xa inhibitors, and the other
3   factor Xa inhibitor drugs are listed there, correct?
4   **A.**   Yes, that is the case.
5   **Q.**   Now, let's flip to page 26.  And there's a slide that you
6   had in your presentation called "Monitoring."  Do you see that?
7   **A.**   Yes.
8   **Q.**   It says:  "How to monitor this plurality of substances."
9           Do you see that?
10  **A.**   Yes.
11  **Q.**   You describe specific anti-Xa or anti-IIa methods in every
12  lab.  And that refers to the problem that if you try to have a
13  test for every single drug, there would be a lot of tests for a
14  lab to have to run and to keep track of, correct?
15  **A.**   Yes, that is one of the considerations.
16  **Q.**   You basically describe you would have to have 20 different
17  sets of specific calibrators or controls, correct?
18  **A.**   Some number here.  It says 20.
19  **Q.**   So then you say, "The good news."  Do you see that?
20  **A.**   Yes.
21  **Q.**   It says:  "Good news.  Routine monitoring required only."
22  And you have a picture of Coumadin and a picture of heparin,
23  correct?
24  **A.**   Yes.
25  **Q.**   Then in the yellow box, you say:  "All the other

THEODORE SPIRO - EXAMINATION

02:36

1  substances require monitoring only in special situations."

2        Correct?

3  A.   Correct.

4  Q.   You and I have discussed the fact that it was Bayer's

5  position with respect to this assay development that there were

6  special situations that would require monitoring?

7  A.   There are situations in which measurements of the plasma

8  concentration of the drug are important.

9  Q.   You and I certainly discussed that it was your position

10  that there were special situations that made monitoring of

11  Xarelto plasma concentration levels necessary, correct?

12  A.   Again --

13        THE COURT:  There's some issue with the screens.

14  What is it?

15        THE DEPUTY CLERK:  Some of the exhibits are being cut

16  off.

17        JUROR:  Yeah, these three screens, it's like it's

18  over to the left-hand side where it's like -- the screens over

19  here --

20        MR. BIRCHFIELD:  Is it just certain monitors?

21        THE COURT:  We will take a break and we'll see if we

22  can work it out.

23        Dean, let's see if we can get it straightened

24  out.

25        (Recess.)

THEODORE SPIRO - EXAMINATION

02:49   1          THE COURT:  Let's be seated, please.

2                   Let me know, members of the jury, if you have

3      any problems, and I will get on it right away.

4                   How much longer?

5          MR. BIRCHFIELD:  Your Honor, by agreement we backed

6      it up just a little bit to the start of the PowerPoint

7      presentation.

8          THE COURT:  Sure.

9          MR. BIRCHFIELD:  My guess is that we have about 20 to

10     25 minutes left.

11         THE COURT:  Okay.

12     Q.   I want to show you what we will mark as Exhibit 36, which

13     is Record 1158771.  This is Bates BHCP 02644383.

14                  If you will look with me on the first page, just so

15     we are clear what you are looking at, this file was produced to

16     us as a PowerPoint file, and the file name was described as

17     "TES Edits Advisory Board 19 June 2008 Agenda and Presentation

18     bis.PowerPoint."

19                  Do you see that?

20     A.   Yes.

21     Q.   If we look at the screen, it talks about the TES Edits

22     Advisory Board.  The TES, that would be yourself?

23     A.   Correct.

24     Q.   The next section is "Xarelto and Monitoring," correct?

25     A.   Yes, it is.

THEODORE SPIRO - EXAMINATION

02:50  1   Q.   And you're listed as the presenter there and described as
       2   the global clinical leader, correct?
       3   A.   Yes.
       4   Q.   So if we can flip over to page 25, there's a description
       5   of the new anticoagulants, correct?
       6   A.   Yes, there is.
       7   Q.   And on the left side, you see rivaroxaban listed at the
       8   top, correct?
       9   A.   Correct.
      10   Q.   And the arrow points to the Xa circle, which rivaroxaban
      11   was one of the factor Xa inhibitors, and the other factor Xa
      12   inhibitor drugs are listed there, correct?
      13   A.   Yes, that is the case.
      14   Q.   Now, let's flip to page 26.  And there's a slide that you
      15   had in your presentation called "Monitoring."  Do you see that?
      16   A.   Yes.
      17   Q.   It says:  "How to monitor this plurality of substances."
      18        Do you see that?
      19   A.   Yes.
      20   Q.   You describe specific anti-Xa or anti-IIa methods in every
      21   lab.  And that refers to the problem that if you try to have a
      22   test for every single drug, there would be a lot of tests for a
      23   lab to have to run and to keep track of, correct?
      24   A.   Yes, that is one of the considerations.
      25   Q.   You basically describe you would have to have 20 different

THEODORE SPIRO - EXAMINATION

02:52

1    sets of specific calibrators or controls, correct?

2    A.   Some number.  Here it says 20.

3    Q.   So then you say, "The good news."  Do you see that?

4    A.   Yes.

5    Q.   It says:  "Good news.  Routine monitoring required only."

6    And you have a picture of Coumadin and a picture of heparin,

7    correct?

8    A.   Yes.

9    Q.   And then in a yellow box, you say:  "All the other

10   substances require monitoring only in special situations."

11           Correct?

12   A.   Correct.

13   Q.   You and I have discussed the fact that it was Bayer's

14   position with respect to this assay development that there were

15   special situations that would require monitoring.

16   A.   There are situations in which measurements of the plasma

17   concentration of the drug are important.

18   Q.   You and I certainly discussed that it was your position

19   that there were special situations that made monitoring of

20   Xarelto plasma concentration levels necessary, correct?

21   A.   Again, measurement because of the confusion between

22   monitoring and dose adaptation and measurement to understand

23   where a patient is at a specific point in time.

24   Q.   You did hold the opinion that it was necessary in certain

25   situations?

1640

THEODORE SPIRO - EXAMINATION

02:53

1  A.   Yes, and I hold the opinion that it is necessary in
2  certain situations.
3  Q.   So you say:  "The good news was that routine monitoring
4  was required only in Coumadin and heparin and that all the
5  other substances require monitoring only in special
6  situations."
7           And then you present the next slide.  If we can look
8  at page 27.
9           There, this slide is labeled "The bad news," correct?
10  A.   That is correct.
11  Q.   If you look with me over in the top right corner, your
12  presentation said:  "There are many special situations."
13  Correct?
14  A.   That is what is written here, yes.
15  Q.   And "many" is bolded in dark black, correct?
16  A.   Correct.
17  Q.   And we see on the left an example of very low weight,
18  correct?
19  A.   Yes.
20  Q.   The next example, elderly people, do you see that?
21  A.   Yes.
22  Q.   You agree that elderly are a special situation that could
23  require monitoring, correct?
24  A.   They may require measurement, yes.
25  Q.   We see a pregnant woman, correct?

THEODORE SPIRO - EXAMINATION

02:54   1  **A.**   Yes.

2  **Q.**   Critically ill patients, and there's a picture of someone

3  in a hospital setting, correct?

4  **A.**   Correct.

5  **Q.**   Children is listed, and there's a picture of a cute baby

6  looking at the camera, right?

7  **A.**   That is correct.

8  **Q.**   Obesity, also a special situation that you described,

9  correct?

10  **A.**   Large-body-weight patients may require measurements, yes.

11  **Q.**   What happens in large-body-weight patients that might

12  require monitoring?

13  **A.**   There may be malabsorption in some patients who have had

14  surgical interventions to attempt weight loss.  There may be

15  inadequate amounts of drug for plasma volumes in extreme body

16  weight situations.

17  **Q.**   Bleeding under anticoagulation, in the middle, under

18  "elderly people," do you see that?

19  **A.**   Yes, I do.

20  **Q.**   So that's a special situation you identified that could

21  require monitoring, correct?

22  **A.**   It could require measurement of plasma concentrations,

23  yes.

24  **Q.**   Now if we can look at page 49.  This is a slide called

25  "Prolongation of PT, multiple doses of 5, 10, 20, 30 milligrams

THEODORE SPIRO - EXAMINATION

02:56  1    twice daily for five days."  Do you see that?

2    A.    Yes, I do.

3    Q.    What you see is, for example, is that after the dose, you

4    see the graphs shoot up, indicating a peak prothrombin time

5    after dosing; and then that number comes down before the second

6    dose during a one-day period, on the left side of the graph,

7    correct?

8    A.    Yes, that is correct.

9    Q.    And what we see from here is that the higher the dose, the

10   greater change in prothrombin time during this short study

11   related to prolongation of PT, correct?

12   A.    Yes, that is correct.

13   Q.    And that's not surprising.  Higher doses usually result in

14   more prolongation of PT, correct?

15   A.    Yes, that is correct.

16   Q.    And the reason why higher doses result in a prolongation

17   of PT is because higher doses result in higher exposures of the

18   drug in plasma concentration, correct?

19   A.    Well, higher concentrations of the drug in the plasma and

20   the impact on -- resulting impact on the coagulation test.

21   Q.    Let me ask you a question about Slide 27 on the screen.

22          This is a slide where you said the bad news is there

23   are many special situations.  Does the labeling for the product

24   in the United States tell doctors that these are special

25   situations that require monitoring?

THEODORE SPIRO - EXAMINATION

02:57   1   **A.**   To the best of my recollection, the prescribing

2   information in the United States does not include measurement

3   of rivaroxaban concentrations, and assays for rivaroxaban

4   concentration measurement are not approved by the Food and Drug

5   Administration.

6   **Q.**   Would you agree that if a patient had more than one of

7   these special situations ongoing, such as an elderly person

8   with a very low weight, that could exaggerate their situation

9   with respect to their potential increased exposures in terms of

10   plasma concentration and potentially the increased concern for

11   those patients?

12   **A.**   As we become elderly and fall into the category of elderly

13   patients, we develop a variety of frailties and sensitivities

14   to all the medications that we take, and rivaroxaban is no

15   different.  And in treating an elderly patient with an

16   anticoagulant, be it warfarin, be it rivaroxaban, be it

17   heparin, the specific underlying conditions in that patient,

18   and as an elderly patient, we become what we call complex or

19   sometimes interesting.  It makes our management quite -- more

20   challenging than in the case of a healthier, younger

21   individual.

22   **Q.**   There's no recommendation in the U.S. label for monitoring

23   rivaroxaban plasma concentration levels in elderly people,

24   correct?

25   **A.**   There's no -- that I remember, there's no recommendations

**THEODORE SPIRO - EXAMINATION**

02:59   1    for measuring rivaroxaban concentrations in elderly patients.

2    We do not have an assay approved in the United States as an

3    in vitro diagnostic test for this purpose.

4    **Q.**    Now, you mentioned a couple minutes ago that there was not

5    an approved assay for measuring plasma concentration levels of

6    Xarelto in the United States.  Do you recall that?

7    **A.**    Yes.

8    **Q.**    PT Neoplastin is a widely available assay for measuring PT

9    in the United States, correct?

10    **A.**    Yes.  The Neoplastin reagent is marketed by

11    Diagnostica Stago in the United States.

12    **Q.**    You agree it's widely available?

13    **A.**    I think Innovin is still the primary agent used in the

14    American laboratories, but I think the Neoplastin reagent may

15    be the second most widely used reagent.

16    **Q.**    And that is an existing PT assay available on the market,

17    correct?

18    **A.**    Correct.

19    **Q.**    There was a lot of discussion with plaintiff's counsel

20    about use of the word "monitoring" versus "measure."  Do you

21    recall that?

22    **A.**    Yes.

23    **Q.**    What you were developing, did you consider that to be

24    measure or monitor?

25    **A.**    We realized during the course of the development that the

**THEODORE SPIRO – EXAMINATION**

03:01

1    use of the term "monitoring" engendered the association of

2    monitoring with dosage adaptation, and we understood that given

3    that our development program in Phase II and Phase III to date

4    had been a fixed-dose approach, that we needed to be clear that

5    we were not developing monitoring regimens that required dose

6    adjustment but were rather developing testing systems that

7    allowed point estimates, point measurements of drug

8    concentration in plasma.

9    **Q.**   What are the circumstances under which one might want to

10   be able to measure how much rivaroxaban is in a patient's

11   blood?

12   **A.**   Well, we saw earlier today a very interesting slide which

13   I can redirect our attention to, but basically we are looking

14   at patients in very special situations, such as the very young

15   patient, pediatric indications, patients with impaired renal

16   function or worsening renal function on treatment, patients

17   with impaired hepatic function or worsening hepatic function on

18   treatment, extremes of -- of body weight.  Emergency settings

19   such as a patient that requires a spinal tap for assessment of

20   a spinal cord infection, this patient being potentially on a

21   non-vitamin K oral anticoagulant such as rivaroxaban.  Patients

22   requiring emergency surgery also in the setting of their being

23   treated otherwise with a non-vitamin K oral antagonist such as

24   rivaroxaban.

25   **Q.**   How would you characterize these situations?

THEODORE SPIRO - EXAMINATION

03:03

1  A.    I would characterize these as special situations where we

2  need to understand more specifically what is occurring in an

3  individual patient in order to make certain types of decisions

4  as to what to do next and when to do it.

5  Q.    What is Spiro 52?  What is this paper?

6  A.    This is a review article that Professor Samama authored

7  with -- in collaboration with colleagues from Bayer Healthcare

8  and Diagnostica Stago where we did a review article on the

9  laboratory assessment of rivaroxaban.

10  Q.    As a general matter, what is addressed within this

11  article?

12  A.    We provided an overview of the assay developments that had

13  taken place during the preceding several years, probably

14  beginning as early as 2004 and 2005.

15        We provided some information of -- concerning

16  pharmacokinetic parameters associated with rivaroxaban.  We

17  provided information about clinical situations in which

18  laboratory testing for rivaroxaban might be required.

19  Q.    Did you have many different conversations over the last

20  couple of days about the use of PT as a means to measure plasma

21  concentration in patients who have taken rivaroxaban?

22  A.    Yes, we did.

23  Q.    What do you say in the first paragraph with respect to

24  whether or not prothrombin time is suitable for measuring

25  rivaroxaban?  What do you say in your published paper?

**THEODORE SPIRO – EXAMINATION**

03:05

1    **A.**    We point out that the variability in the responses with

2    the different thromboplastin reagent kits results in a

3    too-large variation in the results when they are expressed in

4    seconds for specific patient samples that are tested.

5    **Q.**    What causes that variation?

6    **A.**    It's caused by the different international sensitivity

7    index of the thromboplastin reagents which are used in the

8    reagent kits.

9    **Q.**    If you go down to the next paragraph, about halfway down,

10   there's a discussion that involves the Neoplastin reagent.  Do

11   you see that?

12   **A.**    Yes.

13   **Q.**    And you were asked a lot of questions, particularly this

14   afternoon, about the use of the Neoplastin reagent system to

15   measure PT in patients who have taken rivaroxaban.

16         Do you recall that?

17   **A.**    Yes, I do.

18   **Q.**    What do you tell readers of your published article with

19   respect to PT, even if it's Neoplastin reagent?

20   **A.**    Well, the bottom line of the concern about the assay from

21   the laboratician's perspective or the individual that is

22   actually working in the clinical laboratory is contained in the

23   last sentence:  "The assay lacks precision, particularly at low

24   rivaroxaban concentrations, and is, therefore, not suitable for

25   measuring rivaroxaban levels in blood samples taken near the

THEODORE SPIRO - EXAMINATION

03:07

1    time of Ctrough.  In addition, specific calibrators,"

2    et cetera.

3  **Q.**    Go ahead and read that.

4  **A.**    "In addition, specific calibrators for use with the

5    prothrombin time test are not commercially available."

6  **Q.**    I would like you to turn to the conclusion section of your

7    paper.

8  **A.**    Yes.

9  **Q.**    In the first couple of sentences, what do you tell doctors

10   who are reading your article with respect to whether or not

11   routine coagulation monitoring is used for rivaroxaban?

12 **A.**    We tell them that the non-vitamin K oral anticoagulants --

13   or we refer to them here as target-specific, meaning they

14   target a specific coagulation factor -- that are used -- are

15   used currently in clinical practice at fixed doses without the

16   need for routine coagulation monitoring.

17 **Q.**    Unlike the VKA, right?

18 **A.**    Unlike the vitamin K antagonist, correct.

19 **Q.**    And that would include warfarin?

20 **A.**    Yes, that would include warfarin.

21 **Q.**    Rivaroxaban ain't warfarin, is it?

22 **A.**    No, rivaroxaban is not warfarin.

23 **Q.**    Dr. Spiro, I have a couple more questions for you.

24         Counsel for Bayer asked you some questions regarding

25   the review article that you were a coauthor on with Dr. Samama,

THEODORE SPIRO - EXAMINATION

03:08

1   published in *Thrombosis Journal* in 2013, the "Laboratory
2   Assessment of Rivaroxaban:  A Review."  Do you recall that?
3   **A.**   Yes, I do recall that.
4   **Q.**   He asked you about the statement:  "The concentration of
5   target-specific oral anticoagulants may potentially need to be
6   published in certain clinical situations"?
7   **A.**   Yes.
8   **Q.**   And then it gave the examples of urgent surgery,
9   perioperative management, thromboembolic or bleeding events, or
10  in cases of suspected overdose.
11          Do you recall those questions?
12  **A.**   Yes, I do.
13  **Q.**   In your review of the labeling for Xarelto in the
14  United States, does it make any recommendation that these
15  groups of patients need to be measured, depending on their
16  clinical situation?
17  **A.**   I would need to look at the U.S. label quickly again.
18  **Q.**   I think it's 46.
19  **A.**   I do not find that it does.
20  **Q.**   Now, if I could point your direction to page 6 of 7 in
21  your conclusion section.
22  **A.**   Yes.
23  **Q.**   That says:  "To conclude, the choice of laboratory test
24  for rivaroxaban will depend on the clinical situation.  If a
25  qualitative assessment of the presence of rivaroxaban in the

THEODORE SPIRO - EXAMINATION

03:09

1  blood is needed, the PT test is suitable, provided that a
2  rivaroxaban-sensitive agent is used."
3       Did I read that correctly?
4  A.   Yes, you did.
5  Q.   And you agree with that statement, that a PT test is
6  suitable if you want to make a qualitative assessment of the
7  presence of rivaroxaban in the blood?
8  A.   Yes.
9  Q.   PT has been suitable for Bayer to use regarding their
10 PK/PD measurements in their Phase III study programs, correct?
11 A.   That was used in the Phase III study programs.
12 Q.   I want to show you what we will mark as Exhibit 53.
13      So if you'll look with me on the email on the first
14 page, Wolfgang Mueck is responding to Scott Berkowitz, his
15 email, and copies yourself, correct?
16 A.   Yes, he does.
17 Q.   This email is from May 28, 2014, and it had to do with the
18 responses that we talked about earlier related to the EMA's
19 request regarding PK/PD information and bleeding risk, correct?
20 A.   Yes.
21 Q.   You indicated that Dr. Mueck was one of the people
22 responsible for pharmacokinetics and pharmacological evaluation
23 of Xarelto, correct?
24 A.   Yes, he was involved in it.
25 Q.   He says: "Hi, Scott. First of all, let's recall what our

THEODORE SPIRO - EXAMINATION

03:11   1   strategy has been, planned and executed for all indications.

2   See respective ClinPharm CTD Parts 2.7.2, *i.e.*" -- bullet

3   point 1 -- "do a comprehensive ClinPharm program to profile

4   rivaroxaban to the best we can.  Implement PK/PD components in

5   all Phase II dose-finding trials to characterize PK/PD in the

6   target populations."

7        Correct?

8   A.   Yes, that is what he wrote.

9   Q.   Then I want you to focus on bullet point 3.

10        He says:  "Based on the established linear

11   relationship between rivaroxaban plasma concentration and

12   prothrombin PT, carry PT measured at peak and trough, in all

13   pivotal Phase III programs to use them as a PK surrogate for

14   subsequent exposure/response, mainly bleeding event analysis,

15   all conducted by Biometry/GIA."

16        Do you see that?

17   A.   Yes.

18   Q.   So the use of PT as a surrogate for exposure/response

19   analysis, mainly bleeding events, was acceptable to Bayer for

20   their Phase III trial programs for Xarelto, correct?

21   A.   It was used during the Phase III program in the Bayer

22   indication studies.

23   Q.   You recall being asked questions by counsel for Bayer

24   related to this back-and-forth between the term "monitor" and

25   "measure," do you recall that?

THEODORE SPIRO - EXAMINATION

03:13

1   **A.**   Yes.

2   **Q.**   You indicated that at some point, based on the fact that

3   there was a development plan for a drug that would be a fixed

4   dose with no dose adaptation needed, that what you were really

5   talking about when you meant monitoring was measuring

6   rivaroxaban plasma concentration levels, correct?

7   **A.**   Correct.

8   **Q.**   What is the point of measuring Xarelto plasma

9   concentration levels if you aren't going to do anything about

10   it?

11   **A.**   Measuring Xarelto plasma concentrations allows you --

12   would allow a clinician to, as we have discussed, know whether

13   a patient is taking Xarelto if it was not present.  If there

14   were concentrations present to make decisions related to

15   proceeding with an invasive procedure or not proceeding with an

16   invasive procedure.  If high levels were present in a specific

17   clinical setting, to stopping the medication until whatever

18   clinical setting that was would resolve.  There could be a

19   number of specific actions taken other than dose adaptation.

20          **THE COURT:**  Is that it?

21          **MR. BIRCHFIELD:**  Yes, Your Honor.

22             Your Honor, could we approach for just a moment?

23          **THE COURT:**  Sure.

24          (The following proceedings were held at the bench.)

25          **MR. BIRCHFIELD:**  Your Honor, at this time we are

03:15   1   prepared to rest conditioned upon moving in and getting
        2   exhibits cleared up and with the possibility of calling Nauman
        3   Shah tomorrow morning out of turn.
        4                  We have the issue of the PowerPoint in the email
        5   that the Court has already indicated it's going to rule on.  I
        6   think we have a stipulation now that we would offer and ask the
        7   Court to handle.  So at this point, Your Honor, if it's okay,
        8   I'll ask about this stipulation.
        9          **THE COURT:**  Okay.
       10          **MR. BIRCHFIELD:**  Then once you do that, I will rest
       11   with those conditions.  Is that satisfactory?
       12          **THE COURT:**  Yes.
       13                  Then you all are going to start?
       14          **MS. PRUITT:**  Yes.
       15          **THE COURT:**  What I will do, I will assume that the
       16   proper motions have been made at this particular time, when the
       17   plaintiff rests.  We will do that later on so that I don't have
       18   to interrupt and send the jury back and forth.  I will assume
       19   that motions have been made appropriately, timely, and I will
       20   let you explain what the motions are at end of the day when the
       21   jury leaves.
       22          **MR. BONEY:**  Yes, sir.  Yes, sir.  Thank you,
       23   Your Honor.  We would make a motion.  I guess because the
       24   plaintiffs are resting subject to recalling Mr. Shah, that if
       25   they do, then we could relate the motion back to the close of

03:16   1  their case?

2          THE COURT:  Sure.

3          MR. BONEY:  Thank you, Your Honor.

4          MR. BIRCHFIELD:  Your Honor, perhaps at the close of

5  the day, if we could have just a couple minutes with the Court

6  to discuss the logistics of tomorrow?

7          THE COURT:  We will do that.

8          MR. BONEY:  Your Honor, I'm sorry.  Just to be clear,

9  we also file written motions when we file our motion for a

10  judgment as a matter of law.  If we could have leave to file

11  tomorrow after they call Mr. Shah?

12          THE COURT:  Sure.

13          MR. MEUNIER:  We will respond at that time as well,

14  Judge.

15          THE COURT:  Sure.  File them.  If you need time to

16  file them, I will do that, give you time to file them.

17          MR. BONEY:  Yes, Your Honor.

18          MR. MEUNIER:  Your Honor, when you speak to the jury

19  about the admission of those Seifert exhibits, we have agreed

20  that you would read subparts 1 and 2 -- that's the actual

21  language that you say the parties have stipulated to -- without

22  needing to read the preamble, which is just legalese.

23          THE COURT:  That's fine.

24          (End of bench conference.)

25          MR. BIRCHFIELD:  Your Honor, at this time plaintiffs

03:17   1   would offer Exhibits 13 and 14 that were previously addressed

2   with Angela Seifert on the stand.

3        **THE COURT:**  Let me mention something, members of the

4   jury.  A witness was called at 2:30 on Tuesday, and her name

5   was Angela Seifert.  She is a senior sales representative for

6   an area which included Dr. Jordon's office.  It had to do with

7   an email and also an attachment to the email which was termed a

8   PowerPoint.

9        I was concerned as to whether or not it was

10   admissible under what I saw at that particular time, and I

11   reserved ruling on it, depending upon whether or not that issue

12   of her receipt of it was cleared up.  Well, it has been cleared

13   up now, and the parties agree by and between themselves that

14   Angela Seifert did, in fact, receive on her office computer the

15   email dated May 14, 2012, from Paul Ruis, with a PowerPoint

16   attachment.

17        On January 9, 2014, Ms. Seifert sent through her

18   office computer an email with a PowerPoint to Lori Matthews.

19   Ms. Matthews is contract personnel from the defendant.

20        So the PowerPoint presents, as I recall, a

21   presentation from a Dr. C. Bilazarian, B-I-L-A-Z-A-R-I-A-N.  He

22   is a key opinion leader for the defendants' drug Xarelto.

23        The material, as I say, was forwarded to her in

24   an email, and it was placed in her archives.  Either the

25   metadata or the stipulation does indicate that she received it,

03:20  1    as I said, and distributed it.

2                As I mentioned, this was done in the usual

3    course of business.  Therefore, I find that the email and the

4    PowerPoint are relevant to issues presented in this case, and

5    they are admissible under a rule which we know as a business

6    record rule.  So I will admit the email, and I will admit the

7    PowerPoint attached thereto.

8                **MR. BIRCHFIELD:**  Thank you, Your Honor.

9                At this time, subject to moving and clearing up

10   exhibit issues and subject to the possibility of calling a

11   corporate witness out of turn, the plaintiff rests.

12               **THE COURT:**  Okay.  As I mentioned to you at the

13   outset, members of the jury, the way the trial proceeds, the

14   plaintiff produces witnesses.  They have the burden of proving

15   their case.  At this point they rest.  The defendant may call

16   witnesses on their portion of the case.

17               So we will proceed now to the defendants'

18   portion of the case.

19               **MS. PRUITT:**  Your Honor, I hope this is the last

20   videotape.  The defendants now present the videotape deposition

21   of Dr. Stephen Keith, taken on August 11, 2016.

22               Dr. Keith is the board-certified

23   gastroenterologist.  He treated Ms. Mingo on February 13,

24   February 14, 2015.  The deposition begins with questioning from

25   an attorney for the defendants, followed by questioning from an

STEPHEN KEITH - EXAMINATION

03:21   1    attorney for Ms. Mingo.

2                              **STEPHEN KEITH,**

3    having been duly sworn, testified by deposition as follows:

4                              **EXAMINATION**

5    **Q.**   Good morning, Dr. Keith.  My name, as I mentioned a few

6    minutes ago, is Kim Moore.  I am here today to take your

7    deposition in the Dora Mingo matter.  So we are really here

8    focusing on your role as a treater for Ms. Mingo.

9    **A.**   Okay.

10   **Q.**   Have you ever prescribed Xarelto?

11   **A.**   I have not personally, no.  I have managed it with respect

12   to procedures, you know, stopped it, but it's usually in

13   consultation with a cardiologist or another involved physician.

14   **Q.**   That's not part of what you do --

15   **A.**   No.

16   **Q.**   -- as a gastroenterologist?

17   **A.**   No, I do not prescribe directly.  No.

18   **Q.**   You are not a prescriber of Xarelto?

19   **A.**   No.

20   **Q.**   Have you ever had a chance to look at the package insert

21   documentation on Xarelto?

22   **A.**   I don't think so.

23   **Q.**   So it makes sense you have not prescribed Xarelto, so,

24   therefore, you wouldn't necessarily be familiar with the

25   prescribing information on it because you have never had to

STEPHEN KEITH - EXAMINATION

03:22

1  prescribe it?

2  **A.**  Yes.  Intimately familiar with the prescribing details,

3  no; but familiar with the other issues of management and

4  creatinine clearance and risk or lack thereof with respect to

5  how it affects what I do with a patient, really.

6  **Q.**  As you said earlier, you have not had an opportunity to

7  come into contact with any of the detail representatives from

8  Janssen or Bayer?

9  **A.**  No.

10  **Q.**  If you would take us through your medical training and

11  experience.

12  **A.**  I went to medical school in Alberta.  I graduated in 1997,

13  in Edmonton, the University of Alberta.  And I did internal

14  medicine there for three years.  So I graduated from medical

15  school in 1997, in Edmonton.  I did internal medicine at the

16  same institution, set of hospitals.  Finished in 2000 and then

17  went to Ochsner Clinic Foundation -- I guess it's now Ochsner

18  Health Systems -- for three years for a GI fellowship, and

19  finished in 2003.

20  **Q.**  We've got on the record that you are licensed in Hawaii,

21  Mississippi, Colorado, and now --

22  **A.**  Georgia as well.

23  **Q.**  You're currently practicing here in McComb?

24  **A.**  Yes.

25  **Q.**  You left Ochsner.  Tell me through --

STEPHEN KEITH - EXAMINATION

03:24   1   A.   I went to Lake Charles for almost five years.

2   Q.   Okay.

3   A.   Then I was in Hawaii for almost four years.  And then --

4   Q.   That's tough.

5   A.   And then I'm here for 4 1/2 years.

6   Q.   Your current practice is GI, of course.

7   A.   Yes.

8   Q.   You have been here for how long?

9   A.   Since the end of January of 2012, so fifth year.

10   Q.   I looked at your CV and see you're a member of the

11   American College of Gastroenterology, American Gastrological

12   Association and American Society of Gastrointestinal Endoscopy.

13   A.   Yes.

14   Q.   Would it be fair to say, in making your treatment

15   decisions for a patient, you weigh the risks and the benefits

16   of medicine for the individual patient?  You weigh the risks?

17   A.   That would be fair to say.

18   Q.   As a gastroenterologist you have different medications

19   that can have great benefits for a patient, but there are some

20   that may also have risk.  That's just what you do day in and

21   day out?

22   A.   Everything has risk; everything has benefit.  It's kind of

23   a risk/benefit ratio that you weigh --

24   Q.   There are no guarantees?

25   A.   That's right.  Yes.  Exactly.

STEPHEN KEITH - EXAMINATION

03:25  1    **Q.**   Despite the best efforts of someone like yourself --

2    **A.**   Correct.

3    **Q.**   -- in a patient, sometimes there can be unfortunate

4    outcomes?

5    **A.**   Correct.  Yes.  You look at the frequency of that risk to

6    decide, you know, is it worth putting that patient on that, or

7    do they have other factors that increase their risk.

8          But some cases I recommend against things because the

9    risk is too great, actually.  That's not just with medications,

10   but procedures as well, though.

11   **Q.**   It's fair to say it varies from patient to patient, as it

12   should.

13   **A.**   Correct.

14   **Q.**   You can't make one decision about all your patients.

15   **A.**   Right.  Well, yes.  And there are certain patients, they

16   want something done, but I won't do it if the risk is too great

17   anyway.  It's not just their decision; it's mine.  If something

18   is too great, I won't do it.

19   **Q.**   You understand that every prescription medication

20   available in the U.S. has been approved by the FDA, correct?

21   **A.**   Yes.

22   **Q.**   And that the FDA actually takes the time to approve each

23   and every word and phrase in its prescription -- in its

24   accompanying labeling information?

25   **A.**   Right.

**STEPHEN KEITH - EXAMINATION**

03:26

1   **Q.**   You're not an expert in regulatory matters, right?

2   **A.**   No.

3   **Q.**   You're here today as the treater of Ms. Mingo?

4   **A.**   Yes.

5   **Q.**   You are not an expert in clinical trials?

6   **A.**   I'm not.

7   **Q.**   Or in PK/PD data, analyzing PK/PD data?

8   **A.**   No.

9   **Q.**   You are aware Xarelto is an anticoagulant, correct?

10  **A.**   Correct.

11  **Q.**   You know the purpose of anticoagulants is, of course, to

12  prevent the formation of blood clots?

13  **A.**   Correct.

14  **Q.**   Obviously blood clots can be serious and life-threatening?

15  **A.**   Uh-huh.  Or not.

16  **Q.**   Or not.  Very good.

17  **A.**   More often not.

18  **Q.**   Some blood clots, though, can cause VTE?

19  **A.**   Significant, yes, exactly.

20  **Q.**   Things like VT --

21  **A.**   They tend to be managed with fairly low risk generally,

22  though --

23  **Q.**   Okay.

24  **A.**   -- for the most part.  When they are picked up, you know,

25  usually they have fairly favorable outcomes with treatment

STEPHEN KEITH - EXAMINATION

03:27  1   then.

2   Q.   When you prevent the formation of a blood clot, there is

3   also a risk of bleeding?

4   A.   Absolutely.

5   Q.   Sometimes that risk of bleeding can be serious and fatal,

6   correct?

7   A.   Uh-huh.

8   Q.   But also can carry the risk of a GI bleed?

9   A.   Yes.

10   Q.   You have known that since med school?

11   A.   Right.

12   Q.   That's nothing new?

13   A.   No, no, that's not unusual.  That's --

14   Q.   Right.

15   A.   -- not unexpected knowledge.

16   Q.   What about warfarin?  Are you familiar with warfarin?

17   A.   Oh, yeah.  It's -- well, it's the agent that's been around

18   the longest and predated all these newer agents.

19   Q.   Have you ever prescribed it?

20   A.   Yeah.  As a medicine resident, I prescribed it actually

21   then.  Not so much since, like, being a GI fellow, but as --

22   when I was an internal medicine resident, I prescribed it then

23   quite often, actually.

24   Q.   Have you ever treated a patient who had a bleed while on

25   Coumadin?

STEPHEN KEITH - EXAMINATION

03:28  1  A.   Yeah, lots.

2  Q.   What does that mean, "Yeah, lots"?

3  A.   As far as a number, that would be a guess.

4  Q.   It's just something that's --

5  A.   It's a regular occurrence.

6  Q.   Is it your experience that you have seen patients with too

7  low of an INR can still have a clot?

8  A.   I have seen it happen where they are subtherapeutic and --

9  Q.   Yes.

10  A.   -- they do develop a clot, yes.

11  Q.   And too high, obviously, you can have a bleed?

12  A.   Correct.

13  Q.   There's a narrow therapeutic range with warfarin --

14  A.   Right.

15  Q.   -- that's it's difficult to keep that patient in, correct?

16  A.   Some patients, yes; some patients, no.  Some people, it's

17  really hard to get them there and keep them there.

18  Q.   Patients on warfarin often have to be monitored to make --

19  A.   They do have to be monitored, yes, and they don't always

20  do that either.  Often they don't.  Initially they do, usually,

21  but as time goes by, sometimes they don't follow up for their

22  INR to be checked.

23  Q.   As you mentioned, compliance can just be an issue?

24  A.   Uh-huh.

25  Q.   Even patients who are carefully monitored can have a

STEPHEN KEITH - EXAMINATION

03:29  1  bleeding event, correct?

2  **A.**  Yes.

3  **Q.**  Have you had experience treating patients who had a GI

4  bleed while taking warfarin?

5  **A.**  Yes.

6  **Q.**  What's your estimate of the number of those types of

7  patients?

8  **A.**  Oh, that would he -- that's a big number.  That's just a

9  shot in the dark.  I really don't know.  I mean, more than a

10  hundred easily.

11  **Q.**  Have some of those patients had severe major bleeds?

12  **A.**  Yes.

13  **Q.**  How do you treat a patient with a GI bleed who is taking

14  warfarin?

15  **A.**  Well, number one is to assess the patient and stabilize

16  them hemodynamically before doing anything.

17        And then ideally, you know, endoscopy should be as

18  early as possible.  But you may need consultation with others

19  if there's cardiac issues.  If they have had an acute MI, then

20  the timing is really determined with other consultants.

21        But ideally you want to have an endoscopy within

22  24 hours if it's appropriate.

23        Then the other issue is reversal of

24  anticoagulation --

25  **Q.**  Uh-huh.

STEPHEN KEITH - EXAMINATION

03:30

1  A.    -- depending on what the INR is.  If the INR is

2  1 1/2 to -- 1.5 to 2.5, then usually you can proceed with

3  endoscopy.  That's kind of the range that you want.

4        If somebody is, you know -- it's a really aggressive,

5  life-threatening bleed, you may deviate above that and proceed

6  with endoscopy before reversing that INR.  But ideally you are

7  trying to get it down even while you are doing that, in

8  addition to giving blood products.  And reversal can be

9  generally with fresh frozen plasma or vitamin K, as well, in

10 some cases, actually.

11 Q.    Have you ever had a patient on warfarin who has a bleed

12 where you just simply discontinue the warfarin?

13 A.    Yes.  Yep.  Yeah, when it's not a high-risk bleed, you

14 just stop it, and it comes down on its own.

15 Q.    With respect to Xarelto, it's obviously a NOAC.  Are you

16 aware of that?

17 A.    Yeah.  It's in that, yeah.

18 Q.    Yeah, we covered that.  And you are aware that bleeding is

19 a risk for Xarelto?

20 A.    Sure.

21 Q.    And that along with that bleeding risk is the risk of a

22 serious or a fatal bleed?

23 A.    (Nods head.)

24 Q.    Obviously risk for a GI bleed?

25 A.    Right.

STEPHEN KEITH - EXAMINATION

03:31

1    **Q.**   Are you aware that Xarelto does not require routine

2    monitoring?

3    **A.**   Yes.  That's one of the advantages, obviously, is because

4    you don't have to routinely monitor, so that offsets the cost

5    somewhat and the convenience.

6    **Q.**   The article that you gave us, which is very helpful, by

7    the way, which we talked about as Exhibit 3, I wanted just to

8    point out to you --

9    **A.**   Sure.

10   **Q.**   -- it looks like it's on page 8.

11   **A.**   Uh-huh.

12   **Q.**   And if you go down under the first full sentence, if

13   you'll read that for us, please.

14   **A.**   "The effect of the anti-Xa anticoagulants is best assessed

15   by measuring anti-Xa levels with drug-specific calibrators.

16   Prothrombin time and activated partial thromboplastin time are

17   crude measures of drug effect and are insensitive tests, only

18   after minimally prolonged or even normal, in spite of

19   therapeutic drug levels.  However, normal tests rule out high

20   circulating drug levels.  There is no reliable serum assay to

21   assess the degree of anticoagulant activity with these agents

22   at this time.  Caution should be used in interpretation of

23   activated partial thromboplastin time in situations of drug

24   toxicity because the assay is subject to a ceiling effect and

25   does not reliably capture the severity of the anticoagulant

1667

STEPHEN KEITH - EXAMINATION

03:33  1    effect."

2    **Q.**   So you are not aware of any peer-reviewed literature

3    connecting PT exposure with clinically significant outcomes of

4    bleeding with Xarelto?

5    **A.**   No.  No.

6    **Q.**   So as a doctor, something like the PT is important with

7    warfarin, but it's not something --

8    **A.**   It doesn't mean much with this, no.

9    **Q.**   "With this" meaning Xarelto?

10   **A.**   Xarelto, correct.

11   **Q.**   Okay.  Thank you.

12   **A.**   You don't have the equivalent of a PT/INR with the other

13   agents that -- or with something that's easily accessible to

14   monitor.

15   **Q.**   "With the other agents" meaning?

16   **A.**   Yeah, the other NOACs, essentially.

17   **Q.**   Like Xarelto?

18   **A.**   Xarelto, Pradaxa, and Eliquis.

19   **Q.**   All right.  Let's see.

20          An let me just -- that, again, we have seen with the

21   FDA.  You are aware the FDA has even acknowledged that these

22   drugs don't require blood monitoring?

23   **A.**   Yes.

24   **Q.**   Let's turn to Ms. Mingo.  My records indicate that you

25   first saw her in February of 2015.  It looks like February 10,

STEPHEN KEITH - EXAMINATION

03:34

1    2015.  Either you or your nurse practitioner saw her.  Let's
2    look at that for a moment.
3    A.    She saw my nurse practitioner.
4    Q.    What were her symptoms, please?
5    A.    I think that the main referral was really because of the
6    fact that she had what's hemoccult positive.
7    Q.    Would you explain that for the ladies and gentlemen of the
8    jury, please.
9    A.    It's a stool test that detects blood -- occult blood,
10   where it's not grossly visible.  So it's, you know, an
11   indication of blood loss in the gut.  It's occult as opposed to
12   overt -- as opposed to overt.  So you don't -- like I say, you
13   don't see it, but it's there at the microscopic level.  And she
14   was anemic as well at that presentation.
15   Q.    Let me ask you about the diagnosis of anemic.  What does
16   that mean?
17   A.    Anemia just refers to a decrease in the hemoglobin or
18   hematocrit, you know, below what's considered the normal range.
19   Q.    What is the normal range, please?
20   A.    Depending on the age, but, you know, typically we look
21   around 11 to 15, you know.  And that varies with age somewhat.
22   But that's kind of the range level we look at.  Older people,
23   the range is a little bit lower.  Like a woman this age,
24   probably we would say around 12.4 or 12.5 would be more her
25   upper limit of normal, actually.

1669

**STEPHEN KEITH - EXAMINATION**

03:35  1  **Q.**   What causes anemia?

2  **A.**   Fairly simple, I guess.  Three things from the GI bleeding

3  perspective is blood loss, lack of production, or something

4  called sequestration, actually.

5  **Q.**   Lack of production?

6  **A.**   Or sequestration.

7  **Q.**   What is that?

8  **A.**   That's basically where the red cells accumulate in the

9  spleen, actually.  It's sequestered in the spleen.

10          There's one other category you can consider which may

11  not be included.  That would be hemolysis, which is breakdown

12  of blood cells in the body as well.

13  **Q.**   What causes one to not produce red blood cells; the number

14  two category, lack of production?

15  **A.**   If you have a primary bone marrow problem, you know, like

16  aplastic anemia, multiple myeloma, any of those sorts of

17  disorders, actually, you can have lack of iron where you don't

18  make enough red cells.

19          You can have lack of folates or B12 or other factors

20  that are important in production.

21          So you can have a primary marrow problem.  You can

22  have some other diseases, actually, like lead poisoning and

23  liver disease, thyroid disease, where we think production is

24  impaired as well.

25          Those are the main factors, really.

STEPHEN KEITH - EXAMINATION

03:36

1  Q.   Any other symptoms she had that were significant?

2  A.   She indicated that she has some decreased exercise

3  tolerance and getting short of breath when she exerts herself,

4  but -- associated with the anemia.

5  Q.   And so I see it references "chronic anemia is

6  uncontrolled"?

7  A.   Uncontrolled.  Anemia status uncontrolled.

8  Q.   What is the --

9  A.   That's one of these computer programs that you click on

10 and that --

11 Q.   Okay.

12 A.   -- you know, the implication there is somewhat unclear

13 with some of these things sometimes.

14 Q.   Okay.

15 A.   Uncontrolled.  I guess, you know, in my mind we just

16 haven't evaluated what the cause is yet, so we don't know what

17 we are dealing with exactly.  So --

18 Q.   Okay.

19 A.   -- whereas, you know, if someone has had an unidentifiable

20 cause and it's been treated, I guess that's what I would

21 consider controlled, really.  It's -- I think it's a bad term

22 and somewhat misleading, perhaps, I guess.

23 Q.   All right.  Let's look at her past --

24 A.   It's not something how I would -- you know, when we used

25 to dictate notes, it's not something I would put into a

STEPHEN KEITH - EXAMINATION

03:38   1   dictated note, really.  It's -- we are mandated by government

2   now to have these EMRs, and they are designed by nonphysicians

3   in some cases, so they are not really the best descriptors

4   often, or they don't convey the same level of detail as you can

5   when you dictate a note sometimes.

6   Q.   Would you take us through the past medical history,

7   please.

8   A.   Okay.  So history of diabetes -- Type II diabetes,

9   hypertension, arthritis, anemia.

10   Q.   Okay.  And -- so she had had anemia for some time?

11   A.   I'm not certain from this how long, but --

12   Q.   But it is a history --

13   A.   Correct.  It's an historical issue for her, yes.  She was

14   on iron, yes.

15   Q.   That was -- she had been on iron for some time.  What

16   other medications was she on?  Aspirin?  Xarelto?

17   A.   Xarelto, Lortab, Xanax, potassium supplement, Lasix, a

18   vitamin D, metformin, Lovastatin, Klor-Con.  We got Lasix twice

19   in there.

20   Q.   Okay.

21   A.   Azor, aspirin, alprazolam, which is also Xanax.

22   Q.   And the aspirin and the Xarelto also had this known

23   risk -- a known potential risk, the risk of bleeding?

24   A.   Yes.

25   Q.   Specifically the risk of GI bleeding, correct?

STEPHEN KEITH - EXAMINATION

03:39  1  **A.**    Sure.  The other -- the aspirin is more injurious to the
       2  stomach, though, really.
       3  **Q.**    Why?
       4  **A.**    Because of the mechanism of the action of the drug.  It
       5  can cause ulceration directly.  The other drugs don't do that.
       6  **Q.**    So you have seen that quite often in your practice?
       7  **A.**    Yes.
       8  **Q.**    But aspirin is a medication that is commonly taken?
       9  **A.**    It's very common, yes.
      10  **Q.**    All right.  Let's move to your impressions, then.  It
      11  looks like anemia?
      12  **A.**    Uh-huh.
      13  **Q.**    Nonspecific, abnormal findings in the stool?
      14  **A.**    That's referring to the occult positive.
      15  **Q.**    Thank you.  And then it looks like you are recommending
      16  the colonoscopy and EGD --
      17  **A.**    Correct.
      18  **Q.**    -- as well as the anemia follow-up?
      19  **A.**    Yes.
      20  **Q.**    And you recommended -- or your office recommended a high
      21  fiber diet, weight loss, and smoking cessation.
      22          She was smoking at that time?
      23  **A.**    I believe so.  Current smoker, yes, according to that
      24  note, at that time.
      25  **Q.**    Let's talk about underlying conditions or diseases that

1673

**STEPHEN KEITH - EXAMINATION**

03:40

1  can lead one to have an increased risk of a GI bleed.

2  **A.**   Age does.  Aspirin does.  Age over 65, aspirin.  If they

3  have renal disease, which often could be the case with

4  diabetes, then there's a higher risk of bleeding.

5  **Q.**   Okay.

6  **A.**   Obviously, if they are anticoagulated, which she is, then

7  that's what poses a high risk of bleeding.  If they have had

8  previous GI bleeding, if they have had ulcer disease, if they

9  are on corticosteroids, if they are on other nonsteroidals

10  outside of, you know, the aspirin family.

11       Those are all risk factors for GI bleeding, really.

12  **Q.**   Peptic ulcer?

13  **A.**   Yes, if she had ulcer disease -- had peptic ulcer disease

14  in the past, then that's relevant.  That's an increased risk in

15  the future.

16  **Q.**   And smoking?

17  **A.**   Smoking --

18  **Q.**   Well, smoking, I guess, is the risk for peptic ulcer

19  disease.  Smoking causes peptic ulcer disease?

20  **A.**   It's higher -- can be a contributory factor, yes.

21  **Q.**   What are the things that can cause peptic ulcer disease?

22  **A.**   The aspirin can, or any of the nonsteroidals.

23  **Q.**   Got it.  What were the other factors?

24  **A.**   Might increase the risk a little bit, but just smoking by

25  itself won't cause ulcer disease, no.

STEPHEN KEITH - EXAMINATION

03:41

1  Q.   If a patient is on aspirin, are they more likely to have a
2  GI bleed?
3  A.   Yes.
4  Q.   And if a patient is on aspirin?
5  A.   If it's a 325, that's greater than if it's 81.  But even
6  if someone has an ulcer now and we treat it, we don't stop the
7  aspirin, because it will heal even, still, with low-dose
8  aspirin, actually.
9  Q.   So, again --
10 A.   We used to stop it, but now we have found it makes no
11 difference, actually.
12 Q.   Because the ulcer heals?
13 A.   The ulcer heals anyway when you treat it medically, yes.
14 Q.   The benefit of using the aspirin outweighs that potential
15 risk of a bleed, which can heal?
16 A.   Presumably, you know -- presumably they are on it for a
17 good reason to begin with, and that risk still exists, right?
18 So I would think so.  Whatever else they had has not gone away.
19 So, yes.
20 Q.   And would that be true also with an anticoagulant like
21 Xarelto, that the ulcer still can heal?
22 A.   Yes.  It doesn't impair ulcer healing, no.
23 Q.   Is it your usual practice, when a patient has been on an
24 anticoagulant like Xarelto, has a bleed from an ulcer in the
25 stomach that heals, is it your usual practice to have -- to

STEPHEN KEITH - EXAMINATION

03:42   1   recommend resumption of the anticoagulant?

2   **A.**   Yeah, unless there's direction, you know, that the patient

3   won't do it or doesn't want it, or there's direction from

4   somebody else, like the cardiologist or otherwise, who don't

5   feel they need it otherwise.  But if they do, then, yeah, it

6   would be typical practice to restart it.

7   **Q.**   What would be the risk/benefit analysis in your mind for

8   recommending that they go back to the anticoagulant like

9   Xarelto?

10   **A.**   Risk/benefit.

11   **Q.**   That the ulcer can heal?

12   **A.**   Yeah.  You know, it's only within a few days, actually,

13   that that risk is really minimized.  So, you know, the risk of

14   not getting back on it exposes them to the risk of the

15   condition you were trying to prevent, really, in the short

16   term.

17          The way I look at it is I can control bleeding.  If

18   they have a catastrophic stroke, then that's something you

19   can't fix.  Most bleeding you can stop, you can fix, you know.

20          And sometimes it's even an argument with the

21   cardiologist.  They are saying, Stop it, and we are saying, No,

22   don't.  Because we know the risk is fairly low, once that event

23   is resolved, really.

24          Once you have done something therapeutic and they are

25   on medication, then our society really says, you know, the

1676

**STEPHEN KEITH - EXAMINATION**

03:44   1   liability exists if you don't start it sooner than later,

2   really.

3        If a patient has evidence for ongoing bleeding or

4   they have still got blood in the stool, the blood count is

5   dropping, or they're hypotensive or tachycardiac, then you kind

6   of rethink whether you are going to put them back on something.

7   But that's clinical judgment, and that's risk being greater

8   than benefit, potentially.

9        But if things seem to be resolving and they are

10  stable hemodynamically and they're not -- there's no evidence

11  of bleeding, and it fits in that time frame, then, yeah, it

12  makes sense to restart it, really.

13  **Q.**  Thank you.

14       It looks like on the next visit you actually see

15  Ms. Mingo, and it's when you are -- she is in the hospital.

16  **A.**  Okay.

17  **Q.**  Yes, sir.  It looks like February 13, 2015.  Do you have

18  that record?

19  **A.**  I have the endoscopy report, actually.

20  **Q.**  Let's go to that.  The document that we referenced a

21  minute ago, 2/10/15, I will mark as Exhibit 7.

22       And this document that we just handed Dr. Keith will

23  be Exhibit 8.

24       So, Doctor, take us through this EGD procedure,

25  beginning with what was the, I guess, the prognosis pre-op?

1677

STEPHEN KEITH - EXAMINATION

03:45

1   A.   The prognosis.  Well, generally, in a situation like this

2   it's fairly good, actually.  If it's -- you know, black stool

3   usually indicates an upper GI bleed most often.  She is anemic,

4   and so it's fairly acute presentation, because just prior to

5   that, within the last few days, she only had positive blood in

6   the stool, which is not an emergent endoscopy.  Something like

7   this usually would be -- require endoscopy within 24 hours of

8   presentation.

9   Q.   Okay.

10  A.   But, you know, not terribly high risk, though.

11  Q.   I'm going to hand you what I will mark as Exhibit 9.

12  A.   Right.

13  Q.   This is a procedural report from -- looks like Nurse

14  Ashley Anderson, on the same day, February 13, 2015.  If you go

15  to the top, under "Patient" and then "ASA PS Code 3."

16  A.   ASA Code 3.  Okay.

17  Q.   "Emergent"?  Is this --

18  A.   Yes.

19  Q.   I was just trying to understand, what does that mean?

20  It's not an emergency situation.

21  A.   No, it's not urgent or emergent.  ASA code is just

22  basically the acuity of the patient.  And that takes into

23  consideration not only their acute presentation of symptoms at

24  the time, but also their preexisting health issues relevant to

25  that.  That's an anesthesia classification, actually.

1678

STEPHEN KEITH - EXAMINATION

03:47

1   Q.   And then the -- on here, also, under the pre-op diagnosis

2   is GI bleed.  It says "pre-op GI bleed"?

3   A.   I'm sorry.  How far down are you?

4        Oh, you are up here.  Yeah, I'm sorry.  Yep.

5   Q.   And then over to the right, "post-op oozing ulcer of

6   fundus, clip x3.  APC."

7   A.   Correct.

8   Q.   That's the argon plasma coagulation?

9   A.   Yes, it is.

10  Q.   You're in there.  And why don't you tell us about that.

11  What's the goal here?

12  A.   Well, number one, you're looking to find out site of

13  bleeding, what's causing the bleeding, severity of bleeding,

14  and then to decide management once those things are done.

15  Q.   Now, would you describe for the ladies and gentlemen of

16  the jury, how is this happening?  What type of tool are you

17  using?  Many people may have gone through this, but if you

18  could just explain to them.

19  A.   Using an endoscope to intubate the esophagus through the

20  mouth and then go down through the esophagus into the stomach.

21  Q.   You are able to visually see?

22  A.   Yeah, we have a big monitor, like not quite that big, but

23  along these lines.

24  Q.   So you are going down through the esophagus --

25  A.   Uh-huh.

STEPHEN KEITH - EXAMINATION

03:48  1  **Q.**    -- and actually into --

2  **A.**    Yeah, orally, esophagus, stomach, and then as far as the

3  top of the small intestine as well.

4  **Q.**    In Ms. Mingo's case, what did you see?

5  **A.**    So the esophagus was essentially normal.  There was no

6  evidence of bleeding in the esophagus.  She did have a small

7  hernia, which was really clinically insignificant in this

8  situation.  So the top of the stomach --

9  **Q.**    Is that the fundus?

10  **A.**    Yeah, cardia and fundus, and then the volume were

11  inspected.  And there was an ulcer seen in the fundus,

12  actually, which is high up in the stomach.  And there was some

13  oozing, which is, you know, some bleeding occurring from that

14  ulcer, but not aggressively, not like an active, arterial

15  stream.  This was just an oozing ulcer.

16  **Q.**    What did you do?

17  **A.**    Therapeutically initially, ablation with APC means to burn

18  that vessel with an argon gas, therapeutic heat essentially.

19              And then two modalities tend to be better than one in

20  a situation where there's bleeding.  So then I put clips on

21  after that, actually.  Or clip, I guess, in this case.  Just

22  one clip.

23  **Q.**    Was it hemorrhaging?

24  **A.**    Oozing.  So that implies that there's bleeding that is

25  occurring but not, you know, aggressive bleeding.  I mean, if

STEPHEN KEITH - EXAMINATION

03:49   1   somebody has like a -- like the highest risk is a visible

2   vessel.  And if that's the case, then if someone presents with

3   a bleed like that, they can be vomiting blood, like fresh

4   blood.

5          Or it could be so much that fresh red blood actually

6   makes it all the way through the gut rapidly and they have red

7   blood, bright red blood, through the rectum, actually, which is

8   a very aggressive and kind of a scary situation when that

9   happens.

10          So the highest risk is like a visible vessel artery

11   in the ulcer -- I'm sorry.  The highest risk is active

12   bleeding, like an arterial spurt, then a visible vessel, then

13   an adherent clot.  And then black-based ulcer, then clean-based

14   ulcer, as far as risk from highest to lowest of rebleeding.

15   Q.   And what do we have here?

16   A.   This is bleeding, but I wouldn't say it's high risk like

17   an active spurt, though.  This is much lower risk than that.

18          So it's oozing, but it's not -- like I say, I mean,

19   sometimes you've got arterial, like where you see a stream of

20   blood.  You know, this is not that.  This is a much slower

21   bleed.

22   Q.   So you treated with the argon plasma coagulation.  I was

23   interested in that and I looked it up.  That's a noncontact

24   thermal?

25   A.   Yes, it's a few millimeters above the vessel, or above the

STEPHEN KEITH - EXAMINATION

03:51   1   ulcer.

2   Q.   So just explain for the ladies and gentlemen of the jury

3   how you are able to fix those --

4   A.   Yeah.  It's a catheter that goes through the endoscope and

5   it's hooked up to argon gas.  Then the heat associated with

6   that, the heat source provided serves to ablate or burn that

7   tissue, actually.  And in doing so, we'll coagulate bleeding or

8   a vessel.  We use it for other things that require ablation as

9   well in the gut, whether it be tissue, or more often than not,

10   lesions that bleed or tend to rebleed.

11   Q.   Thank you.

12        It looks like you also treated her with some

13   transfusions?

14   A.   She was transfused also, yes.

15   Q.   And do you have information there on -- my records, the

16   transfusion records indicate four units of packed red blood

17   cells and two units of fresh frozen plasma.

18   A.   Right.

19   Q.   But just going back to the procedure itself, based on your

20   records, there were no complications?

21   A.   Yes.  No complications.

22   Q.   She did well during that EGD?

23   A.   Oh, yeah.

24   Q.   How many EGDs do you perform a week?

25   A.   A week?  Maybe 40.

STEPHEN KEITH - EXAMINATION

03:52

1   Q.   And then -- do you think the -- did the Xarelto cause the

2   peptic ulcer?

3   A.   No.

4   Q.   What caused the peptic ulcer with Ms. Mingo?

5   A.   Probably the aspirin.

6   Q.   So as you sit here today, you think it would have been

7   most likely caused by her smoking?  I'm sorry, her aspirin use?

8   A.   Yeah, the aspirin would be the major player there really.

9   Q.   Okay.  Let's go to the next time you see her.  And she is

10  still in the hospital.  It looks like it's February 14?

11  A.   Uh-huh.

12  Q.   On this particular visit, it looks like you have an

13  opportunity to speak -- you're talking to the family?

14  A.   Right.

15  Q.   Can you tell us about that communication or the

16  discussion?

17  A.   I can tell you what's in the note.  I can't really tell

18  you specifically about what the discussion was.

19  Q.   That's fine.  Because I could not -- I had a hard time

20  reading it.

21  A.   Yeah, just -- it looks well, stable.  Stool is dark, vital

22  signs stable.  Basically a benign abdominal exam.

23       Her hemoglobin is more or less appropriate.  It had

24  appropriately come up to 9.8, because I think it was 6.4 before

25  that, so that's close to a 4-gram rise.  So that suggests that

1683

STEPHEN KEITH - EXAMINATION

03:53

1   she's not really having any further, ongoing blood loss.  Her

2   PT/INR is reduced, actually, which -- as a crude indicator.

3   Q.   She is not having any further --

4   A.   Bleeding.

5   Q.   Okay.  That's what I wanted to make sure.

6        And she was stable and doing well?

7   A.   Correct.  You know, after -- well, no -- no obvious

8   evidence for ongoing bleeding.  The stools can actually be

9   black or dark for several days after it's resolved because it

10  still passes through the gut.

11       But anyway, so we resumed her -- her diet and put a

12  note in to start Xarelto shortly thereafter and then keep her

13  on the same medication.

14  Q.   It looks like you say "resume Xarelto."

15  A.   Uh-huh.

16  Q.   What they have gone through -- you did the risk/benefit

17  analysis after your procedure treating Ms. Mingo's ulcer bleed,

18  and you felt that she would be in a position to resume Xarelto.

19  A.   Right.  Which would have been the 18th, I guess the

20  Wednesday, then.

21  Q.   Now, if the plaintiff told, or testified, rather, in her

22  deposition that you told her to stop Xarelto, that would not be

23  accurate?

24  A.   No.

25  Q.   Did you tell Ms. Mingo to stop Xarelto?

STEPHEN KEITH - EXAMINATION

03:55

1  A.   I don't recall telling her that.  That would contradict
2  what I've written here, which would be really atypical of what
3  I -- I wouldn't tell the patient one thing and write another.
4  Q.   Right.  In fact, your records indicate that she can --
5  A.   Correct.
6  Q.   -- resume Xarelto.
7  A.   Yes.  That would be my suggestion in this case to do that,
8  actually.  Because the risk of rebleeding from that at this
9  point, after several days, would be quite low, and the benefit
10 of doing so would be greater than the risk of bleeding.
11 Q.   At the time you treated Ms. Mingo, you knew that there was
12 no reversal agent for Xarelto?
13 A.   Right.
14 Q.   But the fact that you didn't have a reversal agent didn't
15 alter you by any means; you treated her as if you would have
16 treated her had she been on any other anticoagulant, including
17 warfarin, correct?
18 A.   Yes.
19 Q.   Let's go to the next time that you see her.  My records
20 indicate that is going to be -- at least your office, Mary
21 Thornton, sees her February 19.
22          I'll mark that as Exhibit 13.
23 A.   Four days later.
24 Q.   Just quickly, Doctor, you can take us through.  It looks
25 like this is a visit where Ms. Mingo is presenting for

STEPHEN KEITH - EXAMINATION

03:56   1   follow-up --

2   A.   Right.

3   Q.   -- for her severe anemia.

4   A.   Correct.

5   Q.   She's still having problems with the anemia?

6   A.   Yeah, it's going to take time for that to resolve, though.

7   I mean, she's still anemic leaving the hospital, but she's in a

8   reasonable range, though.  But, you know, she's on iron, and

9   that gives time for the bone marrow to make red cells, and that

10   anemia will gradually correct.  But, you know, as long as they

11   are transfused, somewhere in that range, then that's fine to

12   leave the hospital then.

13   Q.   Under "etiology," it says "PUD," peptic ulcer disease.

14        And etiology means the cause of --

15   A.   Correct, yeah, the underlying cause.

16   Q.   That was a question I had.  What is causing her anemia?

17   A.   That blood loss, the ulcer.

18   Q.   Did the Xarelto cause the anemia?

19   A.   No.  It caused her to bleed more, but not to cause the

20   ulcer, no.

21   Q.   Thank you.

22   A.   I mean, just like if you cut your hand and you are on an

23   anticoagulant, you are going to bleed more than if you weren't

24   on an anticoagulant.  But it doesn't -- didn't cause the cut,

25   though.

STEPHEN KEITH - EXAMINATION

03:57  1   Q.   Because the anticoagulant is doing its job.  I mean, it's
       2   supposed to --
       3   A.   Yea, you're supposed to bleed, that's right.  It doesn't
       4   cause you to bleed, it just causes you to bleed more.
       5         I mean, the only time you'll have bleeding with an
       6   anticoagulant is if you're super-therapeutic, then you can have
       7   spontaneous bleeding then.  But that's typically a case we've
       8   seen with Coumadin.  If someone's INR is really high, then they
       9   can have spontaneous bleeding, almost akin to if you have
      10   extremely low platelets.  Once you get below a certain range,
      11   you can start spontaneous bleeding from mucus membranes and
      12   otherwise, or in the gut or retroperitoneally, same thing.
      13   Q.   I'm going to go straight to the last visit that you've
      14   given us records on, August 8, 2016.  We've labeled that as
      15   Exhibit 4.
      16         Doctor, let's just kind of quickly go through, and if
      17   we can talk about things -- because I don't have a copy I've
      18   highlighted, let's just -- she is still using aspirin, correct?
      19   A.   Correct.
      20   Q.   Can you tell us any complaints she had on that particular
      21   visit?
      22   A.   This was not really a particular complaint-driven visit,
      23   other than some acid reflux.  It was more she got a letter
      24   about this.
      25   Q.   All right.  And she didn't -- on that particular visit,

STEPHEN KEITH - EXAMINATION

03:58

1  last -- three days ago she had no abdominal pain and no blood

2  in the stool, correct?

3  A.   No.  All she had was some acid reflux and that's it.

4  Q.   No GI problems other than the acid flux?

5  A.   Yeah, no.

6  Q.   We talked earlier about -- you cannot say to a reasonable

7  degree of medical certainty that the plaintiff would have

8  experienced her GI bleeding event had she been taking

9  another -- would not have experienced her GI bleeding event had

10 she been taking another anticoagulant, correct?

11 A.   I can't say there would be any difference really, no.

12 Q.   And along these lines, you can't say -- even if she hadn't

13 been on an anticoagulant, given her aspirin history or use of

14 aspirin, she still could have experienced that GI bleed,

15 correct?

16 A.   Yes.

17 Q.   For the type procedure you performed on Ms. Mingo, would

18 that be properly characterized as a high-risk procedure --

19 A.   It would be a high-risk procedure, yes.

20 Q.   The procedure that you performed on Ms. Mingo on

21 February 13, 2015, that would have been a higher risk procedure

22 than just a simple diagnostic EGD, correct?

23 A.   Yes.

24 Q.   And that's because you actually took steps during that

25 procedure to cauterize the point of her bleeding; is that

STEPHEN KEITH - EXAMINATION

04:00  1    correct?

2    A.    Yes.

3    Q.    Obviously, the more Xarelto medication a patient is

4    taking, the more anticoagulated they would be, correct?

5    A.    Correct.

6    Q.    And the more anticoagulated a patient would be, the more

7    at risk they are for a bleed, would you agree?

8    A.    Yes, that would make sense.

9    Q.    In other words, when Ms. Mingo, for instance, when she

10   presented on February 13, 2015, of course she was taken off

11   Xarelto immediately, correct?

12   A.    Yes.

13   Q.    And that would be true of any anticoagulant, correct?

14   A.    Yeah, you would stop it, sure.

15   Q.    Now, we talked a little bit about your own prescribing

16   practices and specifically prescribing practices for

17   anticoagulants.  I understood you to say you had not prescribed

18   Xarelto before, correct?

19   A.    Correct.

20   Q.    Turn if you would, though, to the last page of Exhibit 15.

21   I want to look at the prothrombin time and INR scores that were

22   measured for Ms. Mingo on February 13, 2015, when she was

23   admitted.  What was her prothrombin time score?

24   A.    26.2.

25   Q.    And the reference range, according to the lab, for PT --

STEPHEN KEITH - EXAMINATION

04:01   1   in other words, normal PT, is between 12.1 and 15.2 seconds,

2   correct?

3   **A.**   Correct.

4   **Q.**   So this is nearly double that level, correct?

5   **A.**   Right.

6   **Q.**   This is a high score, as indicated by the symbol that

7   appears next to the 26.2 entry?

8   **A.**   Right.

9   **Q.**   Does this suggest to you, based on everything we've

10   reviewed thus far, that Xarelto was the cause or at least a

11   substantial contributing cause of Ms. Mingo's gastrointestinal

12   bleeding on that day?

13   **A.**   I would characterize it as not underlying cause, but as a

14   contributing factor.  But as would be any other anticoagulant

15   or Coumadin, a patient on that has a higher risk of bleeding.

16   If something happens by which they bleed, then the risk is --

17   **Q.**   Wasn't a good way to put it.

18           Does this PT time score of 26.2 at the time for

19   admission on February 13 indicate to you that Xarelto caused or

20   contributed to cause the specific size and duration of

21   Ms. Mingo's GI bleed?

22   **A.**   Yes, being anticoagulated is a contributing factor, but

23   the bleeding is a known risk.  But I think the major factor was

24   really the ulcer.  So being anticoagulated, whether it was

25   Coumadin or Xarelto or any other agents, would be a

STEPHEN KEITH - EXAMINATION

04:03

1  contributing factor and increase the risk of bleeding, but I

2  can't say Xarelto particularly, per se -- that's not a terribly

3  high INR really; and if you just took Coumadin alone, that's a

4  therapeutic range for her indication.  So it doesn't seem

5  excessive.

6  Q.  Well, the lab score said it's high.  Do you see that?

7  A.  Correct, yes.

8  Q.  It's nearly double the reference range, correct?

9  A.  Right.  But we've said, you know, as you established, the

10  drug did increase the INR to some extent.  From what I've seen

11  and read and heard in meetings was that the reliability of that

12  is less than optimal.  So we still correct -- we don't do

13  anything different clinically.  We still -- that's why the FFP

14  was given to help reduce that risk of subsequent bleeding.

15  Q.  Did you review these labs prior to performing your

16  procedure; do you know?

17  A.  Well, I only would have seen the first lab on there.

18  Yeah, I typically review the labs immediately prior to.

19  Q.  Well, let's look at the lab, the prothrombin time, on the

20  day following your procedure.

21  A.  Right.

22  Q.  So this would be February 14.

23  A.  Yes.

24  Q.  And what was her prothrombin time score as of that point?

25  A.  I think it's -- I'm not sure if that's a 15 or a 16.4.

STEPHEN KEITH - EXAMINATION

04:04  1   Q.   I think it's a 16.4.

2   A.   16.4, okay.

3   Q.   And then her INR is what?

4   A.   1.28.

5   Q.   So both her prothrombin time and INR score is markedly

6   reduced from what it was when she presented the previous day,

7   correct?

8   A.   Yes, yes.

9   Q.   Does that provide a further indication to you that Xarelto

10   certainly had something to do with the extent of her GI bleed?

11   A.   Not really.  It just shows it was held and it's come down,

12   and it's partially come down because of the FFP, as well as

13   holding the drug, because of the fairly short duration of the

14   half-life.  It just indicates to me that what was done was

15   clinically appropriate.

16   Q.   The holding of the drug?

17   A.   The holding of the drug and the FFP has brought that down,

18   so the risk of further bleeding has been reduced significantly.

19   Q.   So is it basically your position that -- well, strike

20   that -- that in the presence of healthy tissue, a drug like

21   Xarelto wouldn't initiate a bleed?

22   A.   I think any drug like Xarelto can cause spontaneous

23   bleeding if it's super-therapeutic.  You see that more with

24   Coumadin.

25   Q.   What do you mean by "super-therapeutic"?

STEPHEN KEITH - EXAMINATION

04:06

1   A.   Super-therapeutic, if someone has an INR of 10 to 20,
2   somewhere in that range.  Super-therapeutic is significantly
3   above the desired therapeutic range.  So once that gets up into
4   that range, then there can be spontaneous bleeding, like you
5   said, in healthy tissue as well.
6   Q.   Now, if a person is overly anticoagulated on Xarelto, that
7   can certainly exacerbate a bleed from, say, an ulcer, correct?
8   A.   Yes, that's fair to say.
9   Q.   You're not testifying today, are you, that you hold the
10  opinion that Xarelto had nothing to do with the extent of her
11  bleeding on February 12, 2015, and February 13, 2015?
12  A.   I would say that as opposed to her not being on the
13  Xarelto, she would have bled more being on the Xarelto.
14  Q.   Explain again what you mean by that.
15  A.   Well, the presence of Xarelto means that she would have
16  bled more than if she had not been on the Xarelto.
17  Q.   In fact, she did; is that right?
18  A.   Yes.  Well, to what extent she would have bled not being
19  on Xarelto, I don't know, because she was also on aspirin and
20  it's a contributing factor, and she's got platelet antagonism
21  on board.  So I don't know how much that contributed, but it's
22  a factor certainly.
23  Q.   The procedure that you performed on February 13, 2015 --
24  A.   Yes.
25  Q.   -- in your opinion, was that a reasonable and medically

STEPHEN KEITH - EXAMINATION

04:07   1   necessary procedure?

2   **A.**   In that situation, yes, very reasonable.

3   **Q.**   Had you not performed that procedure, had you not stepped

4   in and done what you did, would Ms. Mingo have been exposed to

5   serious and perhaps life-threatening injury?

6   **A.**   Well, the risk with more bleeding could have entailed more

7   end organ damage, and in her case being diabetic and with

8   impaired renal function, then yes, the risk could be

9   significant potentially.

10   **Q.**   Turn if you would to page 3 of Exhibit 15.  I want to

11   focus on the serial hemoglobin and hematocrit scores that we

12   have reported here.  Do you see those?

13   **A.**   Yes.

14   **Q.**   And let's look first of all at her hemoglobin and her

15   hematocrit scores when she first presented to the hospital.  Do

16   you see that?

17   **A.**   Right.

18   **Q.**   And what was her hemoglobin score at that time?

19   **A.**   6.4 grams per deciliter.

20   **Q.**   And what was her hematocrit scores at that time?

21   **A.**   20 percent.

22   **Q.**   And those are both critically low levels; would you agree?

23   **A.**   Yes.

24   **Q.**   And that's why we have the double L designation next to

25   both, correct?

STEPHEN KEITH - EXAMINATION

04:09  1    **A.**   Right.

2    **Q.**   Had you not intervened and cauterized the bleed site or

3    the place where the bleeding was emanating from, is there any

4    doubt in your mind that her hemoglobin and hematocrit levels

5    would have continued to decrease beyond where they are on this

6    page of Exhibit 15?

7    **A.**   Yes, I think she would have trended down more.

8    **Q.**   And had she trended much further down, she would have been

9    at serious risk of permanent injury, if not perhaps even risk

10   of death, correct?

11   **A.**   Yeah, the risk of death and morbidity with GI bleeds is

12   significant.

13   **Q.**   And I guess what I'm getting at is:  The procedure that

14   you performed was a life-saving procedure?

15   **A.**   Correct.

16   **Q.**   Now, sitting here today, do you have any understanding or

17   idea as to how long she had this peptic ulcer?

18   **A.**   I can't say how long it was there, but it obviously became

19   acute in, you know, just a few days where she had had some, you

20   know, just occult positive to overt bleeding now.  But I

21   suspect it was there before that, likely from the aspirin.

22   **Q.**   Okay.  And it could have been there for many years,

23   correct?

24   **A.**   Perhaps.

25   **Q.**   But the bleed -- the bleed that you treated on

**STEPHEN KEITH - EXAMINATION**

04:10

1   February 13, 2015, that bleed only presented in that fashion

2   after she started Xarelto, correct, in combination with

3   aspirin.  Is that fair?

4   A.   Yes, she did bleed after she was anticoagulated.

5   Q.   On Xarelto?

6   A.   On Xarelto, with being on aspirin prior to that.

7   Q.   And you can't say for certain whether she would have ever

8   had the bleed that you treated had she not been put on Xarelto?

9   A.   No, I can't say that.  I don't know.

10   Q.   She may have never had a problem at all.

11   A.   She may not have.

12   Q.   Correct?

13   A.   That's true, she may not have.

14   Q.   Dr. Keith, do you still have Exhibit 7 in front of you?

15   A.   Which one was that?

16   Q.   It is the record of the first visit that Ms. Mingo made to

17   your office on February 10, 2015.  Do you see that?

18   A.   Okay.

19   Q.   Does it appear that as of that day, Ms. Mingo was taking

20   low-dose aspirin?

21   A.   Yes, it does.

22   Q.   She was taking the 81 milligrams?

23   A.   81.

24   Q.   And 81 milligrams of aspirin is far less likely to cause a

25   peptic ulcer; would you agree?

04:12

1    **A.**   That's correct.

2    **Q.**   And far less likely to contribute to any bleeding event if

3    taken in combination with Xarelto; would you agree?

4    **A.**   Yeah, the 81-milligram is less ulcerogenic than the 325.

5    **Q.**   I mean, clearly, taking 30 milligrams of Xarelto a day

6    would do far, far more to anticoagulate a person than

7    81 milligrams of aspirin; would you agree?

8    **A.**   The mechanism of action -- aspirin is not an

9    anticoagulant; it's only an antiplatelet agent.

10   **Q.**   True.

11   **A.**   Whereas, that is, like you say, an anticoagulant.

12   **Q.**   I see.  Okay.

13          Now, you understand, don't you, that ultimately

14   Ms. Mingo did not go back on Xarelto?

15   **A.**   I saw that, yes.

16   **Q.**   And you know, based on your postoperative visits that

17   you've had with her, that she hasn't suffered a DVT since the

18   time she went off Xarelto, has she?

19   **A.**   Not that I'm aware of, no.

20   **Q.**   So she's done well; no more DVTs, even without the

21   Xarelto?

22   **A.**   Correct.

23   **Q.**   What I'm getting at is this:  Would you defer to her other

24   doctors, particularly her prescribing doctor, when it comes to

25   whether she should or should not have resumed Xarelto following

STEPHEN KEITH - EXAMINATION

04:13   1    your procedure?

2    **A.**    Would I defer to them?  Well, in this case, we deferred to

3    the patient, who didn't want to do it.  But from my

4    perspective, the appropriate thing would have been to go back

5    on the Xarelto following control of the bleeding.

6    **Q.**    And you would agree that if the hospitalist felt that she

7    needed to be on some form of novel oral anticoagulant or

8    warfarin, the hospitalist would have put her on that?

9    **A.**    Yes, that would be the one.  They would be in the position

10   to write that prescription.

11   **Q.**    He did not in this instance, correct?

12   **A.**    From what I understand, yeah, that's correct.

13   **Q.**    You don't second-guess that decision, do you?

14   **A.**    I would actually, yeah.  Because I would think it's

15   appropriate to remain on it, really.  The risk of bleeding is

16   really resolved.  The indication for the risk of DVT is still

17   there.  So yeah, I don't agree with that, no.  Other doctors do

18   things I don't agree with, but that doesn't mean it doesn't get

19   done sometimes, you know.

20          If I was that physician, I would have continued, or

21   recommended at least that she continue with that at least,

22   anyway.  Because aspirin doesn't pertain -- doesn't portend the

23   same benefit, and a higher dose of aspirin actually increases

24   the risk of subsequent ulcer bleeding.  So she was actually at

25   a higher risk by a higher dose of aspirin, probably.

STEPHEN KEITH - EXAMINATION

04:14

1    **Q.**   Well, she has been on aspirin ever since you did your

2    procedure, right?

3    **A.**   Yeah, it looks like the 325.

4    **Q.**   And that hasn't caused her any further problems, has it,

5    from a gastro standpoint?

6    **A.**   Not that I have seen, no.

7    **Q.**   And she certainly hasn't had another DVT, has she?

8    **A.**   Not that we know, no.

9    **Q.**   So ultimately, isn't it the goal to administer the least

10   amount of medication to get the job done?

11   **A.**   Yes, the lowest dose of any drug that you can give for the

12   greatest benefit while minimizing the risk.  But you have to

13   choose the appropriate drug as well.

14   **Q.**   Well, the combination of medications that she has been on

15   since you treated her have not caused her to have another

16   bleeding ulcer and have not caused her -- or she has not had a

17   DVT while on that regimen, correct?

18   **A.**   Correct.  I think the -- her risk factor for the DVT was

19   really the orthopedic surgery, though.  So given that she

20   hasn't had any other risk factors, she hasn't really had a

21   significant probability of having a recurrent DVT.

22        So her treatment with Xarelto after that would have

23   been finite, it would have been a set period of time, and then

24   she would have discontinued it because that risk would have

25   dissipated over time.

STEPHEN KEITH - EXAMINATION

04:16
1  Q.   And so for that reason, wasn't it okay for her treating

2  doctor at the hospital not to put her back on Xarelto or some

3  other form of novel oral anticoagulant or warfarin?

4  A.   No, it was not appropriate.  I would say -- I would

5  disagree with the aspirin because it doesn't have the same

6  degree of risk reduction for the DVT.  So it really was driven

7  by the patient's choice, not the physician.

8  Q.   Being overly anticoagulated can do more than just put you

9  at risk for a gastrointestinal bleed, right?

10  A.   Yes.

11  Q.   Is it your testimony that Ms. Mingo should be on Xarelto

12  right now?

13  A.   No.

14  Q.   For how long a period of time do you believe she should

15  have been on Xarelto following your procedure?

16  A.   Following my procedure.  Well, the time really started

17  from the DVT, really, I guess, at that diagnostic point.  I

18  would say six months from then.  So it would be a little over

19  five months after that procedure, I guess.

20  Q.   This is, again, the labeling that we talked earlier.  You

21  have not prescribed Xarelto, correct?

22  A.   No.

23  Q.   You have never read the package insert, correct?

24  A.   No.

25  Q.   Ms. Mingo was prescribed Xarelto because of the DVT --

STEPHEN KEITH - EXAMINATION

04:17   1   **A.**   Yes.

2   **Q.**   -- indication, correct?

3   **A.**   That's right.

4   **Q.**   And you have not seen any of the DVT studies, correct?

5   **A.**   No.

6   **Q.**   Plaintiff's counsel asked you:  If a patient took more

7   Xarelto, then would that mean that they were more

8   anticoagulated, and therefore, at a greater risk of bleeding?

9   Correct?

10   **A.**   That's right.

11   **Q.**   You haven't seen any peer-reviewed literature

12   demonstrating the risk of bleeding with Xarelto would be

13   correlated to drug exposure or concentration, correct?

14   **A.**   Yeah, I have not seen that.  I mean, I have seen it with

15   Coumadin, but I haven't seen it with this, though.

16   **Q.**   Focusing on Ms. Mingo, you have been asked about, well,

17   what could have happened?  Could it have been serious?  Could

18   there have been a death?

19          The bottom line is with respect to your care and

20   treatment of Ms. Mingo, she healed completely without

21   complications, correct?

22   **A.**   Yes, that's absolutely correct.

23   **Q.**   She did not have any long-standing or any follow-up

24   problems, correct?

25   **A.**   Not that I've seen, no, she has not.

STEPHEN KEITH - EXAMINATION

04:18

1    Q.    You were asked questions about being over-anticoagulated.

2    There's no evidence that Ms. Mingo was ever -- that she was

3    ever over-anticoagulated?

4    A.    No.

5    Q.    The last thing:  You expect drug manufacturers to provide

6    you as a physician all of the relevant clinical information you

7    need to make an informed decision about the risks and benefits

8    of the drugs you prescribe, don't you?

9    A.    Yes.

10   Q.    And if a drug manufacturer has information pertaining to

11   the risks and benefits of a particular drug that are relevant,

12   you want them to share that with you?

13   A.    I want to see it, yes.

14             THE COURT:  Is that it?

15                  Okay.  What's next?

16             MS. PRUITT:  May we approach, Your Honor, for

17   scheduling?

18             (The following proceedings were held at the bench.)

19             THE COURT:  Do you want to stop here and come back

20   tomorrow?  Is that it?

21             MS. PRUITT:  Yes, for Shah.

22             THE COURT:  You're not sure about Shah at this time?

23             MR. BIRCHFIELD:  Well, what I would like to do,

24   Your Honor -- I know we have the courthouse scheduling issue.

25   I would like to assess with my team and then let the Court know

04:19    1   and let the defense counsel know by 7:00, but I would like to

2   evaluate the situation.

3         **MS. PRUITT:**  Yes.  So if you don't call him, I need

4   to get my expert here, and he is a doctor.

5         **THE COURT:**  Okay.

6         **MR. SARVER:**  7:00 tonight, Your Honor?

7         **THE COURT:**  Yes.

8         (End of bench conference.)

9         **THE COURT:**  Members of the jury, we will stop here

10   today, and we will start tomorrow at 8:30.  Hopefully we are

11   moving along.  We will pick up the pace again; we will try to

12   keep that up.

13         Please, again, don't talk to anybody about the

14   case, and I'll see you all tomorrow at 8:30.  I'll see counsel

15   at 8:15.

16         Thank you.  Court will stand in recess.

17         **THE DEPUTY CLERK:**  All rise.

18         (Jury exited.)

19         **MR. OVERHOLTZ:**  Plaintiffs would introduce Lensing

20   Deposition Exhibit 46, which is 113354, as Plaintiff's Trial

21   Exhibit 67.

22         Plaintiffs would next introduce Lensing

23   Deposition Exhibit 50, which is 245248, as Plaintiff's Trial

24   Exhibit 68.

25         Plaintiffs would next introduce Lensing

04:26   1    Deposition Exhibit 56, which is 1117899, as Plaintiff's Trial

2    Exhibit 69.

3                    Plaintiffs would next introduce Lensing

4    Deposition Exhibit 58, 1117901, as Plaintiff's Trial

5    Exhibit 70.

6                    Plaintiffs would then introduce Lensing

7    Deposition Exhibit 59, which is 1117902, which is Plaintiff's

8    Exhibit 71.

9                    Plaintiffs would next introduce Lensing

10   Deposition Exhibit 60, which is 371020, as Plaintiff's

11   Exhibit 72.

12                   Plaintiffs would introduce Lensing Deposition

13   Exhibit 61, which is 371022, as Plaintiff's Trial Exhibit 73.

14                   Plaintiffs would introduce Lensing Deposition

15   Exhibit 63, which is 5813659, as Plaintiff's Trial Exhibit 74.

16                   Plaintiffs next introduce Lensing Deposition

17   Exhibit 63, which is 1075455, as Plaintiff's Trial Exhibit 75.

18                   Plaintiffs introduce Lensing Deposition

19   Exhibit 64, which is 1100669, as Plaintiff's Trial Exhibit 76.

20                   Plaintiffs would introduce Lensing Deposition

21   Exhibit 65, which is 1100670, as Plaintiff's Trial Exhibit 77.

22                   Plaintiffs would next introduce Lensing

23   Deposition Exhibit 66, which is 4822612, as Plaintiff's

24   Exhibit 78.

25                   Plaintiffs would then introduce Lensing

04:28   1    Deposition Exhibit 70, which is 890973, as Plaintiff's Trial

2    Exhibit 79.

3                    Plaintiffs would then introduce Lensing

4    Deposition Exhibit 71, which is 922245, as Plaintiff's Trial

5    Exhibit 80.

6                    Plaintiffs would then introduce Lensing

7    Deposition Exhibit 72, which is 3860407, as Plaintiff's Trial

8    Exhibit 81.

9                    We are going to skip Plaintiff's Trial

10   Exhibit 82, as that was a demonstrative.

11                   And then we are going to move to Plaintiff's

12   Deposition Exhibit 74, which was 3860407.594, which is

13   introduced as Plaintiff's Trial Exhibit 83.

14                   Plaintiffs introduce Lensing Deposition

15   Exhibit 75, which is 3860407.610, as Plaintiff's Trial

16   Exhibit 84.

17                   Plaintiffs introduce Lensing Deposition

18   Exhibit 76, which is 3860407.632, which is Plaintiff's

19   Exhibit 85.

20                   Plaintiffs next introduce Lensing Deposition

21   Exhibit 40, which is 1117901.10, as Plaintiff's Trial

22   Exhibit 86.

23                   Plaintiffs next introduce Lensing Deposition 86,

24   which is 5590540, as Plaintiff's Trial Exhibit 89.

25                   Plaintiffs introduce Lensing Deposition

04:30   1   Exhibit 88, which is 5404271, as Plaintiff's Exhibit 90.
2                       Plaintiffs introduce Lensing Deposition
3   Exhibit 89, which is 5399133, as Plaintiff's Trial Exhibit 91.
4                       Plaintiffs next introduce Lensing Deposition
5   Exhibit 90, which is 5590539, as Plaintiff's Trial Exhibit 92.
6                       And then finally for Lensing, Lensing Deposition
7   Exhibit 91, which is 1318145, will be introduced as Plaintiff's
8   Trial Exhibit 93.
9                       So that concludes the Lensing deposition
10   exhibits for plaintiffs.
11              **THE DEPUTY CLERK:**  Just for clarity, 94, we did -- I
12   think 94 might be skipped completely, which is fine, as long as
13   we all know.  And 87 and 88 also skipped?
14              **MR. OVERHOLTZ:**  87 and 88 also skipped.  They were
15   demonstratives.  So if we have to solve the 19 problem, we
16   might solve it there.
17                  (Proceedings adjourned.)
18                          *  *  *
19
20
21
22
23
24
25

1    **<u>CERTIFICATE</u>**

2         I, Toni Doyle Tusa, CCR, FCRR, Official Court

3    Reporter for the United States District Court, Eastern District

4    of Louisiana, certify that the foregoing is a true and correct

5    transcript, to the best of my ability and understanding, from

6    the record of proceedings in the above-entitled matter.

7

8

9                                    *s/ Toni Doyle Tusa*

10                                   Toni Doyle Tusa, CCR, FCRR
                                     Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25