1          UNITED STATES DISTRICT COURT
          EASTERN DISTRICT OF LOUISIANA
2

3    ****************************************************************

4    IN RE: XARELTO (RIVAROXABAN)
     PRODUCTS LIABILITY LITIGATION
5
                              CIVIL ACTION NO. 14-MD-2592 "L"
6                             JACKSON, MISSISSIPPI
                              WEDNESDAY, AUGUST 16, 2017, 8:30 A.M.
7

8    THIS DOCUMENT RELATES TO:

9    DOCKET NO. 14-MD-2592
     *DORA MINGO, ET AL. V.*
10   *JANSSEN RESEARCH & DEVELOPMENT,*
     *LLC, ET. AL.,*
11   CASE NO. 15-CV-3469

12   ****************************************************************

13
                    **DAY VIII  MORNING SESSION**
14          TRANSCRIPT OF JURY TRIAL PROCEEDINGS
          HEARD BEFORE THE HONORABLE ELDON E. FALLON
15              UNITED STATES DISTRICT JUDGE

16

17   APPEARANCES:

18
     FOR THE PLAINTIFFS'
19   LIAISON COUNSEL:          GAINSBURGH BENJAMIN DAVID
                               MEUNIER & WARSHAUER
20                             BY:  GERALD E. MEUNIER, ESQ.
                               2800 ENERGY CENTRE
21                             1100 POYDRAS STREET
                               NEW ORLEANS, LOUISIANA  70163
22

23
     FOR THE PLAINTIFFS:       BEASLEY ALLEN
24                             BY:  ANDY BIRCHFIELD, ESQ.
                               P.O. BOX 4160
25                             MONTGOMERY, ALABAMA  36103

                    ***OFFICIAL TRANSCRIPT***

1    APPEARANCES CONTINUED:

2

3                              GAINSBURGH BENJAMIN DAVIS
                              MEUNIER & WARSHAUER
4                              BY:  WALTER C. MORRISON, IV, ESQ.
                              240 TRACE COLONY PARK DRIVE
5                              SUITE 100
                              RIDGELAND, MISSISSIPPI  39157
6

7
                              GOZA HONNOLD
8                              BY:  BRADLEY D. HONNOLD, ESQ.
                              11181 OVERBROOK ROAD, SUITE 200
9                              LEAWOOD, KANSAS  66211

10

11                             THE LAMBERT FIRM
                              BY:  EMILY JEFFCOTT, ESQ.
12                             701 MAGAZINE STREET
                              NEW ORLEANS, LOUISIANA  70130
13

14
                              LEVIN FISHBEIN SEDRAN & BERMAN
15                             BY:  FREDERICK S. LONGER, ESQ.
                              510 WALNUT STREET
16                             SUITE 500
                              PHILADELPHIA, PENNSYLVANIA  19106
17

18
     FOR THE DEFENDANT BAYER
19   HEALTHCARE PHARMACEUTICALS
     INC. AND BAYER PHARMA AG:  MITCHELL WILLIAMS SELIG GATES &
20                             WOODYARD, P.L.L.C.
                              BY:  LYN P. PRUITT, ESQ.
21                             425 W. CAPITOL AVENUE, SUITE 1800
                              LITTLE ROCK, ARKANSAS  72201
22

23
                              WATKINS & EAGER, PLCC
24                             BY:  WALTER T. JOHNSON, ESQ.
                              400 EAST CAPITOL STREET
25                             JACKSON, MISSISSIPPI  39201

                         *OFFICIAL TRANSCRIPT*

1   APPEARANCES CONTINUED:

2

3                                   BRADLEY ARANT BOULT CUMMINGS, LLP
                                    BY:  LINDSEY C. BONEY, IV, ESQ.
4                                   ONE FEDERAL PLACE
                                    1819 FIFTH AVENUE NORTH
5                                   BIRMINGHAM, ALABAMA  35203

6

7   FOR JANSSEN PHARMACEUTICALS,
    INC. AND JANSSEN RESEARCH &
8   DEVELOPMENT, LLC:             BARRASSO USDIN KUPPERMAN FREEMAN &
                                  SARVER, LLC
9                                 BY:  RICHARD E. SARVER, ESQ.
                                  909 POYDRAS STREET, 24TH FLOOR
10                                NEW ORLEANS, LOUISIANA  70112

11

12  OFFICIAL COURT REPORTER:     CATHY PEPPER, CRR, RMR, CCR
                                 CERTIFIED REALTIME REPORTER
13                               REGISTERED MERIT REPORTER
                                 500 POYDRAS STREET, ROOM B-275
14                               NEW ORLEANS, LA  70130
                                 (504) 589-7779
15                               Cathy_Pepper@laed.uscourts.gov

16

17  PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
    PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

18

19

20

21

22

23

24

25

*OFFICIAL TRANSCRIPT*

1                     **P-R-O-C-E-E-D-I-N-G-S**

2                 M O R N I N G    S E S S I O N

3                 WEDNESDAY, AUGUST 16, 2017

4                  (COURT CALLED TO ORDER)

5

6

7          (WHEREUPON, at 8:38 a.m., the jury panel enters the

8     courtroom.)

08:39:38  9          THE DEPUTY CLERK:  All rise.

08:39:38 10          THE COURT:  Be seated, please.

08:39:54 11               Good morning, ladies and gentlemen.

08:39:56 12               Call your next witness, please.

08:39:59 13          MR. BIRCHFIELD:  Your Honor, at this time, the

08:40:02 14     plaintiff, Dora Mingo, will call, out of turn, Mr. Nauman Shah,

08:40:06 15     by way of satellite.

08:40:11 16          THE DEPUTY CLERK:  Mr. Shah, would you raise your right

17     hand.  Do you solemnly swear that the testimony you are about

18     to give will be the truth, the whole truth and nothing but the

19     truth, so help you God?

20          THE WITNESS:  Yes, I do.

21                       **NAUMAN SHAH**

22      was called as a witness and, after being first duly sworn by

23      the Clerk, was examined and testified on his oath as follows:

24          THE DEPUTY CLERK:  Please state your name, and spell

25     your name for the record, sir.

                         *OFFICIAL TRANSCRIPT*

08:40:25 1          THE WITNESS:  My name is Nauman Shah.  It's spelled

08:40:29 2     N-A-U-M-A-N.  S-H-A-H is my last name.

08:40:38 3                     DIRECT EXAMINATION

08:40:39 4     BY MR. BIRCHFIELD:

08:40:39 5     Q.   Good morning, Mr. Shah.

08:40:39 6     A.   Good morning.

08:40:41 7     Q.   Welcome to Jackson, by way of satellite.

08:40:43 8     A.   Thank you.  It's nice to be connected to you.

08:40:45 9     Q.   My name is Andy Birchfield.  I don't think that we have

08:40:48 10    met before, but I have some questions for you this morning

08:40:50 11    about Xarelto, okay?

08:40:52 12    A.   Okay.

08:40:52 13    Q.   Mr. Shah, you're currently a vice-president for Johnson &

08:41:00 14    Johnson; is that right?

08:41:00 15    A.   That is correct.

08:41:01 16    Q.   In that capacity, you report directly to the CEO of

08:41:05 17    Johnson & Johnson; is that right?

08:41:08 18    A.   I actually report both to the CEO and also our chief

08:41:12 19    financial officer in this position.

08:41:14 20    Q.   Mr. Shah, are you also a vice-president for Janssen at

08:41:20 21    this time?

08:41:22 22    A.   At this time, no, I'm not.

08:41:22 23    Q.   Okay.  So you've moved from being a vice-president of

08:41:27 24    Janssen to being a vice-president for Johnson & Johnson; is

08:41:31 25    that right?

                          *OFFICIAL TRANSCRIPT*

08:41:31  1    A.    Yes, that's correct.

08:41:32  2    Q.    Before you became a vice-president of Johnson & Johnson,

08:41:38  3    did you also serve as director of marketing as it related to

08:41:42  4    Xarelto?

08:41:45  5    A.    Yes, I was the director of marketing for Xarelto from July

08:41:49  6    of 2008 to August of 2012.

08:41:53  7    Q.    Okay.  All right.  So I want to put up a timeline -- or

08:41:59  8    build a timeline as we go.

08:42:01  9          So Xarelto was first approved and marketed in the

08:42:07 10    U.S. in July of 2011; is that correct?

08:42:11 11    A.    The signal is breaking up a little bit on me.  I'm not

08:42:17 12    sure I heard the question clearly.

08:42:20 13          SPEAKER:  We've got a frozen picture.  Can you just

08:42:22 14    give us a moment.

08:42:23 15    EXAMINATION BY MR. BIRCHFIELD:

08:42:23 16    Q.    Mr. Shah, can you hear me now?

08:42:30 17    A.    It's still choppy, but I think I can make out what you're

08:42:33 18    saying.

08:42:34 19    Q.    Xarelto was first approved for any indication in the U.S.

08:42:38 20    in July of 2011; is that right?

08:42:44 21    A.    So, sir, just because it was breaking up, if it's okay,

08:42:47 22    I'll repeat the question to make sure I heard it correctly.  I

08:42:50 23    think you're asking me if Xarelto was approved in July of 2011;

08:42:53 24    is that correct?

08:42:53 25    Q.    Yes.

*OFFICIAL TRANSCRIPT*

08:42:55  1   A.   Yes, that is correct.

08:43:12  2   Q.   Mr. Shah, can you hear me now?

08:43:14  3   A.   Yes, I can.

08:43:14  4   Q.   All right.  So, in 2011, it was approved -- Xarelto was

08:43:22  5   approved for use.  That was for DVT prophylaxis; is that right?

08:43:28  6   A.   Yes, the July 2011 approval was for DVT prophylaxis

08:43:35  7   following hip or knee replacement surgery.

08:43:42  8   Q.   Mr. Shah, so you served as director of marketing for about

08:43:47  9   three years prior to the launch of Xarelto; is that correct?

08:43:54 10   A.   Yes, that seems approximately correct.

08:43:56 11   Q.   Mr. Shah, you have -- your background is in business and

08:44:03 12   finance; is that right?

08:44:06 13   A.   So my educational background is combination of science and

08:44:11 14   business.  Then my professional career has been predominantly

08:44:17 15   on the business side, yes.

08:44:18 16   Q.   You have an MBA in finance, right?

08:44:24 17   A.   I have an undergraduate degree in biological basis of

08:44:27 18   behavior, which was a neuroscience degree.  Then I have an MBA

08:44:35 19   in finance.

08:44:35 20   Q.   You're not a licensed physician, are you, Mr. Shah?

08:44:39 21   A.   No, I'm not a medical doctor or a physician.

08:44:41 22   Q.   As it pertains to Xarelto, your focus was on the marketing

08:44:46 23   aspect of Xarelto; is that right?

08:44:50 24   A.   Yes.  My responsibility was predominantly on the marketing

08:44:54 25   side.  I was the brand commercial leader in that capacity

*OFFICIAL TRANSCRIPT*

08:45:00 1    during the time you mentioned.

08:45:01 2    Q.    Mr. Shah, in 2005, there was a collaborative agreement

08:45:06 3    that was reached between Janssen -- or the predecessor of

08:45:11 4    Janssen and Bayer for the marketing of Xarelto; is that right?

08:45:16 5    A.    Yes.  That's my understanding.  I think that's correct.

08:45:18 6    Q.    That's called a *collaborative agreement*; is that right?

08:45:23 7    A.    I believe that's true.

08:45:24 8    Q.    Mr. Shah, as part of the collaborative agreement, one of

08:45:50 9    the provisions of the collaborative agreement was that this

08:45:54 10   product, Xarelto, shall not require monitoring, regular

08:46:00 11   monitoring; is that right?

08:46:03 12   A.    I believe -- so the agreement predates my time on Xarelto

08:46:08 13   by about three years, but I believe the agreement did stipulate

08:46:13 14   a desire for the product to have no monitoring, to your point.

08:46:17 15   That was obviously based upon a number of studies that had been

08:46:21 16   done over the previous six to seven or eight years.

08:46:23 17   Q.    Okay.  Now, in 2005, had any of the Phase III clinical

08:46:31 18   trials, had any of those results come in, sir?

08:46:34 19   A.    I believe -- the results definitely had not come in yet

08:46:38 20   from Phase III.  Phase I and II, from my recollection, had been

08:46:43 21   completed, which were obviously pretty significant as well;

08:46:47 22   but, the Phase III trial results had not been available yet.

08:46:50 23   Q.    Just to remind us, the Phase III clinical trials, those

08:46:56 24   are the trials that are using real patients, patients that have

08:47:01 25   the condition and are taking the drug, versus a comparator arm;

**OFFICIAL TRANSCRIPT**

08:47:07  1    is that right?

08:47:07  2    A.    So our clinical team certainly could give you a much

08:47:10  3    better background on the design of the various studies.  As a

08:47:14  4    general rule of thumb, Phase I also includes people, but they

08:47:18  5    are not patients.  Phase II includes patients, and you're

08:47:21  6    looking for the right doses.  Then Phase III ultimately

08:47:24  7    includes patients, and it's our larger scale studies.

08:47:28  8    Q.    Mr. Shah, I want to show you what's marked as Plaintiff's

08:47:35  9    Exhibit 119.

08:47:37  10   A.    Okay.

08:47:38  11   Q.    It's marked for identification purposes as Record Number

08:47:47  12   1481553.

08:47:50  13          Do you see, Mr. Shah, that this is an e-mail Vanessa

08:48:18  14   Broadhurst to you on July 1st, 2008?

08:48:19  15   A.    Yes, that is correct.

08:48:22  16   Q.    Vanessa Broadhurst, she was your -- was she your

08:48:31  17   supervisor, your boss, at that time?

08:48:32  18   A.    Yes.  I started my role on Xarelto towards the end of that

08:48:35  19   month.  This e-mail preceded that by about three weeks.  She

08:48:40  20   was my hiring manager and my boss at that time.

08:48:43  21   Q.    This e-mail indicates that there was an attachment that

08:48:48  22   was a launch status, 24 June PowerPoint; is that correct?

08:48:57  23   A.    It looks like there was a PowerPoint attachment to this

08:49:00  24   e-mail, yes.

08:49:00  25   Q.    You received this e-mail; is that right?

*OFFICIAL TRANSCRIPT*

08:49:05 1    A.    It looks -- the e-mail was directed to me, so, yes, I

08:49:08 2    would have received it.

08:49:09 3            MR. BIRCHFIELD:  Your Honor, Plaintiffs offer

08:49:11 4    Exhibit 119.

08:49:13 5            MR. SARVER:  No objection, Your Honor.

08:49:15 6            THE COURT:  Let it be admitted.

08:49:16 7    EXAMINATION BY MR. BIRCHFIELD:

08:49:17 8    Q.    Mr. Shah, I want to hand you what's marked as Plaintiff's

08:49:21 9    Exhibit 120.  For identification purposes, it's Record Number

08:49:26 10   1481556.

08:49:32 11   A.    Okay.

08:49:32 12   Q.    Do you see that -- Mr. Shah, you see that this is a

08:49:41 13   Xarelto launch PowerPoint dated June 24, 2008, right?

08:49:47 14   A.    Yes.  That's correct.

08:49:48 15   Q.    This is the PowerPoint that was attached to the e-mail

08:49:51 16   from Vanessa Broadhurst, correct?

08:49:56 17   A.    It appears to be.

08:49:58 18   Q.    You see that it's the launch update, June 24, 2008.  I'm

08:50:03 19   going to ask you to turn to PDF 16, PDF page 16.  Do you see

08:50:11 20   that, Mr. Shah?  It has the core messages.

08:50:17 21   A.    Yes, I am with you.

08:50:19 22   Q.    All right.  In the right-hand -- in the right-hand box, we

08:50:23 23   see ease of use/less hassle; is that right?

08:50:29 24   A.    Yes.  That's correct.

08:50:29 25   Q.    In that box, it says:  Riva, or Xarelto, is oral, dosed

*OFFICIAL TRANSCRIPT*

08:50:37  1    once a day, and does not require monitoring or dose

08:50:42  2    adjustments; is that right?

08:50:45  3    A.    That's what it states.

08:50:46  4    Q.    Down at the bottom, it has the overall selling message.

08:50:50  5    Do you see that, Mr. Shah?

08:50:52  6    A.    I do.

08:50:52  7    Q.    The very last phrase there:  Does not require monitoring;

08:51:01  8    is that correct?

08:51:01  9    A.    Yes.

08:51:03 10    Q.    So, by 2008, it was clear that a core message for the

08:51:11 11    marketing of Xarelto would be no monitoring required; is that

08:51:11 12    right?

08:51:19 13    A.    By this time, our Phase III studies for the orthopedic

08:51:24 14    surgery indication had been completed, and no monitoring was

08:51:27 15    required or demonstrated -- the need for monitoring was not

08:51:31 16    demonstrated in those studies.

08:51:32 17          So we had those study results, and it appears to be

08:51:38 18    that whoever put this presentation together therefore

08:51:40 19    summarized that.

08:51:42 20          MR. BIRCHFIELD:  Your Honor, we offer Plaintiff's

08:51:43 21    Exhibit 120.

08:51:45 22          MR. SARVER:  Just a second, Your Honor.

08:51:46 23          There is an issue on page 7 of the document that

08:51:51 24    we talked about previously, Your Honor.  It has not been

08:51:55 25    handled.

                              *OFFICIAL TRANSCRIPT*

08:51:55   1          MR. BIRCHFIELD:  Your Honor, we'll get together and
08:52:01   2    redact the figures at the appropriate time.
08:52:02   3          MR. SARVER:  In that case, we don't have an objection,
08:52:04   4    Your Honor.
08:52:04   5          THE COURT:  Let it be admitted, with the understanding
08:52:07   6    that it will be redacted.
08:52:08   7          MR. SARVER:  Thank you, sir.
08:52:09   8    EXAMINATION BY MR. BIRCHFIELD:
08:52:10   9    Q.   So, Mr. Shah, you would agree, by 2008, a core message was
08:52:17  10    no monitoring required, right?
08:52:20  11    A.   That is part of the core message that, again, whoever put
08:52:24  12    this document together wrote.
08:52:53  13    Q.   Mr. Shah, I want to hand you what's marked as Plaintiff's
08:52:57  14    Exhibit 121.  The Record Number is 1478370.
08:53:07  15    A.   Okay.  Should I put away the previous document, sir?
08:53:09  16    Q.   Yes, sir.  That will be fine.
08:53:12  17    A.   Okay.
08:53:12  18    Q.   Mr. Shah, I don't know if you can see the Elmo.  Do you
08:53:32  19    have access to a screen there?
08:53:36  20          MR. BIRCHFIELD:  Dean, can I get the Elmo, please?
08:53:39  21          THE WITNESS:  I don't.
08:53:39  22    EXAMINATION BY MR. BIRCHFIELD:
08:53:39  23    Q.   All right.  Mr. Shah, we have information from counsel for
08:53:48  24    Janssen and Bayer that this -- that this document was part of
08:53:52  25    your custodial file.  Do you have any reason to doubt or

*OFFICIAL TRANSCRIPT*

08:53:55   1    question that, sir?

08:53:59   2    A.    No.  I would imagine it probably was in my files

08:54:03   3    somewhere.

08:54:04   4          MR. BIRCHFIELD:  Dean, can we go back to the --

08:54:04   5    EXAMINATION BY MR. BIRCHFIELD:

08:54:11   6    Q.    We see that this is a PowerPoint presentation dated

08:54:16   7    October 20, 2008.  Do you see that, Mr. Shah?

08:54:22   8    A.    Yes, I do.

08:54:22   9    Q.    If you'll turn to PDF number 28.  It's also identified as

08:54:32  10    Slide Number 27.  Do you see that, sir?

08:54:37  11    A.    Slide 27.  Yes, I'm there.

08:54:39  12    Q.    We see that this is a communications ladder, message

08:54:46  13    themes pertaining to the orthopedic launch.  Do you see that,

08:54:50  14    sir?

08:54:51  15    A.    Yes, that's correct.

08:54:51  16    Q.    At the top of the stack there, we see:  No monitoring.

08:55:03  17    VTE prevention after MOS, no SC injection, no dose adjustment,

08:55:09  18    no monitoring.

08:55:09  19          Do you see that --

08:55:10  20    A.    Yes, that is one of the -- sorry.  Yes, that is one of the

08:55:14  21    items listed on this page.

08:55:17  22          MR. BIRCHFIELD:  Your Honor, we'd offer Plaintiff's

08:55:18  23    Exhibit 121.

08:55:19  24          MR. SARVER:  Your Honor, I don't think we have an

08:55:21  25    objection to this one.

*OFFICIAL TRANSCRIPT*

08:55:22 1             THE COURT:  Let it be admitted.

08:55:23 2    EXAMINATION BY MR. BIRCHFIELD:

08:55:26 3    Q.   Now, I want to move to -- that's in 2008.  Mr. Shah, you

08:55:32 4    can set that aside.  I want us to move to 2009, if we can.

08:55:35 5             I want to show you what's marked as Record

08:55:39 6    Identification Number 1471269.  Mark this as Plaintiff's

08:55:45 7    Exhibit 122.

08:56:07 8             Mr. Shah, we have been provided information from

08:56:09 9    counsel for Bayer and Janssen that this was a -- this was part

08:56:13 10   of your custodial file.  Do you have any reason to doubt or

08:56:17 11   question that, sir?

08:56:19 12   A.   I do not.

08:56:19 13   Q.   All right.  If you'll turn to the first page, we see that

08:56:24 14   this is a strategic steering committee meeting, August 15,

08:56:30 15   2009.  Do you see that, Mr. Shah?

08:56:32 16   A.   Yes.

08:56:34 17   Q.   Okay.  All right.  If you will turn to -- turn to the

08:56:42 18   third page, or three of seven, and we see that -- the list of

08:56:49 19   company participants.  Do you see that, sir?  Company

08:56:56 20   participants, you're listed as a participant?

08:57:03 21   A.   Yes, I do.

08:57:04 22   Q.   Mr. Shah, tell us what the strategic steering committee

08:57:11 23   meeting was for.  Was this a group of advisors that were

08:57:18 24   gathered to provide input regarding Xarelto?

08:57:19 25   A.   Yes.  So I recognize some of the names from back whenever

                         *OFFICIAL TRANSCRIPT*

08:57:25 1   this meeting occurred.  It does appear to be a meeting -- an

08:57:32 2   advisory committee meeting composed of key thought leaders and

08:57:37 3   experts in the field of anticoagulation, who we brought

08:57:40 4   together to provide us input on the medication and give us some

08:57:45 5   advice.

08:57:45 6   Q.   The executive summary, these are slides that would have

08:57:49 7   been prepared following that meeting, right?

08:57:50 8   A.   Well, I don't see slides, but this appears to be a summary

08:57:57 9   of the meeting in terms of the key feedback and input that we

08:58:02 10  heard.

08:58:02 11  Q.   My apologies, not slides.  This is a report that is

08:58:06 12  prepared following the meeting, right?

08:58:09 13  A.   That is correct, yes.

08:58:10 14  Q.   It is to gather the insights that were gained from the

08:58:16 15  experts that had been brought together for this meeting in

08:58:20 16  Philadelphia; is that correct?

08:58:21 17  A.   Yes.  It would summarize some of the key points that we

08:58:25 18  heard during the course of the meeting.

08:58:26 19  Q.   If you'll turn to the next page, page 4.  Page 4 of 7.

08:58:36 20  A.   Okay.

08:58:36 21  Q.   All right.  We see that, under the -- under the heading

08:58:43 22  Market Overview, you were to provide -- you were to provide a

08:58:47 23  presentation; is that right?

08:58:49 24  A.   Yes.  It appears that during this meeting, I gave a

08:58:53 25  15-minute overview of the market.

*OFFICIAL TRANSCRIPT*

08:58:56  1  Q.   Let's look at some of the key insights that came out of

08:59:02  2  this meeting.  If you'll turn to -- if you'll turn to page 7,

08:59:06  3  Mr. Shah.

08:59:13  4  A.   Okay.

08:59:13  5  Q.   All right.  We see on page 7, there are -- there is a

08:59:19  6  subheading for drug monitoring, toward the bottom of the page.

08:59:25  7  Do you see that?

08:59:25  8  A.   Drug monitoring.  I don't see a heading for drug

08:59:33  9  monitoring.  I see anticoagulation clinics.

08:59:33 10  Q.   Flip back to --

08:59:36 11  A.   I'm sorry, it's on the previous page.  Sorry.  It's

08:59:38 12  number 6.  It's on, actually, page 6.

08:59:40 13  Q.   Okay.

08:59:41 14  A.   Got it.

08:59:41 15  Q.   Okay.  All right.  It says: "Drug monitoring.  The

08:59:46 16  company has to understand all the implications of not having a

08:59:50 17  monitoring program."

08:59:51 18       Is that correct?

08:59:51 19  A.   Yes.  That's what the document states.

08:59:55 20  Q.   Then the next bullet point says:  "The absence of the need

09:00:00 21  for routine coagulation monitoring for novel oral agents is an

09:00:06 22  advantage."

09:00:07 23       Do you see that, Mr. Shah?

09:00:10 24  A.   I do.  That appears to be the feedback we got.

09:00:13 25  Q.   Then it states:  "However, there is a critically important

*OFFICIAL TRANSCRIPT*

09:00:18 1    need for a coagulation assessment assay" --

09:00:23 2          Do you see that, Mr. Shah?

09:00:27 3    A.    I do.

09:00:28 4    Q.    -- "in a number of situations, to determine if a patient

09:00:32 5    has been compliant with the regimen, to better understand how

09:00:35 6    to deal with bleeding or therapy failure with the drug on board

09:00:41 7    versus not on board, and physician desire to titrate dose, even

09:00:45 8    if not recommended."

09:00:46 9          Do you see that, sir?

09:00:46 10   A.    Yes, that's what's written here.

09:00:49 11   Q.    So some of the feedback that you were getting from your

09:00:53 12   advisors is that it would be important, it would be critically

09:00:59 13   important to have a way to measure the coagulation effect of

09:01:05 14   Xarelto; is that fair, sir?

09:01:10 15   A.    Yes.  I mean, that was certainly not uncommon at that

09:01:11 16   point for us to be getting that feedback, given that the agents

09:01:14 17   on the market at that time, specifically warfarin, had

09:01:17 18   monitoring available.  Certainly, there was a desire, including

09:01:21 19   by us, to have it, if there was a scientifically valid way to

09:01:24 20   do so.

09:01:24 21   Q.    All right.  Thank you, Mr. Shah.

09:01:28 22          MR. BIRCHFIELD:  My apologies, Your Honor.  I move

09:01:30 23   Plaintiff's Exhibit 122, if I haven't already.

09:01:32 24          MR. SARVER:  No objection, Your Honor.

09:01:34 25          THE COURT:  Let it be admitted.

                                        *OFFICIAL TRANSCRIPT*

09:01:35  1    EXAMINATION BY MR. BIRCHFIELD:

09:01:39  2    Q.   Mr. Shah, I want to -- well, so this was August 15, 2009;

09:01:46  3    is that correct, Mr. Shah?

09:01:48  4    A.   Yes, that is correct.

09:01:51  5    Q.   You can set that aside.

09:02:36  6         I want to move to later in 2009, to November of 2009.

09:02:46  7    I want to provide you with an e-mail.  The identification

09:02:53  8    number is 3045270.

09:03:02  9    A.   Okay.

09:03:03 10    Q.   I'll mark this as Plaintiff's Exhibit 123.

09:03:10 11         Mr. Shah, do you see that this is an e-mail from you

09:03:16 12    dated November 10, 2009?  Do you see that, sir?

09:03:20 13    A.   Yes, that's -- sorry to interrupt.  Yes, that's correct.

09:03:25 14         MR. BIRCHFIELD:  Your Honor, we offer Plaintiff's

09:03:27 15    Exhibit 123.

09:03:27 16         MR. SARVER:  No objection, Your Honor.

09:03:28 17         THE COURT:  Let it be admitted.

09:03:29 18    EXAMINATION BY MR. BIRCHFIELD:

09:03:31 19    Q.   Mr. Shah, if we see, the first part, the top part of the

09:03:36 20    e-mail, it's sent to several individuals, including Susan

09:03:43 21    Geiger; is that right?

09:03:46 22    A.   Yes, this appears to be an e-mail I wrote to some of my

09:03:50 23    direct reports at the time.

09:03:51 24    Q.   The subject line on this is the review of ASH Poster, 2009

09:03:58 25    poster.  Do you see that, Mr. Shah?

**OFFICIAL TRANSCRIPT**

09:04:00 1    A.    I do.

09:04:02 2    Q.    What is ASH?

09:04:05 3    A.    ASH stands for the American Society of Hematology.

09:04:11 4    Q.    If we look farther down, we see that you were actually

09:04:20 5    forwarding an e-mail that you had received from -- help me with

09:04:26 6    name there, sir.

09:04:26 7    A.    Oh, boy.  Chandrabala Shah.  No relation to me.

09:04:39 8    Q.    No relation.  Okay.  All right.

09:04:39 9          So Ms. Shaw, she had sent this e-mail to you and to

09:04:44 10   others about this American Society of Hematology poster; is

09:04:46 11   that correct?

09:04:46 12   A.    Yes.  That appears to be correct.

09:04:50 13   Q.    Ms. Shaw was with an organization -- or a company called

09:04:57 14   *Chameleon*; is that right?

09:05:00 15   A.    Yes.

09:05:00 16   Q.    Chameleon is a company that Janssen has -- had hired to

09:05:06 17   help -- to help manage in the publication strategy, help with

09:05:12 18   the medical literature aspect, marketing through medical

09:05:16 19   literature; is that correct, sir?

09:05:18 20   A.    No.  That is not correct.

09:05:21 21         So Chameleon was actually hired -- prior to my time,

09:05:27 22   by the way, on Xarelto -- but it was hired jointly by the Bayer

09:05:30 23   and Janssen organizations, and the hiring would have occurred

09:05:34 24   from our medical affairs department or from R&D, I -- I don't

09:05:40 25   recall.  But it wasn't a marketing hire.

*OFFICIAL TRANSCRIPT*

09:05:41  1    Q.    Well, part of what Chameleon would do is actually write
09:05:48  2    drafts of articles to be published in the medical literature;
09:05:51  3    is that correct?
09:05:52  4    A.    So, I would recommend speaking to our medical affairs
09:05:57  5    people, who managed them on a day-to-day basis for the
09:06:00  6    precision, but, yes, they certainly worked with the study
09:06:03  7    investigators and authors to help compose articles, pull
09:06:07  8    together the information necessary to publish our research.
09:06:12  9    Q.    And Chameleon worked to make sure that the medical
09:06:16  10   literature aligned, as best you could, with the core messages,
09:06:19  11   or marketing messages for Xarelto, correct?
09:06:22  12   A.    Well, anytime we publish, as a general -- you know,
09:06:27  13   obviously anytime we have results of study, one of the
09:06:30  14   principles we have lived by as a company, and it's an
09:06:34  15   industry-wide principle now, is that you should always publish
09:06:36  16   the research results that you have of every study, regardless
09:06:39  17   of whether they are positive or negative.
09:06:42  18          And certainly, you know, in this case, their primary
09:06:44  19   objective was to publish the results of those studies.
09:06:46  20   Q.    Are you saying that's Chameleon's responsibility to
09:06:54  21   publish that or Janssen and Bayer's responsibility to publish?
09:06:57  22   A.    It's ultimately the study investigator's responsibility
09:07:00  23   first and foremost.  You're absolutely right about that.  First
09:07:01  24   and foremost it is the study investigator's responsibility to
09:07:05  25   publish the results of their research.  And Chameleon, in the

*OFFICIAL TRANSCRIPT*

09:07:08  1   case, would obviously help them compose these articles.

09:07:12  2   Q.   Okay.  Thank you, sir.

09:07:14  3        Let's move into the body of the e-mail from Mrs. Shah

09:07:19  4   at Chameleon, and there it has stated the communicative

09:07:24  5   objective.  Do you see that, Mr. Shah?

09:07:27  6   A.   I do.

09:07:28  7   Q.   Okay.  So the communicative objective, the purpose of the

09:07:33  8   communication, "PT was not indicative of bleeding events:

09:07:38  9   Patients with bleeding did not exhibit higher PT values than

09:07:42 10   patients without bleeding."

09:07:47 11        Did I read that correctly, sir?

09:07:49 12   A.   You did.

09:07:49 13   Q.   So, that's the communication objective.  But the article,

09:07:54 14   the poster, was actually attached to this e-mail; is that

09:07:58 15   correct?

09:07:58 16   A.   Yes.  It appears that there was an attachment to this

09:08:05 17   e-mail.

09:08:05 18   Q.   And the attachment -- the attachment, as well as the

09:08:10 19   e-mail, you forwarded to others within the marketing

09:08:14 20   department, including Susan Geiger; is that right?

09:08:18 21   A.   It appears that I did, yes.

09:08:19 22   Q.   I want to hand you what's marked as Plaintiff's

09:08:26 23   Exhibit 124, the Record Identification Number 5813730.

09:08:34 24   A.   Okay.

09:08:36 25        MR. BIRCHFIELD:  Your Honor, at this time we would

*OFFICIAL TRANSCRIPT*

09:08:38  1    offer Plaintiff's Exhibit 124?

09:08:40  2            MR. SARVER:  No objection, Your Honor.

09:08:42  3            THE COURT:  Let it be admitted.

09:08:43  4    EXAMINATION BY MR. BIRCHFIELD:

09:08:46  5    Q.    Mr. Shah, do you have the article in front of you now?

09:08:49  6    A.    Yes, I do.

09:08:50  7    Q.    All right.  And so, the -- if we look at the authors, do

09:08:55  8    you recognize the name of any of these authors, sir, as being

09:09:00  9    connected with Bayer or Janssen?

09:09:02 10    A.    Yes.  I do recognize some external physicians and thought

09:09:11 11    leaders, and I also recognize some folks from Bayer on here.

09:09:15 12    Q.    All right.  If you'll take a look at the second page,

09:09:15 13    and --

09:09:15 14    A.    Okay.

09:09:31 15    Q.    Well, I'm sorry, Mr. Shah, if you'll flip back to the

09:09:34 16    first page, we see that this is talking about the RECORD

09:09:38 17    trials, right?  RECORD 1, 2, 3 and 4; is that right?

09:09:50 18    A.    The title does indicate that there was some level of

09:09:53 19    results here from people undergoing hip and knee replacement

09:09:58 20    surgeries, which were the RECORD trials.  I don't know which

09:10:01 21    specific RECORD trials this includes data from, but it looks

09:10:04 22    like it's saying RECORD program 1, 2, 3 and 4, so that appears

09:10:06 23    to be the case.

09:10:07 24    Q.    If you'll turn to the next page, and I'll be glad to read

09:10:12 25    any of this that you want to.  For time sake, I want to go to

*OFFICIAL TRANSCRIPT*

09:10:15  1    the points that I think are pertinent here.  But if you think

09:10:19  2    theirs others, I'll be glad to take a look at that as well.

09:10:24  3    Okay, sir?

09:10:24  4    A.    Okay.  Thank you.

09:10:25  5    Q.    So, if we go to the top, we see the relationship between

09:10:27  6    PT measured by Neoplastin reagent and adjudicated bleeding

09:10:34  7    events was evaluated in 6,040 subjects valid for the safety

09:10:40  8    analysis who underwent surgery and had taken at least one dose

09:10:43  9    of rivaroxaban or Xarelto; is that right?

09:10:47 10    A.    Yes, that's what it states.

09:10:49 11    Q.    And then we see that PT was measured on day zero,

09:10:53 12    baseline, and Day 6, trough and peak, and grouped according to

09:10:59 13    quartiles.  Do you see that, Mr. Shah?

09:11:02 14    A.    I do.

09:11:02 15    Q.    Okay.  All right.  If we -- and then it provides some

09:11:06 16    additional information about the events and how they were

09:11:10 17    evaluated.  But if you'll move down to -- about six lines up,

09:11:15 18    it says, "Of the patients with bleeding events."  Are you

09:11:19 19    following where I am, sir?

09:11:19 20    A.    (No audible response.)

09:11:21 21    Q.    "Of the patients with bleeding events, most events

09:11:24 22    occurred in those with PT values in the extreme Q4" --

09:11:31 23          Q4, that would be fourth quartile, right, Mr. Shah?

09:11:36 24    A.    I don't recall what the quartiles in the case would be,

09:11:39 25    and I don't have enough familiarity with the research to recall

*OFFICIAL TRANSCRIPT*

09:11:42 1    that.  But what you read is accurately stated here.

09:11:44 2    Q.    Okay.

09:11:45 3              -- "in extreme Q4 peak and trough quartiles."

09:11:49 4              And then it refers to the table, and we see the table

09:11:53 5    below; is that right?

09:11:53 6    A.    Yes, there is a table below.

09:11:57 7    Q.    And if we look at that table, and it has Q1, 2, 3 and 4,

09:12:03 8    and it's measuring prothrombin time and trough on Day 6.  Do

09:12:08 9    you see that?

09:12:12 10   A.    Prothrombin time and tough at Day 6, yes, that's what it

09:12:16 11   says.

09:12:16 12   Q.    So if you look at the -- Q4, it has a range of greater

09:12:22 13   than 14.7 to 36.4.  Do you see that?

09:12:28 14   A.    Yes, that's what's written here.

09:12:31 15   Q.    All right.  And if the testimony in this case is that

09:12:36 16   Ms. Mingo had a trough PT of 23.6, that would put her in the

09:12:42 17   fourth quartile, correct, Mr. Shah?

09:12:46 18   A.    You know, that's a better question for one of our

09:12:49 19   physicians or clinicians.  But if that's the value and that's

09:12:52 20   how these quartiles are done, I guess that would be the case,

09:12:55 21   but I'm not sure.

09:12:56 22   Q.    Okay.  All right.  And then we see prothrombin time Day 6,

09:13:01 23   peak.  Do you see that, sir?

09:13:04 24   A.    Yes, I do.

09:13:05 25   Q.    Okay.  And then for the fourth quartile, the range is 21.1

*OFFICIAL TRANSCRIPT*

1731

09:13:11 1  to 70.4.  Do you see that, Mr. Shah?

09:13:15 2  A.    I do.

09:13:16 3  Q.    All right.  And then let's go back to the body of the

09:13:23 4  poster here.  It states:  "The reproducible effects of

09:13:31 5  rivaroxaban on PT are consistent with its known

09:13:37 6  pharmacokinetics in plasma."

09:13:40 7  A.    Sorry.  Just one second.  Where did you just move to?

09:13:45 8  Q.    We were in the body of the text.

09:13:48 9  A.    Okay.  I think -- I found it.  Okay.  Thank you.

09:13:50 10  Q.    So, "The reproducible effects of rivaroxaban on PT are

09:13:55 11  consistent with its known pharmacokinetics in plasma, although

09:14:01 12  extreme PT trough and peak values were are associated with an

09:14:06 13  increased risk of bleeding.  This analysis suggests that PT

09:14:10 14  over a wide range is not an accurate predictor of bleeding

09:14:14 15  events in individual patients undergoing total hip or knee

09:14:17 16  replacement surgery receiving 10 milligrams of rivaroxaban."

09:14:21 17          Do you see that, Mr. Shah?

09:14:24 18  A.    Yes, that's what it states.

09:14:25 19  Q.    So, while it may not predict bleeding in the lower level

09:14:30 20  quartiles, the extreme quartile, the fourth quartile at peak

09:14:36 21  and trough are associated with an increased risk of bleeding.

09:14:40 22          MR. SARVER:  Objection, Your Honor, that's not --

09:14:40 23  EXAMINATION BY MR. BIRCHFIELD:

09:14:43 24  Q.    Is that correct?

09:14:43 25          MR. SARVER:  That's not what the document says.

*OFFICIAL TRANSCRIPT*

09:14:46  1          MR. BIRCHFIELD:  I'm reading from the document,

09:14:47  2     Your Honor.

09:14:48  3          THE COURT:  Show him where you're reading from.

09:14:49  4          MR. BIRCHFIELD:  Yes, sir.

09:14:50  5     EXAMINATION BY MR. BIRCHFIELD:

09:14:50  6     Q.   Mr. Shah, do you see where it says "although extreme

09:14:53  7     PT" -- we are four lines from the bottom of that paragraph --

09:14:58  8     "although extreme PT trough and peak values were associated

09:15:02  9     with an increased risk of bleeding"?

09:15:08 10     A.   Yes.  That's what it says.

09:15:09 11     Q.   And if you look up three lines above that where we read

09:15:18 12     earlier, it describes the extreme as Q4, peak and trough

09:15:27 13     quartiles, correct?

09:15:34 14     A.   Sorry, give me one second.

09:15:35 15     Q.   Yes, sir.

09:15:40 16          THE COURT:  Why don't you read that whole sentence to

09:15:43 17     him so he can locate it.

09:15:44 18          MR. BIRCHFIELD:  Yes, sir.

09:15:46 19          THE WITNESS:  Yeah, that would be helpful.

09:15:46 20     EXAMINATION BY MR. BIRCHFIELD:

09:15:49 21     Q.   Okay.  Mr. Shah, it's the same sentence that we read

09:15:53 22     earlier, but it's three lines up.  It says, "Of the patients

09:15:56 23     with bleeding events, most events occurred in those with PT

09:16:00 24     values in the extreme Q4 peak and trough quartiles table."

09:16:07 25          Do you see that, sir?

*OFFICIAL TRANSCRIPT*

09:16:09 1    A.    I do.

09:16:09 2    Q.    All right.  Let's -- let me put this on our board.

09:16:23 3          This is a 2009 -- November of 2009, Mr. Shah?

09:16:29 4    A.    Yes.  It appears to be from 2009.

09:16:33 5    Q.    All right.  You can set that aside, Mr. Shah.

09:16:55 6          And I want to hand you what's marked as Plaintiff's

09:17:06 7    Exhibit 125, Record Number 255699.

09:17:23 8          Mr. Shah, do you see that this is an e-mail from

09:17:28 9    Nini Bode to others, including yourself?

09:17:32 10   A.    Yes, that's correct.

09:17:32 11   Q.    And it's dated June 15, 2010?

09:17:36 12   A.    Yes, that's correct.

09:17:41 13         MR. BIRCHFIELD:  Okay.  All right.  Your Honor, we

09:17:44 14   offer Plaintiff's Exhibit 125?

09:17:45 15         MR. SARVER:  No objection.

09:17:48 16         THE COURT:  Let it be admitted.

09:17:49 17   EXAMINATION BY MR. BIRCHFIELD:

09:17:50 18   Q.    All right.  And if you will, let's take a look at

09:18:01 19   Ms. Bode's e-mail here.  It says:  "Dear all, for the upcoming

09:18:10 20   VTE treatment, Bayer only, and AFib submissions preclinical is

09:18:15 21   ahead of clinical with regards to writing CTD modules."

09:18:22 22         Do you see that, sir?

09:18:22 23   A.    I do.

09:18:22 24   Q.    And what are *CTD modules*?

09:18:24 25   A.    I don't recall.  I'm not sure what that acronym stands

*OFFICIAL TRANSCRIPT*

09:18:29  1   for.

09:18:29  2   Q.   Then it says:  "We uncovered the attached paper by Samama

09:18:33  3   on attempts to find an assay to measure rivaroxaban in clinical

09:18:38  4   practice."

09:18:38  5        Do you see that?

09:18:42  6   A.   Yes, that's what's written here.

09:18:44  7   Q.   All right.  And if you move down, I'll be glad to read any

09:18:50  8   of that that you think is pertinent, but for time sake, if you

09:18:54  9   will move to, "Hence, we have several questions," and then the

09:18:59 10   questions are numbered.  Number 1:  "With regard to upcoming

09:19:02 11   VTE treatment/AFib commissions, what is the strategy regarding

09:19:10 12   rivaroxaban measurements in clinical practice?"

09:19:12 13        Is that correct, Mr. Shah?

09:19:17 14   A.   Yes.  This would be for the follow-on studies or the

09:19:22 15   approvals, I guess, at that point, for which we didn't have the

09:19:25 16   drug yet, and that's what she's referring to.

09:19:26 17   Q.   Right.  And that would include the VTE treatment

09:19:31 18   indication, right?

09:19:33 19   A.   Yes, that's correct.

09:19:34 20   Q.   And it would include the AFib, correct?

09:19:42 21   A.   Yes, that's also correct.

09:19:42 22   Q.   And AFib was considered to be the largest, the most

09:19:47 23   valuable indication for Janssen and Johnson & Johnson, correct?

09:19:52 24   A.   Well, it's the largest because it had the highest number

09:19:56 25   of patients, and those patients tend to take the medication

**OFFICIAL TRANSCRIPT**

09:19:59 1   chronically, so by default, that would be the population that
09:20:02 2   would take the medication for longest and the most amount.
09:20:06 3   Q.    And you were expecting the most sales to come from the
09:20:08 4   AFib indication, correct?
09:20:10 5   A.    Well, naturally.  I mean, if a patient population is going
09:20:14 6   to use more of the drug, you would expect more sales from that
09:20:16 7   population than you would others.
09:20:18 8   Q.    So let's look at No. 2.  "Do we want health authorities
09:20:21 9   outside EMA" --
09:20:22 10            Now, EMA, that would be the FDA equivalent in Europe;
09:20:27 11   is that right?
09:20:27 12   A.    Yes.  That's my -- that's exactly right.
09:20:30 13   Q.    Okay.  So, "Do we want health authorities outside EMA to
09:20:35 14   find out about the Samama paper themselves and draw their own
09:20:39 15   conclusions, or do we point them to the Samama paper and
09:20:43 16   present it together with the joint Bayer/J&J agreed message
09:20:48 17   regarding rivaroxaban measurements?"  For the latter case, what
09:20:52 18   is the joint Bayer/J&J message and how prominent; i.e., in
09:20:58 19   which CTD module do we want to present it?"
09:21:02 20            Is that correct?
09:21:04 21   A.    Yes, that's what she writes.
09:21:05 22   Q.    And health authorities outside the EMA, that would include
09:21:10 23   the FDA, correct?
09:21:15 24   A.    I'm assuming that that would be the case.  I think that's
09:21:18 25   what she's implying here.

**OFFICIAL TRANSCRIPT**

1736

09:21:19 1  Q.   And then 3 is -- question is:  "Is there agreement with

09:21:26 2  Bayer regarding 1 and 2?"

09:21:29 3        Regarding Questions 1 and 2; is that right?

09:21:33 4  A.   Yes, that's what she writes.

09:21:41 5  Q.   Is there anything else in this e-mail that you consider to

09:21:44 6  be important, Mr. Shah, before I move to the next e-mail?

09:21:47 7  A.   No.  There is additional detail she writes.  I'm not sure

09:21:51 8  what the importance of that is.

09:21:51 9  Q.   Okay.

09:21:53 10 A.   I think we're fine to move on.

09:21:55 11 Q.   And let me show you what's marked as Plaintiff's

09:22:00 12 Exhibit 126.  It is Record Number 255700.

09:22:17 13 A.   Okay.

09:22:17 14 Q.   And, Mr. Shah, do you recognize as the -- this is the

09:22:21 15 Samama article that was attached to the e-mail that we just

09:22:23 16 looked at; is that right?

09:22:27 17 A.   I have no reason to doubt that.  It looks like it.

09:22:33 18      MR. BIRCHFIELD:  All right.  Your Honor, we would offer

09:22:38 19 Plaintiff's Exhibit 126.

09:22:39 20      MR. SARVER:  Your Honor, this is fine for the usual

09:22:44 21 purpose of scientific literature.  We don't have any objection

09:22:47 22 for that demonstrative purpose.

09:22:49 23      THE COURT:  Let's use it in that fashion.  And if there

09:22:55 24 are portions of it that are critical, then I'll consider

09:22:58 25 putting that portion in, but let's do it the way we've done.

*OFFICIAL TRANSCRIPT*

09:23:03  1               Members of the Jury, what we're trying to do is

09:23:05  2   rather than put in medical literature so that you would have to

09:23:08  3   read all of the medical literature, we're referring to it and

09:23:11  4   asking the witnesses what their comments are.  But we don't put

09:23:18  5   it medical literature itself.

09:23:20  6   EXAMINATION BY MR. BIRCHFIELD:

09:23:21  7   Q.    So if we take a look at the article under the summary

09:23:26  8   section, are you with me, Mr. Shah?

09:23:31  9   A.    Yes, I have a summary in front of me.

09:23:34 10   Q.    And it states:  "Although there is no need for routine

09:23:37 11   coagulation monitoring with rivaroxaban, an oral, direct

09:23:41 12   Factor Xa inhibitor, a hemostasis assay:

09:23:47 13               And a *hemostasis assay*, that's a coagulation test,

09:23:52 14   correct?

09:23:52 15   A.    I believe that's what it refers to.  But again, our

09:23:54 16   clinicians would be better able to answer that.

09:23:57 17   Q.    Okay.

09:23:57 18               -- "a hemostasis assay might be valuable to measure

09:24:05 19   its pharmacodynamic effects.  This study aimed to find assays,

09:24:10 20   among those commercially available, to measure rivaroxaban

09:24:14 21   pharmacodynamics."

09:24:15 22               Is that correct, Mr. Shah?

09:24:18 23   A.    Yes, that's what it states.

09:24:20 24   Q.    And if you'll look at the -- in the column to the right,

09:24:28 25   and there in the middle of the paragraph it says:  "The

                          ***OFFICIAL TRANSCRIPT***

09:24:30  1    chromogenic tests found a dose-dependent relationship between

09:24:37  2    anti-Factor Xa activity and rivaroxaban concentration."

09:24:41  3             Is that correct, Mr. Shah?

09:24:43  4    A.    That's what it states.

09:24:44  5    Q.    And then we look a little bit further, it says:  "One

09:24:50  6    step, PiCT and Hep-Tests with shortened incubation times, as

09:24:58  7    well as the widely available PT assay using a rivaroxaban

09:25:03  8    calibrator, could be useful to monitor the pharmacodynamic

09:25:07  9    effects of rivaroxaban accurately."

09:25:10 10             Is that right?

09:25:10 11    A.    Yes.  It says that that could be useful.

09:25:14 12    Q.    Okay.  Right.  So -- just so that we're clear, the e-mail

09:25:19 13    that you received asking questions about the Samama article is

09:25:24 14    referring to a Samama article that is evaluating, is assessing

09:25:29 15    tests to measure the anticoagulant effect of Xarelto, correct?

09:25:36 16    A.    Yeah.  I mean, listen, this is obviously from years ago

09:25:40 17    now, but that certainly appears to be the case.  I don't recall

09:25:43 18    all the details of the study or the research by any means, but

09:25:46 19    that's what it appears to be doing.  And then the author seems

09:25:50 20    to be concluding that some of these tests could be useful.  I'm

09:25:54 21    not sure what they mean by *could,* but -- that says there may be

09:25:59 22    some indication, but perhaps further testing is needed.

09:26:02 23    Q.    I'm sorry, Mr. Shah, what was the -- what was the date on

09:26:06 24    the e-mail that you forwarded?

09:26:10 25    A.    The date to which this article was attached?

                            *OFFICIAL TRANSCRIPT*

09:26:13 1    Q.    Yes, sir.  Is it June 15th?

09:26:15 2    A.    That date is June 15th, 2010.

09:26:49 3    Q.    And, Mr. Shah, I want to move to the next e-mail in

09:27:01 4    this -- in this stream, and I'll show you what's marked as

09:27:12 5    Plaintiff's Exhibit 126 -- 127, and Record Identification

09:27:20 6    Number 1023223.

09:27:28 7             And, Mr. Shah, if you look at the -- well, first of

09:27:33 8    all, this is an e-mail that you sent on June 15, 2010; is that

09:27:33 9    right?

09:27:41 10   A.    Yes, that is correct.

09:27:43 11        MR. BIRCHFIELD:  Okay.  All right.  Your Honor, we

09:27:47 12   offer Plaintiff's Exhibit 127.

09:27:50 13        MR. SARVER:  No objection.

09:27:50 14        THE COURT:  Let it be admitted.

09:27:51 15   EXAMINATION BY MR. BIRCHFIELD:

09:27:51 16   Q.    Mr. Shah, if we go down to the -- it's an e-mail stream,

09:27:55 17   so if we go down to the bottom, we see that that is the e-mail

09:27:59 18   from Nini Bode to you and others that we just talked about,

09:28:05 19   that we just covered; is that right?

09:28:07 20   A.    Yes.  That appears to be the case.

09:28:09 21   Q.    And so now you are -- you are forwarding -- or you're

09:28:13 22   actually replying to Nini -- to Nini's e-mail and you're

09:28:19 23   sending it to her and others, right?

09:28:23 24   A.    Yes.  Her e-mail was addressed to me and some other folks

09:28:27 25   and she was asking obviously for our thoughts, and I am one of

*OFFICIAL TRANSCRIPT*

09:28:31 1    the folks responding.  I'm not sure who else responded to her.

09:28:34 2    Q.   Okay.  All right.  And so let's look at your e-mail.  You

09:28:40 3    say:  "Thanks for forwarding this on."

09:28:42 4         Are you with me?

09:28:46 5    A.   Yes, I am.

09:28:47 6    Q.   "Thanks for forwarding this on.  From a commercial

09:28:54 7    strategy standpoint, we do not want to recommended or encourage

09:29:00 8    use of any measurements with rivaroxaban..."

09:29:06 9         Did I read that part correctly?

09:29:09 10   A.   That is part of what I wrote.

09:29:09 11   Q.   Right.

09:29:11 12   A.   There is a second component of that sentence.

09:29:13 13   Q.   Right.

09:29:14 14        "...given that they will not accomplish the primary

09:29:17 15   purpose that most clinicians have for measuring levels in

09:29:20 16   chronic treatment situations - compliance."

09:29:25 17        Is that right?

09:29:26 18   A.   Yes, that is correct.

09:29:26 19   Q.   All right.  And then you say:  "While these tests may

09:29:31 20   provide an indication of whether rivaroxaban is on board, none

09:29:35 21   will convey whether the patient has been taking rivaroxaban

09:29:38 22   regularly."

09:29:39 23        Right?

09:29:41 24   A.   Yes.  That's what I wrote.

09:29:44 25   Q.   Okay.  And then you state that:  "Given the length of time

*OFFICIAL TRANSCRIPT*

09:29:49 1    it can take to achieve target INR levels with warfarin,

09:29:54 2    clinicians sometimes relay" --

09:29:57 3            I think you mean *rely*; is that right?  Typo there?

09:30:00 4    A.    It looks like I have a typo there, yes.

09:30:02 5    Q.    -- "on the INR tests to also measure compliance.  Finally,

09:30:08 6    it's my understanding that while the measurements may indicate

09:30:11 7    current rivaroxaban levels in the body, they don't correlate to

09:30:15 8    risk of bleeding or other outcomes."

09:30:17 9            Is that right?

09:30:18 10   A.    Yes.  That's what I wrote, that that was my

09:30:22 11   understanding --

09:30:22 12   Q.    Okay.

09:30:23 13   A.    -- based on what I had learned from the science and our

09:30:26 14   researchers.

09:30:27 15   Q.    But that is -- that's contrary to the blood article that

09:30:33 16   you forwarded to Susan Geiger and others that we just went

09:30:37 17   through a few moments ago, correct?

09:30:40 18   A.    I'm not sure it would be contrary.  And again, I hadn't

09:30:46 19   read the entire article here that you -- that we just walked

09:30:49 20   through, but the statement that we read towards the end of that

09:30:52 21   abstract in that article certainly stated that these could have

09:30:55 22   relevance in measuring levels but certainly wasn't a definitive

09:30:59 23   conclusion that those tests would be useful.

09:31:01 24            I think what I'm doing here, there was likely other

09:31:04 25   research that I had come into view of based on our -- what our

***OFFICIAL TRANSCRIPT***

09:31:08  1   researchers and clinicians had shared with me, and that's what,

09:31:12  2   in essence, I'm writing, is that it's my understanding that

09:31:14  3   while the measurement may indicate current levels, they don't

09:31:18  4   correlate to risks of bleeding or other outcomes.

09:31:21  5   Q.   Then you go forward in your e-mail and you say:

09:31:24  6   "Therefore, assuming this indeed is the case, we are planning

09:31:27  7   to stick with a" -- do you mean "simple strategy to not

09:31:34  8   recommend measurement."

09:31:35  9        Is that right?

09:31:37 10   A.   Yeah.  I mean, basically what I'm saying there is that

09:31:40 11   assuming this is indeed the case, which I think is a key

09:31:43 12   component, unless there is some other research that I'm not

09:31:45 13   aware of, that there obviously would be no need to shift the

09:31:49 14   strategy that we had.

09:31:50 15   Q.   Okay.  All right.  Are you familiar with the FDA medical

09:31:56 16   reviewers' position on PT predicting bleed risk, Mr. Shah?

09:32:03 17   A.   I'm not sure.  It was obviously awhile ago, but I'm not

09:32:06 18   sure which reviewer you're talking about.

09:32:08 19   Q.   The -- well, I'll tell you what.  We'll move on.  That's

09:32:14 20   in evidence.  The jury can look at that.

09:32:18 21        MR. SARVER:  I object to the commentary, Your Honor.

09:32:20 22        MR. BIRCHFIELD:  I'll be glad to -- we'll go there.

09:32:22 23   EXAMINATION BY MR. BIRCHFIELD:

09:32:28 24   Q.   Plaintiff's Exhibit 102.

09:32:30 25        Mr. Shah, this is the FDA summary review.  And if

*OFFICIAL TRANSCRIPT*

09:32:38 1    you'll go to the -- to the second page, we see -- we see it's

09:32:46 2    dated November 4, 2011.

09:32:50 3    A.    November 4th.  Yes, that's correct.

09:32:52 4    Q.    All right.  And if you look down a little bit farther,

09:33:00 5    this pertains to Xarelto, rivaroxaban.  Do you see that, sir?

09:33:07 6    A.    Yes, it does.

09:33:07 7    Q.    And in the dosage strength, this is 20 milligrams,

09:33:16 8    15 milligrams.  You're familiar with that, sir?

09:33:19 9    A.    Those are two of the doses we have approved for Xarelto.

09:33:22 10   Q.    All right.  And if you will -- if you'll turn to page --

09:33:31 11   if you'll turn to page 7 or PDF 8.

09:33:44 12   A.    Okay.

09:33:44 13   Q.    And it states:  "Consideration of labeling Xarelto as a

09:33:51 14   second-line therapy."  This is the FDA medical reviewers, the

09:33:56 15   medical summary review.  And it stating:  "Consideration of

09:34:00 16   labeling Xarelto as second-line therapy."

09:34:03 17         Do you see where I'm reading, Mr. Shah?

09:34:07 18   A.    Yes.  This particular reviewer wrote that it looks like.

09:34:10 19   Q.    So then it says:  "Some on the review team, as well as

09:34:14 20   several members of the advisory committee, suggested that if

09:34:17 21   Xarelto were approved, that it be restricted to second-line

09:34:21 22   therapy.  The rationale for this suggestion seems to be as

09:34:27 23   follows:"

09:34:28 24         The first bullet point --

09:34:30 25         Do you see where I'm reading, Mr. Shah?

*OFFICIAL TRANSCRIPT*

09:34:31  1    A.    Yes.  Yes, I'm with you.

09:34:34  2    Q.    -- "It's not clear that outcomes in Xarelto subjects in

09:34:37  3    ROCKET were as good as warfarin subjects whose INR could be

09:34:43  4    well controlled."  And it says:  "See discussion below" --

09:34:48  5    above."  I'm sorry.

09:34:48  6          Do you see that?

09:34:49  7    A.    Yes, I do.

09:34:49  8    Q.    Then it states:  "Pradaxa was shown to be superior to

09:34:53  9    warfarin in RE-LY whereas Xarelto did not demonstrate

09:34:59 10    superiority in ROCKET."

09:35:02 11          Do you see that, sir?

09:35:05 12    A.    Yes.  That's what he seems to have written.

09:35:08 13    Q.    And ROCKET was a clinical trial involving Xarelto,

09:35:08 14    correct?

09:35:11 15    A.    Yes.  ROCKET was our primary trial for assessing the

09:35:14 16    efficacy and safety in atrial fibrillation patients.

09:35:19 17    Q.    RE-LY was the clinical trial for Pradaxa; is that correct?

09:35:22 18    A.    Yes, it was their trial for atrial fibrillation as well.

09:35:28 19    Q.    Then the third bullet point:  "Therefore, Xarelto should

09:35:34 20    be used only in patients whose INR cannot be well controlled on

09:35:39 21    warfarin and who cannot take dabigatran, or Pradaxa."

09:35:43 22          Is that right?

09:35:44 23    A.    Yes, that's what this reviewer writes.

09:35:45 24    Q.    Now, if you'll turn to page 9, PDF page 10, where it

09:35:53 25    states:  "Additional issues."

                        *OFFICIAL TRANSCRIPT*

1745

09:35:55  1        Do you see that, Mr. Shah?

09:35:58  2   A.   I do.

09:35:58  3   Q.   "Desirability of monitoring for adjustment of Xarelto

09:36:03  4   dose.  The clinical pharmacology and clinical reviewers

09:36:10  5   demonstrated that there is a linear correlation between

09:36:11  6   rivaroxaban levels and prothrombin time, PT."

09:36:18  7        Is that correct, sir?

09:36:20  8   A.   Yes, that's what's written here.

09:36:23  9   Q.   "They also demonstrated that there is a correlation

09:36:25 10   between PT and risk of bleeding.  The applicant has not chosen

09:36:32 11   to utilize this information."

09:36:37 12        The applicant, that would be Janssen, right?

09:36:41 13   A.   It would be Janssen -- yes, in the United States, it would

09:36:44 14   be Janssen.

09:36:44 15   Q.   Okay.  All right.  For time's sake, skip down just a

09:36:50 16   sentence or two, where it states:  "It is convenient for

09:36:53 17   patients to be able to dispense with at least monthly

09:36:57 18   monitoring required for warfarin, perhaps increasing the

09:37:01 19   willingness of healthcare providers to prescribe and patients

09:37:04 20   to take an anticoagulant.  However, infrequent monitoring,

09:37:09 21   perhaps at initiation and yearly thereafter, to assure

09:37:13 22   appropriate dosing of drugs that prevent stroke and cause

09:37:17 23   bleeding may improve outcomes and be acceptable to patients."

09:37:26 24        Do you see that?

09:37:27 25   A.   Yes, that's what this reviewer's -- that's what this

*OFFICIAL TRANSCRIPT*

09:37:30  1    reviewer's opinion appears to be.

09:37:31  2    Q.   When you say "this reviewer," you're talking about the

09:37:35  3    medical reviewer that was assigned to review the clinical data

09:37:40  4    submitted by Janssen to the FDA, correct?

09:37:43  5    A.   Yeah.  I mean, again, our regulatory folks could comment

09:37:47  6    better on the review structure at the FDA.  But, certainly, any

09:37:50  7    time we send a file down to the regulatory authorities, there

09:37:54  8    are multiple reviewers, and this gentleman who wrote this

09:37:58  9    appears to be one of them.

09:37:59 10    Q.   All right.  You can set that aside now, Mr. Shah.

09:38:09 11         Let's move to Plaintiff's Exhibit 128.  Mr. Shah, do

09:38:24 12    you see that this is an e-mail to a number of folks, including

09:38:31 13    you?  Your name is about three lines up from the bottom of the

09:38:42 14    *To* area.  Do you see that, sir?

09:38:42 15    A.   Yes, this e-mail appears to have been sent to a large

09:38:45 16    number of people, and I'm one of them.

09:38:46 17    Q.   All right.  For identification purposes, it's

09:38:51 18    Record 375050.

09:38:57 19         Under the attachments, it says:  "Publication

09:39:00 20    planning workshops, key actions, draft 2."

09:39:04 21         Do you see that, sir?

09:39:05 22    A.   I do.

09:39:06 23         MR. BIRCHFIELD:  Your Honor, we offer Plaintiff's

09:39:09 24    Exhibit 128.

09:39:09 25         MR. SARVER:  Your Honor, we don't object, but this has

*OFFICIAL TRANSCRIPT*

09:39:11 1   been going on a while.

09:39:12 2               THE COURT:  Let's try to move a little faster.

09:39:15 3               MR. BIRCHFIELD:  This is a new area, Your Honor.

09:39:17 4               THE COURT:  All right.  I'll admit it.  Let's admit

09:39:23 5   this.

09:39:23 6   EXAMINATION BY MR. BIRCHFIELD:

09:39:25 7   Q.   Mr. Shah, let me show you what's marked as Plaintiff's

09:39:27 8   Exhibit 129.  This is Record Identification Number 375051.

09:39:35 9   A.   Yes.

09:39:35 10  Q.   If you look at the heading on this, this is -- this

09:39:42 11  matches the attachment in the previous e-mail; is that right?

09:39:48 12  A.   Yes, it appears to be.

09:39:50 13              MR. BIRCHFIELD:  All right.  Your Honor, we offer

09:39:51 14  Plaintiff's Exhibit 129.

09:39:52 15              MR. SARVER:  Your Honor, I just need to take a look to

09:39:56 16  make sure that we don't have the same issue.

09:39:58 17              THE COURT:  Let's admit it subject to that.

09:40:00 18              MR. SARVER:  Thank you, Your Honor.

09:40:01 19  EXAMINATION BY MR. BIRCHFIELD:

09:40:01 20  Q.   If you'll look at the second page, Mr. Shah, we see that

09:40:05 21  you are listed as a participant for this strategic publication

09:40:14 22  planning workshop.  You see that, sir?

09:40:15 23  A.   Yes, it appears that I attended the meeting, as in one of

09:40:18 24  the folks that was there out of many.

09:40:20 25  Q.   Then, if you will turn to page 6.  It says:  Plenary

*OFFICIAL TRANSCRIPT*

09:40:30  1   presentations.  It suggests that you made a presentation on the

09:40:34  2   background, current status of rivaroxaban, competitor status

09:40:38  3   and brand aspirations; is that correct?

09:40:40  4   A.    Yes.  So Scott Berkowitz is a physician at Bayer.  He and

09:40:51  5   I apparently made a presentation on rivaroxaban in this

09:40:54  6   meeting.

09:40:55  7   Q.    So part of the marketing plan was to manage the

09:41:09  8   publications and the literature; is that right?

09:41:13  9   A.    No.  I would not agree with that statement.

09:41:14 10   Q.    Okay.  All right.  So we look at the areas that are

09:41:21 11   covered.  When you say you presented background to current

09:41:25 12   status of rivaroxaban, competitor status and brand aspirations

09:41:30 13   during discussions around VTE -- and that's the venous

09:41:39 14   thromboembolism indication, right?

09:41:39 15   A.    VTE stands for venous thromboembolism, yes.

09:41:44 16   Q.    Then you noted that: "It will be important to emphasize

09:41:48 17   prevent of clot expansion."  Right?

09:41:49 18   A.    Yes.  It says that.

09:41:52 19   Q.    It says:  "It's assumed that patients will get less than

09:42:02 20   48 hours of the unfractionated heparin or low molecular weight

09:42:09 21   heparin."  Do you see that?

09:42:09 22   A.    Yes, that's what it says.

09:42:10 23   Q.    Now, let's go to page 8.  It has key publication topics

09:42:19 24   suggested.  The first bullet point is:  "Emphasis on monitoring

09:42:23 25   and that more monitoring is not necessary.  Continue to drive

*OFFICIAL TRANSCRIPT*

09:42:26  1    understanding of why INR is not an issue/appropriate to

09:42:33  2    treatment with rivaroxaban."  Is that right?

09:42:37  3    A.    That's what it says.

09:42:38  4    Q.    Okay.  Part of the marketing plan included training the

09:42:45  5    sales force that monitoring with rivaroxaban was not necessary,

09:42:50  6    and it was not possible; would you agree with that, sir?

09:42:54  7    A.    Well, rivaroxaban, there was no monitoring instrument

09:42:58  8    available at the time.  Obviously, whatever we trained the

09:43:02  9    sales force on would ultimately depend upon what the FDA stated

09:43:06 10    in its label and what it guided us to do.

09:43:09 11          Ultimately, when the FDA approved Xarelto, it did not

09:43:12 12    require monitoring, and, as such, we couldn't articulate that

09:43:16 13    there was a need for monitoring.

09:43:17 14    Q.    Well, but you went a little further than just saying there

09:43:21 15    is not a need for monitoring.  You actually said you cannot

09:43:25 16    monitor, it's not possible to monitor or measure, right?

09:43:29 17    A.    From a monitoring of -- the way warfarin was measured at

09:43:34 18    the time, which was that there was an INR instrument that

09:43:39 19    measures blood levels that correlated to efficacy and safety of

09:43:42 20    warfarin, which was definitely the case, at that moment in time

09:43:45 21    our understanding was that there was nothing scientifically

09:43:48 22    that would indicate a similar correlation of some type of

09:43:51 23    monitoring that would predict efficacy or safety.

09:43:54 24          But, as I said, ultimately the final decision on that

09:43:58 25    rests with the FDA and what they would decide would ultimately

*OFFICIAL TRANSCRIPT*

09:44:02  1    be guided.

09:44:03  2            If I may, just real quick, I also want to point out

09:44:06  3    that, you know, it looks like I made this joint presentation

09:44:09  4    with Scott Berkowitz.  As I stated earlier, he is a physician

09:44:13  5    with Bayer.  I'm not sure what elements of this summary came

09:44:18  6    from my statements or Scott's during the meeting.

09:44:20  7    Q.   All right.  Let me show you what's already in evidence as

09:44:26  8    Plaintiff's Exhibit Number 9.  For identification purposes,

09:44:30  9    it's Record Number 2054294.

09:44:39 10            Mr. Shah, I'm not going to ask you to read this, but

09:44:44 11    this is already in evidence.  This is a list of national key

09:44:48 12    opinion leaders pertaining to Xarelto; is that correct?

09:44:52 13            MR. SARVER:  Your Honor, we don't object, but this is

09:44:54 14    repeating something that has been done before.

09:44:55 15            THE COURT:  We're going to have to move on, Counsel.

09:44:57 16    We're getting repetitive at this point.  I mean, you're getting

09:45:01 17    into argument, as opposed to information.

09:45:04 18            MR. BIRCHFIELD:  I apologize, Your Honor.  I do not

09:45:07 19    intend to argue.

09:45:08 20    EXAMINATION BY MR. BIRCHFIELD:

09:45:08 21    Q.   Mr. Shah, if you'll look at PDF 9 on Trial Exhibit

09:45:13 22    Number 9.

09:45:18 23    A.   Yes, sir, I have it in front of me.

09:45:19 24    Q.   I would ask you to identify that Seth Bilazarian is a

09:45:28 25    national key opinion leader hired by Janssen for Xarelto; is

                         *OFFICIAL TRANSCRIPT*

09:45:32  1   that correct?

09:45:34  2   A.    I have a very large file in front of me of about

09:45:38  3   175 pages, so I'm not sure where he's listed.  It seems to

09:45:42  4   contain a ton of names.

09:45:44  5   Q.    I'll help you, sir.  If you will look at PDF 9, do you see

09:45:53  6   the first name there at the top of the list, Nathan Estes?

09:46:01  7   A.    Yes, I see that name.

09:46:02  8   Q.    Then if you will count down, I believe, eight names, you

09:46:10  9   see Seth Bilazarian?

09:46:16 10   A.    Yes, I see the name.

09:46:17 11   Q.    So Seth Bilazarian would be a national key opinion leader

09:46:22 12   for Xarelto, correct?

09:46:24 13   A.    In the area of cardiology, which is what appears to be his

09:46:28 14   focus area, according to this document, yes.

09:46:30 15   Q.    All right.  Let me show you what's marked as Trial

09:46:38 16   Exhibit 14.  For identification purposes, it's Record Number

09:46:44 17   4797235.

09:46:51 18   A.    Okay.

09:46:51 19   Q.    I just want you to see that this is -- this is an e-mail.

09:47:00 20   Angela Seifert is a sales representative, a detail person for

09:47:05 21   Xarelto, and this is a PowerPoint that she received.  I'm just

09:47:10 22   giving you context here, sir.  I'm about to --

09:47:14 23        THE WITNESS:  Okay.

09:47:14 24   EXAMINATION BY MR. BIRCHFIELD:

09:47:14 25   Q.    Now let me show you what's marked as Trial Exhibit 13.

*OFFICIAL TRANSCRIPT*

09:47:20  1  For identification purposes, Record Number 4797236.

09:47:48  2       Do you see this --

09:47:48  3  A.   Okay.

09:47:50  4  Q.   -- as a PowerPoint from Dr. Seth Bilazarian, the gentleman

09:47:54  5  we just identified as a national key opinion leader?

09:47:57  6  A.   Yes.  I mean, he is -- again, he's a cardiologist, so I

09:48:03  7  would say he's a specialist in that field specifically.  It

09:48:05  8  does look like he put this together.  His name is on it.

09:48:08  9  Q.   It was provided to detail representatives that were

09:48:15 10  talking to doctors about Xarelto, correct?

09:48:20 11  A.   Honestly, sir, I have no context as to where and when or

09:48:23 12  what -- not when, but why this was provided.  The letter is

09:48:27 13  dated -- or this e-mail is dated January 9, 2014, which is

09:48:31 14  about two and a half years after my time on Xarelto ended.

09:48:34 15  Q.   All right.  Sir, if you will -- if you will turn to

09:48:41 16  page -- page 6, the slide that is headed Similarities.

09:48:51 17       MR. SARVER:  Objection, Your Honor, lack of knowledge.

09:48:53 18       MR. BIRCHFIELD:  It's in evidence, Your Honor.

09:48:59 19       THE COURT:  It is in evidence, but if he doesn't know

09:49:00 20  anything about it -- ask him whether he knows something about

09:49:02 21  it.

09:49:03 22  EXAMINATION BY MR. BIRCHFIELD:

09:49:05 23  Q.   Mr. Shah, do you see the PowerPoint?  Do you recognize the

09:49:08 24  PowerPoint?

09:49:10 25  A.   I don't recognize the PowerPoint because -- I'm just not

*OFFICIAL TRANSCRIPT*

09:49:13  1    familiar with it, but -- well, there is a -- I see the

09:49:16  2    PowerPoint in front me.

09:49:18  3    Q.    Mr. Shah, if a PowerPoint that was provided to detail

09:49:27  4    representatives, detail representatives for Xarelto, that said

09:49:30  5    no monitoring necessary or possible, would that be consistent

09:49:35  6    or inconsistent with the marketing messages that you sought to

09:49:41  7    convey with Xarelto?

09:49:43  8    A.    Well, at the time that I was on the product, which was

09:49:46  9    about two and a half years prior to this, I believe that that

09:49:50  10   was consistent with our approved FDA product label, which did

09:49:55  11   not require monitoring of Xarelto.

09:49:57  12          Again, I just don't have context as to who exactly

09:50:01  13   got this.  You just stated that detail representatives got

09:50:03  14   this.  I don't know how many people saw this, in what context

09:50:07  15   this was given.  So I simply can't comment on that.

09:50:10  16   Q.    Okay.  All right.

09:50:12  17          THE COURT:  Let's get to an end point, Counsel.

09:50:18  18          MR. BIRCHFIELD:  Your Honor, can I take just a moment

09:50:26  19   to look and see what I can --

09:50:46  20          THE COURT:  Okay.

09:50:46  21   EXAMINATION BY MR. BIRCHFIELD:

09:50:48  22   Q.    Mr. Shah, let me see if I can move through some key points

09:50:52  23   in an efficient manner.

09:50:53  24          Would you agree that Xarelto was viewed as critical

09:50:59  25   to J&J's success?

*OFFICIAL TRANSCRIPT*

09:51:06 1        MR. SARVER:  Your Honor, I object to the repetition.

09:51:09 2  He did this with Ms. Geiger.  He's just repeating things.

09:51:14 3        THE COURT:  Just ask him.  I'll allow it.

09:51:15 4  EXAMINATION BY MR. BIRCHFIELD:

09:51:19 5  Q.    Was Xarelto considered to be critical for J&J's success?

09:51:21 6  A.    I don't know what the word "critical" means.  I mean,

09:51:24 7  we're a very large company.  It was certainly one of our drugs.

09:51:28 8  We were excited about it, given the unmet need that was there

09:51:31 9  and the profile that we saw in the clinical trials.

09:51:33 10 Q.    Was it projected to be the Number 1 selling product for

09:51:38 11 J&J?

09:51:39 12 A.    No, I don't believe that it necessarily was, at least in

09:51:42 13 my time on the brand.  We had -- we have, again, a number of

09:51:46 14 drugs and a number of other products outside of pharmaceuticals

09:51:51 15 as well.  But I couldn't tell you at what time it was projected

09:51:54 16 to be the biggest per se.  I don't know if that's even true

09:51:58 17 today.

09:51:58 18 Q.    Is it true that Xarelto was projected to generate ten

09:52:05 19 percent of the revenue for J&J?

09:52:08 20 A.    Well, we are a $75 billion company annually in terms of

09:52:17 21 sales, 74 billion.  Xarelto, according to what I know, last

09:52:19 22 year sold approximately two billion.  So percentage-wise, that

09:52:23 23 would be quite a bit lower than ten percent.  I don't know of

09:52:27 24 any indication that it would be ten percent at any given time.

09:52:30 25        That would certainly depend upon a number of factors,

**OFFICIAL TRANSCRIPT**

09:52:32  1   how other drugs do, how our other products in other categories

09:52:37  2   do, but I can't validate that that would ever be the case.

09:52:42  3   Q.   Mr. Shah, in regards to capturing market share, would you

09:52:49  4   agree that it's important to get a product to the market first,

09:52:54  5   first in class?

09:52:56  6        MR. SARVER:  Objection, Your Honor.  We went through

09:52:57  7   this exact line of questioning with Ms. Geiger.

09:53:01  8        THE COURT:  We did.

09:53:01  9        MR. BIRCHFIELD:  Your Honor, Mr. Shah is the director

09:53:04 10   of marketing, from Ms. Geiger.

09:53:08 11        THE COURT:  I understand, but I don't think there is

09:53:10 12   any question about that.

09:53:12 13             Can you answer that, Mr. Shah?

09:53:15 14        THE WITNESS:  Sure, Your Honor.  I would say, as a

09:53:19 15   general rule of thumb, it's always good to be first to the

09:53:21 16   mark.  Just like in any category, you always want to be the

09:53:24 17   first to launch a major innovation, if you possibly can.

09:53:28 18             But I know of several examples in the

09:53:30 19   pharmaceutical industry where products have launched second or

09:53:35 20   third, and, because of their clinical trial results and the

09:53:38 21   benefits they provide being deemed superior, they've often

09:53:43 22   overtaken whoever launched first or second.

09:53:45 23        MR. BIRCHFIELD:  Your Honor, one last area, and I'll be

09:53:47 24   done.

09:53:48 25   EXAMINATION BY MR. BIRCHFIELD:

*OFFICIAL TRANSCRIPT*

09:53:50 1   Q.    Mr. Shah, is the appropriate dosing or the appropriate

09:54:00 2   dosage, is that primarily a science and medicine decision or a

09:54:06 3   marketing decision?

09:54:12 4   A.    So the amount of a given drug and how often you take it is

09:54:17 5   always dictated ultimately by the results of the studies.  The

09:54:20 6   drug obviously has to show sufficient efficacy and safety and

09:54:26 7   certain advantages to be approved by the FDA at any given dose.

09:54:30 8   Q.    Let me show you what is marked as Plaintiff's

09:54:35 9   Exhibit 129 --

09:54:37 10          THE DEPUTY CLERK:  130.

09:54:38 11  EXAMINATION BY MR. BIRCHFIELD:

09:54:39 12  Q.    -- 130.  It's identification number 1482662.

09:54:53 13  A.    Is it okay for me to set aside all of this?  Sorry, the

09:54:57 14  pile is getting big in front of me.

09:54:58 15          Okay.

09:54:59 16  Q.    All right.  Mr. Shah, you recognize that this is an e-mail

09:55:06 17  from Patricia Torr to you dated March 1, 2012?

09:55:14 18          MR. SARVER:  Your Honor, this is the subject of Motion

09:55:17 19  in Limine 24.  We object.

09:55:18 20          MR. BIRCHFIELD:  Your Honor, this is highly relevant to

09:55:22 21  an issue in this case regarding marketing being involved in

09:55:27 22  science decisions.

09:55:29 23          THE COURT:  Just for that limited purpose, I'll allow

09:55:31 24  it.

09:55:33 25  EXAMINATION BY MR. BIRCHFIELD:

*OFFICIAL TRANSCRIPT*

09:55:34 1   Q.   Mr. Shah, do you recognize this as an e-mail from

09:55:37 2   Patricia Torr to you dated March 1, 2012?

09:55:41 3   A.   Yes, it appears to be from her to me on that date, yes.

09:55:45 4   Q.   If you look down to the first e-mail in this string, it is

09:55:53 5   from Robert Califf.  Do you see that?

09:55:56 6   A.   I do.

09:55:57 7   Q.   That's Dr. Robert Califf, who was at Duke Clinical

09:56:05 8   Research; is that right?

09:56:06 9   A.   Yes, at that time he was.

09:56:06 10  Q.   Dr. Califf went on to become the commissioner of the FDA;

09:56:14 11  is that right?

09:56:14 12  A.   Very briefly, yes.

09:56:15 13  Q.   So the e-mail that is later forwarded to you originates

09:56:22 14  from Dr. Califf.  It's to Peter DiBattiste and Gary Peters.  Do

09:56:29 15  you see that, sir?

09:56:29 16  A.   Yes, that appears to be the case.

09:56:31 17  Q.   He writes:  "Guys, this is a simple two pager to let you

09:56:36 18  know I'm working on something.  I think this could be done

09:56:39 19  using the ORBIT template at a fraction of the additional cost

09:56:43 20  that we normally attribute to clinical trials."

09:56:48 21          Do you see that?

09:56:49 22  A.   I do.

09:56:49 23  Q.   "The motivation is enclosed on Page 1.  I've been skimpy

09:56:54 24  with the operational details because I'm working through some

09:56:58 25  thoughts about endpoints."

*OFFICIAL TRANSCRIPT*

09:57:00 1          Do you see that?

09:57:00 2    A.    I do.

09:57:01 3    Q.    "This whole thing is based on the two premises.  Number

09:57:07 4    one, it's the right thing to do for a drug that has a long life

09:57:10 5    and can make a huge difference."

09:57:15 6          Do you see that, sir?

09:57:16 7    A.    Yes.  That's what he writes.

09:57:18 8    Q.    "And, number two, CADTH is just the beginning of the

09:57:23 9    comparative effectiveness issues, and the dosing of riva will

09:57:27 10   be a key issue.  I look forward to discussing."

09:57:34 11         Did I read that right?

09:57:35 12   A.    Yes, that's what he writes.

09:57:37 13   Q.    Let me show you what is marked as Plaintiff's Exhibit 131.

09:57:45 14   For identification purposes, it's Record Number 1482663.

09:57:57 15         Mr. Shah, this is the --

09:58:06 16         MR. SARVER:  Your Honor, we object.  This is Motion in

09:58:11 17   Limine 24.  It's not appropriate.

09:58:13 18         MR. BIRCHFIELD:  Your Honor, the defendants have taken

09:58:23 19   the position that marketing and science must be separate, and

09:58:32 20   they have put that -- that was what they stated.  That's what

09:58:35 21   their witness stated.

09:58:36 22         THE COURT:  Members of the Jury, dosing is not a part

09:58:40 23   of the case.  This issue is whether or not there is any

09:58:45 24   influence with regard to marketing.  So for that limited

09:58:49 25   purpose, I'll let the witness testify.

                              *OFFICIAL TRANSCRIPT*

09:58:54  1             Let's do it fast, please.

09:58:55  2          MR. BIRCHFIELD:  Yes, sir.

09:58:56  3  EXAMINATION BY MR. BIRCHFIELD:

09:58:57  4  Q.    Mr. Shah, this is the two-pager that is referenced in

09:59:00  5  Dr. Califf's e-mail; is that correct?

09:59:05  6  A.    I believe that's correct.  I'm not sure.  But yes, I don't

09:59:08  7  have any reason to doubt it.

09:59:11  8          MR. BIRCHFIELD:  Your Honor, we offer Plaintiff's

09:59:13  9  Exhibit 131.

09:59:13 10          MR. SARVER:  Objection, Your Honor --

09:59:17 11          THE COURT:  I'll allow it for that limited purpose.

09:59:19 12  Admitted.

09:59:19 13  EXAMINATION BY MR. BIRCHFIELD:

09:59:20 14  Q.    Mr. Shah, the proposal deals with finding the right dose

09:59:24 15  or finding an effective dose for Xarelto, correct?

09:59:29 16  A.    Well, at the time -- at the time of this e-mail, which, if

09:59:34 17  it's accurate, 3/1/2012, we already had an approved dose that

09:59:38 18  had been deemed to be effective by the FDA, so I don't know if

09:59:42 19  the characterization of that question would be accurate.

09:59:46 20  Q.    We'll leave the document to stand for itself, okay.

09:59:54 21          MR. SARVER:  I object to the commentary, Your Honor.

09:59:57 22          MR. BIRCHFIELD:  I'll be glad to go back to it.  I'm

09:59:57 23  trying to move on.

09:59:58 24          THE COURT:  Ask the question.

09:59:58 25  EXAMINATION BY MR. BIRCHFIELD:

*OFFICIAL TRANSCRIPT*

10:00:00 1    Q.   You understood that his proposal was to do ROCKET 2, a

10:00:06 2    follow-up clinical trial to find the lowest effective dose for

10:00:10 3    Xarelto, correct?

10:00:13 4    A.   Yes.  Dr. Califf had recommended -- obviously, he had led

10:00:18 5    our first study, and also had actually presented to the FDA

10:00:22 6    supporting its approval.  Then he is recommending here --

10:00:25 7    proposing, anyway, I should say, a second study, it appears to

10:00:28 8    be, to evaluate additional doses.

10:00:30 9    Q.   Let's go back to Exhibit 130, the e-mail to you from

10:00:37 10   Patricia Torr.  Let's work our way up.

10:00:39 11   A.   Okay.

10:00:41 12   Q.   So, then the next e-mail in the string is from Peter

10:00:46 13   DiBattiste to Vanessa Broadhurst and Patricia Torr; is that

10:00:54 14   right?

10:00:54 15   A.   Yes, that appears to be the case.

10:00:56 16   Q.   Then we have the e-mail from Patricia Torr to you.

10:01:00 17        Can we go back to Exhibit 130, identification

10:01:05 18   number 1482662.

10:01:12 19        Ms. Torr's e-mail to you is:  "Need a swift and

10:01:15 20   strong response to me, please."

10:01:17 21        Right?

10:01:19 22   A.   Yes, that's what she writes.

10:01:20 23   Q.   Then let me show you what's marked as Plaintiff's

10:01:31 24   Exhibit 132, identification number 259501.

10:01:47 25   A.   Okay.

***OFFICIAL TRANSCRIPT***

10:01:48  1   Q.   This is an e-mail from Patricia Torr to you and others; is

10:01:48  2   that right?

10:01:58  3   A.   Yes, I'm included in the e-mail.

10:02:00  4   Q.   At this point, Patricia Torr, would she be your

10:02:07  5   supervisor, would she be vice-president of sales and marketing?

10:02:11  6   A.   No.  She was not the vice-president of sales and

10:02:14  7   marketing.  She was the vice-president of marketing at this

10:02:16  8   time.  At that moment, in this given time period, she was my

10:02:20  9   boss, yes.

10:02:20 10   Q.   Okay.  All right.

10:02:25 11        MR. BIRCHFIELD:  Your Honor, this will be the last

10:02:27 12   exhibit that I cover.

10:02:27 13   EXAMINATION BY MR. BIRCHFIELD:

10:02:34 14   Q.   If you'll take a look at the e-mail just below that.  We

10:02:37 15   see Dr. Paul Chang; is that right?

10:02:41 16   A.   Yes.

10:02:42 17   Q.   This is discussing Dr. Califf's proposal -- this e-mail

10:02:52 18   string is discussing Dr. Califf's proposal, correct?

10:02:55 19   A.   I don't know if the entire e-mail is discussing it,

10:03:00 20   because Dr. Chang is also mentioning ASA, thienopyridine, which

10:03:07 21   is Plavix, and I think he's also talking about some other

10:03:12 22   studies.

10:03:12 23   Q.   Okay.

10:03:12 24   A.   So I'm not sure, but part of it appears to be addressing

10:03:16 25   Dr. Califf's e-mail.

*OFFICIAL TRANSCRIPT*

10:03:17  1    Q.    So we have responses from Gary Peters and from Dr. Paul

10:03:26  2    Chang that go supportive of doing the ROCKET 2 study; is that

10:03:26  3    right?

10:03:32  4    A.    No, I don't know if that's what it says, because Dr. Chang

10:03:36  5    appears to be talking about a combination study of atrial

10:03:39  6    fibrillation and acute coronary syndrome, which was a different

10:03:42  7    indication.  So I'm not sure if that's what he's referring to

10:03:46  8    here.

10:03:46  9    Q.    Okay.  All right.

10:03:47 10    A.    Just that or --

10:03:49 11    Q.    Let's move up to Patricia Torr's e-mail to you and others.

10:03:53 12    A.    Okay.

10:03:54 13    Q.    If we move to the third paragraph, addressing the ROCKET 2

10:04:03 14    study --

10:04:03 15          Are you with me, Mr. Shah?

10:04:05 16    A.    I am.

10:04:05 17    Q.    -- "would not support doing a ROCKET 2 study and unwinding

10:04:13 18    everything we invested and are actively selling today.  It

10:04:19 19    would say to the market, the competition is right, we are a

10:04:25 20    b.i.d. drug."

10:04:26 21          That's a twice daily drug; is that right, sir?

10:04:29 22    A.    Yes.  B.i.d. stands for twice daily.

10:04:32 23    Q.    "Would kill us in the market today.  By the time the study

10:04:38 24    was done, the market would have moved on."

10:04:47 25          Did I read that correctly, sir?

*OFFICIAL TRANSCRIPT*

10:04:48  1     A.    Yes, that's what she writes.

10:04:49  2     Q.    So, Ms. Torr, as a vice-president in marketing, opposes

10:04:55  3     doing the ROCKET 2 study, correct?

10:05:03  4     A.    That appears to be her position in stating it.  It

10:05:06  5     certainly doesn't mean that that's what ultimately dictated the

10:05:09  6     decision.

10:05:09  7     Q.    Was the ROCKET 2 study ever done, sir?

10:05:14  8     A.     No, but I also disagree with her assertion that -- the

10:05:18  9     b.i.d. component of her statement, because today the market

10:05:21 10     leader is a twice-a-day drug.

10:05:23 11               THE COURT:  Anything further?

10:05:23 12               MR. BIRCHFIELD:  Thank you, Your Honor.

10:05:23 13               THE COURT:  Let's take a 10-minute break at this time.

10:05:26 14     Court will stand in recess.

10:05:27 15               (WHEREUPON, at 10:05 a.m., the jury panel leaves the

10:07:48 16     courtroom, and then a brief recess was taken.)

10:20:11 17               (WHEREUPON, at 10:20 a.m. the jury panel enters the

10:20:47 18     courtroom.)

10:20:47 19               THE COURT:  Be seated, please.

10:20:48 20               MR. BIRCHFIELD:  Your Honor, we offer Plaintiff's

10:20:50 21     Exhibit 132.  It's the e-mail from Patricia Torr to Mr. Shah.

10:20:54 22               MR. SARVER:  No objection, Your Honor.

10:20:55 23               THE COURT:  I'll admit it.

10:20:55 24               MR. SARVER:  Good morning, Your Honor, may I proceed?

10:20:55 25               THE COURT:  Yes.

                                    *OFFICIAL TRANSCRIPT*

10:20:59   1          MR. SARVER:   Thank you, sir.

10:20:59   2                      CROSS-EXAMINATION

10:21:03   3   BY MR. SARVER:

10:21:03   4   Q.   Good morning, Mr. Shah.

10:21:09   5   A.   Good morning.

10:21:10   6   Q.   My name is Rick Sarver.  I represent Janssen and Bayer.

10:21:16   7        I have some questions for you, but first would you

10:21:17   8   introduce yourself to the jury, please.

10:21:18   9   A.   Yes.  My name is Nauman Shah.

10:21:23  10   Q.   And could you tell us a little bit about yourself?

10:21:25  11   A.   Sure.  I have -- let's see.  I am married.  I have five

10:21:32  12   daughters at home.  I know that might be interesting to know.

10:21:37  13   But, yes, we have five girls at home.  And I was actually born

10:21:42  14   overseas.  My parents immigrated to the United States when I

10:21:45  15   was nine years old.  I grew up in the beautiful state of

10:21:50  16   Georgia, most of my time, and ended up going to the University

10:21:58  17   of Pennsylvania where I got my undergrad education and then

10:22:01  18   eventually my graduate degree.  And I was actually recruited

10:22:05  19   into the industry while I was still an undergrad at University

10:22:05  20   of Pennsylvania.

10:22:10  21   Q.   We're in SEC country.  But am I right that you actually

10:22:13  22   played football at University of Pennsylvania?

10:22:17  23   A.   I did.  I played football in Georgia in high school and

10:22:21  24   obviously fell in love with that sport and ended up alongside a

10:22:26  25   very heavy academic load at Penn and also played football.

*OFFICIAL TRANSCRIPT*

10:22:30 1   Q.    I think you were a quarterback; is that right?

10:22:32 2   A.    I was.  I was a defensive back, yes.

10:22:35 3   Q.    Were you any good?

10:22:36 4   A.    Well, if they let me play at Penn, I hope I was good

10:22:41 5   enough.  I certainly couldn't have played at Georgia or

10:22:45 6   Ole Miss or any of those kind of schools.

10:22:47 7   Q.    Let's get right to it.  How long have you worked for

10:22:50 8   either Janssen or J&J?

10:22:53 9   A.    I have been at Johnson & Johnson since January of 2003, so

10:22:58 10  going on almost 15 years.

10:22:59 11  Q.    And you worked as a product director on Xarelto for a

10:23:05 12  period of time; is that correct?

10:23:07 13  A.    I was the director of marketing on Xarelto, yes, for about

10:23:10 14  four years.

10:23:11 15  Q.    And the years were 2008 to 2012, I think you've told us?

10:23:16 16  A.    Yes.  From July of 2008 to August of 2012.

10:23:21 17  Q.    What were your duties when you were working on Xarelto?

10:23:26 18  A.    So -- yeah.  My duties were basically to formulate our

10:23:32 19  launch plan, to obviously hire a team, which we didn't have at

10:23:38 20  that time.  I was the first person hired under my boss at that

10:23:41 21  time, who was Vanessa Broadhurst, and she was the

10:23:45 22  vice-president at that time, so I had to build a team.

10:23:47 23       I had to formulate an understanding of the market.  I

10:23:49 24  had to formulate an understanding of patient needs, physician

10:23:52 25  needs, and then ultimately develop a strategy for launch based

*OFFICIAL TRANSCRIPT*

10:23:58  1   on the combination of my knowledge of the market, as well as
10:24:00  2   the clinical trials.
10:24:02  3          And obviously part of my responsibility was also to
10:24:05  4   be a leader in the role and work collaboratively with our
10:24:09  5   medical affairs team, with our R&D group, with Bayer, to make
10:24:14  6   sure that things were well coordinated.
10:24:16  7   Q.   Mr. Shah, we've had a lot of discussion about the FDA
10:24:19  8   here.  I'm not going to repeat it.  But I would like to have
10:24:21  9   you tell the jury, is there a difference between marketing a
10:24:26 10   product that is regulated by the FDA and marketing some other
10:24:31 11   product?
10:24:33 12   A.   Oh, absolutely.  It's actually, you know, one of the first
10:24:36 13   things you learn, even in school when you're looking at these
10:24:40 14   different industries.
10:24:42 15          And I should say, you know, what I didn't say in my
10:24:45 16   opening to your remarks is, I've always had a passion for
10:24:48 17   healthcare.  I lost a sister to a terminal illness when I was
10:24:51 18   only 14, and I can tell you I absolutely wanted to be in
10:24:58 19   healthcare.  And part of the reason I joined this industry was
10:25:00 20   because I felt like I could make a big impact on a lot of
10:25:03 21   people.
10:25:04 22          But this industry, when you do the kind of work that
10:25:06 23   I've done in my time on Xarelto, you have to understand that
10:25:11 24   this is a regulated industry.  We can't just say whatever we
10:25:14 25   want.  We can't -- we can have wishes, we can have desires to

*OFFICIAL TRANSCRIPT*

1   do certain things or say certain things, but we are absolutely

2   a regulated industry.

3        The FDA ultimately determines what we can and cannot

4   say in the United States, and our promotional materials are

5   reviewed by the FDA as are obviously our consumer

6   advertisements.

7   Q.   And internally within Janssen, are there procedures to

8   make sure that everything that is said outside the company is

9   right?

10  A.   There are actually multiple steps to ensure that that

11  happens.  I think one of the things that is very germane to

12  that question is that we have what is called a *review committee*

13  or *promotional review committee*.  It is basically a body

14  composed of our medical affairs people, our scientists, our

15  medical information people, our legal department as well, and

16  pretty much everything that my team or I would have created or

17  developed in my time on Xarelto, and certainly for other

18  products as well, goes through that committee.

19       And what they evaluate is to make sure, A, it's in

20  line with rules and regulations established by the FDA, which

21  obviously FDA regulations and rules are based upon Congress and

22  laws and things like that.

23       And then the other thing they look for is to make

24  sure nothing we're saying, or implying even, is inconsistent

25  with the FDA-approved labeling that we have been given.

*OFFICIAL TRANSCRIPT*

10:26:41 1    Q.    Can you tell the jury, who sit on that PRC?

10:26:47 2    A.    Yes.  I was kind of alluding that to a short while ago.

10:26:51 3    Our legal department is certainly represented there.  Our

10:26:54 4    medical affairs department is represented there.  They will

10:26:57 5    sometimes call in our R&D clinical leads as well to be on the

10:27:01 6    team depending upon what's being reviewed.  Medical

10:27:04 7    information, which looks at all of the literature and obviously

10:27:06 8    has a very good understanding of all of our studies is on the

10:27:09 9    team.  Healthcare compliance, which ensures rules and

10:27:13 10   regulations are followed, are also on the team.

10:27:16 11          That's really the composition of the team.

10:27:17 12   Q.    Well.  Let me ask you this:  Does marketing have a vote on

10:27:22 13   that team?

10:27:24 14   A.    Oh, absolutely not.  We submit materials to that

10:27:28 15   committee, that committee reviews them in advance of even a

10:27:33 16   conversation.  First they review them individually.  Then they

10:27:36 17   come together as a group and will review those materials, and

10:27:38 18   almost always make comments and changes, which we then have to

10:27:42 19   make.

10:27:43 20   Q.    And before any of that material is cleared by the PRC,

10:27:49 21   what does that vote have to be?

10:27:53 22   A.    It has to be unanimous.  There is -- there is actually

10:27:56 23   never a vote count.  Everyone has to agree that everything

10:28:00 24   we've put together is in the hundred percent agreement or

10:28:02 25   alignment with the FDA-approved label and rules and

**OFFICIAL TRANSCRIPT**

10:28:06  1    regulations, and only then when we're given that green light

10:28:10  2    can we move forward.

10:28:11  3          And as we're moving forward, I should say, you know,

10:28:14  4    a point that I think is important for everyone to understand,

10:28:18  5    those materials are then submitted to the FDA.  All of the

10:28:21  6    materials that we actually will end up using are submitted to

10:28:24  7    the FDA for review as well.

10:28:26  8          In the case of any TV advertisement especially, we

10:28:29  9    always submit that to the FDA and actually have to wait for

10:28:33 10    them to finish, review and approve that before we can actually

10:28:37 11    launch it.

10:28:38 12    Q.   So is it correct that once material is reviewed and

10:28:43 13    approved by the PRC, it then goes to the FDA, is that what you

10:28:48 14    said?

10:28:49 15    A.   Everything that we're going to use to promote the drug has

10:28:54 16    absolutely got to go the FDA, and as a policy, Johnson &

10:28:58 17    Johnson and Janssen specifically always sends everything.

10:29:00 18    Q.   So is it correct then, that the FDA has the opportunity to

10:29:02 19    review everything that Janssen says about its products to

10:29:08 20    whoever?

10:29:10 21    A.   Oh, absolutely.  And they do.

10:29:11 22    Q.   In terms of advertisements I think you mentioned that

10:29:18 23    might go on the television, does the FDA actually have to

10:29:20 24    approve every single word?

10:29:24 25    A.   They approve, not only every single word, but every image,

*OFFICIAL TRANSCRIPT*

10:29:29  1    everything that appears on the screen.  Those reviews often

10:29:32  2    will take multiple rounds with the FDA where we will submit

10:29:35  3    something, they will comment, we may submit it again.  If there

10:29:39  4    is obviously a significant number of changes, then they will

10:29:43  5    respond again.  So without question, they review those TV ads

10:29:47  6    in detail for every word, every image.

10:29:51  7    Q.    Now, Mr. Shah, before we go into some of the specific

10:29:54  8    points that Mr. Birchfield made with you, I would like you to

10:29:56  9    clear up something that came up as an issue with another

10:30:00 10    witness in this case, a witness who says she didn't know who

10:30:05 11    made some strikethroughs on a document and she didn't know who

10:30:09 12    added some language to our label.  I would like to see if you

10:30:12 13    can help us with that.

10:30:16 14         So when you were working on Xarelto, were you --

10:30:18 15         MR. BIRCHFIELD:  Your Honor, at this point, could we

10:30:20 16    take the witness on voir dire about form and foundation issues?

10:30:26 17         MR. SARVER:  I'm about to go through the foundation,

10:30:29 18    Your Honor.

10:30:29 19         THE COURT:  Go ahead.

10:30:29 20    EXAMINATION BY MR. SARVER:

10:30:30 21    Q.    When you were working on Xarelto, were you part of a

10:30:32 22    committee that is known as the *Label Working Group*?

10:30:38 23    A.    Yes, I was.  Typically a director of marketing in my

10:30:41 24    position would be one of the members of that committee.

10:30:42 25    Q.    And tell us, what is the Label Working Group?

**OFFICIAL TRANSCRIPT**

10:30:46  1    A.    So the Label Working Group basically is a committee that's

10:30:52  2    composed of our clinical leads, our scientists that work on the

10:30:59  3    manufacturing, chemical nature of the drug, our preclinical

10:31:04  4    people, as well as the compound development team leader, our

10:31:07  5    medical affairs as well.

10:31:09  6          And the idea is for us to evaluate -- first of all,

10:31:14  7    review the label as it goes in, but also evaluate FDA comments

10:31:19  8    as they start coming in on the label to then adjust for those

10:31:22  9    comments, and make those necessary recommendations back to the

10:31:26  10   FDA.

10:31:27  11   Q.    Now, sir, as a member of the -- it's the Label Working

10:31:33  12   Group.  Were you made aware of, personally, correspondence

10:31:38  13   between your regulatory colleagues at Janssen and the FDA?

10:31:41  14   A.    Yes.  Every single round I was.

10:31:46  15   Q.    Do you recall that when Janssen and the FDA had

10:31:51  16   discussions regarding the label for Xarelto that there was

10:31:56  17   information back and forth between Janssen and the FDA

10:32:00  18   regarding prothrombin time, PT testing?

10:32:03  19   A.    Yes.  I mean, it's awhile ago.  Obviously we're talking

10:32:07  20   back in 2011, but I do recall that being one of the things that

10:32:11  21   was discussed or debated back and forth via the documents that

10:32:15  22   were exchanged.

10:32:16  23   Q.    And, sir, do you recall that Janssen actually proposed

10:32:22  24   language on its label about PT testing to the FDA?

10:32:27  25   A.    Yes.  That was actually included in the initial document

*OFFICIAL TRANSCRIPT*

10:32:33  1   that was sent to the FDA, our first draft of the label.  It was

10:32:38  2   also sent again a second time, and the FDA did not agree.

10:32:42  3   Q.   You anticipated my question.

10:32:45  4        Did the FDA accept Janssen's proposed labeling

10:32:49  5   language regarding prothrombin time?

10:32:53  6   A.   No.  They -- if my recollection is correct, they -- first

10:32:57  7   of all, I know for a fact they definitely struck a lot of that

10:33:01  8   language, and part of the rationale that they gave was that

10:33:04  9   there wasn't sufficient evidence or need for that information

10:33:07 10   to be in the label.

10:33:07 11   Q.   Jim, I would like to go to Defense Exhibit 5389.  And if

10:33:15 12   Mr. Shah could be provided with 5389, please.

10:33:27 13        Sir, do you recognize Defense Exhibit 5389?

10:33:32 14   A.   Yes, I do.

10:33:32 15   Q.   What is it?

10:33:35 16   A.   It appears to be a letter from the Food and Drug

10:33:40 17   Administration to our company.

10:33:41 18   Q.   I'm sorry, sir.  Could you take a look at it one more

10:33:45 19   time?  Is it a letter from J&J or from the FDA?

10:33:50 20   A.   Yes, it's from the FDA.

10:33:55 21   Q.   One more time, sir.

10:33:56 22   A.   I'm sorry.  Sorry, sorry, sorry.  Hold on.  Let me just

10:33:59 23   flip to the back so I can make sure.

10:34:03 24        Sorry, my apologies.

10:34:03 25   Q.   That's all right.

**OFFICIAL TRANSCRIPT**

10:34:04 1  A.    The letterhead is actually Johnson & Johnson.  It appears

10:34:07 2  to be a letter from us to the FDA.

10:34:08 3  Q.    Right.  And if you would turn with me, what is this

10:34:15 4  letter?  Could you take a second and refresh yourself on it,

10:34:18 5  please?

10:34:19 6  A.    (Witness reviews the document.)

10:34:29 7          Yes, this appears to be our submission back to the

10:34:31 8  FDA following the complete response that we had received, so

10:34:35 9  it's our new package, new file that the FDA had requested to

10:34:41 10  support approvability of the drug.

10:34:42 11  Q.    I would like you to turn to page 4, please, Question 13.

10:34:52 12  A.    Okay.

10:34:52 13  Q.    And what was going on in Question 13, sir?

10:34:58 14  A.    (Witness reviews the document.)

10:35:12 15          This reflects revisions that we had made in response

10:35:17 16  to the FDA request related to some information in a box

10:35:23 17  warning, warnings and precautions, and also to the section

10:35:27 18  related to use of Xarelto in pregnancy and lactation.

10:35:32 19  Q.    And we'll get to that in a moment, sir.

10:35:32 20  A.    Okay.

10:35:35 21  Q.    Could you tell us who signed this letter for J&J?

10:35:41 22  A.    The letter is signed by Andrea Kollath, who is in our

10:35:46 23  regulatory department, within our R&D group, I should add.

10:35:51 24  Q.    I would like you to go to Defense Exhibit 5390.  Someone

10:35:59 25  will provide that to you.

**OFFICIAL TRANSCRIPT**

10:36:01  1          And what is this, Mr. Shah?

10:36:05  2    A.    This is the package insert or label for Xarelto.

10:36:08  3    Q.    Was this the draft label that was mentioned in the letter

10:36:12  4    that you just saw?

10:36:13  5    A.    Yes, it appears to be.

10:36:17  6    Q.    All right.  As a member of the Label Working Group at

10:36:22  7    Janssen, was this information provided to you?

10:36:25  8    A.    Yes, it would have been.

10:36:28  9    Q.    Let's take a look at Section 12.2.  It's on the very

10:36:35 10    bottom of page 13 of 24, sir.

10:36:38 11    A.    Okay.

10:36:38 12    Q.    All right.  What's that section titled, 12.2?

10:36:45 13    A.    It's titled *Pharmacodynamics*.

10:36:49 14    Q.    And was this language in Section 12.2 proposed by Janssen

10:36:53 15    to the FDA to be included in the Xarelto label?

10:36:57 16    A.    Yes.  It would have been.

10:37:00 17    Q.    All right.

10:37:00 18    A.    And it was.

10:37:02 19    Q.    If you would read with me the highlighted portion.

10:37:09 20          "Anti-Factor Xa activity is also influenced by

10:37:14 21    rivaroxaban.  The relationship between PT and rivaroxaban

10:37:18 22    plasma concentration is linear and closely correlated.  If

10:37:21 23    assessment of the pharmacodynamic effect of rivaroxaban is

10:37:24 24    considered necessary in individual cases, PT, measured in

10:37:29 25    seconds, is recommended.  The Neoplastin PT assay was measured

*OFFICIAL TRANSCRIPT*

10:37:34 1    in the Record program in median."  And we can go on.

10:37:38 2          Was that language proposed by Janssen to the FDA?

10:37:40 3    A.   Yes, it was.

10:37:43 4    Q.   All right.  I would like you to take a look at Defense

10:37:47 5    Exhibit 6009.  If that could be provided to Mr. Shah.

10:38:00 6          And do you have that in front of you, sir?

10:38:03 7    A.   I do.

10:38:03 8    Q.   What is Defense Exhibit 6009?

10:38:09 9    A.   It is an e-mail from Andrea Kollath, the same person who

10:38:15 10   wrote the letter to the FDA, alerting us that we have received

10:38:19 11   the revisions to our proposed label and that she has attached

10:38:25 12   the FDA comments, etcetera.

10:38:28 13   Q.   Now, were you copied on this e-mail?

10:38:34 14   A.   Yes, my name is on the e-mail.

10:38:35 15   Q.   What was the subject line of the e-mail?

10:38:39 16   A.   "FDA marked-up version of orthopedic surgery, U.S. package

10:38:44 17   insert."

10:38:44 18   Q.   And did the FDA actually attach a redlined version of the

10:38:50 19   label proposed by Janssen?

10:38:52 20   A.   Yes, that's correct.

10:38:52 21   Q.   All right.  And did you have the opportunity to review

10:38:55 22   that attachment?

10:38:57 23   A.   Yes, I did.

10:38:58 24   Q.   All right.  I would like you to turn to the same section

10:39:01 25   that we were looking at before, Section 12.2 Pharmacodynamics,

**OFFICIAL TRANSCRIPT**

10:39:07 1    please.

10:39:13 2    A.    Would you happen to know the page number?

10:39:16 3    Q.    Yes, sir.  Page 33 of 47.  I had -- I cheated.  I had a

10:39:22 4    tab on mine.

10:39:22 5    A.    Got it.

10:39:24 6    Q.    Are you there?

10:39:24 7    A.    I'm there.

10:39:25 8    Q.    All right.  Do you see Section 12.2?

10:39:30 9    A.    I do.

10:39:30 10   Q.    Do you see that in Section 12.2, as it came back from the

10:39:36 11   FDA, certain language is struck out?

10:39:37 12   A.    Yes.

10:39:38 13   Q.    Who struck that language out?

10:39:43 14   A.    The FDA did.

10:39:43 15   Q.    And the language that we just read to the jury regarding

10:39:50 16   the relationship between PT and rivaroxaban and the measurement

10:39:55 17   of PT and Neoplastin, PT assay, was that language struck out?

10:40:02 18   A.    It was.

10:40:03 19   Q.    And who struck it out?

10:40:06 20   A.    The FDA.

10:40:06 21   Q.    All right.  Now, did the FDA also add certain language to

10:40:20 22   the Xarelto label that had not been in place when Janssen

10:40:24 23   submitted the label to the FDA?

10:40:26 24   A.    Yes.  And that is typical.  FDA will typically delete as

10:40:33 25   well as add comments and information.

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 10:40:35 | 1 | Q.   Now, let's stay on Defense Exhibit 6009.  I think it's in |
| 10:40:41 | 2 | front of you; is that right, sir? |
| 10:40:43 | 3 | A.   It is. |
| 10:40:43 | 4 | Q.   All right.  Would you turn to page 9. |
| 10:40:54 | 5 | A.   Okay. |
| 10:40:54 | 6 | Q.   And I would like to direct your attention to 5.3.  Do you |
| 10:41:02 | 7 | see that section? |
| 10:41:03 | 8 | A.   I do. |
| 10:41:03 | 9 | Q.   Is there language in Section 5.3 that was added to the |
| 10:41:09 | 10 | label by the Food and Drug Administration? |
| 10:41:11 | 11 | A.   Yes. |
| 10:41:13 | 12 | Q.   Could you read that language for us, please? |
| 10:41:18 | 13 | A.   It states:  "Xarelto should be used with caution in |
| 10:41:22 | 14 | pregnant women.  Xarelto dosing in pregnancy has not been |
| 10:41:25 | 15 | studied.  The anticoagulation effect of Xarelto cannot be |
| 10:41:29 | 16 | monitored with standard laboratory testing nor readily |
| 10:41:33 | 17 | reversed.  Promptly evaluate any signs or symptoms suggestive |
| 10:41:37 | 18 | of blood loss," and then in parentheses, "for example, a drop |
| 10:41:44 | 19 | in hemoglobin and/or hematocrit, hypotension or fetal |
| 10:41:48 | 20 | distress." |
| 10:41:48 | 21 | Q.   The language "The anticoagulant effect of Xarelto cannot |
| 10:41:55 | 22 | be readily monitored with standard laboratory testing nor |
| 10:42:00 | 23 | readily reversed" was added by who? |
| 10:42:02 | 24 | A.   Yes.  All, with the exception of the word *readily*, that |
| 10:42:05 | 25 | you mentioned. |

*OFFICIAL TRANSCRIPT*

10:42:06  1    Q.   The language that was added, who added that language?

10:42:14  2    A.   That language was added to the FDA -- by the FDA, excuse

10:42:17  3    me.

10:42:17  4    Q.   Thank you, sir.

10:42:21  5         I would like to show you Defense Exhibit 6100.  Do

10:42:34  6    you have that in front you, sir?  Or you will have.

10:42:38  7    A.   I do.

10:42:38  8    Q.   Thank you.

10:42:42  9         And if you could turn to the first page, is what is

10:42:46 10    in front of you something called a *red ribbon* document?

10:42:50 11    A.   Yes.  I can tell by the red ribbon.

10:42:54 12    Q.   It's a good hint, right?

10:42:56 13    A.   Yes.

10:42:57 14    Q.   If you turn to the third page, do you see a copy of an

10:43:07 15    e-mail, sir?

10:43:09 16    A.   I do.

10:43:10 17    Q.   And who is the e-mail from?

10:43:16 18    A.   The e-mail is from Tyree Newman, who is the regulatory

10:43:20 19    project manager at the Food and Drug Administration, or FDA.

10:43:22 20    Q.   And who was it to?

10:43:25 21    A.   And it was written to Andrea Kollath, who is in our

10:43:30 22    regulatory department.

10:43:31 23    Q.   Do you see the text of the e-mail is:  "Good morning,

10:43:34 24    Andrea.  Please see the attached redlined version of the label

10:43:39 25    regarding New Drug Application 22406 for your review and

*OFFICIAL TRANSCRIPT*

10:43:44 1    comments"?  Do you see that?

10:43:46 2    A.    Yes, I do.

10:43:47 3    Q.    And what was *New Drug Application 22406*?

10:43:54 4    A.    This particular NDA, or new drug application, was for the

10:43:59 5    approval of Xarelto for the orthopedic surgery indication,

10:44:01 6    which was VTE prophylaxis or prophylaxis following hip or knee

10:44:09 7    replacement surgery.

10:44:10 8    Q.    Sir, have you had the opportunity to review Defense

10:44:13 9    Exhibit 6100?

10:44:15 10   A.    Yes, I have it in front of me, and I would have reviewed

10:44:18 11   it back then in my role.

10:44:20 12   Q.    Have you reviewed it recently to confirm that the

10:44:24 13   strikethrough and the additions that we've just talked about

10:44:27 14   are confirmed by Defense Exhibit 6100?

10:44:31 15   A.    Yes.  This is the exact same.

10:44:37 16         MR. SARVER:  Your Honor, I move for --

10:44:38 17         THE WITNESS:  I have had a chance to review it.

10:44:41 18         MR. SARVER:  -- I move for admission of Defense

10:44:43 19   Exhibit 6100.

10:44:45 20         THE COURT:  I already admitted it.

10:44:48 21         MR. SARVER:  Oh, it's already admitted.  Thank you.

10:44:52 22   EXAMINATION BY MR. SARVER:

10:44:52 23   Q.    Now, during the time that you worked on the label

10:44:56 24   committee, was it frequent that the FDA would go back to

10:45:01 25   Janssen with edits and changes to Janssen's label?

*OFFICIAL TRANSCRIPT*

10:45:07 1   A.   Yes, it was actually very typical.  In fact, there were

10:45:13 2 probably about -- a number of rounds, I can't precisely recall

10:45:18 3 exactly how many rounds of comments we received from the FDA.

10:45:21 4   Q.   Is it required before any label is approved by the FDA

10:45:25 5 that they approve every word in that label?

10:45:33 6   A.   I have learned from my experience on multiple launches

10:45:37 7 that they look at every single word, every single dash, every

10:45:42 8 single table.  They are very, very precise in looking through

10:45:46 9 that document, from the very beginning to the very end.

10:45:49 10        Ultimately, what they -- what they decide, as a rule

10:45:53 11 of thumb -- which they have the power to do -- is ultimately

10:45:56 12 what goes in our final label.

10:45:58 13   Q.   Is it your knowledge, sitting here today, in 2017, that

10:46:04 14 the language that the FDA struck from the Xarelto label and the

10:46:08 15 language that the FDA added to the Xarelto label remains in the

10:46:14 16 approved label?

10:46:16 17   A.   Yes, that is still the case.

10:46:19 18   Q.   All right.  Mr. Shah, what I would like to do is talk just

10:46:32 19 a little bit about a different topic.  Mr. Birchfield was

10:46:37 20 asking you questions about whether or not there was a belief at

10:46:45 21 Janssen that Xarelto would be a product that would be very

10:46:48 22 successful.  Was there such a belief?

10:46:52 23   A.   Yeah, we certainly had very high hopes for Xarelto, given

10:46:56 24 the fact that we knew there had not been a new drug in this

10:47:00 25 category for almost 50 years, which is highly unusual; we knew

*OFFICIAL TRANSCRIPT*

10:47:04  1   there were a large number of people out there that needed help

10:47:07  2   in preventing clots and also in treating clots; and, people

10:47:12  3   wanted not only effective medications, but they wanted safer

10:47:15  4   medications, and also medications that could alleviate some of

10:47:19  5   the burdens associated with warfarin, which prevented people

10:47:22  6   from eating certain types of foods, taking certain drugs, and

10:47:25  7   requiring monitoring.

10:47:28  8          So we knew that there was a large unmet need, and

10:47:31  9   this drug showed a lot of promise.  It showed a lot of promise

10:47:34 10   in the early stage clinical results that were obviously there.

10:47:37 11   Clearly, that was part of the reason the company was interested

10:47:40 12   and put billions of dollars into its development.

10:47:43 13   Q.   You mentioned something called an *unmet need*.  If a

10:47:48 14   medicine doesn't fulfill an unmet need, will it ever be

10:47:53 15   successful?

10:47:54 16   A.   No.  I mean, the bottom line is, you know, we can

10:47:57 17   identify -- Alzheimer's is a great example, right?  We have

10:48:01 18   been trying to solve Alzheimer's for years now.  We've poured

10:48:06 19   billions of dollars in terms of trying to do that, and we've

10:48:09 20   come up empty.  So there is a huge unmet need there, but we

10:48:12 21   just don't have a solution that's been scientifically valid.

10:48:16 22          In this case, we had an unmet need, and we were able

10:48:19 23   to identify an innovation; and, not only identify that

10:48:22 24   innovation, we then had to conduct very large scale trials over

10:48:25 25   a number of years, including thousands and thousands, tens of

*OFFICIAL TRANSCRIPT*

10:48:29 1   thousands of patients, to prove that it would actually be

10:48:32 2   effective and safe and supportive of bringing it to the market.

10:48:34 3   Q.   Sir, in your experience, is any medicine going to be a

10:48:41 4   commercial success if it isn't safe and effective in the hands

10:48:47 5   of doctors using it with their patients?

10:48:50 6   A.   No, not even close.  Even -- you know, there are plenty of

10:48:55 7   examples where something unforeseen happens, and drugs can then

10:48:58 8   be unsuccessful even after they are successful.

10:49:01 9        So the bottom line is, it has to hit the unmet need,

10:49:05 10  and then, after the product is introduced, people have to have

10:49:09 11  good success with it, have to have good experiences with it,

10:49:12 12  specifically doctors, to even recommend it to their patients or

10:49:15 13  to continue to use that drug.

10:49:17 14  Q.   Now, Mr. Birchfield asked you questions about a clinical

10:49:22 15  trial.  The clinical trial he asked you about was called the

10:49:26 16  *ROCKET trial*.  Are you familiar with that trial?

10:49:29 17  A.   Yes, very familiar.

10:49:30 18  Q.   Now, I don't know if you know anything about the plaintiff

10:49:34 19  in this case, Ms. Mingo, but she was treated with Xarelto for a

10:49:41 20  clot, a deep vein thrombosis, extensive deep vein thrombosis.

10:49:46 21  Is that the indication that was tested in the ROCKET study?

10:49:51 22  A.   No.  The patients that were studied in the ROCKET study

10:49:55 23  actually had atrial fibrillation, which obviously is,

10:49:58 24  unfortunately, a defect that occurs in the heart and causes

10:50:02 25  pooling of the blood, and leads to the formation of clots,

*OFFICIAL TRANSCRIPT*

10:50:05  1    which can then cause stroke.

10:50:08  2            What you just described would be a patient who would

10:50:10  3    develop a clot typically in the lower part of the legs, and

10:50:14  4    then obviously would be treated for that clot and prevention of

10:50:16  5    a secondary clot occurring.

10:50:18  6    Q.   Is looking at the ROCKET trial the appropriate trial to

10:50:22  7    look at for someone like Ms. Mingo?

10:50:25  8    A.   No.  ROCKET trial was in a totally different population.

10:50:29  9    We conducted a different set of trials to evaluate Xarelto's

10:50:33 10    effectiveness and safety and dosing in patients who would fit

10:50:38 11    the description you just gave.

10:50:39 12    Q.   I would like to take you on a little bit of a different

10:50:43 13    topic, and show you Defense Exhibit 10, Mr. Shah.

10:50:47 14            What's coming to you will be the Xarelto label -- or

10:50:51 15    package insert.  Do you have that in front of you, sir?

10:50:56 16    A.   I do.

10:50:56 17    Q.   I believe this is already in evidence.

10:51:01 18            Would you turn to page 41 of the package insert.

10:51:08 19    A.   I'm sorry.  40 -- okay, got it.  I'm there.

10:51:13 20    Q.   What is -- what begins on page 41?

10:51:17 21    A.   This is the medication guide.

10:51:19 22    Q.   What is the medication guide?

10:51:22 23    A.   So the medication guide is a document that the FDA will

10:51:27 24    often approve alongside the package insert.  While the package

10:51:31 25    insert is written in very technical terms and is meant for the

10:51:35   1    physician community -- or healthcare provider community, the

10:51:38   2    FDA will sometimes add a medication guide, which is written for

10:51:42   3    patients.

10:51:43   4    Q.    Who drafts the document?

10:51:47   5    A.    This document, the medication guide, is typically drafted

10:51:51   6    in response to an FDA request.  Then the FDA ultimately owns

10:51:57   7    the content of the medication guide --

10:51:59   8    Q.    Who is the intended audience --

10:52:02   9    A.    -- alongside us.

10:52:05  10    Q.    Thank you, sir.  Sorry.  Who is the intended audience for

10:52:08  11    the medication guide?

10:52:08  12    A.    The medication guide is meant for your average layperson.

10:52:11  13    So it's written in very simple terms that -- at least the FDA

10:52:17  14    tries to write it, and they ask us to write it as well with

10:52:19  15    them, in very simple language that the average person can

10:52:24  16    understand, even if they don't have a science background.

10:52:26  17    Q.    Is the medication guide included with the medicine for the

10:52:31  18    patients to read?

10:52:34  19    A.    Always.  It has to be -- whenever an FDA label includes a

10:52:39  20    medication guide, we're required by law and rules and

10:52:42  21    regulations to then include that medication guide with the

10:52:47  22    product when it's distributed, and also include it in a number

10:52:51  23    of patient materials that may associate -- may be accompanying

10:52:54  24    that product.

10:52:58  25    Q.    Now, is there a section titled:  "What is the most

**OFFICIAL TRANSCRIPT**

10:53:01  1   important information I should know about Xarelto?"

10:53:03  2   A.   Yes.  It's actually all the way at the top.

10:53:05  3   Q.   Right.

10:53:08  4        Jim, if you wouldn't mind moving up a little bit on

10:53:11  5   our document, so the jury can see a little more.

10:53:14  6        Under the second bullet point -- is it the second or

10:53:17  7   the third, I can't tell -- second bullet point, what does it

10:53:23  8   say?

10:53:23  9   A.   Second bullet point states in bold:  "Xarelto can cause

10:53:29 10   bleeding."  Then there is other information that's not bolded.

10:53:34 11        Would you like me to read it?

10:53:37 12   Q.   You know, I'm going to try to move this along, but is it

10:53:40 13   very clear that on the first page of the medication guide given

10:53:42 14   to patients, we tell them:  One of the most important things to

10:53:46 15   know is that Xarelto can cause bleeding?

10:53:48 16   A.   Yes.  That was the intention of the medication guide is to

10:53:52 17   specifically state that Xarelto can cause bleeding as one of

10:53:56 18   the leading key things that it conveys.  It's put in bold for

10:54:00 19   exactly that reason, because -- and it's listed towards the

10:54:03 20   top, because it is the most common side effect.

10:54:07 21   Q.   Are you old enough to remember a radio show called *The*

10:54:12 22   *Rest of the Story*?  Or are you too young for that?

10:54:17 23   A.   I'm not familiar with that radio show, sorry.

10:54:19 24   Q.   Maybe some of the jurors are as old as me.  But I would

10:54:22 25   like to talk about a couple of the documents that

*OFFICIAL TRANSCRIPT*

10:54:26  1   Mr. Birchfield showed you, but didn't talk about some parts,

10:54:30  2   all right?

10:54:31  3   A.    Okay.

10:54:31  4   Q.    Remember that article called *Blood*.

10:54:33  5         Mr. Hoy, it's 5813730.

10:54:40  6         Do you remember that -- do you remember this one?

10:54:43  7   Can you see it?

10:54:43  8   A.    Yes.  I can see it on your screen, yes.

10:54:47  9   Q.    Okay.  Do you have a hard copy in front of you?  Maybe

10:54:50 10   that would be easier.

10:54:51 11   A.    I don't.

10:54:53 12   Q.    Big stack of documents?

10:55:03 13   A.    Can I get one?

10:55:03 14   Q.    I won't take too long, but it's always easier to have the

10:55:08 15   hard copy, isn't it?

10:55:16 16   A.    Thank you.

10:55:16 17   Q.    Thank you, Mr. Shah.  Sorry to make you work.

10:55:22 18         Do you recall being asked some questions about this

10:55:24 19   document?

10:55:25 20   A.    Yes, I do.

10:55:26 21   Q.    The document is dated 2009?

10:55:31 22   A.    Yes, it is.

10:55:34 23   Q.    It's an abstract; is that correct?  Actually, it says

10:55:38 24   abstract 2099, but I think that's the number of the abstract.

10:55:44 25   We're not quite to 2099.

*OFFICIAL TRANSCRIPT*

10:55:46  1   A.    Yes.  It has an abstract.  It could have been a poster or

10:55:49  2   just could be an abstract.  I'm not sure.

10:55:51  3   Q.    I'd like you to take a look at the second page of the

10:55:54  4   abstract.

10:55:59  5   A.    Okay.

10:55:59  6   Q.    Do you recall being asked some questions about the

10:56:02  7   abstract?

10:56:04  8   A.    I was.

10:56:05  9   Q.    Okay.  If you wouldn't mind turning to the line beginning

10:56:12  10  with, "this analysis."  It's toward the very bottom of the

10:56:17  11  page.  It's three lines up, "this analysis."

10:56:27  12          Jim, just move your cursor all the way over to --

10:56:31  13  there you go.  You're almost there.  Down one.  There you are.

10:56:35  14  Now you're there.

10:56:36  15  A.    I'm sorry, you said this was -- oh, okay.  On page 2,

10:56:43  16  right?  "This analysis focused on treatment emergent"; is that

10:56:46  17  where you are?

10:56:46  18  Q.    No, I'm actually, "this analysis suggests."

10:56:54  19          It's highlighted on the screen now.  Perhaps you can

10:56:56  20  see it.

10:56:57  21  A.    Unfortunately, I can't see your screen, but it's on

10:57:01  22  page 2, correct?

10:57:01  23  Q.    It's on page 2.  It's just above the big chart at the

10:57:06  24  bottom.

10:57:18  25          Go up three lines.

*OFFICIAL TRANSCRIPT*

10:57:18 1   A.   Yes.

10:57:19 2   Q.   "This analysis suggests that PT over a wide range is not

10:57:24 3   an accurate predictor of bleeding."  Do you see that?

10:57:35 4          Jim, could you crunch the screen a little bit.

10:57:37 5   A.   I haven't found it yet.  I apologize.  I don't know why

10:57:42 6   I'm missing it here.

10:57:43 7   Q.   That's all right.  It's important for us to get there

10:57:46 8   because we need to be on the same page.

10:57:47 9          So if you go up three lines from the top of the

10:57:51 10  chart --

10:57:53 11         THE COURT:  He's on the wrong page.

10:57:54 12  EXAMINATION BY MR. SARVER:

10:57:57 13  Q.   Are you on the wrong page, sir?  It's on page 2.

10:58:01 14  A.   I'm on page 2 -- it's listed PDF 2, and 2 of 5, correct?

10:58:07 15  That's what I'm supposed to be on.

10:58:07 16  Q.   It is?

10:58:08 17  A.   I see two sentences.  One states:  "The reproducible

10:58:11 18  effects of rivaroxaban."  Then it starts -- then the next

10:58:14 19  sentence is:  "Although extreme PT trough and peak values."

10:58:17 20  Q.   There we go.  Read that whole line.

10:58:19 21  A.   I got you now.  Okay.  I was looking for the beginning of

10:58:24 22  the sentence starting with "this analysis."  I apologize.

10:58:24 23  Q.   My fault.

10:58:26 24  A.   "Although extreme PT trough and peak values were

10:58:30 25  associated with an increased risk of bleeding, this analysis

*OFFICIAL TRANSCRIPT*

10:58:32 1    suggests that PT over a wide range is not an accurate predictor

10:58:36 2    of bleeding events in individual patients undergoing total hip

10:58:41 3    or knee replacement surgery receiving 10 milligrams of

10:58:45 4    rivaroxaban."

10:58:45 5    Q.    Now, is that the ultimate conclusion of the article, that

10:58:50 6    PT is not a predictor?

10:58:52 7    A.    Yes, that appears to be the case.

10:58:54 8    Q.    Is that your understanding, sitting here today in 2017, of

10:59:00 9    what the state of the science is?

10:59:02 10   A.    Yes.  That's exactly ultimately where the conclusion

10:59:07 11   landed, and that's actually what the FDA's position was.

10:59:10 12   Q.    Is that the reason the FDA struck the language it struck

10:59:13 13   from our label?

10:59:14 14   A.    Yes.  The FDA felt that any information related to PT and

10:59:20 15   what it measured or could imply, they felt was superfluous and

10:59:27 16   could cause confusion.

10:59:28 17   Q.    If we could take a look now at Plaintiff's Exhibit 127,

10:59:33 18   another one that was shown to you, 1023223.

10:59:43 19          I don't know if someone can give that to Mr. Shah.

10:59:48 20   Plaintiff's Exhibit 127.

10:59:54 21          Do you remember talking about this with

10:59:56 22   Mr. Birchfield?

10:59:58 23   A.    Yes, I do.

10:59:59 24   Q.    Just to the point we were going to, if you would go -- and

11:00:04 25   did you write this, by the way?  This is your e-mail?

*OFFICIAL TRANSCRIPT*

11:00:06  1   A.   I did.  Yes, I did.

11:00:09  2   Q.   Going to the point we were just talking about, the last

11:00:12  3   sentence in the first paragraph --

11:00:16  4   A.   Yep.

11:00:17  5   Q.   -- would you read that for us?

11:00:18  6   A.   It says:  "Finally, it's my understanding that, while the

11:00:23  7   measurements may indicate current rivaroxaban levels in the

11:00:26  8   body, they don't correlate to risks of bleedings or other

11:00:30  9   outcomes."

11:00:31 10   Q.   Is that your understanding today?

11:00:35 11   A.   Yes, that's still my understanding.

11:00:37 12   Q.   Do you know when Bayer --

11:00:47 13         We're done with that.  Thank you, Mr. Shah.  Sorry.

11:00:50 14   A.   Okay.

11:00:51 15   Q.   You were asked some questions about the CDLA -- do you

11:00:58 16   remember those questions -- that agreement between Bayer and

11:01:00 17   Janssen?

11:01:00 18   A.   Yes.

11:01:01 19   Q.   Do you know when Bayer began the clinical study and the

11:01:05 20   scientific study of rivaroxaban?

11:01:09 21   A.   I believe -- well, I don't recall the exact year.  I know

11:01:13 22   that the studies were started sometime in the late 1990s.

11:01:16 23   Q.   By the time that the CDLA was entered into, had there been

11:01:24 24   literature, scientific articles, published by Bayer scientists

11:01:29 25   about rivaroxaban?

*OFFICIAL TRANSCRIPT*

11:01:32 1    A.   Multiple, actually, were published prior to that document

11:01:37 2    being signed.

11:01:38 3    Q.   I won't take a huge amount of our time, but I would like

11:01:42 4    to show you one of them, because it's one that's been used in

11:01:47 5    this case already.  It's Document 5767718, and if someone can

11:01:58 6    provide a copy to Mr. Shah.

11:02:03 7         The lead author here is a Bayer scientist,

11:02:09 8    Dagmar Kutbitza.  She wrote this article.  If you're able to,

11:02:13 9    first question is going to be, when did she write the article?

11:02:16 10   A.   We're still searching for that item on this end.  Sorry.

11:02:26 11   Q.   If I put this on the Elmo, will you be able to see that,

11:02:29 12   do you think?  Try that.

11:02:30 13   A.   We can give it a shot.

11:02:31 14   Q.   I have no idea if it will work.

11:02:34 15        Jim, can we give it a shot?

11:02:35 16        Does that help at all?

11:02:40 17   A.   No, it's quite small on my side.  I can't make it out.

11:02:43 18   Q.   Is this doing any good at all?  No?  Okay.  Worth a shot.

11:02:43 19   We'll try something else.

11:02:54 20        Do you have Defense Exhibit 1689?

11:03:05 21   A.   Okay.

11:03:05 22   Q.   Sorry for the delay.  Entirely my fault.

11:03:09 23        What is Defense Exhibit 1689?

11:03:14 24   A.   1689 appears to be an article written sometime in July of

11:03:21 25   2005 that's titled Safety, Pharmacodynamics and

*OFFICIAL TRANSCRIPT*

11:03:26  1    Pharmacokinetics of BAY 59-7939 -- which was the rivaroxaban

11:03:33  2    molecule number -- an oral direct Factor Xa inhibitor, after

11:03:39  3    multiple dosing studies in healthy male subjects.

11:03:46  4    Q.   Could you look at the date that it was received.  Was it

11:03:49  5    received in July of 2005?

11:03:50  6    A.   Yes, it appears to be July 1st -- which is my birthday --

11:03:53  7    but 2005.

11:03:53  8    Q.   All right.  I'd like to direct your attention to the first

11:04:00  9    sentence of the abstract, all right.  Do you have that in front

11:04:04 10    you have?

11:04:04 11    A.   Okay.  I do.

11:04:05 12    Q.   Could you read that for us?

11:04:06 13    A.   Yes.  It states:  "There is a clinical need for safe new

11:04:12 14    oral anticoagulants."

11:04:14 15    Q.   Is that something that, in your experience, turned out to

11:04:18 16    be exactly true?

11:04:19 17    A.   Yes.  That's what I was alluding to earlier when I was

11:04:23 18    describing the unmet need, that there had not been really any

11:04:26 19    major oral drug that had come to the market in almost 50 years,

11:04:33 20    since warfarin had been introduced back whenever.

11:04:35 21    Q.   I would like to direct your attention to the results in

11:04:40 22    the abstract.  It starts right after the italicized statement

11:04:48 23    results.

11:04:51 24         Mr. Hoy, we were there just a minute ago, back in the

11:04:55 25    abstract.

**_OFFICIAL TRANSCRIPT_**

11:04:56  1    A.    Okay.

11:04:56  2    Q.    Could you read for us the sentence under results?

11:05:01  3    A.    The first sentence?

11:05:04  4    Q.    Yes.

11:05:05  5          Jim, are we're on a different section.  We're back in

11:05:08  6    the abstract, Jim.

11:05:09  7    A.    So the first sentence in the results section states that:

11:05:16  8    "There were no clinically relevant changes in bleeding time or

11:05:19  9    other safety variables across all doses and regimens.  There

11:05:25 10    was no dose related increase in the frequency or severity of

11:05:28 11    adverse effects with BAY 59-7939."

11:05:28 12    Q.    That's enough.

11:05:33 13    A.    Did you want me to keep reading?

11:05:34 14    Q.    No, that's good enough.

11:05:37 15          Adverse events in this study were bleeding events,

11:05:41 16    correct?

11:05:41 17    A.    Bleeding events would have been included in adverse

11:05:47 18    events.  There could have been others.

11:05:49 19    Q.    If you look at the conclusion at the bottom of the

11:05:52 20    abstract --

11:05:56 21    A.    Yep.

11:05:56 22    Q.    -- would you read for us -- well, let me read it, and you

11:06:01 23    tell me if I get it right.

11:06:03 24          "BAY 59-7939 was safe and well tolerated across the

11:06:09 25    wide dose range studied with predictable, dose proportional

*OFFICIAL TRANSCRIPT*

11:06:16 1   pharmacokinetics and pharmacodynamics and no relevant

11:06:21 2   accumulation beyond steady states.  These results support

11:06:26 3   further investigation of BAY 59-7939 in Phase II clinical

11:06:26 4   trials."

11:06:32 5            Did I read that correctly?

11:06:33 6   A.   You did.

11:06:33 7   Q.   So was this study simply one of the pillars on which the

11:06:39 8   further scientific evidence that Xarelto was safe and effective

11:06:42 9   was based?

11:06:44 10   A.   Yes, I would imagine so.  You know, obviously, this was

11:06:47 11   all prior my time on Xarelto; but, in essence, you would think

11:06:51 12   that -- as I described earlier in my testimony, that there are

11:06:56 13   Phase I studies, there are Phase II studies, and this type of a

11:07:00 14   paper would have been written after those studies -- some of

11:07:02 15   those studies had been completed.

11:07:04 16   Q.   Mr. Shah, sitting here today in 2017, has Xarelto been

11:07:15 17   used by doctors and patients for now over six years?

11:07:21 18   A.   It's been used very broadly for about six years, correct.

11:07:24 19   Q.   Today, sitting here today, is the FDA's position that

11:07:30 20   Xarelto today is safe and effective for use in patients?

11:07:35 21   A.   Yes, that is definitively the FDA's position, and actually

11:07:41 22   has been restated formally by the FDA.

11:07:43 23   Q.   Thank you, Mr. Shah.

11:07:44 24            THE COURT:  Any redirect?

11:07:46 25            MR. BIRCHFIELD:  Yes, sir.

**OFFICIAL TRANSCRIPT**

REDIRECT EXAMINATION

BY MR. BIRCHFIELD:

Q.    Mr. Shah, let's start with first, how many employees does J&J have?

A.    Worldwide?

Q.    Yes.  How many employees of J&J?

        MR. SARVER:  Your Honor, I'm going to object.

        THE WITNESS:  Johnson & Johnson --

        THE COURT:  Wait.

        THE WITNESS:  I'm sorry.

        MR. SARVER:  The objection is it's beyond the scope of my examination.

        THE COURT:  Let's limit to it to the scope of the examination, please, or his credibility.

        MR. BIRCHFIELD:  Well, this would go to the issue of J&J being regulated by the FDA.  We have testimony about the size of the FDA.  We'll establish the relative size.

EXAMINATION BY MR. BIRCHFIELD:

Q.    Can you tell us, sir, how many employees J&J has worldwide?

A.    So, Johnson & Johnson holistically, which obviously would include all three sectors of our business, of which pharmaceuticals is one -- we also have a medical device and a consumer business that's quite significantly large -- worldwide we have about 130,000 employees.  About half of those -- less

*OFFICIAL TRANSCRIPT*

1796

11:09:14  1    than half of those are in the United States.

11:09:15  2    Q.    Mr. Shah, I want to -- I want you to take a look at

11:09:20  3    Defense Exhibit 6100.  It's the document with the red ribbon on

11:09:28  4    it.  Do you see that, sir?

11:09:30  5    A.    Okay.

11:09:34  6    Q.    When is the first time you saw this document, Mr. Shah?

11:09:41  7    A.    I would have seen this when we received it from the FDA.

11:09:45  8    Obviously, anything we receive from the FDA goes first to our

11:09:48  9    regulatory department.  They will look at it, and then they

11:09:52 10    would forward it on to the label working group, which would

11:09:56 11    have included me.

11:09:56 12    Q.    So, when -- can you give us a month, a year -- when would

11:10:03 13    you have seen it?

11:10:05 14    A.    Immediately after we had received it, you would image

11:10:08 15    within a -- within a day or two.

11:10:09 16    Q.    All right.  So did you receive this back in 2011?  Did you

11:10:18 17    receive it last month?  Two months ago?  When did you receive

11:10:22 18    it, sir?

11:10:23 19    A.    So, what I was trying to do in addressing your question

11:10:27 20    was, basically, as a general rule of thumb, whenever we get

11:10:30 21    something like this from the FDA, we would then get it, as the

11:10:33 22    label working group, immediately.  It just first goes to our

11:10:37 23    regulatory department, because that's who has ultimately the

11:10:41 24    direct communication with the FDA.

11:10:42 25              So if this was received in 2011, whatever date it was

*OFFICIAL TRANSCRIPT*

11:10:46 1   received on specifically in June, let's say, June 13th, I would

11:10:50 2   have received it within a day or two.

11:10:51 3   Q.   All right.  Mr. Shah, I want to make sure that I

11:11:00 4   understand your position clearly.  Is it your position that the

11:11:03 5   FDA struck the language from section 12.2?

11:11:10 6   A.   Yes, that's what I stated.

11:11:11 7   Q.   Okay.  Is it your position that the FDA struck the

11:11:17 8   language from section 12.2 because the FDA believes that PT

11:11:23 9   does not relate to bleeding risks; is that your opinion?

11:11:28 10  A.   The FDA -- so, what precisely the FDA believes in terms

11:11:33 11  what the PT test means or doesn't mean, you'd certainly have to

11:11:38 12  ask the FDA in terms of their detailed explanation.

11:11:41 13         But certainly, they struck it because they didn't

11:11:43 14  agree with what we had written, and asked us to, obviously,

11:11:47 15  delete it from the label.  What I think I stated earlier was

11:11:54 16  that they would either have considered it to be superfluous or

11:11:56 17  nonmeaningful information.

11:11:57 18  Q.   Did Janssen take the position that the PT does not relate

11:12:06 19  to bleeding risk, and that type language should not be part of

11:12:11 20  the label?

11:12:15 21  A.   So I have no -- what our position was, was obviously what

11:12:19 22  we put in the label, which we had read a little while ago, that

11:12:22 23  went down to the FDA.  So I think that's an accurate reflection

11:12:25 24  of what our position would have been based on the science that

11:12:28 25  would have existed.

*OFFICIAL TRANSCRIPT*

11:12:28 1          Once the FDA obviously gives us a -- the feedback

11:12:32 2   that they did, unless we have, as a general rule of thumb,

11:12:37 3   clinical evidence or some new scientific data that would

11:12:40 4   convince the other FDA otherwise -- which we, obviously, always

11:12:43 5   have the purview of submitting -- it would be difficult to

11:12:46 6   overturn the FDA's position.

11:12:48 7   Q.   Mr. Shah, did -- you told us that you were involved every

11:12:56 8   step of the way, right, with --

11:12:57 9   A.   Correct.

11:12:57 10  Q.   So if we look at the -- if we look at the e-mail here from

11:13:06 11  Tyree Newman, it was June 13th --

11:13:10 12  A.   I'm sorry, I'm not looking at an e-mail.  I'm looking at

11:13:13 13  the red ribbon document you had asked me to look at.

11:13:16 14  Q.   If you turn to page 3 of the red ribbon document --

11:13:21 15  A.   Okay.

11:13:22 16  Q.   -- it is an e-mail from Tyree Newman to --

11:13:26 17  A.   Yes.

11:13:27 18  Q.   -- Andrea Kollath, right?

11:13:34 19  A.   Yes, it is.

11:13:34 20  Q.   So what I would like for you to do, Mr. Shah, is walk us

11:13:38 21  through, walk us through the timeline of the regulatory steps,

11:13:43 22  what happened next between now and the time that the label was

11:13:49 23  approved in July of 2011, and then the label in November of

11:13:55 24  2011.

11:13:57 25  A.   Right.  So, as I described earlier, FDA communication of

**OFFICIAL TRANSCRIPT**

11:14:01   1   this sort, and as this e-mail proves what I just stated a

11:14:06   2   little while ago, it would go to our regulatory department.

11:14:09   3   Our regulatory department would then forward that information

11:14:11   4   to the label working group, which I was a part of.  That would

11:14:15   5   occur within just a day or two.  Obviously, they would need

11:14:18   6   enough time to just get the e-mail, turn it around, forward it

11:14:22   7   on.

11:14:22   8       Then we would typically have a meeting to review FDA

11:14:25   9   comments.  Obviously, respond and adjust things for the FDA's

11:14:31  10   comments.  Then, ultimately, send a cleaner version back to the

11:14:34  11   FDA within whatever time period we could adjust and make all

11:14:39  12   those changes that they requested.

11:14:40  13   Q.   So when was that, sir?  When was the follow-up?  I'm

11:14:43  14   asking you to factually walk us through.

11:14:47  15   A.   I can't possibly remember from seven years ago when the

11:14:49  16   exact timing -- or six years ago, when the exact timing of that

11:14:53  17   follow-up would be.  But, typically, what I would tell you is,

11:14:56  18   in those circumstances, we tried to do that as quickly as

11:14:59  19   possible.

11:14:59  20       So, obviously, when we get FDA's comments, we absorb

11:15:02  21   them, we study them.  Obviously, if we need some additional

11:15:05  22   help to digest some of the comments, go look up studies that

11:15:08  23   they've requested follow-up on, we would do that.  Then we

11:15:12  24   would do our best to turn it around within a matter of days

11:15:15  25   back to the FDA.

*OFFICIAL TRANSCRIPT*

11:15:15  1    Q.   All right.  I want you to turn, if you would, Mr. Shah, to

11:15:24  2    page 18 of 52 of that red ribbon document.

11:15:30  3    A.   Okay.

11:15:31  4    Q.   Dean, can I get the --

11:15:45  5         All right.  So, following the redline, if you'll look

11:15:51  6    at that section, let's look at the -- at what was deleted --

11:15:59  7    you have stated this language was deleted by the FDA, correct?

11:16:04  8    A.   Correct.

11:16:04  9    Q.   So deleted is:  "Routine monitoring of coagulation

11:16:10 10    parameters is not required with Xarelto use."  That was deleted

11:16:15 11    by the FDA; is that your testimony, sir?

11:16:18 12    A.   It appears, yes, that's exactly right.

11:16:22 13    Q.   Then deleted from this section:  "The relationship between

11:16:27 14    PT and rivaroxaban plasma concentration is linear and closely

11:16:35 15    correlated.  If assessment of the pharmacodynamic effect of

11:16:39 16    rivaroxaban is considered necessary in individual cases, PT

11:16:45 17    measured in seconds is recommended.  The Neoplastin PT assay

11:16:50 18    was measured in the RECORD program, and the median, with 95.5

11:17:05 19    percentile for PT Neoplastin, two to four hours after tablet

11:17:06 20    intake, i.e., at the time of maximum effect, was 18."

11:17:11 21         Are you following me there, sir?

11:17:13 22    A.   Yes, I am.

11:17:14 23    Q.   Then it says:  "The internationalized normalized ratio

11:17:22 24    should not be used for measuring rivaroxaban pharmacodynamic

11:17:26 25    effect."  Is that right?  Did I read that --

*OFFICIAL TRANSCRIPT*

1801

11:17:29  1    A.    Yes, you read -- you read that correctly, yes.

11:17:31  2    Q.    That was stricken by the FDA?

11:17:33  3    A.    Yes.

11:17:34  4    Q.    Is there any information in that language that would

11:17:43  5    instruct doctors that the Neoplastin PT could be useful to help

11:17:50  6    identify patients in the upper quartile, the fourth quartile?

11:17:56  7    A.    So I'm not sure I completely understand your question.

11:18:01  8          First of all, I think that, you know -- and, listen,

11:18:04  9    I would recommend, you know, our clinicians obviously look at

11:18:08 10    that.  But, generally speaking, if somebody is doing quartiles,

11:18:13 11    you're segmenting a group of patients you're doing in a study

11:18:17 12    into different groupings.  Ultimately, you're then analyzing

11:18:20 13    the results of those people.

11:18:22 14          This specifically is ultimately saying that the

11:18:28 15    information we had included obviously stated that this could be

11:18:33 16    a pharmacodynamic assessment if necessary.  You could -- you

11:18:38 17    could use PT potentially to look at that.  Then, obviously, the

11:18:43 18    FDA struck that.

11:18:43 19          So I'm not sure -- like, obviously, the quartile

11:18:48 20    information, which we had just discussed in my previous line of

11:18:52 21    questioning, the results of that study clearly stated that PT

11:18:57 22    was not an active -- or accurate predictor of the bleeding

11:19:03 23    risk.  So that's why this -- I would imagine that's why our

11:19:07 24    clinicians decided not to include that originally.

11:19:11 25          MR. BIRCHFIELD:  Your Honor, may I get an easel?

*OFFICIAL TRANSCRIPT*

11:19:27 1        THE COURT:  Yes.

11:19:27 2        MR. SARVER:  Your Honor, may I walk over, please?

11:19:31 3        THE COURT:  Yes.

11:19:32 4   EXAMINATION BY MR. BIRCHFIELD:

11:19:33 5   Q.   Mr. Shah, the redlined red ribbon document that we just

11:19:37 6   looked at, that was a -- that was a communication from the --

11:19:41 7   from the FDA to Johnson & Johnson on June 13, 2011; is that

11:19:41 8   right?

11:19:50 9   A.   Yes, that's correct.

11:19:51 10  Q.   Mr. Shah, the language in this strikethrough, it

11:20:25 11  references particular clinical trials; is that right?  The

11:20:32 12  RECORD trial?

11:20:33 13  A.   The language that was deleted, you mean, by the FDA?  I'm

11:20:37 14  not sure what you're asking me.

11:20:39 15  Q.   So, sir, what clinical trials are being considered, what

11:20:43 16  data is being considered when they make this -- when they

11:20:46 17  provide this strikethrough?

11:20:49 18  A.   So, the FDA -- again, you know, I would recommend you talk

11:20:54 19  to our clinical team about that, and specifically the file that

11:20:57 20  was sent down.  But the label is basically typically a summary

11:21:01 21  of all the things that are down at the FDA.

11:21:04 22        You know, clearly, when we send an NDA down, it's not

11:21:08 23  this.  It's a massive file.  All these statements are

11:21:12 24  ultimately supported by all the studies that have been done,

11:21:14 25  those studies are sent down to the FDA.

                        *OFFICIAL TRANSCRIPT*

11:21:17  1          So I would imagine -- and, again, our regulatory

11:21:21  2     folks could give you specifics on that -- is that the studies

11:21:23  3     that would have been done assessing PT, relevance of PT, that

11:21:27  4     you would imagine that those would have been done at the FDA,

11:21:30  5     the FDA would have reviewed those.  Ultimately, that's how they

11:21:34  6     make the decision as to what they leave in, what they add, or

11:21:38  7     what they strike from the label.

11:21:41  8          They certainly just don't take our summary and base

11:21:44  9     their entire knowledge based off of that.

11:21:48 10     Q.   So you would agree, Mr. Shah, that it's important to

11:21:50 11     consider all of the data from all of the clinical trials in

11:21:53 12     providing information to doctors, right?

11:21:56 13     A.   Well, I mean, you take -- the FDA, I would imagine, would

11:22:00 14     have assessed the composition of the clinical trial data that

11:22:04 15     was at their disposal, as well as any other information that

11:22:07 16     they wanted to take a look at, even beyond those packages, that

11:22:10 17     was in the public domain.

11:22:11 18     Q.   Okay.  All right.  Let's go back to the language that was

11:22:19 19     deleted here.  Can you see that, Mr. Shah?  Do you see the box

11:22:23 20     where it's referring to, deleted?

11:22:26 21     A.   The same box that we were just referring to?  Yes.

11:22:28 22     Q.   Okay.  It says:  "The Neoplastin PT was measured in the

11:22:34 23     RECORD program."  Is that right?

11:22:38 24     A.   That's what it says.

11:22:38 25     Q.   The RECORD program -- there were four RECORD clinical

*OFFICIAL TRANSCRIPT*

11:22:46 1  trials, right?  RECORD-1, RECORD-2, RECORD-3 and RECORD-4,

11:22:51 2  right?

11:22:52 3  A.   Yes, that's correct.

11:22:52 4  Q.   Those clinical trials involved the prevention or

11:22:58 5  prophylaxis of DVT and PE's; is that right?

11:23:04 6  A.   Following hip or knee replacement surgery, yes.

11:23:06 7  Q.   Okay.  This data -- I mean, the FDA strikes language

11:23:12 8  pertaining to the RECORD trials, agreed?

11:23:15 9  A.   Yes.  The date of this exchange indicates that this was

11:23:23 10 the review for the orthopedic surgery indication, so that's not

11:23:28 11 surprising that that's what it's referencing.

11:23:30 12 Q.   All right.  So, before June 11th -- I mean, June 13, 2011,

11:23:44 13 the position of the company was that PT -- PT information

11:23:50 14 should be included in the label to inform doctors that you can

11:23:54 15 measure and monitor the plasma concentration of Xarelto using

11:23:59 16 the Neoplastin PT?

11:24:04 17       MR. SARVER:  Objection, Your Honor, misstates the

11:24:06 18 evidence.

11:24:06 19 EXAMINATION BY MR. BIRCHFIELD:

11:24:07 20 Q.   Mr. Shah, was it the position of the company before

11:24:10 21 June 13, 2011, that Neoplastin PT would be useful and helpful

11:24:16 22 for doctors in measuring -- in measuring the plasma

11:24:23 23 concentration of Xarelto?

11:24:25 24 A.   So, you know, again, I would refer you to our clinical

11:24:29 25 team for that assessment, because they would be the best to

*OFFICIAL TRANSCRIPT*

11:24:32  1   evaluate or give you our, quote, unquote, you know, official

11:24:35  2   position.

11:24:37  3          What my recollection of this is, is that when this

11:24:39  4   was formulated, and this information that ultimately was

11:24:43  5   deleted by the FDA, I recall hearing from our clinical team

11:24:47  6   that, look, you know, while we don't think that this is going

11:24:51  7   to necessarily be a predictor of clinical outcome, there may be

11:24:54  8   situations where people want to just know what a level is, and

11:24:58  9   this is all we've got scientifically available at this time,

11:25:01 10   and so we put that in.

11:25:03 11          Obviously, the FDA didn't feel that it was necessary

11:25:05 12   to include because the FDA's position clearly here was that

11:25:09 13   they didn't see a clinical rationale or an outcome-based

11:25:13 14   decision that it would lead to.

11:25:15 15   Q.   Mr. Shah, after, after June 13, 2011, there were

11:25:20 16   additional clinical data pertaining to Xarelto that was

11:25:25 17   obtained by the company, correct?

11:25:28 18   A.   Well, sure.  We had other clinical trials that came to

11:25:32 19   completion after this specific date.  Atrial fibrillation, by

11:25:37 20   this time, the ROCKET trial, I know, had been completed.  I

11:25:40 21   can't recall the exact date when the EINSTEIN studies were

11:25:44 22   completed.

11:25:44 23   Q.   But the ROCKET data was still being analyzed at this

11:25:48 24   point, right?

11:25:50 25   A.   No.  The ROCKET data had been analyzed at this point, and

*OFFICIAL TRANSCRIPT*

11:25:54 1   the FDA actually had it.

11:25:55 2   Q.   All right.  So, after June 13, 2011, did Janssen or Bayer

11:26:03 3   ever recommend to the FDA, ever amend its label, try to get

11:26:10 4   language in the label about the usefulness of the PT

11:26:17 5   Neoplastin?

11:26:17 6   A.   So since -- so my time obviously on Xarelto ended in 2012.

11:26:22 7   I can't speak to any other conversations that occurred

11:26:25 8   specifically within the team prior -- after 2012 to now.

11:26:29 9          What I can tell you is that during the time, if my

11:26:32 10  recollection is correct -- and, again, I would refer you to our

11:26:35 11  clinical people for this -- there was no other evidence that

11:26:38 12  was sufficient enough to overturn or change that position.

11:26:43 13  That, obviously, was scientifically based, and, as much, we

11:26:47 14  didn't do it.

11:26:48 15         Now, you know, even the ROCKET trial that you just

11:26:50 16  mentioned a couple of minutes ago, the ROCKET NDA, the atrial

11:26:55 17  fibrillation NDA was at the FDA at this time.  Part of the

11:26:58 18  reason we had a two-year delay on our orthopedic surgery

11:27:00 19  indication was that the FDA wanted that data as well, and

11:27:03 20  wanted some long-term safety data.

11:27:05 21         So they obviously had it, and they didn't approve us

11:27:07 22  for orthopedic surgery indication until they had that full data

11:27:11 23  available to them.

11:27:12 24  Q.   Mr. Shah, can you tell -- can you tell us, can you tell

11:27:17 25  the jury whether Janssen or Bayer ever attempted to have

*OFFICIAL TRANSCRIPT*

11:27:22  1   language added to the label, the Xarelto label, pertaining to

11:27:27  2   the usefulness of the Neoplastin PT after June 13, 2011?

11:27:33  3   A.   As I just stated, I haven't been on the product since

11:27:38  4   2012, so I can't speak to any conversations that have occurred

11:27:41  5   in the last five years.

11:27:43  6           During my time on the product when I was part of this

11:27:46  7   label working committee, there was no new evidence that I'm

11:27:50  8   aware of that would have suggested the usefulness of PT.  So

11:27:54  9   you would have to ask others who obviously have been there in

11:27:56 10   the last 5 years to see if there is any other scientific

11:28:00 11   information that's come out that would support the need for

11:28:03 12   that inclusion, and that would be sufficient enough to overturn

11:28:06 13   the FDA's position that it wasn't necessary.

11:28:09 14   Q.   All right.  So do you recall us looking at the FDA summary

11:28:17 15   review that was dated November 4th, 2011?

11:28:27 16   A.   November -- I don't recall the exact date.  I thought it

11:28:29 17   was earlier than that, the FDA document we reviewed.

11:28:32 18   Q.   So --

11:28:33 19   A.   I'm not sure.  It would be helpful to have it as a

11:28:36 20   reference.

11:28:36 21   Q.   Okay.  So if we look -- well, let me flip the page.

11:28:47 22           The FDA summary review, you recall us looking at this

11:28:56 23   document earlier?

11:28:56 24   A.   Yes.  As my recollection was correct, it's not dated

11:29:01 25   November of 2011.  It's dated January 5, 2011, which was

**OFFICIAL TRANSCRIPT**

11:29:07  1   preceding the document -- the redline document that we had

11:29:12  2   received.

11:29:12  3   Q.   Okay.  Mr. Shah, I think you're just off a little bit

11:29:18  4   there.  That's the date of submission.  Can you see it, sir?

11:29:22  5   The top line is the -- the top line is the date.

11:29:28  6   A.   Oh, I see.  Okay.  I see.  Sorry.  I was looking at the

11:29:30  7   January 5th.  So the date -- you're right, the date on the top

11:29:34  8   is November 4th.  Sorry.  There are three dates on this

11:29:37  9   document.

11:29:37 10          So the top says November 4th, and then the date of

11:29:41 11   submission is below, yes.

11:29:41 12   Q.   Right.  So the date of submission --

11:29:43 13   A.   I was looking at the date of submission.

11:29:44 14   Q.   Right.  So the date of this document, though, sir, is

11:29:48 15   November 4, 2011?

11:29:50 16   A.   Yes.  That appears to be the case.

11:29:52 17   Q.   Okay.  So, the -- at this point, the summary review

11:29:57 18   provided by the -- by the FDA states that the -- and at this

11:30:05 19   point, at this point the FDA has had the -- is considering the

11:30:15 20   clinical data from ROCKET, the ROCKET study, the large AFib

11:30:25 21   indication study; is that right?

11:30:26 22   A.   Yes.  At this point, obviously, the FDA -- and if this

11:30:28 23   date -- as we just discussed, November 4, 2011, the atrial

11:30:32 24   fibrillation indication has actually been approved at this

11:30:35 25   point by the FDA.  So they would have had not only the data,

*OFFICIAL TRANSCRIPT*

11:30:38  1  they would have actually made a decision on that data for that

11:30:41  2  indication.

11:30:41  3  Q.   It states that the clinical pharmacology and clinical

11:30:45  4  reviewers demonstrated that there is a linear correlation

11:30:50  5  between rivaroxaban levels and prothrombin time, PT.  They also

11:30:58  6  demonstrated that there is --

11:30:59  7  A.   I'm sorry, could you tell me what page you're on?  I just

11:31:03  8  want to be able to follow.

11:31:04  9  Q.   Yes, I apologize.  Page 9, or PDF 10.  Do you see that,

11:31:08 10  sir?

11:31:08 11  A.   Okay.  Sorry for the interruption.

11:31:11 12  Q.   Okay.  We're looking at the additional issues, the

11:31:16 13  desirability of monitoring, do you see that?

11:31:18 14  A.   Yeah.

11:31:18 15  Q.   The clinical pharmacological and clinical reviewers

11:31:24 16  demonstrated that there is a linear correlation between

11:31:26 17  rivaroxaban levels and prothrombin time.  They also --

11:31:29 18  A.   Yes, that's what it states.

11:31:30 19  Q.   They also demonstrated that there is a correlation between

11:31:33 20  PT and risk of bleeding.  Correct?

11:31:39 21  A.   Yes.  That's what it says.

11:31:40 22  Q.   Okay.  Then it states:  "This applicant has not chosen to

11:31:45 23  utilize this information."

11:31:50 24           Is that correct, sir?

11:31:52 25  A.   That's what it says.

*OFFICIAL TRANSCRIPT*

11:31:53 1  Q.   So does that suggest that the -- that the FDA believes

11:32:01 2  that there is a link, a correlation between PT and risk of

11:32:05 3  bleeding?

11:32:07 4  A.   So I don't think that that's an accurate statement, no.  I

11:32:10 5  would disagree with that.

11:32:11 6       The reason I say that is because the document is

11:32:14 7  written by one of the reviewers of the FDA.  It is my

11:32:20 8  appearance often time the FDA will have multiple positions

11:32:25 9  within the review.  This is a reflection of one of the reviews

11:32:28 10 that occurred, which was obviously made public after the

11:32:31 11 completion of the review has occurred.  Ultimately, the FDA's

11:32:34 12 joint final recommendation is what's recommended in the label,

11:32:38 13 and obviously that's what we'll end up following.

11:32:40 14 Q.   So let's make sure that we are -- that we're clear on this

11:32:44 15 point.  So, is it your position that the label is the FDA's

11:32:50 16 label, not the company's label?

11:32:54 17 A.   Well, obviously, it's our label, too, because, ultimately,

11:32:58 18 it's what we use to promote the product, and, ultimately, it's

11:33:01 19 the stuff that we have to communicate.

11:33:04 20      But, clearly, the FDA has the authority to help us --

11:33:08 21 or the authority to actually say to us what can and cannot be

11:33:12 22 included in a label.  So, yes, that is my position that I

11:33:17 23 stated earlier as well.

11:33:18 24 Q.   So is the label -- is the label ultimately the company's

11:33:24 25 responsibility or the FDA's responsibility?

*OFFICIAL TRANSCRIPT*

A.    Okay.  I thought I just answered that question, so maybe I could state again.  It's our label, obviously.  We submit it to the FDA for review.  The FDA, however, has the authority to revise the label accordingly based on scientific evidence, and then, obviously, we have to follow ultimately the FDA's authority.

        I mean, let me take it the other way.  We could put in there something highly positive, right?  We could say the drug is better than it really is.  If the FDA doesn't agree with that statement because they don't feel the evidence is there to support it, they legitimately will strike that statement.

        So it goes both ways here.  That's how this process works.

Q.    All right.  So, you received the summary review from the medical reviewers on November 4, 2011?

A.    Right, which was after the FDA had already approved the product, which I think is an important point to make because these reviews are actually not made available to us after the FDA -- until after the FDA has already completed their review.  Obviously, at that point in time, we not only have the approval letter from the FDA, we also have the approved package insert from the FDA.

Q.    After you received the summary review, the position of the medical reviewers at the FDA -- you're still there, you're

*OFFICIAL TRANSCRIPT*

11:34:53  1   still working on Xarelto -- did Janssen attempt to add language

11:34:59  2   to the label about the Neoplastin PT as a useful tool for

11:35:04  3   doctors?

11:35:05  4   A.   There was no scientific evidence available to my

11:35:08  5   knowledge, based on everything that I knew, and based on what I

11:35:12  6   had been told by our clinical team, that would necessity us

11:35:15  7   being able to go back and actually convince the FDA to change

11:35:19  8   their position.

11:35:19  9   Q.   Okay.  All right.  Let's take a look at the letter that

11:35:28 10   you received from the FDA.  I'm sorry.  The letter that you

11:35:36 11   provided to the FDA on December 27, 2010.  This is what you

11:35:47 12   discussed with your counsel; is that right?

11:35:51 13   A.   I'm sorry, I don't have a letter.

11:35:53 14   Q.   Okay.  It is marked as Defense Exhibit 5389.  Do you see

11:36:04 15   that, Mr. Shah?

11:36:05 16   A.   I don't have anything in front of me.  I think our friend

11:36:12 17   here is looking for them.

11:36:13 18   Q.   Okay.  While he's looking, I'll ask you, and see if you

11:36:24 19   can just help us without the need of the letter.

11:36:28 20        Do you have the letter now, sir?

11:36:29 21   A.   Yes, I believe I do.

11:36:30 22   Q.   All right.  The reference -- if we look at the middle of

11:36:36 23   the letter, it says:  "Reference is made to the FDA action

11:36:40 24   letter received May 27, 2009."

11:36:46 25        Do you see that, sir?

*OFFICIAL TRANSCRIPT*

11:36:48 1   A.   I do.

11:36:48 2   Q.   That letter is a letter that Johnson & Johnson received

11:36:58 3   from the FDA pertaining to the RECORD clinical trials; is that

11:36:58 4   right?

11:37:07 5   A.   Yes, it appears to be.

11:37:09 6   Q.   All right.  Let's take a look at Plaintiff's Exhibit --

11:37:18 7   Record Number 113437.

11:37:26 8        THE COURT:  Just a minute.  The jury says they need to

11:37:27 9   take a break.  We're going to have to take a break at this

11:37:29 10  time, a 10-minute break.

11:37:30 11       Court will stand in recess for 10 minutes.

11:37:32 12       THE DEPUTY CLERK:  All rise.

11:37:32 13       (WHEREUPON, at 11:37 a.m., the jury panel leaves the

10:07:48 14  courtroom, and then a brief recess was taken.)

10:07:48 15       (WHEREUPON, at 11:38 a.m. the jury panel leaves the

11:46:39 16  courtroom and then a brief recess was taken.)

11:46:39 17       (WHEREUPON, at 11:46 a.m. the jury panel enters the

11:46:57 18  courtroom.)

11:46:57 19       THE COURT:  Let me see counsel at the bench, please.

11:46:57 20       (WHEREUPON, at this point in the proceedings, there was

11:46:57 21  a conference held at the bench.)

11:47:10 22       THE COURT:  Andy, we have to finish this case.  You're

11:47:12 23  going to have until five after 12:00.  That's 20 minutes.  You

11:47:16 24  just have to do it.

11:47:17 25       You're taking it too much by inches.  You can't

**OFFICIAL TRANSCRIPT**

11:47:22 1   get there by inches.  Instead of having to -- I show you a

11:47:26 2   document, a two-page document that's already been introduced

11:47:28 3   into evidence, exhibit such and such.  I call your attention to

11:47:32 4   the second paragraph in it.  You're not doing that.

11:47:34 5        You're saying:  I show you a document.  What is

11:47:36 6   it?  Do you see that it is such and such?

11:47:37 7        You have got 15 questions before you get to your

11:47:41 8   question.  You have to -- you're on redirect.  You're losing

11:47:45 9   the jury and it's just taking too long.  You're getting too

11:47:48 10  much in the weeds.  Try and make your point quickly.  I don't

11:47:53 11  mean to fuss.  It's just that we have to move.

11:47:56 12      MR. BIRCHFIELD:  Judge, the FDA strikethrough, I mean,

11:47:59 13  that is a morass that has -- of major proportions.  And I

11:48:05 14  apologize to the Court for wasting time.

11:48:06 15      THE COURT:  No, you're not wasting time.  Just make it

11:48:09 16  shorter.

11:48:09 17      MR. BIRCHFIELD:  Last night -- last night about just

11:48:14 18  before midnight we found a document, Shah's document, where

11:48:21 19  they took the opposite position.  I've got to get there.  I'm

11:48:24 20  headed there now.

11:48:25 21      THE COURT:  Okay.

11:48:25 22      (WHEREUPON, at this point in the proceedings, the bench

11:48:43 23  conference concluded.)

11:48:43 24      THE COURT:  Okay.  Mr. Shah, you're back with us?

11:48:48 25      THE WITNESS:  Yes, sir, I am.

*OFFICIAL TRANSCRIPT*

EXAMINATION BY MR. BIRCHFIELD:

Q.   All right.  Mr. Shah, I've got to move quickly here, but the letter that you wrote to the FDA -- that Johnson & Johnson wrote to the FDA, that was in response to an FDA complete response letter; is that right?

A.   The previous letter that we were taking a look at, yes, it was.

Q.   And that complete response letter was a letter that was written to Johnson & Johnson about major issues and concerns with the RECORD clinical trial program; is that right?

A.   The letter that we would have received, when we received the complete response, would have requested potentially additional information, as well as additional questions by the FDA.  And I recall one of the big questions that they had in the complete response was that they wanted additional longer-term safety data, which is obviously what the ROCKET trial was able to give them.

Q.   Well, it's a little more than that, isn't it, Mr. Shah. It says:  "The data from five sites are considered unreliable for the following reasons:

         "Failure to conduct study according to signed investigator statement and the investigational plan."

         Correct?

         MR. SARVER:  Your Honor, we're going to object to going into a completely different clinical trial than the one at

*OFFICIAL TRANSCRIPT*

11:50:06  1    issue in this case.  Certainly the high level part about the

11:50:08  2    letter is fine, but we could go into an entire trial on the

11:50:14  3    RECORD, on ROCKET, on EINSTEIN.  We can do this for days.

11:50:19  4         THE COURT:  I understand.

11:50:20  5              Go ahead.

11:50:21  6    EXAMINATION BY MR. BIRCHFIELD:

11:50:22  7    Q.   All right.  "The failure to report adverse events" --

11:50:25  8    A.   Sorry.  I'm sorry.  What -- I just want to be on the same

11:50:29  9    page and section with you.  Would you mind telling me where you

11:50:32 10    are?

11:50:32 11    Q.   Sure.  Second page, PDF 2, middle of the page, the bullet

11:50:38 12    points.

11:50:39 13              "The failure to report adverse events to the sponsor.

11:50:42 14              "Failure to prepare or maintain adequate and accurate

11:50:45 15    case histories with" --

11:50:46 16    A.   Oh.  Sorry.  I didn't have the correct document in front

11:50:48 17    of me.  I apologize.  Let's start again.

11:50:50 18    Q.   Okay.  Second page, middle of the page.

11:50:56 19              "The data from the five sites listed above are

11:50:59 20    considered unreliable for the following reasons:

11:51:01 21              "Failure to conduct study according to the signed

11:51:04 22    investigator statement and the investigational plan.

11:51:09 23              "Failure to report adverse events to the sponsor.

11:51:11 24              "Failure to prepare or maintain adequate and accurate

11:51:14 25    case histories with respect to observations and data pertinent

                           *OFFICIAL TRANSCRIPT*

11:51:18  1    to the inspection."

11:51:20  2              Do you see that, sir?

11:51:21  3    A.   Okay.  I do.

11:51:23  4    Q.   It's more than just asking for other data.  There were

11:51:26  5    major data integrity issues with the RECORD program, true?

11:51:31  6    A.   No.  I don't agree with your assessment.

11:51:33  7              MR. BIRCHFIELD:  Your Honor, we offer Plaintiff's

11:51:35  8    Exhibit 133.

11:51:35  9              MR. SARVER:  Objection, Your Honor.  We have a Motion

11:51:40 10    in *Limine* on that.  Your Honor took it under advisement.  It's

11:51:42 11    not ruled on yet.  We object.

11:51:45 12              THE COURT:  All right.  I'll allow the second page to

11:51:49 13    be introduced.

11:51:54 14              MR. BIRCHFIELD:  Your Honor, can we address that at

11:51:56 15    break?

11:51:57 16              THE COURT:  Yes.  Okay, let's move on.

11:51:59 17              MR. BIRCHFIELD:  Yes.

11:51:59 18    EXAMINATION BY MR. BIRCHFIELD:

11:52:00 19    Q.   Mr. Shah, I want to ask you to take a look at an e-mail.

11:52:05 20    It's Identification Number 54668.

11:52:15 21              And this an e-mail, if you look at the top, it's from

11:52:19 22    Andrea Kollath, and you're listed as a recipient.  Do you see

11:52:24 23    that, Mr. Shah?

11:52:26 24    A.   Yes, I do.

11:52:26 25    Q.   And this is dated June 23rd, 2011.  Do you see that?

*OFFICIAL TRANSCRIPT*

11:52:31  1   A.   I do.

11:52:34  2   Q.   And it states:  "6/22/11 J&J sponsor response to FDA NDA

11:52:46  3   22406 label comments."

11:52:48  4        Do you see that, sir?

11:52:51  5   A.   I do.

11:52:51  6        MR. BIRCHFIELD:  Your Honor, we offer -- this

11:52:54  7   Plaintiff's Exhibit 134.

11:52:55  8        MR. SARVER:  Your Honor, we're haven't talked about

11:52:59  9   whether or not it's even relevant.  But if there is some

11:53:02 10   relevance to it and it will move it along, I don't object.

11:53:08 11        THE COURT:  I'll admit it.  He's received it.  Go

11:53:08 12   ahead.

11:53:08 13   EXAMINATION BY MR. BIRCHFIELD:

11:53:11 14   Q.   Mr. Shah, if you'll notice what I've marked as Plaintiff's

11:53:15 15   Exhibit 135, it is Document Number 54669, which is the

11:53:22 16   attachment to the e-mail that we just looked at.

11:53:28 17   A.   Okay.  I have it in front of me.

11:53:29 18   Q.   Okay.  If you will -- if you'll turn to PDF 20.

11:53:44 19   A.   Okay.

11:53:44 20   Q.   Now, in this e-mail, it is a -- it's a redline version

11:53:53 21   with the FDA, correct?

11:53:56 22   A.   Yes, it appears to be.

11:53:57 23   Q.   Okay.  And the FDA is adding language in:  "Increases

11:54:04 24   in rivaroxaban exposure may increase bleeding risk."

11:54:08 25        Do you see that, sir?

***OFFICIAL TRANSCRIPT***

11:54:12  1    A.    Yes, I do.

11:54:13  2    Q.    And then if we look down below that, we see the sponsor's

11:54:21  3    response.   That would be Johnson & Johnson's response, sir,

11:54:25  4    right?

11:54:25  5    A.    Yes, that would be correct.

11:54:28  6    Q.    And the sponsor does not agree with the approach proposed

11:54:36  7    by the FDA for the description of the potential risk of

11:54:40  8    rivaroxaban for either drug-drug interactions or drug-disease

11:54:45  9    interactions.   Do you see that?

11:54:47 10    A.    Yes, I do see that.

11:54:48 11    Q.    And if you see in the middle of that paragraph, it states:

11:54:54 12    "In the original label proposal, sponsor used term *clinically*

11:55:00 13    *relevant* to identify this threshold and increases of exposure."

11:55:03 14          Do you see that, sir?

11:55:06 15    A.    Yes, I see that.

11:55:07 16    Q.    And the -- and the FDA response is:  "The use of the term

11:55:11 17    *clinically relevant* is vague and not appropriate for labeling."

11:55:14 18          Right?

11:55:18 19    A.    Yes.   That's what the FDA wrote back to us.

11:55:19 20    Q.    And then if you'll turn to the next page, this is the --

11:55:24 21    again, this is the company's response to the FDA on this issue,

11:55:29 22    right?

11:55:31 23    A.    Looks like it, yes.

11:55:32 24    Q.    Okay.   Again, it is in response to the FDA's statement

11:55:38 25    that:  "Increases in rivaroxaban exposure may increase bleeding

*OFFICIAL TRANSCRIPT*

11:55:44 1    risk."

11:55:44 2         Now let's look at the company response.

11:55:47 3         "There was not a strong relationship between

11:55:50 4    rivaroxaban 10-milligram dose exposure measured by PT values

11:55:55 5    and bleeding risk in the RECORD program."

11:55:58 6         Right?

11:56:00 7    A.   Yes, that's what it says.

11:56:00 8    Q.   And so the FDA in this version ten days later, ten days

11:56:07 9    after the red ribbon document that you showed us, the FDA is

11:56:13 10   saying that there is a link, "Increases in rivaroxaban exposure

11:56:18 11   and bleeding risk," and the company is fighting back, correct?

11:56:21 12   A.   Well, I don't know if I would call it *fighting back*.  I

11:56:28 13   think there is dialing obviously going on between the FDA and

11:56:32 14   our company's scientists, which is not atypical of any of these

11:56:38 15   situations.

11:56:38 16        The FDA will provide us a position.  If we have other

11:56:43 17   supportive information, we will provide it back.  And then

11:56:46 18   obviously the FDA will ultimately make a ruling.  And if the

11:56:48 19   FDA wanted to include a strong statement like the one you just

11:56:51 20   stated, they certainly could have easily added it to the label,

11:56:54 21   and we would have had to live with it.

11:56:56 22   Q.   Mr. Shah, isn't it correct that the company can add or

11:57:06 23   strengthen its label on its own, its warnings and precaution

11:57:11 24   section, at any time?

11:57:13 25   A.   I would imagine -- so, first of all, I would ask one of

**OFFICIAL TRANSCRIPT**

11:57:16  1     our regulatory experts on that, because I don't know if I can

11:57:19  2     answer that question that broadly, because I'm sure -- it

11:57:24  3     depends is probably the answer, I'm imaging.

11:57:28  4         But as far as what we typically can add, obviously

11:57:31  5     the FDA has to review it.  I know of a situation not too long

11:57:35  6     ago where something like that occurred where we had wanted to

11:57:38  7     add something for a different product, and the FDA didn't

11:57:41  8     agree.

11:57:41  9     Q.   Mr. Shah, you gave a presentation with Scott Berkowitz.

11:57:53 10     We saw that in a PowerPoint earlier this morning.  Are you

11:57:57 11     aware of Scott Berkowitz' position on PT and bleeding risk and

11:58:04 12     PT and plasma concentration?

11:58:07 13     A.   I haven't spoken to Scott probably since 2012 at some

11:58:12 14     point, so I have no clue what his position would be at this

11:58:15 15     moment in time.

11:58:16 16     Q.   Okay.  Let's take a look at Scott Berkowitz' testimony in

11:58:20 17     this case on that issue.

11:58:21 18         MR. SARVER:  Your Honor, objection.  This is beyond the

11:58:23 19     scope.  It's not a proper question.  He doesn't know what

11:58:27 20     Mr. Berkowitz thinks.  Now we're going way afield.

11:58:30 21         THE COURT:  But you can't do that with a witness who is

11:58:33 22     not an expert.  You can do an expert because he's got to give

11:58:36 23     an opinion and you can't ask him to assume things, because he's

11:58:40 24     not an expert.

11:58:41 25         MR. BIRCHFIELD:  He has taken the position that the --

*OFFICIAL TRANSCRIPT*

11:58:44  1    that he has no scientists -- no scientists have stated that

11:58:48  2    there is a relationship between PT, plasma concentration and

11:58:54  3    bleeding risk.  I should be allowed to impeach him on a Bayer

11:58:57  4    scientist's testimony that he works with, that he participated

11:59:02  5    in a presentation and relied on him for his science.  That was

11:59:06  6    the testimony.

11:59:07  7         MR. SARVER:  Your Honor, that's a mischaracterization

11:59:10  8    of his testimony.  He said:  "Overall the science doesn't

11:59:13  9    support any connection between PT and bleeding risk."  He

11:59:16 10    didn't talk about Mr. Berkowitz.

11:59:18 11         And if we're going to talk about Scott Berkowitz,

11:59:20 12    that deposition lasted two days, and it doesn't say overall the

11:59:24 13    things that Mr. Birchfield is saying.

11:59:27 14         THE COURT:  Look, if that's the argument that you want

11:59:29 15    to make, you can make the argument, but not with this witness.

11:59:33 16    You can't ask a fact witness to -- you can't show him another

11:59:37 17    witness' testimony because he's then simply giving an opinion

11:59:41 18    on it.

11:59:44 19         It is what it is.  If he says one thing and the

11:59:46 20    other person says the other thing, you make that argument to

11:59:50 21    the jury.  But what he thinks about it is not -- is not

11:59:55 22    relevant.  I mean, what's he going to say, I agree with it or I

11:59:59 23    disagree with it or he said that or he didn't say that?  He

12:00:02 24    doesn't know.  He's a fact witness.

12:00:08 25         MR. BIRCHFIELD:  Okay.  Last question, Your Honor.

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 12:00:08 | 1 |
| 12:00:12 | 2 |
| 12:00:19 | 3 |
| 12:00:23 | 4 |
| 12:00:26 | 5 |
| 12:00:32 | 6 |
| 12:00:35 | 7 |
| 12:00:42 | 8 |
| 12:00:43 | 9 |
| 12:00:43 | 10 |
| 12:00:48 | 11 |
| 12:00:51 | 12 |
| 12:00:52 | 13 |

1  EXAMINATION BY MR. BIRCHFIELD:

2  Q.   Mr. Shah, are you aware of any occasion where Janssen

3  attempted to supply information about PT, plasma concentration

4  and bleeding risk after June 13, 2011?

5  A.   No.  Because, as I stated earlier, I was not aware of any

6  new scientific evidence that came out that would have supported

7  our ability to go back and present new information on PT's

8  correlation with bleeding.

9        MR. BIRCHFIELD:  Thank you, Your Honor.

10        THE COURT:  We'll stop here and we'll come back at

11  1:15.  The court is in recess until 1:15.

12        THE DEPUTY CLERK:  All rise.

13        (WHEREUPON, at 12:00 p.m. the jury panel leaves the

14  courtroom, and the Court was in luncheon recess.)

15                        *    *    *

16

17                   REPORTER'S CERTIFICATE

18        I, Cathy Pepper, Certified Realtime Reporter, Registered
   Merit Reporter, Certified Court Reporter in and for the State
19  of Louisiana, Official Court Reporter for the United States
   District Court, Eastern District of Louisiana, do hereby
20  certify that the foregoing is a true and correct transcript to
   the best of my ability and understanding from the record of the
21  proceedings in the above-entitled and numbered matter.

22                        *s/Cathy Pepper*
                         Cathy Pepper, CRR, RMR, CCR
23                       Certified Realtime Reporter
                         Registered Merit Reporter
24                       Official Court Reporter
                         United States District Court
25                       Cathy_Pepper@laed.uscourts.gov

                   **OFFICIAL TRANSCRIPT**