08:15:59

```
 1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
 2

 3     ****************************************************************

 4     IN RE: XARELTO (RIVAROXABAN)
       PRODUCTS LIABILITY LITIGATION
 5
                             CIVIL ACTION NO. 14-MD-2592 "L"
 6                           JACKSON, MISSISSIPPI
                             THURSDAY, AUGUST 17, 2017, 8:30 A.M.
 7

 8     THIS DOCUMENT RELATES TO:

 9     DOCKET NO. 14-MD-2592
       DORA MINGO, ET AL. V.
10     JANSSEN RESEARCH & DEVELOPMENT,
       LLC, ET. AL.,
11     CASE NO. 15-CV-3469

12     ****************************************************************

13
                         DAY IX  MORNING SESSION
14               TRANSCRIPT OF JURY TRIAL PROCEEDINGS
               HEARD BEFORE THE HONORABLE ELDON E. FALLON
15                  UNITED STATES DISTRICT JUDGE

16

17     APPEARANCES:

18
       FOR THE PLAINTIFFS'
19     LIAISON COUNSEL:           GAINSBURGH BENJAMIN DAVID
                                  MEUNIER & WARSHAUER
20                                BY:  GERALD E. MEUNIER, ESQ.
                                  2800 ENERGY CENTRE
21                                1100 POYDRAS STREET
                                  NEW ORLEANS, LOUISIANA  70163
22

23
       FOR THE PLAINTIFFS:        BEASLEY ALLEN
24                                BY:  ANDY BIRCHFIELD, ESQ.
                                  P.O. BOX 4160
25                                MONTGOMERY, ALABAMA  36103
```

**OFFICIAL TRANSCRIPT**

1   APPEARANCES CONTINUED:

2

3                                    GAINSBURGH BENJAMIN DAVIS
                                     MEUNIER & WARSHAUER
4                                    BY:  WALTER C. MORRISON, IV, ESQ.
                                     240 TRACE COLONY PARK DRIVE
5                                    SUITE 100
                                     RIDGELAND, MISSISSIPPI  39157
6

7
                                     GOZA HONNOLD
8                                    BY:  BRADLEY D. HONNOLD, ESQ.
                                     11181 OVERBROOK ROAD, SUITE 200
9                                    LEAWOOD, KANSAS  66211

10

11                                   THE LAMBERT FIRM
                                     BY:  EMILY JEFFCOTT, ESQ.
12                                   701 MAGAZINE STREET
                                     NEW ORLEANS, LOUISIANA  70130
13

14
                                     LEVIN FISHBEIN SEDRAN & BERMAN
15                                   BY:  FREDERICK S. LONGER, ESQ.
                                     510 WALNUT STREET
16                                   SUITE 500
                                     PHILADELPHIA, PENNSYLVANIA  19106
17

18
     FOR THE DEFENDANT BAYER
19   HEALTHCARE PHARMACEUTICALS
     INC. AND BAYER PHARMA AG:  MITCHELL WILLIAMS SELIG GATES &
20                               WOODYARD, P.L.L.C.
                                 BY:  LYN P. PRUITT, ESQ.
21                               425 W. CAPITOL AVENUE, SUITE 1800
                                 LITTLE ROCK, ARKANSAS  72201
22

23
                                     WATKINS & EAGER, PLCC
24                                   BY:  WALTER T. JOHNSON, ESQ.
                                     400 EAST CAPITOL STREET
25                                   JACKSON, MISSISSIPPI  39201

*OFFICIAL TRANSCRIPT*

1    APPEARANCES CONTINUED:

2

3                                    BRADLEY ARANT BOULT CUMMINGS, LLP
                                     BY:  LINDSEY C. BONEY, IV, ESQ.
4                                    ONE FEDERAL PLACE
                                     1819 FIFTH AVENUE NORTH
5                                    BIRMINGHAM, ALABAMA  35203

6

7    FOR JANSSEN PHARMACEUTICALS,
     INC. AND JANSSEN RESEARCH &
8    DEVELOPMENT, LLC:            BARRASSO USDIN KUPPERMAN FREEMAN &
                                     SARVER, LLC
9                                    BY:  RICHARD E. SARVER, ESQ.
                                     909 POYDRAS STREET, 24TH FLOOR
10                                   NEW ORLEANS, LOUISIANA  70112

11

12   OFFICIAL COURT REPORTER:    CATHY PEPPER, CRR, RMR, CCR
                                     CERTIFIED REALTIME REPORTER
13                                   REGISTERED MERIT REPORTER
                                     500 POYDRAS STREET, ROOM B-275
14                                   NEW ORLEANS, LA  70130
                                     (504) 589-7779
15                                   Cathy_Pepper@laed.uscourts.gov

16

17   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

18

19

20

21

22

23

24

25

                          *OFFICIAL TRANSCRIPT*

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# I N D E X

PAGE

**VINCENT E. HERRIN, M.D.**...............................1971

VOIR DIRE EXAMINATION BY MR. SARVER..................1972

TRAVERSE EXAMINATION BY MR. BIRCHFIELD...............1982

DIRECT EXAMINATION BY MR. SARVER.....................1989

CROSS-EXAMINATION BY MR. BIRCHFIELD..................2032

REDIRECT EXAMINATION BY MR. SARVER...................2077

LUNCHEON RECESS......................................2096

*OFFICIAL TRANSCRIPT*

|       |    |                                                     |
|-------|----|-----------------------------------------------------|
|       | 1  | **P-R-O-C-E-E-D-I-N-G-S**                           |
|       | 2  | M O R N I N G   S E S S I O N                       |
| 08:15:59 | 3  | THURSDAY, AUGUST 17, 2017                         |
| 08:15:59 | 4  | (COURT CALLED TO ORDER)                          |
| 08:15:59 | 5  |                                                  |
| 08:15:59 | 6  |                                                  |
| 08:35:10 | 7  | THE DEPUTY CLERK:  All rise.                     |
| 08:35:10 | 8  | (WHEREUPON, at 8:35 a.m., the jury panel enters the |
| 08:35:50 | 9  | courtroom.)                                      |
| 08:35:50 | 10 | THE COURT:  Be seated, please.                  |
| 08:35:52 | 11 | Good morning, ladies and gentlemen.             |
| 08:35:54 | 12 | VOICES:  Good morning.                           |
| 08:35:58 | 13 | MR. SARVER:  Good morning, Your Honor.           |
| 08:35:58 | 14 | THE COURT:  Call your witness, please.          |
| 08:35:59 | 15 | MR. SARVER:  May we proceed, sir?               |
| 08:36:02 | 16 | THE COURT:  Sure, please do.                    |
| 08:36:02 | 17 | MR. SARVER:  Our next witness is Dr. Vincent Herrin. |
|       | 18 | THE DEPUTY CLERK:  Raise your right hand, please.  Do |
|       | 19 | you solemnly swear that the testimony you are about to give |
|       | 20 | will be the truth, the whole truth and nothing but the truth, |
|       | 21 | so help you God?                                 |
|       | 22 | THE WITNESS:  I do.                             |
|       | 23 | **VINCENT E. HERRIN, M.D.**                     |
|       | 24 | was called as a witness and, after being first duly sworn by |
|       | 25 | the Clerk, was examined and testified on his oath as follows: |

*OFFICIAL TRANSCRIPT*

|  |  |
|--|--|
| | 1 |
| | 2 |
| 08:36:31 | 3 |
| 08:36:34 | 4 |
| 08:36:44 | 5 |
| 08:36:44 | 6 |
| 08:36:45 | 7 |
| 08:36:49 | 8 |
| 08:36:49 | 9 |
| 08:36:52 | 10 |

          THE DEPUTY CLERK:  Please have a seat, sir, and state

and spell your name for the record.

          THE WITNESS:  Good morning.  My name is Vincent Edward

Herrin, V-I-N-C-E-N-T, E-D-W-A-R-D, H-E-R-R-I-N.

                    VOIR DIRE EXAMINATION

BY MR. SARVER:

Q.    Dr. Herrin, would you please put the microphone a little

closer to you, so that you don't have to reach into it.

A.    Sure.

Q.    Good morning, sir.  Could you please introduce yourself to

the jury.

A.    Yes, sir.  Good morning.  My name is Vince Herrin.  I am a

hematologist-oncologist.  I work at the University of

Mississippi Medical Center.

Q.    Can you tell us, what is a hematologist.

A.    Surely.  A hematologist is a physician who specializes in

diseases of the blood.  Those may be what we consider benign

diseases, like anemias, they may be clotting problems, or

malignant diseases, leukemia, lymphoma, multiple myeloma.  We

do bone marrow transports as well.

Q.    Is it fair to say that you are able to talk about both

clotting and bleeding and tests like the prothrombin time test?

A.    Yes, we are trained and specialists in all of those

things.

Q.    Now, this case is about the treatment of a deep vein

***OFFICIAL TRANSCRIPT***

08:37:42 1    thrombosis in Ms. Mingo.  Is that something you are very
08:37:45 2    familiar with in your practice?
08:37:46 3    A.    It is.
08:37:47 4    Q.    Do you treat patients with that condition, deep vein
08:37:51 5    thrombosis?
08:37:51 6    A.    I do, frequently.
08:37:52 7    Q.    Now, Dr. Haynes testified yesterday as a pulmonologist.
08:38:00 8    Do you, as a hematologist, treat the same patients from a
08:38:03 9    somewhat different perspective?
08:38:05 10   A.    Yes, many of the same patients.  We often work with the
08:38:08 11   pulmonologists for the same patients.
08:38:10 12   Q.    Could you explain how that works.  How do you go back and
08:38:14 13   forth with your pulmonologist colleague?
08:38:16 14   A.    Well, the pulmonologists get involved because when a clot
08:38:20 15   goes to the lung, that's very damaging to the body.  It's
08:38:23 16   life-threatening.  So they often get involved from that angle.
08:38:27 17   It's a critical care type situation.
08:38:29 18           We get involved often where there is a question about
08:38:32 19   what caused these clots to happen, how long should patients be
08:38:36 20   treated, if there is complications related to anticoagulants.
08:38:41 21   We might both be working with the same patient, just from
08:38:44 22   different angles.
08:38:46 23   Q.    Thank you, sir.  Now, before we continue with the
08:38:48 24   substance, I'd like you to talk a little bit about yourself.
08:38:51 25           Where did you grow up?

**OFFICIAL TRANSCRIPT**

08:38:52  1    A.    I grew up in a variety of places due to my dad's job, but
08:38:56  2    generally south Mississippi, outside of Hattiesburg.
08:38:58  3    Q.    Where did you attend college, sir?
08:39:02  4    A.    The Naval Academy and Mississippi college.
08:39:04  5    Q.    I'll keep talking with you, but I'm an Air Force Academy
08:39:08  6    grad, so there is a little bit of tension here.
08:39:11  7    A.    We can be friends.
08:39:12  8    Q.    All right.  We'll try.
08:39:13  9          So when did you know you wanted to become a doctor?
08:39:15 10    A.    I made that decision actually after I started college.  I
08:39:20 11    was always an earth science guy, but I just, I kept coming back
08:39:24 12    to medicine in the back of my mind because of the interaction
08:39:27 13    with people combined with science.  It just became evident to
08:39:32 14    me that's what I needed to do.
08:39:35 15    Q.    Where did you attend medical school?
08:39:37 16    A.    Here in Jackson, University of Mississippi.
08:39:40 17    Q.    We have been through this a little bit, but after you
08:39:43 18    finished medical school, did you perform a residency?
08:39:46 19    A.    I did.
08:39:46 20    Q.    Where at?
08:39:47 21    A.    At the University of Mississippi.
08:39:49 22    Q.    When you go into a residency, do you start looking for a
08:39:53 23    specialty?
08:39:54 24    A.    You can.  With internal medicine, which is what I did, you
08:39:57 25    can just finish three years and then go into general practice

*OFFICIAL TRANSCRIPT*

08:40:00  1    and be a general internist, a hospitalist.  There is a variety

08:40:04  2    of things you can do.

08:40:04  3             I initially thought that's what I was going to do,

08:40:07  4    but I fell in love with hematology and the patients and the

08:40:09  5    subject matter during my intern year.

08:40:11  6    Q.   After you did your internship and your residency, did you

08:40:16  7    do more specialized training in the field of hematology?

08:40:19  8    A.   I did.  I did what we call a fellowship.  After three

08:40:22  9    years of internal medicine, which followed the four years of

08:40:25 10    medical school, I did three more years that was devoted to

08:40:29 11    hematology-oncology training.

08:40:30 12    Q.   After you finished your training, your medical school,

08:40:32 13    your residency, your fellowship, what did you do?

08:40:37 14    A.   I went to active duty with the United States Navy.  It had

08:40:41 15    always been my goal, and I was able to circle back to that.

08:40:44 16    Q.   When you were serving with the United States Navy, did you

08:40:48 17    treat active duty members of the Navy?

08:40:50 18    A.   Yes, and retirees and dependents as well.

08:40:55 19    Q.   Did you actually -- were you deployed overseas during the

08:40:59 20    time you were in the Navy?

08:41:00 21    A.   I was.

08:41:00 22    Q.   Where did you go?

08:41:01 23    A.   I spent six months in Guantanamo Bay, Cuba.

08:41:06 24    Q.   I've looked at your record.  There is one -- I understand

08:41:10 25    you earned some medals -- everybody does in the service -- but

*OFFICIAL TRANSCRIPT*

08:41:13  1    you actually earned in 2004 something called the *Defense*
08:41:18  2    *Meritorious Service Medal*; is that correct?
08:41:19  3    A.    That's right.
08:41:20  4    Q.    That's just not the ordinary medal, is it?
08:41:23  5    A.    That's not ordinary, no.
08:41:24  6    Q.    You don't have to brag on yourself, but it's kind of a big
08:41:28  7    deal.
08:41:28  8    A.    It was to me.
08:41:28  9    Q.    Now, after you completed your five years with the United
08:41:31 10    States Navy, where did you go?
08:41:33 11    A.    Well, I owed four years and stayed longer than that, and
08:41:39 12    considered making a career, but it became a family decision.
08:41:43 13    I'd already missed significant life events, as deployed members
08:41:47 14    do.  After discussion with my wife, we decided to move home to
08:41:50 15    Mississippi.
08:41:51 16          The obvious choice for me, despite many options, was
08:41:55 17    to join the faculty where I trained, because I enjoy teaching,
08:42:00 18    and I enjoy being able to focus on hematology, which when
08:42:06 19    you're in private practice you really don't get the luxury of
08:42:08 20    focussing on a specific subject area so much.
08:42:10 21    Q.    Are you raising a family here in Jackson?
08:42:12 22    A.    Yes, I am.
08:42:13 23    Q.    Do you have children?
08:42:15 24    A.    I do.  I have three.
08:42:16 25    Q.    What are their ages?

                          ***OFFICIAL TRANSCRIPT***

08:42:17  1   A.   My daughter is about to start her sophomore year in

08:42:21  2   college, I have a 10th grade son, and my youngest started

08:42:25  3   kindergarten this morning.

08:42:28  4   Q.   This morning?

08:42:28  5   A.   This morning.

08:42:28  6   Q.   All right.  Sir, are you Board certified in hematology?

08:42:31  7   A.   I am.

08:42:33  8   Q.   For how long have you been Board certified in hematology?

08:42:36  9   A.   17 -- 17 years.

08:42:38 10   Q.   Could you tell the jury a little bit, what does it mean to

08:42:41 11   be Board certified in a medical specialty like hematology?

08:42:44 12   A.   Well, Board certification you cannot accomplish until

08:42:48 13   you've completed training.  After you've completed training and

08:42:51 14   you're certified by your program, you can sit for boards.  It's

08:42:55 15   a hard test that covers all the subject matter related to that

08:42:58 16   specialty.

08:43:00 17        But then you have to redo that every ten years.  Not

08:43:04 18   only retake the test, but go through a process of certifying

08:43:08 19   that you're current in other areas.  They call it maintenance

08:43:10 20   of certification, and you do that every ten years.

08:43:13 21   Q.   Do you keep your Board certification current?

08:43:16 22   A.   I do, in internal medicine and in hematology.

08:43:19 23   Q.   Now, one of the witnesses in the case, Henry Rinder, said

08:43:25 24   that he let his hematology Board certification lapse 17 years

08:43:29 25   ago.  Is that a good idea?

*OFFICIAL TRANSCRIPT*

08:43:30  1    A.    Not if you're going to be seeing patients.  It depends on

08:43:33  2    what you're doing in your practice, but if you're going to be

08:43:35  3    working with patients, keeping that certification current

08:43:40  4    demonstrates to patients, to hospitals, to insurance companies,

08:43:45  5    to review boards, that you're current in your subject material,

08:43:48  6    and that you're devoted to remaining that way.

08:43:50  7    Q.    Are you currently practicing medicine at the University of

08:43:54  8    Mississippi Medical Center?

08:43:55  9    A.    I am.

08:43:55 10    Q.    Could you tell the jury about your practice, please.

08:43:57 11    A.    I have a great practice.  I very much enjoy what I do

08:44:04 12    because of the variety of experiences that I get.  I get to

08:44:07 13    treat hematology patients.  I have my own clinic.  We do bone

08:44:11 14    marrow transplants there.

08:44:15 15          I tell students that hematology is the best specialty

08:44:18 16    in all of medicine because we're the only people in medicine

08:44:20 17    that diagnose and treat all of our own benign diseases,

08:44:24 18    diagnose and treat all of our own malignant diseases, and

08:44:29 19    harvest and transplant our own organ system.  So that's

08:44:29 20    fascinating in and of itself.

08:44:33 21          But I also get to supervise fellows who are seeing

08:44:35 22    their patients, and residents who are learning to see patients,

08:44:36 23    and teach medical students.  I run the residency program, the

08:44:39 24    internal medicine residency program.  I have responsibility day

08:44:42 25    to day for training 76 -- it varies a little year to year, but

*OFFICIAL TRANSCRIPT*

08:44:47  1    roughly 76 residents.  I get to work that in with patient care,

08:44:51  2    so that I'm doing something different every day.

08:44:53  3    Q.   Do you personally treat patients?

08:44:56  4    A.   Yes, I do.

08:44:56  5    Q.   How much of your practice is actually treating patients?

08:45:00  6    A.   I have two to three half days of clinic that I have my own

08:45:04  7    patients, in addition to going to other clinics where I'm

08:45:08  8    supervising the fellows seeing their clinics.

08:45:11  9         Then there are certain periods of time we take turns

08:45:13 10    attending in the hospital.  There are four of us hematologists

08:45:16 11    that do this.  When I'm on service, as I will be for the first

08:45:20 12    half of September, I'm spending all day in the hospital

08:45:23 13    rounding on the hematology wards, rounding on the bone marrow

08:45:27 14    transplant service, and answering hematology consults in the

08:45:29 15    hospital.

08:45:30 16    Q.   Dr. Herrin, do you treat patients like Ms. Mingo who have

08:45:35 17    suffered a deep vein thrombosis in their leg?

08:45:37 18    A.   Yes, we do.

08:45:37 19    Q.   Do you prescribe anticoagulants in your practice?

08:45:46 20    A.   I do.

08:45:46 21    Q.   Do you prescribe warfarin?

08:45:46 22    A.   Yes.

08:45:46 23    Q.   Do you prescribe Xarelto?

08:45:48 24    A.   Yes.

08:45:48 25    Q.   Do you prescribe Eliquis?

**OFFICIAL TRANSCRIPT**

08:45:51 1    A.    I do.

08:45:51 2    Q.    Have you prescribed other NOACs?

08:45:54 3    A.    Yes.

08:45:57 4    Q.    Is this something you do routinely in your practice?

08:46:00 5    A.    It is.

08:46:01 6    Q.    Now, are you often the prescribing doctor that makes the

08:46:06 7    decision to prescribe an anticoagulant to a patient?

08:46:09 8    A.    Yes.

08:46:12 9    Q.    Do you prescribe Xarelto today?

08:46:14 10   A.    Yes.

08:46:16 11   Q.    Well, I mean, you may not have done it today --

08:46:18 12   A.    Not this morning.

08:46:19 13   Q.    -- but currently, are you?

08:46:19 14   A.    Right.

08:46:21 15   Q.    For how long have you prescribed Xarelto?

08:46:23 16   A.    Since it became available roughly six years ago.

08:46:27 17   Q.    In your work, do you teach medical students, residents and

08:46:35 18   fellows about how to use anticoagulants?

08:46:38 19   A.    We do.

08:46:39 20   Q.    Do you train medical students and residents on the risks

08:46:44 21   and the benefits of anticoagulants?

08:46:47 22   A.    I do.

08:46:47 23   Q.    Have you also published scientific medical literature in

08:46:53 24   the peer-reviewed literature?

08:46:54 25   A.    I have.

*OFFICIAL TRANSCRIPT*

08:46:54 1  Q.    Have you published approximately 59 times?

08:46:59 2  A.    Roughly.

08:46:59 3  Q.    Have you presented your research to other doctors and your

08:47:05 4  peers?

08:47:05 5  A.    Yes.

08:47:05 6  Q.    In addition to your work and raising a family, do you also

08:47:13 7  do something called *medical mission work*?

08:47:15 8  A.    I do.  I found out about that too late in life, but I've

08:47:21 9  tried to make the most of it since then.

08:47:23 10  Q.    Tell us a little bit about that.

08:47:24 11  A.    I went on my first medical mission trip in 2005.  I

08:47:28 12  actually went on two that year, one with the military, and then

08:47:31 13  one aside from the military, both to Africa, to Kenya and to

08:47:37 14  Uganda.  Fell in love with going overseas, helping people in

08:47:41 15  need, practicing medicine without all of the technology that we

08:47:46 16  have here, just nuts and bolts, seeing people where they are,

08:47:49 17  and relieving suffering where you can.

08:47:52 18  Q.    What kind of things do you do when you go to Uganda and

08:48:00 19  Kenya and Brazil and other places?  What do you do?

08:48:02 20  A.    We set up shop in a village, in an abandoned school, in

08:48:07 21  the middle of a field, in a tent, as we did in Papua New

08:48:12 22  Guinea, up in the mountains.

08:48:13 23        We just invite people in the village to come.  We've

08:48:17 24  seen anywhere from 20 in a day to a three-day span in Uganda

08:48:22 25  where between three and four thousand patients showed up to our

*OFFICIAL TRANSCRIPT*

08:48:26 1    little clinic.

08:48:27 2              Obviously, you're not treating diabetes and

08:48:30 3    hypertension, things that you are not going to be there to

08:48:34 4    follow up, and things that you have no way to really measure

08:48:37 5    effectively.  You're treating worms and malaria, infections,

08:48:41 6    pain, draining abscesses, things that hopefully provide

08:48:46 7    immediate benefit to people.

08:48:47 8    Q.   I'd like to bring you back to this case.  In your

08:48:50 9    practice, do you treat patients who have had a gastric ulcer

08:48:55 10   like Ms. Mingo?

08:48:55 11   A.   Yes, we see those patients occasionally.

08:48:57 12   Q.   Do you consult with GI doctors in determining how to treat

08:49:02 13   a patient with a gastric ulcer and what caused it?

08:49:04 14   A.   Yes.

08:49:06 15              MR. SARVER:  Your Honor, I would tender Dr. Herrin as

08:49:10 16   an expert in the field of hematology.

08:49:13 17              THE COURT:  Any questions?

08:49:16 18              MR. BIRCHFIELD:  Yes, Your Honor.

08:49:16 19                        TRAVERSE EXAMINATION

08:49:16 20   BY MR. BIRCHFIELD:

08:49:17 21   Q.   Good morning, Dr. Herrin.

08:49:18 22   A.   Good morning.

08:49:19 23   Q.   I'm Andy Birchfield, and I represent, along with other

08:49:21 24   lawyers, Mrs. Dora Mingo.

08:49:21 25   A.   Good morning.

*OFFICIAL TRANSCRIPT*

08:49:24 1    Q.   We haven't met, but good to see you this morning.  Just a

08:49:26 2    few questions.

08:49:26 3              Have you ever published in the peer-reviewed

08:49:28 4    literature on the issue of anticoagulation therapy?

08:49:32 5    A.   My research hasn't focused on that, my research time

08:49:36 6    hasn't.

08:49:36 7    Q.   Have you ever published in the peer-reviewed literature on

08:49:39 8    laboratory testing or anticoagulant effects?

08:49:43 9    A.   No.

08:49:43 10   Q.   Have you ever published in the peer-reviewed literature on

08:49:50 11   prothrombin time, or the PT test?

08:49:50 12   A.   No, I have not published on that.

08:49:53 13   Q.   What about the anti-Factor Xa assay or testing?

08:49:58 14   A.   No.

08:49:59 15   Q.   Have you ever published, Dr. Herrin, on the issue of

08:50:02 16   Xarelto --

08:50:03 17   A.   No.  I've not published on that.

08:50:04 18   Q.   -- or any of the other DOACs or NOACs?

08:50:08 19   A.   No.

08:50:08 20   Q.   Have you ever published in any non-peer-reviewed medical

08:50:13 21   literature on any of these issues?

08:50:15 22   A.   No.

08:50:16 23   Q.   You described for us that you have participated in

08:50:22 24   research; is that right?

08:50:23 25   A.   Yes.

*OFFICIAL TRANSCRIPT*

08:50:25  1    Q.    Have you ever participated in any research on
08:50:28  2    anticoagulation therapy?
08:50:31  3    A.    I've mentored projects that fellows have done, but I
08:50:34  4    personally haven't done research in that area.
08:50:36  5    Q.    Have you ever participated in any research on Xarelto?
08:50:40  6    A.    No.
08:50:41  7    Q.    Or Eliquis?
08:50:43  8    A.    No.
08:50:43  9    Q.    Pradaxa?
08:50:44 10    A.    No.
08:50:44 11    Q.    Warfarin, or Coumadin?
08:50:46 12    A.    No.
08:50:46 13    Q.    Have you participated in any research evaluating
08:50:52 14    laboratory tests to measure the effects of anticoagulants?
08:50:56 15    A.    Only on Coumadin, abstracts.
08:50:58 16    Q.    Have you ever been invited to make a presentation at a
08:51:04 17    medical conference or to other doctors on anticoagulation
08:51:08 18    therapy in general?
08:51:09 19    A.    Yes.
08:51:09 20    Q.    You have.  When was that, sir?
08:51:14 21    A.    We teach that all the time.  We're invited to speak to
08:51:17 22    faculty, to fellows, to residents.  Because we're the
08:51:20 23    hematologists, and we understand the coagulation system, we're
08:51:24 24    frequently asked to do that.
08:51:24 25    Q.    On anticoagulant medicines?

*OFFICIAL TRANSCRIPT*

08:51:26  1   A.    Right.   The coagulation cascade and the medicines.

08:51:30  2   Q.    What about Xarelto?

08:51:31  3   A.    Not specifically, no.

08:51:32  4   Q.    Eliquis?

08:51:33  5   A.    Just as part of the general discussion of all of those

08:51:37  6   agents, yes.

08:51:37  7   Q.    Have you been invited to make a presentation at a medical

08:51:42  8   conference on laboratory test measures or the effects of

08:51:46  9   anticoagulation?

08:51:46  10  A.    No.

08:51:46  11  Q.    Dr. Herrin, in looking at the material that you provided

08:51:55  12  as part of your report here, it looks like most of your

08:51:58  13  research is focused on cancer and tumors.   Would that be fair?

08:52:04  14  A.    Yes.   I was fortunate, when I first went to Bethesda, to

08:52:10  15  the National Naval Medical Center, to be asked to participate

08:52:20  16  in a research group from the National Cancer Institute across

08:52:21  17  the street.   I was asked to participate in a research group, as

08:52:21  18  a new faculty who had some time to devote to research, and that

08:52:27  19  particular group was working on cancer vaccines.   So that's

08:52:32  20  where most of my research has been.

08:52:33  21  Q.    Cancer vaccines, tumors, in that field, right?

08:52:35  22  A.    Yes.

08:52:36  23  Q.    Dr. Herrin, in caring for or treating patients with -- I

08:52:43  24  mean, GI bleeds, is that a primary focus of your practice?

08:52:45  25  A.    Yes -- well, it occurs frequently in practice.   I don't

*OFFICIAL TRANSCRIPT*

08:52:51 1    focus on gastrointestinal diseases, but we not infrequently see

08:53:00 2    patients with ulcers.

08:53:01 3    Q.    Dr. Herrin, you've prepared a report in this case; is that

08:53:03 4    right?

08:53:03 5    A.    I did.

08:53:04 6    Q.    This is the report.  You submitted this report on

08:53:22 7    January 6th of this year; is that right?

08:53:24 8    A.    That's right.

08:53:24 9    Q.    Dr. Herrin, you understand, under the rules, that you are

08:53:31 10   to provide the basis for your opinion, you're to provide the

08:53:35 11   information that you relied on in forming and arriving at your

08:53:40 12   opinions, right?

08:53:41 13          MR. SARVER:  Your Honor, I'm going to object.  This

08:53:42 14   isn't proper voir dire.

08:53:43 15          MR. BIRCHFIELD:  It is, Your Honor.

08:53:44 16          THE COURT:  I'll let him go.  I'll overrule the

08:53:47 17   objection.

08:53:48 18   EXAMINATION BY MR. BIRCHFIELD:

08:53:50 19   Q.    Sir, you understand that you are to provide a list of the

08:53:52 20   materials that you relied on in arriving and forming your

08:53:56 21   opinions, right?

08:53:57 22   A.    Right.  That's what I did.  The way I would write up a

08:54:00 23   patient case, yes.

08:54:01 24   Q.    You provided that as part of your report, as Exhibit B; is

08:54:01 25   that right?

*OFFICIAL TRANSCRIPT*

08:54:07  1    A.    That's right.

08:54:07  2    Q.    Exhibit B is the reference list that you provided.

08:54:18  3          Dr. Herrin, would it be fair to say that you

08:54:22  4    reviewed, relied on two articles pertaining to testing or

08:54:28  5    assays for measuring rivaroxaban or coagulation screening

08:54:35  6    tests; is that right?

08:54:35  7    A.    I wouldn't entirely agree with that.  What I did was pick

08:54:39  8    representative articles that relate to established practices of

08:54:43  9    care.

08:54:44 10          When I write up a patient report, if there is

08:54:46 11    something that's standard of care, that's general practice,

08:54:49 12    that's widely accepted knowledge, you don't pick -- you don't

08:54:52 13    go find every single article that backs that up, if it's

08:54:57 14    already standard of care and widely known.

08:54:59 15          You would if you were writing a review of that topic

08:55:02 16    for the scientific literature, but not for a patient case

08:55:06 17    report.

08:55:06 18    Q.    So, Dr. Herrin, at least on the list, the reference list

08:55:10 19    that you provided for us, would you agree that two of the

08:55:15 20    articles pertain to measuring the anticoagulant effect of

08:55:21 21    Xarelto?

08:55:21 22    A.    Yes, these are representative articles.

08:55:23 23    Q.    Then there are two articles that pertain to GI risk

08:55:30 24    factors or diagnosing a GI bleed; is that right?

08:55:33 25    A.    Yes, those are representative as well.

                        *OFFICIAL TRANSCRIPT*

08:55:35  1   Q.    Then you also reviewed the Xarelto label that was in

08:55:42  2   effect in January of 2015; is that right?

08:55:45  3   A.    That's right.

08:55:45  4   Q.    You also reviewed the expert report of Dr. Henry Rinder;

08:55:45  5   is that right?

08:55:56  6   A.    Yes.

08:55:56  7   Q.    In forming your opinions in this case, you did not review

08:56:05  8   any of the testimony of Bayer scientists; is that fair?

08:56:11  9   A.    That's fair.

08:56:11 10   Q.    You did not review the testimony of any Janssen employees

08:56:17 11   or scientists, correct?

08:56:18 12   A.    That's correct.  That didn't seem germane to a patient

08:56:22 13   case report.

08:56:22 14        MR. SARVER:  Your Honor, I'm going to object.  This is

08:56:23 15   all nice cross, but it's not voir dire.

08:56:25 16        MR. BIRCHFIELD:  Your Honor, this is the basis of his

08:56:27 17   opinion.  I'm just trying to establish it.

08:56:29 18        THE COURT:  It goes to the basis of opinion.  I'll

08:56:32 19   allow it.

08:56:33 20   EXAMINATION BY MR. BIRCHFIELD:

08:56:34 21   Q.    Did you review any internal documents to learn what the

08:56:39 22   company scientists knew about Xarelto or coagulation testing?

08:56:45 23   A.    Not for a patient clinical case report, no.

08:56:48 24        MR. BIRCHFIELD:  Thank you, Your Honor.

08:56:49 25        THE COURT:  The Court will accept him in the field of

*OFFICIAL TRANSCRIPT*

08:56:53 1    hematology, expert hematologist.

08:56:56 2         MR. SARVER:  Thank you, Your Honor.

08:56:57 3                    DIRECT EXAMINATION

08:56:59 4    BY MR. SARVER:

08:56:59 5    Q.   Dr. Herrin, have you ever done this before?  Have you ever

08:57:03 6    been an expert witness?

08:57:04 7    A.   Never to this stage.  I've reviewed medical records before

08:57:08 8    and never got asked to go further than that, after expressing

08:57:09 9    an honest opinion about what I saw.

08:57:11 10   Q.   Have you ever testified in court?

08:57:12 11   A.   Never.

08:57:13 12   Q.   Your first time?

08:57:14 13   A.   First time.

08:57:15 14   Q.   First time you've been cross-examined by a plaintiff

08:57:19 15   lawyer?

08:57:19 16   A.   Yes.

08:57:19 17   Q.   So is it correct, sir, that as an expert witness, you are

08:57:23 18   billing for your time?

08:57:24 19   A.   Yes.

08:57:24 20   Q.   That your hourly rate for reviewing records is $300 an

08:57:29 21   hour?

08:57:29 22   A.   Yes.

08:57:30 23   Q.   For testifying, it's $500 an hour --

08:57:30 24   A.   Yes.

08:57:33 25   Q.   -- is that correct?

                                    *OFFICIAL TRANSCRIPT*

08:57:33   1    A.    That's correct.

08:57:34   2    Q.    I'd like to go the guts of why you're here.  Is there a

08:57:39   3    test known as the *PT test*, the *prothrombin time test*?

08:57:42   4    A.    There is such a test.

08:57:43   5    Q.    What is it?

08:57:44   6    A.    The PT measures part of the coagulation system.  You've

08:57:49   7    probably heard, I would imagine, this week a lot about the

08:57:54   8    coagulation system.  It is a very, very complex process in the

08:57:58   9    body, a very dynamic process.  We have tests that we can

08:58:02  10    perform in a test tube that measure portions of that test.

08:58:06  11    That's what the PT does.

08:58:08  12    Q.    Has the PT test been around for a long time?

08:58:11  13    A.    Many, many decades, yes.

08:58:12  14    Q.    Is the PT test commonly used as a routine screening test?

08:58:17  15    A.    It is.

08:58:18  16    Q.    If one of us goes into the hospital, and we have fallen

08:58:23  17    down and hurt ourselves, are we likely to get a PT test?

08:58:27  18    A.    You wouldn't necessarily get it for a minor injury, but,

08:58:32  19    if you were anticipating surgery, or if you were having

08:58:35  20    bleeding, you would probably have that test done as part of the

08:58:38  21    workup.

08:58:38  22    Q.    So here is where the case kind of stands.  Dr. Rinder has

08:58:44  23    told the jury that you can use the PT test to predict patients

08:58:51  24    who will bleed.  All right.  Is he right?

08:58:54  25    A.    He is not right.

***OFFICIAL TRANSCRIPT***

08:58:55  1  Q.   Can you tell the jury in general why he's wrong?

08:58:59  2  A.   There are specific circumstances with specific drugs and

08:59:04  3  specific diseases where the PT might be used that way, but you

08:59:07  4  have to understand context.  You would never use a PT number

08:59:11  5  without looking at the patient, their clinical situation, what

08:59:14  6  medications they're on, and then deciding whether the test is a

08:59:18  7  useful test or not.

08:59:18  8  Q.   Don't ever let me interrupt you.

08:59:22  9  A.   I'm good.

08:59:22 10  Q.   Okay.  Does the PT test with Neoplastin reagent work to

08:59:31 11  predict for patients on Xarelto which patients will bleed and

08:59:35 12  which patients won't bleed?

08:59:37 13  A.   It does not.

08:59:37 14  Q.   Would it help you to come down and explain to the jury

08:59:41 15  why?

08:59:42 16  A.   Yes.

08:59:43 17       MR. SARVER:  Your Honor, may Dr. Herrin step down,

08:59:46 18  please?

08:59:47 19       THE COURT:  Yes.

08:59:47 20       MR. SARVER:  Thank you, sir.

08:59:52 21  EXAMINATION BY MR. SARVER:

08:59:53 22  Q.   We're going to go right over here, Dr. Herrin, where the

08:59:56 23  jury can see.  Take your pick of colors.

09:00:04 24  A.   I'll use red.

09:00:06 25  Q.   All right, sir.  Now, Dr. Herrin, will it help you in

*OFFICIAL TRANSCRIPT*

09:00:10 1    explaining why Xarelto doesn't work in terms of PT and

09:00:14 2    predicting bleeding to go through a little bit of the

09:00:18 3    coagulation testing?

09:00:19 4    A.    I think it would make it more clear if I can visually

09:00:23 5    illustrate that, rather than simply explaining it, if that's

09:00:27 6    okay.

09:00:27 7    Q.    Will you talk us through that?

09:00:29 8    A.    I will.

09:00:29 9    Q.    Please.

09:00:30 10   A.    So I don't know if you've seen this before this week --

09:00:35 11   Q.    They have, Dr. Herrin, so let's be as efficient as we can.

09:00:39 12   A.    We'll be efficient with this.

09:00:41 13         I start off simply, whether I'm explaining this to a

09:00:45 14   patient that I'm trying to make understand it, or whether I'm

09:00:47 15   explaining it to a fellow that's had medical training, because

09:00:50 16   you can understand it better if you simplify it first.  So I'm

09:00:53 17   going to draw you the same diagram.

09:00:56 18         We use Roman numerals when we're talking about the

09:01:01 19   coagulation cascade, but I'm not going to use those because it

09:01:03 20   will make it neater and easier to understand if I just do it

09:01:06 21   this way.

09:01:06 22   Q.    So the jury has seen that at times that ten that you've

09:01:12 23   drawn --

09:01:12 24   A.    Is an X.

09:01:16 25   Q.    -- is an X.  Okay.

                            *OFFICIAL TRANSCRIPT*

09:01:19  1   A.    So imagine that there is Roman numerals there, if you
09:01:23  2   prefer those.  I have a hard time doing it this way because
09:01:25  3   I've seen Roman numerals for years.
09:01:28  4   Q.    Now, tell us, for the record, what have you just drawn on
09:01:30  5   the whiteboard?
09:01:31  6   A.    What I've drawn is something called the *extrinsic pathway*
09:01:35  7   and something called the *common pathway*.  You may have seen
09:01:38  8   this illustrated with another pathway going off here, so that
09:01:42  9   it looks like a Y.  This is the intrinsic pathway over here,
09:01:46 10   which isn't germane to what we're talking about right now.
09:01:51 11   Q.    This is all part of the coagulation cascade.
09:01:52 12   A.    It's a very simplified shorthand of the coagulation system
09:01:58 13   that helps us know how to interpret the tests.  It doesn't
09:01:58 14   adequately explain what's happening in the body.
09:02:00 15         What's happening in the body is far more complicated
09:02:03 16   than this.  There is ways around it.  But it's a good summary
09:02:07 17   because, again, it helps us understand the test.
09:02:09 18   Q.    How does this help us understand why PT will not predict
09:02:18 19   bleeding in Xarelto?
09:02:18 20   A.    Well, there's a lot more to that than I could even draw on
09:02:20 21   the board, but the basis for that begins with a fairly simple
09:02:23 22   fact.
09:02:26 23         Xarelto, which I'll illustrate with an X, is working
09:02:31 24   at one specific site on Factor X in a long coagulation cascade.
09:02:39 25   Now, the PT does measure everything that occurs here, both the

*OFFICIAL TRANSCRIPT*

09:02:45  1   extrinsic pathway and the common pathway, but the PT has most

09:02:51  2   sensitivity for this area right here, Factor VII.

09:02:54  3   Q.   Factor VII.  Thank you.

09:02:59  4   A.   Because Factor VII has a very short half-life in the body,

09:03:02  5   it's used up after six hours, the liver is always having to

09:03:06  6   make more and more Factor VII to replace what's being used or

09:03:10  7   what's decaying.

09:03:11  8        So, Coumadin, for example, that's been around for

09:03:15  9   decades, the PT is a very good test for monitoring Coumadin for

09:03:21 10   a few reasons.  Coumadin affects Factor VII, as well as

09:03:24 11   Factor IX, which is up here, and Factor X, and Factor II.  It

09:03:30 12   has multiple effects on the entire coagulation cascade, but

09:03:34 13   it's primary useful because of what it's doing to Factor VII.

09:03:40 14        PT is quite sensitive to changes in VII because,

09:03:44 15   again, PT is most specifically looking at this portion of the

09:03:46 16   coagulation cascade.

09:03:46 17   Q.   I hate to interrupt, but does Xarelto affect Factor VII?

09:03:51 18   A.   Not at all.

09:03:51 19   Q.   All right.  Coumadin affects how many of these factors in

09:03:59 20   a coagulation cascade?

09:04:00 21   A.   Well, it affects three of the ones that I've drawn here.

09:04:05 22   It affects a fourth one that's up here.  It also has effects on

09:04:09 23   some factors that we don't draw when we draw this system.

09:04:12 24   Q.   Does PT measure them all?

09:04:15 25   A.   PT measures all of these.  It doesn't measure what's

*OFFICIAL TRANSCRIPT*

09:04:17  1    happening with IX.

09:04:18  2    Q.    Sorry I interrupted you.  You were talking about why it is

09:04:23  3    that PT doesn't work to predict bleeding in Xarelto.

09:04:28  4    A.    Right.  So I was using Coumadin as the example.  So we

09:04:31  5    know that Factor VII, again, has the very short half-life.  PT

09:04:35  6    is measuring that.  But even then, for decades, PT wasn't even

09:04:40  7    a good measure of what was happening Coumadin.

09:04:42  8    Q.    Why not?

09:04:43  9    A.    Because the reagents vary lab to lab to lab, and PT varies

09:04:50 10    depending on what reagent you use.

09:04:51 11    Q.    What had to happen to make PT useful even for Coumadin?

09:04:55 12    A.    So in the 1980s, some scientists developed something

09:05:00 13    called an *INR*, which takes into account the specific properties

09:05:04 14    of the specific reagent that's used.  Then a calculation is

09:05:08 15    applied to the PT number that turns it into an INR number.

09:05:14 16          When you're talking INR, you can go to any lab in the

09:05:17 17    world that measures PT's and get what should be the same

09:05:20 18    number.  So, if you're on Coumadin, now you can travel.  Now

09:05:24 19    you can take your medicine and go on vacation and get an INR

09:05:29 20    checked somewhere else, or even a different lab in the same

09:05:32 21    city, and the INR works.  But even then, the INR only works

09:05:36 22    because there is a literature that tells you how to dose adjust

09:05:42 23    Coumadin so that you fall within that specific range.

09:05:44 24    Q.    Is there an INR for Xarelto or any of the other NOACs?

09:05:50 25    A.    There is not.

**OFFICIAL TRANSCRIPT**

09:05:51 1    Q.   Is there anything else that is important here to help

09:05:57 2    understand why Xarelto doesn't work to predict bleeding?

09:06:03 3    A.   That's the basis for it.  Nothing else I can draw on the

09:06:06 4    board for that.

09:06:06 5    Q.   Thank you very much.  If you'll take the witness stand

09:06:09 6    again, I'll move this out of your way.

09:06:25 7           Dr. Herrin, have we simplified this down to the bare,

09:06:29 8    bare bones?

09:06:29 9    A.   Yes.  But even for medical students and residents and

09:06:33 10   fellows I start this way, because the system is so hard to

09:06:37 11   understand that you need to get the shorthand in your mind

09:06:41 12   first.  But, yes, that's bare bones.

09:06:43 13   Q.   Just one more question about this.  Is it correct that

09:06:49 14   Xarelto and the other anti-Factor Xa drugs work only on one

09:07:00 15   part of the coagulation cascade?

09:07:01 16   A.   That's right.

09:07:01 17   Q.   Is that on only Factor X?

09:07:06 18   A.   Yes, or Factor II, there are some.  But yes, they are very

09:07:10 19   localized effect.

09:07:10 20   Q.   So when you run a PT test, it tests all these factors; is

09:07:10 21   that right?

09:07:16 22   A.   It does, and most specifically VII.

09:07:19 23   Q.   But Xarelto doesn't affect Factor VII?

09:07:22 24   A.   No.

09:07:22 25   Q.   All right.  Now, again, I'm trying to get to the heart of

*OFFICIAL TRANSCRIPT*

09:07:33  1   where we are.  We have been in this trial for almost two weeks.

09:07:37  2   Does a PT test with a patient on Xarelto predict which patients

09:07:44  3   are most likely to bleed?

09:07:46  4   A.    It does not.

09:07:47  5   Q.    Does the PT test work with any of the NOACs to predict

09:07:54  6   bleeding?

09:07:55  7   A.    It does not.

09:07:55  8   Q.    Now, we heard a laboratory person who brought in a big

09:08:01  9   machine, set it over here, and said, I can run a test on the

09:08:06 10   blood, and -- I can run a PT test, and I can get a number, and

09:08:13 11   I can get that number, that PT number.  Do you think that's

09:08:19 12   probably true, you can get a number?

09:08:20 13   A.    I'm certain that's true.

09:08:22 14   Q.    It might be a nice number, but does it have any meaning to

09:08:25 15   you as a doctor in treating a patient on an anticoagulant?

09:08:29 16   A.    It doesn't have any meaning at the bedside.  I mean, there

09:08:33 17   is some literature showing correlation between PT and drug

09:08:40 18   levels.  You could use that number if you wanted to do a study,

09:08:43 19   if you wanted to some follow-ups, if you wanted to do

09:08:43 20   pharmacokinetic studies.

09:08:47 21        But to be useful at the bedside, a PT has to be able

09:08:48 22   to guide therapy.  Since we know that PT is not correlated with

09:08:53 23   bleeding risk, and there is no literature that says, well, if

09:08:56 24   you have this PT, here is what you should do with your dose,

09:08:59 25   and here is the range that you're shooting for to adequately

*OFFICIAL TRANSCRIPT*

09:09:02  1    protect a patient from the consequences of clot, since we don't

09:09:05  2    have that, it's not useful at the bedside.

09:09:08  3    Q.    Now, is there any kind of a therapeutic cutoff range for a

09:09:17  4    PT with Xarelto that says above this PT, you are more likely to

09:09:20  5    bleed?

09:09:20  6    A.    There is not.

09:09:21  7    Q.    Is that in the scientific literature?

09:09:24  8    A.    Yes, it is.

09:09:25  9    Q.    Now, I would like to talk with you about an article that a

09:09:30 10    Mr. Gosselin actually was an author on and talked to the jury

09:09:34 11    about.  I'm going to first show this to you, Dr. Herrin, and

09:09:47 12    then we'll show it to the jury.

09:09:51 13          Did you come to learn that Mr. Gosselin wrote this

09:09:54 14    article, Laboratory Assessment of Director Oral Anticoagulants?

09:10:00 15    A.    Yes.

09:10:00 16    Q.    Have you reviewed it?

09:10:01 17    A.    Yes.

09:10:01 18    Q.    We see here on the last column that there is a cutoff for

09:10:05 19    risk of bleeding, do you see that?

09:10:06 20    A.    Yes.

09:10:06 21    Q.    Do you see that there is a column here studying the

09:10:12 22    different anticoagulants, including rivaroxaban?

09:10:14 23    A.    Yes.

09:10:15 24    Q.    What did these authors, Dr. Douxfils and Mr. Gosselin,

09:10:22 25    determine about a cutoff for a risk of bleeding?

*OFFICIAL TRANSCRIPT*

09:10:24  1    A.    That it's not established.

09:10:26  2    Q.    For Xarelto?

09:10:27  3    A.    For Xarelto.

09:10:28  4    Q.    Dr. Herrin, have you seen any contrary medical scientific

09:10:40  5    literature indicating that there is such a cutoff level

09:10:45  6    establishing for Xarelto, if you're above this PT, you're at a

09:10:50  7    higher risk of bleeding?

09:10:51  8    A.    No.

09:10:51  9    Q.    Now, Dr. Rinder testified that he has a theory that you

09:10:59 10    should use 20 seconds on the PT as a cutoff for those patients

09:11:05 11    at risk of bleeding.  Is he right about that?

09:11:08 12    A.    He's not right about that.  In fact, using such a cutoff

09:11:15 13    could endanger patients.

09:11:16 14    Q.    Would it just be a very, very bad idea?

09:11:18 15    A.    It's bad medicine.

09:11:20 16    Q.    Does the PT work to predict bleeding for any NOAC, not

09:11:28 17    just Xarelto?

09:11:28 18    A.    It does not.

09:11:33 19    Q.    Does knowing what the plasma level of rivaroxaban is in a

09:11:40 20    particular patient help you as a doctor in treating that

09:11:43 21    patient?

09:11:44 22    A.    Again, it does not help me at the bedside.  It may help

09:11:48 23    inform studies, pharmacokinetic studies, pharmacology studies,

09:11:54 24    but that's not information that you can take and make dose

09:11:58 25    adjustments with these drugs, because that plasma level doesn't

*OFFICIAL TRANSCRIPT*

09:12:00 1   necessarily coordinate with what's actually happening to that

09:12:05 2   complicated whole coagulation cascade in the body.

09:12:10 3   Q.   We have heard from Dr. Rinder, who tested testified about

09:12:18 4   some of the study of PT done by Janssen and Bayer.  Were you

09:12:22 5   made aware of that?

09:12:23 6   A.   Yes.

09:12:24 7   Q.   He talked about one of the clinical trials that was done.

09:12:33 8   I'm going to move this down, so I'm not blocking everybody from

09:12:36 9   the jury.

09:12:43 10          Do you recall that Dr. Rinder talked about something

09:12:45 11   called the *ROCKET trial*?

09:12:46 12   A.   Yes.

09:12:46 13   Q.   Was the ROCKET trial performed on patients like Ms. Mingo?

09:12:50 14   A.   No.

09:12:50 15   Q.   The ROCKET trial was performed on patients who had a

09:12:53 16   disease called *atrial fibrillation*; is that correct?

09:12:55 17   A.   That's correct.

09:12:56 18   Q.   You've reviewed all of Ms. Mingo's medical records?

09:13:00 19   A.   Yes.

09:13:00 20   Q.   Does she have atrial fibrillation?

09:13:02 21   A.   Not that I've seen documented.

09:13:03 22   Q.   Was the EINSTEIN trial performed on patients like

09:13:07 23   Ms. Mingo?

09:13:07 24   A.   Yes.  With DVT and PE -- and/or PE.

09:13:11 25   Q.   If we're going to look at the value of PT in predicting

*OFFICIAL TRANSCRIPT*

09:13:16 1  bleeding in a patient like Ms. Mingo, where should we go to
09:13:20 2  look?
09:13:20 3  A.   We should look at the EINSTEIN data.  There is a fairly
09:13:24 4  simple reason for that.  You have prevention, and you have
09:13:27 5  active treatment.  There is a difference in the physiology of
09:13:30 6  those two.
09:13:31 7  Q.   If Dr. Rinder told the jury, it doesn't matter, you can
09:13:34 8  look at the ROCKET data, and it works just fine for patients
09:13:39 9  like Ms. Mingo, is he right about that?
09:13:41 10 A.   He's not right about that, because they're different
09:13:44 11 patients.  One set of patients has an activated clotting system
09:13:48 12 and has actually formed clot.  The other set of patients has
09:13:51 13 different diseases, and they are simply trying to prevent clot
09:13:55 14 from forming.
09:13:55 15      So just as diabetes prevention is different than
09:14:00 16 diabetes treatment, cancer prevention is different than cancer
09:14:04 17 treatment, clot prevention is different than clot treatment.
09:14:07 18 Q.   Dr. Herrin, already introduced into evidence in this case
09:14:11 19 is an analysis of the PT data from the EINSTEIN trial.  Have
09:14:16 20 you had a chance to take a look at that?
09:14:19 21 A.   I have.
09:14:19 22 Q.   I'd like to show you what's been marked as Defense
09:14:22 23 Exhibit -- and already admitted as Defense Exhibit 11.
09:14:29 24      Would you like a hard copy, sir?
09:14:31 25 A.   Will I be able to see it here?

*OFFICIAL TRANSCRIPT*

09:13:37  1    Q.    I don't know.  Let me just give you a hard copy.

09:13:41  2          Jim, could we have Defense Exhibit 11, please.

09:13:54  3          Sorry.  I'm always rushing.  My fault.

09:13:57  4          Have you seen this before?

09:13:57  5    A.    Yes.

09:13:58  6    Q.    And do you see that this is an explorative analysis of

09:14:05  7    prothrombin time measured by Neoplastin reagent in patients

09:14:09  8    treated with rivaroxaban in the EINSTEIN study?

09:14:12  9    A.    Yes.

09:14:12 10    Q.    Is that a good idea for a company who is running a

09:14:18 11    clinical trial, to try to glean what they can from the data?

09:14:23 12    A.    I would imagine.  And, in fact, I have seen with a variety

09:14:27 13    of drugs, which is also data analyses, information gathering,

09:14:32 14    search for safety signals when you're proposing a drug for a

09:14:36 15    big clinical trial.  Yes, always a good idea.

09:14:38 16          THE COURT:  Excuse me.  Counsel, are you going to

09:14:40 17    introduce that?

09:14:41 18          MR. SARVER:  It's already in evidence, Your Honor.

09:14:43 19          THE DEPUTY CLERK:  Defense 11?

09:14:45 20          MR. SARVER:  Defense Exhibit 11, I believe, is already

09:14:48 21    in evidence through Dr. Parisian as was introduced by

09:14:53 22    Ms. Pruitt.

09:14:53 23          THE DEPUTY CLERK:  I don't have that transcript.

09:15:02 24          MR. SARVER:  I can show you the transcript page.

09:15:05 25          MR. BIRCHFIELD:  Your Honor, if this is already in

*OFFICIAL TRANSCRIPT*

09:15:07  1   evidence, I don't have any problem with him going into this,

09:15:09  2   but we're getting far away from anything that he relied on in

09:15:13  3   forming his opinions.

09:15:14  4         THE COURT:  I'll admit it -- go ahead.

09:15:22  5         MR. SARVER:  Because it's already in evidence.

09:15:24  6   EXAMINATION BY MR. SARVER:

09:15:26  7   Q.    Now, I would like you to take a look at page 4.

09:15:30  8         Jim, if we could go to page 4 under the objectives.

09:15:33  9         Do you see that, Dr. Herrin?

09:15:35 10   A.    Yes.

09:15:35 11   Q.    And one of the objectives was to investigate the

09:15:40 12   relationship between measurements of PT Neoplastin and the

09:15:44 13   first occurrence of a confirmed bleeding event among

09:15:47 14   rivaroxaban exposed subjects overall and in subpopulations.

09:15:51 15         Do you see that?

09:15:52 16   A.    Yes, I do.

09:15:52 17   Q.    Is that a good idea, to try to figure out if there is

09:15:57 18   anything that this shows?

09:15:58 19   A.    Yes, it is.

09:16:00 20   Q.    Now, did you take a look at the data that was actually

09:16:07 21   discovered, uncovered and analyzed in ROCKET, in the EINSTEIN

09:16:12 22   trial regarding PT?

09:16:14 23   A.    Yes.

09:16:14 24   Q.    I would like to take a look at the internal page 26 from

09:16:24 25   Exhibit 11, Defense Exhibit 11.

*OFFICIAL TRANSCRIPT*

09:16:35 1          Do we have that, Jim?  I'm sorry, Jim.  I gave you
09:16:43 2     the wrong page.  It's actually internal page 348.  It's the
09:16:48 3     chart.
09:16:52 4          All right.  Now, this is kind of a big gulp.  Do you
09:16:58 5     see the data here, Dr. Herrin?
09:17:00 6     A.   Yes.
09:17:00 7     Q.   Have you had a chance to look at it?
09:17:05 8     A.   Yes, I have.
09:17:05 9     Q.   All right.  And at the top of the table we see a
09:17:08 10    descriptive summary, statistics for PT Neoplastin, measurements
09:17:12 11    in b.i.d. dosing phase.
09:17:15 12         And tell the jury, what's *b.i.d. dosing phase*?
09:17:18 13    A.   B.i.d. means twice daily dosing, and that was the phase of
09:17:22 14    treatment that Ms. Mingo was in.  That's what you do first for
09:17:24 15    a clot.
09:17:25 16    Q.   So Mrs. Mingo was in this phase getting Xarelto twice a
09:17:29 17    day to try to prevent her clot from spreading?
09:17:32 18    A.   Correct.
09:17:32 19    Q.   Now, have you reviewed this data in terms of what the PT
09:17:36 20    can tell us and what the PT can't?
09:17:38 21    A.   Yes.
09:17:38 22    Q.   I would like to direct your attention first to the top of
09:17:45 23    the page, where it says:  "No event in b.i.d. dosing phase."
09:17:51 24         And is that patients who are not bleeding?
09:17:54 25    A.   Right.  That's patients who did not have a bleeding event.

*OFFICIAL TRANSCRIPT*

09:17:58  1    Q.   And if we look at the Day 15 peak for the prothrombin

09:18:02  2    time, the PT time, the mean --

09:18:06  3            Is that just the average?

09:18:07  4    A.   Basically, yes.

09:18:08  5    Q.   -- the average PT for patients in Mrs. Mingo's condition

09:18:13  6    in the b.i.d. time, was what?

09:18:16  7    A.   23.137.

09:18:19  8    Q.   Now, we'll keep that in mind as we go on to look at the

09:18:23  9    other parts of this document.

09:18:26 10            So for patients who don't bleed, their PT is a little

09:18:30 11    over 23?

09:18:31 12    A.   Correct.

09:18:31 13    Q.   Let's take a look at the mean for patients who suffered a

09:18:40 14    major bleed.  Have you looked at that?

09:18:41 15    A.   Yes.

09:18:42 16    Q.   Now, patients who suffered a major bleed during this phase

09:18:46 17    of dosing, what was their PT -- mean PT?

09:18:50 18    A.   20.6.

09:18:51 19    Q.   So, is the mean PT for those patients who suffered a major

09:18:56 20    bleed actually three seconds lower than patients who didn't

09:19:00 21    bleed at all?

09:19:01 22    A.   Yes, it is.

09:19:02 23    Q.   What value is a PT to you as a treating doctor when the

09:19:08 24    patients who bleed actually have a lower PT than the patients

09:19:11 25    who don't bleed?

*OFFICIAL TRANSCRIPT*

09:19:13 1  A.   This illustrates well what we have been saying, which is

09:19:17 2  that clinically, at the bedside, PT does not predict bleeding

09:19:22 3  risk.

09:19:22 4  Q.   Is that consistent with your knowledge, training and

09:19:25 5  experience?

09:19:25 6  A.   Yes, it is.

09:19:26 7  Q.   Now, let's go down and look at all of these numbers in

09:19:31 8  this chart just so that we're thorough, because Dr. Rinder

09:19:36 9  actually focused on the next one:  "Clinically Relevant

09:19:40 10 Bleeding."

09:19:41 11      Now, can you tell the jury, what's *clinically

09:19:45 12 relevant bleeding*?

09:19:46 13 A.   Well, in different trials it's lumped differently, but

09:19:52 14 clinically relevant bleeding, the broadest definition would

09:19:55 15 include everybody that has to come to medical attention, either

09:19:59 16 calls their doctor or goes to the ER for a bleeding event.  It

09:20:03 17 might be something like a nosebleed that lasts for 20 minutes.

09:20:06 18      We all know that bleeding is scary.  A small amount

09:20:09 19 of blood looks bad, look gory.  If you have a nosebleed for any

09:20:14 20 period of time in a child, it looks like an auto accident

09:20:17 21 scene.  A few drops of blood in a toilet makes the whole thing

09:20:21 22 red.  So this is, you know, bleeding that gets your attention

09:20:25 23 that makes you call your doctor.

09:20:27 24      In the broadest meaning, it would include all the way

09:20:30 25 up to major bleeding and death.  But there are subsets in that.

**OFFICIAL TRANSCRIPT**

09:20:38  1    Q.    Some if I'm on an anticoagulant, I brush my teeth and I
09:20:42  2    have some blood and it bothers me, I call the doctor and I say,
09:20:46  3    "Doc, I've got some blood in my mouth," would that be -- would
09:20:49  4    that fall under clinically relevant bleeding?
09:20:52  5    A.    Yes.
09:20:52  6    Q.    So, let's take a look at the mean PT for this clinically
09:20:57  7    relevant bleeding.  Do you see that the mean is 25.6?
09:21:01  8    A.    Yes.
09:21:02  9    Q.    Now let's go down to any bleeding, any confirmed bleeding
09:21:08  10   at all.  Do you see that, that mean?
09:21:11  11   A.    Yes.
09:21:11  12   Q.    And that mean is 23.3?
09:21:16  13   A.    Right.
09:21:16  14   Q.    Is the mean for any bleeding at all virtually the same as
09:21:22  15   the mean for people who don't bleed at all?
09:21:25  16   A.    Yes.  And higher than the PT for those that have major
09:21:30  17   bleeds.
09:21:30  18   Q.    So taking all of this information about PT, does that tell
09:21:35  19   you anything useful as a doctor trying to treat -- your best to
09:21:40  20   treat a patient?
09:21:40  21   A.    Not about the DOACs, not at the bedside, not about dosing,
09:21:45  22   not about bleeding risk, no.
09:21:48  23   Q.    Now, we also heard about something called a *quartile*
09:21:58  24   *analysis*.  Are you familiar with what is called *quartile*
09:22:01  25   *analysis*?

**OFFICIAL TRANSCRIPT**

09:22:01  1   A.    Yes.

09:22:01  2   Q.    And tell the jury, what's a quartile analysis?

09:22:05  3   A.    The quartile analysis is a valid way of looking at your

09:22:10  4   safety signals in these and other patients, but it's also an

09:22:15  5   artificial construct.  You basically take the patient

09:22:18  6   population and divide it into fourths, and you do rough

09:22:22  7   statistical analysis on each section of patients.

09:22:27  8   Q.    Now, this might be wholly unscientific, but I've got a

09:22:32  9   chocolate bar here.  If I break that chocolate bar into four

09:22:38 10   pieces and count up the number of peanuts in each piece, can we

09:22:43 11   do a quartile analysis?

09:22:44 12   A.    Yes, that would be a quartile analysis.

09:22:46 13   Q.    Anytime you break the data into four pieces, one of the

09:22:47 14   pieces is going to be a fourth quartile?

09:22:50 15   A.    That's right.

09:22:51 16   Q.    Is that right?

09:22:51 17   A.    Okay.

09:22:52 18   Q.    Doesn't matter if it's chocolate bars or PTs?

09:22:52 19   A.    And if you get rid of a quartile, then it's not a quartile

09:22:55 20   analysis.  There is always four parts.

09:22:57 21   Q.    Or you could break it into three parts and then you'd have

09:23:01 22   a tertile analysis.

09:23:01 23   A.    Right.

09:23:02 24   Q.    Or ten parts.  You can break it anyway you want?

09:23:04 25   A.    Right.

*OFFICIAL TRANSCRIPT*

09:23:05  1   Q.   So, let me show you the Plaintiff's Trial Exhibit 18.

09:23:10  2        And, Jim, this is Defense Exhibit 6080, page 595.

09:23:24  3        Have you taken a look at this data, sir?

09:23:26  4   A.   Yes, I have.

09:23:27  5   Q.   And if we look at this data, is it referring to the kind

09:23:29  6   of -- from the EINSTEIN trial?

09:23:32  7   A.   Yes, it from the EINSTEIN trial.

09:23:33  8   Q.   And if we look at PT Neoplastin at peak, do you see the

09:23:38  9   different levels of peak values?

09:23:41 10   A.   Yes.

09:23:41 11   Q.   And they are broken into quartiles, right?

09:23:46 12   A.   Right.

09:23:46 13   Q.   And if we look at the fourth quartile, it goes from 25.1

09:23:51 14   PT all the way up to 120 PT; is that correct?

09:23:55 15   A.   That's right.

09:23:55 16   Q.   That's the fourth quartile.

09:23:57 17        Now, were they looking here in this table at the

09:24:01 18   number of major bleeding events by quartile?

09:24:04 19   A.   Yes, they were.

09:24:05 20   Q.   What do you see?

09:24:07 21   A.   You see that there were two -- again, we're talking

09:24:10 22   between 750 and 800 patients in each quartile -- there were two

09:24:15 23   major bleeds in the first, one in the second quartile, three in

09:24:17 24   the third, and three in the fourth.  Those low numbers, with

09:24:21 25   that many patients, that's statistically the same thing.  It's

*OFFICIAL TRANSCRIPT*

09:24:26 1    a random result.

09:24:27 2    Q.    Does PT there tell you anything about whether somebody

09:24:31 3    with -- in the fourth quartile is going to bleed more often

09:24:36 4    than somebody in the first quartile?

09:24:38 5    A.    They certainly didn't when it was analyzed in the study.

09:24:41 6    Q.    And if we could take a look at Defense Exhibit 6065, 547.

09:24:50 7          MR. SARVER:  Which I believe has been admitted as

09:24:53 8    Defense Exhibit 11, Dean.

09:24:54 9          THE DEPUTY CLERK:  That's right.

09:24:54 10          MR. SARVER:  Thank you, sir.

09:25:02 11          Did I get the number wrong the first time?

09:25:05 12          THE DEPUTY CLERK:  I didn't get 11.

09:25:05 13   EXAMINATION BY MR. SARVER:

09:25:05 14   Q.    What is this, Dr. Herrin?

09:25:07 15   A.    So this is the same quartile analysis looking at major

09:25:11 16   bleeding with PT Neoplastin, looking at peak for major

09:25:17 17   bleeding.

09:25:17 18   Q.    And if we look at the quartile analysis again, this is

09:25:22 19   something Dr. Rinder told us is important, what do you see in

09:25:26 20   terms of the number of bleeds in the first quartile versus the

09:25:30 21   number of bleeds in the fourth quartile?

09:25:34 22   A.    There are actually twice as many.

09:25:36 23   Q.    Now, one thing that's important, though, is we're talking

09:25:38 24   about -- I don't want the jury to get the idea that everybody

09:25:42 25   bleeds on Xarelto.  Is this a small number of people who

                              *OFFICIAL TRANSCRIPT*

09:25:45  1    actually bleed?

09:25:45  2    A.    Yes.  These are timed numbers, and so even though there is

09:25:49  3    twice as many in quartile one, you still wouldn't make any of

09:25:52  4    that.  Statistically that's insignificant.  The bottom line is

09:25:57  5    that they are roughly the same.  There is no correlation.

09:25:59  6    There is no predictive value.

09:26:01  7    Q.    Now, we're looking here at the peak number for PT.  Is

09:26:05  8    there also a trough number of PT that we can analyze the same

09:26:10  9    way, break it into quartiles?

09:26:12  10   A.    Sure.

09:26:12  11   Q.    Let's take a look at that.  What do you see in terms of

09:26:15  12   the trough in the quartile analysis?

09:26:18  13   A.    The same thing that's at the bottom of the table, and the

09:26:22  14   numbers are roughly the same depending on the quartile of

09:26:26  15   bleeding, major bleeding events.

09:26:28  16   Q.    And would a GI bleed that required transfusions, like

09:26:32  17   Ms. Mingo, be categorized as a major bleed?

09:26:36  18   A.    Yes, that's definitely a major bleeding event.

09:26:40  19   Q.    Is that what we're seeing here?

09:26:42  20   A.    Yes.

09:26:43  21   Q.    Do these PT values tell you anything -- would it have told

09:26:47  22   Dr. Jordon anything about whether or not Mrs. Mingo was more

09:26:49  23   likely to bleed?

09:26:50  24   A.    No.

09:26:50  25   Q.    Would you ever rely upon a PT in treating your patients

*OFFICIAL TRANSCRIPT*

09:26:55  1   with Xarelto or any NOAC?

09:26:57  2   A.   No, not with any of the NOACs.  It doesn't inform you on

09:27:03  3   risk of bleeding.  It doesn't inform you on effect on the

09:27:07  4   entire anticoagulant system.  Therefore, it's not information

09:27:11  5   that I would use to make treatment and dosing decisions.

09:27:14  6   Q.   I would like to show you what has been introduced in the

09:27:19  7   case as Defense Exhibit 342 with Dr. Lensing.

09:27:26  8        By the way, did you read the Dr. Lensing deposition?

09:27:31  9   A.   Yes.

09:27:31 10   Q.   If we could take a look at Defense Exhibit 342, is that

09:27:35 11   something called and *Integrated Summary of Safety*?

09:27:37 12   A.   Yes.

09:27:37 13   Q.   And is that for the EINSTEIN trial?

09:27:40 14   A.   Yes.

09:27:46 15   Q.   Let's take a look at Defense Exhibit 342 at -- I believe

09:27:54 16   it's page 67, Jim.  Yes.  There we are.

09:28:05 17        Did the company take the data in the EINSTEIN trial,

09:28:09 18   look at it, as you've done today on the stand, and come to a

09:28:13 19   conclusion?

09:28:13 20   A.   Yes, they did.

09:28:14 21   Q.   And could you read that for us.

09:28:16 22   A.   "In general, there was no evidence that PT Neoplastin,

09:28:20 23   measured in seconds at peak, was different in subjects with

09:28:24 24   bleeding events compared to subjects without bleeding events."

09:28:29 25   Q.   Given that, would it be inappropriate and wrong for the

*OFFICIAL TRANSCRIPT*

09:28:33  1   company to put something in the label saying that PT was

09:28:37  2   valuable in predicting bleeding risks?

09:28:44  3   A.   Yes.  It would be incorrect.

09:29:02  4   Q.   Now, I would like to take you a little bit back in time,

09:29:05  5   because this is something that was relied upon by Dr. Rinder

09:29:09  6   when he testified.  It's an article from a scientist by name of

09:29:15  7   Mueck, who works for Bayer, a Bayer scientist.

09:29:18  8        And have you read his published literature, some of

09:29:22  9   it at least?

09:29:22 10   A.   Yes, some of it.

09:29:24 11   Q.   I would like to take a look at Defense Exhibit 1902, that

09:29:27 12   was referred to by Dr. Rinder in his examination.

09:29:30 13        Have you read this article?

09:29:31 14   A.   Yes, I have.

09:29:32 15   Q.   And one of the things that was shown by Dr. Rinder was on

09:29:37 16   page 7.  It was a graph.

09:29:40 17        Could we go to that, Jim?

09:29:41 18        And do we see a graph here regarding the plasma

09:29:49 19   concentration and the prothrombin time?

09:29:51 20   A.   Yes.

09:29:51 21   Q.   What we didn't hear from Dr. Rinder, where he didn't go is

09:30:00 22   on page 14, where Dr. Mueck talks about what this information

09:30:05 23   means.  Shall we go there?

09:30:07 24   A.   Sure.

09:30:07 25   Q.   Okay.  Let's go to page 14.

*OFFICIAL TRANSCRIPT*

09:30:11  1        Here's what the conclusion was:  "However, there are

09:30:16  2    currently no data showing a direct correlation between bleeding

09:30:20  3    events and rivaroxaban plasma levels in the patients receiving

09:30:23  4    therapeutic doses of rivaroxaban."

09:30:26  5        Did I read that correctly?

09:30:27  6    A.    Yes, you did.

09:30:28  7    Q.    Based on your knowledge, training and experience, is that

09:30:30  8    100 percent true?

09:30:31  9    A.    Yes, it is.

09:30:32 10    Q.    Now, I would like to talk a little bit about how science

09:30:45 11    progresses.  Have there been randomized controlled clinical

09:30:49 12    trials to determine the safety and efficacy of Xarelto?

09:30:53 13    A.    Yes.  And no drug is going to get approval without trial

09:30:59 14    demonstrating efficacy and acceptable safety.

09:31:01 15    Q.    Now, in all of those randomized control clinical trials,

09:31:05 16    were the patients treated without monitoring decisions --

09:31:11 17    or without monitoring and treatment decisions made on PT?

09:31:14 18    A.    Yes.  They were monitored in the background to assess

09:31:20 19    safety and all that.  But they were treated without monitoring.

09:31:23 20    No dose adjustment were made on the basis of monitoring.

09:31:27 21    Q.    And did the FDA find that the results showed that without

09:31:33 22    monitoring Xarelto is safe and effective in patients?

09:31:37 23    A.    Yes.  It was approved that way, with no monitoring.  And,

09:31:41 24    in fact, we now have six years clinical experience with the

09:31:44 25    drug on the market, and the FDA has reviewed all of the safety

*OFFICIAL TRANSCRIPT*

09:31:50  1    signals and information that has come since that time, and they

09:31:52  2    still have not made any determination -- they have not gone

09:31:54  3    back and recommended any change in the language to suggest that

09:31:57  4    PT monitoring is helpful.

09:31:58  5    Q.   I would like to talk for just a moment about whether or

09:32:01  6    not the Dr. Rinder theory has ever been studied in real people.

09:32:06  7    Do you know the Rinder theory?

09:32:08  8    A.   I do.

09:32:08  9    Q.   He says you take this PT of 20 --

09:32:12 10          MR. BIRCHFIELD:  Your Honor, I'm going to object.

09:32:14 11    Mr. Sarver is testifying.

09:32:15 12          MR. SARVER:  Your Honor, to set the question up.

09:32:18 13          THE COURT:  Let's ask him what he understands the

09:32:21 14    Rinder theory to be.

09:32:21 15    EXAMINATION BY MR. SARVER:

09:32:21 16    Q.   What do you understand the Dr. Rinder theory to be?

09:32:24 17    A.   That there is a cutoff above which if you see a PT value,

09:32:28 18    you need to change the dose or stop the drug.

09:32:31 19    Q.   Now, has that theory ever be tested in a clinical trial

09:32:34 20    anywhere in the world?

09:32:35 21    A.   It has not.

09:32:36 22    Q.   Without testing whether that theory would cause harm, is

09:32:43 23    it something you would ever choose to do in your patients?

09:32:46 24    A.   No.  I understand a lab guy may look at those numbers and

09:32:50 25    come to some conclusions, make suggestions, but clinically,

*OFFICIAL TRANSCRIPT*

that does not give us information that we can use to safely treat patients.

Q.   Has the FDA ever approved any drug, including any NOAC, like Xarelto, on the basis of this Dr. Rinder theory of a cutoff?

A.   No.

Q.   Are you familiar with the medical society guidelines for treating patients, like Mrs. Mingo, with a deep vein thrombosis?

A.   Yes.

Q.   Do any of those medical societies in this country recommend using the PT as some cutoff level like Dr. Rinder says?

A.   No.

Q.   Have you ever even seen whether or not Dr. Rinder has published so that his peers could review his theory?

A.   I have not been able to find that anywhere.

          MR. BIRCHFIELD:  Your Honor, on that point, we would ask for an instruction.  I mean, because Mr. Sarver knows that --

          MR. SARVER:  Your Honor, I'm going to object.  If he wants to talk, let's go up and talk at the bench.

          (WHEREUPON, at this point in the proceedings, there was a conference held at the bench.)

          MR. BIRCHFIELD:  Your Honor, Mr. Sarver knows that

*OFFICIAL TRANSCRIPT*

09:34:23 1    Dr. Rinder's expert report, his opinions there, is based on
09:34:29 2    included information that was under a confidentiality provision
09:34:34 3    that has only recently been lifted and has not been in a place
09:34:37 4    where he could have published on this information.
09:34:39 5            And it is -- it's prejudicial and misleading to
09:34:42 6    the jury to suggest that this is a theory that wouldn't be
09:34:45 7    supported because he hasn't published it when it is under a --
09:34:49 8    essentially a gag order imposed by the defendants here.
09:34:52 9            MR. SARVER:  And, Your Honor, that isn't correct.  The
09:34:54 10   EINSTEIN data has been in the literature.  It is available.  If
09:35:00 11   Dr. Rinder had wanted to publish about the EINSTEIN data, or
09:35:05 12   had ever wanted to publish about a PT cutoff, he was certainly
09:35:08 13   able to do it.  He just couldn't use the documents that were
09:35:11 14   confidential, but he was never barred from publishing about
09:35:15 15   this theory.
09:35:15 16           THE COURT:  There is a nuance here, and I'll let you go
09:35:18 17   into it on cross-examination.  And you can deal with it on
09:35:21 18   redirect.  But I'm not going to make it the instructions.
09:35:21 19           (WHEREUPON, at this point in the proceedings, the bench
09:35:36 20   conference concluded.)
09:35:36 21           THE COURT:  Anything further, Counsel.
09:35:37 22           MR. SARVER:  Yes, Your Honor, just a few things.
09:35:39 23   EXAMINATION BY MR. SARVER:
09:35:40 24   Q.    Dr. Herrin, do you monitor any of your patients on NOACs
09:35:45 25   using PT?

**OFFICIAL TRANSCRIPT**

09:35:45  1    A.    No.

09:35:46  2    Q.    Do your patients do well without that monitoring?

09:35:51  3    A.    Yes.

09:35:51  4    Q.    Do you monitor your patients on Lovenox with the PT?

09:35:56  5    A.    No.

09:35:57  6    Q.    Do they do well?

09:35:58  7    A.    Yes.  And that's been true for 20 years, this idea of not

09:36:02  8    having to monitor certain drugs.

09:36:04  9    Q.    And in terms of the overall -- you prescribe a lot of

09:36:07 10    drugs?

09:36:07 11    A.    Yes.

09:36:08 12    Q.    What percentage of drugs, in your experience, actually

09:36:12 13    require monitoring?

09:36:13 14    A.    Very few drugs require checking levels to adjust for

09:36:19 15    therapy.

09:36:19 16    Q.    Would using the PT test with the Neoplastin reagent be

09:36:26 17    helpful to you as a practicing clinician for your patients on

09:36:31 18    Xarelto?

09:36:32 19    A.    Again, that test is not helpful for treating patients on

09:36:37 20    DOACs because of what I described.  You cannot use that number

09:36:41 21    to make any assumptions about bleeding.  You can't use that

09:36:44 22    number to determine exactly what anticoagulant effect is

09:36:48 23    happening in the body; therefore, you can't use that number to

09:36:51 24    adjust doses.

09:36:53 25            And if you adjust downwards because of concern over a

*OFFICIAL TRANSCRIPT*

09:36:57  1    number that doesn't mean anything, you're putting people at

09:37:00  2    risk for extension of their blood clot, pulmonary embolism,

09:37:05  3    stroke.

09:37:05  4    Q.    Could relying upon the PT test for patients using Xarelto

09:37:11  5    actually harm patients?

09:37:13  6    A.    Yes.

09:37:13  7    Q.    Has there ever been any clinical studies to determine

09:37:20  8    whether or not that reliance would work?

09:37:23  9    A.    No.  Because the clinical trials tested a dose that was

09:37:27 10    found to be very effective and safe.  There has not been

09:37:32 11    studies to change that dose.

09:37:33 12    Q.    Have you, in your practice, reviewed the package insert,

09:37:39 13    the label for Xarelto?

09:37:40 14    A.    Yes.

09:37:40 15    Q.    Does it tell you what you need to know as a practicing

09:37:43 16    physician in treating your patients?

09:37:45 17    A.    Yes, it does.

09:37:47 18    Q.    And have your patients on Xarelto done well?

09:37:49 19    A.    Yes.

09:37:50 20    Q.    Have your patients on the other NOACs done well?

09:37:53 21    A.    Yes.

09:37:53 22    Q.    And have you monitored any of them with PT?

09:37:57 23    A.    No.

09:37:57 24    Q.    I would like to talk for just a minute --

09:38:02 25           MR. SARVER:  Your Honor, may I proceed for a little bit

*OFFICIAL TRANSCRIPT*

09:38:05  1   or do we need a break now?

09:38:07  2          THE COURT:  Does anybody need a break?

09:38:09  3              Let's take a quick break.  Court will stand in

09:38:13  4   recess for ten minutes.

09:38:15  5          (WHEREUPON, at 9:38 a.m. the jury panel leaves the

09:52:01  6   courtroom and then a brief recess was taken.)

09:52:01  7          (WHEREUPON, at 9:52 a.m., the jury panel enters the

09:52:32  8   courtroom.)

09:52:32  9          THE COURT:  Be seated, please.

09:52:33 10              Let's continue, Counsel.

09:52:35 11          MR. SARVER:  Thank you very much, Your Honor.

09:52:35 12   EXAMINATION BY MR. SARVER:

09:52:36 13   Q.    Dr. Herrin, I'd like to talk to you for, really, just a

09:52:39 14   few minutes about Ms. Mingo in particular.

09:52:41 15          Have you reviewed her medical records?

09:52:43 16   A.    Yes.

09:52:43 17   Q.    Did Xarelto work for Ms. Mingo?

09:52:49 18   A.    Yes, it did.

09:52:50 19   Q.    Let's talk about that a little bit.

09:52:54 20          Did Ms. Mingo develop a deep vein thrombosis

09:52:57 21   following her hip surgery?

09:52:58 22   A.    She did.

09:52:59 23   Q.    After her hip surgery, was Ms. Mingo placed on a different

09:53:03 24   kind of an anticoagulant?

09:53:05 25   A.    Yes.

*OFFICIAL TRANSCRIPT*

2021

09:53:05   1    Q.    What?

09:53:07   2    A.    Lovenox.

09:53:08   3    Q.    Did the Lovenox prevent Ms. Mingo from developing a

09:53:12   4    deep vein thrombosis?

09:53:14   5    A.    She developed one after being on the Lovenox, so not as

09:53:21   6    efficacious as you hope.

09:53:23   7    Q.    I would like to take a look at Defense Exhibit 071 at

09:53:29   8    page 2.  We have a chart, actually, for the jury.

09:53:34   9          Are you familiar with this section of her medical

09:53:36  10    records, Doctor?

09:53:36  11    A.    I am.

09:53:37  12    Q.    It indicates that Ms. Mingo developed extensive blood

09:53:42  13    clots; is that correct?

09:53:42  14    A.    That's correct.

09:53:43  15    Q.    Was that a serious condition for Ms. Mingo?

09:53:46  16    A.    It is.  It's a life-threatening condition.

09:53:50  17    Q.    We won't repeat what Dr. Haynes told us yesterday, but did

09:53:56  18    she need treatment?

09:53:57  19    A.    Yes, she did.

09:54:02  20          MR. SARVER:  We'd offer Defense Exhibit 071 into

09:54:03  21    evidence.

09:54:03  22          THE COURT:  Let it be admitted.

09:54:05  23    EXAMINATION BY MR. SARVER:

09:54:05  24    Q.    Was Ms. Mingo, at the time that Dr. Jordon treated her and

09:54:09  25    prescribed Xarelto, did she have other conditions that made her

*OFFICIAL TRANSCRIPT*

09:54:13  1   even more at risk from her deep vein thrombosis?

09:54:16  2   A.    She did.

09:54:18  3   Q.    Let's take a look at Defense Exhibit 071 at page 1.

09:54:23  4         Can you tell us -- is this from Ms. Mingo's medical

09:54:27  5   record?

09:54:27  6   A.    It is.

09:54:28  7   Q.    Can you tell us here, point out what are her additional

09:54:32  8   risk factors for having her blood clot progress?

09:54:35  9   A.    Well, surgery is itself a risk factor, and particularly a

09:54:41 10   surgery that immobilizes you or decreases your mobility

09:54:44 11   compared to baseline, because stasis is a risk factor as well.

09:54:50 12   Smoking is a risk factor for clots.  Obesity is a risk factor

09:54:54 13   for clots.

09:54:54 14   Q.    Did the fact that Ms. Mingo developed a blood clot after

09:54:59 15   she had been treated with a different anticoagulant, was that a

09:55:03 16   risk factor?

09:55:03 17   A.    Yes.

09:55:04 18   Q.    Was Xarelto an appropriate choice of medicine for

09:55:10 19   Ms. Mingo?

09:55:10 20   A.    Yes, it was.

09:55:11 21   Q.    Now, when you have a clot, when you have a clot -- and

09:55:19 22   Dr. Haynes described them -- is the first period of time -- and

09:55:24 23   for Xarelto, it's three weeks -- do you have a higher dose?

09:55:27 24   A.    Yes.

09:55:28 25   Q.    Why?

*OFFICIAL TRANSCRIPT*

09:55:30  1  A.   With Xarelto specifically, and with many anticoagulants,

09:55:33  2  that's true.  Because, as I said earlier, the physiology of an

09:55:38  3  active clot is different than when you're just trying to

09:55:41  4  prevent clot and the system is not activated.

09:55:44  5       When you form a clot, that tells you the clotting

09:55:48  6  system has been activated.  I already alluded to the fact that

09:55:51  7  it's a very complicated system.  It depends on this cascade of

09:55:55  8  proteins coming in proximity to each other and activating each

09:55:59  9  other.

09:55:59 10       A clot is an ongoing activator.  There are things in

09:56:02 11  the clot that activate all the other clotting proteins that

09:56:08 12  happen to go by.  So the first period of time when you have a

09:56:12 13  blood clot, you're at great risk for extending that blood clot.

09:56:16 14  There is no reason for it to stop growing right way.  Then

09:56:18 15  pieces of it can break off and travel to the lungs and

09:56:23 16  potentially kill people.

09:56:23 17  Q.   Is sometimes the first symptom that you have that, what is

09:56:26 18  it?

09:56:27 19  A.   Well, unfortunately, a quarter of the time, the first

09:56:29 20  symptom of pulmonary embolism is sudden death.

09:56:32 21  Q.   Now, you told us that Xarelto worked for Ms. Mingo.  Is

09:56:37 22  that reflected in her medical records?

09:56:38 23  A.   It is.  You asked about the b.i.d. dosing.  So the

09:56:43 24  activated clot required a larger dose to get ahead of the

09:56:47 25  clotting system.  Yes, then she had a follow-up ultrasound that

09:56:51 1    demonstrated that the clot was, indeed, gone.

09:56:54 2    Q.   Let's take a look at Defense Exhibit 4 at page 40.  Was

09:56:58 3    there something called a -- well, what was the test that they

09:57:01 4    did?

09:57:02 5    A.   They did Doppler ultrasounds.

09:57:04 6    Q.   What did the Doppler ultrasound find for Ms. Mingo

09:57:10 7    three weeks after she began Xarelto?

09:57:13 8    A.   That there was no clot in either leg.

09:57:15 9    Q.   I say three weeks after.  Do you see from the date of the

09:57:19 10   study that that is correct?

09:57:20 11   A.   Yes.

09:57:23 12   Q.   How long is the original treatment period of twice a day,

09:57:26 13   15 milligrams twice a day?

09:57:28 14   A.   Three weeks.

09:57:28 15   Q.   For Ms. Mingo, at the end of that time, did she have

09:57:32 16   evidence of a blood clot?

09:57:32 17   A.   No.

09:57:33 18   Q.   Now, I'd like to talk a little bit about something that we

09:57:46 19   were told, again, by Dr. Rinder.

09:57:50 20        On January 24th, the day after starting Xarelto,

09:57:55 21   Ms. Mingo had a prothrombin time of 23.6.  Were you aware of

09:58:02 22   that in the records?

09:58:03 23   A.   Yes.

09:58:03 24   Q.   Dr. Rinder told the jury that that PT was only elevated

09:58:10 25   because of Xarelto.  Is he right?

*OFFICIAL TRANSCRIPT*

09:58:14 1    A.    That's not correct.

09:58:15 2    Q.    Tell us why.

09:58:15 3    A.    The patient also got a large dose of Coumadin, a

09:58:22 4    10-milligram dose.  Often we start people on 5 milligrams.

09:58:26 5    There are some physicians who choose to load to achieve

09:58:30 6    coagulation more quickly.  She got a 10 milligram dose, and

09:58:34 7    that definitely has impact on the clotting system.  I already

09:58:37 8    demonstrated that Factor VII is very sensitive to Coumadin, and

09:58:39 9    the PT is very sensitive to Factor VII.

09:58:42 10   Q.    If we take a look at Defense Exhibit 66 at page 1, is

09:58:47 11   there evidence that on January 22, 2015, Ms. Mingo was given a

09:58:53 12   dose of warfarin, Coumadin?

09:58:56 13   A.    Yes.

09:58:57 14   Q.    You told us that's a 10-milligram dose?

09:59:00 15   A.    Yes.

09:59:01 16   Q.    How does that stack up in terms of the dosages for

09:59:07 17   warfarin?

09:59:07 18   A.    So, the most common dosing approach is 5 milligrams daily

09:59:12 19   starting out.  Ten milligrams is the highest dose tablet that

09:59:16 20   you can use.

09:59:17 21         As I said, there are some physicians who, in their

09:59:21 22   practice, choose to start at a higher dose, hoping to achieve

09:59:27 23   anticoagulation more quickly.  So she got the largest dose

09:59:30 24   tablet there is.

09:59:31 25   Q.    Ms. Mingo's prothrombin time test was taken about 30 hours

*OFFICIAL TRANSCRIPT*

09:59:38 1    after her warfarin dose?

09:59:41 2    A.    Yes.

09:59:41 3    Q.    Why does taking warfarin 30 hours before you do a

09:59:47 4    prothrombin time test affect the PT?

09:59:50 5    A.    Because you fall right in the window where Coumadin is

09:59:53 6    having action.

09:59:55 7          If you remember my chart, I described that the

09:59:58 8    Coumadin has effect on multiple factors in that clotting

10:00:01 9    system.  The PT, very short half-life, so it's obviously

10:00:05 10   affected first in most, but the effect of Coumadin hangs around

10:00:10 11   because those other factors have longer half-lives.

10:00:14 12         In fact, Factor II, its half-life is 72 hours, a

10:00:20 13   full -- longer period of time, far longer than Factor VII.  So,

10:00:27 14   that one dose of warfarin hangs around in the system for a

10:00:30 15   while, has ongoing effect for quite some time.

10:00:33 16   Q.    Was there anything unusual about Ms. Mingo having a PT

10:00:39 17   test of 23.6 on January 24th?

10:00:44 18   A.    No.  It's outside the expected range for somebody that's

10:00:48 19   not on a blood thinner, but, for somebody that's on an

10:00:53 20   anticoagulant, that's not a surprise.

10:00:55 21   Q.    Now, there was another PT test taken on Ms. Mingo when she

10:01:01 22   went into the hospital for her GI bleed.  Were you aware of

10:01:06 23   that?

10:01:06 24   A.    Yes.

10:01:07 25   Q.    That number was 26.2?

**OFFICIAL TRANSCRIPT**

10:01:09  1    A.    Yes.

10:01:10  2    Q.    Was there anything affecting that number other than her

10:01:15  3    Xarelto use?

10:01:16  4    A.    Well, potentially.  There is evidence from the hematocrit

10:01:21  5    that she's bled a substantial amount.  We've called this a

10:01:24  6    *major bleed*.

10:01:25  7             When your body has ongoing bleeding, these clotting

10:01:28  8    factors are working to stop the bleeding.  You only have a

10:01:33  9    certain supply.  They get used up.  If they get used up by

10:01:36 10    bleeding more quickly than they can be made, that will affect

10:01:40 11    way the PT test works in the test tube.  There is not enough

10:01:44 12    factor in there to make it work normally.

10:01:46 13    Q.    Was there anything unusual or troubling about Ms. Mingo's

10:01:51 14    PT test of 26.2?

10:01:54 15    A.    Nobody likes to see that, but it doesn't tell you anything

10:01:57 16    about the status of her anticoagulation system.

10:02:01 17    Q.    Now, Dr. Keith testified in this case.  He was her

10:02:08 18    gastroenterologist that fixed her ulcer.

10:02:08 19    A.    Yes.

10:02:11 20    Q.    Do you recall that?

10:02:11 21    A.    Yes.

10:02:11 22    Q.    He testified that the cause of Ms. Mingo's ulcer was her

10:02:16 23    aspirin use.  Do you agree?

10:02:17 24    A.    Yes.

10:02:17 25    Q.    Have you reviewed Ms. Mingo's aspirin usage in her medical

*OFFICIAL TRANSCRIPT*

10:02:22 1   record?

10:02:23 2   A.    Yes.

10:02:23 3   Q.    We have Defense Exhibit 295.

10:02:28 4           Could you provide a copy to counsel, please.

10:02:32 5           I'm showing you Defense Exhibit 295, sir.  Is that a

10:02:40 6   compilation of Ms. Mingo's aspirin use over the years?

10:02:43 7   A.    Yes.

10:02:45 8           MR. SARVER:  Your Honor, we would offer Defense

10:02:48 9   Exhibit 295.

10:02:49 10          MR. BIRCHFIELD:  As long as it's redacted for the HIPAA

10:02:53 11  information, Your Honor, I'm fine.

10:02:58 12          MR. SARVER:  Of course, Your Honor.  We will do that.

10:02:58 13          THE COURT:  Admitted.

10:02:59 14  EXAMINATION BY MR. SARVER:

10:03:00 15  Q.    Do you agree that it was Ms. Mingo's long-term aspirin use

10:03:03 16  that was the most likely cause of her ulcer?

10:03:04 17  A.    Yes.

10:03:05 18  Q.    In your practice, have you seen patients who have had

10:03:09 19  GI bleeds, serious GI bleeds, who weren't taking any

10:03:13 20  anticoagulant at all?

10:03:14 21  A.    Yes.

10:03:14 22  Q.    Have you seen patients with serious GI bleeds on warfarin?

10:03:19 23  A.    Yes.

10:03:20 24  Q.    And on all of the different NOACs?

10:03:23 25  A.    Yes.  Any anticoagulant, yes.

*OFFICIAL TRANSCRIPT*

10:03:28  1  Q.   Dr. Rinder told the jury that he could rule out aspirin as

10:03:39  2  a cause of Ms. Mingo's GI bleed.  Was he right?

10:03:44  3  A.   I don't believe that's correct.

10:03:45  4  Q.   Why not?

10:03:46  5  A.   Because aspirin is a known anticoagulant.  It promotes

10:03:52  6  ulcer formation as well.  You put those two things together, a

10:03:56  7  drug that we know that can cause ulcers, and a drug that works

10:03:59  8  on the coagulation system by interfering with the way platelets

10:04:04  9  work -- which is a different part of the clotting system that I

10:04:07 10  didn't draw on the board -- you put those two things together,

10:04:10 11  and at some point there's a chance you will have bleeding.

10:04:12 12  Q.   Now, does the Xarelto label discuss the concomitant use,

10:04:20 13  use at the same time, of Xarelto and aspirin?

10:04:24 14  A.   Yes, it does.

10:04:24 15  Q.   What does it tell doctors?

10:04:26 16  A.   It tells doctors that there is increased risk for

10:04:28 17  bleeding.

10:04:28 18  Q.   Now, in your review of the medical records for Ms. Mingo,

10:04:32 19  was there ever a time when she was taking Xarelto but not

10:04:36 20  taking aspirin?

10:04:37 21  A.   Not that I can see.

10:04:44 22  Q.   Is it correct that after Dr. Keith fixed Ms. Mingo's

10:04:50 23  ulcer, she hasn't had any more bleeding problems?

10:04:54 24  A.   Not overt bleeding that I'm aware of.

10:04:57 25  Q.   Did Dr. Keith -- from your review of the medical records,

***OFFICIAL TRANSCRIPT***

10:05:01 1    did Dr. Keith recommend that after he fixed Ms. Mingo's ulcer,

10:05:06 2    she should go back on Xarelto?

10:05:08 3    A.    He did make that statement, Yes.

10:05:09 4    Q.    Do you agree?

10:05:10 5    A.    Yes.  I would defer to the gastroenterologist as to

10:05:14 6    whether her ulcer was adequately dealt with in order to be able

10:05:19 7    to resume anticoagulants safely; but, beyond that, she

10:05:22 8    absolutely needed to be back on anticoagulation because of the

10:05:24 9    risk, the ongoing risk for thrombosis.

10:05:27 10   Q.    I would like to take a look at Defense Exhibit 4 at page

10:05:31 11   34, the February 19, 2015, note from Dr. Keith.  Did you review

10:05:40 12   that, sir?

10:05:40 13   A.    Yes.

10:05:41 14   Q.    Jim, if we could have that.  There we are.  Thank you.

10:05:48 15         Do you see the note from February 19 of 2015?

10:05:52 16   A.    Yes.

10:05:53 17   Q.    Do you see that -- and this is doctor writing -- do you

10:05:58 18   see the section, "Resume"?

10:06:00 19   A.    Yes.

10:06:01 20   Q.    What does it say?

10:06:02 21   A.    "Resume Xarelto."  That third word, I've been less certain

10:06:08 22   about, but Wednesday, perhaps.  I can't read what the third

10:06:16 23   word says, but the first two words say, "Resume Xarelto."

10:06:21 24   Q.    Does it look kind of like resume Xarelto Wednesday?

10:06:24 25   A.    That would be my best guess for what that third word is.

**OFFICIAL TRANSCRIPT**

10:06:28 1   It is doctor handwriting, yes.

10:06:30 2   Q.   Do you agree with Dr. Keith that after he fixed

10:06:36 3   Ms. Mingo's ulcer, she was at low risk of another GI bleed?

10:06:41 4   A.   Yes.

10:06:43 5   Q.   Do you agree that the right thing to do was put her back

10:06:44 6   on Xarelto?

10:06:45 7   A.   I do.

10:06:46 8        MR. SARVER:  Your Honor, I would at this time offer, if

10:06:49 9   it's not already admitted, Defense Exhibit 71, Defense

10:06:57 10  Exhibit 4, Defense Exhibit 60, page 66, and I believe we've

10:07:06 11  already offered the aspirin records.

10:07:08 12       THE COURT:  Are those in already, Dean?

10:07:12 13       THE DEPUTY CLERK:  No.  71 was, but the other ones

10:07:15 14  weren't.

10:07:16 15       MR. SARVER:  We offer those at this time.

10:07:17 16       MR. BIRCHFIELD:  What is Exhibit 71?

10:07:20 17       MR. SARVER:  It's a medical record from Ms. Mingo's

10:07:25 18  medical records.

10:07:25 19       THE COURT:  Okay.  Let it be admitted then.

10:07:28 20  EXAMINATION BY MR. SARVER:

10:07:28 21  Q.   Doctor, do you hold all the opinions that you've given

10:07:31 22  today to a reasonable degree of medical certainty?

10:07:35 23  A.   Certainly.

10:07:35 24       MR. SARVER:  Thank you very much.

10:07:36 25            I tender the witness, Your Honor.

***OFFICIAL TRANSCRIPT***

10:07:38  1            THE COURT:  Okay.

10:07:38  2                        CROSS-EXAMINATION

10:07:41  3  BY MR. BIRCHFIELD:

10:07:41  4  Q.    Dr. Herrin, I want to make sure that I'm clear on your

10:08:02  5  understanding regarding your opinion about PT.

10:08:05  6  A.    Okay.

10:08:05  7  Q.    Did you -- is it your opinion that PT, when it comes to

10:08:12  8  measuring the effect of Xarelto, is meaningless, it's

10:08:18  9  irrelevant?

10:08:18 10  A.    PT is potentially a measure.  There is some correlation

10:08:22 11  with certain specific reagents, the Neoplastin in question, and

10:08:26 12  drug levels.

10:08:29 13            The part that's a bit of a leap is to say that that

10:08:33 14  drug level informs you fully about the level of anticoagulation

10:08:37 15  in the body.  It's yet another leap to say that it provides

10:08:41 16  useful clinical information on how you should change doses.

10:08:45 17  Q.    So would you say that PT has a close correlation to plasma

10:08:53 18  concentration for Xarelto?

10:08:55 19  A.    That's been demonstrated reasonably close.  I think there

10:08:59 20  is levels above which that's not the case, but there is a

10:09:03 21  fairly linear correlation there.

10:09:04 22  Q.    So PT -- PT Neoplastin, right?

10:09:08 23  A.    Right.

10:09:09 24  Q.    PT Neoplastin --

10:09:11 25  A.    -- and plasma concentration of the drug.

                        ***OFFICIAL TRANSCRIPT***

10:09:14   1    Q.    So if I say equals plasma concentration, would that be
10:09:29   2    fair?  We're talking about PT Neoplastin.
10:09:29   3    A.    Yes.
10:09:29   4    Q.    So if we say PT Neoplastin does give you an accurate
10:09:34   5    measure, a reliable measure of the plasma concentration with
10:09:37   6    Xarelto?
10:09:37   7    A.    Overall.  When they mapped out all the patients, they were
10:09:40   8    able to draw a line that generally correlated with that.
10:09:43   9    Q.    Okay.  All right.  But it's your position that plasma
10:09:48  10    concentration of Xarelto does not relate to bleeding risk?
10:09:55  11    A.    Not effectively, because we've seen that data.
10:09:57  12    Q.    Okay.  All right.  When you say, "we've seen that data,"
10:10:02  13    what data?  What do you mean by that?
10:10:04  14    A.    We've just talked about it earlier this morning.
10:10:06  15    Q.    Oh, the data that you walked through with Mr. Sarver?
10:10:11  16    A.    Yes, and that the FDA used as part of their basis, yes.
10:10:14  17    Q.    Okay.  So let's take a look at that.
10:10:18  18          So you talked about the EINSTEIN data; is that right?
10:10:22  19    A.    Yes.
10:10:22  20    Q.    Okay.  All right.  EINSTEIN, it looked at -- it was a
10:10:31  21    treatment for DVT's, right?
10:10:34  22    A.    Right, and PE.
10:10:34  23    Q.    But in the EINSTEIN -- in the EINSTEIN clinical trial,
10:10:38  24    what was the -- what was the safety endpoint that they were
10:10:42  25    looking at?

*OFFICIAL TRANSCRIPT*

10:10:43  1    A.   They were looking at a variety of safety endpoints, but

10:10:48  2    bleeding certainly is the primary safety endpoint for an

10:10:51  3    anticoagulant.

10:10:51  4    Q.   I think you mentioned to Mr. Sarver -- you and Mr. Sarver

10:10:55  5    talked about the ROCKET trial.  You're familiar with the ROCKET

10:10:59  6    trial, right?

10:11:00  7    A.   Yes.

10:11:00  8    Q.   The ROCKET trial looked at patients with AFib, or atrial

10:11:10  9    fibrillation; is that right?

10:11:10 10    A.   Right, for clot prevention.  Right.

10:11:12 11    Q.   But it also looked at bleeding for the safety endpoint,

10:11:17 12    right?

10:11:17 13    A.   Yes.

10:11:20 14    Q.   Okay.  What other clinical trials are you aware of

10:11:25 15    involving Xarelto?

10:11:26 16    A.   There was a trial that looked at comparison of extended

10:11:30 17    therapy with aspirin.  There is a lot of preclinical -- are you

10:11:30 18    talking only Phase III trials?

10:11:36 19    Q.   Let's just talk about Phase III clinical trials.

10:11:39 20    A.   There is the three major indications, and each of those

10:11:43 21    come out of a clinical trial, looking at prophylaxis after knee

10:11:47 22    and hip surgeries, looking at prevention of stroke in AFib

10:11:54 23    patients, and then looking at DVT and PE.

10:11:57 24    Q.   So what was the clinical trial for the DVT prophylaxis?

10:12:05 25    A.   I'm blanking on the name of it at the moment.

*OFFICIAL TRANSCRIPT*

10:12:06  1    Q.   The RECORD trials?

10:12:10  2    A.   Yes.  That was the first -- the first, yes.

10:12:14  3    Q.   The first three RECORD trials?

10:12:15  4    A.   Well, the first indication, yes.

10:12:16  5    Q.   So we have the RECORD trials.  That was looking at, as you

10:12:23  6    said, DVT prophylaxis.

10:12:23  7    A.   Right.

10:12:25  8    Q.   On the safety side, they looked at bleeding risk, right?

10:12:31  9    A.   They always would, yes.

10:12:34 10    Q.   Are you aware of any other Phase III clinical trials?

10:12:41 11    A.   As I mentioned, there's a trial that looked at extending

10:12:44 12    therapy compared with low-dose aspirin for long-term prevention

10:12:49 13    of clots.

10:12:50 14    Q.   What was that called?

10:12:51 15    A.   (No verbal response.)

10:12:55 16    Q.   In that trial, did it look at bleeding risk as well?

10:12:59 17    A.   They all do, yes.

10:13:01 18    Q.   So we'll just say ASA extension --

10:13:04 19    A.   Right.

10:13:05 20    Q.   -- and bleeding.

10:13:09 21         So if you're looking at -- if you want to look at the

10:13:12 22    safety aspect of the drug as it relates to bleeding, wouldn't

10:13:17 23    it be appropriate to learn as much as you can from all of these

10:13:21 24    clinical trials about the bleeding risk?

10:13:22 25    A.   You would look at those clinical trials as it relates to

*OFFICIAL TRANSCRIPT*

10:13:25  1     the patient population that you're going to be treating.  You

10:13:28  2     can't lump clinical trials together -- you can lump clinical

10:13:34  3     trials together, and you can get information about safety

10:13:42  4     signals, but you have to understand, if you do that, that they

10:13:42  5     don't necessarily apply to a particular patient.  You can't

10:13:43  6     compare apples and oranges, in other words.

10:13:45  7     Q.    So we go back, and your opinion -- I want to make sure

10:13:49  8     that I've got this right -- is that PT is not meaningful when

10:13:54  9     it relates to Xarelto, because it gives you some correlation

10:13:58 10     with plasma concentration, but it gives you no information

10:14:02 11     about bleeding risk; is that a fair assessment?

10:14:07 12     A.    It hasn't correlated.  It has not been found to correlate

10:14:10 13     as a predictive value.

10:14:13 14     Q.    So we would say PT for Xarelto is not reliable?

10:14:21 15     A.    Not as a predictor of bleeding, and not as a way to dose

10:14:26 16     adjust, no.

10:14:27 17     Q.    You had a discussion with Mr. Sarver about quartile

10:14:37 18     analysis.  Do you recall that?

10:14:37 19     A.    Yes.

10:14:38 20     Q.    Mr. Sarver used the candy bar.  Is the point of that, that

10:14:47 21     the quartile analysis is really worthless too?

10:14:49 22     A.    No, it's not worthless.  He was explaining how you do

10:14:53 23     quartiles.  You break things into fourths, and then you look

10:14:58 24     for events that happen in each quarter.  I thought it was a

10:14:59 25     good illustration.

**OFFICIAL TRANSCRIPT**

10:14:59  1   Q.    But the analysis was you could have peanuts in any of

10:15:03  2   those, it really didn't give you any meaningful information;

10:15:07  3   would that be wrong?

10:15:08  4   A.    No, that's not what we said.

10:15:10  5   Q.    Quartile analysis is a valid scientific approach to

10:15:14  6   evaluating data, correct?

10:15:15  7   A.    Correct.

10:15:15  8   Q.    Would you agree that quartile analysis is important in

10:15:26  9   detecting safety signals with drugs?

10:15:29 10   A.    It can be.  We've said it's a valid scientific analysis,

10:15:34 11   but it's always -- it's always taken into account with a full

10:15:39 12   evaluation of rough data.

10:15:41 13          Often quartile analyses are done on rough data, and

10:15:44 14   you're just looking for events.  But you've got to look beyond

10:15:47 15   that, and look at statistical significance, etcetera.

10:15:50 16   Q.    When you're prescribing a drug to a large number of

10:15:55 17   people, it's crucial that you look for important safety

10:16:00 18   signals, right?

10:16:00 19   A.    Oh, yes.

10:16:01 20   Q.    All right.  So, let's -- I want to -- I want to ask you,

10:16:09 21   Dr. Herrin, when you say that the PT -- plasma concentration

10:16:17 22   for Xarelto -- I'm sorry -- plasma concentration for Xarelto

10:16:19 23   really has no correlation with bleeding risk, have you seen the

10:16:29 24   FDA's position or any analysis of the FDA on that issue when it

10:16:33 25   pertains to Xarelto?

*OFFICIAL TRANSCRIPT*

10:16:34 1   A.    I know that there is thousands of pages of analysis by the

10:16:37 2   FDA, and there is individuals within the FDA who have different

10:16:40 3   opinions, but I know what the bottom line recommendation of the

10:16:44 4   FDA was.

10:16:45 5   Q.    When you say that there are -- that there are members

10:16:49 6   within the FDA, some individuals within the FDA, are you

10:16:53 7   talking about the medical officers at the FDA that were charged

10:16:58 8   with the responsibility for evaluating all of the data

10:17:02 9   regarding Xarelto?  Is that who you mean?

10:17:05 10  A.    I'm talking about whoever at the FDA is responsible for

10:17:09 11  decision-making.  I'm not sure what you're asking.

10:17:11 12  Q.    So who were these individuals that you say suggested that

10:17:16 13  there is a correlation between plasma concentration and

10:17:20 14  bleeding risk?

10:17:21 15  A.    I didn't say that there were specific individuals who did

10:17:24 16  or didn't.  I am saying that it would be normal, in

10:17:29 17  deliberations about a drug, to have people with different

10:17:33 18  opinions.  I think I have seen, in passing, different opinions,

10:17:36 19  and that would be part of a robust discussion.  When I'm going

10:17:41 20  to treat a patient, I often discuss with my colleagues, do you

10:17:43 21  think this is the right approach, this patient has already had

10:17:47 22  this, we have to take this into consideration.  Multiple

10:17:49 23  opinions are often needed.  That's not a surprise.

10:17:54 24  Q.    Are you familiar with the Factor Xa assay, or test?

10:18:03 25  A.    Yes.

*OFFICIAL TRANSCRIPT*

10:18:03 1    Q.    Are you familiar with the Factor Xa assay as it pertains
10:18:09 2    to measuring Xarelto?
10:18:10 3    A.    Yes.  I know that there is a literature on that.
10:18:14 4    Q.    Do you agree that the Factor A (verbatim) assay is a
10:18:21 5    reliable way to measure the plasma concentration of Xarelto?
10:18:26 6    A.    The Factor Xa assay may be a reliable way, but it has to
10:18:32 7    be specifically calibrated for Xarelto.  I'm sure there are
10:18:35 8    some labs that can use it in a similar way to the way the
10:18:43 9    Neoplastin PT is used.
10:18:44 10   Q.    So let's take this one step at a time.  Is the Factor Xa
10:18:50 11   assay, if it's calibrated specifically for Xarelto, is it a
10:18:54 12   reliable way to measure the plasma concentration of Xarelto?
10:18:58 13   A.    There are some investigators who have demonstrated that or
10:19:03 14   expressed that opinion.
10:19:03 15   Q.    But, Dr. Herrin, you -- you're an expert in this case on
10:19:08 16   the issue of measuring.  So is it your opinion, is it your
10:19:13 17   opinion that the Factor Xa assay is a reliable way to measure
10:19:18 18   the plasma concentration of Xarelto?
10:19:22 19   A.    I don't have an opinion because I don't use that test.
10:19:25 20   Q.    So Factor Xa may be reliable?
10:19:45 21   A.    For measuring plasma concentration.  I've certainly seen
10:19:46 22   some researchers say that.
10:19:48 23   Q.    For measuring plasma concentration.  I'm abbreviating
10:19:54 24   plasma concentration PC.
10:19:56 25         But, again, it's your position that the Factor Xa

*OFFICIAL TRANSCRIPT*

10:20:00 1    assay would be meaningless for Xarelto because there is no

10:20:03 2    correlation between plasma concentration and bleeding risk in

10:20:08 3    your opinion?

10:20:08 4    A.    That's not been well demonstrated, at least as measured by

10:20:14 5    the PT.

10:20:14 6    Q.    I'm sorry?

10:20:16 7    A.    That's not been well demonstrated, at least as measured by

10:20:16 8    the PT, the PT correlation.  There's not as much work that's

10:20:21 9    been done on Factor Xa in plasma concentration and bleeding

10:20:26 10   levels.

10:20:26 11   Q.    But the PT does correlate with the plasma concentration,

10:20:34 12   right?

10:20:35 13   A.    To some degree, yes.

10:20:37 14   Q.    The Factor Xa specifically measures the plasma

10:20:41 15   concentration of Xarelto, right?

10:20:44 16   A.    The Factor Xa level, what it's measuring is the amount of

10:20:48 17   activity against Factor Xa, which is that one piece that I

10:20:53 18   demonstrated on that drawing.

10:20:55 19          Then there are scientists who say -- who have tried

10:21:00 20   to demonstrate a correlation between that specific level of

10:21:03 21   activity against Factor Xa and what plasma concentrations would

10:21:08 22   be.

10:21:08 23   Q.    Dr. Herrin, I think you stated that there is -- that there

10:21:19 24   is no literature that provides a 20 second cutoff in Xarelto

10:21:28 25   patients; is that right?

*OFFICIAL TRANSCRIPT*

10:21:29  1    A.    I was asked if I had seen Dr. Rinder published his theory

10:21:34  2    about using that cutoff for clinical management, and I have not

10:21:37  3    seen that, no.

10:21:38  4    Q.    Are you aware that there is published literature proposing

10:21:46  5    a 20 second cutoff?

10:21:48  6    A.    I would be happy to look a lot, if you have it.

10:21:50  7    Q.    Thank you, Dr. Herrin, but my question is, are you aware

10:21:54  8    that there is medical literature regarding a 20 second cutoff

10:21:59  9    for Xarelto?

10:22:00 10    A.    No.

10:22:00 11    Q.    Let's take a look at this article.

10:22:13 12          Dean, can I have the Elmo.

10:22:16 13          All right.  Dr. Herrin, do you see that this is

10:22:26 14    published in the *Journal of Cardiology*?

10:22:30 15    A.    Yes.

10:22:30 16    Q.    Do you see, in the abstract section here -- let's look at

10:22:38 17    the conclusion section, if we can.  "Conclusion.  In Japanese

10:22:46 18    patients with nonvalvular atrial fibrillation receiving

10:22:50 19    rivaroxaban, a prolonged peak PT, greater than 20 seconds,

10:22:56 20    could indicate increased risk of bleeding, and both trough and

10:23:00 21    peak SF levels were reduced relative to baseline."

10:23:05 22    A.    I see that.

10:23:05 23    Q.    Okay.  So that would be some published literature dealing

10:23:09 24    with the 20 second cutoff; is that right?

10:23:12 25    A.    For AFib patients, yes.

**OFFICIAL TRANSCRIPT**

10:23:14  1          How large was that study?  May I see it?

10:23:18  2          MR. SARVER:  Your Honor, the doctor doesn't have a

10:23:20  3   copy.  Could he be provided with a copy?

10:23:22  4          THE COURT:  Sure.

10:23:23  5   EXAMINATION BY MR. BIRCHFIELD:

10:23:34  6   Q.   The size of the population, that's important, right?

10:23:38  7   A.   It can be.  You have to look at what statistical analyses

10:23:42  8   were applied and what conclusions were drawn.

10:23:42  9          THE COURT REPORTER:  Could you speak into the

10:23:42 10   microphone, please.

10:23:47 11          THE WITNESS:  I'm sorry.  He's asking me questions

10:23:49 12   while I'm reading.  I'm sorry.

10:23:56 13          So there were 136 patients.

10:23:57 14   EXAMINATION BY MR. BIRCHFIELD:

10:23:57 15   Q.   I mean, you have different types of trials.  You have

10:24:02 16   trials that are specifically looking at dosing, you're looking

10:24:07 17   at a specific issue.  Those types of trials are completely

10:24:11 18   different than the Phase III clinical trials that are looking

10:24:15 19   at outcomes, right?

10:24:17 20   A.   Completely different -- I mean, I'm not sure what you mean

10:24:20 21   by that.  There are different ways that you can do trials,

10:24:23 22   different statistical analyses that can be employed, different

10:24:27 23   ways of setting up trials.

10:24:29 24          So yes, there are different kinds of trials that you

10:24:32 25   can do.

**OFFICIAL TRANSCRIPT**

Q.    All right.  Dr. Herrin, Mr. Sarver walked you through the quartile analysis for major bleeding in the EINSTEIN trial.  Do you recall that?

A.    Yes.

Q.    You understand that the company told the FDA that to get a better estimate of bleeding risk, you have to look at major bleeding and clinically relevant bleeding?

A.    I don't know what -- you said what the company told the FDA?

Q.    Right.

A.    I'm not sure what you're referring to.

Q.    Well, in arriving at your opinions, did you review -- did you review the information that the company submitted to the FDA regarding Xarelto?

A.    I'm generally familiar, but there is thousands of pages that I did not read because it doesn't inform my clinical practice.  I was asked to do a clinical survey of this patient's care and questions related to that.

Q.    Thank you, sir.

        Let's take a look at Exhibit 5768669, please.  If you would turn to page -- well, first, you see this is an FDA archived document, sir?  Do you see that?

A.    Yes, I see the notice that it's an archived document.

Q.    You see that this is a cardiovascular and renal drugs advisory committee meeting; do you see that, sir?

*OFFICIAL TRANSCRIPT*

10:26:31  1   A.   Yes, I do.

10:26:32  2   Q.   All right.  If you'll turn to page 45 of the transcript,

10:26:39  3   PDF 46.  Are you with me, Dr. Herrin?

10:26:49  4   A.   I'm getting there.  You said PDF page 46?

10:26:53  5   Q.   Yes.

10:26:54  6   A.   Okay.

10:26:54  7   Q.   Let's start with the paragraph:  "One way to get a better

10:26:59  8   estimate of the bleeding risk with rivaroxaban is to include

10:27:03  9   more events so that a more precise estimate is possible.

10:27:09 10   Adding the nonmajor clinically relevant bleeding events to the

10:27:15 11   major bleeding events increases the event rates and is shown

10:27:19 12   here.

10:27:20 13          "Now, with more events, the absolute and relative

10:27:23 14   differences are more consistent across the studies.  Each study

10:27:26 15   shows a modest increase in this bleeding event endpoint for

10:27:31 16   rivaroxaban" -- right -- "compared with enoxaparin."  Is that

10:27:39 17   right?

10:27:40 18   A.   Yes, you've read that correctly.

10:27:42 19   Q.   "Another approach for estimating the bleeding risk, given

10:27:47 20   the relatively low event rates, is to pool the results across

10:27:51 21   the studies similarly to what was done with the symptomatic VTE

10:27:55 22   events."

10:27:56 23          THE COURT:  Mr. Roberts, are you okay?

10:27:59 24          JUROR ROBERTS:  Yes.

10:27:59 25   EXAMINATION BY MR. BIRCHFIELD:

                              *OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 10:28:01 1 | Q.   Now, let's turn to Plaintiff's Exhibit 18 that's admitted |
| 10:28:08 2 | in trial here.  I think you covered this with Mr. Sarver. |
| 10:28:27 3 | So when we look at -- when we look at the data where |
| 10:28:32 4 | you combined -- let's walk through the quartile analysis here. |
| 10:28:38 5 | Do you have this? |
| 10:28:40 6 | Okay.  Go to PDF 28, Dr. Herrin.  It's the last page. |
| 10:28:54 7 | A.   You're talking about PDF 1058? |
| 10:28:56 8 | Q.   Page 28, sir. |
| 10:28:57 9 | A.   It doesn't say that. |
| 10:29:02 10 | Q.   You can take my copy.  I've got that. |
| 10:29:21 11 | Carl, can you go to PDF 28. |
| 10:29:31 12 | So, Dr. Herrin, let's look at the values that we have |
| 10:29:36 13 | here.  PT Neoplastin -- and that is the PT reagent that was |
| 10:29:43 14 | used in the clinical trials by the companies for this drug, |
| 10:29:48 15 | right? |
| 10:29:48 16 | A.   Yes, that's correct. |
| 10:29:49 17 | Q.   All right.  So let's look at the quartile analysis here. |
| 10:29:57 18 | We have the peak at the top.  We look at the fourth quarter -- |
| 10:30:06 19 | fourth quartile, and what is the range there, sir? |
| 10:30:10 20 | A.   The range of PT is greater than 25.1 to 120. |
| 10:30:15 21 | Q.   You know that Ms. Mingo's PT -- peak PT was 26.2, right? |
| 10:30:23 22 | A.   Yes. |
| 10:30:25 23 | Q.   Then if we look at the trough level, PT Neoplastin day 15 |
| 10:30:34 24 | trough, and what is the fourth quartile cutoff there, sir? |
| 10:30:37 25 | A.   19 to 69.1. |

*OFFICIAL TRANSCRIPT*

| | |
|---|---|
| 10:30:41 1 | Q.   So greater than 19, right? |
| 10:30:43 2 | A.   Yes. |
| 10:30:44 3 | Q.   Ms. Mingo's PT measured at trough was 23.2, correct? |
| 10:30:50 4 | A.   Yes.  With Coumadin also on board, but yes. |
| 10:30:52 5 | Q.   While we're there, we know that was there a PT that was |
| 10:31:07 6 | measured on January 24th, right, that was the 23.2?  That was |
| 10:31:11 7 | the trough measurement, right? |
| 10:31:13 8 | A.   Yes. |
| 10:31:13 9 | Q.   It's your opinion that the reason that that PT was |
| 10:31:18 10 | elevated was because she had one dose of Coumadin 35 hours |
| 10:31:27 11 | prior; is that right? |
| 10:31:28 12 | A.   No.  It's my opinion that she's in the time frame where |
| 10:31:31 13 | her PT is potentially impacted by both Coumadin and Xarelto. |
| 10:31:35 14 | You can't know what contribution each drug has. |
| 10:31:40 15 | Q.   Then we have -- and I'll turn this to the jury -- but we |
| 10:31:44 16 | have a measurement on February 13th that's 26.2; is that right? |
| 10:31:49 17 | A.   Yes. |
| 10:31:49 18 | Q.   Dr. Herrin, is it your opinion that the 26.2 is affected |
| 10:32:00 19 | by the single dose of Coumadin? |
| 10:32:03 20 | A.   And her bleeding, and we can't know what contribution each |
| 10:32:06 21 | has. |
| 10:32:07 22 | Q.   Okay.  So it's your view that the single dose of |
| 10:32:13 23 | Coumadin -- |
| 10:32:14 24 | A.   I'm sorry.  I misunderstood what you said.  I thought you |
| 10:32:19 25 | were talking about Xarelto and bleeding. |

*OFFICIAL TRANSCRIPT*

10:32:21  1          No, that does of Coumadin, that's how many days

10:32:23  2  later?  Three weeks?  No, that's not affecting that PT.  No, I

10:32:27  3  didn't mean to say that (speaking simultaneously).

10:32:27  4  Q.    So the Coumadin didn't have anything to do with the 26.2?

10:32:33  5  A.    Not the 26.2.  That's unknown for a different reason.

10:32:39  6  Q.    For some reason other than Xarelto?

10:32:44  7  A.    Potentially, yes.

10:32:45  8  Q.    You stated in your direct examination with Mr. Sarver that

10:32:57  9  you're not aware of any guidelines in the U.S. regarding

10:33:11 10  measuring Xarelto; is that right?

10:33:15 11  A.    That tell you how to use PT for clinical management,

10:33:18 12  that's correct.

10:33:18 13  Q.    If we could take a look at Plaintiff's identification

10:33:22 14  number 5769427.

10:33:26 15  A.    Do you want me to hang on to this bleeding quartile

10:33:36 16  analysis?

10:33:37 17  Q.    I'll hand this to you.  You can set that aside.

10:33:49 18          Dr. Herrin, you recognize this as the American

10:33:51 19  Society of Hematology; is that correct?

10:33:54 20  A.    Yes.  That's correct.

10:33:54 21  Q.    February 24th is the date; is that right?

10:34:02 22  A.    Yes.

10:34:02 23  Q.    Then, if you will turn to the third page there.  It

10:34:19 24  states:  "Commonly available tests to assess for presence of

10:34:24 25  dabigatran" -- that's Pradaxa, right?

**OFFICIAL TRANSCRIPT**

10:34:27 1  A.   My third page was different than yours.  Hold on.  What

10:34:31 2  page did you want me on?  I'm sorry, where are you looking?

10:34:39 3  Q.   Right here.  This is the page.  "Commonly available tests

10:34:46 4  to assess for the presence of dabigatran" -- and that's

10:34:48 5  Pradaxa, right?

10:34:49 6  A.   Yes.

10:34:49 7  Q.   -- "are the aPTT, and for rivaroxaban, or Xarelto, the

10:34:56 8  PT"; is that right?

10:34:56 9  A.   Yes.

10:34:57 10  Q.   Again, that does not -- that's not specifying which

10:35:04 11  reagent is used there.  It's not specifying --

10:35:07 12  A.   It's not.

10:35:08 13  Q.   -- the Neoplastin?

10:35:09 14       Then, if you will --

10:35:10 15  A.   But -- were you relating this back to my opinion?  Because

10:35:17 16  it's important to note that this is talking about the presence

10:35:21 17  of the drug.  We've already agreed that there is some

10:35:24 18  correlation between elevation of PT and drug levels.

10:35:27 19       So certainly, if you -- the common sense conclusion

10:35:31 20  is that yes, you may be able to check presence, but the next

10:35:34 21  sentence is the key.  "The tests may be prolonged, but they do

10:35:40 22  not measure reliably the anticoagulant activity."

10:35:44 23  Q.   But with bleeding, you can still use PT, right?

10:35:48 24  A.   We've already said that you can use PT -- or that there is

10:35:52 25  some correlation between PT and drug level.

*OFFICIAL TRANSCRIPT*

10:35:56  1    What this says, is that if you want to know if the

10:35:58  2  drug is still on board, you may be able to use a PT to figure

10:36:02  3  that out.

10:36:02  4  Q.   All right.  If you will turn to the next page.

10:36:09  5    We see the diagram there at the bottom.  It has the

10:36:14  6  prolonged PT, rivaroxaban present and may be contributing to

10:36:21  7  bleed.  Do you see that, sir?

10:36:23  8  A.   Yes.

10:36:23  9  Q.   All right.  So is it your position that the American

10:36:30 10  Society of Hematology points outs that you can use the PT to

10:36:38 11  detect whether there is drug on board, or there is a presence,

10:36:42 12  even though that presence has no meaning?

10:36:47 13  A.   Let's not wrap up too much of what we said in one

10:36:52 14  sentence.  So presence of the drug may have meaning.  I've

10:36:56 15  never said that it doesn't.

10:36:57 16    What I've said, and what the guidelines support, and

10:37:00 17  what the FDA supports, and what the label supports, is that you

10:37:04 18  cannot use that information to make dosing decisions or to make

10:37:09 19  assumptions.

10:37:09 20    I mean, the guidelines also clearly say this doesn't

10:37:12 21  tell you anything about anticoagulant activity in the body.  It

10:37:16 22  simply tells you whether the drug is present or not.

10:37:20 23    These are -- these are helpful guidelines.  We give

10:37:24 24  them to our residents.  You know, if you've got a patient, and

10:37:27 25  you want to know is there rivaroxaban on board, you can check a

**OFFICIAL TRANSCRIPT**

10:37:30  1   PT.  If it's elevated, that's one of the possibilities.  That's

10:37:35  2   why I said it may tell you that.

10:37:37  3         There is also literature that shows a normal PT does

10:37:41  4   not rule out presence of the drug either.  So you couldn't make

10:37:44  5   the opposite assumption, well, the PT is normal, so that means

10:37:47  6   there is no drug on board.  So this is a rough guideline that

10:37:50  7   says exactly what it says, and doesn't mean anything more than

10:37:55  8   that.

10:37:55  9   Q.   Dr. Herrin, have you treated patients that have high

10:38:04 10   cholesterol?

10:38:06 11   A.   I don't treat cholesterol for a living, but, yes, I've

10:38:11 12   treated patients with high cholesterol.

10:38:12 13   Q.   You have patients that have high cholesterol, right?

10:38:15 14   A.   I'm sure I do.

10:38:16 15   Q.   Do you have patients that have high cholesterol that have

10:38:20 16   a heart attack, and patients that have high cholesterol that

10:38:23 17   don't have a heart attack?

10:38:24 18   A.   Yes, and patients with normal cholesterol that have a

10:38:28 19   heart attack, yes.

10:38:29 20   Q.   But you wouldn't conclude from that, that there is no

10:38:33 21   connection between high cholesterol and the risk of a heart

10:38:37 22   attack, would you, sir?

10:38:37 23   A.   I wouldn't make that conclusion at all because there is a

10:38:40 24   whole literature describing what the different ranges of

10:38:43 25   cholesterol contribute as far as risk factor.  There is no

*OFFICIAL TRANSCRIPT*

10:38:46  1    comparison with PT and clinical management of DOACs.

10:38:49  2    Q.   When you pointed that out, that there is -- that there is

10:38:55  3    no -- there is no therapeutic range, there is no cutoff, that's

10:39:00  4    important information, but you don't have it, right?

10:39:03  5    A.   Yes.  Then the Japanese, that article we just looked at,

10:39:08  6    they are looking at data.  This is not uncommon after a drug is

10:39:12  7    on the market, groups look at different aspects of the drug,

10:39:17  8    see if they can publish something.

10:39:17  9          It's interesting, if you look at the quartiles you

10:39:20 10    just gave me that we didn't quite get to, their cutoff of 20 is

10:39:25 11    lower second quartile.  That would affect of lot of people on

10:39:27 12    the drug.

10:39:28 13          That is simply not something that would impact my

10:39:32 14    clinical practice at this time.  There's going to be groups

10:39:34 15    that put out small studies, surely.

10:39:37 16    Q.   Dr. Herrin, in your research, in your reviewing the

10:39:41 17    medical literature, your reviewing the Xarelto label, you

10:39:47 18    didn't find any information about a cutoff or a therapeutic

10:39:50 19    range for Xarelto; is that right?

10:39:52 20    A.   There is no -- there is no guideline, there is no

10:39:55 21    literature that informs my practice on how you would dose

10:39:59 22    adjust Xarelto based on a lab number that would also ensure

10:40:05 23    that you maintain the therapeutic effect that you want.

10:40:09 24          Any time you diminish the dose of a drug, especially

10:40:13 25    an important one like this, that's preventing something that

*OFFICIAL TRANSCRIPT*

10:40:16 1    may kill you, you want to have a basis to do that.  Otherwise,

10:40:19 2    you're putting people at unnecessary risk of a really bad

10:40:22 3    outcome.  That literature doesn't --

10:40:25 4    Q.   So dose adjustment would be one option, but it's not your

10:40:31 5    only option, is it, Dr. Herrin?

10:40:33 6         If you had a patient that you identified through a

10:40:39 7    measure, PT Neoplastin, Factor Xa, you identified them in the

10:40:43 8    fourth quartile at an elevated risk, high levels of exposure,

10:40:49 9    one option would be to dose adjust.  The other option would be

10:40:53 10   to switch drugs, right?

10:40:55 11   A.   You could stop the drug and put them in danger, or you

10:40:58 12   could switch drugs, if you had reliable information to base

10:41:01 13   that decision on.

10:41:01 14   Q.   But I just want to make sure that we are perfectly clear

10:41:08 15   on this point.  You have found in the medical literature -- in

10:41:12 16   the Xarelto label, you have found no -- no guidelines, no

10:41:18 17   therapeutic range, no cutoff; is that right?

10:41:20 18   A.   There is nothing that says that you should dose adjust

10:41:26 19   based on this piece of information, and that's how we do

10:41:29 20   clinical practice.

10:41:29 21   Q.   I know that you read Dr. Lensing's deposition, right?

10:41:38 22   A.   Yes.

10:41:38 23   Q.   You have the trial testimony of Dr. Rinder; is that right?

10:41:45 24   A.   Yes.

10:41:45 25   Q.   Were you in court while Dr. Rinder was testifying?

*OFFICIAL TRANSCRIPT*

10:41:49  1    A.    No, I was seeing patients.

10:41:51  2    Q.    So did you read his testimony, or did somebody tell you

10:41:55  3    about it?  How did you get --

10:41:57  4    A.    I've read it.

10:41:58  5    Q.    Did you read the trial testimony of Dr. Theodore Spiro?

10:42:09  6    A.    I have not.

10:42:11  7    Q.    I want you to listen to the testimony of Dr. Theodore

10:42:17  8    Spiro, and tell me if this would impact your decision, your

10:42:20  9    opinions here.

10:42:20 10          MR. SARVER:  Your Honor, I'm going to object because of

10:42:22 11    the rule that we have regarding the reading of what purports to

10:42:26 12    be the transcript.  He can certainly say, this is what I think

10:42:32 13    it says.

10:42:33 14          THE COURT:  In any event, 703 allows him to use it on

10:42:39 15    an expert.

10:42:42 16          I'll let you do that.

10:42:42 17    EXAMINATION BY MR. BIRCHFIELD:

10:42:42 18    Q.    Yes, sir.  Assume that the testimony was the following of

10:42:48 19    Dr. Theodore Spiro:

10:42:50 20    A.    Who is Dr. Spiro?

10:42:51 21    Q.    You're not familiar with -- Dr. Spiro is the global

10:42:56 22    product director for Xarelto --

10:42:57 23    A.    No.

10:42:57 24    Q.    -- for Bayer?

10:42:59 25          "My simple question was:  Did you provide

*OFFICIAL TRANSCRIPT*

information -- or were you able to provide information to Yongling Lu related to a therapeutic plasma concentration range that could be given in the objective of Dr. Samama's paper for ISTH?

"ANSWER:  I don't remember if I gave it or not. Would it have been possible to give a therapeutic concentration range for the one approved indication?  Yes, it would have been.

"Okay.  And you don't believe the company has ever provided to clinicians a therapeutic plasma concentration range in any of their labeling or studies for the product, correct?

"ANSWER:  In the prescribing information in the United States, I do not believe there is a table showing estimated or measured plasma concentrations for the three approved doses available to clinicians.  In the publication -- in publications in the medical literature, we have provided that information, and it is present in those publications."

A.    May I read that?  I have trouble following that chain of discussion.

So this is Dr. Spiro being asked this question.

Q.    Would it help you to see it, Dr. Herrin?

A.    Well, you mean --

Q.    To see the testimony?

A.    Well, I think that's -- is that what I'm looking at?

Q.    Yes.

*OFFICIAL TRANSCRIPT*

10:44:42 1    A.    Are you asking me if I want it projected?

10:44:42 2    Q.    Yes.

10:44:48 3    A.    Sure, whatever you want to do.

10:44:53 4         MR. BIRCHFIELD:  At this point we'll play the portion

10:44:55 5    of Dr. Spiro's testimony.

10:44:55 6         THE WITNESS:  So the question is about whether

10:44:55 7    information was provided to Yongling Lu, and I don't know who

10:44:55 8    that is.

10:44:55 9    EXAMINATION BY MR. BIRCHFIELD:

10:45:15 10   Q.    My point, Dr. Herrin, is that Dr. Spiro, Dr. Theodore

10:45:19 11   Spiro, says that that information is available and it has been

10:45:22 12   published in the medical literature.  True?

10:45:30 13   A.    I'll tell you in just a minute.

10:45:54 14        So, may I summarize what I think I'm reading?

10:45:56 15   Because this is way out of context, not hearing the whole

10:45:59 16   discussion.

10:45:59 17        It looks like he's being asked about prescribing

10:46:02 18   information in the United States, if there is not a table

10:46:07 19   showing estimated or measured plasma concentrations for the

10:46:11 20   three approved doses, and then there is something that's

10:46:14 21   written in red, different -- I don't know how this works.

10:46:14 22   Q.    Okay.

10:46:19 23   A.    And then he goes on to say that in publications in the

10:46:22 24   medical literature, we have provided that information, and it

10:46:24 25   is present in those publications.

**OFFICIAL TRANSCRIPT**

10:46:27 1    Q.    Let's take a look, Dr. Herrin.

10:46:27 2            (WHEREUPON, at this point in the proceedings a video

10:46:30 3    clip was played as follows:)

10:46:37 4            "My simple question was:  Did you provide

10:46:48 5    information -- were you able to provide information to

10:46:51 6    Yongling Lu related to a therapeutic plasma concentration range

10:46:58 7    that could be given in the objective of Dr. Samama's paper for

10:47:01 8    ISTH?

10:47:02 9            "ANSWER:  I don't remember if I gave it or not.

10:47:10 10   Would it have been possible to give a therapeutic concentration

10:47:13 11   range for the one approved indication?  Yes, it would have

10:47:20 12   been.

10:47:24 13           "QUESTION:  Okay."

10:47:24 14           (WHEREUPON, at this point in the proceedings the video

10:47:24 15   clip concluded.)

10:47:25 16   EXAMINATION BY MR. BIRCHFIELD:

10:47:25 17   Q.    Does that help you?

10:47:29 18   A.    I'm not sure, because I'm not sure what the question is.

10:47:32 19           THE COURT:  What is the question?  Ask him the question

10:47:32 20   again.

10:47:32 21           THE WITNESS:  He talked about approved indication.

10:47:35 22   There's more.  I'm not following this.

10:47:36 23   EXAMINATION BY MR. BIRCHFIELD:

10:47:37 24   Q.    Dr. Spiro has testified that the therapeutic range, the

10:47:42 25   concentration range, is available in the medical literature,

*OFFICIAL TRANSCRIPT*

10:47:45  1   but it's not in the prescribing information for U.S. doctors.

10:47:49  2   Correct?  You heard that testimony?

10:47:52  3   A.   He said for one indication, though.  I don't even know

10:47:55  4   what this was referring to.  Because there was more than one

10:47:58  5   indication.

10:47:58  6   Q.   So, Dr. Herrin, let's shift gears for a moment.  When

10:48:02  7   Ms. Mingo was diagnosed with a DVT, you stated that she needed

10:48:09  8   anticoagulant therapy; is that right?

10:48:10  9   A.   Yes.

10:48:11 10   Q.   And you know that that's not a dispute, right?

10:48:15 11   A.   I would hope not, but...

10:48:18 12   Q.   When Mrs. Mingo was diagnosed with a DVT, what were the

10:48:27 13   options -- what were the options available for her treatment?

10:48:30 14   We know Xarelto, because she was prescribed Xarelto, right?

10:48:33 15   A.   Yes.  She could have been on Coumadin, but she would have

10:48:38 16   had to take Heparin or Lovenox along with that.

10:48:42 17   Q.   For a bridging to get her stable; is that right?

10:48:45 18   A.   Right.  Or she could have been left on Lovenox.  She could

10:48:48 19   have been put on Arixtra, one of the other DOACs.  There is

10:48:55 20   several options for anticoagulant therapy.

10:48:58 21   Q.   And you said *the other DOACs*.  That would be Eliquis,

10:48:58 22   right?

10:49:07 23   A.   Yes.  Pradaxa, Savaysa, yes.

10:49:12 24        She could have had an IVC filter placed with no

10:49:19 25   anticoagulation.  There are a lot of less good decisions that

**OFFICIAL TRANSCRIPT**

10:49:22  1   could have been made, but anticoagulation therapy is the first

10:49:24  2   choice in her situation.

10:49:25  3   Q.   So if we look at -- if we look at these options, has

10:49:32  4   Xarelto be shown to be superior to -- let's look at the other

10:49:37  5   DOACs.  Has it been shown to be superior to Eliquis?

10:49:40  6   A.   No.

10:49:41  7   Q.   Has it been shown to be superior to Pradaxa?

10:49:44  8   A.   No.

10:49:44  9   Q.   Has it been shown to be superior to Savaysa?

10:49:48 10   A.   No.  It hasn't been shown to be inferior or superior.

10:49:54 11   Q.   But of these options, of these options, just looking at

10:49:58 12   the DOACs, which one of these options has the greatest bleeding

10:50:02 13   risk?

10:50:06 14   A.   That's a complicated question because you have to take

10:50:09 15   into account -- we were about to have this discussion, I think,

10:50:12 16   earlier.

10:50:13 17           When you look at major bleeding, which is what I'm

10:50:16 18   going to discuss with a patient clinically, when I make my

10:50:20 19   clinical decision, you would have to do a head-to-head

10:50:24 20   comparison of these agents to be able to statistically validly

10:50:30 21   determine -- make that determination.

10:50:31 22   Q.   Okay.  And -- a head-to-head study, clinical trial, that

10:50:37 23   would be one way.  Another way would be to look at real world

10:50:43 24   epidemiology data, right?

10:50:44 25   A.   You can do that.  You can do retrospective review, but you

*OFFICIAL TRANSCRIPT*

10:50:47 1  always take into consideration, that's not as powerful a look

10:50:50 2  at data.

10:50:50 3  Q.    Let's take a look at the -- are you familiar with the Yao

10:50:59 4  article that was published in the American -- by the American

10:51:02 5  Heart Association and Stroke Association, sir?

10:51:06 6  A.    May I see it?  I don't -- I see so many papers.  I don't

10:51:11 7  memorize them all by name.

10:51:18 8  Q.    All right.  Are you -- let me ask you -- maybe we can

10:51:40 9  short-circuit this while we're looking for a copy.

10:51:42 10          Are you familiar with real world epidemiology that

10:51:45 11  shows that Eliquis has a lower bleeding risk than Xarelto?

10:51:55 12  A.    There are certain studies in certain populations where

10:51:58 13  that may be true.  You would have to sit down and look at all

10:52:01 14  of those numbers.  But that's a dangerous thing to do.  A

10:52:07 15  trial -- the data within a trial is supposed to be used within

10:52:09 16  that trial.

10:52:10 17          We wouldn't go back, for example, and say, let's look

10:52:13 18  at what happened to cancer patients treated 30 years ago with

10:52:17 19  Coumadin and the safety signals there, and then look at safety

10:52:21 20  signals from Xarelto now and make a comparison about what was

10:52:24 21  safer.  You wouldn't -- you wouldn't -- you don't do that.

10:52:28 22  Q.    All right.  Are you familiar with an article published by

10:52:34 23  Dr. David Graham?

10:52:37 24  A.    Not by name.  Do you have it?

10:52:39 25  Q.    Do you know that Dr. David Graham is an epidemiologist at

*OFFICIAL TRANSCRIPT*

10:52:46 1   the FDA?

10:52:46 2   A.   I don't know him.

10:52:47 3   Q.   Let's take a look at the document identified as 5767552.

10:53:02 4   And let's take a look at -- well, first of all, you see that

10:53:06 5   this is published in *JAMA*, *Internal Medicine*, *Journal of the*

10:53:13 6   *American Medical Association*; is that right?

10:53:14 7   A.   Yes.

10:53:15 8   Q.   And that's a peer-reviewed -- is that a peer-reviewed

10:53:19 9   journal, sir?

10:53:20 10  A.   Yes.  This is a subjournal of *JAMA*.  It's the one focused

10:53:30 11  on internal medicine, but yes, that's still true.

10:53:32 12  Q.   And then if you'll look at the conclusion and relevance

10:53:38 13  section here, sir.

10:53:38 14  A.   Yes.

10:53:41 15  Q.   "Treatment with rivaroxaban 20 milligrams once daily was

10:53:46 16  associated with statistically significant increases in ICH" --

10:53:50 17          That's intercranial hemorrhage; is that right?

10:53:53 18  A.   Yes.

10:53:53 19  Q.   -- "and major extracranial bleeding, including major

10:53:59 20  gastrointestinal bleeding compared with dabigatran

10:54:03 21  150 milligrams twice daily."

10:54:05 22  A.   Yes.

10:54:06 23  Q.   And dabigatran is Pradaxa, right?

10:54:10 24  A.   Yes.

10:54:11 25  Q.   So Xarelto had statistically increased number of major

*OFFICIAL TRANSCRIPT*

10:54:17  1   bleeding, including GI bleeding, versus Pradaxa, right?

10:54:22  2   A.    I've heard cardiologists discuss this.  We have journal

10:54:27  3   clubs and we talked to residents about data, and I've heard it

10:54:29  4   pointed out that they were higher CHADS scores in the

10:54:34  5   rivaroxaban population, which are riskier individuals.  I'm not

10:54:39  6   an expert on that.

10:54:40  7           The bottom line is that this is a different -- this

10:54:41  8   is not even the same set of patients that Ms. Mingo belongs to.

10:54:44  9   This is AFib data.  And she didn't have AFib.  And she wasn't

10:54:48 10   getting prevention.  She was getting treatment.

10:54:51 11   Q.    But in the AFib -- in the AFib clinical trials, they were

10:54:55 12   looking at the risk of bleeding, right?

10:54:57 13   A.    Yes.

10:54:57 14   Q.    And let's --

10:55:00 15   A.    But you can't compare those, because it's different

10:55:03 16   patient populations.

10:55:04 17   Q.    Let's take a look at the Peter Nosworthy article.  It is

10:55:12 18   5769434.

10:55:20 19           And do you see that this is an accepted manuscript.

10:55:25 20   Do you see *CHEST* there?

10:55:26 21   A.    Yes.

10:55:27 22   Q.    What is *CHEST*, sir?

10:55:31 23   A.    *CHEST* is a publication of the Association of Chest

10:55:37 24   Physicians.

10:55:37 25   Q.    And this was accepted on -- for publication on July 5,

*OFFICIAL TRANSCRIPT*

10:55:45  1    2016; is that right?

10:55:46  2    A.    That's correct.

10:55:46  3    Q.    And if you will turn to PDF page 3, and we look at -- in

10:55:56  4    the results, the results section there, sir.

10:56:00  5    A.    Yes.

10:56:01  6    Q.    And it says:  "Rivaroxaban was associated with increased

10:56:04  7    risk of major bleeding and intracranial bleeding compared to

10:56:10  8    dabigatran," compared to Pradaxa.  Is that right?

10:56:13  9    A.    That's what that says, yes.

10:56:18 10          This is more atrial fibrillation data, not DVT data.

10:56:22 11    Q.    Right.  I mean, the largest number of users of these DOACs

10:56:29 12    were for AFib, right?

10:56:30 13    A.    That's right.  And they use it for prevention, which is a

10:56:33 14    different disease process than when you have an activated

10:56:36 15    clotting system.

10:56:36 16    Q.    Right.  And if you want to get the most robust data on the

10:56:40 17    bleeding risk, you could get that from the AFib population

10:56:44 18    because it's a much higher number of people, right?

10:56:47 19    A.    Well, you have to dig deeper than that to know if it

10:56:50 20    applies.  You have to look at who those patients were.

10:56:53 21          For example, if you have one study that looks like it

10:56:55 22    shows a greater bleed risk than another study, but then you dig

10:56:58 23    into the study and you find out that on the study with more

10:57:02 24    bleeding there were older patients, sicker patients, patients

10:57:05 25    with poorer renal function.  That would potentially explain the

*OFFICIAL TRANSCRIPT*

10:57:09  1   differences that you found.  That's why you don't draw those

10:57:13  2   conclusions.  You only look at within the study where there are

10:57:19  3   statistical analyses that allow for head-to-head comparison.

10:57:24  4        It is true, and I see this with cancer drugs, with

10:57:28  5   anticoagulants, because safety is a big concern -- safety is

10:57:33  6   always a big concern, the pharmacological industry, the FDA,

10:57:39  7   everybody wants to make sure drugs are safe -- they do pooled

10:57:41  8   safety analyses to look for events, numbers of events, but then

10:57:45  9   you have to be careful going beyond that in drawing

10:57:48 10   conclusions.  They are looking for numbers of signals.

10:57:50 11   Q.   Let's take a look at Document Number 5769433.  And is this

10:57:57 12   an article by Steven Deitelzweig, 2007.

10:58:25 13        And if you take a look at this article, Doctor, this

10:58:27 14   is a comparison of the effectiveness and safety of treatment

10:58:31 15   with apixaban --

10:58:31 16        Now, that would be Eliquis, right?

10:58:34 17   A.   Yes.

10:58:34 18   Q.   -- versus other oral anticoagulants among elderly

10:58:38 19   nonvalvular atrial fibrillation patients.  Right?

10:58:41 20   A.   Yes.  Elderly atrial fibrillation patients.

10:58:43 21   Q.   Pardon?

10:58:44 22   A.   Elderly atrial fibrillation patients, yes.

10:58:49 23   Q.   So let's take a look at the conclusion section here, sir.

10:58:53 24   A.   What page are you on?

10:58:57 25   Q.   Page 4.

**OFFICIAL TRANSCRIPT**

10:59:07  1                    "In the real world setting, after controlling for

10:59:11  2      differences in patient characteristics, apixaban" -- or

10:59:14  3      Eliquis -- "is associated with significantly lower risk of

10:59:21  4      S/SE" --

10:59:23  5      A.    Where are you?

10:59:24  6      Q.    The conclusion section, sir.

10:59:29  7      A.    You said it was on page 4?

10:59:29  8      Q.    PDF 4.

10:59:32  9      A.    Page 3.

10:59:32 10      Q.    Can you see this, sir?

10:59:35 11      A.    Yes.

10:59:39 12      Q.    Stroke, systemic embolism; is that right?

10:59:43 13      A.    Yes.

10:59:43 14      Q.    -- "and MB" --

10:59:44 15                    That would be major bleeding, right?

10:59:46 16      A.    Yes.

10:59:47 17      Q.    -- "than rivaroxaban and warfarin, and a trend towards

10:59:52 18      better outcomes versus dabigatran among elderly nonvalvular

11:00:01 19      AFib patients in the U.S."

11:00:02 20      A.    Yes.

11:00:04 21                    MR. SARVER:  Your Honor, Rule 106.  Could we read the

11:00:06 22      next sentence?

11:00:07 23                    THE COURT:  Yes.  Let's do it.  What's the next

11:00:09 24      sentence?

11:00:11 25                    MR. BIRCHFIELD:  Pulling it up, Your Honor.

                                 *OFFICIAL TRANSCRIPT*

11:00:12 1    EXAMINATION BY MR. BIRCHFIELD:

11:00:17 2    Q.   "Keywords:  Elderly, nonvalvular atrial fibrillation, oral

11:00:25 3    anticoagulants, apixaban, rivaroxaban, dabigatran, warfarin,

11:00:28 4    effectiveness, safety."

11:00:29 5          MR. SARVER:  That's not the next sentence.

11:00:29 6          THE COURT:  What is the next sentence?

11:00:32 7          MR. SARVER:  The next sentence is:  "Further evaluation

11:00:33 8    with longer time frames and/or based on other data sources may

11:00:38 9    be needed to validate the findings of this study."

11:00:42 10         THE COURT:  Okay.

11:00:42 11         MR. BIRCHFIELD:  Where are you reading?

11:00:46 12         THE WITNESS:  I would point out, again, that this is an

11:00:49 13   atrial fibrillation study; that is this a retrospective

11:00:52 14   analysis.

11:00:52 15         I was just looking in a sentence here that:

11:00:55 16   "There are no direct comparisons of the DOACs in randomized

11:00:58 17   control trials, and only a few in the real world setting."

11:01:02 18         So what they did was look back at different

11:01:04 19   populations, different studies and draw potential conclusions

11:01:08 20   that merit further investigation, but that investigation has

11:01:12 21   not been done.  And it's not even Ms. Mingo's patient

11:01:16 22   population.

11:01:16 23         THE COURT:  Let's get to a breaking point and we'll

11:01:18 24   take a break when you can.

11:01:20 25         Go ahead.

**OFFICIAL TRANSCRIPT**

11:01:20 1          MR. BIRCHFIELD:  Just two questions and I'll be at a

11:01:23 2     good breaking place.

11:01:24 3          THE COURT:  Okay.

11:01:24 4     EXAMINATION BY MR. BIRCHFIELD:

11:01:26 5     Q.   Dr. Herrin, if a doctor is making a decision about which

11:01:30 6     one of these treatment options to prescribe, knowing which one

11:01:36 7     has a greater bleeding risk should be information that the

11:01:41 8     doctor should take into account, right?

11:01:45 9     A.   I'm not --

11:01:46 10    Q.   As a doctor, you're making a decision, which one of these

11:01:50 11    treatments do you -- do you want to use with a particular

11:01:54 12    patient?  Wouldn't you want to know which one is most effective

11:01:58 13    and which one has the greatest bleeding risk?

11:02:00 14    A.   If you can show me a randomized controlled trial that

11:02:05 15    answers that question, that's the one I'll use.

11:02:07 16         MR. BIRCHFIELD:  This is a good place.

11:02:09 17         THE COURT:  Okay.  Let's take a break at this time.

11:02:12 18    Court will stand in recess for ten minutes.

11:02:15 19         THE DEPUTY CLERK:  All rise.

11:02:18 20         (WHEREUPON, at 11:02 a.m. the jury panel leaves the

11:02:18 21    courtroom and then a brief recess was taken.)

11:02:18 22         (WHEREUPON, at 11:12 a.m., the jury panel enters the

11:13:17 23    courtroom.)

11:13:17 24         THE COURT:  Be seated, please.

11:13:22 25              We have to pick up the pace, folks.  The jury

*OFFICIAL TRANSCRIPT*

11:13:24  1   expects this case to be finished, from the standpoint of the

11:13:29  2   evidence, today.  We've got to do better than we're doing.

11:13:29  3         MR. BIRCHFIELD:  Just a few more issues, Your Honor.

11:13:31  4   EXAMINATION BY MR. BIRCHFIELD:

11:13:32  5   Q.   I want to clear up one thing.  In regards to Ms. Mingo

11:13:36  6   having a DVT, she did not have a DVT while she was taking

11:13:40  7   Lovenox, did she, sir?

11:13:43  8   A.   We don't know that.  The imaging came later.  We don't

11:13:46  9   know when the clot formed.

11:13:48 10         They have to get to a certain size before they cause

11:13:51 11   symptoms.  In fact, some DVTs don't cause symptoms at all.  So

11:13:54 12   we simply don't know that.

11:13:56 13   Q.   You talked to Mr. Sarver about the FDA approving Xarelto

11:14:01 14   as safe and effective, do you recall that?

11:14:04 15   A.   They approved the drug for use in those indications that

11:14:06 16   they listed.

11:14:07 17   Q.   All right.  You also said that the FDA has never said to

11:14:12 18   add language about the PT test; is that right?

11:14:17 19   A.   I believe what I said was the FDA has not required that

11:14:20 20   that -- and they exert a lot of control over the label.  They

11:14:24 21   have to approve the label that goes out, because they are all

11:14:27 22   about safety and protection of patients.

11:14:29 23   Q.   So, Dr. Herrin, when you made that statement, was it your

11:14:32 24   understanding of the law that the FDA controls what's in the

11:14:37 25   label, as opposed to the company?

*OFFICIAL TRANSCRIPT*

11:14:39 1   A.   I don't know what the law is.  I'm not a legal scholar.

11:14:43 2   But it's common knowledge to those of us in practice that the

11:14:47 3   FDA exerts considerable influence over what's in the label, and

11:14:50 4   certainly they have the final word on how a drug is approved.

11:14:53 5   Q.   Okay.  As far as the FDA approval process and when the FDA

11:14:58 6   approves a drug as safe and effective, you understand that the

11:15:04 7   FDA is looking at a standard, minimum standard of being safe

11:15:11 8   and effective against a placebo, right?

11:15:14 9        MR. SARVER:  No.  Objection, Your Honor.  That's

11:15:17 10  utterly, utterly wrong.  He's just stating the law wrong.

11:15:20 11       MR. BIRCHFIELD:  No, that's not wrong.

11:15:20 12       THE COURT:  Do you know anything about that, anyway?

11:15:22 13       THE WITNESS:  Just general knowledge that every

11:15:25 14  physician would know.  But there is plenty of drugs that are

11:15:28 15  compared to something besides placebo.

11:15:31 16        I don't think that can be right, your statement,

11:15:32 17  but I'm not a lawyer.

11:15:34 18  EXAMINATION BY MR. BIRCHFIELD:

11:15:36 19  Q.   Do you know the standard that the FDA applies when it

11:15:38 20  determines safe and effective?

11:15:39 21  A.   No.  Their standards change because each drug requires a

11:15:43 22  different approach.  I don't know what their regulation says,

11:15:45 23  no.

11:15:46 24  Q.   Dr. Herrin, you read the testimony of Dr. Lensing; is that

11:15:54 25  right?

*OFFICIAL TRANSCRIPT*

11:15:54 1    A.    Yes.

11:15:55 2    Q.    Dr. Lensing, in his testimony, he described the efficacy

11:16:05 3    curve as being flat.  Do you recall that?

11:16:07 4    A.    Just to make sure I'm referencing the right thing, when

11:16:11 5    you say testimony, is that his deposition?

11:16:14 6          THE COURT:  Yes.

11:16:14 7    EXAMINATION BY MR. BIRCHFIELD:

11:16:15 8    Q.    You said that you read his deposition, right?

11:16:18 9    A.    Yes.

11:16:18 10   Q.    In his deposition, he testified that the efficacy curve

11:16:24 11   for Xarelto in the EINSTEIN study is flat.  Do you recall that?

11:16:31 12   A.    I don't recall that specifically.

11:16:32 13   Q.    He described the efficacy curve as being flat, but yet the

11:16:38 14   risk of bleeding would go up with the level of concentration,

11:16:42 15   right?

11:16:44 16   A.    I don't specifically recall that, no.

11:16:44 17   Q.    You don't recall that part?

11:16:46 18         MR. BIRCHFIELD:  Objection, Your Honor.  This isn't

11:16:48 19   what we recall, either.

11:16:50 20   EXAMINATION BY MR. BIRCHFIELD:

11:16:51 21   Q.    All right.  So if the jury heard testimony from

11:16:56 22   Dr. Lensing, if the jury heard testimony from Dr. Lensing that

11:17:01 23   the efficacy curve was flat, but the risk of bleeding increased

11:17:05 24   with the level of concentration, that would be counter to your

11:17:09 25   opinions in the case, right?

                              *OFFICIAL TRANSCRIPT*

11:17:11  1    A.    If he said that the efficacy curve was flat, meaning what?

11:17:18  2    Q.    Well, if the efficacy curve is flat --

11:17:21  3    A.    I'd have to know what he meant.

11:17:21  4    Q.    -- meaning that you don't get any better treatment, you

11:17:23  5    don't get any greater efficacy with a higher dosage of the

11:17:28  6    drug, a higher concentration of the drug?

11:17:31  7    A.    Was he talking about preclinical dose finding studies when

11:17:34  8    they went all the way up to 80 milligrams?  I mean, there would

11:17:37  9    have to be some context for me to know how to interpret that.

11:17:41 10    Q.    But it's your opinion that the concentration level has

11:17:43 11    nothing to do with an increased bleeding risk?

11:17:45 12    A.    The concentration level cannot reliably be used to predict

11:17:50 13    bleeding risk.

11:17:50 14    Q.    Dr. Herrin, when you're looking at the data for Xarelto,

11:18:00 15    did you see information about interpatient variability?

11:18:06 16    A.    There is interpatient variability in every trial with

11:18:10 17    every patient.  What are you specifically talking about?

11:18:13 18    Q.    Are you aware that the variability for Xarelto measured at

11:18:17 19    trough is tenfold or greater?

11:18:19 20    A.    Are we talking PT, drug level?  What are you talking

11:18:22 21    about?

11:18:22 22    Q.    However you measure it.  PT?

11:18:26 23    A.    Well, interpatient variability could be age.  It could be

11:18:28 24    where they were from.  So I don't know what you're asking, so I

11:18:31 25    can't answer it.

*OFFICIAL TRANSCRIPT*

11:18:31  1    Q.    So if you are -- if you are evaluating the response of a

11:18:38  2    patient to Xarelto, and you measure the level of

11:18:42  3    concentration -- whether it's by PT, Factor Xa, regardless of

11:18:47  4    how you measure it -- and you measure one patient, you measure

11:18:51  5    another patient, and you measure another patient, that you may

11:18:57  6    have a tenfold difference between patient one and patient two.

11:19:01  7    A.    So you're talking about drug levels?  Because you also

11:19:05  8    said effect on the patient, and those aren't the same thing.

11:19:07  9    I've got to be clear on that.

11:19:09 10          But if you're specifically talking about drug levels,

11:19:11 11    it is true that the same dose in this patient would not give

11:19:15 12    you the same exact drug level at the same exact time as another

11:19:21 13    patient.  If it did, that would be coincidence.  You wouldn't

11:19:25 14    expect that with any medication.

11:19:26 15    Q.    From your review of the data, you understand that the

11:19:30 16    variability, the interpatient variability for Xarelto is higher

11:19:34 17    than the interpatient variability for Eliquis and Pradaxa,

11:19:34 18    right?

11:19:40 19    A.    I haven't compared that.  You're talking about the drug

11:19:42 20    levels?

11:19:42 21    Q.    Yes.

11:19:43 22    A.    Serum drug levels?  Plasma concentration?

11:19:43 23    Q.    Yes.

11:19:48 24    A.    If you show me that, I'll look at it and see if I agree.

11:19:52 25    Q.    You haven't looked at that?

*OFFICIAL TRANSCRIPT*

11:19:53  1    A.    I hadn't looked at drug levels and compared them with

11:19:58  2    each, no.

11:19:58  3    Q.    Dr. Herrin, when you were approached by Bayer and Janssen

11:20:06  4    to serve as an expert witness for them in this case, did you

11:20:13  5    ask why?

11:20:15  6    A.    No.

11:20:16  7    Q.    You know that Bayer and Janssen have had scientists that

11:20:24  8    have worked on this drug for years, right?

11:20:29  9    A.    I'm sure that's true.

11:20:31 10    Q.    You know that Bayer and Janssen, that they have used

11:20:38 11    doctors -- they've hired doctors in the United States to

11:20:41 12    participate in the clinical trials of this drug, right?

11:20:49 13    A.    Clinical trials are usually voluntary that doctors

11:20:54 14    participate.  I'm not sure that's a correct statement to say

11:20:57 15    that doctors were hired to participate in clinical trials.

11:21:00 16          But if I can -- I didn't quite finish my answer to

11:21:02 17    your earlier question.  You asked if they -- if I asked why

11:21:06 18    when they first approached me, and the answer is no.

11:21:09 19          What I was about to say is that I first wanted to

11:21:12 20    draw my own conclusions, as I have in every other case that I

11:21:16 21    have reviewed, so all I asked for initially was the lab values.

11:21:22 22    I wanted to look at those, see what I saw in there.

11:21:24 23          Then I asked for medical records and reviewed those.

11:21:27 24    Then I asked, you know, what is it that you want from me

11:21:31 25    specifically production-wise?  They asked for an expert review

*OFFICIAL TRANSCRIPT*

1  of her medical case and an opinion about Dr. Rinder's expert

2  testimony.

3  Q.    One of the opinions that you offered in this case on

4  behalf of the defendants is that anticoagulants like Xarelto do

5  not cause blood loss or anemia, right?

6  A.    That's correct.

7  Q.    So you're saying that Xarelto does not cause, it doesn't

8  cause GI bleeding -- it doesn't cause a GI bleed?

9  A.    Causation, there has to be an anatomic source.  So Xarelto

10 does not cause ulcers to happen.  Xarelto doesn't cause kidney

11 stones to happen.

12       But if there is something there that has a propensity

13 to bleed, any anticoagulant certainly can make that worse.

14 Sometimes -- sometimes we're sloppy with our language and say

15 that that's a cause, but that's not truly the underlying

16 pathology.

17 Q.    I want to -- one of the things that you reviewed, that you

18 listed on your reference list, was the January 2015 product

19 label --

20 A.    Yes.

21 Q.    -- is that right?

22       MR. BIRCHFIELD:  Your Honor, we have multiple versions.

23 I'm not sure if this one is actually in.

24       MR. SARVER:  We don't object to any of the them,

25 Your Honor.

**OFFICIAL TRANSCRIPT**

11:22:56  1            THE COURT:  Okay.

11:22:58  2  EXAMINATION BY MR. BIRCHFIELD:

11:23:02  3  Q.   Dr. Herrin, if you'll take a look at the product label

11:23:08  4  there on the first page, under the warnings and precautions

11:23:12  5  section.  Do you see that, sir?

11:23:15  6  A.   Yes.

11:23:16  7  Q.   On the right-hand page, I'm sorry, up at the top, where it

11:23:26  8  states:  "Risk of bleeding.  Xarelto can cause serious and

11:23:36  9  fatal bleeding."  Do you see that, sir?

11:23:39 10  A.   I was looking at the lower warnings and precautions.

11:23:43 11  Number 5.  You're looking higher.

11:23:44 12            Yes, I see that.

11:23:48 13  Q.   Then if you will turn to PDF 8, section 5.2 of the label.

11:24:01 14  It states:  "Xarelto increases the risk of bleeding and can

11:24:06 15  cause serious or fatal bleeding."  Do you see that, sir?

11:24:13 16  A.   I do.  That's a simple language different.  If you

11:24:20 17  actually look at medical, sight of bleeding, then there is a

11:24:27 18  different issue with whether the anticoagulant caused the

11:24:31 19  bleeding to start or whether it exacerbated bleeding.  I mean,

11:24:37 20  it's a language difference.

11:24:38 21  Q.   Then, sir, on the product label, you're familiar with the

11:24:45 22  section for contraindications, right?

11:24:47 23  A.   Yes.

11:24:47 24  Q.   Okay.  The contraindications, that is a section where you

11:24:53 25  put times when the drug should not be prescribed, right?

*OFFICIAL TRANSCRIPT*

11:24:59  1    A.    Well, there is relative and absolute contraindications.

11:25:04  2    So contraindications tell you things that you better look at

11:25:06  3    before you prescribe the drug, not necessarily that you

11:25:09  4    shouldn't.

11:25:09  5    Q.    Sir, there is no contraindication for Xarelto and aspirin

11:25:16  6    use, is there, sir?

11:25:17  7    A.    Well, you'd have to be careful with that.  There are

11:25:20  8    patients who need their aspirin.

11:25:22  9           Aspirin works on the clotting system differently.

11:25:25 10    Aspirin affects platelets.  Coumadin, Xarelto, most of the

11:25:29 11    other drugs affect the coagulation cascade side.

11:25:34 12           The reason that distinction is very important is that

11:25:36 13    it is platelet activation that drives most strokes and heart

11:25:41 14    attacks.  Now, there is a little difference in atrial

11:25:44 15    fibrillation because it's actually blood that's pooling around

11:25:47 16    the edge.  It acts more like venous clotting.  But for many

11:25:51 17    strokes and heart attacks, it's platelets that are driving that

11:25:53 18    process.

11:25:54 19           These anticoagulants are not very protective against

11:25:59 20    strokes that aren't related to atrial fibrillation and against

11:26:03 21    heart attacks, just like aspirin is not very effective against

11:26:07 22    preventing deep vein thrombosis or pulmonary embolism.  They

11:26:12 23    act differently.

11:26:13 24           THE COURT:  Just a moment, Doctor.  That's not his

11:26:15 25    question.

11:26:15  1          Rephrase the question.

11:26:17  2          THE WITNESS:  Can I answer his question?

11:26:18  3          THE COURT:  Well, you can answer the question, but, I

11:26:20  4    mean, you're telling us other things.  He's asking you one

11:26:23  5    thing, and you're answering --

11:26:25  6          THE WITNESS:  I'm sorry, I thought I was answering it.

11:26:27  7    I thought I was.

11:26:28  8    EXAMINATION BY MR. BIRCHFIELD:

11:26:29  9    Q.    Dr. Herrin, aspirin use is not contraindicated in the

11:26:31 10    Xarelto label, is it, sir?

11:26:33 11    A.    No, and it shouldn't be.  It should just be warned about,

11:26:38 12    which it is.

11:26:38 13    Q.    If the company determined that aspirin should not be used

11:26:42 14    with Xarelto, they could put that in the contraindications

11:26:47 15    section, couldn't they, sir?

11:26:48 16    A.    If there were an absolute determination, surely.

11:26:51 17    Q.    You're aware that the patient population that takes

11:26:55 18    Xarelto across all of these indications are a -- there is a

11:27:02 19    high prevalence of aspirin use among that patient population,

11:27:05 20    right?

11:27:06 21    A.    Yes, and even more so in AFib.

11:27:12 22          THE COURT:  Anything further?

11:27:14 23          MR. BIRCHFIELD:  Just two more questions, Your Honor.

11:27:14 24    EXAMINATION BY MR. BIRCHFIELD:

11:27:17 25    Q.    One of the opinions that you offered is that "PT does not

**OFFICIAL TRANSCRIPT**

11:27:19  1    provide a reliable measure whatsoever of the amount of exposure

11:27:25  2    to Xarelto in any given patient or at any given point in time

11:27:30  3    during his/her anticoagulation therapy," right?

11:27:32  4    A.    Yes.

11:27:32  5    Q.    Dr. Herrin, did you consider that you were retained to be

11:27:39  6    an expert because you're taking positions that the company or

11:27:43  7    its scientists cannot take?

11:27:45  8    A.    I did not consider that.  That's why I looked at the

11:27:47  9    records first.

11:27:48 10          MR. BIRCHFIELD:  Thank you, Your Honor.

11:27:50 11          THE COURT:  Any redirect?

11:27:50 12          MR. SARVER:  Yes, Your Honor.

11:27:55 13                We will finish up before lunch.

11:27:55 14                      REDIRECT EXAMINATION

11:27:55 15    BY MR. SARVER:

11:28:00 16    Q.    Dr. Herrin, I'm going to start with the last question that

11:28:03 17    Mr. Birchfield asked you.  When you were asked to become an

11:28:07 18    expert to tell the jury what the science is, what was the first

11:28:11 19    thing you asked to do?

11:28:13 20    A.    If I could review the lab records, and then the medical

11:28:16 21    records.

11:28:17 22    Q.    When you reviewed the records, did you tell whoever asked

11:28:21 23    you to get involved that you were going to form your

11:28:24 24    independent opinion, and whatever it was, it was?

11:28:28 25    A.    Yes.  I've done that that way every time.  As my old

                         *OFFICIAL TRANSCRIPT*

11:28:33 1   mentor said -- the first time I was approached, and I asked

11:28:36 2   him, is this something you've done, yes, but you do it

11:28:39 3   carefully because you can only lose your credibility one time.

11:28:42 4          So I've always asked to look at the records myself

11:28:45 5   before I have a conversation with the lawyers about their take

11:28:49 6   on the case.

11:28:50 7   Q.   The chips fall where they may?

11:28:55 8   A.   Yes.  This is the first time I've ever made it this far.

11:28:58 9   Q.   Now, Mr. Birchfield asked you about someone with a

11:29:05 10  deep vein thrombosis and the treatment options, correct?

11:29:07 11  A.   Yes.

11:29:07 12  Q.   You probably can't see, but I want the jury to.  There are

11:29:13 13  a number of treatment options; is that fair?

11:29:14 14  A.   That's fair.

11:29:16 15  Q.   In Ms. Mingo's case, with her 6-millimeter oozing ulcer,

11:29:24 16  would her result have been different, to a reasonable degree of

11:29:28 17  medical certainty, with any of these anticoagulants?

11:29:34 18  A.   No.

11:29:35 19        MR. BIRCHFIELD:  Your Honor, there is no basis for

11:29:36 20  that.  We have been down this road multiple times.  I think,

11:29:40 21  now that that bell has been rung, I'm going to need to address

11:29:44 22  that with him.

11:29:45 23        MR. SARVER:  Your Honor, he brought it up.  I'm doing

11:29:47 24  redirect.

11:29:48 25        THE COURT:  Well, yes, but that was a whole different

*OFFICIAL TRANSCRIPT*

11:29:52 1    kind of question.

11:29:54 2    EXAMINATION BY MR. SARVER:

11:29:55 3    Q.   Mr. Birchfield also brought up part of the integrated

11:30:00 4    analysis.

11:30:02 5          Jim Hoy, I'm talking about Defense Exhibit 6080,

11:30:08 6    page 596.  Can you bring that up for us?

11:30:14 7          This is part of that quartile analysis we've talked

11:30:16 8    about for a while.

11:30:17 9    A.   Uh-huh (affirmative response).

11:30:17 10   Q.   I'd like to talk a little bit about what Mr. Birchfield

11:30:21 11   showed the jury, and ask you a couple of questions about it.

11:30:32 12         Thank you, sir.  I realize I'm having you go all

11:30:39 13   around, Jim.  Thanks a lot.

11:30:40 14         Do you remember Mr. Birchfield showing you this

11:30:43 15   chart?

11:30:43 16   A.   I think we looked at it.  I'm not sure we asked questions

11:30:46 17   on it.  We went on to something else.

11:30:48 18   Q.   All right.  Well, let's take a look at -- why don't we go

11:30:54 19   to PT Neoplastin, day 15, trough.  Shall we?

11:31:02 20   A.   Sure.

11:31:02 21   Q.   If we look at the third and fourth quartile, which one is

11:31:06 22   higher?

11:31:07 23   A.   They are the same.

11:31:07 24   Q.   They are basically the same.  One is slightly higher than

11:31:11 25   the other, but, in terms of science, they are the same?

*OFFICIAL TRANSCRIPT*

11:31:14  1    A.    They are the same.

11:31:14  2    Q.    Do these PT values that Mr. Birchfield showed you on this

11:31:20  3    screen tell you anything, allow you to predict bleeding for a

11:31:26  4    patient or for a population based on PT?

11:31:28  5    A.    They do not.

11:31:29  6    Q.    Would you ever use that in your medical practice?

11:31:32  7    A.    No, because you would endanger patients if you made

11:31:36  8    decisions based on a number that doesn't actually measure

11:31:41  9    something valid.

11:31:43 10    Q.    If we go -- and I think it's the next page.  I won't go to

11:31:47 11    it.  But you recall the discussion that we had this morning

11:31:50 12    regarding the PT levels for patients who didn't bleed?

11:31:54 13    A.    Yes.

11:31:54 14    Q.    We compared that with the patients who did have major

11:31:59 15    bleeds.  Which PT's were higher?

11:32:02 16    A.    The ones who did not bleed had higher PT's in that

11:32:06 17    comparison.

11:32:06 18    Q.    Now, Mr. Birchfield showed you part of a document from the

11:32:17 19    American Society of Hematology.  Do you recall that?

11:32:20 20    A.    I do.

11:32:21 21    Q.    Do you have that in front of you?

11:32:22 22    A.    I do.

11:32:23 23    Q.    I'm going to try the Elmo.  You know I'm bad at it, but

11:32:31 24    I'm going to try.

11:32:36 25            Is this the document that you were shown by

**OFFICIAL TRANSCRIPT**

11:32:38   1    Mr. Birchfield?

11:32:40   2    A.    It is.

11:32:40   3    Q.    All right.  I would like to read the whole first paragraph

11:32:44   4    here.  "Commonly available tests to assess the presence of

11:32:50   5    dabigatran are the aPTT and, for rivaroxaban, the PT.  These

11:32:56   6    tests may be prolonged when dabigatran and rivaroxaban are used

11:33:03   7    at recommended doses, but they do not reliably measure the

11:33:06   8    anticoagulant activity."  Do you see that?

11:33:07   9    A.    Yes.

11:33:08   10   Q.    Is that what you've been telling us all day?

11:33:11   11   A.    Yes.

11:33:11   12   Q.    Is this guideline in any way at odds with your testimony?

11:33:15   13   A.    No.

11:33:15   14   Q.    Now, you mentioned that if a clinician like yourself were

11:33:29   15   to base a clinical decision on a laboratory test, this number,

11:33:36   16   this PT, or this Factor Xa assay, there could be bad things

11:33:42   17   that happen to the patient; is that fair?

11:33:44   18   A.    There could, yes.

11:33:47   19   Q.    The jury has heard this.  There has been testimony from a

11:33:54   20   witness in this case who actually was one of the authors of

11:33:58   21   this article.  The title of the article is *The Danger of*

11:34:03   22   *Relying on the aPTT and the PT in Patients on DOAC Therapy, a*

11:34:09   23   *Potential Patient Safety Issue*.  Do you agree?

11:34:12   24   A.    I do agree.

11:34:13   25   Q.    Why?

**OFFICIAL TRANSCRIPT**

A.   The reason we don't do it -- you can look at it at least
two different ways.  As I mentioned earlier, if you make an
assumption about a normal PT, you may endanger the patient
because they could still have drug levels, they could still
have drug in their system.

          The converse is true.  If you made judgments about
dosing based on an elevated PT, which is not valid to look at
anticoagulation effect, you would think, well, gosh, this PT is
high, so that must mean I need to decrease the dose of
medication.  You wouldn't do that, because you would then put
that patient at increased risk of having whatever event you
started the drug to protect them from.

Q.   In Ms. Mingo's case, was that event, what you're trying to
protect her from, is dying from a pulmonary embolism caused by
her DVT?

A.   Absolutely.

Q.   Is that -- I mean, are you willing to accept, and must you
accept, some risk of bleeding if you want to prevent that
outcome?

A.   Yes.  That's why we look at major bleeding, and not all
other bleeding, when we're looking at risk factors.

Q.   If we look at the article that is on the poster, Defense
Exhibit 2451, at page 2, internal page 38.

          MR. BIRCHFIELD:  Your Honor, I didn't go there.  I
didn't go to this article in my cross-examination.  We have

*OFFICIAL TRANSCRIPT*

11:35:50  1   been limited to articles and documents that were brought up in

11:35:54  2   cross.  This is outside the scope.

11:35:55  3           THE COURT:  Well, it's not outside the scope when he

11:35:59  4   talks about the exact same things that you were talking about.

11:36:03  5   So I overrule that objection.

11:36:07  6   EXAMINATION BY MR. SARVER:

11:36:07  7   Q.   Are you ready, sir?  In fact, if you've got it, I'll put

11:36:12  8   it up on the Elmo.  I'm happy to do it.

11:36:18  9           First, I'm going to show you the title page -- try

11:36:23 10   to.  Here we are.  Is this the same article that is up on the

11:36:32 11   chart in front of the jury?

11:36:33 12   A.   Yes, it is.  Yes, it is.

11:36:35 13   Q.   If we take a look at the abstract, do you see that these

11:36:44 14   authors have written -- and I'd like you to follow me,

11:36:49 15   beginning with the sentence, "as DOACs."  Do you see that?

11:36:49 16   A.   Yes.

11:36:54 17   Q.   "As DOACs are becoming more commonly used, the need to

11:36:58 18   educate clinical colleagues regarding this paradigm shift,

11:37:03 19   specifically the lack of clinical utility of the aPTT and the

11:37:07 20   PT in patients on DOACs, is paramount."  Do you agree with

11:37:12 21   that?

11:37:12 22   A.   Yes, I do.

11:37:13 23   Q.   You were asked some questions about Dr. Lensing.  Do you

11:37:20 24   remember that?

11:37:20 25   A.   Yes.

*OFFICIAL TRANSCRIPT*

11:37:21 1    Q.    Do you remember that at a point in time in that

11:37:25 2    deposition, Dr. Lensing got fairly animated, and do you

11:37:30 3    remember him saying, "I hope to God nobody uses that PT to

11:37:36 4    predict bleeding risk"?

11:37:38 5    A.    Yes.

11:37:38 6    Q.    Do you agree with him?

11:37:39 7    A.    Yes, I do.

11:37:40 8    Q.    Now, Mr. Birchfield showed you some literature that talked

11:37:49 9    about the various performances of the different NOACs.  Do you

11:37:56 10   remember that?

11:37:56 11   A.    I do.

11:37:56 12   Q.    First, has there ever been a head-to-head clinical trial

11:38:01 13   that allows anyone to make a valid comparison about the

11:38:06 14   effectiveness or the safety of the different NOACs as they

11:38:10 15   relate to each other?

11:38:11 16   A.    There has not been, and that's important before you draw

11:38:18 17   conclusions.

11:38:18 18   Q.    Now --

11:38:19 19   A.    I'm not sure I did a great job of illustrating why, but --

11:38:19 20   Q.    Tell us why.

11:38:25 21   A.    -- may I spend a second on that?

11:38:27 22   Q.    Please.

11:38:28 23   A.    So to leave medicine for a moment, this is the exact

11:38:31 24   analogy that I use with medical students when I'm talking about

11:38:34 25   why you have to have all the data, and why you can't

*OFFICIAL TRANSCRIPT*

11:38:37  1   cross-compare studies.

11:38:38  2           Let's say your only question was which car is the

11:38:42  3   safest.  You looked at the total number of accidents -- or are

11:38:46  4   cars safe?  You looked the total number of accidents.

11:38:49  5           Then the question was, which car is safest?  You

11:38:52  6   looked at the number of accidents each car had.  Then you

11:38:56  7   looked back at industry data and their performance testing.

11:39:00  8           Let's say there was a signal that -- we'll just make

11:39:03  9   up something -- that Fords had twice as many wrecks in this

11:39:06 10   data than some other car.  You would draw a conclusion from

11:39:09 11   that.

11:39:10 12           But then if you looked further, and you saw that

11:39:13 13   every accident the Ford was in, or every testing that was done

11:39:16 14   on it involved rainy weather and wet roads.  Then you would

11:39:21 15   say, oh, wait a minute, that's no longer a valid assumption.

11:39:25 16           You have to have all the data, and it truly needs to

11:39:28 17   be head to head for you to actually compare those pieces of

11:39:32 18   information.

11:39:32 19   Q.   Has that ever been done with the different NOACs, Xarelto,

11:39:37 20   Eliquis, Pradaxa, Savaysa?

11:39:40 21   A.   It has not.

11:39:41 22   Q.   Now, have you heard the word "cherry-picking," do you know

11:39:47 23   what that means?

11:39:47 24   A.   I do know what that means.

11:39:49 25   Q.   Do you know that there are other studies that

*OFFICIAL TRANSCRIPT*

11:39:52 1   Mr. Birchfield didn't talk to you about that showed the

11:39:57 2   opposite of what he was saying?

11:39:58 3   A.   Yes.  This is not uncommon in the literature, debate back

11:40:03 4   and forth.

11:40:04 5   Q.   We could go on for a while, but let me show you one,

11:40:09 6   Defense Exhibit 1374, an article from 2016 written by a

11:40:15 7   Dr. Ellis and others.

11:40:21 8        I'm going to show you a copy.

11:40:23 9        MR. SARVER:  May I bring him a copy, Your Honor?

11:40:23 10        THE COURT:  Yes.

11:40:27 11        MR. SARVER:  Should I use the Elmo, Jim?

11:40:31 12        MR. HOY:  No, I'm ready.

11:40:33 13   EXAMINATION BY MR. SARVER:

11:40:34 14   Q.   Take your time.  Have you had an opportunity to

11:40:36 15   familiarize yourself with Defense Exhibit 1374?

11:40:40 16   A.   I've run across this article before.

11:40:42 17   Q.   Okay.  Does this article support the contentions that

11:40:46 18   Mr. Birchfield was saying that somehow another NOAC performs

11:40:51 19   better than rivaroxaban?

11:40:52 20   A.   No, it does not.

11:40:54 21   Q.   In fact, does it show the opposite?

11:40:55 22   A.   Yes.

11:40:55 23   Q.   Do we actually have a chart on page 3 of 5 that is

11:41:04 24   something that we can look at fairly quickly to determine what

11:41:08 25   this article shows?

11:41:09  1    A.    Yes.

11:41:10  2    Q.    Now, I want to be fair.  This is not definitive that

11:41:17  3    Eliquis is not as good as Xarelto, is it?

11:41:19  4    A.    It's not.

11:41:20  5    Q.    It's just one study that goes a different way than what

11:41:23  6    Mr. Birchfield said?

11:41:24  7    A.    That's correct.

11:41:24  8    Q.    Let's take a look.  What do we see here, Doctor?

11:41:27  9    A.    Are you looking at the table or the graphs at the bottom?

11:41:30 10    Q.    I'm looking at the table because I think it's kind of the

11:41:32 11    easiest way to get a gist of what's going on.

11:41:35 12    A.    So you're looking at bleeding events per 100 patient

11:41:39 13    years.

11:41:39 14    Q.    If we look at these bars, are the bars showing more

11:41:45 15    bleeding events if the bar is higher?

11:41:47 16    A.    Yes.

11:41:51 17          For the jury, that doesn't mean -- 100 patient years

11:41:55 18    means that if you add up the amount of time each individual in

11:41:57 19    an analysis was on Coumadin.  So if you had five patients that

11:42:04 20    were all took Coumadin for 20 years, that's 100 patient years.

11:42:07 21          THE COURT:  Let's not get too far in the weeds,

11:42:10 22    Counsel.

11:42:11 23          MR. SARVER:  I'm sorry.

11:42:11 24    EXAMINATION BY MR. SARVER:

11:42:11 25    Q.    Let me just ask the question.  Does this article show that

*OFFICIAL TRANSCRIPT*

11:42:14 1    Xarelto did better than other NOACs in safety and efficacy?

11:42:18 2    A.    Yes.

11:42:24 3    Q.    Has there actually been something called a *meta-analysis*

11:42:29 4    that looked at all of the existing literature to determine

11:42:34 5    whether or not you could make a comparison between the

11:42:39 6    different NOACs?

11:42:40 7    A.    That's what a meta-analysis does is compiles all that

11:42:45 8    information.

11:42:45 9    Q.    Are you familiar with a meta-analysis published in 2016 by

11:42:52 10   Dr. He?

11:42:56 11   A.    Yes.

11:42:56 12   Q.    It's Defense Exhibit 1521.

11:43:05 13          Now, Doctor, without going into a lot of detail, does

11:43:09 14   this article, this meta-analysis, go the other direction and

11:43:14 15   show that rivaroxaban does well in comparison to the other

11:43:18 16   NOACs?

11:43:18 17   A.    Yes, it does.

11:43:20 18   Q.    Now, Doctor --

11:43:22 19          We can take that down, Jim.

11:43:24 20          -- do you prescribe Xarelto for your patients?

11:43:30 21   A.    I do.

11:43:30 22   Q.    Do you monitor those Xarelto patients for PT or Factor Xa?

11:43:35 23   A.    I do not because it's not helpful to guide what I'm going

11:43:38 24   to do with the doses.

11:43:39 25   Q.    Could it potentially be harmful?

***OFFICIAL TRANSCRIPT***

| | |
|---|---|
| 11:43:41  1 | A.    Yes, it could. |
| 11:43:43  2 | Q.    Has anything that the plaintiff lawyer has talked to you |
| 11:43:47  3 | about in any way swayed your opinion on how to treat your |
| 11:43:50  4 | patients? |
| 11:43:51  5 | A.    No, not at the bedside, no. |
| 11:43:55  6 | MR. SARVER:  Thank you, Your Honor. |
| 11:43:55  7 | MR. BIRCHFIELD:  Your Honor, may I have two minutes to |
| 11:43:57  8 | address this issue? |
| 11:43:57  9 | THE COURT:  Well, but that's your chart.  I mean, you |
| 11:43:59 10 | put the chart up, and you asked him questions about it.  You |
| 11:44:02 11 | put all those things on the chart. |
| 11:44:05 12 | It's your chart that he redirected on. |
| 11:44:09 13 | MR. BIRCHFIELD:  It's a different issue, Your Honor. |
| 11:44:11 14 | THE COURT:  I'm going to exercise my position and say |
| 11:44:15 15 | no.  You're finished, Doctor.  Thank you very much. |
| 11:44:19 16 | We'll stop here, and we'll come back. |
| 11:44:21 17 | Let me see counsel at the sidebar about |
| 11:44:25 18 | logistics.  I don't need this on the record. |
| 11:44:28 19 | Thank you, Doctor.  You're excused. |
| 11:44:50 20 | (WHEREUPON, at this point in the proceedings, there was |
| 11:44:50 21 | a conference held at the bench outside the presence of the |
| 11:45:25 22 | court reporter.) |
| 11:45:25 23 | THE COURT:  Okay, Members of the Jury, the attorneys |
| 11:45:28 24 | tell me that the -- |
| 11:45:33 25 | Well, let me ask.  Any rebuttal from the plaintiffs? |

*OFFICIAL TRANSCRIPT*

```
11:45:34  1        MR. BIRCHFIELD:  No, Your Honor.
11:45:35  2        THE COURT:  So the plaintiffs rest.
11:45:39  3            So the defendants rest?
11:45:40  4        MR. SARVER:  Except for the documents.
11:45:43  5        THE COURT:  Except for the documents, and we'll go into
11:45:44  6    that.  The defendants rest.
11:45:46  7            So the parties have rested, Members of the Jury.
11:45:50  8    What we're going to do now, I have some work to do with the
11:45:53  9    lawyers.  Tomorrow, we're going to come back and give the
11:45:58 10    summation.  The witnesses and the evidence is in for you, but
11:46:04 11    now they have an opportunity to sum up to you, to tell you how
11:46:09 12    they see the case, to draw your attention to various aspects of
11:46:15 13    the case.  We'll do that.
11:46:18 14            The plaintiff opens the summation, followed by
11:46:22 15    the defendant, and then the plaintiff closes the summation.
11:46:25 16    The reason for that is the plaintiff has the burden of proof,
11:46:28 17    so the law gives them two opportunities to address you.
11:46:32 18            After that, I'll have an opportunity to discuss
11:46:35 19    the law applicable to the case.  Then you'll be able to
11:46:41 20    deliberate.  We should be finished all of this probably
11:46:43 21    noontime, and then you can begin your deliberations.
11:46:47 22            So, again, we'll stop here.  We'll give you an
11:46:54 23    afternoon off.  You've worked very hard on it, and you deserve
11:46:58 24    an afternoon off.  But we have some work to do on the jury
11:47:02 25    charges.
```

***OFFICIAL TRANSCRIPT***

11:47:03  1          What I do is I have been receiving from the

11:47:07  2     parties various suggestions on the law applicable.  We've

11:47:11  3     researched the law ourselves and given to them a draft of a

11:47:17  4     jury charge.  I'll get their input, and eventually I'll get to

11:47:21  5     a draft that I'm comfortable with, and I'll tell them that

11:47:25  6     that's the draft that you're going to see, that I'm going to

11:47:28  7     present to you all.  They'll have an opportunity to make any

11:47:32  8     objections to it.  Then we'll begin with the closing arguments.

11:47:35  9          So we have to work this afternoon and maybe

11:47:38  10    tonight, but you all don't have to.  So we'll see you tomorrow

11:47:43  11    at 8:30.

11:47:44  12         Again, don't look at anything or read anything.

11:47:46  13    We're almost there, folks, so hang in there.

11:47:49  14         Court will stand in recess at this time from the

11:47:52  15    standpoint of the jury.

11:47:55  16     (WHEREUPON, at 11:47 a.m., the jury panel leaves the

11:47:55  17    courtroom.)

11:48:23  18         THE COURT:  Be seated, please.

11:48:23  19         So the jury is outside of the courtroom.  With

11:48:26  20    the consent of both sides, we have some issues on admission of

11:48:29  21    various evidence.  I'll hear from the parties at this time.

11:48:29  22         You're excused.  Thank you, Doctor, for your

11:48:34  23    time.

11:48:34  24         MR. SARVER:  Your Honor, Dr. Herrin is excused?

11:48:36  25         THE COURT:  Yes.

                          *OFFICIAL TRANSCRIPT*

11:48:37 1      MS. PRUITT:  Your Honor, we have a stipulation that all

11:48:42 2  the medical records are authenticated and admissible, but we

11:48:46 3  need to formally move in Defense Exhibit Mingo 14, Defense

11:48:51 4  Exhibit Mingo 20, Defense Exhibit Mingo 21, Defense Exhibit

11:48:58 5  Mingo 23, Defense Exhibit Mingo 28, Defense Exhibit Mingo 31A,

11:49:09 6  Defense Exhibit Mingo 31B, Defense Exhibit Mingo 35.

11:49:15 7      Then one document that Mr. Sarver failed to move

11:49:22 8  in is Defense Exhibit 6009 that was used with Mr. Shah.

11:49:34 9      THE COURT:  Andy, have you had a chance to look at

11:49:36 10 those?

11:49:37 11     MR. BIRCHFIELD:  No.

11:49:38 12     MS. PRUITT:  I showed Mr. Birchfield all the medical

11:49:42 13 records.  I just received an e-mail that 6009 is not in yet, so

11:49:52 14 I'm handing it to him.

11:49:55 15     MR. BIRCHFIELD:  I know it was used, Your Honor.  I

11:49:59 16 don't have an objection.

11:50:00 17     THE COURT:  Okay, let those documents be admitted then.

11:50:03 18     MS. PRUITT:  Thank you, Your Honor.

11:50:05 19     THE COURT:  Both sides, check with Dean to make sure

11:50:10 20 the exhibits are in the form and fashion that you wish them to

11:50:10 21 be in.

11:50:15 22     Anything from you, Andy?

11:50:17 23     MR. BIRCHFIELD:  No, Your Honor.

11:50:28 24     The label that we discussed with Dr. Herrin is

11:50:35 25 the January 2015 edition, and I just want to make sure that

*OFFICIAL TRANSCRIPT*

11:50:40 1    that's in.

11:50:42 2           THE COURT:  I'll admit that if it's not.

11:50:45 3           MR. SARVER:  No objection, Your Honor.

11:50:46 4           MR. OVERHOLTZ:  Also, Your Honor, there was an exhibit

11:50:49 5    that was introduced by Mr. Honnold during the testimony of

11:50:52 6    Mr. Wu, he introduced erroneously as Exhibit 19.  It was

11:50:59 7    Plaintiff's Exhibit 5503934.  That should have been admitted as

11:51:04 8    Plaintiff's Exhibit 94.

11:51:08 9           There were also three other of those series of

11:51:12 10   exhibits that were shown to Mr. Wu, Plaintiff's Exhibit 23 --

11:51:17 11   I'm sorry, Plaintiff's Exhibit 106224, Plaintiff's

11:51:21 12   Exhibit 2371986, and Plaintiff's Exhibit 5503973.  We would

11:51:30 13   move those four exhibits in as 94A, B, C and D.

11:51:36 14          THE COURT:  Rick, did you see those?

11:51:38 15          MR. SARVER:  No, Your Honor.  I'm going to need a

11:51:39 16   minute to look at them first.

11:51:39 17          MR. MEUNIER:  When do you want to see the lawyers about

11:51:51 18   the jury charges?

11:51:51 19          THE COURT:  Why don't we do it at 1:15.  Would that

11:51:59 20   give you all a chance to have lunch and talk to me about it?

11:52:07 21          MR. BONEY:  Yes, Your Honor, that's fine.

11:52:07 22          THE COURT:  Are you all right with that, Lindsey?

11:52:07 23          MR. BONEY:  Yes, sir, Your Honor.  That's fine.

11:52:11 24          Your Honor, Lindsey Boney for the defendants.

11:52:12 25   Just want to make clear that at this time, at the close of all

*OFFICIAL TRANSCRIPT*

11:52:15 1    of the evidence in this case, the Defendants make a Rule 50

11:52:18 2    motion.

11:52:18 3            THE COURT:  Right.

11:52:18 4            MR. BONEY:  As we've done before, Your Honor, we would

11:52:20 5    ask for your permission to consider our motion filed as now.

11:52:23 6    We'll file written papers on the record and request argument at

11:52:26 7    the appropriate time at the Court's convenience.

11:52:28 8            THE COURT:  It's my understanding that it's agreeable

11:52:30 9    to both sides that I do that, so I'll do it.

11:52:31 10           MR. BONEY:  Yes, sir, Your Honor.  Thank you very much.

11:52:35 11           MR. SARVER:  I can help on two of them.  94A and B, we

11:52:40 12   do not have an objection to.

11:52:41 13               94C and D, we do have objections to.  It's based

11:52:46 14   on the nature of the document being an individual patient

11:52:52 15   report, which ordinarily would not come into evidence in a case

11:52:55 16   involving a different patient.

11:52:59 17           MR. HONNOLD:  Your Honor, the best I can say, without

11:53:02 18   going back to the transcript, that was in the series of the

11:53:06 19   bleeding questionnaires.  I thought they were all parallel and

11:53:11 20   equivalent documents.  They were all shown on the Elmo with

11:53:15 21   Dr. Wu and discussed in detail.  It was a sequence of the

11:53:17 22   questionnaires that showed the PTs.  I just failed to offer

11:53:21 23   those two.

11:53:22 24           MR. OVERHOLTZ:  I believe, Your Honor, you actually

11:53:24 25   admitted 94C as Exhibit 19, subject to redaction of any

*OFFICIAL TRANSCRIPT*

11:53:28  1  personal information under HIPAA rules.

11:53:30  2      MR. SARVER:  If I didn't object properly at the time,

11:53:34  3  it's my fault.  But at this point, we do object to a document

11:53:37  4  that reflects a bleeding event on a different patient.

11:53:40  5  Certainly, the idea of using it as a demonstrative for notice

11:53:46  6  for Dr. Wu is fine, but to admit it itself -- and then there's

11:53:51  7  other issues for that patient that aren't appropriate for this

11:53:53  8  case.

11:53:54  9      MR. HONNOLD:  I'm not sure that I understand the

11:53:55 10  objection.  If there's individual patient information in terms

11:53:58 11  of identity that needs to come out, it's no different than the

11:54:01 12  other documents that have been admitted.

11:54:02 13      MR. SARVER:  It's a trial within a trial, Your Honor.

11:54:05 14  Why did this person bleed?  Do we need to know more about that?

11:54:08 15      THE COURT:  I think the point's made.  I don't see any

11:54:14 16  reason.  Do you have any problem with not putting in those,

11:54:20 17  when you've got everything else in?

11:54:21 18      MR. HONNOLD:  No.  I just think in terms of

11:54:26 19  pharmacovigilance work, in that the additional evidence of

11:54:28 20  note, it's just important to have in the ones we went through

11:54:31 21  Dr. Wu.

11:54:32 22      MR. SARVER:  We don't object to notice, Your Honor.

11:54:34 23  That can be done with a demonstrative.

11:54:36 24      THE COURT:  I'll overrule the objection, provided you

11:54:39 25  take out all the material that's necessary with HIPAA.

*OFFICIAL TRANSCRIPT*

11:54:43  1      MR. LONGER:  Your Honor, excuse me, just for

11:54:45  2  clarification.  Fred Longer.  Do you want to have the Rule 50

11:54:49  3  motion when we return from lunch?

11:54:53  4      THE COURT:  How about the parties?  What is your view?

11:54:55  5  I really don't care one way or the other.

11:54:57  6      MR. GLICKSTEIN:  Whichever is best for Your Honor.  Do

11:55:02  7  you want to get some food in your tummy?

11:55:04  8      THE COURT:  Let's do that later.  I want you all to

11:55:09  9  have enough time to look at the jury charges.  That's the next

11:55:15 10  step, the jury charges.  That's important to me.

11:55:17 11      MR. GLICKSTEIN:  Yes, sir.  Agreed.

11:55:17 12      THE COURT:  Court will stand in recess until 1:15.

11:55:22 13      THE DEPUTY CLERK:  All rise.

         14      (WHEREUPON, at 11:55 a.m., the Court was in luncheon

         15  recess.)

         16                    *   *   *

         17

         18              REPORTER'S CERTIFICATE

         19      I, Cathy Pepper, Certified Realtime Reporter, Registered
             Merit Reporter, Certified Court Reporter in and for the State
         20  of Louisiana, Official Court Reporter for the United States
             District Court, Eastern District of Louisiana, do hereby
         21  certify that the foregoing is a true and correct transcript to
             the best of my ability and understanding from the record of the
         22  proceedings in the above-entitled and numbered matter.

         23              s/Cathy Pepper
                         Cathy Pepper, CRR, RMR, CCR
         24              Certified Realtime Reporter
                         Registered Merit Reporter
         25              Official Court Reporter
                         United States District Court
                         Cathy_Pepper@laed.uscourts.gov

                         *OFFICIAL TRANSCRIPT*