UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF MISSISSIPPI


IN RE:  XARELTO (RIVAROXABAN)  *
PRODUCTS LIABILITY LITIGATION  *     Docket No. 14-MD-2592
                               *
                               *     Section L
THIS DOCUMENT RELATES TO:      *
                               *     Jackson, Mississippi
*Dora Mingo, et al.*           *
*v. Janssen Research &*         *     August 17, 2017
*Development, LLC, et. al.,*    *
Case No. 15-CV-3469            *
                               *
*  *  *  *  *  *  *  *  *  *  *  *  *  *  *


VOLUME IX – AFTERNOON SESSION
TRANSCRIPT OF JURY TRIAL BEFORE
THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE


<u>Appearances</u>:


For the Plaintiffs:          Beasley Allen Crow Methvin
                                Portis & Miles, PC
                             BY:  ANDY BIRCHFIELD, ESQ.
                             Post Office Box 4160
                             Montgomery, Alabama 36103


For the Plaintiffs:          Gainsburgh Benjamin David
                                Meunier & Warshauer, LLC
                             BY:  GERALD E. MEUNIER, ESQ.
                             1100 Poydras Street, Suite 2800
                             New Orleans, Louisiana 70163


For the Plaintiffs:          Gainsburgh Benjamin David
                                Meunier & Warshauer, LLC
                             BY:  WALTER C. MORRISON IV, ESQ.
                             240 Trace Colony Park Drive
                             Suite 100
                             Ridgeland, Mississippi 39157

Appearances:

| | |
|---|---|
| For the Plaintiffs: | Goza & Honnold, LLC<br>BY:  BRADLEY D. HONNOLD, ESQ.<br>11181 Overbrook Road, Suite 200<br>Leawood, Kansas 66211 |
| For the Plaintiffs: | The Lambert Firm, PLC<br>BY:  EMILY C. JEFFCOTT, ESQ.<br>701 Magazine Street<br>New Orleans, Louisiana 70130 |
| For the Plaintiffs: | Levin Sedran & Berman<br>BY:  FRED S. LONGER, ESQ.<br>510 Walnut Street, Suite 500<br>Philadelphia, Pennsylvania 19106 |
| For Bayer Healthcare<br>Pharmaceuticals, Inc.<br>and Bayer Pharma AG: | Mitchell Williams Selig Gates<br>  & Woodyard, PLLC<br>BY:  LYN P. PRUITT, ESQ.<br>425 W. Capitol Avenue<br>Suite 1800<br>Little Rock, Arkansas 72201 |
| For Bayer Healthcare<br>Pharmaceuticals, Inc.<br>and Bayer Pharma AG: | Watkins & Eager, PLLC<br>BY:  WALTER T. JOHNSON, ESQ.<br>400 East Capitol Street<br>Jackson, Mississippi 39201 |
| For Bayer Healthcare<br>Pharmaceuticals, Inc.<br>and Bayer Pharma AG: | Bradley Arant Boult Cummings<br>BY:  LINDSEY C. BONEY IV, ESQ.<br>1819 5th Avenue N<br>Birmingham, Alabama 35203 |
| For Janssen Pharmaceuticals,<br>Inc. and Janssen Research<br>& Development, LLC: | Barrasso Usdin Kupperman Freeman<br>  & Sarver, LLC<br>BY:  RICHARD E. SARVER, ESQ.<br>909 Poydras Street, Suite 2400<br>New Orleans, Louisiana 70112 |

Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                500 Poydras Street, Room B-275
                                New Orleans, Louisiana 70130
                                (504) 589-7778


Proceedings recorded by mechanical stenography, transcript
produced by computer.

1                            <u>**AFTERNOON SESSION**</u>

2                           **(August 17, 2017)**

3         **THE COURT:**  Be seated, please.

4               The jury is outside of the courtroom.  The

5 parties have timely filed Rule 50 motions.  As I understand it,

6 they want to argue it now.

7               Do you want to supplement it with written

8 papers, or have you already done that?

9         **MR. BONEY:**  Yes, sir, Your Honor.  This is Lindsey

10 Boney for the record.

11               Just to be clear, Your Honor, we filed

12 previously -- I think it was yesterday -- our Rule 50 motions

13 at the close of the plaintiff's case.  And now the defense, at

14 the close of evidence -- we have renewed that motion again,

15 Rule 50, at the close of evidence.  We are going to, if

16 Your Honor permits, file those papers at the end of today or at

17 some point today.

18         **THE COURT:**  Okay.

19         **MR. BONEY:**  Your Honor, one housekeeping bit on that

20 is that we have filed a motion and two supporting briefs.

21              Additionally, we have made a motion at the close

22 of the evidence for plaintiff's punitive damages claim.  The

23 parties, though, Your Honor, have agreed that the Court can

24 defer ruling on that until such time as the punitive damages

25 question becomes ripe under the Mississippi statute that the

01:21

1    Court is applying.

2                    So at this time, Your Honor, we will just stand

3    on our papers for most of the arguments that we've made, but we

4    would like to highlight two arguments for the Court now.

5              **THE COURT:**  That's fine.

6              **MR. BONEY:**  Mr. Glickstein will argue.

7              **THE COURT:**  Okay.

8              **MR. LONGER:**  Your Honor, Fred Longer.  Just

9    housekeeping matters to your point initially.  This morning

10   plaintiffs filed written papers.  They are at docket numbers

11   7378 and 7379.  The defendants' moving papers are at docket

12   numbers 7361 and 7362.

13             **THE COURT:**  Okay.  Steve, do you want to start the

14   argument?

15             **MR. GLICKSTEIN:**  Yes, sir.  Steven Glickstein for the

16   defendants.

17                    Your Honor, there are two aspects of our Rule 50

18   motion that we would like to bring to your attention.  One has

19   to do with the lack of specific causation evidence relating to

20   the plaintiff's design defect claim, and that's the

21   anti-factor Xa claim.

22                    The second has to do with the legal significance

23   of Ms. Mingo's testimony that the language on the medication

24   guide that she received from the pharmacy was sufficient to

25   advise her of risks of the drug such that she would not take

it.

Let me deal with the anti-factor Xa first.  We all know that there is both general causation and specific causation.  You can have all the testimony in the world on liability, and you can have all the testimony in the world on general causation, but if you don't link it up to the specific plaintiff's case, you are out.

In this case we've gone through seven days of the plaintiff's case, we've now completed the defense case, and there has not been one question, not one single question asked on specific causation relating to anti-factor Xa.  We've heard a lot about PT.  They asked Dr. Rinder about PT.  They asked Dr. Jordon about PT.  But no question, not a single one, about whether the absence of an anti-factor Xa assay made any difference in Ms. Mingo's case, whether it would have altered her treatment or care, or whether it would have avoided her injuries.

So this is going to be a little bit different from some of the motions that Your Honor has considered where we look at the sufficiency of the evidence and try and decide whether there's a scintilla or a kernel or a peppercorn or whatever the standard is.  There's no scintilla, there's no peppercorn, there's no kernel, zero, because the question was not asked; and because the question wasn't asked, there's no answer from which the jury can find specific causation.

01:24

1        Here is how the testimony went:  The plaintiffs
2   had three generic experts:  Dr. Parisian, Dr. Plunkett, and
3   Mr. Gosselin.  All of them explicitly disclaim having any
4   case-specific opinion regarding Ms. Mingo, and we quoted that
5   testimony in the brief that we sent to Your Honor.  In fact,
6   Mr. Gosselin said, famously, "Who is Ms. Mingo?"  And I think
7   you can take the first five days of the testimony that the
8   plaintiffs presented in this case, and there was not one word
9   linking anything -- PT or anti-factor assay -- to her injury.
10        So then we came to Monday, and the plaintiffs
11   presented Dr. Rinder and Dr. Jordon.
12        Let me just, if I may, hand up another copy of
13   our brief because we reproduced the testimony in full.  I'm
14   directing His Honor's attention to pages 3 and 4 of our brief.
15   This is for the plaintiffs.
16        You will see, Your Honor, at the top of page 3,
17   we quote the generic experts, all of whom disclaim
18   case-specific opinions, and then we turn to Dr. Rinder.  And if
19   you look at the Q&A, the question that was asked of
20   Mr. Birchfield, if I recall correctly, who did the exam, was:
21        "Dr. Rinder, if there were information in the
22   Xarelto label about the usefulness of PT in circumstances like
23   this, would you have expected a different course of treatment
24   by her health providers here?"
25        There was an objection.  Your Honor permitted the

1    answer, and he answered:

2            "If that data is in the label and doctors know that a

3    prothrombin time" -- that's PT -- and then he goes on with his

4    answer.

5            So we can debate whether that answer is

6    sufficient for the purposes of specific causation on the PT

7    claim.  And in our Rule 50 motion, we say it isn't, but for

8    purposes of what we are dealing here, that tells you nothing

9    about anti-factor Xa.  There's nothing in the question, nothing

10   in that answer that has specific causation relating to the

11   assay.  And if we go back, we will recall that the PT is the

12   warnings claim and the anti-factor Xa is the design defect

13   claim.  So that's Dr. Rinder.

14           So then if you turn to the next page,

15   Your Honor, page 4, we have Dr. Jordon's testimony.

16   Dr. Jordon, of course, was the prescribing physician.

17   Mr. Morrison questioned Dr. Jordon.

18           And to put these questions and answers in some

19   context, anti-factor Xa was not mentioned once during the

20   entirety of Dr. Jordon's testimony.  It wasn't raised on

21   direct; it wasn't raised on cross; it wasn't raised on

22   redirect.  PT was all over the record.  I think we counted up

23   33 mentions, 24 times in the questioning of the plaintiffs.

24           And again, the questioning is directed to PT.

25   And sometimes they use other words which are linked to PT, such

01:29

1    as Coumadin or warfarin, because we know that PT testing is

2    used in that.  There's no testimony in the record about

3    anti-factor Xa and Coumadin where they talk about anticoagulant

4    effect.  Your Honor has heard from both plaintiff's and

5    defendants' experts that anticoagulant effect is what PT

6    measures.  Concentration levels are what anti-factor Xa

7    addresses.

8            So when you go through all of the testimony of

9    Dr. Jordon, once again, the question is not even asked what

10   would have happened in Ms. Mingo's case had there been

11   anti-factor Xa assay.  So this is literally a case of not

12   whether, you know, some evidence is enough evidence.  This is

13   really a zero, nothing, nada, zilch evidence case, and it can't

14   go to the jury.  It just can't go to the jury like that.

15           And I have to say that nobody could believe it's

16   an accident that those questions were not asked of Dr. Rinder

17   or of Dr. Jordon.

18           We've got on this side of the bar no shortage of

19   very talented, smart, legal people.  Three are at the table

20   now -- Lenny, Fred, and Jerry -- but they've got Mr. Overholtz

21   also and Mr. Birchfield and Ms. Jeffcott and Mr. Honnold and

22   Mr. Barr.

23           You can bet that if Dr. Rinder could have

24   answered the question, "Doctor, what would have happened in

25   Ms. Mingo's case if there was an anti-factor Xa assay?" they

01:31

1    would have asked it.  He would have answered it.  They didn't

2    ask it because they weren't going to get it.

3                The same thing with Dr. Jordon.  If they thought

4    they could get testimony from Dr. Jordon by asking the

5    question, they would have asked the question, but they didn't.

6                So if this were a normal case, if we weren't in

7    an MDL bellwether, I don't think anyone could submit this case

8    to the jury.  There's just no specific causation evidence.

9                Now, I want to address what I think is the

10   800-pound gorilla in the room, which is should we let it go to

11   the case [sic] because it is an MDL case.

12               And I know that Your Honor has on occasion -- we

13   did this with lost chance, we've talked about it with punitive

14   damages -- is of the point of view:  I want to put the question

15   to the jury.  If there's no evidence, I can fix it afterwards.

16   If I don't submit it to the jury and the Fifth Circuit

17   disagrees with me, they could at least reinstate the verdict.

18               I would say that's not the right thing to do

19   here and it's not the right thing to do from an MDL management

20   point of view.  We've got 19,000 cases, and they all assert

21   these design defect, anti-factor Xa claims.  We are now through

22   our third bellwether trial.  And in the first bellwether trial,

23   we, the defendants, spent an enormous amount of resources in

24   *Boudreaux*, preparing and working up a design defect claim, and

25   it was dropped on the eve of the trial.

01:33

1     In the second case, *Orr*, we spent an enormous
2     amount of time and resources working up a design defect claim.
3     It was dropped on the eve of the trial.
4     Here we spent an enormous amount of time and
5     resources working up a design defect claim, and they took it to
6     trial, and they didn't ask a specific causation question.
7     From a case management standpoint, we just can't
8     have 19,000 cases hanging out there with design defect claims
9     if the plaintiffs are not willing to come into court and prove
10    that that design defect claim relates to their plaintiff.
11    I think it's important for the management of
12    these cases that plaintiff lawyers know that if you're going to
13    assert the claim, you've got to prove the claim.  If you can't
14    prove the claim, you shouldn't assert the claim.
15    I might also say that from the perspective of
16    case management, these trials, as Your Honor knows, are long
17    enough, and Your Honor has understandably at times become
18    impatient.  We have all lost patience.  The jury is losing some
19    patience.  We don't need two or three extra days of anti-factor
20    assay liability testimony clogging up these cases if you are
21    not going to ask a specific causation question.
22    Again, I don't think it was "Oops, we forgot."
23    If they had it, they would have asked for it.
24    Now, to put it maybe a little different way, if
25    we were in a situation where Your Honor had issued a *Lone Pine*

01:35

1    order and said, "You know what?  Nobody is going to proceed

2    unless they have some expert who is willing to say that there

3    was a link between anti-factor Xa and the plaintiff's case,"

4    and somebody didn't put it in a declaration, Your Honor would

5    say, "They are out."

6              You have patience; you give them a chance.  But

7    we are at trial.  This is their chance.  I can't imagine why

8    the plaintiff would fare better in a court case, jury trial,

9    than they would in a *Lone Pine* situation when they don't do

10   that.

11             Finally, I just want to talk about the prejudice

12   to the defense of having to close on a case and to argue a case

13   and have the jury talking about anti-factor Xa when it doesn't

14   really belong here.  It's a distraction.  We all know that

15   pharmaceutical cases are warnings cases quintessentially, and I

16   think this trial proved it.

17             For all these reasons, Your Honor, I think in

18   this situation -- I know Your Honor has been reluctant to grant

19   Rule 50 motions, but the evidence just isn't here to proceed.

20   I can't see a circumstance when the question wasn't asked that

21   the court of appeals could possibly second-guess Your Honor for

22   granting the motion.

23             **THE COURT:**  Let me hear you folks.

24             **MR. LONGER:**  Your Honor, hearing Mr. Glickstein's

25   arguments, I'm reminded of Charles Dickens, the *Tale of Two*

01:37

1    *Cities,* where "[i]t was the best of times" and "[i]t was the

2    worst of times."  For Steve, it's the worst of times; and for

3    ourselves, it's the best of times.

4              I strongly disagree with Mr. Glickstein's

5    characterization of the testimony and the evidence in the trial

6    to date.  I think that the plaintiffs have more than adequately

7    met our burden and established our design defect claim.

8              With all due respect to Mr. Glickstein, I don't

9    think that the Court or the plaintiffs need to be told how to

10   try a design defect claim, and I don't believe that this is a

11   case management conference.  I think this is a trial.  We are

12   here on a Rule 50 motion to see whether or not there's enough

13   evidence that a reasonable juror could find on behalf of the

14   plaintiffs.

15        **THE COURT:**  He says there's no evidence.  How do you

16   deal with that?

17        **MR. LONGER:**  Well, I guess he wasn't listening to the

18   same evidence that we heard.

19             There's a number of witnesses, including the

20   defendants themselves -- and I will start with Dr. Lensing, who

21   testified that there is a laboratory test which can measure the

22   effect of rivaroxaban on blood coagulation.  One of those

23   laboratory tests is an anti-factor Xa assay, and he says it is

24   indeed.  That's at page 1453.

25             Mr. Shah testified that, in fact, there are

01:38

1    coagulation assays available, that the defendants have known

2    about them for a long time, and that they are commercially

3    available.

4              Where I think Mr. Glickstein wants to really

5    focus is on this causation concept of his, but it's a false

6    argument because what we know, because the defendants never

7    offered or instructed, either in the label or at the time of

8    sale of Xarelto, an anti-factor Xa assay, no such test was

9    actually performed on Ms. Mingo.  The only test that was

10   performed is a PT Neoplastin test.

11             What we also know from the evidence is that all

12   of the experts and many of the defendants' own witnesses have

13   said the PT Neoplastin measures blood concentration, which can

14   be -- I'm sorry -- which measures the anticoagulation effect of

15   the drug, which is a surrogate for blood concentration, which

16   is precisely what the anti-factor Xa assay would have measured.

17   And because of that, you have one -- the PT is acting as a

18   surrogate for the other.

19             Dr. Rinder was able to testify -- based on the

20   surrogate data that was available, not some fictitious

21   unavailable data -- that there was specific causation, and

22   Dr. Rinder testified that it was a substantial contributing

23   factor to Ms. Mingo's injury.

24             So the cumulative effect of all of the testimony

25   satisfies our burden that the jury can find specific causation

01:40

1    with an anti-factor Xa assay.

2                    There was no assay, so we are in this

3    counterfactual world.  Had it been available, then it would

4    have been conducted.  Dr. Jordon said, "I needed to be told

5    that.  If I had been told that, of course I would have obeyed

6    the label and had that done."  That's clearly Dr. Jordon's

7    testimony.

8                    So where you are is that you have all of this

9    evidence coming in up to a point where you can't fill in the

10   blank, because it was never done.  So what you need is to get

11   through that with the surrogate data that comes in through the

12   PT.

13                   Mr. Glickstein didn't talk about the fact that

14   Dr. Rinder did testify specifically to that point, which is

15   that he said that there was a substantial contributing factor,

16   because of Xarelto, to Ms. Mingo's injury and that had the

17   doctor been told that, he would not have performed [sic] the

18   use of Xarelto the way he had done it.  He would have performed

19   either the assay -- and he did say that, Dr. Jordon -- or the

20   PT test.  The PT test was available, but he didn't know what to

21   make of it.

22                   So that is where we are.  The plaintiffs feel

23   that we have more than met our burden of proof on this and that

24   we need to look at these cases one at a time.  We are here on

25   Ms. Mingo's case, not on the MDL.  This is an MDL case, no

01:42
 1    doubt.  It's a bellwether case, no doubt.  We are here to

 2    represent Ms. Mingo today, and we are doing, I think, an

 3    outstanding job doing so.

 4              We have met our burden on all claims, especially

 5    this one.

 6         **THE COURT:**  Do you want to respond, Steve?

 7         **MR. GLICKSTEIN:**  I know you like these to be brief,

 8    so I will be.

 9              What was the question and what is the answer

10    that gives rise to evidence of specific causation?  Where is

11    the Q, where is the A?

12              Dr. Lensing and Dr. Shah don't know any more

13    about Ms. Mingo than Mr. Gosselin.  That doesn't get them to

14    specific causation.  We are not talking about general

15    causation.  We are not talking about liability.

16              Dr. Rinder might have -- yes, he did render a

17    causation opinion.  I handed it up to Your Honor, and it's

18    quoted in full, PT.

19         **THE COURT:**  They, in effect, say that you didn't

20    prove it, you didn't have any factor Xa assay, that it was

21    available, they didn't devise any and, therefore, PT was a

22    substitute for it.  You don't do PT, you don't tell them the

23    significance of the PT, you also cross the bridge of factor Xa

24    assay or lack thereof.  He says, "I would have done the PT."

25    They say that had the assay been on the label, he would have

01:44

1    said the same thing.

2           **MR. GLICKSTEIN:**  Right.  I understand the thrust of

3    Mr. Longer's argument, but somebody has to ask that question

4    and establish it in Ms. Mingo's case.

5                  The fact that the tests may correlate, that's

6    great for general causation.  But they had their witness, they

7    had their expert, Dr. Rinder.  They could have asked him, in

8    this case:  Can you tell the ladies and gentlemen of the jury

9    whether anti-factor Xa would have linked up with PT in this

10   case?  Do you have an opinion on that?  Yes or no?  If so, what

11   is it?

12                 He could have given it.  I don't think there can

13   be any inference that can be drawn from the lack of asking him

14   that question other than it wouldn't have been favorable.

15                 So generalized testimony -- we all know it's the

16   difference between general and specific.  Even in a smoking or

17   asbestos lung cancer case, you can't get to the jury without

18   linking it up to -- no matter how strong the evidence is on

19   general, you don't get to the jury without specific.

20           **THE COURT:**  Okay.  I understand the issues.  Look, I

21   take this point seriously, but I also call the attention of the

22   parties, under Rule 50, the drafters also suggest this:

23                 "Often it appears to the court or to the moving

24   party that a motion for judgment as a matter of law made at the

25   close of the evidence should be reserved for a post-verdict

01:45

1   decision.  This is so because a jury verdict for the moving

2   parties moots the issue and because a pre-verdict ruling

3   gambles that a reversal may result in a new trial that might

4   have been avoided.  For these reasons the Court may often

5   wisely decline to rule on a motion for judgment as a matter of

6   law made at the close of evidence, and it is not inappropriate

7   for the moving party to suggest a postponement of the ruling."

8           I don't have to tell you folks how much you

9   spent on the case.  You, Steve, I assume, guarantee that the

10  Fifth Circuit will affirm me.  I don't know whether you would

11  be willing to put your house up and your pension up and

12  everything else guaranteeing that.

13          MR. GLICKSTEIN:  After as much as I have renovated

14  it, you can have it.

15          THE COURT:  Sure.  So if I would rule on a partial

16  motion of this sort, and it would go up to the circuit and the

17  circuit would reverse me, and we would have to do this thing

18  all over again, I think some of you may quit.  I don't think

19  you want to do that.

20          I think it's serious enough that I not rule on

21  it.  I'm going to take it up, but I'll defer ruling on it.

22  I'll let the jury speak on it.  If you all want to write on it

23  later, I'll do that too.

24          Any other motions that we have?

25          MR. GLICKSTEIN:  Sure.  Based on that, I kind of feel

01:47

1  this one may be heading in the same direction --

2         **THE COURT:**  I think it is, but you make it.

3         **MR. GLICKSTEIN:**  -- but I do want to bring it to your

4  attention because it is a unique issue that Your Honor hasn't

5  considered before.  I think it's good that as we go through the

6  charge and the closings and post-trial motions, Your Honor at

7  least has the issue in mind.

8           This concerns Ms. Mingo's testimony, that I

9  think we all recall, where she at various times said she either

10  had or hadn't read the label, but was pretty clear that the

11  information on the label was sufficient; so had it been

12  communicated to her, she would not have taken the drug.

13           I'll do this while I'm still up.  What I have

14  done, I've just gotten the relevant testimony and the physician

15  package insert and the patient information guide in a little

16  package so that Your Honor can look at it with me.

17         **THE COURT:**  Okay.

18         **MR. GLICKSTEIN:**  To put it in context, you will

19  recall that she got the patient medication guide from the

20  pharmacy.  Mr. Johnson walked through some of the information

21  that was in the patient information guide, particularly

22  concerning the risk of bleeding, and particularly concerning

23  the higher risk of bleeding when Xarelto was combined with

24  aspirin.  Again, I don't think I need to read the testimony

25  into the record.

1          THE COURT:  No, I don't need it.

2          MR. GLICKSTEIN:  It's there for Your Honor to look

3     at.

4               Then the smaller piece is the medication guide,

5     and the larger piece is the physician insert.  I will just say

6     that these two documents combined are Defendants' Exhibit 10.

7     The patient medication guide is actually a part of or attached

8     to the physician insert.  I have separated them out just so

9     it's easier for Your Honor to do a side-by-side comparison.

10    This really is one exhibit.  You see pages 1 through 40 is the

11    physician guide, and then the second piece of paper I gave

12    Your Honor starts on page 41.

13         THE COURT:  Great.

14         MR. GLICKSTEIN:  The important thing to note about

15    this -- and I have tagged the pages -- is that the information

16    that is in the physician insert is the same as the information

17    that is in the patient guide.  It's said in a teeny bit more

18    technical terms in the physician insert.

19               If we are looking at page 8 of the physician

20    guide, Section 5.2, it says "Risk of Bleeding."  I have

21    highlighted those statements in the physician insert that have

22    parallels to the first page of the patient medication guide

23    that Ms. Mingo was asked about, particularly with the emphasis

24    that there could be serious bleeding, there could be fatal

25    bleeding, and that the risk is increased when taking aspirin

01:52

1    and NSAIDs.

2              So the question is:  What does this mean?  When

3    I was informally chatting about the motion with Mr. Longer, he

4    said, "Steve, are you running away from the learned

5    intermediary?"  And of course I'm not.

6              I want to, if I could, do an amateur diagram on

7    the board here and show how her testimony interrelates with the

8    learned intermediary --

9         **MR. LONGER:**  We will stipulate that he has been

10   practicing, Your Honor.

11        **MR. GLICKSTEIN:**  -- because what this really is, is

12   it an issue of causation.

13             Will you hear me if I stay away from the mic?

14        **THE COURT:**  Yes.

15        **MR. GLICKSTEIN:**  We have the manufacturer, we've

16   charted the defendants; the doctor, which is Dr. Jordon; and

17   the patient, who is Ms. Mingo.

18             How is the learned intermediary supposed to

19   work?  The manufacturer is supposed to disclose the information

20   to the physician.  The doctor, in his or her discretion,

21   communicates that information to the patient.  But since the

22   manufacturer's duty is to the doctor, so long as they

23   sufficiently advise the doctor, any deficiency in the

24   physician's communication of that information to the patient is

25   not the manufacturer's fault.  But ultimately, as we recognize,

01:54

1    there will be a discussion between doctor and patient.

2                What the patient has now said is:  "If I had

3    read the information in the medication guide, I wouldn't have

4    taken the drug."

5                If she wouldn't have taken the drug, she

6    wouldn't have been injured, according to her theory of the

7    case, if you assume that Xarelto is what caused the injury.

8                So the question is -- so that warning, that

9    medication guide, had enough information about risk to

10   communicate to Ms. Mingo that she shouldn't take the drug.

11   That's her testimony.

12               What that means in terms of causation is that

13   it's not necessary for additional information to be in that

14   package insert to have prevented her from getting the drug had

15   it been communicated to her by the doctor.  In other words, she

16   didn't need information about prothrombin time or anti-factor

17   assay or anything else.  Merely the fact that Xarelto can cause

18   serious bleeding and possibly death, and merely the fact that

19   the risk is higher when used with aspirin was enough,

20   sufficient as a matter of causation, to not have her take the

21   drug.  We are not talking about adequacy of the label but

22   whether not putting more information on the label is what

23   caused her to use it or not use it.

24               Now we get to learned intermediary.  Because the

25   manufacturer disclosed everything to the doctor that Ms. Mingo

01:56

1  said she needed to know in order to not take the drug, there's

2  no causation.  We could have put in 50 more warnings in the

3  package insert.  The information we did communicate was enough

4  so that if the doctor communicated it to Ms. Mingo, she

5  wouldn't have taken the drug.

6              That's why we think, based on her own testimony

7  as a matter of undisputed fact, even if the warning could have

8  been improved, even if the warning was inadequate, the warning,

9  as it was, was sufficient to have resulted in her not receiving

10  those prescriptions and her getting a different drug and

11  avoiding the injury.

12          **THE COURT:**  Okay.  I got it.

13              Who is going to respond to that?  Fred, are you

14  up?

15          **MR. LONGER:**  I'm up again, Your Honor.

16          **THE COURT:**  Defendant says that she said, "If I had

17  read it, I would not have taken the drug."  I don't care who

18  told her to take it.  How do you deal with that?

19          **MR. LONGER:**  Your Honor, we are all living in the

20  real world.  What I have just heard from Mr. Glickstein is fake

21  news.  Because what happened here was in the real world, which

22  we have not heard, is that Ms. Mingo was prescribed Xarelto.

23  She was taking Xarelto before she even got the medication

24  guide.  So she was in the hospital.  She didn't get the

25  medication guide until she goes to the CVS, or whatever the

01:58

1   drugstore was, with her daughter, and they go through the

2   drive-through to pick up the medication.

3             She had been on the drug; the doctor had given

4   whatever instructions he had to her.  What Ms. Mingo had

5   testified to on a number of occasions was that she relies on

6   her doctor's advice to warn of risks, and she generally takes

7   the medications they prescribe.  That was at pages 1528

8   through 1529.

9             When Dr. Jordon prescribed to her the drug in

10  the hospital, she took it.  That was at page 1534.  So she was

11  on this drug before she even got the medication guide.

12            Now, had she read the medication guide -- she

13  gave the testimony that if she had, she may not have taken the

14  drug.  But, frankly, that testimony was impeachment testimony

15  that Mr. Johnson read from a deposition, and he was just asking

16  her to confirm:  "That's what I asked you at the deposition."

17  So the fact of the matter is that whatever responsibility

18  Ms. Mingo had, it was not discharged by the medication guide.

19            In fact, the defendants are proposing in their

20  Request No. 19 for jury instructions on the learned

21  intermediary that the manufacturer's obligation to the consumer

22  is fulfilled when the prescribing physician -- in this case

23  Dr. Renie Jordon -- is informed of any potential side effects

24  or risks from the drug's use so that he may intelligently

25  decide on its use.

1    In Mississippi that duty goes to the doctor.

2  The doctor got the warnings here.  He gave the instruction to

3  Ms. Mingo.  She took the drug.  Had she read something, she

4  might have done something differently.  But as it was informed

5  to her through Dr. Jordon, she agreed to take the drug,

6  obviously, because she did.

7    So with that, there's more than enough evidence

8  to let the jury make a decision on this, and we think that

9  there are a host of factual questions that really must be

10  resolved by a jury because there's more than enough evidence

11  before them that a reasonable jury could find for Ms. Mingo.

12      **THE COURT:**  Steve, let's not waste a lot of time.

13  I'm not going to rule on this motion at this time.

14    I will talk to you all about jury charges now.

15  Let's get together, and we'll talk about them in about five

16  minutes.

17      **MR. GLICKSTEIN:**  Thank you, Your Honor.

18      **MR. LONGER:**  Thank you, Your Honor.

19      (Proceedings adjourned.)

20                    * * *

21

22

23

24

25

1                        **<u>CERTIFICATE</u>**

2            I, Toni Doyle Tusa, CCR, FCRR, Official Court

3   Reporter for the United States District Court, Eastern District

4   of Louisiana, certify that the foregoing is a true and correct

5   transcript, to the best of my ability and understanding, from

6   the record of proceedings in the above-entitled matter.

7

8

9                                *s/ Toni Doyle Tusa*

10                               Toni Doyle Tusa, CCR, FCRR
                                 Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25