1                    UNITED STATES DISTRICT COURT
                     EASTERN DISTRICT OF LOUISIANA
2

3     ****************************************************************

4     IN RE: XARELTO (RIVAROXABAN)
      PRODUCTS LIABILITY LITIGATION
5
                              CIVIL ACTION NO. 14-MD-2592 "L"
6                             JACKSON, MISSISSIPPI
08:15:59                      FRIDAY, AUGUST 18, 2017, 8:30 A.M.
7

8     THIS DOCUMENT RELATES TO:

9     DOCKET NO. 14-MD-2592
      *DORA MINGO, ET AL. V.*
10    *JANSSEN RESEARCH & DEVELOPMENT,*
      *LLC, ET. AL.,*
11    CASE NO. 15-CV-3469

12    ****************************************************************

13
                   **DAY X   MORNING AND AFTERNOON SESSIONS**
14                   TRANSCRIPT OF JURY TRIAL PROCEEDINGS
                   HEARD BEFORE THE HONORABLE ELDON E. FALLON
15                     UNITED STATES DISTRICT JUDGE

16

17    APPEARANCES:

18
      FOR THE PLAINTIFFS'
19    LIAISON COUNSEL:              GAINSBURGH BENJAMIN DAVID
                                    MEUNIER & WARSHAUER
20                                  BY:  GERALD E. MEUNIER, ESQ.
                                    2800 ENERGY CENTRE
21                                  1100 POYDRAS STREET
                                    NEW ORLEANS, LOUISIANA  70163
22

23
      FOR THE PLAINTIFFS:          BEASLEY ALLEN
24                                  BY:  ANDY BIRCHFIELD, ESQ.
                                    P.O. BOX 4160
25                                  MONTGOMERY, ALABAMA  36103

                         *OFFICIAL TRANSCRIPT*

```
1    APPEARANCES CONTINUED:

2

3                              GAINSBURGH BENJAMIN DAVIS
                               MEUNIER & WARSHAUER
4                              BY:  WALTER C. MORRISON, IV, ESQ.
                               240 TRACE COLONY PARK DRIVE
5                              SUITE 100
                               RIDGELAND, MISSISSIPPI  39157
6

7
                               GOZA HONNOLD
8                              BY:  BRADLEY D. HONNOLD, ESQ.
                               11181 OVERBROOK ROAD, SUITE 200
9                              LEAWOOD, KANSAS  66211

10

11                             THE LAMBERT FIRM
                               BY:  EMILY JEFFCOTT, ESQ.
12                             701 MAGAZINE STREET
                               NEW ORLEANS, LOUISIANA  70130
13

14
                               LEVIN FISHBEIN SEDRAN & BERMAN
15                             BY:  FREDERICK S. LONGER, ESQ.
                               510 WALNUT STREET
16                             SUITE 500
                               PHILADELPHIA, PENNSYLVANIA  19106
17

18
     FOR THE DEFENDANT BAYER
19   HEALTHCARE PHARMACEUTICALS
     INC. AND BAYER PHARMA AG:  MITCHELL WILLIAMS SELIG GATES &
20                             WOODYARD, P.L.L.C.
                               BY:  LYN P. PRUITT, ESQ.
21                             425 W. CAPITOL AVENUE, SUITE 1800
                               LITTLE ROCK, ARKANSAS  72201
22

23
                               WATKINS & EAGER, PLCC
24                             BY:  WALTER T. JOHNSON, ESQ.
                               400 EAST CAPITOL STREET
25                             JACKSON, MISSISSIPPI  39201
```

***OFFICIAL TRANSCRIPT***

1    APPEARANCES CONTINUED:

2

3                                    BRADLEY ARANT BOULT CUMMINGS, LLP
                                     BY:  LINDSEY C. BONEY, IV, ESQ.
4                                    ONE FEDERAL PLACE
                                     1819 FIFTH AVENUE NORTH
5                                    BIRMINGHAM, ALABAMA  35203

6

7    FOR JANSSEN PHARMACEUTICALS,
     INC. AND JANSSEN RESEARCH &
8    DEVELOPMENT, LLC:             BARRASSO USDIN KUPPERMAN FREEMAN &
                                   SARVER, LLC
9                                  BY:  RICHARD E. SARVER, ESQ.
                                   909 POYDRAS STREET, 24TH FLOOR
10                                 NEW ORLEANS, LOUISIANA  70112

11

12   OFFICIAL COURT REPORTER:     CATHY PEPPER, CRR, RMR, CCR
                                  CERTIFIED REALTIME REPORTER
13                                REGISTERED MERIT REPORTER
                                  500 POYDRAS STREET, ROOM B-275
14                                NEW ORLEANS, LA  70130
                                  (504) 589-7779
15                                Cathy_Pepper@laed.uscourts.gov

16

17   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

18

19

20

21

22

23

24

25

*OFFICIAL TRANSCRIPT*

**I N D E X**

<u>PAGE</u>

JUROR ROBBINS.......................................2127

THE COURT...........................................2134

CLOSING ARGUMENTS BY MR. BIRCHFIELD.................2153

CLOSING ARGUMENTS BY MS. PRUITT.....................2174

REBUTTAL CLOSING ARGUMENTS BY MR. BIRCHFIELD........2204

JURY INSTRUCTIONS...................................2216

DELIBERATIONS.......................................2246

LUNCHEON RECESS.....................................2246

VERDICT.............................................2247

*OFFICIAL TRANSCRIPT*

1                    **P-R-O-C-E-E-D-I-N-G-S**

2                    FRIDAY, AUGUST 18, 2017

3              M O R N I N G   S E S S I O N

4                       (IN CHAMBERS)

5

08:25:50  6

08:25:51  7          THE COURT:  Good morning, Mr. Robbins.  Have a seat,

08:25:53  8    please sir.

08:25:53  9              Mr. Robbins, I just want to talk with you.  I

08:25:56 10    received several reports that you have been nodding off or

08:25:58 11    sleeping during the evidence in the case; is that correct, sir?

08:26:02 12          JUROR ROBBINS:  Well, I thought I was doing pretty good

08:26:05 13    the last few days, keeping coffee in there with me and

08:26:09 14    everything.  But, I mean, I did have a little bit of trouble

08:26:12 15    yesterday morning, but you asked me if I was all right, and

08:26:18 16    that tended to embarrass me enough to wake me up.

08:26:23 17          THE COURT:  Well, I didn't mean to embarrass you.

08:26:26 18          JUROR ROBBINS:  Well, no.  That was just my phrase.  It

08:26:28 19    wasn't no problem.  But, I mean, I believe I've heard -- yes,

08:26:30 20    sir, I mean, I don't think it's any --

08:26:34 21          THE COURT:  Do you have any sleeping problem or

08:26:36 22    anything of that sort?

08:26:37 23          JUROR ROBBINS:  Well, I mean, I don't know, maybe.

08:26:38 24    But, I mean, I've been retired ten years, and I just hadn't,

08:26:41 25    you know, been getting up early or doing anything, but I got

                       *OFFICIAL TRANSCRIPT*

08:26:45 1    plenty of sleep last night.

08:26:48 2         THE COURT:  Have you been paying attention to the

08:26:50 3    evidence?

08:26:51 4         JUROR ROBBINS:  Yes, sir, I have.

08:26:54 5         THE COURT:  Will you be able to meaningfully

08:26:56 6    participate in the discussions, the jury deliberations and the

08:27:00 7    discussions with your fellow jurors?

08:27:02 8         JUROR ROBBINS:  Yes, sir, I believe so.

08:27:04 9         THE COURT:  You think so.

08:27:07 10         At the beginning of the case, you recall that I

08:27:10 11    instructed the jurors to not talk to each other about the case,

08:27:15 12    and not to make any final decisions until you've heard all the

08:27:19 13    evidence and the arguments of counsel and the instructions of

08:27:25 14    the Court.  Will you do that, sir?

08:27:28 15         JUROR ROBBINS:  Yes, sir.

08:27:29 16         THE COURT:  Are you able to promise both sides that you

08:27:45 17    will listen to them and decide the case, and give each side

08:27:45 18    fair --

08:27:45 19         JUROR ROBBINS:  Yes, sir.

08:27:45 20         THE COURT:  If you were one of the parties in this

08:27:47 21    case, would you be satisfied with somebody on the jury with

08:27:55 22    your participation during the trial?

08:27:58 23         JUROR ROBBINS:  I'd think so, yes, sir.

08:28:01 24         THE COURT:  Any problem at all?  You recall the

08:28:05 25    evidence, sir, and you've been listening to the evidence?

                        *OFFICIAL TRANSCRIPT*

08:28:09 1          JUROR ROBBINS:  Yes, sir.

08:28:10 2          THE COURT:  You'll be able to utilize that information

08:28:12 3    and participate meaningfully in the discussions of the jury?

08:28:15 4          JUROR ROBBINS:  (Witness nods head affirmatively.)

08:28:16 5          THE COURT:  You feel comfortable doing it?

08:28:18 6          JUROR ROBBINS:  I feel like it, yes, sir.  But, I mean,

08:28:21 7    if they don't --

08:28:21 8          THE COURT:  No, no, no.  I really want to make sure

08:28:24 9    that you're comfortable with -- you know, I noticed that you

08:28:30 10   were nodding, but we have been here two weeks now.  You feel

08:28:36 11   you've listened to the evidence and understand the evidence?

08:28:40 12         JUROR ROBBINS:  Yes, sir.

08:28:41 13         THE COURT:  You'll give both sides a fair shot?

08:28:44 14         JUROR ROBBINS:  Yes, sir.

08:28:45 15         THE COURT:  Okay.  Well, thanks, Mr. Robbins.

08:28:54 16         (WHEREUPON, at this point in the proceedings, the juror

08:28:54 17   was excused.)

08:28:54 18         THE COURT:  Any comments from counsel?

08:28:58 19         MR. MEUNIER:  Your Honor, you have gone on the record

08:29:03 20   to the effect that you've observed this juror sleeping through

08:29:07 21   both sides, cross-examination by Defendant and examination by

08:29:12 22   us.

08:29:12 23         You've gone on the record and said that the

08:29:13 24   marshals have had to speak to him, your staff has had to speak

08:29:16 25   to him.  You've gone on the record and say that you've seen him

*OFFICIAL TRANSCRIPT*

08:29:19  1   sleeping during direct and cross.  The marshals have to keep

08:29:22  2   hitting him to wake him up.  Your staff has reported the

08:29:26  3   problem several times.

08:29:27  4        Here is the issue, Judge:  Mr. Robbins has been

08:29:33  5   observed nodding off repeatedly from the start of the case.  He

08:29:36  6   was seen by us to be nodding off during opening statements by

08:29:39  7   both sides.  He has continued to nod off.

08:29:43  8        Then, all of this culminated when the Court made

08:29:46  9   these comments on the record Monday.  You took him into

08:29:49 10   chambers and asked him to try to do better.  He said he would

08:29:53 11   try to do better.

08:29:54 12        A day and a half after that discussion with you,

08:29:58 13   yesterday, during Andy's cross -- Mr. Birchfield's

08:30:04 14   cross-examination of a critical witness, the Defendants' last

08:30:08 15   expert, Dr. Herrin, you again observed him to be nodding, had

08:30:13 16   to go on record again and ask him if he was okay to bring him

08:30:16 17   back to being more attentive.

08:30:17 18        The case law is pretty clear that sleeping

08:30:21 19   negates the jury's most fundamental obligation, which is to be

08:29:26 20   attentive, and to hear the evidence, and to listen to the

08:29:29 21   evidence, and to be able to participate in deliberation.

08:29:31 22        What will happen when Mr. Robbins goes into that

08:29:35 23   jury room to deliberate, and there are stretches of evidence

08:29:38 24   that he has slept through, missed, didn't catch fully because

08:29:44 25   he was nodding off?

*OFFICIAL TRANSCRIPT*

08:29:45  1          At one point, I might add, we watched the jury be

08:29:50  2     excused for recess.  The juror next to Mr. Robbins had to nudge

08:29:53  3     him because he was asleep in his chair as the jury was leaving

08:29:57  4     the box.

08:29:59  5          So, we don't think it's fair to either side, in a

08:30:03  6     bellwether case of this significance, to have a juror in the

08:30:06  7     deliberation room -- here is where the prejudice is -- when a

08:30:10  8     matter comes up about a piece of evidence he didn't catch, two

08:30:15  9     or three questions of a critical witness he didn't hear, and

08:30:18  10    the other jurors are discussing that evidence, what is

08:30:22  11    Mr. Robbins supposed to do?  Just say, well, it's up to you, I

08:30:26  12    don't remember.  I won't participate in the part of the

08:30:28  13    deliberation.  That can't work for a deliberative process,

08:30:32  14    Judge.  We deserve better.  Both sides do.

08:30:34  15         You know, if we could just all of us step back

08:30:36  16    from the strategy concerns people have about is he a good juror

08:30:42  17    or bad juror, and just ask the question -- we've all come here,

08:30:45  18    worked hard, lost sleep, you've moved the Court here -- in this

08:30:48  19    bellwether case, everyone, the system deserves a fully

08:30:53  20    deliberative jury.  It's a matter of record now he has missed

08:30:58  21    evidence by sleeping.

08:31:00  22         I'm not fussing.  I'm not saying the man has ill

08:31:05  23    will.  But he said, "Well, I've done better."  Well, but he's

08:31:09  24    already -- the prejudice is already done.  He can't possibly

08:31:15  25    recapture things that happened while he was asleep.  So we

*OFFICIAL TRANSCRIPT*

08:31:19  1    think the prejudice is there, and he should be excused.

08:31:19  2         THE COURT:  Let me hear from you, Steve.

08:31:27  3         MR. GLICKSTEIN:  Your Honor, of course, one thing that

08:31:28  4    we have to be very careful about is the potential for strategic

08:31:33  5    strikes of jurors.  We go through a jury selection process that

08:31:39  6    is designed to make sure that the jury is there and

08:31:46  7    representative.  The parties have strikes for cause; they have

08:31:51  8    peremptory challenges.

08:31:51  9         It's a fairly high standard to exclude a juror

08:31:54 10    for cause after the jury has been empaneled, because we all

08:32:00 11    know that justice requires the appearance of justice.  You're

08:32:04 12    entitled to a jury as selected under the rules.  You're not

08:32:07 13    entitled to kind of pick out jurors that you may think are

08:32:15 14    predisposed one way or the other and see if you can get them

08:32:17 15    off.

08:32:18 16         I think the case law is clear that if a juror has

08:32:24 17    a lapse or two, that's not sufficient basis to excuse the

08:32:29 18    juror.  Your Honor has discretion in terms of how you deal with

08:32:33 19    it.  You did take Mr. Robbins aside, and you had a talk with

08:32:38 20    him.  I think he has been very attentive since Your Honor spoke

08:32:46 21    with him.

08:32:46 22         He's brought coffee into the courtroom.  I

08:32:53 23    don't for a minute deny that he had a momentary lapse,

08:32:59 24    Your Honor, yesterday when Your Honor made a comment.  But I

08:33:05 25    was fixed on him yesterday.  I came to the courtroom toward

*OFFICIAL TRANSCRIPT*

08:33:12 1  the -- after the first break, while Mr. Sarver was completing
08:33:19 2  his direct examination.  I looked at him throughout
08:33:25 3  Mr. Birchfield's cross-examination.  I looked at him throughout
08:33:28 4  the redirect.  He was paying attention.
08:33:33 5        To be sure, he, like a lot of jurors, looked a
08:33:38 6  little bored and fidgety.  You have to realize, he is a
08:33:46 7  heavy-set guy with -- to just look at the man, his eyelids
08:33:54 8  naturally don't cover the complete of his eyes.  But I saw him
08:33:59 9  looking at the video screen.  I saw him looking forward.  I
08:34:03 10 also saw him leaning backwards.
08:34:05 11       I was observing Your Honor observing the juror as
08:34:08 12 well.  I think it's fair to say that, except for that one time,
08:34:13 13 which lasted about 10 or 15 seconds, that he was paying
08:34:18 14 attention.  We've heard what he has said about it, and I think
08:34:23 15 that accurately and fairly characterized the circumstances
08:34:29 16 here.
08:34:30 17       So, Your Honor exercised your discretion to talk
08:34:37 18 to him.  I think he has paid attention.  I think he's been
08:34:39 19 truthful in his answers to Your Honor.  I don't think it's
08:34:42 20 appropriate to single him out.
08:34:47 21       All of the jurors were fidgety yesterday.  There
08:34:54 22 were several of them that yawned.  Let's face it, this is
08:34:58 23 not -- when we're talking about antifactor assays and
08:35:04 24 prothrombin times and anticoagulant cascades, and on the ninth
08:35:09 25 day of trial, it's going to be difficult.

*OFFICIAL TRANSCRIPT*

08:35:12  1            When questioning is not as sharp as it ought to

08:35:14  2   be, and there is not a lot of drama going on, some jurors may

08:35:18  3   be thinking about their families.  Some jurors may be thinking

08:35:21  4   about the work that they are missing.  I don't think that what

08:35:26  5   has happened with this juror rises to the level of cause for

08:35:29  6   excusing him that we should interfere with the normal jury

08:35:34  7   selection process.

08:35:37  8            THE COURT:  Anything?

08:35:37  9            MR. JOHNSON:  I don't have anything further.

08:35:40 10            THE COURT:  I got it.  I understand the situation.

08:35:41 11            Just from the very beginning, I noticed this

08:35:44 12   juror was nodding off.  It concerned me.  I asked the marshal

08:35:48 13   to stand with him.  The marshal stood up by him.  Occasionally

08:35:53 14   he had to nudge him.  There was occasions also when another

08:35:59 15   juror had to nudge him to wake him up.

08:36:03 16            He's a good fellow.  He's been around, obviously,

08:36:07 17   a while.  He's been retired for a number of years, he said.

08:36:12 18   He's doing his very best.  But, notwithstanding that, he has

08:36:19 19   been sleeping throughout this case.  I've done my best to talk

08:36:21 20   to him, even when -- yesterday, I noticed that he was awake, I

08:36:28 21   had to -- and he interpreted that as being -- insulting him or

08:36:33 22   something.  I didn't mean to do that.  I didn't mean to offend

08:36:36 23   him in any way or embarrasses him in any way.  But,

08:36:39 24   notwithstanding meeting with him, notwithstanding putting him

08:36:42 25   on the record, the poor gentleman went to sleep again in the

*OFFICIAL TRANSCRIPT*

08:36:46  1     trial.

08:36:47  2            This is a very significant case for both sides.

08:36:51  3     It just seems to me that, to be uncertain as to whether this

08:36:57  4     juror -- all the other jurors know this.  I mean, they've

08:37:04  5     looked at him strange.  I just feel that, in view of all of

08:37:08  6     this situation, the right thing to do is to excuse this juror,

08:37:12  7     and let's go with the other seven jurors.

08:37:15  8            I understand the point.  For that reason, I'm

08:37:17  9     going to exercise my discretion and excuse him for cause.

08:37:22 10            MR. MEUNIER:  Thank you, Judge.

08:37:23 11            THE COURT:  Thank you.

         12                         *   *   *

         13

         14

         15

         16

         17

         18

         19

         20

         21

         22

         23

         24

         25

                              *OFFICIAL TRANSCRIPT*

1          **P-R-O-C-E-E-D-I-N-G-S**

2          FRIDAY, AUGUST 18, 2017

3          M O R N I N G   S E S S I O N

4          (COURT CALLED TO ORDER)

08:39:46  5

08:52:04  6

08:52:08  7          THE DEPUTY CLERK:  All rise.

08:52:08  8          THE COURT:  Be seated, please.

08:52:19  9          The jury is outside of the courtroom.  We're here

08:52:24 10  today to talk about the jury charges.

08:52:26 11          I've received meaningful input from both sides.

08:52:30 12  They've given me suggested jury instructions.  I've taken that

08:52:38 13  and prepared drafts and given them back to the parties.

08:52:41 14          I've had an opportunity now on several occasions

08:52:43 15  to meet with them and discuss the drafts.  My final jury charge

08:52:52 16  was drafted.  I've given it to the parties.  I'll invite any

08:52:57 17  observations or any objections to the charge as given.

08:53:03 18          Let me hear from the Plaintiff first.

08:53:04 19          MR. MEUNIER:  May it please, the Court, Jerry Meunier

08:53:09 20  for the Plaintiffs.

08:53:10 21          Your Honor, we respectfully object to the Court's

08:53:14 22  failure to give at page 8 of the charge an instruction

08:53:19 23  regarding the granting of Plaintiff's Motion in Limine

08:53:23 24  Number 30, and your order and reasons, which are

08:53:29 25  Record Document 6645, to the effect that any experts in this

*OFFICIAL TRANSCRIPT*

08:53:31 1    case should not have been cross-examined on their failure to

08:53:35 2    publish their opinions, given the Court's ruling in regard to

08:53:38 3    that motion that such publication would have been violative of

08:53:42 4    the confidentiality as to materials that would support

08:53:46 5    publication.

08:53:46 6          THE COURT:  I think I've answered that and provided

08:53:52 7    that it's up to the jury to decide on their credibility.  Any

08:53:56 8    information that they have or any bias or anything that they

08:54:05 9    have had, I don't think I need to focus necessarily on that.

08:54:09 10          So I deny the motion.

08:54:12 11          MR. MEUNIER:  Judge, we respectfully object at page 23

08:54:16 12   of the charge to refer to what would have altered Dr. Jordon's,

08:54:20 13   quote, "prescribing behavior."  We've had motion practice on

08:54:22 14   this and on the law of Mississippi in a failure to instruct

08:54:26 15   case, that it is whether -- the question is whether his medical

08:54:30 16   conduct and decisionmaking would have been altered.  We think

08:54:36 17   the phrase "prescribing behavior" is ambiguous and invites the

08:54:40 18   erroneous conclusion that it is only his decision whether or

08:54:42 19   not to prescribe Xarelto which is at issue.

08:54:44 20          We have had briefing on that, Judge.  You know

08:54:48 21   our authorities in support.

08:54:48 22          THE COURT:  Right.  Only a lawyer could find some

08:54:53 23   problem with that.  I think the "prescribing behavior" is shirt

08:55:03 24   sleeve English.

08:55:03 25          MR. MEUNIER:  It's an awful thing to be trained to get

*OFFICIAL TRANSCRIPT*

08:55:06   1    so deep in the weeds with words.

08:55:08   2         THE COURT:  We all are, including the Court.

08:55:11   3         MR. MEUNIER:  Judge, on page 24 of the Court's charge,

08:55:17   4    we had suggested that you make it clear in saying that FDA

08:55:23   5    approval is not dispositive as to the lack of instructions

08:55:27   6    claim, that, likewise, FDA approval is not dispositive as to

08:55:29   7    the design defect claim.

08:55:32   8         THE COURT:  I said it's not dispositive.  I think that,

08:55:36   9    taken as whole, this is an accurate statement of the law.

08:55:39  10    Therefore, I deny the motion.

08:55:41  11         MR. MEUNIER:  Your Honor, at page 25 of your charge,

08:55:44  12    you had removed from a prior draft the following language which

08:55:49  13    was given by the Court in prior bellwether trials in this

08:55:54  14    litigation, and we believe it's critically important to have

08:55:57  15    included it here in the final, which is -- and I'll quote from

08:56:01  16    page 25 of the Court's previous jury charge draft in this

08:56:05  17    matter -- "Therefore, even if the Defendants have met all the

08:56:08  18    appropriate minimum standards for FDA approval and governmental

08:56:14  19    regulations and requirements to obtain FDA approval, this

08:56:19  20    compliance and approval, though relevant, is not sufficient to

08:56:21  21    conclusively establish that the Defendants have taken the steps

08:56:25  22    necessary under the law which applies in this case."

08:56:28  23         THE COURT:  I think I've expressed the law accurately

08:56:30  24    and thoroughly and in a balanced format, so I don't think it's

08:56:36  25    necessary.  I deny the motion.

*OFFICIAL TRANSCRIPT*

08:56:38  1       MR. MEUNIER:  I'd just say for the record that the

08:56:42  2  language "minimum standards for FDA approval" was set forth in

08:56:47  3  Plaintiff's proposed Jury Charge Number 13, pursuant to the

08:56:51  4  authorities cited.

08:56:52  5       Your Honor, we respectfully object, again at

08:56:55  6  page 25, to the Court's failure to include Plaintiff's proposed

08:57:00  7  Jury Charge Number 11, which has to do with the ability of

08:57:05  8  manufacturers to make safety improvement changes in labels

08:57:09  9  without prior FDA approval, citing your earlier decision in

08:57:15 10  this case, as well as the *Wyeth* decision.  We respectfully

08:57:21 11  object to that not being included in the jury charges.

08:57:25 12       THE COURT:  I think that's a fact that the jury has to

08:57:28 13  consider, but not from a legal standpoint.  I think my charge

08:57:33 14  accurately discusses the law applicable.

08:57:36 15       MR. MEUNIER:  We also object, Your Honor, to your

08:57:37 16  failure to include Plaintiff's proposed Jury Charge Number 12,

08:57:42 17  which deals with the so-called strikethrough label.

08:57:45 18       Your Honor, this proposed instruction, that we

08:57:48 19  have submitted more than once in this litigation, we think is

08:57:54 20  critically important because it disabuses the jury of any

08:57:58 21  concept or notion that any action the FDA took, not in

08:58:04 22  ultimately approving Xarelto, but, in the process of approval,

08:58:09 23  striking through certain language, whether they did it or not,

08:58:13 24  whether that's established or not, we think it's critically

08:58:16 25  important to disabuse the jury of the notion that that action

*OFFICIAL TRANSCRIPT*

08:58:20  1    by the FDA is in any way preemptive.

08:58:23  2            Under the case law, it is not.  It is not

08:58:25  3    preemptive because the Defendants would have to show it's

08:58:29  4    impossible for the FDA to have ever included the language that

08:58:32  5    the Plaintiffs feel should have been in the label.

08:58:35  6            We've heard specific reference to the

08:58:38  7    strikethrough.  I think it has a prejudicial effect for the

08:58:41  8    jury not to understand that the strikethrough activity by the

08:58:44  9    FDA cannot be, could not be in a legal sense preemptive.  It

08:58:50 10    may be relevant, but it is not preemptive.  We think it has the

08:58:55 11    effect -- potential effect of implied preemption, which is

08:59:00 12    inappropriate.

08:59:00 13        THE COURT:  I put this sentence in:  "In fact, any

08:59:03 14    action or inaction on the part of the FDA, though relevant to

08:59:06 15    your consideration of liability, does not foreclose a claim

08:59:11 16    under Mississippi law.  More specifically, if you find that the

08:59:14 17    Defendant failed to apprise prescribing physicians of

08:59:18 18    appropriate testing to address risks that they knew or should

08:59:23 19    have known prior to FDA's approval, or became known or should

08:59:27 20    have become known after FDA approval of the Xarelto label, then

08:59:31 21    FDA approval is not conclusive."

08:59:33 22            I think that accurately and fully expresses the

08:59:35 23    law.  So I'll deny the motion.

08:59:37 24        MR. MEUNIER:  Your Honor, with respectfully object to

08:59:38 25    the Court's failure to give Plaintiff's proposed Jury Charge

*OFFICIAL TRANSCRIPT*

08:59:43 1   Number 14, which talks about the fact that noncompliance with

08:59:48 2   federal regulations may be considered relevant in deciding

08:59:53 3   fault in this case.  We cited Mississippi case law to that

08:59:57 4   effect.

08:59:57 5        THE COURT:  I've reviewed that, and I think my charge

08:59:59 6   as a whole accurately summarizes the law.

09:00:02 7             Anything further?

09:00:03 8        MR. MEUNIER:  Your Honor, let me -- not to belabor

09:00:10 9   this.  I know we're short of time.  There was statutory

09:00:13 10  language about what the FDA -- what the Defendants, rather, not

09:00:17 11  only reasonably should have known, but should have known in the

09:00:19 12  light of reasonable available knowledge or the exercise of

09:00:23 13  reasonable care.

09:00:23 14            We've brought that to the attention.  It's in the

09:00:26 15  statute.  I know the Court has limited the phraseology to what

09:00:29 16  they reasonably should have known, but we do think that extra

09:00:33 17  verbiage from the MPLA is important.

09:00:34 18       THE COURT:  I think "reasonableness" is sufficient to

09:00:38 19  cover all of that.  Deny the motion.

09:00:38 20       MR. MEUNIER:  Judge, finally, just in a general sense,

09:00:41 21  we do want to go on record and object to the Court's decision

09:00:46 22  not to utilize the verdict form which the Plaintiffs proposed.

09:00:53 23            In short, I guess, in essence, what we endeavored

09:00:58 24  to do with our proposed verdict form was keep the language in

09:01:01 25  the verdict form itself as simple and as direct and as limited

*OFFICIAL TRANSCRIPT*

09:01:07 1    as possible, and invite expressly the jury to go to the jury

09:01:12 2    charges that you're going to allow them to take into the jury

09:01:15 3    room in order to find the language that guides the answer to

09:01:19 4    that question.

09:01:19 5            The problem -- and I think we saw it in the last

09:01:22 6    jury trial -- is that when you have verbiage in the verdict

09:01:26 7    form -- the last trial, it was the phrase "for safe use," which

09:01:29 8    is still in there, in this verdict form -- the jury can get

09:01:33 9    confused by that word, by that language.

09:01:36 10           So we believe it would have been appropriate in

09:01:38 11   this case to use a much simpler and more limited in language

09:01:44 12   verdict form for that reason.

09:01:46 13       THE COURT:  I have four or five questions on the

09:01:50 14   verdict form.  It's only three pages -- two and a half pages,

09:01:53 15   really.  I think this jury is able to handle that.  So I'll

09:01:58 16   deny that motion.

09:02:00 17       MR. MEUNIER:  Thank you, Judge.

09:02:01 18       THE COURT:  Thank you very much.

09:02:02 19           Let me hear from the Defendants.

09:02:03 20       MR. BONEY:  Good morning, Your Honor, Lindsey Boney for

09:02:08 21   the Defendants, here to talk about the Defendants' objections

09:02:11 22   to the jury charge before the jury comes back.

09:02:14 23           Your Honor, we're filing, as we speak, written

09:02:17 24   objections as well, but want to put these on the record to urge

09:02:21 25   the Court --

*OFFICIAL TRANSCRIPT*

09:02:21  1        THE COURT:  In any event, I'll make all of your written

09:02:24  2    objections, either plaintiff or defendant, I'll make it a part

09:02:27  3    of this process.

09:02:28  4        MR. BONEY:  Very good.  Thank you, Your Honor.

09:02:31  5             Just want the record to be clear.  Mr. Glickstein

09:02:36  6    will address just a couple of additional objections, in

09:02:39  7    addition to these.

09:02:40  8             The first is, Your Honor, just a few -- three

09:02:43  9    general objections to the Court's charge.  Apologies for no

09:02:48 10    line numbers.  We're just sort of triaging the final draft.

09:02:53 11             But on page 16, where the Court uses "defective

09:02:56 12    or unreasonably dangerous" to describe the burden, Defendants

09:02:59 13    object to the use of that language because it's inconsistent

09:03:02 14    with the text of the MPLA and suggests a lower burden of proof.

09:03:07 15             In fact, the MPLA requires the Plaintiff to prove

09:03:08 16    that the manufacturer's product is both defective and

09:03:11 17    unreasonably dangerous under Section 11-1-63.  It's internally

09:03:16 18    inconsistent with pages 25 to 26 of the charge, where the Court

09:03:21 19    has framed the standard in this way.

09:03:24 20        THE COURT:  I disagree.  For example, in an automobile

09:03:27 21    case, it might be defective design, so that the car can't

09:03:35 22    start.  If the car can't start, it's not going to be dangerous,

09:03:38 23    it just can't start.

09:03:39 24             You've got to have a claim for defective design

09:03:42 25    if you buy a car that's supposed to start, and you can't start

*OFFICIAL TRANSCRIPT*

it.  There is no defense saying, well, it can't start, but it's
not dangerous, therefore it's not defectively designed.

I think it's either defectively designed or
inherently dangerous.  But that's the reason I put that in.  I
understand.

MR. BONEY:  Thank you, Your Honor.

The second general objection is to the language
throughout the instructions about substantially contributed or
substantial factor causation.  Defendants object to that
language and words to its effect because the MPLA requires
proof of proximate cause, which Mississippi law consistently
defines as that cause which, in natural and continuous sequence
unbroken by any efficient intervening cause, produces the
injury, and without which the result would not have occurred.

We've cited the Court, in our papers, numerous
cases to this effect.  That, in other words, under
Mississippi's proximate cause test, substantial factor is
really but-for causation, and that applies whether it's medical
caution or proximate cause for a product claim.

THE COURT:  In my instructions, I go into that in
greater detail and express the accurate law.

MR. BONEY:  Yes, sir, Your Honor.  Thank you.

Finally, in terms of a general objection, the
Defendants object to the use of the word "instructions" instead
of "warnings and instructions."

*OFFICIAL TRANSCRIPT*

09:05:06  1          We've discussed this with the Court numerous

09:05:09  2    times, but, just to be clear, Your Honor, our position is that

09:05:10  3    the case law is clear that Defendants are entitled to have the

09:05:13  4    jury instructed on the law that supports defensive theories

09:05:17  5    that are raised by the evidence, and not just Plaintiff's

09:05:20  6    theory of the case.  The Pierce case from the Fifth Circuit,

09:05:24  7    753 F.2d 416.

09:05:26  8          It's not just, Your Honor, use of the words

09:05:28  9    "warnings or instructions," which is included in the statute,

09:05:31 10    but it could also be cured by the Court, by adding a line on

09:05:35 11    page 18, line 5 -- this was at least the last version of the

09:05:39 12    charge before we received this morning -- the language would

09:05:42 13    be:  "In considering whether Defendants adequately instructed

09:05:46 14    Ms. Mingo's prescribing physician, Dr. Jordon, about the safe

09:05:50 15    use of Xarelto, you may consider any warnings provided in the

09:05:53 16    label and whether any additional instructions were required."

09:05:56 17          Regardless of the Plaintiff's theory of this

09:05:58 18    case, warnings are relevant to Defendants' theory of the case.

09:06:12 19          THE COURT:  Okay.  I understand.  To me, this is an

09:06:23 20    instruction case.  There is no issue of warnings.  In fact, the

09:06:27 21    Plaintiff says they were warned about the bleeding risk.

09:06:30 22    That's not their issue.  Their issue is instructions.

09:06:32 23          So that's the reason I did it.  I understand.

09:06:35 24          MR. BONEY:  Thank you, Your Honor.  Just a couple of

09:06:38 25    specific objections about the charge.

**OFFICIAL TRANSCRIPT**

09:06:38  1          THE COURT:  Sure.

09:06:39  2          MR. BONEY:  On page 17, Defendants object to the Court

09:06:41  3    describing Defendants as collectively responsible to the

09:06:45  4    Plaintiff, as opposed to collectively responsible for the

09:06:48  5    product's labeling and design.

09:06:50  6          THE COURT:  I understand.  I think it's accurate.

09:06:53  7              Thank you very much.

09:06:53  8          MR. BONEY:  On page 18, Your Honor, we merely object to

09:06:56  9    the placement of the instruction regarding unreasonably

09:07:00 10    dangerous, about unavoidably unsafe products.  It really should

09:07:05 11    be unreasonably dangerous in design.  We ask that the Court

09:07:08 12    move that to the design portion of the instructions.

09:07:10 13          THE COURT:  I made it general to include both of them.

09:07:13 14    That's the reason.  I understand.

09:07:15 15          MR. BONEY:  Yes, sir.  Thank you, Your Honor.

09:07:17 16              On page 21, the Defendants object that the

09:07:20 17    instruction there is incomplete without the final sentence of

09:07:25 18    Defendants' Request Number 21.  This additional statement is

09:07:28 19    necessary for the jury to understand, Your Honor, that --

09:07:31 20    another fact that would relieve Defendants of any liability

09:07:34 21    here.

09:07:35 22          THE COURT:  Okay.

09:07:37 23          MR. BONEY:  Your Honor, on page 28, Defendants object

09:07:40 24    that this instruction is at best incomplete because it's

09:07:43 25    unaccompanied by a preexisting condition instruction.  This the

*OFFICIAL TRANSCRIPT*

09:07:47  1    Court's aggravation instruction.  We would request that the

09:07:52  2    Court substitute Defendants' Number 17 instead.

09:07:55  3            THE COURT:  Okay.

09:07:55  4            MR. BONEY:  The last specific objection, Your Honor, is

09:07:59  5    on page 23 to 24, again, the Court's proximate cause warning.

09:08:04  6    Defendants object to this instruction because it misstates the

09:08:08  7    warnings causation standard by requiring Plaintiffs merely to

09:08:13  8    prove that a claimed inadequate warning affected the decision

09:08:15  9    or decisions of Dr. Jordon.  We would urge the Court to

09:08:18 10    continue to use there, as in other polices in the instruction,

09:08:23 11    about the prescribing decision.

09:08:25 12            THE COURT:  Deny those motions.

09:08:26 13            MR. BONEY:  So, finally, Your Honor, just a couple of

09:08:30 14    instructions that the Court failed to give of Defendants'

09:08:33 15    proposed instructions.  That would be Defendants' Number 21,

09:08:36 16    Defendants' Number 20, and Defendants' number 28, which are

09:08:40 17    accurate statements of Mississippi law, and we urge the Court

09:08:44 18    to adopt those.

09:08:45 19            THE COURT:  Okay.

09:08:45 20            MR. BONEY:  Finally, Your Honor -- and Mr. Glickstein

09:08:49 21    will address just a couple of FDA issues -- but on the verdict

09:08:51 22    form, Question 1 on the verdict form, Your Honor, asks the jury

09:08:56 23    to find whether Xarelto either proximately caused or

09:09:01 24    substantially contributed to Ms. Mingo's GI bleed.

09:09:05 25            Your Honor, it's our view that Mississippi law is

*OFFICIAL TRANSCRIPT*

09:09:07 1   proximate cause, it's not proximate cause or substantially

09:09:10 2   contributed to.  It's a tautological statement, that it should

09:09:15 3   just be substantially caused.

09:09:17 4        THE COURT:  I think that proximate cause does include

09:09:20 5   that.  But, not to confuse the jury, I put both.

09:09:23 6        MR. BONEY:  Your Honor, after Question 2, there is an

09:09:26 7   instruction about where the jury should go on the verdict form.

09:09:29 8   In light of the Court's admonition about unreasonably dangerous

09:09:33 9   products and unavoidably unsafe products, the jury should be

09:09:37 10  instructed that if they answer no to the question of whether

09:09:41 11  Xarelto had an inadequate warning, that they should be directed

09:09:44 12  to sign the verdict form and not go to the design defect claim

09:09:48 13  because, under the Court's instruction, an adequate warning

09:09:52 14  precludes a finding of design defect.  The *Swayze* case that we

09:09:58 15  cited in our papers, as well as the Court's instruction.

09:09:59 16       THE COURT:  I understand.  I deny the motion.

09:10:01 17       MR. BONEY:  Finally, Your Honor, on Question 4, we've

09:10:04 18  talked about this before and in our proposed verdict form, that

09:10:08 19  the Court use the date July 1, 2011, or after FDA had first

09:10:13 20  approval, instead of the language "at the time that the product

09:10:16 21  left Defendant's control."

09:10:18 22            Thank you, Your Honor.

09:10:19 23       THE COURT:  Thank you very much.

09:10:21 24            As I said, I'll allow you to supplement it with

09:10:24 25  any written documents that you wish to file.

*OFFICIAL TRANSCRIPT*

09:10:33  1          MR. GLICKSTEIN:  Your Honor, I'm here to address just
09:10:35  2    two points regarding FDA regulation.  Also, because Your Honor
09:10:37  3    asked us in chambers to be as specific as possible, just to
09:10:40  4    make one point in relation to a comment Your Honor just made.
09:10:47  5          On page 23 of the proposed instruction -- at
09:10:53  6    least it was page 23 in the last draft -- Defendants object to
09:10:58  7    the words, "and federal drug regulations," on page 23, line 3,
09:11:06  8    and propose that the sentence read, "under Mississippi law
09:11:12  9    applicable to this case, drug manufacturers at all times bear
09:11:17 10    responsibility for the content of the drug's label."
09:11:21 11          The reason that the words, "and FDA regulations,"
09:11:26 12    should be stricken, because it is an incomplete and, therefore,
09:11:33 13    inaccurate statement of the law.
09:11:34 14          We recognize, of course, that *Wyeth v. Levine*
09:11:40 15    says that manufacturers bear responsible (verbatim) for the
09:11:43 16    drug label, but the Supreme Court was emphasizing one
09:11:46 17    particular aspect of a very complex FDA/drug company
09:11:51 18    relationship, and it was never intended to be a balanced jury
09:11:57 19    charge.
09:11:58 20          Other language in *Wyeth* confirms that the FDA's
09:12:01 21    premarket approval of a new drug application includes approval
09:12:05 22    of the exact text of the proposed label; that the proposed
09:12:10 23    label must be rejected if it's false or misleading in any
09:12:17 24    particular aspect; that the manufacturer lacks the capacity to
09:12:21 25    change the label absent newly acquired information; and, that

*OFFICIAL TRANSCRIPT*

09:12:24 1   the FDA at all times retains authority to reject labeling

09:12:29 2   changes.

09:12:30 3              So, it's not possible to fairly summarize the

09:12:35 4   complex regulatory balance in one isolated sentence.  For these

09:12:40 5   reasons, we ask that the Court either strike the language

09:12:44 6   referenced above, or, alternatively, add the Defendants'

09:12:49 7   proposed supplemental and contingent jury instructions, which

09:12:53 8   are at Document 7338 in the record and incorporated herein,

09:12:59 9   that provide fair balance to what we think is a one-sided

09:13:05 10  description of the FDA/manufacturer relationship.

09:13:09 11             In addition to the ones that we previously

09:13:11 12  submitted at the end of Request D, we would propose the

09:13:14 13  following language:  "The FDA must reject proposed labeling if

09:13:19 14  it is false or misleading in any particular."

09:13:22 15        THE COURT:  Okay.  All right.  Thank you very much.  I

09:13:25 16  deny the motion.

09:13:26 17        MR. GLICKSTEIN:  The other section of the charge that

09:13:29 18  deals with FDA is page 24, carrying over to page 25, and

09:13:37 19  defendants object to this instruction because it gives

09:13:42 20  insufficient attention to the relevance of FDA's approval of

09:13:46 21  Xarelto and its design and labeling.  And we ask instead that

09:13:51 22  the Court give Defendants' corrected proposed Instruction

09:13:57 23  Number 12 previously submitted to Your Honor.

09:13:58 24             In Defendants' view, the charge it's unbalanced.

09:14:04 25  One sentence -- it states in one sentence that the jury can

*OFFICIAL TRANSCRIPT*

09:14:09  1    consider FDA approval while devoting three sentences,

09:14:16  2    comprising 13 lines, stating that the jury need not give it

09:14:21  3    very much, if any, weight.

09:14:23  4         And we also think there's an imbalance in the

09:14:27  5    levels of specificity in the charge when advising the jury that

09:14:30  6    it can disregard FDA approval, the Court specific, but it is

09:14:35  7    not nonspecific as to how the jury can permissibly consider FDA

09:14:40  8    approval.  And it does not explicitly state, as the Mississippi

09:14:45  9    Supreme Court has held, that it's evidence that Defendants'

09:14:52 10    conduct is reasonable.  And that's the *Union Carbide* case

09:14:56 11    142 So.3d 387.

09:14:58 12         So, for these reasons, we think that the proposed

09:15:05 13    charge is unbalanced and also incorrect and incomplete.

09:15:08 14         THE COURT:  Thank you.  I will take that into

09:15:08 15    consideration.

09:15:09 16         MR. GLICKSTEIN:  And, finally, there was the one area

09:15:12 17    where I needed to be more specific.  As Your Honor had said,

09:15:16 18    it's not a warnings case, because it warns of the bleeding

09:15:21 19    risk.  But we need to keep in mind that the warning also says

09:15:25 20    that there is no laboratory tests which can predict the

09:15:33 21    bleeding risk.  And that's the guts of the case.

09:15:36 22         And so the jury has to be able to consider, I

09:15:39 23    believe, that statement when considering whether there needs to

09:15:45 24    be an additional instruction.  And I don't think you can slice

09:15:48 25    the salami that thin and tell them they can only focus on

*OFFICIAL TRANSCRIPT*

09:15:52  1   instructions and kind of ignore the warning section in

09:15:56  2   determining whether there ought to be an instruction.

09:15:58  3         THE COURT:  Okay.  I understand.  Thank you very much.

09:16:00  4   I'll be back in a minute.

09:16:01  5               Court will stand in recess.

09:16:03  6         THE DEPUTY CLERK:  All rise.

09:16:04  7         (WHEREUPON, at 9:16 a.m. the Court took a recess.)

09:23:48  8         (WHEREUPON, at 9:23 a.m. the jury panel enters the

09:23:59  9   courtroom.)

09:23:59 10         THE COURT:  Be seated, please.

09:24:15 11               Good morning, ladies and gentlemen.  We're at the

09:24:19 12   point now where all of the evidence has been in, and we're

09:24:23 13   going to start the closing arguments.

09:24:27 14               I want to take the opportunity first to thank

09:24:30 15   each of you for your participation.  The lawyers very much

09:24:33 16   appreciate it, and you need to know that the Court appreciates

09:24:36 17   it.  You've worked very hard.  All of us realize that.  And

09:24:40 18   we've taken you from your affairs in life that you would be

09:24:46 19   ordinarily doing, and you need to know that we appreciates it.

09:24:49 20   And you've served to your country and the judicial system by

09:24:54 21   your service here today.  The lawyers thank you, and I thank

09:24:58 22   you.

09:24:58 23               Now, you know from watching these lawyers that

09:25:01 24   they are very good lawyers.  They can speak for days, and I

09:25:08 25   can't have them speak for days, so I've given them limitations.

*OFFICIAL TRANSCRIPT*

09:25:12  1   The point is, it's my limitation, not theirs.  They have a lot

09:25:18  2   to say, but I've asked them to limit it to one hour each, so

09:25:21  3   each side will have one hour.

09:25:23  4          And following that, I'll have an opportunity to

09:25:26  5   discuss the law applicable to the case.  And then you'll have

09:25:28  6   it.  And we've arranged for you to have lunch on the Court, and

09:25:36  7   you can relax, have a nice lunch, and then begin your

09:25:40  8   deliberations.  But we'll first hear from the lawyers for the

09:25:40  9   Plaintiff.

09:25:40 10          You may proceed, Counsel.

09:25:40 11                     CLOSING ARGUMENTS

09:25:40 12   BY MR. BIRCHFIELD:

09:25:45 13          Good morning, Your Honor.

09:25:46 14          Good morning.  I want to kind of tell you where

09:25:51 15   I'm heading with this.  Over the past two weeks you have

09:25:55 16   been -- you've been bombarded with a lot of evidence.  And what

09:25:57 17   I want to do in the time that I have is marshal this evidence

09:26:06 18   with the questions that all of you are going to be asked.  The

09:26:09 19   anticoagulant market is a fiercely competitive and highly

09:26:12 20   profitable market.  So any marketing disadvantage would have

09:26:17 21   major ramifications for the company.  So the temptation -- the

09:26:21 22   temptation to violate the rules is significant.

09:26:27 23          But we're not talking about selling cars.  We're

09:26:32 24   talking about blood thinners, anticoagulants.  This is a class

09:26:36 25   of drug that you have -- that you heard is a particularly

*OFFICIAL TRANSCRIPT*

09:26:39  1    dangerous class of drugs.  The conditions that these drugs
09:26:45  2    treat are life-threatening conditions.  There is no question
09:26:47  3    about that.  DVT can be a life-threatening condition.
09:26:52  4            But the risk with these drugs are life
09:26:56  5    threatening and what -- a GI bleed can be a fatal bleed.  A
09:27:02  6    brain bleed can be a fatal bleed.  So it is very important that
09:27:07  7    the doctors have the tools that they need to safely administer
09:27:12  8    these medications.
09:27:14  9            And so what I want to do is just walk through the
09:27:18 10    verdict form.  This is a copy -- best I can tell, this would be
09:27:24 11    a copy of the verdict form that you will receive that
09:27:27 12    Judge Fallon mentioned to you.  And let's take a look at, you
09:27:31 13    know, at the first question.
09:27:33 14            The first question -- I apologize for the typo
09:27:36 15    there -- the first question:  Do you find by a preponderance of
09:27:39 16    the evidence that Xarelto either proximately caused or
09:27:45 17    substantially contributed to Mrs. Mingo's GI bleed?
09:27:48 18            Now, when you -- when you go back into in the
09:27:52 19    deliberation room, you're going to have jury charges.
09:27:55 20    Judge Fallon is going to read the charges to you and then he's
09:27:58 21    going to give you a copy.  What I suggest that you do is look
09:28:00 22    at -- look at pages 26 through 29 to guide you as you answer
09:28:09 23    this question.
09:28:11 24            One of the things that you will see and you'll
09:28:13 25    hear from the Court as he gives you the instructions is that

*OFFICIAL TRANSCRIPT*

09:28:18  1    Mrs. Mingo -- what we're charged with doing is to show that it

09:28:22  2    either proximately caused or substantially contributed to

09:28:26  3    Mrs. Mingo's bleed.

09:28:27  4             So what do we have to show?  It's not necessary

09:28:30  5    that we show that it was the sole cause of her GI bleed.  Just

09:28:35  6    that it was a substantial contributing role, played a

09:28:39  7    substantial contributing role in causing her GI bleed, even if

09:28:43  8    there were other causes.

09:28:47  9             So, if there was an underlying GI ulcer or if she

09:28:52 10    was taking aspirin and they played a role, that that's okay.

09:28:55 11    As long as we show more likely than not Xarelto was a

09:29:00 12    substantial contributing factor in her bleed.

09:29:02 13             And it's not just a question of, you know,

09:29:07 14    whether it caused the bleed in and of itself.  If it was -- did

09:29:12 15    it aggravate it, the underlying condition, if it made it worse,

09:29:19 16    through the fault of the defendant that it made it worse, then

09:29:23 17    the answer to Question Number 1 would be yes.

09:29:25 18             Now, what do we have?  What evidence do we have

09:29:29 19    that plays to this issue?  First, we have the testimony of

09:29:37 20    Dr. Rinder.  Remember Dr. Rinder?  Dr. Rinder, hematologist.

09:29:45 21    He came in and testified that Xarelto is a significant

09:29:49 22    contributing factor to Mrs. Mingo's GI bleed.

09:29:52 23             And one of the key factors was -- that showed him

09:29:57 24    that she was -- she was at an excessive risk of bleeding on

09:30:00 25    Xarelto were the PT readings that she had.  The first one, the

*OFFICIAL TRANSCRIPT*

09:30:05  1   23.6, remember, that was the day after, the day after she

09:30:10  2   started taking Xarelto.  She had taken two pills, and then the

09:30:15  3   next morning, before she took her next pill, it was a 23.6.

09:30:19  4          And Dr. Rinder -- if you remember, she took the

09:30:22  5   one dose, the single dose of Coumadin that had been given

09:30:26  6   35 hours earlier, and he looked at that and he looked at the

09:30:31  7   evidence and said, no, I don't think that a single dose,

09:30:35  8   35 hours earlier, would have affected this 23.6.

09:30:39  9          Because when you start Coumadin, you have to --

09:30:41 10   you keep folks in the hospital for three or four days

09:30:44 11   so that -- until you can get at that regulated.  Remember, the

09:30:48 12   step?

09:30:48 13          But even if, even if the single dose factored in

09:30:54 14   here, it clearly did not factor in on the 26.2.  So those two

09:31:00 15   taken together make it very clear that Mrs. Mingo was a high

09:31:05 16   responder.  She was in the fourth quartile for PT, so she was

09:31:10 17   in that extra high level.

09:31:12 18          All right.  So, what does that mean?  What does

09:31:14 19   it mean when you say that you're in a fourth quartile?  You're

09:31:18 20   at an excessively high risk of bleeding.  And we have evidence

09:31:25 21   across all their clinical trials that there is a fourth

09:31:28 22   quartile analysis and that those folks are the high responders,

09:31:33 23   they are the ones at excessive risk.

09:31:35 24          And, remember, when we're talking about fourth

09:31:38 25   quartile analysis, that is not something that -- that's not

*OFFICIAL TRANSCRIPT*

09:31:42 1    something that we came up with.  That is something that the

09:31:45 2    companies used, the FDA uses this quartile analysis.  It's not

09:31:51 3    some kind of plaintiff/lawyer made-up hooey that you can

09:31:55 4    dismiss with a candy bar.  This is science.  They used it

09:31:59 5    themselves.

09:32:00 6             Remember the blood article?  The blood article --

09:32:03 7    and look at the authors there.  Those are -- those are Bayer

09:32:07 8    scientists.  They did this analysis.  And they show that that

09:32:12 9    fourth quartile analysis poses -- puts folks at a high risk,

09:32:17 10   you can call it an extreme risk of bleeding.  They are at

09:32:23 11   extreme risk.  Those are the people at a high-risk.

09:32:27 12            The blood article, that was the RECORD trial.

09:32:29 13   Remember, those were the ones that were -- those are the trials

09:32:31 14   that were used for DVT prophylaxis or preventing DVTs.

09:32:37 15            Then we have the EINSTEIN analysis.  Remember

09:32:42 16   Dr. Lensing, you saw in his deposition -- seems like it took

09:32:46 17   forever for us to get that in, short chunks at a time.  But

09:32:49 18   when he's looking at the EINSTEIN analysis, then he did

09:32:53 19   quartile analysis, and there, again, we see, where did

09:32:56 20   Mrs. Mingo fall with her peak PT or her trough PT?  She was at

09:33:00 21   an excessive risk of bleeding.

09:33:03 22            So, when we look at -- when we look at these

09:33:08 23   trials, you have the RECORD trial, you have the EINSTEIN trial,

09:33:12 24   you have the ROCKET trial.  The ROCKET with the AFib, that was

09:33:14 25   the biggest one.  Every one of these, every one of these shows

*OFFICIAL TRANSCRIPT*

2158

09:33:18 1   the risks that are involved in being in that fourth quartile,

09:33:21 2   that high risk.

09:33:24 3            So, Mrs. Mingo, she was -- she was in that

09:33:27 4   category.  So when I ask -- when you go back and you look at

09:33:30 5   the evidence, look at Plaintiff's Exhibit 18 and Plaintiff's

09:33:38 6   Exhibit 83.  And look at Plaintiff's Exhibit 124, the blood

09:33:48 7   article.  You'll see here the company documents are showing,

09:33:52 8   you know, that Mrs. Mingo was at a high-risk.

09:33:55 9            So, what else do we have?  We've got -- we've got

09:33:59 10  Ms. Mingo clearly up there.  We've got Dr. Rinder's testimony.

09:34:02 11  And we have Dr. Keith, Dr. Stephen Keith's testimony.  He was

09:34:08 12  the treating physician.  And you saw his deposition.  He

09:34:10 13  testified Xarelto was a substantial contributing factor to

09:34:15 14  Mrs. Mingo's bleed.

09:34:17 15           He acknowledges that over anticoagulation, like

09:34:20 16  Mrs. Mingo had in that fourth quartile, can make a bleed worse.

09:34:24 17  If you have a little bleed, if you're over anticoagulated, it's

09:34:28 18  going to be worse.  He also told us that her bleed was a

09:34:34 19  life-threatening bleed.

09:34:35 20           And then we have Demond Haynes.  And this was --

09:34:39 21  Dr. Haynes and he was a defense expert that they called, and he

09:34:45 22  wouldn't say that Xarelto caused Mrs. Mingo's bleed.  But he

09:34:48 23  does say that Xarelto can be a contributing factor to the

09:34:51 24  GI bleed, and he did acknowledge that Xarelto affected

09:34:55 25  Mrs. Mingo's clotting cascade.

*OFFICIAL TRANSCRIPT*

09:34:59  1          Then we have the label.  The label itself.

09:35:02  2   Remember when we started, it seems like forever ago when I was

09:35:07  3   here giving an opening, and I said:  "This is not a failure to

09:35:09  4   warn claim.  This is not a failure to warn case.  It is a

09:35:12  5   failure to instruct.  Failure to you adequately instruct."

09:35:18  6          The label itself clearly warns about bleeding.

09:35:21  7   Look at the language in the label.  In the label itself,

09:35:23  8   Xarelto can cause, can cause serious bleeding.  And the

09:35:30  9   defendants, so they -- remember, the last witness that we heard

09:35:35 10   from was Dr. Herrin.  Nice guy.  But he was brought in as a

09:35:42 11   hired expert to say that Xarelto can't cause bleeding.

09:35:50 12      Why?  Because the scientist know that it can cause

09:35:54 13   bleeding.  They needed someone to take the position that their

09:35:58 14   scientists couldn't take.

09:36:00 15          So we have the label itself.  Take a look at the

09:36:03 16   label.  Xarelto can cause, can actually cause bleeding.

09:36:08 17          So, the issue is raised, well, would she have

09:36:11 18   bled on any other anticoagulant?  So what do we know?  Well,

09:36:16 19   first of all, we look at all of the options.  Remember this, we

09:36:22 20   covered all of the options with Dr. Herrin that are out there?

09:36:26 21   And there is no evidence to suggest that Mrs. Mingo would have

09:36:31 22   had a high response to any of the other NOACs or any of the

09:36:36 23   other medicines.

09:36:37 24          She took Lovenox, and she did fine on Lovenox.

09:36:41 25   After she stopped taking her Lovenox, then she had a -- she had

*OFFICIAL TRANSCRIPT*

2160

09:36:45 1    a DVT.  She had a clot, but not while she was on Lovenox.  She

09:36:50 2    didn't have a bleed while on Lovenox.  So that would have --

09:36:54 3    but if you look at all of the NOACs, Xarelto is the one with

09:36:58 4    the highest bleeding risk.

09:37:00 5              So, if you add all of this together, I think the

09:37:06 6    evidence supports more likely than not Xarelto proximately

09:37:11 7    caused or substantially contributed to Mrs. Dora Mingo's bleed.

09:37:16 8              And that will bring us to Question Number 2.  Do

09:37:21 9    you find by a preponderance of the evidence that the defendants

09:37:25 10   failed to provide Dr. Renie Jordon adequate instructions for

09:37:32 11   safe use?

09:37:33 12             So when you're evaluating this question and

09:37:37 13   looking at the instructions here, go to pages 18 through 25,

09:37:48 14   and there we find the instructions that I believe Judge Fallon

09:37:52 15   will give you regarding, what does Ms. Mingo have to prove to

09:37:56 16   establish a failure to adequately instruct claim?

09:38:04 17             And you'll see in this claim we have to show that

09:38:06 18   the defendants knew or reasonably should have known that

09:38:11 19   Xarelto had a dangerous characteristic.  So what is this

09:38:15 20   dangerous characteristic?  You've heard about this from

09:38:22 21   Laura Plunkett, about the variability of the drug, tenfold

09:38:26 22   variability.

09:38:26 23             It's different.  Xarelto is different than what

09:38:29 24   you have with the other -- the other anticoagulants.  There is

09:38:31 25   this tenfold difference.  You have people that will take the

*OFFICIAL TRANSCRIPT*

medicine and one person may -- the way their body responds may be ten times different than the next person.  So we have this dangerous characteristic.

The defendants failed to adequately instruct Mrs. Mingo's prescribing physician, that's Dr. Jordon, about using a PT test to detect, evaluate and avoid this dangerous characteristic.  It's undisputed, I believe.  I don't believe there is any evidence that says that we -- the companies gave Dr. Jordon and other doctors instructions about using the PT test.

No, they take the position -- they've taken the position in this courtroom that that would be -- that would be dangerous.  So that's -- I think it's undisputed that they provided those instructions.

The absence of adequate instructions -- the next thing we need to show -- the absence of those instructions made Xarelto unreasonably dangerous.  And that goes back to the fourth quartile.  Mrs. Mingo, she is in that upper -- in that upper quartile, and so it was unreasonably dangerous, because you have this wide variability.  Without a way to test to identify those people, it's unreasonably dangerous.

And then you must show that the injury that she suffered, her GI bleed, was proximately caused by that failure to instruct.  So what do we have on that?  We have Dr. Jordon's testimony.  Dr. Jordon, he testified that if he had known that

*OFFICIAL TRANSCRIPT*

09:40:12  1    she was -- if he had known about this test, he would have -- he

09:40:16  2    would have administered the test.  He knew that she was an

09:40:19  3    excessive risk, he would have stopped the drug.  Another

09:40:22  4    option.

09:40:23  5            What else do we have?  And so is that -- is that

09:40:26  6    an unreasonable position for Dr. Jordon to take?  No.  It's

09:40:34  7    supported by Bayer scientists.

09:40:36  8            Remember Dr. Spiro?  Dr. Spiro, the Bayer

09:40:39  9    scientist?  And he was asked -- you saw his video deposition --

09:40:42 10    and he was asked:  What would you do if someone had an overly

09:40:48 11    high plasma concentration?  Too much blood on board, blood too

09:40:53 12    thin, excessive risk of bleeding, what would you do if you had

09:40:56 13    a patient that had excessively high plasma concentration?

09:41:03 14            He said:  Well, if they were reasonably impaired.

09:41:08 15            Well, if they weren't reasonably impaired?

09:41:11 16            I would stop the drug, stop the dose.  Hold the

09:41:14 17    dose.

09:41:14 18            That's what he would have done.  That's Bayer

09:41:16 19    scientists.

09:41:16 20            That's what Dr. Jordon said he would have done

09:41:19 21    had he known about this test, about the way to --

09:41:24 22            I think if you look at the evidence here, you

09:41:25 23    will see that the answer, more likely than not, the defendants

09:41:31 24    failed to adequately instruct Dr. Jordon on the safe use of

09:41:37 25    this product.

                              *OFFICIAL TRANSCRIPT*

09:41:38 1          And so we have -- we have -- you know, one of the

09:41:43 2  issues is, can you do the test?  Can you test?  We have

09:41:48 3  Dr. Gosselin -- not Dr. Gosselin -- Mr. Gosselin, Bob Gosselin,

09:41:52 4  who came in.  This is the guy whose life, his career has been

09:41:57 5  devoted to these laboratory tests.  One of the most published,

09:42:00 6  greatest researchers in this area.  And he came in and he told

09:42:03 7  us, yes, you can test.  Neoplastin is a particularly sensitive

09:42:08 8  reagent.  It can be used to identify the blood levels, the high

09:42:13 9  responders on these drugs.

09:42:15 10          We have Dr. Rinder who told us that it is -- that

09:42:20 11  Neoplastin is a tool that doctors can use to identify folks

09:42:26 12  that are at risk.

09:42:27 13          We have the medical literature, the medical

09:42:29 14  literature that includes the Bayer scientists.  Back in 2005 --

09:42:34 15  back in 2005 they were using -- they were studying, what are

09:42:38 16  the best tools to measure -- measure the effect here?  And they

09:42:42 17  recognized that Neoplastin is the right one.  That's confirmed

09:42:46 18  by Bayer scientists in 2013.  And Dr. Spiro himself is involved

09:42:53 19  in these studies.

09:42:53 20          So we have -- we have Dr. Rinder.  We have

09:42:57 21  Bob Gosselin.  We have Bayer scientists.  We have their

09:43:00 22  clinical trials.

09:43:00 23          When they -- when they were doing their clinical

09:43:03 24  trials and they were studying this drug and they were getting

09:43:05 25  ready to submit this data to the FDA, what did they use to

*OFFICIAL TRANSCRIPT*

09:43:09  1    measure the plasma concentration?  PT with Neoplastin.

09:43:15  2              Then we have what Bayer says to regulators and

09:43:21  3    doctors outside of the United States.  You've heard the

09:43:25  4    testimony of Dr. Lensing by video.  You heard him say about how

09:43:32  5    to make sure that the information -- it is important that the

09:43:34  6    information be right, that the information be correct.

09:43:38  7              What do they say?  This test is useful.  This

09:43:42  8    test can be useful.  So when we look at -- what are we talking

09:43:49  9    about?  What test are we talking about?  The Neoplastin PT may

09:43:55 10    be useful to assist in determining an excess anticoagulant.  Is

09:44:04 11    the blood too thin?  Are they at risk (inaudible)?

09:44:07 12              So when we look at all of this together, we've

09:44:12 13    got Rinder, we have Gosselin, we have Bayer scientists, we have

09:44:25 14    what they tell doctors and regulators in Canada, we have the

09:44:30 15    medical literature, the early medical literature.  All of this

09:44:37 16    tells us that they know that there is a test that could be

09:44:42 17    measured -- used to measure this.

09:44:43 18              Again, why is this important?  It's important

09:44:47 19    because of the variability, the high variability.

09:44:53 20              All right.  So, let's go to Question Number 3.

09:44:56 21    We look at Question Number 3:  Do you find by a preponderance

09:44:58 22    of the evidence that the Defendants' failure to provide

09:45:02 23    adequate instructions to Dr. Jordon was a proximate cause of

09:45:02 24    Dora Mingo's GI bleed?

09:45:08 25              So what do we have that shows that there is a

**OFFICIAL TRANSCRIPT**

09:45:14  1   connection between the adequate instructions to Dr. Jordon and

09:45:21  2   Dora Mingo's bleed?

09:45:21  3            There again, we go to Dr. Jordon's testimony.

09:45:23  4   What would he have done if he had known?  He would have stopped

09:45:28  5   the Xarelto.

09:45:33  6            Is that reasonable?  What did Dr. Spiro say?

09:45:38  7   Dr. Spiro said, if there is an overly high level of plasma

09:45:45  8   concentration, I would stop the drug.

09:45:48  9            So I suggest to you that when you weigh the

09:45:50 10   evidence and take into consideration here, take into

09:45:54 11   consideration here all of this about the fourth quartile, and

09:46:00 12   was she at an excessively high level of bleeding, look at

09:46:06 13   Dr. Jordon's testimony and Dr. Spiro's testimony.  The answer,

09:46:11 14   I believe, to Question 3 is yes.

09:46:15 15            Question 4:  Do you find by a preponderance of

09:46:18 16   the evidence that Xarelto had a defective design at the time it

09:46:23 17   left the Defendants' control?

09:46:25 18            So, when they went to market with this drug, when

09:46:32 19   they put it out, was it defectively designed?  So what's the

09:46:36 20   instructions that we'll need to look at for a defective design?

09:46:45 21            I suggest you go to pages 25 and 26 of the jury

09:46:48 22   charges that Judge Fallon will give you.  When he gives us the

09:46:53 23   elements of the law, what do we need to establish, on pages 25

09:46:57 24   and 26, one, you have to show that it was defectively designed,

09:47:01 25   and that the design made it unreasonably dangerous.

                              *OFFICIAL TRANSCRIPT*

09:47:04  1          So what are we talking about?  Again, what is the

09:47:07  2  defective aspect of this drug?  It's the high degree of

09:47:11  3  variability.  That is Dr. Laura Plunkett.  The tenfold

09:47:17  4  variability.  That is the dangerous characteristic of this drug

09:47:23  5  that requires that it comes with a way to measure.

09:47:27  6          The next element of the claim is did the

09:47:31  7  Defendants know or should they reasonably have known of

09:47:35  8  Xarelto's danger.  Well, that's clear.  How do we know about

09:47:40  9  this variability?  How do we know?  It's from their own data.

09:47:46  10  It's what they submitted to the FDA.  It's all of this about

09:47:48  11  the degree of variability and that the increased risk of plasma

09:47:53  12  concentration leads to a bleeding risk.

09:47:56  13          Then, Xarelto failed to function as expected.

09:48:02  14  So, how does this high degree of variability, how does it

09:48:07  15  impact the drug's expected response?  What do you expect?

09:48:11  16          You heard this from Dr. Rinder.  When you are

09:48:15  17  giving -- giving a patient an anticoagulant, you're doing that

09:48:20  18  because the balance has been tilted in favor of clotting.  You

09:48:24  19  need to bring that balance -- you need to bring that

09:48:30  20  hemostasis, that process, back into balance.  That's the

09:48:33  21  expectation, that you bring it back into balance, not here.  Up

09:48:37  22  here is a problem.  That's the variability.  So that's the

09:48:41  23  dangerous aspect of this.  That's why you need a way to test.

09:48:49  24          Failure to instruct, that's the PT test.  It's

09:48:52  25  out there.  That is a tool that the doctors have in their

*OFFICIAL TRANSCRIPT*

09:48:55 1    toolboxes.  It's used all over the country.  It's readily

09:48:59 2    available.  It's the very PT reagent that was used in

09:49:02 3    Ms. Mingo's case in McComb, Mississippi.  The doctors are told

09:49:07 4    it has no relevance to Xarelto.  That's the PT up here.

09:49:12 5            When you're talking about defective design,

09:49:16 6    you're talking about the Factor Xa test, the Factor Xa test

09:49:21 7    that Dr. Spiro said, it is available, it's been on the market

09:49:24 8    there in Europe.  Dr. Gosselin testified that it is a test that

09:49:31 9    is effective in measuring the effect of Xarelto.  It measures

09:49:36 10   the plasma concentration.  So it is a -- it's a way, but it's

09:49:41 11   not -- it doesn't come with Xarelto here.

09:49:44 12           So how does Dr. Gosselin measure it?  He does

09:49:48 13   what's called a lab-developed test.  Remember the process that

09:49:53 14   you go through, you have to validate it.  It's done.  It's done

09:49:56 15   regularly.  Labs all across the country have their own

09:50:00 16   lab-developed test.  But it is a way that the Defendants could

09:50:02 17   have -- could have sold Xarelto with its own Factor Xa test.

09:50:13 18           So we have Dr. Spiro.  We have Bob Gosselin

09:50:18 19   talking about the -- testifying about the Factor Xa test, that

09:50:23 20   it is an effective way to measure the plasma concentration --

09:50:29 21   to identify, it's another way to identify those patients that

09:50:31 22   are in the fourth quartile, those that are in the high risk

09:50:36 23   zone.

09:50:38 24           I submit to you, again, take all of this, all of

09:50:42 25   this turns on the showing that Dora Mingo was in the upper

**OFFICIAL TRANSCRIPT**

09:50:48 1  portion.  The answer to Question 4, I suggest to you, based on

09:50:51 2  the evidence, is yes.

09:50:54 3          That brings us to Question 5:  Do you find by a

09:50:59 4  preponderance of the evidence that Xarelto's defective design

09:51:01 5  was a proximate cause to Dora Mingo's GI bleed?

09:51:06 6          So, how does -- how does the lack of the

09:51:10 7  Factor Xa test, how does that connect with Dora Mingo's

09:51:16 8  GI bleed?  What we're talking about here is Dora Mingo.

09:51:21 9  Dora Mingo is a high responder to Xarelto.  How do we know

09:51:26 10 that?  We know that her plasma concentration, how much drug is

09:51:30 11 in her blood, how thin does Xarelto make her blood, she's in

09:51:34 12 this upper quartile.

09:51:35 13         Well, there are two -- there are two different

09:51:37 14 ways to identify how to show that she is in that high zone.

09:51:43 15 One is a PT test.  The other is to measure the precise level

09:51:48 16 with a Factor Xa test.

09:51:50 17         She's there.  We know she's there because we have

09:51:52 18 these two PT tests with Neoplastin that clearly establish where

09:51:56 19 she is.

09:51:57 20         So, if you have the Xa test, the Factor Xa test,

09:52:04 21 as another way to have measured her, it would have shown that

09:52:07 22 she is in that fourth quartile.  She is at a high risk.  The

09:52:11 23 answer to Question 5 would be yes.

09:52:17 24         That's supported by Gosselin's testimony about

09:52:20 25 the reliability of the Factor Xa, supported by Dr. Spiro's

*OFFICIAL TRANSCRIPT*

09:52:25  1   testimony about the use, that it is -- it was used in their

09:52:30  2   clinical trials, it's used in other places with Xarelto.

09:52:34  3          That brings us to Question Number 6:  What amount

09:52:39  4   do you find by a preponderance of the evidence is appropriate

09:52:45  5   to fairly and adequately compensate Dora Mingo for her

09:52:49  6   injuries?

09:52:51  7          So on the medical expenses, we actually have a

09:52:57  8   stipulation to that amount.  If you'll turn -- when you get

09:53:02  9   your instructions, you'll find it, I believe, on page 32.  The

09:53:08 10   medical expenses that were stipulated to here are $28,758.21.

09:53:19 11          So what about the past physical pain and

09:53:23 12   suffering and mental anguish?  Ms. Mingo leaves that to you, to

09:53:33 13   your good judgment.

09:53:36 14          You've heard testimony about the experience that

09:53:39 15   she went through.  There is -- you know, Ms. Mingo, we are

09:53:45 16   thankful that she is here, and she's recovered.  She's able to

09:53:49 17   go about her business.  We're not trying to overextend the

09:53:54 18   extent of her injuries, but we don't want to minimize either.

09:53:58 19          This was a serious, frightening, life-threatening

09:54:02 20   ordeal that she went through.  She spent time in the ICU.  She

09:54:09 21   had to undergo this procedure and recovery.  It was a serious

09:54:12 22   ordeal.  We just leave this, what was her past pain and

09:54:16 23   suffering and mental anguish as a result of that, we leave that

09:54:20 24   to your discretion.

09:54:23 25          When you take all of the evidence -- and there is

*OFFICIAL TRANSCRIPT*

09:54:27  1    a lot, I know that there is a lot -- I ask that you take the

09:54:33  2    time, go through the evidence, go through the testimony of the

09:54:38  3    experts that you have heard in this case.

09:54:41  4            You've heard from Dr. Laura Plunkett about the

09:54:51  5    pharmacology and the toxicology of this drug, the variability,

09:54:55  6    that dangerous aspect.  You heard from Dr. Parisian about the

09:54:57  7    rules that are in place, the rules that require, if there is a

09:54:59  8    useful -- if there is a helpful test, it must, it must be in

09:55:05  9    the label -- in the warnings and precautions section of the

09:55:08 10    label.  That's what a reasonable pharmaceutical company would

09:55:13 11    do.

09:55:13 12            How do we know that?  We know that because other

09:55:19 13    companies do it.  You heard from the experts that in the

09:55:25 14    Arixtra label, they put -- in Section 5 of the label, they put

09:55:29 15    those instructions there.  In the Lovenox label, there are

09:55:33 16    instructions there about the use of laboratory tests that are

09:55:37 17    helpful in a doctor following, following the response of a

09:55:44 18    patient to the drug.  That information should have been in the

09:55:49 19    label.

09:55:51 20            So that brings us back to why?  Why would the

09:55:56 21    companies here not include this instruction?  We go back to the

09:56:05 22    very beginning.

09:56:06 23            When did they develop the core message that no

09:56:13 24    monitoring would be required?  It goes back to 2005, before the

09:56:18 25    clinical trials in patients with these diseases were concluded.

***OFFICIAL TRANSCRIPT***

09:56:23  1    They had already established by contract between Janssen and

09:56:27  2    Bayer, no monitoring will be required.  It was a core message,

09:56:32  3    a core message.  They were protecting this message every step

09:56:42  4    of the way.

09:56:43  5            So one of the -- one of the instructions that

09:56:47  6    Judge Fallon will give you is in regards to what would a

09:56:55  7    reasonable pharmaceutical company do to provide adequate

09:56:58  8    instructions about a test.  That's your job, that's your

09:57:02  9    responsibility, to evaluate it.  Is what Bayer and Janssen did

09:57:06 10    here what a reasonable pharmaceutical company would do?  When

09:57:12 11    you look at the Lovenox label, you look the Arixtra label,

09:57:16 12    reasonable pharmacological companies put it in.

09:57:18 13            You heard the testimony of Susan Geiger.  She was

09:57:21 14    on the TV screen here.  She testified by way of satellite.  I

09:57:25 15    think her testimony is particularly enlightening about what a

09:57:31 16    reasonable pharmaceutical company would do.

09:57:34 17            She said, look, we keep -- we keep marketing and

09:57:40 18    science separate.  She even used the analogy of church and

09:57:43 19    state to say that they are completely separate.  Why?  Because

09:57:51 20    we know that a reasonable pharmaceutical company would not be

09:57:57 21    guided in important decisions by marketing.  Instead, they

09:58:01 22    would be guided by what is the science, what does the medicine

09:58:06 23    show.

09:58:06 24            When we look at motive -- and you can go through

09:58:08 25    the -- go through the exhibit stack here.  You'll see

*OFFICIAL TRANSCRIPT*

09:58:11 1    Plaintiff's Exhibit 3 and Plaintiff's Exhibit 4.  Look at
09:58:14 2    Plaintiff's Exhibit 29 about the motive here.  Remember
09:58:26 3    Mr. Shah's testimony about the critical nature of the
09:58:28 4    importance of Xarelto to the company.  Remember Ms. Geiger's
09:58:34 5    testimony about the importance of Xarelto to the company.
09:58:39 6            Take a look at what did they know on the science
09:58:45 7    side.  Take a look at Plaintiff's Exhibit 116.  That's
09:58:50 8    Dr. Spiro's testimony about the good news and the bad news.
09:58:53 9    Remember that, that, look, the good news is you only need to
09:58:59 10   monitor in special circumstances; the bad news, there are a lot
09:59:05 11   of special circumstances.
09:59:08 12           You know what, Dora Mingo would fit in one of
09:59:11 13   those special circumstances, elderly patient over 65.
09:59:15 14   Dora Mingo would fit in one of those special circumstances.
09:59:19 15   The science side of the company knew they needed to -- they
09:59:24 16   needed to (inaudible due to someone sneezing).
09:59:32 17           Then take a look at Plaintiff's Exhibit 127.
09:59:33 18   This is the e-mail from Mr. Shah, who testified by satellite.
09:59:38 19   What did Mr. Shah say?  He evaluated this from a commercial
09:59:44 20   standpoint, the marketing side:  We don't want to have anything
09:59:49 21   to do with measurement.  That would cut against the core
09:59:55 22   message.
09:59:56 23           Then we have a couple of other examples of where
09:59:59 24   marketing and science had different views.  So on this issue,
10:00:03 25   the science side, we need to measure; the marketing side, we

**OFFICIAL TRANSCRIPT**

10:00:07 1   don't want anything to do with a measure or monitor.  What did

10:00:11 2   they do?  There is nothing.  There is nothing in the label

10:00:14 3   about measuring or monitoring.  In fact, they promote the

10:00:18 4   message through KOLs, through their label, that you cannot --

10:00:21 5   it's impossible to monitor.

10:00:24 6             Another example.  Remember the testimony about

10:00:26 7   the ROCKET 2, the ROCKET 2 trial, the booster that Dr.

10:00:30 8   Califf -- who was head of the clinical research and did their

10:00:35 9   big ROCKET study, went on to become, for a short while, the

10:00:39 10  commissioner of the FDA -- he said, look, we got to get the

10:00:42 11  dose right.  We need to do a second study.  We need to find a

10:00:47 12  lower dose that's effective.

10:00:48 13            He made that proposal.  Scientists within the

10:00:53 14  company agreed, this is something we need to do.  We've got

10:00:55 15  science saying, yes, we need to find this dose.

10:00:59 16            What did marketing say?  We had Mr. Shah's

10:01:03 17  superior, vice-president Patricia Torr, writes an e-mail, she

10:01:10 18  says she's opposed to this.  This would kill us in the market.

10:01:14 19  It would tell us that the competition is right.  It would be

10:01:19 20  too late.

10:01:20 21            So science says, yes, we need to do the study.

10:01:25 22  Marketing says, no.  Did they do the study?  No.

10:01:28 23            A reasonable pharmaceutical company follows the

10:01:33 24  rules.  They put the important test in the label -- Section 5

10:01:36 25  of the label.  A reasonable pharmaceutical company is guided by

*OFFICIAL TRANSCRIPT*

10:01:40  1    the science, and not by the market.  But that's not what

10:01:44  2    happened here.  That's not what happened with Xarelto.

10:01:47  3         I'll reserve the rest and remainder of my time for

10:01:53  4    rebuttal closing.

10:01:54  5         THE COURT:  Okay.

10:01:55  6                   CLOSING ARGUMENTS

10:01:55  7    BY MS. PRUITT:

10:02:37  8         Good afternoon -- good morning.  It's been a long

10:02:40  9    two weeks, and my client appreciates each of your time and

10:02:44 10    attention with all of the evidence.  You've all been very, very

10:02:46 11    attentive.  I know at times that it gets tedious and boring,

10:02:52 12    and you probably have a lot of other words for it, but we

10:02:55 13    really appreciate it.

10:02:56 14         I want to go through for just a moment the

10:02:58 15    questions that you're going to be asked to answer when you go

10:03:01 16    back as a group and deliberate today.

10:03:03 17         As you might imagine, our views are different on

10:03:10 18    how the questions should be answered.  So I want to go through

10:03:13 19    the evidence and the Judge's instructions as to what we believe

10:03:18 20    the evidence shows and how that's connected to the questions

10:03:24 21    that you're going to be asked to answer.

10:03:42 22         So the first question -- and everybody here

10:03:45 23    understands, because you've heard the Judge talk about it in

10:03:49 24    his instructions, but it's the Plaintiff's burden of proof.

10:03:52 25    It's the Plaintiff's job to prove their case to you by a

*OFFICIAL TRANSCRIPT*

10:03:56 1      preponderance of the evidence.

10:03:57 2              So the questions are:  Do you find that the

10:03:59 3      Plaintiff proved by a preponderance of the evidence that

10:04:02 4      Xarelto either proximately caused or substantially contributed

10:04:08 5      to Ms. Mingo's GI bleed?

10:04:11 6              What is the evidence that you've heard in this

10:04:13 7      case, from the witnesses on the stand and the documents about

10:04:16 8      this?  What we know is it's undisputed that Ms. Mingo had a

10:04:24 9      serious, life-threatening blood clot.  No one disputes that

10:04:28 10     fact.

10:04:29 11             Two, no one disputes the fact that Ms. Mingo

10:04:33 12     needed an anticoagulant.  No witness came in here to tell you

10:04:36 13     that she did not need to be treated with an anticoagulant.

10:04:41 14     Undisputed.  No factual dispute.

10:04:44 15             Three, undisputed, Ms. Mingo had an ulcer.  No

10:04:50 16     one has said anything to the contrary in this trial.

10:04:54 17             Four, Ms. Mingo's ulcer was not caused by her

10:05:00 18     Xarelto.  Undisputed.  Every doctor or every expert that was

10:05:06 19     qualified to talk about that agreed that Ms. Mingo's ulcer was

10:05:12 20     not caused by Xarelto.

10:05:15 21             Ms. Mingo's ulcer was caused by aspirin.  We'll

10:05:22 22     go through the evidence.  Ms. Mingo's ulcer was caused by

10:05:26 23     aspirin.

10:05:29 24             She bled from her ulcer.  She bled from her

10:05:35 25     ulcer.  We believe the evidence shows that if Ms. Mingo had not

*OFFICIAL TRANSCRIPT*

10:05:45 1   had an ulcer, she wouldn't have bled.

10:05:50 2          Finally, Ms. Mingo would have had the same bleed

10:05:56 3   from any anticoagulant, because all of the anticoagulants, no

10:06:02 4   matter how they work -- some of them work with different

10:06:08 5   factors, as you've all heard -- no matter how they work, they

10:06:12 6   all do a job in the blood.  The job that they do is to thin the

10:06:16 7   blood.

10:06:17 8          So when you have a preexisting ulcer, a wound,

10:06:23 9   that is a tear in your stomach in the gastrointestinal lining,

10:06:30 10  a medicine that thins your blood is going to make you bleed.

10:06:33 11  So, Ms. Mingo, we believe the evidence shows, would have the

10:06:39 12  same bleed from any anticoagulant.

10:06:42 13         Why is that important?  The reason it's

10:06:46 14  important, ladies and gentlemen, is you will get the

10:06:47 15  instructions that Judge Fallon gives you at the end of this.  I

10:06:52 16  anticipate you will hear him read to you the instructions about

10:06:56 17  proximate cause.

10:06:57 18         Proximate cause is the issue you've got to decide

10:07:01 19  for all of the claims made by the plaintiffs in this case,

10:07:05 20  proximate cause.

10:07:07 21         I anticipate the Judge will tell you, on page 27

10:07:10 22  of the instructions, if you conclude that Ms. Mingo suffered

10:07:16 23  her GI bleed even without any fault on the part of the

10:07:22 24  Defendants, then Defendants' fault cannot be considered a

10:07:30 25  proximate cause of Plaintiff's harm.

                          *OFFICIAL TRANSCRIPT*

10:07:33  1          It's important.  If you conclude Ms. Mingo would

10:07:37  2   have suffered her GI bleed even without anything the Defendants

10:07:41  3   did, then even if you find Defendants are at fault, that cannot

10:07:46  4   be considered a proximate cause of Plaintiff's harm.

10:07:51  5          Second question.  So, the first question, we

10:08:02  6   suggest this is the evidence that answers that question.  The

10:08:05  7   answer to the first question is, no, they haven't proven by a

10:08:11  8   preponderance of the evidence.

10:08:11  9          That's for you to decide.  It's not for me to

10:08:14 10   tell you.  You are the factfinders in this case.  That

10:08:17 11   Question Number 1 is for you to decide.  We believe the

10:08:20 12   evidence supports that the answer to Question Number 1 is no.

10:08:23 13          Question Number 2:  Do you find by a

10:08:28 14   preponderance of the evidence that Defendants failed to provide

10:08:29 15   to Dr. Renie Jordon adequate instructions for the safe use of

10:08:36 16   Xarelto?

10:08:39 17          What is the evidence about whether Bayer and

10:08:43 18   Janssen provided adequate instructions for the safe use of

10:08:48 19   Xarelto?  What we know from the label -- and the label is

10:08:53 20   Defendants' Exhibit 10 -- what we know is that Bayer and

10:08:59 21   Janssen warned of a risk of serious and fatal bleeding.  What

10:09:05 22   we know is we told doctors to promptly evaluate signs and

10:09:11 23   symptoms of blood loss.  What we told doctors was to weigh the

10:09:21 24   risk of bleeding against the risk of the clotting events.

10:09:29 25          In Ms. Mingo's case, the risk of a clotting event

*OFFICIAL TRANSCRIPT*

was serious and life threatening.  In the label, we told

doctors, we instructed them, you should weigh the risk of

bleeding and the risk of a life-threatening clot.  That's what

we told them.  That's what instructs doctors in how to use this

drug safely.

        We also told doctors to talk to your patients

about this.  Counsel your patients about bleeding.  Tell your

patients to report unusual bleeding or bruising.  If you see

any of these signs and symptoms of problems, call me.  Call our

office.  Come back in and get checked.

        So that is the evidence that answers Question

Number 2.  Did they prove by a preponderance of the evidence

that we failed to provide Dr. Jordon adequate instructions?  We

believe the evidence shows that the adequate instructions were

provided in the label.  I'll show you the sections in a moment.

We believe the answer to Question 2 is no for those reasons.

        Question 3:  Do you find by a preponderance of

the evidence that the Defendants' failure to provide adequate

instructions to Dr. Jordon that either proximately caused or

substantially contributed to Ms. Mingo's GI bleed?

        Again, in both counts, proximate cause is an

issue.  Proximate cause will be defined for you by

Judge Fallon.  Proximate cause includes this, on page 27:  If

you conclude that she would have suffered from a GI bleed even

without any fault of the Defendants, then Defendants' fault

*OFFICIAL TRANSCRIPT*

10:11:34 1  cannot be considered a proximate cause of Plaintiff's harm.

10:11:40 2          What do we know about whether Dr. Jordon's

10:11:46 3  prescription would have been changed?  It was interesting that

10:11:51 4  I heard Counsel tell you that Dr. Jordon would have done

10:11:55 5  something different.  You heard the evidence, ladies and

10:11:57 6  gentlemen.  You remember that the questions were asked like

10:12:00 7  this.  If what we say is true about PT, and if this is a

10:12:09 8  helpful test, would you have prescribed it?  But Dr. Jordon was

10:12:12 9  also asked, would a PT have affected your decision to prescribe

10:12:18 10 Xarelto to Ms. Mingo?  And he said, no, PT wouldn't have

10:12:22 11 affected my decision to prescribe Xarelto to Ms. Mingo.

10:12:27 12         Dr. Jordon also told you that he would prescribe

10:12:33 13 Xarelto today to patients with DVT.  He still prescribes

10:12:39 14 Xarelto today.  Those are the things that Dr. Jordon said, and

10:12:45 15 that's the evidence that will help you answer the third

10:12:48 16 question, no, do you find by a preponderance of the evidence

10:12:52 17 that the Defendants failed to provide adequate instructions to

10:12:56 18 Dr. Jordon that caused -- proximately caused or substantially

10:13:01 19 contributed to Ms. Mingo's GI bleed.

10:13:04 20         Fourth question:  Do you find by a preponderance

10:13:08 21 of the evidence that Xarelto had a defective design at the time

10:13:12 22 it left Defendants' control?

10:13:17 23         What is the evidence about defective design?

10:13:22 24 Undisputed evidence, Xarelto worked.  Ms. Mingo did not develop

10:13:33 25 any additional blood clots.  No blood clot broke off.  No blood

*OFFICIAL TRANSCRIPT*

10:13:38  1    clot broke off and traveled.  She did not develop a pulmonary

10:13:44  2    embolism.  What we know is she would have had the same bleed on

10:13:49  3    any other anticoagulant.

10:13:51  4         Now, why is that important when you're looking at

10:13:56  5    this Question 4, do you find by a preponderance of the evidence

10:13:58  6    that Xarelto had a defective design?  Because of the

10:14:06  7    instruction.

10:14:06  8         You'll get an instruction from Judge Fallon about

10:14:09  9    defective design and what the elements are for a defective

10:14:12 10    design.  And he will tell you, Plaintiffs have to prove each

10:14:15 11    and every element by a preponderance of the evidence.  And one

10:14:19 12    of those elements that you'll hear about is that they have to

10:14:22 13    prove by a preponderance of the evidence that Xarelto failed to

10:14:25 14    function as expected.  They have to prove that Xarelto failed

10:14:31 15    to function as expected.  And what we know is Xarelto's job is

10:14:37 16    to thin the blood.

10:14:38 17         And in Mrs. Mingo's case, with someone who has a

10:14:42 18    DVT clot, Xarelto's job is to prevent an additional blood clot

10:14:47 19    from forming, to prevent that clot that she already has from

10:14:54 20    breaking off, to prevent a clot from traveling and going to the

10:14:57 21    lungs and causing a pulmonary embolism.  That is what the drug

10:15:03 22    is designed to do, and that is exactly what the drug did in

10:15:08 23    this case, and that evidence is not in dispute.

10:15:14 24         They also had to prove in a design defect claim

10:15:22 25    that there was a feasible alternative design to Xarelto that

*OFFICIAL TRANSCRIPT*

10:15:27 1   would have prevented the plaintiff's harm, a feasible

10:15:27 2   alternative design that would have prevented the plaintiff's

10:15:42 3   harm.  And we've already discussed this.  That's why the last

10:15:45 4   bullet point is on this slide.

10:15:48 5           Any other anticoagulant that would have been

10:15:52 6   prescribed to treat this blood clot would have resulted in the

10:15:57 7   very same thing.  It would not have prevented harm to her.  And

10:16:03 8   in order to meet their burden of proof, they have to show there

10:16:09 9   is a feasible alternative design that would have prevented the

10:16:13 10  plaintiff's harm.

10:16:14 11          Question 5:  Do you find by a preponderance of

10:16:19 12  the evidence that Xarelto's defective design either proximately

10:16:23 13  caused or substantially contributed to Ms. Dora Mingo's

10:16:28 14  GI bleed?

10:16:29 15          What is the evidence that helps you answer

10:16:30 16  Question 5?  We believe the evidence that helps you answer

10:16:33 17  Question 5 is as follows:

10:16:36 18          We know the anti-Factor Xa is not an option.

10:16:41 19  It's not FDA approved for Xarelto.  There are no Xarelto

10:16:47 20  specific calibrators or controls.  And we know anti-Factor Xa

10:16:56 21  assay has been approved for research purposes only.

10:16:59 22          And you heard me and saw me put up on the Elmo

10:17:03 23  that picture of the Biophen Factor Xa assay, and I showed it to

10:17:12 24  Dr. Parisian and I asked her about it, because up in a small

10:17:15 25  corner, in the left-hand corner, it said:  "For research

**OFFICIAL TRANSCRIPT**

10:17:18  1    purposes only."  You guys remember that.

10:17:20  2            And then down in the chart, on the far right-hand

10:17:23  3    column, you remember this, it said:  "Not for diagnosis and

10:17:27  4    treatment of patients."  Go back and look at your notes.  You

10:17:31  5    remember that.  "For research purposes only."

10:17:35  6            That's the evidence that allows you and prompts

10:17:39  7    you in your responsibilities to look at considering Question 5.

10:17:46  8    Did they prove by a preponderance of the evidence that

10:17:49  9    defective design either proximately caused or substantially

10:17:53 10    contributed to Ms. Mingo's GI bleed?  We believe the answer

10:17:58 11    being no.

10:18:05 12            Now, I want to talk a little about what the

10:18:06 13    evidence was that the Plaintiffs brought to you these topics.

10:18:09 14    You know, when we just went through those questions, ladies and

10:18:11 15    gentlemen, what you will notice is not one of those questions

10:18:16 16    has to do with marketing, not one of them.  Not one of them has

10:18:22 17    to do with whether Bayer or Janssen made a profit by selling

10:18:28 18    Xarelto.

10:18:29 19            Of course they made a profit by selling Xarelto.

10:18:32 20    Because Xarelto is a good drug.  It's an innovation.  It's an

10:18:36 21    improvement from the old standard that existed with warfarin

10:18:41 22    and Coumadin.  But those questions that you have just gone

10:18:45 23    through, none of them talk about marketing.

10:18:51 24            The plaintiff's experts, the first three

10:18:53 25    plaintiff's experts that were brought to testify, they hadn't

*OFFICIAL TRANSCRIPT*

10:18:55  1   even looked at Mrs. Mingo's medical records.  As a matter of

10:18:59  2   fact, Dr. Gosselin -- Mr. Gosselin -- I kept -- like

10:19:03  3   Mr. Sarver, kept calling him doctor.  Mr. Gosselin said he

10:19:09  4   didn't actually know who she was.

10:19:11  5          And so this case is about Mrs. Mingo and it's

10:19:16  6   about what happened to her and what she needed and what she got

10:19:20  7   and her relationship with her doctor.

10:19:25  8          So the testimony that was brought to you about

10:19:27  9   marketing and -- from doctors who didn't even look at her

10:19:30 10   medical record, it's up to you to evaluate the importance of

10:19:35 11   it.  And I would encourage you to look at the questions when

10:19:38 12   you to that and ask yourself:  Does this question have anything

10:19:42 13   to do with marketing?

10:19:43 14          Let's talk real quickly about the specifics of

10:19:52 15   the evidence to answer Question 1.  We know that Mrs. Mingo's

10:19:59 16   blood clots were dangerous.

10:20:00 17          And I'm going to go through some of this

10:20:01 18   relatively quickly because you've seen these medical records

10:20:04 19   over and over again, and I know you have thought through this

10:20:08 20   process.  Because they think I'm stupid, because you have heard

10:20:12 21   repeat and repeat and repeat.  So I'm going to click through

10:20:16 22   some of this fairly quickly, because I've seen it all and you

10:20:19 23   already know it.

10:20:20 24          But the medical records show that Mrs. Mingo's

10:20:22 25   clots were dangerous.  We know that everybody agrees she needed

*OFFICIAL TRANSCRIPT*

10:20:26  1    an anticoagulant.  These are all the doctors that testified,

10:20:30  2    including their expert on the far right there, Dr. Rinder, that

10:20:34  3    she need an anticoagulant.  That's why I said it's undisputed.

10:20:38  4              We know that every single anticoagulant warns of

10:20:42  5    a risk of bleeding, all of them, Coumadin, Pradaxa, Xarelto,

10:20:50  6    Eliquis and Savaysa.

10:20:53  7              We know that Mrs. Mingo took aspirin for years.

10:20:57  8    And you're going to have the medical records back there with

10:20:59  9    you, and the records support that she took aspirin from 2007 to

10:21:08 10    2015.  So she needed it.  She had some other issues.  She has a

10:21:13 11    heart problem.  She also has arthritic pain, that's why she had

10:21:16 12    to have a hip replacement.  Nobody is criticizing Mrs. Mingo

10:21:20 13    for taking the aspirin, because she needed to take aspirin.

10:21:23 14    But it's a fact, and facts are stubborn things sometimes.  It's

10:21:28 15    an undisputed fact that she took all the aspirin.  And that's

10:21:31 16    why she got an ulcer.

10:21:33 17              Now, there is this issue that I just want to talk

10:21:37 18    to you about for just a minute.  When someone has a slow oozing

10:21:43 19    ulcer, those things develop -- as you heard Dr. Haynes talk

10:21:48 20    about, they can develop over time.  And I just want to tell

10:21:53 21    you, and this is your decision, not mine, there is a record in

10:21:57 22    the medical records that says that Ms. Mingo came to the

10:22:02 23    emergency room on February the 13th and she was talking to

10:22:05 24    Dr. Casey as you see here on the record, and she told

10:22:10 25    Dr. Casey, she reported black stools since January the 9th, and

*OFFICIAL TRANSCRIPT*

said she was put on Xarelto around the 23rd.

And you heard evidence, ladies and gentlemen, the testimony, that black stools mean gastrointestinal bleeding or bleeding in your gastrointestinal tract somewhere, be it from hemorrhoids or stomach bleeding or whatever.

And what we know is that we warn doctors in our label to watch out for black stools, right? And what we know is we warned patients in the medication guide that if they had black stools, they were to report them to their doctor.

So the Plaintiffs had Dr. Rinder come up here and tell you that it was his opinion that this was a mistake in the medical records. He said: "Well, that's just a mistake, because I don't see any evidence of that in the home health records."

But that's not for -- that's for you to decide. And all I'm trying to show you is there is this medical record where it discusses that Mrs. Mingo reported to this doctor on February 13th, when she was diagnosed with an ulcer, that she had been having black stools since January 9th. And you all know that she did not begin to take Xarelto until January 23rd.

Now, this is undisputed. All the doctors pictured there below said that aspirin causes ulcers, Xarelto does not. It's undisputed.

We know that Dr. Keith, her treating gastroenterologist, says that aspirin probably caused her

*OFFICIAL TRANSCRIPT*

1    ulcers.  This is the man who scoped her, who used the scope to

2    go down through her esophagus and into her stomach, to look in

3    there and see what he saw.  He said:  "I believe the aspirin

4    probably caused her ulcer."

5           We know that on February 13th, this is when she

6    came in and reported -- when she had a -- to the emergency room

7    doctor that she had black stools on January 9th and started

8    Xarelto on January 23rd, and then Dr. Keith went in to look

9    around in her stomach and what he found was a 6 millimeter

10   oozing ulcer.  And on February 13th, he went in and fixed it.

11          Do you know what?  The Plaintiffs keep talking

12   about the fact that Mrs. Mingo was overanticoagulated.  When

13   people are overanticoagulated and procedures are done or

14   surgeries are done, what happens?  You bleed.  You bleed more

15   than you otherwise would.  And sometimes doctors will even wait

16   and not do a surgery, because if they think they are too

17   anticoagulated, they won't do the surgery.

18          But Dr. Keith didn't wait.  Dr. Keith went in

19   that very afternoon and did the EGD procedure and fixed --

20   cauterized and fixed the 6 millimeter oozing ulcer that

21   Mrs. Mingo presented with.

22          And Dr. Keith said that he thought she should go

23   back on to her blood thinner after he fixed the ulcer.  Now why

24   did he say that?  Because you guys remember the testimony that

25   the first few weeks after a hip replacement surgery, that is

*OFFICIAL TRANSCRIPT*

10:25:38  1    the time when you're at the highest risk to develop about blood

10:25:43  2    clots.  And if you already have developed a blood clot, you're

10:25:47  3    at an even higher risk to develop another.

10:25:52  4          So her risk of having more blood clots develop in

10:25:57  5    those first few weeks after her surgery are very high, and Dr.

10:26:01  6    Keith and others that we'll talk about recognized that.  And he

10:26:04  7    recognized it and said:  "I've fixed the bleeding ulcer.  She

10:26:10  8    should go back on her Xarelto."  Because he determined with her

10:26:17  9    high risk for another clot, that the benefits of Xarelto

10:26:21 10    outweigh the risk of another bleed.

10:26:25 11          Now, let's talk about Question 2 -- that's the

10:26:27 12    evidence on Question 1.  Let's talk about Question 2.  We

10:26:37 13    warned and instructed doctors, Bayer and Janssen's label not

10:26:41 14    only warned doctors about the risk of bleeding, but we told

10:26:43 15    them what to do about it and the importance of it.

10:26:46 16          You can see here, we warned about a risk of

10:26:49 17    bleeding.  You see in the second sentence there that's not

10:26:53 18    highlighted, that I would like for you to highlight in your

10:26:56 19    minds:  "In deciding whether to prescribe Xarelto to patients

10:27:00 20    at increased risk of bleeding, the risk of thrombotic events

10:27:06 21    should be weighed against the risk of bleeding."

10:27:09 22          So we are telling doctors, there is a risk of

10:27:12 23    bleeding.  It could be serious or fatal.  When you are

10:27:17 24    prescribing this medication, we are instructing you to weigh

10:27:21 25    the risk of a clot in that particular patient's situation

*OFFICIAL TRANSCRIPT*

10:27:26 1   against the risk of bleeding.  So we were instructing doctors
10:27:30 2   how to do this.
10:27:31 3          We talked about bleeding and bleeding risks 70
10:27:37 4   times in the label.  It's not disputed by anybody in here that
10:27:41 5   we warned about a risk of bleeding, which is the very thing
10:27:45 6   that happened to Mrs. Mingo.  We warned about the very thing
10:27:52 7   that happened to Ms. Mingo.
10:27:53 8          And we also instructed doctors on the use of
10:27:58 9   aspirin and NSAIDs taken at the same time as Xarelto.  Now, we
10:28:06 10  didn't say:  Don't do it.  Because sometimes patients have to
10:28:09 11  have both because of other medical conditions.  But what we
10:28:14 12  told the doctors was:  "Single doses of warfarin," which is
10:28:20 13  also Coumadin, "and Xarelto resulted in an additive effect on
10:28:26 14  Factor Xa inhibition and PE.  Concomitant aspirin use has been
10:28:31 15  identified as an independent risk factor for major bleeding in
10:28:35 16  efficacy trials."
10:28:37 17         Concomitant means you use aspirin at the same
10:28:41 18  time as Xarelto.  And we told doctors, we instructed them,
10:28:47 19  concomitant aspirin use has been identified as an independent
10:28:50 20  risk factor for major bleeding.  And when you say *independent*
10:28:55 21  *risk factor*, that means aspirin has -- independently has a risk
10:29:01 22  factor for bleeding.
10:29:02 23         We also instructed doctors in the second
10:29:05 24  paragraph:  "Avoid concurrent use of Xarelto with other
10:29:09 25  anticoagulants due to increased bleeding risks, unless the

**OFFICIAL TRANSCRIPT**

10:29:17 1    benefits outweigh the risks for that patient."

10:29:19 2            We told doctors:  "Promptly evaluate any signs or

10:29:27 3    symptoms of blood loss if your patients are treated

10:29:31 4    concomitantly," or at the same time, "with aspirin or other

10:29:39 5    platelet aggregation inhibitors or NSAIDs."

10:29:43 6            So what we did in this label was instruct doctors

10:29:45 7    about what happens when a patient takes both aspirin and

10:29:49 8    Xarelto, what happens when a patient takes Xarelto with another

10:29:54 9    anticoagulant.  And you remember that happening in the case,

10:29:57 10   and we'll talk about that in a moment.  What happens?  We told

10:30:04 11   doctors.  It puts them at an increased risk of bleeding.

10:30:07 12   Aspirin on its own puts them at an increased risk of bleeding.

10:30:11 13   If you do it, and you can, because sometimes the benefits

10:30:13 14   outweigh the risks, you should watch and you should promptly

10:30:17 15   evaluate any signs or symptoms of blood loss.  We instructed

10:30:23 16   the doctors on this issue.

10:30:25 17           In the risk of bleeding section -- and we covered

10:30:35 18   most of this -- we told them to balance the risk and the

10:30:38 19   benefits in the first paragraph.  In the second paragraph we

10:30:40 20   said:  "Promptly evaluate any signs or symptoms of blood loss

10:30:43 21   and consider the need for blood replacement.  Discontinue

10:30:46 22   Xarelto in patients with active pathological hemorrhage."

10:30:52 23           So we told doctors, we instructed them under the

10:30:57 24   risk of bleeding, in the warnings and precautions section, to

10:31:00 25   evaluate signs and symptoms of blood loss and to discontinue

*OFFICIAL TRANSCRIPT*

10:31:05  1   Xarelto if they had patients with active pathological

10:31:10  2   hemorrhage.

10:31:10  3            Now, we also put in the label the EINSTEIN study

10:31:14  4   findings.  And, remember, I talked about this in opening, about

10:31:16  5   the risk of bleeding in the Xarelto population versus the

10:31:20  6   Lovenox and Coumadin population.  And you guys remember that

10:31:24  7   the risk of major bleeding is low, less than 1 percent for

10:31:30  8   those patients in the EINSTEIN study.  And, remember, the

10:31:34  9   EINSTEIN study was on people who had a deep vein clot, like

10:31:40 10   Mrs. Mingo.  The risk of major bleeding is low.

10:31:41 11            Now, I want to say something about that, because

10:31:43 12   you heard Dr. Rinder get on the stand and say:  Well, in my

10:31:45 13   interpretation of the ROCKET data and the RECORD data and all

10:31:49 14   of this other data, I think her risk could have been 5,

10:31:53 15   6 percent to bleed."

10:31:55 16            Okay.  So you accept his 5, 6 percent to bleed.

10:31:59 17   What does that mean?  That means 94 percent of people that had

10:32:03 18   a situation -- if you want to accept Dr. Rinder's testimony,

10:32:06 19   that had that situation like Mrs. Mingo, 94 percent of those

10:32:10 20   people would not bleed.

10:32:11 21            And so what does the doctor do with that

10:32:13 22   information?  He takes it and he looks at it, and he knows

10:32:17 23   Mrs. Mingo has extensive blood clots, and he knows that if

10:32:23 24   those extensive blood clots travel, she could die.  It's

10:32:26 25   life-threatening.  And so when he is considering this, even if

*OFFICIAL TRANSCRIPT*

10:32:29  1    the risk is higher than this, than he believes it is, she

10:32:34  2    needed to be anticoagulated.  And nobody disputes that.

10:32:38  3            We also told the doctors in the last section of

10:32:44  4    the label, we told them to counsel their patients.  We said:

10:32:47  5    "Advise the patients to report any unusual bleeding or bruising

10:32:50  6    to their physician.  Inform patients that it might take them

10:32:54  7    longer than usual to stop bleeding, and that they may bruise

10:32:58  8    and/or bleed more easily when they are treated with Xarelto."

10:33:01  9            So not only were we instructing doctors what to

10:33:05 10    do, but we were instructing doctors to tell their patients

10:33:09 11    about what they needed to do, and what they needed to pay

10:33:12 12    attention to as far as signs and symptoms of bleeding.

10:33:15 13            We know -- you heard Ms. Mingo testify.  She said

10:33:21 14    she would not have taken Xarelto if she had read the medication

10:33:25 15    guide.  You saw the medication guide.  It's in evidence.  It

10:33:29 16    warns patients of bleeding risks.  It warns about aspirin being

10:33:34 17    taken at the same time as Xarelto.  And Mrs. Mingo told Mr.

10:33:41 18    Johnson that she would not have taken the medicine if she would

10:33:43 19    have read the medication guide.

10:33:45 20            What does that tell you?  That tells you that

10:33:48 21    that medication guide was an adequate warning.  It tells that

10:33:51 22    you that medication guide adequately instructed, not only the

10:33:56 23    doctor, but Mrs. Mingo.

10:33:57 24            And you know -- you heard the daughter,

10:34:05 25    Ms. Mingo, who testified that Dr. Jordon warned her mother of a

*OFFICIAL TRANSCRIPT*

10:34:09  1   risk of bleeding and handed her the pamphlet when they had that

10:34:12  2   conversation, and you guys remember that testimony.

10:34:14  3          Now, let's talk about this PT issue for a minute.

10:34:18  4   And I know you're probably going to drop your head and say,

10:34:21  5   please, no more about PT.  But I have to talk to you about it

10:34:24  6   for just a little bit, because that is what they are saying my

10:34:27  7   clients did wrong.

10:34:29  8          And what -- it's very difficult science.  It's

10:34:32  9   incredibly hard to understand.  But it's easy to confuse.  And

10:34:38 10   so the concept is not that there is a correlation between PT

10:34:42 11   and plasma concentration.  There is a correlation.  But what

10:34:46 12   that correlation tells you is the question.  And what our

10:34:51 13   experts who came to talk to you were trying to say and explain

10:34:55 14   is that concentration is not the same thing as bleeding risks,

10:34:59 15   and that the Xarelto concentration in somebody's blood, as

10:35:03 16   measured by PT, doesn't tell you anything about whether that

10:35:08 17   patient is going to bleed or not.

10:35:11 18          After two weeks, that's the bottom line.  And

10:35:15 19   don't let that get confused, because when you see all these

10:35:19 20   statements about a correlation, a correlation, a correlation, a

10:35:22 21   correlation between PT and plasma levels, nobody is denying

10:35:28 22   that in this case.  And you'll see all these documents put up

10:35:32 23   about that.  Okay.  But what the data shows is that doesn't

10:35:38 24   tell you anything about the bleeding risks.

10:35:40 25          And for a doctor, for that to be useful, helpful

*OFFICIAL TRANSCRIPT*

10:35:43 1  information for a doctor in prescribing this medicine, it needs

10:35:48 2  to tell him or her something about bleeding risk.  And that's

10:35:52 3  why Dr. Haynes and Dr. Jordon got up here and told you:  "I

10:35:57 4  don't rely on this PT test to treat my patients.  It can be

10:36:01 5  harmful."  And we'll talk about that in just a minute.

10:36:05 6           So, let's talk about what the companies did do

10:36:09 7  with regard to this PT test.  You heard by videotape Dr.

10:36:15 8  Misselwitz and Dr. Lensing.  I think Dr. Lensing testified for

10:36:21 9  four days in a row by the time we finally got it finished.  But

10:36:25 10 what we know is that Bayer and Janssen looked at the data, they

10:36:29 11 published the data, and they gave the data to the FDA.  That's

10:36:35 12 what we know.  We looked at it, we published it, and we passed

10:36:40 13 it on to the FDA.

10:36:42 14          Now, this article that you heard about Dagmar

10:36:47 15 Kubitza -- it was in 2005.  This was before all the trials were

10:36:51 16 finished.  And she said:  "This suggests that PT, a routinely

10:36:53 17 used coagulation test, could be used clinically to monitor the

10:36:58 18 anticoagulant effect of BAY 59-7939, if necessary."  This is

10:37:03 19 what she was looking at, at that time before the clinical

10:37:07 20 trial, and she put it in the literature.  It's published for

10:37:10 21 everybody that wants to read it and all the medical doctors and

10:37:13 22 scientists that will see it.  It's not hidden.  It's published.

10:37:16 23          Then we did the ROCKET trial.  We did the RECORD

10:37:23 24 trial.  We did the EINSTEIN trial.  The chart that you've seen

10:37:27 25 so much about, this concentration level, you see at the bottom

**OFFICIAL TRANSCRIPT**

10:37:29 1   it says "plasma conc," concentration?  And it's -- that data

10:37:35 2   came out of the ROCKET trial and we published it.  It's in the

10:37:39 3   medical literature.  It's not hidden from anybody.  And we gave

10:37:42 4   it to the FDA.

10:37:44 5           Now, does that mean that this is useful

10:37:48 6   information to a doctor?  We wanted to know.  We, the

10:37:52 7   companies, wanted to know.  Does this concentration mean

10:37:56 8   somebody is going to bleed?  Does it tell a doctor who is going

10:37:59 9   to bleed?

10:38:02 10          So, after we did all this, when we were

10:38:06 11  submitting our proposed label to the FDA, here is what we

10:38:13 12  decided to put in the label based on the fact that we had seen

10:38:17 13  this correlation.  We said:  "The relationship between PT and

10:38:20 14  rivaroxaban plasma concentration is linear and closely

10:38:23 15  correlated.  If assessment of the pharmacodynamic effect of

10:38:27 16  rivaroxaban is considered necessary in individual cases, PT,

10:38:31 17  measured in seconds, is recommended."  That's what we put in

10:38:35 18  Section -- the pharmacokinetic -- pharmacodynamic section of

10:38:40 19  the label.

10:38:40 20          And you remember -- you'll remember the testimony

10:38:43 21  about this.  What happened after we sent that to the FDA?  The

10:38:48 22  label came back to us and that the two sentences that I just

10:38:52 23  read to you were stricken by the FDA.  They struck it out.

10:39:00 24          And you remember who they brought to talk to you

10:39:02 25  about the label?  The only person that came in and said, "I'm a

*OFFICIAL TRANSCRIPT*

10:39:07 1    labeling expert." Remember? Dr. Parisian. One that I

10:39:13 2    questioned about. And she has always testified that every

10:39:16 3    label in a case where she has testified is inadequate.

10:39:19 4            She came and told you that she was going to talk

10:39:21 5    about the label. And don't you find it interesting that she

10:39:26 6    said, I reviewed all of these hundreds of documents -- I know

10:39:30 7    she said more than hundreds, thousands and thousands of

10:39:33 8    documents, and I'm going to come here and tell that you the

10:39:36 9    label is inadequate. But she didn't even look at the back and

10:39:40 10   forth between Janssen and Bayer and the FDA? You heard me ask

10:39:44 11   her: "Who struck this language? Who struck it out?"

10:39:50 12           And she said: "Well, I don't know. I don't

10:39:50 13   know."

10:39:54 14           She's the labeling expert. She looked at all of

10:39:56 15   these documents. Now, you ask yourself, does that make sense?

10:40:03 16           And we know that this document from the FDA is a

10:40:05 17   different version of this very same language that I just read.

10:40:09 18   Those two sentences that we initially proposed in this label

10:40:13 19   about the correlation between plasma concentration and PT time,

10:40:19 20   we put it in there, FDA struck it out.

10:40:34 21           So what happened after that? We continue to look

10:40:38 22   at this data. You'll see this slide, which is about the

10:40:40 23   EINSTEIN study. We looked at the data to see if that

10:40:44 24   correlation between PT and plasma concentration meant anything.

10:40:49 25   We looked. And what did we find in the EINSTEIN study? What

*OFFICIAL TRANSCRIPT*

10:40:53  1   we found when we looked was there was no evidence that

10:40:59  2   PT Neoplastin was different in subjects with bleeding events

10:41:03  3   compared to subjects without bleeding events.

10:41:06  4          So what we did as a company was take the data

10:41:09  5   from EINSTEIN, which is about patients like Ms. Mingo, and we

10:41:12  6   looked to see who bled.  And then we figured out who had the

10:41:19  7   bleeding complication and we looked at their PT to see whether

10:41:22  8   there was any difference in high, low PTs in the people that

10:41:28  9   bled.

10:41:28 10          And what we found was, bleeding events compared,

10:41:31 11   there was no difference and no evidence that PT Neoplastin was

10:41:36 12   different -- in other words, their value -- no evidence that it

10:41:40 13   was different in subjects that did bleed compared to subjects

10:41:43 14   that didn't bleed.  That was science.

10:41:49 15          That's why the doctors testified that they don't

10:41:52 16   find this helpful, because the data doesn't support that PT can

10:41:58 17   tell you who is going to bleed.

10:42:00 18          In 2014 there is still no data showing a direct

10:42:05 19   correlation between bleeding events and rivaroxaban or Xarelto

10:42:09 20   plasma levels.

10:42:10 21          And what do Mr. Gosselin's published articles say

10:42:16 22   about this?  Mr. Gosselin, the plaintiff's expert -- you

10:42:19 23   remember Mr. Sarver cross-examining him -- came in here and

10:42:24 24   told you one thing about PT and its value, and his published

10:42:29 25   literature says something exactly the opposite.  And it wasn't

*OFFICIAL TRANSCRIPT*

10:42:31 1    just one study.  It was a number of studies.

10:42:36 2            Gosselin's article, it's not reliable, not

10:42:39 3    suitable or recommended, not a reliable measure, not adequate,

10:42:43 4    dangerous.  You saw that up on a big board as Mr. Sarver showed

10:42:49 5    you.  And a cutoff is not established.  A cutoff means you can

10:42:55 6    take somebody off the medicine if they are over a certain

10:42:59 7    level.  Dr. Gosselin, their own expert, came in here and told

10:43:03 8    you, when his own article suggests that the PT is not reliable,

10:43:11 9    not adequate, not suitable, a cutoff has not been established.

10:43:16 10           And this slide, look, we pulled this out of this

10:43:22 11   pile.  What you need to do is remember what the testimony is

10:43:25 12   and remember yourself, because what is important for you to do

10:43:30 13   is remember the complete story, not just a sentence or two, not

10:43:34 14   just something one lawyer put up on a board trying to, you

10:43:37 15   know, make it look like it was all in their favor.

10:43:41 16           You need to consider the totality of the evidence

10:43:44 17   and everything you heard because you are the finders of facts.

10:43:47 18   And what we believe was demonstrated is that Dr. Gosselin came

10:43:52 19   in here and told you one thing and has published literature in

10:43:54 20   this country that says something different.  Published

10:43:57 21   literature in this country that says PT is not particularly

10:43:59 22   reliable, and there is -- no cutoff has been established.

10:44:04 23           Now, we also know medical organizations agree

10:44:07 24   with that.  You can see that this is the International Society

10:44:11 25   for Laboratory Hematology.  This is that article that

*OFFICIAL TRANSCRIPT*

10:44:15 1   Mr. Sarver put up. And it's a Gosselin article. You can see

10:44:18 2   his name right behind that first cull out.

10:44:23 3        "The danger of relying on PT in patients on DOAC

10:44:27 4   therapy, a potential safety issue. PT can no longer be used as

10:44:32 5   a gauge of a patient's bleeding risk." That's what I'm trying

10:44:37 6   to say. That's what the evidence supports. "PT can no longer

10:44:40 7   be used as a gauge of a patient's level of bleeding risk."

10:44:44 8        Not only did this organization conclude that, but

10:44:48 9   the CHEST guidelines. The guidelines for the type of

10:44:52 10  physicians that treat deep vein thrombosis and pulmonary

10:44:58 11  embolism -- these guidelines, the CHEST guidelines that were in

10:45:02 12  effect at the time Mrs. Mingo was prescribed Xarelto say

10:45:07 13  neither the PT nor the APTT should be used to monitor the

10:45:14 14  anticoagulant effect of rivaroxaban.

10:45:20 15       These were the medical organizations that put

10:45:22 16  out -- are composed of committees and doctors in these

10:45:28 17  specialties from all over the country and they collaborate and

10:45:31 18  put out these guidelines so that there is a consistent standard

10:45:35 19  of care in this country for how patients are treated. And

10:45:38 20  these professionals and these doctors trained in the field --

10:45:43 21  in the area that treats DVTs and pulmonary embolisms, they said

10:45:48 22  the PT should not be used to monitor the anticoagulant effect

10:45:52 23  of Xarelto.

10:45:53 24       Other organizations have said the same thing. We

10:46:02 25  know that Xarelto continues to be approved as safe and

*OFFICIAL TRANSCRIPT*

10:46:09  1  effective for the treatment of DVT in the same dosage for the

10:46:13  2  same period of time that it was taken by Mrs. Mingo.

10:46:17  3        We know that on 14 different occasions the FDA

10:46:21  4  had an opportunity to look at this label.  These times that

10:46:28  5  this was done, ladies and gentlemen, were for label changes.

10:46:32  6  Label changes, 14 times.  The FDA looked at this section.

10:46:36  7  Fourteen times they looked at Section 12 and looked at Section

10:46:40  8  5, and they never suggested putting anything in there that we

10:46:45  9  should tell doctors that PT test was useful in helping them to

10:46:49 10  predict who was going to bleed and who was not going to bleed.

10:46:55 11        Dr. Parisian came in here.  $35,000 a week, she

10:47:02 12  stated, in Jackson she made.  She's testified over the course

10:47:06 13  of the year she makes $6.4 million, as you guys remember.  And

10:47:11 14  she didn't know about how this label -- section of the label

10:47:15 15  came about?

10:47:18 16        Now, who did testify that PT would have helped

10:47:24 17  Mrs. Mingo?  The only person that came in was Dr. Rinder, who

10:47:27 18  said a PT value would have helped or changed things for

10:47:31 19  Mrs. Mingo.  He actually didn't say it would change them.  He

10:47:34 20  just said it would have been helpful.

10:47:35 21        None of these other experts talked about it at

10:47:38 22  all.  It was only Dr. Rinder that said that.  And what do we

10:47:43 23  know about Dr. Rinder's theory, that there is a cutoff and you

10:47:47 24  should take people off of the medications at certain cutoffs.

10:47:53 25  What do we know about that?  We know about Dr. Rinder, that he

*OFFICIAL TRANSCRIPT*

10:47:56  1   never prescribed Xarelto, I will tell you that.  We know he has

10:48:01  2   never told a patient to discontinue Xarelto, which is what he

10:48:05  3   suggested or inferred should have happened in this case.

10:48:08  4        THE DEPUTY CLERK:  You have 15 minutes.

10:48:12  5        MS. PRUITT:  He's never presented his PT theory to a

10:48:14  6   conference.  And he's never published his PT theory.  The study

10:48:20  7   you heard about yesterday that said something about a 20-second

10:48:25  8   cutoff, it was 136 people.  That's it.  Dr. Rinder's theory

10:48:34  9   that there is a cutoff, where you should take someone off of

10:48:38 10   the medicine.

10:48:38 11        And why is that scary, ladies and gentlemen?

10:48:41 12   That's scary because if you have someone who has a

10:48:46 13   life-threatening clotting disorder in their blood system that's

10:48:48 14   developing and they have a PT of 20 and you take them off the

10:48:52 15   medication, and they could have a stroke, a heart attack, or a

10:49:02 16   pulmonary embolism and die.

10:49:04 17        And that's why Dr. Haynes and Dr. Herrin came and

10:49:06 18   told you, "You're asking me to use a lab value that could be

10:49:10 19   dangerous for my patients."  And they -- Dr. Haynes got a

10:49:17 20   little revved about it.  He said, "You're asking me to do

10:49:20 21   something that might be dangerous for my patients."  Dr. Herrin

10:49:23 22   said, "This test, this value is not going to help me treat a

10:49:26 23   patient at the bedside, and it could harm them.  Because if I

10:49:30 24   take you off a medicine and you have this going on in your

10:49:34 25   system, you could die."

*OFFICIAL TRANSCRIPT*

10:49:42  1          Dr. Haynes told you that all this stuff you're
10:49:44  2   hearing about the ROCKET data, what you need to be focused on
10:49:47  3   is the EINSTEIN data, which is the condition that Mrs. Mingo
10:49:51  4   had, because otherwise you are comparing apples and oranges.
10:49:56  5   Dr. Herrin also talked about that yesterday.  Dr. Haynes, as I
10:49:58  6   just said, to rely on PT is asking doctors -- he said, it's
10:50:01  7   asking doctors to put their patients at risk.
10:50:03  8          Dr. Herrin said the PT is not useful at the
10:50:07  9   patient's bedside.  He said, "You are asking me to make
10:50:11 10   decisions based on meaningless numbers that could hurt my
10:50:16 11   patients."  And he said using a PT cutoff like Dr. Rinder's
10:50:23 12   theory -- or Dr. Rinder suggested would be bad medicine.
10:50:28 13          And the reason, ladies and gentlemen, is because
10:50:33 14   Xarelto concentration of plasma levels in someone's blood does
10:50:37 15   not tell a doctor who is going to bleed and who is not going to
10:50:42 16   bleed.  And that's why these doctors came in and said that the
10:50:47 17   data doesn't support that it tells them -- that it can tell
10:50:50 18   them who is going to bleed and who is not going to bleed.
10:50:53 19          Now, I'm going to go through this Question 3 real
10:50:58 20   quickly on the PT values for Mrs. Mingo.  You remember the
10:51:02 21   first PT?  She had Coumadin, another anticoagulant, that we
10:51:05 22   know from the Coumadin label is still effective in her
10:51:09 23   bloodstream when she took her first Xarelto.  So for them to
10:51:14 24   suggest that this PT value, even if you believe it's related,
10:51:17 25   is somehow related to Xarelto doesn't make any sense, because

*OFFICIAL TRANSCRIPT*

10:51:20  1    she another anticoagulant on board.

10:51:22  2              And remember in the label, you just saw we told

10:51:26  3    doctors that another anticoagulant can make -- can affect the

10:51:30  4    PT.  And you know that the PT is a test designed for Coumadin,

10:51:35  5    so a PT value does mean something if it's being used for

10:51:39  6    Coumadin.  And so that first value was being affected by

10:51:43  7    Coumadin, and you heard the testimony about that.  You saw the

10:51:46  8    high dose of Coumadin of 10 milligrams and the low.  And that's

10:51:49  9    the label for Coumadin.

10:51:52 10              Now, we know -- again, we did not find any

10:51:55 11    evidence that PT Neoplastin was different in subjects with

10:52:01 12    bleeding events or without bleeding events in the EINSTEIN

10:52:05 13    study.  We know Dr. Jordon still prescribes Xarelto today.  He

10:52:09 14    said PT wouldn't have been affected his decision.  Even with

10:52:12 15    PT, he can't predict bleeding.  And he still prescribes Xarelto

10:52:15 16    today to patients with DVT.  And it's the standard of care

10:52:19 17    today for doctors treating patients with DVT to prescribe

10:52:24 18    Xarelto or one of the other NOACs.

10:52:26 19              Question 4, we know that Coumadin and warfarin

10:52:33 20    had some issues with food interactions, had a lot of drug

10:52:37 21    interactions.  But Xarelto is an improvement.  Xarelto, the way

10:52:44 22    it's different is, there are no food interactions, there are

10:52:47 23    fewer drug interactions, there is no routine monitoring

10:52:50 24    necessary and no dose adjustment.  That's why this medication

10:52:55 25    was such an innovation.

*OFFICIAL TRANSCRIPT*

10:52:57 1          That's why Dr. Haynes told you these medicines

10:52:57 2   are an improvement over what he had to do.  Because, remember,

10:53:01 3   Dr. Haynes told you, if you take Coumadin or warfarin, you got

10:53:04 4   to go to the clinic, get your blood drawn, get all of this

10:53:07 5   measured all the time.

10:53:08 6          These medicines, and Xarelto particularly, were

10:53:10 7   an improvement on what existed, and they should be available

10:53:12 8   for doctors.  And, in this case, it's a standard of care to

10:53:17 9   treat a deep vein blood clot.

10:53:22 10         Dr. Haynes testified and told you that Mrs. Mingo

10:53:24 11  needed treatment; that Xarelto is approved as safe and

10:53:29 12  effective to treat her clot; that it worked; and that

10:53:32 13  Mrs. Mingo would have bled off of any other anticoagulant.

10:53:35 14  Why?  Because she had an ulcer.  Because she had

10:53:39 15  an (inaudible).

10:53:41 16         Now, we know that anti-Factor Xa is not FDA

10:53:46 17  approved for Xarelto.  There is no Xarelto-specific calibrators

10:53:50 18  or controls, and it's only available for research purposes.

10:53:54 19         And Dr. Haynes came and testified and told you

10:53:57 20  anti-Factor Xa wouldn't have made a difference in Ms. Mingo's

10:54:01 21  outcome.  That's what Dr. Haynes said.  He said:  "I don't use

10:54:05 22  anti-Factor Xa assay at University Mississippi Medical Center

10:54:10 23  because there is not one that is designed to measure Xarelto.

10:54:14 24  There is not one that has calibrators and controls specifically

10:54:19 25  designed for Xarelto, and we don't use it in this institution."

*OFFICIAL TRANSCRIPT*

10:54:22  1          So, on behalf of my client, Bayer and Janssen, we

10:54:29  2   want to thank you for your time and your attention and your

10:54:32  3   careful thoughtful consideration of everything that we've said

10:54:35  4   and all the evidence that we brought to you.  And we now place

10:54:38  5   in this your capable hands.

10:54:40  6          THE COURT:  Thank you very, very much.  Let's take a

10:54:43  7   brief break of five, ten minutes.

10:54:46  8          THE DEPUTY CLERK:  Ten minutes.  All rise.

10:54:58  9          (WHEREUPON, at 10:54 a.m. the jury panel leaves the

10:55:16 10   courtroom.)

10:55:16 11          (WHEREUPON, at 10:55 a.m. the jury panel leaves the

10:55:16 12   courtroom and then a brief recess was taken.)

10:55:16 13          (WHEREUPON, at 11:06 a.m., the jury panel enters the

11:06:55 14   courtroom.)

11:06:55 15          THE COURT:  Be seated, please.

11:06:57 16             You may proceed.

11:06:57 17          MR. BIRCHFIELD:  Thank you, Your Honor.

11:06:58 18                   REBUTTAL CLOSING ARGUMENTS

11:06:58 19   BY MR. BIRCHFIELD:

11:06:59 20             We all have biases, and we all have prejudices.

11:07:03 21   In this case, you have agreed, when serving as jurors, to set

11:07:09 22   aside those prejudices, and render your verdict based on the

11:07:17 23   facts as they apply to the law.  The Defendants are banking on

11:07:23 24   you not being able to do that.  We're trusting that you can.

11:07:30 25             We have prejudices that we come in with, and one

*OFFICIAL TRANSCRIPT*

11:07:32  1    of those that is very prevalent and was played on by the

11:07:36  2    Defendants is the idea that the FDA controls; the FDA controls

11:07:43  3    the product, the FDA controls the label.

11:07:47  4        That is a prejudice, that's a prejudging that is

11:07:52  5    very difficult to set aside, but that is not the law.

11:07:59  6    Judge Fallon will give you instructions on the law.

11:08:02  7        You've heard the witnesses for the Defendants,

11:08:06  8    the testimony they gave, the FDA controls -- the FDA writes the

11:08:12  9    labels, the FDA controls every dot and dash, and the FDA writes

11:08:17 10    the medication data.  That's the prejudice, the prejudging of

11:08:20 11    the role of the FDA that the Defendants are counting on you not

11:08:25 12    being able to set aside in rendering your verdict here.  We're

11:08:29 13    trusting that you will.

11:08:30 14        I want to go to -- I want to start with the FDA

11:08:37 15    document, because here is what I want to walk through.  There

11:08:42 16    is a lot that was just laid out that is misleading and was

11:08:48 17    designed for misdirection.  I want to try to bring us back to

11:08:52 18    the law and the facts of this case, starting with the FDA

11:08:57 19    label, suggesting that, hey, we wanted to put in information

11:09:03 20    about the PT test, suggesting we thought maybe it would be

11:09:09 21    helpful to doctors.

11:09:11 22        Look, please look, at this exhibit, at

11:09:18 23    section 12.2.  There is nothing anything in there that isn't

11:09:20 24    struck through that would advise doctors about using the

11:09:24 25    PT test, instructing them that it could be helpful or useful in

**OFFICIAL TRANSCRIPT**

11:09:29  1    following the response.

11:09:30  2         But then, look over here.  Look on the -- look at

11:09:34  3    the document and how they do the track changes, and see what

11:09:38  4    they said.  It says author.  That document is chock full of

11:09:44  5    these changes, and the only description is author.

11:09:48  6         Then go -- you remember what happened.  We had --

11:09:52  7    we had -- Mr. Shah testified about this.  Then we showed him a

11:09:58  8    strikethrough that he received two days later.  This is -- this

11:10:02  9    is January 11th.  There is a strikethrough, an e-mail and a

11:10:07 10    strikethrough that came in on January 13th, two days later,

11:10:14 11    from the FDA.

11:10:15 12         I want you to take a look, if you will, at those

11:10:18 13    two documents.  Look at that strikethrough.  It's very clear,

11:10:23 14    very clear the changes that the FDA -- it's identified, FDA.

11:10:28 15    This is their comments, sponsor.  This is their comments.

11:10:32 16    That's not the case here.

11:10:33 17         So to come in and be critical of Dr. Parisian

11:10:36 18    because she couldn't follow that, she didn't know who did what,

11:10:42 19    that's misleading.  That's misdirection in this case here.  To

11:10:46 20    take this, to take this document and suggest that they were

11:10:51 21    proposing the PT test that would be helpful to doctors, and the

11:10:55 22    FDA rejected it, is misleading.

11:11:00 23         Look at the exhibit two days later.  Look at the

11:11:02 24    position the FDA took in Section 7, in Section 7 of the label.

11:11:07 25    It's clear.  The FDA was not saying that the PT test is

**OFFICIAL TRANSCRIPT**

meaningless, is worthless with Xarelto.  That is not their

position at all.

                But here is the final word.  I implore you,

please take a look at Plaintiff's Exhibit 102.  This is the FDA

summary review.  This is five months later.  This is five

months later after this.

                During those five months, the FDA has the ROCKET

data, the big -- the big study for the AFib indication, much

more robust data.  They have that data to evaluate.

                If you'll take the Exhibit 102, and go to page --

go to page 9.  You'll see on page 9, they are addressing the

issue, the desirability of monitoring for Xarelto.  Here is

what they say.  So this is five months after this.

                The clinical and pharmacology reviewers

demonstrated that there is a linear correlation between

rivaroxaban levels and prothrombin time, PT.  They also

demonstrated that there is a correlation between PT and risk of

bleeding.  The applicant -- that's the company -- the applicant

has not chosen to utilize this information.

                You look and -- read the whole paragraph, read

that whole section on this, I implore you.  Look at the last

sentence:  "However, infrequent monitoring, perhaps at

initiation and yearly thereafter, to assure appropriate dosing

of drugs that prevent stroke and cause bleeding may improve

outcomes and be acceptable to patients."

                         *OFFICIAL TRANSCRIPT*

11:13:01  1        This is the final word of the FDA on this issue.

11:13:06  2   Never, never after, after this strikethrough five months

11:13:12  3   earlier, never did they propose any methods.  They certainly

11:13:17  4   didn't propose any helpful laboratory testing in their label in

11:13:21  5   Section 5 after this or anywhere else in their label.  None.

11:13:24  6        So it's misleading to come in and say, the FDA

11:13:28  7   has just rejected our position, that's it, that's the final

11:13:32  8   word.

11:13:33  9        They are -- they are banking on you not being

11:13:37 10   able to set aside prejudging thoughts that most people in our

11:13:41 11   society have about the control of the FDA.

11:13:44 12        Judge Fallon will give you instructions on the

11:13:50 13   FDA and the label.  You will see, you will see from the charges

11:13:56 14   that he gives you, you will able to hear Judge Fallon instruct

11:14:00 15   you that the manufacturer has a continuing duty to use

11:14:06 16   reasonable care to provide adequate instructions to the

11:14:10 17   prescriber of its drugs concerning such later discovered

11:14:14 18   matters.  The label is -- it's their label.  They bear that

11:14:19 19   responsibility.  They bear that responsibility at all times.

11:14:22 20        You will hear that the responsibility for the

11:14:29 21   contents, the contents of the label, is the manufacturer's.

11:14:34 22   It's not the FDA.  It's the company's label, not theirs.

11:14:40 23        You will see that the company -- the company knew

11:14:50 24   about the usefulness of the PT, but they never, they never put

11:14:55 25   that in their label.  That's their responsibility.  That's what

*OFFICIAL TRANSCRIPT*

11:14:58  1    this case is about.

11:15:00  2            It is not about did we put the risk of bleeding

11:15:05  3    on the label.  So why would the Defendants -- or defense

11:15:12  4    counsel talk about the warning of bleeding being in the label

11:15:20  5    70 times, why would they talk about we provide instructions for

11:15:23  6    doctors to look at the signs and symptoms of bleeding, if

11:15:26  7    that's not what the case is about.

11:15:30  8            If the case is about, did you -- did you know

11:15:32  9    about a useful test, a way to test, and not provide it, that's

11:15:38 10    the issue.  That's what we presented.  So why, why the

11:15:42 11    misdirection on this.

11:15:43 12            I want to walk through, if I can, in the

11:15:47 13    remaining time I have, a number of issues where we have seen

11:15:52 14    and we've heard just now this effort at misdirection.

11:15:56 15            One, let's go back to Ms. Mingo and the dark

11:16:03 16    stool issue.  Ms. Pruitt talked about the record that was --

11:16:10 17    right here, that says, on January -- I mean, on February 13th,

11:16:15 18    when she's in, there is a reference in the medical record then

11:16:19 19    that she had -- that Ms. Mingo had been complaining of dark

11:16:23 20    stools back in January.

11:16:26 21            She is suggesting to you that Dr. Rinder, to

11:16:31 22    support Ms. Mingo's case, is making it up, that it must have

11:16:33 23    been a mistake.  That's not what happened.  Dr. Rinder walked

11:16:36 24    through all of these medical records.  Go back to January 9th.

11:16:41 25    Where was Ms. Mingo on January 9th?  She was in the hospital.

*OFFICIAL TRANSCRIPT*

11:16:45 1   She was in the hospital on January 9th for her hip replacement

11:16:50 2   surgery.  There is no reference in there about dark stools.

11:16:53 3   She's put on an anticoagulant.  So she is given

11:16:57 4   the Lovenox.  She has to have the injections.  She has home

11:17:02 5   health.  Because when she's discharged, she has these

11:17:05 6   injections that she has to do at home.  Her daughter helps her.

11:17:09 7   She has home health workers coming.

11:17:12 8   She has a toilet, a portable toilet by her

11:17:15 9   bedside.  So that's where she goes.  The home health workers

11:17:19 10  come, and they check.  They check her stool.  They make notes

11:17:22 11  in this records.  The stool -- they talk about the color of the

11:17:26 12  stools, the consistency of the stools.  They are looking for

11:17:29 13  these signs and symptoms.

11:17:30 14  You have all of these visits, all of these

11:17:33 15  records that show that there was no issue.  So why, why would

11:17:36 16  the defense raise this issue unless it is an effort to mislead

11:17:43 17  and misdirect.

11:17:44 18  You heard -- you heard the focus on the ulcer,

11:17:50 19  that Ms. Mingo's ulcer was not caused by Xarelto, it was caused

11:17:54 20  by aspirin, long-term aspirin use.  We didn't -- we're not

11:18:07 21  denying that she has a long-time use of aspirin.  She used baby

11:18:12 22  aspirin for a long, long time.  Then, when she's instructed to,

11:18:16 23  she switches to the regular dose of aspirin, and then goes back

11:18:18 24  on baby aspirin.

11:18:21 25  All of this time that she is on -- that she is on

*OFFICIAL TRANSCRIPT*

11:18:26 1    aspirin, there is no -- there is no bleeding.  There is no

11:18:30 2    GI bleed that causes her to go to the hospital.  The only time

11:18:35 3    is this 21 days while she is on Xarelto.  But the point is that

11:18:42 4    the defense is taking the position aspirin caused the ulcer,

11:18:46 5    and it's the ulcer that bled.

11:18:49 6              Here is what the Judge, I believe, will instruct

11:18:53 7    you on the law about proximate cause.  This is an effort to

11:19:02 8    misdirect, so that you won't look and really apply what the law

11:19:06 9    is here on this issue.

11:19:08 10             The issue is did Xarelto, did Xarelto contribute

11:19:13 11   to making this bleed -- this ulcer, this underlying ulcer that

11:19:17 12   she had, into a bleeding ulcer?  One that is aggravated by

11:19:23 13   Xarelto, is made worse by Xarelto.

11:19:26 14             Judge Fallon, I believe, will give you

11:19:30 15   instructions that said that the -- that you are -- the

11:19:33 16   Defendants are to take the victim as they find the victim.

11:19:39 17             What does -- what does that mean, take the victim

11:19:42 18   as it finds her?  That means if Ms. Mingo, if she has an

11:19:50 19   underlying ulcer, that's the way you take her.  If your drug

11:19:56 20   contributes and is a substantial factor in making that

11:19:59 21   underlying condition worse, aggravating it, making it into a

11:20:04 22   bleeding ulcer, then they are responsible.  That meets the

11:20:07 23   standard of proximate cause.  Did Xarelto substantially

11:20:13 24   contribute to Ms. Mingo's bleed?

11:20:20 25             There was no one who, there was no one who

**OFFICIAL TRANSCRIPT**

11:20:23 1  testified to anything different.  Even their own doctors

11:20:27 2  couldn't deny that her being on a blood thinner, her being on

11:20:32 3  Xarelto, made that bleed worse.

11:20:35 4        Now, one other issue, an effort at misdirection,

11:20:42 5  is the claim that she would have bled on any other

11:20:49 6  anticoagulant.  She would have bled on any other blood thinner.

11:20:55 7  That's just -- (inaudible).  Every blood thinner has bleeding

11:20:58 8  risk, so how can you say she wouldn't have bled?

11:21:00 9        Well, here is what we know.  What we know, that

11:21:02 10 of these -- of these DOACs, this class of drugs, it is Xarelto

11:21:07 11 that has the greatest risk of bleeding.  You've heard

11:21:11 12 Dr. Rinder testify that in the study of Eliquis versus

11:21:16 13 warfarin, the standard of care, 70 percent less on Eliquis.

11:21:19 14 Eliquis has a much, much lesser risk of bleeding.

11:21:24 15       That goes to another question, another point of

11:21:27 16 misdirection.  Here is how they claim it.  She had a condition

11:21:34 17 where she needed -- where she needed to be an on anticoagulant.

11:21:38 18 We're not denying that.  So they make this claim, they say that

11:21:43 19 Dr. Rinder's theory that if you take her off the medication,

11:21:47 20 that would be dangerous.  They had -- they had Dr. Haynes say

11:21:52 21 that would be dangerous, that would be a risk to my patient,

11:21:54 22 with the idea that if you take her off the -- if you take her

11:21:59 23 off Xarelto, there are no other options.  She doesn't have

11:22:01 24 another option for a blood thinner.

11:22:03 25       That is not true.  If you're taking a patient off

*OFFICIAL TRANSCRIPT*

11:22:07 1   Xarelto, you switch the patient to an anticoagulant with a

11:22:11 2   lesser bleed risk.  You switch the patient -- you could switch

11:22:17 3   her to warfarin.  You could switch her to warfarin, where

11:22:21 4   doctors have managed, they have monitored the levels of

11:22:24 5   warfarin for decades.  You can switch her so you can monitor

11:22:30 6   her.

11:22:31 7            So to plant the idea that, well, it would be

11:22:33 8   scary, it would be dangerous to take her off of Xarelto, that's

11:22:37 9   ignoring the fact that there are a lot of other safer options.

11:22:42 10           THE DEPUTY CLERK:  Five minutes left.

11:22:43 11           MR. BIRCHFIELD:  Thank you.

11:22:46 12           Another area of misdirection, the slide that has

11:22:48 13   the big pie chart that shows the 99 percent of the people don't

11:22:55 14   have a bleed.  Did you notice, did you notice the language that

11:22:58 15   they used there?  It was major bleed.  Major bleed.

11:23:04 16           When they were doing their study -- remember this

11:23:07 17   with Dr. Herrin yesterday -- when they were doing their study,

11:23:11 18   they appeared before the FDA.  Dr. Gary Peters appears before

11:23:17 19   the FDA.  I read the transcript to Dr. Herrin yesterday.  What

11:23:25 20   did he say?  They are too small a number.  When you look at

11:23:28 21   major bleeds, in order to have the adequate data, you've got to

11:23:31 22   look at the clinically relevant bleeds.

11:23:35 23           That's why, that's why, ladies and gentlemen,

11:23:39 24   they -- the experts that they bring to offer these opinions

11:23:44 25   are -- they don't know what the company knows.  They can come

**OFFICIAL TRANSCRIPT**

11:23:47 1   in here, and they can be led to give testimony about things

11:23:51 2   that they don't know.

11:23:54 3          Because Gary Peters knows that's wrong.  It's

11:23:57 4   wrong to look at the major bleeding, as opposed to the

11:24:01 5   clinically relevant bleeding.  But they can do it here when

11:24:03 6   they don't bring scientists, they bring paid experts who don't

11:24:08 7   know what the company knows about a drug.

11:24:10 8          I want to go over one other area of surprising

11:24:24 9   misleading, misdirection.  That pertains to Dr. Jordon.

11:24:30 10          The testimony -- and you recall the testimony

11:24:33 11   that if there was a test that was done, and the test results

11:24:37 12   showed that she was at a risk, he would have taken her off

11:24:40 13   Xarelto.

11:24:42 14          Ms. Pruitt points out, well, he still prescribes

11:24:46 15   Xarelto today.  But what was left out?  What did Dr. Jordon

11:24:51 16   testify about what he does now when he prescribes Xarelto?  He

11:24:56 17   tests.  He tests.  So we know that it would have changed his

11:25:01 18   prescribing that.

11:25:03 19          Ladies and gentlemen, the evidence, the evidence

11:25:10 20   is overwhelming.  The misdirection is staggering.  You heard

11:25:16 21   all of these articles about PT being dangerous.  You know the

11:25:21 22   basis of that.  They didn't confront Mr. Gosselin about that.

11:25:26 23   They used these articles.

11:25:27 24          But what's the context?  Do you remember the

11:25:28 25   context?  It's lumping all of the DOACs together.  It is

*OFFICIAL TRANSCRIPT*

11:25:33  1   lumping all of the reagents together.  There are multiple

11:25:37  2   reagents.  There is Innovin.  There is Neoplastin.  There is

11:25:43  3   RD2 -- there are different DOACs.  There is Eliquis and Savaysa

11:25:49  4   and Pradaxa.  Well, each of those, they work differently.  You

11:25:53  5   have different measures.

11:25:53  6            So if you lump them all together, and you lump

11:25:55  7   all of the PT's together, that could be dangerous because they

11:25:59  8   are not all sensitive.

11:26:01  9            But Mr. Gosselin explained all of that.  He said,

11:26:03 10   if you look at -- if you look at Xarelto, and you look at

11:26:10 11   Neoplastin PT, that is reliable.  That is a reliable test.

11:26:12 12            So they are using -- they are using Mr. Gosselin,

11:26:15 13   they are using those studies to mislead and misdirect.

11:26:21 14            Our prayer is that you will be able to put aside

11:26:24 15   the prejudged notions about the role of the FDA.  Take this

11:26:31 16   evidence.  See through this evidence.  See that Neoplastin is a

11:26:34 17   useful test.  This is a drug with high variability.  It

11:26:38 18   needs -- the Defendants need to tell doctors in the U.S. what

11:26:42 19   they tell doctors and regulators in other places, they need to

11:26:46 20   tell them this is a useful test.

11:26:48 21            Tomorrow or next week, you'll go back to your

11:26:54 22   jobs, and important jobs, you all have important roles.  But

11:27:00 23   today, but today is different.  Today, you are a jury.  You

11:27:07 24   have the full authority of the United States Government behind

11:27:13 25   you.  This jury box, this jury box is the one place in America

*OFFICIAL TRANSCRIPT*

11:27:19  1    that is free from outside influence, outside money.  This is

11:27:26  2    the one place in America where an individual, where Dora Mingo,

11:27:34  3    can stand on equal footing with the largest, most powerful

11:27:39  4    corporations in the world.  This is the one place.

11:27:43  5         Your job, your responsibility is vitally

11:27:46  6    important to the functioning of our government.  Today, you are

11:27:51  7    a jury.  We trust that you will take this job seriously.  You

11:28:00  8    will sift through the evidence and render a verdict, speak the

11:28:04  9    truth about what happened.

11:28:10 10         One last thing.  You were told that marketing had

11:28:12 11    nothing to do with this.  That's what Ms. Pruitt said.  Look at

11:28:16 12    the evidence.  You saw -- you saw an e-mail, from a commercial

11:28:22 13    standpoint, we cannot monitor, we can't mention measure.

11:28:24 14    That's what this is all about.  This is about this company's

11:28:29 15    effort to put marketing ahead of science.  The scientists said

11:28:35 16    we must, the marketing said we can't, and they went with

11:28:35 17    marketing.

11:28:39 18         Thank you.

11:28:44 19         THE COURT:  Thank you, Counsel.

11:28:44 20                    JURY INSTRUCTIONS

11:28:47 21         Members of the Jury, you have now heard all of the

11:28:49 22    evidence in this case, as well as the final argument.  It

11:28:53 23    becomes my duty to instruct you on the rules of law that you

11:28:56 24    must follow and apply in arriving at your decision.

11:29:04 25         I will first give you some general instructions

*OFFICIAL TRANSCRIPT*

11:29:06 1   which apply in all cases.  Then I will give you some special
11:29:10 2   instructions that apply to this case.
11:29:12 3          First, to the general instructions.  In any jury
11:29:15 4   trial, as I've mentioned several times, there are, in effect,
11:29:18 5   two judges.  I am one of the judges, but you, the jury, is the
11:29:26 6   other judge.  It is my duty to preside over the trial and
11:29:29 7   determine what testimony and other evidence is admissible under
11:29:31 8   the law for your consideration.  It is also my duty at the end
11:29:36 9   of trial to instruct you on the laws applicable to the case.
11:29:39 10          You, as jurors, however, are the judges of the
11:29:43 11   facts.  But in determining what actually happened in this case,
11:29:47 12   that is, in reaching your decision as to the facts, it is your
11:29:51 13   sworn duty to follow the law as I am now in the process of
11:29:55 14   defining for you, and you must follow my instructions as a
11:29:59 15   whole.  You have no right to disregard or give special
11:30:02 16   attention to any one instruction or to question the wisdom or
11:30:06 17   correctness of any rule that I may state to you.  That is, you
11:30:10 18   must not substitute your own notion or opinion as to what the
11:30:15 19   law is or ought to be.  It is your duty to apply the law as I
11:30:21 20   give it to you, regardless of the consequences.
11:30:23 21          By the same token, it is also your duty to base
11:30:28 22   your verdict solely on the testimony and other evidence in this
11:30:32 23   case, without prejudice and without sympathy.  That was the
11:30:37 24   promise you made and the oath you took before being selected
11:30:42 25   and accepted by the parties as jurors in this case.  They have

*OFFICIAL TRANSCRIPT*

11:30:48 1    the right to expect nothing less from you.

11:30:51 2              Now, this case should be considered and decided

11:30:53 3    by you as an action between persons of equal standing in the

11:30:57 4    community, of equal worth, holding the same or similar stations

11:31:01 5    in life.  All persons, all corporations, all public entities

11:31:08 6    stand equal under the law and are to be dealt with as equals in

11:31:13 7    a court of justice.

11:31:14 8              As I stated earlier, it is your duty to determine

11:31:17 9    the facts, and in so doing, you must consider only the evidence

11:31:20 10   I have admitted in the case.  The term "evidence" includes the

11:31:26 11   sworn testimony of the witnesses and the exhibits admitted into

11:31:30 12   the record.

11:31:31 13             Remember that any statements or objections or

11:31:34 14   arguments made by the lawyers are not evidence in this case.

11:31:38 15   The function of the lawyer is to point out those things that

11:31:42 16   are most significant or most helpful to their side of the case,

11:31:47 17   and, in so doing, to call your attention to certain facts or

11:31:52 18   certain inferences that they are particularly concerned that

11:31:56 19   you, the jury, recall.  In the final analysis, however, it is

11:31:59 20   your own recollection and interpretation of the evidence that

11:32:05 21   controls in the case.  What the lawyers say is not binding upon

11:32:08 22   you.

11:32:08 23             Also, during the course of the trial, I have

11:32:11 24   occasionally made comments to the lawyers, or perhaps even

11:32:15 25   asked a question of a witness or admonished a witness

11:32:18  1    concerning the manner in which he or she should respond to the

11:32:21  2    questions of counsel.  Do not assume from anything that I may

11:32:25  3    have said that I have any opinion concerning any of the facts

11:32:27  4    in this case.  In arriving at your findings as to the facts,

11:32:32  5    you can disregard and should disregard anything I may have said

11:32:36  6    during the trial, except for my instructions on the law.

11:32:41  7           The law of the United States permits the judge to

11:32:44  8    comment on the evidence presented during a case.  I do not

11:32:47  9    believe that I have made any comments on the evidence in this

11:32:50 10    case.  However, if you could possibly construe any remarks

11:32:54 11    which I may have made during the course of this trial as a

11:32:57 12    comment on the evidence, then I specifically instruct you that

11:33:02 13    any such comments on my part are only an expression of my

11:33:06 14    opinion as to the facts.  Remember, you, the jury, may

11:33:10 15    disregard such comment or comments entirely, since you, as

11:33:17 16    jurors, are the sole judges of the facts.

11:33:19 17           Now, while you should consider only the evidence

11:33:22 18    in the case, you are permitted to draw such reasonable

11:33:26 19    inferences from the testimony and exhibits as you feel are

11:33:29 20    justified in the light of common experience.  In other words,

11:33:32 21    you may make deductions and reach conclusions that reason and

11:33:37 22    common sense lead you to draw from the facts that have been

11:33:41 23    established by the testimony and evidence in this case.

11:33:44 24           You may consider either direct or circumstantial

11:33:48 25    evidence.  Direct evidence is the testimony of one who asserts

*OFFICIAL TRANSCRIPT*

actual knowledge of a fact, such as an eyewitness. Circumstantial evidence is proof of a chain of facts and circumstances indicating a fact to be proved.  The law makes no distinction between the weight to be given to either direct or circumstantial evidence.

Certain charts and summaries have been shown to you solely to help explain or summarize the facts disclosed by the records and other documents that are in evidence.  These charts and summaries are not evidence or proof of any facts. You should determine the facts from the evidence.

In deciding the case, you are expected to use your good sense.  Give the evidence and the testimony of witnesses a reasonable and fair interpretation in light of your knowledge of the natural tendencies of human beings.

In weighing the testimony and in determining the credibility of any witness, you may consider the conduct of a witness, his or her bearing on the stand, his or her personal feelings as demonstrated by his or her testimony and actions, any interest he or she may have in the outcome of the case, any prejudice or bias he or she may have shown, any partiality he or she may have demonstrated.

If a witness is shown to have testified falsely concerning any material matter, you, the jury, have a right to distrust such witness' testimony in other matters, and you may distrust all of the testimony of that particular witness.

*OFFICIAL TRANSCRIPT*

11:35:36 1          You should keep in mind, of course, that a simple

11:35:39 2     mistake by a witness does not necessarily mean that a witness

11:35:41 3     was not telling the truth as he or she remembers it because

11:35:45 4     people may forget some things and remember other things

11:35:49 5     inaccurately.  So if a witness has made a misstatement, you

11:35:53 6     need to consider whether that misstatement was an intentional

11:35:57 7     falsehood or simply an innocent lapse of memory; and the

11:36:01 8     significance of that may well depend on whether it has to do

11:36:06 9     with an important fact or only an unimportant detail.

11:36:09 10          The testimony of a single witness may be

11:36:13 11    sufficient to prove any fact, even if a greater number of

11:36:17 12    witnesses may have testified to the contrary, if, after

11:36:22 13    considering all of the other evidence, you, the jury, believe

11:36:24 14    that single witness.

11:36:29 15          When knowledge of technical subject matter may be

11:36:33 16    helpful to the jury, a person who has special training or

11:36:36 17    experience in that technical field may be called as an expert

11:36:40 18    witness, and is permitted to state his or her opinions as to

11:36:44 19    those technical matters.  Such witnesses, you will recall, have

11:36:49 20    testified in this case.  You are not, however, required to

11:36:52 21    accept that opinion.  As with any other witness, it is up to

11:36:58 22    you, the jury, to decide whether to rely upon it.

11:37:01 23          If you should decide that the opinion of an

11:37:06 24    expert witness is not based upon sufficient education or

11:37:10 25    experience, or if you should conclude that the facts that the

*OFFICIAL TRANSCRIPT*

11:37:13  1   expert relied upon are incorrect, that the reasons given in

11:37:18  2   support of the opinion are not sound, or that the opinion is

11:37:21  3   outweighed by other evidence, then you may disregard that

11:37:26  4   opinion entirely.

11:37:27  5          In deciding whether to accept or rely upon the

11:37:31  6   opinion of an expert witness, you may consider any bias of the

11:37:36  7   witness, including any bias you may infer from evidence that

11:37:40  8   the expert witness has economic, philosophical or other

11:37:47  9   interest in the outcome of the case.

11:37:49 10          Certain testimony, you will recall, has been

11:37:51 11   presented to you through video depositions.  A deposition is

11:37:54 12   the sworn, recorded answers to questions asked to the witness

11:37:59 13   in advance of the trial.  Upon some circumstances, if a witness

11:38:04 14   cannot be present to testify from the witness stand, that

11:38:07 15   witness' testimony may be presented under oath, in the form of

11:38:13 16   a deposition.

11:38:14 17          Sometime before the trial, attorneys representing

11:38:17 18   the parties in this case questioned the witness under oath.  A

11:38:23 19   court reporter was present and recorded the testimony.  The

11:38:26 20   questions and answers were presented by video to you.  This

11:38:29 21   deposition testimony is entitled to the same consideration, is

11:38:33 22   to be judged by you as to credibility, and is to be weighed and

11:38:38 23   otherwise considered by you, insofar as it is possible, in the

11:38:42 24   same way as if the witness were present and had testified from

11:38:46 25   the witness stand in this Court.

*OFFICIAL TRANSCRIPT*

11:38:48  1          Likewise, testimony presented to you via

11:38:52  2   satellite from other locations are to be treated the same as if

11:38:56  3   those witnesses were present in court.

11:38:59  4          Now, during the course of the trial, you have

11:39:04  5   heard objections to the evidence.  Sometimes these have been

11:39:07  6   argued out of the hearing of the jury.

11:39:09  7          It is the duty of the attorney for each side of

11:39:13  8   the case to object when the other side offers testimony or

11:39:16  9   other evidence which the attorney believes is not properly

11:39:20 10   admissible.  You should not draw any inference against or show

11:39:26 11   any prejudice against a lawyer or his or her client because of

11:39:30 12   the making of the objections.

11:39:33 13          Upon allowing testimony or other evidence to be

11:39:35 14   introduced over the objections of an attorney, the Court does

11:39:39 15   not, unless expressly stated, indicate any opinion as to the

11:39:44 16   weight or effect of such evidence.  As stated before, you, the

11:39:48 17   jury, are indeed the sole judges of the credibility of all

11:39:53 18   witnesses and the weight and effect of all evidence.

11:40:01 19          When the Court has sustained an objection to a

11:40:06 20   question addressed to a witness, the jury must disregard the

11:40:08 21   question entirely and may draw no inference from the wording of

11:40:12 22   it or speculate as to what the witness would have said if

11:40:17 23   permitted to answer the question.

11:40:21 24          During the course of the trial, I have

11:40:22 25   occasionally asked a question of a witness in order to bring

**OFFICIAL TRANSCRIPT**

11:40:25 1    out a fact not then fully covered in the testimony.  Again, I

11:40:30 2    tell you, do not assume that I hold any opinion on the facts to

11:40:33 3    which my question or questions may have related.  Remember,

11:40:39 4    again, that at all times you, as jurors, are indeed the judges

11:40:45 5    of the facts.

11:40:48 6            Statements and arguments of the lawyers are not

11:40:50 7    evidence in the case unless made as an admission or a

11:40:53 8    stipulation of fact.  A stipulation is an agreement between

11:40:57 9    both sides that certain facts are true, or that a person would

11:41:03 10   have given certain testimony.  When the lawyers on both sides

11:41:08 11   stipulate or agree that the existence of a fact -- on the

11:41:12 12   existence of a fact, you must, unless otherwise instructed,

11:41:16 13   accept the stipulation as evidence, and regard that fact to be

11:41:21 14   proved.

11:41:21 15           Finally, certain materials have been shown to you

11:41:25 16   solely as an aid to help explain the facts disclosed by the

11:41:30 17   evidence (testimony, records and other documents) in this case.

11:41:36 18   That is what we refer to as demonstrative evidence because it

11:41:40 19   is offered merely to demonstrate or illustrate a point, rather

11:41:44 20   than as actual proof of that point.  Demonstrative evidence is

11:41:51 21   not admitted evidence or proof of facts.  You should determine

11:41:55 22   the facts from the evidence which is admitted.

11:41:58 23           Remember, demonstrative evidence is only as good

11:42:00 24   as the underlying testimony, data, assumptions and opinions

11:42:06 25   that serve as a basis for it, and the maxim, "garbage in,

garbage out" -- we've all heard that -- applies in demonstrative evidence.  Like all other evidence in this case, you may accept it or reject it in whole or in part.

Again, any notes that you may have taken during this trial are only aids to your memory.  If your memory differs from your notes, you should rely upon your memory, and not your notes.  The notes are not evidence.  If you did not take notes, you should rely upon your independent recollection of the evidence, and should not be unduly influenced by the notes of other jurors.  Again, I remind you that notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

Now, let me talk to you about some specific instructions that apply in this case.

As you know, this action arises out of Ms. Dora Mingo's use of Xarelto.  The Janssen and Bayer Defendants manufacture Xarelto.  Ms. Mingo contends that she suffered a gastrointestinal bleed, or we call it a GI bleed, as a result of her use of Xarelto.  She claims two separate theories of liability.  First, that are the Defendant failed to properly instruct her prescribing doctor, Dr. Jordon, about the safe use of Xarelto, specifically the use of a PT test to determine her bleed risk.  Ms. Mingo claims that had Dr. Jordon been properly instructed, he would have followed that instruction, and Ms. Mingo's GI bleed would have been

*OFFICIAL TRANSCRIPT*

11:44:05  1    prevented.

11:44:05  2            Second, that Xarelto had a defective design

11:44:11  3    because it lacked an anti-Factor Xa assay, and that this caused

11:44:18  4    her GI bleed.  Ms. Mingo seeks monetary damages proximately

11:44:24  5    caused by her GI bleed.

11:44:26  6            The Defendants deny all of these allegations.

11:44:29  7    They contend that Xarelto's warnings or instructions were

11:44:34  8    adequate, and that any alleged inadequacy in the warnings or

11:44:40  9    instructions did not proximately cause Ms. Mingo's injury.

11:44:47 10    They contend that Xarelto was properly designed to be used

11:44:50 11    without any anti-Factor Xa assay, and that the use of the

11:45:00 12    product without an anti-Factor Xa assay did not proximately

11:45:05 13    cause Ms. Mingo's injury.  Defendants contend that Ms. Mingo's

11:45:09 14    GI bleed did not result from her use of Xarelto.  Further, the

11:45:17 15    Defendants contend that Xarelto's label contains accurate

11:45:21 16    science-based information enabling doctors to make informed

11:45:25 17    decisions about the risks and benefits of prescribing this

11:45:28 18    medication to their patients.

11:45:29 19            The mere fact that the Plaintiff may have been

11:45:36 20    injured, standing alone, does not permit you, the jury, to draw

11:45:45 21    inferences that such injuries were caused by the Defendants.

11:45:49 22    Moreover, although Ms. Mingo's two theories of recovery have

11:45:53 23    been tried together, they are separate from one another, and

11:45:56 24    each party is entitled to have you separately consider the two

11:45:59 25    claims.  Therefore, in your deliberations, you should consider

                          *OFFICIAL TRANSCRIPT*

11:46:03 1    the evidence as it relates to each claim separately, just as

11:46:08 2    you would be doing if each claim had been tried separately.

11:46:15 3         Remember, the burden of proof is on the

11:46:17 4    Plaintiffs, in these civil actions such as this one, to prove

11:46:21 5    every essential element of her claim by a preponderance of the

11:46:26 6    evidence.  A preponderance of the evidence means such evidence

11:46:30 7    as, when considered and compared with that opposed to it, has

11:46:34 8    more convincing force and produces in your minds a belief that

11:46:41 9    what is sought to be proved is more likely true than not true.

11:46:49 10   In other words, to establish a claim by a preponderance of the

11:46:53 11   evidence means to prove that the claim is more likely so than

11:46:57 12   not so.

11:46:58 13        In determining whether any fact has been proved

11:47:03 14   by a preponderance of the evidence in this case, you may,

11:47:06 15   unless otherwise instructed, consider the testimony of all

11:47:09 16   witnesses, regardless of who may have called them, and all

11:47:14 17   exhibits received into evidence, regardless of who may have

11:47:18 18   produced them.

11:47:19 19        If the Plaintiff fails to establish any essential

11:47:25 20   element of her claim by a preponderance of the evidence, you,

11:47:27 21   the jury, should find for the Defendants.  The Plaintiff need

11:47:32 22   not produce every possible witness, and they need not prove --

11:47:38 23   and she need not prove her claim beyond a reasonable doubt, as

11:47:42 24   is necessary in a criminal prosecution, but speculation or mere

11:47:48 25   possibility and even unsupported probability is not sufficient

**OFFICIAL TRANSCRIPT**

11:47:53  1    to support a judgment in her favor.

11:47:56  2              Now, let me discuss the law applicable to the

11:48:00  3    Plaintiff's theories of recovery.

11:48:03  4              Mississippi Products Liability Act.  The law

11:48:07  5    applicable to this case is the law of Mississippi.  In

11:48:10  6    Mississippi, a products liability action such as this one is

11:48:14  7    governed by the Mississippi Products Liability Act.  We

11:48:19  8    sometimes call it the MPLA.  The MPLA provides that the

11:48:26  9    manufacturer of a product shall be liable to a claimant for

11:48:29 10    damages proximately caused by one or more ways in which the

11:48:35 11    product was defective or unreasonably dangerous.  One of the

11:48:41 12    ways in which a drug can be defective or unreasonably dangerous

11:48:44 13    is in cases where the product's manufacturer fails to include

11:48:50 14    adequate instructions for using the product when the

11:48:53 15    information given through those instructions is not otherwise

11:48:57 16    known to or appreciated by the user of the product.  In the

11:49:04 17    case of a prescription drug product, that user would be the

11:49:09 18    doctor prescribing the drug.  Another way a product can be

11:49:14 19    defective or unreasonably dangerous is by being designed in a

11:49:19 20    defective manner.

11:49:20 21              In order to recover, the plaintiff in this case

11:49:22 22    must show that her damages were proximately caused either by,

11:49:28 23    one, the Defendants' failure to provide adequate instructions

11:49:30 24    about a characteristic of the product that renders it

11:49:34 25    unreasonably dangerous; or, two, that the design defect renders

*OFFICIAL TRANSCRIPT*

11:49:39  1    it unreasonably dangerous.

11:49:42  2              Now, it has been stipulated and agreed upon in

11:49:44  3    this case, and therefore you may consider it to be established,

11:49:49  4    that both Janssen and Bayer Defendants in this case are

11:49:53  5    manufacturers of Xarelto within the meaning of the MPLA.  Where

11:49:59  6    there is a relationship between manufacturers, a plaintiff is

11:50:03  7    injured by a product that may be deemed manufactured by more

11:50:06  8    than one manufacturer, these manufacturers are collectively

11:50:10  9    responsible to the plaintiff.  Xarelto is a brand name for

11:50:15 10    rivaroxaban.  Xarelto is a prescription drug, that is to say, a

11:50:23 11    medical provider or a doctor must prescribe the drug.

11:50:27 12              Now, let me say something about failure to

11:50:31 13    instruct.

11:50:31 14              I will now discuss with you the law governing the

11:50:36 15    Plaintiff's claim for failure to instruct.

11:50:38 16              In order to decide the Plaintiff's failure to

11:50:40 17    instruct claim, you must determine whether the Plaintiff has

11:50:43 18    proven by a preponderance of the evidence that the Defendants

11:50:47 19    failed to adequately instruct Ms. Mingo's treating physician,

11:50:51 20    Dr. Jordon, about the proper use of Xarelto, and, if so,

11:50:56 21    whether the Defendants' failure to instruct was a proximate

11:51:00 22    cause of the Plaintiff's GI bleed.

11:51:02 23              Prescription drugs often cause unwanted side

11:51:07 24    effects despite the fact that they have been carefully designed

11:51:09 25    and properly manufactured.  However, they are not defective

**OFFICIAL TRANSCRIPT**

11:51:13 1     under the law, no unreasonably dangerous, if they include

11:51:20 2     adequate instructions for the save use of the drug.

11:51:23 3             The Plaintiff claims that Xarelto was

11:51:28 4     unreasonably dangerous because of inadequate instructions about

11:51:32 5     its potential risks when taken on the recommended dosing

11:51:36 6     schedule without an assessment of the Plaintiff's PT time.  In

11:51:41 7     order to be successful on Plaintiff's failure to instruct

11:51:44 8     claim, the Plaintiff must have proof by a preponderance of the

11:51:48 9     evidence that at the time Xarelto was prescribed to Ms. Mingo:

11:51:55 10             First, the Defendants knew or reasonably should

11:51:58 11     have known Xarelto had a dangerous characteristic;

11:52:05 12             Two, that the Defendants failed to adequately

11:52:10 13     instruct Ms. Mingo's prescribing physician, Dr. Jordon, about

11:52:15 14     using a PT test to detect, evaluate, and avoid this dangerous

11:52:19 15     characteristic;

11:52:21 16             Three, the absence of adequate instructions made

11:52:25 17     Xarelto unreasonably dangerous; and

11:52:27 18     Four, the injury Ms. Mingo suffered, that is to say her

11:52:36 19     GI bleed, was proximately caused by the allegedly inadequate

11:52:40 20     instructions.

11:52:40 21             Under the MPLA, a manufacturer of a drug product

11:52:45 22     has a duty to provide a physician with adequate instructions

11:52:51 23     concerning the safe use of the drug.  An adequate instruction

11:52:55 24     is one that a reasonably prudent drug manufacturer in the same

11:53:01 25     or similar circumstance would have provided with respect to the

*OFFICIAL TRANSCRIPT*

11:53:07 1   dangers associated with taking the drug.  It is one which

11:53:11 2   communicates sufficient information about the dangers and safe

11:53:15 3   use of the drug, taking into account both the characteristics

11:53:21 4   of the drug and the ordinary knowledge common to a physician

11:53:25 5   who would be prescribing it to a patient.

11:53:28 6           Under the applicable law, a prescription drug

11:53:33 7   manufacturer only has a duty to instruct a learned

11:53:39 8   intermediary, such as the prescribing physician, about the safe

11:53:42 9   use of the drug.  It does not have a duty to instruct the

11:53:46 10  consumer directly.  This is because a physician is the one who

11:53:51 11  must prescribe the drug, and is someone who, through

11:53:57 12  specialized education and experience, is in the best position

11:54:01 13  to make decisions or recommendations in regard to a specific

11:54:05 14  drug for a specific patient.  Although a prescription drug

11:54:12 15  manufacturer's duty to instruct about potential risks and safe

11:54:17 16  use of the product is directed only to the reasonably prudent

11:54:20 17  prescriber, and not to the consumer, the manufacturer is

11:54:24 18  directly liable to the patient for breach of such a duty.

11:54:30 19          Now, when a prescription drug manufacturer

11:54:34 20  provides an instruction about the safe use of its drug, it may

11:54:38 21  reasonably assume that it will be read and heeded by the

11:54:45 22  prescriber.  It is a physician's duty to remain abreast of a

11:54:50 23  drug's characteristic and to take into account the information

11:54:52 24  contained in a prescription drug's label.  The drug

11:54:56 25  manufacturer may reasonably assume the prescriber will apply

*OFFICIAL TRANSCRIPT*

the same knowledge, professional expertise and good judgment that a reasonably physician would apply in using the product. Providing adequate instructions to the prescribing doctor relieves the manufacturer of its duty to the patient.

An instruction is inadequate if the manufacturer fails to give a reasonably prudent prescriber instructions about how to detect, evaluate, and avoid a dangerous characteristic that was known or knowable to the manufacturer in light of the generally recognized and prevailing best scientific and medical knowledge available at the time of manufacture and distribution.  The drug manufacturer has a duty to take reasonable precautions to provide an adequate instruction in their label that would inform a prescriber how to detect and avoid dangerous characteristics that might result from the use of a product.

The manufacturer may communicate instructions through a label or package insert or other communications or literature.  In determining the scope of a manufacturer's duty to provide instructions associated with the use of its product, the manufacturer is held to the knowledge and skill of an expert in its field.  The manufacturer must keep up with scientific knowledge, discoveries and advances, and is presumed to know what could be learned by doing so.  This duty is continuing.  If the manufacturer learns of a characteristic or danger that may cause injury after its product is on the

market, the manufacturer has a continuing duty to use reasonable care to provide adequate instructions to the prescribers of its product concerning such later discovered matters.  That is to say, under the law (including federal regulations) applicable to this case, drug manufacturers have the responsibility for drafting the label for their product and for assuring that the labeling continues to reflect the current knowledge concerning the risks posed by the drug.  Under both Mississippi law and federal drug regulations applicable to this case, drug manufacturers at all times bear responsibility for the contents of the drug's label.

Where the defendants are shown to have failed to adequately instruct a prescribing doctor about a drug, the learned intermediary doctrine does not relieve the manufacturer of legal responsibility.  In other words, in that circumstance, the prescribing doctor cannot be said to be a learned intermediary because he or she was not adequately informed by the Defendants.

In order to prove her failure to instruct claim, the Plaintiff must not only prove that the Defendants' instructions regarding Xarelto were inadequate, but also that such inadequacy affected the decision or decisions of the prescribing physician with regards to Xarelto.  In other words, you must determine if Dr. Jordon would have altered his prescribing behavior and Ms. Mingo would not have suffered her

11:58:52  1    GI bleed had the doctor be provided with adequate instructions.

11:58:56  2    Thus, Ms. Mingo must show by a preponderance of the evidence

11:59:02  3    that Dr. Jordon would have recommended a different course of

11:59:05  4    treatment in her case, and her GI bleed that was diagnosed on

11:59:09  5    February 13, 2015, would have been avoided had Dr. Jordon

11:59:18  6    received adequate instructions.

11:59:19  7           If the greater weight of the evidence does not

11:59:22  8    support Plaintiff's claim, your verdict should be for the

11:59:25  9    Defendants.  If the greater weight of evidence, however, does

11:59:31 10    support the Plaintiff's claim, then your verdict should be for

11:59:34 11    the Plaintiff.

11:59:35 12           Let me say something about the Labeling and

11:59:40 13    Federal Regulations.

11:59:43 14           As I previously mentioned, Xarelto is a brand

11:59:45 15    name drug.  The FDA approved both Xarelto and its label.  You

11:59:53 16    may consider this fact in weighing the evidence in this case in

11:59:57 17    determining the liability of the Defendants.  However, FDA

12:00:03 18    approval, although relevant, does not in and of itself absolve

12:00:09 19    the Defendants of all liability, nor does it establish that

12:00:13 20    instructions provided with the drug were adequate under the

12:00:18 21    standards of Mississippi law.  In fact, any action or inaction

12:00:24 22    on the part of the FDA, though relevant to your consideration

12:00:30 23    of liability, does not foreclose a claim under Mississippi law.

12:00:35 24    More specifically, if you find that the Defendants failed to

12:00:40 25    apprise prescribing physicians of appropriate testing to

*OFFICIAL TRANSCRIPT*

12:00:44 1    address the risks that they knew or should have known prior to

12:00:48 2    FDA approval, or became known or should have become known after

12:00:53 3    FDA approved Xarelto's label, then FDA approval of the drug is

12:00:58 4    not conclusive.

12:01:00 5              Let me say a word about the Design Defect Claim.

12:01:05 6              I will now discuss the law specifically referring

12:01:10 7    to and governing the Plaintiff's claim that Xarelto was

12:01:16 8    defectively designed.  As previously mentioned, Ms. Mingo

12:01:19 9    claims that Xarelto was defectively designed because it lacked

12:01:24 10   an anti-Factor Xa assay, and that this caused her GI bleed.  In

12:01:31 11   order to succeed on such a claim, the Plaintiff must prove by a

12:01:35 12   preponderance of the evidence that at the time of the FDA's

12:01:38 13   first approval of Xarelto on July 1, 2011, that:  One, Xarelto

12:01:43 14   was defectively designed; two, Xarelto's design made the drug

12:01:48 15   unreasonably dangerous; three, that Defendants knew or

12:01:52 16   reasonably should have known of Xarelto's dangerous condition;

12:01:59 17   four, Xarelto failed to function as expected; and, five, there

12:02:02 18   was a feasible alternative design to Xarelto that would have

12:02:06 19   prevented the Plaintiff's harm without impairing the utility,

12:02:12 20   usefulness, practicality or desirability of Xarelto; and, six,

12:02:17 21   the defective design proximately caused the Plaintiff's injury.

12:02:23 22             In considering Ms. Mingo's design defect claim,

12:02:27 23   you are to determine what Defendants knew or should have known

12:02:30 24   with regard to Xarelto's design, by holding Defendants to the

12:02:36 25   knowledge and skill of an expert on Xarelto.  Moreover, a

*OFFICIAL TRANSCRIPT*

12:02:40  1   prescription drug manufacturer is required by law to keep
12:02:44  2   abreast of research, patient reaction reports, and other
12:02:50  3   scientific literature pertaining to a drug that it has placed
12:02:56  4   on the market.
12:02:56  5           Let me say a word about Causation.
12:03:00  6           In order for the Plaintiff to prevail on either
12:03:03  7   claim, she must establish that the inadequate instruction or
12:03:07  8   the design defect, if any, was the proximate cause of
12:03:14  9   Ms. Mingo's GI bleed.
12:03:15 10           Now, proximate cause means the efficient cause or
12:03:21 11   direct cause.  The law defines proximate cause as something
12:03:23 12   that produces a natural chain of events, which, in the end,
12:03:27 13   brings about the injury.  In other words, proximate cause is
12:03:31 14   the cause without which the injury would not have occurred.
12:03:34 15           In order to be a proximate cause of Ms. Mingo's
12:03:39 16   GI bleed, any fault you find on the part of the Defendants must
12:03:43 17   have been a cause or a substantial contributing factor in
12:03:48 18   producing Ms. Mingo's injury.  If you conclude Ms. Mingo would
12:03:54 19   have suffered her GI bleed even without any fault, as alleged
12:03:58 20   on the part of the Defendants, then the Defendants' fault
12:04:02 21   cannot be considered a proximate cause of the Plaintiff's harm.
12:04:06 22   But, on the other hand, it is not necessary for the Defendants'
12:04:11 23   fault to have been the sole cause of Ms. Mingo's GI bleed.  If
12:04:19 24   Defendants' fault played a substantial contributing role in
12:04:24 25   causing Ms. Mingo's GI bleed, Defendants can be considered

*OFFICIAL TRANSCRIPT*

12:04:28  1    liable for Plaintiff's GI bleed and associated damages, even if

12:04:35  2    other causes may have contributed to the GI bleed.

12:04:42  3           In this case, Ms. Mingo does not allege that her

12:04:45  4    gastrointestinal ulcer was itself caused by Xarelto.  Rather,

12:04:50  5    that the significant bleeding of this ulcer was either

12:04:53  6    proximately caused by or substantially contributed to or made

12:04:59  7    worse as a result of her use of Xarelto.  Defendants, if found

12:05:05  8    at fault, are liable for all harm proximately caused to

12:05:11  9    Ms. Mingo as a result of their fault, even if a preexisting

12:05:16 10    physical condition (in this case, Ms. Mingo's ulcers) meant

12:05:20 11    that the medical outcome in her case was worse than it would

12:05:24 12    have otherwise been.  Under the law, a wrongdoer must take the

12:05:31 13    victim as it finds her.  Therefore, if you find by a

12:05:37 14    preponderance of the evidence that Ms. Mingo's existing

12:05:39 15    condition was aggravated or worsened due to the Defendants'

12:05:44 16    fault, Ms. Mingo still is entitled to a verdict which will

12:05:49 17    reasonably and fairly compensate her for the aggravation of

12:05:54 18    that preexisting condition.

12:06:00 19           To recover for the failure-to-instruct claim, the

12:06:04 20    Plaintiff must prove by a preponderance of the evidence that an

12:06:07 21    inadequate instruction itself, in addition to the medication,

12:06:15 22    was the proximate cause of Ms. Mingo's alleged GI bleed.  When

12:06:17 23    I say proximate cause, I mean that the Plaintiff must prove by

12:06:21 24    a preponderance of the evidence that if an adequate instruction

12:06:24 25    had accompanied Xarelto, then Dr. Jordon would have altered his

12:06:28 1   prescribing behavior, and Ms. Mingo would not have suffered her

12:06:33 2   GI bleed.

12:06:33 3           To recover for design defect, the Plaintiff must

12:06:38 4   prove by a preponderance of the evidence that Xarelto's design

12:06:42 5   was the proximate cause of her injury.  When I say proximate

12:06:45 6   cause, I mean the Plaintiff must prove that if Xarelto had been

12:06:49 7   designed differently, Ms. Mingo would not have suffered her

12:06:53 8   GI bleed.

12:06:53 9           Now, let me say something about Damages.

12:07:01 10          Damages is the term used to indicate in dollars

12:07:05 11  and cents what, if any, monetary losses the Plaintiff has

12:07:10 12  sustained.  If you find the Plaintiff has proven her claim

12:07:14 13  against the Defendants by a preponderance of the evidence, you

12:07:16 14  must then determine the amount of damages, if any, to which

12:07:22 15  she's entitled.  You should not interpret the fact that I am

12:07:25 16  giving you instructions about Plaintiff's damages as an

12:07:29 17  indication in any way that I believe that the Plaintiff should

12:07:33 18  or should not win the case.  It is your task, ladies and

12:07:39 19  gentlemen, to first decide whether the Plaintiff suffered

12:07:42 20  damages as a result of the fault of the Defendants.  I am

12:07:46 21  instructing you on damages only so that you will have some

12:07:52 22  guidance in the event that you decide that Plaintiff has proved

12:07:57 23  that she sustained damages as a result of the fault of the

12:08:00 24  Defendants, and that she is entitled to recover money from the

12:08:05 25  Defendants.  Plaintiff must prove her damages with reasonable

*OFFICIAL TRANSCRIPT*

12:08:10 1   certainly and cannot be awarded on the basis of speculation and

12:08:15 2   conjecture.

12:08:16 3          If you find that the Defendants are liable to the

12:08:20 4   Plaintiff, then you must determine an amount that is fair

12:08:22 5   compensation for the Plaintiff's damages.  These damages are

12:08:27 6   called compensatory damages.  The purpose of compensatory

12:08:30 7   damages is to make the Plaintiff whole, that is, to compensate

12:08:34 8   the Plaintiff for the damages she suffered.

12:08:39 9          You may award compensatory damages only for

12:08:43 10  injuries that the Plaintiff proves were caused by the

12:08:46 11  Defendants' wrongful act.

12:08:49 12         The damages you award must be fair compensation

12:08:51 13  for the Plaintiff's damages, no more and no less.  Compensatory

12:08:57 14  damages are not allowed as punishment and cannot be imposed or

12:09:01 15  increased to penalize the Defendants.  You should not award

12:09:05 16  compensatory damages for speculative injuries, but only for

12:09:10 17  injuries which the Plaintiff actually sustained.

12:09:12 18         If you decide to award compensatory damages, you

12:09:17 19  should be guided by dispassionate common sense.  That is to

12:09:22 20  say, you should not be affected by sympathy, compassion,

12:09:26 21  prejudice, or bias.  Computing damages may be difficult, but

12:09:31 22  you should not let that difficultly lead you to engage in

12:09:36 23  arbitrary guesswork.  On the other hand, the law does not

12:09:41 24  require that the Plaintiff prove the amount of the damages with

12:09:45 25  any mathematical precision, but only with as much definiteness

*OFFICIAL TRANSCRIPT*

12:09:52 1   and accuracy as circumstances permit.

12:09:57 2          You must use sound discretion in fixing an amount

12:10:00 3   of damages, drawing reasonable inferences where you find them

12:10:03 4   appropriate from the facts and circumstances in the evidence.

12:10:06 5          You should consider the following elements of

12:10:08 6   damages to the extent you find that the Plaintiff has

12:10:11 7   established them:  Ms. Mingo's past physical pain and suffering

12:10:15 8   and resulting mental anguish and loss of enjoyment of life;

12:10:21 9          Ms. Mingo's reasonable and necessary medical

12:10:24 10  expenses already incurred, which the parties have stipulated to

12:10:30 11  be $28,758.21.

12:10:37 12         Some of these damages, such as mental or physical

12:10:42 13  pain and suffering, are intangible things about which no

12:10:46 14  evidence of value is required.  In awarding these damages, you

12:10:49 15  are not really determining the value, but you should award an

12:10:54 16  amount that will fairly compensate the Plaintiff for her

12:10:58 17  injuries.  There is no exact standard for fixing the

12:11:02 18  compensation to be awarded for this element of damage.  Any

12:11:06 19  award that you make, however, must be fair in light of the

12:11:13 20  evidence.

12:11:14 21         Physical Pain and Suffering and Mental Anguish.

12:11:17 22         You may award damages for any bodily injury

12:11:20 23  sustained as a result of Xarelto and any pain, suffering,

12:11:23 24  disability, inconvenience and/or loss of capacity, enjoyment of

12:11:30 25  life, mental anguish, worry and emotional distress that the

*OFFICIAL TRANSCRIPT*

12:11:34 1    Plaintiff experienced as a result of the GI bleed.  No evidence

12:11:37 2    of the value of these intangible things, such as mental or

12:11:40 3    physical pain and suffering, need be introduced.  You are not

12:11:43 4    trying to determine value, but an amount that will fairly

12:11:46 5    compensate the Plaintiff for the damages she suffered.  There

12:11:48 6    is no exact standard for fixing the compensation to be awarded

12:11:52 7    for these elements of damage.  Any award you make should be

12:11:56 8    fair in light of the evidence.

12:11:57 9         As previously mentioned, under our laws, the

12:12:02 10   Defendants take the victim as they find her.  The age and

12:12:05 11   preexisting health of a plaintiff prior to her injury should

12:12:11 12   not result in a discount in the amount of compensation she

12:12:15 13   receives for an injury.

12:12:16 14        In the event you find that the Plaintiff is

12:12:19 15   entitled to receive an award for mental and physical pain and

12:12:23 16   suffering, I instruct you that such award is not subject to

12:12:27 17   income tax; neither the state nor the federal government will

12:12:32 18   tax it.  Therefore, you should determine the amount that the

12:12:35 19   plaintiff is entitled to receive without considering the effect

12:12:39 20   of taxes upon it.

12:12:42 21        Again, I'll remind you, the mere fact that I have

12:12:45 22   given you instructions on the law of damages does not in any

12:12:50 23   way suggest that I believe that any damages are due in the

12:12:55 24   case.  The Plaintiff must prove her damages with reasonable

12:12:59 25   certainty and cannot be awarded damages on the basis of

**OFFICIAL TRANSCRIPT**

12:13:03 1   speculation.  Whether or not the Plaintiff is entitled to

12:13:06 2   recover, and whether or not she has proven that any damages are

12:13:11 3   due, is for you, the jury, to decide.

12:13:14 4          Now, in conclusion, ladies and gentlemen, it is

12:13:19 5   your sworn duty as jurors to decide this case with one another

12:13:26 6   in an effort to reach a unanimous agreement, if you can do so.

12:13:30 7   Each of you must decide the case for yourself, but only after

12:13:38 8   full consideration of the evidence with the other members of

12:13:41 9   the jury.  While you are discussing the case, ladies and

12:13:45 10  gentlemen, do not hesitate to re-examine your opinion and

12:13:51 11  change your mind if you become convinced that you are wrong.

12:13:55 12  Do not, however, give up your honest beliefs solely because

12:14:05 13  others think differently or merely to finish the case.

12:14:08 14         Remember that in a very real sense, you are the

12:14:16 15  judges -- judges of the facts.  Your only interest is to seek

12:14:21 16  the truth from the evidence in this case.

12:14:25 17         I have prepared a special verdict form for your

12:14:32 18  convenience to aid you in reaching a unanimous decision, if you

12:14:36 19  can do so.  You will take the form with you to the jury room.

12:14:40 20  The verdict must represent the considered judgment of each

12:14:43 21  juror.

12:14:46 22                    Jury Verdict Form

12:14:47 23         Question 1:  Do you find by a preponderance of the

12:14:51 24  evidence that Xarelto either proximately caused or

12:14:54 25  substantially contributed to Ms. Dora Mingo's GI bleed.

*OFFICIAL TRANSCRIPT*

12:14:58   1           Yes or no.  You fill in the one that's

12:15:04   2   appropriate.

12:15:05   3           I have some directions.  If you answer "yes," do

12:15:10   4   so forth.  If you answer "no," do so forth.

12:15:14   5           Question 2:  Do you find by a preponderance of

12:15:16   6   the evidence that the Defendants failed to provide Dr. Renie

12:15:21   7   Jordon adequate instructions for the safe use of Xarelto?

12:15:27   8           Yes or no, you decide.  Then follow the

12:15:29   9   instructions.

12:15:29 10           Question 3:  Do you find by a preponderance of

12:15:34 11   the evidence that the Defendants' failure to provide adequate

12:15:37 12   instructions to Dr. Jordon either proximately caused or

12:15:41 13   substantially contributed to Dora Mingo's GI bleed?

12:15:45 14           Yes or no.  You fill in the appropriate thing.

12:15:50 15   Please follow the instructions.

12:15:51 16           Question 4:  Do you find by a preponderance of

12:15:54 17   the evidence that Xarelto had a defective design at the time it

12:15:59 18   left Defendants' control?

12:16:00 19           Yes or no.  You fill out the appropriate answer

12:16:04 20   and follow the instructions.

12:16:05 21           Question 5:  Do you find by a preponderance of

12:16:08 22   the evidence that Xarelto's defective design either proximately

12:16:11 23   caused or substantially contributed to Ms. Dora Mingo's

12:16:16 24   GI bleed?

12:16:16 25           Yes or no.  You fill out the appropriate one

12:16:20  1   based on the evidence and follow the instructions.

12:16:24  2              Finally, Question 6:  What amount do you find by

12:16:25  3   a preponderance of the evidence is appropriate to fairly and

12:16:29  4   adequately compensate Ms. Dora Mingo for her injuries?

12:16:35  5              Physical pain and suffering, that language, there

12:16:38  6   is a line.

12:16:40  7              Medical expenses, there is a line.

12:16:42  8              You fill out whatever you feel appropriate.

12:16:45  9   Total amount, add it up.

12:16:47  10             Please date and sign the verdict form where

12:16:51  11  indicated on the last page, and inform the marshal you have

12:16:55  12  reached a verdict.  Date and sign it.  The foreperson signs the

12:16:58  13  verdict form.

12:16:59  14             You will note the form contains several

12:17:02  15  interrogatories, or questions.  As I mentioned, the answers to

12:17:06  16  each question must be unanimous by the jury.  In the space

12:17:11  17  provided below each question, you'll find directions which

12:17:15  18  instruct you either to answer the next question, to answer some

12:17:18  19  other question, or to stop and return to the courtroom with

12:17:23  20  your verdict.  Please follow the instructions.

12:17:25  21             Now, when you retire to the jury room, ladies and

12:17:30  22  gentlemen, to deliberate on your verdict, you may take this

12:17:33  23  charge with you, as well as all the evidence which I have

12:17:38  24  admitted, all the exhibits which I have admitted into the

12:17:41  25  evidence.

*OFFICIAL TRANSCRIPT*

12:17:42 1          First, select your foreperson, and then relax,

12:17:51 2   have lunch, and then conduct your deliberations.  Follow all

12:17:55 3   the instructions that the Court has given about your conduct

12:17:58 4   during the trial.  After you have reached your unanimous

12:18:03 5   verdict, if you have done so, your foreperson is to fill in the

12:18:07 6   form, your answers to the questions.

12:18:11 7          Do not reveal your answers until such time as you

12:18:15 8   are discharged, unless otherwise directed by me.  You must

12:18:18 9   never disclose to anyone, not even to me, a numerical division

12:18:24 10  on any question, if, indeed, there be any.

12:18:27 11         If you want to communicate with me at any time,

12:18:29 12  please give a signed, written message or question to the

12:18:36 13  United States Marshal, who will bring it to me.  I will then

12:18:39 14  respond as promptly as possible, either in writing or by having

12:18:43 15  you brought into the courtroom so I can address you in person.

12:18:48 16  I will always first discuss with the attorneys the question and

12:18:54 17  my response to it before I answer your question.

12:19:00 18         After you have reached a verdict, you are not

12:19:02 19  required to talk with anyone about the case unless I order

12:19:05 20  otherwise.

12:19:08 21         Ladies and gentlemen, you may now retire to the

12:19:10 22  jury room to conduct your deliberations.  We've already ordered

12:19:15 23  lunch for you.  I think it's available for you now.

12:19:18 24         The Court will rise as the jury leaves, please.

12:19:23 25         (WHEREUPON, at 12:19 p.m., the jury panel leaves the

*OFFICIAL TRANSCRIPT*

12:19:40  1    courtroom for deliberations.)

12:19:40  2         THE COURT:  Be seated, please.

12:19:43  3              The jury is outside of the courtroom.  You might

12:19:46  4    leave your cell phone numbers, so we can contact you in case

12:19:50  5    there is any question that the jury asks, so that we can get in

12:19:53  6    touch with you and discuss the question with you.

12:19:55  7              The jury, I expect, will have lunch, and then

12:20:03  8    will begin their deliberations.  So, perhaps, if you want

12:20:06  9    lunch, now is the time to get it.

12:20:08 10              Just on a personal note, let me thank each of you

12:20:11 11    for the good work that you have done in the case.  I understand

12:20:14 12    and know from personal experience that there are other people

12:20:19 13    other than the people who presented the case who did work in

12:20:22 14    this case.  You need to know that the Court appreciates that.

12:20:28 15              I also should say that your clients should be

12:20:32 16    proud, proud of the way you conducted yourselves, proud of the

12:20:36 17    work you did.  I feel that whatever it is in the end, because

12:20:43 18    of your work, because of your efforts, justice will be done.

12:20:48 19              Thank you very much.  Court will stand in recess.

12:20:51 20         THE DEPUTY CLERK:  All rise.

12:20:53 21         (WHEREUPON, at 12:20 p.m., the Court was in luncheon

12:21:02 22    recess while the jury deliberates.)

         23                        *    *    *

         24

         25

                                  *OFFICIAL TRANSCRIPT*

**P-R-O-C-E-E-I-N-G-S**

FRIDAY, AUGUST 18, 2017

A F T E R N O O N   S E S S I O N

(COURT CALLED TO ORDER)

VERDICT

(WHEREUPON, at 3:53 p.m., the jury panel enters the courtroom.)

THE COURT:  Be seated, please.

The record should reflect that the jury has returned.  The parties are in the courtroom.

Ladies and gentlemen, have you reached a verdict?

THE FOREPERSON:  Yes, we have.

THE COURT:  Would the foreperson please give the verdict to my courtroom deputy.

Courtroom Deputy, will you please read the verdict.

THE DEPUTY CLERK:  For MDL 2592, Xarelto Products Liability Litigation, regarding Dora Mingo versus Janssen Research and Development, L.L.C., which is Civil Action 15-3469.

Jury verdict form.

Answer to Question Number 1, do you find by a preponderance of the evidence that Xarelto either proximately

*OFFICIAL TRANSCRIPT*

03:55:22  1   caused or substantially contributed to Ms. Dora Mingo's
03:55:28  2   GI bleed?  The answer was yes.
03:55:29  3        Question Number 2, do you find by a preponderance
03:55:34  4   of the evidence that the defendants failed to provide to
03:55:37  5   Dr. Renie Jordon adequate instructions for the safe use of
03:55:43  6   Xarelto?  The answer, no.
03:55:47  7        Question Number 4, do you find by a preponderance
03:55:50  8   of the evidence that Xarelto had a defective design at the time
03:55:55  9   it left the Defendants' control?  The answer was no.
03:56:01 10        Signed by the jury foreperson on August 18, 2017.
03:56:07 11        Members of the Jury, is that your verdict?
03:56:10 12   JURORS:  Yes.
03:56:11 13   THE COURT:  Would anyone wish for the jury to be
03:56:12 14   polled?
03:56:14 15   MR. BIRCHFIELD:  No.
03:56:14 16   MS. PRUITT:  No, Your Honor.
03:56:16 17   THE COURT:  This will be made a part of the record.
03:56:20 18   The Court thanks the jury for their hard work.  Thank you very
03:56:23 19   much.
03:56:23 20        All rise as the jury leaves, please.
03:56:27 21        (WHEREUPON, at 3:56 p.m., the jury panel leaves the
03:56:43 22   courtroom.)
03:56:43 23   THE COURT:  I'll make the verdict a part of the record.
03:56:45 24   Thank you very much.  Court will stand in recess.
         25        (WHEREUPON, at 3:56 p.m., the Court was in recess.)

*OFFICIAL TRANSCRIPT*

1                    REPORTER'S CERTIFICATE

2

3          I, Cathy Pepper, Certified Realtime Reporter, Registered

4    Merit Reporter, Certified Court Reporter in and for the State

5    of Louisiana, Official Court Reporter for the United States

6    District Court, Eastern District of Louisiana, do hereby

7    certify that the foregoing is a true and correct transcript to

8    the best of my ability and understanding from the record of the

9    proceedings in the above-entitled and numbered matter.

10

11                              *s/Cathy Pepper*
                                _____

12                              Cathy Pepper, CRR, RMR, CCR
                                Certified Realtime Reporter
13                              Official Court Reporter
                                United States District Court
14                              Cathy_Pepper@laed.uscourts.gov

15

16

17

18

19

20

21

22

23

24

25

                        ***OFFICIAL TRANSCRIPT***