UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | * | MDL 2592 "L" |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | |
| | * | September 19, 2017 |
| | * | |
| | * | |
| THIS DOCUMENT RELATES TO | * | Judge Eldon E. Fallon |
| *Boudreaux v Bayer Corp., Et Al*, | * | |
| 14-2720; and *Orr v Bayer Corp,* | * | |
| *Et Al*, 15-3708 | * | Mag. Judge Michael North |
| | * | |

*********************************************************************

**REPORTER'S OFFICIAL TRANSCRIPT OF THE
HEARING ON THE MOTIONS FOR NEW TRIAL
BEFORE THE HONORABLE ELDON E. FALLON,
UNITED STATES JUDGE.**

*********************************************************************

**APPEARANCES:**


FOR THE PLAINTIFFS:              Gainsburgh Benjamin David
                                 Meunier and Warshauer
                                 BY: GERALD E. MEUNIER, ESQ.
                                 1100 Poydras St., Ste. 2800
                                 New Orleans, La  70163


FOR THE DEFENDANT JANSSEN:       Irwin Fritchie Urquhart & Moore
                                 BY: JAMES B. IRWIN, V, ESQ.
                                 400 Poydras St., Ste. 2700
                                 New Orleans, La  70130


FOR THE DEFENDANT BAYER:         Wilkinson Walsh & Eskovitz
                                 BY: BETH A. WILKINSON, ESQ
                                 2001 M Street NW, Ste. 800
                                 Washington, DC  20036


**REPORTED BY:**        Mary V. Thompson, RMR, FCRR
                        500 Poydras Street
                        Box B2-13
                        New Orleans, LA  70130
                        (504) 589-7783

**OFFICIAL TRANSCRIPT**

<div align="center">

**P R O C E E D I N G S**
</div>

1

2                                          (Call to order of the court.)

3              THE COURT:  Be seated, please.  Good morning, ladies

4    and gentlemen.

09:00:14    5              Let's call the case, please.

6              THE CASE MANAGER:  14 MDL 2592, *In Re: Xarelto Products*

7    *Liability Litigation.*

8              THE COURT:  Counsel, make your appearances for the

9    record.

09:00:22   10              MR. MUNIER:  Jerry Meunier for the plaintiffs.

11              MS. WILKINSON:  Beth Wilkinson for Bayer.  Good

12    morning, Your Honor.

13              THE COURT:  Good morning.

14              MR. IRWIN:  Jim Irwin for Janssen, Your Honor.

09:00:33   15              THE COURT:  Okay.  This is a multidistrict-litigation

16    case involving a drug, Xarelto.  We've had three trials thus far,

17    two in New Orleans and one in Jackson, Mississippi.  The cases

18    went to the jury, the jury returned a verdict for the defendants,

19    and the plaintiffs now move for a new trial.

09:00:59   20              I'll hear from the plaintiffs.

21              MR. MUNIER:  Good morning, Your Honor.  May it please

22    the Court.  Jerry Meunier for the plaintiffs appearing today

23    before you to argue in support of motions filed in both the

24    Boudreaux and Orr bellwether trial cases, motions which seek new

09:01:23   25    trials in these cases pursuant to the provisions of Federal Rule

**OFFICIAL TRANSCRIPT**

1   of Civil Procedure 59(a)(1)(A).

2        The Fifth Circuit jurisprudence directs district courts

3   to exercise their authority under those provisions by granting a

4   new trial in any case where it's shown that the verdict followed

*09:01:46*   5   a trial which was unfair to the moving party or was a trial in

6   the course of which prejudicial error occurred.

7        And, Judge, recognizing that there's some issue overlap

8   between the motions in both of these cases, I'm going to avoid,

9   obviously, any repetition and I'll incorporate arguments as I

*09:02:03*   10   need to.  But since these are different cases with different

11   records, I would like to first address the *Boudreaux* motion; and

12   then perhaps after response from defendants, we can move to

13   argument in *Orr*.

14        At the outset, Judge, I think it's important that the

*09:02:21*   15   PSC and plaintiffs in these cases acknowledge the substantial

16   investment of resources, time, and effort which these two

17   bellwether trials demanded, both on the part of the litigants and

18   their counsel and on the part of the Court and its staff, and we

19   realize that new trials entail a repetition of that.

*09:02:45*   20        THE COURT:  It's kind of like capturing the Chinese

21   Army.  You have to feed them then.

22        MR. MUNIER:  So we are very careful what we ask for.

23        But if the main objective of these trials, irrespective

24   of verdict outcome, is to develop and present evidence in a way

*09:03:02*   25   that is instructive to the Court and to the parties in the larger

**OFFICIAL TRANSCRIPT**

1  MDL context -- if that's what we're trying to accomplish, then
2  we, frankly, believe we'd be remiss if we did not today seek to
3  have the Court consider retrial in cases where, without the
4  influence of certain substantial and prejudicial errors both in
5  jury instructions and in evidentiary rulings, we would have a
6  more instructive and reflective exercise for the purpose of the
7  MDL.

8          The first issue I would like to address in *Boudreaux*
9  has to do with the Court's exclusion of the plaintiff's use of or
10 reference to the so-called Lippi article.  And the full title of
11 that article, Judge, is given on Page 3 in Footnote 6 of our memo
12 in support of the motion, which is Record Doc. 6818-1.

13         Dr. Colleen Johnson, arguably a key defendant expert to
14 testify in *Boudreaux,* was adamant that the Neoplastin PT test was
15 not a useful or reliable means of screening patients on Xarelto
16 or measuring the anticoagulant effects of Xarelto.  She suggested
17 to the jury that she knew of no peer-reviewed publications to
18 indicate otherwise.

19         And this point was then dramatically, and with great
20 emphasis, driven home in the closing argument of defense counsel,
21 Ms. Wilkinson, who told the jury this, and I'll quote (as read):
22 Medical associations -- you didn't hear them cite a single
23 medical association that says this test should be used or a
24 peer-reviewed publication that says this test should be used.
25 Now, why is that?  Because on the outside, outside of this

09:03:29
09:03:49
09:04:15
09:04:32
09:04:55

**OFFICIAL TRANSCRIPT**

1  courtroom, nobody thinks this test works.

2         But the Lippi article exposes the falsehood of both

3  Dr. Johnson's testimony and counsel's statement to the jury,

4  because Table 3 of that 2014 article, which is published in the

09:05:23   5  journal *Clinical Chemistry and Laboratory Medicine*, demonstrates

6  unequivocally that six -- six -- medical associations have

7  concluded that PT is a reliable screening test to measure the

8  anticoagulant effects of an anti-factor Xa inhibitor such as

9  Xarelto.

09:05:42   10         And when we tried, on plaintiff's behalf, to

11  cross-examine Dr. Johnson by reference to the article, the

12  defendants objected and the Court sustained their objection on

13  the grounds these are not U.S. medical associations and that it

14  might create juror confusion if the statements of foreign

09:06:00   15  associations implicated somehow foreign regulatory matters.

16         Your Honor, we respectfully submit that the science

17  addressed in the Lippi article, as distinguished from legal or

18  regulatory standards, is not bounded or limited by nationhood or

19  country.  Science, if you will, is science regardless of where

09:06:26   20  the scientist is who pursues and develops a scientific principle

21  or truth.

22         Indeed, one of the six medical associations, the

23  International Society on Thrombosis and Haemostasis, is by its

24  own charter and mission statement unaffiliated with any one

09:06:46   25  nation.  It is a global membership organization dedicated to the

**OFFICIAL TRANSCRIPT**

1    development of science throughout the world.

2            By not allowing us to use the Lippi article to

3    cross-examine Dr. Johnson, and in turn contradict and preclude

4    counsel's statement to the jury in closing, we believe

5    significant prejudice was visited on the plaintiff's case in

6    *Boudreaux,* and we would ask the Court to grant a new trial on

7    this basis.

8            And just a couple of quick things about the defendant's

9    response on this.  They say first that we never explained

10   adequately in the record why we wanted to use the Lippi article.

11   That's a remarkable takeaway from the record, and we have given

12   the Court, in our briefing, ample reference to Mr. Denton's

13   statements on the record, as well as our briefing, which more

14   than clearly showed what the purpose of that reference would have

15   been.

16           We've also been challenged by the defendants on the

17   grounds that we did not proffer the Lippi article into evidence.

18   Of course, under Federal Rule 803(18) that would not have been

19   proper.  Learned treatises are not admissible into evidence.

20           What we purported to do was read from the article --

21   have Dr. Johnson, the witness, read from the article, but, of

22   course, the Court's ruling precluded that.

23           And finally they say, well, you know, it's harmless

24   error if it's error because our expert, Dr. Cindy Leissinger,

25   told the jury that there were associations or scientists outside

09:07:01
09:07:16
09:07:33
09:07:53
09:08:08

**OFFICIAL TRANSCRIPT**

1  of the U.S. who took that position on PT.

2       So the defendants say they had a choice, Judge, they

3  could have believed Dr. Johnson or they could have believed

4  Dr. Leissinger, but the problem is that choice is predicated on a

5  falsehood.  For Dr. Johnson or counsel to say no associations

6  exist outside of this courtroom and these experts who say this,

7  and then to invite the jury to take that statement and compare it

8  to Dr. Leissinger saying otherwise, is a false choice.

9       The truth is medical associations outside of the U.S.

10  do say things that are consistent with the plaintiff's position,

11  and the jury should never have even been given a choice of

12  whether to believe that or not since it is unequivocally true.

13       So the prejudice was real in this regard and we

14  consider this error to be important.

15       The second thing to address, Your Honor, is the

16  inclusion of the foreign label evidence.  And of course this

17  issue has come up in all three bellwether trials with different

18  permutations in each case, so I'm going to try to first be

19  specific with respect to *Boudreaux*.

20       In an *in limine* order before *Boudreaux*, the Court

21  reserved a ruling on the defendant's motion to exclude any and

22  all reference to foreign labeling or regulatory action, noting,

23  however, that the evidence was likely excludable but might be

24  admissible depending on context.  And then the Court struck the

25  proposed excerpts that the plaintiff offered from the trial

**OFFICIAL TRANSCRIPT**

1    deposition testimony of Bayer's Dr. Scott Berkowitz.

2              The plaintiff therefor submits that the exclusion of

3    Dr. Berkowitz's testimony about communications between Bayer and

4    the Canadian regulators was error.

*09:10:11*

5              And we further submit that this issue was fully

6    preserved by our making our position clear in briefing before

7    trial.

8              Moreover, combined with the denial of the opportunity

9    to disclose to the jury the scientific findings reflected in the

*09:10:27*  10   Lippi article, the elimination of the testimony of Bayer's own

11   scientist disclosing that Bayer itself proposed PT language to

12   Canada, Canadian regulators, that was especially prejudicial in

13   *Boudreaux*.

14             It allowed the defense counsel again to proclaim to the

*09:10:46*  15   jury that no one outside of this courtroom takes this position on

16   PT, and we know that's not true.  In fact, not only is it

17   contradicted by the scientists who said what they said in the

18   Lippi article, it is flatly contradicted by Bayer's own

19   statements made to the Canadian regulators.

*09:11:02*  20             And although in *Orr* the Court modified its position in

21   an important way ruling *in limine* in *Orr* that anything the

22   defendants said to regulators would be admissible, but not actual

23   actions taken to comply with foreign rules or regulations, that

24   modification, frankly, came too late for Mr. and Mrs. Boudreaux,

*09:11:26*  25   because in *Boudreaux* it was Dr. Berkowitz's testimony reflecting

**OFFICIAL TRANSCRIPT**

1    what Bayer said to regulators which the jury was not able to

2    hear.

3           The third issue we raised in *Boudreaux* has to do with

4    the evidence that the Court allowed as to the use of Xarelto by

09:11:44    5    the wife of Janssen's employee Dr. Gary Peters.  This issue of

6    so-called personal use of Xarelto was again the subject of an

7    *in limine* ruling by the Court in *Boudreaux* which both sustained

8    the plaintiff's motion to exclude any evidence of personal use

9    but also reserved a ruling on that issue to the extent that it,

09:12:10    10    quote, may go to credibility, closed quote.

11           We then objected when defense counsel asked Dr. Peters,

12    their witness, about his wife's use of Xarelto.

13           So, again, this was not Dr. Peters' use of the product,

14    this was Dr. Peters talking about his wife's use of the product.

09:12:34    15           We objected, we approached the bench, and Your Honor

16    concluded that Dr. Peters' credibility was being placed at issue

17    by the plaintiff, and therefor our objection to his testifying

18    about his wife's use was overruled.

19           And then the jury heard this, that he asked his wife's

09:12:53    20    orthopedic surgeon to put her on Xarelto, not aspirin, after her

21    knee replacement surgery.  And that she, his wife, has done,

22    quote, very well, closed quote, on the medication.

23           Faced with this testimony, and of course the matter not

24    having been explored in discussions or discovery with Dr. Peters

09:13:13    25    or otherwise before trial, our cross-examination was obviously

**OFFICIAL TRANSCRIPT**

1   limited as a practical matter at that point, limited to simply

2   confirming that the wife's dose and indication was different than

3   the dose and indication that was at issue in *Boudreaux,* but the

4   jury harm was irreversible at that point.

09:13:35

5           A defendant witness who was actually asked by counsel,

6   Do you love your wife -- a defendant witness was able to promote

7   his wife's use of the drug and suggest that it was, therefore,

8   something that had to be considered safe.

9           Your Honor, not only is the probative value of that

09:13:54

10  testimony by Dr. Peters highly questionable, and not only was it

11  inconsistent, we believe for the Court to have allowed it --

12  inconsistent in light of other MDL rulings, other MDL Court's

13  rulings on this, and, in fact, Your Honor's own rulings in the

14  *Vioxx* case -- but it was prejudicial.

09:14:16

15          And we think that the state court judge in *Vioxx* in

16  fact had it correct as well when she said in her reasoning as to

17  why she would not let the personal use of Vioxx into evidence

18  (as read):  Because different individuals are willing to accept

19  different risks depending on the drug and the consultation they

09:14:38

20  have with their doctor, a given individual's willingness to

21  accept a risk by taking a drug proves little, if anything, with

22  respect to the case on trial.

23          And the problem is that if it goes to credibility, and

24  if the point of letting it in is, well, now you know Dr. Peters

09:14:59

25  must think -- he must really believe the drug is safe or else he

**OFFICIAL TRANSCRIPT**

1   wouldn't have urged it for his wife -- if you don't know the

2   circumstances under which the wife took the drug, Dr. Peters'

3   belief about it being safe in that particular case doesn't really

4   address anything having to do with the case at hand.  In fact, he

5   could be credible in saying, Yes, I thought it was safe for my

6   wife, but I'm not saying it's safe here because it's a totally

7   different thing.

8          Judge, I'll just, again, point to a modification in the

9   course of the trials, because when the matter came up again in

10  *Orr*, the Court importantly modified its position on this issue

11  and ruled that if the defendants wanted to use a witness to refer

12  to any family or personal use of Xarelto, they would have to

13  first produce the medical records for that use and provide it to

14  plaintiff's counsel who could then conduct intelligent and

15  informed cross-examination based on the records.

16         And when you did that in *Orr*, this was your reasoning.

17  I'll quote from the Court's order and reasons.

18         Quote (as read):  Each person who takes Xarelto is

19  different and the circumstances are different.  In fairness,

20  there ought to be some testing of the specific circumstances of

21  that person if the defendants wish to bring up this issue at

22  trial.  Accordingly, defendants will not be permitted to elicit

23  information about a witness's family member taking Xarelto

24  without producing their medical records.

25         This properly had the effect, by the way, in *Boudreaux*,

**OFFICIAL TRANSCRIPT**

1   of precluding any such effort on the defendant's side to raise
2   any personal use of Xarelto.
3       But, again, that important modification came too late
4   for Mr. and Mrs. Boudreaux, and we respectfully submit that the
5   prejudicial impact of that personal use evidence was significant
6   enough to warrant reconsideration of Rule 59 relief.
7       The fourth error we raise in *Boudreaux* has to do with
8   the Court's decision not to give certain jury charges to the
9   jury, charges which we believe were critically important to a
10  fair trial of the *Boudreaux* case.
11      The issue here has to do with two charges, Judge.
12  Plaintiff's Proposed Charge No. 19 in *Boudreaux* was the one that
13  referred the jury to that federal regulation published in the CFR
14  that says a manufacturer must -- it's not optional, it is
15  mandatory -- must include in the warning section of the label
16  any, quote, helpful lab tests.  Specifically, a lab test that's
17  helpful in following the patient's response or in identifying
18  possible adverse reactions.
19      And, of course, this goes to the very heart of the
20  plaintiff's case regarding the PT test, because we think there
21  was certainly evidence sufficient for the jury to conclude that
22  it was a helpful lab test for that purpose, and, therefore, there
23  was a federal mandate that the warning section include reference
24  to that test.
25      That was Proposed Charge No. 19.

**OFFICIAL TRANSCRIPT**

09:16:50
09:17:13
09:17:30
09:17:52
09:18:07

1       Proposed Charge No. 20 was in follow-up to that, and it

2   simply told the jury that, look, the violation of a federal

3   regulation is not conclusive.  However, if you believe that the

4   defendant violated a federal regulation, you may consider that in

09:18:34   5   determining the standard you apply for whether the instructions

6   or warnings were adequate.

7       And that's a very important legal principle the jury

8   never heard, that if they believe that regulation was violated,

9   then the law is that they can actually use that violation to

09:18:54   10   define the standard for what is or isn't an adequate instruction

11   about the drug given to the doctors.

12       And so when the Court did not give charges proposed by

13   the plaintiff, Nos. 19 and 20, we think that was significantly

14   prejudicial.  And the Court, at the time we presented this -- and

09:19:19   15   we do think we made clear why we wanted these charges -- so the

16   defendant's argument that we haven't preserved the record I

17   think, again, is belied by the transcript.  And Your Honor fully

18   understood the basis for us asking for those charges.

19       But as I appreciate the Court's position, it was, I

09:19:36   20   have a general charge that tells the jury FDA approval is not

21   conclusive, it's relevant but not conclusive.  And I also tell

22   the jury that any action or inaction taken by the FDA likewise is

23   relevant but not conclusive.  And frankly, Your Honor, as

24   important as that principle is, we don't think that it

09:20:02   25   meaningfully covers the issue that is addressed by these two jury

**OFFICIAL TRANSCRIPT**

1   charges having to do with a specific federal regulation, a

2   mandate that we believe was violated.

3          And the fifth error -- and this is the final one to

4   discuss in *Boudreaux*, Judge -- has to do with the demonstratives

09:20:23   5   that went into the jury room.

6          As you know, at the conclusion of the case, both sides

7   approach Dean, and there are binders which contain what each side

8   purports to be a complete set of admitted exhibits by the party,

9   and then each side certifies that those are the exhibits.  It

09:20:48   10   does that in writing and it goes into the jury room.

11          Unfortunately what happened in *Boudreaux* is the

12   defendant's binder contained more than exhibits.  It contained,

13   in fact, all of the demonstrative aids that the defense counsel

14   used in connection with the testimony of Colleen Johnson.  Again,

09:21:14   15   a critical -- perhaps the key expert witness who appeared with

16   respect to liability in *Boudreaux*.

17          And we didn't know about it.  Didn't know about it, in

18   fact, until the *Orr* case.  And in *Orr,* when the parties

19   approached with the binders of material -- exhibits to go into

09:21:37   20   the jury room, one of the defense counsel had included

21   demonstrative aids, and we objected because we saw that is what

22   was happening.  And the response on the other side was, Why are

23   you objecting?  You let this -- we did this in *Boudreaux*.

24          And the word "flabbergasted" is often overused, but

09:22:03   25   I'll tell you in this case it applies.  The whole plaintiff team

**OFFICIAL TRANSCRIPT**

1   was saying, What do you mean it was done in *Boudreaux?*  And we

2   had to go back and try to unpack what had happened.

3          Your Honor, candidly if what happened in *Boudreaux* was

4   the result of inadvertence or oversight -- we are certainly not

09:22:23   5   here to suggest that anything was deliberately or intentionally

6   done to hide something from us.  But even if there was

7   inadvertence in not noticing that a binder of exhibits also

8   contained demonstrative aids, the Court's protocol is pretty

9   clear on this, that demonstrative aids are only given to the jury

09:22:43   10   in deliberation if both sides consent.

11          Now, the defendants say, well, this is cured as well

12   because the Court tells the jury in your charge -- there's a

13   difference, you tell them, between exhibits and demonstrative

14   evidence.  You say demonstrative evidence is not admitted as

09:23:02   15   exhibits; you give them the weight that you think they deserve.

16          But, frankly, Judge, that general charge is of little

17   practical effect, in our view, once the jury has a binder and

18   they're deliberating and they've got, in the same binder, the

19   exhibits and all of these beautiful aids that help drive home the

09:23:23   20   testimony of Dr. Colleen Johnson.

21          So we, again, respectfully submit that this was

22   substantially prejudicial and that it warrants consideration of a

23   new trial.

24          Judge, just so our position is clear, since we cite

09:23:39   25   multiple errors, our position is that, under the law, each error

**OFFICIAL TRANSCRIPT**

1  certainly has to be significant and not trivial on a stand-alone

2  basis.  But the defendants say, well, they can't talk about

3  cumulative effect.  I disagree.  If each error is significant,

4  the Court can and should, and we submit must, consider not just

09:24:05  5  was that error prejudicial, what was the effect of that, was this

6  one prejudicial, you can and should and must consider the

7  cumulative effect of all of that.

8          In fact, some of the errors, as I've mentioned,

9  collapse into one another.  The Lippi article and the exclusion

09:24:22  10  of Dr. Berkowitz's testimony about what Bayer told Canada.  I

11  mean, there's a lot of confluence here.

12          But we really do submit that the cumulative effect in

13  *Boudreaux* is that a case for Rule 59 relief has been made and we

14  respectfully ask the Court to consider it.

09:24:41  15          Thank you, Judge.

16          THE COURT:  Thank you very much.

17          Who wants to speak to it?

18          MS. WILKINSON:  Good morning, Your Honor.  Nice to see

19  you again.

09:24:52  20          To save the Court's time, I'm only going to address the

21  main arguments that apply to *Boudreaux* and leave to my good

22  co-counsel, Mr. Irwin, to address the jury instructions and the

23  rest of the issues with regard to *Orr.*  Unless the Court would

24  prefer otherwise, I think it would just be more efficient.

09:25:12  25          As Your Honor knows better than I do, having presided

**OFFICIAL TRANSCRIPT**

1   over many, many trials, this Court has great discretion on

2   evidentiary issues.  And this Court has, I say in the most

3   respectful way, many years of experience in making those

4   decisions.  And plaintiff's main complaints about this case are

09:25:36   5   evidentiary rules that Your Honor has made.

6           It's our position that, as you might imagine, we might

7   think you made a few mistakes, but usually they were admitting

8   evidence against us.  You went out of your way to hear both

9   sides, to listen to the case carefully, to take notes, and to

09:25:53   10   make decisions in the context of each particular witness and each

11   particular issue.

12          So the issues that plaintiffs raise I think need to be

13   put back in context to what Your Honor was hearing and deciding

14   at the time.

09:26:06   15          And I think, as is your practice, some of the motions

16   *in limine*, while you gave us your preliminary opinion, you always

17   said you would make a more informed decision if necessary in the

18   context of the evidence and the witnesses that were describing or

19   introducing that evidence, and that's what happened in this case.

09:26:25   20          We don't think you made any errors with regard to these

21   issues.  But even if you did, we think that they were harmless

22   and they have no impact on the ultimate decision that the jury

23   made in the *Boudreaux* case.

24          The first one is the Lippi article.  And I think

09:26:43   25   plaintiffs are unhappy with the argument that we made in the

**OFFICIAL TRANSCRIPT**

1  closing, but the truth is they had plenty of evidence to argue

2  against that statement that they introduced themselves.

3  Your Honor properly limited the Lippi article, I would

4  say, because you did allow Dr. Johnson to testify about it when

09:27:02  5  counsel read to her from the article and asked her if it showed

6  that there were international societies that were commenting,

7  including the International Society on Thrombosis and

8  Haemostasis, which was a society that Dr. Leissinger had also

9  mentioned.

09:27:21  10  The only reason that the testimony was cut off after

11  she agreed that the article did show that there were

12  international medical associations that had some commentary about

13  PT is because we were starting to get into the regulatory

14  standards that would have informed those international

09:27:43  15  associations, and Your Honor rightly ruled that under 403, that

16  kind of discussion would be confusing to the jury.  That was

17  consistent with your position, I think, on the foreign labels in

18  that plaintiff's theory in this case was that the companies

19  violated the FDA rules by not, as you just heard from

09:28:04  20  Mr. Meunier, providing helpful laboratory information as was set

21  out in the federal regulations.

22  This was about U.S. federal regulations, and, of

23  course, the standards under Louisiana law.  It was not about

24  different foreign regulatory agencies and the different standards

09:28:20  25  that those medical associations -- different standards of care

**OFFICIAL TRANSCRIPT**

09:28:36 that they would describe. So it was under 403, once you had heard that, that you decided any further discussion of that would be confusing. So that was the right ruling.

But in the end, plaintiffs had more than their fair share of evidence to argue against the proposition that no one was saying it outside if they chose to use it. I don't know why they chose not to use it.

09:28:48 And there is argument I want to point Your Honor to that plaintiff's counsel did make about there being, you know, as they called it, overwhelming evidence that PT was useful.

But they started with Dr. Leissinger's and Dr. Kessler's testimony where they introduced the Kubitza article, which you may recall is a Bayer scientist, and they used that to say that Bayer scientists suggested PT could be used.

09:29:08 I won't put the trial transcripts in, Your Honor, I believe that they are in the brief, but that's during Dr. Leissinger's testimony.

09:29:23 Dr. Kessler introduced the 2014 Mueck article, which plaintiff characterizes as showing a strong correlation between PT and the risk of bleeding. And Dr. Leissinger herself talked about the International Society on Thrombosis and Haemostasis that recommended using PT to measure the level of the drug. She went on to say, Your Honor, that there were literally dozens and dozens, if not hundreds, of articles that deal with this.

09:29:40 So plaintiff had all that information and more that

1  they could use.  Mr. Denton, when he was arguing at sidebar with

2  us about whether the Lippi article should be introduced or

3  discussed any further -- he acknowledged, and I quote, that this

4  is about the various societies that Dr. Leissinger testified

09:29:56  5  about.  So they had that information in the record.

6  When we got to the closing arguments, Mr. Barr stated:

7  The evidence that Neoplastine PT predicts bleeding risk is

8  overwhelming.  He cited the FDA medical review.  He cited the

9  testimony of Berkowitz and Eikelboom.  And he said it's not

09:30:17  10  really questionable; the overwhelming majority of the evidence is

11  there.

12  And then he went on to talk about all the evidence.

13  And he specifically pulled out some of our exhibits, but he said

14  (as read):  Remember the testimony of Drs. Spiro, Berkowitz,

09:30:32  15  Leissinger, Kessler.  Remember it.  Stack up the evidence.

16  So they did make this argument that there was evidence

17  from outside of the courtroom that, in their mind, showed that PT

18  was a useful test.  There's really no basis to say that

19  Your Honor's decision was wrong, or that if there is some

09:30:50  20  question about it, that it created any harm.  The plaintiffs were

21  more than well-armed to make the arguments that they wanted to

22  make.

23  Similarly with the labels, Your Honor made a principle

24  decision I believe that many judges across the country have made

09:31:07  25  that when a U.S. label is in question, foreign labels are

**OFFICIAL TRANSCRIPT**

1  generally irrelevant.  Your Honor I don't think changed his

2  opinion, but refined it, I would say, in saying that if we made a

3  different prior statement -- or plaintiff wanted to argue we made

4  a different statement from what we're saying now, that was

09:31:23  5  admissible; but that was admissible as a prior inconsistent

6  statement, not because it was in a foreign label.

7  Foreign labels were excluded because they are

8  confusing.  They involve different regulatory standards.  And

9  while we have arguments in the brief about how the plaintiff

09:31:37  10  waived all these arguments, and those are true, the foreign label

11  should not have been admitted because they would require us to

12  have a mini trial.

13  More importantly, the labels don't say what plaintiff

14  wants them to say.  They do not say that the PT tests can

09:31:55  15  accurately evaluate the bleeding risk.  And there are two

16  examples we give, the Canadian label and the New Zealand label.

17  And when you look at them, they do not say what plaintiff wants

18  to tell the jury that they say.

19  So for all those reasons, Your Honor, we don't believe

09:32:11  20  that there is any reason why the labels should have been

21  admitted, and there's certainly no harm.  And there certainly

22  would have been quite a bit of confusion if they were.

23  On the personal use of Xarelto, it was clear at the

24  beginning of the trial Your Honor put plaintiff on notice that if

09:32:28  25  they challenged the credibility of the company witnesses with the

**OFFICIAL TRANSCRIPT**

1  kind of proverbial, you know, the companies and the individuals

2  who work there choose money over lives, and they put the

3  credibility at issue, then personal use could be brought in, and

4  that's exactly what happened in this case.  That's what happened

09:32:45  5  when Dr. Peters was challenged during his cross-examination and

6  that's why this evidence was introduced.

7          Plaintiff was allowed to cross-examine that witness

8  again on the different -- that it was used for a different

9  purpose than Mr. Boudreaux was prescribed, that he had different

09:33:04  10  medical issues; and so while it was appropriate for challenging

11  the credibility, it really did not have a big impact on the case

12  and certainly couldn't be seen as harmful error in this

13  particular case.

14          I would say, Your Honor -- and with regard to almost

09:33:21  15  all of those, you did not allow that in the second and third

16  trials and we didn't have different verdicts.  So every case is

17  different.  I want to be careful about saying, you know, these

18  are the -- they show the same outcome, because, as I said at the

19  beginning, Your Honor has made very careful rulings depending on

09:33:41  20  the specific evidence, the specific witness, the objections

21  counsel makes, and the theories that we advocate; but it is

22  instructive, I think, that when these changes are made in the

23  trials, there's really no difference in the outcome.

24          And that is informative as to whether there was any

09:33:56  25  harm in precluding any of this evidence in the *Boudreaux* trial.

**OFFICIAL TRANSCRIPT**

1    Finally on the demonstrative exhibits, Your Honor set

2  up a process I believe for the reason that you wouldn't have

3  these arguments where everyone has to sign off.  And I think you

4  said that to us three or four times, that once you sign off, that

09:34:13   5  means you agree that this evidence can go back.  And that was

6  what happened in this case.

7    But there was no attempt by anyone -- and I think it's

8  important to just make clear there was no attempt to mislead

9  plaintiff lawyers.  Mr. Barber, who works with us, who had a very

09:34:29  10  good relationship with plaintiff counsel -- they worked with us

11  and we appreciate that -- but he wrote a very specific email to

12  counsel and said we wanted to include the demonstratives from

13  Dr. Johnson -- it was the night before -- and we said they were

14  going to be on the index.

09:34:44  15    So there was no attempt to mislead them.  Plaintiff was

16  on notice.  I'm not sure why the larger group didn't realize it.

17  But I think it's important to realize not only did they sign off,

18  but there was notice to them that these demonstratives were going

19  to be included.

09:34:58  20    So for all those reasons, Your Honor, I think the

21  verdict should stand.

22    THE COURT:  Thank you.

23    Jim, do you have anything?

24    MR. IRWIN:  Your Honor, I was going to speak, with the

09:35:08  25  Court's permission, with respect to the *Orr* case after Jerry

**OFFICIAL TRANSCRIPT**

1   rests with that.

2           THE COURT:  All right.

3           MR. MUNIER:  Are you ready to move to *Orr*, Judge?

4           THE COURT:  Yeah.

*09:35:14*  5           MR. MUNIER:  Okay.  Your Honor, of the three discrete

6   issues that we raised in our Rule 59 motion in *Orr*, two do

7   overlap with what has already been discussed today in regard to

8   the *Boudreaux* case.

9           Nonetheless, the first of these issues, the exclusion

*09:35:30*  10  of the evidence of foreign labeling, did arise in a different

11  context in *Orr* inasmuch as the Court ruled *in limine* that

12  anything the defendants said to foreign regulators would be

13  admissible while labeling actions taken to comply with foreign

14  regulatory standards would not be.

*09:35:49*  15         And we respectfully submit to the Court that this

16  distinction, which the Court undertook to make, between relevant

17  and admissible statements by an opposing party or defendant on

18  the one hand and a potentially confusing reference to foreign

19  standards on the other, is, in theory, one that certainly has a

*09:36:13*  20  rational evidentiary basis.

21         But we also submit that in practice, and given the

22  dynamics and the flow of the trial and how this area of evidence

23  so important to the plaintiff was sought to be developed and

24  presented -- given how that worked, we respectfully submit to the

*09:36:34*  25  Court that the distinction you had made broke down a bit in the

**OFFICIAL TRANSCRIPT**

1  course of trial to the effect that the jury, we don't think, was

2  able to ever fully understand what happened and what was at issue

3  to the point of failing to grasp the important point, which is

4  this remarkable discrepancy between the position that Bayer has

09:37:00  5  taken in Canada, in order to instruct, in a safe way, Canadian

6  doctors and patients about this drug, and the position that both

7  Bayer and Janssen have adopted in the litigation now that they've

8  been sought to be held accountable in a court of law.

9         The discrepancy there is a dramatic one, and we just

09:37:27  10  think having -- that the Court, having made what is at least in

11  theory a rational distinction in the course of trial, had the

12  effect of preventing the jury from getting the point.

13         So let me be a little more specific about what happened

14  in *Orr*.

09:37:44  15         The plaintiff's expert, Dr. Suzanne Parisian, was shown

16  the content of what was the Canadian label reference to PT, that

17  language.  It was not identified as the Canadian label, but we

18  showed her that language, and, in essence, asked her whether she

19  thought that language, dealing with the helpfulness of

09:38:07  20  Neoplastine PT, would be useful and should be included in the

21  Xarelto label, and she said "yes."

22         And it's important here to remember that the

23  language -- I heard counsel say it really doesn't help the

24  plaintiff, but that language we're talking about here

09:38:27  25  specifically tells doctors that in acute emergency bleeding

**OFFICIAL TRANSCRIPT**

1    cases, PT can be useful.

2         Remember the facts in *Orr*.  In *Orr,* the plaintiff's

3    argument was that if the doctor had been given an educated, fully

4    informed reference to a normal PT test that was in the record of

09:38:47   5    Ms. Orr, life-saving surgery could have been performed.

6         So Dr. Parisian testified, yes, this language would be

7    important and is helpful and appropriate to put in the label.

8         Then two defendant experts took the stand during the

9    defendant's case, Dr. Sammy Khatib and Dr. Najeeb Thomas.  They

09:39:14   10   were both shown the same language and here's what they said:

11        (As read):  Not only do we say that language isn't

12   helpful, that language is reckless.  That language could be

13   dangerous.

14        So now we have not just this discrepancy I mentioned,

09:39:32   15   but we have the defendants, through their experts, staking out a

16   position before an American jury that language which Bayer has

17   promoted in Canada is dangerous.

18        And, Your Honor, I know that the Court has discretion,

19   and I know that you struggled -- I know that you struggled with

09:39:57   20   this issue, but given that -- I almost hate to call it

21   "discrepancy."  It's more than a discrepancy -- that gap, that

22   chasm in positions taken by the same company, I just submit to

23   the Court that the jury has to be told the story about what went

24   on in Canada.

09:40:19   25        And I believe the Court -- and we asked for this in

**OFFICIAL TRANSCRIPT**

*Orr.*   The Court would certainly be in a position to give a
limiting instruction to the jury and tell them, Look, you're
going to hear the story of what happened there, and it's relevant
to what the defendants knew, when they knew it, and what they did
with the knowledge about it.  That's the relevance of the
evidence.  That's why you're going to hear it.  But please do not
decide this case in any way based on what you may consider to be
compliance with a Canadian rule that has nothing to do with this
case.

I think a jury is smart enough to get it.  I don't
think it would have been a heavy lift for the jury to understand
what the evidence was and what it could not be taken to be.

And so, you know, after the experts Khatib and Thomas
tell the jury, Oh, this is dangerous, this is reckless, the
defendants say, Well, you've got your cure anyway, because, after
all, plaintiff's counsel went on and on in the case and
questioned witnesses, Well, don't you know what Bayer says
outside of the U.S., et cetera.

That's all questioning of counsel, is what that is.
And the Court tells the jury what lawyers say may be important
and informative, but it's not evidence and you can disregard it.

So, yes, the jury is hearing us suggest to witnesses,
Don't you know what Bayer says outside of the U.S., and the
witnesses saying, I don't know what Bayer says outside of the
U.S., and they say that's your cure.

**OFFICIAL TRANSCRIPT**

1          And that really kind of leads to the second error we
2     raised in *Orr*, which is the Court's exclusion of an email and
3     attachment that was received by Janssen's witness Sanjay Jalota,
4     and the Court's further prohibition of our conducting a
5     meaningful cross-examination of Mr. Jalota concerning these
6     business records.
7          In November 2014 in the course of his business
8     activities as Janssen's senior director of global regulatory
9     affairs, Mr. Jalota received an email with an attachment from
10    Ms. Lori Birkenberger of Bayer.  The attachment set forth a
11    series of draft responses made by Bayer to Canadian regulators in
12    response to the Canadian regulator's request for further
13    information and clarification about this PT-related language
14    which Bayer was proposing for the drug's Canadian label.
15         The Court sustained the defendants' objection to the
16    admissibility of the email and attachment on the grounds that the
17    material was not shown to be a business record and further on the
18    grounds that the material would unfairly confuse the jury again
19    by referring to these Canadian regulatory activities.
20         Your Honor, first, whether even the definition of
21    "hearsay" applies to the statement of an opposing party is, of
22    course, questionable under Federal Rule of Evidence 801(d)(2).
23    "Hearsay" is defined to exclude opposing party statements.  So
24    Bayer's statements in response to the Canadian regulators is not
25    even defined as hearsay so we don't have to reach any exceptions

**OFFICIAL TRANSCRIPT**

1    to the hearsay rule.

2    In any event, surely an email received and kept on file

3    by Mr. Jalota in his official capacity, and, more importantly,

4    the attached record of responses to regulators, gives rise to the

09:44:17    5    business records exception if it is hearsay under 803(6).

6    And then finally going more to the question of use

7    rather than admissibility, Mr. Jalota is simply saying he may not

8    have read what he received, but he didn't deny receiving it.  He

9    may not have read it.

09:44:37    10    That also came up, as you remember, with another

11    witness in *Mingo*.  But here we have a -- the ability of a witness

12    to simply say, Well, yeah, I got it, but I don't remember it, and

13    then we have to sit down.  We can't question the witness.

14    We, again, submit that that's inappropriate.  It's

09:44:56    15    prejudicial.  We should have certainly been able to question

16    Mr. Jalota if he acknowledged receiving the material and asked

17    him questions about what the document says on its face.

18    So in the final analysis the Court will recall that the

19    plaintiffs in *Orr* were allowed to redact that attachment, lots of

09:45:21    20    black ink on it, and only have shown what was the content of the

21    Canadian label language without, of course, identifying it for

22    the jury as a Canadian label.  And then citing some, I guess,

23    version of the rule of completeness, the defendants said, Well,

24    Judge, if you're going to let them do that, let us unredact this

09:45:42    25    following little paragraph down here, which they said, you know,

**OFFICIAL TRANSCRIPT**

1  kind of qualifies the impact -- offsets the impact of the other,

2  and the jury ought to see both sides.

3       Your Honor, it is far from reasonable to conclude that

4  the jury in *Orr* had any idea what that largely redacted document

09:46:06  5  meant, what it said.  They certainly had no understanding about

6  the context of it.  And, in fact, the limitations of the document

7  came to be manifest when we cross-examined the defendant's

8  expert, Dr. Khatib, showing him this redacted document.

9       He was asked the question on cross-examination whether

09:46:33  10  it was true that Bayer had said these things to doctors outside

11  of the U.S., and what did Dr. Khatib do in response?  He took the

12  expected refuge in the incompleteness of what he was being shown.

13       And this excerpt from his testimony is cited by both

14  sides in their briefs.  Quote (as read):  I don't have a whole

09:46:57  15  document.  I am not going to comment on what Bayer thinks or

16  doesn't think.  I am not going to look at snippets.

17       A clear signal to the jury is, neither should you.  I

18  don't know what these lawyers are hiding from you; they've

19  blacked out most of this thing.  They've cherry-picked what they

09:47:20  20  want you to see.  The jury is not going to know what to do with

21  that, Judge, if they look at it at all.

22       So the redacted solution we sought sort of highlighted

23  the problem.  Unless you tell the whole story about Canada to the

24  jury, trying to do it in bits and pieces or saying you can have

09:47:37  25  this part but not that part, the story is lost.

**OFFICIAL TRANSCRIPT**

1    And, again, I think a limiting instruction -- because
2    it is so highly relevant in this litigation, that the jury --
3    that people know what happened and know about the discrepancy.
4    They call it dangerous and reckless and yet they promote it
5    elsewhere.  I just think, Judge, that that is a recurrent issue
6    that we will have to look at trial-package-wise or otherwise in
7    this litigation and figure a way, hopefully with the Court's
8    support, to let the jury know the truth without having them go
9    down a rabbit hole of foreign rules and regulations.  I think
10    there's a way to do that with limiting instructions.

11    Finally the final error we raise in *Orr* is a direct
12    overlap with what I've already talked about in *Boudreaux*.

13    There were two proposed jury charges in *Orr* which the
14    Court declined to give.  In that case there were Proposed Charges
15    12 and 13.  No. 12 was the one that invited the jury to refer to
16    the helpful lab test federal reg as a mandate, and Charge No. 13
17    told them that the violation of that could be useful for the
18    purpose I mentioned.  I'll simply incorporate my comments from
19    the discussion of the *Boudreaux* motion as to those jury charges.

20    Again, Judge, in conclusion, we believe that each error
21    we've highlighted in our motions is sufficient to indicate
22    prejudice to the plaintiff; and we submit that, in assessing the
23    impact of these errors, the Court can and should consider them
24    cumulatively and collectively and not necessarily in isolated
25    form.

**OFFICIAL TRANSCRIPT**

1        It's an extraordinary relief; we know that.  It's a
2   significant investment of time and resources, we know that.  But
3   let's try to get it right is our view and try these cases in a
4   way that allows the jury to focus on important evidence they were
09:49:31   5   not able to hear.
6        Thank you, Judge.
7        THE COURT:  Thank you very much.
8        MR. IRWIN:  Your Honor, Jim Irwin from Janssen.
9        I found it helpful, in going back through this to try
09:49:44  10   to restore my memory about some of these things, to actually get
11   the pieces of paper so I'm going to put a couple of things up on
12   the ELMO maybe with a little help from Dean.  It's been a while
13   since I've used it.
14        First, with respect to the jury instructions, one of
09:50:01  15   the most important things that we said in our briefs has to do
16   with the fact that one has to be very careful about singling out
17   a single regulation from the Code of Regulations.  Chapter 21 of
18   the CFR contains hundreds and hundreds of regulations, and I
19   think one has to use care in singling one of them out which the
09:50:26  20   plaintiff did.  I think it becomes even more delicate if the
21   Court singles one out, and the Court did not single one out, I
22   think properly.
23        But the Court did allow them to use that regulation, to
24   use that regulation as they saw fit with their experts and in
09:50:43  25   cross-examination of our witnesses.  And I'll show you that.

**OFFICIAL TRANSCRIPT**

          1          But Jury Instruction No. 12 is indeed the instruction.

          2          And I need to kind of shrink this down a little bit --

          3    I guess I do that this way.

          4          THE COURT:  That's it.

09:51:02  5          MR. IRWIN:  There we go.

          6          That's the instruction, Your Honor, that they asked for

          7    regarding 21 CFR 201.57.

          8          Here is the instruction that they asked for suggesting

          9    that a violation of those standards may be considered evidence.

09:51:17 10          They got what they wanted with the use of 201.57

         11    through their primary regulatory witness, Dr. Parisian, when she

         12    was asked (as read):  Now, let's move to the Xarelto label

         13    itself.  Are there regulations that discuss whether information

         14    about helpful laboratory tests --

09:51:41 15          That's 21 CFR 201.57.

         16          ... that discuss whether the information about helpful

         17    laboratory tests are required to be in the warning section of the

         18    drug label?

         19          Yes.

09:51:52 20          And then she refers to 21 CFR 201.57.

         21          (As read):  Did you create a demonstrative that has the

         22    language of 21 CFR 201.57 in it?

         23          Well, she most certainly did and it was shown to the

         24    jury several times during the trial.

09:52:10 25          Mr. Dukes said:  No objection.

**OFFICIAL TRANSCRIPT**

1       And this is where she said (as read):  The regulation
2  requires that you must...
3       That means you must do this.  That was the expert that
4  was recognized by this Court as an expert in regulatory matters
09:52:27   5  referring to this very same regulation.  It is not that you shall
6  or you should, you must.
7       And this was her concluding line (as read):  So it's
8  requiring the manufacturer must identify any helpful tests.  It
9  is part of the requirement for a manufacturer selling a drug.
09:52:48  10       It was repeated in closing arguments, as we pointed out
11  in our brief, by Mr. Barr.
12       (As read):  And the label Dr. Parisian proposed was
13  information that met the regulatory mandate to provide helpful
14  laboratory testing in the warning section of the label.
09:53:06  15       When it came time to object to the instructions, Jerry,
16  being typically eloquent, did object to Instruction No. 12, as
17  you can see there, and to Instruction No. 13.
18       Your Honor said (as read):  I think, taken as a whole,
19  the jury charges are accurate and they express what the plaintiff
09:53:34  20  indicated.
21       And we would respectfully suggest, Your Honor, that
22  indeed they did.
23       Here is Page 23 of your *Orr* instructions.  The language
24  is also in the *Boudreaux* instructions.  And this has to do with
09:53:53  25  the failure to warn claim and the manufacturer's duty with

**OFFICIAL TRANSCRIPT**

1   respect to labeling.

2         (As read):  That is to say under the law --

3         Of course, that's the LPLA.

4         -- including federal regulations applicable to this

09:54:06   5   case, drug manufacturers are responsible to draft the initial

6   label for their product and to keep it up to date.

7         That's exactly what Dr. Parisian said with the 201.57

8   regulation.

9         We think Your Honor's instructions were correct.  We

09:54:26   10   think Your Honor instructed the jury correctly with respect to

11   the federal regulations, and you specifically used the phrase

12   "federal regulations."

13         Next, with respect to the email, Your Honor held, in

14   excluding that transmittal email and the attachment, that it was

09:54:49   15   not established by the testimony of Mr. Jalota because he did not

16   know anything about the email; he did not read it, he did not

17   remember it, and it was not part of his sphere of activity.  He

18   was responsible for United States labeling.  He was provided an

19   information copy of this material by his assistant,

09:55:15   20   Ms. Birkenberger.

21         I'll show you the email to bring it back.

22         Lori Birkenberger sends it to Mr. Jalota on

23   November 19, 2014, at 2:50 p.m.  It has an attachment which is

24   the response to the clarification request, the famous document

09:55:39   25   between Bayer and Health Canada which eventually ended up being

**OFFICIAL TRANSCRIPT**

1   PX 190 redacted.

2        Significantly, she sent it to him and said:  FYI, for

3   your appreciation.

4        She did not ask him to do anything with it.  She did

09:55:56  5   not ask him to respond to it.  And it's noteworthy that this was

6   an email that she forwarded on a string from Dagmar Kubitza,

7   well-known to this Court, and to Christopher Nessel who was

8   copied on it.  There were 33 people working on this Canadian

9   project.  Mr. Jalota was not one of those 33.  It was simply

09:56:26  10  forwarded to him for information purposes.

11        He was asked about it at the trial.

12        Mr. Barr (as read):  Have you read this page?

13        I have not read it.

14        We objected.

09:56:40  15        Your Honor sustained the objection.

16        Your Honor said (as read):  The problem is that this

17   email is just more than an email, it is an attachment.  And this

18   fellow gets an attachment, as I understand it, he's not part of.

19        Indeed he's not.  He's not part of that 33.  He's not

09:56:55  20  part of the Canadian labeling.

21        (As read):  He gets an attachment.  He says now he

22   hasn't even read the attachment so how does it get in if he

23   didn't read it, doesn't know anything about it?  It's not a

24   business record.

09:57:10  25        Plaintiff counsel says (as read):  Yes, Your Honor, but

**OFFICIAL TRANSCRIPT**

1    he got it in the ordinary course of business.

2             And Your Honor says (as read):  But that doesn't make

3    an email a business record.  Otherwise, you would never need a

4    witness at any time to get emails into evidence.

09:57:22   5             And then you may recall, Your Honor, several days later

6    this was the subject of an extensive proffer, a proffer that went

7    on and on.  At one point I objected to it, that it was tantamount

8    to a deposition.  The Court may remember that.

9             And this was a question that was asked of Mr. Jalota in

09:57:45  10    the proffer.

11             (As read):  It's your testimony from last week that you

12    don't recall the email.  Is that still true today?

13             That is correct.

14             And then the questioner goes on (as read):  Let me ask

09:57:54  15    you a little bit about that.  You know, I may not recall an email

16    that I received, you know, yesterday, but do you have any reason

17    to believe that when you received the email, you would not have

18    received it --

19             And here comes a compound question.

09:58:08  20             (As read):  -- you would not have read it at the time?

21             And he answers the second half of that compound

22    question and he says (as read):  Yes, that's actually a good

23    possibility that I didn't read it because in 2014, I was involved

24    in other projects.  And Lori Birkenberger had sent me something

09:58:28  25    saying it was for appreciation of what's going on in Canada.  If

**OFFICIAL TRANSCRIPT**

1   she had specifically said look at it and review it and let me

2   know if you have anything, I probably would have looked at it in

3   more detail, but what she said was for appreciation.

4          As Your Honor said before our trial, and I think during

09:58:47   5   our trial, you have to do something with an email.  An email is

6   not a business record in the traditional sense.  Under 803(6),

7   what gave business records the sense of trustworthiness, which is

8   what is at the core of all exceptions to the hearsay rule, is

9   something that's regularly done, it's systematically done.

09:59:10   10          Emails are really in the nature of a conversation.

11   They are, at bottom, the widest part of the -- they are the

12   modern conversation in this day and age.  And that is why there

13   was Your Honor's ruling about how somebody has to lay a

14   foundation for an email, somebody has to do something with an

09:59:26   15   email, somebody has to act with an email before it becomes

16   something other than a conversation.

17          Next, Your Honor, going to Rule 403 and the Canadian

18   label, the Fifth Circuit said the law, and I think it's the law

19   in every circuit in the country, and it's pretty darn strong.

09:59:56   20          (As read):  When a trial court makes a 403 ruling about

21   prejudice and confusion, the Court of Appeal is going to reverse

22   that only in the rarest case.  The trial court is given an

23   especially high level of deference and there has to be a showing

24   of clear abuse.

10:00:15   25          Your Honor, I think it can be stated even more strongly

**OFFICIAL TRANSCRIPT**

1    with respect to a situation in an MDL where a Court does a deep

2    dive into a case, namely thousands of cases.  And so I have

3    pulled out a couple of the cases that they have cited, because

4    there are MDL judges and other judges who have ruled differently

5    than Your Honor that have allowed some measure of foreign

6    regulatory evidence to come through.  But it is noteworthy that

7    all those rulings are so carefully made and carefully followed

8    like your ruling here.

9         And one, for example, is in the Levaquin MDL that

10   Judge Tunheim made.  I know a little bit about this one because I

11   worked on a couple of those trials up there.

12        In the Levaquin MDL, Judge Tunheim did allow evidence

13   of foreign regulatory, but he was careful about it.  He said

14   (as read):  In this case the plaintiffs are not presenting the

15   final regulatory action to the jury.

16        Your Honor, it was a back-and-forth between the company

17   and the French regulators and it was not a final decision by the

18   French regulators, and that was important to Judge Tunheim.

19        And he also said at the bottom (as read):  This Court

20   does not want significant time devoted to this evidence.

21        So much of a 403 ruling, particularly in an MDL

22   setting, is a management ruling as well.  You're trying to manage

23   the evidence and trying to manage the trial; and here

24   Judge Tunheim was very sensitive to both of these things.

25        In a single case, not an MDL case, cited by the

**OFFICIAL TRANSCRIPT**

10:00:37
10:00:57
10:01:16
10:01:31
10:01:52

1    plaintiffs, *Mahaney v Novartis*, the Zometa med case, the judge

2    here said (as read):  Differing regulatory schemes and objectives

3    in other nations should not impact those which govern Zometa's

4    use in the United States.  Thus, any attempt by plaintiff to

5    color the FDA requirements with those of other countries would be

6    improper.  The parties shall address the use of these foreign

7    labels with more detail at trial.

8           I don't know what happened there, but the judge was

9    quite sensitive to the issue.

10           And then in *Testosterone*, AbbVie asked the Court to

11    discount the analysis because Health Canada -- there we go again

12    with Health Canada -- was addressing a different label.  But the

13    judge there said (as read):  The analysis is not being used to

14    dispute the adequacy of AbbVie's FDA-approved labels.

15           He limited the use of it.

16           So, Your Honor, that gets us to the Canadian label.

17           The plaintiffs were able to show it and show the

18    language that they wanted to use to Dr. Parisian.

19           We'll take a look at that.

20           They were able to use the language from the Canadian

21    label that they liked with Dr. Khatib.  They chose not to use it

22    with Dr. Thomas, but I'll show you how they only asked Dr. Thomas

23    questions for 16 minutes and 5 seconds, and in that time frame

24    they elected not to do it.

25           They used that same language to cross-examine

**OFFICIAL TRANSCRIPT**

1    Mr. Jalota.  They got it into evidence through redacted PX 190.

2         They argued that the jury was confused, but that is

3    clearly speculation.  There is no evidence at all that the jury

4    was confused about anything.

5         So we'll go through it.

6         This is the Canadian label to start the foundation.

7         There is the language that was, in part, used by

8    Dr. Parisian in crafting her proposed label that would have been

9    helpful (indicating).

10        It is identified here at the bottom as the Xarelto

11   product monograph.

12        We'll follow that language.

13        Here's Dr. Parisian's testimony (indicating).

14        Mr. Barr says, on Page 1687 (as read):  Your Honor, for

15   purposes of the record, we've redacted any mention of the

16   reference to the foreign label to Canada, and we've instructed

17   the witness not to raise those issues in her answer.

18        And then he goes on, and he says, Dr. Parisian --

19        And you can read it there, Judge.

20        -- in this -- is this statement by Bayer, this document

21   on the screen, the document you have reviewed and relied upon in

22   coming to your conclusions that Bayer supports the statements

23   you've offered in your label?

24        That was her demonstrative label.

25        And then she goes on and she reads from the -- from

**OFFICIAL TRANSCRIPT**

1    PX 190, which I'll show you in a minute.

2              And it starts off (as read):  Question:  Wait --

3              On Line 5.

4              -- start with the first paragraph.

10:05:19   5              Answer:  The sponsor?

6              Yes, ma'am.

7              And I've noted over here, Judge, this part under

8    "sponsor" is the language that she used to craft the first

9    sentence in her demonstrative evidence of her label that she

10:05:38   10   proposed should have been put on our labeling.

11             She takes this sentence (as read):  The sponsor

12   requires that in certain and frequent situations (such as

13   overdoses, acute bleeding, urgent surgery, suspected

14   non-compliance, or other unusual circumstances) assessment of the

10:05:58   15   anticoagulant effect of Xarelto may be desirable.  In these

16   circumstances, chromogenic assays can be utilized.

17             Then the next paragraph that I've indicated "label" is

18   the paragraph from PX 190 that is actually an excerpt of the

19   label from Canada that we just read.

10:06:16   20             And I won't read it, Judge, but that's the same as the

21   Canadian label that I just showed you.

22             So here is where it came from, Plaintiff

23   Exhibit 3061444, which morphs eventually into PX 190.

24             And here's the language that she read from:  The

10:06:44   25   sponsor recognizes that in certain circumstances, et cetera.

**OFFICIAL TRANSCRIPT**

1          The sponsor, of course, is Bayer.

2          And then she read from the label that I read earlier.

3          The jury got all of that.  She read it all to them.

4          Then the same language was presented to the jury by

10:07:07   5   Mr. Barr on cross-examination of Mr. Jalota.

6          I added the little red quotes, Judge.

7          "Although there is no need to monitor clinical

8   practice, et cetera, et cetera."  That's the exact same language

9   from the label.

10:07:24   10          And then they asked Dr. Khatib, and here it is again.

11          (As read):  Let me show you what the company says.

12   Accordingly, measuring PT using Neoplastin reagent or factor Xa

13   may be useful to informed clinical decisions in these

14   circumstances.

10:07:41   15          I see that, but you don't have the whole document.

16          And then finally we get to Dr. Thomas.  I put in the

17   16 minutes and 5 seconds there (indicating).

18          They say that they were forbidden from presenting

19   Dr. Thomas with the same purportedly dangerous language from

10:08:04   20   Bayer's own label in Canada.  I've scratched that out because it

21   is Parisian's and I'll show Your Honor that.

22          First of all, they weren't forbidden to ask him

23   anything about that.  They were allowed to ask Jalota about it.

24   They were allowed to ask Khatib about it.  They decided not to

10:08:21   25   ask him about it.

**OFFICIAL TRANSCRIPT**

1          And it's completely incorrect to say that he testified

2   that the Bayer language was dangerous.  What he testified to was

3   that the Parisian language was dangerous, and here it is.

4          He was shown the demonstrative, which I'll pull up in a

5   minute, Parisian's proposed correct label, her 21 CFR label, and

6   he said (as read):  My understanding is, if I read this, if I was

7   a practitioner I would think, okay, a normal PT value indicates

8   that maybe levels of rivaroxaban are unlikely clinically

9   significant and it's okay to operate.

10          He said, I think that's dangerous.

11          He's a neurosurgeon and he says (as read):  If you tell

12   me that a normal PT gives me a pass to the operating room with a

13   patient who has been on rivaroxaban, I'm telling you that's

14   dangerous.

15          Where did that language come from?  It came from

16   Dr. Parisian.

17          The first sentence (as read):  In situations of urgent

18   surgery, assessment of anticoagulation effect of rivaroxaban is

19   appropriate.

20          She crafted that from the sponsor's statement.

21          The second sentence (as read):  Accordingly, measuring

22   PT may be useful to inform clinical decisions in this

23   circumstance.

24          She crafted that from the Canadian label.

25          The third sentence, the one that Dr. Thomas said was

**OFFICIAL TRANSCRIPT**

1  dangerous (as read):  A normal PT value indicates that clinically

2  significant levels of rivaroxaban are unlikely.

3         What's dangerous is a pathologist who hasn't practiced

4  medicine for decades suggesting to a neurosurgeon that you've got

10:10:18  5  a pass to go to the OR if you have a normal PT.  That's what's

6  dangerous.

7         Your Honor worked tirelessly to keep things straight

8  under 403.  We were up and down many times at the bench.  There

9  were many times that you worked with us and worked with plaintiff

10:10:43  10  counsel to maintain this balance under 403.

11         And you even spoke to the jury about it more than once.

12  I thought this was the most direct statement.  You told the jury

13  (as read):  Members of the jury, there's something there called a

14  Canadian label.  Disregard the Canadian label.  And the reason

10:11:02  15  for that is that it's a different country.  It has different

16  rules, different regulations, different procedures, and different

17  requirements.  The only relevance to this testimony is what the

18  defendants knew and when they knew it.

19         So, Your Honor, in conclusion, we would suggest that

10:11:26  20  the plaintiff had full use of 21 CFR 201.57 and that your jury

21  instructions adequately covered the law on that without singling

22  out a single instruction.

23         And you clearly said that the manufacturer -- the

24  defendants' labeling obligations were governed not only by

10:11:45  25  Louisiana law but by federal regulations.

**OFFICIAL TRANSCRIPT**

1    Your evidentiary ruling that an email is neither a

2  business record nor an admission without a proper foundation is

3  exemplified by your exclusion of the Birkenberger email.

4  Besides, they got the attachment into evidence, and that was the

5  substance of what they were trying to do.

6    And, finally, your careful management of Rule 403

7  involved in the Canadian label was not error.  The plaintiff had

8  the full use of the associated documents to establish what the

9  defendants knew and when they knew it.

10    We respectfully ask that the Court deny the motions for

11  a new trial.

12    THE COURT:  Do you want to --

13    MR. MUNIER:  Judge, just 60 seconds.

14    THE COURT:  Okay.

15    MR. MUNIER:  One point in response to Mr. Irwin.

16    The heart of today's inquiry is not what the Court

17  might appreciate about this Canadian label issue, not what the

18  lawyers who have been working this case for years and taking all

19  the depositions and unpacking all discovery -- it's not what they

20  know or think or appreciate, it's what a jury that's brought in

21  to court with no knowledge about this case and sits there and

22  tries to absorb all this evidence over the course of a week or

23  two -- it's the impact on them.  It's the impact on them and how

24  that may have prejudiced the plaintiff's effort to present the

25  trial.

**OFFICIAL TRANSCRIPT**

1      So we can point, as Mr. Irwin does, to all this

2 expert-level debate about this language.  He says, look, the

3 language is all over the place in the record.  One expert is

4 talking about it here; another expert, Parisian, says this about

10:13:25 5 it.  It's all up there.

6      The missing truth that brings it down from the level of

7 expert academia into the jury box -- the missing truth is guess

8 where the language came from?  Guess how it originated?  It

9 didn't originate with Parisian saying what she thinks a sponsor

10:13:43 10 ought to say, it's Bayer's own stuff.  And I think without that

11 truth, it stays like a pretty air balloon but it's not anchored

12 into the jury box.

13      And what we should be focusing on in Rule 59 is how the

14 elimination of that fundamental truth affected the folks who

10:13:59 15 deliberated.

16      Thank you, Judge.

17      THE COURT:  I appreciate both sides.  It's amazing

18 always that looking at things from different sides, people see

19 different things.  And in a two-person race, the individual who

10:14:14 20 comes in second always feels that something has gone wrong.  And

21 the person who comes in first feels everything was done very well

22 and very right.  That's nothing unusual.  We've lived this life

23 for a long time and that's the way it works.

24      I give a lot of thought to these matters before we go

10:14:36 25 to trial, and I don't really shoot from the hip in many of these

**OFFICIAL TRANSCRIPT**

1   things unless I have to.  Most of the time I've thought about it;

2   I've aimed at it very well.  The reason being is that when you've

3   done this a while, you begin hearing footsteps.  And you've heard

4   them long enough to know whether it's an elephant or a donkey or

10:15:08   5   a horse or whatever.  And so when you see that donkey or horse or

6   elephant, you've been hearing those footsteps for some period of

7   time and have thought about it.  And when you see it and rule on

8   it, it appears sometimes that you're ruling very quickly; but

9   actually you've had a long time to think about it if your ear is

10:15:34   10  tuned to those footsteps.

11          And not only that, but I've had the opportunity to

12  think about it in advance of the trial because counsel, in their

13  way, have brought it to me *in limine*.

14          I really feel that the decisions that I made were made

10:15:57   15  properly.  I tried to, with the Canadian label -- I'm concerned

16  in a case of this sort, the trying of -- putting on a play within

17  a play.  It seems like only Shakespeare has done that well.  It's

18  a problem when you try to do that because you get into different

19  laws, different procedures, different requirements, and the

10:16:27   20  different regulatory agencies making different views.  And unless

21  you first explain how that is done, the relevance of it is not

22  clear and so a 401 comes into play.

23          And if it gets past the 401, just squeaks past the

24  windowsill, it seems to me that it creates confusion in 403.  So

10:16:57   25  I excluded that.

**OFFICIAL TRANSCRIPT**

1          However, I did recognize that there is either an
2    801(d)(2) or a 613 which can allow for prior statements made that
3    are inconsistent with the present statement.  And so I allowed
4    that to be used.
5          But I think that all of the material has gotten to the
6    jury.  The information has gotten to the jury, and I think my
7    decisions on the foreign label were appropriate.
8          With regard to the use of the wife, it is somewhat
9    different because the parties are different.  The wife may have
10   taken it for a reason that the other person didn't, but to me his
11   credibility was at issue.  It was a defense employee and the
12   feeling of his interest was put forth very strongly, and I felt
13   with the level of scales, that was important.
14         With regard to the jury charges, I thought I covered
15   all of the material that was given to me, and I explained to the
16   jury that they must consider it as a whole and not partially.  I
17   think it was covered.
18         The demonstrative evidence, I've been down that road a
19   number of times and that's the reason I get counsel together and
20   I say, Look over the material.  Take your time.  Make sure that
21   the evidence is in, in the form and fashion that you want it to
22   be in, and attest to that in writing.  So I get both sides to
23   look over it and say, I have looked over it, I have read all of
24   the material, and I attest that it is accurate.
25         When I get that, I assume that the parties have done

**OFFICIAL TRANSCRIPT**

1   what they said they have done and that the evidence is
2   appropriate.  That was the situation here.
3          But even with demonstrative evidence, I always put in a
4   charge that says demonstrative evidence -- and it was used in
10:19:16    5   this case -- is only as good as the evidence that supports it.
6   If you find that the evidence that supported it is invalid, then
7   demonstrative evidence should be disregarded.
8          So even if demonstrative evidence sneaks in through
9   some mistake of counsel, I think it's taken care of in that
10:19:41    10  fashion.
11         So I'll write specifically on this so that you will
12  have a record of it, but I don't see any new trial appropriate in
13  these cases.  But I appreciate counsel's well-done briefs and
14  fine arguments.
10:19:56    15         I'll meet you-all in about 10 minutes when we regroup
16  in the conference room, and we'll talk about where we go now.
17         THE CASE MANAGER:  All rise.
18                              (Proceedings adjourned.)
19
20
21              *  *  *  *  *
22
23
24
25

**OFFICIAL TRANSCRIPT**

1                             CERTIFICATE

2

3          I hereby certify this 20th day of September, 2017, that

4    the foregoing is, to the best of my ability and understanding, a

5    true and correct transcript of the proceedings in the

6    above-entitled matter.

7

8                                      /s/ Mary V. Thompson

9                                   Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**OFFICIAL TRANSCRIPT**