UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

IN RE:  XARELTO (RIVAROXABAN)          MDL No. 2592
PRODUCTS LIABILITY LITIGATION

                                       SECTION L

THIS DOCUMENT RELATES TO:              JUDGE ELDON E. FALLON

William Henry v. Janssen Research &    MAGISTRATE NORTH
Development, LLC f/k/a
Johnson & Johnson Pharmaceutical
Research and Development, LLC, et al.
Case No. 2:15-cv-0224

Harriet Ibanez, et al. v. Janssen Research &
Development, LLC f/k/a
Johnson & Johnson Pharmaceutical
Research and Development, LLC, et al.
Case No. 2:14-cv-02669

DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT
ON THE GROUND THAT FEDERAL LAW PREEMPTS PLAINTIFFS'
DESIGN-DEFECT CLAIM

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................. iii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF THE CASE ........................................................................................ 5

I.  Regulatory Framework and Background ................................................................. 5

     A.  The FDA Approval Process ............................................................................ 5

     B.  FDA's Approval of Xarelto ............................................................................ 7

II.  Plaintiffs' Dosing, Monitoring, and Other Design-Related Theories ................. 9

LEGAL FRAMEWORK .............................................................................................. 10

ARGUMENT ............................................................................................................... 12

I.  Federal law preempts any claim that Defendants should have altered Xarelto's
    design before seeking FDA approval. .................................................................. 12

     A.  Plaintiffs' "pre-approval" design-defect claim is inconsistent with the
         Supreme Court's preemption precedents. ................................................... 13

     B.  The *Guidry* decision on which this Court relied is distinguishable and
         contrary to Supreme Court precedent. ....................................................... 15

II.  Federal law preempts Plaintiffs' theories that Xarelto is unreasonably dangerous
     because the medicine's FDA-approved dosages are too high or should be reduced
     and does not incorporate a monitoring test for dose adjustment. ...................... 19

     A.  Plaintiffs' dosing- and monitoring-related theories challenge Xarelto's
         FDA-approved design. .................................................................................. 20

     B.  Plaintiffs' dosing- and monitoring-related theories are preempted by
         federal law, which categorically forbids Defendants to "independently"
         change Xarelto's design in the way Plaintiffs suggest. ............................... 21

          1.  Applicable FDA regulations prevent Defendants from
              independently changing Xarelto's FDA-approved dosage. .................. 21

          2.  Applicable FDA regulations prevent Defendants from
              independently incorporating a monitoring test into Xarelto's
              design. ............................................................................................... 23

3.  Analogous cases make clear that because Defendants cannot independently change Xarelto's FDA-approved dosage or alter Xarelto's design to incorporate monitoring for clinical purposes, Plaintiffs' dosing- and monitoring-related design theories are preempted................................................................................ 25

III.  Federal law preempts Plaintiffs' claim that Xarelto is unreasonably dangerous in the absence of a Xarelto-specific anti-Factor Xa assay. .................................................. 27

IV.  Federal law preempts Plaintiffs' claim that Xarelto is unreasonably dangerous in the absence of a reversal agent.......................................................................................... 29

CONCLUSION.................................................................................................................... 30

CERTIFICATE OF SERVICE ............................................................................................ 32

# TABLE OF AUTHORITIES

**Cases**

*Aldous v. Darwin Nat'l Assurance Co.*,
   851 F.3d 473 (5th Cir. 2017) ....................................................................................16

*Am. Tobacco Co. v. Grinnell*,
   951 S.W.2d 420 (Tex. 1997)......................................................................................26

*Amos v. Biogen Idec Inc.*,
   28 F. Supp. 3d 164 (W.D.N.Y. 2014) ......................................................................12

*Barcal v. EMD Serono, Inc.*,
   No. 5:14-cv-01709, 2016 WL 1086028 (N.D. Ala. Mar. 21, 2016) ............................. *passim*

*Batoh v. McNeil-PPC, Inc.*,
   No. 3:14-cv-01462, 2016 WL 922779 (D. Conn. Mar. 10, 2016) ..............................12, 16, 27

*Bellum v. PCE Constructors, Inc.*,
   407 F.3d 734 (5th Cir. 2005) ....................................................................................16

*Bernard v. Ferrellgas, Inc.*,
   689 So. 2d 554 (La. Ct. App. 1997)..........................................................................26

*Booker v. Johnson & Johnson*,
   54 F. Supp. 3d 868 (N.D. Ohio 2014).................................................................12, 27

*Brazil v. Janssen Research & Development LLC*,
   Civ. A. No. 4:15-CV-0204, 2016 WL 3748771 (N.D. Ga. July 11, 2016)............12, 15, 16, 27

*Bruesewitz v. Wyeth Inc.*,
   561 F.3d 233 (3d Cir. 2009), *aff'd*, 131 S. Ct. 1068 (2011) ......................................7

*EMJ Corp. v. Hudson Specialty Ins. Co.*,
   833 F.3d 544 (5th Cir. 2016) ....................................................................................16

*Estate of Cassel v. Alza Corp.*,
   No. 12-CV-771-WMC, 2014 WL 856023 (W.D. Wis. Mar. 5, 2014) .....................12

*Ezell v. Kan. City S. Ry. Co.*,
   866 F.3d 294 (5th Cir. 2017) ....................................................................................12

*Fleming v. Janssen Pharmaceuticals, Inc.*,
   No. 2:15-cv-02799, 2016 WL 3180299 (W.D. Tenn. May 6, 2016)................12, 15

*Flock v. Scripto-Tokai Corp.*,
   319 F.3d 231 (5th Cir. 2003) ....................................................................................26

*Freightliner Corp. v. Myrick*,
   514 U.S. 280 (1995) ............................................................................................10

*Geier v. Am. Honda Motor Co.*,
   529 U.S. 861 (2000) ............................................................................................10

*Guidry v. Janssen Pharmaceuticals, Inc.*,
   206 F. Supp. 3d 1187 (E.D. La. 2016) ............................................................ *passim*

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*,
   779 F.3d 34 (1st Cir. 2015) ................................................................................12

*In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*,
   756 F.3d 917 (6th Cir. 2014) ..............................................................................12

*In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*,
   MDL No. 2592 .......................................................................................................1

*Kruszka v. Novartis Pharm. Corp.*,
   19 F. Supp. 3d 875 (D. Minn. 2014) ..................................................................20

*Mutual Pharmaceutical Co. v. Bartlett*,
   133 S. Ct. 2466 (2013) ................................................................................... *passim*

*PLIVA, Inc. v. Mensing*,
   564 U.S. 604 (2011) ...................................................................................... *passim*

*Rheinfrank v. Abbott Labs., Inc.*,
   No. 1:13-cv-144, 2015 WL 5836973 (S.D. Ohio Oct. 2, 2015) ...........................12

*Sheline v. Dun & Bradstreet Corp.*,
   948 F.2d 174 (5th Cir. 1991) ..............................................................................12

*Thompson v. Allergan USA, Inc.*,
   993 F. Supp. 2d 1007 (E.D. Mo. 2014) ...................................................12, 25, 27

*United States ex rel. King v. Solvay Pharms., Inc.*,
   __ F.3d __, 2017 WL 4003473 (5th Cir. Sept. 12, 2017) ....................................17

*United States v. Baxter Healthcare Corp.*,
   901 F.2d 1401 (7th Cir. 1990) ............................................................................21

*Utts v. Bristol-Myers Squibb Co.*,
   226 F. Supp. 3d 166 (S.D.N.Y. 2016) ............................................................ *passim*

*Wollens v. Merck & Co.*,
   No. 12-1408, 2012 WL 6504210 (E.D. La. Dec. 13, 2012) ................................20

*Wyeth v. Levine*,
   555 U.S. 555 (2009) .......................................................................11, 16, 18, 21

*Yates v. Ortho-McNeil-Janssen Pharms., Inc.*,
   808 F.3d 281 (6th Cir. 2015) ................................................... *passim*

**Constitutional Provisions**

U.S. Const. art. VI cl. 2 .........................................................................10

**Statutes**

21 U.S.C. § 355 .....................................................................................21

21 U.S.C. § 355(a) ..................................................................... *passim*

21 U.S.C. § 355(b) .................................................................................18

21 U.S.C. § 355(b)(1) .........................................................................6, 7

21 U.S.C. § 355(d) ..................................................................................7

21 U.S.C. § 360(k) .................................................................................28

21 U.S.C. § 360e(a) ...............................................................................28

28 U.S.C. § 1292(b) .................................................................................1

42 U.S.C. § 262(a) .................................................................................30

42 U.S.C. § 262(j) ..................................................................................30

**Regulations**

21 C.F.R. 314.70(b)(i) ...........................................................................22

21 C.F.R. Part 809 .................................................................................28

21 C.F.R. § 310.3 ...................................................................................21

21 C.F.R. § 310.3(h)(5) ..........................................................................21

21 C.F.R § 312.21 .....................................................................................7

21 C.F.R. § 314.70 .................................................................................22

21 C.F.R. § 314.70(b) ............................................................................22

21 C.F.R. § 314.70(b)(i) .........................................................................23

21 C.F.R. § 314.70(b)(2)(i) ................................................................................ *passim*

21 C.F.R. § 314.105 ..................................................................................7, 18

21 C.F.R. § 314.110(a) ..................................................................................7

21 C.F.R. § 320.21(c) ..................................................................................23

21 C.F.R § 807.81(a)(3)(ii) ..................................................................................25

21 C.F.R. § 814.39(a) ..................................................................................25

21 C.F.R. § 864.7750(a) ..................................................................................24

**Other Authorities**

Devices and Radiological Health, Transcript, *In Vitro Diagnostic Testing for Direct Oral Anticoagulants* (Oct. 26, 2015) ....................................23, 28

Drug Evaluation and Research, *ROCKET AF Reanalysis Reviews* § 1.1 (Sept. 26, 2016) ..................................................................................1

FDA, CDER, Guidance for Industry, *Changes to an Approved NDA or ANDA*, 2004 WL 3199016 (Apr. 2004) ..................................................................................22

Lea Carrington, *In Vitro Diagnostic Testing for Direct Oral Anticoagulants* (presentation to Center for Devices and Radiological Health public workshop; Oct. 26, 2015) ..................................................................................8

Xarelto Nov. 2011 USPI ..................................................................................9, 30

Xarelto Aug. 2013 USPI ..................................................................................9

Xarelto May 2016 USPI ..................................................................................2, 9

Neoplastin Oct. 2013 USPI ..................................................................................24

Defendants hereby move for summary judgment on Plaintiffs' design-defect claims in the two above-captioned discovery pool cases on the ground that federal law preempts such a claim.[1]

## INTRODUCTION

This is not the typical pharmaceutical product-liability case. This litigation involves a product, Xarelto® (rivaroxaban), that has been approved by health authorities around the globe, remains on the market as one of the world's most successful and innovative medicines, and continues to save lives every day. Indeed, after considering some of the very same arguments and theories that Plaintiffs' lawyers and experts have advanced in this litigation, FDA recently reaffirmed, in a September 2016 public report, "the conclusion [it] made in 2011 that the benefits of rivaroxaban in patients with [AFib] outweigh the risks . . . ." FDA: Center for Drug Evaluation and Research, *ROCKET AF Reanalysis Reviews* § 1.1, at 3 (Sept. 26, 2016) (Exh. 1); *see also* Abstract, *Prospective Surveillance Pilot of Rivaroxaban Safety Within the US Food and Drug Administration Sentinel System*, *available at* http://www.abstractsonline.com/pp8/#!/4385/presentation/386 (Exh. 2). Thus, FDA has endorsed Xarelto's safety and efficacy not just in the initial

---

[1] Defendants move for summary judgment in the *Henry* case in accordance with CMO No. 2H, which requires all dispositive motions in that case to be filed by September 21, 2017. Defendants also hereby move for summary judgment on Plaintiffs' design-defect claims in the *Ibanez* case, which was included in the discovery pool through random selection by the Court. *See* Docs. 2626, 3093. There currently is no dispositive-motion deadline set in the *Ibanez* case, and Defendants make this motion without prejudice to their right to later make additional dispositive motions in that case, if necessary.

The Court has addressed Defendants' preemption arguments before, in the context of the first three Xarelto bellwether trials. Defendants hereby incorporate all of the earlier briefing and argument from the *Boudreaux*, *Orr*, and *Mingo* cases regarding their argument that federal law preempts Plaintiffs' design-defect claims and ask that the Court consider that earlier briefing—and the associated exhibits that Defendants filed in support of those motions—to have been filed in this case. *See In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, Docs. 5109-1, 5678, 5904, 5988, 6745, 7066. Defendants also incorporate the March 23, 2017, oral argument related to Defendants' argument that federal law preempts Plaintiffs' design-defect claims.

Defendants recognize that the Court denied summary judgment on these grounds in the *Boudreaux*, *Orr*, and *Mingo* cases, but Defendants believe that appellate review of this threshold issue is important to the MDL as a whole, and Plaintiffs' decision to drop the design claim in *Boudreaux* and *Orr* and the defense verdict on this claim in the *Mingo* trial make it unlikely that the Fifth Circuit will address the preemption issue following another bellwether trial. For that reason, if the Court adheres to its prior rulings, Defendants intend to request that the Court certify the preemption issues for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

approvals for each of the medicine's five indications, but now more recently, during the pendency of this litigation.

Nor are Plaintiffs' claims standard pharmaceutical-case fare.  Perhaps most significantly, this is not a case in which a plaintiff alleges that a pharmaceutical company failed to warn about the adverse event that she claims to have experienced.  Plaintiffs here do not seriously dispute that Xarelto's labeling warns about the risk of bleeding—a risk associated with all anticoagulants.  Nor could they, as Xarelto's label is replete with warnings that use of the drug may increase the "Risk of Bleeding," including "serious or fatal bleeding."  *E.g.*, May 2016 USPI (Exh. 3) Highlights of Prescribing Information, § 5.2 (Warnings and Precautions).  Indeed, the word "bleed" or "bleeding" appears more than 100 times in Xarelto's label.  And Xarelto's Medication Guide—a plain-English explanation of a medicine's most significant prescribing information—warns that "**Xarelto can cause bleeding** which can be serious, and rarely may lead to death."  (Exh. 4).

In light of these clear and extensive warnings, it is perhaps unsurprising that Plaintiffs' liability theories have been less traditional.  In the first three bellwether cases, Plaintiffs ultimately trained their case on a novel "pre-approval" design-defect claim—that Defendants had a duty to do something to change Xarelto's design *before* the medicine was approved.  But they initially asserted a "post-approval" design-defect theory focused on Xarelto's FDA-approved dosages, arguing (1) that the total daily dose is too high, (2) that Xarelto should be dosed twice daily instead of once-a-day as approved by FDA, and (3) that doctors should be given the ability to adjust patients' doses.  In response to Defendants' dispositive-motion briefing in the *Boudreaux*, *Orr*, and *Mingo* cases, Plaintiffs changed course, abandoning those theories to focus instead on Xarelto's lack of a specific anti-Factor Xa assay that would measure a patient's Xarelto-concentration levels

or a reversal agent.  Plaintiffs dismissed their design-defect claims in the first two bellwether cases shortly before trial, and the jury rejected the design-defect claim in the third.

It is unclear what form Plaintiffs' design-defect claim will ultimately take in these cases, but however Plaintiffs frame their theory, federal law preempts their design-defect claim.

1.      Plaintiffs' design-defect claim hinges on the novel theory that Defendants were obligated—prior to ever seeking FDA approval—to design Xarelto differently to incorporate a test or assay to measure patients' blood levels and, in Plaintiffs' view, allow physicians to predict whether a patient was at an elevated risk of adverse events.  Even if such a "pre-approval" claim exists under state law, federal law preempts it.  The majority of courts to address this theory— including the only U.S. Court of Appeals to consider the question—have rejected "pre-approval" design-defect claims, holding that the Supreme Court's decisions in *Mutual Pharmaceutical Co. v. Bartlett*, 133 S. Ct. 2466 (2013), and *PLIVA, Inc. v. Mensing*, 564 U.S. 604 (2011), squarely foreclose this sort of never-should-have-sold-the-product theory.  *See, e.g.*, *Yates v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F.3d 281, 298–300 (6th Cir. 2015); *Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 185–86 (S.D.N.Y. 2016).  This Court denied Defendants' design-defect preemption motion in the first three bellwether cases, finding that Defendants could have brought a differently designed drug to market in the first instance.  Docs. 6196, 7110.  In so holding, the Court followed *Guidry v. Janssen Pharmaceuticals, Inc.*, 206 F. Supp. 3d 1187 (E.D. La. 2016), but that case is distinguishable and wrongly decided.

2.      But Plaintiffs also have asserted a "post-approval" design-defect claim grounded on the premise that Xarelto is defectively designed because the particular dosages and dosing regimen approved by FDA render the medicine unreasonably dangerous.  These dosing-related claims, all of which challenge Xarelto's FDA-approved design, are both contrary to federal law

and dangerous to public health.  The governing law is clear: Under applicable FDA regulations (and for that matter binding Supreme Court precedent) *no* manufacturer, "whether generic or brand-name," can make major changes to an approved medicine's design unilaterally, *i.e.*, without prior FDA approval.  *Bartlett*, 133 S. Ct. at 2471.  Were it to do so, "the altered chemical would be a new drug" requiring new FDA approval.  *Id.* at 2475.  And yet that is *precisely* what Plaintiffs would have Defendants do by altering the dosages and dosing regimen that FDA approved for Xarelto.  Because Defendants cannot "independently" change agency-approved dosages—and indeed are flatly prohibited from doing so—Plaintiffs' dosing-related claims are preempted.

3.     Relatedly, Plaintiffs assert that Xarelto is unreasonably dangerous on the ground that, as designed, labeled, and approved by FDA, it does not specifically incorporate or entail a requirement that doctors monitor or test their patients' Xarelto-related coagulation parameters for dose-adjustment purposes—in particular, Plaintiffs say, through prothrombin time ("PT") testing. That claim, too, is preempted because Defendants cannot "independently" alter Xarelto's design to incorporate a PT-monitoring requirement or recommendation, as no PT test has been cleared or approved for use with Xarelto.

4.     Plaintiffs also assert that Xarelto is defectively designed and unreasonably dangerous because Defendants did not develop or design two "adjunct" products—namely, an anti-Factor Xa assay specifically calibrated to Xarelto or an antidote/reversal agent.  Although Plaintiffs agree that there is no Xarelto-specific assay approved for use in the United States, they contend that such an assay would allow physicians to measure the amount of Xarelto in a patient's blood and make dose adjustments or discontinue the medicine accordingly.  The same is true for an antidote/reversal agent that would reverse the effects of Xarelto in a patient who is bleeding: Xarelto's label has always advised that no reversal agent exists, but Plaintiffs contend that such a product would be

beneficial for certain patients.  Both of these claims, like Plaintiffs' contention that Xarelto should have been designed for use in conjunction with a PT-monitoring test, are preempted for the simple reason that, under the applicable federal regulations, Defendants cannot "independently" develop and market (or alter Xarelto's design to incorporate) these adjunct products, which require separate FDA approval.

* * *

Because Defendants cannot unilaterally change Xarelto's design to alter the FDA-approved dosages, to incorporate a monitoring test, or to incorporate a specific anti-Factor Xa assay or reversal agent, Plaintiffs' claims are preempted.  And as a public-health matter, that *must* be the law. Plaintiffs' contrary position threatens dangerous chaos.  Neither Congress nor FDA could possibly have intended a regime in which, despite the agency's years-in-the-making determinations that a 15 or 20 mg once-daily dose of Xarelto for AFib patients without routine monitoring or testing or a reversal agent appropriately balances the twin statutory objectives of safety and efficacy, Defendants could simply decide—on their own and without further authorization—that a different dosage, monitoring or testing, or some other separate adjunct product for use with the medicine would be better than what FDA approved.  Plaintiffs' design-defect claims are preempted.

## STATEMENT OF THE CASE

## I.     Regulatory Framework and Background

### A.     The FDA Approval Process

Before a manufacturer can "introduce or deliver for introduction into interstate commerce" any new drug, it must submit to FDA a New Drug Application ("NDA").  21 U.S.C. § 355(a).  In the NDA, the manufacturer must describe the drug's composition, provide the data establishing the drug's safety and effectiveness, and propose labeling for the drug.  *See id.* § 355(b)(1).

Obtaining an NDA is enormously expensive.  The average cost of bringing a new medicine to market has more than doubled during the last decade, to approximately $2.6 billion.  *See* PhRMA, Biopharmaceutical Research & Development: The Process Behind New Medicines 1 (2015), *available at* http://www.phrma.org/sites/default/files/pdf/rd_brochure_022307.pdf (Exh. 5).  The drug-development process is not only costly but also "onerous and lengthy." *Bartlett*, 133 S. Ct. at 2471.  Between drug research and discovery, clinical development and trials, and FDA review and approval, getting a medicine from the chemistry lab to the pharmacy shelf takes 10 years on average.  *See* PhRMA, at 19.   And notably, less than 12% of medicines that undergo FDA review ultimately achieve approval and reach the market.  *Id*. at 10. The cost and labor involved in developing a new drug result, in large part, from the comprehensiveness of the clinical testing required and the rigor of FDA's review process.  To obtain FDA approval of a new medicine, a manufacturer must conduct three separate testing "phases."  Phase I is designed to assess the proposed drug's pharmacokinetics (*i.e.*, the way the human body affects the drug) and pharmacodynamics (*i.e.*, the way the drug affects the body) and to begin to test the range of possible doses.  In Phase II, the manufacturer performs more sensitive dose-ranging studies to pinpoint the appropriate doses for particular uses of the medicine (or "indications") in particular patient populations.  Finally, in Phase III, the manufacturer conducts large-scale clinical trials to confirm the safety and efficacy of those indications and doses.  *See generally* 21 C.F.R § 312.21.

If FDA determines that any aspect of an NDA is deficient, it will notify the applicant of the deficiencies, which must be corrected before the application is resubmitted.  *See, e.g.*, 21 C.F.R. § 314.110(a).  Once FDA—after a thorough review of the manufacturer's testing data—approves a new drug, its approval covers the medicine's design, manufacture, and labeling.  *See* 21 U.S.C.

§ 355(b)(1); 21 C.F.R. § 314.105.  Because a manufacturer may not distribute a drug unless FDA has found it to be safe and effective under the labeled conditions of use, the agency's review and approval of a drug's design and labeling are essential to the NDA process.  *See* 21 U.S.C. § 355(a), (d).

The FDA regulations governing product design are stringent.  *See, e.g.*, *Bruesewitz v. Wyeth Inc.*, 561 F.3d 233, 246 n.8 (3d Cir. 2009) (noting "FDA's far-more extensive control and oversight of the approval of a drug's design and alteration" than its labeling), *aff'd*, 131 S. Ct. 1068 (2011).  Most notably for present purposes, a manufacturer can *never* make major changes to a drug's design unilaterally.  *See, e.g.*, *Barcal v. EMD Serono, Inc.*, No. 5:14-cv-01709, 2016 WL 1086028, at *4 (N.D. Ala. Mar. 21, 2016) (observing that, as distinguished from FDA's labeling regulations, "no . . . process exists for [unilateral] changes" to a drug's design).  Rather, "were [a pharmaceutical manufacturer] to change the composition of its [medicine], the altered chemical would be a new drug that would require its own NDA to be marketed in interstate commerce." *Bartlett*, 133 S. Ct. at 2475; *see also, e.g.*, *Yates*, 808 F.3d at 298–99; *Utts*, 226 F. Supp. 3d at 185–86.

### B.    FDA's Approval of Xarelto

Defendants researched, tested, and evaluated Xarelto in tens of thousands of patients through an unprecedented program of clinical trials.  FDA exhaustively reviewed the data generated in those trials and engaged in a robust intra-agency debate about Xarelto's safety and efficacy—and, in particular, about the safety and efficacy of different dosages.

There was extensive discussion during Xarelto's approval process, as there should be, of the science behind and studies supporting the medicine.  *See* FDA Cross-Discipline Team Leader Review (NDA 202439), at 7, *available at* http://www.accessdata.fda.gov/drugsat-fda_docs/nda/2011/202439Orig1s000CrossR.pdf (Exh. 6).  Indeed, FDA confronted the *very same*

*issues* that Plaintiffs now make the focus of this litigation, including the approved doses and whether there should be coagulation monitoring for Xarelto (or other NOAC) patients.  *See, e.g.*, Robert Temple, *NOAC Dosing: Precision Dosing—Yes!* (presentation to Cardiac Safety Research Consortium;  Dec.  3,  2015),  *available  at*  http://cardiac-safety-org/wp-content/up-loads/2015/12/S2_1a_Temple.pdf (Exh. 7); Lea Carrington, *In Vitro Diagnostic Testing for Direct Oral Anticoagulants*, at 5–6 (presentation to Center for Devices and Radiological Health public workshop; Oct. 26, 2015) (Exh. 8).

Following this vigorous debate about the safety and efficacy of different dosages and the need for coagulation monitoring, FDA approved Xarelto for prescription to patients.  As reflected in the label, FDA has approved Xarelto for multiple indications, each time at a specific dose and without a monitoring requirement or recommendation:

| Indication | Dosage | |
|---|---|---|
| **Reduction in Risk of Stroke in Nonvalvular Atrial Fibrillation (2.3)** | CrCl >50 mL/min: | 20 mg once daily **with the evening meal** |
| | CrCl 15 to 50 mL/min: | 15 mg once daily **with the evening meal** |
| **Treatment of DVT (2.4)** **Treatment of PE (2.4)** | 15 mg _twice daily_ with food, for first 21 days | |
| | ▼after 21 days, transition to ▼ | |
| | 20 mg once daily with food, for remaining treatment | |
| **Reduction in the Risk of Recurrence of DVT and of PE (2.4)** | 20 mg once daily with food | |
| **Prophylaxis of DVT Following Hip or Knee Replacement Surgery (2.5)** | Hip replacement: | 10 mg once daily for 35 days |
| | Knee replacement: | 10 mg once daily for 12 days |

May 2016 USPI § 2.[2]

## II.    Plaintiffs' Dosing, Monitoring, and Other Design-Related Theories

This motion addresses the following design-defect theories, as articulated in Plaintiffs'

complaints and elaborated in their expert reports:

1.        Xarelto is defectively designed on the grounds that—

a.        the approved 15 or 20 mg daily dose for AFib patients is too high[3];

b.        the medicine should be dosed twice daily rather than once, as indicated[4]; and

c.        doctors should be instructed to adjust patients' doses according to the results of blood-monitoring tests aimed at determining the concentration of Xarelto in patients' blood or their Xarelto-related coagulation parameters.[5]

---

[2] Indeed, Xarelto's label has stated at all times that "[t]he anticoagulant effect of XARELTO cannot be reliably monitored with standard laboratory testing." Nov. 2011 USPI §§ 5.4, 8.1 (Ex. 9); Aug. 2013 USPI §§ 5.4, 8.1 (Ex. 10). Mr. Henry was first prescribed Xarelto in April 2012 to prevent strokes incident to his AFib, and he continued using Xarelto until December 1, 2014, despite experiencing a rectal bleed in December 2012. _See Henry_ Amended Compl. (Doc. 2392), ¶ 1; _Henry_ Fourth Amended Pl. Fact Sheet, at 2 (Ex. 11). Ms. Ibanez was first prescribed Xarelto in October 2013 to prevent strokes incident to her AFib, and she continued using Xarelto until February 17, 2014, when she suffered gastrointestinal and rectal bleeding. _See Ibanez_ Compl. (Case No. 2:14-cv-02669, Doc. 1), ¶¶ 13–14; _Ibanez_ Second Amended Pl. Fact Sheet, at 3 (Ex. 12).

[3] _See, e.g._, Smart Rep. at 5 (Ex. 13) ("The dose of Xarelto currently marketed for atrial fibrillation is too high."); _id._ at 6 ("[T]he 15/20 mg daily dose . . . is excessive."); Rosing Rep. at 21 (Ex. 14) (advocating "a reduction in the total daily dose"); Backes Rep. at 11 (Ex. 15) ("too high"); Parisian Rep. at 9, 10, 159, 365 (Ex. 16) ("too high"); _Henry_ Amended Compl. ¶¶ 56, 175; _Ibanez_ Compl. ¶¶ 81, 102, 112.

[4] _See, e.g._, Backes Rep. at 12 (advocating "multiple dosing (e.g., twice per day at 10 mg vs. OD at 20 mg), or development of a time-released formulation of Xarelto"); Cuculich Rep. at 14 (Ex. 17) ("twice-daily smaller dose" in place of approved "once-daily larger dose"); Rosing Rep. at 5 ("twice daily dosing" rather than "once daily dosing"); Gerstman Rep. at 64 (Ex. 18) (advocating "10 mg twice-daily rivaroxaban" dosing); _Henry_ Amended Compl. ¶¶ 62, 63, 65, 175; _Ibanez_ Compl. ¶¶ 81, 102, 112.

[5] _See, e.g._, Cuculich Rep. at 4 (advocating "a way to measure the plasma concentration or anticoagulant effect of the medication in a patient-specific way" for purpose of "dosing adjustment to tailor the perfect amount of anticoagulant

9

2.  Xarelto is defectively designed on the ground that it does not specifically incorporate the use of a test or assay to monitor patients' prothrombin time ("PT") as a means of assessing the risk that a patient will experience a bleeding event, an extensively warned-of and unavoidable side effect of anticoagulation therapy.[6]

3.  Xarelto is defectively designed on the ground that it does not specifically incorporate the use of an anti-Factor Xa assay or the use of an antidote or reversal agent.[7]

Because federal law preempts all of these design-related claims and theories, Defendants are entitled to partial summary judgment.

## LEGAL FRAMEWORK

Under the Supremacy Clause, federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI cl. 2.  "Accordingly, it has long been settled that state laws that conflict with federal law are 'without effect.'"  *Bartlett*, 133 S. Ct. at 2473.  It is likewise settled that common-law tort claims seeking damages are a form of state "law" subject to preemption.  *See, e.g.*, *Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000).

As relevant here, "state and federal law conflict"—and state law is preempted—"where it is 'impossible for a private party to comply with both state and federal requirements.'"  *Mensing*, 564 U.S. at 618 (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)).  The United

---

effect while avoiding unnecessary bleeding"); Backes Rep. at 12 (similar); Bussey Rep. at 5 (Exh. 19) (similar); Gerstman Rep. at 60 (similar); Parisian Rep. at 9 (similar); Plunkett Rep. at 32 (Exh. 20) (similar); Rinder Rep. at 14 (Exh. 21) (advocating that "Xarelto should be discontinued in patients whose PT . . . is greater than 20 seconds"); Kessler Rep. at 80 (Exh. 22) (similar); *Henry* Amended Compl. ¶¶ 63, 65, 175; *Ibanez* Compl. ¶ 112.

[6] *See, e.g.*, Rinder Rep. at 3 (claiming that "safe and effective use" of Xarelto "requires measuring drug concentration levels or activity levels (*e.g.*, prothrombin time (PT) or anti-Factor Xa)"); *Henry* Amended Compl. ¶¶ 63, 65, 76, 175; *Ibanez* Compl. ¶¶ 80, 112, 132.

[7] *See, e.g.*, Rinder Rep. at 3; Liechty Rep. at 8 (Exh. 23) (asserting that the lack of a reversal agent "represents a significant hazard and danger with Xarelto use"); Cerri Rep. at 6 (Exh. 24) ("Using Xarelto puts these patients at great risk because there [is] . . . no reversal agent to treat emergent conditions."); Leissinger Generic Dep. (Nov. 15, 2016) at 52 (Exh. 25) (noting the lack of a reversal agent as one of the reasons patients should be taken off of Xarelto); *supra* n.6; *Henry* Amended Compl. ¶¶ 66, 134, 144, 149; *Ibanez* Compl. ¶¶ 82, 112, 132.

States Supreme Court has established the standard for "impossibility" preemption in pharmaceutical cases in three recent decisions: *Wyeth v. Levine*, 555 U.S. 555 (2009); *Mensing*, 564 U.S. 604 (2011); and *Bartlett*, 133 S. Ct. 2466 (2013).

These decisions explain that "[t]he question for 'impossibility' is whether the [defendant drug manufacturer] could *independently* do under federal law what state law requires of it." *Mensing*, 564 U.S. at 620 (emphasis added); *see also Bartlett*, 133 S. Ct. at 2470 (citing *Mensing*).  And by "independently," the Supreme Court has made it clear, it means "unilaterally."  *Mensing*, 564 U.S. at 620 (citing *Levine*, 555 U.S. at 573, for the proposition that preemption turns on whether "the defendant could 'unilaterally' do what state law required").  Accordingly, "when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *Mensing*, 564 U.S. at 623–24.

Under the *Levine-Mensing-Bartlett* trilogy, if a manufacturer *can* "independently" effectuate the change that a plaintiff's claim would require, the claim against it *is not* preempted and may proceed absent "clear evidence" (*e.g.*, *Levine*); where the manufacturer *cannot* "independently" make that change, the claim *is* preempted and must be dismissed (*e.g.*, *Mensing*, *Bartlett*).  Because Defendants here could not have independently done what Plaintiffs say they should have—*i.e.*, altered Xarelto's dosage strength or dosing regimen; recommended patient monitoring; or marketed an anti-Factor Xa assay and/or a reversal agent for use with Xarelto, or incorporated those separate products into Xarelto's design—Plaintiffs' claim that Xarelto is unreasonably dangerous based on those theories is preempted. *Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 620.[8]

---

[8] Defendants recognize that this Court has previously stated that *Bartlett* and *Mensing* "relate to generic drug manufacturers." Doc. 6196, at 9; Doc. 7110, at 9.  Defendants respectfully disagree as explained *supra*.  Moreover, *Levine*, which involved a brand-name manufacturer, makes clear that the relevant question is whether the manufacturer can act unilaterally under the federal regulations that apply to that manufacturer.  555 U.S. at 568 (no preemption because

## ARGUMENT

Federal law preempts Plaintiffs' design-defect claims because those claims, however, framed, would require Defendants to take actions that they cannot lawfully take "independently." "Whether a state statute or common law cause of action is preempted by federal law is a question of law," *Ezell v. Kan. City S. Ry. Co.*, 866 F.3d 294, 298 (5th Cir. 2017), that is appropriately decided on summary judgment. *See Sheline v. Dun & Bradstreet Corp.*, 948 F.2d 174, 176 (5th Cir. 1991). This Court should grant Defendants summary judgment.

## I.   Federal law preempts any claim that Defendants should have altered Xarelto's design before seeking FDA approval.

Plaintiffs have previously asserted that Defendants had a duty to re-design Xarelto *before* seeking FDA's approval of the drug. Docs. 5652, 7007. Relying on *Guidry*, this Court concluded that this sort of "pre-approval" design claim is not preempted. Docs. 6196, 7110. But *Guidry* is contrary to the Supreme Court's decisions in *Bartlett* and *Mensing*, the majority of post-*Bartlett*

---

"[t]here is . . . an FDA regulation that permits a [brand-name] manufacturer to make certain changes to its label before receiving the agency's approval"). And although *Bartlett* and *Mensing* involved generic manufacturers, the Supreme Court did not limit the legal principles applicable to impossibility preemption on that basis. *See Bartlett*, 133 S. Ct. at 2473 (state law is preempted "where it is impossible for a *private party* to comply with both state and federal requirements" (emphasis added) (citation and internal quotation marks omitted)); *Mensing*, 564 U.S. at 620 ("The question for 'impossibility' is whether *the private party* could independently do under federal law what state law requires of it." (emphasis added)). In other words, the only question for impossibility is whether the federal statutes and regulations applicable to the manufacturers here allow the design changes Plaintiffs claim should be made.

Indeed, since *Bartlett* was decided in 2013, courts have overwhelmingly concluded that the *Levine-Mensing-Bartlett* "impossibility" analysis—focused on the permissibility of "independent," "unilateral" manufacturer action—applies equally to both brand-name and generic products and manufacturers. *See, e.g.*, *Yates*, 808 F.3d 281 (6th Cir. 2015); *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34 (1st Cir. 2015); *In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917 (6th Cir. 2014); *Brazil v. Janssen Research & Development LLC*, Civ. A. No. 4:15-CV-0204, 2016 WL 3748771 (N.D. Ga. July 11, 2016); *Fleming v. Janssen Pharmaceuticals, Inc.*, No. 2:15-cv-02799, 2016 WL 3180299 (W.D. Tenn. May 6, 2016); *Barcal v. EMD Sorono, Inc.*, No. 5:14-cv-01709, 2016 WL 1086028 (N.D. Ala. Mar. 21, 2016); *Batoh v. McNeil-PPC, Inc.*, No. 3:14-cv-01462, 2016 WL 922779 (D. Conn. Mar. 10, 2016); *Rheinfrank v. Abbott Labs., Inc.*, No. 1:13-cv-144, 2015 WL 5836973 (S.D. Ohio Oct. 2, 2015); *Booker v. Johnson & Johnson*, 54 F. Supp. 3d 868 (N.D. Ohio 2014); *Thompson v. Allergan USA, Inc.*, 993 F. Supp. 2d 1007 (E.D. Mo. 2014); *Amos v. Biogen Idec Inc.*, 28 F. Supp. 3d 164 (W.D.N.Y. 2014). *But see Estate of Cassel v. Alza Corp.*, No. 12-CV-771-WMC, 2014 WL 856023, at *5 (W.D. Wis. Mar. 5, 2014) (holding that *Bartlett* does not apply to brand-name drugs).

decisions—including the only federal court of appeals decision on the issue—and the only other decision involving a NOAC.

### A.   Plaintiffs' "pre-approval" design-defect claim is inconsistent with the Supreme Court's preemption precedents.

A "pre-approval" design-defect theory is inconsistent with the Supreme Court's decisions in *Bartlett* and *Mensing*.  In *Mensing*, the Supreme Court made clear that "conjecture[]" does not suffice to avoid impossibility preemption, noting that it could "often imagine that . . . the Federal Government *might* do something that makes it lawful for a private party to accomplish under federal law what state law requires of it."  564 U.S. at 619–20.  But such an approach—*i.e.*, "imagin[ing]" that a federal agency would accede to a manufacturer's request—"would render conflict pre-emption largely meaningless because it would make most conflicts between state and federal law illusory."  *Id.* at 620.  Plaintiffs' pre-approval design-defect claim does just that—it necessarily "imagine[s]" that FDA would have approved some alternative design of Xarelto and, thus, hinges on the very type of speculation rejected in *Mensing*.  Moreover, Plaintiffs essentially claim that Defendants should never have sold the FDA-approved formulation of Xarelto in the first place.  The Supreme Court has expressly rejected this type of "stop-selling" rationale as "incompatible" with its preemption decisions.  *Bartlett*, 133 S. Ct. at 2477–78.  And more fundamentally, even if Defendants had a duty to redesign Xarelto before seeking FDA approval, they could not have marketed the "redesigned" drug without first obtaining FDA approval.  *See* 21 U.S.C. § 355(a); *Yates*, 808 F.3d at 300.  Plaintiffs' so-called "pre-approval" claim is preempted.

The Sixth Circuit's decision in *Yates*, which post-dates both *Bartlett* and *Mensing*, is directly on point.  There, the court rejected on several grounds the plaintiff's claim that the brand-name manufacturer should have altered its birth control patch's estrogen dosage *before* FDA approval—*i.e.*, should have brought a lower-dose product to market in the first instance.  The Sixth

Circuit found the claim "too attenuated."  808 F.3d at 299.  Although nothing in federal law pre-

vented the manufacturers from designing a lower-dose patch, the court said it would still "have to

speculate" (1) that "the FDA would have approved the alternate design," which controls the "ulti-

mate availability" of the drug for use; (2) that the plaintiff "would have selected" it; and (3) that

"this alternate design would not have caused [the plaintiff] to suffer" an injury.  *Id.*  This, the court

said, was "several steps too far."  *Id.*  Separately, because "the ultimate availability" of any differ-

ently designed drug would be "contingent upon whether the FDA would approve the alternate

design," the Sixth Circuit held the plaintiff's claim foreclosed under the rationale of *Mensing* that

preemption attaches where a manufacturer could not act unilaterally, but rather only "ask for the

FDA's help."  *Id.* at 299–300 (quoting *Mensing*, 564 U.S. at 619).  Finally, the court explained that

the plaintiff's "pre-approval" theory was incompatible with *Bartlett*, which rejected the contention

that a manufacturer could comply with its state and federal law duties by "pull[ing the drug] from

the market."  133 S. Ct. at 2470.  The Sixth Circuit held: "In contending that defendants' pre-

approval duty would have resulted in a birth control patch with a different formulation, [plaintiff]

essentially argues that defendants should never have sold the FDA-approved formulation of [the

patch] in the first place.  We reject this never-start-selling rationale for the same reasons the Su-

preme Court in *Bartlett* rejected the stop-selling rationale . . . ."  808 F.3d at 300.

Even more recently, and more closely on point, the court overseeing the *In re Eliquis* MDL

held that federal law preempted nearly identical design-defect claims concerning Eliquis, a brand-

name medication in the same NOAC class as Xarelto.  *Utts*, 226 F. Supp. 3d at 185–86.  The *Utts*

court rejected the plaintiffs' assertion "that the defendants had a *pre-approval* duty to submit a

differently designed drug for FDA approval" in the first instance.  *Id.* (emphasis added).  Just like

14

the Sixth Circuit in *Yates*, the *Utts* court held that the plaintiffs' alleged "pre-approval duty" impermissibly required it to "speculate" that "FDA would have approved the alternate design; that [the patient] would have been prescribed this alternately designed Eliquis; and that this alternate design would not have caused [the patient] to suffer severe internal bleeding." *Id.* And, as in *Yates*, the court rejected the plaintiffs' pre-approval claim as inconsistent with *Mensing*'s rejection of "Mouse Trap" causal theories and *Bartlett*'s condemnation of the "stop selling" (and by extension, "should never have sold") rationale.[9]

So too here. Defendants "could not have complied with whatever pre-approval duty might exist without ultimately seeking the FDA's approval prior to marketing [Xarelto], and certainly prior to [any plaintiff's] use of the drug." *Yates*, 808 F.3d at 300. And any "pre-approval" theory—*i.e.*, a claim that Defendants should have redesigned Xarelto from the very beginning—rests on the contention that Defendants never should have sold Xarelto in its FDA-approved formulation. That is precisely the "stop-selling" (or "should never have sold") claim that Supreme Court precedent squarely bars. *Bartlett*, 133 S. Ct. at 2477–78.

**B.**   **The *Guidry* decision on which this Court relied is distinguishable and contrary to Supreme Court precedent.**

In holding that federal law does not preempt a so-called "pre-approval" design-defect claim, this Court followed *Guidry*, 206 F. Supp. 3d 1187 (E.D. La. 2016), to recognize the sort of "pre-approval" claim that *Yates* and *Utts* flatly rejected. Docs. 6196, 7110. But *Guidry* is distinguishable. Unlike *Yates* and this case, *Guidry* was decided on the pleadings rather than on summary judgment. *Compare Utts*, 226 F. Supp. 3d at 186 (dismissing design-defect claims, even on

---

[9] *See also, e.g.*, *Brazil*, 2016 WL 3748771, at *11 (holding that "pre-approval" design-defect theory "makes little sense in the face of the Supreme Court's precedents," which have "repeatedly characterized the state tort law at issue in this case as a duty to make changes or as a remedial effort"); *Fleming*, 186 F. Supp. 3d at 833 (rejecting claim that Defendants should have "design[ed] the drug differently before FDA approval").

the pleadings, "with prejudice, and without leave to amend").  And again unlike *Yates*, *Utts*, and this case, *Guidry* did not involve dosing-related claims, which go to the very heart of the medicine's design.[10]

In any event, *Guidry* is wrong on the merits for at least four reasons.  *First*, by the *Guidry* court's own admission, its decision was result-oriented.  The court there said that it viewed the preemption issue as presenting a "fundamental public policy question[]" and that it sought to avoid any "result" whereby "Louisiana plaintiffs will have no remedy against a drug manufacturer for a defect in a drug's design."  206 F. Supp. 3d at 1207.  But this type of result-oriented decision-making was improper because preemption is a pure question of law, governed by statutory and regulatory language, and the Supreme Court's preemption decisions make clear that public-policy considerations are for the political branches, not courts, to consider.  *See, e.g.*, *Bartlett*, 133 S. Ct. at 2478, 2480; *Mensing*, 564 U.S. at 625–26.[11]

*Second*, with respect to the governing "impossibility" issue, the *Guidry* court asked and answered the wrong question: "Can a drug manufacturer independently *design* a reasonably safe drug in compliance with its state-law duties before seeking FDA approval?  The answer is yes."

---

[10] It is not clear that a pre-approval duty even exists under state law in this context.  In construing a pre-approval design-defect claim under New York law, the Sixth Circuit in *Yates* found it difficult, if not impossible, "to conceive of any coherent pre-approval duty that [a manufacturer] would have owed to [the plaintiff] when designing [a prescription drug]."  808 F.3d at 300.  As in *Yates*, it is difficult to imagine any "coherent" duty that Defendants would have owed to Plaintiffs.  More fundamentally, no Texas or Louisiana state court has imposed a duty on prescription drug manufacturers in this context, and federal courts sitting in diversity "do not 'adopt innovative theories of recovery under state law.'"  *EMJ Corp. v. Hudson Specialty Ins. Co.*, 833 F.3d 544, 555 (5th Cir. 2016).  Imposing this sort of pre-approval duty on prescription drug manufacturers—and defining its contours—is "solely the prerogative" of the states' own courts.  *Bellum v. PCE Constructors, Inc.*, 407 F.3d 734, 742 (5th Cir. 2005); *see also Aldous v. Darwin Nat'l Assurance Co.*, 851 F.3d 473, 483 (5th Cir. 2017) ("As a federal court with diversity jurisdiction and an obligation to follow [state] law, innovation is verboten.").

[11] Moreover, the *Guidry* court was incorrect to assume that design-defect preemption forecloses all remedies against brand-name drug manufacturers.  Under *Levine*, where a manufacturer can "unilaterally" change its label pursuant to the "changes being effected" (or "CBE") regulation, failure-to-warn claims are not preempted.  *See Brazil*, 2016 WL 3748771, at *10–11 (finding design-defect claims against brand-name manufacturer preempted but failure-to-warn claims viable where CBE procedure available); *Barcal*, 2016 WL 1086028, at *3–5 (same); *Batoh*, 2016 WL 922779, at *17 (same).

16

206 F. Supp. 3d at 1207 (emphasis added).  But a manufacturer accomplishes no public-health objective by (and cannot be liable under state law for) merely "designing" a medicine.  Rather, the manufacturer must be able to obtain regulatory *approval* and *market* that medicine for consumer use.  And federal law "prohibits a drug from being introduced in interstate commerce unless the FDA approves the drug as safe and effective for each of the uses suggested on its labeling," *United States ex rel. King v. Solvay Pharms., Inc.*, __ F.3d __, 2017 WL 4003473, at *5 (5th Cir. Sept. 12, 2017) (citing 21 U.S.C. § 355(a)), a fact the *Guidry* court expressly acknowledged.  *See* 206 F. Supp. 3d at 1207 (recognizing that drug manufacturers "cannot independently *sell* pharmaceutical products without FDA approval" (emphasis added)).  Put simply, even if Defendants had a duty to redesign Xarelto before seeking FDA approval, the agency would still have had to approve any alternative design before it could be marketed.

The *Guidry* court sought to finesse this problem by "assum[ing] that the FDA would approve a safer, alternative design of a drug that it has already approved."  206 F. Supp. 3d at 1208.  But Supreme Court precedent expressly forbids that assumption, holding that preemption applies where the manufacturer can only "propose[]" a different product and must ultimately seek a federal agency's "permission" or "help" to discharge its state-law duty.  *Mensing*, 564 U.S. at 620–21 ("imagin[ing] that . . . the Federal Government *might* do something that makes it lawful for a private party" to satisfy a state-law duty "would make most conflicts between state and federal law illusory"); *id.* at 623–24 & n.8 (rejecting "the possibility of *possibility*" as sufficient to avoid preemption).  That is particularly true where, as the Supreme Court recognized, the drug approval process is so "onerous and lengthy," *Bartlett*, 133 S. Ct. at 2471, and agency approval is contingent not (as the *Guidry* court incorrectly assumed) exclusively on a particular medicine's safety profile, but rather on the agency's expert assessment that the drug strikes the proper balance between safety

*and* efficacy, *see* 21 C.F.R. § 314.105; *see also* 21 U.S.C. § 355(b).[12]  *Cf. Bartlett*, 133 S. Ct. at 2475 ("In the drug context, either increasing the 'usefulness' of a product or reducing its 'risk of danger' would require redesigning the drug . . . .").

*Third*, the *Guidry* court improperly found "guidance" about preemption of *design-defect* claims in the Supreme Court's statement in *Levine*—declining to find all *failure-to-warn* claims preempted—that FDA's labeling regulations do not "establish[] both a floor and a ceiling."  206 F. Supp. 3d at 1207 (quoting *Levine*, 555 U.S. at 573–74).  The Supreme Court's floor-ceiling metaphor cannot be so wrenched out of context.  Notably, the *Levine* decision makes clear that the metaphor pertains to "obstacle" preemption, not to the separate issue (presented here) of "impossibility" preemption.  *Cf. Levine*, 555 U.S. at 563–64 (distinguishing impossibility preemption and obstacle preemption as "two separate [conflict] preemption" theories).  More importantly, the *reason* that *Levine* held that compliance with FDA's *labeling* regulations does not necessarily preempt failure-to-warn claims is that those regulations *do not even purport to establish a "ceiling."*  Rather, as the Supreme Court repeatedly emphasized, in the circumstances presented there, the "changes being effected" (or "CBE") regulation—which applies uniquely to labeling changes— expressly "permitted Wyeth to unilaterally strengthen its warning."  *Levine*, 555 U.S. at 573.  That one fact—the CBE regulation's authorization of independent manufacturer action—dictated the outcome.  *See, e.g.*, *id.* at 562, 563, 568, 571, 572 (emphasizing that no-preemption decision turned on CBE's unique unilateral-change authorization).  Because "no such process exists for changes to" a drug's *design*, *Barcal*, 2016 WL 1086028, at *4—put simply, because there is no CBE option for major design changes—neither *Levine*'s holding nor its floor-ceiling metaphor applies in the design-defect context.  *Cf. Bartlett*, 133 S. Ct. at 2471.

---

[12] As noted above, less than 12% of candidate medicines ever achieve FDA approval, demonstrating the problem with the *Guidry* court's assumption.  *See supra* at 6.

*Finally*, *Guidry*'s rationale proves too much.  Not only does the decision render FDA's approval of a prescription medicine essentially meaningless, but it would eviscerate the Supreme Court's impossibility jurisprudence.  Under the court's reasoning, neither design-defect nor failure-to-warn claims would *ever* be preempted, as a plaintiff can always assert that the manufacturer could have (at least in theory) designed and sought approval of a "safer" medicine.  But courts cannot interpret "the Supremacy Clause to permit an approach to pre-emption that renders conflict pre-emption all but meaningless."  *Mensing*, 564 U.S. at 621.

\* \* \*

In effect, Plaintiffs' so-called "pre-approval" design-defect claim is based on a series of "ifs": perhaps Defendants *could* have proposed an alternative design for Xarelto before seeking FDA approval; then FDA *may* have approved it; and finally, Plaintiffs' alleged injuries *might* have been avoided.  But "the possibility of *possibility*" does not defeat preemption.  *Id.* at 624 & n.8.  Federal law—and binding Supreme Court precedent—bars the pre-approval design claim.

## II.   Federal law preempts Plaintiffs' theories that Xarelto is unreasonably dangerous because the medicine's FDA-approved dosages are too high or should be reduced and does not incorporate a monitoring test for dose adjustment.

Plaintiffs have alleged in their complaints, and their experts have offered opinions, that Defendants should have altered Xarelto's dosages or dosing regimen or incorporated a PT monitoring test *after* FDA approval.  To the extent that Plaintiffs here continue to pursue these claims, they are "clearly" preempted.  *Yates*, 808 F.3d at 298.  In fact, the majority of courts, including the court in *Guidry*, have recognized that under *Bartlett*, federal law preempts a claim that a manufacturer should have made a major change to a medicine's design *after* its approval by FDA.

Following careful deliberation about the safety and efficacy of different dosages, FDA approved Xarelto in particular strengths and doses for particular indications.  Plaintiffs nonetheless

challenge Xarelto's design on the grounds (1) that the approved dose is too high, (2) that the medicine should be dosed twice daily rather than once, and (3) that doctors should adjust patients' doses based on blood-monitoring tests.  All of Plaintiffs' dosing- and monitoring-related claims challenge the FDA-approved design of Xarelto and are preempted by federal law, which strictly forbids Defendants to make major changes to Xarelto's design—including by altering or adjusting approved dosages—without FDA's prior authorization.

### A.  Plaintiffs' dosing- and monitoring-related theories challenge Xarelto's FDA-approved design.

All of Plaintiffs' dosing- and monitoring-related theories challenge Xarelto's design, as approved by FDA to treat specific conditions.  Courts have recognized that such challenges to the "formulation" of a prescription drug are design-defect claims.  *See, e.g.*, *Yates*, 808 F.3d at 298–99 (under New York law, claim that defendants should have "changed the dosage level" of the drug was a design-defect claim); *Kruszka v. Novartis Pharm. Corp.*, 19 F. Supp. 3d 875, 897–98 (D. Minn. 2014) (under Minnesota law, claims regarding "duration and dose" were design-defect claims); *Wollens v. Merck & Co.*, No. 12-1408, 2012 WL 6504210, at *2 (E.D. La. Dec. 13, 2012) (under Louisiana law, claim that manufacturer should have used "lower dosage" was a design-defect claim).

The sole question (for this motion) is whether Defendants could have "independently" changed Xarelto's FDA-approved dosages or incorporated a monitoring test for dose adjustment in the way that Plaintiffs' state-law claims would require.  Because the answer to that question is no, Plaintiffs' dosing- and monitoring-related claims are preempted.

**B.     Plaintiffs' dosing- and monitoring-related theories are preempted by federal law, which categorically forbids Defendants to "independently" change Xarelto's design in the way Plaintiffs suggest.**

As already explained, under *Levine*, *Mensing*, and *Bartlett*, preemption depends on whether the defendant manufacturer can "independently" (or "unilaterally") take the action that a plaintiff's claim would require.  Here, the governing regulations make clear that Defendants may *not* independently change Xarelto's FDA-approved dosages or unilaterally incorporate a monitoring assay into the medicine's design, and analogous decisions hold that, in that circumstance, claims like those here are preempted.

**1.     Applicable FDA regulations prevent Defendants from independently changing Xarelto's FDA-approved dosage.**

Under governing FDA regulations, a pharmaceutical company may not independently— *i.e.*, without prior FDA approval—alter a medicine's approved dosages.  Indeed, the parties apparently agree about this uncontroversial regulatory fact.  *See, e.g.*, Parisian Dep. at 57–59 (Exh. 26) (testifying that, whatever a manufacturer may be able to do to strengthen its warnings, it *cannot* unilaterally change "the dose itself" or "the approved dosage").

***First***, FDA regulations make clear that any change to a drug's approved dosages renders an existing drug a "new" product, requiring fresh agency approval.  21 U.S.C. § 355(a).  Significantly, the implementing regulations explicitly define a new or different dosage as a new drug: "The newness of a drug may arise by reason (among other reasons) of . . . [t]he newness of a dosage . . . even though such drug when used in other dosage . . . is not a new drug."  21 C.F.R. § 310.3(h)(5); *see United States v. Baxter Healthcare Corp.*, 901 F.2d 1401, 1411 (7th Cir. 1990) (Section 310.3 "addresses the factors that may make a substance a 'new drug' subject to approval under 21 U.S.C. § 355").

*Second*, and to the same effect, the regulations specify that any "major change" to a medicine's approved application requires FDA's prior approval; a manufacturer may not effectuate such a change independently. 21 C.F.R. § 314.70(b). The regulations go on to define "major change" to include "any change in the drug substance, drug product, production process, quality controls, or facilities that has a substantial potential to have an adverse effect on the identity, *strength*, quality, purity, or potency of the drug product as these factors may relate to the safety or effectiveness of the drug product." 21 C.F.R. 314.70(b)(i) (emphasis added). The changes that Plaintiffs advocate directly affect Xarelto's FDA-approved "strength" for particular patients. *See* FDA, Orange Book, Preface, http://fda.gov/Drugs/DevelopmentApprovalProcess/ucm079068.htm (Exh. 27) ("*Strength* refers to the amount of drug substance (active ingredient) contained in, delivered, or deliverable from a drug product."); Drugs@FDA Glossary of Terms, http://www.fda.gov/drugs/informationondrugs/ucm079436.htm (Exh. 28) ("The *strength* of a drug product tells how much of the active ingredient is present in each dosage."). Indeed, reducing a medication's FDA-approved dose would be the quintessential "strength"-altering change. Plaintiffs' proposed changes fall squarely within the definition of "major change." *Accord* FDA, CDER, Guidance for Industry, *Changes to an Approved NDA or ANDA*, 2004 WL 3199016, at *10 (Apr. 2004) (defining "major change" as any change "that may affect . . . characteristics . . . of the dose delivered to the patient").[13]

Similarly, FDA regulations further specify that "major changes" include "changes in the qualitative or *quantitative formulation* of the drug product, including inactive ingredients, or in the specifications provided in the approved NDA." 21 C.F.R. § 314.70(b)(2)(i) (emphasis added). By

---

[13] Notably, this Guidance explains that it "ha[s] binding effect" to the extent that it "adjusts reporting categories"—*i.e.*, qualifies a change as a "major change"—under 21 C.F.R. § 314.70. 2004 WL 3199016, at *2 n.a1; *id.* at *3.

altering or adjusting the FDA-indicated dosages, the changes that Plaintiffs advocate would un-
doubtedly alter the "quantitative formulation of the drug product"—and, indeed, would alter the
medicine's *active* ingredients.

Plaintiffs' proposed changes to Xarelto's dosing regimen are "major" changes that require
prior FDA approval because they directly affect Xarelto's FDA-approved "strength" for particular
patients and the "quantitative formulation of the drug product." 21 C.F.R. § 314.70(b)(i), (b)(2)(i);
*see also id.* § 320.21(c) (requiring "supplemental application to FDA," supported by "evidence,"
for any "propose[d]" change "in product formulation or dosage strength, beyond the variations
provided for in the approved application"). Accordingly, the governing regulations make clear
that Defendants cannot "independently" change Xarelto's FDA-approved dosages, as Plaintiffs'
claims would require.[14]

### 2. Applicable FDA regulations prevent Defendants from independently incorporating a monitoring test into Xarelto's design.

Some of Plaintiffs' experts seem to contend that Xarelto is unreasonably dangerous unless
used in conjunction with a PT-monitoring test designed to equip doctors to assess risk and adjust
patients' doses, but they concede—as they must—that FDA has not approved any PT-monitoring
test for use with Xarelto.[15]

---

[14] Information on FDA's Drugs@FDA website confirms that when manufacturers intend to market new or different
dosage strengths for approved medications, they seek FDA's advance authorization, *see* Exh. 30 (approval letters for
new doses of various medications), and that when they fail to do so, FDA threatens enforcement action, *see* Exh. 31
(warning letters concerning promotional materials touting "unapproved dosing regimens" for various medications).

[15] *See, e.g.,* Rinder Dep. at 247–49 (Exh. 32); Plunkett Dep. at 403–04 (Exh. 33); Leissinger Generic Dep. (Nov. 15,
2016) at 184–85; Gosselin Dep. at 305–07 (Exh. 34); Cerri Dep. at 147, 268 (Exh. 35); Bussey Dep. at 257 (Exh. 36);
Ix Dep. at 316 (Exh. 37); *see also See also* FDA: Center for Devices and Radiological Health, Transcript, *In Vitro
Diagnostic Testing for Direct Oral Anticoagulants* at 9 (Oct. 26, 2015) ("Importantly, the DOAC drugs were approved
without a requirement for monitoring. So currently, manufacturers are developing devices to assess the effect or
concentration of direct oral anticoagulants. *There are currently no cleared or approved devices that measure that.*")
(Lea Carrington, Director, Division of Immunology and Hematology Devices) (emphasis added); Carrington presen-
tation, at 5 (same).

Several of Plaintiffs' experts focus on the Neoplastin PT test.  *See, e.g.*, Cuculich Rep. at 4; Rinder Rep. at 14; Kessler Rep. at 11; Gosselin Rep. at 22 (Exh. 29); Leissinger Rep. at 10.  But the Neoplastin PT test that Plaintiffs advocate is an *in vitro diagnostic* ("IVD") product regulated as a Class II medical device, and it is neither designed nor approved to monitor anticoagulation attributable to Xarelto or any other Factor Xa inhibitor.  To the contrary, FDA cleared Neoplastin as a Class II medical device for use as a "general screening procedure . . . to monitor patients receiving *coumarin* [*i.e.*, warfarin] therapy," 21 C.F.R. § 864.7750(a) (emphasis added), and Neoplastin's label states that PT "is commonly used for monitoring vitamin K antagonist therapy," Neoplastin Oct. 2013 USPI § 2 (Exh. 38).[16]  Plaintiffs have not pointed to—nor are Defendants aware of—any other PT test that has been approved or cleared by FDA for use in monitoring Xarelto- or Factor-Xa-related coagulation parameters.

To the extent that Plaintiffs contend that Xarelto is unreasonably dangerous because it should have been designed for use in conjunction with Neoplastin or any other PT-monitoring test, that claim is preempted.  Because neither Neoplastin nor any other PT-monitoring test has been cleared or approved by FDA for use with Xarelto, any recommendation for such use would require fresh agency approval.  *See* Guidance for Industry and Food and Drug Administration Staff: In Vitro Companion Diagnostic Devices ("IVD Guidance") (Aug. 6, 2014) at 10 (Exh. 39) ("If an IVD diagnostic device is already legally marketed and the IVD diagnostic device manufacturer intends to market its device for a new use as an IVD companion diagnostic device for a novel therapeutic product, FDA would likely consider the new use of the IVD diagnostic device with the novel therapeutic product as a new use for the device that would require an additional premarket

---

[16] Regardless of Neoplastin PT's availability as a "general screening procedure," incorporating the assay into Xarelto's design would be a change—like any major change to a medicine's design—requiring FDA's advance approval.

submission."); *see also* 21 C.F.R § 807.81(a)(3)(ii) (requiring new approval for any new "intended use" of FDA-cleared device); *id.* § 814.39(a) (same, for approval of a supplement for a new indication for previously approved device).[17]   Because Defendants cannot "independently" alter Xarelto's design to require coagulation monitoring through Neoplastin or any other PT-related test or assay—as such a change would require advance FDA approval—any claim based on their failure to do so is preempted.  *See Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 620.

> **3.    Analogous cases make clear that because Defendants cannot independently change Xarelto's FDA-approved dosage or alter Xarelto's design to incorporate monitoring for clinical purposes, Plaintiffs' dosing- and monitoring-related design theories are preempted.**

In *Bartlett*, the Supreme Court dealt specifically with the preemption of state-law, "post-approval" design-defect claims.  Although the case before it involved a generic company, the Court emphasized that the governing regulation (quoted above)—and thus the operative legal rule—applies to both brand-name and generic manufacturers: "Once a drug—*whether generic or brand-name*—is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product . . . or in the specifications provided in the approved application.'"   133 S. Ct. at 2471 (quoting 21 C.F.R. § 314.70(b)(2)(i)) (emphasis added).  That rule applies here precisely.  Once FDA approved Xarelto, Defendants were "prohibited from making" the very sorts of design changes that Plaintiffs advocate.  Accordingly, Plaintiffs' dosing-related claims are preempted under *Bartlett*.[18]

---

[17] To the extent Plaintiffs suggest that FDA guidance is not binding, courts have relied on FDA guidelines in determining whether a plaintiff's claims are preempted, particularly where, as here, the guidance is consistent with the "plain meaning of the statute" or the applicable regulations.  *See Thompson*, 993 F. Supp. 2d at 1014.

[18] Although *Bartlett* left open the question whether "absolute-liability" tort regimes—*i.e.*, those "in which liability does not reflect the breach of any duties," 133 S. Ct. at 2473–74 & n.1—could give rise to impossibility preemption, neither Texas nor Louisiana adheres to such a regime.  Rather, just as design-defect liability in New Hampshire "signal[ed] the breach of a duty," *id.* at 2473, liability in Texas and Louisiana requires proof that the manufacturer breached a duty to the plaintiff.  *See, e.g., Flock v. Scripto-Tokai Corp.*, 319 F.3d 231, 241 (5th Cir. 2003) (recognizing manufacturer's "duty to design a safe product" under Texas law) (citing *Am. Tobacco Co. v. Grinnell*, 951 S.W.2d 420, 432 (Tex. 1997)); *Bernard v. Ferrellgas, Inc.*, 689 So. 2d 554, 560 (La. Ct. App. 1997) (under Louisiana's risk-utility

The Sixth Circuit in *Yates* found that federal law preempted (just like here) *dosing-related* design-defect claims against a *brand-name drug manufacturer*. 808 F.3d at 298–300. There, the plaintiff claimed that the manufacturer should have designed its birth-control patch with .6 mg rather than .75 mg of estrogen. As to the plaintiff's claim that the manufacturer should have reduced the dosage *after* FDA had approved the .75 mg patch, the Sixth Circuit held (echoing *Bartlett*) that the claim was "clearly preempted by federal law" because "FDA regulations provide that once a drug, whether generic or brand-name, is approved, the manufacturer is prohibited from making any major changes to the 'qualitative or quantitative formulation of the drug product, including inactive ingredients, or in the specifications provided in the approved application.'" *Id.* at 298 (quoting 21 C.F.R. § 314.70(b)(2)(i)). "Based on the plain meaning of the regulation," the court wrote, the manufacturer "could not have altered the dosage of estrogen in [the patch] without submission to the FDA and the agency's 'approval *prior to* distribution of the product made using the change.'" *Id.* (quoting 21 C.F.R. § 314.70(b)(2)(i) (emphasis in *Yates*)). The court found it "clear" that "changing the dosage level of the active ingredient [in the patch] constitute[d] a 'major change,' such that prior FDA approval is necessary." *Id.* (quoting 21 C.F.R. § 314.70(b)(2)(i)'s statement that "'major changes' include 'changes in the qualitative or *quantitative formulation* of the drug product'") (emphasis in *Yates*). "Quite simply," the Sixth Circuit concluded, "federal law prohibited defendants from decreasing the dosage of estrogen post-approval." *Id.*

Similarly, the *Utts* court held that federal law preempted the plaintiffs' post-approval design-defect claims. 226 F. Supp. 3d at 185–86. Echoing *Bartlett* and *Yates*, the court held that

---

analysis, "the court must determine whether the manufacturer had a duty to [re]design the product"). Furthermore, Plaintiffs here have made clear what duties they contend state law imposes—a duty to re-design Xarelto (a) to have a different dosage strength or dosing regimen; (b) to require use alongside an adjunct test that would monitor Xarelto-related coagulation parameters; and (c) to incorporate a rivaroxaban-specific anti-Factor Xa assay and reversal agent. Accordingly, Plaintiffs' design-defect claims are of the type found to be preempted in *Bartlett*.

federal law preempted any claim that the manufacturers should have changed Eliquis' agency-approved design because under 21 C.F.R. § 314.70(b)(2)(i), "[t]he defendants had no ability to alter [the drug's] composition without prior approval of the FDA."[19]  *Id.* at 186.

* * *

Put simply, federal regulations prohibit Defendants from altering Xarelto's design after the medicine received FDA approval.  Because Defendants cannot "independently" make the dosing and monitoring changes that Plaintiffs contend state law requires—reducing the total daily Xarelto dose, dosing Xarelto twice daily throughout the treatment period, and adjusting doses according to the results of coagulation-monitoring measurements—Plaintiffs' dosing-and monitoring-related design-defect claims are preempted.[20]

## III.    Federal law preempts Plaintiffs' claim that Xarelto is unreasonably dangerous in the absence of a Xarelto-specific anti-Factor Xa assay.

Defendants could not have "independently" marketed a Xarelto-specific anti-Factor Xa assay, or incorporated such an assay into Xarelto's design, and, accordingly, this claim is preempted.

---

[19] *Yates* and *Utts* reflect a larger consensus.  A number of other post-*Bartlett* decisions have held that federal law preempts design-defect claims against brand-name manufacturers.  *See, e.g., Brazil*, 2016 WL 3748771, at *10 ("[a]ny claim . . . that [the manufacturer] should change the formulation of [the drug] is preempted"); *Barcal*, 2016 WL 1086028, at *3–5 (federal law preempted any claim that "would essentially require [the manufacturer] to redesign" an FDA-approved drug); *Batoh*, 2016 WL 922779, at *16–17 (federal law preempted claim alleging that manufacturer "could have altered the chemical composition" of its drug); *Booker*, 54 F. Supp. 3d at 873 ("it was impossible for [the manufacturers] to comply with both [their] state-law obligation to alter the drug's composition, and [their] federal-law duty not to do so"); *Thompson*, 993 F. Supp. 2d at 1011–13 (holding that federal law preempted a dosing-related claim against a brand-name pharmaceutical company).

[20] Although *Bartlett* left open the possibility that a manufacturer may in certain circumstances be able to discharge its design-defect obligations by strengthening its warning label, *see* 133 S. Ct. at 2479, that option is unavailable here for two reasons.  *First*, there is no "warning" that would remedy the dosing-related problems that Plaintiffs allege.  Those are "pure" design-defect claims, in the sense that the only "fix" for the alleged defects is a differently designed drug.  *Second*, and in any event, even if Plaintiffs could re-characterize their dosing-related claims in failure-to-warn (rather than design-defect) terms, they would be preempted because applicable FDA regulations make clear, in multiple re-spects—as Defendants explain in a separate motion for partial summary judgment—that federal law also preempts Plaintiffs' failure-to-warn claim.

To be clear, the anti-Factor Xa assay that Plaintiffs seem to envision would be an altogether separate product—in particular, a "medical device"—requiring separate FDA pre-approval (indeed, by a different division than the one that considers and approves drug products).[21]  *See* 21 U.S.C. § 360e(a), 360(k); 21 C.F.R. Part 809.  Although a company called Diagnostica Stago has formally engaged FDA to discuss approval of an anti-Factor Xa assay that is calibrated and controlled to Xarelto for use in the United States, FDA has not yet cleared *any* Xarelto-specific anti-Factor Xa assay (Stago's or otherwise) for *any* purpose.[22]

Absent that FDA approval, Defendants could not have acted "independently" to incorporate an anti-Factor Xa assay into Xarelto's design or otherwise to market such an assay.  As Defendants have explained, FDA's IVD Guidance makes clear that any use of a new IVD device (like the anti-Factor Xa assay) in conjunction with an existing drug product (like Xarelto) requires FDA's approval of *both* (1) the device and its labeling, specifying that it is to be used in conjunction with the drug product, *and* (2) an amendment to the drug's labeling specifying that it is to be used in conjunction with the device.  *See* IVD Guidance at 6, 8–9, 11–12.  That simple fact preempts Plaintiffs' anti-Factor-Xa-based claim.  *Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 624 (preemption attaches where "[t]he only action the [defendants] could independently take" is to "ask[] for the FDA's help").[23]

---

[21] Approval of the assay would fall to the Division of Immunology and Hematology Devices, Office of In Vitro Diagnostics and Radiological Health, in FDA's Center for Devices and Radiological Health.

[22] *See* Gosselin Dep. at 207:5–13 (agreeing that no "rivaroxaban-specific test [has] been cleared by the FDA"); Leissinger Generic Dep. (Nov. 15, 2016) at 184:6–16 ("I know that there is no recommended FDA-approved test" to measure Xarelto concentration or effect); Plunkett Dep. at 408:21–409:7 (agreeing that there are no FDA-cleared devices "that measure the effect or concentration of direct oral anticoagulants"); *id.* at 409:9–414:7 (acknowledging "that there has been an application" to FDA and answering questions about "FDA feedback" to Stago); Plunkett Dep. Exh. 13 (Extract of FDA Feedback: STA—Rivaroxaban Calibrator & Control) (Exh. 40); *see also* FDA: Center for Devices and Radiological Health, Transcript, *In Vitro Diagnostic Testing for Direct Oral Anticoagulants* at 9 (Oct. 26, 2015) ("There are currently no cleared or approved devices that measure [the effect or concentration of NOACs.]") (Lea Carrington, Director, Division of Immunology and Hematology Devices).

[23] To the extent Plaintiffs suggest that a Xarelto-specific anti-Factor Xa assay existed at the time of Xarelto's U.S. approval (and is now commercially available in Europe), had been tested, or was used by Defendants in the clinical

**IV.     Federal law preempts Plaintiffs' claim that Xarelto is unreasonably dangerous in the absence of a reversal agent.**

Several of Plaintiffs' experts contend that Xarelto is unreasonably dangerous because it was marketed without an antidote, or reversal agent.  *See, e.g.*, Liechty Rep. at 8 (asserting that the lack of a reversal agent "represents a significant hazard and danger with Xarelto use"); Cerri Rep. at 6 ("Using Xarelto puts these patients at great risk because there [is] . . . no reversal agent to treat emergent conditions."); Leissinger Generic Dep. (Nov. 15, 2016) at 52 (noting the lack of a reversal agent as one of the reasons patients should be taken off of Xarelto).  Federal law preempts that claim for the same reason that it preempts Plaintiffs' contention that Xarelto should have been designed for use with a monitoring test or assay—namely, that Defendants cannot "independently" (*i.e.*, without prior FDA approval) develop and market a reversal agent, or change Xarelto's design to incorporate the use of such an agent.  *See supra* at 19–29.

FDA approved Xarelto as safe and effective—and as an important addition to the anticoagulant market—despite the absence of a reversal agent, and without any requirement that Xarelto be marketed or used in conjunction with such an agent.  Indeed, the FDA-approved labeling explicitly warns that "[a] specific antidote for rivaroxaban is not available."  Nov. 2011 USPI § 5.2 (Risk of Bleeding); *see also* § 10 (Overdosage) (same).  Although a third party, Portola Pharmaceuticals, is currently working to develop a rivaroxaban-specific reversal agent, Plaintiffs and their experts have acknowledged—as they must—that no such agent has been approved by FDA for use in the United States.[24]

---

trials, this is irrelevant to preemption.  Rather, the only relevant question is whether Defendants could independently market or incorporate such an assay into Xarelto's design.  They cannot.

[24] *See* Portola Pharmaceuticals, News Release: Portola Pharmaceuticals Receives Complete Response Letter from FDA for Biologics License Application for AndexXa™ (Aug. 18, 2016), *available at* http://investors.portola.com/phoenix.zhtml?c=198136&p=irol-newsroomArticle&ID=2196085 (Exh. 41); Parisian Dep. at 480 (noting that the "FDA has not approved any potential [reversal agents]").

Defendants cannot "independently" market a reversal agent, or alter Xarelto's design to incorporate the use of such an agent because, as a separate product, the reversal agent would require separate FDA approval.  The particular rivaroxaban-specific reversal agent currently in development qualifies as a "biologic."  42 U.S.C. § 262(j); Portola (Exh. 41).  Under federal law, a manufacturer seeking to market a brand-name biologic must first submit to FDA a Biologic License Application, which FDA may approve only upon a determination that the product is "safe, pure, and potent."  42 U.S.C. § 262(a).  Because Defendants cannot "independently" market a reversal agent or change Xarelto's design to incorporate the use of such an agent—as such a change requires advance FDA approval—any claim based on their failure to do so is preempted.  *See Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 620.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants summary judgment on Plaintiffs' design-defect claim.

DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com
Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com
Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
Chanda.Miller@dbr.com


IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ *James B. Irwin*
James B. Irwin
Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com


*Attorneys for Janssen Defendants*

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *William Hoffman*
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com
Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com


BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ *Lindsey C Boney IV*
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
lboney@bradley.com


CHAFFE MCCALL L.L.P.
By: /s/ *John F. Olinde*
John F. Olinde
Chaffe McCall L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com


*Attorneys for Bayer Defendants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 21st day of September, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system and a copy of the proposed documents to be placed under seal sent to Plaintiffs' Liaison Counsel by email transmission.

*/s/     John F. Olinde*

32