UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO: | JUDGE ELDON E. FALLON |
| James Henry, et al. v. Janssen et al. Case No. 2:15-cv-00224 | MAGISTRATE NORTH |

### DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT ON PLAINTIFF'S CLAIMS FOR FAILURE TO WARN UNDER THE LEARNED INTERMEDIARY DOCTRINE

William Henry's prescribing physician, Dr. David McCain, testified that a different warning or instruction regarding Xarelto would not have changed his prescribing or treatment decision. Indeed, he testified that at all relevant times Xarelto's benefits uniquely outweighed the risk of Mr. Henry developing a debilitating or deadly stroke. Under these circumstances, on this record, the Defendants' motion for summary judgment should be granted.

Dr. McCain prescribed Xarelto to Mr. Henry because he was a "non-compliant alcoholic" who was at a significantly increased risk of stroke from his Atrial Fibrillation ("AFib") due to his unwillingness after "multiple chances" to follow blood monitoring and strict dietary guidelines for taking warfarin. Ex. A, McCain Dep. 45:3-16; 71:20-72:12, July 1, 2016. Dr. McCain testified that "it was extremely dangerous . . . to keep [Mr. Henry] on [warfarin] if he was not willing to comply with getting regular" tests to monitor coagulation levels and maintain strict adherence to dietary restrictions, which are necessary to stay within the warfarin therapeutic range. *Id.* at 66:3-8. Indeed, Mr. Henry had a blood clot on warfarin which caused him to lose his vision in one eye.

Plaintiff cannot prevail under the learned intermediary doctrine because Dr. McCain was aware of the risk of bleeding associated with Xarelto, discussed the risk with Mr. Henry, and

testified that he would make the same treatment decision today. Even after December 2012, when Mr. Henry experienced a bleeding event that was successfully treated, Dr. McCain continued to prescribe Xarelto to Mr. Henry because the benefits—including the lack of a monitoring requirement, less restrictive dietary guidelines, and a once-daily dosing regimen—outweighed the risk of bleeding. There is no evidence that a different warning or instruction to use a prothrombin time ("PT") test as a purported means to evaluate the risk of bleeding would have changed Dr. McCain's prescribing decision. Dr. McCain testified that, knowing everything he knows today—including additional information that Plaintiff now contends should have been included in the Xarelto label—he still would prescribe Xarelto for Mr. Henry (and keep him on the medicine) today. As a result, Plaintiff cannot prevail on his failure-to-warn claim as a matter of Texas law.

Similarly, Plaintiff's claims for alleged design defect fail because Texas does not recognize design defect claims involving prescription medicines as set forth in Defendants' Motion for Summary Judgment Under the Texas Product Liability Act ("TPLA"), and the case specific testimony of Dr. McCain confirms that Plaintiff's proposed twice-a-day dosing—as opposed to Xarelto's once-a-day regimen and anti-Factor Xa assay monitoring requirement—in contrast to Xarelto's lack of a monitoring requirement—would not have made a difference to his treatment decision and would not have been safer for Mr. Henry based on his non-compliance with instructions on the safe use of prescription medications.

For these and the following reasons, Defendants' Motion for Summary Judgment should be granted.

**FACTUAL BACKGROUND**

    A.    **Plaintiff's Claims and William Henry's Use of Xarelto.**

Plaintiff James Henry brought this action individually and on behalf of the estate of William Henry, alleging that, as a result of his use of Xarelto, Mr. Henry had a bleeding episode in December 2012 that was treated successfully. (Ex. B, Fifth Amended Plaintiff Fact Sheet ("Fifth Am. PFS") I.D.1.).[1] Plaintiff alleges claims for Negligence (Compl. ¶ 109 (Count 1)), Strict Products Liability (*id*. ¶ 120 (Count 2)), Breach of Express Warranty (*id.* ¶ 143 (Count 3)), Breach of Implied Warranties (*id.* ¶ 153 (Count 4), Fraudulent Misrepresentation (*id*. ¶ 164 (Count 5)), Fraudulent Concealment (*id*. ¶ 176 (Count 6)) and Fraud and Deceit (*id*. ¶ 187 (Count 7)).

Mr. Henry was diagnosed with AFib in 1985. (Ex. B, Fifth Am. PFS III.A.1.b.). AFib increases the risk of developing blood clots, which could lead to a serious thrombotic event, another stroke or heart attack. Mr. Henry was initially prescribed warfarin to reduce the risks associated with his AFib. (*Id.* at III.A.1.c.). In April, 2012, Dr. David B. McCain switched Mr. Henry to Xarelto because Mr. Henry was a "non-compliant alcoholic" who was at a significantly increased risk of stroke from his Afib due to his unwillingness after "multiple chances" to follow blood monitoring and strict dietary guidelines for taking warfarin. (*Id.* at I.C.; Ex. A, McCain Dep. 45:3-16; 71:20-72:12).

Xarelto is in a class of medications known as novel oral anticoagulants ("NOACs"). Xarelto was initially approved by the FDA in July, 2011. *See* Compl. ¶ 72. All NOACs carry an increased risk of bleeding and are intended to prevent patients from developing deadly clots. Dr. McCain knew and understood these risks. (*See* Ex. A, McCain Dep. at 35:16-22 ("Q. . . . you understood that one of the potential side effects of Xarelto was serious and fatal bleeding,

---

[1] Plaintiffs' claims are premised on an alleged failure to warn.

correct? A. Absolutely. Q. And that's true for all anticoagulation medications, correct? A. Yes, ma'am.")). Xarelto's FDA-approved labeling clearly and repeatedly warns of the risk of bleeding, mentioning the terms "bleed" or "bleeding" more than 90 times. (*See, e.g.*, Ex. C, Nov. 2011 USPI Highlights of Prescribing Information: Warnings and Precautions (warning of "serious or fatal bleeding"; *id.* § 5.2 (Warnings and Precautions) (same); *see id.* at Medication Guide (warning that "Xarelto can cause bleeding which can be serious, and rarely may lead to death")).

At the time Dr. McCain prescribed Xarelto, Mr. Henry had a multitude of underlying health conditions, including AFib, obesity, chronic obstructive pulmonary disease, hypertension, and a history of stroke affecting his left eye, as well as tobacco and alcohol abuse. (*See* Ex. B, Fifth Am. PFS V.H.; Ex. D, WHenry-HMC-MD-132, 133, 254-257). Mr. Henry also was taking many different prescription medications to treat his various health conditions including aspirin and Naprosyn/Naproxen, both of which also increased his risk of bleeding. (Ex. E, WHenry-EHHNCT-1405-1407, 1438-1443, 1467, 1484-1487, 1532-1546, 1553-1557).

B.   **Dr. McCain's Prescription Decision.**

Dr. McCain changed Mr. Henry from warfarin to Xarelto because Mr. Henry had a long history of failing to comply with the requirements for the safe use of warfarin. (Ex. F, Henry-WMP-MedBill-00002 to 00004). While taking warfarin, Mr. Henry had a cerebral vascular event in his left eye that left him partially blind. (Ex. A, McCain Dep. 75:14-16 ("So yes, that's – we've now established that he had a [cerebral vascular accident] with left eye blindness.")). Dr. McCain testified that he and other doctors have "waited for 50 years for [NOACs] to be brought to the market" because "[w]arfarin is a very difficult drug to manage, for patients and for

physicians." *Id*. at 32:18-22.  Dr. McCain explained that Mr. Henry repeatedly failed to comply with his instructions regarding warfarin use:

> A. But, I mean, I'll just state for the record, Mr. you know, William Howard Henry was a noncompliant alcoholic, and I gave him multiple chances, and he – and he was a likeable individual, but I think we can cut to the chase that he was a noncompliant alcoholic.
>
> Q. And so under those circumstances, when you wanted to treat his atrial fibrillation and reduce his risk of stroke, when Xarelto came on the market, it was a good choice for a patient like Mr. Henry –
>
> A. That is –
>
> Q. – based on your experience?
>
> A. That is correct.
>
> Q. Okay.
>
> A. Which is why I put him on it.

*Id.* at 71:20-72:12.  Due to Mr. Henry's non-compliance with the warfarin requirement to monitor coagulation levels and maintain a strict diet, Dr. McCain believed that in his medical judgment Xarelto was a better treatment option and that once-a-day dosing with no blood testing was very important to the safe and effective treatment of Mr. Henry.  *Id.* at 81:17-25 ("To me, compliance was a major issue with him. So once-a-day dosing was attractive. Once-a-day dosing with no testing was attractive."); *id.* at 96:23-97:7 ("I knew [Xarelto] was equivalent to [warfarin] and easier to use, and that's a huge attraction to me . . . And, plus, with [Mr. Henry's] historical issues, that was very beneficial to me and to him."); *id.* at 85:7-24. ("A. . . . And so basically, based – trying to practice evidence-based medicine, you try to follow those guidelines. It does have to be tailored to each individual patient. If you want specific issues of how I treat atrial fibrillation, you'd almost have to give me a patient to treat."); *id.* at 58:11-14 ("Q. For

somebody like Mr. Henry, once a day was better than twice a day?  A. For every patient once a day is better than twice a day.").

In prescribing Xarelto for Mr. Henry, Dr. McCain followed the label's direction to weigh the risk of bleeding against the risk of thrombotic events, as reflected in the "CHADS-VASc" score—a metric that evaluates a patient's risk of stroke and other embolic events.  At the time that Dr. McCain prescribed Mr. Henry Xarelto, Mr. Henry's CHADS-VASc score was 7, which placed him at a much higher risk of a stroke: "It puts him at very high risk. It puts him at the much higher end risk. The CHADS-VASc2 score goes to 9, and so a risk of 7 puts him at the much higher end risk of systemic embolic events, be it stroke or embolus to anywhere." *Id*. at 77:13-23. Dr. McCain believed that with a CHADS-VASc score that high, Mr. Henry had a 15% to 18% chance per year of having a stroke or embolus. *Id.* at 77:24-78:4.

Throughout the time that Dr. McCain prescribed Xarelto to Mr. Henry, he was satisfied that the benefits of Xarelto outweighed the risks:

> Q. Okay. And you note that Mr. Henry had problems with compliance on Coumadin, and you were going to give him a trial of Xarelto –
>
> A. Correct.
>
> Q. Correct? And you were satisfied at that time and at all times when you were treating Mr. Henry, that the benefits of Xarelto for him outweighed the risks?
>  A. I felt that way.
>
> Q. And do you still feel that way today?
>
> A. Yes.

*Id.* at 73:15-25.  Even after Mr. Henry experienced a bleeding event in December 2012, Dr. McCain believed that Xarelto remained an appropriate medicine for Mr. Henry and resumed his treatment on Xarelto:

> A. . . . [O]ur standard of care practice is once the GI doctor says, hey, the situation is resolved – and I'm again presuming from my – my conversation with Dr. Reynolds, if it truly was all internal hemorrhoids, that's obviously not necessarily life threatening. And so typically once the problem has resolved, yes, we will resume anticoagulation regardless of the type, because their risk of stroke is so high compared to their risk of bleeding.

*Id.* at 80:17–81:2.  Dr. McCain believed that the benefits of Xarelto still outweighed the risks for Mr. Henry and continued to prescribe Xarelto to Mr. Henry until July, 2014.  *Id.* at 81:6-15.  From September 2, 2014 until December 1, 2014 another physician, Dr. Jarrell P. Reynolds, continued Mr. Henry on Xarelto.  *Id.*  Dr. Reynolds believed that Xarelto continued to be a proper choice for Mr. Henry.  (Ex. G, Reynolds Dep. 36:1-10, July 29, 2016).  After Mr. Henry consulted a lawyer and filed this lawsuit, he stopped staking Xarelto and went back to warfarin.  *Id.* at 120:14-124:1.

> C. **Dr. McCain understood that Xarelto presented a risk of bleeding and, given Mr. Henry's condition, would make the same treatment decision today.**

Before prescribing Xarelto, Dr. McCain read the Xarelto label.  (Ex. A, McCain Dep. 35:9-19).  He understood that one of the potential side effects was serious or fatal bleeding.

> Q. . . . [A]nd the package insert states that "Xarelto increases the risk of bleeding and can cause serious or fatal bleeding. In deciding whether to prescribe Xarelto to patients at increased risk of bleeding, the risk of thrombotic events should be weighed against the risk of bleeding." This was something you knew at the time you first prescribed Xarelto to Mr. Henry, correct?
>
> A. Correct.

*Id.* at 37:8-18; *see id.* at 35:13-19 ("Q. At the time you fist prescribed Xarelto . . . for Mr. Henry, you understood that one of the potential side effects of Xarelto was serious and fatal bleeding, correct? A. Absolutely.").  Dr. McCain also was aware that there is an increased risk of bleeding for patients—like Mr. Henry—who concomitantly use NSAIDs or aspirin.  *Id.* at 38:12-22.  He was also aware that there was no reversal agent for Xarelto.  *Id.* at 37:19–38:1.  The label clearly

7

reflected his understanding.  (*See* Ex. C, Nov. 2011 USPI Highlights of Prescribing Information: § 5.2 Warnings and Precautions).

It is Dr. McCain's practice to explain to his patients the risk of medications like Xarelto, and he typically informs his patients "that [their] risk of stroke or systemic emboli is much higher than [their] risk of bleeding, therefore, you know, take your medicine." (Ex. A, McCain Dep. 83:1-9).  Dr. McCain testified that he had a detailed discussion with Mr. Henry about medication risks and compliance issues:

> A. Do I go over risks and things to do and things to avoid?  Yes, I do.
>
> Q. Okay.  And did you do that with Mr. Henry when you first prescribed Xarelto for him?
>
> A. I probably would have done it more diligently with Mr. Henry because of his history, but also because it was a new drug at the time.
>
> Q. Okay.  When you say "because of his history," what do you mean?
>
> A. Of compliance.
>
> Q. Okay. What about his history of compliance would cause you to do that?
>
> A. It would be non-compliance.

*Id.* at 41:8-22.

Plaintiff's counsel questioned Dr. McCain about certain studies and literature that were allegedly omitted from the label, but Dr. McCain unequivocally testified that none of the information presented to him during the deposition would have made a difference in his treatment and decision to prescribe Xarelto for Mr. Henry: "It would not have altered my decision process[.]"  *Id.* at 206:4-21.  When asked, after all of the questioning from Plaintiff's counsel, "knowing what you know today, do you still believe that it was a medically appropriate

8

decision to prescribe Xarelto to Mr. Henry," Dr. McCain unequivocally stated "I do." *Id.* at 248:23–249:2.

\* \* \*

In summary, Dr. McCain's decision to prescribe Xarelto for Mr. Henry—and to keep him on Xarelto—was based on the gravity of Mr. Henry's condition and his inability to safely use warfarin. Dr. McCain concluded that Xarelto's benefits outweighed those risks and even knowing all that he knows today—including information that Plaintiff now says should have been included in Xarelto's label—he would make the same treatment decision. There is no evidence that a different label would have changed Dr. McCain's decision to treat Mr. Henry with Xarelto.

## **LEGAL STANDARD**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgement as a matter of law." Fed. R. Civ. P. 56(a). "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which the party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). The moving party need not negate the elements of the opposing party's case; it is enough to show that the opposing party cannot satisfy an element of his or her claim. *Bayle v. Allstate Ins. Co.*, 615 F.3d 350,355 (5th Cir. 2010). A fact is material only if its resolution would affect the outcome of the action. *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009). Alleged "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 248 (1986). Summary judgment is required if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to his or her case on which he or she bears the burden of proof at trial. *Celotex Corp.*, 477 U.S. at 322.

## ARGUMENT

**I. Plaintiff's failure-to-warn-or-instruct claim fails because he cannot prove that a different warning would have prevented the alleged harm.**

Under the learned intermediary doctrine adopted in Texas, Plaintiff cannot satisfy his burden to prove that a different warning would have changed Mr. Henry's physician's decision to prescribe (and keep him on) Xarelto, and therefore the failure-to-warn-or-instruct claim fails as a matter of law.

Texas has adopted the "learned intermediary" doctrine, which holds that "a prescription manufacturer fulfills its duty to warn end users of its product's risks by providing adequate warnings to the intermediaries who prescribe the drug and, once filled, it has no further duty to warn the end user directly." *Centocor, Inc. v Hamilton*, 372 S.W.3d 140, 157 (Tex. 2012). The rationale underlying the learned intermediary doctrine is that "a patient-purchaser's doctor stands between the patient and the manufacturer, professionally evaluating the patient's needs, assessing the risks and benefits of available drugs, prescribing one, and supervising its use." *Ackermann v. Wyeth Pharm.*, 526 F.3d 203, 207 (5th Cir. 2008).

To prevail on a claim for alleged failure to warn or instruct under the learned intermediary doctrine, Plaintiff must prove (1) that Defendants failed to adequately warn the prescribing physicians of a risk associated with the use of a medication that was not otherwise known to the physicians, and (2) that the inadequate warning or instruction was a producing cause of Mr. Henry's alleged injury. *See id.* at 208; *see also Wyeth-Ayerst Labs. Co. v. Medrano*, 28 S.W.3d 87, 95 (Tex. App. 2000) ("[A] plaintiff must show that a proper warning would have

changed the decision of the intermediary to prescribe the product."); *Pustejovsky v. Pliva, Inc.*, 623 F.3d 271, 276 (5th Cir. 2010) (finding that plaintiff did not carry its burden to show that an inadequate warning was the producing cause of plaintiffs injuries). To carry this burden, Plaintiff must prove that a different warning would have changed Mr. Henry's prescribing physician's decision to prescribe (and maintain Mr. Henry on) Xarelto. *Ackermann*, 526 F.3d at 208 ("[B]ut for the inadequate warning, the treating physician would not have used or prescribed the medication.").

"[W]hen the prescribing physician is aware of the product's risks and decides to use it anyway, any inadequacy of the product's warning, as a matter of law, is not the producing cause of the patient's injuries." *Centocor*, 372 S.W.3d at 170 (citing *Stewart v. Janssen Pharmaceutica, Inc.*, 780 S.W.2d 910, 912 (Tex. App. 1989); *Ethicon Endo–Surgery, Inc. v. Meyer,* 249 S.W.3d 513, 516 (Tex. App. Ct. 2007); *Ebel v. Eli Lilly & Co*., 321 F. App'x. 350, 356 (5th Cir. 2009) ("If . . . the physician was aware of the possible risks involved in the use of the product but decided to use it anyway, the adequacy of the warning is not a producing cause of the injury and the plaintiff's recovery must be denied" (quoting *Ackermann*, 526 F.3d at 208)); *Smith v. Johnson & Johnson*, Inc., 483 F. App'x 909, 914–15 (5th Cir. 2012) ("Because the plaintiffs have provided no evidence showing that there were risks of which Dr. Barksdale was unaware, they have not raised an issue of material fact as to whether a more detailed warning would have prevented Dr. Barksdale from using Mersilene mesh.").

As the Texas Supreme Court held in *Centocor*, "[b]ecause [plaintiff's] prescribing physicians were aware of the potential risk of contracting lupus-like syndrome but chose to prescribe it in spite of those risks, and because the [plaintiff] failed to present any evidence that including additional post-approval reports in the warning would have caused [plaintiff's]

11

physicians to change their prescription, the [plaintiffs] failed to meet their burden of proof." *Centocor*, 372 S.W.3d at 170.

Here, Plaintiff cannot prevail on his claim that the Xarelto label was inadequate because it failed to warn of the risk of bleeding or that the label failed to instruct Mr. Henry's prescribing physician to perform a PT test. Dr. McCain's testimony clearly shows that a different warning or instruction would not have changed his prescription decision.

### A. Dr. McCain was aware of the risk of bleeding and continued to prescribe Xarelto after Mr. Henry's bleeding event.

Here, at the time that Dr. McCain prescribed Xarelto to Mr. Henry, he was aware of the risk of bleeding based on his education, training, experience, and review of the labeling and other literature. Ex. A, McCain Dep. 35:9-19 (Dr. McCain read the package insert); *id*. at 99:7–100:3 ("Q. Okay. Now, you've talked a lot about the medical literature. Are there journals, specific journals that you read regularly? A. I read a lot of excerpted material. So, in other words, we have – we have various things that compile journals. I get a lot of stuff from Doximity . . . . And so, yeah, I read a lot of these ones that compile and excerpt a lot of things, and if they piqued my interest, I go and get the original and review it. So I can't – I read JAC, which is Journal of American Cardiology. I read New England Journal of Medicine or excerpts from that. I lead JAMA . . . I read Interventional Cardiology. I read Cath Lab Digest. That's a smattering of what I read."). He discussed this risk with Mr. Henry and, indeed, reinforced the risk because of Mr. Henry's non-compliance with warfarin's strict use requirements and his inability to stay within a therapeutic range due to his lifestyle choices. *Id.* at 41:8-15 ("A. Do I go over risks and things to do and things to avoid? Yes, I do. Q. Okay. And did you do that with Mr. Henry when you first prescribed Xarelto for him? A. I probably would have done it more diligently with Mr. Henry . . . .").

Even after Mr. Henry experienced bleeding, Dr. McCain continued to prescribe Xarelto to Mr. Henry because the benefits outweighed the risk of bleeding. Dr. McCain testified:

> A. . . . And so typically once the problem has resolved, yes, we will resume anticoagulation regardless of the type, because their risk of stroke is so high compared to their risk of bleeding.

*Id.* at 80:23–81:2.

Plaintiff's counsel's questioning at Dr. McCain's deposition focused on various studies and literature regarding the risk of bleeding that Plaintiff alleges should have been included in the Xarelto label. But when asked about all of the cherry-picked studies and data, Dr. McCain testified that he stood behind his decision to prescribe Xarelto. When asked about a study explaining the risk of bleeding with combination use of Xarelto and aspirin, Dr. McCain responded, "[i]t would not have altered my decision process . . . ." *Id.* at 206:4-21. Dr. McCain continues to believe that—at all times—the benefits of Xarelto outweighed the risks for Mr. Henry. *Id.* at 73:19-25. Dr. McCain testified as follows:

> Q. [K]nowing what you know today, do you still believe that it was a medically appropriate decision to prescribe Xarelto to Mr. Henry?
>
> A. I do.

*Id.* at 248:23-249:2.

Accordingly, Plaintiff's claim that the Xarelto label failed to include a different warning regarding the risk of bleeding fails as a matter of law.

### B. There is no evidence that a recommendation to monitor PT levels would have changed Dr. McCain's prescribing decision.

Nor can Plaintiff prevail on a claim that the Xarelto label should have instructed Dr. McCain to perform a PT test on Mr. Henry. Dr. McCain believed that Xarelto's lack of a monitoring requirement made Xarelto a better medicine for Mr. Henry. Ex. A, McCain Dep.

13

45:3-16. Even if, as Plaintiff alleges, a monitoring requirement would have revealed information about Mr. Henry's risk of bleeding, Dr. McCain still prescribed Xarelto after Mr. Henry experienced bleeding—and would do so again today.  Because Dr. McCain continued to prescribe Xarelto after Mr. Henry's bleed, there is no evidence that use of a PT test to assess Mr. Henry's risk of bleeding would have changed Dr. McCain's treatment and prescription decision. Dr. McCain testified that at all times, the benefits of Xarelto uniquely outweighed the risks for Mr. Henry because he was non-compliant on warfarin, which put him at an increased risk of a stroke or embolic event.  *Id.* at 73:19-25; *see also id.* at 81:17-25 ("A. To me, compliance was a major issue with him. So once-a-day dosing was attractive. Once-a-day dosing with no testing was attractive.").

Accordingly, Plaintiff cannot satisfy his burden to prove that a different warning or instruction would have changed Dr. McCain's treatment or prescribing decision for Mr. Henry, and therefore his failure-to-warn-or-instruct claim should be dismissed.

**II.     Plaintiff's design-defect claim fails because Mr. Henry's prescribing physician confirmed that Xarelto's lack of a monitoring requirement and once-a-day dosing were safer because of Mr. Henry's warfarin non-compliance.**

For the reasons set forth in Defendants' Motion for Summary Judgment under the TPLA, Plaintiff cannot prevail on a claim for design defect as a matter of law because Texas does not recognize such as a claim. But even if this Court were to recognize such a claim, the Texas Supreme Court has held that a plaintiff cannot prove a design defect by claiming that the defendant should have sold an entirely different product.  *See Brockett v. Wyeth*, 287 S.W. 3d. 760 (Tex. Ct. App. 2009), (citing *Caterpillar v. Shears,* 911 S.W.2d 379, 384–85 (Tex. 1993)). Here, Plaintiff cannot prevail any alleged design-defect claims—Plaintiff alleges that Xarelto should have had a different dosing design or been sold with an anti-Factor Xa assay and a

14

reversal agent—because those different designs would not have prevented Mr. Henry's alleged injuries. To prevail on any alleged design-defect claim, a plaintiff must prove that an alternative design would have avoided his injuries. *Id.* Mr. Henry's prescribing physician testified that Plaintiff's proposed alternate-design theories—twice-a-day dosing and monitoring coagulation status with an anti-Factor Xa assay—would not have been safer for Mr. Henry because he was non-compliant with warfarin and repeatedly failed to undergo the required testing for warfarin— *i.e.*, he needed a once-daily medicine that would make him more likely to be compliant. Ex, A, McCain Dep. 45:3-16; 71:20–72:12.

Accordingly, there is no evidence that Plaintiff's proposed alternative designs would have avoided Mr. Henry's injuries. To the extent that the Court rules that a design-defect claim is permissible under Texas law, that claim fails here on under these facts.

## CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment should be granted.

| | |
|---|---|
| DRINKER BIDDLE & REATH LLP | ARNOLD & PORTER KAYE SCHOLER LLP |
| By: /s/ *Susan M. Sharko* <br> Susan M. Sharko <br> Drinker Biddle & Reath LLP <br> 600 Campus Drive <br> Florham Park, NJ 07932-1047 <br> Telephone: (973) 549-7000 <br> susan.sharko@dbr.com | By: /s/ *William Hoffman* <br> William Hoffman <br> ARNOLD & PORTER KAYE SCHOLER LLP <br> 601 Massachusetts Ave., NW <br> Washington, D.C. 20001 <br> Telephone: (202) 942-5000 <br> william.hoffman@apks.com |
| Rodney M. Hudson <br> DRINKER BIDDLE & REATH LLP <br> 50 Fremont Street, 20th Floor <br> San Francisco, CA 94105-2235 <br> Telephone: (415) 591-7500 <br> Rodney.hudson@dbr.com | Andrew K. Solow <br> Steven Glickstein <br> ARNOLD & PORTER KAYE SCHOLER LLP <br> 250 West 55th Street <br> New York, New York 10019-9710 <br> Telephone: (212) 836-8485 <br> andrew.solow@apks.com <br> steven.glickstein@apks.com |

Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
Chanda.Miller@dbr.com

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ *James B. Irwin*
James B. Irwin
Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

*Attorneys for Janssen Defendants*

BRADLEY ARANT BOULT CUMMINGS LLP

By: */s/ Lindsey C Boney IV*
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
lboney@bradley.com

CHAFFE MCCALL L.L.P.
By: /s/ *John F. Olinde*
John F. Olinde
Chaffe McCall L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer Defendants*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 21st of September, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system and a copy of the proposed documents to be placed under seal sent to Plaintiffs' Liaison Counsel by email transmission.

                                                          */s/ James B. Irwin*