**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO: | JUDGE ELDON E. FALLON |
| James Henry, et al. v. Janssen et al. Case No. 2:15-cv-00224 | MAGISTRATE NORTH |
| Harriet Ibanez, et al. v. Janssen et al. Case No. 2:14-cv-02669 | |

**DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT**
**ON THE GROUND THAT FEDERAL LAW PREEMPTS PLAINTIFFS'**
**FAILURE-TO-WARN OR INSTRUCT CLAIM**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

STATEMENT OF RELEVANT FACTS ........................................................................... 4

LEGAL FRAMEWORK ................................................................................................... 11

ARGUMENT ..................................................................................................................... 13

    I.      Plaintiffs' claims that the Xarelto label should have recommended use of
          Neoplastin PT is preempted as a matter of law ................................................... 13

          A.     Plaintiffs' failure-to-warn claim is preempted because Defendants
                 could not "unilaterally" change Xarelto's labeling to recommend
                 an "off-label" use of the Neoplastin PT test ............................................. 14

          B.     There is clear evidence FDA would not have approved Plaintiffs'
                 proposed labeling change regarding use of Neoplastin PT ...................... 17

                1.     "Clear evidence" shows that FDA would have rejected—
                       and in fact did reject—a proposal to add PT language to
                       Xarelto's label ............................................................................ 17

                2.     Plaintiffs' claim is preempted because there is no "newly
                       acquired  information" that would have allowed Defendants
                       to unilaterally  change the Xarelto label to include PT
                       language ...................................................................................... 20

          C.     Because Defendants could not "independently" add any
                 "monitoring recommendations" to Xarelto's label—regarding
                 Neoplastin PT or otherwise—Plaintiffs' claim based on their
                 failure to do so is preempted .................................................................... 23

    II.     Plaintiffs' claims regarding bleeding risks also are preempted for the
          reasons explained in Defendants' prior motions for summary judgment ........... 25

          A.     Plaintiffs' claim that Xarelto's label should have included a
                 warning about the impact of recall of the INRatio device on
                 ROCKET AF is preempted as a matter of law ........................................ 25

          B.     Plaintiffs' claims that the Xarelto label should have included
                 subgroup data from ROCKET AF earlier is preempted as a matter
                 of law ........................................................................................................ 27

          C.     Plaintiffs' claims that the Xarelto label should have included a
                 black box warning is preempted as a matter of law ................................. 29

CONCLUSION .................................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Ackerman v. Wyeth Pharms.*,
   526 F.3d 203 (5th Cir. 2008) ................................................................30

*Amos v. Biogen Idec Inc.*,
   28 F. Supp. 3d 164 (W.D.N.Y. 2014) ...................................................13

*In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*,
   817 F. Supp. 2d 535 (E.D. Pa. 2011) ....................................................30

*Barcal v. EMD Serono, Inc.*,
   No. 5:14-cv-01709-MHH, 2016 WL 1086028 (N.D. Ala. Mar. 21, 2016) ............................13

*Batoh v. McNeil-PPC, Inc.*,
   167 F. Supp. 3d 296 (D. Conn. 2016) ...................................................13

*Booker v. Johnson & Johnson*,
   54 F. Supp. 3d 868 (N.D. Ohio 2014) ..................................................13

*Brazil v. Janssen Research & Development LLC*,
   196 F. Supp. 3d 1351 (N.D. Ga. 2016) ................................................13

*Buckman Co. v. Plaintiffs' Legal Committee*,
   531 U.S. 341 (2001)..................................................................15, 27

*Estate of Cassel v. Alza Corp.*,
   No. 12-CV-771-WMC, 2014 WL 856023 (W.D. Wis. Mar. 5, 2014) ...................................13

*In re Celexa & Lexapro Mktg. & Sales Practices Litig.*,
   779 F.3d 34 (1st Cir. 2015)...................................................13, 20, 21

*Cerveny v. Aventis, Inc.*,
   855 F.3d 1091, 1105 (10th Cir. 2017) ..................................................18

*Christison v. Biogen Idec Inc.*,
   199 F. Supp. 3d 1315, 1347-48 (D. Utah 2016) ...........................................17, 18

*Clark v. Pfizer, Inc.*,
   990 A.2d 17 (Pa. Sup. Ct. 2010) ........................................................15

*In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*,
   756 F.3d 917 (6th Cir. 2014) .............................................................13

*In re Depakote*,
    87 F. Supp. 3d 916, 922 (S.D. Ill. 2015)......................................................................18

*Dobbs v. Wyeth Pharm.*,
    797 F. Supp. 2d 1264 (W.D. Okla. 2011) ...................................................................18

*Fleming v. Janssen Pharmaceuticals, Inc.*,
    186 F. Supp. 3d 826 (W.D. Tenn. 2016)......................................................................13

*In re: Fosamax (Aldendronate Sodium) Prods. Liab. Litig.*,
    852 F.3d 268 (3d Cir. 2017)..........................................................................................18

*Freightliner Corp. v. Myrick*,
    514 U.S. 280 (1995).......................................................................................................11

*Gavin v. Medtronic*,
    2013 U.S. Dist. LEXIS 101216 (E.D. La. 2013) .........................................................15

*Geier v. Am. Honda Motor Co.*,
    529 U.S. 861 (2000).......................................................................................................11

*In re Incretin-Based Therapies Prods. Liab. Litig.*,
    142 F. Supp. 3d 1108, 1131 (S.D. Cal. 2015).............................................................22

*In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Products
    Liability Litigation*,
    185 F. Supp. 3d 761 (D. S.C. 2016)..............................................................................21

*Lofton v. McNeil Consumer & Specialty Pharm.*,
    672 F.3d 372 (5th Cir. 2012) ........................................................................................27

*Matrixx Initiatives, Inc. v. Siracusano*,
    563 U.S. 27 (2011).........................................................................................................23

*Mutual Pharmaceutical Co. v. Bartlett*,
    133 S. Ct. 2466 (2013)...........................................................................................*passim*

*Newman v. McNeil Consumer Healthcare*,
    No. 10-CV-01541, 2012 WL 39793 (N.D. Ill. Jan. 9, 2012)...............................18, 19

*PLIVA, Inc. v. Mensing*,
    564 U.S. 604 (2011)................................................................................................*passim*

*Rheinfrank v. Abbott Labs.*,
    119 F. Supp. 3d 749, 766 (S.D. Ohio 2015) ...............................................................18

*Rheinfrank v. Abbott Labs., Inc.*,
    137 F. Supp. 3d 1035 (S.D. Ohio 2015) ......................................................................13

*Seufert v. Merck Sharp & Dohme Corp.*,
   187 F. Supp. 3d 1163, 1173 (S.D. Cal. 2016)................................................18, 27

*Thompson v. Allergan USA, Inc.*,
   993 F. Supp. 2d 1007 (E.D. Mo. 2014)...................................................................13

*Utts v. Bristol-Myers Squibb Co.*,
   __ F. Supp. 3d ___, MDL No. 2754, 2017 WL 1906875 (S.D.N.Y. May 8,
   2017) ...............................................................................................................2, 22, 23

*Wyeth v. Levine*, 555 U.S. 555 (2009) ............................................................... *passim*

*Yates v. Ortho-McNeil-Janssen*,
   808 F.3d 281 (6th Cir. 2015) ................................................................................13

## STATUTES, RULES & REGULATIONS

21 C.F.R. pt. 314...........................................................................................................16

21 C.F.R. §§ 201.5........................................................................................................15

21 C.F.R. §§ 201.128....................................................................................................15

21 C.F.R. § 201.56(a)(3)...............................................................................................17

21 C.F.R. § 201.56(b)....................................................................................................30

21 C.F.R. § 201.57(a)....................................................................................................24

21 C.F.R. § 201.57(a)(7)...............................................................................................24

21 C.F.R. § 201.57(c)(1)..........................................................................................29, 30

21 C.F.R. § 201.57(c)(6)(iii).........................................................................................16

21 C.F.R. § 201.80(e)....................................................................................................29

21 C.F.R. § 314.3(b)......................................................................................................20

21 C.F.R. § 314.70(A)...................................................................................................23

21 C.F.R. § 314.70(b)(2)(v)(C).....................................................................................24

21 C.F.R. § 314.70(c)(6)(iii).............................................................................20, 23, 24

21 C.F.R. § 314.80........................................................................................................23

21 C.F.R. § 314.80(a)....................................................................................................23

21 C.F.R. § 314.80(l) ........................................................................................................23

21 C.F.R. § 807.81(a)(3)(ii) ..............................................................................................17

21 C.F.R. § 814.39(a) .........................................................................................................17

21 C.F.R. § 864.7750(a) ....................................................................................................14

44 Fed. Reg. 37434, 37448 (June 26, 1979) ...................................................................30

51 Fed. Reg. 43900, 43902 (Dec. 5, 1986) .....................................................................30

73 Fed. Reg. 2848, 2850 (Jan. 16, 2008) ........................................................................23

73 Fed. Reg. at 49604 .......................................................................................................23

21 U.S.C. §§ 331(a) and 352(f).........................................................................................15

28 U.S.C. § 1292(b) .............................................................................................................1

**OTHER AUTHORITIES**

Devices and Radiological Health, Transcript, *In Vitro Diagnostic Testing for
    Direct Oral Anticoagulants* (Oct. 26, 2015) ..............................................................14

FDA, AER System, Office of Pharmacoepidemiology and Statistical Science,
    Brief Description with Caveats of System at 4 (July 18, 2005) ................................23

Guidance for Industry and Food and Drug Administration Staff: In Vitro
    Companion Diagnostic Devices (Aug. 6, 2014) .......................................................15

Guidance for Industry Responding to Unsolicited Requests for Off-Label
    Information About Prescription Drugs and Medical Devices (Dec. 11, 2011) .......15

http://www.fda.gov/Drugs/DrugSafety/ucm524678.htm ..............................................26

U.S. Const. Article VI cl. 2................................................................................................11

Defendants respectfully move for partial summary judgment in the above-referenced discovery pool cases on the ground that federal law preempts Plaintiffs' failure-to-warn-or-instruct claim.[1]

## INTRODUCTION

Plaintiffs' failure-to-warn theory has evolved throughout this litigation.   As other Plaintiffs have alleged in their Complaints, Plaintiffs here assert that the Xarelto label failed to provide "proper and/or adequate warnings regarding all possible side effects associated with use of Xarelto" (See Doc. 1, ¶115(a)-(h), at 25, Dkt, Case No. 6:14-cv-00073-C) and that as a result "Plaintiff was caused to suffer. . . life-threatening bleeding…" *Id.*, ¶119; *see also* MDL No. 2592 Dkt. Doc. 2932 ¶ 74.   Because the Xarelto labeling references "bleed" or "bleeding" more than 100 times and specifically warns that "Xarelto increases the risk of bleeding and can cause serious or fatal bleeding" (Ex. A, Xarelto USPI Rev. Mar. 2017), Plaintiffs have shifted their focus to a different theory of liability—that the label should have instructed physicians to perform a blood test with a Neoplastin prothrombin time ("PT") reagent in order to identify

---

[1]     Defendants move for summary judgment in the *Henry* case in accordance with CMO No. 2H, which requires all dispositive motions in that case to be filed by September 21, 2017.  Defendants also hereby move for summary judgment on Plaintiffs' failure to warn claims in the *Ibanez* case, which was included in the discovery pool through random selection by the Court.  *See* Docs. 2626, 3093. There currently is no dispositive-motion deadline set in the *Ibanez* case, and Defendants make this motion without prejudice to their right to later make additional dispositive motions in that case, if necessary.

   This Court has addressed Defendants' preemption arguments before, in the context of the first three Xarelto bellwether trials.  In the interest of efficiency and judicial economy, Defendants hereby expressly incorporate all of the earlier briefing and argument from the *Boudreaux, Orr* and *Mingo* cases regarding their argument that federal law preempts Plaintiffs' failure-to-warn claims.  Defendants ask that the Court consider that earlier briefing—and the associated exhibits that Defendants filed in support of those motions—also to have been filed in this case.  In particular, Defendants direct the Court to the following briefs related to Plaintiffs' failure-to-warn claims in the *Boudreaux, Orr* and *Mingo* cases: Docs 5109-1, 5110-1, 5677, 5678, 5689, 5904, 5988, 6345, 6346, 6376, 6749, 6770, 6771, 6776, 7067, 7361, 7362, 7390, 7391, 7392, and 7393. Defendants also incorporate the March 23, 2017 oral argument.

   Defendants recognize that the Court denied summary judgment on these grounds in the *Boudreaux, Orr,* and *Mingo* cases, but Defendants believe that appellate review of this threshold issue is important to the MDL as a whole, and the defense verdicts in the *Boudreaux, Orr,* and *Mingo* trials make it unlikely that the Fifth Circuit will address the preemption issue following another bellwether trial.  For that reason, if the Court adheres to its prior rulings, Defendants intend to request that the Court certify the preemption issues for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).

patients who may be at an increased risk of bleeding, and to prescribe a different anticoagulant medication if the blood test results are "abnormal."  Pls. Opp. To Defs.' Dosing & Monitoring Preemption MSJ (Doc. 5531) at 1.[2]

The preemption analysis that applies to the failure-to-warn claims here was recently articulated by the *Eliquis* MDL court in *Utts v. Bristol-Myers Squibb Co*., __ F. Supp. 3d ___, MDL No. 2754, 2017 WL 1906875, at *9 (S.D.N.Y. May 8, 2017), which held that federal law preempted failure-to-warn-or-instruct claims asserted against the manufacturer of the prescription medication Eliquis.  Eliquis, like Xarelto, is in a class of medicines known as "Novel Oral Anticoagulants."  The *Utts* court, responding to the plaintiffs' allegations that the defendant failed to warn of the risk of bleeding and should have instructed physicians to monitor patients' coagulation status, stated the standard as follows:

> Post-FDA approval preemption analysis proceeds in two stages.  First, the plaintiff must show that there existed "newly acquired information" such that the defendants could unilaterally change the label pursuant to the CBE regulation without FDA approval.  But, the mere availability of a CBE label amendment does not necessarily defeat a manufacturer's preemption defense.  Because the FDA 'retains authority to reject label changes,' a manufacturer may still – even after the plaintiff has identified 'newly acquired information' – establish an impossibility preemption defense through 'clear evidence that the FDA would not have approved a change' to the label.

Just so here.  Plaintiffs' failure-to-warn-or-instruct claims are preempted as a matter of law because, among other reasons, (1) there is "clear evidence" that FDA would not have approved Plaintiffs' proposal (and in fact rejected similar proposed labeling) to instruct

---

[2] This theory too has taken on various forms.  In *Boudreaux*, Plaintiffs characterized PT as a "safety test that would identify people at high risk of bleeding."  *Boudreaux* Tr. at 85:6-7 (Ex. B) (Plaintiffs' opening statement).  In *Orr*, Plaintiffs characterized PT as an "indicator test that a doctor can order to indicate whether it's safe to proceed to emergency surgery."  *Orr* Tr. at 127:4-6 (Ex. C) (Plaintiffs' opening statement).  In *Mingo*, Plaintiffs described PT as an "indicator test", which would "identify those patients at high risk" so that they can stop taking the medication. *Mingo* Tr. at 142:2-4 (Ex. D) (Plaintiffs' opening statement); *see also id.* at 142:7-11 ("There will be patients - - there will be patients that are at extra-high risk.  They have this high variability.  They need to be taken off Xarelto early, before they have a major bleeding event."); *id.* at 143:22-24 ("How do you identify those patients that are at extra-high risk?  One, you tell doctors about the tool that's in their kit already?  Tell them about the PT test . . .").

physicians to monitor bleeding risks with the "off label" use of the Neoplastin PT test that is used (as stated in its FDA-approved labeling) to monitor the anticoagulant effect of warfarin (a different type of anticoagulant medicine), and (2) there is no "newly acquired information" under FDA's Changes Being Effected ("CBE") regulation that would have permitted Defendants to unilaterally change the FDA-approved Xarelto label to reflect Plaintiffs' proposed changes.

Xarelto, like all other anticoagulants, carries an increased risk of bleeding because the medicines are intended to prevent patients from developing blood clots that can lead to death and other serious injury.  Xarelto was approved by FDA based on clinical trial and other data and information demonstrating the safety and efficacy of the medicine.  After extensive review and consideration, FDA approved Xarelto in November 2011 to prevent strokes in patients—like William Henry and Harriet Ibanez—who have atrial fibrillation ("AFib").  AFib patients have an irregular heartbeat and, accordingly, are pre-disposed to developing blood clots that could lead to a deadly or debilitating stroke.

Federal law precludes Plaintiffs' claims for alleged failure to warn or instruct for several reasons.

*First*, Defendants could not independently or unilaterally change Xarelto's label to instruct doctors to conduct PT testing because Defendants could not recommend in Xarelto's label to use the Neoplastin PT test—which was designed (and cleared by FDA as a Class II medical device) explicitly for use with warfarin—"off label."  The Neoplastin label provides that it is a diagnostic device to be used in "monitoring vitamin k antagonist therapy" with "Coumadin," not with a Factor Xa inhibitor such as Xarelto.

*Second*, FDA expressly considered and rejected PT-related language that Janssen proposed for inclusion in Xarelto's label—namely, that the relationship between PT and Xarelto

concentration is "linear and closely correlated" and that PT may be used if "considered necessary." Thus, there is "clear evidence" that FDA would have rejected Plaintiffs' proposed instruction regarding PT.

**Third,** Janssen could not have independently added PT information to Xarelto's labeling because there is no "newly acquired information" that would justify a change under the CBE procedure.

**Fourth**, Plaintiffs' proposed PT-related instruction is a "monitoring recommendation" that cannot be added to the Xarelto label without prior FDA approval, pursuant to FDA regulations and guidance documents.[3]

## STATEMENT OF RELEVANT FACTS

Xarelto is a Novel Oral Anticoagulant that has been approved by FDA for five "indications" (or uses):

- Xarelto was first approved for use in the United States on July l, 2011 for the prophylaxis of deep vein thrombosis (DVT), which may lead to pulmonary embolism (PE) in patients undergoing hip or knee replacement surgery ("orthopedic indication"). (Ex. E).

- On November 4, 2011, Xarelto was approved to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation ("AFib indication"). (Ex. F).

- On November 2, 2012, Xarelto was approved for the treatment of three different conditions, including deep vein thrombosis, treatment of pulmonary embolism, and the reduction in risk for DVT and PE ("DVT treatment indication"). (Ex. G).

---

[3] Plaintiffs in this proceeding at one time asserted failure-to-warn theories that Defendants should have added to Xarelto's label (1) language advising of problems with a medical device used to measure warfarin patients' coagulation parameters in ROCKET AF, the clinical trial that supported FDA's approval of Xarelto's AFib indication, (2) a chart quantifying bleeding rates specifically among U.S. participants in the 14,000-patient ROCKET AF study before September 2015, and (3) a black box warning about the risk of bleeding. *See, e.g.,* Doc. 5110-1, at 1–2. As set forth in Section II, Plaintiffs abandoned these claims in the previous three trials. To the extent Plaintiffs seek to revive these claims, Defendants incorporate their prior briefing on these matters. *See* Docs. 5110-1 and 5689.

With each indication, the Xarelto label has always warned of the risk of bleeding, and each time a different indication was approved, Xarelto was approved at different doses and without the need for coagulation monitoring.

Although FDA has never required coagulation monitoring for patients taking Xarelto, Janssen proposed—on five separate occasions—language for the Xarelto label that would have advised physicians that the relationship between PT and Xarelto concentration is "linear and closely correlated" and that PT may be used to assess anticoagulation effect if "considered necessary."[4]

- On July 22, 2008, Janssen filed a New Drug Application (NDA) 22406 with FDA's Division of Hematology Products for the prophylaxis of DVT, which may lead to PE, in patients undergoing hip or knee replacement surgery. (Ex. K). With this submission, Janssen included proposed labeling. In Section 12.2 (Pharmacodynamics) of that proposed labeling, Janssen proposed the following language regarding PT:

  **12.2 Pharmacodynamics**

  Routine monitoring of coagulation parameters is not required with XARELTO use.

  Dose-dependent inhibition of Factor Xa activity was observed in humans and the prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest are prolonged dose-dependently. **The relationship between PT and rivaroxaban plasma concentration is linear and closely correlated. If assessment of the pharmacodynamic effect of rivaroxaban is considered necessary in individual cases, PT (measured in seconds) is recommended. The Neoplastin PT assay was measured in the RECORD program and the 5/95 percentiles for PT (Neoplastin) 2 to 4 hours after tablet intake (i.e., at the**

---

[4] Indeed, Xarelto's label has stated at all times that "[t]he anticoagulant effect of XARELTO cannot be reliably monitored with standard laboratory testing." *See* Nov. 2011 USPI §§ 5.4, 8.1 (Ex. F); Aug. 2013 USPI §§ 5.4, 8.1 (Ex. H). There are no material differences in the relevant labels for the *Henry* case (Nov. 2011) and the *Ibanez* case (Aug. 2013). Mr. Henry was first prescribed Xarelto in April 2012 to prevent strokes incident to his AFib, and he continued using Xarelto until December 1, 2014, despite experiencing a rectal bleed in December 2012. *See Henry* Amended Compl. (Doc. 2392), ¶ 1; *Henry* Fifth Amended Pl. Fact Sheet, at 2 (Ex. I). Ms. Ibanez was first prescribed Xarelto in October 2013 to prevent strokes incident to her AFib, and she continued using Xarelto until February 17, 2014, when she suffered gastrointestinal and rectal bleeding. *See Ibanez* Compl. (Doc. 1), ¶¶ 13–14; *Ibanez* Second Amended Pl. Fact Sheet, at 3 (Ex. J).

**time of maximum effect) ranged from 13 to 26 seconds.** The International Normalized Ratio (INR) should not be used for measuring rivaroxaban pharmacodynamic effect.

In a thorough QT study in healthy men and women aged 50 years and older, no QTc prolonging effects were observed for XARELTO (15 mg and 45 mg, single dose).

(*Id.* (emphasis added)).

- In December 2010, Janssen resubmitted proposed revised labeling language for NDA 22406. In that proposed label, Janssen again included the sentence, "If assessment of the pharmacodynamic effect of rivaroxaban is considered necessary in individual cases, PT (measured in seconds) is recommended", followed by a range of PT values that were observed with Neoplastin use in the RECORD[5] study. (Ex. L).

- In January 2011, Janssen filed a second NDA 202439 for the use of Xarelto to reduce the risk of the risk of stroke and systemic embolism in patients with nonvalvular atrial fibrillation. (Ex. M). This NDA was filed with FDA's Cardio Renal Division, the FDA Division responsible for overseeing anticoagulants used to prevent stroke in patients with AFib. In this proposed label, Janssen again included the statement, "If assessment of the pharmacodynamic effect of rivaroxaban is considered necessary in individual cases, PT (measured in seconds) is recommended," followed by PT values observed in the ROCKET study[6] when Neoplastin PT assay was used. (*See id.*).

- Janssen again submitted proposed labeling for NDA 202439 to the Cardio Renal Division in April and May 2011, and again included this PT-related language. (Ex. N; Ex. O).

FDA first provided comments on the proposed label for NDA 22406 on June 13, 2011, via an email from Tyree Newman, a Regulatory Project Manager for FDA's Hematology Division, to Andrea Kollath and Sanjay Jalota of Janssen. (Ex. P; Ex. Q). Mr. Newman attached a "redlined version of the label regarding NDA 22406 for [the sponsor's] review and comments." (*Id.*).

---

[5] The RECORD study was conducted by Defendants in support of NDA 22406 for the use of Xarelto in patients following hip or knee replacement surgery.

[6] The ROCKET study was conducted by Defendants in support of NDA 202439 for the use of Xarelto in patients with AFib.

In the attached redlined label, FDA struck Janssen's proposed language in Section 12 about PT:

**12.2 Pharmacodynamics**

~~Routine monitoring of coagulation parameters is not required with XARELTO® use.~~

Dose-dependent inhibition of factor Xa activity was observed in humans and the prothrombin time (PT), activated partial thromboplastin time (aPTT) and HepTest® are prolonged dose-dependently. Anti-factor Xa activity is also influenced by rivaroxaban.  ~~The relationship between PT and rivaroxaban plasma concentration is linear and closely correlated. If assessment of the pharmacodynamic effect of rivaroxaban is considered necessary in individual cases, PT (measured in seconds) is recommended.  The Neoplastin® PT assay was measured in the RECORD program and the median (with 5/95 percentiles) for PT (Neoplastin®) 2 to 4 hours after tablet intake (i.e., at the time of maximum effect) was 18 (13 to 26) seconds. The International Normalized Ratio (INR) should not be used for measuring rivaroxaban pharmacodynamic effect~~The predictive value of these coagulation parameters for ~~relevant~~ bleeding risk or efficacy has not been adequately studied. ~~-~~

~~Cardiac Electrophysiology: In a thorough QT study in healthy men and women aged 50 years and older, no QTc prolonging effects were observed for XARELTO® (15 mg and 45 mg, single dose).~~

(Ex. P).  Moreover, FDA added language in Sections 5.3 and 8.1 that "the anticoagulant effect of Xarelto cannot be monitored with standard laboratory testing":

**5.3    Risk of pregnancy related hemorrhage**

XARELTO should be used with caution in pregnant women.  XARELTO dosing in pregnancy has not been studied. The anticoagulant effect of XARELTO cannot be monitored with standard laboratory testing nor readily reversed.  Promptly evaluate any signs or symptoms suggesting of blood loss (e.g., a drop in hemoglobin and/or hematocrit, hypotension, or fetal distress).

**7.18.1 Pregnancy**

Pregnancy Category C

There are no adequate or well-controlled studies of XARELTO in pregnant women, and dosing for pregnant women has not been established.  Use XARELTO with caution in pregnant patients because of the potential for pregnancy related hemorrhage and/or emergent delivery with an anticoagulant that is not readily reversible. The anticoagulant effect of XARELTO cannot be reliably monitored with standard laboratory testing.  Animal reproduction studies showed no increased risk of structural malformations but increased post-implantation pregnancy loss occurred in rabbits.  XARELTO should be used during pregnancy only if the potential benefit justifies the potential risk to mother and fetus.

Animal reproduction studies have shown pronounced maternal hemorrhagic complications in rats and an increased incidence of post-implantation pregnancy loss in rabbits.  Rivaroxaban crosses the placenta in animals.  Rivaroxaban increased fetal toxicity (increased resorptions, decreased number of live fetuses, and decreased fetal body weight) when pregnant rabbits were given oral doses of ≥ 10 mg/kg rivaroxaban during the period of organogenesis. This dose is about 11 times the human exposure of unbound drug, based on AUC comparisons at the maximum recommended human dose of 10 mg/day. Fetal body weights decreased when pregnant rats were given oral doses of 120 mg/kg.  This dose is about 40 times the human exposure of unbound drug.

(*Id.*).[7]

On June 16, 2011, Janssen accepted FDA's redlined label, including the statements in Sections 5.3 and 8.1 that standard laboratory testing cannot be used to monitor Xarelto's anticoagulant effect.  (Ex. U).  Janssen also initially accepted FDA's position that language in Section 12.2 regarding PT testing should not be included, although Janssen proposed keeping the statement that INR should not be used.  (*Id.*).

On June 23, 2011, FDA responded to Janssen's comments and proposed changes to the label, including those in Section 12.2, writing, "We disagree."  (Ex. V).  Janssen and FDA had a teleconference the next day to discuss some of FDA's changes.  (Ex. W).  During this meeting, Janssen expressed concerns that there may be additional changes to the Xarelto label when

---

[7] In the first three bellwether trials, Janssen witness testimony about these documents showed that these redline edits were made by FDA.  *Boudreaux* Trial Tr. at 667:22-668:6 (Testimony of Dr. Scott Berkowitz) and 1103:24-1104:23 (Testimony of Dr. Gary Peters) (Ex.R); *Orr* Trial Tr. at 1240:25-1241:8 (Testimony of Dr. Scott Berkowitz) and 1383:7-18, 1386:12-1387:17, 1390:5-19, 1399:2-11, 1400:25-1401:5 (Testimony of Sanjay Jalota (Ex. S); and *Mingo* Trial Tr. at 1512:17-20 (Testimony of Dr. Anthonie Lensing) and 1771:23-1772:10, 1774:19-1776:20, and 1797:3-17 (Testimony of Nauman Shah) (Ex. T).

working with the Cardio Renal Division for AFib, but FDA's Hematology Division confirmed that "Cardio Renal has been involved in the current labeling review".  (*Id.*).

On June 28, 2011, Janssen responded to FDA's comments.  (Ex. X).  In Section 12.2, Janssen again proposed language about the use of PT, keeping the statement in the label that INR should not be used, and changing "has not been adequately studied" to "has not been established":



(*Id.*).  As shown above, Janssen provided a lengthy comment with its rationale for making these proposed changes in Section 12.2.  (*Id.*).

FDA ultimately allowed Janssen to make some of these changes, but *again* struck the PT language from Section 12.2:

(Ex. Y).

On July 1, 2011, FDA approved Xarelto for the prophylaxis of DVT, which may lead to PE, in patients undergoing hip or knee replacement surgery. (Ex. E). The approved label did not include in Section 12.2 any statement about the use of PT; instead, as proposed by FDA, in Sections 5.3 and 8.1, the label stated that Xarelto cannot be monitored with standard laboratory testing. (*Id.*).

FDA's Cardio Renal Division then instructed Janssen to resubmit the label for the AFib indication using the "NDA 22-406 approved label . . . as the basis for the updated label and the AFib specific information added to it." (Ex. Z). Janssen resubmitted the proposed labeling in August 2011 using the approved label as the basis—*i.e.*, without the previously proposed sentence in Section 12.2 about PT, because FDA had just struck it from the approved label. (*See* Ex. AA).

In August 2011, FDA's clinical pharmacology reviewers and clinical reviewers completed their respective reviews of NDA 202439. These reviewers found a relationship between PT and bleeding risk in their own analysis of the ROCKET data. (Ex. BB). However, FDA's clinical reviewers expressly stated in their review that "[m]onitoring rivaroxaban therapy with sequential prothrombin times to optimize safety outcomes cannot be recommended . . . ." (Ex. CC).[8]

On November 4, 2011, FDA's Cardio Renal Division approved Xarelto for use in patients with AFib, again *without* a recommendation for PT monitoring or the proposed PT language in Section 12.2, and *with* statements in Sections 5.4 (previously in 5.3) and 8.1 stating that there is no standard laboratory test that can be used to assess the anticoagulant effect of Xarelto. (Ex. F).

_____

[8] FDA also left the statements in Section 5.4 and Section 8.1 that there is no standard lab test that can be used to monitor Xarelto. (*See* Ex. DD (explaining FDA's reviewer Dr. Harlow recommended changes to the pregnancy section, which were also incorporated into the July 2011 label)).

In May 2012, Janssen submitted sNDAs for the use of Xarelto for the treatment of DVT, treatment of PE, and reduction in the risk of recurrence of DVT and/or PE.  In the proposed labeling submitted with these sNDAs, Janssen did not include the previously proposed PT language because FDA had previously rejected that language.  (*See* Ex. EE).  Janssen did include statements in Section 5.4 and 8.1 stating that there is no standard laboratory test that can be used to monitor the anticoagulant effect of Xarelto.  (*See id.*).  FDA reaffirmed its position on November 2, 2012, when it approved the three sNDAs for the treatment of DVT, treatment of PE, and reduction in the risk of recurrence of DVT/PE without a recommendation for PT monitoring and with statements in Section 5.7 (previously in 5.4) and 8.1 stating that there is no standard laboratory test that can be used to assess the anticoagulant effect of Xarelto. (Ex. G). These statements remain in the Xarelto label today.  (*See* Ex. A).[9]

## LEGAL FRAMEWORK

Under the Supremacy Clause, federal law "shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI cl. 2.  "Accordingly, it has long been settled that state laws that conflict with federal law are 'without effect.'"  *Mutual Pharmaceutical Co. v. Bartlett*, 133 S. Ct. 2466, 2473 (2013).  It is likewise settled that common-law tort claims seeking damages are a form of state "law" subject to preemption.  *See, e.g., Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 881 (2000).

As relevant here, state law is preempted "where it is 'impossible for a private party to comply with both state and federal requirements.'"  *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 618 (2011) (quoting *Freightliner Corp. v. Myrick*, 514 U.S. 280, 287 (1995)). The Supreme Court

---

[9] FDA has during the pendency of this litigation reaffirmed the adequacy of Xarelto's labeling and its benefit/risk profile, including in September 2016 (*see* Section II.A *infra*), and on August 30, 2017, in an abstract based on FDA data entitled "Prospective Surveillance Pilot of Rivaroxaban Safety Within the US Food and Drug Administration Sentinel System" (Ex. FF), which concluded that the analysis "does not raise any new safety concerns regarding use of rivaroxaban."

has established the standard for "impossibility" preemption in pharmaceutical cases in three recent decisions: *Wyeth v. Levine*, 555 U.S. 555 (2009); *Mensing*, 564 U.S. 604 (2011); and *Bartlett*, 133 S. Ct. 2466 (2013).  These decisions explain that "[t]he question for 'impossibility' is whether the [defendant drug manufacturer] could *independently* do under federal law what state law requires of it." *Mensing*, 564 U.S. at 620 (emphasis added); *see also Bartlett*, 133 S. Ct. at 2470 (citing *Mensing*). And by "independently," the Supreme Court has made clear it means "unilaterally." *Mensing*, 564 U.S. at 620 (citing *Levine*, 555 U.S. at 573, for the proposition that preemption turns on whether "the defendant could 'unilaterally' do what state law required"). Accordingly, "when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency, that party cannot independently satisfy those state duties for pre-emption purposes." *Mensing*, 564 U.S. at 623–24.

Under *Levine*, *Mensing*, and *Bartlett*, it is "impossible" for a pharmaceutical manufacturer to comply with both federal and state law—and preemption attaches—in either of two instances. *First*, because "[t]he question for 'impossibility' is whether the [manufacturer] could *independently* do under federal law what state law requires of it," preemption attaches "when a party cannot satisfy its state duties without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency." *Mensing*, 564 U.S. at 620, 623–24; *see also Bartlett*, 133 S. Ct. at 2478 (citing *Mensing*). *Second*, and separately, even where a manufacturer *can* act independently—for instance, to change its label under the Changes Being Effected ("CBE") regulation at issue in *Levine*—the Supreme Court

has held that the claims are still preempted if there is "clear evidence" that FDA would not have approved a label change. *See Levine*, 555 U.S. at 571.[10]

## ARGUMENT

Plaintiffs have alleged that the Xarelto label failed to instruct physicians to use a Neoplastin PT test to assess patients' coagulation status. Plaintiffs previously alleged other theories that they have either been abandoned after briefing (*i.e.*, failure to warn about recall of INR Device or U.S. Subgroup data) or that the Court has ruled irrelevant to these cases (*i.e.*, black box warning). *See* n.2 & Part II below.

**I.     Plaintiffs' claims that the Xarelto label should have recommended use of Neoplastin PT is preempted as a matter of law.**

As set forth below, federal law preempts Plaintiffs' failure-to-instruct claims regarding the use of Neoplastin PT for at least four reasons. *First*, Defendants could not "independently" under the CBE regulation recommend in Xarelto's label an off-label use of Neoplastin, which was designed and cleared by FDA for use with warfarin. *Second*, there is "clear evidence" FDA would reject Plaintiffs' proposed PT-related instruction because FDA did in fact reject Janssen's repeated proposals to include very similar language in Xarelto's label. *Third*, after FDA struck the PT language in Xarelto's approved label, Janssen could not have independently or

---

[10] Defendants recognize that this Court has previously stated that *Bartlett* and *Mensing* "relate to generic drug manufacturers." Doc. 6196, at 5; Doc. 7110, at 5. Defendants respectfully disagree that *Bartlett* and *Mensing* are so limited. Since *Levine*, *Mensing* and *Bartlett*, courts have overwhelmingly concluded that the "impossibility" analysis—focused on the permissibility of "independent," "unilateral" manufacturer action—applies equally to both brand-name and generic products and manufacturers. *See, e.g.*, *Yates v. Ortho-McNeil-Janssen*, 808 F.3d 281 (6th Cir. 2015); *In re Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34 (1st Cir. 2015); *In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917 (6th Cir. 2014); *Brazil v. Janssen Research & Development LLC*, 196 F. Supp. 3d 1351 (N.D. Ga. 2016); *Fleming v. Janssen Pharmaceuticals, Inc.*, 186 F. Supp. 3d 826  (W.D. Tenn. 2016); *Barcal v. EMD Serono, Inc.*, No. 5:14-cv-01709-MHH, 2016 WL 1086028 (N.D. Ala. Mar. 21, 2016); *Batoh v. McNeil-PPC, Inc.*, 167 F. Supp. 3d 296 (D. Conn. 2016); *Rheinfrank v. Abbott Labs., Inc.*, 137 F. Supp. 3d 1035 (S.D. Ohio 2015); *Booker v. Johnson & Johnson*, 54 F. Supp. 3d 868 (N.D. Ohio 2014); *Thompson v. Allergan USA, Inc.*, 993 F. Supp. 2d 1007 (E.D. Mo. 2014); *Amos v. Biogen Idec Inc.*, 28 F. Supp. 3d 164 (W.D.N.Y. 2014).  *But see Estate of Cassel v. Alza Corp.*, No. 12-CV-771-WMC, 2014 WL 856023, at *5 (W.D. Wis. Mar. 5, 2014) (holding that *Bartlett* does not apply to brand-name drugs).

unilaterally added such a recommendation to the labeling because no "newly acquired information" allowed for the use of the CBE procedure. *Fourth*, and finally, Plaintiffs' proposed PT-related instruction is a "monitoring recommendation" that must (but cannot, absent prior FDA approval) be included in the "Highlights" section of Xarelto's label.

### A. Plaintiffs' failure-to-warn claim is preempted because Defendants could not "unilaterally" change Xarelto's labeling to recommend an "off-label" use of the Neoplastin PT test.

Plaintiffs have asserted that the Neoplastin PT test is FDA-approved as a general coagulation test and is commercially available in the United States, but there is no PT test—Neoplastin or otherwise—that FDA has approved for use with Xarelto.

FDA cleared Neoplastin as a Class II medical device for use as a "general screening procedure . . . to monitor patients receiving *coumarin* [*i.e.*, warfarin] therapy."  21 C.F.R. § 864.7750(a) (emphasis added).  Neoplastin is not designed or approved to monitor the anticoagulation effect of Xarelto or any other Factor Xa inhibitor.  Indeed, consistent with FDA's regulations governing Class II medical devices, Neoplastin's label makes clear that the device was designed and cleared for use in "monitoring vitamin K antagonist therapy" with "Coumadin."  Ex. GG, Neoplastin USPI § 2.  Xarelto, in contrast to Coumadin (warfarin), is not a vitamin K antagonist, but is instead a direct Factor Xa inhibitor.  Importantly, the Neoplastin label explains in its "Limitations" section that the PT test is "insensitive" to certain "anti-Xa" levels.  *Id.* at § 11; *see also* Ex.HH, FDA: Center for Devices and Radiological Health, Transcript, *In Vitro Diagnostic Testing for Direct Oral Anticoagulants*, at 9 (Oct. 26, 2015) (Lea Carrington, Director, Division of Immunology and Hematology Devices) ("Importantly, the DOAC drugs were approved without a requirement for monitoring.  So currently, manufacturers

are developing devices to assess the effect or concentration of direct oral anticoagulants. *There are currently no cleared or approved devices that measure that*.") (emphasis added).

Not only does the labeling for Neoplastin PT specifically refer to use with warfarin, but federal regulations do not allow Defendants to unilaterally change the Xarelto label to recommend the "off label" use of Neoplastin with Xarelto.[11]   In the case of diagnostic devices, such as Neoplastin PT, FDA has further stated that "it is important that the approved labeling for an IVD companion diagnostic device and its corresponding therapeutic product be complete and consistent." Ex. JJ, Guidance for Industry and Food and Drug Administration Staff: In Vitro Companion Diagnostic Devices (Aug. 6, 2014) ("IVD Guidance") at 11.  Plaintiffs' claims here would result in inconsistent labeling of the intended use stated in the Neoplastin PT labeling and the Xarelto label.  As a result, Defendants could not "independently" change Xarelto's labeling to recommend coagulation measurements using Neoplastin or any other PT-related test because such a change would be prohibited without advance FDA approval, and any claim based on their failure to do so is preempted.  *Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 620; *see also* IVD Guidance at 10 ("If an IVD diagnostic device is already legally marketed and the IVD diagnostic device manufacturer intends to market its device for a new use as an IVD companion diagnostic device for a novel therapeutic product, FDA would likely consider the new use of the IVD diagnostic device with the novel therapeutic product as a new use for the device that would require an additional premarket submission.").

---

[11] To the contrary, FDA has long interpreted 21 U.S.C. §§ 331(a) and 352(f), together with 21 C.F.R. §§ 201.5 and 201.128, to *prohibit* off-label promotion.  *See* Ex. II, Guidance for Industry Responding to Unsolicited Requests for Off-Label Information About Prescription Drugs and Medical Devices (Dec. 11, 2011), at 2 (stating that "[a] new intended use without FDA approval or clearance would . . . generally violate the law"); *see also Clark v. Pfizer, Inc.*, 990 A.2d 17 (Pa. Sup. Ct. 2010) ("[F]ederal law prohibits a drug manufacturer from promoting off-label uses of an FDA-approved medication."); *Gavin v. Medtronic*, 2013 U.S. Dist. LEXIS 101216, at *55 (E.D. La. 2013) ("the very concept of 'off label' use and promotion is derived exclusively from the regulatory system imposed" by the Food, Drug, and Cosmetic Act); *cf. Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341 (2001).

FDA guidance documents specifically address this issue, stating that: "When an IVD companion diagnostic device has been approved or cleared for use with one therapeutic product"—here, Neoplastin for use with warfarin—"and evidence becomes available that use of the same device is essential for the safe and effective use of a different therapeutic product"—as Plaintiffs here claim for Xarelto—"the IVD companion diagnostic device labeling should be expanded through approval or clearance of a new premarket submission (PMA or 510(k) as appropriate) or PMA supplement . . . to include the new therapeutic product." IVD Guidance at 12. So too, "[l]abeling of the therapeutic product should also be amended through submission of a supplement." *Id.*[12]

Accordingly, Plaintiffs' assertion that Defendants could have unilaterally changed the labeling to recommend the off label use of Neoplastin PT with Xarelto is not supported by the law. Rather, the law would require FDA approval of that use prior to making such a claim in the Xarelto labeling.

Nor can Plaintiffs avoid preemption by asserting that Defendants could have unilaterally implemented a label change under FDA's "helpful" laboratory tests regulation, 21 C.F.R. § 201.57(c)(6)(iii). The only regulation that permits label changes without prior FDA approval is the CBE regulation, in 21 C.F.R. part 314. *See Levine*, 555 U.S. 555. But even so, section 201.57(c)(6)(iii) requires scientific evidence and proof that a test can reliably be used before a new use may be recommended:

> *Monitoring: Laboratory tests*. This section must identify any laboratory tests helpful in following the patient's response or in identifying possible adverse reactions. If appropriate, the information must be provided on such factors as the range of

---

[12] To be clear, Defendants do not concede that there is evidence that "use of" Neoplastin PT or any other PT test "is essential for the safe and effective us of" Xarelto. IVD Guidance at 12. Indeed, there is no such evidence. The point here is simply that *even if* Plaintiffs could present such evidence—they have not—a separate labeling supplement would be necessary for both Neoplastin PT (or any other PT test) and Xarelto.

> normal and abnormal values expected in the particular situation
> and the recommended frequency with which tests should be
> performed before, during, and after therapy.

*See also* 21 C.F.R. § 201.56(a)(3) ("The labeling must be based whenever possible on data

derived from human experience.  No implied claims or suggestions of the drug use may be made

if there is inadequate evidence of safety or lack of substantial evidence of effectiveness . . .").

Whether a specific laboratory test is "helpful" and can reliably be used with Xarelto is a

decision (as discussed above) that requires a separate showing to obtain FDA approval and

clearance before recommending that physicians rely on the testing in clinical practice.  *See* 21

C.F.R. § 807.81(a)(3)(ii) (requiring new marketing clearance for any new "intended use" of

FDA-cleared device); *id*. § 814.39(a) (same, for approval of a supplement for a new indication

for previously approved device); *see also* IVD Guidance, at 10.

**B.      There is clear evidence FDA would not have approved Plaintiffs' proposed
labeling change regarding use of Neoplastin PT.**

**1.      "Clear evidence" shows that FDA would have rejected—and in fact
did reject—a proposal to add PT language to Xarelto's label.**

Plaintiffs' failure-to-warn-or-instruct claim also is preempted because there is "clear

evidence" that FDA would and has already rejected a proposal to add PT monitoring language to

the Xarelto label.

In *Levine*, the Supreme Court recognized that federal law will preempt any state-law

claim based on the manufacturer's failure to change its label if there is "clear evidence that the

FDA would not have approved [the label] change."  555 U.S. at 571.  Post-*Levine* cases have

explained the "clear evidence" standard.  As particularly relevant here, those cases demonstrate

that the standard is met, and preemption applies, where FDA rejects a proposal to add a warning

that is substantially similar to the warning that a plaintiff advocates.  *See, e.g.*, *Christison v.*

-17-

*Biogen Idec Inc.*, 199 F. Supp. 3d 1315, 1347-48 (D. Utah 2016) (emphasizing the FDA's rejection of manufacturer's proposed labeling change); *Rheinfrank v. Abbott Labs.*, 119 F. Supp. 3d 749, 766 (S.D. Ohio 2015) (emphasizing that manufacturer attempted to strengthen its warning label and the FDA twice denied the request); *In re Depakote*, 87 F. Supp. 3d 916, 922 (S.D. Ill. 2015) (same); *Dobbs v. Wyeth Pharm.*, 797 F. Supp. 2d 1264, 1274–75 (W.D. Okla. 2011) (noting FDA's rejection of manufacturer's attempts to strengthen warning labels); *see also Cerveny v. Aventis, Inc.*, 855 F.3d 1091, 1105 (10th Cir. 2017) (FDA's rejection of a citizen petition, which presented "claims and data virtually identical to those submitted by" the plaintiffs "constitutes clear evidence that the FDA would not have approved the [plaintiffs'] desired warning"). *But see In re: Fosamax (Aldendronate Sodium) Prods. Liab. Litig.*, 852 F.3d 268 (3d Cir. 2017).[13]

For preemption to attach, FDA is not required to reject the *precise* phraseology that a plaintiff advocates in litigation; rather, it is sufficient that FDA rejected the substance of a plaintiff's proposed warning. *See, e.g.*, *Levine*, 555 U.S. at 572 (relevant question whether FDA considered the "kind of warning" that plaintiff seeks); *Mensing*, 564 U.S. at 637 (Sotomayor, J., dissenting) (observing that clear-evidence standard is met when FDA has "considered whether to request warnings in light of the evidence on which a plaintiff's claim rests but … decided to leave the warnings as is"); *Seufert v. Merck Sharp & Dohme Corp.*, 187 F. Supp. 3d 1163, 1173 (S.D. Cal. 2016) (rejecting plaintiff's argument that FDA must reject "specific proposed warning language"); *Newman v. McNeil Consumer Healthcare*, No. 10-CV-01541, 2012 WL 39793, at

---

[13] In *Fosamax*, the Third Circuit reversed the district court's holding that federal law preempted the plaintiff's claim because the manufacturer "submitted a label change and the FDA rejected it." *Fosamax*, 951 F. Supp. 2d at 703–04. The Third Circuit reversed on the ground that "whether the FDA would have approved a plaintiff's proposed warning is a question of fact for the jury." 852 F.3d at 293.  But, as this Court has recognized, preemption is a question of law for the Court. *See, e.g.*, Order and Reasons (Apr. 18, 2017), at 5 (Doc. 6254) (holding that preemption is "a question of law that is not appropriate for consideration by the finder of fact").

*7–8 & n.8 (N.D. Ill. Jan. 9, 2012) ("FDA should not have to reject every possible formulation of a particular warning in order for there to be clear evidence of rejection.").

Here, there is overwhelmingly "clear evidence" that FDA would have rejected any attempt to change Xarelto's label to instruct doctors to measure PT as a means of monitoring or otherwise measuring patients' anticoagulation levels.  As outlined above, Janssen specifically and repeatedly, on five separate occasions and to both FDA divisions reviewing Xarelto's label, proposed specific language in Section 12.2 stating that "[i]f assessment of the pharmacodynamic effect of rivaroxaban is considered necessary in individual cases, PT (measured in seconds) is recommended." (Ex. K; Ex. L; Ex. M; Ex. N; Ex. O).  Janssen also provided PT ranges when Neoplastin PT is used with Xarelto as observed in the clinical studies (RECORD and ROCKET) that were performed in support of the two NDA submissions. (*See id.*).  But, FDA struck this proposed language and added statements to the label in Section 5.3 and 8.1 that there is no standard laboratory test that can be used to monitor the anticoagulant effect of Xarelto.  (Ex. P).

Janssen initially accepted FDA's deletion of the PT language, *see* (Ex. U), but later suggested to add: "While the Prothrombin Time (PT) could be used for estimating rivaroxaban pharmacodynamic effect the International Normalized Ratio (INR) should not be used."  (Ex. X).  FDA rejected this proposal too, *see* Ex. Y, and ultimately approved Xarelto on three separate occasions for five different indications *without* a monitoring recommendation or statement regarding the use of PT, and *with* statements that there is not a standard laboratory test that can be used to monitor Xarelto's anticoagulant effect.  (Ex. E, Ex. F, Ex. G).  In these respects, the Xarelto label remains the same today.

Accordingly, there is clear evidence that FDA rejected proposed PT-monitoring language, and therefore Plaintiffs' claims are preempted as a matter of law.

> 2. **Plaintiffs' claim is preempted because there is no "newly acquired information" that would have allowed Defendants to unilaterally change the Xarelto label to include PT language.**

Federal law also preempts Plaintiffs' state law claims because Janssen could not have independently added PT information to Xarelto's labeling after FDA struck that language because there was no "newly acquired information" justifying that change through the CBE procedure.

By its express terms, the CBE provision permits "moderate changes" to a label and applies only to labeling changes that are made "to reflect newly acquired information." 21 C.F.R. § 314.70(c)(6)(iii).   "[N]ewly acquired information" is defined as "data, analyses, or other information *not previously submitted to the agency*, which may include (but are not limited to) data derived from new clinical studies, reports of adverse events, or new analyses of previously submitted data (*e.g.*, meta-analyses) if the studies, events or analyses reveal risks of a different type or greater severity or frequency than previously included in submissions to FDA." 21 C.F.R. § 314.3(b) (emphasis added).

Plaintiffs have not identified any "newly acquired information" not previously considered by FDA that reveals "risks of a different type or greater severity or frequency than previously included in submissions to FDA."  *See id.*  *In re Celexa*, 779 F.3d 34 (1st Cir. 2015), illustrates why federal law preempts Plaintiffs' claim.  There, the plaintiffs alleged that FDA had initially approved Lexapro based on "questionable" data from clinical studies available at the time, and that two articles published post-approval constituted "newly acquired information" warranting a label change. *Id*. at 38, 42. The First Circuit rejected the plaintiffs' argument and held that, although the CBE regulation applies in "virtually all situations in which new information indicates new or greater risks, or misleading claims of efficacy," a failure-to-warn claim must be

premised on the failure of a pharmaceutical manufacturer "to respond to information *not considered by the FDA.*" *Id.* at 41 (emphasis added); *see also id.* at 43 (holding the claims were preempted because the plaintiffs "ma[de] no claim . . . that this information was unknown to the FDA prior to label approval"). Under the circumstances presented, there was "no precedent . . . that would have allowed [the defendant manufacturer] to use the CBE procedure to alter the FDA label in the manner that plaintiffs allege is necessary so as to render it not 'misleading.'" *Id.* at 43. Just so here—FDA considered language regarding the use of PT in certain situations, but FDA rejected it.

Similarly, the court in *In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Products Liability Litigation*, 185 F. Supp. 3d 761 (D. S.C. 2016), recently applied *Celexa* to find that state law claims based on clinical-study data already submitted and considered by FDA were not based on "newly acquired information" under the CBE regulation, and thus also were preempted in circumstances nearly identical to those here. *See id.* at 769 ("[A]ny claim that a drug label should be changed based on information previously submitted to the FDA is preempted because the CBE regulation cannot be used to make a label change based on such information."). There, the plaintiffs alleged that the Lipitor label did not accurately describe the product's efficacy for use in women based on a particular clinical study—called ASCOT—that had been submitted to and considered by FDA during the approval process. *See id.* at 769 ("[T]he FDA approved the Lipitor label based on the ASCOT trial and data."). The court held that the plaintiffs' claim that "Lipitor's label should have included different statements about Lipitor[] . . . based on the ASCOT data" was preempted because "neither Plaintiffs nor their experts have identified any . . . 'new analyses' of the ASCOT data that should have caused Defendant to change its label." *Id.* at 769–70 ("The only 'new analysis' of ASCOT efficacy data

-21-

mentioned by Plaintiffs' experts is Dr. Wells' analysis, which was conducted as part of this litigation.").[14]

Even more recently, the court in *Utts*, 2017 WL 1906875, held that federal law preempted failure-to-warn-or-instruct claims concerning Eliquis. The plaintiffs there—like here—"focus[ed] on three categories of warnings: (1) monitoring; (2) advice regarding bleeding reversal strategies; and (3) dosage recommendations." *Id.* at *11. The plaintiffs relied on "nine reports, studies, and articles as the bases for [the] assertion that the Eliquis labeling was inadequate in failing to give these warnings." *Id.* The court concluded that none of the information to which Plaintiffs pointed—including adverse drug event data— constituted "newly acquired information." *Id.* at *11–20. Accordingly, the court granted the defendants' motion to dismiss the plaintiffs' failure-to-warn-or-instruct claim. *Id.*

The reasoning of these cases applies equally here.  Plaintiffs cannot rely on clinical studies already submitted to FDA as a basis for a label change and have pointed to no "newly acquired information" that would support a labeling change here.  In these cases, Plaintiffs used Xarelto between 2012 and 2013 when they experienced their bleeding events.   The evidence is that FDA previously considered the relevant studies and information, and the Xarelto label was approved by the FDA in November 2012 (without a PT monitoring recommendation and with statements in Section 5.7 and 8.1 that there is no standard laboratory test that can be used to monitor Xarelto's anticoagulant effect).

Plaintiffs have previously pointed to data from ROCKET AF and FDA's Clinical Pharmacology Review to suggest that FDA first learned in August 2011 of a supposed

---

[14] When FDA has already considered a particular safety issue based on the same studies that were subject to the FDA's decision to approve the product and its labeling, the Agency's decision is not "new" information and cannot form the basis of a claim for relief. *Cf. In re Incretin-Based Therapies Prods. Liab. Litig.*, 142 F. Supp. 3d 1108, 1131 (S.D. Cal. 2015) ("A reevaluation of scientific data or a judicial challenge to the accuracy of the FDA's conclusions would disrupt the 'delicate balance of statutory objectives.'").

correlation between PT and bleeding risk, but FDA had already reviewed that information prior

to approving the Xarelto label in November 2011.  As the Court in *Utts,* information already

considered by FDA is by definition not "newly acquired information" because it was already

known by FDA. *See Utts*, 2017 WL 1906875, at *13–14.  The *Utts* court's reasoning correctly

applied the law of federal preemption because adverse event reports regarding bleeding that post-

date approval would have been only "cumulative of information previously submitted to

FDA"—and in that case, "a CBE supplement would not be appropriate." 73 Fed. Reg. 2848,

2850 (Jan. 16, 2008); *see also id.* ("[I]f the reports of adverse events are consistent in type,

severity, and frequency with information previously provided to FDA, such reports may not

constitute newly acquired information appropriate for a CBE supplement.").[15]

> **C.    Because Defendants could not "independently" add any "monitoring recommendations" to Xarelto's label—regarding Neoplastin PT or otherwise—Plaintiffs' claim based on their failure to do so is preempted.**

FDA regulations make clear that Defendants were prohibited from independently altering

---

[15] Critically, the CBE regulation, 21 C.F.R. § 314.70(c)(6)(iii), requires that—at least for CBE supplements that would "add or strengthen a contraindication, warning, precaution or adverse reaction for which the evidence of a causal association satisfies the standard for inclusion in the labeling under § 201.57(c)"—"newly acquired information" must satisfy a specific causation standard.  21 C.F.R. § 314.70(A).  The FDA has stated that the relevant regulations were amended "to make it clear that a CBE supplement may be used to add or strengthen a contraindication, warning, precaution, or adverse reaction *only if* there is sufficient evidence of a causal association with the drug." 73 Fed. Reg. at 49604 (emphasis added); *id.* ("Expressly requiring that a CBE supplement reflect newly acquired information and *be based on sufficient evidence of a causal association* will help to ensure that scientifically accurate information appears in the approved labeling for such products." (emphasis added)). Federal regulations require pharmaceutical manufacturers to submit adverse event reports to FDA, see 21 C.F.R. § 314.80, but, as a regulatory matter, these are simply anecdotal reports of a correlation or association between the use of a drug and some adverse event, "*whether or not considered drug related*"—*i.e.*, regardless whether the drug caused the event. Id. § 314.80(a) (emphasis added). According to FDA regulations, AERs do not demonstrate "that the drug caused or contributed to an adverse effect." 21 C.F.R. § 314.80(l). To the contrary, FDA has explained that the information in AERs "has not been scientifically or otherwise verified," and that "there is no certainty that the suspected drug caused the reaction," as the "event . . . may have occurred by chance at the same time the suspected drug was taken." FDA, AER System, Office of Pharmacoepidemiology and Statistical Science, Brief Description with Caveats of System at 4 (July 18, 2005) (Ex. KK); *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (noting that "the mere existence of reports of adverse events . . . says nothing in and of itself about whether the drug is causing the adverse events").

Xarelto's label to make *any* "monitoring recommendations."[16]  As Defendants have explained (*see* Doc. 5904), and as Plaintiffs concede, a pharmaceutical manufacturer cannot unilaterally change any aspect of the "Highlights" section of a medicine's FDA-approved label; rather, *any* change to that particular section requires advance agency authorization. *See* Doc. 5966, at 5 ("The Defendants are correct that they are prohibited from changing the Highlights portion of the label without prior FDA approval."). The FDA regulation governing "[c]hanges to an approved application" unambiguously states that "[a]ny change to the information required by § 201.57(a)"—*i.e.*, information required to be included in the Highlights section—constitutes a "major change" that "require[s a] supplement submission and approval prior to distribution of the product." 21 C.F.R. § 314.70(b)(2)(v)(C). And notably, the CBE provision—which Plaintiffs cite for the proposition that "manufacturers have always been permitted to alter warnings and labels without prior FDA approval" (Doc. 5531, Pls.' Opp. 13)—*expressly excludes from its scope information that, under § 201.57(a), must go in the Highlights section*.  *See* 21 C.F.R. § 314.70(c)(6)(iii) (permitting unilateral labeling changes to accomplish specified purposes, "except for changes to the information required in § 201.57(a)").   In light of these regulations, Plaintiffs and their regulatory expert, Dr. Suzanne Parisian, concede that "the regulation says that the highlights section should stay the same and get FDA approval" and that "the highlights cannot be changed without prior approval." Parisian Dep. at 50, 56 (Ex. LL); *see also* Doc. 5966, at 5.

Critically here, section 201.57(a) clearly provides that, among other information, "monitoring recommendations" *must* be included in the Highlights section of product labeling. 21 C.F.R. § 201.57(a)(7). Plaintiffs concede that their claim—*i.e.*, that Xarelto's label fails to

---

[16] Defendants expressly incorporate their prior briefing on this point. *See* Doc. 5109-1, at 22 n.7; Doc. 5678, at 11–12; *see also* Docs. 5904, 5988.

adequately instruct doctors to use the Neoplastin PT assay to assess patients' rivaroxaban-related coagulation parameters—would require Defendants to add a "monitoring recommendation" to the label. *See* Doc. 5966, at 3–4. Because any such recommendation would have to be included in the Highlights section of the label, and because Defendants cannot "independently" make that change, Plaintiff's claim is preempted. *Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 620.

## II.   Plaintiffs' claims regarding bleeding risks also are preempted for the reasons explained in Defendants' prior motions for summary judgment.

Earlier in the litigation—in their complaints and experts' reports—Plaintiffs asserted failure-to-warn theories that Defendants should have added to Xarelto's label (1) language advising of problems with a medical device (known as the INRatio device) that was used to measure warfarin patients' coagulation parameters in ROCKET AF, the clinical trial that supported FDA's approval of Xarelto's AFib indication, (2) a chart quantifying bleeding rates specifically among U.S. participants in the 14,000-patient ROCKET AF study before September 2015, and (3) a "black box" warning regarding the risk of bleeding.  *See, e.g.*, Doc. 5110-1, at 1–2.  Plaintiffs abandoned these claims in their responses to Defendants' dispositive motions in the first three bellwether trials.  To the extent that these Plaintiffs seek to revive those claims in these cases, Defendants incorporate their prior briefing on these matters, that Plaintiffs' claims are preempted as a matter of law as set forth below.  *See* Docs. 5110-1 and 5689.

### A.   Plaintiffs' claim that Xarelto's label should have included a warning about the impact of recall of the INRatio device on ROCKET AF is preempted as a matter of law.

Plaintiffs' claim that the Xarelto label should have warned about the recall of the INRatio device used in ROCKET AF is preempted.  In September 2015, years after Xarelto was approved for AFib patients, Janssen learned that the manufacturer (a company now known as Alere) of a "point of care" device (called the INRatio device) used to monitor warfarin patients in the

ROCKET AF clinical trial had instituted a Class 1 recall of the devices. *See* September 29, 2015 Letter from Janssen to FDA, Ex. MM at 4. The recall notice had stated that "[i]n certain cases," the device "may provide an INR result that is clinically significantly lower than a result obtained using a reference INR system (laboratory method)." FDA Reanalysis, Ex. NN, at 13. Upon learning of the recall, Janssen advised FDA that devices similar to those used in ROCKET AF had been recalled. Ex. MM, at 4. FDA then "independently performed a variety of analyses intended to characterize the impact of use of the INRatio device on the safety and efficacy results of ROCKET." Ex. NN, at 1. On September 26, 2016, FDA issued a comprehensive, 74-page "ROCKET AF Reanalysis Review," which reaffirmed the ROCKET AF study's findings, Xarelto's positive benefit-risk profile, and the adequacy of the product labeling. Ex. NN, *generally*.

> [T]he conclusion we made in 2011 that the benefits of rivaroxaban in patients with non-valvular atrial fibrillation outweigh its risks should not be changed.
> . . . .
>
> [N]o changes in rivaroxaban labeling to reflect the impact of use of the INRatio device in ROCKET are warranted. No other major regulatory action should be taken with respect to rivaroxaban.

*Id.* at 2–3. FDA further observed "that a labeling change to describe the modeling results would be very difficult to write in a concise manner and might be more likely to confuse than to edify, and is not warranted." *Id.* at 42; *see also* October 11, 2016 FDA Public Statement, "FDA analyses conclude that Xarelto clinical trial results were not affected by faulty monitoring device," available at: http://www.fda.gov/Drugs/DrugSafety/ucm524678.htm (Ex. OO) (concluding that "Xarelto is a safe and effective alternative to warfarin in patients with atrial fibrillation").

As in *Seufert*, 187 F. Supp. 3d 1163, because FDA has already undertaken an extensive investigation of, and published findings concerning, the INRatio-related issue that Plaintiffs now assert—and concluded, flatly contrary to Plaintiffs' current contention, that "no changes in rivaroxaban labeling to reflect the impact of use of the INRatio device in ROCKET are warranted" and that no further regulatory action is necessary, Ex. NN, at 3—there is "clear evidence" that FDA would have rejected Plaintiffs' proposed change.[17]

### B. Plaintiffs' claims that the Xarelto label should have included subgroup data from ROCKET AF earlier is preempted as a matter of law.

Plaintiffs' claim that the Xarelto label should have included U.S. subgroup data from ROCKET AF earlier also is preempted as a matter of law.  As part of its ROCKET AF submission for NDA 202439 (AFib), Janssen provided data to FDA, including data pertaining to discrete "subgroups" of patients within the clinical trial.  Then, as part of labeling discussions, Janssen proposed to include certain ROCKET AF subgroup data—in particular, that the efficacy of Xarelto in preventing strokes and embolism "was generally consistent across major subgroups."  JRD's August 18, 2011 submission to FDA, at 27 (Ex. AA).  FDA provided its own proposal referring to "US practice"; that proposal would have added language to the Clinical Trials section of the label that "[t]here is insufficient experience with INR control more typical of US practice to say how XARELTO and warfarin compare in this setting."  FDA's October 11, 2011 revision, , at 35 (Ex. PP).[18]  Janssen then suggested different language, likewise referring to

---

[17] To the extent Plaintiffs contend that Defendants should be held liable for allegedly failing to share with FDA at an earlier date certain data related to use of the INRatio device in ROCKET, any such claim is preempted under *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 343, 349–50 (2001), which held that federal law preempts any state-law claim that is premised on the notion that the defendant misled FDA or violated FDA regulations.  *See also Lofton v. McNeil Consumer & Specialty Pharm.*, 672 F.3d 372, 380 (5th Cir. 2012) ("In cases like this, where the FDA has not found fraud, the threat of imposing state liability on a drug manufacturer for defrauding the FDA intrudes on the competency of the FDA and its relationship with regulated entities.  Under such circumstances *Buckman* found a violation of the Supremacy Clause.").

[18] *See also, e.g.*, Ex. AA, at 26, 28 (JRD's proposal to add to "CLINICAL STUDIES," Section 14.2, Figure 1, summarizing data of adjudicated primary composite endpoints of stroke and non-CNS systemic embolism, including

U.S. patients:  "In ROCKET AF, the patients randomized to warfarin had a mean percentage time in the INR target range of 2.0 to 3.0 of 55% with limited number of patients with a time in range >70%.  *In the US*, the mean target range was 63%."  JRD's October 14, 2011 submission to FDA, at 26 (Ex. QQ) (emphasis added).  FDA subsequently concluded that none of these statements suggesting that there were differences in subgroup data should be included in the label.  FDA's October 19, 2011 revision, at 23 (Ex. RR) (adopting JRD's original proposal stating "the efficacy of Xarelto was generally consistent across major subgroups").  Significantly, during FDA's internal labeling discussions, the Agency also considered and then expressly rejected the inclusion of a statement that "North American subjects on XARELTO experienced a higher annual bleeding rate compared to their warfarin treated counterparts than subjects from any other region."  Ex. PP, at 19.

So matters stood for more than two years.  Then, in January 2014, FDA undertook a class-wide effort "to harmonize the presentation of safety and efficacy data in the labels for *all* recently approved non-vitamin K-dependent oral anticoagulants (NOACs)"—not just Xarelto, but also Pradaxa and Eliquis.  January 28, 2014 letter from FDA (Ex. SS); September 10, 2015 letter from FDA, at 1 (Ex. TT).  For Xarelto, in particular, this class-wide "harmoniz[ation]" meant adding to the label additional data from ROCKET AF pertaining to various subgroups—*e.g.*, gender, weight, and others, including U.S. patients.  Janssen responded to multiple inquiries from FDA, and on September 10, 2015, FDA approved the addition of a new chart regarding bleeding risks of various subgroups of patients from ROCKET AF, including the U.S. subgroup.

---

the North American region and stating "the efficacy of Xarelto was generally consistent across major subgroups" and proposing to add Figure 2 "Subgroup Analysis of Adjudicated Primary Composite Endpoints by Patient Baseline Characteristics Safety Population / On Treatment" summarizing a subgroup data analysis); Ex. PP, at 35 (FDA rejects these proposals).

Ex. TT, at 3.[19]  The chart summarizes data that were indisputably derived from ROCKET AF, and thus were before FDA from the outset—it was not based on any new or different study not previously considered by the Agency.  *Id.*

Plaintiffs' entire claim turns on FDA's decision in 2015—as part of an effort to "harmonize" labeling for *all* NOAC products—to include a chart summarizing and categorizing the same subgroup data that had been studied in ROCKET AF and supplied to the Agency at the outset of the approval process.  FDA's "harmoniz[ation]" project cannot bear the weight that Plaintiffs' attribute to this post hoc administrative decision to include additional (but long extant) information about ROCKET AF in the label.  Both because the U.S.-subgroup data were not "new" and because FDA rejected several proposals to include those data earlier, federal law preempts Plaintiffs' claim that Defendants should be held liable for failing to do so.

> **C.   Plaintiffs' claims that the Xarelto label should have included a black box warning is preempted as a matter of law.**

Plaintiffs also previously abandoned—and this Court also previously excluded—an argument that the label was inadequate because it did not include a "black box" warning regarding the risk of bleeding.  *See Orr* Tr. at 518:8–9 ("I am going to tell [the jury] to disregard testimony regarding the black box warning.") (Ex. UU); *id.* at 526:11–14 (instructing the jury).

FDA regulations permit a manufacturer to add a black box warning to its product's label *only* if specifically required to do so by FDA.  In particular, the regulations state that "[s]pecial problems, particularly those that may lead to death or serious injury, may be required by the Food and Drug Administration to be placed in a prominently displayed box" and that "[i]f a boxed warning is required, its location will be specified by the Food and Drug Administration."  21 C.F.R. § 201.80(e); *see also* 21 C.F.R. § 201.57(c)(1) ("Certain

---

[19] The chart also cautions, among other things, that subgroup information "should not be over-interpreted."  *See id.*

(blank)

contraindications or serious warnings, particularly those that may lead to death or serious injury, may be required by the FDA to be presented in a box." (applying rule to prescription drugs approved after June 30, 2001, pursuant to 21 C.F.R. § 201.56(b))). Notably, during the notice-and-comment period for this rule, FDA clarified its view that only the Agency can institute black-box warnings. *See* 44 Fed. Reg. 37434, 37448 (June 26, 1979) (explaining that black-box warnings "are permitted only when specifically required by FDA"). The reason: "to ensure the significance of boxed warnings in drug labeling." *Id.*; *see also* 51 Fed. Reg. 43900, 43902 (Dec. 5, 1986) ("[T]he agency has the authority to require a 'boxed' warning on prescription drug packages for special problems, particularly those that may lead to death or serious injury. . . . The agency's policy is to use restraint in requiring warnings to be boxed because overuse of the box will ultimately lead to reducing its effect."); *In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 817 F. Supp. 2d 535, 553 n.97 (E.D. Pa. 2011). *Cf. Ackerman v. Wyeth Pharms.*, 526 F.3d 203, 211 n.12 (5th Cir. 2008) (noting that "Wyeth was forbidden from providing a 'black box' warning because '[t]o ensure the significance of boxed warnings in drug labeling, they are permitted in labeling only when specifically required by the FDA.'" (alternation in original)). Because federal law forbade Defendants from "independently" adding a black-box warning to Xarelto's label without prior FDA approval, and because FDA did not require the risk of bleeding to be included in the black-box warning, any claim arising out of their failure to do so is preempted. *See Bartlett*, 133 S. Ct. at 2470; *Mensing*, 564 U.S. at 620.

## CONCLUSION

For the foregoing reasons, the Court should grant Defendants' summary judgment on Plaintiffs' failure-to-warn claim.

DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
Drinker Biddle & Reath LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
Drinker Biddle & Reath LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
Chanda.Miller@dbr.com

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ *James B. Irwin*
James B. Irwin
Kim E. Moore
Irwin Fritchie Urquhart & Moore LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

*Attorneys for Janssen Defendants*

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *William Hoffman*
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ *Lindsey C Boney IV*
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8803
lboney@bradley.com

CHAFFE MCCALL L.L.P.
By: /s/ *John F. Olinde*
John F. Olinde
Chaffe McCall L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer Defendants*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on September 21, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre- Trial Order No. 17.

*/s/ James B. Irwin*
**James B. Irwin**
