# EXHIBIT D

```
 1                UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF MISSISSIPPI

 3

 4

 5   IN RE:   XARELTO               *
     (RIVAROXABAN) PRODUCTS         *
 6   LIABILITY LITIGATION           *
                                    *
 7   THIS DOCUMENT RELATES TO:      *   Docket No.: 14-MD-2592
                                    *   Section "L"
 8   Dora Mingo, et al. v.          *   Jackson, Mississippi
     Janssen Research &             *   August 7, 2017
 9   Development, LLC, et. al.,     *
     Case No.: 15-CV-3469           *
10   * * * * * * * * * * * * * * * *

11               VOLUME I - AFTERNOON SESSION
            TRANSCRIPT OF JURY TRIAL PROCEEDINGS
12          BEFORE THE HONORABLE ELDON E. FALLON
                UNITED STATES DISTRICT JUDGE
13

14   APPEARANCES:

15
     For the Plaintiffs'
16   Liaison Counsel:            Gainsburg Benjamin David
                                   Meunier & Warshauer
17                               BY:  GERALD E. MEUNIER, ESQ.
                                 2800 Energy Centre
18                               1100 Poydras Street
                                 New Orleans, Louisiana 70163
19

20
     For the Plaintiffs:         Beasley Allen
21                               BY:  ANDY BIRCHFIELD, ESQ.
                                 P.O. Box 4160
22                               Montgomery, Alabama 36103

23

24

25
```

```
 1   APPEARANCES:

 2                                    Gainsburg Benjamin Davis
                                        Meunier & Warshauer
 3                                    BY:  WALTER C. MORRISON, IV, ESQ.
                                      240 Trace Colony Park Drive
 4                                    Suite 100
                                      Ridgeland, Mississippi 39157
 5

 6
                                      Goza Honnold
 7                                    BY:  BRADLEY D. HONNOLD, ESQ.
                                      11181 Overbrook Road, Suite 200
 8                                    Leawood, Kansas 66211

 9
                                      The Lambert Firm
10                                    BY:  EMILY JEFFCOTT, ESQ.
                                      701 Magazine Street
11                                    New Orleans, Louisiana 70130

12
     For the Defendant Bayer
13   HealthCare Pharmaceuticals
     Inc. and Bayer Pharma AG:        Mitchell, Williams, Selig, Gates &
14                                      Woodyard, P.L.L.C.
                                      BY:  LYN P. PRUITT, ESQ.
15                                    425 W. Capitol Avenue, Suite 1800
                                      Little Rock, Arkansas 72201
16

17
                                      Watkins & Eager, PLCC
18                                    BY:  WALTER T. JOHNSON, ESQ.
                                      400 East Capitol Street
19                                    Jackson, Mississippi 39201

20

21   For Janssen Pharmaceuticals,
     Inc. and Janssen Research &
22   Development, LLC:                Barrasso Usdin Kupperman Freeman &
                                        Sarver, LLC
23                                    BY:  RICHARD E. SARVER, ESQ.
                                      909 Poydras Street, 24th Floor
24                                    New Orleans, Louisiana 70112

25
```

*OFFICIAL TRANSCRIPT*

```
 1
 2
      Official Court Reporter:      Tana J. Hess, CRR, RMR
 3                                   500 Poydras Street
                                     Room B275
 4                                   New Orleans, Louisiana 70130
                                     (504) 589-7781
 5
 6
      Proceedings recorded by mechanical stenography using
 7    computer-aided transcription software.
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1:35PM 1 designed? We're not talking about changing up the way the
1:35PM 2 molecule is constructed. What we're talking about here is
1:35PM 3 should it have been marketed with its own test?
1:35PM 4 And so Judge Fallon at the end of the -- at the
1:35PM 5 end of the evidence, he will give you instructions on the law
1:35PM 6 that applies to this case. And I believe that he will talk to
1:35PM 7 you about what it means to have a defectively designed product.
1:35PM 8 The sellers -- did the sellers know about the
1:35PM 9 danger with this product? Was there a danger that the sellers
1:35PM 10 knew about? And did that danger cause the product to work less
1:35PM 11 effectively and less safely than was expected? And was there a
1:35PM 12 safer, feasible design?
1:35PM 13 And I think that you will see the evidence in
1:36PM 14 this case that there is a danger, and this danger was known to
1:36PM 15 the sellers, and this danger keeps Xarelto from working as
1:36PM 16 safely and effectively as you would expect, not being at too
1:36PM 17 high a risk of thin blood, and that there is an alternative
1:36PM 18 design, a feasible design, a design that will really work.
1:36PM 19 Before Xarelto was ever sold here in the United
1:36PM 20 States, these corporations had some decisions to make, some
1:36PM 21 important decisions. And the decisions that they made had
1:36PM 22 safety implications and selling implications. Health versus
1:36PM 23 wealth, if you will.
1:36PM 24 One of the key decisions that the company had to
1:36PM 25 make -- several of these key decisions involved the design of

1:36PM 1 the drug. One was whether this drug, whether Xarelto, should
1:36PM 2 be marketed with its own safety indicator test. Should it come
1:37PM 3 with an indicator test, identify those patients that are at
1:37PM 4 high risk?
1:37PM 5 So as the company is making this decision on the
1:37PM 6 health side, the answer to that question, should it have an
1:37PM 7 indicator test, is yes, absolutely. There will be patients --
1:37PM 8 there will be patients that are at extra-high risk. They have
1:37PM 9 this high variability. They need to be identified so that
1:37PM 10 those patients can be taken off Xarelto early, before they have
1:37PM 11 a major bleeding event.
1:37PM 12 There will be emergency surgery situations.
1:37PM 13 There will be patients on Xarelto -- there may be a patient on
1:37PM 14 Xarelto that has a stroke or they have some other type of
1:37PM 15 problem that needs immediate surgery. You got a patient on
1:37PM 16 Xarelto. They have a brain bleed and a stroke, and the doctors
1:37PM 17 know that there's pressure building. They need to do surgery.
1:37PM 18 They need to do it immediately. Should there be a test, an
1:37PM 19 indicator test, to let them know whether they can do surgery
1:38PM 20 immediately? Or do they need to wait until more of the drug
1:38PM 21 clears the system?
1:38PM 22 On the health side of the equation, the answer
1:38PM 23 was yes. Yes, there should be -- there should be a safety
1:38PM 24 test. Xarelto should be marketed with its own safety indicator
1:38PM 25 test.

1:38PM 1   On the wealth side of the equation, the answer
1:38PM 2 was no, because there was concern. There was concern that if
1:38PM 3 there is -- if doctors know that there's a test, they know that
1:38PM 4 there's a way to test, they'll think they should test, and that
1:38PM 5 will make us too much like -- that will make us too much like
1:38PM 6 warfarin.
1:38PM 7   In marketing, one of the key things that you
1:38PM 8 need is differentiation. You want differentiation in a
1:38PM 9 positive way, not in a negative way. And so they did not want
1:38PM 10 to be in that same boat with warfarin. So the marketing side,
1:38PM 11 the sales and marketing side, said no -- or at least the
1:38PM 12 loudest voices on the marketing side said, "No, do not -- do
1:39PM 13 not put this on safety indicator test. Do not tell doctors
1:39PM 14 about a test."
1:39PM 15   You will see that the decision was made to go
1:39PM 16 forward marketing Xarelto in the US without its own -- without
1:39PM 17 its own safety indicator test.
1:39PM 18   That test is in addition to the PT test, that
1:39PM 19 tool kit that the doctors have. They've got a way to measure
1:39PM 20 the PT. They just don't have the instructions to it. We're
1:39PM 21 talking about two different ways to address this problem.
1:39PM 22   How do you identify those patients that are at
1:39PM 23 extra-high risk? One, you tell doctors about the tool that's
1:39PM 24 in their kit already. Tell them about the PT test. Don't tell
1:39PM 25 them it's not possible.

| | |
|---|---|
| 1:39PM | 1 |            The other way is to market Xarelto with its own
| 1:39PM | 2 | test, with its own indicator test.  That test -- that second
| 1:39PM | 3 | test is what's called a Factor Xa test or the anti-Factor Xa
| 1:39PM | 4 | test.  And the way that -- all these blood thinners work in
| 1:40PM | 5 | different ways.  And our body has different proteins, different
| 1:40PM | 6 | factors that are involved in the clotting process.  One of
| 1:40PM | 7 | those factors is Factor X, Factor Xa, when it becomes
| 1:40PM | 8 | activated.
| 1:40PM | 9 |            And so Xarelto, that's the factor that Xarelto
| 1:40PM | 10 | affects.  So you can measure.  You can measure the effect that
| 1:40PM | 11 | Xarelto is having blocking Factor Xa.  That's a test that is
| 1:40PM | 12 | used in other places and other places Xarelto is marketed where
| 1:40PM | 13 | Factor Xa test is readily available; not here in the US.  They
| 1:40PM | 14 | use the Factor Xa test in their own studies to get approval for
| 1:40PM | 15 | the drug.  It is -- it is a test that is -- that is used in
| 1:40PM | 16 | other places, and the companies know about it, but they made
| 1:40PM | 17 | the decision not to market Xarelto in the US with this test.
| 1:40PM | 18 |            The tests that we are talking about, the tests
| 1:40PM | 19 | that we are offering you as evidence in this case, are proven,
| 1:41PM | 20 | valid, scientific tests.  We are not offering you any unproven
| 1:41PM | 21 | theories.  We are offering you valid science.
| 1:41PM | 22 |            Now, you may hear that doctors in the
| 1:41PM | 23 | community -- in this community do not do what we suggest, and
| 1:41PM | 24 | that's true.  But all of that would change, all of that would
| 1:41PM | 25 | change, if the -- if the defendants would tell doctors about

**CERTIFICATE**

I, Tana J. Hess, CCR, FCRR, Official Court Reporter for the United States District Court, Eastern District of Louisiana, certify that the foregoing is a true and correct transcript, to the best of my ability and understanding, from the record of proceedings in the above-entitled matter.

_____
Tana J. Hess, CCR, FCRR, RMR
Official Court Reporter