# EXHIBIT S

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION

                                     Docket No. 14-MD-2592

THIS DOCUMENT RELATES TO:          Section L
                                   New Orleans, Louisiana
Joseph Orr, Jr., as Lawful       Tuesday, June 6, 2017
Surviving Spouse of
Sharyn Orr v. Janssen, et al.
Case No. 2:15-cv-03708


*******************************************************************

TRANSCRIPT OF TRIAL PROCEEDINGS
HEARD BEFORE THE HONORABLE ELDON E. FALLON,
UNITED STATES DISTRICT JUDGE,
AND A JURY.
VOLUME V - MORNING SESSION

*******************************************************************

APPEARANCES:


FOR THE PLAINTIFFS'          MR. ANTHONY BIRCHFIELD, JR.
LIAISON COUNSEL:              Beasley Allen Crow Methvin
                               Portis & Miles
                        Post Office Box 4160
                        Montgomery, AL  36103

                        MR. BRIAN H. BARR
                        MR. NEIL E. McWILLIAMS
                        Levin Papantonio Thomas
                         Mitchell Rafferty & Proctor
                        316 Baylen Street
                        Suite 600
                        Pensacola, FL 32502

                        MR. GERALD EDWARD MEUNIER
                        Gainsburgh, Benjamin, David,
                         Meunier & Warshauer
                        Energy Centre
                        1100 Poydras Street
                        Suite 2800
                        New Orleans, LA  70163-2800

```
 1                                    MS. EMILY JEFFCOTT
                                      The Lambert Firm, PLC
 2                                    701 Magazine Street
                                      New Orleans, LA  70130
 3

 4                                    MR. BRADLEY D. HONNOLD
                                      Goza & Honnold, LLC
 5                                    11181 Overbrook Road
                                      Suite 200
 6                                    Leawood, KS 66211

 7

 8   FOR THE DEFENDANT JANSSEN        MR. JAMES B. IRWIN, V
     PHARMACEUTICALS, INC.,           Irwin Fritchie
 9   and JANSSEN RESEARCH &               Urquhart & Moore, LLC
     DEVELOPMENT, LLC:                400 Poydras Street
10                                    Suite 2700
                                      New Orleans, LA  70130
11

12
     FOR THE DEFENDANT               MR. DAVID E. DUKES
13   BAYER HEALTHCARE                Nelson Mullins Riley &
     PHARMACEUTICALS, INC.,              Scarborough, LLP and
14   BAYER PHARMA AG:                Meridian, 17th Floor
                                     1320 Main Street
15                                   Columbia, SC  29201

16
                                     MS. BETH A. WILKINSON
17                                   Wilkinson Walsh + Eskovitz, LLP
                                     1900 M Street NW
18                                   Suite 800
                                     Washington, DC 20036
19

20
     REPORTED BY:  Mary V. Thompson, RMR, FCRR
21                 United States District Court
                   500 Poydras, Room B275
22                 New Orleans, LA  70130

23

24

25
```

Page 1239

1    initially, but worked in antithrombotics for many years.  And he

2    reports to me.  He had expertise in that area.  So he's been

3    working on that.

4        Q.   What was -- why was the company looking at PT in terms

5    of developing a test that could measure prothrombin time in the

6    context of the Xarelto development program?

7        A.   Well, they were looking at it, not that the PT itself

8    would be, but that you could use it as the base to develop a

9    test.  And it's simpler.  So -- and doctors would have some --

10   more familiarity.  The lab -- it would be a little bit easier.

11   So that's the start.  I mean, if you could, you would.

12            But doing that work, it turned out that anti-Factor Xa

13   assay, which is a little bit more complicated, was a better base,

14   a more reliable base, to develop the entire test on.

15       Q.   So as between the PT test, even when using the

16   Neoplastine assay and the anti-Factor Xa for measuring

17   rivaroxaban, it turned out that anti-Factor Xa was the better way

18   to go?

19       A.   Yeah.  Because the PT test was -- was just not

20   sensitive, especially at the lower levels.

21       Q.   That said, does the U.S. label for Xarelto provide

22   information that doctors need, in your view, to make appropriate

23   decisions about how to best treat their patients?

24       A.   I think it does.

25       Q.   Why don't we take a look at a few.  Why don't we look

Page 1240

1    at Example Section 5.

2         A.    Okay.

3         Q.    The warnings and precautions section.

4         A.    Right.

5         Q.    What is Section 5.2 headed?  What, if anything, does it

6    say with regard to evaluation of patients?

7         A.    Well, as we had discussed about how we care for

8    patients, promptly evaluate any signs or symptoms of blood loss,

9    and consider the need for blood replacement.

10             So clearly that's evidence that you have to watch

11   patients on anticoagulants.

12        Q.    What about, for example, Section 5.4, use in patients

13   with renal impairment?  What does it say with respect to patients

14   and what does it -- what type of information is provided to

15   doctors about patients with nonvalvular atrial fibrillation?

16        A.    In that particular situation, it says periodically

17   assess renal function as clinically indicated, that is, more

18   frequently in situations in which renal function may decline, and

19   adjust therapy accordingly to the dosage in administration

20   section of 2.4, where we provide that information.

21        Q.    One of the things you spent some time talking about was

22   language about PT in the United States product insert.  Do you

23   remember that?

24        A.    Yes.

25        Q.    And you said there was language about PT that was

1  proposed by Janssen, I believe, that the regulatory authority

2  would not allow in to the label; is that correct?

3      A.    What I said was that we have standard language in our

4  CCDS, our core data sheet, and we include it in the SPC.  I know

5  that we use it for all the labels, and that it was initially

6  there.  And then, during the interchange back and forth, it's

7  not.  They struck it.  They have their reasons for why they do

8  different things, but that's what I know.

9      Q.    You were not involved in label negotiations between

10  Janssen and the FDA for the United States product insert, were

11  you?

12      A.    No, that's not correct.  I am.  I'm not deeply involved

13  in it.  They keep us in communication.  We may comment on the

14  label that they go back and forth.  So there's some interaction,

15  but they're responsible.

16      Q.    You were not, yourself, directly involved in the

17  negotiations negotiating the label with the FDA?

18      A.    No.  That's a part of the regulatory positions at

19  J & J.

20      Q.    And as I believe you testified to, you don't know why

21  the FDA struck that language, do you?

22      A.    I don't remember why that was.

23      Q.    Let me show you what I'm going to mark as Exhibit 58,

24  and this will be Plaintiffs' 2905274.

25          Exhibit 58 is a document entitled Xarelto USPI Label

Page 1242

1    Contingency Document from LRC, April 23rd, 2009, correct?

2         A.   Yes.

3         Q.   And if you look, you'll see this -- there's a statement

4    in the middle of the box that says, "Will we need to add a new

5    5.4 laboratory section like Lovenox?"  Do you see that?

6         A.   I do.

7         Q.   You understand that Section 5 is the warning section of

8    the United States product insert, right?

9         A.   Yes.

10        Q.   Okay.  It says, "Only if section is requested, consider

11   modifying significantly without stool occult blood test and PT is

12   not insensitive."  Do you see that?

13        A.   Yeah.

14        Q.   And so the instruction is only give this if the section

15   is requested, right?

16        A.   Well, it says, "Only if section is requested, consider

17   modifying significantly without stool occult blood test and PT is

18   not insensitive."

19        Q.   Right.

20        A.   Yeah.

21        Q.   So if you go over to the third box there on the bottom,

22   it just has in bold at No. 1, "Defend not having any laboratory

23   monitoring statement in the warning section," doesn't it?

24        A.   Sorry.  Where are you?

25        Q.   This box right here (indicating).

Page 1349

1                          CERTIFICATE

2

3        I hereby certify this 6th day of June, 2017, that the

4   foregoing is, to the best of my ability and understanding, a true

5   and correct transcript of the proceedings in the above-entitled

6   matter.

7

8                                   /s/ Mary V. Thompson
                                _____
9                                   Official Court Reporter

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 1350

                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA

*********************************************************************

IN RE:  XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION          Docket No. 14-MD-2592
                                       Section "L"
                                       New Orleans, Louisiana
THIS DOCUMENT RELATES TO:              Tuesday, June 6, 2017
Joseph Orr, et al
v. Janssen Research &
Development, et. al.,
Case No. 15-CV-3708

*********************************************************************

                    TRANSCRIPT OF TRIAL PROCEEDINGS
            HEARD BEFORE THE HONORABLE ELDON E. FALLON
                    UNITED STATES DISTRICT JUDGE
                    VOLUME VII - AFTERNOON SESSION


APPEARANCES:

FOR THE PLAINTIFFS'
LIAISON COUNSEL:                  LEVIN PAPANTONIO
                                  BRIAN H. BARR, ESQ.
                                  316 Baylen Street, Suite 600
                                  Pensacola, FL 32502

                                  BEASLEY ALLEN
                                  BY:  ANDY BIRCHFIELD, ESQ.
                                  P.O. Box 4160
                                  Montgomery, AL 36103

                                  GAINSBURGH BENJAMIN DAVID
                                  MEUNIER & WARSHAUER
                                  BY:  GERALD E. MEUNIER, ESQ.
                                  2800 Energy Centre
                                  1100 Poydras Street
                                  New Orleans, LA 70163

                                  GOZA & HONNOLD, LLC
                                  BY:  BRADLEY D. HONNOLD, ESQ.
                                  11181 Overbrook Road, Suite 200
                                  Leawood, Kansas 66211

```
 1                                   THE LAMBERT FIRM, PLC
                                     BY:  EMILY JEFFCOTT, ESQ.
 2                                   701 Magazine Street
                                     New Orleans, Louisiana 70130
 3

 4   FOR THE DEFENDANT BAYER
     HEALTHCARE PHARMACEUTICALS
 5   INC. and BAYER PHARMA AG:       WILKINSON WALSH & ESKOVITZ, LLP
                                     BY:  BETH A. WILKINSON, ESQ.
 6                                   1900 M Street NW, Suite 800
                                     Washington, DC 20036
 7
                                     Nelson Mullins Riley
 8                                   & Scarborough, LLP
                                     BY:  DAVID E. DUKES, ESQ.
 9                                   Meridian, 17th Floor
                                     1320 Main Street
10                                   Columbia, SC 29201

11
     FOR JANSSEN PHARMACEUTICALS,
12   INC. AND JANSSEN RESEARCH &
     DEVELOPMENT, LLC:               IRWIN FRITCHIE URQUHART & MOORE
13                                   BY:  JAMES B. IRWIN, ESQ.
                                     400 Poydras St., Suite 2700
14                                   New Orleans, LA 70130

15

16   Official Court Reporter:       Karen A. Ibos, CCR, RPR, CRR, RMR
                                     500 Poydras Street, B-275
17                                   New Orleans, Louisiana 70130
                                     (504) 589-7776
18

19     Proceedings recorded by mechanical stenography, transcript
     produced by computer.
20

21

22

23

24

25
```

Page 1382

1  A.  That is correct, sir.

2  Q.  Containing the same language for a PT test?

3  A.  Yes.

4  Q.  Then next let's go to DX 05280, the cover letter, and DX 05281,

5  which is another submission of the AFib labelling in April of 2011.

6       MR. IRWIN:  And, your Honor, we offer the cover letter as

7  Defense Exhibit 17, and the label as 18.

8       THE COURT:  Let's see if he recognizes it.

9  BY MR. IRWIN:

10  Q.  Mr. Jalota, would you please look at the cover letter and

11  affirm that you're familiar with and recognize that that cover

12  letter in April of 2011 is what indeed did submit -- the transmit

13  the label to the FDA?

14  A.  That is correct.  That is right.

15       MR. IRWIN:  We offer them both, your Honor.

16       THE COURT:  Admitted.

17  BY MR. IRWIN:

18  Q.  Then if we can go back to the timeline.  We'll skip the cover

19  letter and go right to 12.2.  That's the same language submitted to

20  the FDA in April of 2011 for a PT test, this the fourth time; is

21  that correct, sir?

22  A.  That is correct.

23  Q.  And then, finally, let's go to May of 2011 for the AFib

24  labelling submission again.

25       MR. IRWIN:  And we would offer Defense Exhibit 05285 and

1   05286 as Defense Exhibits 19 and 20.

2              MR. BARR:  He signed this one, your Honor.  No objection.

3              MR. IRWIN:  Are they admitted, your Honor?

4              THE COURT:  Admitted.

5              MR. IRWIN:  Thank you, sir.

6   BY MR. IRWIN:

7   Q.  Let's take a look.  We'll go straight to the label.  And would

8   you read that again before we move to the next section.  What is

9   the highlighted labelling language say, please?

10  A.  "The relationship between PT and rivaroxaban plasma

11  concentration is linear and closely correlated.  If assessment of

12  the pharmacodynamic effect of rivaroxaban is considered necessary

13  in individual cases, PT (measured in seconds) is recommended."

14  Q.  This is the fifth time that language -- that identical language

15  was submitted to FDA?

16  A.  That is correct.

17  Q.  Did there come a time when the FDA struck that language out?

18  A.  Yes, they did.  In June --

19  Q.  Then if we -- I'm sorry.  Please go ahead.

20  A.  I was just going to say -- there's an echo on the line.  I'm

21  sorry.

22             MR. IRWIN:  We will offer defense exhibits, it's actually

23  a DX number, 5221 and 5222.  First is an e-mail and the next is an

24  transmission back from FDA with the strike through.

25             We offer them, your Honor, as Defense Exhibits 20 and 21.

Page 1384

1        MR. BARR:  Can we just approach really quick?

2        THE COURT:  Sure.

3        THE DEPUTY CLERK:  Twenty-one and 22.

4        MR. IRWIN:  Twenty-one and 22.

5     (WHEREUPON, THE FOLLOWING BENCH CONFERENCE WAS HELD:)

6        MR. BARR:  Your Honor, as we did in the Boudreaux

7   trial --

8        MR. IRWIN:  Wait, wait.

9        MR. BARR:  I'm sorry.  As we did in the Boudreaux trial,

10   we think if we're going to go into this, it's appropriate for a

11   limiting instruction like we did so that the jury understands that

12   this isn't definitive of anything.

13        THE COURT:  I'll do that.  And the reason I am admitting

14   it is there is -- obviously, the plaintiffs say they didn't do it,

15   and this has some information that contradicts that.  So it seems

16   to me that that's a part of the plaintiffs' case, it's responsive.

17   So I will give the instruction.

18        MR. BARR:  Thank you.

19        MR. MEUNIER:  Your Honor, just for the record, I ask the

20   jury be told that this evidence is not to be taken in any way

21   relevant to whether the FDA would have approved the language in the

22   label that the plaintiffs feel should have been in there.

23        MR. IRWIN:  I think that's argument, your Honor.

24        THE COURT:  Yes.  I'll give my regular instruction to

25   them.  Thank you.

Page 1385

1          MR. BARR:  Thank you, Judge.

2          MR. MEUNIER:  Thank you.

3       (OPEN COURT.)

4          THE COURT:  Members of the jury, let me just talk with

5    you about the FDA and their relationship with the label.

6          FDA approval of a label is not conclusive.  A drug

7    manufacturer's compliance with the FDA criteria for approval of a

8    drug may establish that the manufacturer has met the minimum

9    standards for the safety of the drug.  But such compliance does not

10   in and of itself absolve the manufacturer of all legal

11   responsibility.  Neither does it necessarily establish by itself

12   that the drug label's warnings or instructions are adequate under

13   the law with regard to the drug's labels, warnings, and

14   instructions.  The law holds that the final responsibility for the

15   label rests with the manufacturer.

16          You'll probably be hearing from me again on that, but

17   that's an instruction to you.  So you may take it into

18   consideration, but it's not conclusive.

19          MR. IRWIN:  Thank you, your Honor.

20   BY MR. IRWIN:

21   Q.  Let's pull up the e-mail Defense Exhibit 21, which is an e-mail

22   first on June 13, 2011, from Tyree Newman at the FDA to Andrea

23   Kollath, your assistant, with a copy to you.

24          Can you identify that e-mail, Mr. Jalota?

25   A.  Yes.  That is an e-mail received from Tyree Newman, a project

1  manager at the FDA.

2  Q.  And can you read this paragraph that begins, "Good morning,

3  Andrea"?

4  A.  "Good morning, Andrea.  Please see attached redlined version of

5  the label regarding NDA 22-406 for your review and comments.

6  Please accept changes you agreed to and for changes you do not,

7  keep in track changes."

8  Q.  Now, Mr. Jalota, is this a representative example of the kind

9  of exchanges that go back and forth between the sponsor and the FDA

10  as the label is developed?

11  A.  Yes, that is.

12  Q.  And are you going to next show us -- when I pull up the

13  document -- where the FDA struck out the language that we've been

14  talking about in Section 12.2?

15  A.  I will.

16  Q.  And let's please pull that up.  Defense Exhibit 22,

17  Section 12.2.

18        Mr. Jalota, is this the same section in the label that

19  we've looked at earlier that was submitted five times by the

20  company?

21  A.  That is correct.

22  Q.  And so would you please read what has been stricken out?

23  A.  The agency struck out the sentence that was highlighted

24  earlier.  "The relationship between PT and rivaroxaban plasma

25  concentration is linear and closely correlated.  If assessment of

1  the pharmacodynamic effect of rivaroxaban is considered necessary

2  in individual cases, PT (measured in seconds) is recommended."

3  Q.  And can you keep reading?

4  A.  "The Neoplastin PT assay was measured in the RECORD program and

5  the median (with 5-95 percentiles) for PT (Neoplastin) two to four

6  hours after tablet intake (that is at the time of maximum effect)

7  was 18 (13 to 26) seconds.  The International Normalized Ratio

8  (INR) should not be used for measuring rivaroxaban pharmacodynamic

9  effect."

10  Q.  And what is the next sentence?  Can you tell us what happened

11  there as part of these labelling discussions?

12  A.  The agency introduced this -- deleted all of the text I just

13  described and added the additional text -- additional sentence

14  below.

15  Q.  And can you read that sentence for us, please?

16  A.  "The predictive value of these coagulation parameters for

17  bleeding risk or efficacy has not been adequately studied."

18  Q.  Now, Mr. Jalota, did the FDA also at this time in June of 2011

19  offer some additional language about tests in Sections 5.3 and 8.1

20  of this label?

21  A.  Yes, they did.

22  Q.  So if we can then take a look at Section 5.3.

23       Do you see it up there on your screen, Mr. Jalota?

24  A.  I do see it on the screen.  The highlighted text is, "The

25  anticoagulant effect of Xarelto cannot be monitored with standard

Page 1388

1  laboratory testing nor readily reversed."

2  Q.  And was this language in 5.3 that you just read added into the

3  label by the FDA?

4  A.  That is correct.

5  Q.  Let's also take a look at Section 8.1.  And if we can call that

6  up, please, Joshu.

7  A.  Section 8.1 is the pregnancy category, and it states again,

8  "The anticoagulant effect of Xarelto cannot be reliably monitored

9  with standard laboratory testing."

10  Q.  And, likewise, was this sentence also added by FDA?

11  A.  That is correct.

12  Q.  What was Janssen's response to the FDA about the deletion of

13  the PT language that we saw them strike through?

14  A.  We accepted the additional piece, but we added an additional

15  sentence towards the end of June to provide more information again.

16        MR. IRWIN:  We would offer Defense Exhibit 5353 and 5355

17  as Exhibits 23 and 24.

18        MR. BARR:  Your Honor, we object.  These are e-mails.

19  Mr. Jalota is not on any of these e-mails.

20        THE COURT:  Ask him about whether he knows them and

21  recognizes them.

22  BY MR. IRWIN:

23  Q.  Mr. Jalota, can you take a look at the e-mail, which is

24  DX 05353.  It is an e-mail from Andrea Kollath forwarding an e-mail

25  from Tyree Newman, the same Tyree Newman who transmitted the strike

1    out from FDA.  Are you familiar with this e-mail?

2    A.  I am.

3    Q.  And how are you familiar with it?

4    A.  Well, Andrea would have notified the team that she actually

5    sent information to the team, to the FDA.

6    Q.  And so can you identify this e-mail as being true and accurate?

7    A.  I can.

8            MR. IRWIN:  Your Honor, we offer the e-mail.

9            THE COURT:  Admitted under 901.  901 says that one way of

10    satisfying the authenticity is the testimony that an item is what

11    it is claimed to be by a witness with knowledge.  I'll admit it.

12            MR. IRWIN:  So may we publish that, your Honor?

13            THE COURT:  Yes.

14    BY MR. IRWIN:

15    Q.  If we could put up Exhibit 23.  And what do we have here,

16    Mr. Jalota?

17    A.  That is an e-mail -- the bottom e-mail is an e-mail from Andrea

18    Kollath, who was working with Xarelto with me, to Tyree Newman, who

19    is the project manager at the FDA, and we are providing our sponsor

20    responses to the FDA's comments and strikeouts.  And that was in

21    June 28th, 2011.

22            MR. IRWIN:  And, your Honor, if I failed to do so, I

23    would offer the attachment, which is the U.S. package insert, as

24    Exhibit 24.

25            THE COURT:  Admitted.

Page 1390

1   BY MR. IRWIN:

2   Q.  We then can pull up Section 12.2 in Exhibit 24.  Do you see

3   that, Mr. Jalota?

4   A.  I'm sorry, I missed that, I apologize.

5   Q.  Do you see the language that was added by the company back into

6   Section 12.2 on your screen?

7   A.  "While the prothrombin time (PT) could be used for estimating

8   rivaroxaban pharmacodynamic effect, the International Normalized

9   Ratio (INR) should not be used."

10  Q.  Why did the company propose this PT language as something of an

11  alternative after the strikethrough?

12  A.  My understanding, based on the clinical team, was they did

13  not -- they wanted PT -- they wanted to provide some information on

14  the PT, but also make it clear that the INR should not be used

15  because that was my understanding, again, that that was specific to

16  warfarin.

17  Q.  And did the FDA accept this alternative proposal for this PT

18  testing language?

19  A.  No, they did not.  They struck it out again.

20  Q.  Then if we can go to DX 05357.  And before we put that up on

21  the screen, Mr. Jalota, can you tell us what that is?

22  A.  Yes.  That is the approval letter for the orthopedic indication

23  for rivaroxaban.

24  Q.  And are you familiar with that approval letter and can you

25  identify it as true and accurate?

Page 1391

1   A.  I can identify it as true and accurate.

2          MR. IRWIN:  Your Honor, we would offer Defense

3   Exhibit 05357.

4          MR. BARR:  No objection, your Honor.

5          THE COURT:  I'll admit it.

6   BY MR. IRWIN:

7   Q.  And if we can go and take a look at Section 5.2, again, in the

8   label from this exhibit.  Let's see, it is 5357, yes.  And go to

9   12.2.  12.2, please.  And if you can --

10         So what did the FDA, Mr. Jalota, do with the alternative

11  PT test language that was proposed?

12  A.  They deleted that text.

13  Q.  And what did they do, if anything, with Sections 5.3 and 8.1,

14  those sections which previously said, "The anticoagulant effect of

15  Xarelto cannot be monitored with standard laboratory testing or

16  readily reversed."  Did they make any changes in that language in

17  those two sections?

18  A.  No, they did not.  They retained the text that they gave us.

19  Q.  Now, Mr. Jalota, did it come to pass that labelling

20  negotiations and discussions occurred between the company and the

21  FDA regarding the AFib indication?  Because what we just saw was

22  the DVT labelling; is that correct?

23  A.  That is correct, sir.

24  Q.  And so did the company and the FDA then transition to

25  discussing the labelling for the AFib indication?

Page 1398

1  BY MR. BARR:

2  Q.  Now, Mr. Jalota, you were listening, you heard Judge Fallon's

3  charge to the jury.  So you know, don't you, that the ultimate

4  content of a label is the responsibility of the drug company, not

5  the manufacturer, right -- I mean, not the FDA?

6          MR. IRWIN:  Object to the form of the question, your

7  Honor.

8          THE WITNESS:  I --

9          THE COURT:  Just restate it from the standpoint --

10  correct what you just said.

11  BY MR. BARR:

12  Q.  You know, don't you, that the ultimate content of a drug label

13  is the responsibility of the drug manufacturer, not the FDA?

14  A.  That is correct.  Ultimately it's the sponsor's responsibility,

15  the responsibility for the label.  But it needs to be approved by

16  the FDA before it can be marketed or released.

17  Q.  So you don't know that the company at any time can strengthen a

18  warning without FDA approval; you know that's true, right?

19  A.  Can you just rephrase that again for a second, please.

20  Q.  You know that it's true that a drug company can strengthen the

21  warning of its label at any time without FDA approval, right?

22  A.  That is not correct.

23  Q.  So that's what you believe the regulatory structure of the

24  United States is; just so the jury understands that's what you

25  believe?

Page 1399

1  A.  That is correct, sir.

2  Q.  Okay.  So if you agree with me that the content of the label is

3  always the responsibility of the manufacturer, for this jury,

4  please detail all of the steps taken by Janssen to advise of the

5  usefulness of PT in emergency medical care?

6  A.  So what we did -- what we did for -- specifically the PT

7  language is, as you saw this in Section 12.2, we provided the

8  initial text to both divisions.  They saw it five times.  The

9  agency struck it off.  We tried one more time.  The agency struck

10  that off.  And ultimately we ended up with information in Section 5

11  and Section 12.  And that's where it has been since then.

12  Q.  Let's look at this actual redline.

13       MR. BARR:  Can I get Defendant's 5222 on the board,

14  please?  And let's go to page 30, which is 12.2.  And let's blow

15  this out.

16  BY MR. BARR:

17  Q.  Now, let's establish a few things about this.  Let's say you're

18  looking at this, and you're trying to decide whether or not

19  somebody has Xarelto on board.  Where does it tell you in there

20  that the PT test can be used to tell a doctor that information?

21  A.  I am unsure as to what you're asking.  I'm sorry.  On the --

22  I'm sorry.  Please continue.

23  Q.  You have Defendant's 5222 in front of you, correct?

24  A.  I do.  I do.

25  Q.  That's Section 12.2, right?

Page 1400

1   A.   Yes.

2   Q.   What information in here tells a doctor that you can use PT to

3   determine if somebody has Xarelto on board?  Where is it?

4   A.   The only information is what the agency struck out.

5   Q.   And where does it say in there -- anywhere in there, than in an

6   emergency care situation you can run a PT and some result will tell

7   you there is no Xarelto on board?  Where is that?

8   A.   Okay.  So the emergency situation setting that you're

9   requesting -- you're suggesting is not there; however, we do

10  state -- and this is how the clinical team had determined this --

11  the relationship -- "If assessment of the pharmacodynamic effect of

12  rivaroxaban is considered necessary in individual cases."  And at

13  least my understanding was individual cases, emergencies and other

14  aspects could be -- would be encompassed in individual cases.

15  Q.   Okay.  So a patient has a normal PT on Xarelto.  Let's look at

16  that and tell me what that means.

17  A.   I couldn't tell you.  I'm not a clinical expert, I am just

18  saying this is what the dat is.  I don't know what would I be

19  looking for with a normal or other information.

20  Q.   And that language doesn't tell you anything about that, does

21  it?

22  A.   That information just gives you -- the information that was

23  there says -- again, if it's required in individual cases, and this

24  is what was tested in the RECORD program.

25  Q.   So this information that's struck out, all of this information,

Page 1401

1  you're telling me the FDA will not allow you to say this stuff that

2  is struck out; that's your testimony?

3  A.  The FDA deleted that text.  We don't know specifically why they

4  deleted it, but they did delete that.  That's correct.  We tried --

5  sorry.  I apologize -- we tried that again.

6  Q.  So let me ask you:  Are you allowed to tell doctors that the

7  routine monitoring of coagulation parameters is not required with

8  Xarelto use?  Are you allowed to say that?

9  A.  We are not allowed to do that in -- as per label.  It's deleted

10 there.

11 Q.  So you're not allowed to walk around and tell people that you

12 don't have to routinely monitor with Xarelto; that's what you're

13 telling this jury?  You're not allowed to say that?

14 A.  I'm saying -- I'm saying it's in the label -- it's deleted from

15 the label.  A determination by others would have to be made whether

16 they could or could not talk about this externally.

17 Q.  Are you really telling this jury that Janssen believes that PT

18 is a useful and helpful test for doctors, and the FDA will not

19 allow the company to tell that to doctors; is that what you're

20 really telling this jury?

21 A.  I can't comment on the first part.  The perspective I'll offer

22 you is this is what the FDA did, and we've tried that and this is

23 the information based on the data we put into a label and the

24 agency struck that out.  Janssen's position would be somebody I

25 think you would have to talk to our clinical team for that.

Page 1402

1   Q.  So you're not aware that the position that's been taken in this

2   courtroom is that it would be dangerous to use PT to make clinical

3   decisions?  You're not aware of that?

4           MR. IRWIN:  Your Honor, asked and answered, and it's now

5   argument.

6           THE COURT:  I'll let him answer it.  Go ahead.  He's

7   under cross.

8           THE WITNESS:  My understanding -- I'm sorry.  Can you

9   please repeat the question.

10  BY MR. BARR:

11  Q.  Are you aware that Bayer and Janssen have taken the position in

12  this courtroom that it would be dangerous to use PT in clinical

13  situations?

14  A.  I confess I don't know.  My perspective is I am offering you

15  the regulation perspective and what the regulator history was.  I

16  don't know the specifics of this case of the discussions that are

17  taking place in this case.

18  Q.  Let me ask you:  You would agree with me that in the regulatory

19  process in the life of a drug things like dates are important,

20  right?

21  A.  Dates as in?

22  Q.  Dates, when things happen; it's important, right?

23  A.  Correct, it is.

24  Q.  So let's look at what the FDA said on -- this is June 13, 2011,

25  when the FDA, according to you, struck this language.  They said

Page 1482

1

2

3                        REPORTER'S CERTIFICATE

4

5          I, Karen A. Ibos, CCR, Official Court Reporter, United

6    States District Court, Eastern District of Louisiana, do hereby

7    certify that the foregoing is a true and correct transcript, to the

8    best of my ability and understanding, from the record of the

9    proceedings in the above-entitled and numbered matter.

10

11

12                        /s/ Karen A. Ibos

13                    Karen A. Ibos, CCR, RPR, CRR, RMR

14                    Official Court Reporter

15

16

17

18

19

20

21

22

23

24

25