## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE:  XARELTO (RIVAROXABAN)             MDL No. 2592
PRODUCTS LIABILITY LITIGATION

                                          SECTION L

THIS DOCUMENT RELATES TO:                 JUDGE ELDON E. FALLON

Dora Mingo v. Janssen Research &
Development, LLC et al.                    MAGISTRATE NORTH
Case No. 2:15-cv-03469

### DEFENDANTS' OPPOSITION TO PLAINTIFF'S
### RULE 59 MOTION FOR A NEW TRIAL

After a two-week jury trial, on August 18, 2017, the *Mingo* jury unanimously determined

that Defendants "provide[d] . . . adequate instructions for the safe use of Xarelto" and that Xarelto

did not have "a defective design at the time it left Defendants' control."  Doc. 7412.  That verdict,

and the Court's resulting judgment, fully comported with the evidence at trial and the legal

principles applicable to the case.  Plaintiff now seeks a second chance, claiming that the publication

of one scientific journal article and two evidentiary rulings entitle her to a new trial.  *See* Pls.' Rule

59 Mot. (Doc. 7586).  As set forth below, none of these arguments has merit—Plaintiff has not

shown, as she must, that "manifest injustice will result from letting the verdict stand."  *Learmonth*

*v. Sears, Roebuck & Co.*, 631 F.3d 724, 731 (5th Cir. 2011).

**1.**      Plaintiff is not entitled to a new trial based on the publication of a scientific article

that, in Plaintiff's view, supports her claim that prothrombin time (PT) can purportedly be used to

predict individual bleeding risk.  Contrary to Plaintiff's claim, the article presents nothing new on

the issue of whether PT can be used to measure the anticoagulant effect of Xarelto, but even if it

did, as a matter of law, a newly published article in a scientific journal cannot justify a new trial.

*See, e.g.*, *In re Neurontin Mktg. & Sales Pracs. Litig.*, 799 F. Supp. 2d 110, 116 (D. Mass. 2011).

That is because scientific knowledge is constantly evolving, and the judicial system's substantial

interest in finality requires a case to be determined by the state of the scientific knowledge at the time the plaintiff brings her claim; otherwise, no claim could ever be finally determined in a case involving ongoing research. Moreover, the article is cumulative of similar articles that Plaintiff used at trial—hardly a game-changer. Plaintiff's experts testified repeatedly—and at length—that they believed Neoplastin PT could be used to assess the anticoagulant effect of Xarelto, and Plaintiff introduced evidence that some of Defendants' scientists allegedly share that view. But the article to which Plaintiff now points adds nothing new on this point. This type of cumulative evidence does not warrant a new trial. *Diaz v. Methodist Hosp.*, 46 F.3d 492, 495 (5th Cir. 1995). The evidence presented at trial supported the verdict, and Plaintiff has not met her burden to show that a single article, by itself—on an issue already exhaustively presented to the jury—would probably have changed the outcome of the trial. Rather, the article simply "supports" the evidence and Plaintiff's theory of the case, and "newly discovered evidence" that only "corroborates" trial evidence cannot justify a new trial. *See Caldwell v. Lozano*, 689 F. App'x 315, 323 (5th Cir. 2017).

**2.** Plaintiff is not entitled to a new trial based on Defendants' alleged violations of the Court's *in limine* ruling that "[w]hether the FDA approved Neoplastin PT or not is not the ultimate issue" in the case. Order & Reasons (May 26, 2017), at 15–16 (Doc. 6645). Defendants did not violate the Court's pretrial order, which prohibited argument as to any *legal effect* of a lack of FDA approval—not *factual evidence* that FDA has not approved Neoplastin PT for use with Xarelto. As the Court explained at trial, Defendants were entitled to elicit evidence regarding this lack of FDA approval and how it might influence a physician's decision whether to use Neoplastin PT. And although the Court's pretrial order stated that FDA approval of Neoplastin PT was "not the ultimate issue," evidence need not be conclusive of an ultimate issue to be relevant and admissible. Here, the evidence was relevant to whether Defendants acted reasonably in labeling Xarelto and

to whether Plaintiff's proposed instruction would have altered prescribing behavior.  In any event, the Court twice instructed the jury about this evidence, which cured any theoretical prejudice.

**3.**      Nor is Plaintiff entitled to a new trial based on the Court's admission of an FDA-certified copy of Janssen's proposed labeling submission in which the Agency struck language similar to what Plaintiff proposes here (the "FDA strikethrough documents").  Although Plaintiff contends that this evidence was relevant only to preemption and thus should have been excluded, the Court has already rejected that argument.  As the Court explained, even putting aside preemption, Defendants were entitled "to show that they did suggest some label changes that the FDA purportedly rejected."  Doc. 6645, at 6.  Furthermore, the Court did not err in refusing to give Plaintiff's proposed instruction regarding the FDA strikethrough documents.  The Court rejected similar arguments in denying Plaintiffs' new trial motions in *Boudreaux* and *Orr*—Plaintiff has not shown that her proposed instruction was a correct statement of the law, she has not asserted that the Court's instructions were inaccurate, and throughout trial she emphasized her views on the FDA strikethrough documents; thus, she cannot show that the Court's failure to instruct the jury regarding this evidence impaired her ability to present her claim.  *See* Doc. 7644, at 7–10.

* * *

In light of "the sanctity of the jury's role in our system of adjudication," *Melear v. Spears*, 862 F.2d 1177, 1178 (5th Cir. 1989), this Court has recognized that "[a] motion for a new trial pursuant to Rule 59 is an extraordinary remedy that should be used sparingly," *Karim v. Finch Shipping Co.*, 111 F. Supp. 2d 783, 784 (E.D. La. 2000) (Fallon, J.).  Plaintiff has not met that standard, and her motion for a new trial in the *Mingo* case should be denied.

## LEGAL STANDARD

As this Court observed in denying Plaintiffs' motions for a new trial in *Boudreaux* and *Orr*, "[m]odifying or setting aside a judgment under Rule 59 is an extraordinary remedy; motions for

3

new trial or to alter or amend a judgment should not be avenues for relitigating old matters, raising new arguments, or submitting evidence that could have been presented before." *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.*, MDL No. 2592, 2017 WL 4168410, at *3 (E.D. La. Sept. 20, 2017). Plaintiffs bear the burden to "clearly establish either a manifest error of law or fact." *Turner v. Baylor Richardson Med. Ctr.*, 476 F.3d 337, 344 (5th Cir. 2007); *see also Streber v. Hunter*, 221 F.3d 701, 736 (5th Cir. 2000) ("Courts do not grant new trials unless it is reasonably clear that prejudicial error has crept into the record or that substantial justice has not been done." (citation and internal quotation marks omitted)). Further, this Court has recognized that "newly discovered evidence" warrants a new trial only "if such evidence would probably have changed the outcome of the trial, and could not have been discovered earlier with due diligence and is not merely cumulative or impeaching." *Washington v. City of Gretna*, No. Civ.A. 99-3442, 2001 WL 417795, at *3 (E.D. La. Apr. 23, 2001) (Fallon, J.). This also is "an extraordinary motion"—these requirements must be "strictly met," *Johnson Waste Materials v. Marshall*, 611 F.2d 593, 597 (5th Cir. 1980), and the moving party must "demonstrate that the new evidence clearly weighs in favor of a new trial," *Diaz*, 46 F.3d at 495.[1]

## ARGUMENT

### I.   Plaintiff is not entitled to a new trial based on a recently published scientific article.

At trial, both sides presented evidence on the issue of whether Neoplastin PT was clinically useful with Xarelto. Plaintiff repeatedly argued (and introduced evidence suggesting) that Neoplastin PT testing could be used to assess the anticoagulant effect of Xarelto. Each of

---

[1] The same standard applies to a motion for new trial based on newly discovered evidence, "whether the motion is under Rule 59 or Rule 60(b)(2)." Wright & Miller, 11 Fed. Prac. & Proc. § 2808 (3d ed.); *N.L.R.B. v. Jacob E. Decker & Sons*, 569 F.2d 357, 363 (5th Cir. 1978); *see also Mondis Tech., Ltd. v. LG Elecs., Inc.*, Nos. 2:07-CV-565-TJW & 2:08-CV-478-TJW, 2011 WL 3665158, at *2 (N.D. Tex. Aug. 22, 2011) ("Although the 'newly discovered evidence' rule is codified in Federal Rule of Civil Procedure 60(b), the Fifth Circuit also applies the rule for motions for a new trial filed under Federal Rule of Civil Procedure 59.").

Plaintiff's experts—Dr. Suzanne Parisian, Dr. Laura Plunkett, Dr. Henry Rinder, and Robert Gosselin—testified that Neoplastin PT was sensitive to Xarelto, and, accordingly, that physicians could use Neoplastin PT testing to measure Xarelto's anticoagulant effect and to make treatment decisions. *See, e.g.*, *Mingo* Trial Tr. 587:15–21, 628:3–8, 703:1–3, 789:8–16, 791:3–19, 1062:22–25, 1087:10–20, 1102:6–1103:1, 1278:11–16 (attached hereto as Exh. A). Similarly, Plaintiff's experts testified that Defendants had always known that Neoplastin PT could be used to measure anticoagulant effect. *See, e.g.*, *id.* 707:5–708:13, 1088:13–23, 1396:16–1397:2. And Plaintiff introduced evidence that leading Bayer scientists—including Dr. Dagmar Kubitza and Dr. Wolfgang Mueck—allegedly hold the view that physicians could use Neoplastin PT to measure anticoagulant effect and had published articles to that effect. *See, e.g.*, *id.* 791:25–792:8, 890:11–23, 897:14–20, 1103:2–1106:11, 1286:13–1290:9, 1603:18–1604:11. Plaintiff also introduced testimony—over Defendants' objection—concerning Bayer's communications with Health Canada, including the draft and final Canadian Product Monograph, in an attempt to prove that Defendants purportedly conceded the efficacy of PT testing. *Mingo* Trial Tr. 1456:3–1466:13.

Despite already having made the purported utility of Neoplastin PT testing her central theme at trial and introducing substantial evidence to that effect, including evidence that Defendants had allegedly conceded the point, Plaintiff now points to a scientific journal article (the "Kreutz article")—co-authored by "Bayer scientists" and accepted for publication on August 14, 2017, before Plaintiff rested her case—concluding that PT "can be used to estimate the anticoagulant effect of rivaroxaban." Pls.' Mem. at 3–9. This one article, Plaintiff contends, constitutes "newly discovered evidence" that entitles her to a new trial. That is not so.

A.      **The Kreutz article is not "newly discovered evidence."**

As an initial matter, the conclusion from the Kreutz article to which Plaintiff points— that PT "can be used to estimate the anticoagulant effect of rivaroxaban" (Pls.' Mem. 3–4, 6, 8)—is

not new.  Far from it.  It mirrors conclusions that Bayer scientists and others have long published in the scientific literature (in articles that the plaintiffs have highlighted throughout the first three trials).  For example, in 2005, Dr. Kubitza and others wrote that PT "could be used clinically to monitor the anticoagulant effect of [rivaroxaban] if necessary."[2]  And in 2011, Dr. Mueck and others wrote that PT "could be used to assess exposure [to rivaroxaban]."[3]  Indeed, as explained in greater detail in Part I.B below, Plaintiff used both of these articles with her witnesses at trial. The Kreutz article, on which Dr. Kubitza is a co-author, is not the game-changer that Plaintiff suggests—its conclusion, like that of numerous articles before it, that PT can "estimate" anticoagulant effect says nothing to support Plaintiff's actual theory in this case (namely, that PT is clinically useful to predict an individual Xarelto patient's risk of bleeding).

More fundamentally, the publication of an article in the medical literature is not the sort of "new" evidence that could give rise to a new trial.  Rather, as courts have recognized, scientific or medical journal articles published after trial do not constitute newly discovered evidence because of the judicial system's substantial interest in finality:

> Although science is a constantly evolving process, the law depends upon a high level of certainty once an outcome has been determined. A trial can be no more than a resolution of an immediate dispute on the basis of present knowledge; its outcome must turn upon the teachings of science as understood at the time of trial as best can be discerned through the presentations of the parties. Where scientific facts are at issue, it is not unexpected, given the nature of the process, that the passage of time will bring forth further scientific data and inquiry relating to the

---

[2] Kubitza, D., et al, *Safety, pharmacodynamics, and pharmacokinetics of BAY 59-7939—an oral, direct Factor Xa inhibitor—after multiple dosing in health male subjects*, 61 EUR. J. CLINICAL PHARMACOLOGY 873, 879–880 (2005) (Exh. B) ("There was a direct, linear relationship between plasma [rivaroxaban] concentration and PT.  This suggests that PT, a routinely used coagulation test, could be used clinically to monitor the anticoagulant effect of [rivaroxaban] if necessary.").

[3] Mueck, W., et al, *Population Pharmacokinetic Analyses in Patients Treated for Acute Deep-Vein Thrombosis and Exposure Simulations in Patients with Atrial Fibrillation Treated for Stroke Prevention*, 50 CLINICAL PHARMACOKINETICS 676, 684 (2011) (Exh. C) ("The slope of the plasma concentration-PT correlation graph reflected the sensitivity of the PT to increases in rivaroxaban exposure.  The PT correlated in an almost linear fashion with rivaroxaban concentrations ≤ 500 µG/L, confirming that the PT could be used to assess exposure.").

> ultimate scientific fact at issue. To reopen the trial's determination of scientific
> truth, however, runs squarely into the fundamental principle of certainty.

*In re Neurontin*, 799 F. Supp. 2d at 116 (quoting *Merrell Dow Pharms., Inc. v. Oxendine*, 649

A.2d 825, 831 (D.C. 1994)). In *Neurontin*, for example, the MDL court rejected the defendants'

attempt to obtain a new trial based on a scientific article, published after trial, that supported the

efficacy of their drug. *Id.* at 114.  As the court explained, the parties cited no "case law in support

of the premise that a new scholarly article, which essentially represents an expert opinion,

constitutes newly discovered evidence." *Id.* at 116.  Furthermore, because "[k]nowledge about

drug efficacy and safety" is "constantly evolving," the article was "not 'newly discovered

evidence' under the case law analyzing Rule 59(e)." *Id.*

The Supreme Court has emphasized the same point in the context of expert testimony.  In

*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 596–97 (1993), the Court acknowledged that

science is constantly evolving, but recognized that the judicial system cannot wait until the last

experiment is conducted, the last article published, or the last study concluded:

> It is true that open debate is an essential part of both legal and scientific analyses.
> Yet there are important differences between the quest for truth in the courtroom and
> the quest for truth in the laboratory. Scientific conclusions are subject to perpetual
> revision.  Law, on the other hand, must resolve disputes finally and quickly.

For this reason, the rules of evidence and procedure were "designed not for the exhaustive search

for cosmic understanding but for the particularized resolution of legal disputes." *Id.*[4]

So too here.  Plaintiff has not pointed the Court to any authority for the proposition that a

scientific article first accepted for publication during trial can be newly discovered evidence

---

[4] *Cf. In re Viagra Prods. Liab. Litig.*, 658 F. Supp. 2d 936, 949–50 (D. Minn. 2009) (excluding supplemental expert report) ("It has been three years since this multidistrict litigation began. The parties, including each individual Plaintiff and Pfizer, deserve to have this matter resolved in a timely manner. Although it may be true that, with even more time, the issues with the McGwin Study and [the] expert['s] testimony could be resolved, the matter is now before the Court and ripe for a decision.").

warranting a new trial.  The Kreutz article, at best, reflects the type of "constantly evolving" scientific knowledge that is insufficient to justify a new trial.

### B.    The Kreutz article is cumulative of evidence that was admitted during trial.

Separately and independently, Plaintiff introduced evidence at trial that is cumulative of the Kreutz article, and a new trial cannot be premised on evidence that is simply "cumulative or impeaching." *Washington*, 2001 WL 417795, at *3; *see also, e.g.*, *Simoneaux v. E.I. du Pont de Nemours & Co.*, No. 12-219-SDD, 2015 WL 3905069, at *1 (M.D. La. June 25, 2015) (Evidence that "merely affect[s] the weight and credibility of trial evidence may be considered cumulative and thus insufficient to warrant a new trial."); *Poullard v. McCoy*, No. 12-299-JWD, 2016 WL 394000, at *4 (M.D. La. Feb. 1, 2016) (same).

Plaintiff contends that the Kreutz article warrants a new trial because it reflects the views of "Defendants' own scientists" (*e.g.*, Dr. Kubitza) and contradicts Defendants' position at trial (*see* Pls.' Mem. at 4–5, 8–9), but, as noted above, Plaintiff presented these very arguments at trial. Plaintiff introduced evidence that Defendants allegedly knew from the Xarelto clinical trials that PT could be used to assess anticoagulant effect.  And, critically, the Court admitted evidence—through Plaintiff's experts' opinions and company witness deposition designations—of company scientists' statements (including the views of Dr. Kubitza and other Bayer scientists) regarding the utility of PT testing.[5]

For example, Plaintiff used Dr. Kubitza's 2005 article with Dr. Parisian, who testified that Bayer—indeed, Dr. Kubitza—had "published on this particular issue" regarding PT:

Q. And, Doctor, has Bayer published on this particular issue?

A. Yes, they have. Their employees have. I think Kubitza in 2005 published an article about it.

---

[5] See Appendix A attached hereto for relevant excerpts of trial testimony.

Q. Let me stop you there. MR. HONNOLD: Mr. Carl, can we put up the Kubitza 2005 article at 5767878? And I'd like to go to pages 7 and 8, please. And there's a particular section at page 7, we can highlight. There's a sentence, Mr. Carl, that says, "There was a direct linear relationship between plasma, BAY-7939 concentration in PT." There you go. Can you go down a little bit and capture it a little bit more? Thank you. BY MR. HONNOLD: Q. So we've called out this specific section, Dr. Parisian, this sentence that says, "There was a direct linear relationship between plasma, BAY 59-7939 concentration, and PT. This suggests that PT, a routinely used coagulation test, could be used clinically to monitor the anticoagulant effect of pharmacodynamic" -- excuse me -- "between plasma BAY 59-7939 concentration and PT. This suggests that PT, a routinely used coagulation test, could be used clinically to monitor the anticoagulant effects of BAY 59-7939 if necessary." Can you explain the significance of that findings and statement in the Kubitza article?

A. Well, yeah. It's basically, this is a Bayer employee saying -- who was head of the research in terms of this drug, and she's saying that you could routinely use a coag test which is your PT, and she goes down at the end to say, at the very end, "This suggests that PT would be a viable monitoring test of the anticoagulant effect of BAY 59-7939, whatever the ISI of the reagent used." She's talking about the tissue factor that's being used. So she -- this person is saying that PT should be used for monitoring the effect, especially when necessary, if there are patients that it's necessary to determine. So this internally is 2005. So the company had that information."

*Mingo* Trial Tr. 1103:2–1104:12; *see also id.* 1456:3–1466:13 (Dr. Anthonie Lensing) (testifying about Bayer's communications with Health Canada regarding use of PT). Plaintiff emphasized these points during closing argument. *See, e.g., id.* 2163:13–2164:17.

Further, to the extent Plaintiff suggests that the Kreutz article contradicts "key testimony from defense experts," Pls.' Mem. at 8, it is well settled that this type of impeachment evidence does not warrant a new trial. *See, e.g., In re BOPCO, L.P.*, No. 11-3137, 2014 WL 241591, at *4 (E.D. La. Jan. 22, 2014) ("[E]vidence that merely impeaches need not warrant a new trial." (citing *Diaz*, 46 F.3d at 495)).

And although Plaintiff characterizes the Kreutz article and its conclusion that PT can be used to assess Xarelto's anticoagulant effect as "striking new evidence" (Pls.' Mem. at 3), each of Plaintiff's experts already testified to the same effect as the Kreutz article's statements about PT:

- "There is one more method – or one more indirect measure that was used by the company in their development of the drug, and that is – and this is discussed in the medical literature too – and it's an anticoagulation assay that's called 'prothrombin time' or a 'PT test.' So this is another laboratory assay where you're measuring the effect." *Mingo* Trial Tr. 587:15–21 (Dr. Laura Plunkett); *id.* 628:3–8 (similar); *id.* 703:1–3 (similar).

- "So, based on a study that I collaborated with at the University of North Carolina, we looked at patients who were getting Xarelto, and we looked at what we call peak and trough collections. . . . And we demonstrated that Neoplastin . . . [was] pretty sensitive to the anticoagulant effects of Xarelto." *Id.* 789:8–16 (Robert Gosselin); *id.* 791:3–19 (similar).

- "So all through all of this research, [Defendants were] always using Neoplastin PT to show what the plasma concentration was to look at the PT and the effects." *Id.* 1062:22–25 (Dr. Suzanne Parisian); *id.* 1087:10–20 (similar); *id.* 1102:6–1103:1 (similar).

- "My opinion is that the PT test, especially using an activator called *Neoplastin*, can correlate with the amount of Xarelto that's in the blood, and that the people that have the highest amounts of Xarelto in the blood and the highest PT values are at a greater risk of bleeding than people that have low amounts of drug in the blood and low PT levels." *Id.* at 1278:11–16 (Dr. Henry Rinder).

Plaintiff's invocation of the Kreutz article is paradigmatic cumulative evidence in light of that admitted testimony. The Middle District's decision in *Poullard* is instructive. There, the plaintiff asserted that he was entitled to a new trial where he allegedly obtained evidence post-trial that supported his claimed medical condition. 2016 WL 394000, at *1, 4. The court disagreed, explaining that "the record already contain[ed] evidence of the Plaintiff['s medical condition], and this [new evidence] merely would have gone to the weight; the jury simply decided to believe Defendants' evidence." *Id.* at *4. Put simply, additional testimony would only have been "cumulative" of the evidence the plaintiff had already introduced. *See id.*[6]

---

[6] *See also, e.g.*, *Delor v. Intercosmos Media Grp., Inc.*, No. Civ.A. 04-3262, 2006 WL 3186871, at *1 (E.D. La. Feb. 9, 2006) (rejecting newly discovered evidence as "cumulative" where "it merely attempt[ed] to provide additional support for the argument plaintiff ha[d] already made"); *Washington v. Patlis*, 916 F.2d 1036, 1039 (5th Cir. 1990) (new trial to "provide additional testimony regarding allegedly discriminatory hiring practices" was not warranted where a witness "testified about the allegedly discriminatory hiring practices at trial," and "additional testimony . . . would be merely cumulative"); *Wilson v. Thompson*, 638 F.2d 801, 804 (5th Cir. Unit B 1981) (evidence was "merely cumulative" where it only had a "tendency to support the testimony" of a prior witness); *cf. Luhrsen v. Vantage S.S.*

The Kreutz article, at most, affects the "weight and credibility" of the evidence admitted regarding the utility of PT testing, and Plaintiff is thus not entitled to a new trial.  *See Poullard*, 2016 WL 394000, at *4; *Simoneaux*, 2015 WL 3905069, at *1.

### C.   Plaintiff has not demonstrated that the Kreutz article would probably have changed the outcome of the trial.

In any event, Plaintiff has not shown, as she must, that the Kreutz article "would probably have changed the outcome of the trial," *Washington*, 2001 WL 417795, at *3—an outcome that was amply supported by the trial evidence.

As an initial matter, the Kreutz article does not support Plaintiff's ultimate theory— namely, that PT can be used to identify Xarelto patients at an increased risk of bleeding.  Rather, the article's statement that PT "can be used to estimate the anticoagulant effects of rivaroxaban" is a general one.  The article does not conclude that the resulting information can be translated to bleeding risk.  And, as shown above, even if the Kreutz article supported Plaintiff's theory, it would simply corroborate the evidence Plaintiff introduced at trial—but evidence that merely "corroborates" a plaintiff's theory or the existing trial evidence does not warrant a new trial.  *See, e.g.*, *Caldwell*, 689 F. App'x at 323 (affirming district court's conclusion that new evidence "would not have altered the outcome, as [it] largely corroborated [the plaintiff's] existing allegations"); *BOPCO*, 2014 WL 241591, at *4 (similar); *Diaz*, 46 F.3d at 496 (affirming denial of new trial for introduction of additional testimony supporting plaintiff's claim; noting that it was "a complicated case requiring nearly two weeks of trial and numerous expert witnesses" where "[s]everal experts testified that the medical treatment administered . . . was appropriate under the circumstances").

---

*Corp.*, 514 F.2d 105, 106 (5th Cir. 1975) ("[T]he plaintiff simply found another witness to give a different opinion on a point at issue throughout the case.  This is not enough.").

Additionally, although Plaintiff now says that she was prejudiced because she was unable to "cross-examine Defendants' witnesses with this evidence" (Pls.' Mem. at 7–9), it is telling that Plaintiff failed to cross-examine Defendants' expert witnesses with Dr. Kubitza's (or Dr. Mueck's) articles that she presented to the jury through her own witnesses. Plaintiff was not prejudiced by an "inability" (*id.* at 8) to present the Kreutz article to the jury.

## II.     Plaintiff is not entitled to a new trial based on Defendants' questions regarding whether FDA has approved Neoplastin PT for use with Xarelto.

Plaintiff next contends that Defendants violated the Court's *in limine* ruling regarding evidence that FDA has not approved Neoplastin PT for use with Xarelto. Pls.' Mem. at 9–12. But the Court's pretrial order only prohibited the legal argument that FDA must specifically approve Neoplastin PT for use with Xarelto—an argument Defendants did not make. In any event, the Court twice instructed the jury regarding Neoplastin PT, which cured any theoretical prejudice.

### A.     The Court's *in limine* ruling did not prohibit Defendants from introducing factual evidence that FDA has not approved Neoplastin PT for use with Xarelto, which is relevant evidence.

Before the *Mingo* trial, Plaintiff moved *in limine* to exclude "argument that a PT reagent must be specifically approved by the FDA for use with Xarelto." Doc. 6492-1, at 5. The Court sustained Plaintiff's motion, explaining that "[w]hether the FDA approved Neoplastin PT or not is not the ultimate issue—the Defendants have not shown they gave the FDA sufficient information to adequately decide whether or not Neoplastin PT should be used with Xarelto." Doc. 6645, at 15–16. In other words, the Court prohibited Defendants from arguing that, *as a matter of law*, FDA must specifically clear Neoplastin PT for use with Xarelto. Defendants followed that ruling and never made such an argument at trial. By contrast, the Court did not exclude evidence that,

*as a matter of fact*, Neoplastin PT is not approved for use with Xarelto—a fact that is undisputed[7]—or evidence of Neoplastin's labeling or that lack of FDA's approval of Neoplastin for use with Xarelto might affect a physician's treatment decision.[8]

At trial, Defendants elicited testimony regarding the Neoplastin label and the impact on physicians' treatment decisions.  During cross-examination of Plaintiff's expert Robert Gosselin, Defendants' counsel asked Mr. Gosselin (without a contemporaneous objection) whether he was aware that FDA has not approved Neoplastin PT for use with Xarelto.  *See Mingo* Trial Tr. 839:5–842:17.[9]  Later in the trial, Defendants' expert Dr. Demondes Haynes testified that he and his colleagues do not use PT testing when prescribing Xarelto or other novel anticoagulants.  *See id.* at 1870:13–21.  Dr. Haynes explained that the "primary reason" is that PT testing is "not approved to be utilized or recommended to be utilized."  *Id.* at 1870:22–25.  Plaintiff's counsel objected,

---

[7] Plaintiff's experts and FDA have all acknowledged that Neoplastin PT has not been approved for use with Xarelto.  *See, e.g.*, Rinder Dep. at 247–49 (Doc. 5109, Exh. 27); Plunkett Dep. at 403–04 (Doc. 5109, Exh. 28); Leissinger Generic Dep. (Nov. 15, 2016) at 184–85 (Doc. 5109, Exh. 29); Gosselin Dep. at 305–07 (Doc. 5109, Exh. 30); Cerri Dep. at 147, 268 (Doc. 5109, Exh. 25); Bussey Dep. at 257 (Doc. 5109, Exh. 31); Ix Dep. at 316 (Doc. 5109, Exh. 32); *see also* FDA: Center for Devices and Radiological Health, Transcript, *In Vitro Diagnostic Testing for Direct Oral Anticoagulants*, at 9 (Oct. 26, 2015) (Lea Carrington, Director, Division of Immunology and Hematology Devices) (emphasis added) (Doc. 5109-16) ("Importantly, the DOAC drugs were approved without a requirement for monitoring.  So currently, manufacturers are developing devices to assess the effect or concentration of direct oral anticoagulants.  *There are currently no cleared or approved devices that measure that.*").

[8] Plaintiff disputes what type of evidence should have been inadmissible under the Court's *in limine* ruling (*see* Pls.' Mem. at 9–11), but that is an additional reason to deny her motion.  As courts have recognized, "[i]n order for a violation of an order granting an in limine motion to serve as a basis for a new trial, the order must be specific in its prohibition and the violation must be clear."  *Pullman v. Land O'Lakes, Inc.*, 262 F.3d 759, 762 (8th Cir. 2001) (citing *Mouton v. Tug Ironworker*, 811 F.2d 946, 948 (5th Cir. 1987)).  Plaintiff's disagreement as to what evidence the *in limine* ruling covered indicates that the ruling was—at most—not "specific" in its prohibition.  Nor would any violation be clear—the Court's ruling on Plaintiff's objections at trial demonstrates that evidence regarding the fact of FDA approval was relevant.

[9] Plaintiff did not object to Defendants' questions to Mr. Gosselin at that time, during the ensuing lunch break, or before or during redirect examination.  After Mr. Gosselin was excused, Plaintiff first raised the issue of whether Defendants' questions violated the motion *in limine*.  *Mingo* Trial Tr. 898:12–899:4.  Accordingly, Plaintiff's claim of error is not preserved.  *See U.S. Aviation Underwriters, Inc. v. Olympia Wings, Inc.*, 896 F.2d 949, 956 (5th Cir. 1990) (holding that a party who fails to "lodge a contemporaneous objection" to questions that allegedly violate an *in limine* order does "not preserve its objection to this evidence"); *Cushman v. GC Servs., L.P.*, 397 F. App'x 24, 29–30 (5th Cir. 2010) (error unpreserved where plaintiff "did not object when [defendant's] counsel allegedly violated the motion in limine while questioning a witness").  But, as explained *infra*, Plaintiff's argument that Defendants' questions violated the Court's *in limine* ruling is without merit.

claiming that Dr. Haynes' answer violated the Court's *in limine* ruling, which prompted the Court

to clarify the scope of its ruling:

> MR. HONNOLD: I apologize.  Just briefly, I don't know whether the cat is out of the bag on this issue, if things have been mentioned, but this issue of a specific reagent being approved by the FDA or not really is not a probative, relevant issue. There is no such requirement.  We did file a motion in limine on this, which I think you did rule favorably on, and I think it's important.  It is misleading to the jury to suggest that there's a requirement that the individual reagents have to be individually cleared by the agency.  It's just not true.
>
> THE COURT: See, the issue really is not that.  She is asking why he didn't do it. If he said it is a requirement that you have to do it, then that would be improper, but that's the reason he doesn't do it.  Now, under cross you can do what you can do on it, but that's the reason he doesn't do it.  That's what it is.  What am I going to say, that you don't need to use that reason?
>
> . . .
>
> MR. HONNOLD: As he has expressed it, that's suggested it's sanctioning or a requirement.
>
> THE COURT: Well, but that's something you can clear up on cross.  That's what it's there for.

*Id.* at 1871:9–1872:2.  Dr. Haynes further testified that he does not "use the PT test when [he]

prescribe[s] Xarelto or other DOAC medications" because "[t]he PT test is not approved to be

utilized for making patient care decisions on patients who are taking Xarelto or medications like

that.  It's not recommended by the FDA . . . ."  *Id.* at 1873:4–18.  The Court then instructed the

jury "that's his reason for doing it.  It's not necessarily what the facts are one way or the other, but

that's his reason for doing it."  *Id.* at 1873:19–21.

Although the Court ruled *in limine* that whether or not Neoplastin PT has received FDA

approval for use with Xarelto was not the "ultimate issue" (Doc. 6645, at 15–16), the *fact* of

Neoplastin's non-approval for use with Xarelto (and whether that is a basis for physicians' failure

to use the test with Xarelto patients in the real world) is relevant.  Again, the Court's ruling went

to the *legal question* that Plaintiff raised in her motion *in limine*—whether FDA must specifically

14

clear a device for a particular use—but it is well settled that "[e]vidence need not be conclusive of a material issue in order to be admitted."[10] *United States v. Madera*, 574 F.2d 1320, 1322 (5th Cir. 1978). An ultimate issue in this case, as in any prescription drug failure-to-warn case under Mississippi law, is whether a different or additional warning or instruction "would have convinced the treating physician not to prescribe the product for the plaintiff." *Cross v. Forest Labs.*, 102 F. Supp. 3d 896, 903 (N.D. Miss. 2015) (quoting *Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 812 (5th Cir. 1992)). Although the legal significance of the fact that FDA has not approved Neoplastin PT for use with Xarelto was not itself the ultimate issue in the case, the fact of non-approval, including statements in the Neoplastin label, was relevant to whether Plaintiff's proposed instruction would have altered the physician's prescribing decision. *See, e.g.*, *Mingo* Trial Tr. 1870:18–25; *cf. Iacangelo v. Georgetown Univ.*, No. 05-2086 (PLF), 2010 WL 5479556, at *1 (D.D.C. Dec. 31, 2010) ("A jury may well conclude that a device's lack of FDA approval would be material information that a reasonable person would want to know . . . ."). The evidence was relevant, and the Court properly allowed this questioning.[11]

### B.  The Court's instructions to the jury cured any theoretical prejudice.

In any event, the Court twice specifically instructed the jury about this evidence, which cured any theoretical prejudice.

---

[10] *See also Shell Offshore Inc. v. Tesla Offshore, L.L.C.*, No. 13-6278, 2015 WL 2131274, at *2 (E.D. La. May 7, 2015) ("[I]t is universally recognized that evidence, to be relevant to an inquiry, need not conclusively prove the ultimate fact in issue, but only have any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." (quoting *New Jersey v. T.L.O.*, 469 U.S. 325, 345 (1985))).

[11] Plaintiff has attempted to bootstrap Defendants' questioning about FDA's lack approval of a Xarelto-specific anti-Factor Xa assay into their argument (Pls.' Mem. at 10), but it is clear that Plaintiff's motion *in limine*—and the Court's pretrial ruling—had nothing to do with an anti-Factor Xa assay. In any event, Plaintiff did not object to Defendants' questioning on this basis and thus failed to preserve this argument. *See Olympia Wings*, 896 F.2d at 956.

*First*, after Plaintiff's expert Mr. Gosselin had been excused (and well after Defendants' counsel first questioned him regarding FDA's lack of approval for Neoplastin PT for use with Xarelto), the Court instructed the jury, at Plaintiff's request, that FDA approval was not dispositive of Plaintiff's failure-to-warn-or-instruct claim:[12]

> THE COURT: With regard to -- we've heard the FDA approval with regard to labels, and you should know that the defendant at all times has the responsibility of providing an adequate label to warn and instruct treaters on prescription drugs.  In fact, any action, or actually inaction, on the part of the FDA, though relevant, does not foreclose a claim under Mississippi law.  In other words, it's relevant, but not dispositive.

*Mingo* Trial Tr. 899:25–900:7.  *Second*, the Court provided the jury with a contemporaneous, specific instruction about Dr. Haynes's testimony that he does not use Neoplastin PT to measure anticoagulant effect in patients to whom he has prescribed Xarelto or other novel oral anticoagulants because FDA has not approved Neoplastin PT for that purpose:

> THE COURT: Now, members of the jury, that's his reason for doing it.  It's not necessarily what the facts are one way or the other, but that's his reason for doing it.

*Id.* at 1873:19–21.

Accordingly, even if evidence regarding the lack of FDA approval of Neoplastin PT for use with Xarelto had been inadmissible, the Court's instructions were sufficient to cure any prejudice.  *See, e.g.*, *Mouton*, 811 F.2d at 948 (district court did not abuse its discretion in denying motion for new trial based on violation of motion *in limine* where court gave curative instruction); *Huey v. Super Fresh/Sav-A-Ctr., Inc.*, No. 07-1169, 2009 WL 3834334, at *1 (E.D. La. Nov. 16, 2009) (no new trial where court gave appropriate instruction in final jury charges); *see also*

---

[12] Plaintiff contends that the Court "recognize[d] the violation and resolved the matter by inviting Plaintiff to request a proper corrective instruction." Pls.' Mem. at 10.  The record belies this contention—Plaintiff's counsel first stated: "[W]e would ask the Court to -- to give an instruction to the jury regarding the lack of necessity of the FDA approval for Neoplastin PT."  *Mingo* Trial Tr. 898:18–20.

*Jackson v. CTB, Inc.*, No. 04-24-JJB, 2009 WL 3447282, at *4 (M.D. La. Oct. 23, 2009) ("Most motions for a new trial based on allegedly improper questions are denied . . . because any prejudice was cured by the instructions of the court.").

### III.   Plaintiff is not entitled to a new trial based on the Court's admission of the FDA strikethrough documents.

Plaintiff finally asserts that the Court erred in admitting into evidence FDA-certified copies of the FDA strikethrough documents (along with accompanying affidavits from an FDA custodian of records) and, then, having admitted them, in not instructing the jury regarding the "clear evidence" standard of *Wyeth v. Levine*, 555 U.S. 555 (2009). *See* Pls.' Mem. at 12–16. The Court properly admitted this evidence and appropriately refused to give Plaintiff's proposed instruction.

### A.   The Court did not abuse its discretion in admitting the FDA "red ribbon" strikethrough documents.

#### 1.   The FDA strikethrough documents are relevant.

Plaintiff contends that the Court should have excluded the FDA strikethrough documents as irrelevant and prejudicial because the Court previously denied Defendants' motion for summary judgment on labeling preemption. *See* Order & Reasons (Doc. 7110), at 10–12. This argument is not new. Before the *Orr* trial, Plaintiffs moved *in limine* to exclude these documents, claiming that "if impossibility preemption is a matter of law to be decided by the court, evidence about any FDA redlining is irrelevant." Doc. 6645, at 6. This Court properly rejected that argument:

> This Court finds that the FDA's alleged rejection of Defendants' proposed language, or the 'strike-through' document,' is relevant evidence. The Plaintiffs claim that the Defendants should have made certain changes to Xarelto's label; the Defendants therefore should be able to show that they did suggest some label changes that the FDA purportedly rejected. It may be necessary at trial for the Court to instruct the jury that this strike-through is neither decisive nor conclusive, but at this stage the Court finds no justification for keeping the evidence out when Plaintiffs contend such label changes should have been made.

*Id.* at 7.

The same is true here.  Under Mississippi law, "[a]n adequate product warning or instruction is one that a reasonably prudent person in the same or similar circumstances would have provided with respect to the danger and that communicates sufficient information on the dangers and safe use of the product."  Miss. Code Ann. § 11-1-63(c)(ii).  Mississippi courts have routinely recognized that a product warning or instruction is adequate if it is "reasonable under the circumstances."  *Wyeth Labs., Inc. v. Fortenberry*, 530 So. 2d 688, 692 (Miss. 1988); *see also Bennett v. Madakasira*, 821 So. 2d 794, 805 (Miss. 2002), *abrogated on other grounds by Hutzel v. City of Jackson*, 33 So. 3d 1116, 1121–22 (Miss. 2010).  Evidence that Janssen proposed PT language for Xarelto's label, that FDA rejected it, and that FDA instead added statements to the label that "the anticoagulant effect of Xarelto cannot be monitored with standard laboratory testing" was admissible—not because it shows that it was impossible for Defendants to change the Xarelto label, but because it was relevant to the jury's consideration of whether Defendants' actions were reasonable under the circumstances.

The jury here was entitled to consider FDA's previous rejection of a similar warning or instruction in evaluating whether Defendants acted as "reasonably prudent" manufacturers would have.[13]  *Fortenberry*, 530 So. 2d at 692; *Bennett*, 821 So. 2d at 805; *Swayze v. McNeil Labs., Inc.*, 807 F.2d 464, 471 (5th Cir. 1987) ("the reasonableness of the defendant's conduct depends on the situation it confronted") (Mississippi law); *see also Union Carbide Corp. v. Nix*, 142 So. 3d 374, 387 (Miss. 2014) (recognizing that "compliance with [federal agency's] standards may be used as

---

[13] *Accord Huggins v. Stryker Corp.*, 932 F. Supp. 2d 972, 990 (D. Minn. 2013) ("What constitutes 'reasonable care' depends on the surrounding circumstances.  Here, those circumstances include [the manufacturer's] interactions with the FDA . . . ." (internal citations omitted)); *Georges v. Novartis Pharm. Corp.*, No. CV 06-5207 SJO, 2012 WL 9064768, at *11 (C.D. Cal. Nov. 2, 2012) ("[T]he issue of adequacy of warning and labeling must be viewed, in part, in the context of the FDA's role in the approval and marketing of pharmaceuticals."); *Winter v. Novartis Pharm. Corp.*, No. 06-4049-CV-C-MJW, 2012 WL 827305, at *4 (W.D. Mo. Mar. 8, 2012) (same); *Zeneca Inc. v. Eli Lilly & Co.*, No. 99-CV-1452, 1999 WL 509471, at *3 (S.D.N.Y. July 19, 1999) (documents regarding "what the FDA said to Eli Lilly about Evista . . . and the meaning of the language in the Evista label" "relevant to Eli Lilly's contention concerning the FDA's interpretation of [the clinical trial data] and the meaning of the language on Evista's label").

evidence of the reasonableness of [a defendant's] actions").  And because the Court "enjoy[s] wide discretion in making the relevancy and prejudice assessments that Rules 401 and 403 require," *United States ex rel. Colquitt v. Abbott Labs.*, 858 F.3d 365, 377 (5th Cir. 2017), Plaintiff cannot meet her burden to show that the admission of the FDA strikethrough documents were "manifestly erroneous," *Brumfield v. Hollins*, 551 F.3d 322, 330 (5th Cir. 2008).

### 2. The Court properly admitted the FDA strikethrough documents as self-authenticating.

Plaintiff also suggests that the FDA strikethrough documents were "rife with foundational deficiencies," *see* Pls.' Mem. at 13, but the Court properly admitted these FDA "red ribbon" documents as self-authenticating, recognizing that "[t]he document is authenticated because it appears to be what it is, a US Food and Drug Administration certificate on it." *Mingo* Trial Tr. 1181:4–14; *see also* Fed. R. Evid. 902(4); Fed. R. Civ. P. 44; *United States v. Alejandro*, 354 F. App'x 124, 128 (5th Cir. 2009) (self-authenticating document "require[s] no extrinsic foundation for admission"); *Golden v. Columbia Gas Co.*, No. 13-cv-547, 2015 WL 3650761, at *22 (M.D. La. June 11, 2015) ("A public record is also admissible if it is self-authenticating, for example, when it . . . is certified by its custodian or other qualified person."); *Burkhalter v. Allstate Indem. Co.*, No. 12-cv-2368, 2012 WL 6697230, at *1 (E.D. La. Dec. 21, 2012) (Brown, J.) (fire report admissible under Rule 902(4) because it was a "public record" and the "Court was in receipt of a certified copy signed by the Records Clerk").

Plaintiff's challenge to the substantive content of the FDA strikethrough documents is irrelevant to their authenticity and admissibility. *See, e.g.*, *United States v. Barnes*, 803 F.3d 209, 217 (5th Cir. 2015) (affirming admission of evidence despite the fact that it was "not certain [who] authored the messages," because "the jury holds the ultimate responsibility for evaluating the reliability of the evidence"); *United States v. Ceballos*, 789 F.3d 607, 618 (5th Cir. 2015)

(explaining that, after the threshold for authentication is met, "alleged flaws in authentication go to the weight of the evidence instead of its admissibility" (citation and internal quotation marks omitted)); *United States v. Barlow*, 568 F.3d 215, 220 (5th Cir. 2009) ("The ultimate responsibility for determining whether evidence is what its proponent says it is rests with the jury.").

In any event, there are no foundational issues with the FDA strikethrough documents. Nauman Shah, the former director of marketing for Xarelto at Janssen, testified (and was cross-examined) at length at trial that Janssen proposed certain PT labeling language to FDA that the Agency later struck. *Mingo* Trial Tr. 1770:21–1780:17, 1796:6–1806:1. And although Dr. Parisian denied knowing the authorship of the FDA strikethrough documents at trial (*see id.* at 1178:2–1179:5), she previously testified that it was "just a fact that the FDA struck" Janssen's proposed language. *See, e.g.*, Parisian Dep. 660:19–661:4, 651:5–13, 677:1–9, 681:4–9 (Doc. 7318, Exh. B); *Orr* Trial Tr. 1669:7–10 ("Q. . . . So the FDA struck the relationship between PT and rivaroxaban plasma concentration as linear and closely correlated, didn't they? A. Yes, sir.") (attached hereto as Exh. D).

### 3. The admission of the FDA strikethrough documents was not unfairly prejudicial.

Finally, Plaintiff contends that admitting the FDA strikethrough documents was unfairly prejudicial. Not so. Under Rule 403, "the probative value of the evidence must be 'substantially outweighed by the danger of unfair prejudice' before the court may exclude the disputed evidence." *Learmonth*, 631 F.3d at 733 (citation omitted). "[T]he exclusion of relevant evidence" under Rule 403 "is an extraordinary measure that should be used sparingly." *Campbell v. Keystone Aerial Surveys, Inc.*, 138 F.3d 996, 1004 (5th Cir. 1998).

As the Court recognized in overruling Plaintiff's motion *in limine*, the FDA strikethrough documents have significant probative value in that Defendants "should be able to show that they

20

did suggest some label changes that the FDA purportedly rejected." Doc. 6645, at 7. Plaintiff asserts that she was unfairly prejudiced because Defendants were able to argue to the jury "that the FDA refused to allow language regarding PT testing, which was at the very heart of Plaintiff's failure to instruct claim." Pls.' Mem. at 14. But "'[p]rejudice' to one party is the natural and intended consequence of the admission of evidence by another," so Rule 403 is not satisfied simply because "the evidence is adverse to the opposing party."[14] *Hinojosa v. Butler*, 547 F.3d 285, 295 (5th Cir. 2008) (citation omitted). That is the case here. The FDA strikethrough documents undercut Plaintiff's claim that Defendants did not act as reasonable manufacturers in labeling Xarelto, but the fact that they present a problem for Plaintiff's theory does not warrant exclusion.

### B.     The Court properly refused to provide Plaintiff's requested jury instruction.

Plaintiff next contends that she is entitled to a new trial because, after admitting the FDA strikethrough documents, the Court refused to give her proposed instruction No. 12, which would have instructed the jury as to Defendants' purported "burden of proof" regarding clear evidence preemption. Pls.' Mem. at 14–16.

But this argument fails—just as it did in *Boudreaux* and *Orr*—because Plaintiff cannot demonstrate prejudicial error. Plaintiff has not shown "[a]s a threshold matter" that her "proposed instruction correctly states the law." *F.D.I.C. v. Henderson*, 61 F.3d 421, 425 (5th Cir. 1995). Even if the proposed instruction is correct, the question is "whether the charge as given was accurate or misleading," because "[a] judgment will be reversed only when the charge as a whole leaves [the court] with a substantial and ineradicable doubt whether the jury has been properly guided in its deliberations." *Id.* (citation and internal quotation marks omitted). Finally, Plaintiff

---

[14] *See also, e.g.*, *Learmonth*, 631 F.3d at 733 ("Unfair prejudice is not satisfied by evidence that is 'merely adverse to the opposing party.'" (citation omitted)); *Brazos River Auth. v. GE Ionics, Inc.*, 469 F.3d 416, 427 (5th Cir. 2006) ("'Unfair prejudice' as used in rule 403 is not to be equated with testimony that is merely adverse to the opposing party. Virtually all evidence is prejudicial; otherwise it would not be material.").

cannot show that the Court's refusal to include the instruction affected the outcome of the case. *Id.*; *accord Janvey v. Dillon Gage, Inc. of Dall.*, 856 F.3d 377, 388 (5th Cir. 2017).

> **1.     Plaintiff has not shown, "as a threshold matter," that her requested instruction is a correct statement of the law.**

Plaintiff's proposed instruction No. 12 purported to instruct the jury regarding the "clear evidence" standard that the Supreme Court established for impossibility preemption in the prescription-drug-labeling context in *Levine*.   But Plaintiff cannot show that this proposed instruction is correct, because the instruction seeks to charge the jury on—and to shift the burden of proof for Defendants to prove—a legal question that is inappropriate for determination by the jury.[15]   Rather, this Court has already explained that preemption is a question of law that should not be considered by the trier of fact.  *See, e.g.*, Order & Reasons (Apr. 18, 2017), at 5 (Doc. 6254) (holding that preemption is "a question of law that is not appropriate for consideration by the finder of fact"); *Boudreaux* Trial Tr. at 1147:3–15 (stating that preemption is "a question of law, not for the jury") (attached hereto as Exh. E).   And rightly so—the Fifth Circuit has repeatedly acknowledged that the preemptive effect of federal law is a legal question, not a factual one.  *See, e.g.*, *Ezell v. Kan. City S. Ry. Co.*, 866 F.3d 294, 298 (5th Cir. 2017) ("Whether a state statute or common law cause of action is preempted by federal law is a question of law . . . .").[16]   Instructing the jury as to this pure question of law would have been inappropriate.  *See City of Fort Worth v. United States*, 212 F.2d 474, 476 (5th Cir. 1954) (giving instruction that "shifted to the jury the determination of a legal question that was for the trial court" was "prejudicial and reversible

---

[15] Plaintiff's No. 12 is derived from *In re Fosamax (Alendronate Sodium) Products Liability Litigation*, 852 F.3d 268 (3d Cir. 2017), *petition for cert. filed*, No. 17-290 (Aug. 22, 2017), in which the Third Circuit held that clear evidence preemption is a question of fact for the jury.  *Id.* at 286–94.  As explained *infra*, that court's ruling, which leaves the preemption question to individual juries, is inconsistent with this Court's own rulings and with Fifth Circuit precedent.

[16] *See also, e.g.*, *Lofton v. McNeil Consumer & Specialty Pharms.*, 672 F.3d 372, 375 (5th Cir. 2012); *Frank v. Delta Airlines, Inc.*, 314 F.3d 195, 197 (5th Cir. 2002).

error"); *cf. Tamez v. City of San Marcos*, 118 F.3d 1085, 1094 (5th Cir. 1997) (noting that "the court erroneously instructed the jury to answer . . . the legal question").

And even if it were appropriate to instruct the jury regarding clear evidence preemption, such an instruction would have improperly focused the jury's attention on a single item of evidence. As this Court has previously recognized, "the jury charge should [not] focus on specific items of evidence," but should "instead speak the law generally and let the jury decide on it." *Boudreaux* Trial Tr. 1537:19–23.

> 2. **Plaintiff does not claim that the Court's instruction was inaccurate or misleading.**

In any event, Plaintiff does not now assert that any of the Court's instructions were *incorrect*. Instead, she simply claims that the Court's instruction was too "general" because it was not "sufficiently clear with regard to what import the jury could attach to any action by the FDA regarding contested language in the warning." Pls.' Mem. at 15. But, again, it was not error for the Court to decline to instruct the jury regarding *Levine*'s clear evidence standard, which is relevant only to failure-to-warn preemption—a question that is not appropriate for the trier of fact. In any event, the Court should reject this argument for the same reasons that it rejected Plaintiffs' identical argument in *Boudreaux* and *Orr*. *See* 2017 WL 4168410, at *4 ("In choosing the jury instructions, the Court reasoned that the jury charge should focus on the governing law as a whole (comprehensively), rather than a specific part of the law. . . . Here, the jury instructions were comprehensive and were not confusing or misleading. Therefore, the Court finds that declining Plaintiff's proposed jury instructions was not error.").

> 3. **Plaintiff has not demonstrated that the Court's refusal to give her requested instruction affected the outcome of the case.**

Finally, Plaintiff must show that the Court's refusal to give her requested instruction "seriously impaired [her] ability to present a given [claim]." *Janvey*, 856 F.3d at 388 (second

alteration in original).  As in *Boudreaux* and *Orr*, Plaintiff cannot do so.  *See* 2017 WL 4168410, at *4 (rejecting argument "that it was prejudicial error to decline to use Plaintiff's proposed jury instructions" and holding that "declining Plaintiff's proposed jury instructions was not error").

Plaintiff contends that without "being instructed on the weight of the FDA's action *viz.* the label's instructions on the use of PT Neoplastin, jurors were not fully advised as to how to consider Plaintiff's key contention."  Pls.' Mem. at 15–16.  But the Court's instructions went to great lengths to explain that FDA's approval, "although relevant," did not "absolve the defendants of all liability," did not "establish that instructions provided with the drug were adequate under the standards of Mississippi law," and was "not conclusive."  Doc. 7407, at 24–25.  And the Court's charge further explained that any "action or inaction" by FDA did "not foreclose a claim."  *Id.*[17] As such, nothing in the Court's instructions can be read to suggest that FDA's approval of the label or the Agency's actions leading up to the medicine's approval would be conclusive.  Furthermore, Plaintiff emphasized throughout trial (including in opening and closing) her views (1) that the jury could decline to give weight to FDA's approval, (2) that it was unclear whether FDA struck Janssen's proposed PT language, and/or (3) that the removal of the language did not represent FDA's ultimate view regarding Neoplastin PT.  *See, e.g., Mingo* Trial Tr. at 132:9–13, 1051:3–1052:17, 1054:5–21, 1177:12–1180:11, 1216:14–1217:20, 2204:20–2208:8.  Accordingly, Plaintiff cannot show that the Court's refusal to give her requested instruction "seriously impaired [her] ability to present [her] claim."  *Schilling v. La. Dept. of Transp. & Dev.*, 662 F. App'x 243, 246–47 (5th Cir. 2016) (holding that plaintiff could not show reversible error in refusal to give

---

[17] Indeed, if anything, the Court's FDA instruction was unfairly balanced *in favor of Plaintiff*—the charge stated in one sentence encompassing three lines that the jury can consider FDA approval, while spending three sentences covering thirteen lines stating that the jury need not give FDA approval, action, or inaction very much (if any) weight. Defendants objected to the Court's FDA charge on this basis and submitted that their proposed instruction No. 12 would have been more accurate and balanced.  *See, e.g.*, Doc. 7397, at 10–12, 14.

requested instruction where "[s]he raised th[e] argument in her opening statement," provided testimony, and included it as a "principal theme[] at closing").

**IV.    Plaintiff is not entitled to a new trial on the basis of "cumulative error."**

Plaintiff also cursorily asserts that the Court's alleged errors, "when considered cumulatively," warrant a new trial. Pls.' Mem. at 16. But, as in *Boudreaux* and *Orr*, Plaintiff has not shown that any of the Court's rulings were erroneous, much less "that manifest injustice will result from letting the verdict stand." *Learmonth*, 631 F.3d at 731. Her failure to "establish[] *any* error" means that "there is nothing to cumulate." *United States v. McIntosh*, 280 F.3d 479, 484 (5th Cir. 2002); *see also, e.g.*, *In re Wheeler*, 612 F. App'x 763, 770 (5th Cir. 2015).

**V.    Plaintiff is not entitled to a new trial because Defendants were entitled to judgment as a matter of law.**

Finally, even if there had been error in the conduct of the trial, the Court should deny Plaintiff's motion for a new trial because any error would have been harmless because Defendants were entitled to judgment as a matter of law, as stated in their Motion for Judgment as a Matter of Law at the Close of the Evidence (Docs. 7390, 7390-1, 7391, 7393).

## CONCLUSION

The jury here, following a two-week trial, unanimously found that Defendants adequately instructed physicians as to the safe use of Xarelto and that Xarelto is not defectively designed. As the Fifth Circuit has observed, courts "are not to tamper lightly with the considered judgment of those drawn together at one point in time to render a judgment that is representative of the good common sense of the American people." *E.E.O.C. v. Boh Bros. Constr. Co., L.L.C.*, 731 F.3d 444, 452 (5th Cir. 2013) (en banc) (citation omitted). Plaintiff has not met her burden to show that "manifest injustice will result from letting the verdict stand." *Learmonth*, 631 F.3d at 731. The Court should deny Plaintiff's motion for a new trial.

Respectfully submitted,

BARRASSO USDIN KUPPERMAN FREEMAN &
SARVER, L.L.C.

BY: /s/ *Richard E. Sarver*
Richard E. Sarver
Celeste R. Coco-Ewing
BARRASSO USDIN KUPPERMAN FREEMAN &
SARVER, L.L.C.
909 Poydras Street, 24th Floor
New Orleans, Louisiana  70112
Telephone:  (504) 589-9700
rsarver@barrassousdin.com
ccoco-ewing@barrassousdin.com


DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
Chanda.Miller@dbr.com


IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ *James B. Irwin*
James B. Irwin

MITCHELL, WILLIAMS, SELIG,
GATES & WOODYARD, P.L.L.C.

By: /s/ *Lyn P. Pruitt*
Lyn P. Pruitt
Adria W. Conklin
Benjamin D. Brenner
Mary Catherine Way
MITCHELL, WILLIAMS, SELIG,
GATES & WOODYARD, P.L.L.C.
425 West Capitol Ave., Suite 1800
Little Rock, AR  72201
Telephone: (501) 688-8800
lpruitt@mwlaw.com
aconklin@mwlaw.com
bbrenner@mwlaw.com
mway@mwlaw.com


WATKINS & EAGER PLLC

By: /s/ *Walter T. Johnson*
Walter T. Johnson
WATKINS & EAGER PLLC
The Emporium Building
400 East Capitol Street
Jackson, Mississippi 39201
Telephone: (601) 965-1846
wjohnson@watkinseager.com

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *William Hoffman*
William Hoffman
ARNOLD & PORTER KAYE SCHOLER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@apks.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street

Kim E. Moore
IRWIN FRITCHIE URQUHART & MOORE LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

*Attorneys for Defendants Janssen*
*Pharmaceuticals, Inc. and Janssen Research*
*& Development, LLC*

New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@apks.com
steven.glickstein@apks.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: */s/ Lindsey C Boney IV*
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8914
lboney@bradley.com

CHAFFE MCCALL L.L.P.

By: */s/ John F. Olinde*
John F. Olinde
CHAFFE MCCALL L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer HealthCare*
*Pharmaceuticals Inc. and Bayer Pharma AG*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 20th of October, 2017, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system.

*/s/       John F. Olinde*