## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | : : : | MDL No. 2592 |
| | : | SECTION L |
| THIS DOCUMENT RELATES TO: | : : | JUDGE ELDON E. FALLON |
| | : : | MAGISTRATE NORTH |
| Harriet Ibanez, et al. v. Janssen Research & Development, LLC f/k/a Johnson & Johnson Pharmaceutical Research and Development, LLC, et al. Case No. 2:14-cv-02669 | : : : : : : | |

### PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE GROUND THAT FEDERAL LAW PREEMPTS PLAINTIFFS' DESIGN-DEFECT CLAIM

Plaintiffs respectfully submit this response in opposition to *Defendants' Joint Motion for Partial Summary Judgment on the Ground that Federal Law Preempts Plaintiffs' Design Defect Claim* ("Defendants' motion" or "Def. Motion").[1]

## I.      INTRODUCTION

This Court has already considered and rejected Defendants' arguments that federal law preempts Plaintiffs' state-law claims that Xarelto was defectively designed in three earlier bellwether cases, *Boudreaux*, *Orr*, and *Mingo*.[2]    Numerous state and federal courts across the

---

[1] Defendants' motion originally related to two different cases, one concerning William Henry and the other regarding Harriet Ibanez, but this Court recently granted Plaintiffs' motion to voluntarily dismiss Mr. Henry's case. *See* Order, dated 11/2/17 [Doc. No. 7943].  As set forth below, Plaintiffs in the Ibanez case are entitled to additional discovery prior to consideration of this motion.  Discussion of the reasons is set forth *infra* at 24.

[2] As Defendants note in their motion, this preemption motion raises arguments already decided by the MDL Court in *In re Xarelto (Rivaroxaban) Prods. Liab. Liab. Litig.*, MDL No. 2592 Section L, 2017 U.S. Dist.

country have similarly rejected preemption challenges concerning brand-name prescription drugs. Nonetheless, Defendants raise the defense of preemption again here, with the stated goal of requesting interlocutory review of the preemption issue pursuant to 28 U.S.C. § 1292(b). Supreme Court and related precedent make clear, however, that federal law did not prevent Defendants from complying with their obligations under Louisiana law not to design and market an unreasonably dangerous product. Accordingly, Plaintiffs' design defect claims are not preempted and, for the reasons set forth below, this Court should deny Defendants' motion.

Xarelto is a brand-name prescription blood thinner that was approved by the FDA in 2011 to help prevent deep-vein thrombosis and pulmonary embolism in patients who undergo hip replacement and knee replacement surgeries and for other uses. Even before the drug was approved, however, studies raised concerns that taking Xarelto led to higher incidences of major bleeding events. Ibanez Compl. ¶¶ 77-78.

Before Xarelto was approved and marketed, Defendants knew that there were two alternative designs that were available and that would have reduced the high risk of major bleeding events. One was to sell Xarelto along with an anti-Factor Xa assay specifically designed to work with Xarelto by determining how much of the drug was in a patient's system and, thus, assess a patient's risk of bleeding.[3] The other was to design and include a reversal agent or antidote that could stop the bleeding and save patients from death or severe injury. Either of these alternatives would have prevented Plaintiffs' injuries.[4] Ibanez Compl., ¶¶ 4, 12-16, 110, 112. Both of these

---

LEXIS 56629 (E.D. La. Apr. 13, 2017), and *In re Xarelto Rivaroxaban Prods. Liab. Litig.*, MDL No. 2592 Section L, 2017 U.S. Dist. LEXIS 114338 (E.D. La. July 21, 2017). *See* Def. Motion. at 1 n.1.

[3] Exhibit 1, Declaration of Suzanne Parisian, M.D., at ¶ 5.

[4] Defendants spend many pages in their motion arguing that Plaintiffs' design-defect claims based on dosing and monitoring are preempted. Mot. 19-25. This Court should disregard these arguments because Plaintiffs do not claim that Xarelto is defectively designed based on dosing or monitoring. Plaintiffs do continue to make a failure-to-warn claim based on Defendants' failure to change their label to instruct physicians that

alternative designs existed when Defendants went through the approval process for Xarelto.  Both are commercially available in Europe, and had been tested; in fact, Defendants had relied on the Xarelto-specific assay in their own clinical studies.[5]

No federal law or regulation prevented Defendants from pursuing one or both of these safer alternative designs, as Plaintiffs allege they were required by state law to do.[6]  While it is true that some regulatory barriers make it more burdensome for manufacturers to alter a drug's design after the FDA has approved it, these barriers do not apply before approval.  And while it is, of course, the case that Defendants would have had to get FDA approval in order to market these alternative designs, the Supreme Court has cautioned that courts may not presume, for purposes of preemption analysis, that the necessary approval would have been denied.  Courts have recognized, therefore, that federal law cannot preempt manufacturers from pursuing an available, safer alternative that they knew about before they went through the approval process.

Courts, including the Supreme Court, also have recognized in several contexts that federal law does not prevent defendants from complying with state-law safety requirements that parallel federal law.  The Supreme Court has noted that some state-law claims that a drug was defectively designed parallel the federal misbranding statute, 21 U.S.C. § 352(j), which requires a manufacturer to pull a drug from the shelves if it is too dangerous even when used as directed by the label.  *See Mutual Pharmaceutical Co. v. Bartlett*, 133 S. Ct. 2466, 2477 n.4 (2013).  That is the case here.  Plaintiffs allege that Xarelto is dangerous to health when used as directed on the

Xarelto's risks could be reduced through use of the Neoplastin PT test to identify those patients at highest risk of dangerous bleeding.  *See* Plaintiffs' Response in Opposition to Defendants' Joint Motion for Partial Summary Judgment on the Ground that Federal Law Preempts Plaintiffs' Failure to Warn or Instruct Claim ("FTW Opp.").

[5] *See* Exhibit 1, Declaration of Suzanne Parisian, M.D., at ¶¶ 14-15

[6] *See id.* at ¶¶ 2, 25.

label – allegations that parallel the federal law.  They allege that Defendants continued selling Xarelto, even when new information made it clear that the FDA-approved instructions for use were not protecting patients from serious bleeding-related injuries and even death.  In that circumstance, federal law did not make it impossible for Defendants to comply with their state-law duties concerning unreasonably dangerous products.

For these reasons, the Court should reject Defendants' federal preemption arguments and deny the Motion.

## II.  COUNTERSTATEMENT OF THE CASE

### A. Early studies raised concerns that Xarelto could cause dangerous and difficult-to-predict bleeding.

After Xarelto was approved and began to be sold, it turned out to be even more dangerous than initial studies had suggested.  Defendants received a staggering number of reports of serious incidents of bleeding by patients taking Xarelto.  An alarming number of these involved patients dying from bleeding caused by Xarelto.  In fact, after Xarelto was approved, from 2012 through 2015, Xarelto-related adverse events were the most frequently reported among all pharmaceutical drugs sold in the U.S. market, with 81% involving bleeding events.[7]  In this regard, the Institute for Safe Medication Practices ("ISMP"), an independent industry watchdog organization, reported in 2013 that Xarelto ranked tenth in terms of direct Serious Adverse Event ("SAE") reports to the FDA in 2012, its first full year on the market, with 2,081 SAE reports, 151 of which involved death.[8]  Post-market observational studies also reported that use of Xarelto results in an increased bleeding risk compared to other new oral anticoagulants and warfarin.[9]

---

[7] *See* Exhibit 2, Report of Cindy Leissinger, M.D., ("Leissinger Report") at 17 (citing data sources).

[8] *See* Exhibit 3, QuarterWatch Report 2012 Q4, 10/17/13, at 10.

[9] *See* Exhibit 4, Report of David Kessler, M.D. ("Kessler Report"), at 43-50 (summarizing post-market epidemiology and stating that post- market evidence further indicates need to improve safety of Xarelto).

Defendants did not respond to this new information about how deadly Xarelto, when used as directed, actually was.  They neither analyzed the new data, nor pulled the drug, nor changed their labeling instructions.[10]  They just kept selling Xarelto, as-is, while reports of serious and fatal bleeding events piled up.

**B.  Before seeking FDA approval, Defendants were aware of two alternative designs that would have reduced the dangers of Xarelto.**

In addition to serious safety concerns about the use of Xarelto, the record in this case shows Anti-Factor Xa assays – used to determine bleeding risk by testing the level of Xarelto in a patient's body – were known to Defendants long before Xarelto was marketed in the United States.[11]  For example, a 2005 article published by Bayer's Dr. Kubitza showed Xarelto anticoagulation activity was assessed by using anti-Factor Xa assays.[12]  Furthermore, by 2011, Bayer's report to the European Medicines Agency ("EMA") stated that there were "appropriate assays currently marketed by two different diagnostic companies."[13]  The report made it clear the anti-Factor Xa assays were approved and commercially available.[14]

## III.   SUMMARY OF ARGUMENT

Governing Supreme Court and related precedent compel the conclusion that no federal law prevented Defendants from designing and marketing a less dangerous Xarelto product by presuming that the FDA would deny approval of safer alternatives.  The framework governing

---

[10] *See* FTW Opp. at pages 22-25.

[11] *See* Exhibit 1, Declaration of Suzanne Parisian, M.D., at ¶ 14-15.

[12] *See* Exhibit 5, Dagmar Kubitza, et al., *Safety, pharmacodynamics, and pharmacokinetics of BAY 59-7939 – an oral, direct Factor Xa inhibitor*, 78 Clinical Pharmacology & Therapeutics 412 (2005) ("Kubitza Article").

[13] *See* Exhibit 6, EMA Progress Report (11/08/11), at 6. This report covers developments between September 16, 2010 and September 15, 2011. *Id*.

[14] *See id.* at 12.

preemption of state-law claims against brand-name drug manufacturers was established by the Supreme Court in *Wyeth v. Levine*.[15]  Subsequent courts have applied *Wyeth*'s mandate to design-defect claims, including claims brought under Louisiana products liability law, as in *Guidry v. Janssen Pharm., Inc.*, 206 F. Supp. 3d 1187 (E.D. La. 2016), and held that a drug manufacturer can "independently design a reasonably safe drug in compliance with its state-law duties before seeking FDA approval," and that claims based on those state-law duties were therefore not preempted.  *Id.* at 1208.

In their present motion, Defendants have proffered no evidence that the FDA would not have approved a Xarelto-specific assay or an antidote, and, as explained *infra* at 18-22, ample evidence indicated that those options could safely be approved, as they were in other markets.  Nevertheless, Defendants argue that, because they would have had to secure FDA approval for these alternative designs in order to discharge their state-law duty, they could not independently satisfy those state duties for preemption purposes.  In doing so, Defendants primarily rely on *Yates*,[16] a much criticized federal appellate court decision where the Sixth Circuit stretched Supreme Court teachings on preemption too far.[17]

As stated above, this Court has already considered and rejected Defendants' summary judgment arguments based on preemption in previous bellwether cases.  *See*, *e.g.*, *In re Xarelto Rivaroxaban Prods. Liab. Litig.*, MDL No. 2592 Section L,  2017 U.S. Dist. LEXIS 114338, *12 (E.D. La. July 21, 2017) ("While this Court acknowledges that pharmaceutical companies generally cannot take unilateral action or alter an FDA approved drug, Defendants' argument takes

---

[15] *Wyeth v. Levine*, 555 U.S. 555 (2009).

[16] *Yates v. Ortho-McNeil-Janssen*, 808 F.3d 2801 (6th Cir. 2015).

[17] Defendants' own cited case law, *Brazil v. Janssen Research & Dev. LLC.*, No. 15-cv-0204, 2016 U.S. Dist. LEXIS 137695, *54-55 (N.D. Ga. Mar. 24, 2016), highly criticizes *Yates*, the very same authority that Defendants argue should be adopted herein.

the preemption doctrine one step too far.").  In this latest attempt to prematurely jettison Plaintiffs' design defect claims, Defendants have presented nothing new and, again, fail to meet their demanding burden of showing that it would have been impossible to comply with both federal and state law.

As demonstrated below, the record in this case shows that Plaintiffs' design-defect claims based on the Anti-Factor Xa Assay and the Lack of a Reversal Agent are not preempted by federal law.  Accordingly, Defendants' motion based on recycled arguments should be denied.

## IV.   <u>ARGUMENT</u>

### A.  Standard for the affirmative defense of preemption on summary judgment

On summary judgment, Rule 56 of the Federal Rules of Civil Procedure requires Defendants – the moving party – to show that there is no genuine issue of material fact and the moving party is entitled to relief as a matter of law.[18]  In considering such a motion, courts must thoroughly examine the whole record to determine whether there is a genuine issue as to any material fact, with all doubts as to the existence of a genuine issue resolved against the moving party.[19]

Defendants' motion raises the affirmative defense of impossibility preemption, contending that it would have been impossible for them to comply with the requirements of both federal and state law.  Defendants have the burden of pleading and proving the affirmative defense of federal impossibility preemption,[20] a burden the Supreme Court has recognized as "demanding."[21]  With

---

[18] *Ctr. For Restorative Breast Surgery, LLC v. Blue Cross Blue Shield of La.*, CIVIL ACTION NO. 11-806 Section E (5), 2016 U.S. Dist. LEXIS 143531, *10-11 (E.D. La. Sept. 19, 2016).

[19] *Id.*

[20] *Met. Life Ins. Co. v. Taylor,* 481 U.S. 58, 63 (1987) ("Federal pre-emption is ordinarily a federal defense to the plaintiff's suit.").

[21] *Wyeth*, 555 U.S. at 573.

7

respect to Plaintiffs' design defect claims, Defendants must show that no reasonable jury could conclude that they could have designed and marketed a safe alternative product, as state law required.[22]  As demonstrated below, Defendants herein have failed to show that there is no genuine issue of fact as to whether they could have used and marketed the available alternative designs of Xarelto and, thus, this Court should deny their motion for partial summary judgment.  In any event, Plaintiffs' design-defect claims are not preempted because the standard governing those claims under state law parallels the federal misbranding statute.

### B. Governing Supreme Court and related precedent require the conclusion that no federal law stood in the way of Defendants' designing and marketing a less dangerous product.

#### 1. *Wyeth v. Levine* and its progeny establish the framework governing preemption of state-law claims against brand-name drug manufacturers and forbid presuming that the FDA would deny approval of safer alternatives.

The affirmative defense of federal preemption is predicated on the principle that the laws of sovereign states must yield in certain areas to federal law and regulations. A presumption against preemption applies with particular force when Congress has legislated in a field traditionally occupied by the States, such as the protection of health and safety.[23] The Supreme Court has "worked on the 'assumption that the historic police powers of the States were not to be superseded

---

[22] *Cf. In re: Fosamax (Alendronate Sodium) Prods Liab. Litig.*, 852 F.3d 268, 282 (3d Cir. 2017) ("When there is no genuine issue of material fact—that is, when no reasonable jury applying the clear-evidence standard of proof could conclude that the FDA would have approved a label change—the manufacturer will be entitled to judgment as a matter of law. At the summary judgment stage, the court cannot decide for itself whether the FDA would have rejected a change, but must instead ask whether a reasonable jury could find that the FDA would have approved the change.").

[23] *See Altria Group, Inc. v. Good*, 555 U.S. 70, 77 (2008).  *See also Riegel v. Medtronic, Inc.*, 552 U.S. 312, 334–35 (2008) (presumption against preemption, particularly "where federal law is said to bar state action in fields of traditional state regulation").

by the Federal Act unless that was the clear and manifest purpose of Congress.'"[24]   "In fields . . . such as health and safety regulation, there is a strong presumption against federal preemption."

In the landmark case of *Wyeth v. Levine*, the Supreme Court established how courts should assess the defense of impossibility preemption in the context of branded prescription drugs and ruled that, without clear evidence to the contrary, courts may not presume that the FDA would have rejected safety-related changes that the manufacturer was required to make under state law. The plaintiff sued Wyeth under a Vermont state law failure-to-warn theory, arguing that Wyeth could have unilaterally added a stronger warning against the IV-push method, including an instruction for use of the IV-drip method.[25]   Wyeth argued that the FDA would have rejected such stronger labeling and that, if it had unilaterally added a stronger warning, it would have been subject to liability for unauthorized new labeling.[26]

The Supreme Court rejected these arguments and held that federal law did not preempt the plaintiffs' claims.   The Court determined that Congress had declined to limit the historical state police power over health and safety matters and had allowed for coexistence between state regulation and federal regulation of prescription medications.   The Court took note that in contrast to the express preemption clause found in the Medical Device Amendment Act within the federal Food, Drug, and Cosmetic Act ("FDCA"), no such clause exists for branded prescription drugs.[27]

---

[24] *In re Vioxx Prod. Liab. Litig.*, 501 F. Supp. 2d 776, 785 (E.D. La. 2007).

[25] *Id.*

[26] *Id.* at 570.

[27] *Id.* at 566.  In 1975, Congress passed the Medical Device Amendment Act, which provided for an express preemption provision for medical devices. *See* 21 U.S.C. § 360k(a).  Notably, Congress did *not* enact any preemption provisions for prescription drugs.  "If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70–year history. But despite its 1976 enactment of an express pre-emption provision for medical devices, *see* 21 U.S.C. § 360k(a), Congress has not enacted such a provision for prescription drugs."  *Id.* at 574.

The Court rejected Wyeth's argument that it could not unilaterally strengthen its warning, noting that an applicable FDA regulation allows manufacturers to change their label to "add or strengthen a contraindication, warning, precaution, or adverse reaction" or to "add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product," without FDA pre-approval.[28]

Importantly, the Supreme Court ruled that courts may not assume that the FDA would have rejected a change aimed at making the warning safer – in that case, a change to the drug's label. The Court held that the federal requirements created a minimum floor, but not a ceiling.  Instead, the Court refused to "conclude that it was impossible for [the manufacturer] to comply with both federal and state requirements," unless the manufacturer could provide "clear evidence that the FDA would not have approved" the change that state law demanded.[29]  Because Wyeth failed to prove by clear evidence that it was impossible to alter its label, the Court held that federal law did not preempt the plaintiff's state law failure to warn claims.

Subsequent court decisions have applied *Wyeth*'s mandate to design-defect claims, including claims brought under Louisiana products liability law.  In *Guidry*, the district court considered a claim that it would have been impossible for the defendant to design a drug that would have been less dangerous to patients' kidneys (as the plaintiff alleged Louisiana law required) while complying with federal law's prohibition on changing the design of a prescription drug without FDA approval. *Guidry,* 206 F. Supp. 3d at 1201.  Applying *Wyeth*, the court held that a drug manufacturer can "independently design a reasonably safe drug in compliance with its state-

---

[28] *Id.* at 568, *citing* 21 CFR §§ 314.70(c)(6)(iii)(A), (C).

[29] *Id.* at 571. In *Pliva, Inc. v. Mensing,* 564 U.S. 604, 635 n.8 (2011), the Supreme Court confirmed that federal law preempts a state-law duty to warn only where there is "clear evidence" that the FDA would have "rescinded" a CBE labeling change to add the warning required by state law.  *See also, Fosamax*, 852 F.3 at 282 (jury must find by clear-evidence that FDA would not have approved label change).

law duties before seeking FDA approval," and that claims based on those state-law duties were therefore not preempted.  *Id.* at 1208.

Indeed, a large number of courts, "focusing on a manufacturer's wide discretion to submit proposals to the FDA for approval," have, applying *Wyeth*, "held there is no conflict between a manufacturer's state-law duty to produce a safe drug and its federal law duties to obtain approval."[30]  The Supreme Court held, based on Congress's decision not to provide a federal remedy for consumers harmed by unsafe drugs, that "widely-available state rights of action" continued to provide that relief.  *Wyeth*, 555 U.S. at 574.  As the *Guidry* court put it in applying *Wyeth* to a Louisiana design-defect claim: "[T]he dispositive question presented here is simply: Can a drug manufacturer independently design a reasonably safe drug in compliance with its state-law duties before seeking FDA approval? The answer is yes."  *Guidry*, 206 F. Supp. 3d at 308.

    **2.   Plaintiffs' design-defect claims are not preempted, because federal law did not prevent Defendants from designing and marketing a less dangerous alternative.**

These principles govern – and mandate rejection of -- Defendants' argument that Plaintiffs' design-defect claims are preempted.  As explained in more detail at pages 18-22, *infra*, Defendants were aware when designing Xarelto that either an anti-Factor Xa assay or an appropriate reversal agent would have lessened significantly the extreme dangers of their product.  In fact, both of these

---

[30] *See Young v. Bristol-Myers Squibb Co.,* CASE NO. 4:16-CV-00108-DMB-JMV, 2017 U.S. Dist. LEXIS 24730, *17-18 n.3 (N.D. Miss. 2017) (citing *Guidry v. Janssen Pharms., Inc.*, 206 F. Supp. 3d 1187, 1208 (E.D. La. 2016)). Similarly, defendants have offered no evidence that the FDA would have exercised its authority to prohibit defendants from creating and submitting such a design for approval.") (emphasis omitted); *Trahan v. Sandoz, Inc.*, No. 3:13-CV-350-J-34MCR, 2015 U.S. Dist. LEXIS 66869, 2015 WL 2365502, at *6 (M.D. Fla. Mar. 26, 2015) ("[I]n her Amended Complaint Trahan arguably states a claim that Sandoz breached its duty to design a reasonably safe product when it initially selected the defective glass, prior to FDA approval. Complying with its state law duty of care at that time was not 'impossible' in the absence of any federal law requiring Sandoz to utilize the allegedly defective glass container.") (emphasis omitted); *Sullivan v. Aventis, Inc.*, No. 14-dv-2939, 2015 U.S. Dist. LEXIS 107360, 2015 WL 4879112, at *6 (S.D.N.Y. Aug. 13, 2015) ("[C]ounsel has cited no federal law that restricts a brand-name drug manufacturer from designing a reasonably safe product *prior* to FDA approval.") (emphasis in original)).

11

alternative designs existed at the relevant time, before the FDA approved the existing design. Xarelto-specific anti-Factor Xa assays were actually available to consumers in Europe, and had been tested and were extensively relied upon by Defendants in many of the clinical studies before the FDA's approval. Thus, Defendants could have – as Louisiana law required – created those less dangerous products and brought them to approval and market in lieu of the more dangerous drug they chose to produce.

Federal law did not prevent Defendants from carrying out this duty. As another court applying *Wyeth* held, "[n]o federal law prohibited defendants from submitting a different design." *Estate of Cassel v. Alza Corp.*, No. 12-cv-771, 2014 U.S. Dist. LEXIS 27924, 2014 WL 856023, at *5-6 (W.D. Wis. Mar. 5, 2014). On the contrary, as the court in *Guidry* explained:

> "Louisiana law imposes a duty on all manufacturers to consider feasible, alternative designs and reasonably weigh the risks and utility of the final product before it leaves the manufacturer's control. Federal law does not prevent a drug manufacturer from complying with this state-imposed duty before seeking FDA approval. Far from impossible, the two are complimentary, preferable, and perhaps necessary to protect the public health and assure the safety, effectiveness, and reliability of drugs."[31]

Defendants may not rely on a presumption that the FDA would not have approved these less dangerous alternatives. As the Supreme Court noted in *Wyeth*, "[o]f course, the FDA retains authority to reject" safer alternatives – there, a labeling change; here, a proposed alternative drug design that would include an assay and/or antidote. But this fact alone is insufficient to establish preemption without "clear evidence that the FDA would not have approved" the safer option. *Wyeth*, 555 U.S. at 571. Defendants have proffered no evidence that the FDA would not have

---

[31] *Guidry*, 206 F. Supp. 3d at 1209.

approved a Xarelto-specific assay or an antidote, and, as explained *infra* at 18-22, ample evidence indicated that those options could safely be approved, as they were in other markets.

Defendants argue that, because they would have had to secure FDA approval for these alternative designs in order to discharge their state-law duty, they could not have met that state-law duty "without the Federal Government's special permission and assistance, which is dependent on the exercise of judgment by a federal agency," and therefore could not "independently satisfy those state duties for pre-emption purposes.[32]  This argument is predicated on a misreading of *Mensing* and other Supreme Court precedent.  *Mensing*, which concerned generic drugs and the impossibility under federal law of altering their labels, turned on the Supreme Court's conclusion that it can be impossible to comply with federal and state law for preemption purposes, even where a series of events and decisions by outside and third parties, no matter how remote and convoluted, could have made it theoretically "possible" to comply with both.  The Court found that, for dual compliance to be possible in *Mensing*, the generic manufacturer defendants would have had to ask the FDA to "help in changing the corresponding brand-name label," and,

> "if they had done so, and if the FDA decided there was sufficient supporting information, and if the FDA undertook negotiations with the brand-name manufacturer, and if adequate label changes were decided on and implemented, then the Manufacturers would have started a Mouse Trap game that eventually led to a better label."[33]

The Court reasoned that such "anything's-possible" hypotheses could not be the correct place to draw the line for purposes of impossibility preemption, because relying on the possibility

---

[32] Def. Motion at 21-30, *id.* at 11 (quoting *Mensing*, 564 U.S. at 623-24).

[33] *Mensing,* 564 U.S. at 619.

of such remote chains of events would "would make most conflicts between state and federal law illusory." *Id.* at 620.[34]

Courts considering the question have correctly recognized that the outlandish scenarios the Supreme Court considered and rejected in *Mensing* are a far cry from the argument that a manufacturer with access to a safe alternative design could have independently marketed that design, including by securing FDA approval.  For example, another court considering design-defect claims under Louisiana law recently rejected a defense of impossibility preemption based on the theory Defendants advance here.[35]  The district court in *Warren* explained that the manufacturers' need to obtain FDA approval of a safer design does not mean that manufacturers are not working "sufficiently independently" under Supreme Court precedent:

> *Mensing* rejected the need for extraordinary or special pleading with a federal agency, private third parties, and Congress for their co-operation in changing or working around federal law. *See id.* at 623 ("special effort"), 623-24 ("special permission and assistance"). *Mensing* … carefully avoided rejecting the need for submitting a change for the FDA's approval according to the terms of federal law. In other words, *Mensing* rejected as defeating pre-emption, not the possibility of dual compliance *within* the terms of federal law, but the possibility of dual compliance *outside* them.[36]

The court in *Warren* further correctly explained that, even where FDA approval of a design change is required, *Wyeth* prohibits manufacturers from assuming that the FDA would not approve

---

[34] "We can often imagine that a third party or the Federal Government might do something that makes it lawful for a private party to accomplish under federal law what state law requires of it. …[It] is certainly possible that, had the Manufacturers asked the FDA for help, they might have eventually been able to strengthen their warning label. Of course, it is also possible that the Manufacturers could have convinced the FDA to reinterpret its regulations in a manner that would have opened the CBE process to them. Following [this] argument to its logical conclusion, it is also possible that, by asking, the Manufacturers could have persuaded the FDA to rewrite its generic drug regulations entirely or talked Congress into amending the Hatch–Waxman Amendments." *Id.* at 620-21.

[35] *Warren v. Boehringer Ingelheim Pharms, Inc.*, 16-cv-01326, 2017 U.S. Dist. LEXIS 145542, *37-40 (S.D. Ind. Sept. 8, 2017).

[36] *Id.* at *37-38 (emphasis added).

14

a safer design.   On the contrary, the rule articulated in *Wyeth* is that, "absent clear evidence that the FDA would not have approved" a change that would make a product safer, courts should not find impossibility.   The same can be said here: Defendants could have designed a safer product with sufficient independence, and may not rely on an assumption that they would have been denied FDA approval for such a product. Other federal courts also have rejected preemption arguments made by defendant manufacturers in similar pharmaceutical cases.[37]

The presumption that the FDA would not approve a change – prohibited by *Wyeth* -- is at the root of the widespread criticism and rejection of the Sixth Circuit's decision in *Yates*,[38] on which Defendants rely.[39] There, the Sixth Circuit extended the Supreme Court's holding in *Mensing* that the plaintiff could not base a "possibility" argument on a series of remote occurrences to reject plaintiffs' claim that the defendant could have designed a safer drug, reasoning that "the ultimate availability to Yates is contingent upon whether the FDA would approve the alternate design in the first place."   *Yates*, 808 F.3d at 299.   Other courts have since recognized that the Sixth Circuit stretched the holding of *Mensing* too far, in a manner that conflicts with the basic

---

[37] Courts in Louisiana, where Plaintiffs reside, have similarly rejected such preemption challenges by drug manufacturers.  *See, e.g., In re Vioxx*, 501 F. Supp. 2d at 788 ("Following longstanding and well-reasoned precedent, the Court concludes that there is no actual conflict between the plaintiffs' state-law claims against Merck and federal law.  Therefore, preemption of state law is inappropriate.").

[38] *Yates v. Ortho-McNeil-Janssen Pharmaceuticals Inc.,* 808 F.3d 281 (6th Cir. 2015).

[39] *See Guidry*, 206 F. Supp. 3d at 1208 ("It is not too attenuated to assume that the FDA would approve a safer, alternative design of a drug that it has already approved. Nor does the Court share the Sixth Circuit's reservations about the so-called 'never-start-selling' argument. Indeed, the raison d'être of products liability litigation is to penalize manufacturers who design unreasonably dangerous products *in hopes that they never start selling them*. State products liability law functions as a compliment to federal drug regulations to keep unreasonably dangerous drugs off the market."); *Young*, 2017 WL 706320 at *20-21 (finding the analysis in *Guidry* persuasive in concluding that Mississippi specifically allows pre-market design defect claims and that *Yates* misstated the "stop selling" rationale explained by the Supreme Court in *Bartlett* – "[t]he pre-approval theory does not argue that a manufacturer should have stopped acting, just that it should have acted *differently*."); *Brazil v. Janssen Research & Dev. LLC.*, No. 15-cv-0204, 2016 U.S. Dist. LEXIS 137695, *54-55 (N.D. Ga. Mar. 24, 2016) (rejecting the Sixth Circuit's preemption conclusion in *Yates*).

teachings of *Wyeth.*  For example, in *Brazil,*[40] the district court criticized the Sixth Circuit's conclusion that "the design defect claim could not have survived in light of the risk-utility factor of strengthening a warning label, which may not be preempted."  *Brazil*, 2016 U.S. Dist. LEXIS 137695 at \*54.  Disagreeing with the Sixth Circuit, the district court reasoned that "*Bartlett* and *Levine* would allow a state law design defect claim to survive preemption if there was any way for the manufacturer to comply with both federal and state law."  *Id.* at \*53-56 (*citing also Trahan v. Sandoz, Inc.*, No. 3:13-CV-350-J-34MCR, 2015 U.S. Dist. LEXIS 66869, 2015 WL 2365502, at \*9 n.5 (M.D. Fla. Mar. 26, 2015) ("[T]his Court does not interpret the *Bartlett* decision to change course and foreclose all design defect claims against prescription drug manufacturers in the absence of an express statement that it was doing so.")).[41]

Courts have likewise cautioned against thoughtless application of the Supreme Court's cases concerning generic drugs, particularly *Mensing* and *Bartlett*, to design-defect claims in the

---

[40] Defendants remarkably cite *Brazil* throughout their brief in support of their motion, *see* Defs.' Mem. at 12, 15, 16, and 27, albeit that court's later July 2016 decision that reaffirmed its earlier decision in March of that same year. *Brazil v. Janssen Research & Dev. LLC*, 196 F. Supp. 3d 1351, 1363-64 (N.D. Ga. 2016) (rejecting any need to reconsider its previous rejection of the Sixth Circuit's decision in *Yates*) (Mar. 24, 2016 Order at 77-81.). While the court in *Brazil* did eventually dismiss the design defect claim, it was because the court found that the amended complaint in that case provided no notice to the defendants as to what wrongdoing was alleged.  *Brazil,* 196 F. Supp. 3d at 1359.   Thus, Defendants' reliance on *Brazil* is misplaced.

[41] Defendants also rely on *Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166 (S.D.N.Y. 2016) to support their contention that a "stop-selling" rationale, as rejected by the Supreme Court in *Bartlett*, precludes Plaintiffs' design defect claims in the instant action.  *See* Defs.' Mem. at 14-15.  However, *Utts* like *Yates*, misstated the "stop selling" rationale explained by the Supreme Court in *Bartlett*.  *See Young v. Bristol-Myers Squibb Co.*, CASE NO. 4:16-CV-00108-DMB-JMV, 2017 U.S. Dist. LEXIS 24730, \*18-21 (N.D. Miss. 2017) (considering *Utts* as one of the cases aligned with *Yates* and rejecting that line of reasoning). As the court in *Young* clarified, a pre-approval claim does not suggest, as Defendants contend in the present case, that a manufacturer should cease acting altogether by choosing not to make the drug at all in order to satisfy both federal and state law and avoid liability, "just that it should have acted *differently*."  *Id.* (emphasis in original).  Accordingly, the court in *Young* concluded that the "stop selling" doctrine does not preclude a pre-approval theory of recovery.  *Id.*

brand-name drug context. *Tylenol*[42] concerned allegations that the defendant should have designed Extra Strength Tylenol in a way that would reduce or eliminate the risk of liver damage to consumers. Rejecting defendants' preemption argument, the district court focused on the fact that, unlike the generic manufacturers in *Bartlett*, who "cannot change the design of their products because their products have to be the same as the brand-name manufacturer's," *id.* at 73 (citing *Bartlett*, 133 S. Ct. at 2475), "[b]rand name manufacturers… can petition the FDA to change their drug's dosing, strength, etc. if the design poses a risk to consumers," *id.* at 73-74 (citing and applying *Wyeth*, 555 U.S. 568-576 to find no preemption).

Because courts may not presume that the FDA will reject a change in the context of brand-name drugs, Defendants' criticism of the decision in *Guidry* (Mot at 16-17) is misplaced. Of course, a manufacturer cannot stop at designing a safer product, and must also secure regulatory approval to sell it – but the Supreme Court has held that clear evidence that such approval would not be forthcoming is required. *Wyeth*, 555 U.S. at 571.

These courts' reasoning governs the preemption analysis in this case. As explained in the next sections, the record supports Plaintiffs' claim that safer alternative designs were available to Defendants. It was not impossible, under federal law, for Defendants to create these safer products,[43] nor may Defendants rely on any presumption that the FDA would have declined to approve them. Therefore, Plaintiffs' design-defect claims are not preempted.

Defendants further argue that this Court should adopt the reasoning of the Sixth Circuit in *Yates* rejecting the claim that Defendants could have and should have designed a safer product as "too attenuated" and/or equivalent to a "never-start selling rationale." This argument is not

---

[42] *In re Tylenol (Acetaminophen) Mktg., Sales Practices & Prods. Liab. Litig.*, 12-cv-07263, 2015 U.S. Dist. LEXIS 153972, *70-79 (E.D. Pa. Nov. 13, 2015).

[43] *See* Exhibit 1, Declaration of Suzanne Parisian, M.D., at ¶¶ 2, 25.

supported by evidence or law. As shown below, the alternative designs already existed and were being sold in other markets; indeed, Defendants considered and rejected those designs. Thus, Plaintiffs are not arguing that Defendants never should have started selling Xarelto, but only that they should have sold the less dangerous versions of it that were already on offer elsewhere.

> **3.   The record demonstrates that Plaintiffs' design-defect claims based on the Anti-Factor Xa Assay and the Lack of a Reversal Agent are not preempted by federal law.**

No reasonable jury could conclude, based on the record, that there is clear evidence the FDA would have denied Defendants approval of the safer alternative designs that plaintiffs have identified; namely, inclusion of an anti-Factor Xa assay and a reversal agent. Furthermore, the record supports Plaintiffs' argument that Defendants were aware of these designs, that they were available, and that they would have reduced the extreme dangers of Xarelto. The design defect claims that Plaintiffs are pursuing address the absence of an anti-Factor Xa assay and the lack of any reversal agent, which would have prevented Plaintiffs' injuries.[44] The evidence of record confirms that Xarelto-specific anti-Factor Xa assays existed at the time of Xarelto's U.S. approval, are commercially available in Europe, and had been tested and were extensively relied upon by Defendants in many of the clinical studies before the FDA's approval of Xarelto.[45] Similarly, a

---

[44] Both a Prothrombin Time ("PT") test and an anti-Factor Xa test would reveal that Plaintiffs were at a high risk for experiencing a bleed. However, Plaintiffs' design defect claims are not based on Neoplastin PT testing. Neoplastin PT testing instead forms the basis of Plaintiffs' failure to warn claims. Thus, any arguments about preemption in relation to Neoplastin PT testing will be addressed in Plaintiffs' Response in Opposition to Defendants' Joint Motion for Partial Summary Judgment on the Ground that Federal Law Preempts Plaintiffs' Failure to Warn Claims. A Xarelto-specific anti-factor Xa assay is the alternative design – the precise design provided to physicians in Europe to identify high risk patients. It is also worth noting that Plaintiffs herein are not pursuing dosing claims, however, Plaintiffs intend to discuss dosing to highlight the pharmacological profile of Xarelto. The high levels of Xarelto create a greater need for a test to determine whether Plaintiffs had too much Xarelto in their systems, which correlates to a higher risk of bleeding. Thus, Plaintiffs will present dosing evidence about the correlation between dosing and bleed risk, but will not be pursuing a theory of liability based on dosing.

[45] *See, e.g.*, Exhibit 5, Kubitza Article. *See also* Exhibit 1, Declaration of Suzanne Parisian, M.D., at ¶ 14-15.

reversal agent for Xarelto existed, and had been tested, although it is not yet commercially available in the United States.[46]  Nevertheless, an alternative design existed at the time Defendants sold Xarelto.[47]

In addition, Plaintiffs' proposed alternative designs were practical and feasible.  Indeed, the record shows the following with respect to the existence of anti-Factor Xa assays:

- Anti-Factor Xa assays were known to Defendants long before Xarelto was marketed in the United States. For example, in 2005, Bayer's Dr. Kubitza published an article, which showed Xarelto anticoagulation activity was assessed by using anti-Factor Xa assays.[48]

- By 2011, Bayer's report to the European Medicines Agency ("EMA") stated that there were "appropriate assays currently marketed by two different diagnostic companies."[49] The report made it clear the anti-Factor Xa assays were approved and commercially available: "[A]nti-Factor Xa assay [has] now received CE mark certification and [is] commercially available."[50]

- Bayer's Canadian Monograph for Xarelto states that in certain circumstances, it may be desirable to assess the anticoagulant effect of rivaroxaban. The Monograph suggests that using anti-Factor Xa assays, with rivaroxaban-specific calibrators and controls, may be useful to inform clinical decisions in these circumstances.[51]

---

[46] *See* Exhibit 7, "Xarelto" – Rivaroxaban specific Antidote (BAY1110262), at 3 (Jan. 19, 2011) (Xarelto_Janssen_01114248) ("Antidote Working Draft").  Moreover, an antidote for rivaroxaban was tested in a clinical trial and was shown to completely reverse the anti-coagulant effect of Xarelto in a matter of minutes.  *See* Exhibit 8, Deborah Siegel, M.D., et. al., *Andexanet Alfa for the Reversal of Factor Xa Inhibitor Activity*, 373 N. Engl. J. Med. 2413 (2015) ("Andexanet reversed the anticoagulant activity of…rivaroxaban in older healthy participants within minutes after administration and for the duration of infusion, without evidence of clinical toxic effects.").

[47] Defendants' opening papers sought partial summary judgment only to dismiss Plaintiffs' claims, and not to affirmatively establish their defenses, so, in their reply, they will be estopped from attempting to reinforce arguments or present new facts on matters pertaining to this affirmative defense.

[48] *See* Exhibit 5, Kubitza Article.

[49] *See* Exhibit 6, EMA Progress Report (11/08/11), at 6. This report covers developments between September 16, 2010 and September 15, 2011. *Id*.

[50] *See id.* at 12.

[51] Exhibit 9, Canadian Monograph, at 9-10, 30.

- • Bayer employees have admitted the benefits and need for an anti-Factor Xa assay. For example, Andrea Derix, Ph.D., Bayer's Global Program Team Leader for Research and Development of Xarelto, testified that in certain situations, an anti-Factor Xa assay would be useful to indirectly measure Xarelto's plasma concentrations.[52]

As to whether a reversal agent existed, the record shows that by the time the FDA approved Xarelto in 2011, Bayer had developed a reversal agent (BAY1110262), which "specifically binds to rivaroxaban and neutralizes riva activity on FXa by lowering the fraction of unbound riva in plasma…. BAY1110262 potent[ial]ly reverses rivaroxaban effect in human plasma."[53]  Thus, it is irrefutable that both alternative designs have been proven to have existed at the time Xarelto was first sold in the United States.

Moreover, Defendants cannot seriously dispute the safety benefits of a laboratory test to assess the bleeding risk of Xarelto patients. In fact, Bayer endorsed such tests with the EMA well before the sale of Xarelto in the United States:

> Testing of coagulation parameters during the administration of antithrombotic agents is a *common and accepted practice in clinical medicine*.... While routine monitoring [of Xarelto] may not be required, certain clinical situations exist when monitoring and measurement of their blood concentration as well as their pharmacodynamic effects would be desirable."[54]

Plainly, an anti-Factor Xa assay would allow treating doctors to more safely tailor Xarelto to the individual needs of their patients.

---

[52] Exhibit 10, Deposition of Andrea Derix, Ph.D., at 289:19-290:09.

[53] *See* Exhibit 7, Antidote Working Draft, at 3, 4.

[54] *See* Exhibit 11, EMA Progress Report (03/26/09), at 4.

The risk of a Xarelto patient having a bleed is significant,[55] and it could be significantly reduced by Plaintiffs' proposed alternative designs. Record evidence supports Plaintiffs' claim that these alternatives were available to Defendants. And Defendants have failed to satisfy their burden of showing clear evidence that no reasonable jury could find that the FDA would have approved these alternatives.

As to the first alternative design – the anti-Factor Xa assay – Defendants' own conduct is strong evidence that the burden of using this as a one-time screening test is minimal compared to the increased risk of a bleed without such a test.[56] As set forth above, Defendants used an anti-Factor Xa assay to evaluate patients' bleeding risks in their own Xarelto clinical studies. Such assays are commercially available in Europe, and Defendants' Xarelto label in Canada specifically provides instructions for the safe use of anti-Factor Xa assays to assess patient exposure to Xarelto. Moreover, the cost of an anti-Factor Xa tests is minimal.[57]

The evidence set forth above would enable a jury to reasonably conclude that the utility of a one-time screening test, using an anti-Factor Xa assay, far outweighed the increased risk of

---

[55] *See, e.g.,* Exhibit 12, Peacock, Patel, *et al.,"Major bleeding in a postmarketing assessment of 39,052 nonvalvular atrial fibrillation patients on rivaroxaban,"* 36 European Heart Journal 687 (2015) ("Peacock abstract") (summarizing major bleeding events of patients taking Xarelto).

[56] *See, e.g.,* Leissinger Report at 4 ("Thus, for every one million patients on Xarelto for atrial fibrillation, approximately 150,000 persons per year will have a clinically relevant bleeding event. On a global scale, and over multiple years, more than a million patients will experience a clinically relevant bleeding event as a direct result of their use of this medication") (attached as Exhibit 2); Kessler Report at 9 ("According to the Phase III pivotal clinical trials conducted by the sponsors, Xarelto was shown to result on 14.9 major or non-major clinically relevant bleeding events per 100 patient years.") (Also addressing bleeding events of patients taking Xarelto compared to patients taking warfarin.) (attached as Exhibit 4); Exhibit 12, Peacock abstract (summarizing major bleeding events of patients taking Xarelto).

[57] Exhibit 13, Report of Robert Gosselin, at 33.

bleeding on Xarelto without such a test.[58] The constellation of these facts readily creates contested issues of fact for the jury to determine liability.[59]

As to the second alternative design – a reversal agent – in 2011, before Xarelto was sold in the United States, Bayer prepared a summary of its plan for a reversal agent.[60] Bayer already had tested the reversal agent, and it worked. Bayer's summary included a positive risk/benefit analysis for the reversal agent, noting no major safety signals. Additionally, Bayer found that there was an "unmet medical need" for a reversal agent because one to three percent of Xarelto patients would experience a life-threatening bleed. Bayer concluded that a reversal agent would result in a commercial advantage because physicians would have increased confidence in Xarelto, which would produce a 3.5% increase in Xarelto sales.[61]  Thus, the need and utility of a reversal agent are demonstrated in Bayer's own documents.

Plaintiffs may therefore pursue design defect claims based on the absence of an anti-Factor Xa assay and the lack of a reversal agent.[62]

### 4.  Defendants Fail to Provide Any New Basis for this Court to Reconsider Its Prior Decisions on Preemption of Plaintiffs' Design-Defect Claims.

---

[58] *See generally Krummel v. Bombardier Corp.*, 206 F.3d 548, 551-52 (5th Cir. 2000).

[59] While Defendants' motion initially related to both William Henry and Harriet Ibanez, as noted above, this Court recently granted Plaintiffs' motion to voluntarily dismiss Mr. Henry's case, and the Ibanez case is subject to updated discovery. Moreover, as explained further below, Defendants have failed to produce essential discovery relating to FDA communications as well as a regulatory database, which Plaintiffs require in order to fully respond to Defendants' design defect arguments with a complete factual record. *See* Fed. R. Civ. P. 56(d); Exhibit 14, Declaration of Neil D. Overholtz in Support of Plaintiffs' Memorandum in Opposition to Defendants' Joint Motions for Partial Summary Judgment on the Ground that Federal Law Preempts Plaintiffs' Failure to Warn or Instruct and Design Defect Claims ("Overholtz Declaration").

[60] *See* Exhibit 7, Antidote Working Draft.

[61] *Id.* at 3, 7.

[62] As noted above, to the extent that Defendants' motion seeking partial summary judgment of Plaintiffs' design defect claims moves against Plaintiffs' PT-testing theory, Plaintiffs hereby incorporate their response in opposition to Defendants' motion for partial summary judgment on Plaintiffs' failure to warn claims.

The instant motion asks this Court to essentially reexamine its prior decisions denying Defendants' motion for partial summary judgment of the plaintiffs' design defect claims in *Boudreaux*, *Orr*, and *Mingo*.   In those cases, this Court rejected the same arguments that Defendants make again here and twice held that pre-market, state law design defect claims are not preempted.[63]  In doing so, this Court found the reasoning in *Guidry* persuasive.[64]

> The court in *Guidry*, relying on *Wyeth*, found that Plaintiff's pre-market defective design claims under the LPLA were not preempted. *Guidry v. Janssen Pharms., Inc.*, No. 15-4591, 2016 U.S. Dist. LEXIS 115447, at *48 (E.D. La. Aug. 29, 2016) (quoting *Guidry*). This is exactly the Plaintiffs' contention in the instant case. Plaintiffs aver that Defendants should have designed an specific assay and/or antidote before sending Xarelto to the FDA for approval. In the alternative, Defendants should have included a warning and instruction regarding the availability of Neoplastin PT tests to measure anticoagulation. Accordingly, *Guidry* is directly on point and the Court finds Plaintiffs' pre-market design defect claims under the LPLA are not preempted.[65]

Rather than allow Defendants a third bite at the preemption apple, this Court should remain consistent and reject Defendants' motion, especially given they have failed to raise any new basis in support of preemption.[66]  Indeed, nothing has changed since this Court issued its April and July

---

[63] *See In re Xarelto,* 2017 U.S. Dist. LEXIS 56629, at *10; *In re Xarelto,* 2017 U.S. Dist. LEXIS 114338, at *18.

[64] Defendants' contention that the rationale employed by the court in *Guidry* would eviscerate the Supreme Court's impossibility jurisprudence (see Defendants' motion at 17), in that no claims would ever be preempted, is flawed.  Indeed, Defendants fail to acknowledge, for example, that state law failure to warn claims against generic drug manufacturers seeking elevated warnings remain preempted under the rationale of *Guidry* and the MDL court because generic manufacturers are still limited, under federal law, to the same warnings as brand-name drug manufacturers.

[65] *In re Xarelto,* 2017 U.S. Dist. LEXIS 56629, at *9-10.

[66] *See Michaels v. Mr. Heater, Inc.*, 411 F. Supp. 2d 992, 995 (W.D. Wis. 2006) (as a general rule, courts should not reconsider issues which have already been decided in an action, but prior rulings can be reevaluated taking into account changed circumstances).

opinions, (earlier this same year) denying Defendants' similar motions based on preemption grounds.

While Defendants acknowledge, albeit in a footnote, that this Court has already ruled on this issue, Defendants confess that the real reason behind filing the present motion is, in the event this Court's decision remains consistent with its prior rulings, to request that the preemption issue be certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b).[67]  In this regard, Defendants appear to have included the Ibanez case in this motion as a means of ensuring that the preemption issue is preserved for such an appeal, despite the procedural posture of her case and this litigation. Indeed, not only has discovery in the Ibanez case not closed, but, more importantly, certain essential and unresolved production failures of Defendants concerning FDA communications and a regulatory database, the GRAIL ("Global Regulatory Affairs Information Link") database, may significantly affect the ability of this Court, and any appellate review, to fully consider these preemption issues, in light of the incomplete factual record.  *See* Exhibit 14, Overholtz Declaration.

In any event, the same body of case law weighs in favor of applying this Court's previous rulings.  Accordingly, Defendants' redundant motion should likewise be denied.

### C.  Because Plaintiffs' design-defect claims parallel the federal misbranding statute, they are not preempted by federal law.

Plaintiffs' claims that Xarelto is unreasonably dangerous when marketed and sold without an anti-Factor Xa assay and without an antidote are not preempted for a further reason.  The Supreme Court in *Bartlett*, a case concerning the constraints faced by generic drug manufacturers

---

[67] *See* Def. Motion at 1 n.1. Defendants' underlying reason for filing the present motion – to seek appellate review – appears to be nothing more than a waste of time, given the Fifth Circuit's rulings in *Osburn v. Anchor Labs., Inc.*, 825 F.2d 908, 912-13 (5th Cir. 1987) (holding that preemption was not appropriate in a failure to warn case under Texas law because the FDA regulations permitted the manufacturer to add warnings to a previously-approved label), and *Hurley v. Lederle Labs.*, 863 F.2d 1173, 1180 (5th Cir. 1988) (finding that the FDCA and its regulations did not preempt a state law failure to warn claim against a vaccine manufacturer), and their application to the present case.

under federal law, discussed the subset of state-law design-defect claims that parallel the federal misbranding statute, 21 U.S.C. § 352(j).  *See Bartlett*, 133 S. Ct. at 2477 n.4.  That statute provides that a drug is "misbranded" (and therefore must be pulled from the market) if it "it is dangerous to health when used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof."  21 U.S.C. § 352(j); *see* 21 U.S.C. § 331(a)**.**  In a range of contexts, the Supreme Court has recognized that it cannot be impossible, for preemption purposes, to comply with both state and federal law where state-law requirements are parallel or equivalent to a federal-law mandate.  *See Bates v. Dow Agrosciences LLC,* 544 U.S. 431, 447 (2005) (state-law pesticide labeling requirement not pre-empted by express pre-emption provision of Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136, provided it was "equivalent to, and fully consistent with, [federal] misbranding provisions"); *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 495 (1996) (state-law claims not preempted by the Medical Device Amendments Act, 21 U.S.C. § 360k, where state-law "duties parallel federal requirements").

Discussing the parallel-requirements exception to preemption in Footnote 4, the *Bartlett* Court stated, without ruling on the question,  that the parties and the FDA appeared to agree in that case that a drug only fit the federal definition of misbranding where "liability is based on new and scientifically significant information that was not before the FDA."  Since the jury had not been asked to consider whether any information in that category rendered the drug dangerous enough to meet the definition in § 352(j), the federal misbranding provision was not applicable in *Bartlett.*

Here, Plaintiffs have alleged violations of state law that parallel the federal misbranding statute, § 352(j).  Throughout their Complaint, Plaintiffs allege that Xarelto is unreasonably dangerous to human health when used as directed.  Ibanez Compl. ¶¶ 12-16, 108, 110, 112, 122,

139, 142, 144.  These allegations in the Ibanez Complaint parallel the elements of a claim of federal misbranding under 21 U.S.C. § 352(j) prohibiting sale of a drug that is "dangerous to health."

Moreover, while neither the misbranding statute nor the Supreme Court in any holding has required that liability be based on new information not before the FDA, liability in this case *is* based on such information, which the record amply documents.[68]  Defendants had new and scientifically significant data that the FDA had not seen – most notably, the alarming number of post-marketing consumer complaints about major bleeding events.  *See* FTW Opp. at 36-37; *In re Xarelto*, 2017 U.S. Dist. LEXIS 56629, at \*11; *In re Xarelto*, 2017 U.S. Dist. LEXIS 56630, at \*9-10; *In re Xarelto*, 2017 U.S. Dist. LEXIS 114338, at \*14-15.  This new information has been deemed scientifically significant by virtue of, for example, being reported in the ISMP findings published in QuarterWatch, which concluded that Xarelto ranked tenth in terms of direct Serious Adverse Event ("SAE") reports to the FDA in 2012, its first full year on the market.  In late 2013, ISMP called these findings an "important safety signal," defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation." Exhibit 3, QuarterWatch Report 2012 Q4, 10/17/13, at 1; *See also* Exhibit 2, Leissinger Report, at 17 (reporting that after Xarelto was approved, from 2012 through 2015, Xarelto-related adverse events were the most frequently reported among all pharmaceutical drugs sold in the U.S. market, with 81% involving bleeding events).

---

[68] Although the government argued in *Bartlett* that a parallel claim would have to be based on new and scientifically significant information that was not before the FDA, and the Court stated that the parties "appear[ed] to agree" with that new-evidence limitation, any such limitation has no basis in the text of the misbranding provision, and is inconsistent with the Court's recognition in *Wyeth*, 555 U.S. at 576, that the FDA lacks unilateral authority to determine when a drug is misbranded. The better view is that any state-law claim that parallels the misbranding statute is not preempted. In any event, Plaintiffs' claims here are based in significant part on new evidence.

In light of the wealth and weight of post-approval information about the dangerousness of Xarelto when used as instructed by its label, this Court should hold that the equivalence between Plaintiffs' state-law claims and the federal misbranding provision provide a further reason why Plaintiffs' claims are not preempted.

## V.    __CONCLUSION__

No federal law prevented Defendants from designing and marketing a less dangerous drug. The record herein shows no clear evidence that the alternative designs proposed by Plaintiffs would have been absolutely rejected by the FDA.  Furthermore, Plaintiffs have presented evidence proving that an anti-Factor Xa assay and/or a reversal agent existed, that Defendants knew about them, and that they would have prevented or diminished Plaintiffs' injuries.  Under the governing case law, federal law was no impediment to Defendants seeking FDA approval of such designs, and the cases forbid any presumption that the FDA would have denied that approval.  Additionally, federal law did not prevent Defendants from stopping its sale of Xarelto once the full extent of its dangerous risks became known, as state-law duties parallel to the federal misbranding statute required Defendant to do.  For these reasons, Defendants have failed to meet their burden in seeking dismissal of Plaintiffs' design defect claims as a matter of law. For all of the above reasons, Plaintiffs respectfully request that this Court deny Defendants' motion.

Respectfully submitted,

Dated:  November 3, 2017

/s/ Leonard A. Davis
Leonard A. Davis, Esq. (Bar No. 14190)
HERMAN, HERMAN & KATZ, LLC
820 O'Keefe Avenue
New Orleans, LA  70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Email: ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
***GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC***
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA  70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
Email: gmeunier@gainsben.com

*Plaintiffs' Liaison Counsel*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 3, 2017, the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre- Trial Order No. 17.

*/s/ Leonard A. Davis*
**LEONARD A. DAVIS**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on November 3, 2017, the foregoing memorandum of law was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre- Trial Order No. 17.

*/s/ Leonard A. Davis*
**LEONARD A. DAVIS**