# Derix, Andrea Ph.D. - 1

Volume 1 - 03/01/2016

Condensed Transcript

Printed 02/26/2017 06:45PM CST

CONFIDENTIAL

01: 00001:       IN THE UNITED STATES DISTRICT COURT
02: FOR THE EASTERN DISTRICT OF LOUISIANA
03: MDL No. 2592, Section L
04: **********************************************
05: IN RE:  XARELTO (RIVAROXABAN)
06: PRODUCTS LIABILITY LITIGATION
07: THIS DOCUMENT RELATES TO ALL CASES
08: **********************************************
09: - PROTECTED -
10:
     - SUBJECT TO FURTHER PROTECTIVE REVIEW -
11:
     _ _ _
12:
     TUESDAY, MARCH 1, 2016
13:
     ANDREA DERIX, Ph.D.
14:
     VOLUME I
15: _ _ _
16:
17: Videotaped deposition of ANDREA DERIX,
     Ph.D., held at the law offices of Allen &
18: Overy LLP, Apollolaan 15, 1077 AB Amsterdam,
     The Netherlands, commencing at 8:52 a.m., on
19: the above date, before Michael E. Miller,
     Fellow of the Academy of Professional
20: Reporters, Registered Diplomate Reporter,
     Certified Realtime Reporter, and Realtime
21: Systems Administrator.
22: _ _ _
23: GOLKOW TECHNOLOGIES, INC.
     877.370.3377 ph | 917.591.5672 fax

                                                          p. 00001

24: deps@golkow.com

01: 00002:   A P P E A R A N C E S:
02: LEVIN PAPANTONIO THOMAS MITCHELL
     RAFFERTY & PROCTOR PA
03: BY:  NEIL E. "NED" MCWILLIAMS, ESQUIRE
     nmcwilliams@levinlaw.com
04: EMMIE PAULOS, ESQUIRE
     epaulos@levinlaw.com
05: 316 South Baylen Street
     Suite 600
06: Pensacola, Florida 32502-5996
     (850) 435-7000
07: Counsel for Plaintiffs
08:
     SCHLICHTER BOGARD & DENTON LLP
09: BY:  ROGER C. DENTON, ESQUIRE
     rdenton@uselaws.com
10: ASHLEY BRITTAIN-LANDERS
     alanders@uselaws.com
11: 100 South Fourth Street
     Suite 900
12: St. Louis, Missouri 63102
     (314) 621-6115
13: Counsel for Plaintiffs
14:
     FELDMAN & PINTO
15: BY:  ROSEMARY PINTO, ESQUIRE
     rpinto@feldmanpinto.com
16: 1604 Locust Street, Suite 2R
     Philadelphia, Pennsylvania 19103
17: (215) 546-2604
     Counsel for Plaintiffs
18:
19: KAYE SCHOLER LLP

                                                          p. 00002

     BY:  WILLIAM HOFFMAN, ESQUIRE
20: william.hoffman@kayescholer.com
     The McPherson Building
21: 901 Fifteenth Street, N.W.
     Washington, D.C. 20005
22: (202) 682-3500
     Counsel for Defendant Bayer Pharmaceuticals
23:
24:

Case 2:14-md-02592-EEF-MBN   Document 7946-12   Filed 11/03/17   Page 3 of 210

01: 00003:   A P P E A R A N C E S:
02: BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
    BY:  STEVEN E. DERRINGER, ESQUIRE
03: steven.derringer@bartlit-beck.com
    JEANNIE TINKHAM, ESQUIRE
04: jean.tinkham@bartlit-beck.com
    Courthouse Place
05: 54 West Hubbard Street
    Chicago, Illinois 60610
06: (312) 494-4400
    Counsel for Defendant Bayer Pharmaceuticals
07:
08: DRINKER BIDDLE & REATH LLP
    BY:  JULIE L. TERSIGNI, ESQUIRE
09: julie.tersigni@dbr.com
    600 Campus Drive
10: Florham, Park, New Jersey 07932
    (973) 549-7350
11: Counsel for Defendants Janssen and
    Johnson & Johnson
12:
13:
    ALSO PRESENT:
14:
    EDDA DOLZER, Bayer
15: LARISSA EUSTICE, Bayer
    MAX THUEMMEL, Bayer
16:
17:
    STAND-BY INTERPRETER:
18:
    SYBILLE VON M\\LMANN
19:

20:
    VIDEOGRAPHERS/TECHNICIANS:
21:
    DAVID LANE, Primary Videographer
22: OSWIN FRAAI, Secondary Videographer
    EVAN J. WOLFE, Trial Technician
23:
    _ _ _
24:

01: 00004:              INDEX
02:
    PROCEEDINGS              10
03:
04:
    EXAMINATION OF ANDREA DERIX, Ph.D.:
05:
    BY MR. McWILLIAMS        11
06:
    BY MR. DENTON            375
07:
08:
    CERTIFICATE              418
09:
    ERRATA                   420
10:
    ACKNOWLEDGMENT OF DEPONENT    421
11:
    LAWYER'S NOTES           422
12:
13:
14:
15:
16:
17:
18:
19:
20:
21:
22:
23:
24:

01: 00005:          DEPOSITION EXHIBITS
    ANDREA DERIX, Ph.D.
02: March 1, 2016
03: NUMBER        DESCRIPTION        PAGE
04: Derix-1   Xarelto Issue Report,      21
    XARELTO_BPAG_25627238 -
05: XARELTO_BPAG_25627242,
    Ref. 3395732
06:
    Derix-2   E-mail(s) re: Review of     30
07: Updated Assessment Report of
    LEG 037,
08: XARELTO_BHCP_08001755 -
    XARELTO_BHCP_08001755,
09: Ref. 3402466
10: Derix-3   Rapporteur's Updated Draft    31
    Assessment Report,
11: XARELTO_BHCP_08001757 -
    XARELTO_BHCP_08001802,
12: Ref. 3402467
13: Derix-4   EMA Assessment Report        50
    [No Bates]
14:
    Derix-5   E-mail(s) re: U.S. FDA Daily    58
15: Digest Bulletin,
    XARELTO_JANSSEN_14522268 -
16: XARELTO_JANSSEN_14522271,
    Ref. 2956104
17:
    Derix-6   E-mail(s) re: NDA 202439 -     64
18: Clinical IR,
    XARELTO_JANSSEN_04932509,
19: Ref. 748350

20: Derix-7  E-mail(s) re: BMJ query about    71
    INRatio device,
21: XARELTO_JANSSEN_15527978 -
    XARELTO_JANSSEN_15527979,
22: Ref. 3019911
23:
24:

Ref. 3402844
21:
    Derix-15  FDA Information Request,    182
22: XARELTO_BHCP_08009905 -
    XARELTO_BHCP_08009908,
23: Ref. 3402845
24:

01: 00006:        DEPOSITION EXHIBITS
02: Derix-8  E-mail(s) re: ROCKET AF and    90
    target INR,
03: XARELTO_JANSSEN_14557985 -
    XARELTO_JANSSEN_14557986,
04: Ref. 2959513
05: Derix-9  E-mail(s) re: 1st Draft EMA    112
    Response to Request 2,
06: XARELTO_JANSSEN_16381911,
    Ref. 3394816
07:
    Derix-10  Response to EMA Request,    113
08: XARELTO_JANSSEN_16381912 -
    XARELTO_JANSSEN_16381920,
09: Ref. 3394817
10: Derix-11  ROCKET AF Task Force Chat    121
    Transcript,
11: XARELTO_BHCP_07993872 -
    XARELTO_BHCP_07993873,
12: Ref. 3396352
13: Derix-12  Xarelto Teams Overview Org    137
    Chart,
14: XARELTO_BHCP_08065503 -
    XARELTO_BHCP_08065505,
15: Ref. 3407882
16: Derix-13  E-mail(s) re: References for    138
    INR ratio specifications,
17: XARELTO_JANSSEN_1552217 -
    XARELTO_JANSSEN_1552218,
18: Ref. 3109548
19: Derix-14  E-mail(s) re: IND 75238,    181
    XARELTO_BHCP_08009903 -
20: XARELTO_BHCP_08009904,

01: 00007:        DEPOSITION EXHIBITS
02: Derix-16  E-mail(s) re: POC/SAE,    187
    XARELTO_JANSSEN_03933641 -
03: XARELTO_JANSSEN_03933643,
    Ref. 671161
04:
    Derix-17  E-mail(s) re: ROCKET AF,    198
05: XARELTO_JANSSEN_13596622 -
    XARELTO_JANSSEN_13596623,
06: Ref. 2840934
07: Derix-18  E-mail(s) [No Subject],    201
    XARELTO_JANSSEN_07545453 -
08: XARELTO_JANSSEN_07545456,
    Ref. 1322746
09:
    Derix-19  E-mail(s) Another POC    209
10: Problem,
    XARELTO_JANSSEN_11444538 -
11: XARELTO_JANSSEN_11444539,
    Ref. 2416273
12:
    Derix-20  E-mail(s) re: ROCKET - INR    219
13: Draft Proposal,
    XARELTO_JANSSEN_04961856,
14: Ref. 753519
15: Derix-21  ROCKET Proposal for QC Checks    219
    on HemoSense Device,
16: XARELTO_JANSSEN_04961857,
    Ref. 753520
17:
    Derix-22  ROCKET Proposal for    219
18: Additional Education on
    HemoSense Device,

19: XARELTO_JANSSEN_04961858,
   Ref. 753521
20:
   Derix-23   Dear ROCKET Investigator      232
21: Letter,
   XARELTO_JANSSEN_07050218,
22: Ref. 1052801
23:
24:

19: Ref. 3375706
20: Derix-31   Draft TDM Position      301
   PowerPoint,
21: XARELTO_BPAG_25183363,
   Ref. 3375707
22:
   Derix-32   CDER Summary Review      326
23: [No Bates]
24:

01: 00008:            DEPOSITION EXHIBITS
02: Derix-24   E-mail(s) re: INR check for      238
   patient 111178,
03: XARELTO_JANSSEN_14556639,
   Ref. 2959134
04:
   Derix-25   Blinded INRs from Covance      245
05: Spreadsheet,
   XARELTO_JANSSEN_14724821 -
06: XARELTO_JANSSEN_14724826,
   Ref. 2973209
07:
   Derix-26   E-mail(s) re: Your E-mail of      260
08: 11/6/06 regarding rivaroxaban
   SPAF protocol,
09: XARELTO_JANSSEN_13403496 -
   XARELTO_JANSSEN_13403502,
10: Ref. 2822412
11: Derix-27   E-mail(s) re: Ad Hoc Xarelto      271
   JSC - PK/PD Analysis,
12: XARELTO_JANSSEN_15329030,
   Ref. 3064874
13:
   Derix-28   Model Based E-R Analysis      272
14: PowerPoint,
   XARELTO_JANSSEN_15329031,
15: Ref. 3064875
16: Derix-29   Feedback from the EMA      281
   PowerPoint [No Bates]
17:
   Derix-30   E-mail(s) re: To review at      301
18: our update today,
   XARELTO_BPAG_25183362,

01: 00009:            DEPOSITION EXHIBITS
02: Derix-33   2013 M|ck et al Publication      334
03: Derix-34   NOAC Dosing: Pharmacometric      348
   Guidance Regulatory
04: Considerations PowerPoint
   [No Bates]
05:
   Derix-35   E-mail(s) re: Xarelto - CHMP      369
06: Request on TDM,
   XARELTO_JANSSEN_15368506 -
07: XARELTO_JANSSEN_15368511,
   Ref. 3071268
08:
   Derix-36   CHMP Assessment Report for      369
09: LEG 036,
   XARELTO_JANSSEN_15368512 -
10: XARELTO_JANSSEN_15368533,
   Ref. 3071269
11:
12: --o0o--
13:
14:
15:
16:
17:
18:
19:
20:
21:
22:
23:
24:

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00010:              PROCEEDINGS
02: (March 1, 2016 at 8:52 a.m.)
03: THE VIDEOGRAPHER:  We're now on
04: the record.  My name is David Lane.
05: I'm a videographer for Golkow
06: Technologies.  Today's date is
07: March 1st, 2016.  Our time is
08: 8:52 a.m.
09: This deposition is taking place
10: in Amsterdam, Netherlands, in the
11: matter of Xarelto Products Liability
12: Litigation.
13: Our deponent today is Andrea
14: Derix, Ph.D.
15: Counsel will be noted on the
16: stenographic record.
17: Our court reporter today is
18: Mike Miller, and he will now swear in
19: the interpreter as well as the
20: witness.
21: (Interpreter duly sworn.)
22: (Witness duly sworn.)
23: ///
24: ///

p. 00010

01: 00011:              ANDREA DERIX, Ph.D.,
02: having been duly sworn,
03: testified as follows:
04: EXAMINATION
05: BY MR. McWILLIAMS:
06: Q.    Good morning.
07: A.    Good morning.
08: Q.    Would you please state your
09: full name for the record?
10: A.    My name is Andrea Derix.
11: Q.    And are you a doctor?
12: A.    I'm a Ph.D.  I'm a doctor of
13: natural sciences.  My educational background
14: is I'm a pharmacist and with a Ph.D. in
15: medicinal chemistry.
16: Q.    Okay.  Is it okay if I refer to
17: you as "Dr. Derix"?
18: A.    Yes, that's okay.
19: Q.    Okay.  Dr. Derix, where are you
20: presently employed?
21: A.    Could you please repeat?
22: Q.    Where are you presently
23: employed?  Where do you work?
24: A.    I work at Bayer Research and

p. 00011

01: 00012:    Development Center in Wuppertal, Germany.
02: Q.    And how long have you worked
03: there?
04: A.    I'm with Bayer since 2004.
05: Q.    Okay.  And what do you do with
06: Bayer?
07: A.    At present I'm leading the
08: global program team for Xarelto.  I'm also
09: heading the entire program management group
10: for thrombosis.  Bayer has other early
11: research projects in thrombosis ongoing, and
12: so I'm also responsible for those.
13: Q.    What does that mean, to lead
14: the global program team?
15: A.    I'm leading a team of -- a
16: cross-functional team of experts.  In the
17: team I have representatives from regulatory
18: affairs, from clinical medical affairs,
19: pharmacovigilance, marketing and market
20: access functions; and we work together in all
21: matters that are related to development
22: activities of Xarelto, leading the lifecycle
23: management activities, but also maintenance
24: activities, all activities that are required

p. 00012

01: 00013:    to keep Xarelto adequately according to the
02: regulations on the market.
03: Q.    Okay.  And do those various
04: functional teams you just identified, do they
05: report to you?
06: A.    No, they don't report directly
07: to me, so there's a dotted line reporting.
08: They report directly into the functional
09: heads, so supervisors in the expert
10: functions.
11: Q.    Okay.  And have you ever had
12: your deposition taken before?
13: A.    No, this is my first
14: deposition.
15: Q.    Okay.  I'll try to make it as
16: painless as possible.  If you ever need to
17: take a break for any reason, you just let us
18: know.  Sometimes lawyers have a tendency to
19: do a marathon session, so if you ever just
20: need a break, just let us know, okay?
21: A.    Okay.
22: Q.    All right.  Can you tell us a
23: little bit about your education.  I
24: understand you have a master's degree in drug

p. 00013

Page 5

01: 00014:   regulatory affairs; is that correct?
02: A.   Yes, that's correct.  After
03: finishing my science work at university, I
04: entered into pharmaceutical industry, and my
05: first job employment was in regulatory
06: affairs, at the time at Takeda Pharma.
07: And during the time I was
08: employed at Takeda Pharma, I entered into the
09: master's courses at University of Bonn, and I
10: finished my master's at the time when I was
11: already employed as a regulatory manager at
12: the time.
13: At that time I was responsible
14: for local regulatory affairs, that means
15: everything that was going on in Germany,
16: Austria and Switzerland.  Later on in my next
17: job employment at PAION, I started working on
18: a global basis.
19: I was responsible for
20: regulatory affairs worldwide at that company.
21: It's a small biotech company, also located in
22: Aachen, and was focused at the time on
23: research in stroke treatment, so acute stroke
24: treatment.  We had projects in that area.

01: 00015:           And in 2004, I then entered at
02: Bayer, also as a regulatory expert, so the
03: functional name was regulatory strategist at
04: the time.  I was responsible for some early
05: development programs before.  I then, after
06: one year, became part of the Xarelto program
07: team as the regulatory representative in that
08: team.
09: As the Xarelto program grew
10: over time, we had developments in several
11: indications in parallel.  I built up a small
12: team of regulatory experts and led this team,
13: and that's what I did until 2011.
14: Then I moved into another area
15: within Bayer.  At the time I was leading the
16: regulatory affairs group women's sales before
17: I then returned back into the Xarelto team in
18: a new function, and since then I'm leading
19: the program, and I'm no longer the regulatory
20: expert since then.  So I have a new
21: regulatory expert in the team, my successor.
22: But I'm now responsible for the entire
23: program development.
24: Q.   Thank you.

01: 00016:           Going back to your education,
02: can you tell us a little bit about what the
03: discipline is of drug regulatory affairs?
04: What did you learn in achieving that degree?
05: A.   You learn the regulations that
06: apply worldwide in regulatory affairs law,
07: the pharmaceutical medicine legislation, and
08: then you also learn about the guidelines that
09: apply for pharmaceutical legislation, not
10: only the high-level legal text, but there is
11: also a set of guidances that are already,
12: really quite scientific, so it goes quite
13: into the detail of science already in those
14: legislations, and that has to also be
15: understood.  And that's what was part of this
16: program.
17: Also, regulatory affairs is an
18: area where you don't have really the
19: expertise as a scientist any longer, so you
20: rely very much on the scientists you work
21: with.  But you have to connect them, and you
22: have to make sure that they have appropriate
23: dialogue that you get some guidance on the
24: pharmaceutical legislation, the background,

01: 00017:   and, so it's also quite a lot of
02: communication involved in that job.
03: Q.   So between your education and
04: your experience at Bayer, is it fair to say
05: you're knowledgeable on the topic of the type
06: of information that should be shared with
07: regulators and when that information should
08: be shared?
09: MR. HOFFMAN:  Objection to the
10: form of the question.
11: A.   I said already that I, yeah,
12: left this job five years ago, almost now, and
13: I'm now in a new responsibility, so I
14: certainly probably don't have the latest
15: knowledge because I did not follow any longer
16: this special area.
17: But in general, I have this
18: educational background, that's correct.
19: BY MR. McWILLIAMS:
20: Q.   You have the educational
21: background.  You also have the real world
22: experience of dealing with regulatory affairs
23: while at Bayer; is that fair?
24: A.   Yes, I have the experience of

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00018: interacting with health authorities also from
02: my past work.
03: (Clarification requested by the
04: reporter.)
05: BY MR. McWILLIAMS:
06: Q. In one of your prior answers
07: you referred to yourself as a "regulatory
08: expert." Did I hear you correctly?
09: A. Yes, I kind of named it in a
10: different way, so sometimes the title,
11: regulatory affairs manager, regulatory
12: affairs strategist, or regulatory affairs
13: expert, so that's not a -- sort of a fixed
14: job title but different titles are used.
15: Q. Understood. And I understand
16: you also have a Ph.D. in medicinal chemistry
17: and pharmacology; is that correct?
18: A. That's correct, yes.
19: Q. And can you just briefly
20: explain to the jury what that discipline is?
21: What is pharmacology, generally?
22: A. In my Ph.D. thesis, I worked on
23: a drug class that were supposed to be
24: antihypertensive drugs; and what I did, I did

p. 00018

01: 00020: complex, the whole area of pharmacology. And
02: my expertise is not in pharmacokinetics or
03: pharmacodynamics.
04: BY MR. McWILLIAMS:
05: Q. Okay. But do you understand
06: what those two terms mean, what they are?
07: A. Yeah, I understand what the
08: terms mean.
09: Q. Okay. Now, did there come a
10: point in time when you became personally
11: aware that a recalled device was used to
12: measure INR in the warfarin arm of the ROCKET
13: clinical trial?
14: A. Yes. I learned last September
15: from the colleagues -- our pharma colleague
16: internally who had got information from
17: Janssen, our colleagues and our partner
18: company in the U.S.; and they had received a
19: call from an external third party, and
20: started to look into this question.
21: Q. Is it fair to say that you were
22: part of the team that was put together to
23: help investigate and respond to issues
24: surrounding that topic?

p. 00020

01: 00019: chemical modifications to a certain molecule
02: in order to see how these chemical
03: modifications changed the properties. And I
04: did pharmacological experiments to test the
05: properties. So I looked what type of
06: molecule had higher antihypertensive activity
07: other than another one.
08: But in that context, I only
09: did, yeah, a LEP test and animal tests, but
10: not really any clinical studies. So that did
11: not involve -- because I'm not a medical
12: doctor, so I'm a natural scientist, and so
13: all the work I did scientifically was really
14: in the lab.
15: Q. But in obtaining that degree,
16: you became generally familiar with some of
17: the broad topics of pharmacology, such as
18: pharmacokinetics, pharmacodynamics; is that
19: fair?
20: MR. HOFFMAN: Objection to the
21: form of the question.
22: You may answer.
23: A. No, that did not belong to this
24: because that's another specialty so it's very

p. 00019

01: 00021: A. Yes. We founded a team, what
02: we call task force, and I was a member of the
03: team. My -- I was not involved in all parts
04: because also, there again, we worked as a
05: team of experts, and some experts dealt with
06: more the analytical part, and other experts,
07: yeah, looked into different topics. And we
08: regularly met and exchanged information.
09: MR. McWILLIAMS: Well, let me
10: hand you what's being marked as
11: Derix-1, which is Record No. 3395732.
12: (Whereupon, Deposition Exhibit
13: Derix-1, Xarelto Issue Report,
14: XARELTO_BPAG_25627238 -
15: XARELTO_BPAG_25627242, Ref. 3395732,
16: was marked for identification.)
17: BY MR. McWILLIAMS:
18: Q. Do you recognize this as a
19: Bayer document, a global issue management?
20: A. Yes, I do.
21: Q. And you see on the very first
22: page it is dated September 30th, 2015?
23: On the very first page.
24: MR. HOFFMAN: First page.

p. 00021

01: 00022:     A.    Ah. Yes.
02: BY MR. McWILLIAMS:
03: Q.     And that's the same month I
04: believe you said that you first learned about
05: the recalled device being used in ROCKET?
06: A.     That's correct.
07: Q.     Okay. And you see that this is
08: an issue report relating to the topic we've
09: been discussing the last few minutes? It
10: says, "Xarelto - Potential applicability of
11: Alere INRatio Monitor System recall notice."
12: Do you see that on the first
13: page?
14: MR. HOFFMAN:  First page.
15: BY MR. McWILLIAMS:
16: Q.     And, again, one other thing,
17: Dr. Derix, I understand this is your first
18: deposition.  You can always look on the
19: screen there or you can look on the screen
20: right here.  Mr. Wolfe usually does a pretty
21: good job of pointing you to the area I'm
22: discussing, okay?
23: A.     Okay.
24: Q.     So, again --

p. 00022

01: 00024:    on the issue; is that correct?
02: A.    Yes, that's correct.
03: Q.     And if we look at this first
04: bullet point, for example, on the second page
05: where it says, "On September 9th, 2015
06: through an inquiry from a journalist working
07: for the British Medical Journal, the BMJ, our
08: development partner Janssen became aware of
09: the potential applicability of a recall
10: notice of the Alere INRatio and
11: INRatio2 PT/INR Monitor System."
12: Do you see that?
13: A.     Yes, I see that.
14: Q.     And again, that's the same
15: issue we've been discussing the last few
16: minutes?
17: A.     Yes.
18: Q.     Okay. In the second bullet
19: point, it goes on.  It says, "The BMJ
20: reporter mentioned that she was 'interested
21: in the use of diagnostics in clinical trials.
22: The focus may be on ROCKET and if the
23: warfarin arm used a potentially defective
24: point-of-care device for managing warfarin.'

p. 00024

01: 00023:       A.    I prefer the paper.
02: Q.    Of course.  We all prefer the
03: paper, but just as an aid.
04: A.    Yeah.
05: Q.     So on the first page, you see
06: this is titled "Issue Report," discussing the
07: issue we've been discussing the last couple
08: of minutes?
09: A.     Yes, I see.  That's correct.
10: Q.     And then there's a team
11: identified; is that correct?
12: A.     Yes.  That's the Bayer internal
13: team that we -- that ran the issue management
14: process and met frequently, yes.
15: Q.     And nine individuals are
16: identified as being a member of this team,
17: you being one of them; is that correct?
18: A.     That's correct, yes.
19: Q.     And you are identified as the
20: GD - global program head.  Is that global
21: development - global program head?
22: A.     That's correct, yes.
23: Q.     Okay. And the document
24: continues to discuss background information

p. 00023

01: 00025:    She asked if we 'used blood draws for
02: analysis at a central lab to evaluate the
03: performance of the INRatio point of care.'"
04: Did I read that correctly?
05: A.     You read that correctly, yes.
06: Q.     Okay. If you go to the next
07: page, page 3, this is the draft messages on
08: what Bayer would say to people that would ask
09: about this issue. Is that a fair
10: characterization?
11: A.     Yes.  It says it's a draft and
12: that it's still under discussion at that
13: point of time when it was written here, so,
14: uh-huh.
15: Q.     Were under discussion, but on
16: the very first page it does say the status of
17: this report is final; is that correct?
18: A.     Yeah, it refers to what -- I
19: mean, it's somehow like minutes of one
20: meeting and -- that we got so it's certainly
21: considered as final, but not -- and it
22: says -- but it says clearly here that the
23: draft key messages that were discussed here
24: are still under discussion with the partner

p. 00025

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00026:   Janssen, and -- but you can see from the list
02: of participants, they are all Bayer internal
03: participants.  So this was a Bayer internal
04: team, and we had another task force team
05: meeting with Janssen.
06: Q.     And were you a member of that
07: joint team?
08: A.     Yes, I was a member of that
09: joint team.
10: Q.     And if you go to page 4,
11: please, you'll see the section titled
12: "Communication to Health Authorities."  You
13: see where it says on September 23rd and 24th,
14: Bayer and Janssen provided notification to
15: health authorities including EMA and FDA?
16: A.     Yes, I see that.
17: Q.     So is that when Bayer and
18: Janssen first notified global regulators
19: about this potential issue?
20: A.     I would have to check this
21: exactly with my colleagues, because I'm no
22: longer the person who is doing the regulatory
23: interactions.  But I assume it's correct in
24: terms of providing a written notice, so it

01: 00028:   provide input on the actual EMA assessment
02: report?
03: A.     No, not at Bayer.  That's not
04: typical that we provide edits to the
05: assessment report, but it's just a working
06: document where the assessment report also
07: includes questions that they,
08: rapporteur/co-rapporteur, are asking, and
09: those questions directly work, and so we have
10: to address the questions.  We can see what
11: they have already assessed and -- but then we
12: also can see what the new questions are,
13: whether they would like to get more
14: information, and that's where we respond to
15: them.
16: Q.     And, yes, ma'am, and I'm
17: familiar with the process, but isn't it also
18: true at the end of that process, prior to --
19: once the process has concluded, but prior to
20: EMA issuing its formal assessment report, you
21: and your colleagues at Bayer were provided an
22: opportunity to edit and make changes that you
23: felt were necessary to that EMA assessment
24: report?

01: 00027:   may well be that the colleagues already had
02: an informal phone call beforehand; so I would
03: have to check that because I don't remember
04: exactly.
05: Q.     Okay.  And I understand there
06: was quite a bit of back and forth that
07: happened after you formally notified the
08: regulators, and then ultimately, on
09: February 5th of this year, 2016, EMA issued
10: its formal assessment report; is that
11: accurate?
12: A.     Yes, that's correct, because
13: certainly we tried to provide as much
14: information as we could that we have
15: confirmed so far to the health authorities,
16: and the health authority, the European health
17: authority also came back with questions in
18: the course, yeah, of the review.  And we did
19: additional work that they requested before
20: they finally could conclude.
21: Q.     All right.  And prior to EMA
22: issuing their final assessment report, is it
23: fair to say that you and your colleagues at
24: Bayer were provided opportunity to edit and

01: 00029:            MR. HOFFMAN:  Objection to the
02: form of the question.
03: A.     That's not correct.  As I said,
04: there is a round of review, yes, but EMA only
05: accepts comments that are related to certain
06: rules, I mean privacy rules, for example,
07: which are very high in Europe, and we cannot
08: change the content.  We can only ask them if
09: they are to redact certain information, names
10: primarily, that fall under the privacy rule.
11: BY MR. McWILLIAMS:
12: Q.     So you weren't provided an
13: opportunity to rephrase any of the wording in
14: the edits?
15: A.     Only in case it is very -- very
16: misunderstanding or it's very clear that a
17: word is missing in a sentence, just -- and
18: then we can ask if that's the correct
19: understanding that we're dismissing or a
20: sentence somehow is not easy to understand,
21: and it's always EMA's decision then to -- if
22: they change it, but we can just point at it.
23: Q.     Right.  So you did have an
24: opportunity to provide -- if you saw anything

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00030:    that you felt was in error or misleading or
02: inaccurate, you had an opportunity to point
03: that out to EMA prior to them issuing their
04: final assessment report, correct?
05: MR. HOFFMAN:  Objection, asked
06: and answered.
07: A.    As I said, we could provide
08: suggestions to redact privacy information and
09: also, yeah, if we found something which is
10: not in line to -- for example, a prior
11: document, so it's not that you can change
12: content or you can change phrases.  It's
13: really kind of a -- yeah.  How do you say it?
14: It's a -- if you have --
15: MR. McWILLIAMS:  You can use
16: the interpreter.
17: (Interpretation.)
18: THE INTERPRETER:  Spelling
19: errors.
20: (Whereupon, Deposition Exhibit
21: Derix-2, E-mail(s) re: Review of
22: Updated Assessment Report of LEG 037,
23: XARELTO_BHCP_08001755 -
24: XARELTO_BHCP_08001755, Ref. 3402466,

01: 00031:        was marked for identification.)
02: (Whereupon, Deposition Exhibit
03: Derix-3, Rapporteur's Updated Draft
04: Assessment Report,
05: XARELTO_BHCP_08001757 -
06: XARELTO_BHCP_08001802, Ref. 3402467,
07: was marked for identification.)
08: BY MR. McWILLIAMS:
09: Q.    All right.  Let me see if I can
10: refresh your memory as to the process.  I'm
11: going to now hand you what's been marked as
12: Derix-2 and Derix-3, which is also Record
13: Nos. 3402466 and 3402467.
14: And, Dr. Derix, I'll represent
15: to you that these are -- this is an
16: attachment to the e-mail.  It's based on
17: information provided by your attorneys.
18: So do you have Derix Exhibit 2
19: and Derix Exhibit 3 in front of you?
20: A.    2 and 3, yes.
21: Q.    Yeah.  So let's look at Derix
22: Exhibit 2 first, which is an e-mail dated
23: January 28th, 2016; is that correct?
24: A.    Yes, that's correct.

01: 00032:        Q.    And this an e-mail from Sabine
02: Frenzen; is that correct?
03: A.    That's correct.
04: Q.    And that's to you and others at
05: Bayer; is that correct?  Is that your name,
06: Andrea Derix?
07: A.    That's correct, uh-huh.
08: Q.    And the subject line is "Review
09: of updated Assessment report of LEG 37 (POC
10: device)"?
11: A.    Yes.
12: Q.    Okay.  And then what the e-mail
13: that was written to you reads, "Now that the
14: procedure is nearly finalized, we will be
15: asked by EMA to review the assessment report
16: that will be published afterwards due to the
17: high public interest of this topic.
18: "We do not have the final CHMP
19: report in our hands yet but would like to ask
20: you to review the attached document carefully
21: and mark everything that you feel should be
22: kept confidential or that should be
23: rephrased.  We assume that the final report
24: won't differ much from the one currently

01: 00033:   available."
02: Did I read that correctly?
03: A.    You read it correctly, yes.
04: Q.    And did you follow the
05: recommendation of Ms. Frenzen and carefully
06: read and mark everything that you felt should
07: be kept confidential or rephrased?
08: A.    I reviewed the document, and --
09: but I do not recall that I had major topics
10: or any -- not any comment, but I would like
11: to comment on her e-mail here.  So it can be
12: easily misunderstood, because it has "should
13: be kept confidential," and that's exactly not
14: referring to something that should not be
15: shared with anyone or shared with public, so
16: it really is what I said, the privacy rules.
17: And -- yeah, and "should be
18: rephrased" is referring to what I just
19: explained, that if we find some difference
20: from prior reports or phrases that we felt
21: could be misunderstood or have obvious
22: mistakes, spelling mistakes, that we could
23: ask to -- EMA to change that.
24: Q.    Well, in addition to small

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00034: typos and spelling mistakes, if you saw
02: something that you felt was fundamentally
03: misleading, inaccurate or scientifically
04: invalid, a good scientist like you, you would
05: have raised it with EMA; is that fair?
06: MR. HOFFMAN: Objection to the
07: form of the question.
08: A. Typically, we would have raised
09: it already in the -- in the pre-work, because
10: we would have seen things in the
11: preassessment reports already. And at the
12: time when we have the opportunity to submit
13: our responses to the questions, we could have
14: pointed that out.
15: BY MR. McWILLIAMS:
16: Q. Yes.
17: A. So that's not typically
18: happening here.
19: Q. At this phase?
20: A. At this phase.
21: Q. So this would be the last and
22: kind of final chance to fix any errors that
23: you felt that -- you believed existed in the
24: document?

p. 00034

01: 00036: assessment report by EMA that you had the
02: opportunity to review and read and look for
03: any spelling errors or any other type of
04: errors; is that correct?
05: MR. HOFFMAN: Objection to the
06: form of the question.
07: A. Yes, this is a draft report
08: issued on January 22nd on the -- yeah,
09: post-authorization measure procedure.
10: BY MR. McWILLIAMS:
11: Q. Did you, in fact, review the
12: draft report at the time it was provided to
13: you prior to the final report being issued in
14: February of 2016?
15: A. I reviewed the part of the
16: document, but I only focused on those areas
17: where I really had the background on, so I
18: also told my colleague that I only looked at
19: the areas where I had been involved with in
20: the preparation phase, and so I did not
21: provide any comments to the -- the areas and
22: the analysis that the colleagues had done,
23: the clinical and statistical colleagues
24: because that's not my area of expertise.

p. 00036

01: 00035: A. As I just said, it is really
02: that we can point at things, misspelling and
03: some things. But it's not really meant to
04: change the content.
05: Q. Okay. But you were provided
06: opportunity earlier to make sure that the
07: document contained truthful, accurate and
08: complete information; is that fair?
09: MR. HOFFMAN: Objection to the
10: form of the question.
11: A. I mean, it's always -- the
12: document is always issued by the health
13: authority, so we don't interfere in their
14: documents. But when we see that there is
15: something in there where we could add with
16: information and just because we feel it's not
17: giving the full, yeah, picture or something
18: is missing, then we can submit this into our
19: responses.
20: BY MR. McWILLIAMS:
21: Q. And if we look at Derix-3, this
22: is the attachment to the e-mail?
23: A. Uh-huh.
24: Q. And this is the draft

p. 00035

01: 00037: Q. Which areas did you focus on
02: that you had background in?
03: A. I focused on the information,
04: basically the section where we described when
05: we learned about a potential interaction of
06: the -- or the potential impact of the Alere
07: recall notice and the ROCKET AF trial, and
08: also what we did in order to find out more
09: about the potential relation.
10: So that included, yeah,
11: contacts with Janssen because Janssen
12: colleagues were the primary contact to the
13: company in the area. Janssen colleagues had
14: run the ROCKET AF trial from a clinical
15: operations perspective at the time, and so
16: they were certainly the primary contact. And
17: I was somehow the contact to Janssen, and
18: when we had discussions, we needed documents
19: for Europe, I talked to Christopher Nessel
20: from Janssen how to get those documents from
21: the company in Europe because Bayer did not
22: have a direct contact to Europe.
23: So that was the part where I
24: focused on what we described what we did, and

p. 00037

01: 00038:   but the other areas related to the analysis
02: that were done, I did not review because I
03: was not part of that group who decided on
04: the -- prepared for the analysis and proposed
05: and ran them and also, yeah, described and
06: drew conclusions from the analysis.
07: Q.    Aside from investigating when
08: it was first learned that there's a potential
09: impact of this recalled device used in the
10: trial and following up with your colleagues
11: at Janssen who were in direct contact with
12: Alere, what else, if anything, did you review
13: or have input on in this assessment report?
14: A.    That was what I -- what I had
15: input on, so I did not provide input to the
16: other sections.
17: Q.    You didn't have your own
18: responsibilities for the device
19: specifications?
20: A.    I was in a small subgroup
21: and -- or Janssen task force, together with
22: Sigmund Johnson, who led this group.  And
23: what we did, we looked up device
24: specification guidance, or we retrieved them

p. 00038

01: 00040:    several things to analyze the potential
02: impact of the Alere recall notice to the
03: ROCKET AF data, and one part of the analysis
04: were the so-called sensitivity analysis were
05: based on the patient populations that were
06: described in the recall notice.  So those
07: patient populations that were proposed not to
08: use the Alere INR device in that recall
09: notice.
10: So we -- based on that
11: information, we prepared sensitivity analysis
12: excluding patients with that clinical
13: characteristics from the entire dataset, and
14: looked at whether the exclusion of those
15: patient populations from the entire dataset
16: changed the overall result.  So that was one
17: part.
18: And the second part was that in
19: the ROCKET AF trial, there had been samples
20: taken at two time points, plasma samples at
21: week 12 and week 24 initially for further
22: characterization of the pharmacokinetic
23: profile in this patient population.
24: And now the question was

p. 00040

01: 00039:    basically as a factfinding exercise and
02: provided them to the clinical team that ran
03: the sensitivity analysis.
04: Q.    Did you review that section of
05: the EMA assessment report?
06: A.    It's basically a copy of, yeah,
07: this -- it's somewhat a copy out of the ISO
08: guideline into it.
09: Q.    The International Standards
10: Organization guideline for point-of-care
11: devices?
12: A.    Yes.  Yes.
13: Q.    Okay.  Did you review that
14: section of the EMA assessment report?
15: A.    I just -- I mean, just this
16: part about the ISO standards that were put in
17: because we were kind of providing that
18: information to the team who then implemented
19: the knowledge into the analysis.
20: Q.    So why did you look up those
21: ISO standards?  What relevance, if any, do
22: they have to this topic?
23: A.    We looked at that because I
24: mentioned that there were -- I mean, we did

p. 00039

01: 00041:    whether these samples that have been taken
02: and measured at the central laboratory -- and
03: analyzed for coagulation parameters like, for
04: example, prothrombin time, whether they could
05: be used to compare results that might have
06: been measured with the Alere INR device at
07: the time point which was somehow in relation
08: to the measurement in the central lab.
09: And in that regard, we would
10: construct an analysis setting which is not
11: the same, but somehow similar to what you do
12: when you test new devices according to the
13: ISO standards.  Also when you test new
14: devices according to the ISO standards, the
15: new test device is tested against the
16: laboratory measurement, laboratory testing.
17: And so that's what made sense
18: to get oriented at what, yeah, the ISO
19: guidance is describing as analytical
20: specification for this fixed type of setting,
21: and we could probably translate it to the
22: situation in the ROCKET AF trial, although
23: certainly the conditions are not the same as
24: if you'd run an analytical sample according

p. 00041

Page 12

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00042:   to ISO standards.
02: Q.    How is the situation different
03: than had you run analytical samples according
04: to ISO standards?
05: A.    I personally have to admit I
06: have not -- I'm not a medical device expert,
07: but -- and I really would want to refer to
08: experts for this kind of detailed
09: information, because I cannot give you the
10: full details.
11: But definitely, if you ran such
12: an experiment for the ISO standards, it's
13: really planned in time at the time of
14: measurement with the device and the plot
15: sampling time for the central laboratory
16: measurement much closer.
17: And also, in the clinical
18: trial, you can imagine we had, yeah, more
19: than 10,000 patients in the ROCKET trial, and
20: I don't recall the exact number of the
21: samplings here, but it was more than a
22: thousand, and they were taken at different
23: sites across the globe from patients.
24: And so it had to be transported

01: 00043:   to the central laboratory first and were
02: analyzed in batches at the central
03: laboratory.  So it's a totally different type
04: of setting.
05: Q.    Does the ISO standard say that
06: they must be analyzed at the same time?
07: A.    I do not recall that, but
08: it's -- I mean, it's typically done in that
09: way, because, yeah, it's a different setting
10: here in this international clinical trial.
11: Q.    Well, other than the intent or
12: the reason for collecting the samples, how,
13: if at all, is the comparison between the
14: point of care in the week 12 and 24 lab data
15: any different than the analysis plan laid out
16: in the ISO standard?
17: A.    I already said, so they -- it's
18: different because it's information from
19: numerous sites around the world, plasma
20: samples that have been taken.  Also, the time
21: point between the INR point-of-care
22: measurement and the plasma sample taken time
23: point are not as close.  They may also vary.
24: But, again, here, I would like

01: 00044:   to point you to my colleague, Christopher
02: Nessel, and his clinical team because they
03: were much closer into the details of the
04: ROCKET trial and can describe this much
05: better than I can do.
06: Q.    And I appreciate that, and we
07: certainly will do that.  But these -- the
08: answers you provided in your deposition
09: today, so I need to explore the basis for
10: your answers and understand why you gave the
11: testimony you did.
12: You -- I heard two explanations
13: on how the week 12 and 24 comparison with
14: point of care was different than ISO
15: evaluation.  I heard the number of sites, and
16: I heard you talk about the point in time
17: between the two sampling events.  Let's take
18: them one at a time.
19: What's the basis of your belief
20: that the numerous sites where blood samples
21: were collected, both with the point of care
22: and the central lab, is in any way
23: inconsistent with the standards set out by
24: ISO?

01: 00045:         A.    That's all what I can share
02: from the discussion I attended, so I have not
03: personally, as I said, looked after this
04: information, and I have also not possibility
05: to do because I'm not a clinical expert who
06: could look into the clinical files.  So what
07: I just shared with you is what I know from
08: the discussion in the group which we had.
09: Q.    So this is something that
10: somebody told you, nothing that you
11: independently evaluated; is that fair?
12: A.    That's fair.
13: Q.    Okay.  And then the other point
14: you raised is that the samples were not
15: necessarily collected at the same point in
16: time.  Did I understand you correctly,
17: meaning the point of care and the central
18: lab?
19: A.    Yes.
20: Q.    And what's the basis of that
21: understanding?
22: A.    That's likewise, also, what,
23: you know, I learned in the discussion with
24: colleagues, and so I would have to ask the

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00046:   colleagues who ran -- I mean, really worked
02: with the data and looked them up and prepared
03: for the analysis that were conducted for the
04: health associates who could provide more
05: detailed information on this.
06: Q.    But you understand there are
07: thousands, almost, I think, over 10,000
08: paired samples that were collected on the
09: exact same day in the exact same patient, one
10: analyzed by the point of care and the other
11: analyzed by a central lab.  You're aware of
12: that, right?
13: A.    Not by the same patient, so
14: there were -- I mean, there were as you said
15: a thousand plus.
16: Q.    Fair point.  Probably
17: supplied -- more than 5,000 patients provided
18: two split samples that were collected on the
19: same day.  You're aware of that, correct?
20: A.    I'm -- I cannot concur because
21: I don't know the detail.  I'm really here
22: working out of the zone where I'm really the
23: expert of, and so I would like to ask you to
24: check those details with the colleagues who

01: 00047:   really worked with the data.
02: Q.    And we will.
03: So is there anything else --
04: because you decided that -- you added in that
05: point at the end of your answer that this
06: was -- that the ISO standards were different
07: than the data that was collected in ROCKET.
08: Is there any other basis you
09: have for making that statement, other than
10: the number of sites and the timing of the
11: collection of the samples?
12: A.    Not only the collection, also
13: the timing of the analysis, so because -- in
14: the central lab, if you have so many samples,
15: they're usually measured in batches, and so
16: that's also a difference.  And you have to
17: bear in mind that the data or the PK samples
18: collected were collected for a different
19: purpose, and so there was not a plan set up
20: as you would do if you do an experiment
21: according to ISO standards.  And so we
22: retrospectively used that information, but
23: that makes a difference.
24: Q.    Well, I understand it wasn't

01: 00048:   prespecified, but that doesn't invalidate the
02: actual numbers generated by the lab, does it?
03: A.    I mean, the numbers that were
04: generated by the lab, so the PK data and PT
05: data, they were already measured and also
06: reported, yeah, in reports we had, so they
07: are certainly not -- I mean, they're not --
08: they are unchanged, so they are effects that
09: we had already, but just we used them now for
10: a different answer, different question, and
11: so that was not planned initially.
12: Q.    I understand that.
13: A.    It makes a difference.
14: Q.    Well, you would agree with me
15: that is a very important dataset, the week 12
16: and 24 data, that was what was relied upon by
17: regulators to inform them about the
18: pharmacodynamics of rivaroxaban?
19: A.    The health authority
20: appreciated very much the work we did.  They
21: evaluated the sensitivity analysis, but then
22: they came back and said, yeah, we want to
23: really have a very thorough look at the
24: question, and this is very reassuring, but

01: 00049:   please do this additional step as well, and
02: look at these data.  We understand that there
03: are limitations to such retrospective
04: analysis, but it will complete the picture.
05: And so that's how we did it.
06: Q.    And I appreciate that.  But I
07: was more talking about whenever you collected
08: the week 12 and 24 data for an important
09: purpose, and that was to understand the
10: pharmacodynamics of rivaroxaban.  And your
11: company still today depends on that data in
12: evaluating the pharmacodynamics of
13: rivaroxaban, fair?
14: A.    I don't know exactly where
15: you're -- I mean, what you're referring to in
16: this question, because you're moving away
17: from a different topic here, and --
18: Q.    Well, your -- I'm backing up.
19: Why was the week 12 and 24 data collected in
20: the first place?
21: A.    To collect pharmacokinetic data
22: in the patient population.  We had already
23: numerous PK data beforehand and intense
24: characterization of the PK profile, but this

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00050:   was just another piece of information to be
02: added specifically in this patient
03: population.
04: MR. McWILLIAMS:  Okay.  And I'd
05: like to hand you what we're marking as
06: Derix-4, and I believe this is the
07: final published EMA assessment report
08: on this topic.
09: (Whereupon, Deposition Exhibit
10: Derix-4, EMA Assessment Report
11: [No Bates], was marked for
12: identification.)
13: BY MR. McWILLIAMS:
14: Q.    Do you recognize this document
15: as the final EMA assessment report on the
16: topic we've been discussing here the last
17: 30 minutes or so, the use of the recalled
18: device in ROCKET?
19: A.    Yes, this is the final report
20: issued on February 5th.
21: Q.    All right.  And have you
22: reviewed this document prior to today, the
23: final version?
24: A.    I have, yes, looked at parts of

p. 00050

01: 00052:   if anything, to independently evaluate or
02: investigate whether or not that is a true and
03: accurate statement?
04: A.    We had frequent interactions
05: with our colleagues at Janssen and our -- the
06: nature of our collaboration with Janssen over
07: the years was very trustful, and so, yeah, we
08: got this information from our colleagues.
09: Q.    Okay.  Well, would it surprise
10: you to learn that members of regulatory
11: affairs at Janssen responsible for Xarelto,
12: specifically responsible,
13: with responsibilities for Xarelto in the
14: ROCKET trial, were made aware of the recall
15: in December of 2014, would that surprise you
16: to learn that today?
17: A.    It depends on the context.  It
18: may well be that colleagues who work in
19: regulatory receive regular notices from FDA,
20: so some colleagues have this, but they get
21: all the issue reports from FDA on a daily
22: basis.
23: And so that may well be, but it
24: does not mean automatically that they have --

p. 00052

01: 00051:   it, probably not every table, but I'm --
02: yeah, I've looked at the document.
03: Q.    Okay.  And if we could read
04: through it together, if you go to page 5,
05: please.  And I believe you testified that
06: this was one of your areas of responsibility,
07: was to investigate and help answer EMA's
08: question as to why there was this apparent
09: delay between the recall notification in
10: December of 2014 and your company notifying
11: EMA in September of 2015 about the potential
12: applicability of the device recall to your
13: trial; is that fair?
14: A.    Yes, I was part of the team who
15: looked into this question and, yeah, wrote up
16: the document, uh-huh.
17: Q.    And essentially what you told
18: EMA was that it was Janssen that first
19: learned about the potential applicability
20: and -- but Janssen did not learn about the
21: potential applicability until September 9th,
22: 2015; is that fair?
23: A.    That's fair, yes.
24: Q.    And tell me, what did you do,

p. 00051

01: 00053:   really could pick it up easily.  That's also
02: laid out here in the -- in the document, that
03: even if somebody would have seen the notice,
04: it was not occurring easily that there was
05: any connection to our trial.
06: And if you would be receiving
07: like 10, 15, 20 notices of that kind a day
08: and reviewed them with a very specific focus,
09: it can easily happen that you don't mark that
10: as an important information.
11: And the reason why that there's
12: not an immediate connection between such a
13: notice and the ROCKET AF trial is on the
14: firsthand, that when -- when Janssen
15: purchased the device for the clinical -- for
16: the use in the ROCKET AF trial, they
17: purchased it under the name of HemoSense INR
18: device because HemoSense was the company that
19: at the time produced it.
20: HemoSense was later bought up
21: by the company Alere, and so they changed
22: also subsequently the name of the device into
23: Alere INR device.  And if you haven't
24: followed up that, yeah, sequence of events,

p. 00053

Page 15

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00054: you would not naturally make a connection
02: between the two things.
03: And there are more factors
04: that, yeah, make it difficult to have that
05: connection immediately occurring to you,
06: because the recall notice also had a specific
07: time frame, and the time frame was after
08: finalization of the ROCKET AF trial. So this
09: is a second reason why it's not immediately
10: occurring.
11: And thirdly, there are batch
12: number -- or batch numbers listed on the
13: recall notice, and, yeah, even when later on,
14: comparing the batch numbers that were used in
15: the ROCKET AF trial and the batch numbers in
16: the recall, they did not match, and so this
17: information about the potential impact of the
18: recall notice to the device that was used in
19: ROCKET AF could only be made by several
20: interactions and with the company Alere, and
21: them going back into their files and
22: providing the information that was not
23: publicly available.
24: Q.    Well, one correction.  The name

p. 00054

01: 00055: of the device has never changed.  It's always
02: been called INRatio, correct?
03: A.    But it was called HemoSense
04: INRatio, not called Alere INRatio.
05: Q.    That's just the name of the
06: company that makes it.  It's like Janssen
07: Xarelto or Bayer Xarelto.  The name of the
08: product is the same, right?
09: MR. HOFFMAN:  Objection to the
10: form of the question, but you can
11: answer.
12: A.    I recall always the name was
13: mentioned in connection to the company, so
14: HemoSense INR in the prior times and now
15: Alere INRatio device, and that's also how it
16: is called in the recall notice.
17: BY MR. McWILLIAMS:
18: Q.    Well, Doctor, as someone who
19: has experience in regulatory affairs, you
20: would agree with me that it's important to
21: carefully read communications from the FDA
22: that pertain to a drug over which you have
23: responsibility and a device that was used in
24: the clinical trial involving that drug, fair?

p. 00055

01: 00056:          MR. HOFFMAN:  Objection to the
02: form of the question.
03: A.    I cannot fully agree because in
04: general, certainly, regulatory
05: representatives in the company very carefully
06: read the information, and they -- yeah,
07: that's part of the job.
08: But as I just explained to you,
09: if you get numerous alerts every day, it's
10: perfectly fine to just focus on the
11: information and read it, yeah, and pick out
12: the information that you need for your daily
13: work.
14: And that was certainly not
15: obvious in such a notice.
16: BY MR. McWILLIAMS:
17: Q.    Well, not obvious, but you
18: certainly could have done the investigation
19: sooner.  You didn't have to wait for the
20: British Medical Journal to contact you to do
21: this investigation to conclude that, in fact,
22: you had used a recalled device in your
23: clinical trial, fair?
24: MR. HOFFMAN:  Objection to the

p. 00056

01: 00057:          form of the question.
02: A.    As I said, there was no
03: awareness of this, and only very intense
04: interaction with the company, Alere finally
05: revealed that there was a potential impact.
06: And so, therefore, I think this is, yeah -- I
07: mean, this is very --
08: BY MR. McWILLIAMS:
09: Q.    An intense interaction could
10: have begun earlier, right?  That intense
11: interaction with Alere began in response to
12: questions from the British Medical Journal,
13: correct?
14: A.    It could only start once, yeah,
15: we became aware of the potential, and we --
16: this question was raised, and so that was
17: really the point in time when the work could
18: start.
19: MR. McWILLIAMS:  Well, let me
20: show you what's being marked as
21: Derix-5, and I'll represent to you
22: that this is an e-mail that was
23: produced to us by your colleagues at
24: Janssen.

p. 00057

01: 00058:              (Whereupon Deposition Exhibit
02: Derix-5, E-mail(s) re: U.S. FDA Daily
03: Digest Bulletin,
04: XARELTO_JANSSEN_14522268 -
05: XARELTO_JANSSEN_14522271, Ref.
06: 2956104, was marked for
07: identification.)
08: BY MR. McWILLIAMS:
09: Q.    This is an e-mail from the FDA
10: to Ms. Alla Rhoge.  Are you familiar with
11: that individual?
12: A.     Alla Rhoge, yes, is a
13: regulatory colleague who, in former times --
14: I'm not sure nowadays -- worked together with
15: Sanjay Jalota and his team, regulatory
16: affairs.
17: BY MR. McWILLIAMS:
18: Q.    But had -- specifically had
19: responsibilities for regulatory affairs for
20: the drug Xarelto, correct?
21: A.    At the time in the past she
22: had -- yes, she was also responsible for the
23: Xarelto product at Janssen.
24: Q.    And I apologize, this is

01: 00059:   Record No. 2956104.
02: And if you go to page 2,
03: please, Dr. Derix.  You'll see there's a
04: section that says "FDA MedWatch - Alere
05: INRatio2 PT/INR Professional Test Strips,"
06: and then you go down underneath, it says
07: "Update, 12/9/2014, Alere initiated a
08: voluntary correction to inform US users of
09: the Alere INRatio and INRatio2 PT/INR Monitor
10: system of certain medical conditions that
11: should not be tested with the system.  In
12: certain cases, the INRatio and
13: INRatio2 PT/INR Monitor system may provide an
14: INR result that is clinically significantly
15: lower than a result obtained using a
16: reference INR system (laboratory method)."
17: Did I read that correctly?
18: A.    Yes, you read that correctly.
19: Q.    That's all I asked, ma'am, if I
20: read it correctly.
21: A.    This is --
22: MR. HOFFMAN:  Just let him ask
23: his next question.
24: A.    Okay.  Sorry, because I wanted

01: 00060:   to point that the last sentence is also
02: important of this paragraph in context.
03: BY MR. McWILLIAMS:
04: Q.    I appreciate that, but
05: ultimately, this same information is what was
06: communicated to you by the British Medical
07: Journal that triggered your investigation,
08: correct?  The December 2014 recall notice,
09: correct?
10: A.    It's not correct.  The
11: journalist from the British Medical Journal
12: asked whether there could be, yeah, a
13: connection between the recall notice and,
14: yeah --
15: Q.    In her e-mail to Dr. Nessel,
16: she linked to this same recall notice,
17: correct?
18: A.    That's correct, yes.
19: Q.    Okay.  And you and I both know
20: that Ms. Rhoge specifically had
21: responsibilities pertaining to the regulatory
22: affairs, including the performance of this
23: device in ROCKET?
24: MS. TERSIGNI:  Objection, form.

01: 00061:              MR. HOFFMAN:  Object to the
02: form of the question.
03: BY MR. McWILLIAMS:
04: Q.    Did you know that?
05: A.    I cannot comment on this
06: because I am not aware of the tasks that Alla
07: Rhoge had exactly at the time during the
08: ROCKET AF trial, and especially also in
09: October 2014, I don't know whether she still
10: has -- is working on the Xarelto team,
11: because I haven't seen her for a while.
12: And just as we talked before,
13: you're showing me this document here now,
14: it's exactly what I said.  It's a list of
15: one, two, three, four, five, six, seven,
16: eight, nine, 10, 11, 12, 13, 14, 15 --
17: probably 20 -- 20 to 30, I haven't counted --
18: Q.    Paragraphs?
19: A.    -- I haven't counted them
20: quickly, paragraphs of alerts, and so she --
21: this is from a daily digest per her term, and
22: it's not -- it's not immediately obvious that
23: this connection can be made very quickly and
24: that she really could do that for the reasons

01: 00062:   I just mentioned.
02: Q.    But you're able to make it
03: immediately obvious nine months later when
04: the BMJ pointed out the exact same recall
05: notice when you performed an investigation,
06: fair?
07: MR. HOFFMAN:  Objection to the
08: form of the question.
09: You may answer.
10: A.    I will have to go back to what
11: I said before, even when the British Medical
12: Journal made this inquiry, it took quite some
13: time before we really could go through all
14: the steps and find out of the potential --
15: BY MR. McWILLIAMS:
16: Q.    It took like two weeks, right?
17: A.    Yeah, but it took quite some
18: intensive interaction with the company Alere,
19: and without the help of the company Alere --
20: Q.    It took two weeks, right?
21: MR. HOFFMAN:  Please don't
22: interrupt.
23: Were you finished with your
24: answer?

01: 00063:        A.    I cannot comment on the exact
02: time, maybe --
03: BY MR. McWILLIAMS:
04: Q.    It was less than a month,
05: wasn't it, right?
06: A.    Yeah.
07: Q.    Yeah.  Okay.
08: Now, back to my question about
09: Alla Rhoge.  This wasn't just some nobody at
10: Janssen.  This was somebody who had specific
11: responsibilities for regulatory affairs for
12: ROCKET, including the performance of this
13: very device in ROCKET.
14: Are you aware of that?
15: MR. HOFFMAN:  Objection, asked
16: and answered.
17: MS. TERSIGNI:  Objection.
18: A.    As I said before, I'm not aware
19: of Alla's specific task in the Janssen team
20: because my primary contact partner at that
21: point in time was Sanjay Jalota, who was the
22: team lead at the time, and so you would
23: probably have to ask him if you would like to
24: understand the specific tasks of his

01: 00064:    colleague.
02: MR. McWILLIAMS:  Okay.  Well,
03: let me hand you what's being marked as
04: Derix-6, which is Record No. 748350.
05: (Whereupon Deposition Exhibit
06: Derix-6, E-mail(s) re: NDA 202439 -
07: Clinical IR, XARELTO_JANSSEN_04932509,
08: Ref. 748350, was marked for
09: identification.)
10: BY MR. McWILLIAMS:
11: Q.    And this is an e-mail from the
12: FDA -- wait, I may have given you my copy.
13: Did I do that?
14: MR. HOFFMAN:  I think you may
15: have given her --
16: MR. McWILLIAMS:  No, I found it
17: actually.  Thank you for that.
18: BY MR. McWILLIAMS:
19: Q.    And this is an e-mail from
20: Ms. Alison Blaus at the FDA to Alla Rhoge and
21: Sanjay Jalota; is that correct?
22: A.    Yes, that's correct.
23: Q.    And this is -- and you see this
24: is a -- the FDA asking Janssen for

01: 00065:   information about the INR point-of-care
02: device used in ROCKET.  Do you see that
03: question number 2, "Please also provide the
04: following information on the INR
05: point-of-care device used in ROCKET."
06: Do you see that, ma'am?
07: A.    Yes.
08: Q.    And see the last bullet point
09: it says, "Please provide us with any
10: available information on the performance
11: characteristics of the device beyond the
12: information found in the labeling."
13: Did I read that correctly?
14: A.    Yes, you read that correctly.
15: Q.    So the FDA was specifically
16: asking this person, Alla Rhoge, about the
17: performance of this device that we now know
18: has been recalled, right?
19: And this is the same individual
20: that received an e-mail in December of 2014
21: notifying Janssen of the recall of the
22: device, correct?  Is it --
23: A.    There's one point the FDA asks
24: about -- not about the performance as such,

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00066:   but about the performance characteristics of
02: the device, so that could point into
03: information which is displayed, for example,
04: in the ISO guidance.
05: So that is not a direct request
06: on the performance, but it's correct what you
07: said, that the request is from Alison Blaus
08: to Alla Rhoge and Sanjay Jalota.
09: Q.    All right.  So this same person
10: has had communications with the FDA about
11: this device that was used in ROCKET, correct,
12: the exact same person?
13: A.    Yes, that's the same person.
14: Q.    Okay.  Now, let's keep reading
15: the EMA assessment report, and we're going to
16: keep going back to this so probably -- I
17: would recommend you keep that out.
18: A.    Document 3?
19: Q.    The final one, I believe it's
20: document 4.
21: A.    Okay.
22: Q.    If you go to page 5, please,
23: you can see the pages are numbered in the
24: bottom right corner.

01: 00067:       A.   Yes.
02: Q.    And, again, this is a section
03: that you were tasked with investigating and
04: making sure that EMA was provided with
05: truthful and accurate responses, the timeline
06: of learning of the device recall?
07: A.    Uh-huh, yes.
08: Q.    And what's the -- in the very
09: bottom paragraph, it says, "On September 9th,
10: 2015, JRD became aware through a third party
11: that the recall notice of the Alere INRatio
12: device be applicable to the HemoSense INRatio
13: devices used in the ROCKET AF trial program
14: as well."
15: Did I read that correctly?
16: A.    That's correct, yeah, uh-huh.
17: Q.    And the third party that's
18: referenced there, is that the e-mail from the
19: British Medical Journal?
20: A.    Yes.
21: MR. HOFFMAN:  Object.
22: A.    That's referring to, yeah, the
23: e-mail that -- I don't necessarily -- yeah,
24: at least this -- to -- to information that

01: 00068:   was received from a third party and from the
02: British journal.
03: BY MR. McWILLIAMS:
04: Q.    And did you ask to see a copy
05: of that communication to make sure the date
06: was correct in this EMA report?
07: A.    No, I didn't -- not ask to see
08: a copy of that --
09: Q.    What --
10: A.    I got the information from our
11: Janssen colleagues, and they also reviewed,
12: yeah, the text.  So I -- that was for me to
13: make sure that we had really provided the
14: appropriate information.  And so I assumed
15: that this is the correct information.
16: Q.    What, if anything, did you do
17: to independently validate -- verify this
18: information?
19: A.    As I said, so we reviewed this
20: in the team and including the Janssen
21: colleagues, and so that after that review, I
22: think, yeah, we provided enough.
23: Q.    Have you ever actually seen the
24: communication from the British Medical

01: 00069:   Journal to Janssen?
02: A.    I don't recall that.  So we
03: talked about this, and Christopher Nessel,
04: yeah, mentioned to me, but I don't recall
05: that I have seen it myself.
06: Q.    Did he ever tell you that he
07: actually received the e-mail on
08: September 4th, not September 9th?
09: A.    I'm not aware, so it may well
10: be that this was referring that not when the
11: e-mail was sent, but when -- when he -- when
12: he shared it with the colleagues at Janssen.
13: So that may be an explanation.  So that it
14: was the day when -- yeah, it was shared
15: between colleagues at JRD.
16: Q.    Well, as someone who has a
17: history of working in regulatory affairs,
18: would you agree with me it's important to be
19: truthful and accurate in communications with
20: regulatory bodies?
21: MR. HOFFMAN:  Objection to the
22: form of the question.
23: BY MR. McWILLIAMS:
24: Q.    And precise?

01: 00070:          MR. HOFFMAN:  Same objection.
02: A.    Certainly, the information we
03: are providing, we are making sure that it is,
04: yeah, to our best knowledge, and that's what
05: we also did here.  And writing it up and
06: having it reviewed by -- by several
07: colleagues, and that's, yeah, what we did.
08: BY MR. McWILLIAMS:
09: Q.    And you understand there's --
10: again, as someone who's worked in regulatory
11: affairs and someone with a degree in that
12: field, that there are certain timelines and
13: reporting requirements upon learning of
14: certain information; there's reporting
15: deadlines of when certain information should
16: be provided to regulators, correct?
17: A.    There are reporting that --
18: timelines if -- in specific areas, but also
19: reporting timelines do not apply to all
20: information.  Those reporting timelines apply
21: to specific regulatory procedures, and so --
22: Q.    You understand this is a
23: specific regulatory procedure that the EMA
24: undertook, correct?

01: 00071:          A.    That's a procedure that EMA
02: started after we informed them, and so, then,
03: only after assessing the first information
04: they had provided from us -- got from us, on
05: an informal basis, on a really daily, normal
06: communication basis, they decided that they
07: would like to have a so-called LEG procedure
08: because that gives them a framework to work
09: through.  So at the time when we gave the
10: information first time to EMA, it was not yet
11: in a formal procedure.  So they just opened
12: it then afterwards.
13: MR. McWILLIAMS:  Okay.  Let me
14: hand you what's being marked as
15: Derix-7, which is Record 3019911.
16: (Whereupon Deposition Exhibit
17: Derix-7, E-mail(s) re: BMJ query about
18: INRatio device,
19: XARELTO_JANSSEN_15527978 -
20: XARELTO_JANSSEN_15527979,
21: Ref. 3019911, was marked for
22: identification.)
23: BY MR. McWILLIAMS:
24: Q.    You'll see this is an e-mail

01: 00072:   from Deborah Cohen.  Do you recognize that
02: name as the reporter at the British Medical
03: Journal?
04: A.    I recall that I have heard the
05: name.  I have not met her personally and
06: don't know her personally, but I recall the
07: name was mentioned by the team.
08: Q.    And you see this is an e-mail
09: to Christopher Nessel at Janssen?
10: A.    Yes.
11: Q.    And you see that this is dated
12: September 4th, 2015?
13: A.    Yes, I see that.
14: Q.    You see the subject is "BMJ
15: query about INRatio device"?
16: Do you see that?
17: A.    Yes, I see that.
18: And it says, "Dear Dr. Nessel:
19: I'm taking a look at devices used in
20: clinical trials.  I noted that the
21: ROCKET trial used the HemoSense
22: INRatio POC.  This is now owned by
23: Alere.
24: "Are you aware of this recall

01: 00073:          notice relating to Alere's INRatio
02: POC?"
03: And she then provides a link to
04: the FDA recall notice that we read
05: previously in Ms. Rhoge -- Alla
06: Rhoge's e-mail.
07: Do you remember that?
08: A.    Yes, this is a link to the
09: safety MedWatch information from FDA.
10: BY MR. McWILLIAMS:
11: Q.    Dr. Cohen continues.  She says,
12: "Additional information relating to the
13: recall can be found at the manufacturer's
14: website," and she then gives a link to
15: Alere's website to provide more information;
16: is that correct?
17: A.    Yes, that's correct.
18: Q.    Okay.  And then Dr. Cohen
19: continues, she says, "The recall relates to
20: all of the devices that have been cleared
21: since 2002," and then she gives another link
22: in support of that statement.
23: Do you see that?
24: A.    Yes.

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00074:     Q.    So Dr. Cohen was able to link
02: up the fact that Janssen had used a recalled
03: device in ROCKET prior to Janssen figuring it
04: out?  Do I understand that correctly?
05: A.     That's not correct because she
06: was not figuring it out.  She just pointed to
07: the potential, and so she just asked about
08: the awareness, and she also asked about
09: thoughts about this.  But she -- and also
10: she's indicating in her e-mail that she's
11: taking a look at devices used in clinical
12: trials.  So she was working on the topic of
13: devices in a more general sense and had done
14: obviously some specific research on devices.
15: And that's why she came
16: obviously across this information and then
17: asked, yeah.
18: Q.     But it turns out she was right.
19: I mean, the defective device, the recalled
20: device was used in ROCKET.
21: A.     You said, yeah, the
22: defective -- that's not correct.  It was -- I
23: mean, it wasn't really a --
24: Q.    The recalled device, I correct

p. 00074

01: 00075:   myself.
02: A.    The recalled device, and
03: recalled in that context also is somewhat
04: misleading because it was never withdrawn
05: from the market.  It was a restriction of the
06: labeling of the device for patient
07: populations to be used.
08: Yeah, she had -- she had gone
09: through device research obviously, and that
10: question came across.  And she wanted to find
11: out more about it.
12: Q.     But it turned out she was
13: right, that the recalled device was used in
14: ROCKET, fair?
15: A.     Not completely.  She was right
16: in the fact that the HemoSense INR device
17: that was used in the ROCKET AF trial, yeah,
18: had a connection to this recall because
19: basically the HemoSense company had been
20: bought, and this is -- the Alere INRatio is
21: the follow-up device, successor device after
22: the HemoSense INR device.
23: Q.     And this communication was
24: dated September 4th, not September 9th as

p. 00075

01: 00076:    indicated in the EMA report; is that fair?
02: Do you agree those are two different dates?
03: A.     Yes, this is September 4th, and
04: when the e-mail stated.
05: Q.     Do you have any intentions
06: on -- since this was a -- you had
07: responsibility for this section of the EMA
08: report, and you were earlier provided an
09: opportunity to correct any typos and errors,
10: did you have any intention on correcting this
11: error that exists in the EMA assessment
12: report?
13: MR. HOFFMAN:  Objection to the
14: form of the question.
15: A.     I do not recall any discussions
16: about the change, and really, I followed the
17: information that we had jointly received and
18: reviewed.  And, again, here, I correct, this
19: is a holiday time in the U.S. also, and it
20: may be that -- yeah, that Christopher really
21: just pointed at the time when he started
22: really actively reading, following up,
23: looking up the information and really started
24: realizing this.  And --

p. 00076

01: 00077:   BY MR. McWILLIAMS:
02: Q.     Did Dr. Berkowitz not receive
03: the same e-mail on the same date?
04: A.     I'm not aware of.  Because when
05: I received the information, it came from
06: Janssen, and so I suppose that Janssen was
07: the primary point of contact here.
08: Q.     But if Dr. Berkowitz did
09: receive this same e-mail on the same date, we
10: would expect to find that in his e-mail
11: folder, fair?
12: MR. HOFFMAN:  Objection to the
13: form of the question.
14: BY MR. McWILLIAMS:
15: Q.     Unless he deleted it?
16: MR. HOFFMAN:  Objection.
17: A.     I would suppose that he, as
18: well as our other colleagues who are involved
19: in Xarelto at the moment, are adhering to the
20: retention policy of documents, and so...
21: BY MR. McWILLIAMS:
22: Q.     Okay.  Let's keep reading the
23: EMA report, which is Derix-4.  Let's see.
24: MR. McWILLIAMS:  Actually, why

p. 00077

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00078:    don't we take our first quick break,
02: if that's okay.
03: MR. HOFFMAN:  Yeah, that's
04: fine.  That's fine.
05: THE VIDEOGRAPHER:  Going off
06: the record at 10:04 a.m.
07: (Recess taken, 10:04 a.m. to
08: 10:17 a.m.)
09: THE VIDEOGRAPHER:  Back on
10: record at 10:17 a.m.
11: BY MR. McWILLIAMS:
12: Q.    Dr. Derix, if you would please
13: turn to page 8 of the EMA assessment report.
14: And so if I understand the first question
15: that EMA wanted an answer to was, you know,
16: explain when you learned about this device
17: and explain -- about this recall and why the
18: delay in informing EMA.
19: Is that a fair paraphrase of
20: the first request from EMA?
21: A.    Yes, that's fair.
22: Q.    Okay.  And then the second
23: request from EMA was to basically ask the
24: sponsor of Bayer and Janssen what their

p. 00078

01: 00080:    Q.   Okay.  And then there's the --
02: it says the summary of the MAH response.  So
03: this is information that the -- Bayer and
04: Janssen provided to EMA that we see here on
05: the page 8, continuing on to page 9, page 10,
06: and then continuing on to page 11; is that
07: correct?
08: A.    Yeah, typically, EMA is using
09: part of the documents that are submitted by
10: the marketing authorization holder for their
11: summaries as well, and that weave that in --
12: they work that into their documents.
13: Q.    So it's a summary of what Bayer
14: and Janssen told EMA, correct?
15: A.    Yes.  It can also be partially
16: copied from the submission, so that depends
17: how they do it, yeah.
18: Q.    All right.  If we go to page --
19: and so what we see here is there's a -- in
20: the summary is background information on the
21: ROCKET trial, talking about what the
22: principal safety endpoint and principal
23: safety efficacy endpoints are, and then on
24: page 9 it has a table with the primary top

p. 00080

01: 00079:    opinion was on the impact of the recalled
02: device on the results of ROCKET.
03: Is that a fair paraphrase?  I
04: tried to --
05: A.    If you can again --
06: Q.    I tried to get you on page 8.
07: I think that's where it is.
08: A.    Uh-huh.
09: Q.    You see request number 2, they
10: asked for the MAH, that's the market
11: authorization holder, right?
12: A.    That's correct.
13: Q.    That's also known as the
14: sponsor, right?
15: A.    Yeah.
16: Q.    So they want to know the
17: sponsor's view on the impact on the results
18: of ROCKET, of the -- of use of this, what we
19: now know, recalled device, fair?
20: A.    Yes, they asked -- and that's a
21: typical question of EMA because they always
22: want to hear the company's position on
23: topics, and then they build their own opinion
24: independently on it, yeah, uh-huh.

p. 00079

01: 00081:    line data from ROCKET --
02: A.    Yes.
03: Q.    -- correct?  Or the efficacy
04: data.  Page 10 has a table with the safety
05: data.  Are you following me so far?
06: A.    Yes, uh-huh.
07: Q.    And then on the bottom of
08: page 10, there's a section titled "Potential
09: pertinence of the Alere Correction/Recall in
10: the ROCKET AF trial," and then there's a
11: discussion on the use of the device in the
12: trial; is that correct?  It talks about the
13: INR shamming mechanism that was in place to
14: provide the double-blind component of ROCKET?
15: A.    Yes, that's correct.
16: Q.    And there in the last paragraph
17: on page 11 is a discussion about the
18: unblinded monitor.
19: Do you see that?
20: A.    Yes.
21: Q.    And, again, this is a summary
22: of information provided by the drug company
23: to the regulators, correct?
24: A.    That's correct.

p. 00081

Page 22

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00082:     Q.   Okay.  So let's read this
02: together.  This says, "A monitor unblinded to
03: study data was employed to review INR data
04: and ascertain if subjects were frequently out
05: of range.  This monitor could consult with a
06: physician unblinded to study data at DCRI to
07: discuss specifying cases, if needed."  And
08: I'll pause real quick.
09: DCRI, that's Duke Clinical
10: Research Institute, correct?
11: A.     That's correct.
12: Q.     That was the academic
13: institution that helped facilitate the ROCKET
14: trial?
15: A.     Yes, that's correct.
16: Q.     Let's keep reading.  It says,
17: "Occasionally and as a result of these
18: surveillance efforts, specific investigators
19: whose patients were found to be persistently
20: below or above the target range received
21: correspondence reminding them of the
22: importance of achieving the INR target.  The
23: monitor unblinded to study data was also
24: available to answer questions about

p. 00082

01: 00083:   individual INR results, in a blinded fashion,
02: from investigators, through local medical
03: monitors.  At no time did the monitor
04: unblinded to the study data towards the end of
05: INR time in therapeutic range."
06: What does that sentence mean,
07: the last sentence I just read?
08: A.     Yeah.  Aggregate INR time in
09: therapeutic range would mean that the monitor
10: has data available from several patients over
11: a longer time period, and assesses over a
12: longer time period the adherence of the
13: patients to the optimal INR range.
14: It just says that this monitor
15: was really available to help physicians who
16: had questions and also to watch, yeah,
17: whether individually at one side or at one
18: patient level, subjects were frequently out
19: of range.
20: Q.     Well, what does that mean,
21: aggregate INR time in therapeutic range?
22: A.     That's a technical term, and
23: from this technical term, also I would like
24: to refer you to my colleagues in clinical

p. 00083

01: 00084:   development because time in therapeutic range
02: is a term that is being used in clinical
03: trials to assess the adherence to the optimal
04: INR range.
05: But I don't know by myself,
06: because I'm not a specialist, how it's
07: exactly calculated.  You would have to talk
08: to statisticians or clinicians to know how
09: it's -- and aggregate just means that the
10: monitor has just more than individual patient
11: data; it means there's a database where data
12: are compiled from several patients or ideally
13: the entire patient population.
14: Q.     And the therapeutic range is an
15: INR between 2 and 3, and out of range would
16: be below 2 or above 3, correct?
17: MR. HOFFMAN:  Objection to the
18: form of the question.
19: A.     The INR target range that is
20: applied, yeah, for vitamin K antagonist is 2
21: to 3, so that is where physicians target to
22: bring patients into.
23: BY MR. McWILLIAMS:
24: Q.     And this says at no time did

p. 00084

01: 00085:   the monitor unblinded to study data evaluate
02: aggregate INR time in range.  That means at
03: no time at the beginning of the study, in the
04: middle of the trial, or towards the end of
05: the study did he have access to that data,
06: correct?  That's what that --
07: A.     As far as I understand, is that
08: because the monitor was, yeah, available
09: during the conduct of the trial, that, yeah,
10: this does refer to this time point.
11: But as I said, I was not
12: involved in the operational details after
13: clinical trial, and so these are specifics
14: you would better ask the clinical team that
15: ran the study.
16: Q.     And we will, but just to be
17: clear, as someone who had an opportunity to
18: review this, what this means in English is
19: that at no time did this unblinded monitor
20: take aggregate data, at any point during the
21: trial, and look to see how many patients were
22: within range compared to those out of range,
23: right?
24: MR. HOFFMAN:  Objection, asked

p. 00085

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00086:       and answered.
02: A.    At least as I understand the
03: task of the monitor, that really, this
04: monitor was there to look into individual
05: patient subject data and to consult with the
06: physician if there was an individual
07: patient's level of concern --
08: BY MR. McWILLIAMS:
09: Q.    I agree.
10: A.    -- and a need to unblind the
11: patient.
12: BY MR. McWILLIAMS:
13: Q.    Would you agree with me it
14: would be inappropriate for this unblinded
15: monitor to, at any point during the trial,
16: observe aggregate INR time in therapeutic
17: range of the warfarin patients in ROCKET?
18: MR. HOFFMAN:  Objection to the
19: form of the question.
20: A.    I said it was not his task, and
21: therefore, it really -- it -- he was not
22: tasked to do that.
23: BY MR. McWILLIAMS:
24: Q.    But not only was he not tasked

p. 00086

01: 00087:   to do that, you specifically and
02: affirmatively told the EMA that he did not
03: see such data, correct?
04: MR. HOFFMAN:  Objection to the
05: form of the question.
06: A.    That's -- I mean, the sentence
07: is "At no time did the monitor unblinded to
08: study data evaluate aggregate INR time in
09: therapeutic range," so -- and that is how
10: it's -- yeah.
11: BY MR. McWILLIAMS:
12: Q.    Okay.  Let's -- so let's -- and
13: did any of your -- and if it were true -- and
14: I think you previously testified that Janssen
15: was primarily responsible for running the
16: ROCKET trial, correct?
17: A.    Yes, that's how we set up the
18: model.  We have -- in our collaboration, we
19: have responsibility agreement developed, and
20: underneath the contract level for each study,
21: some of the studies were operationally
22: conducted by Bayer, and in the grid, it's
23: clearly defined what responsibilities in that
24: case is.

p. 00087

01: 00088:           And other trials like the
02: ROCKET AF trial were operationally conducted
03: by Janssen and, again, we have the
04: responsibility grid for what Janssen's
05: obligation is in that trial and what Bayer's
06: obligation is.
07: Q.    And if it were true --
08: A.    And all these things fall under
09: the obligation of the Janssen team.
10: Q.    All right.  And you expect
11: Janssen to communicate pertinent and relevant
12: information to you in a truthful, transparent
13: and honest manner; is that fair?
14: MR. HOFFMAN:  Objection.
15: A.    There was another, yeah, kind
16: of level of interaction.  We had for each
17: trial a so-called shadow team; so if the
18: primary responsibility for a trial was with
19: Janssen, we also had a shadow clinical leader
20: who worked with and attended meetings, team
21: meetings with Janssen and so could pick up
22: the relevant information.
23: BY MR. McWILLIAMS:
24: Q.    But if Janssen were to know

p. 00088

01: 00089:   that this unblinded monitor had, in fact,
02: evaluated aggregate INR time in therapeutic
03: range data, is that something you would
04: expect to be communicated to Bayer as your --
05: as its development partner?
06: MS. TERSIGNI:  Objection to
07: form.
08: A.    That is really far from my
09: experience level here, to judge on
10: operational aspects and rules in the clinical
11: trial.
12: So as I said, we had colleagues
13: at the time really sitting in that team and,
14: yeah, and there was -- I was supposed to have
15: transparency to that colleague and the team.
16: BY MR. McWILLIAMS:
17: Q.    But you know Dr. Christopher
18: Nessel, correct?
19: A.    I know Christopher Nessel, yes.
20: Q.    Did Dr. Nessel ever tell you
21: that he personally had been provided
22: aggregate INR time in therapeutic range while
23: the trial was ongoing by the unblinded
24: monitor?  Did he ever tell you that?

p. 00089

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00090:       A.   I do not recall information
02: like that.
03: MR. McWILLIAMS:  Let's see if
04: this refreshes your memory.  This is
05: Derix-8, Record 2959513.
06: (Whereupon, Deposition Exhibit
07: Derix-8, E-mail(s) re: ROCKET AF and
08: target INR, XARELTO_JANSSEN_14557985 -
09: XARELTO_JANSSEN_14557986,
10: Ref. 2959513, was marked for
11: identification.)
12: BY MR. McWILLIAMS:
13: Q.    And just -- I should have asked
14: this earlier, but the unblinded monitor, you
15: understand that was a gentleman named
16: Mr. Bernard Chalecki?
17: A.    I don't know the name because
18: that level of detail, I was -- yeah, I wasn't
19: aware of.
20: Q.    Well, I'll show you documents
21: that are -- for now, I'll represent to you
22: that the unblinded monitor was, in fact, a
23: gentleman named Mr. Bernard Chalecki, okay?
24: A.    Okay.

01: 00092:    time between sampling nor allowing any time
02: for dose stabilization."
03: And down below he says, "We
04: have 20876 warfarin samples" collected --
05: well, collected so far, that's what that
06: means, "postrandomization," right?
07: A.    Uh-huh.
08: Q.    And he reports the data, the
09: aggregate time in therapeutic range at 45.2%,
10: as of April 1st, 2008, correct?  That's
11: what's written on this piece of paper, right,
12: Dr. Derix?
13: A.    I would have to read it
14: carefully first because I see this for the
15: first time, and I would have to also try to
16: understand the figures that are mentioned
17: here.  So I'd like to read it.
18: Q.    Well, let's -- you can do
19: whatever you need to do to answer my
20: question.  But is it true -- my question is
21: simply this:  Is it true that as of
22: April 1st, 2008, Mr. Chalecki was reporting
23: to Dr. Nessel the results of more than 20,000
24: warfarin samples taken so far in the trial

01: 00091:       Q.    Okay.  And let's look at this
02: exhibit, which is Derix-8, and this is an
03: e-mail from Mr. Chalecki to Christopher
04: Nessel; is that correct?
05: A.    That's correct.
06: Q.    And you see where -- and this
07: is in April of 2008; is that correct?
08: A.    Yes, April 2008.
09: Q.    In April 2008, the ROCKET trial
10: was ongoing; is that correct?
11: A.    I would have -- yeah, I think
12: so, yeah.
13: Q.    Okay.  It started in late -- in
14: 2007?
15: A.    I would have to look it up
16: exactly.  I don't know it in my heart.
17: Q.    Okay.  Let's look at what
18: Mr. Chalecki told Dr. Nessel, and then
19: ultimately, I want to ask whether or not
20: Dr. Nessel told -- relayed this information
21: to you.
22: Mr. Chalecki wrote, "I took a
23: quick look at all the warfarin data collected
24: and the current compliance, not adjusted for

01: 00093:    and reporting the ranges, the low range, in
02: range and above range?
03: A.    That's what I'm just trying to
04: find -- understand from the sentence --
05: MR. HOFFMAN:  Objection to
06: the --
07: A.    -- from this sentence and data
08: is correct, the timing you mentioned and the
09: topic and the people and the number of
10: samples, but I -- as I said, I would have to
11: make -- try to make sense from the figures
12: that are listed here.
13: BY MR. McWILLIAMS:
14: Q.    Okay.  Let's -- I think this is
15: an important topic, so let's take the time to
16: do that.
17: MR. HOFFMAN:  And, Doctor,
18: could you just wait one second before
19: starting to answer Mr. McWilliams'
20: questions so I have time to interpose
21: an objection?
22: THE WITNESS:  Uh-huh.
23: MR. HOFFMAN:  Thank you.
24: ///

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00094:   BY MR. McWILLIAMS:
02: Q.    Just to make sure we're clear,
03: the question is:  Is it true that as of
04: April 1st, 2008, Dr. Nessel was in possession
05: of aggregate INR time in therapeutic range?
06: (Document review.)
07: A.    I have read the document now.
08: It is talking about a sample set that says
09: about all the warfarin data collected at the
10: beginning, and it talks about 20,876 warfarin
11: samples postrandomization.
12: BY MR. McWILLIAMS:
13: Q.    And it --
14: A.    And it's not adjusted for time
15: between sampling and not allowing any time
16: for dose stabilization, so -- and then it
17: gives percentages, yeah, for certain ranges
18: that were observed.
19: I assume -- but I don't know,
20: this is really not specific -- could be INR
21: ranges here, but -- so from the context,
22: could be assumed --
23: Q.    Well, it says INR --
24: A.    Really, this is a clinical

p. 00094

01: 00095:   expertise question.
02: Q.    But you know the INR range is
03: between 2 and 3?
04: A.    Uh-huh.
05: Q.    And that's what's right there
06: on the page, right?
07: A.    Uh-huh.
08: Q.    45.2%?  Yes?
09: A.    It says 2.0 to 3.0 is 45.2%,
10: yes.
11: Q.    And, Doctor, the subject line
12: of the e-mail is "ROCKET AF and target INR,"
13: right?
14: A.    The subject line is correct,
15: yes.
16: Q.    Okay.  All right.  But just to
17: be clear, I'm not accusing you of anything,
18: but did Dr. Nessel ever tell you about this
19: data he was in possession of back in April of
20: 2008?
21: MR. HOFFMAN:  Objection to the
22: form of the question.
23: A.    I'm not aware.  I do not recall
24: that specifically I would have seen this

p. 00095

01: 00096:   data.  This is a long time ago.  But I don't
02: really recall that we talked about it.
03: BY MR. McWILLIAMS:
04: Q.    All right.  Did any of your
05: colleagues at Janssen have an opportunity to
06: review this EMA assessment report to make
07: sure truthful and accurate and complete
08: information was being provided to EMA with
09: respect to whether or not the unblinded
10: monitor had evaluated aggregate INR data and
11: communicated it to the sponsor?
12: MR. HOFFMAN:  Objection to the
13: form of the question.
14: A.    I said before that when we
15: wrote the submission, we had a review
16: including our colleagues from Janssen that's
17: what we typically are doing for the
18: submissions, that one team is preparing them,
19: but the other team has also an opportunity to
20: review and provide comments.
21: BY MR. McWILLIAMS:
22: Q.    All right.  Let's keep reading.
23: Let's go to page 12, please, of the EMA
24: assessment report, and this is where a

p. 00096

01: 00097:   discussion on the sensitivity analyses that
02: were performed, and you testified to that
03: earlier today.  You seemed to be generally
04: familiar with that; is that fair?
05: A.    I'm generally familiar about,
06: yeah, what was done, but I was -- I'm not in
07: the expert team that really discussed the
08: details.
09: Q.    I understand.  I'm not an
10: expert either, but we both read the document,
11: and I just want to see if we have a similar
12: understanding.
13: But you understand the original
14: sensitivity analyses was based upon the
15: conditions listed in the recall notice, and
16: you essentially looked to see -- you
17: identified those patients in ROCKET with
18: those conditions and looked to see if those
19: patients had a different rate of strokes and
20: bleeds compared to patients without those
21: conditions, in a nutshell, right?
22: A.    That's a long-winded question
23: you're asking, so I would not off --
24: Q.    Would you like me to repeat it?

p. 00097

01: 00098:      A.   So, yeah, so maybe we put it in
02: parts that is easier for me to follow, so...
03: Q.   The original sensitivity
04: analysis was informed based upon the
05: conditions, the physiological conditions,
06: identified in the recall notice, correct?
07: A.   That's correct, yes.
08: Q.   Okay.  And then you essentially
09: looked for patients with those conditions in
10: the ROCKET clinical trial, correct?
11: A.   Yes, there was a clinical and
12: statistical team that translated the
13: information from the recall notice into,
14: yeah, information that could be used to
15: detect potentially patients with those
16: conditions in the ROCKET AF dataset.
17: Q.   Okay.  And essentially what you
18: did was you looked to see if those patients
19: had a different rate of strokes or bleeds
20: than patients without those conditions as a
21: way to determine whether or not this
22: defective device may have malfunctioned in
23: ROCKET, fair?
24: MR. HOFFMAN: Objection to the

01: 00099:      form of the question.
02: A.   I mean, there were a couple
03: of -- there were three different sensitivity
04: analyses run, and that's what you do
05: typically with sensitivity analyses.  If you
06: have a question about a subset of the data or
07: a subset of the population, you compare them
08: with the entire dataset, and to compare with
09: the, yeah --
10: BY MR. McWILLIAMS:
11: Q.   Right.
12: A.   -- remaining dataset.
13: Q.   Let's go to page 18 and the
14: conclusion of the sensitivity analysis.
15: A.   Page 18?
16: Q.   Yes, ma'am.  You see where it's
17: written -- it says, "In summary, the MAH" --
18: and again, that's Bayer and Janssen, right?
19: A.   In this case --
20: Q.   It's Bayer, right?
21: A.   -- in the European legislation,
22: it's Bayer.
23: Q.   Thank you.
24: So, "In summary, Bayer

01: 00100:    concluded that the three sensitivity analyses
02: support the original efficacy and safety
03: analyses of ROCKET AF trial and confirm the
04: positive benefit-risk profile which
05: rivaroxaban provides."
06: Did I read that correctly?
07: MR. HOFFMAN: I'm going to
08: object.  I think you misspoke.
09: MR. McWILLIAMS:  I did?
10: MR. HOFFMAN: Yeah.  I think
11: you said, "In summary, Bayer
12: concluded" --
13: MR. McWILLIAMS: Yeah, that's
14: because we had just established that
15: Bayer was the MAH.
16: MR. HOFFMAN:  I apologize to
17: you.  I'm sorry.
18: MR. McWILLIAMS:  That's okay.
19: MR. HOFFMAN:  You're right.
20: MR. McWILLIAMS:  That's all
21: right.  I'll try that again.
22: BY MR. McWILLIAMS:
23: Q.   So I just want to make sure,
24: just for the benefit of the jury, who may not

01: 00101:    know what MAH stands for.  So "In summary,
02: Bayer concluded that the three sensitivity
03: analyses support the original efficacy and
04: safety analyses of the ROCKET AF trial and
05: confirm the positive benefit-risk profile
06: which rivaroxaban provides."
07: Did I read that correctly with
08: the caveat of --
09: A.   Yes.
10: Q.   Okay.  And then the last
11: sentence on that paragraph, it says, "The
12: effect of potentially discrepant INR readings
13: does not alter the conclusions of ROCKET AF
14: trial."
15: Did I read that correctly?
16: A.   Yeah, you read that correctly.
17: Q.   And I'm going to have you jump
18: to page 37, so now there's a lot more
19: analysis, but at the end of the day, I kind
20: of want to get the final company position.
21: So, actually, go to page 36,
22: Section 2.3, at the title it says "MAH
23: conclusions on the scientific analyses
24: provided."

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00102:          Do you see where I am?
02: A.    Yes.
03: Q.    And then if you will please
04: just continue to page 37, the very last
05: paragraph under the -- the section titled
06: "Conclusions." It says, "The MAH would" --
07: and, again, that's Bayer, right?
08: A.    In this case it's Bayer.
09: Q.    All right. So Bayer "would
10: like to reiterate that the initial response
11: dated 15 October 2015 with the three
12: sensitivity analyses constitutes the most
13: sound assessment of the effect of the Alere
14: correction notice on the ROCKET AF trial and
15: provides the evidence that the results and
16: conclusions from the ROCKET AF trial remain
17: valid."
18: Did I read that correctly?
19: A.    Yes.
20: Q.    And is that still Bayer's
21: position, that the original sensitivity
22: analyses is the best analyses to answer this
23: question as to whether or not this device
24: malfunctioned in ROCKET?

01: 00104:    ROCKET AF data and its results.
02: BY MR. McWILLIAMS:
03: Q.    And the recall notice notified
04: Bayer that the device provided erroneously
05: low INR values, correct?
06: A.    It informed about a certain
07: patient population, that there was -- and
08: that that patient population should not use
09: the device any longer because of the
10: potential for erroneous INR.  And so these
11: sensitivity analyses strictly follow that
12: information in the Alere INR recall notice.
13: Q.    Well, let me ask you this way:
14: Do you think that the sensitivity analyses
15: performed -- the original sensitivity
16: analyses performed by Bayer and your
17: colleagues at Janssen provide the best
18: insight into whether or not this device
19: malfunctioned, and if so, to create clinical
20: consequences?
21: MR. HOFFMAN:  Objection to the
22: form of the question.
23: A.    That's not what it really here
24: says.

01: 00103:          A.    That's different as it is
02: worded here. So it says "constitutes the
03: most sound assessment of the effect of the
04: Alere correction notice" and as this -- the
05: sensitivity analyses are really directly
06: following the information from the Alere
07: correction notice.  Yeah, that's what it
08: says.  It does --
09: Q.    All right. Okay. And I
10: appreciate that correction, but would you
11: agree with me, Doctor, that really, the
12: spirit of this exercise was to investigate
13: and try to answer the question of whether or
14: not this device malfunctioned and had
15: clinical consequences as a result of that
16: malfunction.
17: That's what you were trying to
18: answer, correct?
19: MR. HOFFMAN:  Objection to the
20: form of the question.
21: A.    The spirit of the exercise was
22: really to investigate whether the information
23: that we got from the Alere INR recall notice
24: could have any potential impact on the

01: 00105:    BY MR. McWILLIAMS:
02: Q.    I know that.  That's why I'm
03: asking you the question I'm asking.
04: MR. HOFFMAN:  Hold on.  Just
05: try not to speak over each other.  Go
06: ahead with your answer.
07: THE WITNESS:  Okay.
08: BY MR. McWILLIAMS:
09: Q.    So I want you to put this
10: document aside for a second and just answer
11: this question.
12: The original sensitivity
13: analyses, you know what I'm talking about,
14: right?
15: A.    Yes, uh-huh.
16: Q.    Do you believe that that work
17: is the best work to answer the question
18: whether or not the device malfunctioned in
19: the trial and results in additional bleeds in
20: warfarin patients?
21: A.    It's difficult for me to judge
22: what is really the best.  I mean, we did
23: several things, and all the pieces altogether
24: taken, yeah, led to the final conclusion.

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00106:          And it's difficult really for
02: me to judge on which piece is the best piece,
03: so they all work together. And certainly,
04: this was a step-wise process, and so every
05: step we did, we came after we did it to the
06: conclusion that the benefit-risk of the
07: ROCKET AF trial was not altered by the
08: information we had obtained.
09: And so the first step was the
10: sensitivity analysis, and then there were
11: continuous other analyses as described also
12: in the document. And everything together has
13: to be taken into account. And I cannot judge
14: what is the best piece of evidence. I think
15: it's important that we look at everything
16: altogether.
17: Q.     In your opinion, is the
18: sensitivity analysis scientifically robust?
19: A.     That's depending on how you
20: define scientific robustness. Typically in
21: clinical science, information from
22: prospective randomized double-blind big
23: pivotal studies is seen as robust, and so
24: it's important to look at this kind of

p. 00106

01: 00108:    double-blind, multi-center is the best and it
02: goes down from there.
03: A.    Yes.
04: Q.    Fair?
05: A.    That's -- I mean, that's
06: typically the characteristics is
07: prospectively defined double-blind
08: randomized.
09: Q.    All right. And also, there's a
10: certain methodology that should be employed,
11: the scientific method that's been around for
12: centuries, right? Galileo articulated the
13: scientific method; hypothesis, generate data
14: to test the hypothesis, and then at the end
15: you form conclusions, right?
16: A.    That's typically how you do it
17: when you set up a new experiment or study. I
18: mean, we don't call -- but certainly, you
19: provide an objective and a hypothesis, and
20: then you start it. That's, yeah, what you
21: typically do.
22: Q.    You never start with a
23: conclusion. That would be invalid?
24: MR. HOFFMAN: Objection to the

p. 00108

01: 00107:    dataset.
02: And here in this case we really
03: did do the analysis retrospectively, but as
04: far as I can assess with my background what
05: the clinical and statistical colleagues did
06: is really that they -- they did it to the
07: best of their knowledge and tried to, for
08: example, predefine -- they predefined
09: analyses before they ran them, although
10: certainly, the ROCKET AF database was
11: unblinded already, so you could debate that,
12: whether anything -- you're doing an unblinded
13: database is robust, therefore, it's a
14: relative and not an absolute term.
15: But in that situation, given
16: that the data were already unblinded, we were
17: asked a question later on, did things
18: retrospectively, and taking that into
19: context, I think that the analysis as far as
20: I can judge, are robust.
21: Q.    Okay. Are robust.
22: You talked about -- and I
23: understand there's different levels of
24: scientific evidence of prospective,

p. 00107

01: 00109:          form of the question.
02: BY MR. McWILLIAMS:
03: Q.    Fair?
04: MR. HOFFMAN: But you can
05: answer.
06: A.    I mean that's -- starting with
07: a conclusion is certainly not a typical way
08: of running a --
09: BY MR. McWILLIAMS:
10: Q.    I agree. Isn't it true that
11: that's how you guys started the sensitivity
12: analysis, was with a conclusion?
13: A.    That's not true.
14: Q.    Okay.
15: A.    Because we certainly had a
16: framework for -- of information from the
17: Alere INR recall notice, and we had our
18: information from the entire ROCKET AF
19: dataset, but what was done was a statistical
20: analysis planned for this resensitivity
21: analysis, and then they were run afterwards.
22: So that was the most robust thing the team
23: could do in that situation.
24: Q.    Okay. Well, again, my question

p. 00109

01: 00110:     was whether or not you started with a
02: conclusion. And did I hear you correctly
03: that you did not do that and that would be
04: inappropriate to do so?
05: MR. HOFFMAN: Objection, asked
06: and answered.
07: A.    You did not phrase exactly what
08: you meant by it, and so certainly, we had --
09: we had the data of the ROCKET AF data in
10: hand, published, analyzed, and they had a
11: conclusion. But the question here was a
12: different one, and it started going back to a
13: statistical analysis plan and a task to be
14: investigated.
15: BY MR. McWILLIAMS:
16: Q.    And I'm --
17: A.    And that led to a new
18: conclusion, if you want.
19: Q.    Well, I appreciate that, and
20: that's what I'm talking about. The
21: sensitivity analyses, it would be
22: inappropriate to begin the sensitivity
23: analyses with a predetermined conclusion.
24: Would you agree with that?

01: 00111:           MR. HOFFMAN: Objection, asked
02: and answered.)
03: A.    I think that is -- I mean, that
04: would be certainly not what you're typically
05: doing, that you start like that. But as I
06: said, the data of the ROCKET AF trial were
07: already available, and that could not be
08: changed.
09: BY MR. McWILLIAMS:
10: Q.    But that was for a different
11: analyses. I'm talking about the sensitivity
12: analyses, and you've got to answer this
13: question.
14: Would you agree with me, ma'am,
15: that it would be inappropriate to start with
16: a conclusion prior to actually seeing the
17: results of the sensitivity analyses?
18: MR. HOFFMAN: Objection, asked
19: and answered.
20: A.    I still don't understand why
21: you want to get at, because the question at
22: hand was whether the information that was
23: obtained from the Alere INR recall could have
24: any -- had any impact on the robustness of

01: 00112:   the ROCKET AF dataset, and so that is not a
02: conclusion. That's a question.
03: BY MR. McWILLIAMS:
04: Q.    Well, you have to run the data
05: before you can answer that question, correct?
06: A.    Right.
07: Q.    All right. And so it would be
08: inappropriate to answer the question prior to
09: running the data.
10: MR. HOFFMAN: Objection to the
11: form of the question.
12: BY MR. McWILLIAMS:
13: Q.    Fair?
14: A.    I wouldn't call it
15: inappropriate. It's just not possible
16: because you have to run the analysis before
17: you can do it.
18: MR. McWILLIAMS: Okay. Well,
19: let me hand you what's being marked as
20: Derix-9, which is Record No. 3394816.
21: (Whereupon, Deposition Exhibit
22: Derix-9, E-mail(s) re: 1st Draft EMA
23: Response to Request 2,
24: XARELTO_JANSSEN_16381911,

01: 00113:         Ref. 3394816, was marked for
02: identification.)
03: MR. McWILLIAMS: And its
04: attachment, which is Derix-10, which
05: is Record No. 3394817.
06: (Whereupon, Deposition Exhibit
07: Derix-10, Response to EMA Request,
08: XARELTO_JANSSEN_16381912 -
09: XARELTO_JANSSEN_16381920,
10: Ref. 3394817, was marked for
11: identification.)
12: BY MR. McWILLIAMS:
13: Q.    And so 9 -- and, again, this is
14: an e-mail you received from Dr. Berkowitz,
15: dated --
16: A.    Yes, it's from Scott Berkowitz.
17: Q.    Dated October 7th, 2015; is
18: that correct?
19: A.    Yes, that's correct.
20: Q.    So this is literally just a few
21: weeks after learning about the potential
22: impact -- strike that.
23: This was literally just a few
24: weeks after learning about the recall

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00114:   applying to the device used in ROCKET,
02: correct?
03: A.    Yes, it's in the next month, so
04: we talked about September 9th.  This is
05: October 7th.
06: Q.    And you had not completed the
07: sensitivity analyses at this point, correct?
08: A.    May I read this first so I can
09: put it in context so I -- it's difficult to
10: remember all the different dates in the
11: course.  But it's clear -- yeah, here in the
12: text Scott says "No results yet," so --
13: Q.    No results yet.  So now let's
14: look at the attachment, which is marked as
15: Derix-10, which is a draft, you know, report,
16: reporting the sensitivity analyses.  And
17: let's go to the very end and see if there's
18: any conclusions.
19: If you go to page 8, the final
20: bolded answers, down at the bottom, Evan, you
21: can see page 8.  Are you there, ma'am?  I
22: think you're on the wrong page, I apologize.
23: I think you want to go back one.
24: MR. HOFFMAN:  She's on page 9.

p. 00114

01: 00115:   BY MR. McWILLIAMS:
02: Q.    I apologize.  At the very
03: bottom it says --
04: A.    Page 8 -- it's a different
05: numbering at the bottom.
06: MR. HOFFMAN:  No, no.  You've
07: got it now.
08: BY MR. McWILLIAMS:
09: Q.    So "The MAH's view on the
10: impact of the results reported in the ROCKET
11: trials - initial thoughts ahead of
12: availability of sensitivity analyses."
13: And it's already written here
14: that the "Benefit-Risk, efficacy and safety
15: of Xarelto is not altered, results pending.
16: Issue related to the POC device/test strip
17: leading to potentially discrepant INRs."
18: Let's go to the next page.
19: "Efficacy of rivaroxaban in relation to
20: warfarin not anticipated to be affected, and
21: was not observed to be changed."  Again,
22: results pending.
23: Conclusions made without any
24: results.

p. 00115

01: 00116:           Keeps going.  "Safety
02: comparison of rivaroxaban to warfarin not
03: found to be altered."  Again, making it very
04: clear, results pending.
05: Finally, "Whatever effect
06: device fault may have had on INR readings and
07: possible dose adjustments based on them did
08: not appear to affect the results of ROCKET,
09: results pending."
10: Did I read all that correctly?
11: MR. HOFFMAN:  Objection to the
12: form of the question.
13: A.    You read the text as far as
14: I -- yeah, as I have it in front of me.
15: BY MR. McWILLIAMS:
16: Q.    All right.  And that's because,
17: ma'am, you knew -- and this was an e-mail
18: sent to you by who, Dr. Berkowitz; is that
19: correct?
20: A.    It's an e-mail by Scott
21: Berkowitz, yes.
22: Q.    Okay.  And you were comfortable
23: or Dr. Berkowitz or whoever put that in the
24: conclusions in there, was comfortable putting

p. 00116

01: 00117:   the conclusions to the sensitivity analysis
02: prior to actually seeing the data because you
03: all knew that sensitivity analyses can easily
04: be turned to say what one does or does not
05: want to hear.
06: MR. HOFFMAN:  Objection to the
07: form of the question.
08: BY MR. McWILLIAMS:
09: Q.    Right?
10: A.    I have to explain this type of
11: document here.  This is a typical document,
12: what we prepare in regulatory affairs teams
13: ahead of submissions in order to save time
14: until -- between availability of the
15: information and the actual submission.
16: And we call those documents
17: shell documents, and in those documents, we
18: outline what we already know, so the summary
19: of the analysis and those kind of things.
20: And after availability of the
21: analysis, the data are implemented in the
22: document and the document is finalized.  And
23: that was the type of document you're showing
24: here to me and which I have received as well.

p. 00117

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00118:       Q.    But, Dr. Derix, the same
02: Dr. Berkowitz that sent you this draft
03: sensitivity analysis with the conclusions
04: inserted prior to any data being generated
05: had previously told you that this type of
06: analysis was essentially a fishing expedition
07: that holds no weight and can easily be turned
08: to say what one does or does not want -- let
09: me say that again.
10: Dr. Derix, the same
11: Dr. Berkowitz that sent you this draft
12: sensitivity analysis with the conclusions
13: inserted prior to the data actually being
14: generated, is the same Dr. Berkowitz that had
15: previously told you that these type of
16: analyses are fishing expeditions and that
17: hold no weight, and that they can easily be
18: turned to say what one does or does not want
19: to hear, correct?
20: MR. HOFFMAN:  Objection to the
21: form of the question.
22: BY MR. McWILLIAMS:
23: Q.    Do you remember him telling you
24: that?

p. 00118

01: 00120:    draft document and it's a shell document
02: before data are being imputed, and so as
03: such, you have to look at it.
04: And it doesn't mean that
05: conclusions were firmly formulated because it
06: says results pending, and that is the
07: disclaimer for this can be changed once the
08: data are available.  But it's certainly also
09: showing a general confidence of the author
10: into our dataset as in general.
11: BY MR. McWILLIAMS:
12: Q.    All right.  I appreciate that,
13: Dr. Derix.  Let's get back to whether or not
14: Dr. Berkowitz had previously told you that
15: this type of analysis was just a fishing
16: expedition that held no weight, and that
17: essentially, your company was capable of
18: generating results that they wanted.
19: MR. HOFFMAN:  Objection --
20: BY MR. McWILLIAMS:
21: Q.    Do you have any memory of him
22: communicating that to you?
23: MR. HOFFMAN:  Objection to the
24: form of the question.

p. 00120

01: 00119:              MR. HOFFMAN:  Objection to the
02: form of the question.
03: A.    I cannot specifically recall
04: what you're citing from.
05: BY MR. McWILLIAMS:
06: Q.    Okay.  Then I won't --
07: A.    But certainly I'm working only
08: with one Scott Berkowitz, so if you could
09: just point me --
10: Q.    I'll try to refresh your
11: memory.
12: A.    And one point also in addition
13: to this document.  It clearly says "results
14: pending," so it clearly has this disclaimer;
15: and --
16: Q.    Right.  But right before the
17: "results pending" are -- just so happen to be
18: the exact same conclusions that we see in the
19: final EMA assessment report, right?  You guys
20: just -- you're that good, you just happened
21: to guess the right conclusion exactly right?
22: MR. HOFFMAN:  Objection to the
23: form of the question.
24: A.    Certainly, I said this is a

01: 00121:       A.    I don't recall in context of
02: this document or this analysis.  Also there
03: may be some different context, but you would
04: have to refresh my memory.
05: (Whereupon Deposition Exhibit
06: Derix-11, ROCKET AF Task Force Chat
07: Transcript, XARELTO_BHCP_07993872 -
08: XARELTO_BHCP_07993873, Ref. 3396352,
09: was marked for identification.)
10: BY MR. McWILLIAMS:
11: Q.    Okay.  I'll refresh your
12: memory.  Let me hand you what's been marked
13: as Derix-11, which is Record 3396352.
14: A.    Okay.
15: Q.    And you see, this is a document
16: titled "ROCKET AF Task Force," dated
17: September 22nd, 2015; is that correct?
18: A.    Yes, sorry.
19: Q.    Have you seen this document in
20: the last two weeks?
21: A.    Yes, I've got it from William
22: Hoffman, yes.
23: Q.    You got -- your lawyer showed
24: this to you recently?

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00122:      A.   Yes.
02: Q.    Okay.  So did you remember this
03: document when I asked you two minutes ago
04: whether or not Dr. Berkowitz told you this
05: was a fishing expedition that held no weight
06: and that you could turn the results to say
07: whatever you want?
08: A.    You made a citation, and I mean
09: I didn't hold the document, and so...
10: Q.    All right.  But your lawyer
11: showed you this document, right?
12: A.   Yes.
13: Q.    They knew this was going to
14: come up in your deposition.
15: A.    They showed it to me because
16: I --
17: MR. HOFFMAN:  Don't reveal any
18: of the discussions between counsel.
19: You've answered the question already.
20: That's fine.
21: MR. McWILLIAMS:  All right.
22: BY MR. McWILLIAMS:
23: Q.    Well, let's look at -- and this
24: is a chat, right, back and forth between you

p. 00122

01: 00123:   and Dr. Berkowitz?
02: A.    Yeah, this is a recorded chat.
03: Q.    This is a communication back
04: and forth between the two of you, correct?
05: A.    That's correct, yes.
06: Q.    All right.  And the AF task
07: force, this was the group of people that set
08: up to evaluate and investigate this Alere
09: INRatio issue, correct?
10: A.    ROCKET AF task force, yeah, was
11: the -- the team was Janssen and Bayer.
12: Q.    That's what this whole -- okay.
13: And let's look at what
14: Dr. Berkowitz said to you on September 22nd,
15: 2015, at 7:36 a.m.  He says, "Yes, I
16: understand that.  I always have difficulty
17: with these types -- with these kinds of
18: retrospective analyses, basically 'fishing
19: expeditions.'  They hold almost no weight for
20: me and can easily be turned to say what one
21: does or does not want to hear."
22: Did I read that correctly?
23: A.    I have to look where you are.
24: Okay, now I have it.  Uh-huh.

p. 00123

01: 00124:      Q.    Does that refresh your memory
02: as to what Dr. Berkowitz told you about the
03: sensitivity analyses?
04: A.    That's a totally different
05: point in time, so this is really earlier.
06: This is the 22nd of September when it was at
07: a point in time when we really, yeah, were
08: starting to explore what we could do in order
09: to provide sufficient information and rule
10: out potential impact and investigate a
11: potential impact of the recall notice.
12: And I don't recall the specific
13: meeting, but it was really starting kind of
14: as brainstorming in the team, what could be
15: done to -- in the situation, with having not
16: so much information from Alere other than the
17: recall notice, having, yeah, closed our
18: database already for some years, and had to
19: go back, and that is in the context.
20: It was not in the context of
21: when we later on were already a step further
22: ahead, where we had made up our mind and had
23: some discussions.  And what Scott is writing
24: here is his general impression and attitude

p. 00124

01: 00125:   towards, yeah, retrospective analysis.  So he
02: says that, in general, yeah, the
03: retrospective analyses are weaker than
04: prospective randomized, what we talked about
05: beforehand, and that in the context he used
06: is what -- of a fishing expedition, because
07: if it is not done thoroughly, such
08: retrospective analysis, it's just -- could be
09: considered as weaker.
10: But later on, that's what you
11: see here in this communication as well, I
12: convinced him that we have only this
13: opportunity to work with the data that we
14: have to respond to the question, and that we
15: have to -- and that's the only way to analyze
16: if we would deny a retrospective analysis
17: just from the beginning, just because we feel
18: they are weaker than prospective analysis,
19: then we would -- could not, yeah, respond to
20: the questions that are -- that were
21: addressed.
22: And so it was important for us
23: to find a way to set up analysis that are as
24: vigorous as possible in this situation, and

p. 00125

Page 33

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00126:   work through them.
02: And it does not mean that
03: really it was a preempting of conclusions
04: here.  He's raising his general concern about
05: retrospective analysis.
06: Q.   Are you done?
07: THE WITNESS:  Yes.
08: MR. McWILLIAMS:  Okay.  I move
09: to strike as nonresponsive.
10: BY MR. McWILLIAMS:
11: Q.    Doctor, my question was simply
12: whether or not this refreshes your memory as
13: to whether or not Dr. Berkowitz used those
14: words and communicating them to you in
15: September of 2015.
16: MR. HOFFMAN:  Objection.
17: BY MR. McWILLIAMS:
18: Q.    Yes?  Did he?
19: A.    He used those words --
20: Q.    That's all I'm asking.
21: A.    -- in this communication,
22: that's --
23: Q.    That's all I'm asking.
24: A.    That's correct.

p. 00126

01: 00128:   really of general nature, and they were not
02: related directly to the analyses that were
03: performed later on.
04: And I'm sure that EMA
05: understands the nature of retrospective
06: analysis, and that we had also set up the
07: analysis plan before we ran the analysis that
08: was the most strict approach we could take at
09: the -- in that situation.
10: MR. McWILLIAMS:  I move to
11: strike as nonresponsive.
12: BY MR. McWILLIAMS:
13: Q.    Doctor, my question was simply
14: whether or not we can find any of those
15: sentiments in this document, that
16: it's Dr. Berkowitz's opinion that these type
17: of analyses are fishing expeditions that hold
18: almost no weight and can be generated to
19: generate whatever data one does or does not
20: want to see.  Is that information in any way,
21: shape or form contained in this EMA
22: assessment report?
23: MR. HOFFMAN:  Objection, asked
24: and answered.

p. 00128

01: 00127:        Q.   I appreciate it.  And we'll ask
02: Dr. Berkowitz what he meant, but you seem to
03: have suddenly remembered a whole lot about
04: this conversation.  I'm impressed.
05: MR. HOFFMAN:  Object to the
06: colloquy from counsel.
07: MR. McWILLIAMS:  I'm genuinely
08: I'm impressed.
09: MR. HOFFMAN:  I'm genuinely
10: impressed too, but that doesn't mean
11: anything in a court of law.
12: BY MR. McWILLIAMS:
13: Q.    Well, did you ever communicate
14: to EMA that the sensitivity analyses was a
15: fishing expedition that holds almost no
16: weight?  Can I find that anywhere in the EMA
17: report, those words?
18: A.    Those words are in a
19: conversation, and they are, how do you say
20: this --
21: (Interpretation.)
22: THE INTERPRETER:  Everyday
23: language, in nontechnical language.
24: A.    And they were, as I said,

p. 00127

01: 00129:        A.   I do not agree to your
02: statements and to also -- what you can find
03: is in the assessment report, and I don't know
04: exactly does -- about how to -- that EMA also
05: acknowledges that some of the analysis that
06: they asked for and that were run had
07: limitations.
08: And so they fully understand,
09: and that's also the way how it was presented
10: and to discuss with EMA, that, yeah, those
11: are retrospective analyses, and they have to
12: be looked at knowing this and understanding
13: what the limitations are, but also what the
14: benefits are in gathering information.
15: MR. McWILLIAMS:  I move to
16: strike as nonresponsive.
17: BY MR. McWILLIAMS:
18: Q.    Let's continue looking through
19: Derix-4, which is the EMA assessment report.
20: If you go to the bottom of page 19, there's a
21: further discussion of the sensitivity
22: analyses.
23: At page 19, the very bottom,
24: Evan, it says, "The CHMP considered that

p. 00129

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00130:   there are uncertainties related to these
02: analyses, and it is assumed that the
03: available information is probably somewhat
04: limited, for example, fibrinogen levels have
05: not been measured regularly and is rarely
06: measured in clinical routine.  The analyses
07: were based on the assumption that INR values
08: are only affected in case of recall-related
09: conditions."
10: Did I read that correctly?
11: A.    You read that correctly.
12: Q.    And is that consistent with
13: your understanding of the sensitivity
14: analyses, that they were based upon an
15: assumption that the INR values are only
16: affected in case of recall-related
17: conditions?
18: A.    That's correct, because that's
19: what the assumption was, that that was the
20: reason why FDA considered this warning or the
21: limitation of the patient population that
22: introduced the ratio, the INR ratio, revised,
23: because in those patients, the deviations had
24: occurred, so that was how we interpreted the

01: 00131:   recall.
02: Q.    But we know now that the INR
03: values were not affected only in patients
04: with recall-related conditions, correct?
05: A.    It depends on how you define
06: "affected" and so that -- the only thing that
07: we know is that we did not see in some of the
08: analyses a difference in comparing the
09: patient populations that are affected by the
10: recall and patient populations that are not
11: affected by the recall.
12: Q.    But what, if anything, did you
13: do to test that assumption?
14: A.    Which assumption do you mean?
15: Q.    That the -- the assumption that
16: INR values are only affected in case of
17: recall-related conditions.
18: A.    That came from the information
19: we had from the recall notice.  I mean, that
20: was just what we took as fact and worked with
21: that as a fact.
22: Q.    But you understand you had
23: paired samples, you had 10,000 paired samples
24: when you could look to see if there was a

01: 00132:   discrepancy between what the INR value was
02: generated by the point-of-care device as
03: compared to a central lab value, correct?
04: A.    We talked about this earlier,
05: yeah, these samples from week 12 and week 24
06: from the central lab.
07: Q.    And you did find that there
08: were differences, there were discrepancies?
09: A.    That's typically the -- if you
10: compare two analytical methods, there is a
11: variation around the mean, and so here again,
12: we're going into very much detail of lab and
13: analytical knowledge.  I would like to refer
14: you to colleagues who know this much better.
15: But that's, in very general terms, what --
16: Q.    I'm sure we will talk to your
17: colleagues about that.  But you would agree
18: that -- let's just see, but you are aware
19: that they compared the point-of-care values
20: with the central lab values, right?
21: A.    Yes, that's part of the
22: document here was displayed and some of the
23: analogies and plots that were made.
24: Q.    Let's go to page 21, please,

01: 00133:   and let's see what the EMA says about that
02: comparison when you compare central lab with
03: point of care.
04: Paragraph number 4, Mr. Wolfe.
05: Are you on page 21, Doctor?
06: Let's read what they say.  They say, "The
07: preliminary data" --
08: MR. HOFFMAN:  Hold on a second.
09: I don't think she's on the page.
10: MR. McWILLIAMS:  Page 21.
11: A.    You said 21 or 20?
12: BY MR. McWILLIAMS:
13: Q.    21.
14: A.    Okay, uh-huh.
15: Q.    Numbered paragraph 4, it says,
16: "The preliminary data provided on INR values
17: estimated simultaneously on weeks 12 and 24
18: with the two methods (POC device vs. the lab)
19: indicate that discrepancies of potential
20: clinical relevance were rather frequently
21: observed (approximately in 35% of the
22: estimations)."
23: Did I read that correctly?
24: A.    Yes, that is correct.

01: 00134:     Q.    And that's just simple math,
02: that there is the values, the INR values that
03: were generated by the point-of-care device,
04: the device that was used to manage the
05: warfarin patients, was generating different
06: values than the lab when they analyzed blood
07: from the exact same patient, collected the
08: exact same day, right?
09: A.    I have to -- I don't know
10: whether it was exact same day, so --
11: Q.    It was.  It was.
12: A.    -- again it was very much in
13: detail --
14: MR. HOFFMAN:  Let her finish
15: her answer, please.
16: A.    And also, we discussed earlier
17: about the differences and this kind of
18: technicality around plasma sample collection
19: and the measurement.
20: But that's correct, it's the
21: same patient data.
22: BY MR. McWILLIAMS:
23: Q.    Will you accept my
24: representation that they were from the same

01: 00135:   day?
02: MR. HOFFMAN:  Objection to the
03: form of the question.
04: A.    I don't -- I don't know that,
05: and I would have to --
06: BY MR. McWILLIAMS:
07: Q.    Do you have any reason to
08: disagree with me?
09: A.    I can nor disagree nor agree
10: because I just simply said I don't know.
11: Q.    Okay.  Let's go to page 25,
12: please.  Up at the top, the second full
13: paragraph, Evan, that begins with "A simple
14: graphical presentation."
15: In that last sentence, it says,
16: "Furthermore the attachment provided a
17: discussion of the discrepancies between the
18: two methods where the definition for a
19: discrepancy was adapted from the 2007 ISO
20: guidance document."
21: Did I read that correctly?
22: A.    Yes, you read that correctly.
23: Q.    And you were responsible for
24: collecting that guidance information,

01: 00136:   correct?
02: A.    I was part of the team that
03: collected, yeah, the respective ISO guidance
04: information from other experts in the company
05: who have knowledge about medical devices and
06: standards, yes.  I made that contact.
07: Q.    And why were you selected to --
08: with that particular responsibility?
09: A.    When the team was formed, there
10: were -- yeah, we formed several sub-tasks for
11: this -- yeah, ROCKET AF investigation.  And
12: so we wanted to have one Bayer colleague in
13: each of the teams, and so most of the teams
14: had already representatives, but this one
15: not.
16: And therefore I deliberately
17: self-assigned myself into that team as a
18: Bayer representative, and also because I know
19: quite a number of colleagues in the company,
20: and proposed to reach out to them.
21: Q.    And your counterpart at Janssen
22: was Sig Johnson; is that correct?
23: A.    That's correct, yes.
24: MR. McWILLIAMS:  Okay.  Let me

01: 00137:     hand you what we're marking as
02: Derix-12, Record 3407882.
03: (Whereupon, Deposition Exhibit
04: Derix-12, Xarelto Teams Overview Org
05: Chart, XARELTO_BHCP_08065503 -
06: XARELTO_BHCP_08065505, Ref. 3407882,
07: was marked for identification.)
08: BY MR. McWILLIAMS:
09: Q.    And we can cover this quickly.
10: Is this a depiction of the teams, of the team
11: that was built to address this issue of the
12: potential device malfunction in ROCKET?
13: A.    I have to -- I just need to
14: look at it.
15: (Document review.)
16: A.    This is, again, from the Bayer
17: issue management process, so this is the team
18: structure that was involved from a Bayer --
19: pure Bayer perspective.
20: BY MR. McWILLIAMS:
21: Q.    Okay.  But you see the section
22: titled "Device Characteristics," and it has
23: your name listed?
24: A.    I don't see it yet, but it must

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00138:   be --
02: MR. HOFFMAN:  Here.
03: A.    Yeah, yeah. Yeah.
04: BY MR. McWILLIAMS:
05: Q.    And to the right of that it
06: says "Summary of device standards and related
07: standard deviations"?
08: A.    Yes, that was the task of the
09: team.
10: Q.    Okay.  And so one of the things
11: you looked up was the ISO standard that
12: applies to point-of-care INR measuring
13: devices, correct?
14: A.    That's correct.
15: MR. McWILLIAMS:  Okay.  Give me
16: one second.  I'm going to pull that up
17: for you.
18: (Whereupon Deposition Exhibit
19: Derix-13, E-mail(s) re: References for
20: INR ratio specifications,
21: XARELTO_JANSSEN_1552217 -
22: XARELTO_JANSSEN_1552218, Ref. 3109548,
23: was marked for identification.)
24: BY MR. McWILLIAMS:

p. 00138

01: 00139:       Q.    I'm going to hand you what's
02: been marked as Derix-13, Record 3109548.  Is
03: this an e-mail you received on November 12th,
04: 2015?
05: A.    Yes.
06: Q.    The subject line is "References
07: for INR ratio specifications"?
08: A.    Yes.
09: Q.    Have you reviewed this e-mail
10: in the last couple of weeks in preparation
11: for your deposition?
12: A.    No, not specifically this
13: e-mail.
14: Q.    Okay.  Let's look at this
15: e-mail that you received -- and you received
16: this e-mail in the ordinary course of
17: business?
18: A.    What do you mean with that?
19: Q.    I don't know what that means
20: either.  It's a silly thing that lawyers ask.
21: I'll keep going.
22: "Dear All, The 30% acceptance
23: criteria is the specification stated in the
24: 2007 ISO 17593 guidance document

p. 00139

01: 00140:    (Section 8.6, Minimum acceptable system
02: accuracy), for INR interval between 2 and
03: 4.5."
04: Did I read that correctly?
05: A.    Yes.
06: Q.    And what does that mean,
07: "minimal acceptable system accuracy"?
08: A.    It's giving a kind of -- it's
09: giving a specification that says that, yeah,
10: I mean, this 30% is the specification for --
11: that was describing somewhat the variability
12: I just mentioned between two measurements,
13: and it's kind of the --
14: Q.    Right.  You don't expect them
15: to line up perfectly --
16: A.    Right.
17: Q.    -- but you expect them to line
18: up to a certain degree; is that fair?
19: A.    Yes, that's fair.  So it's what
20: we call specification.
21: Q.    And the way you determine how
22: much alignment you expect is defined in this
23: ISO standard, correct?
24: A.    It's -- yeah, it's defined in

p. 00140

01: 00141:   the ISO standard for this specific device and
02: also for the comparison to a reference
03: method.
04: Q.    Right.
05: A.    And as I mentioned before, it's
06: also certainly assuming to apply the method
07: in a certain way.
08: Q.    And "The minimum accepted
09: accuracy for results produced by an oral
10: anticoagulant monitoring system for
11: self-testing shall be as follows:  90% of the
12: difference between results from the oral
13: anticoagulant monitoring system and results
14: from the reference measurement procedure."
15: Do you see where I'm reading
16: from?
17: A.    I lost you.
18: Q.    This is in the e-mail.  It
19: says -- where it says "The exact guidance
20: follows."
21: MR. HOFFMAN:  Starting here.
22: THE WITNESS:  Ah, yeah, uh-huh.
23: BY MR. McWILLIAMS:
24: Q.    So you're aware of what the

p. 00141

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00142:   minimum threshold was, what the minimum
02: performance that's expected according at
03: least to these ISO standards, correct?
04: A.   Yes.  So Sig cited from the ISO
05: standard specifications, and that's
06: understood here in the e-mail.
07: Q.   And the minimum expected per
08: this ISO standard is 90% or greater, correct?
09: MR. HOFFMAN:  Objection to the
10: form of the question.
11: A.   I mean, it says -- as to just
12: to me -- 90% of the difference is between
13: results from the system and results from the
14: reference measurement procedure, and then it
15: continues to be more specific as to the INR
16: ranges that are applied, yes.
17: BY MR. McWILLIAMS:
18: Q.   Right.  But the threshold, the
19: minimum acceptable threshold is 90%, correct?
20: A.   Minimum acceptable accuracy.
21: Q.   Right.  And the device -- the
22: point-of-care device, the INRatio device in
23: ROCKET compared to the central lab at week 12
24: and 24, failed to meet that minimum

01: 00144:        Q.   Well, I'm talking about how the
02: device performed in ROCKET.  And your company
03: analyzed the data.  It compared the
04: point-of-care measurements with the central
05: lab measurements.
06: A.   Yes.
07: Q.   And then compared it to the ISO
08: standard, and concluded it failed to meet the
09: 90% minimum criteria, correct?
10: MR. HOFFMAN:  Objection to the
11: form of the question.
12: A.   No, that's not correct in the
13: way you phrase it.  We used the ISO criteria
14: to guide and to apply our dataset to it, but
15: we did not really do the same thing as is
16: described in the ISO guidance.  We just used
17: this as a -- yeah, as a set of criteria to
18: guide the analysis.
19: BY MR. McWILLIAMS:
20: Q.   You did the analysis but you
21: didn't form any conclusion; is that fair?
22: You compared the data to the ISO standard,
23: correct?
24: A.   Yes.

01: 00143:   acceptable system criteria, correct?
02: MR. HOFFMAN:  Objection to the
03: form of the question.
04: A.   That's not how you can phrase
05: it because only Alere knows the results of
06: the testing of the Alere INR device according
07: to those ISO standards because they did
08: validation and analysis work that they had to
09: submit to the health authority.  We are
10: not -- we are not privileged to have this
11: information.
12: And that followed exactly those
13: guidance.  And by approval of the Alere INR
14: device, we have to assume that the
15: information that was looked at showed that
16: the accuracy of the device was within the
17: required specification.
18: BY MR. McWILLIAMS:
19: Q.   It wasn't -- you're saying it
20: was within the required specification?
21: A.   That's what I said, what the
22: approval of such a device --
23: Q.   Right.
24: A.   -- yeah --

01: 00145:        Q.   Okay.  Well, let's look at that
02: together, and maybe we can form a conclusion
03: together.  So let's --
04: A.   Maybe I didn't -- I
05: misunderstood your question.  So I did not
06: mean it was my method.  We didn't take a
07: conclusion from it, so I just meant that we
08: used the ISO standards to guide the analysis,
09: yeah.
10: Q.   And did the point-of-care
11: device meet the ISO standards, meaning 90% or
12: more?
13: A.   No, it did not meet the 90%.
14: Q.   That's all I asked.
15: MR. HOFFMAN:  She's not
16: finished.
17: A.   It says also here in the
18: document that nearly 90% of the
19: warfarin-treated subjects had no discrepancy
20: observed between the lab INR and the device
21: INR at week 12 or 24, and is exactly, it
22: says, 87% of INR fall in range.
23: BY MR. McWILLIAMS:
24: Q.   So 87 is less than 90, right?

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00146:      A.   87 is less than 90, that's
02: correct.
03: Q.    So if a passing grade is 90 and
04: you get an 87, do you pass the class?
05: MR. HOFFMAN: Objection to the
06: form of the question.
07: A.    I said again, we used this
08: information to guide our analysis, and we did
09: not perform a validation analysis according
10: to the ISO standard. That's what Alere did.
11: So we used the data that were
12: not supposed to build the plan for testing
13: according to ISO standards retrospectively as
14: a guidance, and so that's -- it was -- that's
15: something different.
16: MR. McWILLIAMS: Move to strike
17: as nonresponsive.
18: BY MR. McWILLIAMS:
19: Q.    Doctor, you went to school and
20: you know what it means to -- you have to
21: perform to a certain degree to get a passing
22: grade, right? You understand that basic
23: concept, right?
24: A.    Yes.

01: 00147:        Q.    And you understand that if
02: you -- and there are certain scores that one
03: must achieve in order to get a passing grade,
04: correct?
05: A.    Yes, that's correct.
06: Q.    And if you -- and if your score
07: is less than the passing grade, you don't
08: pass the class, do you?
09: A.    It depends on the exam, and
10: that's exactly a good example, because the
11: passing grade is always related to the exam
12: it belongs to. And we are here talking about
13: very similar approaches, but not exactly the
14: same.
15: Q.    But the INR --
16: A.    So, therefore, yeah...
17: Q.    The ISO passing grade is 90 or
18: better, and the INRatio device as used in
19: ROCKET had a score of 87, correct?
20: MR. HOFFMAN: Objection to the
21: form of the question. Asked and
22: answered.
23: A.    Your cite of the data are
24: correct of that 87%, and our analysis fall in

01: 00148:   range.
02: BY MR. McWILLIAMS:
03: Q.    And 87 is less than 90,
04: correct?
05: A.    And 87 is less than 90, that's
06: correct.
07: Q.    Okay. And there's no reference
08: to 87 in the ISO guidance. The guidance
09: references 90, correct?
10: A.    The ISO guidance references 90,
11: right.
12: Q.    All right. Like they have --
13: do they have drunk driving laws in Germany,
14: like a blood alcohol content?
15: A.    I don't understand what you're
16: referring to.
17: Q.    Well, in the United States, if
18: you have more than .08 blood alcohol content,
19: it's considered drunk and you're not allowed
20: to drive a car.
21: MR. HOFFMAN: Do you want to
22: ask the translator about this, if you
23: don't understand it.
24: THE WITNESS: I understand what

01: 00149:      he means.
02: MR. McWILLIAMS: Okay.
03: MR. HOFFMAN: Okay.
04: BY MR. McWILLIAMS:
05: Q.    So if you're almost not drunk,
06: that doesn't get you out of jail, does it?
07: MR. HOFFMAN: Objection to the
08: form of the question.
09: A.    It's -- again, it's an analogy
10: you can look at different things. So I mean,
11: the alcohol test is also based on always the
12: same methods, and if you would have a
13: policeman who applied the alcohol test in a
14: totally -- in a different way, you would also
15: probably question whether this is okay.
16: And so we have to really bear
17: in mind that analyzing retrospectively data
18: from a sample set that was taken for a
19: totally different purpose and applying an ISO
20: standard that is designed -- or is based on
21: the specific design of an analysis, that
22: somehow I wouldn't say apple and pears is too
23: extreme because we said we make the link, but
24: they're not exactly the same.

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00150:          And when you look at what the
02: health society concluded from that for them,
03: it finally -- looking at all the data they
04: analyzed, it was okay for them.  They
05: concluded that the data -- all the data and
06: all the information they had seen, including
07: this 87% INR fall in range, led them to the
08: final conclusion that there is -- such
09: information is sufficient, and they conclude
10: that the benefit-risk of ROCKET AF is not
11: altered.
12: MR. McWILLIAMS:  I move to
13: strike as nonresponsive.
14: BY MR. McWILLIAMS:
15: Q.    Do you remember my question?
16: What question were you just answering?
17: A.    You can repeat it for me if you
18: had the impression I did not respond
19: according to your expectation.
20: MR. McWILLIAMS:  I move to
21: strike as nonresponsive.  Let's keep
22: reading.
23: BY MR. McWILLIAMS:
24: Q.    Go to page 26, please.  Whose

p. 00150

01: 00151:    idea was it to compare the point of care and
02: central lab with the ISO standards?  Was it
03: EMA's idea, or was it Bayer's idea?  Or if
04: you know.
05: A.    It was proposed by EMA, but I
06: remember that also in the team we had some
07: discussion whether this information could be
08: useful, and you showed me the e-mail from
09: Ms. Cohen, who somehow also had suggested to
10: use the information from week 12 and week 24.
11: And we had some discussion whether this could
12: also contribute and form --
13: Q.    She also suggested the ISO
14: standard too, didn't she?
15: A.    I don't recall that, but I just
16: recall that she mentioned the week 12 and 24
17: sampling.
18: Q.    But ultimately, it was EMA that
19: asked Bayer to include that analysis, to
20: compare the point of care and central lab
21: data to the ISO standard, correct?
22: A.    I do not recall the detail
23: because there was quite some work ongoing in
24: the regulatory team back and forth with EMA,

p. 00151

01: 00152:   but, yeah, that's what you can see from the
02: sequence.
03: So our first proposal was the
04: sensitivity analysis, and then the additional
05: information was added later on.
06: Q.    Okay.  Let's go to page 26,
07: which is where they discussed the results of
08: the ISO comparison or the ISO analysis.
09: The very top, full paragraph,
10: Evan.  It's discussing, in this table,
11: "subjects with an unascertainable difference
12: are not included in the Yes or No category."
13: It continues and says, "No
14: discrepancy was observed in almost 90% of
15: those warfarin-treated subjects."
16: Did I read that correctly?
17: A.    Yes.
18: Q.    And, again, the reason that
19: you're using 90 is because you know 90 is the
20: standard.  That's why you're saying it's
21: almost 90?
22: MR. HOFFMAN:  Objection to the
23: form of the question.
24: ///

p. 00152

01: 00153:   BY MR. McWILLIAMS:
02: Q.    Right?
03: A.    Yeah, the ISO guidance is cited
04: also here in the document, so --
05: Q.    Almost 90 is less than -- is
06: not 90, correct?
07: MR. HOFFMAN:  Objection.
08: BY MR. McWILLIAMS:
09: Q.    Simple English, right?
10: A.    Almost 90 is -- yeah, okay.
11: Hard to say.
12: (Interpretation.)
13: THE INTERPRETER:
14: Approximation.
15: A.    Approximation to 90.
16: BY MR. McWILLIAMS:
17: Q.    Well, it's not an
18: approximation.  You could say approximately
19: 90, but almost 90 means you're falling short
20: of 90, correct?
21: A.    If you look later --
22: Q.    I know, it says 87.
23: A.    -- in the section, it says 87.
24: Q.    I know.  We'll get there.  But

p. 00153

01: 00154:   in this text, it says almost 90, right?
02: A.    Yeah, but that's almost 90,
03: yes.
04: Q.    And then down again, the next
05: full paragraph below, it says nearly 90.
06: A.    It says nearly 90, yes.
07: Q.    Again, not 90, but nearly 90,
08: less than 90, correct?
09: A.    Nearly 90, yeah.
10: Q.    And then it's confirmed at the
11: end and it tells us the actual number, 87,
12: right?
13: A.    Yes, it says 87.
14: Q.    So 90 is the threshold, and you
15: guys fell just short, right?
16: MR. HOFFMAN:  Objection,
17: misstates the evidence.
18: You may answer.
19: A.    Again, as we discussed, 90% is
20: a value that is given in the ISO guidance,
21: which was used here in this context as -- and
22: that is also mentioned in the text as a
23: guiding principle for the analyses that were
24: run with these existing data.

p. 00154

01: 00156:   there were discrepancies observed between the
02: point-of-care device and the central lab, but
03: it was not in alignment with the original
04: sensitivity analyses the company performed,
05: right?
06: A.    It's depending how you phrase
07: it again. And we talked about it. The -- if
08: you look at this graph here, you can see that
09: there are deviations from the -- I mean, in
10: this correlation graph and device-based INR,
11: whereas this lab-based INR, and that is what
12: is meant by deviation discrepancies.
13: And those discrepancies are
14: across the entire patient population. That's
15: what we all saw, and so, therefore, it means
16: that -- certainly at the -- yeah, and that
17: says that the sensitivity analysis have --
18: does not seem to have captured -- or you
19: could say it the other way around, this does
20: not confirm in some way the recall notice.
21: Q.    Right.
22: A.    But --
23: Q.    But a discrepancy was observed,
24: right?  The INR values were not as expected,

p. 00156

01: 00155:   BY MR. McWILLIAMS:
02: Q.    Thank you for that.
03: If you go to page 27, please.
04: A.    Yes.
05: Q.    And so this is where the EMA is
06: discussing the point of care versus central
07: lab data. And I want to draw your attention
08: this middle paragraph that begins, "It is
09: also concluded."
10: Do you see where I am?
11: A.    Uh-huh, yes.
12: Q.    And EMA writes, "It is also
13: concluded that the originally performed
14: sensitivity analyses provided in October 2015
15: do not seem to have captured the
16: discrepancies observed at week 12 and 24.
17: These analyses were based on retrospective
18: identification of patients with clinical or
19: laboratory conditions where the device
20: estimated INR would be unreliable according
21: to the Alere recall notice information."
22: Did I read that correctly?
23: A.    You read that correctly.
24: Q.    So what that means is that

p. 00155

01: 00157:   as generated by the point-of-care device.
02: A.    It's not as you would say, it's
03: not as expected, and that's also not the
04: conclusion EMA drew here, so they just said
05: that -- you see -- I mean, the deviation from
06: the mean here, and we talked about it also in
07: that context of the 87% INR, but it -- it
08: just tells that there was no -- obviously, no
09: difference whether the patient had these
10: conditions or not.
11: Q.    Right.
12: A.    And so it's additional
13: information that -- that was obtained by both
14: analysis.
15: Q.    If you --
16: MR. HOFFMAN:  Hold on.
17: A.    So both analysis have their own
18: value in itself, and the whole package of
19: analysis was used by EMA to conclude that
20: it's not impact on the benefit-risk of the
21: ROCKET AF data.
22: MR. McWILLIAMS:  Move to strike
23: as nonresponsive.
24: ///

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00158:   BY MR. McWILLIAMS:
02: Q.    I simply asked that a
03: discrepancy was observed, that INR values
04: were not as expected as generated by the
05: point-of-care device, correct?
06: MR. HOFFMAN:  Objection, asked
07: and answered.
08: A.    It says that discrepancies were
09: observed, but it does not say here that it
10: was not as expected.  That's your
11: interpretation.
12: But here it says discrepancies
13: were observed at week 12 and 24, and that was
14: displayed in the graph as well.
15: BY MR. McWILLIAMS:
16: Q.    Okay.  So you're saying
17: discrepancies were expected?  You were hoping
18: this device would generate accurate and
19: reliable INR values, correct?
20: A.    We talked about the methodology
21: beforehand, that if you compare two methods,
22: there is some discrepancy expected just
23: because of the technicality in the
24: measurements.

p. 00158

01: 00159:             And so, yes, that's also
02: described in the ISO guidance that you would
03: not expect exactly the same value at any
04: point in time you measure it.
05: Q.    Right.
06: A.    Otherwise, you would see just a
07: line here in this graph, and that's not what
08: you see.
09: Q.    Right.  So it confirms that the
10: device malfunctioned, right?
11: MR. HOFFMAN:  Objection to the
12: form of the question.
13: A.    Again, that's the conclusion
14: that you are drawing here, which was not
15: taken by the health authority.  The health
16: authority says that the analysis captures the
17: discrepancies, but when they came to their
18: conclusion, they found that the data that
19: were provided do not alter the benefit-risk
20: trial -- the benefit-risk assessment in the
21: ROCKET AF trial.
22: MR. McWILLIAMS:  Move to strike
23: as nonresponsive.
24: ///

p. 00159

01: 00160:   BY MR. McWILLIAMS:
02: Q.    Dr. Derix, did the device
03: malfunction in ROCKET?
04: MR. HOFFMAN:  Objection, asked
05: and answered.
06: BY MR. McWILLIAMS:
07: Q.    Your opinion.  Not EMA's
08: opinion, not Bayer's opinion.  In your
09: opinion, did the device malfunction?
10: MR. HOFFMAN:  Objection.
11: A.    I just -- I mean, I just refer
12: to the data that are here, and all the
13: information that we have, and we talked about
14: it, and we -- what is noted here, and that's
15: also what I stand behind is the information
16: about the variability, which we saw.
17: But that does not lead to the
18: conclusion that the device did malfunction in
19: my view, personally.
20: BY MR. McWILLIAMS:
21: Q.    All right.  So your personal
22: view is that the device did not malfunction
23: in ROCKET?  Did I hear you correctly?
24: A.    I just referred to all the

p. 00160

01: 00161:   information that we have here and that we
02: have evaluated very transparently, and so
03: that's what I -- what I want.  I stand
04: behind.
05: Q.    That the device did not
06: malfunction in ROCKET?  Can I get you to say
07: those words, the device did not malfunction
08: in ROCKET?
09: MR. HOFFMAN:  Objection to the
10: form of the question.  Asked and
11: answered.
12: A.    I could respond to the question
13: if you have defined malfunction, because
14: that's not a term that has been used in any
15: of the definitions or -- and that's a
16: judgment call in my view, what --
17: BY MR. McWILLIAMS:
18: Q.    Well, do you agree with this
19: statement, that there were discrepancies
20: observed of potential clinical relevance and
21: they were observed rather frequently?
22: MR. HOFFMAN:  What page are you
23: on?
24: A.    Where did you get this from?

p. 00161

01: 00162: BY MR. McWILLIAMS:
02: Q. No, that's just my statement.
03: Do you agree with that?
04: MR. HOFFMAN: Objection to the
05: form of the question.
06: BY MR. McWILLIAMS:
07: Q. Because you said it depends on
08: how I define "malfunction."
09: Do you agree that discrepancies
10: were observed between the point of care and
11: central lab frequently and to a degree of
12: clinical relevance?
13: MR. HOFFMAN: I think in
14: fairness to the witness, if you're
15: reading from a document --
16: MR. McWILLIAMS: I'm not
17: reading from a document.
18: MR. HOFFMAN: You were before
19: when you asked the question.
20: MR. McWILLIAMS: I wasn't that
21: last time, so...
22: MR. HOFFMAN: If you'd like to
23: take the time to look at the document
24: before you answer the question, go

p. 00162

01: 00163: ahead.
02: MR. McWILLIAMS: Are you ready
03: for my question?
04: BY MR. McWILLIAMS:
05: Q. Do you agree that discrepancies
06: were observed between the point-of-care
07: device and the central lab frequently and to
08: a degree of clinical relevance?
09: A. I still haven't -- the document
10: in front of me, so clearly, I agree that
11: there was discrepancy observed at week 12 and
12: 24 as described here in the document.
13: Q. And do you agree that it was --
14: that the discrepancy was observed often and
15: to a degree of clinical relevance?
16: A. I cannot judge on this, because
17: it's taken out of context. I'm sorry.
18: Q. Well, okay. Well, let's do the
19: context. Let's go to page 21 and let's see
20: if you agree with this statement.
21: MR. HOFFMAN: Thank you,
22: Counsel.
23: BY MR. McWILLIAMS:
24: Q. Paragraph number 4, "The

p. 00163

01: 00164: preliminary data provided on INR values
02: estimated simultaneously on weeks 12 and 24
03: with the two methods" comparing the device
04: with the lab, "indicate that discrepancies of
05: potential clinical relevance were rather
06: frequently observed."
07: Do you agree with that
08: statement?
09: A. It's a statement made by the
10: health authority after the review, yes.
11: Q. Do you agree with that
12: statement?
13: A. Again, it's very difficult for
14: me to judge on how -- what I would use --
15: what frequently or clinical extent, that's
16: something I cannot evaluate myself, and so
17: because I'm not a medical doctor, I'm not a
18: clinician, and so in order to -- the person
19: who wrote this is a medical doctor.
20: So I can really not form an
21: opinion myself on the very details of
22: clinical relevance. So here I would always
23: rely on my colleagues, and therefore, it's
24: just very difficult for me to assess those

p. 00164

01: 00165: statements based on my experience.
02: Q. Well, you understand the target
03: INR range for the warfarin arm in ROCKET was
04: an INR between 2 and 3 -- actually, a target
05: of 2.5 with a range of 2 to 3. You knew
06: that, right?
07: A. Yes, I know that.
08: Q. Okay. And that INR value is
09: what informs the doctor in deciding what dose
10: to give the warfarin patient going forward,
11: right?
12: A. That's right. That's the
13: target range the physician is trying to keep
14: the patients in by its dose -- specific
15: dosing, yeah.
16: Q. And if the doctor is provided
17: the incorrect INR value, the doctor may then
18: in turn provide the incorrect dose, correct?
19: A. That may be, but, again, here I
20: would have to refer to my clinical
21: colleagues, because it's my understanding
22: that a physician is not reacting
23: automatically, for example, to a small
24: deviation. And so it's always still a

p. 00165

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00166:   judgment call of the physicians at which INR
02: level the physician is reacting to change the
03: dose.
04: But in principle, this INR
05: value is used to inform about dosing
06: decisions the physician is taking.
07: Q.    So if the doctor is provided
08: the wrong INR, the patient may get the wrong
09: dose, right?
10: A.    In the worst case that I --
11: that I cannot exclude that, but as I said,
12: the physician is always using a judgment
13: call, and if the physician also has some
14: doubt about the INR measurements or if he
15: receives a single measurement and has
16: experience with the patient for some time
17: already, he would start wondering if the
18: value is out of the normal range and probably
19: doing some more investigation.
20: That's at least how I
21: understand clinical practice, and so it's
22: often not only a single value that's
23: guiding --
24: Q.    But you understand the doctors

01: 00167:   in ROCKET were specifically instructed to
02: only obtain INR values from the INRatio
03: point-of-care device, right?
04: A.    That's -- that was the
05: instruction that they had, but we said
06: beforehand there was always the opportunity
07: for the physician in case of a concern or
08: specific question to contact with the
09: monitor -- unblinded monitor and to get,
10: yeah, advice from that and --
11: Q.    All right. Well, you know the
12: first thing they were instructed to do was to
13: test the INR with the other defective device.
14: Did you know that?
15: MR. HOFFMAN: Objection to the
16: form of the question.
17: A.    I don't know the extent --
18: BY MR. McWILLIAMS:
19: Q.    Do you know every site was
20: provided two INRatio devices, and in the
21: instance a doctor felt uncomfortable with an
22: INR value, that doctor was instructed to test
23: with the other INRatio device?
24: A.    I was not aware and I'm not

01: 00168:   aware -- I was not involved in the details of
02: the trial conduct. I don't know.
03: Q.    Let me hand you what's being
04: marked --
05: MR. HOFFMAN: Do you want to
06: take a break now --
07: MR. McWILLIAMS: Sure.
08: MR. HOFFMAN: -- and then shoot
09: for lunch at like 12:45, 1:00 o'clock?
10: Does that make sense?
11: MR. McWILLIAMS: Yeah, take a
12: break. Sure.
13: THE VIDEOGRAPHER: Going off
14: the record at 11:47 a.m.
15: (Recess taken, 11:47 a.m. to
16: 11:58 a.m.)
17: THE VIDEOGRAPHER: We're back
18: on record at 11:58 a.m.
19: BY MR. McWILLIAMS:
20: Q.    Dr. Derix, before we took the
21: break, you mentioned that if any of the
22: physicians in ROCKET had concerns about the
23: potential error with the result of the
24: device, that they could reach out to the

01: 00169:   unblinded monitor.
02: Did I hear you correctly?
03: A.    Yes, somehow in that -- yeah,
04: in that regard I responded to you, yes, there
05: was one monitor available and could be
06: contacted by investigators.
07: Q.    And you understand that one of
08: the mechanisms in place for the unblinded
09: monitor was to take a split sample, one with
10: the point-of-care device, and other to be
11: evaluated by central lab so that the
12: unblinded monitor could determine whether or
13: not the device was operating properly?
14: A.    I'm not aware of the detailed
15: proceedings that the monitor applied, no.
16: Q.    So do you have any knowledge of
17: that ever happening?
18: A.    No, I have -- no, because I was
19: not involved in that type of, yeah,
20: procedure, so I'm -- no, not that I recall at
21: least.
22: Q.    Have you ever heard the Covance
23: recheck program?
24: A.    I mean, no, not -- I cannot

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00170:   connect any content to it.  Maybe if I heard
02: it, but I'm not -- I was not involved in it,
03: in that discussion or detail or if you could
04: get me any information.
05: Q.    So you certainly, then, haven't
06: heard that come up at all in any of the
07: discussions with EMA about this issue; is
08: that fair?
09: A.    I do not recall it.
10: Q.    Okay.  On the EMA report,
11: assessment report, which is Derix Exhibit 4,
12: if you would go to page 38, please.  And the
13: section in the middle titled "2.4.2, Request
14: 4"?
15: A.    Uh-huh.
16: Q.    And Bayer was asked whether or
17: not there were any other ongoing regulatory
18: investigations; is that correct?
19: A.    That's correct.  Yes.
20: Q.    And you essentially reported
21: when you notified global regulators and when
22: about the potential issue; is that fair?
23: A.    Yes.
24: Q.    And then you go on to say that

01: 00171:   on October 1, 2015, Bayer received a written
02: request from EMA to provide further
03: information about this issue.
04: Then on October 9th, you got an
05: information request from essentially the
06: Japanese FDA.  Is that accurate?
07: A.    Yes, that's the Japanese health
08: authority, MHLW.
09: Q.    And it goes on to say, "So far,
10: no other subsequent actions have been taken
11: in other jurisdictions."  And then it has a
12: cut-off date of October 11, 2015.
13: A.    Uh-huh, yes.  That's correct.
14: Q.    But -- and this is a report
15: that's dated February 5th, 2016, right?
16: A.    Yes.
17: Q.    And you knew at this point in
18: time FDA was doing an investigation into this
19: issue, right?
20: A.    I mean, we had shared all the
21: information with the health authority, also
22: with FDA about what was going on at EMA, and
23: I do not recall specifically when FDA started
24: asking additional questions.  So there was a

01: 00172:   point in time, yes, FDA started additional
02: questions for investigation, but it may have
03: been after October 11th.  I don't recall
04: because I'm currently not working in
05: regulatory affairs anymore.
06: Q.    And I'm not disputing -- I
07: think it was after October 11th, but why pick
08: the date October -- I mean, don't you think
09: it's a little misleading?  Because this
10: suggests to the reader that you've told FDA,
11: but FDA is not doing any investigation?
12: MR. HOFFMAN:  Objection to the
13: form of the question.
14: BY MR. McWILLIAMS:
15: Q.    Right?  I mean, that's how this
16: reads.  You've told FDA, and as of
17: October 11, 2015, no other regulators have
18: launched an investigation, right?
19: MR. HOFFMAN:  Same objection.
20: A.    That's how you interpret, but I
21: think this is really just a factual
22: statement, and it clearly says also at the
23: beginning that also FDA was included in the
24: information flow as any other health

01: 00173:   authority on the list as well.
02: BY MR. McWILLIAMS:
03: Q.    But you don't tell the readers
04: of this report, the citizens of Europe, that
05: FDA is doing its own investigation, and you
06: knew that when this report came out in
07: February of 2016, right?
08: MR. HOFFMAN:  Objection to the
09: form of the question.
10: A.    The sentence says "no other
11: subsequent actions have been taken," so that
12: would refer to issuing an official procedure
13: or so.  And as I said, I don't recall exactly
14: when FDA for the first time, after they got
15: informed by Janssen, when the first time they
16: started to ask questions and looking into it,
17: so...
18: BY MR. McWILLIAMS:
19: Q.    But you knew even in January of
20: this year FDA was issuing information
21: requests to your company and Janssen about
22: what they knew about this potential
23: malfunction, right?
24: A.    I said you know the dates

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00174: better than I, yeah.
02: Q. Well, January 12th, 2016. But
03: there's no mention of that here. Don't you
04: think that's a little misleading, to use a
05: cut-off date? If you're really trying to be
06: transparent and honest with the readers,
07: isn't it important to tell the readers that
08: the FDA is doing its own independent
09: investigation?
10: MR. HOFFMAN: Objection to the
11: form of the question.
12: A. This is a document -- sorry.
13: MR. HOFFMAN: No, no, you may
14: answer.
15: A. This is a document that was
16: written by EMA, and so -- and as I explained
17: to you before, there was a sequence of
18: information that was provided, and at the
19: end, an assessment report.
20: It's all -- it's all collected,
21: or sometimes it's reporting information that
22: was provided at an earlier time, but it's
23: just implemented as it was, and that's citing
24: the October cut-off date.

p. 00174

01: 00175: So, therefore, it's making
02: clear that at that time, that was still the
03: status of information. And so in my view, by
04: giving the cut-off date, it's not misleading.
05: BY MR. McWILLIAMS:
06: Q. But back in January of 2016,
07: you had the opportunity to review this draft
08: report, and you knew that a week previously,
09: FDA had sent a very pointed letter asking for
10: additional information --
11: MR. HOFFMAN: Objection to the
12: form of the question.
13: BY MR. McWILLIAMS:
14: Q. -- right?
15: A. I had the opportunity to review
16: the document, but as I said, it's not
17: misleading as long as the cut-off date is
18: mentioned in the document here.
19: Q. Right. As long as the cut-off
20: date is mentioned, it's not misleading.
21: A. Yeah, because it clearly states
22: from which point in time this information
23: has --
24: Q. Who picked the cut-off date?

p. 00175

01: 00176: A. The cut-off date was picked by
02: end of submission at that time, and so --
03: Q. Who? Who picked it?
04: MR. HOFFMAN: Let her finish
05: her answer. She might actually get to
06: it.
07: MR. McWILLIAMS: Fingers
08: crossed.
09: A. The cut-off date was at the
10: time when it was submitted picked by the --
11: by the -- yeah, by the marketing association
12: or the team that provided that information
13: and --
14: BY MR. McWILLIAMS:
15: Q. So Bayer. Can you just say
16: Bayer? It's a one-word answer, right?
17: A. Yeah.
18: MR. HOFFMAN: Objection to the
19: form of the question.
20: BY MR. McWILLIAMS:
21: Q. Who picked the cut-off date.
22: Let's practice. Who picked the cut-off date?
23: MR. HOFFMAN: Don't answer that
24: question. Next question.

p. 00176

01: 00177: BY MR. McWILLIAMS:
02: Q. Who picked the cut-off date?
03: Ma'am?
04: A. It's my interpretation from
05: this text that this was taken from the
06: submission documents that the marketing
07: authorization holder, namely Bayer, provided
08: to EMA at some point in time in the course of
09: the process, and that's how it is phrased
10: here.
11: MR. McWILLIAMS: I'll move to
12: strike as nonresponsive.
13: BY MR. McWILLIAMS:
14: Q. Let me try it another way: Did
15: Bayer pick the cut-off date?
16: A. As I interpret here as it is
17: written, it's taken from the documents that
18: were submitted by Bayer, and in that way, the
19: cut-off date was provided in the documents
20: submitted earlier time.
21: Q. Is that a yes? Did Bayer pick
22: the cut-off date?
23: MR. HOFFMAN: Objection to the
24: form of the question. Asked and

p. 00177

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00178:        answered.
02: BY MR. McWILLIAMS:
03: Q.    Ma'am, if Bayer picked the
04: cut-off date, you can say yes.
05: MR. HOFFMAN:  Objection.
06: A.    As I said, I can only hear and
07: read from the document of all -- as I
08: interpret it, and I did not write this part
09: of the document myself.  So I would have
10: to -- yeah.
11: BY MR. McWILLIAMS:
12: Q.    So now you don't know?  Are
13: you -- I can't follow your answers.  Do you
14: know who picked the cut-off date?
15: A.    Are you asking now for a
16: specific name of a person or who worked on
17: this --
18: Q.    No, I'm just --
19: A.    I mean, this is --
20: Q.    Was it Bayer who picked the
21: cut-off date?
22: MR. HOFFMAN:  Objection, asked
23: and answered.
24: ///

p. 00178

01: 00179:   BY MR. McWILLIAMS:
02: Q.    Was it?
03: A.    It is -- as I interpret here,
04: as it is written, that's taken from a
05: document that was submitted by Bayer.
06: Q.    Okay.  And so Bayer picked this
07: cut-off date, not withstanding the fact that
08: you personally and your colleagues at Bayer
09: were aware the FDA's investigation was still
10: ongoing, correct?
11: A.    I would have to go back to give
12: you 100% answer to this, but as I -- I think
13: that this question was already answered in
14: the early phase of the proceeding with EMA,
15: so they -- we got all questions directly at
16: the beginning of the proceeding, and we
17: responded to all questions.
18: And then there was subsequent
19: questions, and as I read this here, this was
20: taken from an earlier response in the
21: procedure.  And so EMA considered this
22: question as responded to adequately, and
23: therefore it was not updated at a later point
24: in time.

p. 00179

01: 00180:        That's how I interpret --
02: interpret what I'm reading here in this EMA
03: assessment report.
04: MR. McWILLIAMS:  I move to
05: strike as nonresponsive.
06: BY MR. McWILLIAMS:
07: Q.    Dr. Derix, are you aware or
08: were you aware in January of 2016 that FDA
09: issued a series of information requests to
10: your colleagues at Janssen specific to this
11: issue of whether or not the INRatio device
12: malfunctioned in ROCKET?
13: A.    I was aware that Janssen
14: received additional questions.  I'm not -- I
15: cannot recall the exact date and the exact
16: content of the questions, but I was aware
17: that FDA raised questions.
18: Q.    And you received a copy of
19: those questions, didn't you?
20: A.    May well be.  I...
21: Q.    You don't know?
22: A.    I don't specifically recall.
23: Q.    It was just a couple of weeks
24: ago, right?

p. 00180

01: 00181:        A.    Right.  But as I said, I'm no
02: longer a regulatory responsible now.  My
03: responsibility is different, and so although
04: I'm copied in many documents and information
05: just to know that there's a request the team
06: is working on, doesn't mean that I, yeah,
07: reviewed all the content and follow the
08: content.
09: Q.    So how do you decide which
10: e-mails to read and which to not read?
11: A.    When I see it is an e-mail that
12: is referring to an expert question, and I see
13: that expert's already involved in that
14: question, I rely on the experts to follow up.
15: MR. McWILLIAMS:  Okay.  Well,
16: let me hand you what we're marking as
17: Derix-14 and 15.  Derix-14 is
18: Record 3402844, and its attachment,
19: which is Derix-15, which is
20: Record 3402845.
21: (Whereupon Deposition Exhibit
22: Derix-14, E-mail(s) re: IND 75238,
23: XARELTO_BHCP_08009903 -
24: XARELTO_BHCP_08009904, Ref. 3402844,

p. 00181

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00182:        was marked for identification.)
02: (Whereupon Deposition Exhibit
03: Derix-15, FDA Information Request,
04: XARELTO_BHCP_08009905 -
05: XARELTO_BHCP_08009908, Ref. 3402845,
06: was marked for identification.)
07: BY MR. McWILLIAMS:
08: Q.    And you see this is an e-mail
09: dated January 13th, 2016?
10: A.    Uh-huh. Yes.
11: Q.    And this is an e-mail you
12: received; is that correct?
13: A.    Yes, I received it, amongst
14: other colleagues.
15: Q.    Yes. And you see that the
16: subject line is -- well, the attachment says
17: "ROCKET INRatio Information Request Letter."
18: Do you see that?
19: A.    Yes, I see that.
20: Q.    And you see then the next
21: document I handed you, which is the actual
22: copy of the information request that you were
23: provided? Do you see that?
24: A.    Yes.

01: 00183:        Q.    Does this refresh your memory
02: as to whether or not you ever read this
03: information request propounded by the FDA?
04: A.    As I said, I said it was
05: forwarded to me amongst other colleagues, and
06: I -- and I also said that I was aware that
07: there were questions from FDA. But I'm
08: not -- not in -- I did not follow up in
09: detail.
10: Q.    But did you read the actual
11: request?
12: A.    I read this summary, most
13: likely.
14: Q.    Well, the summary was actually
15: not really a summary. It's a cut and paste,
16: right?
17: A.    Uh-huh.
18: Q.    They said "Please provide
19: reports of any serious adverse events
20: mentioning the INRatio device in ROCKET,"
21: right?
22: A.    Yes, that's what it says.
23: Q.    And as someone who's worked in
24: regulatory affairs, you understand that the

01: 00184:   spirit of that request is seeking evidence of
02: the device malfunctioning during ROCKET?
03: MR. HOFFMAN: Objection to the
04: form of the question.
05: BY MR. McWILLIAMS:
06: Q.    Correct?
07: A.    I understand the request -- the
08: request in the way that FDA is obtaining
09: information, so that's all. That's what
10: they're asking questions about.
11: Q.    Right.
12: A.    They want to have information
13: for their assessment.
14: Q.    And what information are they
15: requesting?
16: A.    They are requesting reports of
17: any serious adverse event reports mentioning
18: the INR device and ROCKET data.
19: Q.    And as someone who's got a
20: degree in regulatory affairs and who has
21: worked in regulatory affairs, and someone who
22: is familiar with this ROCKET point of care
23: issue, what is your understanding of the
24: spirit of that request? What type of

01: 00185:   information are they seeking?
02: MR. HOFFMAN: Objection to the
03: form of the question.
04: A.    For me, it's a typical
05: fact-finding request. So FDA is asking for
06: this information to be provided to them in
07: order to -- for their assessment.
08: BY MR. McWILLIAMS:
09: Q.    And --
10: A.    It's not suggesting anything.
11: It just says that they want to have this data
12: and this information for their evaluation.
13: Q.    And if it were true that
14: Janssen was in possession of information that
15: the device did, in fact, malfunction and
16: resulted in an adverse event to warfarin
17: patients, would you expect Janssen to supply
18: that information in response to this FDA
19: information request?
20: MR. HOFFMAN: Objection --
21: MS. TERSIGNI: Objection.
22: MR. HOFFMAN: -- to the form of
23: the question.
24: A.    FDA specifically asked about

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00186:   any serious adverse event reports, so that's
02: a technical term.  And it refers to specific
03: documents, adverse event reports, and that's
04: a specific area of expertise of
05: pharmacovigilance colleagues you would have
06: to ask to define that.
07: And then it says that those
08: reports should mention INR device in a very
09: general term, just whether it's included in
10: any of those report documents or it's very
11: factual requests as it is written here.
12: BY MR. McWILLIAMS:
13: Q.    Okay.  I'm going to show you
14: some documents, and then we're just going to
15: have a little test.  I just want you to tell
16: me whether or not, just using -- putting on
17: your regulatory affairs hat, using your
18: degree and your experience, and you tell me
19: whether or not you think this is the type of
20: information that should be supplied to the
21: FDA, okay?
22: MR. HOFFMAN:  Objection to the
23: form of the question and all questions
24: under the umbrella of this speech.

p. 00186

01: 00188:            MR. HOFFMAN:  Congratulations.
02: A.    Yeah, Manesh Patel also was
03: part of the steering committee of the
04: ROCKET --
05: BY MR. McWILLIAMS:
06: Q.    He was the lead author, right?
07: I mean, you cite it as Patel 2010, right?
08: A.    I -- I would have to look up,
09: yeah, the documents you're referring to, the
10: publications.  There were several
11: publications on ROCKET AF, and --
12: Q.    Okay.  Anyways --
13: A.    -- so certainly, he's one of
14: the --
15: Q.    So there's people on this
16: e-mail that include people from Duke and
17: people from Janssen, but I don't see anyone
18: from Bayer, do you?
19: A.    No, I don't see anyone from
20: Bayer.
21: Q.    Okay.  Have you seen this
22: document in the last two weeks in preparation
23: for your deposition?
24: A.    No, I haven't seen this

p. 00188

01: 00187:            MR. McWILLIAMS:  Okay.  I'm
02: handing you now what's been marked as
03: Derix-16, which is Record 671161.
04: (Whereupon, Deposition Exhibit
05: Derix-16, E-mail(s) re: POC/SAE,
06: XARELTO_JANSSEN_03933641 -
07: XARELTO_JANSSEN_03933643, Ref. 671161,
08: was marked for identification.)
09: BY MR. McWILLIAMS:
10: Q.    And you see this is an e-mail,
11: at the top dated October 17, 2007; is that
12: correct?
13: A.    Yes, that's correct.
14: Q.    And it's to -- it's from
15: someone named William Byra to Kenneth
16: Mahaffey.  Do you know Dr. Mahaffey?
17: A.    Yeah.  I don't know him
18: personally, but I've seen him, and he had a
19: role in the ROCKET AF trial in leading the
20: adjudication committee.
21: Q.    All right.  And you see that
22: this was also sent to Manesh Patel.  He was
23: the lead author of the ROCKET publication,
24: right?  That's the first time I caught that.

p. 00187

01: 00189:   document.
02: Q.    Okay.  Well, let's just start
03: at the top.  Do you see the subject line?
04: A.    Yes.
05: Q.    Okay.
06: A.    POC/SAE, uh-huh.
07: Q.    And someone who's familiar with
08: the issues in ROCKET, what does POC stand
09: for?
10: A.    Point-of-care device.
11: Q.    And what does SAE stand for?
12: A.    Typically, SAE is an
13: abbreviation that used also for serious
14: adverse event, but not exclusively.
15: Q.    Right.  But that's -- but
16: that's exactly what the FDA was asking for,
17: right, serious adverse events involving the
18: point-of-care device in ROCKET, right?
19: A.    No.  They were asking for
20: serious adverse event reports.  So that's a
21: distinctive description, because serious
22: adverse event reports is a clearly described
23: document that requires certain procedures
24: report -- or has certain requirements in

p. 00189

Page 49

01: 00190:   terms of reporting. And that's clearly
02: defined --
03: Q.    Okay. But you see the author
04: of this e-mail put "SAE" in the subject line,
05: right?
06: A.    Yeah, but it doesn't say SAE
07: report.
08: Q.    It just saying SAE?
09: A.    Uh-huh, yeah.
10: Q.    Okay. So it's a serious
11: adverse event that may or may not have been
12: reported is what you're saying?
13: MR. HOFFMAN: Objection to the
14: form of the question.
15: A.    That's not what I'm saying. I
16: just said that SAE is sometimes standing for
17: serious adverse event.
18: BY MR. McWILLIAMS:
19: Q.    Right. And --
20: A.    And so I would have to read the
21: document before I can --
22: Q.    Well, let's read it together --
23: A.    -- explaining on POC and SAE.
24: Q.    No, I understand. Let's read

01: 00191:   it together. Let's go to the very -- let's
02: go to the second page, because we'll look at
03: the very first e-mail that goes in the --
04: starts on the bottom.
05: And you see this is --
06: originally, this is an e-mail written by
07: Jonathan Piccini, dated October 17th, 2007,
08: written at 11:04 a.m. to Dr. Nessel, to
09: Dr. Byra and Kimberly Schwabe, and then cc's
10: a bunch of folks, including Dr. Patel.
11: Do you see that?
12: A.    Yes.
13: Q.    And then the subject line
14: there, in this original e-mail, the words
15: chosen by Dr. Piccini was "POC/SAE," right?
16: A.    Right.
17: Q.    Okay. Now let's go to the next
18: page, and let's see what Dr. Piccini wrote.
19: He wrote, "Team, I received a number of
20: helpline calls this morning regarding a
21: ROCKET patient at site 11008."
22: Do you see where I'm reading,
23: Dr. Derix?
24: A.    Yes.

01: 00192:         Q.    Okay. It says, "Apparently
02: this patient was warfarin naive and was being
03: titrated on study drug, when he presented
04: with hematuria." That's blood in your urine,
05: right?
06: A.    Right.
07: Q.    Okay. "His POC in the office
08: was 2.9." That's right within range, right?
09: That's between 2 and 3?
10: A.    If it is referring to the INR,
11: yeah, POC --
12: Q.    "Four hours later, he developed
13: severe epistaxis which required
14: hospitalization. He had an 'unblinded' INR
15: of greater than 10. He received 4 units of
16: fresh frozen plasma and IV vitamin K. ENT
17: packed his nose and called me. I spoke with
18: the ENT team, and helped them formulate a
19: plan. I also asked them to keep the INR and
20: other info to themselves due to the blind,
21: but the study MD had already tracked down the
22: information.
23: "The study PI, study
24: coordinator, and family are very upset. The

01: 00193:    PI has concern that the POC device is
02: defective, since there was a 7-unit
03: difference in the INR between the POC and
04: serum assay within 4 years -- 4 hours.
05: Apparently, they had a previous episode of
06: what they considered 'bad POC data'."
07: Do you see where I'm reading
08: from?
09: A.    Yes, I see what you're reading
10: from.
11: Q.    Okay. Now, just putting on
12: your regulatory affairs hat, is this not a
13: serious adverse event that should be
14: reported?
15: MR. HOFFMAN: Objection to the
16: form of the question.
17: MR. McWILLIAMS: I won't ask a
18: double negative.
19: BY MR. McWILLIAMS:
20: Q.    Is this a serious adverse event
21: that should be reported, in your opinion?
22: MR. HOFFMAN: Objection to the
23: form of the question.
24: A.    I'm -- typically it's not part

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00194:   of the role as a regulatory person, and also
02: not in my control to judge clinically on
03: adverse events or -- you have to be an expert
04: to do that, and you have to be a medical
05: doctor to do that, and so it's not upon me to
06: judge on this.
07: And as you see, there was a
08: clinical team involved who could certainly
09: better judge on this as I can do now here.
10: BY MR. McWILLIAMS:
11: Q.    I understand that.
12: Prior to today, have you ever
13: been made aware of this event that occurred
14: in this patient?
15: MR. HOFFMAN:  Objection to the
16: form of the question.
17: A.    We talked beforehand, so I'm
18: not copied on these e-mails and I have -- you
19: just showed them to me, so I just see it
20: here.
21: BY MR. McWILLIAMS:
22: Q.    Separate and apart from the
23: e-mail, have you ever been made aware of the
24: existence of patients in ROCKET whose

01: 00195:   point-of-care device said they were perfectly
02: within range, who had a bleeding event and
03: whose non-point-of-care device said they were
04: out of range?  Are you aware of any such
05: incidences?
06: A.    I do not recall that we
07: discussed that in the team, and as I said
08: before, typically, that's really something
09: that is -- yeah, those -- information is
10: being evaluated in the clinical team and not
11: in the broader cross-functional team.
12: Because it's going very much into a detail of
13: one specific patient's side, and the
14: investigator's name, and that's really not
15: the level of detail of information that we,
16: the regulatory person, or in my view as
17: program lead that I'm working on.
18: Q.    Well, just maybe let's -- maybe
19: don't put on your regulatory hat.  Let's just
20: put on your common sense hat.
21: Doesn't this look like an
22: instance of the device malfunctioning and a
23: patient suffering a bleeding event as a
24: result?

01: 00196:            MR. HOFFMAN:  Objection to the
02: form of the question.
03: A.    I cannot judge this from the
04: information provided here.  It just describes
05: an event that, as you can see from the e-mail
06: chain, that obviously caused some follow-up,
07: and it was shared and discussed.  That's all
08: I can comment on that.
09: BY MR. McWILLIAMS:
10: Q.    But do you know if this event
11: was ever shared with the FDA or EMA?
12: A.    I cannot see this from this
13: e-mail chain because it's, again, a different
14: process you have, and applied about serious
15: adverse event reporting.
16: Q.    Well, in all your dealings with
17: EMA, are you aware of any communication to
18: EMA that the clinicians involved in ROCKET
19: observed instances of the device
20: malfunctioning?  In any of the communications
21: with EMA, was that ever told?
22: A.    I'm not aware of such
23: communication, but it's also not the typical
24: way of communication to health authorities,

01: 00197:   because not -- I mean, there are certain
02: rules for information that is being shared
03: with the health authorities, and -- so that
04: they can also work in a structured way and to
05: have an opportunity to assess information
06: properly.
07: Q.    Well, they can't --
08: A.    So it's not typically that each
09: and every communication or source shared
10: immediately, so there's processes in place to
11: share the information in order to help them
12: to appropriately also assess the --
13: Q.    Well, you would agree it's
14: impossible for them to assess the information
15: if they're not provided the information,
16: right?
17: MR. HOFFMAN:  Objection to the
18: form of the question.
19: BY MR. McWILLIAMS:
20: Q.    Again, wearing your common
21: sense hat, you can agree to that, can't you?
22: MR. HOFFMAN:  Objection to the
23: form of the question.
24: A.    In general, EMA and other

01: 00198:   health authorities can only, yeah, work with
02: the information that they have, that's --
03: MR. McWILLIAMS:  Okay.  So let
04: me show you another e-mail relating to
05: this same subject.  This is Derix-17,
06: Record 2840934.
07: (Whereupon, Deposition Exhibit
08: Derix-17, E-mail(s) re: ROCKET AF,
09: XARELTO_JANSSEN_13596622 -
10: XARELTO_JANSSEN_13596623,
11: Ref. 2840934, was marked for
12: identification.)
13: BY MR. McWILLIAMS:
14: Q.    Again, this is Dr. Nessel at
15: the top.  You've met him, haven't you?
16: A.    Yes, I have met him several
17: times in the course of the years of the
18: collaboration with Janssen.
19: Q.    And let's look at the second
20: e-mail down, the one dated September 18th,
21: 2008.  And I'll represent to you that they're
22: talking about the same patient.
23: A.    I would like to read this
24: before I can --

p. 00198

01: 00199:          Q.    You can read whatever you need
02: to to answer my question.
03: A.    Okay.
04: Q.    I promise it's not a trick.
05: Let's just read this together, and then I'll
06: ask you some questions.
07: Dr. Byra writes to Dr. Nessel
08: on September 18th, 2008, "This is another old
09: one from a year ago.  They are just catching
10: up on the queries for the bleed terms after
11: switching to inForm.  This was not just a
12: nosebleed.  This was bleeding from every
13: orifice with an INR of 10 -- greater than 10.
14: Somehow they got a wrong reading from the
15: HemoSense device - even though when we sent
16: it back it tested out okay at HemoSense.
17: "The SAEs were separated out --
18: rectal, urine, et cetera."
19: Did I read that correctly?
20: A.    You read it correctly.
21: Q.    And again, just from your
22: dealings with EMA, do you have any
23: recollection of this event being discussed in
24: any way, shape or form?

p. 00199

01: 00200:          MR. HOFFMAN:  Objection to the
02: form of the question.
03: A.    I'm not aware of discussing any
04: patient level information in that regard, so
05: we worked with the data that were collected
06: in the ROCKET AF database, and used that as a
07: basis for the information in our submission.
08: BY MR. McWILLIAMS:
09: Q.    But you understand the FDA did
10: specifically ask for patient level data?
11: A.    They asked for serious adverse
12: event reports, and --
13: Q.    And, again, if you don't report
14: it, you can't review it, right?  Wearing the
15: common sense hat?
16: MR. HOFFMAN:  Objection to the
17: form of the question.
18: A.    Certainly some obligation to
19: report adverse events according to the
20: guidelines, yes.
21: MR. McWILLIAMS:  Okay.  Let me
22: show you Derix-18, which is Record
23: No. 1322746.
24: (Whereupon, Deposition Exhibit

p. 00200

01: 00201:          Derix-18, E-mail(s) [No Subject],
02: XARELTO_JANSSEN_07545453 -
03: XARELTO_JANSSEN_07545456,
04: Ref. 1322746, was marked for
05: identification.)
06: BY MR. McWILLIAMS:
07: Q.    This is another e-mail chain
08: involving Dr. Nessel, Dr. DiBattiste,
09: Dr. Byra, Dr. Peters.  You recognize those
10: names, don't you?
11: A.    Yes, I recognize.
12: Q.    It was the guys at Janssen that
13: were in charge of ROCKET, right?
14: A.    Yes.
15: Q.    All right.  So let's -- this is
16: an e-mail chain, so let's look at the first
17: e-mail in time, which is on the last page.
18: You see it says this is an e-mail from
19: Dr. DiBattiste, dated October 17th, 2010, to
20: Dr. Nessel and others at Janssen.
21: It says, "Gary and Christopher,
22: I see that you are online, so I want to make
23: you aware of a case that occurred today in
24: Canada.  A subject who had a HemoSense device

p. 00201

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00202:   INR (or sham) value of 2.9 early today
02: subsequently developed epistaxis" -- I'm sure
03: I'm saying that wrong -- "and upon
04: presentation to the ER, had an INR of 10,
05: four hours after the device measurement.
06: "Questions have thus arisen
07: about the device and the accuracy of its
08: readouts, both for this particular device and
09: for the devices in general.  We've discussed
10: some plans for this subject and device.  Bill
11: can fill you in on the details.
12: "An immediate question relates
13: to how high of an INR can be seen with
14: rivaroxaban.  Has a value as high as 10 ever
15: been recorded?  If yes, what does this imply?
16: If no, is this the first such case?  On the
17: other hand, if the subject is on warfarin,
18: then do we have an issue with the accuracy of
19: this device?"
20: Did I read that correctly?
21: A.    You read the e-mail correctly,
22: yes.
23: Q.    And let me ask you this:  In
24: any of your dealings with Dr. Nessel,

p. 00202

01: 00203:   Dr. DiBattiste, did they ever communicate to
02: you that they had questions or concerns about
03: the accuracy of the HemoSense INRatio device
04: in ROCKET?
05: A.    I do not recall any
06: conversation at the time -- yeah, before
07: the -- we ran --
08: Q.    Before Deborah Cohen?
09: A.    -- the INR analysis on this.
10: Q.    Okay.  Let's go to page -- the
11: Bates number ends in 454.  I told you that
12: earlier, these weird codes that we put on the
13: bottom of every page.
14: A.    Okay.
15: Q.    Go to 454.  This is
16: Dr. DiBattiste again, doing a reply all to
17: all these same colleagues that you know at
18: Janssen.  He writes, "Definitely agree with
19: you about warfarin - I don't think it is
20: possible for an INR to move that much in such
21: a short time.
22: And, of course, if the patient
23: is on riva, then the 2.9 is a sham value.  So
24: it seems that we would conclude, based on the

p. 00203

01: 00204:   current knowledge and remaining blinded, that
02: either this patient is on riva or the device
03: is faulty."
04: Did I read that correctly?
05: A.    You read this correctly.
06: Q.    And would you accept my
07: representation that this patient was indeed
08: on warfarin?
09: MR. HOFFMAN:  Objection to the
10: form of the question.
11: MS. TERSIGNI:  Objection.
12: A.    I don't know where you took --
13: can take this conclusion from, just looking
14: at this document --
15: BY MR. McWILLIAMS:
16: Q.    That's a very fair point.  You
17: can't take it from reading just this
18: document, but I have access to the entire
19: clinical trial database, and I was able to
20: determine that this patient was indeed
21: randomized to warfarin.
22: So with that in mind, does it
23: concern you that Dr. DiBattiste said that it
24: would allow one to conclude that if this

p. 00204

01: 00205:   patient is on warfarin, that the device is
02: faulty?
03: MR. HOFFMAN:  Objection to the
04: form of the question.
05: BY MR. McWILLIAMS:
06: Q.    So does that concern you?
07: MR. HOFFMAN:  Objection.
08: A.    We are talking here about,
09: yeah, a situation that is way back, and it's
10: from a daily clinical practice communication,
11: and it's one single case.  So --
12: BY MR. McWILLIAMS:
13: Q.    Well, this is one single
14: case --
15: MR. HOFFMAN:  Hold on a second,
16: let her finish.
17: MR. McWILLIAMS:  I apologize.
18: MR. HOFFMAN:  That's okay.
19: A.    I think it's not appropriate to
20: just take such a judgment from just one
21: e-mail chain we're looking at here.
22: BY MR. McWILLIAMS:
23: Q.    I agree.  Maybe one in
24: isolation, but perhaps a series might provide

p. 00205

Page 53

01: 00206:   evidence of a bigger problem. Would you
02: agree with that?
03: MR. HOFFMAN:  Objection to the
04: form of the question.
05: A.    I would like to get this in the
06: hands of the clinical team.  We have more
07: than 14,000 patients in this trial, and so --
08: and the trial run many years under -- in our
09: measurements were done frequently, and also,
10: as I understand from what I heard from my
11: clinical colleagues, that such INR
12: measurements that are done repetitively,
13: those kind of situations also occur.
14: And we're live, and so
15: probably, yeah, only the clinical colleagues
16: can really make a judgment whether the single
17: case reported here, or as used supposed
18: sequence of potential cases, as falling out
19: of what normally happens in the daily
20: practice.  I cannot make that judgment for
21: them.
22: BY MR. McWILLIAMS:
23: Q.    Okay.  But sitting here today,
24: you have no recollection of Dr. Nessel,

p. 00206

01: 00207:   Dr. DiBattiste, Dr. Peters sharing their
02: experience with this particular patient with
03: you?
04: A.    I have no recollection.  And
05: typically --
06: Q.    And therefore, you have no
07: recollection of that experience being shared
08: with regulators, either EMA, FDA or other?
09: MR. HOFFMAN:  Objection to the
10: form of the question.
11: BY MR. McWILLIAMS:
12: Q.    Fair?
13: A.    As I said, there are really
14: clearly clear rules for serious adverse event
15: collection and reporting to the health
16: authorities, and they fall under the
17: responsibility of the pharmacovigilance team.
18: So I would have to talk to
19: those expert colleagues, whether they can
20: retrieve the information for you by knowing
21: the patient identification, the timing of the
22: event, and so whether there was a report
23: created.
24: MR. McWILLIAMS:  Move to strike

p. 00207

01: 00208:         as nonresponsive.
02: BY MR. McWILLIAMS:
03: Q.    Ma'am, my question was simply
04: whether or not you had any recollection of
05: this incident being reported to EMA or FDA?
06: MR. HOFFMAN:  Objection to the
07: form of the question.  Asked and
08: answered.
09: A.    I don't have a recollection --
10: BY MR. McWILLIAMS:
11: Q.    Thank you.
12: A.    -- but I --
13: Q.    That's all I asked.
14: MR. HOFFMAN:  No.  Go ahead and
15: finish your answer.
16: A.    Because the information that is
17: sent by our regulatory representatives to the
18: health authorities is typically aggregate
19: information and is not just, yeah, this type
20: of information.
21: MR. McWILLIAMS:  Okay.  Well,
22: let me show you another one.  Let's
23: look at Derix-19, which is
24: Record 2416273.

p. 00208

01: 00209:         (Whereupon, Deposition Exhibit
02: Derix-19, E-mail(s) Another POC
03: Problem, XARELTO_JANSSEN_11444538 -
04: XARELTO_JANSSEN_11444539,
05: Ref. 2416273, was marked for
06: identification.)
07: BY MR. McWILLIAMS:
08: Q.    You see this is another e-mail
09: chain from Dr. Byra, sending it to
10: Dr. Nessel, Dr. Peters -- you see this?
11: A.    Yes, I see this.
12: Q.    And the e-mail at the very
13: bottom was written by Dr. Piccini again,
14: copying Manesh Patel, lead author, knew about
15: these issues.  Amazing.
16: You see at the bottom, the
17: original e-mail, bottommost e-mail, what's
18: the subject line of this e-mail?
19: MR. HOFFMAN:  I move to strike
20: the preface to the question.
21: A.    The subject line reads,
22: "Another POC problem."
23: BY MR. McWILLIAMS:
24: Q.    And another, just again, just

p. 00209

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00210:   putting on your -- strike that.
02: That means this is not the
03: first problem with the point of care they've
04: observed, right?  That's what the word
05: "another" means?
06: A.    I would have to read the e-mail
07: to -- yeah, to discuss this, but if you --
08: Q.    That's what the word --
09: A.    From some general context, you
10: could suggest that.
11: Q.    Okay.  Well, perhaps.  Let's
12: try the context.  That's fair.  Let's read
13: this together.
14: "Team, I just got off the phone
15: with another troubling helpline call.  Rhonda
16: Olmstead (site coordinator in Lincoln,
17: Nebraska - site 1028) called me regarding a
18: patient with afib and diabetes who came into
19: the clinic on October 17th with a point of
20: care INR of 1.7.  The patient's warfarin was
21: changed from 2 milligrams 5 -- 2 milligrams 5
22: days a week with 2.5 Tuesday/Thursday, to a
23: new regimen of 2.5 daily."
24: So what they did was they saw

p. 00210

01: 00211:   his point of care of 1.7, and they increased
02: the patient's dose is what they're saying,
03: correct?
04: A.    Yes, that's correct.  But as
05: far as interpreted here as -- you're not
06: talking about the blind and unblinded?  Is
07: this an unblinded report?  Because you have
08: to bear in mind that even for the rivaroxaban
09: patients, they had a warfarin dose, and also,
10: that warfarin dose kind of was a placebo
11: certainly, but it was adapted according to
12: measurements of the same INR device.
13: So here in this case, I cannot
14: say whether this was before or after
15: unblinding, and whether it was a true
16: warfarin dose, same regimen change, or
17: placebo.
18: Q.    You're a hundred percent right,
19: but I assure you this was a warfarin patient,
20: okay?  So with that in mind, let's continue
21: reading.
22: "48 hours later the patient had
23: an appointment with his primary care
24: physician for diabetes, et cetera.  His

p. 00211

01: 00212:   primary care doctor checked a lab INR and
02: unfortunately communicated the result to
03: the -- to the ROCKET cardiologist.  The lab
04: INR was greater than 6, approximately
05: 48 hours after the point of care.  She called
06: because she thought the patient needed to be
07: treated as if he was formally unblinded.  We
08: reviewed the difference, but she remains
09: concerned (as am I) about the INR
10: discordance."
11: Did I read that correctly?
12: A.    You read it correctly, yes.
13: Q.    And sitting here today, do you
14: have any recollection of this event being
15: communicated to any regulators anywhere?
16: MR. HOFFMAN:  Objection to the
17: form of the question.
18: A.    As I said before, there is a
19: process in place for the clinical team
20: information, the clinical studies information
21: is provided, and if appropriate according to
22: the guidance as put in the report forms and
23: submitted as a very regular procedure to the
24: health authorities and for very regulated.

p. 00212

01: 00213:            I have no recollect --
02: recollection whether this specific patient
03: information that is cited here in the e-mail
04: was, yeah, deemed -- yeah, for -- or was part
05: of an adverse event reporting later on that
06: I -- that I can see from this information.
07: And I also can't recall and
08: know about this.
09: BY MR. McWILLIAMS:
10: Q.    But what you can see by looking
11: at the piece of paper is that the members of
12: the ROCKET executive committee were aware of
13: this information, right?  They were copied on
14: the e-mail; Dr. Patel, Dr. Nessel, right?
15: A.    Yes, some members were copied.
16: Q.    Okay.
17: A.    I don't know all the people who
18: are in this list, and know their function,
19: but Manesh Patel, I know.
20: MR. McWILLIAMS:  Okay.  We'll
21: take a break for lunch.
22: THE VIDEOGRAPHER:  Going off
23: the record at 12:42 p.m.
24: (Recess taken, 12:42 p.m. to

p. 00213

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00214:        1:35 p.m.)
02: THE VIDEOGRAPHER: We're back
03: on record at 1:35 p.m.
04: BY MR. McWILLIAMS:
05: Q.    Dr. Derix, Exhibits 14 and 15
06: was an FDA information request dated
07: January 12th, 2016.  There's an e-mail
08: attaching the information request.
09: Do you know whether or not EMA
10: has been informed about this information
11: request?
12: A.    I don't know specifically about
13: this information request because it's work,
14: day-to-day work my colleagues in the
15: regulatory department do.  But I don't know.
16: Q.    Is there any type of policy or
17: procedure where that type of information
18: typically would be communicated to other
19: regulators?
20: A.    I mean, typically we are very
21: transparent, so that's the attitude, but it's
22: not a regulation.  This is a disquieting
23: attitude, but certainly there's also some
24: information that's per regulation also

p. 00214

01: 00215:    shared.
02: And then there's also an
03: opportunity between the health authorities
04: they have -- especially EMA, FDA and the
05: Japanese health authority, they have an
06: agreement on -- a transparency agreement.
07: They can exchange on confidentiality basis
08: relevant information, and they can directly
09: talk to each other.  And they do this from
10: time to time when they feel it necessary.
11: Q.    What's the current status of
12: the Japanese FDA investigation into the
13: issue?
14: A.    As far as I recall the
15: information I have seen, they have also got
16: the submission that we did to EMA, and there
17: was a specifically conducted study to support
18: the approval in Japan called the ROCKET AF
19: study, and so similar set -- or the same set
20: of analysis was also applied to that study
21: and submitted.
22: And I do not recall any kind of
23: review feedback from Japanese health
24: authority so far, but they have received the

p. 00215

01: 00216:    information.
02: Q.    Have any other health
03: authorities around the world expressed
04: interest in this topic?  I saw one reference
05: to Australia asked to be kept apprised of any
06: information exchange with FDA or EMA.  Are
07: you aware of any other global health
08: authorities?
09: A.    You may have to direct that
10: question to regulatory colleagues.  In their
11: daily work they may have some information I
12: don't have, but I don't recall.
13: Q.    Okay.  And I appreciate that,
14: and I'm just asking you just the best of your
15: knowledge or memory.  Who would be the best
16: person to ask at Bayer to figure out or to
17: find out what other health authorities, if
18: any, have expressed interest in this topic?
19: A.    The colleague who's currently
20: the representative of regulatory in the
21: Xarelto team is J|rgen Weber.
22: (Clarification requested by the
23: reporter.)
24: MR. HOFFMAN:  He needs to hear

p. 00216

01: 00217:        what you said again.  "The
02: colleague"...
03: A.    The colleague who is currently
04: responsible for regulatory affairs in the
05: Bayer Xarelto team is J|rgen Weber.
06: BY MR. McWILLIAMS:
07: Q.    Okay.  Thank you.
08: Did anyone ever communicate to
09: you that -- strike that.  Let me back up.
10: What was the role of Duke,
11: DCRI, in ROCKET?
12: A.    Duke was the so-called ARO,
13: academic research organization, and in that
14: role they did specific things.  They would
15: try, for example, running the adjudication
16: committee.  But there were more tasks they
17: had to do, and I can't give you all of them
18: in detail because, again, that's clinical
19: operations teamwork, but just in general
20: terms to describe what they did.
21: Q.    But that would have included
22: Dr. Patel, Dr. Piccini, Dr. Mahaffey, those
23: were --
24: A.    Those were people, at least

p. 00217

01: 00218:   Dr. Mahaffey and Dr. Patel, I recall.  Other
02: name, I'm not so familiar with who decided,
03: who were at the time at Duke, and they, yeah,
04: also supported the ROCKET AF trial.
05: Q.    Did anyone ever communicate to
06: you in your role and responsibility for
07: regulatory affairs for Xarelto that
08: individuals at Duke, at DCRI, had concerns
09: over the accuracy and reliability of the
10: INRatio device as used in ROCKET?
11: A.    I do not recall a discussion
12: about Duke members.
13: Q.    To your knowledge, has that
14: information -- have you seen any evidence
15: that such information has been communicated
16: to EMA or any other regulators, that
17: specifically Duke, DCRI, expressed concerns
18: over the accuracy and reliability of the
19: device as used in ROCKET?
20: MR. HOFFMAN:  Objection to the
21: form of the question.
22: A.    I don't know.
23: MR. McWILLIAMS:  Okay.  I'm
24: going to hand you what we're marking

01: 00219:       as Derix-20, which is Record 753519,
02: and its two attachments, which is
03: Derix-21, 753520, and Derix-22, which
04: is Record 753521, and all of these go
05: together.
06: (Whereupon, Deposition Exhibit
07: Derix-20, E-mail(s) re: ROCKET - INR
08: Draft Proposal,
09: XARELTO_JANSSEN_04961856, Ref. 753519,
10: was marked for identification.)
11: (Whereupon, Deposition Exhibit
12: Derix-21, ROCKET Proposal for QC
13: Checks on HemoSense Device,
14: XARELTO_JANSSEN_04961857, Ref. 753520,
15: was marked for identification.)
16: (Whereupon, Deposition Exhibit
17: Derix-22, ROCKET Proposal for
18: Additional Education on HemoSense
19: Device, XARELTO_JANSSEN_04961858,
20: Ref. 753521, was marked for
21: identification.)
22: BY MR. McWILLIAMS:
23: Q.    And you can see the top one is
24: the e-mail attaching the next two documents,

01: 00220:   and this is dated October 29th, 2007.
02: Do you see that?
03: A.    Yes, I see that.
04: Q.    And this -- and they say, "All,
05: Attached is the draft proposal and recap of
06: the education piece we discussed on Friday.
07: I will send the draft proposal to Gary and
08: Pete for comment.  Let me know if you have
09: any questions."  And this is written by
10: Catherine Vanden Boom, clinical scientist at
11: Janssen; is that correct?
12: A.    That's correct.
13: Q.    And then attached to this
14: e-mail are two documents, the first being
15: "ROCKET Proposal for QC Checks of HemoSense
16: Device."
17: Do you see this?
18: A.    I see this.
19: Q.    And it says the "Issue:  The
20: ROCKET study lacks a mechanism to check the
21: accuracy of the HemoSense device.  Although
22: rare, a few investigator sites have expressed
23: concern regarding the accuracy of the Point
24: of Care device.  In addition, the unblinded

01: 00221:   INR monitor could also request a QC check."
02: Did I read that correctly?
03: A.    Yes, it says could also
04: request, yeah, uh-huh.
05: Q.    Sitting here today, is this the
06: first time you've been made aware that
07: investigator sites have expressed concern
08: regarding the accuracy of the point-of-care
09: device in ROCKET?
10: A.    It talks about an education
11: piece, so I would have to bring it into
12: context.  So here in this communication, it
13: does not talk about the site.
14: Q.    No, I'm talking -- I'm looking
15: at the first attachment.
16: MR. HOFFMAN:  This document.
17: A.    Uh-huh.  Okay.  Uh-huh.
18: BY MR. McWILLIAMS:
19: Q.    You see where it's written --
20: A.    Where a few investigator sites
21: have -- yeah, okay.
22: Q.    And prior to today, had you
23: been made aware that investigator sites had
24: expressed concern specifically with respect

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00222:   to the accuracy of the point-of-care device?
02: A.    No, I have not been involved in
03: this communication here.
04: Q.   Well, separate and apart from
05: this specific communication, was the
06: substance of this communication ever
07: communicated to you in any way, shape or
08: form?
09: A.    I do not recall that.
10: Q.   Okay.  Is that the -- as
11: someone with responsibility for regulatory
12: affairs, is that the type of information you
13: would expect to be communicated to you, that
14: specifically, doctors involved in the
15: clinical trial ROCKET were expressing
16: concerns over the accuracy of the device that
17: was informing their dosing decisions for the
18: warfarin patients?
19: A.    It would depend on the
20: evaluation of the situation by the clinical
21: team leaders, so not all information is just
22: flooded through, and there was an evaluation
23: by the people who are familiar and can assess
24: the information.  So that's the first level.

p. 00222

01: 00223:        And depending on the assessment
02: of the clinical team leader, the information
03: would have, yeah, provided also to regulatory
04: colleagues.  But first of all, it's really
05: the assessment of the situation by the people
06: who, yeah, have the experience and knowledge
07: to do so.
08: Q.   Well, let's keep reading.  It
09: says for the draft proposal, "QC checks of
10: the HemoSense device (i.e., concurrent INR
11: testing) could be triggered by investigator.
12: For example, the investigator contacts
13: Parexel or the DCRI hotline or the unblinded
14: monitor.  At this time, it is felt that a
15: random surveillance of sites is not necessary
16: since the device has been validated by the
17: manufacturer and approved by the FDA.
18: "The site would be responsible
19: for obtaining a blood sample for a PT, as
20: well as standard INR reading through the
21: HemoSense device.  The PT blood samples would
22: then be shipped to Covance for analysis.  The
23: report would only be available to the
24: unblinded monitor."

p. 00223

01: 00224:        Did I read that correctly?
02: A.    You read that correctly.
03: Q.   And sitting here today, had you
04: ever heard of this initiative to allow
05: investigators to collect split samples to
06: evaluate the accuracy of the point-of-care
07: device?
08: MR. HOFFMAN:  Objection to the
09: form of the question.
10: A.    I'm seeing this document for
11: the first time, so I -- even now, I would
12: have to read it twice in order to fully
13: understand the proposal that is made here.
14: BY MR. McWILLIAMS:
15: Q.    Okay.  Well, please do read it
16: twice.  And I'm not asking -- and I
17: understand you may not have seen this exact
18: document, but I want to know if you're
19: familiar with what's being discussed in this
20: document as someone responsible for
21: regulatory affairs for Xarelto at this time.
22: (Document review.)
23: A.    So this is information that is
24: still under -- on the clinical trial level,

p. 00224

01: 00225:   and first of all, it's a draft proposal, so I
02: don't know where it really went finally.
03: And it's -- yeah, procedural
04: and information contained here would be part
05: of the -- or is certainly part of the
06: clinical trial master file.  So that's why I
07: would, yeah, think it is being recorded.  And
08: so not necessarily as a regulatory
09: representative to the team, I would get such
10: information.
11: BY MR. McWILLIAMS:
12: Q.    Well, do you know if this
13: proposal was actually enacted?
14: A.    I don't know.
15: Q.    Okay.  So you -- you understand
16: that what's being proposed here is a
17: mechanism to allow investigators to collect
18: split samples, one to be analyzed by the
19: point-of-care device --
20: A.    Yes.
21: Q.    -- the other to be analyzed by
22: a central lab, to evaluate the performance
23: and accuracy of that device?  You understand
24: that, right?

p. 00225

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00226:     A.    Yeah, I understand that there's
02: a procedure proposed, yeah, in a blinded
03: fashion to -- yeah, to split the sample
04: and -- yeah, then there is equipment and
05: procedures, end result reporting procedures
06: proposed.
07: Q.    And you understand this was
08: proposed in response to concerns raised of
09: the accuracy of the point-of-care device?
10: A.    That is what I cannot judge on,
11: because suddenly the -- I wasn't involved in
12: the discussion about it. It gives -- yeah,
13: it mentions that few investigator sites have
14: expressed concern, so --
15: Q.    Right.  Well, let's go to the
16: next page.  Again, this is meeting minutes
17: from a meeting that occurred on Friday,
18: October 26th, 2007.  The attendees included
19: Sanjay Jalota.  That was your counterpart at
20: Janssen; is that correct?
21: A.    That was correct.  At the time,
22: yeah, in 2007, he was my counterpart at --
23: Q.    And included Christopher
24: Nessel, he was a member of the ROCKET AF

p. 00226

01: 00228:    continued working on the study and finally
02: also reported on the study, so I can only
03: assume that it was a resolve to do
04: satisfaction of the participants in this.
05: So that's only what I can
06: conclude from the process, but I am -- I
07: cannot comment on the specific note here and
08: the date.
09: Q.    Well, if it's true -- if they
10: did enact this procedure to take split
11: samples to evaluate the accuracy of the
12: point-of-care device that's being used to
13: manage the warfarin arm in ROCKET, is that
14: the type of information that should be shared
15: with regulators?
16: MR. HOFFMAN:  Objection to the
17: form of the question.
18: A.    You said -- I mean, should be
19: shared is always a question, and which type
20: of form and --
21: BY MR. McWILLIAMS:
22: Q.    In any form.
23: A.    -- in which context?
24: So as it is here, it is still

p. 00228

01: 00227:    executive committee; is that correct?
02: A.    Yes, he was the clinical lead
03: on the Janssen side for ROCKET AF.
04: Q.    And the issue reported is
05: "There is concern on the part of DCRI,
06: Parexel and the investigator sites with the
07: accuracy of the POC device."
08: Did I read that correctly?
09: A.    You read that correctly.
10: Q.    And so sitting here today, this
11: is the first time you ever learned that the
12: physicians at Duke, at DCRI, at your academic
13: research institute, had concerns about the
14: accuracy of this device that was being used
15: to manage the warfarin arm in ROCKET?
16: A.    Yes, I see this document the
17: first time, and it's referring to specific
18: point in time where -- where they obviously
19: discussed the topic.
20: Q.    Right.  And sitting here today,
21: you still don't know whether or not this was
22: actually enacted or dismissed?
23: A.    I don't know that, but I -- as
24: the study moved forward and all participants

p. 00227

01: 00229:    an operational meeting, an operational topic
02: that is in the course of the clinical trial,
03: and everything was happening also on a very
04: detailed level, even outside the clinical
05: trial report that is, at the end, submitted
06: to the health authorities.
07: There's a clinical trial master
08: file, and that file is auditable for the
09: health authorities and so also accessible.
10: So even without having a direct
11: reporting requirement for all information
12: that is captured in the course of a clinical
13: trial, there is this auditable file where
14: information can be found.
15: Q.    But what's being proposed here
16: is to generate and to collect data
17: specifically aimed to evaluate whether or not
18: this device is operating properly, correct?
19: A.    I'm not sure whether it is
20: really a general process, because it also
21: talks here about for urgent safety issues.
22: So special situations, I really cannot
23: comment on whether it was meant to be a
24: general process or how it was to be applied

p. 00229

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00230:  and how -- and what -- yeah, what -- yeah,
02: how the data should be shared or were meant
03: to be used.  So -- and because I'm reading
04: this the first time, so it's --
05: Q.    I understand.  I think that's
06: part of my point, ma'am, is that you are
07: just -- you are just now learning about this
08: program for the first time.  And sitting here
09: today, you don't know whether or not this
10: program was enacted and whether any data was
11: generated, what that data showed, and whether
12: that data has been shared with global
13: regulators.  Do I understand your testimony
14: correctly?
15: A.    At least in that first point
16: where you said that I was not aware of this
17: program and I don't know the results.  I
18: cannot comment because the people who are in
19: contact with the health authorities in the
20: U.S. are my Janssen colleagues, and so I
21: cannot comment on how they -- yeah, what type
22: of information they provided or not.
23: But at least for the first
24: part, it's correct, that I haven't seen this

p. 00230

01: 00231:  before.
02: Q.    And if you look here at the
03: first attachment I showed you, it says
04: this -- the report, the data, the split
05: sample data will be available to the
06: unblinded monitor, and you see down below, it
07: identifies the unblinded monitor as Bud
08: Chalecki.
09: Do you see that?
10: Are you with me, Evan?  You can
11: always look on the screen.
12: So, Evan, highlight just the
13: report --
14: A.    Yeah, the reporting of
15: results -- I see where you are.
16: Q.    And so there would be this
17: individual, Bud Chalecki, who would be able
18: to see the results of these paired samples,
19: again, paired samples that were generated for
20: the sole purpose of evaluating whether or not
21: this device was malfunctioning.
22: And sitting here today, this is
23: the first time you knew that this individual
24: was given this job?

p. 00231

01: 00232:         MR. HOFFMAN:  Objection to the
02: form of the question, misstates the
03: evidence.
04: A.    At least for the first time I
05: see this, yeah, draft proposal for the QC
06: checks and the procedure that was laid out
07: here in this document.
08: BY MR. McWILLIAMS:
09: Q.    Let me hand you -- and, again,
10: I guess, I think I've got it crystal clear.
11: But you don't know whether or not this
12: proposal was actually acted upon?
13: A.    I don't know that.
14: MR. McWILLIAMS:  Okay.  Let me
15: hand you Derix-23, which is Record
16: No. 1052801.
17: (Whereupon, Deposition Exhibit
18: Derix-23, Dear ROCKET Investigator
19: Letter, XARELTO_JANSSEN_07050218,
20: Ref. 1052801, was marked for
21: identification.)
22: BY MR. McWILLIAMS:
23: Q.    And this is a letter that was
24: sent to all 1,000 investigators in all

p. 00232

01: 00233:   40-plus countries around the world that were
02: involved in ROCKET, notifying them of this
03: special program, where if they had concerns
04: about the accuracy of the point-of-care
05: device, they could take a split sample that
06: would then be analyzed by the unblinded INR
07: monitor, who we previously identified as Bud
08: Chalecki.
09: Have you ever seen this letter
10: before?
11: A.    I do not recall having seen the
12: letter before.
13: Q.    You see down at very bottom, it
14: says the un -- this is dated February 21,
15: 2008, and it's signed by Christopher Nessel,
16: right?
17: A.    It's signed by Christopher
18: Nessel, yes.
19: Q.    It says in the top, "You will
20: be receiving or have recently received a
21: special kit for collecting single samples for
22: a Special Blinded INR which is to be drawn
23: only after discussion with one of the medical
24: monitors or with the Parexel or DCR helpline.

p. 00233

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00234:          "These special blinded INRs,
02: performed through Covance" --
03: And Covance is the central
04: laboratory company, right?
05: A.    Yeah, Covance is a contract
06: research organization applying different
07: types of rules in trials.  And as far as I
08: recall, in the ROCKET AF trial, they ran the
09: central laboratory --
10: Q.    Right.
11: A.    -- for analysis.
12: Q.    So these -- "These special
13: blinded INRs, performed through Covance, are
14: designed to assist investigators who believe
15: that a subject's INR values obtained with the
16: HemoSense point-of-care device are greatly
17: different from what was expected."
18: Did I read that correctly?
19: A.    Yes, you read it correctly.
20: Q.    So does this indicate to you
21: that the proposal that we discussed
22: previously was actually enacted upon and that
23: the special blinded INR kits were sent to
24: investigators all over the world?

p. 00234

01: 00235:          A.    At least there is, I mean,
02: similarity on the information, so from the
03: draft to this, yeah, letter on official
04: letterhead, that this kit was provided to
05: investigators or could be provided to
06: investigators.
07: Q.    And does this refresh your
08: memory at all as to whether or not this has
09: been communicated to EMA or global regulators
10: that this special procedure was put in place
11: after concerns were raised over the accuracy
12: of the device?
13: MR. HOFFMAN:  Objection to the
14: form of the question.
15: BY MR. McWILLIAMS:
16: Q.    This wasn't prespecified.  This
17: wasn't contemplated prior to patients being
18: enrolled in ROCKET.  This was a special
19: procedure put in place after doctors were
20: concerned that the device was malfunctioning.
21: You understand that, right?
22: MR. HOFFMAN:  Objection to the
23: form of the question.
24: A.    I understand that this was a

p. 00235

01: 00236:    proposal that was made, yeah, during the
02: course -- during the course of the trial
03: while the trial was running.
04: BY MR. McWILLIAMS:
05: Q.    And you understand it was
06: proposed in response to concerns raised by
07: doctors, and Duke specifically, right?
08: That's what the documents say, right?
09: A.    That's what this document says,
10: that a few investigator sites have expressed
11: concern.
12: Q.    Right.  And I just want to make
13: sure that sitting today, on March 1st, 2016,
14: this is the first time you've ever heard of
15: this special program that was enacted as part
16: of ROCKET.
17: Do I understand your testimony?
18: A.    Yes, I understand and I repeat,
19: I have not been aware of this procedure, and
20: so this is the first time that I read this
21: letter.
22: Q.    All right.
23: A.    At least I can recall to read
24: it.

p. 00236

01: 00237:          Q.    And so if you didn't know about
02: it before today, there's no way you could
03: have told EMA about it in any of your recent
04: correspondence where they were investigating
05: this very topic; is that fair?
06: MR. HOFFMAN:  Objection to the
07: form of the question.
08: A.    Yeah.  As I just said, I see
09: this here the first time, and I don't have,
10: yeah, information on even -- I mean,
11: important would be what followed this letter.
12: I mean, the letter was --
13: BY MR. McWILLIAMS:
14: Q.    We'll get to that.
15: A.    -- an offer, but it -- yeah, I
16: don't know how many, at the end, physicians
17: really took that offer, how the information
18: was processed, and -- yeah.
19: Q.    I want to say that's the same
20: question I have, so let's keep going a little
21: bit.  Let me show you one of these instances.
22: MR. McWILLIAMS:  Evan, this is
23: Record 2959134.  We're marking this as
24: Derix-24.

p. 00237

Page 61

01: 00238:          (Whereupon, Deposition Exhibit
02: Derix-24, E-mail(s) re: INR check for
03: patient 111178,
04: XARELTO_JANSSEN_14556639,
05: Ref. 2959134, was marked for
06: identification.)
07: BY MR. McWILLIAMS:
08: Q.   I'm handing you Derix-24, which
09: is Record 2959134.  And I just want to focus
10: your attention on the very bottommost e-mail,
11: and it's from Bud Chalecki, dated August 5th,
12: 2009, correct?
13: A.   Yes.
14: Q.   And this is the same Bud
15: Chalecki -- that's the name we saw referenced
16: earlier as the unblinded monitor?
17: A.   If I recall the name correctly,
18: yes, I think it's the same.
19: Q.   So that's the individual that
20: would have access to the data whenever a --
21: whenever a doctor had concerns about the
22: device malfunctioning, that doctor was given
23: this special kit where they could take a
24: split sample, one would be analyzed by the

01: 00239:   point-of-care device, the other would be
02: analyzed by the Covance central lab.  And
03: then Mr. Bud Chalecki would have access to
04: see that data.
05: Do you remember that
06: discussion?
07: A.   Yeah.  It was kind of suggested
08: here in this procedure.  I don't know whether
09: it was really mentioned that Bud Chalecki has
10: this information, so at least he was
11: mentioned here as to -- in the reporting of
12: results section.
13: Q.   Right.  And let's look at what
14: Mr. Chalecki reports, and the subject line is
15: "INR check for patient 11178 at site 011608."
16: And I've looked it up, and that
17: is, in fact, a patient that was randomized to
18: warfarin.  And we'll have to sort that out
19: later, but I'll represent to you that that's
20: what my research showed.
21: And Mr. Chalecki reports to
22: Bill Byra at Janssen that "The INR check for
23: this patient was almost three units higher
24: than the result reported by the HemoSense

01: 00240:   device."
02: Did I read that correctly?
03: A.   You read that correctly, yes.
04: Q.   So is this further evidence
05: that this proposal to investigate instances
06: where doctors fear or have concerns about the
07: accuracy of the device was actually enacted
08: upon and, in fact, confirmed, at least one
09: instance of the device generating a result
10: that's inconsistent with the central lab
11: value?
12: A.   Yeah.  I mean, in the e-mail,
13: it reads that there was an INR check.  If
14: that referred to the check procedure you just
15: mentioned, so I would have to take that from
16: the context, for one specific patient at one
17: specific site, was higher than the results
18: reported by the HemoSense device, yes.
19: Q.   All right.  And if you go to
20: the middle --
21: A.   So this information --
22: Q.   -- the middle e-mail, it says,
23: "There is a discrepancy between the POC INR
24: and the blinded Covance INR."

01: 00241:          Does that further help you
02: understand that that's exactly what's being
03: discussed here, that this is one example of
04: the special blinded INR procedure being
05: implemented and confirming that the device is
06: generating a result that's inconsistent than
07: that observed by a central lab?
08: MR. HOFFMAN:  Objection to the
09: form of the question.
10: A.   It falls into the context of
11: what we just discussed, the procedure and
12: that there were two measurements done, and,
13: yeah, also there was -- for this one specific
14: patient found a difference in result for the
15: two different measurements.  That's what this
16: factually states.
17: BY MR. McWILLIAMS:
18: Q.   And sitting here today, have we
19: gotten any closer to refreshing your memory
20: of your being aware of this program at all?
21: A.   Again, I have -- I've not been
22: aware of this program.  I don't recall a
23: discussion about the program, and also, I
24: don't recall having seen any of their results

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00242: or any of that information from individual --
02: yeah, instances where the program might have
03: been used.
04: Q.   Okay.
05: A.   So --
06: Q.   So, again, if you weren't made
07: aware of it and someone who has got
08: responsibility for regulatory affairs, it's
09: fair to say that you see no evidence of this
10: being communicated to regulators, fair?
11: MR. HOFFMAN: Objection to the
12: form of the question.
13: A.   At least I cannot recall, and
14: so from my work at the time, that I or
15: someone in my group actively had this
16: information or forwarded it, but this is
17: not -- I mean, this is not the only way of
18: communication to the health authorities.  Not
19: everything is going to the regulatory team,
20: but there are also other direct communication
21: links, for example, through the
22: pharmacovigilance department.  And so I
23: cannot exclude that some of information was
24: submitted through those channels.

p. 00242

01: 00243:  BY MR. McWILLIAMS:
02: Q.   But, Doctor, don't you think
03: the fact that there was a special program
04: created in direct response to concerns of the
05: accuracy and reliability of this device,
06: don't you think that should have been
07: communicated to regulators, especially in
08: light of everything that's going on now with
09: this investigation with the device?
10: MR. HOFFMAN: Objection to the
11: form of the question.
12: BY MR. McWILLIAMS:
13: Q.   I mean, isn't it a little
14: troubling to you that you're learning about
15: this today for the first time?
16: A.   I said earlier, in many things,
17: yeah, the regulatory function is relying on
18: experts and cannot judge by themselves on
19: cases, on single events.  And so also here, I
20: would have to refer to my colleagues and
21: really let them describe and also decide for
22: us -- or not decide, but to explain the
23: relevance and to judge on the relevance.
24: And, yeah, for -- how broadly to communicate.

p. 00243

01: 00244:           Sometimes, I mean, there's a
02: question asked and a question answered in the
03: course of a trial, and there may be other
04: events where some special measures were
05: implied just because of learning during the
06: clinical trials.  And so that's not all
07: immediately going, yeah, into the -- I mean,
08: into the hands of the regulatory team at the
09: time.
10: So it's not complete -- it's
11: not completely unusual that not all the
12: information that is shared on the clinical
13: team is provided, yeah, to the regulatory
14: teams.
15: Q.   How many meetings, either in
16: person or telephone or video conference, have
17: you had in the last six months about this
18: very particular issue, this device
19: potentially malfunctioning in ROCKET.
20: Dozens, right?
21: A.   I don't know the number
22: exactly, but we met regularly --
23: Q.   Dozens?  Would you agree with
24: that?

p. 00244

01: 00245:           A.   I cannot fix in on a number, so
02: it was -- it was frequent meetings, so --
03: Q.   Very frequent meetings.  And
04: this never came up?
05: A.   I do not recall, at least in
06: the meetings I participated in, that it came
07: up.
08: MR. McWILLIAMS:  Now, let me
09: hand you -- well, let me show you
10: because I think I know the answer.
11: (Whereupon, Deposition Exhibit
12: Derix-25, Blinded INRs from Covance
13: Spreadsheet,
14: XARELTO_JANSSEN_14724821 -
15: XARELTO_JANSSEN_14724826,
16: Ref. 2973209, was marked for
17: identification.)
18: BY MR. McWILLIAMS:
19: Q.   This is Derix-25,
20: Record No. 2973209.  And I'll represent to
21: you that counsel for Janssen -- I'll back up.
22: Dr. Nessel testified -- I asked
23: him how many times this special program was
24: actually utilized by doctors, and he told me

p. 00245

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00246:   it was approximately 140. And I asked
02: Dr. Nessel's attorney to provide us with
03: those results, and this is what they gave us.
04: And I count 144 different
05: instances, again, where doctors had concerns
06: about the accuracy of this device, this
07: device that directly informed them on how to
08: dose their warfarin patients; over 140
09: instances where they had concerns about the
10: accuracy of that device that they actually
11: triggered this special program where a split
12: sample was collected, and then Mr. Bud
13: Chalecki observed the results.
14: Sitting here, is this the first
15: time you've ever been made aware of that?
16: A.    This is the first time I see
17: this list of information and so -- yeah.
18: This is the first time I see this list.
19: Q.    And do you have any
20: recollection of this 144 instances of doctors
21: expressing concern about the accuracy and
22: reliability of this device and Janssen then
23: actually testing, taking split samples?
24: Do you know -- do you have any

01: 00248:   discrepancy between, which may have been due
02: to misdispensed drug. Repeat in 3 days."
03: Go down to cell 8 --
04: A.    But this is already a good
05: example that not every discrepancy was
06: directly linked to a device issue, because
07: there can also be other reasons, yeah, like
08: misdispensed drug, for example --
09: Q.    How --
10: A.    -- that led the physician to
11: ask the question and to get reconfirmation
12: for them whether the treatment they were
13: applying in the trial was correct.
14: Q.    Doctor, how does misdispensed
15: medicine have any bearing on a split sample?
16: If you measure the INR in a patient's blood
17: at one point in time and then you measure it
18: with two different methods, you would expect
19: the same number or a similar number.
20: MR. HOFFMAN: Objection to the
21: form of the question.
22: BY MR. McWILLIAMS:
23: Q.    You can't -- right?
24: A.    That's correct, if the sample

01: 00247:   evidence that this data was ever actually
02: communicated to regulators?
03: MR. HOFFMAN: Objection to the
04: form of the question.
05: A.    First of all, I mean, you say
06: it is a list of concerns, but if you look,
07: really it also includes other issues like out
08: of stability or deviations, so it does not
09: express directly a concern.
10: So it's really also again a
11: fact sheet where facts are collected, and I'm
12: not aware of this sheet and I have not been
13: aware. And so I cannot --
14: BY MR. McWILLIAMS:
15: Q.    Let's go --
16: A.    -- comment on whether
17: information -- what information can be found
18: in the documentation.
19: Q.    Let's look at like cell 7.
20: Do you have this up, Evan? And
21: go to the comments.
22: This is, you know, a doctor in
23: Australia, patient 104078, comment, "Sent
24: e-mail to J. Larsen, Parexel. Some

01: 00249:   is the same sample and measurement done
02: and --
03: Q.    So let's keep going then.
04: Cell 8. It says, "Sent
05: follow-up to J. Larsen on 7/21. INRs are
06: discrepant by 1. Site to receive new devices
07: and strips."
08: Did I read that correctly?
09: A.    Which cell are you at?
10: Q.    Cell 8.
11: A.    8? Okay.
12: Q.    So the question is whether I
13: read it correctly.
14: A.    Uh-huh, yes.
15: Q.    Then cell 11, again, another --
16: this is another doctor, Dr. David Packham in
17: Australia. Cell 11, "E-mail sent on 8/20/08,
18: blinded INR not consistent with HemoSense."
19: Did I read that correctly?
20: A.    You read that correctly.
21: Q.    Let's go down to cell 15,
22: another doctor in Australia. "E-mail sent --
23: sent e-mail to site on November 2nd, 2008.
24: Discrepancy exists, but subject still within

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00250:   target range.  Repeat INR with POC and send
02: in blinded INR."
03: Did I read that correctly?
04: A.    You read that correctly.
05: Q.    Go down to cell 23, Dr. Michael
06: Ling in Canada.  The note says, "INR high
07: from Covance.  Replace the machines."
08: Go to the next --
09: A.    It says, "INR high from
10: Covance," but it doesn't say anything
11: about --
12: MR. HOFFMAN: You read 24.
13: MR. McWILLIAMS:  Oh, I'm sorry.
14: THE WITNESS: Ah.  Yeah, okay.
15: BY MR. McWILLIAMS:
16: Q.    Let me go to the next cell,
17: same doctor, same patient says, "Replace
18: machines," right?
19: A.    Okay. I see.  Yeah.  Yeah.
20: Q.    Go to the next page, cell 35,
21: Dr. Neil Hudson in Canada, "Spoke with
22: nurse" -- her name was Flo -- "INR higher
23: than expected and subject may be taking
24: exogenous warfarin."

p. 00250

01: 00252:   So if that's --
02: Q.    And "INR check" is the same
03: language used by Doctor -- by Mr. Chalecki in
04: the prior exhibit.  Dr. Derix, just look at
05: the prior exhibit, you'll see that the
06: subject line was "INR check for patient 11178
07: at site 011608."
08: A.    Now I lost you.
09: MR. HOFFMAN:  He's referring
10: to --
11: (Simultaneous discussion
12: interrupted by the reporter.)
13: BY MR. McWILLIAMS:
14: Q.    You see the subject line is
15: "INR check."  That's the lingo Bud Chalecki
16: uses, right?
17: A.    Yes.  Yes.
18: Q.    So let's look and see if we can
19: find that patient.  That's cell 38.  Patient
20: 11178 at site 011608.  Do you see that?  And
21: it's reported, "E-mail to Parexel Medical
22: Monitor.  INRs discrepant.  To check with
23: investigator."
24: Did I read that correctly?

p. 00252

01: 00251:         But, again, even if a doctor --
02: even if a patient is taking warfarin outside
03: of the study medication, you would expect the
04: INR to be the same if it's measured at the
05: same time, right?
06: MR. HOFFMAN:  Objection to the
07: form of the question.
08: A.    That is not to be -- yeah, you
09: cannot see this from the context.  It just
10: says higher than expected.
11: BY MR. McWILLIAMS:
12: Q.    Right.
13: A.    And just saying not --
14: Q.    Well, this is all in the
15: context of INR checks, of split samples --
16: (Simultaneous discussion
17: interrupted by the reporter.)
18: BY MR. McWILLIAMS:
19: Q.    And this was all in the context
20: of INR checks, split samples, right?  That's
21: what it says right there in column G, "INR
22: check," C-K.
23: A.    Yeah, the list represents
24: blinded INRs from Covance as of April 20th.

p. 00251

01: 00253:         A.    That's correct, yes.
02: Q.    And that's the same patient,
03: the same site and same date that Mr. Chalecki
04: reported as having a discrepancy of almost
05: three units between the HemoSense device and
06: the Covance central lab, right?
07: A.    In his e-mail, Bud Chalecki is
08: talking about three units higher from the INR
09: check, yes.
10: Q.    Okay.  Let's keep reading.
11: Let's go to page -- the third page.  Go down
12: to cell 74, a doctor in Lithuania had
13: concerns, "E-mail sent on 4/30.  Blinded INR
14: higher 2 units than the POC device.  Repeat
15: with other machine."
16: Repeating with another machine
17: doesn't help if all the machines are
18: defective; would you agree with that?
19: MR. HOFFMAN:  Objection to the
20: form of the question.
21: A.    You recall that we talked about
22: earlier that there is some variance, if you
23: compare to a different devices or --
24: ///

p. 00253
Page 65

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00254:  BY MR. McWILLIAMS:
02: Q.    You see --
03: A.    -- predicate with a new device,
04: and so some deviation --
05: Q.    Some discrepancy is expected,
06: but here they're talking about two whole
07: units, right?
08: A.    Yeah.  It doesn't really say
09: that it was two units higher.  It just could
10: also mean that the reported value was 2, but
11: okay, that's -- we really would have to look
12: into the context.
13: Q.    Okay.  Go to the next page,
14: please.  Cell 92, doctor in South Africa has
15: concerns, does the INR check.  Bud Chalecki
16: reports, "E-mail sent 5/20.  INRs elevated.
17: Repeat."
18: Did I read that correctly?
19: A.    Yes, you read that correctly.
20: Q.    Cell 96, a doctor in Taiwan in
21: May of '09 has concerns, has an INR check.
22: "E-mail sent 5/19/09.  INR discrepant with
23: POC.  Repeat Covance INR in about 2 weeks."
24: Did I read that correctly?

01: 00256:    included in the EMA response because
02: information out of the clinical database is
03: going into also the study reports, and so we
04: really would have to carefully check whether
05: some of this information also appeared in a
06: different way in other -- in information that
07: was also used for the sensitivity analysis
08: and other analysis.
09: So I cannot give you that
10: response from the information here because it
11: would require a detailed follow-up of the
12: subject numbers and the site numbers and --
13: yeah, to make that conclusion.
14: BY MR. McWILLIAMS:
15: Q.    But sitting here today, you've
16: seen no indication whatsoever this has ever
17: been done.  This is the first time today you
18: ever became even aware of this program, the
19: reason for the program or the data generated
20: as a result of the program, correct?
21: A.    I have not been aware of this
22: information you just told to me, yeah,
23: before.
24: Q.    Dr. Derix, isn't it true that

01: 00255:       A.    You read that correctly.
02: Q.    Go to the last page, cell 142,
03: it's the Dr. Herzog in the United States.
04: Again, concerns about the device not working
05: properly, utilizes this special procedure
06: that Janssen put in place.  Reports, "Spoke
07: with Tanya.  Patient got wrong bottle of
08: study med.  INR greater than 3, higher than
09: POC, which was less than 2.  Hold warfarin
10: placebo for three days, then repeat INR and
11: blinded INR."
12: Did I read that correctly?
13: A.    You read that correctly, yes.
14: Q.    And to the best of your
15: knowledge, none of this data has been --
16: well, none of this data was presented in any
17: of the information that you recently
18: submitted to EMA when they were doing an
19: investigation into this device; is that
20: correct?
21: MR. HOFFMAN:  Objection to the
22: form of the question.
23: A.    We cannot conclude this from
24: this list and the information that was

01: 00257:    you specifically had been put on notice prior
02: to the first patient was ever randomized in
03: ROCKET, there was a Dr. Kaste from Finland
04: who reached out to you and your colleagues
05: about the need to validate the POC device
06: prior to randomizing the subjects in this
07: trial, and he raised the specification
08: concern about the device being inaccurate and
09: it resulting in improper dosing of the
10: warfarin patients?
11: MR. HOFFMAN:  Objection to the
12: form of the question.
13: A.    I cannot follow all the
14: information you just represented to me, but
15: the name -- Dr. Kaste is familiar to me.  He
16: is a well-known neurologist --
17: BY MR. McWILLIAMS:
18: Q.    Have you ever --
19: A.    And I think he was -- I recall
20: he was an investigator in the trial, the
21: ROCKET AF trial.
22: Q.    And have you reviewed any
23: e-mails or documents in the last week or two
24: that include correspondence from Dr. Kaste

01: 00258: specific to this issue, the use of
02: point-of-care devices in ROCKET?
03: A. I have reviewed the document
04: at -- well, I was copied on -- from
05: Dr. Kaste, yeah, in the course of the
06: preparation of the ROCKET AF trial, yes.
07: Q. Did you review it in
08: preparation for your deposition today?
09: A. I reviewed it also in
10: preparation of the deposition.
11: Q. And how long did you meet with
12: lawyers to prepare for your deposition?
13: A. I don't know the exact time --
14: Q. Well, how many days?
15: A. I met primarily with William
16: Hoffman and Edda Dolzer from Bayer, and
17: several hours maybe, difficult, five days or
18: so in total, just -- yeah.
19: Q. Five days total?
20: A. Yeah.
21: Q. And approximately how many
22: hours per day?
23: A. Approximately five, six hours
24: per day.

p. 00258

01: 00260: So, for example, a periodic
02: safety update report is already a totality of
03: a document that considers three boxes of
04: paper, but if it's counted as one document.
05: It's one document. It's not that much.
06: Q. I understand.
07: A. So I find this question really
08: difficult to respond to.
09: Q. I understand. I understand.
10: (Whereupon, Deposition Exhibit
11: Derix-26, E-mail(s) re: Your E-mail of
12: 11/6/06 regarding rivaroxaban SPAF
13: protocol, XARELTO_JANSSEN_13403496 -
14: XARELTO_JANSSEN_13403502,
15: Ref. 2822412, was marked for
16: identification.)
17: BY MR. McWILLIAMS:
18: Q. Let me show you what we're
19: marking as Derix-26, Record 2822412, and I
20: guess I'd just like you to tell me if this is
21: the e-mail that you just referenced that you
22: reviewed in preparation for your deposition
23: today.
24: (Document review.)

p. 00260

01: 00259: Q. Okay. And how many documents
02: approximately did you review?
03: A. I don't know the number of
04: documents. I reviewed -- I identified a
05: number of documents as documents that I had
06: been familiar with, like the regulatory
07: submission documents primarily from the past
08: and meeting minutes from committees that I
09: attended.
10: Q. But can you give me an
11: approximate number of documents?
12: A. No.
13: Q. Was it more than a thousand?
14: A. I cannot give you a number of
15: documents that were --
16: Q. Less than a million?
17: A. Certainly, yes.
18: Q. But other than that, you can't
19: tell me if it's -- this can be -- I promise,
20: this isn't a trick question.
21: A. It could be totally wrong
22: because, I mean, what you consider is a
23: document and -- yeah, it's really -- I could
24: be totally off.

p. 00259

01: 00261: A. Yes, I read this e-mail.
02: BY MR. McWILLIAMS:
03: Q. And did you pick out this
04: e-mail to review, or did the lawyers pick it
05: out for you?
06: MR. HOFFMAN: Don't answer that
07: question.
08: MR. McWILLIAMS: Is that
09: privileged?
10: MR. HOFFMAN: I think it gets
11: into work product, whether I selected
12: it or not. You're entitled to ask her
13: if she reviewed it.
14: MR. McWILLIAMS: Okay.
15: BY MR. McWILLIAMS:
16: Q. Well, let's go to the
17: second-to-last page, please. Just to make
18: sure, my understanding is that this is an
19: e-mail -- originally, it's an e-mail written
20: by Scott Berkowitz, reciting or just giving a
21: summary of a telephone conversation he had
22: with Dr. Kaste of Finland, who is a famous
23: neurologist, I think you said.
24: A. Yes. So it's an e-mail chain

p. 00261

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00262:   between Christopher and Scott, and --
02: Q.    I just want to start with the
03: oldest e-mail in time.
04: A.    Okay.
05: Q.    Let's start with the
06: second-to-the-last page.
07: And Evan, if you'll just go to
08: the big paragraph in the middle, go down
09: about nine lines over on the right.
10: And, again, Doctor, you can
11: always look on the screen if it helps you
12: find it, but Professor Kaste --
13: A.    Yeah.
14: Q.    -- also raised the issue of
15: variation.  Do you see where I'm reading?
16: And, again, you can look on the screen if
17: that assists you.
18: MR. HOFFMAN:  It's in that
19: paragraph.
20: MR. McWILLIAMS:  Thank you.
21: BY MR. McWILLIAMS:
22: Q.    "Professor Kaste also raised
23: the issue of variations in point of care PT
24: monitor measurements and the discrepancy that

p. 00262

01: 00263:   may exist between INR values from those
02: machines and those done in hospital labs.  He
03: would like to ensure that a few central PT
04: measurements are made at least early in
05: patients' enrollment to know that there is a
06: reasonable match between the POC and the
07: central/hospital 'wet' lab PT INRs."
08: Did I read that correctly?
09: A.    You read that correctly.
10: Q.    And is that -- and do you
11: remember receiving this e-mail from
12: Professor -- or from Dr. Berkowitz relaying
13: the concerns of Professor Kaste?
14: A.    I did not remember that
15: specific type of information.  I just --
16: yeah, now I have recently looked at it, but I
17: could not remember from the time because it
18: is -- that type of information as a
19: regulatory representative, you get to be kept
20: in the loop.
21: But you're not typically
22: digging into that because in the preparation
23: of a clinical trial there are two processes.
24: One is the ethic committee approval and one

p. 00263

01: 00264:   is the regulatory, health authority approval
02: of a protocol.  And those run in parallel,
03: and those are done in each country separately
04: in -- that participate in the clinical trial.
05: And so it was important as a
06: regulatory representative to know that in the
07: course of the -- yeah, such discussions,
08: there -- I mean, there is an open -- open
09: topic in Finland with Professor Kaste and the
10: clinical team.  But it did not involve my
11: judgment or my call at that point in time.
12: MR. McWILLIAMS:  Move to strike
13: as nonresponsive.
14: BY MR. McWILLIAMS:
15: Q.    Doctor, I simply asked whether
16: or not you remember receiving this e-mail.
17: Either you do remember or you don't.
18: A.    I said I did not remember from
19: my heart, but I just looked at it recently,
20: yes, previous to this.
21: Q.    I appreciate that.
22: Let's go now to Professor
23: Kaste's e-mail response, which is on page --
24: if you look at the Bates numbers, its last

p. 00264

01: 00265:   three digits are 499, and there's a series of
02: numbered paragraphs.  And then just to make
03: this extra confusing, my understanding of the
04: way this works is that -- and Evan, if you
05: could highlight "The trial leadership has
06: confidence" -- that section is actually
07: Dr. Berkowitz's response -- you know,
08: sometimes when you're looking at e-mails and
09: you'll reply to someone's e-mail by going to
10: the body of their original e-mail, Doctor?
11: A.    Uh-huh.
12: Q.    Okay.  And I'll represent to
13: you that that's what happened, but it's hard
14: to tell.  But I'll represent to you that the
15: yellow highlighting section is
16: Dr. Berkowitz's response to Dr. Kaste's
17: e-mail.
18: Do you have any reason to
19: disagree with that representation?
20: MR. HOFFMAN:  Objection to the
21: form of the question.
22: A.    On the top after -- no, it
23: says, "Dear Dr. Berkowitz...  my suggestions
24: are to minimize" -- sorry, it's written by

p. 00265

01: 00266:   Professor Kaste --
02: BY MR. McWILLIAMS:
03: Q.    Right.
04: A.    -- yeah, to Scott, so I -- and
05: as I read it, it gives his suggestions to
06: Scott Berkowitz.
07: Q.    Okay.  Well, let's just read it
08: together and maybe, hopefully it will make
09: sense as we go along.  Let's read what
10: Professor Kaste -- Kaste -- how do you say
11: his name again?
12: A.    I don't.
13: Q.    Okay.  Is it --
14: A.    In German we would say "Kaste,"
15: maybe it's "Kaste," "Kaste"?
16: Q.    Well, we can both do it wrong.
17: A.    I don't know the Finnish.
18: Q.    Yeah, let's read what the good
19: doctor from Finland wrote.
20: "Among the 14- to 16,000
21: patients enrolled in the trial there will be
22: quite a few, in whom the point-of-care device
23: shows a .6 to .7 higher or lower value than
24: the true INR is.  In such a patient, the

p. 00266

01: 00267:   point-of-care device may show 2.1 and the
02: true INR is 1.5, i.e., the patient is not
03: properly treated and has a risk of
04: cardioembolism.  In another patient, the
05: point-of-care device may show 2.9 when the
06: true INR is 3.6, i.e., the patient has an
07: increased risk of intracranial hemorrhage.
08: "To prevent such disasters, I
09: propose that a blood test of every patient be
10: sent to a central laboratory at the beginning
11: of the participation in the trial to find out
12: if the patient is one of these peculiar
13: patients."
14: Did I read that correctly?
15: A.    Yeah, you read this correctly.
16: Q.    Now, the remainder of this
17: paragraph was my understanding is
18: Dr. Berkowitz's response.
19: A.    You could only see this --
20: Q.    Right, exactly.
21: A.    -- if it's highlighted in a
22: different color or something like that.
23: Q.    Right.  But let's see if -- and
24: Dr. Berkowitz responds, "The trial leadership

p. 00267

01: 00268:   has confidence in the performance,
02: reliability and validity of the HemoSense
03: device.  The data from the company does not
04: support the variability described above.  The
05: device has exceptionally low and acceptable
06: intra- and inter-individual variability as
07: well as remarkable congruence with a
08: plasma-based assay."
09: Did I read that correctly?
10: A.    You read that correctly.
11: Q.    And to back up, Doctor, the
12: good doctor from Finland specifically
13: recommended that you take split samples
14: between the point of care and central lab to
15: evaluate the performance of the device at the
16: initiation of the trial; is that correct?  In
17: order to avoid disaster, to use his word.
18: A.    Yeah.  As I read it, he
19: proposed that one test per patient as being
20: sent to central lab, yeah.  It's the question
21: what he was really intending with that single
22: measurement.
23: Q.    He wanted to validate the
24: device because that's the best way, to

p. 00268

01: 00269:   compare the device with the central lab.
02: That's how the device got approved.  You told
03: me that earlier today.
04: MR. HOFFMAN:  Objection to the
05: form of the question.
06: BY MR. McWILLIAMS:
07: Q.    Right?
08: A.    Usually this is done by --
09: yeah, where we take preventative measurements
10: and comparing it to a reference, then a
11: method, so --
12: Q.    And did you follow Dr. Kaste's
13: advice?
14: A.    I mean, as far as I understand,
15: we did at that time -- point in time there
16: was no such measure implemented so far that I
17: can recollect.
18: MR. McWILLIAMS:  All right.
19: We're changing topics.  You want to
20: take a quick break?
21: MR. HOFFMAN:  Up to you.
22: MR. McWILLIAMS:  Sure.
23: THE VIDEOGRAPHER:  Going off
24: the record at 2:30 p.m.

p. 00269

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00270:          (Recess taken, 2:30 p.m. to
02: 2:45 p.m.)
03: THE VIDEOGRAPHER: We're back
04: on the record at 2:45 p.m.
05: BY MR. McWILLIAMS:
06: Q.    All right. Changing topics, no
07: more INRatio, I promise. I want to talk
08: about therapeutic drug monitoring, TDM. Do
09: you know what that is?
10: A.    Yes, I heard the expression
11: several times, yeah.
12: Q.    Warfarin requires therapeutic
13: drug monitoring, correct?
14: A.    Yes, that's what we talked
15: about beforehand, that warfarin has a narrow
16: therapeutic window, and it's -- you can
17: achieve the best benefit-risk for the
18: patients if the patients are in the optimal
19: INR range. And so that is meant by, yeah,
20: you're doing measurements and you're taking a
21: decision on the dosing based on those
22: measurements.
23: Q.    And I know it's your company's
24: very strongly held position that rivaroxaban

p. 00270

01: 00271:   does not require therapeutic drug monitoring,
02: but would you agree with me that there is an
03: ongoing discussion or debate in the
04: scientific and regulatory fields around this
05: topic, about whether or not patient safety or
06: efficacy could be further improved by some
07: type of measurement of PK or PD parameter and
08: NOACs?
09: A.    I agree about the ongoing
10: general debate about the drug monitoring for
11: all new oral anticoagulants that came on the
12: market in the past years.
13: MR. McWILLIAMS: Okay. I'm
14: going to hand you an e-mail that you
15: sent along with a PowerPoint that was
16: attached to it. This is Derix-27,
17: Record 3064874.
18: (Whereupon, Deposition Exhibit
19: Derix-27, E-mail(s) re: Ad Hoc Xarelto
20: JSC - PK/PD Analysis,
21: XARELTO_JANSSEN_15329030,
22: Ref. 3064874, was marked for
23: identification.)
24: MR. McWILLIAMS: And this

p. 00271

01: 00272:        attachment, which is Derix-28, which
02: is Record 3064875.
03: (Whereupon, Deposition Exhibit
04: Derix-28, Model Based E-R Analysis
05: PowerPoint, XARELTO_JANSSEN_15329031,
06: Ref. 3064875, was marked for
07: identification.)
08: BY MR. McWILLIAMS:
09: Q.    And is it fair to say that both
10: the EMA and FDA has expressed interest in
11: monitoring -- or I'm hesitant to use the word
12: monitor, but just a measurement in order to
13: tailor the dose for rivaroxaban?
14: MR. HOFFMAN:  Objection to the
15: form of the question.
16: You can answer.
17: A.    FDA as well as also EMA have
18: both, yeah, entered into a dialogue about
19: targeted monitoring, targeted dosing for all
20: oral anticoagulants, so it's not a request
21: that was sent specifically to Janssen or
22: Bayer, but it's an open dialogue. Some part
23: of the meetings were public meetings, also
24: where a discussion was held about the topic

p. 00272

01: 00273:   with different experts.
02: BY MR. McWILLIAMS:
03: Q.    Okay. And this is an e-mail
04: you wrote on September 23rd, 2015; is that
05: correct?
06: A.    That's correct, yes.
07: Q.    And it's -- you said, "Dear JSC
08: members." What does JSC stand for?
09: A.    It stands for joint steering
10: committee, and that's one of the alliance
11: committees that we have in our collaboration
12: per contract with Janssen, and joint steering
13: committee is consisting of management
14: representatives from both companies.
15: Yet another committee is called
16: GDC, global development committee. That's
17: consisting of the working -- the so-called
18: working team with members from both
19: companies.
20: Q.    And that's who you sent this
21: e-mail to. These are all the members of the
22: JSC ad hoc --
23: A.    Right, they are, indeed, yeah.
24: Q.    Okay. And just -- so the

p. 00273

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00274:   subject line is, "Ad hoc Xarelto JSC - PK/PD
02: analysis/EMA request"; is that correct?
03: A.    That's correct, yes.
04: Q.    And you said, "Dear JSC
05: members.  We scheduled the ad hoc JSC a while
06: ago because we wanted to share with you" --
07: and then you have several bullet points.
08: First is "our analysis to comply with the
09: PK/PD simulation analysis request from EMA;
10: feedback from the rapporteur and
11: co-rapporteur regarding the proposal; and the
12: latest update regarding scheduled public
13: meeting around the topic, both EMA and FDA;
14: and then resource implications for Bayer and
15: Janssen team."
16: And then you say, "I have
17: attached a short presentation for the ad hoc
18: JSC.  Probably the topic won't require the
19: full scheduled time."
20: A.    Uh-huh.
21: Q.    And then you attach this.
22: And so to be clear, EMA had a
23: very specific -- EMA had a very specific
24: request, very specific data request.  They

01: 00276:   team at the moment, the Xarelto team for
02: Bayer.
03: Q.    All right.  So let's slowly --
04: let's go through this together.  The first
05: slide says it's a "Model-based
06: Exposure-Response Analysis on Rivaroxaban."
07: It's an EMA request LEG 36, correct?  I'm
08: on --
09: A.    Yes, uh-huh.
10: Q.    And the next page it says the
11: purpose of the presentation is "To inform the
12: JSC about the planned analyses on the
13: integrated data on the rivaroxaban clinical
14: development program as requested by EMA,"
15: right?
16: A.    Right.  Yeah.
17: Q.    And then the next, on slide
18: number 3, you say "Outline of presentation."
19: You're going to give the regulatory history,
20: the LEG request with detailed list of
21: questions, and, again, that was when the EMA
22: specifically asked for you to do analyses of
23: the relationship between dose, exposure,
24: pharmacodynamic markers and important

01: 00275:   asked you to build a model to be able to
02: simulate or predict exposure levels in
03: individual patients to then correlate it with
04: outcomes to see if it's possible to find
05: essentially a therapeutic range; is that
06: fair?
07: A.    This EMA PK/PD simulation
08: proposal resulted out of communication with
09: EMA, and it was starting earlier in the year.
10: And in the course of that communication,
11: yeah, EMA -- it was agreed to provide this
12: PK/PD simulation analysis and subsequent
13: analysis to EMA, yeah, and that process is
14: still ongoing, so it's not all available yet.
15: Q.    All right.  So --
16: A.    Because it's a very complex
17: analysis and procedure.
18: Q.    I understand.  Thank you.
19: And let's look through this
20: PowerPoint.  Did you create this PowerPoint
21: that you circulated to the team?
22: A.    I did it together, as you can
23: see, with my colleague, J|rgen Weber, with
24: the regulatory affairs representatives in my

01: 00277:   efficacy and safety outcomes; is that
02: correct?
03: A.    Yes, that's correct.
04: Q.    And then you told the team
05: about these upcoming public meetings being
06: held by both -- there's two held by FDA and
07: one by EMA; is that correct?
08: A.    Yeah.  Yes.  Uh-huh.
09: Q.    One in London, two in D.C.?
10: A.    So there was -- I mean, the
11: so-called think tank meetings by FDA that,
12: yeah, they held sometimes together with
13: academia for specific topics.
14: And FDA had such a meeting in
15: December last year, but they also had prior
16: meetings to a different topic, where they
17: already started, yeah, launching into this
18: discussion about the PK/PD information to be
19: used to inform dosing.
20: Q.    Let's go to page 4.  This is
21: where you provided the regulatory history for
22: this request from EMA, right?
23: A.    Yes.  That's the regulatory
24: history.  And here it just has that -- and it

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00278:   makes clear that this is a request that was
02: sent to all manufacturers of marketing
03: authorization holders from NOAC -- of all
04: NOACs in the --
05: Q.    But I want to start at the
06: beginning, because it says that this --
07: essentially what started this, and correct me
08: if I'm wrong, but what initiated this whole
09: process within EMA is this discussion around
10: Pradaxa, dabigatran, in 2014, whether routine
11: monitoring of dabigatran concentrations may
12: provide increased benefits and lower risks
13: for patients.  And that was what triggered
14: this broader request to go to all NOAC
15: manufacturers; is that correct?
16: A.    Yeah, that was our
17: understanding.  So we are not part of those
18: CHMP/PRAC discussions because they're
19: confidential in nature, but we -- yeah, it
20: was our assumption based on information we
21: had received from the coordinator at EMA.
22: Q.    But do you know what actually
23: prompted that -- I mean, Pradaxa had been out
24: since 2010, right?

01: 00279:      A.    Pradaxa was approved, yeah, the
02: first NOAC on the market.
03: Q.    So what happened in 2014 that
04: made EMA get all interested in therapeutic
05: drug monitoring for Pradaxa, if you know?
06: A.    I can only guess that -- I
07: mean, the -- I mean, they have regular
08: discussions, and this would be guesswork.  I
09: don't know.
10: Q.    Yeah, I certainly don't want
11: you to guess.  I mean, I want to be helpful.
12: But are you aware of any events
13: that occurred in the year 2014, four years
14: after the drug had been approved, that may
15: have triggered interest in this topic?
16: A.    Certainly general interest in
17: this topic was triggered by a publication of
18: data from the RE-LY trial where Paul Reilly
19: published, yeah, data, PK data, that had been
20: previously unpublished at the time.
21: Q.    Right.  And there was --
22: there's lots of news that came out around
23: the -- the controversy around the publication
24: of that paper.  Are you familiar with the

01: 00280:   New York Times article or the British Medical
02: Journal?
03: A.    No, I'm not so familiar with
04: that because that really was kind of a
05: clinical discussion, so here it became a
06: regulatory type of discussion.  So I have
07: faint knowledge about discussions, but I
08: didn't follow it in detail.
09: Q.    Did you attend the Cardiac
10: Safety Research Consortium meeting in D.C. in
11: December of 2015?
12: A.    I attended that meeting in
13: Washington, yes.
14: Q.    And did you hear -- so you saw
15: the presentation by the EMA representative
16: who explained what got this whole thing
17: started?  Do you remember that?
18: A.    Not in detail.
19: Q.    Okay.  Let me see if I can
20: refresh your memory.  Let me hand you what's
21: been marked as Derix-29, and this is
22: PowerPoint presentation by Jens Heisterberg,
23: who presented at the FDA meeting?
24: A.    Yes.

01: 00281:      (Whereupon, Deposition Exhibit
02: Derix-29, Feedback from the EMA
03: PowerPoint [No Bates], was marked for
04: identification.)
05: BY MR. McWILLIAMS:
06: Q.    I mean, I was there, and if you
07: just -- the first page is his cover page, the
08: second page is where he declares his conflict
09: of interest, and the third page is where he
10: told the participants in the meeting why
11: we're all here.
12: Do you remember that?  Do you
13: remember him putting the cover of the
14: July 2014 British Medical Journal up on the
15: screen and everyone kind of chuckled a
16: little?
17: A.    I did not specifically recall
18: this picture, but I recall certainly that he
19: brought up the discussion.
20: Q.    Did you read the July 2014
21: edition of the British Medical Journal?
22: A.    I -- no, I don't think I read
23: it, no.
24: Q.    Are you aware that this cover

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00282:   article was based on information that was
02: uncovered in the litigation against the
03: makers of dabigatran?
04: A.   I cannot comment on that.  I
05: don't -- I mean, I -- I read some related
06: articles talking about that information might
07: not have been uncovered, but I did not
08: specifically follow this up because this is a
09: clinical team assessment or discussion.
10: Q.   Right?  But so -- well, then
11: maybe I can -- I'll let you know what they
12: found.
13: This -- the reason why this got
14: on the cover of the British Medical Journal
15: is because doctors within Boehringer
16: Ingelheim, including Dr. Reilly, had done
17: advanced clinical trial simulations, and they
18: concluded that relative to the way dabigatran
19: and all NOACs are currently prescribed, that
20: if you do a one-time blood test and adjust
21: the dose, you can maintain efficacy, but
22: reduce bleeds by 40%.
23: Is this the first time you've
24: heard that?

01: 00284:      Q.   But you don't dispute the fact
02: that this PowerPoint presentation titled
03: "Feedback from the EMA" meeting -- and this
04: is -- this was Dr. Heisterberg reporting on
05: the November 2015 meeting in London.  The
06: third slide was the cover of the BMJ article
07: relating to the data uncovered from the
08: dabigatran litigation.
09: A.   Yeah.  I mean, I agree that
10: this is part of the presentation you just
11: told me, so yeah.
12: Q.   Okay.  So back to your slide, I
13: just want to -- because again, that's my
14: understanding of how this whole issue got
15: started.  EMA took -- even though the drug
16: had been on the market for four years, it
17: wasn't until the British Medical Journal
18: revealed that a one-time blood test could
19: improve patient safety significantly that the
20: EMA took very keen interest in this topic.
21: MR. HOFFMAN:  Objection to the
22: form of the question.
23: BY MR. McWILLIAMS:
24: Q.   Does that sound about right?

01: 00283:           MR. HOFFMAN:  Objection to the
02: form of the question.
03: A.   I cannot comment on this
04: statement, because I -- the only time I --
05: yeah, really, I heard Dr. Reilly speaking at
06: those public meetings, and I do not recall
07: that in these meetings he made such a
08: comment.
09: BY MR. McWILLIAMS:
10: Q.   All right.  And you see that
11: the -- you know, the title of the article is
12: "Dabigatran.  The analysis the regulators
13: didn't see."  And if you'd read the article,
14: you would have read that this was analysis
15: they had internally that they decided not to
16: share with the regulators for -- for whatever
17: reason.
18: MR. HOFFMAN:  Objection to the
19: form of the question.
20: BY MR. McWILLIAMS:
21: Q.   You're completely unaware of
22: that?
23: A.   I'm unaware of the background
24: of this.

01: 00285:           MR. HOFFMAN:  Objection to the
02: form of the question.
03: A.   That's your interpretation.  I
04: can really not judge because I don't have the
05: background, and I don't know exactly what
06: triggered the discussion at EMA.  But at that
07: time, the Reilly paper was already published
08: so -- also, the paper itself could have
09: triggered the discussion.
10: BY MR. McWILLIAMS:
11: Q.   All right.  But nonetheless,
12: we'll agree that it was in 2014 that issues
13: or interest in Pradaxa is what triggered
14: this -- the class-wide issue of whether or
15: not tailored dosing could improve patient
16: safety; is that fair?
17: A.   That's our understanding, yes.
18: Q.   Okay.  And so in this slide
19: 4 -- Evan, could you go back to this one?
20: Thank you.  Sorry.
21: And so, then, you lay out the
22: timeline in terms of the company's response
23: to the EMA's request on this very particular
24: topic of whether or not patient safety could

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00286: be improved through a blood test.
02: A. Yes.
03: Q. I mean, it's -- okay.
04: And it says in March of 2015,
05: "Initial request from EMA on 'the potential
06: need to measure plasma concentrations or
07: pharmacodynamic markers of anticoagulant
08: activity of the new oral anticoagulants' with
09: short response timelines."
10: Did I read that correctly?
11: A. You read that correctly.
12: Q. And then in April of 2015 was
13: the first Bayer response. And in July of
14: 2015 was a "Detailed request from EMA with
15: concrete proposals for a PopPK analysis,
16: exposure predictions and a PK/PD analysis
17: including clinical outcomes"?
18: A. Yes, you read that correct.
19: Q. And you understand -- or maybe
20: you don't understand, but that's exactly what
21: the makers of Pradaxa had done. They had
22: done clinical trial simulations to predict
23: what the difference would be with safety and
24: efficacy if you did a blood test to inform

p. 00286

01: 00287: dosing.
02: A. No, it's different. What the
03: dabigatran team did was really they took a
04: huge number of blood samples from the RE-LY
05: trial for both dose and patients, and with
06: the intention to investigate PK and PD. And
07: then they took the dose real measured values
08: and put them into perspective in this Reilly
09: paper, and with these clinical outcomes.
10: And certainly there was also
11: some simulation work involved, but it is
12: completely different from the EMA request
13: here, because for -- for rivaroxaban, the
14: amount of such similar amount of data or
15: similar data that were collected in the RE-LY
16: trial were not available.
17: And so this simulation approach
18: that we are conducting is much more
19: comprehensive and it's different. And again
20: here, you would have to talk to experts in
21: pharmacokinetics and pharmacodynamics, yeah,
22: who can better explain the type of -- the
23: nature of simulation work that was done or is
24: being done currently still.

p. 00287

01: 00288: Q. Well, I don't want to argue,
02: but I can tell you that I -- you're right,
03: they did have a much larger PK dataset in the
04: RE-LY trial, approximately 70% of the
05: patients versus the 161 from ROCKET.
06: But ultimately, all they did
07: was take that PK data and make a PopPK model,
08: and they validated it with the roughly 70% of
09: the patients, whereas your ROCKET model was
10: validated with 161 patients.
11: Ultimately, it was the PopPK
12: model that was used to predict exposure and
13: then correlate with the outcomes. Are you
14: aware of that?
15: MR. HOFFMAN: Objection to the
16: form of the question.
17: A. And that's -- that is going
18: beyond my type of -- yeah, my involvement and
19: judgment on this topic. So, yeah, I would
20: have to really relate this to my colleagues
21: who can better, yeah, talk about the
22: differences in how the RE-LY data were
23: generated and how, yeah, we are planning to
24: do this.

p. 00288

01: 00289: BY MR. McWILLIAMS:
02: Q. All right. Fair enough. We're
03: here to talk about Xarelto, not Pradaxa. I
04: agree. Let's keep flipping.
05: Let's go to page 5 of your
06: PowerPoint, and I think this is where you're
07: talking about what triggered this discussion
08: in academia and health authorities. You cite
09: to the FDA analysis and the Reilly paper on
10: Pradaxa. And the question was posed, "Can
11: you improve the benefit-risk by individual
12: dosing based on biomarkers?"
13: Did I read that correctly?
14: A. Yes, you read that correctly.
15: Q. And then the next slide is
16: "Bayer's position in initial response to
17: EMA"?
18: A. Yes.
19: Q. And it's Bayer's position that
20: in routine clinical practice, there is no
21: need to monitor the anticoagulant effect of
22: rivaroxaban. But you say in certain
23: exceptional circumstances, rivaroxaban levels
24: with a calibrated assay may be useful, such

p. 00289

Page 74

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00290:    as overdosage or emergency situations,
02: correct?
03: A.    That's correct.
04: Q.    And you've suggested PT with a
05: Neoplastin reagent or an anti-factor Xa
06: assay, which is a way to indirectly measure
07: drug concentration, correct?
08: A.    These are given here as
09: examples, yes.
10: Q.    But then you go on and you say,
11: "Attempting to incorporate a post hoc
12: adjustment for a drug... is deemed
13: scientifically inappropriate," and then you
14: say when -- and you have four bullet points.
15: You say when it "does not have
16: a narrow therapeutic index," correct?
17: A.    Never -- yeah, no -- doesn't
18: have a narrow therapeutic range, yeah.
19: Q.    So it's Bayer's position that
20: Xarelto does not have a narrow therapeutic
21: index, correct?
22: A.    That's not written here, so it
23: says --
24: Q.    Well, that's my question.

p. 00290

01: 00291:    A.    -- very -- I mean, it's very
02: general, and that it also, yeah, in
03: congruence with the positions that were
04: shared by external experts that, in general,
05: incorporating dose adjustments for a drug
06: that does not have a narrow therapeutic range
07: is deemed scientifically appropriate.
08: Q.    Well, let me ask you this
09: question:  Does Xarelto have a narrow
10: therapeutic index or -- let me use these
11: exact words.
12: Does Xarelto have a narrow
13: therapeutic range?
14: A.    That's, again, a question I
15: would really want you to discuss with the
16: clinical pharmacology and my clinical
17: colleagues, but as far as I understand from
18: the discussions that I had with my
19: colleagues, it's my understanding that
20: Xarelto does not have narrow therapeutic
21: range.
22: Q.    But you -- and then likewise,
23: it's Bayer's position that Xarelto does not
24: have marked pharmacokinetic variability?

p. 00291

01: 00292:    A.    That's, again, a topic, yeah, I
02: would have to really intensively discuss with
03: the colleagues who are experts in -- and to
04: whom certainly also provided the input into
05: this statement.
06: Q.    And that's discussing
07: interpatient variability, correct?
08: A.    It's discussing pharmacokinetic
09: variability and -- so that can probably more
10: than one type of variability, but please
11: refer these type of questions on the
12: specifics to my colleagues.
13: Q.    Well, would you agree with me
14: that Pradaxa -- excuse me.  Would you agree
15: with me that Xarelto does exhibit high
16: interpatient variability?
17: MR. HOFFMAN:  Objection to the
18: form of the question.
19: A.    I don't agree, and I can also
20: say this is not my area of expertise.  And so
21: I refer that question to my colleagues who
22: can better inform -- respond to the question.
23: BY MR. McWILLIAMS:
24: Q.    Okay.  Let's go on to the next

p. 00292

01: 00293:    page.  So the "Subsequent LEG 36 request with
02: detailed questions from EMA," and it
03: discusses how Bayer was provided with a
04: comprehensive basis for further discussion
05: for each of the licensed indications and the
06: following should be provided.  A PopPK
07: analysis, prediction of exposure, Ctrough, Cmax,
08: area under the curve, at steady state for
09: each of the indications and each patient
10: subgroups, and other things that influence
11: exposure such as concomitant medications.
12: And then you were asked to do a
13: pharmacokinetic/pharmacodynamic analysis to
14: evaluate whether or not there's a correlation
15: between drug levels or pharmacodynamic
16: markers and outcomes, strokes and bleeds,
17: right?
18: A.    Yeah.  So EMA is requesting to
19: look at these three
20: pharmacokinetic/pharmacodynamic analysis
21: parameters.
22: Q.    And on page 8 is a description
23: of the model that's going to be built -- so
24: this is the integrated PopPK model.  And

p. 00293

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00294:   essentially what it's designed to do is to
02: take patient characteristics and predict drug
03: concentrations either, you know, Cmax, Ctrough,
04: area under the curve, correct?
05: A.    Yeah, that's how I understand
06: the model that first there are data that are
07: being imputed from PopPK data that are
08: available from phase two and other
09: information from phase one.
10: And then, yeah, the model is
11: created with all the information that is
12: available from all indications in which
13: Xarelto and all the others in which Xarelto
14: is applied to.
15: And then the model is supposed
16: to predict patient -- individual patient
17: level data for each patient based on the
18: characteristics that we know from the
19: patient, yes.
20: Q.    And then the next slide, slide
21: 9, is where you describe, I think, what you
22: just touched on, is the various phase two and
23: phase three studies where PK data was
24: collected --

01: 00296:   wrong, but my understanding is that you have
02: to build this PopPK model because you don't
03: have PK measurements for all the patients in
04: these clinical trials, but you do have
05: outcome data; you know who had a clot or a
06: stroke or a bleed, and so you're using the
07: PopPK model to predict the -- their exposure,
08: either Ctrough, Cmax or area under the curve,
09: and then correlate that with outcomes,
10: strokes and bleeds, to see if there's people
11: with high levels are having more bleeds or
12: people with low levels are having more
13: strokes relative to others, fair?
14: MR. HOFFMAN: Objection to the
15: form of the question.
16: A.    My understanding is from --
17: from this analysis and model, that we used
18: information from the model, and as we said,
19: we correlate it to the clinical outcomes, and
20: then we will look at the data, and then we
21: will see whether such further conclusions can
22: be made.
23: So that's preemptive, but
24: certainly the purpose of this exercise is

01: 00295:        A.    Uh-huh.
02: Q.    -- and it's aggregated in order
03: to build this integrated PopPK model,
04: correct?
05: A.    Slide 9 is describing something
06: different, so I'll just -- and in the
07: phase -- I mean, in the PopPK model,
08: information went in from phase two studies as
09: well, so where we had those two aligning.
10: Q.    These two.
11: A.    And here it just says that we
12: have four different indications which Xarelto
13: is approved in Europe; VTE intervention, VTE
14: treatment, SPAF and ACS.  And for each of
15: those indications separately, there will be a
16: correlation analysis with the clinical
17: outcomes, that will not be done in a
18: totality.
19: So the totality data is only
20: used to inform the model, to provide as much
21: information into the model as possible, but
22: then the analysis will be conducted
23: separately for each indication.
24: Q.    Right.  And correct me if I'm

01: 00297:   from the predictor of plasma concentration
02: data for each patient correlate with the
03: clinical outcomes of efficacy and safety.
04: BY MR. McWILLIAMS:
05: Q.    And I understand and I
06: appreciate that Xarelto is originally
07: designed to go head to head with warfarin,
08: for example, but not require the routine
09: monitoring that warfarin does.
10: But are you guys going into
11: this exercise with an open mind?  If the data
12: says that patient safety could be improved,
13: are you going to embrace that data and
14: perhaps suggest some type of measurement to
15: improve patient safety?
16: MR. HOFFMAN: Objection to the
17: form of the question.
18: A.    Certainly what I can say is
19: that we are going into this analysis with an
20: open mind and, really, yeah, we'll evaluate
21: the results of the analysis, which we don't
22: know yet, appropriately.
23: BY MR. McWILLIAMS:
24: Q.    So no predetermined conclusions

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00298:   on this like we arguably saw in that other
02: document earlier today; is that fair?
03: MR. HOFFMAN:  Objection,
04: "arguably," argumentative.
05: A.    We talked about the other
06: situation, and we have not yet drafted any
07: shell documents here in this, because there's
08: still some work that's ongoing.
09: BY MR. McWILLIAMS:
10: Q.    Okay.  Would you just go to the
11: last page, please, under the "Summary and
12: Potential reactions by EMA"?
13: A.    Yes.
14: Q.    You see where you wrote -- and
15: this is, again, a PowerPoint you wrote with
16: one of your colleagues, that "The team is
17: confident that the simulation analysis will
18: deliver information to further substantiate
19: our position."
20: Did I read that correctly?
21: A.    Yes.
22: Q.    And your position is that
23: there's no need for therapeutic drug
24: monitoring, correct?

p. 00298

01: 00300:   information to healthcare professionals
02: depending on results.  So it gives different
03: options.
04: BY MR. McWILLIAMS:
05: Q.    All right.  But you didn't
06: dispute the fact that the very first thing
07: you wrote at the top of this is that the team
08: is confident that the simulation analysis,
09: that it's yet to be performed at this point
10: in time, right?  It had not been performed,
11: right?
12: A.    They had not been performed at
13: this point in time when we're speaking, so
14: ongoing.
15: Q.    When you wrote at this point in
16: time, when the simulation analysis had not
17: been performed, you wrote that you were
18: confident it would deliver information to
19: further substantiate the company's position
20: of no need to monitor, right?  That's what
21: you wrote?
22: A.    That's what we wrote, yes.
23: MR. McWILLIAMS: Okay.  Let's
24: now move to what we're marking as

p. 00300

01: 00299:       A.    That's the position that we're
02: having before running into --
03: Q.    And you wrote this statement
04: prior to doing any of the analysis, building
05: the model, doing exposure response.  You said
06: you're confident that the simulation will
07: support the position, right?
08: A.    That's right that we wrote
09: this, this statement.
10: Q.    That's not exactly the
11: scientific method we discussed earlier.
12: Remember Galileo, you start with the
13: hypothesis and you don't form conclusions
14: until the end, remember that?
15: MR. HOFFMAN: Objection to the
16: form of the question.
17: A.    We are not talking here about a
18: hypothesis of an analysis.  It's really kind
19: of what our potential outcomes of the
20: discussion that's different.  And it also
21: says in the next bullet point that "EMA may
22: request a label change," for example,
23: depending on the results, and also gives
24: another example, EMA may decide on

p. 00299

01: 00301:       Derix-30 and 31, which is an e-mail
02: you received, and this is a Record
03: 3375706 and 3375707.
04: (Whereupon, Deposition Exhibit
05: Derix-30, E-mail(s) re: To review at
06: our update today,
07: XARELTO_BPAG_25183362, Ref. 3375706,
08: was marked for identification.)
09: (Whereupon, Deposition Exhibit
10: Derix-31, Draft TDM Position
11: PowerPoint, XARELTO_BPAG_25183363,
12: Ref. 3375707, was marked for
13: identification.)
14: MR. McWILLIAMS:  Here's the
15: attachment.
16: BY MR. McWILLIAMS:
17: Q.    And is this an e-mail that you
18: received on October 21st, 2015?
19: A.    This is an e-mail I received,
20: yes.
21: Q.    Okay.  And the subject line is
22: "to review our update today at 9:30," and it
23: attaches the filename "Draft TDM Position
24: Janssen CDT," and then attaches a PowerPoint?

p. 00301

Page 77

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00302:    A.    Yes, that's correct.
02: Q.    Okay.  And let's look at the
03: PowerPoint together, please.  It says -- back
04: on the e-mail, I'm sorry, it says, "Hi,
05: Andrea" -- and this is directed to you and
06: only you, and I understand there's others
07: that are copied, but both the header of the
08: e-mail, then this body of the e-mail is
09: directed to you, correct?
10: A.    That's correct, yes.
11: Q.    And it says, "The Janssen CDT
12: met Monday of this week and drafted a
13: proposed position statement on TDM - take a
14: look and let's discuss at our update."
15: And let's look at what they
16: sent you.  And if you just go to the first
17: page, it cites to the February 3rd, 2015 CSRC
18: think tank agenda.  And that's where Bob
19: Temple first, I think, publicly advocated TDM
20: for NOACs; is that correct?
21: MR. HOFFMAN:  Objection to the
22: form of the question.
23: A.    I recall that he at the time,
24: for the first time, raised the question and

p. 00302

01: 00303:    indicated that he would like to follow up on
02: the topic.
03: BY MR. McWILLIAMS:
04: Q.    And so quoting from that think
05: tank agenda, it says, "Using Pharmacokinetic
06: and pharmacodynamic parameters to inform NOAC
07: dosing:  Should we consider
08: pharmacometric-guided dosing of NOAC agents
09: to maximize the benefit-risk relationship?"
10: Did I read that correctly?
11: A.    You read that correctly.
12: Q.    And then in March of 2015, this
13: was another meeting, I believe, where Bob
14: Temple presented at.  This is an EMA meeting
15: he participated via videoconference -- or,
16: actually, just on the phone, I believe, but
17: his PowerPoint's available.  It's quote, the
18: "MAH are requested to discuss if the
19: benefit-risk balance based on available data
20: could be enhanced by implementing therapeutic
21: drug monitoring (TDM)."
22: Did I read that correctly?
23: A.    You read it correctly, but I'm
24: not too sure about the context of what Temple

p. 00303

01: 00304:    is presenting, so it can also be taken from
02: one of the discussions we mentioned earlier
03: from starting in -- at the CHMP/PRAC meeting.
04: Q.    I think you're right.  I'll
05: check real quick.  You're right, that was
06: December 2014.  I stand corrected.  I
07: apologize.  Let's go to the next page,
08: please, page 2 of the PowerPoint.
09: This is, again, the three
10: public meetings we talked about previously?
11: A.    Uh-huh.
12: Q.    The FDA public workshop on --
13: and that was focused on assays and the stages
14: of development of various assays to measure
15: either the drug concentration or the effect
16: of the drug for NOACs; is that correct?
17: A.    It was a meeting to discuss the
18: availability and also, yeah, of in vitro
19: diagnostic testing for all --
20: Q.    Did you watch that webcast?
21: A.    I watched that webcast.
22: Q.    So you heard the FDA at the
23: end, do you remember her -- I forgot the
24: woman's name, but she said, "We hear you loud

p. 00304

01: 00305:    and clear.  We need to get these things
02: approved."
03: Do you remember that?
04: MR. HOFFMAN:  Objection to the
05: form of the question.
06: A.    I don't recall every citation,
07: but certainly the tone of the meeting was
08: that certain specific in vitro diagnostic
09: testing such as, for example, the anti-Xa
10: testing -- tests are not yet approved in the
11: United States.
12: BY MR. McWILLIAMS:
13: Q.    Right.  And then the next
14: public meeting was the EMA public workshop,
15: which was held in London on November 23rd,
16: 2015.  Were you there for that meeting?
17: A.    No, I was not attending the
18: meeting.  Only my colleagues attended the
19: meeting.
20: Q.    Okay.  Dr. Berkowitz was there,
21: right?
22: A.    Yes, Dr. Berkowitz --
23: Q.    Dr. Kubitza was there?
24: A.    Dr. Kubitza was there, yes,

p. 00305

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00306:   and --
02: Q.    They actually even let me in.
03: It's crazy.
04: And then the third public
05: meeting was the CSRC meeting that took place
06: in D.C. on December 3rd.  Again, the topic
07: for that meeting is, "Is there a role for
08: pharmacokinetic/pharmacodynamic guided dosing
09: for novel anticoagulants?"
10: Did I read that correctly?
11: A.    Yes.
12: Q.    Were you at that meeting?
13: A.    I attended that meeting, yes.
14: Q.    So you -- do you remember
15: seeing me there?
16: A.    No.
17: MR. HOFFMAN:  It's okay.  Don't
18: get upset.
19: MR. McWILLIAMS:  No, it's okay.
20: No, I'm just saying I want to make
21: sure we --
22: BY MR. McWILLIAMS:
23: Q.    Did you sit through the whole
24: thing?

01: 00307:       A.    Yeah, basically.  Maybe an
02: interruption for some calls that I had to
03: take --
04: Q.    But you heard Bob --
05: A.    -- but most of the time I was
06: sitting in the meeting.
07: Q.    But you heard Bob Temple.  No
08: uncertain terms, Bob Temple is in favor of
09: tailored dosing of NOACs.
10: Would you agree with that?
11: MR. HOFFMAN:  Objection to the
12: form of the question.
13: A.    I don't agree to that statement
14: that he's in favor of -- yeah, exploring the,
15: rather, targeted monitoring and targeted
16: dosing could further improve the benefit-risk
17: of new oral anticoagulant drugs, and he
18: several times made the statement that he
19: stands fully behind his and the FDA's
20: decision to approve the drugs without
21: targeted drug monitoring, but he's interested
22: scientifically in following, yeah, the
23: thinking and trying to explore, yeah,
24: information to learn more about this

01: 00308:    scientific regression.
02: BY MR. McWILLIAMS:
03: Q.    And you understand the
04: rationale behind that, that while these are
05: fabulous, lifesaving drugs, they're also
06: very, very dangerous.
07: MR. HOFFMAN:  Objection to the
08: form of the question.
09: BY MR. McWILLIAMS:
10: Q.    Would you agree with that?
11: MR. HOFFMAN:  Objection to the
12: form of the question.
13: A.    As most of the -- almost all, I
14: would say, pharmaceutical products have
15: benefits and have also safety risks
16: sometimes.  And that's the same also for new
17: oral anticoagulants, that given due to the
18: mechanism of action, they have very
19: beneficial effects, but there's also side
20: effects that physicians have to take into
21: consideration when prescribing the drugs and
22: treating the patients.
23: BY MR. McWILLIAMS:
24: Q.    But NOACs -- well, all oral

01: 00309:    anticoagulants, they have a very serious but
02: quite common serious adverse effect in the
03: form of major bleeding.  You know that all
04: the NOACs, depending which study you look at,
05: you know, roughly 3% of patients per year
06: suffer a major bleeding event, and that means
07: someone in the hospital getting a
08: transfusion.
09: And that's -- and so 3% is a
10: relatively common side -- that's a pretty
11: high number for a serious side effect.  Would
12: you agree with that?
13: MR. HOFFMAN:  Objection to the
14: form of the question.
15: A.    You're making a series of
16: qualifiers here which, yeah, I really cannot
17: comment to what you say is common, and that's
18: really a discussion you will have to have
19: with a medical doctor, not with me, to judge
20: about the seriousness and also the ability to
21: handle certain bleeding events and the
22: frequency.
23: And, yeah, so that's really
24: a -- clearly a medical topic you will have to

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00310:  follow up, but just bear in mind also the
02: seriousness of the events that are being
03: prevented by the therapy.  That's why, yeah,
04: we're talking about devastating strokes
05: and --
06: BY MR. McWILLIAMS:
07: Q.    Absolutely.
08: A.    -- cardiovascular death and
09: also myocardial infarction.
10: Q.    But you understand, though --
11: A.    I mean, you have to really put
12: this into perspective when you're -- that's
13: what always is being done when new drugs are
14: being approved, that both benefit and risk
15: are being put into perspective, and that's
16: the basis we have to look at.
17: Q.    I completely agree.
18: But you understand the
19: rationale behind the effort on the part of
20: EMA and FDA is that if we can reduce the
21: number of bleeding events, that's something
22: we should do.  Would you -- do you agree with
23: that general proposition?
24: A.    Again, for me, it's too general

p. 00310

01: 00311:  because for them, it's really to look whether
02: they can improve the benefit-risk.  So that
03: means also not just --
04: Q.    Compromising efficacy --
05: A.    -- compromising on the
06: efficacy, so they would have to -- we would
07: have to find out whether there's a way to
08: improve on both sides at the same time.
09: Q.    Well, let's say if you could
10: maintain efficacy but improve safety, reduce
11: the number of bleeding events by way of a
12: one-time blood test, that would be a good
13: thing, wouldn't it?
14: MR. HOFFMAN:  Objection to the
15: form of the question.
16: A.    It's also very general.  I
17: mean, certain -- certainly there's always an
18: attempt to further improve, if -- a therapy
19: in any way or form, but it has to be
20: evaluated against the complications that it
21: implies, and really also the amount of
22: improvement you can achieve with it.
23: BY MR. McWILLIAMS:
24: Q.    Well, and, again, I think

p. 00311

01: 00312:   that's why it's important to talk about the
02: relatively high event rate for major bleeds.
03: If it's 3% a year and you're prescribing this
04: drug to a million Americans a year, that's
05: 30,000 major bleeding events being caused by
06: this drug every year.
07: And I understand it's
08: preventing lots of strokes, and that's a good
09: thing.  But if we could still prevent strokes
10: but reduce the 30,000 people that have to
11: spend the night in the hospital and get a
12: blood transfusion every year, that would be a
13: good thing, wouldn't it?
14: MR. HOFFMAN:  Objection to the
15: form of the question.
16: A.    Again, you're mixing things,
17: whereas not -- for example, not every patient
18: who experiences major bleeding ends up in
19: hospital.  And really, this is very detailed
20: clinical discussion, and you cannot just
21: compare the numbers with certain events or --
22: and I really ask you to have that discussion
23: with my clinical colleagues who are much --
24: can much better judge on the figures, on the

p. 00312

01: 00313:   seriousness, and on the impact.
02: BY MR. McWILLIAMS:
03: Q.    But you know the top line
04: results for ROCKET, don't you?  Do you not
05: know what the primary safety endpoint, major
06: bleed definition is?
07: A.    Yeah.  And as I understand
08: it --
09: Q.    It's roughly 3% -- more than 3%
10: a year, right?
11: A.    I -- we can -- you know, we
12: can -- I mean, we can look at the data, but
13: it -- I did not disagree with the numbers,
14: but I -- I just disagree with the conclusions
15: that --
16: Q.    That it would be a good idea to
17: reduce the number of people that go to the
18: hospital?  Just -- I want you to just
19: hypothetically accept -- here's a
20: hypothetical.  I want you to assume for a
21: second that it's true, that according to the
22: ROCKET data and according to your sales data,
23: that Xarelto's responsible for tens of
24: thousands of hospitalizations related to

p. 00313

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00314:   bleeding events.
02: Assuming that's true, would you
03: agree with me that if you could reduce the
04: number of patients going into the hospital
05: and having to get blood transfusions by way
06: of a single blood test, that that would be a
07: good thing?
08: MR. HOFFMAN: Objection to the
09: form of the question.
10: A.   I do not agree to the
11: statement, because it's just, again, only
12: looking into one aspect of safety, and it all
13: will have to fall into a bigger amount of
14: evaluation, also in terms of what the
15: additional measurements would mean to the
16: patient and -- sorry, it cannot really just
17: be seen as just a one sided.
18: And that's also why the health
19: authorities and also Bob Temple, as one of
20: the health authority representatives, have
21: called for these discussions.  If you
22: followed the meeting, it was very obvious
23: that at the meetings many experts went out of
24: the meetings and said this is much more

p. 00314

01: 00316:   of the current status of the approval of an
02: assay that can estimate -- reliably estimate
03: rivaroxaban exposure?
04: A.   So the proposal that is made by
05: our research teams and also that is what we
06: supported from Bayer perspective was the
07: diagnostic companies and a Xa assay.  And so
08: we supported and, yeah, worked with several
09: companies that developed Xa assays, some of
10: which are approved in Europe, but not in the
11: U.S.
12: And that would be, from my
13: perspective as I understand the tests as a
14: nonexpert, again, be the most robust -- the
15: most robust assay in relation to
16: rivaroxaban --
17: Q.   And do you have any --
18: A.   -- and was not approved by FDA
19: so far.
20: Q.   Do you have any knowledge of
21: the -- any assays being approved in the near
22: future?
23: A.   I don't know about the status.
24: I just know that applications were made by

p. 00316

01: 00315:   complex as we had thought it would be.
02: And doesn't mean that people
03: stop work on it, but it is really not an easy
04: yes/no or, yeah, analysis and judgment.
05: BY MR. McWILLIAMS:
06: Q.   Okay.  Let's keep looking at
07: this PowerPoint.  This is the last page.
08: A.   Yeah.
09: Q.   And this is Janssen's position
10: statement on therapeutic drug monitoring as
11: of fourth quarter 2015.  It says, "Based on
12: currently available data from the extensive
13: clinical development program and
14: postmarketing experience using fixed
15: rivaroxaban doses without TDM, the CDT does
16: not recommend TDM for rivaroxaban patients.
17: "We would consider TDM if the
18: following conditions are met:  A robust assay
19: were approved by FDA and available in the
20: U.S. to estimate rivaroxaban exposure."
21: Let's stop right there.  Did I
22: read that correctly?
23: A.   You read that correctly.
24: Q.   And what is your understanding

p. 00315

01: 00317:   companies like, for example, Diagnostica
02: Stago was one of the companies which we
03: supported in developing the calibrators and
04: controls, but I don't know about the status
05: of their interaction and approval with FDA.
06: Q.   Okay.  And the next criteria
07: where, according to Janssen, they would
08: consider TDM would be if the
09: "Exposure/response analysis were to indicate
10: that substantial numbers of patients fall
11: outside the exposure range that delivers the
12: optimal benefit-risk."
13: Did I read that correctly?
14: A.   You read that correctly.
15: Q.   And can you put any more
16: substance on that?  What does it mean -- what
17: does substantial?  Is it 5%, 10%, 1%?  How
18: many patients would need to be helped before
19: your company would be willing to adopt a
20: proposal that could potentially improve
21: patient safety?
22: MR. HOFFMAN: Objection to the
23: form of the question.
24: A.   Substantial numbers of patients

p. 00317

01: 00318:   was not characterized further here in this
02: proposal. The proposal, as we already read,
03: the Janssen CDT proposal, so it's the
04: proposal of the Janssen development team,
05: which they shared with us for discussion and
06: saw that's basically their text. And so you
07: would have to ask about the understanding of
08: "substantial." So I do not recall that we
09: discussed specific figures.
10: BY MR. McWILLIAMS:
11: Q.    Well, has the joint CDT adopted
12: this position? Is that the current position
13: of the manufacturer of Xarelto?
14: A.    Not as a proposal that was
15: shared for discussion.
16: Q.    Was this proposal accepted or
17: rejected, amended?
18: A.    I recall that we discussed it,
19: but I don't recall that it was finalized or
20: that it went into further documents.
21: Q.    Would it be fair to say that
22: this is not the position of Bayer, that Bayer
23: would not consider TDM if these conditions
24: were met?

01: 00319:    A.    I mean, we have not put out the
02: conditions; so, therefore, we would really
03: have to have discussion on, yeah, what it
04: really means, substantial numbers, and that's
05: also what I recall the way how we discussed
06: it, that certainly, does this in general --
07: can be supported, but it's not specific
08: enough to -- and so it would really be -- I
09: mean, we'd have to see the data and to
10: discuss the data with experts before we can
11: make such a judgment call.
12: Q.    Okay. And this says -- the
13: last bullet point that would have to -- the
14: conditions that would have to be met before
15: they would endorse TDM is to "verify that
16: performing TDM will improve upon the number
17: of patients that fall within the exposure
18: range that delivers the optimal
19: benefit-risk."
20: Did I read that correctly?
21: A.    You read that correctly.
22: Q.    Is it Bayer's position that a
23: prospective randomized multicenter clinical
24: trial would need to be performed before TDM

01: 00320:   could be endorsed?
02: A.    That's -- yeah, that's the
03: clinical team position and was shared also by
04: my colleague, Scott Berkowitz, at the
05: meeting, because it's one step that currently
06: is being done to look at whether we find
07: patients that are -- I'll use the word of
08: "temporesis," at the fringes, so that our --
09: in the outer range of exposure. And then
10: also, where these PK levels really correlate
11: to different outcomes than for the general
12: population. So that would be the first step,
13: to find this out.
14: But it's -- and we think that
15: it's not enough to do so because we would
16: have to run a second trial where we would
17: have to first develop a new dosing regimen
18: from that information. So it's all
19: hypothetical, but that would be the first
20: step from the information, to develop a new
21: dosing regimen.
22: And then we would have to apply
23: the new dosing regimen and compare it to the
24: existing one because that's what you

01: 00321:   currently always have to do to approve new
02: drugs and new regimens to compare to the
03: existing ones, and only if you have that
04: information you could really conclude that
05: the targeted drug monitoring has a better
06: benefit-risk than the currently approved
07: regimen.
08: Q.    So who is in -- who has been
09: placed in charge of designing this clinical
10: trial?
11: A.    I mean, you cannot design the
12: clinical trial before you have to -- the
13: hypotheses are the first steps done. So what
14: we currently are doing is to run the
15: simulation analysis.
16: Certainly I recall there were
17: some speculative kind of trial designs, not
18: only by us, but also by the other NOAC
19: manufacturers presented at such meetings.
20: And so suddenly, those trials
21: are supposed to be very large, simply because
22: I had -- the NOAC as approved are already
23: very effective, and so the number of events
24: that you detect are low. And so if you want

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00322:    to design a non-inferiority trial in such a
02: setting, it's automatically going to be a
03: very large trial that will take also time
04: before --
05: Q.    And very expensive as well?
06: MR. HOFFMAN:  Objection to the
07: form of the question.
08: BY MR. McWILLIAMS:
09: Q.    Fair?  It would probably cost
10: more than ROCKET, right?
11: A.    I mean, if you have more
12: patients involved in a trial, then -- where
13: in ROCKET you could assume that the trial is
14: also becoming more expensive than ROCKET
15: because the trial costs are depending on the
16: number of patients in a trial involved.
17: Q.    And ROCKET cost more than
18: $50 million; is that fair?
19: A.    You said 50?
20: Q.    50.
21: A.    Yes.
22: Q.    Okay.  And so -- and I don't
23: know if you've seen the news, but you guys
24: make more than like  1.7 billion a year on

p. 00322

01: 00324:    you guys have built this model in such a way,
02: to use your own words, that you're confident
03: the analysis will deliver information that
04: substantiates the company's position.
05: MR. HOFFMAN:  Objection to the
06: form of the question.
07: BY MR. McWILLIAMS:
08: Q.    Right?  So this whole
09: discussion about a clinical trial is kind of
10: silly talk, right?
11: MR. HOFFMAN:  Objection.
12: A.    I do not agree because you're
13: suggesting that the model is not built in a
14: scientifically -- scientifically rigorous
15: way, and that's not what I can agree with.
16: And the statement you refer to
17: is really based on the knowledge that is
18: existing so far.
19: BY MR. McWILLIAMS:
20: Q.    The first thing I want to ask
21: you about is -- I mean, I think you said two
22: of the reasons why there's no need for
23: therapeutic drug monitoring is whenever we
24: get a drug with low interpatient variability

p. 00324

01: 00323:    Xarelto.  So how much money have you budgeted
02: for this new clinical trial to determine
03: whether or not TDM is safe and effective?
04: MR. HOFFMAN:  Objection to the
05: form of the question.
06: A.    That's -- yeah, that's just
07: speculative because, as I said, we would have
08: to first, yeah, run the first steps, and when
09: it becomes evident that there -- that we have
10: seen discrepancies that would lead to the
11: next steps, then we would start designing and
12: discussing about such a study.
13: And certainly, if studies are
14: deemed necessary for patient safety and
15: regulatory purposes in general, they are not
16: prospectively budgeted, so they are -- I
17: mean, they are to stand, and there's no
18: discussion about a budget if it is a study
19: that, yeah, investigates, yeah, safety
20: aspects and are also a requirement by the
21: health authority.
22: BY MR. McWILLIAMS:
23: Q.    Let's just be honest, we're
24: likely not going to get to that step because

p. 00323

01: 00325:    and a wide therapeutic index; is that fair?
02: MR. HOFFMAN:  Objection to the
03: form of the question.
04: A.    I would have to go back.  I
05: mean, certainly one is the availability of an
06: appropriate assay that is predictive and
07: validated, and one is that there is really a
08: reason, yeah, to pause the targeted drug
09: monitoring because this drug has a narrow
10: therapeutic range.
11: And if you look into
12: pharmaceutical developments in general,
13: there's only -- I mean, to monitor the
14: products are the exceptions not --
15: BY MR. McWILLIAMS:
16: Q.    Do you agree with the statement
17: that anticoagulants are intrinsically narrow
18: therapeutic range drugs because their
19: principal toxicity, bleeding, is a result of
20: their intended pharmacodynamic activity; too
21: low a dose results in inadequate prevention
22: of pathological thrombosis and consequent
23: serious clinical events, and too high a dose
24: results in excessive inhibition of

p. 00325

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00326:   physiologic clotting and excessive bleeding?
02: A.    Can you start the sentence
03: again --
04: Q.    Yeah, that's fair.  I'll show
05: you the document.
06: A.     -- because certainly parts I
07: understand and can agree to, but I did not
08: get the full context.
09: MR. McWILLIAMS:  I understand.
10: That was a long one.
11: Mr. Wolfe, this is the FDA
12: summary review.  I don't think it has
13: a Bates number.  Go to page 8.
14: I'm handing you there's being
15: marked as Derix-32.
16: (Whereupon, Deposition Exhibit
17: Derix-32, CDER Summary Review
18: [No Bates], was marked for
19: identification.)
20: BY MR. McWILLIAMS:
21: Q.    Tell me if you recognize this
22: document?
23: (Document review.)
24: ///

01: 00328:   their intended pharmacodynamic activity."
02: So it's a very general
03: statement, and also here it is not really
04: defining saying what narrow therapeutic range
05: really means.
06: And so, therefore, I have,
07: yeah, really -- based on all what I
08: understand from the discussions, this is not
09: something every expert would agree to, and I
10: have also some question marks around this
11: statement.
12: However, I agree that -- to the
13: following statements that are made here in
14: respect to, yeah, that generally, too low
15: doses would result in inadequate prevention,
16: and too high doses could result in excessive
17: bleeding.
18: And also, I follow that, yeah,
19: "prudent drug development of anticoagulants
20: should include robust investigation of the
21: relationship between dose and outcomes in
22: order to choose reasonable doses for
23: administration to patients," and that's what
24: I agree to.

01: 00327:   BY MR. McWILLIAMS:
02: Q.    Do you recognize this as the
03: FDA summary review for Xarelto afib
04: indication?
05: A.    Yes, it's summary of review,
06: dated from November 2011, just...
07: Q.    If you go to page 8, please.
08: In the paragraph under "Dose of Xarelto
09: administered in ROCKET."
10: A.    Yes.
11: Q.    And that's the statement I read
12: to you earlier.  And if you would just -- we
13: can read it aloud again or if you can just
14: read it quietly to yourself, my question is
15: whether you agree with this statement issued
16: by the United States Food and Drug
17: Administration.
18: (Document review.)
19: A.    It's -- the first part, that
20: does also strike to me when you read it --
21: it's really a judgment call -- it says
22: "Anticoagulants are intrinsically narrow
23: therapeutic range drugs because their
24: principal toxicity, bleeding, is a result of

01: 00329:            So I just have some trouble
02: with the general nature of the first
03: sentence.
04: BY MR. McWILLIAMS:
05: Q.    Okay.  But you don't dispute
06: that's the statement and position of the
07: USFDA, do you?
08: MR. HOFFMAN:  Objection to the
09: form of the question.
10: A.    I agree that this is a
11: statement taken out of the document that was
12: issued by the FDA as a summary document.
13: BY MR. McWILLIAMS:
14: Q.    So ultimately, at the end of
15: the day, whether or not their therapeutic
16: index is wide or narrow, that's a subjective
17: opinion; is that fair?
18: A.    That's the question the experts
19: are discussing because there's no accurate --
20: at least to my knowledge, accurate definition
21: for that.
22: Q.    So some people think Xarelto
23: has a narrow therapeutic index, others, such
24: as you and your company, think it's wide; is

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00330:  that fair?
02: A.    This statement is made for
03: anticoagulants in general --
04: Q.    Yes.
05: A.    -- so it's not specific to
06: Xarelto.
07: Q.    Yes.
08: A.    And if you just say some people
09: think that anti -- new oral anticoagulants in
10: general have no therapeutic -- no narrow
11: therapeutic range, I can agree because I have
12: heard experts saying that in public, so --
13: Q.    And here, the FDA is saying
14: that in a public document.
15: A.    FDA is saying the opposite, so
16: the FDA's position is that it -- it is here,
17: at least as it reads here in this statement,
18: in the document, that they think
19: anticoagulants are intrinsically narrow
20: therapeutic range.  But I heard also experts
21: saying in public that they don't think that
22: new oral anticoagulants in general have a
23: narrow therapeutic range.
24: Q.    So different minds can

01: 00331:  disagree?
02: A.    Yeah.  Explained different.
03: Q.    Okay.  And similarly, there's
04: some -- there's disagreement over whether or
05: not Xarelto exhibits high interpatient
06: variability, and that's one of the factors
07: you identified as why there's no need for
08: therapeutic drug monitoring for Xarelto,
09: correct?
10: MR. HOFFMAN:  Objection to the
11: form.
12: A.    That's not correct.  So we
13: talked about general pharmacokinetic
14: properties and variability, but not
15: specifically about intrapatient or --
16: interpatient or intrapatient variability, so
17: that's a specific -- yeah, content, in this
18: whole area.
19: BY MR. McWILLIAMS:
20: Q.    Well, pharmacokinetic
21: variability is demonstrated either within
22: patient variability or among patient
23: variability.  That's the only two types of
24: pharmacokinetic variability I'm aware of.

01: 00332:           MR. HOFFMAN:  Objection to the
02: form of the question.
03: BY MR. McWILLIAMS:
04: Q.    Are there others?
05: A.    To my knowledge, there's
06: also -- it looks into a variability that is
07: probably caused by interactions with other
08: drugs, with food, specific patient
09: characteristics and so on.  So that's --
10: Q.    Right.  But ultimately, all
11: that can be seen -- that's interpatient
12: variability, and that's what creates
13: interpatient variability, the different
14: kidney function, different patients have
15: different kidney function, different patients
16: are on different comedications, and all those
17: things are pharmacokinetic properties that
18: ultimately determine that individual
19: patient's exposure, correct?
20: A.    That's correct.
21: Q.    Okay.  And that's why simply
22: knowing what dose pill someone takes does not
23: tell you about their exposure because every
24: person has different pharmacokinetic

01: 00333:  properties, correct?
02: A.    Now we're getting into an area
03: again of very much -- you would have to rely
04: on expertise of my colleagues.  So typically
05: the pharmaceutical development does not only
06: consist of what we discuss and what's here
07: now as the pivotal trial, phase three trial,
08: where adults as being -- a given dose is
09: being tested against the standard of care.
10: The development starts earlier,
11: and in those earlier phases, there's
12: characterization made of the pharmacokinetic
13: properties, as you just alluded to, and all
14: this information is then used to learn about
15: the most optimal dose to be brought forward
16: into testing into phase three.  So it's not
17: the kind of singular question that has been
18: asked during development.
19: Q.    Well, Doctor, you're aware that
20: there was a dedicated PK substudy in ROCKET
21: where they actually measured the amount of
22: Xarelto in the patient's blood, right?
23: A.    I'm aware there was a PK study,
24: but I do not recall the details and content

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00334:   of the --
02: (Clarification requested by the
03: reporter.)
04: A.    -- and the content of the data,
05: and so I would have to refer that question to
06: experts who --
07: Q.    That would be like Dr. M|ck?
08: A.    Dr. M|ck, Dr. Kubitza, and also
09: Scott Berkowitz because he's also providing
10: clinical judgments when it comes to
11: affiliation of the outcomes.
12: MR. McWILLIAMS:  All right.
13: Well, let me hand you a paper by
14: Dr. M|ck, Kubitza.  It doesn't have
15: Berkowitz, but two out of three isn't
16: bad.  This is Derix-33.
17: (Whereupon, Deposition Exhibit
18: Derix-33, 2013 M|ck et al Publication
19: [No Bates], was marked for
20: identification.)
21: BY MR. McWILLIAMS:
22: Q.    And you see this is a
23: publication from 2014 titled "Clinical
24: Pharmacokinetic and Pharmacodynamic Profile

p. 00334

01: 00335:   of Rivaroxaban."
02: A.    Yes, it's the application as --
03: Q.    And if you'd please turn to
04: page 7, Table 3.  And this is where the
05: results of the dedicated substudy for the
06: various indications is reported.  And to the
07: best of my knowledge, this is the only place
08: that it's reported.
09: And I want to direct your
10: attention to the two lines that read "Stroke
11: prevention in patients," because you know in
12: ROCKET, there's two different doses.
13: A.    Yes.
14: Q.    15 milligrams and 20 milligrams
15: depending on the kidney function.
16: A.    Right.  A patient with moderate
17: renal impairment are advised in the -- yeah,
18: advised in the study and also are advised in
19: the label to take the dose of 15 milligrams
20: once daily.
21: Q.    Okay.  And so then let's look
22: at for stroke provision, the 15 to
23: 20 milligrams, let's look at the trough.  And
24: that's meant -- trough is meant to represent

p. 00335

01: 00336:   the lowest amount of active drug in the body
02: prior to the next dose, correct?
03: A.    As I said, I'm not an expert in
04: pharmacokinetics, but as you explained, it's
05: also my understanding.
06: Q.    And so let's look at the trough
07: values for the patients in ROCKET.  And the
08: median trough value was 44 for the patients
09: on the 20 milligrams, correct?
10: A.    I would have to check whether
11: this is the median, but it's --
12: Q.    You can look at little C down
13: below?
14: A.    Yeah.
15: Q.    Evan, can we highlight little C
16: median?
17: So it gives -- that's the
18: median, and then in the brackets, it gives
19: you the 5th to the 95th percentile, correct?
20: A.    Yes, that's how it says in the
21: note, uh-huh.
22: Q.    So even though all of these
23: patients took the exact same pill, they took
24: the exact same 20-milligram Xarelto pill, and

p. 00336

01: 00337:   they had their blood measured at the exact
02: same time, the concentration of Xarelto in
03: their blood ranged from 12 micrograms per
04: liter at the 5th percentile to 137 micrograms
05: per liter at the 95th percentile.  That's a
06: tenfold variation, correct?
07: A.    I don't know the information
08: about exact point in time that you just
09: stated because there's some -- also some
10: technicalities behind, and there's also
11: practical because, yeah --
12: Q.    Well, they're --
13: A.    I mean, I would have to check
14: just because I cannot conclude that it may --
15: must have been all at the exact time.
16: Q.    Well, they're all identified as
17: trough, and trough is time dependent,
18: correct?
19: A.    It's the measurement that is
20: taking at a certain time after the dose was
21: taken.
22: Q.    Right.
23: A.    But as again, I said, I am
24: really not the expert, but I can only give

p. 00337

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00338: some recollection of the discussion we had
02: that if you take the dose in the evening and
03: go back to the hospital in the morning to get
04: your blood sample taken, it probably cannot
05: be always the exact time.
06: Q.    But Dr. M|ck and --
07: A.    So as -- yeah, as good as
08: possible as the measurements allowed --
09: Q.    But that's talking in the real
10: world and concerns over PK/PD.  Here in this
11: controlled clinical trial, Dr. M|ck and
12: Dr. Kubitza were very careful to properly
13: identify what was the peak, what was trough,
14: what was area under the curve.
15: And for trough, they identify
16: the range from 5th to 95th percentile as
17: being 12 micrograms per liter all the way up
18: to 137 micrograms per liter, correct?
19: A.    That's correct, according to
20: the method they used.  And so we would have
21: to take that into consideration.  But that's
22: still numbers that they report here in this
23: publication.
24: Q.    And that's a tenfold variation,

p. 00338

01: 00339:    despite these patients taking the exact same
02: pill.  Some patients had ten times as much
03: Xarelto in their blood compared to others,
04: correct?
05: MR. HOFFMAN: Objection to the
06: form of the question.
07: A.    Correct, that they took -- or
08: that we have to assume -- so that they took
09: the 20-milligram once daily, but as I said,
10: we would have to take more into
11: consideration, the details, and talk --
12: please talk to the colleagues about the
13: interpretation of the data.
14: But I agree that as displayed
15: here, it's a range from 12 to 137, which
16: would represent ten times.
17: BY MR. McWILLIAMS:
18: Q.    And that's ten times higher,
19: right?
20: A.    Yes.
21: Q.    And would you agree with me
22: that if someone -- you'd agree with me that
23: anyone who takes a Xarelto pill has an
24: increased risk of a bleed compared to someone

p. 00339

01: 00340:    who doesn't take a Xarelto pill?
02: MR. HOFFMAN: Objection to the
03: form of the question.
04: BY MR. McWILLIAMS:
05: Q.    Taking Xarelto increasing your
06: risk of bleeding, right?
07: MR. HOFFMAN: Objection to the
08: form of the question.
09: A.    I mean, it's clear that, yeah,
10: influencing the coagulation system by an
11: effective dosing of a new -- an anticoagulant
12: and as well Xarelto, there is an inherent
13: bleeding risk.
14: BY MR. McWILLIAMS:
15: Q.    And you went to pharmacology
16: school.  You understand dose-response, you
17: understand that as you're exposed to more
18: anticoagulant, your risk of a bleed goes up?
19: MR. HOFFMAN: Objection to the
20: form of the question.
21: A.    That's again a question I would
22: like to ask you to discuss with my
23: colleagues.  Scott Berkowitz is a
24: hematologist and expert in the field of

p. 00340

01: 00341:    anticoagulation, so he -- and that's also
02: what -- only what I can recall.  As told us
03: several times, that anticoagulation, it's not
04: an -- yeah, it's a complex procedure, so --
05: and several mechanisms apply, and it's not
06: always that easy to take the one to the
07: next -- I mean, to take A to B.  And so,
08: therefore, I would refer these questions to
09: him.
10: BY MR. McWILLIAMS:
11: Q.    I assure you we will talk to
12: Dr. Berkowitz about it, but today is my
13: opportunity to talk to you about it.
14: A.    Uh-huh.
15: Q.    So as one who's been working on
16: this drug for ten years, someone who's got a
17: background in pharmacology, you understand
18: there's a dose-response with respect to
19: exposure of anticoagulants, all
20: anticoagulants, including Xarelto, and your
21: risk of bleeding?
22: A.    Yes.  There is a dose-response,
23: and that is also shown in data we have in
24: phase two, where doses that were a multiple

p. 00341

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00342:   of the 20-milligram dose were investigated.
02: However, what we see there is that the
03: dose-response is very flat, so there's no
04: steep increase of observed bleeding in those
05: phase two studies, even up to a total daily
06: dose of 60-milligram.  And so that's also
07: what has to be taken into context.
08: Q.   Okay.  But more exposure equals
09: higher bleed risk?
10: MR. HOFFMAN:  Objection to the
11: form of the question.
12: BY MR. McWILLIAMS:
13: Q.   Correct?
14: MR. HOFFMAN:  Objection to the
15: form of the question.
16: BY MR. McWILLIAMS:
17: Q.   Exposure matters.
18: MR. HOFFMAN:  Objection to the
19: form of the question.
20: A.   I just said there is a
21: dose-response which you can see in the phase
22: two trials, if you go beyond doses that were
23: investigated here in the ROCKET AF trial, and
24: this response is quite flat.

p. 00342

01: 00344:   response on both efficacy and safety.
02: Q.   Okay.  And so exposure matters.
03: Exposure is informative in determining
04: your -- the efficacy of response and the
05: safety of response.
06: MR. HOFFMAN:  Objection to the
07: form of the question.
08: BY MR. McWILLIAMS:
09: Q.   Correct?  You just said that
10: you see a dose-response for both efficacy and
11: safety, right?
12: MR. HOFFMAN:  Objection to the
13: form of the question.
14: A.   I -- I agree that we saw a
15: dose-response in the phase two studies,
16: although it was, yeah, a very flat and was
17: not -- it was not a steep increase of the
18: curve.
19: And also, we talked about this
20: before, the investigational pharmacokinetic
21: profiles and information is important, and in
22: that regard, I can agree that exposure is
23: important.
24: You can see this already in the

p. 00344

01: 00343:   BY MR. McWILLIAMS:
02: Q.   I understand.  I understand it
03: eventually flattens out.
04: A.   But it is generally existing.
05: Q.   But just as the general basic
06: proposition is that as exposure goes up, your
07: bleed risk goes up?
08: MR. HOFFMAN:  Objection to the
09: form of the question, asked and
10: answered.
11: BY MR. McWILLIAMS:
12: Q.   Correct?
13: A.   I did not deny what you're
14: saying so that in general, there is -- there
15: is a dose-response --
16: Q.   Thank you.
17: A.   -- that can be seen if you test
18: several doses, and it's just to the matter of
19: extent that you have to also take into
20: consideration when you make such statement
21: that, yeah, if the exposure is going up to a
22: very high extent, and there's a
23: clinically evaluated again, there's a
24: response and an expect -- yeah, expected

p. 00343

01: 00345:   dosing regimen that was applied in the
02: ROCKET AF trial because exactly that was the
03: information behind that patients with
04: moderate renal impairment have, yeah, a -- or
05: are predicted -- are predicted to have the
06: same exposure or similar exposure if they
07: take 15-milligram as compared to patients
08: with normal renal function.
09: So take 20-milligram, and so
10: that was how this dosing regimen was
11: developed, which was then later on tested
12: successfully in the phase two trial.
13: BY MR. McWILLIAMS:
14: Q.   Okay.  And you keep talking
15: about dose, and I understand you want to keep
16: talking about dose, but I'm talking about
17: something very different.  Because we've
18: already seen that dose doesn't tell you about
19: exposure.
20: There's tenfold variation in
21: patients who take the same dose in terms of
22: their exposure, and I'm asking you whether or
23: not, as a patient's exposure increases, not
24: their dose, as their exposure increases,

p. 00345

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00346:  their risk of a bleed increases?
02: MR. HOFFMAN:  Objection to the
03: form of the question.
04: A.    I do not agree to your
05: statement that the dose doesn't inform about
06: exposure.
07: BY MR. McWILLIAMS:
08: Q.    But I need you to answer my
09: question, and I'll need you to put dose aside
10: for a second, and I need you to focus on
11: exposure.
12: Do you agree that as exposure
13: increases, the risk of a bleed increases?
14: MR. HOFFMAN:  Objection to the
15: form of the question.
16: A.    We went back to that question
17: several times so --
18: BY MR. McWILLIAMS:
19: Q.    Is it a yes?
20: A.    -- it's a matter of -- it's a
21: matter of the extent of exposure increases
22: and not any exposure increases has an
23: immediate impact on the safety profile.
24: But I said that in terms of a

01: 00348:   question already.  I cannot give you a
02: different response than I have given
03: previously.
04: BY MR. McWILLIAMS:
05: Q.    Okay.  Did you attend the
06: Cardiac Safety Research Consortium meeting in
07: February of 2015?  There's one also in
08: December of 2015, but there's one in
09: February.  Did you attend that one?
10: A.    Yes, I attended that one too.
11: Q.    Okay.  And did you see
12: Dr. Temple's presentation on tailored dosing?
13: A.    Yes, I saw the presentation.
14: MR. McWILLIAMS:  Let me hand
15: you what we're marking as Derix-34.
16: (Whereupon, Deposition Exhibit
17: Derix-34, NOAC Dosing: Pharmacometric
18: Guidance Regulatory Considerations
19: PowerPoint [No Bates], was marked for
20: identification.)
21: BY MR. McWILLIAMS:
22: Q.    Do you recognize this as the
23: PowerPoint presentation that Dr. Temple
24: presented?

01: 00347:   certain extent, and if this extent is
02: described in the phase two studies as up to
03: the exposure that is generated by
04: 60 milligrams.  So in a maximum of total
05: daily dose, there isn't -- you can see an
06: increase in bleeding if you're -- if
07: you're -- increased exposure to -- in the
08: experiment, in the phase two.
09: Q.    I get you loud and clear.  I
10: understand there's a ceiling on the exposure
11: and in the increased bleed risk, and we can
12: argue until we're blue in the face about the
13: shape of the line.
14: I'm just trying to just cover
15: basic, pharmacology 101, that as exposure
16: increases, the risk of bleed increases,
17: generally.  Can you agree to that?
18: MR. HOFFMAN:  Objection to the
19: form of the question.
20: BY MR. McWILLIAMS:
21: Q.    Can you agree to that?  Yes?
22: MR. HOFFMAN:  Objection to the
23: form of the question.
24: A.    I think I responded to that

01: 00349:        A.    Yes, I recognize this as his
02: presentation.
03: MR. McWILLIAMS:  Just a second.
04: (Pause.)
05: BY MR. McWILLIAMS:
06: Q.    All right.  Let's walk through
07: this together.  It's titled "NOAC Dosing:
08: Pharmacometric Guidance Regulatory
09: Considerations"?
10: A.    Uh-huh.
11: Q.    And this is by Dr. Robert
12: Temple; is that correct?
13: A.    Yes, that's correct.
14: Q.    This is dated February 3rd,
15: 2015; is that correct?
16: A.    That's correct, yes.
17: Q.    Let's go through this together.
18: Page 2, it says, "What is different about
19: NOACs?  We dose by blood level or
20: pharmacologic effect very rarely... Why?"
21: And he just says that "For most
22: drugs, dose-response or concentration
23: response is not steep in the therapeutic
24: range.  So getting the dose just right is not

01: 00350:   so critical.  Most people will be in the
02: right place.  We often are on the flat part
03: of the dose-response curve (most
04: antihypertensives, antidepressants), so blood
05: levels are not critical.  If there is an
06: adverse effect, you can see it and lower the
07: dose," and he gives some examples.
08: "But suppose the benefits and
09: toxicity that are concentration of
10: dose-related are outcome events.  Then
11: monitoring benefit and risk is too late.  The
12: patient has had a stroke or bleed.  You need
13: to get to the right place right away."
14: Do you agree with that general
15: sentiment articulated by Dr. Temple in this
16: PowerPoint presentation?
17: MR. HOFFMAN:  Objection to the
18: form of the question.
19: A.    Yeah.  I have some difficulty
20: in translating what "general sentiment" means
21: in -- and you are -- yeah, your question.
22: BY MR. McWILLIAMS:
23: Q.    Well, do you agree you need --
24: you would ideally like to get the patient in

p. 00350

01: 00352:   statement.
02: Q.    Okay.  So is rivaroxaban the
03: only anticoagulant in the world that doesn't
04: have a steep dose-response curve for major
05: bleeding?
06: MR. HOFFMAN:  Objection.
07: BY MR. McWILLIAMS:
08: Q.    Is it a miracle pill?
09: MR. HOFFMAN:  Objection.
10: THE WITNESS:  Can you repeat
11: the question?
12: BY MR. McWILLIAMS:
13: Q.    Yeah.  Is it true -- is it your
14: position that Xarelto does not have a steep
15: dose-response curve for major bleeding?
16: MR. HOFFMAN:  Objection to the
17: form of the question.
18: A.    We talked about this earlier
19: about a narrow therapeutic range, and I made
20: the point that from the data that we have
21: from the phase two dose and by that also
22: exposure relationship by the doses that were
23: applied in that study was flat, was not
24: steep.

p. 00352

01: 00351:   the right place right away in terms of their
02: exposure, this topic we've been discussing
03: for the last 15 minutes?
04: MR. HOFFMAN:  Objection to the
05: form of the question.
06: BY MR. McWILLIAMS:
07: Q.    That's what he means by
08: concentration of dose.  He's talking about an
09: individual patient's level of exposure.
10: MR. HOFFMAN:  Objection to the
11: form of the question.
12: BY MR. McWILLIAMS:
13: Q.    Right?
14: A.    That's not immediately clear
15: from this here.
16: Q.    Okay.  Let's keep reading.
17: Maybe it will become clear.
18: Slide 3 says again,
19: continuation of "What's different about
20: NOACs?"  Number one, he says, "The
21: concentration relationship is very steep in
22: some places."  That's what he says, right?
23: A.    Yes, and it's underlined "in
24: some places" because it's not a general

p. 00351

01: 00353:   BY MR. McWILLIAMS:
02: Q.    And as we pointed out when we
03: looked at that FDA document, the FDA
04: respectfully disagrees with you, and they
05: view the data differently.  And they think
06: all anticoagulants, including Xarelto, has a
07: narrow therapeutic index.
08: Do you remember that?
09: A.    I remember that there was that
10: general statement that --
11: Q.    Thank you.  That's all I asked.
12: A.    -- was not related to Xarelto
13: specifically.
14: Q.    Ma'am, it was the summary
15: approval letter for Xarelto.  You understand
16: that, right?
17: A.    I understand that, but --
18: Q.    It was unrelated to --
19: A.    -- the statement was -- it was
20: unrelated, was in the document, but it was
21: still a general statement made in the text --
22: Q.    And it said all oral
23: anticoagulants are intrinsically narrow
24: therapeutic index drugs, right?  All oral

p. 00353

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00354:    anticoagulants in the context of a document
02: discussing Xarelto, right?
03: MR. HOFFMAN:   Objection to the
04: form of the question.
05: A.    I think that is somehow how it
06: was read, but we would have to go back --
07: BY MR. McWILLIAMS:
08: Q.    Yes, I assure you, that's
09: what it says.
10: (Simultaneous discussion
11: interrupted by the reporter.)
12: A.    We would have to look back to
13: the exact wording, but this -- the general
14: statement was taken out of this summary
15: approval document for Xarelto.
16: Q.    Okay.  So let's keep reading
17: Dr. Temple's presentation.
18: Point number 2 is, "The
19: dose/concentration relationship is, for some
20: of the drugs, quite variable because of renal
21: excretion and other factors."
22: 3, "It is easy to focus on the
23: overall comparison of results with warfarin
24: and not worry about 'optimal.'"

p. 00354

01: 00356:    table, and he mentioned, I think, edoxaban
02: somewhere before.  And so that's a
03: comprehensive list of all NOACs that are
04: approved to date.
05: BY MR. McWILLIAMS:
06: Q.    So let's keep going.
07: On page 5, under the slide
08: title, "NOAC Results.  As the slide showed,
09: all 3 drugs were clearly superior to warfarin
10: on hemorrhagic stroke but only dabigatran was
11: superior for ischemic stroke, and only at the
12: higher dose.  Was that the best they could
13: do?
14: "We now have results with a
15: fourth drug, edoxaban, which shows reduced
16: hemorrhagic strokes and slightly lower
17: ischemic stroke at 60 milligrams."
18: It continues on the next page,
19: discussion of edoxaban data.  Let's go to
20: page 7, slide titled "Concentration
21: Response."  Dr. Temple writes, "These results
22: are no surprise.  We have long known warfarin
23: concentration and the resulting effect on INR
24: relate to the drug's benefits and risks and

p. 00356

01: 00355:           3 [sic], "We, the FDA, did not
02: require any attempt to monitor or modify
03: individual dosing, although we did encourage
04: study of more than one dose, which was done
05: for dabigatran and edoxaban.  Fortunately,
06: for those 2 drugs, we also had extensive
07: blood level data, allowing us to relate
08: outcome to blood levels.
09: "And the results were, overall,
10: quite good."
11: Did I read that correctly?
12: A.    You read that correctly, yes.
13: Q.    If you go to the next page,
14: page 4, Dr. Temple's heading is "NOAC Results
15: Are Good," and he includes results from
16: rivaroxaban ROCKET to make it crystal clear
17: that he is including Xarelto in this broader
18: discussion on NOACs, fair?
19: A.    That's fair.  So he had
20: included dabigatran, apixaban --
21: (Clarification requested by the
22: reporter.)
23: A.    It included dabigatran,
24: rivaroxaban, apixaban, information in the

p. 00355

01: 00357:    would not dream of giving everyone the same
02: dose."
03: Did I read that correctly?
04: A.    You read it correctly, yes.
05: Q.    If you go to page 8, you can
06: see a chart you've probably seen more times
07: than I have, showing the relationship between
08: INR and warfarin patients and ischemic stroke
09: and hemorrhagic -- excuse me, and
10: intracranial bleeds; is that correct?
11: A.    That's correct.
12: Q.    And, again, this is why going
13: back -- I promised I wouldn't talk about it,
14: but I guess I lied.  The INRatio, that's why
15: it was so important for the doctors to get
16: the correct -- the most accurate INR reading
17: because if a patient is not within that
18: therapeutic range of between 2 and 3, you're
19: unnecessarily placing that patient at risk of
20: ischemic stroke or intracranial hemorrhage,
21: correct?
22: A.    I agree that it's important to
23: keep the patient in that range from 2 to 3,
24: but you can see that there are like from 1.8

p. 00357

Page 91

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00358:   or 3.2, and then the curve is really
02: increasing, yeah, most deeply, and indicating
03: that if the patient -- or if an INR is in
04: that range, there's an increased risk for
05: either ischemic stroke or intracranial
06: bleeding in this graph.
07: Q.    Okay.  Let's keep reading.  Go
08: to page 9, please.  And Dr. Temple writes,
09: "The slide shows the relation of INR to
10: thrombotic stroke and intracranial bleeding,
11: but the total bleeding curve is similar to
12: intracranial bleeding.
13: "We can see that INR of less
14: than 2 does not reduce stroke adequately and
15: the worsening with low INR is very steep, and
16: that beyond an INR of 2 there is very little
17: further benefit, but there is increased
18: bleeding.  The 'sweet spot' is an INR of
19: about 2 to 3, perhaps 2 to 3.5.
20: "So, for the previous standard
21: of care, warfarin, we do not use a fixed dose
22: but always use a dose titrated to
23: anticoagulant effect.  Why should NOACs be
24: any different," he postulates.

p. 00358

01: 00359:          He goes on.  He says, "Maybe
02: they shouldn't be.  The next slide shows the
03: relationship of dabigatran blood levels to
04: stroke and bleeding."
05: And then on page 10 is the
06: famous Reilly chart that started this whole
07: commotion with the EMA and the FDA, right?
08: MR. HOFFMAN:  Is there a
09: question?
10: MR. McWILLIAMS:  Yeah.
11: BY MR. McWILLIAMS:
12: Q.    Did I read it correctly?
13: MR. HOFFMAN:  Objection, you
14: didn't.  But that's okay.
15: BY MR. McWILLIAMS:
16: Q.    Are you with me, Doctor?  Do
17: you recognize page 10 as the Reilly chart?
18: A.    It looks like, but it is not,
19: yeah, clearly quoted here as taking from
20: the -- from the publication.
21: Q.    Let's keep going.  Slide 11 --
22: and, again, you saw Dr. Temple present this
23: slideshow, correct?
24: A.    Yes, I saw this recent.

p. 00359

01: 00360:        Q.    Okay.  Let's keep reading, see
02: if this -- he writes, "The curves, based on
03: trough blood levels, look a lot like
04: warfarin."
05: Do you agree with that?
06: A.    I don't agree that you can
07: necessarily compare them because they're --
08: yeah, they're just different type of display
09: here, and this is some -- on the one hand
10: side, it's a draft concentration level, and
11: on the other hand side is an INR range, which
12: is a pharmacodynamic parameter.  And so we
13: can say they look alike, but suddenly it's
14: very general.
15: Q.    Well, it's what he says, isn't
16: it, and that's what he presented at the
17: meeting you attended, correct?
18: A.    Yeah, he -- it's a citation --
19: or it's a quotation from the slides, yeah.
20: Q.    Okay.  So let's keep reading.
21: He writes, "In particular, the full benefit
22: on thromboembolic stroke is there at 75 to
23: 150 nanograms per ml at trough; but bleeding
24: increases above that.  Below 50 nanograms per

p. 00360

01: 00361:   ml strokes go up a lot."
02: You see where I'm reading from?
03: A.    Uh-huh.
04: Q.    So he's essentially comparing
05: drug concentration for dabigatran with INR
06: levels for warfarin, fair?
07: A.    Yeah, in those sentences he is
08: referring -- it was due to the curves on
09: dabigatran, where he cites the concentration
10: levels and, yeah, describes the curves.
11: Q.    All right.  He says, "Very few
12: dabigatran 150 patients were below
13: 50 nanograms per ml, but a fair number on
14: dabigatran 110-milligram were.  On the other
15: hand, dabigatran 150 puts a fair number into
16: bleeding range."
17: And then he proposes, "Why not
18: adjust trough doses to get 75 to 150 or 75 to
19: 100 in everyone," right?  That's what he
20: says?
21: A.    That's the question that he's
22: posing to --
23: Q.    And he's --
24: A.    -- and it's a rhetorical

p. 00361

Page 92

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00362:   question to the, yeah, audience.
02: Q.    Well, he's essentially
03: proposing a therapeutic range for dabigatran,
04: correct?
05: A.    He's raising a hypothesis here
06: to be further tested, and I recall there was
07: quite some discussion about it.  And you also
08: have to bear in mind that FDA, yeah, did not
09: approve one of the doses, and so that needs
10: to be taken also into the context here, into
11: the discussion.
12: Q.    He's just saying there appears
13: to be a therapeutic range for dabigatran
14: plasma concentrations measured at trough,
15: right?
16: A.    Not exactly.  He poses the
17: question for discussion and debate, yeah, why
18: adjustment of doses for dabigatran could --
19: yeah, why it could be done or why it could
20: not make sense in a way.
21: Q.    Okay.  If you go to page 17,
22: please.  This is skipping over his section on
23: edoxaban.  He then moves into a broader
24: discussion on other NOACs; in fact, that's

p. 00362

01: 00363:   the title of the slide, right, "Other NOACs"?
02: A.    Yeah, that's right.  Yeah.
03: Q.    He says, "We don't have
04: concentration/response data on apixaban or
05: rivaroxaban.  They are less renally excreted
06: than dabigatran or rivaroxaban and perhaps
07: get most patients to the right place."
08: He says, "But neither was
09: superior to warfarin on ischemic stroke, so
10: perhaps they could do better."
11: Did I read that correctly?
12: A.    You read that correctly.
13: Q.    And so what Dr. Temple here is
14: proposing is that your drug could potentially
15: be used more safely or more effectively by
16: way of tailored dosing.
17: MR. HOFFMAN:  Objection to the
18: form of the question.
19: BY MR. McWILLIAMS:
20: Q.    Right?
21: A.    I do not agree because, first
22: of all, he says that perhaps it looks as if
23: most patients got to the right place, and
24: then he speaks to ischemic stroke, which is

p. 00363

01: 00364:   the efficacy parameter.
02: And he has pointed out that
03: several times in his speeches, that for him,
04: it's the most important to prevent ischemic
05: stroke, and may just also as the reason why
06: he did not support approval of lower doses
07: for the two other drugs.
08: So here he just said that
09: neither was superior in efficacy to warfarin
10: on ischemic stroke specifically.
11: Q.    But --
12: A.    And so he -- then posing the
13: hypothesis, is it, yeah, probably there is
14: further room for improvement.  We don't know.
15: But he is saying this all on the basis, and
16: that's not standing here on the slide, but
17: he -- I definitely recall him saying that he
18: stands behind the approvals that the agencies
19: have -- yeah, made, because they stand behind
20: a positive benefit-risk assessment and
21: compares them to the standard of care.
22: And that they -- it was
23: important for them to have new oral
24: anticoagulants on the market, especially as

p. 00364

01: 00365:   they believe that by these new drugs more
02: patients get access to the drug.
03: And so -- but still, he says in
04: a hypothetical way, yeah, perhaps there's
05: still room for improvement, and that's why,
06: yeah, he issued the dialogue.  He wanted to
07: get to know whether this is -- yeah,
08: what's -- if there's anything behind the
09: hypothesis he's raising here.
10: Q.    And the hypothesis is that
11: patient -- that improvement can be gained by
12: way of a blood test to tailor the dose.
13: MR. HOFFMAN:  Objection to the
14: form of the question.
15: A.    Yes.
16: BY MR. McWILLIAMS:
17: Q.    Yes?
18: A.    I mean, that's how you could,
19: yeah, interpret from reading and listening to
20: his statements, that he would like to
21: understand whether involving a specific
22: measurement of PK or PD could, yeah,
23: improve -- further improve.
24: Q.    Okay.  Let's -- and so what he

p. 00365

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00366:  says he continues, he says, "Note that
02: monitoring of trough blood level or an
03: appropriate coagulation measure does not need
04: to be done often; maybe once is enough, as
05: suggested by the dabigatran data. This is
06: true because there's a range of
07: concentrations that are sufficient for stroke
08: reduction but do not cause a lot of
09: bleeding."
10: Did I read that correctly?
11: A.    You read that correctly.
12: Q.    Let's go on to the next slide,
13: page 18, the last page, on why it matters and
14: why this is of interest to Dr. Temple at FDA.
15: He says, "Not having the
16: optimal dose at initial dosing is tolerable
17: for many drugs. You can adjust up or down
18: according to response. But here, being too
19: low leads to a stroke, a very bad outcome,
20: and being too high leads to major bleeds,
21: also bad, so that early optimization seems
22: worthwhile."
23: Do you agree with that
24: sentiment --

p. 00366

01: 00368:    to what I said before, that he several times
02: mentioned that he stands behind the approvals
03: that were given because he thinks that it's a
04: valuable addition to the -- yeah, to
05: armamentarium physicians have to treat
06: patients.
07: But he still is -- poses this
08: question about could -- could they probably
09: do better, and that's why he initiates the
10: discussion and we are continuing this
11: dialogue.
12: Q.    And that's the same theory or
13: hypothesis that has stimulated the discussion
14: with EMA and has triggered this very detailed
15: list of questions asking you to explore
16: therapeutic drug monitoring, correct?
17: A.    That's my understanding, yes,
18: that this is the same interest of the health
19: authority to find out whether by means of,
20: yeah, further scientific evaluation there is
21: room for improvement.
22: They don't know yet, but they
23: are interested in the question and would like
24: to further explore it.

p. 00368

01: 00367:            MR. HOFFMAN: Objection to the
02: form of the question.
03: BY MR. McWILLIAMS:
04: Q.    -- articulated by Dr. Temple?
05: A.    It's -- again, this is a --
06: it's a suggestion that's not a statement that
07: is a conclusion, and so he says that it seems
08: worthwhile, and that's indicating that, yeah,
09: that he wants to look into this question, and
10: so in that -- I mean, it's in his interest to
11: further explore this question. I'm in
12: agreement with him.
13: So -- but it does not mean that
14: this is already giving a definite statement.
15: It's really just the start of the discussion
16: and his question to the scientific community
17: and to NOAC marketing authorization holders.
18: Q.    And the last word, the final
19: word from Dr. Temple at this presentation
20: that you attended, is "So, the NOACs are very
21: good, but they could probably be better."
22: That's what he said, right?
23: A.    That is what he said here in --
24: yeah, in the slide, and that's also congruent

p. 00367

01: 00369:            MR. McWILLIAMS: All right.
02: Q.    Okay. And I'm going to -- I just want
03: to put this document on the record and
04: make sure we're clear that that is, in
05: fact, the EMA's position on this. So
06: these next documents will be Derix-35
07: and 36. 35 will be Record 3071268 and
08: 3071269.
09: (Whereupon, Deposition Exhibit
10: Derix-35, E-mail(s) re: Xarelto - CHMP
11: Request on TDM,
12: XARELTO_JANSSEN_15368506 -
13: XARELTO_JANSSEN_15368511,
14: Ref. 3071268, was marked for
15: identification.)
16: (Whereupon, Deposition Exhibit
17: Derix-36, CHMP Assessment Report for
18: LEG 036, XARELTO_JANSSEN_15368512 -
19: XARELTO_JANSSEN_15368533,
20: Ref. 3071269, was marked for
21: identification.)
22: BY MR. McWILLIAMS:
23: Q.    So this is Derix-35. This is
24: an e-mail I believe you received, and then

p. 00369

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00370:   the attachment which has been marked as
02: Derix-36.
03: And so I just want to make sure
04: that this is an e-mail you received on
05: July 1st, 2015, from Jṛrgen Weber.  I don't
06: know if you can -- Evan, see, the name is
07: right here.
08: And, Dr. Derix, I know it's
09: getting late in the day.  If you just want to
10: look on the screen, you can see your name?
11: A.     Okay.  Yeah, it's from July.
12: Q.     So you received this e-mail --
13: A.     I received this e-mail, yes.
14: Q.     -- and the attachment, which is
15: the next exhibit to your right; is that
16: correct?
17: A.     Yes.
18: Q.     Okay.  And I just want to turn
19: your attention to page 9 of the attachment.
20: And, actually, I'm sorry, just back up for a
21: second.
22: Can you just please identify
23: for me what this is, this CHMP Assessment
24: Report For the Post-Authorization Measure

01: 00372:   position of the drug company of Bayer, the
02: MAH, and then down at the very bottom on
03: page 9 is the assessors' comments, which is
04: essentially EMA's response to Bayer's
05: position statement; is that fair?
06: A.     Yes, that's fair.
07: Q.     Okay.  And I'll just read this.
08: And so the EMA writes, in response to Bayer's
09: position statement, that "It is recognized
10: that all phase three studies supportive of
11: the approved indications were performed
12: without TDM guided dosage estimates.  The MAH
13: has, in his detailed response to this
14: question, rather extensively described the
15: data supportive for the approved indications
16: with some focus on subpopulations potentially
17: susceptible to increased bleeding risk, i.e.,
18: the elderly, low bodyweight, renal
19: impairment.
20: "It is, however, not questioned
21: by the Rapporteur that the overall
22: benefit-risk balance is favorable with the
23: approved treatment strategy based on the
24: standard doses without routinely applied

01: 00371:   LEG 36?
02: A.     LEG is an abbreviation for a
03: specific type of procedure that EMA can apply
04: for questions that occur, irrespective of an
05: approval procedure of a drug.  And so this is
06: just a number system.
07: Q.     Okay.  And, again, this is
08: the -- this is the regulatory situation
09: dealing with therapeutic drug monitoring,
10: right?  The LEG --
11: A.     Yes, that's right, referring
12: to --
13: (Simultaneous discussion
14: interrupted by the reporter.)
15: A.     It is right that this is
16: dealing with the topic of target -- TDM, so
17: targeted drug monitoring, and it's called
18: LEG 36, yeah.
19: Q.     All right.  If we go to page 9,
20: Mike, I think this is my last document.
21: THE REPORTER:  Good.
22: BY MR. McWILLIAMS:
23: Q.     This is the summary, so
24: essentially the previous eight pages is the

01: 00373:   estimations of drug exposure.  The purpose
02: with CHMP initiative is rather to discuss
03: whether further improvement of the
04: benefit-risk balance can be achieved by
05: recommendation of some form of therapeutic
06: drug monitoring."
07: Did I read that correctly?
08: A.     You read that correctly.
09: Q.     And so that's the -- and that's
10: a very similar position that was articulated
11: by Dr. Temple at the February CSRC meeting,
12: correct, that while these are good drugs,
13: there may be potential benefit to improve
14: upon them by way of a blood test and tailored
15: dosing, correct?
16: A.     I agree that's the same tone of
17: the questions that -- yeah, that's addressed
18: here, yes.
19: Q.     Okay.  And that effort -- and
20: the drug company's currently undertaking all
21: efforts to try to address this question
22: that's been raised by both the FDA and EMA
23: now, fair?
24: MR. HOFFMAN:  Objection to the

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00374:        form of the question.
02: A.    I can only comment for -- on
03: what Bayer and Janssen are doing, and so we
04: are slowly following the data requests that
05: are -- and the proposals that are being made
06: and address the questions from EMA in that
07: regard.
08: I cannot speculate on what the
09: other companies are doing because although
10: the request was sent to all NOAC companies,
11: everybody is responding individually based on
12: their own data.
13: Q.    Okay.
14: MR. McWILLIAMS:  Dr. Derix, I
15: believe that's all the questions I
16: have.  My colleagues will likely have
17: some questions.  I don't know if we'll
18: start today or tomorrow, but let's
19: just go off the record.
20: MR. HOFFMAN:  Let's go off the
21: record.
22: THE VIDEOGRAPHER:  Going off
23: the record at 4:30.
24: (Recess taken, 4:30 p.m. to

01: 00375:        4:41 p.m.)
02: THE VIDEOGRAPHER:  We're back
03: on record at 4:41 p.m.
04: EXAMINATION
05: BY MR. DENTON:
06: Q.    Hello, Dr. Derix.  My name is
07: Roger Denton.
08: A.    Hello.
09: Q.    And I have a few different
10: questions to ask you.  First thing I want to
11: do is kind of step back to your time as the
12: regulatory person on Xarelto, okay?
13: A.    Okay.
14: Q.    And we've talked a lot today
15: about what EMA has done and what FDA has
16: done.  But I really want to put in
17: perspective what regulators do and what drug
18: manufacturers do when we talk about approval
19: of a drug to be sold, okay.  That's just the
20: background.
21: First of all, regulators,
22: whether it be EMA, FDA or any of the other
23: regulators around the world, do not conduct
24: clinical trials, do they?

01: 00376:        A.    That's correct.  They do not
02: conduct clinical trials on their own.
03: Q.    I mean the regulators don't
04: test the drugs for safety or efficacy,
05: correct?
06: A.    That's not correct, because in
07: their way, testing is also that they work
08: with the data that they get from the -- the
09: marketing authorization holders; especially
10: FDA gets the full database of -- with patient
11: level data, and so they perform their
12: independent analysis on the dataset.  But
13: they do not run their own studies.
14: Q.    Well, my point is:  In this
15: case, Xarelto, or rivaroxaban, the clinical
16: trials were either conducted by Bayer or
17: Janssen or some contract resource
18: organization that either Bayer or Janssen
19: hired, correct?
20: A.    Yeah, the trials were conducted
21: either under the lead and so-called
22: sponsorship of Janssen or Bayer, and they
23: used sometimes the contract research
24: organization to --

01: 00377:        Q.    Right.
02: A.    -- perform work, yes.
03: Q.    Okay.  And so it's the drug
04: companies that either conduct these studies
05: or sponsor these studies and collect all the
06: data that's submitted to the regulators,
07: right?
08: A.    That's correct.
09: Q.    All right.  And the maker of
10: the drug, in this case Xarelto, is
11: responsible for the safety and efficacy of
12: the drug, not the regulators, correct?
13: MR. HOFFMAN:  Objection to the
14: form of the question.
15: A.    The health authorities have a
16: different point in time that they can weigh
17: in, and so they also, in that form, by this
18: assessment share responsibility for the
19: assessment.
20: And so only -- also, before any
21: clinical trial is being conducted, the health
22: authorities have a look into the proposals
23: that the marketing authorization holder is
24: making, and so by that, they can already

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00378:   judge based on the information available,
02: yeah, whether it is ethical to include
03: patients in the trials.
04: So they do not only after the
05: trial was conducted see the data and look at
06: them, but they also look before the trial
07: even is starting.
08: BY MR. DENTON:
09: Q.    All right.  My question is much
10: simpler:  The maker of the drug is
11: responsible for the safety and efficacy of
12: the drug, true?
13: MR. HOFFMAN:  Objection to the
14: form of the question.
15: A.    The -- I mean, it's the
16: company's responsibility to assess the safety
17: and efficacy of the drug, and -- but they're
18: sharing this information, and then it's
19: evaluated by the health authorities as well.
20: So this will...
21: BY MR. DENTON:
22: Q.    Well, okay.  Let's move on
23: then.
24: And the maker of the drug has

p. 00378

01: 00379:   more information and knowledge about the drug
02: than the regulators, true?
03: A.    The marketing authorization
04: holder has greater detail, but there are
05: clear processes and relations in place on the
06: type of information that has to be shared
07: with the health authority and also the time
08: when it is going to be shared with the
09: inform -- you know, with the health
10: authorities.
11: So certainly, there is a level
12: of detail that is, yeah, in the knowledge of
13: the marketing authorization holder.  But the
14: most pertinent information is always shared
15: with the health authorities as well.
16: Q.    Well, but the maker of the drug
17: is responsible for providing accurate and
18: complete internal information that the
19: company knows about the safety and efficacy
20: of the drug, true?
21: A.    This is -- as a general
22: statement, if it is related to a submission
23: or that is going to be made or any procedural
24: information, I would agree that in general,

p. 00379

01: 00380:   the expectation is that information provided
02: in that is accurate and complete to the
03: question that is raised there.
04: But it does in no way mean that
05: there's an obligation by the marketing
06: authorization holder to share all the level
07: of information that existed at any day --
08: point in time in the company databases.  So
09: that would just overwhelm the health
10: authorities if every marketing authorization
11: holder would do that.
12: Q.    So, in other words, you've
13: agreed with me that the maker of the drug, in
14: this case Xarelto, knows more about the drug
15: than the regulators do?
16: MR. HOFFMAN:  Object to
17: the form.
18: BY MR. DENTON:
19: Q.    Fair?  Isn't that what you just
20: told me?
21: MR. HOFFMAN:  I'm sorry, I
22: apologize.  Objection to the form of
23: the question.  Asked and answered.
24: A.    Is the question about how you

p. 00380

01: 00381:   qualify what it means more, and I explained
02: to you so that there's certainly a level of
03: detail that is in the information databases
04: that the manufacturer has, but it's clearly
05: regulated, yeah, what pertinent information
06: is being shared with the health authorities.
07: And they can always come back
08: and ask questions and -- for more detailed
09: information if it's deemed necessary from
10: their perspective.
11: BY MR. DENTON:
12: Q.    Would you agree that the
13: manufacturer of a drug is responsible for the
14: content of the label?
15: A.    The manufacturer of the drug is
16: proposing a label based on the information
17: that is available, and so certainly is also
18: responsible for the proposal and the data
19: that are underlying.
20: But the final approval of the
21: label is granted by the health authority.
22: Q.    So it's your understanding that
23: the law in the United States that the
24: manufacturer is not responsible for the

p. 00381

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00382:   content of the label?  Is that your
02: understanding?
03: MR. HOFFMAN:  Objection to the
04: form of the question.
05: A.    That's not what I said.
06: BY MR. DENTON:
07: Q.    Okay.  Let me ask a different
08: question, see if you can agree with me.
09: The manufacturer of the drug
10: sold in the United States is responsible for
11: the content of the label, true?
12: A.    The manufacturer is responsible
13: for the proposal to be made to the health
14: authority for the label text according to the
15: rules that apply, and the manufacturer is
16: also certainly having the background
17: information that is supported -- supportive
18: of any statement that's made in the label.
19: The final approval of the label
20: is given by the health authority, and that
21: implies an agreement of the health authority
22: to what is written in the label.
23: Q.    You understand it's Bayer and
24: Janssen that are the defendants in this case,

p. 00382

01: 00383:   not the FDA.  You understand that, right?
02: A.    Could you please respond --
03: Q.    You understand that --
04: A.    -- or repeat the question?
05: Q.    -- the patients in the United
06: States in this litigation are suing Bayer and
07: Janssen, not the FDA.  You understand that,
08: right?
09: A.    That's -- I understand why I'm
10: asked here in the deposition to give
11: information.
12: Q.    Okay.  All right.  So I want a
13: very clear answer.  I mean, you have a
14: master's degree, as I understand it, in
15: regulatory affairs, right?
16: A.    That's correct.
17: Q.    Okay.  And as I also understand
18: it, on Xarelto, you were either a regulatory
19: strategist or the head regulatory strategist
20: for Xarelto for at least seven years, right?
21: A.    That's correct.
22: Q.    From 2004 to 2011?
23: A.    That's correct, yes.
24: Q.    And that's when these drugs

p. 00383

01: 00384:   were being evaluated by the regulators,
02: right?
03: A.    At least for the initial
04: indications that were approved in that time
05: frame.
06: Q.    Okay.  And so I want to ask you
07: very specifically:  The maker of the drug,
08: Bayer and Janssen, in the United States is
09: responsible to -- for the content of the
10: label?
11: MR. HOFFMAN:  Objection.
12: BY MR. DENTON:
13: Q.    You agree with that, right?
14: MR. HOFFMAN:  Objection to the
15: form of the question.
16: A.    I have to go back to my earlier
17: response, and as I said, that the proposal is
18: being made and the information that is
19: supportive to the label text, that is, again,
20: provided by the marketing authorization
21: holder, and it's also intensively discussed
22: also in internal documents, resources, but
23: it's finally approved by the health
24: authorities.

p. 00384

01: 00385:        So only with the agreement of
02: the health authorities, and the label is
03: becoming really the legally binding document
04: that you're describing.
05: BY MR. DENTON:
06: Q.    Right.  Would you agree with me
07: that the maker of the drug is responsible for
08: accurate and complete information about the
09: potential risks of a drug and putting that in
10: a label?
11: A.    This is a very general
12: statement --
13: Q.    Yes, ma'am.
14: A.    -- so I'll just -- certainly I
15: agree that to the point of accurate
16: information, it's always the responsibility
17: of the marketing authorization holder to
18: provide the accurate data that, yeah, being
19: proposed for the labeling later on.
20: Q.    I mean, you would agree,
21: wouldn't you, Dr. Derix, that the company
22: scientists and the company physicians who
23: have worked on Xarelto know more about the
24: drug than the regulators; is that fair?

p. 00385

Derix, Andrea Ph.D. - I - Volume 1 - 03/01/2016

01: 00386:     A.    I think, once again, I have to
02: go back to my prior response that this is a
03: structured information approach, and it is
04: strongly regulated, and so "more" is very
05: general, and if you would assume "more" in
06: the terms of amount of detailed day-to-day
07: information, I would have to agree with you.
08: But if it's meant to be like
09: relevant information or information that is
10: ultimately necessary to -- yeah, to assess
11: the benefit-risk, then it's the expectation
12: that the health authority also has access to
13: that information to make their decisions.
14: Q.    But I mean, we heard -- when
15: Mr. McWilliams was questioning you, we saw
16: that the company scientists and doctors knew
17: about defects or problems with the INRatio
18: device that was never shared with the
19: regulators, true?
20: A.    From the prior conversations,
21: we did not make that conclusion.  So we
22: just -- I mean, I would have to follow up to
23: really fully understand this.  We just looked
24: at -- but I saw this conversation for the

p. 00386

01: 00388:   new information coming from health authority
02: to the development team, to the other experts
03: in the team.  So that's one part of the role.
04: And the other part of the role
05: is to communicate directly with health
06: authorities, and especially in Bayer, it's
07: primarily the EMA in my team, because
08: communication to FDA went through Janssen
09: directly.
10: It's also leading a team with
11: other regulatory experts, so there are
12: experts on labeling, there are experts on
13: CMC, experts for different regions in the
14: world.
15: And so all this -- as such this
16: role also implies leading such a team of
17: experts that allows also the strategist to
18: get information from the people who are more
19: specialized in areas in regulatory affairs.
20: Q.    So one of the things you did as
21: global regulatory strategist was to be aware
22: of communications with EMA; is that fair, on
23: Xarelto?
24: A.    That's a part of the role.  So

p. 00388

01: 00387:   first time, which does not mean that they did
02: not -- yeah, were not implemented in other
03: reporting documents that were issued and
04: provided to FDA.
05: So -- but it's exactly what I
06: just described to you.  There's a day-to-day
07: working level in which things happen,
08: communication back and forth, and then there
09: is a clearly structured way of providing
10: information to FDA so that they also can
11: easily work with those data and information.
12: So these are two different levels.
13: Q.    Well, from 2004 to 2011, those
14: seven years, you were the global regulatory
15: strategist for Xarelto, true?
16: A.    Yes, that's true.
17: Q.    What does that mean?  What was
18: your role?
19: A.    That's, yeah, global regulatory
20: strategist is a title that we use in Bayer to
21: describe a role that is very much a
22: coordinative role, so it's a role that is
23: supposed to provide information on
24: regulations, on -- also on health authority,

p. 00387

01: 00389:   I am -- yeah, one of my team members at the
02: time was the direct contact to EMA, so -- and
03: did the day-to-day communication, but most of
04: the time I was aware of this, yes.
05: Q.    Okay.  So let me ask you this:
06: The information that Mr. McWilliams went over
07: of all those reports of the INRatio device
08: not working properly, during the period of
09: 2004 and 2011, was any of that communicated
10: to EMA?
11: MR. HOFFMAN:  Objection to the
12: form of the question.
13: A.    No.  I said this morning that I
14: saw this information for the first time, so
15: I -- in the form of e-mails, because I was
16: not copied on any of the e-mails, and I do
17: not recall a communication around this type
18: of information.
19: So in that regard, I'm not
20: aware that this type of information was
21: submitted.  However, it could well be that
22: the information which we discussed from
23: e-mails can also be found in the databases
24: that -- yeah, were reported to EMA.  So there

p. 00389

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00390: is another level of judgment implied here if
02: an event that is discussed and being reported
03: by an investigator is looked at again
04: independently. And so sometimes it's
05: reported to the FDA. It's according to
06: various clearly defined rules.
07: And those, yeah, investigations
08: and, really, medical assessment of single
09: information is being done by colleagues in
10: pharmacovigilance. And so we would have to
11: follow up to see whether the information from
12: the e-mail exchange might have, yeah, been
13: implemented in their reporting and by that
14: way reported to the health authorities.
15: But I don't know that, because,
16: yeah, I would have to -- yeah, I would have
17: to further look this up.
18: BY MR. DENTON:
19: Q.    Where would we look?  If we
20: want to find out if any regulator anywhere in
21: the world was told about the malfunction of
22: the INRatio device during the ROCKET trial,
23: where would we go to look for that to see if
24: any regulator in the world knew anything

p. 00390

01: 00392: Horvat-Brvcker. She said she never heard
02: about this. Who else should we ask?
03: A.    I think it would be prudent to
04: follow up with the colleagues in the clinical
05: operation team at Janssen, because they
06: certainly at least were involved in this
07: e-mail communication.
08: So it's probably best to follow
09: up with them to -- yeah, also to locate the
10: patient identifiers with, yeah, reported
11: adverse events in the database.
12: Q.    But Janssen folks didn't
13: communicate with EMA with respect to Xarelto.
14: Bayer folks did, true?
15: A.    Janssen colleagues are
16: typically not talking to EMA, but we have --
17: in our collaboration in place that, yeah,
18: adverse event reporting, pharmacovigilance
19: reporting is ruled in a way that the
20: information is being provided to our
21: pharmacovigilance department at Bayer so they
22: could appropriately inform the health
23: authorities.
24: The root cause you have to look

p. 00392

01: 00391: about this during the trial?
02: MR. HOFFMAN:  Objection to the
03: form of the question.
04: A.    Based on my own knowledge, I
05: have -- I would like to ask you to follow
06: this up with colleagues from the
07: pharmacovigilance group.  So if the events
08: reported by investigators qualified for a
09: certain type of adverse event reports that's
10: being reported, then they would be
11: implemented in the safety database.
12: BY MR. DENTON:
13: Q.    Who?  Who should we ask?  Can
14: you give us a name?
15: A.    In Bayer?
16: Q.    Sure.
17: A.    The colleagues who are
18: responsible for pharmacovigilance, data
19: collection and reporting are Andrea
20: Horvat-Brvcker and Sabine Dittmar.
21: Q.    And --
22: A.    Sabine Dittmar and Andrea
23: Horvat-Brvcker.
24: Q.    Okay.  So we asked Andrea

p. 00391

01: 00393: at is really whether the information you just
02: referred to was brought in a different way,
03: not in the way of this e-mail.  So it would
04: have to, yeah, be brought into a different
05: way into this other information,
06: communication channel.
07: Q.    The truth is -- the truth is,
08: is no regulator anywhere in the world was
09: told about the defective INRatio device while
10: the trial was going on.  That's a fact, isn't
11: it?
12: MR. HOFFMAN:  Object to the --
13: A.    I cannot agree --
14: MR. HOFFMAN:  I'm sorry.  Just
15: give me time to object to the
16: question.
17: THE WITNESS:  I'm sorry.
18: MR. HOFFMAN:  It's okay.  Go
19: ahead.  You can answer his question
20: now.
21: A.    I cannot agree to this
22: statement, so I just discussed it.  You would
23: really have to investigate and look into the
24: database first before such conclusion can be

p. 00393

Page 100

01: 00394:   drawn.
02: BY MR. DENTON:
03: Q.    Okay.  What database?
04: A.    I just referred to you to the
05: pharmacovigilance database, so -- to look up
06: whether one of the report in this e-mail
07: chain mentioned events and described events
08: were also reported by the investigator as an
09: adverse event, and that way they are
10: classified and assessed and further
11: implemented into the safety database.
12: Q.    Okay.  So am I understanding
13: you correctly that these adverse events
14: related to the defective INRatio device
15: should be reported by the pharmacovigilance
16: group to the regulators?
17: MR. HOFFMAN:  Object to the
18: form.
19: BY MR. DENTON:
20: Q.    Do I understand that correctly?
21: MR. HOFFMAN:  Objection to the
22: form of the question.  Misstates
23: testimony.
24: You can answer.

p. 00394

01: 00395:        A.    That's not what I said, so the
02: pharmacovigilance department is receiving
03: notifications of adverse events.  Typically,
04: then they evaluate and assess, and based on
05: the rules.  And then according to the rules,
06: the information flow is, yeah, to the health
07: authorities.
08: So it's not automatically what
09: you said.  And, first of all, they would have
10: to assess whether one of the events that were
11: reported in those e-mails, yeah, really
12: qualified for an adverse event in the way it
13: is defined in the regulation.
14: And so, then, they would have
15: certainly, if it did so, process this
16: notification accordingly.
17: BY MR. DENTON:
18: Q.    Certainly, as we saw in those
19: e-mails with the patient bleeding out of
20: every orifice in their body as those doctors
21: talked about is serious enough to report to
22: the regulators, true?
23: MR. HOFFMAN:  Objection to the
24: form of the question.

p. 00395

01: 00396:        Go ahead.
02: A.    I would have to defer this
03: question to the pharmacovigilance experts
04: because there are a number of factors that
05: are being taken into account for the
06: assessment, so -- and I'm not the expert, but
07: it is also kind of time of relation of the
08: drug intake to the adverse event, and there
09: are numerous factors that clinically are
10: taken into consideration, and those are in my
11: view as far as I can judge on the case, not
12: directly obvious from this e-mail, and so,
13: therefore, it requires further assessment by
14: experts before we can make such statements.
15: BY MR. DENTON:
16: Q.    All right.  Let me kind of
17: switch gears a bit.  As far as communications
18: with regulators, a lot of that is in writing
19: or submissions, formal written submissions,
20: true?  We've seen some of those today.
21: A.    Yes, it's in writing, a form of
22: submissions, but there's also communication.
23: Most of the time it's more procedural than
24: content related to the coordinator of --

p. 00396

01: 00397:        (Clarification requested by the
02: reporter.)
03: A.    -- content related to the
04: coordinators of the procedures at the health
05: authorities.  So it's the role of -- a job
06: description of the health authorities that
07: they have a person who is really taking
08: responsibility of the primary communication
09: and instead reaching out to the experts in
10: the agency, and that's the same kind of
11: mirroring what a regulatory strategist does
12: in Bayer.
13: Q.    And what I'm -- and I
14: appreciate that.  And what I'm trying to find
15: out is:  Do you maintain a file or a database
16: or a share room somewhere that would gather
17: all of those communications and store them so
18: one can go back and look at them?
19: MR. HOFFMAN:  Objection to the
20: form.  It's a little vague.  I mean,
21: do you want to break it up or:  --
22: MR. DENTON:  Let's see how she
23: does.  I'm just probing a bit.
24: MR. HOFFMAN:  I understand.

p. 00397

Derix, Andrea Ph.D. - I - Volume 1 - 03/01/2016

01: 00398:      I'm sorry.
02: Go ahead.  You can answer his
03: question.
04: THE WITNESS:  Okay.
05: A.      There are different types of
06: databases you would have to look at.  So all
07: the pharmacovigilance reporting is kind of --
08: appears on its own because it has a direct
09: communication chain to the health
10: authorities.
11: Then there is, yeah, the
12: submission files that documents that were
13: submitted to the health authorities, so it's
14: also one regulatory database.
15: The third piece is what we call
16: a contact database, so that's a database
17: where colleagues provide communication --
18: yeah, colleagues provide communication in the
19: form of contact reports.
20: BY MR. DENTON:
21: Q.      So, for example, the contact
22: database, would that attempt to memorialize
23: things that the agencies would tell Bayer and
24: what Bayer would respond to the agencies?  Is

p. 00398

01: 00400:   database.
02: So it works in a way that every
03: regulatory strategist in Bayer has the
04: responsibility to provide the information to
05: the contact database for the contacts he or
06: she has had within the health authority, and
07: therefore, the FDA interaction is not
08: included on rivaroxaban.
09: Q.      Okay.  But on rivaroxaban, for
10: example, with EMA, Bayer would have the
11: contact database, true?
12: A.      Yes.
13: Q.      For example, the
14: communications -- let's say, with Health
15: Canada, Bayer would have that database for
16: rivaroxaban, wouldn't they?
17: A.      Yeah, I would expect that
18: information is also being put into the
19: database, yeah, for contacts at Health Canada
20: by the colleagues.
21: Q.      Okay.  So the only exception on
22: the contact database for rivaroxaban is
23: because Janssen is the authorization holder
24: in the U.S., and Janssen maintains that

p. 00400

01: 00399:   that what that generally does?
02: A.      In principle, yes.  It shortly
03: describes communication that's coming from
04: the agency to the company and the other way
05: around.
06: Q.      Okay.  And that's called a
07: contact database?
08: A.      Yes.
09: Q.      Okay.  And do you have one of
10: those contact data -- when I say you --
11: strike that.
12: Does Bayer have a contact
13: database for each regulator or are they
14: combined into one?  Can you help me in that
15: regard?
16: A.      Bayer has a database where,
17: yeah, where communications from all health
18: authorities is implemented, also for all
19: drugs across -- in the company.  For
20: rivaroxaban, it's the exemption that Janssen
21: is the IND and NDA holder, and therefore,
22: the -- I mean, the contact, back and forth
23: contact information that Janssen has with the
24: FDA is not implemented in the Bayer contact

p. 00399

01: 00401:   contact database with the FDA for
02: rivaroxaban, true?
03: Did I understand you correctly?
04: A.      I can't confirm that -- the
05: exemptions, so I cannot comment on Janssen's
06: contact database.  So I only know about the
07: processes in Bayer, and I don't know how
08: Janssen is --
09: Q.      Fair enough.
10: A.      -- dealing with that, whether
11: they have the same type of contact databases
12: we have.
13: Q.      Well, who is the current global
14: regulatory strategist for Xarelto?  I
15: understand you left that job in 2011.  Who
16: took over for you?
17: A.      Jⁿrgen Weber was my successor
18: on that role.
19: Q.      And he still has that role?
20: A.      Yes, he still has that role.
21: He was a team member at the time when I was
22: leaving, and he took over my position when I
23: left.
24: Q.      All right.  Do you have, at

p. 00401

Page 102

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00402:   Bayer, specific global regulatory folks that
02: communicate, for example, with EMA?  Do you
03: have an assigned person that is the primary
04: contact with the EMA folks on Xarelto?
05: A.    In our case it's not just one
06: person, and it also has changed over time
07: depending on the assignments the colleagues
08: had.  And at the moment, as far as I
09: recall -- but please, also confirm this with
10: J|rgen Weber, because it's in his area --
11: it's two colleagues who shared that
12: responsibility.  And they have -- just
13: topic-wise, share that responsibility, at
14: least it's my recollection, but --
15: Q.    Okay.  And can you share with
16: us your two colleagues' names, please?
17: A.    Colleagues' names are Sabine
18: Frenzen and Christina Tarenz.
19: Q.    In your current job, you're
20: vice president and head of program management
21: thrombosis, if I copied that correctly from
22: your CV?
23: A.    That's correct.
24: Q.    Okay.  And does that still

p. 00402

01: 00404:   Xarelto.
02: So as I mentioned, focus on the
03: lifecycle program, but it also includes
04: general activities that are being done in
05: the -- what we call maintenance, and that
06: means all activities that are required to
07: keep the product on the market, to support --
08: yeah, support -- report regular health
09: authority, yeah, submissions and the
10: information that are needed and so on.
11: Q.    I'm going to switch to clinical
12: trials for a second.  The phase one and phase
13: two trials on rivaroxaban, did Bayer conduct
14: those trials?
15: A.    Phase one and phase two, yeah,
16: most of the indications -- there's one
17: exemption on ACS phase two; the program was
18: conducted by Janssen.
19: Q.    Okay.  But the original, for
20: example, phase one and phase two studies,
21: other than ACS, were all conducted by Bayer,
22: correct?
23: A.    That's correct.
24: Q.    And who was the person that was

p. 00404

01: 00403:   involve Xarelto?
02: A.    Yes, that still involves
03: Xarelto because Xarelto is considered as a
04: development program in thrombosis because
05: we're running a quite intensive, extensive
06: lifecycle management program exploring the
07: potential use of Xarelto in other patient
08: population, other diseases.  And it does also
09: include other, yeah, development programs in
10: the area of thrombosis that are unrelated to
11: Xarelto.
12: Q.    Okay.  I assume that was a
13: promotion when you became vice president and
14: head of program management thrombosis, true?
15: A.    Yes, that's true.
16: Q.    And what is your current
17: involvement with Xarelto?
18: A.    Together with two colleagues of
19: mine who support me in global program
20: management, I'm leading still the global
21: program team for Xarelto.  So that means,
22: yeah, we meet regularly, meeting and
23: following up on all activities that are,
24: yeah, continuing in the development of

p. 00403

01: 00405:   the -- was in charge of the clinical program,
02: the phase one and the phase two, if you
03: recall?
04: A.    Somehow before the time that I
05: joined the team, but typically, phase one
06: studies are falling under the leadership of
07: the clinical pharmacology department, and so
08: at the time when I joined the team, the
09: responsibility was with Dagmar Kubitza, and
10: she is still in charge.
11: Q.    All right.  Were any contact
12: research organizations used in phase one or
13: phase two on Xarelto, if you know?
14: A.    That's a question I have to
15: refer to my colleagues, because I'm
16: unfamiliar the number of trials that were
17: conducted, and so you would have to talk to
18: either, yeah, Dagmar Kubitza or the clinical
19: leaders, because starting from phase two,
20: there's a hand-over of the responsibility to
21: the clinical leaders.
22: And so our primary contact
23: point in that regard is Scott Berkowitz, so
24: he's currently the clinical lead for Xarelto

p. 00405

Derix, Andrea Ph.D. - 1 - Volume 1 - 03/01/2016

01: 00406:   in my team.  He has also colleagues working
02: with him dedicated to specific indications,
03: but he's probably a primary go-to person for
04: those questions.
05: Q.    Let's move on to phase three a
06: second.  The first series of phase three
07: studies were the RECORD studies, true?
08: A.    That's true.
09: Q.    And that was to see if Xarelto
10: was helpful in reducing blood clot risk for
11: folks after hip and knee surgery, correct?
12: A.    Yeah, that's correct, VTE
13: prevention.
14: Q.    And as I understand it, there
15: were four record studies, and they were
16: actually numbered 1, 2, 3 and 4, correct?
17: A.    That's correct, yeah.
18: Q.    Did Bayer run those studies?
19: Did Bayer conduct those studies, RECORD1, 2,
20: 3 and 4, do you know?
21: A.    Bayer conduct those studies,
22: RECORD1 to 4.
23: Q.    Do you know, was Scott
24: Berkowitz, Dr. Berkowitz, the clinical lead

01: 00407:   on those studies?
02: A.    I would have to check back to
03: when he really joined the company, so the
04: clinical lead on those studies was Tiemo
05: Bandel, so he was, yeah, at the time --
06: (Clarification requested by the
07: reporter.)
08: A.    Tiemo Bandel.
09: BY MR. DENTON:
10: Q.    Is that a name?
11: A.    Yeah, that's a name of the
12: clinical lead.  And Scott Berkowitz joined in
13: the course of while the studies were still
14: running, focusing on -- yeah, more the
15: long-term indications, but he was already at
16: the time also partly in the team as I --
17: Q.    Okay.  Again, I'm just probing
18: for some information you might be able to
19: help me with.
20: Were any contract resource
21: organizations used for the phase three RECORD
22: studies?
23: A.    I specifically recall on one,
24: RECORD4, Kendle was involved as a clinical

01: 00408:   research organization.
02: Q.    And why do you remember that
03: about RECORD4?  Was it because of all the
04: problems?
05: A.    I remember because there was a
06: discussion with the health authority and,
07: yeah, there was an investigation about
08: adherence to good clinical practice in this
09: trial.  And so in that context, yeah, I
10: recall that this was the only trial of the
11: RECORD program that -- where a CRO was
12: involved.
13: Q.    Right.  And that was the one
14: where the FDA found the work done in RECORD4
15: was unreliable.  You remember that, right?
16: A.    FDA criticized the DCP
17: adherence, and so decided that they did not
18: take this study into consideration for the
19: label, and as a pivotal study.  So they based
20: approval on the indications, primarily on
21: RECORD1, 2 and 3.
22: Q.    Who is Andy Hargreaves?
23: A.    Andy Hargreaves is a colleague
24: in Bayer in the quality assurance, clinical

01: 00409:   quality assurance group, and at the time --
02: yeah, he's now leading the quality assurance
03: strategy group for the area cardiovascular.
04: At the time he was, yeah, in
05: the audit group of quality assurance, and so
06: he was responsible to, yeah, set up some of
07: the activities in relation to FDA's requests,
08: yeah, in terms of reauditing study
09: information.
10: Q.    So Mr. Hargreaves is in a group
11: that audits or tries to oversee the quality
12: of the clinical trial work, in specific, this
13: gentleman did that with respect to
14: rivaroxaban or Xarelto, right?
15: A.    Yes.
16: Q.    And he's still with the
17: company?
18: A.    He's still with the company,
19: yes.
20: Q.    The ROCKET study, as I
21: understand, was sponsored by Janssen, but the
22: CRO -- or the CRO was Duke or DCRI, true?
23: A.    Janssen sponsored and so Duke
24: was the so-called ARO, the academic research

01: 00410:   organization.  Janssen involved a subparty, a
02: serial clinical research organization, as far
03: as I recall, Parexel.
04: Q.    Right.  And Parexel did -- or
05: coordinated the clinical trials that were
06: done outside of the United States in the rest
07: of the world.  Is that your understanding or
08: do you not --
09: A.    That's not my area of
10: expertise --
11: Q.    Okay.
12: A.    -- so I would have to look it
13: up --
14: Q.    Fair enough.
15: A.    -- for what's really clearly
16: their delegation of tasks was to Parexel.
17: Q.    Bayer did the EINSTEIN studies,
18: true?
19: A.    That's true, yes.
20: Q.    Did Bayer have a CRO for the
21: EINSTEIN studies?
22: A.    Also here I would have to refer
23: you to the colleagues who -- the colleague
24: who ran the program, so there were external

01: 00411:   groups also involved, but you would have to
02: look into really what the task was.
03: For example, sometimes also
04: Covance was a CRO, just involved in doing the
05: central laboratory, but not involved in other
06: conducts -- yeah, topics of the study like
07: monitoring.
08: So it's really a study by -- a
09: study looking at what you have to have.
10: Q.    Who was the Bayer clinical lead
11: on the EINSTEIN study, if you know?
12: A.    Bayer clinical lead on the
13: EINSTEIN studies has been -- or is still,
14: because we're still running one EINSTEIN
15: study.  It's Ton Lensing, Anthonie Lensing.
16: Q.    Tony Lensing?
17: A.    The full name is Anthonie
18: Lensing, but he lots of the time goes by
19: "Ton" Lensing.
20: Q.    Okay.  And is that a doctor?
21: Is that Dr. Lensing?
22: A.    Yes.
23: Q.    Medical doctor?
24: A.    Medical doctor.

01: 00412:        Q.    And does Dr. Lensing, does he
02: work in Germany or the U.S., or do you know?
03: A.    He's working from the
04: Netherlands --
05: Q.    Okay.
06: A.    -- actually, from Amsterdam.
07: Q.    So he's in Amsterdam; is that
08: right?
09: A.    That's right.
10: Q.    And has he been in Amsterdam
11: throughout the time he has worked as clinical
12: lead on the EINSTEIN project, as far as you
13: know?
14: A.    As far as I know, yes, sorry.
15: Q.    But does Dr. Lensing work for
16: Bayer, the same company you work for?
17: MR. HOFFMAN:  Objection to the
18: form of the question.
19: BY MR. DENTON:
20: Q.    Or do you know?
21: A.    Dr. Lensing works for Bayer.
22: So Bayer also has a subsidiary in the
23: Netherlands.
24: Q.    Sure.

01: 00413:        A.    And so he's not employed by the
02: same entity of the company.
03: Q.    Sure.
04: A.    But it's all under the umbrella
05: Bayer.
06: Q.    Okay.  Fair enough.  Thank you.
07: The J-ROCKET study, the afib
08: study done on the Japanese population, you're
09: generally familiar with that study, are you
10: not?
11: A.    I'm generally familiar with
12: that study, yes.
13: Q.    Who conducted that study?  Was
14: it Bayer, was it Janssen, or was it a CRO, or
15: do you know?
16: A.    I'm not 100% sure, but also
17: here exactly the type of responsibility of --
18: but certainly the study was conducted under
19: the lead of Bayer, and specifically
20: colleagues in the Japanese organization of
21: Bayer.
22: Q.    And I might be testing you
23: here, but do you know who the clinical lead
24: was on the J-ROCKET study for Bayer?

01: 00414:      A.   I do not recall.
02: Q.    Okay.
03: A.    So I would have to -- yeah, I
04: would have to refer to Scott Berkowitz
05: Q.    So you think Scott Berkowitz
06: could answer that question?
07: A.    Yes, I think so, because he was
08: directly involved in the communication with
09: the team, the clinical team in Japan when the
10: trial was set up.
11: Q.    Okay.  The ATLAS study, is that
12: the ACS indication?
13: A.    That's the ACS indication, yes.
14: Q.    And did you tell me that
15: Janssen ran that study or Bayer, I forgot?
16: A.    Janssen ran the study, so it's
17: consisting of a phase two study called ATLAS
18: TIMI 46 and a phase three study, ATLAS
19: TIMI 51.
20: Q.    Okay.  The medically ill
21: studies, I think it's referred to as
22: MAGELLAN, which -- is it Janssen or Bayer
23: responsible for that?
24: A.    Bayer ran the MAGELLAN trial.

01: 00415:        Q.    And did you have a CRO for
02: that?
03: A.    I do not recall, but I, again,
04: ask you to reconfirm that information with --
05: Q.    Dr. Berkowitz?
06: A.    -- Dr. Berkowitz, but I do not
07: recall in a typical sense of a CRO, which has
08: a broad involvement.
09: Q.    Sure.
10: A.    May again be in the way of
11: doing centralized measurements.
12: Q.    Are there ongoing clinical
13: trials with respect to a pediatric
14: indication?
15: A.    Yes, there are.  There's a
16: pediatric program and there are a number of
17: trials ongoing in pediatric indication.  And
18: here we're talking about VTE treatment, so
19: that's the same indication as in adults, you
20: refer to as the EINSTEIN program, is also
21: treatment of venous thromboembolism.
22: And so that's an indication
23: which is also relevant for children because
24: also children can have venous

01: 00416:   thromboembolism.  And so, therefore, yeah,
02: this is a link between the programs.  They
03: have the same title.  They also run under the
04: EINSTEIN title.
05: Q.    And is Dr. Lensing running the
06: pediatric program, or someone else?
07: A.    In part.  So the pediatric
08: program also consists of phase one studies,
09: so they fall again under the responsibility
10: of Dagmar Kubitza.  Then there are phase two,
11: phase three parts, and they are running under
12: the responsibility of Ton Lensing and J|rgen
13: Heubach, who is a second GCL who is
14: supporting him because of the yet a number of
15: trials and the complexity of the trial; there
16: are two clinical leads in this program.
17: Q.    So in addition to Dr. Lensing,
18: there's another individual who's working as a
19: global clinical lead on --
20: A.    Yes.
21: Q.    -- the pediatric extension of
22: the EINSTEIN project, right?
23: A.    That's correct, yes.
24: Q.    And I didn't quite get that

01: 00417:   name, but where does that individual work or
02: reside in addition to --
03: A.    The name is J|rgen Heubach.
04: Q.    Okay.
05: A.    And the colleague is based in
06: the Berlin offices in Germany.
07: MR. DENTON:  Okay.  Why don't
08: we quit there for the day.  It's about
09: 5:30.
10: MR. HOFFMAN:  Yeah, that's
11: fine.
12: THE VIDEOGRAPHER:  Going off
13: the record.  The time is 5:28 p.m.
14: (Proceedings recessed at
15: 5:28 p.m.)
16: --o0o--
17:
18:
19:
20:
21:
22:
23:
24:

01: 00418:                CERTIFICATE
02: I, MICHAEL E. MILLER, Fellow of
    the Academy of Professional Reporters,
03: Registered Diplomate Reporter, Certified
    Realtime Reporter, Certified Court Reporter
04: and Notary Public, do hereby certify that
    prior to the commencement of the examination,
05: ANDREA DERIX, Ph.D. was duly sworn by me to
    testify to the truth, the whole truth and
06: nothing but the truth.
07: I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
08: testimony as taken stenographically by and
    before me at the time, place and on the date
09: hereinbefore set forth, to the best of my
    ability.
10:
    I DO FURTHER CERTIFY that pursuant
11: to FRCP Rule 30, signature of the witness was
    not requested by the witness or other party
12: before the conclusion of the deposition.
13: I DO FURTHER CERTIFY that I am
    neither a relative nor employee nor attorney
14: nor counsel of any of the parties to this
    action, and that I am neither a relative nor
15: employee of such attorney or counsel, and
    that I am not financially interested in the
16: action.
17:
18: _____
    MICHAEL E. MILLER, FAPR, RDR, CRR
19: Fellow of the Academy of Professional Reporters
    NCRA Registered Diplomate Reporter

                                        p. 00418

20: NCRA Certified Realtime Reporter
    Certified Court Reporter
21:
    Notary Public in and for the
22: State of Texas
    My Commission Expires:  7/9/2016
23:
    Dated: March 3, 2016
24:

01: 00419:        INSTRUCTIONS TO WITNESS
02:
03: Please read your deposition over
04: carefully and make any necessary corrections.
05: You should state the reason in the
06: appropriate space on the errata sheet for any
07: corrections that are made.
08: After doing so, please sign the
09: errata sheet and date it.
10: You are signing same subject to
11: the changes you have noted on the errata
12: sheet, which will be attached to your
13: deposition.
14: It is imperative that you return
15: the original errata sheet to the deposing
16: attorney within thirty (30) days of receipt
17: of the deposition transcript by you.  If you
18: fail to do so, the deposition transcript may
19: be deemed to be accurate and may be used in
20: court.
21:
22:
23:
24:

                                        p. 00419

01: 00420:            ERRATA
02: PAGE  LINE  CHANGE
03: ____  ____  _____
04: REASON: _____
05: ____  ____  _____
06: REASON: _____
07: ____  ____  _____
08: REASON: _____
09: ____  ____  _____
10: REASON: _____
11: ____  ____  _____
12: REASON: _____
13: ____  ____  _____
14: REASON: _____
15: ____  ____  _____
16: REASON: _____
17: ____  ____  _____
18: REASON: _____
19: ____  ____  _____
20: REASON: _____
21: ____  ____  _____
22: REASON: _____
23: ____  ____  _____
24: REASON: _____

01: 00421:          ACKNOWLEDGMENT OF DEPONENT
02:
03:
04: I, ANDREA DERIX, Ph.D., do hereby
    certify that I have read the foregoing pages
05: and that the same is a correct transcription
    of the answers given by me to the questions
06: therein propounded, except for the
    corrections or changes in form or substance,
07: if any, noted in the attached
    Errata Sheet.
08:
09:
10:
11:
12: _____
    ANDREA DERIX, Ph.D.              DATE
13:
14:
15: Subscribed and sworn to before me this
16: _____ day of _____, 20 _____.
17: My commission expires: _____
18:
19: _____
20: Notary Public
21:
22:
23:
24:

01: 00422:          LAWYER'S NOTES
02:
03: PAGE   LINE
04: _____   _____   _____
05: _____   _____   _____
06: _____   _____   _____
07: _____   _____   _____
08: _____   _____   _____
09: _____   _____   _____
10: _____   _____   _____
11: _____   _____   _____
12: _____   _____   _____
13: _____   _____   _____
14: _____   _____   _____
15: _____   _____   _____
16: _____   _____   _____
17: _____   _____   _____
18: _____   _____   _____
19: _____   _____   _____
20: _____   _____   _____
21: _____   _____   _____
22: _____   _____   _____
23: _____   _____   _____
24: _____   _____   _____

# Derix, Andrea Ph.D. - 2

Volume 2 - 03/02/2016

Condensed Transcript

Printed 02/26/2017 06:47PM CST

CONFIDENTIAL

01: 00423:        IN THE UNITED STATES DISTRICT COURT
02: FOR THE EASTERN DISTRICT OF LOUISIANA
03: MDL No. 2592, Section L
04: ********************************************
05: IN RE:  XARELTO (RIVAROXABAN)
06: PRODUCTS LIABILITY LITIGATION
07: THIS DOCUMENT RELATES TO ALL CASES
08: ********************************************
09: - PROTECTED -
10:
     - SUBJECT TO FURTHER PROTECTIVE REVIEW -
11:
      _ _ _
12:
      WEDNESDAY, MARCH 2, 2016
13:
      ANDREA DERIX, Ph.D.
14:
      VOLUME II
15: _ _ _
16:
17: Videotaped deposition of ANDREA DERIX,
      Ph.D., held at the law offices of Allen &
18: Overy LLP, Apollolaan 15, 1077 AB Amsterdam,
      The Netherlands, commencing at 8:56 a.m., on
19: the above date, before Michael E. Miller,
      Fellow of the Academy of Professional
20: Reporters, Registered Diplomate Reporter,
      Certified Realtime Reporter, and Realtime
21: Systems Administrator.
22: _ _ _
23: GOLKOW TECHNOLOGIES, INC.
      877.370.3377 ph | 917.591.5672 fax

p. 00423

24: deps@golkow.com

01: 00424:   A P P E A R A N C E S:
02: SCHLICHTER BOGARD & DENTON LLP
      BY:  ROGER C. DENTON, ESQUIRE
03: rdenton@uselaws.com
      ASHLEY BRITTAIN-LANDERS
04: alanders@uselaws.com
      100 South Fourth Street
05: Suite 900
      St. Louis, Missouri 63102
06: (314) 621-6115
      Counsel for Plaintiffs
07:
08: LEVIN PAPANTONIO THOMAS MITCHELL
      RAFFERTY & PROCTOR PA
09: BY:  EMMIE PAULOS, ESQUIRE
      epaulos@levinlaw.com
10: 316 South Baylen Street
      Suite 600
11: Pensacola, Florida 32502-5996
      (850) 435-7000
12: Counsel for Plaintiffs
13:
      FELDMAN & PINTO
14: BY:  ROSEMARY PINTO, ESQUIRE
      rpinto@feldmanpinto.com
15: 6706 Springbank Street
      Philadelphia, Pennsylvania 19119
16: (215) 546-2604
      Counsel for Plaintiffs
17:
18: HERMAN HERMAN & KATZ LLC
      BY:  ANNE E. DEVAUGHN, ESQUIRE
19: adevaughn@hhklawfirm.com

p. 00424

      820 O'Keefe Avenue
20: New Orleans, Louisiana 70113
      (504) 581-4892
21: Counsel for Plaintiffs
22:
23:
24:

01: 00425:   A P P E A R A N C E S:
02: KAYE SCHOLER LLP
   BY:  WILLIAM HOFFMAN, ESQUIRE
03: william.hoffman@kayescholer.com
   The McPherson Building
04: 901 Fifteenth Street, N.W.
   Washington, D.C. 20005
05: (202) 682-3500
   Counsel for Defendant Bayer Pharmaceuticals
06:
07: BARTLIT BECK HERMAN PALENCHAR & SCOTT LLP
   BY:  STEVEN E. DERRINGER, ESQUIRE
08: steven.derringer@bartlit-beck.com
   JEANNIE TINKHAM, ESQUIRE
09: jean.tinkham@bartlit-beck.com
   Courthouse Place
10: 54 West Hubbard Street
   Chicago, Illinois 60610
11: (312) 494-4400
   Counsel for Defendant Bayer Pharmaceuticals
12:
13: DRINKER BIDDLE & REATH LLP
   BY:  JULIE L. TERSIGNI, ESQUIRE
14: julie.tersigni@dbr.com
   600 Campus Drive
15: Florham Park, New Jersey 07932
   (973) 549-7350
16: Counsel for Defendants Janssen and
   Johnson & Johnson
17:
18: ALSO PRESENT:
19: EDDA DOLZER, Bayer
   LARISSA EUSTICE, Bayer

p. 00425

20: MAX THUEMMEL, Bayer
21:
22:
23:
24:

p. 00425a

01: 00426:   A P P E A R A N C E S:
02: STAND-BY INTERPRETER:
03: SYBILLE VON M\\LMANN
04:
   VIDEOGRAPHERS/TECHNICIANS:
05:
   DAVID LANE, Primary Videographer
06: OSWIN FRAAI, Secondary Videographer
   EVAN J. WOLFE, Trial Technician
07:
   _ _ _
08:
09:
10:
11:
12:
13:
14:
15:
16:
17:
18:
19:
20:
21:
22:
23:
24:

p. 00426

01: 00427:              INDEX
02:
   PROCEEDINGS                 433
03:
04:
   EXAMINATION OF ANDREA DERIX, Ph.D.:
05:
   BY MR. DENTON               433
06:
   BY MS. PINTO                670
07:
   BY MR. HOFFMAN              683
08:
   BY MR. DENTON               758
09:
10:
   CERTIFICATE                 806
11:
   ERRATA                      808
12:
   ACKNOWLEDGMENT OF DEPONENT      809
13:
   LAWYER'S NOTES                 810
14:
15:
16:
17:
18:
19:
20:
21:
22:
23:

p. 00427

Page 2

24:

20: FDA, XARELTO_BPAG_02563352 -
  Ref. 1224164
21:
  Derix-43  E-mail(s) re: FDA        509
22: Preliminary Responses,
  XARELTO_BPAG_02609087 -
23: XARELTO_BPAG_02609090,
  Ref. 1226766
24:

01: 00428:            DEPOSITION EXHIBITS
  ANDREA DERIX, Ph.D.
02: March 2, 2016
03: NUMBER          DESCRIPTION       PAGE
04: Derix-37  E-mail(s) re: FDA Inspection   459
  in RECORD Trials,
05: XARELTO_BPAG_01656235 -
  XARELTO_BPAG_01656238,
06: Ref. 897009
07: Derix-38  E-mail(s) re: Bayer and J&J   474
  Discussion on the CRL,
08: XARELTO_BPAG_02563181 -
  XARELTO_BPAG_02563182,
09: Ref. 1224146
10: Derix-39  FDA Complete Response    474
  Letter,
11: XARELTO_BPAG_02563183 -
  XARELTO_BPAG_02563191,
12: Ref. 1224147
13: Derix-40  E-mail(s) re: FDA Type C   500
  meeting - Background
14: Document submitted,
  XARELTO_BPAG_02563261 -
15: XARELTO_BPAG_02563263,
  Ref. 1224162
16:
  Derix-41  Rivaroxaban Background    501
17: Information,
  XARELTO_BPAG_02563264 -
18: XARELTO_BPAG_02563351,
  Ref. 1224163
19:
  Derix-42  5/5/10 Kollath Letter to   501

01: 00429:            DEPOSITION EXHIBITS
02: Derix-44  Sponsor Questions and FDA   509
  Response,
03: XARELTO_BPAG_02609091 -
  XARELTO_BPAG_02609094,
04: Ref. 1226767
05: Derix-45  E-mail(s) re: FDA Minutes   522
  7 April 2010 Meeting,
06: XARELTO_BPAG_01254606 -
  XARELTO_BPAG_01254607,
07: Ref. 447607
08: Derix-46  FDA Meeting Minutes,     522
  XARELTO_BPAG_01254608 -
09: XARELTO_BPAG_01254626,
  Ref. 447608
10:
  Derix-47  FDA Compliance Review    541
11: [No Bates]
12: Derix-48  E-mail(s) re: NDA 22-406 FDA   565
  Telcon on RECORD4,
13: XARELTO_BPAG_17026015 -
  XARELTO_BPAG_17026019,
14: Ref. 3160467
15: Derix-49  E-mail(s) re: Draft Lancet   574
  RECORD4 press release,
16: XARELTO_BPAG_02709474 -
  XARELTO_BPAG_02709476,
17: Ref. 1233459
18: Derix-50  BHC News Release, re:    574
  The Lancet Publishes RECORD4
19: Study,
  XARELTO_BPAG_02709477 -
20: XARELTO_BPAG_02709482,

Ref. 1233460
21:
  Derix-51   E-mail(s) re: Weekly E-mail      577
22: #61 RECORD4 Publication
  Update,
23: XARELTO_BPAG_02548102 -
  XARELTO_BPAG_02548107,
24: Ref. 1221843

21: Ref. 1217814
22: Derix-59   FDA Complete Response      619
  Letter,
23: XARELTO_BPAG_02515046 -
  XARELTO_BPAG_02515050,
24: Ref. 1217815

01: 00430:            DEPOSITION EXHIBITS
02: Derix-52   2009 Turpie et al            577
  Publication,
03: XARELTO_BPAG_02548108 -
  XARELTO_BPAG_02548115,
04: Ref. 1221844
05: Derix-53   E-mail(s) re: RECORD4        595
  questions,
06: XARELTO_JANSSEN_01196801 -
  XARELTO_JANSSEN_01196803,
07: Ref. 258276
08: Derix-54   E-mail(s) re: RECORD         595
  inquiries,
09: XARELTO_BPAG_01188141 -
  XARELTO_BPAG_01188143,
10: Ref. 440637
11: Derix-55   E-mail(s) re: RECORD4        596
  questions,
12: XARELTO_JANSSEN_01373174 -
  XARELTO_JANSSEN_01373175,
13: Ref. 288795
14: Derix-56   E-mail(s) re: Update,        596
  XARELTO_JANSSEN_01373177,
15: Ref. 288797
16: Derix-57   E-mail(s) re: ACS CRL 2 -    618
  reference docs,
17: XARELTO_BPAG_02515032 -
  XARELTO_BPAG_02515033,
18: Ref. 1217813
19: Derix-58   FDA Complete Response        618
  Letter,
20: XARELTO_BPAG_02515034 -
  XARELTO_BPAG_02515045,

01: 00431:            DEPOSITION EXHIBITS
02: Derix-60   FDA Complete Response        620
  Letter,
03: XARELTO_BPAG_02515051 -
  XARELTO_BPAG_02515054,
04: Ref. 1217816
05: Derix-61   1/6/14 FDA Summary Minutes   626
  of Cardiovascular and Renal
06: Drugs Ad Comm [No Bates]
07: Derix-62   E-mail(s) re: Xarelto/VTE    634
  Treatment - Issues with PE
08: Study,
  XARELTO_BPAG_01654834 -
09: XARELTO_BPAG_01654835,
  Ref. 896518
10:
  Derix-63   E-mail(s) re: GDC Minutes,    643
11: XARELTO_BPAG_01283913 -
  XARELTO_BPAG_01283914,
12: Ref. 450068
13: Derix-64   Meeting Minutes,            644
  XARELTO_BPAG_01283915 -
14: XARELTO_BPAG_01283919,
  Ref. 450069
15:
  Derix-65   E-mail(s) re: Final DVI       648
16: Interim Report,
  XARELTO_BPAG_02565288 -
17: XARELTO_BPAG_02565289,
  Ref. 1224278
18:
  Derix-66   Covance Interim Report on     648
19: DVI, XARELTO_BPAG_02565290 -

XARELTO_BPAG_02565302,
20: Ref. 122479
21: Derix-67   Summary Statement on Covance     648
Interim Report on DVI,
22: XARELTO_BPAG_02565305 -
XARELTO_BPAG_02565306,
23: Ref. 1224282
24:

22:
23:
24:

01: 00432:            DEPOSITION EXHIBITS
02: Derix-68   E-mail(s) re: Contract          656
Report re: Rivaroxaban,
03: XARELTO_BPAG_01217208 -
XARELTO_BPAG_01217211,
04: Ref. 442922
05: Derix-69   9/10/09 Kollath Letter to       656
FDA, XARELTO_BPAG_01217212 -
06: XARELTO_BPAG_01217213,
Ref. 442923
07:
Derix-70   Derix Curriculum Vitae       684
08: [No Bates]
09: Derix-71   EMA Assessment Repot,          708
XARELTO_BPAG_10929210 -
10: XARELTO_BPAG_10929258
11: Derix-72   EMA CHMP Variation            714
Assessment Report,
12: XARELTO_BHCP_00456368 -
XARELTO_BHCP_00456435
13:
Derix-73   Collaborative Development     793
14: and License Agreement,
XARELTO_BHCP_00015914 -
15: XARELTO_BHCP_00016190,
Ref. 7741
16:
17:
--o0o--
18:
19:
20:
21:

01: 00433:            PROCEEDINGS
02: (March 2, 2016 at 8:56 a.m.)
03: THE VIDEOGRAPHER: We're now on
04: the record.  My name is David Lane,
05: videographer for Golkow Technologies.
06: Today's date is March 2nd, 2016.  Our
07: time is 8:56 a.m.
08: This deposition is taking place
09: in Amsterdam, Netherlands, in the
10: matter of Xarelto Products Liability
11: Litigation.
12: Our deponent today is
13: Dr. Andrea Derix Ph.D.
14: Counsel will be noted on the
15: stenographic record.
16: Doctor and Interpreter, I just
17: want to remind you you're both still
18: under oath.  Please begin.
19: ANDREA DERIX, Ph.D.,
20: having been duly sworn,
21: testified as follows:
22: EXAMINATION
23: BY MR. DENTON:
24: Q.    Welcome back, Dr. Derix.  Are

01: 00434:   you doing okay?
02: A.    Yes, I'm doing okay.
03: Q.    Okay.  Since our break and
04: reflecting on the questions you were asked,
05: are there any answers you need to modify or
06: change or correct before we go forward?
07: MR. HOFFMAN:  Objection to the
08: form of the question.  We're reserving
09: our right to review and revise the
10: transcript as appropriate.
11: But you may answer counsel's
12: questions.
13: A.    I have no correction that comes
14: spontaneously to my mind now.  That's
15: something I have to look, as William said,
16: into the transcript --
17: BY MR. DENTON:
18: Q.    I understand you're following
19: your lawyer's advice, but what I'm trying to
20: do is:  After reflecting on anything yourself
21: that you've testified to so far, is there
22: anything that comes to mind that you think
23: you need to correct or change before we go
24: forward?

p. 00434

01: 00436:   patients do not yet have a clotting.  So
02: it's -- they have an increased risk.  And so
03: what you do is really a preventive treat --
04: yeah, a preventive treatment.
05: Q.    Okay.
06: A.    But if we talk about treatment,
07: then usually there's patient already has a
08: symptomatic clot, and then it's a different
09: therapeutic regimen.
10: Q.    So folks have knee surgery,
11: replacement -- knee replacement or hip
12: replacement, they take an anticoagulant for
13: some short duration, a number of weeks, and
14: the hope is, is that would reduce the risk of
15: them having a blood clot after the surgery?
16: A.    That's correct.
17: Q.    Is that a lay person's overview
18: of that?
19: A.    Yes, that's correct.
20: Q.    Okay.  And that was the RECORD
21: series of clinical trials, right?
22: A.    Yes.
23: Q.    And that -- and this isn't a
24: memory test, but from my notes, I believe

p. 00436

01: 00435:         MR. HOFFMAN:  Objection to the
02: form of the question.
03: A.    No, I have no change at this
04: point in time.
05: BY MR. DENTON:
06: Q.    Okay.  Very good.  That's fine.
07: It wasn't a trick question.  I just wanted to
08: make sure there wasn't anything that you
09: had -- that you thought about that may have
10: caused you to need to reflect on something.
11: MR. HOFFMAN:  And I wasn't
12: suggesting it was a trick question.
13: MR. DENTON:  Yeah.  All right.
14: BY MR. DENTON:
15: Q.    Let's shift a little bit to the
16: U.S. regulatory history with Xarelto, okay?
17: A.    Okay.
18: Q.    As I understand it in
19: chronological order, the first Xarelto
20: indication was for treatment to reduce or
21: prevent venous thromboembolism after hip or
22: knee replacement surgery, true?
23: A.    A little correction.  It's a
24: prevention.  So at that point in time,

p. 00435

01: 00437:   that the RECORD indication was licensed in
02: the U.S. in about July 2011?
03: MR. HOFFMAN:  Objection to the
04: form of the question.
05: A.    I would have to check the
06: exact --
07: BY MR. DENTON:
08: Q.    Okay.  Fair enough.
09: A.    -- dates again, but to correct
10: that, this was the first indication which,
11: yeah, was submitted for review to the FDA.
12: Q.    And as I -- my notes tell me
13: that that was a 10-milligram, once-a-day
14: dose, correct?
15: A.    That's correct, yes.
16: Q.    And depending on the surgery,
17: it was to be given for about 14 to 35 days?
18: A.    That's correct, yes.
19: Q.    Okay.  Then the second
20: indication shortly thereafter in 2011 was the
21: reduction of strokes in patients with afib,
22: correct?
23: A.    It's, yeah, prevention of
24: stroke and non-CNS embolism in patients who

p. 00437

Derix, Andrea Ph.D. - 2 - Volume 2 - 03/02/2016

01: 00438:   have underlying afib.
02: Q.    Right.  And my notes indicate
03: that that was licensed in the U.S. in
04: November, November 4th, 2011.
05: A.    Yes, that's correct.
06: Q.    All right.  But it differed
07: from the dosing from the RECORD study.  It
08: was increased.  It was doubled to
09: 20 milligrams per day, correct?
10: A.    That's correct.  The dosing for
11: prevention of stroke is 20 milligram once
12: daily or 15 milligram in patients who have
13: moderate renal impairment.
14: Q.    Right, 15 is the reduction,
15: correct?
16: A.    15, uh-huh.
17: Q.    But folks with afib tend to
18: have the anticoagulation prescribed for a
19: long period of time, perhaps the rest of
20: their life.  Unlike the RECORD indication,
21: true?
22: A.    That's correct.  It's a typical
23: chronic indication, unless the patient
24: undergoes cardioversion, and so the heart

p. 00438

01: 00439:   rhythm is -- is brought back to normal, so to
02: say then sometimes also their anticoagulant
03: treatment after a while can be stopped.
04: Q.    All right.  But certainly the
05: indication for the afib population was
06: expected by Bayer and Janssen to be
07: prescribed in patients for long-term use?
08: A.    Yes, that's correct.  It's
09: developed as a chronic-use indication.
10: Q.    All right.  And then the third
11: indication about a year later related to the
12: EINSTEIN series of studies, true?
13: A.    Yes, that's correct.
14: Q.    And EINSTEIN is either for the
15: treatment and/or longer-term prevention of
16: folks who have either had a venous
17: thromboembolism and may need long-term
18: protection from that, right?
19: It's acute and long term?
20: A.    Yes, that's right.  So it's --
21: because the patient who have once had a
22: thromboembolism, they have an increased risk
23: for recurrent event, and therefore it's both
24: the treatment part plus prevention of a new

p. 00439

01: 00440:   event.
02: Q.    All right.
03: And then, as I understand the
04: regulatory process, the companies, Bayer and
05: Janssen, were submitting their data for the
06: RECORD study, for the ROCKET study and even
07: for the EINSTEIN study, some of it all at the
08: same time, to the FDA.  I mean, there was
09: multiple reviews going on by the FDA with
10: respect to Xarelto; is that fair?
11: A.    Yeah.  So we prepared the
12: documents jointly so as a kind of a core
13: document, and then it was modified by each
14: regulatory specialist group in the U.S. and
15: in Europe as to the format that the health
16: authorities require.
17: Especially the procedure for
18: the stroke prevention indication ran almost
19: in parallel in both, yeah, at the FDA and
20: EMA.  For the other indications as well, it's
21: not as -- yeah, a little bit shifted, but
22: especially for the AF review it ran in
23: parallel.
24: Q.    Okay.  And the efficacy and

p. 00440

01: 00441:   safety data from the various clinical trials
02: were pooled together by your company for a
03: number of the analyses that were submitted
04: for review by the regulators, true?
05: MR. HOFFMAN:  Objection to the
06: form of the question.
07: A.    Could you please repeat the
08: question?  It wasn't --
09: BY MR. DENTON:
10: Q.    Okay.  So, I mean, every
11: clinical trial, the company generates some
12: safety data and some efficacy data, true?  I
13: mean, that's what the phase three trials do?
14: A.    Yeah, that's true, yeah.
15: Q.    Okay.  And in addition to the
16: safety and efficacy endpoints, there's
17: laboratory data gathered in these various
18: clinical trials, true?
19: A.    Yes, that's true.  So in the
20: protocol there's a definition made on all the
21: analyses that are being done on -- if there
22: are additional blood samples, for example,
23: taken.  That's in a part of the patient
24: population, sometimes only.  That's defined

p. 00441

01: 00442:   in the protocol ahead, and then later on it's
02: also analyzed, so everything that's defined
03: in the protocol is also being analyzed and
04: reported.
05: Q.    And, for example, this came up
06: yesterday:  The integrated exposure-response
07: model for EMA that Mr. McWilliams asked you
08: about yesterday -- one of the things your
09: company is doing is pooling data from
10: the various clinical trials to build that
11: exposure-response model, right?
12: A.    Yes, that's currently a process
13: ongoing that all those data are pooled
14: together.
15: Q.    So the model, the
16: pharmacokinetic model is trying to predict
17: the exposure for all the patients across all
18: the clinical trials, correct?
19: A.    That's -- if you're referring
20: to the model simulation that is currently
21: running, so that's the idea behind, that
22: first all the information is, yeah,
23: implemented into the model and then the model
24: should enable to predict based on the

p. 00442

01: 00443:   characteristics of any given patients in any
02: of the trial, the plasma, yeah, curves or the
03: important parameter that characterize plasma
04: curves, like maximum concentration and Ctrough
05: and ASC.
06: Q.    And we had a slide up there
07: yesterday that you prepared, and this is just
08: a high-level question, but you're pooling
09: pharmacokinetic data from all four ROCKET
10: studies -- or excuse me, RECORD studies,
11: true?
12: MR. HOFFMAN:  Objection to the
13: form of the question.
14: A.    I -- yeah, I would have to
15: refer the question to my colleague who are
16: really actually running these analyses to
17: give you more on the detail of which data and
18: when it will be implemented into the model,
19: and also which trials had actually a sampling
20: and characterization in the protocol.  So
21: that's a level of detail I do not remember
22: exactly, and so I would like to refer this
23: question to my colleagues, Dagmar Kubitza, so
24: she's involved, and also our modeling expert,

p. 00443

01: 00444:   Stefan Willmann.
02: BY MR. DENTON:
03: Q.    Okay.  Well, Dr. Kubitza told
04: us yesterday that they're taking data from
05: all the clinical trials.
06: MR. HOFFMAN:  Objection to the
07: form of the question.
08: A.    I can't --
09: MR. HOFFMAN:  You don't have to
10: answer any questions about what
11: happened in the other deposition.  You
12: weren't there.
13: BY MR. DENTON:
14: Q.    Well, can we just -- and if we
15: have to get your slide out from yesterday
16: that Mr. McWilliams said -- do you remember
17: that PowerPoint where you said you're going
18: to collect all the data from ROCKET, from
19: RECORD, from ATLAS, from MAGELLAN, and pool
20: all that -- from J-ROCKET and pool all that
21: together?
22: Do you remember that slide?
23: MR. HOFFMAN:  Objection to the
24: form of the question.

p. 00444

01: 00445:     A.    I remember the slide, yes.
02: BY MR. DENTON:
03: Q.    Okay.  And I know you're not
04: claiming expertise in how to do the modeling
05: or what the raw data is from those studies.
06: I appreciate that.
07: But my point is simply:  At a
08: high level, you understand that data,
09: pharmacokinetic data, pharmacodynamic data,
10: from the various studies are being pooled
11: together and then a model was being built to
12: predict concentration exposure for all those
13: patients, true?
14: MR. HOFFMAN:  Objection, asked
15: and answered.
16: A.    It is my understanding that the
17: approach is to -- yeah, to comprehensively
18: collect the available PK data from across the
19: entire program and to put that information
20: into the model, yes.
21: BY MR. DENTON:
22: Q.    Okay.  And then once the
23: exposure model is built, then the company is
24: going to look at outcome events, such as

p. 00445

01: 00446:   thrombosis on the efficacy side and bleeding
02: on the safety side, correct?
03: A.    That is the planning for the --
04: the idea is that then for each indication
05: separately.  So then the analysis will leave
06: this kind of pooled approach.  It will go
07: back to study or indication by indication
08: approach and will then, yeah, correlate the
09: exposure, predicted exposure data to outcomes
10: from the clinical trial.
11: And as I said, yeah, efficacy
12: outcomes as specified in the, yeah, protocols
13: for each indication is different and also the
14: safety endpoints.
15: Q.    So the group that's doing this
16: exposure-response model will then look at the
17: clinical trial data for the various
18: indications and see which patients, for
19: example, have bleeding events on the safety
20: side, true?
21: A.    It's not the same group, so
22: it's one group of experts who run the model,
23: and then we have another group of
24: statisticians and experts who, yeah, are

p. 00446

01: 00447:   familiar with the databases of the
02: phase three trials.  And so then they will,
03: yeah -- I mean, it will be done together
04: then.
05: So it's basically --
06: Q.    Oh, okay.
07: A.    -- two independent things, so
08: one is building the model and then the next
09: is experts from the different indications,
10: yeah, are linked and provide the information
11: from the phase three databases in terms of
12: outcomes.
13: Q.    Okay.  And I didn't want to
14: imply that there's any one particular person
15: in charge of the entire project.  I
16: understand it's a large project, okay?
17: A.    Yes, it's indeed a large
18: project, and it's a complex project.  So
19: until part of it -- part of the analysis, so
20: the first steps, were also already submitted
21: to the European health authority, so they
22: look at -- yeah, at the analysis being done
23: and also review them and provide feedback.
24: Q.    But the point I was trying to

p. 00447

01: 00448:   understand, and maybe I'm dense, is part of
02: the analysis is to go back to the phase three
03: databases and look at which patients had
04: outcome events, particularly bleeding events
05: or thrombosis events on the safety side,
06: correct?
07: MR. HOFFMAN:  Objection asked
08: and answered.
09: A.    Again, I have to refer to my
10: colleagues for the exact technicalities how
11: they're doing, because I'm typically not
12: working with clinical databases, raw data
13: myself.  So when I get the data, they are
14: typically already in the report format, and
15: so you'd really have to talk to the
16: colleagues how it's exactly technically being
17: done.
18: But from the understanding,
19: yeah, this correlation really means that you
20: correlate the exposure that is predicted by
21: the model to outcomes of --
22: BY MR. DENTON:
23: Q.    The actual outcomes that took
24: place in the trials, true?

p. 00448

01: 00449:    A.    Yes, that's the idea.
02: Q.    And as vice president and head
03: of program management, thrombosis, and still
04: involved in Xarelto, at a very high level,
05: you understand that the model is attempting
06: to predict concentration or exposure for all
07: the patients and comparing that to the
08: outcome data from the clinical trials to see
09: if some conclusions can be drawn in an
10: exposure-response analysis?
11: MR. HOFFMAN:  Objection --
12: BY MR. DENTON:
13: Q.    That's what's going on, right?
14: You understand that?
15: MR. HOFFMAN:  Objection to the
16: form of the question.
17: A.    I would have to go back to what
18: I explained and saw -- I may have used
19: somewhat different word, but the
20: understanding is that there's a model built
21: up to predict exposure of patients and then
22: to link that exposure information to
23: outcomes.
24: ///

p. 00449

Page 9

01: 00450:   BY MR. DENTON:
02: Q.    Okay.  Thank you.
03: So let's talk about the outcome
04: side in the clinical trials.  When
05: phase three clinical trials are done, and
06: particularly in the Xarelto program, there
07: were clinical investigators dispersed in
08: many, many countries, in fact, generally
09: around the world, true?
10: A.    Typically, the phase three
11: pivotal trials, due to the fact that they
12: require large numbers of patients to be
13: involved, are multinational studies.  And so,
14: yeah, it's also the case for the -- most of
15: the trials that were conducted in the Xarelto
16: program, yes, one -- yeah, no, that's not one
17: study that was conducted in just one country.
18: Q.    Right.  And so physicians in
19: their office or their clinics would enroll or
20: ask patients to become involved in a clinical
21: trial, correct?  That's how it generally
22: works, very simplistically?
23: A.    I mean, also here I'm not
24: really the person whose daily, really,

p. 00450

01: 00451:   business --
02: Q.    I understand.
03: A.    -- it is to run the clinical
04: trials.  So I'm really a little bit at a
05: distance that, I'm sorry, you would have to
06: talk to my colleague Scott Berkowitz, who is
07: the clinical leader, who can, yeah, talk much
08: more in detail about how the clinical study
09: is being run.
10: But certainly the patient is
11: under yeah -- yeah, with -- I mean,
12: physicians -- yeah, to say so -- a physician
13: is overseeing the patient while the patient
14: is in the trial.
15: And, so the physicians'
16: assistants has also obligations, yeah, to
17: provide information and his observations into
18: the clinical trial database, so that's how
19: it's in principal running there.
20: Q.    Right, and I'm not trying to
21: imply that you know all these details.  I'm
22: really looking at it at a very high level and
23: just trying to help the jury understand some
24: of the basic concepts that we're talking

p. 00451

01: 00452:   about today.
02: And so -- but I do think you
03: understand at a high level, for example, that
04: when you have multiple clinical trials --
05: let's just say RECORD -- after knee surgery,
06: you'd have orthopedic surgeons.  They would
07: have a patient that needs knee surgery.  They
08: would randomize them.  Some might get
09: rivaroxaban after the surgery.  Some might
10: get Lovenox after the surgery.  They would
11: follow those patients in their practice, and
12: they would follow the study protocol and
13: document what happened to those patients.
14: That's generally what happens
15: in a clinical trial, right?
16: A.    That's my understanding as
17: well.
18: Q.    Okay.  In the ROCKET study, for
19: example, patients with afib would go to their
20: doctor, they would be told about whether they
21: wanted to be on warfarin for that treatment,
22: which was the standard at the time, or be
23: randomized to Xarelto.
24: They would have a series of

p. 00452

01: 00453:   patients on either study drug, and then they
02: would follow them -- in that case, they
03: followed them for a couple of years -- and
04: document their outcomes.
05: That's generally how this was
06: done, right?
07: A.    It's my understanding that the
08: physician is, yeah, doing first of all the
09: diagnosis.
10: Q.    Right.
11: A.    And in that case it would have
12: been the diagnosis that the patient has
13: increased risk and requires anticoagulant
14: treatment in general.
15: Q.    Sure.
16: A.    And then certainly there's a
17: requirement of the physician to inform the
18: patient if he's asked to participate in the
19: trial, and so the patient will receive
20: information and give his informed consent for
21: the participation.
22: And so, then, yeah, the patient
23: is -- can be enrolled in the trial,
24: randomized and, yeah, will, under the

p. 00453

Page 10

Derix, Andrea Ph.D. - 2 - Volume 2 - 03/02/2016

01: 00454: surveillance of the physician, then continue
02: his treatment.
03: Q. All right.
04: Now, how does a company like
05: Bayer or Janssen monitor your clinical
06: investigators to make sure they're following
07: the protocol and doing what they're supposed
08: to be doing in these clinical trials?
09: A. Again, that's the question, and
10: this is out of my daily experience. So
11: certainly there's a -- I mean, there are
12: monitors in the clinical trial that have --
13: collecting the data and visit the sites, and
14: therein there's an independent of this --
15: yeah, daily operational team, there's an
16: audit team, also quality assurance audit team
17: and they conduct, during the course of the
18: trial, also, yeah, audits.
19: Q. Is that Mr. Hargreaves'
20: department, the audit department?
21: A. No. Mr. Hargreaves is working
22: in -- yeah, in the quality assurance
23: department, and part of his responsibility at
24: the time was also the auditing, yeah.

p. 00454

01: 00455: Q. But the auditing of these
02: clinical trials -- not all clinical trial
03: sites are audited, are they?
04: A. Again, I would like to ask you
05: to talk to the specialists here. So
06: there's -- and as to my understanding,
07: there's an audit plan performed, and so there
08: are also, yeah, certain practices, rules,
09: agreed with the health authorities according
10: to which of those audit plans are being
11: conducted.
12: And typically they don't, yeah,
13: visit all the sites in an audit. So they are
14: really done according to criteria. Sites are
15: being picked.
16: Q. I'm not sure that I clearly
17: understand your last answer. So I'm going to
18: try to ask the question again without trying
19: to be repetitive.
20: Are all the clinical trial
21: sites audited to make sure they're complying
22: with protocol, such as reporting adverse
23: events in these clinical trials, these
24: phase three clinical trials?

p. 00455

01: 00456: Do you know?
02: A. Just to avoid a
03: misunderstanding, some -- all sites are
04: monitored, so that's the monitoring work, but
05: then there is this additional layer of
06: auditing, and the audit is, to my knowledge,
07: typically performed according to plan, where
08: a number of sites, but not all sites, are
09: being audited.
10: Q. Okay. So not all sites are
11: actually audited. Is that your
12: understanding?
13: There's a plan, but the plan as
14: defined is not audit all sites. Am I right
15: about that?
16: A. That is my understanding.
17: Q. Okay. Now, you have been
18: involved with or at least reviewing documents
19: associated with various audits that have been
20: conducted in the Xarelto phase three
21: programs, true?
22: A. Typically, I'm not involved
23: that much in detail into reviewing the audit
24: plans, but there was one case, and I think we

p. 00456

01: 00457: briefly talked yesterday about it already,
02: for one study in the RECORD program, RECORD4,
03: where FDA had raised concerns about the
04: clinical GCP quality of the trial. And so
05: that -- and in that context, yeah, additional
06: audits -- reaudits were performed, and I was
07: involved in the review on that case.
08: But typically, yeah, I'm not
09: involved, so -- in that procedure, so it was
10: kind of an exemption.
11: Q. Well, do you mean an
12: "exception"?
13: I don't mean to --
14: A. Exception, yeah. I messed up
15: on words, maybe.
16: MR. HOFFMAN: That's fine. No,
17: no.
18: THE WITNESS: Yeah. Thank you.
19: MR. DENTON: I'm not trying to
20: be -- I appreciate you speaking with
21: us in English. I'm just trying to
22: make sure we have clear answers.
23: BY MR. DENTON:
24: Q. So from a -- I understand you

p. 00457

01: 00458:   didn't perform any audits, but I do
02: understand, I believe, that you had some
03: communication with or are aware of some
04: communication with the regulators concerning
05: some of the audit work done in the
06: phase three Xarelto clinical trials, correct?
07: A.   As I said, yeah, primarily
08: in -- for the RECORD program because there
09: was some discussion back and forth with the
10: health authority, and so there was more focus
11: on the GCP work for that one trial, as usual,
12: because usually there's also the FDA is doing
13: audits.  And so that's a separate channel
14: sometimes, also, of communication.  It's not
15: necessarily all going through the regulatory
16: affairs strategist or manager.
17: Q.   Okay.  But we know that the
18: ultimate conclusion by the FDA after their
19: investigation of the RECORD4 sites is that
20: the data was so lacking, that the results of
21: that study were deemed by the regulators in
22: the U.S. to be unreliable.
23: That was the bottom line
24: result, correct?

p. 00458

01: 00459:   A.   FDA did not consider the
02: RECORD4 trial for the approval as a pivotal
03: trial, so they certainly, yeah, looked at the
04: data from safety perspective and -- but they
05: did not consider the trial to be a pivotal
06: trial because of their concerns and, yeah,
07: study oversight and, yeah, what -- you can
08: summarize under clinical -- good clinical
09: practice.
10: MR. DENTON:  All right.  We'll
11: look at some documents here perhaps to
12: maybe focus this in.
13: Let's look at Record
14: No. 897009.  We'll put a sticker on
15: that for you.
16: (Whereupon, Deposition Exhibit
17: Derix-37, E-mail(s) re: FDA Inspection
18: in RECORD Trials,
19: XARELTO_BPAG_01656235 -
20: XARELTO_BPAG_01656238, Ref. 897009,
21: was marked for identification.)
22: BY MR. DENTON:
23: Q.   And this is --
24: MR. DENTON:  I'll read it in

p. 00459

01: 00460:   there for you, Mike.
02: MR. DENTON:
03: Q.   This is Derix Exhibit 37, and
04: our Record No. 897009.
05: And this is an e-mail string,
06: and if you'll look at the first page at the
07: top, you see that e-mail was sent to you on
08: March 27th, 2009.
09: A.   Yes, that's correct.
10: Q.   Okay.  And it was sent to you
11: by Gerhard Schlueter?
12: A.   Yes.
13: Q.   Who is that individual?
14: A.   At the time, Gerhard Schlueter
15: was my supervisor, regulatory affairs.
16: Q.   Okay.  And there's some
17: discussion about the FDA inspection of RECORD
18: trials, monitoring and additional
19: information.
20: Do you see that in the subject
21: line?
22: A.   Yeah.  It's an e-mail that was
23: forwarded, yeah.  Yeah, uh-huh.
24: Q.   So this was forwarded to you by

p. 00460

01: 00461:   your boss in regulatory affairs as part of
02: your work at Bayer, correct?
03: A.   That's correct.
04: Q.   And you did, in fact, get this
05: e-mail string at -- on that date in March,
06: correct, in 2009?
07: A.   Yes, correct.
08: Q.   Okay.  So now, just to kind of
09: give this some context, I'd like to go to
10: page 3 of the document, which is really where
11: the substance starts.  It was before you were
12: copied in.
13: Do you see that, where it says
14: "e-mail from FDA to JNJ"?  It's right in the
15: middle of page 3.
16: A.   Yeah, uh-huh.
17: Q.   Okay.  And, again, the folks on
18: this e-mail -- this is an e-mail from the
19: FDA.  Do you see that?  Dawn Wydner, Wydner?
20: A.   Yes.
21: Q.   To Joan Lucas.
22: Who is Joan Lucas at that time?
23: A.   I don't know.  I have to say I
24: don't -- I don't recall who Joan Lucas is.

p. 00461

01: 00462:      Q.    Okay.
02: A.     So there are a couple of other
03: colleagues at JNJ in cc. I suppose I might,
04: but --
05: MR. HOFFMAN:   Don't speculate.
06: He doesn't want you to guess.
07: A.     Yeah, I don't know.
08: BY MR. DENTON:
09: Q.     But you know Sanjay Jalota.
10: That was a U.S. regulatory person on Xarelto,
11: correct?
12: A.     Yes.
13: Q.     And Dr. Peter DiBattiste, you
14: knew he was involved in Xarelto, correct?
15: A.     Yes, Peter DiBattiste and
16: Gary Peters are clinical.
17: Q.     Okay.  So let's read through
18: this.
19: It starts with, "Good morning.
20: Per our phone conversation this morning" --
21: and this is the FDA writing this -- "some new
22: information has come to my attention, and
23: I -- and what I see is there is a major
24: concern at this point that we, FDA, continue

01: 00463:      to accumulate from the CI inspections and
02: preliminary information from the sponsor
03: inspection of Bayer that monitoring of these
04: clinical trial sites may not have been
05: adequate [as read]."
06: Do you see where I'm reading
07: from?
08: A.     Yes, I see.
09: Q.     Okay.  And it makes reference
10: to a CI inspection.
11: Can you tell us what that
12: means?
13: A.     I am not familiar with the CI
14: here in this context, so --
15: Q.     Clinical investigator?
16: A.     Okay, maybe, but I --
17: Q.     Okay.  All right.
18: And then it goes on to say, and
19: this is the FDA person speaking, "I know I
20: have asked this in more ways than one, but
21: want to confirm in knowing what specific
22: measures J&J took to ensure that the events
23: resulting in data exclusion from three
24: sites" -- and she lists three sites -- "have

01: 00464:      not occurred in other instances in the RECORD
02: studies."
03: Do you see that?
04: A.     Yes, I see that.
05: Q.     And then it goes on to say,
06: "Also, with this recent additional
07: information now from the CI inspections that
08: Bayer/Kendle sponsor/CRO monitoring oversight
09: did not detect the violations at these CI
10: [sic] sites," and lists two sites in Poland
11: and China.
12: Do you see that?
13: A.     Yes, I see that.
14: Q.     "And it is important for me to
15: know and convey to the center is what
16: specific efforts had J&J put forth to be sure
17: that the data they were submitting with this
18: NDA had no data integrity issues?"
19: Do you see that?
20: A.     I see that, yes.
21: Q.     Okay.  So I want to dissect
22: this a bit to make sure I understand what the
23: FDA is reporting to Janssen.
24: They're talking about some

01: 00465:      inspections from Bayer/Kendle sponsor/CRO.
02: Let me see if I understand that.
03: Bayer was a sponsor, and Kendle
04: was the CRO for one of the record studies,
05: correct?
06: A.     Yes, that's correct.  This was
07: only for the RECORD4 study, so RECORD1, 2 and
08: 3 were conducted and run by Bayer internal
09: operational group, and the RECORD4 study was
10: conducted operationally, so that means
11: monitoring and other operational activities
12: by Kendle.
13: Q.     So Kendle actually was
14: contracted with Bayer to do the RECORD4
15: study; am I right about that?
16: A.     Yes, that's right.
17: Q.     Okay.  So then if we go up to
18: the top of the page, you can see you're, I
19: believe, brought into that discussion.
20: It says, "Dear Andrea M.,
21: Chiari and Andrea D."
22: I assume Andrea D. is you.  Is
23: that correct?
24: A.     Not necessarily, because there

01: 00466:   are quite --
02: Q.    There's a bunch of Andreas?
03: Okay.
04: A.    -- a couple of them, and we
05: have --
06: Q.    All right.  But --
07: A.    -- in this project that -- I
08: cannot --
09: Q.    Well, maybe let's --
10: A.    Maybe.  So because there are
11: other colleagues from Bayer on this e-mail
12: chain as well.  So but there was, for
13: example, an Andrea Duszczyszyn, who was the
14: study manager -- one of the study manager of
15: the records, so it can also maintain
16: Andrea D.
17: Q.    All right.  But in any event,
18: we know you ultimately got this e-mail at the
19: top, right?
20: A.    Yeah, at the end.
21: Q.    So there's no dispute.
22: I want to go to this other one
23: that says "Dear Andrea" and a few other
24: folks:  "Andy Hargreaves and Larry Winick

p. 00466

01: 00467:   contacted me today regarding the ongoing FDA
02: inspection for the RECORD trials."
03: Do you see that?
04: A.    Yes.
05: Q.    So it wasn't just RECORD4 that
06: was being looked at.  It was all the RECORD
07: sites, correct?
08: A.    At some point in time, FDA
09: certainly looked into all RECORD trials, yes.
10: Q.    All right.  And who is Larry
11: Winick?
12: A.    Larry Winick is a colleague in
13: the Bayer U.S. organization.  He, at the
14: time, was in my regulatory team, so -- I
15: explained yesterday that, as a regulatory
16: strategist, who worked with a team of
17: regulatory experts, because, yeah, you need
18: also the special knowledge of colleagues in
19: the countries.
20: And so Larry Winick at the time
21: was my colleague responsible for U.S., and he
22: also was the direct, yeah, named person
23: for -- at Bayer for contacts to the FDA
24: before the IND was transferred to Janssen.

p. 00467

01: 00468:   And after the transfer, yeah, the direct
02: contact person was -- and Janssen no longer
03: in Bayer.
04: Q.    All right.  So he's a
05: regulatory person?
06: A.    Yes.
07: Q.    All right.
08: Let's go on with this e-mail:
09: "The inspector mentioned concern at the FDA
10: about the quality of monitoring at the RECORD
11: sites, and communication regarding SAE
12: reporting."
13: Do you see that?
14: A.    I see that.
15: Q.    And "SAE" means "serious
16: adverse event," correct?
17: A.    Yes, that's the typical
18: abbreviation in this context here, which
19: means "serious adverse event reporting."
20: Q.    Okay.  So the FDA is concerned
21: about the quality of monitoring at the RECORD
22: sites concerning regarding reporting of
23: serious adverse events, right?
24: A.    These are two different

p. 00468

01: 00469:   aspects.  So one is general monitoring and
02: the other is communication, yeah, regarding
03: SAE reporting.
04: Q.    But serious adverse events in
05: the RECORD trial would be, for example,
06: someone who had a serious bleeding event,
07: true?
08: That would be a serious adverse
09: event.
10: MR. HOFFMAN:  Objection to the
11: form of the question.
12: MR. DENTON:
13: Q.    Right?
14: A.    In general.  So -- I mean,
15: that -- yeah, this is one example for adverse
16: event, yeah.
17: BY MR. DENTON:
18: Q.    And another example of what
19: would be considered your serious adverse
20: event in the RECORD trial would be someone
21: who took rivaroxaban but ended up with a
22: thrombosis, a deep vein thrombosis after
23: their surgery.  That would be another example
24: of a serious adverse event that could occur

p. 00469

Case 2:14-md-02592-EEF-MBN   Document 7946-12   Filed 11/03/17   Page 125 of 210

01: 00470:   in the RECORD study, true?
02: MR. HOFFMAN:  Objection to the
03: form of the question.
04: You can answer.
05: A.    We are moving here, again, in a
06: very specialist area about definitions, what
07: is considered "serious adverse event" or
08: "clinical outcome."
09: So -- and, yeah, really, for
10: those details, I would like to refer to the
11: colleagues who are more familiar with the
12: detailed definition, which event that you
13: describe fall in which category, so --
14: BY MR. DENTON:
15: Q.   Okay.  But you know "SAE" in
16: this e-mail means "serious adverse event,"
17: right?
18: A.    Yes.  That is my understanding
19: also of this e-mail, and that's a common term
20: used for this --
21: Q.    And you use that term commonly
22: in your regulatory work?
23: A.    Yes.
24: Q.   All right.  Let's read on.

01: 00471:         "This was brought to the
02: inspector's attention by his home office
03: relating to inspections in Poland and China,
04: where the finding of under-reporting of AEs
05: has been raised."
06: Do you see where I'm reading
07: from?
08: A.    I see where you're reading
09: from, yes.
10: Q.    And an "AE" in this context
11: means "adverse event," right?
12: A.    Yes, in this context, I read
13: this abbreviation also as "adverse event."
14: Q.    Okay.  And so they're talking
15: about concerns relating to underreporting of
16: adverse events, correct?
17: A.    Correct.  That's what they are
18: talking about.
19: Q.    All right.  And I want to go
20: down to the next paragraph.  It says, "At
21: this point, this e-mail is, quote, 'for your
22: information,' end quote, notice."
23: Do you see that?
24: A.    No, I lost you.

01: 00472:         Q.  I'm sorry.  Second paragraph,
02: same e-mail.
03: A.    Okay.  Yeah, uh-huh.
04: Q.    "At this point" -- right.
05: And I'm just -- we've got a lot
06: to cover, so I'm not trying to cherry-pick,
07: but -- if your lawyer wants to ask some other
08: questions he can, but I'm trying to get
09: through all this on a short timeline.
10: So let's move to the front page
11: of this e-mail.
12: And we know you received this,
13: right?
14: A.    Yes, so it was forwarded to me.
15: Q.    Okay.  And this e-mail in the
16: middle, on the first page, which starts off
17: with "Joseph" --
18: A.    Yeah.
19: Q.    -- it looks like it was sent by
20: Gerhard Schlueter to Joseph Scheeren?
21: A.    It was sent by Larry Winick.
22: Q.    Oh, I see.  Yes, Larry Winick.
23: A.    Yes, Winick to Joseph Scheeren,
24: yes.

01: 00473:         Q.   Okay.  So who is Joseph?
02: A.    Joseph Scheeren is the head of
03: regulatory affairs at Bayer.
04: Q.    Head of regulatory affairs at
05: Bayer?
06: A.    Yes.
07: Q.    Is he the highest person at the
08: time in the regulatory affairs department at
09: Bayer?
10: A.    Yes.
11: Q.    Is he still with the company?
12: A.    Yes, he's still with company.
13: Q.    Is he still head of regulatory
14: affairs?
15: A.    Yes, he's still in -- head of
16: regulatory affairs.
17: Q.    So this e-mail about the
18: problems in the ROCKET study -- or RECORD
19: study, went all the way to the top, to the
20: head of the regulatory affairs department at
21: Bayer, correct?
22: A.    That's correct.
23: MR. DENTON:  All right.  Let's
24: look at another document.  Let's look

01: 00474:     at 1224146.
02: (Whereupon, Deposition Exhibit
03: Derix-38, E-mail(s) re: Bayer and J&J
04: Discussion on the CRL,
05: XARELTO_BPAG_02563181 -
06: XARELTO_BPAG_02563182, Ref. 1224146,
07: was marked for identification.)
08: MR. DENTON:  And the attachment
09: too, actually, 147.
10: (Whereupon, Deposition Exhibit
11: Derix-39, FDA Complete Response
12: Letter, XARELTO_BPAG_02563183 -
13: XARELTO_BPAG_02563191, Ref. 1224147,
14: was marked for identification.)
15: BY MR. DENTON:
16: Q.    We're going to hand you two
17: documents.  One is a cover e-mail with an
18: attachment.
19: MR. DENTON:  So this will be
20: 39?
21: MS. BRITTAIN-LANDERS:  Yep,
22: that's 39.
23: MR. DENTON:
24: Q.    Okay.  So what we're going to

01: 00475:    hand to you and your counsel is Derix-38,
02: which is Record No. 1224146, which is an
03: e-mail, and an attachment, which is Derix-39,
04: Record No. 1224147.
05: MR. DENTON:  There's your copy,
06: Anne.
07: MS. DEVAUGHN:  Thanks.
08: MR. HOFFMAN:  Thanks.
09: BY MR. DENTON:
10: Q.    And we'll put up Exhibit 38
11: first, which is Record 1224146, which is the
12: cover e-mail.  And it's an e-mail that you
13: wrote, correct?
14: A.    Yes, I wrote the e-mail.
15: Q.    Okay.  And it's dated May 28th,
16: 2009, correct?
17: A.    That's correct.
18: Q.    And the subject is "Bayer and
19: J&J discussions on the complete response
20: letter."
21: Do you see that?
22: A.    Yes, I see that.
23: Q.    And what is a complete response
24: letter?

01: 00476:      A.    A complete response letter is a
02: letter that's sent by FDA when they have
03: concluded their review and saw they have
04: still -- they still have open questions or
05: concerns.  They are, at that point in time,
06: not, yeah, able to grant the approval.
07: And so they come back to the
08: sponsor with a list of questions and giving
09: the sponsor a chance to respond to those
10: questions and so they can continue their
11: review.
12: Q.    So when you get a complete
13: response letter, that's not necessarily a
14: good thing from regulatory approval, is it?
15: MR. HOFFMAN:  Objection to the
16: form of the question.
17: You can answer.
18: A.    I mean, certainly complete
19: response letter means that you have to
20: continue work, you have to understand the
21: health authority is concerned with the file
22: and continue to provide responses.
23: BY MR. DENTON:
24: Q.    All right.  So let's look at

01: 00477:    your e-mail.  You write, "Dear colleagues.
02: We have received a complete response letter
03: from FDA for Xarelto.  Please find the PDF
04: file with the content."
05: And then you go on to say, "May
06: I ask you not to distribute this letter
07: widely."
08: Do you see that?
09: A.    Yes, I see that.
10: MR. DENTON:  Could you
11: highlight that please, Evan.
12: (Conference out of the hearing
13: of the reporter.)
14: BY MR. DENTON:
15: Q.      "But I only involve
16: colleagues who will work on the responses."
17: Do you see that?
18: A.    Yes.
19: Q.    So I assume the colleagues that
20: were working on the responses, most of them
21: or a lot of them would be on this e-mail that
22: you sent, right?
23: A.    Yes, it looks like.  So maybe
24: some of the colleagues in the e-mail would

01: 00478:   want to involve, yeah, one of their team
02: members, but most of the colleagues who were
03: working in some way of:  In the RECORD
04: program and could contribute already in the
05: e-mail.
06: Q.    So you get this complete
07: response letter from the FDA, which you said
08: means they have concerns, and you're sending
09: that letter to your colleagues to figure out
10: how to respond or what additional work you
11: needed to do; is that generally what was
12: going on here?
13: A.    Yes, that was generally what
14: was going on.
15: Q.    But when you say don't
16: distribute this widely, so that means you
17: don't tell the marketing people, you don't
18: tell the doctors in the clinics, you don't
19: tell the patients taking Xarelto.  Is that
20: what you mean by that?
21: MR. HOFFMAN:  Objection to the
22: form of the question.
23: A.    At that point in time, it was
24: really meant for the team.  You have to

p. 00478

01: 00479:   understand that our team was working on
02: several different indications and projects.
03: And so it was also to safeguard their
04: resources, because, yeah, I wanted to really
05: keep a focus group working on this very
06: intensively and other colleagues who might
07: not necessarily be able to contribute to
08: these responses weren't involved.
09: But that doesn't mean that, in
10: general, the fact that a complete response
11: letter was issued was not mentioned to
12: others.  Just, I mean, the whole detail work
13: would not have made sense to distribute
14: widely.  And, yeah, colleagues spent their
15: resources on reading it and not working on
16: it.
17: BY MR. DENTON:
18: Q.    Well, you didn't even send it
19: to the principal investigators of the RECORD
20: study, RECORD4, did you?
21: They didn't even know about
22: this investigation?
23: A.    That is not my area of
24: responsibility as a regulatory person.  I'm

p. 00479

01: 00480:   usually not having direct contacts to
02: investigators.  Direct contacts to
03: investigators are only through the clinical
04: team lead, and you would have to ask the
05: clinical team leads to better understand,
06: yeah, about information that was shared in
07: the steering committee meetings and with the
08: investigators.
09: So I cannot comment on that
10: because I only focused on, yeah, gathering
11: the team and work on the responses.
12: Q.    Well, you do know, don't you,
13: Doctor, because you were involved later on,
14: that your company -- even after the FDA found
15: the data from RECORD4 to be completely
16: unreliable, your company never told the
17: principal study investigator who had
18: published an article on this topic?
19: MR. HOFFMAN:  Objection.
20: BY MR. DENTON:
21: Q.    You know that, don't you?
22: MR. HOFFMAN:  I apologize.
23: Objection to the form of the
24: question.

p. 00480

01: 00481:     A.    I cannot agree because I really
02: have not been involved in the communication,
03: and so you would really have to ask this
04: question to my colleague, because I'm
05: typically not involved in any steering
06: committee or investigator communication nor
07: in the publication in general.  So that's
08: really something I cannot agree with.  I just
09: don't know.
10: BY MR. DENTON:
11: Q.    Okay.  Well, I'll help refresh
12: your recollection with some documents later
13: on in the chronology.
14: Let's look at the complete
15: response letter, which is exhibit -- is it
16: 39?  And that's Record 1224147.
17: The complete response letter is
18: a number of pages, correct?
19: A.    Yes.
20: Q.    And that's what was attached to
21: this e-mail that you said not to distribute
22: widely, correct?
23: MR. HOFFMAN:  Objection to the
24: form of the question.

p. 00481

01: 00482:       A.    It's the complete response
02: letter, which was attached to the e-mail.
03: BY MR. DENTON:
04: Q.    Okay.  And so let's work
05: through some of this complete response
06: letter.  We don't have time to go through
07: every paragraph.
08: But, first of all, it's sent to
09: Johnson & Johnson, attention Andrea Kollath,
10: if I'm saying her name correctly.
11: A.    Yes.
12: Q.    And who is Andrea Kollath?
13: A.    Andrea Kollath is a
14: regulatory --
15: Q.    Kollath.
16: A.    -- colleague at Janssen who, at
17: the time, used to work together with Sanjay
18: Jalota and a team --
19: (Clarification requested by the
20: reporter.)
21: THE WITNESS:  With Sanjay
22: Jalota, the regulatory affairs lead at
23: the time at Janssen.
24: ///

01: 00484:    correct?
02: A.    Yes, that's correct.  It's
03: giving the reasons of the FDA for the
04: complete response letter and recommendations
05: to address the issues they raised.
06: Q.    It goes on to say -- let's go
07: down to the clinical part, paragraph 1,
08: "Investigator audits of a total of 11
09: clinical sites, your firm as the applicant,
10: and Bayer as the sponsor of the RECORD
11: studies (1, 2, 3 and 4) were undertaken to
12: evaluate the conduct of these four studies."
13: Do you see where I'm reading
14: from?
15: A.    Yes, I see where you're reading
16: from.
17: Q.    And then it goes and it talks
18: about clinical investigator inspections.  It
19: says, "A total of eight sites were inspected
20: by the FDA," correct?
21: A.    That's what it says here in
22: this.
23: Q.    And they're talking about all
24: four RECORD studies, correct?

01: 00483:   BY MR. DENTON:
02: Q.    Okay.  So this is talking about
03: a particular NDA, and that's the new drug
04: application that had been submitted for
05: Xarelto, correct?
06: A.    Yes.  Specifically they're
07: talking about the application we were
08: speaking about, VTE prevention in patients,
09: after total hip replacement.
10: Q.    Right.  Okay.
11: And if we go down three
12: paragraphs, it says, "We" -- the FDA
13: speaking -- "We have completed the review of
14: your application and have determined that we
15: cannot approve this application in its
16: present form."
17: Do you see where I'm reading
18: from?
19: A.    Yes, that's correct.
20: Q.    And then -- which is consistent
21: with what you told us, that a complete
22: response letter is never good news, and they
23: list a number of things that have to be
24: addressed by the company for approval,

01: 00485:       A.    Yes.  They're talking about the
02: completion of the data audit, yeah, for the
03: entire NDA, which comprised of four RECORD
04: studies.
05: Q.    And the clinical investigators,
06: there were thousands of clinical
07: investigators around the world on these
08: various sites, correct?
09: A.    I do not recall the number of
10: investigators that were involved in the
11: programs, so each of the trials had about
12: 3,000 patients, so -- but I cannot recall the
13: number of investigators --
14: Q.    Okay.  Certainly hundreds of
15: clinical investigators?
16: A.    Yeah, well, probably close.
17: Q.    Hundreds and hundreds?
18: A.    Yeah.
19: Q.    Okay.  My point is simply this:
20: The FDA only looked at eight of those
21: hundreds of sites, correct?  That's what
22: they're saying here?
23: A.    Yes, they say that they're
24: talking about a total of eight investigator

01: 00486:   inspections.
02: Q.    Right.  And then they go on to
03: be more specific, for RECORD1, they only
04: looked at two sites, were audited by FDA.
05: RECORD2 study, there were two sites
06: investigated.
07: Do you see that?
08: A.    Yes, I see that.
09: Q.    And then they go on and they
10: talk about two more in RECORD3 and RECORD4.
11: But what the FDA basically says
12: is that, in our spot audits, we find a lot of
13: the data unreliable.
14: That's what it says, right?
15: A.    Where do you read this from?
16: Q.    Very last sentence, "FDA" -- of
17: paragraph 1, first page, "FDA" it says --
18: well, let's just read the whole sentence:
19: "From the RECORD2 study, data from one of two
20: clinical investigations audited by the
21: FDA" -- one of two -- "are not considered
22: reliable in support of this NDA."
23: Do you see that?
24: A.    Yeah, that's giving the example

p. 00486

01: 00487:   of -- yeah, of the two clinical investigators
02: that were audited, yes, one of two in that
03: case, yes.
04: Q.    I know it's a small sample, but
05: 50% of the sites, one out of two, were
06: unreliable, right?
07: A.    I think it's probably not --
08: yeah, 50% is mathematically correct, but --
09: Q.    I understand it's a small
10: sample size.
11: A.    -- one out of two is, yeah --
12: Q.    Let's go back to RECORD1 in the
13: middle of the paragraph, "For the RECORD1
14: study, data from two clinical inspections --
15: investigators audited by FDA are considered
16: reliable [as read]."  Okay?  You see that?
17: So you've got two out of two in
18: RECORD1.  You see that?
19: A.    Yes.
20: Q.    Then let's go to the next page,
21: top of the next page, for RECORD3.  "RECORD3,
22: of one of two investigators audited by the --
23: had a field classification office action
24: indication, OAI, indicating that serious

p. 00487

01: 00488:   deficiencies were noted, raised concerns
02: regarding human subjects' protection."
03: Do you see that?
04: A.    Yes, I see that in this.
05: Q.    What's an OAI, official action
06: indication -- or indicated.  What's that?
07: A.    I would like to refer that
08: question to my colleagues in quality
09: assurance because I'm not familiar with this
10: term.
11: Q.    Okay.  Fair enough.
12: And then it goes on to say,
13: "For the RECORD4 study, data of one of two
14: clinical investigators were not considered
15: reliable."
16: Do you see that?
17: A.    Yes, I see that sentence in the
18: text.
19: Q.    That's not a very good report
20: from the FDA in their spot audits, is it?
21: MR. HOFFMAN:  Objection to the
22: form of the question.
23: A.    I mean, it's really describing
24: the facts that FDA found here, and we, yeah,

p. 00488

01: 00489:   basically continued to work, yeah, through
02: the list of issues that were -- and address
03: the questions.
04: And so at this point in time,
05: certainly, yeah, FDA had raised a number of
06: questions and topics here in this report.
07: BY MR. DENTON:
08: Q.    Well, let's go on to -- let's
09: look at the next paragraph.  It says, "The
10: data from the five sites listed that are
11: considered unreliable and for the reasons."
12: So just so we're clear now,
13: five of eight sites that were spot-audited by
14: the FDA, the FDA found serious problems with,
15: right?  And they're going to list them here.
16: We're talking about five of
17: eight audits, right, that had these problems?
18: A.    Yes.  It says "The data from
19: the five sites listed above," and then they
20: gave reasons for their -- yeah, the concerns
21: FDA had.
22: Q.    Let's read what the concerns
23: were:
24: "Failure to conduct the study

p. 00489

01: 00490:   according to the signed investigator
02: statement and the investigational plan," and
03: they cite a regulation.
04: Do you see that?
05: A.    I see that.
06: Q.    "Failure to report adverse
07: events to the sponsor."
08: So what that means is, is that
09: five of eight audited places had not reported
10: adverse events to Bayer or Janssen.  That's
11: what that says.
12: A.    That is not what it says.  So
13: they did not report it was events, so it's --
14: I mean, those studies are over a period of
15: time, and so it can also be that one adverse
16: event at a point in time was not reported.
17: So -- and it doesn't mean that they did not
18: report any adverse event.
19: Q.    I didn't mean to imply that.
20: But the sponsor here was Bayer on RECORD,
21: correct?
22: A.    The sponsor was Bayer, yes.
23: Q.    Okay.  So they're basically
24: saying of the five out of eight spot audits,

01: 00491:   there was failure to report adverse events to
02: the sponsor.
03: That's what it says, right?
04: A.    That's what it says, yes.
05: Q.    It goes on to say, "Failure to
06: prepare or maintain adequate and accurate
07: case histories with respect to observations
08: and data pertinent to the inspection,"
09: correct?
10: A.    That's what it says, yes.
11: Q.    And then some other things,
12: "Failed to have adequate informed consent.
13: Failure to maintain drug accountability
14: records.  Failure to report to the IRB all
15: unanticipated problems involving risk to
16: human subjects."
17: Do you see that?
18: A.    Yes, I see that.
19: Q.    That's not a very good
20: scorecard on your RECORD4 study, is it?  Or
21: your RECORD1, 2, 3 and 4 studies?
22: MR. HOFFMAN:  Objection to the
23: form of the question.
24: A.    In this paragraph, yeah, it

01: 00492:   describes the issues that were observed at
02: the five sites, and certainly those were
03: taken seriously and followed up and looked up
04: also by the team.
05: And in order to understand
06: better the detail, may I ask you, again, to
07: talk to my colleagues who are more familiar
08: with, yeah, clinical conduct monitoring and
09: also the nature of the findings behind, yeah,
10: the legislation text that is cited here.
11: BY MR. DENTON:
12: Q.    I understand other people did
13: the audits, but you got this e-mail and you
14: sent this e-mail as part of your duties in
15: regulatory affairs, right?
16: A.    Yes, I -- I sent this e-mail to
17: my colleagues in order to start working.
18: That's a typical process.
19: Q.    Right.
20: A.    As a regulatory person, you
21: never are in a position to respond to health
22: authority requests directly based on your own
23: knowledge, so it's always that this is a
24: coordination and to work with the colleagues

01: 00493:   who provide the expertise.
02: And that was basically the
03: starting point to share this feedback from
04: FDA and work with the colleagues who had a
05: more detailed knowledge providing FDA
06: responses to their questions and issues.
07: Q.    Okay.  So the FDA does eight
08: audits.  They find five -- five sites to have
09: unreliable information, including not
10: reporting adverse events.  And then Bayer
11: also did some spot audits, right?  That's
12: what's taking place down here in the next
13: part of this letter, correct?
14: A.    Yes, that's what we talked
15: about before.  So that -- this part of the
16: general audit procedure at the company.  Also
17: that --
18: Q.    But you -- I'm sorry.
19: A.    -- the results of those audits
20: are typically shared with the health
21: authorities.
22: Q.    Okay.  But your company, Bayer,
23: didn't audit all the sites either on the
24: RECORD studies.  You did a spot audit?

Case 2:14-md-02592-EEF-MBN Document 7946-12 Filed 11/03/17 Page 131 of 210

01: 00494:     A.   Yes, that's my understanding,
02: and it's also my understanding that this is a
03: typical agreed-upon process of auditing.
04: Q.   Okay.
05: A.   But, again, please talk to the
06: experts.
07: Q.   Sure.  I'll be happy to talk to
08: the experts, but I want to talk to you about
09: this e-mail and document you sent around that
10: you didn't want to distribute widely.
11: MR. HOFFMAN:  Objection to the
12: form of the question.
13: BY MR. DENTON:
14: Q.   Let's -- that is what your
15: e-mail says, "Please do not distribute this
16: letter widely," correct?  We talked about
17: that.
18: MR. HOFFMAN:  Objection, asked
19: and answered.
20: A.   The e-mail says this, but we
21: talked already about it.  So it's not
22: intending to hide anything from colleagues,
23: but it was really to structure the workload.
24: And, as you can see, there are also

01: 00496:     Q.   So you have doctors in your
02: study that are throwing away medical records?
03: That's what Bayer found?
04: A.   At least here in this case, it
05: is my understanding, as it says, that, yeah,
06: the medical records were not available.  And
07: typically medical records in the clinical
08: studies, yeah, need to be kept in order to
09: document their study drug administration.
10: And so in this case, documents
11: obviously were not available.
12: Q.   And that's not good, is it?
13: That's not good clinical practice?
14: A.   It is not according to the -- I
15: mean, the clinical practice, not to keep the
16: records on after -- medical records of the
17: patients from the trial, that's correct.
18: Q.   All right.  Let's move on in
19: the letter.
20: The next section is the
21: "Sponsor Inspection," and my first question
22: to you is:  Is the sponsor inspection
23: different than what Bayer informed the FDA
24: earlier, or is this just more detail what

01: 00495:   colleagues involved who have, yeah,
02: functional representative and functional
03: responsibilities, so they could certainly
04: also involve the team members they needed.
05: BY MR. DENTON:
06: Q.   Are you finished?
07: A.   Yes.
08: Q.   I just wasn't sure.
09: So let's look at the middle of
10: page 2 of this letter.  Starts with, "Bayer
11: Pharmaceuticals informed that they found
12: different or additional problems with the
13: RECORD4 study at a site in Mexico."
14: Correct?
15: A.   That's what it says, yes.
16: Q.   And during Bayer's spot audit,
17: this one site in Mexico, the letter says,
18: "These issues included an inability to
19: confirm the study medication was administered
20: consistent with the protocol expectations due
21: to systemically discarding of medical records
22: and documentation of the study drug."
23: Did I read that correctly?
24: A.   Yes, that's what it says.

01: 00497:   Bayer did, or do you know?
02: A.   I would have to look into
03: the -- through the text in detail.  So
04: what -- at least what I recall is that there
05: was, first of all, I mean, this general
06: audit, sort of what we were talking about,
07: yeah, where the process where also the
08: sponsor is an independent group and the
09: company running audits.
10: But later on in the course of
11: the interactions with the FDA, a second audit
12: was initiated that reviewed all available
13: data in order to -- yeah, I mean, to provide
14: the -- all the information to the FDA.  And
15: that process also was called "audit," I think
16: in some documents, or "Falcon audit."
17: And I would have to look into
18: this, yeah, to see -- to get the context
19: again because it's already quite some time
20: ago.
21: Q.   All right.  Well --
22: A.   I don't recall the documents in
23: detail.
24: Q.   Okay.  All right.  Well, then,

01: 00498:   maybe we'll just read this together to
02: refresh your memory.
03: The sponsor's inspection.  That
04: refers to a Bayer inspection; is that
05: correct?
06: A.   Yeah, that -- if...
07: (Document review.)
08: BY MR. DENTON:
09: Q.   It starts, "Inspection of Bayer
10: Pharmaceuticals as the sponsor of RECORD4."
11: I think I'm right about that.
12: A.   Uh-huh, yeah.  So it's --
13: Q.   Okay.
14: A.   It's another part of the
15: inspection where the health authorities
16: inspect the files that are kept at the
17: sponsor.
18: Q.   Okay.  So FDA looked at the
19: records kept at Bayer and determined that the
20: sponsor, Bayer, failed to ensure proper
21: monitoring of the study, correct?
22: A.   That's how it reads here, yes,
23: uh-huh.
24: Q.   "To ensure the study was

01: 00500:   general.  It doesn't say -- and it's not
02: correct to interpret it from that that no
03: adverse events were reported.
04: The deficiency that FDA
05: recorded was that the adverse events were not
06: reported in a completeness as it had been
07: expected.
08: BY MR. DENTON:
09: Q.   Hundreds of adverse events were
10: missed in the RECORD studies, correct?
11: Hundreds?
12: A.   I cannot comment on the numbers
13: because I don't know by heart, and we would
14: have to go back into the respective documents
15: and, again, talk to the colleagues who ran
16: the audit and also analyzed the findings and
17: discussed the findings with FDA directly.
18: MR. McWILLIAMS:  Well, let's go
19: to some documents that you received.
20: Let's go to 1224162 and 63.
21: (Whereupon, Deposition Exhibit
22: Derix-40, E-mail(s) re: FDA Type C
23: meeting - Background Document
24: submitted, XARELTO_BPAG_02563261 -

01: 00499:   conducted in accordance with the protocol
02: and/or investigational plan," correct?
03: A.   That's correct.
04: Q.   And "to ensure that the FDA and
05: all investigators were promptly informed of
06: significant adverse effects or risks."
07: Do you see where I'm reading
08: from?
09: A.   Yes, I see what you're reading
10: from.
11: Q.   So, again, this isn't the way
12: you're supposed to conduct clinical trials.
13: Not reporting adverse events?
14: MR. HOFFMAN:  Objection to the
15: form of the question.
16: BY MR. DENTON:
17: Q.   Correct?
18: A.   Again, it doesn't say that
19: there were no adverse events --
20: Q.   Oh, I know you reported some,
21: but how many did you miss -- I'm sorry?
22: MR. HOFFMAN:  Let her finish,
23: and then -- sorry.  Go ahead.
24: A.   It just says -- talks about in

01: 00501:      XARELTO_BPAG_02563263, Ref. 1224162,
02: was marked for identification.)
03: (Whereupon, Deposition Exhibit
04: Derix-41, Rivaroxaban Background
05: Information, XARELTO_BPAG_02563264 -
06: XARELTO_BPAG_02563351, Ref. 1224163,
07: was marked for identification.)
08: MR. HOFFMAN:  Would it be a
09: good idea to take a break now, if
10: you're going to go into a new long
11: area?
12: MR. DENTON:  It's not.  I just
13: want to just tie up that one loose
14: end.
15: MR. HOFFMAN:  Then let's do
16: that.  That's fine.
17: BY MR. DENTON:
18: Q.   Okay.  Let me hand you
19: Exhibit 40 and Exhibit 41.  And, excuse me,
20: it's Record 1224162 and 1224163.
21: And there's one more attachment
22: as well.
23: (Whereupon, Deposition Exhibit
24: Derix-42, 5/5/10 Kollath Letter to

Derix, Andrea Ph.D. - 2 - Volume 2 - 03/02/2016

01: 00502:        FDA, XARELTO_BPAG_02563352 -
02: Ref. 1224164, was marked for
03: identification.)
04: BY MR. DENTON:
05: Q.    And there's 42.  There was
06: actually two attachments to that e-mail,
07: Doctor.
08: MR. DENTON:  Would you hand me
09: that over there.  It's not a big deal.
10: MR. WOLFE:  You want to read
11: the third record number?
12: MR. DENTON:  Yes.  It's
13: 1224164.
14: BY MR. DENTON:
15: Q.    Again, this is an e-mail that
16: you wrote, Exhibit 40, correct?
17: A.    Exhibit 40 is an e-mail that I
18: wrote, yes.
19: Q.    And you're talking about a
20: Type C meeting with the FDA, right?
21: A.    Right.
22: Q.    And you're writing to some
23: colleagues at Bayer.  You talk -- you're
24: writing to Robert, Scott, Martin, Julie and

p. 00502

01: 00503:   Andy, right?
02: A.    Yes, that's correct.
03: Q.    And they're listed in the
04: e-mail string, right?
05: A.    Yes, they're listed.
06: Q.    And you attach -- and what I
07: want to get to, you attach some information
08: that was going to be discussed with the FDA,
09: right?  You talk about background document,
10: which was submitted to the FDA?
11: A.    Yes, it's a background document
12: which was submitted to the FDA, and it was
13: about Xarelto RECORD4 data verification --
14: Q.    Right.
15: A.    -- so one of the four trials.
16: Q.    All right.  And then one of the
17: attachments, which is a big document,
18: Exhibit 41, Record 1224163, this was a big,
19: lengthy document that your company prepared
20: to submit to the FDA in response to that
21: complete response letter we talked about,
22: right?
23: A.    Yes.  So it's a briefing
24: document that is typically prepared ahead of

p. 00503

01: 00504:   meetings, like these Type C meetings with
02: FDA, yeah, in order -- as a background and to
03: inform further discussion.
04: Q.    Right.  And if we go to page 8
05: of this document, it shows who participated;
06: right?
07: A.    Yes, page 8 is the list -- the
08: proposed list of participants.
09: Q.    And down on the bottom, the
10: Bayer participants included you,
11: Andrea Derix Ph.D., correct?
12: A.    Yes, I'm included in the list
13: of proposed participants for this meeting.
14: Q.    Okay.  Did you go to the
15: meeting?
16: A.    Yes, I went to the meeting.
17: Q.    Okay.  And this is -- this
18: exhibit, Exhibit 41, is the written
19: submission that your company was providing to
20: the FDA to see if you could get RECORD4
21: approved, right?
22: A.    It was a document in -- yeah,
23: in response to the complete response letter.
24: And as it says here, it's also sharing the

p. 00504

01: 00505:   results of a series of independent
02: third-party audits that I was talking before
03: by Falcon.  And I saw that the purpose of the
04: meeting was to discuss the results of this
05: third-party audit and also, yeah, to follow
06: up on the provability of the RECORD4 trial.
07: Q.    So we've had an FDA audit, we
08: had a sponsor audit and then you -- then
09: you-all went out and hired Falcon to also
10: audit some sites.  And that's the independent
11: or additional audit you were talking about?
12: A.    Yes, that was -- that's what is
13: talking here about as in the third-party
14: audit that was conducted in addition to the
15: prior audits.
16: Q.    All right.  Let's look at
17: page 24.  And remember those questions where
18: I told you that there were hundreds of
19: unreported adverse events in RECORD4 and you
20: said you didn't remember that?  Look at the
21: bottom of the paragraph, paragraph 3.4, right
22: in the middle of the page.  Let's read this
23: together.
24: "The independent Falcon audits

p. 00505

Page 23

01: 00506:   identified deficiencies in reporting of AEs
02: and SAEs.  603 unreported AEs were identified
03: across all four RECORD studies, with the
04: highest proportion of these subjects found in
05: RECORD4 and all serious -- serious adverse
06: events were identified in RECORD4."
07: Q.   Does that refresh your
08: recollection, that it was hundreds of
09: unreported adverse events, 603 to be precise?
10: A.   It's mentioned here in the text
11: as you read from it, so it's -- yeah, it's
12: the totality across all studies, but it also
13: makes it very clear that primarily the
14: RECORD4 study came into focus because it
15: deviated and -- after the audit and after all
16: information was looked at from the other
17: trials in terms of the GCP quality.
18: Q.   But there were missed
19: unreported adverse events across all four
20: RECORD trials.  That's what this says.
21: MR. HOFFMAN:  Objection to the
22: form of the question.
23: MR. DENTON:  Well, let me
24: rephrase it.

01: 00507:   BY MR. DENTON:
02: Q.   "The independent Falcon audits
03: identified deficiencies in reporting of
04: adverse events and serious adverse events,
05: semicolon, 603 unreported adverse events were
06: identified across all four RECORD studies.
07: The highest proportion of subjects of those
08: were found to be in the RECORD4 study."
09: Did I read that correctly?
10: A.   You read that correctly.
11: MR. DENTON:  All right.  Let's
12: take a short break.
13: THE VIDEOGRAPHER:  Going off
14: the record at 10:14 a.m.
15: (Recess taken, 10:14 a.m. to
16: 10:29 a.m.)
17: THE VIDEOGRAPHER:  Back on
18: record at 10:29 a.m.
19: BY MR. DENTON:
20: Q.   Let's go back to the audits
21: done by Falcon.
22: Where are those reports stored,
23: do you know?
24: I assume they're written

01: 00508:   reports, correct?
02: A.   That's --
03: MR. HOFFMAN:  Do you know what
04: he means by "stored"?
05: THE WITNESS:  No.
06: BY MR. DENTON:
07: Q.   Kept.
08: MR. HOFFMAN:  Yeah, a
09: database --
10: BY MR. DENTON:
11: Q.   Database on the server.
12: MR. HOFFMAN:  Physical copies.
13: MR. DENTON:
14: Q.   Paper copies.
15: Where could I receive a
16: photocopy of all the Falcon audit reports for
17: all the work they did for Bayer involving
18: Xarelto?
19: A.   There are two possible
20: locations.  One is in the submissions that
21: went to FDA, so the NDA; and also there's a
22: database for -- an audit database in the
23: quality assurance group, so the contacts
24: would be then to Andy Hargreaves.

01: 00509:       Q.   Okay.
02: A.   So those two are the possible
03: connections.
04: Q.   So Mr. Hargreaves would
05: probably be the person who would know where
06: the sponsor audits would be, where
07: third-party audits would be with respect to
08: Xarelto programs.
09: Is that your best judgment?
10: A.   Yes, that's my understanding.
11: Q.   Okay.  So let's get back to
12: this series of meetings and dialogue with the
13: FDA.  Let's move on to a new document,
14: 1226766, which is an e-mail, and 1226767,
15: which is an attachment to that e-mail.
16: (Whereupon, Deposition Exhibit
17: Derix-43, E-mail(s) re: FDA
18: Preliminary Responses,
19: XARELTO_BPAG_02609087 -
20: XARELTO_BPAG_02609090, Ref. 1226766,
21: was marked for identification.)
22: (Whereupon, Deposition Exhibit
23: Derix-44, Sponsor Questions and FDA
24: Response, XARELTO_BPAG_02609091 -

01: 00510:       XARELTO_BPAG_02609094, Ref. 1226767,
02: was marked for identification.)
03: BY MR. DENTON:
04: Q.    All right.  I'm going to hand
05: to you, Dr. Derix, Exhibit 43 and Exhibit 44.
06: Exhibit 43 is a cover e-mail that you wrote,
07: and Exhibit 44 is the attachment.  Sorry.
08: Thank you, ma'am.
09: So we're moving forward on this
10: discussion about the RECORD issues, and let's
11: just read through this e-mail, and I think it
12: will help refresh your recollection, and then
13: I can ask you some questions.
14: First of all, the cover e-mail,
15: which is Document 1226766, Exhibit 43, is an
16: e-mail you wrote, correct?
17: A.    That's correct.
18: Q.    And you wrote that e-mail on
19: March 31, 2010, correct?
20: A.    That's correct.
21: Q.    And this was the FDA
22: preliminary response after that Type C
23: meeting, where you submitted that lengthy
24: written document that we just looked at,

01: 00511:   correct?
02: A.    Yes, that's what it says in the
03: e-mail text.
04: Q.    All right.  And if we look at
05: Exhibit 44, that is actually the written
06: response from FDA, correct, or at least
07: minute meetings?
08: A.    You have to check.  It says
09: April 7, 2010, and -- yeah.
10: Q.    Okay.
11: A.    Yeah.
12: Q.    And the purpose -- the
13: objective of the meeting is to obtain
14: feedback from agency -- that means FDA --
15: regarding the third-party audits conducted to
16: date and plan data verifications --
17: activities to provide assurance that the data
18: quality of the -- and reliability of the
19: RECORD studies, correct?
20: That's what the purpose of that
21: was, that meeting?
22: A.    Yeah, that was the objective of
23: the meeting.
24: Q.    Okay.  So, basically, your

01: 00512:    company has submitted some information to the
02: FDA.  They're looking at some things, and
03: they're getting back to you and making
04: comments, right?  That's what's going on here
05: at a high level?
06: A.    That's a typical process, so
07: that their sponsor is raising questions to
08: the FDA, and that's -- the Type C meeting is
09: a kind of a scientific discussion meeting.
10: And FDA is giving responses to the questions,
11: first of all, preliminary responses before
12: the meeting, and then you meet, and then
13: afterwards, they issue the final minutes.
14: Q.    So let's look at page 2, some
15: of the FDA comments.
16: Basically what Johnson &
17: Johnson was doing -- and they use Johnson &
18: Johnson here, but it's basically Janssen as
19: the sponsor and Bayer as the entity that
20: conducted these studies, submitted the
21: briefing package to the FDA, right, that we
22: talked about?
23: A.    Yeah, at the time the NDA was
24: already -- or the IND was already transferred

01: 00513:    to Janssen, and so Janssen was the primary
02: contact to FDA.
03: Q.    And, actually -- so that brings
04: up a point that I'd like to talk to you
05: about.
06: When Xarelto first started,
07: historically it was Bayer, the Bayer company
08: that found the molecule, patented the
09: molecule, and began the early development,
10: correct?
11: A.    Yes, that's correct.
12: Q.    And Janssen at that point was
13: not involved, correct?
14: A.    At that point in the time,
15: Janssen was not involved.
16: Q.    Right.
17: A.    Only after the co-development
18: contract was signed, the collaboration
19: started.
20: Q.    Right.  And that was actually
21: in October of 2005, correct?
22: A.    Yeah, I would have to look up
23: the exact date.  I don't recall, but it was
24: at the time, yeah.

Derix, Andrea Ph.D. - 2 - Volume 2 - 03/02/2016

01: 00514:     Q.     So the investigational new drug
02: application for Xarelto and particularly for
03: this indication that the RECORD studies were
04: involved with were filed initially by the
05: Bayer companies, right?
06: A.     I would have to look back into
07: the exact timing of the, so to say,
08: transition.  But -- yeah, I would have to
09: check it.  But there was an IND transfer made
10: in the course of the collaboration at some
11: point in time, and so, from that point
12: onwards, Janssen was the primary contact
13: after that.
14: Q.     Well, but we know what that --
15: at this point in this exhibit, Janssen had --
16: that the regulatory work at the FDA had been
17: transferred from Bayer to Johnson & Johnson,
18: right?
19: A.     Yes.
20: Q.     Okay.  In fact, you did that
21: right in the middle of this record audit,
22: didn't you?
23: A.     I would have to exactly look up
24: the timing, when it was done.  In fact, I

01: 00516:     A.     So I don't recall the exact
02: point in time and also not in relation to
03: where in the process of RECORD1, 2, 3, 4 was,
04: so I would have to look at that up in order
05: to confirm the dates.
06: Q.     Was the transfer -- well, first
07: of all, Bayer did all the RECORD studies.
08: Janssen didn't do them, right?  We've already
09: established that.
10: A.     Yeah, that's the model after
11: collaboration, that some of the trials are
12: run, operationally conducted, under the
13: sponsorship of one of the companies.
14: And there was a shared
15: responsibility grid for each trial, which you
16: can find in our records, which is clearly
17: describing the responsibility for each of the
18: partner for each trial.
19: And in this case, yeah, the
20: RECORD program was run by Bayer.
21: Q.     Okay.  It was a very simple
22: question.  My question was:  Did Bayer do the
23: RECORD studies, and the answer is yes,
24: correct?

01: 00515:     mean, from the point of the time that Janssen
02: entered into the collaboration, we shared all
03: the work and all the content, and we already
04: at that time attended the FDA meetings
05: together.
06: And I recall on the first
07: meeting after the transition, FDA said -- we
08: made them aware and said now there was a
09: transition, and they just laughed and said
10: they wouldn't have noticed it.  So -- meaning
11: that they had the impression that really all
12: the time in that process both companies
13: worked very closely together.
14: Q.     Right.  And even though you
15: were working together, Bayer decided right in
16: the middle of those RECORD audits to transfer
17: the communication and the responsibility of
18: the communication to Janssen to the FDA --
19: with the FDA, correct?
20: MR. HOFFMAN:  Objection, asked
21: and answered.
22: BY MR. DENTON:
23: Q.     That's what happened
24: chronologically?

01: 00517:     A.     Yes, uh-huh.
02: Q.     All right.  I'd appreciate it
03: if they're simple answers and simple answers
04: would be responsive -- that would make things
05: go faster for all of us.  Is that fair?
06: A.     I understand.
07: MR. HOFFMAN:  I object to the
08: preface to whatever question is
09: coming.
10: MR. DENTON:  All right.
11: BY MR. DENTON:
12: Q.     So was there -- let me ask you
13: this:  Did Bayer transfer the responsibility
14: of the RECORD studies to Janssen to help with
15: the FDA approval of RECORD?
16: Do you know?
17: MR. HOFFMAN:  Objection to the
18: form of the question.
19: A.     The transfer of the IND was
20: already defined in the initial contract that
21: was established with Janssen, and so this was
22: not so to say an unplanned procedure.
23: BY MR. DENTON:
24: Q.     All right.  Let's look at --

Derix, Andrea Ph.D. - 2 - Volume 2 - 03/02/2016

01: 00518:   back at Exhibit 44, the FDA's response.
02: It's -- do you need a record number --
03: 1226767.  I'm sorry.
04: And, again, I want to move this
05: along because we've got a lot of studies to
06: talk about today, so I'm going to try to
07: focus in on this but at the end of the FDA
08: comments in the first paragraph, it says
09: something like this -- exactly like this,
10: "Without DSI's review of the full Falcon
11: audit reports, DSI is unable to make any
12: definitive conclusion regarding the data
13: reliability for any of the RECORD studies,
14: RECORD1, 2, 3 and 4, at this time."
15: Do you see where I'm reading
16: from?
17: A.    Yes, I see where you're reading
18: from.
19: Q.    What is DSI?
20: A.    DSI is a division in FDA that
21: is responsible for the GCP -- assessment of
22: the GCP quality of trials.
23: Q.    But DSI doesn't look into all
24: clinical trials, do they?

01: 00520:   agree that the proposed analysis adequately
02: addresses the agencies concerned in the
03: complete response letter?"
04: Do you see that, "CR letter"?
05: That's what they're referring to, right?
06: A.    Yes.
07: Q.    FDA responds, "The proposed
08: analyses do not adequately address DSI's
09: areas of concern.  Johnson & Johnson focused
10: only on RECORD4 data.  However, DSI is
11: concerned that there are many issues with
12: data reliability for RECORD1, 2 and 3.
13: However, as stated previously, DSI is unable
14: to make any conclusions regarding the data
15: reliability of RECORD1, 2 and 3 at this
16: time.
17: Do you see that?
18: A.    I see that.
19: Q.    So there were problems in all
20: four RECORD studies that were being
21: investigated, right?
22: A.    That is not what it is saying
23: here.  It just says that at this point in
24: time DSI was unable to make conclusions on

01: 00519:         A.    In the course of the -- of
02: their review activity and FDA's work, DSI
03: does, it's my understanding.
04: Q.    So DSI has looked at every one
05: of your clinical trials?  They've audited
06: every single one of them?
07: MR. HOFFMAN:  Objection to the
08: form of the question.
09: BY MR. DENTON:
10: Q.    I say "your."  I mean Bayer's
11: or Janssen's clinical trials.
12: MR. HOFFMAN:  Same objection.
13: BY MR. DENTON:
14: Q.    You know that's not true?
15: MR. HOFFMAN:  No.
16: BY MR. DENTON:
17: Q.    Don't you?
18: A.    They have -- that's -- I cannot
19: recall -- recollect, or I don't know.
20: Q.    All right.  Let's look at --
21: let's just look at some of this.  Let's go to
22: page 3 of this exhibit.  There's a
23: question (c).  This is where Bayer and
24: Janssen are asking, "Does the agency further

01: 00521:   RECORD1, 2 and 3.
02: Q.    Well, let's keep going.  Let's
03: look at the bullet points.  In RECORD1 there
04: were critical/major findings, .12 per
05: subject; RECORD 2, critical/major findings;
06: RECORD3, critical/major findings.  Next page.
07: You see where I'm reading from?
08: It was RECORD1, 2 and 3.  And then they go on
09: to RECORD4, "These results show that the
10: number of critical and major findings noted
11: per subject audit is similar across all
12: studies and not limited to RECORD4."
13: Do you see where I'm reading
14: from?  Do you see where I'm reading from?
15: A.    Yes, I see where you're reading
16: from.
17: Q.    And this is a document that you
18: transmitted to your colleagues at Bayer that
19: are working on Xarelto, right?  You received
20: this document.
21: A.    Yes, we received this document
22: as a preliminary response to the submission
23: for the Type C meeting.
24: Q.    So my point is simply this:

01: 00522:   There were major findings and problems across
02: all four RECORD studies, right?
03: A.    It says "critical/major" audit
04: findings, so it does not talk about
05: "problems," and so this is critical and
06: major.
07: Findings in audits are also
08: terminology that are very specific to this,
09: yeah -- I mean, to this area of expertise, so
10: you'd have to talk to Andy Hargreaves to get
11: more insight into what the definitions for
12: "critical and major finding" means.
13: MR. DENTON:  Well, let's go on
14: to the next document, 447607 and 608,
15: which is another e-mail and
16: attachment.
17: (Whereupon, Deposition Exhibit
18: Derix-45, E-mail(s) re: FDA Minutes
19: 7 April 2010 Meeting,
20: XARELTO_BPAG_01254606 -
21: XARELTO_BPAG_01254607, Ref. 447607,
22: was marked for identification.)
23: (Whereupon, Deposition Exhibit
24: Derix-46, FDA Meeting Minutes,

01: 00524:   involved with Xarelto development in Janssen
02: and Bayer.
03: Q.    Let's read what this is.
04: Basically, the cover e-mail says, "Please
05: find the FDA meetings regarding the minute
06: where we discussed our RECORD4 study data [as
07: read]."
08: A.    "Verification plan," yeah.
09: Q.    Yeah, "verification plan,"
10: right.
11: "The minutes confirm that until
12: DSI reviews the third-party Falcon audits,
13: they cannot comment on our strategy to verify
14: RECORD4."
15: Do you see that?
16: A.  I see that.
17: Q.    Okay.  And you received this
18: e-mail in -- at your work and in your
19: business as a regulatory affairs person,
20: correct?
21: A.  Yes, I received this e-mail in
22: the collaboration with my regulatory
23: colleagues, right.
24: Q.    Right.  I mean, this is the

01: 00523:      XARELTO_BPAG_01254608 -
02: XARELTO_BPAG_01254626, Ref. 447608,
03: was marked for identification.)
04: BY MR. DENTON:
05: Q.    Okay.  I have two documents for
06: you, Dr. Derix.  I have a cover e-mail, which
07: is Derix-45, Record No. 447607, and the
08: attachment, which is Exhibit 46, Record
09: No. 447608.  I hand those to you, ma'am.
10: A.  Thank you.
11: Q.    Again, this is an e-mail that
12: you did not send, but you did receive.  You
13: got it from Andrea Kollath, right?
14: A.  Yes, that's right.
15: Q.    Yeah, I think you're a
16: recipient in the second line over there to
17: the right.  Do you see your name?
18: A.  I see my name.
19: Q.    So this is another document
20: being sent around by regulatory folks and
21: being shared with the clinical and expert
22: team on Xarelto, fair?
23: A.  Yes, it's a document shared by,
24: yeah, a number of colleagues that are -- were

01: 00525:   kind of work you do, or did at that time?
02: A.  Yes, at the time.
03: Q.    All right.  And then the
04: attachment is an official document from the
05: FDA, right?  The minutes were attached?
06: A.  Yes, the attachment is other
07: meeting minutes.
08: Q.    Right.  And, again, I don't
09: want to go through all of this, but it
10: continues to talk about -- well, let's just
11: look at some of it.
12: Let's look at page 2 of the
13: minutes, which are actually at the Bates
14: number -- the bottom -- number at the bottom,
15: which ends in 614.  Maybe that will help you.
16: And, Evan.
17: And it says "page 2" at the
18: top, but that's because it's another
19: document.  Do you see that?
20: A.  Yes, I see that.
21: Q.    And one of the questions,
22: Question 1, "Data Verification Plan.  Does
23: the agency agree with the plan to perform
24: data verification at the sites participating

01: 00526:   in RECORD4 to identify unreported AEs and
02: SAEs," adverse events and serious adverse
03: events.
04: Do you see that?
05: A.    Yes, I see that.
06: Q.    All right.  And, again, the FDA
07: wants to review the full Falcon audits before
08: they'll comment on the data reliability.
09: Do you see that?
10: A.    Yes, I see that.
11: Q.    It goes on to say, and I'm
12: paraphrasing, given the number and type of
13: violations revealed by the audit, DSI are
14: concerned that the data in RECORD4 may not be
15: reliable, and a definitive assessment will
16: not be feasible until the agency evaluation
17: of RECORD4 and Falcon audit results, right?
18: A.    Yes.  That's how --
19: Q.    So what's going on here is your
20: company is trying to convince the FDA that
21: RECORD4 data is good, and the agency keeps
22: telling you no.
23: That's what's going on, right?
24: A.    That's not my interpretation of

p. 00526

01: 00528:          Do you see that?
02: A.    I see that sentence, yes.
03: Q.    It says, "Please explain this
04: finding.  What was the number of subjects
05: unblinded?  How did the coagulation
06: measurement unblind these study subjects?"
07: Do you see that?
08: A.    I see those questions, yes.
09: Q.    You understand what a
10: coagulation measurement is, don't you?
11: That's some of the laboratory work done in
12: these studies?
13: A.    Yes, that's my understanding,
14: that coagulation parameter measurements can
15: mean any blood coagulation parameter, yeah,
16: measured from patient's plasma samples.
17: Q.    Right.  And that's part of the
18: data that's going into this exposure-response
19: project for the FDA --
20: A.    I can --
21: Q.    -- coagulation parameters,
22: measurements?
23: A.    It's not my understanding as it
24: reads here from this text, so here the

p. 00528

01: 00527:   the -- what is written here, so I was really
02: trying to get an understanding whether the
03: plan to run the Falcon audits past
04: independent additional audits would help FDA
05: to inform, yeah, the decision-making process.
06: And here they clearly say they
07: would have to see the outcome or the
08: different report before they can comment on
09: the procedure.
10: Q.    Let's go to page 4 of this
11: document, which is ending in Bates 616.  You
12: see where it says, "DSI Questions and
13: Comments for Janssen," and they're commenting
14: on your briefing submission that we've talked
15: about, right?
16: A.    Yes, it's referring to a page
17: as to the content of the background package.
18: That's the briefing package, in my
19: understanding.
20: Q.    And it talks about not just
21: adverse events, but it talks about the audit
22: identified only a few subjects that were
23: unblinded, potentially unblinded through the
24: measurement of local coagulation parameters.

p. 00527

01: 00529:   concern was -- I mean, there were certainly
02: in the protocol planned coagulation parameter
03: measurements and planned plasma sample
04: collection.
05: But here it's talking about
06: local coagulation parameter measurements, so
07: in my interpretation that means that
08: physicians do additional work -- additional
09: coagulation parameter measurements outside of
10: the protocol.
11: And the concern raised here was
12: that such additional local coagulation
13: parameter measurement could result in a
14: patient unblinding, so the physicians could
15: potentially draw conclusions in which -- in
16: which group Bayer -- or a new investigational
17: drug the patient was randomized.
18: And here this criticism is
19: clearly going about the potential number of
20: patients that might have been unblinded in
21: the trial, which is usually a concern of
22: Bayer's, of the physician in a trial.  So if
23: there's unblinding in a trial, there's a
24: concern that physicians might be biased.

p. 00529

Page 29

01: 00530:          And so here that's my
02: interpretation of this question.
03: MR. DENTON:  Okay.  That's not
04: what my question was.  I move to
05: strike.
06: BY MR. DENTON:
07: Q.    I simply asked:  In the
08: exposure-response model, are coagulation
09: parameters and measurements, including plasma
10: concentrations, being used in the
11: exposure-response model, or should we have to
12: ask Dr. Kubitza?
13: MR. HOFFMAN:  Objection to the
14: form of the question, asked and
15: answered.
16: A.    I confirm to you that in the
17: trial programs there was prespecified plasma
18: sample taking process, but it's not my
19: understanding that this comment here is
20: referring to the predefined protocol -- in
21: the protocol, predefined plasma sampling.
22: So this is -- my understanding
23: is that this comment here is referring to
24: additional individual local coagulation

p. 00530

01: 00531:    parameter measurements the physicians are
02: taking.
03: MR. DENTON:  All right, I move
04: to strike.  I'll move on.  We clearly
05: aren't communicating.
06: BY MR. DENTON:
07: Q.    Let's look back at page 4, same
08: area, paragraph 2.  This works easier.  "For
09: RECORD1, 2 and 3, the sponsor states that the
10: Falcon -- that Falcon determined that
11: monitoring was effective at 65 to 75% of the
12: audited sites."
13: Do you see that?  It's the same
14: page we were on, ma'am.
15: A.    Yeah, you read the text
16: correctly.
17: Q.    So Falcon is the independent
18: auditor, right?  And they're determining that
19: the sites were only effectively monitored in
20: RECORD1, 2 and 3, 60 to 75% of the sites that
21: were audited?  Right?
22: A.    That's how it is written here
23: in the sentences.
24: Q.    So -- so only 60 to 75% of the

p. 00531

01: 00532:    sites audited were doing the study correctly?
02: MR. HOFFMAN:  Objection to the
03: form -- sorry.
04: BY MR. DENTON:
05: Q.    Is that the way clinical trials
06: are conducted?
07: A.    You're implying an
08: interpretation here in what it means,
09: "monitoring was effective."  And I think,
10: yeah, we will have to look into really what
11: is behind -- in terms of fact, behind the
12: sentence.
13: And so I would like to defer
14: this topic to my colleague who can better
15: inform you about the background of this
16: statement here.
17: Q.    Well, I will ask that person
18: hopefully those questions, but you as a
19: regulatory affairs person received this
20: e-mail.  You work in regulatory affairs, and
21: you read this document when you received it,
22: correct?
23: A.    Yes, that's correct.
24: Q.    All right.  Let's continue to

p. 00532

01: 00533:    go on.
02: They ask a question, "What is
03: the percentage for each individual study?"
04: At that point the audits don't
05: even know how effective all the studies were.
06: We just know that 60 to 75% of the sites
07: audited were not properly monitored, right?
08: A.    That's -- again, I read this
09: differently because it's my understanding
10: that at the point of time when this was
11: discussed with FDA, FDA had received a
12: briefing document which included a summary of
13: the Falcon -- of, I mean -- and so this is
14: just fact-finding questions in my view to say
15: what is the percentage for each individual
16: study.
17: Q.    Well, this is the FDA's
18: response to all that briefing package, way
19: back -- Exhibit 41?
20: A.    Right.
21: Q.    Right?
22: A.    Yeah, and it's my understanding
23: that they did not find this information in
24: the briefing document, and that's why it's

p. 00533

01: 00534:   asked here.
02: Q.   It goes on to say, "We note
03: that effective monitoring was assessed at 35%
04: for the RECORD sites."
05: Do you see that?
06: A.   I see that.
07: Q.   It goes on to say that
08: inadequate monitoring at 25 to 65% of the
09: clinical sites is concerning.
10: It is concerning, isn't it?
11: You agree with that.
12: MR. HOFFMAN:  Objection to the
13: form of the question.
14: A.   FDA clearly states that, yeah,
15: inadequate monitoring at 25 to 65 of clinical
16: sites in that trial is concerning.
17: BY MR. DENTON:
18: Q.   Is it concerning to you as the
19: person -- as the regulatory specialist on
20: this drug at this time?  Was it concerning to
21: you?
22: A.   I mean, certainly in the
23: process of these interactions and these
24: findings and comments made by FDA, I took it

p. 00534

01: 00535:   very serious and followed up with the team.
02: We had intensive discussions and, yeah,
03: provided FDA as much as possible information
04: we could to work -- to work with FDA and to
05: alleviate their concerns.
06: Q.   Well, let's continue to talk
07: about their concerns.  Let's continue to
08: read.  We'll start over on that sentence.
09: "Inadequate monitoring at 20 to
10: 65% of the clinical sites is concerning and
11: may call for further measures to assure data
12: integrity before any or all of the data from
13: RECORD1, 2, 3 and 4 are determined to be
14: acceptable."
15: Do you see that?
16: A.   Yes, I see that.
17: Q.   So even after the company's
18: complete response, this lengthy document,
19: this document you submitted back on
20: April 10th with almost a hundred pages of
21: explanations -- 88 pages of explanations, the
22: FDA is still concerned about the data from
23: RECORD1, 2, 3 and 4, correct?
24: A.   One correction.  So it was

p. 00535

01: 00536:   not -- I mean, it was not the complete
02: response, so it was the background
03: information package for the Type C discussion
04: meeting that occurred.
05: Q.   Yeah, Exhibit 41, right?
06: A.   Yeah.
07: Q.   And it's 88 pages, right?
08: A.   Yes, exactly.  So that was the
09: background briefing package to inform for
10: this meeting.
11: Q.   Right.
12: A.   And so in that regard, I concur
13: with you that after FDA had seen this
14: background briefing document, and they still
15: had these open questions.
16: Q.   And then it goes on to say,
17: "Regarding the sponsor's proposal for further
18: additional -- or further auditing of
19: RECORD4."
20: Do you see where I'm reading
21: from?
22: A.   Yes.
23: Q.   It says, "How was Parexel
24: chosen?"  Who is Parexel?

p. 00536

01: 00537:   A.   Parexel is a clinical research
02: organization that is offering various
03: services to the pharmaceutical industry in
04: the context of running clinical trials.
05: Q.   Okay.  So do you know how
06: Parexel was chosen?
07: A.   No, I don't recall it.  I was
08: not involved in the decision-making process
09: because that's not in my area of expertise.
10: So you'd have to follow up with
11: the clinical representatives in the team and
12: also again our colleagues in clinical and
13: quality assurance.
14: Q.   Mr. Hargreaves?  Is that where
15: all this is headed?
16: A.   Mr. Hargreaves is one of the,
17: yeah, people to talk to about clinical
18: quality assurance measurements, and, yeah,
19: Scott Berkowitz is the person to talk to
20: about general questions regarding the
21: clinical programs, phase three.
22: Q.   Let's go back to an earlier
23: page in this document, which is page 2 of
24: the -- well, let's just go back to the

p. 00537

Derix, Andrea Ph.D. - 2 - Volume 2 - 03/02/2016

01: 00538:   first -- I'm sorry.  Sponsor attendees,
02: that's where I want to go.  All right.
03: This meeting on April 7th,
04: again, you were one of the participants as
05: senior global regulatory specialist, right?
06: A.    I was one of the participants,
07: yes.
08: Q.    And you were at that meeting?
09: A.    I was at that meeting, yes.
10: Q.    Let's go to page 2.  It talks
11: about slides 5 through 9 down at the bottom.
12: Do you see that?
13: A.    Yes, I see that.
14: Q.    And, "FDA expressed concerns
15: regarding the 603 additional adverse events
16: not reported but identified in the Falcon
17: audit."
18: Do you see that?
19: A.    I see that comment, yes.
20: Q.    And, again, it goes on to the
21: next page.  "These events were not specific
22: to RECORD4, but they also were identified in
23: RECORD1, 2 and 3."
24: Do you see that?

01: 00540:   documents to the side.  Put your regulatory
02: hat on.
03: Do you know what an FDA
04: compliance review is?
05: MR. HOFFMAN:  I object to the
06: preface of the question.
07: MR. DENTON:  I'm sorry, I'll
08: strike that.
09: MR. HOFFMAN:  It's okay.  It's
10: okay.
11: MR. DENTON:  I'm just trying to
12: focus her on it.
13: MR. HOFFMAN:  I just have to
14: protect the record.
15: MR. DENTON:  I understand.
16: I'll withdraw everything.
17: BY MR. DENTON:
18: Q.    Do you know what an FDA
19: compliance review is?
20: A.    I have some understanding, but
21: as I'm not, yeah, the U.S. -- specific U.S.
22: regulatory affairs person, so I had always,
23: yeah, my colleagues in the U.S., like Larry
24: Winick, and also in Janssen who are more

01: 00539:      A.    I see that, yes.
02: Q.    And it goes on to say that your
03: company -- or J&J, your partner, Bayer's
04: partner, that they wanted to focus on RECORD4
05: because it was a problematic study and it
06: appeared to be the most egregious.
07: Do you see that?
08: A.    I see that.
09: Q.    Those were the company's words,
10: that the RECORD4 was the "problematic study"
11: and the "most egregious," right?  Right?
12: A.    Yes, that's as -- as mentioned
13: here in the minutes that are stated as a
14: company statement.
15: Q.    All right.  And then it went
16: longer and longer.  Then the FDA, the
17: department of DSI, did a compliance
18: evaluation or actually known as a
19: compliance -- an FDA compliance review,
20: correct?
21: A.    I don't see where --
22: Q.    I'm going to a new document.
23: A.    Oh, okay.
24: Q.    I'm just asking you to put the

01: 00541:   familiar in detail with the FDA proceedings.
02: I relied on them.
03: But I have, yeah, attended
04: those meetings and so, by being involved,
05: have some understanding of this procedure.
06: (Whereupon, Deposition Exhibit
07: Derix-47, FDA Compliance Review
08: [No Bates], was marked for
09: identification.)
10: BY MR. DENTON:
11: Q.    Okay.  I understand.  Let me
12: hand you Exhibit 47, if I can almost get it
13: to you.  Thank you.
14: Have you seen this document
15: before?
16: A.    Yeah, it's very likely that
17: I've seen it, but as I said, it's a long time
18: ago, and we had parallel procedures running
19: in Europe and the U.S., and so oftentimes I
20: was not as deeply involved in the review of
21: the U.S. documents while focusing on the
22: approval procedures in Europe.
23: Q.    But this compliance review is
24: kind of the written conclusions after all the

01: 00542:   investigation is done with respect to
02: RECORD1, 2, 3 and 4, and this was the
03: official position of the FDA after reviewing
04: all that document -- all those documents,
05: correct?
06: A.    Yes, it is my understanding
07: that this was a report that was, yeah, issued
08: by the Division of Scientific Investigations
09: to the reviewing division for the file, which
10: was division of hematology product, in which
11: they, yeah, summarized their review findings.
12: Q.    So let's just identify this.
13: This is a compliance review.  It's dated
14: May 24th, 2001, correct?
15: A.    2011.
16: Q.    I'm sorry, 2011.  Thank you.
17: A.    Yes.
18: Q.    And this is an official
19: document issued to your company by the FDA,
20: and it was actually from the Division of
21: Scientific Investigations as you point out,
22: DSI, correct?
23: A.    Yes, it's an official FDA
24: memorandum document.  It's, yeah, addressed

01: 00544:   and that's the RECORD studies, correct, that
02: were submitted in support of that IND, right?
03: Along with a lot of other documents.
04: I mean, we're talking about
05: RECORD here, right, in this indication?
06: A.    Yeah, the IND is referencing to
07: all the information they had at that time
08: being submitted to the division of
09: hematology.
10: Q.    All right.
11: A.    And that's, yeah, dealing with,
12: in general, VTE prophylaxis and VTE
13: treatment.
14: Q.    Okay.  And that's what it says.
15: Maybe I should have just read it with you.
16: It would have been easier than discussing it.
17: "IND 64,892 for rivaroxaban was
18: submitted May 29th, 2002, for the treatment
19: and secondary prophylaxis of VTE by Bayer."
20: Do you see that?
21: A.    I see that.
22: Q.    All the clinical trials
23: submitted with the current NDA were conducted
24: by Bayer, correct?

01: 00543:   from one division in FDA to another, but it's
02: part of the NDA.
03: Q.    All right.  And let's look down
04: at "Indications."  This is the indication for
05: prophylaxis of deep vein thrombosis and
06: pulmonary embolism in patients undergoing hip
07: or knee replacement surgery; is that correct?
08: A.    That's correct.
09: Q.    And that would be RECORD
10: studies -- phase three studies, 1, 2, 3 and
11: 4, correct?
12: A.    Yes, those four studies were
13: submitted as part of the NDA to support this
14: approval of this indication --
15: Q.    All right.  So I'm not going to
16: go through this hundred-page document
17: completely, but I do want to point some
18: things out with you.
19: Let's go to page 2.  Let's go
20: down.  Do you see where it starts, third
21: paragraph, "IND 64,892"?  Do you see where
22: I'm reading from?
23: A.    Yes, I see.
24: Q.    Okay.  It says in IND 64,892 --

01: 00545:        A.    That's correct.
02: Q.    And they're right about that,
03: correct?
04: A.    Yes, that's correct.
05: Q.    And I asked you earlier when
06: the NDA was transferred to Janssen.  Let's
07: just read what the FDA says.
08: "Approximately one month prior
09: to the submission of this NDA, Bayer sold the
10: rights of reference and the use of
11: investigations to Johnson & Johnson."
12: Do you see that?
13: A.    Yes, I see that comment.
14: Q.    So what happened was, is Bayer
15: did all the work, RECORD1, 2, 3 and 4, and
16: then a month before this submission for
17: approval -- one month before, transferred
18: that to Johnson & Johnson -- or actually
19: Janssen Pharmaceutical, right?
20: A.    Right, that's what it says
21: here.  It gives more specifically the date.
22: I did not recall beforehand.
23: Q.    I understand you can't remember
24: everything, but if we refresh your memory,

01: 00546:   that's good.
02: And then this document just
03: goes through on and on and on about -- and we
04: won't go through all of it, about the
05: problems in the various RECORD studies,
06: correct?
07: MR. HOFFMAN:  Objection to the
08: form of the question.
09: A.    The document is a comprehensive
10: summary, yeah, about the evaluation of the
11: DSI division, and, yeah, it contains detailed
12: information on findings of each of the
13: studies.
14: BY MR. DENTON:
15: Q.    Let's look at some of the major
16: summaries.  Let's go to page 23 of the
17: document down at the bottom.  It goes on to
18: say -- and this is after your company, Bayer,
19: and Janssen -- your companies, submitted all
20: your arguments, written or otherwise, in
21: support of your RECORD study data, right?
22: A.    I would have to put this --
23: this timing into context, when it was exactly
24: issued.

p. 00546

01: 00547:        Q.    This is May 24th, 2011.  All
02: those other documents were before that.
03: A.    Yes.
04: Q.    Okay.  Let's look at the bottom
05: of page 23.  "Overall, monitoring
06: deficiencies were noted for all RECORD
07: studies -- all four RECORD studies.  However,
08: in comparison, RECORD1 through 3, the extent
09: and scope of the monitoring deficiencies
10: noted for RECORD4 are considered more
11: significant and raise concerns regarding the
12: pervasiveness of the monitoring deficiencies
13: for the other sites not inspected or not
14: audited, as such undermine the confidence in
15: reliability of the data."
16: Do you see where I'm reading?
17: A.    Yes, I see the paragraph.
18: Q.    Okay.  So first of all, not all
19: sites were inspected or audited, correct?
20: That's what this paragraph says.
21: MR. HOFFMAN:  Objection to the
22: form of the question.
23: A.    It is my understanding from,
24: yeah, what I read here in the paragraph that

p. 00547

01: 00548:    it's talking about, yeah, RECORD4 and as I
02: said, raises -- yeah, raised general concern
03: about reliability of this specific RECORD4
04: trial at FDA.
05: BY MR. DENTON:
06: Q.    Well, actually, the paragraph
07: talks about monitoring deficiencies were
08: noted for all four RECORD studies, right,
09: clearly pointing out that RECORD4 was worse
10: than RECORD1 through 3.  That's what they're
11: saying, right?
12: A.    It says that, in comparison to
13: RECORD1 to 3, the extent and scope of
14: monitoring deficiencies noted for RECORD4 are
15: considered more significant.
16: Q.    Right.  But I guess the point I
17: was trying to make, not even -- even these
18: deficiencies that were found, this isn't an
19: inspection of all the sites or an auditing of
20: all the sites.  This is just a sample size, a
21: small sample size of all the study sites.
22: A.    That is typically what happens,
23: and we talked beforehand that it's the
24: typical process of selecting according to an

p. 00548

01: 00549:    audit plan specific sites, and that was also
02: done here in the program.  And then in the
03: course of the discussions with FDA, the
04: extent of the audits was -- was increased by
05: the additional audits that were performed.
06: I don't have the detailed
07: knowledge to comment on which trial exactly
08: was audited 100% and how many audits were
09: conducted for each of the trials because
10: that, to my memory and understanding, varied
11: from trial to trial depending on the number
12: of concerns that the FDA had raised.
13: Q.    I understand you didn't do the
14: audits or the monitoring or the inspections.
15: But my point is simply this:
16: We don't even know because not all sites were
17: inspected or audited.  We really don't even
18: know how bad it was, do we --
19: MR. HOFFMAN:  Objection --
20: BY MR. DENTON:
21: Q.    -- in these clinical trial
22: sites?
23: MR. HOFFMAN:  Objection to the
24: form of the question.

p. 00549

01: 00550:      A.   I do not agree to your
02: statement because typically as a normal
03: process in clinical trials, the assessment is
04: being done based on, yeah, the audit plan and
05: a sample audit that have been taken.  So this
06: is not unusual.
07: BY MR. DENTON:
08: Q.    It's not -- I didn't ask
09: whether it was unusual or not.  I'm just
10: simply saying: Bayer doesn't know, FDA
11: doesn't know, really how bad it was because
12: not all the sites were audited or inspected
13: across RECORD1, 2, 3 and 4, true?
14: MR. HOFFMAN:  Objection to the
15: form of the question, asked and
16: answered.
17: BY MR. DENTON:
18: Q.    You just don't know?
19: MR. HOFFMAN:  Objection to the
20: form of the question, asked and
21: answered.
22: A.    I do not agree to your
23: statement.  I mean, otherwise, FDA would not
24: have given approval to the indication if they

01: 00551:   had not been -- after seeing all the
02: information that was submitted and that they
03: evaluated, yeah, based on RECORD1, 2 and 3.
04: So they excluded RECORD4 from
05: the approval because, for RECORD4, clearly as
06: is stated here, the number of deficiencies
07: led them to consider RECORD4 as not pivotal
08: trial anymore.  So they excluded it and --
09: but RECORD1, 2 and 3, which they also looked
10: intensively at, were considered finally for
11: approval.
12: BY MR. DENTON:
13: Q.    Well, I understand that Janssen
14: was able to convince the FDA to give you
15: approval.  I understand that.
16: We don't know how bad it is to
17: this day, how many missed events were in the
18: clinical trials of the RECORD study, the
19: adverse events.  We don't know, do we?
20: MR. HOFFMAN:  Objection to the
21: form of the question.
22: MS. TERSIGNI:  Objection.
23: A.    I do not agree to your
24: statement also about -- it's not about

01: 00552:    convincing the health authority.  So that's
02: not really -- it's based on factual
03: information that is being provided to the
04: health authority to address their questions,
05: and they make their independent assessment on
06: this.
07: BY MR. DENTON:
08: Q.    Let's go to page 39 of this
09: document, Roman numeral V.  DSI -- I'll wait
10: until you get there.  I'm sorry.
11: Do you see where I -- Roman
12: numeral V, "DSI Overall Assessments of
13: RECORD1, 2, 3 and 4, based on audits and FDA
14: inspections"?
15: Do you see where I'm reading
16: from?
17: A.    I'm not yet there.  Okay.
18: Yeah.
19: Q.    Let's go to the second
20: paragraph, "Clearly drug accountability
21: issues at a significant number of sites in
22: each -- each RECORD study raises fundamental
23: issues whether DSI is able, based on
24: inspectional findings and audit results, to

01: 00553:    confirm that subjects at each site actually
02: received study drug as given in line listings
03: submitted to the FDA [as read]."
04: Do you see that?
05: A.    I see the sentence, yes.
06: Q.    "Drug accountability issues" --
07: continuing -- "were noted in all four RECORD
08: studies, ranging from 27 to 30% of the
09: audited sites [as read]."
10: Do you see that?  Do you see
11: where I'm reading from?
12: A.    Yes, I see where you're reading
13: from.
14: Q.    It continues, "Since only three
15: RECORD sites were audited" -- and there were
16: hundreds of RECORD3 sites, right?
17: You see where we're reading?
18: A.    Yes, uh-huh.
19: Q.    Three sites were audited, and
20: there were hundreds of those, right?
21: A.    Yeah, again, you would have to
22: look up the numbers of sites.  I cannot
23: comment on, yeah, the number of sites.  Yeah,
24: we would have to look it up.

Derix, Andrea Ph.D. - 2 - Volume 2 - 03/02/2016

01: 00554:    Q.   So it says, "Since only three
02: RECORD sites were audited, the
03: significance -- the statistical significance
04: of this finding is uncertain."
05: Do you see that?
06: A.    Yes, I see the sentence.
07: Q.    Let's continue -- I mean, we
08: could be here for days reading all these
09: findings, so let's skip over some.  Let's go
10: to --
11: MR. HOFFMAN:  Objection to the
12: preface.
13: MR. DENTON:  I'll withdraw
14: that.
15: MR. HOFFMAN:  Thank you.
16: BY MR. DENTON:
17: Q.    "If monitoring is inadequate at
18: the majority of sites examined, it becomes
19: impossible for DSI to prove -- provide
20: assurance that study conduct flaws (e.g., in
21: drug accountability) did not occur at the
22: vast majority of the clinical sites which
23: were not audited or inspected; or that the
24: other undetected flaws impacting the safety

p. 00554

01: 00555:    and efficacy of this data did not occur.
02: Do you see where I'm reading
03: from?
04: A.    I see where you're reading
05: from.
06: Q.    So my point is this, is that we
07: don't know, even the regulators don't know
08: how bad it was on drug accountability,
09: missing adverse events, not following
10: protocols, because they didn't even have the
11: opportunity to inspect and audit all the
12: sites, right?
13: MR. HOFFMAN:  Objection, asked
14: and answered.
15: A.    I can't follow your conclusion
16: here, so it's certainly -- you read the
17: document correctly here as it is, but it's
18: just an extract of the entire, yeah,
19: information that DSI looked at.  And so you
20: would have to look at -- in the totality, and
21: we cannot just extract just one sentence.
22: And as I previously mentioned,
23: this report was provided to the reviewing
24: division, the hematology division.  And so

p. 00555

01: 00556:    finally after internal FDA discussions, they
02: deemed that RECORD1, 2, 3 was appropriate for
03: approval of the indications.
04: MR. DENTON:  Move to strike as
05: nonresponsive.
06: BY MR. DENTON:
07: Q.    Let's keep reading in context.
08: "Given the relatively small percentage of
09: subjects and sites examined, consideration
10: must be given to the interrelated study
11: conduct issues (the number of unreliable
12: sites together with ineffective monitoring in
13: a given study); that is, the more essential
14: elements of good study conduct that are
15: defective in a given study, the more likely
16: the overall data integrity for that study is
17: unreliable."
18: Do you see that?
19: A.    I see that paragraph, yes.
20: Q.    So my point is simply this:  It
21: was a relatively small amount of the study
22: sites that were, in fact, inspected and
23: audited.  You will agree with that, correct?
24: A.    I cannot agree to the

p. 00556

01: 00557:    general -- yeah, what you consider as a
02: small, so that is really upon the experts to
03: decide or to comment on what number of sites
04: is being considered small, sufficient, or
05: however you would like to call it.
06: And so, therefore, I would like
07: to refer this topic really to an expert
08: discussion, to colleagues who regularly are
09: involved in clinical study audits who can,
10: yeah, better put this in perspective.
11: Q.    Let me just ask you this:  When
12: you received this document as the global
13: regulatory strategist for Xarelto, the FDA
14: said to you that there was a relatively small
15: percentage of subjects and sites examined,
16: right?
17: A.    Yeah, I lost you way earlier in
18: the text, but that's...
19: Q.    Quote, "Given the relatively
20: small percentage of subjects and sites
21: examined."
22: Those were the FDA's words,
23: right?
24: A.    Yes, that's FDA's assessment of

p. 00557

Derix, Andrea Ph.D. - 2 - Volume 2 - 03/02/2016

01: 00558:   the --
02: Q.   And you received this document,
03: right?
04: A.   Yes.  But normally I would --
05: MR. DENTON:  That's all I
06: asked.
07: A.   -- really take the document --
08: MR. HOFFMAN:  It's okay.
09: THE WITNESS:  Okay.
10: MR. HOFFMAN:  It's okay,
11: Doctor.
12: MR. DENTON:  I'm not trying to
13: cut you off, but I do have a time
14: limit, and I'm just looking for
15: responsive answers, okay?
16: THE WITNESS:  I understand.
17: BY MR. DENTON:
18: Q.   Let's continue.  "Lastly" --
19: you see where we're at?
20: A.   Yeah.
21: Q.   "Lastly DSI considered the
22: relative number of unreported adverse events
23: and serious adverse events in the assessment
24: of the overall study integrity."

01: 00559:         Do you see that?
02: A.   Yes, thank you.
03: Q.   Continues, "Although each
04: RECORD study had flaws which had the
05: potential to affect data integrity, DSI took
06: a global approach in applying the analysis to
07: each study conduct element to overall RECORD
08: study reliability."
09: Do you see that?
10: A.   I see that sentence, yes.
11: Q.   Let's then -- we're just going
12: to have to skip some of this.  I just can't
13: get through all of it.  Page 42.
14: A.   Yes.
15: Q.   Let's talk about the RECORD4
16: sites.  It says, "Eight of 16 (50%) of the
17: RECORD sites were audited."
18: Do you see that?
19: A.   Yes, I see that.
20: Q.   50%, then, of the audited sites
21: inspected by the FDA ended with an evaluation
22: that the data from the sites was not
23: reliable.
24: Do you see that?

01: 00560:         A.   I see that.
02: Q.   Drug accountability
03: deficiencies, violation of good clinical
04: practices.  Falsification?  Do you see that?
05: Missing records, improper study drug dose --
06: or storage -- study drug storage.  Do you see
07: that?
08: A.   Yes, I see that.
09: Q.   50% of the audited sites had
10: falsification and missing records and
11: improper reporting?
12: MR. HOFFMAN:  Objection to the
13: form of the question.
14: BY MR. DENTON:
15: Q.   50%?
16: MR. HOFFMAN:  Objection to the
17: form of the question.
18: A.   That's not what it says, but --
19: BY MR. DENTON:
20: Q.   That's exactly what it says.
21: MR. HOFFMAN:  Don't interrupt
22: her.
23: MR. DENTON:  Go ahead and
24: answer.

01: 00561:         MR. HOFFMAN:  Go ahead and
02: finish your answer, Doctor.
03: A.   It says that overall, in the
04: totality, eight of 16 sites, which is 50%
05: that were inspected.  And there was an
06: evaluation, and then it says -- it gives a
07: number of things that were part of the
08: evaluation.
09: But in my interpretation, it
10: doesn't mean that in 50% of the sites was --
11: each of the mentioned violations was found.
12: BY MR. DENTON:
13: Q.   That's my point.  We just don't
14: know.  But the statistics are that 50% of the
15: sites in RECORD4 inspected, the data wasn't
16: reliable, the documents were falsified,
17: records were missing, and improper study drug
18: storage.
19: That's what the inspectors
20: found.  It's right here in black and white,
21: right?
22: MR. HOFFMAN:  Objection to the
23: form of the question, asked and
24: answered.

01: 00562:       A.   I do not agree.  It just talks
02: about these eight of six -- of 16 sites.
03: BY MR. DENTON:
04: Q.    Okay.  Let's move on.
05: It goes on to say, "It's
06: important to note that these sites audited
07: represented only 7% of the total sites and
08: only 10% of the total subjects of the RECORD4
09: study."
10: Do you see that?
11: A.    Yes, I see that.
12: Q.    So only 10% of the patients in
13: the RECORD4 study were actually audited and
14: inspected.  That's what this says.
15: A.    As far as I read it, it's
16: referring to FDA audits, so -- and we talked
17: beforehand that there were additional audits
18: that were taken into consideration.
19: And I would have to take more
20: time to read the paragraph correctly, but my
21: understanding is that here in this paragraph
22: it's only talking about sites that were
23: inspected by FDA.
24: Q.    Well, I'll help you there,

01: 00563:    because the FDA redacts at your company's
02: request -- that (b)(4) redaction, that is a
03: third party.  That's Falcon.
04: It says, "Four sites were
05: audited by" -- see the redaction?  That's
06: Falcon -- "or inspected by FDA."
07: Do you see where I'm reading?
08: That what that is.
09: MR. HOFFMAN:  Objection to the
10: form of the question.
11: BY MR. DENTON:
12: Q.    We're talking about both the
13: Falcon inspections and the FDA inspections,
14: the third party that's been redacted from
15: this public document.
16: And my point is simply this,
17: that only 10% of the total subjects in the
18: RECORD4 study were actually audited.
19: A.    Of the total subjects, yeah,
20: that's what it says, 10% total subjects in
21: the RECORD --
22: Q.    All right.  And it goes on to
23: say that the DSI recommends that the data
24: from RECORD4 be considered unreliable?

01: 00564:       A.   Yes, that's how this is written
02: here in the document, right.
03: Q.    All right.  Let's go to the
04: last page -- maybe that summary helps --
05: page 45.  It says, "In summary, the pervasive
06: findings of deficient clinical trial
07: monitoring, high number of clinical
08: investigator sites with data assessed as
09: unreliable, failure to follow protocol,
10: improper randomization, postoperative
11: randomization, deficient clinical trial
12: conduct, including the failure to report" --
13: and this is what has me interested --
14: "failure to report adverse events and serious
15: adverse events, DSI cannot provide a
16: favorable assessment of RECORD4 data
17: reliability for the remaining unaudited sites
18: based on the extrapolation of the third-party
19: audit findings."
20: Do you see where I'm reading
21: from?
22: A.    Yes, I see where I'm
23: reading from -- what you're reading from, and
24: that is also, yeah, congruent with what I

01: 00565:    said before about the assessment of RECORD4
02: data.
03: MR. DENTON:  Let's go to a new
04: document, Exhibit -- or Record
05: No. 3160467.
06: (Whereupon, Deposition Exhibit
07: Derix-48, E-mail(s) re: NDA 22-406 FDA
08: Telcon on RECORD4,
09: XARELTO_BPAG_17026015 -
10: XARELTO_BPAG_17026019, Ref. 3160467,
11: was marked for identification.)
12: BY MR. DENTON:
13: Q.    Here's an e-mail, Derix
14: Exhibit 48, which is also Record No. 3160467,
15: and you'll see this is dated in June,
16: June 27th, 2011.  Do you see that at the top?
17: A.    Yes.
18: Q.    It's an e-mail string, and
19: before we go through it, I just want to put
20: this in context.
21: That document we just talked
22: about, that compliance review where all these
23: findings were made and we just discussed, was
24: dated May 24th, 2011, right, that compliance

Derix, Andrea Ph.D. - 2 - Volume 2 - 03/02/2016

01: 00566:   review?
02: A.     Uh-huh.
03: Q.     So this is about a month later,
04: right?  June 27th, 2011.
05: A.     Yes.
06: Q.     And this looks like some
07: regulatory correspondence that you were
08: involved with, correct?
09: A.     Yes, that's correct.
10: Q.     And it gets confusing because
11: one of your regulatory colleagues is also
12: named Andrea, right?
13: A.     Right.
14: Q.     So let's go to page -- let's go
15: to the end of this e-mail.  The original
16: e-mail was written by Andrea Kollath, global
17: regulatory affairs, right?
18: A.     Yeah, that's also how I read
19: it.
20: Q.     Okay.  And then -- and it says
21: "Despite" -- it says, "Dear all" -- this is
22: page 3 -- "Despite several alternative
23: proposals presented by the team, the final
24: decision by hematology division is that

p. 00566

01: 00567:   RECORD4 study data cannot be included in the
02: USPI currently under discussion," right?
03: A.     Yes, that's correct.
04: Q.     And that's because they found
05: that study data to be unreliable, right?
06: A.     Yes.  We discussed before it
07: was the assessment that FDA made, and so they
08: deemed that the RECORD4 study data could not
09: be included in the --
10: Q.     Okay.  So after all this --
11: these problems with RECORD1, 2, 3 and 4, what
12: was your response?
13: MR. HOFFMAN:  Objection to the
14: form of the question.
15: BY MR. DENTON:
16: Q.     Page 1, "Hi, Andrea.  One silly
17: question:  Do you think we can get approval
18: on Friday this week?  My communications
19: people are driving me crazy."
20: You wrote that, didn't you?
21: A.     I wrote that e-mail, yes.
22: Q.     And you're talking about the --
23: who are your communications people you're
24: referring to?

p. 00567

01: 00568:        A.   That's, yeah, typical
02: colleagues who work on external
03: communications, so they prepare, for example,
04: press releases.  And it's very typical that
05: the companies are issuing a press release
06: when an approval is granted on one of the
07: drugs.
08: And so certainly when there is
09: a -- the approval date is approaching, so
10: after the review phase is ended, so this is
11: the so-called action date I'm talking about,
12: the FDA -- the colleagues in the background
13: are already preparing for their
14: communication --
15: Q.     Right.
16: A.     -- ahead.
17: And even though they -- it's
18: not clear whether the approval is going to be
19: granted, they prepare for a scenario -- yeah,
20: a positive scenario that approval is being
21: granted, but also for a scenario that
22: approval is not being granted.  That's the
23: typical process.
24: Q.     Okay.  And she writes back,

p. 00568

01: 00569:   yeah, in four days we should get approval.
02: That was the trigger date that you guys were
03: anticipating, right, at the top?
04: A.     That's how I understand.  So
05: this was, yeah, kind of a quick
06: communication --
07: Q.     Right.
08: A.     -- back and forth, so what --
09: Q.     Did your --
10: A.     -- what the expectation was.
11: Q.     Okay.  Did your communications
12: people put out a press release that
13: department states the investigation found the
14: RECORD4 study is found to be unreliable?
15: Did you put out such a press
16: release?
17: A.     I do not recollect, and I'm not
18: aware of a press release.  But I can also not
19: recall all the texts and -- of the --
20: Q.     The only press release your
21: company sent out and their people were
22: bugging you about is they wanted approval.
23: They didn't want to tell the whole story, did
24: they, about the problems in RECORD4?

p. 00569

00570:

MR. HOFFMAN: Objection to the form of the question.

A. The press release that were -- they were talking about was certainly the press release about the approval of the drug, and it was just also very typical that in press releases that are very high level, typically, yeah, just --

BY MR. DENTON:

Q. Just the good news, right?

MR. HOFFMAN: Don't interrupt.

A. It's not just the good news, but it's very high-level information. It's typically stating the texts of the indication, the exact texts, and some information around it, but not very much in scientific detail. That's not a typical thing for a press release.

But all the scientific background information is being made publicly available by the FDA on their homepages, so everybody can have access to that information, also to the information on the evaluation on the RECORD4 data.

p. 00570

00571:

BY MR. DENTON:

Q. Did you put in the press release that the FDA, after two years of investigation, found RECORD4 data to be unreliable? Was that ever put in a press release by your company, yes or no?

A. I cannot comment on the text of the press release in detail, so -- but as I said, it is not -- I mean, yeah, we have -- we'd have to look back into the press releases.

Q. All right.

A. But otherwise, I cannot comment on your question.

Q. Did your company, when you were global regulatory affairs strategist, send this compliance review to EMA and the rest of the regulators?

A. I -- I would -- I don't recall specifically. So typically the evaluation and the clinical quality assessment is being done by the health authorities independently, and EMA and the European health authorities have done their own audits and have done

p. 00571

00572:

their own evaluation, and that evaluation was already, yeah, finalized at that time. So I would really have to look back. I don't recall exactly the time.

Q. The truth is that no regulator, EMA or anyone, got this compliance review from the FDA that found your studies to be unreliable, the Bayer studies. It was never sent to those other regulators, was it? You would know if it was. You were the global regulatory strategist.

MR. HOFFMAN: Objection to the form of the question.

A. I don't recall because this is a process over ten years, and I can't recall each document that was submitted. I would have to look it up by myself before I can give you a definite response to your question.

BY MR. DENTON:

Q. Let's talk about another subject, the study principal investigator for RECORD4. Do you remember when I asked you whether or not you-all shared with him this

p. 00572

00573:

audit and this finding of unreliability of the RECORD4 data? Do you remember me asking you about that?

A. Yeah, you asked the question about sharing the findings.

Q. Yeah. Don't you think the guy who put his name on a publication would like to know about this audit and the findings of the audit?

MR. HOFFMAN: Objection to the form of the question.

A. I explained to you before that I'm not typically involved in the communication with the steering committees and the information that is being shared during the conduct of the study.

So you would have to ask my colleagues, Scott Berkowitz and his team members, about the communication they had in the course of the study and also afterwards during the process of regulatory approval at FDA.

MR. DENTON: Let's look at

p. 00573

01: 00574:      Record No. 1233459 and the attachment,
02: which is 1233460 --
03: What exhibit are we on?
04: MS. BRITTAIN-LANDERS: You're
05: on 49.
06: MR. DENTON:  -- Exhibit 49 and
07: Exhibit 50.
08: This is 50.
09: (Whereupon, Deposition Exhibit
10: Derix-49, E-mail(s) re: Draft Lancet
11: RECORD4 press release,
12: XARELTO_BPAG_02709474 -
13: XARELTO_BPAG_02709476, Ref. 1233459,
14: was marked for identification.)
15: (Whereupon, Deposition Exhibit
16: Derix-50, BHC News Release, re:
17: The Lancet Publishes RECORD4 Study,
18: XARELTO_BPAG_02709477 -
19: XARELTO_BPAG_02709482, Ref. 1233460,
20: was marked for identification.)
21: BY MR. DENTON:
22: Q.    Let me hand you Exhibit 49 and
23: Exhibit 50.  It's another e-mail that you
24: wrote, with an attachment.

01: 00575:      A.    Okay.
02: Q.    You see this e-mail you wrote
03: on April 29th, 2009?
04: A.    Yes, I see this e-mail.
05: Q.    And maybe if we start at the
06: back, it's an e-mail that's being circulated
07: about a press release about this article.
08: Let's go to page 2 of the
09: RECORD4 in The Lancet publication on May 5th.
10: Do you see that?
11: A.    Yes, I can see that.
12: Q.    And they've got quotes from
13: Dr. Turpie; that was one of the principal
14: investigators.
15: Do you see that?  I think
16: that's on the last page of the e-mail.
17: It goes on to say he's the
18: principal investigator for the RECORD
19: program, the entire RECORD program.
20: Do you see that?
21: A.    Yes, I see that.
22: Q.    Okay.  So basically this is an
23: e-mail going around with a proposed press
24: release concerning publication of the RECORD4

01: 00576:    study data in a medical magazine, correct?
02: A.    That's correct, yes.
03: Q.    And then it comes to you, and
04: on the front page, you say, "This is fine.
05: Thanks for sharing the press release.  Fine
06: from my side," correct?
07: A.    Yes, that's correct.
08: Q.    So you approved -- from your
09: perspective as -- from a regulatory
10: perspective, based on all the knowledge you
11: had, it was okay to send that out, right?
12: A.    Yes.  Typically I -- yeah, I
13: get those -- got those press release drafts
14: and -- for review, and I reviewed this draft
15: and had no -- and said this was okay from my
16: side, yes.
17: Q.    You said it was okay to send
18: out the press release -- let's get this
19: right --
20: MR. HOFFMAN:  Objection to the
21: form.
22: BY MR. DENTON:
23: Q.    -- to publish the RECORD4 study
24: data when you knew, as a regulatory

01: 00577:    specialist, at that time there were all these
02: serious problems with the RECORD4 study and
03: all the ongoing audits, right?
04: A.    I read it, this text.  And,
05: yeah, I agreed with the content of the text.
06: Q.    And there's no mention in this
07: press release of the ongoing audits of
08: RECORD4, the one that was found ultimately to
09: be unreliable.  That's not mentioned
10: anywhere, is it?
11: A.    That's correct.  It's talking
12: about the results of the design and the
13: result of the study.
14: MR. DENTON:  Let's go to the
15: next document, 1221843, and the
16: attachment.
17: (Whereupon, Deposition Exhibit
18: Derix-51, E-mail(s) re: Weekly E-mail
19: #61 RECORD4 Publication Update,
20: XARELTO_BPAG_02548102 -
21: XARELTO_BPAG_02548107, Ref. 1221843,
22: was marked for identification.)
23: (Whereupon, Deposition Exhibit
24: Derix-52, 2009 Turpie et al

01: 00578:      Publication, XARELTO_BPAG_02548108 -
02: XARELTO_BPAG_02548115, Ref. 1221844,
03: was marked for identification.)
04: BY MR. DENTON:
05: Q.    I'm going to highlight your
06: name on this e-mail string, even though it's
07: the original.  It's exhibit -- or Record
08: No. 1221843, Exhibit 51; and 1221844,
09: Exhibit 52.  And I did deface, I guess, the
10: original exhibit.  I put a yellow highlighter
11: on there just so you could find your name in
12: that long e-mail string, just to save some
13: time.
14: Do you see your name on there?
15: A.    I see my name on the e-mail,
16: yes.
17: Q.    And it came from a gentleman,
18: Marc Vanunen, Bayer Healthcare.  Who was he?
19: A.    Marc Vanunen was a colleague in
20: the marketing group at that time.
21: Q.    The marketing group.  Those are
22: the people that sell the drug, right?
23: MR. HOFFMAN:  Objection to the
24: form of the question.

p. 00578

01: 00580:    with EMA -- with FDA, sorry, I mixed it up --
02: was going on.
03: So just from my memory, I
04: cannot respond to your question --
05: Q.    Let's go to --
06: A.    -- because we have to put
07: everything into perspective with regard to
08: timing.  And so --
09: Q.    Well, I'm trying to put it into
10: perspective.  You have an e-mail that went
11: out to three and a half pages of folks.  I
12: assume that's everybody in the company
13: working on Xarelto, right?
14: MR. HOFFMAN:  Objection --
15: BY MR. DENTON:
16: Q.    Big e-mail.
17: MR. HOFFMAN:  -- to the form of
18: the question.
19: BY MR. DENTON:
20: Q.    Three and a half pages of
21: e-mail addresses, right?
22: MR. HOFFMAN:  Is that a
23: question?
24: MR. DENTON:  Yes.

p. 00580

01: 00579:   BY MR. DENTON:
02: Q.    Correct?
03: A.    Marc Vanunen was one of the
04: colleagues in the marketing department, and
05: they were, yeah, involved in the preparation
06: of the launch of the program -- product.
07: Q.    Did you ever tell the marketing
08: folks about the RECORD4 audit and the data
09: being unreliable?
10: A.    It's typical for our teams at
11: Bayer, that also one representative of the
12: marketing team is involved in the global
13: program team discussions.  And so in that
14: context I suppose that also colleagues in the
15: marketing team knew about the ongoing -- the
16: proceedings with FDA.
17: Q.    So you believe the marketing
18: folks knew that there was a finding by the
19: FDA that the RECORD4 data was unreliable, and
20: they just went ahead and did this?  Is that
21: what you're telling us?
22: A.    I would, again, have to check
23: in detail the timing of this e-mail and the
24: context where, at the time, yeah, the process

p. 00579

01: 00581:   BY MR. DENTON:
02: Q.    Am I right about that?
03: A.    There's a huge number of
04: participant --
05: Q.    Right.
06: A.    -- addressees in this e-mail,
07: yes.
08: Q.    And the subject on page 3 is
09: "RECORD4 publication update," right?
10: A.    That's the subject, yes.
11: Q.    And you're talking -- they're
12: talking about it's going to be published in
13: The Lancet magazine, right?
14: A.    Yes, uh-huh.
15: Q.    And then it goes on to say,
16: "Driving the market."
17: Do you see that?
18: And it goes on to say, "RECORD4
19: has been accepted and published by
20: The Lancet.  This print will come out on
21: May 16th."
22: Do you see that?
23: A.    I see that, yes.
24: Q.    One of the things -- it just

01: 00582:   goes on and on and on.  Down at the bottom of
02: page 2, it talks about ordering 50,000
03: copies, reprints of the RECORD4 publication?
04: MR. HOFFMAN:  Objection to the
05: form.
06: BY MR. DENTON:
07: Q.    The one with the unreliable
08: data?
09: MR. HOFFMAN:  Objection to the
10: form of the question.
11: BY MR. DENTON:
12: Q.    Do you see that?  50,000
13: copies.  What were those for?  For the sales
14: reps?
15: A.    That's -- I don't -- I don't
16: know.
17: Q.    But there's no mention in
18: The Lancet article about the ongoing audit,
19: and there was never anything sent to
20: The Lancet to tell them that the FDA found
21: this data unreliable, correct?
22: A.    I can't -- I cannot concur
23: because I'm not involved that deeply in the
24: publication procedures, and if read here a

01: 00583:   publication document, which was, in my role
02: as a regulatory person, one of my tasks, I
03: principally only looked into information to
04: compare to the label, so to make sure that
05: information that is provided in the
06: publication is -- yeah, concurs with the
07: label or is aligned with the label, so
08: that's -- and, therefore, I cannot respond to
09: your question.
10: Q.    Look at Exhibit 52, The Lancet
11: article that was attached to this e-mail.  Is
12: there any mention of the ongoing audit of all
13: the unreported adverse events, the RECORD
14: falsifications, the missing records, the
15: study protocol violations?
16: Is any of that in this report?
17: MR. HOFFMAN:  Objection to the
18: form of the question.
19: A.    I would have to read through
20: the document completely, but what I can
21: comment generally, that this information
22: about audits and quality assurance measures
23: in clinical trials are not -- usually not
24: included in publications in detail because it

01: 00584:   often goes to -- down to really patient-level
02: data and -- which are not shared in public.
03: But typically there's a general
04: statement as to why the data are deemed,
05: according to good clinical practice at least,
06: and regulatory report.  And so I would have
07: to look up what is mentioned in that regard
08: here.
09: BY MR. DENTON:
10: Q.    Well, after your company
11: brought 50,000 copies of this article that
12: was distributed by the marketing department,
13: 16 days later -- let's go back to Exhibit 38,
14: Record 1224146.  16 days later -- can we find
15: Exhibit 38, Record 1224146?
16: (Interruption by the reporter.)
17: MR. DENTON:  No, it was one
18: this morning.
19: BY MR. DENTON:
20: Q.    16 days later, after your
21: marketing department orders up 50,000 copies
22: of that article and sends it throughout the
23: sales rep teams, you get the e-mail of the
24: complete response letter showing all the

01: 00585:   deficiencies in RECORD4, and you say, "Please
02: do not distribute this letter widely," right?
03: MR. HOFFMAN:  Objection to the
04: form of the question.
05: BY MR. DENTON:
06: Q.    16 days later, right?
07: MR. HOFFMAN:  Same objection.
08: A.    This -- as I explained to you
09: before, why I asked the colleagues not to
10: distribute the letter widely, so it's really
11: that was supposed to -- those colleagues who
12: work on the responses and so not to distract
13: other colleagues who were working on other --
14: other ongoing procedures from their work by
15: reading this long document, to where they,
16: anyhow, weren't involved and could not
17: contribute to the responses.
18: But I did not preclude anyone
19: in this e-mail list to -- yeah, to involve
20: other colleagues that were deemed necessary.
21: And also, all the data or all the information
22: that was coming in from the health
23: authorities being implemented into a
24: so-called regulatory contact database within

01: 00586:   Bayer, and so, through that contact database,
02: many colleagues have access to reports as
03: well, so just if they needed it, so on.
04: Therefore it does not mean that
05: the information was not shared to people who
06: needed to know it in Bayer.
07: MR. DENTON:  Move to strike as
08: nonresponsive.
09: BY MR. DENTON:
10: Q.    I simply ask is if this e-mail,
11: Exhibit 38, Record 1224146, was sent to you
12: 16 days after the previous e-mail where
13: 50,000 copies of this article was purchased
14: and distributed.  It's a simple mathematical
15: question:  Is it 16 days later?
16: MR. HOFFMAN:  That really
17: wasn't your question.  But --
18: MR. DENTON:  That is my
19: question now.
20: MR. HOFFMAN:  Okay.  That's --
21: MR. DENTON:  I think it's the
22: same one, but...
23: MR. HOFFMAN:  I object to the
24: form of the question.

p. 00586

01: 00587:           You may answer.
02: BY MR. DENTON:
03: Q.    16 days later, right?
04: A.    I was lost in the dates, but
05: now I can check it.  So this is 28th of
06: May 2009, and the e-mail was -- or the other
07: e-mail was from --
08: Q.    May 12th, 2009.
09: A.    May 12th, okay.
10: Q.    16 days.
11: So you as global regulatory
12: affairs person know two pieces of
13: information.  You know The Lancet article had
14: been published and 50,000 copies had been
15: ordered to be distributed by the marketing
16: folks, right?
17: MR. HOFFMAN:  Objection to the
18: form of the question.
19: BY MR. DENTON:
20: Q.    You knew that through that
21: e-mail on May 12th, 2009, right?
22: MR. HOFFMAN:  Objection to the
23: form.
24: A.    I was copied on the e-mail --

p. 00587

01: 00588:   BY MR. DENTON:
02: Q.    Right.
03: A.    -- on the -- on the, yeah,
04: The Lancet publication, yes.
05: Q.    You actually got a copy of
06: The Lancet publication attached to that
07: e-mail, right?
08: A.    Yes, I got a copy of The Lancet
09: publication.
10: Q.    And nowhere in that Lancet
11: publication is there any mention of an
12: ongoing audit or investigation of the data
13: from RECORD4, right?
14: MR. HOFFMAN:  Objection, asked
15: and answered.
16: BY MR. DENTON:
17: Q.    It's not there, right?
18: A.    That's why, as I said, I would
19: have to look it up before I can respond to
20: your question with a definite yes or no.  But
21: I guess you already --
22: Q.    Okay.  And then you told me
23: earlier in the deposition -- you got this
24: complete response letter 16 days later, and

p. 00588

01: 00589:   you told me that's not a good thing, right?
02: From a regulatory point of view, that's not a
03: good thing they're looking into your data,
04: right?
05: MR. HOFFMAN:  Objection, asked
06: and answered.
07: A.    I did not say that to you.  I
08: said this is certainly -- a complete response
09: letter is call for action to the regulatory
10: team, and it means that the procedure at that
11: time cannot be concluded with an approval by
12: FDA, and that further information and
13: dialogue is needed in order -- yeah, before
14: an approval can be granted.
15: BY MR. DENTON:
16: Q.    Did you tell -- did you say,
17: "Hold the presses, folks.  We've got 50,000
18: articles going out with data that's still
19: being audited in an investigation"?
20: Did you hold up the process?
21: Did the sales reps know about this at that
22: time, the complete response letter?
23: MR. HOFFMAN:  Objection to
24: the --

p. 00589

01: 00590:   BY MR. DENTON:
02: Q.    Dr. Derix, did they know?  Were
03: they told?  Were the patients told?  Were the
04: doctors told?
05: MR. HOFFMAN:  Objection to the
06: form of the question.
07: A.    I -- I communicated the
08: complete response letter appropriately to the
09: team -- to the members at Bayer who needed to
10: be involved, and certainly also our
11: management and other people were informed
12: about the complete response letter and on
13: the -- in the other regard.
14: So I'm not responsible and also
15: not deeply involved in the publication
16: procedures.  So my role is to read parts of
17: the text and make sure that they are in
18: compliance with the label that is shipped by
19: the health authorities.  So I just simply
20: cannot comment on your --
21: BY MR. DENTON:
22: Q.    What you did say is, "Please do
23: not distribute this complete response letter
24: widely."  And you didn't send it to

p. 00590

01: 00591:   marketing, you didn't sent it to a sales rep
02: manager, you didn't send it to doctors, did
03: you?
04: MR. HOFFMAN:  Objection, asked
05: and answered.
06: A.    I just commented to you on this
07: specific e-mail, and I explained to you that
08: there are -- besides this e-mail that went to
09: the team members that were involved in the
10: response, there are other communication
11: channels within Bayer and other information
12: channels so that their communication was
13: appropriate.
14: BY MR. DENTON:
15: Q.    Let's move on to something
16: else.
17: MR. HOFFMAN:  Why don't we take
18: a break if you're moving on to
19: something else.
20: MR. DENTON:  Well, it's the
21: same topic.  I just want to move to a
22: different document.
23: MR. HOFFMAN:  We've been going
24: for an hour and 30 minutes, so I think

p. 00591

01: 00592:      a break is probably --
02: MR. DENTON:  I could close this
03: out soon.
04: MR. HOFFMAN:  That's okay.
05: Let's take a break anyway.
06: MR. DENTON:  It's not going
07: well.  I understand.
08: THE VIDEOGRAPHER:  Going off
09: the record --
10: MR. HOFFMAN:  I move to --
11: actually, I'm going to include that so
12: that Judge Fallon can see.
13: MR. DENTON:  We've got a video
14: of it.
15: THE VIDEOGRAPHER:  Going off
16: record --
17: MR. HOFFMAN:  We do.
18: THE VIDEOGRAPHER:  Off record
19: 11:58 a.m.
20: (Recess taken, 11:58 a.m. to
21: 12:16 p.m.)
22: THE VIDEOGRAPHER:  We're back
23: on record at 12:16 p.m.
24: ///

p. 00592

01: 00593:   BY MR. DENTON:
02: Q.    I want to go back to this
03: Lancet article, the RECORD4 publication that
04: you knew went out, okay?
05: A.    Okay.  I have it in front of
06: me.
07: Q.    You can look at the article if
08: you want.
09: A.    No, I --
10: Q.    You haven't found in that
11: article where the audit reports and the
12: unreliability of that data was reported in
13: that study, have you?
14: MR. HOFFMAN:  Objection to the
15: form of the question, asked and
16: answered.
17: BY MR. DENTON:
18: Q.    I think you've got it there.  I
19: was wondering if you happened to look at it
20: over the break to see if you could find where
21: your company put in the audit reports and put
22: some kind of a notation that the data was not
23: reliable.
24: MR. HOFFMAN:  Objection to the

p. 00593

01: 00594:        form of the question, asked and
02: answered.
03: A.    I have not taken the document
04: with me at the break, so I would need time
05: to --
06: BY MR. DENTON:
07: Q.    Okay.  We'll let you do that
08: over the lunch break then.
09: But you did have more
10: conversations about that article and
11: Dr. Turpie himself not being aware of the
12: findings of the study data being unreliable.
13: You do recall that, don't you?
14: A.    I don't recall what you are
15: specifically referring to.
16: Q.    Well, you were involved with
17: some conversations with Dr. Berkowitz
18: concerning Dr. Turpie being informed by a
19: reporter from NYU, a journalist, who was --
20: who was looking at articles on their failure
21: to disclose pertinent information and
22: contacted Dr. Turpie, and then they got in
23: touch with you.
24: You don't remember any of that?

p. 00594

01: 00595:        A.    I do not recall exactly because
02: I had certainly had many conversations with
03: Scott Berkowitz in the course of the year,
04: and it's already quite some time ago.
05: MR. DENTON:  Well, let me see
06: if I can refresh your recollection.
07: Let's start with Record No. 258267,
08: Exhibit 53.
09: (Whereupon, Deposition Exhibit
10: Derix-53, E-mail(s) re: RECORD4
11: questions, XARELTO_JANSSEN_01196801 -
12: XARELTO_JANSSEN_01196803, Ref. 258276,
13: was marked for identification.)
14: MR. DENTON:  And why don't we
15: hand her this whole series of e-mails
16: that happened over the course of this
17: week.
18: I'll just hand them all to you.
19: I'm going to also hand to you
20: Exhibit 54, which is record 440637.
21: (Whereupon, Deposition Exhibit
22: Derix-54, E-mail(s) re: RECORD
23: inquiries, XARELTO_BPAG_01188141 -
24: XARELTO_BPAG_01188143, Ref. 440637,

p. 00595

01: 00596:        was marked for identification.)
02: MR. DENTON:  And Exhibit 55,
03: which is Record 28795.
04: (Whereupon, Deposition Exhibit
05: Derix-55, E-mail(s) re: RECORD4
06: questions, XARELTO_JANSSEN_01373174 -
07: XARELTO_JANSSEN_01373175, Ref. 288795,
08: was marked for identification.)
09: MR. DENTON:  And then the last
10: one in the series, 56, which is Record
11: No. 288797.
12: (Whereupon, Deposition Exhibit
13: Derix-56, E-mail(s) re: Update,
14: XARELTO_JANSSEN_01373177, Ref. 288797,
15: was marked for identification.)
16: MR. DENTON:  Sorry, Doctor.
17: THE WITNESS:  That's okay.
18: BY MR. DENTON:
19: Q.    I believe I put those in
20: chronological order for you.  They're only
21: two days apart, and some of the e-mails are
22: on the same day.
23: And this is a series of e-mails
24: that you were involved in concerning the

p. 00596

01: 00597:    issue of whether or not Dr. Turpie, the lead
02: author, the principal investigator in the
03: RECORD4 study, knew anything about the audits
04: or the data being found unreliable.
05: You were, in fact, involved
06: with that discussion, weren't you, in May of
07: 2013?
08: A.    I do not recall, so I would
09: have to take some time to look through the
10: documents.
11: Q.    Okay.  Well let's do this.
12: Maybe we'll just look through them together
13: and let's see if this refreshes your
14: recollection.
15: Let's look at Exhibit 53, first
16: of all.
17: A.    Yes.
18: Q.    Let's go to page 2 of that
19: e-mail, and I understand you weren't on that
20: original e-mail.  It's dated May 6th, 2013.
21: Do you see that?
22: It's an e-mail from the
23: journalism professor at NYU to Dr. Fisher,
24: one of the investigators.

p. 00597

Page 46

01: 00598:        Do you see that?
02: A.   Yes, I see that e-mail, yeah.
03: Q.   And paragraph 2 he says, "I'm
04: an NYU and a journalism -- journalist writing
05: for ProPublica, and I'm interested in RECORD4
06: study."
07: Do you see that?
08: A.   I see that paragraph, yes.
09: Q.   Okay. I'm going to see if this
10: refreshes your recollection, because you get
11: involved with this discussion soon.
12: It goes on to say --
13: A.   But I was not on this e-mail --
14: MR. HOFFMAN:  That's what he
15: said. That's okay.
16: Go ahead.
17: BY MR. DENTON:
18: Q.   You're going to get on the next
19: one really quick.
20: A.   Okay. I would like to take
21: some time to read it before --
22: Q.   I tell you what. You read that
23: whole e-mail and you read Exhibit 54,
24: Exhibit 55 and Exhibit 56, because that kind

p. 00598

01: 00599:   of tells the whole story and where you're
02: involved. So why don't you go ahead and
03: review all three of those, and then I'll ask
04: you about them.
05: A.   Okay.
06: (Document review.)
07: A.   Okay.
08: BY MR. DENTON:
09: Q.   Have you had a chance to review
10: all that?
11: A.   Yes.
12: Q.   Okay. So let's get it more
13: annotated, first of all, in time.
14: These are some e-mails that
15: took place in May 2013, right?
16: A.   Yes, all e-mails are from
17: May 2013.
18: Q.   And during that time, if my
19: notes are correct, you were at that point in
20: time the senior global program head for
21: Xarelto, right?
22: A.   That's correct, yes.
23: Q.   Okay. And your counterpart on
24: the Janssen side was Sigmund Johnson. He was

p. 00599

01: 00600:   kind of the project leader for Janssen,
02: right?
03: A.   No, strictly speaking my
04: counterpart was Troy Sarich.
05: Q.   Okay.
06: A.   Compound development team lead
07: at the time, and Sigmund Johnson was working
08: with Troy as the project -- in project
09: management.
10: Q.   Okay. So let's look at
11: Exhibit 53, the first e-mail in this string.
12: And it starts on page 2, and this is what I
13: was starting to ask you about before we took
14: the time for you to review things.
15: This whole thing starts with an
16: NYU journalism professor looking into
17: clinical studies that are reported in the
18: literature and the quality of the data,
19: right?
20: A.   Yes, the professor introduced
21: himself as a journalism professor at NYU and
22: a journalist writing for ProPublica and
23: shared his interest in specifically the
24: RECORD4 study data.

p. 00600

01: 00601:        Q.   And some of the things that he
02: was asking Dr. Fisher -- who was part of the
03: study group on RECORD4, right?
04: A.   I'm not aware of the exact role
05: of Dr. Fisher in the RECORD program, but I
06: remember his name, so I would have to check
07: about his exact involvement.
08: Q.   Okay. So, basically, you have
09: a journalism professor writing someone
10: involved with the study whose name is on the
11: published article, and he's inquiring of that
12: physician about FDA records where they found
13: 265 unreported adverse events, including
14: eight significant adverse events.
15: Do you see where I'm reading
16: from?
17: A.   Yes, I see the paragraph you're
18: reading from.
19: Q.   And he talks about different
20: things -- data fabrication, irregularities
21: and problems with RECORD4 -- and he goes down
22: at the end to say, "There's a fairly strong
23: opinion from the FDA that the RECORD4 study
24: is unreliable [as read]."

p. 00601

01: 00602:            Do you see where I'm reading
02: from?
03: A.    Roughly it's -- well, it's --
04: yeah, the journalist is referring to FDA
05: records, and it's referring to some of the
06: FDA findings and also mentioning sites and
07: specific site names that were -- of sites
08: that were reviewed in the context of good
09: clinical practice.
10: Q.    Right.  So what's happened is,
11: is this journalism professor has found on the
12: FDA website this compliance review from
13: May 2011, and he's paraphrasing or taking
14: some specifics out from that, that document
15: we talked about, and asking the study author
16: about comments, right?
17: MR. HOFFMAN:  Objection,
18: assumes facts not in evidence.
19: A.    Just my understanding from the
20: e-mail in front of me that the -- the
21: journalism professor had looked into FDA
22: records.  It's not specifically mentioned --
23: at least I can't see it -- which type of
24: records, and he is addressing questions to

01: 00603:  Dr. Fisher.
02: BY MR. DENTON:
03: Q.    Okay.  Well, let's move
04: forward.  Dr. Fisher apparently passes that
05: on to Dr. Turpie, and then Dr. Turpie, on the
06: bottom of page 1, writes to Scott Berkowitz,
07: Dr. Berkowitz at Bayer, and he copies
08: Dr. William Fisher.
09: Do you see that?
10: A.    Yes, I see that.
11: Q.    He goes on to say -- let's read
12: this e-mail:  "Bill Fisher passed this e-mail
13: on to me.  The author, Charles Seife, called
14: Bill at his office.  Bill did not answer his
15: questions.  Seife told Bill that he had
16: spent -- he sent the e-mail to me as well.
17: He also called my home today (I was out).  I
18: did not get his e-mail.  Probably went to my
19: junk."
20: He then goes on to say, "There
21: seems to be some serious allegations
22: regarding the conduct of the trial that
23: neither I or the steering committee were made
24: aware of.  Please let me know how we should

01: 00604:   proceed.  Best regards."
02: Do you see that?
03: A.    You read this correctly from
04: the text, yes.
05: Q.    Okay.  So Dr. Turpie, who was
06: the principal investigator in RECORD4, gets
07: this e-mail and he sends it to
08: Scott Berkowitz and tells him that they
09: didn't know about these allegations that were
10: in the FDA compliance review, right?
11: A.    That is not what he
12: specifically says here, but he -- yeah, he
13: said that there seemed to be allegations he
14: was not aware of, so --
15: Q.    Well, one of the allegations in
16: the e-mail that was referred to him was that
17: the data from RECORD4 study was unreliable.
18: That is, in fact, what the FDA
19: found, right?  We went through that earlier
20: today?
21: A.    We went earlier through the FDA
22: records, yes.
23: Q.    And they found the data to be
24: unreliable.  That was their --

01: 00605:            A.    That was the final conclusion
02: on RECORD4, that the FDA --
03: Q.    Right.
04: A.    -- did not deem the data was
05: sufficient to be included in the approval.
06: Q.    And then what happens is, is
07: once Dr. Berkowitz finds out about this, he
08: sends a copy to Sig Johnson, Troy Sarich,
09: right?
10: A.    Yes, that's right.
11: Q.    Okay.  And then the next
12: document, Exhibit 54, Record 440637, you get
13: brought into the conversation.
14: Do you see that?
15: A.    I'm in copy of an e-mail from
16: Andy Hargreaves to a group of colleagues.
17: Q.    And it's a discussion about --
18: it's just -- it's just a few days later in
19: May 2013, right?
20: A.    It's May 14, yes, 2013.
21: Q.    And you can see that "Dear
22: Scott and all" -- it goes to Dr. Berkowitz,
23: and you're one of the cc's -- "I am currently
24: pulling together documents that should be

Derix, Andrea Ph.D. - 2 - Volume 2 - 03/02/2016

01: 00606:   helpful in better understanding Seife's
02: questions and in particular his statement
03: that the FDA determined that the data from
04: the following sites should be excluded," and
05: it lists some sites.
06: Do you see that?
07: A.    Yes, I see that paragraph.
08: Q.    Okay.  So this conversation
09: continues, Exhibit 55, and you're copied on
10: that.  That's record No. 288795.
11: Do you see that?  Dr. Berkowitz
12: to Troy Sarich and Andrea Derix.
13: Do you see that?
14: A.    Yes, I see that document in
15: front of me.
16: Q.    And you two, as I understood
17: it, you're the senior global product head for
18: Bayer on Xarelto and Troy Sarich has the
19: similar role at Janssen at that time, right?
20: A.    Yes.
21: Q.    So we've got a small e-mail
22: string of the two people at the top of the
23: project, the Xarelto project, on this from
24: Dr. Berkowitz, right?

p. 00606

01: 00607:      A.    Yes, he passed this on for
02: information to Troy Sarich and myself.
03: Q.    And what you find out in the
04: middle of this e-mail is that the
05: investigator -- the journalism professor is
06: writing back to Dr. Fisher, "Hello,
07: Dr. Fisher.  Charles Seife here again.  I
08: haven't heard anything from Dr. Turpie or
09: anyone else on the committee.  Has my request
10: gone through?  Is there any hope of speaking
11: to someone in the next few days?"
12: And then Dr. Fisher forwards
13: that to Dr. Turpie and Scott Berkowitz,
14: right?  And then it gets forwarded to you,
15: right?
16: A.    That's right, yes.
17: Q.    And Scott Berkowitz only says,
18: "Dear both, one more."  Right?
19: A.    In this e-mail he said, yeah,
20: "one more," so he's passing on one more
21: e-mail to us.
22: Q.    Right.
23: And then let's go to
24: Exhibit 56.  Two hours later that day, again,

p. 00607

01: 00608:    to you from Scott Berkowitz, Troy and Andrea
02: Derix, right?  The topic is just "update."
03: "Just so you know, I have kept
04: the e-mails to a minimum externally, but this
05: AM provided is a short update about these
06: sites to Dr. Turpie on present plans and
07: preparation of the record -- of RECORD
08: leading up to our call today."
09: Do you see that?
10: A.    Yes, I see that e-mail.
11: Q.    You guys are circling the
12: wagons.  You don't want it to be known that
13: Dr. Turpie didn't know about the unreliable
14: results in the study that his name is on,
15: right?
16: MR. HOFFMAN:  Objection to the
17: form of the question.
18: BY MR. DENTON:
19: Q.    That's what's going on here?
20: MR. HOFFMAN:  Objection.
21: A.    That's not a conclusion I would
22: draw from the e-mails.  It's not written in
23: here as you have just expressed.
24: ///

p. 00608

01: 00609:   BY MR. DENTON:
02: Q.    Okay.  Well, let's pull up
03: Exhibit 52, which is the article.  This is
04: the article -- it's Record 1221844.  Sorry.
05: This is the article that was published that
06: the investigative journalist was talking
07: about, right?  This is the RECORD4 study that
08: you said was great news, and 50,000 copies
09: were circulated through the marketing
10: department, right?  It's this one, RECORD4.
11: Do you see the title?
12: MR. HOFFMAN:  Objection to the
13: form of the question.
14: A.    This is the RECORD4 publication
15: in Lancet.
16: BY MR. DENTON:
17: Q.    Right.  And you see the lead
18: author is Dr. Turpie?
19: A.    Yes, Dr. Turpie is mentioned as
20: the first author amongst, yeah --
21: Q.    And then you see --
22: A.    -- others.
23: Q.    -- Dr. William D. Fisher, he
24: was one of the investigators, down to the

p. 00609

Page 49

Derix, Andrea Ph.D. - 2 - Volume 2 - 03/02/2016

01: 00610:   last author, the one -- the corresponding
02: author that the journalism professor was
03: e-mailing?
04: Do you see that?
05: A.    I see the name of
06: William Fisher.
07: Q.    And let's look at who else is
08: on this article.  Scott Berkowitz.
09: Dr. Berkowitz, right?
10: A.    Yes, he's also one of -- or
11: isn't he?  No.  Frank Misselwitz,
12: Scott Berkowitz too, yes.
13: Q.    And Frank Misselwitz, Bayer
14: doctors, right?  Bayer employees and
15: physicians, right?
16: A.    Yes, there are a number of
17: investigators of the RECORD4 trial as far as
18: I recall.
19: Q.    Right.
20: A.    And there are, in the second
21: row, colleagues from Bayer also who were
22: involved in the RECORD4 clinical trial.
23: Q.    Certainly Dr. Berkowitz --
24: certainly Dr. Berkowitz, as the clinical

01: 00612:   circulated by the marketing department.  We
02: saw that in that previous e-mail, correct?
03: MR. HOFFMAN:  Objection to the
04: form of the question.
05: A.    The e-mail stated about 50 -- a
06: number of copies that were prepared.  I
07: cannot conclude or concur to whom it was
08: distributed on which way or form.
09: BY MR. DENTON:
10: Q.    All right.
11: 16 days later, you got a copy
12: of the complete response letter from the FDA,
13: right?
14: A.    Again, I have a hard time to
15: follow the timing because I don't have the
16: documents all in front of me.
17: Q.    Right.
18: A.    But I received a copy of the
19: FDA correspondence regarding RECORD4.
20: Q.    You had received the compliance
21: review on May 24th, 2011, from the FDA, where
22: they found the results of RECORD4 to be
23: completely unreliable.  You got that, right?
24: A.    That's what we discussed

01: 00611:   trial director for Xarelto, including
02: RECORD4, knew about the FDA findings that the
03: RECORD4 data was unreliable.
04: Dr. Berkowitz has known that,
05: correct?
06: MR. HOFFMAN:  Objection to the
07: form of the question.
08: A.    Dr. Berkowitz was involved in
09: the interactions with FDA, and so he knew
10: about the questions that FDA had raised.
11: BY MR. DENTON:
12: Q.    In fact, he participated in the
13: meetings with you with FDA, right?
14: A.    I would have to look it up, but
15: it's very likely because he had the role as
16: the clinical lead and participated with me in
17: many meetings, yes.
18: Q.    So your company -- doctors from
19: your company that you sponsored -- this
20: study, this RECORD4 study, you have it
21: published in The Lancet, true?
22: A.    The publication is, yeah, in
23: front of me, and this is --
24: Q.    50,000 copies were made and

01: 00613:   beforehand --
02: Q.    Right.
03: A.    -- about this report on the
04: ongoing proceedings with FDA.  So it was
05: certainly an interim report that was shared
06: and issued in the course of the ordinary
07: procedure of FDA.
08: Q.    Two years later, an
09: investigative journalist is asking the
10: physicians who did the RECORD4 study about
11: the findings of the unreliability of the
12: data, right?
13: We just looked at those, and
14: you were part of that e-mail string in May of
15: 2013, right?
16: A.    Yes, we just looked at the
17: e-mails in that -- that had the context of
18: the request from the journalist, yes.
19: Q.    And to this day, February --
20: actually, March 2nd, 2016, no one from your
21: company, Scott Berkowitz or anyone, has told
22: The Lancet that the FDA found that the data
23: that supported this publication in RECORD4
24: was, in fact, audited and determined to be

01: 00614:   unreliable; isn't that a fact?
02: A.    I would like to -- you to ask
03: this question to Scott Berkowitz because he
04: is, in fact -- and some other colleagues are
05: the contacts to Lancet, and I might not be
06: aware of all information in that regard, and
07: so, therefore, I cannot respond to the
08: question.
09: Q.    Well, what we do know that
10: Dr. Berkowitz said on this topic, Exhibit 56,
11: Record 288797, which was sent to you as the
12: head of this project for Bayer and the head
13: of the project, Dr. Sarich, for Janssen, was
14: "Let's keep the e-mails to a minimum
15: externally," right?
16: MR. HOFFMAN: Objection to the
17: form of the question.
18: A.    I agree to your reading the
19: text, but it is not -- I mean, it's not clear
20: about the context, and, therefore, I do not
21: agree to the context you provided around it.
22: So it is -- as I -- I mean, the
23: closest connection I can make from the e-mail
24: chain you provided to me here is that it is

p. 00614

01: 00615:   referring to the communication about the
02: details about the journalist's requests.
03: BY MR. DENTON:
04: Q.    All right.  So we have the FDA
05: finding the data to be unreliable.  We
06: have -- you've told us that was not sent to
07: the EMA, that report, right?  That compliance
08: report?
09: A.    I have not told you that.  I
10: said I would have to look it up.  So I have
11: not said it was not sent to EMA.  I just do
12: not recall.  And so I would have to look it
13: up, whether it was submitted in the course of
14: some of the regular documents that are being
15: sent to EMA.
16: Q.    You didn't tell the study
17: author, the principal investigator, that the
18: audit was ongoing, true?
19: MR. HOFFMAN: Objection to the
20: form of the question.
21: A.    I don't know.
22: BY MR. DENTON:
23: Q.    Well, he -- you were on e-mail
24: strings where he said he didn't know anything

p. 00615

01: 00616:   about it.
02: A.    In the e-mail, he referred to
03: the comments made by the journalist.  So I
04: would have to put this into context of the
05: entire information, so...
06: MR. DENTON:  I think we'll take
07: our lunch break.
08: THE VIDEOGRAPHER:  Going off
09: the record at 12:45.
10: (Recess taken, 12:45 p.m. to
11: 1:32 p.m.)
12: THE VIDEOGRAPHER:  Back on
13: record at 1:32 p.m.
14: BY MR. DENTON:
15: Q.    Good afternoon.
16: A.    Good afternoon.
17: Q.    I'm going to shift gears.
18: Topics are going to change a bit.  I'm going
19: to leave the RECORD4 studies -- or the RECORD
20: studies, and I'm going to shift to the ATLAS
21: studies, okay?
22: A.    Okay.
23: Q.    And I don't have a lot of time,
24: so I'm going to have to move quickly, and I

p. 00616

01: 00617:   would ask if you could answer completely and
02: directly my questions, I'd appreciate it,
03: okay?
04: A.    That's okay.
05: Q.    The ATLAS studies were
06: submitted for -- as a phase three study to
07: the FDA as well, correct?
08: A.    Yes, that's correct.  ATLAS
09: TIMI 51 was the phase three study.
10: Q.    Right.  And you were called in
11: to deal with some complete response letters
12: from the FDA relative to the ATLAS study,
13: true?
14: A.    Yes, that's true.
15: Q.    And there were additional
16: issues in that study, including missing data
17: from clinical trials, right?
18: A.    I would have to see exactly
19: what you are referring to, because there were
20: a number of topics were being discussed
21: with the agency.
22: Q.    All right.  Well, then, we're
23: going to have to look at a couple of
24: documents.  I was hoping to move quickly.

p. 00617

Case 2:14-md-02592-EEF-MBN   Document 7946-12   Filed 11/03/17   Page 162 of 210

01: 00618:        MR. DENTON:  But I'm going to
02: mess you up, Ashley.  I need 1217813
03: and 814.
04: (Whereupon, Deposition Exhibit
05: Derix-57, E-mail(s) re: ACS CRL 2 -
06: reference docs,
07: XARELTO_BPAG_02515032 -
08: XARELTO_BPAG_02515033, Ref. 1217813,
09: was marked for identification.)
10: (Whereupon, Deposition Exhibit
11: Derix-58, FDA Complete Response
12: Letter, XARELTO_BPAG_02515034 -
13: XARELTO_BPAG_02515045, Ref. 1217814,
14: was marked for identification.)
15: BY MR. DENTON:
16: Q.     Here is Record No. 1217813,
17: Exhibit 57, and we're going to have the
18: attachment.
19: A.     Okay.  Thank you.
20: Q.     And you see on the cover
21: e-mail, Exhibit 57, you were cc'd on "ACS
22: CRL 2 reference documents"?
23: A.     Yes, I see that.
24: Q.     You're talking about the ACS

01: 00620:        Letter, XARELTO_BPAG_02515046 -
02: XARELTO_BPAG_02515050, Ref. 1217815,
03: was marked for identification.)
04: (Whereupon, Deposition Exhibit
05: Derix-60, FDA Complete Response
06: Letter, XARELTO_BPAG_02515051 -
07: XARELTO_BPAG_02515054, Ref. 1217816,
08: was marked for identification.)
09: BY MR. DENTON:
10: Q.     There was a series of these
11: complete response letters from the FDA that
12: were sent to you, right?
13: MR. HOFFMAN:  Well, objection
14: to the form of the question.
15: BY MR. DENTON:
16: Q.     There were three attachments to
17: the e-mail that was sent to you on March 5th,
18: 2013, correct?
19: A.     Yes, there were two complete
20: response letters and one additional document.
21: Q.     And one additional document,
22: Exhibit 60, which is an information request.
23: All this from the FDA, right?
24: A.     All documents are from the FDA

01: 00619:    indication, right?
02: A.     Yes, that's right.
03: Q.     Complete response letter No. 2?
04: A.     Yes, that's right.
05: Q.     And it's attached to this
06: e-mail, right?
07: A.     Yes, it's attached to the
08: e-mail.
09: Q.     Yes.  And that's -- and let's
10: go to Exhibit 58, which is Record
11: No. 1217814, and this is a complete response
12: letter from the FDA related to the ATLAS
13: study, right?
14: A.     That's right.
15: Q.     And you received this in your
16: work at the company, right?
17: A.     Yes, I received this.
18: MR. DENTON:  And there's two
19: other documents attached to that
20: e-mail, which are Record No. 1217815,
21: Exhibit 59, and Record No. 1217816,
22: Exhibit 60.
23: (Whereupon, Deposition Exhibit
24: Derix-59, FDA Complete Response

01: 00621:    in these attachments, yes.
02: Q.     Right.  Right.
03: And, frankly, we're short on
04: time that I've been allotted, so I'm going to
05: go through just a few points with you.
06: On Exhibit 58 --
07: A.     Yes.
08: Q.     -- on page 2, down at the
09: bottom, talking about "You believe you are
10: unable" -- referring to Bayer -- "to obtain
11: additional follow-up on the subjects in the
12: 'Other' and 'Lost to follow-up' categories,
13: but investigated another follow-up for 1,294
14: who withdrew consent.  Of those, you were
15: unable to follow 50 -- 552 patients" --
16: MR. HOFFMAN:  Objection to the
17: form.
18: BY MR. DENTON:
19: Q.     -- "for administrative reasons?
20: MR. HOFFMAN:  Objection to the
21: form of the question.
22: BY MR. DENTON:
23: Q.     That's what the FDA is saying
24: to you, right?

01: 00622:            MR. HOFFMAN:  Objection to the
02: form of the question.
03: A.     In the -- in the text it reads,
04: yeah, that there was -- yeah, "unable to
05: follow 552 for administrative reasons,
06: including national laws or policies."
07: BY MR. DENTON:
08: Q.    Right.  Let's -- I just
09: can't -- I don't have time for all of it.
10: There's another complete response letter, 59.
11: That one is in March.  You have that.
12: A.    Yes, I have.
13: Q.    Asking for more information
14: from the company related to this indication,
15: true?
16: A.    Yes.
17: Q.    And I don't have time to go
18: through all of it, but like we talked about
19: in the record study, there were responses by
20: your company to the complete response letters
21: from the FDA, right?
22: MR. HOFFMAN:  Objection to the
23: form of the question.
24: A.    It's a normal process that,

01: 00624:   review issue."
02: Do you see that?
03: A.    I see that paragraph, yes.
04: Q.    Okay.  So one of the concerns
05: in this complete response letter from the FDA
06: on this study was missing data, right?
07: A.    That's right, in the context of
08: patient follow-up after discontinuation of
09: study medication.
10: Q.    All right.
11: A.    It's a totally unrelated topic
12: to the topics we discussed before, and this
13: is a specific topic that is discussed in the
14: context of long-lasting trial reparations --
15: yeah, stay for several years.
16: Q.    It's talking about missing data
17: in clinical trials, isn't it?
18: MR. HOFFMAN:  Objection to the
19: form of the question.
20: BY MR. DENTON:
21: Q.    People discontinuing and lost
22: to follow-up, right?
23: A.    That's what it's talking about,
24: the -- yeah, the restrictions in some

01: 00623:   yeah, as I explained before, the company is
02: working with FDA to address the questions in
03: a complete response letter.
04: BY MR. DENTON:
05: Q.    Well, let's look at Exhibit 60,
06: which is Record 1217816, page 2.
07: Second paragraph at the top, it
08: reads, "The second most important problem is
09: missing data."
10: Do you see where I'm reading
11: from?
12: A.    Yes, I see where you're reading
13: from.
14: Q.    And it says, "As we understand
15: it, you plan to address by further follow-up
16: on mortality and then seek to show that
17: bleeding, which might cause disproportionate
18: discontinuation in the rivaroxaban group, is
19: not associated with increased mortality so
20: that the information censoring is unlikely.
21: Certainly determining vital status on a
22: substantial fraction of the patients now
23: missing would be helpful, but whether it is
24: sufficient to resolve the concerns will be a

01: 00625:   countries for patients who withdrew the
02: consent or who discontinued to follow up on
03: information.  And that wasn't a topic that
04: was discussed in the context of the ATLAS
05: trial.
06: Q.    And then this goes on for some
07: period of time.  Your company responds to
08: these requests, true?
09: MR. HOFFMAN:  Objection to the
10: form of the question.
11: A.    Certainly in the context of the
12: review and procedures and of responses to the
13: complete response letter, the companies also
14: provided information to FDA.
15: BY MR. DENTON:
16: Q.    And then at the end of all this
17: process, the FDA did not approve this
18: indication, did they?
19: A.    FDA did not approve this
20: indication, yeah, that's right.
21: MR. DENTON:  Okay.  And let me
22: have the Ad Comm minutes, please,
23: Ashley.
24: (Whereupon, Deposition Exhibit

01: 00626:        Derix-61, 1/6/14 FDA Summary Minutes
02: of Cardiovascular and Renal Drugs Ad
03: Comm [No Bates], was marked for
04: identification.)
05: BY MR. DENTON:
06: Q.    I'm going to hand you -- excuse
07: me -- Exhibit 61.  Summary of the minutes of
08: the Ad Comm, and then this is when the
09: company presents their position on a study,
10: the FDA presents their position and experts
11: are called in and evaluate and vote on
12: certain requests, true?
13: A.    It's a public meeting where, as
14: you said, experts are invited by the
15: Cardiovascular and Renal Drugs Advisory
16: Committee, and, yeah, also both the sponsor
17: but also FDA is giving their perspectives and
18: presentations for discussion.
19: Q.    Let's look at page 6 of 7 of
20: the notes.  Page 6 and Question 6.
21: Do you see that?
22: A.    Yes, I see that.
23: Q.    The question posed to the FDA
24: committee, Ad Comm committee was "Should

01: 00627:    rivaroxaban be approved for use in ACS?"
02: Do you see that?
03: A.    I see that question.
04: Q.    Unanimously ten voted against
05: the approval, right?  Not a single one yes
06: vote?
07: A.    There was one abstain and ten
08: voted against it who believed --
09: Q.    Not a single yes vote, correct?
10: A.    That is right, there were no
11: yes votes.
12: Q.    And let's look -- let's look at
13: the reason, the decision.  "The majority of
14: the committee agreed that rivaroxaban should
15: not be approved for use in ACS.  The
16: committee members who voted no stated there
17: were concerns regarding the increased risk of
18: bleeding."
19: Do you see that?
20: A.    I see that.
21: Q.    "It was noted that study
22: imperfections, such as missing data, a high
23: likelihood of information -- or informative
24: censoring and loss to follow-up were also

01: 00628:    concerns."
02: Do you see that?
03: A.    I see that, and that's about
04: the topic we just talked before.
05: Q.    Right.
06: Another study submitted to the
07: regulators in the U.S. where the review
08: showed that your company had missing data,
09: right?
10: MR. HOFFMAN:  Objection to the
11: form of the question.
12: A.    I disagree with the summary you
13: make.
14: So there were a couple of
15: topics that FDA looked into --
16: BY MR. DENTON:
17: Q.    Including --
18: A.    -- including the missing data
19: and in the lost-to-follow-up patients, but
20: it's too much simplified to just focus on
21: this one topic.
22: Q.    Well, the reason I'm talking
23: about ACS, that's one of the studies, data
24: from that study that you're all using in your

01: 00629:    exposure-response modeling, right --
02: MR. HOFFMAN:  Objection to the
03: form of the question.
04: BY MR. DENTON:
05: Q.    -- with the EMA?
06: A.    I explained beforehand that the
07: proposal is to use all available data from PK
08: and PD information to -- yeah, to build up
09: the most informative model.  That is the
10: plan, and we have to add --
11: Q.    But if you're missing data as
12: shown in the ACS indication, the ATLAS
13: trials, for whatever reason, lost to
14: follow-up, you don't know, your company
15: doesn't know if those folks had adverse
16: events, do you?
17: MR. HOFFMAN:  Objection to the
18: form of the question.
19: BY MR. DENTON:
20: Q.    That's what the Ad Comm folks
21: are telling you why they voted against it?
22: MR. HOFFMAN:  No, objection to
23: the form of the question, misstates
24: the evidence.

01: 00630:       A.    I mentioned to you that there
02: were several discussion topics with ACS --
03: about ACS that let FDA to nonapproval.  And,
04: secondly, the information that is built into
05: the model is just the PK information.  It's
06: not about adverse events.  And so this is in
07: the second step where the correlation is
08: being made to efficacy and safety.
09: And I explained before that
10: this part is being done separately for each
11: indication.  And so, yeah, it can be variated
12: based on each study information by itself.
13: BY MR. DENTON:
14: Q.    I understand that, but here's
15: my point:  If your studies are so poorly done
16: that you miss adverse events like we saw in
17: RECORD and you lose people to "lost to
18: follow-up" in these studies, how do you know
19: those people didn't have adverse events?  How
20: do you know?  How can you make this
21: comparison to exposure and events when you've
22: lost so much data?
23: A.    I disagree to your statement
24: that it's generalizing the quality of studies

01: 00631:   that were conducted by Bayer and Janssen in
02: this case.  ACS trial was conducted under the
03: lead of Janssen.
04: Q.    Okay.  But your company is
05: using the study results from Janssen as part
06: of your exposure-response modeling to EMA,
07: right?  You saw that yesterday.
08: A.    Yeah, I agree that we used this
09: information and that -- I would have to add
10: again that, for the simulation model, only
11: the PK data from the prespecified PK sampling
12: is included, and that is not related to any
13: discussion about missing this data here as
14: cited here.  So I would have to really
15: clearly differentiate those two aspects when,
16: yeah, discussing the adequacy of the
17: simulation model.
18: And in addition, the proposal
19: for the simulation model is being discussed
20: with EMA, and EMA could interject in the same
21: way if they feel that the approach is not
22: deemed adequate.
23: Q.    I've got -- we're having
24: trouble communicating.

01: 00632:            Part of the evaluation that EMA
02: is asking is:  At the very high end,
03: layperson view, they're saying:  Does the
04: exposure in these patients have a correlation
05: with outcome events, thrombosis on the
06: efficacy side and bleeding on the safety
07: side?
08: That's what's going on, right?
09: MR. HOFFMAN:  Objection, asked
10: and answered.
11: BY MR. DENTON:
12: Q.    Am I right about that?
13: A.    On a very --
14: MR. HOFFMAN:  Objection, asked
15: and answered.
16: You may answer now.
17: A.    On a very high level, it's that
18: the --
19: BY MR. DENTON:
20: Q.    Right?
21: A.    -- on one-hand side, the
22: objective is to build a simulation model with
23: all available information to best inform the
24: model, and then the second step to correlate

01: 00633:   to outcomes.
02: Q.    Okay.  But we know from RECORD
03: you missed 536 outcome events -- that's what
04: the audits show -- of 10% of the studies,
05: right?  We went through that this morning.
06: MR. HOFFMAN:  Objection to the
07: form of the question, asked and
08: answered.
09: A.    We went through a discussion on
10: the RECORD data this morning.
11: BY MR. DENTON:
12: Q.    And my point simply is:  In
13: ACS, you lost 500 people to follow-up in the
14: study, and that study was not approved,
15: right?
16: MR. HOFFMAN:  Objection --
17: BY MR. DENTON:
18: Q.    That was in the complete
19: response letter?
20: MR. HOFFMAN:  Objection to the
21: form of the question.
22: A.    The complete response letter is
23: talking about missing information on patients
24: was to follow-up.

01: 00634:   BY MR. DENTON:
02: Q.    Okay.
03: A.    That means after they
04: discontinued their study on medication and
05: resigned from the study.
06: Q.    Let's talk about EINSTEIN.
07: EINSTEIN had troubles too in the studies,
08: right?
09: A.    I don't know what you're
10: referring in this statement.
11: MR. DENTON:  Okay.  That's
12: fair.  That's a fair answer.  Let's
13: look at 896518.
14: (Whereupon, Deposition Exhibit
15: Derix-62, E-mail(s) re: Xarelto/VTE
16: Treatment - Issues with PE Study,
17: XARELTO_BPAG_01654834 -
18: XARELTO_BPAG_01654835, Ref. 896518,
19: was marked for identification.)
20: (Comments off the stenographic
21: record.)
22: BY MR. DENTON:
23: Q.    This is Record 896518,
24: Exhibit 62.  Now, we're talking about the

01: 00635:   EINSTEIN studies, right?  VTE treatment,
02: e-mail from you June 29 -- 29, 2009?
03: A.    Yes.
04: Q.    You're writing to
05: Joseph Scheeren.  Who is he?
06: A.    Joseph Scheeren was and is the
07: head of global regulatory affairs at Bayer.
08: Q.    So it was your boss at the
09: time?
10: A.    Yes.
11: Q.    You write to him that you --
12: and I'm going to paraphrase to move this
13: along, but correct me if I'm stating
14: something that's not accurate.
15: You had a core team meeting and
16: you're reporting to him, right?  And part of
17: your report relates to the VTE treatment
18: EINSTEIN program, right?
19: A.    I would have to read it quickly
20: so I can...
21: Q.    Maybe let's just read it
22: together.
23: "In the core team meeting last
24: week, we again discussed the situation for

01: 00636:   the VTE treatment EINSTEIN program."
02: Are you with me so far?
03: A.    Yes.
04: Q.    You say, "The overall situation
05: remains very critical."
06: Do you see that?
07: A.    Yes, I see that.
08: Q.    "The enrollment rates for the
09: DVT part of the study have decreased also,
10: thus we only can finish the study time, i.e.,
11: clean database, together with the ROCKET AF
12: in June '10 if we manage to clean the data in
13: four weeks (the fastest database cleaning
14: within the BSP organization in the Xarelto
15: program was eight weeks!!)"  Right?
16: A.    Right.
17: Q.    So why was -- why was it -- why
18: were you all in such a hurry?
19: A.    It was not -- I mean, it was
20: not in such a hurry, so it was in context
21: with our submission plan that we had prepared
22: for -- and also we had discussed ahead of
23: time with the EMA.
24: We wanted to submit the

01: 00637:   ROCKET AF data and the DVT treatment data on
02: phase three at the same time because both
03: programs relied on the same phase two
04: dose-finding programs, so they have
05: commonalities.  And so we felt it was
06: important for EMA to be able to review both
07: programs in parallel.
08: And so our plan was to get the
09: datasets, both sides, in at the same time so
10: we could run the submissions in parallel.
11: Q.    So my question is, is why were
12: you -- why was your company in such a hurry?
13: Was it to beat the competition to the market?
14: Is that the concern?
15: MR. HOFFMAN:  Objection, asked
16: and answered.
17: You may answer again.
18: A.    I answered your -- answered
19: your questions, so I explained that it had a
20: content relation and that we had agreed with
21: EMA in our presubmission meetings that we
22: planned to submit both programs, the
23: ROCKET AF data and the DVT data, and parallel
24: to them so they could have a comprehensive

01: 00638:  review of both programs in parallel.
02: BY MR. DENTON:
03: Q.   Okay.  I understand that you
04: wanted both programs to be submitted in
05: parallel.  I get that part.
06: A.   And also approved --
07: Q.   And also approved in parallel,
08: right?
09: A.   Yes.
10: Q.   Now, answer my question:  What
11: were you in such a hurry for?
12: MR. HOFFMAN:  Objection to the
13: form of the question.
14: BY MR. DENTON:
15: Q.   Why not slow them both down and
16: get the data right?
17: MR. HOFFMAN:  Objection to the
18: form of the question.
19: You may answer again.
20: A.   As I had -- I told you already
21: that we had discussed a plan ahead of time,
22: and as we had, yeah, projected the
23: finalization of the trials.
24: And so as explained to you in

p. 00638

01: 00639:  the e-mail, there was some delay of the DVT
02: trial, and so, therefore, we were discussing
03: whether we could still manage to get the data
04: in in time in order to be able to prepare for
05: the submission and run the submission in
06: parallel because that was what we had
07: discussed with the health authority ahead of
08: time.
09: BY MR. DENTON:
10: Q.   You all, the companies, whether
11: it be Bayer on EINSTEIN or Janssen on
12: ROCKET AF -- you guys can decide the date you
13: submit your results, right?  This was an
14: internal company deadline that you were
15: trying to meet, right?
16: A.   I just explained to you that
17: typically you have also an agreement with the
18: health authorities to help them, also to
19: prepare for the review period.  And so we had
20: also that -- yeah, I wouldn't tell it
21: "obligation"; that's too strong of a word for
22: it.  But we had discussed with the EMA ahead
23: of time our tentative submission date, and so
24: they had also prepared for it.  And we would

p. 00639

01: 00640:  have, yeah, also screwed up that planning, so
02: to say.
03: But I agreed.  In addition, it
04: is a company internal timeline which we had
05: set to ourselves.
06: Q.   Okay.  So the answer to my
07: question is it is, in fact, a company
08: internal timeline for these submissions,
09: right?
10: A.   As I said before, it's two
11: things.  So just on the one-hand side, it's a
12: plan agreed upon in order to manage the
13: resources.  Also on the other side, in
14: addition, it's a company internal timeline.
15: Q.   Let's go back to the e-mail.
16: You write -- continue to write to your boss,
17: "My major concern at the moment is the PE
18: study.  It seems that enrollment in incident
19: rates point to a finalization in 2012 rather
20: than 2011, i.e., the study is on a very
21: critical path."
22: Do you see where I'm reading
23: from?
24: A.   Yes, I see where you're reading

p. 00640

01: 00641:  from.
02: Q.   You wrote those words, right?
03: A.   I wrote that to
04: Joseph Scheeren, yes.
05: Q.   "Centers are already switching
06: to other studies as according to the timeline
07: predictions we gave.  The study should have
08: already been over," right?
09: A.   Yes.
10: Q.   Next paragraph, "We are asked
11: now to evaluate a scenario in which the PE
12: study will be interrupted at the time of
13: finalization of the DVT study."
14: Do you see that?
15: A.   I see that.
16: Q.   You go on to say, "In the worst
17: case we are producing a bunch of dump data
18: with such an interruption."
19: A.   Yes, I see that sentence.
20: Q.   "I would like to evaluate
21: whether we can save any value, or other
22: safety data [as read]."
23: Do you see that?
24: A.   Yes, I see that.

p. 00641

Derix, Andrea Ph.D. - 2 - Volume 2 - 03/02/2016

01: 00642:      Q.   And then your boss writes back
02: at the top of the e-mail, right?
03: A.   Yes, he writes back.
04: Q.   "Dear Andrea, this" --
05: MR. HOFFMAN:  Roger, I just
06: noticed, I think you left one word out
07: in your reading that matters, "other
08: than safety data."
09: I apologize for interrupting
10: you.
11: MR. DENTON:  Yeah, I thought I
12: said that.  I intended to.
13: MR. HOFFMAN:  It didn't come up
14: on the transcript, and I didn't hear
15: you say it.
16: MR. DENTON:  Well, it's
17: certainly on the screen.
18: MR. HOFFMAN:  That's fine.
19: MR. DENTON:  Okay.
20: BY MR. DENTON:
21: Q.   Your boss writes back, "This is
22: not good news.  I'm very concerned about
23: separate filings of DVT only, without PE.  I
24: also do not want to jeopardize the ROCKET

01: 00643:   filing.  I believe that J&J want to wait for
02: the PE data."
03: You see that?
04: A.   Yes, I see that.
05: Q.   So, Sig Johnson was the project
06: coordinator for J&J on the ROCKET study?
07: A.   The program lead was
08: Troy Sarich, and now it's Anne Vosatka, and
09: Sig Johnson is the, yeah, program management
10: lead at Johnson.
11: Q.   Right, and somebody who you --
12: was at a lot of these joint meetings or joint
13: phone calls with you, right?
14: A.   Yes.
15: MR. DENTON:  Let's go on to
16: another document, the next one.
17: Okay.  We've got two exhibits
18: here for you.  63 is Record
19: No. 450068, and 64 is Record
20: No. 450069, which is the attachment of
21: meeting minutes.
22: (Whereupon, Deposition Exhibit
23: Derix-63, E-mail(s) re: GDC Minutes,
24: XARELTO_BPAG_01283913 -

01: 00644:      XARELTO_BPAG_01283914, Ref. 450068,
02: was marked for identification.)
03: (Whereupon, Deposition Exhibit
04: Derix-64, Meeting Minutes,
05: XARELTO_BPAG_01283915 -
06: XARELTO_BPAG_01283919, Ref. 450069,
07: was marked for identification.)
08: BY MR. DENTON:
09: Q.   And, again, I'm trying to move
10: this along, but this is an e-mail that you
11: received.  You were one of the recipients.
12: Do you see that?
13: A.   Yes, I'm copied to this e-mail.
14: BY MR. DENTON:
15: Q.   Right, July 21st, 2009, right?
16: A.   Yes, right.
17: Q.   GDC minutes, global development
18: committee minutes?
19: A.   That's correct.
20: Q.   Okay.  And let's go to the
21: minutes themselves, which were the
22: attachment, Exhibit 64.  You were involved in
23: that meeting it says, according to the
24: minutes, right?

01: 00645:      A.   Yes, I was a member of the GDC
02: at the time, and I'm now a member again of
03: the GDC.
04: Q.   Okay.  And there's some folks
05: on here from -- not only Bayer, but some
06: folks from Janssen, right?
07: A.   That's right, because it's a
08: joint -- it's one of the Alliance committee.
09: Q.   Right.  It's a joint committee.
10: That's my point.
11: A.   Yes.
12: Q.   Okay.
13: And there's discussions about a
14: number of things, but it includes you talked
15: about, at paragraph 4, the SPAF/ROCKET study
16: update, right?
17: A.   It's, yeah, under -- under 4.
18: Q.   One of the things you talked
19: about with the SPAF and ROCKET was the
20: "decision on data availability of PK/PD
21: samples, PK/PD analyses/plan, determine best
22: path forward to completion," right?
23: A.   Yeah, that's as submitted here.
24: Q.   It says "DCR" -- that's Duke,

Case 2:14-md-02592-EEF-MBN  Document 7946-12  Filed 11/03/17  Page 169 of 210

01: 00646:   right --
02: A.    Yes.
03: Q.    -- the CRO -- "is ready to
04: analyze the PK samples, can be completed
05: within a year, but acceleration will be
06: discussed with DCRI.  PK subjects' sampling
07: will begin in August to September.  Target is
08: PK data in ROCKET database.  PD samples will
09: be analyzed by J&J.  Discussions are ongoing
10: to determine timelines."  Right?
11: A.    Yes, that's how it reads here
12: in the --
13: Q.    And then 4.3 talks about that
14: submission timelines with ROCKET AF, with
15: EINSTEIN, U.S. versus EU, right?
16: A.    Yes.
17: Q.    And I'm just moving quickly.
18: Paragraph 5 you talked about
19: the ACS update, right?
20: A.    Yes, that's right.
21: Q.    6 you talked about the VTE
22: program, right?
23: A.    Yes, it's about VTE treatment
24: program update, yes.

01: 00647:      Q.    All right.
02: Then you also mentioned -- it
03: looks like at 7 you were talking about the
04: medically ill program.  Is that the MAGELLAN
05: work, the MAGELLAN study?
06: A.    Yes, at that time it was the
07: MAGELLAN trial.  Currently it is a running
08: study in medical population.  But 2009 it
09: must have referred to the MAGELLAN trial.
10: Q.    Okay.  So you were involved
11: with the discussions relative to EINSTEIN as
12: well as these other studies, at least in
13: these global committee meetings, right?
14: A.    I was involved in discussions
15: and as respective to my role as regulatory
16: member in the team.
17: Q.    Yeah, you were regulatory back
18: in -- at that period of time in 2009, right?
19: A.    Yes, at that time I was a
20: regulatory representative in the team.
21: MR. DENTON:  All right.  Let's
22: look at another document relative to
23: EINSTEIN.  Okay.  Record No. 1224278,
24: Exhibit 65.

01: 00648:            (Whereupon, Deposition Exhibit
02: Derix-65, E-mail(s) re: Final DVI
03: Interim Report,
04: XARELTO_BPAG_02565288 -
05: XARELTO_BPAG_02565289, Ref. 1224278,
06: was marked for identification.)
07: MR. DENTON:  Record No. 122479,
08: Exhibit 66.
09: (Whereupon, Deposition Exhibit
10: Derix-66, Covance Interim Report on
11: DVI, XARELTO_BPAG_02565290 -
12: XARELTO_BPAG_02565302, Ref. 122479,
13: was marked for identification.)
14: MR. DENTON:  And
15: Record 1224282, Exhibit 67.  It's
16: another e-mail with some attachments
17: on there for you.
18: (Whereupon, Deposition Exhibit
19: Derix-67, Summary Statement on Covance
20: Interim Report on DVI,
21: XARELTO_BPAG_02565305 -
22: XARELTO_BPAG_02565306, Ref. 1224282,
23: was marked for identification.)
24: ///

01: 00649:   BY MR. DENTON:
02: Q.    It's a cover e-mail from
03: Christian Kraus to a number of people.
04: Scott Berkowitz is the first one.  You're on
05: there on the third line as a cc.  Do you see
06: that?
07: A.    I see that.
08: Q.    It's dated July 9th, 2010,
09: right?
10: A.    That's right.
11: Q.    It's a final DVI interim report
12: for DVT database lock, version, July 7th,
13: final summary statement.
14: Do you see that?
15: A.    Yes, I see that.
16: Q.    And then there's attachments,
17: and we have those attachments to the e-mail,
18: right?
19: A.    Right.
20: Q.    What is a DVI interim report?
21: A.    DVI stands for Data
22: Verification Initiative, and that was the
23: report, yeah, from this Data Verification
24: Initiative.

Derix, Andrea Ph.D. - 2 - Volume 2 - 03/02/2016

01: 00650:        Q.    So, in other words, there
02: was -- there was a clinical trial that had
03: been ongoing for VTE prevention, the EINSTEIN
04: trials, and now you're going back to see what
05: the quality of the data is, right?  That's
06: what's going on here?
07: A.    That's not correct.  Data
08: Verification Initiative means that in the
09: course of this -- yeah, the trial, and with
10: the experience and the information on the
11: RECORD4 trial, there was an additional, yeah,
12: source data verification program run on the
13: EINSTEIN trial.
14: Q.    So because --
15: A.    It was not triggered by any
16: observation made in the trial.  It was
17: triggered by the experience with the RECORD4
18: trial as an additional measure under rigidity
19: of the data.
20: Q.    Right.  In other words, because
21: the RECORD4 trial, the data was so bad, you
22: all decided to verify the EINSTEIN data,
23: right?
24: MR. HOFFMAN:  Objection to the

p. 00650

01: 00651:        form of the question.
02: BY MR. DENTON:
03: Q.    That's what you just said,
04: right?
05: MR. HOFFMAN:  Objection.
06: A.    No, that's not what I said.
07: MR. DENTON:  All right.  Let me
08: withdraw that.
09: MR. HOFFMAN:  Hold on.  Hold
10: on.
11: MR. DENTON:  I'm going to
12: withdraw it.
13: MR. HOFFMAN:  Fair enough.
14: MR. DENTON:  Fair enough?
15: MR. HOFFMAN:  Fair enough.
16: MR. DENTON:  I'm out of time.
17: And just if we're not going to get a
18: straight -- I'm just out of time.
19: BY MR. DENTON:
20: Q.    Let's move to Exhibit 66.  That
21: was attached to this e-mail, right?  This is
22: the interim report that the Data Verification
23: Initiative -- and it was done by Covance,
24: right?  It says right at the top, "EINSTEIN

p. 00651

01: 00652:   Data Verification"?
02: A.    Yeah.  Yeah, the report was
03: prepared by Covance.
04: Q.    All right.  Let's go to
05: Exhibit 67 that was also attached, which is
06: the summary of that report dated July 8th,
07: 2010.  Do you see that?
08: A.    Yes.
09: Q.    It's "Data Verification
10: Initiative and Additional Audit Program for
11: database lock for DVT patients in EINSTEIN,
12: Study 11720 [as read]," right?
13: A.    Right.
14: Q.    It says, "Data Verification,
15: DVI, performed a comparison of the eCRF and
16: source data in the EINSTEIN arms of the study
17: as an additional initiative to confirm the
18: quality of stata duddy -- stata data --
19: right -- study data"?
20: A.    Yeah, "study data," right.
21: Q.    Having trouble, I'm sorry.
22: And one of the things they
23: found, paragraph 3, "The DVI did not directly
24: identify any missing serious adverse events

p. 00652

01: 00653:   in DVI patients -- DVT patients; however, one
02: serious adverse event for acute liver fail
03: was identified following data review
04: [as read]."
05: Do you see where I'm reading
06: from?
07: A.    Yes, I see where you are
08: reading from.
09: Q.    And then the conclusion on the
10: second page, "The interim report of DVI and
11: findings from additional audits did not
12: identify any general trend or systemic
13: quality deficiencies and reconfirmed the
14: quality of the database," right?
15: A.    Yes.
16: Q.    All right.  Now, did you do
17: that for the other arms of EINSTEIN, that
18: data quality check, or just that one?
19: A.    I would have to check with my
20: colleague overseeing the program because the
21: PE study finished at a time when I was no
22: longer responsible for Xarelto --
23: Q.    Right.
24: A.    -- so that's falling in the

p. 00653

Derix, Andrea Ph.D. - 2 - Volume 2 - 03/02/2016

01: 00654:   time window when I moved --
02: (Clarification requested by the
03: reporter.)
04: A.    -- responsible for Xarelto,
05: falling in a time window when I moved to
06: another department within Bayer regulatory.
07: BY MR. DENTON:
08: Q.    So what I'm trying to find out
09: is:  I know you were signed off and went to
10: some other project for this -- after this.
11: Who should we ask about the data quality in
12: the EINSTEIN studies?
13: A.    I mentioned to you
14: Scott Berkowitz as the overseeing leader of
15: clinical development, and the direct
16: responsible clinical leader for the EINSTEIN
17: program was Anthonie Lensing.
18: Q.    But I'm talking about the
19: people who did the audits, not the clinical
20: people, the audits, the ones that look and
21: see if the data has been maintained properly.
22: A.    So here in this case, you find
23: in the addressee list the colleagues who were
24: involved in the Data Verification Initiative.

p. 00654

01: 00655:   And in addition, I would also refer you to
02: Andy Hargreaves again, who might be able to
03: direct you to the appropriate colleagues.
04: Q.    Okay.  That's the Bayer
05: colleagues.  Do you know who the Janssen
06: colleagues might be that do the audits and
07: keep track of the quality assurance program
08: for Janssen?  Do you know that?
09: A.    No, I can't give you a name on
10: the Janssen side who was the responsible
11: person at this point in time for quality.
12: There was a joint quality
13: working team, Bayer and Janssen, and so,
14: also, again, Andy Hargreaves is in direct
15: contact to his colleague or -- at Janssen.
16: Q.    Okay.  All right.  MAGELLAN,
17: the medical ill, had problems too with data
18: quality, right?
19: MR. HOFFMAN:  Objection to the
20: form of the question.
21: A.    I do not -- yeah, I cannot
22: follow where you are taking your statement
23: from or your conclusion.
24: ///

p. 00655

01: 00656:   BY MR. DENTON:
02: Q.    You don't recall that?
03: A.    No, I don't recall directly
04: what you are referring to.
05: MR. DENTON:  All right.  Let's
06: pull this out.
07: (Whereupon, Deposition Exhibit
08: Derix-68, E-mail(s) re: Contract
09: Report re: Rivaroxaban,
10: XARELTO_BPAG_01217208 -
11: XARELTO_BPAG_01217211, Ref. 442922,
12: was marked for identification.)
13: (Whereupon, Deposition Exhibit
14: Derix-69, 9/10/09 Kollath Letter to
15: FDA, XARELTO_BPAG_01217212 -
16: XARELTO_BPAG_01217213, Ref. 442923,
17: was marked for identification.)
18: BY MR. DENTON:
19: Q.    Let me show you Exhibit 68 and
20: 69.  68 is Record No. 442922.  Exhibit 69 is
21: Record No. 442923.  68 and 69.  We found
22: those in your files that were produced by the
23: company.
24: And if you will turn to the

p. 00656

01: 00657:   attachment, which is Exhibit 69, it's one
02: Johnson & Johnson sent to the FDA.
03: MR. HOFFMAN:  I'm sorry, you're
04: representing this is --
05: MR. DENTON:  From her file.
06: MR. HOFFMAN:  -- from her file?
07: MR. DENTON:  Yeah, it is.
08: BY MR. DENTON:
09: Q.    You were in regulatory affairs
10: in September of 2009, weren't you?
11: A.    Yes, I was in regulatory
12: affairs at that time.
13: Q.    And you see the letter that
14: Johnson & Johnson wrote to the FDA on that
15: date in reference to the MAGELLAN study --
16: That's the medical ill
17: patients?
18: A.    Yes, that is --
19: Q.    -- comparing rivaroxaban with
20: Lovenox --
21: A.    Yes.
22: Q.    -- right?
23: And the company is reporting
24: that they found a doctor that had "Protocol

p. 00657

01: 00658:   violations" -- first bullet point, page 1 --
02: "were detected which included enrollment of
03: subjects that did not meet the
04: inclusion/exclusion criteria, failure to
05: perform necessary screening assessments (INR
06: and creatinine clearance assessments)."
07: Next page, "Failed to follow
08: protocol concerning study dosing regimens.
09: SAEs" -- serious adverse events -- "and
10: bleeding events were not identified and
11: reported promptly to the investigator."
12: Do you see that?
13: A.    Yes, I see that.
14: Q.    Would this be -- MAGELLAN,
15: who did -- is this a Johnson & Johnson study?
16: A.    Bayer ran the study
17: operationally, and it was run under the joint
18: contractual agreement with Johnson & Johnson.
19: Q.    So Bayer ran this study?
20: A.    Bayer ran this study, yes.
21: Q.    Who's the clinical lead on that
22: study?
23: A.    The clinical lead on that study
24: was Theodore Spiro.

p. 00658

01: 00659:      Q.    Theodore Spiro?
02: A.    Yes.
03: Q.    And would that, again, be Andy
04: Hargreaves that would look into the quality
05: assurance for that study?
06: A.    Yes.
07: MR. DENTON:  Let's -- Evan,
08: could you pull that slide for me from
09: an exhibit that we showed Dr. Derix
10: yesterday, Exhibit 28?  And that might
11: be in the envelope there, Exhibit 28
12: from yesterday.
13: MR. HOFFMAN:  I'll get it for
14: you.
15: MR. WOLFE:  It's slide 9.
16: MR. DENTON:  Got it, but let's
17: let her look at the -- let's wait.  I
18: want to make sure your lawyer can find
19: that for you so you can have a chance
20: to look at it.
21: Maybe let's go to the front
22: page, Evan, and we'll come back to
23: slide 9.
24: ///

p. 00659

01: 00660:   BY MR. DENTON:
02: Q.    Remember this was one of the
03: PowerPoints that we talked about yesterday,
04: Mr. McWilliams asked you about, one that you
05: wrote along with J|rgen Weber?
06: A.    Yes, we talked about this
07: yesterday.
08: Q.    This is the LEG 36.  This is
09: the request by the EMA to do this
10: exposure-response analysis, right?
11: A.    Yes, that is about the ongoing,
12: yeah, procedure.
13: Q.    Right.  So let's go to that
14: slide, slide 9 --
15: A.    Yes.
16: Q.    -- please.
17: And as I understand it, you're
18: pooling all the pharmacology data from all
19: these studies and then going to analyze them
20: separately, right?
21: MR. HOFFMAN:  Objection, asked
22: and answered seven times.
23: MR. DENTON:  Actually, it's
24: four times.  I'm just laying the

p. 00660

01: 00661:      foundation for my next question.  Let
02: me withdraw it.  I don't want your
03: lawyer to be...
04: BY MR. DENTON:
05: Q.    All these studies listed here,
06: the ACS study, the SPAF study, the EINSTEIN
07: studies -- and I can't see them all -- are
08: all involved with this exposure analysis,
09: right?
10: A.    All those studies are planned
11: to be involved in the exposure-response
12: analysis.
13: MR. DENTON:  All right.  Let's
14: take a break.  I'm about done.
15: THE VIDEOGRAPHER:  Going off
16: record at 2:20 p.m.
17: (Recess taken, 2:20 p.m. to
18: 2:40 p.m.)
19: THE VIDEOGRAPHER:  We're back
20: on record at 2:40 p.m.
21: BY MR. DENTON:
22: Q.    I want to go back to
23: Exhibit 28, which is your PowerPoint, which
24: is Record No. 064875.  This front page, this

p. 00661

01: 00662: is the -- this is the PowerPoint that you
02: prepared recently relative to the LEG 36 EMA
03: request, correct?
04: A. Correct.
05: Q. All right. I want to go to
06: slide 9, which was that "Exposure-Response
07: (E-R) Analysis as Proposed by the Xarelto
08: Team." And I was having trouble seeing what
09: I knew was on that document, but I want to --
10: so now I'm orientated, and we're going to go
11: with that.
12: The studies involved are the
13: phase three studies of RECORD1, 2, 3 and 4,
14: right?
15: A. This slide is referring to the
16: exposure-response analysis, so that is when
17: simulated PK out of the model is being
18: correlated to outcome events --
19: Q. Right.
20: A. -- per indication. And here at
21: that point in time, the analyses split, so,
22: then, analyses are being done per study --
23: Q. Okay. And then we --
24: A. -- or per indication or --

p. 00662

01: 00664: A. Yes, that's right.
02: Q. Okay. So the RECORD4 study is
03: the one that the FDA found to be unreliable,
04: right?
05: A. Yes, that's what we discussed,
06: the RECORD4 study was excluded from the first
07: one.
08: Q. All right. RECORD AF -- or
09: ROCKET AF is the study that your company used
10: a recalled device for monitoring warfarin.
11: We talked about that yesterday,
12: right?
13: MR. HOFFMAN: Objection to the
14: form of the question.
15: A. ROCKET AF, that's the trial
16: that formed the basis for approval in the
17: indication stroke prevention in AF patients
18: in the U.S. and Europe and other countries.
19: BY MR. DENTON:
20: Q. It's the one that used the
21: defective recalled HemoSense device that we
22: talked about all day yesterday, right?
23: MR. HOFFMAN: Objection to the
24: form of the question.

p. 00664

01: 00663: Q. And then also you have the
02: EINSTEIN phase three DVT/PE study, right?
03: A. Yes. Both studies are planned
04: to be taken into consideration for an
05: exposure-response analysis on VTE treatment.
06: Q. Okay. And you also were
07: talking about the ROCKET AF and the Japan
08: J-ROCKET, right?
09: A. Yes.
10: Q. And the ATLAS ACS2 TIMI 51 and
11: 46, right?
12: A. Yes, right.
13: Q. All right. So the studies that
14: are going into this analysis where you're
15: going to compare two outcome events -- well,
16: let's look at that. Look at slide 7.
17: A. Uh-huh.
18: Q. Slide 7, one of the things --
19: bullet point down underneath
20: "Pharmacokinetic/Pharmacodynamic Analysis,"
21: your third point, "Important clinical
22: outcomes such as thrombolic events and major
23: bleeding events should also be included in
24: this analysis," right?

p. 00663

01: 00665: You may answer.
02: A. A device was used -- produced
03: by the company HemoSense, and that device was
04: used in the ROCKET AF trial because it was a
05: double-blinded trial.
06: And there was extensive
07: analysis being done -- we discussed
08: yesterday -- in order to show that the
09: recall -- I mean, that the recall of the
10: device later on did not have a potential
11: impact on the data -- the data -- the
12: benefit-risk of the ROCKET AF trial in
13: general.
14: MR. DENTON: Move to strike as
15: nonresponsive.
16: BY MR. DENTON:
17: Q. The recalled HemoSense device
18: was used in the ROCKET AF study, true?
19: MR. HOFFMAN: Objection to the
20: form of the question.
21: A. The recall notice was on a
22: device from the company Alere, and the
23: HemoSense device that was produced earlier in
24: time before the recall had some similarity to

p. 00665

Derix, Andrea Ph.D. - 2 - Volume 2 - 03/02/2016

01: 00666:   the devices that were mentioned in the recall
02: notice.
03: BY MR. DENTON:
04: Q.    The device used in ROCKET AF,
05: the HemoSense device, has been recalled,
06: right?  We talked about that all day
07: yesterday.  This is not hard.
08: MR. HOFFMAN:  Objection to the
09: form of the question.
10: A.    The device was not recalled in
11: a sense that it was withdrawn from the
12: market.  The recall contained a restriction
13: to the labeling of that device.
14: MR. DENTON:  You're just wrong.
15: But I'll strike that.
16: BY MR. DENTON:
17: Q.    The HemoSense device, same
18: recalled device, was used in J-ROCKET, right?
19: MR. HOFFMAN:  Objection to the
20: form of the question.
21: A.    The devices used in the
22: J-ROCKET trial were purchased from the same
23: company, HemoSense, at the time as the
24: devices used in the ROCKET AF trial.

p. 00666

01: 00667:   BY MR. DENTON:
02: Q.    And the phase three ATLAS
03: study, ACS2 TIMI 51, that was the one that
04: the FDA said -- or the Ad Comm said ten to
05: nothing that that shouldn't be approved, that
06: indication shouldn't be approved, in part due
07: to missing data, right?
08: MR. HOFFMAN:  Objection to the
09: form of the question.
10: A.    The FDA did not approve the ACS
11: indication based on the available data from
12: the two ATLAS trials that are mentioned here.
13: BY MR. DENTON:
14: Q.    Right.
15: Have you, Dr. Derix -- put the
16: documents aside.
17: Have you ever heard of the
18: concept "junk in/junk out" in scientific
19: discussions?
20: MR. HOFFMAN:  Objection to the
21: form of the question.
22: A.    I'm not familiar with the
23: wording you're using.  Maybe I need to use my
24: translator for that.

p. 00667

01: 00668:   BY MR. DENTON:
02: Q.    Well, how about this, that if
03: your data is no good on outcome events, then
04: the output would be no good on this exposure
05: analysis?
06: MR. HOFFMAN:  Objection to the
07: form --
08: BY MR. DENTON:
09: Q.    Can you follow that question?
10: MR. HOFFMAN:  Objection to the
11: form of the question.
12: A.    The ATLAS TIMI 51 and also
13: TIMI 46 study was approved in Europe by the
14: health authorities, and the European health
15: authorities deemed those data adequate for an
16: approval.
17: So here that is showing that,
18: yeah, there was not a unanimous position in
19: between of regulators in the U.S. and in
20: Europe, and so I cannot agree to your
21: statements that are very generalizing.
22: MR. DENTON:  Move to strike as
23: nonresponsive.
24: ///

p. 00668

01: 00669:   BY MR. DENTON:
02: Q.    In scientific literature you've
03: never heard the concept of "junk in/junk
04: out"?  Is that your testimony?  You've never
05: heard of that?
06: MR. HOFFMAN:  Objection, asked
07: and answered.
08: A.    I don't know the -- I mean,
09: the --
10: (Interpretation.)
11: THE INTERPRETER:  Expression.
12: A.    -- expression, yeah.
13: MR. DENTON:  Okay.  All right.
14: I am out of time.  I wish I could
15: spend more time with you.  I didn't
16: get everything answered, but I have to
17: pass to my colleagues from
18: Pennsylvania.
19: THE VIDEOGRAPHER:  Going off
20: the record.  The time is 2:48 p.m.
21: (Recess taken, 2:48 p.m. to
22: 2:49 p.m.)
23: THE VIDEOGRAPHER:  We're back
24: on record at 2:49 p.m.

01: 00670:                   EXAMINATION
02: BY MS. PINTO:
03: Q.     Hi, Dr. Derix.  My name is
04: Rosemary Pinto, and I'm going to be asking
05: you just a few questions.
06: You previously said that you're
07: currently leading a team -- cross-functional
08: team of experts related to Xarelto, and they
09: don't report to you directly, but there's a
10: dotted-line reporting.  Can you tell me what
11: that means?  What's a dotted-line reporting?
12: A.     The colleagues are working in
13: my team, so -- and, therefore, I'm leading
14: them in discussions.  Also, I provide input
15: as to their individual performance in the
16: teamwork to the line managers, but I'm not
17: directly responsible for -- yeah,
18: functionally responsible for the colleagues.
19: Q.     Who do you report to?
20: A.     I'm reporting to Max Wegner,
21: who is the head of the therapeutic area,
22: general medicine at Bayer.
23: Q.     And who did you report to --
24: A.     Development --

01: 00671:         Q.   -- in 2004 to 2011?  Well,
02: let's start when you were the global -- let's
03: start when you were the team leader of the
04: Xarelto regulatory team.  What years were you
05: in that position?  Because it says 2004 to
06: 2011 on your CV.
07: A.     Right.  And during that time
08: period, my supervisors changed, although my
09: role remained the same.
10: Q.     Okay.
11: A.     So in that period, I had
12: different supervisors, so when I started to
13: work at Bayer, I reported to Matthias
14: Hoepfner.  Then I reported to Max Wegner,
15: who -- at that time in a different role.  At
16: the time he was leading regulatory group.
17: And I also reported at the time to Gerhard
18: Schlueter, yeah, and then again to Max
19: Wegner.
20: So the supervisors switched,
21: because they got different department
22: leadership while I stayed on the Xarelto
23: team.
24: Q.     In all the testimony that

01: 00672:    you've given for the last two days related to
02: e-mails that you received through the course
03: of your employment at Bayer -- I'm just
04: talking generally -- those e-mails were all
05: related to your job at Bayer, correct?  In
06: other words, they weren't personal e-mails.
07: They were work e-mails, correct?
08: A.     Yeah, they were all related to
09: my work at Bayer.
10: Q.     Okay.  You said that there was
11: very intense interaction with the Alere
12: company related to the potential malfunction
13: of the machine.  What was the intense
14: interaction?  What were you talking about
15: when you said that?
16: A.     I was referring to the very
17: short time period from the point in time when
18: we became aware of the potential impact of
19: the Alere INR recall notice to the ROCKET AF
20: trial.  The interaction was through my
21: colleagues at Janssen because they were the
22: primary contact to the company, HemoSense, in
23: prior time and then also to Alere.
24: Q.     And who was having the contact

01: 00673:    with Alere?
02: A.     Primarily, Christopher Nessel.
03: Q.     Okay.
04: A.     And during that time the --
05: sorry, you asked about the intense
06: interaction.  We were trying to get
07: information from Alere as to the background
08: of the recall notice when we prepared the
09: sensitivity analysis.
10: Q.     Okay.  I think you said that
11: there was a shadow clinical leader who worked
12: with Janssen from Bayer, correct?
13: A.     Yes, that's the typical way how
14: we worked together, so if one of the
15: companies is running a trial operation, then
16: there's always a so-called shadow team from
17: the other company.
18: Q.     And who was the shadow leader
19: for Bayer?
20: A.     On which trial?
21: Q.     The ROCKET trials.
22: A.     On the ROCKET AF trial, it was
23: John Paolini.
24: Q.     So would he have had access to

Derix, Andrea Ph.D. - 2 - Volume 2 - 03/02/2016

01: 00674:   all the same information that the Janssen or
02: Johnson & Johnson people had related to
03: ROCKET?
04: A.   I cannot comment on that
05: because I was a little bit too far away, but
06: what I know, that he was attending meetings
07: together with the Janssen team when they
08: discussed, yeah --
09: Q.   The running trials?
10: A.   -- the running trial
11: operations.
12: Q.   Okay.  You recall yesterday you
13: were testifying about the communications with
14: the EMA related to ROCKET.  I'm just
15: generally giving you a reference to where I'm
16: talking about now.  Do you recall talking
17: about that yesterday?
18: A.   Uh-huh.
19: Q.   Okay.  And you said that you
20: weren't aware of any communications to the
21: EMA regarding the possibility of the device
22: malfunctioning, and you said that there were
23: certain rules for information sharing with
24: the health authorities.

p. 00674

01: 00676:   but that's important, because while the study
02: was running it was under the surveillance of
03: the individual health authorities in Europe
04: because, at the time when the clinic trial
05: protocol is being submitted and approved and
06: the trial is running, at that time this is a
07: responsibility of the national health
08: authorities in Europe, so all countries that
09: are participating in the trial.
10: EMA only comes later as the
11: central European agency, when we start the
12: approval procedures.
13: Q.   Okay.
14: A.   And so at the time, certainly
15: EMA, yeah, there was no process in place or
16: EMA would not have expected any communication
17: from the running trial.
18: Q.   Is there anything that
19: prohibited you or anyone at Bayer from
20: communicating with any regulatory agency
21: about the malfunctioning that -- or the
22: potential malfunctioning of the device that
23: was used in the ROCKET studies?
24: A.   I never experienced the

p. 00676

01: 00675:         I'm not purporting to quote
02: you.  I'm just trying to give you a
03: reference.  Do you remember talking about
04: that?
05: A.   Yeah, but I think I would have
06: to put it in context, because --
07: Q.   Right.  I'm not asking you to
08: testify to anything now.  I'm just trying to
09: say:  Do you remember that conversation?
10: A.   Yeah, I remember that we had a
11: conversation about --
12: Q.   Okay.
13: A.   -- yeah, reporting to the
14: health authority.
15: Q.   Sure.  And my question is:
16: There are no rules that would have prohibited
17: you or another representative of Bayer from
18: communicating to the EMA any information that
19: the company had related to any potential
20: malfunction of the machine that was at issue,
21: correct?
22: A.   Are you referring back to the
23: time when the study was running?  Because, I
24: mean, the study was running in 2000, yeah,

p. 00675

01: 00677:   situation that somebody in the company was
02: prohibited from submitting information that
03: would have been deemed necessary for
04: submission to or proposed by the regulatory
05: team for submission to the health
06: authorities.
07: Q.   Okay.  I'm still not clear if
08: you answered me.
09: Is there anything that would
10: have prohibited you -- if you give me a yes
11: or a no, then you can explain it and then
12: I'll know what your answer is.
13: Is there anything that would
14: have prohibited you or anyone at Bayer from
15: providing to regulatory authorities,
16: including the EMA, information related to
17: potential malfunction of the device used in
18: ROCKET?
19: If you give me a yes or no,
20: then I'll know what your answer is, and then
21: you can explain it.
22: A.   I can't give you a yes or no
23: because I still do not understand your
24: question.

p. 00677

01: 00678:     Q.     If you thought it was the right
02: thing to do to tell a regulatory agency,
03: "Hey, we think this device malfunctioned in
04: the ROCKET studies," could you have done it?
05: MR. HOFFMAN:  Objection to the
06: form of the question.
07: You may answer.
08: A.     In general, certainly
09: there's -- as I said, if there's a feeling
10: for important information to be shared with
11: the health authority, as you described it
12: just as such, as it's deemed necessary,
13: there's potential possibility to -- yeah, to
14: send information.
15: BY MS. PINTO:
16: Q.     So that's a yes, correct?  You
17: could do it?  There's nothing prohibiting you
18: from doing it, correct?
19: A.     You can -- there's nothing
20: prohibiting to send in information, that's
21: correct.
22: Q.     And I have -- do you remember
23: you talked about the -- in response to
24: Mr. Denton's questions, you were talking

p. 00678

01: 00680:          You may answer.
02: A.     As I said before, I mean,
03: that's typically not in my area of
04: responsibility or work to -- to interact with
05: any journal or any publication.  But as
06: always, there's, I mean, free -- how do we
07: call it?
08: (Interpretation.)
09: THE INTERPRETER:  The right to
10: express your opinion freely.
11: BY MS. PINTO:
12: Q.     Okay.  And even if you don't
13: have a regulatory responsibility right now,
14: you understand that there are people that do,
15: at the company, still have regulatory
16: responsibilities; and if Bayer thinks it's
17: the right thing to do to protect patient
18: safety, somebody at Bayer could have called
19: up The Lancet and said what they really --
20: what they knew about what the FDA's position
21: was with regard to RECORD4, correct?
22: A.     The important thing is that you
23: said if there had been a concern about a
24: patient's safety, which was not the case here

p. 00680

01: 00679:     about The Lancet article that came out
02: regarding RECORD4 in May of 2009.  Do you
03: remember discussing that?
04: Again, I'm not asking you any
05: specific question now.  I'm just asking you:
06: Do you remember talking about that article?
07: A.     Yes, I remember that we talked
08: about the article.
09: Q.     Okay.  And when you realized
10: that there were problems with RECORD -- the
11: RECORD4 and that it was not getting approved,
12: was there anything stopping you, if you
13: thought it was the right thing to do, from
14: calling up The Lancet and saying, "You know
15: what, there were problems with that study, so
16: the article is misleading"?
17: MR. HOFFMAN:  Objection to the
18: form.
19: BY MS. PINTO:
20: Q.     Would there be anything
21: stopping you from doing that in terms of a
22: regulatory rule that you couldn't do that?
23: MR. HOFFMAN:  Objection to the
24: form of the question.

p. 00679

01: 00681:     in terms of the RECORD4 trial.
02: Q.     Okay.
03: A.     Because the trial was not
04: included into the approval by FDA, and so it
05: was also not included in the label.  Hence
06: the RECORD1 to 3 studies were deemed
07: sufficient by the health authority to grant
08: approval for the indication based on these
09: three trials.
10: Q.     Well, don't you think that any
11: physician who read The Lancet might
12: appreciate knowing that information for the
13: safety of patients?
14: MR. HOFFMAN:  Objection to the
15: form of the question.
16: A.     It's my understanding that the
17: physicians primarily look, when they
18: prescribe drugs, into the information that is
19: described in the label, and that they base
20: their prescription decision on what they know
21: from the label and from the information.  In
22: addition, they can certainly also take other
23: sources into consideration.
24: BY MS. PINTO:

p. 00681

Page 67

01: 00682:       Q.    But you've already told us that
02: you're not a medical doctor.  In fact, you
03: said earlier in your deposition that you
04: wouldn't even try to fill out an adverse
05: event report because that's not your area.
06: So how are you so familiar with
07: what doctors do in their prescribing
08: practices?
09: MR. HOFFMAN:  Objection to the
10: form of the question.
11: A.    That is my understanding from
12: the regulatory perspective, because we're
13: paying a lot of attention to provide
14: sufficient and appropriate information into
15: labels.
16: BY MS. PINTO:
17: Q.    Okay.  And, in fact, you do
18: have a pharmacy background, so you are a
19: healthcare practitioner, correct?
20: A.    I started a pharmacy and --
21: yeah, that's my --
22: Q.    In Germany, you'd be considered
23: a healthcare practitioner, correct, as a
24: pharmacist?

p. 00682

01: 00683:        A.    As a pharmacist, I'm part of,
02: yeah, a healthcare provider, that's right.
03: But I, yeah, continued to work in science and
04: then university and then went into industry,
05: so I don't have the practical experience you
06: typically have as a pharmacist in a local
07: pharmacy practice.
08: MS. PINTO:  Okay.  Thank you.
09: THE VIDEOGRAPHER:  Going off
10: the record at 3:03 p.m.
11: (Recess taken, 3:03 p.m. to
12: 3:12 p.m.)
13: THE VIDEOGRAPHER:  We're back
14: on record at 3:13 p.m.
15: EXAMINATION
16: BY MR. HOFFMAN:
17: Q.    Good afternoon, Dr. Derix.  I'm
18: William Hoffman, and I'm here representing
19: the Bayer defendants in this litigation.  And
20: I'm going to ask you a short series of
21: questions about a handful of issues that have
22: come up in your deposition over the course of
23: the past two days.
24: Do you understand that?

p. 00683

01: 00684:        A.    Yes.
02: Q.    Okay.  First thing I'd like to
03: do is mark as Derix Exhibit 70 your
04: curriculum vitae, which I think counsel for
05: plaintiffs discussed with you a little bit
06: yesterday, but we didn't mark it.
07: (Whereupon, Deposition Exhibit
08: Derix-70, Derix Curriculum Vitae
09: [No Bates], was marked for
10: identification.)
11: BY MR. HOFFMAN:
12: Q.    Is this a true and correct copy
13: of your CV?
14: A.    Yes, it is.
15: Q.    Okay.  Let me ask you some
16: background information that's not on your CV
17: before we get into that.
18: Where were you born?
19: A.    I was born in Bitburg, in
20: Germany.
21: Q.    Okay.  And have you lived in
22: Germany all of your life?
23: A.    Yes, I lived in Germany all of
24: my life.

p. 00684

01: 00685:        Q.    Okay.  And you're answering
02: questions today in English; that's not your
03: native tongue?
04: A.    No, that's not my native
05: tongue.  I learned it at school, and then
06: yeah, later on also started to use it more
07: and more in the -- primarily in my
08: professional life.
09: Q.    Okay.  So you speak English
10: sometimes in your professional life, but it's
11: not your native tongue?
12: A.    That's correct.
13: Q.    So some of the questioning that
14: went on, the phrasing may have not been
15: familiar to you, but you were able to answer
16: the questions that were posed to you?  Is
17: that fair?
18: A.    That's fair, yes.
19: Q.    Okay.  Now, turning to your CV,
20: it appears that most of your professional
21: experience has been as a regulatory affairs
22: professional at pharmaceutical companies?
23: A.    That's correct.
24: Q.    Okay.  And I think you were

p. 00685

01: 00686:  asked about this yesterday, but I want to
02: just revisit it briefly.
03: You did a Ph.D. thesis in
04: medicinal chemistry/pharmacology in the late
05: 1990s?
06: A.    Yes, that's correct.
07: Q.    Okay.  And that was in a
08: particular area, not a broad-based
09: pharmacology program?
10: A.    Right.  It was a very specific
11: area.  It's also mentioned here in the title
12: of my Ph.D. thesis, so I synthesized a couple
13: of molecules called here benzopyranes, which
14: are modulators of a potassium channel, and
15: that leads to antihypertensive activity.
16: So I tested the substances that
17: I synthesized in the chemical lab in
18: pharmacological models, that means also in
19: animal models.
20: Q.    You were asked some questions
21: yesterday about pharmacokinetic and
22: pharmacodynamic issues with respect to
23: Xarelto.
24: Are you an expert in those

p. 00686

01: 00687:  areas?
02: A.    No, I'm not an expert in those
03: areas.  So the title "pharmacology" here is
04: really referring only to specific
05: pharmacological models that I used to assess
06: antihypertensive activity.
07: Q.    And with respect to questions
08: that relate to the pharmacokinetic or
09: pharmacodynamic properties of Xarelto or
10: rivaroxaban, to whom would you refer those
11: questions within Bayer?
12: A.    I would refer questions related
13: to pharmacokinetics of Xarelto to Dagmar
14: Kubitza and to Wolfgang M|ck.
15: Q.    As I had indicated a couple of
16: moments ago, primarily, your professional
17: career has involved working as a regulatory
18: affairs specialist.  Can you describe to the
19: jury what a regulatory affairs specialist
20: does within the context of a pharmaceutical
21: company?
22: A.    Yes, I can do that.
23: So it's two primary things.  So
24: one is the contact to the health authorities,

p. 00687

01: 00688:  so that means preparing for submissions to
02: the health authorities, also receiving the
03: feedback from the health authorities and
04: discussing it with the functional experts in
05: the company.  That was my primary role in the
06: first job assignments I had where I was more
07: responsible for local regulatory affairs in
08: the German-speaking countries of Takeda.
09: Later on, the responsibility in
10: my assignments at PAION and Bayer expanded to
11: more global responsibility, so in that
12: function I was part of a program management
13: team where other functions were represented,
14: and I was the regulatory representative in
15: that team.  So we all continued working on
16: projects, and specifically on Xarelto.
17: And here my role was, in part,
18: providing advice to the development team on
19: regulations, on health authority input, so
20: they could implement that in the development
21: plans, but also still, in part, communication
22: to -- direct communication to health
23: authorities.
24: But here the focus was on

p. 00688

01: 00689:  European health authorities, primarily the
02: EMA.  For direct contacts to health
03: authorities outside of Europe I had other
04: experts on my team who were more familiar
05: with the local regulations such as in the
06: U.S. at the time, Larry Winick, who was the
07: direct contact to FDA, and likewise in Japan
08: and China and other countries.
09: Q.    So over the past couple of
10: days, you've been asked a number of questions
11: that touched on different disciplines or
12: different areas within the company, and even
13: though you're a senior regulatory affairs
14: professional, you indicated in your answers
15: that it would be better to talk to others at
16: the company.
17: Why is that?  How does that
18: work?  Why is it that you're not able to be
19: the best source of information on those
20: questions?
21: MR. DENTON:  Object to the form
22: of the question.
23: Go ahead.
24: A.    It's typical for the role as a

p. 00689

Page 69

Derix, Andrea Ph.D. - 2 - Volume 2 - 03/02/2016

01: 00690:   regulatory manager or regulatory strategist,
02: so most of the time we have some kind of
03: natural science background, but the primary
04: role is really to facilitate the
05: communication to make sure that the team is
06: well informed about the pharmaceutical
07: legislation and guidelines issued by the
08: health authorities.
09: And it's also leading the team
10: when it comes to preparations for health
11: authority meetings or submissions to give
12: them the framework in which they work.
13: But the scientific content is
14: always provided by the experts, and they
15: provide this input to the regulatory
16: strategists.  So typically regulatory manager
17: or strategists are not writing up scientific
18: content by themselves, so always relying to
19: the experts in the team.
20: BY MR. HOFFMAN:
21: Q.    You indicated that you -- or
22: that part of your function is to facilitate
23: communications between experts or scientists.
24: Can you explain what you mean

01: 00691:   by that?
02: A.    Yeah.  Part of the role is also
03: to provide appropriate information.  For
04: example, in early development, there are
05: regulations that describe which type of
06: animal toxicity data will have to be
07: performed and completed successfully before
08: you can enter into a clinical trial.
09: So in such a situation, as to
10: give an example, it would be the role of the
11: regulatory representative to -- yeah, to make
12: sure that this information is -- yeah,
13: exchanged and provided so that the team can
14: continue the work altogether.
15: Q.    Okay.  And over the past couple
16: of days, we saw a number of e-mails that you
17: were copied on.  Why is it that you're copied
18: on so many e-mails?
19: A.    This is also explained by the
20: role as a facilitator and kind of -- yeah,
21: so -- yeah, you keep -- are keeping all the
22: information, so it's also part of the
23: regulatory responsibility to keep an
24: extensive database of information that is

01: 00692:   relevant to later health authority
02: submissions.
03: And so, in that regard, it's
04: often the case that colleagues who exchanged
05: scientific content or discuss content copy
06: regulatory affairs managers just to let them
07: know that they are in touch, that they are
08: working on a topic, sometimes indicating the
09: time frame they still need to finish the
10: document, and that is required for the
11: planning.
12: Q.    And, Doctor, if at any point
13: any of my questions are unclear and you need
14: to consult with the stand-by translator who's
15: here today, please feel free to do that.
16: A.    Okay.
17: Q.    You mentioned in your response
18: that your experience has primarily been in
19: European regulation.
20: Did I understand that
21: correctly?
22: A.    Yes, you understood that
23: correctly.  That's my primary expertise,
24: especially as the European health authorities

01: 00693:   were the only health authorities I typically
02: worked with in direct communication line.
03: Q.    Can you describe for the jury
04: at a high level how the approval process for
05: a medicine works in Europe?
06: A.    Yes, I can do that.
07: So in general, the health
08: authorities accompany a process for
09: pharmaceutical product development from very
10: early on.  So the approval process is the
11: latest step in the chain, so to say, when all
12: the information that has been gathered in the
13: course of the development, and that can be
14: five, six or seven years, as being collected
15: and completed.
16: And at that point in time, then
17: the marketing authorization -- or future
18: marketing authorization holder or sponsor is
19: compiling a comprehensive package which is
20: called marketing authorization application or
21: new drug application.  And that contains all
22: the information that has been collected so
23: far for the review of the health authorities.
24: Q.    Let me try to step back in this

01: 00694:   process a little bit.
02: Before a company submits one of
03: these applications, does it have interaction
04: with the health authorities in Europe?
05: A.    Yes, certainly.  The process of
06: involvement and direction with the health
07: authorities is typically starting way before
08: the submission of the final application.  It
09: typically starts at the time when the first
10: clinical studies, so studies in human beings,
11: are being proposed.
12: So there was -- one important
13: process is the approval of the -- of a
14: protocol for a study that is going to be
15: conducted, and for the approval of such a
16: protocol, it is required to present to the
17: health authority all available data for them
18: to assess the risk-benefit for the patients
19: that will be included in the study, and it's
20: also assessing the objective of the study.
21: And only after the thorough
22: assessment, the health authority will approve
23: a protocol, even to start with.  So that's a
24: very early point in time.

p. 00694

01: 00696:   discuss those plans with the health authority
02: and seek their agreement.
03: Q.    You used a couple of phrases
04: there that I want to make sure I understand.
05: Phase one, what is that?
06: A.    A phase one study is a study in
07: healthy volunteers, so -- and that's a study
08: where primarily the characteristics on
09: absorption, excretion, metabolism, so
10: pharmacokinetic properties, are being
11: assessed of a new drug.
12: Q.    So it's a test that's done in
13: patients who aren't the target for the
14: medicine, but just regular people to see what
15: impact the medicine has on them?
16: A.    Yes, so that is what the term
17: "healthy volunteers" means.
18: Q.    Okay.
19: A.    Those are not patients
20: suffering from the disease.
21: Q.    So going back to this timeline
22: of how the approval process works, did I
23: understand you correctly that there are
24: scientific meetings throughout the process

p. 00696

01: 00695:         And then there's another
02: process that is often used, and I have always
03: urged our teams to really make use of that
04: opportunity.  Those are scientific advice
05: meetings that can be asked for by the
06: applicants, by the sponsor from the health
07: authorities.
08: And in those scientific advice
09: meetings there's an opportunity to discuss up
10: front the development plans for a new
11: pharmaceutical product with the health
12: authority.  It's an opportunity to ask
13: questions to the health authority about the
14: appropriateness of the plans and also to
15: discuss very specific scientific topics of
16: relevance.
17: Those scientific meetings are
18: typically run several times in the course of
19: the development, usually after finalization
20: of one step, let's say once the phase one
21: studies have been completed, information has
22: been gathered, and the sponsor is considering
23: to enter into the next phase for those
24: range-finding studies, they will typically

p. 00695

01: 00697:   and that health authorities will approve the
02: protocol or study plan that the company
03: intends to follow to show that the medicine
04: is safe and effective?
05: MR. DENTON:  Object to the
06: leading form of the question.
07: MR. HOFFMAN:  Well, let me
08: rephrase the question, then.
09: BY MR. HOFFMAN:
10: Q.    Can you elaborate on how the
11: scientific meetings work and what their role
12: is in the medicine approval process?
13: A.    The scientific meetings work in
14: a way that the sponsor is sending information
15: about the status or all available information
16: from the development program at the time to
17: the health authority, together with a
18: proposal for the next steps of development.
19: So next steps can be, yeah, the phase two
20: program, for example, dose findings.
21: And so, then, the health
22: authority has been asked questions whether
23: they are in agreement, yeah, with the
24: proposals that are made for the next steps in

p. 00697

Page 71

Derix, Andrea Ph.D. - 2 - Volume 2 - 03/02/2016

01: 00698:   the development plan, and then there's a
02: discussion with the health authorities in
03: which the health authority is providing
04: advice to the sponsor.
05: Q.    Do health authorities approve
06: the study plan for proving that the medicine
07: is safe and effective?
08: MR. DENTON:  Object to the
09: leading form of the question.
10: BY MR. HOFFMAN:
11: Q.    What if any role do health
12: authorities have in reviewing the study plan
13: for medicines to show that they're safe and
14: effective?
15: MR. DENTON:  Same objection.
16: A.    Health authorities approve all
17: clinical study protocols before -- of the
18: study, so pharmaceutical sponsor is not
19: allowed to start any study, any clinical
20: study, before approval is granted by the
21: health authority in the territory where the
22: study is planned to be conducted.
23: BY MR. HOFFMAN:
24: Q.    So we get to the point where a

p. 00698

01: 00699:   submission is made, an application to market
02: a medicine to treat patients.
03: A.    Uh-huh.
04: Q.    What do health authorities
05: typically do at that point in the process?
06: A.    The health authorities receive
07: the full extensive package on all aspects of
08: the pharmaceutical product collected so far,
09: and then they start an extensive review
10: period.  They have a predefined amount of
11: time, which is defined in the legislation for
12: this process; it's about a year, so it's
13: depending a little bit on the region.  They
14: have different legislation.
15: So that's the point in time
16: frame the health authority has to assess all
17: the information that was provided to them and
18: to come to a conclusion whether the new
19: product is -- has positive benefit-risk and
20: can be granted market approval.
21: And this process in the health
22: authority is running similar to in the
23: company.  Also in the health authority there
24: is a regulatory quality manager or

p. 00699

01: 00700:   coordinator who is running the procedure, but
02: this coordinator is also reaching out then to
03: other functional experts who are in the
04: health authority, experts who can evaluate
05: the pharmaceutical quality, sort of so-called
06: CMC, how the experts, for example, would have
07: the knowledge to evaluate the
08: pharmacokinetics/dynamics, just to give an
09: example that you also had.
10: Q.    So you wouldn't ask a
11: regulatory strategist at a health authority a
12: question about pharmacokinetics?
13: MR. DENTON:  Objection to the
14: form of the question.
15: A.    I agree.  So the regulatory
16: representative or the counterpart at the
17: health authority directly would also reach
18: out to experts in the agency who -- who
19: provide, yeah, the respective answers or who
20: evaluate those specific questions.
21: BY MR. HOFFMAN:
22: Q.    At this point in the process,
23: after the submission or application has been
24: made, do health authorities ask for

p. 00700

01: 00701:   additional data or ask questions to the
02: company that has filed the application?
03: A.    Yes, that's the part of the
04: process where there's always a possibility
05: for the health authorities to come back with
06: questions, and especially in Europe, the
07: process is very much regulated because it
08: involves representatives from health
09: authorities from all national countries in
10: Europe.
11: And so as they have to
12: coordinate this, it's strongly regulated.  So
13: there's a point in time for the first time
14: the health authorities provide their first
15: feedback in way of a preliminary assessment,
16: plus additional questions.
17: And then the company has --
18: then there's a clock stop in the procedure,
19: so during that clock stop in the procedure,
20: the sponsor has time to prepare responses to
21: the questions that were raised by the health
22: authorities and resubmit them.
23: And then the health authority
24: again has a predefined time frame to look

p. 00701

Page 72

01: 00702:   into the responses and to continue the review
02: of the initial application, and has another
03: opportunity to ask questions at a later point
04: in the procedure if there are still open
05: topics they would like to continue
06: discussing.
07: And, again, same procedure.
08: There's a clock stop, and the sponsor has an
09: opportunity to respond to the open questions.
10: And only after all the
11: questions are being responded that have been
12: posed, the health authority is then entering
13: into the final phase where they bring
14: together the expertise and the review
15: assessments of all the experts in the
16: authority and form their final opinion.
17: Q.    At the end of this process,
18: what happens?
19: A.    At the end of the process, the
20: health authority is either granting an
21: approval for a new product to go on the
22: market or, yeah, they also have the
23: opportunity to not grant approval if they
24: feel that their questions have not been

p. 00702

01: 00704:   authorities in Europe and this final
02: decision?
03: A.    To what aspects you were
04: referring to were in --
05: Q.    I apologize.  My question was
06: unclear.  Let me ask it again.
07: How long does the process, the
08: approval process, take from the first point
09: in time when a company interacts with the
10: health authorities about a possible
11: application and the final decision?
12: A.    It's typically six -- five,
13: six, seven years that this process takes.
14: Sometimes longer, but it's -- yeah, not
15: shorter than five years, typically.
16: Q.    When the European health
17: authorities are considering a medicine at the
18: same time that the U.S. Food and Drug
19: Administration is considering a medicine, are
20: there mechanisms or ways that these two
21: regulatory bodies can communicate about the
22: product?
23: MR. DENTON:  Object to the
24: form.

p. 00704

01: 00703:   answered sufficiently or if there -- if the
02: material information is not sufficient to
03: grant approval.
04: Q.    And assuming that the European
05: regulators grant approval, what form does
06: that take?  What does the company see at the
07: end of this process?
08: A.    In Europe specifically, it's an
09: assessment report, so-called European public
10: assessment report.  So this assessment report
11: is a summary of -- yeah, the results of
12: assessments done during the course of the
13: review period, so almost a year.
14: And that assessment report is
15: made public on the EMA homepage.  And once
16: the EMA has published their opinion, there's
17: another formal administrative procedure
18: afterwards by the EU commission.  That's the
19: authority that's formally then granting the
20: approval before the product can go on the
21: market.
22: Q.    About how long does this
23: process take from the first interaction
24: between the company and the health

p. 00703

01: 00705:         A.    Yes, there are.  There's an
02: agreement between several health authorities,
03: including FDA and EMA, that they can, under
04: confidentiality agreement, exchange
05: information under the running procedures and
06: under the assessments they are involved with.
07: And that's happening quite
08: frequently that they have meetings.  The
09: sponsors are not involved in those meetings
10: and do not typically get information from
11: those meetings, but sometimes the
12: coordinators mention that meetings took
13: place.
14: BY MR. HOFFMAN:
15: Q.    That was going to be my next
16: question:  In your experience, do these types
17: of interactions between the European health
18: authorities and the FDA take place, and how
19: do you know that?
20: A.    Yeah, I know that there's
21: typically a monthly meeting, but with a
22: varying agenda, so they don't publish the
23: agenda.  And on the special notes, sometimes
24: the coordinators of the procedures tell us

01: 00706:   whether they have had interactions or whether
02: they plan interactions with the FDA.
03: Q.    Let me turn to Xarelto and the
04: regulatory history here in Europe.  And by
05: that, I mean, can you describe the approvals
06: for Xarelto that have taken place and for
07: what condition those approvals were for?
08: A.    The first development program
09: was on VTE prevention in patients who undergo
10: total knee replacement or total hip
11: replacement.  That was the first approval
12: granted for the 10-milligram dose of Xarelto
13: in 2008.
14: And subsequently, further
15: submissions were made, and there was a
16: submission made for DVT treatment and for
17: prophylaxis -- yeah, secondary prophylaxis of
18: DVT and PE and for prevention of stroke in
19: patients with atrial fibrillation.  And those
20: two indications were approved in 2011.
21: The -- another submission was
22: made for PE treatment, so it's pulmonary
23: embolism, is also a form of venous
24: thromboembolism that occurs in the lung, and

01: 00707:   that submission was made separately and
02: approved also separately as a label extension
03: later on.
04: And the third submission that
05: was made was related to the ACS indication,
06: so that's prevention of major cardiovascular
07: events and --
08: Q.    I'm sorry to interrupt you, but
09: can you tell the jury what ACS is?
10: A.    ACS is standing for acute
11: coronary syndrome.
12: And, yeah, there's also a
13: prevention indication in patients who suffer
14: from acute coronary syndrome to prevent from
15: subsequent myocardial infarction, stroke or
16: sudden CV death.
17: MR. HOFFMAN:  I wanted to mark
18: a couple of these assessment reports
19: that you described as exhibits so that
20: the jury can see what they're like.
21: So let's mark as Derix
22: Exhibit 71 one of these assessment
23: reports.
24: (Whereupon, Deposition Exhibit

01: 00708:       Derix-71, EMA Assessment Repot,
02: XARELTO_BPAG_10929210 -
03: XARELTO_BPAG_10929258, was marked for
04: identification.)
05: BY MR. HOFFMAN:
06: Q.    Take a moment to look at it.
07: A.    Yeah, that's the assessment
08: report on treatment of deep vein thrombosis,
09: DVT, and prevention of recurrent DVT and PE
10: following acute DVT in 2011 that I was
11: talking about.
12: Q.    Okay.  And if you need to take
13: a moment to familiarize yourself with this,
14: please go ahead, but I only have a handful of
15: questions, just parts of this that I want to
16: focus the jury on.
17: And if it helps you, the first
18: part is on page 5 and 6 of this document, if
19: you want to turn to that.
20: A.    Yeah.
21: Q.    So this appears to me to be a
22: description of the process that this
23: application followed, particularly over on to
24: page 6 at the top?

01: 00709:       A.    Yes, that's correct.  It's
02: stating the different steps in the submission
03: and approval procedure, starting with the
04: initial submission.
05: Q.    Okay.  And is this a typical
06: part of one of these final assessment reports
07: that would go through the process?
08: A.    Yes, that's very typical.  So
09: in this report, it's typically listed how,
10: yeah -- which steps were taken and also the
11: time frame, yeah, when questions were sent to
12: the applicant and when the applicant sent
13: back their responses.
14: Q.    Okay.  Then let's turn to
15: page 46 of this document.  You had indicated
16: earlier that the health authorities reach a
17: conclusion about whether the medicine should
18: be approved or not, and I wanted to ask you
19: about the paragraph right below the word
20: "Balance," "Importance of favorable and
21: unfavorable effects."
22: Can you take a look at that?
23: A.    Uh-huh.
24: (Document review.)

01: 00710:     A.   Yes.
02: Q.    So here the European health
03: authorities indicate that "The only available
04: major alternative for oral long-term
05: secondary prophylaxis after DVT today is VKA
06: treatment from which experience exists in
07: several decades.  VKA treatment requires
08: continuous monitoring and careful
09: consideration of numerous possibilities for
10: interaction with other drugs and food.  The
11: quality of VKA treatment is varying between
12: centers and patients where lower quality is
13: associated with increased risks of bleeding
14: and VTE recurrences.  A simpler and more
15: predictable alternative for oral use that
16: would not need such intense monitoring would
17: therefore be a potentially valuable
18: alternative, especially for patients where
19: VKA treatment is not functioning well."
20: And I read that just to orient
21: you to this particular part:  Is that
22: something that's typically found in these
23: assessment reports, a comparison to existing
24: therapy?

01: 00712:   BY MR. HOFFMAN:
02: Q.    Let me ask this slightly
03: differently:  Do the European health
04: authorities in the process of reviewing and
05: approving drugs consider alternative
06: therapies?
07: A.    Yes, certainly that's -- that's
08: the principal of evaluating whether, yeah, a
09: new drug to come on the market is deemed
10: appropriate and is providing an alternative
11: or a better alternative or appropriate
12: alternative to existing therapy.
13: Q.    And with respect to the review
14: and approval of Xarelto for VTE treatment,
15: did the European health authorities weigh
16: that question?
17: MR. DENTON:  Object to the form
18: of the question.
19: BY MR. HOFFMAN:
20: Q.    If you know.
21: MR. DENTON:  Same objection.
22: A.    It is displayed here in the
23: paragraph that they took into consideration
24: the alternative therapy that's available.

01: 00711:             MR. DENTON:  I object to the
02: form of the question and leading
03: nature of reading from the document as
04: a preamble to your question.
05: BY MR. HOFFMAN:
06: Q.    So my question, Dr. Derix,
07: having looked at this first paragraph, which
08: is displayed for the jury, is this a typical
09: thing that you see in an assessment report?
10: MR. DENTON:  Same objection.
11: It's the same question.
12: A.    Yes, this is a fundamental
13: principle of the health authorities, that if
14: there is a treatment available for a certain
15: disease, then a new pharmaceutical product,
16: an alternative, is always compared to the
17: existing treatment, called also sometimes
18: standard of care.
19: And in that regard, this
20: paragraph is just concluding what the health
21: authority in very short few sentences has,
22: yeah, reviewed from the review and is
23: providing their opinion.
24: ///

01: 00713:   BY MR. HOFFMAN:
02: Q.    And did the final assessment
03: report -- well, do final assessment reports
04: typically review the risk-benefit balance for
05: the medicine that is under consideration?
06: A.    Yes.  It's a very important
07: component of the assessment reports.
08: Q.    And did the European health
09: authorities in reviewing the application for
10: Xarelto for VTE treatment assess the
11: risk-benefit balance?
12: A.    Yes, we have authorities that
13: did that in this case.
14: Q.    And what conclusion did they
15: come to?
16: MR. DENTON:  Object to the form
17: of the question.
18: BY MR. HOFFMAN:
19: Q.    With respect to Xarelto for VTE
20: treatment?
21: MR. DENTON:  Same objection.
22: A.    The final conclusion is a very
23: short sentence, which can be found here in
24: the document under 2.9, and it concludes

01: 00714:   that, "The overall benefit-risk of
02: rivaroxaban in the treatment of DVT and PE is
03: considered positive."
04: And there is a little bit
05: further up also a discussion of the
06: benefit-risk balance, and in that discussion,
07: it said that "The value of an alternative
08: with reduced need for monitoring, simpler
09: dosing and reduced interaction potential than
10: currently required for VKA treatment, which
11: is the standard of care, is considered to
12: outweigh the perceived potential risks with
13: rivaroxaban treatment."
14: (Whereupon, Deposition Exhibit
15: Derix-72, EMA CHMP Variation
16: Assessment Report,
17: XARELTO_BHCP_00456368 -
18: XARELTO_BHCP_00456435, was marked for
19: identification.)
20: BY MR. HOFFMAN:
21: Q.    Let me show you another one of
22: these, which we'll mark as Derix-72.  I'll
23: hand it to you, and you can take a minute to
24: look at it, and then if you're able to,

p. 00714

01: 00715:   identify it for the jury.
02: A.    This is the CHMP assessment
03: report on the indication for the use of
04: rivaroxaban in prevention of stroke and
05: systemic embolism in patients with
06: nonvalvular atrial fibrillation.
07: Q.    And I want to ask you the same
08: series of questions that I asked you about
09: the previous final assessment report.  First,
10: does this document including a summary of the
11: process that was followed once the
12: application was submitted?
13: A.    Yes, it does.
14: Q.    And where can we find that?
15: A.    You can find that on the second
16: page of the document under "Steps taken for
17: the assessment."
18: Q.    And this goes through the
19: question and answer process that we talked
20: about earlier that normally takes place when
21: the European health authorities review an
22: application?
23: A.    Yes, exactly.  So it indicates,
24: yeah, when the first request for

p. 00715

01: 00716:    supplementary application was sent and also
02: the second request for supplementary
03: information, which is reflecting the normal
04: process in the review, sometimes also
05: referred to as day 120 or day 150 requests.
06: Q.    And then I want to ask you
07: about the final conclusion of the European
08: regulators on this, if you can find that in
09: the document.
10: Have you located it, Doctor?
11: A.    The final conclusion is in this
12: document under Section 3.6, "Conclusions."
13: Q.    And is that on page 58 of the
14: document?
15: A.    Yes, on page 58.
16: Q.    And what were the -- what was
17: the final conclusion of the European health
18: authorities?
19: A.    Also for this indication it was
20: the conclusion that the overall benefit-risk
21: of Xarelto was considered positive for the
22: indication, and here in the document the
23: indication is cited in greater detail.
24: Q.    Okay.  In the U.S., does Bayer

p. 00716

01: 00717:    hold the license for the product for the new
02: drug application?
03: A.    No, Bayer does not hold the
04: license.  The license holder is Janssen
05: Pharmaceuticals.
06: Q.    Okay.  You were asked some
07: questions about the RECORD studies that were
08: submitted in support of the application for
09: the use of Xarelto to treat patients who have
10: had knee and hip surgery.
11: Do you recall that?
12: A.    Yes, I recall that.
13: Q.    I wanted to just make sure that
14: the timeline was clear to the jury here.
15: Mr. Denton showed you a complete response
16: letter from the FDA that was, I believe,
17: dated May of 2009; is that familiar to you?
18: A.    Yes, that's familiar from the
19: documents I reviewed before.
20: Q.    Okay.  And after that complete
21: response letter was sent to Janssen, both of
22: the companies participated in meetings with
23: the FDA to talk about some of the issues at
24: clinical trial sites and the audits that were

p. 00717

Page 76

01: 00718:   done to address those issues?
02: A.   Yes, that's what we typically
03: do for all of the meetings that, even though,
04: yeah, one company is in the lead, and for
05: U.S. it's Janssen, there are also
06: participants from the Bayer team, and
07: likewise, so if we have important meetings
08: with the EMA, also one or two colleagues from
09: the Janssen team attend.
10: And this is just to really
11: facilitate also the discussion, to have a
12: direct, yeah, access, also to listen in to
13: the discussions that happen at the health
14: authorities, and it also helps then really
15: support later on if new information is needed
16: to follow up on questions from the health
17: authorities that I'm sure is -- both
18: companies can work together to provide this
19: information irrespective of who was in the
20: lead of the communication or who is the
21: marketing authorization holder in the region.
22: Q.   Okay.  And you were asked some
23: questions about an audit by a company called
24: Falcon.

p. 00718

01: 00719:          Do you recall that?
02: A.   Yes, I recall those questions.
03: Q.   And were the reports from the
04: Falcon audits of the RECORD studies submitted
05: to FDA?
06: A.   Yes, that's my understanding.
07: Q.   And did the companies also hire
08: a company called Parexel to look at some of
09: the clinical trial sites in the RECORD
10: studies?
11: A.   Yes.  Yes.
12: Q.   And were the results of the
13: Parexel audit submitted to the FDA?
14: A.   Yes, my understanding, that the
15: result of all of this that had been conducted
16: in this context were submitted.
17: Q.   And at the end of the process,
18: what did FDA conclude about the -- its
19: ability to rely on the data in the RECORD1,
20: RECORD2 and RECORD3 studies?
21: MR. DENTON:  Object to the form
22: of the question.
23: A.   FDA, after the review,
24: concluded that they could grant approval of

p. 00719

01: 00720:   the indication, VTE prophylaxis in total hip
02: and total knee replacement patients based on
03: the results of the RECORD1, 2 and 3 studies.
04: BY MR. HOFFMAN:
05: Q.   Well, maybe just so that we're
06: clear, I'll address a document that
07: Mr. Denton used with you.
08: Can you pick up Exhibit 47?
09: It's in a small pile in front of you.
10: A.   Okay.
11: Q.   And it's a big thick document.
12: A.   Yeah, I have it.
13: Q.   Okay.  And Mr. Denton -- well,
14: take your time and get to that page, I
15: apologize.
16: A.   I didn't recall -- I do not
17: recall the page you mentioned.
18: Q.   Oh, I'm sorry.  It's page 45.
19: The pages are at the top.
20: A.   I have to remove this.
21: (Document review.)
22: A.   Yes.
23: BY MR. HOFFMAN:
24: Q.   Okay.  If you could focus on

p. 00720

01: 00721:   the last paragraph, I believe Mr. Denton read
02: almost all of that to you, but he didn't read
03: the last two sentences.  And could you just
04: share with the jury what those last two
05: sentences say?
06: MR. DENTON:  Object to the
07: form.
08: A.   "Therefore, the data from
09: RECORD1, 2 and 3, with exception of select
10: sites as identified earlier, are considered
11: reliable in support of the application.  The
12: data from RECORD4 are not considered reliable
13: in report of the respective indication."
14: BY MR. HOFFMAN:
15: Q.   Okay.  So the FDA considered
16: the data from RECORD1, RECORD2 and RECORD3 in
17: connection with the application to approve
18: Xarelto for use in patients who have hip and
19: knee surgery?
20: A.   Yes, FDA considered those data,
21: as said here, reliable in support of the --
22: Q.   But they did not consider for
23: purposes of the application the data in
24: RECORD4?

p. 00721

01: 00722:      A.    That's correct.  They did not
02: consider the RECORD4 data for the indication,
03: and that means also the data of the RECORD4
04: trial are not included in the label for the
05: indication.
06: Q.    Well --
07: A.    As --
08: Q.    You're one step ahead of me,
09: which is fine.
10: After all of this process, the
11: complete response letter, the meetings, the
12: submission of the audits, FDA approved the
13: application for Xarelto for use in patients
14: who have hip and knee surgery?
15: A.    Yes, that's correct.
16: Q.    Okay.  And you were asked some
17: questions about the EMA in connection with
18: this issue.  When did the EMA approve
19: Xarelto -- I'm sorry, could you tell the jury
20: what EMA means?
21: A.    It means European Medicines
22: Agency.
23: Q.    Would that be the equivalent
24: when I say the European health authorities,

01: 00723:    is that roughly equivalent?
02: A.    The EMA is an essential agency
03: that approves drugs for entire Europe, so
04: approval that is granted by the EMA is
05: automatically granted in all countries of
06: Europe.
07: Q.    So, then, going back to what I
08: was asking:  When did the EMA or the European
09: health authorities approve Xarelto for the
10: use -- for use in patients who have hip and
11: knee surgery?
12: A.    Xarelto was approved in Europe
13: in this indication in 2008.
14: Q.    And was RECORD4 part of that
15: application?
16: A.    No, RECORD4 was not part of
17: that application.  The application in Europe
18: was based on the RECORD1, 2 and 3.  RECORD4
19: was still running later, and so it was not
20: included in the application in Europe.
21: Q.    I want to go back to the
22: timeline of how the European health
23: authorities regulate products.
24: After they approve a product,

01: 00724:    is that the end of the line?  Do they wash
02: their hands of the product, or are there more
03: things that they do?
04: MR. DENTON:  Object to the form
05: of the question.
06: A.    The approval is not the final
07: step of the health authorities, so the
08: communication and also responsibility to
09: provide information is continuing
10: postapproval.  There are a couple of things.
11: One is that the health
12: authority, in their approval, can also add a
13: list of commitments, that means there are
14: specific tasks that the marketing
15: authorization holder is given to fulfill in a
16: certain time frame.
17: And the second thing is --
18: that's sometimes happening, that's not
19: necessarily happening, but this is a tool the
20: health authority can use.
21: What is always happening is a
22: regular review of the safety information,
23: that is including all the safety information,
24: not only from still-ongoing trials, but also

01: 00725:    spontaneous reporting from the physicians
02: after approval of the drug.
03: And that comprehensive safety
04: information is being reviewed regularly, and
05: so-called PSURs, Periodic Safety Update
06: Reports, are being submitted, first, shortly
07: after approval, in short time frames --
08: shorter time frames of six months, and later
09: on, when more experience is available, so the
10: time frame is prolonged to yearly reports.
11: BY MR. HOFFMAN:
12: Q.    Can you -- I'm sorry again to
13: interrupt you, but could you just describe to
14: the jury briefly what one of these PSURs or
15: Periodic Safety Update Reports, look like,
16: what form they take?
17: A.    I'm not the expert on the
18: PSURs.  So to get this more in detail, you
19: would have to refer to the colleagues who are
20: in the pharmacovigilance department because
21: they are responsible for collecting the
22: information, also evaluating and putting
23: together the PSUR.  And in the Xarelto case,
24: that's Andrea Horvat-Brvcker.

01: 00726:          But in general, the PSUR, as I
02: said, is collecting all the available
03: information that has, yeah -- at the time of
04: the submission, but also continuously being
05: collected after submission.
06: So that at the time this PSUR
07: is being submitted to the health authority,
08: the health authority has an updated view on
09: all information that is necessary for them to
10: reassess the question of the benefit-risk of
11: the drug after this period of time.
12: MR. DENTON: Move to strike the
13: answer. She clearly said she wasn't
14: the expert, and testified, and
15: referred to her colleagues.
16: BY MR. HOFFMAN:
17: Q.    Doctor, are you able, based on
18: your regulatory experience, to describe a
19: PSUR at a high level, without talking about
20: the content or the actual medical analysis
21: that's included within it?
22: A.    Yeah, that was what I was
23: referring to, to the high level, just to
24: explain the process in a few words.

01: 00727:          Q.    Okay. You mentioned in your
02: answer that the European health authorities
03: reassess the -- I believe I wrote that down
04: right -- that they reassess the risk-benefit
05: of a product in connection with these PSURs.
06: Did I get that right? Did I
07: write it down correctly?
08: A.    Yes, that's correctly. The
09: important part of it is that the health
10: authority can look at the information they
11: receive after the drug has been approved, so
12: when the drug is being used no longer in an
13: environment of a controlled trial, but in
14: real life and based on the approved label.
15: And so it's very important for
16: them to look at the information on the safety
17: they receive from that period and to put it
18: into perspective from what they had learned
19: beforehand from the clinical trials.
20: And so at the end of the
21: process, they -- yeah, they review this and
22: they come to a conclusion whether the
23: benefit-risk assessment that was granted at
24: the time of approval is still unchanged

01: 00728:    based -- or given the new information that
02: has been reviewed.
03: Q.    Approximately how many PSURs
04: have been submitted on Xarelto since it was
05: first approved?
06: A.    I would have to count.
07: Q.    You can do it approximately.
08: A.    Like from 2008 -- roughly 15.
09: Q.    Roughly 15?
10: A.    16, something.
11: Q.    And for each one of those, the
12: European health authority assessed it and
13: would come to a conclusion, a new conclusion
14: about the risk-benefit for Xarelto?
15: MR. DENTON: Object to the
16: leading form of the question.
17: BY MR. HOFFMAN:
18: Q.    What, if anything, did the
19: European health authorities do after
20: reviewing these approximately 15 PSURs with
21: respect to the risk-benefit of Xarelto?
22: MR. DENTON: Same objection.
23: A.    The primary task of the health
24: authority at that point in time is to

01: 00729:    reassess the benefit-risk given the new
02: information they have got in that report.
03: So that's -- that's -- they
04: will draw a conclusion whether the
05: benefit-risk is unchanged as compared to
06: the -- their prior approval.
07: And for this conclusion they
08: take into consideration all the new
09: information they have received in the period
10: and from the PSUR.
11: BY MR. HOFFMAN:
12: Q.    And if you know, in response to
13: any of these approximately 15 PSURs, did the
14: European regulators ever conclude that the
15: risk-benefit balance for Xarelto was
16: negative?
17: MR. DENTON: Object to the
18: leading form of the question.
19: A.    The health authorities and all
20: the regulators of the PSUR concluded that
21: benefit-risks of Xarelto, according to the
22: approved indication, remained unchanged
23: positively.
24: ///

01: 00730:   BY MR. HOFFMAN:
02: Q.    Is this the only form of review
03: that the European regulators do after a
04: product is approved?
05: A.    No, this is not the only form
06: of review.  It's one of a very systematic and
07: regulated process.
08: There is another important
09: procedure which is called a renewal
10: procedure, so that means in the time period
11: of five years, the health authority is
12: looking backwards into the entire experience
13: of five years and decides whether the
14: approval can be renewed.
15: And that's, again, a process of
16: reevaluating the benefit -- positive
17: benefit-risk assessment over the period of
18: five years.
19: Q.    Has this happened for Xarelto?
20: A.    Yes, this happened for Xarelto
21: five years after initial approval.
22: Q.    So when was that?
23: A.    This was in May 2005 -- 2013.
24: Q.    2013?

01: 00731:     A.   Yes.
02: Q.    And what was the result of that
03: review?
04: A.    The result of that review was
05: that the benefit-risk remained unchanged
06: positive.
07: Q.    And what was the result of the
08: reviews of the PSURs that we were describing
09: before?
10: A.    The result of the PSURs was
11: that the benefit-risk remained positive for
12: Xarelto in the approved indications.
13: Sometimes the PSURs are also used to -- by
14: the health authority to give tasks to the
15: marketing authorization holder to look
16: specifically into aspects they are interested
17: in to get specific information, and so
18: sometimes in the course of those years such
19: tasks were given to look into data that the
20: health authority was interested, but, yeah,
21: those tasks were all fulfilled and so led to
22: the positive benefit-risk conclusion after
23: the assessment.
24: Q.    Are there any other ways in

01: 00732:    which the European regulators can review
02: issues or concerns or questions about a
03: product after it's approved?
04: A.    Yes, there are more procedures
05: that can be used.  One is a so-called
06: referral procedure, so that is sometimes
07: issued if there are upcoming concerns.
08: So after receiving information,
09: especially about the safety assessment.  But
10: there are also more informal procedures,
11: so-called LEG procedures.  So those are
12: legally binding measures.
13: And LEG stands for legally
14: binding.  And those are not as formal as the
15: other review procedures that I just
16: described.  That means they are not adhering
17: to a predefined time schedule.
18: But they also have legally
19: binding character.  In those procedures the
20: health authority can ask the marketing
21: authorization holder for questions also,
22: propose analyses to be run, propose, yeah,
23: studies to be performed if deemed necessary.
24: Q.    And yesterday and today you

01: 00733:    were asked some questions about a couple of
02: these LEG proceedings.
03: Do you recall that?
04: A.    Yes, I recall questions about
05: LEG proceedings.
06: Q.    And one of those was the
07: proceeding with respect to the Alere device?
08: A.    Yes, I recall that under, yeah,
09: the proceeding LEG 37.
10: Q.    If you can pick up Exhibit 4
11: that was marked yesterday.  It should be in
12: that small pile in front of you.  I want to
13: ask you just a few questions about this.
14: First, on pages 3 and 4, is
15: this a description of the process that was
16: followed in the proceeding, the steps that
17: took place?
18: A.    Yes, that's a description of
19: the steps that took place in this procedure.
20: Q.    And on page 4, on this chart
21: that's now highlighted for the jury, there's,
22: at the bottom, an entry for something called
23: a CHMP discussion.
24: Can you explain what that is?

01: 00734:      A.    CHMP is a committee at EMA,
02: stands for Committee of Human Medicinal
03: Product, and this committee is consisting of
04: representatives from each European country
05: health authority.  And that is the decisive
06: body at EMA that is taking, yeah, the final
07: decisions on, yeah, approvals, non-approvals
08: or other important decisions related to
09: pharmaceutical products.
10: Q.    And there are two other CHMP
11: discussions on this chart, November 2015,
12: December 2015.  Same sort of thing as you
13: just described a moment ago?
14: A.    Yes, the CHMP is meeting
15: monthly, and that's because of the complexity
16: of the European regulatory system.  So every
17: month the representatives of the European
18: national health authorities meet at EMA in
19: London, and then they -- yeah, they run
20: through their agenda and proceedings.
21: And sometimes, yeah, they have
22: time for discussions.  Then they get
23: presentations by the medical reviewer who is
24: primarily responsible for reviewing a file

p. 00734

01: 00735:    or -- and then they have an opportunity to
02: weigh in from all the different country
03: perspectives and discuss.
04: And either they continue the
05: dialogue, which happened here in November and
06: December, so they had discussions and had
07: further questions that they wanted to raise,
08: or at some point in time, they can, yeah --
09: once you can take a decision --
10: Q.    And the drug company does not
11: attend these meetings?
12: A.    Typically, the sponsor does not
13: attend these meetings, only on very special
14: occasions.  But those are clearly marked as
15: oral explanations, and then there's a --
16: yeah, a dedicated slot where the company can
17: be invited for a presentation.  That did not
18: happen here in this case.
19: Q.    That was my next question.
20: One other question about these
21: proceedings in these discussion meetings.  Do
22: the European regulators make public that
23: they're considering issues like the one
24: involved in this LEG assessment?

p. 00735

01: 00736:      A.    Yes.  Every month before the
02: CHMP meeting, they issue an agenda of the
03: meeting, and on that agenda, they list on a
04: very high level discussion topics.
05: Q.    And that's publicly available?
06: A.    That's publicly available on
07: the homepage of the EMA.
08: Q.    And can anyone who wants to
09: submit information for whatever reason submit
10: information in connection with one of these
11: proceedings?
12: A.    I have to admit, I'm not aware
13: of such situations, so that -- I mean, that
14: there's a direct submission into those
15: proceedings.
16: Q.    Well, let me ask it a different
17: way:  Do you know of a regulation that
18: prohibits anyone from -- anyone who's
19: interested in an issue making a submission?
20: MR. DENTON:  Object to the
21: leading form of the question.
22: A.    No, I'm not aware of such a
23: regulation.
24: ///

p. 00736

01: 00737:   BY MR. HOFFMAN:
02: Q.    Let me ask you about the
03: conclusion of this proceeding, starting on
04: page 38.  Can you just summarize what the
05: conclusion was?
06: MR. DENTON:  Object to the form
07: of the question.
08: BY MR. HOFFMAN:
09: Q.    What is your understanding of
10: what the conclusion of this proceeding by the
11: European health authorities with respect to
12: the Alere device was?
13: A.    My understanding of the
14: conclusion is that the health authority,
15: after reviewing the sensitivity analysis and
16: other analysis were provided for assessment,
17: that they concluded that the benefit-risk
18: assessment of the ROCKET AF trial and
19: likewise also the basis, yeah, for the
20: approval of AF indication remained unchanged.
21: Q.    And did the European regulators
22: indicate whether they got all the information
23: that they had sought in connection with the
24: proceeding?

p. 00737

01: 00738:        A.    I just do not recall whether it
02: is mentioned somewhere here in the document,
03: but it's implicit in that they concluded -- I
04: mean, typically, if they would have had
05: further questions, they would have continued
06: to ask those.  And so, yeah, I would have to
07: look whether it is mentioned in the sentence
08: here.
09: But for me, it is implicit when
10: they decide that they have enough information
11: to come to conclusion, yeah, that they then
12: finalize the assessment, and the assessment
13: report is being issued.  That's implicit.
14: Q.    Okay.  Let me ask you a
15: question related to this issue.
16: On the first day of your
17: deposition you were asked about a document,
18: Derix-11.  It should be in that short stack.
19: Can you pick that up?
20: A.    Yes.
21: Q.    This is what I think you
22: described as a Lync conversation that you had
23: with the colleague, Scott Berkowitz, on
24: September 22nd, 2015?

01: 00740:   BY MR. HOFFMAN:
02: Q.    What did you say in response to
03: that?
04: A.    I pointed out to him that in
05: this case, we only have -- yeah, we cannot --
06: or we only have the retrospective analysis,
07: and that it's important that we follow
08: investigations on the question that was posed
09: when we became aware of the potential impact
10: of the Alere INR recall to the ROCKET AF
11: data.
12: And so I somewhat tried to
13: convince him and to engage in that,
14: certainly, despite the fact that in general
15: terms retrospective analysis are seen as
16: inferior to prospective analysis.
17: And in this case, yeah, we
18: should follow doing those because it's
19: important to -- and that this is basically
20: the only choice we have to -- yeah, to find
21: answers to the question that was posed here.
22: Q.    And after you made that point
23: in this discussion, did Dr. Berkowitz say
24: anything else about retrospective analyses

01: 00739:        A.    Yes, that's correct.
02: Q.    You were asked some questions
03: about some -- a part of the discussion where
04: Dr. Berkowitz talked about retrospective
05: analysis -- analyses.  Do you see that on
06: there?
07: A.    Yes, I see the comment.
08: Q.    How did you interpret his
09: comments?
10: MR. DENTON:  Object to the form
11: of the question.
12: A.    I interpreted his comments,
13: yeah, that he's generally -- he wanted to
14: point out generally that retrospective
15: analyses have less scientific rigor as
16: compared to prospective analyses, and
17: especially, yeah, with a prospective defined
18: objective, and also being defined before
19: collecting any data.
20: And he pointed out that in
21: general, retrospective analyses are being
22: seen as weaker and -- yeah, that's how I
23: interpreted it, his -- or his comments.
24: ///

01: 00741:   and their value?
02: A.    No, he didn't.  He agreed, and
03: he very much engaged into the work that
04: continued, and with this -- yeah, in mind,
05: really, made sure that the analyses that were
06: being done in the most rigorous way possible.
07: Q.    And at any point in the
08: process, when you had involvement, did you
09: have concerns that the work was being done in
10: anything other than the rigorous fashion you
11: just mentioned?
12: MR. DENTON:  Object to the form
13: of the question, no foundation.
14: A.    I did not have concerns that --
15: that the analyses weren't done in a rigorous
16: way, and just to give you one example for
17: that is that when the sensitivity analyses
18: were discussed, the definition of the three
19: types of analyses that were run later on was
20: made before the analysis started.  So it was
21: made based on the information that other
22: teams had from the Alere INR recall notice
23: that listed patient populations that were
24: impacted by the recall notice.

01: 00742:          And so that was one way of
02: implying rigor to the analyses, to have a
03: statistical analysis plan before running the
04: study, the analysis.
05: BY MR. HOFFMAN:
06: Q.    Did the report from -- the
07: final assessment report on this issue from
08: the European Medicines Agency, note or
09: indicate that retrospective analyses are of
10: limited value?
11: MR. DENTON:  Object to the form
12: of the question.
13: A.    I do not recall that
14: specifically, that they made such a comment.
15: At some point in the report, they make a
16: comment that -- but that is more referring to
17: deferred analyses that were being done on
18: the -- yeah, the different plant/animal plots
19: and other plots, so that they are aware of
20: limitations that analyses could have that are
21: done based, yeah, as post hoc, so to say, but
22: that they considered those and understood
23: those, and so that's my understanding, at
24: least from this small comment and report.

p. 00742

01: 00743:          And so finally, the information
02: they had from the various analyses taken into
03: as a totality led them to the conclusion that
04: the benefit-risk of the -- from the ROCKET AF
05: trial, the assessment of the benefit-risk
06: from the ROCKET AF trial remained unchanged.
07: BY MR. HOFFMAN:
08: Q.    We should just go back to the
09: report for a moment, because there were a
10: couple of other things I wanted to follow up
11: on.  And, again, Doctor, that's Exhibit 4.
12: Do you -- did the European
13: health authorities have access to information
14: beyond what was submitted by the companies?
15: MR. DENTON:  Object to the form
16: of the question.
17: A.    I do not fully understand your
18: question, so what do you mean by --
19: BY MR. HOFFMAN:
20: Q.    Were there other things
21: submitted to the European health authorities
22: besides the materials submitted by the
23: companies?
24: A.    By the companies, you mean

p. 00743

01: 00744:   Bayer or Janssen or Bayer and --
02: Q.    Correct.  Correct.
03: A.    Correct.  Yeah.
04: Yes, the Alere INR topic
05: considered certainly also Alere as a company
06: that is responsible for the medical device
07: that it has on the market, and in the context
08: of the request we received from EMA, there
09: was also a question about more detailed
10: information from Alere.
11: And we contacted Alere at the
12: time and asked them whether they would
13: provide us the information that was requested
14: by EMA.  As it is of a confidential nature,
15: it was then agreed that, yeah, Alere can
16: directly submit the information without
17: sharing it with the -- yeah, with Bayer.
18: Q.    So let me see if I understand.
19: Alere, the company who marketed
20: this product, submitted information directly
21: to the health authorities that the companies
22: have not seen?
23: A.    Yes, that's my understanding.
24: That's what I wanted to describe.

p. 00744

01: 00745:          Q.    If you could just turn to
02: page 7, in the middle of the page, there's a
03: description of a health hazard assessment.
04: Did you find that?
05: A.    Yes, I found that.
06: Q.    Is that the information that
07: you're talking about?
08: A.    That's -- yeah, that's part of
09: the information I was talking about.
10: Q.    And what is a health hazard
11: assessment?
12: A.    I cannot describe the health
13: hazard assessment in detail.  It's a specific
14: term that is used in medical device
15: regulation, so I'm not so much of an expert
16: on, but in general, it's a little bit
17: comparable to what we would call a safety
18: assessment.
19: Q.    And what -- according to this
20: final report, what was the conclusion of
21: Alere's analysis?
22: MR. DENTON:  Object to the
23: form.
24: A.    It's cited here in -- as in an

p. 00745

01: 00746:   e-mail that Janssen received from Alere, so
02: it's basically a summary, and it's not --
03: it's quoted here in the document.
04: BY MR. HOFFMAN:
05: Q.    Okay.  If you could turn to --
06: can you just summarize it for the jury?  Can
07: you tell them what it says?
08: A.    Yeah, it says that assessment
09: has -- "A health hazard assessment was
10: conducted that concluded that the occurrence
11: rate of a discrepant low result was
12: occasional and the probability of injury as a
13: result of the discrepancy is unlikely, but
14: possible.
15: "With INR testing, there's the
16: possibility of a severe or life-threatening
17: injury but the overall risk was determined to
18: be moderate."
19: Q.    Let's just make sure that we've
20: summarized the conclusion of this report for
21: the jury.  Could you turn to page 40?
22: A.    Yes.
23: Q.    So towards the bottom of the
24: page, there's a description of the comparison

01: 00747:   between the two arms in the ROCKET trial.
02: Just in layman's terms, what is
03: the conclusion of the EMA on this point?
04: (Document review.)
05: BY MR. HOFFMAN:
06: Q.    And if it's just easier,
07: Doctor, for you to summarize, it may be --
08: you could just read it.  That would be fine
09: too.
10: A.    Yeah, I was just --
11: MR. DENTON:  Object to the
12: form.
13: A.    -- not referring to what you
14: meant as a conclusion because this paragraph
15: is concluding also detailed data information.
16: But it says, "The conclusions
17: derived from the ROCKET AF trial are
18: supported by the performed sensitivity
19: analyses and by external evidence from large
20: trials in other therapeutic areas comparing
21: the efficacy and safety of rivaroxaban
22: vs. Warfarin."
23: And that is what, in other
24: words, I -- yeah, I described as that the

01: 00748:   health authority came to the conclusion that
02: the overall benefit-risk assessment based on
03: the ROCKET AF data remains unchanged and
04: unchanged assessed as positive.
05: BY MR. HOFFMAN:
06: Q.    Okay.  Thank you, Doctor.
07: You were asked some questions
08: about the ISO standards, and whether ISO
09: standards could be applied to the analyses
10: that have been done on the ROCKET data,
11: taking into account the Alere device and
12: situations when there were discrepant
13: readings.
14: Can you just explain why the
15: ISO standards are not comparable to the
16: results of these reanalyses that have been
17: done of the ROCKET study?
18: MR. DENTON:  Object to the
19: leading form and absolute lack of
20: qualification and foundation for this
21: witness to talk about ISO analysis.
22: MR. HOFFMAN:  Okay.  I move to
23: strike the objection.  It is
24: interposed in an inappropriate manner

01: 00749:   under the Federal Rules.
02: MR. DENTON:  Same objection.
03: MS. PINTO:  I object to the
04: form.
05: MR. DENTON:  I object to the
06: form.
07: MR. HOFFMAN:  Let me rephrase.
08: BY MR. HOFFMAN:
09: Q.    You were asked some questions
10: by Mr. McWilliams about drunk driving tests.
11: You were asked questions by Mr. McWilliams
12: about examination scores with respect to the
13: ISO standards and why they were comparable to
14: the results of the ROCKET study.
15: And you gave answers, and the
16: lawyers in this room objected to those
17: answers.  So I'd like to give you an
18: opportunity before this jury to fully explain
19: what you were trying to say in response to
20: those questions.
21: MR. DENTON:  Objection.  Object
22: to the form of the question and the
23: preamble by counsel.
24: MR. HOFFMAN:  Go ahead, Doctor.

01: 00750:          THE WITNESS:  Okay.
02: A.    The ISO standards are
03: describing standards in a very technical way
04: for -- that apply to the assessment of
05: medical devices, and in that context, medical
06: devices are assessed in certain prospectively
07: defined studies also.
08: And those studies are planned
09: very rigorously according to protocol, and
10: sometimes -- and I just guess here a little
11: bit, but I don't know exactly the number of
12: sites, but the number of sites that are
13: typically involved in such clinical trials
14: for medical device approvals are much smaller
15: than you typically have as a trial size for
16: pharmaceutical products.
17: And so it is a very narrow
18: predefined frame of ten to a hundred sites as
19: compared to what we see in -- in a big
20: clinical product trial -- in a big clinical
21: pivotal trial that is deemed as a phase three
22: study for pharmaceutical product approval
23: such as the ROCKET AF trial, where hundreds
24: of sites were involved and more than 14,000

01: 00751:    patient data were collected.
02: And so that's one big
03: difference in terms of when an ISO guidance
04: is being read -- to be read as compared when
05: we look at our clinical study.
06: And what I also explained
07: yesterday is that in the ROCKET AF trial,
08: there was, in the protocol, a predefined time
09: point for collection of PK samples at week 12
10: and week 24.  We talked several times about
11: the dose -- and dose plasma sampling, was
12: done for characterization of the
13: pharmacokinetic profile in the trial.
14: So it was not meant to inform
15: about the -- yeah, the functionality or
16: the -- to inform or to be compared to
17: measurements that were conducted by the
18: device.
19: So that information was
20: available in the database, but it was yet
21: just used later on for a different purpose.
22: And that's, again, a big difference to the
23: typical setup of a trial under the ISO
24: standards guidance.

01: 00752:          MR. DENTON:  I move to strike
02: the answer.  Right in the middle of
03: that speech she said "I'm guessing."
04: There's no foundation.
05: MR. HOFFMAN:  Mr. Denton,
06: please act appropriately and
07: consistent with the pretrial order.
08: MR. DENTON:  I gave you the
09: reason why I moved to strike the
10: answer.  I'm very appropriate.
11: MR. HOFFMAN:  You interposed an
12: objection for purposes of harassment
13: by using "that speech."  You know that
14: that's not appropriate under
15: Judge Fallon's rule or the Federal
16: Rules of Evidence.
17: MR. DENTON:  I moved to strike
18: the answer because she said it was a
19: guess.
20: MR. HOFFMAN:  Thank you.
21: BY MR. HOFFMAN:
22: Q.    Dr. Derix, you've looked at the
23: ISO standards.  Is that -- I believe you
24: testified to that yesterday.

01: 00753:          A.    Yes, that was part of the
02: smaller task that I was in, that we retrieved
03: the ISO standards that applied to INR
04: devices, yeah, from sources and provided the
05: information to the team that was running the
06: sensitivity analysis.
07: Q.    Do you have an understanding of
08: how the testing that is embodied in the ISO
09: guidelines is conducted?
10: A.    I have, yeah, a general
11: understanding, although, as I said, I'm not a
12: medical device expert.
13: Q.    I understand that.  I'm only
14: asking if you have a general understanding.
15: And you have a general
16: understanding of how the analysis of ROCKET
17: samples was conducted?
18: A.    Yes, I also have a general
19: understanding of this and, yeah, we learned
20: information during the discussions from the
21: colleagues who ran the studies.
22: Q.    And can you say whether the way
23: studies -- or the way testing is conducted
24: under the ISO standards is comparable to what

01: 00754:   was done under the ROCKET study -- in the
02: ROCKET analysis?
03: MR. DENTON:  Object to the form
04: and object to the lack of foundation.
05: BY MR. HOFFMAN:
06: Q.   Can you say?
07: MR. DENTON:  Same objection.
08: A.   According -- according to
09: knowledge and my understanding, there is a
10: difference in the way of form that the
11: analyses are being run that are a basis for
12: the medical device approval using the ISO
13: standards as a specification, and the way of
14: form that the PK samples were collected in
15: the ROCKET AF trial, and compared to
16: measurements done by the POC device in the
17: somewhat similar time frame.
18: BY MR. HOFFMAN:
19: Q.   Thank you.
20: One last question:  If you
21: could pick up Derix-62.  You were asked some
22: questions a little while ago about this
23: e-mail, and in particular, a portion of it --
24: this e-mail chain, and in particular, a

01: 00756:   delay was quite extensive.
02: And so it would have been one
03: possibility to stop the study and not finish
04: it and not obtain an indication for it, just
05: to be -- to stop it at the same time as the
06: DVT trial, and to submit the information that
07: was available at that time already by then.
08: But later on we, we decided not to
09: do so, so we decided to finalize the PE study
10: as planned and to collect the sufficient
11: patient data according to the prospectively
12: designed protocol, although it meant that the
13: study finished more than a year later than
14: initially planned, and it also meant that the
15: submission for the PE study could only be
16: done later, and also the indication for PE
17: treatment was obtained at a later point in
18: time.
19: Q.   Did you have any concerns about
20: missing data?
21: MR. DENTON:  Object to the form
22: of the question.
23: A.   No, I did not have any concerns
24: about missing data.  The concerns raised in

01: 00755:   portion of it that you drafted.
02: Do you recall that?
03: A.   Yes, I recall that.
04: Q.   Can you just explain what you
05: were trying to say in this e-mail in your own
06: words?
07: A.   I was -- yeah, I was conveying
08: to Joseph Scheeren that there was a delay
09: observed in one of the clinical trials, the
10: DVT trial, which was not that big, but it
11: shrinked down the timeline that we had for
12: the preparation of the submission dossier.
13: And so in the following, we
14: discussed whether I could get additional
15: resources, yeah, to support the process and
16: in order to be able to prepare the file in
17: time, and that was now becoming shorter.  So
18: I got additional resources from the
19: organization to -- yeah, to make up for this.
20: And the second part of the
21: e-mail is related to the PE study, and at
22: some point in time it was suggested here that
23: we may interrupt the PE study because the PE
24: study was enrolling very slowly and the time

01: 00757:   this e-mail were only related to the timing
02: aspect and to the timing delay of the PE
03: study.
04: BY MR. HOFFMAN:
05: Q.   Did you have any concerns about
06: data integrity?
07: MR. DENTON:  Objection to the
08: leading form of the question.
09: A.   No, I did not have any concerns
10: regarding data integrity, and as I said,
11: yeah, the concerns were only regarding the
12: timing of the study and the delay in the
13: study recruitment.
14: MR. HOFFMAN:  Those are all the
15: questions I have, Dr. Derix.  Thank
16: you for your time.
17: MS. PINTO:  Before you pass the
18: witness, I join in all Mr. Denton's
19: objections.
20: MR. HOFFMAN:  Yeah, that's fine
21: under the order.
22: MR. DENTON:  It's automatic.
23: MR. HOFFMAN:  That's fine.
24: THE VIDEOGRAPHER:  Going off

01: 00758:      the record, 4:40 p.m.
02: (Recess taken, 4:40 p.m. to
03: 5:03 p.m.)
04: THE VIDEOGRAPHER: We're back
05: on record at 5:03 p.m.
06: EXAMINATION
07: BY MR. DENTON:
08: Q.    Dr. Derix, just a few
09: follow-up.  Before you just testified in
10: response to the questions of your lawyer, how
11: many times have you met with Mr. Hoffman?
12: MR. HOFFMAN:  Objection, asked
13: and answered.
14: A.    I met with Mr. Hoffman and Edda
15: Dolzer several times.  I do not recall
16: exactly, and I said yesterday my assessment
17: is a totality of probably five days, if I
18: count all the hours altogether.
19: BY MR. DENTON:
20: Q.    Five full days; is that right?
21: MR. HOFFMAN:  Objection,
22: misstates testimony.  You can clarify
23: for him.
24: MR. DENTON:  Yeah, please.

p. 00758

01: 00759:  BY MR. DENTON:
02: Q.    I just want to know how many --
03: first of all, how many times have you met
04: with Mr. Hoffman before we got here to the
05: deposition yesterday?  Is that the five times
06: you're telling us?
07: A.    I said that if I could -- it is
08: my assessment of the entire time frame --
09: Q.    Okay.
10: A.    -- so the totality.
11: Q.    And every time we take a break,
12: you-all go to another room and Mr. Hoffman is
13: in that room, right?
14: A.    In the course of this
15: deposition, yesterday and today, in the
16: breaks I met with Mr. Hoffman and colleagues.
17: Q.    Before you just testified, did
18: you go over the questions that you would be
19: asked by Mr. Hoffman?
20: A.    No, the questions Mr. Hoffman
21: asked were just before.
22: Q.    You had no idea what questions
23: he was going to ask you or what topics he was
24: going to raise?

p. 00759

01: 00760:       A.    I had an idea from the
02: previous -- yeah, the sequence or the
03: proceeding of the last two days.  So we
04: touched upon several topics and -- yesterday
05: and today, and so from that, certainly I had
06: an idea of what topics we're focusing on.
07: Q.    You mentioned that your native
08: language is German, true?
09: A.    That's true.
10: Q.    But you've had no trouble
11: understanding my questions, have you?
12: A.    In general, I sometimes asked
13: you back, so if I had difficulties in
14: understanding, I sought clarification, and I
15: was also -- yeah, the translate -- the
16: colleague who was here for translations made
17: me aware that in some instances I had used a
18: word which was not completely correct.  But
19: in general, yeah, I understood your
20: questions.
21: Q.    And we fixed all that, didn't
22: we, any translation problems or your not
23: understanding me, right?
24: A.    So when I made the comment, you

p. 00760

01: 00761:   repeated the questions.
02: Q.    Sure.
03: A.    So yeah, I would have asked for
04: them more if I had further concerns
05: understanding it.
06: Q.    Sure.  Sure.  And you've met
07: many times with the FDA relative to your work
08: in Xarelto, correct?
09: A.    Yes.  I met several times with
10: FDA in my role.
11: Q.    And you spoke English there?
12: A.    Yes, but as I indicated before,
13: I was not the primary spokesperson.
14: Sometimes I was asked to give some reference
15: to the proceedings that were ongoing in
16: Europe, so my role most of the time was to
17: listen in and to take notes and, yeah, to
18: share the information with my colleagues at
19: home.
20: Q.    All right.  When you interact
21: with your Janssen colleagues on Xarelto, you
22: speak in English, like with Dr. Berkowitz,
23: right?
24: A.    Yes, when I'm interacting with

p. 00761

Derix, Andrea Ph.D. - 2 - Volume 2 - 03/02/2016

01: 00762:   colleagues in the U.S. or in other
02: countries --
03: Q.   Right.
04: A.   -- outside of Europe, we speak
05: English, but with the colleagues in Germany,
06: who are located at the offices in Germany,
07: our day-to-day working language is German.
08: Q.   Understood.  Understood.  But
09: you've been on this project for 15 years,
10: right, Xarelto project?
11: A.   No, I joined the project in
12: 2004 -- beginning of 2005.
13: Q.   Oh, I did the math wrong.
14: 11 years?
15: A.   Yes, but there was an
16: interruption of a time when I moved into a
17: different department.
18: Q.   For one year, about?
19: A.   Yes, for one year.
20: Q.   Okay.  But you're now vice
21: president, head of the -- vice president,
22: head of program development for Xarelto,
23: right?
24: A.   The correct title is head of

01: 00764:   "testing," because what the health
02: authorities are doing is also some form of
03: testing because they get the raw data of --
04: of all data that's been collected in the
05: clinical trials, and with that raw data, they
06: do their own independent analysis as well in
07: addition.
08: So it's -- yeah, and you could
09: also say that this is some form of testing.
10: Q.   Well, they evaluate, but submit
11: it, right?
12: A.   They use the data also for
13: their own analysis.  So there's more than
14: just evaluation.
15: Q.   And if the regulator doesn't
16: have certain data, they can't evaluate it,
17: can they?
18: A.   That's correct, they base their
19: evaluation on the data that they have as
20: basis of the submissions the sponsors are
21: doing.
22: Q.   You never -- Bayer never shared
23: with EMA, did they, that the audit in the
24: United States showed that the RECORD4 trial

01: 00763:   program management, thrombosis, and that
02: includes also other programs that are in
03: development in the area of thrombosis,
04: besides Xarelto.
05: Q.   All right.  So you talked a bit
06: about regulatory processes, and I just want
07: to clarify a few things, okay?
08: Just so it is crystal clear,
09: regulators do not conduct clinical trials, do
10: they; the sponsors do?
11: A.   I agree with your statements
12: that the regulators do not conduct clinical
13: trials by themselves.
14: Q.   The regulators do not conduct
15: any clinical trials, do they?
16: A.   Typically, the regulators do
17: not conduct trials by themselves.
18: Q.   Okay.  And the regulators don't
19: test the drugs for safety or efficacy; the
20: sponsor does, right, and submits this
21: information to the regulators.  That's what
22: happens, right?
23: A.   I do not agree to your
24: statements in the form that you used, of

01: 00765:   was unreliable.  That was never shared with
02: EMA, was it?
03: MR. HOFFMAN:  Objection, asked
04: and answered.
05: A.   We talked about this before,
06: so -- and I think I responded to the question
07: that I would have to go back in detail to
08: look it up, whether the reports were all
09: submitted.
10: BY MR. DENTON:
11: Q.   Well, we have the assessment
12: reports.  Your counsel marked them, right?
13: You marked Exhibit 71, the
14: assessment report of September 22nd, 2011.
15: Do you remember him marking that document.
16: You have it there in front of you?
17: A.   Yeah, I may have it in front of
18: me.  So we are talking here about the
19: assessment report, I understand, on VTE
20: prophylaxis in patients who undergo total hip
21: and total knee replacement from the year 2007
22: and 2008.
23: Q.   Right.  But this assessment
24: that your counsel marked is dated

01: 00766:   September 22nd, 2011, right, Exhibit 71?
02: A.    I would have to look because
03: I --
04: Q.    Here I'll give you --
05: MR. HOFFMAN:  No, no, no.
06: They're right in front of you.  I
07: pulled them out.  Don't worry.
08: THE WITNESS:  Okay.  Okay.
09: A.    NEED TO CORRECT TO END so
10: Exhibit 72 is about the assessment of the
11: ROCKET AF trial for the indication of
12: prevention of stroke and systemic embolism
13: patients with AF.
14: BY MR. DENTON:
15: Q.    I wanted to go to Exhibit 71,
16: I'm sorry.
17: A.    71 is about --
18: Q.    It's about RECORD, right?
19: A.    No, it's not about RECORD.
20: It's about EINSTEIN program.
21: Q.    Okay.
22: A.    It's about the treatment of
23: deep vein thrombosis.
24: Q.    Here's what I'm trying to find

p. 00766

01: 00767:   out is:  That is -- that assessment is four
02: months, in September of 2011, after the DSI
03: in the United States determined all this data
04: from the RECORD study was unreliable.
05: Do you remember that document?
06: MR. HOFFMAN:  Objection to the
07: form of the question.
08: A.    I remember the DSI report we
09: looked at earlier this -- today.
10: BY MR. DENTON:
11: Q.    The -- all the assessments that
12: your counsel marked, I think it's 71 and 72,
13: the approval assessments, they're very thick,
14: but I've gone through them at the break.
15: There's not one mention of the Falcon audits,
16: the Kendle audits, the Covance audits in any
17: of those assessments.
18: The truth is, your company did
19: not provide those audits to EMA, did they?
20: A.    I said already before, I would
21: have to check in which way the form audits
22: were submitted to EMA, but I would have to
23: clarify that this submission is specific to
24: treatment of deep vein thrombosis, EINSTEIN

p. 00767

01: 00768:   program, DVT. And so, therefore, it contains
02: information about this program, about this
03: indication.
04: And the RECORD1, 2, 3 and 4
05: studies all did not -- I mean, were not part
06: of the assessment of this indication because
07: this indication is totally different and it's
08: a different dosing regimen, and it's
09: unrelated to RECORD1, 2, 3 and 4.
10: Q.    All right.  Let's do something
11: here.  Turn that exhibit over.  Don't look at
12: any documents.  Just answer my question,
13: please.
14: Here is the question:  Did
15: Bayer provide any of the audits from any of
16: the Xarelto studies to EMA, yes or no or you
17: don't know?
18: MR. HOFFMAN:  Objection to the
19: form of the question.
20: You may answer.
21: A.    I said I -- before, I would
22: have to go back into the documents because I
23: do not recall specifically what type of
24: information in terms of audit information was

p. 00768

01: 00769:   submitted to the EMA, and I would have to
02: follow this up, because I don't recall it as
03: this one piece of document of many documents.
04: And so I would really have to
05: go back to the files and -- to check this for
06: you.
07: BY MR. DENTON:
08: Q.    Well, you answered questions
09: when Mr. Hoffman was asking; you said you
10: were sure that all the audits were sent to
11: FDA.
12: Do you remember that answer?
13: You didn't have to go look anything up.
14: A.    I -- I remember that answer
15: because I was part of the -- I mean, of these
16: proceedings, and so we looked specifically
17: around, even this morning, into documents
18: where the audit reports were mentioned.  And
19: so, even from that document I looked this
20: morning, I could certainly make that
21: connection if I had a similar document in
22: front of me with that level of detail for
23: EMA.  I could also respond to your question.
24: But I said I'm unable to

p. 00769

01: 00770:    respond to a question for EMA because I would
02: have to look it up.
03: Q.    Well, I thought, as I
04: understood a lot of your testimony in
05: response to your counsel's questions, that
06: one of your specialties was the regulatory
07: process with EMA as it relates to Xarelto.
08: That's one of the main things
09: you did in your job when you were in
10: regulatory, right?
11: A.    That's correct, but even at
12: that time I was leading a team because the
13: submission activities are very comprehensive
14: and they cannot be run by one person alone.
15: And so many of the detailed
16: aspects content-wise that went into the
17: compilation of the documents were done by my
18: team members at the time, and so I cannot
19: recall each and every document that went into
20: the various submissions in the course of over
21: more than six years.
22: Q.    Okay.  So when you were
23: preparing for this deposition, you must have
24: reviewed some documents, correct?

01: 00771:        A.    Yes, I --
02: Q.    Do you have an estimate of the
03: volume, the amount of documents you
04: reviewed --
05: MR. HOFFMAN:  Objection, asked
06: and answered.
07: BY MR. DENTON:
08: Q.    -- over the five meetings with
09: counsel?
10: MR. HOFFMAN:  Objection, asked
11: and answered.
12: A.    I don't have an estimate of the
13: number of documents, and some documents I was
14: asked to identify, to put them into context,
15: like the PSURs are very comprehensive
16: documents, and so I did not review all these
17: documents in detail.  And so that's a
18: question, yeah, I can also just give a guess.
19: BY MR. DENTON:
20: Q.    Well, I don't want you to give
21: a guess.  Give me your best estimate of the
22: number of documents that you have reviewed
23: before you gave -- came in here today to
24: prepare for your deposition?

01: 00772:            MR. HOFFMAN:  Objection asked
02: and answered.
03: A.    No, I can't.
04: BY MR. DENTON:
05: Q.    You just can't do it.  Is it
06: more than five documents?
07: MR. HOFFMAN:  Objection, asked
08: and answered.
09: A.    Yes, it's more than five
10: documents.
11: BY MR. DENTON:
12: Q.    Is it more than 20?
13: MR. HOFFMAN:  Objection, asked
14: and answered.
15: BY MR. DENTON:
16: Q.    Just trying to find out your
17: best judgment.
18: MR. HOFFMAN:  Mr. McWilliams
19: asked word for word these questions.
20: This is in violation of the Court's
21: order.
22: MR. DENTON:  It's not --
23: MR. HOFFMAN:  Recross
24: examination is --

01: 00773:            MR. DENTON:  She brought it up.
02: MR. HOFFMAN:  No, she didn't
03: bring it up.  Recross-examination is
04: supposed to be --
05: MR. DENTON:  No, no, no, no,
06: no.  If we're going to have a talk,
07: she needs to leave.  She needs to
08: leave if we're going to have a
09: discussion on the record.
10: MR. HOFFMAN:  I've made my
11: point.  Objection, beyond the scope,
12: duplicative.
13: You can continue.
14: BY MR. DENTON:
15: Q.    You mentioned that the reason
16: you knew that the audit reports were given to
17: the FDA is because you looked at some
18: documents to refresh your memory, right?
19: MR. HOFFMAN:  The exhibits, she
20: said.
21: A.    No.
22: MR. DENTON:  Would you --
23: Mr. Hoffman --
24: MR. HOFFMAN:  Don't

01: 00774:        misrepresent the record. Don't
02: misrepresent the record.
03: MR. DENTON: Mr. Hoffman, do
04: not have a speaking objection.
05: MR. HOFFMAN: Do not
06: misrepresent the record.
07: MR. DENTON: I'm not
08: misrepresenting.
09: BY MR. DENTON:
10: Q.    You reviewed documents, right,
11: to know whether or not the audit reports were
12: submitted to FDA, right?
13: MR. HOFFMAN: Objection to the
14: form of the question.
15: A.    In my response, I referred to
16: documents that we reviewed in this
17: deposition --
18: BY MR. DENTON:
19: Q.    Right.
20: A.    -- procedure this morning, and
21: I did not refer to a review of before.
22: Q.    Okay. I didn't understand your
23: previous answer.
24: MR. HOFFMAN: That's fine. I

01: 00775:        withdraw -- I withdraw my conflict
02: with counsel. That's fine.
03: MR. DENTON: Okay. Let's just
04: move on.
05: BY MR. DENTON:
06: Q.    But what we do know this, as a
07: regulatory specialist. The regulators can
08: only review what is submitted to them, right?
09: MR. HOFFMAN: Objection, asked
10: and answered.
11: A.    I mean, there are several
12: procedures, and we talked this morning about
13: it, but basically, the information that the
14: health authority take into consideration for
15: their approvals is provided by the sponsors.
16: BY MR. DENTON:
17: Q.    Let's look at Exhibit 11,
18: change topics, Record No. 3396352,
19: Exhibit 11. That's the chat between you and
20: Dr. Berkowitz that your counsel referred to.
21: A.    Where is it?
22: MR. HOFFMAN: I'll help her try
23: to find it.
24: MR. DENTON: Sure.

01: 00776:        THE WITNESS: Here it is.
02: BY MR. DENTON:
03: Q.    Okay. Let's put that up there.
04: And what I'm trying to figure out: What is
05: this? Is this like an instant chat or a
06: company internal chat service?
07: A.    It's called Lync program.
08: Q.    Lync?
09: A.    And this is a -- yeah, and kind
10: of a written chat in the company internally,
11: yes.
12: Q.    Oh, right. And you can talk to
13: your colleagues internally through this
14: device?
15: A.    Yes, I can -- I mean, in
16: writing I could.
17: Q.    Do you print out all these
18: chats on a piece of paper like apparently
19: Dr. Berkowitz did on this one?
20: A.    No, I do not do that.
21: Q.    Do you have substantive
22: conversations with your colleagues, like you
23: see in Exhibit 11, about ongoing issues with
24: Xarelto? Do you do that?

01: 00777:        A.    Most of the time we use this
02: chat for appointment making or some, yeah,
03: day-to-day work, procedures. Sometimes
04: they're also content-related chats, but it's
05: very rare, and this is one example.
06: Q.    So it was rare that this was
07: printed out, this Lync chat was printed out
08: and it was substantive. Do I understand that
09: correctly?
10: A.    No, that's not correct. I said
11: that it is rare that we have content-related
12: discussion in the form of a chat. Most of
13: the time it is really procedural discussion,
14: like appointments and so on.
15: Q.    Well, this was a very
16: substantive private conversation between you
17: and Dr. Berkowitz related to the INRatio
18: issue, correct?
19: A.    That example of the chat is a
20: content-related chat, yes.
21: Q.    Did you think that
22: Dr. Berkowitz didn't think this would ever
23: see the light of day in litigation when he
24: sent this?

01: 00778:          MR. HOFFMAN:  Objection to the
02: form of the question.
03: MR. DENTON:  Let me withdraw
04: it.
05: BY MR. DENTON:
06: Q.    Did you, because you're on
07: here, think this was ever going to see the
08: light of day in litigation?
09: MR. HOFFMAN:  Objection to the
10: form of the question.
11: A.    I was -- I mean, I was informed
12: by our legal group about the obligations of
13: the litigation hold, and I adhere to it.  So
14: therefore, yeah, that's the basis.  And so I
15: would have to assume that my colleagues also
16: do so, and obviously, Scott Berkowitz did
17: here, according to U.S. regulations.
18: BY MR. DENTON:
19: Q.    Right.  But do you maintain all
20: your Lync chats, or do you delete them?
21: A.    I do not delete Lync chats
22: actively.  In Germany in the system, the Lync
23: chats are not stored.  Once you finish the
24: chat, the information is not -- how to say,

01: 00779:    yeah, stored.
02: Q.    It's not stored, but one can
03: print it out like we see here in Exhibit 11
04: and store it that way, right?
05: A.    I -- I don't know how this was
06: stored, in which way or form, and so I can't
07: comment on it.
08: Q.    All right.  Well, let's talk
09: about what you said.  Let's go right in the
10: middle of this document.  At 7:30 a.m.,
11: that's you writing, Andrea Derix, right?
12: A.    Yes, that's my name.
13: Q.    And it starts off, "When
14: Janssen is now doing all types of analyses we
15: will need someone in our team who is involved
16: and understands the type of analyses and
17: results."
18: You're typing this, right?
19: A.    Yes, that's my text.
20: Q.    You say, "I personally find it
21: very difficult to follow the discussions in
22: our high level calls, e.g., are we trying to
23: identify the patient population defined in
24: the recall in our database?  How are we going

01: 00780:    to do that?  What does this information tell
02: us?  On which basis do we exclude patients
03: from the overall dataset to run the
04: sensitivity analyses - how do we find out
05: whether an unprecise measurement triggered a
06: change of warfarin dose... the analyses have
07: to make sense clinically."
08: You wrote all that?
09: A.    Yes, I wrote that.
10: Q.    So in September 2015, shortly
11: after your company found out about this
12: recalled device being used in ROCKET, you
13: typed to Dr. Berkowitz privately, "I
14: personally find it difficult to follow the
15: discussions," correct?
16: A.    The date of the conversation is
17: September 22nd, and it was in the very early
18: phase when we had learned about the potential
19: impact of the recall notice.  And so as
20: usual, there was quite some discussion what
21: we could do in order to analyze the database
22: in the way that I said here that the analyses
23: have to make sense clinically.
24: And at that point in time when

01: 00781:    we had the conversation, the Janssen team,
02: who was, yeah, already aware at the time and
03: had started brainstorming, and their team
04: already had shared, as I indicated here on
05: very high level, some ideas of what analysis
06: that could be done.
07: And so the topics that I raised
08: here in my view are relevant questions, and
09: those questions were addressed in the
10: following weeks when the analyses were
11: defined more clearly, and we moved out of
12: this brainstorming phase here into, yeah,
13: more concrete, yeah, development of the
14: statistical analysis plan that I was
15: referring to earlier also for the sensitivity
16: analyses.
17: MR. DENTON:  Would you
18: underline in red where she typed, "I
19: personally find it very difficult to
20: follow the discussions on our high
21: level calls."
22: BY MR. DENTON:
23: Q.    Do you see where I underlined
24: that?

01: 00782:    A.   Yes, I see that.
02: Q.    Okay.  And the next response
03: from Dr. Scott Berkowitz is:  "I understand.
04: I always have difficulty with these kinds of
05: retrospective analyses because -- basically,
06: fishing expeditions."
07: Do you see that?
08: A.    I see that sentence you just
09: read for me, yes.
10: Q.    He goes on to say, "They hold
11: almost no weight for me, and can easily be
12: turned to say what one does or does not want
13: to hear."
14: You see where I'm reading from?
15: A.    Yes, I see where you're reading
16: from.
17: Q.    Then down below, you start
18: talking about the device, at 7:41.  You
19: write, "We don't have a person in the device
20: standards team."  Right?
21: A.    Yes.
22: Q.    "I will have to nominate
23: someone -- nominate one or self-appoint to
24: that -- retrospective analyses seems like the

p. 00782

01: 00783:    only choice."
02: So when you're talking about
03: the device standards, you're talking about
04: that ISO standard that you eventually found?
05: A.    When I was talking about the
06: device standards team, that was a subpart of
07: the task force, and we talked about the task
08: force team yesterday I think, also, and the
09: device standards team was, yeah, part of the
10: team looking up the standards that applied
11: for INR measuring devices.
12: And, again, that fits into the
13: context that this was in the very early phase
14: when we became aware, and really just had to
15: inform ourselves and work through different
16: information channels before we were able to
17: plan the analyses thoroughly that were run
18: later on.
19: Q.    You knew nothing about device
20: standards as of September 22nd, 2015, that
21: had to do with the HemoSense device, did you?
22: Nothing?
23: A.    That's not what it says here.
24: Q.    I'm not asking what it says.

p. 00783

01: 00784:   I'm asking you:  Did you ever know what the
02: device standard was for the HemoSense device
03: before September 22nd, 2015, when you wrote
04: this chat to Dr. Berkowitz?
05: A.    I personally was not aware on
06: the details, yeah, that are in the ISO
07: standards and on the -- yeah, requirements
08: and specifications that are needed to approve
09: a medical device of that kind.
10: Q.    Right.  And you're still not a
11: device standards expert, are you?
12: A.    I'm still not a very much in
13: detail device standard expert, but from what
14: the work we did in that device standards team
15: and what we learned still talking to our
16: internal experts in both companies who are
17: more familiar with the device regulations,
18: yeah, I acquired a knowledge.
19: Q.    They sent it to you.  They sent
20: the standards to you.  Someone from Janssen
21: sent you the standards and circulated them,
22: right?
23: A.    Yeah, I mean, that's also in
24: one of my topics we talked to about

p. 00784

01: 00785:   yesterday.
02: Q.    Right.
03: A.    But we also had several
04: meetings, telephone conference, where also
05: colleagues were involved who, yeah, are
06: experts in medical devices, because both
07: Janssen and also Bayer also have medical
08: device experts unrelated to Xarelto, and so
09: we could involve those experts in
10: conversations helping us to interpret the ISO
11: standards.
12: Q.    And the experts from Janssen,
13: the device experts, told you that this device
14: did not meet the standards as it performed in
15: the ROCKET study.  That's what they told you.
16: A.    That is not true.
17: Q.    They told you it was 85 -- or
18: 87%, and the minimum standard was 90%.  We
19: talked about that yesterday.
20: MR. HOFFMAN:  Objection, asked
21: and answered.
22: A.    It is not true that experts
23: told me that -- for the results that we were
24: talking about as -- was one of the results of

p. 00785

01: 00786:   the analysis that were being run as -- yeah,
02: in the consequence of the dialogue with the
03: EMA and in consequence of their request.  And
04: also analyses were being run by the ROCKET
05: arm AF team, so meaning those people who were
06: most familiar with the -- yeah, the conduct
07: and the database of the ROCKET AF trial.
08: BY MR. DENTON:
09: Q.    The minimum compliance standard
10: for that ISO standard for this device was it
11: had to be accurate 90% of the time.  That was
12: the standard you were sent, right?
13: MR. HOFFMAN:  Objection, asked
14: and answered.
15: A.    I would like to go back to the
16: exact document --
17: BY MR. DENTON:
18: Q.    I thought you remembered the
19: standards.
20: A.     -- so not to mix up the wording
21: I saw, because that's typically also what you
22: do as a regulatory person.
23: Q.    To mix up the words?
24: A.    No.  Looking at the document --

p. 00786

01: 00788:       A.  Yes, that --
02: Q.    Okay.
03: A.    -- document was attached, and
04: this is a comprehensive document which cannot
05: be summarized in one sentence.  And so I just
06: said I would really prefer if we look into
07: the document when talking about it and citing
08: content out of it.
09: Q.    Well, you're the expert, right?
10: Are you the device standard expert, yes or
11: no?  I need to know.
12: MR. HOFFMAN:  Objection, asked
13: and answered.
14: A.    I have told you that we looked
15: up the documents and that we had
16: conversations about it, and so we learned
17: about it, but that's not making me
18: automatically a medical device expert.
19: BY MR. DENTON:
20: Q.    Okay.  Let me ask this
21: question:  The device failed in ROCKET to
22: meet that standard, correct?
23: MR. HOFFMAN:  Objection to the
24: form of the question.

p. 00788

01: 00787:          MR. HOFFMAN:  Move to strike --
02: A.    -- at regulations and
03: guidance --
04: MR. HOFFMAN:  -- inconsistent
05: with the Federal Rules and the
06: pretrial order.
07: MR. DENTON:  Let me withdraw
08: the question.
09: MR. HOFFMAN:  Thank you.
10: BY MR. DENTON:
11: Q.    The device expert over at
12: Janssen said the ISO standard required, at a
13: minimum, that the device was to be accurate
14: 90% of the time within certain ranges, right?
15: A.    It is not as you refer to it.
16: Device experts said something.  I mean --
17: Q.    The device --
18: A.    We looked it up in ISO --
19: Q.    Let me withdraw it.  Let me
20: withdraw it.  I'm running out of time.
21: The device expert at Janssen
22: sent a standard to the group, including you,
23: that attached the ISO standard that we've
24: been talking about, correct?

p. 00787

01: 00789:   BY MR. DENTON:
02: Q.    You know that to be the fact?
03: MR. HOFFMAN:  Objection, asked
04: and answered.
05: A.    I disagree to your statement.
06: BY MR. DENTON:
07: Q.    So it did comply with the
08: standard.  Is that your testimony?
09: MR. HOFFMAN:  Objection.  Let
10: her finish her answer.
11: Go ahead.
12: THE WITNESS:  Can you please
13: repeat the statement?
14: MR. DENTON:  Let's just move
15: on.  You clearly don't want to answer
16: that, so let's move on to a different
17: question.
18: BY MR. DENTON:
19: Q.    Let's go to a document your
20: lawyer showed you, Exhibit 4, page 7.  That's
21: the assessment report, LEG 37, page 7, Evan.
22: Do you recall your lawyer said
23: that there were some things that the Alere
24: company provided to the regulators that the

p. 00789

Case 2:14-md-02592-EEF-MBN   Document 7946-12   Filed 11/03/17   Page 205 of 210

01: 00790:   companies didn't have any communication
02: about?
03: MR. HOFFMAN:  Objection,
04: misstates the evidence.
05: But you can go ahead and
06: answer.
07: A.    We talked about documents that
08: were -- that are confidential information of
09: the company Alere, and Alere agreed to submit
10: directly to the health authority, but not,
11: yeah, to -- to us as the sponsors of ROCKET
12: AF.
13: MR. DENTON:  Can we put up
14: pages 7, Evan?  That's the page that
15: Mr. Hoffman asked her about.
16: BY MR. DENTON:
17: Q.    You see there you were talking
18: about that there's a health hazard
19: assessment, you were talking about what some
20: of the information Alere has done.  And the
21: very last sentence, "Alere has communicated
22: to the customers that more than 99% of all
23: patient INR results are not to be -- expected
24: to be affected by this issue."

p. 00790

01: 00791:           That's what they told EMA,
02: right?
03: MR. HOFFMAN:  Objection, form
04: of the question, calls for
05: speculation.
06: A.    That's a citation from an
07: e-mail Alere sent to JRD, to Janssen.
08: BY MR. DENTON:
09: Q.    Right.
10: A.    And so this is a quote from
11: that e-mail.  But the field safety notice
12: that is also mentioned here in this context,
13: I assume is containing more information than
14: just this quote from the e-mail.
15: BY MR. DENTON:
16: Q.    But the truth was, even under
17: the sensitivity analysis that your company
18: did and Janssen did, only 80% -- 87% of the
19: patients were in range.
20: MR. HOFFMAN:  Objection to the
21: form of the question.
22: BY MR. DENTON:
23: Q.    This is just not the truth, is
24: it?

p. 00791

01: 00792:           MR. HOFFMAN:  Objection to the
02: form of the question.
03: A.    That's a different context
04: to -- than this quote, which is cited here
05: from the health hazard assessment of Alere.
06: BY MR. DENTON:
07: Q.    You were asked some questions
08: about timelines about the approval by your
09: counsel.  Do you remember some of that?
10: A.    Yes, I was referring to some of
11: the timeline tables --
12: Q.    Right.
13: A.    -- which I had also in front of
14: me here --
15: Q.    Right.  And you've also
16: referred from time to time about the
17: timelines in the collaborative agreement,
18: right?  The agreement between Bayer and
19: Janssen as it relates to Xarelto, right?
20: A.    I did not refer to timelines,
21: but in general aspects.
22: Q.    Well, you know there's a
23: written collaborative agreement that had
24: timelines and different things, and set out

p. 00792

01: 00793:   the respective responsibilities for the
02: companies, right?
03: A.    I'm aware of, yeah --
04: Q.    Okay.  Let me hand you --
05: A.    -- a company agreement --
06: (Whereupon, Deposition Exhibit
07: Derix-73, Collaborative Development
08: and License Agreement,
09: XARELTO_BHCP_00015914 -
10: XARELTO_BHCP_00016190, Ref. 7741, was
11: marked for identification.)
12: BY MR. DENTON:
13: Q.    -- Exhibit 73, which is
14: Record 7741, and that's the collaborative
15: agreement.  And I'm not going to ask very
16: much because I'm out of time.
17: But you see it's dated
18: October 1st, 2005, right there on the cover?
19: A.    Yes.
20: Q.    And I want to turn to
21: Exhibit E, which is Bates number ending
22: 16064.
23: MR. HOFFMAN:  I'm sorry, 161 --
24: MR. DENTON:  Excuse me, 16064.

p. 00793

Page 95

01: 00794:      I apologize.  It's Exhibit E.
02: MR. HOFFMAN:  I understand.
03: A.    16064?
04: MR. HOFFMAN:  Here, you can
05: look at this one.  I found it.
06: THE WITNESS:  Uh-huh.
07: MR. HOFFMAN:  Oh, you found it
08: too.  Okay.
09: THE WITNESS:  Uh-huh.
10: BY MR. DENTON:
11: Q.    Let's look at Exhibit E.  We
12: have it up on the screen.  It's the marketing
13: plan, and it's dated September 2005.
14: Do you see that?
15: A.    Yes, I see that.
16: Q.    And this is -- let me set the
17: stage here.  In 2005, not a single phase
18: three study had taken place, right?  The
19: clinical -- the phase three studies?
20: A.    2005 was before, yeah, the
21: phase three studies.
22: Q.    All right.  So we don't know
23: how the drug is going to do in clinical
24: trials until those clinical trials are

p. 00794

01: 00795:    completed, right?
02: A.    At that time, yes, the -- I
03: mean, the results of the phase three studies
04: were not known, yeah.
05: Q.    And on page 2 of the Exhibit E,
06: which is the next page, you talk about the
07: various indications that were going to be
08: part of this project.
09: Do you see that?
10: A.    Are you referring to the second
11: paragraph?
12: Q.    Yes, the -- you know, B-A-Y,
13: they're talking about Xarelto, "Breadth of
14: indications as the commercial foundation."
15: Do you see that?
16: A.    I see that, yes.
17: Q.    And it talks about DVT/PE
18: prophylaxis.  It talks about DVT/PE
19: prophylaxis after hip and knee surgery.  It
20: talks about afib patients and on and on.
21: That was what the plan was, was
22: to try to get all those indications for this
23: drug, right?
24: A.    Yes.  That is indicating a

p. 00795

01: 00796:    direction for the plan to develop those
02: indications in the future collaboration.
03: Q.    Right.  And then if you turn to
04: the next page, there's actually a timeline of
05: the phase three tactical plan.
06: Do you see that?
07: A.    Yes, I see that.
08: Q.    And so those were timelines
09: that the two companies got together and
10: collaborated.  See at the bottom it says
11: Bayer Healthcare and Johnson & Johnson?
12: A.    Yes, so there's -- I mean, this
13: is a timeline projection.
14: Q.    Right.  I mean, those are
15: timelines that the companies agreed between
16: themselves, right, for this project?
17: A.    Those are the timelines that
18: the companies projected, based on their
19: experience from other programs.
20: Q.    Right.  Let's go back to the
21: commercial impact of this strategy.  Go back
22: to page 2.
23: A.    Uh-huh.
24: Q.    "We plan to establish" -- and

p. 00796

01: 00797:    it keeps referring to BAY, but that's
02: Xarelto, right?  That was the --
03: A.    Yeah, there's a short number.
04: It's not complete, but this is certainly a
05: call behind, but --
06: Q.    Right.  We're going to make it
07: a U.S. blockbuster drug.
08: Do you see that?
09: A.    It says, "We plan to establish
10: BAY as a," yes, "a U.S. blockbuster drug."
11: Q.    And a blockbuster drug means
12: a billion dollars a year in sales, right?
13: MR. HOFFMAN:  Objection to the
14: form of the question.
15: A.    Certainly this is a subject of
16: there's no firm definition, but a blockbuster
17: drug means a drug that has a broad outreach.
18: BY MR. DENTON:
19: Q.    Billions of dollars a year is
20: the definition, isn't it, in the U.S.
21: market?
22: MR. HOFFMAN:  Objection to the
23: form of the question.
24: BY MR. DENTON:

p. 00797

Page 96

Case 2:14-md-02592-EEF-MBN   Document 7946-12   Filed 11/03/17   Page 207 of 210

01: 00798:        Q.   Or you don't know?
02: A.   I don't know.
03: Q.   Well, some other stuff that was
04: done before a single phase three study was
05: done -- let's go to page 4 of Exhibit E.
06: A.   Uh-huh.
07: Q.   It talks about the various
08: studies and how you were hoping that Xarelto
09: would perform, and you see the last dot, this
10: "product shall not require routine
11: monitoring."
12: Do you see that?
13: A.   I see that bullet point, yes.
14: Q.   So before you-all did a single
15: clinical trial in phase three, both companies
16: got together and agreed that this drug would
17: not require routine monitoring, right?
18: A.   That's not my understanding of
19: the text here.  I --
20: Q.   Well, then you read it.
21: MR. HOFFMAN:  Let her finish
22: her answer, please.
23: MR. DENTON:  Sure.  I was just
24: going to move on.

p. 00798

01: 00799:              MR. HOFFMAN:  Go ahead, finish
02: your answer, and then if he wants you
03: to read the text, you can read the
04: text.
05: A.   The header of this section
06: says, "The target product profile is
07: summarized as following," and then there are
08: a couple of bullets taken out of the target
09: product profile.  Target product profiles are
10: typical documents that are prepared for -- in
11: the course of the pharmaceutical development,
12: and they are profiles that, on one hand side
13: are aspirational, but on the other hand side,
14: based on the available information at a
15: certain time.
16: Target product profiles are
17: documents that are developing over time, and
18: they are changed based on information that is
19: coming in through the -- of the development
20: plan.  And, therefore, it phrases product
21: profile based on -- at the point in time, but
22: it does in no way mean that this is a formal
23: agreement or a fixed and cast in stone
24: summary of the profile.

p. 00799

01: 00800:              MR. DENTON:  Move to strike as
02: nonresponsive.
03: BY MR. DENTON:
04: Q.   Would you read that last bullet
05: point?
06: A.   The last bullet point of this
07: outline target product profile says, "Use of
08: the product shall not require routine
09: monitoring."
10: BY MR. DENTON:
11: Q.   Shall not require routine
12: monitoring, right?  That was the agreement
13: back in 2005, correct?
14: A.   I disagree that it was an
15: agreement.  It was part of the target product
16: profile.
17: Q.   Well, look at the front -- look
18: at the front page of this document.
19: MR. HOFFMAN:  Objection.
20: BY MR. DENTON:
21: Q.   The name of the document is
22: "Collaborative Development and License
23: Agreement between Bayer Healthcare AG and
24: Ortho-McNeil Pharmaceutical," which was the

p. 00800

01: 00801:   precursor to Janssen.
02: MR. HOFFMAN:  Objection to the
03: form of the question.
04: BY MR. DENTON:
05: Q.   This is, in fact, an agreement,
06: that your two companies signed about Xarelto.
07: A.   But the term agreement, license
08: agreement, is a fixed term, and so that is
09: characterizing the overall document.  But it
10: does not mean that the bullet point here
11: means an agreement at -- it has to be read
12: into the context of the target product
13: profile, which is summarized.
14: Q.   All right.  Let's move on.
15: MR. HOFFMAN:  Mr. Denton, I
16: just want to advise you that by our
17: calculation, you have five minutes
18: left.
19: MR. DENTON:  Well, I'm doing my
20: best if they're responsive.
21: MR. HOFFMAN:  I don't --
22: MR. DENTON:  Let's move on.
23: MR. HOFFMAN:  I don't agree
24: with that.  You have five minutes.

p. 00801

01: 00802:          MR. DENTON:  But we --
02: BY MR. DENTON:
03: Q.     Let's move on to page 5, the
04: pricing.
05: A.     Uh-huh.
06: Q.     Down at the bottom,
07: "Specifically, Xarelto will be priced at a
08: modest net discount to Lovenox for the
09: planned period of acute only indications
10: (estimated from 2008 to 2010)."
11: Do you see that?
12: A.     I see that sentence.
13: Q.     And so the standard of care at
14: that time was Lovenox for these acute
15: indications, right, and so you were trying to
16: compete at a slight discount in 2008 and
17: 2010 -- through 2010, correct?
18: MR. HOFFMAN:  I object to these
19: questions as beyond the scope of
20: direct.
21: You can answer.
22: A.     The first part is, yes, Lovenox
23: is enoxaparin, and that's a
24: low-molecular-weight heparin that was seen as

01: 00803:    the standard of care in VTE prevention
02: indications.
03: BY MR. DENTON:
04: Q.     And the pricing then, the afib
05: indication that was projected in 2010, that
06: was going to be the biggest market share for
07: this drug, right?  That was the biggest
08: population according to this document?
09: MR. HOFFMAN:  Can I have a
10: running objection to the pricing
11: questions?  I don't want to interrupt
12: you.
13: MR. DENTON:  You can have any
14: objection you want.
15: MR. HOFFMAN:  Thank you.
16: A.     The atrial fibrillation
17: indication is, yeah, out of the indications
18: so far approved for Xarelto, that was the
19: biggest patient population, that was right.
20: BY MR. DENTON:
21: Q.     Right.  And so what you were
22: doing here -- what this plan was in this
23: agreement, way back in 2005, "Upon approval
24: of the atrial fibrillation in 2010, the net

01: 00804:    price for Xarelto will be positioned at a
02: premium to warfarin and it will be the same
03: for all indications."
04: Do you see that?
05: MR. HOFFMAN:  Objection to the
06: form of the question.
07: A.     I see that sentence, yes.
08: BY MR. DENTON:
09: Q.     You know what premium means.
10: It could cost patients more to pay for
11: Xarelto as opposed to the standard of care
12: warfarin that exists, that still is the gold
13: standard, right?
14: A.     Yeah, we would have to
15: specifically refer to colleagues who are --
16: that can better talk about pricing and
17: building of pharmaceutical product prices.
18: So I just can confirm what you just read,
19: that is correct, but otherwise, I can't
20: comment.
21: MR. DENTON:  I'm done.  No more
22: questions.
23: MR. HOFFMAN:  We're done.  I
24: have no questions.  Thank you very

01: 00805:          much.
02: THE VIDEOGRAPHER:  This ends
03: today's deposition.  We're off the
04: record at 5:45 p.m.
05: (Proceedings recessed at
06: 5:45 p.m.)
07: --o0o--
08:
09:
10:
11:
12:
13:
14:
15:
16:
17:
18:
19:
20:
21:
22:
23:
24:

01: 00806:                CERTIFICATE
02: I, MICHAEL E. MILLER, Fellow of
    the Academy of Professional Reporters,
03: Registered Diplomate Reporter, Certified
    Realtime Reporter, Certified Court Reporter
04: and Notary Public, do hereby certify that
    prior to the commencement of the examination,
05: ANDREA DERIX, Ph.D. was duly sworn by me to
    testify to the truth, the whole truth and
06: nothing but the truth.
07: I DO FURTHER CERTIFY that the
    foregoing is a verbatim transcript of the
08: testimony as taken stenographically by and
    before me at the time, place and on the date
09: hereinbefore set forth, to the best of my
    ability.
10:
    I DO FURTHER CERTIFY that pursuant
11: to FRCP Rule 30, signature of the witness was
    not requested by the witness or other party
12: before the conclusion of the deposition.
13: I DO FURTHER CERTIFY that I am
    neither a relative nor employee nor attorney
14: nor counsel of any of the parties to this
    action, and that I am neither a relative nor
15: employee of such attorney or counsel, and
    that I am not financially interested in the
16: action.
17:
18: _____
    MICHAEL E. MILLER, FAPR, RDR, CRR
19: Fellow of the Academy of Professional Reporters
    NCRA Registered Diplomate Reporter

p. 00806

20: NCRA Certified Realtime Reporter
    Certified Court Reporter
21:
    Notary Public in and for the
22: State of Texas
    My Commission Expires:  7/9/2016
23:
    Dated: March 4, 2016
24:

p. 00806a

01: 00807:          INSTRUCTIONS TO WITNESS
02:
03: Please read your deposition over
04: carefully and make any necessary corrections.
05: You should state the reason in the
06: appropriate space on the errata sheet for any
07: corrections that are made.
08: After doing so, please sign the
09: errata sheet and date it.
10: You are signing same subject to
11: the changes you have noted on the errata
12: sheet, which will be attached to your
13: deposition.
14: It is imperative that you return
15: the original errata sheet to the deposing
16: attorney within thirty (30) days of receipt
17: of the deposition transcript by you.  If you
18: fail to do so, the deposition transcript may
19: be deemed to be accurate and may be used in
20: court.
21:
22:
23:
24:

p. 00807

01: 00808:              ERRATA
02: PAGE  LINE  CHANGE
03: ____  ____  _____
04: REASON: _____
05: ____  ____  _____
06: REASON: _____
07: ____  ____  _____
08: REASON: _____
09: ____  ____  _____
10: REASON: _____
11: ____  ____  _____
12: REASON: _____
13: ____  ____  _____
14: REASON: _____
15: ____  ____  _____
16: REASON: _____
17: ____  ____  _____
18: REASON: _____
19: ____  ____  _____
20: REASON: _____
21: ____  ____  _____
22: REASON: _____
23: ____  ____  _____
24: REASON: _____

p. 00808

```
01: 00809:        ACKNOWLEDGMENT OF DEPONENT
02:
03:
04: I, ANDREA DERIX, Ph.D., do hereby
    certify that I have read the foregoing pages
05: and that the same is a correct transcription
    of the answers given by me to the questions
06: therein propounded, except for the
    corrections or changes in form or substance,
07: if any, noted in the attached
    Errata Sheet.
08:
09:
10:
11:
12: _____
    ANDREA DERIX, Ph.D.              DATE
13:
14:
15: Subscribed and sworn to before me this
16: _____ day of _____, 20 _____.
17: My commission expires: _____
18:
19: _____
20: Notary Public
21:
22:
23:
24:
```

```
01: 00810:        LAWYER'S NOTES
02:
03: PAGE   LINE
04: ____   ____   _____
05: ____   ____   _____
06: ____   ____   _____
07: ____   ____   _____
08: ____   ____   _____
09: ____   ____   _____
10: ____   ____   _____
11: ____   ____   _____
12: ____   ____   _____
13: ____   ____   _____
14: ____   ____   _____
15: ____   ____   _____
16: ____   ____   _____
17: ____   ____   _____
18: ____   ____   _____
19: ____   ____   _____
20: ____   ____   _____
21: ____   ____   _____
22: ____   ____   _____
23: ____   ____   _____
24: ____   ____   _____
```