UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * | |
| | * | JUDGE ELDON E. FALLON |
| *Harriet Ibanez, et al. v. Janssen, et al.* | * | |
| **Case No. 2:14-cv-02669** | * | MAGISTRATE JUDGE NORTH |
| | * | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

---

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
DEFENDANTS' JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT
ON THE GROUND THAT FEDERAL LAW PREEMPTS
PLAINTIFFS' FAILURE TO WARN OR INSTRUCT CLAIM**

---

Plaintiffs respectfully submit this response in opposition to Defendants' Joint Motion for

Partial Summary Judgment on the Ground that Federal Law Preempts Plaintiffs' Failure to Warn

or Instruct Claim ("Defendants' motion" or "Def. Motion").[1]

I.      **INTRODUCTION**

Defendants' motion is essentially a rehash of arguments that have been raised many times

throughout the course of this litigation.[2] Each time, this Court has rejected those arguments and

---

[1] While Defendants' motion initially related to both William Henry and Harriet Ibanez, Mr. Henry's case has been dismissed, *see* Record Doc. 7943, so the issue is now moot as it related to Mr. Henry. Thus, this opposition addresses only the claim of Ms. Ibanez.

[2] Given the number of times this issue already has been raised and ruled upon, Plaintiffs incorporate the following briefs and arguments from *Boudreaux, Orr*, and *Mingo* into this memorandum, including all the exhibits to those briefs, as if they were set forth fully herein: (1) Plaintiffs' Response in Opposition to Defendants' Joint Motion for Partial Summary Judgment on the Ground that Federal Law Preempts Plaintiffs' Failure to Warn Claims (*Boudreaux* and *Orr*) [Record Doc. 5650]; (2) Plaintiffs' Response in Opposition to Defendants' Joint Motion for Partial Summary Judgment on the Ground that Federal Law Preempts Plaintiffs' Dosing, Monitoring, and Other Design Related Claims (*Boudreaux* and *Orr*) [Record Doc. 5652]; (3) Plaintiffs' Reply Memorandum in Opposition to Defendants' Post-Hearing Letter Brief on the Ground that Federal Law Preempts Plaintiffs' Dosing, Monitoring, and Other Design-Related Claims (*Boudreaux* and *Orr*) [Record Doc. 5966]; (4) Memorandum in Support of Plaintiffs' Motion for Judgment as a Matter of Law at the Close of Defendants' Case (*Boudreaux*) [Record Doc. 6378-1]; (5) Plaintiffs'

ruled against preemption.[3] Just this week, the court in the consolidated *Xarelto* litigation pending in the Court of Common Pleas of Philadelphia County likewise rejected the preemption analysis, and applied its ruling on a global basis to the entire litigation.[4] Numerous state and federal courts across the country have similarly rejected preemption challenges concerning brand-name prescription drugs.

Nonetheless, Defendants raise the defense of preemption again here, with the stated goal of requesting interlocutory review of the issue pursuant to 28 U.S.C. § 1292(b).[5] In this regard, Defendants appear to have included Ms. Ibanez's case in this motion as a means of ensuring that the preemption issue is preserved for such an appeal, despite the fact that discovery in Ms. Ibanez's case is not closed.

---

Memorandum in Support of Motion in Limine No. 37 to Preclude the False and Misleading Argument that a Prothrombin Time (PT) Test Must Be Specifically Approved by the FDA for Use with Xarelto (*Orr*) [Record Doc. 6492-1]; (6) Plaintiffs' Memorandum of Law in Response to Defendants' Motion for Judgment as a Matter of Law at the Close of Plaintiffs' Case (*Orr*) [Record Doc. 6782]; (7) Plaintiffs' Memorandum of Law in Response to Defendants' Supplemental Motion for Judgment as a Matter of Law (*Orr*) (Regarding Preemption0 [Record Doc. 6783]; (8) Plaintiffs' Memorandum in Response to Defendants' Motion for Judgment as a Matter of Law at the Close of Evidence (*Orr*) [Record Doc. 6784]; (9) Plaintiff's Response in Opposition to Defendants' Joint Motion for Partial Summary Judgment on the Purported Ground that Federal Law Preempts Plaintiffs' Failure to Warn Claims (*Mingo*) [Record Doc. 7040]; (10) Plaintiff's Response in Opposition to Defendants' Joint Motion for Partial Summary Judgment on the Ground that Federal Law Preempts Plaintiffs' Design Defect Claim (*Mingo*) [Record Doc. 7044]; (11) Plaintiff's Response to Defendants' Motion for Judgment as a Matter of Law at the Close of Plaintiff's Case (*Mingo*) [Record Doc. 7378]; and (12) Plaintiff's Response in Opposition to Defendants' Amended Motion for Judgment as a Matter of Law at the Close of Evidence (*Mingo*) [Record Doc. 7395]. Plaintiffs also incorporate by reference the oral argument transcript from March 23, 2017, and oral arguments made on these issues during each trial.

[3] *See In re Xarelto (Rivaroxaban) Prods. Liab. Litig.,* MDL No. 2592 Section L, 2017 U.S. Dist. LEXIS 56629, 2017 WL 1395312 (E.D. La. Apr. 13, 2017); *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.,* MDL No. 2592 Section L, 2017 U.S. Dist. LEXIS 56630, 2017 WL 1352860 (E.D. La. Apr. 13, 2017); *In re Xarelto Rivaroxaban Prods. Liab. Litig.,* MDL No. 2592 Section L, 2017 U.S. Dist. LEXIS 114338 (E.D. La. July 21, 2017).

[4] *See* Exhibit 1, *In re Xarelto Prods. Liab. Litig.,* Jan. 2015, No. 002349, Order (Phila. Ct. Com. Pl. Oct. 31, 2017) ("Philadelphia Preemption Order").

[5] *See* Def. Motion at 1 n.1.

The prematurity of this motion is further, and more importantly, underscored by the fact that certain essential and unresolved procedural failures of Defendants may significantly affect the ability of this Court, and any appellate court, to fully consider all issues, particularly as they relate to the strikethrough document and Defendants' claim that there is "clear evidence" that it was impossible to amend the Xarelto label to include PT-related information. During the *Mingo* trial, it was revealed that Defendants had not produced the original email from Tyree Newman, which allegedly had attached the strikethrough document, despite that original email having been contained within Defendants' email system. Because of this, the PSC undertook an investigation and explored the nature of email communications between Janssen and the FDA, the encryption system used by Janssen for such emails, policies and procedures for storing and saving such communications, and the availability of any additional discovery that had not been, but should have been, previously produced. As a result of what was learned in this investigation, Plaintiffs are seeking discovery of all original encrypted FDA communications related to Xarelto, and all Xarelto-related materials saved in the Global Regulatory Affairs Information Link ("GRAIL") database that was first disclosed in the context of the PSC's investigation.

This discovery will produce evidence that will allow Plaintiffs to demonstrate more fully that a genuine issue of material fact exists as to who initiated label changes, when such changes were proposed and/or made, and why such changes were proposed and/or made. This also will provide full foundational context for the label change communications. While Plaintiffs appreciate that this Court already has determined that Defendants have not established clear evidence with regard to label changes as a matter of law, and likely will make the same determination here, this does not change the fact that the record on this point is not complete. This could negatively impact Plaintiffs if an interlocutory appeal is granted, and the preemption issues are considered by a

tribunal that will not have gained a day-to-day, detailed, appreciation of the facts involved in this litigation. Consequently, Plaintiffs "cannot present facts essential to justify its opposition," and thus request relief under Fed. R. Civ. P. 56(d), so this discovery can be completed before briefing is closed and an opinion is issued. Plaintiffs have attached a declaration to support this request for relief.[6]

In any event, Supreme Court and related precedent make clear that federal law did not prevent Defendants from complying with their obligations under Louisiana law to update their label to provide instructions to avoid significant and potentially fatal adverse effects, along with additional information relating to the reliability of the studies on which approval of Xarelto was based. Accordingly, Plaintiffs' failure to warn claim is not preempted and, for the reasons set forth below, this Court should deny Defendants' motion.

Xarelto is a brand-name prescription blood thinner that was approved by the FDA in July 2011 to help prevent deep-vein thrombosis ("DVT") and pulmonary embolism ("PE") in patients who undergo hip replacement and knee replacement surgeries.[7] Its approval was expanded to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, and to treat and/or reduce the risk for DVT and PE.[8] Studies conducted before the drug was approved for sale raised concerns that taking Xarelto led to higher incidences of major bleeding events.[9]

---

[6] See Exhibit 2, Declaration of Neil D. Overholtz in Support of Plaintiffs' Memorandum in Opposition to Defendants' Joint Motions for Partial Summary Judgment on the Ground that Federal Law Preempts Plaintiffs' Failure to Warn or Instruct and Design Defect Claims ("Overholtz Declaration").

[7] *See* Def. Motion at 4.

[8] *See id.*

[9] *See* Ibanez Complaint at ¶¶ 76-78.

After Xarelto was approved and started being sold, it turned out to be even more dangerous than these initial studies had suggested. Defendants received a staggering number of reports of serious incidents of bleeding by patients taking Xarelto. An alarming number of these involved patients dying from bleeding caused by Xarelto. In 2012, the first full year during which Xarelto was on the market, Xarelto ranked tenth in terms of direct Serious Adverse Event ("SAE") reports to the FDA.[10] This trend continued. From 2012 through 2015, Xarelto-related adverse events were the most frequently reported among all pharmaceuticals sold in the U.S. market, with 81% involving bleeding events.[11] Additionally, data from Defendants' post-marketing surveillance program identified numerous instances of patients with elevated PT results who experienced bleeding complications.[12]

Most patients who take Xarelto do not experience bleeding, but it can be life-threatening for those patients who do, because there is no reversal agent available to stop the bleeding. Clinical studies showed significant variation in the way Xarelto is absorbed, distributed, metabolized, and eliminated by different patients.[13] As a result, it is not possible to reliably predict a patient's exposure to Xarelto, or risk of bleeding, based solely on the dose administered.

A one-time screening test, using Neoplastin PT when first prescribing Xarelto, can be used by doctors to screen patients and identify those at a high risk of bleeding.[14] This test would allow physicians and patients to avoid the risk of bleeding by discontinuing the use of Xarelto.

---

[10] *See* Exhibit 3, QuarterWatch Report 2012 Q4, 10/17/13 ("QuarterWatch Report"), at 10.

[11] *See* Exhibit 4, Expert Report of Cindy Leissinger, M.D. ("Leissinger Report"), at 17 (citing data sources).

[12] *See* Exhibit 5, Declaration of Suzanne Parisian, M.D. ("Parisian Declaration"), at ¶ 20.

[13] *See id.* at ¶ 6.

[14] *See id.* at ¶ 8.

There is no dispute that the Neoplastin PT test is a safe and effective way to identify which patients are at higher risk for bleeding. Scientific and regulatory communities throughout the world have recognized the benefits of PT testing for Xarelto users, and Defendants themselves relied in their studies on Neoplastin PT to make reliable scientific findings about Xarelto concentrations.[15]

The problem is that doctors and patients, following Defendants' instructions, were not conducting any screening to identify patients at high risk for severe bleeding events. The failure to include instructions for screening to identify patients at high risk for severe bleeding events in Xarelto's warning label is the crux of the failure to warn claim for Ms. Ibanez.

Additionally, Plaintiffs' failure to warn claim is based on Defendants' failure to provide information impacting the reliability of the ROCKET trial, which concluded that Xarelto was non-inferior to warfarin, and on which approval of Xarelto was based. The omitted information included: (1) the fact that there was a statistically significant 50% greater risk of major bleeding events among patients using Xarelto versus warfarin among U.S. patients, which contradicts the reported aggregate worldwide data showing there was no statistically significant increase in major bleeding events among patients receiving Xarelto versus warfarin; and (2) the fact that the INRatio device used to manage the warfarin arm of the study was defective because it wrongly informed warfarin patients that their levels were in therapeutic range, when, in fact, they were over-anticoagulated, making them more susceptible to major bleeding events. Any thought that these

---

[15] *See, e.g.,* Plaintiffs' Response in Opposition to Defendants' Joint *Daubert* Motion to Exclude Expert Opinions and Testimony Regarding Unapproved Dosing and Monitoring Regimens; and the Experts' 20-Second PT Cut-Off Guideline in the *Orr* and *Boudreaux* Cases [Record Doc. 5641], at 11-26; Plaintiffs' Memorandum in Opposition to Defendants' Renewed Joint *Daubert* Motion to Exclude Expert Opinions and Testimony Regarding Unapproved Dosing and Monitoring Regimens [Record Doc. 7001], at 1-5. Plaintiffs incorporate those memoranda and their exhibits herein by reference. *See also,* Exhibit 5, Parisian Declaration, at ¶ 9,

pieces of information were unimportant anomalies should have been erased once Xarelto was placed on the market and the SAE reports began pouring in.[16]

Defendants' motion is based on their theory that it would have been impossible to change the label of Xarelto to include any of these instructions or warnings consistent with federal law. They argue that FDA regulations prohibited them from changing Xarelto's label. Not so.[17] As governing Supreme Court precedent and subsequent decisions make clear, manufacturers of brand-name drugs like Xarelto are permitted to make changes, under the FDA's Changes Being Effected ("CBE") regulation and related agency guidance, to "add or strengthen a contraindication, warning, precaution, or adverse reaction" or "an instruction about dosage and administration that is intended to increase the safe use of the drug product" without prior approval from the FDA.[18]

In *Wyeth,* the leading case on preemption in the context of brand-name drugs, the Supreme Court ruled that the CBE regulation negates impossibility preemption in this context, "absent clear evidence that the FDA would not have approved a change."[19] Defendants have not provided clear evidence that the FDA would have rejected any of the label changes proposed above, and available evidence suggests the opposite. For this and the additional reasons given herein, Defendants' argument that it was impossible for them to comply with their state-law duties to warn, consistent with the federal regulatory regime, fails.

---

[16] Contrary to what Defendants suggest, Ms. Ibanez, like the other bellwether plaintiffs before her, is not contending that the label should have included instructions for warfarin-like routine monitoring with PT tests and dose adjustments, or "black box" warnings about the risk of bleeding. For this reason, this memorandum will not address those arguments.

[17] *See* Exhibit 5, Parisian Declaration, at ¶¶ 2, 17.

[18] *Wyeth v. Levine,* 555 U.S. 555, 568 (2009). This Court has issued opinions in this litigation recognizing this ability. *See, e.g., In re Xarelto,* 2017 U.S. Dist. LEXIS 56629, at *10-11, *citing Wyeth,* 555 U.S. at 568; *In re Xarelto,* 2017 U.S. Dist. LEXIS 56630, at *9, *citing Wyeth,* 555 U.S. at 568; *In re Xarelto,* 2017 U.S. Dist. LEXIS 114338, at *14, *citing Wyeth,* 555 U.S. at 568.

[19] *Wyeth,* 555 U.S. at 571.

## II.    COUNTERSTATEMENT OF THE CASE

### A.    The unreasonable dangers of Xarelto can be reduced by using the Neoplastin PT test.

#### 1.    Defendants' own clinical trial supports using the Neoplastin PT test.

Prothrombin ("PT") is the terminology for a test to measure coagulation time. The result is expressed in the number of seconds it takes for the blood to coagulate. Depending on the laboratory conducting the test, a number of different reagents may be used to cause the blood to clot and measure the time it takes to do so. Neoplastin is one such reagent. Innovin is another such reagent, but there are numerous others. The interpretation of the test depends upon the reagent used, because each reagent is more or less sensitive to the pharmacodynamic effects caused by different drugs, and as such, each reagent has a different range of normal. An International Normalized Ratio ("INR") was developed for warfarin, to standardize the results, regardless of the reagent used, to assess if the warfarin patient's anticoagulation status is within the "normal" range. No standardized measurement has been developed for Xarelto, although guidance is available when the Neoplastin reagent is used, as addressed below.[20]

Neoplastin PT is an FDA-cleared laboratory coagulation test, and is the PT test of choice in approximately one-third of U.S. hospitals.[21] While the label for Neoplastin does not specifically state that this reagent can be used to measure the anticoagulant activity of Xarelto, it leaves open this possibility. The Neoplastin label says: "The prothrombin time is a coagulation screening test.

---

[20] Additionally, one peer-reviewed study has correlated the degree of drug plasma concentration for Xarelto for several reagents. *See* Exhibit 6, Jonathan Douxfils, et al., *Assessment of the impact of rivaroxaban on coagulation assays: laboratory recommendations for the monitoring of rivaroxaban and review of the literature,* 130 Thrombosis Research 955, 958 Fig. 1 (Dec. 2012). Plaintiffs' experts have relied on this source in their assessments. *See, e.g.,* Exhibit 7, Expert Report of Henry Michael Rinder, MD ("Rinder Report"), at 11.

[21] *See* Exhibit 5, Parisian Declaration, at ¶ 4.

It **measures**, as a whole, the **activity** of the coagulation **factors** II, V, VII, **X** and I."[22] As such, it is clear from the Neoplastin label itself that it is entirely appropriate to use this generic coagulation test to measure the activity of factor X in a patient on a drug that acts on factor X, such as Xarelto.

In practice, Neoplastin PT has been proven to be highly sensitive to Xarelto and, for this reason, Plaintiffs' experts advocate for the use of only Neoplastin PT – and no other PT reagent – as the blood test to identify Xarelto patients at a high bleeding risk. This is supported by Defendants' own Phase III robust, multi-center, double-blinded, and randomized clinical trial: Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation ("ROCKET").[23] Specifically, the ROCKET trial established the following regarding the use of Xarelto:

- Exposure to Xarelto "increases the risk of bleeding."[24]

- Exposure to Xarelto is highly variable.[25]

- There is a linear relationship between Xarelto exposure and Neoplastin PT (as measured in seconds).[26]

---

[22] *See* Exhibit 8, Neoplastine Label, at ¶ 2 (The trade names Neoplastin and Neoplastine are interchangeable; the slight difference in name is attributable to international spelling conventions.)

[23] *See* Exhibit 5, Parisian Declaration, at ¶ 9. Neoplastin PT also was used in the two additional major clinical trial programs for Xarelto: RECORD and EINSTEIN. *See id.*

[24] *See* Def. Motion at 7.

[25] Even though all Xarelto-treated patients in ROCKET took the same 20 mg pill, the top 5% had Xarelto-plasma concentrations eleven times higher than the lowest 5% of patients, thus demonstrating the high degree of variability in exposure with Xarelto use. *See* Exhibit 9, Wolfgang Mueck, et al., *Clinical Pharmacokinetic and Pharmacodynamic Profile of Rivaroxaban,* 53 Clinical Pharmacodynamics 1 (2014); *see also* Exhibit 5, Parisian Declaration, at ¶ 6.

[26] Analysis of the ROCKET data by the FDA revealed a linear correlation between Neoplastin PT and Xarelto plasma concentration: "The PK data from 161 ROCKET patients confirms the linear relationship between the plasma concentration of rivaroxaban, and the PT." *See* Exhibit 10, FDA Draft Briefing Document for the Cardiovascular and Renal Drugs Advisory Committee (CRDAC), 09/08/11 ("FDA Draft Briefing Document"), at 38; *see also* Exhibit 5, Parisian Declaration, at ¶ 3.

- There is a correlation between Neoplastin PT and bleeding risk.[27]

- Xarelto-treated patients in the top quartile (of Neoplastin PT values) had a greater than doubling of the risk of a major bleed compared to the rest of the ROCKET population with lower PT values.[28]

Thus, the ROCKET trial, in and of itself, has proven that Xarelto increases a patient's risk of bleeding, that this risk of bleeding is variable among patients, and that Neoplastin PT can be used to evaluate the risk of bleeding in an individual Xarelto-treated patient.

### 2.   Defendants' own scientists support using the Neoplastin PT test.

Additionally, Defendants' own scientists, when operating outside the context of litigation, identified Neoplastin PT as an appropriate tool. For example, Defendant Bayer's Dagmar Kubitza (Clinical Pharmacology Lead for Xarelto and Head of Clinical Pharmacodynamics), published the following as far back as 2005, and as recently as this year:

- "This suggests that PT [Neoplastin], a routinely used coagulation test, could be used clinically to monitor the anticoagulant effect of BAY 59-7939[29] [rivaroxaban] if necessary."[30]

---

[27] The FDA analysis of ROCKET data also found a corresponding relationship between Neoplastin PT and bleeding risk in Xarelto-treated patients: "PT data from the 7008 patients in the ROCKET per protocol analysis dataset demonstrates that *the risk of major bleeds increases with PT*, regardless of whether major bleeding defined as ISTH major bleeding per the ROCKET protocol, or as TIMI major bleeding." *See* Exhibit 10, FDA Draft Briefing Document, at 39 (emphasis added). This analysis thereby proved not only the relationship between Neoplastin PT and Xarelto, but also the fact that increasing Xarelto exposure leads to an increasing risk of bleeding. *See also* Exhibit 5, Parisian Declaration, at ¶¶ 8, 9.

[28] *See, e.g.*, Exhibit 11, Exploratory Analyses Of Pharmacodynamic Coagulation Measurements in Subjects with Non-Valvular Atrial Fibrillation Treated With Rivaroxaban For The Prevention of Stroke and Non-Central Nervous System Systemic Embolism Based on Data from the Study 39039039AFL3001 (XARELTO_JANSSEN_00002044), at Tables 568, 571, 574, 577, 580, and 583; *see also* Exhibit 12, Deposition of Dr. David A. Kessler, at 176:10-179:22; Exhibit 5, Parisian Declaration, at ¶ 9.

[29] The term BAY 59-7939 was used in the early development stages to refer to rivaroxaban, the active ingredient in Xarelto.

[30] *See* Exhibit 13, Dagmar Kubitza, et al., *Safety, pharmacodynamics, and pharmacokinetics of BAY 59-7939 – an oral, direct Factor Xa inhibitor – after multiple dosing in healthy male subjects,* 61 European Journal of Clinical Pharmacology 873, 880 (2005).

- "Inhibition of factor Xa activity and prolongation of [Neoplastin] prothrombin time correlated well with BAY 59-7939 plasma concentrations ($r$=0.949 and 0.935, respectively)."[31]

- "The availability of both pharmacodynamic and pharmacokinetic data for such a large number of patients enabled us to show a good correlation between these parameters, particularly between BAY 59-7939 concentrations and [Neoplastin] PT and factor Xa activity tests. Therefore tests such as [Neoplastin] PT may be used in future trials for monitoring, if necessary."[32]

- "[T]he anticoagulant activity of rivaroxaban may be … readily assessed … in the clinical setting, provided that sensitive PT or aPTT assays are used."[33]

Similarly, Wolfgang Mueck (Head of Clinical Pharmacokinetics, Cardiovascular) published the following:

- "The slope of the plasma concentration-PT correlation graph reflected the sensitivity of the [Neoplastin] PT to increases in rivaroxaban exposure. The [Neoplastin] PT correlated in an almost linear fashion with rivaroxaban concentrations ≤ 500 mg/L, confirming that the [Neoplastin] PT could be used to assess exposure."[34]

- "Nevertheless, if used in an emergency and in the absence of any other available test, Neoplastine Plus (with results expressed in seconds) is the recommended agent for assessing the anticoagulant effect of rivaroxaban."[35]

---

[31] *See* Exhibit 14, Dagmar Kubitza, et al., *Safety, pharmacodynamics, and pharmacokinetics of single dozes of BAY 59-7939, an oral, direct factor Xa inhibitor,* 78 Clinical Pharmacology & Therapeutics 412, 412 (2005).

[32] *See id.* at 420.

[33] *See* Exhibit 15, Dagmar Kubitza, et al., *Dissociation between the pharmacokinetics and pharmacodynamics of once-daily rivaroxaban and twice-daily apixaban: a randomized crossover study,* doi:10.1111/jth.13801, at p.17 (2017).

[34] *See* Exhibit 16, Wolfgang Mueck, et al., *Population Pharmacodynamic Analyses in Patients Treated for Acute Deep-Vein Thrombosis and Exposure Simulations in Patients with Atrial Fibrillation Treated for Stroke Prevention,* 50 Clinical Pharmacokinetics 675, 684 (2011).

[35] *See* Exhibit 17, Wolfgang Mueck, et al., *Rivaroxaban and other novel oral anticoagulants: pharmacokinetics in healthy subjects, specific patient populations and relevance of coagulation monitoring,* 11 Thrombosis Journal 10, at p.11 (2013).

Additionally, Defendant Janssen prepared a document entitled "Coagulation Monitoring"[36] to disseminate assessment information – outside the context of litigation – in response to specific inquiries from practicing healthcare providers regarding coagulation parameters. This document contained the following statements:

- "If assessment of rivaroxaban plasma concentrations is necessary, the PT was reported to be an appropriate coagulation test. The relationship between PT and rivaroxaban plasma concentration when Neoplastin Plus […] is used as the reagent is linear and closely correlated."[37]

- "In a human plasma study, STA Neoplastin Plus was found to be the most precise method for determination of rivaroxaban."[38]

- "The higher cut-offs of rivaroxaban plasma concentrations correspond to values associated with a significant risk of bleeding."[39]

### 3.    Peer-reviewed literature supports using the Neoplastin PT test.

There are multiple additional peer-reviewed publications that discuss the relationship between PT and Xarelto and/or the use of PT to evaluate the anticoagulant effect of Xarelto. Plaintiffs offer the following examples:

- "[W]e have hence developed an algorithm based on first-line tests for urgent **screening of the anticoagulant effect of direct oral anticoagulants**, which entails activated partial thromboplastin time (aPTT) for dabigatran and **prothrombin time (PT) for rivaroxaban…** [T]his strategy appears **suitable to reliably define** the thrombotic or **bleeding risk** in an urgent setting, contextually saving precious laboratory resources."[40]

---

[36]*See* Exhibit 18, Xarelto Coagulation Monitoring.

[37] *Id*. at 1.

[38] *Id*. at 2.

[39] *Id*. at 3.

[40] *See* Exhibit 19, Giuseppe Lippi, et al., *Urgent monitoring of direct oral anticoagulants in patients with atrial fibrillation: A tentative approach based on routine laboratory tests,* 38 Journal of Thrombosis and Thrombolysis 269, 269 (2014) (emphasis added).

- "The PT reagent (Thrombosis S) could be considered as a rough method to **monitor the anticoagulation activity of rivaroxaban and evaluate bleeding risk caused by rivaroxaban**."[41]

- "In Japanese patients with non-valvular atrial fibrillation receiving **rivaroxaban, a prolonged peak PT ($\geq$20 s) could indicate increased risk of bleeding,** and both trough and peak SF levels were reduced relative to baseline. **PT and SF are both valuable measures of coagulation status in patients receiving rivaroxaban**, regardless of prior anticoagulant history."[42]

- "Furthermore, the pharmacodynamic effects of BAY 59-7939 correlated well with its pharmacokinetic effects; inhibition of FXa activity and prolongation of prothrombin time both correlated strongly with BAY 59-7939 plasma concentrations."[43]

- "Selective FXa inhibitors show varying effects on the commonly used coagulation tests aPTT or [Neoplastin] PT, which use complex mechanisms within the coagulation pathway, such as feedback activation of the intrinsic pathway by thrombin…. Rivaroxaban affected [Neoplastin] PT and aPTT to a similar extent to that observed in previous Phase I studies; at clinically relevant concentrations, rivaroxaban prolongs [Neoplastin] PT more than aPTT."[44]

- "Inhibition of FXa activity and PT both correlated strongly with rivaroxaban plasma concentrations. Inhibition of FXa activity correlated with rivaroxaban plasma concentrations following an

---

[41] *See* Exhibit 20, Yuanyuan Zhang, at al., *Laboratory monitoring of rivaroxaban and assessment of its bleeding risk,* 73 British Journal of Biomedical Science 134, at p.2 (2016) (emphasis added).

[42] *See* Exhibit 21, Yoshihisa Nakano, et al., *Clinical usefulness of measuring prothrombin time and soluble fibrin levels in Japanese patients with atrial fibrillation receiving rivaroxaban,* 65 Journal of Cardiology 185, 185 (2015) (emphasis added).

[43] *See* Exhibit 22, Bengt Eriksson, et al., *Oral, direct Factor Xa inhibition with BAY 59-7939 for the prevention of venous thromboembolism after total hip replacement,* 4 Journal of Thrombosis and Haemostasis 121, 122 (2006).

[44] *See* Exhibit 23, Jochen Graff, et al., *Effects of the Oral, Direct Factor Xa Inhibitor Rivaroxaban on Platelet-Induced Thrombin Generation and Prothrombinase Activity,* 47 Journal of Clinical Pharmacology 1398, 1406 (2007).

$E_{max}$[Q6] model, whereas a direct linear relationship was observed between rivaroxaban plasma concentrations and PT."[45]

- "Rivaroxaban demonstrated anticoagulant effects in human plasma, with the prothrombin time being more sensitive than the activated partial thromboplastin time, a finding also observed with other direct factor Xa inhibitors in clinical development. This may be because direct factor Xa inhibitors, including rivaroxaban, are highly effective inhibitors of the prothrombinase complex, although differences in enzyme kinetics may also be responsible. A dose-dependent prolongation of prothrombin time was demonstrated *in vivo* in rat and rabbit models, with a strong correlation observed between prothrombin time and plasma concentrations of rivaroxaban ($r$=0.98)."[46]

- "There were close correlations between pharmacokinetic and pharmacodynamic parameters. Rivaroxaban plasma concentrations correlated closely with prolongation of prothrombin time and inhibition of factor Xa. Plasma concentrations correlated with prothrombin time both in healthy volunteers and in patients undergoing either total hip replacement (THR) or total knee replacement (TKR) in Phase II studies."[47]

### 4. Government agencies and medical associations support using the Neoplastin PT test.

Numerous government agencies and medical associations also support the use of Neoplastin PT testing to assess the anticoagulant effect of Xarelto:

- New Zealand Medicines and Medical Devices Safety Authority: "Xarelto at recommended doses prolongs the global clotting tests **prothrombin time (PT)**, activated partial thromboplastin time (aPTT), HepTest®, as well as the specific clotting test, anti-Factor Xa activity. **PT is influenced by Xarelto in a dose-dependent manner if Neoplastin® is used for the assay**. The 5/95 percentiles of PT (Neoplastin®) 2 to 4 hours after tablet intake (i.e. at the time of maximum effect) is described in Table

---

[45] *See* Exhibit 24, Volker Laux, et al., *Preclinical and Clinical Characteristics of Rivaroxaban: A Novel, Oral, Direct Factor Xa Inhibitor,* 33 Seminars in Thrombosis and Hemostasis 515, 518 (2007).

[46] *See* Exhibit 25, Elisabeth Perzborn, *The discovery and development of rivaroxaban, an oral, direct factor Xa inhibitor,* 10 Drug Discovery 61, 67 (2011).

[47] *Id.* at 68.

1 (see Pharmacodynamic effects). In case of excessive doses, the PT is expected to be outside of this range."[48]

- Health Canada: "The **prothrombin time (PT)**, measured in seconds, is influenced by XARELTO in a dose-dependent way with a close correlation to plasma concentration if the **Neoplastin® reagent** is used. In patients who are bleeding, **measuring the PT using the Neoplastin® reagent may be useful to assist in determining an excess of anticoagulant activity**."[49]

- FDA: "The clinical pharmacology and clinical reviewers demonstrated that there is a **linear correlation between rivaroxaban levels and [Neoplastin] prothrombin time (PT)**. They also demonstrated that there is also a **correlation between [Neoplastin] PT and risk of bleeding**. This applicant has not chosen to utilize this information … [I]nfrequent **monitoring** (perhaps at initiation and yearly thereafter) to assure appropriate dosing of drugs that prevent stroke and cause bleeding **may improve outcomes** and be acceptable to patients."[50]

- British Committee for Standards in Haematology: "The **PT is useful as a readily available method for determining the relative degree of anticoagulation in patients taking rivaroxaban, if a reagent with known sensitivity is used,** but it cannot be used to determine the drug level."[51]

- International Society on Thrombosis and Haemostasis: "When a Quick-type **PT reagent with known sensitivity is used, the PT is useful as a readily available method for determining the relative degree of anticoagulation in patients taking rivaroxaban**."[52]

---

[48] *See* Exhibit 26, New Zealand Xarelto Data Sheet, at 7 (emphasis added).

[49] *See* Exhibit 27, Canadian Xarelto Product Monograph, at 9 (emphasis added).

[50] *See* Exhibit 28, FDA Summary Review, 11/04/11 ("FDA Summary Review"), at 9 (emphasis added).

[51] *See* Exhibit 29, Trevor Baglin, et al., *Effects of routine coagulation screens and assessment of anticoagulant intensity in patients taking oral dabigatran or rivaroxaban: Guidance from the British Committee for Standards in Haematology,* 159 British Journal of Haematology 427, 429 (2012) (emphasis added).

[52] *See* Exhibit 30, Trevor Baglin, et al., *Measuring oral direct inhibitors of thrombin and factor Xa: a recommendation from the Subcommittee on Control of Anticoagulation of the Scientific and Standardization Committee of the International Society on Thrombosis and Haemostasis,* 11 Journal of Thrombosis and Haemostasis 756, 758 (2013).

**B.      Defendants proposed including information about PT testing only when developing the initial labels, without explaining or pressing their position.**

The first four times when Janssen submitted its label for Xarelto, without any apparent feedback, the label said: "The relationship between PT and rivaroxaban plasma concentration is linear and closely correlated. If assessment of the pharmacodynamic effect of rivaroxaban is considered necessary in individual cases, PT (measured in seconds) is recommended."[53] This was followed by a range of PT values that were observed with Neoplastin used in Defendants' studies, and a caution against using INR for measuring rivaroxaban pharmacodynamic effects.[54] Importantly, no explanation was provided for if, or why, assessment of the pharmacodynamic effect of rivaroxaban would ever be considered necessary.[55]

In June 2011, anonymous strikethroughs, which Defendants attribute to the FDA, appeared in Janssen's proposed language about the ability to use PT but not INR measurements with Xarelto. This same document included a proposed addition, which Defendants attribute to the FDA, of the statement that "[t]he predictive value of these coagulation parameters for bleeding risk or efficacy has not been *adequately studied*."[56] For purposes of motions practice only, the parties have assumed these strikethroughs are attributed to the FDA. This matter requires discovery, however, because Defendants have not yet presented evidence to prove that the strikethroughs were added by the FDA.[57]

---

[53] *See* Def. Motion at 5-7.

[54] *Id.*

[55] *See* Exhibit 5, Parisian Declaration, at ¶ 23 (noting no effort was made to explain the quartile analysis from the pivotal clinical trials that showed an increased bleeding risk with higher PT levels).

[56] *See* Def. Motion at 7 (emphasis added).

[57] *See* pages 3-4 *infra,* and Exhibit 2, Overholtz Declaration.

Based on Janssen's recommendation, the latter statement was changed to read that "[t]he predictive value of these coagulation parameters for bleeding risk or efficacy has not been *established*."[58] While Janssen proposed adding back a shorter statement about PT and INR, in its related comment, it provided an explanation about and advocated only for inclusion of the INR language.[59] Janssen did not state that it also believed the PT information to be important, and did nothing more to pursue inclusion of the PT-related language.[60] Consequently, the FDA rejected the PT language that had not been explained, and accepted the INR language that had been explained, with minor revisions.[61] At the time this statement was made, only the FDA review for the orthopedic indication had been completed. Importantly, this review was based only upon Defendants' RECORD studies.

As a result of a review of the RECORD data by the orthopedic surgery medical officers, the FDA agreed with Defendants' representation that there was no correlation between Neoplastin PT and the risk of bleeding. In the FDA's review of NDA 22406 (the orthopedic surgery indication), the FDA stated the following:

- There was no relationship observed between steady state PT levels and proportion of patients with major bleeding in 11527 and RECORD studies;

- The applicant's integrated safety summary reports that it found no relationship between PT or PTR and relevant bleeding risk.[62]

---

[58] *See* Def. Motion at 9 (emphasis added).

[59] *Id.*

[60] *See* Exhibit 5, Parisian Declaration, at ¶ 23.

[61] *See* Def. Motion at 9.

[62] *See* Exhibit 31, Office of Clinical Pharmacology Review, 04/06/09 ("Clinical Pharmacology Review"), at 4.

Given these FDA findings, it is apparent why the FDA would not allow Janssen to make the proposed PT statements in that label: the FDA did not believe Defendants had gathered sufficient evidence to show a relationship between PT and the risk of bleeding.

The FDA's view of the relationship between PT and the risk of bleeding diametrically changed just months later, after the atrial fibrillation medical officers (a group entirely separate from the orthopedic surgery medical officers who had reviewed the label for the orthopedic surgery indication) completed their review of the ROCKET AF data. While Defendants maintained their position with the FDA that there was no relationship between PT and the risk of bleeding, this new group of FDA Reviewers – studying the ROCKET AF data – concluded that "[m]ajor bleeding events are dependent of PT over the observed range."[63] By September 8, 2011, the FDA's internal pharmacologists concluded that "PT data from the 7008 patients in the ROCKET per protocol analysis dataset demonstrates that the risk of major bleeds increases with PT."[64]

This turnaround in the FDA's view resulted in a significant change to the label. The FDA removed the statement that "[t]he predictive value of these coagulation parameters for bleeding risk or efficacy has not been established."[65] The only conclusion that can be drawn from such an action is that the FDA concluded that PT was in fact predictive of the risk of bleeding. Despite this FDA finding, Defendants made no attempt (through CBE or otherwise) to update the label or provide a warning to physicians that Neoplastin PT could be used to identify patients at a high risk of bleeding.[66] Defendants' failures in this regard did not go unnoticed. In a damning indictment,

---

[63] *See* Exhibit 32, Clinical Pharmacology Technical Report for PD Outcome Analysis ("Tech Report"), at 3.

[64] *See* Exhibit 10, FDA Draft Briefing Document, at 39.

[65] *See* Exhibit 33, NDA 202439 Approval Letter and Label, Nov. 2011 ("NDA Approval").

[66] *See* Exhibit 5, Parisian Declaration, at ¶ 10.

the FDA's Summary Review observed: "They also demonstrated that there is also a correlation between PT and risk of bleeding. *This applicant has not chosen to utilize this information.*"[67]

In May 2012, when Janssen submitted its proposed label for the DVT/PE indication, Janssen simply submitted language similar to what had been used in its past labels, again without suggesting the inclusion of PT instructions.[68] This is what the FDA approved in November 2012.[69]

### C.   Problems with earlier studies made Xarelto initially seem safer than it was – a fact Defendants decided not to tell doctors.

When Xarelto entered the U.S. market, Defendants claimed it was safe and effective for preventing strokes based on the results of a clinical trial referred to as ROCKET AF.[70] The investigators randomly assigned patients with atrial fibrillation to receive Xarelto or warfarin.[71] The patients who received warfarin were given varying doses of the drug, depending on the results of monitoring of their INR, using a hand-held device called INRatio.[72]

Before the ROCKET trial began enrolling patients, Janssen knew that the device they intended to use to manage the warfarin arm (the INRatio point-of-care device) had seriously malfunctioned, as it was inaccurately measuring the INR of warfarin patients. Specifically, Janssen was aware that the device maker – HemoSense – had received two warning letters saying the device was not meeting performance specifications in that it was providing inaccurate INR

---

[67] *See* Exhibit 28, FDA Summary Review, at 9; *see also* Exhibit 5, Parisian Declaration, at ¶ 18.

[68] *See* Def. Motion at 11.

[69] *Id.*

[70] Exhibit 34, Xarelto Label, 11/2011.

[71] Exhibit 35, Manesh Patel, et al., *Rivaroxaban versus Warfarin in Nonvalvular Atrial Fibrillation*, 365 New England J. Med. 883, 883 (2011) ("Patel Article").

[72] *See* Exhibit 36, Center for Drug Evaluation and Research: ROCKET AF Reanalysis Review ("ROCKET AF Reanalysis"), at 5-6.

results, such that it was wrongly informing patients that their INR was in therapeutic range when, in fact, the INR showed them to be over-anticoagulated.[73]

Despite this information, Janssen decided to go forward and use the defective INRatio device in the ROCKET study. Further, during the ROCKET trial, Janssen received reports of the device malfunctions and even developed a program – the COVANCE Re-check Program – to check discrepant results from the device and compare them to a central lab result.[74] There is no evidence that Janssen informed the clinical trial investigators, Bayer (its collaboration partner on ROCKET), or the FDA, about any of this.

The reported conclusion of the ROCKET trial was that Xarelto was "non-inferior," *i.e.*, no worse but not better than, warfarin in the prevention of subsequent stroke with no significant differences in the rates of major bleeding events between the Xarelto and warfarin treatment groups.[75] However, because of the defective INRatio device, the ROCKET study outcomes were skewed in favor of Xarelto due to the poor warfarin control causing more bleedings in the warfarin arm. As a result, when the Xarelto patients' bleeding events were compared to the warfarin patients' bleeding events, the safety profile of Xarelto looked better than if the warfarin arm had been appropriately managed.

**D.    The way in which the data from earlier studies was reported made Xarelto <u>initially seem safer than it was – a fact Defendants decided not to tell doctors.</u>**

The ROCKET trial included participants in the U.S. and elsewhere in the world. From the time Xarelto entered the U.S. market in November 2011 until September 2015, however,

---

[70] *See* Exhibit 37, FDA Warning letter (10/04/05); Exhibit 38, FDA Warning Letter (11/29/06); Exhibit 39, Deposition of Christopher Nessel, M.D. at 97:1-11, 101: 2-7, 113:17-114:11.

[74] *Id.* at 169:21-170:9; *see also, e.g.,* Exhibit 40, Deposition of William Byra M.D., at 213:13-24.

[75] *See* Exhibit 35, Patel Article, at 1.

Defendants did not report the U.S. safety data from ROCKET for Xarelto in their label; they disclosed only aggregated, worldwide safety data.[76] By aggregating data from all locations worldwide, Defendants were able to report in their labeling that there was no statistically significant increase in major bleeding events among patients receiving Xarelto versus warfarin.[77]

This aggregate reporting was essential for Xarelto to compete in the multi-billion-dollar anticoagulant market, since it had lost the race to be the first new oral anticoagulant to market to Pradaxa, which had demonstrated, and was marketed as being, superior to warfarin in reducing stroke risk in atrial fibrillation patients. Reporting the data separately for the U.S. patients, however, would have revealed a statistically significant 50% greater risk of major bleeding events among patients using Xarelto versus warfarin. Physicians and scientists in the U.S. have described this data as critical to understanding the drug's risk/benefit ratio in the U.S.[78]

It is true that in 2011, an FDA employee struck the following language from a draft of the original label: "Likewise, North American subjects on XARELTO experienced a higher annual bleeding rate compared to their warfarin treated counterparts than subjects from any other region."[79] However, this statement was stricken with no explanation, and Janssen's response to the deletion was to remain silent. Additionally, this statement relates to a more expansive subgroup (North America versus U.S.), and does not even begin to equate to information about the 50%

---

[76] *See* Exhibit 34, Xarelto Label, 11/2011, at 9.

[77] *See* Exhibit 7, Rinder Report, at 20.

[78] *See, e.g., id.* ("From November 2011 under September 2015, the Xarelto label failed to properly inform physicians of the bleeding risk for Xarelto relative to well-controlled INR for Warfarin in U.S. patients. The hazard ratio for bleeding in U.S. patients in ROCKET AF is critical to understanding the risk/benefit ratio of Xarelto, this important information was not included in the label until September 2015.").

[79] *See* Exhibit 41, Cross Discipline Team Leader Review, at 19.

greater risk of major bleeding events experienced by patients taking Xarelto versus warfarin in the United States.

> E.    **The CBE regulation, and similar agency guidance, provide a mechanism for manufacturers to change their labels for safety reasons based on newly <u>acquired information.</u>**

Under the CBE regulation, a drug manufacturer may "add or strengthen a contraindication, warning, precaution, or adverse reaction" or "an instruction about dosage and administration that is intended to increase the safe use of the drug product" without prior approval from the FDA.[80] Labeling changes under the CBE process are based on "newly acquired information," which is not limited to new data, but also includes "new analyses of previously submitted data."[81]

The FDA's Guidance for Industry and Food and Drug Administration Staff: In Vitro Companion Diagnostic Devices (Aug 6, 2014) ("IVD Guidance"), likewise explicitly allows for labeling to be revised without prior FDA approval in CBE-like instances:

> FDA recognizes that there may be occasions when the labeling for an already approved therapeutic product must be revised to address a serious safety issue. Under these circumstances, if the benefits from the use of the therapeutic product are so pronounced as to outweigh the risks from the lack of an approved or cleared IVD companion diagnostic device, FDA does not intend to delay approval of changes to the labeling of the therapeutic product until the IVD companion diagnostic device is approved or cleared.[82]

---

[80] *See Wyeth,* 555 U.S. at 568; *In re Xarelto,* 2017 U.S. Dist. LEXIS 56629, at *10-11, *citing Wyeth,* 555 U.S. at 568; *In re Xarelto,* 2017 U.S. Dist. LEXIS 56630, *citing Wyeth,* 555 U.S. at 568; *In re Xarelto,* 2017 U.S. Dist. LEXIS 114338, at *14, *citing Wyeth,* 555 U.S. at 568.

[81] *See Wyeth,* 555 U.S. at 569; *In re Xarelto,* 2017 U.S. Dist. LEXIS 56629, at *10-11, *citing Wyeth,* 555 U.S. at 569; *In re Xarelto,* 2017 U.S. Dist. LEXIS 56630, at *9-10, *citing Wyeth,* 555 U.S. at 569; *In re Xarelto,* 2017 U.S. Dist. LEXIS 114338, at *14-15, *citing Wyeth,* 555 U.S. at 568.

[82] *See* Exhibit 42, IVD Guidance, at 9, § IV(B)(2).

**F.    After Xarelto came to market, Defendants received significant new information about how dangerous it was when not used in conjunction with an <u>appropriate screening test.</u>**

In this case, as the Court explained in its prior opinions, there was a great deal of new information that Defendants received after they started selling Xarelto. The information included both new reports of bleeding and new analyses of those reports – by outside parties -- as significant.

The Institute for Safe Medication Practices ("ISMP"), an independent watchdog group, reported in 2013 that Xarelto ranked tenth in terms of direct SAE reports to the FDA in 2012, its first full year on the market, with 2,081 SAE reports, 151 of which involved death.[83] During the same period, there were only 861 SAE reports for warfarin, and only 56 of those involved death.[84] The ISMP concluded that these figures constituted an "important safety signal,"[85] defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."[86] While this report was not published until October 2013 – and therefore clearly constitutes newly available information -- Defendants would have received information about each SAE report as the reports were made, and were obligated to monitor them.

After Xarelto hit the shelves, its dangers reached headline proportions. From 2012 through 2015, Xarelto-related adverse events were *the most frequently reported* among all pharmaceutical drugs sold in the U.S. market, with 81% involving bleeding events.[87] Post-market observational

---

[83] *See* Exhibit 3, QuarterWatch Report, at 10.

[84] *Id.*

[85] *Id.* The "important safety signal" was predicated on SAEs involving not only Xarelto, but also Pradaxa and Coumadin. *See id.*

[86] *Id.* at 8.

[87] *See* Exhibit 4, Leissinger Report, at 17 (citing data sources).

studies also reported that use of Xarelto results in an increased bleeding risk compared to other new oral anticoagulants and warfarin.[88]

Additionally, data from Defendants' own post-marketing "Enhanced Pharmacovigilance" program, which involved the collection of "bleeding questionnaires" from healthcare providers who measured the PT levels of Xarelto patients who developed bleeding complications, clearly identified numerous instances of patients with elevated PT results who experienced bleeding complications.[89]

### G. After Xarelto came to market, Defendants received confirmation of problems with their earlier study.

In December 2014, the INRatio device used to manage the warfarin arm of the ROCKET study was recalled based on post-marketing reports that the INR values (reported by the device) were artificially low, which can lead to over-dosing patients with warfarin and thereby increase their bleeding risk.[90] This is the very defective condition of which Janssen was aware **before** the ROCKET trial was initiated. In September 2015, Janssen (for the very first time) reported to the FDA that they had confirmed the INRatio devices used in the ROCKET study were part of the recall.[91]

When the FDA reanalyzed the data in light of this fact, it determined that patients in ROCKET who were treated with warfarin had received higher doses of warfarin than were appropriate, which increased the incidence of bleeding events in that group by 7% to 10% and

---

[88] *See* Exhibit 43, Report of David A. Kessler ("Kessler Report"), at 43-50 (summarizing post-market epidemiology and stating that post-market evidence further indicates need to improve safety of Xarelto).

[89] *See* Exhibit 5, Parisian Declaration, at ¶ 20.

[90] *See* Exhibit 44, FDA letter to Alere (06/14/16).

[91] Exhibit 36, ROCKET AF Reanalysis, at 1.

skewed the comparison of bleeding rates between warfarin and Xarelto users in favor of Xarelto.[92] Likewise, Plaintiffs' experts comment on this important safety issue in their reports,[93] and opined that it needs to be reported to physicians who are determining whether to prescribe Xarelto.[94]

> **H.     After Xarelto came to market, Defendants did not change their label to include instructions for screening patients or to address the problems with their earlier study, and delayed in changing their label to include the U.S. subgroup data.**

There is no evidence that Defendants gave any consideration to changing their label to include instructions about screening patients to identify those at a high risk of bleeding, even after they received significant new information about the serious adverse events being reported and the recall of the INRatio device used in the warfarin arm of the ROCKET study.[95] Likewise, there is no evidence that Defendants attempted to change their label to include information about the U.S. subgroup data until after January 28, 2014, when the FDA sent Defendants a letter stating that it was "exploring ways to present efficacy and safety data similarly in the labeling for the new oral anticoagulants," and asked Defendants to provide the number of major bleeding events in a specified format with a forest plot showing the risk of major bleeding in several subgroups, including the U.S. population.[96] Defendants did not add this bleeding risk information to the label until September 10, 2015.[97]

---

[92] *Id.* at 2. In June 2016, the device division of the FDA mandated a permanent ban of the INRatio device to be used in the U.S., based significantly on the inaccuracies of the device in measuring the warfarin arm of ROCKET. *See* Exhibit 44, FDA letter to Alere (06/14/16).

[93] *See e.g.* Exhibit 45, Expert Report of B. Burt Gertsman, Ph.D., at 39-54; Exhibit 7, Rinder Report, at 3; Exhibit 4, Leissinger Report, at 2, 14-15.

[94] *See e.g.,* Exhibit 7, Rinder Report, at 3.

[95] *See* Exhibit 5, Parisian Declaration, at ¶ 10.

[96] *See* Exhibit 46, Letter from the FDA to JPI, 01/28/14.

[97] *See* Exhibit 47, Letter from the FDA to JRD, 09/10/15.

III.    **SUMMARY OF ARGUMENT**

Governing Supreme Court and related precedent compel the conclusion that no federal law prevented Defendants from updating their label to provide instructions for avoiding significant and potentially fatal adverse effects associated with using Xarelto, along with additional information relating to the reliability of the studies on which approval of Xarelto was based. The CBE process would have allowed Defendants to make those changes after Xarelto was placed on the market, once they obtained significant new information about the rate and severity of SAE reports and/or about recall of the INRatio device used to monitor the warfarin arm of the pivotal ROCKET study.[98]

In their present motion, Defendants have proffered no evidence, let alone clear evidence, that the FDA would have rejected the changes required by state law, and, as explained below, ample evidence indicates that the FDA would have readily approved the changes. As stated above, this Court, and the state court overseeing consolidated *Xarelto* litigation in Philadelphia, already have considered and rejected the arguments Defendants have made in this motion in previous bellwether cases.[99] In this latest attempt to prematurely jettison Plaintiffs' failure to warn claim, Defendants have presented nothing new and, again, fail to meet their demanding burden of showing that it would have been impossible to comply with both federal and state law. Accordingly, Defendants' motion based on recycled arguments should be denied.

---

[98] *See* Exhibit 5, Parisian Declaration, at ¶ 12.

[99] *See In re Xarelto*, 2017 U.S. Dist. LEXIS 56629; *In re Xarelto,* 2017 U.S. Dist. LEXIS 56630; *In re Xarelto,* 2017 U.S. Dist. LEXIS 114338; Exhibit 1, Philadelphia Preemption Order.

## IV.   **ARGUMENT**

**A.    The Supreme Court has established that federal law permits manufacturers of brand-name drugs to improve the safety of their warnings and labels, absent <u>clear evidence that the FDA would reject the change required by state law.</u>**

In the watershed case of *Wyeth,*[100] the Supreme Court clarified the limited scope of the affirmative defense of preemption in the context of claims against brand-name drug manufacturers. The Court proceeded from the fact that, throughout its history, Congress has "[taken] care to preserve state law."[101] Congress has declined to enact a preemption provision for prescription drugs, even though it has enacted a preemption provision for medical devices,[102] and "may also have recognized that state-law remedies further consumer protection by motivating manufacturers to provide safe and effective drugs and to give adequate warnings."[103] This "is powerful evidence that Congress did not intend FDA oversight to be the exclusive means of ensuring drug safety and effectiveness."[104]

Consistent with the law of most states, federal regulations state that an adequate label must provide information necessary for the safe administration of the drug,[105] including an identification

---

[100] *Wyeth,* 555 U.S. 555.

[101] *Id.* at 567.

[102] *Id.* at 566. In 1975, Congress passed the Medical Device Amendment Act, which provided for an express preemption provision for medical devices. *See* 21 U.S.C. § 360k(a). Notably, Congress did *not* enact any preemption provisions for prescription drugs. "If Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express pre-emption provision at some point during the FDCA's 70–year history. But despite its 1976 enactment of an express pre-emption provision for medical devices, *see* 21 U.S.C. § 360k(a), Congress has not enacted such a provision for prescription drugs." *Id.* at 574.

[103] *Id.* at 574.

[104] *Id.* at 575; *see also Silverman v. Watson Pharms., Inc.,* 2013 U.S. Dist. LEXIS 55992, at *7-9 (S.D. Tex. Apr. 17, 2013) ("Upon examining in the plain language of the FDCA, which lacked any preemption language, and the history of the Act, the Court [in *Wyeth*] found that Congress had not intended the FDCA to preempt state tort remedies in the area of pharmaceuticals."); *In re Vioxx Prods. Liab. Litig.,* 501 F. Supp. 2d 776, 788 (E.D. La. 2007) (rejecting preemption of state law in pharmaceutical case by "[f]ollowing longstanding and well-reasoned precedent.").

[105] 21 C.F.R. § 201.56(a)(1).

of any "laboratory tests helpful in following a patient's response or in identifying possible adverse reactions."[106] In *Wyeth,* the Court confirmed that drug companies, not the FDA, bear the responsibility for drafting those warnings:

> [T]hrough many amendments to the FDCA and to FDA regulations, it has remained a central premise of federal drug regulation that the manufacturer bears responsibility for the content of its label at all times. It is charged both with crafting an adequate label and with ensuring that its warnings remain adequate as long as the drug is on the market.[107]

In its previous decisions addressing and rejecting Defendants' preemption argument, this Court likewise recognized that drug "[m]anufacturers remain the master of their labels even after FDA approval" and that "clear pathways" exist "through which a brand-name drug manufacturer can make changes to their label without FDA approval."[108] This Court quoted and discussed *Wyeth*'s description of the CBE regulation:

> Among other things … 'changes being effected' (CBE) regulation provides that if a manufacturer is changing a label to 'add or strengthen a contraindication, warning, precaution, or adverse reaction' or to 'add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product,' it may make the labeling change upon filing its supplemental application with the FDA; it need not wait for FDA approval.[109]

---

[106] 21 C.F.R. § 314.70(c)(6)(iii); *see also* Exhibit 5, Parisian Declaration, at ¶¶ 13, 19.

[107] *Wyeth,* 555 U.S. at 570-71. This same principle applies in Canada. *See* Exhibit 48, *Attis v. Her Majesty the Queen in Right of Canada,* 93 O.R. 3d 35, at ¶ 56 (Ontario Ct. App. Sept. 30, 2008) (safety obligations are explicitly placed on the manufacturers and distributors of medical devices; no obligations are placed on the government).

[108] *In re Xarelto,* 2017 U.S. Dist. LEXIS 56629, at *10; *In re Xarelto,* 2017 U.S. Dist. LEXIS 56630, at *9; *In re Xarelto,* 2017 U.S. Dist. LEXIS 114338, at *14.

[109] *In re Xarelto,* 2017 U.S. Dist. LEXIS 56629, at *10-11, *quoting Wyeth,* 555 U.S. at 568, *citing* 21 C.F.R. §§ 314.70(c)(6)(iii)(A), (C); *In re Xarelto,* 2017 U.S. Dist. LEXIS 56630, at *9, *quoting Wyeth,* 555 U.S. at 568, *citing* 21 C.F.R. §§ 314.70(c)(6)(iii)(A), (C); *In re Xarelto,* 2017 U.S. Dist. LEXIS 114338, at *14, *quoting Wyeth,* 555 U.S. at 568, *citing* 21 C.F.R. §§ 314.70(c)(6)(iii)(A), (C).

Case 2:14-md-02592-EEF-MBN  Document 7962  Filed 11/06/17  Page 29 of 56

As the Court in *Wyeth* explained, the CBE regulation "accounts for the fact that risk information accumulates over time and that the same data may take on a different meaning in light of subsequent developments."[110] Under the regulation, as quoted in the Supreme Court's opinion, if a manufacturer "'conducts a new analysis of data showing risks of a different type or of a greater severity or frequency than did reports previously submitted to FDA, the sponsor meets the requirement for 'newly acquired information.'"[111]

Similarly, IVD Guidance explicitly allows for labeling to be revised without prior FDA approval in CBE-like instances. It states the FDA's recognition "that there may be occasions when the labeling for an already approved therapeutic product must be revised to address a serious safety issue."[112] The Guidance provides that, "if the benefits from the use of the therapeutic product .... outweigh the risks from the lack of an approved or cleared IVD companion diagnostic device, FDA does not intend to delay approval of changes to the labeling of the therapeutic product until the IVD companion diagnostic device is approved or cleared.[113]

Because federal law requires a manufacturer to maintain responsibility for its label at all times, and further allows a manufacturer to update its label in view of newly acquired risk information – the same updates required by state law – federal law generally does not preempt state warning law in cases involving brand-name prescription drugs. The Court further emphasized that "[i]mpossibility preemption is a demanding defense."[114] A rare exception applies when a

---

[110] 555 U.S. at 569.

[111] *Id.*

[112] *See* Exhibit 42, IVD Guidance, at 9, § IV(B)(2).

[113] *Id.*

[114] *Wyeth,* 555 U.S. at 573; *see also In re Xarelto,* 2017 U.S. Dist. LEXIS 56629, at *7, *citing Wyeth,* 555 U.S. at 573; *In re Xarelto,* 2017 U.S. Dist. LEXIS 56630, at *7, *citing Wyeth,* 555 U.S. at 573; *In re Xarelto,* 2017 U.S. Dist. LEXIS 114338, at *12, *citing Wyeth,* 555 U.S. at 568.

manufacturer can prove with clear evidence that, before the plaintiff was prescribed the drug in question, the FDA would have taken the necessary steps to rescind a CBE labeling change to add the warning required by state law.[115] The manufacturer must prove this through admissible evidence.[116] However, "the very idea that the FDA would bring an enforcement action against a manufacturer for strengthening a warning pursuant to the CBE regulation is difficult to accept."[117]

Thus, the Court may not grant summary judgment to Defendants on their preemption defense unless the Court determines that Defendants have provided clear evidence that the FDA would have rejected the changes required by state law. In assessing whether Defendants have met their burden, all reasonable inferences must be drawn in favor of Plaintiffs.[118] The Court must deny summary judgment unless it determines that any reasonable factfinder must conclude that it is "highly probable" that the FDA would have rejected the warning.[119]

---

[115] *Wyeth,* 555 U.S. at 571. In *Pliva, Inc. v. Mensing,* 564 U.S. 604, 635 n.8 (2011), the Supreme Court confirmed that federal law preempts a state-law duty to warn only where there is "clear evidence" that the FDA would have "rescinded" a CBE labeling change to add the warning required by state law.

[116] *Wyeth,* 555 U.S. at 571.

[117] *Id.* at 570.

[118] *In re Fosamax Alendronate Sodium Prods. Liab. Litig.,* 852 F.3d 268, 293, 297 (3d Cir. 2017).

[119] *See Fosamax,* 852 F.3d at 295. Defendants instead state that this is a question of law, citing to this Court's motion in limine order in *Boudreaux. See* Def. Motion at 18 n.13. In the cited portion of the actual order, however, this Court simply sustained Plaintiffs' motion "for an order prohibiting all witnesses and counsel from commenting on, referring to, attempting to introduce testimony or evidence, or introducing testimony or evidence, suggesting that state law should be preempted by federal law, or that Defendants should not be subjected to fifty-one separate tort law regimens," noting that these matters involved questions of law. *See In re Xarelto (Rivaroxaban) Prods. Liab. Litig.,* MDL No. 2592 Section L, Order and Reasons, at 5 (Apr. 18, 2017) [Record Doc. 2654]. This Court did <u>not</u> state in that order that the absence or presence of "clear evidence" that the FDA would have rejected a warning/instruction was a question of law, and, in fact, all of the rulings stating that the "clear evidence" issues were "factually pregnant" support that this Court instead believes it is a question of fact. *See* page 18 and n.64 *infra.* Additionally, in the *Boudreaux* trial, this Court clarified that what the FDA would or would not have done with regard to a warning is "a question of fact or evidence." Exhibit 49, *Boudreaux* Trial Transcript, at 1530:19-25. Nevertheless, this Court determined that the overall preemption decision is a question of law for the court. *See id.* at 1531:8-20.

The FDA's past rejection of proposed language on a similar topic does not necessarily constitute "clear evidence" that a change would have been rejected, because, for example, the FDA might have disagreed with the company's proposed language.[120] Additionally, if the FDA does reject proposed language, the matter is not concluded. The ball is back in the drug manufacturer's court to submit a revised, corrected proposal.[121] It is essential that manufacturers asserting a clear evidence preemption defense "press their position" with the FDA.[122]

Consistently, this Court recognized the demanding standard that is required to establish a clear evidence preemption defense when it rejected similar arguments made in Defendants' summary judgment motions in *Boudreaux, Orr,* and *Mingo*:

> To prove that the FDA would reject a label update, **Defendants must press their position with the FDA**; it is not enough that the FDA believed the label change was false or misleading or that the change was not necessary. **There must be clear evidence that the FDA would rescind Defendants' change to the label.**[123]
>
> . . .
>
> **Clear evidence requires more than a prior refusal to add similar language. … Courts have found that the FDA and defendants are required to give more than 'passing attention' to the issue** – there must be evidence the FDA intended to or would *prohibit* a defendant from strengthening [a] warning.[124]

---

[120] *Fosamax,* 852 F.3d at 290-91.

[121] *Id.* at 299.

[122] *Aaron v. Wyeth,* No. 07-cv-927, 2010 WL 653984, at *6 (W.D. Pa. Feb. 19. 2010) (no preemption where the "FDA disagreed with certain changes to the Effexor labeling proposed by Wyeth, [but] Wyeth did not press its position"). Additionally, the position the FDA took in the past might not be an accurate predictor of the position it would take at a later time. *See Fosamax,* 852 F.3d at 290-91.

[123] *In re Xarelto,* 2017 U.S. Dist. LEXIS 56630, at *4 (emphasis added).

[124] *In re Xarelto,* 2017 U.S. Dist. LEXIS 56629, at *11-12, *citing Wyeth,* 555 U.S. at 572 (emphasis added and in original); *In re Xarelto,* 2017 U.S. Dist. LEXIS 56630, at *11-12, *citing Wyeth,* 555 U.S. at 572 (emphasis added and in original); *In re Xarelto,* 2017 U.S. Dist. LEXIS 114338, at *16-17, *citing Wyeth,* 555 U.S. at 572 (emphasis added and in original).

Recently, the U.S. Supreme Court acknowledged a manufacturer's First Amendment right to include truthful, non-misleading *benefit* statements in its drug labeling.[125] Certainly, the same protections must apply to disclosing truthful, non-misleading *risk* information in a drug label.[126]

A drug label is not the only avenue for pharmaceutical companies to disclose safety and risk information. They also have the ability under federal law to disclose safety and risk information in a variety of important ways without invoking the CBE regulation, which is related *only* to label updates. Specifically, safety and risk information can be disseminated in "journals, magazines, other periodicals, and newspapers, and in advertisements broadcast through media such as radio, television, and telephone communication systems."[127]

**B.     Federal law does not preempt an instruction about a Neoplastin PT screening test.**

Neoplastin PT can be used safely with Xarelto. The fact that it has been approved for use with other blood-thinners does not stand in the way of Defendants recommending that it be used with Xarelto. Additionally, as required by federal CBE regulations, Defendants had newly-acquired information on which to base a change in their label instructions. Defendants' arguments to the contrary are incorrect. Defendants have failed to present clear evidence, as required by Supreme Court precedent, demonstrating that the FDA would have rejected a change to Xarelto's label to instruct physicians to use the Neoplastin PT screening test. In particular, the fact that the FDA might have rejected some different PT-related language, which Defendants had proposed to

---

[125] *See Sorrell v. IMS Health Inc.,* 564 U.S. 552, 557 (2011) (declaring that speech "in aid of pharmaceutical marketing . . . is a form of expression protected by the Free Speech Clause of the First Amendment."); *see also Amarin Pharma, Inc. v. FDA,* 119 F. Supp. 3d 196, 226 (S.D.N.Y. 2015).

[126] *Cf. United States v. Caronia,* 703 F. 3d 149, 167 (2d Cir. 2012) ("[I]n the fields of medicine and public health, where information can save lives, it only furthers the public interest to ensure that decisions about the use of prescription drugs . . . are intelligent and well-informed.").

[127] 21 C.F.R. § 202.1 (l)(1); *see also In re Lipitor (Atorvastatin Calcium) Mktg., Sales Practices & Prods. Liab. Litig.,* 185 F. Supp. 3d 761, 772 (D.S.C. 2016).

include in a different part of their label, without explaining or pressing the issue, does not amount to clear evidence that the FDA would have rejected the change at issue here.

### 1. Neoplastin PT may be used with Xarelto consistent with its label and FDA requirements.

Neoplastin PT may be used with Xarelto safely and in accordance with its label and FDA requirements. While it is routinely used to monitor patients on Coumadin/warfarin therapy (another anticoagulant),[128] nothing on Neoplastin's label says that it can *only* be used in that way. In fact, the label states that Neoplastin is intended for the "determination of the prothrombin time (PT),"[129] which is exactly what Plaintiffs are arguing it should have been used for with Xarelto. Neoplastin's label further explains that "[t]he prothrombin time is a coagulation screening test" that measures various coagulation factors, including Factor X.[130]

Defendants' arguments to the contrary are based on their misstatements about what Neoplastin's label actually says. Contrary to what Defendants suggest, the Neoplastin label does not say that Neoplastin is "'insensitive' to certain anti-Xa levels."[131] To the contrary, the language quoted by Defendants is taken out of context from a section addressing limitations with testing for heparins. That sentence, from a section entitled "Heparins," actually reads as follows: "The STA – Neoplastine Cl Plus test is insensitive to unfractionated heparin levels up to IU/ml and to low molecular weight heparin levels up to 1.5 anti-XA IU/ml."[132]

---

[128] *See* Exhibit 8, Neoplastine Label, at § 2. This section states that Neoplastin is "commonly used for monitoring vitamin K antagonist therapy, and Coumadin/warfarin therapy is a vitamin K antagonist therapy.

[129] *See id.* at § 2.

[130] *See id.* As stated above, Xarelto is a drug that acts on Factor X.

[131] *See* Def. Motion at 14.

[132] *See* Exhibit 8, Neoplastine Label, at § 11.

It is Defendants' heavy burden, under *Wyeth*, to proffer clear evidence that the FDA would have rejected an instruction to use Neoplastin with Xarelto.[133] Evidence that the FDA has not *already* approved Neoplastin for such use does not help Defendants meet that burden. For this reason, Defendants' statements to the effect that the FDA agrees "[t]here are currently no cleared or approved devices that measure" the effect or concentration of direct oral anticoagulants, such as Xarelto,[134] is irrelevant to the inquiry as to whether the FDA would have rejected such a change if Defendants had made it.[135] The FDA's IVD Guidance suggests that the FDA would not have rejected the proposed change, because it says that the FDA recognizes that "serious safety issue[s]" will sometimes provide "occasions when the labeling for an already approved" product to "be revised."[136] In that situation, even where there is no approved or cleared diagnostic device (like Neoplastin), the FDA will not "delay approval of changes to the labeling" of a product like Xarelto if the benefits from the use of it outweigh the risks of using a diagnostic tool that has not yet been approved for that particular product.[137]

---

[133] *See* 555 U.S. at 571**.**

[134] *See* Def. Motion at 14-15.

[135] *See* Exhibit 5, Parisian Declaration, at ¶ 4 (noting the ability to use this FDA-cleared test with Xarelto).

[136] *See* Exhibit 42, IVD Guidance, at 9, § IV(B)(2). Defendants, inexplicably, cite to the IVD Guidance as support for the opposite conclusion. *See* Def. Motion, at 15. The additional cases cited in footnote 11 of Defendants' motion are equally unavailing, as they involve an entirely different set of facts: the promotion by the defendants, and use by the plaintiffs, of drugs or devices that were the subject of the lawsuits for off-label purposes, resulting in harm to the plaintiffs, without any references to a companion diagnostic device such as Neoplastin PT. *See Clark v. Pfizer, Inc.,* 990 A.2d 17, 21 (Pa. Super. Ct. 2010) (Neurontin approved for seizures and neuralgia, but promoted and used for psychiatric disorders, pain syndromes, reflex sympathetic dystrophy, restless leg syndrome, fibromyalgia, anxiety disorder, and migraine headaches); *Gavin v. Medtronic, Inc.,* No. 12-cv-0851, 2013 U.S. Dist. LEXIS 101216 (E.D. La. July 19, 2013) (device approved for lumbar, tibia, and oral/maxillofacial fusions, but promoted and used for posterior fusion). Unlike the plaintiffs in those cases, neither Mr. Henry nor Ms. Ibanez have accused Defendants of marketing Xarelto of off-label uses, nor have they used and/or been injured as a result of off-label uses of Xarelto.

[137] *See id.; see also* Exhibit 5, Parisian Declaration, at ¶ 19.

Indeed, the label for Pradaxa, another brand-name prescription anticoagulant and Xarelto's primary competitor, *includes* instructions as to which general coagulation tests should and should not be used to measure the anticoagulant effect of the drug.[138] The manufacturer of Pradaxa used the CBE process to add these instructions to its label prior to seeking approval from the FDA, and the FDA later approved the language.[139] This demonstrates the FDA's willingness to allow the inclusion of laboratory test guidance into New Oral Anticoagulant ("NOAC") labeling.

This Court correctly identified the critical question in sustaining Plaintiffs' Motion in Limine No. 37 in *Orr*, precluding Defendants from arguing at trial that the FDA must specifically approve a PT test for use with Xarelto, explaining: "Whether the FDA approved Neoplastin PT or not is not the ultimate issue – the Defendants have not shown they gave the FDA sufficient information to adequately decide whether or not Neoplastin PT should be used with Xarelto. Accordingly, Plaintiffs' Motion is SUSTAINED."[140]

### 2. Newly-acquired information would have allowed Defendants to add an instruction about Neoplastin PT testing.

As addressed in Section I above, while labeling changes under the CBE process must be based on "newly acquired information," this is not limited to new data, but also includes "new analyses of previously submitted data.[141] As the Court in *Wyeth* observed:

> The rule accounts for the fact that risk information accumulates over time and that the same data may take on a different meaning in light of subsequent developments. If the sponsor submits adverse event

---

[138] *See* Exhibit 50, Pradaxa Label, at §§ 2.2, 10, 12.2.

[139] *See* Exhibit 51, Pradaxa/FDA Letter.

[140] *In re Xarelto (Rivaroxaban) Prods. Liab. Litig.,* MDL No. 2592 Section L, 2017 U.S. Dist. LEXIS 81056, at *25-26, 2017 WL 2311719 (E.D. La. May 26, 2017). The parties stipulated to application of this ruling in the bellwether trial that followed (*Mingo*). See Exhibit 52, *Mingo v. Janssen Research & Dev., LLC,* No. 15-3469, Joint Stipulation on Motion in Limine Filings and Rulings, at ¶¶ I(B) (27), II (E.D. La. July 18, 2017).

[141] *Wyeth,* 555 U.S. at 569.

information to FDA, and then later conducts a new analysis of data
showing risks of a different type or of a greater severity or frequency
than did reports previously submitted to FDA, the sponsor meets the
requirement for 'newly acquired information.'[142]

This Court has noted this important distinction, and ruled three times that the number of

post-marketing consumer complaints about major bleeding events constitutes the "newly acquired

information" needed to establish a question of fact for the jury:

> The Defendants point out that the manufacturer's ability to change
> a label under the CBE is limited to newly-acquired information.
> Both the FDA and the courts have clarified, however, that newly-
> acquired information is not limited to brand new information – it
> also includes "new analyses of previously submitted data." *Id.* at
> 569 (citing to 73 Fed. Reg. 49604). In this case, the Defendants
> may have been permitted to update their label pursuant to the CBE
> after they became aware of the number of its consumers claiming
> they experienced a major bleeding event while taking Xarelto. In
> any event, there are sufficient questions of fact to merit a jury
> determination of the issue.[143]

As described in more detail above, this Court was correct in its observation about the

number of post-marketing complaints that constitute "newly acquired information." Xarelto

was ranked tenth in terms of direct SAE reports to the FDA in 2012, its first full year on the

market, involving more than twice the number of SAE reports than warfarin, and almost triple

the number of reported deaths. This was determined to be an "important safety signal" that was

"of sufficient weight to justify an alert to the public and the scientific community, and to warrant

further investigation."[144] Then from 2012 through 2015, Xarelto-related adverse events were the

---

[142] *Id.*

[143] *In re Xarelto,* 2017 U.S. Dist. LEXIS 56629, at *11, *citing Wyeth,* 555 U.S. at 569; *In re Xarelto,* 2017 U.S. Dist. LEXIS 56630, at *9-10, *citing Wyeth,* 555 U.S. at 569; *In re Xarelto,* 2017 U.S. Dist. LEXIS 114338, at *14-15, *citing Wyeth,* 555 U.S. at 569.

[144] *See* Exhibit 3, QuarterWatch Report, at 8, 10.

most frequently reported among all pharmaceutical drugs sold in the U.S. market,[145] and post-market observational studies also reported that use of Xarelto results in an increased bleeding risk compared to other new oral anticoagulants and warfarin.[146] Additionally, data from Defendants' own post-marketing surveillance program identified numerous instances of patients with elevated PT results who experienced bleeding complications.[147]

A CBE amendment could have been based on any of this "newly acquired information." *Wyeth* is on point. There, the first amputation resulting from a Phenergan injection precipitated a FDA-approved change in the drug's label.[148] The Supreme Court explained that, "[i]n later years, as amputations continued to occur, Wyeth could have analyzed the accumulating data and added a stronger warning about IV-push administration of the drug."[149] Here, too, "as [bleeding events] continued to occur, [Defendants] could have analyzed the accumulating data and added" a new instruction to the Xarelto label.[150] At a minimum, the wealth of evidence creates is a genuine issue of material fact as to whether a CBE amendment could have been based on it.[151]

The cases cited by Defendants do not support their argument that they lacked the requisite newly acquired information. Defendants acknowledge in their motion that "newly

---

[145] *See* Exhibit 4, Leissinger Report, at 17 (citing data sources).

[146] *See* Exhibit 43, Kessler Report, at 43-50 (summarizing post-market epidemiology and stating that post-market evidence further indicates need to improve safety of Xarelto).

[147] *See* Exhibit 5, Parisian Declaration, at ¶ 20.

[148] *See Wyeth,* 555 U.S. at 569.

[149] *Id.* at 570.

[150] *See id.*

[151] *See* Draft Joint Complaint, at ¶¶ 73-79 [Record Doc. 923] (addressing safety signals from post-marketing adverse event data); Ibanez Complaint, at ¶¶ 94-99 [Ibanez Record Doc. 1] (same).

acquired information" could include such "reports of adverse events."[152] Inexplicably, however, Defendants rely on one case holding that "newly acquired information" did not include post-approval articles where the plaintiffs made no claim that the information had not been known already by the FDA,[153] and from another holding that "newly acquired information" did not include an expert report prepared solely for that litigation.[154] Neither case is relevant here, because Plaintiffs have never cited any such evidence as examples of "newly acquired information." The post-approval adverse event reports that form the foundation of the "newly acquired information," by their very nature, could not have been known by the FDA prior to approval. Nor can they be considered products of litigation, considering that many were submitted years before this multi-district litigation was formed.[155]

Defendants also rely on a district court case involving Eliquis, another anticoagulant.[156] In that case, however, the plaintiffs observed, and neither the court nor the defendants appeared to have disputed, that "real-world signal data from Xarelto was … found to have a much high[er] incidence of adverse events than reported in the clinical studies."[157] The court noted that this "says nothing about how the real world performance of Eliquis compares to the clinical data disclosed by the defendants to the FDA," and added that "[t]he table and the description from the ISMP report do not suggest – nor do the plaintiffs allege – that the real-world signal data

---

[152] *See* Def. Motion at 20, *citing* 21 C.F.R. § 314.3(b).

[153] *See id.* at 20-21, *citing In re Celexa,* 779 F.3d 34 (1st Cir. 2015).

[154] *See id.* at 21-22, *citing In re Lipitor (Atorvastatin Calcium) Marketing, Sales Practices & Prods. Liab. Litig.,* 185 F. Supp. 3d 761 (D.S.C. 2016).

[155] As addressed above, the pertinent data was collected from 2012-2015. The first Transfer Order was not entered until December 12, 2014. *See* Exhibit 53, *In re: Xarelto (Rivaroxaban) Prods. Liab. Litig.,* MDL No. 2592, Transfer Order (J.P.M.L. Dec. 12, 2014).

[156] *See* Def. Motion at 22-23, *citing Utts v. Bristol-Myers Squibb Co.,* No. 16-cv-5668, 2017 U.S. Dist. LEXIS 70317, 2017 WL 1906875 (S.D.N.Y. May 8, 2017).

[157] *See Utts,* 2017 U.S. Dist. LEXIS 70317, at *34.

for Eliquis shows a greater severity or frequency of bleeding events or deaths than previously disclosed in Eliquis' submissions to the FDA."[158]

In other words, the Eliquis case is different because, in that case, the drug's post-approval performance was not shown to be worse than indicated in the information the FDA already had. Here, however, Xarelto was shown pre-approval to be non-inferior to warfarin, but post-approval to be the subject of more than double the number of SAEs and almost triple the number of deaths than warfarin. Additionally, the independent watchdog group noted that the reports for Xarelto – unlike the reports for Eliquis – were sufficient to create an "important safety signal" that "justif[ied] an alert to the public and the scientific community" and "further investigation."[159]

### 3. Defendants fail to present "clear evidence" that the FDA would have rejected an instruction about Neoplastin PT testing.

Defendants have presented no evidence to show that any instruction to conduct Neoplastin PT testing to identify Xarelto users at a high risk of bleeding was ever proffered to the FDA for inclusion in the Xarelto label. Because Defendants never tendered such an instruction to the FDA, there is no evidence – let alone clear evidence – that the FDA would have rejected its inclusion.

Defendants instead have suggested that they were relieved of their obligation to provide this instruction because the FDA had rejected certain PT language proposed by Janssen for Section 12 (the Clinical Pharmacology section) of the Xarelto label for the proposed orthopedic indication. While the FDA did strike language touching upon PT in that section of the label, this does not represent clear evidence that the FDA would have struck an appropriate instruction in Section 5 (the Warnings section) before Ms. Ibanez ingested Xarelto. A careful review of the evidence shows

---

[158] *Id.*

[159] *See* Exhibit 3, QuarterWatch Report, at 10.

that, as the science developed, the FDA indicated it would be open to such a warning, but Defendants chose not to include it at the relevant juncture.

As detailed above, Defendants have shown only that Janssen proposed the following language with regard to PT testing: "The relationship between PT and rivaroxaban plasma concentration is linear and closely correlated. If assessment of the pharmacodynamic effect of rivaroxaban is considered necessary in individual cases, PT (measured in seconds) is recommended," along with a range of PT values observed with Neoplastin used in Defendants' studies, and a caution against using INR for measuring the effect of rivaroxaban.[160] Defendants later presented a shorter version of this statement.[161] Defendants never explained if, or why, an assessment of the effect of rivaroxaban ever would be considered necessary, either when they submitted the PT-related statements, or when the FDA is presumed to have struck them.[162] Defendants did, however, explain why the INR language that had been stricken should be included, after which INR language was added back to the label.[163]

There is no evidence that the PT-related language was stricken based on even passing attention, let alone following a pressing of the issue by Defendants. In any event, at the time this language was proposed, and presumably stricken, the RECORD study showed no correlation between Neoplastin PT and the risk of bleeding.[164] Just months later, however, based on new ROCKET AF data, a new group of FDA Reviewers concluded that "[m]ajor bleeding events are

---

[160] *See* Def. Motion at 5-7.

[161] *See id.*

[162] *See* Exhibit 5, Parisian Declaration, at ¶ 23. As noted above, the assumption that the strikethroughs came from the FDA is being made solely for purposes of responding to this motion.

[163] *See* Def. Motion at 9.

[164] *See* Exhibit 31, Clinical Pharmacology Review, at 4.

dependent of PT over the observed range."[165] By September 8, 2011, the FDA's internal pharmacologists concluded that "PT data from the 7008 patients in the ROCKET per protocol analysis dataset demonstrates that the risk of major bleeds increases with PT."[166] Because of this, the FDA removed from the Xarelto label the statement that "[t]he predictive value of these coagulation parameters for bleeding risk or efficacy has not been established."[167] The only conclusion that can be drawn from such an action is that the FDA concluded that PT was, in fact, predictive of the risk of bleeding.

Despite this FDA finding, Defendants made no attempt (through CBE or otherwise) to update the label or provide a warning to physicians that Neoplastin PT could be used to identify patients at a high risk of bleeding.[168] The FDA noticed Defendants' failures in this regard, stating in its Summary Review noted: "They also demonstrated that there is also a correlation between PT and risk of bleeding. *This applicant has not chosen to utilize this information.*"[169] Months, later, in May 2012, when Janssen submitted its proposed label for the DVT/PE indication, Janssen simply submitted language similar to what had been used in its past labels, again without suggesting the inclusion of PT instructions, and the FDA approved it in November 2012.[170]

Far from establishing "clear evidence" that the FDA would have revoked instructions about PT testing, the evidence indicates that, as the information about PT and its relationship to Xarelto became known, the FDA's intent during the label negotiations with Defendants was to *allow*

---

[165] *See* Exhibit 32, Tech Report, at 3.

[166] *See* Exhibit 10, FDA Draft Briefing Document, at 39.

[167] *See* Exhibit 33, NDA Approval.

[168] *See* Exhibit 5, Parisian Declaration, at ¶ 10.

[169] *See* Exhibit 28, FDA Summary Review, at 9.

[170] *See* Def. Motion at 11.

Defendants to provide stronger language in the correct part of the label. Dr. Suzanne Parisian, an

expert in FDA and regulatory practices, had concluded that the FDA's actions *were not* a bar to

Defendants providing amended language:

> Because FDA and Sponsor negotiations are ongoing, it would be
> incorrect to imply that by striking that proposed language in the
> context of these discussions, that the FDA was in any way
> preventing the Sponsor from proposing additional or amended
> language regarding these coagulation parameters in any relevant
> section of the label.[171]

Indeed, upon returning its suggested edits, the FDA said in its email to Defendants: "Please

accept changes you agree to and for changes you do not, keep in track changes."[172] Such language

is not the type used when a party has no choice in the matter. The FDA's statement reflects that

Defendants had leeway to determine which edits they wanted to use and which they wanted to

reject. Dr. Parisian confirmed Defendants' ability to alter the Xarelto label in this circumstance:

> FDA at no time, including FDA's June 13, 2011 response to
> proposed labeling striking language in Section 12.2, prevented the
> Defendants from including in its label information regarding
> pertinent biomarkers PT, aPTT, and HepTest (the same biomarkers
> used by Defendants throughout all the XARELTO clinical trials and
> which were relied upon by FDA in review of the NDA, described in
> FDA's Summary Review, and as markers of bioactivity of
> XARELTO).[173]
> . . .
>
> It has always been Defendants' decision not to voluntarily include a
> Section 5.4 Laboratory Tests or similar dosing recommendations in
> its XARELTO label. FDA's role in the negotiations with the Sponsor
> was ongoing. It would be incorrect to imply that the FDA precluded
> the Sponsor from proposing additional or amended language
> regarding dosing/monitoring coagulation information for bleeding
> and efficacy in any relevant section of the label.[174]

---

[171] *See* Exhibit 54, Expert Report of Suzanne Parisian ("Parisian Report"), at ¶ 424.

[172] *See* Exhibit 55, Email of Tyree Newman.

[173] *See* Exhibit 54, Parisian Report, at ¶ 432.

[174] *Id.* at ¶ 434.

Further, there were no independent opinions published by the FDA that prove the FDA would have rejected such language. As noted by Dr. Parisian:

> I have also not seen an official FDA advisory opinion, or a request by Defendants for an official FDA advisory opinion, precluding Defendants from including information in the label regarding the FDA's June 13, 2011 response to proposed labeling striking language in Section 12.2. FDA has permitted Defendants throughout the label negotiation processes to update the contents of Section 12.2 Pharmacodynamics to be consistent with the information in its two NDAs.").[175]

Additionally, there were many other instances where Defendants proposed language for their label, pushed the issue, and ultimately obtained approval for the additional language.[176] There is no reason to believe that the same result would not have occurred here, had Defendants pushed, or even explained, the issue.

Finally, the available evidence demonstrates that Defendants purposely chose not to propose including PT instructions to warn patients and the medical community for business reasons. In a working internal memorandum updated and attached to a June 1, 2011 email, Janssen discussed whether to propose PT language in Section 5.4 (the Warnings and Precautions Section) of the label. Janssen weighed its competitive position, noting that Xarelto's primary competitor product, Pradaxa, had not included such language in its label. As such, Janssen concluded that no such language would be proposed in the warning section; instead it would be done "[o]nly if the section is requested."[177] According to the memo, in that instance, language pertaining to PT measurement would be proposed only after "modifying significantly" the language Bayer had put

---

[175] *Id.* at ¶ 433.

[176] *See* Exhibit 5, Parisian Declaration, at ¶ 16.

[177] *See* Exhibit 56, Jalota Email, 06/01/11, with attached Xarelto USPI Labeling Contingency Document ("Jalota Email Attachment"), at 15.

into the Xarelto label in Canada.[178] This language was never proposed in the United States. Rather

Defendants chose to "[d]efend not having *any* laboratory monitoring statement."[179]

In short, there is nothing in the record to suggest the FDA would have rejected accurate

and up-to-date information about PT testing if Janssen had made the effort. Accordingly, the

greater weight of the evidence, in line with the findings of the FDA, is that such language would

have been approved had Defendants chosen to present it. Defendants have therefore failed to

satisfy their burden to show by clear evidence that the FDA would have rejected such a warning.[180]

Furthermore, this Court already rejected the same argument when it was made by

Defendants in *Boudreaux* and *Orr,* as follows:

> While Defendants contend the FDA's refusal to add Defendants'
> proposed warning language indicates they would also refuse to
> approve a similar label change under the CBE, the Court does not
> find this altogether clear. The requirements, as elucidated by
> *Wyeth*, is "clear evidence: that the FDA would not approve the
> change. Clear evidence requires more than a prior refusal to add
> similar language. In *Wyeth,* the Defendant submitted a proposed
> warning to [the] FDA which did not respond to the proposal, but
> later approved the Defendant's application without the proposed
> warning. Nevertheless, the Court found this insufficient, because
> there was no indication that the Defendant had "'earnestly
> attempted' to strengthen . . . the warning or that the FDA had
> 'specifically disallowed' stronger language." *Wyeth,* 555 U.S. at
> 561. Courts have found that the FDA and defendants are required
> to give more than "passing attention" to the issue – there must be
> evidence the FDA intended to or would *prohibit* a defendant from
> strengthening [the] warning. *Id.* at 572. The Court finds these
> issues in the instant case are factually pregnant and inappropriate
> for summary judgment.[181]

---

[178] *Id.*; *see also* Exhibit 57, Bayer Email Chain, 05/03/11.

[179] *See* Exhibit 56, Jalota Email Attachment, at 15 (emphasis added).

[180] *See Fosamax,* 852 F.3d at 290-91, 299 (rejecting "clear evidence" defense because the FDA could have disagreed with the language proposed, and the defendant did not try to re-submit with revised language).

[181] *In re Xarelto,* 2017 U.S. Dist. LEXIS 56629, at *11-12; *see also In re Xarelto,* 2017 U.S. Dist. LEXIS 56630, at *12 ("Finally, while Defendants did not address the Plaintiffs' failure to warn claim regarding Neoplastin PT tests, as addressed in its order on design-defect preemption, issues of fact remain as to whether Defendants could have added a warning about the test's availability either pre-market or through

This Court came to the same conclusion when Defendants raised the issue, again, in *Mingo*: "Finally, issues of fact remain as to whether Defendants could have added a warning about the test's availability either pre-market or through CBE. The Court finds these issues in the instant case are factually pregnant and inappropriate for summary judgment."[182]

The five cases cited by Defendants in an attempt to support their position[183] lend nothing to the analysis. Three of Defendants' cited cases involved the FDA's specific rejection of the proposed language years *after* the injuries occurred.[184] In this case, by contrast, the FDA's asserted rejection of related language occurred years *before* the injuries occurred, and months before a subsequent study confirmed the reliability of Neoplastin PT testing. As explained above, the FDA then stated on the record that it saw the correlation between PT and bleeding risk, but Defendants chose not to use the information about that correlation to seek different label language.

Another of Defendants' cited cases involved specific statements that the FDA had made *both before and after* the injury occurred, specifically stating that there was no scientific evidence to support a connection between SSRIs and suicide, in a case involving a failure to warn of a risk of suicide associated with the use of SSRIs.[185] In this case, by contrast, the FDA

---

CBE. The Court finds these issues in the instant case are factually pregnant and inappropriate for summary judgment.").

[182] *In re Xarelto,* 2017 U.S. Dist. LEXIS 114338, at *17.

[183] *See* Def. Motion at 17-18.

[184] *See Rheinfrank v. Abbott Labs.,* 119 F. Supp. 3d 749, 766 (S.D. Ohio 2015) (rejection of proposed language in 2006 and 2008 was clear evidence that it would have been rejected three to five years earlier, in 2003); *In re Depakote,* 87 F. Supp. 3d 916, 922 (S.D. Ill. 2015) (rejection of proposed language in 2006 was clear evidence that it would have been rejected seven years earlier, in 1999); *Cerveny v. Aventis, Inc.,* 855 F.3d 1091, 1101, 1103 (10th Cir. 2017) (rejection of citizen's petition requesting similar language in 2009 was clear evidence that it would have been rejected in 1992).

[185] *See Dobbs v. Wyeth Pharm.,* 797 F. Supp. 2d 1264, 1974 (W.D. Okla. 2011).

made statements that there was a connection between PT and bleeding risk *before* Ms. Ibanez was injured. Finally, the last of Defendants' cited cases did not even involve a preemption or "clear evidence" analysis. It instead involved an analysis of whether the proffered expert was qualified to opine about labeling, and if so, to what extent.[186]

### 4. CBE regulations permit the Neoplastin PT instruction proposed by Plaintiffs outside of the "Highlights" section.

Defendants insist that "'monitoring recommendations' *must* be included in the 'Highlights' section of product labeling [pursuant to] 21 C.F.R. § 201.57(a)(7)," changes to which require prior approval, and, therefore, that the warnings at issue would have required prior FDA approval and could not have been added by Defendants under the CBE regulation.[187] This argument is a red herring. Section 201.57(a)(7), by its own terms, requires a summary of only the information that must be included in 21 C.F.R. § 201.57(c)(3).[188] A review of § 201.57(c)(3) reveals that, as to monitoring, it relates only to "therapeutic drug concentration monitoring (TDM) … when TDM is necessary."[189] As discussed above and in many previously-filed memoranda, Plaintiffs are not advocating for instructions for physicians to perform warfarin-like routine monitoring with PT tests and dose adjustments, so this provision does not apply.

Plaintiffs instead are advocating for the inclusion of instructions that can be added to the label prior to approval pursuant to the CBE provisions of 21 C.F.R. § 314.70(c)(6)(iii), to "add or strengthen a contraindication, warning, precaution, or adverse reaction" or "an instruction about

---

[186] *See Christison v. Biogen Idec Inc.,* 199 F. Supp. 3d 1315 (D. Utah 2016).

[187] *See* Def. Motion at 24.

[188] *See* 21 C.F.R. § 201.57(a)(7) ("A concise summary of the information required under paragraph (c)(3) of this section, with any appropriate subheadings, including … monitoring recommendations.").

[189] *See* 21 C.F.R. § 201.57(c)(3)(J).

dosage and administration that is intended to increase the safe use of the drug product." While this CBE provision explicitly *excludes* the right to make non-approved changes to the "Highlights" section covered by 21 C.F.R. § 201.57(a),[190] it also specifically *includes* the right to make non-approved changes to the "Full Prescribing Information" covered by 21 C.F.R. § 201.57(c).[191] This inherently encompasses 21 C.F.R. § 201.57(c)(6)(iii), involving the addition to the "Warnings and Precautions" section of information about "any laboratory tests helpful in following the patient's response or in identifying possible adverse reaction," such as the Neoplastin PT test here. Thus, there were no procedural barriers to Defendants making this change through the CBE process.

### C.    <u>Federal law does not preempt a warning about the INRatio recall.</u>

As detailed above, because of the defective INRatio device used to monitor the warfarin arm of the ROCKET study, the study's outcomes were skewed in favor of Xarelto – making it look safer than it actually is, roughly on par with the existing standard, warfarin. As later reports of bleeding events made clear, Xarelto is significantly more dangerous than warfarin. Plaintiffs have alleged that Defendants should have used the CBE process to add a warning in the Xarelto label about the recall of the INRatio device.

In response, Defendants argue only that there is "clear evidence" that such a warning would have been rejected,[192] and for this, they rely on quotes from one portion of an analysis by an FDA

---

[190] *See* 21 C.F.R. § 314.70(c)(6)(iii) (Changes that do not require pre-approval include "[c]hanges to the labeling to reflect newly acquired information, except for changes to the information required in § 201.57(a) of this chapter (which must be made under paragraph (b)(2)(v)(C) of this section).").

[191] *See* 21 C.F.R. § 314.70(c)(6)(iii)(A) (Changes that do not require pre-approval include "[c]hanges to the labeling to reflect newly acquired information … [t]o add or strengthen a contraindication, warning, precaution, or adverse reaction for which the evidence of a causal connection satisfies the standard for inclusion in the labeling under § 201.57(c) of this chapter.").

[192] *See* Def. Motion at 25-27.

47

employee to suggest he said no communications about the recall should be made.[193] Defendants, however, have omitted additional language from the same analysis, showing that the FDA employee actually had recommended communicating the results to the public, albeit through something other than a label change, and invited comments from others about a possible change in labeling:

> Recommendations:
>
> 1)   No changes in rivaroxaban labeling to reflect the impact of use of the INRatio device in ROCKET are warranted. No other major regulatory action should be taken with respect to rivaroxaban.
>
> 2)   Our conclusions regarding the issues addressed by this review **should be communicated to the public in a suitable manner**, but not through any changes in labeling.[194]
>
> . . . .
>
> We think that a labeling change to describe the modeling results would very difficult to write in a concise manner and might be more likely to confuse than to edify, and is not warranted. FDA might make a brief announcement regarding our conclusions and make this review or a summary of it available to the public online. **A publication of our analyses in a journal might be desirable. <u>If others think it is important to change labeling, we might add a simple statement that FDA has reviewed the INR and outcomes information in ROCKET and determined that the effect of use of the INRatio device on outcomes in ROCKET was too small to affect our prior conclusion that the benefits of rivaroxaban outweigh its risks relative to warfarin</u>**.[195]

This invitation by the FDA employee to comment on a prospective label change is clear evidence that the FDA would have considered a label change to address the INRatio recall, but in response to that invitation, Janssen remained silent. Thus, Defendants lack clear evidence that the

---

[193] *See* Def. Motion 26.

[194] Exhibit 36, ROCKET AF Reanalysis, at 3 (emphasis added).

[195] *Id.* at 42 (emphasis added).

FDA would have rejected warning doctors about the INRatio recall – on the contrary, the evidence indicates the FDA was open to such a warning, which Defendants decided not to pursue. Moreover, to this day, Janssen has not provided this important information to prescribing physicians via a Dear Doctor letter or to the scientific community via publications. Janssen also has never proposed a label change to reflect the increased bleeding risk in Xarelto patients revealed by the ROCKET AF Reanalysis. No federal law would have prevented Defendants from taking either of those steps.[196]

Clearly, as stated by the *Xarelto* MDL Court in denying similar motions for summary judgment on failure to warn claims based on preemption,[197] issues of fact remain such that summary judgment should be denied.

### D. Federal law does not preempt a warning about the U.S. subgroup data from ROCKET AF.

The ROCKET data, when aggregated worldwide, makes Xarelto look safer than it is – roughly on par with the existing standard, warfarin. However, U.S.-only data indicates the true dangers of Xarelto. Reporting the data separately for the U.S. patients, as the current Xarelto label does, would have revealed a statistically significant *50% greater risk* of major bleeding events among patients using Xarelto versus warfarin. Physicians and scientists in the U.S. have described this data as critical to understanding the drug's risk/benefit ratio in the U.S.[198] Plaintiffs have

---

[196] *See Hutto v. McNeil-PPC, Inc.,* 79 So. 3d 1199, 1210 (3d Cir. 2011) (The court rejected the clear evidence defense because "McNeil admitted it did not attempt to have all the warnings the Huttos argue would have prevented Brianna from being overdosed included on its Infants' Tylenol label. Therefore, it did not establish that it was impossible to comply with both federal and state law and failed to show that the Hutto's claims are preempted by federal law.").

[197] *In re Xarelto,* 2017 WL 1393508, at *4 ("[I]ssues of fact remain as to whether Defendants could have warned doctors about the INRatio recall, either through the label or other means…. The Court finds these issues in the instant case are factually pregnant and inappropriate for summary judgment."); *In re Xarelto,* 2017 WL 3188456, at *5 (same).

[198] *See*, *e.g.*, Exhibit 7, Rinder Report, at 20.

alleged that Defendants should have used the CBE process to add information about the U.S.-specific data years earlier. In response, Defendants argue that the U.S. data was not "newly acquired information" that could be added through the CBE process, and contend that even if it was, there is "clear evidence" that this such a warning would have been rejected. [199] Neither argument has merit.

### 1. Newly-acquired information would have allowed Defendants to add a warning about the U.S. subgroup data from ROCKET AF.

As detailed above, after Xarelto entered the U.S. market in November 2011, behind Pradaxa and with Eliquis soon to follow, reports of SAEs began to skyrocket. The ISMP reported that in 2012, the number of direct reports to the FDA of SAEs was 2,081 for Xarelto versus only 861 for Warfarin, and the number of direct-reported deaths was 151 for Xarelto versus only 56 for warfarin.[200] From 2012 through 2015, Xarelto-related adverse events were the most frequently reported among all pharmaceutical drugs sold in the U.S. market, with 81% involving bleeding events,[201] and post-market observational studies reported that use of Xarelto results in an increased bleeding risk compared to other new oral anticoagulants and warfarin.[202]

Newly acquired information includes "new analyses of previously submitted data that . . . reveal risks of a . . . greater severity or frequency than previously included in submissions to FDA."[203] The staggering number of adverse events and observational studies reported after the public started using Xarelto affirmed the 50% greater risk of major bleeding events among patients using

---

[199] *See* Def. Motion at 27-29.

[200] *See* Exhibit 3, QuarterWatch Report, at 10.

[201] *See* Exhibit 4, Leissinger Report, at 17 (citing data sources).

[202] *See* Exhibit 43, Kessler Report, at 43-50 (summarizing post-market epidemiology and stating that post-market evidence further indicates need to improve safety of Xarelto).

[203] *See* 21 C.F.R. § 314.70(c)(6)(iii); *Wyeth*, 555 U.S. at 568-69.

Xarelto versus warfarin, and an increased bleeding risk for Xarelto patients versus patients using other new oral anticoagulants. This post-market data put Defendants on notice, at least as early as 2012,[204] that the U.S. data was not an anomaly, and led to the conclusion that there was, indeed, a statistically significant 50% greater risk of major bleeding events among patients using Xarelto versus warfarin. This is the "newly acquired information" that should have triggered Defendants to use the CBE process to update their label with U.S.-specific data in a format consistent with that of other new oral anticoagulants, so prescribers could more easily compare the bleeding rates reported among these drugs.[205]

### 2. Defendants fail to present "clear evidence" that the FDA would have rejected a warning about the U.S. subgroup data from ROCKET AF.

There is no clear evidence that the FDA would have rejected the inclusion of U.S. data in the Xarelto label. To the contrary, there is evidence that the FDA might have approved inclusion of the data from the start. Dr. Aliza Thompson, Cross-Discipline Team Leader for the FDA's review of Xarelto NDA 202439, wrote in her October 2011 review document: "If weight is to be given to the U.S. point estimate for efficacy (as an indication of what the trial findings might have looked like if warfarin had been better managed), then perhaps equal emphasis should be given to the bleeding findings as an indication of rivaroxaban's safety. In the U.S. the incidence of major bleeding was significantly higher in patients randomized to rivaroxaban (HR=1.5; 95% CI of 1.14 to 1.98; nominal p=0.004).[206] Dr. Thompson added, "important issues that should be addressed

---

[204] Including negative data about Xarelto's risk profile in 2012 would have put Xarelto at a further disadvantage in the highly-competitive anticoagulant market. Xarelto already had lost the race to the market in the atrial fibrillation indication to Pradaxa and Eliquis, which, unlike Xarelto, were marketed as having superior efficacy and superior safety compared to Warfarin.

[205] Defendants appears to suggest in passing that Plaintiffs contend the U.S. subgroup data itself might be the "newly acquired information." *See* Def. Motion at 29. That is not the case.

[206] *See* Exhibit 41, Cross Discipline Team Leader Review, at 16.

in the labeling include the following: … the bleeding risk (findings in the U.S. should be included)."[207]

For whatever reason, the U.S. data was not included at that time. Perhaps it was due to the uncertainty about whether the U.S. data was an anomaly. In any event, the post-market data indicated that the U.S.-only data was, in fact, the correct data. Given the relevance of this data, the "idea that the FDA would bring an enforcement action against a manufacturer for strengthening a warning pursuant to the CBE regulation is difficult to accept,"[208] even more so because the disclosure could have been done in a truthful and non-misleading manner.[209] Additionally, the FDA's pre-market comments about the U.S. data, and eventual *sua sponte* request to include the U.S. data, undermine the suggestion that it would have rescinded a label change to include the data had Defendants implemented it, or proposed it, before the FDA requested it.[210]

Defendants try to dispute this by pointing to two deletions in 2011 to drafts of the original Xarelto label, but neither submission involved the U.S. data that is at issue here. For example, Defendants first argue that an unidentified FDA employee's deletion in 2011 of a statement about bleeding rates in all "North American" patients is clear evidence that the FDA would have rescinded a post-market warning by Defendants about U.S. safety data showing a greater bleeding risk. The FDA employee proposed and struck the following statement from a draft of the original label: "Likewise, North American subjects on XARELTO experienced a higher annual bleeding

---

[207] *Id.* at 21.

[208] *See Wyeth*, 555 U.S. at 570.

[209] *See Dorsett v. Sandoz*, Inc., 699 F. Supp. 2d 1142, 1159 (C.D. Cal. 2010) ("Providing additional warning to a drug label is a far cry from the types of labeling that the FDA has deemed 'misbranded.'").

[210] *See, e.g., Cross v. Forest Labs.*, 102 F.Supp.3d 896, 901 (N.D. Miss., Apr. 6, 2015) ("This court cannot say the FDA would have clearly rejected a change they asked to be implemented").

rate compared to their warfarin treated counterparts than subjects from any other region."[211] However, this statement was stricken with no explanation, and Janssen's response to the deletion was to remain silent.

Nor is the other revision to a draft of the original label relied upon by Defendants clear evidence that adding the U.S. safety data was impossible. Defendants refer to an FDA employee's deletion in 2011 of the statement, "In the US, the mean time in target range was 63%," as evidence that the FDA would also reject a post-market addition stating that Xarelto's bleeding risk was 50% higher than warfarin's in U.S. patients.[212] This is a *non-sequitur* because the deleted language about mean time in target range for warfarin patients never mentioned the bleeding risk in U.S. patients. Moreover, the record contains no explanation for this 2011 revision, and no response by Janssen to the deletion.

In neither instance did Defendants press their position with the FDA, which is essential to the clear evidence preemption defense.[213] It appears instead that only passing attention was given to the issue. The lack of any evidence that Defendants requested inclusion of U.S. safety data or explained its importance to U.S. prescribers and patients matters because the question posed by the clear evidence exception to preemption is whether "the FDA, *had it been presented with a complete, accurate, and forthright description of the evidence,* would have chosen to *hide* from the medical community and the general public the possibility of an increased risk of the very serious side effect."[214]

---

[211] Exhibit 41, Cross Discipline Team Leader Review, at 19.

[212] Exhibit 58, JRD's Submission to the FDA, 10/14/01, at 26.

[213] *See Wyeth,* 555 U.S. at 570; *Aaron,* 2010 WL 653984, at *6; *Fosamax,* 852 F.3d at 290-91; *In re Xarelto,* 2017 U.S. Dist. LEXIS 56630, at *4 (emphasis added).

[214] *See In re Actos (Pioglitazone) Prod. Liab. Litig.,* No. 12-CV-64, 2014 U.S. Dist. LEXIS 121648, at *85, 2014 WL 4286927 (W.D. La. Jan. 7, 2014) (emphasis in original).

Clearly, as stated by this Court in denying similar motions for summary judgment on failure to warn claims based on preemption,[215] issues of fact remain as to the U.S. data such that summary judgment should be denied.

### E. This Court should reject Defendants' redundant efforts to relitigate issues on which this Court has already ruled, and should ignore Defendants' arguments aimed at claims not being asserted.

The instant motion essentially asks this Court to reexamine its prior decisions denying Defendants' motion for partial summary judgment of the plaintiffs' warning/instruction claims in *Boudreaux*, *Orr*, and *Mingo*. In those cases, this Court rejected the same arguments that Defendants have made again here, and held that these claims are not preempted.[216]

While Defendants acknowledge, albeit in a footnote, that this Court has already ruled on this issue, they confess that the real reason behind filing the present motion is to request that the preemption issue be certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b), in the event this Court's decision remains consistent with its prior rulings.[217] Rather than allow Defendants a fourth bite at the preemption apple, this Court should remain consistent and reject Defendants' motion, especially given that they have failed to raise any new basis in support of preemption.[218]

---

[215] *See In re Xarelto,* 2017 WL 1393508, at *4 ("Defendants bear the responsibility for their label and may have been able to include U.S.-specific data at the outset or after post-market data was released showing high instances of bleeding…. The Court finds these issues in the instant case are factually pregnant and inappropriate for summary judgment."); *In re Xarelto,* 2017 WL 3188456, at *5 (same).

[216] *See In re Xarelto,* 2017 U.S. Dist. LEXIS 56629, at *10-12; *In re Xarelto,* 2017 U.S. Dist. LEXIS 56630, at *8-12; *In re Xarelto,* 2017 U.S. Dist. LEXIS 114338, at *12-17.

[217] *See* Def. Motion at 1 n.1. Defendants' underlying reason for filing the present motion – to seek appellate review – appears to be nothing more than a waste of time, given the Fifth Circuit's ruling in *Hurley v. Lederle Labs.*, 863 F.2d 1173, 1180 (5th Cir. 1988) (finding that the FDCA and its regulations did not preempt a state law failure to warn claim against a vaccine manufacturer), and its application to the present case.

[218] *See Michaels v. Mr. Heater, Inc.*, 411 F. Supp. 2d 992, 995 (W.D. Wis. 2006) (as a general rule, courts should not reconsider issues which have already been decided in an action, but prior rulings can be reevaluated taking into account changed circumstances).

Indeed, nothing has changed since this Court issued its opinions in April and July of this year, denying essentially the same motions.

Additionally, Defendants' memorandum addresses numerous claims that these Plaintiffs are not pursuing, including arguments related to alleged claims about missing instructions for physicians to perform warfarin-like routine monitoring with PT tests and dose adjustments, or missing "black box" warnings about the risk of bleeding while using Xarelto. Consequently, Defendants' arguments on those non-existent claims should be dismissed as moot.

## V.   CONCLUSION

The record shows, or, at a minimum, would allow for the conclusion, that Defendants could have unilaterally amended the Xarelto label through the CBE process with the newly acquired information they obtained post-approval. Defendants have failed to meet their burden in seeking dismissal of Plaintiffs' failure to warn claims based on preemption, and, for all of the above reasons, their motion should be denied in its entirety. However, Plaintiffs request that this Court defer ruling on the motion, to allow for additional discovery, so the record on all applicable issues may be complete for trial and appellate court consideration.

Respectfully submitted,

Dated: November 3, 2017

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Email: ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
*GAINSBURGH BENJAMIN DAVID MEUNIER*
*& WARSHAUER, LLC*
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
Email: gmeunier@gainsben.com

*Plaintiffs' Liaison Counsel*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 3, 2017, the foregoing was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre- Trial Order No. 17.

*/s/ Leonard A. Davis*
**LEONARD A. DAVIS**