<pre>
 1                  UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF LOUISIANA
 2
      ********************************************************
 3    IN RE:  XARELTO (RIVAROXABAN)
      PRODUCTS LIABILITY LITIGATION
 4
                                     Docket No. 14-MD-2592
 5    THIS DOCUMENT RELATES TO:      Section L
                                     New Orleans, Louisiana
 6    Dora Mingo v. Janssen          December 12, 2017
      Research & Development, LLC,
 7    et al.
      Case No. 2:15-cv-03469
 8
      ********************************************************
 9
                  TRANSCRIPT OF MOTION FOR NEW TRIAL
10        HEARD BEFORE THE HONORABLE ELDON E. FALLON
                   UNITED STATES DISTRICT JUDGE
11
      ********************************************************
12

13    APPEARANCES:

14    FOR THE PLAINTIFF:          MR. ANDY BIRCHFIELD
                                  Beasley Allen Crow Methvin
15                                  Portis & Miles, PC
                                  Post Office Box 4160
16                                Montgomery, AL  36103

17

18    FOR THE DEFENDANTS:         MR. STEVEN JAY GLICKSTEIN
                                  Kaye Scholer, LLP
19                                250 West 55th Street
                                  New York, NY  10019
20
                                  MS. SUSAN M. SHARKO
21                                Drinker, Biddle & Reath, LLP
                                  600 Campus Drive
22                                Florham Park, NJ 07932-1047

23                                MR. RICHARD E. SARVER
                                  Barrasso Usdin Kupperman
24                                  Freeman & Sarver, LLC
                                  909 Poydras Street
25                                24th Floor
                                  New Orleans, LA  70112
</pre>

1    Official Court Reporter:          Lanie M. Smith, RPR, CRR
                                       500 Poydras Street, B-275
2                                      New Orleans, Louisiana 70130
                                       (504) 589-7782
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
          Proceedings recorded by mechanical stenography,
25   transcript produced via computer.

1           P R O C E E D I N G S

2              (Call to order of the court.)

3      THE COURT:  Be seated, please.  Good morning, ladies

4   and gentlemen.

5              Call the case, please.

6      THE COURTROOM MANAGER:  MDL No. 2592, *In Re:  Xarelto*

7   *Products Liability Litigation.*

8      THE COURT:  Counsel, make your appearance for the

9   record, please.

10     MR. BIRCHFIELD:  Good morning, Your Honor.

11  Andy Birchfield on behalf of the plaintiff, Dora Mingo.

12     MR. GLICKSTEIN:  Steven Glickstein on behalf of the

13  defendants.

14     THE COURT:  Okay.  This is a case that grows out of the

15  Xarelto litigation.  We have approximately 20,000 of those

16  cases filed in the court; and after about 10,000 or so, we saw

17  some patterns develop that could help in trying to group the

18  cases into various groups to see whether or not we could get

19  some experience in trying those several cases.

20              One of the cases is the *Mingo* case.  That case

21  was tried in Jackson, Mississippi between August the 7th and

22  August the 18th of this year.  The jury was out for

23  approximately three and a half hours and came back in favor of

24  the defendants.

25              The plaintiffs have now filed a motion for a new

1    trial.  They argue three particular points.  One is the newly

2    discovered evidence in the form of an article written by Bayer

3    scientists they feel should be taken into consideration.  The

4    second, inadequate jury instruction regarding PT testing.  And,

5    third, the admission of what has come to be known as the

6    strike-through document.

7         The defendants respond and say that there's no

8    new evidence, it's only cumulative; that the jury instructions

9    were appropriate; and that the admission of the strike-through

10   document is consistent with the facts and also an appropriate

11   response to the plaintiffs' position.

12        I'll hear from the parties at this time.

13        MR. BIRCHFIELD:  Good morning.  Thank you, Your Honor.

14        In regards to the plaintiffs' new trial motion,

15   we take the position that Dora Mingo is entitled to a new trial

16   in this case regardless of whether it is a bellwether case that

17   is retried or a new trial that is put in a remand pool.

18        It's our position that she is entitled to a new

19   trial based on the three reasons that you outlined.  For the

20   purposes of the time this morning, my plan is to focus on the

21   new evidence component.  I'll be glad to address any issues

22   that the Court has on the other two.

23        The new evidence component is based on an

24   article, an article that was published after the *Mingo* trial,

25   after the *Mingo* verdict.  It was accepted for a manuscript

1   online on August the 14th.  It came to our attention -- it came

2   to the plaintiff's counsel's attention on the morning of

3   August 18th -- not by way of the defendants, but by way of a

4   service that alerts us to new publications in this area.  So at

5   the time we received notice of this article that had been

6   accepted for publication, it was just a matter of a few minutes

7   before we were giving our closing argument.

8          Just to reset the stage for the *Mingo* trial, the

9   plaintiff's claim in the *Mingo* trial, the plaintiff's theme in

10  the *Mingo* trial is that there is a way to test and the

11  defendants should tell.  There's a way to test and that is the

12  PT test that we have been discussing throughout this

13  litigation.

14         The defendants' duty to tell is based in large

15  measure on the *Code of Federal Regulations*.  The *Code of*

16  *Federal Regulations* require that the warnings and precautions

17  section include any helpful laboratory tests.  The warnings and

18  precautions section must -- must -- identify any laboratory

19  tests helpful in following the patients, the patient's response

20  or in identifying any possible adverse reactions.  That was the

21  key theme of the plaintiff's case -- that there is a way to

22  test and the defendants must tell.

23         The defense to the plaintiff's case was that PT

24  is not a helpful test.  Instead, the defendants' position was

25  that the PT test is meaningless, it is unreliable, it is

1   dangerous.  This study, the *Kreutz* article, and the underlying

2   study puts the defense position to a lie.

3           The study is authored -- there are eight authors

4   on the study.  Two of the authors are Bayer consultants.  The

5   remaining six authors are Bayer scientists -- leading

6   scientists in regards to Xarelto, including Dagmar Kubitza.

7   The Court is familiar with Dr. Kubitza.  She was head of the

8   clinical pharmacodynamics there.  She was involved in the

9   development of Xarelto from the very early stages and this

10  study, this study has a primary objective of comparing -- of

11  comparing the pharmacodynamic, pharmacokinetic properties of

12  Xarelto with Eliquis.

13          The secondary -- the secondary objectives were --

14  and this is critical -- the secondary objectives were to

15  examine corresponding surrogate measures of the effectiveness

16  of the drugs.  The anti-Factor Xa activity, thrombin

17  generation, PT and aPTT and to explore their relationships with

18  the plasma concentrations of both drugs.  These data will help

19  to further inform physician decisions regarding DOACs and the

20  appropriate dosing regimen.  This data is to inform physician

21  decisions within the clinical setting.

22          We look at the article and we see that the

23  Neoplastin reagent that was used is the Neoplastin CI Plus.

24  It's the exact same reagent that was used in Dora Mingo's case.

25          We look at the conclusions.  What is the results?

1   They find that sensitive PT and aPTT assays can be used to

2   estimate the anticoagulant effects, the blood-thinning effects

3   of rivaroxaban or Xarelto.

4          We go on to say that in addition, global

5   screening assays such as PT or the aPTT may be used to assess

6   the anticoagulant effect and have been shown to be sensitive to

7   rivaroxaban -- Xarelto.  And they cite there Footnotes 11

8   through 14.

9          And then they go on to say that DOACs like

10  Xarelto, they don't require routine coagulation monitoring.

11  However, in some clinical situations, such as medical

12  emergencies that require prompt decision-making, it may still

13  be beneficial, helpful, to assess the extent of drug exposure

14  and how this relates to anticoagulant effect.

15         You see that the finding -- when they get to the

16  findings of the study -- the finding that rivaroxaban,

17  Xarelto -- but not Eliquis, not apixaban -- cause a clear

18  prolongation of PT and aPTT is in agreement with other recently

19  published data, and they cite Footnote 13.  I'll get to

20  Footnote 13 in just a moment here.

21         Although it is acknowledged that the extent of

22  the prolongation of coagulation assessed with these assays

23  depends on the reagents used, nevertheless a recent clinical

24  guideline recommends the use of PT tests to determine whether

25  clinically relevant plasma concentration -- clinically

1  relevant -- does it matter to patients, does it matter at

2  bedside, does it matter to a doctor in treating his patients --

3  clinically relevant plasma concentrations of rivaroxaban may be

4  present during an occurrence of bleeding.  This strategy is not

5  recommended for patients receiving apixaban or Eliquis.

6          I noted just a moment ago Footnote No. 13 and we

7  see that when they're making these statements about the global

8  screening assays such as PT and aPTT, that they may be used to

9  assess the anticoagulant activity and have been shown to be

10 sensitive to rivaroxaban.  When they're citing these positions,

11 they are citing to articles by Robert Gosselin, the plaintiff's

12 expert.

13         At the same time that the defendants were in the

14 courtroom trashing the plaintiff's expert, saying that he is

15 taking one position in all of his articles and he's taking

16 another position when he's hired by plaintiff's lawyers to come

17 in this courtroom, at the same moment, at the same moment that

18 they are trashing the plaintiff's expert, the defendants are

19 outside the courtroom citing to his articles as authority for

20 the same positions that he has taken in the courtroom that

21 they're trashing him for.

22         I'm going to switch to the ELMO for just a

23 second.  This is a slide.  It was used during the closing of

24 the *Mingo.*  That's what they're doing.  They are talking about

25 Robert Gosselin.  What does he do?  He comes in court, and he

1    takes a position exactly opposite of what he is saying in the

2    literature.  So they are attacking Robert Gosselin for the

3    position that they cite him -- their scientists cite him in the

4    article.  One thing is happening in the courtroom and something

5    completely contradictory is taking place by the defendants

6    outside, outside the courtroom.

7            We look at the -- continuing in the article.  I'm

8    sorry.  We get to the conclusion.  The concluding paragraph of

9    this study:  The present findings do, however, confirm previous

10   reports suggesting that the anticoagulant activity of

11   rivaroxaban may be more readily assessed than that of Eliquis,

12   apixaban, in the clinical setting -- again, treating patients

13   at bedside -- provided that sensitive PT or aPTT assays are

14   used.

15           The defense case.  The defense case was that the

16   PT tests that the plaintiffs claim is helpful and that the *Code*

17   *of Federal Regulations* would require that it be included in the

18   warnings and precaution section of the label, the defense

19   position is that that PT test, their position in the courtroom

20   is that that PT test is meaningless, it's unreliable, it is

21   dangerous.  They put forth that defense in a variety of ways.

22   They call Dr. Desmondes Haynes as an expert witness, and he

23   puts forth that position.

24           They offer medical organizations, medical

25   literature, *Chest*, as taking that position.  They call

1    Dr. Herrin as an expert who takes that position.  They put

2    forth the label.  Their label says that the anticoagulant

3    effect cannot be used, it's not valid.  And the defense counsel

4    take that position that PT is not helpful, it's meaningless,

5    it's even dangerous.

6              Dr. Haynes, that's his testimony, PT is not a

7    useful test for monitoring Xarelto.  The defendants put an

8    expert on the stand that says PT is not useful for monitoring.

9    At the same time -- at the same time outside the courtroom the

10   defendants are taking the position that Neoplastin PT can be

11   used to assess Xarelto's anticoagulant effect in a clinical

12   setting.

13             They call Dr. Herrin.  Dr. Herrin testifies that

14   PT is not helpful.  It could harm patients.  Outside the

15   courtroom, the defendants are taking the position PT is

16   helpful.

17             Inside the courtroom Dr. Herrin, the defense

18   expert, says PT cannot be used to determine the anticoagulant

19   effect of Xarelto in a patient's body.  Outside the courtroom,

20   the defendants take the position that this study confirms PT

21   can be used to assess Xarelto's anticoagulant effect.

22             Inside the courtroom, the defendant expert,

23   Dr. Herrin, says PT does not provide a reliable measure

24   whatsoever of the amount of exposure to Xarelto in any given

25   patient or at any given point in time during his or her

1   anticoagulation therapy.  Outside the courtroom, the defendants

2   are telling the scientific community that PT is beneficial to

3   assess Xarelto's concentration in the anticoagulant effect.

4   It's useful in a clinical setting.

5           Dr. Herrin says that PT results are meaningless

6   numbers.  Outside the courtroom the defendants are saying --

7   they're endorsing clinical guidelines that recommend the use of

8   PT in a clinical setting.

9           We take a look -- this is a prominent part of the

10  defense case.  They highlighted this in the closing, taking the

11  position that PT is not useful to predict a bleeding risk.

12  They talk about the danger, the potential safety issues.

13  That's the position that they're taking.  Inside the courtroom

14  they're taking the position that PT is dangerous.  They're

15  referring to -- they refer to *Chest* guidelines that say that

16  the PT should not be used to measure or monitor the

17  anticoagulant effect.

18          They cite to the medical organizations that they

19  say that are taking that position that PT is not useful, it's

20  not helpful.  They highlight the testimony that they had

21  proffered from Dr. Haynes that relying on PT is asking doctors

22  to put patients at risk.  They're taking the position in the

23  courtroom that PT is dangerous.

24          Dr. Herrin.  PT is not useful in a clinical

25  setting, not useful at a patient's bedside and making decisions

1   based on meaningless numbers will hurt patients.  They're

2   taking the position in the courtroom that PT is meaningless.

3            So when we look at the position that the

4   defendants have taken, the position that they have taken in

5   defending against the plaintiff's claim that it is required,

6   the regulations require that helpful tests go in the warnings

7   and precautions testing and PT is a helpful test.

8            To refute that, they claim -- they claim in the

9   courtroom that PT is meaningless, unreliable and dangerous.  At

10  the same time -- at the same time outside the courtroom they

11  are saying just the opposite.  The defendants take the position

12  in their briefing papers that this is not new evidence, this is

13  merely cumulative evidence, evidence that could have been used

14  for impeachment, just accumulation of what has gone before; but

15  that's not the case, Your Honor.

16           Before I get to that, let me go back.  Here's the

17  position that they take in their label as well:  The

18  anticoagulant effect of Xarelto cannot be monitored with

19  standard laboratory testing, nor readily reversed.

20           When we look at each of these defenses, each of

21  these defenses -- the label, Dr. Haynes, the medical

22  organizations, Dr. Herrin, all of these, all of these are shown

23  to be false based on the underlying study and the publication

24  of that study in October of 2017.  So why is this not merely

25  cumulative?  Why is it something more?  Why is this new

1    evidence?  Let's go back to the timeline for just a moment.  We

2    see -- and the defendants say you talked about what the Bayer

3    scientists believed and we did.  We go back to 2005 and

4    Dagmar Kubitza and what did she publish?  PT can be used

5    clinically to monitor the anticoagulant effect.

6              2006, tests such as PT may be used in future

7    trials for monitoring.

8              2008, confirms relationship between Xarelto and

9    PT.

10             Well, what happens?  What happens in the Xarelto

11   litigation?  The defendants disavow that position.  They

12   disavow that position.  We have -- in the litigation, in the

13   course of the litigation, the defendants have taken the

14   position and we go back to -- it's statements that defendants

15   have made in prior cases.  And, say, remember we showed you

16   some of the most recent literature which matters -- this is an

17   example of them disavowing the prior position of Bayer

18   scientists -- remember we showed you some of the most recent

19   literature which matters?  What are scientists saying today?

20   Why is it this test won't work?

21             This is just from a month ago -- referring to an

22   article -- they're saying you can't use it to determine the

23   anticoagulation effect.  This is the latest science.  And

24   they're saying you can't use it, you can't use PT.  The

25   companies don't get to just ignore the literature and

1    plaintiffs say, oh, you should ignore that.  You should ignore

2    peer-reviewed literature because we found little snippets of

3    where Bayer or Janssen say it could be used even though they

4    then later say it's not reliable.

5            The position has been of the defendants, yes, the

6    Bayer scientists thought that and we submitted information to

7    the FDA.  The FDA struck through that language.  We listened to

8    the FDA.  We listened to the scientists and what they're saying

9    in the medical literature.  We no longer believe that.  That's

10   their position.  We're going with what the current literature

11   says.  At the moment they take that position, they know -- they

12   know that they are undergoing -- they're looking for a study to

13   show, to verify that PT is useful in clinical settings.  That's

14   the position.  That same position was put forth in the *Mingo*

15   case as well.  Ms. Pruitt says -- now, this article that you

16   heard about -- Oh, I'm sorry.

17           Now, this article that you heard about,

18   Dagmar Kubitza, it was in 2005.  This was before all the trials

19   were finished.  And she said this suggests PT, a routinely used

20   coagulation test, could be used clinically to monitor the

21   anticoagulation effect of Xarelto if necessary.  This is what

22   she was looking at and at that time the clinical trial -- and

23   she put it in the literature.  She goes on -- that was before

24   the ROCKET trial and the RECORD trial and the  EINSTEIN trial

25   and she says, look, that's the position.  That's what they have

1  done.  They have disavowed it.  They said that was the early

2  position.  Then we looked at all the clinical trials and we

3  said that's not there.  So why?  Why is the article in 2017 not

4  merely cumulative.  It's not cumulative at all because this

5  article, unlike any of the other literature, shows the current

6  position -- the current position of the defendants outside the

7  courtroom -- and it completely contradicts the position that

8  the defendants have taken, are taking, in the courtroom.  This

9  is an article.  It is new evidence, it was published after the

10 *Mingo* trial and, Your Honor, I submit that given the position

11 of the defendants in the courtroom, that this would -- this

12 would likely have changed the outcome of the trial.  It is

13 evidence that Dora Mingo should be allowed to use in a new

14 trial.

15           Thank you, Your Honor.

16           THE COURT:  Thank you.  Let me hear from the

17 defendants.

18           MR. GLICKSTEIN:  Good morning, Your Honor.  I'm

19 old-fashioned.  I don't have a PowerPoint, but I will be using

20 an ELMO; and because I'm old-fashioned, I'm going to ask

21 Mr. Slonim here to help me with it with your permission.

22           Your Honor, I think it's important to start by

23 talking about what is or is not an issue with respect to PT and

24 anti-Factor Xa.  And Mr. Birchfield's brief mentions

25 anti-Factor Xa, in addition to PT.  I think his argument

1    focused exclusively or almost exclusively on PT.  But the issue

2    in the case and plaintiff's theory of the case is whether

3    prothrombin time, PT, can be used as a screening test in order

4    to weed out high-risk patients.  And the principal proponent of

5    that theory at trial was Dr. Rinder.  The plaintiffs had other

6    experts, Dr. Plunkett and Mr. Gosselin, who also testified to

7    that effect; but that if you got a reading above a certain

8    threshold, then the patient was at high risk of bleeding and

9    shouldn't take the drug.  That was the theory.  And if you got

10   a reading below that threshold, the patient can safely take the

11   drug and Dr. Rinder said that because Ms. Mingo had a PT

12   reading -- I think it was in the twenties when she went to the

13   hospital after her bleeding episode -- that would have been

14   indicative of what the reading she would have had had she taken

15   a PT test before she took the drug and then the defendants

16   should have warned the plaintiff's doctor, Dr. Jordan, that she

17   was an appropriate candidate for the drug.

18            So the use of PT that is the bottom of the

19   plaintiff's case is that this is a screening test.  You can use

20   it to figure out who is going to bleed and who's not going to

21   bleed; and if you get a certain reading, you shouldn't take the

22   drug; and if you get a different reading, it's safe to take the

23   drug.

24            Now, what was the defendants' position?  The

25   defendants' position was not that PT and anti-Factor Xa was

1    junk science, it was not that PT and anti-Factor Xa was never

2    used.  In fact, I think it was undisputed that PT readings and

3    anti-Factor Xa measurements were taken at least during some of

4    the clinical studies and could show concentration levels and

5    can show anticoagulant effects.  But what it couldn't do and

6    what it didn't do is predict an individual's risk of

7    bleeding -- is the person going to bleed on Xarelto or not.

8                And, Your Honor will recall that, of course, that

9    the defendants' proposed language to the FDA concerning what PT

10   could be used for properly and the FDA looked at it and deleted

11   the language.  They felt that it was inappropriate for the

12   label.

13               So the question I think that we have to address,

14   right, and there are three questions.  Along comes *Kreutz*,

15   2017.  Does *Kreutz* say PT or anti-Factor Xa can be used as a

16   screening?  You have the test and you know who should take

17   Xarelto and you know who shouldn't take Xarelto.  That's

18   question number one.  And I'll go through the evidence with

19   Your Honor, but I think emphatically the answer to that

20   question is no.

21               The second question that Your Honor has to

22   consider is if you'll look at what *Kreutz* actually does say

23   about PT and anti-Factor Xa, right, does that article say

24   anything different from a multitude of other articles also

25   coauthored by Bayer scientists and not just dating back to

1    2005, but all the way through 2014?  Does that *Kreutz* article

2    say anything different about the utility of PT or

3    anti-Factor Xa in measuring anticoagulation effect or

4    concentration than does *Kreutz*?  And the answer I'm prepared to

5    show Your Honor to that question is also no.

6              And then the third question is a legal question

7    and that legal question is as a matter of law, when as occurred

8    here, both parties agreed to a trial date and they agree to a

9    stipulated discovery cutoff date and they try their case within

10   their deadlines, knowing that the product at issue is the

11   subject of ongoing study and investigation and testing, do not

12   the parties agree to try the case based on the state of the

13   science that exists at the time the discovery record is created

14   and the case is tried or are we going to undo any trial result,

15   whether a defense verdict or a plaintiff verdict, each and

16   every time a new article is published in the medical literature

17   that arguably helps one side or the other?

18              That, to me, is a legal issue and I would argue

19   and I believe the Supreme Court of the United States would

20   confirm that that's not newly discovered evidence within the

21   meaning of the law.

22              So let me address each of those three questions

23   distinctly.  The first question is does the *Kreutz* article say

24   that PT or anti-Factor Xa can be used in a clinical setting for

25   the purpose of screening patients and determining whether or

1    not they can take Xarelto because that's what Mr. Birchfield

2    claims it says as an advocate, but that's not what the article

3    says.

4            And I would refer Your Honor to Plaintiff's

5    Exhibit 2.  Plaintiff's Exhibit 2 is an affidavit submitted by

6    Dr. Rinder where he is characterizing what the *Kreutz* article

7    says and it's very, very carefully worded, Your Honor, and I

8    would submit it's carefully worded for a reason and that reason

9    is the article doesn't go nearly as far as Mr. Birchfield says

10   it does.  So read Dr. Rinder's affidavit and see.  I can't put

11   something up on the ELMO because it's proving a negative.  But

12   you can read that affidavit from front to back, and you will

13   not see anywhere where Dr. Rinder claims that *Kreutz*

14   demonstrates that PT or anti-Factor Xa can be used as a

15   screening test.  It doesn't say that.

16           What does Dr. Rinder say?  Since that's the

17   ultimate issue on the new trial motion, one would think the

18   expert would, in fact, say that.  It's not as if Dr. Rinder is

19   not familiar with the issue.  He was their primary proponent of

20   the theory.  The last two paragraphs of Dr. Rinder's affidavit

21   shows what he says:  Bayer's own scientists used Neoplastin PT

22   to assess the anticoagulant effect of Xarelto in patients.

23   Additionally the data from the study demonstrated the close

24   relationship between plasma concentration time profiles and the

25   anti-Factor Xa activity of Xarelto and the data supports the

1    use of anti-Factor Xa assays to estimate plasma concentrations

2    of Xarelto.

3            Nothing here about screening patients.  Nothing

4    here about Bayer supposedly admitting that if you get a value

5    above a certain amount, you shouldn't take Xarelto or if you

6    get a value below a certain amount, you should.  That's

7    advocacy by lawyers, but it's not what their expert is claiming

8    that this article says.

9            And then I would ask Your Honor to go through

10   Exhibit 1.  It's highly technical.  It's the *Kreutz* medical

11   journal article and it does talk about anticoagulant effect and

12   it does talk about concentration, but you will see the words

13   never appear once in the article anywhere that you can use

14   these values to figure out who should take Xarelto and who

15   shouldn't and that's the theory of their case.

16           Now, what is it that the article does say and is

17   it new?  On that issue, I prepared some charts and I'm going to

18   hand them out the old-fashioned way if I may.

19           So what we've attempted to do in this chart is to

20   outline, is to list all of the articles that were used by the

21   plaintiffs in the trial and that were coauthored by Bayer

22   employees in which Bayer witnesses talked about what PT and/or

23   anti-Factor Xa could be used for.  I'm giving you now the

24   summary page, and I'll hand out afterwards what those articles

25   say.  But if you'll see we're not just talking about the

1    Kubitza 2005 article.  If you look at the first column, it

2    lists all of the Bayer employees who were coauthors of these

3    articles.  So you've got Kubitza in 2005, with one, two, three,

4    four, five Bayer employees.  Mueck, 2011, with three Bayer

5    employees.  Samama, 2013.  This chart lists two.  There's

6    actually a third that we forgot to put on here -- Bayer

7    employees.  Mueck, 2013 and then Mueck, 2014.

8              And then we list where whether or not the

9    plaintiffs noted the affiliation of the Bayer employees at

10   trial.  In one case they didn't, but they could have and that's

11   what's relevant for the new trial motion; but in most cases, of

12   course, they did.

13             And then the next line in the chart we identify

14   where in the trial the plaintiffs marked the article for

15   identification.  Usually it's with the trial witness.

16   Sometimes as in the Samama and Mueck 2011 articles it was done

17   as part of the deposition.  And then in the bottom we

18   discuss -- and this is not necessarily exhaustive, but places

19   in the trial transcript where each of these articles was

20   referenced.  So, again, we're not just talking about 2005 here.

21   We're talking about 2011, 2013, 2014, during the period that

22   Mr. Birchfield characterizes as the Xarelto litigation period.

23             Then what I have on the next two pages, the first

24   page is a comparison of what *Kreutz* 2017 -- how that compares

25   with the plaintiff's trial literature on PT and the third page

1    does the same with respect to anti-Factor Xa.

2              So I don't want to take Your Honor's time to

3    exhaustively go through each and every one of these quotes, but

4    I think -- they say a picture is worth a thousand words and

5    what you can tell by this is that the statements that are made

6    in *Kreutz* 2017 are not materially different than those made

7    three years ago in Mueck 2014 or four years ago in Mueck 2013

8    or four years ago in Samama 2013 or six years ago in Mueck 2011

9    or 12 years ago in Kubitza 2005.

10             It's been the theory of the plaintiff's case from

11   the very beginning and what they've been telling the jury is

12   that the defendants are saying something different outside the

13   courtroom from inside the courtroom.  We disagree with that

14   characterization.  The defendants believe that the statements

15   are consistent -- that you can use PT and anti-Factor Xa to get

16   some measure of pharmacodynamic effect, but it is not refined

17   enough.  There are too many false positives and too many false

18   negatives to be able to use it as a screening test to determine

19   who can safely take the drug or not.

20             And to the extent there is an inconsistency

21   between the articles and what the plaintiffs advocate in trial,

22   which we deny, that inconsistency does not appear magically in

23   *Kreutz* 2017.  They had all this ammunition in all these other

24   medical journal articles that they actually used at trial.  And

25   it doesn't just end in 2014 because the plaintiffs played our

1    witness' deposition testimony at trial that was more recent

2    than 2014 in which the plaintiffs contended was inconsistent

3    with the position that the defendants had taken at trial.

4              For example, Dr. Spiro's deposition was taken in

5    May 2016, one year before the trial and he was asked at

6    Page 1603 of the transcript:  (As read) So you learned that

7    Bayer in their development program up to this point in time had

8    used a specific prothrombin time PT reagent in their testing?

9              Correct.

10             Was that a Neoplastin reagent?

11             Yes, it was.

12             And using that Neoplastin reagent, did you learn

13   that the people at Bayer that had been involved in the

14   development believed that there was a strong correlation

15   between PT and drug exposure levels?

16             There was a correlation between prothrombin time

17   and prolongation in seconds and the concentration of

18   rivaroxaban present in the patient's plasma.

19             So you understood from the people at Bayer that

20   had worked on this development that using the Neoplastin PT

21   there was a correlation between PT using that reagent and

22   plasma concentration of Xarelto; isn't that fair?

23             He says:  Yes, it is.

24             And then on 1608, he says pretty much the same

25   thing about anti-Factor Xa assays:  (As read) Two different

1    types of -- this is at 1608 and 1609 of the transcript -- "of

2    factor Xa and inhibitory assays were discussed.  One was

3    presented by Dagmar Kubitza that was used in a certain way to

4    measure Factor Xa inhibition.

5              Yes.

6              The other looked at a different type of assay

7    Factor Xa inhibition that had been used for the monitoring of

8    low molecular weight heparin in the clinic; is that fair?

9              Yes.

10             And then going down to Line 16, he quotes from

11   the Samama article, I believe:  (As read) Rivaroxaban standards

12   could be prepared as calibration reagents in tests used to

13   quantitate rivaroxaban plasma levels which could then be

14   correlated to the pharmacokinetics of the dose being

15   administered to see whether the patient was within the expected

16   concentration ranges given the timing of that sample drug.  Do

17   you see that?

18             Yes.

19             In fact, I will say that the plaintiffs were so

20   inspired by Dr. Spiro's testimony that they crossed the

21   defendants' two experts, Dr. Haynes and Dr. Herrin, with his

22   testimony.  This is -- here it is.  I'm doing it with the ELMO.

23             (As read) Did you read Dr. Ted Spiro?

24             I didn't.

25             You didn't receive the deposition of

1    Theodore Spiro?

2              I don't remember reading it.

3              Dr. Spiro is someone who works for Bayer.  He is

4    a physician.  He testified in detail regarding his work on

5    Xarelto.

6              You have mentioned on your direct examination the

7    issue of therapeutic range, right?  Do you recall talking about

8    that?

9              I remember therapeutic index.  I don't remember

10   specifically if we talked about therapeutic range.  We may

11   have.

12             And then my notes reflect that Dr. Spiro was

13   asked a question along these lines.  Did you provide

14   information or were you able to provide information to

15   Yong-Ling Lieu regarding a therapeutic plasma concentration

16   range that could be given in the objective of Dr. Samama's

17   paper?

18             I don't remember if I gave it or not.

19             It would have been possible to give a therapeutic

20   concentration range for that improved indication?

21             Dr. Spiro said:  Yes.  It would have been.

22             And they crossed Dr. Herrin with the same

23   deposition testimony that Dr. Spiro gave in 2016.  First they

24   established he's not familiar with Dr. Spiro, but nonetheless

25   they read him the exact same testimony that I just read to

1    Your Honor.

2            Even more recent is Dr. Lensing's deposition one

3    month before trial in July 2017.  Your Honor will recall we had

4    lengthy argument about what could or couldn't be admitted from

5    the Canadian -- they called it monograph, but us lay people

6    call it the Canadian label.  And Your Honor ruled over the

7    defendants' objection that Dr. Lensing had sufficiently

8    endorsed the statements in the Canadian label, that his

9    testimony about it could be admitted and that the plaintiffs'

10   reading from the Canadian label could be considered by the jury

11   because under the plaintiff's theory, which Your Honor accepted

12   over objection, Dr. Lensing had endorsed it.

13           So here is a sample of Dr. Lensing's testimony.

14   This is at Page 1466 of the trial transcript.  And remember

15   this is a Bayer witness testifying one month before the trial.

16   This isn't old news.

17           (As read) I want to just take a look at what

18   ended up being in the final version of the pharmacodynamics

19   section which started on the bottom of Page 29.  Do you see

20   that?  Do you see that, Dr. Lensing?

21           Dr. Lensing says:  Yes, I see that.

22           So then if we turn to the next page, we see in

23   this product monograph final from May 2015 -- that's the

24   Canadian label -- the statement in patients who are bleeding

25   measuring the PT Neoplastin reagent may be useful to assist in

1    determining the excess of anticoagulant activity.  Do you see
2    that?

3              I see this as being assumed.

4              If you can look with me at the next page, there's
5    information provided here regarding Table 11 again.  Do you see
6    that?

7              I see that.

8              Is this information, as you understand it,
9    correct with respect to PT ranges for max and trough for VTE
10   indication for the 15-milligram twice-daily dose?

11             It says these figures were taken as blood
12   samplings and ultimately he agrees with that.

13             And the exact Canadian label was, in fact,
14   introduced into evidence, the very label that the plaintiffs
15   have said regarding PT -- have said should have been adopted in
16   the United States of America on the theory that Dr. Lensing's
17   testimony had endorsed that.

18             So it's unmistakable, Your Honor.  *Kreutz* does
19   say that you can use PT for some purposes to measure
20   anticoagulant effect.  It does say that it can be -- that you
21   can measure concentration, but it does not say -- it does not
22   say that it can be used as a screening test.  And what it does
23   say about the ability to measure anticoagulation effect and
24   concentration is nothing new.  From 2015 all the way through to
25   a month before the trial, the plaintiffs have had the same

1    thing.

2              Finally I want to address the legal question

3    because it's a question that's not unique, I think, to the

4    Xarelto case.  We have mass torts where the product is

5    withdrawn from the market and people stop studying it.  The

6    science gets frozen and there's not much to be learned once the

7    cases begin.  But there are also many cases where a product is

8    still on the market and it is still being studied and is being

9    studied by company scientists, it's being studied by

10   independent doctors and scientists and, yes, it's being studied

11   by doctors and scientists sometimes retained by plaintiffs.

12             And I think we have to talk about how is it that

13   we manage a case in situations where science is ongoing and

14   developing and there's really no way that we can be having

15   do-overs every time a new medical journal comes out.  It's

16   impossible.

17             You set a trial date.  These were bellwether

18   trials.  You know, Ms. Mingo asked for -- she was a

19   plaintiff-selected in the case.  She asked for a trial date.

20   Inherently the trial date is a discovery cutoff.  Inherently

21   the discovery cutoff is -- there are going to be things that

22   happen after the discovery cutoff that isn't going to get into

23   this trial.

24             Both parties and the Court know that when a case

25   is selected for trial and the information -- scientific

1   information may be developed afterwards, that one side or the

2   other is going to say, "Gosh, I really wish I had that, but I

3   didn't."

4           And we just can't have a situation where there's

5   no finality.  And I'm thinking the science can go in both

6   directions.  I don't consider *Kreutz* to be a bad article.  If

7   you read the article, what it's showing once upon a time one of

8   the plaintiffs' key theories in these cases was that

9   twice-a-day dosing is better than once-a-day dosing.

10          And what the study in *Kreutz* is showing is that

11  when you look at anticoagulant activity for Xarelto on

12  twice-a-day dosing, it's at least as good or not better as

13  Eliquis, that's apixaban, which has twice-a-day dosing.

14          But science can go in both directions.  And I

15  think back to the litigation in the silicone gel breast implant

16  days where, you know, we had Dow Corning lost a lot of verdicts

17  to women who claimed that silicone gel breast implants caused

18  their autoimmune disease and ultimately the company went

19  bankrupt.  And epidemiology studies were conducted that refuted

20  that proposition.  Judge Pointer, who was the MDL judge,

21  selected an expert panel to review all of the medical

22  literature; and they concluded that there was no association.

23          So, I mean, what's going to happen in those

24  cases?  Should the women who won those verdicts give them their

25  money back?  The law doesn't work that way.  And I think the

1   Supreme Court got it right in the *Daubert* case and the

2   plaintiffs in their brief point out that dealt with the

3   exclusion of expert testimony, not a Motion for a New Trial.

4   But the point it seems that the Supreme Court is making is the

5   same, which is that you have to resolve legal disputes at

6   concrete points in time and that you can't be revisiting those

7   decisions as the science develops.

8          And so what the Supreme Court says at -- I don't

9   have the U.S. cite -- 113 Supreme Court Reporter at 2798:  "It

10  is true that open debate is an essential part of both legal and

11  scientific analyses.  Yet there are important differences

12  between the quest for truth in the courtroom and the quest for

13  truth in the laboratory.  Scientific conclusions are subject to

14  perpetual revision.  Law, on the other hand, must resolve

15  disputes finally and quickly."

16         The Court then goes on to point out that the

17  project of reaching a quick, final and binding legal judgment

18  is often about great consequence, but it's about a particular

19  set of events in the past.  And we recognize that in practice,

20  a gatekeeping role for the Judge, no matter how flexible,

21  invariably on occasion will prevent the jury from learning

22  authentic insights and innovations.  And I think you can apply

23  that reasoning to new trial motions by trying a case based on

24  the record that exists at a particular time, you know, it's

25  inevitable that some juries are not going to have the benefit

1   of new scientific developments that occur after the parties

2   have completed discovery.  But the Supreme Court says that

3   nevertheless is the balance that's struck by the Federal Rules

4   designed not for the exhaustive search for cosmic

5   understanding, but for the particularized resolution of legal

6   disputes.

7              So on the issue of *Kreutz*, I just request

8   Your Honor to deny the motion for a new trial.  The article

9   does not say PT or anti-Factor Xa can be used as a screening

10  test.  What it does say in terms of being able to use PT and

11  anti-Factor Xa to measure anticoagulant effect and

12  concentration levels is not new.  It was in the trial in at

13  least five or six articles coauthored by Bayer employees, plus

14  the deposition of Dr. Spiro, plus the deposition of

15  Dr. Lensing.  And even if it were new, and it's not, it's not

16  the type of newly discovered evidence that legally can give

17  rise to a new trial.

18             Mr. Birchfield didn't address the other two

19  points.  I won't either unless Your Honor has questions.

20             THE COURT:  No.  I've got it.

21             Anything from Bayer?  I'm sorry.  Anything from

22  J&J?

23             MR. SARVER:  No, Your Honor.

24             THE COURT:  Okay.  You adopt the same.

25             Any response?

1    MR. BIRCHFIELD:  Yes, Your Honor, if I may in brief

2    fashion.

3    THE COURT:  Yes.

4    MR. BIRCHFIELD:  Let me start with the last point in

5    regards to the need for finality and being in a place where you

6    try the case based on the current state of science.

7    That's not the case.  This is not a situation

8    where someone tried a cigarette-smoking case several years ago

9    and then a few years later they do a study and they find, holy

10   smoke, cigarette smoking is hazardous to your health and

11   nicotine is addictive.  That's not the case here.

12   This is not a situation where the defendants have

13   taken a position and after the trial, there was a new study

14   that was done that changed the state of the science.  That's

15   not what we're saying.

16   I mean, if you look at the *Kreutz* article, we see

17   that -- when was this received?  It was received for

18   publication in December of 2016.  The study was done and

19   concluded and the transcript was submitted for publication in

20   December of 2016 before -- before we ever started the first

21   bellwether trial in this case.  This is not a case where

22   science in the laboratory -- the quest for truth in the

23   laboratory has, after the trial, revealed a new truth.  That's

24   not it.

25   Our Motion for a New Trial is that the quest for

1   truth in the laboratory cannot be divorced from the search for

2   truth in the courtroom.  You can't say at the same time:  This

3   is the truth in the courtroom, and there's a different truth in

4   the laboratory.

5           And I want to go back to the first point because

6   Mr. Glickstein -- he may not be able to use a PowerPoint or

7   chooses not to; but he's still a very skilled advocate.  And

8   what he has done here is to reframe the plaintiff's position

9   and the plaintiff's theory of the case.

10          But in the opening in the *Mingo* trial, we very

11  clearly stated what is our position.  What is the dispute

12  between the parties here?  It boils down to this:  There's a

13  way to test and they -- the defendants -- should tell and we

14  hinged that on the *Code of Federal Regulations*.  If there is a

15  laboratory test that is helpful -- if it's helpful -- it must

16  be in the warnings and precautions section.  That's it.  The

17  *Kreutz* article says that PT is beneficial.  It is helpful in

18  clinical settings.

19          And Mr. Glickstein is right.  We did not -- we

20  did not hear the defendants use the term "junk science."  That

21  wasn't the term that they used.  Instead they said that what

22  the plaintiffs are claiming -- using PT -- is meaningless, it's

23  unreliable, it is dangerous.  It's not any help at the bedside.

24  That is the position that they took.  The fact that PT is

25  beneficial, that it is helpful, the fact that that is the

1   current position of the Bayer scientists is new evidence to us.

2   We didn't have the benefit of this publication in the *Mingo*

3   trial.  They knew what the study showed, but we didn't.  It's

4   new evidence in that regard.

5            Your Honor, this -- I mean, I can't view this in

6   any other way than to say that either this publication in this

7   study is fake science or it's a sham defense.  It's one or the

8   other because in the courtroom they're saying it's dangerous,

9   it's unreliable, it's meaningless.  Outside the courtroom

10  they're saying it's beneficial.  It can't be both.

11           Thank you, Your Honor.

12       THE COURT:  Thank you very much.  I didn't interrupt

13  either one of you-all because I read your briefs and I

14  understood them and I wanted to hear what you have to say and I

15  appreciate it.  I'll take this matter under consideration.

16  I'll be ruling shortly on it.

17           Let me ask you another question while I have

18  everybody here.  Should we reset some status conferences now?

19  What's your view, your input?

20       MR. BIRCHFIELD:  Your Honor, we think it would be

21  beneficial.

22       THE COURT:  We didn't have one because both of you-all

23  were busy trying a case in state court, and I know we have

24  several other cases in state court.  But what's your view?

25       MR. BIRCHFIELD:  I think we should get back to

1    scheduling a status conference.  If we could schedule one in

2    January, that would be helpful.

3              THE COURT:  Steve, how do you see it?

4              MR. GLICKSTEIN:  I totally agree that status

5    conferences would be useful.  I think, Your Honor, we have

6    scheduled an informal meeting with Your Honor in chambers to

7    talk about maybe some things that come next and it might be

8    best to set some dates then.

9              THE COURT:  All right.  Susan?

10             MS. SHARKO:  We agree.

11             THE COURT:  Okay.  Let's do that then.  I'll get with

12   you-all and we'll pick some dates and get it back on track.

13             Okay.  Thank you very much for your arguments and

14   briefs.

15             Court is in recess.

16             THE COURTROOM MANAGER:  All rise.

17             (WHEREUPON, the proceedings were adjourned.)

18                          * * * *

19                   REPORTER'S CERTIFICATE

20             I, Lanie M. Smith, CRR, RPR, Official Court
     Reporter, United States District Court, Eastern District of
21   Louisiana, do hereby certify that the foregoing is a true and
     correct transcript, to the best of my ability and
22   understanding, from the record of the proceedings in the
     above-entitled and numbered matter.

23

24                          ___/s/ Lanie M. Smith_____
                            Official Court Reporter

25