# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **IN RE: XARELTO (RIVAROXABAN)** | **MDL No. 2592** |
| **PRODUCTS LIABILITY LITIGATION** | |
| | **SECTION L** |
| **THIS DOCUMENT RELATES TO ALL ACTIONS** | |
| | **JUDGE ELDON E FALLON** |
| | **MAG. JUDGE NORTH** |

### DEFENDANTS' JOINT BRIEF IN SUPPORT OF
### PROPOSED CASE MANAGEMENT ORDER 6

Pursuant to the Court's December 18, 2017 Order [Doc. 8159], the Janssen and Bayer Defendants jointly submit this memorandum in support of their proposed Case Management Order 6, attached as Exhibit 1.  The proposed CMO contains five sections:

**Section A**: Procedures for addressing the parties' dispute concerning the propriety of certifying the federal preemption defense for interlocutory appeal.

**Section B**: Procedures for resolving disputes concerning Plaintiffs' extensive new generic discovery requests, many in support of proposed new theories of liability not previously litigated in the bellwether trials.

**Section C**: Procedures for taking generic expert trial preservation depositions, as Plaintiffs have requested, and for appropriate expert disclosure and discovery based on the new evidence and new theories that result from Plaintiffs' proposed new round of discovery.

**Section D**: Procedures for resuming completion of Plaintiff Fact Sheets and Defendant Fact Sheets.

**Section E**: Procedures for case work-ups, which include collection of medical records, disclosure of claims being pursued, and the taking of case-specific depositions.

Plaintiffs proposed order addresses only Section E on case work-ups. For the reasons set forth below, a fair and practical case management order cannot be fashioned by addressing only case work-ups—without considering what new document, deposition and expert discovery will be allowed; what new theories will be developed as a result; and how those new theories and new evidence will affect case work-ups.

## I.    INTRODUCTION

The Court and the parties are now faced with the question of what to do next in the Xarelto MDL, which is unique in a number of important aspects. First, it involves a novel and important medicine that is still on the market and widely supported by physicians; it has not been the subject of punitive regulatory action or label change of the type that usually spurs mass tort litigation; and FDA continues regularly to review the medicine and affirm both its safety profile and effectiveness.[1] Second, Defendants have been successful in all bellwether cases to date. Third, a key legal defense in the case (federal preemption)—on which Xarelto's main competitor in the same class of medicine has been exonerated in another MDL—has eluded appellate review.

In the traditional MDL, all generic fact and expert discovery is completed before the bellwether trials. Based on that closed discovery record, MDL plaintiffs narrow their claims and MDL defendants narrow their defenses. The narrowed claims and defenses are then tested by motion, trial and appeal. At the end of that process, the work of the MDL Court may well be

---

[1] *E.g.*, Chrischilles et al., *Prospective surveillance pilot of rivaroxaban safety within the US Food and Drug Administration Sentinel System*, Pharmacoepidemiol Drug Saf. 2018:1-9, available at http://onlinelibrary.wiley.com/doi/10.1002/pds.4375/full (January 2018) (FDA-sponsored and co-authored publication).

finished:  generic fact discovery is complete; generic expert discovery is complete; the theories of liability are well-defined and fully tested by motion, trial and appeal; and the parties are able to fairly evaluate the strength or weakness of the inventory.  At that point, the transferor courts are well positioned to efficiently handle remanded cases, as the key legal and factual issues will have been fully developed, litigated and resolved. The process is well-described in the *Manual for Complex Litigation*.

Plaintiffs here ask that the *Xarelto* litigation proceed along a different path.  Instead of the bellwether trials framing the issues to be litigated by the remaining plaintiffs, Plaintiffs seek to initiate a new round of expansive generic discovery and to supplement their expert reports to assert new theories of liability.  At the same time, Plaintiffs ask this Court to order 5,000 cases be worked up and remanded—an unprecedented number according to JPML data and, as we demonstrate below, a physically impossible request that would require taking over 130 depositions a day even working seven days a week.  Defendants' proposal that the Court address the interconnected issues of fact discovery, expert discovery, fact sheets, and work-ups in one order—including work-ups of 260 cases, a very large number for an MDL in its fourth year according to JPML data—is ambitious, practical and fair.  For the reasons outlined below, Plaintiffs' work-up proposal should be rejected and Defendants' comprehensive approach adopted.

### A.    Procedural History

The results of the four bellwether trials were three jury verdicts in favor of the Defendants (*Boudreaux*, *Orr* and *Mingo*) and a dismissal with prejudice (*Henry*).  There has been one trial in the PCCP which resulted in judgment notwithstanding the verdict in favor of Defendants (*Hartman*).  Of the remaining 23 PCCP discovery pool plaintiffs, 10 dismissed their

cases rather than litigate them.[2]  There are four trials currently scheduled in the PCCP: *Russell* on March 15, *Cooney* on April 12, *Fu* on May 10, and *Rush* on June 7.

One bellwether plaintiff in the MDL (*Louviere*) has been dismissed on statute of limitations grounds.   The reasoning of this decision, which was not appealed, is likely to apply to a large number of plaintiffs.  In the PCCP, Judge New had already indicated that the same logic would apply to at least one discovery pool plaintiff (*Jannetta*), though Plaintiffs ultimately dismissed that case before any ruling on the issue.

Plaintiffs have appealed the *Boudreaux*, *Orr*, and *Mingo* verdicts.[3]  They claim that the jury's findings that Defendants adequately warned or instructed about the risks of Xarelto are tainted because the Court erred in admitting evidence and in instructing the jury.    Plaintiffs likely will appeal *Hartman* on the ground that, in their view, Judge Erdos erred in finding that plaintiff offered no evidence that Mrs. Hartman's prescribing physician would have altered her prescribing decision if the Xarelto label was changed in the way Plaintiffs' experts suggested.[4]

Because all the judgments are in Defendants' favor, the overarching defense of federal preemption likely will evade appellate review unless that controlling issue is certified for interlocutory appeal to the Fifth Circuit under 28 U.S.C. § 1292(b).   In order to tee up this important appellate issue, Defendants moved for summary judgment based on federal

---

[2] *Butler*, *Childress*, *Espersen*, *Howell*, *Lehman*, *Lenahan*, *Pitts*, *Polakiewicz*, and *Skousen*.  The *Jannetta* case was voluntarily dismissed after the Court informed the parties that the motion for summary judgment on statute of limitations would be granted.  One of the dismissals related to a plaintiff who had substituted for another plaintiff who was initially in the discovery pool.

[3] The *Boudreaux* and *Orr* appeals have been consolidated.

[4] The learned intermediary doctrine requires proof that a different label would have altered the physician's decision to prescribe.  Plaintiff's counsel contended they could create an issue of fact by proving the proposed different label would have altered the physician's communication with the patient, even if the prescribing decision would not have changed.  Judge Erdos ruled that Mrs. Hartman offered no proof even under the legal standard plaintiff proposed.

preemption in the *Ibanez* case.   Plaintiffs opposed summary judgment on the ground that they

desired information relating to "encrypted" documents.  That information has now been

provided, and so the Court can now set a schedule to complete briefing and decide whether to

certify the Court's ruling for interlocutory review.  It is important for the parties to know whether

the Fifth Circuit will agree with this Court's analysis of the preemption issue, or with the

analysis of Judge Cote with respect to defendants' competitor product, Eliquis.[5]

### B.    Plaintiffs' Proposal and Why it Should Not Be Adopted

The results of the bellwether cases have caused Plaintiffs to rethink their strategy and

seek a do-over.  Apparently convinced that the current discovery record will not support the PT

and anti-Factor Xa theories that ultimately were litigated in the MDL bellwether trials, Plaintiffs

have served Defendants with additional broad document requests, attached as Exhibit 2, on ten

different subject matters in an attempt to (1)  salvage the PT and Anti-Factor Xa theories, and (2)

develop brand new theories of liability that were not asserted in the four MDL bellwether cases,

were not pled in the Master Complaint, and have never been espoused in any of Plaintiffs' MDL

expert reports.  These new theories include allegations that (1) Xarelto's warnings were deficient

because the label fails to adequately warn of the use of Xarelto in combination with aspirin ("the

---

[5] *Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 184h (S.D.N.Y. 2016) (dismissing failure-to-warn claims in Eliquis MDL because "[t]o the extent that the failure to warn claims are premised on the adequacy of the label as approved by the FDA when the drug was first marketed in the United States, they are preempted"); *Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 673 (S.D.N.Y. 2017) (dismissing failure-to-warn claims in Eliquis MDL as preempted "because the information upon which [plaintiff] relies to plausibly plead these claims does not, upon examination, demonstrate that any newly acquired information exists to support a label change pursuant to CBE regulations").

In addition, in the second-wave litigation involving another competitor's product, Pradaxa, a federal court recently found claims that the sponsor of the medication should have changed the dose of the product to be preempted.  *See Chambers v. Boehringer Ingelheim Pharms, Inc.*, No. 15-cv-00068-CDL (M.D. Ga. Jan. 02, 2018).

aspirin theory"), (2) Xarelto's warnings were deficient because the label fails to adequately warn of the use of a 20 mg Xarelto dose in combination with two other anti-platelet medications ("the triple therapy theory"), and (3) Xarelto's design was defective because Defendants did not obtain earlier approval of the 10 mg dose for use in reducing the risk of venous thromboembolism following six months of initial therapy ("the VTE-P dosing theory").[6]  *See also* Exhibit 3, Declaration of Timothy S. Coon (detailing the work and time it will take to comply with Plaintiffs' new document requests).

If this huge new set of discovery requests is permitted, Plaintiffs will of course contend they are entitled to take company witness depositions on the newly-produced documents.  And they will of course contend that their experts should be allowed to rely on the new documents, new depositions and new theories of liability.  This will in turn trigger a new round of expert supplementation and expert discovery depositions.

Plaintiffs also say they want to take generic expert trial preservation depositions so that their experts will not have to appear live at trial in every case.  Needless to say, generic expert trial preservation depositions should only be taken after Plaintiffs' theories of liability are disclosed and the discovery record on those new theories has been fixed.  If trial preservation depositions are taken before discovery is completed, they will have to be re-taken to account for the new theories and new evidence after the documents are produced and witnesses deposed.[7]

---

[6] While Plaintiffs' new theories would require extensive new discovery and a defense would have to be tailored to the particulars of the new claim, they have in common Plaintiffs' insistence that the Xarelto label's 70+ warnings regarding bleeding risk somehow failed to warn of the bleeding risk, and that prescribing physicians somehow don't understand the risk.

[7] Fed. R. Civ. P. 26(a)(2) and (b)(4)(A) require disclosure of new expert opinions and reliance materials and provide the right to take a discovery deposition of those new opinions and reliance materials prior to the expert's trial testimony.

The necessity of not putting the cart before the horse applies with equal force to case-specific depositions of plaintiffs, physicians and detail representatives, which the parties refer to as case "work-ups."  Defendants cannot be expected to frame appropriate deposition questions to plaintiffs and their physicians, or to properly consult with their experts on how to best defend a particular plaintiff's case, so long as the discovery record is in a state of flux and the potential theories of liability are still undergoing metamorphosis.  That is why the Court's prior case management orders presumed that the fact and expert discovery record would be completed—and that Plaintiffs' theories of liability would be well-defined and fully vetted through the bellwether process—*before* there would be a massive number of work-ups.

The *Manual for Complex Litigation* makes this very point about the orderly progression of a mass tort to maturity.

> Litigation is generally considered mature if through previous cases (1) discovery has been thorough, producing a consensus that the available important information has been provided, (2) a number of verdicts have been received indicating the value of the claims, and (3) plaintiffs' contentions have been shown to have merit.  In a typical mature mass tort, little or no new evidence is likely, appellate review of novel legal issues has been completed, and a full cycle of trial strategies has been explored.

MANUAL FOR COMPLEX LITIGATION (FOURTH) § 22.314 (2004).

Because Plaintiffs seek to start over with new discovery and new theories, and because important legal questions remain unresolved on appeal, the bellwether process in the *Xarelto* litigation has not yet achieved its primary purposes.

- There is no "consensus that the available important information has been provided." As Plaintiffs are seeking another round of massive generic discovery—to include document production, company witness depositions, and expert discovery—it can hardly be said that "little or no new evidence is likely."  Quite the opposite, Plaintiffs seek a fresh start.

- While there have been "a number of verdicts," they have not resulted in consensus on the overall merits or lack thereof of the litigation because "appellate review of novel legal issues" has not been "completed." Plaintiffs believe the defense judgments were the result of reversible error. Defendants believe that the cases should not have been submitted to juries at all because of an overarching defense.[8] These conflicting viewpoints can only be resolved by the Fifth Circuit.

- Plaintiffs' cases have not "been shown to have merit." To the contrary, counting dismissals, Defendants have won 16 straight discovery pool cases in the MDL and the PCCP without a loss.

- Nor has a "full cycle of trial strategies been explored." Plaintiffs are seeking massive discovery to try to develop new theories not alleged in their MDL complaint or previously espoused by their experts. To the extent they want to continue to try the PT and anti-Factor Xa theories, they want to do so on a different record.

The Court has to decide whether to allow Plaintiffs to start over with a new round of document production, a new round of company witness depositions, and a new round of expert disclosures and discovery.[9] If the Court is inclined to allow Plaintiffs to effectively start discovery over in spite of the long-passed deadlines, the next CMO needs to take into account that the cases are not "trial-ready," but in the earliest stage of a second round of generic discovery and case development.

---

[8] *See* note 5 supra.

[9] CMO 2 established a July 29, 2016 deadline for document production; CMO 2A established an October 3, 2016 deadline for company witness depositions.

II.     **KEY DIFFERENCES BETWEEN DEFENDANTS' AND PLAINTIFFS'
        PROPOSALS**

There is a fundamental difference in approach between Defendants' proposed CMO 6

and Plaintiffs' proposed CMO, which explains nearly all of the variances between the proposals.

Defendants' proposal deals comprehensively with all of the interconnected open issues

that must be considered in designing a practical and fair plan for the future course of the MDL.

Plaintiffs' proposal addresses a single isolated issue—case work-ups—without giving any

consideration to Plaintiffs' abandonment (at least on the current discovery record) of the theories

pursued in the bellwether trials and their pursuit of new theories based on new discovery yet to

be conducted.  The problem with Plaintiffs' hyper-focus on work-ups is that all issues are inter-

related.  As the Court knows, when it comes to case management, the shin bone is connected to

the knee bone is connected to the thigh bone.

This difference in approach largely explains the parties' competing proposals regarding

work-ups.  Defendants propose that 260 plaintiffs be chosen for work-ups on a rolling basis in

2018—with work-ups on the 35 remaining discovery pool plaintiffs beginning immediately, 75

more plaintiffs being chosen in March 2018, and 150 more being chosen in September 2018.

Historically, this is a huge number of work-ups at this stage of an MDL.  *See* Declaration of Alan

E. Rothman, attached as Exhibit 4 (attaching JPML data).  We know of no other MDL where a

comparable number of work-ups was attempted before discovery was completed, while theories

of the case were in flux, and before appellate review.  *Id.*

Plaintiffs ask that 5,000 plaintiffs be selected immediately for case work-ups, and that all

of the work-ups—encompassing medical record collection for 5,000 plaintiffs and 20,000

depositions (four per work-up) —be completed in just six months.  Never in the history of any

MDL has anywhere close to that number of work-ups ever been attempted.  Not even in asbestos. *Id.* (attaching JPML data)

And for good reason.  Under Plaintiffs' proposal, depositions can start 30 days after the 5,000 work-up plaintiffs are designated—a manifestly inadequate amount of time to collect and analyze medical records in 5,000 cases.  *See* Exhibit 5, Declaration of Hillary Johnson.  But even allowing no extra time to collect or analyze medical records—and even working seven days a week, with no time off for weekends or holidays—the parties would have to take over 130 simultaneous depositions each and every day to complete 5,000 work-ups in six months.[10] Working five days a week, and again assuming no extra time to collect or analyze medical records, the number jumps to over 180 simultaneous depositions per day.[11]  Even cutting the number to 1,000 work-ups would still require at least 36 simultaneous depositions per day.[12]

Plaintiffs' proposal is impossible—which is why nothing like it has ever been attempted. The far better course, which reflects the pattern adopted in other MDLs (*see* Exhibit 4), is to start with a more realistic number, and then adjust up or down as the parties and the Court gain experience and work the kinks out.

## III.    DETAILS OF DEFENDANTS' AND PLAINTIFFS' PROPOSALS

We address Defendants' Proposed CMO 6, how it differs from Plaintiffs' proposal, and why Plaintiffs' proposal is neither practical nor fair.

---

[10] Six months is 183 days.  Plaintiffs say depositions can start 30 days after cases are designated for work-up, leaving 153 days to finish depositions.  Plaintiffs seek 4 depositions each in 5,000 cases, or 20,000 depositions.  $20,000 \div 153 = 130+$ depositions / day.

[11] 153 days $\times$ 5/7 days per week = 109 days.  20,000 depositions $\div$ 109 days = 183+ depositions / day.

[12] 1,000 workups $\times$ 4 depositions per case = 4,000 depositions.  4,000 depositions $\div$ 109 days = 36+ depositions / day.

**A.      Appellate Review.**

Section A of proposed CMO 6 addresses the important question of interlocutory appellate review of Defendants' federal preemption defense, acknowledging a dispute between the parties over the propriety of interlocutory appellate review and establishing a procedure for resolving that question. The *Manual for Complex Litigation* recognizes that bellwether appeals are as important as bellwether trials.[13]  Neither the Plaintiffs nor the Defendants nor this Court nor the transferor courts can intelligently assess how to proceed with this litigation so long as the viability of a critical defense—which another District Court has upheld with respect to a competitor's product[14]—remains untested on appeal.

Plaintiffs' proposed CMO ignores the issue of appellate review.  The issue is far too important to be ignored.  It makes no sense for the parties to expend enormous resources working up thousands of cases if there is a threshold legal defense that will dispose of all or most of them.[15]  Especially where a different MDL Judge came to a different conclusion for a medicine in the same class.

**B.      Plaintiffs' Proposed New Generic Discovery.**

The Court probably believed (as Defendants believed) that generic discovery was completed prior to the bellwether trials after Defendants produced over 130 million pages of documents and produced 44 company witnesses for deposition (excluding detail representatives).

---

[13] MANUAL FOR COMPLEX LITIGATION (FOURTH) § 22.314 (2004).

[14] *See* note 5 supra.

[15] *See In re Chinese Manufactured Drywall Products Liability Litigation*, 09-md-02047 (E.D. La. Aug. 4, 2017) (certifying personal jurisdiction question for interlocutory appeal where appeal "involves a controlling question of law . . . especially when the case will involve a 'long and costly process of serial trials" and "an immediate appeal from that Order and Reasons may materially advance the ultimate termination of this MDL") (vacated due to intervening Supreme Court decision on underlying jurisdictional question).

However, as a result of Plaintiffs' expansive new discovery demands, that assumption has proven to be incorrect.

Section B of proposed CMO 6 addresses a method for conducting and resolving disputes regarding the massive amount of additional generic discovery that Plaintiffs want to take of Defendants.  In particular, the proposed order requires Plaintiffs to formalize and finalize their discovery requests, and asks the Court to set a deadline to resolve any disputes.

Although Plaintiffs once represented that any new generic discovery would be limited to discrete "rifle shots," Plaintiffs have promulgated ten separate document requests on a broad range of issues.  A significant portion of this proposed generic discovery is directed toward new liability theories not addressed in any of the four bellwether cases or any prior expert reports.  As set forth in the accompanying declaration of Timothy Coon, attached as Exhibit 3, compliance with the new discovery requests, if the Court permits them, would require:

(1) negotiation of new search terms;

(2) negotiation of the custodial and non-custodial files to be searched;

(3) harvesting and processing of new computer files;

(4) hiring and training a new document production review staff (vendors can keep document review staffs intact only while a production is ongoing; when the Xarelto production ended in 2016, staff members were reassigned to other clients' productions or left the vendor);

(5) review by the new staff of documents generated by search terms for responsiveness, confidentiality and privilege; and

(6) final quality control and production of documents.

It would take at least six months for Defendants to comply with the proposed new document requests even if Plaintiffs substantially moderated their demands. *Id.*

On top of that, Plaintiffs will almost certainly seek to take additional depositions of company witnesses about any documents obtained through new discovery permitted by the Court. And of course Plaintiffs will want their experts to be able to use this new discovery and to develop new theories based on it. The case management plan needs to build in time—after any new document production is complete—for these activities.[16]

Any CMO governing the future course of proceedings needs to take into account the scope of any discovery that Defendants will be required to undertake, and the extent to which Plaintiffs will seek to modify their theories of liability based on that new discovery. These activities necessarily affect both the timing of and number of case work-ups.

Plaintiffs' proposed CMO is silent on this issue.

### C.   Generic Expert Supplemental Disclosures and Trial Preservation Depositions.

Section C of proposed CMO 6 addresses procedures for the trial preservation depositions of generic MDL experts, as Plaintiffs have proposed. This is a very substantial undertaking, as the parties have designated 35 generic experts in the MDL (16 by Plaintiffs and 19 by Defendants). Perhaps more significantly, Plaintiffs have reserved the right to supplement their generic expert reports to include the new discovery they are taking and the new theories of liability they are now developing. Needless to say, the Federal Rules require disclosure of these new theories and new reliance materials[17], and permit the opposing party to take discovery

---

[16] Defendants' proposed CMO 6 does not allocate a specific time frame for company witness depositions, as the scope of Plaintiffs' requests are unknown at this time.

[17] Fed. R. Civ. Proc. 26(a)(2)(B)(i) (requiring "a complete statement of all opinions the witness will express and the basis and reasons for them").

depositions prior to the expert's trial testimony[18].  Consequently, the future course of MDL proceedings must take into account a timetable for experts to issue supplemental reports containing these new theories and/or reliance materials—and for the taking of discovery depositions on the supplemental reports—before the expert's trial testimony is taken for use in all future MDL cases.  Plaintiffs' proposed CMO ignores this issue.

>    **D.    Plaintiff and Defendant Fact Sheets.**

Section D of proposed CMO 6 addresses the completion of Plaintiff Fact Sheets (PFSs) and Defendant Fact Sheets (DFSs).  In PTO 13 and 14, the parties stipulated to the form of the PFS and DFS.  In PTO 27 the parties agreed that, while the parties were focusing their efforts on the bellwether trials, plaintiffs would have to complete only a portion of the PFS and Defendants could hold off completing the DFS for any plaintiff not in the discovery pool.

Section D proposes that the parties should now resume the full exchange of information to which each party stipulated the other was entitled, and proposes a rolling schedule for completion of same.

Plaintiffs' proposed CMO contemplates that only plaintiffs designated for work-ups will have to submit a complete PFS.  Defendants respectfully disagree.  Experience has shown that many plaintiffs are not serious about pursuing their claims, but will continue to linger in the litigation so long as they do not have to provide substantial information about their claims.  The Court has expressed a desire to get a more accurate count of the inventory of plaintiffs who genuinely intend to pursue their claims.  Requiring a full PFS from each plaintiff is a necessary first step in conducting that census.  The completion of a PFS and production of medical records

---

[18] Fed. R. Civ. Proc. 26(b)(4) ("A party may depose any person who has been identified as an expert whose opinion may be presented at trial.").

substantiating that the plaintiff was prescribed the medicine and had the event at issue while taking the medicine should be required of every plaintiff as a minimal first step.

> **E.      Case Work-ups.**

Section E of proposed CMO 6 deals with case work-ups, which is the only issue addressed in Plaintiffs' proposed CMO.  Plaintiffs and Defendants agree that a work-up should include four depositions:  the plaintiff, one prescribing physician, one treating physician, and one detail representative who called upon the plaintiffs' physician before the prescription at issue. Plaintiffs and Defendants disagree on a number of other important issues:

> 1.      *Are Defendants entitled to collect medical records from health care providers or must Defendants accept only those medical records unilaterally determined by Plaintiffs' counsel to be relevant*?

Plaintiffs' allotment of only six months to complete a work-up is predicated on an assumption that Plaintiffs' counsel will have already collected all relevant medical records and that Defendants can simply rely on the medical records that were produced by Plaintiffs' counsel to be complete.  Defendants are aware of no litigation where the defense was limited in its proofs to only the medical records that the plaintiffs chose selective to produce.  And for good reason— such an edict would tie the defendants' hands and deprive them of the ability to defend the cases adequately.

This is a key issue because of the inherent danger in potentially allowing Plaintiffs to determine what discovery Defendants are entitled to, as Plaintiffs' counsel often does not produce critical medical records.  This can be shown both quantitatively and qualitatively.  *See* declarations of Hillary Johnson (quantitative) and Joan M. Goddard (qualitative), attached as Exhibits 5 and 6.  Quantitatively, the statistics show that Defendants obtain, on average, 87% more pages of medical records than Plaintiffs produce *from the very same medical provider*; put another way, 62% of the medical providers whose records are produced by Plaintiffs' counsel

produce more records to Defendants than Plaintiffs' counsel turned over to Defendants.  *See* Exhibit 5.  Qualitatively, the missing information is often important, particularly to regarding the adequacy of warnings and alternative causation.  As set forth in Exhibit 6, among the discovery pool cases, there are plaintiffs whose counsel did not produce medical records revealing bleeding episodes before taking Xarelto; bleeding events on other anti-coagulants; clotting complications on other anti-coagulants; clotting complications after discontinuing Xarelto; and prior non-compliance while on other anti-coagulants.

The Federal Rules do not require Defendants to take at face value Plaintiffs' voluntary disclosures; they permit formal discovery to obtain information relevant to the defense of Plaintiffs' claims.  Consequently, any proposed CMO should build in adequate time to identify and collect records from health care providers.

The amount of time needed to identify and collect medical records in the Xarelto litigation varies from plaintiff to plaintiff based on a variety of factors beyond Defendants' control, including (1) the completeness and accuracy of the plaintiff's initial disclosure identifying relevant physicians, (2) the number of medical providers from whom records must be collected, and (3) the responsiveness of each medical provider to requests for records.  As set forth in the accompanying declaration of Hillary Johnson, attached as Exhibit 5, the process of assembling a reasonably complete set of relevant medical records most often takes 4-5 months.[19] Of course, once the records are obtained, there needs to be a reasonable time for Defendants' counsel and their experts to analyze the records in order to plan their strategy for the depositions of plaintiff and his or her physicians.

_____

[19] Sometimes medical records can be collected in a somewhat shorter time, and sometimes collection takes longer.  The actual length of time is largely out of Defendants' control for the reasons explained in Exhibit 5.

Plaintiffs' proposal that all work-ups be completed in six months is unrealistic.  It would require that many plaintiff and physician depositions be taken before medical records can be collected and analyzed.

2.   ***How many cases should be chosen for work-up in 2018***?

Defendants propose 260; Plaintiffs propose 5,000.  Defendants' proposal represents a very high number for the current stage of these MDL proceedings; Plaintiffs' proposal is unprecedented and impractical.  We refer the Court to pages 9-10 for a fuller explanation why this is so.[20]

3.   ***How should work-up cases be chosen***?

Defendants propose that work-up plaintiffs should be selected randomly to assure representativeness and to prevent manipulation.  Plaintiffs say they alone should be able to cherry-pick every single work-up case.

There is no precedent for one party to have unilateral control over case work-up selections.  Such a one-sided procedure would drastically skew the work-up process in Plaintiffs' favor.  Moreover, there is no reason why Plaintiffs should be allowed to prioritize what they perceive to be their strongest cases while letting what they perceive to be their weakest cases languish on the docket with no activity.

Work-ups should reflect a fair cross-section of the MDL.  Anyone who brings a case should be as prepared as any other plaintiff to work it up.  Neither party should be permitted to hijack the choice of case work-ups in order to stack the deck in their favor.  Random selection favors neither party and is mostly likely to result in the most representative mix of cases reflective of the docket as a whole.

---

[20] As with the MDLs, proposed CMO 6 does not commit the parties or the Court to any particular course of action beyond this year.  The proposed CMO contemplates that the parties and the Court will revisit that question periodically as current circumstances warrant.

4. ***Are Defendants entitled to know the theory of liability a plaintiff intends to pursue in his or her particular case before deposing the plaintiff and his/her physicians*?**

The presumption underlying a request for a large number of work-ups is that the cases have been fully discovered and that the disputed factual issues have crystallized through the trial of the bellwether plaintiffs' cases.  In that way, the case-specific discovery in cases selected for work-up can focus on well-articulated claims and defenses, rather than proceeding blindly.  That is not how Plaintiffs in this MDL propose to proceed.  Instead, Plaintiffs have initiated a new round of generic document and deposition discovery, followed by a right of their experts to rely on the new discovery to pursue new theories and/or revise old theories.

The case-specific discovery in the bellwether cases illustrates this point.  Defendants' case-specific discovery focused on the theories of liability that predominated in Plaintiffs' expert reports: once-a-day dosing, routine monitoring, alleged inferiority to other NOACs, reversal agent, the Alere device, failure to include subgroup data in the label, etc.  Then, after Defendants filed dispositive motions, Plaintiffs claimed that Defendants misapprehended the theories they were pursuing—abandoning all theories in *Boudreaux* and *Orr* except PT, and all theories in *Mingo* except PT and anti-Factor Xa.  Plaintiffs switched theories in the first bellwether case in Pennsylvania (*Hartman*), and now have a new line-up of theories for the second trial (*Russell*), laid out on the eve of trial and resulting in the need for a round of supplemental expert disclosures and depositions and a postponement of the trial.  The work-up of large number of cases for remand is untenable while Plaintiffs' theories are still a moving target.  Defendants cannot be expected to prepare a case and retain case-specific experts in hundreds of cases to cover every conceivable theory, only to have Plaintiffs abandon most of the theories—or perhaps devise brand new ones—*after* all the depositions are taken.  It is inordinately wasteful and unjustified.

18

Plaintiffs' counsel have unilateral access to their plaintiffs and to plaintiffs' physicians. Under Rule 11, they are supposed to have conducted a reasonable investigation of their clients' claims before bringing a lawsuit. Moreover, individual plaintiffs' counsel will have had the benefit of the PSC's years of work developing the case and establishing the potential theories of liability and the evidence supporting those theories.

At this point, if an individual plaintiff intends to pursue a claim not litigated in one of the four bellwether trials—*i.e.*, a claim other than PT or anti-Factor Xa—plaintiff's counsel should be required to divulge that *before* Defendants start taking case-specific depositions. Similarly, if plaintiffs want to pursue a PT or anti-Factor Xa theory—but unlike the bellwether plaintiffs have never had a PT or anti-Factor Xa test result—that too would be a novel theory, and Defendants should be so advised. Further, if an individual plaintiff is claiming a physical injury other than a bleeding episode, that also would be a brand new claim. The plaintiff should have to disclose that. The purpose of the disclosure would be two-fold. First, it would appropriately focus the work-up depositions on issues actually in dispute. Second, for some theories, it may be appropriate to discuss with the Court whether there is a sufficient record with respect to any new contentions to proceed with the work-up. It may be, depending on the facts of the particular case, that there should be *Lone Pine* or other procedure to determine whether there is a sufficient basis to proceed with the claim before the parties and the Court expend resources on it, and for those cases which will go forward, to identify the theories upon which the claims are based, whether new theories or old ones.

In sum, given the ever-changing nature of Plaintiffs' contentions, it is appropriate that individual work-up plaintiffs specify which theory or theories of liability they actually intend to pursue so that Defendants can intelligently frame their questions to plaintiffs and their physicians

to the theories and evidence that will actually be litigated.  If Plaintiffs have not reached the stage where they are able to do so, they have not reached the stage where it is appropriate to order large numbers of cases to be worked up.

5.     ***Should cases automatically be remanded when work-ups are complete***?

Plaintiffs proposed CMO contemplates that cases will be automatically remanded to the transferor courts upon completion of work-up depositions.  Defendants believe it is premature to make that decision.  As set forth at pages 7-8, the Xarelto MDL has not reached the state of maturity where it would be wise or proper to dump hundreds (or thousands) of cases on the transferor courts while the discovery record is still open, theories are still evolving, and there has been no appellate review of key issues.

## IV.   ISSUES THAT COULD LIKELY BE RESOLVED WITHOUT COURT INTERVENTION

There are a number of issues raised in Defendants proposed CMO 6 and Plaintiffs' proposed CMO that most likely could be resolved by agreement without judicial intervention once the Court resolved the larger disputed issues.

### A.  Scope of Document Discovery

Plaintiffs have sent Defendants a letter containing informal discovery requests.  The parties have been meeting and conferring on those requests, and have made some progress.  A principal obstacle to reaching agreement on the scope of discovery is the Defendants' lack of knowledge concerning how much time will be allotted for such discovery, whether company witness depositions will be allowed, the procedures and timetable for further expert discovery and expert trial preservation depositions, and the parameters for case work-ups.  (How many will there be?  When will they begin?  In what time period will they have to be completed?)

Simply stated, Defendants will be able to agree to broader document discovery if they are assured that they will be given adequate time to produce the requested documents, and if they are assured there will be adequate time following document production (and, if allowed, company witness depositions) to learn how that new discovery will change or supplement Plaintiffs' theories *before* Defendants are forced to take expert trial preservation depositions and *before* Defendants are forced to work up a massive number of cases. If Defendants will not be given adequate time to make the production—or if Defendants are not protected from having to take plaintiff, physician and expert depositions before fact discovery is complete—then Defendants must of necessity request that the Court enforce the July 29, 2016 document production cutoff in CMO 2 and the October 3, 2016 fact discovery cutoff in CMO 2A.

Defendants therefore request that the Court provide guidance as to whether it will build into the case management order adequate time to produce documents, take company witness depositions, obtain supplemental expert disclosures, and take discovery depositions before those supplemental disclosures—*before Defendants are forced to take expert trial preservation depositions or conduct massive case-specific discovery.* If the answer is "yes," we suspect that the scope of discovery will be completely (or almost completely) resolved without the need for judicial intervention.

### B.  Procedures for Generic Expert Trial Preservation Depositions

Defendants' proposed CMO 6 contains very detailed proposals for the taking of generic expert trial preservation depositions. Because of the much larger issues dividing the parties, Plaintiffs have not commented on Defendants' proposed procedures. Defendants believe that the procedures they have proposed are fair to both parties. However, if the Court did not want to address the details of those procedures at this time, we suspect the parties would be able to agree

on most (if not all of the procedures) once the larger issues have been resolved.  Our only caution is to point out that because Defendants are being asked to waive their right to confront and cross examine Plaintiffs' generic experts at trial, the preservation depositions must closely simulate what would happen if the expert appeared live in an individual case—*i.e.*, there would be an opportunity before the trial preservation deposition to learn whether the expert would be offering previously undisclosed opinions and/or was relying on new evidence; there would be a discovery deposition prior to the trial testimony on any previously undisclosed opinions or reliance materials; the testimony would be taken in the same order as in a trial (plaintiff first); and the trial testimony be supervised to assure responsiveness and appropriate conduct.  With these caveats, we are reasonably certain the parties could work out the details if requested to do so by the Court.

### C.  Procedures for PFSs and DFSs

The critical question in dispute is whether every plaintiff, or just the work-up plaintiffs, will have to complete the full PFS.  Because that question remains open, it has been impossible to address the details and logistics.  We suspect that once given guidance on that critical question, the parties will be able to work out the details on their own, and that it won't be necessary for the Court to decide between competing proposals.

### D.  Procedures for Scheduling Plaintiff, Physician and Detail Representative Depositions

Defendants' proposed CMO 6 and Plaintiffs' Proposed CMO suggest different procedures for the scheduling of "work-up" depositions of plaintiffs, prescribing physicians, treating physicians and detail representatives.  Here again, the larger issues in dispute—*i.e.*, Will Defendants continue to be able to collect their own medical records?  How many work-ups will

take place?  Will work-ups be chosen randomly or unilaterally by the PSC?—have overshadowed the procedural details and prevented agreement on those issues.

Defendants have serious concerns with some of Plaintiffs' scheduling suggestions. Among those concerns are (1) Plaintiffs' suggestion that Defendants can be compelled to take depositions within 30 days of a plaintiff being designated for work-up, before medical records can be collected and analyzed; (2) Plaintiffs' suggestion that they can set a deposition date with plaintiff's physician without coordination with defense counsel and force defense counsel to accept that date; and (3) Plaintiffs' suggestion that defense counsel must accept one of three dates unilaterally offered—without coordination with defense counsel—for a plaintiff's deposition with no good cause exception.

Here again, we suspect that most if not all of these logistical details can and will be worked out once the Court resolves the larger issues in dispute.

## V.    CONCLUSION

For the reasons stated above, Defendants request that the Court enter proposed CMO 6.

## <u>TABLE OF EXHIBITS</u>

| | |
|---|---|
| **Exhibit 1** | **Defendants' Proposed CMO 6** |
| **Exhibit 2** | **Plaintiffs' New Discovery Requests** |
| **Exhibit 3** | **Declaration of Timothy S. Coon** |
| **Exhibit 4** | **Declaration of Alan E. Rothman** |
| **Exhibit 5** | **Declaration of Hillary Johnson** |
| **Exhibit 6** | **Declaration of Joan M. Goddard** |

January 16, 2018
Respectfully submitted:

**Arnold & Porter Kaye Scholer LLP**

*/s/ Andrew Solow*
Andrew Solow
Steve Glickstein
William Hoffman
250 West 55th Street
New York, NY  10019-9710
Telephone: (212) 836-8485
sglickstein@akps.com
*Counsel for Defendants Bayer Healthcare*
*Pharmaceuticals Inc., and Bayer Pharma AG*

**Drinker Biddle & Reath LLP**
**A Delaware Limited Liability Partnership**

*/s/ Susan M. Sharko*
Susan M. Sharko
600 Campus Drive
Florham Park, NJ  07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com
*Counsel for Defendants Janssen*
*Pharmaceuticals, Inc., Janssen Research &*
*Development, LLC, and Janssen Ortho LLC*

**Irwin Fritchie Urquhart & Moore LLC**

*/s/ James B. Irwin*
James B. Irwin
Kim E. Moore
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com
*Defendants' Co-Liaison Counsel*

**Chaffe McCall L.L.P.**

*/s/ John F. Olinde*
John F. Olinde
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com
*Defendants' Co-Liaison Counsel*

**<u>CERTIFICATE OF SERVICE</u>**

The undersigned hereby certifies that on the 16th day of January, 2018, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system.

*/s/ John F. Olinde*