1          UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF MISSISSIPPI

3

4

5   IN RE:  XARELTO                *
    (RIVAROXABAN) PRODUCTS         *
6   LIABILITY LITIGATION           *

7   THIS DOCUMENT RELATES TO:      *   Docket No.: 14-MD-2592
                                   *   Section "L"
8   *Dora Mingo, et al. v.*        *   New Orleans, Louisiana
    *Janssen Research &*           *   August 1, 2017
9   *Development, LLC, et. al.,*   *
    Case No.: 15-CV-3469           *
10  * * * * * * * * * * * * * * * * *

11        TRANSCRIPT OF TELEPHONIC ORAL ARGUMENT PROCEEDINGS
12             BEFORE THE HONORABLE ELDON E. FALLON
                  UNITED STATES DISTRICT JUDGE
13

14  APPEARANCES:

15
    For the Plaintiffs'
16  Liaison Counsel:              Herman, Herman & Katz
                                  BY:  LEONARD A. DAVIS, ESQ.
17                                820 O'Keefe Avenue
                                  New Orleans, Louisiana 70113
18

19
                                  Gainsburg Benjamin David
20                                  Meunier & Warshauer
                                  BY:  GERALD E. MEUNIER, ESQ.
21                                2800 Energy Centre
                                  1100 Poydras Street
22                                New Orleans, Louisiana 70163

23

24  For the Plaintiffs:           Beasley Allen
                                  BY:  ANDY BIRCHFIELD, ESQ.
25                                P.O. Box 4160
                                  Montgomery, Alabama 36103

OFFICIAL REALTIME TRANSCRIPT

```
 1   APPEARANCES:

 2   For the Plaintiffs:          Levin Papantonio Thomas Mitchell
                                    Rafferty & Proctor
 3                               BY:  BRIAN H. BARR, ESQ.
                                 316 South Baylen Street
 4                               Suite 600
                                 Pensacola, Florida 32502
 5

 6
                                 Gainsburg Benjamin Davis
 7                                 Meunier & Warshauer
                                 BY:  WALTER C. MORRISON, IV, ESQ.
 8                               240 Trace Colony Park Drive
                                 Suite 100
 9                               Ridgeland, Mississippi 39157

10

11                               Levin, Fishbein, Sedran & Berman
                                 BY: FREDERICK S. LONGER, ESQ.
12                               510 Walnut Street
                                 Suite 500
13                               Philadelphia, Pennsylvania 19106

14

15   For the Defendant Bayer
     HealthCare Pharmaceuticals
16   Inc. and Bayer Pharma AG:    Mitchell, Williams, Selig, Gates &
                                    Woodyard, P.L.L.C.
17                               BY:  LYN P. PRUITT, ESQ.
                                 425 W. Capitol Avenue, Suite 1800
18                               Little Rock, Arkansas 72201

19

20                               Watkins & Eager, PLCC
                                 BY:  WALTER T. JOHNSON, ESQ.
21                               400 East Capitol Street
                                 Jackson, Mississippi 39201
22

23

24

25
```

OFFICIAL REALTIME TRANSCRIPT

1  APPEARANCES:

2

3  For the Defendant Bayer
   HealthCare Pharmaceuticals
   Inc. and Bayer Pharma AG:     Arnold & Porter Kaye Scholer, LLP
4                                BY:  STEVEN GLICKSTEIN, ESQ.
                                 BY:  ANDREW K. SOLOW, ESQ.
5                                250 West 55th Street
                                 New York, New York 10019
6

7
                                 Chaffe McCall, LLP
8                                BY:  JOHN F. OLINDE, ESQ.
                                 1100 Poydras Street, Suite 2300
9                                New Orleans, Louisiana 70163

10

11                               Bradley Arant Boult Cummings, LLP
                                 BY:  LINDSEY C. BONEY, IV, ESQ.
12                               One Federal Place
                                 1819 Fifth Avenue North
13                               Birmingham, Alabama 35203-2119

14

15  For Janssen Pharmaceuticals,
    Inc. and Janssen Research &
16  Development, LLC:            Barrasso Usdin Kupperman Freeman &
                                   Sarver, LLC
17                               BY:  RICHARD E. SARVER, ESQ.
                                 BY:  CELESTE COCO-EWING, ESQ.
18                               909 Poydras Street, 24th Floor
                                 New Orleans, Louisiana 70112
19

20

21

22

23

24

25

OFFICIAL REALTIME TRANSCRIPT

```
1    APPEARANCES:

2    For Janssen Pharmaceuticals,
     Inc. and Janssen Research &
3    Development, LLC:              Drinker Biddle & Reath, LLP
                                    BY:   SUSAN M. SHARKO, ESQ.
4                                   600 Campus Drive
                                    Florham Park, New Jersey 07932
5

6
     Official Court Reporter:      Jodi Simcox, RMR, FCRR
7                                  500 Poydras Street
                                   Room HB-406
8                                  New Orleans, Louisiana 70130
                                   (504) 589-7780
9

10

11   Proceedings recorded by mechanical stenography, transcript

12   produced by computer.

13

14

15

16

17

18

19

20

21

22

23

24

25
```

OFFICIAL REALTIME TRANSCRIPT

**PROCEEDINGS**

**(August 1, 2017)**

**\*\*\*\*\*\***

1   02:13
2   02:13
3   02:13
4   02:13
5   02:13          (WHEREUPON, the following proceedings were held in
6   02:13   chambers via telephone.)
7   02:13          THE COURT:  Good afternoon, everyone.  This is Judge
8   02:29   Fallon.
9   02:29              Who's on the line for the plaintiffs?
10  02:29          MR. DAVIS:  Hello, Judge.  This is Lenny.
11  02:29          THE COURT:  All right, Lenny.
12  02:29          MR. MEUNIER:  Judge, Jerry Meunier and Bubba
13  02:29   Morrison.
14  02:29          THE COURT:  Okay.
15  02:29          MR. LONGER:  Fred Longer's on, Your Honor.
16  02:29          THE COURT:  All right, Fred.
17  02:29          MR. BARR:  Brian Barr, Your Honor.
18  02:29          THE COURT:  Okay, Brian.
19  02:29          MR. DAVIS:  I thought Andy was on also.
20  02:30              Andy, your phone is breaking up.  Andy, we can't
21  02:30   hear you.
22  02:30          MR. BIRCHFIELD:  Okay.  I'll try --
23  02:30          MR. MEUNIER:  Yeah.  Try to call in again, Andy.
24  02:30   You're breaking up.
25  02:30          THE COURT:  You sound like you're under water, Andy.

OFFICIAL REALTIME TRANSCRIPT

02:30 1        MR. BIRCHFIELD:  I'm sorry, Judge.  I feel that way,
02:30 2   too, Judge.
02:30 3        MS. PRUITT:  This is Lyn Pruitt.
02:30 4        THE COURT:  Okay.
02:30 5        MR. JOHNSON:  Walter Johnson.
02:30 6        THE COURT:  All right.
02:30 7        MR. SARVER:  And Rick Sarver.
02:30 8        THE COURT:  Rick.
02:30 9        MR. GLICKSTEIN:  Steve Glickstein, Your Honor.
02:30 10       THE COURT:  All right, Steve.
02:30 11            We didn't get that.  Who was that?
02:30 12       MS. SHARKO:  Susan Sharko.
02:30 13       THE COURT:  Okay.  I've got you, Susan.
02:30 14       MR. SOLOW:  And Andy Solow's on, Your Honor.
02:30 15       THE COURT:  Okay, Andy.
02:30 16       MR. OLINDE:  And John Olinde's here, Your Honor.
02:30 17       THE COURT:  Okay, John.
02:30 18       MS. BONEY:  And Lindsey Boney, Your Honor.
02:30 19       THE COURT:  All right, Lindsey.
02:30 20       MS. COCO-EWING:  And Celeste Coco-Ewing, Your Honor.
02:31 21       THE COURT:  Okay.  Is that it?
02:31 22            Okay.  We have two matters to talk about today.
02:31 23   One is the motions of the defendant to quash various
02:31 24   depositions.  The plaintiff in this case seeks to have some six
02:31 25   individuals from the defendants, either employed by the

OFFICIAL REALTIME TRANSCRIPT

defendants now, or had been employed at one time and no longer employed, some of whom fit in both categories.  There's also an issue regarding news coverage of this matter.  Let me take the one up first with the motions to quash.

As I understand it, the plaintiffs seek to have some six people, and it's not clear to me whether they want the people to come from the New Jersey/Pennsylvania area to Jackson, Mississippi, or whether we're dealing with streaming as we have done in the past.  With regard to if it's the former, I'm not going to require the individuals to come from more than 100 miles in person to testify.

As I read Rule 45(c), the draft was -- I guess the best way of saying it is that they may have been offended or something by my ruling in *Vioxx* and did something about it, and I think that they have a right to do that.  So I won't do that again.  So I'm not going to require somebody to come from Pennsylvania or New Jersey to Jackson, Mississippi.

But I do feel that it's within my power, notwithstanding the amendment to Rule 45(c), to require an individual employed by a defendant to come from either their residence and/or place of business to the nearest courthouse within the state, or within 100 miles, and present themselves for deposition.  The question really is how many.  I think it's a stretch to have six.  I agree with the defendants that six is pushing the envelope.

OFFICIAL REALTIME TRANSCRIPT

1         I looked at the people, the ones that are on

2 vacation, but the vacations either start after the trial or

3 they have finished their vacations by the trial:  Dr. Wu,

4 Dr. Major, M-A-J-O-R, and Ms. Susan Geiger.  Either there's no

5 conflict, as is with Dr. Major, or there's some conflict with

6 Dr. Wu, but he finishes his vacation on August the 7th.  We

7 start the trial on August the 7th.  Ms. Geiger starts her

8 vacation from August the 16th to the 21st.  We start August the

9 7th.

10         So I think that those three are doable, and it

11 would be my suggestion that that's what we do, have those

12 three.  But let me hear some input from the parties.

13         **MR. BIRCHFIELD:**  Your Honor, this is Andy Birchfield.

14         **THE COURT:**  Yes.  Go ahead, Andy.

15         **MR. BIRCHFIELD:**  Can you hear me?

16         **THE COURT:**  Yes, we can.

17         **MR. BIRCHFIELD:**  Your Honor, as far as our requests,

18 when we were seeking to have these witnesses appear via

19 satellite, it was not our intention to call six live witnesses.

20 But the witnesses, the six that we named are -- they all have

21 relevant and pertinent areas of testimony, but the ones that

22 are available, and we were told that Dr. Wu was available on

23 August 9th, and subject to this motion to quash the subpoena.

24 And we can make that work.  The August 9th would work for

25 Dr. Wu.

02:36  1          **THE COURT:**  Okay.  I'll deny the motion to quash for

02:36  2  Dr. Wu with the understanding that he present himself after

02:36  3  he's back from vacation.

02:36  4          **MS. SHARKO:**  Judge, the date we gave for Dr. Wu was

02:36  5  August 10th, not August 9th.

02:36  6          **THE COURT:**  All right.  Okay.  That seems fair.

02:36  7          What's the next one, Andy?

02:36  8          **MR. BIRCHFIELD:**  Thank you, Your Honor.

02:36  9          The next witnesses that would be -- and the

02:36  10  witnesses that would be, we believe, most important for the

02:36  11  plaintiff to hear from live are Dr. Shah -- I mean, Nauman

02:36  12  Shah, not Dr. Shah -- Nauman Shah and Moye.

02:36  13          Shah is a current employee of J&J.  And he's now

02:37  14  elevated.  He's now vice president.  But at the time, he was

02:37  15  the director of marketing for Xarelto.  He handled the

02:37  16  marketing overall -- you know, marketing program through the

02:37  17  launch.  And we think that it would be important to have his

02:37  18  testimony.  And we think it would be -- for the plaintiff to

02:37  19  effectively put on her case, we would need him on August the

02:37  20  7th.

02:37  21          **THE COURT:**  Andy, do you have his deposition?

02:37  22          **MR. BIRCHFIELD:**  Yes, sir.

02:37  23          **THE COURT:**  Okay.

02:37  24          **MR. BIRCHFIELD:**  We do have his deposition.  But one

02:37  25  of the things that -- Your Honor, it is necessary -- it's

1 absolutely necessary for us to play some video depositions in
2 this case, but one thing that is becoming more and more clear
3 is that it's really difficult for the plaintiff to get their
4 message across through so much video depositions.
5         This is a critical area.  This is a critical
6 witness for the plaintiff.  And so we feel that Mr. Shah does
7 have, you know, according to the affidavit, he has a vacation
8 scheduled for the week of August the 7th.  And in light of, and
9 weighing about, he is a high-level executive.  It's not like,
10 you know, someone who it would be a major financial burden to
11 shift their vacation for a couple of days, and that's what
12 we're seeking here.
13     **THE COURT:**  All right.  I've got it.  Let me hear
14 from the other side.
15         Susan, do you want to take that?
16     **MS. SHARKO:**  Yes.  Mr. Shah has not worked on Xarelto
17 for many, many years.  He was deposed for over 16 hours.  The
18 transcript is 926 pages long.  He has nothing more to add now
19 than he did at his deposition.
20         And, more importantly, perhaps, is he has this
21 long-planned trip with his two 14-year-old daughters to visit
22 his elderly parents who he hasn't seen for six months.  And it
23 is an extreme burden for him to have to give up that vacation
24 and tell the two girls that they cannot go away with him and
25 visit his parents.  And his parents are obviously looking

02:39   1   forward to seeing him too.

02:39   2               If he has to testify, we agreed to bring him on

02:39   3   August 16th.  I appreciate that's not the plaintiff's first

02:39   4   day, but it just isn't fair to impose this burden on this

02:40   5   individual.

02:40   6           THE COURT:  Okay.  I've got it.

02:40   7               Andy, do you have a response to that?

02:40   8           MR. BIRCHFIELD:  Yes, Your Honor.  We're not asking

02:40   9   Mr. Shah to forego his family vacation; we're asking him to

02:40  10   postpone it for a day.  And this is Ms. Mingo's one day, one

02:40  11   opportunity to have her day in court.  And I think that her

02:40  12   ability to put on her case in the way that she considers most

02:40  13   effective should be an important consideration.  And as you

02:40  14   balance that against postponing a vacation for one day, I think

02:40  15   it weighs in favor of compelling him to testify by satellite.

02:40  16           MS. SHARKO:  Well, the man is traveling out of state

02:40  17   and has plane tickets and everything all set up for his

02:41  18   daughters.  I believe he's leaving on Friday or Saturday.  He's

02:41  19   going to miss that whole week of work.  So it's not a matter of

02:41  20   just postponing vacation a day; it's a matter of disrupting an

02:41  21   important family trip when the plaintiffs have deposition

02:41  22   testimony.

02:41  23           THE COURT:  Okay.  I've got it.  I understand both

02:41  24   sides of it.  I'm not going to quash the subpoena there, with

02:41  25   the understanding that if the plaintiffs feel that his

1    testimony is critical live, do it on the 16th.  We'll interrupt
2    the defendants' case if that's the situation, or you can put
3    portions of the deposition on at the appropriate time.
4           So to the extent that he has to participate
5    during the week of the first week, the week of the 7th, I'll
6    quash that notice.  But if the plaintiff does wish to have him
7    live, do it on the 16th; if not, then we'll play the
8    deposition.
9           Let the defendants know your choice sometime.
10   It would be better if you could do it before trial, but if not,
11   soon after trial so they'll know to make him available.
12          What's the next person?  So Dr. Wu is coming.
13   What about Christopher Major, Andy, do you want him live?
14          **MR. BIRCHFIELD:**  Your Honor, if I can take it in this
15   order, I think that we can forego Dr. Major based on
16   Dr. Lensing's testimony.  So what our first choice, after we
17   have -- we have two individuals in the marketing area, one is
18   Mr. Moye, who was the director of marketing.  He succeeded
19   Nauman Shah.  He was the director of marketing up until March
20   of 2017, when he left the company.  He is no longer an employee
21   of Johnson & Johnson.
22          He would be -- and you have an affidavit from
23   him that -- that he is on vacation during the plaintiff's first
24   week of trial as well.  Our first option would be, since we
25   cannot have Mr. Shah, to have Mr. Moye on August 7th, the first

02:43   1   day of trial.

02:43   2           THE COURT:  What's the situation there, Susan?

02:44   3           MS. SHARKO:  So it's our position -- I mean, he is a

02:44   4   former employee, Judge.  I don't, respectfully, think the Court

02:44   5   has jurisdiction over him.  He doesn't work for any of the

02:44   6   defendants.  He works for a company called Shire.  I understand

02:44   7   that his lawyer gave the plaintiffs a very detailed statement

02:44   8   as to Mr. Moye's business obligations the week of the 14th and

02:44   9   the long-planned family vacation he has set for the week of

02:44  10   August 7th.

02:44  11           So, number one, I just don't see how the Court

02:44  12   can do anything with regard to him because he's a non-employee

02:44  13   or a former employee; number two, he has the same family

02:44  14   vacation issue on the week of August 7th.  Then the third

02:45  15   argument, Mr. Moye was deposed extensively by deposition.  It

02:45  16   was over 17 hours.  It was almost an 800-page transcript.  He

02:45  17   has not worked on Xarelto really in the last six to nine

02:45  18   months.

02:45  19           So our position is that he should not be

02:45  20   compelled to come in.  The plaintiff has -- now they have

02:45  21   Mr. Shah and Ms. Geiger live.  That's two marketing witnesses.

02:45  22   As marketing witnesses, there's Mr. Ruppersbeger and

02:45  23   Mr. Herman, and we believe it's burdensome and beyond

02:45  24   reasonable to now bring in Mr. Moye.

02:45  25           MR. BIRCHFIELD:  Your Honor, if I may.  If I may

1   address the deposition issue.  We hear of the -- you know, the

2   hours and hours of deposition, and I get that, and we

3   appreciate discovery.  That's important in this case.  But the

4   way that we have to play these depositions, and the defendants

5   play their portion of the depositions in our case, makes it,

6   from a practical, forensic standpoint, it makes it extremely

7   difficult for the plaintiff to present her case through video

8   depositions.

9           We have to do that, but we need to balance that

10  with corporate witnesses.  And Mr. Moye, he was the director of

11  marketing from shortly after the launch and was involved

12  through the time of Mrs. Mingo's injury here.  He has critical

13  information.  We think that it would be important for him to be

14  a live witness on the first day of trial.

15          **THE COURT:**  Well, let me ask you, Andy, he's not

16  working for the defendants anymore.  He's not working for

17  either Janssen or Bayer.  I don't know about necessarily

18  jurisdiction, but what's my remedy in that type of situation?

19          **MR. BIRCHFIELD:**  Your Honor, and Fred may address

20  this more in depth, but my reading of the rule doesn't limit

21  the 100-mile restriction to the -- to an officer.  I mean, I

22  think the subpoena power of the Court is sufficient to compel

23  him to show up to appear for trial within 100 miles, and that's

24  what he would be doing.  Fred can speak to that more in depth.

25          **MR. LONGER:**  I think Andy has covered it, Your Honor.

1    Your Honor's ability to enforce the subpoena and
2    compel a witness within 100 miles of that person's residence or
3    place of business to appear at a hearing and give testimony.
4    In essence, that's what we are asking the Court to do, is to
5    enforce a modified subpoena which would direct Mr. Moye to
6    appear before -- at the courthouse, I believe in upstate New
7    Jersey, where he would -- which is well within 100 miles, and
8    well within the Court's subpoena power.
9    And, I guess from there, then we're piggybacking
10   on Rule 43, and then live transmitting that testimony into the
11   Jackson, Mississippi courthouse.
12   THE COURT:  Yes.  What I'm saying, though, is that if
13   a person is employed by a defendant, then my encouraging words
14   to the defendant are that, "If he doesn't show up, I'm going to
15   tell the jury that it's an adverse inference that he shouldn't
16   show up."  I don't have that same suggestion available to a
17   non-employee.  I can't tell the jury that.
18   If the person who's validly subpoenaed doesn't
19   respond to the subpoena, what I do is send a marshal to pick
20   him up, but that gets a little more problematic when it's
21   outside of my jurisdiction.  It's not as easy for me to send
22   the marshal as it is when it's in Louisiana or Mississippi.
23   They respond immediately to me.  So it's a little bit more
24   problematic.
25   MR. BIRCHFIELD:  Your Honor, in light of that,

02:50 1   perhaps -- perhaps we could switch Mr. Moye and Mr. Shah and

02:50 2   have Mr. Shah on the 7th, the first day of trial, since he is

02:50 3   employed by the defendants, and then Mr. Moye on the 14th when

02:50 4   he is not on vacation, when he's back from vacation.  And if he

02:50 5   does not show up, then that's at the tail end of the

02:50 6   plaintiffs' case, and we just -- we deal with the consequences

02:50 7   at that point.

02:50 8           THE COURT:  Well, I thought you had Shah -- wait.  I

02:50 9   thought you had Shah on the 14th or available on the 14th.

02:50 10          MR. BIRCHFIELD:  We do, Your Honor.  I mean, that was

02:50 11  what she said, and we discussed that.  I'm just asking to flip

02:50 12  that and put Shah on the 7th, and have Mr. Moye -- quash the

02:51 13  subpoena -- don't quash the subpoena for Mr. Moye, have him

02:51 14  appear on the 14th; and if he does not, then you can send the

02:51 15  marshal, but we won't have him, and we would just deal with

02:51 16  those consequences there.  But Shaw is an employee, a current

02:51 17  employee of Johnson & Johnson.  So you'd have the remedy that

02:51 18  you discussed about informing the jury.

02:51 19          MS. SHARKO:  The Court already ruled on Shah, and

02:51 20  I've already gone into the family obligations which haven't

02:51 21  changed in the last ten minutes that we've been on the phone.

02:51 22  The Court ruled that Shah would be on August 16th.  I don't

02:51 23  think it's fair to conflate Moye and Shah.  Mr. Moye is not an

02:51 24  employee.  He's not a party.  He's not a party's officer.  So

02:52 25  he -- I just don't think the Court has the power to make him

1  come.

2          THE COURT:  All right.  Who's next, Andy?

3          MR. BIRCHFIELD:  It would be Susan Geiger.  If we

4  don't have Shah or Moye on the 7th, then we would want

5  Ms. Geiger.

6          THE COURT:  Yeah, let's have Geiger there.  She's

7  starting her vacation on August the 16th, so she's available on

8  the 7th.  Christopher Major, if you want him, to produce him,

9  Susan, and Dr. Wu, the same way, produce him after August the

10  7th.  Nauman Shah, if he's available on the 16th, let's produce

11  him.  Otherwise, Andy, use the deposition.

12          MR. BIRCHFIELD:  Yes, sir.

13          THE COURT:  Okay.  So we've got Wu, Nauman Shah,

14  Christopher Major, and Susan Geiger.  Okay.

15              Can we go to the next issue?

16          MS. SHARKO:  If I could just ask Mr. Birchfield one

17  question through the Court.

18          THE COURT:  Sure.

19          MS. SHARKO:  I assume the motion to quash is then

20  granted as to Moye and Torr.  And Mr. Birchfield said he didn't

21  need Dr. Major anymore?

22          MR. BIRCHFIELD:  No.  In light of Lensing's

23  deposition, we may not need Major.  But I'll give you an answer

24  on Major soon.  Hopefully, in the next couple of days.

25          MR. DAVIS:  May I?  This is Lenny.  Just so that we

OFFICIAL REALTIME TRANSCRIPT

1    can work out -- because I've gotten and we've had some e-mails

2    from Steve in the Court from a technological issue.  Wu is in

3    what courthouse?

4              MS. SHARKO:  I will -- now that the Court has ruled,

5    I will go back and figure out what courthouse works for each of

6    these people, whether there's any way to do them all in the

7    same courthouse so that you don't -- with the three different

8    federal courthouses in Newark, and I will get back to you.

9              MR. DAVIS:  I know Steve from the courthouse has

10   asked questions, and he'd appreciate us getting back to him.

11   So, Susan, I appreciate that, and as soon as you can let us

12   know, we can let Steve know.  I know the Court wants to set up

13   some tests to make sure that remote access in the courtroom,

14   logistics, all will work and there won't be a problem from

15   courthouse to courthouse.

16             MS. SHARKO:  Okay.  And, likewise, I would ask that

17   you please let me know about Dr. Major even as soon as tomorrow

18   because, A, it's not fair to keep him hanging; and, B, I know

19   he lives in Pennsylvania, and so what courthouse we pick,

20   trying to get the most central one, may be influenced whether

21   he's involved or not.

22             MR. DAVIS:  And I don't know whether or not orders

23   may be needed from Judge Fallon for these particular

24   courthouses.  I think we had that in the first trial.

25             THE COURT:  Well, Lenny, you take the lead on that

OFFICIAL REALTIME TRANSCRIPT

1   and let me know.  If there's an issue, you and Susan get to me
2   and we'll talk about it.
3        **MR. DAVIS:**  Will do.
4        And, Susan, I look forward to hearing from you
5   tomorrow.
6        **MS. SHARKO:**  Likewise, on Dr. Major.
7        **THE COURT:**  All right.  The next issue is the issue
8   of the press, concerns with the press.  I know that the
9   defendants expressed a concern about that and sent me a copy of
10  a press release.  But I've gotten some press commentary at
11  least with looking at it on the Internet from something called
12  Law360.
13       There's a number of articles there:  *Janssen,*
14  *Bayer Must Face Third Bellwether Trial*.  There's one that says
15  something about *Bayer, Janssen Say Blood Thinner Warning Claim*
16  *Preempted*.  There's an article saying, *Bayer, Janssen Score Win*
17  *First Xarelto Trial*.  There's another article, *Janssen, Bayer*
18  *Lose Preemption Bids*.  There's another one, *Janssen, Bayer Call*
19  *Xarelto MDL Exclusion Request Too Broad*.
20       So I guess what I'm saying is that we're at the
21  point now where the material is in the public domain and we
22  just have to deal with it.  I'm going to have to ask the jury
23  whether or not they have read anything.  These days it seems
24  like that the preses is not the way it used to be, or at least
25  many people don't look upon it that way.  So I don't know

OFFICIAL REALTIME TRANSCRIPT

02:57  1    whether that's going to help or hurt either side, frankly.

02:57  2                    MR. SARVER:  Your Honor, could we be heard on that

02:57  3    briefly?

02:57  4                    THE COURT:  Of course.  Yes.  Go ahead, Rick.

02:57  5                    MR. SARVER:  Yes, it's Rick.  Judge, this is

02:57  6    different, and the reason it's different is they've targeted a

02:57  7    press release for Jackson, Mississippi.

02:57  8                    And the -- and I hesitate to name Andy because

02:58  9    he was a good friend to me at the last hearing and told me my

02:58  10   fly was down, and I raised it quickly, but Andy's quoted in

02:58  11   there.  He's the lead trial lawyer for the plaintiffs on this

02:58  12   case.

02:58  13                    It's targeted to Jackson, Mississippi.  It was

02:58  14   released between the time that we got our jury questionnaires

02:58  15   back.  So now the jurors who could have commented on that press

02:58  16   release, having seen it, can't do that until we get them into

02:58  17   the courtroom for voir dire.  And because the jury

02:58  18   questionnaire focused their attention on Xarelto and blood

02:58  19   thinners, they're more likely to be interested in it and to go

02:58  20   online and start doing some research.

02:58  21                    Once they do that -- we've checked, and once

02:58  22   they go online and do any research, if they do the query

02:58  23   "Xarelto, Jackson, Mississippi," the first thing that comes up

02:59  24   is this article.  The first hit.  You don't have to go through

02:59  25   17 clicks like I heard was an issue in the *Orr* trial.

02:59 1            And the statements in the press release are

02:59 2 particularly troubling.  It talks about thousands of lawsuits.

02:59 3 It talks about the bellwether procedure.  It talks about the

02:59 4 results from the bellwether procedure determining the

02:59 5 settlement value for a case as though there is some settlement

02:59 6 value for a case that the defendants have taken the position

02:59 7 and believe are entirely un-meritorious for all of them.

02:59 8            So it's just too easy for the jurors in this day

02:59 9 and age to get on the computer, hit it once, and, boom, off

02:59 10 they go.  And now they've got one side of the story that, in

02:59 11 our view, is completely inaccurate.  So it is different than

02:59 12 just general press releases.  Why on earth is it targeted to

03:00 13 Jackson, Mississippi, and just a couple of weeks before trial?

03:00 14 That's really disturbing.  And our clients are very, very

03:00 15 concerned that they can't get a fair trial.

03:00 16            THE COURT:  Well, what do you suggest, Rick?

03:00 17            MR. SARVER:  Well, I think --

03:00 18            MR. BIRCHFIELD:  May I address these issues, Your

03:00 19 Honor?

03:00 20            THE COURT:  Go ahead, Andy.

03:00 21            MR. BIRCHFIELD:  I mean, I choose that the letter was

03:00 22 signed by the three trial counsel, and I choose not to believe

03:00 23 that they know that the allegations that they are making in

03:00 24 this letter are false, and I choose to believe that Rick in his

03:00 25 statement about a press release targeting Jackson, I choose to

1  believe that he doesn't know -- but their clients surely do.

2  And a date line on a press release does not target the media

3  outlet in that area.  It is a -- it's a general press release

4  that could be picked up anywhere, and is not a -- it is not

5  targeted toward Jackson, Mississippi.

6         The site of the trial is Jackson, Mississippi,

7  that's the point of interest, that's what's entered in the date

8  line.  The letter further describes the -- I mean, all existed

9  in regards to a report from the Institute for Safe Medication

10  Practices and their report, QuarterWatch, and the adverse

11  events that had been reported to the FDA.  This is newsworthy.

12  And, yet, the letter describes the Institute for Safe

13  Medication Practices as a plaintiff's organization.

14         And just a quick -- just quick research would

15  show that the Institute for Safe Medication is supported by

16  Baxter International, a major corporate player in the health

17  care field.  They are -- they coordinate efforts with the FDA.

18  To characterize them as a plaintiff's organization is just

19  false.  To say that this press release targeted Jackson,

20  Mississippi, is false.

21         We will see -- we've seen it before, jurors

22  hear, they see TV ads about Xarelto and tauting the benefits of

23  Xarelto.  To say that this press release makes it unfair or

24  makes it impossible for them to get a fair jury is an

25  overstatement of significant proportions.

03:03 1          **MR. SARVER:**  Your Honor, I choose to believe that
03:03 2 Andy wants it to be that way, but if you look at it -- I think
03:03 3 we attach the press release -- it says, "Jackson, Mississippi,
03:03 4 July 25th."  It is, in fact, targeted to Jackson, Mississippi.
03:03 5 And the timing is targeted to the trial.  I can't get away from
03:03 6 that, and I'm not quite sure how Mr. Birchfield can have it
03:03 7 otherwise.
03:03 8          And as to the source of the information, one of
03:03 9 the authors of the paper is Curt Furberg.  He's a plaintiff
03:03 10 expert who has been paid by the PSC for a report in this case.
03:03 11 And I understand they've withdrawn him from this case, but I
03:03 12 think it's in order so that he can write articles like this.
03:04 13          It's just the kind of information that is too
03:04 14 prejudicial, too close in time, too targeted to our Jackson
03:04 15 jurors at a time when we've already gotten our questionnaires
03:04 16 back.  We don't know which of those jurors have now seen this.
03:04 17 And if during trial a juror chooses not to follow the Court's
03:04 18 instruction, it's just one click away for them to say, "Oh, I
03:04 19 want to find out a little bit about Xarelto."  Boom, they've
03:04 20 got the plaintiffs' side of this again.
03:04 21          I understand why our clients are unhappy and
03:04 22 believe this leads to an unfair trial.
03:04 23          **THE COURT:**  Well, I'm not able to unring a bell.  I
03:04 24 mean, it is what it is.  We're just going to have to ask those
03:04 25 questions in voir dire.  I hope we don't have to deal with more

03:04  1    of these, at least before the trial gets started.

03:05  2           **MR. SARVER:**  Your Honor, could we ask for a few

03:05  3    things just to kind of see where we are at least?

03:05  4           **THE COURT:**  Yes.  Go ahead, Rick.

03:05  5           **MR. SARVER:**  First, we'd request that the Beasley

03:05  6    Allen firm pull down this press release.  It's actually already

03:05  7    been picked up for republication by 36 different news outlets.

03:05  8    We can't stop that, but at least we can have them pull it down.

03:05  9           Second, we'd like an accounting of what else is

03:05 10    out there, what else has been released and where in terms of

03:05 11    publication about this litigation, and ask the PSC to stop any

03:05 12    further efforts to publicize this during trial, which I think

03:05 13    you just did.

03:05 14           And then I think we've got to have individual

03:05 15    voir dire of the jurors to make sure they're not tainted now

03:05 16    that this has come out between the time that we got their

03:06 17    questionnaires.  Then we'd ask you to provide daily

03:06 18    instructions to the jury not to consult the TV, the Internet or

03:06 19    newspapers or any source of information other than what comes

03:06 20    in through the courthouse.

03:06 21           **THE COURT:**  Yes.  Well, I do that.  With regard to

03:06 22    the material, then whatever it is, it's got to be both sides.

03:06 23    If the defendants have done anything, either defendant, either

03:06 24    press or television or doctor letters or anything of that sort,

03:06 25    that I guess ought to be reported also if we have the

OFFICIAL REALTIME TRANSCRIPT

1   plaintiffs report.  So it will be fair to everybody.

2        MR. DAVIS:  Your Honor, I believe this type of -- go

3   ahead, Andy.

4        MR. BIRCHFIELD:  Your Honor, I will, in accordance

5   with the Court's urges, I will be glad to give an accounting of

6   any public relations efforts, press releases on behalf of

7   Beasley Allen or the PSC, if we get the same from the

8   defendants.

9        THE COURT:  Yes.

10        MR. BIRCHFIELD:  And, you know, we will cease any

11   efforts at best in any fashion if they will cease and desist

12   any commercials or TV ads for Xarelto, any press issues for

13   Xarelto, we'll do the same.

14        THE COURT:  Yes.  Whatever one side does, the other

15   side is going to have to do, too.

16            What are you saying, Rick?

17        MR. SARVER:  I'm sorry, Your Honor.  I didn't mean to

18   interrupt.

19        THE COURT:  No, that's all right.

20        MR. SARVER:  Andy, are you then saying you're willing

21   to draw down all the 1-800-bad-drug ads as well?  Because

22   that's what -- that's part of the picture, too.  Is that part

23   of what you're saying?

24        MR. BIRCHFIELD:  I don't control all the lawyers

25   across the country, Rick, and you know that.

OFFICIAL REALTIME TRANSCRIPT

03:08  1          **MR. SARVER:**  Well, and that's the problem.  I mean,
03:08  2     those "bad drug" ads are out there.  They were targeted during
03:08  3     the *Boudreaux* trial.  There was an onslaught during *Boudreaux*.
03:08  4     We got reports of dozens of those ads during that trial.  We
03:08  5     expect the same thing during the *Mingo* trial.  So it's, you
03:08  6     know...

03:08  7          **THE COURT:**  Well, it's a problem for both sides,
03:08  8     though, Rick.  I understand your position.  But on the other
03:08  9     side of it, there's the television ads, there's "dear doctor"
03:08 10     ads, there's other ads for the defendants.  You don't control
03:08 11     them, and I understand that.  They have a whole group of people
03:08 12     who do advertising for them, and you don't control them.  You
03:08 13     do your best you can, but you can't really control them.

03:08 14               It's a problem that we have with a lot of these
03:08 15     cases.  Whatever the plaintiffs do, the defendants are going to
03:09 16     have to do too.  I mean, if the plaintiffs are going to stop
03:09 17     the material that they have put out, then the defendants have
03:09 18     to do that.  If you want the plaintiffs to give you an
03:09 19     accounting of what they have done, then they have a right to
03:09 20     ask you to give them an accounting of what you and Bayer and
03:09 21     J&J have done.  That becomes then an issue that takes over the
03:09 22     trial.

03:09 23               You know, I do the best I can with it.  I'll
03:09 24     tell the jury, the way that I always do, and I'll tell them
03:09 25     every day to not read and not go on the Internet, and I've been

03:09  1    doing that.  The Courts of Appeal generally feel that jurors
03:09  2    follow the Court's instructions.  I'll explain why, as I did
03:10  3    the last time, it's so important.
03:10  4        MS. SHARKO:  Judge, this is Susan.  I want to make
03:10  5    sure I understand what the ruling is, and perhaps this is
03:10  6    something that we need to meet and confer with the plaintiffs
03:10  7    on.  I'm assuming that there's a suggestion or requirement that
03:10  8    the company cease communications with doctors or health care
03:10  9    providers who ask for information, that we stop any advertising
03:10 10    that's out there.
03:10 11        There's no advertising that's targeted to
03:10 12    Jackson or to Mississippi.  We don't issue press releases about
03:10 13    lawsuits.  But there's regular -- and the plaintiffs know this,
03:10 14    and I guess we'll hear about it a lot at trial, there's a lot
03:10 15    of marketing efforts that go on communicating the information
03:10 16    about the medicine.  I'm assuming that that's not the subject
03:10 17    of this discussion.
03:10 18        THE COURT:  Yeah, well I would hope not.  It's just
03:11 19    that once you open the door to the plaintiffs and say the
03:11 20    plaintiffs have to give you that information, you've got to
03:11 21    understand that they have a right then to ask you to do the
03:11 22    same, and that then becomes a little more problematic from your
03:11 23    standpoint because it's not as clear cut as it is from the
03:11 24    plaintiffs' standpoint.
03:11 25        With your material, you have multiple reasons

OFFICIAL REALTIME TRANSCRIPT

03:11   1   for the advertisement:  To inform the public about the

03:11   2   availability of good drugs, to advertise your drug, and to

03:11   3   assure the public that it's safe, and it gets a little blurry,

03:11   4   those three different lines.

03:11   5          So I'm really trying to avoid having a hole of

03:11   6   rules for this type of situation.  I don't want to use the

03:12   7   atomic bomb to kill an ant.  It's just not a good thing.  I

03:12   8   take Rick's position.  I understand it.  I think we can correct

03:12   9   the situation by dealing with it in voir dire and dealing with

03:12   10  it every day.  I would expect both sides not to issue press

03:12   11  releases involving this Jackson trial.

03:12   12         Rick, if you're interested in finding out what

03:12   13  the plaintiffs have done, probably you ought to meet and confer

03:12   14  so that I get from them -- or you get from them their wish list

03:12   15  from your standpoint, and then present it to me and I'll make

03:13   16  the cut.

03:13   17         MR. SARVER:  That sounds good, Your Honor.  I suppose

03:13   18  we can start at least by saying that none of the trial lawyers

03:13   19  or their firms will engage in this kind of information

03:13   20  dissemination.

03:13   21         THE COURT:  Andy, where are you on that?

03:13   22         MR. BIRCHFIELD:  Well, Your Honor, I mean if we're

03:13   23  saying that the defendants can -- if the defendants can present

03:13   24  information on their side, we should be able to respond.  I

03:13   25  mean, if we're having a -- if we're having an order to cease

OFFICIAL REALTIME TRANSCRIPT

| | | |
|---|---|---|
| 03:13 | 1 | and desist all PR relations on behalf of the Plaintiffs' |
| 03:13 | 2 | Steering Committee, then it should apply to the defendants as |
| 03:13 | 3 | well.  The plaintiffs shouldn't be restricted from public |
| 03:14 | 4 | relations activity while the defendants have free rein. |
| 03:14 | 5 | So I'm fine.  We did not.  And despite what Rick |
| 03:14 | 6 | says, there was not a target on the Jackson media outlet.  That |
| 03:14 | 7 | was not the case.  And can it be picked up?  Just like Xarelto |
| 03:14 | 8 | ads, maybe they're not targeted to Jackson, but they're playing |
| 03:14 | 9 | in Jackson, and it would work the same way.  So I'm fine if we |
| 03:14 | 10 | want to have a stand-down of all PR activity for Johnson & |
| 03:14 | 11 | Johnson and Bayer and the plaintiffs' committee, I think that's |
| 03:14 | 12 | fine, but it shouldn't be one-sided. |
| 03:14 | 13 | **THE COURT:**  Rick, why don't you and Andy -- |
| 03:14 | 14 | **MR. SARVER:**  Yeah, I agree. |
| 03:14 | 15 | **THE COURT:**  Yes.  Why don't you and Andy meet and see |
| 03:14 | 16 | if you can work this out; if not, then I'll get involved in it |
| 03:15 | 17 | and I'll deal with it. |
| 03:15 | 18 | But you both have to know that what's sauce for |
| 03:15 | 19 | the goose is going to be sauce for the gander.  So it's not |
| 03:15 | 20 | going to just be one-sided, either one-sided defendants or |
| 03:15 | 21 | one-sided plaintiffs.  I try to be fair to both sides in these |
| 03:15 | 22 | situations.  So my preference is that you work it out, and that |
| 03:15 | 23 | you satisfy each other, that you use your best efforts to do |
| 03:15 | 24 | what you can do. |
| 03:15 | 25 | If that's the case, then so be it; if not, then |

1   I'll get involved in it, and I'll put something in an order and

2   have that circulated.

3         MR. SARVER:  We understand, your Honor.  Thank you

4   very much.

5         THE COURT:  All right.

6         MR. BIRCHFIELD:  Thank you, Your Honor.

7         THE COURT:  All right, folks.  Then I'll talk to you

8   probably in Jackson unless I hear from you sooner.  I'm working

9   on --

10        MR. MEUNIER:  Your Honor, what time do you want us in

11  chambers Monday in Jackson?

12        THE COURT:  Probably 8:00, Jerry, the way we did last

13  time so that we can start -- we'll start picking the jury about

14  8:30.

15        MR. MEUNIER:  Okay.

16        THE COURT:  And we'll have to play it from there.

17        Go ahead, Brian.

18        MR. BARR:  Your Honor, it may be necessary for you to

19  issue an order to allow parties to carry in their computers and

20  their phone.

21        THE COURT:  Yes.  I think we've already done that.

22        MR. BARR:  Okay.  Thank you, sir.

23        THE COURT:  Let's see.  Something else with that.

24  The press coverage, we've got them in the back of the room.  My

25  ruling there, I don't want them to record or take pictures, but

OFFICIAL REALTIME TRANSCRIPT

1  the idea of them making notes by a computer or a laptop or a

2  notebook or something, it's the way of the world now.  There's

3  some people who don't know how to write anymore except type.

4  But I want them in the back so that they're not distracting the

5  jury.  So I'll have to allow them to come in too with

6  something.

7              It used to be that we had two phones in every

8  floor here, but now we don't have any phones on any floor, and

9  that almost compels attorneys to have a cell phone with them.

10             All right.  I'll talk to you all then at 8:00 on

11  Monday.  Have a good day.

12             (WHEREUPON, the proceedings were concluded.)

13                           *****

14                       **CERTIFICATE**

15         I, Jodi Simcox, RMR, FCRR, Official Court Reporter

16  for the United States District Court, Eastern District of

17  Louisiana, do hereby certify that the foregoing is a true and

18  correct transcript, to the best of my ability and

19  understanding, from the record of the proceedings in the

20  above-entitled and numbered matter.

21

22

23                    *s/Jodi Simcox, RMR, FCRR*
                      Jodi Simcox, RMR, FCRR
24                    Official Court Reporter

25

OFFICIAL REALTIME TRANSCRIPT