UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * | |
| ALL CASES | * | JUDGE ELDON E. FALLON |
| | * | |
| | * | MAGISTRATE JUDGE NORTH |

* * * * * * * * * * * * * * * * * * * * * * * *

**PSC REPLY BRIEF IN SUPPORT OF PLAINTIFFS'
PROPOSED CASE WORKUP AND REMAND PLAN**

**MAY IT PLEASE THE COURT:**

Many Plaintiffs in this court have had claims pending for more three years. These Plaintiffs have completed Fact sheets and provided proof of use as well as proof of injury. Now they are awaiting their day in Court. The median age of the Plaintiffs with pending claims is 74. More than 60% are 70 years of age or older. The practical result of substantial delay is a denial of a day in court for many of these Plaintiffs.

Plaintiffs in this litigation have produced reports of well-credentialed experts to both establish general causation and support theories of liability. These experts have been deposed and have withstood *Daubert* challenges. Theories of liability in three MDL cases have been tested by summary judgment motions and motions for a judgment as a matter of law. In addition, a state court jury in a fourth case heard evidence and returned a verdict in favor of plaintiff awarding a $28 million verdict for compensatory and punitive damages. The Plaintiffs' claims are not lacking merit. The PSC plan for the next phase in the MDL provides a reasonable blueprint for these MDL Plaintiffs to have their cases adjudicated.

The Defendants plan, by contrast, would keep the 20,000-plus claimants parked in the MDL Court with minimal activity and a diminishing likelihood of living long enough to see their day in court. The underlying theme of the Defendants position is that this is acceptable because (1) since the Defendants have won the first four trials, the Plaintiffs' claims have no merit; (2) the drug is still on the market, so it must be good; and (3) a competitor drug received a favorable ruling on preemption, so Xarelto is entitled to the same ruling.   These proffered justifications for Defendants' plan lack merit, and, when further scrutinized, amount to considerations which are more supportive of the prioritized remand proposed by the PSC.

First, history dispels the fallacy that four jury trials in a handful of venues serve as a fair indicator regarding the merits of nationwide litigation involving thousands of Plaintiffs.   The tobacco and asbestos cases are clear examples of this. In truth, the rulings on *Daubert* motions and dispositive motions in *Boudreaux*, *Orr* and *Mingo* are much more informative regarding the merits of this litigation.   While limited to the laws of two States and the fact patterns of only three of individual Plaintiffs, these rulings demonstrate that sufficient evidence is available to warrant a plaintiff having his or her claim decided by a jury.

Additionally, in the *Hartman* case tried in Philadelphia, which Defendants cite as a victory because of the district judge's set-aside of the compensatory and punitive damages verdicts rendered in Plaintiff's favor, it is instructive to consider what the presiding trial judge, the Hon. Michael Erdos, concluded, and expressly observed, about the evidence and verdicts at the January 9, 2018 hearing on Defendants' JNOV motion.   The Plaintiff Hartman had been awarded $1.8 million in compensatory damages and $26 million in punitive damages by the jury and Judge Erdos rejected the Defendants' post-trial argument that the punitive damage verdict was not supported under the evidence and prevailing law.   The Court declared that there <u>was</u> sufficient evidence of

2

Defendants' liability for punitive damages, and accordingly denied the Defendants' JNOV motion with respect to the punitive damage verdict. *See E*xcerpts from transcript of 1/9/18 Post-Trial Motions in *Hartman v. Janssen, et al*, at page 99, lines 18 through 20 [attached as Exhibit I].

Judge Erdos did vacate the compensatory damage verdict on the case-specific ground there was insufficient evidence at trial to satisfy the causation prong of the "learned intermediary" doctrine. Specifically, the Court concluded that Plaintiff failed to establish a jury question as to whether Plaintiff's physician would have communicated to her about the risk of Xarelto use which Plaintiff alleged should have been disclosed. *Id.* at pp. 165-168. Only because of the Court's determination regarding proximate cause was the punitive damages verdict vacated, i.e., not because of insufficient evidence of the Defendants' punitive fault, but solely due to the set-aside of the compensatory damage verdict as a necessary predicate for Plaintiff's punitive damages claim.[1]

The jury's conclusion in *Hartman* of the Defendants' willful and wanton conduct put not only that Plaintiff but other patients at serious risk of injury and harm by deliberately choosing not to disclose to the doctors what they needed to know in order to safely prescribe or use Xarelto, will not, in Plaintiffs' view, be an isolated occurrence. The same evidence of Defendant wrongdoing presented in *Hartman* instead will be heard in case after case and trial after trial, by multiple juries in multiple venues, regardless of whether punitive damages are available in any

---

[1] As the Court is aware, the "learned intermediary" doctrine, properly inclusive of the medical decision-making of both prescribers and treaters, will continue to require refinement by application to the facts of a given case at trial. The PSC submits that under the better and emerging view of "learned intermediary" causation, the use of an objective, "reasonable physician" standard, as opposed to or in addition to the subjective testimony of the actual physician involved in the case, will be both necessary and appropriate in most instances. Moreover, as new scientific information emerges regarding the relative risks and benefits of Xarelto, it is reasonable to expect that prescribers and treaters will be increasingly inclined to agree that their medical decision-making probably would have been different had additional information about the risks of Xarelto been made available to them.

particular jurisdiction as the evidence is directed to notice, motive and breach of duty.  The Defendants are in error to expect that a similar accountability for such wrongful and egregious conduct can or will be avoided in the many merits trials still to occur.

Second, the fact that Xarelto continues to be marketed is not compelling evidence that the Plaintiffs' claims lack merit, and to suggest otherwise is belied by a number of examples: Cigarettes, linked to serious diseases and addiction, continue to be sold;  Actos, linked to bladder cancer, resulted in a multibillion dollar settlement but continues to be sold; Celebrex, linked to a significant increase in risk of heart attack, resulted in a large settlement and continues to be marketed; Pinnacle hip implants resulted in multiple, multimillion dollar verdicts but remain on the market; Pradaxa, a Xarelto competitor, was involved in MDL litigation which resulted in a large settlement, yet it continues to be sold; and prescription opioids, which according to the CDC cause 44 deaths per day and over 16,000 deaths per year, continue to be marketed. As in these cases, the fact that Xarelto continues to be marketed and promoted to doctors and patients, is anything but an indication that Plaintiffs' claims lack merit.  More to the point, the active marketing of Xarelto in no way justifies the extent of a delay in these proceedings which would effectively deny the rightful opportunity of thousands of Plaintiffs to present meritorious claims to juries in the proper fora.

Third, a ruling favorable to the Defendants on preemption in *Utts v. Bristol-Myers Squibb Company*, 251 F.Supp.3d 644 (S.D.N.Y. 2017),  a case involving one of Xarelto's competitors (Eliquis) and based on a completely different fact pattern and record, speaks nothing of the applicability of the doctrine in this litigation.  The safety profile and the efficacy profile of Eliquis are vastly different than those regarding Xarelto, and these differences are evident in the post-approval experiences of the two competing drugs.  Such post-approval evidence is of critical

4

importance in a preemption analysis.  In fact, the Court in *Utts* expressly limited its holding to Eliquis and went so far as to expressly distinguish Xarelto.  *See 251F.Supp.3d at pp. 664-65.*

Given the posture of this litigation after the trial of three bellwether trials, preparing substantial numbers of cases to be worked up and remanded in waves is the most appropriate next step. Counsel for the Defendants already are "on record" that the prospect of settlement in these proceedings is, to say the least, highly unlikely.  When questioned by the Court at a status conference as to the risk of bellwether cases being settled and resulting in vacated trial dates, Susan Sharko, speaking on Defendants' behalf, stated their broader position with striking candor:

> Ms. Sharko:  We'll certainly talk to the plaintiffs about it, but I
> don't see that there is any prospect of settlement of this litigation.

Transcript of 8/4/16 MDL Status Conference at page 6:24 through page 7:1 (emphasis added) [attached as Exhibit II].

Defendants who are thus emboldened both by the outcomes in the bellwether trials and by the enormous profits they will continue to receive by promoting and advertising Xarelto as a safe drug, cannot be expected to come to the table in the foreseeable future with any serious intent to settle the thousands of claims herein.  Nor should Plaintiffs wait any longer for their day in Court in the hopes of obtaining reasonable compensation through settlement.  These Plaintiffs' claims are not going away voluntarily.  They will have to be tried on the merits at some point; and a substantial remand is the way to get started with that process, first by working up qualified and selected cases for discovery, and then by having these cases transferred to be tried in the fora of Plaintiffs' choice.

To the extent Defendants complain that the generic discovery requests recently made by the PSC are too broad to be concluded within a short period of time (per the Affidavit of Tim

Coon), the solution is not to put limits on that discovery, but rather to allow cases to proceed to be presented and tried with whatever information and discovery is available in those cases. Allowing Plaintiffs to have their day in Court even with less than the full amount of discovery that will eventuate in the case, is a far better outcome than artificially closing all generic discovery and forcing thousands of Plaintiffs to go to trial without the benefit of information and evidence otherwise available but for this deadline.

The fact that Xarelto remains on the market likewise is a strong consideration warranting departure from the traditional approach of first forcing a complete "trial package" to be developed in the MDL before any and all cases can be remanded for merits trials. Under the PSC plan, the first substantial wave of remanded cases will have a calendar deadline for the closure of discovery usable in those cases. As each successive wave arrives at the same closure, more disclosures and evidence concerning the risks Xarelto poses for patients, may well become available and should be usable in those matters. In other words, the trial package that is developed in this MDL should be viewed as a core product, subject to expansion and supplementation as waves of remanded cases establish new schedules for discovery deadlines.

Such a substantial remand serves the goal of just accommodation under the unique circumstances of this case, without necessarily giving unfair advantage to Plaintiffs as a whole. The truth is that, for Plaintiffs with cases in the MDL, there will be both "good news" and "bad news" under the PSC proposal: The cases worked up for remand will proceed with whatever generic discovery, trial package information, and scientific evidence is available within the workup and trial timetable for each case, but at some disadvantage when compared to cases awaiting the next remand wave, in which Plaintiffs may have access to the more current information and evidence available. At the same time, the remanded cases will secure an earlier trial date, while

those awaiting later remand will endure further delay in presenting their cases to a jury.  This tension is unavoidable, given the posture of this case with a drug actively and profitably remaining on the market; but, on balance, it is only through the initiation and continuing implementation of a meaningful remand process that the MDL can achieve its prime objective of fair and expeditious case resolution.

Defendants in their brief set up a classic "strawman" to knock down for their purposes. They argue that they cannot depose remand case Plaintiffs or physicians in those cases, or even consult with their own experts, if the discovery record remains "in flux" and if the theories of liability are "undergoing metamorphosis."  *See* Defendants' Joint Brief in Support of Proposed CMO No. 6 at Rec. Doc. 8346, p. 7.  But no such pressure will be put on Defendants once appropriate discovery and expert report/deposition deadlines are established for these cases.  There will be case-related cutoffs and deadlines which the Court will impose after hearing from both sides.  Defendants will know in advance of each trial what the expert opinions are in that case, and what the theory of liability is in that case.  What Defendants will not have available is a "one size fits all" theory of fault that applies across the board to each and every case against them. Defendants' complaint about the shifting theories of liability in this case likewise must be framed in the important context of a drug being challenged in Court even as it remains on the market and subject to ongoing study.[2]  It would be remarkable, therefore, if Plaintiffs did identify one and only one theory of inadequate warnings or instructions associated with this drug, since the understood risks associated with Xarelto continue to emerge as the drug is more and more prescribed and used,

---

[2] This dynamic of how emerging scientific study might interface with trial evidence, was well-illustrated in the *Mingo* bellwether trial.  As the Court will recall, trial counsel for the Plaintiff Dora Mingo became aware of a new and arguably-relevant scientific journal article on Xarelto, literally as the case was being given to the jury for decision.

giving rise to more claims of injury by ever expanding patient population.  Inevitably, a single case being presented in a single trial can only serve to provide a "snapshot" of the scientific evidence in that case; but the PSC submits that this is no reason why later-arising or worked-up cases need be relegated to an outdated lens through which to view relevant evidence.

Defendants complain that the PSC has revealed an improper "hyper focus" on remand, citing the proverb that the "shin bone is connected to the knee bone is connected to the thigh bone." In fact, the proper case-workup of a substantial number of cases, and remand those cases for merits trials, will be the best way to assure that the "thigh bone" in this case is not so artificially immobilized and fixed that it impairs the gait of the entire body, including the function of other, connected bones.  The interrelationship of individual case and global case issues is a given; but the PSC submits that the remand plan it proposes is the better way to manage that interrelationship, by allowing individual case workups to define the proper timetable for inventory-wide activity, while at the same time preserving fully for later-remanded cases the inevitable development of new and important generic evidence.

Respectfully submitted,

Dated: January 25, 2018

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
***HERMAN, HERMAN & KATZ, LLC***
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Email: ldavis@hhklawfirm.com

*/s/ Gerald E. Meunier*
Gerald E. Meunier (Bar No. 9471)
**GAINSBURGH BENJAMIN DAVID MEUNIER & WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
Email: gmeunier@gainsben.com

**Plaintiffs' Liaison Counsel**

## CERTIFICATE OF SERVICE

I hereby certify that on January 25, 2018 a copy of the above and foregoing has contemporaneously with or before filing been served on all parties or their attorneys in a manner authorized by FRCP 5(b)(2), Local Rule 5.1 of the Eastern District of Louisiana and via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

*/s/ Gerald E. Meunier*
**Gerald E. Meunier**

9