# In The Matter Of:
## *Hartman v. Janssen, et al*

*(Post-Trial Motions)*
*January 9, 2018*

*John J. Kurz, RMR, CRR, Official Court Reporter*
*City of Philadelphia*
*First Judicial District Of Pennsylvania*
*100 South Broad Street, 2nd Floor*
*Philadelphia, PA 19110*

Original File 09JANUARY-2018-MOTIONS-FINISHED.txt
Min-U-Script® with Word Index

**EXHIBIT I**

- HARTMAN -vs- JANSSEN, et al. -                                              Page 97

1  numbers that were reported there are
2  statistically significant. They're very low.
3  It doesn't mean you're likely to harm people.
4  It means only 3.6 percent chance or an
5  8.1 percent chance. That's not more likely than
6  not. That's not thinking you're giving this
7  drug to harm people. I mean, honestly, to give
8  this drug to harm people?
9        Even their own expert prescribed it.
10 So I don't think you can use this 3.6 or 8.1 as
11 statistically significant. Those numbers were
12 known by the FDA and in the original label,
13 which is the only label that's at issue; it was
14 approved. Therefore, it couldn't be listening
15 to your regulator is willful and wanton
16 misconduct.
17       So for all those reasons, Your Honor,
18 I think the punitive damages award should be
19 thrown out. And we'll address the other issues
20 when you're ready to hear them.
21       THE COURT: All right. We'll take a
22 lunch break till 2:30. At 2:30 I'll have a
23 decision on one or both of the punitive damages
24 JNOV and the new trial, closing argument.
25       And then --

- HARTMAN -vs- JANSSEN, et al. -                                              Page 98

1        MR. LONGER: Your Honor, can I --
2        MR. DOUGLAS: I was just going to say
3  that we can provide the Court with the places in
4  the record where the --
5        MR. LONGER: If she wants record
6  cites, I think it's in our brief, but I'm happy
7  to give them to you.
8        THE COURT: That's okay. You can
9  hand them up to the Court over the break if you
10 wish. I'll take a look at them. I don't want
11 to take any more time now.
12       MR. LONGER: Okay. Thank you.
13 Great.
14       THE COURT: The next issue we should
15 be ready to address after the lunch break is the
16 proximate cause.
17       MR. DOUGLAS: Yes, sir.
18       MR. LONGER: Thank you, Your Honor.
19       THE COURT: All right. We'll be back
20 at 2:30.
21       (Whereupon a luncheon recess was
22 taken from 1:30 to 2:30 p.m.)
23           - - -
24       THE TIPSTAFF: Court is back in
25 session.

- HARTMAN -vs- JANSSEN, et al. -                                              Page 99

1        (Time noted: 2:41 p.m.)
2        THE COURT: Thanks. You may be
3  seated.
4        Thank you.
5        Is everyone here that you want to
6  have here?
7        MS. WILKINSON: Yes, Your Honor.
8        THE COURT: Okay.
9        MR. DOUGLAS: We just...
10       THE COURT: Oh, I just really --
11 briefly in the back, could I see one attorney
12 from each side?
13       Off the record.
14           - - -
15       (Whereupon an off-the-record
16 discussion was held.)
17           - - -
18       THE COURT: Okay. The defense motion
19 for judgment notwithstanding the verdict with
20 respect to punitive damages is denied.
21       I am not ready at this point to
22 announce my decision on the motion for a new
23 trial based on the closing arguments.
24       I would like to turn our attention
25 now to proximate cause.

- HARTMAN -vs- JANSSEN, et al. -                                             Page 100

1        I guess it's defense.
2        MS. WILKINSON: Yes, Your Honor.
3        Your Honor, as you know from the
4  beginning of this case, we've been talking about
5  learned intermediary doctrine and proximate
6  cause. Under Indiana law, we believe the
7  standard is clear, and I want to put up Slide
8  No. 2, if I could.
9        (Slide displayed.)
10       MS. WILKINSON: This is from the
11 Minisan case. It's cited in our brief several
12 times from the Northern District of Indiana.
13 And it says, "A plaintiff must not only show
14 that the manufacturer's warning was inadequate,
15 but that such inadequacy affected the
16 prescribing physician's use of the product and
17 thereby injured the plaintiff."
18       As you know, this is focused on the
19 prescriber for a reason. Our duty to warn, as
20 you instructed the jury, is only to the
21 prescriber because the prescriber has the
22 training and knowledge. And it is not what the
23 plaintiff would have done. It is what would the
24 prescriber have done in light of a different
25 warning as proposed by the plaintiffs -- or the

- HARTMAN -vs- JANSSEN, et al. -                               Page 161

1   Pennsylvania law, they're not Indiana law. And
2   if the doctor doesn't say that they would do --
3   you know, make a different prescribing decision,
4   they don't get to go forward.
5           THE COURT: Right.
6           MS. WILKINSON: And so the fact that
7   the doctor would say I wouldn't have given that
8   information and then the jury finds that the --
9   I mean, the doctor is not on trial.
10          THE COURT: Right.
11          MS. WILKINSON: And there's no
12  question for the jury to determine that. It's
13  their prescriber. And in this case, of course,
14  she said she liked her doctor. She trusted her
15  doctor. All the evidence suggested that she
16  liked Dr. Randazzo and she had given her the
17  information she needed. There was no
18  contention --
19          THE COURT: Probably not relevant in
20  this case. But it did make me wonder to what
21  extent a jury could consider credibility when
22  we're talking about getting over that hurdle of
23  burden of proof.
24          MS. WILKINSON: Yeah. I mean, it's a
25  good law school exam question.

- HARTMAN -vs- JANSSEN, et al. -                               Page 162

1           THE COURT: Yeah.
2           MS. WILKINSON: So, you know, I
3   hesitate to answer it totally. But because her
4   credibility is not at issue and because you have
5   to get past the legal standard of presenting
6   affirmative evidence, I don't see how the jury
7   could find that. And that certainly wouldn't
8   apply in this case.
9           THE COURT: All right. I'll give you
10  a chance to respond just very briefly because,
11  again, my decision doesn't hinge on that.
12          MR. LONGER: I have very brief
13  response.
14          Every witness's credibility is at
15  issue, Your Honor. Once it gets to a jury, the
16  jury could make a credibility determination. So
17  to say that her -- she is not on trial,
18  Dr. Randazzo was a witness. Her credibility was
19  before the jury. And we get every favorable
20  inference determined in our favor.
21          Your Honor's reasoning just there,
22  even though we didn't posit it, is certainly --
23  the capacity of that to be before the jury was
24  before the jury. And under Pennsylvania law, we
25  get every reasonable inference in our favor

- HARTMAN -vs- JANSSEN, et al. -                               Page 163

1   since we won the verdict.
2           THE COURT: All right. Thank you.
3           I mean, it is an interesting
4   question. And if plaintiff is right, then all a
5   party would have to do is ask a question of a
6   witness and regardless of how they answer, their
7   burden would have been met in terms of surviving
8   motions for nonsuit and such, but all right. So
9   I jotted down some stuff so I'd be marginally
10  coherent.
11          With respect to both issues, and I
12  say this regardless of how I rule today, I
13  should stress that it is important and common
14  for a judge to reexamine decisions made in the
15  heat of battle. Typically that's why we allow
16  for post-trial motions. If I made a mistake, I
17  would only make it worse by not correcting it
18  now.
19          Furthermore, as our appellate courts
20  have made clear, there is a strong preference
21  for having juries decide cases in jury trials,
22  not the judges. Arguably, then, it's better,
23  prior to having let the dust settle and
24  reexamining the issues in a more academic way,
25  to let cases go to the jury if the issue isn't

- HARTMAN -vs- JANSSEN, et al. -                               Page 164

1   obvious at the moment.
2           Now, with respect to the substantive
3   issues, closing arguments, the only way to
4   say -- this is first on the first issue of
5   whether we could use those post-trial pictures
6   and posts. The only way to say that the
7   plaintiffs' intent had anything to do with the
8   impact on the jury is to say either, A, they
9   might not have made that argument if they didn't
10  have the intent; or, B, because they had the
11  intent, they knew specifically how to craft
12  their argument to get the desired effect.
13          The first argument is irrelevant
14  because they did make the argument, and that's
15  what I'm here to adjudicate. And the second is
16  far too speculative.
17          For those reasons, I will not
18  consider any of the materials submitted to me
19  post trial in resolving this particular issue.
20          During trial, I said the plaintiff
21  was not wildly over the line. I said it wasn't
22  terrible. And I think I meant the same thing by
23  those two terms.
24          I think I underestimated the impact
25  of the verbiage "us Americans." I totally

- HARTMAN -vs- JANSSEN, et al. -  Page 165

1 overlooked the line about "bodies piling up,"
2 and probably didn't appreciate the comments in
3 their totality. The comments alluding to Berlin
4 and Nazi Germany and the remaining comments on
5 that topic -- and, again, I say "alluding."
6 Nazi Germany was never mentioned -- were in fact
7 terrible.
8     With respect to the judgment
9 notwithstanding the verdict and proximate
10 cause -- and I should mention here that I think
11 the standard is the same in fact as it was
12 before when I decided the compulsory nonsuit
13 motion, granting it at either stage or as a
14 directed verdict is indeed drastic regardless of
15 when I might do it.
16     I continue to believe that it is not
17 the doctor's prescribing decision in a vacuum.
18 It is whether she ultimately would have
19 prescribed Xarelto to her patient. So the fact
20 that she stands by her decision today is not
21 dispositive.
22     The three prongs which I laid out and
23 still stand by are: Heeding, communicating, and
24 the rejection of a prescription by Ms. Hartman.
25     There's certainly sufficient evidence

- HARTMAN -vs- JANSSEN, et al. -  Page 166

1 to find that the doctor would have read/heeded a
2 majority of the information the plaintiff claims
3 was lacking. And I'll go into more detail in a
4 moment.
5     There's certainly sufficient evidence
6 to find that Ms. Hartman would have declined to
7 have a prescription for Xarelto had she known
8 about these three issues, keeping in mind, of
9 course, that all reasonable inferences do go to
10 the plaintiff.
11     The most difficult prong for the
12 plaintiff is showing that Dr. Randazzo would
13 have communicated one or more of these three
14 pieces of information; namely, the information
15 pertaining to aspirin, the U.S. subgroup, and
16 the intervariability.
17     In fact, with respect to the subgroup
18 data, she said she may take that information
19 into account. That's why I said she would have
20 heeded in the majority of the issues two out of
21 three. I'm not sure that saying may have taken
22 that information into account even suggests or
23 implies more likely than not.
24     When Dr. Randazzo wanted to say yes,
25 she said yes. When she wanted to suggest that

- HARTMAN -vs- JANSSEN, et al. -  Page 167

1 something would typically happen, she said
2 generally. She said generally and probably with
3 respect to the intervariability. She said
4 generally yes with respect to aspirin. But with
5 respect to the subdata, the U.S. subgroup, she
6 said "may." She's not ruling it out. But
7 beyond that, it's hard to say what she would or
8 would not have done.
9     So proximate cause with respect to
10 the subgroup data probably can't make it past
11 the heeding inquiry.
12     More generally -- and this applies to
13 all three issues, unless I'm overlooking some
14 direct testimony or reasonable inference -- she
15 said she wasn't sure she would discuss specific
16 percentages. This then totally begs the
17 question and leaves us at square one. She did
18 say she would discuss increased risks based on a
19 hypothetical PT test. But I think it is
20 speculative to say that based on that she would
21 have communicated the increased risk with
22 respect to the other issues, particularly in
23 light of her answer about not discussing
24 percentages generally, and also in accord with
25 Ms. Wilkinson's argument the PT test is more

- HARTMAN -vs- JANSSEN, et al. -  Page 168

1 individualized. In fact, she would not even
2 concede that the tone and demeanor of the
3 conversation would have been any different. She
4 was never asked specifically if she would have
5 communicated the new information to Mrs. Hartman
6 as opposed to just generally. She never
7 volunteered it.
8     I agree with plaintiff that the
9 doctor adheres to the notion of informed
10 consent, but there is only speculation that she
11 would have informed plaintiff about these
12 issues.
13     The defendants do deserve a new trial
14 on account of plaintiffs' highly inflammatory
15 remarks during closing. However, a new trial is
16 not necessary because plaintiff did not
17 adequately demonstrate responsible cause.
18     The defense motion for judgment
19 notwithstanding the verdict is granted.
20 Judgment is entered for the defendants.
21     The remaining issue about the amount
22 of damages are for now at least moot.
23     Court is adjourned.
24     (Court adjourned.)
25