1            UNITED STATES DISTRICT COURT

2           EASTERN DISTRICT OF LOUISIANA

3

4

5   IN RE:  XARELTO              *
    (RIVAROXABAN) PRODUCTS       *
6   LIABILITY LITIGATION         *

7   THIS DOCUMENT RELATES TO:    *    Docket No.: 14-MD-2592
                                 *    Section "L"
8   *Dora Mingo, et al. v.*       *    New Orleans, Louisiana
    *Janssen Research &*          *    July 21, 2017
9   *Development, LLC, et. al.,*  *
    Case No.: 15-CV-3469         *
10  * * * * * * * * * * * * * * * *

11           TRANSCRIPT OF ORAL ARGUMENT PROCEEDINGS
             BEFORE THE HONORABLE ELDON E. FALLON
12              UNITED STATES DISTRICT JUDGE

13
    APPEARANCES:
14

15  For the Plaintiffs'
    Liaison Counsel:          Gainsburg Benjamin David
16                              Meunier & Warshauer
                             BY:  GERALD E. MEUNIER, ESQ.
17                           2800 Energy Centre
                             1100 Poydras Street
18                           New Orleans, Louisiana 70163

19

20                           Levin, Fishbein, Sedran & Berman
                             BY: FREDERICK S. LONGER, ESQ.
21                           510 Walnut Street
                             Suite 500
22                           Philadelphia, Pennsylvania 19106

23

24

25

1    APPEARANCES:

2

3    For the Defendant Bayer
     HealthCare Pharmaceuticals
     Inc. and Bayer Pharma AG:      Arnold & Porter Kaye Scholer, LLP
4                                   BY:  STEVEN GLICKSTEIN, ESQ.
                                    250 West 55th Street
5                                   New York, New York 10019

6

7                                   Bradley Arant Boult Cummings, LLP
                                    BY:  W. WAYNE DRINKWATER, ESQ.
8                                   One Jackson Place
                                    Jackson, Mississippi 39201
9

10
     For Janssen Pharmaceuticals,
11   Inc. and Janssen Research &
     Development, LLC:              Barrasso Usdin Kupperman Freeman &
12                                    Sarver, LLC
                                    BY:  RICHARD E. SARVER, ESQ.
13                                  909 Poydras Street, 24th Floor
                                    New Orleans, Louisiana 70112
14

15
                                    Drinker Biddle & Reath, LLP
16                                  BY:  RODNEY M. HUDSON, ESQ.
                                    50 Fremont Street, 20th Floor
17                                  San Francisco, California 94105

18

19   Official Court Reporter:      Jodi Simcox, RMR, FCRR
                                   500 Poydras Street
20                                 Room HB-406
                                   New Orleans, Louisiana 70130
21                                 (504) 589-7780

22

23   Proceedings recorded by mechanical stenography, transcript

24   produced by computer.

25

**PROCEEDINGS**

**(July 21, 2017)**

**\*\*\*\*\*\***

(COURT CALLED TO ORDER)

**THE COURT:**  Be seated, please.  Good morning, ladies and gentlemen.

Okay.  Call the case.

**THE DEPUTY CLERK:**  MDL No. 2592, *In re: Xarelto Products Liability Litigation.*

**THE COURT:**  Counsel, make their appearance for the record.

**MR. GLICKSTEIN:**  Your Honor, if I just may make an introduction of a lawyer who you haven't met yet who will argue a portion of our motions, Wayne Drinkwater is from the Bradley Arant firm in Jackson, Mississippi -- their Jackson, Mississippi office, and he'll be dealing with the Mississippi choice of law issues.

With Your Honor's indulgence, I'll reintroduce you to two lawyers you've only had brief contact with who will be on our trial team in *Mingo*, Lyn Pruitt from the Mitchell Williams firm in Little Rock, Arkansas, and Walter Johnson from Watkins & Eager in Jackson, Mississippi.  They, together with Rick Sarver, who you know very well, will be our trial team.

**THE COURT:**  Okay.  Fine.  Welcome to you all.

11:00  1       **MR. MEUNIER:**  Good morning, Your Honor.  Jerry

11:00  2  Meunier, co-liaison counsel for plaintiff.  I think you know

11:00  3  the members of our team already.  Fred Longer and I will be

11:00  4  arguing motions before the Court this morning.

11:00  5       **THE COURT:**  Okay.  While we're introducing folks, I

11:00  6  have a new law clerk, Jason Siu.  This is his first term with

11:01  7  me.  He's a graduate of Georgetown, and he went to UC Berkeley.

11:01  8  He did a Fulbright in Macao.  He worked in the Senate and the

11:01  9  White House, and now he's with us for a year.  So it's a hard

11:01  10  act to follow with Hanne, but she's doing good work now, and I

11:01  11  know he can do it.  They're big shoes, but he's able to do it.

11:01  12       Okay.  We're here today on several motions in a

11:01  13  bellwether case in *Xarelto*, MDL-2592.  The bellwether case that

11:01  14  we're focusing on is Dora Mingo.  This is set for trial in two

11:01  15  weeks in the Southern District of Mississippi in Jackson,

11:01  16  Mississippi.

11:01  17       The two motions that are set for oral argument

11:02  18  today involve a motion by the defendant for partial summary

11:02  19  judgment dismissing the punitive damage claim, and another

11:02  20  motion for defendants for partial summary judgment dismissing

11:02  21  the plaintiff's failure-to-warn claim on the basis of failure

11:02  22  to satisfy the requirements of the learned intermediary

11:02  23  doctrine.  I'll take them in that order, if that's okay with

11:02  24  counsel.

11:02  25       **MR. MEUNIER:**  Your Honor, counsel discussed the

| | | |
|--|--|--|
| 11:02 | 1 | order, and if it's all right with you, we were going to present |
| 11:02 | 2 | the argument on the learned intermediary motion first. |
| 11:02 | 3 | THE COURT:  That's fine.  Either one is fine.  Okay. |
| 11:02 | 4 | MR. SARVER:  Good morning, Your Honor. |
| 11:02 | 5 | THE COURT:  Good morning, Rick. |
| 11:02 | 6 | MR. SARVER:  Rick Sarver for the defendants.  I know |
| 11:02 | 7 | that I'll be very, very brief. |
| 11:02 | 8 | I know that you and Mr. Siu have read the |
| 11:02 | 9 | briefing, have read the cases, but there are two reasons that |
| 11:02 | 10 | we should prevail on the motion.  The first one is our warning |
| 11:03 | 11 | is adequate; and until you get to the point that the warning is |
| 11:03 | 12 | inadequate, you never get to the question of whether or not the |
| 11:03 | 13 | reliance of the learned intermediary is important at all. |
| 11:03 | 14 | The reason that our warning is adequate was |
| 11:03 | 15 | stated by the Mississippi Supreme Court about 30 years ago:  If |
| 11:03 | 16 | the warning warns about the very event that befell the |
| 11:03 | 17 | plaintiff -- and we did -- the warning is adequate.  And I know |
| 11:03 | 18 | you've read the deposition of Renie Jordan, the doctor that |
| 11:03 | 19 | prescribed the drug.  He said, "Absolutely.  I knew that the |
| 11:03 | 20 | risk of bleeding, the risk of gastrointestinal bleeding was -- |
| 11:03 | 21 | on the warning was a potential risk of Mrs. Mingo taking the |
| 11:03 | 22 | drug, and I told Mrs. Mingo that." |
| 11:03 | 23 | Under Mississippi law, which differs from |
| 11:03 | 24 | Louisiana law, that's dispositive.  It is an adequate warning |
| 11:03 | 25 | as a matter of law. |

| | |
|---|---|
| 11:03 | 1 |
| 11:04 | 2 |
| 11:04 | 3 |
| 11:04 | 4 |
| 11:04 | 5 |
| 11:04 | 6 |

**THE COURT:**  Well, let me ask you this:  The
plaintiff's approach is that -- and they focus on instruction,
which they say is part of the Mississippi warning, warning or
instruction, and they say their problem with the drug is not
that it doesn't warn sufficiently about bleeding.  They all
know that it's a bleeding risk.

They say that what the issue is is the proper
use of the drug, and the proper use of the drug includes
instructions on how to use the drug, and the instructions on
how to use the drug are not sufficient, according to them,
because they do not alert doctors to the presence or potential
of using an assay to determine the variability of the drug;
that is to say, it has some effect on certain people different
than the others, and with a PT test, you can determine how much
of the drug is in a particular person and, therefore, stave off
any of the risks or at least minimize the risk.

That's their situation.  How do you see that?

**MR. SARVER:**  Your Honor, the problem is Mississippi
law doesn't go that far.  The plaintiffs in their brief says,
"Well, apparently the courts in Mississippi didn't realize how
elastic their law was."  But the fact is, no court, applying
Mississippi law, has ever done what the plaintiffs are asking
you to do.

And as recently as 2014, Judge Katz in the
*Averhart* case took a look at this very point, and he said --

11:05
11:05
11:05
11:05
11:06
11:06
11:06
11:06
11:06
11:06
11:06
11:06
11:06
11:06
11:06
11:06
11:06
11:06
11:06
11:06
11:06
11:07
11:07
11:07
11:07

1   and I think he got it right, applying Mississippi law -- if the

2   warning warns about the very event that befell the plaintiff,

3   the warning is adequate as a matter of law, and you never get

4   to the question of whether or not the prescribing doctor had

5   enough information in front of him.

6                Dr. Renie said, I knew all about it.  And I

7   think the plaintiff's briefing is very clear on this point,

8   they agree we warn about bleeding.  They agree that Dr. Jordan

9   knew about that risk.  All of that is dispositive under the

10  first element, and that's before we ever get to the second

11  element.

12                Mississippi law is focused entirely on one

13  aspect of the physician's conduct, entirely:  It's the

14  prescribing decision.  And if we go back to 1991, Judge John

15  Minor Wisdom wrote about that and said if the -- if an adequate

16  warning would have changed the prescribing decision, then the

17  plaintiffs might have a case; but if an adequate warning would

18  not have changed the prescribing decision, the case fails as a

19  matter of law.

20                It's the prescribing decision; it's not

21  something that happens afterwards.  And the plaintiff's

22  briefing even goes so far as to say, "We don't have any problem

23  with Dr. Jordan's prescribing Xarelto.  We don't have a problem

24  with that."

25                Well, when Dr. Jordan testified, he was asked

repeatedly by the defense:  "Would you have changed your
prescribing decision?"  He was absolutely certain:  "I would
not have changed my prescribing decision.  I wouldn't have
rethought it.  I've got no reason to go back and rethink it.
After all the things that I heard today, I would not change my
prescribing decision."

   That is the end of the inquiry under Mississippi
law.  It is different than the law applied in *Boudreaux* and
*Orr*.  And if we focus on something other than the prescribing
decision, we're expanding Mississippi law in a way that we
shouldn't be doing.

   Thank you, Your Honor.

**THE COURT:**  Okay.  I got your theory.  Thank you.

   What's wrong with that approach?  He says that
you knew that there was a risk of bleeding, the person fell
into that risk, that is to say she bled, and you knew it.  So
why are you here?

**MR. MEUNIER:**  Your Honor, it's a case of the ships
passing in the night.  You know, when in proceedings like this
there are a significant number of factual and legal issues that
are being addressed by the Court, I think it becomes
particularly critical that when a single selected bellwether
case is set for trial and is before the Court on motion
practice, the motion practice address what the actual triable
claims are in that case and not other claims and theories that

11:08  1    might be tried in another case.  Otherwise, we have the issue

11:08  2    of this motion.

11:08  3              The *Mingo* case that the defendant motion

11:08  4    challenges rests on a claim that Dr. Renie Jordan's decision

11:08  5    whether to prescribe Xarelto would have been different had he

11:08  6    been adequately warned about the risk of bleeding.  That's the

11:08  7    *Mingo* case that they attack.

11:09  8              And if that were the plaintiff's case, if that

11:09  9    were the theory of fault in this case, the defendant's motion

11:09  10   would be at least relevant, if not meritorious, but that is not

11:09  11   the case that is being presented and tried on plaintiff's

11:09  12   behalf.

11:09  13             The case actually being presented and tried on

11:09  14   behalf of Dora Mingo is one of inadequate instructions to a

11:09  15   prescribing doctor about the safe use of Xarelto once

11:09  16   prescribed, not inadequate warnings about the risk of

11:09  17   prescribing the drug in the first place focusing upon the known

11:09  18   risk of bleeding.

11:09  19             More specifically, Your Honor, we allege that

11:09  20   the defendants failed to advise and instruct Dr. Jordan.  Given

11:09  21   the high degree of inter-patient variability in response to the

11:09  22   same dose of Xarelto -- something that's well known by the

11:09  23   defendants -- they failed to instruct and advise Dr. Jordan

11:09  24   that a simple available PT test, the standard prothrombin test,

11:09  25   could be used and referred to to identify the fact that this

11:09  1  patient, like others, is a high absorber and had been placed at
11:10  2  an unacceptably high risk of bleeding once the drug was
11:10  3  prescribed.
11:10  4          Now, it's important factually to note, the day
11:10  5  before she takes Xarelto, right before, normal PT.  The day
11:10  6  after, elevated PT.  That's the critical fact in the case.
11:10  7          Now, a threshold question legally is whether
11:10  8  this theory is available under the MPLA.  And, Your Honor, our
11:10  9  position is that it is firmly anchored in the language of the
11:10  10  statute.  I'll get to the case law in a moment, but I think
11:10  11  it's important that we begin with the statute.
11:10  12          I'm sorry, Dean.  I didn't give you a heads up
11:10  13  on this.
11:10  14          **THE COURT:**  Just a moment.
11:11  15          **MR. MEUNIER:**  So, Your Honor, the statute, the
11:11  16  pertinent provisions are set forth here in Section 11-1-63.
11:11  17  (a)(i)(2) states that a product is defective because it fails
11:11  18  to contain adequate warnings or instructions.  The word *or* is
11:11  19  an important disjunctive.
11:11  20          (c)(ii) provides further in defining what that
11:11  21  means:  "An adequate warning or instruction is one that a
11:11  22  reasonably prudent person in the same or similar circumstances
11:11  23  would have provided with respect to the danger" -- earlier in
11:11  24  the statute that's meant to be the danger that caused the
11:11  25  harm -- "and that communicates sufficient information on the

1  dangers and safe use of the product, taking into account" -- in

2  the case of a prescription drug -- "the ordinary knowledge

3  common to" a physician who prescribes the drug.

4  　　　　　　Your Honor, it bears stating the obvious, that

5  even though these MPLA provisions include a reference to the

6  role of the prescribing physician, there is nothing either

7  explicit, and certainly even remotely implicit, in the language

8  that limits a pharmaceutical failure-to-warn case or

9  instruction case in the way that the defendants urge.

10  　　　　　　And yet, faced with this, the defendants

11  effectively argue that the MPLA cannot really mean what it

12  seems to say; and that the Mississippi jurisprudence, the case

13  law, has so substantially narrowed the remedy that's set forth

14  in the statute, that there's only one medical decision that can

15  be looked at, the decision to prescribe, despite what the

16  language in the statute says, ruling out all other

17  consequential decisions that may cause harm from the drug, in

18  this case, the consequential medical decision to keep a patient

19  on the drug once you have a PT test indicating, sure enough,

20  this is one of those patients known to be at risk, and an

21  unacceptably high and avoidable risk because of being a high

22  absorber.

23  　　　　　　And principally they refer to the *Cross* case,

24  which is a decision in 2015 by a district judge in the Northern

25  District of Mississippi.  I want to talk about that case, Your

11:13 1   Honor, because we are respectfully going to submit to you that

11:13 2   the *Cross* case itself, and the trilogy of cases that it chiefly

11:13 3   relies on, is all case law that is factually distinguishable

11:13 4   from the instant case for a very important reason.  It's the

11:13 5   same basic reason.

11:13 6          In each one of those cases, the plaintiff's

11:13 7   theory focused on whether the doctor should or should not have

11:13 8   prescribed the drug in the first place.  That was the

11:13 9   plaintiff's theory in each of those cases.  There was a twist

11:13 10  on that theory in *Cross*, but certainly in all of the others,

11:13 11  and that is, in fact, a dispositive distinction because that is

11:13 12  not the focus of plaintiff's theory here.

11:13 13         So it is logical -- in the learned intermediary

11:13 14  causation test, it is logical to say that the causation prong

11:13 15  of learned intermediary, the test must be whether the doctor

11:13 16  would have prescribed the drug.  It's logical to put that as

11:13 17  the test when the patient's theory focuses on the prescription

11:13 18  decision.  There is a fit.

11:13 19         When the plaintiff's theory, which we think is

11:14 20  clearly permitted under the statute when it talks about

11:14 21  instructions for safe use, is not the prescription decision but

11:14 22  a decision -- a medical decision to keep a patient on the drug,

11:14 23  not having been warned that there was a PT test that indicated

11:14 24  she should not be kept on the drug, when that is the focus of

11:14 25  the plaintiff's theory, it is utterly illogical to say that the

11:14  1   causation prong of the learned intermediary has to go back to
11:14  2   the prescription decision, which is not even being challenged
11:14  3   by the plaintiff.
11:14  4          So let's look at the *Cross* case, which, again,
11:14  5   is decided by the Federal District Court in the Northern
11:14  6   District of Mississippi.  And *Cross* refers to three cases, Your
11:14  7   Honor, which are important to note.
11:14  8          The first, in order of date, is the -- I'm
11:15  9   sorry, the *Fortenberry* case.  This one down here was decided by
11:15  10  the Mississippi Supreme Court in 1988, which, by the way, was
11:15  11  five years before the enactment of the MPLA.
11:15  12         In that case, the Mississippi Supreme Court
11:15  13  adopted the learned intermediary doctrine.  That was the
11:15  14  jurisprudence that adopted it.  1988, before the MPLA was
11:15  15  decided -- was enacted.
11:15  16         Then there's the *Thomas* case, which the Court is
11:15  17  familiar with --
11:15  18         **THE COURT:**  Right.
11:15  19         **MR. MEUNIER:**  -- because we talked about *Thomas* in
11:15  20  the earlier bellwether trials on the objective versus
11:15  21  subjective proof of learned intermediary causation.  Again,
11:15  22  *Thomas*, a 1992 decision by the Fifth Circuit a year before the
11:15  23  MPLA was decided.
11:15  24         And then you've got *Janssen* down here, which is
11:15  25  *Janssen versus Bailey*.  That's the Propulsid case of 2004.

| | | |
|---|---|---|
| 11:16 | 1 | Now, what the court in *Cross* says is, in |
| 11:16 | 2 | applying these cases -- so they're now doing a sweep of all of |
| 11:16 | 3 | the case law dealing with the learned intermediary causation |
| 11:16 | 4 | test.  This is the test:  "A plaintiff can overcome this |
| 11:16 | 5 | doctrine by showing:  (1) the warning was inadequate; (2) the |
| 11:16 | 6 | physician would have altered his conduct if the warning was |
| 11:16 | 7 | inadequate."  Altered his conduct, not his decision to |
| 11:16 | 8 | prescribe; altered his conduct.  That's the takeaway, that's |
| 11:16 | 9 | the test in Mississippi. |
| 11:16 | 10 | Now, the court says, we're going to clarify what |
| 11:16 | 11 | that means here, and they note properly:  "In *Fortenberry*, |
| 11:16 | 12 | Thomas and *Janssen*, altering the conduct meant altering the |
| 11:16 | 13 | decision to prescribe."  That's a factual matter.  That was the |
| 11:16 | 14 | theory of the liability in all those cases, just like in *Cross*. |
| 11:16 | 15 | That's where the plaintiff took the alteration of conduct |
| 11:16 | 16 | inquiry into the prescription decision, but that's not the |
| 11:16 | 17 | test, which is alteration of conduct. |
| 11:17 | 18 | So how does *Cross* go from this alteration of |
| 11:17 | 19 | conduct test to apply the *Fortenberry*, *Thomas*, and *Janssen* |
| 11:17 | 20 | version of whether the doctor prescribes?  The answer is the |
| 11:17 | 21 | same answer:  The plaintiff's theory in *Cross* took the court to |
| 11:17 | 22 | the decision whether to prescribe.  And it's an odd -- Judge, |
| 11:17 | 23 | I'm not here to sit in judgment of a plaintiff's theory of |
| 11:17 | 24 | fault, but if you read *Cross*, here's what the plaintiff was |
| 11:17 | 25 | arguing. |

1    11:17    The plaintiff was saying that, according to the
2    11:17  plaintiff, an adequate warning would have instructed how to
3    11:17  safely use the product or avoid a preventable risk.  Fair
4    11:17  enough, failure to give instructions on safe use.  It sounds
5    11:17  like our case.  "But plaintiff's did not provide, and this
6    11:17  court has not been able to find, any authority that would
7    11:17  extend the meaning of 'altering the conduct' beyond the
8    11:17  decision to prescribe or not to prescribe and into the realm of
9    11:17  what instructions the doctor gives the patient when prescribing
10   11:17  the drug.  This court is unable to make an *Erie* prediction that
11   11:18  the Mississippi Supreme Court would extend failure-to-warn
12   11:18  jurisprudence to the instructions a doctor gives the patient."
13   11:18    So where the plaintiff has taken the court in
14   11:18  *Cross* is back to the prescription decision.  What the plaintiff
15   11:18  is saying is when you prescribe the drug, a doctor should be
16   11:18  told how to instruct the patient how to safely use the drug.
17   11:18  It's not an instruction of how the doctor should use the drug;
18   11:18  it's a theory that says, the doctor should give safe
19   11:18  instructions -- safe use instructions to the patient.  That's
20   11:18  the theory.
21   11:18    Now, again, I don't sit in judgment of why the
22   11:18  plaintiff chose to go there.  It's a curious twist on safe use
23   11:18  because you're basically saying the doctor, not the
24   11:18  manufacturer, has the obligation to instruct the patient about
25   11:18  how to safely use a drug.  And the court in *Cross* said, we

11:18   1   don't see any way to go there.

11:18   2        All I'm pointing out is that all of these cases,

11:18   3   *Cross* and these three main cases it refers to, there's a proper

11:18   4   statement of the general test, which is alteration of conduct,

11:19   5   but there's an application of the test which goes to

11:19   6   prescription which is driven by the plaintiff's theory, which

11:19   7   is not the theory in this case.

11:19   8        So, Your Honor, I think just suffice it to say

11:19   9   that when we focus on the initial prescription decision of

11:19   10   learned intermediary as the conduct which would have been

11:19   11   altered by an adequate warning, we have the defendant motion

11:19   12   fitting our case.  We have this jurisprudence becoming a

11:19   13   problem for our case, but that is not the plaintiff's theory.

11:19   14   And for that reason, to take that version of alteration of

11:19   15   conduct of the learned intermediary causation and apply it to a

11:19   16   case where the prescription decision is not even placed at

11:19   17   issue is illogical and makes no sense.

11:19   18        The defendants also cite a case called *Deese*

11:19   19   *versus Immunex*.  It's a 2012 decision.  Again, in that case, it

11:19   20   was the prescription decision that was placed at issue, and if

11:20   21   you read the case, you will see that.  So, factually, all of

11:20   22   these cases are distinguishable.  Which leaves us, Judge, with

11:20   23   this jurisprudence.

11:20   24        Again, in the context of fairly broad language

11:20   25   in the MPLA, this is the jurisprudence that the defendants

1  claim narrows the theory of liability under the MPLA to only

2  being a theory that can attack one decision, which is

3  prescription.

4         *Fortenberry*, as I mentioned, is the 1988 Supreme

5  Court case decided even before the MPLA, which was about

6  whether the learned intermediary was sufficiently warned of the

7  risk of the patient harm in prescribing an influenza vaccine.

8         By the way, I should mention that in this same

9  pre-MPLA decision by the Mississippi Supreme Court, if you look

10 at 530 So. 2d 691, you find this language, quote:  "It is not

11 necessary for us to determine whether Dr. Moore's conduct would

12 have been altered since we hold the warning was adequate as a

13 matter of law."  So the learned intermediary causation

14 authority in *Fortenberry* could be seen even as dictum.

15        In *Thomas*, again, this was another case decided

16 before the MPLA was enacted.  If you remember, Judge -- and

17 this is set forth really at 949 F.2d 811, 812 -- what is really

18 addressed in *Thomas* is, again, the question of whether

19 objective or subjective evidence can be used to prove that the

20 doctor would have acted differently, and the Court said that

21 both objective and subjective proof was permissible.

22        *Janssen versus Bailey*.  This is -- Judge, I'm

23 sure you're familiar with this one because this was the

24 Mississippi case law -- or, I'm sorry, trials of flights of

25 *Propulsid* cases when you had the *Propulsid* MDL.

11:22  1        In addition, similar to *Fortenberry*, it appears
11:22  2  from the decision that the case was decided not on the
11:22  3  application of a learned intermediary causation test at all,
11:22  4  even though the challenge was, again, whether the learned
11:22  5  intermediary had been warned enough about the risk of Propulsid
11:22  6  in prescribing the drug.  But if you read the decision, the
11:22  7  court remanded all the cases and said those jury verdicts don't
11:22  8  count because of the lack of medical causation.

11:22  9        And then you have the *Deese* case, which I
11:22 10  mentioned.  The question there, whether the doctor was
11:22 11  sufficiently warned about the risk of patient harm in
11:22 12  prescribing Enbrel.  And then *Cross*, whether the doctor in
11:22 13  prescribing Lexapro was sufficiently warned of the need to
11:22 14  instruct the patient regarding safe use.

11:22 15        And so, Your Honor, the takeaway from the
11:22 16  Mississippi jurisprudence is that if we were to challenge the
11:22 17  prescription decision, learned intermediary causation would be:
11:23 18  Can you prove the doctor wouldn't have prescribed the drug?

11:23 19        But the test, as stated in *Cross*, is alteration
11:23 20  of conduct.  And there's nothing in the language of the statute
11:23 21  that precludes us from saying safe instruction should have been
11:23 22  given to the prescribing doctor about whether this woman should
11:23 23  have been kept on the drug, not knowing there was a PT test he
11:23 24  could have looked at which clearly indicated she should have
11:23 25  been taken off Xarelto immediately.

|        |    |
|--------|----|
| 11:23  | 1  |
| 11:23  | 2  |
| 11:23  | 3  |
| 11:23  | 4  |
| 11:23  | 5  |
| 11:23  | 6  |
| 11:23  | 7  |
| 11:23  | 8  |

1    And I think the defendants take the position,

2  "Well, you won't find a Mississippi case that factually fits

3  that."  But when the law is set forth as it is in the statute,

4  and the test as stated in *Cross* is alteration of conduct, and

5  we don't have a prescription decision at issue, we say the

6  fallout from all of that is that we get to argue whether

7  inadequate instructions on the safe use of Xarelto would have

8  altered Dr. Jordan's conduct.

9         **THE COURT:**  They say it wouldn't have; he would have

10  done the same thing.

11         **MR. MEUNIER:**  Well, let me close then by referencing

12  what's in the record.  I'll give you -- the cites are at the

13  bottom of this sheet, Judge.  But let's just look at the

14  language first.

15         These are from the deposition -- this is taken

16  verbatim from the deposition of Dr. Renie Jordan, the

17  prescribing doctor.  The question:

18         "Q.  So, Doctor, if after you prescribed Xarelto to

19      her on the 23rd" -- that was January 23rd, 2015, when Dora

20      Mingo was given her initial prescription of Xarelto -- "if

21      after you prescribed Xarelto to her on the 23rd, if you

22      knew that there was a test that you could have ran the

23      next day that would have shown you the effect that Xarelto

24      was having on her blood, you would have ran that test;

25      correct?

| | | |
|---|---|---|
| 11:24 | 1 | "A.  Correct. |
| 11:24 | 2 | "Q.  And if that test showed that Xarelto was causing |
| 11:24 | 3 | her blood to become too anticoagulated" -- and, again, she |
| 11:25 | 4 | had an extremely elevated prothrombin test result -- |
| 11:25 | 5 | "would you have made some kind of adjustment to her dosage |
| 11:25 | 6 | or her medication?" |
| 11:25 | 7 | Answer: |
| 11:25 | 8 | "A.  Yes, I would." |
| 11:25 | 9 | That's at page 106, lines 12 to 25. |
| 11:25 | 10 | Later in the deposition: |
| 11:25 | 11 | "Q.  So, Doctor, if you would have known back in |
| 11:25 | 12 | January of 2015, if Janssen would have told you prior to |
| 11:25 | 13 | that time that there is a correlation between the |
| 11:25 | 14 | anticoagulation effect of Xarelto and PT time, if you had |
| 11:25 | 15 | been told that, and then you saw that Ms. Mingo's PT rate |
| 11:25 | 16 | was 23.6 the day after she started Xarelto, would that |
| 11:25 | 17 | have any affect on the course of your treatment with |
| 11:25 | 18 | Ms. Mingo? |
| 11:25 | 19 | "A.  Yes. |
| 11:25 | 20 | Alteration of the conduct. |
| 11:25 | 21 | (Reading:) |
| 11:25 | 22 | "Q.  Would you have reduced her dosage or changed her |
| 11:25 | 23 | to different medication?" |
| 11:25 | 24 | And there's a lengthy answer: |
| 11:25 | 25 | "A.  Well, in addition, if they had told us that |

there was a correlation, if they would have given us an
explanation of what to do in that case, if the
manufacturer of the drug would have instructed us, 'If
that was the case, this is what you do,' I mean, it
wouldn't be -- we know what to do with Coumadin and
warfarin.  We know this.  It's been long established.

"And I guess if they would have pointed out to us at
that time that there's a correlation between Xarelto and PT,
and if the PT number was this, and they would have said, you do
X, Y, Z, I'm pretty sure there would have been a
recommendation" -- yeah, the recommendation, going back to the
question -- "reducing her dosage or changing her to a different
medication."

So, Your Honor, there's nothing in the statute
that limits this to a warning about a bleed risk.  There's
nothing in the statute that says we can't talk about
instructions for the safe use.  In fact, the opposite is true
of the statute.  There's nothing in the case law.  When you're
not dealing with a case that attacks or challenges the decision
to prescribe, there's nothing in those cases that rules this
out as a matter of law.  In fact, the case law says the test on
causation -- learned intermediary causation is:  Does it alter
the conduct?  It's in the record, it would have altered this
prescribing doctor's conduct.

For all those reasons, Your Honor, we submit

11:27  1   that the motion should be denied.

11:27  2             THE COURT:  Okay.  Any response?

11:27  3             MR. SARVER:  Just very briefly, Your Honor.

11:27  4             Sorry, Jerry.  I don't mean to crowd you.

11:27  5             MR. MEUNIER:  Yeah.

11:27  6             MR. SARVER:  Your Honor, we probably better get back

11:27  7   to Dr. Renie, Dr. Jordan.  Here's what he said.  The issue is

11:27  8   the prescriber's conduct, and the prescriber's conduct has been

11:27  9   described in every case from the Mississippi Supreme Court

11:27  10  through the Fifth Circuit to be the decision to prescribe.  The

11:27  11  plaintiffs are asking you to expand that to something that has

11:27  12  never been done, and the MPLA has been around for 25 years.  So

11:27  13  they're asking you to do something that's never been done.

11:27  14            Here's what Dr. Jordan said:

11:27  15            "A.  As I sit here today, there's nothing we talked

11:27  16       about that would have changed my view on that.  No."

11:28  17            So after Mr. Meunier showed the documents that

11:28  18  they showed, last question:

11:28  19            "Q.  If the impression was somehow left that you

11:28  20       would not consider prescribing Xarelto to Mrs. Mingo

11:28  21       because of something counsel showed you, that's not

11:28  22       correct, is it?

11:28  23            "A.  No, that's not the impression.  No."

11:28  24            So that's the answer, Your Honor.  Dr. Jordan's

11:28  25  prescribing decision, which is the conduct that is important,

11:28  1   applicable, and the law here, would not have changed if the

11:28  2   instructions that plaintiff asked for had been given.

11:28  3           And the *Cross* case actually did go exactly to

11:28  4   the issue of instructions.  If we look at *Cross* -- and I'm

11:28  5   sorry for making this kind of small -- but, in other words,

11:28  6   according to the plaintiffs, and where I've got my little

11:28  7   marking there, Your Honor.

11:28  8           **THE COURT:**  Yes, I see it.

11:28  9           **MR. SARVER:**  "An adequate warning would have

11:28  10  instructed how to safely use the product or avoid a preventable

11:29  11  risk."  That was directly raised to the judge in *Cross*, and he

11:29  12  said, I can't go that far.  I can't go that far because the law

11:29  13  doesn't take me there, and I would be expanding Mississippi

11:29  14  law.  It wouldn't be an *Erie* guess.  It would be going against

11:29  15  direct adverse precedent, and that's not where we ought to be

11:29  16  going.

11:29  17          Mississippi is different.  Their law has been

11:29  18  established now for a long time on this point.  The issue is

11:29  19  the conduct of the physician, the prescribing decision; and, in

11:29  20  this case, there isn't any dispute:  Dr. Jordan would have done

11:29  21  the same thing with the same information.

11:29  22          Thank you, Your Honor.

11:29  23          **THE COURT:**  Okay.  Thank you very much.  Let's go to

11:29  24  the next one.  I should write on this one, and I will sometime

11:29  25  today.  Let's go to the next one.  The next one is the summary

| | | |
|---|---|---|
| 11:29 | 1 | judgment on punitive damages. |
| 11:30 | 2 | **MR. DRINKWATER:** Your Honor, Wayne Drinkwater. |
| 11:30 | 3 | Mr. Hudson on behalf of Janssen, and I on behalf of Bayer, are |
| 11:30 | 4 | trying to divide our argument up. |
| 11:30 | 5 | **THE COURT:** Okay. |
| 11:30 | 6 | **MR. DRINKWATER:** With the Court's permission, I'm |
| 11:30 | 7 | going to talk a little generally about choice of law rules, |
| 11:30 | 8 | particularly in Mississippi, the facts relating to Bayer, and I |
| 11:30 | 9 | might even mention German law a little bit right at the end. |
| 11:30 | 10 | **THE COURT:** Okay. |
| 11:30 | 11 | **MR. DRINKWATER:** Mr. Hudson will talk about the facts |
| 11:30 | 12 | generally and also New Jersey law. |
| 11:30 | 13 | I took the Court's comment when you began at |
| 11:30 | 14 | being focused on the *Mingo* case today. This motion, on its |
| 11:30 | 15 | face at least, includes *Henry*, but we are happy to focus on |
| 11:30 | 16 | *Mingo* for oral argument. |
| 11:30 | 17 | **THE COURT:** Yes. Let's focus on *Mingo* for argument. |
| 11:30 | 18 | I know to some extent they're the same issues, and we'll deal |
| 11:30 | 19 | with *Henry* if that's necessary, but let's do *Mingo*. |
| 11:30 | 20 | **MR. DRINKWATER:** Thank you, Your Honor. That will |
| 11:30 | 21 | shorten the argument further. |
| 11:30 | 22 | Most of the general rules at issue here are |
| 11:30 | 23 | agreed by the parties. I think everybody understands that |
| 11:31 | 24 | Mississippi choice of law rules govern the *Mingo* case. |
| 11:31 | 25 | Mississippi has adopted the Restatement Conflict of Laws "most |

significant relationship" test.

The critical twist on this particular motion is that the Restatement and Mississippi recognize that the "most significant relationship" test is not applied on a case-by-case basis; it is applied on an issue-by-issue basis, and that's critical to the present motion because different rules of law and different issues in cases have different important factors. So even though you have one set of rules which is prescribed by Section 145 of the Restatement about how to do this stuff, those rules are weighted in different ways depending on the issue that the Court has to deal with.

So what is the issue that we deal with today? It is the issue of punitive damages under Mississippi Conflict of Law rules. I think our brief does an adequate job of pointing out the factors under Section 145 of the Restatement (Second) that predominate with respect to punitive damages, and those factors are two.

First, where the wrongful conduct of the defendant has occurred -- I know my clients would want me to say, allegedly wrongful conduct of the defendants has occurred; and second, where the defendant's principal place of business is. Those are the two factors of the four contacts listed in Section 145 of the Restatement that under all of the cases that I have seen, and under the Restatement by text, predominate.

So what does -- what's the reason for this?

| | | |
|---|---|---|
| 11:32 | 1 | Well, the reason for it is, Your Honor, if you're looking at |
| 11:33 | 2 | punitive damages, you're obviously looking at the conduct and |
| 11:33 | 3 | the behavior of the defendant.  You're looking to regulate that |
| 11:33 | 4 | conduct, to punish and to deter.  And so the cases in the |
| 11:33 | 5 | Restatement all say, well, in that case, the state with the |
| 11:33 | 6 | dominate interest in this issue, the punitive damages issue, is |
| 11:33 | 7 | going to be the state where the defendants are acting.  It's |
| 11:33 | 8 | going to be the state in which the defendant has its principal |
| 11:33 | 9 | place of business. |
| 11:33 | 10 | THE COURT:  Because that's where the decisions are |
| 11:33 | 11 | made? |
| 11:33 | 12 | MR. DRINKWATER:  That's correct.  And that is |
| 11:33 | 13 | especially true in this case, Your Honor, where the complaints |
| 11:33 | 14 | that are made about us, and about Janssen, are complaints about |
| 11:33 | 15 | conduct that is made at a policy level, a corporate level. |
| 11:33 | 16 | This is not a case where a trunk driver goes out |
| 11:33 | 17 | and runs over somebody on the highway, or some rogue agent does |
| 11:33 | 18 | something in particular that is undiscussed or unauthorized by |
| 11:33 | 19 | the company.  These are deliberate policy decisions.  They were |
| 11:33 | 20 | made at the corporate level, and, of course, that means they |
| 11:34 | 21 | were made in the jurisdiction of the principal place of |
| 11:34 | 22 | business. |
| 11:34 | 23 | Now, where are these places?  A stipulation, I |
| 11:34 | 24 | am told, Your Honor, was submitted to the Court in the last day |
| 11:34 | 25 | or two dismissing all of the defendants on the Bayer side |

| | |
|---|---|
| 11:34 | 1 |
| 11:34 | 2 |
| 11:34 | 3 |

except for Bayer Pharma AG and Bayer HealthCare
Pharmaceuticals, Inc., and those are the same defendants, I am
told, that were here in the first two cases.

There's no issue about this.  We've got an
affidavit, a declaration, from Keith Abrams.  Take a look at
Exhibit 1, that's the Mississippi version of it.  It tells us
that the principal place of BPAG is in Germany, and has been.
The principal place of BHCP is New Jersey, and has been.
There's no issue about that.

**THE COURT:**  Right.

**MR. DRINKWATER:**  So where did these companies act, if
they acted at all wrongly?  Well, they acted where they are.
BPAG, if it acted wrongly, which we deny, acted in Germany; and
BHCP, if it acted wrongly, which we deny, acted in New Jersey.
Again, Mr. Abrams' affidavit, the declaration, discusses this;
that is, to the extent that they did anything, they did it
where they are.

We also have at least one Fifth Circuit case,
*Spence versus Glock*, that I really want to focus on.  Judge
Jones wrote it.  It was a class action case.  She made the
point that in a products case -- and I don't really think it's
limited to a defective design claim.  I think it is limited to
any products case -- if you have a claim against a products
manufacturer, the assumption is, maybe even a presumption is,
that the conduct of the defendant, if it occurred, occurs where

| | |
|---|---|
| 11:35 | 1 |
| 11:35 | 2 |
| 11:35 | 3 |
| 11:35 | 4 |
| 11:36 | 5 |
| 11:36 | 6 |
| 11:36 | 7 |
| 11:36 | 8 |
| 11:36 | 9 |
| 11:36 | 10 |

the defendant has its principal place of business where the corporate decisions are made.  And that comes through clearly in *Spence versus Glock*.

Now, so all of this seems pretty obvious and commonplace, so what do the plaintiffs say about this?  Well, with respect to the Mississippi version of our motion to which we're limiting ourselves today, they say there is one case -- one case -- by the Mississippi Supreme Court decided 24 years ago called the *Valley Forge Insurance Company* case that throws everything I have said up until now into a trash can.

They say there is one sentence in that opinion that overrules the *Boardman* case, rejects all of the Restatement principles we've discussed, and changes Mississippi law 180 degrees by saying that in any tort case, only one state's law applies, and it applies to all issues.  That's what they say.  In fact, they're so confident of this case, Your Honor, that they tell us in their brief they're not even going to discuss the Restatement factors.  I think they say that on the first couple of pages of their brief.

The Court, I know can read, and probably has already read, the *Valley Forge* case --

**THE COURT:**  Right.  Yes.

**MR. DRINKWATER:**  -- but there are a number of reasons why this just doesn't make any sense at all.

First, if you read the opinion, what Chief

| | |
|---|---|
| 11:37 | 1 |

Justice -- or I guess he was a Presiding Justice at the time, Dan Lee, was saying was the district court, the trial judge in that case, made a conflict of laws analysis back at the trial level. And the Supreme Court said, "You didn't need to do that. You didn't need to make that analysis."

Because, Your Honor, what the Mississippi Supreme Court said about *Valley Forge* was the tort -- the tort -- was not a bad faith application of a policy of insurance, which is kind of how the trial court thought it was.

What the Supreme Court in Mississippi said was, there's a tort all right, but the tort was a frivolous lawsuit. It was the declaratory judgment action that *Valley Forge* filed against the Stricklands seeking to grab the $25,000 through a subrogation claim. So once you characterize the tort in that way, it becomes obvious that 100 percent of everything happened in Mississippi. There was no Louisiana influence whatsoever. And the court said that. So at one level, you could say, "Well, gee, *Valley Forge* isn't even a conflicts case in any event."

Second, the one sentence that they quote in their brief out of *Valley Forge*, even if you didn't believe what I just said, that sentence does not purport to announce a rule of law that in every case applies the law of only one state to decision. It simply says that in this case on these facts, the punitive damages, and the compensatory damages,

1    indeed everything else is going to be decided by the law of
2    Mississippi.  It is a fact-based and fact-bound statement.  It
3    is not an announcement of a rule of law.

4          How can you tell that?  Well, if I'm wrong, what
5    you would expect an appellate court to do would be to overrule
6    *Boardman*, which adopts the issue-by-issue analysis that we were
7    just talking about.  It doesn't mention *Boardman*.  You would
8    expect it to specifically reject Section 145 and 171 of the
9    Restatement (Second) of Conflict of Laws which says, you've got
10   to do it issue by issue.  They don't mention that.

11         And you would also expect that sometime in the
12   succeeding 24 years there had been oodles of Mississippi cases
13   interpreting *Valley Forge Insurance Company* as the plaintiff's
14   would have it.  None.  Zero.  In fact, we had several
15   Mississippi cases, one federal district court opinion, and one
16   Court of Appeals opinion that I'll mention that go ahead and
17   perform the same issue-by-issue analysis that I've been talking
18   about.

19         There are no -- repeat, no -- Mississippi cases
20   giving the *Valley Forge Insurance Company* case the meaning that
21   the plaintiffs ambitiously ascribe to it.

22         The two cases that I found in just kind of
23   briefly looking, there's a case called *Shortie versus George*
24   cited in our brief.  It's a 2000, I think, 17 case that does
25   this issue-by-issue analysis.  In that case, I think that the

```
11:40    1   subject matter related to determining beneficiaries in a
11:40    2   wrongful death case.  So that's beside the point.  The point is
11:40    3   that they do not apply the law of a single state to every issue
11:40    4   in the case.
11:40    5              The second one is a case called Dale versus Ala
11:40    6   Acquisitions, which is a Southern District of Mississippi case
11:40    7   involving a massive insurance fraud.  The same thing there.
11:41    8   The same thing there.  They do an issue-by-issue analysis.
11:41    9              And so you look at all this, and you see this
11:41   10   construct of choice of law rules that Mississippi has developed
11:41   11   over many years that is entirely consistent with what the
11:41   12   Restatement says, and, frankly, what the law of most other
11:41   13   states say, and then you look at this one sentence in this one
11:41   14   case that has never been decided or used by any Mississippi
11:41   15   decision ever in the next 24 years, and you think:  Really?  Is
11:41   16   this possible?  Well, it's not possible, and it didn't happen.
11:41   17   So the Valley Forge case gets really nowhere.
11:41   18              Final point, German law.  I wanted to mention it
11:41   19   briefly.  We are told that the fact that we mentioned German
11:41   20   law in our motion, which was two months before trial, and six
11:42   21   weeks before this hearing, did not give very fine lawyers the
11:42   22   opportunity to walk over to the Tulane Law School and figure
11:42   23   out what punitive damages in Germany are.
11:42   24              I do not believe that.  I think that the time
11:42   25   that was provided certainly did not prejudice these lawyers in
```

1   seeking to determine what punitive damages in Germany are and

2   what the law is.

3           Second, there is a short reference in their

4   papers to the fact that even though we cited an on-point

5   decision by the Supreme Court of the United States, that was

6   the *Exxon Valdez* case, and it was followed by a Sixth Circuit

7   case decided I think last year in 2016, both of which announce

8   that there's no punitive damages in Germany, that's not good

9   enough.

10           It is good enough.  They were given timely

11   notice, and they do nothing whatsoever to disturb the

12   conclusion that we have drawn that German law simply does not

13   allow for punitive damages.

14           So for these reasons, Your Honor, we think

15   punitive damages ought to be out.

16           **THE COURT:**  Okay.  Thank you very much.

17           **MR. HUDSON:**  Good morning, Your Honor.  Rodney Hudson

18   for the Janssen defendants.

19           I want to begin by echoing what Mr. Drinkwater

20   said about Mississippi law and its application of its choice of

21   law rules.  We think Mr. Drinkwater is correct in his

22   assessment and recognition that Mississippi does consider

23   issue-by-issue analysis on a choice of law question, and

24   particularly with respect to punitive damages and liability

25   questions.  And in looking at those issues, Mississippi does

11:43  1   apply the "most significant relationship" test, and there is no
11:43  2   dispute about that.
11:43  3          What I want to do, Your Honor, is focus my
11:44  4   comments on the Janssen defendants' alleged wrongful conduct,
11:44  5   and the place that it allegedly occurred, and then also, Your
11:44  6   Honor, address New Jersey law and why the plaintiffs here
11:44  7   cannot prevail on a claim for punitive damages under the law of
11:44  8   that state.
11:44  9          First, Your Honor, in applying the "most
11:44  10  significant relationship" test to the alleged conduct of
11:44  11  Janssen, it's important to note that that test looks at the
11:44  12  qualitative nature of the contacts with the forum and the
11:44  13  conduct in relation to the claim alleged.
11:44  14         And as Mr. Drinkwater said, the punitive damages
11:44  15  part of this claim really focuses on the alleged wrongful
11:44  16  conduct of the defendants.  And here the plaintiffs have
11:44  17  alleged in the punitive damages portion of their case that the
11:44  18  defendants intentionally and willfully did not include
11:44  19  information in their label about the risk of bleeding and an
11:45  20  instruction to monitor with a PT test.
11:45  21         And so, Your Honor, if we focus on that aspect
11:45  22  of the claim, and we focus on where decisions regarding
11:45  23  labeling and marketing are made by the Janssen defendants, in
11:45  24  this case, we have Janssen Research and Development, LLC, which
11:45  25  is a New Jersey Limited Liability Company with its principal

| | | |
|---|---|---|
| 11:45 | 1 | place of business in Rariton, New Jersey.  We also have Janssen |
| 11:45 | 2 | Pharmaceuticals, Inc. with its principal place of business in |
| 11:45 | 3 | Titusville, New Jersey. |
| 11:45 | 4 | And as Mr. Drinkwater correctly noted, companies |
| 11:45 | 5 | make decisions where they have their principal places of |
| 11:45 | 6 | business.  And here, as between those two companies, Your |
| 11:45 | 7 | Honor, Janssen Research and Development and Janssen |
| 11:45 | 8 | Pharmaceuticals, Inc. submitted the new drug application to the |
| 11:46 | 9 | FDA from New Jersey, made labeling decisions in New Jersey, |
| 11:46 | 10 | made marketing decisions in New Jersey, and both communicated |
| 11:46 | 11 | with the FDA about Xarelto's labeling in New Jersey. |
| 11:46 | 12 | So if we look at the claims alleged in |
| 11:46 | 13 | connection with that conduct, and the decisions made about the |
| 11:46 | 14 | precise issues that are raised in this case in relation to the |
| 11:46 | 15 | punitive damages claims, we think clearly under the "most |
| 11:46 | 16 | significant relationship" test, New Jersey law would apply. |
| 11:46 | 17 | And, Your Honor, I understand that the |
| 11:46 | 18 | plaintiffs have said, "Well, the plaintiff was injured in |
| 11:46 | 19 | Mississippi." |
| 11:46 | 20 | Well, Your Honor, when we look at application of |
| 11:46 | 21 | the "most significant relationship" test and the Restatement |
| 11:46 | 22 | sections, the place of the injury does have some weight in the |
| 11:47 | 23 | compensatory analysis, but the courts have consistently, when |
| 11:47 | 24 | applying the factors that Mr. Drinkwater mentioned, have looked |
| 11:47 | 25 | to the place of the alleged wrongful conduct because the |

11:47 1   punitive damage nature of the claim is designed to punish that

11:47 2   conduct.  And so in the analysis, Your Honor, here, New Jersey

11:47 3   would clearly have more of an interest in having its laws

11:47 4   applied than Mississippi.

11:47 5           And I also want to briefly, Your Honor, mention

11:47 6   New Jersey punitive damage law.  Your Honor, in applying New

11:47 7   Jersey punitive damage law, the New Jersey Legislature has

11:47 8   adopted the New Jersey Product Liability Act.  And one feature

11:47 9   of that act, Your Honor, is that it doesn't allow for punitive

11:47 10  damages with respect to medications that are approved by the

11:47 11  FDA.  And we've cited that statute and quoted it in our brief

11:47 12  on page 12.

11:47 13          The statute says, quote, punitive damages shall

11:48 14  not be awarded if a drug, end quote, and I will paraphrase, is

11:48 15  regulated by the FDA or is generally recognized as safe and

11:48 16  effective pursuant to conditions established by the FDA,

11:48 17  including packaging and labeling regulations.

11:48 18          And so, Your Honor, it's undisputed here that

11:48 19  Xarelto is regulated by the FDA.  Its labeling was approved by

11:48 20  the FDA.  So under that provision of the statute, there would

11:48 21  be no entitlement to punitive damages.

11:48 22          Now, the New Jersey Legislature did carve out

11:48 23  one exception to the New Jersey statute, and that exception,

11:48 24  Your Honor, is -- has been characterized by many courts as a

11:48 25  fraud on the FDA exception.  And that exception states:  "Where

the product manufacturer knowingly withheld or misrepresented
information required to be submitted under the agency's
regulations, there might be a claim for punitive damages."

Here, Your Honor, as Your Honor is aware, the
*Buckman* decision by the U.S. Supreme Court held that fraud on
the FDA claims are preempted as a matter of law.

And in that case, Your Honor, the plaintiffs
alleged that an entity that was assisting in obtaining approval
for a medical device had defrauded the FDA.  And the court
looked at that question closely and noted that the claim was
based on a violation of federal law, and noted that the FDA has
exclusive authority to regulate whether or not a fraud has been
perpetrated on the agency, and that plaintiffs in state court
cannot enforce FDA regulations; that's the FDA's
responsibility.

**THE COURT:**  It's not a claim by the individual; it's
a claim by the FDA.

**MR. HUDSON:**  Yes, Your Honor.

And with the *Buckman* decision, Your Honor, in
place, when courts in New Jersey have addressed the application
of preemption to the fraud on the FDA exception, they have held
and followed *Buckman*, and applied it, and held that this
exception to the punitive damage statute is preempted as a
matter of law.  And we've cited a number of those decisions,
Your Honor.

11:50  1    The *McDarby versus Merck* case in particular is

11:50  2  one that we've cited.  The court there, Your Honor, said:

11:50  3  "Because the punitive damage provision of the statute impinges

11:50  4  upon federal statute and regulations, to the same extent that

11:50  5  was recognized in *Buckman*, we find the principles of implied

11:50  6  preemption applied by the court in *Buckman* to be applicable

11:50  7  here."

11:50  8    And the court there concluded that the plaintiff

11:50  9  could not state a claim for punitive damages under that fraud

11:50  10  on the FDA exception.  Your Honor, we've cited other decisions.

11:50  11  The *Cornett versus Johnson & Johnson* case.  Other federal

11:50  12  district courts throughout the country have applied the statute

11:51  13  in the same way.

11:51  14    THE COURT:  Yes.  I think if there is punitive

11:51  15  damages, it's for the FDA to claim it, not the plaintiffs.

11:51  16  That's the way I see it.

11:51  17    MR. HUDSON:  Thank you, Your Honor.  That's all I

11:51  18  have.

11:51  19    THE COURT:  Yes.  Let me ask you this:  If the whole

11:51  20  purpose of punitive damages is to discourage improper conduct,

11:51  21  and I get it, that the conduct that it's trying to discourage

11:51  22  is in either Germany or New Jersey, if there's no punitive

11:51  23  damages in those places, how is it discouraged then?  It's not

11:51  24  to be discouraged?

11:51  25    MR. HUDSON:  Well, Your Honor, two points on that.

|    |    |
|----|----|
| 11:51 | 1 |
| 11:51 | 2 |
| 11:51 | 3 |
| 11:51 | 4 |
| 11:52 | 5 |
| 11:52 | 6 |
| 11:52 | 7 |
| 11:52 | 8 |
| 11:52 | 9 |

1  And I think that if Your Honor is really asking the question
2  of, well, the states have an interest here, and New Jersey has
3  made a decision to carve out rules related to FDA-regulated
4  products.  Here, Your Honor, I think the analysis is, if you're
5  looking at the different state laws -- I mean, New Jersey has
6  made a decision, and its legislature has adopted a statute, and
7  the courts have interpreted it in a way that will -- that is
8  designed to bring predictability to product liability
9  litigation.
10           And if we look at the competing state interest
11  of New Jersey, which has really drafted a statute that
12  recognizes that federal law does regulate prescription products
13  and that they should be treated differently.  I understand
14  Mississippi has not done that, and I think Mr. Drinkwater can
15  address this issue more thoroughly.  But Mississippi, in
16  application of its punitive damages statutes, hasn't held that
17  its punitive damage rules somehow trump another state's rules.
18           It has in certain instances where it's looked at
19  issues has said that it has an important interest in certain
20  issues that are ingrained in the state's policies, but punitive
21  damages has not yet been articulated as one of those.
22           With that, Your Honor, that's all I have.
23       THE COURT:  All right.  Thank you very much.
24           Let me hear any response.
25       MR. LONGER:  Good morning, Your Honor.  Fred Longer

1    on behalf of the plaintiffs.  It's a pleasure to be here, Your
2    Honor.
3             We've heard from the two defendants that the
4    punitive damages of New Jersey should be applied into
5    Mississippi, and if you accept their argument, New Jersey law
6    is applicable on punitive damages across the country.  There's
7    a number of reasons why that should not be the case, but I'm
8    going to focus on the issues that were really developed right
9    here and the matters that we heard.
10            The first point that I think is significant to
11   address is the -- and if we're just going to focus on this
12   *Mingo* case, that's fine.  The Mississippi Supreme Court --
13            Steve always wants to be in on the argument.
14       MR. GLICKSTEIN:  That was just a drum roll
15   introduction, Your Honor.
16       THE COURT:  All right.
17       MR. LONGER:  Here comes the rim shot.
18            The Mississippi Supreme Court, even though it
19   spoke years ago, spoke definitely.  And this Court, Your Honor,
20   is sitting in diversity over the matter, so in a sense, you're
21   making an *Erie* prediction of what Mississippi's choice of law
22   analysis would be with regard to punitive damages, and the
23   acceptance of a foreign state's law for that of -- a foreign
24   state's, in this case, New Jersey's punitive damages as opposed
25   to Mississippi's.

11:55   1          What I would suggest is you don't need to make

11:55   2   any guess anymore, Your Honor.  You have the highest court of

11:55   3   Mississippi telling you definitely what the answer is, which is

11:55   4   in the *Valley Forge* case.  The court there was, in fact,

11:55   5   looking at conflicts of law.  I presume the Supreme Court of

11:55   6   Mississippi knows Mississippi's Conflicts of Law law because it

11:55   7   wrote it.  The cases that the defendants are relying on go back

11:55   8   even earlier than the 1993 case of *Valley Forge*.

11:56   9          **THE COURT:**  They say that the *Valley Forge* case came

11:56  10   out in 1993, but not one case has cited that.  How do you deal

11:56  11   with that?

11:56  12          **MR. LONGER:**  Frankly, I really don't care, is my

11:56  13   first point.  It's the Supreme Court of Mississippi.  It's the

11:56  14   highest court in the land.  It has spoken.  But the defendants

11:56  15   actually did the homework for me, and they cite to Judge

11:56  16   Zainey's opinion in the *Train Derailment at Amite, Louisiana*

11:56  17   case.

11:56  18          Judge Zainey in that opinion cites to *Valley*

11:56  19   *Forge* for the very same principle that I'm citing to, which is

11:56  20   that the law applicable to the underlying tort is also

11:56  21   applicable on the issue of punitive damages.  That's what the

11:56  22   Supreme Court of Mississippi said.

11:56  23          So all the parties here agree.  The defendants

11:56  24   are not arguing that Mississippi substantive law does not apply

11:57  25   to Mrs. Mingo's case.  They accept that.  Having accepted that,

11:57   1   where they differ from me, or from Ms. Mingo, is that they want

11:57   2   to import New Jersey law, but the conflicts of law doesn't

11:57   3   allow that under the Mississippi Supreme Court precedent.

11:57   4             So, Your Honor, you would actually be overruling

11:57   5   the Mississippi Supreme Court on Mississippi law to rule in

11:57   6   their favor.  The Supreme Court of Mississippi repeated that

11:57   7   Mississippi tort law, including the rules related to punitive

11:57   8   damages, control in a case involving Mississippi substantive

11:57   9   law.

11:57   10             And another point, Your Honor, they keep saying

11:57   11   that Mrs. Mingo's claims can be bifurcated between compensatory

11:58   12   and punitive damages, and that applying decoupage principles,

11:58   13   the court can split the claim between compensatory and punitive

11:58   14   damages.  And on that point, Your Honor, I tend to disagree,

11:58   15   and I know that there's cases out there that have gone their

11:58   16   way.

11:58   17             But when the Mississippi Legislature enacted the

11:58   18   what we call the Mississippi Product Liability Act, it -- just

11:58   19   one second.  Let me put this up.

11:59   20             The House Bill 1270 became -- it was enacted in

11:59   21   1993.  This became the act.  It had two sections, and one is

11:59   22   the Act to Codify Certain Rules and Establish New Rules

11:59   23   Applicable to Product Liability Actions, but it also codified

11:59   24   Certain Rules Concerning the Propriety and Manner of An Award

11:59   25   of Punitive Damages.

11:59  1    So there's Section 1, which we understand now to
11:59  2  be Section 11-1-63 of the statute, and the punitive damages is
11:59  3  now 11-1-65 dealing with punitive damages.
11:59  4    And I have a copy that I could present to your
11:59  5  clerk.
11:59  6    **THE COURT:**  We have it.  I have it.
12:00  7    **MR. LONGER:**  So the point of all this is that the
12:00  8  substantive law that is applying here, the MPLA, has within it
12:00  9  punitive damages.  It is a unified claim that Ms. Mingo is
12:00 10  presenting under Mississippi substantive law.  So if everyone
12:00 11  agrees that Mississippi substantive law applies, punitive
12:00 12  damages is incorporated in the failure-to-warn and the design
12:00 13  defect claims that are presented.
12:00 14    **THE COURT:**  Except they take the position that the
12:00 15  alleged wrongful conduct occurred in other places, not in
12:00 16  Mississippi.  That what you're concerned about, that what
12:00 17  you're complaining about, that all of those decisions occurred
12:00 18  in New Jersey or Germany, and therefore the laws of those
12:01 19  states ought to be applicable to that aspect of the plaintiff's
12:01 20  claim, namely, the punitive damage aspect, not the compensatory
12:01 21  aspect.
12:01 22    Most of the things that give rise to
12:01 23  compensatory damages occurred in Mississippi.  They say it's
12:01 24  not so with the punitive damages, and therefore you should
12:01 25  split the claims, which is not unheard of in Louisiana.  That

```
12:01   1   principle is really a civil law principle that we've been using
12:01   2   for years here.  So I understand that.
12:01   3            Why isn't that a fair way of doing it?
12:01   4            MR. LONGER:  Well, for a number of reasons here, Your
12:01   5   Honor.
12:01   6            First of all, factually, as we've set forth in
12:01   7   our brief, there's a number of factual matters that actually
12:01   8   diminish their arguments that all the major activities took
12:01   9   place in Pennsylvania -- I'm sorry, in New Jersey.
12:02  10            The defendants make a big point that
12:02  11   communications to the FDA took place in New Jersey.  And,
12:02  12   frankly, I don't know that I could say that that didn't happen,
12:02  13   but those are ministerial acts.  The actual corporate decision
12:02  14   making is really the more important decision, and they don't
12:02  15   have any facts in their papers to support their position.
12:02  16            And as we've pointed out, and as Your Honor even
12:02  17   knows, Dr. Peters, Gary Peters, was here testifying.  He was
12:02  18   from -- he's in Pennsylvania.  The decision makers were not all
12:02  19   in New Jersey.  Activities were happening around different
12:02  20   areas, and we can't -- and they have not established, as a
12:02  21   matter of fact, that all of the major decisions actually took
12:02  22   place in New Jersey.
12:02  23            But, more importantly, and this is the point
12:02  24   that Judge Stengel made in the *Tylenol* opinion, which we rely
12:03  25   upon, and we also see it from Judge Martinotti as well in the
```

| | |
|---|---|
| 12:03 | 1 |
| 12:03 | 2 |
| 12:03 | 3 |
| 12:03 | 4 |
| 12:03 | 5 |
| 12:03 | 6 |
| 12:03 | 7 |
| 12:03 | 8 |
| 12:03 | 9 |
| 12:04 | 10 |
| 12:04 | 11 |
| 12:04 | 12 |
| 12:04 | 13 |
| 12:04 | 14 |
| 12:04 | 15 |
| 12:04 | 16 |
| 12:04 | 17 |
| 12:04 | 18 |
| 12:04 | 19 |
| 12:04 | 20 |
| 12:04 | 21 |
| 12:04 | 22 |
| 12:05 | 23 |
| 12:05 | 24 |
| 12:05 | 25 |

New Jersey opinion, is that some of the corporate decisions had impact in Texas.

So, in other words, the defendants chose to detail Dr. Jordan in Mississippi.  That is a significant contact to Mississippi.  They advertised him in Mississippi, and the doctor learned about the drug through the detailing and advertising that he saw in Mississippi.  Those were actions that were exported and actually occurred in Mississippi.

If you look at the factors of Section 6 and Section 145, the place where the injury occurred is absolutely paramount in a personal injury case.  And a lot of the opinions that they cite to, Your Honor, by the way, are not personal injury cases.  They cite to a handful of them, but the ones that they principally rely upon, like Judge Vance's opinion, that dealt with really a negligent enforcement of contract.

It really was not where there were personal injuries at stake.  And here you have a person, Ms. Mingo, who never went to New Jersey; her doctor never went to New Jersey.  All of the activities were focused in Mississippi because that's where Ms. Mingo was, that's where her injury occurred, that's where her doctor was detailed, that's where he read the label, that's where he learned about the dangers of Xarelto.

And, in fact, Your Honor, at the beginning of this MDL, the defendants made a huge point about Lexicon not being waived because they said the doctor is so insignificant

| | | |
|---|---|---|
| 12:05 | 1 | to the cases here that we have to try these cases where the |
| 12:05 | 2 | doctors are.  So now they're running away from that and they're |
| 12:05 | 3 | saying, "Oh, look, it's all New Jersey." |
| 12:05 | 4 | But, you know, there are cases, and I |
| 12:05 | 5 | acknowledge that, and we have acknowledged that, and there |
| 12:05 | 6 | seems to be a very good split of opinion in cases more related |
| 12:05 | 7 | to contractual theories than tort -- personal injury theories |
| 12:05 | 8 | where the facts -- and, again, you have to look at facts.  And |
| 12:05 | 9 | as I mentioned to you, the notion that Judge Stengel was |
| 12:06 | 10 | pointing out is that the physician received the warnings in |
| 12:06 | 11 | Mississippi, and they were detailed in Mississippi, and those |
| 12:06 | 12 | points are the relevant factors. |
| 12:06 | 13 | I'm reading from the Nuvaring opinion:  "The |
| 12:06 | 14 | court acknowledges that the product and label were submitted to |
| 12:06 | 15 | the FDA for approval and subsequently distributed from |
| 12:06 | 16 | defendant's New Jersey headquarters, but the more relevant |
| 12:06 | 17 | conduct at issue is what defendant revealed to plaintiff and |
| 12:06 | 18 | her doctor about the drug, conduct which occurred, if at all, |
| 12:06 | 19 | in each plaintiff's state." |
| 12:06 | 20 | And here, Your Honor, going back to my other |
| 12:06 | 21 | point with the Mississippi Legislature, they codified punitive |
| 12:07 | 22 | damages into the statute.  So it had to know that foreign |
| 12:07 | 23 | manufacturers would be bringing products into the state, and it |
| 12:07 | 24 | wanted Mississippi law to apply, not New Jersey law to apply. |
| 12:07 | 25 | It's really the fact that there are questions of |

| | |
|---|---|
| 12:07 | 1 | fact as to where all the major decisions occurred.  We know |
| 12:07 | 2 | where the major decisions were made about Ms. Mingo's |
| 12:07 | 3 | treatment, it was in Mississippi.  And then really to your |
| 12:07 | 4 | point, Your Honor -- |
| 12:07 | 5 | Well, let me also say, the place where the |
| 12:07 | 6 | relationship occurred, which is one of the factors that the |
| 12:07 | 7 | Court has to consider, is right there in Mississippi. |
| 12:07 | 8 | Ms. Mingo did not go to New Jersey.  Her doctor didn't go to |
| 12:07 | 9 | New Jersey.  All those activities were centered right there in |
| 12:08 | 10 | Mississippi.  And there are cases that we cite to support that, |
| 12:08 | 11 | and there's a split of opinion. |
| 12:08 | 12 | Finally, though, Your Honor, and I understand |
| 12:08 | 13 | time is important here, and I gather that you understand the |
| 12:08 | 14 | issue. |
| 12:08 | 15 | THE COURT:  Yeah, I understand both sides.  I got it. |
| 12:08 | 16 | MR. LONGER:  You know, New Jersey should not be able |
| 12:08 | 17 | to dictate the laws of the land as it is as to punitive |
| 12:08 | 18 | damages.  It may want to protect its corporate citizens by |
| 12:08 | 19 | giving them blanket immunity from punitive damages, but that |
| 12:08 | 20 | doesn't mean that other states, like Mississippi, can choose a |
| 12:08 | 21 | different course. |
| 12:08 | 22 | And even under Conflict of Law principles, that |
| 12:08 | 23 | is certainly that state's prerogative.  And the *Valley Forge* |
| 12:08 | 24 | case says Mississippi chooses to apply substantive and punitive |
| 12:08 | 25 | laws -- punitive damages to its citizens and provide that to |

12:08   1   its citizens.

12:09   2               THE COURT:  Okay.

12:09   3               MR. LONGER:  And beyond that, you know, I'm from New

12:09   4   Jersey, Your Honor.  I grew up in New Jersey.  I'm from

12:09   5   Philadelphia; I grew up in New Jersey.  But Bruce Springsteen

12:09   6   wrote the national -- or the state's youth anthem, and that is:

12:09   7   "It's a death trap.  It's a suicide rap.  We gotta get out

12:09   8   while we're young because, baby, we were born to run."

12:09   9               You don't want to apply New Jersey here.  Thank

12:09  10   you, Your Honor.

12:09  11               THE COURT:  Okay.  All right.  I got it.

12:09  12               Are you going to cite somebody else?

12:09  13               MR. DRINKWATER:  This is going to be real brief.

12:09  14               THE COURT:  Okay.

12:09  15               MR. DRINKWATER:  I understand that there is a fact

12:09  16   sheet that the Court has required the parties to submit with

12:10  17   respect separately to each case.  The fact sheet in the *Mingo*

12:10  18   case, not other cases, the *Mingo* case, for Bayer reflects that

12:10  19   no detail reps visited Dr. Jordan.  So whatever facts may

12:10  20   exist, and to wherever extent the Court thinks they're relevant

12:10  21   about detail reps visiting people, it didn't happen here.

12:10  22               There are two cases that we have cited in

12:10  23   response to the personal injury point made by counsel, and

12:10  24   they're both multi-district cases.  There's a *Cessna 208* case.

12:10  25   It's an air crash case that talks about the defendant's

| | |
|---|---|
| 12:10 | 1 |
| 12:10 | 2 |
| 12:10 | 3 |
| 12:10 | 4 |
| 12:10 | 5 |
| 12:10 | 6 |
| 12:11 | 7 |
| 12:11 | 8 |
| 12:11 | 9 |
| 12:11 | 10 |
| 12:11 | 11 |
| 12:11 | 12 |
| 12:11 | 13 |
| 12:11 | 14 |
| 12:11 | 15 |
| 12:11 | 16 |
| 12:11 | 17 |
| 12:11 | 18 |
| 12:11 | 19 |
| 12:11 | 20 |
| 12:11 | 21 |
| 12:12 | 22 |
| 12:12 | 23 |
| 12:12 | 24 |
| 12:12 | 25 |

principal place of business being most important.  There's the
*Testosterone* case, which is remarkably like this case, that
talks about it.  I can see that Judge Vance's case is not a
personal injury case, but that's another case.

Your Honor said something as counsel began
arguing that struck me that I wanted to respond to.  You said,
well, granted that the states of the principal place of
business of the defendant corporations may have an interest in
punishing and deterring, but what if they don't do it?  I'm
paraphrasing.

I think the point made by the Restatement is
that the states of the residence of those corporations have an
interest in determining whether to do it and how to do it.

New Jersey, by the way, does have punitive
damages.  It does it on a multiplier of compensatory damages.
What New Jersey has done, though, is make a judgment about
FDA-approved drugs.  So New Jersey has exercised its interests
and made a reasoned determination on the subject.  To say that
you or I or others may disagree with that reasoned judgment
does not mean that the state does not have an interest in
making it, and that's the point, I think, of the Restatement.

Thank you, Your Honor.

THE COURT:  Okay.  Thank you very much.  Let me take
this under advisement.  I'm going to try to get out an opinion,
hopefully, today so that you all have it because I'll be out of

1   town next week.  So I'm going to have to stay up late tonight.

2                    I think we ought to take a break here for lunch

3   and then come back and do our other matters, the jury, and also

4   the pretrial.

5              MR. MEUNIER:  What time, Judge?

6              THE COURT:  Why don't we do it at 1:15.  Court will

7   stand in recess.  Thank you very much for your argument.

8              THE DEPUTY CLERK:  All rise.

9                            *****

10                         <u>CERTIFICATE</u>

11             I, Jodi Simcox, RMR, FCRR, Official Court Reporter

12   for the United States District Court, Eastern District of

13   Louisiana, do hereby certify that the foregoing is a true and

14   correct transcript, to the best of my ability and

15   understanding, from the record of the proceedings in the

16   above-entitled and numbered matter.

17

18

19                      <u>*s/Jodi Simcox, RMR, FCRR*</u>
                         Jodi Simcox, RMR, FCRR
20                       Official Court Reporter

21

22

23

24

25

                JODI SIMCOX, RMR, FCRR – OFFICIAL COURT REPORTER
                        UNITED STATES DISTRICT COURT
                        EASTERN DISTRICT OF LOUISIANA