```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA


IN RE: XARELTO (RIVAROXABAN)      *    MDL 2592 "L"
PRODUCTS LIABILITY LITIGATION     *
                                  *
                                  *    February 27, 2017
                                  *
                                  *
THIS DOCUMENT RELATES TO          *    Judge Eldon E. Fallon
ALL CASES                         *
                                  *
                                  *    Mag. Judge Michael North
*****************************************************************

        REPORTER'S OFFICIAL TRANSCRIPT OF THE STATUS CONFERENCE
                BEFORE THE HONORABLE ELDON E. FALLON,
                       UNITED STATES JUDGE.

*****************************************************************
```

**APPEARANCES:**

FOR THE PLAINTIFFS'
LIAISON COUNSEL:              GAINSBURGH BENJAMIN DAVID
                              MEUNIER & WARSHAUER
                              BY: GERALD MEUNIER
                              1100 POYDRAS ST., STE 2800
                              NEW ORLEANS, LA  70163


FOR THE DEFENDANTS'
LIAISON COUNSEL:              IRWIN FRITCHIE URQUHART &
                              MOORE
                              BY: JAMES B. IRWIN, V, ESQ.
                              TEXACO CENTER
                              400 POYDRAS ST., STE. 2700
                              NEW ORLEANS, LA  70130



**REPORTED BY:**   Mary V. Thompson, RMR, FCRR
                   Official Court Reporter
                   500 Poydras, Room B-275
                   New Orleans, LA 70130
                   (504)589-7783
                   mary_v_thompson@laed.uscourts.gov

**OFFICIAL TRANSCRIPT**

# I N D E X

PAGE NO.

Pretrial Orders.................................    3
Case Management Orders..........................    4
Counsel Contact Information Form................    6
Plaintiff Fact Sheet............................    6
Defendant Fact Sheet............................    6
Service of Process on Defendants................   12
Preservation Order..............................
Order Governing the Parties' Interactions with MDL
Plaintiffs' Prescribing and Treating Physicians..   13
Bellwether Selections...........................   13
State/Federal Coordination......................   14
Matters Set for Hearing Following the Status
Conference......................................   15
Next Status Conference..........................   15

OFFICIAL TRANSCRIPT

**P R O C E E D I N G S**

(Call to order of the court.)

THE COURT: Be seated, please.

Good morning, ladies and gentlemen.

Let's call the case, please.

THE CASE MANAGER: MDL No. 2592, *In Re: Xarelto Products Liability Litigation*.

THE COURT: Liaison counsel, make your appearance for the record, please.

MR. MEUNIER: Jerry Meunier, co-liaison counsel for the plaintiffs.

MR. IRWIN: Good morning, Your Honor. Jim Irwin for defendants.

THE COURT: We're here today for our monthly status conference. I had an opportunity a moment ago to meet with liaison lead counsel to discuss with them the proposed agenda. We'll take it in the order presented.

MR. MEUNIER: Good morning, Your Honor. Jerry Meunier for the plaintiffs.

Referring to the Joint Report No. 26, we list only the pretrial order that has been entered since the last status conference, and that's Pretrial Order 13B which sets forth the process to re-date in order to make more current the authorization forms that are being used to secure plaintiff medical records.

OFFICIAL TRANSCRIPT

1          Section 2 of the report references case management
2  orders.  And, Your Honor, the parties have been working hard
3  through meet-and-confer efforts to come up with a joint version
4  of CMO No. 6, which will deal with the remand of cases which the
5  Court has ordered.  A proposed order is in the works and will be
6  finalized and submitted shortly.  In fact, I think the Court has
7  already seen the proposed version.
8          THE COURT:  Right.
9          Just for those on the phone, in this matter, as you
10 know, we've had a number of bellwether cases; two in New Orleans
11 and one in Mississippi.  And one case was filed in Texas and that
12 case was dismissed.
13         The purpose of the bellwethers is really multiple
14 purposes.  One of the main purposes is to give the lawyers an
15 opportunity to see their case tried.  It's kind of the concept
16 that you can read a play or you can watch a play being performed,
17 and by and large, whatever good read you have, it's a different
18 play when you see it acted out.
19         And it's the same way with litigants and lawyers.  They
20 think they know their case, but until they see it tried, it's not
21 really known to them.  So it gives them an opportunity to look at
22 the case and see it in a real setting.
23         We moved it around so they could see it as numerous
24 juries took a look at it.  The verdict of the jury is somewhat
25 important, but it's also not the only thing.  The important thing

OFFICIAL TRANSCRIPT

1  is for the lawyers to see their case presented and all of the
2  things that come with that.  We did that.
3          But at that point, the bellwether system is exhausted.
4  It's not designed for the purpose of resolving cases.  That's not
5  the purpose of it.  The purpose of it is to give the parties an
6  opportunity to see their case in action.
7          We've done that.  So now we have to go to Phase II and
8  move the cases.  It's not fair for the litigants, it's not fair
9  for the lawyers, it's not fair for the system just to keep the
10 cases in one place and just let them marinate and just sit there.
11 So it's time to begin focusing on sending them back.
12         I met with the parties earlier and we decided that it
13 would be appropriate to send 1200 cases back.  The parties have
14 met and conferred and feel that it's wise to send 600 back at a
15 time.
16         There's a mechanism for the plaintiffs picking 200, the
17 defendants picking 200, and the Court picking 200 at random with
18 the assistance of counsel.  That's what we're in the process of
19 doing now.  So they have given me a proposed case management
20 order setting that.
21         The first selection date would be April 16th where we
22 pick the first 600 in wave one, and the second wave will be
23 picked on August 16th.  That's what we're in the process of doing
24 now.
25         MR. MEUNIER:  Your Honor, the PSC leadership has

```
09:06:27

09:06:45

09:07:05

09:07:21

09:07:40
```

1  already sent out emails and will send out additional emails to
2  plaintiffs' counsel because their efforts are going to be
3  critical in helping us select an appropriate first wave for the
4  remand, which, as you say, is due in April -- selection in April.
5       THE COURT:  Right.
6       And we get some feel for the courts.  I probably ought
7  to at least talk to the judges so that they know that a number of
8  cases are going to be coming their way so that they don't just
9  find it in their mail one day.
10      So I'll be doing that.  It's helpful for me to give
11 some heads up.
12      MR. MEUNIER:  Section 3 of the joint report refers
13 again to the Court's process for counsel contact information
14 forms.  And both Mr. Lenny Davis, my co-liaison counsel, and I do
15 appreciate plaintiffs' counsel continuing to be attentive to the
16 need to submit those contact forms to keep the inventory
17 information accurate.
18      Sections 4 and 5 discuss plaintiff and defendant fact
19 sheets, Judge.  And as you know, under an earlier order you had
20 set up a protocol to assist in addressing plaintiff fact sheet
21 deficiencies.  We think that process is working.
22      Lenny Davis, as well as Sindhu Daniel, have been active
23 on the plaintiffs' side working with defense counsel to
24 streamline the process by which deficiencies can be addressed.
25      And that will be, again, even more important a process

```
                1   going forward as we begin the selection of cases, to the extent
                2   that eligibility to be selected will be dependent on the value
                3   and validity of the plaintiff fact sheets that are in the --
                4              THE COURT:  Right.  That's really dependent upon
09:07:58        5   counsel and the litigants themselves.  The litigants have to
                6   participate and fill out the forms.  If they don't fill out the
                7   forms or will not fill out the forms, then the Court has to step
                8   in and dismiss their case.
                9              So that part is going to depend not only on the counsel
09:08:20       10   here, but also counsel representing those individual entities.
               11              MR. MEUNIER:  MDL centrality will be an important and
               12   vital tool for the litigants in the process of selection for the
               13   remands, and Jake Woody is here from BrownGreer to report on the
               14   data in that system.
09:08:41       15              THE COURT:  Okay.
               16              MR. WOODY:  Good morning, Your Honor.  Jake Woody from
               17   BrownGreer.  I have a quick report for you on the status of
               18   plaintiff fact sheets in this MDL.
               19              So far we have 20,294 plaintiff fact sheets that have
09:09:15       20   been submitted to us.
               21              We have another 1,589 in progress.
               22              That gives us a total of 21,883 plaintiffs in our
               23   system.
               24              Of the fact sheets that have been submitted, 26 percent
09:09:27       25   have been amended at least once and in some cases more than once.
```

OFFICIAL TRANSCRIPT

```
 1              In January of 2018, we received 491 plaintiff fact
 2  sheets.
 3              So far in February, we've received 391.
 4              The average for the last 12 months is 472 fact sheets a
 5  month.  Obviously it varies a little bit each month, but the
 6  average is pretty steady.  And it's been at about the same level
 7  throughout the whole MDL.
 8              THE COURT:  I think we've seen the same thing in the
 9  court filings.
10              MR. WOODY:  Yes.  I think our fact sheets lag behind
11  the cases because of the deadlines, but the fact that we are so
12  steady means that new cases are coming in at about the same rate.
13              THE COURT:  Yes.
14              MR. WOODY:  We have plaintiffs from all 50 states.
15  I've listed them all here.
16              I won't go through all 50, but I will note that Texas
17  has 1,688 plaintiffs; Florida has 1,651; and California has
18  1,045.  Those are the top three states.  This is based on the
19  residential information that the plaintiffs list on their fact
20  sheets.
21              So I have two slides with all the states, and they --
22  the bottom -- Hawaii is at the bottom with just 15, and everyone
23  else is in-between.
24              THE COURT:  Okay.
25              MR. WOODY:  As far as the information about the actual
```

OFFICIAL TRANSCRIPT

plaintiffs who filled out fact sheets, we're able to calculate their age based on the date of birth that they list on their plaintiff fact sheet.

20 percent of all the plaintiffs are between 60 and 69.

30 percent are between 70 and 79.

26 percent are between 80 and 89.

That's 76 percent of all the plaintiffs in the MDL are in that age range of 60 to 89.

And then all the other age ranges are significantly lower than that.

So that's a pretty good group of plaintiffs within those age ranges.

THE COURT:  It seems like 70 to 79 is where you have the most.

MR. WOODY:  That's right.  You have 30 percent.

THE COURT:  And 80 to 89 after that.

MR. WOODY:  This does shift a little bit as people age.  The 80 to 89 I don't think started out quite as high but over the years has increased slightly as people have gotten older.

THE COURT:  That's the helpful thing about the fact sheets.  And I think centrality has helped a lot in this particular case because we're able to get a feel through the fact sheets.  And through the digital world of working these, you can search them.  And the advantage of that is that you can pick certain cases as representative of that particular area and see

OFFICIAL TRANSCRIPT

1  what the workup involves and what the witnesses say and what the
2  jury's response is.  So it's been very helpful.
3              MR. WOODY:  Turning quickly to the alleged injuries on
4  the plaintiff fact sheets, by far the most common alleged injury
5  is gastrointestinal bleeding.  48 percent of all the plaintiffs
6  allege that injury.
7              After that it drops down to 21 percent, which is the
8  "other" category, which is generally a combination of different
9  injuries.
10             And then from there it drops down to 7 percent, which
11 is brain and cerebral hemorrhage.
12             And all the other injuries listed here are quite a
13 small percentage of the MDL.
14             So gastrointestinal bleeding is obviously the most
15 common alleged injury with about half of all plaintiffs alleging
16 that injury.
17             THE COURT:  Do you have any feel for the death
18 situation, how many of those are brain bleeds or gastrointestinal
19 bleeds or anything of that sort?
20             MR. WOODY:  I don't.  But I know that some of the
21 information we collect has to do with cause of death, and I can
22 extrapolate that and figure that out.
23             I'm not sure -- I know that because we are dealing with
24 sort of an older population, there can be many other reasons for
25 that.

OFFICIAL TRANSCRIPT

```
                    But I can check and see if we're able to extrapolate
out how many of the deaths were related to the injuries listed
here.
                    THE COURT:  All right.
                    MR. WOODY:  Similarly, with indication or reason that
people were prescribed Xarelto, we do have a very common theme
where reduction of risk of stroke is 54 percent of all the cases
listed in the MDL centrality.  So more than half of the people
were prescribed Xarelto for that reason.
                    Then from there it drops down to treatment of deep vein
thrombosis, which is only 16 percent.
                    And it descends from there.
                    So we have a very common theme where people were taking
this to reduce the risk of stroke.
                    THE COURT:  The interesting thing to me, and, of
course, throughout this has been that the main situation is
prophylactic.  It's not treatment as much as it's preventative
measures.
                    MR. WOODY:  That does seem to be the case, Your Honor.
                    And then finally, at the last status conference you
asked if I could tell how long people had been hospitalized.  We
were able to do that.  I've done it here.
                    You can see that 6 percent were hospitalized for less
than one day.
                    59 percent were between 1 and 5.  That's by far the
```

```
                    1  highest category.
                    2           6 to 10 days is 20 percent.
                    3           11 to 30 days is 12 percent.
                    4           31 to 99 days is 2 percent.
09:14:47            5           And then people over 100 days are only 1 percent of the
                    6  MDL.
                    7           So, again, we have a very common theme where people
                    8  were hospitalized -- most people seem to be hospitalized for 1 to
                    9  5 days if they were hospitalized at all.
09:15:00           10           THE COURT:  Okay.
                   11           MR. WOODY:  That's my report for this month.
                   12           I've included our contact information at the end.  We
                   13  do still have, occasionally, new firms coming into the MDL who
                   14  need help or need to get set up with the portal.  They can email
09:15:14           15  us at mdlcentrality@browngreer.com and we'll help them out as
                   16  best we can.
                   17           THE COURT:  Okay.  Thank you, Jake.
                   18           MR. MEUNIER:  Your Honor, the next section of the joint
                   19  report, which is Section 6, deals with the service of process on
09:15:29           20  defendants.
                   21           And we've called the Court's attention to an issue that
                   22  relates to your order of February 15, 2018.  It's in the record
                   23  as Document 8628.  It addressed the backlog of cases in the
                   24  clerk's office and set forth a 60-day deadline for service
09:15:49           25  running from the issuance of summons.
```

*09:16:07*

1   And with the Court's permission, we've been working
2 with defendants. John Olinde and I have been discussing this at
3 length, and we will submit to you a proposed revision of that
4 order which will alleviate the possible problem of those cases in
5 which a summons has not yet been requested.
6   THE COURT: Yeah.
7   MR. MEUNIER: And so that way we'll have a way of not
8 letting that situation lapse.
9   THE COURT: Yeah. I just had assumed that the summons

*09:16:20*

10 would be requested, because the people were calling to find out,
11 you know, what the situation was. And that was the problem from
12 our standpoint.
13   But I didn't intend to simply let somebody file a suit,
14 not request a summons, and just keep it forever in suspension, so

*09:16:42*

15 we needed to clarify that.
16   MR. MEUNIER: Thank you, Judge.
17   The next section I mentioned is Section 8. We
18 reiterate the order that stands regarding the interactions of
19 plaintiffs' counsel with prescribing and treating physicians.

*09:16:57*

20   It's simply to note that in the proposed CMO 6 there
21 will be some modification of that to provide for the parties'
22 ability to jointly contact the treating and prescribing doctors
23 in order to set up the necessary deposition schedule.
24   Section 9 in the report discusses the three MDL

*09:17:17*

25 bellwether cases of *Boudreaux*, *Orr,* and *Mingo*. Those three cases

**OFFICIAL TRANSCRIPT**

```
09:17:39   1  now are on appeal in the Fifth Circuit.  *Boudreaux* and *Orr* had
           2  been consolidated previously.  More recently the court has
           3  consolidated *Mingo* with those two as well.  So now all three of
           4  those cases, *Boudreaux*, *Orr,* and *Mingo,* will be handled in a
           5  consolidated way by the Fifth Circuit for briefing and argument
           6  purposes.
           7           Section 10, Your Honor, is a reference to the
           8  state/federal coordination that's ongoing between this court and
           9  particularly the court in Pennsylvania.
09:17:56  10           I will report on behalf of Mr. Weinkowitz and
          11  Mr. Longer that the next trial date in the Pennsylvania
          12  litigation is April 2nd, and that is the *Russell* case.
          13           And the next trial is the *Cooney* case which I'm told
          14  will begin on April 19th or April 26th.  That has not yet been
09:18:20  15  determined.
          16           Judge, I think that concludes the joint report except
          17  for the scheduling of the next -- oh, I'm sorry.  I did want to
          18  mention one other thing which has to do with the ongoing
          19  discussion about discovery, and particularly the completion of
09:18:35  20  the record for purposes of the preemption motions that are
          21  pending in *Ibonez*.
          22           We mentioned to the Court we thought it would be
          23  helpful to have a telephone conference with you to discuss the
          24  status of meet-and-confer efforts on the remaining discovery for
09:18:50  25  that, and you have scheduled that telephone conference for
```

OFFICIAL TRANSCRIPT

```
 1  Friday, March 9, at 9:30 with counsel.
 2          THE COURT:  Okay.  And the next conference is on March
 3  21st, and the following one is April 24th.
 4          MR. MEUNIER:  Yes, Your Honor, April 24th, which will
 5  be at 9:00 a.m. with the 8:30 meeting in chambers.
 6          THE COURT:  Right.  The same way for the next one.
 7          MR. MEUNIER:  Thank you, Judge.
 8          THE COURT:  Anything else from anybody?
 9          (No response.)
10          THE COURT:  Okay, folks.  Thank you very much.  Court
11  will stand in recess.
12                                  (Proceedings adjourned.)
13
14                              * * * *
15                          **CERTIFICATE**
16
17      I hereby certify this 1st day of March, 2018, that the
18  foregoing is, to the best of my ability and understanding, a true
19  and correct transcript of the proceedings in the above-entitled
20  matter.
21
22                              */s/ Mary V. Thompson*
23                              _____
                                  **Official Court Reporter**
24
25
```

09:19:08
09:19:16

OFFICIAL TRANSCRIPT