1          UNITED STATES DISTRICT COURT

2          EASTERN DISTRICT OF LOUISIANA

3

4

5  IN RE:  XARELTO              *
   (RIVAROXABAN) PRODUCTS       *
6  LIABILITY LITIGATION         *   Docket No.: 14-MD-2592
                                *   Section "L"
7  THIS DOCUMENT RELATES TO:    *   New Olreans, Louisiana
                                *   April 24, 2018
8  *All cases*                  *
                                *
9  * * * * * * * * * * * * * * * *

10

11          TRANSCRIPT OF ORAL ARGUMENT PROCEEDINGS
            BEFORE THE HONORABLE ELDON E. FALLON
12               UNITED STATES DISTRICT JUDGE

13  <u>APPEARANCES</u>:

14  For the Plaintiffs:          Beasley Allen
                                 BY:  ANDY BIRCHFIELD, ESQ.
15                               P.O. Box 4160
                                 Montgomery, Alabama 36103

16

17  For the Plaintiffs:          Aylstock, Witkin, Kreis &
                                    Overholtz, PLLC
18                               BY:  NEIL OVERHOLTZ, ESQ.
                                 17 E. Main Street
19                               Suite 200
                                 Pensacola, Florida 32502
20

21

22  For Janssen Pharmaceuticals,
    Inc. and Janssen Research &
23  Development, LLC:            Drinker Biddle & Reath, LLP
                                 BY:  SUSAN M. SHARKO, ESQ.
23                               600 Campus Drive
                                 Florham Park, New Jersey 07932
24

25

                    OFFICIAL TRANSCRIPT

1    APPEARANCES:

2

3    Official Court Reporter:        Jodi Simcox, RMR, FCRR
                                     500 Poydras Street
                                     Room HB-406
4                                    New Orleans, Louisiana 70130
                                     (504) 589-7780
5

6

7    Proceedings recorded by mechanical stenography, transcript

8    produced by computer.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT

**PROCEEDINGS**

**(April 24, 2018)**

**\*\*\*\*\*\***

**THE COURT:**  Okay.  Are you all ready to go into the motion or do you want to take a break?

**MR. BIRCHFIELD:**  We're ready, Your Honor.

**THE COURT:**  Okay.  I have before me a motion.  It raises the question of whether additional discovery should be performed before the issue of preemption goes before it.  The plaintiffs feel that they need some additional discovery.  The defendants take the position that they have an issue:  They have argued this matter without discovery in the past, and they don't need any additional discovery.

Let me say something about the discovery.  There are certain admissions that the plaintiffs have submitted to the defendant and certain interrogatories, or requests really.  The admissions are a very lame method of discovery.  It's almost like interrogatories.  They're prepared by a lawyer, and they're answered by a lawyer.

When you get lawyers asking questions and answering questions, the person who asks the question generally wants information from day one; and the person answering the question doesn't want to give anything, and so, generally, it's a lot of motions, and in these cases, it presents a problem.

```
 1              Admissions are the same way.  A normal person,
 2   if they want to know your name, they would say, "What is your
 3   name?"  But a lawyer who wants to know your name will say, "Do
 4   you admit that your name is Joe Smith, and that your family has
 5   only called you Joe Smith from the day you were born, and
 6   nobody else has called you other than Joe Smith?"  That causes
 7   the person to answer it, "Well, it's true my parents call me
 8   that, but whether or not they used that name forever, and
 9   whether or not," and it goes on and on and on.
10              And that's what admissions are.  You want to
11   know something; but when a lawyer asks it, somehow or another
12   it gets expanded to the point where the defendant can't admit
13   it.  You've asked so much in an admission that they can't admit
14   it.  So those are very hard to get always.  It's confusing.
15   The answers, they're never satisfied unless it's a one-word
16   answer, and it never is.
17              So talk to me mainly, Andy, about the requests.
18        MR. BIRCHFIELD:  Yes, Your Honor.  Andy Birchfield on
19   behalf of the Plaintiffs' Steering Committee.
20              Your Honor, this dispute really turns on the
21   difference between evidence and argument.  I mean, we know
22   decisions are to be based on evidence.  We tell our juries that
23   they are to base their verdict on evidence, not the lawyer's
24   argument.  This dispute turns on the difference between
25   evidence and argument.
```

OFFICIAL TRANSCRIPT

1           And we have engaged, Your Honor, as the Court is

2      aware, in a lengthy period of discussion, meet and confers,

3      with the defendants.  We have been working, trying to arrive at

4      a mechanism that will give us the evidence that we need.  And

5      we've looked at interrogatories.  We've talked about 30(b)(6)

6      depositions.

7           When we could not reach an agreement, then we

8      came with what we believe, and in just a few minutes with the

9      Court's permission, I'm going to ask Neil Overholtz or Brad to

10     go through the details of these admissions -- the requests to

11     admit and how we have -- how we believe that they are narrowly

12     tailored to get us the answers.

13           But here is the crux of our dispute.  Here is

14     why we cannot reach an agreement:  Because we believe that we

15     need and we are entitled to evidence on this key issue, and the

16     defendants take the position that we should be confined to

17     argument on this issue.  The defendants claim -- they're

18     claiming preemption.  They are claiming that it is -- that it

19     would be impossible for them to comply with federal law and

20     state law.

21           And so now they are seeking -- in their papers,

22     they make it clear, they're looking for a ruling that will go

23     to the Fifth Circuit that will apply to a large number, if not

24     all, of the plaintiffs, to a large number of the plaintiffs in

25     this litigation, the 22,000 plaintiffs that the Court referred

1  to earlier.  They are looking for a decision that would apply

2  to that large swath of cases.  We don't believe that that would

3  be the case, but that's what's hanging in the balance.

4                    So the defendants have taken the position that

5  it is -- it's impossible for us to comply with state and

6  federal law.  And the centerpiece evidence that they offer for

7  that defense is what we have come to refer to as a

8  strike-through document.  Actually, it's two strike-through

9  documents now.

10                   But both of those strike-through documents were

11 documents that were created, they were exchanged between the

12 parties and the FDA before November of 2011, before the atrial

13 fibrillation indication was approved by the FDA.  Those

14 strike-throughs that purport to be the FDA saying, "We're

15 striking through the language," that is similar to what

16 plaintiffs say that doctors and patients should be told about

17 our drug, the warning that they say should be given.  So this

18 is the centerpiece evidence that the defendants purport to

19 offer.

20                   And in response to that, we say, look, in order

21 to meet the demanding defense of preemption, you must show that

22 there were real efforts made on the part of the defendant to

23 strengthen your warning.  Real efforts.  It cannot be just

24 passing attention.  It must be a real effort on your part.

25                   And so what we are seeking to offer as evidence

OFFICIAL TRANSCRIPT

1   is that after that initial strike-through, you as the
2   defendants, you did not -- you did not meet with the FDA.  You
3   didn't offer any proposal to the FDA that would strengthen the
4   warning on this point.  So we're seeking evidence to say there
5   was no effort.
6               After that strike-through, after the approval
7   for AFib was given by the FDA, what happens?  The drug is then
8   sold and adverse events come pouring in, bleeding events.  The
9   company, the sponsor, is receiving a number of these adverse
10  event reports.  After you started receiving these adverse event
11  reports about the bleeding events, did you -- did you go to the
12  FDA?  Did you suggest a meeting with the FDA to discuss
13  strengthening this label?  Did you make a proposal to the FDA
14  about this -- about strengthening the label?
15              After the drug is sold, the FDA, there was a
16  required post-marketing surveillance that was in place where
17  the company was required to submit bleeding questionnaires.
18  And they received this information.  It showed, in many of
19  these cases, that there were elevated PTs with the bleeding
20  event.
21              After you received this information -- so after
22  this strike-through and your receiving this information, did
23  you pay more than passive attention or passing attention to
24  this?  Did you make any effort with the FDA?  Did you submit a
25  proposal?  Did you have a meeting?  Did you request a meeting

1    with the FDA to try to assert language in the label, make a

2    warning of any kind about this issue, about the PT and the

3    bleeding events?  That's the key one.  Also about the subgroup

4    analysis.

5              So what we are seeking is evidence to show that

6    there was no such effort, and that's what these requests are --

7    these Requests for Admission are tailored to address.  And,

8    Your Honor, we have engaged in extensive discussions with the

9    defendants trying to arrive at a place, a mechanism, whatever

10   mechanism -- discovery mechanism we could agree on that would

11   give us evidence on this key issue, but we cannot reach an

12   agreement.

13             We cannot reach an agreement because we -- we

14   must have -- we must have evidence on this point, and the

15   defendants take the position that we should be relegated to

16   argument.

17             **THE COURT:**  Is there a point person for the

18   defendants who was involved with the change?  Is that the --

19             **MR. BIRCHFIELD:**  Well, Your Honor, here's -- so

20   that's a -- that is a very important point, Your Honor.  Any

21   negotiations, any discussions with the FDA from between the

22   sponsor, the drug company, and the FDA, those are matters of

23   regulation.  They are matters of extensive standard operating

24   procedures on the company that require that contact forms,

25   records be kept.  It's a very small pool, a limited pool, of

1    individuals at the company that would have interaction with the

2    sponsor over labeling or warning issues.  That's why we believe

3    that the Request for Admit is a valid mechanism for us.

4              They could determine, you know, did you have any

5    meetings with the FDA?  Was there any proposals made?  Those

6    are questions that could be answered.  This is not, did any of

7    your employees have a casual conversation with an FDA employee?

8    No, we couldn't get there.  But this is a matter of standard

9    operating procedures that guide this process.

10             And so what we are -- that's why we believe

11   that -- but we're not -- we're not in a place where we say, you

12   know, it's a Request for Admit or nothing.  We're just seeking

13   evidence.  We're seeking discovery, and from whatever mechanism

14   will give us evidence that will answer this question so we can

15   submit to the Court, and to juries, that there's evidence that

16   there was no meeting.

17             If I can point, Your Honor, for just a second --

18             Dean, could I have the --

19         **THE DEPUTY CLERK:**  Yes.

20         **MR. BIRCHFIELD:**  So if you look at the defendant's

21   pleading here, they say:

22             "In a spirit of compromise, defendants

23   nonetheless would answer Request to Admit No. 1 and Request for

24   Production 1, which would provide plaintiffs the objective

25   information they seek confirming that there were no meetings

1   between FDA and Janssen explicitly about the strike-through.
2   That fact is neither surprising nor legally relevant since the
3   FDA unambiguously expressed the official position of the
4   federal government to Janssen by striking language in the
5   Xarelto label that plaintiffs' experts contend should be
6   included."
7           That language right there would suggest that
8   they're giving us the answer that we want.  That they're
9   stating there, confirming that there were no meetings between
10  FDA and Janssen explicitly about the strike-through.  If we
11  could get a Request to Admit on that, Your Honor, we would be
12  satisfied, but this is a head fake.
13          And so what they say, you see there, it says:
14  "Nonetheless, we would answer Request to Admit No. 1."  Well,
15  Request to Admit No. 1 refers to -- it's asking about a meeting
16  with the FDA before receipt of the strike-through on June 2011.
17  So they say, there was no meeting with the FDA before
18  June 2011.
19          The other Request to Admit addressed the issue
20  of, what about after?  What happened after the drug goes on the
21  market and you start getting these adverse event reports, after
22  the post-marketing surveillance program is in place and you're
23  seeing issues with these bleeding questionnaires?  What about
24  then?  Was there any meeting?  Was there any effort, any
25  proposal made to the FDA?  It's those Requests for Admissions

1    that the defendants say, "We object.  We're not answering those
2    questions."
3                    And they -- in their papers, they say that,
4    look, that is -- plaintiffs are welcome to argue that.  You're
5    welcome to argue that.  But what we need, and that's the
6    difference, we need evidence that there was no meeting, there
7    was no effort for a meeting.  And, you know, whether that comes
8    through responsive answers to our Request for Admission or
9    whether that comes through a 30(b)(6) or some other mechanism,
10   we're fine with that, Your Honor.  We just need an answer to
11   that issue.
12                   And the defendants say that the absence of
13   evidence is something that we could -- that we can argue.  But,
14   Your Honor, that does not -- that does not help us.  Because
15   we're entitled -- we need -- we need evidence here.  I mean,
16   can you imagine a criminal defendant or an impeachment
17   defendant being told, "Now, your opponent can offer evidence of
18   a meeting, but you can't offer evidence of no meeting"?  "You
19   can argue it all you want to, but you can't offer evidence of
20   that."  Can you imagine the tweet storm that would erupt over
21   that?  That's where we are.
22                   We're seeking evidence.  We believe we're
23   entitled to evidence to this question, this finite group, this
24   small group within the company that interacts with the FDA,
25   that is subject to regulations and SOPs about recording those

1    communications, keeping those minutes, keeping those records.
2    Is there evidence that you made this effort or not?
3                   And, Your Honor, at this point, with the Court's
4    permission, I would ask if Neil Overholtz can come --
5             **THE COURT:**  Sure.
6             **MR. BIRCHFIELD:**  -- and he'll walk through these.
7    Because there are 11 Requests for Admission, and they are --
8    and then we have corresponding six Requests for Production.
9    But all of those -- all of those are addressing the one issue:
10   Is there evidence or not of a meeting or a proposal to the FDA
11   to strengthen or enhance the warning on this issue?
12                   Your Honor, may Neil come up?
13            **THE COURT:**  Yes, sure.
14            **MR. OVERHOLTZ:**  Your Honor, Neil Overholtz.  Thank
15   you.  I have a PowerPoint presentation, and we're going to hand
16   up a couple copies to Your Honor.
17            **THE COURT:**  Sure.  Okay.
18            **MR. OVERHOLTZ:**  So, Your Honor, and I'll try to be
19   brief, but certainly as we began to think about the discovery
20   that we needed, we went through a negotiation process.  And as
21   we realized we weren't going to be able to reach agreement, we
22   attempted to narrow our discovery to what we believed would
23   directly address this question of the burden of the defendants.
24                   Specifically, we tried to narrow our requests to
25   those requests that would answer questions that the documents

1  and the discovery that have been produced to the plaintiffs so
2  far did not answer, this absence of evidence issue, but
3  questions which we believe are critical questions that go to
4  the defendant's burden of demonstrating impossibility.  As
5  Mr. Birchfield discussed, this impossibility, what steps did
6  the company take, what actions did the company take or not take
7  upon receipt of this strike-through information?  And we
8  believe that those requests do that.
9           And Mr. Birchfield touched on the first three,
10 so I'll be brief about these.  But, essentially, the first
11 three Requests for Admissions that we seek to have the
12 defendants answer deal with meeting requests by the company.
13 The company has the right under the regulations to request a
14 meeting with the FDA to discuss issues with respect to their
15 product and the labeling.
16          And as opposed to -- we certainly took Your
17 Honor's admonishments to heart about interrogatories and we
18 tried to avoid interrogatories.  We also understood the
19 difficulties with Requests for Admission and the drafting and
20 how these would be answered.
21          So as opposed to serving one simple Request for
22 Admission, did you ever request a meeting, we attempted to
23 break it up into three separate parts that are specific as to
24 the timing of receipt of the June strike-through document.  The
25 before the receipt; the after they received it, but before the

1   approval in November of 2011; and then after approval, and

2   specific to Section 12.2 because that's the section in the

3   label that had the strike-through information.

4               So we believe that these three requests, this

5   avoids the answer from the defendants that would cause

6   confusion where we would be coming back before Your Honor

7   saying, "Your Honor, they said they didn't request it before,

8   but they didn't tell us whether they did afterwards or in

9   between."  So we attempted to break it up into three easily

10  answerable questions, did they request a meeting at any of

11  those three time periods?

12              The next two, 4 and 5, deal with meeting

13  requests again, but instead are specific to Section 5 of the

14  label.  We didn't want to ask the general Request for

15  Admission, did you ever request a meeting about PT?  So we

16  tried to make it specific as to the section of the label.  Here

17  we have two dealing with Section 5.  Section 5, the warnings

18  and precautions, and, of course, Your Honor knows from the

19  trials, that's the section that we believe this information

20  should have been put in in the beginning.

21              But we specifically broke it apart as well as to

22  both before approval in November of 2011, and then after

23  approval, when they received more adverse event information or

24  received more scientific information or did more studies and

25  they published more studies like the Kubitza article in 2017,

1  which was after the close of discovery, Your Honor.

2              So this kind of breaks down the fact that 1

3  through 5 essentially could be seen as one simple Request for

4  Admission.  But to avoid any confusion and attempt to draft the

5  questions in a way that could be answered that makes sense and

6  you don't have the problems afterwards, we broke it up into the

7  three sections -- the two sections, 12.2, and then the

8  before-and-after.  And, of course, with Section 12.2, they

9  received the strike-through and then got approval several

10  months later.

11              The next four, 6, 7, 8 and 9, essentially fit

12  the same category, which is the plaintiffs' efforts to

13  determine, did the company submit language regarded to PT and

14  the use of Neoplastin PT to the FDA either in the form of a

15  draft label or in the form of, "Dear FDA, we believe that this

16  information should be included in the label, and this is what

17  we think it should say."  So each of these requests, while

18  different, get to the heart of that issue.

19              But to avoid the problem that Your Honor has

20  described with Requests for Admission, we attempted to break it

21  apart.  And No. 6 specifically asks, did they ever submit a

22  form of the label, a draft label, that included Neoplastin PT

23  information in the warning section, Section 5?

24              And then No. 7, if they didn't submit it in the

25  form of a draft label, did they propose language to be included

1  in Section 5?  Because either of those approaches could work
2  for the company.
3              No. 8, do they have any evidence, any contact
4  forms, any FDA contact reports, or reports of communications
5  with the FDA where including that PT in the warning was
6  discussed?
7              And then No. 9, admit that Janssen never
8  proposed to the FDA the addition of Neoplastin.  And this deals
9  specifically with, as Your Honor remembered, Dr. Kessler's
10  testimony that it should have been in that specific section of
11  the label that dealt with laboratory tests where they can say,
12  this tests works, or, this test doesn't work.  And it
13  specifically deals with that section and whether they ever
14  proposed to the FDA the addition of that information.
15              So while these are all interrelated, we
16  attempted to avoid the problems with Requests for Admission by
17  having simple, direct answers.  And, again, we believe they
18  answer the questions that the documents do not answer.
19              And then, of course, for the *Ibanez* case,
20  they've raised the second strike-through document that dealt
21  with the inclusion of subgroup data, North American subgroup
22  data.  And these two requests specifically deal, again, with
23  the plaintiffs' desire to be able to know, did the defendants
24  after they received that strike-through, did they request a
25  meeting of any type?  Did they request a meeting?

1    Because eventually the U.S. subgroup data was
2  added to the label in September of 2015.  So this request says,
3  any time prior to that September 2015 label change, did you
4  request a meeting to discuss inclusion of this U.S. subgroup
5  data, which eventually the FDA did allow?  So that, of course,
6  goes to the plaintiffs' claim of the feasibility of coming
7  forward earlier to the FDA because the data existed and say,
8  "We want to include this information."
9    And then the last request that they never
10  proposed language adding it, again, after they received that
11  strike-through, but before that label change.
12    And so we believe that those Requests for
13  Admissions are narrowly tailored and are the types of Requests
14  for Admission that can be answered with a simple admit or deny
15  those requests.
16    Now, as for the Request for Production, we think
17  that they're pretty straightforward.  1 and 2 deal with the
18  groups within the company.  The labeling working groups, the
19  labeling review committees that deal with labeling issues.  And
20  while -- the discovery that's been produced, we have some of
21  these.  What is unclear is, do we have all of the labeling work
22  group and labeling review committee minutes that the company
23  kept?  There's an e-mail in this PowerPoint, Your Honor, where
24  certainly it seems like that they had a storage place where
25  they kept such minutes.

1       And the defendants in their briefing suggest

2  that plaintiffs chose the way we received the discovery, what

3  custodians, but the custodial production was largely a request

4  of the defendants.  And there was -- because of the bellwether

5  track that we were on, we agreed to a limited number of

6  custodians and a limited number of sources.

7       In our review of this information and our review

8  of the custodians that were produced, it became clear that

9  there were gaps in these labeling review committee minutes.

10 Because you would see e-mail traffic discussing that there was

11 going to be a meeting, but we're unable to locate the minutes.

12 They've agreed in their response that they would answer No. 1.

13      No. 2 are other groups within the company that

14 also discussed labeling and discussed issues related to the

15 science, Neoplastin PT, and therefore we believe that those

16 minutes are also something that the company kept and we would

17 request.

18      No. 3, and this is, I think, an interesting one

19 and an important one because we have minutes.  The defendants

20 have attempted to characterize our request as trying to find

21 out what the FDA knew and what the FDA decided.  But, in fact,

22 what we want to know is, what did the company have from the FDA

23 about this issue?

24      Because, typically, when a meeting was held, the

25 FDA would keep minutes, the company would keep minutes, and

OFFICIAL TRANSCRIPT

1    then they would agree on a final set of minutes to save.  But

2    those minutes that the company received from the FDA, they

3    should have kept those.  Those should have been archived.  And

4    we believe those would be specific, and we're only asking for

5    those that are specific to the issue of PT from the ROCKET

6    major -- on the ROCKET major bleed data.  So that's the Request

7    No. 3.

8               4 and 5 deal with the company receives the

9    strike-through from the FDA.  What did the company do?  That

10   goes to this impossibility.  Did the company simply get the

11   strike-through document and put it in a file and do nothing, or

12   did they discuss it?  Did they consider moving forward?  Did

13   they consider not moving forward?  Did they make a phone call?

14   What did they do?  And 4 and 5 go specifically to the issue of

15   what happened.

16              And while the defendants have said these

17   requests may be unlimited in time, these strike-throughs

18   occurred in very specific time frames:  June of 2011,

19   October 2011.  What happened on those days?  We have some

20   custodians.  We've searched those custodians e-mails.  But if

21   there were meetings or discussions within the company that were

22   recorded either by e-mail or otherwise, we think that those go

23   right to the heart of the matter.

24              And then, finally, we've identified --

25   plaintiffs have identified as part of the discovery that the

OFFICIAL TRANSCRIPT

1   defendants produced in December and previously discovery,

2   certain custodians that worked for Janssen in the regulatory

3   department.  As part of our review, and specifically related to

4   the EINSTEIN study, we identified another key regulatory

5   custodian that had not been produced to us.  This same

6   custodian was working at the same time with the same people

7   involved with both the AFib approval, the VT treatment

8   approval, and we believe that his file is highly relevant.

9              And just, Your Honor, briefly, I just want to

10  discuss why we believe this discovery is necessary, which are

11  gaps.  For example, this shows -- this document that we've

12  included in the PowerPoint, and it's in our briefing, there was

13  a June 23rd, 2011 meeting with the FDA to discuss the clinical

14  pharmacology section.  That's Section 12.12 [sic] of the label.

15             Despite the e-mail traffic at the time

16  indicating there was an expectation that they would discuss

17  Section 12.2, these minutes make no mention of 12.2, but they

18  certainly do demonstrate the company's ability to get on the

19  phone and teleconference with the FDA and discuss various

20  sections of the label.

21             We believe that, in light of receipt of this

22  strike-through, if there were such minutes at the time

23  regarding where they actually discussed that strike-through,

24  Section 12.2, those should be provided to us.  And this gap in

25  these minutes that we received from the company seem to

 1    indicate that that wasn't discussed at all.  And maybe that's

 2    the fact.  But if there were minutes, we think we're entitled

 3    to those.

 4              Other gaps that are -- we think are important.

 5    For example, the reason why we believe this -- the back and

 6    forth between the FDA cannot be just simply read as the FDA

 7    sent the strike-through and made the changes.  In

 8    November 4th of 2011, hours before they have to get the FDA

 9    approval for ROCKET, Alison Blaus from the FDA sends the

10    company a revised label.  It's the final revised label that

11    becomes the final approved label on November 4th of 2011.

12              She says the company has to accept those

13    changes, submit it within the hour.  But right after receiving

14    it, the FDA's key regulatory person for ROCKET sends that label

15    out across the company to a large number of people and says,

16    "By the way, team, Sanjay Jalota, one of the other regulatory

17    employees, spoke to Alison at the FDA this morning, and here

18    are the changes."  Well, this raises the question, every change

19    that occurs in a label, even if the FDA transmits it, doesn't

20    mean that the change was instigated or started with the FDA.

21    It could have started with the company.

22              And it is these types of e-mails that we think

23    that might exist, and these gaps.  And we recognize we may not

24    ever get every single e-mail.  Some e-mails may not exist.  And

25    we may not be able to discover every single custodian that

1    works at their employ.

2              But in light of these gaps is why we believe

3    that the Request for Admissions that we have drafted are

4    important.  Because they allow us to at least know, and have

5    the company answer, did they request a meeting, did they submit

6    language, did they have documents that describe these -- what

7    they did whenever these strike-throughs came into the company.

8    And that's why we believe the discovery is relevant.

9              One other thing, Your Honor, which is why we

10   believe that the gaps exist is that there are -- sometimes we

11   receive an e-mail and all we have is -- it's an e-mail from the

12   FDA to the company.  And while the company went back and

13   searched the files of certain custodians and found encrypted

14   e-mails and gave them to us, certainly filling part of the gap,

15   but there still exists e-mails from the FDA to the company that

16   we can find where we do not have the original e-mail.

17             The only reason we have the e-mail is because

18   someone in the company forwarded it to their colleague down the

19   hall.  But what that doesn't tell us -- while we may have that

20   e-mail, and we can assume that they didn't change it or edit it

21   in some way, we might be able to make that assumption, although

22   certainly we don't like to assume anything in these regards,

23   what about the e-mails that were never forwarded?  What about

24   the e-mails that never got passed along the company that was

25   received from the FDA?  We know that that happens.

1          And, therefore, because of those gaps, we

2     believe this limited set of discovery Request for Admissions

3     and limited Request for Production should be answered and are

4     relevant.

5          Thank you, Your Honor.

6          **THE COURT:**  Any response?

7          **MS. SHARKO:**  Yes.  Good morning.  Susan Sharko for

8     the defendants.

9          I'd like to talk about four things.  First, the

10    law; second, the time line of what we've been doing for the

11    last three years that bears on these issues; third,

12    specifically what discovery there has been in this area; and

13    fourth, why it isn't as easy as they say it is and why it

14    really is argument and not evidence.

15         So first on the law.  This is not a motion to

16    compel discovery.  This is a motion pursuant to Rule 56(d).

17    Here's an excerpt from one case, *Raby versus Livingston*, 600

18    F.3d 552, 2010, the Fifth Circuit.  The plaintiffs are entitled

19    to discovery they need to oppose a summary judgment motion.

20    This rule came into being because people were filing premature

21    summary judgment motions, arguably premature, and the opposing

22    side needed discovery to address the issues in the motion.

23         That's not where we are here after three years,

24    three trials, and three dispositive motions.  Rule 56 -- this

25    says (f), it's now (d) -- requires that the plaintiffs "set

OFFICIAL TRANSCRIPT

1  forth a plausible basis for believing that specific facts,

2  susceptible of collection within a reasonable time frame,

3  probably exist and indicate how those emergent facts, if

4  adduced, will influence the outcome of the pending summary

5  judgment motion."

6          We submit that the plaintiffs have not and

7  cannot do that on this extensive record.

8          Finally, the courts uniformly recognize that

9  discovery before a ruling on summary judgment is not unlimited;

10  and if the discovery is not likely to produce the facts they

11  need, it should not be allowed.

12          And, finally, the courts emphasize, and this is

13  noted, for example, in the case of *McKay versus Novartis*, 751

14  F.3d 694, the Fifth Circuit, that discovery has to be

15  diligently pursued.  So let's look at the time line of where

16  we've been here.  I have a copy for Your Honor.

17          Discovery on these issues started three years

18  ago this week when the plaintiffs served a massive subpoena on

19  the FDA.  Your Honor will recall that we had extensive

20  discussions, formally and informally, about the breadth and

21  scope of that subpoena and whether any assistance was needed

22  from the Court to get the FDA to produce what is necessary.  I

23  submit that to the extent the plaintiffs believe there is

24  anything else, the FDA is the more likely custodian of it than

25  Janssen.

1              We went from April 22nd, 2015, when the subpoena

2      was served, to September 2015, where the parties heavily

3      negotiated and finally agreed on a protocol for discovery.  We

4      would collectively produce five million pages per month, and

5      the PSC got to select the files for production.

6              Then going into March 2016, we had the two-day

7      deposition of a regulatory witness, Mr. Jalota, J-A-L-O-T-A.

8      Then we had a two-day deposition of a regulatory witness,

9      Ms. Kollath, K-O-L-L-A-T-H.  And their names are all over the

10     e-mails that are the subject of this request.  Then in June, we

11     had the deposition of a regulatory witness, Ms. Rhoge,

12     R-H-O-G-E.

13             Discovery was to be completed and cut off on

14     July 29th, 2016.  The parties, by agreement, as embodied in PTO

15     21, had no obligation to produce documents after July 29th,

16     2016.  So one significant issue we have with the discovery

17     requests that are now before the Court, and I'll add more

18     information about this later, is that they seek information

19     beyond July 29th, 2016.  So we would have to go back to all the

20     custodians and all the files and recollect and redo.

21             Fast forward to August 2016.  The plaintiffs

22     served us with interrogatories regarding the affirmative

23     defense of preemption, and we answered those interrogatories,

24     notwithstanding all of the concerns that we all have about

25     interrogatories.

1              We go into September 2016.  Regulatory witness

2    Ms. Patel, P-A-T-E-L, was produced for deposition.  While it

3    was a one-day deposition, they could have had two days.

4              Moving on into October.  We had a discovery

5    cutoff of October 3rd, 2016.  And then, importantly, discovery

6    is over and we turn to trials.  So in January 2017, we filed

7    essentially the same motion that is now pending before Your

8    Honor.  We filed it in the *Boudreaux* and *Orr* cases.  Summary

9    judgment on the grounds that federal law preempts plaintiffs'

10   failure to warn claims.

11             Plaintiffs filed their opposition at the end of

12   February 2017.  They did not argue that they needed more

13   discovery.  They did not argue that the record was complete.

14   Instead they addressed the issues on the merits.  We had oral

15   argument on March 23rd, 2017.  They did not argue discovery is

16   incomplete.  They did not argue they needed more.  They

17   addressed the issue on the merits.  And on April 13th, 2017,

18   they won.  The motion was denied.

19             We move into trial.  We had a witness we were

20   compelled to produce at the *Boudreaux* trial who testified to

21   regulatory issues, these same regulatory issues, Dr. Peters, in

22   April 2017.  Then we had the verdict in favor of the defendants

23   in May.

24             We moved on to trial No. 2.  On June 6th,

25   regulatory witness Mr. Jalota testified live via video connect

OFFICIAL TRANSCRIPT

1    at the *Orr* trial.  Then on June 7th, 2017, we filed for the

2    second time a motion for summary judgment on failure to warn

3    preemption.  The *Orr* verdict came in.  Plaintiffs filed their

4    opposition to the preemption motion in the *Mingo* case on

5    July 7th, 2017.  They did not argue they needed more discovery.

6    They did not argue the record was complete.

7                And, as everybody knows, at the end of July,

8    they won the motion.  It was denied.  We move on to the *Mingo*

9    trial in August.  We bring in another witness, Mr. Shah.  He

10   testifies about the strike-through documents.  The verdict

11   comes in.

12               In September, September 21st, 2017, we file a

13   motion for failure to warn preemption again.  It's essentially

14   the same motion that we've lost on two different occasions

15   before Your Honor, and we've lost it on two different occasions

16   in Philadelphia, and at no time in any of those four motions

17   did anybody say, "Oh, we need more discovery."

18               In November, the plaintiffs filed a formal Rule

19   56(d) declaration in opposition to the motion.  Now, what did

20   they want?  They wanted the, quote/unquote, encrypted

21   documents, and they had a question about a database.  So let me

22   take a few minutes and talk about encryption.

23               The fact that there were encrypted documents was

24   known to everyone.  There was something in the discovery

25   protocol about how to deal with encrypted documents.  At a very

1  high level, when the FDA and the companies communicate, the

2  documents are encrypted for security purposes.  Certain people

3  have passwords that allows them to un-encrypt the documents.

4          But once unencrypted, the documents can be

5  forwarded throughout the company, and they're put in a

6  database.  The plaintiffs said there are still documents that

7  are encrypted, and they may have something important on the

8  issue of preemption.  Our position was, it's extraordinarily

9  burdensome to un-encrypt and produce the documents, and we

10 don't think there's anything important there.  Because if there

11 was, it would have been forwarded and you would have those

12 documents.

13          Nevertheless, to resolve the issues and to move

14 to the merits of preemption, we agreed to produce the encrypted

15 documents in the files of the four or five regulatory

16 custodians up to the agreed upon cutoff, because that's what we

17 had collected, in 2016.  That effort cost the company upwards

18 of $25,000 to do that.

19          Individual document people had to go sit at the

20 computers of those custodians and manually un-encrypt these

21 e-mails one-by-one and then print them and do whatever they do

22 to get them into the production.  But we did that.  We

23 satisfied all the concerns the plaintiffs had in their

24 November 56(d) certification.  And we produced those documents,

25 most of them, on December 21st, 2017.  We produced some

1  additional documents on January 17th, 2018.

2          And then we get to April 6th, when they file the

3  second Rule 56 request.  Now, what have we produced?  What

4  regulatory documents do they have?  Well, this is all laid out

5  on page 7 of our brief.  They have the encrypted documents,

6  which I've discussed.  They have the custodial files of the key

7  regulatory custodians they selected.

8          They mentioned Mr. Truong.  Do they have

9  Mr. Truong's custodial file?  No.  Did they ever ask for

10  Mr. Truong's custodial file over the last three years?  No.

11  Mr. Truong's primary area of responsibility in the regulatory

12  arena was on the EINSTEIN choice series of studies.

13          And I told the plaintiffs that, but Exhibit 19

14  of their submission says it better than I can.  It's a list of

15  Mr. Truong's regulatory accomplishments and duties, and they

16  all relate to the EINSTEIN study.

17          So I submit that this eleventh-hour request for

18  Mr. Truong's custodial file is not pertinent to the preemption

19  motions before the Court.  It doesn't meet the standards of

20  Rule 56(d), and it's more -- it really more relates to the

21  rifle-shot, topping-off discovery issues that we're negotiating

22  now since EINSTEIN choice, the latest study, and label change

23  is the subject there.  But they don't need Mr. Truong's file,

24  his whole custodial file, to respond to this summary judgment

25  motion on preemption, which they've already won four times.

1          Now, what they do have, as listed here on page
2    7, the complete IND and NDA files through early November 2017
3    for multiple indications.  They have our e-mail correspondence
4    with the FDA that was kept in our NDA files and the files of
5    the custodians that were identified and requested, the people
6    Mr. Birchfield identified as the key people.  They have e-mail
7    correspondence with the FDA about the proposed labeling for the
8    AFib indication from the NDA files and from the custodial
9    files.
10          They have the draft labels leading up to
11    approval for one indication.  They have the draft labels
12    leading up to approval for another indication.  And they have
13    the custodial files for these five people up through the 2016
14    date of collection.
15          We submit that that's enough to allow them to
16    oppose summary judgment.  It was enough to allow them to
17    successfully oppose summary judgment four times in the past.
18          They talked about gaps in the argument.  Let me
19    just address a couple of these gaps.  They said we didn't
20    produce the original June 2011 e-mail from Mr. Newman.  They
21    raised this with me, and we looked at it.  We don't have the
22    original stand-alone e-mail from Mr. Newman.  That was over two
23    years before the document hold went into place.  But what we do
24    have is many, many copies of this e-mail at the bottom of other
25    e-mail chains.  So they have it; they just don't have it as a

1    stand-alone e-mail.

2              Are there other e-mails from 2011 that they

3    might not have?  In theory, yes.  But that's because there was

4    no document hold then.  That goes back years before the

5    litigation started.  The same thing with the gap on this Newman

6    e-mail.  And there are others like that.

7              Then they raise as a gap a SharePoint site

8    referenced in, we call this witness Ms. Judy K, so we don't

9    have to pronounce her last name.  They actually have that

10   SharePoint site.  That was produced already.

11             So now turning to the specific discovery

12   questions at issue.  First Request for Admissions -- and, Your

13   Honor, Your Honor is absolutely right about responding to

14   Requests for Admissions.

15             If I asked my oldest son, "Admit what your name

16   is and that you're known by that name," that would result in a

17   long answer.  Because he would admit his name is Matthew

18   William Peterson, but in his squadron, everybody calls him by

19   his call sign.  And when's out on the boat dealing with the

20   enlisted people, they call him "Lieutenant," and it goes on

21   from there.  So these questions they have are not susceptible

22   of a clean admit or deny.  We need to explain, number one.

23             Number two, a lot of them are what I would call,

24   "when did you stop beating your dog" questions.  Because it's

25   not, you know, you didn't have a meeting with the FDA.  Well,

1    we don't have to have a meeting with the FDA.  And then a lot
2    of them are unlimited in time.  So we can respond on some of
3    the before's, but after, that takes us right up to the present.
4    That takes us to documents that haven't been collected.  That
5    takes us to new indications.  That takes us to ongoing
6    discussions with FDA.  And that's well beyond the scope of
7    reasonable discovery or the scope of the motion.

8              And the same thing on the documents.  There was
9    argument on document Request No. 1, label working group minutes
10   and the like.  We've agreed to produce those.  And I hope that
11   there's a relatively small number of documents, I believe, and
12   we hope to have those within two weeks.  That's their Request
13   No. 1.

14             Their Request No. 2, we believe that they have,
15   and we've told them that, and we've described that in our
16   brief.

17             As to the others, they're unlimited in time.
18   They go out into the future.  And it's not the way we -- we
19   jointly, the plaintiffs and the defendants, agreed to do
20   discovery.

21             So all e-mails on issue X.  Well, if there were
22   e-mails on issue X before the cutoff and the documents were
23   collected in the files of the designated custodians, Mr. Jalota
24   and those people, they would have been produced.  Can there
25   possibly be an e-mail in somebody else's file somewhere?  I

1  think that's unlikely, but it's possible.  And the amount of

2  time and money and effort there would be to find that is beyond

3  reasonable.

4          So we go back to where we began, Rule 56(d).

5  What do they really need to oppose a motion that they've won

6  four times?  Does it exist?  Is it reasonably findable?  And

7  will it fill a potential gap in the proof?  And I submit the

8  answer to that is no.

9          The motion should be denied with the exception

10  of Request for Admission No. 1 and Request for Production No.

11  1, which we will respond to.

12        **THE COURT:**  So the request of 1 is before the change,

13  the strike-through, meetings before the strike-through?

14        **MS. SHARKO:**  Yes.

15        **THE COURT:**  And the meetings after the

16  strike-through, the problem that you have is that it's

17  open-ended?

18        **MS. SHARKO:**  It's open-ended and it requires an

19  explanation.

20        **THE COURT:**  Yep.

21        **MS. SHARKO:**  Not just -- it may be that we didn't

22  have -- we didn't ask for meetings within a certain period of

23  time, but why?  It's misleading to just say yes or no.

24        **THE COURT:**  Yeah.  Okay.  All right.  Then really

25  what you're talking about is just the explanation and the time?

OFFICIAL TRANSCRIPT

1    **MS. SHARKO:**  Correct.

2    **THE COURT:**  Okay.  All right.  Any response?

3    **MS. SHARKO:**  Thank you.

4    **THE COURT:**  Thank you, Susan.

5    **MR. BIRCHFIELD:**  Yes, Your Honor.

6            So one of the explanations that Ms. Sharko just

7    offered is that this is -- that the company is not required to

8    have meetings.  And, okay, that's fine.  We're just -- we're

9    entitled to the evidence of whether or not they had a meeting,

10   whether or not they proposed any language.  Because the legal

11   standard for preemption, Your Honor, is whether -- is whether

12   or not they made an earnest attempt.

13           So once the FDA gave them this language, did

14   they make an earnest attempt to strengthen their warning?  It

15   is critical evidence, Your Honor.  If they didn't ask for a

16   meeting, they didn't propose language, if they did nothing,

17   that is critical evidence for the plaintiffs, and it is

18   something that defendants could, and should, answer, Your

19   Honor.

20           **THE COURT:**  I think what she's saying is that there's

21   no date on it.  So if you have a date, like up to today, her

22   answer was they didn't have a meeting, but she explains it that

23   they didn't need it for various reasons.

24           **MR. BIRCHFIELD:**  Yes.  So, Your Honor, I mean, we

25   would accept -- we'll accept an answer that says, "We did not

OFFICIAL TRANSCRIPT

1  request a meeting up to today, today's date.  We did not

2  request -- we did not submit proposed language up to today."

3  That would be acceptable to us, Your Honor.

4          **THE COURT:**  Susan, from your standpoint, if you can

5  explain why you didn't do it, are you able to answer at that

6  point?

7          **MS. SHARKO:**  If we can explain why we didn't do it,

8  we will answer up to the end of 2016, when these issues were

9  the subject of discovery.  I would object to going up to the

10  present.  That requires a whole new round of inquiry.

11          **THE COURT:**  All right.

12          **MR. BIRCHFIELD:**  Your Honor, that would certainly be

13  helpful.  But it's also -- I think it's important, Your Honor,

14  to recognize the different situation that we're in now versus

15  the situation for each of the previous motions for preemption.

16  Always -- and Your Honor has pointed this out to us, to

17  lawyers, numerous times, there's always a tradeoff.  You could

18  always get more discovery, but you have to have a tradeoff.

19  You need some discovery.  I don't think anyone would suggest

20  you don't get any discovery, but there has to be a balance, and

21  there has to be a trial date.

22          So for each of those plaintiffs in the

23  bellwethers, we could have said, "Hey, we really need to answer

24  these questions," but the trade-off would have been, "You don't

25  get your trial date.  It's going to be bumped another six

1    months or a year."  So there was that tradeoff.  It was an
2    individual plaintiff making a decision about a tradeoff from
3    getting the answers that they would certainly like to have,
4    feel like they should have, and getting their day in court.
5    We're in a much different situation now.
6              The pretrial order -- Pretrial Order 21 was
7    entered on the same day as CMO 2.  That dealt with the
8    discovery period for these bellwethers.  We're past that.
9    Ms. Ibanez and the defendants in their pleadings make it clear,
10   they are seeking this summary judgment to apply to Ms. Ibanez.
11   We don't think it's appropriate to go to the Fifth Circuit at
12   this stage, but that's an argument for another day.  But
13   they're seeking to have this preemption apply to all of our
14   plaintiffs, the ones that are in the discovery pool.
15             We're entitled to button down this issue, Your
16   Honor, before it is submitted to the Fifth Circuit, before it
17   becomes a part of every one of the 22,000 plaintiffs in this
18   case.
19        THE COURT:  Okay.  I got it.  I understand it.  All
20   right.  Let me look at it with the material you've given to me.
21   I'll do it immediately for you.
22        MR. BIRCHFIELD:  Thank you, Your Honor.
23        THE COURT:  Thank you very much.  Court will stand in
24   recess.
25        THE DEPUTY CLERK:  All rise.

OFFICIAL TRANSCRIPT

1          (WHEREUPON, the proceedings were concluded.)

2                              *****

3                           <u>**CERTIFICATE**</u>

4          I, Jodi Simcox, RMR, FCRR, Official Court Reporter

5    for the United States District Court, Eastern District of

6    Louisiana, do hereby certify that the foregoing is a true and

7    correct transcript, to the best of my ability and

8    understanding, from the record of the proceedings in the

9    above-entitled and numbered matter.

10

11

12                         <u>*s/Jodi Simcox, RMR, FCRR*</u>
                            Jodi Simcox, RMR, FCRR
13                          Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25

OFFICIAL TRANSCRIPT