UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA


IN RE:  XARELTO (RIVAROXABAN)   *        14-MD-2592
PRODUCTS LIABILITY LITIGATION   *
                                *        Section L
                                *
Relates to:  All Cases          *        May 25, 2018
                                *
*  *  *  *  *  *  *  *  *  *  *  *  *


STATUS CONFERENCE BEFORE
THE HONORABLE ELDON E. FALLON
UNITED STATES DISTRICT JUDGE


<u>Appearances</u>:


For the Plaintiffs:          Herman Herman & Katz, LLC
                             BY:  LEONARD A. DAVIS, ESQ.
                             820 O'Keefe Avenue
                             New Orleans, Louisiana 70113


For the Plaintiffs:          Beasley Allen Crow Methvin
                               Portis & Miles, PC
                             BY:  ANDY BIRCHFIELD, ESQ.
                             Post Office Box 4160
                             Montgomery, Alabama 36103


For the Defendants:          Irwin Fritchie Urquhart
                               & Moore, LLC
                             BY:  JAMES B. IRWIN, ESQ.
                             400 Poydras Street, Suite 2700
                             New Orleans, Louisiana 70130


For the Defendants:          Drinker Biddle & Reath, LLP
                             BY:  SUSAN M. SHARKO, ESQ.
                             600 Campus Drive
                             Florham Park, New Jersey 07932

Official Court Reporter:        Toni Doyle Tusa, CCR, FCRR
                                500 Poydras Street, Room B-275
                                New Orleans, Louisiana 70130
                                (504) 589-7778




Proceedings recorded by mechanical stenography using
computer-aided transcription software.

## PROCEEDINGS

### (May 25, 2018)

THE COURT:  Be seated, please.  Good morning, ladies and gentlemen.

Call the case.

THE DEPUTY CLERK:  MDL 2592, *In re:  Xarelto Products Liability Litigation*.

THE COURT:  Counsel make their appearance for the record, please.

MR. DAVIS:  Good morning, Your Honor.  Leonard Davis from the law firm of Herman Herman & Katz, plaintiffs' co-liaison counsel.

MR. IRWIN:  And also good morning, Your Honor. Jim Irwin for the defendants.

THE COURT:  We are here today for our monthly status conference.  We have several hundred people on the phone, so please use the microphone.

I met a moment ago with lead liaison counsel to go over the agenda.  We will take it in the order presented.

MR. DAVIS:  Thank you, Your Honor.  With respect to the joint report and new pretrial orders, there are two new pretrial orders since the last status conference.  One of them is not listed because it just came out a couple days ago on May 23.

The first one is PTO 13C, which was entered on

09:07

1    April 20, which is a request for new signature on affidavits.

2    We have encouraged plaintiffs' counsel to look at those and get

3    those turned around as they come in so that, in particular, the

4    Wave 1 claimants can get their medical records that have been

5    requested.

6              The other is PTO 14C, which was entered on

7    May 23, which enables data to be produced by execution of

8    authorizations.  We also have encouraged folks to look at those

9    matters because some type of a response needs to be done

10   timely, and they need to show that they are doing efforts to

11   get the information and provide those authorizations.  So those

12   are two new pretrial orders.

13             With respect to Item 2, case management orders,

14   as the Court is well aware, the selections were made by both

15   plaintiffs, defendants, and the random selections by the Court

16   of the approximate 600 individuals into Wave 1.  The parties

17   are continuing to discuss that, look at that, and will be

18   embarking on the discovery phase shortly that's set forth in

19   CMO 6.

20             **THE COURT:**  Yes.  The stage of the litigation at this

21   point, we had the discovery in the matter, extensive discovery,

22   and then we teed up several bellwether trials to give the

23   parties an opportunity to see the case in action and the case

24   being tried.  We tried three of those cases, two in New Orleans

25   and one in Mississippi.  One was scheduled in Texas but did not

09:09   1    go past the motions stage.

2              In any event, at this period it's appropriate

3    for me to begin sending cases back from whence they came rather

4    than just bailing out of the litigation and sending everything

5    back to the various districts.  As we know, I have cases from

6    every district in the United States, every state in the

7    United States, so I'm trying to do it in stages to give the

8    parties an opportunity to handle those cases as they go back.

9              We are in the stage now where the Court has

10   picked 200 randomly, the defendants have picked 200, and the

11   plaintiffs have picked 200.  So we have a wave of those cases

12   that now are being drilled down closer in discovery and things

13   of that sort so that they can be tried at the appropriate state

14   or federal level.  That's what we are doing now.

15        **MR. DAVIS:**  The parties will be working over the next

16   week or so to put together a comprehensive list so that

17   Your Honor can have that list of the Wave 1 claimants.

18   Hopefully we can get that posted and individuals will have an

19   opportunity to get a master what I will call roster of those.

20        **THE COURT:**  Okay.  Susan, do you want to weigh in on

21   this?

22        **MS. SHARKO:**  Yes.  Would this be a good time to give

23   an update on the cases?

24        **THE COURT:**  Sure.

25        **MS. SHARKO:**  We have been working closely with the

09:11

1    plaintiffs and appreciate Mr. Birchfield's, in particular,

2    cooperation to try to drill down and sort these things out.

3                  So we have 600 cases in this first wave.  As of

4    this morning, 43 of those -- and that's an update from the last

5    half hour -- have been dismissed or will be dismissed

6    voluntarily by the plaintiffs.

7                  We have 400 cases the plaintiff picks and the

8    defense picks where the PFS and authorizations were due on

9    May 16.  Right now we have 93 cases that are missing a PFS.

10   That's down from 121.  Of those 93, six people have requested

11   extensions.  We haven't yet responded to them.  26 of those

12   plaintiffs have apparently died at some point in the past, so

13   new authorizations and appointments to proceed with the case

14   are needed.  We urge the plaintiffs to get those PFSs in

15   because workup doesn't proceed until we have a PFS.  Of those

16   93 cases, two-thirds of them were defense picks.

17                  Now, there are 29 cases in the pool of 600 where

18   there's no subject matter jurisdiction.  We gave that list to

19   the plaintiffs, and we understand they are working on it.  Of

20   those 29, 20 can be cured by the dismissal of an unnecessary

21   defendant.  We have told the plaintiffs who that defendant is

22   and will work with them to get those cases dismissed or in the

23   right place, right forum.

24                  There are nine cases in the pool where the

25   plaintiffs have not served one or more defendant.  We will

09:13

1  continue, at least in the short run, to work those cases up,

2  but we urge the plaintiffs -- and we gave Mr. Birchfield a

3  list -- to please serve us because that's the way it works.

4          It turns out, of the cases that were eligible

5  for CMO 6 consideration, there were 178 plaintiffs who had more

6  than one lawsuit filed.  Of those 178 -- and we are trying to

7  work with the plaintiffs to get at least one of the cases

8  dismissed -- three were picked for the CMO 6 pool.

9          So what we agreed with the plaintiffs, for at

10 least this round, is dismiss one of those people, and the other

11 person can have the seat in the CMO 6 pool.  One firm has done

12 that.  One has declined.  Our position is that you are either

13 in CMO 6 or you are dismissed; you can't opt out.  The third

14 firm we haven't heard back from.

15          Then we have 35 cases where we have no medical

16 record authorizations.  That's down from a much larger list.

17 So we appreciate Mr. Birchfield's cooperation in reaching out

18 to the plaintiffs, but that's also a serious deficiency because

19 we cannot work up the case without medical records.  In this

20 one I note, of the 35, 20 of those cases are with the same law

21 firm, The Gallagher Law Firm.  So that list would go way down

22 if the Gallagher firm could get us authorizations.

23          So that's the report on overall of the cases.

24 We do have 304 PFSs in.  We have reviewed 275 of them.  105 we

25 found to be compliant, and then another 170 we believe have

09:15

1    substantive deficiencies.  We have sent out letters through MDL
2    Centrality.  We urged the plaintiffs to get these deficiencies
3    cleared up and resolved.
4            We remind the plaintiffs that these were
5    negotiated PFSs with Court approval, so you can't just not
6    answer questions; you have to answer the questions and provide
7    detail.  Obviously if anybody feels they have gotten a
8    deficiency letter that's not deserved, just reach out to us,
9    and we will figure it out.
10           Looking ahead, as we went through the inventory
11   to select our 200 CMO 6 cases, we saw a number of cases where
12   the plaintiffs had a medical record, for example, that showed a
13   Xarelto prescription, a medical record that showed a bleed,
14   which is at this point all they needed to get into the action,
15   but they weren't on Xarelto at the time of the bleed.  In fact,
16   some of them they were on another oral anticoagulant.
17           So we will be working with the plaintiffs to try
18   and figure out an efficient process to weed out those cases.
19   We also ask that people look at their files and determine, even
20   if they are not in the CMO 6 pool, that they really have all
21   the elements they need to proceed.
22       THE COURT:  Andy, do you have any response?
23       MR. BIRCHFIELD:  Yes, Your Honor.  Just from our
24   vantage point, Your Honor, we have been very pleased with the
25   response that we are getting from plaintiffs' counsel.  There

09:16

1   are some exceptions, but overall the plaintiffs' counsel and

2   the plaintiffs are working very hard to respond, so I think

3   this process is working well.

4            Also, I do appreciate Ms. Sharko and the defense

5   counsel working cooperatively here to advance the process.  We

6   know that there are challenges, and we are just working through

7   those together to get this wave of cases ready and the

8   discovery completed.  I expect that we will continue to have

9   cooperation from the plaintiffs' counsel as well.

10            There are circumstances where plaintiffs have

11   died.  This is due to the nature of this type of case.  As the

12   Court has seen from Mr. Woody's report about the makeup, the

13   demographics of this inventory, it's an elderly population.  We

14   are working together to get these completed, and I appreciate

15   the cooperation.

16            **THE COURT:**  Great.

17            **MR. DAVIS:**  Item 3 on the agenda is counsel contact

18   information forms.  Your Honor, we continue to receive those.

19   In fact, we encourage plaintiffs' counsel to get those to us,

20   together with updates, so they can continue to get information

21   from the executive committee or the PSC with respect to ongoing

22   matters.

23            Plaintiff fact sheets, I think that we have gone

24   through that.  I think Jake also may have a report that he

25   would like to give to the Court.

09:18

1    The next item, just so I can get through that,
2  is defendant fact sheets.  As Your Honor is aware, defendant
3  fact sheets will be due on a number of the Wave 1 claimants
4  quite soon, and we look forward to receiving those.

5         **THE COURT:**  Okay.  Let's get a status of the whole
6  litigation and see what we are dealing with, Jake.

7         **MR. WOODY:**  Good morning, Your Honor.  Jake Woody
8  from BrownGreer.  I have an update on the fact sheets for the
9  whole MDL and also a breakdown of the information on the CMO 6
10 plaintiffs pool.

11        As to date, we somewhere 21,478 fact sheets
12 submitted.  That's an addition of 347 since my last report to
13 you.  We have 23,003 plaintiffs registered with us.  That
14 should roughly match the number of cases, I think, in the MDL.
15 That's an addition of 233 since my last report.

16        In April of 2018 we received 432 fact sheets.
17 Our monthly average is 469.  So far in May we have 328, which
18 is a little lower than the average, but as you can see it sort
19 of bounces around month to month.  So I wouldn't call that a
20 trend until we see it happen a few months in a row.

21        The next few slides I have deal with information
22 about the 600 CMO 6 plaintiffs.  They come from 46 different
23 states.  I think it's 131 different law firms.  The top state
24 is North Carolina with 54, Ohio has 53, and Texas has 41.
25 Those roughly match the statistics in the MDL as a whole.  The

most populous or most frequent states in the MDL also have the
most in the CMO 6 population.  I won't go through the whole
list, but we do have people from 46 of our 50 states.  Montana,
Vermont, and Wyoming are at the bottom.

As Andy mentioned, this is an older population.
This chart shows the age of the CMO 6 plaintiffs.  You can see
that most of them are over the age of 60.  In fact, 92 percent
of the CMO 6 plaintiffs are over 60.  That compares with
82 percent in the MDL as a whole.  The CMO 6 population is just
a little bit older than the MDL population as a whole, but I
think that's somewhat intentional to get representative people
to trial.

The CMO 6 injury information also matches the
MDL.  The most common alleged injury is gastrointestinal
bleeding.  54 percent of the CMO 6 population alleged that
injury, and that compares with 47 percent in the MDL.  So,
again, it's a little bit higher.  The most common injury is a
little bit higher in the CMO 6 population, but again I think
that's intentional.

And then, finally, the indication or the reason
for Xarelto use in the CMO 6 population, the most common
indication is reduction of risk of stroke or AFib.  67 percent
of the CMO 6 population took Xarelto for that reason.  That
compares favorably with the MDL, which I think is 54 percent
make that allegation.  So the CMO 6 population is, I think,

09:22

1    representative at least initially, at first glance, of the MDL

2    as a whole, with some factors weighted to get the right cases

3    to trial at some point.

4              That's my update.  I know that it sounds like

5    the CMO 6 population may change a little bit, so I can update

6    this when I get the final group of people.

7              **THE COURT:**  Let's keep an eye on it.  I would like

8    that population to mimic as much as possible, with the

9    exception of some tweaking, the whole body of the litigation

10   because that's the purpose of it.

11             **MR. WOODY:**  Thank you, Your Honor.

12             **MR. DAVIS:**  There's nothing new to report on service

13   of process on defendants, but plaintiffs certainly can look at

14   the order if they need help in having service.

15             On preservation order, plaintiffs are reminded

16   to review the pretrial orders.

17             There's nothing new on the next item, order

18   governing the parties' interactions with plaintiffs'

19   prescribing and treating physicians, other than look at the

20   order, and the Wave 1 individuals are reminded of that.

21             With respect to the bellwether cases, the

22   appeals are pending.  The plaintiff appellate brief was filed

23   timely with the Fifth Circuit, and the defendants' brief is due

24   soon.

25             On CMO 6, I think we have talked about that.

09:23

1      State/federal coordination, the *Cooney* case is
2  scheduled to begin August 6, and the *Rush* case was postponed by
3  the Court.
4      I believe that's it, Your Honor.
5      **THE COURT:**  There are two cases in Philadelphia to be
6  tried in state court?
7      **MR. DAVIS:**  The *Cooney* case is scheduled for trial in
8  early August.  The *Rush* case that was scheduled to begin
9  June 11 was postponed and is rescheduled at the end of the
10  year.
11      **THE COURT:**  Anything else from anybody?
12      Folks, the next is June 27, and the following
13  one is August 6.  Thank you very much.  Court will stand in
14  recess.
15      **THE DEPUTY CLERK:**  All rise.
16      (Proceedings adjourned.)
17                              * * *
18
19
20
21
22
23
24
25

1        <u>**CERTIFICATE**</u>

2            I, Toni Doyle Tusa, CCR, FCRR, Official Court

3    Reporter for the United States District Court, Eastern District

4    of Louisiana, certify that the foregoing is a true and correct

5    transcript, to the best of my ability and understanding, from

6    the record of proceedings in the above-entitled matter.

7

8

9                                    <u>*/s/ Toni Doyle Tusa*</u>

10                                   Toni Doyle Tusa, CCR, FCRR
                                     Official Court Reporter

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25