# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| | SECTION L |
| THIS DOCUMENT RELATES TO: | JUDGE ELDON E. FALLON |
| Harriet Ibanez, et al. v. Janssen Research & Development, LLC f/k/a Johnson & Johnson Pharmaceutical Research & Development, LLC, et al. Case No. 2:14-cv-02669 | MAGISTRATE NORTH |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION FOR PARTIAL SUMMARY JUDGMENT ON THE GROUND THAT FEDERAL LAW PREEMPTS PLAINTIFFS' DESIGN-DEFECT CLAIM

Plaintiffs cannot—and do not—contest the fact that federal law preempts a claim that a manufacturer should make major changes to a medicine's design after FDA approves it.  *See* Pls.' Opp. at 3 (conceding that "some regulatory barriers make it more burdensome for manufacturers to alter a drug's design after the FDA has approved it").  As a result, Plaintiffs are now asserting that they are pursuing a "pre-approval" design-defect claim, premised on the theory that Xarelto is unreasonably dangerous because Defendants brought it to market without an accompanying Xarelto-specific anti-Factor Xa assay or a reversal agent.  Federal law preempts this claim too.

As explained in Defendants' opening brief, no Xarelto-specific anti-Factor Xa assay is FDA-approved or commercially available in the United States today.  In fact, a company called Diagnostica Stago formally engaged FDA to discuss approval of its Xarelto-specific anti-Factor Xa assay for use in the United States, but FDA has not approved that or any other such assay for *any* purpose.  Defs.' Mem. (Doc. 7653), at 27–28.  And only recently—years after the medicine's initial approval—did FDA grant approval to a third-party company for a reversal agent for Xarelto.  But, importantly, FDA approved Xarelto with full awareness that no reversal agent was available.

That is all undisputed.  Put simply, Plaintiffs' claim is this: over six years ago, before FDA ever approved Xarelto, Defendants should have (and could have) somehow gained the Agency's approval to incorporate into Xarelto's design two adjunct products that FDA had not approved (one of which still is not approved).  In these circumstances, federal law preempts Plaintiffs' design-defect claim.

**I.      Defendants are not required to prove that federal law preempts Plaintiffs' pre-approval design-defect claims by "clear evidence."**

As an initial matter, Plaintiffs misunderstand the relevant legal standard.  Plaintiffs contend that, under the Supreme Court's decision in *Wyeth v. Levine*, 555 U.S. 555 (2009), preemption does not apply unless there is "clear evidence" that "FDA would have rejected safety-related changes that the manufacturer was required to make under state law."[1]  Pls.' Opp. at 9.  That is not so: the standard for "impossibility" preemption that has emerged from the Supreme Court's *Levine-Mensing-Bartlett* trilogy is "whether the [defendant manufacturer] could *independently* do under federal law what state law requires of it."  *PLIVA, Inc. v. Mensing*, 564 U.S. 604, 620 (2011) (emphasis added); *see also Mut. Pharm. Co. v. Bartlett*, 133 S. Ct. 2466, 2470 (2013) (citing *Mensing*).  And by "independently," the Supreme Court has made clear that it means "unilaterally." *Mensing*, 564 U.S. at 620 (citing *Levine*).[2]

---

[1] Plaintiffs also suggest that preemption is a jury question, *see* Pls.' Opp. at 7–8 (citing *In re Fosamax Prods. Liab. Litig.*, 852 F.3d 268 (3d Cir. 2017)), but this Court has already rejected that argument, consistent with settled Fifth Circuit precedent that "[w]hether a state statute or common law cause of action is preempted by federal law is a question of law," *Ezell v. Kan. City S. Ry. Co.*, 866 F.3d 294, 298 (5th Cir. 2017); *Boudreaux* Trial Tr. 1147:3–15 (stating that preemption is "a question of law, not for the jury") (Exh. 1).  The U.S. Solicitor General recently recommended that the Supreme Court grant brand-manufacturer Merck's petition for certiorari in *Fosamax*, arguing that the Third Circuit wrongly held that preemption is a question of fact.  *See* Br. for the United States as Amicus Curiae, *Merck Sharp & Dohme Corp. v. Albrecht*, No. 17-290, at 12–19 (U.S., filed May 23, 2018).

[2] Plaintiffs argue that the Court should not "thoughtless[ly]" apply *Bartlett* and *Mensing*, which involved generic manufacturers, to design-defect claims against brand-name manufacturers. Pls.' Opp. at 16–17.  But *Levine*, *Mensing*, and *Bartlett* all explain that the question for impossibility preemption is whether the federal statutes and regulations applicable to the manufacturer allow it to unilaterally make the changes that the plaintiff says that state law requires. In fact, the vast majority of courts have recognized that "*Levine*, *Mensing*, and *Bartlett* . . . together stat[e] the same

Plaintiffs' attempt to import *Levine*'s clear-evidence standard to design-defect claims ignores the applicable regulations and the nature of the claim in *Levine.* There, the Supreme Court held a manufacturer's compliance with FDA's *labeling* regulations does not necessarily preempt *failure-to-warn claims* absent "clear evidence that the FDA would not have approved a change to [the drug's] label" because FDA's Changes Being Effected (CBE) regulation—which applies uniquely to labeling changes—expressly "permit[s the manufacturer] to unilaterally strengthen its warning." 555 U.S. at 571–73. That one fact—that the CBE regulation authorizes a manufacturer, in certain circumstances, to unilaterally change the prescription-drug labeling—dictated the outcome. *See, e.g.*, *id.* at 562, 563, 568, 571, 572. Indeed, the Supreme Court itself has explicitly recognized that *Levine*'s holding turned on the existence of the CBE regulation. *See Mensing*, 564 U.S. at 624 (explaining that the rationale of *Levine*'s no-preemption holding is "[s]pecifically" because "the CBE regulation permitted a brand-name drug manufacturer like Wyeth 'to unilaterally strengthen its warning' without prior FDA approval" (internal citations omitted)).[3]

Plaintiffs' misapplication of *Levine*'s *labeling preemption* standard thus misses the key point: Where a manufacturer *can* "independently" effectuate the change that a plaintiff's claim would require, the claim against it is not preempted and may proceed absent "clear evidence" (*e.g.*,

---

test for impossibility preemption." *Yates*, 808 F.3d at 297–98; *see also* Defs.' Mem. in Support of MSJ on Design-Defect Claims (Doc. 7653), at 11–12 n.8 (citing cases).

[3] Plaintiffs' reliance on *Warren v. Boehringer Ingleheim Pharmaceuticals Inc.*, No. 1:16-cv-01326-SEB-MDL, 2017 WL 3970666 (S.D. Ind. Sept. 8, 2017), is misplaced. No other court has suggested that *Levine*'s clear evidence standard applies to design-defect claims—and with good reason. The clear evidence standard applies in the labeling context because the federal regulations applicable to brand-name manufacturers—in particular, the CBE regulation—allow brand manufacturers to make unilateral labeling changes. But no manufacturer—"whether generic or brand-name," *Bartlett*, 133 S. Ct. at 2471—can unilaterally market a drug or make major changes to a drug's design without FDA's prior approval. *See* 21 U.S.C. § 355(a). Further, *Warren* was decided at the Rule 12(b)(6) stage when the contours of the plaintiff's design-defect claim had not yet been defined. It was thus possible that the plaintiff's claim would not "impose a change on the design of the drug requiring FDA approval before it is made." *Warren*, 2017 WL 3970666, at *12 (citing *Yates*, 808 F.3d at 296). In any event, *Warren* ultimately focused on *post-approval* changes to a medicine's design, unlike Plaintiffs' pre-approval design-defect claim here. *See id.* at *11–12 (discussing "major changes, moderate changes, and minor changes" to an approved NDA, and explaining that the "question for decision here" is how a "major change to a brand-name drug should be treated under the applicable legal principles").

*Levine*); where the manufacturer *cannot* "independently" make that change, the claim *is* preempted and must be dismissed (*e.g.*, *Mensing*, *Bartlett*).  This case falls squarely in the latter scenario.

## II.   Plaintiffs' pre-approval design-defect claim is preempted by federal law because Defendants could not unilaterally incorporate into Xarelto's design adjunct products.

Federal law "prohibits" a manufacturer from introducing a drug into "interstate commerce unless the FDA approves the drug as safe and effective for each of the uses suggested on its labeling."  *U.S. ex rel. King v. Solvay Pharms., Inc.*, 871 F.3d 318, 327 (5th Cir. 2017); *see also* 21 U.S.C. § 355(a).  Accordingly, even pre-approval, Defendants could not unilaterally change Xarelto's design to be used in conjunction with an anti-Factor Xa assay or reversal agent *and then* market the resulting product without FDA's approval.

Plaintiffs argue that no federal law "prevent[ed] Defendants from carrying out [the] duty" to create "less dangerous products and br[ing] them to approval and market in lieu" of the product FDA approved.  Pls.' Opp. at 11–12 & n.30.[4]  But this argument ignores the fact that FDA's prior approval is *always* required before a manufacturer may introduce a new drug to market.  *See* 21 U.S.C. § 355(a).  Even if Defendants had redesigned Xarelto before seeking FDA approval, its "ultimate availability" would have still been "contingent upon" the Agency's approval.  *Yates v. Ortho-McNeil-Janssen Pharms., Inc.*, 808 F.3d 281, 299–300 (6th Cir. 2015); *see also Gustavesen v. Alcon Labs., Inc.*, 272 F. Supp. 3d 241, 255 (D. Mass. 2017) ("Federal law prohibits 'any person'

---

[4] In support of this argument, Plaintiffs cite the district court decisions in *Young v. Bristol-Myers Squibb Co.*, No. 4:16-CV-00108-DMB-JMV, 2017 WL 706320, at *7 & n.3 (N.D. Miss. Feb. 22, 2017); *Guidry v. Janssen Pharms., Inc.*, 206 F. Supp. 3d 1187, 1204–05 (E.D. La. 2016); *Sullivan v. Aventis, Inc.*, No. 14-dv-2939, 2015 WL 4879112, at *6 (S.D.N.Y. Aug. 13, 2015); *Trahan v. Sandoz, Inc.*, No. 3:13-cv-350-J-34MCR, 2015 WL 2365502, at *6 (M.D. Fla. Mar. 26, 2015); and *Estate of Cassel v. Alza Corp.*, No. 1:12-cv-771-WMC, 2014 WL 856023, at *6 (W.D. Wis. Mar. 5, 2014).  These cases improperly asked whether Defendants could "design" a different drug before seeking FDA approval.  But, as Defendants have explained, that is not the right question: a manufacturer accomplishes no public-health objective by (and cannot be liable under state law for) merely "designing" a medicine.  Rather, as courts have recognized, the question is whether the manufacturer can unilaterally design *and market* a product.  *See Gustavesen*, 272 F. Supp. 3d at 255; *Yates*, 808 F.3d at 300.  In fact, even *Warren*, on which Plaintiffs rely, recognizes that manufacturers have a "clear federal duty not to market *any* drug without FDA approval."  2017 WL 3970666, at *12 n.6.

from 'introduc[ing] or deliver[ing] for introduction into interstate commerce any new drug' if the FDA has not determined that the 'probable therapeutic benefits' outweigh its 'risk of harm.'" (quoting 21 U.S.C. § 355(a))), *appeal filed*, No. 17-2066 (1st Cir. Oct. 27, 2017). Put simply, Defendants could not have marketed Plaintiffs' proposed "redesigned" formulations of Xarelto without first obtaining FDA approval for that different design.

Because Defendants could not have independently designed and marketed Xarelto to be used in conjunction with an anti-Factor Xa assay or reversal agent, Plaintiffs' claim that Xarelto is unreasonably dangerous in the absence of such a product is preempted. *See Yates*, 808 F.3d at 300 (holding that manufacturer "could not have complied with whatever pre-approval duty might exist without ultimately seeking the FDA's approval prior to marketing [the drug]"); *Gustavesen*, 272 F. Supp. 3d at 255 (finding plaintiff's pre-approval design-defect claim preempted).

A.   **The Court may not presume that FDA would have approved some "redesigned" formulation of Xarelto.**

In an effort to avoid preemption, Plaintiffs repeatedly assert that "Defendants may not rely on a presumption that the FDA would not have approved" Plaintiffs' purportedly "less dangerous alternatives." Pls.' Opp. at 12; *see also id.* at 15 (arguing that "[t]he presumption that FDA would not approve a change" is "prohibited by [*Levine*]"). Instead, in Plaintiffs' view, it is Defendants' burden to show that "the FDA would not have approved a Xarelto-specific assay or an antidote." *Id.* There are two problems with this argument. **First**, as explained above, the *Levine* Court's requirement that the manufacturer produce "clear evidence" that FDA would have rejected a *labeling* change was predicated on the existence of the CBE regulation. That regulation, which uniquely applies to labeling changes, allows a manufacturer to change a prescription drug's labeling and market the product (with its altered label) without FDA's prior approval. No such process exists that would allow a drug manufacturer to unilaterally make a major change to its product's

5

*design* and then market that new product without prior approval. *See Barcal v. EMD Serono, Inc.*, No. 5:14-cv-01709, 2016 WL 1086028, at *4 (N.D. Ala. Mar. 21, 2016).

**Second,** Plaintiffs' assertion that courts must presume that FDA would have approved some allegedly safer alternative design, squarely contradicts the Supreme Court's precedents. In *Mensing*, the Supreme Court recognized that a plaintiff cannot avoid impossibility preemption through "conjecture"—*i.e.*, by speculating that a federal agency would allow the private party to take the action that the plaintiff says state law requires. 564 U.S. at 619–20. Although the Court explained that it could "imagine" that FDA might agree to a manufacturer's request to change its label (or, here, its design), such an approach "would render conflict pre-emption largely meaningless because it would make most conflicts between state and federal law illusory." *Id.* at 620. As the *Eliquis* MDL court recognized, the Supremacy Clause does not "contemplate[] th[is] sort of contingent supremacy." *Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 186 (S.D.N.Y. 2016) ("*Utts I*") (alterations in original) (quoting *Mensing*, 564 U.S. at 622–23 (plurality opinion)).

So when a manufacturer can only "ask for the FDA's help," as Plaintiffs' pre-approval claim requires, the state-law claim is preempted. *Mensing*, 564 U.S. at 620–21. Put simply, Supreme Court precedent requires the very opposite of what Plaintiffs ask this Court to assume—namely, that FDA would approve some differently-designed drug, particularly because the drug-approval process is "onerous and lengthy," *Bartlett*, 133 S. Ct. at 2471, and approval depends on FDA's expert judgment that the medicine strikes the proper balance between both safety and efficacy. *See United States v. Rutherford*, 442 U.S. 544, 555 (1979) (explaining that FDA "generally considers a drug safe when the expected therapeutic benefits . . . outweigh its risk of harm"); 21 U.S.C. § 355(d) (requiring FDA to determine *both* that a drug is "safe for use" under "the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof," and that

"substantial evidence" shows that "the drug will have the effect it purports to have or is represented to have" under the proposed labeling).

Indeed, a pre-approval claim, by its very nature, impermissibly second-guesses FDA's judgment that the medicine is safe and effective. *Cf. In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 779 F.3d 34, 41 (1st Cir. 2015) ("To the extent that the underlying policy issue is one of who decides whether and how a drug can be marketed, the line so drawn [by *Levine*] lets the FDA be the exclusive judge of safety and efficacy based on information available at the commencement of marketing, while allowing the states to reach contrary conclusions when new information not considered by the FDA develops.") (considering preemption of failure-to-warn claims); *Mitchell v. Boehringer Ingelheim Pharms., Inc.*, 2017 WL 5617473, at *4 (W.D. Tenn. Nov. 21, 2017) (failure-to-warn claim alleging that medication was "unreasonably dangerous because of its label-ing at the time it was first marketed" is preempted). Because FDA is "the exclusive judge" of whether a drug it approves is safe and effective based on pre-market information, the pre-approval "theory of liability makes little sense in the face of the Supreme Court's precedents," which have "repeatedly characterized the state tort law at issue . . . as a duty to make changes or as a remedial effort." *Brazil v. Janssen Research & Dev. LLC*, 196 F. Supp. 3d 1351, 1364 (N.D. Ga. 2016).[5]

These principles foreclose Plaintiffs' pre-approval claim. A manufacturer cannot market a medicine without first obtaining FDA's approval, *see* 21 U.S.C. § 355(a), and a plaintiff cannot "speculate" that FDA would have approved the differently-designed drug to avoid preemption. Instead, a claim is preempted if the manufacturer can only "propose[]" a different product and must ultimately seek FDA's "permission" or "help" to discharge its state-law duty. *Mensing*, 564

---

[5] Although Plaintiffs call Defendants' citation to *Brazil* "remarkable," Pls.' Opp. at 16 n.40, that case does not support Plaintiffs' position. The *Brazil* court held that a pre-approval claim—the only claim Plaintiffs raise here—is squarely at odds with Supreme Court precedent.

U.S. at 624 & n.8 (rejecting "the possibility of *possibility*" as sufficient to avoid preemption). Courts faced with similar pre-approval claims have followed *Mensing*'s rejection of conjectural causal theories and held such claims preempted. *See, e.g.*, *Yates*, 808 F.3d at 299 (rejecting pre-approval design-defect claim because "the ultimate availability" of the drug would be "contingent upon whether the FDA would approve the alternate design in the first place"); *Gustavesen*, 272 F. Supp. 3d at 255 (concluding that it was "irrelevant that the [manufacturer] could have designed an entirely different product before they sought approval, which may never have been granted"); *Utts I*, 226 F. Supp. 3d at 185–86 (finding pre-approval design-defect claim preempted because it relies on "precisely the type of 'Mouse Trap' game the Supreme Court disavowed in *Mensing*").

This case takes the speculation one level deeper still because neither of the adjunct products that Plaintiffs say Xarelto's design should have incorporated was FDA-approved when FDA approved Xarelto. In Plaintiffs' view, this Court can assume that FDA would have approved an anti-Factor Xa assay or a reversal agent—or would have required approval of these products—*before* it approved Xarelto, even though the Agency has not approved the former and only recently approved the latter. That cannot be right. Plaintiffs' claim calls into question not only the wisdom of FDA's initial approval decision, but it is even more "attenuated" than the sort of pre-approval claims previously held preempted by other courts. *See, e.g.*, *Yates*, 808 F.3d at 298–300; *Gustavesen*, 272 F. Supp. 3d at 255; *Utts I*, 226 F. Supp. 3d at 185–86.[6]

---

[6] Plaintiffs suggest that finding this design-defect claim preempted would conflict with the *Levine* Court's statement that "widely-available state rights of action" should be available to provide relief. Pls.' Opp. at 11 (quoting *Levine*, 555 U.S. at 574). Courts have rightly rejected this argument. *See Gustavesen*, 272 F. Supp. 3d at 255 (holding that preemption of pre-approval design-defect claims does "not establish a 'safe-harbor'" that improperly "shield[s] FDA-approved drugs from state-law liability" because failure-to-warn claims and claims based on the "failure to make 'moderate' or 'minor' changes to a product's design" are not necessarily preempted); *see also* Defs.' Mem. at 16 n.11.

**B.      The Supreme Court's rejection of the "stop-selling" rationale in *Bartlett* fore-closes Plaintiffs' pre-approval design-defect claim.**

In *Bartlett*, the Supreme Court rejected the argument that a manufacturer could "comply[]

with both its federal and state-law duties" by simply not marketing its product, finding it "incom-

patible" with its preemption precedents.  133 S. Ct. at 2477.  As the Court explained, "if the option

of ceasing to act defeated a claim of impossibility, impossibility pre-emption would be 'all but

meaningless.'"  *Id.* (quoting *Mensing*, 564 U.S. at 621).  Plaintiffs attempt to evade *Bartlett* by

arguing that their claim is not "that Defendants never should have started selling Xarelto, but only

that they should have sold the less dangerous versions" of it, Pls.' Opp. at 17–18, but this distinc-

tion is purely semantic.  Indeed, Plaintiffs' brief elsewhere betrays their true contention: they argue

that "federal law did not prevent Defendants from stopping its sale of Xarelto" after its approval.

*Id.* at 27.  So Plaintiffs' theory, at its core, rests on the contention that Defendants never should

have sold or should now stop selling Xarelto in its FDA-approved formulation.

As numerous courts have recognized, that is precisely the "stop-selling" (or "should never

have sold") claim that Supreme Court precedent squarely bars.  *See, e.g.*, *Yates*, 808 F.3d at 298–

300 (pre-approval claim failed because it "essentially argue[d] that defendants should never have

sold the FDA-approved formulation of the [drug] in the first place"); *Utts I*, 226 F. Supp. 3d at 186

(design-defect claim "suggest[ing] that the defendants should never have sold the FDA-approved

formulation of Eliquis" was preempted because this theory was "explicitly repudiated" in *Bartlett*);

*Brazil*, 196 F. Supp. 3d at 1364 ("To the extent Plaintiff argues Defendants should never have sold

Invokana, the Court notes that the Supreme Court rejected a 'stop-selling' rationale in *Bartlett*.").

**C.**     **Plaintiffs assert that an anti-Factor Xa assay and a reversal agent were scientifically available before Defendants sought FDA approval, but this is both wrong and irrelevant to preemption.**

Plaintiffs' response largely focuses on their contentions that (1) "Xarelto-specific anti-Factor Xa assays existed at the time of Xarelto's U.S. approval, are commercially available in Europe, and had been tested and were extensively relied upon by Defendants in many of the clinical studies before the FDA's approval of Xarelto" and (2) "a reversal agent for Xarelto existed, and had been tested." Pls.' Opp. at 18–19. Those assertions are incorrect but irrelevant to preemption, which turns simply on whether the manufacturer could "independently"—*i.e.*, "unilaterally"—"do under federal law what state law requires of it."[7] *Mensing*, 564 U.S. at 620; *Bartlett*, 133 S. Ct. at 2470.

In other words, it is beside the point whether an anti-Factor Xa assay or a reversal agent is commercially available elsewhere in the world (where there are different regulatory standards and requirements); has previously been tested; or was ever used in hypothesis-generating scientific studies—the relevant question is whether Defendants can independently incorporate such a product into Xarelto's design and then market the "redesigned" Xarelto. Without FDA approval, they

---

[7] Although immaterial for purposes of this motion, Plaintiffs' claim seems to rest on inaccurate facts. In particular, Plaintiffs have conflated the experimental *Factor Xa inhibition* biomarker assay that Defendants used as a research tool in their clinical trials to assess the *amount of Factor Xa* in subjects' blood, with the *anti-Factor Xa* assay that has since been developed by third parties to assess *rivaroxaban levels* in patients' blood. *See* Mueck 38, at 236–37 (Exh. 2) (describing the different assays). For example, Plaintiffs incorrectly cite Kubitza 2005, a study that used a Factor Xa inhibition assay, *not* an anti-Factor Xa assay. Pls.' Opp. at 18–19 & nn.45, 48. Plaintiffs also incorrectly assert that Defendants used an anti-Factor Xa assay to evaluate "patients' bleeding risks in their own Xarelto clinical studies." Pls.' Opp. at 21. As an initial matter, an anti-Factor Xa assay does not predict individual bleeding risk—it shows the concentration of Xarelto in a patient's blood. And, while there was some minimal experimental use in a few Phase I trials, *none* of the critical Phase II or Phase III clinical trials used an anti-Factor Xa assay. *See* Bayer Resp. to Health Canada (July 1, 2008) (Exh. 3) ("Anti-Factor Xa tests used in the phase I trials employed either the enoxaparin or the LMWH standard for calibration, mainly to assess effects on these assays in isolated studies but not for monitoring purposes. Therefore no information can be derived from these assays that would provide guidance for monitoring."). Plaintiffs' assertion about a reversal agent is contradicted by the very same exhibits on which Plaintiffs rely (*see* Pls.' Exh. 7). Plaintiffs' cited exhibit is a PowerPoint from 2011 marked "[w]orking draft for information." *Id.* at 1. The draft does not state that a reversal agent has been developed; it indicates only that a certain developmental chemical compound "*potent[ial]ly* reverses" the "rivaroxaban effect in human[s]" and that the developmental compound "sustainably normalizes coagulation and stops rivaroxaban induced bleeding" only "in *rats*." *Id.* at 3 (emphasis added). A "[w]orking draft referencing preliminary rat studies is not evidence of the existence of an effective reversal agent in humans. In fact, Bayer discovered "a toxicity issue in preclinical testing" of its developmental reversal agent, so the compound "never made it into human testing." Sarich Dep. 233:9–234:24 (Exh. 4).

cannot. *See Mensing*, 564 U.S. at 624 (preemption attaches where "[t]he only action the [defend-ants] could independently take" is to "ask[] for the FDA's help"); *see also Gustavesen*, 272 F. Supp. 3d at 255 (argument that defendants could have designed an "entirely different product be-fore they sought approval" is "irrelevant" to preemption); *Yates*, 808 F.3d at 299–300 (preemption attached where the manufacturers "could not have complied with whatever pre-approval duty might exist without ultimately seeking the FDA's approval prior to marketing [the drug]").[8]

**D.      The Fifth Circuit has not recognized a pre-approval design-defect claim.**

Plaintiffs suggest (Pls.' Opp. 24 n.67) that their claims are not preempted under *Osburn v. Anchor Laboratories, Inc.*, 825 F.2d 908 (5th Cir. 1987), and *Hurley v. Lederle Laboratories*, 863 F.2d 1173 (5th Cir. 1988), but neither case supports Plaintiffs.

As an initial matter, *Osburn* and *Hurley*—both of which were decided decades before *Levine*, *Mensing*, and *Bartlett*—involved preemption of failure-to-warn (not design-defect) claims. *Osburn*, 825 F.2d at 912–13; *Hurley*, 863 F.2d at 1179–80.  In any event, *Osburn* held a failure-to-warn claim not preempted because the FDA regulations applicable to animal drugs "permitted [the manufacturer] to add additional warnings to a previously approved label as soon as it became aware of the necessity to do so."  825 F.2d at 912–13.  But as explained, there is a clear federal duty not to market a prescription drug without FDA's approval.  And *Hurley* held a failure-to-warn claim not preempted because there was a "factual issue" regarding "whether the manufacturer provided the FDA all the necessary and available information on which to base the warning."  863 F.2d at 1179.  But the Supreme Court has since held that state-law claims premised on an argument that a manufacturer defrauded FDA are preempted.  *Buckman Co. v. Pltfs.' Legal Comm.*, 531 U.S.

---

[8] Much of Plaintiffs' brief is devoted to state-law design-defect arguments about feasibility, practicality, and risk-utility analysis.  Pls.' Opp. at 18–22.  Because these state-law arguments are not relevant to preemption, Defendants do not address them here.

341, 347 (2001); *see Dusek v. Pfizer Inc.*, No. Civ. A. H-02-3559, 2004 WL 2191804, at *8 (S.D. Tex. Feb. 20, 2004) (holding that "the ruling in *Hurley* allowing a jury to determine whether the manufacturer provided all relevant information to the FDA has been overruled by *Buckman*").

**III.    There is no parallel misbranding exception to implied preemption of design-defect claims.**

In holding that state-law pharmaceutical design-defect claims are preempted, the Supreme Court in *Bartlett* did not consider so-called "parallel misbranding" claims:

> *We do not address state design-defect claims that parallel the federal misbranding statute*.  The misbranding statute requires a manufacturer to pull even an FDA-approved drug from the market when it is "dangerous to health" even if "used in the dosage or manner, or with the frequency or duration prescribed, recommended, or suggested in the labeling thereof." 21 U.S.C. § 352(j).  The parties and the Government appear to agree that a drug is misbranded under federal law only when liability is based on new and scientifically significant information that was not before the FDA. Because the jury was not asked to find whether new evidence concerning sulindac that had not been made available to the FDA rendered sulindac so dangerous as to be misbranded under the federal misbranding statute, the misbranding provision is not applicable here.

133 S. Ct. at 2477 n.4 (emphasis added) (internal citations omitted) ("*Bartlett* footnote 4").

Relying on that footnote from *Bartlett*, Plaintiffs contend that a "parallel-requirements exception to preemption" applies here because they "have alleged violations of state law that parallel the federal misbranding statute, § 352(j)."  Pls.' Opp. at 24–26.  Not so, for three reasons.

***First***, and dispositively, the Fifth Circuit has expressly rejected the idea that there is a parallel misbranding exception to implied preemption.  In *Lashley v. Pfizer, Inc.*, 750 F.3d 470, 476 (5th Cir. 2014), the Fifth Circuit held that "'parallel' state law claims" are potentially viable in the context of express preemption, but not implied preemption.  There, the plaintiffs argued that their state-law claims against the generic drug manufacturers were not preempted because those claims were "parallel to federal law claims."  *Id.*  The court rejected that argument, explaining that, in those cases where parallel claims were allowed to proceed, "there was no express preemption

found in the applicable statute." *Id.* But where "the Supremacy Clause—not a statute—ma[kes] it impossible for the [manufacturer] to do what state law require[s] of it," the question is "not whether there is a 'parallel' claim where one looks for absence of conflict with the statute" but instead is "whether the state law claim is impliedly preempted." *Id.*[9]

**Second**, *Bartlett* did not recognize a parallel misbranding exception. Its footnote 4 arose in response to FDA's argument as amicus that "pure" design-defect claims are preempted unless they "parallel the FDCA's drug 'misbranding' prohibition." FDA Amicus Br., *Bartlett*, 2013 WL 314460, at *23. In FDA's view, "[a] manufacturer has a federal duty not to market a drug if, *inter alia*, it is 'dangerous to health' when used as provided in the labeling." *Id.* (citing 21 U.S.C. § 352(j)). So "[a] state-law duty not to market the drug in the same circumstances would not conflict with federal law if it appropriately accounted for FDA's role under the FDCA." *Id.* To properly account for that role, FDA argued that such a state-law claim would require proof "that the manufacturer knew or should have known of new and scientifically significant evidence that rendered the drug misbranded under federal law." *Id.* at *22. Otherwise, such a claim would effectively second-guess FDA's expert judgment that a particular drug is "safe and effective." *Id.* at *13, 28. But FDA expressly acknowledged that this parallel-misbranding theory was not available to the *Bartlett* plaintiff and that the Court "need not decide" these "difficult" issues, *id.* at

---

[9] *See also In re Darvocet, Darvon, & Propoxyphene Prods. Liab. Litig.*, 756 F.3d 917, 925 (6th Cir. 2014) (observing that the Fifth Circuit, "the only federal appellate court to consider [a] cause of action" "based on the parallel misbranding theory," has found these claims "impliedly preempted"); *Phares v. Actavis-Elizabeth LLC*, No. B-11-63, 2015 WL 12780637, at *3 & n.3 (S.D. Tex. Mar. 19, 2015) ("Plaintiff originally argued that *Mensing* did not foreclose so-called parallel claims under state law. However the Fifth Circuit subsequently held to the contrary[.]"); *Guarino v. Wyeth LLC*, 823 F. Supp. 2d 1289, 1292 (M.D. Fla. 2011) ("Plaintiff's focus on decisions involving express preemption is misplaced. *Mensing* involved conflict preemption, which does not depend on the limitations of the language in a preemption provision. In other words, no parallel state-law claims or alternative theories of liability survive the Supreme Court's ruling in *Mensing*.").

*20—a view the Court ultimately accepted. Indeed, other courts have found the import of *Bartlett* footnote 4 a "legitimate [open] question."[10]

**Third**, and in any event, Plaintiffs have not adequately pleaded a parallel misbranding claim in this case. *See Darvocet*, 756 F.3d at 929 ("This possibly thorny issue need not be resolved today because, even if such a claim does exist under federal and state law, Plaintiffs' claims fail for a simpler reason: Plaintiffs failed to plead such a claim."). In *Darvocet*, the Sixth Circuit explained that, at a minimum, a plaintiff relying on a possible parallel misbranding exception to preemption of state-law design-defect claims must: "(1) allege a cause of action for misbranding under state law, (2) identify the 'new and scientifically significant information that was not before the FDA,' and (3) demonstrate that the FDA would have found the drug to be misbranded in light of this new information in order to 'appropriately account for the FDA's role under the FDCA.'" *Darvocet*, 756 F.3d at 929 (citing FDA Amicus Br., *Bartlett*, 2013 WL 314460, at *24; *Bartlett*, 133 S. Ct. at 2477 n.4); *Yasmin*, 2015 WL 7272766, at *4. Plaintiffs cannot meet this burden.

Plaintiffs have not identified "new and scientifically significant information" that has been unavailable to FDA. In an effort to meet this burden, Plaintiffs point to what they call "the alarming number of post-marketing consumer complaints about major bleeding events," as reported in a publication co-authored by one of Plaintiffs' experts (in which the expert did not disclose his conflict of interest).[11] Pls.' Opp. at 26. But this is not new evidence. *Cf.* 73 Fed. Reg. 2848, 2850 (Jan. 16, 2008) ("[I]f the reports of adverse events are consistent in type, severity, and frequency with information previously provided to FDA, such reports *may not constitute newly acquired*

---

[10] *See Darvocet*, 756 F.3d at 929 ("It is not clear whether this language implies that an exception for 'parallel misbranding' claims actually exists."); *In re Yasmin & Yaz (Drospirenone) Mktg., Sales Pracs. & Prods. Liab. Litig.*, MDL No. 2100, 2015 WL 7272766, at *4 (S.D. Ill. Nov. 18, 2015) ("[T]he background of Footnote 4 raises a legitimate question as to whether *Bartlett* indicates an exception for 'parallel misbranding' claims actually exists.").

[11] *See* Mingo Trial Tr. 1093:16–1094:7 (Exh. 5); *see also, e.g.*, ISMP, QuarterWatch Q4 2016 (attached as Exh. 6).

information . . . ." (emphasis added)).  Nor is it scientifically significant—an adverse event report "does not necessarily reflect a conclusion by the applicant or FDA that the report or information constitutes an admission that the drug caused or contributed to an adverse effect."  21 C.F.R. § 314.80(l).  Rather, as the Supreme Court has recognized, "[t]he fact that a user of a drug has suffered an adverse event, standing alone, does not mean that the drug caused that event," and "the mere existence of reports of adverse events . . . says nothing in and of itself about whether the drug is causing the adverse events."  *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011); *accord Utts v. Bristol-Myers Squibb Co.*, 251 F. Supp. 3d 644, 663–64 (S.D.N.Y. 2017) ("*Utts II*").  In short, mere post-marketing adverse event reports are not scientifically significant information.[12]  Nor have Plaintiffs met their burden to show "that the FDA would have found the drug to be misbranded in light of th[e] new information."  *Darvocet*, 756 F.3d at 929.  There is no evidence, beyond Plaintiffs' speculation, that FDA would find that Xarelto is "dangerous to health" when used as directed under its approved labeling.  This lack of evidence is not surprising: FDA has repeatedly reaffirmed Xarelto's favorable benefit-risk profile since its initial approval.  In short, even if adverse event reports were newly acquired information, Plaintiffs have offered no evidence that these reports, or anything else, would cause FDA to pull Xarelto from the market.

## CONCLUSION

Plaintiffs' design-defect claims are preempted by federal law, and this Court should grant Defendants summary judgment.

---

[12] Adverse event reports could not trigger the parallel misbranding exception for another reason—these reports are available to FDA.  Federal regulations "require drug manufacturers to report '[a]ny adverse event associated with the use of a drug in humans, whether or not considered drug related' to the FDA."  *Utts II*, 251 F. Supp. 3d at 663 (quoting 21 C.F.R. § 314.80(a), (c)).  But "to appropriately account for the FDA's role under the FDCA," FDA Amicus Br., *Bartlett*, 2013 WL 314460, at *24, the new information must be *unavailable* to FDA.  *See Bartlett*, 133 S. Ct. at 2477 n.4 (noting that all "appear to agree that . . . liability [must be] based on new and scientifically significant information that was not before the FDA"); *Darvocet*, 756 F.3d at 929 (exception would require "information that was not before the FDA" and holding that "post-marketing adverse event data" was not new information); *Yates*, 808 F.3d at 299 n.3.

Respectfully submitted,

DRINKER BIDDLE & REATH LLP

By: /s/ Susan M. Sharko
Susan M. Sharko
DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.hudson@dbr.com

Chanda A. Miller
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
Chanda.Miller@dbr.com

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ James B. Irwin
James B. Irwin
Kim E. Moore
IRWIN FRITCHIE URQUHART & MOORE LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

*Attorneys for Defendants Janssen Pharmaceuticals, Inc. and Janssen Research & Development, LLC*

ARNOLD & PORTER LLP

By: /s/ William Hoffman
William Hoffman
ARNOLD & PORTER LLP
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@arnoldporter.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER LLP
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@arnoldporter.com
steven.glickstein@arnoldporter.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ Lindsey C Boney IV
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8914
lboney@bradley.com

CHAFFE MCCALL L.L.P.

By: /s/ John F. Olinde
John F. Olinde
CHAFFE MCCALL L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer HealthCare Pharmaceuticals Inc. and Bayer Pharma AG*

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on the 4th day of June, 2018, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system.  Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system.

*/s/       John F. Olinde*