UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) | MDL No. 2592 |
| PRODUCTS LIABILITY LITIGATION | SECTION L |
| THIS DOCUMENT RELATES TO: | JUDGE ELDON E. FALLON |
| *Harriet Ibanez, et al. v. Janssen Research & Development, LLC, et al.*<br>Case No. 2:14-cv-02669 | MAG. JUDGE NORTH |

**DEFENDANTS' REPLY BRIEF IN SUPPORT OF
THEIR JOINT MOTION FOR PARTIAL SUMMARY JUDGMENT
ON THE GROUND THAT FEDERAL LAW PREEMPTS
PLAINTIFFS' FAILURE-TO-WARN-OR-INSTRUCT CLAIM**

Defendants have demonstrated that Plaintiff Harriet Ibanez's failure-to-warn-or-instruct claims are not based on "newly acquired information" as defined by the federal regulations and that there is "clear evidence" FDA would not have approved Plaintiffs' proposed label changes to (1) instruct physicians to use a Neoplastin PT test with Xarelto, (2) include U.S. subgroup data from the ROCKET AF clinical trial at the time Plaintiff was prescribed Xarelto, and (3) include information about the recall of the INRatio device used in ROCKET AF.[1] Plaintiffs' opposition ignores that FDA had the relevant information and data, considered the relevant issues, and expressly rejected labeling changes of the very type that Plaintiffs propose here. Each of Plaintiffs' claims fail as a matter of law, for several reasons.

*First*, FDA had all of the clinical trial and other data relevant to Plaintiffs' claim that Xarelto's label is inadequate for failing to instruct physicians to use a Neoplastin PT test. Plaintiffs do not dispute that no PT test—including Plaintiffs' preferred Neoplastin test—is FDA approved

---

[1] There have been five Xarelto bellwether trials in this MDL and in Philadelphia involving plaintiffs who alleged that Xarelto's label failed to warn physicians of bleeding risks and instruct them on the safe use of Xarelto. Each time either the jury or the judge found in favor of the Defendants.

for use with Xarelto. Rather they assert—despite FDA regulations confirming the limited commonly accepted use of Neoplastin with Coumadin therapy—that Defendants should have unilaterally used the CBE regulation to recommend an "off label" use of Neoplastin with Xarelto without prior FDA approval. But Defendants could not have unilaterally adopted that proposed label change because it is not based on "newly acquired information" about a different type or greater frequency of risk as defined by federal law and it is not based on scientific data that supports a conclusion that the Neoplastin PT test can be used with Xarelto to make clinical decisions. Nor are Plaintiffs' other claims—for alleged failure to include U.S. subgroup data from the ROCKET AF clinical trial or information about the INRatio recall—based on "newly acquired information." Because Janssen had already submitted the ROCKET AF data to FDA, any claims based on that data are not derived from "newly acquired information" that would have allowed Defendants to use the CBE process. Accordingly, Plaintiffs' claims are preempted as a matter of law.

*Second*, there is clear evidence FDA would not have approved Plaintiffs' proposed labeling changes. FDA rejected multiple proposals by Janssen to include PT-related information in Xarelto's label. These rejections are "clear evidence" that FDA would not have approved a recommendation to use PT with Xarelto. Plaintiffs' attempt to question whether FDA was the source of the strikethrough has been clearly refuted by the indisputable testimony of three trial witnesses and by FDA's red-ribbon production copy of the document. Janssen's recent production also confirms that the strikethrough documents originated from FDA. There also is clear evidence that FDA rejected a proposal to include subgroup information in Xarelto's label before Xarelto was ever approved and expressly concluded that information about the recall of the INRatio device *should not* be included in the label. This is the very type of information that courts have held satisfies the clear evidence standard.

2

Plaintiffs' assertion that FDA's prior consideration of the very same information and rejection of proposed labeling changes is insufficient evidence to establish a preemption defense because Defendants were required to repeatedly make multiple requests to FDA for the same labeling change already rejected is not supported by the law. The "clear evidence" standard from *Wyeth v. Levine*, 555 U.S. 555 (2009) does not require a defendant to ask FDA to revisit every decision. Instead, a plaintiff's claims are preempted if his proposed labeling changes are not based on "newly acquired information" or there is "clear evidence" that FDA would have rejected a labeling change of the type requested. For these and the reasons set forth below, Defendants' Motion for Summary Judgment Based on Labeling Preemption should be granted.

## ARGUMENT

**I. Plaintiffs' claims are not based on "newly acquired information" as defined by federal law and therefore fail as a matter of law.**

**A. Plaintiffs have not identified newly acquired information under the CBE regulation that would support any of their labeling claims.**

Plaintiffs' opposition briefs fail to identify any "newly acquired information" not previously submitted to FDA regarding the use of a Neoplastin PT test, the ROCKET AF U.S. subgroup data, or the recall of the INRatio device. FDA had all of the relevant information and data that Plaintiffs cite in support of their claims—Janssen previously submitted it all to FDA.[2] Once the information and data is submitted to FDA for review and consideration, Defendants cannot use the CBE regulation to unilaterally implement labeling changes that differ from the existing label. *See Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 184-85 (S.D.N.Y. 2016). Without evidence of "newly acquired information" not previously submitted to FDA, Plaintiffs'

---

[2] Contrary to Plaintiffs' assertions, all of the information related to the Investigational New Drug Applications, New Drug Applications and supplemental New Drug Applications for Xarelto that are maintained in its GRAIL database have been produced through the last date of production.

3

claims are preempted as a matter of law. *See Mitchell v. Boehringer Ingelheim Pharms., Inc.*, No. 1:16-cv-02384-STA-egb, 2017 WL 5617473, at *5 (W.D. Tenn. Nov. 21, 2017) ("In order to survive Defendant's motion to dismiss, Plaintiff must allege the existence of information that was unknown to FDA prior to label approval such that Defendant should have changed Jardiance's label through the CBE process."); *Ideus v. Teva Pharms. USA, Inc.*, No. 4:16-CV-3086, 2017 WL 6389630, at *2–3 (D. Neb. Dec. 12, 2017) (burden on plaintiff to identify newly acquired information); *see also Utts*, 226 F. Supp. 3d at 184-85.

As the court in *Celexa & Lexapro Mktg. & Sales Practices Litig.*, 779 F.3d 34 (1st Cir. 2015) observed, to avoid preemption, plaintiffs must point to new information that reveals "risks of a different type or greater severity or frequency than included in submissions to FDA." Here, Plaintiffs attempt to rely on the ROCKET AF, RECORD, and EINSTEIN clinical trials, but that is misguided because all of those trials were previously submitted to FDA, and therefore by definition they cannot be "newly acquired information." The only plausible claim that could arise is if Defendants independently had new data that revealed a different type of risk or greater frequency of risk than previously submitted to FDA. No such evidence exists here, and therefore Plaintiffs' claims based on these clinical trials are preempted as a matter of law.

Plaintiffs' reliance on adverse event reports of bleeding rates published in Quarter Watch (authored by one of Plaintiffs' experts in this litigation) are based on FDA's Adverse Event Reporting system that have been submitted to FDA. As with clinical trial data, these reports are not "newly acquired information" because they were submitted to FDA. Nor do adverse event report "bleeding rates" relate to Plaintiffs' proposed use of a PT test, data from ROCKET AF, or the third-party recall of the INRatio device.[3] Even if this Court were to consider bleeding rates

---

[3] Bleeding rates generally do not inform the question of whether a PT test is useful with Xarelto or if a specific PT value or range is predictive of bleeding risk with Xarelto use. *See* 21 C.F.R. 201.57(c)(6)(iii). As a result, Plaintiffs'

4

from post-marketing safety data—such as Quarter Watch—for some purpose, FDA has specifically concluded on numerous occasions that changes to Xarelto's label based on accumulation of data related to bleeding rates is not warranted. *See also* Ex. B, August 17, 2017 Letter from FDA to Janssen ("FDA has already reviewed [the Mini Sentinel] data and believes that the current labeling is adequate."); *see also*, Ex. C, FDAAA Section 915 Non-New Molecular Entity (non-NME) Postmarket Safety Summary dated January 13, 2015 (FDA concluded, "Overall, review of the FAERS cases for rivaroxaban did not identify new safety issues requiring additional analyses."). A recent analysis using FDA's new Sentinel monitoring system has confirmed that Xarelto's risk-benefit profile during its first three-and-a-half years on the market was similar, if not superior, to what FDA had anticipated when it approved the medication in 2011. *See* Ex. D, Elizabeth Chrischilles et al., *Prospective Surveillance Pilot of Rivaroxaban Safety Within the US Food and Drug Administration Sentinel System*, 27 PHARMACOEPIDEMIOLOGICAL DRUG SAFETY, 263, 268-69 (2018). Because Plaintiffs have failed to satisfy their burden to demonstrate that their labeling claims are based on "newly acquired information" that was not previously submitted to FDA and that reveals a different type or greater frequency of risk, their claims fail as a matter of law. *See Mitchell*, 2017 WL 5617473, at *5.

  **B. Defendants could not have recommended an "off label" use of the Neoplastin PT test without prior FDA approval under the CBE regulation.**

Nor can Plaintiffs avoid preemption by asserting that Defendants could have unilaterally implemented a labeling change under FDA's "helpful" laboratory tests regulation, 21 C.F.R. §

---

reliance on bleeding risks to recommend use of a PT test is not the type of information that would be sufficient under FDA regulations. Nor does Plaintiffs' reliance on information obtained from Bleeding Questionnaires constitute "newly acquired information", as the Bleeding Questionnaires were used in conjunction with Janssen's Enhanced Pharmacovigilance (EPV) Plan, and this data was also submitted to and reviewed by FDA. *See* Ex. A, March 2, 2016 Letter from FDA to Janssen regarding Fulfillment of Postmarketing Requirement ("We have received your submission dated September 30, 2015, containing the final report for the following Postmarketing requirement listed in the July 1, 2011 approval letter. . .We have reviewed your submission and conclude that the above requirement was fulfilled.").

201.57(c)(6)(iii). The only regulation that permits changes without prior FDA approval is the CBE regulation. *Wyeth*, 555 U.S. 555. Section 201.57(c)(6)(iii) governing the use of laboratory tests requires scientific evidence and proof that a test can be reliably used before a new use may be recommended. Whether a specific laboratory test is "helpful" and can reliably be used with Xarelto is a decision that requires a separate showing to obtain FDA approval and clearance that cannot be unilaterally made by the manufacturer. *See* 21 C.F.R. § 807.81(a)(3)(ii); see also 21 C.F.R. § 201.56(a)(3) ("The labeling must be based whenever possible on data derived from human experience. No implied claims or suggestions of the drug use may be made if there is inadequate evidence of safety or lack of substantive evidence of effectiveness.").[4]

This is particularly true for Neoplastin PT because it was not designed or approved to monitor the anticoagulant effect of Xarelto or any other Factor Xa inhibitor. Consistent with FDA regulations governing this type of device, Neoplastin's label makes clear that the device was designed and cleared for use in "monitoring vitamin K antagonist therapy" with "Coumadin." Doc. 7660-33, Neoplastin USPI, § 2. Xarelto is not a Vitamin k antagonist, but is a direct Factor Xa inhibitor. Plaintiffs' claims here would result in inconsistent labeling of the intended use stated in the Neoplastin PT labeling and the Xarelto label. Plaintiffs' assertion that the Defendants should have recommended use of Neoplastin PT without prior FDA approval could not be resolved

---

[4] As Defendants have explained, and as Plaintiffs concede, a pharmaceutical manufacturer cannot unilaterally change any aspect of the "Highlights" section of a medicine's FDA-approved label; rather, any change to that particular section requires advance agency authorization. *See* Doc. 5966, at 5 ("The Defendants are correct that they are prohibited from changing the Highlights portion of the label without prior FDA approval."). The FDA regulation governing "[c]hanges to an approved application" unambiguously states that "[a]ny change to the information required by § 201.57(a)"—i.e., information required to be included in the Highlights section—constitutes a "major change" that "require[s a] supplement submission and approval prior to distribution of the product." 21 C.F.R. § 314.70(b)(2)(v)(C). And notably, the CBE provision—which Plaintiffs cite for the proposition that "manufacturers have always been permitted to alter warnings and labels without prior FDA approval"—expressly excludes from its scope information that, under § 201.57(a), must go in the Highlights section. *See* 21 C.F.R. § 314.70(c)(6)(iii) (permitting unilateral labeling changes to accomplish specified purposes, "except for changes to the information required in § 201.57(a)").

without FDA specifically considering the off label use of Neoplastin PT for this purpose and reconciling this use with the Neoplastin PT label approved by FDA. As a result, Defendants could not have "independently" changed Xarelto's label to recommended use with Neoplastin PT.

**II. Defendants' supplemental discovery confirms that federal law preempts Plaintiffs' failure-to-warn (or instruct) claim because there is "clear evidence" that FDA would not have approved Plaintiffs' proposed labeling changes.**

    **A. There is clear evidence that FDA would not have approved Plaintiffs' proposed instruction to use a Neoplastin PT test with Xarelto.**

The record also demonstrates that there is clear evidence FDA would not have approved a recommendation in the Xarelto label to instruct physicians to use a PT test with Xarelto. Janssen proposed language relating to PT use in the label on five separate occasions—all of which were rejected by FDA.

Plaintiffs' assertion that there is no clear evidence that FDA would have rejected such a change because the tone of FDA's emails conveying the strikethrough of Janssen's proposed language were "hardly inflexible" and that Defendants could have requested "follow-up meetings with FDA" (Suppl. Opp. at 3) to "press" issues FDA has already decided does not defeat preemption here. FDA's correspondence shows that language regarding use of a PT test was stricken from the label on multiple occasions. Plaintiffs' position here that would require a manufacturer to fight FDA in order to demonstrate clear evidence would incentivize manufacturers to raise non-scientifically-based challenges to FDA's decisions for the sole purpose of insulating themselves from state-law, product-liability claims. Such a rule would implicate the same concerns that led the Supreme Court in *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 351 (2001), to hold that fraud-on-the-FDA claims are preempted by federal law. The Court in *Buckman* did not want manufacturers to have "an incentive to submit a deluge of information that the Administration neither wants nor needs, resulting in additional burdens on the FDA's

7

evaluation of an application."  The same consideration counsels that manufacturers should not have to fight FDA decisions to establish "clear evidence" that FDA would have rejected a proposed label change.  *See, e.g. Dobbs v. Wyeth Pharm.*, 797 F. Supp. 2d 1264, 1274-75 (W.D. Okla. 2011) (noting FDA's rejection of manufacturer's attempts to strengthen warning labels).  Indeed, the *manufacturer* need not "press" its position at all; instead, FDA's denial of a *third party's* citizen's petition to change the label is sufficient to satisfy *Wyeth*'s clear evidence standard.  *See, e.g.*, *Cerveny v. Aventis, Inc.*, 855 F.3d 1091, 1105 (10th Cir. 2017) (holding that FDA's rejection of a citizen petition, which presented "claims and data virtually identical to those submitted by" the plaintiffs "constitutes clear evidence that the FDA would not have approved the [plaintiffs'] desired warning").

The evidence here is that FDA rejected on multiple occasions Janssen's proposed language regarding use of PT testing with Xarelto.  It is undisputed that Janssen proposed including PT language in the Xarelto labels for the orthopedic and AFib indications on five separate occasions, and on June 13, 2011, FDA struck that language from the label when completing its review for the orthopedic indication.[5]  *See* Docs. 7660-16 and 7660-17.  When FDA struck the PT language, FDA also added statements to Sections 5.3 and 8.1 that there is no standard laboratory test that can be used to monitor Xarelto.  *Id.*  Janssen initially accepted the deletion of the PT language, but later,

---

[5] Plaintiffs initially challenged the fact that FDA struck the PT language from Section 12.2 of the Xarelto label; however, the evidence is indisputable that the strike came from FDA.  Defendants have now produced the original email with attachment sent from Tyree Newman at FDA to Sanjay Jalota and Andrea Kollath at Janssen on June 13, 2011 where FDA comments on Janssen's proposed label for the orthopedic indication.  Ex. E, XARELTO_JANSSEN_25725678; XARELTO_JANSSEN_25725679.  This original email and the copies of forwarded documents previously produced, the red ribbon email and attachment from FDA and live testimony from three Janssen witnesses at trial, including the testimony of Sanjay Jalota—a recipient of the label from Tyree Newman—unequivocally prove that Janssen proposed the language and FDA rejected it.  The questions raised by Plaintiffs about the credibility of the documents "are nothing more than 'metaphysical doubt[s] as to the material facts' that the Supreme Court has rejected as insufficient to defeat a motion for summary judgment."  *See Willis v. Abbott Labs.*, No. 1:15-cv-00057-JHM, 2017 WL 5988215, at *9 (W.D. Ky. Dec. 1, 2017) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

on June 28, 2011, recommended again that the label include the statement, "While the Prothrombin Time (PT) could be used for estimating rivaroxaban pharmacodynamic effect, the International Normalized Ratio (INR) should not be used." Doc. 7660-24, at Section 12.2. Janssen provided a lengthy comment with its rationale for this proposed addition to the label. Janssen wrote, in part, "If prescribers of rivaroxaban are to use the pharmacodynamic information provided in this label to make clinical decisions, they must use the PT in seconds, not the INR. . . ." *Id.* After considering Janssen's position, FDA again rejected this language on June 29, 2011. Doc. 7660-25 at Section 12.2. FDA struck PT language in Section 12.2 and added statements in Section 5.3 and 8.1 because, as one of the Agency's reviewing team concluded, "although the PT has a linear relationship with Xarelto plasma concentration, data from the phase 3 trials indicate that this is not always a predictable relationship. Therefore, no laboratory test is well correlated with therapeutic effect of Xarelto." Ex. F, FDA's Maternal Health Review. The final approved label did not contain language recommending PT and instead included language added by FDA that there is no standard laboratory test that can be used to monitor Xarelto. Doc. 7660-5 ("The anticoagulant effect of XARELTO cannot be monitored with standard laboratory testing nor readily reversed.").

When Janssen sought approval of the AFib indication, FDA's reviewers rejected PT testing language, concluding, "Monitoring rivaroxaban therapy with sequential prothrombin times to optimize safety outcomes cannot be recommended. . . ." Doc. 7660-29, at 46. FDA again approved the Xarelto label with statements now in Section 5.4 and 8.1 that there is no standard laboratory test that can be used to monitor the anticoagulant effect of Xarelto. Doc. 7660-6.[6]

---

[6] Plaintiffs do not address the fact that FDA instructed Janssen to use the orthopedic label as a basis for the AFib label or that FDA approved the Xarelto label with these statements in 5.4 and 8.1. Instead, Plaintiffs assert that the removal of the sentence, "The predictive value of these coagulation parameters for bleeding risk or efficacy has not been established" when FDA approved the AFib indication is significant. However, FDA deleted the preceding sentence from Section 12.2 that stated: "There are no data on the use of the International Normalized Ratio (INR)." No one suggests that by the removal of these two sentences FDA concluded that INR should be used to assess the anticoagulant

9

Even though Janssen did not find a relationship between PT and bleeding risk in clinical trial data from RECORD or ROCKET, Janssen continued to assess the relationship between PT and bleeding in the EINSTEIN clinical trials. Those results showed that "there was no evidence that PT Neoplastin (measured in seconds at peak) was different in subjects with bleeding events compared to subjects without bleeding events." Ex. G, Excerpts from XARELTO_JANSSEN_00054940. Because a complete review of the data did not reveal any new or different information, Janssen adopted FDA's position declining to adopt PT language. After the numerous communications with Defendants, FDA ultimately again approved the Xarelto label in November 2012 for treatment of deep vein thrombosis ("DVT") and pulmonary embolism ("PE") and reduction in risk for DVT and PE without any PT language and with the same statements now in Section 5.7 and 8.1 that there is no standard laboratory test that can be used to monitor the anticoagulant effect of Xarelto. Doc. 7660-7.

Where FDA has rejected multiple attempts to change a label because there is insufficient evidence to support such a change, courts have found clear evidence that FDA would not approve the label change proposed by Plaintiffs. *See, e.g.*, *Rheinfrank*, 680 Fed. Appx. at 385-87 (finding that because FDA twice refused Abbott's attempts to strengthen Depakote's label because there was not sufficient evidence to support the label change, plaintiff's failure-to-warn claim was preempted by federal law); *Amos v. Biogen Idec Inc.*, 249 F. Supp. 3d 690, 699-700 (W.D.N.Y. 2017) (finding that because the evidence shows that Biogen proposed to modify Tysabri's label on two occasions but FDA rejected the proposal stating that it did not belief there was currently sufficient evidence of utility of testing for JC virus antibodies, plaintiff's claims were preempted); *Dobbs*, 797 F. Supp. 2d at 1277 (W.D. Okla. 2011) (finding that there is clear evidence FDA would

---

effect of Xarelto or that FDA found there was a relationship between PT and Xarelto's efficacy, nor could that be suggested, as the data from ROCKET proves otherwise.

have rejected an expanded warning regarding suicidality because it continued to conclude there was no evidence to support such a warning after additional studies were completed five years after plaintiff took the medication).

This case is similar to *Rheinfrank*, *Amos*, and *Dobbs* because there is clear evidence that FDA rejected a statement recommending PT testing in the Xarelto label due to the lack of sufficient data to support such a recommendation. FDA's own reviews for the orthopedic and AFib indication acknowledge this decision, and FDA has continued to approve Xarelto's label (as recently as October 2017) with the statements now in Section 5.7 and 8.1 that there is no standard laboratory test that can be used to monitor Xarelto. Ex. H, Xarelto USPI Rev. 10/2017. The fact that FDA's reviewers considered the possibility of a relationship between PT and bleeding risk in ROCKET AF but deliberately chose not to include such information in the Xarelto label provides the clear evidence FDA would not accept the warnings Plaintiffs propose.

In order for FDA to adopt the labeling change Plaintiffs propose, FDA requires sufficient evidence that a PT test could reliably be used with Xarelto in helping physicians reliably evaluate bleeding risks. *See* 21 C.F.R. 201.56(a)(3). But, no such evidence exists. *See* Doc. 7660-29, at 46 (PT monitoring cannot be recommended). Accordingly, there is clear evidence that FDA would not approve the label change Plaintiffs propose.

### B. There is clear evidence that FDA would not have approved including U.S. subgroup bleeding data before September 2015.

There also is clear evidence that FDA would not have approved a change to the Xarelto label to include U.S. subgroup data in the label prior September 2015 when FDA conducted a class-wide analysis of clinical trial data. As explained in Defendants' moving brief, there is ample evidence that FDA rejected multiple attempts both by Defendants and some of FDA reviewers to include any mention of subgroup bleeding data in the Xarelto label prior to approval in November

11

2011. In particular, after Janssen had provided the ROCKET AF data to FDA, including data pertaining to specific subgroups of patients, Janssen proposed to include certain ROCKET AF subgroup data. *See* Doc. 7660-27. FDA provided its own proposal referring to "US practice" proposing to add language to the Clinical Trial section of the label that "[t]here is insufficient experience with INR control more typical of US practice to say how XARELTO and warfarin compare in this setting." Doc. 7660-42, at 40. Janssen then proposed additional language about the INR target range "[i]n the US" (*see* Doc. 7660-43) but FDA concluded that none of these statements suggesting differences in subgroup data should be included in the label. Doc. 7660-44, at 28 (adopting JRD's original proposal stating "the efficacy of Xarelto was generally consistent across major subgroups"). FDA also considered and rejected including language stating "North American subjects on XARELTO experience a higher annual bleeding rate compared to their warfarin treated counterparts than subjects from any other region." Doc. 7660-42, at 24.[7] Contrary to Plaintiffs' assertion, FDA gave more than "passing attention" to the inclusion of subgroup data from ROCKET.

When FDA was reviewing the data from ROCKET, FDA sent Janssen multiple information requests requesting that Defendants perform analyses of the US subgroup bleeding rate in ROCKET. *See* Ex. J, XARELTO_JANSSEN_25756122. After Janssen performed and submitted its analyses to the Agency (*see* Ex. K, XARELTO_JANSSEN_00015736 and XARELTO_JANSSEN_00015737), FDA's reviewers performed their own independent analyses of this data. Doc. 7660-29. Specifically, FDA's Medical Reviewers considered this data, noting,

---

[7] Plaintiffs have previously challenged the origin of this stricken language, but the Janssen Defendants produced the original email and attached label that FDA's Alison Blaus sent to Janssen employees Sanjay Jalota and Alla Rhoge on October 11, 2011, in which Ms. Blaus wrote that these changes were "the Agency's revisions to [Janssen's] August 2011 proposed labeling for the AFIB indication (NDA 202439)." Ex. I, XARELTO_JANSSEN_25725063 and XARELTO_JANSSEN_25725064.

"While US major bleeding results may have been due to a small sample in a post-hoc subgroup analysis, for the purposes of a risk-benefit assessment, this reviewer took the most conservative approach in assuming that increased major bleeding noted in the US subgroup might be real. . . ." *Id.* at 20. This language alone demonstrates that FDA gave more than passing attention to these results but declined to include the data in the label. After thoroughly analyzing the data, FDA's reviewers ultimately concluded, "This suggests the possibility that US major bleeding rate differences as compared to the global trial *may have been a chance finding*." *Id.* at p. 197. Because the data may have been a "chance finding", FDA did not ultimately require the company to include this data in labeling. *See* Doc. 7660-6.

Contrary to Plaintiffs' assertion, U.S. subgroup data was not added to the Xarelto label based on any newly acquired bleeding data in U.S. patients. Instead, as FDA explained, the data was added "to harmonize the presentation of safety and efficacy data in the labels for recently approved anticoagulants, we are requesting changes to your label as outlined in our January 28, 2014 letter and as described below." Ex. L, XARELTO_JANSSEN_11046454.[8] If there is any doubt that bleeding rates from ROCKET AF have not changed, Janssen undertook a post marketing safety study involving 51,842 patients who used Xarelto for AFib. Only 1,613 patients experienced at least one major bleeding event for an incidence rate of 2.71 per 100 person-years. Ex. M, Sally Tamayo, et al., *Abstract 15047: Evaluation of the Incidence of Major Bleeding in a Heterogeneous Population of 51,842 Rivaroxaban Users With Nonvalvular Atrial Fibrillation*, CIRCULATION 2016;134:A15047. These rates are lower than and consistent with those previously reported to FDA from ROCKET AF. *See* Ex. H.

---

[8] Because FDA requested that Janssen and other manufacturers add data based on Phase III trials that had already been submitted to the Agency, FDA instructed the companies to "[s]ubmit draft labeling as a prior approval supplement to this application, incorporating all revisions since the last approval of the package insert." *Id.* This clearly shows that FDA did not believe that these labeling changes could have been made through the CBE process.

    **C.**    **Federal law preempts Plaintiffs' claim that the Xarelto label should contain information about the INRatio recall because there is "clear evidence" FDA would reject such a labeling change.**

There also is clear evidence that FDA would not have approved a labeling change about the recall of the INRatio device used in ROCKET AF. Plaintiffs have pointed to no new or different information that calls into question FDA's September 2016 conclusion that, "No changes in rivaroxaban labeling to reflect the impact of use of the INRatio device in ROCKET are warranted. No other major regulatory action should be taken with respect to rivaroxaban." 7660-40. FDA reiterated, "Our conclusions regarding the issues addressed by this review should be communicated to the public in a suitable manner, but not through any changes in labeling." *Id.* These statements by FDA are abundantly clear evidence that FDA would not have approved any labeling that included information about the INRatio device recall.

Plaintiffs' assertion that an internal reviewer comment that it might be possible to draft language about the recall should be viewed as an invitation to Janssen to change the label is wrong. FDA's internal memorandum was made publicly available and the Agency's position was that no labeling changes or further regulatory action were necessary or warranted. FDA's conclusion is clear evidence of its position that it would communicate its conclusions to the public through a press release but "not through any changes in the labeling." *Id.*

**CONCLUSION**

For these reasons, the Court should grant Defendants' Joint Motion for Partial Summary Judgment on Grounds that Federal Law Preempts Plaintiffs' Failure-to-Warn-or-Instruct Claims.

<div style="column-count:2">

DRINKER BIDDLE & REATH LLP

By: /s/ Susan M. Sharko
Susan M. Sharko
DRINKER BIDDLE & REATH LLP
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@dbr.com

Rodney M. Hudson
DRINKER BIDDLE & REATH LLP
50 Fremont Street, 20th Floor
San Francisco, CA 94105-2235
Telephone: (415) 591-7500
Rodney.Hudson@dbr.com

Chanda A. Miller
DRINKER BIDDLE & REATH LLP
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2500
Chanda.Miller@dbr.com

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ James B. Irwin
James B. Irwin
Kim E. Moore
IRWIN FRITCHIE URQUHART & MOORE LLC
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
jirwin@irwinllc.com

*Attorneys for Janssen Defendants*

ARNOLD & PORTER

By: /s/ William Hoffman
William Hoffman
ARNOLD & PORTER
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@arnoldporter.com

Andrew K. Solow
Steven Glickstein
ARNOLD & PORTER
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8485
andrew.solow@arnoldporter.com
steven.glickstein@arnoldporter.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ Lindsey C Boney IV
Lindsey C Boney IV
BRADLEY ARANT BOULT CUMMINGS LLP
One Federal Place, 1819 Fifth Avenue
North Birmingham, AL 35203-2119
Telephone: (205) 521-8803
lboney@bradley.com

CHAFFE MCCALL L.L.P.
By: /s/ John F. Olinde
John F. Olinde
CHAFFE MCCALL L.L.P.
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com

*Attorneys for Bayer Defendant*

</div>

15

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on June 4, 2018, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

*/s/ James B. Irwin*
**James B. Irwin**