UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA
_____

| | | |
|---|---|---|
| RAYMOND E. POTTER, ON BEHALF OF HIMSELF, AND AS ADMINISTRATOR OF THE ESTATE OF LEE A. POTTER, DECEASED, | ) ) ) ) ) | |
| Plaintiff, | ) ) | MDL No. 2592 |
| v. | ) ) ) | SECTION: L JUDGE FALLON MAG. JUDGE NORTH |
| JANSSEN RESEARCH & DEVELOPMENT, LLC; JOHNSON & JOHNSON; JANSSEN ORTHO, LLC; JANSSEN PHARMACEUTICALS, INC.; BAYER CORPORATION; BAYER HEALTHCARE AG; BAYER PHARMA AG; BAYER AG; BAYER HEALTHCARE LLC; BAYER HEALTHCARE PHARMACEUTICALS INC.; AND FICTITIOUS DEFENDANTS 1-100, | ) ) ) ) ) ) ) ) ) ) ) | Civil Action No. |
| Defendants. | ) ) | |

_____)

## FIRST AMENDED COMPLAINT AND JURY DEMAND

COMES NOW the Plaintiff, by and through the undersigned counsel, and hereby submits this First Amended Complaint against (1) Defendants Janssen Research & Development, LLC f/k/a Johnson and Johnson Pharmaceuticals Research and Development LLC; (2) Johnson & Johnson Company; (3) Janssen Ortho, LLC; (4) Janssen Pharmaceuticals, Inc. f/k/a Janssen Pharmaceutica Inc., f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc.; (5) Bayer Corporation; (6) Bayer Healthcare AG; (7) Bayer Pharma AG; (8) Bayer AG; (9) Bayer Healthcare, LLC; (10) Bayer Healthcare Pharmaceuticals, Inc.; and (11) Fictitious Defendants 1-100 (collectively, "Defendants") for compensatory and punitive damages,

equitable relief, and such other relief deemed just and proper arising from the injuries sustained by the Plaintiff as a result of ingesting the product Xarelto®, also known as rivaroxaban and hereby alleges:

## INTRODUCTION

1.      This is an action for damages suffered by the Plaintiff as a direct and proximate Result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the pharmaceutical drug Xarelto® (also known as rivaroxaban). Xarelto® in any of its forms is referred to herein as "Xarelto." Plaintiff maintains that Xarelto is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce, and lacked proper warnings and directions as to the dangers associated with its use.

2.      Defendants concealed their knowledge of Xarelto's defects from the Plaintiff, the FDA and the general public by representing that Xarelto had been sufficiently tested and been found to be safe and/or effective for its intended use.

3.      Defendants engaged in aggressive direct-to-consumer and physician marketing and advertising campaigns for Xarelto.  As a result, Xarelto sales are expected to exceed $1 billion this year.

4.      Plaintiff brings claims for compensatory and punitive damages, equitable relief, and such other relief deemed just and proper arising from injuries as a result of ingesting Xarelto.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to the Plaintiff exceeds $75,000.00, exclusive of interest and costs,

and because Defendants are citizens of states other than the state in which the Plaintiff is a citizen. Specifically, the Plaintiff is a citizen of Tennessee while the Defendants are respectively citizens of the States of Delaware, Indiana, and New Jersey, the Commonwealths of Pennsylvania and Puerto Rico, and the nations of Ireland and Germany.

6.      Venue in this district is proper pursuant to the Court's PTO No. 9 pertaining to direct filing of Complaints subject to transfer to MDL No. 2592 in the United States District Court for the Eastern District of Louisiana.

7.      At all times herein mentioned, Defendants engaged in interstate commerce in this judicial district in that they advertised, promoted, supplied, and sold certain pharmaceutical products, including Xarelto, to distributors and retailers for resale to physicians, hospitals, medical practitioners, and the general public in this district.

## **PLAINTIFF SPECIFIC ALLEGATIONS**

8.      Plaintiff, Raymond E. Potter, is a resident of Nashville, in Davidson County, Tennessee, and files this action as Administrator of the Estate of Lee A. Potter, Deceased.

   a.   Decedent, Lee Potter, was a resident of Nashville, in Davidson County, Tennessee, at the time of his injuries and death.

   b.   Decedent, Lee Potter, was prescribed Xarelto in or about March 2015, to reduce the risk of stroke and systemic embolism due to atrial fibrillation.

   c.   Decedent, Lee Potter, was prescribed Xarelto in the State of Tennessee.

   d.   Thereafter, on March 5, 2016, Decedent, Lee Potter, was admitted to Saint Thomas Midtown Hospital in Nashville, Tennessee, where he was diagnosed as suffering from gastrointestinal bleeding and Anemia.

   e.   Decedent received blood transfusions and additional medical treatment for his injuries, and he remained hospitalized at Saint Thomas Midtown Hospital from March 5, 2016 through March 10, 2016.

f.     At the time of Decedent's injury, he was taking Xarelto as prescribed.

g.     As a result of his injuries, Decedent's doctors discontinued Decedent's use of Xarelto.

h.     Decedent's injuries were directly and proximately caused by Xarelto.

i.     As a direct and proximate result of Defendants' conduct, Decedent has suffered harm and damages including severe pain and suffering, past and future medical expenses and other economic and noneconomic damages.

j.     By reason of the foregoing acts and omissions of Defendants, the Decedent was caused to suffer severe personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above named health consequences.

k.     By reason of the foregoing, Decedent has been severely and permanently injured, and will require more constant and continuous medical monitoring and treatment than prior to Decedent's use of Defendants' Xarelto drug.

## DEFENDANT PARTIES

8.     Defendant Janssen Research & Development LLC f/k/a Johnson and Johnson Pharmaceutical Research and Development LLC ("Janssen R&D") is a limited liability company organized under the laws of New Jersey, with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933. Janssen R&D's sole member is Centocor Research & Development, Inc., a Pennsylvania corporation with its principal place of business in Malvern, Pennsylvania. Janssen R&D is and was at all relevant times involved in the research, development, packaging, labeling, sales, and/or marketing of pharmaceutical products including Xarelto (rivaroxaban). Janssen R&D is and was at all relevant times a sponsor of the New Drug Application ("NDA") for Xarelto, as well as the supplemental NDAs for Xarelto.

9.      Defendant Johnson & Johnson ("J&J") is a corporation organized under the laws of New Jersey with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.  J&J manufactures, markets and sells a wide range of pharmaceutical products including Xarelto (rivaroxaban).  J&J is and was at all relevant times involved in the research, development, packaging, labeling, sales, and/or marketing of pharmaceutical products including Xarelto.

10.     Defendant Janssen Ortho LLC is a limited liability company organized under the laws of Delaware, having a principal place of business at Stateroad 933 Km 0 I, Street Statero, Gurabo, Puerto Rico 00778. The sole member of Janssen Ortho, LLC is OM.T PR Holdings, which is incorporated in Ireland and has its principal place of business in Puerto Rico. Janssen Ortho is and was at all relevant times involved in the research, development, packaging, labeling, manufacturing, sales, and/or marketing of pharmaceutical products including Xarelto.

11.     Defendant Janssen Pharmaceuticals, Inc. f/k/a Janssen Pharmaceutica Inc. f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation, having a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560. Janssen Pharmaceuticals, Inc. is and was at all relevant times involved in the research, development, packaging, labeling, manufacturing, sales, and/or marketing of pharmaceutical products including Xarelto. At all relevant times, Janssen Pharmaceuticals, Inc. has received direct reports from the FDA, healthcare providers and the general public of suspected adverse reactions to Xarelto, and failed to adequately respond to those reports.

12.     Defendant Bayer Corporation is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205. Bayer Corporation is and was at relevant times involved in the research, development, packaging, labeling, testing, manufacturing,

sales, and/or marketing of pharmaceutical products including Xarelto.

13.     Defendant Bayer HealthCare AG is a pharmaceutical company organized under the laws of Germany with its principal place of business located in Leverkusen, Germany. Bayer HealthCare AG is and was at relevant times involved in the research, development, packaging, labeling, testing, manufacturing, sales, and/or marketing of pharmaceutical products including Xarelto.

14.     Defendant Bayer Pharma AG f/k/a Bayer Schering Pharma AG is a German corporation with its principal place of business in Leverkusen, Germany. Bayer Pharma AG is and was at relevant times involved in the research, development packaging, labeling, testing, manufacturing, sales, and/or marketing of pharmaceutical products including Xarelto.

15.     Defendant Bayer AG is a German corporation with its principal place of business in Leverkusen, Germany. Bayer AG is and was a relevant times involved in the research, development packaging, labeling, testing, manufacturing, sales, and/or marketing of pharmaceutical products including Xarelto.

16.     Defendant Bayer Healthcare LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Whippany, New Jersey.  Bayer Corporation is the sole member of Bayer Healthcare LLC.  Defendant Bayer Healthcare LLC is and was at relevant times involved in the research, development, packaging, labeling, testing, manufacturing, sales, and/or marketing of pharmaceutical products including Xarelto.

17.     Defendant Bayer Healthcare Pharmaceuticals, Inc. f/k/a Bayer Healthcare, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Pine Brook, New Jersey 07058. Bayer Healthcare Pharmaceuticals, Inc. is and was at relevant

times involved in the research, development, manufacturing, sales, and marketing of pharmaceutical products including Xarelto. Bayer Healthcare Pharmaceuticals, Inc. is and was at all relevant times a sponsor of the New Drug Application ("NDA") for Xarelto, as well as the supplemental NDAs for Xarelto.

18.    At all relevant times, Defendants conducted business in the State of Tennessee and the Defendants derived substantial revenue from goods and products sold in that state.

19.    Fictitious Defendants 1-100 are those corporations, organizations and/or individuals who at relevant times were involved in the research, development, manufacturing, sales, and marketing of pharmaceutical products including Xarelto, whose identities are unknown at this time, but whose names will be substituted and amended herein when ascertained.

## FACTUAL BACKGROUND

20.    At all relevant times, Defendants were in the business of and did design, research, manufacture, test, package, label, advertise, promote, market, sell and distribute Xarelto.

21.    Defendants received FDA approval for Xarelto on July 1, 2011 for the prophylaxis of deep vein thrombosis (DVT) and pulmonary embolism (PE) in patients undergoing hip replacement or knee replacement surgeries (NDA 022406).

22.    Defendants then received additional FDA approval for Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation on November 4, 2011 (NDA 202439).

23.    An additional indication for treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE was added to the label on November 2, 2012.

24.    Defendants began marketing and selling Xarelto in the United States in 2011.

25.    Xarelto is an anticoagulant that acts as a Factor Xa inhibitor, and is available

by prescription in oral tablet doses of 20 mg, 15 mg, and 10 mg.

26.     Approval of Xarelto for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries was based on a series of clinical trials known as the Regulation of Coagulation in Orthopedic Surgery to Prevent Deep Venous Thrombosis and Pulmonary Embolism studies (the "RECORD" studies). The RECORD studies, however, showed a greater incidence with Xarelto of major bleeding events, leading to decreased hemoglobin levels and transfusion of blood. The increased incidence of major bleeding events occurred despite exclusion from the clinical trials patients who were identified as having a high risk of bleeding.     (Lassen, M.R., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Total Knee Arthroplasty.* 358:26 N. Engl. J. Med. 2776-86 (2008); Kakkar, A.K., et al. *Extended duration rivaroxaban versus short-term enoxaparin for the prevention of venous thromboembolism after total hip arthroplasty: a double-blind, randomised controlled trial.* Lancet 2008; 372:31-39; Ericksson, B.l., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty.* 358:26 N. Engl. J. Med. 2765-75 (2008)).

27.     The term "major bleeding" as used in the RECORD studies was defined as "bleeding that was fatal, that involved a critical organ, or that required reoperation or clinically overt bleeding outside the surgical site that was associated with a decrease in the hemoglobin level of 2 g or more per deciliter or requiring infusion of 2 or more units of blood." Defendants, who funded and had direct involvement in the design and conduct of the studies, ensured that the studies were not designed to accurately assess differences in bleeding risk between Xarelto and other anticoagulants, and further ensured that the studies were designed to under-represent the true bleeding risk presented by Xarelto use.

28.     Approval of Xarelto for reducing the risk of stroke and systemic embolism

in patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as the Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation study ("ROCKET AF"). The study's findings reported that rivaroxaban was non-inferior to Warfarin for the prevention of stroke or systemic embolism in patients with non-valvular atrial fibrillation, with a similar risk of major bleeding. However, "bleeding from gastrointestinal sites, including upper, lower, and rectal sites, occurred more frequently in the rivaroxaban group, as did bleeding that led to a drop in the hemoglobin level or bleeding that required transfusion." (Patel, M.R., et al. *Rivaroxaban versus Warfarin in Nonvalvular Atrial Fibrillation.* 365:10 N. Engl. J. Med. 883- 91 (2011)).

29.     Approval of Xarelto for the treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE in the U.S. was based on the clinical trials known as the EINSTEIN-DVT, EINSTEIN-PE, and EINSTEIN-Extension studies. The EINSTEIN-DVT study tested Xarelto versus a placebo, and merely determined that Xarelto might be an option for treatment of DVT, but that Xarelto carried an obvious increased risk of bleeding events as compared to placebo. (The EINSTEIN Investigators. *Oral Rivaroxaban for Symptomatic Venous Thromboembolism,* 363:26 N. Engl. J. Med. 2499-510 (2010).) The EINSTEIN-Extension study reiterated that result. (Roumualdi, E., et al. *Oral rivaroxaban after symptomatic venous thromboembolism: the continued treatment study (EINSTEIN-Extension study).* Expert Rev. Cardiovasc. Ther. 9(7), 841-44 (2011)). The EINSTEIN-PE study also reported, however, an increased risk of adverse events in users of Xarelto, including those that resulted in permanent discontinuation of Xarelto or prolonged hospitalization. (The EINSTEIN-PE Investigators. *Oral Rivaroxaban for the Treatment of Symptomatic Pulmonary Embolism.* N.

Engl. J. Med. 2012; 366:1287-97).

30.     Defendants have used the results of the ROCKET AF study, the RECORD studies, and the EINSTEIN studies to promote Xarelto in their promotional materials, including the Xarelto website, which have touted the positive results of those studies. However, Defendants' promotional materials have failed to similarly highlight the increased risk of major internal bleeding among other serious bleeding concerns.

31.     Defendants marketed Xarelto as a new oral anticoagulant treatment that is a more convenient alternative to warfarin (coumadin), a long-established safe treatment for preventing stroke and systemic embolism. Defendants emphasized the supposed benefits of treatment with Xarelto over warfarin, which they referred to as the Xarelto Difference-namely, that Xarelto does not require monitoring with blood tests, that its effect is the same on all patients, and that it does not limit a patient's diet.

32.     For example, in advertising Xarelto on Defendant JANSSEN's website, the Defendant states:

> With XARELTO®, blood tests aren't typically necessary to set your starting dose, and you don't need to schedule regular blood tests throughout your treatment to have your dosage adjusted. So **instead of spending time monitoring your blood, you can do more of the things you enjoy.** (emphasis added)

33.     This emphasis on convenience is dangerously misleading. In its QuarterWatch publication for the first quarter of the 2012 fiscal year, the Institute for Safe Medication Practices ("ISMP") noted that, even during the approval process, FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of Xarelto], saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing."

34.     Importantly, there is no antidote to Xarelto, unlike warfarin or coumadin. Therefore, in the event of hemorrhagic complications, there is no available reversal agent. The

original U.S. label approved when the drug was first marketed in the U.S. did not contain a warning regarding Xarelto's lack of antidote, but instead only mentioned this important fact in the overdosage section. Months passed before this information was added to the "Warnings and Precautions" section. Today, Defendants are searching frantically for an antidote that they should have developed before releasing Xarelto into the market.

35.     Defendants spent significant money in promoting Xarelto, which included at least $11,000,000.00 spent during 2013 alone on advertising in journals targeted at prescribers and consumers in the U.S. In the third quarter of the 2013 fiscal year, Xarelto was the number one pharmaceutical product advertised in professional health journals based on pages and dollars spent.

36.     As a result of Defendants' aggressive marketing efforts, in its first full year of being on the market, Xarelto garnered approximately $582 million in sales globally.

37.     Defendants' website for Xarelto claims that over seven million people worldwide have been prescribed Xarelto. In the U.S., approximately 1 million Xarelto prescriptions had been written by the end of 2013.

38.     During the Defendants' 2012 fiscal year, Xarelto garnered approximately $658 million in sales worldwide. Then, in 2013, sales for Xarelto increased even further to more than clear the $1 billion threshold commonly referred to as "blockbuster" status in the pharmaceutical industry, ultimately reaching approximately $2 billion for the fiscal year. Thus, Xarelto is now considered the leading anticoagulant on a global scale in terms of sales.

39.     As part of their marketing of Xarelto, Defendants widely disseminated direct-to-consumer advertising campaigns that were designed to influence patients, including Decedent, to make inquiries to their prescribing physician about Xarelto and/or request prescriptions for Xarelto.

40.      In the course of these direct-to-consumer advertisements, Defendants overstated the efficacy of Xarelto, misleadingly suggested that no blood monitoring was required, failed to adequately disclose to patients that there is no antidote for Xarelto, and that such irreversibility could have permanently disabling, life-threatening and fatal consequences.

41.      On June 6, 2013, Defendants received an untitled letter from the FDA's Office of Prescription Drug Promotion ("OPDP") regarding its promotional material for the atrial fibrillation indication, stating that, "the print ad is false or misleading because it minimizes the risks associated with Xarelto and makes a misleading claim" regarding dose adjustments, which was in violation of FDA regulations. The OPDP thus requested that Defendants immediately cease distribution of such promotional material.

42.      Prior to Decedent's prescriptions of Xarelto, Decedent became aware of the representations in the promotional materials described herein.

43.      Prior to Decedent's prescriptions of Xarelto, Decedent's prescribing physicians became aware of the representations in the promotional materials and information from sales representatives of Defendants that Xarelto was just as effective as warfarin in reducing strokes in patients with non-valvular atrial fibrillation, as well as preventing DVT/PE in patients with prior history of DVT/PE or undergoing hip or knee replacement surgery, and was more convenient, without also adequately informing prescribing physicians of the risks of major internal bleeding events and that there was no reversal agent that could stop or control bleeding in patients taking Xarelto.

44.      At all times relevant hereto, Defendants also failed to adequately warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally- known measures taken to treat and stabilize bleeding in users of warfarin, there is no effective agent to

reverse the anticoagulation effects of Xarelto, and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Xarelto.

45.    At all times relevant to this action, The Xarelto Medication Guide, prepared and distributed by Defendants and intended for U.S. patients to whom Xarelto has been prescribed, failed to warn and disclose to patients that there is no agent to reverse the anticoagulation effects of Xarelto, that failure to monitor patients' blood while taking Xarelto can result in life- threatening thrombotic events on one hand and serious bleeding events on the other, and that if serious bleeding occurs, it may be irreversible, permanently disabling, and life-threatening.

46.    In the year leading up to June 30, 2012, there were 1,080 Xarelto-associated "Serious Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65 deaths. Of the reported hemorrhage events associated with Xarelto, 8% resulted in death, which was approximately twofold the risk of a hemorrhage-related death with warfarin.

47.    At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA in its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death, as compared to only 56 deaths associated with warfarin.

48.    The Institute for Safe Medicine Practices (ISMP) referred to these SAE figures as constituting a "strong signal[]" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

49.    Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528), another new oral anticoagulant, which had previously ranked as the number one reported drug in terms of adverse

events in 2012.

50.     Moreover, on a global scale, in the first eight months of 2013, German regulators received Xarelto-related adverse event reports, including 72 deaths, as compared to a total of 750 reports and 58 deaths in 2012.

51.     Despite the clear signal generated by the SAE data, Defendants failed to either alert the public and the scientific community, or perform further investigation into the safety of Xarelto.

52.     Defendants' labeling and prescribing information for Xarelto:

a.             failed to provide adequate warnings about the true safety risks associated with the use of Xarelto;

b.             failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamic variability of Xarelto and its effects on the degree of anticoagulation in a patient and among patients;

c.             originally failed to disclose in the "Warnings" Section that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto;

d.             failed to advise prescribing physicians, such as the Decedent's physicians, to instruct patients that there was no agent to reverse the  anticoagulant effects of Xarelto;

e.             failed to instruct prescribing physicians and patients on how to determine proper dosing;

f.             failed to provide adequate instructions on how to intervene and/or stabilize a patient who suffers a bleed while taking Xarelto;

g.             failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Xarelto users;

h.             failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Xarelto, especially, in those patients with a prior history of gastrointestinal issues and/or upset;

i.             failed to provide adequate warnings regarding the increased risk of suffering a bleeding event requiring blood transfusions in those taking Xarelto;

j.             failed to provide adequate  warnings regarding the need to assess renal

14

functioning prior to starting a patient on Xarelto and to continue testing and monitoring of renal functioning periodically while the patient is on Xarelto;

k.          failed to provide adequate warnings regarding the need to assess hepatic functioning prior to starting a patient on Xarelto and to continue testing and monitoring of hepatic functioning periodically while the patient is on Xarelto;

l.          failed to include a "BOXED WARNING" about serious bleeding events associated with Xarelto;

m.          failed to include a "Bolded Warning" about serious bleeding events associated with Xarelto; and

n.          in their "Medication Guide" intended for distribution to patients to whom Xarelto has been prescribed, Defendants failed to disclose to patients that blood monitoring is required, that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, such irreversibility could have permanently disabling, life-threatening or fatal consequences.

53.     During the years since first marketing Xarelto in the U.S., Defendants modified the U.S. labeling and prescribing information for Xarelto, which included additional information regarding the use of Xarelto in patients taking certain medications. Despite being aware of: (1) serious, and sometimes fatal, irreversible bleeding events associated with the use of Xarelto; and, (2) the existence of 2,081 SAE Medwatch reports filed with the FDA in 2012 alone, including at least 151 deaths, Defendants nonetheless failed to provide adequate disclosures or warnings in their labeling.

54.     Prior to applying for and obtaining approval of Xarelto, Defendants knew or should have known that consumption of Xarelto was associated with and/or would cause the induction of life-threatening bleeding, and Defendants possessed clinical studies that evidence Defendants knew or should have known were signals that life-threatening bleeding risk needed further testing and studies prior to its introduction to the market.

55.     Defendants designed their studies to under-represent the true risk of adverse bleeding events, and they failed to conduct proper studies that they knew or should have known

would have disclosed the true risks.

56.     From the date Defendants received FDA approval to market Xarelto, Defendants made, distributed, marketed, and sold Xarelto without adequate warning to Decedent's prescribing physicians or Decedent that Xarelto was associated with and/or could cause life-threatening bleeding, presented a risk of life-threatening bleeding in patients who used it, and that Defendants had not adequately conducted complete and proper testing and studies of Xarelto with regard to severe side effects, specifically life-threatening bleeding.

57.     Defendants concealed and failed to completely disclose its knowledge that Xarelto was associated with or could cause life-threatening bleeding as well as its knowledge that they had failed to fully test or study said risk.

58.     Defendants ignored the association between the use of Xarelto and the risk of developing life-threatening bleeding.

59.     Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Xarelto for life-threatening bleeding risk further rendered warnings for this medication inadequate.

### COUNT I
### (NEGLIGENCE)

60.     Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

61.     Defendants had a duty to exercise reasonable care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, and/or distribution of Xarelto into the stream of commerce, including a duty to assure that the product would not cause

users to suffer unreasonable, dangerous side effects.

62.     Defendants failed to exercise ordinary care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality assurance, quality control, and/or distribution of Xarelto into interstate commerce in that Defendants knew or should have known that using Xarelto created a high risk of unreasonable, dangerous side effects, including, life-threatening bleeding, stroke, deep vein thrombosis, pulmonary embolism, liver injury, kidney injury, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

63.     The negligence of the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

a.          Designing, manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without thoroughly testing it;

b.          Designing, manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without adequately testing it;

c.          Not conducting sufficient testing programs to determine whether or not Xarelto was safe for use; in that Defendants herein knew or should have known that Xarelto was unsafe and unfit for use by reason of the dangers to its users;

d.          Selling Xarelto without making proper and sufficient tests to determine the dangers to its users;

e.          Negligently failing to adequately and correctly warn the Decedent, the public, the medical and healthcare profession, and the FDA of the dangers of Xarelto;

f.          Failing to provide adequate instructions regarding blood monitoring and safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with, and more particularly, use, Xarelto;

g.          Failing to test Xarelto and/or failing to adequately, sufficiently and properly test Xarelto;

h.          Negligently advertising and recommending the use of Xarelto without

sufficient knowledge as to its dangerous propensities;

      i.            Negligently representing that Xarelto was safe for use for its intended purpose, when, in fact, it was and is unsafe;

      j.            Negligently representing that Xarelto had equivalent safety and efficacy as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

      k.            Negligently designing Xarelto in a manner which was dangerous to its users;

      l.            Negligently manufacturing Xarelto in a manner which was dangerous to its users;

      m.            Negligently producing Xarelto in a manner which was dangerous to its users;

      n.            Negligently assembling Xarelto in a manner which was dangerous to its users;

      o.            Concealing information from the Decedent in knowing that Xarelto was unsafe, dangerous, and/or non-conforming with FDA regulations;

      p.            Improperly concealing and/or misrepresenting information from the Decedent, healthcare professionals, and/or the FDA, concerning the severity of risks and dangers of Xarelto compared to other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

      64.      Defendants under-reported, underestimated and downplayed the serious dangers of Xarelto.

      65.      Defendants negligently compared the safety risk and/or dangers of Xarelto with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

      66.      Defendants were negligent in the designing, researching, supplying,

manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and sale of Xarelto in that they:

a.      Failed to use due care in designing and manufacturing Xarelto so as to avoid the aforementioned risks to individuals when Xarelto was used for treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

b.      Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Xarelto;

c.      Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Xarelto;

d.      Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Xarelto;

e.      Failed to warn Decedent of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects;

f.      Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Xarelto;

g.      Failed to warn Decedent, prior to actively encouraging the sale of Xarelto, either directly or indirectly, orally or in writing, about the need for more comprehensive, more regular medical monitoring than usual to ensure early discovery of potentially serious side effects.

67.    Despite the fact that Defendants knew or should have known that Xarelto caused unreasonably dangerous side effects, Defendants continued and continue to negligently and misleadingly market, manufacture, distribute and/or sell Xarelto to consumers, including the Decedent.

68.    Defendants knew or should have known that consumers such as the Decedent would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

69.    Defendants' negligence was the proximate cause of Decedent's injuries, harm and economic loss which Decedent suffered and/or will continue to suffer.

70.     As a result of the foregoing acts and omissions, Decedent was caused to suffer serious and did suffer serious personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

71.     As a result of the foregoing acts and omissions, the Decedent required and/or will require more health care and services and did incur medical, health, incidental and related expenses.

72.     As a result of the foregoing acts and omissions, Decedent, Lee A. Potter, suffered and incurred harm including severe pain and suffered personal injuries and incurred damages to include severe pain and suffering, medical expenses and other economic and noneconomic damages.

73.     By reason of the foregoing, the Plaintiff has been damaged by Defendants' wrongful conduct.

## COUNT II
## (STRICT PRODUCTS LIABILITY)

74.     Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

75.     At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have recently acquired the Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Xarelto as hereinabove described that was used by the Decedent.

76.     That Xarelto was expected to and did reach the usual consumers, handlers, and

persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

77.     At those times, Xarelto was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Decedent herein.

78.     The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Xarelto.

79.     The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants manufacturers and/or suppliers, it was unreasonably dangerous, and it was more dangerous than an ordinary consumer would expect.

80.     At all times herein mentioned, Xarelto was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants.

81.     Defendants knew, or should have known that at all times herein mentioned its Xarelto was in a defective condition, and was and is inherently dangerous and unsafe.

82.     At the time of the Decedent's use of Xarelto, Xarelto was being used for the purposes and in a manner normally intended.

83.     Defendants with this knowledge voluntarily designed its Xarelto in a dangerous condition for use by the public, and in particular the Decedent.

84.     Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

85.     Defendants created a product unreasonably dangerous for its normal, intended use.

86.     The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed sold and distributed by Defendants was manufactured defectively in that Xarelto left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

87.     The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Xarelto was manufactured.

88.     Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which created an unreasonable risk to the health of consumers and to the Decedent in particular, and Defendants are therefore strictly liable for the injuries sustained by the Decedent.

89.     The Decedent could not, by the exercise of reasonable care, have discovered Xarelto's defects herein mentioned and perceived its danger.

90.     The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings or instructions as the Defendants knew or should have known that the product created a risk of serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to adequately warn of said risk.

91.     The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings and/or inadequate testing.  The Xarelto designed, researched, manufactured, tested, advertised, promoted,

marketed, sold and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects including, life-threatening bleeding, as well as other severe and permanent health consequences from Xarelto, they failed to provide adequate warnings to users or consumers of the product, and continued to improperly advertise, market and/or promote their product, Xarelto.

92.     By reason of the foregoing, the Defendants have become strictly liable in tort to the Plaintiff for the manufacturing, marketing, promoting, distribution and selling of a defective product, Xarelto.

93.     Defendants' defective design, manufacturing defect, and inadequate warnings of Xarelto were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

94.     The defects in Defendants' drug Xarelto were a substantial factor in causing Decedent's injuries.

95.     As a result of the foregoing acts and omissions, Decedent was caused to suffer serious and did suffer serious personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

96.     As a result of the foregoing acts and omissions, the Decedent required and/or will require more health care and services and did incur medical, health, incidental and related expenses.

97.     As a result of the foregoing acts and omissions, Decedent, Lee A. Potter, suffered and incurred harm including severe pain and suffered personal injuries and incurred damages to include severe pain and suffering, medical expenses and other economic and noneconomic

damages.

98.     By reason of the foregoing, the Plaintiff has been damaged by Defendants' wrongful conduct.

## COUNT III
### (BREACH OF EXPRESS WARRANTY)

99.     Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

100.    Defendants expressly warranted that Xarelto was safe and well accepted by users and did not require blood monitoring and was safe even though it had no antidote.

101.    Xarelto does not conform to these express representations because Xarelto is not safe and has numerous serious side effects, many of which were not accurately warned about by Defendants. As a direct and proximate result of the breach of said warranties, Decedent suffered and/or will continue to suffer severe and permanent personal injuries, harm and economic loss.

102.    Decedent did rely on the express warranties of the Defendants herein.

103.    Members of the medical community, including physicians and other healthcare professionals, relied upon the representations and warranties of the Defendants for use of Xarelto in recommending, prescribing, and/or dispensing Xarelto.

104.    The Defendants herein breached the aforesaid express warranties, as their drug Xarelto was defective.

105.    Defendants expressly represented to Decedent, Decedent's physicians, healthcare providers, and/or the FDA that Xarelto was safe and fit for use for the purposes intended, that it was of merchantable quality, that it did not produce any dangerous side effects in excess of those risks associated with other forms of treatment for reducing the risk of stroke and systemic and/or

24

PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT surgery, that the side effects it did produce were accurately reflected in the warnings and that it was adequately tested and fit for its intended use.

106.     Defendants knew or should have known that, in fact, said representations and warranties were false, misleading and untrue in that Xarelto was not safe and fit for the use intended, and, in fact, produced serious injuries to the users that were not accurately identified and represented by Defendants.

107.     As a result of the foregoing acts and omissions, Decedent was caused to suffer serious and did suffer serious personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

108.     As a result of the foregoing acts and omissions, the Decedent required and/or will require more health care and services and did incur medical, health, incidental and related expenses.

109.     As a result of the foregoing acts and omissions, Decedent, Lee A. Potter, suffered and incurred harm including severe pain and suffered personal injuries and incurred damages to include severe pain and suffering, medical expenses and other economic and noneconomic damages.

110.     By reason of the foregoing, the Plaintiff has been damaged by Defendants' wrongful conduct.

## COUNT IV
## (BREACH OF IMPLIED WARRANTIES)

111.     Plaintiff repeats, reiterates and realleges each and every allegation of this

Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

112.     At all times herein mentioned, the Defendants manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto and/or have recently acquired the Defendants who have manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto, to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

113.     At the time Defendants marketed, sold, and distributed Xarelto for use by the Decedent, Defendants knew of the use for which Xarelto was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

114.     The Defendants impliedly represented and warranted to the users of Xarelto and their physicians, healthcare providers, and/or the FDA that Xarelto was safe and of merchantable quality and fit for the ordinary purpose for which said product was to be used.

115.     That said representations and warranties aforementioned were false, misleading, and inaccurate in that Xarelto was unsafe, unreasonably dangerous, improper, not of merchantable quality, and defective.

116.     Decedent, and/or members of the medical community and/or healthcare professionals did rely on said implied warranty of merchantability of fitness for a particular use and purpose.

117.     Decedent and Decedent's physicians and healthcare professionals reasonably relied upon the skill and judgment of Defendants as to whether Xarelto was of merchantable

quality and safe and fit for its intended use.

118.     Xarelto was placed into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition and the products and materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

119.     The Defendants herein breached the aforesaid implied warranties, as their drug Xarelto was not fit for its intended purposes and uses.

120.     As a result of the foregoing acts and omissions, Decedent was caused to suffer serious and did suffer serious personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

121.     As a result of the foregoing acts and omissions, the Decedent required and/or will require more health care and services and did incur medical, health, incidental and related expenses.

122.     As a result of the foregoing acts and omissions, Decedent, Lee A. Potter, suffered and incurred harm including severe pain and suffered personal injuries and incurred damages to include severe pain and suffering, medical expenses and other economic and noneconomic damages.

123.     By reason of the foregoing, the Plaintiff has been damaged by Defendants' wrongful conduct.

## COUNT V
## (FRAUDULENT MISREPRESENTATION)

124.     Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect

as if more fully set forth herein.

125.    The Defendants falsely and fraudulently represented to the medical and healthcare community, and to the Decedent, and/or the FDA, and the public in general, that said product, Xarelto, had been tested and was found to be safe and/or effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery. Defendants further misrepresented that patients could safely use Xarelto without any blood monitoring, that Xarelto's effect is the same on all patients, and that Xarelto could safely be used without an antidote.

126.    That representations made by Defendants were, in fact, false.

127.    Upon information and belief, when said representations were made by Defendants, they knew those representations to be false. At a minimum, they willfully, wantonly and recklessly disregarded whether the representations were true.

128.    Upon information and belief, these representations were made by Defendants with the intent of defrauding and deceiving the Decedent, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, prescribe, dispense and/or purchase said product, Xarelto, for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Decedent herein.

129.    At the time the aforesaid representations were made by the Defendants and, at the

time the Decedent used Xarelto, the Decedent was unaware of the falsity of said representations and reasonably believed them to be true.

130.    In reliance upon said representations, the Decedent was induced to and did use Xarelto, thereby sustaining severe and permanent personal injuries, and/or being at an increased risk of sustaining severe and permanent personal injuries in the future.

131.    Said Defendants knew and were aware or should have been aware that Xarelto had not been sufficiently tested, was defective in nature, and/or that it lacked adequate and/or sufficient warnings.

132.    Defendants knew or should have known that Xarelto had a potential to, could, and would cause severe and grievous injury to the users of said product, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, and/or down-played warnings and misleading instructions.

133.    Defendants brought Xarelto to the market, and acted fraudulently, wantonly and maliciously to the detriment of the Decedent.

134.    As a result of the foregoing acts and omissions, Decedent was caused to suffer serious and did suffer serious personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

135.    As a result of the foregoing acts and omissions, the Decedent required and/or will require more health care and services and did incur medical, health, incidental and related expenses.

136.    As a result of the foregoing acts and omissions, Decedent, Lee A. Potter, suffered and incurred harm including severe pain and suffered personal injuries and incurred damages to

include severe pain and suffering, medical expenses and other economic and noneconomic damages.

137.    By reason of the foregoing, the Plaintiff has been damaged by Defendants' wrongful conduct.

## COUNT VI
## (FRAUDULENT CONCEALMENT)

138.    Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

139.    At all times during the course of dealing between Defendants and Decedent, and/or Decedent's healthcare providers, and/or the FDA, Defendants misrepresented the safety of Xarelto for its intended use.

140.    Defendants knew or were reckless in not knowing that its representations were false.

141.    In representations to the Decedent, and/or Decedent's healthcare providers, and/or the FDA, Defendants fraudulently concealed and omitted the following material information:

a.          that Xarelto was not as safe as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

b.          that the risks of adverse events with Xarelto were higher than those with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

c.          that the risks of adverse events with Xarelto were not adequately tested and/or known by Defendants;

d.        that Defendants were aware of dangers in Xarelto, in addition to and above and beyond those associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

e.        that Xarelto was defective, and that it caused dangerous side effects, including but not limited to life-threatening bleeding, as well as other severe and permanent health consequences, in a much more and significant rate than other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

f.        that patients needed to be monitored while using Xarelto;

g.        that Xarelto's effect is not the same on all patients;

h.        that Xarelto cannot be safely used without an available antidote;

i.        that Xarelto was manufactured negligently;

j.        that Xarelto was manufactured defectively;

k.        that Xarelto was manufactured improperly;

l.        that Xarelto was designed negligently;

m.        that Xarelto was designed defectively; and,

n.        that Xarelto was designed improperly.

142.    Defendants were under a duty to disclose to Decedent, and Decedent's physicians, hospitals, healthcare providers, and/or the FDA the defective nature of Xarelto, including but not limited to the heightened risks of life-threatening bleeding.

143.    Defendants had sole access to and exclusive control of material facts concerning the defective nature of the product and its propensity to cause serious and dangerous side effects, and hence, cause damage to persons who used Xarelto, including the Decedent, in particular.

144.    Defendants' concealment and omissions of material facts concerning, inter alia, the safety of Xarelto was made purposefully, willfully, wantonly, and/or recklessly, to mislead

Decedent, and Decedent's physicians, hospitals and healthcare providers into reliance, continued use of Xarelto, and actions thereon, and to cause them to purchase, prescribe, and/or dispense Xarelto and/or use the product.

145.     Defendants knew that Decedent, and Decedent's physicians, hospitals, healthcare providers, and/or the FDA had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding Xarelto, as set forth herein.

146.     Decedent, as well as Decedent's doctors, healthcare providers, and/or hospitals reasonably relied on facts revealed which negligently, fraudulently and/or purposefully did not include facts that were concealed and/or omitted by Defendants.

147.     As a result of the foregoing acts and omissions, Decedent was caused to suffer serious and did suffer serious personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

148.     As a result of the foregoing acts and omissions, the Decedent required and/or will require more health care and services and did incur medical, health, incidental and related expenses.

149.     As a result of the foregoing acts and omissions, Decedent, Lee A. Potter, suffered and incurred harm including severe pain and suffered personal injuries and incurred damages to include severe pain and suffering, medical expenses and other economic and noneconomic damages.

150.     By reason of the foregoing, the Plaintiff has been damaged by Defendants' wrongful conduct.

## COUNT VII
## (NEGLIGENT MISREPRESENTATION)

151.     Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

152.     Defendants had a duty to represent to the medical and healthcare community, and to the Decedent, the FDA and the public in general that said product, Xarelto, had been tested and found to be safe and effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

153.     The representations made by Defendants were, in fact, false.

154.     Defendants failed to exercise ordinary care in the representation of Xarelto, while involved in its manufacture, sale, testing, quality assurance, quality control, and/or distribution of said product into interstate commerce, in that Defendants negligently misrepresented Xarelto's high risk of unreasonable, dangerous side effects.

155.     Defendants breached their duty in representing Xarelto's serious side effects to the medical and healthcare community, to the Decedent, the FDA and the public in general.

156.     As a result of the foregoing acts and omissions, Decedent was caused to suffer serious and did suffer serious personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

157.     As a result of the foregoing acts and omissions, the Decedent required and/or will require more health care and services and did incur medical, health, incidental and related expenses.

158.     As a result of the foregoing acts and omissions, Decedent, Lee A. Potter, suffered and incurred harm including severe pain and suffered personal injuries and incurred damages to include severe pain and suffering, medical expenses and other economic and noneconomic damages.

159.     By reason of the foregoing, the Plaintiff has been damaged by Defendants' wrongful conduct.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment of the U.S. Constitution.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff demands judgment against the Defendants on each of the above-referenced claims and Causes of Action and as follows:

a)     For general damages in a sum in excess of $75,000 or the jurisdictional minimum of this Court;

b)     For medical, incidental and hospital expenses according to proof;

c)     For pre-judgment and post-judgment interest as provided by law;

d)     For full refund of all purchase costs Decedent paid for Xarelto;

e)     For consequential damages in excess of the jurisdictional minimum of this Court;

f)     For punitive damages in an amount in excess of any jurisdictional minimum of this Court in an amount sufficient to deter similar conduct in the future;

g)     For attorneys' fees, expenses and costs of this action; and

h)     For such further relief as this Court deems necessary, just and proper.

Dated: June 20, 2018                    s/ Andy D. Birchfield, Jr.

                                        Andy D. Birchfield, Jr.
                                        C. Gibson Vance
                                        David B. Byrne, III
                                        BEASLEY, ALLEN, CROW,
                                        METHVIN, PORTIS & MILES, P.C.
                                        Post Office Box 4160
                                        Montgomery, Alabama 36103-4160
                                        (334) 269-2343
                                        (334) 954-7555 (facsimile)
                                        Andy.Birchfield@BeasleyAllen.com
                                        Gibson.Vance@BeasleyAllen.com
                                        David.Byrne@BeasleyAllen.com

                                        *Attorneys for Plaintiff*