UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA


IN RE: XARELTO (RIVAROXABAN)      *      MDL 2592 "L"
PRODUCTS LIABILITY LITIGATION     *
                                  *
                                  *      June 27, 2018
                                  *
                                  *
THIS DOCUMENT RELATES TO          *      Judge Eldon E. Fallon
*ALL CASES*                       *
                                  *
                                  *      Mag. Judge Michael North
                                  *
*********************************************************************

**REPORTER'S OFFICIAL TRANSCRIPT OF THE
HEARING ON THE MOTIONS FOR NEW TRIAL
BEFORE THE HONORABLE ELDON E. FALLON,
UNITED STATES JUDGE.**

*********************************************************************

**APPEARANCES:**


FOR THE PLAINTIFFS:            Beasley Allen
                               BY: ANDY BIRCHFIELD, ESQ.
                               4200 Northside Pkwy, NW
                               Building One, Ste. 100
                               Atlanta, GA 30327


FOR THE DEFENDANTS:            Arnold & Porter
                               BY: STEVEN J. GLICKSTEIN, ESQ.
                               250 West 55th Street
                               New York, NY 10019


**REPORTED BY:**        Mary V. Thompson, RMR, FCRR
                        500 Poydras Street
                        Box B2-13
                        New Orleans, LA  70130
                        (504) 589-7783


**OFFICIAL TRANSCRIPT**

**P R O C E E D I N G S**

THE COURT:  Just to put the matter in perspective, in the *Ibanez* case, which is before the Court, the defendants move for summary judgment dismissing the plaintiff's failure to warn and design defect claims on the grounds that they're preempted by the federal law.  The defendants say that if the Court should adhere to its prior opinion requesting preemption, the Court then should certify the order for interlocutory appeal under 1292(b).

The summary judgment -- so it's really a twofold motion, one for summary judgment and the other for certification.

The summary judgment portion of the motion, the parties have agreed to present that on the briefs, so the oral argument for today is really limited to the question of certification under 1292(b).

We all know that under 1292(b) the District Court is authorized to certify a ruling for interlocutory review if, one, it involves a controlling question of law; two, there are substantial grounds for a difference of opinion; and, three, that an immediate appeal from the order may materially advance the ultimate termination of the litigation.

Those are the areas that the Court -- for which the District Court can grant certification to the Court of Appeal.

I'll hear from the parties and movant at this time.

MR. GLICKSTEIN:  Good morning, Your Honor.  Steve

**OFFICIAL TRANSCRIPT**

1  Glickstein for the defendants.

2          THE COURT:  Steve.

3          MR. GLICKSTEIN:  Your Honor said that he has a trial

4  coming up at 10:30 so I'm going to consolidate my argument into a

09:16:30  5  single sentence:  If your law clerk, Sheridan, can go to the

6  Fifth Circuit, so can the preemption.

7          THE COURT:  Okay.

8          Let me ask you, Steve, on that issue, what's the

9  difference between this motion and the motion that you have in

09:16:48  10  *Boudreaux*, *Orr*, and *Mingo*?

11          I mean, you've got a cross appeal there.  It's been

12  consolidated.  I assume that if there's a 1292(b), that's going

13  to get consolidated.  So what do we gain?

14          MR. GLICKSTEIN:  There are two important differences.

09:17:10  15  The first important difference is the procedural posture.

16          Because the defendants won the *Boudreaux*, *Orr*, and

17  *Mingo* cases, the preemption issue is not squarely before the

18  Court of Appeals.  To be sure, the defendants have moved to

19  affirm the judgment on the alternative ground that if Your Honor

09:17:35  20  had committed reversible error in your instructions or

21  evidentiary rulings, they need to address the preemption issue.

22          But there's no duty of the Court of Appeal to address

23  alternative grounds for affirmance, and review it as unlikely

24  that they will do so naturally because we think that Your Honor

09:18:03  25  ruled correctly, both on the points of evidence and instructions,

**OFFICIAL TRANSCRIPT**

1    but the plaintiffs are challenging it.

2         A second important difference is the scope of the

3    motion.  Your Honor will recall that plaintiffs in *Boudreaux* and

4    *Orr* abandoned all claims except for the PT theory.  In *Mingo* they

*09:18:26*  5    abandoned all claims except for the PT theory and design defect

6    on Anti-Factor Xa.

7         The *Ibanez* motion addressed all of the theories that

8    the plaintiffs had advanced up through the first *Orr* bellwether

9    trial; and that includes not only the PT theory, not only design

*09:18:47*  10   defect on Anti-Factor Xa, but also the theory that the Xarelto

11   label should have included data not only in the clinical trial

12   population as a whole, but U.S. subgroup data which plaintiffs

13   contend shows more adverse events than the data as a whole.  We

14   call that the U.S. subgroup theory.

*09:19:18*  15        It includes the argument that the plaintiffs make

16   concerning the recall of the INRatio device, Your Honor, which is

17   not at issue in the pending appeal.

18        It includes the design defect claim on a reversal agent

19   which is not included in the pending appeal.

*09:19:42*  20        So the 1292(b) in *Ibanez* is much broader.

21        And I might also add that in recent times the

22   plaintiffs are saying now, having lost the three bellwethers in

23   the MDL, that the U.S. subgroup theory, which is the theory that

24   is involved in the *Ibanez* motion but not in the pending appeal,

*09:20:13*  25   is there go-to theory.

**OFFICIAL TRANSCRIPT**

1        And I have some demonstratives.  As the Judge knows, I
2  do that the old fashioned way by handing up paper.
3        THE COURT:  Right.
4        That's the theory that's being authored in
5  Pennsylvania?
6        MR. GLICKSTEIN:  Exactly.
7        And may I approach?
8        THE COURT:  Uh-huh.
9        MR. GLICKSTEIN:  This is the -- what I just handed up
10  is the plaintiffs' brief to Judge New.
11        And now I'm going to hand up Judge New's order.
12        So if we look at Page No. 3 -- it's the fourth page,
13  but it's the page numbered 3 of the plaintiffs' proceeding.
14        First you'll see that it was submitted by
15  Mike Weinkowitz, who, of course, is the lead in the PCCP and is
16  Mr. Longer's partner.
17        And we do know, of course, that every one of the PCCP
18  cases had an MDL PSC member on the trial team, and in some cases
19  as the lead lawyer.
20        On Page 3 I have yellow-highlighted what plaintiffs
21  have said, and they say going forward -- the context of this is
22  what cases do the plaintiffs want to try in 2019 and beyond, and
23  they say plaintiffs' proposed trial plan seeks to identify a
24  dozen representative cases whose trial results can inform the
25  parties and the Court.

**OFFICIAL TRANSCRIPT**

1      To this end, plaintiffs submit that these cases should

2  include -- and they address five criteria that every case -- not

3  alternative criteria, but five criteria that every case should

4  have.

*09:22:29*

5      And one of those criteria is whose prescriptions of

6  Xarelto predate the addition of the United States subgroup

7  bleeding data.  So that's the theory now that plaintiffs are

8  pressing most vociferously.

9      And if you look at Judge New's order, which was, I

*09:22:53*

10  believe, sent to you by Mr. Weinkowitz in advance of the hearing,

11  Judge New adopted that plan.  So all of the trials going forward

12  are going to include the U.S. subgroup theory which is central in

13  *Ibanez* and was not in *Boudreaux*, *Mingo*, and *Orr*.

14      And I do also want to say that this is not, you know, a

*09:23:22*

15  unique -- a unique PCCP Philadelphia issue.  If you look at the

16  MDL centrality statistics, which we ran -- and I'm focusing now

17  on the plaintiffs' cases because those presumably are the cases

18  that the plaintiffs most want to try -- 185 out of 200, which is

19  92.5 percent, involve claims where the first use of Xarelto

*09:23:57*

20  predates the September 2015 label change when the U.S. subgroup

21  data was added to the label.

22      So they're making a distinction and saying the old

23  label, that didn't contain this U.S. subgroup data, is defective

24  and they are strongly, strongly targeting their claims towards

*09:24:17*

25  that.

**OFFICIAL TRANSCRIPT**

1   Even if you compare apples to apples, because the

2   plaintiffs in Philadelphia are saying, Well, we're limiting

3   ourselves to AFib cases -- atrial fibrillation cases involving

4   the pre-September 2015 label.  Again, looking at MDL centrality

09:24:38   5   data, 131 out of 200 atrial fibrillation cases selected by the

6   plaintiffs -- that's 65.5 percent, virtually two thirds --

7   involve that fact pattern.

8   And so what the plaintiffs told Judge New -- again, I'm

9   quoting from their letter to him -- is that these cases involving

09:25:08   10   the U.S. subgroup theory make up the majority of the docket and

11   will provide the most valuable information in any effort towards

12   finality in this litigation.

13   And we would respectfully submit that whether or not

14   the cases have to be tried or whether there's a dispositive

09:25:32   15   defense provides equally valuable information towards the

16   finality of the litigation, which is, of course, one of the

17   prerequisites of 1292(b).

18   So that's how the -- that's how the appeals are

19   different.

09:25:57   20   In terms of why the motion ought to be granted, you

21   know, bellwether appeals are as important as bellwether trials.

22   We've learned a lot from the bellwether trials.  We selected four

23   cases and tried three; two here in New Orleans, one in Jackson.

24   We've had both predominate indications, AFib, and deep-vein

09:26:35   25   thrombosis sometimes called DVT.  We've dealt with two different

**OFFICIAL TRANSCRIPT**

1   injuries, gastrointestinal bleed and then a brain bleed in the

2   *Orr* case.  And I think we found that there is a viable -- and I

3   would even say strong -- factual defense to cases.  We've had 25

4   jurors in the three cases find that the label is adequate.

09:27:02
5           But what we haven't learned, you know, is whether we

6   have to keep trying them one by one by one, and that's the

7   purpose of a bellwether appeal.  Before we burden judges in every

8   district in the country, in every state, and before we invest

9   God-knows how many hours not only in judge time, but lawyer time,

09:27:30
10  juror time, court personnel time, we should find out, as

11  Your Honor said in *Chinese Drywall* when it certified the personal

12  jurisdiction issue to the circuit, you know, whether we have to

13  go through a long and costly process of serial trials or whether

14  there is an overarching defense.

09:27:50
15          And the Manual For Complex Litigation makes the same

16  point.  They say in Section 15.11 that dispositive motions are

17  the typical type of issues in MDLs for certification.  And they

18  say that a mass tort is not mature until there's been appellate

19  review of the key dispositive issues.

09:28:22
20          And I might say after all, you know, what is the

21  purpose of an MDL if not to resolve those types of dispositive

22  issues, you know, centrally?

23          It doesn't make sense to have 70 or 100 judges around

24  the country -- because we've got to make that motion in every

09:28:44
25  case.  And we know that judges have kind of -- don't see the

**OFFICIAL TRANSCRIPT**

1  issues the same in every case, so we're going to litigate it 100

2  time before we get it resolved on appeal.  I don't think that we

3  would be doing our job in the MDL if we left that issue open.  So

4  to me it just makes sense.

*09:29:12*

5          Look, if the Fifth Circuit disagrees with Your Honor

6  and sustains the defense, then we're going to be done with most,

7  if not all, of the claims.  If the Fifth Circuit agrees with

8  Your Honor and says there is no defense, well, that's important

9  information for the parties, Your Honor, and all of the judges

*09:29:36*

10  across the country to know when we start figuring out what comes

11  next.

12          Let me deal with, just briefly, each of the 1292(b)

13  criteria.

14          The Fifth Circuit has already held that federal

*09:30:00*

15  preemption of state law is a controlling question of law.

16          I have another demonstrative on that, too, Your Honor.

17          I'll hand up two things at once so I don't have to...

18          I hope I'm not being disrespectful by giving them to

19  the law clerk before Your Honor.

*09:30:47*

20          THE COURT:  No, that's fine.

21          MR. GLICKSTEIN:  I know who controls the operation.

22          Okay.  So the first chart is a list of Fifth Circuit

23  cases on preemption.

24          The first case, *Ezell*, I will say is not a 1292(b)

*09:31:16*

25  case, but I think it answers the question definitively as to

**OFFICIAL TRANSCRIPT**

1  whether preemption is a question of law or fact.  One of the

2  plaintiffs' arguments is that preemption is a question of fact,

3  and the Fifth Circuit says, no, whether or not a state statute or

4  common law cause of action is preempted by federal law is a

5  question of law.

6          And the other three cases are situations where, in

7  fact, the -- where, in fact, the Fifth Circuit accepted 1292(b)

8  certification in cases of federal preemption.

9          Excuse me.  Let me correct that.

10          *Spong* and *Greenwich* are cases where they accepted

11  1292(b) on federal preemption, and in *Martin v Halliburton* they

12  declined a premature direct appeal under the Collateral Order

13  Doctrine on the ground that there was no record, but suggested

14  that a 1292(b) appeal would have been a more appropriate vehicle

15  to hear the preemption issue.

16          So we know that the Fifth Circuit believes that it's a

17  controlling issue of law.

18          I think one of the plaintiffs' principal arguments

19  against -- and I want to address this -- is, well, it's not

20  really controlling because we've got other theories besides the

21  ones that are in *Ibanez,* and that's the purpose of the second

22  chart that I gave to Your Honor.

23          And I will say that, first, these are all of the

24  theories that Ms. Ibanez is asserting.  We didn't get an

25  opposition to the summary judgment motion saying:  Don't grant

*09:31:38*
*09:32:06*
*09:32:33*
*09:32:59*
*09:33:27*

**OFFICIAL TRANSCRIPT**

1    summary judgment because we have five theories that are not the

2    subject of this motion.  And they were all the theories that the

3    plaintiffs had not abandoned as of the time we filed the motion

4    last fall.

5    09:33:45          But the *Ibanez* motion addresses PT.  That was asserted

6    in *Boudreaux*, *Orr*, and *Mingo*.

7              The *Ibanez* motion addresses U.S. subgroup theory.  That

8    was a central theory of the *Hartman* case tried in Philadelphia,

9    and that evidence was introduced, albeit not necessarily as a

10   09:34:09   separate claim, in *Orr* and *Russell*.

11             The INRatio device recall has been featured prominently

12   in three of the trials, *Orr*, *Mingo,* and *Hartman*.

13             The design defect claim was tried in *Mingo*.

14             And as I addressed with Your Honor before, we know that

15   09:34:31   the U.S. subgroup is where they're going, and nor would I

16   discount what plaintiffs might do with PT in the future.  Perhaps

17   that theory is in temporary hibernation, but I can also say that,

18   looking at the plaintiffs' picks, again they pick a

19   disproportionately high number of cases where the plaintiffs have

20   09:34:59   elevated PT measurements so I think we haven't seen the end of

21   that theory.

22             So is it true that, you know, as defendants have been

23   successful on one theory or another, you know, the plaintiffs are

24   coming with new ones?  Yeah, I think that that -- to their

25   09:35:22   credit, the creativity of the plaintiffs' lawyers is infinite and

**OFFICIAL TRANSCRIPT**

1    I think there will be other theories that the plaintiffs may

2    devise.

3            But importantly, you know, the guidance that we receive

4    from the Fifth Circuit, their way of analyzing the preemption

5    issue, is going to tell us how we deal with those other cases --

6    which are not in the forefront, but when they do come up

7    sporadically, it's going to tell us how to deal with them.

8            For example, in the *Russell* trial, which Mr. Barr

9    tried, the theory was that there should have been a statement on

10   the label to avoid the use of Xarelto with two other blood

11   thinners simultaneously.  We call that the triple therapy theory.

12   That's not part of Ms. Ibanez's case.

13           But there was a strike-through of the triple therapy

14   language, an FDA strike-through, just as there was an FDA

15   strike-through of the U.S. subgroup language and just as there

16   was an FDA strike-through of the PT language.

17           So how the Fifth Circuit addresses the preemptive

18   effect of an FDA strike-through, and what the defendant is

19   obligated or not obligated to do after the FDA strikes language,

20   is likely to be dispositive of the issue on triple therapy

21   because the strike-through is the same.

22           Similarly, you know, the *Clooney* case that's coming up

23   in Philadelphia is asserting a dosing theory.  That's a new

24   theory.  You know, it should have been a 10-milligram dose rather

25   than 20 milligrams.  It's framed as a design defect claim because

**OFFICIAL TRANSCRIPT**

1   you're changing the formulation.

2       What the Fifth Circuit tells us on how -- on whether

3   both pre- and post-approval design claims are preempted or just

4   post-approval design claims is going to govern any design claim

09:37:48   5   regardless of what the proposed alternative design is.

6       So it's not as if -- it's not as if you would have

7   preemption for an alternative, design that you needed an

8   Anti-Factor Xa assay but not preemption if you had to change the

9   dose.

09:38:09   10       Similarly, even if you framed it as a failure-to-warn

11   claim, dosing is in the highlighted section of the label, just as

12   monitoring is in the highlighted section of the label in our PT

13   claims.

14       So how the Fifth Circuit addresses the issue of whether

09:38:29   15   you could use a CBE, change being effected, for the manufacturer

16   to unilaterally change the label in the highlighted section is

17   going to tell us whether you could do it with dosing, which is

18   also in the highlighted section.

19       You know, in *Hartman*, the plaintiffs came up with

09:38:51   20   theories about interpatient variability and aspirin, and they

21   rely, to some extent, on adverse event reports.  Well, how the

22   Fifth Circuit handles adverse event reports in the *Ibanez* appeal,

23   if Your Honor certifies it, is going to tell us how you ought to

24   handle that issue on these other theories.

09:39:18   25       So the idea that certifying this case is going to be,

**OFFICIAL TRANSCRIPT**

1  you know, narrow and only handle a sliver of litigation, I don't

2  think comports with the facts.  It dealt with every case's theory

3  that's been tried through today, it deals with what the

4  plaintiffs say is their most important theory moving forward, and

*09:39:41*  5  it's going to provide guidance on the other theories.

6          Substantial ground for difference of opinion.

7          I think what the plaintiffs' argument basically comes

8  down to is that because there's a Supreme Court case, and because

9  every judge in the country will cite the Supreme Court case,

*09:40:08*  10  there can't be difference of opinion, because, after all, the

11  Supreme Court is, you know, the law of the land.

12          But we all know that judges construe what the Supreme

13  Court says different ways, and they apply the teachings and

14  learnings of the Supreme Court in different ways, and so there

*09:40:34*  15  has developed a split in authority on these preemption issues.

16          Two more.

17          The first page of what I'm handing you is --

18  Your Honor, I'm just quoting yourself.

19          And perhaps I put the first quote on the top because

*09:41:15*  20  it's the most succinct.  The very first sentence in the

21  discussion of the *Mingo* preemption motion is:  This Court is well

22  aware of the divide among the federal and state courts on the

23  issue of FDA preemption.

24          I don't have to read Your Honor the rest of the quotes,

*09:41:35*  25  you know what you said, but obviously it's something that

**OFFICIAL TRANSCRIPT**

1    Your Honor has recognized.  It's not uniform.

2           The second is just a chart.  Again, I'm not going to go

3    through it in detail, but it does show that there are cases that

4    have agreed with Your Honor or disagreed with Your Honor, and

*09:41:55*   5    there is a healthy split.  We know that Your Honor believes

6    strongly in your point of view, but there are other learned and

7    respected judges that have come to different conclusions.

8           And I would also add, you know, to the equity of this,

9    that we have a situation where the direct competitor of Xarelto,

*09:42:19*  10    Eliquis, in the very same class of drugs, in another MDL, a

11    federal judge has looked at it a little differently.

12           So I think I've already addressed the finality and

13    termination of the litigation, because it's related to the

14    controlling question of law, so let me just kind of conclude with

*09:42:44*  15    a personal observation.

16           Defendants have, I think, earned the right to have the

17    preemption issue heard on appeal.  This isn't a situation

18    where -- that sometimes you see in an MDL where you've had

19    recalcitrant defendants who are just looking to delay, delay,

*09:43:08*  20    delay and put things off.  From the beginning of the MDL we've

21    worked very hard to cooperate with Your Honor.  Almost every

22    pretrial order and case management order has been by stipulation.

23           We've worked up four bellwethers for trial, we've tried

24    three of them, and in a way we're victimized by our success

*09:43:32*  25    because we can't get the preemption issue squarely in front of

**OFFICIAL TRANSCRIPT**

1  the Court of Appeals.

2          Most recently Your Honor asked us to work up

3  1200 cases, and we didn't try and come back and modify the order.

4  We worked hard to come up with a stipulation to make it work.

09:43:54   5  And we had wanted, at that time, to do the certification then,

6  and Your Honor, without -- certainly not promising any ruling one

7  way or the other, did say that one path did not preclude the

8  other.  And I think that's undoubtedly true.

9          The time to explore the other path is upon us.  We've

09:44:21  10  had the bellwether trials.  For all intents and purposes, the

11  plaintiffs have their bellwether appeals, because they have it as

12  a right, and they're going to get their determination as to

13  whether Your Honor's rulings were correct.  But without

14  certification, the defendants are not going to be able to get

09:44:40  15  their bellwether appeal.

16          So we would urge that Your Honor grant certification.

17          THE COURT:  Okay.  Thank you, Steve.

18          Let me hear the response, Andy.

19          MR. BIRCHFIELD:  Good morning, Your Honor.  Andy

09:45:06  20  Birchfield for the plaintiff, Harriet Ibanez.

21          The Ford Pinto and other sedans substantially advanced

22  the automotive industry.  The Mercedes sedan has been exonerated

23  on crashworthiness liability.  The Ford Pinto should receive the

24  same treatment since it's in the same class.  Plus the Pinto

09:45:35  25  owner's manual warns that the vehicle may be involved in

**OFFICIAL TRANSCRIPT**

1   collisions, and collisions may be fatal.

2        Those arguments, Your Honor, parallel the arguments

3   that the defendants make here for 1292(b) certification on

4   preemption.

09:45:51   5        To get what the defendants want, what they're asking

6   the Court to give, they're asking the Court to dramatically

7   weaken two demanding standards:  The demanding standard of

8   impossibility preemption and the demanding standard of 1292(b)

9   certification.

09:46:14   10        The statute requires -- there are three requirements as

11   the Court noted.  All three -- all three -- of those requirements

12   must be met in order to grant a certification.

13        Here the defendants cannot meet any of those three

14   requirements.

09:46:36   15        First, the controlling question of law.

16        It involves a question of law.  It must be a pure

17   question of law.  That's the first element.  And the defendants'

18   proposed controlling questions of law are telling on this point.

19        The first one -- and I'm reframing these, but the

09:46:55   20   essence of their first question is:  Can adverse event reports

21   support a label change?

22        That question has been answered for brand name drugs in

23   *Wyeth v Levine*.

24        But there again, it's a factual issue.  In *Wyeth v*

09:47:19   25   *Levine*, there were 20 adverse event reports over a span of

**OFFICIAL TRANSCRIPT**

1   20-plus years.  The Court determined that that was sufficient to
2   support a label change.
3         What's the context?  What's the number?  What's the
4   severity of those issues?  That's all at play.  It's a factually
5   ladened question.  All of the preemption issues that are before
6   Your Honor are factually pregnant.  And these are not first
7   trimester, these are third-trimester factual issues.
8         In *Xarelto,* the adverse event reports are not in the
9   tens.  It's not twenty.  It's thousands.  And there are -- there
10  are large numbers of adverse event reports to support the change.
11        So the question of law itself has been answered.
12        The second question:  Does any negative suggestion from
13  the FDA, regardless of the circumstances, establish impossibility
14  preemption?  That's the essence of what they are putting forward
15  as their strike-throughs.
16        That question has been answered also again in *Wyeth.*
17        The answer is, no, not for brand name drugs.
18        In *Wyeth v Levine*, the manufacturer, Wyeth, came
19  forward with a letter from the FDA that said use your current
20  label.  The Supreme Court rejected that.  You can't use that as
21  just a passing effort.  You have got to look at the facts.
22        Was it a genuine effort or was it contrived?  Was it a
23  sham?  Were you really pressing?  That is a factually ladened
24  issue.  It's not a pure question of law.
25        Their third question:  Do *Mensing* and *Bartlett* overturn

09:47:41
09:48:06
09:48:27
09:48:46
09:49:05

**OFFICIAL TRANSCRIPT**

1  *Wyeth*'s holding pertaining to brand name drugs?  Both *Mensing* and

2  *Bartlett* answer to that question "no."

3       There is a clear dichotomy in the Supreme Court

4  decisions between the regulatory scheme for brand name drugs and

09:49:27  5  the regulatory scheme for generics.  The generics require

6  sameness; sameness in the product, sameness in the label.

7       Their fourth question:  Are pre-approval design defect

8  claims preempted?

9       Again, I don't think that that is a controlling

09:49:43  10  question of law, but at least it has not been definitively

11  answered by the U.S. Supreme Court.

12       I think a fair reading of those three decisions say no

13  because of the dichotomy, but at least it's a strong "not likely"

14  on whether or not it is a question of law.

09:50:02  15       But not only is it required that the defendant show

16  that there be a question of law versus a question of fact or one

17  that is fact-ladened, it must be a controlling question of law.

18  And will it have a dispositive impact on the litigation.

19       Now, the Courts here have looked to the third prong, is

09:50:25  20  it controlling?  You know, will it materially advance the

21  litigation?  And the answer to that question is no.

22       There are significant, substantial legal claims that

23  are unaddressed in the *Ibanez* case, and Mr. Glickstein

24  highlighted some of those, and urged, Well, we can get an

09:50:50  25  advisory opinion, we can get some guidance from the Fifth Circuit

**OFFICIAL TRANSCRIPT**

1   on these theories, but these are claims that would be completely

2   unaddressed by a decision in the *Ibanez* case.

3            One is aspirin plus Xarelto use.  If you're using

4   low-dose aspirin, as many patients are, plus Xarelto, there's a

*09:51:13*  5   93 percent increased risk of major bleeding.

6            The label provides only a general statement, that if

7   you use the two together, there may be an increase in bleeding

8   risk.

9            The FDA guidance.

*09:51:26*  10           What the FDA provides to the industry, the instructions

11  that they say, are that you are to provide not general

12  statements, you are to provide a numeric estimate of the risk for

13  use in specific populations.  Populations like people that are

14  using low-dose aspirin.

*09:51:46*  15           Eliquis.

16           Eliquis follows those instructions.  They provide that

17  information in their label.  The Aristotle Study, the equivalent

18  of the ROCKET Study, there was a 1.8 percent increase that went

19  to 3.4 with the concomitant use of aspirin.  They put that

*09:52:07*  20  important safety information in their label.

21           Xarelto does not.  Why?  Because the difference is

22  stark.  If you compare the difference between Xarelto plus

23  aspirin, it's a 5.82 versus Eliquis with aspirin of a 3.4.

24           So a large percentage of the cases that are pending in

*09:52:31*  25  this litigation involve the concomitant use of aspirin and

**OFFICIAL TRANSCRIPT**

1   Xarelto.  It would be unaddressed in *Ibanez* if certification were

2   granted and the Fifth Circuit reviewed that issue.

3              Another substantial legal claim is triple therapy.  And

4   Mr. Glickstein, again, mentioned this.

09:52:51   5              Xarelto is prescribed for patients with AFib.  If they

6   have a stent or they have acute coronary syndrome, they're also

7   going to be taking aspirin plus Plavix, or a dual antiplatelet

8   therapy.  This is a significant, specific population.  There are

9   600,000 patients with AFib on triple therapy.  That's a

09:53:17   10  significant market.

11             What does the label say to warn doctors regarding the

12  risk involved of triple therapy?

13             It doesn't say anything about avoiding this use, or

14  that it may be too dangerous, but that's exactly what the

09:53:34   15  defendants know to be the situation.  There's nothing in the

16  label about avoiding this use, but internally they knew from the

17  studies, as you can see here --

18             And if it's okay, Your Honor, I'll provide the Court

19  with a copy of the PowerPoint.

09:53:50   20             But they knew that higher concentrations of

21  rivaroxaban, such as 20 milligrams, with DAPT -- that is dual

22  antiplatelet therapy, Plavix plus aspirin -- resulted in

23  unacceptably high bleeding rates.

24             The defendants had undertaken a study that involved

09:54:09   25  patients in this population, and instead of using the

**OFFICIAL TRANSCRIPT**

```
 1    20-milligram dose, they used a very low dose, 2.5 milligrams
 2    twice a day for patients on dual antiplatelet therapy.
 3              And why did they do that?
 4              Because they recognized that patients that are
 5    receiving dual antiplatelet therapy may be unable to safely
 6    receive the 20-milligram doses of rivaroxaban.
 7              Internally -- internally -- they arrived at the
 8    conclusion that it would be unethical.  The investigators for
 9    this study had determined that it would be unethical to use a
10    20-milligram dose with the dual antiplatelet therapy.  It was
11    deemed unethical to expose patients to this higher dose.
12              So the defendants knew this internally and so they had
13    a decision to make.  You know, do we warn -- do we warn patients
14    and doctors that it should be avoided, that it's too dangerous,
15    we can't use it?  So they faced this decision.
16              The safest course is either to recommend discontinuing
17    Xarelto for AFib patients or switch or to be silent -- or to be
18    silent.
19              J & J wants to be silent.  Bayer agrees.  "We need to
20    keep a label that remains silent on this point."
21              So the aspirin plus Xarelto use, that concomitant
22    aspirin use, is an unaddressed legal claim.
23              The triple therapy, an unaddressed legal claim.
24              Variability is another unaddressed legal claim that
25    cuts across the board with the population.
```

*09:54:28*
*09:54:50*
*09:55:17*
*09:55:37*
*09:55:55*

**OFFICIAL TRANSCRIPT**

1          The Xarelto label.

2          The only reference -- the only information about

3    variability there would be in Figure 2.  At best it shows a

4    threefold variability, but published data shows a tenfold

5    variability.

6          Unpublished data, data that the defendants had, shows

7    much higher.  A 200-fold, a 600-fold, a 1,000-fold difference.

8          And this is significant.  And the defendants, they

9    knew -- they knew the significance of this.

10          Of most interest, there is a clear relationship between

11    blood levels and clinically significant bleeds.

12          Even a 1.5 fold in exposure may double the risk of

13    major bleeding.  This is an important safety concern.

14          Interpatient variability.

15          "Large proportions of our patients may be at

16    considerable risk."  This is missing from the label.  This is

17    information that the defendants had.  This is an issue that is an

18    unaddressed legal claim.

19          The dosing.

20          The dosing is an issue that is addressed for the AFib

21    patients in the *Ibanez* complaint, but there is -- and Your Honor

22    has heard, you know, through the three bellwether trials the

23    significant discourse about "we need to find a lower dose; it

24    will kill us in the marketplace," but this is -- but an

25    unaddressed legal claim involves the dose for the VTE.

**OFFICIAL TRANSCRIPT**

1          Again Mr. Glickstein mentioned this.  It is coming up.

2     It is unaddressed.  It would be unaddressed in *Ibanez*.

3          But after October 2017, the 20-milligram dose is no

4     longer indicated for the VTE, recurrence or mention of a VTE,

09:57:57   5     only 10 milligrams.  That is an unaddressed claim.

6          So the point, Your Honor, is there are substantial

7     numbers of claims that would be unaffected.  They are unaddressed

8     by this.  So they do not meet the controlling question of law.

9     It will not materially advance the litigation.

09:58:21   10          Just a quick note here, Your Honor.  There is much --

11     the defendants make much of the fact that we have -- that we have

12     different -- we've proffered -- we've come forward with different

13     legal theories.  That does not speak to the weakness of our case.

14     It's a different situation here.

09:58:40   15          This litigation does not involve the typical situation

16     where manufacturers, either in the development or even in the

17     post-marketing, discover a serious adverse effect, a heart attack

18     or stroke, and then they're faced with that decision, do we

19     tell -- do we warn about this or do we conceal it?  And they make

09:59:03   20     a bad choice.

21          That's not the situation here.  Here we have a decision

22     from the very beginning, before the clinical trials were done --

23     a decision of we are going to stick to this commercial plan, and

24     so commercial interests are going to trump the public health

09:59:22   25     issue.

**OFFICIAL TRANSCRIPT**

1       So every time a decision point arose, do we put the

2   concomitant aspirin use numbers in our label like Eliquis, it was

3   no.

4       Do we warn about the triple therapy or do we remain

5   silent?  We remain silent.

6       Every step of the way they're making decisions because

7   of commercial interest.  Each of those key decision points gives

8   rise to a legal claim when an injury results.

9       So this is -- that's why there are multiple legal

10  theories.  There are a lot of factors that go into play about

11  which ones you will go forward with, how long are you going to

12  have to try the case -- a number of factors, but not necessarily

13  speaking to the strength of the claim.

14      So, Your Honor, if -- the next -- that will bring us to

15  the last claim here, and that is the substantial ground for

16  difference of opinion.

17      And the District Courts have found substantial grounds

18  for difference of opinion when:

19      A Court rules in a way that all the Court of Appeals --

20  that is contrary to all the Court of Appeals that have addressed

21  the issue.

22      Or when there is -- circuits are in dispute and the

23  Fifth Circuit has not spoken on the point.

24      Or if it's complicated questions of foreign law.

25      Or novel questions of first impression.

*09:59:37*
*09:59:54*
*10:00:10*
*10:00:26*
*10:00:42*

**OFFICIAL TRANSCRIPT**

1        Your Honor, none of those are met here.

2        The defendants instead, to establish the substantial

3   difference of opinion, they look at the *Eliquis* decision.

4        Again, I mean, comparing Xarelto and Eliquis is like

5   the Pinto and the Mercedes.  The *Eliquis* Court -- the *Eliquis*

6   Court looked at the adverse event report data.  It looked at what

7   has been the post-marketing.

8        One of the key issues -- one of the key pieces of

9   evidence that the *Eliquis* Court considered was the ISMP report,

10  the QuarterWatch Report.

11       That report, looking at the adverse event

12  post-marketing experience, found that Eliquis had the strongest

13  safety profile, had the fewest deaths, had the best adverse event

14  safety profile, and the fewest direct reports to the FDA.

15       So the ISMP -- this is what the *Utts* Court found, that

16  the data for Eliquis does not constitute newly acquired

17  information because that report does not suggest, nor do the

18  plaintiffs allege, that the real-world signal data for Eliquis

19  was any worse -- any more severe or of any greater frequency than

20  what they had disclosed to the FDA.

21       But when we look at that same situation -- if you look

22  at the real-world data, that same report for Xarelto shows just

23  the opposite.  It shows that Xarelto constitutes an -- the data,

24  the post-event -- post-marketing event reports show an important

25  safety signal.

**OFFICIAL TRANSCRIPT**

1    It shows that Xarelto-related adverse events were the

2    most frequently reported among all pharmaceuticals sold in the

3    U.S.  Not just the drugs in this class, but all pharmaceuticals

4    sold in the U.S.  And 81 percent of those showed major bleed --

5    showed bleed.

6    The Eliquis Court also focused on what does the

7    real-world data show.

8    Well, as the Court is aware, there has been

9    substantial -- a large number of real-world data studies that

10   show Xarelto to be the worst in class.  And the studies you see

11   here comparing Xarelto to Pradaxa favor Pradaxa.

12   Here the real-world data versus Eliquis favors Eliquis

13   including the top study there.  That's a defense-retained -- in

14   the MDL, an expert report submitted in the MDL.  Their own expert

15   shows that Eliquis is so much better than Xarelto.

16   The defendants offer in their papers the FDA

17   Mini-Sentinel study to suggest that now the FDA says that Xarelto

18   is no worse than what we had to begin with, but the data from the

19   Sentinel study shows that's not the situation.

20   You see the GI bleeding there in the U.S.

21   Now, that's reported on 1000 person-years, but that

22   would be 5.0 for 100 patient-years.

23   So the ROCKET data that's in the label shows a 2.0.

24   So their own study that they're offering you supports

25   our position.  There's something different when you look at the

**OFFICIAL TRANSCRIPT**

1    Xarelto experience in the U.S. versus the global experience, so
2    many outside of the U.S. that they used in the ROCKET study.
3            So quickly, Your Honor -- because I know you're
4    familiar with the theories that are at issue here.

10:04:36

5            But is there a substantial -- is there a substantial
6    ground for difference of opinion on preemption and the issues
7    that we have raised?
8            And I say that there is not, Your Honor.
9            So the defendants must show impossibility.

10:04:51

10           And it's true, there can be theoretical debate.  The
11   defendants say it would be impossible -- it would be
12   impossible -- for us to put Neoplastine PT language in the label
13   because Neoplastine PT has not been approved by the FDA
14   specifically for use with Xarelto.

10:05:09

15           It would be impossible to put the Anti-Factor Xa assay
16   information in the label because the FDA has not approved the
17   Anti-Factor Xa assay.
18           There are times when we have theoretical debate.
19           It was debated before 1963 whether man could walk to

10:05:29

20   the moon.  But that issue, whether it's possible or impossible,
21   was settled when Neil Armstrong took that one small step.
22           In the 1940s and 1950s it was debated among the
23   scientific and medical community, can man break the four-minute
24   mile barrier?  You know, doctors thought the man's heart and

10:05:48

25   lungs couldn't do it.  That was settled when it was done by Roger

**OFFICIAL TRANSCRIPT**

1   Bannister.

2            The issue about whether it is possible or impossible to

3   add this information in the label has been settled because it has

4   been done.

10:06:02   5            The Pradaxa label.

6            The Pradaxa label uses references to these

7   anticoagulant tests, the aPTT and the ECT, and they add this

8   information into the label even though these tests have not been

9   specifically approved by the FDA for use with Pradaxa.

10:06:24   10            How did they get there?

11            They used the changes being effected.  They submitted

12   this -- they submitted this to the -- changed their label, went

13   through the CBE process, and the FDA approved that.

14            Again, quickly, Your Honor, with the Anti-Factor Xa

10:06:47   15   assay.

16            Again there may be theoretical debate if you're just

17   looking at the regs, but it's settled because it's been done.

18   The Arixtra label includes the Anti-Factor Xa assay even though,

19   as the defendants pointed out through the trial, the

10:07:07   20   Anti-Factor Xa assay has not been approved.  It's only for

21   research use only.

22            But it can be included in the label.  It should be

23   included in the label.  It's not impossible for the defendants to

24   put that information in the label.

10:07:22   25            And finally on this point, Your Honor, the last word

**OFFICIAL TRANSCRIPT**

1   from the FDA.

2           So, you know, could they have put it in there?

3           I mean, the FDA -- the FDA said that the manufacturer,

4   "... also demonstrated that there is also a correlation between

5   PT and bleeding risk.  This applicant has not chosen to utilize

6   this information."  They don't say it's impossible.  It's a

7   choice they made not to use it.

8           And then they say, "Infrequent monitoring (perhaps at

9   initiation and yearly thereafter) to assure appropriate dosing of

10  drugs that prevents stroke and cause bleeding may improve

11  outcomes and be acceptable to patients."

12          Your Honor, there is -- the law is settled.  You know,

13  adverse event reports can be used in brand name drugs to support

14  the label.  We've walked through the QuarterWatch data.  There's

15  been significant adverse event reports.

16          But we also have the bleeding questionnaires.

17          The approval -- the approval for Xarelto was

18  conditioned on them doing post-marketing extra pharmacovigilance.

19          The defendants were required to develop and submit to

20  doctors a bleeding questionnaire that could be used that would

21  track the bleeding events and coagulation parameters including

22  PT.

23          So in the Mingo trial we had compiled 112 of these

24  bleeding questionnaires that showed an elevated PT with patients

25  suffering bleeding events.

**OFFICIAL TRANSCRIPT**

1    We walked through with a defense witness five of those

2    bleeding questionnaires, and then Your Honor instructed us that

3    we made our point, move on, so we did after five.  But there are

4    112 there.

5    The medical literature shows that the PT -- that the PT

6    is meaningful and could be helpful.

7    There's nothing, Your Honor, that would prevent the

8    defendants from -- make it impossible for them to change their

9    label to provide that instruction.

10    But what have the defendants done?

11    This slide is blank.

12    That's shown in their response to our requests to

13    admit.  They have done nothing.  They have done nothing since the

14    initial approval.

15    And, Your Honor, I will skip -- well, the same thing

16    with the HemoSense device, just very briefly.

17    This is the device that was -- there were serious

18    concerns.  The defendants were aware that there were serious

19    concerns before they started the -- well, at the time they

20    started the ROCKET trial.  You know, there had been FDA warning

21    letters about this device.

22    The executive committee for the study knew there were

23    problems with this device.  They went forward using the device

24    anyway.

25    They delayed a year in putting together any quality

**OFFICIAL TRANSCRIPT**

1  control measures.

2          And then after the ROCKET study is completed, this

3  device is recalled.

4          And so the FDA -- Your Honor, I won't walk through

10:10:48  5  these for time sake, but the defendants had numerous warnings on

6  this.

7          The FDA did a reanalysis of this.

8          Now, it is -- I think it does bear mention that the

9  principal investigator, Bob Califf at Duke -- this was his study.

10:11:08  10  He had been paid by the defendants to conduct this study -- or

11  Duke had.

12          Then when it's called into question and there is a

13  reanalysis to be done, he's no longer at Duke, he's now the

14  commissioner of the FDA.

10:11:23  15          But the FDA did not foreclose -- they did not foreclose

16  the HemoSense device being -- instructions in the label.  They

17  invited it.  They invited a response.

18          It would be stretching the meaning of "impossibility"

19  to say that the defendants could not have provided instructions.

10:11:42  20          The FDA did invite "Dear Doctor" letters and

21  publications, but none of that was done to get the word out.

22          Your Honor --

23          THE COURT:  But that's a question of certification, and

24  that's not a question of certification.  You're arguing the --

10:12:01  25          MR. BIRCHFIELD:  Your Honor, it is a -- it's a question

**OFFICIAL TRANSCRIPT**

1  of certification on whether or not there is a substantial ground

2  for difference of opinion.  That doesn't cut that close.

3           And, Your Honor, on the U.S. subgroup data, the U.S.

4  subgroup data has been added to the label.  It was added to the

*10:12:19*  5  label in September of 2015.  How can you say -- how could anyone

6  say that it was impossible?  The FDA had asked for it 19 months

7  earlier.

8           The defendants say that the reversal agent, that it

9  would be impossible because it requires FDA approval.  The FDA

*10:12:36*  10  has now approved it.

11           It's not impossible here.

12           Your Honor, I know you have the trial, but if I can

13  point out one thing on this.

14           A key point of the defendants here is that we've got --

*10:13:00*  15  that *Mensing* and *Bartlett* either overturned or drastically

16  changed the decision.

17           The *Mensing* Court makes it clear that's not the case.

18           And start in Section C.  "*Wyeth* is not to the

19  contrary."

*10:13:17*  20           They are not to the contrary.

21           But if we look at this paragraph here, it puts it in

22  very clear and stark terms.

23           (As read):  We recognize -- the Court recognizes that

24  from the perspective of the plaintiffs, Mensing and Demahy,

*10:13:32*  25  finding preemption here but not in *Wyeth* makes little sense.  Had

**OFFICIAL TRANSCRIPT**

1  Mensing -- had these two plaintiffs taken the brand name drug

2  prescribed by their doctors, *Wyeth* would control and their

3  lawsuits would not be preempted.

4          Your Honor, there is no substantial difference of

5  opinion as to whether or not *Wyeth v Levine* controls, especially

6  in the failure-to-warn realm.

7          There are two motions pending before Your Honor now.

8  There is a summary judgment on the failure-to-warn claims and

9  there is a summary judgment -- a separate summary judgment motion

10  on the design defect claims.  Your Honor, I don't think that

11  either one meets the 1292(b) criteria, but the design defect at

12  least comes a little bit closer to their being an open question.

13          So I would urge you to deny both.

14          If the Court is leaning towards granting certification

15  on one, we think that the design defect provides an option.

16          As to Mr. Glickstein's final plea, we do not dispute

17  that the defendants have cooperated here, but a party does not

18  earn -- a party does not earn what the law will not allow.

19          The current standard -- the current standard -- my

20  final point, Your Honor.

21          The current standard does not support 1292

22  certification.  The heart of the defendants' position is in

23  Footnote No. 2 in their reply brief.

24          In Footnote No. 2, they point to the congressional

25  effort to change the rules to allow automatic appeals in MDL

10:13:54
10:14:15
10:14:41
10:15:06
10:15:26

**OFFICIAL TRANSCRIPT**

1  settings.  The end result would take away -- that rule change

2  would take all discretion from the trial court, discretion about

3  determining whether it's necessary, determining whether it would

4  bog down the litigation or advance the litigation.  That's taken

5  away through that congressional effort if that rule were to

6  change.

7          The defendants and others similarly situated, they may

8  influence Congress to make that rule change, but we urge the

9  Court -- we urge the Court not to weaken the standard that would

10  be necessary here to grant certification.  The end result would

11  be the same.  They would get an automatic appeal that would

12  result in litigation being bogged down, and we urge the Court to

13  resist that.

14          Thank you, Your Honor.

15          THE COURT:  Thank you.

16          Steve.

17          MR. GLICKSTEIN:  I know my time is short and Your Honor

18  doesn't like long rebuttals.

19          THE COURT:  Well, I've followed you-all and I

20  understand the issues.  I really do.

21          Go ahead.

22          MR. GLICKSTEIN:  I promise only two minutes.

23          THE COURT:  Okay.

24          MR. GLICKSTEIN:  Sounds like Mr. Birchfield thinks he's

25  going to win the appeal so let's find out.

*10:15:50*

*10:16:11*

*10:16:27*

*10:16:39*

*10:16:48*

**OFFICIAL TRANSCRIPT**

1       If Mr. Birchfield is right and there's no preemption

2   defense, the clients are going to want to know that.  Your Honor

3   is going to want to know that.

4       If Mr. Birchfield is not right and there really isn't a

5   case here, it behooves us all to know that now.

6       Mr. Birchfield said there has to be a pure question of

7   law.  I don't think that's true.  It's a question of the

8   applicability of the law to a set of facts.

9       And the Fifth Circuit made that very clear in the

10  *Martin v Halliburton* case, which is in the list of Fifth Circuit

11  cases that I handed Your Honor a chart.  And they said:  We don't

12  want to handle this preemption issue on a motion to dismiss.

13  Come back on a summary judgment record under 1292(b).

14      And the handout that I gave to Your Honor and our brief

15  quotes that important distinction.

16      The issue that Mr. Birchfield frames I don't think

17  accurately states the issue.  The issue is not whether an adverse

18  event report can ever be really acquired information.

19      The information -- the conflict was -- in *Wyeth*, the

20  issue here is we've got a label that there's a known risk of

21  bleeding.  It's mentioned 70 times.  The intended effect of this

22  drug is to prevent clots.  If you prevent clots, you increase --

23  this is the mechanism of action of the drug.

24      So the question is the -- the broader question is --

25  and this is where the *Utts* decision differs and this is where the

10:17:07

10:17:31

10:17:55

10:18:24

10:18:52

**OFFICIAL TRANSCRIPT**

1  divide is in the cases, is what is the legal standard for

2  determining when there is newly acquired information?  And when

3  you deal with adverse event reports of not an unknown risk but of

4  a known risk, when is it new and when is it old?

*10:19:16*

5         I mean, particularly when both FDA regulations and the

6  very document that Mr. Birchfield cites, which was also cited to

7  Judge Cote in *Utts,* says that you can't use adverse event reports

8  to calculate incident rates.  You have to show, if it's an

9  already known risk, it's of greater severity and frequency.

*10:19:48*

10         So that's a legal question.  That's why there is -- the

11  chart shows cases on both sides of the issue.

12         Similarly, with clear evidence, it's not as in, you

13  know, the *Wyeth* case.

14         And I'm looking up here, the -- Justice Stevens said,

*10:20:10*

15  you know, *Wyeth* doesn't even argue that it attempted to give the

16  kind of warning required by the Vermont jury.

17         Here we've got the FDA actually not just approving

18  language that doesn't contain the warning, they struck it.

19         Or in the case of the INRatio device, they conducted an

*10:20:27*

20  investigation and they issued a report.

21         And so the legal question on which the Courts have

22  divided is that when the FDA makes that ruling, how much further

23  does the defendant have to go to challenge the FDA?

24         That's what's dividing the Courts.  And we know what

*10:20:50*

25  the divide is, the design defect.

**OFFICIAL TRANSCRIPT**

1    We're definitely asking the Court of Appeals to issue

2  advisory rulings on these other theories.  My only point -- and I

3  went through each of the theories that Mr. Birchfield

4  mentioned -- is that their analysis of the claims that they do

10:21:12   5  rule on will provide strong guidance on the analysis of these

6  other claims.

7    And I went through each of the claims that he described

8  and showed the issue, the particular issue, that is -- that

9  Ms. Ibanez's claims raise that are also raised with respect to

10:21:34  10  those other theories.  And I won't waste Your Honor's time

11  repeating those, but they are in the transcript.

12    And, lastly, I just want to clarify, you know, the

13  earn-the-right comment.

14    My comment was not that we're entitled to sympathy

10:21:51  15  because we have cooperated with the Court.  My point was that we

16  had -- this is not a situation where there's a recalcitrant

17  defendant that is using 1292(b) for the purpose of delay.  We're

18  proceeding with Wave 1 and Wave 2.

19    We just had Your Honor enter CMO 7 which includes yet

10:22:21  20  another round of generic discovery that the plaintiffs want.

21    It's as important to get this dispositive issue

22  resolved as it is to do all of that fact work, and so my point is

23  it's time for that legal issue to be resolved.

24    THE COURT:  Okay.  I got it.  Okay.  Thank you very

10:22:45  25  much, both of y'all.  I think that oral arguments help very much.

**OFFICIAL TRANSCRIPT**

1          I appreciate it.

2          Court will stand in recess.

3                              (Proceedings adjourned.)

4

5

6                         *  *  *  *

7                         CERTIFICATE

8

9          I hereby certify this 2nd day of July, 2018, that the

10  foregoing is, to the best of my ability and understanding, a true

11  and correct transcript of the proceedings in the above-entitled

12  matter.

13

14                              /s/ Mary V. Thompson

15                              _____

16                              Official Court Reporter

17

18

19

20

21

22

23

24

25

**OFFICIAL TRANSCRIPT**