## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE:  XARELTO (RIVAROXABAN PRODUCTS LIABILITY LITIGATION | **MDL NO. 2592**<br>**Section: L**<br>**Judge Fallon**<br>**Magistrate Judge Michael North** |
| THIS DOCUMENT RELATES TO: | |
| BETTY JACOBS, | **CIVIL ACTION NO.:**<br>    **2:18-cv-07391** |
|     Plaintiff, | |
|   vs. | |
| JANSSEN RESEARCH & DEVELOPMENT, LLC F/K/A JOHNSON & JOHNSON PHARMACEUTICALS RESEARCH AND DEVELOPMENT, LLC; JOHNSON & JOHNSON COMPANY; JANSSEN ORTHO, LLC; JANSSEN PHARMACEUTICALS, INC. F/K/A JANSSEN PHARMACEUTICA, INC., F/K/A ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS INC.; BAYER CORPORATION; BAYER HEALTHCARE AG; BAYER PHARMA AG; BAYER AG; BAYER HEALTHCARE LLC; and BAYER HEALTHCARE PHARMACEUTICALS INC., | |
|     Defendants. | |
| _____/ | |

## AMENDED COMPLAINT AND JURY DEMAND

Plaintiff,  BETTY JACOBS, by and through the undersigned counsel, hereby submits this

Complaint against Defendants (1) JANSSEN RESEARCH & DEVELOPMENT, LLC, F/K/A

JOHNSON & JOHNSON PHARMACEUTICALS RESEARCH AND DEVELOPMENT, LLC,

(2) JOHNSON & JOHNSON COMPANY (3) JANSSEN ORTHO, LLC (4) JANSSEN

PHARMACEUTICALS, INC. F/K/A JANSSEN PHARMACEUTICA, INC., F/K/A ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS INC. (5) BAYER CORPORATION; (6) BAYER HEALTHCARE AG; (7) BAYER PHARMA AG; (8) BAYER AG; (9) BAYER HEALTHCARE LLC;   and (10) BAYER HEALTHCARE PHARMACEUTICALS INC. (collectively, "Defendants") for compensatory and punitive damages, equitable relief, and such other relief deemed just and proper arising from personal injuries of BETTY JACOBS as a result of ingesting the product Xarelto®, also known as rivaroxaban, and hereby alleges:

## INTRODUCTION

1.      This is an action for damages suffered by Plaintiff as a direct and proximate result of Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, advertising, distribution, labeling, and/or sale of the pharmaceutical drug Xarelto.  Xarelto in any of its forms is referred to herein as "Xarelto."  Plaintiff maintains that Xarelto is defective, dangerous to human health, unfit and unsuitable to be marketed and sold in commerce and lacked proper warnings and directions as to the dangers associated with its use.

2.      Defendants concealed their knowledge of Xarelto's defects from the Plaintiff, FDA and general public when representing that Xarelto had been sufficiently tested and was found to be safe and/or effective for its intended use.

3.      Defendants engaged in aggressive direct-to-consumer and physician marketing and advertising campaigns for Xarelto.  As a result, Xarelto sales are expected to well exceed $1 billion this year.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 3 of 50

4.     Plaintiff brings claims for compensatory and punitive damages, equitable relief and such other relief deemed just and proper arising from injuries as a result of ingesting Xarelto.

## JURISDICTION AND VENUE

5.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §1332, because the amount in controversy as to the Plaintiff exceeds $75,000.00, exclusive of interest and costs, and because Defendants are citizens of states other than the state in which Plaintiff is a citizen. Specifically, Plaintiff BETTY JACOBS is a resident and citizen of Ethridge, Lawrence  County, Tennessee.  Further, Defendants are respectively citizens of the States of Delaware, Indiana, and New Jersey, the Commonwealths of Pennsylvania and Puerto Rico, and the nations of Ireland and Germany.  At all times herein mentioned, Defendants engaged in interstate commerce in this judicial district in that they advertised, promoted, supplied, and sold certain pharmaceutical products, including Xarelto, to distributors and retailers for resale to physicians, hospitals, medical practitioners, and the general public in this district.

6.     This action is a tag-along action to MDL No. 2592 styled *In Re:  Xarelto (Rivaroxaban) Products Liability Litigation*, Case No. 2:14-md-02592, pending in the United States District Court for the Eastern District of Louisiana in New Orleans before U.S. District Court Judge Eldon E. Fallon.  An immediate stay of this action pending transfer by the Judicial Panel on Multi-district Litigation of the instant case to the MDL would be appropriate in order to conserve the resources of the local Court as well as the parties.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.: 2:18-cv-07391
Page 4 of 50

## PARTIES

7.     Plaintiff BETTY JACOBS is a resident and citizen of Arlington, Shelby County County, Tennessee.

8.     Plaintiff was prescribed Xarelto from approximately July 2015 through September 2017, for atrial fibrillation in Arlington, Shelby County, Tennessee.

9.     On or about September 6, 2017, Plaintiff, BETTY JACOBS, suffered an acute gastrointestinal bleed as a result of her ingestion of Xarelto and underwent medical treatment with various physicians in Memphis, Shelby County, Tennessee as a result of these injuries.

10.    As a direct and proximate result of Defendants' conduct, Plaintiff has suffered and incurred harm including severe pain and suffering, disability, medical expenses and other economic and noneconomic damages.

## DEFENDANTS

11.    Upon information and belief, Defendant JANSSEN RESEARCH & DEVELOPMENT LLC, f/k/a JOHNSON AND JOHNSON RESEARCH AND DEVELOPMENT L.L.C. (hereinafter referred to as "JANSSEN R&D") is a limited liability company organized under the laws of New Jersey, with a principal place of business in New Jersey. Defendant JANSSEN R&D's sole member is Janssen Pharmaceuticals, Inc., which is a Delaware corporation with a principal place of business in New Jersey. Accordingly, JANSSEN R&D is a resident and citizen of Delaware and New Jersey for purposes of determining diversity under 28 U.S.C. § 1332.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 5 of 50

12.     As part of its business, JANSSEN R&D is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.

13.     Defendant JANSSEN R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as well as the supplemental NDA.

14.     Upon information and belief, and at all relevant times Defendant JANSSEN R&D, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant. The primary purposes of Xarelto are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat Deep Vein Thrombosis ("DVT") and Pulmonary Embolism ("PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

15.     Upon information and belief, Defendant JANSSEN PHARMACEUTICALS, INC. f/k/a   JANSSEN   PHARMACEUTICA   INC.   f/k/a   ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (hereinafter referred to as "JANSSEN PHARM") is a Pennsylvania corporation, having a principal place of business at 1000 Route 202 South, P.O. Box 300, Rairitan, New Jersey 08869, and would therefore be a resident and citizen of the State of New Jersey.

16.     As part of its business, JANSSEN PHARM is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

17.     Upon information and belief, and at all relevant times, Defendant JANSSEN PHARM was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes

of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

18.    Upon information and belief, Defendant JANSSEN ORTHO LLC (hereinafter referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of Delaware, having a principal place of business at Stateroad 933 Km 0 1, Street Statero, Gurabo, Puerto Rico 00778. Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson. The only member of JANSSEN ORTHO LLC is OMJ PR Holdings, which is incorporated in Ireland with a principal place of business in Puerto Rico. Accordingly, JANSSEN ORTHO LLC is a resident and citizen of Delaware for purposes of determining diversity under 28 U.S.C. § 1332.

19.    As part of its business, JANSSEN ORTHO is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

20.    Upon information and belief, and at all relevant times, Defendant, JANSSEN ORTHO, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

21.    Defendant Johnson & Johnson (hereinafter referred to as "J&J") is a fictitious name adopted by Defendant Johnson & Johnson Company, a New Jersey corporation which has its

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 7 of 50

principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County,

New Jersey 08933, and is a resident and citizen of the state of New Jersey.

22.    As part of its business, J&J, and its "family of companies," is involved in the

research, development, sales, and marketing of pharmaceutical products, including Xarelto.

23.    Upon   information   and   belief,   Defendant   BAYER   HEALTHCARE

PHARMACEUTICALS, INC. is, and at all relevant times was, a corporation organized under the

laws of the State of Delaware, with its principal place of business in the State of New Jersey, and

would be a resident and citizen of the states of Delaware and New Jersey.

24.    As part of its business, BAYER HEALTHCARE PHARMACEUTICALS, INC. is

involved in the research, development, sales, and marketing of pharmaceutical products including

Xarelto.

25.    Upon   information   and   belief,   and   at   all   relevant   times,   Defendant   BAYER

HEALTHCARE PHARMACEUTICALS, INC. was in the business of and did design, research,

manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an

oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic

embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk

of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee

replacement surgery.

26.    Upon   information   and   belief,   Defendant   BAYER   PHARMA   AG   is   a

pharmaceutical company domiciled in Germany.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 8 of 50

27.     Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG. Bayer Schering Pharma AG was formerly known as Schering AG and is the same corporate entity as Schering AG.

28.     Upon information and belief, Schering AG was renamed Bayer Schering Pharma AG effective December 29, 2006.

29.     Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011.

30.     As part of its business, BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

31.     Upon information and belief, and at all relevant times, Defendant BAYER PHARMA AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

32.     Upon information and belief, Defendant BAYER CORPORATION is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205, and is a resident and citizen of the states of Indiana and Pennsylvania.

33.     Upon information and belief, BAYER HEALTHCARE PHARMACEUTICALS, INC. is owned by Defendant BAYER CORPORATION.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 9 of 50

34.     At all relevant times, Defendant BAYER CORPORATION was engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Xarelto.

35.     Upon information and belief, Defendant BAYER HEALTHCARE LLC is a limited liability company duly formed and existing under and by the virtue of the laws of the State of Delaware, with its principal place of business located in the State of New Jersey. BAYER HEALTHCARE LLC's sole member is Bayer Corporation, and is wholly owned by Bayer Corporation, which is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205. Accordingly, BAYER HEALTHCARE LLC is a citizen and resident of the states of Delaware, New Jersey, Indiana and Pennsylvania for purposes of determining diversity under 28 U.S.C. § 1332.

36.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

37.     Upon information and belief, Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company of Defendants BAYER

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 10 of 50

CORPORATION,     BAYER     HEALTHCARE     LLC,     BAYER     HEALTHCARE
PHARMACEUTICALS, INC, and BAYER PHARMA AG.

38.     Upon  information  and  belief,  at  all  relevant  times,  Defendant  BAYER
HEALTHCARE AG exercises control over Defendants BAYER CORPORATION, BAYER
HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER
PHARMA AG.

39.     Upon information and belief, Defendant BAYER AG is a German chemical and
pharmaceutical  company  that  is  headquartered  in  Leverkusen,  North  Rhine-Westphalia,
Germany.

40.     Upon  information  and  belief,  Defendant  BAYER  AG  is  the  third  largest
pharmaceutical company in the world.

41.     Upon information and belief, at all relevant times, Defendant BAYER AG was in
the business of and did design, research, manufacture, test, advertise, promote, market, sell, and
distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce
the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat
DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for
patients undergoing hip and knee replacement surgery.

42.     Defendants Janssen Research & Development LLC, Janssen Ortho LLC, Janssen
Pharmaceuticals,  Inc.,  Johnson  &  Johnson,  Bayer  Healthcare  Pharmaceuticals,  Inc.,  Bayer
Pharma AG, Bayer Corporation, Bayer Healthcare LLC, Bayer Healthcare AG, and Bayer AG,
shall be referred to herein individually by name or jointly as "Defendants.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 11 of 50

43.     At all times alleged herein, Defendants include and included any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint ventures, and organizational units of any kind, their predecessors, successors and assigns and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

44.     At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessors in interest, and joint venture of each of the remaining Defendants herein and was at all times operating and acting with the purpose and scope of said agency, service, employment, partnership, and joint venture.

45.     At all relevant times, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce throughout the United States, either directly or indirectly through third parties, subsidiaries or related entities, the drug Xarelto.

46.     Defendant Johnson & Johnson ("J & J") is a corporation organized under the laws of New Jersey with it principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933. J&J manufactures, markets and sells a wide range of pharmaceutical products including Xarelto (rivaroxaban). J&J is and was at all relevant times involved in the research, development, packaging, labeling, sales, and/or marketing of pharmaceutical products including Xarelto.

47.     Defendant Janssen Ortho LLC is a limited liability company organized under the laws of Delaware, having a principal place of business at State Road 933 Km 01 Street, Statero Gurabo, Puerto Rico 00778. The sole member of Janssen Ortho, LLC is OMJ PR Holdings, which

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 12 of 50

is incorporated in Ireland and has its principal place of business in Puerto Rico. Janssen Ortho is and was at all relevant times involved in the research, development, packaging, labeling, manufacturing, sales, and/or marketing of pharmaceutical products including Xarelto.

48.    Defendant Janssen Pharmaceuticals, Inc. f/k/a Janssen Pharmaceutica Inc. f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc. is a Pennsylvania corporation, having a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560. Janssen Pharmaceuticals, Inc. is and was at all relevant times involved in the research, development, packaging, labeling, manufacturing, sales, and/or marketing of pharmaceutical products including Xarelto.

49.    At all relevant times, Janssen Pharmaceuticals, Inc. has received direct reports from the FDA, healthcare providers and the general public of suspected adverse reactions to Xarelto, and failed to adequately respond to those reports.

50.    Defendant Bayer Corporation is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205. Bayer Corporation is and was at all relevant times involved in the research, development, packaging, labeling, testing, manufacturing, sales, and/or marketing of pharmaceutical products including Xarelto.

51.    Defendant Bayer HealthCare AG is a pharmaceutical company organized under the laws of Germany with its principal place of business located in Leverkusen, Germany. Bayer HealthCare AG is and was at all relevant times involved in the research, development, packaging, labeling, testing, manufacturing, sales, and/or marketing of pharmaceutical products including Xarelto.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 13 of 50

52.     Defendant Bayer Pharma AG f/k/a Bayer Schering Pharma AG is a German corporation with its principal place of business in Leverkusen, Germany. Bayer Pharma AG is and was at all relevant times involved in the research, development packaging, labeling, testing, manufacturing, sales, and/or marketing of pharmaceutical products including Xarelto.

53.     Defendant Bayer AG is a German corporation with its principal place of business in Leverkusen, Germany. Bayer AG is and was at all relevant times involved in the research, development packaging, labeling, testing, manufacturing, sales, and/or marketing of pharmaceutical products including Xarelto.

54.     Defendant Bayer Healthcare LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business located in Whippany, New Jersey. Bayer Corporation is the sole member of Bayer Healthcare LLC. Defendant Bayer Healthcare LLC is and was at all relevant times involved in the research, development, packaging, labeling, testing, manufacturing, sales, and/or marketing of pharmaceutical products including Xarelto.

55.     Defendant Bayer Healthcare Pharmaceuticals, Inc. f/k/a Bayer Healthcare, Inc. is a corporation organized under the laws of the State of Delaware, with its principal place of business in Pine Brook, New Jersey. Bayer Healthcare Pharmaceuticals, Inc. is and was at all relevant times involved in the research, development, manufacturing, sales, and marketing of pharmaceutical products including Xarelto. Bayer Healthcare Pharmaceuticals, Inc. is and was at all relevant times a sponsor of the New Drug Application ("NDA") for Xarelto, as well as the supplemental NDAs for Xarelto.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 14 of 50

## FACTUAL BACKGROUND

### A.    Nature of the Case

56.    Plaintiff brings this case against Defendants for damages associated with ingestion of the pharmaceutical drug Xarelto, which was designed, manufactured, marketed, sold and distributed by Defendants. Specifically, Plaintiff suffered various injuries, serious physical pain and suffering, medical, hospital and surgical expenses, as a direct result of his use of Xarelto.

57.    At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

58.    Xarelto was introduced in the United States ("U.S.") on July 1, 2011, and is part of a class of drugs called New Oral Anticoagulants ("NOACs").

59.    This class of NOACs, which also includes Pradaxa and Eliquis, is marketed as the next generation of blood-thinning drugs to replace warfarin (Coumadin); an established safe treatment for preventing stroke and systemic embolism for the past 60 years.

60.    Xarelto is an anticoagulant that acts as a Factor Xa inhibitor, and is available by prescription in oral tablet doses of 20 mg, 15 mg, and 10mg.

61.    Defendants received FDA approval for Xarelto on July 1, 2011, for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries (NDA 022406).

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 15 of 50

62.     Approval of Xarelto for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries was based on a series of clinical trials known as the Regulation of Coagulation in Orthopedic Surgery to Prevent Deep Venous Thrombosis and Pulmonary Embolism studies (hereinafter referred to as the "RECORD" studies). The findings of the RECORD studies showed that Xarelto was superior (based on the Defendants' definition) to enoxaparin for thromboprophylaxis after total knee and hip arthroplasty, accompanied by similar rates of bleeding. However, the studies also showed a greater bleeding incidence with Xarelto leading to decreased hemoglobin levels and transfusion of blood. (Lassen, M.R., et al. Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Total Knee Arthroplasty. N. Engl. J. Med. 2008; 358:2776-86; Kakkar, A.K., et al. Extended duration Rivaroxaban versus short-term enoxaparin for the prevention of venous thromboembolism after total hip arthroplasty: a double-blind, randomized controlled trial. Lancet 2008; 372:31-39; Ericksson, B.I., et al. Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty. N. Engl. J. Med. 2008; 358:2765-75.).

63.     Despite these findings, the RECORD studies were flawed in design and conducted in a negligent manner. In fact, FDA Official Action Indicated ("OAI")—rated inspections in 2009 disclosed rampant violations including, "systemic discarding of medical records," unauthorized unbinding, falsification, and "concerns regarding improprieties in randomization." As a result, the FDA found that the RECORD 4 studies were so flawed that they were deemed unreliable. (Seife, Charles, *Research Misconduct Identified by US Food and Drug Administration,* JAMA Intern. Med (Feb. 9, 2015)).

64.     Nevertheless, Defendants received additional FDA approval for Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation on November 4, 2011 (NDA 202439). Approval of Xarelto for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as the Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation study (hereinafter referred to as "ROCKET AF").

65.     The Rocket AF study showed that Xarelto was non-inferior to warfarin for the prevention of stroke or systemic embolism in patients with non-valvular atrial fibrillation, with a similar risk of major bleeding. However, "bleeding from gastrointestinal sites, including upper, lower, and rectal sites, occurred more frequently in the rivaroxaban group, as did bleeding that led to a drop in the hemoglobin level or bleeding that required transfusion." (Patel, M.R., et al. Rivaroxaban versus warfarin in Nonvalvular Atrial Fibrillation. N. Engl. J. Med. 2011; 365:883-91.)

66.     The ROCKET AF study compared warfarin to Xarelto. Thus, for the study to be well designed and meaningful, the warfarin study group would have to be well managed because warfarin's safety and efficacy is dose dependent. In other words, if the warfarin group was poorly managed, it would be easy for Xarelto to appear non-inferior to warfarin, which, in turn, would provide Defendants a study to "support" Xarelto's use.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.: 2:18-cv-07391
Page 17 of 50

67.     In fact, in the ROCKET AF study, the warfarin group was not well managed. The warfarin group in the ROCKET AF study was the worst managed warfarin study group in any previously reported clinical trial involving warfarin.

68.     The poor management of the warfarin group in the ROCKET AF study was not lost on the FDA, which noted "the data comparing [Xarelto] to warfarin are not adequate to determine whether [Xarelto] is as effective for its proposed indication in comparison to warfarin when the latter is used skillfully." FDA Advisory Committee Briefing document. P. 10.

69.     Public Citizen also noticed the poor control in the warfarin group. Public Citizen wrote the FDA, stating they "strongly oppose FDA approval... The 3 ROCKET AF trial conducted in support of the proposed indication had a suboptimal control arm..." http://www.citizen.org/documents/1974.pdf.

70.     Another problem with the ROCKET AF study was Xarelto's once-a-day dosing. The FDA clinical reviewers stated that "the sponsor's rationale for evaluating only once daily dosing during Phase 3 is not strong. Most importantly, there is clinical information from Phase 2 trials ... and from clinical pharmacology studies suggesting that twice daily dosing, which would produce lower peak blood levels and higher trough blood levels of [Xarelto], might have been associated with greater efficacy and/or a better safety profile." FDA advisory Committee Briefing document p. 100.

71.     Dr. Steven E. Nissen, more sharply, stated "my concern was that the dose was selected more for a marketing advantage rather than for the scientific data that was available, and was a mistake..." FDA Advisory Meeting Transcript p. 287.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 18 of 50

72.    Furthermore, the FDA expressed desirability in monitoring Xarelto dosage within their NDA approval memo based on the ROCKET studies. The clinical pharmacology in these studies demonstrated a linear correlation between rivaroxaban (Xarelto) levels and prothrombin time ("PT"); and subsequently a correlation between PT and the risk of bleeding. At this time, Defendants were aware of the correlation between Xarelto dosage and bleeding risks, but had "not chosen to utilize this information." (NDA 202439 Summary Review, p. 9). At all relevant times, Defendants' controlled the contents of their label as demonstrated by their decision to go forward without regard to the FDA's suggestion to utilize this information.

73.    The additional indication for treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE was added to the label on November 2, 2012.

74.    Approval of Xarelto for the treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE in the U.S. was based on the clinical trials known as the EINSTEIN-DVT, EINSTEIN-PE, and EINSTEIN-Extension studies. The EINSTEIN-DVT study tested Xarelto versus a placebo, and merely determined that Xarelto offered an option for treatment of DVT, with an increased risk of bleeding events as compared to placebo. (The EINSTEIN Investigators. Oral Rivaroxaban for Symptomatic Venous Thromboembolism. N.Engl.J.Med. 2010; 363:2499-510). The EINSTEIN-Extension study confirmed that result. (Roumualdi, E., et al. Oral rivaroxaban after symptomatic venous thromboembolism: the continued treatment study (EINSTEIN-Extension study). Expert Rev. Cardiovasc. Ther. 2011; 9(7):841-844). The EINSTEIN-PE study's findings showed that a Xarelto regimen was non-inferior to the standard therapy for initial and long-term treatment of PE. However, the studies also demonstrated an

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 19 of 50

increased risk of adverse events with Xarelto, including those that resulted in permanent discontinuation of Xarelto or prolonged hospitalization. (The EINSTEIN-PE Investigators. Oral Rivaroxaban for the Treatment of Symptomatic Pulmonary Embolism. N.Engl.J.Med. 2012; 366:1287-97.)

75.     Defendants use the results of the ROCKET AF study, the RECORD studies, and the EINSTEIN studies to promote Xarelto in their promotional materials, including the Xarelto website, which tout the positive results of those studies. However, Defendants' promotional materials fail to similarly highlight the increased risk of gastrointestinal bleeding and bleeding that required transfusion, among other serious bleeding concerns.

76.     Defendants market Xarelto as a new oral anticoagulant treatment alternative to warfarin (Coumadin), a long-established safe treatment for preventing stroke and systemic embolism.

77.     Defendants market and promote Xarelto as a single daily dose pill that does not require the need to measure a patient's blood plasma levels, touting it more convenient than warfarin, and does not limit a patient's diet. The single dose and no blood testing requirements or dietary constraints are marked by Defendants as the "Xarelto Difference."

78.     However, Xarelto's clinical studies show that Xarelto is safer and more effective when there is blood monitoring, dose adjustments and twice a day dosing.

79.     In its QuarterWatch publication for the first quarter of the 2012 fiscal year, the Institute for Safe Medication Practices ("ISMP"), noted that, even during the approval process, FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of Xarelto],

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 20 of 50

saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day

dosing."

80.    The use of Xarelto without appropriate blood monitoring, dose adjustment and

twice a day dosing can cause major, life-threatening bleeding events. Physicians using Xarelto

have to be able to balance the dose so that the blood is thinned enough to reduce the risk of stroke,

but not thinned so much as to increase the risk for a major bleeding event. The Defendants were

aware of this risk and the need for blood monitoring but have failed to disclose this vital health

information to patients, doctors and the FDA.

81.    Importantly, Xarelto's significant risk of severe, and sometimes fatal, internal

bleeding has no antidote to reverse its effects, unlike warfarin. Therefore, in the event of

hemorrhagic complications, there is no available reversal agent. The original U.S. label, approved

when the drug was first marketed, did not contain a warning regarding the lack of antidote, but

instead only mentioned this important fact in the overdose section.

82.    The FDA's adverse event data indicates staggering, serious adverse events that

have been associated with Xarelto.

83.    In the year leading up to June 30, 2012, there were 1,080 Xarelto-associated

"Serious Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65

deaths. Of the reported hemorrhage events associated with Xarelto, 8% resulted in death, which

was approximately twofold the risk of a hemorrhage-related death with warfarin.

84.    At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE

reports were filed with the FDA, its first full year on the market, ranking tenth among other

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 21 of 50

pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death, as compared to only 56 deaths associated with warfarin.

85.     The ISMP referred to these SAE figures as constituting a "strong signal" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

86.     Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528), another new oral anticoagulant, which had previously ranked as the number one reported drug in terms of adverse events in 2012.

87.     Moreover, in the first eight months of 2013, German regulators received 968 Xarelto-related averse event reports, including 72 deaths, as compared to a total of 750 reports and 58 deaths in 2012.

88.     Despite the clear signal generated by the SAE data, Defendants did not tell consumers, health care professionals and the scientific community about the dangers of Xarelto, nor did Defendants perform further investigation into the safety of Xarelto.

89.     Defendants' original, and in some respects, current labeling and prescribing information for Xarelto:

> a.     failed to investigate, research, study and define, fully and adequately, the safety profile of Xarelto;
>
> b.     failed to provide adequate warnings, about the true safety risks associated with the use of Xarelto;

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.: 2:18-cv-07391
Page 22 of 50

c.     failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamics variability of Xarelto and its effects on the degree of anticoagulation in a patient;

d.     failed to disclose the need for dose adjustments;

e.     failed to disclose the need to twice daily dosing;

f.     failed to warn about the need for blood monitoring;

g.     failed to provide adequate warning that it is difficult or impossible to assess the degree and/or extent of anticoagulation in patients taking Xarelto;

h.     failed to adequately disclose in the "Warnings" Section that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto;

i.     failed to advise prescribing physicians, such as the Plaintiff's physicians, to instruct patients that there was no agent to reverse the anticoagulant effects of Xarelto;

j.     failed to provide adequate instructions on how to intervene and/or stabilize a patient who suffers a bleed while taking Xarelto;

k.     failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Xarelto users;

l.     failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Xarelto, especially, in those patients with a prior history of gastrointestinal issues and/or upset stomach;

m.     failed to provide adequate warnings regarding the increased risk of suffering a bleeding event, requiring blood transfusions in those taking Xarelto;

n.     failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Xarelto and to continue testing and monitoring of renal functioning periodically while the patient is on Xarelto;

o.     failed to provide adequate warnings regarding the need to assess hepatic functioning prior to starting a patient on Xarelto and to continue testing and

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 23 of 50

> monitoring of hepatic functioning periodically while the patient is on Xarelto;
>
> p.  failed to include a "**BOXED WARNING**" about serious bleeding events associated with Xarelto and failed to include a "**BOLDED WARNING**" about serious bleeding events associated with Xarelto; and
>
> q.  in the "Medication Guide" intended for distribution to patients to whom Xarelto has been prescribed, Defendants failed to disclose the need for blood monitoring or to patients that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, such irreversibility could have permanently disabling, life-threatening or fatal consequences.

90.  During the years since first marketing Xarelto in the U.S., Defendants modified the U.S. labeling and prescribing information for Xarelto, which included additional information regarding the use of Xarelto in patients taking certain medications. Despite being aware of: (1) serious, and sometimes fatal, irreversible bleeding events associated with the use of Xarelto; and (2) 2,081 SAE Medwatch reports filed with the FDA in 2012 alone, including at least 151 deaths, Defendants nonetheless failed to provide adequate disclosures or warnings in their label as detailed in Paragraph 74(a) through 74(r).

91.  Despite the wealth of scientific evidence, Defendants have ignored the increased risk of the development of the aforementioned injuries associated with the use of Xarelto, but they have, through their marketing and advertising campaigns, urged consumers to use Xarelto without regular blood monitoring or instead of anticoagulants that present a safer alternative.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 24 of 50

    **B.**    **Over-Promotion of Xarelto**

92.    Xarelto is the second most prescribed drug for treatment of atrial fibrillation, behind only Coumadin (warfarin), and achieved blockbuster status with sales of approximately $2 billion dollars in 2013.

93.    Defendants spent significant amounts of money in promoting Xarelto, which included at least $11,000,000.00 spent during 2013 alone on advertising in journals targeted at prescribers and consumers in the U.S. In the third quarter of fiscal 2013, Xarelto was the number one pharmaceutical product advertised in professional health journals based on pages and dollars spent.

94.    Defendants' aggressive and misrepresentative marketing of a "Xarelto Difference" lead to an explosion in Xarelto sales. The "Xarelto Difference," *i.e.*, was once a day dosing without blood monitoring. In fact, the "Xarelto Difference" was nothing more than a marketing campaign based on flawed science.

95.    As a result of Defendants' aggressive marketing efforts, in its first full year on the market, Xarelto garnered approximately $582 million in sales globally.

96.    Defendants' website for Xarelto claims that over seven million people worldwide have been prescribed Xarelto. In the U.S., approximately 1 million Xarelto prescriptions had been written by the end of 2013.

97.    During the Defendants' 2012 fiscal year, Xarelto garnered approximately $658 million in sales worldwide. Then, in 2013, sales for Xarelto increased even further to more than

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 25 of 50

$1 billion, which is the threshold commonly referred to as "blockbuster" status in the pharmaceutical industry. In fact, Xarelto sales ultimately reached approximately $2 billion for the 2013 fiscal year, and Xarelto is now considered the leading anticoagulant on a global scale in terms of sales.

98.     As part of their marketing of Xarelto, Defendants widely disseminated direct-to-consumer ("DTC") advertising campaigns that were designed to influence patients to make inquiries to their prescribing physicians about Xarelto and/or request prescriptions for Xarelto.

99.     In the course of these DTC advertisements, Defendants overstated the efficacy of Xarelto with respect to preventing stroke and systemic embolism, failed to disclose the need for dose adjustments, failed to disclose the need for blood monitoring, and failed to adequately disclose to patients that there is no drug, agent, or means to reverse the anticoagulation effects of Xarelto, and, that such irreversibility could have permanently disabling, life-threatening and fatal consequences.

100.     On June 6, 2013, Defendants received an untitled letter from the FDA's Office of Prescription Drug Promotion (hereinafter referred to as the "OPDP") regarding its promotional material for the atrial fibrillation indication, stating that, "the print ad is false or misleading because it minimizes the risks associated with Xarelto and makes a misleading claim" regarding dose adjustments, which was in violation of FDA regulations. The OPDP thus requested that Defendants immediately cease distribution of such promotional material.

101.     Prior to Plaintiff's ingestion of Xarelto, Plaintiff became aware of the promotional materials described herein.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 26 of 50

102.    Prior to Plaintiff's prescription of Xarelto, Plaintiff's prescribing physician received promotional materials and information from sales representatives of Defendants claiming that Xarelto was just as effective as warfarin in reducing strokes in patients with non-valvular atrial fibrillation, as well as preventing DVT/PE in patients with prior history of DVT/PE or undergoing hip or knee replacement surgery, and was more convenient, without also requiring blood monitoring, dose adjustments, twice a day dosing or adequately informing prescribing physicians that there was no reversal agent that could stop or control bleeding in patients taking Xarelto.

103.    At all relevant times hereto, Defendants also failed to warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally-known measures taken to treat and stabilize bleeding in users of warfarin, there is no effective agent to reverse the anticoagulation effects of Xarelto, and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Xarelto.

104.    At all relevant times to this action, The Xarelto Medication Guide, prepared and distributed by Defendants and intended for U.S. patients to whom Xarelto has been prescribed, failed to warn about the need for blood monitoring, dose adjustments, and twice a day dosing, and failed to disclose to patients that there is no agent to reverse the anticoagulation effects of Xarelto, and, that if serious bleeding occurs, it may be irreversible, permanently disabling, and life-threatening.

105.    Prior to applying to the FDA for and obtaining approval of Xarelto, Defendants knew or should have known that consumption of Xarelto was associated with and/or would cause

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 27 of 50

the induction of life-threatening bleeding, and Defendants possessed at least one clinical scientific study, which evidence Defendants knew or should have known was a signal that life-threatening bleeding risk needed further testing and studies prior to its introduction to the market.

106.    As a result of Defendants' claim regarding the effectiveness and safety of Xarelto, Plaintiff's medical providers prescribed and Plaintiff ingested Xarelto.

## PLAINTIFF'S USE OF XARELTO

107.    Upon information and belief, BETTY JACOBS began taking Xarelto on approximately July 2015 for atrial fibrillation.

108.    On or about September 6, 2017, at a time when she was taking Xarelto, suffered an acute gastrointestinal bleed as a result of her ingestion of Xarelto and underwent medical treatment with various physicians, numerous evaluations, and transfusions in Arlington and Memphis, Shelby County, Tennessee and was treated at Saint Francis Hospital-Barlett.  Plaintiff, BETTY JACBOS, has never recovered to her previous state of health following this Xarelto-induced bleeding event.

109.    Plaintiff BETTY JACOBS discontinued taking Xarelto following her bleed in approximately September 6, 2017 in Shelby County, Tennessee.

110.    By reason of the foregoing acts and omissions of Defendants, the Plaintiff was caused to suffer from life-threatening bleeding, as well as other severe and personal injuries which were permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications, and fear of developing any of the above named health consequences.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 28 of 50

111.    By reason of the foregoing, Plaintiff was severely and permanently injured, and required more constant and continuous medical monitoring and treatment than prior to Plaintiff's use of Defendants' Xarelto drug.  Pursuant to Tennessee law Plaintiff asserts claims for personal injuries.

## CLAIMS FOR RELIEF

### COUNT I
### (STRICT LIABILITY)

111.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiff pleads this Count in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiff's resident State.

112.    At the time of Plaintiff's injuries, Defendants' pharmaceutical drug Xarelto was defective and unreasonably dangerous to foreseeable consumers, including Plaintiff.

113.    At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have recently acquired the Defendants who have designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed Xarelto as hereinabove described that was used by the Plaintiff.

114.    Defendants' Xarelto was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 29 of 50

115.    At those times, Xarelto was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

116.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design or formulation in that, when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the benefits associated with the design or formulation of Xarelto.

117.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design and/or formulation, in that, when it left the hands of the Defendants, manufacturers, and/or suppliers, it was unreasonably dangerous, and it was more dangerous than an ordinary consumer would expect.

118.    At all times herein mentioned, Xarelto was in a defective condition and unsafe, and Defendants knew or had reason to know that said product was defective and unsafe, especially when used in the form and manner as provided by the Defendants.

119.    Defendants knew, or should have known that at all times herein mentioned, their Xarelto was in a defective condition, and was and is inherently dangerous and unsafe.

120.    At the time of the Plaintiff's use of Xarelto, Xarelto was being used for the purposes and in a manner normally intended, namely to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.: 2:18-cv-07391
Page 30 of 50

121.   Defendants, with this knowledge, voluntarily designed their Xarelto in a dangerous condition for use by the public, and in particular the Plaintiff.

122.   Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

123.   Defendants created a product unreasonably dangerous for its normal, intended use.

124.   The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was manufactured defectively in that Xarelto left the hands of Defendants in a defective condition and was unreasonably dangerous to its intended users.

125.   The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants reached their intended users in the same defective and unreasonably dangerous condition in which the Defendants' Xarelto was manufactured.

126.   Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed a defective product which created an unreasonable risk to the health of consumers and to the Plaintiff in particular; and Defendants are therefore strictly liable for the injuries sustained by the Plaintiff.

127.   The Plaintiff could not, by the exercise of reasonable care, have discovered Xarelto's defects herein mentioned and perceived its danger.

128.   The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings or

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.: 2:18-cv-07391
Page 31 of 50

instructions, as the Defendants knew or should have known that the product created a risk of serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to adequately warn of said risk.

129.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings and/or inadequate testing.

130.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects including, life-threatening bleeding, as well as other severe and permanent health consequences from Xarelto, they failed to provide adequate warnings to users or consumers of the product, and continued to improperly advertise, market and/or promote their product, Xarelto.

131.    The Xarelto ingested by Plaintiff was in the same or substantially similar condition as it was when it left the possession of Defendants.

132.    Plaintiff did not misuse or materially alter their Xarelto.

133.    Defendants are strictly liable for Plaintiff's injuries in the following ways:

    a.    Xarelto as designed, manufactured, sold and supplied by the Defendants, was defectively designed and placed into the stream of commerce by Defendants in a defective and unreasonably dangerous condition;

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 32 of 50

b.   Defendants failed to properly market, design, manufacture, distribute, supply and sell Xarelto;

c.   Defendants failed to warn and place adequate warnings and instructions on Xarelto;

d.   Defendants failed to adequately test Xarelto;

e.   Defendants failed to provide timely and adequate post-marketing warnings and instructions after they knew of the risk of injury associated with the use of Xarelto, and,

f.   A feasible alternative design existed that was capable of preventing Plaintiff's injuries.

134.   By reason of the foregoing, Defendants have become strictly liable in tort to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Xarelto.

135.   Defendants' defective design, manufacturing defect, and inadequate warnings of Xarelto were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

136.   That said defects in Defendants' drug Xarelto were a substantial factor in causing Plaintiff's injuries.

137.   Defendants' negligence was the proximate cause of Plaintiff's injuries, harm and the economic losses which Plaintiff suffered and/or will continue to suffer.

138.   As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries (in some cases death) which are permanent and lasting in nature,

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 33 of 50

physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

138.    As a result of the foregoing acts and omissions Plaintiff required more health care and services and did incur medical, health, incidental and related expenses.

139.    By reason of the foregoing, the Plaintiff has been damaged by Defendants' wrongful conduct.

140.    Defendants' conduct, as described above, was extreme and outrageous. Defendants risked the lives of the consumers and users of their products, including Plaintiff, with knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

## COUNT II
## (MANUFACTURING DEFECT)

141.    Plaintiff incorporates by references each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiff pleads this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

142.    Xarelto was designed, manufactured, marketed, promoted, sold, and introduced into the stream of commerce by Defendants.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 34 of 50

143.    When it left the control of Defendants, Xarelto was expected to, and did reach Plaintiff without substantial change from the condition in which it left Defendants' control.

144.    Xarelto was defective when it left Defendants' control and was placed in the stream of commerce, in that there were foreseeable risks that exceeded the benefits of the product and/or that it deviated from product specifications and/or applicable federal requirements, and posed a risk of serious injury and death.

145.    Specifically, Xarelto was more likely to cause serious bleeding that may be irreversible, permanently disabling, and life-threatening than other anticoagulants.

146.    Plaintiff used Xarelto in substantially the same condition it was in when it left the control of Defendants and any changes or modifications were foreseeable by Defendants.

147.    Plaintiff and her healthcare providers did not misuse or materially alter their Xarelto.

148.    As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

149.    By reason of the foregoing, the Plaintiff has been damaged by Defendants' wrongful conduct.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 35 of 50

150.    As a direct and proximate result of the use of Xarelto, Plaintiff suffered serious physical injury (and in some cases death), harm, damages and economic loss, and will continue to suffer such harm, damages and economic loss in the future.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 36 of 50

## COUNT III
## (DESIGN DEFECT)

151.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiff pleads this Count in the broadest sense available under the law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles, regardless of whether arising under statute and/or common law.

152.    Xarelto was not merchantable and/or reasonably suited to the use intended, and its condition when sold was the proximate cause of the injuries sustained by Plaintiff.

153.    Defendants placed Xarelto into the stream of commerce with wanton and reckless disregard for public safety.

154.    Xarelto was in an unsafe, defective, and inherently dangerous condition.

155.    Xarelto contains defects in its design which render the drug dangerous to consumers, such as Plaintiff, when used as intended or as reasonably foreseeable to Defendants. The design defects render Xarelto more dangerous than other anticoagulants and cause an unreasonable increased risk of injury, including but not limited to life-threatening bleeding events.

156.    Xarelto was in a defective condition and unsafe, and Defendants knew, had reason to know, or should have known that Xarelto was defective and unsafe, even when used as instructed.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 37 of 50

157.    The nature and magnitude of the risk of harm associated with the design of Xarelto, including the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening is high in light of the intended and reasonably foreseeable use of Xarelto.

158.    The risks of harm associated with the design of Xarelto are higher than necessary.

159.    It is highly unlikely that Xarelto users would be aware of the risks associated with Xarelto through either warnings, general knowledge or otherwise, and Plaintiff specifically was not aware of these risks, nor would she expect them.

160.    The design did not conform to any applicable public or private product standard that was in effect when Xarelto left the Defendants' control.

161.    Xarelto's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner. It was more dangerous than Plaintiff expected.

162.    The intended or actual utility of Xarelto is not of such benefit to justify the risk of bleeding that may be irreversible, permanently disabling, and life-threatening.

163.    At the time Xarelto left Defendants' control, it was both technically and economically feasible to have an alternative design that would not cause bleeding that may be irreversible, permanently disabling, and life-threatening or an alternative design that would have substantially reduced the risk of these injuries.

164.    It was both technically and economically feasible to provide a safer alternative product that would have prevented the harm suffered by Plaintiff.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 38 of 50

165.    Defendants' conduct was extreme and outrageous. Defendants risked the lives of consumers and users of their products, including Plaintiff, with the knowledge of the safety and efficacy problems and suppressed this knowledge from the general public. Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public. Defendants' outrageous conduct warrants an award of punitive damages.

166.    The unreasonably dangerous nature of Xarelto caused serious harm to Plaintiff.

167.    As a direct and proximate result of the Plaintiff's use of the Xarelto, which was designed, manufactured, marketed, promoted, sold, and introduced into the stream of commerce by Defendants, Plaintiff suffered serious physical injury, harm, damages and economic loss and will continue to suffer such harm, damages and economic loss in the future.

169.    Plaintiff pleads this Count in the broadest sense available under all applicable law, to include pleading same pursuant to all substantive law that applies to this case, as may be determined by choice of law principles regardless of whether arising under statute and/or common law.

## COUNT IV
## (BREACH OF IMPLIED WARRANTIES)

170.    Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

171.    At all times herein mentioned, the Defendants manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto and/or

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.: 2:18-cv-07391
Page 39 of 50

have recently acquired the Defendants who have manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto, to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

172.   At the time Defendants marketed, sold, and distributed Xarelto for use by Plaintiff, Defendants knew of the use for which Xarelto was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

173.   The Defendants impliedly represented and warranted to the users of Xarelto and their physicians, healthcare providers, and/or the FDA that Xarelto was safe and of merchantable quality and fit for the ordinary purpose for which said product was to be used.

174.   That said representations and warranties aforementioned were false, misleading, and inaccurate in that Xarelto was unsafe, unreasonably dangerous, improper, not of merchantable quality, and defective.

175.   Plaintiff, members of the medical community and/or healthcare professionals did rely on said implied warranty of merchantability of fitness for a particular use and purpose.

176.   Plaintiff and Plaintiff's physicians and healthcare professionals reasonably relied upon the skill and judgment of Defendants as to whether Xarelto was of merchantable quality and safe and fit for its intended use.

177.   Xarelto was placed into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition and the products and materials were expected to and

5

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 40 of 50

did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

178.    The Defendants herein breached the aforesaid implied warranties, as their drug Xarelto was not fit for its intended purposes and uses.

179.    As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

180.    As a result of the foregoing acts and omissions Plaintiff required more health care and services and did incur medical, health, incidental and related expenses.

181.    By reason of the foregoing, Plaintiff has been damaged by Defendants' wrongful conduct.

## COUNT V
## (FRAUDULENT MISREPRESENTATION)

182.    Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

183.    The Defendants falsely and fraudulently represented to the medical and healthcare community, Plaintiff, the FDA, and/or the public in general, that said product, Xarelto, had been tested and was found to be safe and/or effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.: 2:18-cv-07391
Page 41 of 50

recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery. Defendants further misrepresented that that patients could safely use Xarelto without any blood monitoring, that Xarelto's effect is the same on all patients, and that Xarelto could safely be used without an antidote.

184.    The representations made by Defendants were, in fact, false.

185.    When said representations were made by Defendants, they knew those representations to be false or, at a minimum, they willfully, wantonly, and recklessly disregarded whether the representations were true.

186.    These representations were made by said Defendants with the intent of defrauding and deceiving Plaintiff, the public in general, and/or the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, prescribe, dispense and/or purchase said product, Xarelto, for use to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, and depraved indifference to the health, safety and welfare of the Plaintiff herein.

187.    At the time the aforesaid representations were made by the Defendants and, at the time the Plaintiff used Xarelto, the Plaintiff was unaware of the falsity of said representations and reasonably believed them to be true.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 42 of 50

188.    In reliance upon said representations, Plaintiff was induced to and did use Xarelto, thereby sustaining severe and permanent personal injuries, and/or being at an increased risk of sustaining severe and permanent personal injuries in the future.

189.    Said Defendants knew and were aware or should have been aware that Xarelto had not been sufficiently tested, was defective in nature, and/or that it lacked adequate and/or sufficient warnings.

190.    Defendants knew or should have known that Xarelto had a potential to, could, and would cause severe and grievous injury to the users of said product, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, and/or downplayed warnings and misleading instructions.

191.    Defendants brought Xarelto to the market, and acted fraudulently, wantonly and maliciously to the detriment of the Plaintiff and Plaintiff herein.

192.    As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

193.    As a result of the foregoing acts and omissions Plaintiff required more health care and services and did incur medical, health, incidental and related expenses.

194.    By reason of the foregoing, the Plaintiff has been damaged by Defendants' wrongful conduct.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 43 of 50

## COUNT VI
## <u>(FRAUDULENT CONCEALMENT)</u>

195.    Plaintiff repeats, reiterates and realleges each and every allegation of this

Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect

as if more fully set forth herein.

196.    At all times during the course of dealing between Defendants and Plaintiff,

Plaintiff's healthcare providers, and/or the FDA, Defendants misrepresented the safety of Xarelto

for its intended use.

197.    Defendants knew or were reckless in not knowing that its representations were

false.

198.    In representations to Plaintiff, Plaintiff's healthcare providers, and/or the FDA,

Defendants fraudulently concealed and intentionally omitted the following material information:

    a.    that Xarelto was not as safe as other forms of treatment for reducing the
risk of stroke and systemic embolism inpatients with non-valvular atrial
fibrillation, reducing the risk of recurrence of DVT and/or PE, and for
prophylaxis of DVT for patients undergoing hip and knee replacement
surgery;

    b.    that the risks of adverse events with Xarelto were higher than those with
other forms of treatment for reducing the risk of stroke and systemic
embolism in patients with non-valvular atrial fibrillation, reducing the risk
of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients
undergoing hip and knee replacement surgery;

    c.    that the risks of adverse events with Xarelto were not adequately tested
and/or known by Defendants;

    d.    that Defendants were aware of dangers in Xarelto, in addition to and
above and beyond those associated with other forms of treatment for

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 44 of 50

reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

e.    that Xarelto was defective, and that it caused dangerous side effects, including but not limited to life-threatening bleeding, as well as other severe and permanent health consequences, in a much more and significant rate than other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

f.    that patients needed to undergo blood monitoring while using Xarelto;

g.    that Xarelto's effect on blood coagulation varies among different patients and can vary within the same patient at different times;

h.    that Xarelto cannot be safely used without an available antidote;

i.    that Defendants were aware that healthcare providers would not be in a position to reduce the risks of harm associated with Xarelto in accordance with the instructions provided by Defendants;

j.    that Xarelto was manufactured negligently;

k.    that Xarelto was manufactured defectively;

l.    that Xarelto was manufactured improperly;

m.    that Xarelto was designed negligently;

n.    that Xarelto was designed defectively; and

o.    that Xarelto was designed improperly.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.: 2:18-cv-07391
Page 45 of 50

199.    Defendants were under a duty to disclose to Plaintiff, Plaintiff's physicians, hospitals, healthcare providers, and/or the FDA the defective nature of Xarelto, including but not limited to the heightened risks of life-threatening bleeding.

200.    Defendants had sole access to and exclusive control of material facts concerning the defective nature of the product and its propensity to cause serious and dangerous side effects, and hence, cause damage to persons who used Xarelto, including the Plaintiff, in particular.

201.    Defendants' concealment and omissions of material facts concerning, *inter alia*, the safety of Xarelto were made purposefully, willfully, wantonly, and/or recklessly to mislead Plaintiff and Plaintiff's physicians, hospitals and healthcare providers into reliance, continued use of Xarelto and actions thereon, and to cause them to purchase, prescribe, and/or dispense Xarelto and/or use the product.

202.    Defendants knew that Plaintiff, Plaintiff's physicians, hospitals, healthcare providers, and/or the FDA had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding Xarelto, as set forth herein.

203.    Plaintiff, as well as Plaintiff's doctors, healthcare providers, and/or hospitals, reasonably relied on facts revealed which negligently, fraudulently and/or purposefully did not include facts that were concealed and/or omitted by Defendants.

204.    As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish,

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 46 of 50

including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

205.   As a result of the foregoing acts and omissions Plaintiff required more health care and services and did incur medical, health, incidental and related expenses.

206.   By reason of the foregoing, the Plaintiff has been damaged by Defendants' wrongful conduct.

## COUNT VII
## (NEGLIGENT MISREPRESENTATION)

207.   Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

208.   Defendants had a duty to represent to the medical and healthcare community, and to the Plaintiff, the FDA and the public in general that said product, Xarelto, had been tested and found to be safe and effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

209.   The representations made by Defendants were, in fact, false.

210.   Defendants failed to exercise ordinary care in the representation of Xarelto, while involved in its manufacture, sale, testing, quality assurance, quality control, and/or distribution of said product into interstate commerce, in that Defendants negligently misrepresented the high risk of unreasonable, dangerous side effects associated with ingestion of Xarelto.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 47 of 50

211.    Defendants breached their duty in representing the serious side effects associated with use of Xarelto to the medical and healthcare community, to the Plaintiff, the FDA and the public in general.

212.    As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

213.    As a result of the foregoing acts and omissions the Plaintiff required more health care and services and did incur medical, health, incidental and related expenses.

214.    By reason of the foregoing, the Plaintiff has been damaged by Defendants' wrongful conduct.

**COUNT VIII**
**(NEGLIGENT FAILURE TO ISSUE A**
**TIMELY POST-SALE WARNING)**

215.    Plaintiff repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

216.    This is an action against Defendants for the negligent failure to issue a timely post-sale warning to consumers, including Plaintiff, and healthcare providers about the enhanced and/or unique risks associated with ingestion of Xarelto.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 48 of 50

217.     Despite receiving actual knowledge that Xarelto had been linked to a higher incidence of adverse events and significant risks of bleeding injuries, all of which preceded Plaintiff's purchase and ingestion of Xarelto, Defendants failed to give any warnings to consumers (including Plaintiff herein) and healthcare providers beyond the inadequate warning label that accompanied the drugs.

218.     In addition, Defendants engaged in aggressive, misleading, and deceptive direct-to-consumer marketing campaigns with the specific intent to market Xarelto to potential users of the drugs, resulting in false and misleading perceptions that Xarelto was safer than other blood thinners, provided better efficacy than other blood thinners, and/or that routine blood testing was not required in order to minimize the substantial risks of bleeding events associated with Xarelto.

219.     Defendants knew or should have known of the enhanced and/or unique risks associated with ingestion of Xarelto before these drugs were ingested to Plaintiff.

220.     Defendants had a duty to warn the public in a timely fashion when it knew or should have known of the enhanced and/or unique risks associated with Xarelto.

221.     Defendants breached their duty to timely issue a post-sale warning regarding these risks associated with Xarelto to Plaintiff.

222.     As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for lifelong medical treatment, monitoring and/or medications.

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 49 of 50

223.    As a result of the foregoing acts and omissions the Plaintiff required more health care and services and did incur medical, health, incidental and related expenses.

224.    By reason of the foregoing, the Plaintiff has been damaged by Defendants' wrongful conduct.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure and the Seventh Amendment of the U.S. Constitution.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against the Defendants on each of the above-referenced claims and Causes of Action for Plaintiff's personal injuries or, in the alternative, wrongful death as follows:

1.  Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.  Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determine at trial of this action;

3.  Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiff in an amount sufficient to punish Defendants and deter future similar conduct;

4.  Pre-judgment interest;

5.  Post-judgment interest;

Jacobs vs. Ortho-McNeil-Janssen Pharmaceuticals, Inc., et al.
Amended Complaint
Case No.:  2:18-cv-07391
Page 50 of 50

    6.    Awarding Plaintiff reasonable attorneys' fees when applicable;

    7.    Awarding Plaintiff the costs of these proceedings; and

    8.    Such other and further relief as this Court deems just and proper.

Dated this 14th day of  August, 2018.

/s/Brenda S. Fulmer
_____

Brenda S. Fulmer
Florida Bar No.:  999891
bsf@searcylaw.com
Searcy Denney Scarola Barnhart & Shipley, P.A.
2139 Palm Beach Lakes Boulevard
West Palm Beach, Florida 33409
Phone: (561) 686-6300
Fax:     (561) 383-9498
Attorneys for Plaintiff