Protected - Subject to Further Protective Review

```
 1              UNITED STATES DISTRICT COURt
                EASTERN DISTRICT OF LOUISIANA
 2

 3

    IN RE:  XARELTO          )   MDL No.:  2592
 4  (RIVAROXABAN) PRODUCTS   )   Section:  L
    LIABILITY LITIGATION     )   Judge Eldon E. Fallon
 5                           )   Mag. Judge North
                             )
 6                           )
                             )
 7  JOSEPH J. BOUDREAUX,     )   Case No.:
    JR.                      )   2:14-CV-0270
 8  and LORETTA BOUDREAUX    )

 9

10

11  PROTECTED - SUBJECT TO FURTHER PROTECTIVE REVIEW

12

13

14      Videotaped deposition of VERONICA THERIOT, R.N.,

15  taken on Wednesday, September 14, 2016, in the

16  office of St. Anne General Hospital,

17  4608 Highway 1, Raceland, Louisiana 70394,

18  commencing at 1:54 p.m.

19

20

21

22

23

    Reported by:
24  AURORA M. PERRIEN
    CERTIFIED COURT REPORTER
25  REGISTERED PROFESSIONAL REPORTER
```

Protected - Subject to Further Protective Review

```
 1              A P P E A R A N C E S
 2    REPRESENTING JOSEPH J. BOUDREAUX, JR. AND
      LORETTA BOUDREAUX:
 3
              BEASLEY, ALLEN, CROW, METHVIN,
 4            PORTIS & MILES, P.C.
              BY:  DAVID B. BYRNE, ESQ.
 5            218 Commerce Street
              Montgomery, Alabama 36104
 6            334.269.2343
              David.byrne@beasleyallen.com
 7
 8
      REPRESENTING JOSEPH J. BOUDREAUX, JR. AND
 9    LORETTA BOUDREAUX and the PLAINTIFFS' STEERING
      COMMITTEE:
10
              BARRIOS, KINGSDORF & CASTEIX, L.L.P.
11            BY:  DAWN M. BARRIOS, ESQ.
              701 Poydras Street, Suite 3650
12            New Orleans, Louisiana 70139-3650
              504.524.3300
13            Barrios@bkc-law.com
14            BARRIOS, KINGSDORF & CASTEIX, L.L.P.
              BY:  EMMA E. KINGSDORF, ESQ.
15            701 Poydras Street, Suite 3650
              New Orleans, Louisiana 70139-3650
16            504.524.3300
              Ekingsdorf@bkc-law.com
17
18
19    REPRESENTING JANSSEN PHARMACEUTICALS, INC.,
      JANSSEN RESEARCH & DEVELOPMENT, L.L.C., JANSSEN
20    ORTHO, L.L.C.:
21            VENABLE, L.L.P.
              BY:  JOHN A. McCAULEY, ESQ.
22            750 East Pratt Street, Suite 900
              Baltimore, Maryland 21202
23            401.244.7655
              Jmccauley@venable.com
24
25
```

1    REPRESENTING BAYER HEALTHCARE PHARMACEUTICALS,

     INC., and BAYER PHARMA AG:

2

          KAYE SCHOLER, L.L.P.

3         BY:  JULIE B. duPONT, ESQ.

          250 West 55th Street

4         New York, New York 10019-9710

          212.836.8572

5         Julie.dupont@kayescholer.com

6

7    ALSO PRESENT:

8         MARK ANCALADE, VIDEOGRAPHER

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Electronic Copy - ACTIVE #87041202

1    my job to make sure he understood?

2        Q.  Well, to -- to the extent you could, I

3    guess.  If -- would you --

4        A.  If he didn't understand, I would have not

5    -- is it okay?

6        Q.  Go ahead.

7        A.  If he didn't understand, I would not have

8    checked off the box.  You know, I would have then

9    made a note, you know, that I spoke to the

10   daughter or, you know, who understood.

11       Q.  Got it.

12       A.  So . . .

13       Q.  And I assume as you went through each item

14   of the checklist you would check off as they

15   understood each item.  Is that accurate?

16       A.  (Nods head.)

17       Q.  Yes?

18       A.  Yes.

19       Q.  And I -- I assume you wouldn't check it

20   off if -- and you -- in fact, you just said this.

21   You wouldn't check it off if you didn't think the

22   patient understood what you told them?

23       A.  No.

24       Q.  So let's go through the checklist, if --

25   if we can.

1      A.   Okay.

2      Q.   "Diagnosis information - reason

3   anticoagulation is necessary," what would you

4   typically tell a patient about that item on the

5   checklist?

6      A.   The diagnosis information.

7           So the patient would have already known

8   from Dr. Wong that he needed anticoagulation

9   because of an atrial arrhythmia.  And so I would

10   again explain to him atrial arrhythmia, probably

11   show him it had not done it in the hospital, which

12   I'm pretty sure that it was done in the hospital.

13   We usually get either an EKG and show them what a

14   normal EKG looks like compared to what one of the

15   arrhythmia that we are -- being discussed.  So,

16   you know, patients seem to relate better if they

17   understand that your heart is supposed to have,

18   you know, a PR interval versus not it being there.

19           So I take -- you know, I love that part of

20   my job.  So I usually try to show the family when

21   they're in the hospital, you know, This is what

22   normal looks like, This is what -- your rhythm,

23   And so when your heart is quivering like that,

24   you're at greater risk from -- for shattering --

25   shadow -- shattering -- shattering emboli, And so

Protected - Subject to Further Protective Review

```
1    for that reason, we put you on a blood thinner.
2         Q.   And emboli are -- are clots?
3         A.   Are blood clots.
4         Q.   Yeah.
5         A.   Are blood clots.
6         Q.   And so do you explain that because they
7    have this shuddering or --
8         A.   Shattering.
9         Q.   -- shattering --
10        A.   Uh-huh.
11        Q.   -- that they're at an increased risk of
12   stroke?
13        A.   Definitely.
14        Q.   And do you explain that that's the reason
15   why they're -- they have to take this medication,
16   to prevent a stroke like that from happening?
17        A.   Yes.
18        Q.   And did you have that conversation with
19   Mr. Boudreaux?
20        A.   If his signature is here, I would say yes.
21        Q.   And it looks like you checked that item
22   off the checklist; correct?
23        A.   Yes.
24        Q.   The next item is "Action of
25   anticoagulant."  Do you see that?
```

Electronic Copy - ACTIVE #87041202

Protected - Subject to Further Protective Review

1      A.   Yes.

2      Q.   What would you tell patients about the

3  action of an anticoagulant?

4      A.   So at this point I probably wouldn't

5  remember exactly what I told him in 2014.  But,

6  you know, we were well-versed on package insert.

7  And, you know, we knew that every patient knew

8  that Coumadin was rat poison.  So, you know,

9  patients often asked us if it was in the same

10  family.  And so the actions would be that it thins

11  the blood, therefore reducing the risk of a blood

12  clot.

13      Q.   And would you explain that a natural

14  consequence of thinning the blood is that they're

15  more likely to bleed?

16      A.   Oh, definitely.  That's the -- we -- not

17  only did we -- we needed to go over the benefits

18  of the anticoagulant, but we definitely had to go

19  over the risk.

20      Q.   And what would you typically explain about

21  the risks of an anticoagulant like Xarelto?

22      A.   So the risk -- if you see any signs of any

23  abnormal -- if you -- even to the point -- so a

24  lot of our patients were oxygen.  Even in the

25  morning, if you took off your oxygen and you blew

Protected - Subject to Further Protective Review

```
 1    your nose and saw a little blood, you need to

 2    notify us.  When you're brushing your teeth, you

 3    know, if your gums start to bleed, if you cough

 4    and you cough up blood, if you notice that your

 5    stools change color, if you are shaving -- you

 6    know, we -- we advise everyone to use electric

 7    razor, so they should not be using a straight

 8    blade.  But even -- you know, any -- any nick that

 9    requires excessive pressure, we need to be

10    notified.  I would also think that we -- you know,

11    no sharp knives should be used in the kitchen, and

12    that, you know, if they decided to do that against

13    our advice and they cut themselves, you know, that

14    they will bleed more than usual.  I mean, that is

15    not only a risk, it's an expectation.

16         So to avoid the risk of bleeding, not to

17    subject themselves to anything that might cause

18    that.  So that, I think in great detail.

19    Q.  Understood.

20         And was it -- did -- did you have that

21    conversation with Mr. Boudreaux?

22    A.  I'd have to -- I -- I don't remember --

23         MR. BYRNE:

24              Object to form.

25         MS. duPONT:
```

Protected - Subject to Further Protective Review

```
 1              Right.

 2         THE WITNESS:

 3              -- if I had the conversation with

 4         Mr. Boudreaux.  But if I checked it off

 5         and -- if I checked it off and signed it,

 6         yes.

 7  BY MS. duPONT:

 8     Q.  Okay.  And you wouldn't have checked it

 9  off and signed it if you didn't feel he understood

10  the information on this list?

11     A.  Absolutely not.

12         MR. BYRNE:

13              Object to form.

14  BY MS. duPONT:

15     Q.  "Current dosage of medication," do you see

16  that?  That's the third item.

17     A.  Yes.

18     Q.  What would you -- what would you have

19  explained to Mr. Boudreaux about Xarelto

20  20 milligrams daily?

21     A.  It is -- can I . . .

22         It -- it would be the recommended dose of

23  Xarelto for atrial fib.  And that was probably the

24  current dose that he was on.

25     Q.  Okay.  Anything else that you would have
```

Protected - Subject to Further Protective Review

1  advised him about taking Xarelto 20 milligrams

2  daily?

3       A.  Such as taking it at the same time every

4  day, not to miss a dose, if -- you know, call for

5  prescriptions before he runs out, you know, the

6  usual that I would tell for --

7       Q.  Would you -- would you tell him to take

8  the medication with a meal?

9       A.  Yes.

10      Q.  And did you specify an evening meal, if

11 you remember?

12      A.  I don't remember.

13      Q.  Okay.  And would you remind the patient to

14 not discontinue the medication without calling the

15 office?

16      A.  Correct, to take it at the scheduled time

17 every day and not to miss a dose.  Yeah.

18      Q.  And because you checked that item off the

19 checklist and your signature is here, you had that

20 conversation with Mr. Boudreaux?

21      A.  Yes.

22      Q.  "Need for all healthcare providers to be

23 aware of all medications," do you see that?

24      A.  Yes.

25      Q.  What would you have explained there?

Electronic Copy - ACTIVE #87041202

1    A.   So everybody who leaves CIS that is

2    encountered by a nurse leaves with a current list

3    of medications.  So when they enter and they are

4    checked in, we go over their medication list.  It

5    -- you know, it's a part of our routine.  And you

6    can't move on to the next session until that list

7    of medication is reviewed.  So you review their

8    current medications.  And part of their discharge

9    from the clinic is we leave with them -- they

10   leave with them a list of the medications.  So if

11   we change anything, we go into the computer, we

12   update their list, and they are given a new list

13   every time they leave the clinic.

14   Q.   And why is it important to let other

15   health care providers know that they are taking an

16   anticoagulant?

17   A.   Well -- so if there's anything -- so you

18   don't want them to add a non -- you would not want

19   them to go to their family doctor clinic for

20   arthritis and then they add a nonsteroidal or an

21   aspirin or anything that could increase --

22   Q.   Their risk of bleeding?

23   A.   -- their risk of bleeding.

24   Q.   Then it -- it says, "If needing surgery

25   will have to contact us before hand."  What would

Protected - Subject to Further Protective Review

1   you explain there?

2       A.  So the explanation:  If you go to your

3   dentist or if you -- or are recommended to have a

4   surgery, you would have to discontinue your

5   anticoagulation seven days prior to -- seven days

6   prior to your procedure.  So you need to be

7   cleared -- cleared by cardiology prior to having

8   any procedure.

9       Q.  And why is it that they have to

10  discontinue taking their medication before a

11  surgery?

12      A.  For the risk of bleeding.  Increased risk

13  of bleeding during surgery.

14      Q.  Okay.  And you explained that to

15  Mr. Boudreaux?

16      A.  Yes.

17      Q.  "Signs of bleeding," I know you talked

18  about that a little bit already.  But what was

19  your general discussion with patients about the

20  signs of bleeding?

21      A.  Just what I said before.  You know, any --

22  any evidence of prolonged bleeding, you know,

23  whether with a cut, coughing, through your --

24  brushing your teeth, you know, any activity of

25  daily living that you see any unusual signs -- you

Protected - Subject to Further Protective Review

```
1    shouldn't be bleeding.  I mean, you shouldn't be

2    bleeding.  So any sign of bleeding, unusual, you

3    should be reported -- should be reported.

4        Q.  And that included having dark or tarry

5    stools --

6        A.  I said that.

7        Q.  -- correct?

8        A.  Yes.

9        Q.  And you checked that item off the list

10   here.  So you talked to -- to Mr. Boudreaux about

11   that item as well; correct?

12       A.  Yes.

13       Q.  And then it says, "Instructions if

14   bleeding should occur."  And I know you talked a

15   little bit about this earlier.  What were your

16   general instructions if -- if bleeding should

17   occur?

18       A.  So our general instruction was:  If you

19   notice it -- you know, if you nick yourself and it

20   bleeds a little bit longer and it -- it stops,

21   just notify the office.  Notify the office.  But

22   for any severe bleeding, report to the emergency

23   room.

24       Q.  And if there's any sign of bleeding, did

25   you tell them they had to notify you immediately
```

Electronic Copy - ACTIVE #87041202
Protected - Subject to Further Protective Review

1  if they saw a sign of bleeding?

2      A.  I can't remember if I would have used the

3  word "immediately."  But notify the office for any

4  sign of bleeding.

5      Q.  Okay.

6      A.  And we have a 24-hour call.  So, you know,

7  it's not just Monday through Friday.  You know,

8  there is service 24/7.  So . . .

9      Q.  And would you have provided instructions

10  if bleeding should occur to Mr. Boudreaux given

11  that you checked that item off --

12      A.  Yes.

13      Q.  -- the checklist?

14          And then "Avoid activities that pose high

15  risk for fall, injury, etc.," what would you have

16  said there?

17      A.  So in conjunction to what I already said,

18  you know, in -- any activities that would put you

19  at risk for hurting yourself, you know, for

20  cutting yourself.  So I would have included, you

21  know, in the kitchen cooking.  I would have -- you

22  know, climbing a -- climbing a ladder, you know,

23  changing light bulbs, you know, just -- you know,

24  I probably would have already had developed a

25  rapport of what his activities are.  So if he was

Electronic Copy - ACTIVE #87041202
Protected - Subject to Further Protective Review

1   a hunter, we probably would have, you know,

2   focused more on what he does.  You know, you try

3   to individualize a patient, you know, plan of

4   care.  You know, if he didn't do anything, it

5   probably would have just been walking.  You know,

6   if he used a aid, a walker, Make sure you use your

7   walker and that you don't try to attempt --

8   because if you fall and break a hip, you're going

9   to bleed more.  So I'm sure it was general.

10       Q.  And you checked that item off the list

11  here.  So did you have that general discussion

12  with --

13       A.  Yes.

14       Q.  -- Mr. Boudreaux?  Yes, you did?

15       A.  Yes.

16       Q.  Okay.  "Recommend Medic" -- oh.  Sorry.

17           "Call for any injuries, potential for

18  internal bleeding," what would you say there?

19       A.  So if he was in a -- motor vehicle

20  accidents, you would have notified -- I mean, I

21  would talk to him.  If he had a spouse with him

22  that -- you know, if you had any accident -- a

23  four-wheel -- you know, we have a lot of men who

24  hunt.  All right.  They own a four-wheeler.  And,

25  you know, let's say they got thrown.  Usually, not

Electronic Copy - ACTIVE #87041202
Protected - Subject to Further Protective Review

1    on a blood thinner, you would think nothing of it

2    and you'd go out for your hunt.  But if you were

3    having pain anywhere, you know, something that

4    would not normally cause bleeding may actually --

5    it puts you at higher risk now.

6         Just like a man who normally shaves, you

7    know, shouldn't be bleeding for an extended period

8    of time, but now that you're on a blood thinner,

9    you would bleed.

10        So I think that would have probably been

11   individualized to -- to him:  You know, so just

12   know that, you know, typically if you fall and you

13   think nothing of it, you keep moving, you know,

14   for you, you're at higher risk for -- for

15   bleeding.

16     Q.  And it says "internal bleeding."  Did you

17   -- did you typically advise patients that they

18   could have internal bleeding as a result --

19   because they were on an anticoagulant medication

20   like Xarelto?

21     A.  So I'd say like an ulcer -- you know,

22   that --

23     Q.  Yeah.

24     A.  That question came up often:  You know,

25   will it cause me to have a ulcer, could I bleed in

Electronic Copy - ACTIVE #87041202
Protected - Subject to Further Protective Review

1    my stomach?  You know, well, any kind of bleeding.

2    Any kind of bleeding.  So . . .

3        Q.  So it could potentiate any kind of

4    bleeding that was already there?  If there's an

5    ulcer in the stomach, it could make it bleed more

6    than it otherwise would?

7        A.  Sure.  If we had alcoholics who had

8    esophageal varices, you know, that -- you know, if

9    they already had it, if you take an anticoagulant,

10   it poses, you know, a higher risk.  Yes.

11       Q.  And would you explain to patients that

12   they could have a serious bleed on --

13       A.  Definitely.

14       Q.  -- Xarelto?  Definitely?

15       A.  Yes.

16       Q.  Did you explain to them that it could even

17   kill them, the bleeding?

18       A.  I'm not sure if I told them.  But -- but

19   actually -- so in nursing --

20       Q.  Right.

21       A.  -- and in medicine, all of our consents

22   ultimately have death as well.  So it -- it

23   probably would have been part of the conversation.

24   But -- you know, the risk and the benefits, you

25   know, it's for them to decide.  Yeah.

Electronic Copy - ACTIVE #87041202
Protected - Subject to Further Protective Review

1      Q.  Got it.

2          And so would you have had a discussion --

3   all this -- this bleeding discussion that we've

4   just been talking about with Mr. Boudreaux?

5      A.  Yes.

6      Q.  And the last item or the second-to-last

7   item is "Recommend Medic - Alert tag."

8      A.  Uh-huh.

9      Q.  Do you see that?

10     A.  Uh-huh.

11     Q.  Why do you recommend that they wear an

12  alert tag?

13     A.  So what if they're not knocked

14  unconscious?  You know, so you -- if you're

15  knocked unconscious and you're out in the field or

16  you're in a motor vehicle accident, that would

17  alert the person coming to your aid to say that I

18  am on a high-risk medication, comparable to a

19  diabetic saying, I'm a diabetic.  You would know

20  that -- to check their sugar.  You would know that

21  they're at risk for bleeding.

22     Q.  And that item is checked off on the list.

23  So you had that conversation with Mr. Boudreaux?

24     A.  Yes.

25     Q.  And then the last item is just "Contact us

Electronic Copy - ACTIVE #87041202
Protected - Subject to Further Protective Review

```
 1    with any further questions / concerns."  Do you

 2    see that?

 3        A.  I do.

 4        Q.  And you checked that off for Mr. Boudreaux

 5    as well?

 6        A.  That's correct.

 7        Q.  So presumably you talked to him about

 8    that?

 9        A.  Yes.

10        Q.  And was it your practice to make sure

11    before the patient left your care that they

12    understood that they could call you with further

13    questions?  Because everyone's always got --

14    remembers a question after they've left the room;

15    right?

16        A.  Yes.

17        Q.  And did patients typically call you with

18    questions --

19        A.  Yes.

20        Q.  -- or call the office?

21        A.  Yes.

22        Q.  And I'll ask this.  I'm not sure if you'll

23    remember.  Do you remember if Mr. Boudreaux asked

24    any questions at the time you went over this

25    checklist with him?
```

Electronic Copy - ACTIVE #87041202
Protected - Subject to Further Protective Review

1     A.  I don't remember.

2     Q.  But do you think if he had asked a

3  question you would have listened?

4     A.  Yes.

5     Q.  And you would have done your best to

6  provide an answer to his question at that time?

7     A.  Yes.

8     Q.  Other than going over this checklist,

9  would you have provided the patient with any

10  written materials in addition to the checklist?

11     A.  So . . . I'm . . .

12     Q.  You don't remember?

13     A.  I don't remember.

14     Q.  You said that the -- the checklist changed

15  over time.  Is that something that may have

16  changed over time, that you may have passed out

17  materials at one time but maybe not at another

18  time?

19     A.  So if -- I don't want to assume this.  But

20  if he was given samples, he would have been

21  provided with a package insert.  So we do give the

22  package insert with the samples.  So that would be

23  a form of literature but --

24     Q.  And would you -- sorry.  You can finish

25  your -- your answer.  Did you have anything else?

Electronic Copy - ACTIVE #87041202

Protected - Subject to Further Protective Review

1    know, with the doctor and then myself.

2        Q.  And -- for Mr. Boudreaux who is still I

3    think in the hospital at this point, would that

4    have happened in his --

5        A.  In his patient room.

6        Q.  -- in his patient room?

7        A.  Uh-huh.

8        Q.  And how long would this conversation

9    typically last?

10       A.  Depending on questions, I would say at

11   least 30 minutes to an hour.

12       Q.  Okay.  And if there were family members

13   there, would you respond to questions from family

14   members as well?

15       A.  Definitely.

16       Q.  And if -- if a patient was in the hospital

17   when this education happened, would it happen --

18   when would it happen?  Would it happen right

19   before discharge?

20       A.  So I actually think the education, again,

21   would have been happening all along.  But to -- to

22   confirm that they have been learning all along, it

23   would happen on the day of discharge.

24       Q.  Okay.  So let's now turn to the discharge

25   record that we marked earlier as Exhibit 4.

Electronic Copy - ACTIVE #87041202

```
 1            C E R T I F I C A T E

 2       This certification is valid only for

 3   a transcript accompanied by my original signature

 4   and original seal on this page.

 5       I, AURORA M. PERRIEN, Registered Professional

 6   Reporter, Certified Court Reporter, in and for the

 7   State of Louisiana, as the officer before whom

 8   this testimony was taken, do hereby certify that

 9   VERONICA THERIOT, R.N., after having been duly

10   sworn by me upon the authority of R.S. 37:2554,

11   did testify as hereinbefore set forth in the

12   foregoing 278 pages; that this testimony was

13   reported by me in the stenotype reporting method,

14   was prepared and transcribed by me or under my

15   personal direction and supervision, and is a true

16   and correct transcript to the best of my ability

17   and understanding; that the transcript has been

18   prepared in compliance with transcript format

19   guidelines required by statute or by rules of the

20   board; and that I am informed about the complete

21   arrangement, financial or otherwise, with the

22   person or entity making arrangements for

23   deposition services; that I have acted in

24   compliance with the prohibition on contractual

25   relationships, as defined by Louisiana Code of
```

Protected - Subject to Further Protective Review

1    Civil Procedure Article 1434 and in rules and

2    advisory opinions of the board; that I have no

3    actual knowledge of any prohibited employment or

4    contractual relationship, direct or indirect,

5    between a court reporting firm and any party

6    litigant in this matter nor is there any such

7    relationship between myself and a party litigant

8    in this matter.  I am not related to counsel or to

9    the parties herein, nor am I otherwise interested

10   in the outcome of this matter.

11

12

13

14

15                 AURORA M. PERRIEN, CCR, RPR

16

17

18

19

20

21

22

23

24

25