```
                    UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA



IN RE:  XARELTO                *
(RIVAROXABAN) PRODUCTS         *
LIABILITY LITIGATION           *   Docket No.: 14-MD-2592
                               *   Section "L"
THIS DOCUMENT RELATES TO:      *   New Olreans, Louisiana
                               *   December 12, 2018
All cases                      *
                               *
 *  *  *  *  *  *  *  *  *  *  *  *  *  *  *


      TRANSCRIPT OF MONTHLY STATUS CONFERENCE PROCEEDINGS
            BEFORE THE HONORABLE ELDON E. FALLON
                 UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiffs'
Liaison Counsel:                   Herman, Herman & Katz
                                   BY: LEONARD A. DAVIS, ESQ.
                                   820 O'Keefe Avenue
                                   New Orleans, Louisiana 70113



For Defendants'
Liaison Counsel:                   Irwin Fritchie
                                   BY: KIM E. MOORE, ESQ.
                                   400 Poydras Street
                                   Suite 2700
                                   New Orleans, Louisiana 70130


For the Plaintiffs:                New Orleans, Louisiana 70113
                                   BY: ANDY BIRCHFIELD, ESQ.
                                   P.O. Box 4160
                                   Montgomery, Alabama 36103
```

                        UNOFFICIAL REALTIME TRANSCRIPT

```
 1  APPEARANCES:

 2  For Janssen Pharmaceuticals,
    Inc. and Janssen Research &
 3  Development, LLC:              Drinker Biddle & Reath, LLP
                                   BY:  SUSAN M. SHARKO, ESQ.
 4                                 600 Campus Drive
                                   Florham Park, New Jersey 07932
 5

 6
    Special Master:                BrownGreer PLC
 7                                 BY:  JACOB WOODY
                                   250 Rocketts Way
 8                                 Richmond, Virginia 23231

 9

10  Official Court Reporter:       Jodi Simcox, RMR, FCRR
                                   500 Poydras Street
11                                 Room HB-406
                                   New Orleans, Louisiana 70130
12                                 (504) 589-7780

13

14

15  Proceedings recorded by mechanical stenography, transcript

16  produced by computer.

17

18

19

20

21

22

23

24

25
```

```
 1                         PROCEEDINGS
 2                      (December 12, 2018)
 3                            ******
 4
 5          (COURT CALLED TO ORDER)
 6          THE DEPUTY CLERK:  MDL-2592, In re:  Xarelto
 7   Productions Liability Litigation.
 8          THE COURT:  Liaison counsel, make their appearance
 9   for the record, please.
10          MR. DAVIS:  Good morning, Your Honor.  Leonard Davis
11   from the law firm of Herman, Herman, Katz, plaintiff's
12   co-liaison counsel.
13          MS. MOORE:  Kim Moore -- good morning, Your Honor --
14   here on behalf of the Janssen defendants.
15          THE COURT:  Okay.
16          MR. OLINDE:  John Olinde for the Bayer defendants.
17          THE COURT:  Okay.  We're here today for our monthly
18   status conference.  I met with the lead and liaison counsel a
19   moment ago to discuss the proposed agenda with them.  We'll
20   take it in the order presented.  Lenny.
21          MR. DAVIS:  Your Honor, it's a rather thin agenda for
22   today.  There are three things to report to the Court.
23   BrownGreer has a report that they're prepared to give.  After
24   this conference, we have a show cause hearing for a few
25   matters, five matters.  And then we have a discussion regarding
```

```
 1  non-CMO 6 cases, which relates to Pretrial Order No. 31A, which
 2  was docketed by the Court today.  Those are the items really
 3  that are for discussion.
 4              So, Jake?
 5          MR. WOODY:  Good morning, Judge.
 6          THE COURT:  Good morning, Jake.
 7          MR. WOODY:  I just have a brief report, Your Honor,
 8  on the status of plaintiff fact sheets in this MDL.  So far to
 9  date, we have 22,446 fact sheets submitted.  That's an increase
10  of 56.  That's a net increase of 56 since my last report.  We
11  have another 1,372 fact sheets in progress, which gives us a
12  total number of 23,818 plaintiffs in our database.
13              We do -- when we receive notification that a
14  case is dismissed, we mark those plaintiffs as inactive and
15  they don't show up in these counts.  So these are active
16  plaintiffs, although there is some lag time between the
17  dismissal and when we actually mark them.
18              Our monthly submission time status has continued
19  to decrease.  In November of 2018, we received 221 fact sheets.
20  And you can see from this chart that the decline in our monthly
21  submission really started in about July of this year, and it's
22  decreased every month since then.
23              Our average is down to 418 per month, but that
24  is including months and months of where we received 5- or 600
25  fact sheets a month.  So I think this is definitely a trend.  I
```

think you see it also in the case filing statistics which mirror these numbers.

We've received 83 fact sheets so far in December. I expect December to also be a low month given the holidays and our trend here. So it is interesting to see this happening. I don't really know exactly why, although I can guess, but that's what's happening with the monthly submissions.

And then in terms of our CMO 6 case status, 782 CMO 6 cases remain open. That's out of 1200, 65 percent. 35 percent, or 418, of the CMO 6 cases have been dismissed. And the breakdown is 225 defendant picks, 153 random picks, and 40 plaintiff picks have been dismissed.

So that is my report. All of our key statistics that I've gone over in the past in terms of age and injury and things of that nature remain the same. Given the low number of fact sheets we're receiving and the high number we've got, I don't expect those numbers to change much at all.

**THE COURT:** Do you have any feel for when we start seeing the types of cases sort of solidify? It looks about 10 percent of the census or something like that.

**MR. WOODY:** I have to go back and look at my reports, but I feel like it's been pretty solid for a couple of years. Certainly, when we started to do the first round of bellwether selections, I ran the numbers at that time to get the key

1  indicators, and maybe the percentages have changed slightly,
2  but really the main indicators have not changed since then.
3      **THE COURT:** I think that's kind of helpful for
4  everybody to kind of focus on it. Because if the census
5  indicates, you know, 80 percent of the people are over 70 or
6  something of that sort, 68 or whatever, you begin to recognize
7  that lost wages is not the major component in that particular
8  case, and that kind of gets some at least --
9      **MR. WOODY:** I think that's right. I think at a
10 certain point --
11     **THE COURT:** There may be outliers, some people who,
12 you know --
13     **MR. WOODY:** Right. Right. The key statistics really
14 are set fairly early in this case, and in other cases, too,
15 that I've worked on.
16     **THE COURT:** Yeah. I think maybe about 10 percent.
17 When 10 percent come in, you begin seeing something. But maybe
18 it's different in every case, but that's been my experience.
19     **MR. WOODY:** I think that's correct, Your Honor.
20     **THE COURT:** Okay. Thank you.
21     **MR. WOODY:** That is my report for this month. Thank
22 you, Your Honor.
23     **THE COURT:** All right. Thank you, Jake.
24     Susan, you have something on the new program?
25     **MS. SHARKO:** I do, two things. Thank you.

```
 1                THE COURT:  Yes.
 2                MS. SHARKO:  First, on Wave 1 and Wave 2, people are
 3   working really hard.  There are depositions being taken every
 4   day.  Usually, a number of depositions taken every day.  In
 5   Wave 1, we have 250 cases dismissed.  That's 42 percent of the
 6   docket.  There are 18 cases that are tolled -- where discovery
 7   is tolled because of plaintiff fact sheet issues.  There are 11
 8   cases that are stalled because of estate issues.  Andy
 9   Birchfield has been extraordinarily helpful in helping us
10   navigate these and getting issues resolved.
11                There are no longer any cases in Wave 1 with
12   subject matter jurisdiction, duplicate filings, authorizations
13   or service issues, which is amazing from where we were a couple
14   months ago.
15                Turning to Wave 2, which is just kicking in, we
16   have 170 cases dismissed.  That's 28 percent of the pool.
17   There are six where we still don't have a PFS.  Two that are
18   certification issues.  111 where discovery is tolled because we
19   have a PFS, but there are issues as to the substance.  There's
20   one case with subject matter jurisdiction, five without
21   service, two without authorizations, and 22 with estate issues.
22   I'll continue to work with Andy to get those resolved.
23                THE COURT:  What's your feeling about the reason for
24   the dismissals?  What's the reason, basically?
25                MS. SHARKO:  So we've looked at that pretty closely,
```

1  actually, and it seems that -- and I have some numbers on that.
2  **THE COURT:**  Okay.
3  **MS. SHARKO:**  It seems that the cases with the less
4  serious events are more likely to be dismissed.  For example,
5  77 percent of nose bleed cases in the pool were dismissed,
6  85 percent of anemia cases.  It seems that some of it is state
7  specific.  All but two of the Michigan cases in the pool were
8  dismissed.  Most but not all of the Texas cases were.
9          There are some plaintiff firms -- there's five
10 or six of them -- where they dismissed all of the cases that
11 they had in the pool.  Those are not obviously any law firms
12 that are here today.  And then it looks like about half the
13 dismissals come at the time the case is selected.  Presumably,
14 the lawyers go back and talk to their client.  But we're seeing
15 a fair number of cases that are getting dismissed when the
16 deposition request goes out.
17         And now we're seeing some where the case gets
18 dismissed after the plaintiff is deposed, which, frankly, is
19 unfortunate for both of us.  Because on the defense side, we
20 spent all the money to get the records and get ready and depose
21 the plaintiff.  On the plaintiffs' side, why should somebody go
22 through a deposition if they're not going to proceed with the
23 case and get their doctors scheduled and everything?  So that's
24 how it seems to be breaking.
25 **THE COURT:**  Andy, do you have any input on that?  I

```
 1   guess in the Texas issues, the law is rather difficult there
 2   for a case of this sort.  The others, I guess, when you get
 3   right down to it, you recognize how much it's going to cost to
 4   try the case, that factors in sometimes.
 5              MR. BIRCHFIELD:  Yes, sir, it does.  I mean, I would
 6   agree with Ms. Sharko's assessment.  I mean, there is a
 7   correlation between the degree of injury, but that's not the
 8   sole -- you know, that's not the sole driver.  Because there
 9   are a number -- I think it's -- it is a significant factor,
10   what you raised, and that's just the age of the population.
11              If the plaintiff or the person who suffered the
12   injury has subsequently died and then there are family members
13   that are left, many of these spouses are elderly.  It's just
14   challenging.  And they're facing -- and, Your Honor, we have
15   been working with plaintiffs' counsel.  We have urged
16   plaintiffs' counsel to have conversations with their clients,
17   candid conversations, about the cost of litigation, if there is
18   a -- if there's a reason that the case should be dismissed, do
19   that sooner rather than later.  And I think that many
20   plaintiffs' counsel are doing that.
21              But just because a -- you know, because a
22   plaintiff goes through the deposition and then dismisses the
23   case, that's not a -- that's not a signal that the plaintiff
24   counsel didn't have that discussion earlier.  It's oftentimes
25   that going through the deposition process brings a -- puts a
```

```
 1  new perspective on the case for the plaintiff.
 2          THE COURT:  For the litigant themselves.
 3          MR. BIRCHFIELD:  Right.  And plaintiffs' counsel
 4  don't want to go through depositions unnecessarily.  We do
 5  not -- we do not want to put unnecessary costs on the
 6  defendants.  That doesn't serve anyone here.  It's part of the
 7  litigation process.  We're doing what we can to minimize that,
 8  but it's going to happen.
 9          THE COURT:  Yeah.  I think we talk around the country
10  a lot about the value of bellwethers.  I think if you just look
11  upon whether bellwethers are helpful in predicting results, I
12  don't think that's really the real base, the good thing for
13  bellwethers.  I think one of the things that it gives lawyers
14  is an opportunity to see the cost in trying these cases.
15              Now, it's more for a bellwether than an actual
16  case, but at least it's some indication of how much it's going
17  to cost, and the time it takes, and the logistics of the
18  situation, and all of those things.  I think that that has gone
19  into the mix, too.  I think the plaintiff lawyers who may have
20  not participated in bellwethers at least can tell their client,
21  this is how much it costs for a bellwether, you're looking at
22  least maybe as much as this, maybe less, but it's around that
23  figure, and that is helpful, I think.
24              Okay.
25          MR. BIRCHFIELD:  Your Honor, I mean, we are -- we're
```

```
 1   working toward having a trial package that would ameliorate the
 2   cost to some degree, but it would still be expensive.  I think
 3   a key factor in the decision process about whether to go
 4   forward is, what's involved in taking a deposition, plaintiffs
 5   going through the preparation, going through -- you know,
 6   sitting through the deposition.  It gives them a clearer idea
 7   of what the process is and what will be involved.
 8             THE COURT:  Okay.
 9             MR. BIRCHFIELD:  Okay.
10             THE COURT:  All right.  Thank you, Susan.
11             MS. SHARKO:  CMO or Pretrial Order 31A, which Your
12   Honor entered today -- or last night, this is something the
13   parties agreed to.  It mirrors what we've done successfully in
14   another MDL in an effort to streamline the process for
15   non-CMO 6 cases, but at the same time preserving or even
16   broadening the due process protection.
17             So this is how it works:  Cases are eligible for
18   the list either because their PFS is overdue or core deficient
19   and not cured within 20 days of receipt of the notice.  That's
20   the same as it was before.  Where it differs is instead of
21   filing motions and scheduling separate hearing dates on all
22   those cases, we will have a first listing and a second listing.
23             So we will list the cases in the joint report.
24   The parties will continue to meet and confer, and, hopefully,
25   cure the deficiencies.  If the case isn't cured after being
```

```
 1   listed once, it will go to the second time list at the
 2   following case management conference.  And if it isn't cured
 3   after the second listing, then it will go on an order to show
 4   cause list, and the plaintiff will have to show cause why the
 5   case shouldn't be dismissed with prejudice.
 6               So they get two months of notice, and then
 7   really a third month when they're on the order to show cause
 8   list.  The people on the defense side will still be available
 9   to meet and confer and try and get the issues resolved.  We
10   encourage the plaintiffs to do that.
11               But we hope that this will move it along in a
12   more orderly fashion with, hopefully, fewer motions and fewer
13   less involvement with Your Honor.  What we learned from our
14   other MDL is that the vast majority of cases were either
15   dismissed or cured by the time they got to the order to show
16   cause process.
17          THE COURT:  Maybe I can put it on the Web site, too,
18   if you think that would be helpful.  The first listing, if you
19   give it to me, I'll post it so that it's on the Web site and
20   everybody knows.
21          MS. MOORE:  That would be --
22          THE COURT:  If that's helpful.
23          MS. SHARKO:  Yes, we have one edit to the outline of
24   how it works.  So I'll send Melissa a new copy of that.  The
25   listing of cases is in the joint report.  And then since that
```

1  was a week old, this morning, I gave Mr. Birchfield an updated
2  redlined list because five or six cases have already come off
3  the list.  But I've -- my sense is that -- I don't want to
4  speak for Mr. Davis, but it's really the plaintiffs'
5  obligation, individual plaintiffs, to be checking the Web site
6  and looking at the joint report and seeing if they're on the
7  bad list.
8              **THE COURT:**  Right.
9              **MR. DAVIS:**  Your Honor, I just want to point out,
10 specifically in the joint report, in particular for those who
11 may be on the phone, Section 14 of Rec Doc 12014, which is the
12 joint report, identifies overdue plaintiff fact sheets that are
13 alleged by the defendants, as well as those that claim to have
14 core deficiencies.
15             I encourage all plaintiffs' counsel to look at
16 that list.  The law firm is identified, as well as the claimant
17 or the plaintiff, as well as the docket number of the
18 particular case, and that should assist counsel in finding any
19 claimant that may be on that list.  And I encourage counsel to
20 look at the joint report on a monthly basis.  It's now probably
21 more important as some folks may not have looked at it before,
22 but now it will impact your individual case in particular.
23             And plaintiffs' counsel and pro se should be
24 looking at the joint report on a regular monthly basis.  They
25 will prior to that have gotten a letter from defendants

```
 1  asserting the assertion.
 2              And so our office, plaintiffs' liaison counsel,
 3  that being Jerry Meunier, or myself, and Sindu Daniel, will
 4  continue to do what we have done in the past.  Meaning if
 5  plaintiffs' counsel has an issue, I encourage them to reach out
 6  to one of us and let's address it because we do have continuing
 7  dialogue with defense counsel.  We will continue to do that.
 8  I've been assured by defense counsel that that will continue.
 9              So the idea is to try to get some type of
10  resolution on these matters and make this process easier for
11  everybody.  So I encourage people to continue doing what
12  they've been doing, but to pay attention and resolve these
13  asserted deficiencies.
14          THE COURT:  Susan, under your program, you put them
15  on a first list, and then you put them on a second list.  The
16  third time, would they just be automatically dismissed, or
17  would it be necessary to have court proceedings, or what's your
18  thinking?
19          MS. SHARKO:  The third time around for an order to
20  show cause, then if Your Honor agrees, you would enter an order
21  to show cause why the case shouldn't be dismissed.  It would be
22  returnable on a certain date.  So the plaintiff would get one
23  more chance to come in and be heard.
24          THE COURT:  I see.
25          MR. DAVIS:  And, Your Honor, on the third time, if
```

```
 1  there's a disagreement, and that is if there's a disagreement,
 2  then it's brought to the attention of the Court.  And at that
 3  point, plaintiffs' counsel will have had two opportunities in
 4  two months in the joint report to have the issue addressed.  As
 5  I said, I encourage the plaintiffs' lawyers to deal with the
 6  defense counsel, who will be available.
 7             Again, Chanda Miller and Sindu will be
 8  available.  And at the third opportunity, if it's not resolved,
 9  then it comes to the Court's attention.
10             THE COURT:  Okay.
11             MS. SHARKO:  Right.  I would just add one thing.  I
12  believe that these notices come from BrownGreer, so people
13  shouldn't wait for a letter from us.  They should be checking
14  their BrownGreer now.
15             THE COURT:  Okay.  Thank you, Susan.
16             MS. SHARKO:  All right.  Thank you.
17             THE COURT:  Anything else, Lenny?
18             MR. DAVIS:  No, Your Honor.  That's it other than the
19  next status conference.
20             THE COURT:  Okay.  The next status conference is
21  January 23rd, and the following one is March the 12th.
22             MR. DAVIS:  I know it's the end of the year and I
23  just want to wish everybody a happy holiday season.
24             THE COURT:  Same here.  Have a good holiday,
25  everyone.  I'll be back just in a couple minutes so we can make
```

```
 1  telephone calls.  I think we've got one or two people that want
 2  to participate.  Court will stand in recess.
 3              THE DEPUTY CLERK:  All rise.
 4              (WHEREUPON, the Court took a recess.)
 5              (WHEREUPON, the proceedings were concluded.)
 6
 7                              *****
 8                           CERTIFICATE
 9         I, Jodi Simcox, RMR, FCRR, Official Court Reporter
10  for the United States District Court, Eastern District of
11  Louisiana, do hereby certify that the foregoing is a true and
12  correct transcript, to the best of my ability and
13  understanding, from the record of the proceedings in the
14  above-entitled and numbered matter.
15
16
17                            s/Jodi Simcox, RMR, FCRR
                              Jodi Simcox, RMR, FCRR
18                            Official Court Reporter
19
20
21
22
23
24
25
```