**EXHIBIT 2**

EFiled:  Sep 01 2015 05:24PM EDT
Transaction ID 57801584
Case No. N15C-09-008 FWW

**IN THE SUPERIOR COURT OF THE STATE OF DELAWARE**
**IN AND FOR NEW CASTLE COUNTY**

| | |
|---|---|
| FLORENCE R. FURCHAK, | ) |
| | ) |
| Plaintiff, | )  C.A. No.: |
| | ) |
| v. | )  Jury Trial Demanded |
| | ) |
| JANSSEN RESEARCH & DEVELOPMENT, LLC | ) |
| f/k/a JOHNSON AND JOHNSON | ) |
| PHARMACEUTICAL RESEARCH AND | ) |
| DEVELOPMENT, LLC; JANSSEN | ) |
| PHARMACEUTICALS, INC. f/k/a JANSSEN | ) |
| PHARMACEUTICA INC., f/k/a ORTHO-MCNEIL- | ) |
| JANSSEN PHARMACEUTICALS, INC.; JANSSEN | ) |
| ORTHO, LLC; JOHNSON & JOHNSON; | ) |
| JOHNSON & JOHNSON COMPANY;  BAYER | ) |
| HEALTHCARE PHARMACEUTICALS INC., | ) |
| BAYER CORPORATION; BAYER HEALTHCARE | ) |
| LLC; BAYER PHARMA AG; BAYER | ) |
| HEALTHCARE AG; BAYER AG and DOES, INC. | ) |
| | ) |
| Defendants. | ) |
| | ) |

**COMPLAINT**

**COMMON ALLEGATIONS**

**A. PARTIES**

1.      At all times relevant hereto, Plaintiff Florence R. Furchak was a resident of the

State of Michigan.

2.      Defendant, JANSSEN RESEARCH & DEVELOPMENT, LLC (hereinafter

"Janssen R&D"), f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND

DEVELOPMENT, LLC is a limited liability company under the laws of New Jersey, with its

principal place of business located at One Johnson & Johnson Plaza, New Brunswick,

1

Middlesex County, New Jersey 08933.  Janssen R&D has transacted and conducted business within the State of Delaware and has derived substantial revenue from goods and products disseminated and used in the State of Delaware.  As part of its business, Janssen R&D is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.  Defendant Janssen R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as well as the supplemental NDA.

3.     Upon information and belief, and at all relevant times Defendant Janssen R&D, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant. The primary purposes of Xarelto are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat Deep Vein Thrombosis ("DVT") and Pulmonary Embolism ("PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

4.     Defendant, JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC., f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (hereinafter "Janssen Pharm"), at all relevant times at the time suit was commenced, a Pennsylvania corporation with a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560, and a registered agent at One Johnson & Johnson Plaza, New Brunswick, NJ 08933.   Janssen Pharm has transacted and conducted business within the State of Delaware and has derived substantial revenue from goods and products disseminated and used in the State of Delaware. As part of its business, Janssen Pharm is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

5.     Upon information and belief, and at all relevant times, Defendant Janssen Pharm

was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

6.      Defendant, JANSSEN ORTHO, LLC (hereinafter "Janssen Ortho") is a limited liability corporation organized under laws of Delaware whose registered agent for service of process is The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, DE 19801.  Janssen Ortho's principal place of business is at Stateroad 933 Km 0 1, Street Statero, Gurabo, Puerto Rico 00778.  Janssen Ortho is a subsidiary of Johnson & Johnson. As part of its business, Janssen Ortho is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

7.      Upon information and belief, and at all relevant times, Defendant, Janssen Ortho, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

8.      Defendant, JOHNSON & JOHNSON (hereinafter "J&J"), is a fictitious name adopted by Defendant JOHNSON & JOHNSON COMPANY, a New Jersey corporation which has its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.  As part of its business, J&J, and its "family of companies," is involved in the research, development, sales, and marketing of pharmaceutical products,

3

including Xarelto. J&J has transacted and conducted business within the State of Delaware and has derived substantial revenue from goods and products disseminated and used in the State of Delaware.

9.     Upon information and belief, Defendant BAYER HEALTHCARE PHARMACEUTICALS, INC. ("Hereinafter "Bayer Healthcare") is, and at all relevant times was, a corporation organized under the laws of the State of Delaware, with its principal place of business in the State of New Jersey. Its registered agent for service of process is Corporation Service Company, 2711 Centerville Rd., Suite 400, Wilmington, DE 19808. As part of its business, Bayer Healthcare is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto. Bayer Healthcare is the U.S.-based pharmaceuticals operation of Bayer HC, a division of Bayer. Bayer Healthcare is a subsidiary of Bayer and jointly developed, marketed and distributed Xarelto with J&J and Janssen R & D.

10.     Upon information and belief, and at all relevant times, Defendant Bayer Healthcare was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

11.     Upon information and belief, Defendant BAYER PHARMA AG is a pharmaceutical company domiciled in Germany. Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG. Bayer Schering Pharma AG was formerly known as Schering AG and is the same

4

corporate entity as Schering AG.  Upon information and belief, Schering AG was renamed Bayer Schering Pharma AG effective December 29, 2006. Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011. As part of its business, BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products, including Xarelto.

12.    Upon information and belief, and at all relevant times, Defendant BAYER PHARMA AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

13.    Defendant, BAYER CORPORATION ("Bayer Corp") is, and at all times relevant was and remains, an Indiana corporation with its principal place of business at 100 Bayer Road Pittsburgh, Pennsylvania 15205.  Its registered agent for service of process is Corporation Service Company,  2711 Centerville Rd., Suite 400, Wilmington, DE 19808.

14.    Upon information and belief, Bayer Healthcare is owned by Defendant Bayer Corp.

15.    At all relevant times, Defendant Bayer Corp was engaged in the business of researching, developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce, either directly or indirectly through third parties or related entities, its products, including the prescription drug Xarelto.

16.     Upon information and belief, Defendant BAYER HEALTHCARE, LLC (hereinafter "Bayer LLC") is  a limited liability company duly formed and existing under and by the virtue of the laws of the State of Delaware, with its principal place of business located in the State of New Jersey. Bayer HC's sole member is Defendant Bayer Corporation.  Bayer Corp has transacted and conducted business within the State of Delaware and has derived substantial revenue from goods and products disseminated and used in the State of Delaware.  Its registered agent for service of process is Corporation Service Company,  2711 Centerville Rd., Suite 400, Wilmington, DE 19808.

17.     Upon information and belief, at all relevant times, Defendant Bayer LLC was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE to reduce the risk of recurrence of DVT and/or PE,  and  for prophylaxis  of DVT for patients  undergoing hip  and  knee replacement surgery.

18.     Upon information and belief, Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company of Defendants Bayer Corp, Bayer LLC, Bayer Healthcare, and BAYER PHARMA AG.

19.     Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG exercises control over Defendants Bayer Corp, Bayer LLC, Bayer Healthcare, and BAYER PHARMA AG.

20.     Upon information and belief, Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany. Upon information and belief, Defendant BAYER AG is the third largest

pharmaceutical company in the world. Upon information and belief, at all relevant times, Defendant BAYER AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

21.    Bayer HC is a subsidiary of Bayer AG and jointly developed Xarelto with J&J and Janssen R&D.  Bayer AG's cooperation partner, J&J and Janssen R & D, submitted the new drug application for Xarelto to the FDA.  Bayer HC transacts substantial business within Delaware, including the research, manufacture, sale, distribution and marketing of Xarelto, as set forth herein.

22.    Bayer AG's cooperating partner J&J and Janssen R & D submitted the new drug application to the FDA for Xarelto.

23.    Defendants Janssen Research & Development LLC, Janssen Ortho LLC, Janssen Pharmaceuticals, Inc., Johnson & Johnson, Johnson & Johnson, Bayer Healthcare Pharmaceuticals, Inc., Bayer Pharma AG, Bayer Corporation, Bayer Healthcare LLC, Bayer Healthcare AG, and Bayer AG, shall be referred to herein individually by name or jointly as "Defendants."

24.    At all times alleged herein, Defendants include and included any and all parents, subsidiaries, affiliates, divisions, franchises, partners, joint venturers, and organizational units of any kind, their predecessors, successors and assigns and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

25.     At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessors in interest, and joint venturer of each of the remaining Defendants herein and was at all times operating and acting with the purpose and scope of said agency, service, employment, partnership,  and joint venture.

26.     At all times relevant, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce throughout the United States, which necessarily includes Delaware, either directly or indirectly through third parties, subsidiaries or related entities, the drug Xarelto.

## B.      NATURE OF THE CASE

27.     Plaintiff brings this case against Defendants for damages associated with ingestion of the pharmaceutical drug Xarelto, which was designed, manufactured, marketed, sold and distributed by Defendants. Specifically, Plaintiff suffered various injuries, including internal bleeding, serious physical pain and suffering, medical and other expenses as a direct result of her use of Xarelto.

28.     At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

29.     Xarelto was introduced in the United States ("U.S.") on July 1, 2011, and is part of a class of drugs called New Oral Anticoagulants ("NOACs").

30.     This class of NOACs, which also includes Pradaxa and Eliquis, is marketed as the next generation of blood-thinning drugs to replace warfarin (Coumadin); an established safe

treatment for preventing stroke and systemic embolism for the past 60 years.

31.     Xarelto is an anticoagulant that acts as a Factor Xa inhibitor, and is available by prescription in oral tablet doses of 20mg, 15mg, and 10mg.

32.     Defendants received FDA approval for Xarelto on July 1, 2011 for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries (NDA 022406).

33.     Approval of Xarelto for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries was based on a series of clinical trials known as the Regulation of Coagulation in Orthopedic Surgery to Prevent Deep Venous Thrombosis and Pulmonary Embolism studies (hereinafter referred to as the "RECORD" studies). The findings of the RECORD studies showed that Xarelto was  superior (based on the Defendants' definition) to enoxaparin for thromboprophylaxis after total knee and hip arthroplasty, accompanied by similar rates of bleeding. However, the studies also showed a greater bleeding incidence with Xarelto leading to decreased hemoglobin levels and transfusion of blood. (Lassen, M.R., et al. Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Total Knee Arthroplasty. N. Engl. J. Med. 2008; 358:2776-86; Kakkar, A.K., et al. Extended duration rivaroxaban versus short- term enoxaparin for the prevention of venous thromboembolism after total hip arthroplasty:  a double-blind, randomized controlled trial.  Lancet 2008; 372:31-39; Ericksson, B.I., et al. Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip Arthroplasty. N. Engl. J. Med. 2008; 358:2765-75.).

34.     RECORD studies were conducted by Defendants in the United States as well as in foreign countries, and throughout Pennsylvania.

35.     The RECORD studies were flawed in design and conducted in a negligent

manner.   In Fact, FDA Official Action Indicated ("OAI")-rated inspections in 2009, disclosed rampant violations including, "systemic discarding of medical records," unauthorized unblinding, falsification, and "concerns regarding improprieties in randomization."  As a result, the FDA found that RECORD 4 studies were so flawed that they were deemed unreliable. (Seife, Charles, *Research Misconduct Identified by US Food and Drug Administration,* JAMA Intern. Med (Feb. 9, 2015).

36.    Defendants then received additional FDA approval for Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation on November 4, 2011 (NDA 202439).    Approval of Xarelto for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as the Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin  K Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation study (hereinafter referred to as "ROCKET AF").

37.    The Rocket AF study showed that Xarelto was non-inferior to warfarin for the prevention of stroke or systemic embolism in patients with non-valvular atrial fibrillation, with a similar risk of major bleeding.  However, "bleeding from gastrointestinal sites, including upper, lower, and rectal sites, occurred more frequently in the rivaroxaban group, as did bleeding that led to a drop in the hemoglobin level or bleeding that required transfusion." (Patel, M.R., et al. Rivaroxaban versus warfarin in Nonvalvular Atrial Fibrillation. N. Engl. J. Med. 2011; 365:883-91.)

38.    The ROCKET AF study compared warfarin to Xarelto.  Thus, for the study to be well designed and meaningful, the warfarin study group would have to be well managed because warfarin's safety and efficacy is dose dependent. In other words, if the warfarin group was

poorly managed, it would be easy for Xarelto to appear non-inferior to warfarin, which, in turn, would provide Defendants a study to "support" Xarelto's use.

39.     In fact, in the ROCKET AF study, the warfarin group was not well managed. The warfarin group in the ROCKET AF study was the worst managed warfarin study group in any previously reported clinical trial involving warfarin.

40.     The poor management of the warfarin group in the ROCKET AF study was not lost on the FDA, which noted "the data comparing [Xarelto] to warfarin are not adequate to determine whether [Xarelto] is as effective for its proposed indication in comparison to warfarin when the latter is used skillfully." FDA Advisory Committee Briefing document. P. 10.

41.     Public Citizen also noticed the poor control in the warfarin group. Public Citizen wrote the FDA, stating they "strongly oppose FDA approval...   The 3 ROCKET AF trial conducted in support of the proposed indication had a suboptimal control arm..." http://www.citizen.org/documents/1974.pdf.

42.     Another problem with the ROCKET AF study was Xarelto's once-a-day dosing. The FDA clinical reviewers stated that "the sponsor's rationale for evaluating only once daily dosing during Phase 3 is not strong.  Most importantly, there is clinical information from Phase 2 trials ... and from clinical pharmacology studies suggesting that twice daily dosing, which would produce lower peak blood levels and higher trough blood levels of [Xarelto], might have been associated with greater efficacy and/or a better safety profile."   FDA advisory Committee Briefing document p. 100.

43.     Dr. Steven E. Nissen, more sharply, stated "my concern was that the dose was selected more for a marketing advantage rather than for the scientific data that was available, and was a mistake..."  FDA Advisory Meeting Transcript p. 287.

44.     Furthermore, the FDA expressed desirability in monitoring Xarelto dosage within their NDA approval memo based on the ROCKET studies.  The clinical pharmacology in these studies demonstrated a linear correlation between rivaroxaban (Xarelto) levels and prothrombin time ("PT"); and subsequently a correlation between PT and the risk of bleeding.  At this time, Defendants were aware of the correlation between Xarelto dosage and bleeding risks, but had "not chosen to utilize this information."  (NDA 202439 Summary Review, p. 9).  At all relevant times, Defendants' controlled the contents of their label as demonstrated by their decision to go forward without regard to the FDA's suggestion to utilize this information.

45.     The ROCKET AF study was conducted in the United States as well as in foreign countries, and throughout Delaware.

46.     Other studies and clinical trials involving Xarelto continue to be conducted by Defendants in Delaware.

47.     The additional indication for treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE was added to the label on November 2, 2012.

48.     Approval of Xarelto for the treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE in the U.S. was based on the clinical trials known as the EINSTEIN-DVT, EINSTEIN-PE, and EINSTEIN-Extension studies.  The EINSTEIN-DVT study tested Xarelto versus a placebo, and merely determined that Xarelto offered an option for treatment of DVT, with an increased risk of bleeding events as compared to placebo. (The EINSTEIN Investigators. Oral Rivaroxaban for Symptomatic Venous Thromboembolism. N.Engl.J.Med. 2010; 363:2499-510). The EINSTEIN-Extension study confirmed that result. (Roumualdi, E., et al. Oral rivaroxaban after symptomatic venous thromboembolism: the continued treatment study (EINSTEIN-Extension study). Expert Rev. Cardiovasc. Ther.

2011; 9(7):841-844). The EINSTEIN-PE study's findings showed that a Xarelto regimen was non-inferior to the standard therapy for initial and long-term treatment of PE. However, the studies also demonstrated an increased risk of adverse events with Xarelto, including those that resulted in permanent discontinuation of Xarelto or prolonged hospitalization. (The EINSTEIN-PE Investigators. Oral Rivaroxaban for the Treatment of Symptomatic Pulmonary Embolism. N.Engl.J.Med. 2012; 366:1287-97.)

49.    Defendants' use the results of the ROCKET AF study, the RECORD studies, and the EINSTEIN studies to promote Xarelto in their promotional materials, including the Xarelto website, which tout the positive results of those studies. However, Defendants' promotional materials fail to similarly highlight the increased risk of gastrointestinal bleeding and bleeding that required transfusion, among other serious bleeding concerns.

50.    Defendants market Xarelto as a new oral anticoagulant treatment alternative to warfarin (Coumadin), a long-established safe treatment for preventing stroke and systemic embolism.

51.    Defendants market and promote Xarelto as a single daily dose pill that does not require the need to measure a patient's blood plasma levels, touting it more convenient than warfarin, and does not limit a patient's diet.  The single dose and no blood testing requirements or dietary constraints are marked by Defendants as the "Xarelto Difference."

52.    However, Xarelto's clinical studies show that Xarelto is safer and more effective when there is blood monitoring, dose adjustments and twice a day dosing.

53.    In its QuarterWatch publication for the first quarter of the 2012 fiscal year, the Institute for Safe Medication Practices ("ISMP"), headquartered in the Commonwealth of Pennsylvania, at 200 Lakeside Drive #200, Horsham, PA 19044, noted that, even during the

approval process, FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of Xarelto], saying blood level studies had shown peaks and troughs that could be eliminated by twice-a-day dosing."

54.     The use of Xarelto without appropriate blood monitoring, dose adjustment and twice a day dosing can cause major, life-threatening bleeding events. Physicians using Xarelto have to be able to balance the dose so that the blood is thinned enough to reduce the risk of stroke, but not thinned so much as to increase the risk for a major bleeding event. The Defendants were aware of this risk and the need for blood monitoring but have failed to disclose this vital health information to patients, doctors and the FDA.

55.     Importantly, Xarelto's significant risk of severe, and sometimes fatal, internal bleeding has no antidote to reverse its effects, unlike warfarin. Therefore, in the event of hemorrhagic complications, there is no available reversal agent.  The original U.S. label, approved when the drug was first marketed, did not contain a warning regarding the lack of antidote, but instead only mentioned this important fact in the overdose section.

56.     The FDA's adverse event data indicates staggering, serious adverse events that have been associated with Xarelto.

57.     In the year leading up to June 30, 2012, there were 1,080 Xarelto-associated "Serious Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65 deaths. Of the reported hemorrhage events associated with Xarelto, 8% resulted in death, which was approximately twofold the risk of a hemorrhage-related death with warfarin.

58.     At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA, its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death, as

compared to only 56 deaths associated with warfarin.

59.     The ISMP referred to these SAE figures as constituting a "strong signal" regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the public and the scientific community, and to warrant further investigation."

60.     Of particular note, in the first quarter of 2013, the number of reported serious adverse events associated with Xarelto (680) overtook that of Pradaxa (528), another new oral anticoagulant, which had previously ranked as the number one reported drug in terms of adverse events in 2012.

61.     Moreover, in the first eight months of 2013, German regulators received 968 Xarelto-related averse event reports, including 72 deaths, as compared to a total of 750 reports and 58 deaths in 2012.

62.     Despite the clear signal generated by the SAE data, Defendants did not tell consumers, health care professionals and the scientific community about the dangers of Xarelto, nor did Defendants perform further investigation into the safety of Xarelto.

63.     Defendants' original, and in some respects, current labeling and prescribing information for Xarelto:

   a.   failed to investigate, research, study and define, fully and adequately, the safety profile of Xarelto;

   b.   failed to provide adequate warnings, about the true safety risks   associated with the use of Xarelto;

   c.   failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamic variability of Xarelto and its effects on the degree of anticoagulation in a patient;

d.  failed to disclose the need for dose adjustments;

e.  failed to  disclose the need to twice daily dosing;

f.  failed to warn about the need for blood monitoring;

g.  failed to provide adequate warning that it is difficult or impossible to assess the degree and/or extent of anticoagulation in patients taking Xarelto;

h.  failed to adequately disclose in the "Warnings" Section that there is no drug, agent, or means to reverse the anticoagulation effects of Xarelto;

i.  failed to advise prescribing physicians, such as Plaintiff's physicians, to instruct patients that there was no agent to reverse the anticoagulant effects of Xarelto;

j.  failed to provide adequate instructions on how to intervene and/or stabilize a patient who suffers a bleed while taking Xarelto;

k.  failed to provide adequate warnings and information related to the increased risks of bleeding events associated with aging patient populations of Xarelto users;

l.  failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Xarelto, especially, in those patients with a prior history of gastrointestinal issues and/or upset stomach;

m.  failed to provide adequate warnings regarding the increased risk of suffering a bleeding event, requiring blood transfusions in those taking Xarelto;

n.  failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Xarelto and to continue testing and monitoring of renal functioning periodically while the patient is on Xarelto;

o.  failed to provide adequate warnings regarding the need to assess hepatic functioning prior to starting a patient on Xarelto and to continue testing and

16

monitoring of hepatic functioning periodically while the patient is on Xarelto;

p. failed to include a "**BOXED WARNING**" about serious bleeding events associated with Xarelto;

q. failed to include a "**BOLDED WARNING**" about serious bleeding events associated with Xarelto; and

r. in the "Medication Guide" intended for distribution to patients to whom Xarelto has been prescribed, Defendants failed to disclose the need for blood monitoring or to patients that there is no drug, agent, or means to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, such irreversibility could have permanently disabling, life-threatening or fatal consequences.

64.     During the years since first marketing Xarelto in the U.S., Defendants modified the U.S. labeling and prescribing information for Xarelto, which included additional information regarding the use of Xarelto in patients taking certain medications.  Despite being aware of: (1) serious, and sometimes fatal, irreversible bleeding events associated with the use of Xarelto; and (2) 2,081 SAE Medwatch reports filed with the FDA in 2012 alone, including at least 151 deaths, Defendants nonetheless failed to provide adequate disclosures or warnings in their label as detailed in Paragraph 76 (a – r).

65.     Despite the wealth of scientific evidence, Defendants have ignored the increased risk of the development of the aforementioned injuries associated with the use of Xarelto, but they have, through their marketing and advertising campaigns, urged consumers to use Xarelto without regular blood monitoring or instead of anticoagulants that present a safer alternative.

## C.  OVER-PROMOTION OF XARELTO

66.  Xarelto is the second most prescribed drug for treatment of atrial fibrillation, behind only Coumadin (warfarin), and achieved blockbuster status with sales of approximately $2 billion dollars in 2013.

67.  Defendants spent significant amounts of money in promoting Xarelto, which included at least $11,000,000.00 spent during 2013 alone on advertising in journals targeted at prescribers and consumers in the U.S. In the third quarter of fiscal 2013, Xarelto was the number one pharmaceutical product advertised in professional health journals based on pages and dollars spent.

68.  Defendants' aggressive and misrepresentative marketing of a "Xarelto Difference" lead to an explosion in Xarelto sales. The "Xarelto Difference," i.e., was once a day dosing without blood monitoring.  In fact, the "Xarelto Difference" was nothing more than a marketing campaign based on flawed science.

69.  As a result of Defendants' aggressive marketing efforts, in its first full year on the market, Xarelto garnered approximately $582 million in sales globally. Defendants' website for Xarelto claims that over seven million people worldwide have been prescribed Xarelto. In the U.S., approximately 1 million Xarelto prescriptions had been written by the end of 2013.

70.  During the Defendants' 2012 fiscal year, Xarelto garnered approximately $658 million in sales worldwide. Then, in 2013, sales for Xarelto increased even further to more than $1 billion, which is the threshold commonly referred to as "blockbuster" status in the pharmaceutical industry. In 2013, Xarelto sales ultimately reached approximately $2 billion for the fiscal year, and Xarelto is now considered the leading anticoagulant on a global scale in terms of sales.

71.     As part of their marketing of Xarelto, Defendants widely disseminated direct-to-consumer ("DTC") advertising campaigns that were designed to influence patients to make inquiries to their prescribing physicians about Xarelto and/or request prescriptions for Xarelto.

72.     In the course of these DTC advertisements, Defendants overstated the efficacy of Xarelto with respect to preventing stroke and systemic embolism, failed to disclose the need for dose adjustments, failed to disclose the need for blood monitoring and failed to adequately disclose to patients that there is no drug, agent, or means to reverse the anticoagulation effects of Xarelto, and that such irreversibility could have permanently disabling, life-threatening and fatal consequences.

73.     On June 6, 2013, Defendants received an untitled letter from the FDA's Office of Prescription Drug Promotion (hereinafter referred to as the "OPDP") regarding its promotional material for the atrial fibrillation indication, stating that, "the print ad is false or misleading because it minimizes the risks associated with Xarelto and makes a misleading claim" regarding dose adjustments, which was in violation of FDA regulations. The OPDP thus requested that Defendants immediately cease distribution of such promotional material.

74.     Prior to the prescription of Xarelto, Plaintiff became aware of the promotional materials described herein.

75.     Prior to Plaintiff's prescription of Xarelto, Plaintiff's prescribing physician received promotional materials and information from sales representatives of Defendants claiming that Xarelto was just as effective as warfarin in reducing strokes in patients with non-valvular atrial fibrillation, as well as preventing DVT/PE in patients with prior history of DVT/PE  or undergoing hip or knee replacement surgery, and was more convenient, without also requiring blood monitoring, dose adjustments, twice a day dosing or adequately informing

prescribing physicians that there was no reversal agent that could stop or control bleeding in patients taking Xarelto.

76. At all times relevant hereto, Defendants also failed to warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally-known measures taken to treat and stabilize bleeding in users of warfarin, there is no effective agent to reverse the anticoagulation effects of Xarelto, and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Xarelto.

77. At all times relevant to this action, The Xarelto Medication Guide, prepared and distributed by Defendants and intended for U.S. patients to whom Xarelto has been prescribed, failed to warn about the need for blood monitoring, dose adjustments, twice a day dosing and failed to disclose to patients that there is no agent to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, it may be irreversible, permanently disabling, and life-threatening.

78. Prior to applying to the FDA for and obtaining approval of Xarelto, Defendants knew or should have known that consumption of Xarelto was associated with and/or would cause the induction of life-threatening bleeding, and Defendants possessed at least one clinical scientific study, which evidence Defendants knew or should have known was a signal that life- threatening bleeding risk needed further testing and studies prior to its introduction to the market.

79. As a result of Defendants' claim regarding the effectiveness and safety of Xarelto, Plaintiff's medical providers prescribed and Plaintiff ingested Xarelto.

**D.    THE PLAINTIFF'S USE OF XARELTO AND RESULTING INJURIES**

80. By reason of the foregoing acts and omissions, Plaintiff suffered internal

bleeding, as well as other severe and personal injuries, physical pain and mental anguish, including diminished enjoyment of life, expenses, and medical treatment.

81.     Upon information and belief, despite life-threatening bleeding findings in a clinical trial and other clinical evidence, Defendants failed to adequately conduct complete and proper testing of Xarelto prior to filing their New Drug Application for Xarelto.

82.     Upon information and belief, from the date Defendants received FDA approval to market Xarelto, Defendants made, distributed, marketed, and sold Xarelto without adequate warning to Plaintiff's prescribing physicians or Plaintiff that Xarelto was associated with and/or could cause life-threatening bleeding, presented a risk of life-threatening bleeding in patients who used it, and that Defendants had not adequately conducted complete and proper testing and studies of Xarelto with regard to severe side-effects, specifically life-threatening bleeding.

83.     Upon information and belief, Defendants concealed and failed to completely disclose their knowledge that Xarelto was associated with or could cause life-threatening bleeding as well as their knowledge that they had failed to fully test or study said risk.

84.     Upon information and belief, Defendants ignored the association between the use of Xarelto and the risk of developing life-threatening bleeding.

85.     Upon information and belief, Defendants failed to warn Plaintiff and her healthcare providers regarding the need for blood monitoring, dose adjustments and failed to warn of the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening, associated with Xarelto.

86.     Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Xarelto for life-threatening bleeding risk further rendered

warnings for this medication inadequate.

87.    By reason of the forgoing acts and omissions, Plaintiff has suffered damages and harm, including, but not limited to, pain and suffering, emotional distress, medical expenses, hospital expenses and other economic harm.

## FACTUAL ALLEGATIONS

88.    On or around January 1, 2012, Plaintiff was first prescribed and began taking Xarelto upon direction of Plaintiff's physician for atrial fibrillation.  Subsequently, as a direct result of Plaintiff's ingestion of Xarelto, Plaintiff suffered internal bleeding and on or around September 1, 2013 was admitted to Henry Ford Macomb Hospital located at 15855 19 Mile Road, Clinton Township, MI 48038.

89.    As a direct result of being prescribed Xarelto for this period of time, Plaintiff suffered significant injuries, such as those described above.

90.    As a proximate result of Defendants' acts and omissions, Plaintiff suffered the injuries described hereinabove due to Plaintiff's ingestion of Xarelto.  Plaintiff accordingly seeks damages associated with these injuries.

91.    Plaintiff would not have used Xarelto had Defendants properly disclosed the risks associated with its use.

## COUNT I: STRICT LIABILITY

92.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

93.    At all times relevant times hereto, Defendants were engaged in the business of designing, manufacturing, testing, marketing, and placing into the stream of commerce pharmaceuticals for sale to, and use by, members of the public, including the Xarelto at issue in

this lawsuit. The Xarelto manufactured by Defendants reached Plaintiff without substantial change and was ingested as directed. The Xarelto was defective and unreasonably dangerous when it entered into the stream of commerce and when used by Plaintiff.

94.     Defendants, as manufacturers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field, and further, Defendants knew or should have known that warnings and other clinically relevant information and data which they distributed regarding the risks of irreversible bleeds and other injuries and death associated with the use of Xarelto were inadequate.

95.     Plaintiff did not have the same knowledge as Defendants and no adequate warning or other clinically relevant information and data was communicated to Plaintiff or to her treating physicians.

96.     Defendants had a continuing duty to provide consumers, including Plaintiff, and Plaintiff's physicians with warnings and other clinically relevant information and data regarding the risks and dangers associated with Xarelto, as it became or could have become available to Defendants.

97.     Defendants marketed, promoted, distributed and sold an unreasonably dangerous and defective prescription drug, Xarelto, to health care providers empowered to prescribe and dispense Xarelto to consumers, including Plaintiff, without adequate warnings and other clinically relevant information and data. Through both omission and affirmative misstatements, Defendants misled the medical community about the risk and benefit balance of Xarelto, which resulted in injury to Plaintiff.

98.     Despite the fact that Defendants knew or should have known that Xarelto caused unreasonable and dangerous side effects, they continued to promote and market Xarelto without

23

stating that there existed safer and more or equally effective alternative drug products and/or providing adequate clinically relevant information and data.

99.     Defendants knew or should have known that consumers, Plaintiff specifically, would foreseeably and needlessly suffer injury or death as a result of Defendants' failures.

100.     Defendants failed to provide timely and adequate warnings to physicians, pharmacies, and consumers, including Plaintiff and to Plaintiff's intermediary physicians, in the following ways:

    a.     Defendants failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Plaintiff and Plaintiff's physicians to the dangerous risks of Xarelto including, among other things, irreversible bleeds;

    b.     Defendants failed to provide adequate post-marketing warnings and instructions after the Defendants knew or should have known of the significant risks of, among other things, irreversible bleeds;

    c.     Defendants continued to aggressively promote and sell Xarelto, even after they knew or should have known of the unreasonable risks of irreversible bleeds from this drug.

101.     Defendants had an obligation to provide Plaintiff and Plaintiff's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to Xarelto, and/or that there existed safer and more or equally effective alternative drug products.

102.     By failing to provide Plaintiff and Plaintiff's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with

exposure to Xarelto, and/or that there existed safer and more or equally effective alternative drug products, Defendants breached their duty of reasonable care and safety.

103.    Defendants' actions described above were performed willfully, intentionally, and with reckless disregard of the life and safety of the Plaintiff and the public.

104.    As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Plaintiff was exposed to Xarelto and suffered the injuries and damages set forth hereinabove.

## COUNT II: STRICT LIABILITY – DESIGN DEFECT, MARKETING DEFECT AND MANUFACTURING DEFECT

105.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

106.    Xarelto was unreasonably defective in design and marketing, considering the utility of the product and the risk involved in its use, because as designed and marketed, Xarelto ™ could cause injuries such as those suffered by Plaintiff during foreseeable use. This fact was known to Defendants at the time Xarelto was placed into the stream of commerce, but was not readily recognizable to an ordinary consumer, including Plaintiff.  Nonetheless, Defendants failed to warn that Xarelto ™ as designed and marketed was capable of causing serious personal injuries such as those suffered by Plaintiff during foreseeable use. Such a failure to warn rendered the Xarelto ™ unreasonably dangerously defective as designed and marketed.

107.    At all times material to these allegations, Defendants manufactured, distributed, tested, packaged, promoted, marketed, labeled, designed and sold Xarelto ™, as alleged herein.

108.    Defendants, as manufacturers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field.

109.    The Xarelto ™ administered to Plaintiff was defective in design or formulation in the following respects:

    a.   When it left the hands of Defendants, this drug was unreasonably dangerous to the extent beyond that which could reasonably be contemplated by Plaintiff or Plaintiff's physicians;

    b.   Any benefit of this drug was outweighed by the serious and undisclosed risks of its use when prescribed and used as Defendants intended;

    c.   The dosages and/or formulation of Xarelto sold by Defendants was unreasonably dangerous;

    d.   There are no patients for whom the benefits of Xarelto outweighed the risks;

    e.   The subject product was not made in accordance with Defendants' specifications or performance standards;

    f.   There are no patients for whom Xarelto is a safer and more efficacious drug than other drug products in its class; and/or

    g.   There were safer alternatives that did not carry the same risks and dangers that Defendants' Xarelto had.

110.    The Xarelto administered to Plaintiff was defective at the time it was distributed by Defendants or left their control.

111.    The Xarelto administered to Plaintiff was expected to reach the user without substantial change in the condition in which it was sold.

112.    The Xarelto administered to Plaintiff reached Plaintiff without substantial change in the condition in which it was sold.

113.    There were safer alternative methods and designs for Defendants' Xarelto.

114.    Plaintiff was a patient who Defendants reasonably expected would be administered Xarelto.

115.    Defendants were at liberty to withdraw Xarelto from the market at any time, but failed to do so.

116.    The defective and unreasonably dangerous design and marketing of Xarelto was a direct, proximate and producing cause of Plaintiff's injuries and damages.   Under strict products liability theories set forth in Restatement (Second) of Torts, Defendants are liable to Plaintiff for all damages claimed in this case, including punitive damages.

117.    As a direct, legal, proximate and producing result of the defective and unreasonably dangerous condition of Xarelto, Plaintiff was injured as described herein.  All of said injuries caused Plaintiff's damages, for which Plaintiff is entitled to damages.

118.    As a direct, legal, proximate and producing result of the defective and unreasonably dangerous condition of Xarelto, Plaintiff was required to obtain reasonable and necessary healthcare treatment and services and incurred expenses for which Plaintiff is entitled to damages.

119.    As a direct and proximate result of the design, marketing and manufacturing defects of Defendants' product, Xarelto, Plaintiff suffered the injuries as previously alleged herein.

## COUNT III: NEGLIGENCE

120.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

121.    Defendants owed a duty to the general public and specifically to Plaintiff to exercise reasonable care in the design, study, development, manufacture, promotion, sale,

marketing and distribution of their prescription medications, including the Xarelto at issue in this lawsuit. Defendants failed to exercise reasonable care in the design of Xarelto because as designed, it was capable of causing serious personal injuries such as those suffered by Plaintiff during foreseeable use.   Defendants also failed to exercise reasonable care in the marketing of Xarelto because they failed to warn, that as designed, Xarelto was capable of causing serious personal injuries such as those suffered by Plaintiff during foreseeable use.

122.   Defendants breached their duty and were negligent by, but not limited to, the following actions, misrepresentations, and omissions toward Plaintiff:

a. Failing to use due care in developing, testing, designing and manufacturing Xarelto so as to avoid the aforementioned risks to individuals when Xarelto was being used for treatment;

b. Failing to accompany their product with proper or adequate warnings or labeling regarding adverse side effects and health risks associated with the use of Xarelto and the comparative severity and duration of such adverse effects;

c. In disseminating information to Plaintiff and Plaintiff's physicians that was negligently and materially inaccurate, misleading, false, and unreasonably dangerous to patients such as Plaintiff;

d. Failing to accompany their products with proper or adequate rate of incidence or prevalence of irreversible bleeds;

e. Failing to provide warnings or other information that accurately reflected the symptoms, scope, and severity of the side effects and health risks;

f. Failing to conduct adequate pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Xarelto;

28

g.   Failing to warn Plaintiff, the medical and healthcare community, and consumers that the product's risk of harm was unreasonable and that there were safer and effective alternative medications available to Plaintiff and other consumers;

h.   Failing to provide adequate training or information to medical care providers for appropriate use and handling of Xarelto and patients taking Xarelto;

i.   Failing to adequately test and/or warn about the use of Xarelto, including, without limitations, the possible adverse side effects and health risks caused by the use of Xarelto;

j.   Failing to design and/or manufacture a product that could be used safely due to the lack of a known reversal agent or antidote;

k.   In designing, manufacturing, and placing into the stream of commerce a product which was unreasonably dangerous for its reasonably foreseeable use, which Defendant knew or should have known could cause injury to Plaintiff;

l.   Failing to remove Xarelto from the market when Defendants' knew or should have known of the likelihood of serious side effects and injury to its users;

m.   Failing to adequately warn users, consumers and physicians about the severity, scope and likelihood of bleeds and related dangerous conditions to individuals taking Xarelto; and

n.   Representing to physicians, including but not limited to Plaintiff's prescribing physicians, that this drug was safe and effective for use.

123.   The Xarelto that injured Plaintiff was in substantially the same condition when Plaintiff ingested it as it was in when it left the control of Defendants. Xarelto's ability to cause serious personal injuries and damages such as those suffered by Plaintiff was not due

to any voluntary action or contributory negligence of Plaintiff.  Plaintiff consumed the Xarelto as directed and without change in its form or substance.

124.    Defendants' failure to exercise reasonable care in the design, dosing information, marketing, warnings, and/or manufacturing of Xarelto was a proximate cause of Plaintiff's injuries and damages.

125.    Plaintiff seeks all damages to which Plaintiff may be justly entitled.

## COUNT IV: BREACH OF WARRANTY - BREACH OF EXPRESS WARRANTY

126.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

127.    Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise released into the stream of commerce Xarelto, in the course of same, directly advertised or marketed the product to the FDA, healthcare professionals and consumers, including Plaintiff, or persons responsible for consumer.

128.    Xarelto materially failed to conform to those representations made by Defendants in package inserts, and otherwise, concerning the properties and effects of Xarelto, respectively manufactured and/or distributed and sold by Defendants, and which Plaintiff purchased and ingested in direct or indirect reliance upon these express representations. Such failures by Defendants constituted a material breach of express warranties made, directly or indirectly, to Plaintiff concerning Xarelto sold to Plaintiff.

129.    As a direct, foreseeable and proximate result of Defendants' breaches of express warranties, Plaintiff suffered grievous bodily injury and consequent economic and other loss, as described above, when Plaintiff's physician, in reasonable reliance upon such express

warranties, prescribed for Plaintiff the use of Xarelto.  Plaintiff purchased and ingested Xarelto as prescribed and instructed by Plaintiff's physician, leading to Plaintiff's injuries.

## <u>COUNT V: BREACH OF WARRANTY – BREACH OF IMPLIED WARRANTY</u>

130.    Plaintiff incorporates by reference each and every paragraph of this Complaint as if fully set forth herein and further alleges as follows:

131.    Defendants researched, developed, designed, tested, manufactured, inspected, labeled, distributed, marketed, promoted, sold, and/or otherwise released into the stream of commerce Xarelto, in the course of same, directly advertised or marketed the product to the FDA, health care professionals and consumers, including Plaintiff, or persons responsible for consumer.

132.    Defendants impliedly warranted their Xarelto product, which they manufactured and/or distributed and sold, and which Plaintiff purchased and ingested, to be of merchantable quality and fit for the common, ordinary, and intended uses for which the product was sold.

133.    Defendants breached their implied warranties of the Xarelto product sold to Plaintiff because this product was not fit for its common, ordinary, and intended use.

134.    As a direct, foreseeable and proximate result of Defendants' breaches of implied warranties, Plaintiff suffered grievous bodily injury and consequential economic and other losses, as described above, when Plaintiff ingested Xarelto, in reasonable reliance upon the implied warranties.

**WHEREFORE**, Plaintiff demands judgment against each of the Defendants jointly and severally for such sums, including, but not limited to prejudgment and post-judgment interest, as would be necessary to compensate the Plaintiff for the injuries Plaintiff has and will suffer. Plaintiff further demand judgment against each of the Defendants for punitive damages.  Plaintiff

further demand payment by each of the Defendants jointly and severally of the costs and attorney

fees of this action.  Plaintiff further demand payment by each Defendant jointly and severally of

interest on the above and such other relief as the Court deems just.

Dated: September 1, 2015

**NAPOLI BERN RIPKA SHKOLNIK & ASSOCIATES, LLP**


**By:** /s/ Diane M. Coffey
     Diane M. Coffey, Esquire
     Delaware Bar ID No.  200001
     Lincoln Square
     300 North Market Street
     Building One, Suite 100
     Wilmington, DE 19801
     (302) 300-4625
     *Attorney for Plaintiff*