# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION | MDL No. 2592 |
| CHERYL SCHEIDKER and JAN SCHEIDKER, | |
| Plaintiffs, | SECTION: L<br>JUDGE FALLON<br>MAG. JUDGE NORTH |
| v. | |
| JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC, JANSSEN ORTHO LLC, JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., JOHNSON & JOHNSON, BAYER HEALTHCARE PHARMACEUTICALS, INC., BAYER PHARMA AG, BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE AG, and BAYER AG, | JURY TRIAL DEMANDED |
| Defendants. | |

## AMENDED COMPLAINT

Plaintiff by and through the undersigned counsel, upon information and belief, at all times hereinafter mentioned, alleges as follows:

## PLAINTIFF-SPECIFIC ALLEGATIONS

1.     Plaintiff, Cheryl Scheidker was prescribed and began using Xarelto on or around January 27, 2017 upon direction of his physician for the prevention of atrial fibrillation.

2.      As a direct and proximate result of the use of Defendants' Xarelto, Plaintiff experienced dysfunctional internal bleeding, including on or about on May of 2017

3.      Plaintiff, Cheryl Scheidker is a resident of Saint Louis County, MO.

4.      In conjunction with Plaintiff Scheidker' claim, Jan Scheidker, spouse of Cheryl Scheidker asserts a claim for loss of consortium.

### PARTY DEFENDANTS

5.      Upon information     and     belief,     Defendant     JANSSEN     RESEARCH     & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON RESEARCH   AND       DEVELOPMENT LLC (hereinafter referred to as "JANSSEN R&D") is a limited liability  company organized under the laws of New Jersey, with a principal place of business at One   Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.  Defendant JANSSEN R&D's sole member is Janssen Pharmaceuticals, Inc., which is a Pennsylvania corporation with a principal place of business at 1125 Trenton-Harbourton Road, Titusville, New Jersey 08560.  Accordingly, JANSSEN R&D is a citizen of Pennsylvania and New Jersey for purposes of determining diversity under 28 U.S.C. § 1332. Defendant JANSSEN R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as  well as the supplemental NDA.

6.      As part of its business, JANSSEN R&D is involved in the research, development,  sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

7.      Defendant JANSSEN R&D is the holder of the approved New Drug Application ("NDA") for Xarelto as well as the supplemental NDA.

8.      Upon information and belief, and at all relevant times, Defendant, JANSSEN R&D, was in the business of and did design, research, manufacture, test, advertise, promote,  market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the  primary  purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat

DVT and PE, to reduce the risk of recurrence of DVT and/or  PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

9.     Upon information and belief, Defendant JANSSEN PHARMACEUTICALS, INC.  f/k/a JANSSEN       PHARMACEUTICA       INC.       f/k/a       ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC. (hereinafter referred to as "JANSSEN PHARM") is a  Pennsylvania corporation, having a principal place of business at 1125 Trenton-Harbourton  Road, Titusville, New Jersey 08560.

10.     As part of its business, JANSSEN PHARM is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and  rivaroxaban.

11.     Upon information and belief, and at all relevant times, Defendant, JANSSEN PHARM, was in the business of and did design, research, manufacture, test, advertise, promote,  market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the  primary  purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or  PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

12.     Upon information and belief, Defendant JANSSEN ORTHO LLC (hereinafter  referred to as "JANSSEN ORTHO") is a limited liability company organized under the laws of  Delaware, having a principal place of business at State road 933 Km 0 1, Street Statero, Gurabo, Puerto Rico 00778. Defendant JANSSEN ORTHO is a subsidiary of Johnson & Johnson.  The only member of JANSSEN ORTHO LLC is OMJ PR Holdings, which is incorporated in Ireland with a principal place of business in Puerto Rico. Accordingly, JANSSEN ORTHO LLC is a citizen of Delaware, Ireland and Puerto Rico for purposes of determining diversity under 28 U.S.C. § 1332.

13.     As part of its business, JANSSEN ORTHO is involved in the research, development,

sales, and marketing of pharmaceutical products including Xarelto and  rivaroxaban.

14.     Upon information and belief, and at all relevant times, Defendant, JANSSEN ORTHO, was in the business of and did design, research, manufacture, test, advertise, promote,  market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the  primary  purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-  valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or   PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

15.     Upon information and belief, the Defendant, JOHNSON &  JOHNSON (hereinafter referred to as "J&J) is a corporation organized under the laws of New Jersey with its principal place of business at One Johnson & Johnson Plaza, New Brunswick, Middlesex County, New Jersey 08933.

16.     As part of its business, Defendant J&J, and its "family of companies," is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto.

17.     Upon     information     and     belief,     Defendant     BAYER     HEALTHCARE PHARMACEUTICALS, INC. is, and at all relevant times was, a corporation organized under  the laws of the State of Delaware, with its principal place of business in the State of New Jersey.

18.     As part of its business, BAYER HEALTHCARE PHARMACEUTICALS, INC.  is involved in the research, development, sales, and marketing of pharmaceutical products  including Xarelto and rivaroxaban.

19.     Upon information and belief, and at all relevant times, Defendant, BAYER HEALTHCARE PHARMACEUTICALS, INC., was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an  oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic  embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk  of recurrence of

DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

20.    Upon information and belief, Defendant BAYER PHARMA AG is a pharmaceutical company domiciled in Germany.

21.    Defendant BAYER PHARMA AG is formerly known as Bayer Schering Pharma AG and is the same corporate entity as Bayer Schering Pharma AG. Bayer Schering Pharma AG is formerly known as Schering AG and is the same corporate entity as Schering AG.

22.    Upon information and belief, Schering AG was renamed Bayer Schering Pharma AG effective December 29, 2006.

23.    Upon information and belief, Bayer Schering Pharma AG was renamed BAYER PHARMA AG effective July 1, 2011.

24.    As part of its business, BAYER PHARMA AG is involved in the research, development, sales, and marketing of pharmaceutical products including Xarelto and rivaroxaban.

25.    Upon information and belief, and at all relevant times, Defendant, BAYER PHARMA AG, was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute the drug Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

26.    Upon information and belief, Defendant BAYER CORPORATION is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

27.    Upon information and belief, BAYER HEALTHCARE PHARMACEUTICALS, INC. is owned by Defendant BAYER CORPORATION.

28.     At relevant times, Defendant BAYER CORPORATION was engaged in the  business of researching, developing, designing, licensing, manufacturing, distributing, selling,  marketing, and/or introducing into interstate commerce, either directly or indirectly through third  parties or related entities, its products, including the prescription drug Xarelto.

29.     Upon information and belief, Defendant BAYER HEALTHCARE LLC is a  limited liability company duly formed and existing under and by the virtue of the laws of the  State of Delaware, with its principal place of business located in the State of New Jersey.

>  (a)   Upon information and belief, from on or about early January 2003 until on or about late December, 2014, BAYER HEALTHCARE LLC's sole member was Bayer Corporation, and is wholly owned by Bayer Corporation, which is an Indiana corporation with its principal place of business at 100 Bayer Road, Pittsburgh, Pennsylvania 15205.

>  (b)   Upon information and belief, from on or about early January 2015 to on or about June 30, 2015, BAYER HEALTHCARE LLC's sole member was Bayer Medical Care, Inc., which is a Delaware Corporation, with its principal place of business at 1 Medrad Dr., Indianola, Pennsylvania 15051.

>  (c)   Upon information and belief, from on or about July 1, 2015 to present, BAYER HEALTHCARE LLC's members are:

>>  i.    Bayer Medical Care Inc., a Delaware corporation with its principal place of business in Pennsylvania;

>>  ii.   NippoNex Inc., a Delaware corporation with its principal place of business in New York;

>>  iii.  Bayer West Coast Corporation, a Delaware corporation with its

principal place of business in California;

    iv.    Bayer Essure Inc., a Delaware corporation with its principal place of business in California

    v.    Bayer Consumer Care Holdings, LLC, a limited liability company formed in Delaware with its principal place of business in New Jersey;

    vi.    Dr. Scholl's LLC, a limited liability company, formed in Delaware with its principal place of business in California;

    vii.    Coppertone LLC, a limited liability company, formed in Delaware with its principal place of business in California;

    viii.    MiraLAX LLC, a limited liability company, formed in Delaware with its principal place of business in California; and,

    ix.    Bayer HealthCare U.S. Funding LLC, a limited liability company, formed in Delaware with its principal place of business in Pennsylvania.

Accordingly, BAYER HEALTHCARE LLC is a citizen of Delaware, New Jersey, New York, Indiana, Pennsylvania and California for purposes of determining diversity under 28 U.S.C. § 1332.

30.    Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE LLC was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

31.    Upon information and belief, Defendant BAYER HEALTHCARE AG is a company domiciled in Germany and is the parent/holding company of Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC, and BAYER PHARMA AG.

32.    Upon information and belief, at all relevant times, Defendant BAYER HEALTHCARE AG exercises dominion and control over Defendants BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE PHARMACEUTICALS, INC., and BAYER PHARMA AG.

33.    Upon information and belief, Defendant BAYER AG is a German chemical and pharmaceutical company that is headquartered in Leverkusen, North Rhine-Westphalia, Germany.

34.    Upon information and belief, Defendant BAYER AG is the third largest pharmaceutical company in the world.

35.    Upon information and belief, at all relevant times, Defendant BAYER AG was in the business of and did design, research, manufacture, test, advertise, promote, market, sell, and distribute Xarelto for use as an oral anticoagulant, the primary purposes of which are to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

36.    Defendants Janssen Research & Development LLC, Janssen Ortho LLC, Janssen Pharmaceuticals, Inc., Johnson & Johnson, Bayer Healthcare Pharmaceuticals, Inc., Bayer Pharma AG, Bayer Corporation, Bayer Healthcare LLC, Bayer Healthcare AG, and Bayer AG shall be referred to herein individually by name or jointly as "Defendants."

37.    At all times alleged herein, Defendants include and included any and all parents,

subsidiaries, affiliates, divisions, franchises, partners, partners, joint ventures, and organizational units of any kind, predecessors, successors and assigns and their officers, directors, employees, agents, representatives and any and all other persons acting on their behalf.

38.    At all times herein mentioned, each of the Defendants was the agent, servant, partner, predecessors in interest, and joint venture of each of the remaining Defendants herein and was at all times operating and acting with the purpose and scope of said agency, service, employment, partnership, and joint venture.

39.    At all times relevant, Defendants were engaged in the business of developing, designing, licensing, manufacturing, distributing, selling, marketing, and/or introducing into interstate commerce throughout the United States, either directly or indirection through third parties, subsidiaries or related entities, the drug Xarelto.

## JURISDICTION AND VENUE

40.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332, because the amount in controversy as to the Plaintiffs exceeds $75,000.00, exclusive of interest and costs, and because there is complete diversity of citizenship between the Plaintiffs and the Defendants.

41.    Defendants have significant contacts in the vicinage of Plaintiffs' residence such that they are subject to the personal jurisdiction of the court in that vicinage.

42.    A substantial part of the events and omissions giving rise to Plaintiffs' causes of action occurred in the vicinage of Plaintiffs' residence, as well as in this district.  Pursuant to 28 U.S.C. § 1391(a), venue is proper in both districts.

43.     Venue in this district is proper because the United States Judicial Panel on Multi-District Litigation issued a Transfer Order to centralize this litigation in the Eastern District of Louisiana, MDL 2592, and pursuant to Pre-Trial Order No.9 entered on March 24, 2015 in *In Re: Xarelto (Rivaroxaban) Products Liability Litigation.*

## NATURE OF THE CASE

44.     Plaintiff used Xarelto, also known as rivaroxaban, which is a medication used to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat deep vein thrombosis (hereinafter referred to as "DVT") and pulmonary embolism (hereinafter referred to as "PE"), to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

45.     Defendants, JANSSEN RESEARCH & DEVELOPMENT LLC f/k/a JOHNSON AND JOHNSON PHARMACEUTICAL RESEARCH AND DEVELOPMENT LLC, JANSSEN ORTHO LLC, JANSSEN PHARMACEUTICALS, INC. f/k/a JANSSEN PHARMACEUTICA INC. f/k/a ORTHO-MCNEIL-JANSSEN PHARMACEUTICALS, INC., JOHNSON & JOHNSON, BAYER HEALTHCARE PHARMACEUTICALS, INC., BAYER PHARMA AG, BAYER CORPORATION, BAYER HEALTHCARE LLC, BAYER HEALTHCARE AG, and BAYER AG (hereinafter collectively referred to as "Defendants") designed, researched, manufactured, tested, advertised, promoted, marketed, sold, and distributed Xarelto.

46.     When warning of safety and risks of Xarelto, Defendants negligently and/or fraudulently represented to the medical and healthcare community, the Food and Drug Administration (hereinafter referred to as the "FDA"), to Plaintiff and the public in general, that Xarelto had been tested and was found to be safe and/or effective for its indicated use.

47.     Defendants concealed their knowledge of Xarelto's defects from Plaintiff, the FDA, the public in general, and/or the medical community specifically.

48.     These representations were made by Defendants with the intent of defrauding and deceiving Plaintiff, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical community in particular, to recommend, dispense and/or purchase Xarelto for use to reduce the risk of stroke and systemic embolism in patients

with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to health, safety and welfare of the Plaintiff herein.

49.    Defendants negligently and improperly failed to perform sufficient tests, if any, on humans using Xarelto during clinical trials, forcing Plaintiff, and Plaintiff's physicians, hospitals, and/or the FDA, to rely on safety information that applies to other non-valvular atrial fibrillation treatment and DVT/PE treatment and prophylaxis, which does not entirely and/or necessarily apply to Xarelto whatsoever.

50.    As a result of the foregoing acts and omissions, the Plaintiff was and still is caused to suffer serious and dangerous side effects including, inter alia, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, expenses for hospitalization and medical treatment, and loss of earnings. Plaintiff herein has sustained certain of the above health consequences due to Plaintiff's use of Xarelto.

51.    Defendants concealed their knowledge of the defects in their products from the Plaintiff, and Plaintiff's physicians, hospitals, pharmacists, the FDA, and the public in general.

52.    Consequently, Plaintiff seeks compensatory damages as a result of Plaintiff's use of the Xarelto, which has caused Plaintiff to suffer from life-threatening bleeding, as well as other severe and personal injuries, which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, as well as the need for medical treatment, monitoring and/or medications, and loss of earnings.

53.    The Consortium Plaintiff seeks compensatory damages as result of Plaintiff's use of Xarelto and resulting injures. Consortium Plaintiff has suffered damages and harm, including, but not limited to, emotional distress, medical expenses, other economic harm, as well as a loss of consortium, services,

society, companionship, love and comfort.

## FACTUAL BACKGROUND

54.     At all relevant times, Defendants were in the business of and did design, research, manufacture, test, advertise, promote, market, sell and distribute Xarelto and rivaroxaban to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

55.     Defendants received FDA approval for Xarelto, also known as rivaroxaban, on July 1, 2011 for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries (NDA 022406).

56.     Defendants then received additional FDA approval for Xarelto to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation on November 4, 2011 (NDA 202439).

57.     The additional indication for treatment of DVT and/or PE and the reduction in recurrence of DVT and/or PE was added to the label on November 2, 2012.

58.     Defendants launched Xarelto in the United States (hereinafter referred to as the "U.S.") in 2011.

59.     Xarelto is an anticoagulant that acts as a Factor Xa inhibitor, and is available by prescription in oral tablet doses of 20mg, 15mg, and 10mg.

60.     Approval of Xarelto for the prophylaxis of DVT and PE in patients undergoing hip replacement or knee replacement surgeries was based on a series of clinical trials known as the Regulation of Coagulation in Orthopedic Surgery to Prevent Deep Venous Thrombosis and Pulmonary Embolism studies (hereinafter referred to as the "RECORD" studies). The findings of the RECORD studies showed that rivaroxaban was superior to enoxaparin for thromboprophylaxis after total knee

and hip arthroplasty (based on the Defendants' definition),  accompanied by similar rates of bleeding. However, the studies also showed a greater incidence  with Xarelto of bleeding leading to decreased hemoglobin levels and transfusion of blood.  (Lassen, M.R., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Total Knee  Arthroplasty*. N.Engl.J.Med. 2008;358:2776-86;  Kakkar, A.K., et al. *Extended duration  rivaroxaban versus short-term enoxaparin for the prevention of venous thromboembolism after  total hip arthroplasty: a double-blind, randomised controlled trial*. Lancet 2008;372:31-39;  Ericksson, B.I., et al. *Rivaroxaban versus Enoxaparin for Thromboprophylaxis after Hip  Arthroplasty*. N.Engl.J.Med. 2008;358:2765-75.)

61.    Approval of Xarelto for reducing the risk of stroke and systemic embolism in  patients with non-valvular atrial fibrillation in the U.S. was based on a clinical trial known as the  Rivaroxaban Once Daily Oral Direct Factor Xa Inhibition Compared with Vitamin K  Antagonism for Prevention of Stroke and Embolism Trial in Atrial Fibrillation study (hereinafter  referred to as "ROCKET AF"). The study's findings showed that rivaroxaban was noninferior to  warfarin for the prevention of stroke or systemic embolism in patients with non-valvular atrial  fibrillation, with a similar risk of major bleeding. However, "bleeding from gastrointestinal sites,  including upper, lower, and rectal sites, occurred more frequently in the rivaroxaban group, as  did bleeding that led to a drop in the hemoglobin level or bleeding that required transfusion."  (Patel, M.R., et al. *Rivaroxaban versus Warfarin in Nonvalvular Atrial Fibrillation*.  N.Engl.J.Med. 2011;365:883-91.)

62.    Approval of Xarelto for the treatment of DVT and/or PE and the reduction in  recurrence of DVT and/or PE in the U.S. was based on the clinical trials known as the  EINSTEIN-DVT, EINSTEIN-PE, and EINSTEIN-Extension studies. The EINSTEIN-DVT  study tested Xarelto versus a placebo, and merely determined that Xarelto offered an option for  treatment of DVT, with obvious increased risk of bleeding events as compared to placebo. (The  EINSTEIN Investigators. *Oral*

*Rivaroxaban for Symptomatic Venous Thromboembolism*.  N.Engl.J.Med. 2010;363:2499-510). The EINSTEIN-Extension study confirmed that result.  (Roumualdi, E., et al. *Oral rivaroxaban after symptomatic venous thromboembolism: the  continued treatment study (EINSTEIN-Extension study)*. Expert Rev. Cardiovasc. Ther.  2011;9(7):841-844). The EINSTEIN-PE study's findings showed that a rivaroxaban regimen was  non-inferior to the standard therapy for initial and long-term treatment of PE. However, the  studies also demonstrated an increased risk of adverse events with Xarelto, including those that  resulted in permanent discontinuation of Xarelto or prolonged hospitalization. (The EINSTEIN-  PE Investigators. *Oral Rivaroxaban for the Treatment of Symptomatic Pulmonary Embolism*.  N.Engl.J.Med. 2012;366:1287-97.)

63.    Defendants use the results of the ROCKET AF study, the RECORD studies, and  the EINSTEIN studies to promote Xarelto in their promotional materials, including the Xarelto  website, which tout the positive results of those studies. However, Defendants' promotional  materials fail to similarly highlight the increased risk of gastrointestinal bleeding and bleeding  that required transfusion, among other serious bleeding concerns.

64.    Defendants market Xarelto as a new oral anticoagulant treatment alternative to  warfarin (Coumadin), a long-established safe treatment for preventing stroke and systemic  embolism, in 60 years.  Defendants emphasize the supposed benefits of treatment with Xarelto over  warfarin, which they refer to as the Xarelto Difference – namely, that Xarelto does not  require periodic monitoring with blood tests and does not limit a patient's diet.

65.    However, in its QuarterWatch publication for the first quarter of the 2012 fiscal  year, the Institute for Safe Medication Practices ("ISMP") noted that, even during the approval  process, FDA "[r]eviewers also questioned the convenient once-a-day dosing scheme [of Xarelto], saying blood  level studies had shown peaks and troughs that could be eliminated by  twice-a-day dosing."

66.    Importantly, there is no antidote to Xarelto, unlike warfarin. Therefore, in the event of hemorrhagic complications, there is no available reversal agent. The original U.S. label  approved when the drug was first marketed in the U.S. did not contain a warning regarding the  lack of antidote, but instead only mentioned this important fact in the overdosage section.

67.    Defendants spent significant money in promoting Xarelto, which included at least $11,000,000.00 spent during 2013 alone on advertising in journals targeted at prescribers and consumers in the U.S. In the third quarter of the 2013 fiscal year, Xarelto was the number one pharmaceutical product advertised in professional health journals based on pages and dollars  spent.

68.    As a result of Defendants' aggressive marketing efforts, in its first full year of  being on the market, Xarelto garnered approximately $582 million in sales globally.

69.    Defendants' website for Xarelto claims that over seven million people worldwide  have been prescribed Xarelto. In the U.S., approximately 1 million Xarelto prescriptions had  been written by the end of 2013.

70.    During the Defendants' 2012 fiscal year, Xarelto garnered approximately $658 million in sales worldwide. Then, in 2013, sales for Xarelto increased even further to more than clear the $1 billion threshold commonly referred to as "blockbuster" status in the pharmaceutical  industry, ultimately reaching approximately $2 billion for the fiscal year. Thus, Xarelto is now  considered the leading anticoagulant on a global scale in terms of sales.

71.    As part of their marketing of Xarelto, Defendants widely disseminated direct-to-consumer advertising campaigns that were designed to influence patients, including Plaintiffs, to  make inquiries to their prescribing physician about Xarelto and/or request prescriptions for  Xarelto.

72.    In the course of these direct to consumer advertisements, Defendants overstated  the efficacy of Xarelto with respect to preventing stroke and systemic embolism, failed to  adequately

disclose to patients that there is no drug, agent, or means to reverse the anticoagulation effects of Xarelto, and that such irreversibility could have permanently disabling, life-threatening and fatal consequences.

73.     On June 6, 2013, Defendants received an untitled letter from the FDA's Office of Prescription Drug Promotion (hereinafter referred to as the "OPDP") regarding its promotional material for the atrial fibrillation indication, stating that, "the print ad is false or misleading because it minimizes the risks associated with Xarelto and makes a misleading claim" regarding dose adjustments, which was in violation of FDA regulations. The OPDP thus requested that Defendants immediately cease distribution of such promotional material.

74.     Prior to Plaintiffs' prescriptions of Xarelto, Plaintiffs became aware of the promotional materials described herein.

75.     Prior to Plaintiffs' prescription of Xarelto, Plaintiffs' prescribing physician received promotional materials and information from sales representatives of Defendants that Xarelto was just as effective as warfarin in reducing strokes in patients with non-valvular atrial fibrillation, as well as preventing DVT/PE in patients with prior history of DVT/PE or undergoing hip or knee replacement surgery, and was more convenient, without also adequately informing prescribing physicians that there was no reversal agent that could stop or control bleeding in patients taking Xarelto.

76.     At all times relevant hereto, Defendants also failed to warn emergency room doctors, surgeons, and other critical care medical professionals that unlike generally-known measures taken to treat and stabilize bleeding in users of warfarin, there is no effective agent to reverse the anticoagulation effects of Xarelto, and therefore no effective means to treat and stabilize patients who experience uncontrolled bleeding while taking Xarelto.

77.     At all times relevant to this action, The Xarelto Medication Guide, prepared and

distributed by Defendants and intended for U.S. patients to whom Xarelto has been prescribed,  failed to warn and disclose to patients that there is no agent to reverse the anticoagulation effects  of Xarelto and that if serious bleeding occurs, it may be irreversible, permanently disabling, and  life-threatening.

78.     In the year leading up to June 30, 2012, there were 1,080 Xarelto-associated "Serious  Adverse Event" ("SAE") Medwatch reports filed with the FDA, including at least 65  deaths. Of the reported hemorrhage events associated with Xarelto, 8% resulted in death, which  was approximately twofold the risk of a hemorrhage-related death with warfarin.

79.     At the close of the 2012 fiscal year, a total of 2,081 new Xarelto-associated SAE reports were filed with the FDA in its first full year on the market, ranking tenth among other pharmaceuticals in direct reports to the FDA. Of those reported events, 151 resulted in death, as compared to only 56 deaths associated with warfarin.

80.     The ISMP referred to these SAE figures as constituting a "strong signal"  regarding the safety of Xarelto, defined as "evidence of sufficient weight to justify an alert to the  public and the scientific community, and to warrant further investigation."

81.     Of particular note, in the first quarter of 2013, the number of reported serious  adverse events associated with Xarelto (680) overtook that of Pradaxa (528), another new oral  anticoagulant, which had previously ranked as the number one reported drug in terms of adverse  events in 2012.

82.     Moreover, on a global scale, in the first eight months of 2013, German regulators  received 968 Xarelto-related averse event reports, including 72 deaths, as compared to a total of  750 reports and 58 deaths in 2012.

83.     Despite the clear signal generated by the SAE data, Defendants failed to either  alert the public and the scientific community, or perform further investigation into the safety of  Xarelto.

84.     Defendants original, and in some respects current labeling and prescribing  information

for Xarelto:

(a)    failed to investigate, research, study and define, fully and adequately, the  safety profile of Xarelto;

(b)    failed to provide adequate warnings about the true safety risks associated  with the use of Xarelto;

(c)    failed to provide adequate warning regarding the pharmacokinetic and pharmacodynamic variability of Xarelto and its effects on the degree of  anticoagulation in a patient;

(d)    failed to provide adequate warning that it is difficult or impossible to assess   the degree and/or extent of anticoagulation in patients taking Xarelto;

(e)    failed to disclose in the "Warnings" Section that there is no drug, agent or  means to reverse the anticoagulation effects of Xarelto;

(f)    failed to advise prescribing physicians, such as the Plaintiff's physician, to  instruct patients that there was no agent to reverse the anticoagulant effects  of Xarelto;

(g)    failed to provide adequate instructions on how to intervene and/or stabilize a  patient who suffers a bleed while taking Xarelto;

(h)    failed to provide adequate warnings and information related to the increased   risks of bleeding events associated with aging patient populations of Xarelto  users;

(i)    failed to provide adequate warnings regarding the increased risk of gastrointestinal bleeds in those taking Xarelto, especially, in those patients  with a prior history of gastrointestinal issues and/or upset;

(j)    failed to provide adequate warnings regarding the increased risk of suffering  a bleeding event, requiring blood transfusions in those taking Xarelto;

(k)    failed to provide adequate warnings regarding the need to assess renal functioning prior to starting a patient on Xarelto and to continue testing and  monitoring of renal functioning periodically while the patient is on Xarelto;

(l)    failed to provide adequate warnings regarding the need to assess hepatic  functioning prior to starting a patient on Xarelto and to continue testing and  monitoring of hepatic functioning periodically while the patient is on  Xarelto;

(m)  failed to include a "**BOXED WARNING**" about serious bleeding events associated with Xarelto;

(n)  failed to include a "**BOLDED WARNING**" about serious bleeding events associated with Xarelto; and

(o)  in their "Medication Guide" intended for distribution to patients to whom Xarelto has been prescribed, Defendants failed to disclose to patients that there is no drug, agent or means to reverse the anticoagulation effects of Xarelto and that if serious bleeding occurs, such irreversibility could have permanently disabling, life-threatening or fatal consequences.

85.    During the years since first marketing Xarelto in the U.S., Defendants modified the U.S. labeling and prescribing information for Xarelto, which included additional information regarding the use of Xarelto in patients taking certain medications. Despite being aware of: (1) serious, and sometimes fatal, irreversible bleeding events associated with the use of Xarelto; and 2,081 SAE Medwatch reports filed with the FDA in 2012 alone, including at least 151 deaths, Defendants nonetheless failed to provide adequate disclosures or warnings in their label as detailed in Paragraphs 103 (a – o).

86.    Prior to applying for and obtaining approval of Xarelto, Defendants knew or should have known that consumption of Xarelto was associated with and/or would cause the induction of life-threatening bleeding, and Defendants possessed at least one clinical scientific study, which evidence Defendants knew or should have known was a signal that life-threatening bleeding risk needed further testing and studies prior to its introduction to the market.

87.    Upon information and belief, despite life-threatening bleeding findings in a clinical trial and other clinical evidence, Defendants failed to adequately conduct complete and proper testing of Xarelto prior to filing their New Drug Application for Xarelto.

88.    Upon information and belief, from the date Defendants received FDA approval to market Xarelto, Defendants made, distributed, marketed, and sold Xarelto without adequate warning to

Plaintiffs' prescribing physicians or Plaintiffs that Xarelto was associated with and/or could cause life-threatening bleeding, presented a risk of life-threatening bleeding in patients who used it, and that Defendants had not adequately conducted complete and proper testing and studies of Xarelto with regard to severe side effects, specifically life-threatening bleeding.

89.    Upon information and belief, Defendants concealed and failed to completely disclose its knowledge that Xarelto was associated with or could cause life-threatening bleeding as well as its knowledge that they had failed to fully test or study said risk.

90.    Upon information and belief, Defendants ignored the association between the use of Xarelto and the risk of developing life-threatening bleeding.

91.    Defendants' failure to disclose information that they possessed regarding the failure to adequately test and study Xarelto for life-threatening bleeding risk further rendered warnings for this medication inadequate.

92.    By reason of the foregoing acts and omissions, the Plaintiff was caused to suffer from life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, expenses for hospitalization and medical treatment, and loss of earnings.

93.    By reason of the forgoing acts and omissions, the Consortium Plaintiff has suffered damages and harm, including, but not limited to, emotional distress, medical expenses, other economic harm, as well as a loss of consortium, services, society, companionship, love and comfort.


## COUNT I
## (STRICT LIABILITY)

94.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth full at length herein. Plaintiff pleads this Count in the broadest sense possible, pursuant to all

laws that may apply pursuant to choice of law principles, including the law of the Plaintiff's resident state.

95.    At all times herein mentioned, the Defendants designed, researched, manufactured, tested, advertised, promoted, marketed, sold, distributed, and/or have recently  acquired the Defendants who have designed, researched, manufactured, tested, advertised,  promoted, marketed, sold and distributed Xarelto as hereinabove described that was used by the  Plaintiff.

96.    Xarelto was expected to and did reach the usual consumers, handlers, and persons coming into contact with said product without substantial change in the condition in  which it was produced, manufactured, sold, distributed, and marketed by the Defendants.

97.    At those times, Xarelto was in an unsafe, defective, and inherently dangerous condition, which was dangerous to users, and in particular, the Plaintiff herein.

98.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design or formulation in that,  when it left the hands of the manufacturer and/or suppliers, the foreseeable risks exceeded the  benefits associated with the design or formulation of Xarelto.

99.    The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective in design and/or formulation, in that,  when it left the hands of the Defendants, manufacturers, and/or suppliers, it was unreasonably  dangerous, and it was more dangerous than an ordinary consumer would expect.

100.   At all times herein mentioned, Xarelto was in a defective condition and unsafe,  and Defendants knew or had reason to know that said product was defective and unsafe,  especially when used in the form and manner as provided by the Defendants.

101.   Defendants knew, or should have known that at all times herein mentioned, their  Xarelto was in a defective condition, and was and is inherently dangerous and unsafe.

102.  At the time of the Plaintiff's use of Xarelto, Xarelto was being used for the purposes and in a manner normally intended, namely to reduce the risk of stroke and systemic  embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT  and/or  PE,  and for prophylaxis of  DVT  for  patients undergoing  hip and knee  replacement  surgery.

103.  Defendants  with  this  knowledge  voluntarily  designed  its  Xarelto  in  a  dangerous condition for use by the public, and in particular the Plaintiff.

104.  Defendants had a duty to create a product that was not unreasonably dangerous for its normal, intended use.

105.  Defendants  created  a  product  unreasonably  dangerous  for  its  normal,  intended  use.

106.  The  Xarelto  designed,  researched,  manufactured,  tested,  advertised,  promoted, marketed, sold and distributed by Defendants was manufactured defectively in that Xarelto left  the hands of Defendants in a defective condition and was unreasonably dangerous to its intended  users.

107.  The  Xarelto  designed,  researched,  manufactured,  tested,  advertised,  promoted, marketed, sold and distributed by Defendants reached their intended users in the same defective  and unreasonably dangerous condition in which the Defendants' Xarelto was manufactured.

108.  Defendants designed, researched, manufactured, tested, advertised, promoted,  marketed, sold  and  distributed  a  defective  product  which  created  an  unreasonable  risk  to  the   health of consumers and to the Plaintiff in particular; and Defendants are therefore strictly liable  for the injuries sustained by the Plaintiff.

109.  The  Plaintiff could not, by  the exercise of reasonable care, have discovered  Xarelto's defects herein mentioned and perceived its danger.

110.  The  Xarelto  designed,  researched,  manufactured,  tested,  advertised,  promoted, marketed,  sold  and  distributed  by  Defendants  was  defective  due  to  inadequate  warnings  or

instructions, as the Defendants knew or should have known that the product created a risk of serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to adequately warn of said risk.

111. The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate warnings and/or inadequate testing.

112. The Xarelto designed, researched, manufactured, tested, advertised, promoted, marketed, sold and distributed by Defendants was defective due to inadequate post-marketing surveillance and/or warnings because, after Defendants knew or should have known of the risks of serious side effects including, life-threatening bleeding, as well as other severe and permanent health consequences from Xarelto, they failed to provide adequate warnings to users or consumers of the product, and continued to improperly advertise, market and/or promote their product, Xarelto.

113. By reason of the foregoing, the Defendants have become strictly liable in tort to the Plaintiff for the manufacturing, marketing, promoting, distribution, and selling of a defective product, Xarelto.

114. Defendants' defective design, manufacturing defect, and inadequate warnings of Xarelto were acts that amount to willful, wanton, and/or reckless conduct by Defendants.

115. That said defects in Defendants' drug Xarelto were a substantial factor in causing Plaintiff's injuries. As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, expenses for hospitalization and medical treatment, and loss of earnings.

116.   As a result of the foregoing acts and omissions, Consortium Plaintiff has suffered damages and harm, including, but not limited to, emotional distress, medical expenses, other economic harm, as well as a loss of consortium, services, society, companionship, love and comfort.

117.   By reason of the foregoing, Plaintiffs have suffered injuries and damages as alleged herein.

## COUNT II
## MANUFACTURING DEFECT

118.   Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth full at length herein. Plaintiff pleads this Count in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, regardless of whether arising under statute and/or common law.

119.   Xarelto was designed, manufactured, marketed, promoted, sold, and introduced into the stream of commerce by Defendants.

120.   When it left the control of Defendants, Xarelto was expected to, and did, reach Plaintiff without substantial change from the condition in which it left Defendant's control.

121.   Xarelto was defective when it left Defendant's control and was placed in the stream of commerce in that there were foreseeable risks that exceeded the benefits of the product and/or that it deviated from product specifications and/or applicable federal requirements, and posed a risk of serious injury and death.

122.   Specifically, Xarelto was more likely to cause serious bleeding that may be irreversible, permanently disabling, and life-threatening than other anticoagulants.

123.   Plaintiff used Xarelto in substantially the same condition it was when it left the control of Defendants and any changes or modifications were foreseeable by Defendants.

124.   Plaintiff and Plaintiff's healthcare providers did not misuse or materially alter the Xarelto.

125.    As a direct and proximate result of the use of Xarelto, Plaintiff suffered serious physical injury (and in some cases death), harm, damages and economic loss, and will continue to suffer such harm, damages and economic loss in the future.

<u>COUNT III</u>
<u>DESIGN DEFECT</u>

126.    Plaintiff incorporates by reference each preceding and succeeding paragraph as though set forth full at length herein.  Plaintiff pleads this Count in the broadest sense possible, pursuant to all laws that may apply pursuant to choice of law principles, regardless of whether arising under statute and/or common law.

127.    Xarelto was not merchantable and/or reasonably suited to the use intended, and its condition when sold was the proximate cause of the injuries sustained by Plaintiff.

128.    Defendants placed Xarelto into the stream of commerce with wanton and reckless disregard for public safety,

129.    Xarelto was in an unsafe, defective, and inherently dangerous condition.

130.    Xarelto contains defects in its design which render the drug dangerous to consumers, such as Plaintiff, when used as intended or as reasonably foreseeable to Defendants.  The design defects render Xarelto more dangerous than other anticoagulants and cause an unreasonable increased risk of injury, including, but not limited to, life-threatening bleeding events.

131.    Xarelto was in a defection condition and unsafe, and Defendants knew, had reason to know, or should have known that Xarelto was defective and unsafe, even when used as directed.

132.    The nature and magnitude of the risk of harm associated with the design of Xarelto, including the risk of serious bleeding that may be irreversible, permanently disabling, and life-threatening is high in light of the intended and reasonably foreseeable use of Xarelto.

133.     The risks of harm associated with the design of Xarelto are higher than necessary.

134.     It is unlikely that Xarelto users would be aware of the risks associated with Xarelto through either warnings, general knowledge or otherwise, and Plaintiff specifically was not aware of these risks, nor would Plaintiff expect them.

135.     The design did not conform to any applicable public or private product standard that was in effect when Xarelto left the Defendant's control.

136.     Xarelto's design is more dangerous than a reasonably prudent consumer would expect when used in its intended or reasonably foreseeable manner.  It was more dangerous than Plaintiff expected.

137.     The intended or actual utility of Xarelto is not of such benefit to justify the risk of bleeding that may be irreversible, permanently disabling, and life-threatening.

138.     At the time Xarelto left Defendants' control, it was both technically and economically feasible to have an alternative design that would not cause bleeding that may be irreversible, permanently disabling, and life-threatening or an alternative design that would have substantially reduced the risk of these injuries.

139.     It was both technically and economically feasible to provide a safer alternative product that would have prevented the harm suffered by plaintiff.

140.     Defendants' conduct was extreme and outrageous.   Defendants risked the lives of consumers and users of their products, including Plaintiff, with the knowledge of the safety and efficacy problems and suppressed this knowledge from the general public.  Defendants made conscious decisions not to redesign, re-label, warn or inform the unsuspecting consuming public.  Defendants' outrageous conduct warrants an award of punitive damages.

141.     The unreasonably dangerous nature of Xarelto caused serious harm to Plaintiff.

142.    As a direct and proximate result of Plaintiff's use of the Xarelto, which was designed, manufactured, promoted, sold, and introduced into the stream of commerce by Defendants, Plaintiff suffered serious physical injury, harm (and in some cases death), damages and economic loss and will continue to suffer such harm, damages, and economic loss in the future.

## COUNT IV
## (STRICT LIABILITY — FAILURE TO WARN)

143.    Plaintiff repeats and re-alleges the allegations of the prior paragraphs as if set forth at length herein.

144.    Defendants have engaged in the business of selling, distributing, supplying, manufacturing, marketing, and/or promoting Xarelto, and through that conduct has knowingly and intentionally placed the same into the stream of commerce with full knowledge that it reaches consumers such as Plaintiff who ingested it.

145.    Defendants did in fact sell, distribute, supply, manufacture, and/or promote Xarelto to Plaintiff and to Plaintiff's prescribing physicians. Additionally, Defendant expected the Xarelto that it was selling, distributing, supplying, manufacturing, and/or promoting to reach - and Xarelto did in fact reach - prescribing physicians and consumers, including Plaintiff and Plaintiff's prescribing physicians, without any substantial change in the condition of the product from when it was initially distributed by Defendant.

146.    At all times herein mentioned, the aforesaid product was defective and unsafe in manufacture such that it was unreasonably dangerous to the user, and was so at the time it was distributed by Defendant and ingested by Plaintiff.  The defective condition of Xarelto was due in part to the fact that it was not accompanied by proper warnings regarding the possible side effect of life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to  adequately warn of said risk.

147.   This defect caused serious injury to Plaintiff, who used Xarelto in its intended and foreseeable manner.

148.   At all times herein mentioned, Defendant had a duty to properly design, manufacture, compound, test, inspect, package, label, distribute, market, examine, maintain supply, provide proper warnings, and take such steps to assure that Xarelto did not cause users to suffer from unreasonable and dangerous side effects.

149.   Defendant so negligently and recklessly labeled, distributed, and promoted Xarelto that it was dangerous and unsafe for the use and purpose for which it was intended.

150.   Defendant negligently and recklessly failed to warn of the nature and scope of the side effects associated with Xarelto, namely life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature and the Defendants failed to  adequately warn of said risk.

151.   Defendant was aware of the probable consequences of the aforesaid conduct.  Despite the fact that Defendant knew or should have known that Xarelto caused serious injuries, it failed to exercise reasonable care to warn of the dangerous side effect of developing life-threatening bleeding from Xarelto use, even though this side effect was known or reasonably scientifically knowable at the time of distribution. Defendant willfully and deliberately failed to avoid the consequences associated with its failure to warn, and in doing so, Defendant acted with a conscious disregard for the safety of Plaintiffs.

152.   Plaintiff could not have discovered any defect in the subject product through the exercise of reasonable care.

153.   Defendant, as the manufacturer and/or distributor of the subject product, is held to the level of knowledge of an expert in the field.

154.   Plaintiff reasonably relied upon the skill, superior knowledge, and judgment of Defendants.

155.   Had Defendants properly disclosed the risks associated with Xarelto, Plaintiff would have avoided the risk of life-threatening bleeding and other serious injuries by either not using Xarelto at all or by taking other action, including increased monitoring, to prevent the injuries plaintiff ultimately sustained.

156.   As a result of the foregoing acts and omissions, Plaintiff was caused to sufferer serious and dangerous side effects including, life-threatening bleeding, as well as other severe  and person injuries which are permanent and lasting in nature, physical pain and  mental   anguish, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization,  and loss of earnings.

157.   As a result of the foregoing acts and omissions, Consortium Plaintiff has suffered damages and harm, including, but not limited to, emotional distress, medical expenses, other economic harm, as well as a loss of consortium, services, society, companionship, love, and comfort.

158.    By reason of the foregoing, Plaintiffs have suffered injuries and damages as alleged herein.

## COUNT V
## (NEGLIGENCE)

159.   Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if  more fully set forth herein.

160.   Defendants had a duty to exercise reasonable care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale and/or distribution of Xarelto  into the stream of commerce, including a duty to assure that the product would not cause users to  suffer unreasonable, dangerous side effects.

161.   Defendants failed to exercise ordinary care in the designing, researching, manufacturing, marketing, supplying, promoting, packaging, sale, testing, quality  assurance,   quality

control, and/or distribution of Xarelto into interstate commerce in that Defendants knew or should have known that using Xarelto created a high risk of unreasonable, dangerous side effects, including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, including diminished enjoyment of life, expenses for hospitalization and medical treatment, and loss of earnings.

162.   The negligence of the Defendants, their agents, servants, and/or employees, included but was not limited to the following acts and/or omissions:

(a)   Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without thoroughly testing it;

(b)   Manufacturing, producing, promoting, formulating, creating, and/or designing Xarelto without adequately testing it;

(c)   Not conducting sufficient testing programs to determine whether or not Xarelto was safe for use; in that Defendants herein knew or should have known that Xarelto was unsafe and unfit for use by reason of the dangers to its users;

(d)   Selling Xarelto without making proper and sufficient tests to determine the dangers to its users;

(e)   Negligently failing to adequately and correctly warn the Plaintiffs, the public, the medical and healthcare profession, and the FDA of the dangers of Xarelto;

(f)   Failing to provide adequate instructions regarding safety precautions to be observed by users, handlers, and persons who would reasonably and foreseeably come into contact with, and more particularly, use, Xarelto;

(g)   Failing to test Xarelto and/or failing to adequately, sufficiently and properly test Xarelto.

(h)   Negligently advertising and recommending the use of Xarelto without sufficient knowledge as to its dangerous propensities;

(i)   Negligently representing that Xarelto was safe for use for its intended purpose, when, in fact, it was unsafe;

(j)   Negligently representing that Xarelto had equivalent safety and

efficacy as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(k)   Negligently designing Xarelto in a manner which was dangerous to its users;

(l)   Negligently manufacturing Xarelto in a manner which was dangerous to its users;

(m)   Negligently producing Xarelto in a manner which was dangerous to its users;

(n)   Negligently assembling Xarelto in a manner which was dangerous to its users;

(o)   Concealing information from the Plaintiffs in knowing that Xarelto was unsafe, dangerous, and/or non-conforming with FDA regulations;

(p)   Improperly concealing and/or misrepresenting information from the Plaintiffs, healthcare professionals, and/or the FDA, concerning the severity of risks and dangers of Xarelto compared to other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non- valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

163.   Defendants under-reported, underestimated and downplayed the serious dangers of Xarelto.

164.   Defendants negligently compared the safety risk and/or dangers of Xarelto with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

165.   Defendants were negligent in the designing, researching, supplying, manufacturing, promoting, packaging, distributing, testing, advertising, warning, marketing and sale of Xarelto in that they:

(a)   Failed to use due care in designing and manufacturing Xarelto so as to avoid the aforementioned risks to individuals when Xarelto was used

for treatment for reducing the risk of stroke and systemic embolism in patients with non-

valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery;

(b)   Failed to accompany their product with proper and/or accurate warnings regarding all possible adverse side effects associated with the use of Xarelto;

(c)   Failed to accompany their product with proper warnings regarding all possible adverse side effects concerning the failure and/or malfunction of Xarelto;

(d)   Failed to accompany their product with accurate warnings regarding the risks of all possible adverse side effects concerning Xarelto;

(e)   Failed to warn Plaintiffs of the severity and duration of such adverse effects, as the warnings given did not accurately reflect the symptoms, or severity of the side effects;

(f)   Failed to conduct adequate testing, including pre-clinical and clinical testing and post-marketing surveillance to determine the safety of Xarelto;

(g)   Failed to warn Plaintiffs, prior to actively encouraging the sale of Xarelto, either directly or indirectly, orally or in writing, about the need for more comprehensive, more regular medical monitoring than usual to ensure early discovery of potentially serious side effects;

(h)   Were otherwise careless and/or negligent.

166.   Despite the fact that Defendants knew or should have known that Xarelto caused unreasonably dangerous side effects, Defendants continued and continue to market, manufacture, distribute and/or sell Xarelto to consumers, including the Plaintiffs.

167.   Defendants knew or should have known that consumers such as the Plaintiffs would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care, as set forth above.

168.   Defendants' negligence was the proximate cause of Plaintiffs' injuries, harm and economic loss, which Plaintiffs suffered.

169.   As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious

and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, expenses for hospitalization and medical treatment, and loss of earnings.

170. As a result of the foregoing acts and omissions, Consortium Plaintiff has suffered damages and harm, including, but not limited to, emotional distress, medical expenses, other economic harm, as well as a loss of consortium, services, society, companionship, love and comfort.

171. By reason of the foregoing, Plaintiffs have suffered injuries and damages as alleged herein.

## COUNT VI
## (NEGLIGENT FAILURE TO WARN)

172. Plaintiffs hereby incorporate by reference as if fully set forth herein, each and every allegation contained in the paragraphs above.

173. Defendant owed Plaintiff a duty to warn of any dangerous defects or side effects; a duty to assure its product, Xarelto, did not cause users unreasonable and dangerous risks, reactions, or side effects; and a duty to provide adequate post market surveillance and warnings as it learned of Xarelto's substantial dangers.

174. Defendant breached its duty of reasonable care to Plaintiff in that Defendant failed to:

   a) Conduct sufficient testing which, if properly performed, would have shown that Xarelto had serious side effects, including higher risks of life-threatening bleeding and other risks; and/or

   b) Include adequate warnings with Xarelto that would alert users to the potential risks and serious side effects the drug; and/or

   c) Warn the Plaintiff that use of Xarelto carried a risk of life-threatening bleeding and related problems; and/or

d) Advise the FDA, the health care industry, and the public about the adverse reports it had received regarding Xarelto; and/or

e) Other appropriate warnings.

175. Defendant should have known that Xarelto caused unreasonably dangerous risks and serious side effects of which the general public would not be aware. Defendant nevertheless advertised, marketed and promoted its product without adequately warning Plaintiff and Plaintiff's physicians and healthcare providers of the unreasonable risk of life-threatening bleeding associated with use of Xarelto.

176. As a result of the foregoing acts and omissions, Plaintiff was caused to sufferer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and person injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, shortened life expectancy, expenses for hospitalization, and loss of earnings.

177. As a result of the foregoing acts and omissions, Consortium Plaintiff has suffered damages and harm, including, but not limited to, emotional distress, medical expenses, other economic harm, as well as a loss of consortium, services, society, companionship, love, and comfort.

178. By reason of the foregoing, Plaintiffs have suffered injuries and damages as alleged herein.

## <u>COUNT VII</u>
### <u>(BREACH OF EXPRESS WARRANTY)</u>

179. Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

180. Defendants expressly warranted that Xarelto was safe and well accepted by users.

181. Xarelto does not conform to these express representations because Xarelto is not safe and has numerous serious side effects, many of which were not accurately warned about by Defendants. As a direct and proximate result of the breach of said warranties, Plaintiff suffered and/or will continue

to suffer severe and permanent personal injuries, harm and economic loss.

182.   Plaintiff did rely on the express warranties of the Defendants herein.

183.   Members of the medical community, including physicians and other healthcare professionals, relied upon the representations and warranties of the Defendants for use of Xarelto   in recommending, prescribing, and/or dispensing Xarelto.

184.   The Defendants herein breached the aforesaid express warranties, as their drug  Xarelto was defective.

185.   Defendants expressly represented to Plaintiff, Plaintiff's physicians, healthcare providers, and/or the FDA that Xarelto was safe and fit for use for the purposes intended, that it  was of merchantable quality, that it did not produce any dangerous side effects in excess of those  risks associated with other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT  and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement  surgery, that the side effects it did produce were accurately reflected in the warnings and that it  was adequately tested and fit for its intended use.

186.   Defendants knew or should have known that, in fact, said representations and warranties were false, misleading and untrue in that Xarelto was not safe and fit for the use intended, and, in fact, produced serious injuries to the users that were not accurately identified  and represented by Defendants.

187.   As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe  and personal injuries which are permanent and lasting in nature, physical pain and mental  anguish, diminished enjoyment of life, expenses for hospitalization and medical treatment, and  loss of earnings.

188.   As a result of the foregoing acts and omissions, Consortium Plaintiff has suffered damages and harm, including, but not limited to, emotional distress, medical expenses, other economic harm, as well as a loss of consortium, services, society, companionship, love and comfort.

189.   By reason of the foregoing, Plaintiffs have suffered injuries and damages as alleged herein.

## COUNT VIII
## (BREACH OF IMPLIED WARRANTIES)

190.   Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

191.   At all times herein mentioned, the Defendants manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto and/or have recently acquired the Defendants who have manufactured, compounded, portrayed, distributed, recommended, merchandized, advertised, promoted and sold Xarelto, to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

192.   At the time Defendants marketed, sold, and distributed Xarelto for use by Plaintiff, Defendants knew of the use for which Xarelto was intended and impliedly warranted the product to be of merchantable quality and safe and fit for such use.

193.   The Defendants impliedly represented and warranted to the users of Xarelto and their physicians, healthcare providers, and/or the FDA that Xarelto was safe and of merchantable quality and fit for the ordinary purpose for which said product was to be used.

194.   That said representations and warranties aforementioned were false, misleading, and

inaccurate in that Xarelto was unsafe, unreasonably dangerous, improper, not of merchantable quality, and defective.

195.   Plaintiff, and/or members of the medical community and/or healthcare professionals did rely on said implied warranty of merchantability of fitness for a particular use and purpose.

196.   Plaintiff and Plaintiff's physicians and healthcare professionals reasonably relied upon the skill and judgment of Defendants as to whether Xarelto was of merchantable quality and safe and fit for its intended use.

197.   Xarelto was injected into the stream of commerce by the Defendants in a defective, unsafe, and inherently dangerous condition and the products and materials were expected to and did reach users, handlers, and persons coming into contact with said products without substantial change in the condition in which they were sold.

198.   The Defendants herein breached the aforesaid implied warranties, as their drug Xarelto was not fit for its intended purposes and uses.

199.   As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, expenses for hospitalization and medical treatment, and loss of earnings.

200.   As a result of the foregoing acts and omissions, Consortium Plaintiff has suffered damages and harm, including, but not limited to, emotional distress, medical expenses, other economic harm, as well as a loss of consortium, services, society, companionship, love and comfort.

201.   By reason of the foregoing, Plaintiffs have suffered injuries and damages as alleged herein.

**COUNT IX**
**(FRAUDULENT MISREPRESENTATION)**

202.   Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

203.   The Defendants falsely and fraudulently represented to the medical and healthcare community, and to the Plaintiff, and/or the FDA, and the public in general, that said product, Xarelto, had been tested and was found to be safe and/or effective to reduce the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, to treat DVT and PE, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

204.   That representations made by Defendants were, in fact, false.

205.   When said representations were made by Defendants, they knew those representations to be false and it willfully, wantonly, and recklessly disregarded whether the representations were true.

206.   These representations were made by said Defendants with the intent of defrauding and deceiving the Plaintiff, the public in general, and the medical and healthcare community in particular, and were made with the intent of inducing the public in general, and the medical and healthcare community in particular, to recommend, prescribe, dispense and/or purchase said product, Xarelto, for use to reduce the risk of stroke and systemic embolism in patients with non- valvular atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, all of which evinced a callous, reckless, willful, depraved indifference to the health, safety and welfare of the Plaintiff herein.

207.   At the time the aforesaid representations were made by the Defendants and, at the time the Plaintiff used Xarelto, the Plaintiff was unaware of the falsity of said representations and reasonably believed them to be true.

208.   In reliance upon said representations, the Plaintiff was induced to and did use Xarelto, thereby sustaining severe and permanent personal injuries.

209.   Said Defendants knew and were aware or should have been aware that Xarelto had not been sufficiently tested, was defective in nature, and/or that it lacked adequate and/or sufficient warnings.

210.   Defendants knew or should have known that Xarelto had a potential to, could, and would cause severe and grievous injury to the users of said product, and that it was inherently dangerous in a manner that exceeded any purported, inaccurate, and/or down-played warnings.

211.   Defendants brought Xarelto to the market, and acted fraudulently, wantonly and maliciously to the detriment of the Plaintiff.

212.   As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, expenses for hospitalization and medical treatment, and loss of earnings.

213.   As a result of the foregoing acts and omissions, the Consortium Plaintiff has suffered damages and harm, including, but not limited to, emotional distress, medical expenses, other economic harm, as well as a loss of consortium, services, society, companionship, love and comfort.

214.   By reason of the foregoing, Plaintiffs have suffered injuries and damages as alleged herein.

## COUNT X
## (FRAUDULENT CONCEALMENT)

215.   Plaintiffs repeat, reiterate, and reallege each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more

fully set forth herein.

216.   At all times during the course of dealing between Defendants and Plaintiff, and/or Plaintiff's healthcare providers, and/or the FDA, Defendants misrepresented the safety of Xarelto  for its intended use.

217.   Defendants knew or were reckless in not knowing that its representations were false.

218.   In representations to Plaintiff, and/or Plaintiff's healthcare providers, and/or the  FDA, Defendants fraudulently concealed and intentionally omitted the following material  information:

(a)   that Xarelto was not as safe as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial  fibrillation, reducing the risk of recurrence of DVT and/or PE,  and for  prophylaxis of DVT for patients undergoing hip and knee replacement  surgery;

(b)   that the risks of adverse events with Xarelto were higher than those with  other forms of treatment for reducing the risk of stroke and systemic  embolism in patients with non-valvular atrial fibrillation, reducing the risk  of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients  undergoing hip and knee replacement surgery;

(c)   that the risks of adverse events with Xarelto were not adequately tested  and/or known by Defendants;

(d)   that Defendants were aware of dangers in Xarelto, in addition to and above  and beyond those associated with other forms of treatment for reducing the  risk of stroke and systemic embolism in patients with non-valvular atrial  fibrillation, reducing the risk of recurrence of DVT and/or PE, and for  prophylaxis of DVT for patients undergoing hip and knee replacement  surgery;

(e)   that Xarelto was defective, and that it caused dangerous side effects, including but not limited to life-threatening bleeding, as well as other severe  and permanent health consequences, in a much more and significant rate  than other forms of treatment for reducing the risk of stroke and systemic  embolism in patients with non-valvular atrial fibrillation, reducing the risk  of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients  undergoing hip and knee replacement surgery;

(f)   that patients needed to be monitored more regularly than normal while

using Xarelto;

(g)   that Xarelto was manufactured negligently;

(h)   that Xarelto was manufactured defectively;

(i)   that Xarelto was manufactured improperly;

(j)   that Xarelto was designed negligently;

(k)   that Xarelto was designed defectively; and

(l)   that Xarelto was designed improperly.

219.   Defendants were under a duty to disclose to Plaintiff, and Plaintiff's physicians, hospitals, healthcare providers, and/or the FDA the defective nature of Xarelto, including but not limited to the heightened risks of life-threatening bleeding.

220.   Defendants had sole access to material facts concerning the defective nature of the product and its propensity to cause serious and dangerous side effects, and hence, cause damage to persons who used Xarelto, including the Plaintiffs, in particular.

221.   Defendants' concealment and omissions of material facts concerning, inter alia, the safety of Xarelto was made purposefully, willfully, wantonly, and/or recklessly, to mislead Plaintiff, and Plaintiff's physicians, hospitals and healthcare providers into reliance, continued use of Xarelto, and actions thereon, and to cause them to purchase, prescribe, and/or dispense Xarelto and/or use the product.

222.   Defendants knew that Plaintiff, and Plaintiff's physicians, hospitals, healthcare providers, and/or the FDA had no way to determine the truth behind Defendants' concealment and omissions, and that these included material omissions of facts surrounding Xarelto, as set forth herein.

223.   Plaintiffs, as well as Plaintiffs' doctors, healthcare providers, and/or hospitals reasonably relied on facts revealed which negligently, fraudulently and/or purposefully did not include facts that

were concealed and/or omitted by Defendants.

224.   As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe  and  personal injuries which  are  permanent and lasting  in  nature,  physical  pain  and  mental  anguish, diminished enjoyment of life, expenses for hospitalization and medical treatment, and  loss of earnings.

225.   As  a  result  of  the  foregoing  acts  and  omissions,  Consortium  Plaintiff  has  suffered damages and harm, including, but not limited to, emotional distress, medical  expenses, other economic harm, as well as a loss of consortium, services, society,  companionship, love and comfort.

226.   By reason of the foregoing, Plaintiffs have suffered injuries and damages as alleged herein.

## COUNT XI
## (NEGLIGENT MISREPRESENTATION)

227.   Plaintiffs  repeat,  reiterate,  and  reallege  each  and  every  allegation  of  this  Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if  more fully set forth herein.

228.   Defendants had a duty to represent to the medical and healthcare community, and  to the Plaintiffs, the FDA, and the public in general that said product, Xarelto, had been tested and  found to be safe and effective to reduce the risk of stroke and systemic embolism in patients with  non-valvular  atrial fibrillation,  to  reduce  the  risk  of  recurrence  of  DVT  and/or  PE,  and  for  prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

229.   The representations made by Defendants were, in fact, false.

230.   Defendants  failed  to  exercise  ordinary  care  in  the  representation  of  Xarelto,  while involved in its manufacture, sale, testing, quality assurance, quality control, and/or distribution of   said product  into  interstate  commerce,  in  that  Defendants  negligently  misrepresented  Xarelto's   high risk of unreasonable, dangerous side effects.

231.   Defendants breached their duty in representing Xarelto's serious side effects to the medical and healthcare community, to the Plaintiffs, the FDA and the public in general.

232.   As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe  and personal injuries which  are  permanent and lasting  in  nature,  physical  pain and  mental  anguish, diminished enjoyment of life, expenses for hospitalization and medical treatment, and  loss of earnings.

233.   As a result  of  the foregoing  acts  and  omissions,  Consortium Plaintiff has suffered damages and harm, including, but not limited to, emotional distress, medical  expenses, other economic harm, as well as a loss of consortium, services, society,  companionship, love and comfort.

234.   By reason of the foregoing, Plaintiffs have suffered injuries and damages as  alleged herein.

**COUNT XII**
**(FRAUD AND DECEIT)**

235.   Plaintiffs repeat, reiterate, and reallege each  and  every  allegation  of  this  Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if  more fully set forth herein.

236.   Defendants conducted research, or lack thereof, and used Xarelto as part of their  research.

237.   As a result of Defendants' research and testing, or lack thereof, Defendants  blatantly and intentionally distributed false information, including but not limited to assuring the  public, the Plaintiffs, Plaintiffs' doctors, hospitals, healthcare professionals, and/or the FDA that  Xarelto was  safe  and effective  for  use  as  a  means  to  reduce  the  risk  of  stroke  and  systemic  embolism in patients with non-valvular atrial fibrillation, to reduce the risk of recurrence of DVT  and/or PE,  and  for  prophylaxis of  DVT  for  patients undergoing  hip and knee  replacement  surgery.

238.   As a result of Defendants' research and testing, or lack thereof, Defendants  intentionally

omitted certain results of testing and research to the public, healthcare  professionals, and/or the FDA, including the Plaintiffs.

239.   Defendants had a duty when disseminating information to the public to disseminate truthful information and a parallel duty not to deceive the public and the Plaintiffs, as  well as Plaintiffs' respective healthcare providers and/or the FDA.

240.   The information distributed to the public, the FDA, and the Plaintiffs, by  Defendants, including but not limited to reports, press releases, advertising campaigns, television  commercials, print ads, magazine ads, billboards, and all other commercial media contained  material representations of fact and/or omissions.

241.   The information distributed to the public, the FDA, and the Plaintiffs, by  Defendants intentionally included representations that Defendants' drug Xarelto was safe and  effective for use to reduce the risk of stroke and systemic embolism in patients with non-valvular  atrial fibrillation, to reduce the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT  for patients undergoing hip and knee replacement surgery.

242.   The information distributed to the public, the FDA, and the Plaintiffs, by  Defendants intentionally included representations that Defendants' drug Xarelto carried the same  risks, hazards, and/or dangers as other forms of treatment for reducing the risk of stroke and  systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of  recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee  replacement surgery.

243.   The information distributed to the public, the FDA, and the Plaintiffs, by  Defendants intentionally included false representations that Xarelto was not injurious to the health and/or safety of its intended users.

244.   The information distributed to the public, the FDA, and the Plaintiffs, by  Defendants

intentionally included false representations that Xarelto was as potentially injurious to the health and/or safety of its intended users, as other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

245.   These representations were all false and misleading.

246.   Upon information and belief, Defendants intentionally suppressed, ignored and disregarded test results not favorable to the Defendants, and results that demonstrated that Xarelto was not safe as a means of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, and/or was not as safe as other means of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

247.   Defendants intentionally made material representations to the FDA and the public, including the medical profession, and the Plaintiffs, regarding the safety of Xarelto, specifically but not limited to Xarelto not having dangerous and serious health and/or safety concerns.

248.   Defendants intentionally made material representations to the FDA and the public in general, including the medical profession, and the Plaintiffs, regarding the safety of Xarelto, specifically but not limited to Xarelto being a safe means of reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

249.   It was the purpose of Defendants in making these representations to deceive and defraud the public, the FDA, and/or the Plaintiffs, to gain the confidence of the public, healthcare

professionals, the FDA, and/or the Plaintiffs, to falsely ensure the quality and fitness  for use of Xarelto and induce the public, and/or the Plaintiffs to purchase, request, dispense,  prescribe, recommend, and/or continue to use Xarelto.

250.  Defendants made the aforementioned false claims and false representations with  the intent of convincing the public, healthcare professionals, the FDA, and/or the Plaintiffs that  Xarelto was fit and safe for use as treatment for reducing the risk of stroke and systemic  embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT  and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement  surgery.

251.  Defendants made the aforementioned false claims and false representations with  the intent of convincing the public, healthcare professionals, the FDA, and/or the Plaintiffs that  Xarelto was fit and safe for use as treatment for reducing the risk of stroke and systemic  embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT  and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement  surgery, and did not pose risks, dangers, or hazards above and beyond those identified and/or  associated with other forms of treatment for reducing the risk of stroke and systemic embolism in  patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE,  and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

252.  That Defendants made claims and representations in its documents submitted to  the FDA, to the public, to healthcare professionals, and the Plaintiffs that Xarelto did not present  serious health and/or safety risks.

253.  That Defendants made claims and representations in its documents submitted to  the FDA, to the public, to healthcare professionals, and the Plaintiffs that Xarelto did not present  health and/or safety risks greater than other oral forms of treatment for reducing the risk of stroke  and  systemic

embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

254.   That these representations and others made by Defendants were false when made, and/or were made with a pretense of actual knowledge when knowledge did not actually exist, and/or were made recklessly and without regard to the actual facts.

255.   That these representations and others, made by Defendants, were made with the intention of deceiving and defrauding the Plaintiffs, including Plaintiffs' respective healthcare professionals and/or the FDA, and were made in order to induce the Plaintiffs and/or Plaintiffs' respective healthcare professionals to rely upon misrepresentations and caused the Plaintiff to purchase, use, rely on, request, dispense, recommend, and/or prescribe Xarelto

256.   That Defendants, recklessly and intentionally falsely represented the dangerous and serious health and/or safety concerns of Xarelto to the public at large, and the Plaintiffs in particular, for the purpose of influencing the marketing of a product known to be dangerous and defective and/or not as safe as other alternatives, including other forms of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery.

257.   That Defendants willfully and intentionally failed to disclose the material facts regarding the dangerous and serious safety concerns of Xarelto by concealing and suppressing material facts regarding the dangerous and serious health and/or safety concerns of Xarelto.

258.   That Defendants willfully and intentionally failed to disclose the truth, failed to disclose material facts and made false representations with the purpose and design of deceiving and lulling the Plaintiffs, as well as their respective healthcare professionals into a sense of security so that Plaintiffs

would rely on the representations made by Defendants, and purchase, use and rely on Xarelto and/or that Plaintiffs' respective healthcare providers would dispense, prescribe, and/or recommend the same.

259.   Defendants, through their public relations efforts, which included but were not limited to the public statements and press releases, knew or should have known that the public, including the Plaintiffs, as well as Plaintiffs' respective healthcare professionals would rely upon the information being disseminated.

260.   Defendants utilized direct to consumer adverting to market, promote, and/or advertise Xarelto.

261.   The Plaintiffs and/or Plaintiffs' respective healthcare professionals did in fact rely on and believe the Defendants' representations to be true at the time they were made and relied upon the representations as well as the superior knowledge of treatment for reducing the risk of stroke and systemic embolism in patients with non-valvular atrial fibrillation, reducing the risk of recurrence of DVT and/or PE, and for prophylaxis of DVT for patients undergoing hip and knee replacement surgery, and were thereby induced to purchase, use and rely on Defendants' drug Xarelto.

262.   At the time the representations were made, the Plaintiffs and/or Plaintiffs' respective healthcare providers did not know the truth with regard to the dangerous and serious health and/or safety concerns of Xarelto.

263.   The Plaintiffs did not discover the true facts with respect to the dangerous and serious health and/or safety concerns, and the false representations of Defendants, nor could the Plaintiffs with reasonable diligence have discovered the true facts.

264.   Had the Plaintiffs known the true facts with respect to the dangerous and serious health and/or safety concerns of Xarelto, Plaintiffs would not have purchased, used and/or relied on Defendants' drug Xarelto.

265.   That the Defendants' aforementioned conduct constitutes fraud and deceit, and was committed and/or perpetrated willfully, wantonly and/or purposefully on the Plaintiffs.

266.   As a result of the foregoing acts and omissions, Plaintiff was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe  and personal injuries which  are  permanent and lasting  in  nature,  physical  pain and  mental  anguish, diminished enjoyment of life, expenses for hospitalization and medical treatment, and  loss of earnings.

267.   As a result of the foregoing acts and omissions, Consortium Plaintiff has suffered damages and harm, including, but not limited to, emotional distress, medical expenses, other economic harm, as well as a loss of consortium, services, society, companionship, love and comfort.

268.   By reason of the foregoing, Plaintiffs have suffered injuries and damages as  alleged herein.

## COUT XIII AS AGAINST THE DEFENDANTS (VIOLATION OF MISSOURI CONSUMER FRAUD AND DECPTIVE PRACTICES ACT

269.    Plaintiffs repeats, reiterates and realleges each and every allegation of this Complaint contained in each of the foregoing paragraphs inclusive, with the same force and effect as if more fully set forth herein.

270.   Defendants have a statutory duty to refrain from making false or fraudulent representations and/or from engaging in deceptive acts or practices in the sale and promotion of Xarelto pursuant to the Missouri Merchandising Practices Act Mo. Rev. Stat. §§ 407.010, *et seq*., (hereinafter "the Act"), which prohibits "the use of any deception, fraud, false pretense,  false promise, misrepresentation or concealment, suppression or omission of any material fact in the conduct of any trade or commerce" and declares such acts or practices as unlawful.

271.   Defendants engaged in unfair, deceptive, false and/or fraudulent acts and/or practices in

violation of the Act through its false and misleading promotion of Xarelto designed to induce Plaintiff to purchase and use Xarelto.

272.     Defendants' conduct as described herein constituted unfair and deceptive acts and practices, including, but not limited to:

a. Publishing instructions and product material containing inaccurate and incomplete factual information;

b. Misrepresenting the nature, quality, and characteristics about the product; and

c. Engaging in fraudulent or deceptive conduct that creates a likelihood of confusion or misunderstanding

272.     Defendants misrepresented the alleged benefits of Xarelto, failed to disclose material information concerning known side effects of Xarelto, misrepresented the quality of Xarelto, and otherwise engaged in fraudulent and deceptive conduct which induced Plaintiff to purchase and use Xarelto.

273.     Defendants uniformly communicated the purported benefits of Xarelto while failing to disclose the serious and dangerous side-effects related to the use of Xarelto, its safety, its efficacy, and its usefulness. Defendants made these representations to physicians, the medical community at large, and to patients and consumers such as Plaintiff in the marketing and advertising campaign described herein

274.     Defendants' conduct in connection with Xarelto was impermissible and illegal in that it created a likelihood of confusion and misunderstanding, because Defendants misleadingly, falsely and or deceptively misrepresented and omitted numerous material facts regarding, among other things, the utility, benefits, costs, safety, efficacy and advantages of Xarelto.

275.     As a direct, foreseeable and proximate cause of Defendants' conduct in violation of the

Act, Plaintiff suffered damages, including personal injuries, economic damages, and non-economic damages. Defendants' conduct was further wanton, egregious, and reckless so as to warrant the award of punitive damages.

276.    As a result of the foregoing acts and omissions, the Plaintiff was caused to suffer serious and dangerous side effects including, life-threatening bleeding, as well as other severe and personal injuries which are permanent and lasting in nature, physical pain and mental anguish, diminished enjoyment of life, expenses for hospitalization and medical treatment, and loss of earnings.

278.    By reason of the foregoing, Plaintiffs have suffered injuries and damages as alleged herein

## COUNT XIV
## (LOSS OF CONSORTIUM)

279.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though set forth fully at length herein. Plaintiffs plead this Count in the broadest sense, pursuant to all laws that may apply pursuant to choice of law principles, including the law of the Plaintiffs' resident State.

280.    At all relevant times hereto, where applicable, Plaintiffs had spouses (hereafter referred to as "Spouse Plaintiffs") and/or family members (hereafter referred to as "Family Member Plaintiffs") who have suffered injuries and losses as a result of the Plaintiffs' injuries from Xarelto.  Plaintiff has suffered injuries and damages as alleged herein. Consortium Plaintiff was married to Plaintiff at the time of Plaintiff's injuries from Xarelto, and continues to be married to the after Plaintiff sustained those injuries described herein.

281.    For the reasons set forth herein, Spouse Plaintiffs and/or Family Member Plaintiffs have necessarily paid and have become liable to pay for medical aid, treatment, monitoring, medications, and other expenditures and will necessarily incur further expenses of a similar nature in the future as a proximate result of Defendants' misconduct.

282.    For the reasons set forth herein, Spouse Plaintiffs and/or Family Member Plaintiffs have suffered and will continue to suffer the loss of their loved one's support, companionship, services, society, love and affection.

283.    For all Spouse Plaintiffs, Plaintiffs allege that their marital relationship was impaired and depreciated, and the marital association between husband and wife has been altered.

284.    Spouse Plaintiffs and/or Family Member Plaintiffs have suffered great emotional pain and mental anguish.

285.    As a direct and proximate result of Defendants' wrongful conduct, Spouse Plaintiffs, Family Member Plaintiffs, and/or intimate partners of the aforesaid Plaintiffs, have sustained and will continue to sustain severe physical injuries, severe emotional distress, economic losses and other damages for which they are entitled to compensatory and equitable damages and declaratory relief in an amount to be proven at trial. Defendants are liable to Spouse Plaintiffs, Family Member Plaintiffs, and intimate partners jointly and severally for all general, special and equitable relief to which Spouse Plaintiffs, Family Member Plaintiffs, and intimate partners are entitled by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against the Defendants on each of the above-referenced claims and Causes of Action and as follows:

1.    Awarding compensatory damages in excess of the jurisdictional amount, including, but not limited to pain, suffering, emotional distress, loss of enjoyment of life, and other non-economic damages in an amount to be determined at trial of this action;

2.    Awarding economic damages in the form of medical expenses, out of pocket expenses, lost earnings and other economic damages in an amount to be determined at trial of

this action;

      3.    Punitive and/or exemplary damages for the wanton, willful, fraudulent, reckless acts of the Defendants who demonstrated a complete disregard and reckless indifference for the safety and welfare of the general public and to the Plaintiffs in an amount sufficient to punish Defendants and deter future similar conduct;

      4.    Prejudgment interest;

      5.    Postjudgment interest;

      6.    Awarding Plaintiffs reasonable attorneys' fees;

      7.    Awarding Plaintiffs the costs of these proceedings; and

      8.    Such other and further relief as this Court deems just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs hereby demand trial by jury as to all issues.

                Respectfully Submitted,

Dated: May 10, 2019

                BROWN AND CROUPPEN, P.C.

                _____

                SETH SHARROCK WEBB, # 51236
                211 N. Broadway, Suite 1600
                St. Louis, Missouri  63102
                314-421-0216
                314-421-0359 facsimile
                sethw@getbc.com
                **ATTORNEY FOR PLAINTIFF**