UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| IN RE: XARELTO (RIVAROXABAN) | * | MDL 2592 |
| PRODUCTS LIABILITY LITIGATION | * | |
| | * | SECTION L |
| THIS DOCUMENT RELATES TO: | * | |
| | * | JUDGE ELDON E. FALLON |
| *ALL CASES* | * | |
| | * | MAGISTRATE JUDGE NORTH |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * *

### MEMORANDUM OF LAW IN SUPPORT
### OF THE PLAINTIFFS' STEERING COMMITTEE'S
### MOTION FOR AN AWARD OF ATTORNEYS'
### FEES AND REIMBURSEMENT OF EXPENSES

Dated: March 6, 2020

Respectfully submitted,

*/s/ Leonard A. Davis*
Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Email: ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
**GAINSBURGH BENJAMIN DAVID MEUNIER
& WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
Email: gmeunier@gainsben.com

***Plaintiffs' Co-Liaison Counsel/
Plaintiffs' Executive Committee***

Brian Barr, Esq.
*LEVIN PAPANTONIO*
316 S. Baylen St.
Suite 600
Pensacola, FL   32502
Phone:   (850) 435-7045
Fax:   (850) 436-6044
Email:   bbarr@levinlaw.com

Andy Birchfield, Esq.
*BEASLEY ALLEN*
P.O. Box 4160
Montgomery, AL   36103
Phone:   (334) 269-2343
Fax:   (334) 954-7555
Email:   andy.birchfield@beasleyallen.com

*Plaintiffs' Co-Lead Counsel*
*Plaintiffs' Executive Committee*

## TABLE OF CONTENTS

**Page**

I.  INTRODUCTION AND FEE/COST AWARD SOUGHT .................................................1

II.  FACTUAL BACKGROUND ..........................................................................................7

III.  ESTABLISHMENT OF THE MULTIDISTRICT LITIGATION (MDL).......................9

IV.  THE PSC'S EXTENSIVE AND WIDESPREAD DISCOVERY EFFORTS..................10

V.  ARGUMENT ................................................................................................................21

    A.  The Principles Governing the Determination of the
    Amount of a Fee Award in this MDL ................................................................21

    B.  The Historic Underpinnings for Awarding Common Benefit Fees
    Lend Authority to a Global Percentage Fee Award ...........................................22

    C.  The Fifth Circuit Has Endorsed a Percentage-of-Fund Method for
    Awarding Common Fund Fees, with an Abbreviated "Lodestar"
    Crosscheck ........................................................................................................27

    D.  The Requested 12% Fee Falls Well Within the "Benchmark
    Percentage" .......................................................................................................30

    E.  Principles Governing Determination of an Appropriate Fee Award
    Under *Johnson* ..................................................................................................33

        1.  *The Time and Labor Required* .................................................................33

        2.  *The Novelty and Difficulty of the Questions Involved* ..............................34

        3.  *The Skill Requisite to Perform the Legal Service Properly* ......................34

        4.  *The Preclusion of Other Employment by the
        Attorney Due to Acceptance of the Case* ....................................................35

5.     *The Customary Fee* ...................................................................35

6.     *Whether the Fee Is Fixed or Contingent* ...................................35

7.     *Time Limitations Imposed by the Client or the Circumstances* ...............36

8.     *The Amount Involved and the Results Obtained* ........................................36

9.     *The Experience, Reputation, and Ability of the Attorneys* ........................37

10.    *The "Undesirability" of the Case* ..............................................38

11.    *The Nature and Length of the Professional Relationship with the Client* ...............................................38

12.    *Awards in Similar Cases* ...........................................................38

F.     An Abbreviated Lodestar Cross-Check Easily Confirms the Reasonableness of the Requested Percentage of Funds Award Since It Only Accounts for Common Benefit Counsel's Time ...........................39

G.     Common Benefit Counsel Should Be Entitled to Reimbursement of Expenses ................................................................................40

VI.    CONCLUSION ..............................................................................41

## I.      INTRODUCTION AND FEE/COST AWARD SOUGHT

The Plaintiffs' Steering Committee ("PSC"), along with more than sixty (60) additional Common Benefit Law Firms have, since the inception of this MDL on December 12, 2014, dedicated over 214,000 hours and approaching $17 million in held and shared expenses to the common benefit of plaintiffs in this MDL.   The common benefit effort consisted of:

- six (6) multi-week common benefit bellwether trials in both federal court as part of the MDL bellwether trial process and the coordinated Pennsylvania state court proceedings based in Philadelphia;

- two additional cases in Philadelphia were set for trial and had been nearly fully worked up at the time the global resolution was proposed;

- more than 80 deposition days of corporate fact witnesses from Bayer and Janssen in both the United States and Europe;

- the preparation and review of more than 65 expert reports;

- more than 70 deposition days of expert witnesses;

- the review of more than 6.2 million documents produced by the Defendants;

- extensive motion practice, including numerous summary judgment and *Daubert* motions;

- extensive case-specific analysis and discovery including the organization of and participation in prescribing and treating doctor depositions, individual plaintiff depositions, and sales representative depositions in more than 1,200 individual cases to facilitate both the MDL bellwether discovery and remand "wave" process,

and the Pennsylvania state court trial process.

The litigation proceeded quickly and moved efficiently from its inception. The first bellwether trial for Mr. Boudreaux occurred on April 24, 2017, just over two years from the establishment of the MDL on December 17, 2014.   Five more bellwether trials involving Plaintiffs Orr, Mingo, Hartman, Russell and Cooney in three different courts (Eastern District of Louisiana, Southern District of Mississippi and Philadelphia Court of Common Pleas) were tried to a jury by August 2018. This demanding schedule, in recognition of an aging plaintiff population, required an extraordinary commitment by the PSC.

Upon the conclusion of the six bellwether trials, the PSC moved forward on a dual track approach: (1) an additional round of trials in the coordinated Pennsylvania state court proceedings; and (2) individual case discovery in the MDL, conducted in waves of 1,200 cases in preparation for remand. These parallel efforts also required an intense investment of time and resources. Indeed, the challenges and commitment of plaintiffs' counsel to execute this dual track approach cannot be underestimated. At the same time that common benefit counsel were conducting discovery and preparing for trial in Philadelphia, the PSC was engaged in an exhaustive effort to educate all counsel on the evidence applicable to each cause of action so that all individual counsel had the evidence needed for the cases in the pre-remand discovery process.

As a result of the extensive efforts of all common benefit counsel, the PSC was able to commence settlement negotiations, which, after months of often difficult and complex discussions with Defendants, resulted in a $775 million global Settlement Program. This agreement resolves the claims of eligible Xarelto patients who suffered bleeding events, strokes or cerebrovascular accident ("CVA"), venous thromboembolism ("VTE"), blood clots, and other various injuries

which they associated with their use of Xarelto. Having now reached its Effective Date, the Xarelto Settlement Program has resolved, at a nearly 100% participation rate, the claims of more than 28,000 plaintiffs injured by the use of Xarelto. The work of the PSC, and common benefit counsel working at their direction and the coordinated efforts of Plaintiffs' counsel in the Pennsylvania state litigation, proved essential in achieving such resolution.

Since the announcement of the global settlement program on March 25, 2019, the PSC has worked diligently to encourage enrollment into the Settlement Program and to ensure that the Program is administered fairly and efficiently for the benefit of all settlement participants. These efforts have included:

- numerous "town hall" style meetings in New Orleans, Houston, Atlanta, Las Vegas and Philadelphia as well as several webinars and "all counsel" conference calls to explain the details of the settlement program;

- hiring and working with Settlement Special Master Gary Russo to devise a settlement protocol that, applying his independent judgment, offers the fairest distribution of the settlement proceeds. A second Special Master, retired Pennsylvania Supreme Court Justice Jane Cutler Greenspan, was also retained to address allocation appeals by plaintiffs with claims in the coordinated Pennsylvania state court proceedings;

- hiring and working with BrownGreer and Archer to serve as the Settlement Administrator and the Lien Resolution Administrator, respectively, and assisting them to efficiently process and administer the resolution of approximately 28,000 claims; and,

- negotiating multiple pretrial orders and case management orders both to continue to effectively manage the litigation and to assist in the administration of the Settlement

Program.

Due to the efforts of the PSC, enrollment into the Xarelto Settlement Program has been a resounding success. Approximately 35,000 claimants registered with the settlement program by the enrollment deadline.   While not all of these claimants have been deemed eligible to enroll into the Program, approximately 28,000 claimants (almost 100% of Eligible Claimants), ultimately enrolled and have resolved their claims against the settling Defendants.

Given the overwhelming support of the Xarelto Settlement Program, the settlement became effective on December 20, 2019, and was fully funded by the Defendants as of January 17, 2020. Due to work of the PSC, Special Master Russo, Special Master Cutler, BrownGreer and Archer, the PSC expects that the claims for all claimants will be fully processed by the end of August 2020, through "base point" awards as well as Extraordinary Circumstances Fund payments.

The present Fee and Expense Petition is respectfully submitted for the approval of a fee assessment of 12% plus a cost assessment of 3% as to all claimants except those who elected to participate in the Alternative Resolution Program and those claimants awarded a total, gross settlement of $5,000 or less. As the Settlement Program has reached its Effective Date and is now fully funded, payments to claimants is assured. This petition is made in light of the Court's inherent authority to award common benefit fees to counsel who have provided the benefit of a common recovery fund to all plaintiffs in complex cases such as the present MDL. Further, the 12% fee assessment plus 3% cost assessment requests are consistent with Paragraph 13 of the Settlement Agreement, which was made available to all counsel prior to enrolling any of their clients into the settlement. Specifically, paragraph 13 of the Settlement Agreement makes clear it was the intention of the PSC to request a fee assessment of up to 12% plus a cost assessment of up to 3%. By

4

enrolling into the settlement, Eligible Claimants and their counsel further agreed to be subject to the jurisdiction of the MDL Court in connection with the assessment and allocation of common benefit fees and expenses, and agreed to waive the right to an appeal of any order of this Court as to the issue of common benefit fees and expenses, so long as the PSC does not request more than the 12% fee assessment and 3% cost assessment.

The amount requested reflects a percentage of recovery comparable to the benchmark range and percentage awards in other large settlements in litigation of similar scope, complexity, risk and duration.   Many common benefit counsel dedicated a substantial portion of their practice to this litigation alone. For counsel undertaking such risk, fair compensation should follow; and the amount at issue is eminently fair, reasonable and justified.

The counsel who submitted time and expenses to the Court-appointed Accountant pursuant to Pretrial Order No. 8 devoted 214,293.47 hours to this litigation from, its inception through the present time.[1] The law firms that submitted expenses to the Court-appointed CPA incurred $4,008,023.11 in Held Costs.[2] Common benefit counsel contributed $12,820,000.00 in assessments towards the funding of the shared costs in this litigation.[3]   No portion of the common benefit assessments has been reimbursed and the assessments remain outstanding.

The 3% cost assessment is intended to reimburse counsel their held costs, assessments and

---

[1] The submitted time is current as of January 31, 2020.   Additional common benefit time has been expended since that time and will continue to be incurred.   *See* Affidavit of Philip A. Garrett, C.P.A. (March 6, 2020) (attached as Exhibit A).

[2] The held costs are current as of January 31, 2020.   In addition to the approved held costs of $4,008,023.11, Mr. Garrett has rejected $2,062,724.39 in held costs.   Certain of the "rejected" costs are being re-assessed and may become approved held costs. As with the submitted time, held costs continue to be incurred and will be updated as necessary.   *See* Affidavit of Philip A. Garrett, C.P.A. (March 6, 2020) (attached as Exhibit A).

[3] The total shared costs expended is $12,526,555.89 as of January 31, 2020.   *See* Affidavit of Philip A. Garrett, C.P.A. (March 6, 2020) (attached as Exhibit A).

unpaid shared costs. In addition, under the negotiated terms of the Settlement Agreement, the costs and expenses necessary for the operation and administration of the Settlement Program are to be the sole responsibility of the claimants and their counsel. In order to cover these expenses, the Xarelto Plaintiffs' Counsel Leadership ("XPCL") (those counsel for plaintiffs in leadership who are signatories to the settlement agreement) set aside $25,000,000 from the total settlement fund to pay for the cost of settlement administration. If less than this set aside is required to fund settlement administration, the excess is to be used to fund Settlement Payments. Conversely, should the cost of settlement administration exceed the set aside, all settlement payments will be reduced on a *pro rata* basis.   Based on the contracts with BrownGreer, Archer and the Special Masters, the PSC has committed to the payment of $28,000,000 in settlement administration expenses. As settlement administration expenses will exceed the $25 million set aside by at least $3 million, the PSC intends to pay the additional administrative expenses from the 3% cost assessment and to offset the costs of settlement administration in order to maximize the value of the base point awards. A 3% cost assessment will cover the $3 million excess, shared and held expenses and partially offset the $25 million set aside, thereby increasing the value of base points awarded to claimants.

The Court will later address the allocation of any award of attorneys' fees and common benefit cost assessment among the eligible common benefit attorneys. Accordingly, the present determination of the fee award and reimbursement of common benefit expenses merely sets the total amount of common benefit fees which all counsel will be compensated, and the total common benefit cost reimbursement.

As demonstrated below, the fee award requested herein is fair, reasonable and supported

according to the guidelines of the applicable case law and relevant scholarship. *See Union Asset Management Holding, A.G. v. Dell, Inc.*, 669 F.3d 632, 644 (5th Cir. 2012); *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714, 717-19 (5th Cir. 1974); *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, MDL 2047, 2020 WL 128589, * (E.D. La. Jan 20, 2020); *Evans v. TIN, Inc.*, 2013 WL 4501061 (E.D. La. Aug. 21, 2013) (Africk, J.); *In re Vioxx Prod. Liab. Litig.*, 574 F. Supp. 2d 606 (E.D. La. 2008); and Hon. Eldon E. Fallon, *Common Benefit Fees in Multidistrict Litigation*, 74 LA. L. REV. 371 (2014) ["*Common Benefit Fees*"].

## II.   FACTUAL BACKGROUND

Before going into a detailed review of the work performed by all common benefit counsel, a short discussion of the difficulties unique to this litigation is necessary to put the work performed into the appropriate context. Xarelto is a prescription anticoagulant, within the class of Direct Oral Anticoagulants ("DOACs") intended to reduce the ability of blood to clot. These DOACs, which not only include Xarelto, but also Pradaxa and Eliquis, are distinguished from warfarin (or coumadin), which has been the "gold standard" to treat patients with anticoagulation therapy for over fifty years prior to the introduction of DOACs into the United States market.

This products liability litigation challenged the safety of Xarelto and was primarily based on failure to warn theories. Plaintiffs contended that inadequate warnings or instructions provided to physicians by the Defendants resulted in plaintiffs suffering needless internal bleeding.   A central challenge in asserting such bleeding as an avoidable risk of harm, of course, was that the anticoagulant Xarelto, by design, inhibits coagulation, and its use is recognized by prescribing physicians as increasing the risk of bleeding in patients. Indeed, throughout the

litigation and in every trial, Bayer and Janssen made repeated and seemingly unending references to the multiple mentions of the risk of bleeding stated in the Xarelto label. Nonetheless, Plaintiffs undertook to prove that Defendants failed to provide accurate and/or adequate information to physicians in the product label about both: (1) the magnitude of the risk of bleeding; and (2) how to reduce the risk of bleeding.

Plaintiffs therefore faced a very difficult task in this litigation. At all times during this case, Xarelto continued to be marketed to doctors and patients for a variety of indications including to reduce the risk of stroke and systemic embolism in patients with nonvalvular atrial fibrillation (AF); for the treatment of deep vein thrombosis (DVT) and pulmonary embolism (PE); for the reduction in the risk of recurrence of DVT and/or PE after completion of initial treatment lasting at least 6 months; and for the prophylaxis of DVT, which may lead to PE in patients undergoing knee or hip replacement surgery. The benefit risk ratio varied by indication, involving and analysis of the respective different case scenarios with differing medical literature. Thus, in addition to having to actively follow the medical literature regarding the safety and efficacy of Xarelto, PSC members followed the medical literature regarding the underlying medical conditions being treated, and the always changing medical science on the alternative treatments, to wit, competing anticoagulants, antiplatelets, and aspirin.

Xarelto is available today and is still widely prescribed. It was also a wildly successful drug for the Defendants (achieving billion-dollar blockbuster status), and Defendants were eager to aggressively defend it. It also became clear as this litigation advanced, that prescribing doctors were reluctant to acknowledge the defects in the product label and support Plaintiffs' contention that an appropriate warning would have caused them to treat the plaintiff differently. This fact

alone made these cases difficult to try successfully in light of the learned intermediary doctrine. Yet, despite the acknowledged difficulties of the case, the PSC believed strongly in the liability of these Defendants and were determined to bring about a successful resolution. This settlement is a result of that determination and the obstacles overcome by common benefit counsel over the course of this MDL.

### III.   ESTABLISHMENT OF THE MULTIDISTRICT LITIGATION (MDL)

On December 12, 2014, a Transfer Order was issued by the Judicial Panel on Multidistrict Litigation (JPML) transferring actions to the Eastern District of Louisiana and assigning Your Honor the authority to preside over the consolidated proceedings. Upon being assigned the case, this Court issued Pretrial Order No. 1 calling for the initial pretrial conference on January 29, 2015 and ordering the parties to prepare position papers by January 20, 2015. As there was no PSC during this period of time, various plaintiffs' counsel worked cooperatively to prepare and file a comprehensive position statement setting out the multitude of issues that would need to be litigated during this proceeding. In addition to ordering the initial pretrial conference and the preparation of position papers, Your Honor also required all counsel seeking appointment to the PSC to submit applications to the Court by February 2, 2015.

Prior to the initial pretrial conference, the Court appointed Leonard Davis and Gerald Meunier to serve as Co-Plaintiffs' Liaison Counsel, and on February 9, 2015 appointed a twelve-person PSC, designating Andy Birchfield and Brian Barr as Co-Lead Counsel for Plaintiffs.   In Pretrial Order No. 7, the Court set out the responsibilities of the PSC and directed the PSC to, among other things, conduct all pretrial discovery on behalf of all plaintiffs, argue motions, negotiate and enter stipulations and scheduling orders and to coordinate trial team selections and

the management of bellwether trials. Upon appointment, the PSC immediately began work on the tasks set out by the Court.

IV.    **THE PSC'S EXTENSIVE AND WIDESPREAD COMMON BENEFIT EFFORTS**

The Court made clear to the PSC that the initial task was to build the infrastructure of the MDL. This required the PSC to develop a committee and subcommittee structure that was inclusive of all common benefit counsel who wanted to assist the PSC with the common benefit effort on plaintiffs' behalf. It also required the PSC to enter into negotiations with the Defendants on basic infrastructure orders that related to issues like direct filing, streamlined service, Plaintiff and Defendant Fact sheets, document preservation orders, protective orders, document production format and ESI orders, deposition guidelines and scheduling orders.

At the outset, the PSC proposed to the Court a "direct filing" method to eliminate delays associated with the transfer of cases filed in or removed to other federal district courts. This served to promote judicial efficiency and avoid delays, allowing any plaintiff whose case was subject to transfer to the MDL to file a Complaint and immediately be consolidated with other filed MDL cases in the Eastern District of Louisiana. An agreement was reached whereby Defendants stipulated not to assert objections of improper venue to these directly-filed cases that emanated from districts outside of the Eastern District of Louisiana. *See* Pre-Trial Order No. 9 (Direct Filing - Stipulated) on March 24, 2015 [Rec. Doc. 356].

The PSC then negotiated with Defendants a streamlined service of process upon certain Bayer Defendants. This enabled plaintiffs to avoid the delays and expense of having to obtain service on these foreign entities. The agreement also preserved for plaintiffs their rights to pursue discovery against certain other Bayer entities which were not subject to the stream-lined service

process. *See* Pre-Trial Order No. 10 (Streamlined Service on Certain Bayer Defendants), filed March 24, 2015 [Rec. Doc. 357].

In a further effort to minimize expense and promote judicial efficiency, the PSC negotiated with Defendants an agreement for the bundling of Complaints and Answers. The Court authorized this agreement by issuing Pre-Trial Order No. 11, which provided that claims of more than one plaintiff and up to 100 plaintiffs could be filed in a single complaint, subject to one filing fee being paid for the lead plaintiff at the time of filing, with all additional filing fees suspended until the resolution of claims or until further orders issued by the Court. Bundled Complaints then were utilized by numerous plaintiffs and their counsel, and were filed directly in the MDL Court pursuant to the previously entered direct filing order. Additionally, Defendants were required to provide an Omnibus Answer which Pre-Trial Order No. 11 deemed as an operative answer, negating the need for multiple responsive pleadings filed in the MDL. *See* Pre-Trial Order No. 11 (Bundling of Complaints and Answers), filed May 4, 2015 [Rec. Doc. 893].

The PSC negotiated with Defendants to propose a Protective Order that governed all hardcopy and electronic materials from a supplying party, so that Protected Information and Highly Protected Information could be designated to restrict the disclosure of such information upon adherence with Pre-Trial Order No. 12, filed May 4, 2015 [Rec. Doc. 894]. This greatly facilitated the production of discovery on an expedited basis.  The PSC also negotiated with Defendants an extensive production protocol for the discovery of more than 6.2 million documents, including over 88 million pages of electronic documents, all of which were maintained and housed by the PSC in a document depository created and funded by the PSC. In addition, a substantial number of documents were produced by third-parties, all of which also were maintained,

assembled and reviewed by the PSC. The PSC negotiated with Defendants a proposed pre-trial order which set forth a protocol for the treatment of privileged and work product materials. *See* Pre-Trial Order No. 19 (Protocol for Treatment of Privileged and Work Product Materials), filed June 4, 2015 [Rec. Doc. 951].

The PSC next undertook extensive efforts to negotiate and develop Plaintiff Fact Sheets and Authorizations, intended to identify product use and information relating to the injuries claimed to have been suffered due to taking Xarelto. These forms provided basic but essential personal and claims information for each filed case. The PSC negotiated an agreement with Defendants and BrownGreer for the use of MDL Centrality (*see* Pre-Trial Order No. (Electronic Service/MDL Centrality for Plaintiffs Only), filed May 21, 2015 [Rec. Doc. 924]) so that all information from Fact Sheets would be electronically transmitted and stored on a computer system assessible to all parties in the MDL, and in Pennsylvania. *See* Pre-Trial Order No. 13 (Plaintiff Fact Sheets and Authorizations), filed May 4, 2015 [Rec. Doc. 895]. This new centralized online procedure had not previously been utilized in an MDL. It was not only novel, but resulted in streamlining discovery for all parties to the litigation. Additional negotiations took place with Defendants regarding party's interactions with an MDL plaintiff's prescribing and treating physician, following which the Court entered Pre-Trial Order No. 28 on April 28, 2016 [Rec. Doc. 3156] addressing these issues.

The PSC undertook extensive efforts to negotiate and develop Defendant Fact Sheets, which identified Defendants' contacts with prescribing healthcare providers and primary treating doctors and provided for initial disclosure of certain documents relating to Plaintiffs. This information was also electronically transmitted and stored with BrownGreer through MDL

Centrality. *See* Pre-Trial Order No. 14 (Defendant Fact Sheets), filed May 4, 2015 [Rec. Doc. 896].

The PSC worked with all Plaintiff counsel and the Court to address alleged deficiencies in Plaintiff Fact Sheet responses. On a regular basis, a representative of the PSC communicated with counsel and assisted the Court in handling "show cause" hearings. *See* Pre-Trial Order No. 31, filed January 25, 2017 [Rec. Doc. 5183].

The PSC negotiated with Defendants and agreed upon a consent order regarding the preservation of documents and electronically stored information, which included obligations for individual personal injury plaintiffs and acceptable methods of preservation. *See* Pre-Trial Order No. 15 (Consent Order Regarding the Preservation of Documents and Electronically Stored Information), filed May 4, 2015 [Rec. Doc. 897]. This was subsequently modified in a consent order of preservation of voicemail, text messages and instant messages. *See* Pre-Trial Order No. 15A, filed September 17, 2015 [Rec. Doc. 1301].

Prior to moving into intensive discovery, the PSC prepared for Science Day as ordered by the Court. During Science Day, the PSC presented to the Court a comprehensive demonstration of the multitude of scientific issues that were relevant to this litigation. This effort required the PSC to vet our experts to identify which experts were best positioned to cover the broadest range of issues for the Court. The PSC also had to negotiate a Science Day protocol with the Defendants that established the framework of each side's expert presentations.   All this effort culminated in the comprehensive and succinct Science Day presentation to the Court on June 11, 2015.

Once the infrastructure of the MDL was established, the PSC orchestrated a formal discovery plan. The discovery plan was designed to be comprehensive yet efficient and was the product of intense negotiations with the Defendants. As with most pharmaceutical MDLs, the

production of documents is critical to success as virtually all other discovery vehicles are driven by the content of the internal documents produced by the Defendants. Through numerous meet-and-confer discussions with Defendants, and follow-up meetings with the Court, a process was put in place for Defendants to produce critically important documents to Plaintiffs on an expedited basis, and to identify witnesses to be deposed on behalf of Plaintiffs. The document production began with Case Management Order No. 1, dated May 4, 2015 [Rec. Doc. 891], which set forth the voluntary disclosure and production by Defendants of certain documents. However, this production was just the tip of the iceberg of what would ultimately be produced by Defendants and reviewed by the PSC. In order to make the document production and review process as efficient as possible, the parties negotiated a format for the production of hardcopy documents and electronically stored information. *See* Pre-Trial Order No. 20 (Consent Order Regarding the Format for Production of Hardcopy Documents and Electronically Stored Information), [Rec. Doc. 1007]. This was followed shortly by a formalized order requiring documents to be produced to the PSC in waves of 5,000,000 pages each month. *See* Pre-Trial Order No. 21 (Consent Order Regarding Document Production Protocol) [Rec. Doc. 1302].

To review the millions of pages of documents produced each month, the PSC built out an extensive document review team to code and identify documents that would be useful for depositions, experts and trials. Tens of thousands of hours were dedicated to the review of this extensive production, and the review process continued throughout the discovery phase and even through the conduct of the trials.

With document productions coming in on a rolling basis based on custodians identified by the PSC, the PSC began identifying corporate witnesses for depositions. The PSC negotiated

14

deposition guidelines as set forth in Pre-Trial Order No. 23 (Deposition Guidelines) [Rec. Doc. 2283]. The deposition process was particularly intensive. Over a narrow period of time, the PSC endeavored to take the depositions of no less than 40 witnesses, including 30(b)(6) witnesses, from Bayer and Janssen, so that this testimony would be available to Plaintiffs' experts and ready for use at the first bellwether trial. Ultimately, common benefit counsel on behalf of the PSC spent more than 80 days in depositions of witnesses for Bayer and Janssen.

Deposition teams prepared with great diligence before they proceeded to take depositions in both the United States and Europe. Deposition preparation required a thorough review of the custodial file, providing a request to the Court for a particular witness's personnel file and extensive time organizing documents and outlines to be used during the deposition. In addition to the time commitment to prepare for an individual deposition, the PSC also provided deposition teams with the ability to locate additional necessary documents to be used "real time" during the conduct of each deposition.

Even as general liability discovery was ongoing and depositions were being taken for this purpose, the PSC began the process of setting the Bellwether trials. This required the PSC to negotiate the bellwether selection process and to vet eligible cases for enrollment into the bellwether Discovery Pool. The vetting process employed was thorough and extensive. This involved a team of lawyers reviewing, categorizing and analyzing the fact sheets and medical records of thousands of plaintiffs taking Xarelto (and assessing the facts in the context of the different medication indications and different injuries) to strategize bellwether selection choices. Bellwether team members met to discuss their findings and analyze the competing choices.   Once the cases under consideration was reduced, PSC members went to meet with Plaintiffs to interview

15

them as potential bellwether candidates.

The Court ultimately entered an order that established a 40-plaintiff bellwether discovery pool whereby 20 of the bellwether discovery pool plaintiffs were selected by the parties (10 by the PSC and 10 by the Defendants) and 20 were randomly selected by the Court from a pool of eligible bellwether plaintiffs. The selection of discovery pool plaintiffs was completed by January 15, 2016, at which point these forty (40) discovery pool plaintiffs entered into a case-specific discovery phase which included the depositions of the plaintiff, and his or her prescribing and treating physicians, and as one sales representative from the Defendants. This discovery was ordered to be completed by July 15, 2016.

While discovery directed toward the Discovery Pool Plaintiffs was ongoing, the Court entered Case Management Order No. 5, which set the Bellwether Trial Selection Protocol. As a result of this order, four bellwether plaintiffs were set for trial before the MDL Court.   Two cases were to be tried in the Eastern District of Louisiana, one case in the Southern District of Mississippi. A fourth case was designated to be tried in Texas federal court.

As all of the above was proceeding, the PSC invested enormous amounts of time and substantial resources in consulting with and retaining expert witnesses to provide expert opinion testimony during the bellwether trials. Pursuant to Case Management Order No. 2, the PSC was ordered to produce to Defendants it generic and case specific expert reports for all four bellwether plaintiffs by October 14, 2016. As a result of this order, the PSC designated a total of 24 generic and case specific experts for the MDL bellwether trials. Defendants followed the PSC's expert designations and, on November 15, 2016, produced 40 generic and case specific expert reports. This required a significant number of experts to be deposed by December 15, 2016. As a result,

many of the depositions were double and even triple tracked with the PSC spending no less than 58 days in depositions of both the PSC's and Defendants' experts beginning on November 10, 2016 to the conclusion of expert discovery.

A total of three Bellwether trials took place in the MDL: two in the Eastern District of Louisiana and one in the Southern District of Mississippi. For each trial, an extensive pretrial schedule was entered that resulted in an enormous volume of briefing on issues like preemption and other summary judgment motions, numerous *Daubert* challenges to each of the PSC's experts, and a multitude of motions *in limine*. Each trial also required entire teams of common benefit plaintiffs' counsel to spend hundreds of hours not only preparing exhibit lists and trial witnesses but also attending to the intense process of deposition designations, which consisted of making initial designations as well as both raising and responding to objections regarding designations. Trial teams often worked well into the night, if not all night, to complete the laborious but necessary process. The investment of time and resources dedicated to each of these trials cannot be overstated. Each member of the trial team, which included numerous common benefit counsel and staff beyond just those presenting the evidence, moved away from their families for several weeks at a time for each and every trial. Entire floors of hotels were booked by counsel and staff to try these cases.

Each of the trials took at least two weeks to try and entailed an incredible effort of all common benefit counsel – from those working in the courtroom presenting the witnesses and evidence to the jury and the Court, to those who performed all of the thankless but critical "back office" work that allowed the trial teams to present the best case possible. No effort was spared to try these cases.

After the MDL trials were concluded, the PSC shifted its efforts to support the coordinated trial process in the Pennsylvania state court. Despite the results of the MDL trials, the PSC's determination and resolve did not waiver as the trials in Pennsylvania were funded and staffed at an equivalent level to the MDL trials. The Pennsylvania state court cases were designated as common benefit trials by the PSC and occurred with the full support of the PSC – both through time commitments of PSC members and other common benefit counsel as well as the financial commitments of the PSC. Common benefit counsel in Pennsylvania were able to negotiate a trial pool process different from the Philadelphia County's traditional First-in, First-out ("FIFO") trial schedule. The state court proceedings required extensive case-specific fact discovery, including numerous depositions of prescribing and treating physicians and individual plaintiffs. Further, additional expert reports and depositions were needed for both new experts that were not designated as part of the MDL trial process and updated opinions based upon evidence that developed after the MDL trials occurred. Like the MDL trials, each of the trials that occurred entailed a complete team effort by common benefit firms, extending over periods of weeks. The same intensity that was brought to the MDL trials was also brought to the trials in Philadelphia, which were generally longer trials than the MDL trials. As in the MDL trials, no effort was spared to ensure the best case possible was put to the jury. Ultimately, three more cases (Hartman, Russell, and Cooney) were tried in Philadelphia. These trials were critical to the success of the MDL as they allowed common benefit counsel to try different liability theories than were presented to the MDL Court.

Following each of the first six trial cases, the PSC supported appellate efforts and spent significant time and resources briefing what the PSC believed were substantive errors that justified

new trials, and the reinstatement of Mrs. Hartman's compensatory and punitive damages verdicts obtained in Philadelphia. At the time of the settlement program, the appeals to the United States Circuit Court for the Fifth Circuit had been fully briefed and extensive appellate efforts had been made in the Pennsylvania Superior Court.

With appeals pending, the PSC next moved to a two track-process designed to secure additional trial dates in Philadelphia and to have the cases in the MDL ready for remand and immediate trials. On the trial front, a group of 12 plaintiffs was selected by the plaintiffs to be tried in state court, again as common benefit trials for which the PSC promised financial and time support. Each of these cases required individual, case-specific fact discovery and additional experts, expert reports and depositions.   Two of these cases were scheduled for trial starting in the Fall of 2019 and significant pretrial work was well underway, including exhibit lists, depositions designations, preparation of demonstratives, dispositive motions briefing, and extensive time had been spent prepping a multitude of witnesses.   Additionally, not only was a second wave of bellwether trials scheduled in Pennsylvania but a third phase of limited Core Discovery was ordered in the first 50 filed cases in Pennsylvania.

At the same time as the second wave of Philadelphia trial cases was being prepared, and with the third wave of Core-Discovery underway, the MDL Court, at the request of the PSC, engaged in an expansive discovery process intended to develop individual cases and have them ready for remand back to the transferor court for merits trials. Case Management Order No. 6 implemented a process whereby 1,200 cases were to be designated for individual discovery in two waves of 600 cases. For each wave of 600, 200 cases were selected by the PSC, 200 cases were selected by the Defendants and 200 cases were chosen at random by the Court. Discovery for each

plaintiff consisted of an updated Plaintiff Fact Sheet and four depositions: (1) the Plaintiff or Plaintiff representative; (2) Plaintiff's prescribing physician; (3) Plaintiff's treating physician; and (4) one detail representative from the Defendants. Needless to say, the workup of this many cases in a relatively short period of time required an incredible effort by all common benefit counsel. The PSC, having gathered the legal resources necessary to perform this work, is particularly proud of the work done by all counsel, including counsel representing individual plaintiffs, during this period of the litigation. Without these efforts, the PSC does not believe that the result achieved would have been possible.

To make sure that the MDL cases would be ready for trial upon remand, the PSC also embarked on an effort to obtain preservation depositions of their trial experts.   This schedule was formalized in Case Management Order No. 8. In addition, Case Management Order No. 8, designated five (5) cases from the Eastern District of Louisiana for trial with an extensive discovery and briefing schedule. Finally, Case Management Order No. 8 set out how the Court would begin to remand cases back to the transferor court.

By maintaining the morale of Plaintiffs' counsel and their clients' unwavering commitment, the PSC was able to demonstrate to the Defendants that global resolution would be in all parties' best interests.   It was during this time of the PSC's two-track process in both the MDL Court and the Pennsylvania state court that the parties entered into serious settlement discussions. After months of negotiation, the XPCL negotiated with Defendants a private Settlement Agreement that was agreed upon in April 2019 and encompassed a $775 million global resolution of all Xarelto litigation.   This resulted in almost 100% of all cases enrolling into the Settlement Program and resolution of this far-reaching litigation.

## V.     **ARGUMENT**

### A.     **The Principles Governing the Determination of the Amount of a Fee Award in this MDL.**

This fee petition seeks compensation for the common benefit services of all counsel involved in the Xarelto litigation.   This Court has the inherent authority to award attorneys' fees and regulate counsel fees of those attorneys practicing before it.    This authority is expressly acknowledged and reinforced by the provisions of the Settlement Agreement anticipating both this petition and this Your Honor's rulings on the common benefit fees and costs requested.   Section 3 of the Settlement Agreement, in specifying that the Settlement Program is to be funded in the amount of $775 million as an aggregate settlement payment, states that each side is to bear its own costs, attorney's fees and expenses (see Section 3.11 of Settlement Agreement).    The compensation of common benefit attorneys is outlined in Section 13 of the Settlement Agreement, as follows:

> 13.2    It is the intention of the XPCL to request, and to recommend to or through any court-appointed Fee Committee, that an Assessment of no more than 12% be imposed on counsel for each Claimant and a cost assessment of no more than 3% be imposed on each Claimant.  This statement of the maximum common benefit fees and costs intended to be sought by the XPCL does not constitute Defendants' endorsement of, or agreement with, this or any such request, which is a matter of the MDL Court to decide. Defendants will take no position with respect to any common benefit fee and cost request.

Subsequent to this Court's fee award, Your Honor then will be called upon to allocate this total award among the various common benefit attorneys.  *See*, *generally*, *Common Benefit Fees*, 74 LA. L.REV. at 375; *In re Vioxx Prod. Liab. Litig.*, 760 F. Supp. 2d 640, 653 (E.D. La. 2010).

**B.      The Historic Underpinnings for Awarding Common Benefit Fees <u>Authorizes the Requested Percentage Fee Award.</u>**

A brief review of the jurisprudence of common benefit fees is appropriate.  Over one century ago, in *Trustees v. Greenough*, 105 U.S. 527 (1881), the United States Supreme Court made it clear that the federal trial courts possess equity power to reach beyond the confines of formal joinder, case captions and attorney fee contracts, to ensure that all who are the beneficiaries of litigation efforts undertaken for the common good would contribute proportionately to those services.   This doctrine was further articulated and applied in a series of landmark Supreme Court decisions, including *Central Railroad & Banking Co. v.  Pettus*, 113 U.S. 116 (1885); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161 (1939); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970); *Boeing v.Van Gemert*,   444 U.S. 472 (1980); and   *Blum v. Stenson*, 465 U.S. 886 (1984).

In essence, the common benefit doctrine acknowledges "the original authority" of the courts "to do equity in a particular situation" to prevent unjust enrichment.  *Sprague v. Ticonic,* 307 U.S. at 166.   As the Supreme Court has observed, "[t]o allow the others to obtain full benefit from the plaintiffs' efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiffs' expense."   *Mills v. Electric Auto-Lite*, 396 U.S. at 392.

While the common benefit doctrine is routinely invoked as the basis for the award of attorneys' fees from common funds or benefits generated in class actions, it is clear that its application is not limited to the class context.   The Supreme Court's opinion in *Sprague* illuminates this point.   *Sprague* involved a trust fund that was jeopardized when a bank went into receivership.   After the plaintiff successfully sued for a lien establishing her right to recover from the trust, she sought reimbursement of attorneys' fees from the trust.   Although the suit was not a

class action, had only indirectly established the rights of others, and had not created a fund, the

Court held that the plaintiff was entitled to compensation from those benefitted by her efforts:

> That the party in a situation like the present neither purported to sue for a class nor formally established by litigation a fund available to the class, does not seem to be a differentiating factor so far as it affects the source of the recognized power of equity to grant reimbursements of the kind for which the petitioner in this case appealed to the chancellor's discretion.   Plainly the foundation for the historic practice of granting reimbursement for the costs of litigation other than the conventional taxable costs is part of the original authority of the chancellor to do equity in a particular situation.
>
> Whether one sues representatively or formally makes a fund available for others may, of course, be relevant circumstances in making the fund liable for his costs in producing it.   But when such a fund is for all practical purposes created for the benefit of others, the formalities of the litigation - the absence of an avowed class suit or the creation of a fund, as it were, through stare decisis rather than through a decree - hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation.

*Sprague*, 307 U.S. at 166.   *See also Chinese Drywall,* 2020 WL 128589 at *25*; *Guidant Corp.*

*Implantable Defibulators Prod. Liab. Litig.*, 2008 WL 682174, *5 (D. Minn. Mar. 7, 2008), *citing*,

*Awarding Attorneys' Fees and Managing Fee Litigation* at p. 51 (Fed. Jud. Ctr. 1994) ("[a]lthough

many common fund cases are class actions, . . . the doctrine is not limited to class actions");

MANUAL FOR COMPLEX LITIGATION, FOURTH, § 14.121 at 186 (Fed. Jud. Ctr. 2004) ("The

common-fund exception to the American Rule is grounded in the equitable powers of the courts

under the doctrines of *quantum meruit* and unjust enrichment.") [hereafter the "MCL"]; *Common*

*Benefit Fees*, 74 LA. L.REV. at 375 ("But this doctrine is not limited solely to class actions:   it has

been used in complex litigation to compensate attorneys whose work benefits others similarly

23

situated.").

The Common Fund doctrine has also been applied to those rare instances where the defendant agrees to pay to create two funds – one to provide benefits to the class and another to pay for attorneys' fees and costs.   In 1995, the court in *In re General Motors Corp. Pick–Up Truck Fuel Tank Prod. Liab. Litig.*, 55 F.3d 768, 820 (3d Cir. 1995) (Becker, J.) [hereafter "*GMC Pick-Up*"], coined such arrangements as creating a "constructive common fund."   Since then, the concept has been widely recognized to permit percentage-of-fund fee awards provided they conform to accepted practices related to the valuation of the overall benefit to the class.   *See Johnston v. Comerica Mortgage Corp.*, 83 F.3d 241, 246 (8th Cir. 1996) ("Although under the terms of each settlement agreement, attorney fees technically derive from the defendant rather than out of the class' recovery, in essence the entire settlement amount comes from the same source. . . .  Even if the fees are paid directly to the attorneys, those fees are still best viewed as an aspect of the class' recovery."); *In re Bluetooth Headset Prod. Liab. Litig.*, 654 F.3d 935, 943 (9th Cir. 2011) (recognizing constructive common fund approach).   *See also* MCL, *Attorney Fee Awards* §21.7 ("In class actions whose primary objective is to recover money damages, settlements may be negotiated on the basis of a lump sum that covers both class claims and attorney fees. . . . [T]he sum of the two amounts ordinarily should be treated as a settlement fund for the benefit of the class, with the agreed-on fee amount constituting the upper limit on the fees that can be awarded to counsel.").

The majority of courts accept the percentage-of-recovery methodology to determine the amount of the common benefit fee in a mass tort setting where a common fund is created.   Since the issuance of the *Report of the Third Circuit Task Force, Court Awarded Attorneys Fees*, 108

F.R.D. 237 (1985) in 1985, virtually every circuit court, including the Fifth Circuit, has joined the United States Supreme Court in approving use of the percentage-of-the-fund method in common fund cases.   *See*, *e.g.*, *In re Thirteen Appeals Arising out of the San Juan Dupont Plaza Hotel Fire Litig.*, 56 F.3d 295, 308 (1st Cir. 1995) ("the court below did not err in proposing to allocate fees based on the Percentage of Funds method, emphasizing the attorneys' 'relative contribution' to the creation of the Fund"); *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 121 (2d Cir. 2005) ("The trend in this Circuit is toward the percentage method"); *GMC Pick-Up*, 55 F.3d at 821 (Third Circuit recognizes application of the "percentage-of-recovery method" in mass tort cases "which do not actually generate a common fund"); *Rawlings v. Prudential-Bache Props.*, 9 F.3d 513, 515-17 (6th Cir. 1993); *Florin v. Nationsbank, N.A.*, 34 F.3d 560, 564-65 (7th Cir. 1994); *Johnston*, 83 F.3d at 246 (8th Cir. 1996); *Vincent v. Hughes Air West, Inc.*, 557 F.2d 759, 774-75 (9th Cir. 1977); *In re Wash. Pub. Power Supply Sys. Sec. Litig.*, 19 F.3d 1291, 1296 (9th Cir. 1994); *Gottlieb v. Barry*, 43 F.3d 474, 487 (10th Cir. 1994) (authorizing percentage approach and holding that use of lodestar/multiplier method was abuse of discretion); *Camden I Condo. Ass'n v. Dunkle*, 946 F.2d 768, 774 (11th Cir. 1991) ("After reviewing *Blum*, the [Third Circuit] Task Force Report, and . . . cases from other circuits, we believe that the percentage of the fund approach is the better reasoned in a common fund case."); *Swedish Hosp. Corp. v. Shalala*,1 F.3d 1261, 1271 (D.C. Cir. 1993) (percentage of the fund recovered is the *only* permissible measure of awarding fees in common fund cases).

The Fifth Circuit expressly endorsed the principle in 2012.   See *Union Asset Management Holding, A.G. v. Dell, Inc.*, 669 F.3d 632, 644 (5th Cir. 2012).   It there recognized the discretionary authority of district courts to choose between a percentage award or a lodestar analysis in awarding

a common fund fee, provided that whatever method is employed was informed by the traditional

standards of *Johnson v. Georgia Highway Express*, 488 F.2d 714 (5th Cir. 1974):

> We join the majority of circuits in allowing our district courts the
> flexibility to choose between the percentage and lodestar methods
> in common fund cases, with their analyses under either approach
> informed by the *Johnson* considerations.

*Dell,* 669, F.3d at 644.[4]   Some commentators consider the *Dell* opinion to have advanced a hybrid

approach to percentage fee awards referred to as a "blended approach."   See *Common Benefit*

*Fees*, 74 LA.L.REV. at 385-86 & n.62.   In essence, under this blended approach to common fund

fee awards, an initial benchmark percentage is selected, followed by adjustments from a lodestar

---

[4]   Judge Vance of the Fifth Circuit, in his separate opinion in *Foster v. Boise-Cascade, Inc.*, 577 F.2d 335, 337 n.1 (5th Cir. 1978), anticipated the Fifth Circuit's trend away from the lodestar method:

> [I]f mechanically applied, the hourly rate approach almost
> inevitably leads to an unsatisfactory result in this type of litigation.
> This method of compensation–which equates professional services
> to those of laborers and mechanics–frequently has little or no
> relationship to the value of the services performed in anything but
> the most routine work.   A flash of brilliance by a trial lawyer may
> be worth far more to his clients than hours or days of plodding effort.
> Few among us would contend that an operation by a gifted surgeon
> who removes an appendix in fifteen minutes is worth only one-sixth
> that performed by his marginal colleague who requires an hour and
> a half for the same operation.

In fact, many district courts in the Fifth Circuit employed the percentage award method well before *Dell*'s endorsement of same.   *See In re Prudential-Bache Energy Income Partnership Securities Litigation*, 1994 WL 150742, *4 (E.D. La. Apr. 13, 1994); *Batchelder v. Kerr-McGee Corp.*, 246 F. Supp. 2d 525, 531 (N.D. Miss. 2003) ("A percentage fee approach, as opposed to a lodestar computation, is the preferred method for determining awards of attorneys' fees in common fund, or class action, cases."); *Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 967 n.15 (E.D. Tex. 2000) ("the Fifth Circuit has *never* . . . reversed a district court judge's decision to award a fee as a percentage"); *Vioxx*, 760 F. Supp. 2d at 650-51 (employing a blended percentage award).

cross-check based upon the *Johnson* factors.[5]   *Id.* at 385 n.61, *citing Vioxx*, 760 F. Supp. 2d 640;

*Turner v. Murphy Oil USA, Inc.*, 472 F. Supp. 2d 830 (E.D. La. 2007); and other cases.   "The

blended method has been used by many district courts, including this one." *Chinese Drywall*, 2020

WL 128589, at *26.

### C.     The Fifth Circuit Has Endorsed a Percentage-of-Fund Method for Awarding Common Fund Fees, with an Abbreviated "Lodestar" Crosscheck.

For well over a century, the Supreme Court has "recognized consistently that a litigant or

a lawyer who recovers a common fund for the benefit of persons other than himself or his client is

entitled to a reasonable attorney's fee from the fund as a whole." *See Boeing Co. v. Van Gemert*,

444 U.S. 472, 478 (1980).[6]   Under this "common fund doctrine … a private plaintiff, or plaintiff's

attorney, whose efforts create, discover, increase, or preserve a fund to which others also have a

claim, is entitled to recover from the fund the costs of his litigation, including attorneys' fees." *In

re High Sulfur Content Gasoline Prods. Liab. Litig.*, 517 F.3d 220, 227 n.10 (5th Cir. 2008)

(quoting *In re General Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768,

---

[5]   The twelve *Johnson* factors are well known to courts in this circuit:   (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the skill requisite to perform the legal service properly; (4) the preclusion of other employment by the attorney due to acceptance of the case; (5) the customary fee; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the _undesirability_ of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.   *Johnson*, 488 F.2d at 717-19.

[6]   This principle, expressed in the High Court's *Boeing* decision, was derived from the following line of Supreme Court authority: *Alyeska Pipeline Serv. Co. v. Wilderness Soc.*, 421 U.S. 240, 257 (1975); *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 393 (1970); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 164-66 (1939); *Central R.R. & Banking Co. v. Pettus,* 113 U.S. 116, 123-27 (1885); *Trustees v. Greenough,* 105 U.S. 527, 532-37 (1881).

820 n.39 (3d Cir.), *cert. denied*, 516 U.S. 824 (1995)).

For these reasons and others, the vast majority of Courts of Appeals, including the Fifth

Circuit, have approved of (or, in some cases, mandated) the use of the Percentage of Fund method

to award attorneys' fees in common fund cases.   *Dell*, 669 F.3d at 644 ("the Fifth Circuit has

never reversed a district court judge's decision to use the percentage method, and none of our cases

preclude its use.… To be clear, we endorse the district courts' continued use of the percentage

method cross-checked with the *Johnson* factors"). [7]   The Percentage of Funds approach is

consistent with the notion that perfect is the enemy of good while still complying with the "rough

justice" standard that should be applied to this case. *See Fox v. Vice,* 563 U.S. 826, 838 (2011). In

*Fox*, the Supreme Court noted when evaluating the reasonableness of attorney fees, "'[T]rial courts

need not, and indeed should not, become green-eyeshade accountants. The essential goal . . . is to

do rough justice, not to achieve auditing perfection.'" *Id.* (quoting *Hensley v. Eckerhart*, 461 U.S.

---

[7] *See, e.g., In re Thirteen Appeals Arising out of San Juan Dupont Plaza Hotel Fire Litig*., 56 F.3d 295, 307 (1st Cir. 1995); *In re Cendant PRIDES,* 243 F.3d 722, 732 (3rd Cir.), *cert. denied*, 534 U.S. 889 (2001) ("The percentage-of-recovery method is generally favored in cases involving a common fund...."); *Rawlings v. Prudential-Bache Properties, Inc*., 9 F.3d 513, 515-16 (6th Cir. 1993) (noting "the recent trend towards adoption of a percentage-of-the-fund method," and permitting use of this method in common fund cases); *Continental Illinois,* 962 F.2d at 572 (fee award  should not be based on "individual hours," but rather on the percentage that counsel "would have received had they handled a similar suit on a contingent fee basis, with a similar outcome, for a paying client"); *Johnston v. Comerica Mortg. Corp.,* 83 F.3d 241, 246 (8th Cir. 1996*); In re Washington Public Power Supply System Sec. Litig. ("WPPSS"),* 19 F.3d 1291, 1296 (9th Cir. 1994); *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1311 (9th Cir. 1990) ("a reasonable fee under the common fund doctrine is calculated as a percentage of the recovery"); *Paul, Johnson, Alston & Hunt v. Graulty,* 886 F.2d 268, 272 (9th Cir. 1989) (endorsing use of percentage approach); *Gottlieb v. Barry,* 43 F.3d 474, 483 (10th Cir. 1994); *Brown v. Phillips Petroleum Co.*, 838 F.2d 451, 454 (10th Cir.), *cert. denied*, 488 U.S. 822 (1988) ("a fee award based on a percentage of a common fund" is appropriate); *Camden I Condominium Ass'n, Inc. v. Dunkle,* 946 F.2d 768, 774 (11th Cir. 1991); *Swedish Hospital Corp. v. Shalala,* 1 F.3d 1261, 1271 (D.C. Cir. 1993) (requiring application of the POF method in common fund cases).

424, 437 (1983)).

Indeed, virtually all of the recent common fund fee awards made by the district courts within the Fifth Circuit have utilized the Percentage of Funds method to award fees in common fund cases. *See, e.g., Chinese Drywall, supra* (11.4% Percentage of fund award); *In re Vioxx Prod. Liab. Litig.*, MDL No. 1657, 2018 WL 4613941 (E.D. La. Sept. 26, 2018) (18.5% Percentage of Funds awarded in a Third-party Payor settlement) [hereafter "*Vioxx II*"]; *In Re: Oil Spill by the Oil Rig "Deepwater Horizon",* MDL 2179, 2016 WL 6215974, *16 (E.D. La. Oct. 25, 2016) (4.3% requested Percentage of Funds in Super-Mega-Fund awarded); *Pool Prod.,* 2015 WL 4528880 at *19 (30% Percentage of Funds awarded); *In re FEMA Trailer Formaldehyde Prod. Liab. Litig.*, MDL No. 07-1873, 2013 WL 1867117, *3 (E.D. La. May 2, 2013) (28% Percentage of Funds awarded); *Burford, supra,* 2012 WL 5471985 at *1 (33.3% Percentage of Funds awarded); *In re OCA, Inc. Sec. and Derivative Litig.*, No. 05-2165, 2009 WL 512081 at *19 (E.D. La. Mar. 2, 2009) (28.5% Percentage of Funds awarded); *Enron*, 586 F. Supp. 2d at 766, 778; *Murphy Oil,* 472 F. Supp. 2d at 859-61 (17% Percentage of Funds awarded*); In re Bayou Sorrel Class Action*, No. 04-1101, 2006 WL 3230771 at *3 (W.D. La. Oct. 31, 2006) (36% Percentage of Funds awarded); *Educational Testing*, 447 F. Supp. 2d at 628-29 (29% Percentage of Funds awarded); *In re Combustion, Inc.,* 968 F. Supp. 1116, 1135-36 (W.D. La. 1997) (36% Percentage of Funds awarded).   *See also In re Syngenta AG MIR 162 Corn Litig.*, 357 F.Supp.3d 1094, 1112-1115 (D. Kan. 2018)(awarding one-third Percentage of Funds fee in super-mega-fund case).

Accordingly, the Percentage of Funds method should be employed to determine this petition for an award of fees.

**D.  The Requested 12% Fee Falls Well Within the "Benchmark Percentage"**

The Percentage of Funds method requires that the court select a reasonable percentage to be applied to the value of the monetary value of the settlement or the fund itself to produce an appropriate fee award.   The PSC respectfully proposes that a 12% fee assessment applied to all claims (except those in the Alternative Resolution Program and those that received $5,000 or less) resolved through the Settlement Program would result in a total fee for all common benefit Plaintiffs' Counsel that is appropriately fair and reasonable in this case.

The Court's decision as to a given percentage fee award, of course, is discretionary but hardly unguided.  "[T]he percentage should not be completely arbitrary, devoid of reality, or inconsistent with the usual fees for the type of case involved. In short, there is no one percentage that should apply to all cases. Each case should be analyzed on its own basis." *Murphy Oil,* 472 F. Supp. 2d at 862 (quotation omitted).   Generally speaking, the amount of this percentage is determined by reference to the twelve *Johnson* factors. *See, generally, Dell*, 669 F.3d at 644 (requiring that percentage award be "informed by the *Johnson* considerations"); *FEMA Trailer*, 2013 WL 1867117 at *3 (the percentage-of-benefit approach "entails the use of a percentage, the reasonableness of which is analyzed in light of the *Johnson* factors"). However, as noted by one court in commenting on the use of a list of factors to make a percentage award, "[t]he mere listing of … factors for consideration by the court makes meaningful review difficult and gives little guidance to attorneys and claimants." *Lindy I,* 487 F.2d at 166-67.

To make the process more concrete, virtually all district courts within the Fifth Circuit employ a two-step consideration of those factors to select an appropriate fee award percentage. In the first of these two steps the courts consider *Johnson*'s fifth factor, "the customary fee," and the

twelfth *Johnson* factor, "awards in similar cases," to select a "benchmark percentage." *Vioxx,* 760 F. Supp. 2d at 652; *Murphy Oil,* 472 F. Supp. 2d at 862-64; *Educational Testing*, 447 F. Supp. 2d at 629-30; *Enron,* 586 F. Supp. 2d at 745 n.12 ("some courts applying the percentage method have tried to establish a specific 'benchmark' percentage, either a particular number or a range, … depending on the particular facts of the case"); *In re: Diet Drugs Prod. Liab. Litig.,* 553 F. Supp. 2d 442, 479-80 (E.D.Pa. 2008) ("Although the other [fee award] factors can be quite abstract, th[e awards in similar cases] factor affords the court the opportunity to use as a guide the decisions of our fellow federal judges across the country"); *Kemp v. Unum Life Ins. Co. of America,* No. 14-0944, 2015 WL 8526689 (E.D. La. Dec. 11, 2015) ("The Court notes that attorney fees awarded as percentages of a common fund usually range between 20 and 30%, with 50% as an upper limit. In the Fifth Circuit, the average percent awarded as attorneys' fees is 29.5%.  Furthermore, 'it is not unusual for district courts in the Fifth Circuit to award percentages of approximately one third.'").

For purposes of evaluating customary awards in comparable cases, courts frequently (although not always) do so with reference to the size of the recovery. *Vioxx,* 760 F. Supp. 2d at 652-64; *Murphy Oil*, 472 F. Supp. 2d at 862-65; *Diet Drugs*, 553 F. Supp. 2d at 479-80. Class recoveries of $100 million or less are common in the federal judicial system, and the case law readily establishes a customary or benchmark percentage-of-benefit award of twenty-five percent of such recoveries. *Murphy Oil,* 472 F. Supp. 2d at 863-64; *Educational Testing*, 447 F. Supp. 2d at 630 (25% is "the 'typical benchmark'"); *Enron,* 586 F. Supp. 2d at 745 n.12 ("A typical benchmark in a common fund case is 25%"); Manual for Complex Litigation, Fourth § 14.121 (Fed. Jud. Ctr. 2004) (Recognizing 25% of a common fund "represents a typical benchmark").

However, as the size of a class recovery reaches the mega-fund, there are relatively fewer percentage awards to serve as a benchmark. *See, e.g., Murphy Oil*, 472 F. Supp. 2d at 864.[8]  *See, generally*, Theodore Eisenberg, Geoffrey Miller & Roy Germano, *Attorneys' Fees in Class Actions: 2009-2013*, 92 N.Y.U. L. Rev. 937 (2017) (Noting paucity of mega fund cases in this most recent study, while finding "that mean and median fee percentages varied from a low of 16.6% in 2009 to a high of 25.5% in 2011," for settlements in excess of $100 million).

Nonetheless, the courts have been careful to avoid embracing a hard and fast mathematical rule, whereby the percentage award declines in strict proportion to increases in the size of the recovery.   They have focused instead on the individual facts and circumstances of each case in crafting percentage awards from mega-fund or super-mega-fund recoveries.[9]   For example, in this Court's recent *Chinese Drywall* opinion, significant emphasis was given to the empirical study of Eisenberg and Miller to establish the benchmark percentage.   The Court alluded to a "scaling effect" observed in the study but recognized that determining the benchmark percentage "must be

---

[8] *See also* Theodore Eisenberg and Geoffrey P. Miller, *Attorney Fees and Expenses in Class Action Settlements: 1993-2008*, 7 J. EMPIRICAL LEGAL STUD. 248 (2010) (based upon reported settlements between 1993 and 2008); Brian T. Fitzpatrick, *An Empirical Study of Class Action Settlements and their Fee Awards*, 7 J. EMPIRICAL LEGAL STUD. 811 (2010); Manual for Complex Litigation, Fourth § 14.121, *supra*.

[9] *Vioxx*, 760 F. Supp. 2d at 655 ("a reasonable benchmark percentage is a flexible concept"); *Enron*, 586 F. Supp. 2d at 754 ("'[T]here is no rule that a district court must apply a declining percentage reduction in every settlement involving a sizable fund. Put simply, the declining percentage concept does not trump the fact-intensive … analysis'") (quoting *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 302 (3d Cir. 2005)); *Vioxx II,* 2018 WL 4613941 at *10 (awarding an 18.5% Percentage of Funds for a consumer class that had low participation rate and smaller recovery than the *Vioxx* personal injury claimants, while recognizing that the smaller recovery "necessitates a higher percentage to ensure a reasonable fee.").

addressed on a case by case basis."   *Chinese Drywall,* 2020 WL 128589 at *27.   Further, the

Court observed that the study provided a mean percentage award of 12% and that any award within

a standard deviation of the mean fee award would be "reasonable." *Id.*

In the final analysis, the requested 12% assessment is not only within the range deemed

acceptable in case precedent, it also is consistent with the Fifth Circuit precedent when the *Johnson*

factors are applied to the case at hand.

### E.   Principles Governing Determination of an Appropriate Fee Award under *Johnson*.

#### 1.   The Time and Labor Required

Assembling, administrating and successfully resolving an MDL of the magnitude of this

case is a very tall order. During the course of this litigation, approximately 30,000 Plaintiffs

brought Xarelto claims against Defendants.   The claims data confirmed that most were seniors,

and this aging population called for an appropriately efficient pace in the litigation.

Consequently, the completion of countless tasks needed to be accomplished in a compressed time

frame.   Further, given the adversarial nature of this litigation, much attention was given to the

development of case theories of fault and causation which would benefit a large and diverse group

of claimants.   To direct this effort efficiently and effectively, the PSC was obliged to negotiate

trial plans and other schedules, engage in extensive discovery involving millions of pages of

documents from the Defendants and third parties, develop Plaintiff and Defendant Profile Forms,

oversee bundled complaints and expend tens of thousands of hours on pleadings and complex

motions practice.   In addition, the PSC actively participated in numerous trials and the work-up

of cases for remand.   Motion practice, trial preparation and jury trials followed, and continued

through the bellwether trial phase to include a large, "wave" process to prepare numerous cases

for remand.   All of this required extensive efforts to be undertaken by common benefit counsel.

Tremendous efforts on the part of common benefit counsel also were demanded in order to globally resolve the litigation.   Only after the Court initiated remand procedures did the negotiations with Defendants gain traction.   Overseeing the selection and preparation of hundreds of "wave" cases in the remand process proved to be as intense an effort as it was fruitful.   The leadership of the MDL then devoted themselves to negotiating the terms of a private Settlement Agreement which itself became a demanding and complex undertaking.   This effort supports the suggested 12% fee award.

### 2.   The Novelty and Difficulty of the Questions Involved

Throughout the years of this litigation, the Court has repeatedly been reminded of the complex nature of this multidistrict, multi-party litigation.   The Defendant drug product remains on the market, as was set out and discussed in more detail at the beginning of this brief, this litigation was particularly challenging.   Indeed, the Court frequently and correctly observed on numerous occasions that this MDL was complex and challenging with the potential to be both costly for the litigants and lengthy in duration.   In the course of the litigation, the challenges and complexities for Plaintiffs were increasingly clear.   This factor favors a substantial fee award in this case.

### 3.   The Skill Requisite to Perform the Legal Service Properly

The skill necessary to bring about the result achieved here was not ordinary. Counsels' success in confronting the difficult and complex issues presented by this litigation and in ultimately obtaining fair and reasonable compensation for so many individuals should be acknowledged and compensated. This litigation required not just considerable dedication, but also considerable

expertise to bring it to such a successful conclusion. The ability of Plaintiffs' Counsel to obtain the Private Settlement Agreement with Defendants in the face of formidable legal opposition, and without a single verdict standing on behalf of Plaintiffs, confirms the superior quality of the services provided by common benefit counsel for Plaintiffs.  This factor favors the fee award requested in this case.

### 4.   The Preclusion of Other Employment by the Attorneys Due to Acceptance of the Case

As previously noted, a number of firms leading the common benefit effort on plaintiffs' behalf, necessarily had to forego other cases and potential fees.  The compressed timetable of activities in the combined and parallel MDL and Pennsylvania state court proceedings, would not have been completed otherwise.   Many lawyers involved in the common benefit effort exerted the vast majority, if not all, of their available time to the pursuit of this litigation for a period of more than four years.   Therefore, this factor favors the fee award requested in this case.

### 5.   The Customary Fee

A number of common benefit fee awards by different courts are cited *supra* at pages 31-32.  Given these ranges in value, the amount requested in this pharmaceutical personal injury matter – 12% - is eminently reasonable and well-supported.

### 6.   Whether the Fee Is Fixed or Contingent

All Plaintiffs' Counsel undertook this Litigation on a contingent fee basis, assuming a substantial risk that the litigation would yield no recovery and leave them uncompensated. Courts have consistently recognized that the risk of receiving little or no recovery is a major factor in considering an award of attorneys' fees. *See, e.g., In re Enron Corporation Securities, Derivative & "ERISA" Litig.*, 586 F. Supp. 2d 732, 791 (S.D. Tex. 2008). The time in which to evaluate the

risk is *ex ante, i.e.,* as of the time suit was initiated, not with the benefit of hindsight. *See Harman v. Lyphomed, Inc.,* 945 F.2d 969, 974 (7th Cir. 1991). Where counsel face such substantial risks and recover significant compensation for their clients, courts find this factor to favor the fee applicant. *See Enron,* 586 F. Supp. 2d at 796.

### 7.   Time Limitations Imposed by the Client or the Circumstances

This Court has frequently noted the potential for MDL litigation to become so bogged down as to warrant the appellation of a "black hole." Mindful of this potential morass, the Court has used every device available to it to avoid such a consequence. The Court has regularly held monthly status conferences and employed "hands-on" management to see that discovery was being conducted promptly and that the Litigation was progressing at an appropriate rate.   Without fail and never faltering, court-appointed counsel worked extremely hard to meet the Court's deadlines. Counsel were keenly aware of this Court's fierce determination to force them to advance this particular matter on behalf of an aging population of plaintiffs.   This required common benefit counsel to try cases and aggressively push the litigation forward to get to the point where resolution could be accomplished. This strategy, though quite demanding, proved to be successful in the end. This "time" factor deserves weight in the Court's analysis.

### 8.   The Amount Involved and the Results Obtained

The eighth *Johnson* factor – the amount involved and the results achieved – is entitled to arguably the most significant weight when, as in this case, the efforts of counsel were instrumental in realizing a high recovery on behalf of the Plaintiffs.   Indeed, the Supreme Court has observed that "'the most critical factor' in determining the reasonableness of a fee award is the degree of success obtained." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). *See also Migis v. Pearle*

*Vision, Inc*., 135 F.3d 1041, 1047 (5th Cir. 1998) (". . . Where recovery of private damages is the purpose, . . .  consideration to the amount of damages awarded as to the amount sought represents the primary means to evaluate that concern.").  A $775 million settlement in a drug product liability case where the product being challenged remains on the market, and where multiple trials have resulted in defense verdicts, is clearly an outstanding result obtained for plaintiffs.  If outcome weighs as "the most critical" consideration, then surely the requested fee award should be deemed fair and appropriate.

The exceptional success achieved for plaintiffs in this case also must be assessed in light of the litigation alternative.  With thousands of litigants' claims to be processed through the uncertainty of trial and appeals, it was in the collective best interests of an aging population of plaintiffs to conclude this case through settlement.

In *Deepwater Horizon*, Judge Barbier noted that "[s]uccess is determined not only by the gross amount of the recovery but also by the number of individuals who benefit from the class settlement, the degree to which it provides them with full compensation for their injuries, and the extent to which the settlement benefits the public at large."  *Deepwater Horizon,* 2016 WL 6215974 at *18.  Here, thousands of claimants were benefitted through settlement, due to the common benefit work of counsel over the course of this litigation.

By any measure, the settlement is an outstanding result. Given such result, this factor supports the requested fee award.

### 9.  The Experience, Reputation, and Ability of the Attorneys

When this MDL litigation began, the Court underwent an arduous vetting and selection process to appoint experienced, reputable and able counsel to serve on the PSC.  *See* Pretrial Order

Nos. 2 and 7.   Since then, the Court has reappointed PSC Members.   This factor supports the requested percentage here.

### 10. The "Undesirability" of the Case

The risks presented by taking on such a massive case were daunting at the inception of this litigation.   The case involved both a domestic drug manufacturer and a foreign drug manufacturer, both of whom vigorously defended a profitable product still being prescribed by doctors.   This created a high degree of risk for plaintiffs' counsel.   They faced service problems, incurred significant travel expenses, and were exposed to the enormous legal risk associated with preemption and other potentially dispositive issues as well as the customary risks of uncertain jury trial outcomes.   This factor supports the requested fee award.

### 11. The Nature and Length of the Professional Relationship with the Client

This *Johnson f*actor was designed to consider those instances when "a lawyer in private practice may vary his fee for similar work in the light of the professional relationship of the client with his office." *Johnson,* 488 F.2d at 719. But there are few, if any, longstanding client relations with the Xarelto claimants. As this Court pointed out in *Murphy Oil*, "'the relationship did not antedate the litigation, nor will it likely continue beyond the closure of this case,' other than as it relates to this litigation." *Murphy Oil,* 472 F. Supp. 2d at 866-67, quoting, *In re ETS*, 447 F. Supp. 2d 612, 632 (E.D. La. 2006). Accordingly, little weight is to be afforded this factor.

### 12. Awards in Similar Cases

All but two of the *Johnson* fee adjudication factors are abstract in that they do not purport to have any mathematical correlation to the computation of an appropriate percentage award. The final *Johnson* factor provides guidance as to how to concretize abstract consideration of the other

factors into a definitive percentage fee award. That factor prescribes consideration of "awards in similar cases." *Johnson*, 488 F.2d at 719. Such consideration is a dominant feature of contemporary Percentage of Funds fee adjudication. *See, e.g., Dell, supra.*

As demonstrated above, the requested fee percentage is well within the range of percentages that have been awarded by courts in this Circuit.   Accordingly, the "awards in similar cases" factor powerfully argues in support of the reasonableness of the 12% fee requested.   As the other *Johnson* factors fully endorse the requested fee, the fee requested should be awarded.

### F.   An Abbreviated Lodestar Cross-Check Easily Confirms the Reasonableness of the Requested Percentage of Funds Award Since it only Accounts for Common Benefit Counsel's Time

"[T]he loadstar cross-check is a streamlined process, avoiding the detailed analysis that goes into a traditional lodestar examination."   *Deepwater Horizon*, 2016 WL 6215974 at *19 (citing *Vioxx,* 760 F. Supp. 2d at 659).

Plaintiffs' Counsel reported in excess of 214,000 hours of attorney and para-professional time expended toward the common benefit of all plaintiffs in the Xarelto Litigation as of January 31, 2020.   The Court-appointed CPA, Philip Garrett, has made regular reports to the Court on these reported hours, and Your Honor has been active in the oversight of the same.   While the PSC is not seeking a fee assessment for cases that enrolled in the Alternative Resolution Program or cases that received awards of $5,000 or less, for purposes of the "blended approach" lodestar cross check, even if the requested 12% fee assessment were applied to the total amount of the settlement fund ($775 million) and resulted in a common benefit fee award of $93,000,000, the lodestar cross check would result in an hourly rate of $435.   The lodestar cross check would characterize such an award as fair and reasonable.   The cross-check for reasonableness is even

more supportive when the requested 12% fee assessment excludes certain categories of allocation awards and will result in a total fee less than $93,000,000.

**G.  Common Benefit Counsel Should Be Entitled to Reimbursement of Expenses.**

The relevant fee jurisprudence authorizes reimbursement of the reasonable amounts paid out-of-pocket to achieve a common benefit recovery or to advance the common goals of plaintiffs in MDL litigation. *See Sprague v. Ticonic*, 307 U.S. at 166-67 (recognizing a federal court's equity power to award costs from a common fund); *Camden I Condominium Ass'n*, 946 F.2d at 771 ("In accordance with the well-established common fund exception to the American Rule, . . . class counsel . . . are entitled to an award of their . . . expenses out of the fund that has been created for the class by their efforts"); *Pool Products*, 2015 WL 4528880 at *23 ("Class action counsel who create a common fund for the benefit of the class, are entitled to reimbursement of reasonable litigation expenses from that fund.").

Accordingly, a 3% cost assessment for the reimbursement of Shared Expenses, Held Costs, and Settlement Administration expenses, should be separately recognized and provided for in any award by the Court.   As discussed *supra*, this litigation-cost award is a fair and necessary supplement to the set aside provided in the Settlement Agreement to cover the administration and implementation expenses of the Settlement Program.

Based upon the records maintained by Mr. Garrett, which were continually submitted to and reviewed by this Court over the course of these proceedings, the law firms submitting expenses to the court-appointed CPA pursuant to Pretrial Order No. 8, which includes the PSC and common benefit counsel, have incurred $4,008,023.11 in Held Costs, and $12,526,555.89 in Shared Expenses.   Further, administration of the Settlement Program will cost, at the least, $28,000,000.

Counsel's cost reimbursement request of a 3% cost assessment as to all claimants (except those that enrolled in the Alternative Resolution Program and those whose total program award is $5,000 or less) should be found reasonable, and reimbursement of these costs should be awarded.

## VI.    CONCLUSION

The filing of this joint petition for an award of attorneys' fees and reimbursement of costs is the first step towards resolving the compensation of Xarelto common benefit Plaintiffs' Counsel. It is, as the Court has noted, the needed initial step of determining the size of the total fee award to be allocated among all common benefit counsel.   After this Court decides the total amount available to compensate common benefit counsel, there remains the allocation process which will determine the amount earned by each common benefit counsel.   That issue is left for another day. For now, as set forth above, Petitioners have established their entitlement to an overall common benefit fee assessment of 12% plus a 3% cost assessment for the reimbursement of reasonable expenses as to all claimants except those that enrolled in the Alternative Resolution Program and those awarded $5,000 or less.

Dated: March 6, 2020

Respectfully submitted,

/s/ Leonard A. Davis
Leonard A. Davis, Esq. (Bar No. 14190)
**HERMAN, HERMAN & KATZ, LLC**
820 O'Keefe Avenue
New Orleans, LA 70113
Phone: (504) 581-4892
Fax: (504) 561-6024
Email: ldavis@hhklawfirm.com

Gerald E. Meunier (Bar No. 9471)
**GAINSBURGH BENJAMIN DAVID MEUNIER
& WARSHAUER, LLC**
2800 Energy Centre, 1100 Poydras Street
New Orleans, LA 70163-2800
Phone: (504) 522-2304
Fax: (504) 528-9973
Email: gmeunier@gainsben.com

*Plaintiffs' Co-Liaison Counsel/
Plaintiffs' Executive Committee*

Brian Barr, Esq.
**LEVIN PAPANTONIO**
316 S. Baylen St.
Suite 600
Pensacola, FL   32502
Phone:   (850) 435-7045
Fax:   (850) 436-6044
Email:   bbarr@levinlaw.com

Andy Birchfield, Esq.
**BEASLEY ALLEN**
P.O. Box 4160
Montgomery, AL   36103
Phone:   (334) 269-2343
Fax:   (334) 954-7555
Email:   andy.birchfield@beasleyallen.com

*Plaintiffs' Executive Committee*