**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| IN RE: XARELTO (RIVAROXABAN) PRODUCTS LIABILITY LITIGATION : | MDL No. 2592 |
| : | |
| : | SECTION L |
| THIS DOCUMENT RELATES TO: : | |
| : | |
| *Yolundus Murriel*, No. 2:19-cv-13139 : | JUDGE ELDON E. FALLON |
| : | MAGISTRATE JUDGE NORTH |
| : | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
**JOINT MOTION FOR SUMMARY JUDGMENT**

Defendants Janssen Pharmaceuticals, Inc., Johnson & Johnson, and Bayer HealthCare Pharmaceuticals Inc. ("Defendants")[1] respectfully submit this Memorandum of Law in Support of their Joint Motion for Summary Judgment.

**INTRODUCTION**

There are two separate and independent reasons which compel dismissal of this recently filed complaint. First, even if the decedent took Xarelto at the time of her fatal bleeding event (and she did not), the lawsuit is time barred because it was filed almost five years after the expiration of Colorado's two-year statute of limitations. Second, even if the claims were timely filed (and they were not), there is no proof that the decedent was taking Xarelto at the time she experienced a gastrointestinal ("GI") bleed and died on December 21, 2012. This is plainly evident from the contemporaneous medical records, which all state that the decedent was taking warfarin, also known as Coumadin, at the time of her bleeding event and death. For these reasons and as discussed further below, this motion for summary judgment should be granted.

---

[1] Defendants file this motion to the extent they have been properly served and preserving all applicable service defenses.

## PROCEDURAL HISTORY

Plaintiff Yolundus Murriel is one of the surviving children of decedent Bertha Barnes, a Colorado resident who died of a GI bleed on December 21, 2012. In September 2019, nearly 7 years after Ms. Barnes's GI bleed and death, Plaintiff filed this action in Colorado state court, asserting claims for "Negligence Leading to Death (NO PROPER WARNING)" and "Wrongful Death." *See* Ex. A at 4, 5 (Compl.). This was nearly five years beyond Colorado's two-year statute of limitations for both negligence and wrongful death. *See infra* at 8–9. The case was removed to federal court and transferred to this MDL in October 2019. Defendants now move for summary judgment on the grounds that the case is time barred, and in the alternative because there is no evidence that the decedent was on Xarelto at the time of her fatal bleeding event.

## STATEMENT OF FACTS

The late Bertha Barnes was in terrible health at the time of her alleged GI bleed and death at the age of 70. She was suffering from recently diagnosed bile duct or pancreatic cancer, cardiomyopathy, congestive heart failure, hypertension, diabetes, and asthma. She had a defibrillator, a pacemaker, a number of stents, and a history of a heart attack. She was in assisted living facility. *See* Ex. B (Barnes Medical Records).

Notwithstanding this significant medical history, plaintiff has produced only 57 pages of medical records in response to the requirements of Case Management Order No. 11, affirming that all records the family has been able to obtain have been produced. Plaintiff has advised that due to the length of time that has passed since Ms. Barnes's alleged Xarelto use, GI bleed, and death, many of the relevant records have been destroyed and are not available in any form.

Notably, there are no office records from any healthcare providers who allegedly prescribed Xarelto or any other anticoagulant medication to Ms. Barnes. There are no pharmacy

2

records. There are no records that show that Ms. Barnes was actually prescribed Xarelto or ever received any Xarelto pills. Despite the limited quantity of records provided, one thing is clear from them: Ms. Barnes was on warfarin, also known as Coumadin, in February 2012, in March 2012, in July 2012, and during the two weeks leading up to her alleged GI bleed and death on December 21, 2012:

*First*, a February 27, 2012 Discharge/Medication Reconciliation Form from Penrose St. Francis Hospital states that Ms. Barnes was on warfarin as of February 27, 2012. *See* Ex. B at 7 (listing warfarin 2.5 mg as a medication Ms. Barnes took inpatient on Mondays, Tuesdays, Wednesdays, Fridays, and Saturdays and listing warfarin 5 mg as a medication that Ms. Barnes took inpatient on Sundays and Thursdays). In addition to the explicit references to warfarin in the record, the doses are consistent with the use of warfarin and inconsistent with the use of Xarelto. While warfarin was available in doses of 2.5 mg and 5 mg in 2012, Xarelto was not available in those doses in the United States at that time. *See, e.g.*, Ex. C § 2 (warfarin label explaining doses of warfarin available include 2.5 mg and 5 mg and that dosing should be adjusted as needed); Ex. D § 3 (Xarelto label explaining that Xarelto pills were only available in 10 mg, 15, mg, and 20 mg doses in 2012).[2]

*Second*, a March 19, 2012 record from Colorado Springs Endocrine Clinic, P.C. states that Ms. Barnes was taking 2.5 mg of warfarin daily as of March 19, 2012. *See* Ex. B at 8. Again, not only does this record explicitly reference warfarin, not Xarelto, but this dose again confirms the use of warfarin, not Xarelto; there was no 2.5 mg or 5 m mg dose of Xarelto available in the United States at that time. *See, e.g.*, Ex. D § 3 (Xarelto label).

---

[2] For the Court's convenience, the relevant portions of the cited exhibits have been highlighted in yellow.

3

***Third***, a July 2, 2012 record states that Ms. Barnes was hospitalized in late June 2012 and had been taking "Coumadin" (which is the same as warfarin), and that her Coumadin was held temporarily due to high INR levels. *See* Ex. B at 9; *see also id.* at 10. The record also states that Ms. Barnes then resumed taking Coumadin. *See id.* at 9. Once again, this record explicitly states that Ms. Barnes was on warfarin and is consistent with the dosing and dosing regimen for warfarin, not Xarelto.

***Fourth***, in the two weeks before Ms. Barnes's death, from December 8, 2012 through December 20, 2012, Ms. Barnes was hospitalized at Memorial Health System due to weakness, anemia, and dehydration. *See* Ex. B at 13. The hospital's warfarin control log ***and*** its medication administration log each state that Ms. Barnes remained on warfarin throughout that hospitalization. *Id.* at 14–15, 24–26. Her INR levels were tested daily, and her doses of warfarin were adjusted or withheld as necessary depending on her INR levels—all of which is consistent with the instructions for use in the warfarin package insert. *See id.* at 14–15, 24–26; *see also* Ex. C § 2.1 (warfarin package insert). Specifically, Ms. Barnes took warfarin at the hospital on the following days before her discharge to assisted living on December 20 and her death on December 21:

- December 8, 2012 – 2.5 mg warfarin. *See* Ex. B at 14; *id.* at 24–25.
- December 9, 2012 – 2.5 mg warfarin. *See id.* at 14; *id.* at 25.
- December 10, 2012 – 2.5 mg warfarin. *See id.* at 14; *id.* at 25.
- December 11, 2012 – 2.5 mg warfarin. *See id.* 14; *id.* at 25.
- December 15, 2012 – 1 mg warfarin. *See id.* at 14; *id.* at 24.
- December 19, 2012 – 2.5 mg warfarin. *See id.* at 14; *id.* at 26.
- December 20, 2012 – 2.5 mg warfarin. *See id.* at 14; *id.* at 26.

The records reflect that the administration of warfarin was done in consultation with Dr. Daniel Tell. *Id.* at 14–15, 24–26. Plaintiff has produced no medical records for Dr. Tell and reports that she is unable to even locate him.

***Fourth***, on December 21, 2012, the date of Ms. Barnes's bleeding event, Ms. Barnes returned to the Emergency Department at Memorial Health System after she was found unresponsive at the assisted living facility. *See* Ex. B at 38, 40. The records from this date confirm that Ms. Barnes's healthcare providers knew she as on warfarin, also known as Coumadin, and treated her accordingly:

- The "Outpatient Medications" listed in the Critical Care Consult includes: "Coumadin." *See id.* at 38.

- The "History of Present Illness" section from the Critical Care Consultation states: "She is chronically anticoagulated with warfarin [Coumadin]." *See id.* at 40.

- The list of "Home Medications" noted in the Critical Care Consult include: "Coumadin." *Id.* at 41.

- The Consultation Report from the Critical Care Consultation states: "Evidence of gastrointestinal bleeding with Coumadin coagulopathy and anemia." *See id.* at 42.

- The "History of Present Illness" section in the Emergency Department Report states: "She is on Coumadin." *See id.* at 44.

- The "Medications" section in the Emergency Department Report lists "warfarin" as a current medication. *See id.*

- The "Impression and Medical Decision Making" section in the Emergency Department Report states: "She is on Coumadin and so she may be coagulopathic." *See id.* at 45.

- Ms. Barnes's healthcare providers also gave her Vitamin K and fresh frozen plasma to reverse the effects of warfarin. *Id.* at 45, 54.

Ms. Barnes passed away that same day. The "Diagnoses at Death" section of the Discharge Summary also states: "history of Coumadin use." *Id.* at 42–43.

By contrast to the meticulously documented use of warfarin, Ms. Barnes's medical records do not identify if or when she was prescribed Xarelto, who prescribed Xarelto to her, the condition for which Xarelto was prescribed, or pharmacy records showing that Xarelto was dispensed to Ms. Barnes contemporaneously.

There are only two vague references to "Xarelto" in the records, but the dosages in the references make clear that the product could not have been Xarelto.

First, Ms. Barnes was hospitalized at the University of Colorado Hospital from December 29, 2011 to January 1, 2012 for unknown reasons. Ex. B at 5–6. A list of "Discharge Medications" from this hospital dated January 1, 2012 purports to identify a 5 mg dose of "Xarelto" as a medication Ms. Barnes was to take at home that evening. *Id.* at 6. But there is no evidence that Ms. Barnes actually received any Xarelto pills or took it at home that evening. Further, Xarelto was not available in a 5 mg dose at that time in the United States. *See* Ex. D § 3 (Xarelto label showing that as of January 2012, Xarelto was only available in 10 mg, 15 mg, and 20 mg pills in United States).

Second, there is an undated "Patient Medication List" which identifies a "5 MG" dose of "Xarelto" as a medication that Ms. Barnes apparently reported she was taking at home on Saturdays, Mondays, Tuesdays, Wednesdays, and Fridays. *See* Ex. B at 57. However, this Patient Medication List is missing key information: it does not identify the name of the facility where it was prepared, the dates during which the medication was allegedly taken, or the healthcare provider who prescribed the listed medications. The document only notes that it was printed on December 11, 2012—while Ms. Barnes was receiving inpatient treatment at Memorial Hospital where (as discussed above) all records confirm she was taking warfarin, not Xarelto. *See id.*; *see also id.* at 14, 25. Moreover, it is not realistic to believe that this medical record was somehow

actually referring to Xarelto because Xarelto was not available in a 5 mg dose, and a dosing regimen of five days a week has never been approved for the therapeutic use of Xarelto. *See* Ex. D (Xarelto label identifying doses of Xarelto availably and explaining that it is to be taken daily). On the other hand, the 5 mg dose and 5 times per week dosing schedule documented in this record are consistent with the use of warfarin and Ms. Barnes's fully documented and undisputed history of warfarin use. *See, e.g.*, Ex. B at 7–10 (Ms. Barnes's medical records from February, March, and July 2012 explaining her warfarin use and the various doses and dosing regimens she used); Ex. C (warfarin package insert explaining doses are to be adjusted as needed). Finally, there is no evidence that Ms. Barnes received a prescription for Xarelto or any Xarelto pills.

In response to the requirements of CMO 11, Plaintiff was required to produce the medical records demonstrating the use of Xarelto at the time of the event at issue.[3] The records produced by Plaintiff demonstrate that the decedent was not on Xarelto at that time. *See* Ex. B at 14–15, 24–26, 38, 40, 44, 45. Defendants' Motion for Summary Judgment should therefore be granted.

## ARGUMENT

**I.    The Legal Standard for Summary Judgment.**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material only if its resolution would affect the outcome of the action. *Wiley v. State Farm Fire & Cas. Co.*, 585 F.3d 206, 210 (5th Cir. 2009). Alleged "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is required if the nonmovant "fails to make a showing sufficient

---

[3] This motion is filed without waiver of plaintiff's failure to comply with other requirements of Case Management Order 11, including the service of a case-specific expert report.

to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). The moving party need not negate the elements of the opposing party's case; "the movant must merely demonstrate an absence of evidentiary support in the record for the non-movant's case." *Bayle v. Allstate Ins. Co.*, 615 F.3d 350, 355 (5th Cir. 2010).

## II.     Plaintiff's Claims Are Time Barred.

Even if Ms. Barnes took Xarelto (and she did not), Plaintiff's claims are barred by the statute of limitations. Under Colorado law, there is a two-year statute of limitations applicable to Plaintiff's claims. Colo. Rev. Stat. § 13-80-106(1) (two-year statute of limitations on Plaintiff's negligence/failure to warn claim); Colo. Rev. Stat. § 13-80-102(1)(d) (two year statute of limitations on Plaintiff's wrongful death claim). Plaintiff filed this action on September 19, 2019, almost seven years after her death. Her claims are therefore time barred.

Plaintiff's negligence claim began to "accrue on the date both the injury and its cause "[we]re known or should have been known by the exercise of reasonable diligence." Colo. Rev. Stat. § 13-80-108(1); *see also Norris v. Baxter Healthcare Corp.*, 397 F.3d 878, 887 (10th Cir. 2005).

At the time of Ms. Barnes's GI bleed and death, there was ample evidence from which Plaintiff could have concluded there might be a link between Ms. Barnes's bleeding event and whatever anticoagulant she was using. The Xarelto label, for example, warned that "XARELTO can cause ***serious and fatal bleeding***" (emphasis added) and mentioned "bleed" or "bleeding" more than 100 times. *See* Ex. D. In addition, as of December 2012, the Xarelto label also warned that "[a] specific antidote is not available for Xarelto." *Id.* § 5.2. Although Plaintiff may contest the adequacy of the warnings in the Xarelto label, she cannot dispute that they existed and

8

explicitly acknowledged the risk of bleeding, including the risk of fatal bleeding, associated with Xarelto use.

Plaintiff's claims, therefore, began to accrue on December 21, 2012, when Ms. Barnes experienced her alleged GI bleed and passed away. But Plaintiff did not file her claims until September 19, 2019—nearly 5 years after the statute of limitations expired. The sparsity of the records produced here show the prejudice that occurs when a plaintiff delays in pursuing a lawsuit; Plaintiff and her representative have repeatedly informed Defendants' counsel that due to the amount of time that has passed since Ms. Barnes's death, the relevant hospitals and facilities have destroyed many of the relevant records. Plaintiff and her representative have also advised that the prescribing physician is now retired, they cannot locate the prescribing physician's records due to the passage of time, and they cannot collect any pharmacy records.

The claims here are manifestly time barred and the case should be dismissed as barred by the statute of limitations.

### III. Even if the Case Were Timely Filed, Plaintiff Cannot Demonstrate That Ms. Barnes Was on Xarelto at the Time of Ms. Barnes's Alleged Adverse Events.

Plaintiff's product liability action is governed by the Colorado Product Liability Act of 1977. *See* Colo. Rev. Stat. §§ 13-21-401 to 13-21-406. To prevail on her negligent failure to warn claim, Plaintiff must prove, among other things, that (1) Ms. Barnes used a product (Xarelto) manufactured by the Defendants, (2) the FDA-approved label for Xarelto did not adequately warn about the risks of Xarelto use; (3) Ms. Barnes's prescribing physician would not have prescribed Xarelto to Ms. Barnes if Defendants had provided a different warning, and (4) Xarelto was the medical cause of Ms. Barnes's GI bleed and death. *See* Colo. Rev. Stat. § 13-21-401(2); Colo. Standard Jury Instruction 14:17; *Dittman v. DJO, LLC*, No. 08–cv–02791–WDM–KLM, 2009 WL

3246128 (D. Colo. Oct. 5, 2009); *Mile Hi Concrete, Inc. v. Mertz*, 842 P.2d 198, 202 (Colo. 1992).[4] Here, Plaintiff has no proof that the decedent used Xarelto® at the time of her GI bleed and ultimate death or that it was the medical cause of these events.

With respect to Ms. Barnes's alleged Xarelto use, there is no medical record of Xarelto ever having been prescribed and no pharmacy record of Xarelto ever having been dispensed. To the contrary, the records continuously refer to Ms. Barnes's use of warfarin, and to doses that are consistent with warfarin (2.5 mg and 5 mg). Moreover, the hospital discharge summary on the date of Ms. Barnes's fatal bleed lists "history of Coumadin use" in the Cause of Death section. While there are two references to the word "Xarelto,"[5] it is impossible that either record was actually referring to Xarelto because the dose was listed as 5 mg. Xarelto was not available in a 5 mg dose in 2012.

Nor was it possible that Xarelto was prescribed 5 days a week as the second of these two records intimates because Xarelto has such a short half-life, it must be taken every day to provide any benefit. *See, e.g.*, Ex. D (Xarelto label § 2 (Xarelto label explaining it is taken daily); *id.* § 2.3 (Xarelto label instructing that missed doses must be taken as soon as possible on the same day the dose was missed); *id.* § 12.3 (Xarelto label explaining short terminal elimination half-life of Xarelto). By contrast, the 5 mg dose and 5 days a week dosing regimen are perfectly consistent with the use of warfarin generally and specifically with the decedent's well documented pattern of warfarin usage as outlined above.

---

[4] Plaintiff's wrongful death claim is not a separate tort, but is derivative of her negligence claim. *See Steedle v. Sereff*, 167 P.3d 135, 140 (Colo. 2007).

[5] One reference is a record dated January 1, 2012 which purports to identify a 5 mg dose of "Xarelto" as a medication Ms. Barnes was to take at home that evening. Ex. B at 6. The second record is a home medication list where Ms. Barnes reportedly identified that at some point prior to December 11, 2012, she was taking a "5 MG" dose of "Xarelto" at home on Saturdays, Mondays, Tuesdays, Wednesdays, and Fridays. *See id.* at 57.

Moreover, even if the January 2012 reference to Xarelto was accurate, this is nearly one year before to Ms. Barnes's alleged GI bleed and death on December 21, 2012, and could not possibly have been the cause of the fatal bleed, especially when the contemporaneous medical records in December 2012 (including the Cause of death section of the Discharge Summary) reaffirms warfarin rather than Xarelto use.  With respect to the home medication list that was apparently printed on December 11, 2012, there is no evidence to demonstrate that Ms. Barnes ever took a 5 mg dose of Xarelto 5 days a week, when she might have done this, how she would have received a 5 mg Xarelto pill in 2012, which was not available, or how she could have been prescribed Xarelto five days a week when there is no medically suggested dosing scheme for Xarelto, on label or off label, which has the medicine than less frequently than daily or why a medical professional would write such a prescription for an unapproved dose and an unapproved dosing regimen.

Further, even if Ms. Barnes had somehow been taking an unavailable 5 mg Xarelto pill in very early December 2012, the undisputed evidence shows that Ms. Barnes was exclusively on warfarin—not Xarelto—throughout her hospitalization the two weeks leading up to her GI bleed and death.  *See* Ex. B at 14–15, 24–26.  Ms. Barnes's healthcare providers also recognized that she was on warfarin, and that any anticoagulation effects she experienced at that time were due to warfarin.  *See, e.g.*, *id.* at 38, 40, 44, 45 (records from December 21, 2012 stating, for example: "She is on Coumadin." and "She is on Coumadin and so she may be coagulopathic.").  And, as noted, the Cause of Death on the Discharge Summary notes warfarin use and not Xarelto use. Given these undisputed facts, Plaintiff cannot meet fundamental elements of her claims—that Ms. Barnes was on Xarelto at the time of her alleged bleeding event and death and that Xarelto

specifically caused these events—and Defendants are entitled to summary judgment. *See Celotex Corp.*, 477 U.S. at 322; *Bayle*, 615 F.3d at 355.

Courts routinely grant defendants summary judgment where plaintiffs are unable to demonstrate specific causation. In *Howell v. Centric Grp., LLC*, 508 F. App'x 834, 847 (10th Cir. 2013), for example, the plaintiff alleged he experienced injuries based on use of skin oil products. He admitted that he used various products manufactured by various companies and did not offer any evidence that it was defendants' product—as opposed to any other product—that specifically caused his injuries. The district court concluded that the plaintiff's claims failed for lack of specific causation and granted the defendants' motion for summary judgment, and the Tenth Circuit affirmed. *Id.*

Similarly, in *Brown v. Johnson & Johnson*, No. 14-cv-3279-WJM-NYW, 2016 WL 897021, at *2 (D. Colo. Mar. 9, 2016), the plaintiff brought personal injury claims under Colorado law against the manufacturers of a prescription medicine, alleging that the medication caused injuries that "developed gradually" and were "caused by chemicals working in her body." The court concluded that plaintiff was required to produce an expert report on specific causation because a lay jury would not be competent to conclude that the defendants' medication specifically caused plaintiff's injury. *Id.* at *1. Because plaintiff had not provided a specific causation report from an expert, she did not have the requisite evidence of specific causation, and the court granted defendants' motion for summary judgment.

This Court should likewise grant summary judgment in Defendants' favor here. The undisputed facts show that Ms. Barnes was on warfarin—not Xarelto— at the time of her alleged bleeding event and death. Plaintiff has not and cannot demonstrate that Xarelto specifically caused the decedent's injuries, and her claims fail.

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that their Motion for Summary Judgment be granted and judgment entered in favor of Defendants.

Respectfully submitted,

**ARNOLD & PORTER KAYE SCHOLER LLP**

By: */s/Andrew Solow*
Andrew K. Solow
250 West 55th Street
New York, New York 10019-9710
Telephone: (212) 836-8000
Facsimile: (212) 836-8689
William Hoffman
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
Facsimile: (202) 942-5999
andrew.solow@arnoldporter.com
william.hoffman@arnoldporter.com

*Attorneys for Defendant Bayer HealthCare Pharmaceuticals Inc.*

**FAEGRE DRINKER BIDDLE & REATH LLP**

By: */s/ Susan M. Sharko*
Susan M. Sharko
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
Facsimile: (973) 360-9831
susan.sharko@faegredrinker.com

*Counsel for Defendants Janssen Pharmaceuticals, Inc. and Johnson & Johnson*

13

**IRWIN FRITCHIE URQUHART & MOORE LLC**

By: /s/ *Kim E. Moore*
    Kim E. Moore
    400 Poydras Street
    Suite 2700
    New Orleans, LA 70130
    Telephone: (504) 310-2100
    Facsimile: (504) 310-2120
    kmoore@irwinllc.com

    *Defendants' Co-Liaison Counsel*

**CHAFFE MCCALL L.L.P.**

By: /s/ *John F. Olinde*
    John F. Olinde
    1100 Poydras Street
    Suite 2300
    New Orleans, LA 70163
    Telephone: (504) 585-7241
    Facsimile: (504) 544-6084
    olinde@chaffe.com

    *Defendants' Co-Liaison Counsel*

## CERTIFICATE OF SERVICE

    The undersigned hereby certifies that on August 27, 2020, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs and Defendants by operation of the court's electronic filing system and served on all other plaintiff counsel via MDL Centrality, which will send notice of electronic filing in accordance with the procedures established in MDL 2592 pursuant to Pre-Trial Order No. 17.

        */s/ Kim E. Moore*
        **Kim E. Moore**

The undersigned hereby certifies that on August 27, 2020, the foregoing pleading was sent by U.S. mail postage prepaid and by electronic mail to Plaintiff at her address of record.

>*/s/ Chanda A. Miller*
>**Chanda A. Miller**