# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF LOUISIANA

IN RE:  XARELTO (RIVAROXABAN)
PRODUCTS LIABILITY LITIGATION

THIS DOCUMENT RELATES TO:

Louisiana Health Service and Indemnity
Co. d/b/a Blue Cross and Blue Shield
of Louisiana, et al. v. Janssen Research
& Development, LLC, et al.
Case No. 2:15-cv-03913

MDL No. 2592

SECTION L

JUDGE ELDON E. FALLON

MAGISTRATE NORTH

**DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE
FIRST AMENDED CLASS ACTION COMPLAINT OF THREE HEALTH CARE
THIRD-PARTY PAYORS UNDER FEDERAL RULES OF CIVIL PROCEDURE 12(b)(6)
and 9(b)**

# TABLE OF CONTENTS

Page

INTRODUCTION ..................................................................................................................1

COMPLAINT ALLEGATIONS ...........................................................................................7

LEGAL STANDARD ...........................................................................................................9

ARGUMENT.......................................................................................................................11

I.    THE COURT SHOULD DISMISS LABC'S AND HMO LOUISIANA'S
      SUBROGATION CLAIMS (COUNT XII) BECAUSE THE FAC FAILS
      TO PLEAD ESSENTIAL FACTS AND JOIN INDISPENSABLE
      PARTIES. ..................................................................................................................11

      A.    LABC and HMO Louisiana Have Failed to Plead Facts Necessary
            to Establish a Subrogation Claim. ................................................................12

      B.    LABC and HMO Louisiana Have Failed to Join Their Insureds,
            Who are Indispensable Parties......................................................................13

II.   THE COURT SHOULD DISMISS EACH OF PLAINTIFFS' NON-
      SUBROGATION CLAIMS FOR FAILURE TO PLEAD FACTS THAT
      WOULD ESTABLISH PROXIMATE CAUSATION (COUNTS I–XI &
      XIII). ........................................................................................................................14

      A.    To Establish Proximate Causation Plaintiffs Must Allege and
            Prove that Defendants' Misrepresentations Caused Them to Do or
            Refrain from Doing Something, Resulting in Their Alleged
            Injuries. ........................................................................................................14

      B.    Plaintiffs Have Failed to Allege Facts that Could Satisfy the
            *Holmes* Test for Proximate Causation. .......................................................16

            1.    Alleged Misrepresentations to Physicians.........................................17

            2.    Alleged Misrepresentations to PBMs.................................................20

            3.    Alleged Misrepresentations to FDA ...................................................22

            4.    The Court Should Reject the First and Ninth Circuits'
                  View...................................................................................................23

                  a.    The First and Ninth Circuits Misconstrue Supreme
                        Court Authority.......................................................................24

| | b. | The First and Ninth Circuits Inappropriately Conflate Foreseeability with Directness of Injury | 26 |
| | c. | Enforcing the *Holmes* Standard Does Not Leave TPPs Without a Remedy | 27 |
| | d. | The Ninth Circuit's Decision is Contrary to a Previous Decision of that Court | 29 |
| C. | | Plaintiffs May Not Rely on a Fraud-on-the-Market Theory to Establish Proximate Causation. | 31 |

III. THE COURT SHOULD DISMISS PLAINTIFFS' FRAUD-BASED CLAIMS FOR FAILURE TO SATISFY RULE 9(b) (COUNTS I–X & XIII). ... 36

IV. THE COURT SHOULD ALSO DISMISS PLAINTIFFS' RICO AND RICO CONSPIRACY CLAIMS ON ALTERNATIVE GROUNDS (COUNTS IX & X). ... 38

| A. | Plaintiffs Have Failed to Satisfy Their Burden to Allege Facts that Could Plausibly Establish a RICO Enterprise Distinct from the Pattern of Racketeering Activity. | 38 |
| B. | Plaintiffs Have Failed to Allege Facts that Could Plausibly Establish that the RICO Enterprise is Distinct from the Defendants Themselves. | 40 |

V. THE COURT SHOULD ALSO DISMISS PLAINTIFFS' CLAIMS UNDER STATE CONSUMER PROTECTION AND UNFAIR TRADE PRACTICES STATUTES ON ALTERNATIVE GROUNDS (COUNTS IV–VIII). ... 42

| A. | Under Louisiana Choice-of-Law Principles, the ICFA Applies to Allied's Claims, and the LUTPA Applies to LABC's and Louisiana HMO's Claims. | 42 |
| B. | Allied's ICFA Claim Fails as a Matter of Law Because Allied Does Not Allege that It Saw, Read, or Heard any of Defendants' Alleged Misrepresentations. | 43 |
| C. | The Court Should Dismiss LABC's and HMO Louisiana's Claims Under the LUTPA. | 44 |
| D. | Plaintiffs Have Failed to State a Claim Under the NJCFA. | 45 |

VI. LABC'S AND HMO LOUISIANA'S LUTPA, COMMON LAW FRAUDULENT MISREPRESENTATION, FRAUDULENT CONCEALMENT, FRAUD AND DECEIT, AND UNJUST ENRICHMENT CLAIMS ARE BARRED BY THE EXCLUSIVE

REMEDY PROVISION OF THE LOUISIANA PRODUCTS LIABILITY ACT ("LPLA") (COUNTS I–III & V). ...........................................................46

VII.   THE COURT SHOULD ALSO DISMISS LABC'S AND HMO LOUISIANA'S CLAIMS FOR REDHIBITION ON ALTERNATIVE GROUNDS (COUNT XI). ...........................................................46

VIII.  THE COURT SHOULD ALSO DISMISS PLAINTIFFS' UNJUST ENRICHMENT CLAIMS ON ALTERNATIVE GROUNDS (COUNT XIII). ...........................................................48

 A.   Allied's Unjust Enrichment Claim Fails as a Matter of Law. ...............................48

 B.   LABC's and HMO Louisiana's Unjust Enrichment Claims Fail as a Matter of Law. ...........................................................49

  1.   Plaintiffs' Claims are Precluded Under Article 2298 Because the Law Provides Another Remedy. ...........................49

  2.   LABC's and HMO Louisiana's Unjust Enrichment Claims are Precluded Because any Payments They Made for Xarelto Prescriptions Were Due to Their Legal Obligations. ...................49

  3.   The Court Should Dismiss Plaintiffs' Unjust Enrichment Claims Even if New Jersey Law Applied to Them. ...............................50

CONCLUSION ...........................................................50

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Acadian Corp. v. Olin Corp.,*
   824 So.2d 396 (La. Ct. App. 3d Cir. 2002) ............................................................................ 16

*Allgood v. GlaxoSmithKline PLC,*
   Civil Action No. 06-3506, 2008 WL 483574 (E.D. La. Feb. 20, 2008) ................................... 2

*Anza v. Ideal Steel Supply Corp.,*
   547 U.S. 451 (2006) .................................................................................................. 15, 25, 27

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009) ............................................................................................................ 10, 11

*Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.,*
   493 F.3d 841 (7th Cir. 2007) .................................................................................................. 48

*Basic Capital Mgmt., Inc. v. Dynex Capital, Inc.,*
   976 F.3d 585 (5th Cir. 2020) .................................................................................................. 35

*Basic Inc. v. Levinson,*
   485 U.S. 224 (1988) ................................................................................................................ 31

*Bazer v. Honda Motor Co.,*
   872 So.2d 534 (La. Ct. App. 3d Cir. 2004) ............................................................................ 12

*Bell Atlantic Corp. v. Twombly,*
   550 U.S. 544 (2007) ............................................................................................................ 10, 11

*Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC,*
   Civil Action No. 13-4663, 2019 WL 4857737 (E.D. Pa. Sep. 30, 2019) ................................ 24

*Boatner v. Atlanta Specialty Ins. Co.,*
   115 F.3d 1248 (5th Cir. 1997) ................................................................................................ 28

*Boyle v. United States,*
   556 U.S. 938 (2009) ................................................................................................................ 39

*Brand Coupon Network, LLC v. Catalina Mktg. Corp.,*
   No. 11-00556-BAJ-RLB, 2014 WL 6674034 (M.D. La. Nov. 24, 2014) ................................ 37

*Bridge v. Phoenix Bond & Indemnity Co.,*
   553 U.S. 639 (2008) ........................................................................................................*passim*

*Brock v. Dean Morris, L.L.P.*,
   No. 15-2416, 2016 WL 4133572 (W.D. La. Aug. 3, 2016) ...................................................... 9

*Buckman v. Plaintiffs' Legal Committee*,
   531 U.S. 341 (2001) ...................................................................................................... 22

*Byes v. Telecheck Recovery Servs., Inc.*,
   No. Civ.A. 94-3182, 1997 WL 736692 (E.D. La. Nov. 24, 1997) ......................................... 44

*Bynane v. Bank of New York Mellon*,
   866 F.3d 351 (5th Cir. 2017) ................................................................................... 5, 37, 38

*Cathey v. Dow Chem. Co. Med. Care Program*,
   907 F.2d 554 (5th Cir. 1990) ......................................................................................... 29

*Chau v. Aviva Life and Annuity Co.*,
   Civil Action No. 3:09-CV-2305-B, 2011 WL 1990446 (N.D. Tex. May 20,
   2011) .......................................................................................................................... 37

*Chevron Oronite Co. LLC v. Jacobs Field Servs. N. Am., Inc.*,
   No. 18-2279, 2019 WL 290642 (E.D. La. Jan. 23, 2019) ................................................ 35

*Cleary v. Philip Morris Inc.*,
   656 F.3d 511 (7th Cir. 2011) ........................................................................................ 48

*Cnty of Cook v. Philip Morris, Inc.*,
   353 Ill. App.3d 55, 817 N.E.2d 1039 (Ill. Ct. App. 1st Dist. 2004) ................................. 16

*Coastal Envtl. Specialists, Inc. v. Chem-Lig Int'l, Inc.*,
   818 So.2d 12 (La. App. 1st Cir. 2001) ........................................................................... 49

*Corley Enters. Of La., Inc. v. Bear Creek Saloon, Inc.*,
   273 So.3d 1236 (La. Ct. App. 1st Cir. 2019) .................................................................. 12

*Crest Constr. II Inv. v. Doe*,
   660 F.3d 346 (8th Cir. 2011) ........................................................................................ 39

*Crichton v. Golden Rule Ins. Co.*,
   576 F.3d 392 (7th Cir. 2009) ........................................................................................ 41

*De Bouse v. Bayer AG*,
   235 Ill.2d 544, 922 N.E.2d 309 (Ill. 2009) ................................................................ 5, 32, 33

*Desiano v. Warner-Lambert Co.*,
   326 F.3d 339 (2d Cir. 2003) ......................................................................................... 18

*Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*,
   784 F. Supp. 2d 508 (D.N.J. 2011) ............................................................................... 24

*Dugan v. TGI Fridays, Inc.*,
   231 N.J. 24, 171 A.3d 620 (N.J. 2017) ................................................................. 34

*Duplechin v. Adams*,
   665 So.2d 80 (La. Ct. App. 1st Cir. 1995) ............................................................. 46

*Estes v. Lanx, Inc.*,
   660 F. App'x 260 (5th Cir. 2016) ......................................................................... 23

*Gilchrist Constr. Co., LLC v. Travelers Indemnity Co.*,
   358 F. Supp. 3d 583 (W.D. La. 2019) ................................................................... 35

*Global Oil Tools, Inc. v. Barnhill*,
   No. 12-1507, 2012 WL 5866139 (E.D. La. Nov. 19, 2012) ................................... 40

*Gomez v. Aardvark Contractors, Inc.*,
   No. CV 18-4186, 2018 WL 5706319 (E.D. La. Nov. 1, 2018) ............................... 10

*Grant v. Houser*,
   Civil Action Nos. 10-805, 10-872, 2010 WL 3303853 (E.D. La. Aug. 17,
   2010) ..................................................................................................................... 44

*Harnish v. Widener Univ. School of Law*,
   833 F.3d 298 (3d Cir. 2016) ................................................................................. 34

*Health Care Serv. Corp. v. Pfizer, Inc.*,
   No. 2:10-cv-221, 2012 WL 2505555 (E.D. Tex. Apr. 23, 2012) ...................... 4, 18

*Hemi Group, LLC v. City of New York*,
   559 U.S. 1 (2010) ..................................................................................... 15, 27, 29

*Henry v. Cisco Sys., Inc.*,
   106 F. App'x 235 (5th Cir. 2004) ......................................................................... 42

*Heyert v. Taddese*,
   431 N.J. Super. 388, 70 A.3d 680 (N.J. App. Div. 2013) ...................................... 45

*Hickman v. Southern Pac. Transport Co.*,
   262 La. 102, 262 So.2d 385 (La. 1972) ................................................................ 21

*Holmes v. Securities Investor Protection Corp.*,
   503 U.S. 258 (1992) ........................................................................................ *passim*

*IAS Servs. Grp., L.L.C. v. Jim Buckley & Assocs., Inc.*,
   900 F.3d 640 (5th Cir. 2018) ................................................................................ 11

*In re 100% Grated Parmesan Cheese Mktg. & Sales Pracs. Litig.*,
   393 F. Supp. 3d 745 (N.D. Ill. 2019) .................................................................... 43

*In re Avandia Mktg. Sales Pracs. Prods. Liab. Litig.*,
   804 F.3d 633 (3d Cir. 2015) ........................................................................... 30

*In re Cajun Forge Co., Inc.*,
   No. 03-51828, 2008 WL 5144536 (Bankr. W.D. La. Sept. 18, 2008) ................... 42

*In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*,
   915 F.3d 1 (1st Cir. 2019)........................................................................... 24, 27

*In re Chinese-Manufactured Drywall Prods. Liab. Litig.*,
   No. 14-2722, 2020 WL 4470845 (E.D. La. Aug. 3, 2020)..................................... 46

*In re Ford Motor Co. Vehicle Paint Litig.*,
   182 F.R.D. 214 (E.D. La. 1998) ......................................................................... 34

*In re Katrina Canal Litig. Breaches*,
   524 F.3d 700 (5th Cir. 2008) ............................................................................. 13

*In re McCann*,
   268 F. App'x 359 (5th Cir. 2008) ...................................................................... 39

*In re Nat'l Prescription Opiate Litig.*,
   No. 1:17-md-2804-DAP, 2020 WL 871539 (S.D. Ohio Feb. 21, 2020) ................ 24

*In re Neurontin Mktg. & Sales Pracs. Litig.*,
   712 F.3d 21 (1st Cir. 2013).......................................................................*passim*

*In re Oil Spill by Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*,
   802 F. Supp. 2d 725 (E.D. La. 2011).................................................................. 22

*In re Rezulin Prods. Liab. Litig.*,
   392 F. Supp. 2d 597 (S.D.N.Y. 2005) .........................................................*passim*

*In re Rezulin Prods. Liab. Litig.*,
   524 F. Supp. 2d 436 (S.D.N.Y. 2007) ............................................................ 32, 34

*In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*,
   No. 2:06-cv-5774 (SRC), 2009 WL 2043604 (D.N.J. July 10, 2009)........... 33, 45, 46, 50

*In re Testosterone Replacement Therapy Prods. Liab. Litig.*,
   159 F. Supp. 3d 898 (N.D. Ill. 2016).................................................................. 42

*In re Testosterone Replacement Therapy Prods. Liab. Litig.*,
   MDL No. 2545, 2019 WL 652217 (N.D. Ill. Feb. 14, 2019), *aff'd*, 784 F.
   App'x 457 (7th Cir. 2019) ........................................................................ 17, 19, 21

*In re Vioxx Prods. Liab. Litig.,*
    478 F. Supp. 2d 897 (E.D. La. 2007)................................................................42

*In re Vioxx Prods. Liab. Litig.,*
    No. 05-3700, 2010 WL 11570867 (E.D. La. Mar. 31, 2010)..........................*passim*

*In re Yasmin and Yaz (Drosperinone) Mktg., Sales Pracs. & Prods. Liab. Litig.,*
    Nos. 3:09-md-02100-DRH-PMF, 3:09-cv-20071-DRH-PMF, 2010 WL
    3119499 (S.D. Ill. Aug. 5, 2010)..................................................................24

*Indest-Guidry, Ltd. v. Key Office Equipment, Inc.,*
    997 So.2d 796 (La. App. 3d Cir. 2008)..........................................................44

*Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co.,
Inc.,*
    192 N.J. 372, 929 A.2d 1076 (N.J. 2007).....................................................5, 33

*J & L Family, L.L.C. v. BHP Billiton Petroleum Properties (N.A.), L.P.,*
    Civil Action No. 16-1193, 2018 WL 1462108 (W.D. La. Mar. 23, 2018)..............37

*Johnson v. Acosta,*
    No. 10-1756, 2010 WL 4025883 (E.D. La. Oct. 12, 2010)..................................9

*Lawlor v. N. Am. Corp. of Ill.,*
    983 N.E.2d 414 (Ill. 2012)...........................................................................21

*Lincoln v. Danner,*
    No. 14-393, 2015 WL 5307709 (E.D. La. Sept. 10, 2015).................................39

*Lofton v. McNeil Consumer & Specialty Pharms.,*
    672 F.3d 372 (5th Cir. 2012).......................................................................23

*Louisiana Farm Bureau Cas. Ins. Co. v. Burkett,*
    266 So.3d 908 (La. Ct. App. 1st Cir. 2018)....................................................12

*McDarby v. Merck & Co., Inc.,*
    401 N.J. Super. 10, 949 A.2d 223 (N.J. App. Div. 2008)..................................23

*Merrell Dow Pharms. Inc. v. Thompson,*
    478 U.S. 804 (1986).................................................................................22

*Mihalich v. Johnson & Johnson,*
    Case No. 14-cv-600-DRH-SCW, 2015 WL 9455559 (S.D. Ill. Dec. 28, 2015)...............43, 48

*Oliveira v. Amoco Oil Co.,*
    201 Ill.2d 134, 776 N.E.2d 151 (Ill. 2002)....................................................43

*Our Lady of the Lake Med. Ctr. v. Cropper,*
    401 So.2d 403 (La. App. 1st Cir. 1981) ................................................................. 49

*Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms.*
    *Co.,*
    943 F.3d 1243 (9th Cir. 2019) .............................................................................*passim*

*Papergraphics Int'l, Inc. v. Correa,*
    389 N.J. Super. 8, 910 A.2d 625 (N.J. App. Div. 2006)......................................... 45

*Phoenix Bond & Indemnity Co. v. Bridge,*
    477 F.3d 928 (7th Cir. 2007), *aff'd,* 553 U.S. 639 (2008)...................................... 25

*Price v. Philip Morris, Inc.,*
    219 Ill.2d 182, 848 N.E.2d 1 (Ill. 2005) .............................................................. 43

*Quality Envtl. Processes, Inc. v. I.P. Petroleum Co., Inc.,*
    144 So.3d 1011 (La. 2014) .................................................................................... 43

*Schudmak v. Bossetta,*
    No. Civ.A. 05-5194, 2006 WL 151928 (E.D. La. Jan. 19, 2006)........................... 10

*Secs. Investor Protection Corp. v. BDO Seidman, LLP,*
    222 F.3d 63 (2d Cir. 2000) ..................................................................................... 34

*Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP,*
    806 F.3d 71 (2d Cir. 2015) ................................................................................. 3, 18

*Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.,*
    873 F.3d 574 (7th Cir. 2017) ...............................................................3, 17, 26, 30

*Southeast Laborers Health & Welfare Fund v. Bayer Corp.,*
    444 F. App'x 401 (11th Cir. 2001).................................................................3, 18, 23

*Southeast Laborers Health & Welfare Fund v. Bayer Corp.,*
    655 F. Supp. 2d 1270 (S.D. Fla. 2009)................................................................... 24

*Southern Farm Bureau Cas. Ins. Co. v. Sonnier,*
    406 So.2d 178 (La. 1981) ....................................................................................... 13

*Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.,*
    171 F.3d 912 (3d Cir. 1999) ................................................................................... 50

*Thomas v. Wallace, Rush, Schmidt, Inc.,*
    No. CV 16-572-BAJ-RLB, 2019 WL 1781412 (M.D. La. Apr. 22, 2019) ............. 11

*Tipton v. Northrop Grumman Corp.,*
    No. 08-1267, 2009 WL 2914365 (E.D. La. Sept. 2, 2009) ..................................... 39

- ix -

*UCFW Local 1776 v. Eli Lilly & Co.,*
    620 F.3d 121 (2d Cir. 2010) ...................................................................................... 5, 32

*United Food & Commercial Workers Central Pa. & Regional Health & Welfare
    Fund v. Amgen, Inc.,*
    400 F. App'x 255 (9th Cir. 2010) .......................................................................... 29, 30

*United Food & Commercial Workers Unions & Employers Midwest Health
    Benefits Fund v. Walgreen Co.,*
    719 F.3d 849 (7th Cir. 2013) ................................................................................ 40, 41

*Vandeweghe v. Jefferson Parish,*
    No. 11-2128, 2012 WL 1825300 (E.D. La. May 18, 2012) ......................................... 10

*West Coast Liquidators, Inc. v. Commerce & Industry Ins. Co.,*
    Nos. Civ.A. 98-2200S/W, 97-803, 97-775, 1999 WL 52150 (E.D. La. Feb. 1,
    1999) ............................................................................................................................. 12

*Young v. Scruggs,*
    No. 1:09-cv-669KS-MTP, 2010 WL 2301641 (S.D. Miss. June 7, 2010) .................... 39

## **Statutes**

18 U.S.C. § 1962(c) ................................................................................................................ 9, 38

18 U.S.C. § 1962(d) ............................................................................................................... 9, 38

28 U.S.C. § 1292(b) .................................................................................................................... 4

La. Civ. Code Ann. art. 1825 .................................................................................................... 12

La. Civ. Code Ann. art. 2298 .................................................................................................... 49

La. Civ. Code Ann. art. 2439 .................................................................................................... 46

La. Civ. Code Ann. art. 2520 .................................................................................................... 46

La. Civ. Code Ann. art. 3542 .................................................................................................... 42

La. Code Civ. P. art. 697 .......................................................................................................... 13

La. Rev. Stat. § 9:2800.52 ........................................................................................................ 46

La. Rev. Stat. § 51:1409(A) ...................................................................................................... 44

## **Other Authorities**

Fed. R. Civ. P. 9(b) ............................................................................................................ *passim*

Fed. R. Civ. P. 12(b)(6) ............................................................................. 1, 9, 10, 17

Restatement (Third) of Agency § 1.01, Comment f(1) (2006) ..................................................... 21

Defendants Janssen and Bayer submit this memorandum of law in support of their motion to dismiss the First Amended Class Action Complaint ("FAC") of three health care third-party payors (Doc. No. 1337) under Fed. R. Civ. Procedure 12(b)(6) and 9(b).[1]

## INTRODUCTION

Three third-party payors ("TPPs")—Louisiana Health Service and Indemnity Company d/b/a Blue Cross and Blue Shield of Louisiana ("LABC"), HMO Louisiana, Inc. ("HMO Louisiana"), and Allied Services Division Welfare Fund ("Allied")—have brought this action on behalf of themselves and a putative class of TPPs, seeking to recover amounts they paid to fill Xarelto prescriptions dispensed to their insureds. TPPs are insurers or other entities that pay healthcare costs incurred by their insureds or members. Plaintiffs allege that Defendants made misrepresentations to the medical community, pharmacy benefit managers ("PBMs"), and FDA, and thereby caused Plaintiffs to cover their insureds for more Xarelto prescriptions—many of which they claim would not have been written—than would have been the case if Defendants had communicated different information about Xarelto's risks. Plaintiffs' putative class seeks to recover the cost of Xarelto for individual patients who benefitted from Xarelto use without any incident or injury. FAC ¶ 169 ("All persons or entities in the United States and its territories (other than governmental entities), who purchased, paid, and/or reimbursed, in whole or in part, for Xarelto during the period from July 1, 2011 through the present (the "Class Period").").
Under the relevant authority, Plaintiffs' claims fail as a matter of law.

---

[1] This motion is filed on behalf of the served Janssen and Bayer entities: Janssen Research & Development, LLC f/k/a Johnson & Johnson Pharmaceutical Research & Development, LLC, Janssen Ortho LLC, Janssen Pharmaceuticals, Inc. f/k/a Janssen Pharmaceutica, Inc. f/k/a Ortho-McNeil-Janssen Pharmaceuticals, Inc., Johnson & Johnson, Bayer Healthcare Pharmaceuticals Inc., and Bayer Pharma AG. The other Bayer entities named in the FAC have not been served and for that reason are not parties to the motion.

Two of the Plaintiffs, LABC and HMO Louisiana (but not Allied), assert subrogation claims to recover payments for medicines dispensed to, and for medical treatment incurred by, their insureds. Under Louisiana law, a subrogation claim requires proof of each individual insured's claim. Here, the learned intermediary doctrine applies to each insured's case because Xarelto could only be dispensed through a prescription. The law requires proof that the alleged misrepresentations were made to each insured's prescribing physician and that those statements caused that physician to prescribe Xarelto, instead of another medicine, for that insured.[2] Plaintiffs' subrogation claims fail to state a claim because the FAC (i) does not identify the insureds who were prescribed Xarelto; (ii) does not identify the factual basis underlying each insured's claim, including statements relied upon by each of the physicians; and (iii) does not join the insureds, many of whom benefitted from Xarelto use, who are indispensable parties under Louisiana law.

Plaintiffs also attempt to assert other claims, including an alleged violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), common law fraud, violations of state consumer protection and/or deceptive trade practices statutes, redhibition, and unjust enrichment. Under those alternative theories, Plaintiffs claim that they themselves were injured by Defendants' alleged misrepresentations rather than by sustaining losses through their insureds.

---

[2] Under the learned intermediary doctrine, a plaintiff seeking to recover for injuries allegedly caused by a prescription medicine must allege and prove that the manufacturer "failed to warn (or inadequately warned) the physician of a risk associated with the [medicine] that was not otherwise known to the physician" and "that this failure to warn the physician was both a cause in fact and the proximate cause of the plaintiff's injury." *Allgood v. GlaxoSmithKline PLC*, Civil Action No. 06-3506, 2008 WL 483574, at *3 (E.D. La. Feb. 20, 2008) (Fallon, J.) (citation omitted).

The Court should dismiss Plaintiffs' non-subrogation claims for several reasons. *First*, under the legal test established by the Supreme Court in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258 (1992), other than through subrogation where the TPP stands in the shoes of its insured, a TPP cannot establish proximate causation for a misrepresentation allegedly made only to a physician or a PBM or FDA. Rather, the TPP must instead allege that the misrepresentation caused the TPP *itself* (as opposed to other parties) to either act or refrain from an act that allegedly resulted in its asserted injuries. That is because *Holmes* and its progeny require Plaintiffs to allege facts demonstrating "some *direct relation* between the injury asserted and the injurious conduct alleged." *Id.* at 267-68 (emphasis added).

Here, the FAC does not allege that the TPPs were recipients of Defendants' alleged misrepresentations or that those misrepresentations caused the TPPs either to act or refrain from an act that allegedly resulted in their injuries. Instead, the FAC alleges that Xarelto "prescriptions would have been restricted or priced differently if the FDA, Plaintiff's PBM and/or prescribers had truthful and complete information about the drug." FAC ¶¶ 11-13, 160.

The Second, Seventh and Eleventh Circuits have held that the *Holmes* "direct relation" proximate cause requirement bars derivative claims by TPPs, such as those alleged here, based on allegations that third parties (i.e. physicians, PBMs and FDA) were deceived by pharmaceutical manufacturers. Those decisions instead require allegations that the TPP itself, as distinct from others, acted or refrained from acting based on the misrepresentations. *See Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*, 873 F.3d 574, 576-78 (7th Cir. 2017); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71, 97 (2d Cir. 2015); *Southeast Laborers Health & Welfare Fund v. Bayer Corp.*, 444 F. App'x 401, 409-10 (11th Cir. 2001). The Fifth Circuit has never addressed this question, but the district

- 3 -

courts within our Circuit have concluded that TPPs cannot establish causation based on the actions of physicians or other third parties. *See Health Care Serv. Corp. v. Pfizer, Inc.*, No. 2:10-cv-221, 2012 WL 2505555, at *3-4 (E.D. Tex. Apr. 23, 2012), *adopted by* 2012 WL 2504884 (E.D. Tex. June 28, 2012); *In re Vioxx Prods. Liab. Litig.*, No. 05-3700, 2010 WL 11570867, at *6–7 (E.D. La. Mar. 31, 2010) (Fallon, J.) (holding that a governmental TPP could not establish causation based on its allegation that "fewer doctors would have prescribed, and fewer patients would have filled, Vioxx prescriptions had Merck not concealed information regarding the drug" because "such a tenuous causal connection is insufficient").

The First and Ninth Circuits, on the other hand, have held that TPPs may be entitled to recover based on allegations that pharmaceutical manufacturers deceived doctors. *See Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co.*, 943 F.3d 1243, 1260 (9th Cir. 2019); *In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21, 39-40 (1st Cir. 2013). As discussed below, the Second, Seventh and Eleventh Circuits' holdings are more faithful to *Holmes* and its progeny and support dismissal here. *See Point II(B), infra.*[3]

***Second***, the law precludes a TPP from attempting to establish proximate causation through a fraud-on-the-market theory that the medical community as a whole (rather than individual physicians) received and acted upon the alleged misrepresentations. As a matter of law, Plaintiffs are not entitled to assert a claim that an amorphous "medical community" would have reacted in a particular way to an alleged misrepresentation in lieu of allegations or proof of what any particular physician would have done absent the alleged misrepresentation. "Fraud-on-

---

[3] Regardless of how this Court resolves the Circuit split, the Fifth Circuit should have an opportunity to address this important issue. If the Court rules in favor of Defendants, the Fifth Circuit will have that opportunity on direct appeal from a final judgment. If the Court resolves the Circuit split in favor of Plaintiffs, it should certify its order for interlocutory review under 28 U.S.C. § 1292(b) so that the Fifth Circuit can consider the issue.

the-market theories" like those alleged here impermissibly seek to dispense with the burden to plead and prove causation with individualized proof.  Numerous courts have rejected use of "fraud-on-the-market" theories as a matter of law in TPP cases.  *See UCFW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 133 (2d Cir. 2010); *De Bouse v. Bayer AG*, 235 Ill.2d 544, 560, 922 N.E.2d 309, 319 (Ill. 2009); *Int'l Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 192 N.J. 372, 391-92, 929 A.2d 1076, 1088 (N.J. 2007); *Vioxx*, 2010 WL 11570867, at *7.  *See* Point II(C), *infra*.

*Third*, Plaintiffs have failed to allege fraud with particularity as required by Fed. R. Civ. P. 9(b).  *Bynane v. Bank of New York Mellon*, 866 F.3d 351, 360–61 (5th Cir. 2017).  Plaintiffs do not identify any physician, patient, PBM, or TPP that received any alleged misrepresentation concerning Xarelto, nor do they say who made the alleged misrepresentation, when it was made, the specific content of the misrepresentation, or how it caused Plaintiffs to do or refrain from doing anything that resulted in their alleged injuries.  Absent such allegations, the Court should dismiss Plaintiffs' fraud-based claims.  *See* Point III, *infra*.

Alternatively, Plaintiffs' claims should be dismissed for other, independent reasons:

- The Court should dismiss Plaintiffs' RICO and RICO conspiracy claims because Plaintiffs do not allege facts establishing a RICO enterprise that is distinct both from the alleged pattern of racketeering activity and from the Defendants themselves.  *See* Point IV, *infra*.

- The Court should dismiss claims under the consumer protection and deceptive trade practices laws of all states other than Illinois and Louisiana, because those state's laws do not apply to Plaintiffs' claims.  *See* Point V(A), *infra*.

- The Court should dismiss Allied's Illinois Consumer Protection Act ("ICFA") claim and LABC's and HMO Louisiana's LUTPA claim, because Plaintiffs have failed to allege, as required by those statutes, that they saw, read, heard and relied upon Defendants' alleged misrepresentations. *See* Points V(B), V(C), *infra.*

- The Court should dismiss Plaintiffs' New Jersey Consumer Fraud Act ("NJCFA") claims, because New Jersey law does not apply and, even if it did, Plaintiffs have failed to allege that they used and consumed Xarelto, which they cannot do. *See* Point V(D), *infra.*

- The Court should dismiss LABC's and HMO Louisiana's LUTPA, fraudulent misrepresentation, fraudulent concealment, fraud and deceit and unjust enrichment claims, because such claims are barred by the Louisiana Products Liability Act ("LPLA"). *See* Point VI, *infra.*

- The Court should dismiss LABC's and HMO Louisiana's redhibition claims because, as a matter of law, Plaintiffs are not Xarelto "buyers" under Louisiana's redhibition law. *See* Point VII, *infra.*

- The Court should dismiss Allied's unjust enrichment claim because, under Illinois law, such a claim cannot survive when based on the same facts underlying other legal claims that fail to state a claim for relief. *See* Point VIII(A), *infra.*

- The Court should dismiss LABC's and HMO Louisiana's unjust enrichment claims, because their remedies are governed by contracts and subrogation claims, not direct claims against the defendants here. *See* Point VIII(B), *infra.*

- 6 -

## COMPLAINT ALLEGATIONS

Plaintiffs commenced this case on August 28, 2015 and filed their FAC on September 29, 2015.  [Doc. No. 1337].  Plaintiffs provide healthcare insurance to insureds.  FAC ¶¶ 11–13.  In that capacity, Plaintiffs allege that they pay a portion of the cost of prescription medicines dispensed to their insureds.  *See id.*  The case has been dormant since Plaintiffs filed the FAC.  In the meantime, there have been six product-liability bellwether trials—three in the MDL and three in the Pennsylvania state court—each of which Defendants won.[4]

As the Court knows, Xarelto is among a class of medicines known as New Oral Anticoagulants.  FDA approved Xarelto in July 2011 for the prevention of deep vein thrombosis ("DVT") and pulmonary embolism ("PE") following hip or knee replacement surgery; in November 2011 to reduce the risk of stroke and embolism in patients with non-valvular atrial fibrillation; and in November 2012 to treat DVT and PE and their recurrence.  *See* FAC ¶¶ 79, 83, 86, 95.  Plaintiffs allege that Janssen and Bayer misrepresented Xarelto's safety and efficacy to FDA, patients, TPPs, PBMs, health care providers, and the medical and scientific community generally.  *See* FAC ¶¶ 78–149.  The FAC admits that certain information was submitted to FDA (FAC ¶¶ 101–103) and that Defendants have warned in the FDA-approved labeling that "XARELTO can cause serious and fatal bleeding."  FAC ¶ 136.  However, Plaintiffs contend that "Defendants did not adequately inform consumers and the prescribing medical community about the risks of uncontrollable bleeds associated with Xarelto usage, nor did Defendants warn or otherwise advise on how to intervene and stabilize a patient should a bleed occur."  *Id.*

Plaintiffs allege that they "contract with an outside vendor to provide pharmacy benefit management services for the drug component of their healthcare plans."  FAC ¶ 160.  These

---

[4] Defendants won jury verdicts in five cases and a JNOV in the sixth.

PBMs allegedly "prepare a 'formulary,' which is a list of the drugs that are approved for coverage by their third-party payor clients, such as Plaintiffs . . . ." FAC ¶ 162.  Under these arrangements, Plaintiffs "paid or incurred costs for prescriptions of Xarelto dispensed to covered lives in several states."  FAC ¶¶ 11–13.

According to Plaintiffs, "[a]s a result of Defendants' actions, Plaintiffs, patients, prescribing physicians, pharmacy benefit managers, and the medical community were unaware, and could not have reasonably known or have learned through reasonable diligence, that consumers would be exposed to the risks identified in this Complaint, and that those risks were the direct and proximate result of Defendants' acts, omissions, and misrepresentations."  FAC ¶ 149.  Plaintiffs allege that they have incurred economic injury because the Xarelto prescriptions for which they paid "would have been restricted and/or priced differently if the FDA, pharmacy benefit managers, and/or prescribers had truthful and complete information about" Xarelto.  FAC ¶ 160; *see also* FAC ¶¶ 11–13 (same).  More particularly, Plaintiffs allege that "[a]s a result of the fraudulent and/or misleading conduct of Defendants . . . , consumers and third-party payors have paid for Xarelto in greater quantities and at higher prices than they would have but for Defendants' misconduct."  FAC ¶ 161; *see also* FAC ¶ 168 (same).[5]

Based on these allegations, Plaintiffs assert claims on behalf of themselves and a proposed class of TPPs defined as "[a]ll persons or entities in the United States and its territories (other than governmental entities), who purchased, paid and/or reimbursed, in whole or in part, for Xarelto during the period from July 1, 2011 through the present."  FAC ¶ 169.  Plaintiffs

---

[5] The relationship between Plaintiffs, their insureds, PBMs, and physicians is graphically depicted in Judge Kaplan's decision in the Rezulin MDL, which also involved LABC.  *See In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597, 603 (S.D.N.Y. 2005).  Judge Kaplan's diagram is consistent with the allegations of the FAC in this case.

assert claims for: fraudulent misrepresentation (Count I), fraudulent concealment (Count II), fraud and deceit (Count III), violation of the ICFA (Count IV, by Allied only), violation of the LUTPA (Count V, by LABC and HMO Louisiana only), violation of the NJCFA (Count VI), violations of 45 other state consumer protection statutes (Count VII), violations of 23 other state uniform deceptive trade practices acts (Count VIII), violation of 18 U.S.C. § 1962(c) (Count IX), violation of 18 U.S.C. § 1962(d) (Count X), redhibition (Count XI, by LABC and HMO Louisiana only), subrogation (Count XII, by LABC and HMO Louisiana only) and unjust enrichment (Count XIII).

Plaintiffs seek to recover amounts they paid for Xarelto prescriptions dispensed to their insureds, "an award for all measures of damages allowable under such [consumer fraud and protection and deceptive trade practices] statutes," and "where applicable, treble, multiple, punitive, and/or other damages." FAC, Prayer for Relief ¶¶ C, F. Plaintiffs also seek "equitable relief in the nature of disgorgement, restitution, and the creation of a constructive trust to remedy Defendants' unjust enrichment." FAC, Prayer for Relief ¶ E. Finally, as a remedy for their subrogation claims, LABC and HMO Louisiana seek "recovery in the amount of payments for the medical care of their insured treatments for injuries caused by Xarelto ingestion." FAC, Prayer for Relief ¶ D.

## LEGAL STANDARD

"The function of a Rule 12(b)(6) motion to dismiss for the failure to state a claim is to 'allow a defendant to test whether, as a matter of law, the plaintiff is entitled to legal relief even if everything alleged in the complaint is true.'" *Brock v. Dean Morris, L.L.P.*, No. 15-2416, 2016 WL 4133572, at *2 (W.D. La. Aug. 3, 2016) (citation omitted). It follows that a complaint is subject to dismissal where the alleged facts are insufficient as a matter of law to entitle the plaintiff to relief. *See Johnson v. Acosta*, No. 10-1756, 2010 WL 4025883, at *8 (E.D. La. Oct.

- 9 -

12, 2010) ("These allegations, accepted as true for purposes of the pending motion to dismiss, fail to state a claim for wrongful discharge as a matter of Louisiana law.").

It also is well-settled that a claim is subject to dismissal under Fed. R. Civ. Proc. 12(b)(6) if plaintiffs fail to allege essential legal elements of the claim. *See Vandeweghe v. Jefferson Parish*, No. 11-2128, 2012 WL 1825300, at *11 (E.D. La. May 18, 2012) ("Plaintiff fails to allege an essential element of her emotional distress claim, and dismissal is proper on this basis, as well."); *Schudmak v. Bossetta*, No. Civ.A. 05-5194, 2006 WL 151928, at *2 (E.D. La. Jan. 19, 2006) ("Plaintiffs have made no effort to allege this essential element of [the] claim, and thus this claim is also subject to dismissal for failure to state a claim."). But simply reciting the necessary and essential legal elements of a claim alone is not a sufficient basis to avoid dismissal. "[A] plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (alteration in original).

To survive a motion to dismiss under Fed. R. Civ. Proc. 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard requires more than a sheer possibility that the defendant acted unlawfully, and Plaintiff's factual allegations must be enough to raise a right to relief above the speculative level." *Gomez v. Aardvark Contractors, Inc.*, No. CV 18-4186, 2018 WL 5706319, at *1 (E.D. La. Nov. 1, 2018) (Fallon, J.) (citation and internal quotation marks omitted).

"Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

Plaintiffs' claims sounding in fraud are subject to a heightened pleading standard. Fed. R. Civ. Proc. 9(b) requires Plaintiffs to "state with particularity the circumstances constituting fraud," which means that they must "plausibly plead facts establishing the time, place, and contents of the false representation[], as well as the identity of the person making the misrepresentation and what the person obtained thereby." *IAS Servs. Grp., L.L.C. v. Jim Buckley & Assocs., Inc.*, 900 F.3d 640, 647 (5th Cir. 2018) (citation and internal quotation marks omitted; alteration in original); *see also Thomas v. Wallace, Rush, Schmidt, Inc.*, No. CV 16-572-BAJ-RLB, 2019 WL 1781412, at *4 (M.D. La. Apr. 22, 2019) (dismissing claim under Rule 9(b) where the plaintiff did "not identify the person who made the statement or the time or place the statement was made").

## ARGUMENT

### I. THE COURT SHOULD DISMISS LABC'S AND HMO LOUISIANA'S SUBROGATION CLAIMS (COUNT XII) BECAUSE THE FAC FAILS TO PLEAD ESSENTIAL FACTS AND JOIN INDISPENSABLE PARTIES.

The Court should dismiss Plaintiffs' subrogation claims for two reasons. *First*, subrogation claims require Plaintiffs to prove their insureds' underlying claims, subject to defenses against their insureds. But LABC and HMO Louisiana have failed to plead any facts regarding these claims. *Second*, Plaintiffs have failed to join their insureds, who are indispensable parties under Louisiana law.

A.    **LABC and HMO Louisiana Have Failed to Plead Facts Necessary to Establish a Subrogation Claim.**

LABC and HMO Louisiana are "domestic health insurance corporation[s] licensed to conduct business in the state of Louisiana." FAC ¶¶ 11–12. Thus, their subrogation rights are governed by Louisiana law. *See West Coast Liquidators, Inc. v. Commerce & Industry Ins. Co.*, Nos. Civ.A. 98-2200S/W, 97-803, 97-775, 1999 WL 52150, at *4 (E.D. La. Feb. 1, 1999) ("In cases interpreting insurance policies, courts using Louisiana choice of law rules apply the law of the state in which the insurance policy was executed . . . because states have a 'significant policy interest' in regulating insurance policies issued there." (citation omitted)).

Under Louisiana law, "[s]ubrogation is the substitution of one person to the rights of another." La. Civ. Code Ann. art. 1825. It is well-settled that "'[w]hen subrogated to the rights of the insured, the insurer stands in the shoes of the insured and thereby acquires the independent right to assert the actions and rights of the insured.'" *Bazer v. Honda Motor Co.*, 872 So.2d 534, 536 (La. Ct. App. 3d Cir. 2004) (citation omitted). "Additionally, the subrogated insurer acquires no greater rights than those possessed by its subrogor and is subject to all limitations applicable to the original claim of the subrogor." *Id.* (internal quotation omitted); *see also Corley Enters. Of La., Inc. v. Bear Creek Saloon, Inc.*, 273 So.3d 1236, 1238 (La. Ct. App. 1st Cir. 2019) ("Under the principle of subrogation, the insurer stands in the shoes of the insured and acquires the right to assert the actions and rights of the plaintiff."); *Louisiana Farm Bureau Cas. Ins. Co. v. Burkett*, 266 So.3d 908, 911 (La. Ct. App. 1st Cir. 2018) (same).

LABC and HMO Louisiana assert subrogation claims to recover medical expenses paid to treat their insureds who received Xarelto. FAC ¶¶ 309–10. Because LABC and HMO Louisiana purport to assert the rights of their insureds against Defendants and are subject to all defenses against their insureds' claims, they must plead the facts supporting their insureds'

claims.  But Plaintiffs do not identify (a) the insureds in whose shoes they purport to stand, (b)

the injuries allegedly sustained by each insured as a result of Xarelto treatment, or (c) how

Defendants' conduct allegedly caused each of those insureds' injuries.  The Court should dismiss

LABC's and HMO Louisiana's subrogation claims (Count XII) because they have failed to

allege those essential facts.

**B.     LABC and HMO Louisiana Have Failed to Join Their Insureds, Who are Indispensable Parties.**

Louisiana law distinguishes between partial subrogation, where the insurer pays only part

of the insured's costs, and complete subrogation, where the insurer pays all of the insured's

costs.  *See* La. Code Civ. P. art. 697.  In the case of partial subrogation, both the insurer and the

insured are necessary parties in an action commenced by either one.  *See In re Katrina Canal*

*Litig. Breaches*, 524 F.3d 700, 707 n.19 (5th Cir. 2008) ("Where an assignment or subrogation is

partial in Louisiana, the failure to include either of the contracting parties in a suit constitutes

nonjoinder of a necessary party."); *Southern Farm Bureau Cas. Ins. Co. v. Sonnier*, 406 So.2d

178, 181 (La. 1981) (noting that "if there has been a partial subrogation, and the suit is brought

only by the subrogor or the subrogee, there is a non-joinder of a necessary party").

Plaintiffs allege that their insureds make co-payments for prescription medicines that they

purchase, including Xarelto.  *See* FAC ¶ 161 ("The typical third-party payor co-payment ranges

from 70% to 80% of the total cost of the drug depending on the members' prescription co-pay

plan"); *id.* ¶ 163 ("The level of preference on the formulary corresponds with the amount that a

plan participant must contribute as a co-payment when purchasing a drug").  Because Plaintiffs

share the costs of prescription medicines with their insureds, any subrogation rights that

Plaintiffs have acquired for the costs of Xarelto treatment and treatment for injuries allegedly

caused by Xarelto involves partial subrogation.  As partial subrogees, LABC and HMO

- 13 -

Louisiana were required to name their insureds as parties to the FAC, which they have not done. Accordingly, the Court should dismiss Plaintiffs' subrogation claims (Count XII) for failure to join indispensable parties.

## II.    THE COURT SHOULD DISMISS EACH OF PLAINTIFFS' NON-SUBROGATION CLAIMS FOR FAILURE TO PLEAD FACTS THAT WOULD ESTABLISH PROXIMATE CAUSATION (COUNTS I–XI & XIII).

To prevail on each of their non-subrogation claims, Plaintiffs must prove the essential element that Defendants' conduct proximately caused their alleged injuries. Plaintiffs cannot make that showing because they have not alleged facts demonstrating a direct relationship between Defendants' alleged wrongful conduct and Plaintiffs' alleged injuries.

### A.    To Establish Proximate Causation Plaintiffs Must Allege and Prove that Defendants' Misrepresentations Caused Them to Do or Refrain from Doing Something, Resulting in Their Alleged Injuries.

The test articulated by the Supreme Court in *Holmes v. Securities Investor Protection Corp.*, 503 U.S. 258, 267–68 (1992), governs and bars Plaintiffs' claims. It is well-settled that Plaintiff's RICO claim (Count X) imposes a proximate causation requirement that "incorporate[s] common-law principles," including proof of "some direct relation between the injury asserted and injurious conduct alleged." *Id.* In *Holmes*, the Securities Investor Protection Corporation ("SIPC") reimbursed losses incurred by customers of two broker dealers whose liquidation allegedly was caused by the defendants' stock manipulation. *Id.* at 261. The SIPC, as subrogees of the investors, sued the defendants to recover the reimbursements it had paid to the broker dealers' customers. *Id.* at 262. The Supreme Court held that the SIPC could not recover because it could not establish that the defendants' stock manipulation proximately caused the investors' losses. *Id.* at 276. As the Court explained, "the link is too remote between the stock manipulation alleged and the customers' harm, being purely contingent on the harm suffered by the broker–dealers," *i.e.*, "the conspirators have allegedly injured these customers

- 14 -

only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims." *Id.* at 271.

The Supreme Court articulated three reasons for adopting the remoteness doctrine.  First, permitting the customers to sue would create difficulties in "determin[ing] the extent to which their inability to collect from the broker-dealers was the result of the alleged conspiracy to manipulate, as opposed to, say, the broker-dealers' poor business practices or their failures to anticipate developments in the financial markets." *Id.* at 273.  Second, permitting the customers to sue would create difficulties in apportioning damages between the directly injured broker-dealers and the customers.  *Id.*  And third, the directly injured broker-dealers could be counted on to assert claims.  *Id.*

The Supreme Court repeatedly has confirmed and applied the "remoteness doctrine" to affirm dismissal of RICO claims where the defendants' allegedly wrongful conduct is too remote from the plaintiff's alleged injury.  *See Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010) (RICO claim properly dismissed for failure to plausibly allege proximate causation where New York City sought to recover for lost tax revenues allegedly caused by out-of-state seller's failure to file reports with New York State regarding cigarette sales to New York State residents); *Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 457 (2006) (RICO claim properly dismissed for failure to plausibly allege proximate causation where plaintiff sought to recover for competitive injury allegedly caused by defendant's failure to collect sales taxes).

The *Holmes* remoteness doctrine is not limited to federal RICO claims but applies to other claims as well.  The same "common law principles" of proximate causation and the remoteness doctrine addressed by the Court in *Holmes* in connection with a RICO claim apply to state common law and statutory claims, requiring proof of proximate causation under Illinois and

- 15 -

Louisiana law. *See Cnty of Cook v. Philip Morris, Inc.*, 353 Ill. App.3d 55, 60, 817 N.E.2d 1039, 1043 (Ill. Ct. App. 1st Dist. 2004) ("One way in which the concept of proximate cause operates is through the remoteness doctrine, which is sometimes called the 'direct-injury' test. This doctrine states that there must be 'some direct relation between the injury asserted and the injurious conduct alleged.'" (quoting *Holmes*, 503 U.S. at 268)); *Acadian Corp. v. Olin Corp.*, 824 So.2d 396, 402 (La. Ct. App. 3d Cir. 2002) (approving jury instruction that "the law takes no cognizance of negligence which is remote to the accident or the injury. It is only the negligence which actively and directly causes the accident or injury which the Court recognizes and attaches legal consequence to."). Consequently, the remoteness doctrine applies to all of Plaintiffs' state common law and statutory claims.

### B.      Plaintiffs Have Failed to Allege Facts that Could Satisfy the *Holmes* Test for Proximate Causation.

Plaintiffs' claims fail under the *Holmes* test. Plaintiff TPPs do not allege that *they* received, reviewed, or relied on Defendants' alleged misrepresentations. Nor do they allege that those misrepresentations caused them to do or refrain from doing anything that resulted in their alleged injuries. Instead, they allege that the Xarelto prescriptions for which they paid "would have been restricted and/or priced differently if the *FDA, pharmacy benefit managers, and/or prescribers* had truthful and complete information about the drug." FAC ¶ 160 (emphasis added); *see also* FAC ¶¶ 11–13. Because the TPPs here are just like the SIPC in *Holmes* where the injury was too remote, their allegations—that Defendants' alleged misrepresentations to physicians, the medical community generally, PBMs, and FDA ultimately resulted in economic injury to Plaintiffs—are insufficient as a matter of law to establish proximate causation.

### 1.    Alleged Misrepresentations to Physicians

The Second, Seventh and Eleventh Circuits have applied *Holmes* to reject claims by TPPs to recover amounts paid for prescription medicines allegedly caused by pharmaceutical manufacturers' misrepresentations to persons or entities other than the TPPs themselves.  As one district court summarized the case law, "'RICO claims generally survive where TPPs allege that defendants made direct misrepresentations to them and fail where they do not.'"  *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, MDL No. 2545, 2019 WL 652217, at *8 (N.D. Ill. Feb. 14, 2019) (citation omitted), *aff'd*, 784 F. App'x 457 (7th Cir. 2019).

For example, in *Sidney Hillman Health Ctr. of Rochester v. Abbott Labs.*, 873 F.3d 574 (7th Cir. 2017), the Seventh Circuit affirmed dismissal under Rule 12(b)(6) of claims asserted by TPPs to recover amounts paid for off-label prescriptions of a medicine.  The TPPs alleged that the manufacturer's off-label promotion caused physicians to write medically unnecessary prescriptions.  *Id.* at 575.  The Court held that the claim failed as a matter of law because "improper representations made to physicians do not support a RICO claim by Payors, several levels removed in the causal sequence."  *Id.* at 578.  As the Court explained, TPPs are only *derivatively* injured when physicians and patients are deceived: "Payors part with money, to be sure, but it is not at all clear that they are the initially injured parties, let alone the sole injured parties."  *Id.* at 576.  That is because "[p]atients suffer if they take [a medicine] even though it is useless to them and may be harmful," and "physicians may lose business and revenue" if they "prescribe[] an ineffective medicine."  *Id.*  Moreover, "[t]he immediate effect of wrongful off-label promotion is on physicians' conduct," and some "may not have changed their prescribing practices at all, or they might have changed them but done so in response to information that Abbott did not influence."  *Id.* at 577–78.

Similarly, in *Southeast Laborers Health & Welfare Fund v. Bayer Corp.*, 444 F. App'x 401 (11th Cir. 2011), the Eleventh Circuit affirmed the Rule 12(b)(6) dismissal of a TPP's complaint "because, although [the TPP] alleged that it had an independent choice of whether or not to pay for Trasylol, [it] failed to explain how or why it made the choice to pay for Trasylol and how or why Bayer's alleged concealment of the dangers of Trasylol led [the TPP] to pay for Trasylol." *Id.* at 410.

Likewise, in *Sergeants Benevolent Ass'n Health & Welfare Fund v. Sanofi-Aventis U.S. LLP*, 806 F.3d 71 (2d Cir. 2015), the Second Circuit affirmed summary judgment for a pharmaceutical manufacturer on a similar TPP claim, because "Plaintiffs cannot prove third-party reliance, and thus causation, by generalized proof." *Id.* at 97.[6]

District Courts within the Fifth Circuit also have rejected claims by TPPs for recovery of amounts paid for prescription medicines because the TPP did not allege that it acted or failed to act based on misrepresentations made directly to it. In *Health Care Serv. Corp. v. Pfizer, Inc.*, No. 2:10-cv-221, 2012 WL 2505555 (E.D. Tex. Apr. 23, 2012), *adopted by* 2012 WL 2504884 (E.D. Tex. June 28, 2012), the Court dismissed a TPP complaint against a pharmaceutical manufacturer for failure to allege "what misrepresentations were made directly to it and upon which it relied or how these representations caused Plaintiff's harm," which "thwarts the Court's ability to evaluate causation." *Id.* at *3.

---

[6] The Second Circuit's decision in *Desiano v. Warner-Lambert Co.*, 326 F.3d 339 (2d Cir. 2003) is consistent with *Sergeants Benevolent Association*. In *Desiano*, the Second Circuit reversed dismissal of TPP claims against a pharmaceutical manufacturer where the TPPs alleged that *they* acted or refrained from acting based on misrepresentations *they* received directly from the pharmaceutical manufacturer. *See id.* at 349. Plaintiffs here have not alleged those facts. On remand, the district court ultimately granted summary judgment to the manufacturer because the TPP plaintiffs could not prove those allegations. *See Rezulin*, 392 F. Supp. 2d at 620-21.

- 18 -

This Court has addressed causation in the context of claims asserted by a governmental TPP—the Louisiana Department of Health and Hospitals ("LDHH"), which pays for medicines prescribed to Louisiana Medicaid recipients. *See Vioxx*, 2010 WL 11570867 at *4. In *Vioxx*, this Court held that LDHH could not establish causation as a matter of law based on its allegation that "fewer doctors would have prescribed, and fewer patients would have filled, Vioxx prescriptions had Merck not concealed information regarding the drug." *Id.* at *6. Although the Court did not address *Holmes* explicitly, it applied the remoteness principle. As the Court explained, "such a tenuous causal connection is insufficient" because "[i]t is simply impossible, or close to it, to determine the individual thought process of each of the thousands of doctors and patients involved." *Id.* at *7.[7]

Here, as in the foregoing authorities, Plaintiffs have not alleged that they acted or refrained from acting based on anything that Defendants told them. Rather, they allege only indirect injuries—that they incurred injury because physicians relied on Defendants' alleged misrepresentations to others, resulting in an increased quantity of prescriptions or an increased market price for Xarelto. Under the case law cited above, Plaintiffs' allegations that they have been injured derivatively are insufficient as a matter of law to establish proximate causation.

---

[7] This Court's ruling in *Vioxx* that LDHH adequately pleaded proximate causation with respect to the claim that it "could and would have refused to pay for all Vioxx prescriptions, or at least, would have refused to pay for Vioxx prescriptions for certain classes of individuals" (*id.* at *4), supports dismissal and is consistent with the rule that TPP claims "generally survive where TPPs allege that defendants made direct misrepresentations to them and fail where they do not." *Testosterone Replacement Therapy*, 2019 WL 652217 at *8 (citation and quotation marks omitted). As the quoted language from *Vioxx* shows, that case involved an allegation of direct rather than indirect injury because LDHH alleged that it would *itself* have acted upon the alleged misstatements. In this case, unlike in *Vioxx*, Plaintiffs do not allege that they made formulary decisions; instead, they allege that they were damaged indirectly and derivatively via formulary decisions made by independent PBMs. As set forth in Point II(B)(2), a claim that TPPs were injured by formulary decisions made by PBMs, as opposed to formulary decisions made by the TPPs themselves, is not legally sufficient to establish "direct" injury under *Holmes*.

- 19 -

### 2.   Alleged Misrepresentations to PBMs

Plaintiffs also allege that Defendants made misrepresentations to PBMs, which prepare drug formularies that are marketed to TPPs.  *See* FAC ¶¶ 160, 162.  Plaintiffs have not even identified the PBMs they contract with—let alone alleged with specificity what Defendants allegedly misrepresented to those PBMs—or who made the misrepresentations to whom and when.  *See* Point III, *infra*.  But even if Plaintiffs had done so, their allegations regarding PBMs do not satisfy their burden to plausibly allege that Defendants' alleged misrepresentations proximately caused their injuries.  Their claims are insufficient on the face of the FAC for two reasons.

*First*, although Plaintiffs allege that they had contracts with PBMs (FAC ¶ 160), they do not allege that their PBMs received Defendants' alleged misrepresentations or acted on them as Plaintiffs' agents, much less any facts from which an inference of agency plausibly could be drawn.  Consequently, any statement made to and acted upon by the PBM is not a statement made to and acted upon by the TPP.  Second, Plaintiffs do not satisfy the *Holmes* causation standard because they do not allege how any misrepresentations directed to some unknown number of PBMs caused Plaintiffs to do or refrain from doing anything resulting in their injuries.  Absent such allegations, Plaintiffs cannot establish that any alleged misrepresentations to PBMs proximately caused their alleged injuries.

Two MDL courts have applied these principles to grant summary judgment to pharmaceutical manufacturers on TPPs' claims that they were defrauded by alleged misrepresentations made to their PBM.  In *In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597 (S.D.N.Y. 2005), the TPPs (including LABC) alleged that their PBM, acting as their agent, received misrepresentations from a pharmaceutical manufacturer, but the MDL court granted summary judgment because "the undisputed facts make it abundantly clear that the HBPs had no

ability to control [the PBM's] conduct with respect to the purchase of Rezulin or otherwise," as "confirmed by their contracts, which specifically disclaimed [an] agency relationship between them." *Id.* at 607-08.

Just last year, in *In re Testosterone Replacement Therapy Prods. Liab. Litig.*, MDL No. 2545, 2019 WL 652217 (N.D. Ill. Feb. 14, 2019), *aff'd*, 784 F. App'x 457 (7th Cir. 2019), the court granted summary judgment because "no reasonable jury could conclude that [plaintiff's PBM] added defendants' TRT drugs to their formularies in reliance on defendants' alleged misrepresentations" and "even assuming [plaintiff's PBM] adopted . . . policies based on defendants' misrepresentations, no reasonable jury could find that MMO made its utilization management decisions in reliance on any clinically-based decision [plaintiff's PBM] may have made." *Id.* at *15–18.

Although *Rezulin* and *Testosterone Replacement Therapy* are summary judgment decisions, Plaintiffs here have not pleaded any facts that, even if true, would establish that they have a legally cognizable claim for alleged deception of non-party PBMs. Plaintiffs have not alleged that their PBM(s) acted as their agents in creating formularies. Nor have they pleaded facts necessary to establish an agency relationship.[8] To the contrary, Plaintiffs admit that PBMs are "outside vendor[s]." FAC ¶ 160. Moreover, even if Plaintiffs had alleged that their PBMs

---

[8] It is well-settled that "[a]n essential element of agency is the principal's right to control the agent's actions." Restatement (Third) of Agency § 1.01, Comment f(1) (2006). Thus, under Illinois law, the determination whether a person is an agent, or an independent contractor depends primarily on "whether that person retains the right to control the manner of doing the work." *Lawlor v. N. Am. Corp. of Ill.*, 983 N.E.2d 414, 427 (Ill. 2012) (citation omitted). Similarly, under Louisiana law, an independent contract, as distinguished from an agent, provides a service "according to the independent contractor's own methods, without being subject to the control and direction, in the performance of the service, of his employer, except as to the result of the services to be rendered." *Hickman v. Southern Pac. Transport Co.*, 262 La. 102, 117, 262 So.2d 385, 390–91 (La. 1972). Here, Plaintiffs have not pleaded that they control PBMs as required to establish an agency relationship.

- 21 -

made decisions concerning Xarelto based on Defendants' alleged misrepresentations, Plaintiffs have not alleged how that caused the TPPs themselves—rather than the PBMs—to do or refrain from doing anything that resulted in their paying for Xarelto in a higher quantity or at a higher price. Accordingly, Plaintiffs cannot establish that Defendants' alleged misrepresentations to unidentified PBMs proximately caused their alleged injuries under the *Holmes* "direct relation" standard.

### 3. Alleged Misrepresentations to FDA

Plaintiffs allege that Defendants made misrepresentations to FDA, which supposedly caused Plaintiffs' injuries. *See* FAC ¶¶ 11–13, 160. Those allegations, even if accepted as true for purposes of this motion, fail to state a claim for three separate and independent reasons.

*First*, under *Holmes* and its progeny, the Court should dismiss Plaintiffs' claims to the extent that they are based on alleged fraud on FDA because Plaintiffs' injuries are too remote from the alleged fraud to establish proximate causation. *See In re Oil Spill by Oil Rig Deepwater Horizon in the Gulf of Mexico, on April 20, 2010*, 802 F. Supp. 2d 725, 729 (E.D. La. 2011) (dismissing RICO claim where "Plaintiffs urge the Court to accept a link between BP's alleged defrauding of regulators and the economic harms suffered by Plaintiffs that is 'too remote'" (citation omitted)).

*Second*, the Supreme Court has held that the Federal Food, Drug and Cosmetics Act ("FDCA") does not provide a federal private right of action to people allegedly injured by a violation of that statute. *See Merrell Dow Pharms. Inc. v. Thompson*, 478 U.S. 804, 806–07 (1986). Permitting Plaintiffs to base a RICO claim on an alleged violation of the FDCA would defeat the Court's holding in *Merrell Dow*.

*Third*, Plaintiffs' state law claims are preempted by federal law to the extent they are based on an alleged fraud on the FDA. In *Buckman v. Plaintiffs' Legal Committee*, 531 U.S. 341

- 22 -

(2001), the Supreme Court held that state law claims for alleged fraud on the FDA are preempted by federal law.  Numerous courts have applied *Buckman* to reject fraud-on-the-FDA claims.  For example, the Fifth Circuit held that a Texas law requirement that a product liability plaintiff prove fraud on the FDA to rebut a presumption that FDA-approved warnings are adequate is preempted by federal law.  *See Lofton v. McNeil Consumer & Specialty Pharms.*, 672 F.3d 372, 380 (5th Cir. 2012); *see also Estes v. Lanx, Inc.*, 660 F. App'x 260, 260–61 (5th Cir. 2016) (holding that federal law preempts a state law claim for fraudulent concealment arising from alleged misrepresentations to FDA absent which FDA allegedly would not have approved medical device); *Southeast Laborers*, 444 F. App'x at 407 ("A theory of causation relying solely on an allegation that the medication in question would not have been on the market absent the alleged fraudulent conduct is no more than a state law 'fraud on the FDA' theory, a theory that has been specifically rejected by the Supreme Court."); *McDarby v. Merck & Co., Inc.*, 401 N.J. Super. 10, 90-94, 949 A.2d 223, 273-76 (N.J. App. Div. 2008) (provision of New Jersey law that permits punitive damages in pharmaceutical product liability actions upon proof of fraud on the FDA is preempted by federal law).

### 4.    The Court Should Reject the First and Ninth Circuits' View.

Contrary to the Second, Seventh and Eleventh Circuits, the First and Ninth Circuits have upheld TPP claims against pharmaceutical manufacturers based on alleged fraud on other parties. In *Painters & Allied Trades Dist. Council 82 Health Care Fund v. Takeda Pharms. Co. Ltd.*, 943 F.3d 1243 (9th Cir. 2019), the Ninth Circuit reversed a dismissal of TPP RICO claims, upon finding it "was perfectly foreseeable that  physicians who *prescribed* Actos would play a causative role in Defendants' alleged fraudulent scheme to increase Actos's revenues." *Id.* at 1257 (emphasis in original).  And in *In re Neurontin Mktg. & Sales Pracs. Litig.*, 712 F.3d 21 (1st Cir. 2013), the First Circuit affirmed a jury verdict on RICO claims and a bench-trial

judgment on unfair competition law claims in favor of a TPP.[9]  The First Circuit rejected the

manufacturer's argument that "there is no proximate causation in this case because there are too

many steps in the causal chain connecting its misrepresentations to the injury to Kaiser,

particularly because that injury rests on the actions of independent actors—the prescribing

doctors." *Id.* at 34.  This Court should not follow the First and Ninth Circuits' decisions because

they misconstrue Supreme Court precedent and impermissibly conflate foreseeability with

directness of injury.

a.      **The First and Ninth Circuits Misconstrue Supreme Court Authority.**

The First and Ninth Circuit decisions both rely on—but misconstrue—*Bridge v. Phoenix

Bond & Indemnity Co.*, 553 U.S. 639 (2008), to arrive at their conclusions.  *See Painters*, 943

F.3d at 1250–51; *Neurontin*, 712 F.3d at 36 n.9.

To understand why those decisions are wrongly decided, it is necessary to explain why

*Bridge* does not apply to TPP claims.  *Bridge* involved bidders for tax liens who alleged that

rival bidders had violated the county's prohibition on straw bids through agents.  *Bridge*, 553

U.S. at 642.  Because the county allocated ties for the lowest bid on a rotational basis, the

---

[9] In *In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 915 F.3d 1 (1st Cir. 2019), the First Circuit followed its earlier *Neurontin* decision.

The district courts also are divided.  *Compare In re Yasmin and Yaz (Drosperinone) Mktg., Sales Pracs. & Prods. Liab. Litig.*, Nos. 3:09-md-02100-DRH-PMF, 3:09-cv-20071-DRH-PMF, 2010 WL 3119499, at *5–8 (S.D. Ill. Aug. 5, 2010) (granting 12(b)(6) motion to dismiss TPP RICO claims for failure to allege facts that would establish proximate causation); *Southeast Laborers Health & Welfare Fund v. Bayer Corp.*, 655 F. Supp. 2d 1270, 1278–84 (S.D. Fla. 2009) (same); *Dist. 1199P Health & Welfare Plan v. Janssen, L.P.*, 784 F. Supp. 2d 508, 523–25 (D.N.J. 2011) (same) *with In re Nat'l Prescription Opiate Litig.*, No. 1:17-md-2804-DAP, 2020 WL 871539, at *14–16 (S.D. Ohio Feb. 21, 2020) (denying 12(b)(6) motion to dismiss TPP RICO claims); *Blue Cross Blue Shield Ass'n v. GlaxoSmithKline LLC*, Civil Action No. 13-4663, 2019 WL 4857737 at *17 (E.D. Pa. Sep. 30, 2019) (denying summary judgment where TPPs alleged that they would not have paid for allegedly adulterated medicines).

defendant bidders' conduct directly deprived the plaintiff bidders of tax liens that otherwise

would have been allocated to them. *Id.* at 644. The Supreme Court held in *Bridge* that RICO

does not require proof of first-party reliance and that the plaintiff bidders could satisfy the

proximate causation requirement absent first-party reliance. *Id.* at 648–49. As the Court

explained, the allegations "satisf[ied] the proximate-cause principles articulated in *Holmes* and

*Anza*" because "Respondents alleged injury—the loss of valuable liens—is the direct result of

petitioners' fraud" and "there are no independent factors that account for respondents' injury."

*Id.* at 657-58.

    The First and Ninth Circuits misread *Bridge* by focusing solely on its holding regarding

first-party reliance rather than its views of the *Holmes* "direct relationship" proximate causation

requirement. As the Seventh Circuit opinion in *Bridge* that was affirmed by the Supreme Court

noted, the local government rule prohibiting straw bids was designed for the very purpose of

protecting competing bidders like plaintiffs from fraud, and "[t]he *only* injured parties are the

losing bidders, who acquire fewer tax liens than they would if the Single, Simultaneous Bidder

Rule were followed." *See Phoenix Bond & Indemnity Co. v. Bridge*, 477 F.3d 928, 931–32 (7th

Cir. 2007), *aff'd*, 553 U.S. 639 (2008) (emphasis in original). The Supreme Court made the

same point: "respondents and other losing bidders were the *only* parties injured by petitioners'

misrepresentations." *Bridge* 533 U.S. at 658 (emphasis in original). Moreover, because the local

government's action in awarding tax liens was purely ministerial, and did not involve discretion,

it was easy to trace causation even though the fraudulent bids were made to a third party (the

local government) rather than to plaintiffs directly. *Id.* Under the local government regulations,

plaintiffs automatically would have been awarded tax liens because the local government

awarded ties for the lowest bid on a rotational basis and there was no need to speculate about

- 25 -

what the government would have done absent the fraud.  *Id.* at 643.  In that circumstance, where the third party sustained no injury and its response to the fraud was automatic and non-discretionary, there were "no independent facts that account for [plaintiffs'] injury" and therefore the injury to the plaintiff bidders was "direct" even though the fraudulent statement was made to the government rather than the plaintiffs.  *Id.* at 658.

The Seventh Circuit decided *Sidney Hillman* after the Supreme Court affirmed its decision in *Bridge*.  As the Court of Appeals explained in *Sidney Hillman*, its earlier decision that the *Holmes* test was satisfied in *Bridge* is entirely consistent with its later decision in *Sidney Hillman* that the *Holmes* test is not satisfied in TPP cases.  873 F.3d at 576.  Unlike in *Bridge*, in TPP cases there is no presumption what the third party (physicians) would have done had they received different information about Xarelto.  As the Seventh Circuit noted, "[d]isentangling the effects of the improper promotions from the many other influences on physicians' prescribing practices would be difficult—much more difficult than following the one-step causal link in *Bridge*."  *Id.* at 577.  Moreover, unlike in *Bridge*, and as the Seventh Circuit held, TPPs are only derivatively injured—and not directly injured—parties from alleged misstatements to physicians.  *Id.* at 578.  Accordingly, the Seventh Circuit's holding in *Sidney Hillman* is consistent with its prior holding in *Bridge*, which the Supreme Court affirmed.  Both holdings are consistent with the *Holmes* test applying the remoteness doctrine, but the First and Ninth Circuits' decisions in *Neurontin* and *Painters* misinterpreted the Court's views as they apply to TPP cases like this one.

> **b.     The First and Ninth Circuits Inappropriately Conflate Foreseeability with Directness of Injury.**

The First and Ninth Circuits' holdings are inconsistent with *Holmes* and its progeny in another way.  Both held that TPPs can recover even without alleging and proving that they received misrepresentations and acted or refrained from acting based on them simply because it

was foreseeable that the decisions of third parties (doctors) could cause injury to TPPs. *Painters*, 943 F.3d at 1257; *Neurontin*, 712 F.3d at 37 ("Because Kaiser was both the natural and foreseeable victim of the fraud and the intended victim of the fraud, there is no risk of duplicative recovery."). But *Holmes* does not turn on the foreseeability of the alleged injury. To the contrary, in *Hemi Group* the Supreme Court explicitly rejected that very argument, which "would have RICO's proximate cause requirement turn on foreseeability, rather than on the existence of a sufficiently 'direct relationship' between the fraud and the harm." *Hemi Group*, 559 U.S. at 12. As the Supreme Court explained, foreseeability is not the focus of the proximate cause element in a RICO case:

> The concepts of direct relationship and foreseeability are of course two of the "many shapes [proximate cause] took at common law." Our precedents make clear that in the RICO context, the focus is on the directness of the relationship between the conduct and the harm. Indeed, *Anza* and *Holmes* never even mention the concept of foreseeability.

*Id.* (quoting *Holmes*, 503 U.S. at 268). So too here, Plaintiffs' failure to allege a direct relationship between their injury and Defendants' alleged conduct cannot be remedied merely by showing that the harm was a foreseeable consequence of the conduct.[10]

### c. Enforcing the *Holmes* Standard Does Not Leave TPPs Without a Remedy.

In *Painters*, the Ninth Circuit stated that "[i]f we were to hold the opposite—that prescribing physicians' and pharmacy benefit managers' decisions constitute an intervening cause to sever the chain of proximate cause—. . . drug manufacturers would be insulated from

---

[10] *In re Celexa & Lexapro Mktg. & Sales Pracs. Litig.*, 915 F.3d 1 (1st Cir. 2019), which followed *Neurontin*, reversed summary judgment in favor of a pharmaceutical manufacturer where "a jury could find that [TPPs] were 'the primary and intended victims of [Forest's] scheme to defraud'" even though "pediatricians were the immediate target of Forest's fraudulent [off-label] marketing." *Id.* at 13-14. As in *Neurontin* and *Painters*, the Court's rationale is inconsistent with *Hemi Group*, which requires a "direct relationship" and not just foreseeability.

liability for their fraudulent marketing schemes as they could continuously hide behind prescribing physicians and pharmacy benefit managers." 943 F.3d at 1257. But that is not true; TPPs have multiple remedies. TPPs can assert subrogation claims assuming the facts support such a claim. That LABC and HMO Louisiana have failed to satisfy the pleading requirements for a traditional subrogation claim, and that Allied has elected not to assert a subrogation claim at all, is not a reason for courts to create new remedies for them.

Moreover, if TPPs are directly defrauded—*i.e.*, if they or their agents have received or acted upon alleged misrepresentations—they could potentially pursue direct fraud claims. The fact that the TPPs in this case have not asserted a claim for direct fraud, presumably because they could not prove one, does not justify creating a new indirect "fraud-lite" claim that eviscerates the Supreme Court's proximate causation requirements.

The First and Ninth Circuit cases are examples of "the adage that hard cases make bad law." *Boatner v. Atlanta Specialty Ins. Co.*, 115 F.3d 1248, 1258 (5th Cir. 1997). Both decisions involve extreme, atypical situations that do not support legal principles of general application. *Neurontin* involved allegations of off-label marketing against a manufacturer, including a guilty plea to criminal charges. 712 F.3d at 25. *Painters* involved allegations that a pharmaceutical manufacturer withheld information that its medicine could cause bladder cancer based on internal projections that sales would plummet if the cancer risk was disclosed. 943 F.3d at 1246, 1258. Although those cases were wrongly decided, their extreme facts undoubtedly influenced those courts to depart from the *Holmes* direct injury requirement.

The allegations in this case—where Plaintiffs concede (as they must) that Defendants warned that "XARELTO can cause serious and sometimes fatal bleeding" (FAC ¶ 136)—do not even remotely approach the extreme allegations in *Neurontin* and *Painters*, which caused those

- 28 -

courts to deviate from the Supreme Court's rulings.  But as the Fifth Circuit has noted, "it is the duty of all courts of justice to take care, for the general good of the community, that hard cases do not make bad law." *Cathey v. Dow Chem. Co. Med. Care Program*, 907 F.2d 554, 555 (5th Cir. 1990) (citation omitted).  Consistent with its duty, this Court should not extend the First and Ninth Circuit decisions based on their exceptional facts, which are not present in this case.

### d.   The Ninth Circuit's Decision is Contrary to a Previous Decision of that Court.

Before *Painters*, the Ninth Circuit affirmed dismissal of TPP RICO claims because, among other reasons, "the complaint failed to plead a cognizable theory of proximate causation that links [the defendant's] alleged misconduct to Appellants' alleged injury." *United Food & Commercial Workers Central Pa. & Regional Health & Welfare Fund v. Amgen, Inc.*, 400 F. App'x 255, 257 (9th Cir. 2010).  In that case, the defendant allegedly "concealed adverse test results while promoting [medicines] for various off-label uses," thereby allegedly causing TPPs to pay for the medicines prescribed for those off-label uses.  *Id.*  The Court rejected that claim, holding that "the complaint proffered an attenuated causal chain that involved at least four independent links," including the TPPs' decision to cover the medicines for the off-label uses, and physicians' decisions to prescribe the medicines for the off-label uses.  *Id.*

The Ninth Circuit's attempt in *Painters* to distinguish its prior decision is unpersuasive. In a footnote in *Painters*, the Ninth Circuit conceded that, in *United Food*, it "held that the plaintiffs failed to plead a cognizable theory of proximate cause for their civil RICO claim," but stated that "[it] never independently addressed whether patients and TPPs can meet RICO's proximate cause requirement under the Supreme Court's direct relation requirement and *Holmes* factors to hold pharmaceutical companies liable for mail and wire fraud." *Painters*, 943 F.3d at 1253 n.10.  But in *United Food*, the Ninth Circuit cited each of *Holmes*, *Hemi Group*, and *Bridge*

- 29 -

decisions and specifically held that the TPPs' "causal theory is too attenuated to satisfy the Supreme Court's proximate causation requirement in the RICO context." *United Food*, 400 F. App'x at 257. The only fair reading of *United Food* is that the Court held that TPPs could not satisfy the *Holmes* direct relation requirement through allegations that defendants' alleged fraud caused third parties to act or refrain from acting, resulting in injury to TPPs.

Defendants recognize of course that *United Food* is an unpublished decision (unlike *Painters*). Indisputably, *Painters* is the law of the Ninth Circuit. But the persuasiveness of *Painters* outside the Ninth Circuit is questionable, given the fact that a different panel in the same Circuit reached the opposite conclusion. This is especially true because a majority of circuits agree with the decision of the first Ninth Circuit panel.[11]

---

[11] The Seventh and Ninth Circuits disagree on whether the Third Circuit's decision in *In re Avandia Mktg. Sales Pracs. Prods. Liab. Litig.*, 804 F.3d 633, 644 (3d Cir. 2015) supports the proposition that TPPs can assert claims for indirect fraud based on pharmaceutical manufacturers' representations to physicians. The Seventh Circuit in *Sidney Hillman* states that *Avandia* rejects the proposition that TPPs can sue for fraud on physicians, whereas the Ninth Circuit in *Painters* claims that *Avandia* supports the proposition that such claims are allowed. *Compare Sidney Hillman*, 873 F.3d at 578 *with Painters*, 943 F.3d at 1256. The Seventh Circuit is correct—the circuits split 4-2 against permitting TPPs to assert claims for fraud on physicians; the split is not 3-3 as the Ninth Circuit contends. In *Avandia*, the Third Circuit held that "the misrepresentation of the heart-related risks of taking Avandia . . . caused TPPs and PBMs to place Avandia in the formulary." *Avandia*, 804 F.3d at 644. The Third Circuit, however, emphasized that its ruling was predicated upon the allegation that the TPPs *themselves*, as opposed to physicians, acted upon the fraud, expressly distinguishing the situation where "a doctor's decision to prescribe Avandia or a patient's decision to take Avandia caused plaintiffs' injuries." *Id.* It is therefore incorrect to say, as the Ninth Circuit asserts, that *Avandia* permitted an indirect claim for fraud on physicians as opposed to a direct claim for fraud on the TPPs themselves. As the Seventh Circuit accurately observed, the Third Circuit "agrees with the Second Circuit's position as a rule but held that recovery under RICO is possible when misrepresentations are made *directly* to Payors, leading them to add certain drugs to their formularies." *Sidney Hillman*, 873 F.3d at 578 (emphasis added). Here, Plaintiffs' claims would not survive under the Third Circuit's holding in *Avandia* because, unlike in *Avandia*, the FAC does not allege that Defendants made misrepresentations directly to the Plaintiff TPPs upon which the TPPs (as opposed to others) acted.

- 30 -

### C.   Plaintiffs May Not Rely on a Fraud-on-the-Market Theory to Establish Proximate Causation.

Even if, contrary to law, Plaintiffs could establish proximate causation through misrepresentations directed to others, the Court still should dismiss the FAC because Plaintiffs still must identify the allegedly deceived physicians and how that fraud caused those physicians to act in a way that caused injury to Plaintiffs.  Plaintiffs have failed to do so; they have not identified any physicians who allegedly received Defendants' misrepresentations.  In trying to supply the requisite information, Plaintiffs allege generally that unidentified physicians— referred to as "those in the medical community" and the "general public"— received Defendants' non-specific misrepresentations.  FAC ¶¶ 168, 179; *see also* FAC ¶¶ 149, 173.h, 202, 206, 224.d, 246.d, 260, 282.

Thus, the FAC fails to adequately allege the essential element of proximate causation for the additional reason that it impermissibly relies on a fraud-on-the-market theory in order to dispense with proof of individual causation.  Put another way, Plaintiffs rely upon a presumption that the market—*i.e.*, the medical community as a whole—incorporated all available information about Xarelto, and that Defendants' alleged misrepresentations affected the market demand and market price for Xarelto independent of how any physician may have reacted to that information. FAC ¶¶ 11–13, 160.  But significantly, courts have rejected the "fraud-on-the-market" theory as a basis to establish proximate causation where, as here, TPPs seek to recover from pharmaceutical manufacturers for amounts paid to fill prescriptions. [12]

---

[12] The fraud-on-the-market theory refers to a doctrine recognized in the securities law context whereby plaintiffs may invoke a rebuttable presumption that an investor relies on the integrity of a security's market price as incorporating all publicly available information about the security, including a defendant's misrepresentations.  *See Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).  The theory has not been accepted outside of that context.

- 31 -

For example, in *UCFW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121 (2d Cir. 2010), the Second Circuit rejected the fraud-on-the-market theory as a basis to establish proximate causation for RICO claims brought by TPPs to recover amounts paid for a prescription medicine allegedly due to the manufacturer's misrepresentations to physicians. *Id.* at 133-34. The Court reversed class certification and the denial of summary judgment because "plaintiffs' overpricing theory [based on alleged misrepresentations to unidentified physicians was] too attenuated to meet RICO's requirement of a direct causal connection between the predicate offense and the alleged harm." *Id.* at 136 (citation and internal quotation marks omitted). In so holding, the Court distinguished the Supreme Court's decision in *Bridge*. As the Court in *UFCW Local 1776* explained, "while reliance may not be an element of the [RICO] cause of action, there is no question that in this case the plaintiffs allege, and must prove, third-party reliance" because "Plaintiffs allege an injury that is caused by physicians relying on Lilly's misrepresentations and prescribing Zyprexa accordingly." *Id.* at 133.

Similarly, in *In re Rezulin Prods. Liab. Litig.*, 524 F. Supp. 2d 436 (S.D.N.Y. 2007), the MDL court granted summary judgment on Louisiana state law claims to recover amounts paid for medicine under the Medicaid program allegedly caused by the manufacturer's misrepresentations, which amounted to "a quintessential fraud-on-the-market theory" that the court had "no reason to believe" the Louisiana Supreme Court would adopt. *Id.* at 441 (internal quotation marks omitted).

Further, in *De Bouse v. Bayer AG*, 235 Ill.2d 544, 922 N.E.2d 309 (Ill. 2009), the Illinois Supreme Court reversed the denial of summary judgment on a claim brought by a consumer under the ICFA for economic injury allegedly caused by a "drug manufacturer [that] deceived the medical community and the public-at-large by concealing information about negative side

effects of the defendant's cholesterol-lowering drug." *Id.* at 546, 922 N.E.2d at 311. As the court explained, although the plaintiff alleged "the general deception of consumers, the medical community, the health care insurance industry, and the public," she failed "to allege that her particular doctor was actually deceived by any of Bayer's advertisements or statements." *Id.* at 560, 922 N.E.2d at 319. Because the plaintiff "allege[d] the deception of unspecified persons having no demonstrated connection to her," her "claim . . . [was] based on the market theory that this court consistently has rejected." *Id.*

Likewise, in *International Union of Operating Engineers Local No. 68 Welfare Fund v. Merck & Co., Inc.*, 192 N.J. 372, 929 A.2d 1076 (N.J. 2007), the New Jersey Supreme Court reversed certification of a class of TPPs seeking to recover increased amounts paid for a prescription medicine allegedly caused by the manufacturer's fraudulent marketing campaign. The court held that the plaintiff's theory—"that the price charged for Vioxx was higher than it should have been as a result of defendant's fraudulent marketing"—failed to state a claim under the NJCFA because "[w]e have rejected the fraud on the market theory as being inappropriate in any context other than federal securities fraud litigation." *Id.* at 392, 929 A.2d at 1088.

This Court in *Vioxx* also recognized that "[c]ourts have often rejected the argument that 'generalized allegations and aggregate proof' are sufficient to adequately prove causation." *Vioxx*, 2010 WL 11570867, at *7 (quoting *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774 (SRC), 2009 WL 2043604, at *26 (D.N.J. July 10, 2009)); *see also id.* ("aggregate basis of causation must fail as individualized proof is needed" (citation and internal quotation marks omitted)).[13]

---

[13] Although Louisiana state courts have not addressed the fraud-on-the-market theory outside the securities law context, "the vast majority of federal courts have refused to recognize such a presumption in common law fraud cases when the controlling state has not expressly adopted

The First Circuit in *Neurontin* erred when, contrary to this abundant authority, it "disagree[d] with Pfizer's argument that 'attempting to prove non-party doctors' reliance through inferences from aggregate sales data invokes the "fraud on the market" doctrine.'" 712 F.3d at 36 n. 9. Having erred once by permitting TPPs to prove proximate causation based on alleged misrepresentations to physicians, the First Circuit erred a second time by permitting causation to be proven via aggregate market data rather than individualized proof. The First Circuit discussed fraud-on-the-market only in a footnote and disclaimed that it was adopting such a theory of causation (712 F.3d at 36 n.9), but there is no other way to characterize what the First Circuit permitted. The First Circuit allowed causation to be proven based on a comparison of the market volume before and after the alleged fraud, without proof of what any particular physician would have done, which is substantively no different than proving causation by comparing the stock purchase price before and after the alleged fraud, without requiring proof of what any particular stock purchaser would have done. The First Circuit's opinion in *Neurontin* erroneously reverses the burden of proof by presuming causation based on general market data and requiring the

---

such a rule." *In re Ford Motor Co. Vehicle Paint Litig.*, 182 F.R.D. 214, 221 (E.D. La. 1998); *see Rezulin*, 524 F. Supp. 2d at 441 (rejecting fraud-on-the-market theory as applied to Louisiana law claims because "courts repeatedly have refused to apply the fraud on the market theory to state common law cases" and "Plaintiffs have given the Court no reason to believe that Louisiana's Supreme Court would reach a different result" (citation and internal quotation marks omitted)); *see also Harnish v. Widener Univ. School of Law*, 833 F.3d 298, 309 (3d Cir. 2016) ("the plaintiffs' chosen inflated-tuition theory—whatever might be said about its plausibility— belongs to the 'price inflation' species that, like the fraud-on-the-market theory, has been rejected by the New Jersey and Delaware courts outside the federal securities fraud context"); *Secs. Investor Protection Corp. v. BDO Seidman, LLP*, 222 F.3d 63, 73 (2d Cir. 2000) ("federal courts repeatedly have refused to apply the fraud on the market theory to state common law cases despite its wide acceptance in the federal securities fraud context"); *Dugan v. TGI Fridays, Inc.*, 231 N.J. 24, 60, 171 A.3d 620, 641 (N.J. 2017) ("the proposed price-inflation theory does not establish ascertainable loss and causation in this CFA class action case").

defendant to come forward with individualized evidence to rebut a presumption of causation—that is a quintessential prohibited fraud-on-the-market theory.

In any event, *Neurontin* is distinguishable even if it were correctly decided on its unique facts. Plaintiffs here do not allege that Defendants engaged in criminal off-label marketing. This case involves only *approved* uses of Xarelto, as to which there always has been a disclosed "serious and potentially fatal" bleeding risk (FAC ¶ 139), but which Plaintiffs allege should have included additional or different language. Whatever argument might be mustered for deviating from the general rule against a fraud-on-the-market theory of causation in situations where physicians were induced to prescribe a medicine for an unapproved use, there is no basis to presume that a change in language of an *already disclosed* risk for an *approved* use would have changed the prescribing decision of any or all physicians. The only way to determine that is with proof related to each physician's prescribing decision.

Moreover, the unanimous judgments for Defendants in the six product-liability bellwether trials—five verdicts that Defendants adequately warned each plaintiff's physician about Xarelto's risks and a JNOV for Defendants in the sixth case—negate any conceivable presumption that an alleged misrepresentation caused a nebulous aggregation called the "medical community" (as opposed to particular physicians) to act in a specified way.[14]

---

[14] The bellwether verdicts and judgments are attached to the Request to Take Judicial Notice filed contemporaneously herewith. The Court may take judicial notice of the bellwether trial results on a motion to dismiss. *See Basic Capital Mgmt., Inc. v. Dynex Capital, Inc.*, 976 F.3d 585, 589 (5th Cir. 2020) (in ruling on a 12(b)(6) motion, the district court properly judicially noticed a state court record); *Gilchrist Constr. Co., LLC v. Travelers Indemnity Co.*, 358 F. Supp. 3d 583, 592 n.6 (W.D. La. 2019) (on motion to dismiss "the court may take judicial notice of the jury verdict form in the state court record as a matter of public record"); *see also Chevron Oronite Co. LLC v. Jacobs Field Servs. N. Am., Inc.*, No. 18-2279, 2019 WL 290642, at *5 n.48 (E.D. La. Jan. 23, 2019) (taking judicial notice of verdicts from Louisiana state courts because they are "matters of public record").

On this legal question, the First Circuit stands alone. The Ninth Circuit did not reach the issue in *Painters*, which means that, overwhelmingly, courts have rejected claims asserting fraud on an inchoate "medical community."[15] As in the foregoing authorities, Plaintiffs' general allegations of fraud on the medical community and general public do not suffice to establish proximate causation under RICO or Plaintiffs' state law claims.[16]

## III.    THE COURT SHOULD DISMISS PLAINTIFFS' FRAUD-BASED CLAIMS FOR FAILURE TO SATISFY RULE 9(b) (COUNTS I–X & XIII).

In Point II of this brief, we assumed for argument's sake only, that Plaintiffs had alleged with particularity that Defendants defrauded physicians, patients, PBMs, and FDA. However, Plaintiffs' claims should be dismissed for the separate and independent reason that, in fact, Plaintiffs have failed to allege fraud with particularity.

Rule 9(b)'s heightened pleading standard plainly applies to Plaintiffs' RICO and common law fraud claims. In addition, Plaintiffs' claims under the ICFA, LUTPA, NJCFA, other state consumer protection and deceptive trade practices statutes, and unjust enrichment claims rely on their underlying fraud allegations. *See, e.g.*, FAC ¶ 318 ("The misrepresentations and non-disclosures by Defendants of the material facts detailed above allowed Defendants to be unjustly enriched at the expense of Plaintiffs"); ¶ 223 (relying on alleged "materially false and

---

[15] *Painters* said that "[a]ll that is required of [Plaintiff] at this [pleading] stage is to allege that *someone* in the chain of causation relied on Defendants' alleged misrepresentations and omissions, which it has done here," thereby deferring until after the pleading stage the question of whether plaintiffs had to identify the specific "*someone* in the chain of causation" who relied on Defendants' statements. *Painters*, 943 F.3d at 1260 (emphasis in original). The Ninth Circuit did not attempt to reconcile its decision to defer identification of specific physicians until after the pleading stage with the Rule 9(b) requirement that plaintiffs must *plead* fraud with particularity, which as shown immediately below, Plaintiffs here have not done.

[16] Plaintiffs' allegation of fraud on the "general public" suffers from the same infirmities as their allegation of fraud on the "medical community." In addition to those infirmities, Plaintiffs' allegation of fraud on the "general public" runs afoul of the learned intermediary doctrine.

misleading" representations as basis for ICFA claim); ¶ 232 (same, LUTPA); ¶ 244 (same, NJCFA); ¶256 (same, other state consumer protection statutes); ¶ 268 (same, other state deceptive trade practices acts). Consequently, those claims also are subject to Rule 9(b)'s heightened pleading standard. *See, e.g., J & L Family, L.L.C. v. BHP Billiton Petroleum Properties (N.A.), L.P.*, Civil Action No. 16-1193, 2018 WL 1462108, at *5 (W.D. La. Mar. 23, 2018) ("Because Rule 9(b) applies . . . to all averments of fraud, whether they are part of a claim of fraud or not, when fraud gives rise to a cause of action under LUTPA, a plaintiff must comply with the rule's heightened pleading standards" (citation and internal quotation marks omitted)); *Brand Coupon Network, LLC v. Catalina Mktg. Corp.*, No. 11-00556-BAJ-RLB, 2014 WL 6674034, at *5 (M.D. La. Nov. 24, 2014) (same); *Chau v. Aviva Life and Annuity Co.*, Civil Action No. 3:09-CV-2305-B, 2011 WL 1990446, at *8 (N.D. Tex. May 20, 2011) (dismissing "unjust enrichment claim [that] is grounded in fraud and must be dismissed under Rule 9(b)"); *see also Bynane*, 866 F.3d at 360–61 (affirming dismissal of claims for lack of standing to foreclose, quiet title, and breach of contract, each of which was based on fraud allegations, under Rule 9(b)).

Plaintiffs' fraud-based claims fail to satisfy Rule 9(b). They have not even identified any physician or PBM who allegedly received Defendants' misrepresentations. Nor have Plaintiffs identified the content of any alleged misrepresentation to any identified physician or PBM, anyone who made the alleged misrepresentations, or when or where they were made.

Furthermore, although Plaintiffs contend generally that TPPs detrimentally relied on Defendants' alleged misrepresentations (FAC ¶ 167), they do not even allege that *they* received any misrepresentations from Defendants, much less how *they* acted or refrained from acting to their detriment on them and how the alleged misrepresentations caused their alleged injuries.

Plaintiffs' general allegations of fraud on TPPs do not suffice to satisfy Rule 9(b). *See* FAC ¶

153 ("Defendants made, distributed, marketed, and sold Xarelto without adequate warnings to

patients, prescribing physicians, healthcare providers, and third-party payors"). The Court

should dismiss Plaintiffs' fraud-based claims because they have not laid out "the who, what,

when, where, and how" of the alleged fraud as required by Rule 9(b). *Bynane*, 866 F.3d at 361

(citation omitted).

## IV.    THE COURT SHOULD ALSO DISMISS PLAINTIFFS' RICO AND RICO CONSPIRACY CLAIMS ON ALTERNATIVE GROUNDS (COUNTS IX & X).

The Court should dismiss Plaintiffs' RICO (28 U.S.C. § 1962(c)) and RICO conspiracy

(28 U.S.C. § 1962(d)) claims for two other separate and independent reasons. First, Plaintiffs

have failed to allege facts that could plausibly establish a pattern of racketeering activity.

Second, Plaintiffs have failed to allege facts that could plausibly establish the existence of a

RICO enterprise that is distinct from the Defendants themselves.

### A.    Plaintiffs Have Failed to Satisfy Their Burden to Allege Facts that Could Plausibly Establish a RICO Enterprise Distinct from the Pattern of Racketeering Activity.

Under 18 U.S.C. § 1962(c), it is "unlawful for any person employed by or associated with

any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to

conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a

pattern of racketeering activity." Section 1962(d) provides that '[i]t shall be unlawful for any

person to conspire to violate any of the provisions of subsection (a), (b), or (c) of [§ 1962]."

To succeed under RICO, Plaintiffs must plead and prove both that a RICO enterprise

existed and that the Defendants engaged in a pattern of racketeering activity. "'[P]roof of one

does not necessarily establish the other,'" although "the evidence used to prove the racketeering

activity and the evidence establishing an enterprise may in particular cases coalesce." *Boyle v. United States*, 556 U.S. 938, 947 (2009) (citation and internal quotation marks omitted).

The "association-in-fact" enterprise alleged by Plaintiffs (FAC ¶ 275), must have "at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Id.* at 946. "When the relationship between members of an alleged enterprise does not 'exist[] for purposes other than simply to commit the predicate acts and reap the resultant rewards', th[e] requirement [that the enterprise be distinct from the pattern of racketeering activity] is not met." *Young v. Scruggs*, No. 1:09-cv-669KS-MTP, 2010 WL 2301641, at *7 (S.D. Miss. June 7, 2010) (quoting *In re McCann*, 268 F. App'x 359, 366 (5th Cir. 2008)).

For example, in *Young*, the court dismissed a RICO claim where plaintiffs failed to allege that the enterprise "had any existence other than as a series of predicate acts the sole purpose of which was to net the defendants a favorable result . . . ." *Id.* at *8. In *Tipton v. Northrop Grumman Corp.*, No. 08-1267, 2009 WL 2914365 (E.D. La. Sept. 2, 2009), the court dismissed a RICO claim where "[h]aving alleged that the association *existed for the purpose of carrying on the pattern of racketeering* they allege, the plaintiffs have failed to allege the existence of an enterprise separate and apart from the pattern of racketeering." *Id.* at *12 (emphasis in original); *accord Crest Constr. II Inv. v. Doe*, 660 F.3d 346, 354–55 (8th Cir. 2011) ("In deciding whether an alleged RICO enterprise has an ascertainable structure distinct from the pattern of racketeering activity, we must determine if the enterprise would still exist were the predicate acts removed from the equation;" affirming dismissal of RICO claim (citation and internal quotation marks omitted)); *Lincoln v. Danner*, No. 14-393, 2015 WL 5307709, at *3 (E.D. La. Sept. 10, 2015) ("the plaintiff must plead specific facts which establish that the association exists for

purposes other than simply to commit the predicate acts;" dismissing RICO claim (citation

omitted)); *Global Oil Tools, Inc. v. Barnhill*, No. 12-1507, 2012 WL 5866139, at *11 (E.D. La.

Nov. 19, 2012) ("Fifth Circuit precedent makes it clear that individuals who join together for the

commission of one discrete offense have not successfully created an association-in-fact

enterprise because the association of the individuals has no continuity.").

Plaintiffs allege: "The J&J and Janssen family of companies . . . associated with or

combined with the Bayer family of companies . . . for the common purpose of engaging in a

course of racketeering conduct – specifically the development of a market for Xarelto through

the fraudulent means and sell[ing] Xarelto at a premium price over other safer, less expensive

drugs." FAC ¶ 274. In other words, Plaintiffs say the alleged enterprise (the collaboration of

Janssen and Bayer) exists solely for the purpose of committing the alleged predicate acts—

marketing Xarelto through fraudulent means and selling Xarelto at a premium price. As a matter

of law, that does not constitute a RICO enterprise.

**B.      Plaintiffs Have Failed to Allege Facts that Could Plausibly Establish that the
RICO Enterprise is Distinct from the Defendants Themselves.**

To plead RICO and RICO conspiracy claims, Plaintiffs also must show that Defendants

are "distinct from the RICO enterprise," *i.e.*, that the Defendants "conducted or participated in

the conduct of the *enterprise's* affairs, not just [their] own affairs." *United Food & Commercial

Workers Unions & Employers Midwest Health Benefits Fund v. Walgreen Co.*, 719 F.3d 849,

853–54 (7th Cir. 2013) (internal quotation marks and citations omitted; emphasis in original).

For example, in *Walgreen*, the Seventh Circuit affirmed dismissal of a TPP's RICO claim

that alleged a generic drug manufacturer conspired with a retail pharmacy chain to alter

prescriptions to reflect dosage forms (capsules or tablets) sold by the generic manufacturer but

not its competitors. *Id.* at 856-57. The Court held that the TPP failed to plausibly allege that the

- 40 -

parties acted on behalf of a RICO enterprise as distinct from each acting in its own interests. *Id.* at 855. As the Court explained, the alleged interaction between the defendants "shows only that the defendants had a commercial relationship, not that they had joined together to create a distinct entity for purposes of improperly filling . . . prescriptions." *Id.* And, although the defendants alleged cooperative conduct was illegal, "[t]he allegations in the complaint do not indicate how the cooperation in this case exceeded that inherent in every commercial transaction between a drug manufacturer and pharmacy, and without such an indication, we cannot find a basis for inferring that Walgreens and Par were conducting the enterprise's affairs." *Id.* at 856.

Similarly, in *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392 (7th Cir. 2009), the court affirmed dismissal of a RICO claim where the plaintiff "has done little more than plead facts suggesting the existence of the marketing relationship between [the defendants]," which "are activities consistent with the existence of a business partnership, not the prototypical RICO violation in which the defendant seizes control of an enterprise to accomplish an illegal purpose by using the enterprise's resources, contacts, and appearance of legitimacy." *Id.* at 399.

As these authorities demonstrate, "RICO is not violated every time two or more individuals commit one of the predicate crimes listed in the statute." *Walgreen*, 719 F.3d at 854. Here, as in *Walgreen* and *Chricton*, Plaintiffs allege that Janssen and Bayer joined together to market Xarelto. But Plaintiffs' allegations do not indicate how the collaboration in this case exceeded that inherent in every co-marketing venture. Accordingly, the Court should dismiss Plaintiffs' RICO and RICO conspiracy claims because they have failed to allege a RICO enterprise distinct from the Defendants.[17]

---

[17] Neither the First Circuit's *Neurontin* decision nor the Ninth Circuit's *Painters* decision addressed either of these alternative grounds for dismissal of the RICO counts.

V.    **THE COURT SHOULD ALSO DISMISS PLAINTIFFS' CLAIMS UNDER STATE CONSUMER PROTECTION AND UNFAIR TRADE PRACTICES STATUTES ON ALTERNATIVE GROUNDS (COUNTS IV–VIII).**

Allied asserts a claim under ICFA, and LABC and HMO Louisiana assert claims under the LUTPA. Each Plaintiff also purports to assert claims under the NJCFA, and other state consumer protection statutes and uniform deceptive trade practices acts. For the reasons explained below, each of Plaintiffs' claims should be dismissed.

A.    **Under Louisiana Choice-of-Law Principles, the ICFA Applies to Allied's Claims, and the LUTPA Applies to LABC's and Louisiana HMO's Claims.**

Each Plaintiff purports to assert claims under the consumer protection and/or deceptive trade practices statutes of numerous states. However, their individual claims under the laws of their home states (Illinois and Louisiana, respectively) is a concession that only one state's law applies to each Plaintiff's claims. *See In re Testosterone Replacement Therapy Prods. Liab. Litig.*, 159 F. Supp. 3d 898, 926 (N.D. Ill. 2016) ("plaintiff's argument that its own state-law claims are governed by the laws of defendants' home states essentially concedes that only one state's laws can apply to its claims against each respective defendant"). Accordingly, a choice-of-law analysis is required to determine which state's statute applies to each Plaintiff's state law claims.

Louisiana choice-of-law rules apply to this case filed in this Court. *See In re Vioxx Prods. Liab. Litig.*, 478 F. Supp. 2d 897, 903 (E.D. La. 2007) (Fallon, J.). "Under Louisiana's choice-of-law provisions, delictual obligations such as fraud are generally controlled by Louisiana Civil Code Article 3542," which provides that such issues are "governed by the law of the state whose policies would be most seriously impaired if its law were not applied to that issue." *Henry v. Cisco Sys., Inc.*, 106 F. App'x 235, 242 (5th Cir. 2004); *In re Cajun Forge Co., Inc.*, No. 03-51828, 2008 WL 5144536, at *4 (Bankr. W.D. La. Sept. 18, 2008) (same).

- 42 -

Both Illinois and Louisiana have enacted consumer protection or unfair trade practices laws to protect consumers in their respective states. *See Price v. Philip Morris, Inc.*, 219 Ill.2d 182, 233–34, 848 N.E.2d 1, 32 (Ill. 2005) (the ICFA "was enacted . . . for the purpose of protecting consumers and others against fraud, unfair methods of competition, and unfair or deceptive acts or practices in the conduct of any form of trade or commerce"); *Quality Envtl. Processes, Inc. v. I.P. Petroleum Co., Inc.*, 144 So.3d 1011, 1025 (La. 2014) ("LUTPA was modeled after the Federal Trade Commission Act . . ., and the two acts share the same goals: to protect consumers and to foster competition").

Allied is located in—and presumably made payments for Xarelto from and incurred its alleged economic injury in—Illinois. LABC and HMO Louisiana are located in—and presumably made payments for Xarelto from and incurred their alleged economic injuries in—Louisiana. Illinois and Louisiana have the greatest interest in applying their consumer protection statutes to entities in their states. Accordingly, the ICFA applies to Allied's consumer fraud claims, and the LUTPA applies to LABC's and HMO Louisiana's consumer fraud claims. The Court should dismiss Plaintiffs' claims under every other state consumer protection and/or deceptive trade practices statute.

**B.      Allied's ICFA Claim Fails as a Matter of Law Because Allied Does Not Allege that It Saw, Read, or Heard any of Defendants' Alleged Misrepresentations.**

Under the ICFA, Allied must allege and prove that it "was, in some manner deceived," which requires proof that it "saw, heard or read any of" Defendants' alleged misrepresentations. *Oliveira v. Amoco Oil Co.*, 201 Ill.2d 134, 155, 776 N.E.2d 151, 163–64 (Ill. 2002); *see also In re 100% Grated Parmesan Cheese Mktg. & Sales Pracs. Litig.*, 393 F. Supp. 3d 745, 757 (N.D. Ill. 2019) ("Plaintiffs' failure to allege that they saw the ingredient lists' Anticaking representations dooms their ICFA . . . claims."); *Mihalich v. Johnson & Johnson*, Case No. 14-

- 43 -

cv-600-DRH-SCW, 2015 WL 9455559, at *4 (S.D. Ill. Dec. 28, 2015) ("The Illinois Supreme

Court has made clear that a consumer cannot successfully uphold an ICFA claim absent some

communication from defendant—whether that be a communication containing a deceptive

misrepresentation or by deceptive omission."). Allied has not alleged that *it* saw, heard, read or

relied on any of Defendants' alleged misrepresentations; rather it asserts only generally that

FDA, physicians, patients, and PBMs did. That is insufficient to sustain an ICFA claim.

C. **The Court Should Dismiss LABC's and HMO Louisiana's Claims Under the LUTPA.**

Under the LUTPA, as plaintiffs, LABC and HMO Louisiana must prove that Defendants'

wrongful conduct caused their alleged damages. *Byes v. Telecheck Recovery Servs., Inc.*, No.

Civ.A. 94-3182, 1997 WL 736692, at *5 (E.D. La. Nov. 24, 1997) (granting summary judgment

on plaintiff's LUTPA claim where she admitted that she could not remember whether she opened

the debt collection letters that formed the basis for her claim and thus, could not establish they

caused her any damage). Here, as in *Byes*, neither LABC nor HMO Louisiana alleges that it

saw, heard or read any of Defendants' alleged misrepresentations regarding Xarelto.

Accordingly, they cannot establish that any such misrepresentations caused their alleged

damages.

In addition, the LUTPA expressly provides that a private plaintiff "may bring an action

individually but not in a representative capacity." La. Rev. Stat. § 51:1409(A). This provision

refers to "'the clear ban against class actions by private persons' under the Act." *Indest-Guidry,*

*Ltd. v. Key Office Equipment, Inc.*, 997 So.2d 796, 810 (La. App. 3d Cir. 2008) (citation

omitted); *see also Grant v. Houser*, Civil Action Nos. 10-805, 10-872, 2010 WL 3303853, at *6

(E.D. La. Aug. 17, 2010) ("As an initial matter, any class claims under the LUTPA must be

dismissed. LUTPA prohibits class action claims."). Accordingly, even if LABC and HMO

Louisiana plausibly alleged a LUTPA claim, the Court should dismiss their claims on behalf of a purported class under that statute.

### D.    Plaintiffs Have Failed to State a Claim Under the NJCFA.

As explained above, the NJCFA does not apply to Plaintiffs' claims. Even if the NJCFA did apply to Plaintiffs' claims, the Court should dismiss them.

Under the NJCFA, Plaintiffs would be required to allege and prove "that the nature of the transaction was 'consumer oriented,' and involved the sale of 'merchandise,' and that the alleged violator was acting in a professional, 'commercial capacity.'" *Heyert v. Taddese*, 431 N.J. Super. 388, 412, 70 A.3d 680, 695 (N.J. App. Div. 2013) (citations omitted). Applying the NJCFA, courts have held that consumers are "those who both 'use and consume economic goods and services.'" *Papergraphics Int'l, Inc. v. Correa*, 389 N.J. Super. 8, 12, 910 A.2d 625, 628 (N.J. App. Div. 2006). Although corporate entities may be "consumers" involved in the "sale of merchandise," courts nevertheless have found the NJCFA inapplicable to the purchase of non-consumer goods and non-consumer transactions, including purchases for resale. *Id.* at 13, 910 A.2d at 628–29.

Plaintiffs did not purchase Xarelto for their own resale or consumption, much less engage in a consumer transaction. Under those circumstances, Plaintiffs are not "consumers" within the meaning of the NJCFA. For example, in *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774 (SRC), 2009 WL 2043604 (D.N.J. July 10, 2009), the court dismissed TPPs' NJCFA claims because "TPPs do not purchase drugs for their own use or consumption. Rather, they contract with beneficiaries to receive a stream of payments which, in turn, obligates them to pay for all or part of the cost of drugs prescribed to and purchased by their beneficiaries." *Id.* at *31. And, in *In re Rezulin Prods. Liab. Litig.*, 392 F. Supp. 2d 597 (S.D.N.Y. 2005), the court granted summary judgment in favor of a pharmaceutical

- 45 -

manufacturer because the plaintiff TPP "was not a consumer of prescription drugs." *Id.* at 616–17.

## VI.   LABC'S AND HMO LOUISIANA'S LUTPA, COMMON LAW FRAUDULENT MISREPRESENTATION, FRAUDULENT CONCEALMENT, FRAUD AND DECEIT, AND UNJUST ENRICHMENT CLAIMS ARE BARRED BY THE EXCLUSIVE REMEDY PROVISION OF THE LOUISIANA PRODUCTS LIABILITY ACT ("LPLA") (COUNTS I–III & V).

As this Court has twice held, "the LPLA precludes all theories of liability seeking damages arising from a manufacturer's defective product except for redhibition claims involving damage to the product itself or economic loss." *In re Chinese-Manufactured Drywall Prods. Liab. Litig.*, No. 14-2722, 2020 WL 4470845, at *4 & n.2 (E.D. La. Aug. 3, 2020) (Fallon, J.); *see also Vioxx*, , at *12  (same); *see* La. Rev. Stat. § 9:2800.52.  LABC's and HMO Louisiana's LUTPA, common law fraudulent misrepresentation, fraudulent concealment, fraud and deceit, and unjust enrichment claims (Counts I, II, III and V) therefore should be dismissed for the additional reason that they are barred by the exclusive remedy provision of the LPLA.

## VII.   THE COURT SHOULD ALSO DISMISS LABC'S AND HMO LOUISIANA'S CLAIMS FOR REDHIBITION ON ALTERNATIVE GROUNDS (COUNT XI).

Louisiana law provides that "a seller warrants the buyer against redhibitory defects, or vices, in the thing sold." La. Civ. Code Ann. art. 2520.  As the Code makes plain, "[t]he redhibitory action is between seller and buyer, and without such a relationship, the action cannot be maintained." *Duplechin v. Adams*, 665 So.2d 80, 84 (La. Ct. App. 1st Cir. 1995).  The Code provides that a "[s]ale is a contract whereby a person transfers ownership of a thing to another for a price in money." La. Civ. Code Ann. art. 2439.  It follows that a "buyer" must obtain ownership of a thing if the buyer is to maintain an action against the seller.

LABC and HMO Louisiana do not allege that they bought Xarelto.  Nor could they, because neither obtained ownership of Xarelto; they merely paid some of the cost for patients

- 46 -

who purchased Xarelto. *See Rezulin*, 392 F. Supp. 2d at 611 (granting summary judgment for pharmaceutical manufacturer on redhibition claim where "the [TPPs] did not gain ownership of the drug within the meaning of the Louisiana Civil Code" and where "plaintiffs cite no authority for the proposition that in Louisiana, one who supplies part of the payment for a good thereby becomes a buyer of it").

In *Vioxx*, this Court held that LDHH was a "buyer" with a redhibition remedy where it alleged "that it paid the entire cost of the drug and suffered a financial injury as a result." 2010 WL 11570867 at *9. The Court explained that "[a] contrary holding would create an untenable situation whereby drug companies would be immune from redhibition suits for Medicaid funded prescription drugs." *Id.* In so holding, the Court distinguished *Rezulin* on the ground that "unlike Medicaid providers, [private TPPs] pay only a part of the drug price" and, therefore, "patients, who also pay part of the drug price would be able to assert redhibition claims on their own behalf." *Id.* at *9 n.7.

Here, as in *Rezulin*, the "untenable situation" that supported this Court's *Vioxx* ruling does not exist, because Plaintiffs share the cost of medicines with their insureds. FAC ¶ 161 That being so, the TPPs would not be without a remedy because they would be subrogated to their insureds' redhibition claims. Plaintiffs' failure to plead the essential elements of a subrogation claim (*see* Point I, *supra*) is not a reason to dispense with the legal requirement that only a "buyer" who takes ownership may assert such a claim.

Accordingly, the Court should dismiss LABC's and HMO Louisiana's redhibition claims.

## VIII.   THE COURT SHOULD ALSO DISMISS PLAINTIFFS' UNJUST ENRICHMENT CLAIMS ON ALTERNATIVE GROUNDS (COUNT XIII).

### A.      Allied's Unjust Enrichment Claim Fails as a Matter of Law.

Under Illinois law, "if an unjust enrichment claim rests on the same improper conduct alleged in another claim, then the unjust enrichment claim will be tied to this related claim—and, of course, unjust enrichment will stand or fall with the related claim." *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 517 (7th Cir. 2011); *see also Ass'n Benefit Servs., Inc. v. Caremark RX, Inc.*, 493 F.3d 841, 855 (7th Cir. 2007) ("where the plaintiff's claim of unjust enrichment is predicated on the same allegations of fraudulent conduct that support an independent claim of fraud, resolution of the fraud claim against the plaintiff is dispositive of the unjust enrichment claim as well" (citation and emphasis omitted); *Mihalich v. Johnson & Johnson*, Case No. 14-cv-600-DRH-SCW, 2015 WL 9455559, at *5 (S.D. Ill. Dec. 29, 2015) ("Based on th[e] Court's determination that the plaintiff has insufficiently pled her ICFA claims, the unjust enrichment claims arising out of the same facts is also subject to dismissal.").

Allied's unjust enrichment claim is based on its allegation that "Defendants knowingly and intentionally withheld material facts that would have informed Plaintiffs and the medical community that Xarelto's risks outweighed its benefits and that it should not have been a covered prescription medication available to plan members," which "artificially create[d] a demand for Xarelto." FAC ¶ 320.  Because those are the same facts that Allied alleges in support of its RICO and state law claims, its unjust enrichment claim rises or falls with those claims.  And because, as explained above, the Court should dismiss Allied's RICO and state law claims, Allied's unjust enrichment claim should fall with those claims and suffer dismissal.

**B.      LABC's and HMO Louisiana's Unjust Enrichment Claims Fail as a Matter of Law.**

    **1.      Plaintiffs' Claims are Precluded Under Article 2298 Because the Law Provides Another Remedy.**

Article 2298 of the Louisiana Civil Code provides that:  "The remedy [of unjust enrichment] declared here is subsidiary and shall not be available if the law provides another remedy for the impoverishment or declares a contrary rule."  La. Civ. Code Ann. art. 2298. Under Article 2298, the *availability* of another legal remedy precludes an unjust enrichment claim even if the plaintiff is not successful in recovering based on that legal remedy.  "Whether [plaintiff] can succeed in recovering and collecting in its suit . . . is not determinative" of whether the availability of another legal remedy precludes an unjust enrichment claim.  *Coastal Envtl. Specialists, Inc. v. Chem-Lig Int'l, Inc.*, 818 So.2d 12, 20 (La. App. 1st Cir. 2001).

LABC and HMO Louisiana have another legal remedy to recover amounts paid to fill Xarelto prescriptions dispensed to their insureds—a subrogation claim asserting facts relevant to each of their individual claims.  Accordingly, the Court should dismiss their claims for unjust enrichment.

    **2.      LABC's and HMO Louisiana's Unjust Enrichment Claims are Precluded Because any Payments They Made for Xarelto Prescriptions Were Due to Their Legal Obligations.**

Under Louisiana law, a plaintiff is not impoverished, and a defendant is not unjustly enriched where the plaintiff makes a payment pursuant to a legal obligation.  *Our Lady of the Lake Med. Ctr. v. Cropper*, 401 So.2d 403, 405 (La. App. 1st Cir. 1981) (holding "that defendant has not been enriched and that plaintiff had not been impoverished" where "[t]he expenses incurred by plaintiff and the doctor bills paid by it were in payment of its own obligations" to "provide for the medical expenses of its employees injured on the job").  Here, LABC and HMO Louisiana paid the cost to fill Xarelto prescriptions due to their obligations in insurance contracts

to pay for medicines prescribed by their insureds' physicians.  Accordingly, LABC and HMO Louisiana cannot maintain unjust enrichment claims.

**3.**     **The Court Should Dismiss Plaintiffs' Unjust Enrichment Claims Even if New Jersey Law Applied to Them.**

Under New Jersey law, "[i]n the tort setting, an unjust enrichment claim is essentially another way of stating a traditional tort claim." *In re Schering-Plough Corp. Intron/Temodar Consumer Class Action*, No. 2:06-cv-5774 (SRC), 2009 WL 2043604, at *34 (D.N.J. July 10, 2009) (quoting *Steamfitters Local Union No. 420 Welfare Fund v. Philip Morris, Inc.*, 171 F.3d 912, 936 (3d Cir. 1999)).  Where, as here, "the injury or loss is simply too remote and attenuated to establish the causation element required to sustain Plaintiffs' claims[,] [t]he remoteness of the alleged injury to Defendants' actions also dooms Plaintiffs' unjust enrichment claim." *Id.*

In addition, "[u]nder New Jersey law, absent a mistake by the person conferring the benefit, unjust enrichment claims require some direct relationship between the parties." *Rezulin*, 392 F. Supp. 2d at 620 (citation and internal quotation marks omitted).  Because Plaintiffs have not alleged any direct relationship with Defendants, the Court should dismiss their unjust enrichment claims even if they are governed by New Jersey law.

## CONCLUSION

For the foregoing reasons, the Court should dismiss the FAC.

Respectfully submitted,

FAEGRE DRINKER BIDDLE & REATH LLP

By: /s/ *Susan M. Sharko*
Susan M. Sharko
600 Campus Drive
Florham Park, NJ 07932-1047
Telephone: (973) 549-7000
susan.sharko@faegredrinker.com

ARNOLD & PORTER KAYE SCHOLER LLP

By: /s/ *Steven Glickstein*
Andrew K. Solow
Steven Glickstein
Robert M. Grass
250 West 55th Street
New York, NY 10019-9710
Telephone: (212) 836-8485
andrew.solow@arnoldporter.com

- 50 -

Rodney M. Hudson
Four Embarcadero Center, 27th Floor
San Francisco, CA 94111-4180
Telephone: (415) 591-7500
rodney.hudson@faegredrinker.com

Chanda A. Miller
One Logan Square, Suite 2000
Philadelphia, PA 19103-6996
Telephone: (215) 988-2700
chanda.miller@faegredrinker.com

IRWIN FRITCHIE URQUHART & MOORE LLC

By: /s/ Kim E. Moore
Kim E. Moore
400 Poydras Street, Suite 2700
New Orleans, LA 70130
Telephone: (504) 310-2100
kmoore@irwinllc.com

*Attorneys for Janssen Research &
Development, LLC f/k/a Johnson & Johnson
Pharmaceutical Research & Development,
LLC, Janssen Ortho LLC, Janssen
Pharmaceuticals, Inc. f/k/a Janssen
Pharmaceutica, Inc. f/k/a Ortho-McNeil-
Janssen Pharmaceuticals, Inc., and Johnson
& Johnson*

steven.glickstein@arnoldporter.com
robert.grass@arnoldporter.com

William Hoffman
601 Massachusetts Ave., NW
Washington, D.C. 20001
Telephone: (202) 942-5000
william.hoffman@arnoldporter.com

BRADLEY ARANT BOULT CUMMINGS LLP

By: /s/ Lindsey C Boney IV
Lindsey C Boney IV
One Federal Place, 1819 Fifth Avenue North
Birmingham, AL 35203-2119
Telephone: (205) 521-8914
lboney@bradley.com

CHAFFE MCCALL L.L.P.

By: /s/ John F. Olinde
John F. Olinde
1100 Poydras Street, Suite 2300
New Orleans, LA 70163
Telephone: (504) 585-7241
olinde@chaffe.com
*Attorneys for Bayer Healthcare
Pharmaceuticals, Inc. and Bayer Pharma AG*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 4, 2020, the foregoing pleading was filed electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be sent to Liaison Counsel for Plaintiffs by operation of the court's electronic filing system and served on the following counsel for Plaintiffs by electronic transmission:

James R. Dugan , II
Lanson Leon Bordelon
Dugan Law Firm
One Canal Place
365 Canal St., Suite 1000
New Orleans, LA 70130
Email: jdugan@dugan-lawfirm.com
Email: lbordelon@dugan-lawfirm.com

Charles Andrew O'Brien , III
Charles Andrew O'Brien, Attorney at Law
5525 Reitz Ave.
P. O. Box 98029
Baton Rouge, LA 70898
Email: Andy.OBrien@bcbsla.com

David Baylis Franco
Franco Law PLLC
500 W. 2nd Street, 19th Floor, Suite 138
Austin, TX 78701
Email: dfranco@dfrancolaw.com

Douglas Robert Plymale
Plymale Law Firm
201 St. Charles Ave., Suite 2500
New Orleans, LA 70170
Email: drplymale@plymalelawfirm.com

Lewis Scott Joanen
Joanen Law Firm
839 St. Charles Ave., Suite 312
New Orleans, LA 70130
Email: scott@joanenlaw.com

Arthur Sadin
Sadin Law Firm, PC
121 Magnolia, Suite 102
Friendswoods, TX 77546
Email: asadin@sadinlawfirm.com

Thomas M. Sobol
Hagens Berman Sobol Shapiro, LLP
55 Cambridge Parkway, Suite 301
Cambridge, MA   02142
Email:  tom@hbsslaw.com

*/s/ John F. Olinde*